# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE UNITED  :
STATES' MOTION TO CONTINUE ALL  :  MISC. NO.
CRIMINAL CASES IN THE EASTERN  :
DISTRICT OF LOUISIANA  :

## UNITED STATES' MOTION TO CONTINUE ALL PENDING CRIMINAL CASES IN THE EASTERN DISTRICT OF LOUISIANA

NOW INTO COURT, through the United States Attorney, Jim Letten, comes the United States of America which respectfully represents the following:

1.

On August 29, 2005, Hurricane Katrina made landfall in the Eastern District of Louisiana.

2.

Prior to making landfall, a mandatory order of evacuation was issued for all of New Orleans, and several surrounding parishes within the Eastern District of Louisiana, by government officials. It is estimated that 80% of New Orleans is submerged in water. Travel to New Orleans, as well as several surrounding parishes within the Eastern District of Louisiana, is prohibited.

3.

The United States Courthouse for the Eastern District of Louisiana, located in downtown New Orleans, is, because of the above, indefinitely inaccessible.



EXHIBIT
A

4.

The United States Attorney's Office for the Eastern District of Louisiana, located in New Orleans, is, because of the above, inaccessible. This includes access to all case files as well as electronic access to office computers and computerized documents.

5.

Staff and personnel of the United States Attorneys office, as well as staff and personnel from various local, state and federal law enforcement agencies, have lost access to their homes and offices, and have been and remain unable to communicate effectively with government counsel. An unknown number have had their homes and offices destroyed completely.

6.

Members of the Court's bar, too numerous to count, have lost access to their homes and offices, and have been and remain unable to communicate effectively with government counsel or the Court. An unknown number have had their homes and offices destroyed completely.

7.

Many defendants have been released pending trial. It is assumed that many of these individuals have similarly lost their homes and have also been unable to communicate with their attorneys or prepare for trial.

8.

Due to the extensive destruction throughout the district, the United States assumes that the United States Courthouse personnel are similarly affected.

9.

President George W. Bush has declared the portions of Louisiana affected by Hurricane Katrina a national disaster area.

10.

This Court has an extensive criminal docket with numerous cases at various stages of prosecution. Many of these cases involve defendants who have been charged and are awaiting trial.

11.

The United States respectfully submits that due to the above described circumstances, a continuance in all criminal matters is appropriate and that such delay be deemed excludable under the Speedy Trial Act. The United States further submits that the ends of justice served by the requested continuance outweigh the best interest of the public and any defendants with pending charges in a speedy trial. The United States therefore requests a global Order from this Court that all pending criminal matters in the Eastern District of Louisiana be continued for a period of 90 days, pursuant to Title 18, United States Code, Section 3161(h)(8)(A).

12.

The United States submits that such global Order is proper and was previously employed in the Southern District of New York following the terrorist attacks on the World Trade Center on September 11, 2001. See United States v. Correa, 182 F.Supp.2d 326 (S.D.N.Y. 2001).

13.

The United States further requests that such Order be made retroactive, and exclude all time under the Speedy Trial Act beginning with, and including, August 29, 2005. The United States submits that the Court has, and in these extraordinary circumstances should exercise, authority to make a retroactive exclusion of time in the interests of justice.

WHEREFORE, the United States prays that all criminal cases pending in the Eastern District of Louisiana be continued for a period of 90 days and that the period of delay resulting from such continuance be deemed excludable under the Speedy Trial Act. The United States further requests that such continuance retroactively apply beginning on August 29, 2005.

UNITED STATES OF AMERICA, by

Jim Letten, LA Bar Roll #8517
United States Attorney
U.S. Attorney's Office

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE UNITED         :
STATES' MOTION TO CONTINUE ALL      :          MISC. NO.
CRIMINAL CASES IN THE EASTERN       :
DISTRICT OF LOUISIANA               :

### GLOBAL ORDER

In consideration of the foregoing United States' Motion to Continue All Pending

Criminal Cases in the Eastern District of Louisiana,

IT IS ORDERED that all criminal matters currently before this Court be continued

and rescheduled at a later date.

THE COURT FINDS that for the reasons set forth in the United States Motion,

specifically the widespread destruction caused by Hurricane Katrina, the ends of justice

served by granting such continuance outweigh the best interests of the public and any

defendants in a speedy trial.

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 3161(h)(8)(A), that the

period of time beginning on August 29, 2005, through November 27, 2005, be and hereby is

deemed excludable in computing the time within which the trial must be commenced.

DATED AND SO ORDERED this __3_1_ day of August, 2005.


CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

O R D E R

As the United States Court House in New Orleans has reopened on November 1,

numerous attorneys' offices have reopened in New Orleans or are otherwise operating in

alternate locations, and with improving services and communication in the region,

IT IS HEREBY ORDERED that the suspension of deadlines and delays, including

liberative  prescriptive and peremptive  periods in all civil cases pending or to be filed in

this Court, **is terminated effective November 25, 2005**, except for good cause shown as

determined by the presiding judge.

New Orleans, Louisiana, this ___**3ʳᵈ**___ day of November, 2005.


HELEN G. BERRIGAN, CHIEF JUDGE
U.S. DISTRICT COURT

EXHIBIT
B

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 15  PM 4:46

LORETTA G. WHYTE
CLERK

ZAINEY, J.
FEBRUARY 15, 2006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRUCE CONLAY                          CIVIL ACTION

VERSUS                                NO: 06-0151

ENCOMPASS INSURANCE COMPANY           SECTION: "A"(4)
AND THE ORLEANS LEVEE
DISTRICT

### ORDER OF RECUSAL

Plaintiff's claims relate to Hurricane Katrina and its
aftermath, particularly water damage caused by the breaches of the
17th Street Canal and/or London Canal levees that occurred during
or immediately after the hurricane.  Plaintiff's allegations
include an assertion of fault by "the Orleans Levee District" in
maintaining levees adequate to protect the City of New Orleans from
flooding.

The undersigned's home was damaged on or about August 29,
2005, as a result of the breach of the 17th Street Canal levee that
occurred during or immediately after Hurricane Katrina.
Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of

FEB 15 2006

REALLOTTED TO

SECT. R


EXHIBIT
C

Fee_____
Process_____
X  Dktd_____
✓  CtRmDep_____
Doc.No._____

the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

ACCORDINGLY,

**IT IS ORDERED** that the Clerk of court re-allot this matter to a section of this Court other than Section "A."

\* \* \* \* \* \* \* \* \* \* \* \*

2

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 21  A 11: 38

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHARLES VILLA, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 05-4569

COLUMBIA GULF TRANSMISSION               SECTION A
CO., ET AL.

### ORDER OF RECUSAL

In the captioned case the named plaintiffs seek to represent
a class defined as "*all persons, businesses and entities in the
State of Louisiana who have suffered damage as a result of
Hurricane Katrina's winds and storm surge.*"   (Comp. ¶ 4).   My
spouse and I, as well as three of my siblings and my entire staff
have sustained substantial wind and water damage to our homes and
property as a result of Hurricane Katrina.

The Code of Conduct for United States Judges, Canon
3(C)(1)(d)(i), and 28 U.S.C. § 455(b)(5)(i) state that any judge of
the United States shall disqualify himself in any proceeding in
which he, his spouse, or any person within the third degree of
relationship to either of them is a party to the proceeding.

Accordingly,

**REALLOTTED TO**

**SECT. R**

NOV 2 1 2005

EXHIBIT
24

IT IS ORDERED that the above-captioned case be RE-ALLOTTED to another section of this Court.

New Orleans, Louisiana, November 17, 2005.

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

2

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 10 PM 12: 55

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

BRUCE CONLAY

VERSUS

ENCOMPASS INSURANCE COMPANY
AND THE ORLEANS LEVEE DISTRICT

CIVIL ACTION

NO. 06-0151

SECTION "N"

## <u>ORDER</u>

Plaintiff's claims relate to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal and/or London Canal levees that occurred during or immediately after the hurricane.  Plaintiff's allegations include an assertion of fault by "the Orleans Levee District" in maintaining levees adequate to protect the City of New Orleans from flooding.

The undersigned's home was flooded on or about August 29, 2005, as a result of the breach of the 17th Street Canal levee that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C.  §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety. **IT IS THEREFORE ORDERED** that the Clerk of Court re-allott this matter to a section of this Court other than Section "N."

New Orleans, Louisiana, this _9th_ day of February 2006.

KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

FEB 1 0 2006
REALLOTTED TO
SECT. A

EXHIBIT

0

____ Fee _____
____ Process_____
_X_ Dktd _____
_✓_ CtRmDep_____
____ Doc. No. _____

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 10 PM 12: 58

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

MILTON ARMSTEAD AND
MAYDA ARMSTEAD                                    CIVIL ACTION

VERSUS                                            NO. 05-6438

C. RAY NAGIN, ET AL.                              SECTION "N"

### ORDER

Plaintiffs' allegations relate to Hurricane Katrina and its aftermath. Having reviewed the complaint filed in this matter on December 14, 2005, the undersigned notes that paragraph 4 of that document alleges fault by "The Levee Board of the City of New Orleans" in maintaining levees adequate to protect the City of New Orleans from flooding in maintaining levees adequate to protect the City of New Orleans from flooding.

The undersigned's home was flooded on or about August 29, 2005, as a result of the breach of the 17th Street Canal levee that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety. **IT IS THEREFORE ORDERED** that the Clerk of Court reallott this matter to a section of this Court other than Section "N."

New Orleans, Louisiana, this _____ day of February 2006.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**

FEB 1 0 2006

REALLOTTED TO ~

SECT. T

_____ Fee_____
_____ Process_____
X  Dktd_____
_____ CtRmDep_____
_____ Doc. No._____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

COLLEEN BERTHELOT, ET AL                          CIVIL ACTION

VERSUS                                            NO. 05-4182

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL         SECTION T(4)

<u>ORDER</u>

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina.  Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."



EXHIBIT
E

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JARED VODANOVICH** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-4191** |
| **BOH BROTHERS CONSTRUCTION CO., LLC, ET AL** | **SECTION T(4)** |

## ORDER

    Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

    The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

    Accordingly,

    **IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

2

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

ANN VODANOVICH, ET AL                         CIVIL ACTION

VERSUS                                        NO. 05-5237

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL     SECTION T(4)

### ORDER

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DAVID J. KIRSCH, ET AL                          CIVIL ACTION

VERSUS                                          NO. 05-6073

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL        SECTION T(4)

## ORDER

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JIM EZELL, ET AL                                        CIVIL ACTION

VERSUS                                                  NO. 05-6314

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL               SECTION T(4)

## ORDER

    Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

    The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

    Accordingly,

    **IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID M. BROWN, SR., ET AL                      CIVIL ACTION

VERSUS                                          NO. 05-6324

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL       SECTION T(4)

## ORDER

    Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

    The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina.  Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

    Accordingly,

    **IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

BETH LEBLANC, ET AL                                    CIVIL ACTION

VERSUS                                                 NO. 05-6327

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL              SECTION T(4)

## ORDER

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina.  Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TAUZIN, ET AL                                         CIVIL ACTION

VERSUS                                                NO. 06-0020

THE BOARD OF COMMISSIONERS FOR THE                    SECTION T(5)
ORLEANS PARISH LEVEE DISTRICT, ET AL

## ORDER

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water

damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial

Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of

the levee breaches that occurred during or immediately after Hurricane Katrina.  Accordingly,

pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States

Judges, the undersigned excuses himself from adjudication of this dispute to avoid any

appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other

that Section "T."

New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

01/11/06 WED 10:59 [TX/RX NO 6380] Ø002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS


MAUREEN O'DWYER            :     CIVIL ACTION 05-4181 "__"
                          :
VERSUS                     :     New Orleans, Louisiana
                          :     January 6, 2006
THE UNITED STATES OF AMERICA :   1:00 p.m.
: : : : : : : : : : : : : : :


CONFERENCE
JUDGE ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE, presiding.


APPEARANCES:

   For the Plaintiff:         ASHTON R. O'DWYER, JR., ESQUIRE
                              Attorney at Law
                              6034 St. Charles Avenue
                              New Orleans, LA  70118


   For the United States      ROBERT J. BOITMANN, ESQUIRE
   of America:                THOMAS L. WATSON, ESQUIRE
                              JAMES MANSFIELD, ESQUIRE
                              Assistant U.S. Attorneys
                              500 Poydras Street
                              New Orleans, Louisiana  70130


                              Department of Justice
                              BY:  PHYLLIS PYLES, ESQUIRE
                                   KATHLEEN FINNEGAN, ESQUIRE
                              Washington, D.C.




EXHIBIT
F

01/11/2026 09:51   5048342747   LEONARD A WASHOFSKY   PAGE 01

Case 2:05-cv-04181-SRD-DEK    Document 48    Filed 01/11/2006    Page 30 of 52

CONTINUED:

| | |
|---|---|
| For the Parish of<br>Jefferson: | LOUIS GRUNTZ, ESQUIRE<br>Deputy Parish Attorney<br>200 Derbigny St., Suite 5200<br>Gretna, Louisiana  70053 |
| For the Orleans Levee<br>Board: | BY:  THOMAS P. ANZELMO, ESQUIRE<br>3445 N. Causeway Blvd.<br>Metairie, Louisiana  70002 |
| Reported By: | Arlene Movahed, CSR<br>501 Magazine Street<br>New Orleans, Louisiana  70130<br>(504) 589-7777 |

        Proceedings recorded by mechanical stenography;
transcript produced by dictation.

01/11/2025 09:51   19048342747                    LEONARD A WASHOFSKY

01/11/06  WED 10:59  [TX/RX NO 6380]  @004

1               P R O C E E D I N G S

2                 AFTERNOON SESSION

3                 (January 6, 2006)

4       (The following is a transcript of the conference held in

5  chambers on January 6, 2005.  All parties appeared via

6  telephone with the exception of Mr. Thomas T. Anzelmo who

7  appeared in person.)

8            THE COURT:   Hello.

9            MR. O'DWYER:   Yes, Your Honor.

10           THE COURT:   Let me make sure who I have got here.   I

11  have Mr. Watson?

12           MR. WATSON:   That's right.  I am right here.

13           THE COURT:   Mr. Boitmann?

14           MR. BOITMANN:   Yes, Your Honor.

15           THE COURT:   Mr. Mansfield?

16           MR. MANSFIELD:   Yes, Your Honor.

17           THE COURT:   Mr. Anzelmo is here in my office because

18  he had a settlement conference we just got finished with.

19           Mr. Gruntz?

20           MR. GRUNTZ:   I am here.

21           THE COURT:   Mr. O'Dwyer?

22           MR. O'DWYER:   Present, Your Honor.

23           THE COURT:   Do I have anybody else?

24           MS. PYLES:   Yes, Your Honor.  Phyllis Pyles from the

25  Department of Justice in Washington, D.C. and Ms. Finnegan also

1   from the Department of Justice in Washington, D C.

2          THE COURT:   I thought it was best for us to have some

3   preliminary discussions here at least with regard to this

4   rather than continuing with individual phone contacts from my

5   office.

6          First of all, I don't think this is the only suit that

7   has to do with the incident of the breaking of the canals and

8   the flood walls in New Orleans, is it?

9          MR. WATSON:   I believe there are others, too, Judge.

10         MR. ANZELMO:   That's correct, Your Honor.  This is

11  Tommy Anzelmo.  There's potentially, I think, a total of 14

12  lawsuits in the Middle and Eastern District which involve levee

13  breaches.

14         This particular lawsuit, the O'Dwyer lawsuit, that is

15  one aspect of it.

16         MR. GRUNTZ:   Your Honor, this is Louis Gruntz with

17  the Parish Attorney's Office.  I am only aware of this one in

18  which the Parish of Jefferson is named as a party.  We are

19  named in several State Court actions, but this is the only one

20  I know in Federal Court.

21         THE COURT:   As far as Jefferson?

22         MR. GRUNTZ:   As far as Jefferson is concerned.

23         THE COURT:   But the United States has been named in

24  others.

23          THE COURT:   But the United States has been named in

24   others.

25          MR. WATSON:   Named in others, yes.

01/11/06 WED 10:59 [TX/RX NO 6360] Ø006

1    THE COURT:   And your client, Tommy, has been named in
2  others?

3    MR. ANZELMO:   Yes, Orleans Levee District has been
4  named in the majority of the other lawsuits.  There may be one
5  or two others that we aren't named, but there have been
6  discussions about amendments to name us.

7    THE COURT:   Are any of these other lawsuits being
8  consolidated or transferred to a specific section of court?

9    MR. ANZELMO:   Your Honor, I can speak to that, unless
10  somebody else has the answer.  There is a lawsuit, it's
11  entitled Berthelot versus several people.  That is before Judge
12  Porteous and there have been, I believe, it's two or three
13  cases which have been consolidated into the Berthelot case.  I
14  believe one came from Judge Engelhardt.  One came from, I've
15  forgotten who the other two judges were that transferred down
16  to Judge Porteous.

17    THE COURT:   So how many cases have been transferred
18  to Judge Porteous at this point?  Do you know?

19    MR. ANZELMO:   I think three of the cases that are in
20  the Eastern District.

21    THE COURT:   Okay.

22    MR. O'DWYER:   Any of those involve the United States
23  of America?

24    MR. ANZELMO:   None that I know of.

25    MR. O'DWYER:   Your Honor, while we're on this

01/11/06 WED 10:55 [TX/RX NO 5501] ☐007

1   subject, I only chimed in there because I believe that mine is

2   the first filed action that joined the United States of

3   America.

4          THE COURT:  Well I don't know whether or not that's

5   going to be ultimately dispositive of whether it gets

6   transferred to one section of court as opposed to being handled

7   by multiple different judges here.  It's the same facts.

8          MR. O'DWYER:  If the United States Attorney for the

9   Eastern District has to recuse himself, it would seem to me

10  that Judge Porteous would have to recuse himself too because, I

11  think, he lost his house.

12         THE COURT:  Well, I lost mine too.

13         MR. O'DWYER:  Oh, really?

14         THE COURT:  So that's part of what I am getting at

15  here, which was something else I was going to mention to

16  everybody is that I live on Canal Boulevard and the bottom part

17  of my house got seven feet of water in it.  So if that causes

18  anybody any problem, you need to voice an opinion right now and

19  follow it immediately with some kind of Motion to Recuse.

20         MR. O'DWYER:  It doesn't bother me, Judge.

21         MR. BOITMANN:  This is Bob Boitmann.  I think I need

22  to bring to the Court's attention that we got notice today from

23  the Deputy Attorney General's Office that our office is going

24  to be recused in this matter.  Therefore, other counsel will be

25  appointed.  And I can't speak to the issue you just raised

01/11/06  WED 13:11 FAX 504 589 7726          COURT REPORTER'S FAX                    ☒007

01/11/06  WED 10:59  [TX/RX NO 6360] ☒008

1  because that's going to be for whoever is going to be

2  appointed.  I know we have some people that are from

3  Washington.  The official appointment of who in the Department

4  of Justice is going to be handling this case has not yet been

5  made and that's why we're going to be asking that the Court

6  continue these actions on these discussions until this

7  appointment has been made.

8          THE COURT:  Well let me ask you this, because I am

9  thinking that what Mr. O'Dwyer is asking for is basically, it

10 sounds like, preservation of evidence.

11         MR. O'DWYER:  You got that right, Judge.

12         THE COURT:  And I'm wondering, you know, it could be

13 that we can keep all of this in a status quo by some kind of an

14 agreement among the parties as to what it is, or an

15 identification of what it is Mr. O'Dwyer wants preserved and

16 some kind of an agreement on preservation until this can get

17 into one section of court.

18         MR. BOITMANN:  Your Honor, in our position, since

19 we're not going to be handling the case, we have no choice but

20 to oppose until the people who are going to be handling the

21 case are available to do that.

22         THE COURT:  Well, it seems to me, and you have other

23 counsel on the phone, Ms. Pyles and Ms. Finnegan  --  and

24 you're with Justice in Washington?

25         MS. PYLES:  Yes, Your Honor.  And at this point we

01/11/06  WED 10:59  [TX/RX NO 6360]  [2]008

1  are not in a position  --

2              THE COURT:   Would you identify yourself.   I'm sorry.

3              MS. PYLES:   I am Phyllis Pyles.  I'm Director of the

4  Tort Branch, Federal Tort Claims Act Staff.  And with me is

5  Kathleen Finnegan who is the trial attorney in this office.

6              Your Honor, at this point we're not prepared to take a

7  position.  We do consider these very serious matters.  And

8  until such time as the cases are actually assigned to people

9  and we can look into it and contact our client agencies, we are

10 not prepared to do anything at this point.

11             I will say in response to the Court's other matter

12 that we are certainly looking into the issue of recusal.  No

13 decision has been made with respect to that at all.  So that's

14 as far as I can go with that.

15             UNIDENTIFIED SPEAKER:   You were talking about the

16 racusal for the Court?

17             MS. PYLES:   Yes, judicial recusal, I'm sorry.

18             MR. ANZELMO:   And, Your Honor, may it please the

19 Court, Tommy Anzelmo for the Orleans Levee District.  We

20 haven't been served with the complaint.  We're here as a matter

21 of convenience and courtesy to the Court and other counsel

22 because of the nature of the way the thing was done on an

23 expedited basis.  Insofar as the recusal issue is concerned,

24 that is something that has concerned us because of the impact,

25 and no offense to Your Honor and any of the other judges, but

1   of the impact that this has had on the entire judiciary for the

2   Eastern District.  And that is an issue that is being

3   considered by us and I really can't speak to that point right

4   now.  Again, especially because I haven't been served and,

5   again, I am here out of courtesy as opposed to doing something

6   that is going to bind my client.

7         THE COURT:  Well, I guess, I tend to look at things

8   in more of a practical standpoint here.  And I am not sure what

9   it is that Mr. O'Dwyer exactly wants to have preserved.

10        MR. O'DWYER:   Your Honor  --

11        THE COURT:  Yes.

12        MR. O'DWYER:   Can I address that?

13        THE COURT:  Yes.

14        MR. O'DWYER:   The motion which was filed

15  concomitantly with the memorandum in support of the motion

16  lists five specific issues for relief.  They are not repeated

17  in the body of my memorandum.  But they are numbered one

18  through five and I added on a sixth unnumbered paragraph in

19  which I even suggest that this may be a case, because I don't

20  mean to use inflammatory language, but I don't know how to

21  address what my experts and I have experienced at the hands of

22  the United States of America and the Corps of Engineers thus

23  far as being ridden roughshod over.  And I know that the United

24  States and the Corps carry a big stick.  They are used to

25  getting their way.  Many of the cases that they are involved in

1   are contract claims with contractors.  Many of them are

2   criminal cases.  But in this case I represent a very large body

3   of people just like you and just like Mr. Yager and just like

4   Mr. Porteous who did nothing wrong and evidence right now at

5   the 17th Street Canal has already been destroyed.  Not it will

6   be destroyed and subjected to further deterioration, it has

7   been and we need relief, Your Honor.

8           THE COURT:  Mr. O'Dwyer, I am looking at your Motion

9   for Protective Order and I am looking at your five areas that

10  you're describing.

11          MR. O'DWYER:  Yes, ma'am.

12          THE COURT:  And they are very broad, okay.  I am

13  looking at Number 2.

14          MR. O'DWYER:  Where?

15          THE COURT:  Number 2 talks about disclosing plans for

16  rebuilding or modifying levees.

17          MR. O'DWYER:  Yes, ma'am.

18          THE COURT:  Which from everything I have seen on the

19  news is a work in progress.  Number 3 is granting access to

20  relevant material evidence.

21          MR. O'DWYER:  Yes, ma'am.

22          THE COURT:  Also broad.  Meet with plaintiffs.

23          MR. O'DWYER:  Let me narrow it for you and I will

24  tell you how that can be done.  Paul Mlakar, M-L-A-K-A-R,

25  pronounced Mlakar, is one of the point men of Task Force

Case 2:05-cv-04181-SRD-DEK Document 48 Filed 01/11/2006 Page 31 of 52
Case 2:05-cv-04182-SRD-DEK Document 38-7-18 Document Reporters Filed 01/24/06 Page 40 of 89

1    Guardian which has been charged by the Department of Defense

2    and the United States Army Corps of Engineers to rebuild the

3    levee system in New Orleans.  The United States of America

4    through Mr. Mansfield has already hidden behind the smoke

5    screen of rebuilding of the levees has got to take priority

6    over evidentiary matters in a civil litigation.  Tell Mr.

7    Mlakar and his bosses to liaise with Ashton O'Dwyer and his

8    experts.  That's all that has to happen, Judge.

9            THE COURT:    I saw in your memos that the Government

10   has not been properly served.

11           MR. O'DWYER:    Yes, they have.

12           THE COURT:    Well, that's one of the things that I

13   read in a letter, I believe, from Mr. Watson.

14           MR. O'DWYER:    Mr. Letten has been served and the

15   letter, I don't have the return receipt yet on Attorney General

16   Gonzales, but I attached to one of my communications with the

17   Court my January -- sorry -- my December 22nd cover letter

18   to Attorney General Gonzales.

19           THE COURT:    Mr. Watson, who do you contend has not

20   been served?

21           MR. WATSON:    As far as I know, Judge, the Attorney

22   General has not received this letter that Mr. O'Dwyer says he

23   sent.  That's according to the information we have.

24           THE COURT:    Mr. O'Dwyer, what proof do you have that

25   the Attorney General has been properly served?

```
 1          MR. O'DWYER:  Well, Your Honor, I mailed it certified
 2   return receipt requested on December 22nd.  Now in pre-Katrina
 3   days it never took more than five and probably no less than two
 4   or three days for a letter to reach Washington, D.C. from New
 5   Orleans.  If Attorney General Gonzales has not received a
 6   letter that was directed to him over two weeks ago, it ain't my
 7   fault.
 8          THE COURT:  Well, I think --
 9          MR. O'DWYER:  Did Mr. Letten send his copy to the
10   Attorney General?
11          THE COURT:  I don't know.  Mr. Watson or Mr.
12   Boitmann, can you respond to that?
13          MR. O'DWYER:  Your Honor, can I say one other thing?
14   I am sorry for interrupting.  But does anybody who is on the
15   phone recall whether longarm service under the Louisiana
16   Longarm Statute is effective on the date of mailing as opposed
17   to the date of receipt?
18          THE COURT:  I don't know that one off the top of my
19   head.
20          I think, as I am looking at this Motion for Protective
21   Order, there is only one of these items that is really capable
22   of being ruled upon as being narrow enough to be ruled upon and
23   that is your request to preserve as evidence for inspection and
24   survey two soil mounds in way of the breach in the levee at the
25   17th Street Canal.
```

```
 1            MR. O'DWYER:   Yes, ma'am.

 2            THE COURT:   Everything else is too broad to consider

 3     entering any type of an order on it at all.  And I am gathering

 4     that the one that you're looking to get the order against is

 5     the United States as opposed to anybody else.   Is that correct?

 6            MR. O'DWYER:   Well, we're dealing with a multi-headed

 7     hydra, Your Honor.  On the one hand, the United States shows

 8     its hand, no pun intended, by having counsel from the Federal

 9     Tort Claims Office Division of the Department of Justice

10     participate but at the same time the United States of America

11     is the custodian of evidence regardless of whether there is

12     subject matter jurisdiction against the United States and

13     regardless of whether the United States of America has been

14     served or not.  They control the evidence.  The evidence not

15     only is subject to deterioration, particularly these two

16     mounds, and the sheet pile  --

17            THE COURT:   I don't know where the mounds are.  I

18     don't know that I can even identify the mounds that you're

19     talking about.

20            MR. O'DWYER:   Judge, there have been pictures of them

21     in the newspapers.  They're surrounding the vertically driven

22     sheet piles topped with a concrete cap or flood wall moved from

23     their original positions in the area of the breach of the 17th

24     Street laterally 45 feet inboard.  That's toward Bellaire

25     Drive and upward, okay?
```

1        THE COURT:   Mr. Anzelmo says it's on private property

2   now.

3        MR. O'DWYER:   Well, guess what, nobody is living

4   there.  And guess what --

5        THE COURT:   But, wait.  But the issue is --

6        MR. O'DWYER:   They have put around them --

7        THE COURT:   Wait a minute, Ashton, for two seconds.

8   Hold on.

9        MR. O'DWYER:   Yes, ma'am.

10       THE COURT:   If you were asking me to preserve an

11   automobile, I could identify that automobile with specificity

12   through VIN Number and a make and model and year.

13       MR. O'DWYER:   Yes, ma'am.

14       THE COURT:   Now I am being told that what you want is

15   to have two mounds of soil preserved.

16       MR. O'DWYER:   Yes, ma'am.

17       THE COURT:   I don't know where.  I don't know how to

18   describe it.

19       MR. O'DWYER:   Do you want me to go out there with a

20   GPS?  I can't do that in another hour.

21       THE COURT:   I want you to go out there --

22       MR. O'DWYER:   But everybody knows what I'm talking

23   about, okay.

24       THE COURT:   Hold on, Ashton.

25       MR. O'DWYER:   Yes, ma'am.

1      THE COURT:   I want you to go out there with counsel

2  for the Government, counsel for the Levee Board  counsel for

3  Jefferson Parish.  I want some pictures taken of what it is

4  that you want preserved.  And I want some kind of brief

5  description as to where it's located.  I want counsel in

6  Washington to be able to have copies of those pictures so that

7  I can reconvene this next week.

8      MR. O'DWYER:   Okay, Judge.

9      THE COURT:   And we can be specific about what it is,

10  how it's going to be described.  I want the Government in

11  Washington to determine and make a further effort to determine

12  whether the Attorney General has been served as Mr. O'Dwyer

13  suggests.  And with having copies of those pictures, then I

14  want to know from your standpoint, the Government's standpoint,

15  if there is really any major problem with preserving these

16  mounds for some period of time.  And if there is not, I want

17  some discussion as to why not.  I mean, this just doesn't seem

18  like it should be the big major controversy that it's being

19  turned into, okay.  So I would like you all to get out there by

20  Monday at a mutually convenient time, take these pictures, get

21  them to Washington so counsel can see them, and then let's talk

22  again on Wednesday and see what we can do.

23      MS. PYLES:   Your Honor, if I could just interject

24  here.

25      THE COURT:   Okay.  And I am sorry, is this Ms. Pyles

01/11/06 WED 10:59  [TX/RX NO 6380] ☑017

 1   or Ms. Pinnegan?

 2          MS. PYLES:   Yes, Your Honor, it's Phyllis Pyles.

 3          THE COURT:   Okay.

 4          MS. PYLES:   I am at a severe disadvantage here

 5   because although counsel for plaintiff keeps referring to these

 6   mounds, and it sounds like the Court is aware of the specific

 7   mounds that are being discussed  --

 8          THE COURT:   No, I am not and that's why I asked for

 9   the pictures.  I am not.  And I have been out in that area and

10   I don't know what he's talking about.

11          MS. PYLES:   Your Honor, if I could just make a plea

12   for more time so that we can consult with our client agency.

13   We're at a serious disadvantage here because we aren't up to

14   speed on the case.  Counsel hasn't been assigned to it.  And as

15   far as I can tell the relief that plaintiff is seeking is

16   almost in the nature of a Temporary Restraining Order.  And we

17   definitely would like to have an opportunity to be heard on

18   this issue in a manner that is meaningful and helpful to the

19   Court.  And I am extremely concerned that we don't have enough

20   time to do that.

21          THE COURT:   Well, first of all, Ms. Pyles, I first

22   need an identification of what Mr. O'Dwyer is talking about,

23   which is the first step I am trying to put in place here.

24          MR. ANZELMO:   And excuse me, Your Honor, are we only

25   talking about the 17th Street Canal mound?

01/11/06  WED 15:14 FAX 504 589 7726       COURT REPORTER'S FAX                    ☐017

01/11/06  WED 10:59  [TX/RX NO 6380] ☐018

1           THE COURT:   I don't know.

2           MR. O'DWYER:   Yes, ma'am, we're talking about at this

3    point in time because that's the only site that has been opened

4    up for "inspection" by the public and the litigants.  And when

5    we went out there for that first inspection, we were treated so

6    rudely.  Evidence was destroyed before our eyes without our

7    having an opportunity to even see it.  And I could see this

8    coming, Judge.  And this is just the beginning.

9           THE COURT:   Well, I think  --

10           MR. O'DWYER:   This is going to be the same thing

11    that's over 50 different sites around the City.  And the

12    Government has got to be slapped on the wrist with a ruler now

13    so what happened to me a few weeks ago never happens again in

14    the course of this litigation.

15           THE COURT:   Stop, Mr. O'Dwyer.  I have to identify

16    what it is you're talking about first.  That's why I want the

17    pictures taken with counsel with you.

18           MR. O'DWYER:   All right.

19           THE COURT:   All right.

20           MR. O'DWYER:   I can do that, Judge.

21           THE COURT:   Okay.  And I want that done before the

22    end of the day on Monday.

23           MR. O'DWYER:   Yes, ma'am.

24           THE COURT:   Okay.

25           MR. O'DWYER:   Who will be the contact with the

 1   Government?

 2          THE COURT:   I don't know.  Who do you want?

 3          MR. O'DWYER:   I would like either Ms. Pyles or Ms.

 4   Finnegan.

 5          THE COURT:   Certainly there is somebody with the

 6   Corps of Engineers that you can  --  I don't even know who has

 7   got custody of this stuff.

 8          MR. O'DWYER:   Mlakar and someone in the Office of

 9   Counsel.  Either Randy Merchant or Randy Floren.  I know those

10   people and if they could get instructions to cooperate, you

11   know, we can go out there together in a mutually convenient

12   time, take pictures, talk about what is going to be done and

13   report back to you.

14          THE COURT:   Mr. Anzelmo, you wanted to say something?

15          MR. ANZELMO:   Well, Your Honor, I guess it's because

16   I know too much  --

17          THE COURT:   Well you know more than I do.

18          MR. ANZELMO:   And that's true, Your Honor, because I

19   have been involved in all the cases.

20          THE COURT:   Right.

21          MR. ANZELMO:   And no offense to my good friend,

22   Ashton, I've known him for a long time, when there was going to

23   be the removal of sheet piles and the inspection of the

24   concrete wall by the United States Army Corps of Engineers they

25   took pains to notify everybody that they could, including all

1   litigants that they were aware of.  They created some safe

2   areas where people could view the process.  It's my

3   understanding that there were  --  that the Corps took pains to

4   preserve as best they could what was going to be done.  And I

5   think there was even videos and stills taken of the removal of

6   the sheet piles so we could measure the length of those piles

7   and to take samples of the concrete to determine the

8   consistency of the concrete.  The mound of dirt that counsel is

9   making reference to is a mound of dirt that's on private

10  property because it was moved from the levee streetward toward

11  Belle Air which is where it now resides.  And subsequent to

12  that, the United States Army Corps of Engineers as a part of

13  the remedial measures to strengthen the area put in a coffer

14  dam to protect the area where the breach occurred.  So the

15  mound itself, I believe, is on private property.  The

16  Government, the Corps of Engineers, is working to make sure

17  that the structural integrity of the levee is preserved.  And

18  we certainly  --  I know Your Honor doesn't want to do anything

19  to impair that situation.

20          THE COURT:   God no.

21          MR. ANZELMO:   And so where we are right now is the

22  Orleans Levee District is not participating in the removal or

23  remediation.  That's a Corps function right now.  The scene, I

24  believe,  --  and, Ashton, if you have been out there, I can't

25  recall if the chain link fence might have embodied where the

Case 2:05-cv-04181-SRD-DEK   Document 48   Filed 01/11/2006   Page 49 of 52
01/11/06  WED 13:15 FAX 504 589 7726      COURT REPORTER'S FAX                    019

01/11/06  WED 10:59  [TX/RX NO 6360] 022

20

1  mound is.  I know it's right behind somebody's house but I

2  can't remember if the chain link fence impeded that area.  I

3  thought it might have.  And it's a pretty much secure area

4  right now.

5       MR. O'DWYER:  One of the mounds is within the Corps'

6  fenced area.  One is not.  And some people look at two mounds

7  and say it's one mound.

8       But, Your Honor, let me cut to the chase here.

9       MR. ANZELMO:  Well, Ashton, let me just finish.  It's

10  because I have been out there and on the site, because we're

11  trying to maintain that levee system for the people of the City

12  of New Orleans, there is obviously some remedial work that must

13  continue.  I haven't seen anything involving the mounds because

14  that wasn't being done.  It was the coffer dam levee side.  And

15  the pictures can graphically demonstrate that probably to

16  everyone.

17       MR. O'DWYER:  Your Honor, can I cut in here?

18       MR. ANZELMO:  And that's a practical matter.

19       THE COURT:  What, Ashton?

20       MR. O'DWYER:  You have known me for a long time.  You

21  know that I would never misrepresent anything to the Court.  I

22  am not looking for unfair advantage here.  But I made some

23  serious allegations.  I used the word coverup.  Put it in

24  quotes.  I will say it again.  This is the same government that

25  covered up Pearl Harbor for over 50 years.

1          THE COURT:   Stop, Ashton.

2          MR. O'DWYER:   Yes, ma'am.  Wait.  I am not finished.

3          THE COURT:   No, but stop.  I don't want to listen to

4     all of that.

5          MR. O'DWYER:   I need to explain to you what is

6     happening.

7          THE COURT:   Wait a minute, Ashton.  Just wait.  I

8     have to deal with this from a practical standpoint and I don't

9     want anything inflammatory said.  I simply need to deal with

10    this practically.

11         MR. O'DWYER:   I am going to deal with the facts.

12         THE COURT:   But, wait a minute.  The practicality

13    tells me I get pictures of what it is that you want to deal

14    with.  I let the Government see it.  I tell the Government that

15    they have got to find somebody in the Corps of Engineers or

16    whoever their client is going to be on this case and begin that

17    notification process today so that when they get pictures on

18    Monday they have a point person that they can talk to so I can

19    reconvene this next week.

20         I also have to make sure that any other lawyers

21    involved in litigation that's been consolidated in front of

22    Judge Porteous know what is going on in fairness to them and

23    their clients because I don't know how this affects them.

24         So the first step is let's get the pictures, let's get

25    the pictures before the end of the day on Monday.

01/11/2026 09:51   5048342747   LEONARD A WASHOFSKY   PAGE 22

01/11/06 WED 10:59 [TX/RX NO.8380] Ø024

22

1           Counsel for the Government, kindly find a contact

2    person so that when we talk next week you have a position that

3    you can espouse.

4           I would like to do this telephonically on Wednesday.

5    If the Government can't find a contact person by Monday, I need

6    you to call me back and tell me where you are with that.

7           MS. PYLES:   Yes, Your Honor, we will certainly do

8    that.

9           THE COURT:   And my office will contact the other

10   lawyers, plaintiffs' counsel.

11          Mr. Anzelmo, you're involved in how many of these

12   other cases?

13          MR. ANZELMO:   All of them, Your Honor.

14          THE COURT:   All of them?

15          MR. ANZELMO:   All of them except maybe one or two.

16          THE COURT:   And you know the lawyers who are

17   involved?

18          MR. ANZELMO:   Yes.

19          THE COURT:   You can tell me before you leave here

20   today?

21          MR. ANZELMO:   Yes, Your Honor.

22          THE COURT:   Let's handle it like that.  And I am

23   going to tentatively put you down on Wednesday at 2:00 for

24   another telephonic hearing.

23  going to tentatively put you down on Wednesday at 2:00 for

24  another telephonic hearing.

25          MS. PYLES:  Your Honor, this is Phyllis Pyles again.

1    I have two questions.

2           THE COURT:   Yes.

3           MS. PYLES:   First of all, with respect to what is

4    going on on Monday, are you expecting that counsel for the

5    United States will be present while plaintiff is taking these

6    pictures?

7           THE COURT:   Definitely.  Most definitely.

8           MS. PYLES:   Your Honor, we're seriously prejudiced

9    with that because the United States Attorney's Office is now

10   recused.

11          THE COURT:   What about somebody from Baton Rouge?

12          MS. PYLES:   Your Honor, here in Washington it's 3:00

13   on a Friday and I do understand and appreciate that the Court

14   wants to move as expeditiously as possible, but I am putting my

15   client in a very vicarious  --

16          THE COURT:   What time do you suggest that the

17   pictures could be taken on Tuesday?

18          MS. PYLES:   Your Honor, because I lack knowledge

19   about whether or not counsel for plaintiff needs to have

20   consent to get on this property, I am first of all at a

21   disadvantage with respect to that.

22          THE COURT:   Let me say this and this is just

23   generally what is going on out there.  There's nobody living

24   out there.  The levee is something that the Corps of Engineers

25   could probably grant the parties access to so that they could

1  take the pictures from the levee without even having to go on

2  anybody's private property.

3      MR. ANZELMO:   Your Honor, that may be somewhat

4  problematic about getting on the levee.  I mean, there is a

5  construction site and I know the area that he wants to  -- if

6  the Corps of Engineers authorizes access to the site, you can

7  just walk up this kind of shell road.

8      THE COURT:  ·I was out in that area over the Christmas

9  holidays on Belle Air [bellear] Drive, which is what he is talking about.

10 You have got newspaper, television reporters walking around on

11 private property with cameras out there.  You have an abandoned

12 area, basically.  And you have a work site with some gravel

13 that leads back to the levee.  I really don't know where these

14 piles are, but I am assuming you can get to it from this gravel

15 area.

16     MR. ANZELMO:   Absolutely.  Yes, Your Honor,

17 absolutely you can.

18     THE COURT:   So I don't see that as a problem to the

19 Government, okay.

20     MS. PYLES:   In the sense that no permission is

21 needed?

22     THE COURT:   I can't imagine that permission is

23 needed.  It seems to me the Corps would have gotten that

24 permission already to have the gravel road leading back to the

25 levee, or they did it already.  I don't know.  But, I mean, you

1   all have been accessing it. So however it is the Corps has

2   been accessing it, counsel for plaintiff could access it in the

3   same fashion along with Mr. Anzelmo and his representative and

4   other plaintiff counsel.

5          MS. PYLES: Your Honor, I will represent to the Court

6   that I will work as expeditiously as I can in order to have

7   this opportunity for pictures to be taken. But I do have to

8   put on the record that, again, I am seriously disadvantaged

9   here because I do not know exactly what we're talking about. I

10  do not know the details of getting permission to do this. I do

11  not know any of that. But I will undertake to do what the

12  Court has asked and to do it as expeditiously as possible.

13         THE COURT: I appreciate what you're telling me about

14  the difficulty in contacting a client representative this late

15  on a Friday. So for that reason I do think that you can find

16  somebody by Monday, however, to where we could do the pictures

17  on Tuesday.

18         MS. PYLES: Your Honor, I will undertake to try to

19  accomplish that.

20         THE COURT: All right.

21         MR. O'DWYER: Your Honor, this is Ashton again.

22  Could Ms. Pyles and Ms. Finnegan give me their phone numbers?

23         THE COURT: Ladies?

24         MS. PYLES: Yes, Your Honor, we can certainly do

25  that.

1          THE COURT:   Do you want to do it now?

2          MS. PYLES:   202-616-4252.

3          MS. FINNEGAN:   And this is Kat Finnegan.  My number

4     is 202-616-4916.

5          MR. O'DWYER:   If the Government has no objection to

6     my talking to either of these ladies next week?

7          THE COURT:   ~~You~~ They are counsel in the Justice Department

8     so, I mean, since they're appearing at this hearing I don't see

9     why you shouldn't be able to talk with them.

10         MR. O'DWYER:   Got it.

11         MS. PYLES:   Your Honor, the only caveat about that is

12    an assignment has not been made of this particular case.  And I

13    am trying to be as careful as possible so that I am not putting

14    my client at risk given my very limited knowledge of this case.

15

16         THE COURT:   I understand what you're saying, but by

17    the same token it really should not be that controversial a

18    thing to preserve evidence once we get it identified what it is

19    he wants to preserve and why.  Then you have got something to

20    talk to the client about.

21         MS. PYLES:   Yes, Your Honor.  And as I said, I will

22    undertake to make everything that needs to be done so that Mr.

23    O'Dwyer can take the pictures by Tuesday.  I will undertake to

24    do that.

25         Now my next concern arises with respect to the next

1    conference.  By that time, I assume that we will have counsel

2    in place.

3            THE COURT:    Good.

4            MS. PYLES:    The counsel is from Washington and there

5    is a good likelihood of that.  That person is not going to be

6    in a position to defend, to even prepare something that would

7    be helpful to the Court and that would adequately represent the

8    interest of the United States.  I am deeply concerned about

9    that.

10           THE COURT:    I need to take some preliminary steps

11   first and then we can talk about the status of things on

12   Wednesday.

13           MS. PYLES:    It will be essentially a status

14   conference Wednesday?

15           THE COURT:    I want to see where we are on Wednesday

16   and see what position it is that your client takes.  Again, I

17   also need to contact counsel for these other parties who may

18   potentially have an interest in expressing an opinion on this

19   case.  And I also wonder if this case shouldn't just be

20   consolidated with some of these other cases that are pending.

21   I mean, there are some issues we need to talk about, all

22   right?

23           MS. PYLES:    Yes, Your Honor.  While we're identifying

24   potential issues, this is as to the United States, this is an

25   action under the Federal Tort Claims Act and the plaintiffs

Case 2:05-cv-04181-SRD-DEK   Document58-3   Filed 01/24/06   Page 58 of 89

1   have not exhausted their administrative remedies and they point

2   out as much in their responses.  And there may be additional

3   subject matter jurisdiction defenses that the United States has

4   to this case.

5          THE COURT:   Then I think those are all things you

6   need to raise.  Those are all things you need to raise.

7          MR. O'DWYER:   Judge, this is Ashton again.  Since a

8   shot was just fired across my bow, I want to fire a broadside

9   in retaliation.  There may be Federal Tort Claims Act claims in

10  my lawsuit and I may not have filed an administrative claim yet

11  and an administrative claim may not have been denied yet, but I

12  am not conceding any of those points.  But there are also non-

13  Federal Tort Claims Act against the United States of America

14  dealing specifically with the Fifth Amendment, OPEN 90, CERCLA,

15  and other federal statutes, so let the Government think about

16  that over the weekend too.

17         MS. PYLES:   Respond very very briefly.  To the extent

18  that there are these other statutes that may be involved, for

19  example, CERCLA, that might also include attorneys from the

20  Department of Environmental Division and this is another reason

21  that I'm just laying before the Court to beg for more time

22  because these are serious issues.  It's almost in the form of a

23  request for an Injunctive Relief and we're just not prepared at

24  this point.  Our time to respond to the Complaint hasn't

25  expired.  We have 60 days and the plaintiff has taken this

01/11/06  WED 10:59  [TX/RX NO 6380] ☐031

29

1   opportunity to get ahead and I understand that, but we're in a
2   position of prejudice at this point.
3          THE COURT:   Well, everybody is in a position of
4   prejudice, in all fairness, if there is relevant evidence that
5   disappears between now and 60 days from now.  And that's the
6   balancing act, isn't it?
7          Now I need to contact other attorneys and make them
8   aware of this.  And go through the procedure we talked about
9   and then we will discuss it again at 2:00 on January the 11th.
10         MR. GRUNTZ:   Your Honor, this is Louis Gruntz for
11  Jefferson Parish.  I haven't chimed in at all during the
12  conversation.  We are, I think as I said earlier, this is the
13  only federal lawsuit that I think we have been named as a
14  party.  We have a Jefferson Parish Council meeting on Wednesday
15  at which it will go into Executive Session to discuss this and
16  in all likelihood this case will be referred to outside
17  counsel.  I would be happy to represent Jefferson Parish at the
18  photograph taking on Tuesday.  That's not a problem.  But we
19  really have minimal contact with this lawsuit.  We do not own
20  or operate the canals and do not own or operate the levees on
21  either side of the canal.
22         THE COURT:   Right.
23         MR. GRUNTZ:   So I am not really sure why we're
24  involved in the lawsuit.
25         THE COURT:   I mean, if you don't want to participate

1  in the conference, that's okay.

2         MR. GRUNTZ:   I will be there.

3         THE COURT:   I am giving you the opportunity.

4         MR. O'DWYER:   I represent a large number of people in

5  a subdivision in Gretna and Harvey who were flooded through the

6  errors and omissions of Mr. Gruntz's clients who sent the pump

7  workers away.

8         THE COURT:   But that has nothing to do with the 17th

9  Street Canal.

10        MR. GRUNTZ:   Has nothing to do with the 17th Street

11 Canal.

12        THE COURT:   No. So, I mean, to the extent that the

13 17th Street Canal is being discussed and only that, I don't

14 know that Mr. Gruntz really has an issue, a position that he

15 has to be present for the hearing on Wednesday. And that's all

16 right with me. I mean, I am giving you the chance. If you

17 choose not to, that's okay.

18        MR. GRUNTZ:   No, I will be there because I don't know

19 what outside counsel is going to do. What I am saying is, that

20 after Wednesday we will have someone else representing the

21 Parish in the lawsuit.

22        THE COURT:   Good. So 2:00 January 11th, telephone

23 conference.

24        MS. PYLES:   Thank you, Your Honor.

25        THE COURT:   Thank you. Have a nice weekend.

```
1              MR. O'DWYER:   Goodbye, Judge.
2              THE COURT:   Goodbye.
3        (End of proceedings.)
4
```

## REPORTER'S CERTIFICATE

I, Arlene Movahed, Official Court Reporter, for the United States District Court for the Eastern District of Louisiana, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of proceedings had in the within-entitled and numbered cause on the date herein before set forth and I do further certify that the foregoing transcript has been prepared by me or under my direction.

ARLENE MOVAHED
Official Court Reporter
United States District Court
Eastern District of Louisiana

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 24 AM 7:42

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

MAUREEN O'DWYER, ET AL.                    CIVIL ACTION

VERSUS                                     NUMBER: 05-4181

THE UNITED STATES OF AMERICA,              SECTION: "K"(5)
ET AL.

### ORDER

The Court reconvened the hearing today on plaintiffs' expedited motion for protective order (rec. doc. 46):

Participating were: Ashton O'Dwyer, Phyllis Pyles, Tess Finnegan, Paul Figley, Mark Hanna, Andre Legarde, Dennis Phayer, Tom Gardner, Erin Dearie, Jim Mullaly, Alexis Bevis

The government has moved to recuse the undersigned based upon the situs of her residence in relation to the 17th Street Canal levee breach. (Rec. doc. 48). Pursuant to 28 U.S.C. §455(a), that motion is hereby granted. The case is to be realloted to another Magistrate Judge.

New Orleans, Louisiana, this 11th day of January, 2006.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No _____

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 13  PM 3: 07

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

MAUREEN O'DWYER, ET AL.                    **CIVIL ACTION**

VERSUS                                      NO. 05-4181

UNITED STATES OF AMERICA, ET AL            **SECTION "K"**

It having come to the Court's attention that the previously assigned magistrate judge has

recused herself from this matter,

**IT IS ORDERED** that the Clerk of Court shall be re-allot this matter  to Magistrate

Judge Daniel E. Knowles, III.

New Orleans, Louisiana, this 12th  day of January, 2006.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

JAN 13 2006

**TRANSFERRED TO**

**MAG. 3**

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No._____



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR -3 AM 9: 02

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ELIZABETH JUNG; MIKE RICHARDS, ET. AL.          CIVIL ACTION
                                                NO. 06-0947

VERSUS

FEDERAL EMERGENCY MANAGEMENT
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; ET. AL.                               SECTION M

## ORDER

   The United States District Court of the Eastern District of Louisiana is located in very

close proximity to some of our most devastated areas.  All of us here at the U.S. District

Court have lived and worked during the past six months as children of the storm.

   Our experiences are similar, almost identical in many, many ways, to tens of

thousands of our community brothers and sisters including, of course, those in St. Bernard

Parish.  In this unique brotherhood we have come, with each other, to comprehend many

of the Katrina facts of life that fill our days and nights.  One of those facts of post-Katrina

life here in this metro area is the compelling and continuing problems of dealing with the

Federal Emergency Management Agency (FEMA).  These problems result from, in many

instances, ineptitude, inefficiency and indifference at that agency.  It is difficult to describe



EXHIBIT
G

Fee_____
Process_____
X Dktd_____
√ CtRmDep_____
___ Dec. No _____

the devastating effect that these shortcomings have had on our morale and, indeed, our stamina. To say the least, these problems are difficult to put up with, but, put up with them we must because FEMA is basically the only       game in town.

One of the most disappointing yet predictable result of the above-described situation is the rash of litigation that this has precipitated on behalf of many disgruntled victims of the storm. Somehow, they have been told or have come to believe that their myriad problems can be solved at the U.S. Courthouse more efficiently and equitably than inside FEMA's administrative system - an understandable, yet incorrect conclusion.

Indeed, the first jurisdictional test that this Court must apply is to determine whether the alleged improprieties rise to the level of a deprivation of due process – a right protected by the Constitution of the United States and thus a matter to be decided within the processes of the U.S. District Court.

The facts developed in this proceeding center around the administrative management of FEMA, and application by FEMA of their regulations, policies, and administrative processes. This Court is compelled to conclude that plaintiffs' order of proof does not display such actions or failures to act which rise to the level of a due process violation of the U.S. Constitution and thus cannot support the issuance of a restraining order.[1]

The U.S. District Court cannot take over the decision-making management of

---

[1] The record of these proceedings as well as the parties briefs filed March 2, 2006, are attached hereto and made a part hereof.

2

FEMA any more than it can take over those functions at NASA, the Social Security Administration, or the United States Army Corps of Engineers. We are not empowered to transform administrative decisions into Constitutional due process issues in order to bring about a particular or desired result.

We recognize that FEMA has a huge responsibility for which this Court has no training or expertise, and moreover, no mandate. We have neither the authority nor the ability to do that with which FEMA has been charged. Such a notion is fraught with peril. Only in the particular instance of a real and actual Constitutional due process violation can we take action, and then, only to deal with that particular Constitutional issue.

The best this Court can do is hold FEMA to the specific commitments that they have made and thus hold their particular management and leadership-level spokesmen individually and collectively responsible for accurately and promptly fulfilling the commitments they have made in these Court proceedings.

The Court will follow this matter closely and consistently. If FEMA's commitments are not followed in fact and in spirit, this Court will do all that is necessary to make a judicial determination of whether such actions or inactions are contemptuous. The responsible individual or individuals will be cited to show cause why they should not be held in contempt and will, of course, be given all the rights that accrue to anyone so accused. If thereafter this Court concludes that their conduct is contemptuous, it shall impose sentence accordingly. [2]

---

[2] See 42 U.S.C. §5121; see also 5 U.S.C.§702.

3

It is time for FEMA to end its faceless participation in our lives.  Those individuals

in the executive, managerial and advisory capacities must cease their calculated anonymity

and provide their names and addresses, and indeed, their telephone numbers, so that their

accountability for commitments made under oath and to the public generally are as

exposed to daylight as those of all other federal public officials.

This Court will continue the matter as an open case to be dealt with as previously

discussed insofar as the FEMA commitments made in the course of configuring this record

are concerned.

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Rec.

Doc. #1) must be **DENIED**.

New Orleans, Louisiana, this 3rd day of March, 2006.

@ 9:00 A.M.

Peter Beer
United States District Judge

4

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 05-12,915                                    DIVISION: N-8

FREDERICK BRADLEY, LAWRENCE RABIN, AND
MARK H. SAMUELS, INDIVIDUALLY AND ON BEHALF OF
ALL PERSONS SIMILARLY SITUATED

VERSUS

PITTMAN CONSTRUCTION CO., INC., ABC INSURANCE COMPANY,
ORLEANS PARISH LEVEE BOARD, AND DEF INSURANCE COMPANY

DATED: _____        CLERK: _____

## CLASS ACTION PETITION FOR DAMAGES

TO THE HONORABLE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS, STATE
OF LOUISIANA, AND THE JUDGES THEREOF:

Frederick Bradley, Lawrence Rabin, and Mark H. Samuels, all persons of the full age of

majority domiciled in Orleans Parish, Louisiana, bring this action on behalf of themselves and all

persons similarly situated, representing that:

1.

Venue in the Civil District Court for the Parish of Orleans is proper under Louisiana Code

of Civil Procedure Article 42, and more specifically, Louisiana Revised Statute 13:5104.

2.

Made defendants herein are:

A.    Pittman Construction Co., Inc., a Louisiana corporation domiciled in Orleans Parish,
      Louisiana [which may be served through its registered agent, Gloria B. Pittman, at 6125 Marais
      Avenue, New Orleans, Louisiana 70112];

B.    ABC Insurance Company, upon information and belief, an insurance company to be named
      at a later date which is authorized to do and doing business in the State of Louisiana;

C.    The Orleans Levee District, a political subdivision of the Parish of Orleans, State of
      Louisiana [which may be served through its Board President, James P. Huey, at 7300
      Lakeshore Drive, New Orleans, Louisiana 70124]; and

D.    XYZ Insurance Company, upon information and belief, an insurance company to be named
      at a later date which is authorized to do and doing business in the State of Louisiana.


EXHIBIT
H

a. damage to property and or the loss of property;
b. diminution of property value;
c. pain and suffering;
d. mental anguish and emotional distress; and
e. inconvenience and other losses associated with evacuation and displacement from their homes.

16.

Plaintiffs bring this action both individually and on behalf of all other citizens of Louisiana who are similarly situated, and, specifically, on behalf of that class of persons defined as those citizens of the State of Louisiana who suffered injury to person or property as a result of the breach of the 17th Street Canal flood protection system.

17.

For the following reasons, this action is appropriate for disposition as a class action, pursuant to Louisiana Civil Code Article 591:

A. The potential class is so numerous that joinder of all members is impracticable;

B. The large number of potential claimants herein can and will be adjudicated through the class action procedure more efficiently, compared to a mass joinder of individual claims;

C. Common issues of law and fact pertaining to the determination of fault and to liability for damages predominate over individual issues such as quantum;

D. The claims of, and issues pertaining to, Plaintiffs are typical of all persons similarly situated in the class as defined above;

E. The determination of fault and the basis for assessing damages may be adjudicated through the class action procedure without the necessity of contemporaneous trials as to amount due individual claimants, allowing the class action procedure to be utilized to establish guidelines for either settlement or for subsequent individual trials on damage issues, if necessary;

F. Plaintiffs will fairly and adequately protect the interests of the proposed class;

G. The determination of fault and the basis for assessing damages may be adjudicated through the class action procedure without the necessity of contemporaneous trials as to amount due individual claimants, allowing the class action procedure to be utilized to establish guidelines for either settlement or for subsequent individual trials on damage issues, if necessary;

H. Plaintiffs herein are represented by attorneys who are experienced in class action procedure and who can be expected to prosecute this matter for the best interests of the class members;

I. The class action procedure is a superior vehicle to dispose of the issues and claims presented herein in an efficient manner.

10/18/05
Case 2:06-cv-04182-SRD-JCW   Document 53-1   Filed 03/24/06   Page 70 of 89
Case 2:05-cv-0418?-SRD-DEK   Document 1   Filed 09/19/2005   Page 1 of 56
☐ 002

FILED
U.S. DISTRICT COURT
ASTERN DISTRICT OF LA

2005 SEP 19 AM 11:47

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA
# NEW ORLEANS DIVISION

MAUREEN O'DWYER, ET AL

VERSUS

THE UNITED STATES OF AMERICA, ET AL

NO.:05-4181

DIVISION:

MAGISTRATE SECTION

MAG.2

## COMPLAINT FOR COMPENSATORY AND EXEMPLARY DAMAGES, AND FOR REASONABLE ATTORNEY'S FEES AND TAXABLE COSTS IN A CLASS ACTION LAWSUIT FILED PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE

Fee
Process

EXHIBIT
I

⑥

# II.

Plaintiffs are representative of the following classes of people, inter alia:

(A) Survivors of human beings who died as a result of government's intentional and negligent malfeasance, misfeasance and non-feasance prior to and after Hurricane KATRINA.

(B) Citizens and/or residents of the Parish of Orleans, State of Louisiana who suffered bodily injury, mental suffering and emotional distress as a

10/18/05  TUE 16:48 FAX 504 525 6272



intentional and negligent
malfeasance, misfeasance
and non-feasance ~~prior~~
prior to and after Hurricane
KATRINA.

C   Citizens and/or residents
of the Parish of Orleans,
State of Louisiana who
suffered loss of or
damage to property as
a result of government's
intentional and
negligent malfeasance,
misfeasance and
non-feasance, whether
by flood, fire or govern-

D   Citizens and/or residents
of the Parish of Orleans,

mental sanctions of urban
terrorism, see infra.

⑧

State of Louisiana, and
their survivors, who suffered
death, bodily injury,
mental suffering, and
emotional distress as
a result of government's
<u>de facto</u> sanctioning of
urban terrorism
which commenced
even before Hurricane
KATRINA had abated,
and continued, virtually
unchecked, until the
arrival of the United
States military in the
City of New Orleans, long

⑨

(E) Citizens and/or residents of the Parish of Orleans, ~~State of~~ Louisiana who ~~suffered~~ SUSTAINED mental suffering and emotional distress as a result of government's _ultra vires_ acts such as claimed "mandatory evacuation due to exigient circumstances," which is not a legal concept sanctioned by the constitution of the United States of America, and deprive-

⑩

hungry and thirsty
so-called "hold-outs",
who remained in
the City because the
U.S. Constitution gives
them the right to
bear arms and
protect their
property at their
own risk, and
who were entirely
self-sufficient, did not
increase government's burden during
admittedly
trying
times,) and performed
services for the community which
government proved
incompetent to perform

(11)

(F) ~~~~~ Citizens and/or residents of the Parish of Orleans, ~~State~~ of Louisi___ who suffered environmental damages akin to con-tamination of natural resources under the federal and state legislation which ~~~~~ make provision for ~~~~~ Natural Resource Damage Assessments and damages recover-able under the Oil Pollution Act of 1990, the Louisi___ Oil spill Prevention and Recovery

10/18/05
Case 2:05-cv-04182-SRD-JCW   Document 53-1   Filed 03/24/06   Page 77 of 89
Case 2:05-cv-04182-SRD-DEK   Document 1   Filed 09/19/2005   Page 12 of 56

amony oturs.

NO HIATUS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

2005 SEP 19  AM 10: 44

LORETTA G. WHYTE
CLERK

COLLEEN BERTHELOT, WIFE OF/AND
JACKIE BERTHELOT, HEBER
DUNAWAY, ERIC ANDERSON & AMY JANUSA
WIFE OF/AND MICHAEL JANUSA

VERSUS

BOH BROTHERS CONSTRUCTION CO.,
L.L.C. AND GULF COAST, INC.

* CIVIL ACTION
*
* NUMBER: 05-4182
*
* SECTION:
*
* MAGISTRATE:
* **SECT. T MAG. 4**
*
*
*
* * * * * * * * * * * * * * * * * * * * * * * *

DY. CLERK:

FILED: _____

## CLASS ACTION COMPLAINT

NOW INTO COURT, through the undersigned counsel, come Colleen Berthelot, wife

of/and Jackie Berthelot, both persons of the full age of majority and residents of the Parish of

Orleans, State of Louisiana; Heber Dunaway, a person of the full age of majority and a resident

of the Parish of Jefferson, State of Louisiana; and Eric Anderson, a person of the full age of

majority and a resident of the Parish of Orleans, State of Louisiana, and Amy Janusa, wife or/and

Michael Janusa, both persons of the full age of majority and residents of the Parish of Orleans,

State of Louisiana.

1.

Plaintiffs file this Class Action Complaint, on their own behalf, and on behalf of a class

of plaintiffs similarly situated but as yet unidentified, as plaintiffs herein represent that they have

injuries common to all those similarly situated who incurred damages arising out of the breach



Fee____250
Process___✗
X Dktd_____
CtRmDep_____
Doc. No._____

EXHIBIT
J

IX.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00 exclusive of interest and costs as to plaintiffs and each member of the proposed Class, and because there is complete diversity of citizenship between the plaintiffs and the defendant. Alternatively, this court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d)(2) because this is a class action in which there is at least minimal diversity and the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs.

X.

Venue is proper in this District pursuant to 28 U. S. C. § 1391, because the negligent and wrongful actions of the defendants occurred in the Eastern District of Louisiana, the plaintiffs reside in the Eastern District of Louisiana, the damages to plaintiffs occurred within the Eastern District of Louisiana and the applicable facts which form the basis of this lawsuit occurred in the Eastern District of Louisiana.

XI.

The proposed class representatives and named plaintiffs herein seek to represent the following class:

> All residents, domiciliaries, and property owners of the Parishes of Orleans and Jefferson in the State of Louisiana who were affected by the flooding caused by the failure of the hurricane protection levees and flood wall in New Orleans, Louisiana and (a) who have sustained any injury or damage thereby, or (b) who may suffer such injury or damage in the future as a result thereof, or (c) who have sustained a justifiable fear of sustaining such injury or damage in the future as a result thereof.

# THIRD BRANCH

Hor

*Vol. 37, Number 10—October 2005*

# Judicial Conference Acknowledges Loss to Judiciary in Resolutions

Three weeks after events that would change the federal Judiciary—Hurricane Katrina and the death of Chief Justice William H. Rehnquist—the Judicial Conference gathered in Washington, DC. In separate resolutions, the Conference acknowledged the contributions of federal court personnel to the recovery of courts affected by Hurricane Katrina, and the passing of Chief Justice William H. Rehnquist (See the September *Third Branch*.)

The Conference noted, "with deepest appreciation the extraordinary performance and exemplary dedication to the administration of justice of the federal court personnel who are working to help the affected courts recover from the devastation wrought by Hurricane Katrina." The Conference specifically acknowledged the hardships endured and the "courage, commitment, and hard work" of the judges and court staff in the Fifth and Eleventh Circuits. The entire resolution is online at www.uscourts.gov.

The Conference acted on a variety of issues relating to the administration of the federal courts and pending legislative proposals. In other business, the Conference:

- Agreed not to take a position on legislation providing for restructuring of the Ninth Judicial Circuit. Further, the Conference said that any consideration of splitting the Ninth Circuit should be independently based on the circuit split issue alone and not driven by possible linkage of that issue to a judgeship bill. In addition, the Conference expressed great concern with any legislation that would provide inadequate levels of judicial resources and an uncertain level of funding to support new circuit structures, and said it would oppose any such legislation.

- Approved new Rule 32.1 of the Federal Rules of Appellate Procedure, which concerns the citation of unpublished opinions. The proposed rule, which still must be approved by the Supreme Court and transmitted to Congress, was first published for comment in August 2003. Since then, studies have been conducted, a public hearing convened, and more than 500 comments submitted. The present practice governing citation of unpublished opinions varies among the circuits, with some permitting citation, others disfavoring citation but permitting it in certain circumstances, and others prohibiting citation. Proposed Rule 32.1 permits the citation in briefs of opinions, orders, or other judicial dispositions that have been designated "not for publication," "non-precedential," or the like. The rule applies only to decisions issued on or after January 1, 2007.

- Approved additional proposed amendments to the Appellate, Bankruptcy,



Case 2:05-cv-04182-SRD-JCW   Document 53-1   Filed 03/24/06   Page 81 of 89

Civil and Criminal Rules, which are now transmitted to the Supreme Court. The Court must transmit the proposed amendments to Congress by May 1; Congress has at least 7 months to act on the rules. If it does not enact legislation to reject, modify or defer the rules, they take effect as a matter of law on December 1. For more on the transmitted rules, visit the Judiciary's website on Federal Rulemaking at www.uscourts.gov/rules/index.html.

- Expressed opposition to legislation regarding federal habeas corpus petitions filed by state prisoners, including certain sections of the proposed Streamlined Procedures Act of 2005, that has the potential to undermine the traditional role of the federal courts to hear and decide the merits of claims arising under the Constitution, and impede the ability of the federal and state courts to conduct an orderly review of constitutional claims. The Conference remains supportive of efforts to eliminate any unwarranted delay in the fair resolution of habeas corpus petitions filed by state prisoners in the federal courts. For the Conference position on legislation visit www.uscourts.gov/newsroom/StreamlinedProcedures.pdf.

Home/Contents

Published monthly by the Administrative Office of the U.S. Courts Office of Public Affairs
One Columbus Circle, N.E. Washington, DC 20544 — (202) 502-2600

# THIRD
## BRANCH

Ho

*Vol. 37, Number 10—October 2005*

# Courts Regroup After Katrina

Flooded basements, leaky roofs, broken windows, drifts of debris, water-soaked files and carpets, hobbled electronic access, phone line and electrical outages, homeless court employees, and temporary quarters—Hurricane Katrina wreaked havoc on federal courts across Louisiana, Mississippi, Alabama and parts of Florida. But just hours after the hurricane had passed, all affected courts were assessing the damage, locating staff, and looking for ways to reopen for business.

Over 1,500 Judiciary employees in eight districts and one circuit court were affected by Katrina. Katrina hit courts hardest in the Fifth Circuit's New Orleans headquarters, the Eastern, Middle and Western Districts of Louisiana, the Southern District of Mississippi, and the Eleventh Circuit's Southern District of Alabama.

In response, offers of help came from courts across the country in the form of volunteers, computers, help with procurements and travel vouchers, space in their courthouses and rooms in homes—all of which were posted on an information database accessible to everyone on the Judiciary's J-Net. Courts and court associations set up relief funds to help staff who suffered losses in the hurricane.

In Washington, the Administrative Office's Judiciary Emergency Response Team began daily meetings to coordinate information and assistance to the affected courts. Funds were immediately identified to provide supplemental allotments to courts with disaster-related needs.

To guarantee that pay checks reached employees' accounts, the AO's Payroll Services Branch contacted banks with branches in the affected areas to ensure they were capable of posting the funds. A bit of tweaking to the Judiciary's Intranet People Finder let affected courts enter the temporary housing location of staff and how they could be reached. The information was available to anyone in the Judiciary concerned about friends and colleagues.

The Director and staff of the AO Office of Legislative Affairs worked overtime to push legislation that would allow federal courts to conduct business temporarily outside of their geographical boundaries. Passage of the legislation became urgent as the extent of the devastation became clear. (See page 6.)

In many ways, all of the affected courts had been planning for this or a similar disaster.

"Before Katrina hit and throughout the disaster recovery period," said William Lehman, chief of the Administrative Office's Judiciary Emergency Preparedness Office, "the affected courts used their Continuity of Operations Plans (COOPs) to safeguard staff, court files, and property. If there is any good news to come out of

Katrina, it is that the federal courts are prepared."

"At both the circuit and district court levels," said Chief Judge Carolyn Dineen King (5th Cir.) within days of the disaster, "our intensive efforts to install and test COOPs have really paid off in the aftermath of Hurricane Katrina. The Fifth Circuit and the District Courts for the Eastern District of Louisiana and the Southern District of Mississippi have activated their COOPs, and we are on course. The best feature of the installation and testing process is that it equips court employees to ask the right questions as we try to recover from the disaster. In a manner of speaking, we are on familiar territory. We know our space and equipment requirements and we know which employees are critical to the resumption of operations. The employees themselves know their roles. We have a head start on all kinds of other business organizations that are equally affected by the disaster. Also, we have gotten wonderful help from Bill Lehman and other key employees of the AO who, themselves, know how to help us. We are so much farther ahead at this point, 10 days later, than we would have been if Hurricane Katrina had struck four years ago."

In New Orleans, flood waters reached the sandbagged steps of the Fifth Circuit's John Minor Wisdom U.S. Court of Appeals Building and the district and bankruptcy courts in the Hale Boggs Federal Building. Although there was no flood damage to the courthouses, there was minor wind and rain damage to both buildings, and in an evacuated city with a damaged infrastructure, they will remain closed for the foreseeable future. A week after Katrina, the appeals court was operating out of Houston, Texas.

The District Court for the Eastern District of Louisiana initially faced an impasse. Outside New Orleans, the only courthouse in the district was the tiny Houma courthouse with barely enough room for a few staff. With insufficient room for staff, judges and operations—and at the time, barred by statute from conducting business outside its district—the court suspended operations for 90 days, except for emergency orders and new arrests.

"I have been awed by the dedication of our employees, particularly those in our clerk of court's office, many of whom showed up for work immediately after the storm," said Chief Judge Helen Berrigan (E.D. La.), "despite loss of homes and traumatic evacuation events, to make sure we got the court up and running as quickly as possible."

As the water receded in New Orleans, staff from the Eastern District of Louisiana returned with armed U.S. Marshals to retrieve the court's servers and several desktop computers that were dry on the second floor. Eventually, all the computers were recovered—which involved hauling them all out of a multi-story building without working elevators—and both the district and bankruptcy courts began setting up operations in Baton Rouge.

District judges and staff from New Orleans also are working out of Houma, Gretna and Lafayette. Probation Offices for the Eastern District of Louisiana relocated to Baton Rouge, Covington, and Houma, operating at Lafayette on an "as needed" basis, while Pretrial Services Office operations relocated to Baton Rouge and Houma, and may occupy leased space in Covington.



The wind and storm surge from Hurricane Katrina tore through homes, scattered debris, and tossed this boat nearly on the

"We have been overwhelmed by the            steps of the Gulfport courthouse.
generosity of our fellow judges and their
staffs in the Western and Middle Districts of    *(Photos courtesy of Nelson Creath)*
Louisiana, who have taken us in," said
Berrigan. "Their kindness in sharing space,
providing support and just generally thumping us on the back with encouragement
has made this transition so much easier."

Baton Rouge in the Middle District of Louisiana remained open, but, immediately
after Katrina, was without Internet or computer capabilities. Attorneys with pending
deadlines were encouraged to contact attorneys in Baton Rouge who might accept
their e-mail and take it directly to the Middle District for filing. Within a week, even
this expediency was unnecessary.

Clerk of Court for the Western District of Louisiana, Robert Shemwell found room
for the displaced New Orleans courts in his district. "The New Orleans bankruptcy
court relocated to Baton Rouge, and the District Clerk's office came to us in
Lafayette," said Shemwell, noting that at the same time, Baton Rouge's population
doubled in size with the influx of evacuees. "I have to tell you," he said, "much of
their time was spent trying to put roofs over the heads of families."

The Western District of Louisiana, with the Louisiana Bar Association, set up a web
page where displaced attorneys could have a free e-mail box to receive notices and
communications. The district instituted a 60-day exemption from PACER fees for
attorneys in the district who might have lost all their files in the disaster, and a
special master was appointed to help attorneys work with the court throughout the
recovery period. Prior to Hurricane Katrina, the Western and Middle Districts of
Louisiana had implemented both the Case Management and Electronic Case Files
systems, with the Eastern District of Louisiana originally planning to begin the ECF
portion at a later date. However, according to Shemwell, "The Eastern District of
Louisiana is considering going to ECF now, so attorneys can file electronically."

Fifteen of the 40 Gulfport staff members in the Southern District of Mississippi,
including five of the six judges, lost their homes to Hurricane Katrina; other homes
sustained heavy or moderate damage. The 2-year old Dan M. Russell Jr. U.S.
Courthouse proved it was solidly built, but wind and water damage may close the
courthouse for at least six months.

"The building was structurally sound," said Clerk of Court for the Southern District
of Mississippi, J.T. Noblin, "but there was water damage at the curtain wall,
skylights, and some windows."



Floodwaters from Katrina reached the steps of the federal courthouse in Mobile, Alabama. GSA's Regional Judiciary Account Manager, Mona Evans, was on-site assessing Hurricane Katrina's damage as flood waters receded.

The storm surge at the building was about six feet, and water penetrated to about one foot in the lobby of the eight-story courthouse, sited just five blocks from the Gulf of Mexico. Roof and roof equipment also sustained significant wind damage.

"The entrances were all sandbagged prior to the storm surge," said Noblin." And the protection worked reasonably well. However the water and its contents, cooking for about three days in 100 percent humidity, spawned molds. That issue is being aggressively addressed by GSA, stripping floors, walls, wood molding, everything."

Within days of Hurricane Katrina, Chief Judge Henry Wingate (S.D. Miss.) had met with unit executives, representatives of the U.S. Attorney, the U.S. Marshals Service, the Public Defender Office and the Fifth Circuit librarian for a preliminary assessment of the court's status and immediate needs. Orders were entered to suspend court services and the necessary records and equipment were removed from the Gulfport courthouse so that judges and staff could continue court services at alternate locations in the Southern District of Mississippi.

One of those locations was the U.S. Courthouse and Federal Building in Hattiesburg, where by the Friday following the hurricane, power was back on, although problems continued with telephone and Data Communications Network (DCN) connectivity.

"We greatly appreciate the responsiveness and the generosity of so many as our court recovers from the damage and loss resulting from Hurricane Katrina," said Noblin. "We've received numerous offers from members of the court family in other districts to provide personnel, facility and equipment support for the court as services are resumed."

In the Southern District of Alabama, flood waters reached all the way to the front steps of the John A. Campbell U.S. Courthouse in Mobile, and GSA reported about two feet of seawater in the basement. Power was restored to both the district and bankruptcy courts within a few days. While the court was back in operation, DCN access from Sprint was down for a full three weeks, and it took a month to restore

Communications Network, but the Administrative Office could provide a copy of the national PACTS system. "That gave us data, including addresses," said Benoit, and that was a tremendous help. We also had enough laptop and tablet personal computers with current data."

Probation offices around the country offered support for the staff members who were displaced and suffered losses—11 with total losses—as a result of Katrina, and for the staff members from the district who were scattered as far as Virginia, Atlanta, Houston, and Dallas, while the district was in temporary quarters in Lafayette, Houma, and Covington, Louisiana.

In the Southern District of Mississippi, the probation office was located in an annex next to the Gulfport courthouse. The storm surge with its contaminated black water flooded the office, which is now being stripped—mildewed ceiling tiles to moldy floor—and reconstructed. Chief of Probation Gary Mann hopes they'll be back in their facilities by the end of December.

"In the meantime," said Mann, "we've established two trailers at the courthouse complex site. We have 13 or more staff squeezed into two 14 x 60-foot trailers, but it's a place to operate, and it lets our officers get out into the field. Getting back into a routine is important."

Mann estimates that the office now knows the location of approximately 90 percent of its offenders and has made provisions for the supervision of those offenders now residing outside the district.

Part of the probation office's restoration is a cooler truck parked next to the courthouse where waterlogged files are being decontaminated and dried.

"When Katrina hit, we had paperwork on 350 to 400 active files and many inactive files ready for archiving," said Mann. "All of those files have been taken into the cooler truck to stop degradation. We pull out files as needed and rely on PACTS pending the full restoration of the files."

Clerk of Court for the Southern District of Mississippi, J.T. Noblin, projects that the district court will return to the Gulfport courthouse from temporary quarters by the first of the year, with the bankruptcy offices and the U.S. Marshals Service tentatively scheduled to return in February. The courtroom floors in the Gulfport courthouse should be available for re-occupancy in April or May 2006.

"We'll continue to run full building evaluations at the Gulfport courthouse to test for mold risks and other health hazards until we're satisfied nothing is going to grow there," said Noblin.

When the court returns, they'll find the hurricane has had a devastating impact on the local bar.

"Scores of law firms had their offices destroyed," Noblin said. "They're trying to reconstruct, but there are obstacles to relocation and they lack the support the courts enjoy. Further compounding the return to business, Katrina has substantially drained the jury pool. It's a difficult time for everyone."

Home Contents

Published monthly by the Administrative Office of the U.S. Courts Office of Public Affairs

# REPORT OF THE PROCEEDINGS
# OF THE JUDICIAL CONFERENCE
# OF THE UNITED STATES

## September 20, 2005

The Judicial Conference of the United States convened in Washington. D.C., on September 20, 2005, pursuant to the call of the late Chief Justice of the United States, William H. Rehnquist, issued under 28 U.S.C. § 331. Associate Justice John Paul Stevens presided in accordance with 28 U.S.C. § 3, and the following members of the Conference were present:

First Circuit:

>     Chief Judge Michael Boudin
>     Judge Hector M. Laffitte,
>         District of Puerto Rico

Second Circuit:

>     Chief Judge John M. Walker, Jr.
>     Chief Judge Michael B. Mukasey,
>         Southern District of New York

Third Circuit:

>     Chief Judge Anthony J. Scirica
>     Chief Judge Thomas I. Vanaskie,
>         Middle District of Pennsylvania

Fourth Circuit:

>     Chief Judge William W. Wilkins
>     Judge David C. Norton,
>         District of South Carolina

Fifth Circuit:

>     Chief Judge Carolyn Dineen King
>     Chief Judge Glen H. Davidson,
>         Northern District of Mississippi



EXHIBIT

L

statements for the two committees and determined that the organizational change would take effect on October 1, 2005.

## HURRICANE KATRINA RESOLUTION

The Judicial Conference approved a recommendation of the Executive Committee, introduced as new business on the Conference floor, to adopt the following resolution expressing appreciation for the efforts of judiciary employees related to Hurricane Katrina:

> The Judicial Conference of the United States notes with deepest appreciation the extraordinary performance and exemplary dedication to the administration of justice of the federal court personnel who are working to help the affected courts recover from the devastation wrought by Hurricane Katrina.

> The Conference expresses special thanks to the judges and court employees of the Fifth and Eleventh Circuits who have suffered great personal loss but continue to work tirelessly to restore court operations. The Conference also recognizes the extraordinary efforts of the chief judges and their staffs who have displayed remarkable leadership under the most difficult of circumstances. The courage, commitment, and hard work of the court personnel in these locations have enabled the affected courts to continue to serve the public – some in their own courthouses and others in temporary quarters – and help to hasten the return of those courts to normal operations.

> The Conference also would like to acknowledge the fine work and generosity of the entire federal court family. Across the country, judges, court employees, and Administrative Office staff members have devoted countless hours to assisting their colleagues in the areas affected by Hurricane Katrina, and many are also supplying personal financial and other assistance to hurricane victims.

> Finally, on behalf of the entire federal judiciary, the Judicial Conference pledges support and encouragement for the ongoing recovery effort and offers the deepest sympathy to everyone who has lost family, friends, homes, or livelihood in this terrible disaster. The Conference acknowledges with pride the federal judiciary's response to the challenges of recovery –

6

a response that shows firm determination and a strong, cooperative spirit.

## MEMORIAL RESOLUTION FOR
## CHIEF JUSTICE REHNQUIST

The Executive Committee approved, and the Judicial Conference affirmed, the following resolution expressing deep regret at the death of the Honorable William H. Rehnquist of the Supreme Court of the United States:

The Judicial Conference of the United States notes with sadness the death, on September 3, 2005, of the Honorable

### WILLIAM HUBBS REHNQUIST

Chief Justice of the United States. A Wisconsin native and an adopted son of Arizona, he was born in Milwaukee in 1924, and he served in the United States Army Air Corps in North Africa in World War II. He was a Phi Beta Kappa graduate of Stanford University and received Master of Arts degrees from both Stanford and Harvard University. He graduated first in his class from Stanford Law School in 1952, and served as law clerk to Associate Justice Robert H. Jackson at the Supreme Court of the United States.

Chief Justice Rehnquist entered private practice in Phoenix in 1953, and in 1969 was appointed Assistant Attorney General, Office of Legal Counsel in the Department of Justice. In 1971, President Richard M. Nixon nominated him to serve as Associate Justice of the Supreme Court of the United States; he was confirmed by the Senate and took his oath as the 100th Justice in January 1972.

Nominated to serve as Chief Justice by President Ronald Reagan in June of 1986, he became the 16th Chief Justice of the United States on September 26 of that year. In 1999, he became the second Chief Justice in the history of the United States to preside over an impeachment trial of a president of the United States.

The Chief Justice excelled in administering the federal courts. The Chief Justice displayed his leadership in the Judicial Conference of the United States almost immediately