1 of 3 DOCUMENTS

Copyright 2006 Associated Press
All Rights Reserved
The Associated Press State & Local Wire

February 25, 2006 Saturday  5:10 PM GMT

**SECTION:** STATE AND REGIONAL

**LENGTH:** 1785 words

**HEADLINE:** Half a year later, New Orleans is far from whole

**BYLINE:** By RUKMINI CALLIMACHI, Associated Press Writer

**DATELINE:** NEW ORLEANS

**BODY:**

They're throwing Mardi Gras beads again so many strands, they're landing in tree branches and getting snagged on the trellised balconies of the French Quarter.

You'll find them adorning the arms of Spanish statues. Tourists are wearing them, but these days so are contractors and the National Guard. It's hard to walk on Bourbon Street without stepping on them. You're likely to crunch them underfoot, long necklaces of plastic pearls brightening the asphalt.

At the corner of Bourbon and St. Peter, Pat O'Brien's is once again serving its syrupy, yet potent Hurricane cocktail. At Tropical Isle, you can get an equally potent Hand Grenade in a tall, plastic go-cup.

But walk to the end of Bourbon Street, take a left on Esplanade Avenue, a right on Rampart Street and head east. At first, the debris comes in bits: A small pile of siding. A rusted box spring. One taped-up refrigerator. At first, you find them in neat piles, in the front yard or outside on the curb.

There's still a semblance of order. But keep going. It gets worse.

You pass an elegant sofa, the kind you might imagine a grand dame reclining in, sipping her mint julep. It is lodged in the middle of an intersection. A few miles farther, the innards of rotting houses spill out on both sides of the road.

Six months have passed since Katrina ravaged this city. For a half a year, its people have counted the dead (officially, 1,080 in Louisiana and 231 in Mississippi) and struggled mightily to keep their city among the living.

A slimmed-down Mardi Gras is testament to their success; a tour of the devastation that remains is testament to how far they have to go.

Hurricane Katrina created an estimated 60.3 million cubic yards of debris in Louisiana, 25 times as much as the ruins of the World Trade Center and enough to fill the Superdome more than 13 times. Of that, only 32 million cubic yards a bit more than half has been removed.

Meanwhile, there are just under 2,000 people listed as missing. Some are not missing at all they turned up, but their families never notified authorities. Hundreds of others, though, were very likely washed into the Gulf of Mexico or swept into Lake Pontchartrain or alligator-infested swamps, according to Dr. Louis Cataldie, Louisiana's medical examiner. Still more may be buried in the rubble.

At a hurricane morgue near Baton Rouge, 86 bodies remain unidentified. State officials are trying to reach relatives for another 74 who've been identified but have no place to go.



Half a year later, New Orleans is far from whole The Associated Press St

Mayor Ray Nagin says a comparison to New York City should be a favorable one. "Let me remind you that after 9/11 in New York, it took them six to eight months to get out of the fog of what happened to them. And to date, there's still a big hole in the ground. So when I look at everything that's going on, I think we're right on schedule," he said.

Indeed, in the French Quarter and on St. Charles Avenue, on Magazine Street and in the plantation-style mansions of Uptown, life has moved on, though protective blue tarps that serve as roofs for many are a constant reminder of the work left to be done.

In the Quarter, uber chef Paul Prudhomme is blackening his signature redfish again. Bourbon House is shucking oysters, and Antoine's, the 166-year-old dining icon, is dishing up plates of Pompano Pontchartrain with slices of tart lemon.

Yet even here, Katrina has left her mark. All three restaurants are short-handed. Antoine's, which lost its $200,000 wine collection in the storm, is shifting its wine list away from French staples, embracing New World wines instead.

And look closely at the brass band playing outside Prudhomme's K-Paul's Louisiana Kitchen: The golden sheen on the tuba is gone, lost in the deluge at the musician's house.

But in the flood zone, the destruction is not so subtle. Leave the French Quarter on Rampart and head east, toward the devastated Ninth and Lower Ninth wards and East New Orleans.

All around are the carcasses of flooded houses. Katrina laid waste to more than 215,000 homes. Many are abandoned, their doors wide open.

Only an estimated 189,000 of the city's roughly 500,000 pre-Katrina residents have returned. For now, the city is overwhelmingly whiter and more affluent than it was before.

Affordable housing is scarce, and FEMA has only filled 48,158 of the 90,000 trailer requests it's received from displaced families in Louisiana, leaving many to wait out their existence in places like Atlanta, Houston and Little Rock. With only 20 of 128 public schools now open, parents who can't afford to send their children to private schools have no choice but to live elsewhere.

Children who have returned must wade through wreckage to get to school. "You never really get used to it," said 18-year-old Mark Buchert, a senior at Brother Martin, an all-boys Catholic high school in the devastated Gentilly neighborhood.

The destruction gets worse. Keep driving as Rampart turns into St. Claude Avenue and you'll go six miles before you pass a working traffic light. Broken signals swing from their poles like men hanging from gallows. Others blink red. Elsewhere, they lie on their side in intersections, blinking yellow.

Even with a diminished population, traffic at rush-hour is heavy. Many people living elsewhere temporarily return to the city each day to work at their jobs or work on their homes, so the main arteries in and out of town are clogged. Add to the mix the large trucks used for the cleanup, and a commute from suburban New Orleans to the central business district that took 10 minutes before the storm can take 45 minutes now.

At night, the darkness is pervasive. Six months after the storm made landfall Aug. 29, a little over a third of the structures in the city have electricity. Even fewer have hot water or cooking gas.

Past the Industrial Canal, even farther east, is the cement slab upon which Carolyn Berryhill's house used to sit. In the field of rubble, all that remains of her neighborhood in the Lower Ninth Ward, the 60-year-old "Miss Carolyn" recognizes the pieces of her house by their signature green color.

One piece of her home landed at the base of a nearby pecan tree, the same tree whose branches cradled Berryhill for 12 hours after a gush of water the result of a broken levee rushed into her parlor and blew apart her home like a bomb. She somehow floated to the tree and waved madly at rescuers in helicopters until they finally saw her and plucked her to safety.

In what used to be Berryhill's backyard, an unchipped porcelain plate is half-filled with a meal of mud. The earth is still spongy, as if it hasn't fully swallowed the storm's waters. In it, a golden doorknob is embedded as if it's about to open a door to the underworld. "A lot of people, they talk about coming back and rebuild," she said. "Rebuild what? What can you rebuild out of this? What can you salvage out of this?"

A half block away, she finds what she thinks might be her stove.

Half a year later, New Orleans is far from whole The Associated Press St

On a parallel street, 71-year-old Gloria Jordan warns that if you walk much farther, "you'll see things I pray to God you never see again."

It's a street where three people drowned in their attics, including a 12-year-old girl. Their bodies were found months later. "I have no appetite. It's hard to eat these days," says Jordan, frail like a leaf.

She joins her husband, Clarence, on what used to be their porch, now nothing but a concrete foundation. Jordan's eyes gladden as she remembers how each morning she used to sip her coffee in a rocking chair and look out across her small garden of flowers. She wishes she could remember their names.

For now, she and Clarence are living with their daughter in White Castle, 73 miles west of New Orleans.

"Baby, I had a beautiful home," said Jordan, who owned her house for 49 years. "It's hard when you lived on your own for so many years and just like you pop your finger, or in the twinkling of an eye, you're homeless."

Her property is exactly the way the hurricane left it: Her husband's suits were blown into a neighbor's yard, still on hangers. His truck is on its side. Still waiting for her insurance check, she hasn't even started clearing the debris.

Those who are rebuilding are largely the ones who can front the costs of repairs.

Contractor Darren Schmolke returned alone to his destroyed home after losing his wife in a car wreck during their evacuation to Florida. National Guard troops had roped off the posh Lakeview neighborhood where he raised his family.

Each time they chased him away, he would pretend to leave, walking instead around the block and returning through the back door. He worked nonstop to reassemble his house, a two-story colossus in granite, marble and brick. His neighborhood, where homes had water up to their roofs, is one of many that are now in limbo, waiting for government officials to determine whether residents can rebuild. "After I lost my wife, I couldn't sit around and wait," Schmolke said. "I had to do something to get some control back over my life."

Businesses that are rebuilding are running into another problem a shortage of workers.

"Help Wanted" and "Now Hiring" signs are everywhere. They're in the windows of unpretentious delis as well as cultural landmarks like Cafe du Monde, the 144-year-old institution that for generations has served New Orleanians its iconic beignets.

Call any New Orleans Domino's and before you can order a pizza, you'll first be asked to listen to a 20-second message recruiting new drivers.

"The problem is more basic than 'where are the people?' The problem is the people don't have anywhere to live," said Loren Scott, a professor emeritus of economics at Louisiana State University.

Corporations are housing workers in barge dorms, cruise ships, warehouses and converted train cars. Those that can afford to do so are buying trailers for their employees, as Paul Prudhomme did for everyone from his chief operating officer to his line cooks.

Susan Rudolph, a waitress at Cafe du Monde, slept in her truck when she first returned to the city her husband in the driver's seat, she in the passenger seat, and all they own packed tightly behind them.

Now, she begins her day at dawn inside her FEMA-funded motel room, scouring the classifieds for an affordable apartment. With one-bedrooms going for $1,500 and with landlords asking for first and last month's rent plus a security deposit, getting into an apartment is a $4,500 investment a tall order for someone waiting tables.

After a morning spent looking, she puts on a brave face and her white Cafe du Monde cap and smiles sweetly as she serves the hot-and-sticky beignets to chattering visitors.

"New Orleans has always been a tourist area, so we smile like clowns," Rudolph said. "I hope one day there won't be one tear in our eye."

**LOAD-DATE:** February 26, 2006

FOCUS - 34 of 85 DOCUMENTS

Copyright 2005 The Times-Picayune Publishing Company
Times-Picayune (New Orleans)

September 19, 2005 Monday

**SECTION:** NEWS; Pg. B08

**LENGTH:** 1028 words

**HEADLINE:** Evacuees may dry up Houston job market;
But many think they're better off looking in Texas

**BYLINE:** By Tara Young, Staff writer

**BODY:**

HOUSTON - As scores of other job seekers scurried past, Sabrina Lynn mentally checked off the companies she wouldn't interview with from a list of employers at a recent job fair.

Although she had come to terms with losing her job, her four-bedroom home and her car in eastern New Orleans after Hurricane Katrina, Lynn said she wouldn't take an entry-level position that would prevent her from providing the quality of life her family was forced to leave behind.

"I was in sales," said Lynn, disappointed that the major hotels in town weren't at the job fair. "I don't want to be out pounding the pavement for just anything. I'm too old for that."

With the reality that it will take months, possibly years, for life to return to normal in New Orleans, many Louisiana residents are relocating or, at the very least, finding temporary jobs in the Houston area.

Some are snatching up anything to make ends meet, while others are more calculated in their job searches as Houston area business leaders work to fill the void by hosting job fairs and networking events for the displaced.

Barton Smith, director of the Institute for Regional Forecasting at the University of Houston, estimated 20,000 to 30,000 people from the New Orleans area will be looking for employment during the next several weeks.

That influx might stretch thin the job market. About 30,600 jobs were created in the area within the last 12 months ending in August. The numbers equated to about 10,000 more jobs in the Houston area than the previous 12-month period ending in August 2004, according to the Texas Workforce Commission.

The job market is "going to have a hard time absorbing workers," Smith said. "You are asking to absorb right now the number it took an entire year to absorb."

Crowded schools seek staff

The WorkSource, a public employment agency responsible for 13 counties in southeast Texas, including the Houston area, reported a threefold increase in the number of applicants from the usual 5,000 to 16,000 in the first two weeks of September.

Mike Temple, work force manager for The WorkSource, said he is confident the market would stretch to accommodate the increase.

"I think there's enough for everybody," Temple said. "Right now we always need people in health care, education and oil field related (industries)."

Many evacuees might find themselves working in education.


EXHIBIT
B

Evacuees may dry up Houston job market; But many think they're bett

The Houston Independent School District, the nation's 7th largest school district with more than 200,000 students, recently held a job fair where a district spokeswoman said 1,000 applicants showed up. Applications are being processed to help fill the demand for more teachers and staff for the more than 3,400 students from Louisiana who have enrolled in the school system. Overall, the region has absorbed nearly 20,000 students, the Harris County Department of Education said.

Registering their 13-year-old twin boys and finding day care for their three younger sons is the next step for Darnell and Telesha Johnson of Marrero, who want to start a business in Houston.

The Johnsons, who are searching for financial assistance to help them secure an apartment, said they couldn't afford to travel to Jefferson Parish to see the damage for themselves. It was easier just to stay in Texas.

"It seems like it's going to be useless to go back," said Darnell Johnson, who plans on helping his wife re-establish her online business while searching for a full-time job.

Houston seems right for now, said Telesha Johnson, who purchased a laptop computer and plans to have the business up and running again this week.

"I'm very interested in seeing what the city of Houston has to offer," Telesha Johnson said. "We are willing to work. We just need the opportunity."

'A better place'

Belinda Hart, who slept on her apartment balcony for several days before being rescued by helicopter with her family in eastern New Orleans, said she'll take whatever job comes her way to stay in Houston.

"I think that God has moved us to a better place," said Hart, who is four months pregnant and recently attended a job fair with her two young children. "I have no regrets."

The young mother said she will not miss the crime and violence that plagued New Orleans and was hopeful she and her children would have a better life in Texas.

"You have to look forward," Hart said. "You can't look back to what you've lost. Everyone that survived this, I believe they are here for a reason. "

Although some are not having any problems entering the Houston job market, others might take longer to find their niche, said Katy Greenwood, an associate professor in human development and consumer sciences at the University of Houston, who has worked in the past with displaced residents.

"You can't look for a job while you're grieving or under stress," Greenwood said. "I know a lot of them are still worrying about their families."

Most jobs won't be found at the unemployment office but through good old-fashioned networking, Greenwood said. The more contacts, the better, she said.

"It's the perfect time to reassess," Greenwood said. "It's a whole new beginning."

'A lot more opportunity'

A fresh start is just what Thomas Taube of New Orleans is looking for.

Although he still has a job at the Hotel Royal in New Orleans, he has lost everything else, said Taube, who has been attending Houston-area job fairs in search of work.

"At this point, I don't hold a lot of hope for anything," said Taub.

While Hurricane Katrina might have swept away his belongings, Taube said Houston area residents have been more than generous to him and his partner, Thomas Harmon.

A friend has let them use a vacant home, and Whole Foods Market has provided Harmon with a new job and money for relocation, Taube said.

Harmon, who is from Houston and worked at Whole Foods in New Orleans, said the Austin, Texas-based company is working to find openings for all its displaced employees.

In the end, Harmon said, New Orleans residents who choose to stay in Houston will have more opportunities.

Evacuees may dry up Houston job market; But many think they're bett

"It's just so hard to find jobs in New Orleans," Harmon said. "Mainly because it's all service-oriented. I think there's a lot more opportunity in Houston, mainly because of its size."

**LOAD-DATE:** October 14, 2005

FOCUS - 8 of 104 DOCUMENTS

Copyright 2005 Boston Herald Inc.
The Boston Herald

November 25, 2005 Friday
ALL EDITIONS

**SECTION:** NEWS; Pg. 006

**LENGTH:** 320 words

**HEADLINE:** Big Easy exiles find lots to be thankful for in Hub

**BYLINE:** By JESSICA FARGEN

**BODY:**

They lost their homes, their family photos, their jobs - and some even lost loved ones - but for the hundreds of people who fled Hurricane Katrina and landed here in the home of the first Thanksgiving, there is still much to be grateful for.

``We are thankful we have life,'' said Sherry West, who left New Orleans in a minivan with her four sons and her fiance.

``We have life. It could have been worse.''

West celebrated her first Thanksgiving away from New Orleans in years at a VFW hall in Cambridge that the family rented yesterday. West moved from Boston 21 years ago, but much of her extended family stayed.

She said all she salvaged from her Big Easy home when she returned in September were a few photos of her boys.

West's sister, Leona West-Garner, who gave birth to her second son, Ty, just a month ago, said being here doesn't seem so strange.

``It feels good because we are around family,'' said West-Garner, 28, who was 8 when the family moved to New Orleans.

By late September, more than 600 families and individuals displaced by Hurricane Katrina had opened cases with the Red Cross in Massachusetts.

Karen Goines, who is from New Orleans, likes Massachusetts, but just can't get used to the snow and the cold.

``The last time we had snow in New Orleans was 1989,'' she said.

And she can't find File Gumbo seasoning - a cajun spice - in Massachusetts grocery stores.

They'll make due.

``He's cooking some gumbo. Everything we do at home - turkey, cornbread dressing, gumbo, ham roast,'' Goines said of her fiance, Byron Decou, a chef.

Goines, Decou and their 13-year-old daughter spent several months with a Medford woman before moving into a Haverhill apartment where they celebrated Thanksgiving.

Goines imagines this will be the first of many holidays spent in the Bay State.

``We just have to adjust. We can't go back to New Orleans,'' Goines said. ``We don't have anything in New Orleans.''



Big Easy exiles find lots to be thankful for in Hub The Boston Herald No

jfargen@bostonherald.com

**GRAPHIC:** STUFFED: Joyce West of New Orleans and her son Zackery, 3, eat Thanksgiving dinner yesterday at the Cambridge VFW. STAFF PHOTO BY LISA HORNAK

**LOAD-DATE:** November 25, 2005

2 of 7 DOCUMENTS

Copyright 2005 The Times-Picayune Publishing Company
Times-Picayune (New Orleans)

November 23, 2005 Wednesday

**SECTION:** NATIONAL; Pg. 1

**LENGTH:** 820 words

**HEADLINE:** Evacuees in hotels get FEMA reprieve;
Bills for Louisianians to be paid until Jan. 7

**BYLINE:** By Bill Walsh, Washington bureau

**BODY:**

WASHINGTON -- Facing a bitter political outcry, the lead federal disaster agency pulled back Tuesday on a plan to stop paying the hotel bills of nearly 50,000 hurricane evacuee families on Dec. 1.

The Federal Emergency Management Agency announced that evacuees in 10 states with the highest concentration of evacuees, including Louisiana, will have until Jan. 7 to find rental housing. Evacuees elsewhere in the nation have until Dec. 15.

"We recognize that some states have had a difficult time finding appropriate housing for evacuees," FEMA Director David Paulison said at a news conference.

Besides Louisiana, evacuees in the following states will have until January to vacate hotel rooms: Texas, Georgia, Florida, Mississippi, Alabama, California, Tennessee, Arkansas and Nevada. According to FEMA, those states have three weeks to develop comprehensive plans for housing evacuees after their hotel stays.

Since Hurricane Katrina drove millions of Gulf Coast residents from their homes Aug. 29, many have taken up shelter at hotels in 49 states and the District of Columbia. In late October, FEMA agreed to pay the room bills until evacuees moved into longer-term subsidized housing.

But the agency caused a stir last week when it slipped notices under hotel room doors that evacuees had until Dec. 1 to find somewhere else to live. Although the deadline first was announced in October, housing advocates decried the short notice as unfair and members of Congress blasted the agency for disrupting the lives of evacuees on the eve of Thanksgiving.

"They will at least have a temporary home for the holidays," said Rep. Bennie Thompson, D-Miss., an outspoken critic of FEMA's housing policies since the hurricane. "But without a real housing plan that provides permanent housing for families in need, FEMA has simply postponed the evictions."

Stress eases

The deadline will provide some relief for evacuees who have had no luck finding housing. Kemberly Samuels, who evacuated her 9th Ward home to Houston, said she has looked at 80 apartments. Many of them aren't taking FEMA vouchers that are to pay for the longer-term housing, she said.

"I was grateful for that extension, because when they had the Nov. 30 deadline, it had me so stressed I couldn't eat," said Samuels, a 29-year veteran of the Orleans Parish school system, who has been living with her husband and 20-year-old daughter at Suburban Extended Stay Hotel in northwest Houston since September.

"Hopefully the Jan. 7 deadline will help, because a lot of people are saying they will have apartments ready after the first of the year," she said.


EXHIBIT
D

Evacuees in hotels get FEMA reprieve; Bills for Louisianians to be paid

Agency defends strategy

Paulison went out of his way to counter accusations that FEMA was abandoning hurricane evacuees by phasing out the hotel program. Evacuees still will be eligible for three months' rental assistance when they leave.

"We are not putting people out on the street," Paulison said. "We will continue to pay for apartments and more permanent housing while supporting state and local efforts to move families out of hotels."

Evacuees living in Louisiana have few alternatives besides hotels. There are few rentals available and the prices of those on the market have shot up beyond the reach of most evacuees.

Gov. Kathleen Blanco on Monday signed an executive order giving homeowners access to low-interest loans to finance repairs. But there has been little progress made in providing new or refurbished rental property and Blanco spokeswoman Denise Bottcher said she didn't expect the situation to improve much, even by FEMA's new Jan. 7 deadline.

"We're glad they granted the extension," Bottcher said. "It still doesn't give anyone enough time because the housing stock isn't there. People want to move out of hotels but can't find places to live. There aren't a whole lot of options if you are looking to come home to Louisiana."

Working on solutions

In Houston, where 150,000 Louisiana evacuees have settled, officials breathed a sigh of relief that they have more time to find homes for hotel dwellers.

The city had been placing about 400 to 500 evacuees per day in apartments. But with 16,000 evacuees in Houston hotel rooms, the city would not have met the Dec. 1 deadline.

"Do the math," said Frank Michel, a spokesman for Houston Mayor Bill White.

Michel credited FEMA for working with the city to negotiate 12-month leases for evacuees, terms longer than FEMA usually approves. The agency also has sent Houston $140 million to help defray the costs of caring for evacuees, 25,000 of whom are children who have ended up in the city's public school system.

FEMA may have silenced some of its critics by changing its hotel policy. But it has come at a steep price. FEMA spends about $3 million a day on hotel rooms, about twice what it pays for evacuees staying in apartments.

. . . . . .

Michelle Krupa contributed to this story.

Bill Walsh can be reached at bill.walsh@newhouse.com or (202) 383-7817.

**LOAD-DATE:** November 23, 2005

5 of 11 DOCUMENTS

Copyright 2006 Capital City Press
All Rights Reserved
The Advocate

March 4, 2006 Saturday
Main Edition

**SECTION:** A; Pg. 06

**LENGTH:** 763 words

**HEADLINE:** Infrastructure repair, cleanup massive jobs

**BYLINE:** JOE GYAN JR.; New Orleans bureau

**DATELINE:** NEW ORLEANS

**BODY:**

Infrastructure repair, cleanup massive jobs

NEW ORLEANS - For years, New Orleans used the amount of garbage collected along parade routes and in the French Quarter to measure the success of Mardi Gras. If that same tool is utilized to gauge the city's post-Katrina recovery, then residents are in for a long and arduous journey.

The city and U.S. Army Corps of Engineers have removed a whopping 6.8 million cubic yards of debris and refuse from homes and businesses to date, according to the city's latest update or "situation report," but that is merely a seventh of the estimated 50 million cubic yards of debris in the New Orleans area.

Nearly 485,000 discarded "white goods" - appliances such as refrigerators, stoves and air conditioners - and 1.1 million containers of household hazardous waste have been collected. More than 220,000 units of electronic waste - computers, televisions and stereos - have been taken to a staging site at Crowder Boulevard and Interstate 10.

Nearly 8,000 flooded cars have been towed from routes in ZIP code areas to be repopulated, but that is only a small fraction of the estimated 250,000 vehicles claimed by the floodwaters. The corps has removed nearly 1,200 tree stumps, but many remain.

Barring the loss of life and property, Katrina's toll was particularly rough on the city's infrastructure.

Flight capacity at Louis Armstrong New Orleans International Airport is at 48 percent of what it was before Katrina hit Aug. 29. In a report issued this week, the airport said its passenger count for January was 375,000 - down more than 51 percent from its January 2005 count of nearly 775,000.

The Regional Transit Authority, which has yet to resume streetcar service on historic St. Charles Avenue, is operating 30 routes with six streetcars, 59 buses on weekdays, 39 buses on Saturdays and 37 buses on Sundays. RTA plans to extend its Canal Street streetcar service to the cemeteries by the middle of the month.

BellSouth expects to completely restore services to New Orleans residents by June.

Cox Communications says service is available to 80 percent of the metropolitan area. Crews are focusing their efforts on eastern New Orleans, Mid City and St. Bernard Parish.

Entergy New Orleans says electricity is available to 95 percent of its customers and gas to 86 percent of its customers, but less than 40 percent of its 190,000 pre-Katrina electric customers are taking power and only 32 percent of its 125,000 pre-storm gas customers are receiving gas.



Infrastructure repair, cleanup massive jobs The Advocate March 4, 2006 S

In the Upper 9th Ward, which is on the west side of the Industrial Canal, electric service is available to 65 percent of the customers. But in the devastated Lower 9th Ward, on the east side of the canal, where a midnight to 6 a.m. curfew remains in effect, electric service is available to less than a quarter of the residents. Gas is available to 45 percent of the customers in the Upper 9th and 3 percent in the Lower 9th.

Gas servicemen are removing an average of 15,000 to 20,000 gallons of water daily from gas lines in the city. So far, 3.2 million gallons have been pumped from the gas lines.

Meanwhile, across Orleans Parish, more than 1,000 food and beverage businesses have been issued permits to reopen since the storm.

In neighboring St. Bernard Parish, some 2,000 travel trailers have been placed in the parish through the Federal Emergency Management Agency. There are still about 9,000 unmet requests for trailers in the parish, according to the parish's Internet site.

More than 1,800 students are enrolled at the St. Bernard Unified School in Chalmette, the parish's only fully operational public school. The trailer site is a mixture of the parish's 13 public schools.

The metropolitan New Orleans area had a pre-Katrina population of about 1.4 million. Greg Rigamer, who heads a New Orleans planning firm, said he expects the redistributed population to be 1,275,000 by January. Orleans Parish's population, which stood at more than 484,000 just before the storm, now stands at about 188,000 and is expected to increase to 217,000 by July and 252,000 by January, he said.

"Any recovery that occurs will be market driven," Rigamer said. "There is no silver bullet."

New Orleans City Councilwoman Cynthia Hedge-Morrell, who represents the Gentilly area that was inundated when the London Avenue Canal floodwall breached, said property owners will drive the rebuilding process.

"The people of New Orleans are committed to rebuilding their city. They are not afraid of hard work," she said.

"At the end of the day, New Orleans - we are going to come back," Councilman Eddie Sapir said.

LOAD-DATE: March 4, 2006

2 of 4 DOCUMENTS

Copyright 2005 The Times-Picayune Publishing Company
Times-Picayune (New Orleans)

October 25, 2005 Tuesday

**SECTION:** METRO; Pg. 1

**LENGTH:** 347 words

**HEADLINE:** U.S. court nearly ready to make return to N.O.;
But temporary offices will remain in place

**BYLINE:** By Susan Finch, Staff writer

**BODY:**

The U.S. District Court for the Eastern District of Louisiana, which moved out of New Orleans after Hurricane Katrina, will be back in business at its Poydras Street headquarters as of Nov. 1.

"We have been very, very anxious to return to New Orleans," Chief Judge Ginger Berrigan said. "Despite our personal losses, we will return with deep gratitude for what we have and with great enthusiasm to play our part in the rebirth and rebuilding of our wonderful city."

Since Katrina, the district court's 16 judges, six magistrate judges, two bankruptcy judges and several hundred employees have operated from temporary offices in Houma, Baton Rouge and Lafayette, as have related agencies such as the offices of the U.S. attorney, U.S. marshal service and the federal public defender.

While most of the judges and court employees will return to work at the 400 Poydras St. courthouse Nov. 1, the court will keep its temporary offices open to receive filings and conduct proceedings as needed.

"The related court agencies will likewise maintain their temporary locations to ease the transition," Berrigan said.

The federal court based in New Orleans hears civil and criminal cases from 13 parishes: Orleans, Jefferson, St. Tammany, St. Charles, St. John, St. James, Assumption, Terrebonne, Lafourche, Plaquemines, St. Bernard, Washington and Tangipahoa. About 3,400 cases were filed for the year ending Sept. 30, 2004. Numbers of cases filed in temporary locations after Katrina shut down operations were not available.

Still, it won't be business as usual for a spell. Because of delays in mail service to New Orleans, the court has asked that until further notice, attorneys should mail documents for filing to the clerk of court's interim office in Lafayette.

Berrigan said she expects the entire court operation to be back in New Orleans by Jan. 1.

. . . . . . .

Filings should be mailed to Clerk of Court, Eastern District of Louisiana, 102 Versailles St., Suite 501, Lafayette, La. 70501. The phone number is (337) 262-6700.

Susan Finch can be reached at sfinch@tpmail.com or (504) 826-3340.

**LOAD-DATE:** October 25, 2005



Copyright 2005 Associated Press
All Rights Reserved

The Associated Press State & Local Wire

These materials may not be republished without the express written consent of The Associated Press

September 6, 2005, Tuesday, BC cycle

**SECTION:** Business News

**LENGTH:** 604 words

**HEADLINE:** Federal Vioxx cases moving to Houston due to Katrina

**BYLINE:** By LINDA A. JOHNSON, AP Business Writer

**DATELINE:** TRENTON, N.J.

**BODY:**

Coordination of hundreds of federal lawsuits over Merck & Co.'s withdrawn painkiller Vioxx is being moved to Houston from New Orleans, at least temporarily, because of the devastation there from Hurricane Katrina.

The judge overseeing the massive litigation, U.S. District Court Judge Eldon E. Fallon, and a handful of his staff members have already moved into temporary quarters in the federal courthouse in Houston, a law clerk for Fallon told The Associated Press late Tuesday.

The clerk, who did not want her name used, said the judge is trying to keep as close as possible to the case schedule he had set last month, which had the first federal trial starting in New Orleans on Nov. 28. It was still unclear where the trials will be heard, the clerk said.

Fallon is handling pretrial coordination of more than 1,800 federal Vioxx lawsuits alleging the drug caused patients heart attacks and other harm. Such pretrial consolidation is done to streamline steps common to the cases, such as document gathering and witness depositions.

"The present plan is, the case is going to be managed out of Houston," said David Bradley, chief deputy clerk for the Southern District of Texas in Houston.

Bradley said that means his courthouse will take over electronic management of case filings on a national court system server, entering pleadings and other filings by attorneys, as well as filings of new lawsuits.

"If you have a failure locally, then you can go to this national server," which has copies of all filings made electronically at individual federal courthouses around the country, Bradley said.

Whitehouse Station-based Merck pulled Vioxx from the market last September when research showed the arthritis drug doubled the risk of heart attack and stroke after 18 months' use. Besides the federal cases, the company faces about 3,200 state and other lawsuits over Vioxx, a blockbuster arthritis drug that had peak sales of $2.5 billion a year.

Last month, a jury in Angleton, Texas, hit Merck with a $253.4 million verdict - an amount expected to be drastically reduced - in the first Vioxx trial in state court. The second state trial is set to begin Sept. 12 in Atlantic City, about 100 miles from Merck's headquarters.

Late Tuesday, after Merck learned that Court TV had just requested permission to broadcast live from inside the courtroom during that trial, Merck filed a motion urging the judge to refuse.



EXHIBIT
G

Federal Vioxx cases moving to Houston due to Katrina The Associated Pres

"It hurts our chances in later trials," explained Merck spokesman Kent Jarrell.

Meanwhile, Fallon's clerk said staff now in Houston are trying to locate other New Orleans staffers and find places for them to work, in Houston or elsewhere.

"We certainly understand and have a great deal of empathy for the unusual personal and logistical challenges facing the court," Jarrell said late Tuesday. "We have confidence in the judge and will help him in any way because it is very important to keep the (federal trials) moving forward."

Bradley said the Houston courthouse has some available space for Fallon and staff, but the judge legally cannot hold trials there - at least not now.

"There's no statutory authority for Judge Fallon to conduct trials here," Bradley explained.

He said Congress is considering legislation to allow federal judges in Louisiana's eastern district to conduct trials elsewhere.

Meanwhile, Bradley said, about 65 staffers from the New Orleans headquarters of the 5th U.S. Circuit Court of Appeals, which covers Louisiana, Mississippi and Texas, are to be moved to the Houston federal courthouse.

On the Net: http://www.merck.com

**LOAD-DATE:** September 7, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


O R D E R

As the United States Court House in New Orleans has reopened on November 1,
numerous attorneys' offices have reopened in New Orleans or are otherwise operating in
alternate locations, and with improving services and communication in the region,

IT IS HEREBY ORDERED that the suspension of deadlines and delays, including
liberative  prescriptive and peremptive  periods in all civil cases pending or to be filed in
this Court, **is terminated effective November 25, 2005,** except for good cause shown as
determined by the presiding judge.

New Orleans, Louisiana, this ____**3**ʳᵈ____ day of November, 2005.


_____
HELEN G. BERRIGAN, CHIEF JUDGE
U.S. DISTRICT COURT



1 of 1 DOCUMENT

Copyright 2005 Associated Press
All Rights Reserved

The Associated Press State & Local Wire

These materials may not be republished without the express written consent of The Associated Press

December 9, 2005, Friday, BC cycle

**SECTION:** State and Regional

**LENGTH:** 166 words

**HEADLINE:** State courts to use federal building in New Orleans

**DATELINE:** NEW ORLEANS

**BODY:**

The state criminal district courts in New Orleans, which were displaced by Hurricane Katrina, will have a temporary home at the federal district court building.

Ginger Berrigan, the chief federal district judge, said the state courts will be able to use two courtrooms at the federal building until repairs at the state court's flood-damaged building are completed.

The state court judges will make use of the courtrooms four days a week, Berrigan said.

Criminal District Court Chief Judge Calvin Johnson said that schedule will allow each section of his court to convene every three days. The volume of cases will depend on how many prisoners are brought in, Berrigan said.

"The inmates are scattered all over the state, some even out of state," she said. "At the moment, we are anticipating no more than 12 a session."

Four judges sitting each day will be able to process 48 inmates, Johnson said.

---

Information from: The Times-Picayune, http://www.timespicayune.com

**LOAD-DATE:** December 10, 2005



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR -3  AM 9: 02

LORETTA G. WHYTE
CLERK

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

ELIZABETH JUNG; MIKE RICHARDS, ET. AL.       CIVIL ACTION
                                             NO. 06-0947

VERSUS

FEDERAL EMERGENCY MANAGEMENT
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; ET. AL.                            SECTION M

### ORDER

The United States District Court of the Eastern District of Louisiana is located in very close proximity to some of our most devastated areas.  All of us here at the U.S. District Court have lived and worked during the past six months as children of the storm.

Our experiences are similar, almost identical in many, many ways, to tens of thousands of our community brothers and sisters including, of course, those in St. Bernard Parish.  In this unique brotherhood we have come, with each other, to comprehend many of the Katrina facts of life that fill our days and nights.  One of those facts of post-Katrina life here in this metro area is the compelling and continuing problems of dealing with the Federal Emergency Management Agency (FEMA).  These problems result from, in many instances, ineptitude, inefficiency and indifference at that agency.  It is difficult to describe



Fee
Process
Dktd
CtRmDep
Doc. No



EXHIBIT
J

the devastating effect that these shortcomings have had on our morale and, indeed, our stamina. To say the least, these problems are difficult to put up with, but, put up with them we must because FEMA is basically the only      game in town.

   One of the most disappointing yet predictable result of the above-described situation is the rash of litigation that this has precipitated on behalf of many disgruntled victims of the storm.  Somehow, they have been told or have come to believe that their myriad problems can be solved at the U.S. Courthouse more efficiently and equitably than inside FEMA's administrative system -  an understandable, yet incorrect conclusion.

   Indeed, the first jurisdictional test that this Court must apply is to determine whether the alleged improprieties rise to the level of a deprivation of due process – a right protected by the Constitution of the United States and thus a matter to be decided within the processes of the U.S. District Court.

   The facts developed in this proceeding center around the administrative management of FEMA, and application by FEMA of their regulations, policies, and administrative processes. This Court is compelled to conclude that plaintiffs' order of proof does not display such actions or failures to act which rise to the level of a due process violation of the U.S. Constitution and thus cannot support the issuance of a restraining order.[1]

   The U.S. District Court cannot take over the decision-making management of

_____

   [1] The record of these proceedings as well as the parties briefs filed March 2, 2006, are attached hereto and made a part hereof.

2

FEMA any more than it can take over those functions at NASA, the Social Security Administration, or the United States Army Corps of Engineers. We are not empowered to transform administrative decisions into Constitutional due process issues in order to bring about a particular or desired result.

We recognize that FEMA has a huge responsibility for which this Court has no training or expertise, and moreover, no mandate. We have neither the authority nor the ability to do that with which FEMA has been charged. Such a notion is fraught with peril. Only in the particular instance of a real and actual Constitutional due process violation can we take action, and then, only to deal with that particular Constitutional issue.

The best this Court can do is hold FEMA to the specific commitments that they have made and thus hold their particular management and leadership-level spokesmen individually and collectively responsible for accurately and promptly fulfilling the commitments they have made in these Court proceedings.

The Court will follow this matter closely and consistently. If FEMA's commitments are not followed in fact and in spirit, this Court will do all that is necessary to make a judicial determination of whether such actions or inactions are contemptuous. The responsible individual or individuals will be cited to show cause why they should not be held in contempt and will, of course, be given all the rights that accrue to anyone so accused. If thereafter this Court concludes that their conduct is contemptuous, it shall impose sentence accordingly. [2]

---

[2] *See* 42 U.S.C. §5121; *see also* 5 U.S.C. §702.

3

It is time for FEMA to end its faceless participation in our lives. Those individuals in the executive, managerial and advisory capacities must cease their calculated anonymity and provide their names and addresses, and indeed, their telephone numbers, so that their accountability for commitments made under oath and to the public generally are as exposed to daylight as those of all other federal public officials.

This Court will continue the matter as an open case to be dealt with as previously discussed insofar as the FEMA commitments made in the course of configuring this record are concerned.

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Rec. Doc. #1) must be **DENIED.**

New Orleans, Louisiana, this 3rd day of March, 2006.

@ 9:00 A.M.

Peter Beer
United States District Judge

4

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 21  A 11: 38

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHARLES VILLA, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 05-4569

COLUMBIA GULF TRANSMISSION               SECTION A
CO., ET AL.

### ORDER OF RECUSAL

In the captioned case the named plaintiffs seek to represent a class defined as "*all persons, businesses and entities in the State of Louisiana who have suffered damage as a result of Hurricane Katrina's winds and storm surge.*" (Comp. ¶ 4). My spouse and I, as well as three of my siblings and my entire staff have sustained substantial wind and water damage to our homes and property as a result of Hurricane Katrina.

The Code of Conduct for United States Judges, Canon 3(C)(1)(d)(i), and 28 U.S.C. § 455(b)(5)(i) state that any judge of the United States shall disqualify himself in any proceeding in which he, his spouse, or any person within the third degree of relationship to either of them is a party to the proceeding.

Accordingly,

**REALLOTTED TO**

**SECT. R**

NOV 2 1 2005

_____ Fee_____
_____ Process_____
_____ Dktd_____
_____ CtRmDep____
_____ Doc. No_____

EXHIBIT
K

   **IT IS ORDERED** that the above-captioned case be **RE-ALLOTTED** to
another section of this Court.

   New Orleans, Louisiana, November 17, 2005.

                              JAY C. ZAINEY
                       UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

COLLEEN BERTHELOT, ET AL            **CIVIL ACTION**

VERSUS                                  **NO. 05-4182**

BOH BROTHERS CONSTRUCTION CO., LLC, ET AL      **SECTION T(4)**

### ORDER

Plaintiffs' claims related to Hurricane Katrina and its aftermath, particularly water damage caused by the breaches of the 17th Street Canal, London Canal and/or the Industrial Canal levees that occurred during or immediately after the hurricane.

The undersigned's son's home was flooded on or about August 29, 2005, as a result of the levee breaches that occurred during or immediately after Hurricane Katrina. Accordingly, pursuant to 28 U.S.C. §455, and Canons 2 and 3-C of the Code of Conduct for United States Judges, the undersigned excuses himself from adjudication of this dispute to avoid any appearance of bias or impropriety.

Accordingly,

**IT IS ORDERED** that the Clerk of Court re-allot this matter to a section of this Court other that Section "T."



New Orleans, Louisiana, this 23rd day of February, 2006.

G. THOMAS PORTEOUS, JR.
UNITED STATES DISTRICT JUDGE

1

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

   **********************************************************
3  O'DWYER, ET AL
                              Docket No. 05-CV-4181
4  V.                         New Orleans, Louisiana
                              Friday, March 24, 2006
5  UNITED STATES OF AMERICA, ET AL
   **********************************************************
6  BERTHELOT, ET AL
                              Docket No. 05-CV-4182
7  v.                         New Orleans, Louisiana
                              Friday, March 24, 2006
8
   BOH BROTHERS CONSTRUCTION, INC., ET AL
9  **********************************************************
   JARED VODANOVICH
10
                              Docket No. 05-CV-4191
11 v.                         New Orleans, Louisiana
                              Friday, March 24, 2006
12 BOH BROTHERS CONSTRUCTION, INC., ET AL
   **********************************************************
13 ROBERT HARVEY

14                            Docket No. 05-CV-4568
   v.                         New Orleans, Louisiana
15                            Friday, March 24, 2006

16 THE BOARD OF COMMISSIONERS FOR
   THE ORLEANS PARISH LEVEE DISTRICT
17 **********************************************************
   ANN VODANOVICH
18
                              Docket No. 05-CV-5237
19 v.                         New Orleans, Louisiana
                              Friday, March 24, 2006
20
   BOH BROTHERS CONSTRUCTION, INC., ET AL
21 **********************************************************
22 GREER, ET AL
                              Docket No. 05-CV-5709
   V.                         New Orleans, Louisiana
23                            Friday, March 24, 2006
   U. S. ARMY CORPS OF ENGINEERS
24 **********************************************************

25



```
 1   ANN VODANOVICH
                                      Docket No. 05-CV-6069
 2   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
 3   BOH BROTHERS CONSTRUCTION, ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 4   DAVID KIRSCH

 5                                     Docket No. 05-CV-6073
     v.                               New Orleans, Louisiana
 6                                     Friday, March 24, 2006

 7   BOH BROTHERS CONSTRUCTION, INC., ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 8   JIM EZELL

 9                                     Docket No. 05-CV-6314
     v.                               New Orleans, Louisiana
10                                     Friday, March 24, 2006

11   BOH BROTHERS CONSTRUCTION, INC., ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
12   RICHARD VANDERBROOK, ET AL
                                      Docket No. 05-CV-6323
13   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
14   STATE FARM FIRE & CASUALTY
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
15   DAVID M. BROWN, SR.
                                      Docket No. 05-CV-6324
16   v.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
17
     BOH BROTHERS CONSTRUCTION, INC., ET AL
18   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
19   BETH A. LeBLANC
                                      Docket No. 05-CV-6327
     v.                               New Orleans, Louisiana
20                                     Friday, March 24, 2006

21   BOH BROTHERS CONSTRUCTION, INC., ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
22   FREDERICK BRADLEY, ET AL
                                      Docket No. 05-CV-6359
23   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
24   MODJESKI AND MASTER, INC.
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
25
```

```
 1   SULLIVAN, ET AL
                                    Docket No. 05-CV-0004
 2   V.                             New Orleans, Louisiana
                                    Friday, March 24, 2006
 3   STATE FARM FIRE & CASUALTY
     INSURANCE
 4   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     JULIE E. TAUZIN, ET AL
 5                                  Docket No. 06-CV-0020
     v.                             New Orleans, Louisiana
 6                                  Friday, March 24, 2006

 7   THE BOARD OF COMMISSIONERS FOR
     THE ORLEANS PARISH LEVEE DISTRICT
 8   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     BRUCE CONLAY
 9                                  Docket No. 06-CV-0151
     V.                             New Orleans, Louisiana
10                                  Friday, March 24, 2006
     ENCOMPASS INSURANCE COMPANY, ET AL
11
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
12   DIANE W. ROGERS
                                    Docket No. 06-CV-0152
13   V.                             New Orleans, Louisiana
                                    Friday, March 24, 2006
14   ENCOMPASS INSURANCE COMPANY, ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
15   WILLIAM R. BAIRD
                                    Docket No. 06-CV-153
16   V.                             New Orleans, Louisiana
                                    Friday, March 24, 2006
17   ENCOMPASS INSURANCE COMPANY, ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
18   KELLY A. HUMPHREYS
                                    Docket No. 06-CV-0169
19   V.                             New Orleans, Louisiana
                                    Friday, March 24, 2006
20   ENCOMPASS INSURANCE COMPANY, ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
21   FREDERICK BRADLEY, ET AL
                                    Docket No. 06-CV-0225
22   V.                             New Orleans, Louisiana
                                    Friday, March 24, 2006
23   PITTMAN CONSTRUCTION COMPANY, ET AL
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
24

25
```

```
 1   MARY BETH FINNEY, ET AL
                                      Docket No. 06-CV-0886
 2   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
 3   BOH BROTHERS, ET AL
     ***********************************************************
 4   MARY BETH GILLASPIE
                                      Docket No. 05-CV-1301
 5   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
 6   ST. PAUL FIRE AND MARINE
     INSURANCE COMPANY
 7                     (MIDDLE DISTRICT CASE)
     ***********************************************************
 8   GLADYS CHEHARDY
                                      Docket No. 05-CV-1140
 9   V.                               New Orleans, Louisiana
                                      Friday, March 24, 2006
10   J.P. ROBERT WOLLEY, ET AL
                     (MIDDLE DISTRICT CASE)
11   ***********************************************************

12
                     TRANSCRIPT OF STATUS CONFERENCE
13          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
                     UNITED STATES DISTRICT JUDGE
14


15
     APPEARANCES:
16
     FOR THE PLAINTIFFS:         BRUNO & BRUNO
17                               BY:  JOSEPH M. BRUNO, ESQ.
                                      DAVID S. SCALIA, ESQ.
18                               855 Baronne Street
                                 New Orleans, LA 70113
19
                                 LAMBERT & NELSON
20                               BY:  LINDA J. NELSON, ESQ.
                                 701 Magazine Street
21                               New Orleans, LA 70130

22                               GAINSBURGH, BENJAMIN, DAVID,
                                 MEUNIER & WARSHAUER
23                               BY:  GERALD E. MEUNIER, ESQ.
                                      TODD R. SLACK, ESQ.
24                                    KARA M. HADICAN, ESQ.
                                 1100 Poydras Street, Suite 2800
25                               Energy Centre
                                 New Orleans, LA 70163-2800
```

5

```
 1                              JACOBS & SARRAT
                               BY:  DARLEEN M. JACOBS, ESQ.
 2                             823 St. Louis Street
                               New Orleans, LA 70112
 3
                               SMITH & FAWER, L.L.P.
 4                             BY:  STEPHEN M. WILES, ESQ.
                               201 St. Charles Avenue, Ste. 3702
 5                             New Orleans, LA 70170

 6                             LAW OFFICES OF RONNIE G. PENTON
                               BY:  RONNIE G. PENTON, ESQ.
 7                             209 Hoppen Place
                               Bogalusa, LA 70427
 8                             LAW OFFICE OF DANIEL E.BECNEL,JR.
                               BY:  DANIEL E. BECNEL, ESQ.
 9                                  DARRYL J. BECNEL, ESQ.
                                    WILL PERCY
10                             106 Seventh Street
                               Reserve, LA 70084
11                             ASHTON R. O'DWYER, JR., ESQ.
                               One Canal Place, Suite 2670
12                             New Orleans, LA 70130

13                             DUGAN & BROWNE
                               BY:  JAMES DUGAN, ESQ.
14                             650 Poydras Street, Suite 2150
                               New Orleans, LA 70130
15
                               LAW OFFICE OF ROBERT G. HARVEY,SR
16                             BY:  ROBERT G. HARVEY, ESQ.
                               3431 Prytania Street
17                             New Orleans, LA 70115

18                             LANDRY & SWARR
                               BY:  FRANK J. SWARR, ESQ.
19                             1010 Common Street, Suite 2050
                               New Orleans, LA 70112
20
                               ROBERT L. MANARD, PLC
21                             BY:  PAUL E. MAYEAUX, ESQ.
                               1100 Poydras Street, Suite 2610
22                             New Orleans, LA 70163

23                             LAW OFFICES OF ROBERT M. BECNEL
                               BY:  ROBERT M. BECNEL, ESQ.
24                             425 West Airline Highway, Suite B
                               LaPlace, LA 70068
25
```

```
 1                                    FAYARD & HONEYCUTT
                                      BY:  CALVIN C. FAYARD, JR., ESQ.
 2                                         D. BLAYNE HONEYCUTT, ESQ.
                                      519 Florida Avenue Southwest
 3                                    Denham Springs, LA 70726

 4                                    PENDLEY LAW FIRM
                                      BY:  PATRICK W. PENDLEY, ESQ.
 5                                    24110 Eden Street
                                      P.O. Drawer 71
 6                                    Plaquemine, LA 70765-0071

 7

 8
        FOR THE BOARD OF COMMISSIONERS
 9      FOR THE ORLEANS LEVEE DISTRICT:  McCRANIE, SISTRUNK, ANZELMO,
                                      HARDY, MAXWELL & McDANIEL
10                                    BY:  KYLE P. KIRSCH, ESQ.
                                           MARK HANNA, ESQ
11                                     N. Causeway Blvd., Suite 800
                                      Metairie, LA 70002
12

13                                         - AND -

14                                    LABORDE & NEUNER
                                      BY:  BEN L. MAYEAUX, ESQ.
15                                    One Petroleum Center
                                      1001 W. Pinhook Rd., Suite 200
16                                    Lafayette, LA 70505

17
        FOR WASHINGTON GROUP
18      INTERNATIONAL, INC.:          STONE, PIGMAN, WALTHER, WITTMANN
                                      BY:  WILLIAM D. TREEBY, ESQ.
19                                         HEATHER LONIAN, ESQ.
                                      546 Carondelet Street
20                                    New Orleans, LA 70130

21
                                           - AND -
22

23                                    JONES DAY
                                      BY:  GEORGE MANNING, ESQ.
24                                    51 Louisiana Avenue, N.W.
                                      Washington, D.C. 20001-2113
25
```

```
 1
      FOR BOH BROTHERS CONSTRUCTION
 2    COMPANY, L.L.C:                      KINGSMILL RIESS, L.L.C.
                                           BY:  MICHAEL R.C. RIESS, ESQ.
 3                                              CHARLES B. COLVIN, ESQ.
                                           201 St. Charles Avenue, Ste. 3300
 4                                         New Orleans, LA 70170-3300

 5                                             - AND -

 6                                         DEUTSCH, KERRIGAN & STILES
                                           BY:  TERRANCE L. BRENNAN, ESQ.
 7                                         755 Magazine Street
                                           New Orleans, LA 70130
 8
      FOR VIRGINIA WRECKING
 9    COMPANY, INC.:                       GAUDRY, RANSON, HIGGINS &
                                           GREMILLION, L.L.C.
10                                         BY:  WADE A. LANGLOIS, III, ESQ.
                                           401 Whitney Avenue, Suite 500
11                                         Gretna, LA 70054-1910

12
      FOR JAMES CONSTRUCTION
13    GROUP, L.L.C:                        JONES, WALKER, WAECHTER,
                                           POITEVENT, CARRERE & DENEGRE
14                                         BY:  RICHARD J. TYLER, ESQ.
                                           201 St. Charles Avenue, 50th Flr
15                                         New Orleans, LA 70170-5100

16
      FOR ST. PAUL FIRE & MARINE
17    INSURANCE COMPANY:                   LUGENBUHL, WHEATON, PECK,
                                           RANKIN & HUBBARD
18                                         BY:  RALPH S. HUBBARD, ESQ.
                                                JOSEPH P. GUICHET, ESQ.
19                                              MARTIN R. SADLER, ESQ.
                                           601 Poydras Street, Suite 2775
20                                         New Orleans, LA 70130

21
      FOR STANDARD FIRE INSURANCE
22    COMPANY:                             ROBINSON & COLE
                                           BY:  STEPHEN E. GOLDMAN, ESQ.
23                                         280 Turnbull Street
                                           Hartford, CT 06103-3597
24

25
```

8

```
1   FOR B&K CONSTRUCTION
    COMPANY, INC.:                SIMON, PERAGINE, SMITH &
2                                 REDFEARN, L.L.P.
                                  BY:  HERMAN C. HOFFMANN, JR., ESQ
3                                      BETTY F. MULLIN, ESQ.
                                  Energy Centre
4                                 1100 Poydras Street, 30th Floor
                                  New Orleans, LA 70163-3000
5

6
    FOR MODJESKI AND MASTERS, INC.:   DEUTSCH, KERRIGAN & STILES
7                                 BY:  VICTOR E. STILWELL, JR., ESQ
                                  755 Magazine Street
8                                 New Orleans, LA 70130

9
    FOR SEWERAGE AND WATER BOARD
10  OF NEW ORLEANS:               SEWERAGE & WATER BOARD LEGAL DEPT
                                  BY:  GEORGE R. SIMNO, III, ESQ.
11                                625 St. Joseph Street, Room 201
                                  New Orleans, LA 70165
12

13
    FOR BURK-KLEINPETER, INC.:    DEUTSCH, KERRIGAN & STILES
14                                BY:  CHARLES F. SEEMANN, JR., ESQ
                                  755 Magazine Street
15                                New Orleans, LA 70130

16
    FOR EUSTIS ENGINEERING
17  COMPANY, INC.:                GARDNER & KEWLEY
                                  BY:  THOMAS F. GARDNER, ESQ.
18                                1615 Metairie Rd., Suite 200
                                  Metairie, LA 70005
19

20  FOR C.R. PITTMAN:             GALLOWAY, JOHNSON, TOMPKINS,
                                  BURR & SMITH
21                                BY:  GERALD A. MELCHIODE, ESQ.
                                       J. MARSTON FOWLER, ESQ.
22                                One Shell Square
                                  701 Poydras Street, 40th Floor
23                                New Orleans, LA 70130

24

25
```

```
 1   FOR C. RAY NAGIN, EDWIN COMPASS,
     III AND CITY OF NEW ORLEANS:         CITY ATTORNEY'S OFFICE
 2                                        BY:  JAMES B. MULLALY, ESQ.
                                          CITY HALL
 3                                        1300 Perdido Street
                                          Room 5E01
 4                                        New Orleans, LA 70112

 5
     FOR THE UNITED STATES
 6   OF AMERICA:                          U.S. DEPARTMENT OF JUSTICE
                                          BY:  CATHERINE J. FINNEGAN, ESQ.
 7                                             ROBIN D. SMITH, ESQ.
                                          Torts Branch, Civil Division
 8                                        Benjamin Franklin Station
                                          P.O. Box 888
 9                                        Washington, D.C. 20044

10

11   FOR THE STATE OF LOUISIANA AND
     GOVERNOR KATHLEEN BLANCO:            LOUISIANA DEPARTMENT OF JUSTICE
12                                        BY:  PHYLLIS E. GLAZER, ESQ.
                                               MICHAEL KELLER, ESQ.
13                                        Office of Attorney General
                                          Litigation Division
14                                        601 Poydras Street, Suite 1725
                                          New Orleans, LA 70130
15

16   FOR JEFFERSON PARISH AND
     AARON BROUSSARD:
17                                        BURGLASS & TANKERSLEY, L.L.C.
                                          BY:  DENNIS J. PHAYER, ESQ.
18                                        5213 Airline Drive
                                          Metairie, LA 70001
19
     FOR UNITRIN PREFERRED
20   INSURANCE COMPANY:
                                          PHELPS DUNBAR
21                                        BY:  NEIL C. ABRAMSON, ESQ.
                                          365 Canal Street
22                                        Canal Place - Suite 2000
                                          New Orleans, LA 70130-6534
23
     FOR STATE FARM FIRE AND
24   CASUALTY COMPANY:
                                          STONE PIGMAN WALTHER WITTMANN
25                                        BY:  WAYNE J. LEE, ESQ.
                                          546 Carondelet Street
                                          New Orleans, LA 70130-3588
```

```
 1    FOR ENCOMPASS INSURANCE COMPANY:     BARRASSO USDIN KUPPERMAN
                                           FREEMAN & SARVER
 2                                         BY:  JUDY Y. BARRASSO, ESQ.
                                           LL&E Tower, Suite 1800
 3                                         909 Poydras Street
                                           New Orleans, LA 70112
 4

 5    FOR FIREMAN'S FUND INSURANCE
      COMPANY:                             DUPLASS ZWAIN BOURGEOIS & MORTON
 6                                         BY:  D. MICHAEL PFISTER, ESQ.
                                           11814 Market Place Ave, Suite C
 7                                         Baton Rouge, LA 70816

 8

 9
      FOR KIMBERLY WILLIAMSON BUTLER:      BELHIA V. MARTIN, ESQ.
10                                         317 Magazine Street
                                           New Orleans, LA 70130
11

12
      Official Court Reporter:            Karen A. Ibos, CCR, RPR
13                                         500 Poydras Street, Room HB-406
                                           New Orleans, Louisiana 70130
14                                         (504) 589-7776

15

16
          Proceedings recorded by mechanical stenography, transcript
17    produced by computer.

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                 (FRIDAY, MARCH 24, 2006)

 3                    (STATUS CONFERENCE)

 4

 5           THE COURT:  Good morning.  We are going to have a rather

 6   rapid but hopefully clear on the record who you represent and maybe

 7   we can do it in some orderly way.  But I wanted to look at you and

 8   hear you and then we will get into this meeting.

 9           Let me say that the first 30 minutes is going to be Judge

10   Wilkinson, who I'm sure all of you know, and myself talking.  After

11   we talk then we'll listen for awhile and then we are going to have

12   another meeting that I have already set.  So just to let you know

13   that.

14           Let's make our appearances if we can start.  I don't know

15   if you know your case numbers.

16           MR. O'DWYER:  May it please the court, your Honor, Ashton

17   O'Dwyer for plaintiffs in Civil Action No. 05-4181.

18           THE COURT:  Thank you, sir.

19           MR. BRUNO:  Good morning, your Honor, Joseph Bruno and

20   David Scalia from Bruno & Bruno in Ann Vodanovich No. 05-5237, Greer

21   05-5709, which has been dismissed, LeBlanc 05-6327, and Dahlgren

22   06-0188.

23           THE COURT:  Thank you, sir.

24           MR. WILES:  May it please the court, Stephen Wiles on

25   behalf of plaintiff Judy Tauzin, Civil Action No. 06-20, your Honor.
```

```
 1            THE COURT:  Thank you.

 2            MR. PHAYER:  Your Honor, Dennis Phayer on behalf of

 3   Jefferson Parish and Aaron Broussard in the O'Dwyer matter, Civil

 4   Action 05-4181.

 5            THE COURT:  Thank you, sir.

 6            MS. MARTIN:  Good morning, your Honor, Belhia Martin on

 7   behalf of Kimberly Williamson Butler in the O'Dwyer case, Civil No.

 8   05-4181.

 9            THE COURT:  Thank you.

10            MS. GLAZER:  Good morning, your Honor.  Phyllis Glazer and

11   Michael Keller for the State of Louisiana and Governor Kathleen

12   Blanco in the O'Dwyer matter 05-4181.

13            THE COURT:  Thank you.

14            MR. PENTON:  Good morning, Judge.  Ronnie Penton in the

15   Ezell matter, 05-6314.

16            MS. JACOBS:  Good morning, your Honor, Darlene Jacobs in

17   the matter 05-4568, Harvey v. Levee Board.

18            THE COURT:  Thank you.

19            MR. HARVEY:  Good morning, your Honor, Robert Harvey in

20   the Vanderbrook matter, 05-6323.

21            THE COURT:  Thank you, sir.

22            MR. MULLALY:  Good morning, your Honor, Magistrate

23   Wilkinson.  Jim Mullaly here on behalf of the City of New Orleans,

24   Honorable Mayor Nagin and also former Superintendent of Police Edwin

25   Compass, 05-4181.
```

1          THE COURT:  Thank you.

2          MR. MEUNIER:  Good morning, your Honor, Gerald Meunier

3    here with Todd Slack and Kara Hadican for plaintiffs in the Bradley

4    cases numbers 05-6359 and 06-0225.

5          THE COURT:  Thank you.

6          MS. NELSON:  Good morning, Judge, Linda Nelson with the

7    law firm of Lambert & Nelson.  I am here on behalf of the David

8    Kirsch plaintiffs 05-6073.

9          MR. HUBBARD:  Ralph Hubbard appearing here today on behalf

10   of St. Paul Travelers in its capacity as insurer of the Levee

11   District in most of the Levee District cases.  And on behalf of

12   Hanover, the Hartford and Standard Fire Insurance Company in the

13   Vanderbrook matter.

14         THE COURT:  Thank you.

15         MR. HUBBARD:  Joined by Stephen Goldman today here who was

16   admitted pro hoc vice in connection with the Standard Fire matters,

17   and Marty Sadler who is about to be admitted pro hoc for the

18   Hartford.

19         THE COURT:  Thank you, very much.

20         MR. ROBERT BECNEL:  Good morning, your Honor, Robert

21   Becnel, Diane Zink (PHONETIC) and Meghan Burns in the matter of

22   06-0886, Finney, et al v. Boh Brothers, et al.

23         THE COURT:  Thank you, sir.

24         MR. COLVIN:  Good morning, your Honor, Chuck Colvin,

25   Michael Riess and Terry Brennan on behalf of Boh Brothers in

```
 1   Berthelot and eight other cases.

 2           MR. HONEYCUTT:  Good morning, your Honor, Blayne Honeycutt

 3   with Fayard & Honeycutt in the matter of the Gillaspie v. St. Paul,

 4   No. 05-1301.  Presently in the Middle District but it's my

 5   understanding this matter is about to be transferred.

 6           THE COURT:  It has been, yes, sir.

 7           MR. DUGAN:  Good morning, your Honor, James Dugan with the

 8   Dugan & Brown firm on behalf of Vodanovich v. Boh Brothers, Case No.

 9   05-4191.

10           MR. LANGLOIS:  Judge, Wade Langlois on behalf of Virginia

11   Wrecking Company and we are involved in several cases.

12           THE COURT:  Can you tell me which ones?

13           MR. LANGLOIS:  I believe it's Ezell, Berthelot, Ann

14   Vodanovich and Kirsch.

15           THE COURT:  Thank you.

16           MR. SEEMANN:  Charles Seemann, Jr. on behalf of

17   Burk-Kleinpeter, Inc. and Burk-Kleinpeter, L.L.C. in Kirsch 05-6073

18   and LeBlanc 05-6327; and named in other suits, all 05 suits,

19   Berthelot 4182, Vodanovich 4191, Vodanovich 5237, Vodanovich 6069

20   and Ezell 6314.

21           MS. BARRASSO:  Judy Barrasso on behalf of Encompass

22   Insurance Company and we are involved with four cases Conlay, Rogers

23   Humphreys and Baird v. Encompass Insurance Company and the Levee

24   Board.  And they are 0151 through 153 and Humphreys is 0169.

25           THE COURT:  Thank you.
```

1          MR. HOFFMAN:   Good morning, Herman Hoffman and Betty

2   Mullin of Simon Peragine, we're involved for B&K Construction in

3   cases 05-4182, 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, 06-20,

4   06-886.

5          THE COURT:   Thank you.

6          MR. TYLER:   Richard Tyler for the James Construction

7   Group, we are served in Berthelot, 05-4182, Kirsch 05-6073 and

8   LeBlanc 05-6327.  And we are named in Vodanovich 05-4191, Kirsch

9   05-6073 -- I'm sorry, Ezell, 05-6314, Tauzin 06-0020 and Finney

10  06-0886.

11         MR. GUICHET:   Good morning, your Honor, Joe Guichet on

12  behalf of St. Paul Fire and Marine Insurance Company in Berthelot

13  04182, Vodanovich 05237, Kirsch 06073, Ezell 06314, Brown 06324,

14  LeBlanc 06327.   We will also soon be making appearances in O'Dwyer

15  4181 and Finney 00886.

16         MR. LEE:   Good morning.   Wayne Lee here on behalf of

17  St. Farm Fire and Casualty Company in the Vanderbrook case 05-6323

18  and in the Sullivan case which is 06-004.

19         MR. TREEBY:   William Treeby, along with Heather Lonian

20  representing The Washington Group, pro hoc vice motion being filed

21  for George Manning of Jones Day in lead cases Berthelot v. Boh

22  Brothers 05-4182, Ann Vodanovich v. Boh Brothers 05-5237, Beth

23  LeBlanc v. Boh Brothers 05-6327, Julie Tauzin v. Board of

24  Commissioners Levee District 06-0020, Mary Beth Finney Civil Action

25  No. 06-0886, David Kirsch Civil Action No. 05-6073, Jim Ezell Civil

1    Action 05-6314 and David Brown 05-6324.

2            MR. MAYEAUX:   Paul Mayeaux on behalf of the Sullivan

3    plaintiffs in Sullivan v. State Farm 06-0004.

4            THE COURT:   Thank you.

5            MR. SIMNO:   May it please the court, your Honor, George

6    Simno on behalf of the Sewerage & Water Board of New Orleans in

7    Kirsch case, Ezell, Vodanovich and LeBlanc, 05-6073, 05-6314,

8    05-4191 and 05-6327.   We are named in other cases but have not been

9    served as of yet, your Honor.

10           THE COURT:   Thank you.

11           MR. FAYARD:   Good morning, your Honor.   I am here as a

12   result of messages that I received from Mr. Hubbard and the court

13   yesterday with respect to cases that were transferred from Judge

14   Polozola in Baton Rouge to this courthouse.   We are uncertain as to

15   which court or judge it will be assigned to yet, but I will read

16   those cases out for you.

17           MAGISTRATE WILKINSON:   You need identify yourself.

18           MR. FAYARD:   Calvin Fayard for the record.

19           MAGISTRATE WILKINSON:   We know who you are but others may

20   not.

21           MR. FAYARD:   Thank you.   Gladys Chehardy v. Wolley, Civil

22   Action 05-1140; consolidated with Chehardy v. Wolley, civil action

23   05-1162, consolidated with Chehardy v. Wolley, Civil Action 05-1163.

24   I am sure those numbers reflect numbers assigned to these cases by

25   the Middle District court in Baton Rouge.

```
 1              THE COURT:  Thank you, sir.

 2              MR. PENDLEY:  Patrick Pendley in the Kevin Slaton v.

 3    St. Paul case, Civil Action 05-1138.  May I assume that that was

 4    formerly in the Middle District?

 5              THE COURT:  I don't have a record of that one, sir.

 6              MR. PENDLEY:  That's a Middle District case then, your

 7    Honor.

 8              THE COURT:  All right.

 9              MR. PENDLEY:  Thank you.

10              MR. MELCHIODE:  Good morning, your Honor, Gerald Melchiode

11    on behalf of C.R. Pittman Construction Company.  C.R. Pittman has

12    been named in Vodanovich, Berthelot, LeBlanc, Brown, Kirsch, Ezell

13    and Finney.  C.R. Pittman has not been served, it's oftentimes been

14    confused in the pleadings with Pittman Construction Company.  So I

15    want to make it clear today that I am not here for Pittman

16    Construction Company but rather C.R. Pittman Construction Company.

17              THE COURT:  Thank you, sir.

18              MR. HANNA:  May it please the court, Mark Hanna, Ben

19    Mayeaux and Kyle Kirsch on behalf of the Board of Commissioners for

20    the Orleans Levee District here on the Berthelot case 05-4182,

21    O'Dwyer 05-4181, Vodanovich 05-4191, Harvey 05-4568, Vodanovich

22    05-5237, Kirsch 05-6073, Ezell 05-6314, Vanderbrook 05-6323, Brown

23    05-6324, LeBlanc 05-6327, Armstead 05-6438, Tauzin 06-0020, Conlay

24    06-151, Rogers 06-152, Baird 06-153, Humphreys 06-169, Bradley

25    06-225, and the Finney case, and I apologize, your Honor, I do not
```

1    have that number with me.

2              THE COURT:  Thank you.

3              MR. HANNA:  But those are the cases.

4              MR. STILWELL:  Good morning, your Honor, Victor Stilwell

5    of Deutsch, Kerrigan & Stiles representing Modjeski and Masters,

6    Inc.  We are named in ten cases:  Ann Vodanovich 05-4191, LeBlanc

7    05-6327, O'Dwyer 05-4181, Ezell 05-6314, Finney 06-0886, Bradley

8    05-6359, Kirsch 05-6073, Berthelot 05-4182, Tauzin 06-002 and Brown

9    05-6324.  Thank you, your Honor.

10             THE COURT:  Thank you.

11             MR. GARDNER:  Good morning, your Honor, Thomas Gardner of

12   Gardner & Kewley on behalf of Eustis Engineering, Inc.  Eustis is a

13   defendant in three actions that are pending before this court,

14   O'Dwyer 05-4181, LeBlanc 05-6327, and Ezell 05-6314.

15             THE COURT:  Thank you.

16             MR. ABRAMSON:  Good morning, your Honor, Neil Abramson on

17   behalf of Unitrin Preferred Insurance Company in the Richard

18   Vanderbrook case, Civil Action 05-6323.

19             THE COURT:  Thank you, sir.

20             MR. SMITH:  Your Honor, Robin Smith from the Department of

21   Justice, with me is Catherine Finnegan.  We are here in O'Dwyer

22   05-4181, Tauzin 06-20, in which we have not yet been served, Greer

23   05-5709.  And there are two cases which are not before your Honor,

24   which are also Katrina cases, the Parfait Family case which has been

25   consolidated with Ingram barge 05-4419, and Dahlgren 06-0188, in

1    which we also have not been served.

2            THE COURT:  Thank you.

3            MR. SWARR:  Good morning, your Honor, Frank Swarr on

4    behalf of the plaintiffs in the Humphreys case 06-0169, the Baird

5    case 06-0153, Rogers 06-0152 and Conlay 06-0151.

6            THE COURT:  Thank you, sir.

7            MR. BECNEL:  Daniel Becnel as well as Will Percy and

8    Darryl Becnel in Berthelot 05-4182, Brown 05-6324 and we represent

9    tens of thousands of these people.

10           THE COURT:  Thank you, sir.  All right.  I am sure all of

11   you probably know Judge Wilkinson, he is going to be the magistrate

12   judge on the cases that are ultimately under this umbrella, which is

13   not all been decided yet.  And will work closely with me on certain

14   issues, including discovery and other issues.

15           Let me explain the nature of my first notice.  It was

16   mandatory and for the time being all such notices are going to be

17   mandatory because obviously if we had to wait until a time that was

18   convenient for all of us, this case would not be decided in our

19   lifetime, much less even close thereto.  So it's got to be by the

20   very nature of it and the unwielding nature of it these cases and

21   notices have to be mandatory.  So all of you should have at least a

22   second chair who is completely familiar with the case, who has

23   authority to act, at least in procedural matters and settings, and

24   virtually the same authority as you do.

25           Once we get organized and have a structure then perhaps

1    the notices won't be as Draconian or imperious I should say, but

2    until that time we have an imperial court insofar as notices are

3    concerned, that's just the way it is.

4          The primary grouping of our cases -- we have a related

5    case rule.  We have obviously in our related case rule, we, the

6    court, have decided that we are going to liberalize it, at least for

7    the purposes of Katrina.  And so that we can try to efficiently

8    manage cases that appropriately fit under the umbrella sort of as a

9    mini MDL, that is an intracourt MDL in essence.  It will hopefully

10   help all of us be more efficient and have a consistent ruling, right

11   or wrong, that you have then one appeal from at the appropriate

12   time.

13          The groupings that I see now, and this is subject to

14   change because we've had a few announcements that I am not quite

15   sure of yet because there are a lot of complaints and a lot of

16   reading for us to do.  But we have class actions involving the three

17   levees:  Industrial, London and 17th.  We have class actions

18   involving just two of them and we have class actions involving just

19   one.  We have class actions naming a myriad of defendants, we have

20   class actions naming just one defendant.  We have non-class actions

21   in which the insurer and the homeowners, excuse me, the homeowner's

22   insurance policy is named.  And these are what I call the Encompass

23   cases only because Encompass is in four of them.  I think

24   Vanderbrook fits in it.

25          I am interested, and we will talk a little later how the

1    Chehardy, et al, cases fit into that grouping.  I regard that as a

2    separate grouping because only in the Chehardy case only the

3    insurers are named.  And in the cases involving Encompass,

4    Vanderbrook cases, the insurer is named and one individual suing the

5    insurer is named and then the Orleans Levee Board.  We have had, I

6    know of some cases transferred from the Middle District, Mr. Fayard

7    mentioned three that I know we have, and the Gillaspie case I am not

8    quite sure about, I thought it was part of that bundle but we will

9    check it.  We will check that out.

10          At this point I want to describe any recusal situations,

11   and I am going to explain and then let Judge Wilkinson speak to this

12   a little bit.  There's one aspect which he is going to direct

13   himself to and it involves the Jefferson Parish pump situation.  In

14   all of the cases it's only mentioned in one paragraph in

15   Mr. O'Dwyer's complaint.  And Judge Wilkinson.

16          MAGISTRATE WILKINSON:  My brother is the parish attorney

17   for Jefferson Parish and has been for ten years.  I recused myself

18   from what is the lowest numbered case in this set of cases, it's

19   05-4181 in which the plaintiff's attorney is Aston O'Dwyer.  And I

20   understand that the defendant's representative this morning is

21   Mr. Phayer.  I recused myself from that case only when the third

22   amended complaint was filed.  It does have, as Judge Duval said, a

23   paragraph or two alleging a claim against Jefferson Parish and Aaron

24   Broussard in his official capacity concerning the removal of the

25   pump operators out of the parish and the claim is that that caused

1    some flooding.

2            Unless someone speaks up, that is the only one of these

3    cases in which that claim is made as I understand it as I reviewed

4    these cases myself and that is the only one.  Does anybody see that

5    claim in another case?

6            I am required to recuse myself from that case because of

7    my brother's position.  Although he is not counsel of record, he has

8    supervisory authority over the lawyers who work for the parish.

9            There is one other case called Berthelot in which the

10   parish has appeared, it seems to me only for the purposes of

11   opposing a motion to consolidate.  They are not a party in that

12   case.  Who represents Berthelot?

13           MR. BECNEL:  Daniel Becnel, your Honor.  And let me just

14   say, we have a number of these clients that want to add those; but I

15   can assure the court that I will recommend to all of my clients that

16   there is no conflict and I have no objection to your continuing to

17   serve in that capacity or whatever capacity you think is

18   appropriate.

19           However, I would ask, only because I lost it twice in the

20   appellate courts, there is a case called Tramonta v. Chrysler,

21   involved Judge Lemmon, and there may be a problem.  But I don't

22   know.  We don't have any.  We waive any potential conflict.

23           THE COURT:  But the fact is if you have a claim involving

24   Broussard, should I say the flooding or the pump, alleged pump

25   abandonment in Jefferson Parish, Judge Wilkinson is going to recuse

1   as I understand it.

2          MAGISTRATE WILKINSON:  Well, thank you for waving that,

3   Mr. Becnel, but I don't accept it.  I don't handle cases in which my

4   brother has some kind of oversight or even the appearance of some

5   kind of oversight.

6          MR. PHAYER:  Your Honor, Dennis Phayer who is representing

7   the Parish and Aaron Broussard in the O'Dwyer matter.  There was an

8   effort made several weeks ago by the Levee Board or the Orleans

9   Levee Board to consolidate a slew of cases to transfer them to the

10  Middle District, and it was at that time that although the Parish

11  was not a party to the Berthelot case, the effort to consolidate and

12  transfer had been filed under the Berthelot caption.  So we filed an

13  opposition.  That's the sole involvement of the parish in that case.

14  We are not a party of record, we were not named as a defendant.

15         MAGISTRATE WILKINSON:  Unless there is some objection from

16  Mr. O'Dwyer who represents the plaintiffs or Mr. Phayer who

17  represents the two affected defendants, then I think what Judge

18  Duval wants to do is sever that one discrete claim, assign it a

19  separate civil action number for administrative purposes and leave

20  it assigned with Judge Knowles who is assigned to it now; is that

21  right, Judge?

22         THE COURT:  Yes.  And the logic behind that, one, is so we

23  can handle this; and, two, it doesn't involve a levee breach which

24  is the umbrella that -- this particular umbrella is a levee breach.

25         MR. O'DWYER:  No objection, your Honor.

```
 1            MR. PHAYER:  No objection.
 2            MS. JACOBS:  Mr. Phayer and I are involved in the state
 3    court action in Jefferson Parish that seeks class action
 4    certification against Mr. Broussard and the Parish of Jefferson.
 5    It's only in state court, I only point that out to the court that
 6    there may be a conflict.
 7            THE COURT:  Thank you, Ms. Jacobs.  And I will do that and
 8    I am going to.
 9            MS. JACOBS:  I waive any conflict.
10            THE COURT:  Thank you very much and I will sever that.
11    While we are discussing recusal, let me make my disclosures.  And I
12    might point out that there's been a motion filed, my law clerk
13    apprised me this morning, to recuse all of the Middle District,
14    excuse me, all of the Eastern District.  We will deal with that when
15    the time comes.  But let me just say that I thought about this long
16    and hard, and unless there is a statutory recusal, and it's going to
17    be tried by me, I think it's our responsibility to hear it.  But I
18    will certainly look at the motion.
19            And I think if there is a recusal motion that's going to
20    be directed at one specific judge, I am going to give a time limit
21    for it to be filed because I think we have a responsibility to
22    handle these cases.  In essence, in the long run would mean we would
23    have to recuse from 90% of our docket because they're going to be
24    Katrina related.  Unless it's statutorily mandated, I am not
25    inclined to do it.
```

1    But let me tell you my situation so you can think about

2  whether you want to file a motion to recuse.  I had no real damage

3  from Hurricane Katrina, Hurricanes Katrina or Rita, fortunately,

4  either at Grand Isle where I have a place or in New Orleans.  My

5  daughter lives in Metairie near Causeway, she had six inches of

6  water.  She was very fortunate in her insurance coverage and has

7  absolutely zero economic damage.  Being the good negotiator that she

8  is, she will opt out of any class.  She has no economic damage at

9  all.  So that's my situation.

10    I might point out one other thing.  I have a brilliant

11  young law clerk, who is not in this courtroom, named Caroline

12  Fayard.  She happens to be related to one of the lawyers who just

13  spoke, Mr. Calvin Fayard, who is also a good friend of mine.  I want

14  to point out that Ms. Fayard is not my law clerk because of her

15  father, she is a graduate of Dartmouth Michigan Law School with

16  honors and is magnificent.

17    I am friendly with Mr. Fayard, however.  I can tell you

18  that will have nothing to do with my -- I am friendly with a lot of

19  you actually, but Mr. Fayard I have known for a long time.  Let me

20  put it that way.  So I will let you know that it won't have any

21  bearing on what I do, but if it makes you uncomfortable let me know.

22    We haven't decided, I might point out, where Mr. Fayard's

23  cases fit under this umbrella or if they do.  We will talk about

24  that later.  That's about as much disclosure, I think that's about

25  it.  Now.  Go ahead.

1    MAGISTRATE WILKINSON:  I need to make one disclosure.

2    THE COURT:  More disclosures from Judge Wilkinson.

3    MAGISTRATE WILKINSON:  Luckily I am not as friendly as

4    Judge Duval, so I am not friends with any of you.

5    THE COURT:  We have to have one of those here in this

6    case.

7    MAGISTRATE WILKINSON:  Neither myself nor any member of my

8    immediate family had any flooding damage as a result of the

9    hurricane.  The damage we did have in my house or my immediate

10   family was minor wind damage.

11   I have an uncle who resides in the old part of Old

12   Metairie who had about 18 inches of water in his house.  He had some

13   sort of insurance coverage, which he seems to be satisfied with.  I

14   haven't talked to him in any great detail about his troubles, but I

15   am not sure at this point if he is a member of the class or if he

16   would be an opt out; but I think his economic situation is that he

17   may not have any economic damage.

18   I have another uncle who lived in Violet whose house was

19   lost, Violet's in St. Bernard Parish.  As far as I can understand

20   claims made in this case, he would not be a member of any putative

21   class.

22   My law clerk, I have one law clerk, she lived in Broadmoor

23   and had a lot of water in her house.  I don't think she is a member

24   of the class either because she also had adequate coverage which is

25   already paid off and probably doesn't have any damage.  In any

1    event, because of her former residence, she is not going to be
2    involved in anything having to do with this case.  And I don't get
3    my law clerk involved in discovery or case management matters in any
4    event, but she will not be involved.  And to the extent I need law
5    clerk assistance with this, which is probably going to be minimal, I
6    am going to bring in a student during the summer to help me.

7         THE COURT:  I might point out as well that Ms. Fayard will
8    not be working on this case and will not be involved in it at all.
9    Janet Daly will be the law clerk on the case.

10        I might point out that there are motions pending which
11   insofar as, I am going to talk about certain categories of them.
12   The Levee Board in the motions to remand has removed the case on the
13   federal office of the defense and that's at issue and we've heard
14   one oral argument, and frankly, I've done enough research where that
15   oral argument and briefing is sufficient for me to ultimately rule
16   on the issue that would effect any case involving the Orleans Levee
17   Board and I have to decide where there is a remand issue and I have
18   to make a decision, I have not done that.

19        We have some motions in Mr. O'Dwyer's case on immunity
20   that may effect other issues.  And I am going to talk more about
21   preliminary motions later on, as will Judge Wilkinson.  But those
22   are filed and we will talk a little later on about when we think
23   12(b)(6) type motions should be filed involving immunity and other
24   defenses.

25        All right.  Let's look at this thing.  Understanding that

1   the umbrella that we first designed -- and it's growing and we are

2   not sure if we're going to let it grow beyond the original scope, we

3   need to think about it and all of you need to think about it --

4   involving breaches in one of the three canals or all of the three

5   canals.  And as I said earlier, there are some class actions that

6   seek to certify, a class for all three canals.

7           Let me tell you, you do know which circuit you're in.  I

8   find it remote, and maybe not even a good idea from my standpoint,

9   that such a class would be certified.  My suggestion, suggestion,

10  these are suggestions, none of this is coming like lightening on

11  Mount Sinai on a tablet, it's just suggestions for you to ruminate

12  about, is that insofar as the levee breaches are concerned, and if

13  there are any other categories, is to file a master complaint for

14  each category.  We then have separate certification hearings so that

15  the attorneys who are involved in all three can be involved in the

16  master complaint in all three, and those who are involved in one or

17  two would be involved in the master complaint with respect to those

18  respective canals.

19          Then we have some non-class actions which to some degree

20  would be tagalongs, because, as an example, the case Ms. Barrasso is

21  in, she represents Encompass Insurance Company.  It's a coverage

22  issue, but the plaintiff has also sued the Orleans Levee Board

23  saying I want money from one of you, so it does involve the

24  liability with reference to a canal breach.  It also involves an

25  insurance coverage issue.  So it's kind of another -- and there are

1    mold issues in there as well.

2         Then we have the Chehardy cases, which I will call them

3    Mr. Fayard, and I think there are others like it, but they just sue

4    insurance companies; but there is an allegation in those that the

5    cases depend upon, it seems to me and we will hear more articulating

6    from you, depend upon for the coverage issue to even become viable

7    for a court to find that there is negligence relative to the canals,

8    that is the maintenance, the design, et cetera, the engineering, the

9    building.  So that is a linchpin to the coverage issue so it's

10   somewhat related there, but I regard that as a separate category.

11   That is also a class action of the Chehardy cases.

12        So we have those that are there and we realize that

13   everything we're discussing and even on April, and I will tell you

14   about the next meeting, even at our next meeting we have to be

15   somewhat flexible depending on what plays out.  Hydrology may show

16   that one home was flooded by two canals, the breach of two canals.

17   I am not sure what we do with that yet, I haven't thought it all

18   through.

19        Okay.  Unquestionably in a case like this, and all of you,

20   I see a lot of very imminent members of the bar here, and all of you

21   I'm sure are aware we are going to have a committee structure.  This

22   is what I am thinking about.  And again I am going to want your

23   input, not necessarily today, we can talk briefly, but at our next

24   meeting for you to think about.  I would have an overall committee

25   to coordinate all actions.  And that would be appointed by me after

1    I receive your resumes, although I do know most of you.

2              And it would consist of five members who would agree upon

3    that committee, this is again, that committee would be five members.

4    The overall committee would be five members and you would then, you

5    the five members, I would encourage you to appoint the lead liaison

6    counsel, the liaison counsel.

7              Then I would also have committees of three for each

8    separate class action that was filed.  And the reason, I thought a

9    lot about this, we think the master complaint for each category

10   makes it's:  One, easier to manage; and two, if you don't bleed over

11   in your certification questions and you get to a lot of lot of

12   problems with just common sense and Fifth Circuit law.  That's not

13   to say that I am saying we are going to certify any of these

14   classes.  It's just the way to streamline it, we are suggesting a

15   way that we make it more cohesive and discrete.

16             Furthermore, please understand that we may have other

17   categories, but that's sort of the thing we're thinking about.  We

18   are also thinking about requiring you to file certain motions before

19   class certification, so we give you a break on our rule on the time

20   for class certification.

21             I would really like it -- we are going to have a meeting

22   April 6th, 2006 at 10 A.M.  Again, that's why you need a good second

23   or third chair because these dates have to be arbitrary.  And some

24   of the things we are going to discuss is whether you agree to the

25   master complaint and whether you want a class certification hearing

1    for the three canals.  We will also discuss schedules, deadlines,

2    discovery, classes and motions and class certifications.  I am

3    certain that I am going to require immunity motions to be filed and

4    disposed of before we have class certification because it doesn't

5    really make sense otherwise.

6              I don't know, and I'm interested after we finish here,

7    what the Orleans Levee Board's position is, but it's filed a motion

8    to recuse the Eastern District, as I understand.  If it's remanded

9    in the Federal Office of Defense, I am not sure how many of the

10   other cases that may be here on CAFA jurisdiction; so either way

11   it's going to be here whether I remand or not, so that motion is

12   going to become relevant and I am going to rule on it very quickly.

13   But we have a lot of oppositions to get in.  We will talk about

14   that.  If you do want to oppose it -- maybe you all agree.  But that

15   doesn't mean you will win if you all agree; bit if you do oppose it,

16   we may have to have a master opposition because I don't want 5,000

17   oppositions.

18             At any rate, we would like you very much, and this is

19   Judge Wilkinson who is a wonderful organizer and manager himself,

20   suggests to confer and file a joint written report.  You may need to

21   stay here or at least get all of your e-mail address, how do you

22   prefer to do this, it's unwielded since we don't have a committee

23   structure.  Something we would like, I am not demanding, but we

24   would like for you to confer and file a joint written report

25   concerning your master class actions, a proposed schedule for

1   discovery deadlines and any suggestions you may have to streamline

2   these proceedings.

3          Now, if you feel like that's impossible to do until after

4   April 6th, that's fine, but I would like it now and maybe if you

5   could even informally get some of you together to at least get a

6   draft and send it out to the other people, et cetera.  The people

7   who filed individual actions will probably have to tagalong to some

8   degree.

9          Now, to the extent as the Encompass cases, if there is a

10  severance, if in those cases Orleans Levee Board is remanded, again

11  I haven't decided that yet, then I am going to keep the Encompass

12  cases, they are going to be severed because then they will be

13  diversity, that's what I am going to do if I do that, and then I'll

14  have to decide those insurance coverage issues.  But in a way it's a

15  vacuum because the insurance coverage issues may somehow relate to

16  liability, and the Chehardy cases may be a little different than the

17  Encompass cases, we have to think about those a little bit.

18         At this time the MR-GO is not included, and some of you

19  may want to speak to that after I'm through and Judge Wilkinson is

20  through, but because it does not involve a classic levee breach.

21  Now, if there is an argument that it should be included in all of

22  this in another category, we are certainly willing to listen to

23  that.

24         We've looked at some of the complaints and it appears some

25  of the defendants that either, to Judge Wilkinson, have not been

served or not appeared in all of the cases.  At the next meeting you need to be prepared to discuss why and what do you intend to do about it to rectify that issue and prevent dismissal under Rule 4(m).

Judge Wilkinson is going to be coordinating discovery and other things, and he has a great suggestion that I think we should do.

MAGISTRATE WILKINSON:  The size of this group is larger than I anticipated it would be.  What we want from you before the next meeting on April 6th is some sort of report or at least an outline that contains from you all your ideas concerning phased handling of this matter, by which we mean when preliminary motions might be filed, what sort of motions those might be, whether there should be, whether those motions should be filed and determined before any discovery is permitted.  Whether once those motions are filed and determined whether there should discovery limited to class certification issues first.  If so, what sort of discovery might that include, how long do you think it would take to conclude it, what kind of discovery you might think about including in that phase, whether written discovery should proceed before deposition discovery, whether there is any need for expedited discovery in any particular instance.

In other words, the typical sorts of things that you would consider in making a report to the court, including your suggestions, on how something like this should be managed.

1        Because of the massive size of this group and simply as a

2   method of coordinating it and without intending to tell you all who

3   you should make your liaison counsel --

4        THE COURT:  Don't forget I am going to appoint a committee

5   of five, as I said, unless you have other suggestions and that's

6   going to be the liaison, that has something to do with that.

7        MAGISTRATE WILKINSON:  And without any other inference to

8   be drawn from what I am about to say, unless they object, we want to

9   appoint Jerry Meunier for the plaintiffs group and Ralph Hubbard for

10  the defense group for the limited purpose of receiving from the rest

11  of you the suggestions that you have as to what should go in this

12  initial report and for simply typing it up and sending it to us, and

13  for no other purpose.

14       THE COURT:  Thank you, Judge.  That's a great idea.

15       MAGISTRATE WILKINSON:  Mr. Meunier, do you have any

16  objection to doing that?

17       MR. MEUNIER:  No objection.

18       THE COURT:  Mr. Hubbard, do you have any objection?

19       MR. HUBBARD:  No, your Honor.

20       MAGISTRATE WILKINSON:  These are ministers, all right,

21  they are scribes, so don't the two of you think that it means

22  anything else, for good or bad.

23       THE COURT:  One of the other issues on the agenda, and

24  this is directed to the United States, is a pro se case filed

25  against the President and others, President of the United States and

1   others, that's Armstead v. U.S.A. No. 05-6438.  I don't know if the

2   United States wants to do this, but we might suggest just to tidy

3   this thing up, if you would waive service and file your motions it

4   might expedite it.  We simply point that out, we certainly can't

5   order you to do that, we just ask you to contemplate it so that we

6   can get going.

7           MAGISTRATE WILKINSON:  While you're contemplating that.

8   There is something else about that.  Mr. Mullaly, are you here

9   somewhere?

10          MR. MULLALY:  Yes, sir.

11          MAGISTRATE WILKINSON:  Ms. Glazer, are you here somewhere?

12          MS. GLAZER:  Yes, sir.

13          MAGISTRATE WILKINSON:  The Mayor is a defendant in that

14  case, the Governor is a defendant in that case, this is a case filed

15  in forma pauperis by a pro se petitioner, it is not assigned to me

16  yet but it is going to be assigned to me shortly.  I am going to

17  screen it just like you screen any case like that.

18          The same thing that Judge Duval said to the United States

19  also applies to you; in other words, what we want you to do is the

20  same thing that Judge Duval just told the United States to do.

21          MR. MULLALY:  Sir, if I may?  I believe there is a second

22  supplemental amending complaint filed in that case, the Armstead

23  matter, in which in one of the enumerated paragraphs the plaintiff

24  expresses his wishes to dismiss the Honorable C. Ray Nagin from the

25  complaint.  I will submit to the court that I did follow it up since

1  it is in forma pauperis, and I called the plaintiff who also

2  suggested to me that he does not any longer desire to sue the Mayor.

3  And if any further motion on his part is required, he will file

4  such.

5          THE COURT:  There is a motion required, unless we get a

6  motion to dismiss.

7          MR. MULLALY:  That was my immediate concern, that's why I

8  called him, I can try to suggest to him that he should file a

9  voluntarily dismissal.

10          THE COURT:  Otherwise it requires paper.

11          MR. MULLALY:  That's correct, your Honor.

12          MAGISTRATE WILKINSON:  Paper is not a strong point for

13  most pro se litigants, so would you do this, Mr. Mullaly, would you

14  as soon as the case is re-allotted to me, would you arrange for a

15  telephone conference with the plaintiff and yourself and call my

16  office and we will set up a conference?

17          MR. MULLALY:  Yes, sir.

18          MAGISTRATE WILKINSON:  So that we can handle that.

19          MR. MULLALY:  I sure will.

20          THE COURT:  Thank you, Judge.  One of the things that, and

21  many other things, but in thinking about the class or the classes in

22  a lot of the complaints there is a fear of flooding, and I am not

23  certain if that fear of flooding applies to those who actually

24  stayed and were in the flood or those who left because it may make

25  some difference in motion practice.  We just need some clarification