

ENGINEERING AGREEMENT FOR
PROFESSIONAL SERVICES

State of Louisiana
Parish of Orleans

This Agreement is made and entered into on this 26th day of December, 1984, by and between the Board of Commissioners, Orleans Levee District by and through the Board, hereinafter called "OWNER", represented by Emile W. Schneider, President, duly authorized to act pursuant to provisions to Resolution No. 11-032184, adopted the 21st day of March, 1984, and Burk and Associates, Inc., in the State of Louisiana, hereinafter called the "ENGINEER".

All work shall be under the direction of the Chief Engineer of the OWNER and all plans, specifications, selecting of testing laboratory, etc. shall be submitted to him and all approvals and administration of this contract shall be through him.

At the OWNER'S option, the scope of services for this contract may be limited to any phase of approved work or may be expanded as provided below.

Section 1 - The Project

The OWNER hereby contracts with the ENGINEER to perform all necessary professional services in connection with the Project defined as follows:

LONDON AVENUE CANAL FLOODWALLS AND LEVEES

Section 2 - Basic Services of Engineer

The ENGINEER shall provide all basic services required to complete the project, including all necessary services described herein or usually implied as a prerequisite for performance of the services whether or not specifically mentioned in this contract, including attendance by the ENGINEER at project conferences and public hearings.

2.1. Design Memorandum Phase

After written authorization to proceed ENGINEER shall:

2.1.1. Meet with OWNER to clarify and define the extent of OWNER'S requirements for the project.

2.1.2. Obtain from OWNER and from other agencies available project data and report to the OWNER and OWNER'S representative on the source of information and content.

2.1.3. Advise OWNER as to the necessity of OWNER providing or obtaining from others additional data or services.

EXHIBIT
A

2.1.4.   Prepare necessary scopes of services for topographical surveys, hydrographical surveys, geotechnical engineering investigations and aerial photography as required for the project and prepare proposals for OWNER'S approval. The scope of service for each sub-consultant shall be reviewed and approved by the OWNER and/or OWNER'S representative prior to execution of any sub-agreement. The cost for these services shall be added to the Agreement by Amendment and paid for as a separate item of work directly to sub-consultant. It is the OWNER'S intent that this work commence during this phase of the project. However, any such services can be performed by the ENGINEER, if qualified.

2.1.5.   Prepare a Design Memorandum containing schematic layouts, sketches, drawings and conceptual design criteria with appropriate exhibits to indicate clearly the considerations involved and the alternative solutions available to the OWNER and setting forth ENGINEER'S findings and recommendations with opinions of probable Total Project Cost and the project schedule.

        For purposes of this contract, the Construction Cost (C.C.) shall be established in this phase and shall include the Estimated Construction Cost (E.C.C.), Contingencies and Design Fees.

        The Project Cost (P.C.) will include the Construction Cost (C.C.), allowances for charges for geotechnical engineering services, testing, surveying and Resident Inspection.

2.1.6.   Coordinate with OWNER and/or OWNER'S representative as required.

2.1.7.   Attend meetings, conferences or presentations as may be required by OWNER or its representative. During the course of this work effort meetings with the following agencies may be required:

Louisiana Department of Transportation and Development; U.S. Army Corps of Engineers; New Orleans Sewerage and Water Board; Department of Streets and other relative public entities. All work efforts shall be coordinated with OWNER and/or its representative.

2.1.8.   Furnish to OWNER such conceptual documents and conceptual design data as may be required for, and assist in the preparation of, the required documents so that OWNER may apply for preliminary approvals of such governmental authorities as have jurisdiction over design criteria applicable to the Project, and assist in obtaining such approvals by participating in submissions to appropriate authorities.

2.1.9.   Furnish ten (10) copies of the bound Report and present and review it in person with OWNER and/or OWNER'S representative.

2.1.10 ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.2. Preliminary Design Phase

After written authorization to proceed with the Preliminary Design Phase, ENGINEER shall:

2.2.1. In consultation with OWNER and its representative, and on the basis of the accepted Design Memorandum, determine the extent of the Project and determine the amount of compensation for this phase as provided in Section 8.

2.2.2. Prepare preliminary design documents based on the approved design memorandum criteria, preliminary drawings and outline specifications.

2.2.3. Based on the information contained in the preliminary design documents, submit a revised opinion of probable Project costs.

2.2.4. Revise permit applications as necessary and resubmit for approval to Local, State and Federal agencies as applicable.

2.2.5. Revise the Design Memorandum to reflect any newly developed information.

2.2.6. Identify those areas of work which may require additional right-of-way and discuss with the OWNER and/or OWNER'S authorized representative.

2.2.7 Furnish ten (10) copies of the Preliminary Plans and present and review them in person with the OWNER and/or OWNER'S representative.

2.2.8 Such preliminary design documents should be suitable for partial inclusion in the Final Design Phase.

2.2.9 ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.3. Final Design Phase

After written authorization to proceed with the Final Design Phase, ENGINEER shall:

2.3.1. Prepare complete detailed construction plans, specifications and contract documents. These plans are to include locations of all utilities affected, and ownership and taking lines for rights-of-way where required. At the earliest time at which the state of completion of the plans

will allow an effective review of the design work, a set of plans shall be furnished the OWNER for examination. Upon receipt by the ENGINEER of comments by the OWNER, the ENGINEER shall revise and complete the plans.

2.3.2. Finalize and prepare necessary permit applications and submit to local, state and Federal authorities, as applicable, for approval.

2.3.3. Advise OWNER of any adjustments to the latest opinion of probable Project Cost caused by changes in extent or design requirements of the Project or Construction Costs and furnish a revised opinion of probable Project Cost based on the Drawings and Specifications.

2.3.4. Prepare for review and approval by OWNER, his legal counsel and other advisors contract agreement forms, general conditions and supplementary conditions, and bid forms, invitations to bid and instructions to bidders, and assist in the preparation of other related documents.

2.3.5. Furnish ten (10) copies of the above documents and present and review them in person with OWNER and/or OWNER'S representative.

2.3.6 ENGINEER shall not proceed beyond this phase without the express written authorization of the. OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.4. Bidding Phase

After written authorization to proceed with the Bidding Phase, ENGINEER shall:

2.4.1. Assist OWNER in obtaining bids for the project.

2.4.2. Consult with and advise OWNER as to the acceptability of subcontractors and other persons and organizations proposed by the prime contractor (hereinafter called "Contractor") for those portions of the work as to which such acceptability is required by the bidding documents.

2.4.3. Consult with and advise OWNER as to the acceptability of substitute materials and equipment proposed by Contractor when substitution prior to the award of contracts is allowed by the bidding documents.

2.4.4. Assist OWNER in evaluating bids or proposals and in assembling and awarding contracts.

2.4.5 ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to

terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.5. Construction Phase

During the Construction Phase ENGINEER shall:

2.5.1. Consult with and advise OWNER and act as his representative as provided in the General Conditions of the Construction Contract. All of OWNER'S instructions to Contractor will be issued through ENGINEER who will have authority to act on behalf of OWNER to the extent provided in the General Conditions except as otherwise provided in writing.

2.5.2. Make visits to the site at intervals appropriate to the various stages of construction to observe as an experienced and qualified design professional the progress and quality of the executed work of Contractor and to determine in general, if such work is proceeding in accordance with the Contract Documents. ENGINEER shall not be required to make exhaustive or continuous on-site inspections to check the quality of such work. ENGINEER shall not be responsible for the means, methods, techniques, sequences or procedures of construction selected by Contractor or the safety precautions and programs incident to the work of Contractor. ENGINEER'S efforts will be directed toward providing a greater degree of confidence for OWNER that the completed work of Contractor will conform to the Contract Documents, but ENGINEER shall not be responsible for the failure of Contractor to perform the work in accordance with the Contract Documents. During such visits and on the basis of on-site observations ENGINEER shall keep OWNER informed of the progress of the work, shall endeavor to guard OWNER against defects and deficiencies in such work and may disapprove or reject work failing to conform to the Contract Documents.

2.5.3. Review and approve (or take other appropriate action in respect of) Shop Drawings (as that term is defined in the aforesaid General Conditions) and samples, the results of tests and inspections and other data which each Contractor is required to submit, but only for conformance with the design concept of the Project and compliance with the information given in the Contract Documents (but such review and approval or other action shall not extend to means, methods, sequences, techniques or procedures of construction or to safety precautions and programs incident thereto); determine the acceptability of substitute materials and equipment proposed by Contractor; and receive and review (for general content as required by the Specifications) maintenance and operating instructions, schedules, guarantees, bonds and certificates of inspection which are to be assembled by Contractor in accordance with the Contract Documents.

2.5.4.   Issue all instructions of OWNER to Contractor; issue necessary interpretations and clarifications of the Contract Documents and in connection therewith prepare change orders as required; have authority, as OWNER'S representative, to require special inspection or testing of the work; act as initial interpreter of the requirements of the Contract Documents and judge of the acceptability of the work thereunder and make decisions on all claims of OWNER and Contractor relating to the acceptability of the work or the interpretation of the requirements of the Contract Documents pertaining to the execution and progress of the work; but ENGINEER shall not be liable for the results of any such interpretations or decisions rendered by him in good faith.

2.5.5.   Based on ENGINEER's on-site observations as an experienced and qualified design professional and on review of applications for payment and the accompanying data and schedules, determine the amounts owing to Contractor and recommend in writing payments to Contractor in such amounts; such recommendations of payment will constitute a representation to OWNER, based on such observations and review, that the work has progressed to the point indicated, that, to the best of ENGINEER's knowledge, information and belief, the quality of such work is in accordance with the Contract Documents (subject to an evaluation of such work as a functioning Project upon Substantial Completion, to the results of any subsequent tests called for in the Contract Documents, and to any qualifications stated in his recommendation), and that payment of the amount recommended is due Contractor; but by recommending any payment ENGINEER will not thereby be deemed to have represented that continuous or exhaustive examinations have been made by ENGINEER to check the quality or quantity of the work or to review the means, methods, sequences, techniques or procedures of construction or safety precautions or programs incident thereto or that ENGINEER has made an examination to ascertain how or for what purposes any Contractor has used the moneys paid on account of the Contract Price, or that title to any of the work materials or equipment has passed to OWNER free and clear of any lien, claims, security interests or encumbrances, or that Contractors have completed their work exactly in accordance with the Contract Documents.

2.5.6.   Conduct an inspection to determine if the Project is substantially complete and a final inspection to determine if the work has been completed in accordance with the Contract Documents and if each Contractor has fulfilled all of his obligations thereunder so that ENGINEER may recommend, in writing, final payment to each Contractor and may give written notice to OWNER and the Contractor that the work is acceptable (subject to any conditions therein expressed), but any such recommendation and notice shall be subject to the limitations expressed in paragraph 2.5.5.

2.5.7 Establish construction monuments and bench marks as necessary.

2.5.8. Coordinate with owners of utilities for relocation of their facilities to clear construction.

2.5.9. Prepare monthly progress reports for the OWNER and/or OWNER'S representative. This progress report should accompany Contractor's request for payment.

2.5.10. ENGINEER shall not be responsible for the acts or omissions of any Contractor, or subcontractor, or any of the Contractor's or subcontractors' agents or employees or any other persons (except ENGINEER'S own employees and agents) at the site or otherwise performing any of the Contractor's work; however, nothing contained in paragraphs 2.5.1. through 2.5.10. inclusive, shall be construed to release ENGINEER from liability for failure to properly perform duties undertaken by him in the Contract Documents.

2.6 <u>Record Drawings Phase</u>

Prepare for OWNER, a set of reproducible prints of drawings showing those changes made during the construction process based on the marked up prints, drawings and other data furnished by Contractor to ENGINEER.

2.7 Resident inspection by a full time inspector and supporting staff.

If resident inspection is required to be furnished by the ENGINEER, the OWNER shall so direct him in writing. The ENGINEER shall assign personnel acceptable to the OWNER, at a fee acceptable to the OWNER. The fee shall be on the basis of the actual time of personnel used at the then currently approved hourly payroll rates times a multiplier of 2.5 plus expenses, but in no case shall the total payment for resident inspection exceed 2-1/2% (percent) of the cost of construction. The resident inspection may be discontinued at any time upon thirty days notice by the OWNER to the ENGINEER, in writing.

Section 3 - <u>Documents</u>

The ENGINEER shall furnish to the OWNER three (3) sets of drawings, specifications and contract documents for checking and approval and Ten (10) sets for the OWNER'S records.

The ENGINEER shall also furnish sufficient sets of plans, specifications and contract documents for the receipt of competitive bids and the construction of the project.

All data collected by the ENGINEER and all documents, notes, drawings, tracings and files shall remain the property of the ENGINEER except as otherwise provided in Section 10 of this Agreement. The ENGINEER shall furnish to the OWNER reproducible copies of any project documents requested by the OWNER.

The OWNER shall furnish without charge all standard plans and specifications and any other information which the OWNER now has in its files which may be of use to the ENGINEER.

Section 4 - Supplementary Services

The ENGINEER shall provide when requested in writing by the OWNER, supplementary services, not included in the basic services. The OWNER reserves the right to select other consultants for services enumerated below and other services not specifically identified.

Such supplementary services shall include the following:

4.1. Geotechnical engineering services.

4.2 Topographical surveys, hydrological surveys and aerial photography.

4.3 Laboratory inspection of materials and equipment.

4.4 Right-of-way, easement and property acquisition surveys, plats, maps and documents.

4.5 Property Abstracting services.

4.6 Preparation of applications and supporting documents for governmental grants, loans or advances in connection with the Project; preparation or review of environmental assessments and impact statements; review and evaluation of the effect on the design requirements of the Project of any such statements and documents prepared by others; and assistance in obtaining approvals of authorities having jurisdiction over the anticipated environmental impact of the Project.

4.7 Services resulting from significant changes in extent of the Project or its design including, but not limited to, changes in size, complexity, OWNER'S schedule, or character of construction or method of financing; and revising previously accepted studies, reports, design documents or Contract Documents when such revisions are due to causes beyond ENGINEER'S control.

4.8 Providing renderings or models for OWNER'S use.

4.9 Preparing documents for alternate bids requested by OWNER for Contractor's work which is not executed or documents for out-of-sequence work.

4.10 Investigations involving detailed consideration of operations, maintenance and overhead expenses; providing Value Engineering during the course of design; the preparation of feasibility studies,

cash flow and economic evaluations, rate schedules and appraisals; assistance in obtaining financing for the Project; evaluating process available for licensing and assisting the OWNER in obtaining process licensing; detailed quantity surveys of material, equipment and labor; and audits or inventories required in connection with construction performed by OWNER.

4.11  Services resulting from the award of more separate prime contracts for construction, materials, equipment or services for the Project than were previously agreed to with the OWNER, and services resulting from the arranging for performance by persons other than the principal prime contractors of services for the OWNER and administering OWNER'S contracts for such services.

4.12  Services in connection with change orders to reflect changes requested by OWNER if resulting change in compensation for Basic Services is not commensurate with the additional services rendered, services after the award of each contract in evaluating substitutions proposed by Contractor, and in making revisions to Drawings and Specifications occasioned thereby, and services resulting from significant delays, changes or price increases occurring as a direct or indirect result of material, equipment or energy shortages.

4.13  Services during out-of-town travel required of ENGINEER other than visits to the site as required by Section 2.

4.14  Additional or extended services during construction made necessary by (1) work damaged by fire or other cause during construction, (2) a significant amount of defective or neglected work of Contractor, (3) prolongation of the contract time of any prime contract by more than sixty days, (4) acceleration of the progress schedule involving services beyond normal working hours, and (5) default by Contractor.

4.15  Preparation of operating and maintenance manuals; protracted or extensive assistance in the utilization of any equipment or system(such as initial startup, testing, adjusting and balancing); and training personnel for operation and maintenance.

4.16  Services after completion of the Construction Phase, such as inspections during any guarantee period and reporting observed discrepancies under guarantees called for in any contract for the Project.

4.17  Preparing to serve or serving as a consultant or witness for OWNER in any litigation, public hearing or other legal or administrative proceeding involving the Project.

4.18  Additional services in connection with the Project, including services normally furnished by OWNER and services not otherwise provided for in this Agreement.

The compensation to the ENGINEER for the above supplemental services, when performed by the ENGINEER'S force, shall be in the form of a lump sum which is mutually agreeable to the OWNER and to the ENGINEER.

If the parties hereto are unable to agree upon a lump sum for such additional work, the ENGINEER shall be paid on the basis of the actual time of personnel used at the then currently approved hourly payroll rates times a multiplier of 2.5 plus reimbursable expenses. Each claim for additional compensation shall state the authority for performing such additional services, and shall include a description of the work done and, if applicable, give the number of drawings affected.

Payments to ENGINEER for Supplementary Services shall be made monthly upon presentation of the invoice for work performed during the proceeding month.

Section 5 - Owner's Responsibility

It is mutually understood and agreed that the OWNER will furnish, as required for the work and not at the expense of the ENGINEER, the following items:

5.1 Property, boundary, easement, right-of-way property descriptions when such information is required.

5.2 All maps, drawings, records, annual reports, and other data that are available in the file of the OWNER and which may be useful in the work involved under this agreement.

5.3 Access to public and private property, as necessary, when required in conduct of field surveys.

5.4 Charges for review of drawings and specifications by government agencies, if any.

Section 6 - Period of Service

6.1 The provisions of this Section and the various rates of compensation for ENGINEER's services provided for elsewhere in this Agreement have been agreed to in anticipation of the orderly and continuous progress of the Project. ENGINEER's obligation to render services hereunder will extend for a period which may reasonably be required for the design, award of contracts and construction of the Project including extra work and required extensions thereto. The ENGINEER shall provide the required services within the time period established by the OWNER for the Project. The Project time shall be compatable with the schedule established in the Bond Issue Final Offering Memorandum.

6.2 The services called for in the Design Memorandum Phase will be completed and the Design Memorandum submitted within 6 months, after written

authorization to proceed with that phase of services.

6.3 After acceptance by OWNER of the Design Memorandum Phase documents indicating any specific modifications or changes in the extent of the Project desired by OWNER, and upon written authorization from OWNER, ENGINEER shall proceed with performance of the services called for in the Preliminary Design Phase, and shall submit preliminary design documents and a revised opinion of probable Project Cost to the OWNER. The period of completion for the Preliminary Design Phase shall be agreed upon at the conclusion of the Design Memorandum Phase and set forth in the OWNER'S authorization to proceed.

6.4 After acceptance by OWNER of Preliminary Design Phase documents and revised opinion of probable Project Cost, indicating any specific modifications or changes in the extent of the Project desired by OWNER, and upon written authorization from OWNER, ENGINEER shall proceed with the performance of the services called for in Final Design Phase; and shall deliver Contract Documents and a revised opinion of probable Project Cost to the OWNER. The period of completion for the Final Design Phase shall be agreed upon at the conclusion of the Design Memorandum Phase and set forth in the OWNER'S authorization to proceed.

6.5 ENGINEER's services under the Design Memorandum Phase, Preliminary Design Phase and Final Design Phase shall each be considered complete at the earlier of (1) the date when the submissions for that phase have been accepted by OWNER or (2) thirty days after the date when such submissions are delivered to OWNER for final acceptance, plus such additional time as may be considered reasonable for obtaining approval of governmental authorities having jurisdiction over design criteria applicable to the Project.

6.6 After acceptance by OWNER of the ENGINEER's Drawings, Specifications and other Final Design Phase documentation including the most recent opinion of probable Project Cost and upon written authorization to proceed, ENGINEER shall proceed with performance of the services called for in Bidding Phase. This Phase shall terminate and the services to be rendered thereunder shall be considered complete upon commencement of the Construction Phase.

6.7 The construction Phase will commence with the execution of the contract to be executed for the work of the Project or any part thereof, and will terminate upon written approval by ENGINEER of final payment on the contract.

6.8 If OWNER has requested significant modifications or changes in the extent of the project, the time of performance of ENGINEER's services and his various rates of compensation shall be adjusted appropriately.

6.9 The ENGINEER will be given time extensions for delays beyond his control or for those caused by tardy approvals of work in progress by various official agencies, but additional compensation shall be allowed only if specifically requested by the ENGINEER in a timely manner and agreed to by OWNER.

Section 7 - Notice to Proceed

The President of the Orleans Levee Board, through its Chief Engineer, shall notify the ENGINEER in writing to undertake the services stated in Section 2 of this agreement. The Section 2 services shall commence as follows:

7.1 The ENGINEER shall proceed with the Design Memorandum Phase of the work within 10 days of a written notice to proceed.

7.2 The ENGINEER shall proceed with the remaining phases of the work as stipulated in Section 6 of this agreement.

Section 8 - Compensation

The OWNER shall pay and the ENGINEERS agree to accept as full compensation for Engineering services to be performed under this Contract a fee for each phase of work as indicated below. It shall be the OWNER'S option to limit or expand the scope of services provided under this Contract.

8.1 Design Memorandum Phase:

Based on the proposal provided by the ENGINEER and agreed to by the OWNER for Design Memorandum services as outlined in Section 2, the OWNER shall pay the ENGINEER the Lump Sum amount ~~of~~ agreed to by the parties. Payment of the fee shall be in monthly installments proportionate to the progress of the ENGINEER.

8.2 Design, Bidding, Construction, and Record Drawings Phases:

For the remaining Section 2 services, the owner shall pay the Engineer a Lump Sum fee based on a percentage of the Construction Cost as established in Section 2.1 of this Agreement.

Said Lump Sum shall be developed from one of the following methods as indicated by his initials below:

| Engineer | Owner | | |
|---|---|---|---|
| [initials] | [initials] | 1. | Curve A from the American Society of Civil Engineers Manual and Reports on Engineering Practice No. 45; |
| ______ | ______ | 2. | Curve B from the American Society |

of Civil Engineers Manual and Reports on Engineering Practice No. 45; or

3. Fee Percentage = 40 / Log of the (Construction Cost)*

*Construction Cost = Estimated Construction Cost + Contingencies + Design Fees

For purposes of calculating the fee using method 1 and 2 above the Estimated Construction Cost + Contingencies will establish the base contract amount.

8.3 Payments of the Lump Sum Fees as determined above, shall be according to the following schedule:

| Phase | Payments as a % Lump Sum |
|---|---|
| Design Memorandum Phase | 100% of Design Memo Fee |
| Preliminary Design Phase | 30% of Design Fee |
| Final Design Phase | 45% of Design Fee |
| Bidding Phase | 5% of Design Fee |
| Construction Phase | 15% of Design Fee |
| Record Drawings Phase | 5% of Design Fee |

It shall be OWNER'S option to limit or expand the scope of this Contract at the conclusion of each phase. The OWNER may terminate this Contract at the conclusion of payment for each phase.

No payment shall be made to the ENGINEER for any work not authorized by OWNER in writing.

8.4. Payment to the ENGINEER shall become due and payable as follows:

Design Memorandum Phase:

In monthly installments proportionate to the progress of the Engineer.

Final Design Phase:

In monthly installments proportionate to the progress of the ENGINEER. It is mutually agreed that these monthly payments are for the ENGINEER'S convenience only, and they do not imply acceptance by the OWNER of any work performed by the ENGINEER.

Bidding Phase:
In monthly installments proportionate to the progress of the ENGINEER.

Construction Phase:

Monthly based on the percentage of the total cost of the construction work completed during the preceding month.

Record Drawing Phase:

Upon receipt of approved reproducible "Record Drawings."

Section 10 - Termination or Suspension

The terms of this contract shall be binding upon the parties hereto until the work has been completed and accepted by the OWNER and all payments required to be made to the ENGINEER have been made; but his contract may be terminated under any or all of the following conditions:

1. At anytime by mutual agreement and consent of the parties hereto.

2. At anytime by the OWNER as a consequence of the failure of the ENGINEER to comply with the terms, progress or quality of work in a satisfactory manner, proper allowance being made for circumstances beyond the control of the ENGINEER.

3. At anytime by either party upon failure of the other party to fulfill its obligation as set forth in this contract.

4. By satisfactory completion of all services and obligations described herein.

5. At anytime in the event of the abandonment of the project by the OWNER.

6. At the conclusion of any phase of the work identified in Section 2 and/or Section 8 above, it shall be the OWNER'S option to terminate this Contract upon payment of compensation due to the ENGINEER for said phase completed.

Upon termination the ENGINEER shall be paid for actual work performed prior to the notice of termination on a pro-rate share of the basic fee based on the phase or percentage of the work actually completed on a given phase.

Upon termination the ENGINEER shall deliver to the OWNER all Original documents , notes, drawings, tracings and files, except the ENGINEER'S personal and administrative files.

Should the OWNER desire to suspend the work, but not definitely terminate the contract, this may be done by sixty (60) days notice given by the OWNER in writing to that effect, and the work may be reinstated and resumed in full force and effect upon receipt from the OWNER of sixty (60) days notice in writing in that effect.

This section shall serve as the definition of termination wherever that word appears in this contract.

Section 11 - Insurance

The ENGINEER agrees to provide the following Insurance Coverages as initialed below. The OWNER agrees to the

required Insurance Coverage as indicated by his initial below.

Initial

Engineer Owner

A. Workers Compensation and Employer Liability

Statutory Workers compensation. Employer's Liability coverage, in the limit of $500,000.00 each accident. In the event this Contract involves work on, or adjacent to, navigable streams or bays, ENGINEERS' Certificate shall show coverage in complaince with provisions of the Federal Longshoreman's and habor Workers' Compensation laws. If any Watercraft and/or Amphibian is used for work under this contract, coverage must be provided for Employer Maritime Liability (including, but not limited to the Jones Act and the Voluntary Compensation Endorsement) for the limits of $250,000.00 One Employee, and a Total Limit of $500,000.00 for Two or More Employees.

Engineer Owner

B. Comprehensive General Liability

(1) Coverage shall be on an Occurrence Basis

(2) Bodily Injury Limits shall be not less than $500,000.00 per occurance.

(3) Property Damage Limits shall be not less than $100,000.00 per Occurance and $500,000.00 Aggregate. Property Damage shall include Coverage for Crafts or Trades which are subject to normal policy exclusions of :

(a) Blasting or explosion

(b) Collapse

(c) Damage to underground property (wires, conduits, and the like) and injury to, or destruction of any property resulting therefrom.

(4) Coverage shall include Completed Operation and Products along with Contractual Liability.

Engineer Owner

C. Comprehensive Automobile Liability

(1) Bodily Injury Limits $100,000.00 each person $500,000.00 each Occurence.
(2) Property Damage Liability Limits shall be not less than $100,000.00 each Occurence.
(3) Coverage shall include:

(a) Owned Vehicles

(b) Hired or Leased Vehicles

(c) Non-owned Vehicles

Engineer Owner

D. Owners and Engineers Protective(Contingent Liability

(1) This shall be in the name of, and for protection of, the Owner.
(2) Bodily Injury Limits shall be not less than $500,000.00 per Occurence.
(3) Property Damage Limits shall be not less than $100,000.00 per Occurence and $500,000.00 Aggregate.

Engineer Owner

(E) Aviation Liabiltiy Insurance (applicable if aircrafts are used in operations)

(1) Bodily Injury Limits shall be not less than $100,000.00 per person and $500,000.00 per accident, excluding passenger hazard.

(2) Passenger hazard Bodily Injury Limits shall be not less than $100,000.00 per aircraft passenger seat.

(3) Property Damage Limits shall be not less than $100,000.00 per accident.

(4) Coverage shall include all leased, hired or other non-owned aircraft.

Engineer Owner

(F) Marine Insurance (applicable if watercrafts and/or amphibeans are used in operations)

(1) Protection and Indemnity Insurance on all vessels owned and/or charted with Limit of Liability up to value of vessel or $500,000.00 single limit whichever is greater.

Engineer Owner

MON ES

(G) Architects And/Or Engineers Professional Liability

Limit of Liability:

1,000,000.00 per claim of liability (Including Claim Expense).

1,000,000.00 Aggregate Limit of Liability (Including Claim Expense).

Engineer Owner

MON ES

(H) Hold-Harmless Agreement

The Contractor shall indemnify, and hold and save harmless the Board from all loss, liability or expense to which the Board may be subjected as a result of the operations, acts or omission of the Contractor, or any Subcontractor, and the Contractor shall effect and maintain an Insurance Policy with a contractual endorsement to insure the Board's protection, as to bodily injury and property damage. The limits of liability to be applicable under the foregoing indeminity shall be the same limits required under Item B "Comprehensive General Liability".

All certificates of insurance shall be furnished to the Owner and shall provide that insurance shall not be cancelled without ten (10) days prior written notice to the Owner. The Owner may examine the policies. This insurance shall be placed with reliable insurance carriers, satisfactory to the Board, who are authorized to do business in the State of Louisiana.

Section 12 - General

While in the performance of services or carrying out other obligations under this Agreement, the ENGINEER shall be acting in the capacity of independent contractors and not as employees of the OWNER. The OWNER shall not be obligated to any person, firm or corporation for any obligations of the ENGINEER arising from the performance of their services under this Agreement.

The ENGINEER warrants that he has not employed or retained any company or person, other than a bona-fide employee working solely for the consultant, to solicit or secure this contract, and that they have not paid or agreed to pay any company or person, other than bona-fide employees working solely for the consultant, any fee commission,

percentage brokerage fee, gifts, or any other consideration, contingent upon or resulting from the award or making of this contract. For breach of violation of this warranty, the OWNER shall have the right to annul this contract without liability.

This Agreement shall be binding upon the successors and assigns for the parties hereto. This agreement being for the personal services of the ENGINEER shall not be assigned or subcontracted in whole or in part by the ENGINEER as to the services to be performed hereunder without the written consent of the OWNER.

Section 13 - Execution of Agreement

This Agreement is executed in 6 originals. IN TESTIMONY WHEREOF, they have executed this Agreement, the day and year first above written.

WITNESSES:

Alenda Boudreaux

Alenda Boudreaux

BOARD OF COMMISSIONERS
ORLEANS LEVEE DISTRICT

EMILE W. SCHNEIDER
President

Burk & Associates, Inc.

By: William R. Burk, III

243-4000

# The Board of Commissioners

OF THE

# Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

PROTECTING YOU AND YOUR FAMILY

November 25, 1991

Mr. George C. Kleinpeter, Jr. P.E.
Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

RE: LONDON AVENUE CANAL
OLB PROJECT NO. 24902

Dear Mr. Kleinpeter:

Enclosed please find a copy of President Maloney's letter to Colonel Diffley concerning the U. S. Army Corps of Engineers ("Corps") assumption of the design and construction of parallel protection for the London and Orleans Avenue Outfall Canals.

The Corps has advised that they plan to meet with us in early December to discuss the schedule for the completion of the parallel protection work. I will advise you as soon as the Corps proposes a date for said meeting.

In the interim this letter will serve to advise you to:

1. Continue with the interim protection construction contracts that are presently underway.

EXHIBIT
B

FILE COPY

Board of Commissioners
Orleans Levee District

2. Discontinue any further studies, design and/or engineering activities with respect to the London Avenue Outfall Canals, except as related to the on going interim protection construction contracts.

Sincerely,

Harry D. Collins, P.E.
Chief Engineer

HDC:drb-R-38

Encl: a/s

xc: Robert S. Maloney
H.B. Lansden
Richard McGinity
Finance
Linda Leyer
Eugene Tickner
Dan Judlin
Design Engineering, Inc.
Eustis Engineers



DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO ATTENTION OF:

April 2, 1992

Project Management Office

Robert G. Harvey, President
The Board of Levee Commissioners
of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Dear Mr. Harvey:

This is in response to your March 16, 1992 letter, your reference "Parallel Protection and the Louisiana Lake Pontchartrain and Vicinity Hurricane and Flood Protection Plan (sic), the High Level Plan".

Your letter does not agree with my understanding of our February 19, 1992 meeting. I left the meeting with the understanding that we agreed to move toward completion of the parallel flood protection on the London Avenue and Orleans Avenue outfall canals as quickly as we can. This meant that your Architect - Engineer (A-E) would continue with designs on the Orleans outfall canal and we would continue our designs on contracts 1 and 2 on the London Avenue outfall canal. We will complete draft plans and specifications in August 1992 on contract 1 and in October 1992 on contract 2. This is in conflict with your enclosed memorandum proposing that your board furnish A-E designs for these contracts.

As far as contracts 3 and 4 on London Avenue Canal are concerned, we will consider using A-E's as I said in our meeting. We want the city protected as quickly as we can. If A-E's will allow us to step up the schedule, that's the way to go. I understood that we were going to see how we both progressed on the first contracts and let that guide us on the best way to continue on to our goal.

I am also concerned that your plan may duplicate effort, mainly in the area of design of contracts 1 and 2 on London Avenue Canal and on construction management. If we are to build the flood protection, we will provide full construction management. Any other construction management does not seem

EXHIBIT
C

necessary, therefore its cost is not a proper project cost and thereby not creditable to the non-Federal share.   This also applies to any duplication of design effort.

If you feel design and construction management is best done by your board then the construction might be more efficiently done by your board.   I know we have agreed to construct your A-E's design on reaches I and II of Orleans Avenue Canal as the designs are nearly complete and that is the best way to achieve our goal.   I don't know that such an arrangement beyond that is in the best interest of the project.   If your concern is work by A-E's versus work done by our staff in-house, I can only repeat what I said at our last meeting--we have plenty to do without the work on London Avenue and Orleans Avenue Canals and we can contract the designs to A-E contractors using our selection procedures and have them work directly with us as we are doing the construction and construction management.

Through the Levee Board Secretary, we have scheduled a meeting for 1:30 p.m. on April 14, 1992, here in my office to discuss these matters.

Sincerely,

Michael Diffley
Colonel, U.S. Army
District Engineer

Copy Furnished:

Mr. James P. Huey, Chairman
  Engineering Committee
The Board of Levee Commissioners
  of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. Alan Francingues, Interim Chief Engineer
The Board of Levee Commissioners
  of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. H. Baylor Lansdon, Managing Director
The Board of Levee Commissioners
   of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. Richard McGinity, General Counsel
The Board of Levee Commissioners
   of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

243-4000

# The Board of Commissioners

OF THE

# Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

PROTECTING YOU
AND YOUR FAMILY

October 22, 1992

Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

RE: Consultant Selection
London Avenue Canal

Gentlemen:

The Board of Commissioners, Orleans Levee District (OLD), has accepted a recommendation that you proceed with the necessary engineering services for the levees and floodwalls - Mirabeau Avenue to Leon C. Simon Boulevard and East Bank, and Mirabeau Avenue to Robert E. Lee Boulevard, West Bank levees and floodwalls. As discussed, a supplemental agreement to your contract will be negotiated.

The work which you have been selected to accomplish is part of the overall high level parallel protection project for the London Avenue Canal. In addition to yourself, there will be six other engineering firms working on this project.

The work that you will do requires compliance with U. S. Army Corps of Engineers (USACE) standards for design, plans and specifications, and cost estimates including your fees. At this point in time, construction management will be by the USACE. Overall coordination in the scheduling of work and interfacing with other work will be by Design Engineering, Inc. (DEI), OLD coordinating consultant.

EXHIBIT
tabbies
D

Board of Commissioners
Orleans Levee District

By copy of this letter, DEI is requested to coordinate a meeting between our consultants and the USACE so that all will understand the standards to which they will be working to meet.

Sincerely,

[signature]
F. P. Mineo
Acting Chief Engineer

FPM:pns

xc: James P. Huey
H. B. Lansden
Walter Baudier, DEI
W. T. Tickner, USACE

243-4000

The Board of Commissioners

OF THE

Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

PROTECTING YOU
AND YOUR FAMILY

January 4, 1993

DRIL JIM
CL BILL - MIKE - BILL -
GLK

Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

RE: OLB Project No. 24902
London Avenue Canal

Gentlemen:

For your files we are enclosing a fully signed and executed copy of your Supplemental Agreement for the London Avenue Canal Contract No. 3, East Bank Levees and Floodwalls - Mirabeau to Leon C. Simon; West Bank Levees and Floodwalls - Mirabeau to Robert E. Lee.

Payment will be made on a monthly basis, proportionate to the amount of work performed. All invoices and other correspondence must contain the above-referenced OLB Project Number.

You are authorized to proceed in the preliminary phase of this work and the fee for this phase is not to exceed $387,221.00.

Sincerely,

[signature]

F. P. Mineo
For Acting Chief Engineer

FPM:GG:pns
Enclosure

xc: H. B. Lansden
Finance Department (w/original)
Gerry Gillen (w/file copy)

EXHIBIT
E

*Board of Commissioners*
*of the*
*Orleans Levee District*

Scope of Services for
*London Ave Canal Floodwalls Contract No. 3*

---

*General:* This Scope of Services describes the tasks which shall be completed by Burk-Kleinpeter, Inc. (BKI) for the *Board of Commissioners of the Orleans Levee District* in connection with design services for the improvements to *London Ave Canal Floodwalls Contract No. 3.* These tasks shall include those services required to produce preliminary and final construction plans and specifications for the construction of those improvements. The remainder of the proposed levees and floodwalls along the London Avenue Canal are excluded from this scope of services as the Orleans Levee District has selected other consultants to perform the design services for that work.

General : BKI will develop preliminary and final plans and specifications for the construction of floodwalls from Mirabeau Ave to Robert E. Lee Blvd. on the west side and from Mirabeau Ave. to Leon C. Simon Blvd. on the east side.

A. General design criteria is stipulated in **Design Memorandum No. 19A** on London Avenue Outfall Canal, developed by the U.S. Army Corps of Engineers dated January 1989. This memorandum delineates the section between Mirabeau Ave and Robert E. Lee Blvd. on the west side will consist of an I-wall with a gross design grade of 14.4 MSL and 13.9 MSL net grade. The section between Mirabeau Ave and Robert E. Lee Blvd. on the east side will consist of an inverted T-wall with a net design grade of 13.9 MSL. The section between Robert E. Lee Blvd. and Leon C. Simon Blvd. on the east side will consist of an I-wall with a gross design grade of 14.1 MSL and 13.6 MSL net grade. Construction cofferdam for the T-Wall section will be based on a lake level of 4.0 MSL with full nominal pumping capacity from both S&WB drainage pump stations into the London Ave. Canal. Exceptions will be made at all bridge crossings with a transition floodwall to tie into flood protection at the new bridge structures designed by others.

B. Final topographic survey information necessary to detail plans for the project will be performed as supplemental services.

C. Right - Of - Way surveys and mapping necessary for any real estate acquisition will be performed under supplemental services.

D. Preliminary and final design and detailing of all plans and specifications for the project will conform to the following submittal schedule. Four plan submittals will be performed {preliminary (35%), design progress (65%) draft final plans (95%), and final bid documents (100%)}. Preliminary and final construction cost estimates will be provided in addition to all design calculations for review by the OLB and USACE.

E. The OLB through the USACE will provide standard plans and symbols in AutoCad or Intergraph format.

F. BKI will provide to the OLB, one set of AutoCad (Release 11) diskettes and one set of Intergraph Micro Station PC (version 4.0) diskettes converted from AutoCad.

G. The OLB through the USACE will provide BKI with all geotechnical data/criteria as well as current topographic survey data.

H. The estimated construction cost for Contract 3 is $22,292,500. Based on this construction cost estimate the lump sum engineering fees for Preliminary Plans are $387,221.00 and Final Plans are $580,831.00 as per Section 8.2 of the Engineering Agreement between the Orleans Levee Board and Burk-Kleinpeter, Inc. dated December 26, 1984.

I. The attached progress schedule details the completion of the tasks associated with this contract. Final completion of plans and specifications is scheduled to be complete within 13 months from notice to proceed, including 4 months for review.

RECOMMENDED BY:

Frank Mineo
Acting Chief Engineer
Orleans Levee Board

Date: Jan. 4, 1992

ACCEPTED BY:

Robert G. Harvey
President
Orleans Levee Board

Date: January 4, 1993

# London Ave Canal Levees and Floodwalls Contract 3

| Activity Name | Start Date | Finish Date | 1992 Dec | 1993 Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 1994 Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Notice to Proceed Contract 3 | 12/14/199 | | | | | | | | | | | | | | | |
| Preparation of Preliminary P & S | 12/14/199 | 4/14/1993 | | | | | | | | | | | | | | |
| Submit 35% Review P & S | 4/15/1993 | | | | | | | | | | | | | | | |
| Local Review of 35% Progress Prints | 4/15/1993 | 5/15/1993 | | | | | | | | | | | | | | |
| Preparation of Final P & S | 5/15/1993 | 10/15/199 | | | | | | | | | | | | | | |
| Submit 65% Progress Prints | 7/31/1993 | | | | | | | | | | | | | | | |
| Submit 95% Review P & S | 10/15/199 | | | | | | | | | | | | | | | |
| Local Review of 95% P & S | 10/15/199 | 12/14/199 | | | | | | | | | | | | | | |
| Revisions to Final Plans & Specs | 12/15/199 | 12/30/199 | | | | | | | | | | | | | | |
| Final OLB & USACE Review of P & S | 1/1/1994 | 1/14/1994 | | | | | | | | | | | | | | |
| Submit Final P & S | 1/15/1994 | | | | | | | | | | | | | | | |

Prepared By: Burk-Kleinpeter, Inc. OLB Project No. 24968, BKI No. 8407

December 3, 1992

Bill Gardiner 243-4000

Rec'd 9/8/93 deLaine

E Biff J.J. Lost Fil

# The Board of Commissioners

OF THE

# Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

PROTECTING YOU AND YOUR FAMILY

September 8, 1993

8407

Colonel Michael Diffley
District Engineer
U. S. Army Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160-0267

RE: London Avenue Canal
Contract 3
Construction Administration
and Resident Inspection
Services

Dear Colonel Diffley:

Our consultant on the London Avenue Canal Contract 3, Burk-Kleinpeter, Inc., has requested that their firm be allowed to continue from completion of the plans through construction administration and resident inspection. After discussing this with them, I feel that there are compelling reasons for the Corp of Engineers to allow the Orleans Levee Board to have them proceed with this work at the appropriate time. I would like very much to meet with you to discuss these reasons; however, for clarification, I would like to enumerate them, as follows:

* The Orleans Levee Board's present and active contract with its consultant includes responsibility for the referenced services.

* As you know, Burk- Kleinpeter, Inc.'s performance during the design of Contract 3 has been very professional. All work items have been delivered on or before the scheduled dates.

* The consultant has successfully performed construction administration and resident inspection services for many major flood protection projects. In fact, until recently, Burk-Kleinpeter, Inc. was under contract to the New Orleans District Corp of Engineers to provide similar inspection services for major flood protection projects in your district; therefore, their qualifications are beyond question.

EXHIBIT
F
tabbles

* The Orleans Levee Board has recently awarded construction management assignments to other design firms on the London Avenue Canal project; therefore, how can we justify to this consultant that he cannot continue with this project to completion.

* I think that you will agree that it would be best, from a technical standpoint, to have the consultant continue from this point to construction administration and resident inspection of the work his staff designed.

I feel very strongly that this consultant, which has proven itself over the last eight months or so, should be allowed to continue its work through completion of construction.

I personally would find it very difficult to justify the termination of this firm's services when construction administration and resident inspection are yet to be done. They should be allowed to bring this project to completion.

For these reasons, I am requesting a meeting with you so that we can sit down face to face and resolve this very important issue.

Sincerely,

Robert G. Harvey, Sr.
The Board of Commissioners of the
Orleans Levee Board

cc: Stevan G. Spencer, P.E.
Mr. H. Baylor Landsen

OCT-26-1993 14:40 FROM O L B ENGINEERING TO 4881714 P.02

DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO ATTENTION OF:

October 25, 1993

RECEIVED OCT 26 1993

Programs and
Project Management Division

Robert G. Harvey, President
Board of Levee Commissioners
Orleans Levee District
Suite 202, Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Dear Mr. Harvey:

This is in reply to your September 8, 1993 letter requesting a meeting with Colonel Diffley to discuss allowing Burk-Kleinpeter, Inc. to do the construction management for London Outfall Contract 3. This contract is a part of the Lake Pontchartrain, Louisiana and Vicinity hurricane protection project.

Colonel Diffley is out of town. He will return November 1st. He asked that I reply in his absence. Colonel Diffley will be glad to meet with you after he returns. Please have your secretary get with his secretary, Rea Dutton, at 862-2077 to arrange a good time for your meeting.

I appreciate you giving us your reasons for requesting Burk-Kleinpeter, Inc. to continue after the design phase into construction management. Let us share with you our feelings on this matter.

We do not disagree with Burk-Kleinpeter, Inc.'s ability to do the inspection services; however, we currently have an A-E firm under contract to give us these services, if we need them, and believe that, if we do need such support, it is better to get it from a firm under contract directly with us.

Burk-Kleinpeter is coordinating their design work with our designers. We feel confident there is a good connection between the design and construction management. It would be prudent, however, to have Burk-Kleinpeter remain under contract during the construction period to provide design advice.

Sincerely,

James V. Hall
Lieutenant Colonel, U. S. Army
Deputy District Engineer

EXHIBIT
G

Copies Furnished:

Chairman, Engineering Committee
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Stevan G. Spencer
Chief Engineer
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Managing Director
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

ABSTRACT OF BIDS - CONSTRUCTION | LINED-C | PAGE 4 OF 4

LAKE PONTCHARTRAIN, LA & VIC., HPC LISBON AVE. OUTFALL CANAL, PARALLEL PROTECTION, ALABASTER AVE TO LEON C. SIMON & ROBERT E. LEE BLVD.

SOLICITATION NO: 94-B-0047

DATE OPENED: JUNE 13, 1994

| ITEM NO. | DESCRIPTION OF BID ITEM | ESTIMATED QUANTITY | UNIT | UNIT PRICE | ESTIMATED AMOUNT | BID NO: 6 UNIT PRICE | BID NO: 6 ESTIMATED AMOUNT | BID NO: 7 UNIT PRICE | BID NO: 7 ESTIMATED AMOUNT | BID NO: 8 UNIT PRICE | BID NO: 8 ESTIMATED AMOUNT | BID NO: 9 UNIT PRICE | BID NO: 9 ESTIMATED AMOUNT | BID NO: 10 UNIT PRICE | BID NO: 10 ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPIRMAN CONST. METAIRIE, LA. | | IRON BROS NEW ORLEANS, LA. | | T L JAMES NEW ORLEANS, LA. | | K. & R CONTRACTING HATTIESBURG, MS. | | | |
| 19 | EROSION CONTROL | | | | | | | | | | | | | | |
| 19a | FIRST 10,670 | 10,670 | LF | $3.000 | 32,014.00 | $4.700 | 50,149.00 | $4.000 | 42,680.00 | $3.000 | 32,010.00 | $3.250 | 34,677.50 | | |
| 19b | ALL OVER 10,670 | 2,700 | LF | $3.000 | 8,100.00 | $4.700 | 12,690.00 | $4.000 | 10,800.00 | $3.000 | 8,100.00 | $3.250 | 8,775.00 | | |
| 20 | TEMPORARY FLOOD PROTECTION AND COFFERDAMS | 1 | LUMP SUM JOB | $85,330.000 | 85,330.00 | $395,375.000 | 395,375.00 | $5,000.000 | 5,000.00 | $330,000.000 | 336,400.00 | $47,000.000 | 47,000.00 | | |
| 21 | MISCELLANEOUS METALS | 1 | LUMP SUM JOB | $16,490.000 | 16,490.00 | $27,858.000 | 27,858.00 | $10,000.000 | 10,000.00 | $10,000.000 | 10,000.00 | $10,000.000 | 10,000.00 | | |
| | | | | TOTAL | 5,191,581.53 | | 6,665,364.00 | | 4,577,415.60 | | 5,780,000.00 | | 5,181,417.50 | | |
| | | | | EST BALANCE | 16,185,476.88 | | | 16.8%:2ND LOW | -11.8% | | 4.8%:3RD LOW | | -.2% | | |

ESTIMATOR: DARRELL NORMAND

TYPE: FLOODWALL

EXHIBIT

H

tabbies

| ABSTRACT OF BIDS - CONSTRUCTION | LMVED-C \| PAGE 3 OF 4 | | | | BID NO: 6 | | BID NO: 7 | | BID NO: 8 | | BID NO: 9 | | BID NO: 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOR: LAKE PONTCHARTRAIN, LA & VIC., HPL, LONDON AVE. OUTFALL CANAL, PARALLEL PROTECTION, MIRABEAU AVE TO LEON C. SIMON & ROBERT E. LEE BLVD. | INVITATION NO: 94-B-0047 | | | | PITTMAN CONST, METAIRIE, LA. | | BOH BROS, NEW ORLEANS, LA. | | T L JAMES, NEW ORLEANS, LA. | | L & A CONTRACTING, HATTIESBURG, MS. | | | |
| | DATE OPENED: JUNE 15, 1994 | | | | | | | | | | | | | |
| ITEM NO. DESCRIPTION OF BID ITEM | ESTIMATED QUANTITY | UNIT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT |
| 1 MOBILIZATION AND DEMOBILIZATION | 1 LUMP SUM | LS | $166,500.00 | 166,500.00 | $204,504.00 | 204,504.00 | $300,000.00 | 300,000.00 | $200,000.00 | 200,000.00 | $220,000.00 | 220,000.00 | | |
| 2 CLEARING AND GRUBBING | 1 LUMP SUM | LS | $75,360.00 | 75,360.00 | $466,080.00 | 466,080.00 | $100,000.00 | 100,000.00 | $100,000.00 | 100,000.00 | $105,000.00 | 105,000.00 | | |
| 3 SELECTIVE DEMOLITION | 1 LUMP SUM | LS | $122,460.00 | 122,460.00 | $268,473.00 | 268,473.00 | $200,000.00 | 200,000.00 | $200,000.00 | 200,000.00 | $400,000.00 | 400,000.00 | | |
| 4 [illegible] BRIDGE DEMOLITION | 1 LUMP SUM | LS | $8,830.00 | 8,830.00 | $17,928.00 | 17,928.00 | $20,000.00 | 20,000.00 | $30,000.00 | 30,000.00 | $7,500.00 | 7,500.00 | | |
| 5 EMBANKMENT, SEMICOMPACTED FILL | 1 LUMP SUM | LS | $17,660.00 | 17,660.00 | $37,990.00 | 37,990.00 | $20,000.00 | 20,000.00 | $80,000.00 | 80,000.00 | $7,734.00 | 7,734.00 | | |
| 6 STRUCTURAL EXCAVATION & BACKFILL | 1 LUMP SUM | LS | $107,271.00 | 107,271.00 | $108,328.00 | 108,328.00 | $300,000.00 | 300,000.00 | $50,000.00 | 50,000.00 | $130,000.00 | 130,000.00 | | |
| 7 FERTILIZING, SEEDING & MULCHING | [illegible] | ACRE | $2,120.00 | 14,960.00 | $1,060.00 | 2,690.60 | $800.00 | 4,?00.00 | $825.00 | 4,600.00 | $1,200.00 | 7,400.00 | | |
| 8 CUTTING OFF EXISTING AZ-18, AZ-18 AND PZ-27 SHEET PILING | 1 LUMP SUM | LS | $18,840.00 | 18,840.00 | $129,633.00 | 129,633.00 | $5,000.00 | 5,000.00 | $40,000.00 | 40,000.00 | $10,000.00 | 10,000.00 | | |
| 9 PULL, CLEAN, SALVAGE, AND DELIVER EXISTING AZ-18 STEEL SHEET PILING | 1 LUMP SUM | LS | $12,360.00 | 12,360.00 | $45,475.00 | 45,475.00 | $5,000.00 | 5,000.00 | $10,000.00 | 10,000.00 | $20,000.00 | 20,000.00 | | |
| 10 REMOVE EXISTING AZ-18 STEEL SHEET PILING | 1 LUMP SUM | LS | $940.00 | 940.00 | $4,956.00 | 4,956.00 | $8,000.00 | 8,000.00 | $5,000.00 | 5,000.00 | $1,500.00 | 1,500.00 | | |
| 11 PILING, STEEL SHEET, TYPE PZ-27 | 187,844 | SF | $9.00 | 1,690,596.00 | $7.750 | 1,455,791.00 | $8.400 | 1,577,889.60 | $11.000 | 2,066,284.00 | $8.000 | 1,501,752.00 | | |
| 12 PILING, STEEL SHEET, TYPE PSA-23 | 997 | SF | $11.10 | 11,066.70 | $13.000 | 12,961.00 | $18.000 | 17,946.00 | $40.000 | 39,880.00 | $12.000 | 11,964.00 | | |
| 13 DEWATERING | 1 LUMP SUM | LS | $200.00 | 200.00 | $10,250.00 | 10,250.00 | $3,000.00 | 3,000.00 | $1,000.00 | 3,000.00 | $4,000.00 | 4,000.00 | | |
| 14 REINFORCED CONCRETE FLOODWALL | 1 LUMP SUM | LS | $2,303,190.00 | 2,303,190.00 | $2,044,599.00 | 2,044,599.00 | $1,636,000.00 | 1,636,000.00 | $1,988,686.00 | 1,988,686.00 | $3,070,000.00 | 3,070,000.00 | | |
| 15 CONCRETE SLOPE PAVEMENT | 188 | SY | $35.10 | 6,598.80 | $42.250 | 7,943.00 | $25.000 | 4,700.00 | $40.000 | 7,520.00 | $44.750 | 8,413.00 | | |
| 16 UTILITY MODIFICATIONS | 1 LUMP SUM | LS | $10,360.00 | 10,360.00 | $106,587.00 | 106,587.00 | $1,400.00 | 1,400.00 | $50,000.00 | 50,000.00 | $60,000.00 | 60,000.00 | | |
| 17 TEMPORARY RELOCATION OF FEEDER LINE | 1 LUMP SUM | LS | $141,320.00 | 141,320.00 | $337,233.00 | 337,233.00 | $100,000.00 | 100,000.00 | $225,000.00 | 225,000.00 | $105,000.00 | 105,000.00 | | |
| 18 PERMANENT RELOCATION OF FEEDER LINE | 1 LUMP SUM | LS | $339,120.00 | 339,120.00 | $224,962.00 | 224,962.00 | $200,000.00 | 200,000.00 | $200,000.00 | 200,000.00 | $406,000.00 | 406,000.00 | | |
| | | | SUBTOTAL | $5,069,131.50 | | 5,579,172.00 | | 4,508,925.60 | | 5,279,890.00 | | 5,080,965.00 | | |

ESTIMATOR: DARRELL NORMAN

TYPE: FLOODWALL

| ABSTRACT OF BIDS - CONSTRUCTION | LINED C | PAGE 2 OF 4 | | | BID NO: 1 | | BID NO: 2 | | BID NO: 3 | | BID NO: 4 | | BID NO: 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAKE PONTCHARTRAIN, LA & VIC., ORLEAN AVE. OUTFALL CANAL, PARALLEL PROTECTION, ORLEANS AVE TO LEON C. [illegible] & ROBERT E. LEE BLVD. | INVITATION NO: 94-B-0047 | | DATE OPENED: JUNE 13, 1994 | | E & K CONST., MANDEVILLE, LA | | HARDAWAY, COLUMBUS, GA. | | CONTINENTAL, MEMPHIS, TN. | | LUHRSEN BROS., LAKEWEN, LA. | | RIVER ROAD CONST., MANDEVILLE, LA. | |
| ITEM NO. / DESCRIPTION OF BID ITEM | ESTIMATED QUANTITY | UNIT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT |
| 19 [illegible] CONTROL | | | | | | | | | | | | | | |
| (A) FIRST 10,470 | 10,670 | LF | 3.000 | 37,010.00 | 2.000 | 21,340.00 | 2.000 | 21,340.00 | 4.000 | 42,680.00 | 4.000 | 42,680.00 | 2.000 | 21,340.00 |
| (B) OVER 10,470 | 2,700 | LF | 3.000 | 8,100.00 | 2.000 | 5,400.00 | 2.000 | 5,400.00 | 3.500 | 9,450.00 | 2.000 | 5,400.00 | 2.000 | 5,100.00 |
| 20 TEMPORARY FLOOD PROTECTION AND COFFERDAMS | 1 | LUMP SUM LS | 45,356.000 | 45,356.00 | 5,000.000 | 5,000.00 | 60,000.000 | 60,000.00 | 44,700.000 | 44,700.00 | 30,000.000 | 30,000.00 | 25,000.000 | 25,000.00 |
| 21 MISCELLANEOUS METALS | 1 | LUMP SUM LS | 16,496.000 | 16,496.00 | 21,500.000 | 21,500.00 | 20,000.000 | 20,000.00 | 20,000.000 | 20,000.00 | 25,000.000 | 25,000.00 | 10,000.000 | 10,000.00 |
| ENGINEER: DARRELL NORMAND | | | TOTAL | 5,191,561.50 | | 4,554,500.00 | | 5,914,160.00 | | 5,376,179.00 | | 5,431,152.00 | | 5,196,076 |
| TYPE: FLOODWALL | | | IGE MAXIMUM | 16,489,476.00 LOW BIDDER | | -12.31 | | 14.01 | | 3.51 | | 4.61 | | .11 |

BKI-03626

| ABSTRACT OF BIDS - CONSTRUCTION | LMVED-C | PAGE 1 OF 4 | | BID NO: 1 | | BID NO: 2 | | BID NO: 3 | | BID NO: 4 | | BID NO: 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOR: LAKE PONTCHARTRAIN, LA & VIC., SPL LONDON AVE. OUTFALL CANAL, PARALLEL PROTECTION, MIRABEAU AVE TO LEON C. SIMON & ROBERT E. LEE BLVD. | INVITATION NO: 94-B-0047 DATE OPENED: JUNE 13, 1994 | | | E & K CONST., MANDEVILLE, LA | | HARDAWAY, COLUMBUS, GA. | | CONTINENTAL, MEMPHIS, TN. | | JOHNSON BROS., KENNER, LA. | | RIVER ROAD CONST., MANDEVILLE, LA. | |
| ITEM NO. / DESCRIPTION OF BID ITEM | ESTIMATED QUANTITY / UNIT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT |
| 1 MOBILIZATION AND DEMOBILIZATION | 1 LUMP SUM | $146,500.000 | 146,550.00 | $200,000.000 | 200,000.00 | $100,000.000 | 100,000.00 | $120,000.000 | 120,900.00 | $100,000.000 | 100,400.00 | $100,000.000 | 100,000.00 |
| 2 CLEARING AND GRUBBING | 1 LUMP SUM | $75,360.000 | 75,360.00 | $175,000.000 | 175,000.00 | $256,000.000 | 256,000.00 | $19,000.000 | 19,400.00 | $36,000.000 | 34,000.00 | $200,000.000 | 200,000.00 |
| 3 SELECTIVE DEMOLITION | 1 LUMP SUM | $122,440.000 | 122,440.00 | $260,000.000 | 260,000.00 | $200,000.000 | 200,000.00 | $342,000.000 | 342,000.00 | $200,000.000 | 200,000.00 | $200,000.000 | 200,000.00 |
| 4 PEDESTRIAN BRIDGE DEMOLITION | 1 LUMP SUM | $8,030.000 | 8,030.00 | $15,000.000 | 15,000.00 | $10,000.000 | 10,000.00 | $18,000.000 | 16,000.00 | $13,000.000 | 15,000.00 | $20,000.000 | 20,000.00 |
| 5 EMBANKMENT, SEMICOMPACTED FILL | 1 LUMP SUM | $17,440.000 | 17,464.00 | $11,200.000 | 11,200.00 | $30,000.000 | 30,000.00 | $17,000.000 | 17,000.00 | $10,000.000 | 16,000.00 | $100,000.000 | 100,000.00 |
| 6 STRUCTURAL EXCAVATION & BACKFILL | 1 LUMP SUM | $107,771.000 | 107,774.00 | $59,000.000 | 59,000.00 | $40,000.000 | 40,000.00 | $126,000.000 | 126,000.00 | $300,000.000 | 300,000.00 | $50,000.000 | 56,000.00 |
| 7 FERTILIZING, SEEDING & MULCHING | 8 ACRE | $2,170.000 | 16,916.00 | $1,250.000 | 10,000.00 | $3,500.000 | 28,000.00 | $1,650.000 | 13,200.00 | $1,100.000 | 8,800.00 | $1,000.000 | 8,000.00 |
| 8 CUTTING OFF EXISTING AZ-18, MZ-38 AND PZ-27 SHEET PILING | 1 LUMP SUM | $18,840.000 | 18,846.00 | $33,600.000 | 33,600.00 | $30,000.000 | 30,000.00 | $15,000.000 | 15,000.00 | $20,000.000 | 20,000.00 | $25,000.000 | 25,000.00 |
| 9 PULL, CLEAN, SALVAGE, AND DELIVER, EXISTING AZ-18 STEEL SHEET PILING | 1 LUMP SUM | $12,140.000 | 12,344.00 | $20,500.000 | 20,500.00 | $25,000.000 | 25,000.00 | $20,000.000 | 20,900.00 | $20,000.000 | 20,000.00 | $200,000.000 | 200,000.00 |
| 10 REDRIVING EXISTING AZ-18 STEEL SHEET PILING | 1 LUMP SUM | $940.000 | 944.00 | $5,000.000 | 5,000.00 | $3,000.000 | 3,000.00 | $2,300.000 | 2,300.00 | $5,000.000 | 5,000.00 | $1,000.000 | 1,000.00 |
| 11 PILING, STEEL SHEET, TYPE PZ-27 | 187,844 SF | $9.000 | 1,690,596.00 | $6.500 | 1,356,674.00 | $10.000 | 1,878,440.00 | $9.750 | 1,831,479.00 | $8.000 | 1,502,752.00 | $9.000 | 1,690,596.00 |
| 12 PILING, STEEL SHEET, TYPE PSA-23 | 997 SF | $11.100 | 11,066.70 | $18.000 | 17,946.00 | $40.000 | 39,880.00 | $36.000 | 35,892.00 | $20.000 | 19,940.00 | $20.000 | 19,940.00 |
| 13 PAINTING | 1 LUMP SUM | $200.000 | 200.00 | $7,000.000 | 7,000.00 | $5,000.000 | 5,000.00 | $5,000.000 | 5,000.00 | $10,000.000 | 10,000.00 | $1,000.000 | 1,000.00 |
| 14 REINFORCED CONCRETE FLOODWALL | 1 LUMP SUM | $2,301,190.000 | 2,301,190.00 | $1,487,320.000 | 1,487,320.00 | $2,500,000.000 | 2,500,000.00 | $2,145,000.000 | 2,145,000.00 | $2,500,000.000 | 2,500,000.00 | $2,000,000.000 | 2,000,000.00 |
| 15 CONCRETE SLOPE PAVEMENT | 188 SY | $35.100 | 6,596.80 | $40.000 | 7,520.00 | $75.000 | 14,100.00 | $106.000 | 19,928.00 | $35.000 | 6,580.00 | $100.000 | 18,800.00 |
| 16 UTILITY MODIFICATIONS | 1 LUMP SUM | $10,340.000 | 10,340.00 | $117,000.000 | 117,000.00 | $75,000.000 | 75,000.00 | $13,500.000 | 13,500.00 | $100,000.000 | 100,000.00 | $50,000.000 | 50,000.00 |
| 17 TEMPORARY RELOCATION OF FEEDER LINE | 1 LUMP SUM | $161,320.000 | 161,320.00 | $38,500.000 | 38,500.00 | $175,000.000 | 175,000.00 | $105,000.000 | 105,000.00 | $100,000.000 | 100,000.00 | $300,000.000 | 300,000.00 |
| 18 PERMANENT RELOCATION OF FEEDER LINE | 1 LUMP SUM | $335,120.000 | 335,120.00 | $426,000.000 | 426,000.00 | $430,000.000 | 430,000.00 | $405,000.000 | 405,000.00 | $380,000.000 | 380,000.00 | $150,000.000 | 150,000.00 |
| ESTIMATOR: DARRELL BURNHAM CODE: FLOODWALL | | SUBTOTAL | $5,069,631.50 | | 4,501,260.00 | | 5,833,420.00 | | 5,257,799.00 | | 5,338,072.00 | | 5,134,336.00 |



# The Board of Commissioners

# Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

TEL 504-243-4000

PROTECTING YOU AND YOUR FAMILY

August 15, 1994

Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

RE: OLB Project No. 24902
London Avenue Canal
Contract 3
Mirabeau to Robert E. Lee

Gentlemen:

Enclosed for your files is a fully signed copy of Supplemental Agreement No. 15 for additional drawings, geotechnical investigations, vibration monitoring and pre-construction surveys for the subject project.

This letter shall also serve as your authorization to proceed with the additional drawings, geotechnical investigations, vibration monitoring and pre-construction survey. Your fee for this work shall not exceed $64,481.59.

Payment will be made monthly in accordance with the terms and conditions of your Engineering Agreement for Professional Services dated March 21, 1984. Please reference the above OLB project number on all invoices and correspondence.

Sincerely,

Stevan G. Spencer, P. E.
Chief Engineer

SGS:GG:pns

xc: Finance (w/original)
Gerry Gillen (w/copy)

EXHIBIT
I

SUPPLEMENTAL AGREEMENT NO. 15
TO
OLB PROJECT NO. 24902
LONDON AVENUE CANAL FLOODWALLS AND LEVEES

THIS SUPPLEMENTAL AGREEMENT, made and entered into this 15th day of August, 1994, by and between the BOARD OF COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT, hereinafter styled the "BOARD", acting through its duly instituted President, Robert G. Harvey; and Burk-Kleinpeter, Inc., Consulting Engineers, hereinafter referred to as the "ENGINEERS":

WHEREAS, the Board and the Engineers entered into an Agreement on the 21st day of March, 84, to provide Engineering Services for the design of London Avenue Floodwalls and Levees, and

WHEREAS, the Engineers, acting in good faith with the provisions of their contract, have completed 100% plans and publications for Contract No. 3 from Mirabeau Avenue to Robert E. Lee Boulevard, and

WHEREAS, in accordance with the provisions of their Contract under Section 4, Supplementary Services the Engineers are entitled to be compensated for additional services in connection with the project including preparation of additional drawings and geotechnical engineering analysis, vibration monitoring and resident pre-construction surveys, and

WHEREAS, pursuant to provisions of Resolution No. 11-032184, dated March 21, 1984, the Chief Engineer has accepted the Lump Sum Fee of $6,023.11 for additional drawings and geotechnical analysis and $56,185.00 for vibration monitoring and resident surveys as stated in a proposal letter to the Chief Engineer's office dated March 31, 1994 and June 20, 1994, attached hereto and made part hereof as Exhibit "R".

NOW, THEREFORE, it is hereby agreed between the parties hereto that the original contract dated March 21, 1984 be hereby modified and amended as follows:

SCOPE OF WORK

To perform all work to complete additional drawings and geotechnical engineering analysis, as outlined in letter dated March 31, 1994, and to provide vibration monitoring and pre-construction resident surveys for Contract No. 3, as outlined in letter dated June 20, 1994, attached hereto as Exhibit "R" and made part hereof.

COMPENSATION

For all work as described in the above-referenced Exhibit "R", which project budget was previously approved by the Orleans Levee Board, the Engineers agree to perform these services for the lump sum fee of $64,481.59 itemized as follows:

| | |
|---|---|
| Additional Drawings and Geotechnical Investigations | $ 8,296.59 |
| Vibration Monitoring and Pre-Construction Resident Surveys | $56,185.00 |
| Total: | $64,481.59 |

All requirements of the aforesaid contract dated March 21, 1984 shall remain in full force and effect.

IN WITNESS WHEREOF, the President of the Board of Commissioners of the Orleans Levee District, has subscribed his name and the Engineer has also subscribed his name as of the day and year first above written.

WITNESSES:

THE BOARD OF COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT

BY: ______________________
President

BURK-KLEINPETER, INC.

BY: ______________________

1. Expansion of S&WB Drainage Pump Station No. 6 located at south end of 17th Street Canal in1985. Added 2 new horizontal pumps to west end of pump station, modified floodwalls at tie-in to pump station, constructed new frontal protection floodwall at four vertical pumps, added new swing gates to floodwall at NSRR east and west of canal at discharge side of DPS No. 6.

2. Construction of new Canal Street Canal Pump Station discharge piping across 17th Street Canal floodwall including new stilling basin in canal in 1992 in the Canal Street right-of-way on the west side of the 17th Street Canal.

3. Construction of new T-Wall Floodwall, discharge piping and stilling basin for the NSRR/I-10 Drainage Pump Station in 2004 on east side of 17th Street Canal in the south right-of-way of I-10.

4. Construction of a new sheet pile bulkhead to protect the Bruning House from wave damage on the west side of the 17th Street Canal, which is the other side of the canal from the breach, at the north end of the canal in 2000.

LAKE PONTCHARTRAIN

BREACH IN F/W DURING KATRINA EAST SIDE OF CANAL

17TH ST CANAL

ORLEANS AVE CANAL

CITY PARK

LONDON AVE CANAL

I-610

I-10

METAIRIE RD

DPS NO. 6

EXHIBIT

J

BURK-KLEINPETER, INC.

ENGINEERS, ARCHITECTS, PLANNERS, ENVIRONMENTAL SCIENTISTS

4176 CANAL STREET, NEW ORLEANS, LA 70119

(504) 486-5901 - FAX (504) 488-1714