

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 21   PM 4:39

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| COLLEEN BERTHELOT, ET AL., | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 05-4182 |
| | * | |
| BOH BROTHERS CONSTRUCTION CO., LLC, | * | SECTION "K" (2) |
| ET AL, | * | CONS. KATRINA CANAL |
| *    *    *    *    *    *    *    * | | |

THIS DOCUMENT RELATES TO:  ALL ACTIONS

### DEFENDANT UNITED STATES' MOTION TO VACATE
### THE MAY 2, 2006, EVIDENTIARY HEARING

Pursuant to Rule 7(b), Fed. R. Civ. P., the United States moves for an order vacating the evidentiary hearing scheduled for May 2, 2006.

In support of this motion, the Court is respectfully referred to the attached Declaration and documents attached thereto to the United States' Memorandum in Support, and to the entire record.

1

Fee_____
Process_____
X  Dktd_____
   CtRmDep_____
   Doc. No._____

CONCLUSION

For these reasons, the United States' motion to vacate should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director, Torts Branch
Civil Division

PAUL F. FIGLEY
Deputy Director, Torts Branch
Civil Division

ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

DATED: · 4-21-06

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing pleading has been served upon all counsel of record to

this proceeding, by fax, electronic mail, or U.S. Mail on this 21st day of April, 2006.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO.  05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *   *   *   *   *   *   *   * | * | MAG. J. WILKINSON |

### NOTICE OF HEARING

To:    All Counsel of Record

PLEASE TAKE NOTICE that the foregoing motion to vacate will be heard before the

Honorable Joseph C. Wilkinson, Jr., U.S. Magistrate Judge, on Monday, May *10*, 2006, at ~~10:30~~ *11:00*

a.m., at the United States Courthouse, 500 Camp Street, Room B421, New Orleans, Louisiana.

_____

UNITED STATES MAGISTRATE  JUDGE

1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO. 05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *   *   *   *   *   *   *   * | * | MAG. J. WILKINSON |

## DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION TO VACATE HEARING

The United States has moved the Court to vacate the evidentiary hearing that was scheduled for the purpose of receiving testimony concerning the preservation of evidence.  The hearing was prompted by concerns that evidence may be lost as levees and floodwalls are constructed at breach sites along the London Avenue and Seventeenth Street Canals.  The hearing should be vacated, for three reasons.

First, it should be vacated because the Corps of Engineers has adequate protocols for the retention of material collected by the Corps at these sites.  These protocols, which have been provided to the Court and to attorneys for the plaintiffs and other defendants, provide sufficient

1

detail to assure the Court that adequate measures are in place for preserving physical evidence of interest to the Corps. Only a few more recoveries are planned, and receiving testimony from witnesses would not materially add to the information provided in the protocols.

Second, the hearing should be vacated because the United States has implemented a protocol by which litigants are notified of construction activities and given access to construction sites upon request. Under this protocol, notice is provided to attorneys for all of the parties when operations of interest are expected to occur. Groups of representatives of the parties, not larger than a dozen (not counting a videographer), are admitted to the site to view and photographically record activities. The access afforded by this protocol effectively balances the interests of the litigants against the interests of the public safety, which would be jeopardized by access that impeded the construction of the levees and floodwalls. If this protocol does not strike the proper balance, it can be modified without obtaining testimony from witnesses whose special knowledge pertains to the steps that have been and will be taken by the Corps to obtain and preserve materials *of interest to the Corps*. Whether litigants can justify greater access to construction sites is a heavy burden that they must carry; it is not a burden to be carried by the Corps or by testimony from Corps employees whose knowledge is limited to the interests and activities of the Corps. If the plaintiffs' (or for that matter, other defendants') concern is that items of interest to them are being destroyed, that is an entirely different matter than a concern for what the Corps does with materials that the Corps recovers for purposes of its investigation.

Distinguishing between what the Corps does with material it recovers, on the one hand, and whether there is sufficient value in what the Corps chooses not to collect to warrant an order that would halt construction of levees to permit the collection of additional materials, on the

other hand, is central to this motion to vacate.  What the Corps does with materials it recovers is

adequately addressed by the United States' written submission.  And whether the interests of the

parties to this litigation require the recovery of additional materials is a matter that the witnesses

who have been designated to testify at the hearing (or any Corps employees, for that matter) are

not competent to address.  The burden imposed on the designated witnesses (who as members of

the Interagency Performance Evaluation Task force (IPET) are intensely engaged in finalizing

their work) and the public interest served by their efforts is far greater than the benefit to be

obtained by their testimony at the scheduled hearing on May 2.[1]

------

[1]Commissioned by the Chief Engineer of the Army Corps of Engineers and ratified by the
Secretary of Defense, IPET consists of about 150 scientific and engineering specialists whose
mission is to obtain the facts necessary to evaluate the performance of the hurricane protection
system in New Orleans and the surrounding areas.  For the past several months, they have been
collecting, analyzing, testing, and modeling data and information on the performance of the New
Orleans hurricane protection system during Hurricane Katrina.  As IPET's Technical Director has
made plain in the Declaration of John J. Jaeger, which is attached to this motion, now is a
particularly busy time for IPET and its members.  These members compose nine teams, each
having a specific focus related to Hurricane Katrina and its impact on Southeast Louisiana.

The witnesses designated to testify at the evidentiary hearing are Dr. Dr. Paul F. Mlakar
and Mr. George L. Sills.  These men are employed as research engineers at the Corps's Engineer
Research and Development Center, in Vicksburg, Mississippi.  As IPET members, they are
assigned to the Levees and Floodwalls team.  At this time they are involved in the drafting of
IPET's final report, which is due to be released to the public on June 1.  A rough final draft must
be finished within the next two weeks, for on May 4 and 5, IPET will meet with the American
Society of Civil Engineers External Review Panel, which is independently validating IPET's
findings.  Dr. Mlakar will be participating at this meeting, at which IPET leaders will explain and
discuss their teams' factual findings.

After meeting with the ASCE External Review Panel, IPET members must prepare to
defend their factual findings before a second independent panel of experts.  On May 15, IPET
will meet with the National Academies Committee on New Orleans Regional Hurricane
Protection Projects for a final review of IPET's report.  Comments received from both the ASCE
panel and the National Academies Committee will require IPET to re-evaluate their findings, to
ensure that the final report is of the highest quality.

Finally, the hearing should be vacated because there has been no showing that the "evidence" being destroyed during construction of floodwalls and levees is of sufficient importance to warrant measures beyond those already being taken. If the plaintiffs or other defendants desire to make such a showing, then they may be given an opportunity to do so at another time, in a way better suited to the purpose. There is no reason why such an inquiry should begin with testimony from IPET members who are already preserving the materials they deem relevant.

It very well may be that no showing of "evidence destruction" can be made. The breaching of the levees along the outfall canals has been studied by at least three independent teams of technical specialists: the Interagency Performance Evaluation Task force (IPET); a group funded by the National Science Foundation (known colloquially as the Berkeley Group, because it includes professors from the University of California at Berkeley); and a group of professors from Louisiana State University (known colloquially as "Team LSU"). The investigation conducted by IPET is virtually complete. That IPET plans few additional material recoveries may be taken as indicating that the "evidence" lost during the rebuilding of levees and flood walls at the breach sites is not relevant or necessary to an analysis of the failure of these structures. An inference could also perhaps be drawn that the other groups of investigators do not deem the demolition of damaged flood walls to be particularly important to their investigations either. It is believed that the group funded by the NSF is now, like IPET, engaged in drafting a report that will be made public before June 1. Whether the investigators from LSU think evidence probative of the flooding will be destroyed during the repairs that are now ongoing is something only they can say. And that is precisely the point: if any of the litigants

4

believe that the materials being demolished and removed from these breach sites must be

preserved, it is incumbent on them to persuade the Court to impose restrictions on the rebuilding

of the levees.  If those litigants wish to adduce testimony from certain witnesses of their choosing

for that purpose, then they may petition the Court to entertain that testimony.  But the hearing at

issue here, which was ordered for the purpose of receiving testimony from Corps employees, is

not at all suited to that purpose.

CONCLUSION

For these reasons, the United States' motion to vacate should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PAUL F. FIGLEY
Deputy Director, Torts Branch

ROBIN D. SMITH
CATHERINE J. FINNEGAN
Trial Attorneys, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4916 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States

Dated:  4 -21-06

10

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon all counsel of record to this proceeding, by fax, electronic mail, or U.S. Mail on this 21st day of April, 2006.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BERTHELOT             *      CIVIL NO.  05-4182 (ALL CASES)

VERSUS             *      SEC. K  (DIV. 2)

BOH BROTHERS. CONSTRUCTION    *      JUDGE DUVAL

\*    \*    \*    \*    \*    \*    \*    \*      MAG. J. WILKINSON

## DECLARATION OF JOHN J. JAEGER

I, John J. Jaeger, hereby declare the following:

1. I am the Technical Director of the Interagency Performance Evaluation Task Force (IPET).

2. IPET was commissioned by Lt. General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers, and sanctioned by the Secretary of Defense, to investigate the reasons why levees and floodwalls were overtopped or breached as a result of Hurricane Katrina. As it gathers information, finds facts, and reaches conclusions, IPET provides continuous guidance to Task Force Guardian (TFG), which is managing the repair of damaged levees, floodwalls, and

1

other protective structures.  IPET's observations, findings, and conclusions are being provided to
TFG for possible inclusion in repair designs, to aid in the construction of a better hurricane
protection system.

3.  IPET is now in the throes of drafting its final report, which is due to be released to the
public on June 1.  Between now and then, IPET will be engaged in a series of meetings with the
independent groups that will review IPET's factual conclusions and provide critical comments
that IPET will use to improve the quality of the final report.  Review by an Independent
Technical Review team (ITR) is set to begin next week, as team leaders send their volumes to the
ITR as they are completed.  On May 4 and 5, IPET will meet with the American Society of Civil
Engineers External Review Panel, which is independently validating IPET's findings.  On May
15, IPET will meet with the National Academies Committee on New Orleans Regional Hurricane
Protection Projects for a final review of IPET's report.  The process of completing drafts for
review by these independent groups, meeting with the groups to explain and discuss the drafts,
informally discussing and explaining particular findings with members of the independent
groups, and then incorporating comments by these groups (and others) into the final draft will
require all of IPET's resources between now and June 1.

4.  Materials collected by IPET consist of soil, steel bars (rebar), concrete monolith
samples, and sheet piles.  Some of the collected materials were necessarily destroyed during
testing.  Retained soil samples are now in secure storage at the U.S. Army Engineer Research and
Development Center, in Vicksburg, Mississippi.  Retained rebar, monolith samples, and sheet
piles are now in secure storage in New Orleans, under the control of the New Orleans District of
the Army Corps of Engineers.  The protocols by which materials were collected are set forth in

2

the attached documents.  As the protocols reflect, efforts were made to obtain sufficient material for testing so that not all would be destroyed during testing.  For example, medallions were cut from concrete monoliths for testing, and the monoliths from which they were cut are now in District storage.  Coupons were cut from sheet piles for testing, and the sheet piles from which the coupons were cut are now in District storage.  One type of material has been almost entirely used up: peat.  Peat has been used in models subjected to centrifuge tests to simulate the forces exerted on levees and floodwalls.  This testing is ongoing, and it is anticipated that the peat will be entirely used up soon in the course of these tests.

6.  IPET has requested only a few more material recoveries, which will occur when the materials of interest—monoliths, rebar, and sheet piles—become available during the course of levee reconstruction. These materials are of interest only for the purpose of verifying their compliance with design specifications; their specific qualities and character are not thought to be relevant to the failure of the levees and flood walls.  The proposed protocols for future recoveries are set forth in the attached documents.

7.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __21__ day of April, 2006.

_____
JOHN J. JAEGER

3

# Appendices

Communication Plan

Questions and Answers

Media Alert

Fact Sheet

Communication Plan
IHNC Floodwall sampling
January 13, 2006

**Purpose**

This plan is designed to guide the Task Force Guardian PAO in its efforts to effectively and efficiently communicate with the people of New Orleans and others interested in the floodwall material removal activities at the IHNC on January 13, 2006

**Background**
- The Inner Harbor Navigation Canal is part of the Lake Pontchartrain and Vicinity Hurricane Protection Project. The project includes a series of control structures, concrete floodwalls, and levees to provide hurricane protection to areas around Lake Pontchartrain.
- Investigations are ongoing to determine why the levee failed.
- It is generally believed that the floodwall was overtopped, resulting in significant scour behind the wall and the eventual failure of the floodwall.

**Issues**
- There is a negative public perception regarding the Corps' diligence in protecting this area of New Orleans relative to other areas.
- There is a general misunderstanding of the Corps' relationship with local levee and sewerage and water boards
- There is a fear of unaccountability for repairs/reconstruction and the future integrity of the system
- There seem to be concerns about the materials used to construct the hurricane protection system

**Goals**
- Provide transparency to the Corps' investigation into why the floodwall failed, and counteract any misconception that the Corps has something to hide.
- Provide stakeholders with appropriate information about the role of the Corps in the construction of the levee and floodwall.
- Provide stakeholders with information about the collection of data and materials at the site, and the Corps' determination to maintain the integrity of the materials for future analysis.

**Stakeholders**

Stakeholders are the residents of the affected community who are still here and those who want to come back, public officials at all levels, elected officials at all levels, agency staff at all levels, the news media, Corps employees, Corps leadership, and local, state, and federal agencies investigating the levee failure.

**Communication Tools:**

Communication actions need to be timed to coincide with event.

4/20/2006  11:36:21 AM

A news advisory will be issued to the local press shortly before initiation of the material removal activities. No press will be invited to attend, and no visitors will be allowed onsite during the removal activities.

A news advisory will be issued to report completion of the removal activities shortly after the activities are completed.

## Questions and Answers
## Inner Harbor Navigation Canal (IHNC)
## Sheet pile and floodwall sampling
## January 13, 2006

**Why did the levee and floodwall fail?**
- The U.S. Army Corps of Engineers and teams of independent investigators are working to determine why a section of floodwall on the west side of the IHNC failed.
- As part of the investigation, we are collecting samples of concrete, sheet pile, and reinforcement steel in the area of the breach for testing of the material properties.
- We are removing a 4-foot by 8-foot section of the concrete wall, from which concrete sample cylinders will be cut.
- The samples taken will be analyzed by scientists and engineers from the Corps-assigned Interagency Performance Evaluation Task Force.
- The analysis will take approximately two weeks to complete.
- The task force will be looking for the strength of the concrete and the reinforcing steel in the wall, as well as the detailed arrangement of the wall reinforcing steel.
- All of us want to know why parts of the system failed and parts withstood the hurricane.
- We are engaged with others in diligently examining why this happened, and we are committed to building a more effective system.
- Findings from the investigation will help ensure that we succeed in this endeavor.
- We in the Corps of Engineers want that information so that we can ensure optimum designs for reconstruction and for future projects.

**Are you also going to take soil samples?**
- Yes. The Interagency Performance Evaluation Task Force has taken soil samples at the breach site to analyze as part of the investigation.
- IPET was formed by the Chief of Engineers to determine why the hurricane protection system performed the way it did during Hurricanes Katrina and Rita.

**Was the sheet pile at the driven as deep as it was supposed to be?**
- Several sections of the sheet pile removed from the breach will be measured to determine exactly how deep it was driven into the levee.
- This is just one part of our effort to determine why this section of levee failed.

**Who is responsible for these levees?**
- The canal is part of the Corps of Engineers Lake Pontchartrain and Vicinity Hurricane Protection Project and is owned, operated and maintained by the Orleans Levee District.
- These agencies worked together to design and build the canal, and they also work together to maintain it.

**Can you guarantee the levees won't fail again?**
- We can guarantee you that we'll do everything possible using modern engineering and science to make the system safe.

- Most of the 130 people on our team live in New Orleans, and many of them are also victims of Katrina. They have a personal, as well as a professional, interest in the safety of the system.

**Is the Corps going to tear out the whole levee system?**
- We are awaiting the conclusion of this investigation and our analysis of the entire levee system before determining what our course of action will be.
- We will use information gathered and validated during the course of this investigation to adjust and improve our repair and reconstruction of the area's levee system.

**Has the Corps explored other alternatives to providing flood protection or will it just rebuild another sheet pile wall?**
- We are actively seeking a better solution to the flood protection problem.
- We are dedicated to exploring and considering all options that may help us meet that objective.

**Who has access to the information collected here today?**
- We will share the information we have available with anyone who wants it.
- We have and will listen to others who put forth ideas about how we might solve this problem. We live here, too.

**How much are you going to pay property owners for the property you take?**
- Before we acquire private property, we have it appraised by an independent, licensed real estate appraiser.
- We use that appraisal as the basis for our offer of just compensation to the property owner.

**What if we don't want to sell our property?**
- We will only take property if it is necessary in order to increase the level of hurricane and flood protection for the people in your area.
- We prefer to use land already part of the protection system.

**Why are you refusing to release information on the design and construction of the hurricane protection system? What are you hiding?**
- Information on the hurricane protection system is being scanned and posted to the IPET Web site at https://ipet.wes.army.mil.
- Information posted on the Web site includes design memorandums and reports, plans and specifications, and other information on the hurricane protection system.
- We hold ourselves accountable for our work, and we want to make sure we have all the facts when we report to you on why the hurricane and flood protection system performed the way it did.
- You're hearing a lot of speculation, and some may or may not prove to be accurate; only time will tell. Remember, at this point its speculation. When the investigations are completed, we, and most importantly you, will have the facts needed to build a better, stronger, and smarter system.

# U.S. Army Corps of Engineers

## MEDIA ALERT

### Investigators to remove material from IHNC breach site

**Where:** 4800 Florida Ave at the intersection of Surekote Rd and Florida near the Florida Ave Bridge. Please park outside gated construction entrance.

**When:** 11:00 a.m., Friday, Jan. 13.

**This media event is taking place on an active construction site.**
**Media must arrive at 11:00 a.m. to ensure entrance on to the site.**
**Media attendees will be required to show press credentials.**
**Please wear close-toed shoes and appropriate attire.**

Contacts: Jeff Hawk: 916-719-0904 or 504-862-2184; Jim Taylor: 504-862-2076

    The U.S. Army Corps of Engineers and the Interagency Performance Evaluation Task Force will remove samples of floodwall material along the Inter-Harbor Navigational Canal as part of an investigation, Friday, Jan. 13.
    A contractor will remove concrete samples and sections of steel from recovered sheet pile materials. This action will allow investigators to test and analyze the material to help determine why the floodwall performed as it did during Hurricane Katrina.
    Corps and IPET representatives will be available for interviews.



**Fact Sheet**
**IHNC Floodwall Investigation**
**January 13, 2006**

A section of floodwall on the west side of the IHNC failed during Hurricanes. The US Army Corps of Engineers and an Interagency Performance Evaluation Taskforce (IPET), as well as independent investigation teams, are working to determine the cause of this and other flood protection system failures in the New Orleans area.

The Corps of Engineers will remove two 6" x 12' samples of sheet pile, four 2' sections of reinforcement steel, and three 6" diameter x 12" long concrete cylinders from the floodwall in the area of the breach. Testing of the samples will allow investigators to evaluate materials used in the construction of the floodwall.

# Floodwall Material Recovery And Testing Plan
## Inner Harbor Navigation Canal
### Eastside Breach
### New Orleans, Louisiana
### January 13, 2006

## I. Introduction

The purpose of this recovery and testing activity is to determine the strength of the concrete and steel components of the floodwall, in the area of the breach on the east side of the Inner Harbor Navigation Canal (IHNC). Samples will be collected and tested at the request and for the benefit of the Interagency Performance Evaluation Team (IPET). IPET is a cooperative investigative team made up representatives of various government, scientific, and academic agencies. This team is investigating the damages to the Industrial Canal floodwalls and other hurricane protection features in the New Orleans area.

The material properties of the samples will be verified by physical testing at an independent testing laboratory. The results will be compared with the specifications for the original construction materials. The investigation objectives of recovery and testing activities are to determine:

- Concrete material properties
- Reinforcing bars material properties
- Steel sheet pile material properties

**Roles and Responsibilities**

The objective of this Floodwall Material Recovery Operation is to obtain material samples in support of an IPET investigation to determine the floodwall failure mechanism. Materials removed and not sent for physical testing will be turned over to the Material Storage Custodian at MVN, and will be held for any future evaluation or analysis. Figure 1 illustrates the responsibilities for the recovery and testing activities.



IHNC Floodwall Investigation East Side



Figure 1

- **IPET.** IPET is the lead agency for the material recovery and testing. IPET will determine the materials and quantities to be taken, the material recovery technique, and the locations from

where they will be taken.  IPET will be responsible for all on-site measurements. The lead person for IPET will be Dr. Paul Mlakar.

- **Office of Counsel.** The Office of Counsel will provide oversight of the material recovery and custody activities.  The lead person for the Office of Counsel will be Randy Merchant.  Randy will be the Onsite Material Custodian responsible for custody of the recovered materials that remain after the material samples are collected.

- **TFG & MVN.**  Task Force Guardian and the USACE New Orleans District (MVN) will provide the operation's command and control functions as well as coordinate with the contractor performing the work to obtain the samples.

- **Cajun Constructors.** The Contractor will perform the work necessary to cut the material samples, and deliver them to the onsite BETA Laboratory personnel.  The Contractor will be responsible for delivery of the recovered materials to the USACE New Orleans District warehouse. The Contractor will also provide safety materials (i.e., safety tape) and a safety observer. Tim Roth and Chris Wagner of TFG will be responsible for directing the contractor as necessary.

- **BETA Laboratory.** BETA Lab will take custody of all samples collected on site. BETA will number, label, and document the samples and maintain control of the samples throughout all transport and testing activities. Mr. Mark Cheek of BETA will be the Sample Material Custodian responsible for control and documentation of the material samples.

- **Task Force Guardian Public Affairs Office.** The PAO will develop a communication plan for the Operation, and develop necessary materials for press advisories.  PAO activities will be lead by Mr. Jim Taylor.

- **Storage Custodian:**  The Storage Custodian will be responsible for the safekeeping of the recovered materials at the MVN Secure Location and the maintenance of the chain of custody after the recovered materials are delivered to MVN. Rosie Washington has been appointed as the Site Custodian.

- **MVN Contacted Security:**  The Security Contractor for MVN will provide three trained guards for site security during the removal activities. MVN Security will coordinate with the New Orleans Police department to ensure availability in the event they are needed for security and/or crowd control. Homeland Security officers in the area have agreed to provide patrols along the sites east fence line.

- **TFG IMO:** TFG Information Management Office will provide one video photographer and one still frame photographer to document the material recovery and custody activities.

## II.  Sampling Procedures

### Field Operation and Measurement Procedures

Survey services will not be required as a part of this material recovery activity.

Field operations will include all necessary activities to remove and collect samples of concrete, sheet pile, and reinforcement steel from the floodwall.

Prior to cutting any concrete, sheet pile, or reinforcement steel, IPET will mark locations from which the material samples will be taken.

4/20/2006  11:36:21 AM

Photographic documentation will be made of all material recovery activities.

CONCRETE

The contractor will set up all necessary alignment and cutting equipments, and cut an approximate 4 ft by 7 ft section of concrete, as marked on the concrete floodwall monolith, located at approximate station 20+40. The Contractor will cut two handling holes in the cut section and lower it to the ground with chains, cables or other similar equipment. The Contractor will cut three 6" diameter by 12" length concrete samples from the monolith section in accordance with ASTM C42. The Contractor will immediately deliver the samples to the BETA Laboratory onsite representative to ensure custody control.

SHEET PILE

This material recovery activity will not include the pulling of any sheet pile. The sheet pile from which samples will be collected where previously recovered from within the area of the breach as attested to by the TFG Project Manager. The sheet pile has been marked, numbered and photographed by IPET and the MVN Office of Council. IPET and TFG representatives will measure and document the sheet pile dimensions. The Contractor will cut two approximately 6" by 12" coupons from the sheet pile, where previously marked, and immediately deliver the material samples to the BETA Laboratory onsite representative to ensure custody control.

REINFORCEMENT STEEL (REBAR)

Four rebar material samples were previously collected from the area of the floodwall breach by IPET, the TFG Project Manager, and the MVN Office of Counsel. See photo-documentation of these activities in the appendix, Photographic Log. The rebar samples are currently stored within the MVN Construction Division Onsite Office. The MVN representative will deliver these samples to the BETA Laboratory onsite representative during the material removal activities.

MATERIAL TRANSPORTATION

The Contractor will load all recovered materials (remaining after the collection of samples) onto, or into, Contractor provided vehicles and transport the materials to the designated secure location at the USACE New Orleans District Offices. TFG and/or MVN representatives will accompany the materials to the District Offices. At the secure location, the recovered materials will be delivered into the custody of the Storage Custodian.

## III. Material Handling, Transport, Storage and Custody

### Sample Identification and Labeling

Items recovered for inspection and analysis may at some point be considered as evidence in court, and therefore require strict procedures for identification and labeling. Each item will have a unique identification number based on the location of the item. Following recovery, BETA will label each sample item. IPET and/or TFG representatives will label, number, and document the remaining concrete and sheet pile materials before they are transported to the New Orleans District. The materials have already been labeled but may require additional numbering to provide more details of the location and time of collection. Samples and material to be documented should be as follows:

- 3 concrete cores, 6"dia x 12", marked by BETA Laboratory
- 2 sheet pile coupons, 6" x 12", marked by BETA Laboratory
- 4 reinforcement metal rods, approximately 24" long, marked by BETA Laboratory
- Remaining concrete section, approx 4' x 8', marked with marker and/or spray paint
- Remaining sheet pile, 2 pile pairs, marked with marker and/or spray paint

### Material Handling and Custody

It is important to ensure proper custody procedures are followed in handling the items from the time of recovery until arrival at the final storage facility or testing laboratory. Site access will be strictly controlled. Only USACE, contract personnel, and invited local officials and media will allowed on the construction site during these material recovery activities.

### Field Operations Documentation

Field documentation is important in any project; however, it is especially critical in this project as the findings may result in legal action. The types of documentation to be completed are described below.

### Daily Quality Control Reports

The TFG Construction Division representative will complete daily Quality Assurance Report forms (QAR). This form documents all quality control activities for each day. Other information completed on this form includes weather, contractor(s) onsite, equipment onsite, work performed, health and safety levels and activities, and problems encountered. The Contractor is also required to prepare a daily quality control report. Both reports will become part of the official record of these material recovery activities.

### Field Notes

Field notes will bet taken onsite during all material recovery activities by TFG and/or MVN representatives. All field notes will be signed and dated by the note taker. The notes will contain information such as descriptions of field activities, sketches, persons on site, names and phone numbers of field contacts, exceptions and deviations from the work plans, and weather and field conditions.

### Photographic Records

Due to the potential litigation and/or court action, photographic records will vital. Both still and video photography will be used to document field activities, and to record images of the items recovered. These records will be maintained in the project file(s) upon completion of the investigation.

### Custody Records

BETA Laboratory will be responsible for documenting the control and custody of the material samples. MVN Office of Council will be responsible for documenting the control and custody of the remaining material, which will be transported to the USACE New Orleans District Offices.

*Data Management and Retention*

Field logs, photographic records, and other documentation will be maintained at the New Orleans District Offices. Access to these records will be restricted. The records will be maintained in accordance with applicable laws and regulations.

*Transportation Requirements*

The recovered materials (remaining after samples are collected) will be transported to the USACE New Orleans District warehouse on the day in which they are removed. The items will be stored in a secure location within the warehouse. The Site Custodian and or his deputies and designees will accompany the items with the corresponding custody form(s) in their possession. Upon arrival at the storage area, the TFG and/or MVN representative will relinquish custody to the Storage Custodian.

*Storage Requirements*

Secure storage of the recovered items is necessary. The storage area will secured from unauthorized entry as necessary (this will include fencing, signs indicating authorized entry only, locked gates with a high security lock, 24-hour guards seven days a week, etc.). The Storage Custodian and Deputy Storage Custodian will be authorized to enter the area at all times; any request for other entry to the area or inspection or removal of the items will require the USACE New Orleans District Office of Counsel approval. Authorized removal of the items will be conducted only under the Office of Counsel.

*Contractor Quality Control*

The three phases of control under the USACE Construction Quality Management guidelines will be implemented: preparatory, initial, and follow-up. These phases will be implemented by preparing and reviewing all documents prior to the start up of the project, checking preliminary work and ensuring compliance with the contract at the beginning of the site activities, and performing checks to ensure the continuing compliance as the project progresses, and follow-up documentation of all activities

## IV.   Materials Testing Plan – BETA Laboratory

BETA Laboratory will determine the material properties of the concrete, reinforcing steel and sheet pile steel samples collected from the recovered floodwall materials. The laboratory will also document the chain of custody for these samples in accordance with the specific instructions given by the USACE New Orleans District, Office of Counsel. The laboratory will conduct the material testing in accordance with the cited standards of the American Society of Testing and Materials (ASTM). Finally, the laboratory will prepare and provide the results of the in report within two weeks of the collection of the specimens.

**Concrete.**

Three 6"x12" inch cylinders at the identified collected from the floodwall in accordance with ASTM C42. Test these cylinders in accordance with ASTM C39.

**Reinforcing Steel.**

4/20/2006  11:36:21 AM

Test the four reinforcing bars available from the onsite project office in accordance with ASTM A370 and A615.

**Sheet Pile.**
Two specimens collected from marked locations on the extracted sheet piles. Machine and test these specimens in accordance with the provisions of ASTM A370.

**Test Results.**
Report the results of the testing to Dr. Paul Mlakar, IPET, at 1-601-634-3251

# V. Site Safety and Security Plan

## A. SITE DESCRIPTION
Date: 13 January 2006
Location: New Orleans, La.
Hazards: Crowd Control, Physical Hazards
Area Affected: IHNC Floodwall Breach, 9th Ward Vicinity
Surrounding Population: Displaced and Potentially Hostile.
Topography: Floodwater Devastated Residential Area

## B. ENTRY OBJECTIVES
The objective of the initial entry to the IHNC Construction Material Recovery Site is to conduct a comprehensive engineering investigation of a section of floodwall along the Intra-coastal Canal that failed during Hurricane Katrina. Tasks to be accomplished include but are not limited to concrete and steel cutting, burning, sampling, analysis, storage, and documentation activities associated with selected floodwall materials.

Visitors will be required to produce photo identification and sign for an identification badge in order to access the site. Only those visitors on the access roster will be admitted.

## C. ONSITE ORGANIZATION AND COORDINATION
The following personnel are identified for the associated positions or functions

| Recovery Team | |
|---|---|
| Project Team Leader: | Dr. Paul Mlakar |
| Project Coordinator: | Bob Brooks |
| Site Team Leaders: | Chris Wagner & Anthony Bertucci |
| Site Safety Officer: | Edward A. Bernard III |
| Security Officer: | Jerome Wise |
| Public Affairs Officer: | Jeff Hawk |
| Record-keeper: | TBD |
| Contractor, Primary: | Cajun Constructors |
| Contractor, Laboratory: | BETA |
| Cont., Concrete Cutting | All Around Concrete Cutting |

Speakers:

4/20/2006  11:36:21 AM

Dan Hitchings, MVD FWD, Director, Task Force Hope
Col. Lewis Setliff, TFG Commander
Dr. Paul Mlakar, IPET
Stuart Waits, PM, IHNC

All personnel arriving or departing the site should log in and out with the security guard at the entrance gate. All activities on site must be cleared through the Project Team Leader or Project Coordinator.

## D. GENERAL SITE AND SECURITY CONTROLS
**General Site and Security Concept:**
All personnel designated as authorized to enter the work will park vehicles outside of the site entry gate at the north end of the project site. A security guard will be posted at the entrance of the gate. A security guard will be on site to assist in directing parking and directing personnel. Another security guard will provide escort duties to direct personnel to designated support zones. Once at the main gate, all personnel will process through the access control point where their name is checked on the list of authorized personnel. Once the name is checked on the list and identification is verified, personnel will be issued an access badge. The authorized personnel roster will indicate who is authorized for access to the site. Security guard will direct the media vehicles on the where to park. MVN security guards will be present at the access control point to control access. Security personnel will assist in escorting authorized personnel into and out of the site.

Upon completion of floodwall sample acquisition (concrete or sheet piles) personnel will be directed to planned activities. Once all operations are complete, security personnel will ensure all personnel vacate the work area. Prior to leaving the work site personnel will out-process the access control point and turn in their badges. As the security badges are turned in names will be checked off the authorized personnel access roster

The Federal Protective Service (FPS) Police will and provide vehicle patrols for security breaches and security situations. The FPS and NOPD contact numbers have been disseminated to all security personnel and security personnel will request additional support if and when a situation develops.

Security personnel will carefully monitor any protest/demonstration that may develop. It should be known by all that citizens have a right to protest anywhere on public property as long as they do not impede traffic and have the right to protest on private property if the owner of the property allows. Jurisdiction for breaking up a protest falls under the FPS. Security will be in close communication with the FPS if and/when a protest develops.

**Name of Individual or Agency:** The U.S. Army Corps of Engineers will coordinate access control and security at the Construction Material Recovery, IHNC Intra-Coastal Floodwall site.

**Distance or description of controlled area:** IHNC Intra-Coastal waterway levee breach.

4/20/2006  11:36:21 AM

**Control boundaries are established**: Consisting of **Restricted Access Zones** and worksite **Exclusion Zones.** Exclusion Zones are areas where contractor personnel conduct heavy equipment operations and only authorized visitors wearing specified PPE are allowed to enter.

**Support Zones are established:** Areas designated for authorized personnel participating or observing the investigation from a controlled location and under direct supervision.

**Parking Areas are established:** At the main entry control point north of the project area.

**A Command Post is established:** Near the main access control point in the project trailers.

All Zones are clearly identified through the use of highly visible and labeled boundary tape.

An Exclusion Zone (Safe Perimeter) of approximately 60' (sixty) foot should be maintained from the heavy equipment to be used in Construction Material Recovery operations.

A Support Zone (Observation Area) is established within direct line of sight of recovery operations and outside of the 60 ft Exclusion Zone of active operations.

## E. HAZARD IDENTIFICATION AND EVALUATION

The following hazards have been identified as primary threats:
1. Unauthorized Entry by the Public.
2. Potential Violent Protestors.

The following additional hazards are expected on site:
1. General disorderly physical environment associated with hurricane related debris.
2. Heavy equipment operations associated with sheet pile removal.
3. Area movement restrictions.
4. Uneven terrain.
5. Slip, trip, fall hazards with associated potential for puncture or laceration wounds resulting from debris related sharp objects.
6. Potential Eye Irritation from Airborne Dust.
7. Potential High Noise Levels.
8. Potential Inclement Weather Conditions.
9. Holes and ditches from uneven terrain.
10. Sharp objects such as nails, metal shards, and broken glass.
11. Potential electrical hazards associated with contractor and/or participant operations.
12. Biological hazards such as insects or stray animals resulting from a general disorderly physical environment.

## F. HAZARD CONTROLS AND PERSONAL PROTECTIVE EQUIPMENT

Based on evaluation of potential hazards, the following levels of PPE have been designated for the applicable work areas or tasks:

| Location | Function | Level of Protection |
|---|---|---|
| Exclusion Zone | Sheet Pile Removal | Specified in Accident Prevention |

4/20/2006  11:36:21 AM

| | Concrete Samples | Plan for Contractor |
| | Rebar Samples | Hard Hats, Safety Glasses, Steel Toe Shoes, Gloves |
| Support Zone | Observation | Safety Glasses (if applicable) |

The exclusion zone will be the area in the immediate vicinity of the material recovery and sampling cutting activities and will be designated by safety tape.

The support zone, also know as the safety and observation area, will be the area just outside of the exclusion zone, which shall also be designated with safety tape. All visitors and guest will be required to remain in the support zone except when traveling by vehicle onto and off the construction site.

No changes to the specified levels of protection shall be made without the approval of the Site Safety Officer.

## G. ONSITE WORK PLANS

Visitors will be briefed on the contents of this Security and Safety Plan, prior to accessing the site.

## H. COMMUNICATION PROCEDURES

Emergency, command and Safety and Security personnel will communicate via hand held radios as a primary means of communication with cell phones used as a secondary means of communication.

Coordination has been established with local emergency response agencies and a communication plan has been established.

## I. TRANSPORT OF CONSTRUCTION MATERIAL SAMPLES

Recovered materials remaining after the samples have been collected will be transported to a secure location at MVN. USACE security personnel will be notified when the transport vehicle is ready to move and will notify the personnel at the MVN storage facility that the samples are en route. The storage facility will be prepared to receive materials and will have the necessary equipment required to off-load the material samples.

## J. SITE SAFETY AND HEALTH PLAN

**Site Safety Officer:** Ed Bernard CIH is the designated Site Safety Officer and is directly responsible to the Project Team Leader or Project Coordinator for safety recommendations on site.

**Emergency Medical Care is established:** James Sturcke is the qualified nurse on site and can be reached by handheld radio or cell phone.

**East Jefferson General Hospital**, at 4200 Houma Blvd., 504 454-4000, is located approximately 20 minutes from the site location. Dr. Terry Creel has been contacted at 454-4000 and briefed on the situation, the potential hazards, and potential circumstances involved. A map of alternative routes to this facility is available at the COMMAND POST.

**Local ambulance service is established:** New Orleans Health Dept. at 911. Their response time is approximately 20 minutes.

**First aid equipment is available:** On site at the following location(s):  SUPPORT ZONE.

**Emergency phone numbers are established:**

| Agency/Facility | Phone # | Contact |
|---|---|---|
| Police | 911 | FPS (415)850-7004 Officer McHugh |
| Fire | 911 | |
| Hospital | 454-4000 | Dr. Terry Creel |

**Environmental Monitoring**: The necessity for environmental monitoring will be determined by Project Team Leader or Project Coordinator and the Site Safety Officer on a case-by-case basis but is currently limited to noise levels.

**Emergencies**: The Project Team Leader or Project Coordinator and Site Safety Officer and shall be notified of any onsite emergencies and will ensure that the appropriate procedures are followed.

**Personnel Injury in the Exclusion Zone:** Upon notification of an injury in the Exclusion Zone involving contractor personnel, the designated emergency signal (horn) shall be sounded (if required). Exclusion Zone personnel shall assemble in the Support Zone (if required). The onsite nurse will be notified and will enter the Exclusion Zone (if required) to remove the injured person to the Support Zone. The onsite nurse shall initiate the appropriate first aid, and will contact the onsite ambulance for transport to East Jefferson General Hospital (if required). The onsite nurse will brief the Site Safety Officer and Project Team Leader or Project Coordinator regarding the nature and extent of the injury.   After this is completed and the cause of the injury is determined and rectified, Exclusion Zone personnel will than be allowed to resume operations.

**Personnel Injury in the Support Zone:**  Upon discovery or notification of an injury in the Support Zone, the onsite nurse will assess the nature of the injury and the Project Team Leader and Site Safety Officer will be notified. If the cause of the injury or loss of the injured person does not affect the performance of the project, operations may continue, with the onsite nurse initiating the appropriate first aid and necessary follow-up as stated above. If ʳthe injury increases the risks to others, the designated emergency signal (horn) shall be sounded and all Support Zone personnel shall move to another safe area, if necessary, for further

instructions. Activities on site will stop (if necessary) until the added risk is removed or minimized.

**Fire/Explosion:** Upon notification of a fire or explosion on site, the designated emergency signal (horn) shall be sounded and all site personnel will assemble at the staging area. The fire department shall be alerted and all personnel moved to a safe distance from the involved area.

**Equipment Failure:**  If any major equipment on site fails to operate properly, **the Project Team Leader** or Project Coordinator shall be notified and will determine the effect of this failure, and whether to continue operations. If the failure affects the safety of personnel or prevents completion of the Work Plan tasks, all personnel shall leave the Exclusion Zone and the Support Zone and shall assemble at the staging area until the situation is evaluated and appropriate actions taken.

In all situations, when an onsite emergency results in evacuation of the Exclusion Zone and/or Support Zone personnel shall not reenter until:
1.  The conditions resulting in the emergency have been corrected.
2.  The hazards have been reassessed.
3.  The site plan has been reviewed and amended (if appropriate).
4.  Site personnel have been briefed on any changes in the Site Safety Plan.

## K. SITE SAFETY AND SECURITY PLAN – AMENDMENTS

Project Name: IHNC Floodwall Breach Construction Material Recovery

Project Number:

Project Manager:

Location: IHNC Floodwall Breach East Side

Changes in field activities or hazards:

## VI.  Schedule

| TIMELINE JANUARY 13, 2006 | |
|---|---|
| MATERIAL RECOVERY AT IHNC EASTSIDE BREACH | |
| **Time** | **Activity** |
| 0530 | Begin saw set up |
| 0800 | Begin saw cut of concrete section |
| 1030 | Remove concrete section from wall and begin coring |
| 1030 | Media and Guests arrive |
| 1045 | Safety Brief Media and Guests, Outside of Entrance Gate |

4/20/2006  11:36:21 AM

| 1100 | Media and Guests area shuttled across the site by government vehicle to the designated safety area |
| 1115 | Complete coring of concrete and cutting of sheet pile samples and label, document, and load all samples and remaining material for transport |
| 1130 | Comments by IPET and TFG |
| 1200 | Media Interviews |
| 1230 | Media & Guests depart; material transported to USACE New Orleans Offices |
| 1300 | Receive and secure material at USACE New Orleans Offices |
| | Testing Results are anticipated to be available within 3 weeks |

## VII.  Onsite Personnel

**IPET Representative**
Dr. Paul Mlakar

**USACE TFG & MVN**
COL Setliff
Jeff Hawke
Bob Brooks
Stuart Waits
Lane Lefort
Alan Schulz
Tim Roth
Stuart Waits
Anthony Bertucci
Chris Wagner
Tim Roth,
Chris Wagner
Anthony Bertucci
Ernest Murry

**Contractors**
Cajun Constructors, Approx 6 to 8 persons
BETA Laboratory, Approx 1 to 2 persons

Members of the media and local officials - to be determined.

April 3, 2006

# SAMPLE CUSTODY PLAN
# SUPPORT TO THE MATERIAL SAMPLING PROGRAM
# MIRABEAU FLOODWALL BREACH
# NEW ORLEANS, LOUISIANA

**Prepared for**



**US Army Corps
of Engineers.**

**New Orleans District**

Under Contract to
U.S. Army Corps of Engineers – New Orleans District
Environmental Services IAW
DACW29-03-D-0014    Task Order #0018

By



Materials Management Group, Inc.

## Table of Contents

Table of Contents ........................................................................................................i
1.0         Project Background ................................................................... 1
2.0         Project Organization and Responsibilities.......................... 1
2.1         Organization ............................................................................ 1
2.2         Responsibilities........................................................................ 2
3.0         Project Scope and Objectives ............................................... 3
3.1         Task Description ...................................................................... 3
3.2         Applicable Regulations/Standards ...................................... 4
3.3         Project Schedule...................................................................... 4
4.0         Field Activities.......................................................................... 4
4.1         Item Recovery and Sampling................................................ 4
4.2         Sample Identification and Labeling ..................................... 4
4.3         Material Handling and Custody............................................. 5
5.0         Field Operations Documentation ......................................... 6
5.1         Daily Quality Control Reports................................................ 6
5.2         Field Logbook ........................................................................... 6
5.3         Photographic Records ........................................................... 6
5.4         Recovered Item Documentation .......................................... 7
5.4.1       Identification Numbers ........................................................... 7
5.4.2       Labels ........................................................................................ 7
5.4.3       Custody Records ..................................................................... 8
5.5         Data Management and Retention ........................................ 8
6.0         Transportation Requirements ............................................... 8
7.0         Storage Requirements............................................................ 9
9.0         Contractor Quality Control .................................................... 9
10.0        Summary Report...................................................................... 9

Table 1: Recovered Item Summary Table

## 1.0   Project Background

The tidal surge caused by Hurricane Katrina resulted in a rise in Lake Pontchartrain that the levee system could not withstand. The result was a breach in the levee in the Mirabeau section along the London Avenue Canal. Subsequently, studies conducted with sonar suggested that the levee was not constructed to U.S. Army Corps of Engineers (USACE) specifications. Currently, an investigation is being conducted to determine whether the construction materials and the construction itself meet the USACE specifications. The findings of the investigation may result in legal action.

The purpose of this plan is to describe the custody procedures to be implemented during measurement, sample collection, and transport of materials from the intact wall section adjacent to the floodwall breach at the Mirabeau Section of the London Avenue Canal. The primary purpose of the investigation is to measure the dimensions of the floodwall relative to the construction contract drawings. Secondary purposes are to collect samples and analyze the material properties of the wall relative to the requirements in the construction specifications. Due to the implications of the results and on-going litigation, tight control of the procedures and custody of materials as described in this plan is imperative.

## 2.0   Project Organization and Responsibilities

### 2.1   Organization

This investigation involves numerous parties, including groups within the USACE, USACE contractors, and investigative branches of the Federal government. These parties are indicated below.

**USACE**
**Commander Task Force Guardian**
Colonel Lewis F. Setliff

**Task Force Hope**

**Site Custodian**
Bob Brooks

**Storage Custodian**
Rosie Washington

**MVN Office of Council**
Randy Merchant

**MVN Safety Office**

**MVN Public Affairs Office**

**Interagency Performance Evaluation Task Force (IPET)**
Dr. Paul Mlaker (Boh Brothers Representative)

**Custodial Management and Primary Sampling Consultant**
Dr. C. Paul Lo (Materials Management Group, Inc.)

**U.S. Department of Justice**

**U.S. Attorney's Office**

**Department of Defense**

**2.2    Responsibilities**
**IPET:** The IPET is responsible for directing and documenting all removal, sampling and measurement processes on site. The IPET Team will include a Sampling Team leader, and two Technical Assistants. The IPET will prepare all appropriate plans that provide written procedures for all field and laboratory removal, sampling and measurement procedures.  These plans will also establish exact procedures for handling, transport, secure storage and laboratory analyses of all materials removed from the site, including the chain of custody procedures and documentation for the direct purpose of ensuring the data meets the standards for evidence in a court of law. The plans will specify all field and laboratory measurement and testing devices and ASTM Designated test methods. The plans will prescribe the quality control procedures and documentation requirements to assure proper calibration of all measurement devices used in the field and laboratory.  For measurements and analyses not addressed by a specific ASTM procedure, the plans will provide a procedure commensurate with the level of detail in an ASTM procedure. MVN and TF Guardian will assist the IPET with still photograph and video documentation.

**Task Force Guardian:** The Task Force (TF) Guardian will provide all removal and sampling equipment, operators and logistical support.

**MVN Safety Office:** The MVN Safety Office will develop and enforce a Site Specific Health and Safety Plan, which will establish an Exclusion Zone for the workers directly involved in the removal, sampling and measurement processes; an Observation Area for key witnesses; and a Support Zone for other stakeholders.  The MVN Safety Office will be responsible for developing and issuing credentials for access to the Exclusion Zone, the Observation Area and for the Support Area based on the direction of the MVN Executive Office.

**MVN Office of Council:** The MVN Office of Council will review and provide comment to the Detailed Sampling and Analysis Plan, and will prepare a list of approved stakeholder attendees, including designating which shall be granted access to the Observation Area and which shall be limited to the Support Area. MVN Office of Council will observe the field procedures and provide input to the IPET Sampling Team relating to documentation and preservation of evidence for potential use in a court of law.

The MVN Public Affairs Office will prepare a list of approved media attendees, including determining which will be granted access to the Observation Area and which will be limited to the Support Area.  MVN Public Affairs Office will also determine need and make arrangements for establishing a common video link or pool of video photographers and still photographers to assure all television, newspaper and other media have equal access to the visual images of the removal, sampling and measurement processes.

**MVN and Task Force Guardian Executive Offices:** The MVN and Task Force Guardian Executive Offices are responsible for assuring adequate resources are provided to facilitate the process from initiation through final reporting and disposition of samples and any other recovered materials.

**MVD Forward and Task Force Hope:** The MVD Forward and Task Force Hope are responsible for coordinating access to the field and laboratory activities and data results among other agencies conducting investigations into the performance of the levees and floodwalls in response to Hurricane Katrina.  This includes, but may not be limited to the National Science Foundation, the ASCE and Team Louisiana.  MVD Forward is responsible for coordination of all activities associated with the removal, sampling, measurement, and reporting of results with USACE Headquarters, DoD, the US Attorney's Office, and the Department of Justice.

## 3.0   Project Scope and Objectives

### 3.1   Task Description

The investigation will include removal of several items from the floodwall for inspection and evidence purposes and sampling of these materials to evaluate the physical characteristics, as well as labeling, transportation, and secure storage of the recovered materials and associated samples.

The technical objectives of removing a section of the breached floodwall at the Mirabeau section of the London Avenue Canal and the associated subsampling are to establish the following characteristics of the floodwall:

> 1.  Depth of sheetpile penetration into the levee and foundation (tip elevation).

2.  Depth of the sheetpile embedment in the concrete floodwall.

3.  Details of the reinforcing bars in the connection between the sheetpile and the floodwall.

4.  Placement of reinforcing bars in the floodwall.

5.  Cross-sectional dimensions of the concrete.

6.  Material properties of the concrete.

7.  Material properties of the reinforcing bars.

8.  Material properties of the steel sheetpile.

Currently, excavation of materials placed in the area to close the breach is underway.  Once the excavation is complete, removal and sampling of the floodwall materials will be conducted.

## 3.2     Applicable Regulations/Standards
State environmental – LDEQ
Department of Justice – custody requirements
Safety requirements

## 3.3     Project Schedule
**TBD**

# 4.0     Field Activities

## 4.1     Item Recovery and Sampling
The investigation will involve removal of various materials from the breached section of the floodwall and collection of subsamples from these materials.  One area will be investigated, specifically the area of the breach following Hurricane Katrina.  Samples of the materials under investigation will be collected and transported to the testing laboratory.  The material samples will consist of three six-inch (diameter) by one-foot (length) concrete cores (from the monolith); three three-foot lengths of reinforcement steel (rebar) (from the concrete); and two 12-inch by 18-inch sheet pile coupons.  The materials from which these were collected (called the "remaining material sections") will include one four-foot by four-foot section of concrete (monolith) and four sheets of sheet piles.

## 4.2     Sample Identification and Labeling
Items recovered for inspection and analysis are considered evidence and require strict procedures for identification and labeling.  Each item will have a unique identification number based on the location of the item in the levee (in-situ) as described in Section 5.4.  Following recovery, each item or sample will be labeled

according to the methods outlined below.  There will be one concrete section and four sheet piles removed for recovery, and there will be three concrete cores, three pieces of rebar, and two sheet pile coupons collected for laboratory analysis.

It is critical that each item is labeled with the appropriate identification number in a manner so that the number cannot easily be removed.  The Site Custodian or his designee will complete the labeling for each item.  The different items and samples will be labeled using the methods described below.

Concrete
The section of concrete will be stenciled with spray paint, labeled, and custody sealed.  It will be placed on two pieces of four by four inch wood until transport to the USACE storage warehouse.

The concrete core samples taken from the monolith will be labeled by attaching a laminated label to each core using a zip tie or similar.  Labels should be clear and legible and written with indelible ink

Rebar
Each piece of rebar will be labeled using a laminated handwritten label attached to the rebar with a zip tie or similar.  Labels should be clear and legible and written with indelible ink.

Sheet Piles
Each sheet pile will be stenciled with spray paint or labeled using a scribing machine.  The sheet piles will not require a crate or large container.  It is anticipated that the sheet piles will be labeled in place (prior to removal).

The sheet pile coupons will also be labeled with a stencil and spray paint or using a scribing machine.

**4.3    Material Handling and Custody**
It is important to ensure proper custody procedures are followed in handling the items and samples from the time of recovery/samples collection until arrival at the final storage facility or laboratory.  Site access will be strictly controlled, with inspection of credentials of all USACE representatives, contractors, government officials, and visitors (including media).  Visitors and individuals not required to be in the work zone will be restricted to a viewing platform.  Identification of the various zones is defined further in the Site Safety and Security Plan.

During the recovery and sample collection effort, as items are removed (with the exception of the sheet piles, which will be labeled in place) and samples are collected, they will be given to the Site Custodian or their designee for immediate labeling with the identification number.  It is anticipated that the items should be available for viewing by the media and investigating authorities, as well as for

photographing for evidence purposes.  Once items are labeled, they will be staged on a flatbed truck near the viewing platform.  It is anticipated that the concrete section and associated material samples (concrete cores and rebar) will be removed the first day of field activities.  These materials will be transported to the appropriate destination (USACE storage warehouse or testing laboratory) at the end of that day.  The site will be secured and security will patrol the site.  The sheet piles will be removed the second day; these items will be staged on a trailer near the viewing platform until transport at the end of the day.  There will be restricted access to the truck/trailer where the materials will be staged.

## 5.0   Field Operations Documentation

Field documentation is important in any project, however it is especially critical in this project as the findings may result in legal action.  Field documentation is necessary for future reconstruction of the site conditions as well as the field activities, and for documentation of any changes to or deviations from the work plans.  The types of documentation to be completed are described below.

### 5.1   Daily Quality Control Reports

Daily Chemical Quality Control Report forms will be completed each day of the project.  These forms will be signed by the Site Custodian or designee.  This form documents all quality control activities for each day.  Other information completed on this form includes weather, subcontractor(s) onsite, equipment onsite, work performed, health and safety levels and activities, and problems encountered.

### 5.2   Field Logbook

A field logbook will also be maintained at the site.  All entries into the logbook will be written in an objective, factual manner to provide the reader with a clear description of the sequence of events as they happened in the field.  All entries will be signed and dated by the writer.  The logbook will contain information such as descriptions of field activities, sketches, persons on site, names and phone numbers of field contacts, exceptions and deviations from the work plans, and weather and field conditions.

Errors or mistakes in the original field data will be crossed out with a single line, and initialed by the person making the correction.  No data will be erased.  Some original documents will be transcribed, allowing for corrections of errors.  In these cases, the original documents will be kept in the project file.  The field logbook will be kept onsite during field activities, and moved to the project files upon completion of the project.

### 5.3   Photographic Records

Due to the potential outcomes of this investigation, photographic records will be vital.  Both still and video photography will be used to document field activities, and to record images of the items recovered.  These records will be maintained in the project file(s) upon completion of the investigation.

**5.4     Recovered Item Documentation**

5.4.1   Identification Numbers

Each item or sample (concrete, concrete cores, reinforcing bars, sheet pile, and sheet pile coupons) will be labeled based on its exact location prior to removal and recovery or sampling.  This will allow for identification of the exact location during later reconstruction.  The locations will be identified with regard to each concrete monolith as identified on contract drawings (these locations should be verified with actual locations at the site). Sheet piles will be numbered sequentially within each monolith. Therefore, concrete sections and cores, rebar, and sheet piles and coupons will be labeled in the following manner:

Concrete

Monolith (M) number Concrete section (C) number = M__ C__  (The actual number of the item will be determined during the recovery effort. For example, M8 C1 would be concrete removed from Monolith 8.)

Concrete Core

Monolith (M) number Concrete core (CC) number = M__CC__  (The actual number of the item will be determined during the recovery effort. For example, M8 CC1 would be concrete core number 1 removed from Monolith 8.)

Rebar

Monolith (M) number Rebar (R) number = M__ R__  (The actual number of the item will be determined during the recovery effort.  For example, M8 R2 would be the second piece of rebar removed from the concrete section in Monolith 8.)

Sheet Pile

Monolith (M) number Sheet pile (SP) number = M__ SP__  (The actual number of the item will be determined during the recovery effort.  For example, M8 SP2 would be the second sheet pile counting sequentially to Monolith 8.)

Sheet Pile Coupon

Monolith (M) number Sheet pile coupon (SPC) number = M__ SPC__ (The actual number of the item will be determined during the recovery effort.  For example, M8 SPC1 would be sheet pile coupon number 1 removed from the sheet pile under Monolith 8.)

5.4.2   Labels

Section 4.2 describes the types of labels that will be affixed to each item. The labels and manner of attachment should be permanent or not easily removed (in the case of the concrete cores, rebar, and sheet pile coupons).

### 5.4.3  Custody Records

The Site Custodian or their designee will complete the "Evidence/Property Custody Document," DA Form 4137.  This is necessary to meet litigation requirements, as the items are considered evidence in any potential legal action regarding the canal.  A separate custody form will be completed for each item and sample based on the manner in which they will be shipped. For example, the concrete will require its own form, the concrete cores will be grouped on one form, the pieces of rebar will be grouped on one form, the sheet pile coupons will be grouped on one form, and each sheet pile will require its own form.  This will result in eight total custody forms (one concrete section, one group of concrete cores, one group of rebar pieces, one group of sheet pile coupons, and four sheet piles).

In addition, a separate chain of custody from the laboratory will be completed for the material samples (concrete cores, rebar pieces, and sheet pile coupons).

## 5.5    Data Management and Retention

Field logs, photographic records, and other documentation will be maintained at the New Orleans District offices.  Access to these records will be restricted.  The records will be maintained for ___ years following closure of any legal proceedings.

## 6.0    Transportation Requirements

The two types of materials (material samples and remaining material sections) removed will be transported to different locations.

The material samples (concrete cores, rebar, sheet pile coupons) will be transported to Beta Labs in Gretna, Louisiana for analysis.  These samples will be transported at the end of the day in which they were collected.  The Site Custodian or designee will accompany the samples with the corresponding custody form(s) in their possession.  Upon arrival at the laboratory, the Site Custodian or designee will relinquish custody to the receiving personnel.  This will be documented on the custody form (DA 4137).  All changes in custody will be documented on the custody forms.  In addition, a separate chain of custody from the laboratory will be completed for the material samples.

The remaining material sections (concrete and sheet piles) will be transported to the USACE New Orleans District warehouse at the end of the day in which they are removed.  The items will be stored in a secure location within the warehouse. The Site Custodian or designee will accompany the items with the corresponding custody form(s) in their possession.  Upon arrival at the storage area, the Site Custodian will relinquish custody to the Storage Custodian.  This will be documented on the custody form (DA 4137).  All changes in custody will be documented on the custody forms.

## 7.0   Storage Requirements

Secure storage of the remaining material sections is necessary. The items will be permanently stored in a secure area within the New Orleans District warehouse. Only items from the Mirabeau section of the London Avenue Canal site and those designated and authorized by the Office of Counsel will be stored at this location.  The storage area will secured from unauthorized entry as necessary (this will include fencing, signs indicating authorized entry only, locked gates with a high security lock, 24-hour guards seven days a week, etc.).  The Storage Custodian and Deputy Storage Custodian will be authorized to enter the area at all times; any request for other entry to the area or inspection or removal of the items will require District Counsel approval.  Authorized removal of the items will be conducted only under the Office of Counsel; the Office of Counsel will also prepare the appropriate documents for this process.

## 9.0   Contractor Quality Control

The three phases of control under the USACE Construction Quality Management guidelines will be implemented: preparatory, initial, and follow-up.  These phases will be implemented by preparing and reviewing all documents prior to the start up of the project, checking preliminary work and ensuring compliance with the contract at the beginning of the site activities, and performing daily checks to ensure the continuing compliance as the project progresses.

## 10.0  Summary Report

Upon completion of the field activities, a Summary Report will be prepared.  The report will document all activities and will include photographs and field notes. The report narrative and supporting documents will be sufficient to meet legal requirements.

**Table 1: Recovered Item Sample Table**

| Identification Number | Matrix | Recovery Date/Time | Location Description | Comments |
|---|---|---|---|---|
| M____ C1 | Concrete | | | |
| M____ CC1 | Concrete | | | |
| M____ CC2 | Concrete | | | |
| M____ CC3 | Concrete | | | |
| M____ R1 | Rebar | | | |
| M____ R2 | Rebar | | | |
| M____ R3 | Rebar | | | |
| M____ SP1 | Sheet Pile | | | |
| M____ SP2 | Sheet Pile | | | |
| M____ SP3 | Sheet Pile | | | |
| M____ SP4 | Sheet Pile | | | |
| M____ SPC1 | Sheet Pile (coupon) | | | |
| M____ SPC2 | Sheet Pile (coupon) | | | |

_____

Site Custodian                    Date

Page 10

Materials Management Group, Inc.                              New Orleans District Contact

# SCOPE OF WORK

### Support to the Material Sampling Program
### For the Floodwall at the Mirabeau Breach on London Avenue Canal,
### In the Vicinity of New Orleans, Louisiana
### Contract No. - DACW29-03-D-0014

**1. General.** The contractor shall furnish all services, materials, supplies, labor, and equipment to plan and conduct collection, labeling, custody and transportation of samples of sheet pile, concrete and reinforcing steel, which are to be removal from the breached section of floodwall at the Mirabeau Breach on London Avenue Canal. The actual dates of sampling will be dependant upon the progress of the excavation contract currently underway. The excavation contractor will be responsible for the removal of the materials from the floodwall. The samples shall be delivered by the contractor (MMG) to the materials testing laboratory on the same day that they are collected. The contractor shall provide onsite support services at the breach site for a total of two working days within the period 23 March 2006 through 23 April 2006.

The Contractor shall provide independent and professional custodial management of:
- The material samples from the point and time of collection to the point and time of delivery to the materials testing laboratory personnel. The material samples will consist of: three (3), 6 inch diameter by 1 foot length, concrete cores; two (2), approximately 12-inch by 18-inch, sheet-pile coupons, and three (3), 3-feet lengths of reinforcement steel (rebar).
- The "remaining material sections" from the point and time of collection to the point and time of delivery to the New Orleans District USACE Material Storage Custodian, or designated deputy. The "remaining material sections" consist of: one (1) cut-concrete section of the flood wall (4-foot by 4-foot); and four (4) sheets (two pair) of sheet pile which are to be retained for any potential litigation needs.

**2. Individual Work Items and Submittal Dates.** The contractor shall begin, upon the written or verbal notice to proceed from the Contracting Officer, to develop details and plans for the support of the sampling activity, and provide a draft Sample Custody Plan for review and comment. The contractor shall incorporate the government comments and complete a final Sample Custody Plan, with required signatures prior to the sampling event.

Additionally, a summary report with photos, field notes, and a narrative description of the field activities sufficient to document the event for legal purposes will be delivered within two weeks of completion of sampling activities to the government's Site Custodian or to the Storage Custodian, as specified.

The contractor shall also directly support the Site Custodian, Mr. Bob Brooks, or his designated appointee, in the field, during the field activities, by rendering advice and direct sampling support during the field operations including but not limited to:

- Providing and utilizing marking equipment and supplies, including logbooks, forms and labels, stencils and any other support supplies required for permanent sample identification
- Providing field sample handling and custody services
- Rendering technical and legal advice as it relates to the sampling effort
- Providing chain-of-custody and manifesting services and requirements
- Providing transportation of the material samples to the materials testing laboratory.
- Provide escort of the remaining material sections (monolith cut sections and the sheet pile), from which the material samples were collected, from the sampling site to the secure storage location at the New Orleans District, USACE.
- Completing the proper and legal transfer of the material samples to the materials testing laboratory personnel and the remaining material sections to the Storage Custodian, or duly authorized representative, such as the Deputy Storage Custodian at the New Orleans District warehouse.

**3. Project Description**.  This scope of work shall include the development of planning documents, participation in approximately three planning meetings/teleconferences, attendance in at least one pre-constructions site visits, and performance of site work, as necessary. Site work shall include, but not be limited to, sampling, marking, labeling, packaging, manifesting, and transporting samples from the site to the Beta Labs, materials testing laboratory in Gretna LA, or to a laboratory or storage area designated by the Site Custodian.

**4. Submittals.**   The number of copies of Draft and Final Sample Custody Plans are required.

**4.1** Draft Sample Custody Plan

     "Hard Copies"                                                  5 Copies

**4.2** Final Sample Custody Plan

     "Hard Copies"                                                  5 Copies

     Electronic Copies of documents                      1 Copy

**4.3** Draft Activities Summary Report

     "Hard Copies" of report                                    5 Copies

     Electronic Copies of report                             1 Copy

**4.3** Final Activities Summary Report

     "Hard Copies" of report                                    5 Copies

     Electronic Copies of report                             1 Copy

Electronic versions of the text and drawings shall be submitted on Compact Disk (CD) in PDF format for all documents provided in final form.

**5.  Coordination.**  The contractor shall coordinate with Task Force Guardian, the New Orleans District Office (MVN), Task Force Hope, other interagency groups, other State and local officials as necessary to complete the requirements of this task order and to procure information relevant to this activity.

**6.  Approval of Local, State, and Federal Authorities.**  The following is a list of governmental authorities that will be given an opportunity to review and comment on the sample custody documents.  The need for additional agencies to review the project will be determined as the documents are developed.

> (1)     US Army Corps of Engineers.
>
> (2)     Interagency Performance Evaluation Task Force members, as designated by TF Guardian

**7.  Points of Contact**.  The technical points of contact for this task order are:

> o   Mr. Reuben C. Mabry – Engineering and Design, Task Force Guardian
>
> o   Mr. Robert Brooks – Site Custodian, Task Force Guardian
>
> o   Ms Rosie Washington – LMO New Orleans District Warehouse

**Submittal Schedule**

| Submittal | Time Interval For Work Item In Calendar Days |
|---|---|
| NTP | 0 |
| Draft Sample Custody Plan | 2 days from NTP |
| Draft Review - Comments | 1 |
| Final Sample Custody Plan | 2 days from receipt of comments |
| Field Activities | 2 days (non consecutive, TBD) |
| Summary report | 14 days following completion of field activities |

3

Materials Management Group, Inc.                           New Orleans District Contact

## SCOPE OF WORK

**Support to the Material Sampling Program**
**For the Floodwall at the Robert E. Lee Breach on London Avenue Canal,**
**In the Vicinity of New Orleans, Louisiana**
**Contract No. - DACW29-03-D-0014**

**1. General.** The contractor shall furnish all services, materials, supplies, labor, and equipment to plan and conduct collection, labeling, custody and transportation of samples of sheet pile, concrete and reinforcing steel, which are to be removal from the breached section of floodwall at the Robert E. Lee Breach on London Avenue Canal. The actual dates of sampling will be dependant upon the progress of the excavation contract currently underway. The excavation contractor will be responsible for the removal of the materials from the floodwall. The samples shall be delivered by the contractor (MMG) to the materials testing laboratory on the same day that they are collected. The contractor shall provide onsite support services at the breach site for a total of two working days within the period 12 April 2006 through 12 May 2006.

The Contractor shall provide independent and professional custodial management of:
- The material samples from the point and time of collection to the point and time of delivery to the materials testing laboratory personnel. The material samples will consist of: three (3), 6 inch diameter by 1 foot length, concrete cores; two (2), approximately 12-inch by 18-inch, sheet-pile coupons, and three (3), 3-feet lengths of reinforcement steel (rebar).
- The "remaining material sections" from the point and time of collection to the point and time of delivery to the New Orleans District USACE Material Storage Custodian, or designated deputy. The "remaining material sections" consist of: one (1) cut-concrete section of the flood wall (4-foot by 4-foot); and four (4) sheets (two pair) of sheet pile which are to be retained for any potential litigation needs.

**2. Individual Work Items and Submittal Dates.** The contractor shall begin, upon the written or verbal notice to proceed from the Contracting Officer, to develop details and plans for the support of the sampling activity, and provide a draft Sample Custody Plan for review and comment. The contractor shall incorporate the government comments and complete a final Sample Custody Plan, with required signatures prior to the sampling event.

Additionally, a summary report with photos, field notes, and a narrative description of the field activities sufficient to document the event for legal purposes will be delivered within two weeks of completion of sampling activities to the government's Site Custodian or to the Storage Custodian, as specified.

The contractor shall also directly support the Site Custodian, Mr. Bob Brooks, or his designated appointee, in the field, during the field activities, by rendering advice and direct sampling support during the field operations including but not limited to:

- Providing and utilizing marking equipment and supplies, including logbooks, forms and labels, stencils and any other support supplies required for permanent sample identification
- Providing field sample handling and custody services
- Rendering technical and legal advice as it relates to the sampling effort
- Providing chain-of-custody and manifesting services and requirements
- Providing transportation of the material samples to the materials testing laboratory.
- Provide escort of the remaining material sections (monolith cut sections and the sheet pile), from which the material samples were collected, from the sampling site to the secure storage location at the New Orleans District, USACE.
- Completing the proper and legal transfer of the material samples to the materials testing laboratory personnel and the remaining material sections to the Storage Custodian, or duly authorized representative, such as the Deputy Storage Custodian at the New Orleans District warehouse.

**3. Project Description**. This scope of work shall include the development of planning documents, participation in approximately three planning meetings/teleconferences, attendance in at least one pre-constructions site visits, and performance of site work, as necessary. Site work shall include, but not be limited to, sampling, marking, labeling, packaging, manifesting, and transporting samples from the site to the Beta Labs, materials testing laboratory in Gretna LA, or to a laboratory or storage area designated by the Site Custodian.

**4. Submittals.**   The number of copies of Draft and Final Sample Custody Plans are required.

**4.1** Draft Sample Custody Plan

    "Hard Copies"               5 Copies

**4.2** Final Sample Custody Plan

    "Hard Copies"               5 Copies

    Electronic Copies of documents      1 Copy

**4.3** Draft Activities Summary Report

    "Hard Copies" of report        5 Copies

    Electronic Copies of report        1 Copy

**4.3** Final Activities Summary Report

    "Hard Copies" of report        5 Copies

    Electronic Copies of report        1 Copy

Electronic versions of the text and drawings shall be submitted on Compact Disk (CD) in PDF format for all documents provided in final form.

5. **Coordination.** The contractor shall coordinate with Task Force Guardian, the New Orleans District Office (MVN), Task Force Hope, other interagency groups, other State and local officials as necessary to complete the requirements of this task order and to procure information relevant to this activity.

6. **Approval of Local, State, and Federal Authorities**. The following is a list of governmental authorities that will be given an opportunity to review and comment on the sample custody documents. The need for additional agencies to review the project will be determined as the documents are developed.

    (1)    US Army Corps of Engineers.

    (2)    Interagency Performance Evaluation Task Force members, as designated by TF Guardian

7. **Points of Contact**. The technical points of contact for this task order are:

    o   Mr. Reuben C. Mabry – Engineering and Design, Task Force Guardian

    o   Mr. Robert Brooks – Site Custodian, Task Force Guardian

    o   Ms Rosie Washington – LMO New Orleans District Warehouse

**Submittal Schedule**

| Submittal | Time Interval For Work Item In Calendar Days |
|---|---|
| NTP | 0 |
| Draft Sample Custody Plan | 2 days from NTP |
| Draft Review - Comments | 1 |
| Final Sample Custody Plan | 2 days from receipt of comments |
| Field Activities | 2 days (non consecutive, TBD) |
| Summary report | 14 days following completion of field activities |

# Soil Samples taken by IPET

The first series of soil borings were obtained by the U.S. Army Corps of Engineers Vicksburg District.  Most of the borings taken were adjacent to a Core Penetration Test. A two-foot long five inch diameter, Shelby tube sampler was used to obtain the soil sample.  These samples were then extruded in the field and trimmings from this sample were used to field classify the sample.  Some of these trimmings along with the sample identification information were place into glass jars and these jars would later be used to determine moisture content of the samples.  Before the soil samples were placed into a plastic protective jacket, a hardened wax plug was placed first in the jacket.  This plug is used as a base support for the soil sample.  Then the soil sample was placed on top of this plug.  Finally hot wax was pored around the sample to completely seal the sample and a sample identification was attached to the cylinder. These types of undisturbed samples were taken in clays and silts.  Drive tube samples were taken in sand.  Samples for these drive tubes were classified in the field and a representative portion of this sample was then placed into a glass jar along with a sample identification information.  All of these samples would be placed into a Government vehicle and transported off site each night. Once a load of these samples had been obtained, the samples were transported by Government vehicle to the Vicksburg District.  At the District office, the undisturbed samples were temporarily stored and the jar samples were used to determine moisture content.  After laboratory logs were completed on these samples they were then transported to ERDC by Government vehicle and stored in the ERDC humid room until later testing at ERDC.  All transportation of the samples was performed using current industry standards for handling and care of undisturbed samples.

The soil samples taken by Eustis Engineering for ERDC were taken with a similar procedure except for these differences.  A five-foot-long, five-inch-diameter Shelby tube sampler was used to obtain the soil sample.  These samples were not extruded in the field. Instead the ends of the sampler were plugged and each tube labeled for identification. These tubes were then taken to Eustis lab and the sample was then extruded and marked as the A, B, or C sample.  An ERDC Geologist was present for sample extrusion and photographed the soil samples for the 2 borings obtained through the slide block. Trimmings from these samples were used to determine soil moisture content, and to make a preliminary soil classification.  The three sections of the sample were individually wrapped in aluminum foil and then wrapped in plastic bags.  Before being shipped to ERDC, the sample tubes were sealed in wax.  Samples were transported to ERDC Vicksburg by government and stored in the ERDC humid room.  All transportation of the samples was performed using current industry standards for handling and care of undisturbed samples.

Two series of bulk samples of marsh and peat soils were taken at the 17th Street Canal Failure.  These bulk soil samples were taken with a special made box sampler.  The sampler was built by the ERDC machine shop and consisted of an aluminum box, measuring 18-in per side, open on one end, and with beveled edges on the open side to permit pushing into the underlying soil with minimal sample disturbance.  Four box

samplers were built, and were used to obtain marsh and peat samples from the south end of the displaced block of levee and foundation soil. This slide block or slide mass measurers approximately 100 ft wide by 300 ft in length and was displaced approximately 55 ft east of its original position at the site where samples were obtained.

Each box sample was slowly pushed into the soft marsh and peat soils by the backhoe bucket until the sampler was flush with the top of the excavated surface. The bulk samples were removed from their pushed position using nylon straps through special made handles on the outside of the box surface, and lifted out of the soil with the backhoe bucket. The bottoms (open side) of the block samples were then sealed in plastic with duct tape to prevent the sample from drying out. Soil samples were secured in the truck to prevent damage from sliding and shifting and were transported to ERDC for later laboratory testing. At the soils laboratory at ERDC, the plastic was removed and the bottom of the bulk samples were trimmed, sealed in wax, and stored in the humid room until centrifuge testing was conducted, or samples were transported to other university soil testing laboratories.

The ERDC field team maintained custody of the box samples in the field and during transport to ERDC.