# EXHIBIT 5



*IRONMOUNTAIN*
*266779944*

Water and Parenterals (W&P) Subcommittee Meeting
January 13, 1999
Summary Notes

Members Present:                          Staff Present:
James Boylan, Ph.D., Chairman            L. T. Grady, Ph.D.
Henry Avallone                            Frank Barletta
Joseph Gallelli, Ph.D.                    Gail F. Bormel, J.D.
John Levchuk, Ph.D.                       Diane Cousins
Steven Nail, Ph.D.                        Joseph G. Valentino, J.D.
David Newton, Ph.D.
Theodore Roseman, Ph.D.

Visitors
Julia Gorman, CBER, FDA
Paul Stinavage, CDER, FDA


1.   Previous Meeting Notes

     The notes were accepted as written.

2.   International Harmonization

     Drs. Boylan and Gallelli attended the fall 1998 meeting of the USP, EP, and JP in Seville,
     Spain and briefed the members on the significant highlights as follows:

     - USP standards for subvisible particles (<788>) was adopted by the EP (JP already did
       so).  This was a major accomplishment in harmonization.

     - At the Seville meeting it was agreed that the exemptions to <788> need to be
       reconsidered with a view to harmonize the compendia.

     - The *PF 25*(1) [Jan.-Feb. 1999] issue has proposed inclusion of these exemptions in the
       general chapter <788>.  This is to generate discussion only and will not be moved
       forward to Supplement until the Subcommittee has obtained more information and
       harmonizing discussions with EP and JP have occurred.

     - The JP representatives were critical of the USP and EP definition of a SVP.  They use $\leq$
       99 mL (instead of $\leq$ 100 mL) and consideration to change for the sake of harmonization
       was suggested.

3.   Sterile Products Curriculum Resources

     Jim Crandall and Nancy Carothers (External Affairs) provided a status report as follows:

2

Ms. Carothers will be returning to clinical nursing at NIH and the project will now be coordinated by Nancy Best. Tim Greiner, USP Website Administrator will provide access to the information when instructed to do so. The Subcommittee will be responsible for the revision process and Dr. Levchuk will be the responsible person to organize any necessary revision, with the assistance of the DSD liaison. Ms. Carothers was complimented for her invaluable assistance in getting the resources project to completion.

The Subcommittee suggested that the package could be sold as a training resource to industry and suggested developing a promotional plan. A major limitation is the title of the chapter <788> emphasizing home health care. Dr. Levchuk stated that was the charge given to the Subcommittee by the Convention but the title should probably be changed since the content applies to sterile compounding irrespective of the location.

4.   Elastomeric Closures

At the previous Subcommittee meeting the members considered the PDA proposal and requested additional information and a reply has not been received as yet. Dr. Boylan stated that this subject was discussed at the fall PDA meeting in Washington, D.C. and it appears that a major re-evaluation is being conducted. A PDA survey of over 400 compounds from six elastomeric closure manufacturers showed that 15-20% of the samples would fail the "tier one" limit. Dr. Ed Smith, PDA, is coordinating this project for PDA. USP informed PDA that the Subcommittee was not in favor of grandfathering older elastomeric closures. PDA is planning to submit a revised survey to Dr. Nail for his Advisory Panel's review.

The latex issue is also to be resolved. Dr. Robert Hamilton (Johns Hopkins) presented his study proposal at this same PDA meeting and a copy is included in the briefing book. It was noted that he is in need of a mere $15,000 for the study and the Subcommittee is hopeful that industry would provide this support. Dr. Mike Gross, Becton Dickinson (a member of the USP Advisory Panel), is the major PDA proponent for this project.

5.   Neuromuscular Blockers

Dr. Boylan began by reading Dr. Workman's telephone comments (see attachment). Ms. Cousins then stated that because of timing the Subcommittee suggestion, regarding a questionnaire to practitioners, could not be done before the ASHP meeting; however, it is ready to go now. There was much discussion which is highlighted as follows:

- The questionnaire could go to pharmacists, nurses, nurse anesthetists, and anesthesiologists.

- Historically, the USP has not supported color coding of articles.

- Electrolytes, e.g., $MgSO_4$ and liposomal formulations, may be other categories for USP labeling consideration.

3

- Irregular bottles have been used for poisonous materials in the past and are being used by Glaxo Wellcome for neuromuscular blockers. They, however, slow the speed of the conveyor belt or must be hand labeled; thereby increasing the cost.

- Focus groups are used in industry and this was suggested as an information gathering method.

- The Subcommittee needs the results of the survey to make a final decision.

- Changing packaging is a serious matter for industry and the Subcommittee must not act on the basis of a recommendation. It needs data and information in support of any change.

- Any change in packaging needs to be combined with education.

The Subcommittee decision is as follows:

    (a) Product Reporting Network program (PRN) should obtain the labels of the neuromuscular blockers (NMB) products and present them to the Subcommittee in a way that they can be evaluated.

    (b) PRN and its advisory panel should develop a media awareness program; i.e., lapel buttons, stickers, etc., for practitioners to emphasize the importance of reading labels.

    (c) Subcommittee involvement in the design and conducting of the survey is necessary. The proposed questionnaire should be sent to the members for review and comment.

    (d) Subcommittee needs information that shows why the NMB related errors are being made.

6. <u>Labeling on Injection Ferrules and Caps</u>

The Chairman added a related topic to the agenda. The National Coordinating Council for Medication Error Reporting and Prevention recommended that printing on the cap and ferrule of injectables be restricted to warning statements. It was proposed for discussion and the following comments were made:

- No symbols or written matter would be allowed including "flip off" and logos.

- A member stated that is seems reasonable to limit the restriction to the ferrule, since the cap is discarded and the warning remains until the drug is withdrawn completely.

- The FDA labeling group should be given the opportunity to comment before USP proceeds any further.

A motion was made to restrict the use of any printing on the cap and ferrule of injectables to warnings. After discussion the original motion was dropped and following motion was made:

4

> "The Subcommittee will publish the proposal to limit printing on ferrule to warnings in the headquarters column of the *PF* with a request for comments."

The vote was unanimously approved.

Dr. Grady stated that he would consider publishing a short stimuli article if more detailed information is needed. Diane Cousins and Frank Barletta will investigate this possibility. ← Done

Other recommendations of the National Coordinating Council for Medication Error Reporting will be considered at the next Subcommittee meeting.

7.  American Pharmaceutical Partners Request

The company submitted a request to revise the requirement in the Potassium Chloride Injection Concentrate monograph so as to allow the use of a clear cap and red print on the ferrule as an alternate to the black cap and ferrule.                                     ← letter
                                                                                                                                                                     sent

The motion to deny the request was approved unanimously. The Subcommittee believes that a single USP standard is required with no alternatives.

8.  Volume in Container

There are two interrelated issues.

(a)  FDA letter of November 7, 1997 requesting that the *Volume in Container* statement in <1> *Injections* be revised to restrict the amount of excess volume in the container. The discussion was as follows:

- The presumption is that in unit-dose syringes, where the entire content is used, an upper limit is required to insure overdosage.

- In multiple-dose containers there is no issue since you must draw out the required amount.

- There was a difference of opinion in terms of the need for an overage with lyophilized products.

- FDA's use of the word "slight" has no meaning.

A motion was made to add the following to the *Volume in Container* statement:

> "Additionally, where the entire contents of a container 30 mL or less are to be injected as a single administration, the volume in the container shall not exceed 110% of the labeled volume."

There followed a discussion regarding the appropriateness of this statement and the effect it will have on industry. Members were not in favor of a "trial balloon." The motion was

5

*done –*
*Valentino*

defeated with a vote of 4 against, 2 in favor, and 1 abstention. A letter will be sent to FDA requesting clarification of the intent of their revision request.

    (b)  A Subcommittee member submitted a position paper, "Dose Uniformity, Unit Dose and Sterile Products" for Subcommittee consideration. It was felt that the dose uniformity problem exists for all unit dose liquids, both injectable and oral, including sterile powders and lyophilized powders. At present one must conclude that USP requires that every vial (syringe) tested must meet the label claim requirements. However, since the vial contents can vary, the dose uniformity and assay requirements conflict. He concluded that dose uniformity requirements for liquid dosage forms should be established.

The Subcommittee decided on the following:

- A letter will be sent to PDA describing the defeated motion and requesting their *done Grady* comments with particular attention to the "cap" percent limit.

- The Subcommittee intent will be published as a stimuli article in the *PF*. Hank *done To Hank* Avallone will coordinate this effort.

9.   <u>Purified Water</u>

    There continues to be difficulty in harmonization with the EP. EP insists that USP recognize European Union members water as well as those recognized by the EP as participants. Before USP can do so, one must have information regarding the water sources and quality of these countries. An effort should be made to obtain this information; e.g., from the EPA or EP. Dr. Boylan described a city water treatment facility in San Diego that utilizes waste water and suggested a site visit during an Open Conference that could be held there next year covering the same topics as at the Colorado Springs meeting in 1993.

10.   <u>Partial Multidose Vials</u>

    The Subcommittee considered this issue in the past and decided that it was a practice issue and it was referred to DID. The Centers for Disease Control (CDC) has, however, provided recent guidelines which state "discard multidose vials when empty, when suspected or visible contamination occurs, or when the manufacturer's stated expiration date is reached." The referenced articles date back to 1977 and 1982. There has been more recent information that demonstrates that the risk of contamination increases with the number of "sticks." The Subcommittee members will provide this information and then a letter will be sent to CDC with the USP position.

11.   <u>Use of Plastic Injection Vials</u>

    A company requested that USP consider revising the *Packaging and storage* statement for injections so as to allow the use of plastic vials. A notice and a list of injections was published in the Sept.-Oct. 1998 *PF* and there were no comments received. Both the

6

Chairman of the W&P and the PSD Subcommittee (Dr. Medwick) approved the concept and the W&P Subcommittee was in agreement.

It was suggested that instead of revising each monograph, a statement be included in <1> *Injections* allowing the use of plastic vials. The exact wording was to be developed so as to include products in single- and multi-dose vials, e.g., "unless otherwise stated in the individual monograph, plastic containers may be used for packaging single- or multiple-dose vials." In so doing, we can make the change in time for *USP 24* by simultaneously announcing it in *PF*.

*done*
*S-10*

12. Particles in Ophthalmics

PhRMA is conducting a study for the Subcommittee and we have been advised by Dr. Dan Fagan that they are on schedule. We should have their results in December 1999. Bauch & Lomb and Ciba have agreed to join Alcon in this study.

The meeting was adjourned at 2:30 p.m.

FPB

Approved: _____          Date __2/3/99__
James C. Boylan, Ph.D.
Chairman