LOUISIANA OFFICE

3501 HOLIDAY DRIVE, SUITE #203-A
NEW ORLEANS, LA 70114

CELL (24 HOURS): (504) 367-4072
FAX: (504) 367-3790

Email: Oceanoilpazos@cs.com
www.siterrific.com/pazos

# Ocean-Oil
## Expert Witness, Inc.

NAVAL ARCHITECTS and MARINE ENGINEERS
MARINE CONSULTANTS

FLORIDA OFFICE

P. O. BOX 47188
ST. PETERSBURG, FL 33743-7188

566 VILLA GRANDE AVE. S.
ST. PETERSBURG, FL 33707

PH: (727) 347-2556
FAX: (727) 343-9717
CELL (24 HRS): (727) 415-7192
Email: Hectorpazos75597@aol.com

April 26, 2006

VIA E-MAIL

Mr. Ashton R. O'Dwyer, Jr.
Law Offices of Ashton R. O'Dwyer, Jr.
One Canal Street, Suite 2670
New Orleans, LA 70130

Re: Northern Breach of the London Canal Levee

Dear Mr. O'Dwyer:

As per your request, I have prepared a preliminary estimated sequence of events that in my opinion took place during Hurricane Katrina at the northern breach of the London Canal levee, based on observations of the site made on 4/24/06 and 4/25/06.

A.  Although some sheet piles were not visible because on 4/25/06, they were covered by mud, if it is assumed that the sheet pile system remained continuous, that is, no separation of sheet piles occurred. Therefore, the flow of water from the canal to inland must have taken place initially thru the space covered by one or more monoliths. This occurred because the connections between two adjacent monoliths, consisting of water stop material (P.V.C.) and concrete lips (which are part of the monoliths) retaining the P.V.C., were destroyed. The following comments are an explanation of the cause of the connections between monoliths becoming destroyed.

In the case of an I type floodwall as found in the London Canal, there is a strong structural relation between the connection of two monoliths (consisting of a water stop system), and the connection of sheet piles and a monolith, which we will refer to as "Units".

EXHIBIT No. 6

Because the monoliths are not being supported by soil to resist the horizontal forces created by hydrostatic pressures, for the monoliths to maintain their position, their connection to the sheet piles must have adequate structural strength, or a "hinge" will be created in the transition area between the monolith and sheet pile.

But, even if the connection apparently has adequate structural strength, variations in the structural strength from one monolith to the adjacent monolith can also result in a "hinge condition" affecting the water stop systems connection between monoliths.

If the structural capacity of a "unit" consisting of sheet piles and a monolith is almost the same as the adjacent "units", when the water level increases and hydrostatic pressure is applied to the monoliths, the deformation of adjacent "units" will almost be the same and no substantial additional stresses (besides the stresses due to hydrostatic pressure) will be imposed to the water stop system on either end of the monolith. But, if the connection between sheet piles and a monolith is slightly weaker (in a specific monolith) than the adjacent "units", this specific monolith will deform (tilt at the area of the connection between the sheet piles and the monolith), or "hinge" more than the adjacent monoliths, creating additional stresses to the water stop system at each end of this specific monolith. These additional stresses can result in the failure of the water stop system at each end of this specific monolith. If the connection between sheet piles and monoliths is similarly weak in two or more adjacent units, these units will react as a large single unit.

At the present time it appears that the sheet piling remained, after the breach, as a continuous steel structure, that is, was not separated. Hence, the following comments are based on this assumption. To determine if the sheet pile was separated, at least a portion of the top of the sheet pile needs to be excavated, since it is partially covered by soil, mud and water.

B.  OBSERVATIONS

These observations are the basis from which the estimated sequence of events was developed:

2

1. Improper elevation of sheet piles affecting the strength of the connection between sheet piles and some monoliths: The top elevation of the sheet piles, which were encased in concrete monoliths, was observed not to be continuous. That is, the elevation of several sheet piles did not match the elevation of the adjacent sheet piles. The difference in elevations varies from a few inches to approximately 30 inches in some locations. As a result, some sheet piles were embedded or set in the concrete only just a few inches, and the rebars that were intended to transfer the bending moment (created by hydrostatic forces applied to the monoliths) to the sheet piles underneath, were ineffective because, although the rebars were embedded in the concrete, there were very little amount of overlapping of the rebars and the sheet piles. In summary, it was observed that there were multiple locations lacking structural continuity and/or having different strength capacity between monoliths and the sheet piles than adjacent locations, which will increase the possibility of developing a "hinge" between a monolith and the sheet piles, and, as a result, overstressing the water stop material between 2 monoliths and/or the concrete lips securing the water stop material.

2. Multiple rebars bent to almost horizontal configuration: About the center of the north breach of the London Canal, it was observed that in excess of 40 rebars were bent to an almost horizontal configuration, indicating that several monoliths have been knocked down during the breach, probably immediately after the connection between monoliths was destroyed. This observation supports the conclusion that some of the sheet piles and the monoliths did not act as a "homogenous beam", but rather a "hinge" was developed at the connection between sheet piles and monoliths.

3. Curved configuration of the remains of the floodwalls: The top of the sheet piles were relocated inland in an arch or curved configuration between points of reaction, one point of reaction being the bridge at Robert E. Lee Blvd., indicating that the sheet piles were not separated.

4. Insufficient factor of safety: The factors of safety during the design were insufficient to account for fabrication errors such as variations of the elevations of the top of the sheet

3

piles and/or to avoid hinge conditions that occurred as can be ascertained by observation of the rebars being bent almost horizontally.

C.    ESTIMATED SEQUENCE OF EVENTS BASED ON ABOVE OBSERVATIONS:

1. As the water level was rising on the canal and the hydrostatic pressure on the levees increased, the upper portions of the landside of the embankment was compressed and pushed inland with respect to it original location, resulting on the seawalls and levee forming a curved or arch configuration between two strong reacting or supporting points. One of these points is the bridge at Robert E. Lee Blvd., and the other was some 800 to 1,000 feet south of the bridge. Also, because the resistance to the horizontal relocation of the floodwalls is lower at the top of the sheet piles than at the bottom of the sheet piles, the sheet piles will be displaced horizontally at the top, creating a rotation of the sheet piles approximately about the bottom of the sheet piles.

   Although the curved configuration of the levee and floodwalls (in plan view) is longer than the length of the straight-line configuration that the floodwalls had before the increase in pressure, if the sheet piles remain a continuous steel structure, the increase in length will be limited by the structural capacity of the sheet piles, which would have protected the water stop system between monoliths from being overstressed. But, if the connection between sheet piles and a monolith is not of sufficient strength and allows a "hinge" to be created, the water stop connection will be overstressed and will fail at each end of the monolith(s) that hinged, because of insufficient structural capacity of the water stop system to absorb a hinge condition of the joint between the sheet piles and the monoliths.

2. Upon the failure of a water stop connection, the monolith will be knocked down and a large volume of water will pour thru the opening quickly eroding the inland side of the embankment and carrying soil material from the waterside and landside of the embankment inland.

4

3. Simultaneously with the failure of the water stop connection, the related monolith will be easily rotated (due to hydrostatic pressure and gravity), to a configuration determined by the remaining strength of the joint between sheet piles and monolith, or by any soil support that may remain on the landside of the floodwall. Once one or several monoliths are knocked down, as indicated by the rebars that are bent to almost horizontal configuration, the volume of water flowing from the canal towards inland becomes very large washing the soil in the direction of the flow (inland), both on the water side and on the landside of the collapsed monoliths. Furthermore, as the high volume of water is overtopping the knocked down monoliths, creates a high water turbulence excavating the soil under the knocked down monoliths and the sheet piles, resulting in the sheet piles and monoliths sinking due to "excavation" of the soil by large volumes of water.

A contribution to the removal of soil from under the sheet piles and monoliths, could have been the flow of water under the lower end of the sheet piles, but this theory does not appear to be as strong in the case of the London Canal as the collapse of the monoliths in view of the bending of rebars, since the sheet piles remained generally at an "at rest angle" of 45 degrees or less.

D. PRELIMINARY CONCLUSIONS

In the case of the northern breach of the London Canal levee, the observations noted indicates that the breach was primarily initiated as the result of failures of the connecting joints between monoliths and sheet piles, failure which was primarily created by the improper design of the connection between sheet piles and monoliths, and magnified by errors incurred during construction and inspection, which consisted of the sheet piles not having an even elevation of the top end of the sheet piles. In other words, a design deficiency and construction-inspection errors resulted in the breach of the levee. The above conclusion is based on the assumption that the sheet piles remained a continuous steel structure. If the joint between monoliths and the sheet piles would have been strong enough to avoid hinge conditions, the floodwall most probably would not have breached.

Regards,
Hector V. Pazos, P.E.