# SALAS & Co., L.C.
ATTORNEYS & COUNSELORS AT LAW

Camilo K. Salas III
csalas@salaslaw.com

650 Poydras Street
Suite 1650
New Orleans, Louisiana 70130
Telephone: 504-799-3080
Facsimile: 504-799-3085

April 28, 2006

**By Hand Delivery**

Honorable Stanwood R. Duval, Jr.
United States District Judge
Eastern District of Louisiana
Section "K" — Room C368
500 Poydras Street
New Orleans, LA 70130

        Re:    *Maureen O'Dwyer, et al. vs. United States of America, et al.*
              Civil Action No. 05-4181 and all consolidated cases.

Dear Judge Duval:

Please accept this correspondence as my application for appointment to the Plaintiffs' Steering Committee and/or as co-lead counsel in all Mississippi River Gulf Outlet ("MRGO") suits in the referenced litigation.

I am co-counsel of record in *Phillip Reed vs. The United States of America, et al.*, Civil Action No. 06-2152, filed April 24, 2006 and assigned to Section "S." We have filed a motion to transfer it to Section "K." A copy of the Class Action Complaint is attached hereto for your review.

*Reed* is a class action to recover damages suffered by plaintiff and the class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the defendants' maritime activities in the MRGO from 1958 through August 29, 2005. Plaintiff, individually and as class representative, also seeks an injunction to prevent defendants from conducting further similar maritime activities that will cause further damage to the man-made and natural flood protection systems that surround Orleans and St. Bernard Parishes. *Reed* and all other MRGO cases raise complex and interesting issues of admiralty law and environmental law and sciences.

While the curriculum vitae attached to this letter describes my training and experience, I wanted to briefly outline why I am uniquely qualified to have an active role in the MRGO cases.

Honorable Stanwood R. Duval, Jr.
April 28, 2006
Page 2

I have extensive experience in admiralty law.  I attended Tulane Law School from 1978 to 1981 and enrolled in every maritime law course offered there.   From 1979 to 1981 I was a member and editor of the Tulane Maritime Law Journal (then known as The Maritime Lawyer). I joined the Maritime Law Association during my second year of law school and remained a member to date.  Upon graduation  I went to work at the law firm of Sessions, Fishman & Nathan, L.L.P., handling primarily admiralty cases during the first ten years of my 23-year tenure there.  I tried my first admiralty case before Judge Adrian Duplantier only two years after graduation.  Thereafter, I tried several admiralty cases before Judges Peter Beer, Martin L.C. Feldman, Charles Schwartz, Morey Sear, Fred Heebe and Ivan Lemelle (when he was Magistrate Judge).  I  also handled many admiralty cases that did not reach trial before Judges Lansing Mitchell, Mary Ann Vial Lemmon and Marcel Livaudais, as well as many non-admiralty cases before Judges Lance Africk, Carl Barbier, Martin L.C. Feldman, Ivan Lemelle, Marcel Livaudais, A. J. McNamara, Henry Mentz, Thomas Porteous, Sarah Vance, Alma Chasez, Karen Roby and Jay Wilkinson.  Many of them can attest to my qualifications as a trial lawyer.  I also had the pleasure of representing at least one client before Your Honor almost three years ago.

I also have substantial experience in environmental law and sciences.  In 1991, ten years after graduating from law school and while working full time as a partner in my law firm, I enrolled simultaneously in the Tulane School of Law, where I earned an L.L.M in Energy and Environmental Law in 1993, and in the Tulane School of Public Health and  Tropical Medicine, where I earned a Masters of Science in Public Health (Environmental Health Sciences) also in 1993.  After receiving this training I began to represent Bethlehem Steel Corporation in maritime asbestos exposure cases and many other clients in environmental contamination cases.  I was also involved in three personal injury cases arising out of the Exxon Valdez contamination of the Alaska seashore.

The MRGO cases involve claims resulting from soil erosion and damage to Louisiana's wetlands, which caused the destruction of the levees.  I have been interested and involved in the field of natural resources damage and degradation for over a decade, and I have lectured on the subject in several countries throughout Latin America.  For example, in 1993 I wrote an article entitled *Control of Agricultural Runoff as a Requirement for Improving Water Quality: Lessons Learned in the United States*, which was presented to the Natural Resources and Environment Committee of the Inter-American Bar Association, during its annual meeting in Santiago, Chile (a copy is enclosed herewith for your review).

I have practiced law for 25 years and represented both plaintiffs and defendants in the Eastern, Middle and Western Districts of Louisiana, Western District of Wisconsin, Middle District of Florida, Southern District of Texas, District of Minnesota and District of Puerto Rico, as well as the Courts of Appeals for the First, Fifth, Seventh and Eleventh Circuits.  I have an AV Martindale-Hubell rating.

Although I researched, wrote and edited the Class Action Complaint filed in *Reed*, I have been working together with my co-counsel Daniel Becnel and other attorneys, including Richard Arcenault and his staff, in the preparation of the case.  Mr. Becnel has facilitated meetings with

Honorable Stanwood R. Duval, Jr.
April 28, 2006
Page 3

various experts, including Professor Robert G. Bea of the University of  California, Civil and Environmental Engineering Department, who is one of the two leading members of the National Science Foundation group investigating the levee failures.  During our meetings with Dr. Bea we were able to learn information that will become available to the pubic next month (when the final National Science Foundation Report is published), which we used in the preparation of the *Reed* complaint.

In closing, I have the resources, willingness and availability to commit to this time consuming and challenging project.  I possess the ability to work cooperatively with others and I have the requisite professional training, education and experience needed for this type of litigation.  Therefore, I respectfully seek Your Honor's appointment to the Plaintiffs' Steering Committee and/or as co-lead counsel in the MRGO cases.

Sincerely,

Camilo K. Salas III

CKS:dg
Enclosures

cc w/enc.:  Magistrate Judge Jay Wilkinson

<div align="center">

**Camilo K. Salas III**
## SALAS & Co., L.C.
Attorneys and Counsellors at Law
650 Poydras Street — Suite 1650
New Orleans, Louisiana 70130
Office: 504•799•3080  —  Cell:  504•609•9317
Facsimile:  504•799•3085
E-Mail:  csalas@salaslaw.com

</div>

**Legal Training:**     Tulane University School of Law, Juris Doctor, 1981.
Member and Index Editor, Tulane Maritime Law Journal (1979-81).

Tulane University School of Law, L.L.M. in Energy and Environmental Law, 1993.

**Technical Training:**     Tulane University School of Public Health and Tropical Medicine, M.S.P.H. in Environmental Health Sciences, 1993.

**Experience:**     **SALAS & Co., L.C.,** New Orleans, Louisiana. 2005—Present. Founding member.  Plaintiff and defense practice primarily in commercial and products liability litigation.  Currently representing plaintiffs as head of Puerto Rico discovery subcommittee in *In re*: Guidant Defibrillators Products Liability Litigation, MDL No. 05-1708, U.S.D.C. District of Minnesota; as lead counsel in class action brought in U.S.D.C. District of Puerto Rico related to manufacturing defects in the drug Paxil; as co-counsel in *In re*: Viagra Products Liability Litigation, MDL No. 1724, U.S.D.C. District of Minnesota, among several other assignments.

**Niles, Salas, Bourque & Fontana, L.C.,** New Orleans, Louisiana. 2004-2005. Founding member.  Plaintiff and defense practice primarily in commercial and products liability litigation.  About 50% of cases filed in Puerto Rico, where litigation is conducted in English and Spanish.  For two years acted as lead counsel in an antitrust case in Puerto Rico, in which each party produced about one-half million documents, both in English and Spanish, having personally reviewed most of them and translated the most important documents to English as part of trial preparation. Case ultimately settled.  Also represented a company in multi-million dollar litigation against the Puerto Rico Department of Education related to contracts to provide internet services to all 1500 schools in Puerto Rico.  Case recently settled. Also acted as counsel for various companies doing oil production business in Mexico, among many other assignments.

**Sessions, Fishman & Nathan, L.L.P.,** New Orleans, Louisiana. 1981-2004. Partner. Primarily defense practice in products liability, maritime, medical malpractice, environmental and toxic tort litigation.  Represented three foreign car manufacturers for nearly twenty years in products liability and breach of warranty litigation. Involved in many other cases representing a large number of diverse clients, such as a tire manufacturer (defense of environmental class-action litigation), a steel manufacturer (defense of asbestos MDL litigation), foreign and domestic shipyards, companies involved in offshore oil production, and several banks (foreclosure and seizure and sale of vessels), among many others.  Acted as lead counsel in many trials.  Also represented plaintiffs in several cases; in one, obtained multi-million dollar verdict against a car manufacturer.

**Rating:**                        AV rating by Martindale-Hubbell.

**Languages:**                Fluent in English and Spanish.  For many years involved in litigation and transactions conducted in English and Spanish.   Almost all drug and medical device manufacturers have substantial facilities in Puerto Rico (because of tax laws enacted in the 1950's) and they employ many individuals who speak and maintain records only in Spanish.  As a result, much discovery in drug and medical devices litigation (including *In re:* Viagra Products Liability Litigation) requires participation of bilingual counsel.

**Personal:**                    Born in Guayaquil, Ecuador on October 2, 1952.  Married with two children.

RECEIVED
U.S. DISTRICT COURT
EAST DISTRICT OF LA

2006 APR 24  AM 8: 32

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Phillip Reed, on behalf of himself and all others similarly situated, | * |
| | * |
| | * |
| Plaintiff | * |
| | * |
| Versus | * |
| | * |
| | * |
| The United States of America; | * |
| Bean Dredging, L.L.C.; Bean Dredging | * |
| Corporation (f/k/a Eagle Dredging Corporation); | * |
| Bean Dredging Corporation (f/k/a Falcon | * |
| Dredging Corporation); C. F. Bean L.L.C.; | * |
| C. F. Bean Corporation (f/k/a C. F. Bean, Inc.); | * |
| Bean Horizon Corporation; Bean Horizon L.L.C.; | * |
| Bean Stuyvesant, L.L.C.; Stuyvesant Dredging | * |
| Company; Stuyvesant Dredging, Inc.; | * |
| Stuyvesant Dredging Co., L.L.C; Royal Boskalis | * |
| Westminster N.V.; Gulf Coast Trailing Company; | * |
| TLJIC, L.L.C.; T. L. James & Company, Inc.; | * |
| T. L. James Marine, Inc.; T. L. James Marine, | * |
| L.L.C.; Ham Construction Overseas N.V.; Great | * |
| Lakes Dredge & Dock Company; Great Lakes | * |
| Dredge & Dock Company, L.L.C. of Louisiana; | * |
| Great Lakes Dredge & Dock Corporation of | * |
| Delaware; Natco Dredging Limited Partnership; | * |
| Great Lakes Trailing Company; Weeks Marine, | * |
| Inc.; Mike Hooks, Inc.; Luhr Bros. Inc.; Manson | * |
| Construction Co. (a/k/a Manson Construction & | * |
| Engineering Co.); Manson Gulf, L.L.C.; Pine | * |
| Bluff Sand and Gravel Company; King Fisher | * |
| Marine Service, Inc.; King Fisher Marine | * |
| Service, L.P. and KFMSGP, L.L.C. | * |
| | * |
| Defendants. | * |

CASE NO. **06-2152
SECT.S MAG4**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## CLASS ACTION COMPLAINT

Plaintiff, Phillip Reed ("Plaintiff"), individually and as representative of the class defined herein, brings this action against the defendants identified below (collectively "Defendants"), and avers:

### INTRODUCTION.

1.

This is a class action, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, to recover damages suffered by Plaintiff and the Class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the Defendants' maritime activities in the Mississippi River Gulf Outlet ("MRGO") from 1958 through August 29, 2005. Plaintiff, individually and as a Class representative also seeks an injunction to prevent Defendants from conducting further similar maritime activities that will cause further damage to the man-made and natural flood protection systems that surround Orleans and St. Bernard Parishes.

### PARTIES.

2.

Plaintiff is a citizen of Louisiana, who resides within this district at 7300 Morrison Road, New Orleans, Louisiana 70126. Plaintiff's home and property were damaged by the waters that flooded the New Orleans metropolitan area when Hurricane Katrina made land fall, forcing him to evacuate with his family. Plaintiff also suffered other damages described below.

3.

Made defendants herein (collectively "Defendants") are:

a. **The United States of America;**

b. **Bean Dredging, L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

c. **Bean Dredging Corporation (f/k/a Eagle Dredging Corporation),** a Louisiana corporation domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

d. **Bean Dredging Corporation (f/k/a Falcon Dredging Corporation),** a Louisiana corporation domiciled at Hibernia Bank Bldg., Suite 1300, New Orleans, Louisiana, 70112;

e. **C. F. Bean L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

f. **C. F. Bean Corporation (f/k/a C. F. Bean, Inc.),** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

g. **Bean Horizon Corporation,** a Louisiana corporation domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

h. **Bean Horizon L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

i. **Bean Stuyvesant, L.L.C.,** a foreign limited liability company domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office at 1055 St. Charles Avenue, Suite 520, New Orleans, Louisiana 70130;

j.  **Stuyvesant Dredging Company**, a foreign partnership domiciled in New York, with its principal office at 110 West 10th Street, Wilmington, Delaware 19801 and its Louisiana principal place of business at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

k.  **Stuyvesant Dredging, Inc.**, a foreign corporation domiciled at 1209 Orange Street, Wilmington, Delaware 19801 with its office at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

l.  **Stuyvesant Dredging Co., L.L.C.**, a foreign limited liability company domiciled at 110 West 10th Street, Wilmington, Delaware 19801 or at 1209 Orange Street, Wilmington, Delaware 19801, with its Louisiana principal place of business at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

m.  **Royal Boskalis Westminster N.V.**, a Dutch corporation doing business in Louisiana through its wholly-owned subsidiaries Stuyvesant Dredging Company and/or Stuyvesant Dredging, Inc. and/or Stuyvesant Dredging Co., L.L.C.;

n.  **Gulf Coast Trailing Company**, a Louisiana partnership domiciled at 300 Crofton Street, P. O. Box 826, Kenner, Louisiana 70063 and/or at 106 West Mississippi Street, Ruston, Louisiana 71270, and made up of two partners, T. L. James Marine, L.L.C. and Ham Construction Overseas N.V.  On or about March 21, 2001, Gulf Coast Trailing Company was merged into TLJIC, L.L.C.;

o.  **TLJIC, L.L.C.**, a Louisiana limited liability company domiciled at 300 North Vienna Street, Ruston, Louisiana 71270.  One of its members is T. L. James & Company, Inc.;

p.  **T. L. James & Company, Inc.**, a Louisiana corporation domiciled at 300 North Vienna Street, Ruston, Louisiana 71270;

q.  **T. L. James Marine, Inc.,** a Louisiana corporation domiciled at 106 West Mississippi Street, Ruston, Louisiana 71270.  On or about September 24, 1999 T. L. James Marine, Inc. was merged into T. L. James Marine, L.L.C.;

r.  **T. L. James Marine, L.L.C.,** a Louisiana limited liability company domiciled at  106 West Mississippi Street, Ruston, Louisiana 71270.  One of its members is T. L. James & Company, Inc.  On or about December 20, 2000, T. L. James Marine, L.L.C. was merged into TLJIC, L.L.C.;

s.  **Ham Construction Overseas N.V.,** a Dutch Corporation with its principal place of business at 51 de Ruyterkade, Willemstad, Curacao, Netherlands, doing business in Louisiana through Gulf Coast Trailing Company;

t.  **Great Lakes Dredge & Dock Company,** a foreign corporation domiciled at 28 West State Street, Trenton, New Jersey 08608, with its principal place of business at 2122 York Road, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 3925 North I-10 Service Road West, Metairie, Louisiana 70002.  On or about October 31, 2005 it was merged into Great Lakes Dredge & Dock Company, L.L.C. of Louisiana;

u.  **Great Lakes Dredge & Dock Company, L.L.C. of Louisiana,** a foreign limited liability company domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office at 2122 York Road — Tax Department, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

v.  **Great Lakes Dredge & Dock Corporation of Delaware,** a foreign corporation domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office

at 2122 York Road, Suite 200, Oak Brook , Illinois 60523 and its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

w. **Natco Dredging Limited Partnership**, a foreign partnership domiciled in Delaware, with its principal office at 2122 York Road, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809. Its general partner is Great Lakes Trailing Company;

x. **Great Lakes Trailing Company**, a foreign corporation domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office at 2122 York Road, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 601 Poydras Street, New Orleans, Louisiana 70130;

y. **Weeks Marine, Inc.**, a foreign corporation domiciled at 4 Commerce Drive, Cranford, New Jersey 07016, with its principal office at 106 Derouche Ave., Bourg, Louisiana 70343 and its Louisiana principal place of business at 304 Gaille Drive, Innwoods Business Park, Covington, Louisiana 70433;

z. **Mike Hooks, Inc.**, a Louisiana corporation domiciled at 409 Mike Hooks Road, Westlake, Louisiana 70669;

aa. **Luhr Bros. Inc.**, a foreign corporation domiciled at 250 W. Sandbank Road, Columbia, Illinois 62236, with its principal office at 250 W. Sandbank Road, Columbia, Illinois 62236 and its Louisiana principal place of business at 8850 United Plaza Blvd., Baton Rouge, Louisiana 70809;

bb. **Manson Construction Co. (a/k/a Manson Construction & Engineering Co.)**, a foreign corporation domiciled at 5209 East Marginal Way South, Seattle, Washington 98134,

with its principal office at 5209 East Maginal Way South, Seattle, Washington 98134 and

its Louisiana principal place of business at 392 Old Bayou Dularge Road, Houma,

Louisiana 70363;

cc. **Manson Gulf, L.L.C.,** a Louisiana limited liability company domiciled at 392 Old

Bayou Dularge Road, Houma, Louisiana 70363;

dd. **Pine Bluff Sand and Gravel Company,** a foreign corporation domiciled at 1501 Port

Road, Pine Bluff, Arkansas 71611, with its principal office at 1501 Post Road, Pine

Bluff, Arkansas 71611 and its Louisiana principal place of business at Highway 1 North,

P. O. Box 7721, Alexandria, Louisiana 71306;

ee. **King Fisher Marine Service, Inc.,** a foreign corporation domiciled in Texas with its

principal office at 12550 Fuqua, Houston, Texas 77034 and its Louisiana principal place

of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

ff. **King Fisher Marine Service, L.P.,** a foreign limited partnership domiciled in Texas,

with its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge,

Louisiana 70809.   Its general partner is KFMSGP, L.L.C.;

gg. **KFMSGP, L.L.C.,** a foreign limited liability company domiciled in Texas, with its

principal office at 12550 Fuqua, Houston, Texas 77034, which is doing business in

Louisiana as a general partner of King Fisher Marine Service, L.P.; and

hh. **All insurers and underwriters** who provided primary and excess coverage to the

Defendants (except the United States of America) and to the fleet of vessels used by

Defendants (except the United States of America) in dredging operations conducted in

the MRGO from 1965 through August 29, 2005.  Plaintiff reserves the right to amend and

supplement this complaint for the purpose of naming such insurers and underwriters as soon as their identities are established through discovery.

## JURISDICTION, VENUE AND WAIVER OF SOVEREIGN IMMUNITY.

4.

This Court has jurisdiction over this class action pursuant to (1) 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub. L. 109-2, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by a citizen of a State that is different from the State where at least one of the Defendants is incorporated or does business; (2) the Suits in Admiralty Act, 46 U.S.C. §§ 741-52, (in personam) because the negligence of the United States of America arises out of its maritime activities, connected to the construction, continuous dredging and maintenance of the MRGO as a navigable channel, and carried out by the United States of America's own fleet of dredging vessels and by fleets of dredging vessels owned by the other Defendants, pursuant to maritime dredging contracts between them; (3) the Public Vessels Act, 46 U.S.C. §§ 781-90, because this matter involves damage caused by one or more public vessels of the United States of America (including the Dredge Wheeler) which have conducted maritime dredging operations for the construction and maintenance of the MRGO during the past sixty years; and (4) 28 U.S.C. § 1331, because some of the claims asserted herein arise under the laws of the United States of America, including the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*

5.

Prosecution of this action in this district is proper under 28 U.S.C. § 1391(a)(2) because all the events or omissions giving rise to the claims asserted herein occurred in this district.

-8-

6.

The United States of America waived its sovereign immunity in connection with the claims asserted in this suit by the enactment of the Suits in Admiralty Act, 46 U.S.C. § § 741-52; the Public Vessels Act, 46 U.S.C. § § 781-90 and the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.* Furthermore, the United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act of 1928, 33 U.S.C. § 702c, does not immunize the United States of America for its maritime activities (including dredging activities) conducted in the MRGO. *Graci v. United States*, 456 F.2d 20 (1971).

## FACTUAL ALLEGATIONS

7.

**Project History of MRGO**

The MRGO is a 76-mile man-made navigational channel connecting the Gulf of Mexico to the City of New Orleans. Approved by the United States Congress under the Rivers and Harbor Act of 1956, construction by the U.S. Army Corps of Engineers ("the "Corps of Engineers"), an agency and instrumentality of the United States of America, began in 1958 and was completed in 1965 at an initial cost of approximately $92 million. Authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet, the MRGO bisects the marshes of lower St. Bernard Parish and the shallow waters of Chandeleur Sound. Rationale for MRGO construction was primarily economic, because the 40-mile shorter route through St. Bernard Parish promised a safer and more efficient passage than the Mississippi River below New Orleans. Proponents originally touted the project as a means of great industrial development for St. Bernard Parish.

8.

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes. Since the construction of the MRGO, several basic impacts on the region have become evident. These include wetland loss caused by excavation of the channel, soil erosion and shifts in habitat type because of increased salinity. The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh. More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered. Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, where the MRGO is perceived as a "superhighway for storm surge" because of the channel's susceptibility to inundation by tropical storms and hurricanes.

9.

**Prior Knowledge of Potential Harmful Effects**

Before excavation of the MRGO, state and federal resource agencies expressed concern about the project's apparent lack of ecological consideration. Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat. Local concerns mounted as the project's "ecological footprint" expanded and economic benefits failed to emerge. Concerns expanded with a growing perception that the project had dramatically increased the region's vulnerability to hurricanes and tropical storms. By the 1990's, the project was widely characterized as an environmental disaster, although adverse environmental impacts

from the MRGO were evident as early as the late 1960's.  In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.

10.

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters.  Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain.  This combined water storage and braking action lowers flood heights and reduces erosion.  The holding capacity of wetlands helps control floods.  Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

11.

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  The sides of the original channel were at a 25 degree angle. Because the soft soils on the sides of the original channel would not stand up at such a steep angle, the soil began to slide or "slough-off" into the bottom of the channel.  This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the surface.  This "sloughing-off" of the soft sides along the channel banks only partially explains why the MRGO's banks have eroded from 650 feet wide to over 2,000 feet wide today.

12.

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug. This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks. The MRGO has thus created an environmental disaster. Tidal flows, and the wave action, suction, and propeller backwash from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel.

13.

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks which settles in the bottom of the channel impedes the movement of ships. In order to maintain the depth of the channel to allow ships to pass, the Corps of Engineers, using its own fleet of dredge vessels and through maritime dredging contracts with the other Defendants, continuously dredge soil from the bottom of the channel. The Corps of Engineers and all the Defendants use hopper dredges and other types of dredges, such as the Wheeler Dredge, the Newport Dredge, the Manhattan Island Dredge, the Eagle I Dredge, the Bayport Dredge, the Struyvesant Dredge, the Padre Island Dredge, the Ouachita Dredge, the McFarland Dredge and others, to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico. Some of the dredged soil is piled on spoil banks along the channel, but very little is used beneficially to restore the wetlands the channel has

destroyed.   In fact, piling of dredged soil along spoil banks causes further damage to the wetlands behind the spoil banks.

14.

The Corps of Engineers does not mitigate or compensate for the damage it causes to the wetlands.   Each year, the United States of America pays the other Defendants, pursuant to maritime dredging contracts, about $22 million to dredge the bottom of the MRGO channel and dump the soil (originally from St. Bernard Parish's wetlands) into the Gulf of Mexico.   Making matters worse, the Corps of Engineers and its subcontractors (the other Defendants) do advance maintenance dredging to the channel to a depth of 41 feet.   With each dredging, the MRGO channel grows wider and wider.

15.

Until approximately 1992, the Corps of Engineers performed all or most of the dredging of the MRGO.   Since 1993 the Corps of Engineers has dredged the MRGO using the Dredge Wheeler.   The Dredge Wheeler is operated by the New Orleans District of the Corps of Engineers.   It is the largest seagoing hopper dredge in the United States.   The Wheeler is a "trailing suction" hopper dredge and operates much like a giant vacuum cleaner.   It is uniquely designed with three large drag arms and an impressive pumping capacity.   To dredge a channel, the drag arms are lowered over the side of the channel bottom.   While the Wheeler travels forward at a speed of approximately 2 knots, the drag arms suck a water and sand mixture, known as slurry, from the channel bottom.   The slurry passes through the drag heads and pipelines into the hopper.   With all pumps and drag arms operating, the Wheeler fills its hopper with slurry in about 11 minutes; however, pumping continues to allow sediment to displace the

water in the hopper and obtain a maximum load of as much as 7,872 cubic yards of sediment. On a good operating day, the Wheeler can remove 100,000 cubic yards of material, or about 7,000 dumptruck loads, from a project site. The dredged material is transported from the channel being maintained to an authorized Dredge Material Containment Area, where it is deposited by opening 14 hopper doors on the Wheeler's bottom and allowing the material to fall to the ocean floor. In 2005, the Wheeler spent twelve working days dredging the MRGO, from August 11, 2005 to August 27, 2005, and stopping only as Hurricane Katrina was about to make landfall. It removed 503,603 cubic yards of dredge material during that trip alone. The Defendants own and/or operate and/or charter other dredges with characteristics similar to those of the Dredge Wheeler.

16.

From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352,636,430 cubic yards of dredge material. Many of those contracts were awarded to the Defendants.

17.

In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the Defendants dredged the following amounts of dredge material from the MRGO under contracts with the Corps of Engineers:

| YEAR | DEFENDANT | QUANTITY CUBIC YARDS |
|------|-----------|---------------------|
| 1993 | Bean Dredging Corp.<br>Bean Dredging Corp. | 5,700,000<br>11,900,000 |
| 1994 | Gulf Coast Trailing Co.<br>T.L. James & Co., Inc. | 2,000,000<br>6,000,000 |

| 1995 | Great Lakes Dredge & Dock Co.<br>T.L. James & Co., Inc. | 3,600,000<br>2,400,000 |
|---|---|---|
| 1996 | Stuyvesant Dredging Co. L.L.C.<br>Bean Horizon Corporation<br>Bean Horizon Corporation | 2,000,000<br>3,300,000<br>1,800,000 |
| 1997 | Gulf Coast Trailing Co.<br>Natco Limited Partnership<br>T.L. James & Co., Inc. | 2,000,000<br>2,000,000<br>2,500,000 |
| 1998 | Bean Horizon Corporation<br>Great Lakes Dredge & Dock Co. | 1,300,000<br>10,500,000 |
| 1999 | Weeks Marine, Inc.<br>Weeks Marine, Inc.<br>Bean Horizon & Stuyvesant (Joint Venture)<br>Bean Horizon Corporation<br>Bean Horizon Corporation<br>Great Lakes Dredge & Dock Co.<br>Great Lakes Dredge & Dock Co. | 2,000,000<br>2,000,000<br>2,000,000<br>1,600,000<br>1,400,000<br>1,500,000<br>1,500,000 |
| 2000 | NONE | NONE |
| 2001 | Great Lakes Dredge & Dock Co.<br>Mike Hooks, Inc.<br>Luhr Bros., Inc. | 3,000,000<br>4,300,000<br>1,700,000 |
| 2002 | Bean Stuyvesant, L.L.C.<br>Bean Stuyvesant, L.L.C.<br>Weeks Marine, Inc. | 400,000<br>2,000,000<br>2,700,000 |
| 2003 | Manson Construction Co.<br>Manson Construction Co.<br>Weeks Marine, Inc. | 1,500,000<br>2,000,000<br>8,800,000 |
| 2004 | Bean Stuyvesant, L.L.C.<br>Great Lakes Dredge & Dock Co.<br>Pine Bluff Sand & Gravel Co.<br>King Fisher Marine Service, Inc. | 2,000,000<br>2,000,000<br>1,900,000<br>1,000,000 |
| 2005 | Great Lakes Dredge & Dock Co. | 4,700,000 |

18.

**The Defendants' Actions in the MRGO Constitute a Threat to Public Safety**

Since 1965, operation and maintenance of the MRGO channel by Defendants have caused the destruction of over 20,000 acres of Louisiana wetlands due to soil erosion, saltwater intrusion and channel dredging.  In their natural state, wetlands provide a natural barrier against tidal surge from storms and hurricanes.  When hurricanes pass over wetlands, friction is crated, which in turn reduces the storm's wind speeds.  Wetlands also absorb hurricane storm surges, softening and shrinking the wall of water that slams inland during a hurricane.  Wetlands loss caused by the MRGO now allows a greater volume of water from the Gulf of Mexico to move more quickly inland.  Wetlands loss from the MRGO now makes the residents of Orleans and St. Bernard Parishes more vulnerable to tidal surge from tropical storms and hurricanes.  The MRGO has increased the flooding risk to thousands of people, their homes and businesses.

19.

**Prior Similar Events**

In 1965, Hurricane Betsy created a tidal surge that moved up the MRGO channel and breached the levees in Orleans Parish, causing $2 billion in damages.  Today, the MRGO is a much greater threat to the safety of people living in Orleans and St. Bernard Parishes than it was in 1965 because the MRGO is more than 2000 feet wide, allowing it to carry a tidal surge several times greater than the destructive power of Hurricane Betsy.  In 1998, the tidal surge from Hurricane George caused enough erosion to shut down the MRGO for several months, and the channel was re-dredged by the Defendants in order to re-open it to the very small number of

ships that use it for navigation.  Today the MRGO provides a superhighway for tidal surge caused by tropical storms and hurricanes.

20.

**MRGO's Role in Hurricane Katrina Disaster**

The Gulf Intracoastal Waterway ("GICW") from its junction with the MRGO and eastward to its outlet into Lake Borgne and Mississippi Sound, is a dredged small craft and barge channel approximately 400 feet in width, with a project depth of 12 feet.  West of the MRGO junction, the GICW becomes a ship channel and widens to 800 feet and 32-35 feet in depth to accept MRGO ship traffic.  The wider and deeper GICW intersects with the Industrial Canal causing a narrowing funnel shape into the Industrial Canal, which has a depth of approximately 30 feet but a width of approximately 400 feet, and is blocked at its south end by the Industrial Canal locks.  The Industrial Canal becomes progressively narrower and shallower as it proceeds toward New Orleans' Ninth Ward like a funnel.

21.

During Hurricane Katrina, levees along MRGO were breached in approximately 20 places along its length, directly flooding most of St. Bernard Parish and New Orleans East. Storm surge from MRGO also caused and contributed to three breaches of the levees along the Industrial Canal.  The levee failures were caused by overtopping, as the storm surge rose over tops of the levees and produced erosion that subsequently led to failures and breaches of the levees.  The breached levees are located in areas where wetlands had been destroyed.  In other areas where wetlands have not been so extensively damaged, the impact of Hurricane Katrina was not as severe and the levees were not damaged.

-17-

22.

Three months before Hurricane Katrina made land fall, Dr. Hassan Mashriqui, a storm surge expert at Louisiana State University's Hurricane Center, called MRGO a "critical and fundamental flaw" in the flood protection system that protects the New Orleans region because it could amplify storm surges 20 to 40 percent. Following Hurricane Katrina, an engineering investigation and computer modeling has shown that MRGO intensified the initial surge by 20 percent, raised the height of the wall of water about three feet, and increased the velocity of the surge from 3 feet per second to 8 feet per second in the funnel. This contributed to the scouring that undermined the levees and floodwalls along the MRGO and Industrial Canal. "Without MRGO, the flooding would have been much less," Dr. Mashriqui said. "The levees might have overtopped, but they wouldn't have been washed away." The complete devastation of St. Bernard Parish and areas of Orleans Parish would not have occurred.

## CLASS DEFINITION.

23.

Plaintiff brings this action on behalf of himself and all others similarly situated, who are members of the following Class:

> All residents and inhabitants of three of the four protected basins or "Polders" that make up the flood protection system for the New Orleans region:
>
> Polder No. 1 is the Orleans East Bank section polder. This protected unit contains the downtown district, the French Quarter, and the Garden District. The northern edge of this polder is fronted by Lake Pontchartrain on the north, and the Mississippi River passes along its southern edge. The Industrial Canal passes along the east flank of this polder, separating the Orleans East Bank polder from New Orleans East (to the northeast) and from the Ninth Ward and St. Bernard Parish (directly to the east). Three large drainage canals traverse this Orleans East Bank polder from

-18-

south to north, carrying water pumped by large dewatering pumps north into Lake Pontchartrain.   These canals are the 17th Street Canal, the Orleans Canal, and the London Avenue Canal.

Polder No. 2 surrounds and protects New Orleans East.  This polder fronts Lake Pontchartrain along its north edge, and the Industrial Canal along its west flank.  The southern edge is fronted by MRGO.  The eastern portion of this polder is currently largely undeveloped swampland, contained within the protective levee ring.  The east flank of this polder is fronted by additional swampland, and Lake Borgne is located slightly to the southeast.

Polder No. 3 contains both the Ninth Ward and St. Bernard Parish.  This polder is also fronted by the Industrial Canal on its west flank, and has the MRGO channel along its northern and northeaster edges.   Open swampland occurs to the south and southeast.  Lake Borgne occurs to the east, separated from this polder by the MRGO channel and a thin strip of undeveloped marshland.  The main urban areas occur within the southern and western portions of this polder.  The fairly densely populated Ninth Ward is located at the west end, and St. Bernard Parish along approximately the southern half of this polder.  The northeaster portion of this polder is undeveloped marshy wetland, contained within the protected polder in anticipation of future development.  A secondary levee, operated and maintained by local reclamation districts, separates the undeveloped marshlands of the northeastern portions of this polder from the Ninth Ward and St. Bernard Parish metropolitan areas.

24.

Excluded from the Class are:

a.      the officers and directors of any of the Defendants;

b.      any judge or judicial official assigned to this matter and his or her immediate family; and

c.      any legal representative, successor, or assign of any excluded persons or entities.

-19-

## CLASS ACTION ALLEGATIONS.

a.      **Numerosity of the Class.**

### 25.

The proposed Class is so numerous that joinder is impractical.  The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.

b.      **Predominance of Common Questions of Fact and Law.**

### 26.

There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class members and include, but are not limited to, the following:

a.      Whether Defendants caused and/or contributed to the damage of the flood protection system that protects the New Orleans region;

b.      Whether Defendants acted negligent;

c.      Whether Defendants' dredging activities have caused environmental damage to the wetlands that in a natural state would have provided flood protection to Orleans and St. Bernard Parishes;

d.      Whether Defendants knew or should have known that their dredging activities have caused or would cause such environmental damage;

e.      Whether Defendants had a duty to disclose such knowledge to Plaintiff and the Class members; and

f.   The amount of damages Plaintiff and the Class members should receive in compensation.

**c.   Typicality.**

27.

Plaintiff and the Class members have suffered similar harm as a result of Defendants' actions.

**d.   Adequacy of Representation.**

28.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because his interests do not conflict with the interests of the Class members he seeks to represent.   Plaintiff has no claims antagonistic to those of the Class.   Plaintiff has retained counsel competent and experienced in complex class actions and maritime and environmental litigation.

**e.   Superiority.**

29.

A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to this Court in which individual litigation of thousands of cases would proceed.   Individual litigation presents a potential for inconsistent or contradictory judgments, and the prospect of a race for the courthouse and an inequitable allocation of recovery among those with equally meritorious claims.   Individual litigation increases the

expense and delay to all parties and the court system in resolving the legal and factual issues common to all claims related to the Defendants' conduct alleged herein.   By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

30.

The various claims asserted in this action are also certifiable under the provisions of Rules 23(b)(1) and/or 23(b)(2) of the Federal Rules of Civil Procedure because:

a.   The prosecution of separate actions by thousands of individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members who are not parties to such adjudications and would substantially impair or impede their ability to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the entire Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole appropriate.

## **FIRST CAUSE OF ACTION  (NEGLIGENCE).**

### 31.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if copied herein.

### 32.

Defendants breached their duty of reasonable care to Plaintiff and the Class members.

### 33.

As a result of Defendants' reckless and/or negligent conduct, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

### 34.

Plaintiff and the Class members are entitled to a judgment finding Defendants liable to Plaintiff and the Class members for damages suffered as a result of Defendants' negligence and awarding Plaintiff and the Class members adequate compensation therefor in amounts determined by the trier of fact.

## SECOND CAUSE OF ACTION
## <u>(BREACH OF IMPLIED WARRANTY).</u>

### 35.

Plaintiff, on behalf of himself and the Class embers, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

### 36.

Defendants are in the business of dredging the MRGO to maintain it as a navigable channel. When the Defendants undertook the construction and/or dredging of the MRGO they impliedly warranted that their operations would not cause environmental damage to the nearby wetlands and/or flooding of Orleans and St. Bernard Parishes.

### 37.

Defendants breached their implied warranties because they caused damage to the wetlands surrounding the MRGO and flooding of Orleans and St. Bernard Parishes.

### 38.

As a result of Defendants' breach of the implied warranties, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

## THIRD CAUSE OF ACTION
## (CONCEALMENT).

39.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

40.

At all times during the course of building the MRGO and/or conducting their dredging and/or maintenance activities in and around the MRGO, Defendants failed to disclose to the Plaintiff and the Class members that such maritime activities caused damage to the protective wetlands and increased the risk of flooding to Orleans and St. Bernard Parishes, which was known to the Defendants.

41.

Defendants were under a duty to disclose to Plaintiff and the Class members the effects and potential effects of their maritime activities in and around the MRGO.

42.

As a result of Defendants' concealment, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

## FOURTH CAUSE OF ACTION
## (VIOLATION OF ENVIRONMENTAL PROTECTION LAWS).

43.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

44.

Defendants' dredging activities have caused environmental damage in violation of the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*

45.

As a result of the Defendants' violations of the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*, Plaintiff and the Class members have suffered and will continue to suffer damages of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and post and future medical expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class members demand judgment against Defendants, jointly, severally and *in solido,* as follows:

a.   An order certifying the Class for the purpose of going forward with anyone or all of the causes of action alleged herein; appointing Plaintiff as a Class representative; and appointing undersigned counsel as counsel for the Class;

b.   Equitable, injunctive and declaratory relief, including enjoining Defendants from further dredging the MRGO and declaring that Defendants are liable to Plaintiff and the Class members for all the claims set out above;

c.   Economic and compensatory damages in amounts to be determined at trial;

d.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.    .  Attorney's fees and costs of litigation;

f.    Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate;

g.    A trial by jury as to all Defendants.

<div style="margin-left: 40%;">

Respectfully Submitted:

Camilo K. Salas III (Louisiana Bar No. 11657)
SALAS & Co., L.C.
650 Poydras Street, Suite 1650
New Orleans, LA 70130
Telephone: 504-799-3080
Fax: 504-799-3085
E-Mail: csalas@salaslaw.com

_____
CAMILO K. SALAS III


Daniel E. Becnel, Jr. (Louisiana Bar No. 2926)
William Percy, III (Louisiana Bar No. 01532)
Law Offices of Daniel E. Becnel, Jr.
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Telephone: 985-536-1186
Fax: 985-536-6445
E-Mail: dbecnel@becnellaw.com

_____
DANIEL E. BECNEL, JR.

</div>

# CONTROL OF AGRICULTURAL RUNOFF AS A REQUIREMENT FOR IMPROVING WATER QUALITY: LESSONS LEARNED IN THE UNITED STATES

NATURAL RESOURCES AND ENVIRONMENT COMMITTEE

IABA XXX CONFERENCE SANTIAGO, CHILE

APRIL 19-24, 1993

(prepared for XXX Conference of the IABA)

by

CAMILO K. SALAS III

OF

## Sessions & Fishman

ATTORNEYS AND COUNSELLORS AT LAW
THIRTY-FIFTH FLOOR
PLACE ST. CHARLES
201 ST. CHARLES AVENUE
NEW ORLEANS, LOUISIANA 70170
UNITED STATES OF AMERICA
Telephone: (504) 582-1500
Facsimile: (504) 582-1555
Telex: 58364NLN

## <u>INTRODUCTION</u>

In the last twenty years public attention has focused increasingly on problems of contaminated groundwater.  In the United States, state and federal legislation has been enacted to address specific problems such as hazardous waste disposal, leaking storage tanks, and deep-well injection, all of which contribute to the water contamination problem. A few states have even developed more comprehensive strategies for groundwater protection.  Widespread problems of groundwater pollution from agricultural activities, however, have remained overlooked.

Contamination from agricultural activity is particularly problematic because it is not amenable to easy end-of-the-pipe technology solutions and because it can have lasting and often permanent adverse impacts on groundwater resources.  The specific status traditionally afforded to the agricultural sector in the United States and the need to maintain its viability further complicate this picture.  As a result, agricultural pollution of groundwater presents unique challenges to environmental regulators at every level of government.

This article outlines some of the strategies that might be employed at the national and international levels to deal with potential sources of agricultural pollution, focusing specifically on those national and local approaches which can protect vital groundwater resources.

## I. THE PROBLEM OF GROUNDWATER CONTAMINATION

A.      <u>Agricultural Pollution.</u>

Agricultural activity is a major source of surface and groundwater pollution. Contemporary agricultural practices that pose a particular threat to groundwater quality include the extensive use of fertilizers and pesticides, the recent rise of concentrated animal

feedlots, and the continuing application of vast quantities of irrigation water. Each of these activities introduces the possibility that applied or naturally occurring contaminants will leach into underlying groundwater. The resulting threat to human health and the environment poses a unique challenge for preventive policy making.

      1.    <u>Nitrogen Fertilizers</u>.

     Nitrate is the most common contaminant found in groundwater. Its primary source is the leaching of applied synthetic nitrogen fertilizers. Most synthetic nitrogen fertilizer is applied in the form of ammonium, but is then naturally oxidized to nitrate through a process known as nitrification. Application of nitrogen fertilizer in excess of what crops can absorb and utilize results in the accumulation of nitrate in the soil. Because it is water soluble and does not readily adhere to soil particles, nitrate is quite mobile when subjected to rainfall or irrigation water. Therefore, excessive use of fertilizers may result in nitrate accumulation and subsequent leaching of the nutrient into the groundwater of an underlying unconfined aquifer or even into an artesian aquifer if the cultivated field is located over a recharge zone. Drinking water contaminated with nitrates poses significant health hazards, especially for infants.

      2.    <u>Pesticides</u>.

     Applied pesticides pose a serious threat to underground drinking water supplies in agricultural areas. Approximately 800 million pounds of pesticides are applied to croplands annually, at an estimated cost of $2.5 billion. At such application rates, it is inevitable that some of these toxic compounds will find their way into important groundwater resources. In fact, this phenomenon appears to be occurring with some frequency in many countries

2

of the world.   In the United States, a recent study in California found more than fifty different pesticides, of which the fumigant and nematocide DBCP was the most prevalent, in the potable groundwater of twenty-three counties in that state; some of these pesticide contamination incidents led to the closing of drinking water wells across California's Central Valley.   Groundwater contamination from pesticides such as EDB, aldicarb, and DDT, as well as DBCP, have been reported in such diverse locations as Connecticut, Massachusetts, New York, Florida, Nebraska, Wisconsin, Arizona, and Hawaii.   One national study found pesticides in the groundwater of twenty-two states.   These same pesticides and many which are not even allowed to be sold in the United States are used extensively in many countries of Latin America.

     3.    <u>Animal Feedlots</u>.

The utilization of high-density animal feeding operations for the raising of cattle, sheep, pigs, and poultry is a relatively recent development.   Such feedlots generate large quantities of animal waste, including nitrates, which may ultimately percolate down to underground drinking water sources.   These operations may also introduce pathogenic bacteria and viruses, as well as food additives such as hormones and antibiotics, into underlying groundwater. Although the groundwater contamination problem associated with feedlot wastes could be somewhat mitigated by management of this material as a fertilizer (including storage and transportation to croplands), a variety of technical and institutional barriers apparently discourage this alternative.

4.    Irrigation and The Mineralization Problem.

The problem of salt build-up in agricultural soils is a major concern, particularly in the arid western states that rely heavily upon the use of irrigation. The phenomenon is caused by high evapotranspiration rates (evaporation from the soil and transpiration by crops) which result in removal of water from the soil while leaving behind substantial amounts of salt and other contaminants; this problem may be exacerbated by the use of low quality, saline irrigation water. In order to sustain crop growth on such soil, farmers must apply excess irrigation water to flush the build-up salts and pollutants out of the plants root zone, resulting ultimately in the percolation of these contaminants into underlying groundwater.

B.    **Complicating Factors**.

In addition to the usual externality problems associated with environmental pollution, the management of agricultural pollution is complicated by a number of unique factors. Perhaps of greatest significance is the fact that most agricultural contamination can be considered diffuse non-point source pollution, which enters the aquifer over a broad area, rather from a discrete point of discharge. Most regulation enacted in the United States has focused on point sources and largely ignored non-point pollution. This response no doubt derives in part from the inherent difficulty of designing feasible management strategies for non-point sources. The technology-based approach of most existing environmental legislation is best suited for generating end-of-the-pipe solutions to point source discharges; non-point pollution from a variety of widespread land use practices defies a quick technology fix and often raises quite difficult and troubling policy choices.

4

## II.  THE EXISTING LEGAL REGIME FOR GROUNDWATER PROTECTION

**A.**    **The Inadequacy of Private Remedies.**

Private individuals have often turned to the common law doctrines of nuisance, negligence and strict liability to remedy groundwater pollution problems caused by the activities of neighboring landowners.   However, while such tort actions have sometimes proven successful, their limitations are significant and frequently fatal, especially as applied to agricultural pollution.   Moreover, the doctrines do not exist in many countries.

**B.**    **The Role of the Federal Government.**

1.    **The Federal Statutory Regime.**

The Environmental Protection Agency, in exercising its authority under a number of different federal pollution control statutes, plays an important but limited role in protecting the nation's groundwater from contamination.   The fragmented, piecemeal nature of the current statutory structure, together with the Agency's obvious reluctance to assume primary responsibility for groundwater protection, poses serious obstacles to the implementation of effective groundwater policies.   Agricultural pollution of groundwater is particularly problematic because Congress has explicitly exempted agricultural activities and the wastes they generate from a number of environmental regulations.   Until now the federal government has continued to largely ignore agricultural pollution problems.

The Clean Water Act.   The Clean Water Act divides pollution sources into two categories: point and non-point.   There is, of course, no biological rationale for this division. For example, pesticide residues are just as harmful if they are discharged into a river from a chemical company's outfall as they are when they enter drinking water supplies as the

5

result of agricultural runoff.  The reason for the distinction is technological and political,

and the legal consequences are great.  If a source is a point source, a national pollution

discharge elimination system (NPDES) permit must be obtained and the discharger is

subject to the applicable technology-forcing effluent limitations.  Congress expressed great

faith in the ability of engineers to limit what came out of pipes but less faith in the ability

of engineers to fix non-point source pollution:

> There is no effective way as yet, other than land use control, by which you can
> intercept that runoff and control it in the way that you do a point source.  We
> have not yet developed technology to deal with that kind of a problem.  We
> need to find ways to deal with it, because a great quantity of pollutants is
> discharged by runoff, not only from agriculture but from construction sites,
> from streets, from parking lots, and so on, and we have to be concerned with
> developing controls for them. [Senate Debate on S.2770, Nov. 2, 1971,
> reported in 1972 Legislative History, at 1315.]

As the above statement indicates, the solution to non-point pollution involves a

complicated mix of institutional and technical factors.  To move aggressively against non-

point sources of pollution, the federal government would have had to have mandated new

local land use control and agricultural practices standards.  In 1972, when the Act was

passed, Congress was unwilling to do this directly, so it attempted to address local land use

and agricultural management indirectly by shifting the responsibility for non-point pollution

control to the states, subject to federal planning in standards.  The mandated planning

process established in §208 of the Act, and related sections have been a continuing source

of controversy.

States are free to deal with agricultural return flows through the §208 process or

their own NPDES permit programs except that the EPA Administrator is prohibited from

directly or indirectly requiring any state to subject return flows to a permit program.  This

6

is a serious omission and is subject to mounting criticism as the side effects of irrigated agriculture become clearer.

Section 208 areawide plans are, on paper, the core of the water pollution abatement program, but the program has not fulfilled its promise.  Section 208 allocated planning authority among federal, state, and local officials in a multi-step process.  First, subject to EPA approval and after consultation with local officials, the governor must specially designate area with "substantial water quality control problems" and must select an areawide planning agency for each designated area (e.g., the Councils of Governments).  The state serves as the planning agency for nondesignated areas.  Second, each agency must develop a plan ("management strategy") that identifies pollution control techniques and the institutions through which the comprehensive management scheme will be carried out, such as zoning, PUD's (planned unit developments), easements, economic incentives, subsidies and intergovernmental agreements.  Third, EPA must approve the plan and the local management agency selected to implement the plan.  However, EPA cannot write its own §208 plan if the state's plan is inadequate.

Subject to a rigorous timetable, the plan includes controls of both point and non-point source discharges.  It covers the location and construction of facilities under §201 (construction grant program), area NPDES permits, groundwater protection, and financial and managerial measures necessary to execute the plan.  The completed §208 areawide plan is then incorporated in the §303(e) state plan.

Regional §208 agencies did address non-point water pollution problems, but non-point source pollution is politically difficult to remedy.  Legislative authority for non-point

7

pollution control often is either nonexistent or inadequate. Agricultural interests resisted the application of non-point controls to farming even though water runoff from agricultural pursuits is a major water pollution source in many areas.

Section 208 requires EPA to adopt the best management practice (BMP) guidelines, and §208(j) establishes a cooperative program between EPA and the Department of Agriculture to fund non-point management practices through the Soil Conservation Service. A BMP is a control measure for slowing, retaining, or absorbing pollutants produced by non-point surface runoff.

Safe Drinking Water Act. Designed to protect public drinking water supplies and to be implemented primarily by the states, the Safe Drinking Water Act ('SDWA') contains three major provisions which may apply to groundwater quality; 1) the underground injection control ('UIC') program; 2) primary and secondary drinking water standards; and 3) the sole source aquifer program.

Under the SDWA, the EPA has authority to establish national primary (and secondary) drinking water regulations, through the promulgation of maximum contaminant levels ('MCL') or through requiring treatment techniques which will prevent known or anticipated adverse health effects with an adequate margin of safety.

Federal Insecticide, Fungicide, and Rodenticide Act. Because it provides some opportunity for controlling the leaching of pesticides into groundwater, the Federal Insecticide, Fungicide, and Rodenticide Act ('FIFRA') is also relevant to the agricultural pollution problem. The potential impact of the current statute, however, is severely limited by its lack of comprehensive regulatory criteria for protecting the environment. Moreover,

the EPA has been preoccupied with remedial response, through suspension and cancellation proceedings, at the expense of more thorough front-end product use control.

The heart of FIFRA is its pesticide registration and classification scheme. The statute provides that it is unlawful to distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or receive and (having so received) deliver or offer to deliver a pesticide unless it is registered with the EPA. The registration process requires submission of test date by the manufacturer, notice in the Federal Register, and an opportunity for public comment. In approving the registration of a pesticide, the EPA's primary statutory criterion is a determination that when used in accordance with widespread and commonly recognized practice the pesticide will not generally cause unreasonable adverse effects on the environment.

Toxic Substances Control Act. Like FIFRA, the Toxic Substances Control Act ('TSCA') takes a preventive approach to environmental problems by regulating product use at the front-end. The statute gives the EPA authority to 1) require that manufacturers of chemical substances or mixtures conduct tests and submit data with respect to the environmental and health effects of their products. Significantly, the statute is inapplicable to any pesticide subject to FIFRA and therefore, could only be used in a limited way to address agricultural pollution problems. In particular, TSCA is most relevant to the potential regulation of nitrogen fertilizers.

The EPA's Groundwater Protection Strategy. Consistent with the fragmented nature of its groundwater authority under this array of federal statutes, the EPA has taken the position that states, and to some extent local governments, should assume the lead

9

responsibility for protecting groundwater.  In its 1984 Groundwater Protection Strategy, the Agency articulated a four-part approach to the problem, the primary objective of which is to build up institutional capability in the States and within EPA to cope with ground-water problems on a comprehensive basis.  The core elements of this Strategy are:  1) strengthening of state groundwater programs;  2) assessment of currently unaddressed groundwater contamination problems; 3) creation of a policy framework to guide EPA groundwater programs; and 4) enhancement of the Agency's internal organization for groundwater management.  Despite setting forth these specific federal tasks to facilitate comprehensive groundwater protection, the Strategy clearly manifests the EPA's intent that [s]tate and local governments are expected to assume primary responsibility in this area because they are best suited to undertake direct implementation and enforcement of groundwater-protection programs.

### III.  LEGAL STRATEGIES FOR PREVENTING NON-POINT AGRICULTURAL POLLUTION

The legal strategies that might be developed to address agricultural pollution of groundwater can be roughly grouped into three categories: 1) regulatory controls; 2) product controls; and 3) land use controls.

**A.     Regulatory Controls.**

Designing regulatory programs that adequately address non-point source agricultural pollution is quite problematic and probably for that reason, the task has generally been avoided by environmental regulators at the federal level.  This difficulty stems from a physical inability to apply to agricultural activities various process controls which reduce or filter out pollutants before they are discharged - the pollution control model generally

10

imposed on the industrial sector. Because agricultural wastes are not concentrated in effluent pipes or exhaust stacks, it is impossible to measure pollution levels and thus, numerical performance standards are not only unenforceable but are, in this context, nonsensical.

On the other hand, design and operating standards, which are generally disfavored for industrial pollution control because they do not provide the flexibility and hence the efficiency that performance criteria do, may provide a viable alternative in the agricultural sphere. The imposition of standards which mandate the use of particular farming techniques and operating practices may significantly reduce pollutant loading to the groundwater, with a minimum of inconvenience and expense to farmers. Thus, they should be routinely applied to all agricultural operations conducted in the vicinity of ground or surface water, absent a showing of undue hardship, even where the hard-to-prove causal connection has not been established.

1.    Best Management Practices.

BMP is defined as a practice or combination of practices that have been determined to be the most effective, practicable means of preventing or reducing pollution generated by a non-point source. The choice of practice is made after conducting problems assessment and examination of alternative practices, and include the following:

To prevent soil erosion:

a.    Conservation cropping sequence: (i.e. rotation of crops);

b.    Crop residue management: (i.e. till residue into ground);

c.    Cover crop (to ensure some vegetation on property year round);

11

      d.      Critical area protection (identify areas where specific erosion problems exist);

      e.      Water & grade control structures;

      f.      Pasture & hay establishment;

      g.      Grassed waterways; and

      h.      Contour farming (in sloped terrains).

To avoid problems caused by excess nutrients:

      a.      Use proper amount of fertilizer (may not need fertilizer);

      b.      Fertilize at the right time;

      c.      Use proper form of fertilizer;

      d.      Correct placement of fertilizer;

      e.      Alternative to fertilizers (natural, mulch, etc.); and

      f.      Cropping sequence (different crops use different nutrients, and may be best to rotate crops).

To avoid problems caused by pesticides:

      a.      Proper pesticide selection;

      b.      Proper rate of application;

      c.      Proper disposal of unused containers;

      d.      Non-chemical methods; and

      e.      Legal controls (ban or limit use of chemicals).

To avoid problems caused by live stock:

      a.      Containment & treatment;

      b.      Pasture management; and

      c.      Land disposal.

To avoid problems caused by human waste:

    a.       Septic tank;

    b.       Waste holding tank;

    c.       Connect to central treatment system; and

    d.       Legal controls.

To avoid problems caused by solid waste:

    a.       Close dumps; and

    b.       Sanitary land field.

    2.      <u>Implementation and Enforcement</u>.

The implementation of a comprehensive system of BMP's for fertilizer and pesticide uses would most likely be very difficult. Designing individualized programs would consume vast amounts of already overtaxed regulatory time and energy. The necessary expertise would probably be absent at the local level, and in many cases, at the national level as well. Perhaps most significantly, successful enforcement would be dubious since accurate monitoring checks on the activity of thousands of private farmers do not exist and could not be developed in an economically feasible fashion.

This potential implementation nightmare is undoubtedly one of the primary reasons that commentators have insisted that agricultural BMP's be instituted on a voluntary basis. Voluntary programs, animated by the inducement of educational and technical assistance, have in fact been the staple offering of both federal and state soil erosion control agencies for the last fifty years. It is, therefore, not surprising that officials attempting to implement more progressive fertilizer and pesticide BMP's would naturally gravitate toward similar

voluntary approaches, especially where the local soil conservation district is involved. Nitrogen fertilizer BMP demonstration project utilize a small cost-sharing incentive and the offer of technical assistance to include voluntary farmer participation in the hope that such participation would ultimately demonstrate or let the producer prove to himself that the financial benefits and environmental merits of the BMP's through reduced fertilizer and irrigation costs could be realized while production was maintained or improved.

But even where the initial skepticism of tradition-oriented farmers can be overcome, voluntary programs will presumably be ineffective where they actually entail some increased costs or decreased production. This phenomenon probably accounts for the less-than-overwhelming achievements of soil conservation programs. The most striking obstruction to effective national control of agricultural non-point pollution is maintenance of the current forty-year-old program of voluntary adoption of BMP's to prevent soil erosion. It is unrealistic to expect broader voluntary agricultural BMP programs to be any more successful. Because they will need to be more intrusive than traditional soil management programs, voluntary fertilizer and pesticide BMP programs will be successful, if at all, only in those circumstances where actual financial benefits to the farmer are generated.

Mandatory BMP programs, however, engender their own set of equally troubling implementation headaches. The most obvious and insurmountable obstacle is the inability of regulators to enforce mandatory controls when the regulated community is made up of a large number of dispersed individuals, many of whom would probably view government intrusion in this sphere as illegitimate. The enforcement problem, of course, hinders voluntary programs as well; if the farmer accepts governmental assistance but fails to live

14

up to his or her part of the bargain, there is always the possibility that this breach will go undetected by overworked and outnumbered government enforcers. However, where target populations affirmatively opt into a program, they are more likely to act in good faith, and a minor government presence may be sufficient to induce compliance. In contrast, hostility toward externally imposed mandatory regulations will increase the likelihood of noncompliance.

**B.   Product Controls.**

As already discussed, the EPA has statutory authority under FIFRA and TSCA to regulate the use of most inputs to the agricultural production process, but has exercised this authority only sporadically. In most instances FIFRA and TSCA controls do not apply to products made by export to other countries. At least until the Agency assumes the initiative in the area of product controls, States can fill this regulatory gap with programs of their own. The same can be done by Latin American countries. For instance, they can develop more stringent use restrictions for pesticides which pose a significant risk to groundwater (and to human health and the environment more generally), perhaps by tying these limitations to specific land use designations. Similar regulations can be designed to reduce the excessive use of nitrogen fertilizers.

**1.   State Pesticide Programs.**

Some states already have pesticide regulations that are, at least in some respects, more extensive than FIFRA. For example, California's relatively well-established regulatory program for pesticides has been used to require more thorough registration data than that required by the federal government. In addition to regulating the sale of pesticides,

15

certifying applicators, and licensing other handlers, California also issues permits which may contain conditional limitations on the use of restricted material. This type of basic statutory mandate could provide the foundation for a comprehensive pesticide use program that protects vulnerable groundwater resources through a system of stringent permit conditions in all countries.

2.    Confronting the Nitrogen Problem.

The use of nitrogen fertilizer provides a prime target for state and local regulators concerned about the problem of nitrogen contamination in groundwater due to the absence of any federal regulation in this area. Unlike regulatory attempts to address the pesticide contamination problem, which are complicated by the sheer number of chemicals and the uncertainty of their environmental fate, the effort to control nitrogen use should prove to be relatively straightforward. Regulators should be able to design programs which directly reduce the amount of nitrogen being made available for leaching through agricultural applications because the effects and environmental fate of such nitrogen are fairly well understood.

The imposition of a per ton tax on the initial purchase of this material provides a potentially effective approach to the nitrogen fertilizer problem.

The imposition of per acre nitrogen restrictions provides an alternative approach to the fertilizer problem. While this solution could be more easily tailored to the local groundwater situation than an across-the-board fertilizer tax, its inherent drawbacks make it an obvious second best alternative. The most significant drawback is, once again, the problem of enforcement. Attempts to monitor fertilizer usage by individual farmers would

16

probably overload any local or state enforcement mechanisms. Thus, even a marginally effective monitoring program would most likely require the establishment of a permit system similar to that in place for restricted pesticides in California, thereby adding a layer of bureaucratic complexity that would be unnecessary if a per ton tax were levied instead.

Theoretically, the excessive use of irrigation water, a practice which exacerbates the groundwater pollution problem, could be controlled by the same type of per unit tax or per acre restrictions. However, unlike the nitrogen fertilizer situation, there are enormous federal overtones in the field of irrigation water policy. In addition, to substantial political obstacles to any state level reforms in this area, there are significant legal implications to any alteration in the status quo since most of this water is currently provided under long-term contracts.

C.    **Land Use Controls.**

The imposition of land use constraints constitutes the most powerful and familiar tool available to local regulators for controlling agricultural groundwater problem. Such controls might range from a complete prohibition on certain activities in critical areas to more minor restrictions on the amounts, frequency and techniques of chemical and water applications. Thus, to a certain extent, land use controls are inextricably tied to the regulatory and product controls already discussed. More specifically, they provide the primary institutional mechanism for selectively adapting these regulatory and product controls to a given set of environmental constraints. Land use controls include: 1) recharge zone protection and 2) land use initiative.

## IV. **CONCLUSION**

The problem of groundwater contamination resulting from various agricultural activities is a serious one in terms of the widespread hazard it can pose to human health. It remains largely an invisible threat, diminished by the extensive regulatory and media focus on industrial sources of toxic pollution.   For the most part, the existing array of federal environmental statutes enacted in the United States touches upon groundwater problems only incidentally.  Although this focus has begun to shift in very recent amendments to these laws, federal regulation still largely ignores the connection between agricultural operations and groundwater pollution.

A comprehensive program would implement some combination of regulatory, product and land use controls, adopted to meet both local environmental conditions and unique political constraints.   Although such a program could be designated more broadly to encompass non-agricultural activities that also threaten groundwater resources (which is the practical effect of incorporating a groundwater resources protection element into the general land use plan), it should not be expanded at the expense of losing its specific focus on agricultural operations and activities that have been largely ignored in the past.

All the countries of America must address the problem of groundwater pollution. As the countries of this hemisphere embark upon the development of their environmental regulations, they should keep in mind the threat of agricultural contamination, especially in those countries where agriculture predominates.