FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAY -5  PM 5:01

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO.  05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *    *    *    *    *    *    *    * | | MAG. J. WILKINSON |

### DEFENDANT UNITED STATES' MEMORANDUM IN OPPOSITION
### TO THE O'DWYER PLAINTIFFS' MOTION TO COMPEL

The plaintiffs in Civil Action No. 05-4181 have moved for an order compelling the United States to produce sheet piles, concrete monoliths, and water stops from the north breach of the London Avenue Canal levee, near Robert E. Lee Boulevard.  The motion should be denied, for four reasons.

First, the motion is untimely.  The motion was filed on April 28, 2006, after the sheets, monoliths, and stops had been demolished and removed from the breach in the ordinary course of reconstituting the levee and the flood wall.

___ Fee_____
___ Process_____
_X_ Dktd _____
___ CtRmDep_____
___ Doc. No_____

1

Second, the motion lacks adequate support.  The only support even colorably adequate to sustain the requested relief comes in the form of a report by one Hector Pazos, whose qualifications were not provided until two days ago, Wednesday, May 3.  Mr. Pazos is not qualified to render the O'Dwyer Plaintiffs inions that warrant an order to preserve the requested materials.

Third, the plaintiffs have failed to comply with the regulations that must be followed to obtain documents and things from the United States.  Pending before the Court is the United States' motion to dismiss for lack of subject-matter jurisidiction.  The Court has indicated on numerous occasions that the plaintiffs' failure to exhaust their administrative remedies prevents the Court from having jurisdiction under the Federal Tort Claims Act.  Inasmuch as the plaintiffs have failed to carry their burden of establishing jurisdiction over the subject matter of their claims against the United States, no discovery can properly be obtained from the United States until that is established.

Finally, the motion should be denied because the United States has arranged to provide viewing of in-place sheets, monoliths, and waterstops at other breach sites, where these materials remain in place.

For all of these reasons, the O'Dwyer Plaintiffs motion to compel should be denied.

I. THE O'DWYER PLAINTIFFS MOTION TO COMPEL SHOULD BE DENIED AS UNTIMELY.

The O'Dwyer Plaintiffs motion to compel seeks to compel the United States to produce (1) "[t]he in-place sheet piles which are currently under water and buried . . . at the London Avenue North breach site," (2) "[t]he concrete monolith panels which were removed from the London Avenue North breach site . . . between Good Friday and Monday, April 24, 2006," and

2

(3) "[t]he polyvinyl chloride water stops which were . . . between [these] concrete monolith panels." O'Dwyer Plaintiffs Mem. at 1-2.

Demolition of the monoliths within the north breach of the London Avenue Canal levee began on April 12 and was concluded on April 21.  Removal of the sheet piles began on April 24 and was completed on April 29.  Declaration of Donny D. Davidson ¶ 3.  Counsel for the O'Dwyer Plaintiffs first learned that these materials were being demolished and removed on Thursday, April 13, by means of a letter by the undersigned to Judge Wilkinson (Record Document 75), a copy of which was sent to all counsel of record.  Representatives of other litigants in these consolidated cases visited the London Avenue site on Friday, April 14, and learned that sheet piles at the site were going to be pulled beginning on Friday, April 21, or Saturday, April 22.  See Plt. Exh. 1 at 4 (Finnegan letter to all counsel).

On Thursday, April 20, counsel for the O'Dwyer Plaintiffs sent a letter to Magistrate Judge Wilkinson complaining about notices that counsel had received from counsel for the United States about impending work at the London Avenue site.  Later that same day, counsel for the O'Dwyer Plaintiffs participated in a telephonic conference with the magistrate judge and other counsel.  The conference was prompted in large part by the "duplicative motions, letters and phone calls to the court and other parties" by counsel for the O'Dwyer Plaintiffs , all directed at the evidence preservation/destruction issues that the Court had already addressed.  RD 157 at 2.  Upon the conclusion of this conference, the Court entered an order that ensured that counsel for the O'Dwyer Plaintiffs and a consultant of his choosing could visit the London Avenue site on the following Monday, April 24:

The court was apprised that the United States Army Corps of Engineers is again

3

about to conduct critical work at the London Avenue Canal breach that counsel
for the other parties and their experts may be interested in observing. Counsel for
the United States advised that this work is presently expected to commence on
Monday, April 24, 2006, no earlier than 7:00 a.m. IT IS ORDERED that
observation of this work by counsel and their experts is permitted, but subject to
the same restrictions contained in my previous order. Record Doc. No. 74. IT IS
FURTHER ORDERED, however, that as to this particular new anticipated work, one of the
observing plaintiffs' counsel representatives must be Ashton O'Dwyer and one of the observing
plaintiffs' experts must be Hector Pazos, whose attendance and compliance with the court's
orders are the responsibility of Mr. O'Dwyer. (RD 157.)

On Monday, April 24, counsel for the O'Dwyer Plaintiffs and his consultant visited the

London Avenue site and observed the work in progress. See Plt. Exh. 3. Prior to that visit,

however, on Friday, April 21, counsel for the O'Dwyer Plaintiffs transmitted to counsel for the

United States a request for "the written instructions of the Corps of Engineers for the work which

the Corps is instructing its Contractor to perform at the London Avenue site on Monday, to

include any work orders, descriptions of activities to be performed by the Contractor, what

evidence is to be gathered, how the evidence is to be preserved or safe-guarded, and the

estimated time for completion of each task assigned to the Contractor by the Corps of

Engineers." Plt. Exh. 2 at 2. He also made many other requests, including a request that counsel

for the United States "ask the Corp of Engineers to furnish us [him and his consultant], on

Monday, both the design specifications for the attachment of the panels to the sheet piles, as well

as the as-built drawings and related construction documents." *Id.*

Despite knowing on April 13 that the demolition of monoliths at the London Avenue site

was imminent, and despite requesting and receiving a conference on April 20 to discuss the

evidence preservation/destruction issues related to the ongoing repairs at the London Avenue

site, and despite visiting the site on April 24, to see the first pulling of sheet piles from the

4

site—despite all of this, counsel for the O'Dwyer Plaintiffs waited until Friday, April 28, to bring the present motion. Had counsel brought his motion when the nature of the ongoing repairs were first brought to his attention, almost all of the monoliths and sheet piles would have been intact. Had he brought his motion during the conference with Magistrate Judge Wilkinson, all of the sheet piles would have been in place. Had he brought his motion on Monday, April 24, when he saw the sheet piles beginning to be pulled from the ground, at least some of the sheets would have been "in-place." But he did not act when a remedy could be afforded. Counsel's failure to bring this motion in time for a remedy to be afforded warrants an inference that counsel's interest in these materials is feigned and that the motion was brought for an improper purpose, namely, to be vexatious. For these reasons alone, the motion to compel should be denied.

## II. THE O'DWYER PLAINTIFFS MOTION SHOULD BE DENIED FOR LACK OF SUPPORT.

At no time prior to the completion of the work of demolishing monoliths and removing sheet piles did the O'Dwyer Plaintiffs provide to the United States any factual support for their assertion that these materials were "evidence . . . vital to" their case. Wholly lacking in any support, the plaintiffs' assertions appeared then (as, to be sure, they appear now) to be nothing more than yet another attempt by counsel for the plaintiffs to satisfy some unmet psychological need by inserting himself into the maw of a huge (and hugely important) construction project.[1]

---

[1]Counsel's first attempt to insert himself into the center of the reconstitution of the hurricane protection system took the form of a motion for a protective order that would have required the United States to involve the plaintiffs and their experts in "any and all plans for rebuilding, modifying or altering the levees." RD 46 (civ. no. 05-4181) at 1-2. That motion sought an order requiring the United States to "[d]isclose to Plaintiffs and their experts any and all plans," and to "[g]rant Plaintiffs and their experts access to . . . 'the construction zone' . . . at each levee or floodwall breach site." *Id.* at 2. That motion was denied by Magistrate Judge Knowles, whose decision was sustained by Judge Duval.

The plaintiffs' demands were initially framed flamboyantly amid broad assertions by their counsel that his prior evidentiary motions would not have been denied if the Court "had known what I know about evidence" and that "none of the so-called 'independent' investigations" were able to recognize the probative value of the things that he and his hand-picked consultant considered "vital evidence." Plt. Exh. 1 at 2.

When the O'Dwyer plaintiffs' counsel filed the motion to compel on Friday, April 28, he failed to serve the exhibits. Consequently, the United States was not aware of any support for the plaintiffs' request to preserve sheet piles, monoliths, and waterstops until Monday, May 1, when the filing became available electronically. By that time, all of the sheet piles that are the subject of this motion had been removed, and the monoliths had been reduced to rubble, destroying any waterstops that may have been attached to the monoliths). See Davidson Decl. ¶ 3.

The conduct of the United States with respect to the displaced floodfall segments has been guided by the analysis of the Interagency Performance Evaluation Task Force ("IPET"). The "IPET was commissioned by Lt. General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers and sanctioned by the Secretary of Defense to provide credible and objective scientific and engineering answers to fundamental questions about the performance of the hurricane protection and flood damage reduction system in the New Orleans metropolitan area." Declaration of Reed L. Mosher ¶ 2. The IPET comprises about 150 engineers and scientists who are organized into nine teams to study, inter alia, the forces created by Hurricane Katrina, the reasons why levees and floodwalls were overtopped or breached as a result of Hurricane Katrina, and the consequences of the overtopping and breaching. As it gathers information, finds facts, and reaches conclusions, IPET provides continuous guidance to Task

Force Guardian (TFG), which is managing the repair of damaged levees, floodwalls, and other protective structures. IPET's observations, findings, and conclusions are being provided to TFG for possible inclusion in repair designs, to aid in the construction of a better hurricane protection system.

One team in particular has focused on the performance of the levees and floodwalls. The eponymous "Floodwall and Levee Performance Analysis team . . . comprises more than twenty specialists in the fields of structural engineering, geotechnical engineering, geology, and related disciplines. These team members come from positions in academia, government, and the private sector. [The] team has studied the performance of levees and floodwalls to determine why some of these structures failed during the Hurricane Katrina event." *Id.* This team is co-led by Professor J. Michael Duncan, who is a University Distinguished Professor in the Department of Civil and Environmental Engineering at the Virginia Polytechnic and State University, and by Dr. Reed L. Mosher. Dr. Mosher the Technical Director for Survivability and Protective Structures in the Geotechnical and Structures Laboratory at the Engineer Research and Development Center, U.S. Army Corps of Engineers, in Vicksburg, Mississippi. He has more than 18 years of experience in the analysis and design of hydraulic structures such as locks, dams, and bridges. Dr. Mosher earned a Ph.D. degree in civil engineering from Virginia Polytechnic Institute and State University, Blacksburg, VA. Dr. Duncan is the Director of the Center for Geotechnical Practice and Research at Virginia Tech. He earned a Ph.D. in Civil Engineering from the University of California at Berkeley. His areas of interest include slope stability, foundation design, seepage, and finite element analysis of soil-structure interaction.

7

The Floodwall and Levee Performance Analysis team has developed certain facts concerning the performance of the London Avenue Canal floodwall. These facts are set forth in "Volume V - The Performance: Analysis of the London Avenue Canal I-wall Breach," which is attached to Dr. Mosher's Declaration and is publicly available on the internet at https://ipet.wes.army.mil. This volume will be incorporated in the Final Draft Report of the IPET. "Based on field observations, soil analysis, and computer modeling, the Floodwall and Levee Performance Analysis team has concluded that the most likely cause of the north breach, near Robert E. Lee Boulevard, was sliding instability, as a result of seepage of water through the soils below the flood wall. Erosion probably contributed to the north failure." *Id.* ¶ 5. The "team was able to reach these conclusions without examining the dislocated floodwalls in their entirety." Based on the facts found by the team, Dr. Mosher has further concluded that any structural deformities that could now be observed in dislocated floodwalls would be indicative of the sliding and erosion that took place and not indicative of the mechanism of initial failure. See *id.* ¶ 6.

These facts and conclusions contradict the O'Dwyer Plaintiffs inions adduced by the O'Dwyer Plaintiffs in support of their motion to compel. The O'Dwyer Plaintiffs rely on a report furnished by one Hector Pazos, a naval architect educated at the University of Buenos Aires. RD 281 at 3 (Pazos CV). Dr. Pazos took a course in soil mechanics as he was studying to obtain his M.S. degree. For the past 35 years he has been president of his own consulting business. In his opinion, the floodwall failed because the tops of sheet piles were at varying elevations, which produced weaknesses in the floodwall at the point where the sheets entered the monoliths. See Plt. Exh. 6 at 5. Assuming that the sheet piles remained a continuous steel

8

structure, the floodwall breached because the "joint between monoliths and the sheet piles" was not "strong enough to avoid hinge conditions." *Id.* In Mr. Pazos'opinion, deformities in the displaced structures are evidence of the cause of the floodwall's failure and not a result of it. See *id.* at 3-5. Mr. Pazos opines that "the initial flow of water from the canal to inland must have taken place initially thru the space covered by one or more monoliths." *Id.* at 1. This opinion is based on an assumption that "the sheet pile system remained continuous, that is, no separation of sheet piles occurred." *Id.* Mr. Pazos apparently failed to consider that water might have initially seeped through the soils *below* the sheet piles, thereby weakening the levee and allowing the floodwall to begin to slide as a consequence of the hydrostatic pressure being exerted on the wall by the storm surge.

Lacking sufficent training and experience in soil mechanics, Mr. Pazos is unqualified to opine as to the cause of the breach of the London Avenue levee. Mr. Pazos' Curriculum Vitae ("CV") demonstrates that he is primarily a Naval architect and marine engineer and that he has little, if any, experience in areas such as soil mechanics or the design of levees and floodwalls in the New Orleans area. Mr. Pazos is unqualified to testify as an expert and to giveopinions as to the causes of the levee breaches or as to the standard of care applicable to the Army Corps of Engineers. Under Louisiana law, courts use a locality standard to determine whether an expert is qualified to give an opinion about the work of another engineer: "[T]he ordinary care and reasonable skill by virtue of which engineers' . . . preparations of plans and specifications is to be evaluated in determining whether they are guilty of negligence, must be that same care and skill required by others engaged in the same profession in the same locality." Maloney v. Oak Builders, Inc., 224 So. 2d 161, 168 (La. Ct. App. 1969), rev'd in part on other grounds, 235

9

So.2d 386 (La. 1970); see also Carter v. Deitz, 556 So. 2d 842, 868-69 (La. Ct. App. 1990)

(same); Sams v. Kendall Construction Co., et al., 499 So. 2d 370, 373-74 (La. Ct. App. 1987)

(same). The Rules of the Louisiana Board of Engineers, Title 46 Professional and Occupational

Standards, Chapter 25, § 2505, state that professionally licensed engineers should limit their

practice to their *specific* technical fields of engineering. The relevant parts of § 2505 are as

follows:

> A.  Licensees shall perform services only in the area of their competence.
> B.  Licensees shall undertake assignments only when qualified by
> education or experience in the specific technical fields of engineering or land
> surveying involved.
> C.  Licensees shall not affix their signatures or seals to any plans or
> documents dealing with subject matters in which they lack competence . . . .  * * *
> D.  Licensees may accept an assignment outside of their areas of
> competence to the extent that their services are restricted to those phases of the
> project in which they are qualified . . . .
>                          * * *

Id.

Under these standards, Mr. Pazos is not qualified to opine about the causes of the levee

breaches. The cases in which Mr. Pazos has served as an expert primarily involved his expertise

as a Naval architect or a marine engineer. See, e.g., Domar Ocean Transportation, LTD, v. M/V

Andrew Martin, 754 F.2d 616, 619 (5th Cir. 1985); In the Matter of Arosita Shipping Co., LTD,

No. CIV.A. 92-1103, 1996 WL 312068, at *3 (E.D. La. June 10, 1996); Becker Shipping Co., v.

Gramercy Fleet and Harbor Service, Civ.A.Nos. 85-1042, 85-1285 and 86-625, 1986 WL 14186,

at *5 (E.D. La. Dec. 9, 1986); Texas Eastern Transmission Corp., v. Garber Bros., Inc., 494 F.

Supp. 832, 835 (E.D. La. 1980); Delta Transload, Inc., v. Navios Cammander, 818 F.2d 445, 448

(La. Ct. App. 1987); F&S Offshore, Inc., et al., v. Service Machine & Shipbuilding Corp., et al.,

430 So. 2d 1167, 1177 (La. Ct. App. 1983). In Kiger v. Doucet & Adams, Inc., No.Civ.A.96-1915, 1998 WL 249221, at *5 (E.D. La. May 15, 1998), Mr. Pazos grossly overstepped the bounds of his expertise by attempting to testify on the "working of [the plaintiff's] brain." Id. The court held in that case that Mr. Pazos was not qualified as an expert on the human brain: "[Mr. Pazos] stated in his deposition testimony that he does not study the brain but reads articles and books that relate to human locomotion. He could not name one article or book that he read dealing with this subject." Id.

Mr. Pazos has opined about the causes of the levee breaches in the instant cases when he is not sufficiently qualified to do so. He is not an expert in soil mechanics. Indeed, the attachment to his CV, Docket No. 281, Exhibit 2, reveals that he has taken only one course in soil mechanics as part of the requirements to obtain his M.S. degree from the University of Buenos Aires in 1958. A class taken in Buenos Aires will not qualify Mr. Pazos as an expert on the unique soils in the greater New Orleans area under the Louisiana locality rule on professional expert testimony. It is unclear where the remainder of Mr. Pazos' soil-related experience was obtained, but it is so limited that it most likely will not qualify him as an expert in that field. Mr. Pazos is also not an expert in levee and floodwall construction.[2] The attachment to his CV lists his only experience with levees and retaining walls as working for the Department of Civil Works of Argentina from 1953 to 1957. Under Louisiana's locality rule, Mr. Pazos' limited experience working on levees and retaining walls in a foreign jurisdiction almost fifty years ago will not qualify him to testify about the standard of care in the instant cases. Thus, based on the

---

[2] As part of a possible Daubert hearing, the United States would be interested to know whether he has ever affixed his professional seal and signature to any project on levee or floodwall construction.

information it has at this time, the United States submits that Mr. Pazos is not a qualified expert

under Fed. R. Evid. 702 and <u>Daubert v. Merrell Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and

its progeny.  Because Mr. Pazos is not a qualified expert, his report does not justify the type of

work plaintiffs request, and any future motions to compel or for a protective order based on Mr.

Pazos' O'Dwyer Plaintiffs inions should be denied.  <u>See</u> Mag. Judge's Order of May 4, 2006 at

5, Docket No. 286 ("Movers bear the burden of proof as to any motions for protective order

seeking additional relief. . . . Accordingly, any such motion must be . . . supported by the

affidavit of a qualified expert, including a recitation of the expert's specific qualifications to

render a relevant opinion . . . ." ).

### III. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THERE IS NO SUBJECT-MATTER J JURISDICTION OVER THE CLAIMS AGAINST THE UNITED STATES.

The plaintiffs' motion should also be denied because the Court lacks jurisdiction over the

United States, which has not waived its sovereign immunity to this action.  Pending before the

Court is the United States' motion to dismiss, based, inter alia, on the plaintiffs' failure to

exhaust administrative remedies as required by 28 U.S.C. § 2675(a).  This lack of jurisdiction is

important inasmuch as the standards and methods of compelling discovery are different for non-

parties.  Although Rule 34, Fed. R. Civ. P., recognizes that even parties are not obliged to

produce things that are not in their possession, Rule 45 applies to discovery requested from

persons who are not before the court.  Here, not only has discovery not formally commenced but

none of the protections have been applied to guard against unwarranted discovery from the

United States in actions to which it is not party.  Even if some of the relief could be considered

proper under Rule 26 before the dismissal of the United States, imposing discovery on the United

States before the Court has determined the existence and extent of its jurisdiction would circumvent the federal regulations that apply to discovery requests directed to the United States in actions in which the government is not a party. For this reason, the Court should deny the plaintiffs' attempt to commence discovery now, before jurisdiction has been established.

IV. THE PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THE UNITED STATES HAS MADE REASONABLE ACCOMMODATIONS, ENFORCED BY COURT ORDER, TO ALLOW ACCESS TO SITES.

The United States has accommodated the interests of these plaintiffs and other litigants by allowing site access. This access balances the need to ensure uninterrupted repairs against the litigants' need to ensure that vital evidence is not lost. Here, there is no support for the plaintiffs' assertion that the production of sheet piles, monoliths, and waterstops are vital evidence. Moreover, affording the sort of access and inspection desired by the plaintiffs might result in significant delay and expense. See Declaration of Timothy J. Roth ¶¶ 3-4.

CONCLUSION

For these reasons, the O'Dwyer Plaintiffs' motion to compel should be denied.

13

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

PAUL F. FIGLEY
Deputy Director, Torts Branch

TRACI L. COLQUETTE
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 305-7536
(202) 616-5200 (fax)
Attorneys for the United States

Dated: May 5, 2006.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon all counsel of record to this proceeding by fax, electronic mail, or U.S. Mail on this 5th day of May 2006.

Traci L. Colquette

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO.  05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (DIV. 2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *     *     *     *     *     *     *     * | * | MAG. J. WILKINSON |

<u>DECLARATION OF TIMOTHY J. ROTH</u>

I, Timothy J. Roth, declare the following:

1.  I am a Civil Engineer employed by the U.S. Army Corps of Engineers, New Orleans District.  Assigned to Task Force Guardian ("TFG"), which is managing the reconstruction and repair of damaged hurricane protection projects in the greater New Orleans area, I am presently the Area Engineer for Orleans Parish.  As the Area Engineer, I am overseeing the repair work being conducted at the London Avenue Canal breach and the 17th Street Canal breach.

2.  At both the Mirabeau breach and the 17th Street breach, the repairs are being performed by contractors.  At both sites, TFG is planning to employ contractors to recover

1

certain materials sought by the Interagency Performance Evaluation Team ("IPET"). These materials are presently underground and must be excavated for recovery. To ensure safety during recovery operations at each location, contractors are building Temporary Retaining Structures ("TRS") made of steel sheet piles driven deep into the ground and are installing systems to remove water from within the area bounded by the TRS. The TRS is complete at Mirabeau; construction of the TRS at the 17th Street breach has not yet begun. The dimensions of each TRS are designed to allow safe recovery of the desired materials at the lowest cost. The TRS at Mirabeau has a smaller circumference but is deeper than the TRS to be constructed at the 17th Street breach. Excavation of soils and other materials within the TRS at Mirabeau has begun. When the TRS at 17th Street is complete, excavation of the TRS will begin there.

3. The materials that IPET has asked to recover from these sites include steel sheet piles, sections of the concrete monoliths, and sections of waterstops that may be present within the area. Because the exact location and orientation of the buried structures is presently unknown, it cannot presently be determined whether the excavation necessary to obtain these materials would expose the bottoms of the monoliths, where the sheet piles enter them. Additional excavation, beyond that presently planned, might be necessary in order to provide for an inspection of the bottoms of the monoliths. Also, it cannot presently be determined whether the TRSes as presently designed and constructed would be adequate to permit safe viewing of the bottoms of the monoliths.

4. The time and expense associated with any additional excavation and dewatering necessitated by a desire to view the bottoms of the monoliths cannot be calculated until the monoliths become exposed. If the TRSes should prove to be inadequate to allow safe viewing of the bottoms of the monoliths, the time and expense associated with modifying the TRSes would

2

be substantial.  Estimates of time and expense cannot be calculated until the monoliths are

exposed.

Executed on this _5th_ day of May, 2006.

_Timothy J. Roth_

TIMOTHY J. ROTH

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO.  05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (DIV. 2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *     *     *     *     *     *     *     * | | MAG. J. WILKINSON |

<u>DECLARATION OF DONNY D. DAVIDSON</u>

I, Donny D. Davidson, hereby declare the following:

1.  I am a Civil Engineer employed by the U.S. Army Corps of Engineers, Memphis District.  On March 5, 2006, I was assigned to Task Force Guardian, to lead one of the teams that are managing the rebuilding of the hurricane protection system in the New Orleans metropolitan area.

2.  The team I lead has been managing the repair of the north breach of the London Avenue Canal, near Robert E. Lee Boulevard.  To repair this breach, the flood-wall sections that were dislocated during the Hurricane Katrina event had to be removed so that a new flood wall

1

and levee can be constructed at the breach site.  Because the displaced flood-wall sections were massive and extended deep into the earth, they could not be removed intact.  Removal therefore required demolition of the concrete monoliths (the upper part of the wall) so that a vibratory hammer could be attached to the sheet piles (the lower part) to extract them from the ground.

3.  In the ordinary course of repairing the the north London Avenue Canal breach, the contractors demolished and removed all of the concrete monoliths and sheet piles that were within this breach.  The demolition of the monoliths began on April 12, 2006, and was completed on April 21, 2006.  The removal of the sheet piles began on April 24, 2006 and was completed on April 29, 2006 . These operations were necessarily performed in the course of reconstituting the levee and flood wall at this location.

Executed on this ___5___ day of May, 2006.

DONNY D. DAVIDSON

2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| BERTHELOT | * | CIVIL NO.  05-4182 (ALL CASES) |
| VERSUS | * | SEC. K  (DIV. 2) |
| BOH BROTHERS. CONSTRUCTION | * | JUDGE DUVAL |
| *    *    *    *    *    *    *    * | | MAG. J. WILKINSON |

<u>DECLARATION OF REED L. MOSHER</u>

I, Reed L. Mosher, hereby declare the following:

1.  I am the Technical Director for Survivability and Protective Structures in the Geotechnical and Structures Laboratory at the Engineer Research and Development Center, U.S. Army Corps of Engineers, in Vicksburg, Mississippi.

2.  Since October, I have been a member of the Interagency Performance Evaluation Task Force (IPET), which was commissioned by Lt. General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers, and sanctioned by the Secretary of Defense to provide credible and objective scientific and engineering answers to fundamental questions about the performance of

1

the hurricane protection and flood damage reduction system in the New Orleans metropolitan area. J. Michael Duncan, Ph. D., Director of the Center for Geotechnical Practice and Research and University Distinguished Professor in the Department of Civil and Environmental Engineering at the Virginia Polytechnic and State University, and I jointly lead the IPET's Floodwall and Levee Performance Analysis team, which comprises more than twenty specialists in the fields of structural engineering, geotechnical engineering, geology, and related disciplines. These team members come from positions in academia, government, and the private sector. Our team has studied the performance of levees and floodwalls to determine why some of these structures failed during the Hurricane Katrina event.

3. As set forth in the first IPET report, "Performance Evaluation Plan and Interim Status," which is available at https://ipet.wes.army.mil, the Floodwall and Levee Performance Analysis team examined the interaction of the hurricane and the flood control system to gain an understanding of how and why the flood-protection structures performed as they did in the face of the forces to which they were subjected by Hurricane Katrina. The team also compared this performance with the design intent, the actual as-built condition, and the observed performance of flood-protection structures.

4. Some of the facts developed by the Floodwall and Levee Performance Analysis team are set forth in "Volume V - The Performance: Analysis of the London Avenue Canal I-wall Breach." This volume, which will be incorporated in the Final Draft Report of the IPET, is attached hereto and is publicly available on the internet at the URL above.

5. During the Hurricane Katrina event, the levees bounding the London Avenue Canal breached in two locations. Based on field observations, soil analysis, and computer modeling,

2

the Floodwall and Levee Performance Analysis team has concluded that the most likely cause of the north breach, near Robert E. Lee Boulevard, was sliding instability, as a result of seepage of water through the soils below the flood wall.  Erosion probably contributed to the north failure. At the south breach, erosion may have been the principal mode of failure.

6.  Based on the data obtained and its analysis, our team was able to reach these conclusions without examining the dislocated floodwalls in their entirety.  Dewatering and excavating the breaches to permit in situ examination of entire flood walls would not materially contribute to an analysis of the mechanism of failure.  Because these walls were deflected by hydrostatic pressure and dislocated by sliding and erosion, any structural deformities that might now be observed would be secondary to the sliding and erosion, which were the more probable mechanisms of failure.

7.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __05__ day of May, 2006.

_____
REED L. MOSHER

3

**FINAL DRAFT April 24, 2006**

**Analysis of the London Avenue Canal I-wall Breaches**

<u>**Observations**</u>

Two I-wall failures resulting in breaches occurred at the London Avenue Canal during Hurricane Katrina, one on the east side of the canal at Mirabeau Avenue (the south breach), and the other on the west side of the canal at Robert E. Lee Boulevard (the north breach). At both locations the levees and I-walls were founded on a layer of marsh (peat) overlying sand.

The south breach, shown in Figure 1, occurred about 6:00 AM to 7:00 AM on August 29th, when the water level in the canal was 7.1 ft to 8.2 ft NAVD88. The breach was narrower than the breach at 17th Street and the London Avenue north breach. A deep scour hole formed due to the inrush of water, and a large amount of eroded sand was deposited in the neighborhood inland of the breach. It appears that the breach was quite narrow when it formed, and subsequently widened to about 60 ft as wall panels adjacent to the initial breach were undermined by scour, and tilted into the scour hole.

The north breach, shown in Figure 2, occurred about 7:00 AM to 8:00 AM on August 29th, about an hour after the south breach, when the canal water level was 8.2 ft to 9.5 ft NAVD88. The breach was about 410 ft wide, approximately the same width as the breach at 17th Street. A playhouse on the property adjacent to the breach was heaved upward when the breach occurred, indicating upward movement of the ground inboard of the levee toe. The I-wall opposite the north breach (on the east side of the canal) moved and tilted significantly at about the same time as the breach occurred on the west side, but the east I-wall did not breach. A line of sinkholes was observed at the inland side of the distressed east I-wall, and a sand boil at the inboard embankment toe indicate that erosive seepage and piping had occurred beneath the levee.

<u>**Possible Modes of Failure**</u>

At both the south and north breach locations, it seems likely that underseepage and erosion caused or contributed to the failures.

It is not possible to establish the cause of the south breach with certainty based on the field observations made after the failure. The failed sections of the I-wall were not found, and large volumes of sand were moved by the inflow of water through the breach, covering the landscape. The failure might have resulted from underseepage erosion and piping, or from sliding instability aggravated by seepage and uplift pressures. Analyses have been performed to examine both of these possibilities.

It has been reported that cold-rolled sheetpiles were used for the I-wall in the area of the south breach. Cold-rolled sheetpiles have lower interlock strengths than hot-rolled sheetpiles. Consequently, use of cold-rolled sheetpiles increases the likelihood that interlocks could have failed during driving, particularly because the sand in the south breach area was dense, and driving was hard. Interlock failure would result in gaps between adjacent sheets in the sheetpile wall, making it possible for water to seep through the wall as well as under the wall. Such through-flow would result in more severe seepage conditions than those reflected in the seepage

analyses described here, and would make erosion and piping an even more likely mode of failure at the south breach.

Field observations at the north breach indicate that sliding instability was likely the primary mode of failure, with seepage and high pore pressures in the sand as a significant contributing factor. It seems likely that the failure and breach were the result of insufficient passive resistance to counteract the water pressure forces to which the wall was subjected. The passive resistance was likely reduced by the effects of water seeping through the foundation soils beneath the levee and the marsh layer inland, inducing uplift pressures and reducing shear strengths. Analyses have been performed to examine the likelihood of erosion and piping, and instability due to uplift and reduced shear resistance.

## London South Breach Seepage and Stability Analyses

Erosion and Piping

Finite element analyses of seepage beneath the I-wall were performed using the computer program SLIDE[1]. The characteristics of the cross section analyzed are shown in Figure 3. The relevant materials are the sand at the base of the section, the overlying marsh (peat) layer, and the clayey levee fill. The permeability of the sand, based on field pumping tests, was $1.5 \times 10^{-2}$ cm/sec. The permeability of the marsh layer was estimated as $1 \times 10^{-5}$ cm/sec, and the permeability of the levee fill and the Bay Sound clay was estimated as $1 \times 10^{-6}$ cm/sec. Thorough analyses of transient and steady seepage, described in a separate report, indicated that (a) steady seepage through the sand was established quickly, and (b) the pore pressures within the sand and the uplift pressures on the base of the marsh layer are not affected by the permeability values assigned to the marsh layer and the levee fill, provided that those materials are at least two orders of magnitude less permeable than the sand. The values of permeability of the marsh layer and the levee fill used in the seepage analyses described here were selected in accordance with these findings, and are considered to be reasonable estimates of the permeabilities of these materials.

The hydraulic boundary conditions used in these analyses are shown in Figure 3. The canal water level was either 7.1 ft or 8.2 ft NAVD88, a range consistent with the estimated canal water levels at the time of failure. A constant-head boundary condition was imposed at the location of the drain beneath Warrington Drive. This head value was either -8.4 ft (the normal ground water level with pumps operating), or -5.1 ft NAVD88 (a higher level equal to the ground surface elevation, which might have occurred with pumps not operating). Reports indicate that the pumps stopped operating when the wall failed, severing the power line. In all, four different seepage cases were analyzed, as shown in Table 1.

Based on the study of the 17th Street Canal breach, it seems likely that a crack would form between the I-wall and the levee fill on the canal side of the wall. The type of crack assumed to have formed behind the 17th Street Canal I-wall, shown in Figure 4, does not seem feasible for the London Avenue foundation conditions, where the I-wall is driven into sand, because cohesionless sand would be unable to support a crack. A more likely condition for a wall driven into sand is shown in Figure 5. This "half-cracked" condition involves a crack through the levee fill and the marsh layer, down to the top of the sand. Water would fill this crack, loading the wall and introducing the canal head at the top of the sand. The part of the wall embedded in the

---

[1] Available from Rocscience Inc., 31 Balsam Avenue, Toronto, Ontario, Canada M4E 3B5

sand would be loaded by water pressures that are somewhat lower than hydrostatic pressures, plus active earth pressures, as shown in Figure 5. The lower-than-hydrostatic water pressures were determined from the finite element seepage analyses. All of the seepage and stability analyses were performed based on this half-cracked condition.

Six-node triangular elements were used for the seepage analyses. The finite element mesh is shown in Figure 6. Computed total head contours for Case 1 are shown in Figure 7. It can be seen that the flow through the sand is predominantly horizontal, and that the total head on the landward side of the levee is above the ground surface, which is at elevation −5.1 ft. The head contours for the other three cases shown in Table 1 had similar shapes, although the values varied somewhat depending on the canal water level and the Warrington Drive water level.

Computed pore pressures, or uplift pressures, at the base of the marsh layer are shown in Figure 8 for the four cases analyzed, together with the total overburden pressure at the base of the marsh layer. It can be seen that in all four cases the computed pore pressures exceed the total overburden pressure at the base of the marsh layer. This result indicates that the marsh layer would be heaved off the underlying sand by the high uplift water pressures. A likely result of this heave would be rupture of the marsh layer at one or more weak points, and upward flow of water through the rupture in the marsh material. This flow would relieve the high water pressure locally, and create a new hydraulic boundary condition at the point of rupture.

Additional seepage analyses were performed to determine if the hydraulic gradients within the sand after rupture of the marsh layer would be large enough to cause erosion of the sand and begin a piping failure. The seepage boundary conditions used in theses analyses are shown in Figure 9, where a rupture extends upward through the marsh layer, from the top of the sand to the ground surface. The hydraulic gradients computed in these analyses were found to depend on the assumed width of the rupture in the marsh layer. While it seems clear that the marsh layer would rupture when the uplift pressures exceeded the overburden pressures, the width of the rupture would depend on factors that cannot be evaluated, and it is thus necessary to assign a width to the rupture zone based on judgment. Even so, we believe that the analytical results that follow reflect the essential aspects of the situation. The results support the view that the London south breach developed as a result of erosion and piping.

The narrower the assumed rupture zone, the higher the computed hydraulic gradient at the top of the sand below the rupture, because flow converges toward the rupture, and the flow velocities increase near the rupture. This converging flow is shown by the total head contours in the sand near the rupture in Figure 10. A rupture zone width equal to 1.6 ft was used in the analyses, based on a judgment of what seemed a reasonable and possible rupture zone size. Doubling the width of the rupture zone was found to reduce the computed hydraulic gradient by 23%, and cutting the width in half increased the hydraulic gradient by 33%. In the real case, flow would converge in three dimensions rather than two dimensions, as represented in these two-dimensional seepage analyses. It therefore seems likely that the actual hydraulic gradients would be higher than the values discussed in the following sections, but the magnitude of this three-dimensional effect cannot be quantified.

The changed hydraulic boundary conditions caused by the rupture through the marsh layer were computed by imposing a head at the base of the rupture that was equal to the elevation of the ground surface, simulating a condition where the water level within the ruptured zone rises to the ground surface. Values of vertical hydraulic gradient at the top of the sand for this condition

are shown in Table 2 for the four cases analyzed. It can be seen that they range from 1.03 to 1.24.

The value of hydraulic gradient that would cause erosion of the sand is

$$i_{critical} = \frac{\gamma_b}{\gamma_w} = \frac{\gamma_s - \gamma_w}{\gamma_w}$$

where $i_{critical}$ = hydraulic gradient that would cause erosion of the sand, $\gamma_b$ = buoyant unit weight of sand, $\gamma_w$ = unit weight of water, and $\gamma_s$ = saturated unit weight of sand. With $\gamma_s$ for the sand assumed to be 120 pcf, the critical hydraulic gradient is 0.92. Thus the values of hydraulic gradient for all four cases analyzed would be large enough to cause erosion and to begin piping, as shown by the values of $F_{erosion}$ listed in Table 2.

Considering the variation in factor of safety caused by the uncertain landside water level, the probability of erosion was calculated as shown in Table 3. A simple method based on the Taylor series[2] was used for these calculations. It can be seen that the probability of erosion approaches 100% for both canal water levels, indicating a high likelihood that erosion occurred and that erosion was the cause of the failure, or an exacerbating factor in the failure.

Considering that three-dimensional concentration of flow would result in even larger hydraulic gradients, it appears that erosion and piping of the sand would be likely at the south breach. With high hydraulic gradients, backward erosion could occur rapidly, extending back to the I-wall, and leading to a catastrophic failure of the type that was observed. The analyses described here consider only the beginning of this process. Once erosion of the sand into the rupture in the marsh layer began, the situation would deteriorate quickly as seepage converged to the zone of erosion, and the rate of erosion increased. Eventually, after enough sand, marsh and possibly levee fill had been eroded away, an unstable condition would develop, with the passive resistance of the materials landward of the wall becoming too small to resist the forces of the water and earth pressures pushing from the canal side of the wall.

## Slope Instability

While this erosion and piping failure mechanism appears plausible based on the results of the analyses described above, it is of interest also to examine the possibility that the failure could have occurred by sliding, through a slope instability failure mechanism. To examine this possibility, slope stability analyses were performed using the computer program SLIDE[1].

The stability analyses were performed for the cross section shown in Figures 11, 12, 13, and 14. This is the same cross section as used in the seepage analyses, and the same canal water levels and landside water levels were used.

Standard Penetration Tests performed in the breach area before the breach showed that the sand had Standard Penetration Test blow counts ($N_{SPT}$) greater than 50, which would correspond to values of $\phi'$ in the range of 40 degrees to 46 degrees. Cone penetration tests performed after the breach showed high tip resistance in the sand adjacent to the breach, which correspond to

---

[2] Wolff, T. F. (1994). "Evaluating the reliability of existing levees." Report, Research Project: Reliability of Existing Levees, prepared for U.S. Army Engineer Waterways Experiment Station Geotechnical Laboratory, Vicksburg, Miss.

similar values of $\phi'$. In order not to overestimate the strength of the sand, a value of $\phi' = 40$ degrees was used in the stability analyses.

The marsh was treated as undrained, with $s_u = 300$ psf, and $\phi_u = 0$, based on the available test results. A value of $s_u = 300$ psf is considered appropriate for the areas beneath the canal-side levee slope and beyond the levee toe, where the slip circles pass through the marsh. The unit weight of the marsh was assumed to be 80 pcf.

The levee fill was also treated as undrained, with $s_u = 900$ psf, and $\phi_u = 0$. The slip circles do not intersect the levee fill, however, and the levee strength therefore has no influence on the calculated values of factor of safety. The unit weight of the levee fill was assumed to be 109 pcf.

Analyses were performed with canal water levels at 7.1 ft and 8.2 ft NAVD88, using pore pressures in the sand from the finite element seepage analyses without a rupture through the marsh layer. The non-ruptured seepage analyses were used to determine pore pressures because the rupture is conceived as a feature of very limited size, not appropriate for inclusion in a two-dimensional cross section. At the bases of the slices where the pore pressures exceeded the overburden pressures near the top of the sand on the inboard side, zero shear strength was assigned for the sand.

As discussed earlier, it was assumed in all analyses that deflection of the wall toward the land side would result in formation of a crack through the levee fill and the marsh in back of the wall, down to the top of the sand. It was assumed that the crack would not extend into the sand, because the sand is cohesionless, and would be expected to slump and fill any gap. This "half-cracked" condition was used in all stability analyses. It can be seen in Figures 11, 12, 13, and 14 that the slip circles extend to the bottom of the sheetpile wall furthest from the canal.

The factors of safety calculated in these analyses are shown in Figures 11 through 14, and in Table 4. For the canal water levels estimated at the time of the breach (7.1 ft to 8.2 ft) the calculated factors of safety range from a low value of F = 1.19 to a high value of F = 1.56. Thus, with this interpretation of the available data, and consistent assumptions for the seepage and stability analyses, a mechanism of failure involving erosion and piping is plausible at the south breach, but a slope stability failure mechanism is not.

An analysis was performed, with the landside water level at -8.4 ft, to determine the canal water level corresponding to a calculated factor of safety equal to 1.00. As shown in Figure 15, a canal water level equal to 9.7 ft would be required for a factor of safety equal to 1.00. This is 1.5 ft higher than the highest estimated water level at the time the breach occurred, indicating that instability without removal of material by erosion and piping is unlikely at the south breach.

Additional stability analyses were performed, varying the friction angle of the sand and the strength of the marsh layer, to compute the probability of slope instability. The results of these cases are shown in Table 5. The Taylor series approach[2] was used to compute the standard deviation of the factor of safety and the probability of failure. The most likely value of factor of safety was taken as the average of the values for the high and low inland water levels. The probability of instability was estimated assuming a log-normal distribution of factor of safety, with the results shown in Table 5. It can be seen that the estimated probability of instability is 1% for the lower canal water level, and 10% for the higher canal water level. Thus, while there is a small probability that failure might have occurred due to instability without erosion and piping, this mode of failure is much less likely than failure by erosion and piping.

### London North Breach Seepage and Stability Analyses

The possibilities of failure due to erosion and piping, and due to instability, were also examined for the London Avenue north breach. The differences between the London south breach analyses and the London north breach analyses were:

1. The seepage boundary conditions were different. The canal water level at the time of the north breach was 8.2 ft to 9.5 ft, higher than at the south breach because the north breach occurred later. The inland seepage boundary condition ranged from -8.4 ft to -3.9 ft because Pratt Drive is at a slightly higher elevation than Warrington Drive. Four cases were analyzed, using the seepage boundary conditions shown in Figure 16, and summarized Table 6. An additional analysis was performed to determine the canal water level required for a calculated factor of safety equal to 1.00.

2. The cross sections are somewhat different. On the inland side of the wall at the north breach, there is a thin layer of lacustrine clay between the marsh layer and the sand.

3. The sand is less dense in the north breach area. Standard Penetration Test blow counts ($N_{SPT}$) in this area range from 2 to 14, with an average of about 10. This range of values of $N_{SPT}$ corresponds to values of $\phi'$ in the range of 30 degrees to 34 degrees. Cone penetration tests performed after the breach, in the area adjacent to the breach, showed tip resistances that correspond to about the same values of $\phi'$. A value of $\phi' = 32$ degrees was used in the stability analyses for the north breach area.

Erosion and Piping

Six-node triangular elements were used for the seepage analyses, as for the south breach. The finite element mesh for the north breach is shown in Figure 17. The same values of permeability were used as for the south breach. The lacustrine clay between the sand and the marsh layer was assumed to have a permeability of $1 \times 10^{-6}$ cm/sec.

Computed total head contours for Case 1 are shown in Figure 18. As for the south breach, the flow through the sand is predominantly horizontal, and the total head on the landward side of the levee is above the ground surface, which is at elevation – 3.9 ft. The head contours for the other three cases that were analyzed had similar shapes, although the values varied somewhat depending on the canal water level and the Pratt Drive water level.

Water pressures at the base of the marsh layer for the north breach area are shown in Figure 19. As in the case of the south breach area, the uplift water pressures exceed the overburden pressures due to the weight of the marsh layer at the landside of the levee, and it would be expected that the marsh layer would be heaved upward and would rupture.

Additional seepage analyses were performed with revised boundary conditions, as was done in the south breach analyses, using the conditions shown in Figure 20. A rupture 1.6 ft wide, extending through the marsh layer and the lacustrine clay layer was assumed, and a hydraulic boundary condition with the water level at the ground surface was applied in the area of the rupture. Total head contours for the area around the assumed rupture through the lacustrine clay and peat are shown in Figure 21. The hydraulic gradients calculated for these conditions are shown in Table 7.

With $\gamma_s$ for the sand equal to 115 pcf (5 pcf less than at the south breach where the sand was more dense), the critical hydraulic gradient is 0.84. The values of hydraulic gradient all four cases analyzed would be large enough to cause erosion and begin piping of the sand. Thus erosion and piping appears to be a plausible mode of failure for the London north breach, as well as the south breach.

Probabilities of erosion for the high and low canal water levels were calculated using the same procedure as for the south breach[2], with the results shown in Table 8. It can be seen that the probability of erosion exceeds 90% for both the low and the high canal water levels, and approaches 100% for the higher level. These probabilities are slightly smaller than for the south breach, where the probability of erosion approached 100% for both high and low canal water levels.

Slope Instability

While erosion and piping appears possible based on the results of the analyses described above, it is also of interest to examine the factor of safety against slope instability. To examine the possibility that the failure mechanism involved sliding, slope stability analyses were performed using the same procedures as used for the south breach. The stability analyses were performed for the cross section shown in Figures 22, 23, 24, and 25. This is the same cross section as used in the seepage analyses.

Analyses were performed for four cases, using the canal water levels and inland water levels shown in Table 6, and pore pressures in the sand from the same finite element seepage analyses used to compute the uplift pressures shown in Figure 19. As noted previously, a value of $\phi' = 32$ degrees was used for the sand. The strengths and unit weights of the marsh and the levee fill were the same as used in the south breach stability analyses described previously. The undrained strength of the lacustrine clay was assumed to be equal to 42 psf. The strength of this thin layer has a very small influence on the calculated factors of safety. At the bases of slices where the pore pressures exceeded the overburden pressures at the top of the sand on the inland side, zero shear strength was assigned for the sand.

The same half-cracked condition was used in these analyses as was used for stability analyses at the south breach. It can be seen in Figures 22, 23, 24, and 25 that the slip circles extend to the bottom of the sheetpiles. Full hydrostatic water pressure force acts on the sheetpile down to the top of the sand. From the top of the sand to the bottom of the sheetpile, the sheetpile is acted on by water pressures determined from the seepage analyses and active earth pressures.

The factors of safety for Cases 1 through 4 are shown in Figures 22 through 25, and are listed in Table 9. They range from a low value of F = 0.67 to a high value of F = 0.99. Thus, because the sand is considerably less dense in the north breach area, and would have a smaller friction angle, a mechanism of failure involving slope instability is plausible.

An additional analysis was performed, with the landside water level at -8.4 ft, to determine the canal water level corresponding to a calculated factor of safety equal to 1.00. As shown in Figure 26 and Table 9, a canal water level equal to 8.1 ft corresponds to a factor of safety equal to 1.00. This is very nearly equal to the lowest estimated water level at the time the breach occurred, indicating that instability is a highly likely mode of failure at the north breach.

Further analyses were performed, varying the friction angle of the sand and the strength of the marsh layer, to compute the probability of slope instability, using the Taylor series method[2]. The results of these cases are shown in Table 10. The most likely value of factor of safety was taken as the average of the values for the high and low inland water levels. The results of these calculations are shown in Table 10. It can be seen that the estimated probability of instability is 70% for the lower canal water level, and 97% for the higher canal water level. Thus, there is a very significant probability that instability could have occurred without erosion and piping. However, given the very high probability of erosion, it seems likely that both mechanisms were involved in the failure.

## Design analyses

The design was divided into five reaches, designated as Reaches I, II, III, IV, and V. The south and north breaches both occurred in Reach III, which encompassed Stations 37+00 to 120+00. Seepage analyses described in paragraphs 44, 45, 47, and 52 of the geotechnical investigation report[3] were performed to evaluate the potential for erosion and piping in areas where the London Avenue Canal levee and I-wall were underlain by sand, as at the south and north breach locations. The analyses were performed using flow nets, Lane's Weighted Creep Ratio method[4], and Harr's Method.[5]

Flow net analyses were performed for the levees in Reach IV and Reach V, based on levee base width of 80 ft, 60 ft depth of pervious foundation soil, and canal water level at 10.2 ft NAVD88. The calculated values of exit gradient were found to be about 0.25. These were judged to provide a factor of safety of approximately 4.0 against erosion and piping. This factor of safety was considered acceptable, and not to require measures to cut off underseepage.

Lane's Weighted Creep Ratio values were computed for the I-walls in Reaches I, II, III, IV, and V. The results indicated that the calculated creep ratios were not acceptable for parts of Reach V where the levee and I-wall would be underlain by sand, according to Lane's empirical criteria. The required cutoff depths within this reach were subsequently evaluated using Harr's Method, and were found to require sheetpile wall penetration to elevation -14.4 ft NAVD88.

None of the seepage analyses considered the possibility that a crack might develop due to water pressures on the I-wall, resulting in flow down the canal side of the wall and into the foundation at that location.

Paragraph 45 of the design report[3] discussed the likelihood that the canal bottom would be covered with silt, which would impede seepage into the foundation in areas where the foundation soils were permeable sand. The relatively short duration of the design high water was also discussed. Based on data from field piezometer studies, it was judged that head levels on the land side of the levee would not be above the ground surface. Paragraph 46 of the report recommended that piezometers be installed and monitored periodically to provide a basis for estimating piezometric levels during floods more accurately, and for evaluating the need for

---

[3] Geotechnical Investigation, Orleans Levee District, London Avenue Outfall Canal, OLB Project No. 2049-0269, New Orleans, Louisiana, Volume 1, for The Board of Levee Commissioners of the Orleans Levee District, New Orleans, Louisiana, by Eustis Engineering Company, Metairie, Louisiana, 4 March, 1986, contained in GDM86, Volume 1, Part 1, U. S. Army Corps of Engineers, New Orleans District.
[4] Lane, E. W. (1935), "Security from under-seepage – masonry dams on earth foundations," ASCE Transactions, Vol. 100, pp. 1235-1251.
[5] Harr, M. E. (1966), *Groundwater and Seepage*, McGraw-Hill, New York, 381 pp.

landside pressure relief measures.   Paragraph 47 of the report discussed the possible consequences of dredging the canal, exposing more pervious materials in the canal bottom, which could result in more adverse seepage conditions, and requested notification if dredging was planned.

Stability analyses performed for Reach III did not show the failure surface entering the sand layer.  All of the analyses were performed using slip surfaces within the clay layer beneath the levee and the I-wall.  A minimum factor of safety of 1.30 computed by the Method of Planes[6] was required.  Required depths of penetration and bending moment capacity for the I-wall were determined by cantilever analyses, as described in paragraphs 48 and 49 of the report[3].

### Summary

The analyses described in the preceding sections indicate a strong likelihood that high uplift pressure on the base of the levee and the marsh layer was a key factor in the failures at both the south and the north breaches on the London Avenue canal.  At both locations these high uplift pressures probably resulted in development of a rupture through the marsh layer, and hydraulic gradients large enough to cause erosion of the sand.

At the south breach area this erosion may have been the principal mode of failure, with gross instability occurring after considerable volumes of sand, marsh and levee fill had been removed by erosion and piping.  Without alteration of the south breach cross section by erosion and piping, the calculated factors of safety with respect to instability are greater than 1.0, indicating that alteration of the profile by erosion and piping probably played an essential role in the failure at this location where the sand was dense, and the sand friction angle would have been high.  An additional important factor is that cold-rolled sheetpiles, with weak interlocks, were used at this location.  Loss of interlocks during driving in the dense sand would have resulted in even more severe seepage conditions than are reflected in the analyses described here, which modeled the sheetpiles as an intact seepage barrier.  The south breach failure appears to have been caused principally by erosion and piping in a localized area focused in a relatively small zone where hydraulic gradients were increased by a rupture through the marsh layer overlying the sand, or by a gap in the sheetpiles due to interlock failure during driving, or both.  The conclusion that the failure probably started in a small zone of intense seepage is consistent with the narrow breach that eventually developed.

At the north breach area the probability of erosion and piping is slightly less than at the south breach, although still very high.  The probability of instability is higher than the probability of erosion, due to the fact that the sand was loose, and would have had a low friction angle.  High uplift pressures likely resulted in a rupture through the marsh layer and the underlying lacustrine clay.  At this location, however, the high pore pressures within the sand would be sufficient to cause instability without significant alteration of the cross section by erosion.  The failure at the north affected a much wider zone than the failure at the south, indicating that intense localized erosion and piping did not play a key role in the failure at the north breach.  It appears that high uplift pressures and lower friction angle of the less-dense sand were key elements in the failure at the north breach.

---

[6] A study of the Method of Planes, undertaken by IPET at the request of the New Orleans District Task Force Guardian, indicates that the Method of Planes gives lower factors of safety than more accurate methods of analysis, such as Spencer's method.  The magnitude of the difference between the two varies from case to case.

Table 1.  Hydraulic boundary conditions for seepage analyses London Avenue south breach

| Case | Canal water level – CWL (NAVD88) | Warrington Drive water level – LWL (NAVD88) |
|------|-----------------------------------|---------------------------------------------|
| 1 | 7.1 ft | -8.4 ft |
| 2 | 8.2 ft | -8.4 ft |
| 3 | 7.1 ft | -5.1 ft |
| 4 | 8.2 ft | -5.1 ft |

Table 2. Calculated hydraulic gradients and factors of safety against erosion – London Avenue south breach

| Case | CWL | LWL | i = vertical hydraulic gradient | $F_{ersosion} = i_{crit}/i$ |
|------|-----|-----|----------------------------------|------------------------------|
| 1 | 7.1 ft | -8.4 ft | 1.03 | 0.89 |
| 2 | 8.2 ft | -8.4 ft | 1.14 | 0.81 |
| 3 | 7.1 ft | -5.1 ft | 1.13 | 0.81 |
| 4 | 8.2 ft | -5.1 ft | 1.24 | 0.74 |

Note: with $\gamma_{sat}$ = 120 pcf, $i_{crit}$ = 0.92

Table 3. Calculated probabilities of erosion – London Avenue south breach

| Case | CWL | LWL | $F_{erosion}$ | $\Delta F$ | $\sigma_F$ | $F_{MLV}$ | $COV_F$ | $p_{erosion}$ |
|------|-----|-----|----------------|-------------|-------------|------------|----------|----------------|
| 1 | 7.1 ft | -8.4 ft | 0.89 | 0.08 | 0.04 | 0.85 | 5% | > 99% |
| 3 | 7.1 ft | -5.1 ft | 0.81 | | | | | |
| 2 | 8.2 ft | -8.4 ft | 0.81 | 0.07 | 0.04 | 0.78 | 4% | > 99% |
| 4 | 8.2 ft | -5.1 ft | 0.74 | | | | | |

Notes:
$\Delta F$ = change in F due to variation in parameter values
$\sigma_F$ = standard deviation of factor of safety for the variations considered
$F_{MLV}$ = most likely value of factor of safety
$COV_F$ = coefficient of variation of factor of safety
$p_{erosion}$ = probability of erosion

Table 4.  Factor of safety against instability – London south breach

| Case | CWL | LWL | $F_{stability}$ |
|------|-----|-----|------------------|
| 1 | 7.1 ft | -8.4 ft | 1.56 |
| 2 | 8.2 ft | -8.4 ft | 1.29 |
| 3 | 7.1 ft | -5.1 ft | 1.44 |
| 4 | 8.2 ft | -5.1 ft | 1.19 |
| 5 | 9.7 ft | -8.4 ft | 1.00 |

Table 5. Probability of instability – London south breach

| Case | CWL (ft) | LWL (ft) | $\phi'$ (deg) | $S_u$ (psf) | F | $\Delta F$ | $\sigma_F$ | $F_{MLV}$ | $COV_F$ | $p_{instability}$ |
|------|----------|----------|--------------|-------------|-----|-----------|-----------|-----------|---------|-------------------|
| 1 | 7.1 | -8.4 | 40 | 300 | 1.56 | 0.12 | 0.25 | 1.50 | 17% | 1% |
| 3 | 7.1 | -5.1 | 40 | 300 | 1.44 | | | | | |
| 1a | 7.1 | -8.4 | 44 | 300 | 1.78 | 0.40 | | | | |
| 1b | 7.1 | -8.4 | 36 | 300 | 1.38 | | | | | |
| 1c | 7.1 | -8.4 | 40 | 200 | 1.42 | 0.28 | | | | |
| 1d | 7.1 | -8.4 | 40 | 400 | 1.70 | | | | | |
| 2 | 8.2 | -8.4 | 40 | 300 | 1.29 | 0.10 | 0.20 | 1.24 | 16% | 10% |
| 4 | 8.2 | -5.1 | 40 | 300 | 1.19 | | | | | |
| 2a | 8.2 | -8.4 | 44 | 300 | 1.47 | 0.30 | | | | |
| 2b | 8.2 | -8.4 | 36 | 300 | 1.17 | | | | | |
| 2c | 8.2 | -8.4 | 40 | 200 | 1.17 | 0.24 | | | | |
| 2d | 8.2 | -8.4 | 40 | 400 | 1.41 | | | | | |

Notes:
$\Delta F$ = change in F due to variation in parameters for the two conditions
$\sigma_F$ = standard deviation of factor of safety for the variations considered
$F_{MLV}$ = most likely value of factor of safety
$COV_F$ = coefficient of variation of factor of safety
$p_{instability}$ = probability of instability

Table 6.  Hydraulic boundary conditions for seepage analyses London Avenue north breach

| Case | Canal water level – (CWL) NAVD88 | Pratt Drive water level – (LWL) NAVD88 |
|---|---|---|
| 1 | 8.2 ft | -8.4 ft |
| 2 | 9.5 ft | -8.4 ft |
| 3 | 8.2 ft | -3.9 ft |
| 4 | 9.5 ft | -3.9 ft |

Table 7. Calculated hydraulic gradients and factors of safety against erosion – London Avenue north breach

| Case | CWL | LWL | i = vertical hydraulic gradient | $F_{crsosion} = i_{crit}/i$ |
|---|---|---|---|---|
| 1 | 8.2 ft | -8.4 ft | 0.95 | 0.88 |
| 2 | 9.5 ft | -8.4 ft | 1.08 | 0.78 |
| 3 | 8.2 ft | -3.9 ft | 1.12 | 0.75 |
| 4 | 9.5 ft | -3.9 ft | 1.25 | 0.67 |

Note: with $\gamma_{sat} = 115$ pcf, $i_{crit} = 0.84$

Table 8. Calculated probabilities of erosion – London Avenue north breach

| Case | CWL | LWL | $F_{erosion}$ | $\Delta F$ | $\sigma_F$ | $F_{MLV}$ | $COV_F$ | $p_{erosion}$ |
|---|---|---|---|---|---|---|---|---|
| 1 | 8.2ft | -8.4 ft | 0.88 | 0.13 | 0.07 | 0.82 | 16% | 91% |
| 3 | 8.2 ft | -3.9 ft | 0.75 | | | | | |
| 2 | 9.5 ft | -8.4 ft | 0.78 | 0.11 | 0.06 | 0.73 | 15% | 99% |
| 4 | 9.5 ft | -3.9 ft | 0.67 | | | | | |

Notes:
$\Delta F$ = change in F due to variation in parameters for the two conditions
$\sigma_F$ = standard deviation of factor of safety for the variations considered
$F_{MLV}$ = most likely value of factor of safety
$COV_F$ = coefficient of variation of factor of safety
$p_{erosion}$ = probability of erosion

Table 9. Factor of safety against instability – London north breach

| Case | CWL | LWL | $F_{stability}$ |
|------|-----|-----|-----------------|
| 1 | 8.2 ft | -8.4 ft | 0.99 |
| 2 | 9.5 ft | -8.4 ft | 0.77 |
| 3 | 8.2 ft | -3.9 ft | 0.84 |
| 4 | 9.5 ft | -3.9 ft | 0.67 |
| 5 | 8.1 ft | -8.4 ft | 1.00 |

Table 10. Probability of instability – north breach

| Case | CWL (ft) | LWL (ft) | $\phi'$ (deg) | $S_u$ (psf) | F | $\Delta F$ | $\sigma_F$ | $F_{MLV}$ | $C_{OVF}$ | $p_{instability}$ |
|------|----------|----------|---------------|-------------|------|-----------|-----------|-----------|-----------|-------------------|
| 1 | 8.2 | -8.4 | 32 | 300 | 0.99 | 0.15 | 0.17 | 0.92 | 19% | 70% |
| 3 | 8.2 | -3.9 | 32 | 300 | 0.84 | | | | | |
| 1a | 8.2 | -8.4 | 36 | 300 | 1.11 | 0.24 | | | | |
| 1b | 8.2 | -8.4 | 28 | 300 | 0.87 | | | | | |
| 1c | 8.2 | -8.4 | 32 | 200 | 0.89 | 0.20 | | | | |
| 1d | 8.2 | -8.4 | 32 | 400 | 1.09 | | | | | |
| 2 | 9.5 | -8.4 | 32 | 300 | 0.77 | 0.10 | 0.14 | 0.72 | 19% | 97% |
| 4 | 9.5 | -3.9 | 32 | 300 | 0.67 | | | | | |
| 2a | 9.5 | -8.4 | 36 | 300 | 0.87 | 0.18 | | | | |
| 2b | 9.5 | -8.4 | 28 | 300 | 0.69 | | | | | |
| 2c | 9.5 | -8.4 | 32 | 200 | 0.68 | 0.18 | | | | |
| 2d | 9.5 | -8.4 | 32 | 400 | 0.86 | | | | | |

Notes:

$\Delta F$ = change in F due to variation in parameters
$\sigma_F$ = standard deviation of factor of safety for the variations considered
$F_{MLV}$ = most likely value of factor of safety
$C_{OVF}$ = coefficient of variation of factor of safety
$p_{instability}$ = probability of instability

Figure 1 – The south breach at the London Avenue canal occurred at 6:00 AM to 7:00 AM on August 29, 2005. The breach, on the east side of the canal, was approximately 60 feet wide.

Page 15 of 40 pages



Figure 2 – The north breach at the London Avenue canal occurred at 7:00 AM to 8:00 AM on August 29, 2005.  The breach, on the west side of the canal, is approximately 410 feet wide.

Page 16 of 40 pages



Figure 3 – Schematic cross section at London South breach, with seepage boundary conditions.

Page 17 of 40 pages



Figure 4 - Schematic of crack used in 17th Street Canal stability analyses.



Figure 5 - Schematic of crack used in London Avenue Canal stability analyses.



Figure 6 - Finite element mesh used for seepage analysis for London Avenue south breach.



Figure 7 - Total head contours calculated for seepage analysis of London south breach (Case 1).

Page 21 of 40 pages



Figure 8 – Calculated uplift pressures and total overburden pressure for London south breach.



Figure 9 – Schematic cross section at London south breach, showing rupture through marsh layer.

Page 23 of 40 pages