## <u>AFFIDAVIT</u>

**STATE OF FLORIDA**

**COUNTY OF PINELLAS**

       **BEFORE ME**, the undersigned authority, personally came and appeared:

**HECTOR V. PAZOS**

who, being first duly sworn according to law, did depose and say as follows:

       I am a Registered Professional Engineer in the State of Louisiana, and a Naval Architect and Marine Engineer, who has been retained by counsel for plaintiffs as an expert witness in Hurricane KATRINA litigation against the United States of America. I have sufficient knowledge and experience to provide the Court with the statements made herein, which include factual background, analysis, comments, conclusions and opinions.

I.     <u>Regarding Dr. Mlakar's sworn testimony of May 2, 2006.</u>

       Reportedly, Dr. Mlakar testified that "the load is carried by the concrete and steel sheet piles", or words to that effect. The undersigned agrees that an objective of appropriate design and construction is a structure of the type in question that hydrostatic and gravity loads should to be carried by the concrete monolith panels and sheet piles, acting as a "unit", with uniform structural continuity, performing as a cantilever beam. As a matter of fact, the I type sheet pile floodwalls found at the 17th Street Canal and London Avenue Canal breach sites are officially defined as cantilever.

       A cantilever beam is a member with one end projecting beyond the point of support, "free" to move in a vertical plane, under the influence of hydrostatic loads placed between the free end and the support. This freedom of movement, deflection, deformation or distortion, would exist if each monolith panel and attached sheet piles were not connected to the adjacent monoliths and piles. But, because the monoliths are connected through water stop systems, any differential deflection between two adjacent

1

monolith panels will impose stresses to the water stop system. In other words, if the strength capacity (bending moment and shear) of two adjacent monoliths is not exactly the same, loads trying to break and separate the water stop system between monolith panels will be applied, in addition to hydrostatic pressure.

Because the water stop systems failed in many locations, either by failure of the concrete lips or by failure of the PVC water stops, it can be concluded they were not designed or built with differential deformation between two adjacent "units" in mind. In other words, it would appear that the USACE did not anticipate that load would be applied to the water stop systems, except for hydrostatic load. Dr. Mlakar confirmed this design error and construction defect by testifying that "load is carried by the concrete and sheet piles". This statement would only be correct if adjacent cantilever "units" experienced exactly the same deflection under hydrostatic load.

Dr. Mlakar was aware, or should have been aware, that many of the monolith panels were found, after Katrina, to exhibit substantial differential tilt, due to the failure of the water stop systems, since a number of monolith panels were exposed as early as October 2005, and substantial photographic evidence is available from multiple sources, including the undersigned. Furthermore, during the process of excavating monolith panels that had been buried under soil and rip rap at the London Avenue Canal North breach site, and removing the monolith panels, it was found (very visible to any observer) that the tops of the sheet piles were not continuous or even and, therefore, the cantilever "units" had variable strength, which resulted in differential deflection and consequently in the overloading and failure of the water stop systems.

The monoliths are approximately 11'6" high. The tops of the sheet piles appear to be driven rather than cutoff. The intended overlapping of the sheet piles and the concrete of the monolith panels is indicated in available drawings to be 33". Because the tops of the monolith panels are at the same elevation, the tops of the sheet piles must be 8'9" below the tops of the monoliths, and the elevation of each pile with respect to the adjacent piles would have to be very even, in order for the connection to be built with the 33" indicated space of overlapping. If the tops of the sheet piles were uneven, then the 33" intended overlapping would be reduced for those sheet piles that have lower elevation tops, resulting in a weaker connection between the sheet piles and monolith panels with the lower elevations.

Because the monoliths are not being supported by soil to resist the horizontal forces created by hydrostatic pressures, for the monoliths to maintain their position, their connection to the sheet piles must have adequate structural strength, or a "hinge" will be created in the transition area between the monoliths and sheet piles.

If the structural capacity of a "unit" consisting of sheet piles and a monolith is almost the same as the adjacent "units", when the water level increases and hydrostatic pressure is applied to the monoliths, the deformation of adjacent "units" will almost be the same and no substantial additional stresses (besides the stresses due to hydrostatic pressure) will be imposed to the water stop system on either end of the monolith. But, if the connection between sheet piles and a monolith is slightly weaker (in a specific monolith) than the adjacent "units", this specific monolith will deform (tilt at the area of the connection between the sheet piles and the monolith), and "hinge" more than the adjacent monoliths, creating additional stresses to the water stop system at each end of the monolith. These additional stresses can result in the failure of the water stop system at each end of a specific monolith. If the connection between sheet piles and monoliths is similarly weak in two or more adjacent units, then these units can react as a larger single unit, i.e., a larger "hinge".

Despite the testimony of Dr. Mlakar, it is obvious that technical personnel from the USACE New Orleans District are fully aware of the importance of the strength capacity of the connection between the monolith panels and sheet piles, since on April 3, 2006, they issued a "Sample Custodian Plan" for the Mireabeau Floodwall Breach (London Avenue Canal South breach), which includes, under "3.0 Project Scope and Objectives", the following task to be executed as a requirement to establish the characteristics of the floodwall:

"2. Depth of the sheet piles embedment in the concrete floodwall;
   3. Details of the reinforcing bars in the connection between the sheet pile and the floodwall".

In summary, the design and construction of the connection between sheet piles and the concrete monolith panels, as well as the water stop system connection between monoliths, were faulty, and several sample sections of these areas of the floodwalls should be preserved and studied if the USACE is to be considered honest in its statements of interest in improving the safety of the levee system.

It is incomprehensible how Dr. Mlakar could testify that there is no evidence that the concrete panels were damaged, while there exists plenty of photographic evidence of failures between concrete monolith panels, and a "hinge" effect at the connection between monoliths and sheet piles.

In early April, Lt. Gen Carl Strock, Commander of the USACE, told the Senate Appropriations Subcommittee that a design failure led to the breach of the 17th Canal levee. The Corps have changed their theory regarding the failure of the levees several times since Katrina. Initially the Corps insisted in overtopping as a cause for several weeks, but thereafter pointed to weak soils beneath the floodwall, and more recently suggested the creation of a gap between the walls and their earthen foundation. Corps officials initially said that they have never known a levee to fail this way, and they suggested that no one could have predicted it. But shortly thereafter it was found that this type of failure was foreseen by the Corps' own studies, dating to the mid 1980's. This indicates that the Corps' failure to anticipate the problem reflected an overall pattern of engineering judgment inconsistent with that required for critical structures. The previous statement was transmitted by a panel of the America Society of Civil Engineers to Lt. Gen. Carl Strock, about March 26, 2006.

Now, despite substantial photographic evidence indicating otherwise, Dr. Mlakar states that the connections discussed above carry no load, and these connections are being destroyed without preservation for further investigation.

In general, the Corps has reacted defensively to any outside criticism. Because of the Corps reaction, officials, such as Kenner Mayor Phil Capitano, "don't trust the Corps of Engineers" (statement made by Mr. Capitano March 30, 2006).

Team Louisiana, the State investigation of the failures, disagrees with the contention by the USACE that there were no obvious engineering shortcomings.

It should be noted that following the evidentiary hearing on May 2, 2006, attorney Robin Smith, by letter dated May 5, 2006, indicated that action was taken to preserve samples of water stops attached to monoliths. Nevertheless no mention is made regarding recovering and preserving samples of the concrete edges of the monoliths holding the water stops and/or samples of the area of the monoliths where the sheet piles were embedded in concrete. These two items are important because they are directly related to the overall failure of the floodwalls, particularly at the London Avenue North breach site.

II.    Failure of the USACE to provide reasonable notice of events of interest to professionals investigating the levee failures.

1.    On April 13, 2006, the undersigned was notified of possible imminent destruction of evidence at the London Canal Breach, was to start on April 14, 2006 (less than a 24 hours notice).

2.    On April 14, 2006, the undersigned received notice of the removal of material from a failed floodwall, IHNC west side.  However, this event already had taken place on January 6, 2006, without notice to the undersigned.

3.    On April 19, 2006, the Department of Justice issued a notification indicating that on April 21 and 22, 2006, sheet pile was expected to be pulled at the London Avenue North breach site. 24-48 hours notice.

4.    Material Recovery Operation from the North and South ends of the 17th Street Canal Breach.  This event took place on December 12 and 13, 2005, but written material from the Government concerning the evidence retrieval and destruction was not received until April 20, 2006.  It should be emphasized that this document indicates that one of the purposes of the material recovery operation is:  "to obtain evidence for potential litigation", and also that "the finding may result in legal action".

5.    On April 23, 2006, the undersigned received a notification regarding access to the London Canal site on April 24, 2006 and April 25, 2006, although the removal and destruction of monolith panels had been performed during the previous week, without notice.

6.    On May 1, 2006, the undersigned received a memorandum for work which had started on April 12, 2006, regarding the floodwall at the Robert E. Lee Breach of the London Avenue Canal. (London Avenue Canal North breach site).

7.    On May 1, 2006, the undersigned received a memorandum dated April 3, 2006, titled: "Sample Custody Plan Support to the Material Sampling Program – Mireabeau Floodwall Breach".  The memorandum indicates that the findings may result in legal action, and that the procedures are related to the "implications of the results and on-going litigation".

The above summary of communications demonstrates that the Corps has been and is engaged in an extraordinary effort to avoid discovery of design and/or construction deficiencies in any location where the breach of levees and failure of floodwalls occurred.

The Corps had prepared detailed protocols for work to be performed, but delayed submitting the protocols to non-USACE investigators to make it difficult, if not impossible, for the non-USACE investigators to see the evidence, until after the work described in the protocols was completed. The protocols were written and the work was performed with the obvious purpose of eliminating evidence that could be used in litigation.

An example of the above contention is the letter from Mr. Robin D. Smith to Judge Wilkinson dated Thursday, April 13, 2006, indicating that removal and destruction of monoliths within the area of the London Canal levee near the Robert E. Lee Bridge was imminent. Those monoliths were destroyed, apparently without any documentation of the condition of the connections between monoliths and sheet piles, or the condition of the water stop systems at the connections between adjacent monolith panels.

The failure to provide reasonable advance notice of activities bearing directly on the investigation of the failure of the levees, as well as to provide in advance of an event, a detailed protocol of the intended activities, creates the impression that the USACE is attempting to avoid witnessing by non-USACE investigators, of the deficiencies of design and/or construction that resulted in the failure of the levees and floodwalls.

**HECTOR V. PAZOS, P.E.**

Sworn to and subscribed before me

this day _9th day of May_, 2006

**NOTARY PUBLIC**

_____

**NOTARIAL SEAL:**



GINNY D FRAZIER
MY COMMISSION # DD469885
EXPIRES: Dec. 10, 2009
(407) 398-0153   Florida Notary Service.com

6