IVOR VAN HEERDEN AND MIKE BRYAN

WHAT WENT WRONG AND WHY DURING HURRICANE KATRINA
—THE INSIDE STORY FROM ONE LOUISIANA SCIENTIST

# THE STORM

THE STORM

IVOR VAN HEERDEN

TEN

# THE INVESTIGATION

On Thursday, September 8, Paul Kemp, Hassan Mashriqui, and I drove into flooded New Orleans to inspect the levees for the first time, escorted by an LSU cop, which was mandatory, given the roadblocks everywhere that were manned by serious military units. Our guy, Sergeant Bill Thomas, just switched on his blue police lights and the rifles waved us through. Over the following month, Bill and his lights saved us many hours. We turned off West Esplanade Avenue, and drove north on Orpheum Road on the west side of the 17th Street Canal, the dry side. For the first time we saw with our own eyes the state of the earthen embankment: pristine, I would almost say, with the grass green and the turf intact, with no drip lines or mud splatters on the concrete flood walls. As clear as day, there was all the proof we really needed that the Corps's claim was wrong. These levees had not been overtopped. From the beginning, all of us had had our doubts about the official line, but now my doubts instantly crystallized into certainty. We stopped the car and I jumped on the levee and turned to the others and said, "See, I told you we were right. Look, no sign of overtopping, none whatsoever."

These levees have three parts. The foundation is the earthen berm built on old swamp soils. Sheet piling—corrugated steel plates eighteen inches wide, fitted together tongue-and-groove fashion—is then driven into the berm to whatever depth is deemed necessary, based on a design plan that should include the geotechnical characteristics of the soil, the height of the wall, the depth of the canal, the geology, and so on. The designers decide. For many years the sheet piling installed after Hurricane Betsy in 1965 stood alone, protrud-

ing from the top of the embankment by six feet and serving these purposes: increased height for the entire levee; solid, rooted support for the berm itself; and as an underground barrier to prevent water from the canal from seeping all the way under the embankment, thereby weakening the entire structure. In the 1990s the New Orleans District of the Army Corps of Engineers affixed a concrete flood wall to the top of the steel-sheet piling—the third element. The contractor either pulled out the old steel piling and drove in a new piling or used the existing steel. In either case there is an overlap of a couple of feet between the steel and the concrete. This new structure increased the overall height of these levees to thirteen feet to fourteen feet above mean sea level. Of course, the sheet piling still served to support the whole structure, and to act as a barrier to underground water movement from the canal to the outside of the levees—and to the homes beyond. (The water level in these canals is just about sea level, fluctuating with the tides in the lake, which puts it level with the eaves of many of the homes on either side of the canal.)

I'm not a structural engineer nor an expert on levee design and construction, and I haven't spent as much time on the levees in and around New Orleans as I have in the wetlands, but I know these structures pretty well. In 2001, after our Hurricane Public Health Center was funded, I'd occasionally leave home early, drive to New Orleans, and just cruise the city, trying to feel in my veins the natural ridges, the unnatural canals and levees, what would happen during a flood. I knew about the lower section of the levee at Lakefront Airport—the one that overtopped during Katrina. I saw the weak spot at a joint between the earthen levee and the concrete wall near the Lake Pontchartrain causeway. I had seen sections of levee walls that had sagged downward, suggesting potential soil or differential subsidence issues. (Areas mostly underlain by clay will subside more than areas predominantly underlain by sand—always a concern when building levees or anything else in a swampy setting such as New Orleans.) I know that water coming over the top of a flood wall—overtopping—scours a trench in the soil at the base of the wall on the protected side, the side facing the homes. It's common sense, and it always happens.

and serving these
lid, rooted support
r to prevent water
the embankment,
)90s the New Or-
affixed a concrete
he third element.
ing and drove in a
e there is an over-
oncrete. This new
es to thirteen feet
, the sheet piling
act as a barrier to
the outside of the
l in these canals is
lake, which puts it
side of the canal.)
levee design and
the levees in and
but I know these
ne Public Health
arly, drive to New
ny veins the natu-
ould happen dur-
levee at Lakefront
a I saw the weak
oncrete wall near
ons of levee walls
il or differential.
ll subside more
a concern
ing such as
f a flood
of the
mmon



*Cross section of the 17th Street Canal breach (view from the north).*

There was no such scouring here at the 17th Street Canal. I couldn't believe the Corps was taking this line, because surely one of the engineers—many of the engineers—had toured the levees after Katrina and had seen the *absence* of any scouring or other signs of overtopping. Also, the new hurricane bridge just a few hundred yards inland from the lake entrance to this canal would have blocked any significant wave action in the canal itself. Waves pounding on the flood walls would not have been a factor. Nor is this canal wide enough to create significant fetch. (Wind-driven waves get bigger the greater the distance of open water. With the wind mostly blowing across them during Katrina, these narrow canals could not have supported much in the way of waves.)

What the Corps was saying seemed so far from the truth as I observed in the field that I'll admit the word "cover-up" came to my mind—and probably to my lips—as we studied the scene that Thursday. After all, the Corps and its contractors can be sued, under the

Federal Tort Claims Act. They have a lot at stake here. As the LSU group studied and compared notes, there was no question that we had all come to the same conclusion about this levee: It had somehow failed, structurally. Paul and I looked at each other and almost sighed. Here we go again with the Corps.

We crossed the bridge over the canal—the scene of all the action I described in Chapter 6—and then walked toward the breach itself on the new roadway built by the West Jeff crew, right next to the flood wall, right above the floodwaters. Of course, there were no signs of overtopping on this side of the canal either; the walls are roughly the same height on both sides of the canal. At the breach itself a section of the bank with its green grass and fence still intact had heaved laterally thirty to forty feet, carrying with it several large trees. Literally, this heave acted as a huge bulldozer and pushed everything in front of it forward and upward. The yard directly in front of the breach was now a hummocky terrain, rather than the flat, level yard so typical of this area of New Orleans. One frame house had ended up on the high ground and was fairly dry. In the scour areas on each end of the breach, houses were gone. The huge roots of the cypress trees that had grown here hundreds of years ago were scattered here and there in the scour holes. Clearly, the entire structure of the levee—flood wall, sheet piling, and earthen embankment—had succumbed to the pressure of the water in the canal and heaved laterally, almost as a unit. This breach was about five hundred feet across. Water had poured into the city with incredible power.

I met Joseph Bowles and his sister, Schoener Cole, working their way through what was left of the possessions inside Joe's flooded, ruined house near the end of the breach on the north side. This house had never flooded before, Joe said, and during Betsy this levee, just an earthen berm, with no sheet piling or concrete flood wall at all, had held, so Joe's inclination had been to ride out Katrina, just as he had stayed put for all of the other storms over the decades. Like many people, though, he had evacuated on Sunday evening, when the predictions were dire indeed. He had thought he would find a place in Baton Rouge but ended up in Arkansas, and he didn't know

ere. As the LSU
uestion that we
e: It had some-
ther and almost

of all the action
he breach itself
ght next to the
there were no
r; the walls are
t the breach it-
ence still intact
i it several large
er and pushed
yard directly in
cather than the
ns. One frame
irly dry. In the
one. The huge
ds of years ago
learly, the en-
g, and earthen
le water in the
each was about
e city with in-

, working their
e's flooded, ru-
de. This house
this levee, just
ood wall at all,
trina, just as he
decades. Like
evening, when
e would find a
e didn't know

the fate of his house until he came back to see for himself what he
had left. Even with all of the photographs telecast around the clock,
he hadn't realized his house was right at the now-famous 17th Street
breach. He was staying with his sister in nearby Metairie—two of
the two million lives that would never be the same.

Our group now drove east to the London Avenue Canal, where
there were two breaches, but with only one easily accessible, on the
west side of the canal. This breach was about 450 feet across—not as
wide as the one at 17th Street. The berm on either side showed no
signs of overtopping or scouring. It had heaved away from the canal,
shoving a little building 8 feet up and 20 feet back. (This building
turned out to be the clubhouse that homeowner Gus Cantrell, a civil
engineer, had built for his kids years earlier. He sent us the before-
and-after pictures. Inside that house an enormous, extremely solid,
and heavy china cabinet wasn't just shoved or moved by the wall of
water that had roared through. It was gone.)

We couldn't know for sure yet, but at this breach, too, it certainly
looked like something instantaneous and structurally catastrophic
had happened on the morning of August 29, and that water from
Lake Pontchartrain had poured into the city, soon meeting the wa-
ter pouring in from the 17th Street breach to the west.

The third of the fatal breaks in the Orleans Metro Bowl is on the
east side of the London Avenue Canal, just north of the bridge at
Mirabeau Avenue. We were finally able to reach this site a week
later, and we needed my Xterra to do so. Just imagine, I said to the
others, I need four-wheel drive to get around New Orleans. The
reason was all of the sand piled deep over an area two hundred yards
or more around this breach. Dunes of sand—an amazing sight.
Where had it all come from? Possibly Lake Pontchartrain. When
John Pardue and I had crossed the lake on the Saturday after the
storm, the echo sounder revealed that the bottom was now very ir-
regular, with lots of dips and valleys. Scour holes? Normally the
echo sounder shows a flat, smooth bottom. Since I've sailed over
this bottom literally hundreds of times, I pretty much have the ba-
thymetry stored in my head, and it appeared to me that the surge
and waves of Katrina had deepened this lake—shallow to begin

with, averaging twelve feet—by two feet in some areas. That miss-
ing bottom was now sediment suspended in the water, and in the
canal it would have been held in suspension by the current until it
spilled over the breach, where it would have deposited the heaviest
material, which is the fine sand, first. That's what I was thinking as I
studied the new beach inside New Orleans. But why was there so
much more sand here than at the other breach on this canal or at the
one at 17th Street? This was a bit puzzling, and it was puzzling be-
cause my hypothesis was dead wrong, as I learned later when we got
the borehole data for this site. Below this breach the soil from
minus-10 (that is, 10 feet below mean sea level) to minus-50 is thick
beach sand. So this sand deep enough to cover cars was of local ori-
gin. It had come from the breach area itself. This would be a cru-
cially important fact for the levee investigation.

Lined up with the middle of this three-hundred-foot-wide breach
at Mirabeau was a slab house that had been shoved thirty or forty
yards. (Or maybe it floated; entire houses can float down rivers in
floods. We see it all the time.) Other slabs were now bare. Again,
there were no signs of any scouring along the intact berm at both
ends of the breach. No overtopping. To all immediate appearances,
yet another catastrophic failure from some other cause.

A block away, Carmen and Dale Owens were working in their al-
most new two-story brick home. Like all of the homes throughout
the city that had taken in water to eye level or higher, the first floor
was a grim vision of ruined furniture and dried mud and muck on
the floors and walls, juxtaposed with pictures still hanging on the
walls and placed on the mantles. "Depressing" is a pitifully inade-
quate word for these scenes, even for an outsider who's not picking
though a lifetime's possessions, looking for something to save. No
wonder a lot of the evacuees now scattered far and wide were saying
that they would not even come back to see their former homes. Just
too difficult. Carmen said she understood this attitude, but the bed-
rooms and possessions upstairs were fine. They looked exactly the
way they had when she and Dale had fled late Monday morning,
when the winds were dying but water was suddenly in their house.
They couldn't understand what had happened. This neighborhood

s. That miss-
er, and in the
rrent until it
l the heaviest
thinking as I
was there so
anal or at the
puzzling be-
when we got
e soil from
s-50 is thick
of local ori-
ld be a cru-

-wide breach
irty or forty
wn rivers in
bare. Again,
rm at both
ppearances,

g in their al-
throughout
e first floor
d muck on
ging on the
fully inade-
ot picking
save. No
ere saying
omes. Just
the bed-
ctly the
orning,
house.
hood

had *never* flooded. That's why they didn't have flood insurance. They did have another house—dry—not too far way, so they had someplace to live. Still, I was amazed by their spirit. (A few weeks later one of Carmen and Dale's neighbors contacted me. They had video shot right after the breach, and it was time stamped. As our forensic studies moved forward this video would prove more and more important. It is, as far as I know, the only video taken immediately after the failure of a levee.)

Back at the breach, we looked into a house that was completely missing one exterior wall. The furnishings inside were a mud-caked shambles, of course, but there in an open closet were all the winter blankets neatly packed into plastic bags, the kids' school sports bags, Barbie dolls, everything in this one little section looking perfectly okay, but with the house around it a complete loss. My daughters loved to play with Barbie dolls, and it always amazed me how they knew which doll was whose and which clothes belonged to each one. Who and where were the little girl or girls who played with these Barbies? Did they get new ones for Christmas? The garage was filled with sand and a very strong smell of death. I said a silent prayer for this family, wherever they may be.

I've said it before, and I'll say it again now. These images stuck with me, and they convinced me to try to get the federal government to own up to the fact that this city was flooded by the failure of *its* levees. As the month passed and the unwatering of the Orleans Metro Bowl was proceeding nicely, helped in good measure by the huge portable pumps flown in by a number of European nations, more and more residents mustered the courage to return to see what they had left, if anything. My images were their homes and lives. And they were angry, too. They wanted to know what had happened. Many of these neighborhoods had never flooded in the sometimes long experience of the owners. These three breaches had effectively ruined the largest part of New Orleans for the foreseeable future. Call it a blame game if you must, but some of us were determined to find out exactly what had happened and to demand justice from the responsible parties.

The Corps had not dug these canals or built the first levees here,

but when it added the concrete flood walls in the 1990s, it had con-
ducted a comprehensive assessment of what was here and what was
needed. By law and by any moral calculation you choose to perform,
the Corps was now totally responsible. Whether the owners or
renters of these homes had evacuated or not, they were wiped out,
and I believed—and still do, of course—that the federal government
needs to compensate them fully. I don't care whether I become a
one-man band on this issue (but I don't believe I will). One after-
noon when I was a guest on NPR's *To the Point*, Warren Olney
started the program with a quote from President Bush about the
need to balance compassion with fiscal responsibility. What would I
like to see the president do? Olney asked me. I don't miss this kind
of opportunity. Warren had really teed it up for me, and I tried to hit
that ball long and straight. The feds need to step up and compensate
those who trusted the levees—the federal security system—because
that system had failed during Hurricane Katrina.

Like many structures, a levee under pressure is only as strong as its
weakest link. In different trips to the different breaches over the fol-
lowing weeks and months, we looked for that link. We looked at the
panels of the flood walls and the joints between. (The panels were
not linked together, but stood independently with a rubber epoxy
sealing the crack.) We looked at the steel rebar—that is, what we
could find in the rubble—that would usually be tied with wire into a
"cage," with this cage then strengthening the concrete itself and
uniting the concrete in some way with the sheet piling, so that con-
crete, rebar, and steel piling function as one unit. We looked at the
Corps's choice of an I wall for the flood wall rather than a stronger
T wall with batter piles. The term "I wall" is self-explanatory:
Viewed on end, it resembles the letter I, supported at its base by the
vertical steel-sheet piling driven into the berm. The T wall resem-
bles an inverted T, with a wider base than the I wall; in addition, two
piles, one on each edge of the base, penetrate the soil at an angle
away from the wall, almost like the legs of the capital letter A. These
are the batter piles, and they assure a far more robust structure.

They are mandatory in soft, weak soils. The wide base of the T wall also helps protect the system should there be overtopping. But on these canals we have I walls.



*I-wall versus T-wall construction.*

If an I wall begins to give way and leans back under the pressure of the water, a gap will open at its base, providing easy access for water to dig down the sheet piling—percolation, this is called. If this water gets all the way down and under the sheet piling, it may emerge on the outside of the berm as a boil. Obviously, this is a dangerous situation, with "boiling" water cutting completely through the earthen embankment. How deep in the soil was the steel-sheet piling in these embankments? Was it the same depth everywhere? Was it deeper than the canal to help ensure that no sand boils or seeps would develop under the pressure of high water levels due to the storm surge? Was any of the piling, in the failed sections, bent or distorted?

We looked at everything—or tried to, because the Corps was necessarily scrambling to rebuild the ruined berms and come up with some kind of makeshift structure that might stand a chance of holding back a serious surge, if we should get another storm, which was always a possibility. It was only September, in an extremely active hurricane season. Barges and trucks were hauling in rocks and other fill material, bulldozers were shoving and shaping new embankments, and all of this rebuilding work was covering up some of the evidence of the failures. Sections of the failed flood wall were buried. The structure of the original heave was being buried. What if the equivalent of the "black box" or the smoking gun was being buried? This was very frustrating, but there was nothing we could do. Every day that passed less and less of the flood walls and other evidence were visible.

And what did the design plans and specifications show? Did the structures, as we could still piece them together, match those designs? How could we ever get those designs?

On Friday afternoon, September 16, I talked with Michael Grunwald of the *Washington Post*, on the recommendation of John Barry, author of *Rising Tide*. I'd met John during our appearance on *Meet the Press* the previous weekend, and we'd agreed immediately that this flood was a failure of the federal government, which should compensate homeowners and businesses for their losses. Barry would soon publish an Op-ed to this effect in the *New York Times*. But now I needed a national reporter who was following the Katrina story and would be open to our tentative interpretation of why the levees had failed. In a few TV appearances I had tried to get the debate going, but no one seemed to realize its significance. I wasn't getting a lot of traction, as they say. The overtopping explanation from the Corps was misleading and self-serving, because it allowed them to claim that the surge exceeded the design capacity, which would let them off the hook. (Who knows, they may still try to argue this, but without a shred of evidence, it won't be easy.) I was concerned that good forensic evidence would be buried at the breach sites or otherwise lost before any congressional investigation could gear up. I thought we had to get the alternative story out there im-

mediately for Congress and the world to consider. What better way than through the *Washington Post*? I hated not bringing in the *Times-Picayune*, specifically Mark Schleifstein, who is a great comrade-in-arms in the hurricane business, but I thought, rightly or wrongly, that the *Washington Post* would be the best mouthpiece. I wanted everyone in Washington, D.C., to see what was going on and above the fold, if at all possible.

John Barry agreed with me and set up a conversation with Michael Grunwald. On the phone Grunwald was very friendly and polite, heard me out, and seemed to understand right away what I was saying and the gravity of the situation. He said he needed to talk to one of his editors, but would try to fly down as soon as possible. Apparently his editor got the picture too, because I picked up Grunwald at the Baton Rouge airport on Monday just after noon, then collected Paul Kemp and Mashriqui, and we drove straight to New Orleans and toured the 17th Street and London Avenue breaches that afternoon. Level-headed Paul Kemp said straight out at one point, "This should not have been a big deal for these flood walls. It should have been a modest challenge. There's no way this storm should have exceeded the capacity." That was what we wanted to demonstrate to our guest from Washington. We returned to Baton Rouge, had a great dinner on Grunwald's newspaper, then set off early Tuesday morning for the Industrial Canal. That afternoon Grunwald called spokesman Paul Johnston with the Army Corps of Engineers one last time to get comments on the alternative theory shaping up with the LSU hurricane experts—and others—that overtopping had had nothing to do with the three failures on the 17th Street and London Avenue canals. I sat there listening to one end of the conversation, during which Johnston repeated yet again that "the event exceeded the design."

Grunwald talked to former Louisiana congressman Bob Livingston, a Republican who had chaired the House Appropriations Committee and was now a lobbyist in Washington. Livingston, who must understand well the symbiotic relation between the Corps and Congress, noted that the earthen levees along the lake had held while these smaller berms topped by flood walls along the canals had

failed. "I don't know if it's bad construction or bad design, but whoever the contractor is has a problem," Livingston said. So does the Corps, I thought, when I read that quote in Grunwald's story, co-written with Susan Glasser. It ran on Wednesday, September 21, with the headline FAULTY LEVEES CAUSED NEW ORLEANS FLOOD, EXPERTS SAY. And yes, it was above the fold! Since this was my birthday as well, I took the story and its location as a good omen. The following day Mark Schleifstein laid out essentially the same contrarian point of view on the *Times-Picayune*'s Nola Web site. In that story Colonel Richard Wagenaar acknowledged that the overtopping theory was being questioned. He said that the Corps had been ordered by Congress to retain all documents. He added, "My guys want to know what caused this just as bad as everyone else, because we've got two hundred people on the other side of that canal who lost their homes as well—at least two hundred people." He reiterated, however, that the design criteria may have been exceeded by this storm. He pointed to debris inside the lakefront levees at Metairie, in Jefferson Parish west of New Orleans, proving that waves had reached at least seventeen feet in that section of the lake.

Not really. We had also looked at that debris, and it told us that the waves were dumping debris on the lake side of the earthen levees, with winds of up to 70 mph lifting this debris and blowing it over the levee. There was no evidence of overtopping here, as perhaps the colonel was suggesting.

Without a doubt, I think, the batch of overlapping stories in the press turned the corner for us and guaranteed that the truth about the levees would come out, sooner or later. Calls and e-mails from reporters picked up, that's for sure. My phone rang at 2:00 A.M. the morning the *Post* story appeared. I was under the weather and didn't answer, so they called Paul Kemp. Being the tough soldier he is, Paul left his home in Baton Rouge at 4:00 A.M. for a dawn interview in New Orleans with ABC—all part of a great team effort from day one until the present. Our angle about the levees and the Corps gained even more momentum when, unbelievably, sections of the St. Bernard Bowl and the Orleans Metro Bowl, both almost drained from Katrina's floodwaters, took heavy water again on Friday, Sep-

ign, but who-
. So does the
ld's story, co-
ptember 21,
s FLOOD, EX-
my birthday
en. The fol-
me contrar-
site. In that
the overtop-
ps had been
d, "My guys
lse, because
t canal who
" He reiter-
exceeded by
t levees at
roving that
of the lake.
told us that
arthen lev-
blowing it
ere, as per-

ories in the
ruth about
mails from
00 A.M. on
eather and
soldier he
awn inter-
effort from
the Corps
ons of the
st drained
iday, Sep-

tember 23, as powerful Hurricane Rita, passing 150 miles to the
south on her way to a landfall in far western Louisiana, threw up a
seven-foot surge, and the Corps's breach repairs along the Industrial
Canal proved unsatisfactory.

Rita was scary. When she first shaped in the Caribbean the pre-
vious weekend, the most cursory consideration of the weather maps
put a lump in the throat. This storm, too, gave every indication of
floating west, just as Katrina had, right into the Gulf of Mexico for
the almost predictable sudden strengthening, and then at some
point starting her swing to the north. Of course, any kind of reprise
of Katrina's path—or, even worse, one somewhat to the west—
might have been the bitter end for the city of New Orleans. The
levees are "severely degraded," I told one inquiring reporter, and
the city is "extremely vulnerable." To put it mildly. On the Industrial
Canal, the quickly repaired levees on the east side were several feet
lower than the originals. The Corps said these barriers, composed
of rock and limestone chips, would be high enough for the predicted
storm surge. They weren't, and some sections eroded as well, with
water pouring once again into Lower Ninth, Arabi, and Chalmette.
(We had warned the Corps that the limestone chips should have
been protected with surface seals.) The smaller breaches on the west
side of Industrial Canal were also overtopped again, and water re-
turned to the adjacent neighborhoods, including Gentilly, in the
Orleans Metro Bowl. Fortunately, the 17th Street and London Av-
enue canals had by then been sealed near the lake entrances with
sheet piling driven down alongside the bridges—a makeshift mech-
anism whose function should have been in place all along and that
must be a feature, in one form or another, of the upgraded levee sys-
tem everyone is promising will now be built.

With the levee investigation events followed hard and fast for the
next six weeks or so, as everyone came to appreciate how important
the answers were. Three groups were officially investigating what
had happened: one team sent in by American Society of Civil Engi-
neers (ASCE); another from the University of California at Berke-



ley, working under the auspices of the National Science Foundation (NSF); and, as of Wednesday, September 28, the Corps's official investigators (the Interagency Performance Evaluation Task Force), with its report not due until June 2006! A fourth team was our group from LSU, but we were unofficial. I didn't like this. Without an official mandate to do a forensic study, I feared hassles from LSU, where some people apparently were getting nervous about the involvement of us "hurricane center people" in the levee failure story. In fact, just two doors down from my office sit some folks who try to get money out of alumni, some of whom have made huge fortunes in the local petroleum and chemical and shipping industries, and word filtered out that some of these alumni were upset about our visibility. My answer was, tough, but I also knew we needed some kind of independent status, so I worked the phones with state people, pointing out that the ASCE and Cal Berkeley teams didn't have their roots in the details of Louisiana geology. And were these people truly independent? After all, former Corps employees were among the members of the ASCE team. What credibility would such an investigation have? I thought the state of Louisiana needed its own official investigation, beholden only to itself, and my main sounding board for this was Terry Ryder, someone I have known for a number of years. Separately, Johnny Bradberry, the head of the Department of Transport and Development (DOTD), had been moving on a track he called "Team Louisiana." I was not surprised. Secretary Bradberry is extremely sharp and knows how to make a decision (so important in this time of crisis), which I guess he learned from years of managerial experience in the oil patch. I knew we'd be able to work together.

As noted, our LSU team has never enjoyed smooth sailing with the Corps, at least not for long. I didn't help our cause when I suggested at a getting-to-know-you dinner with a group of Corps officials at a Baton Rouge steak house that the site of the levee breaches should be treated as a "crime scene." Typical bluntness and perhaps an unfortunate choice of words. All I wanted to convey was the need to look at all the evidence at every breach before still more of it was covered up by the ongoing repair work. We needed to get every-



nce Foundation
rps's official in-
n Task Force),
was our group
Without an of-
les from LSU,
s about the in-
e failure story.
olks who try to
huge fortunes
industries, and
pset about our
needed some
nes with state
y teams didn't
nd were these
nployees were
dibility would
uisiana needed
and my main
ave known for
e head of the
D), had been
not surprised.
w to make a
h I guess he
patch. I knew

sailing with
when I sug-
f Corps offi-
vee breaches
and perhaps
was the need
ore of it was
o get every-

thing to an off-site building, where all of us could have easy access, including, eventually, the media and the public. Why did the Corps choose that meeting to offer us the use of a valuable centrifuge? Were they trying to get on our good side? Paul Kemp said after the meal, "Well, all we learned tonight was that the Corps likes to eat steak." That cracked me up. We were supposed to meet these guys in the field the next day, but they were no-shows. It was so strange with these engineers: From one day to the next we never knew what we were going to get.

Then someone with the state was told that someone with the Associated Press said that I had called the Corps "nonprofessional." That certainly would have been my thought, but I didn't say that in the interview in question. The reporter might have asked, regarding some action or another (he would have had numerous options), "Isn't that unprofessional?" I might have answered "Yes." Live and learn, but that's one reporter I won't talk to anymore. The damage was done, however, and a state official whose support we needed was upset, so I sent around an e-mail apologizing for any misstatement on my part. (I also sent around e-mails suggesting that the state set up a new coastal restoration czar—a real one, this time, with real powers.) Thank goodness none of this sabotaged the Team Louisiana idea, which was soon ready to go. Before the official announcement I sent Paul Mlakar, head of the Corps's investigative team, an e-mail advising him of the new group and urging full cooperation and sharing of data. Mlakar replied that the Corps had made contact with LSU "last month" about a "joint data-collection effort and have included LSU most intimately in ours thereafter. . . . However, not all in the engineering profession believe that the reason for the disaster is as clear as you suggest." Then, out of the blue, on Saturday morning October 1, we got a call informing us that the Corps was going to begin a survey of high-water marks in two hours. Did we want to join them? How strange: two hours' notice on a Saturday morning, one that also happened to be the first day off most of us had had since the week before Katrina. What we didn't know was that the ASCE and Cal Berkley teams were in town for the first time to kick off their own investigations, hosted by the Corps.

Paul and Mashriqui immediately dropped family plans and rushed down to New Orleans. Paul called me that evening with the news that the Corps had organized a big meeting of all the teams for the next evening, Sunday. I wanted to be there—and I should have been, since I'd be heading the new Team Louisiana. But the damnedest thing happened. I was told there wouldn't be enough room for me at this large meeting of Corps officials and the investigative groups. There was room for Paul Kemp, but not for me? The meeting was at the Corps's district office, where there are some huge assembly rooms. Subsequently, members of both of the other teams confirmed that the room had been crowded, but that there had been space. Of course there'd been space! This was so childish of the Corps. I think the other teams were appalled at what had happened, and they told me that some of the Corps's people had explicitly said that they hoped these other teams wouldn't be like me—that is, full of bothersome questions.

On Tuesday, October 4, we met with staffers for the Senate Homeland Security Committee who were in town for some preliminary fact-finding prior to the committee's upcoming hearings about the federal government's response to Katrina. We put together a CD and a movie that summarized where things stood, in our estimation, and then I was very surprised—more than that, distressed—when, out of the blue, I thought, Paul Kemp brought up the idea that "harmonics" in the canal waters might have caused, or at least contributed to, the collapse of the levees. The Republicans in the room seemed to perk up at this possibility, and I sensed an attempt to get the Corps and the federal government off the hook. Later that day Paul explained that he was just trying to be open-minded because we had not completed our field investigations. (The harmonics argument went nowhere immediately.) We went to dinner with some of the staffers and tried to figure out the political dynamics. My initial conclusion was that there was a split along partisan lines, but, in the end, I decided that the whole group was rather nonpartisan, commendably so.

The following day we drove these folks to New Orleans, and I had a chance to discuss some of the many issues about Katrina that

from the perspective of a disaster science specialist were glaring examples of how not to run a response operation. I told them about the ridiculous episode of the previous weekend, when I'd been excluded from the Corps's meeting. Touring the breaches and the drowned city, the staffers were suitably stunned, even though the buildings didn't look to me as dark as they had just a few weeks before. Still, it was unspeakably desolate, with piles of trees and limbs and garbage everywhere (twenty-two million tons of garbage, by one estimate, easily the biggest cleanup job in American history, including the Twin Towers); boats still parked in the unlikeliest spots; mounds of discarded possessions on every overpass; block after block after block with no people whatsoever; street corners festooned with signs advertising cleanup or restoration work (imagine the scams), and lawyers. At one house someone had placed a Santa Claus by the front door. Was that for Christmas '05, or '06? or '07?

Coincidentally, we ran into both the ASCE and the Cal Berkeley investigators at the London Avenue breach. I thought they were none too friendly to us initially, but I was told later that others in our group had good exchanges with them. Paul Mlakar was also there. The Corps was preparing a handbook for everyone, he said. I took the opportunity to ask him, in front of the folks from Washington, about the Sunday meeting to which I hadn't been invited for space reasons. "It was tight in there," Mlakar replied, but he then assured me that LSU would be invited to the forthcoming meetings.

I guess it's clear that the "banning" episode had really soured me. I decided things weren't quite right in New Orleans, and the first chance I got that day I told Marc Levitan about my concerns that the Corps might interfere in the investigative process, that they were exerting an overbearing presence and attitude, and, most important, that there might be interference from some members of the ASCE headquarters staff. I told Marc that if I called Michael Grunwald of the *Washington Post*, say, with the story about what had been going on with the Corps, topped off by the refusal to allow me in the big meeting, that story would be news two days later. If the ASCE were ever seen as a tool of the Corps, it would be putting itself in a position to get hammered. Marc's face dropped. He is well con-

nected with the society, and he knew that I wasn't bluffing, and he knew my analysis was right. Shortly thereafter, Paul Mlakar was a lot friendlier to me.

But get this: On that very day in New Orleans our geotechnical engineer, Radhey Sharma, was invited to join a working session that evening of the ASCE investigative team. Radhey is an ASCE member. In the afternoon he broke away from us and drove away with some of those engineers. A couple of hours later, he called me. Standing right in the doorway of the meeting someone from the ASCE team had rescinded Radhey's invitation, because of "things difficult to make public at this stage." So we doubled back to pick up Radhey on the steps of the building in which the meeting was going on. I think he was suddenly unwelcome because the ASCE team was going to put together a press release for the next day via a conference call with ASCE management in Washington. They didn't want anyone from Team Louisiana hearing that conversation (which lasted for two hours, I understand).

On Friday I was tied up with a crew from the PBS series *Nova*, but Radhey, Mashriqui, and Paul headed down to New Orleans very early for a meeting prior to the ASCE press conference, where a senior Corps official introduced everyone except the LSU team members. Paul Kemp abruptly stood up and pointed out that not everyone in the room knew the group from LSU, and he then asked Mashriqui and Radhey to introduce themselves. My man.

I was working with *Nova* when Paul called with the news that the ASCE would announce that the levees at the London Avenue and 17th Street canals had *not* been overtopped. Vindication for us, that's all there was to it. That evening Mashriqui hosted two of the ASCE members at his home for a barbeque, one from Japan, the other Professor Jurjen Battjes, one of the world's leading levee experts, from the Netherlands. Now we learned that the official statement from the ASCE team had indeed been watered down after the phone call with the front office. The phrase "soil failure" had been deleted from the statement. I listened to everything they had to say, and I came away with the clear impression that at least some of the field engineers were extremely unhappy with the way ASCE was

dealing with them, their findings, and the whole situation. A few weeks later one of the ASCE team e-mailed me with the remarkable revelation that all eleven investigators had threatened to resign, standing out there on the levee, unless the interference in the process was stopped. Jurjen Battjes told us how he had disagreed with a further watering down of the statement about the nature of the failure. The wall slid. It failed. That was right in front of everyone's eyes. Finally, Jurjen was simply appalled at the design of the levee systems in New Orleans.

Within just a day or two of the release of the watered-down ASCE statement, Team Louisiana was officially in business under a contract with the Department of Transportation and Development. We were the LSU guys and three private-sector civil/geotechnical engineers with truly vast experience with the local geology—Billy Prochaska, Art Theis, and Louis Capozzoli, whom the rest of us soon called the three wise men. (The contract also included small amounts for surveys, for our stopped-clock program, and for a program to capture the oral history of the survivors—these last two part of the effort to pin down as closely as possible the exact time for each failure.)

Now there were *four* investigating teams in the field—ASCE, Cal Berkeley (NSF), the Corps, and us representing the state—and now everyone would be able to collect all the forensic data. We'd have access to the original design plans and specs for the levees. Or would we? When Paul Kemp soon asked for some surveying data from the Corps that he had helped collect, he was advised to submit a FOIA request—under the Freedom of Information Act. This, Paul replied, is "inappropriate." I was amazed by his self-restraint. I might have said, "Look, asshole. Give us what we need, what you've been saying all along you'd give us." Paul took the milder approach, probably wisely, and received an immediate acknowledgement that the FOIA answer had been wrong. The survey data would be forthcoming. Over two weeks later Paul had to send the Corps another note: Now, where's that surveying data? Meanwhile, we read in the newspapers that the Corps would be making available to the investigators (or some of the investigators?) 235 boxes of material. Some of these