Case 2:05-cv-04182-SRD-JCW   Document 460-2   Filed 05/26/06   Page 1 of 20

documents have been posted to the Web, and some of these have key pages missing, such as calculations on lateral stability at the 17th Street breach.

Even after we had official status as Team Louisiana, we had to fight for every scrap of information. We even had to rely on the media. It's almost embarrassing to admit this, but so it was. Sometimes we would point a reporter in a certain direction, at other times a reporter or television producer would find new data, bring it to us, we would comment, and then they'd release it to us. This is how we were forced to build up most of our background information. Then we found some records in the New Orleans office of the DOTD. Getting data out of the Corps was extremely frustrating. We never seemed to get what we asked for, but we were hearing through the grapevine that the Corps's own "independent" investigators had access to boxes and boxes of stuff.

Nor were we alone in battling for the necessary data. The Berkeley levee warriors, as we soon began calling them, were having their own problems with access to the Corps's documents, even though they were working under the auspices of the National Science Foundation, and even though Bob Bea on that team had started his engineering career with the Corps in south Florida in 1954, building levees, canals, and pump stations. His father was a career Corps employee, so Bob truly understands the unique bureaucratic psyche that confronted us. He also has a visceral connection with the Katrina tragedy, because he lost his home in New Orleans when Betsy flooded parts of the city in 1965. He had waded to his house in the Lower Ninth to salvage what he could, which was nothing, not even his wedding photographs. He sold that house for the price of the land—a seriously discounted price.

I've mentioned the press conference for the release of the preliminary ASCE report on the levee failures. The night before, one of the people helping to set up the event had collared Bob Bea and pointedly asked if he was going to attend. Yes, Bob said. Perhaps he shouldn't, this person said—more than once. That's not the way to deal with Bob Bea. He was there the next day—and so was his antagonist, standing right next to him. Was someone hoping to muz-

zle this man? Forget it. He soon met with reporters from the *Los Angeles Times* and elsewhere, and all the coverage over the weekend stated quite clearly that there had been a massive failure of the levee flood walls. Bob was joined in this PR campaign for the truth by Ray Seed, another member of the Berkeley team whose father, Harry, was one of the great geotechnical engineers, now often considered the father of geotechnical earthquake engineering. (Harry Seed was awarded the National Medal of Science by President Reagan.) As Ray tells the story, he was fiercely determined to be anything but another "geotech," but now he occupies his father's old chair at Berkeley!

And people thought they could manipulate the investigation and the judgment of Ray Seed and Bob Bea? Instead, these two scientists helped us carry the banner during the fall, supporting our earlier conclusions, helping the world realize that overtopping did not cause the tragic breaches along the 17th Street and London Avenue canals.

Believe it or not, this is how things went with the investigation of one of the most catastrophic levee breaches and floods in American history—an investigation that was not just an academic exercise, because more storms are coming, and that same levee system is still the only one we have.

In order to set the stage for the next phase of the investigation story I need to backtrack briefly. On September 30, NBC News had broken the story about an old lawsuit against the Army Corps of Engineers regarding work that dated from 1993, when the levees were upgraded. In this action the Pittman Construction Company complained that the Corps had not provided enough information about the problem with the soil at the 17th Street Canal, which turned out to be weak and shifting and "not of sufficient strength, rigidity, and stability." These poor soils caused problems pouring the concrete flood walls, which was Pittman's job. Also, the firm alleged problems with the steel-sheet piling. The dispute concerned just 12 of 257 flood-wall sections, those which had tilted a little and were technically "out of tolerance." The Corps had allowed a variance on the



*A cross section of the 17th Street Canal breach area showing the soils and predominant failure mode.*

work and accepted the job, but the company claimed that it had incurred huge cost overruns and was seeking relief from the Corps.

I had not heard of this lawsuit. None of us at LSU had. At this point in the investigation of the breaches the Corps had not released any design or construction documents (and it would not for another month). As I've said, we were forced to get much of our information with the help of the media, who were now out in force on this story and digging furiously, as this NBC scoop made clear. I also suspected that the Corps was getting "leaky," that at least one of the two hundred or so Corps employees who had lost their homes was divulging information.

These courtroom documents had been filed in 1994, and the administrative law judge had ruled in 1998—in favor of the Corps. For the purposes of the investigation of the Katrina flooding seven years later, the decision itself was irrelevant. Almost irrelevant was whether

the twelve sections addressed by the lawsuit were the sections that had failed on August 29, 2005. (Naturally, the Corps hasn't provided the documents we need to make that determination.) The bombshell here was the revelation that a company had complained during construction about the quality of the *soil* in the 17th Street levee.

The NBC team had come to my home about 11:00 P.M. the night before the piece went on the air. I could tell they were excited about what they had. They should have been. As I told them, and as they quoted me, "That's incredibly damning evidence. I mean, really, incredibly damning. It seems to me that the authorities really should have questioned whether these walls were safe." Bob Bea, the Berkeley levee warrior, agreed. "I think it is very significant," he said. "It begins to explain some things that I couldn't explain based on the information that I've had." Indeed, because the soil that comprises the berm that holds the sheet piling that supports the flood wall is, obviously, all-important. If the weakest link of any structure is the foundation, that structure is a disaster waiting to happen, and that disaster will happen at the most inopportune moment, by definition: in the case of a levee, when it is under pressure from high water.

The judge in the Pittman case may have found for the Corps, but all of us investigating the Katrina flooding sensed a breakthrough here. Recall that this entire city was once a cypress swamp, as indicated by the stumps and logs exposed by the upheavals at the breaches. What happens to sheet piling driven into one of these old logs, which are spaced probably every fifteen feet or so? The steel sections could bend or split apart at the tongue-and-groove sections, and there goes the barrier against seepage. What about the soil itself? The Corps's original environmental impact statement for the levees, dated 1982, describes the soil in the lakefront area as "a thin layer of very soft clay underlain by silty sands" and "peat and very soft highly organic fat clays." The original soil material for these levees was this same dredge material. Peat is organic matter. It decomposes, compresses, subsides (the New Orleans problem in a nutshell). It is an excellent path of least resistance. Under pressure such as that in a storm surge, water moves very easily along layers of peat. It can create a slippery surface. Structures built on such soil

can tilt, break, slide, float, sink. Peat must therefore be carefully considered before construction, and engineers must look at the "global stability" of the whole. What is the history of the compaction of these berms since they first took shape in the first half of the twentieth century? How closely did the Corps test these soils before the flood-wall upgrading program was initiated in the 1990s? Did it account for the peat in the calculations? Did it account for the effect of adding the heavy concrete flood wall to the sheet piling? Did they pay heed to Engineer Manual No. 1110-2-2502, which has language that basically states that if you build a flood wall to fourteen feet, then it must hold water up to fourteen feet without failure? Did the Corps pay heed to the design memorandum for the MR-GO levees that state those levees should be built to withstand overtopping such that overtopping will not endanger the security of the structures or cause material interior flooding?

In the last chapter I mentioned the 1982 GAO report titled "Improved Planning Needed by the Corps of Engineers to Resolve Environmental, Technical and Financial Issues on the Lake Pontchartrain Hurricane Protection Project." I had found this document late one night while searching the Web, terminally frustrated with the Corps for not releasing its records to us. One of the most damning elements of that report, in retrospect, is the Corps's attribution of schedule delays "primarily to unforeseen foundation problems.... Increased construction time for flood walls, levees, and roads as a result of foundation problems discovered after project initiation." There it is, in black and white. The Corps of Engineers was well aware of foundation problems years before it constructed the flood walls along the London Avenue and 17th Street canals. Why, then, did it change some of the designs to call for less robust structures after this date? On Tuesday, October 11, Ray Seed from Cal Berkley fired off a letter to the Corps, pointing to unstable soils as the source of 17th Street and London Avenue failures. He linked the evidence to the Pittman lawsuit.

As the soils in the embankments came under suspicion during the investigation, so did the depth of the sheet piling; with the first

point being a very simple one: The steel must be driven below the softest of the soft stuff. Clearly, it should not be *rooted* in the soft clays, peats, and muck that will just not support the whole structure when high water in the canal adds side forces to the equation. Drive the piles until you hit solid earth! If this is minus-80 feet, then so be it! Spring for the extra steel! The very life of a city hangs in the balance. You don't need to be a structural engineer to understand all this.

The second point is also simple: Even if the soils were the best possible, which they definitely were not, the sheet piling should be at least as deep as the bottom of the adjacent canal—minus-19 feet. What was the case with these levees? We eventually determined that the original design memorandum for the 17th Street Canal called for sheet piling driven only to minus-10 feet. Not nearly deep enough. Reporters were telling me that Corps officials were saying that the steel had been driven to minus-17, so I asked them to get the Corps to supply the records, called Pile Push Lengths. As of early February 2006, we still had not seen the numbers, although certain Corps staffers working at the breaches told us that the district office had the data. Of course it did.

Because pulling the sheet piling to determine its depth would destroy the flood wall, we needed a nondestructive test, and still somewhat experimental sonar testing seemed the way to go. We'd also use a cone penetrometer setup to get data on the strength and other characteristics of the soils. We got the funding for part of our investigation in three hours, working with Secretary Bradberry at the DOTD and the state attorney general's office.

For the sonar test, the investigators, Southern Earth Sciences, pushed a probe equipped with a special sound recorder—a transducer—into the soil, no farther than six feet from the wall. The basic idea of such testing is that at each one-foot increment of depth the concrete flood wall is struck with a special hammer, and the transducer in the ground records the signal. As the recorder is driven deeper and deeper, the signal doesn't change much *until* the receiver is lower than the sheet piling. This change should tell the investigators the depth of the steel at that location. We knew that

the Corps was conducting similar tests using a different system, and we believed ours was superior, because, for starters, our recorder was quite close to the wall, not as far away as twenty-two feet, as with the Corps's system. However, both groups were going to rely on the same Colorado laboratory, Olsen Engineering, to interpret its data.

That lab told both us and the Corps that the steel ended at minus-10 feet—eight feet shy of the bottom of the canal, and not nearly deep enough. Both we and the Corps reported this number to the media, but probably thanks to the Pile Push Length numbers that the Corps has but have not released to us, it had reason to believe that the engineering firm had misinterpreted the data. The sheet piling was at minus-17, the Corps believed, and in December it orchestrated a widely covered media event at which sections of the sheet piling were yanked dramatically from the levee by a large crane. I was in The Netherlands at the time, studying their excellent flood-control system, but I heard and read later about the joy on the faces of Corps officials. This particular piling had been driven to minus-17. The Corps then said our data was bad. After careful analysis of our methods, we thought the data must have been misinterpreted by the engineering firm, and after a reevaluation, owner Larry Olsen realized that he had indeed misinterpreted our data. Subsequently, he flew down to New Orleans and went out in the field for two days with us and Scott Slaughter of Southern Earth Sciences, all of us hoping to better understand how this embarrassing error had occurred. Also along on those two days were investigators from the state attorney general's office, who regularly accompanied us in the field, in case there was any subsequent ligitation between the state and the federal government. They wanted to observe the retesting of the sonar technique.

We used different techniques to collect a series of sonar data sets. In the end, after some discussions in the field, Scott Slaughter came up with his own methodology for the seismic interpretation, which we believe is pretty much foolproof. Really, though, whether the steel in a given section of the canal levees is minus-10 or minus-17 is almost moot, because even minus-17 is not deep enough, not when the channel is more than eighteen feet below sea level and the

Case 2:05-cv-04182-SRD-JCW   Document 460-2   Filed 05/26/06   Page 8 of 20

soils are mucky clays and layers of peat. As Billy Prochaska, an absolute geotechnical engineering whiz, stated clearly in one of his reports, strength calculations show that the flood walls would fail when the water level in the canal approached 11 feet (the Katrina surge, as it turns out), no matter if the sheet pile was minus-10 or minus-17. Billy believes the Corps's engineers failed to consider the weak soils between minus-10 and minus-25 feet when they did their strength and safety calculations. Later, the Berkeley levee warriors came up with exactly the same results.

Modjeski and Masters, the engineering firm that developed the design for the flood wall on the 17th Street Canal, said in a letter to the *Times-Picayune* that it had recommended that the sheet piling be driven to a depth of minus-35 feet, but the Corps requested a shallower depth. The Corps responded to the paper with a written statement, defending its own actions. One point is certain: As part of its latest temporary patches at the breaches, the Corps has driven the new sheet piling to a depth of at least minus-50, sometimes minus-65.

Then in early February 2006 we learned from documents provided the Cal-Berkeley team that a cross section in the design documents for these levees shows the peaty soils between minus-11 and minus-16 feet, while the soil borings on which the cross section was based found the peat as deep as *30 feet*. Excellent detective work by J. David Rogers pointed out this geotechnical data irregularity. Our engineers agree with the Cal-Berkeley engineers that the Corps's levee designers may have designated minus-17 for the depth of the steel-sheet piling because the erroneous cross section showed that to be the bottom of the peat layer. Was this breach at the 17th Street Canal caused by a simple error in transferring the raw data to the visual depiction in the cross section? Of this we can't be absolutely certain, but the error didn't help.

Every day that fall and early winter, new data was announced or old data uncovered by one source or another. Every day, new statements and new stories hit the press, and with almost every one the Corps's valued reputation for conservative overdesign took a serious hit. For all of the criticism that agency has endured over the years,

cutting corners on design has not been one of them, for the most part. The rationale for a project may have been dubious, or the project may not have worked as advertised (the Wax Lake weir described earlier is an example), but rarely has the design been on the cheap. At least, that's been the reputation until now, when *any* reasonably objective observer would conclude that the soil structures for these vital canal levees weren't strong enough, period, and the sheet piling wasn't driven deep enough, period. Terrible errors. Either by itself would have presented problems. Together, they were catastrophic.

At the breach on the west side of the London Avenue Canal (the "clubhouse" breach, as we called it), the sheet piling is minus-10



*Relative depths of sheet piling.*

feet—right to the top of a peat layer—this according to the design memorandum. An enterprising reporter found a consulting engineer for Pittman Construction, the company that lost the lawsuit,



*A cross section of the London Avenue Canal/Mirabeau breach showing the soils and predominant failure mode.*

who suggested that pilings driven just ten feet deeper might have made all the difference. I don't have the impression that that was a deeply "engineered" statement, but it's quite possibly correct anyway. What a crushing thought. There's no doubt that piling driven fifty feet deeper—to a depth of minus-60, say—would have made all the difference. Still a crushing thought, because the need for such design was easily seen, and the work itself easily and inexpensively done. Steel is cheap, and so is the job of driving those extra feet into the ground. How much extra could it conceivably have cost at the time? *Maybe* $10 million.

There's more. The original design memorandum for the wall at the Mirabeau breach on the London Avenue Canal called for the superior T wall design with sheet pilings driven to minus-26 and the letter A-type batter piles to each side. What we got instead was an I wall design, and our one sonar reading in this area suggests that the

sheet piling bottoms out at minus-10. Who made the decision to cut corners from this robust design to something that failed catastrophically? And why? Ray Seed, the Berkeley professor, has suggested that budget cuts may have strapped the Corps. "They still have good people—what they have is less of them," Seed said. "It strikes me as potentially dangerous over the long term." He also noted the general shift away from big projects to environmental restoration, plus the trend toward handing over soil boring and testing to private contractors. Donald Basham, chief of engineering and construction for the Corps, replied, "We have not completely contracted out technical expertise."

Responding to these and many other provocations regarding an agency that is technically part of the U.S. Army, Secretary of Defense Donald Rumsfeld announced in October 2005 the creation of an "independent panel of national experts" to study the levee failures under the auspices of the National Academy of Sciences. So, a *fifth* investigating team. This one will use data and conclusions from the teams working for the Corps, the National Science Foundation (the Berkeley group), and the ASCE. Its report will be peer reviewed. This is fine, but I am not sure what anyone else can say. The evidence is very clear. When we have levee walls sliding forty feet laterally there is no appropriate description other than "catastrophic structural failure." Whether the first water there and at the other breaches seeped through the peat, or down and around the sheet pile, or through deeper sands is almost academic. Important for the investigators, but academic. The bottom line is that these levees were underdesigned and failed under winds and surge equivalent to minimal Cat 1 conditions, much less the Cat 3 conditions the Corps claims they were designed to withstand.

On Wednesday, October 26, Colonel Richard Wagenaar, the district engineer for the Corps in New Orleans—the local boss—paid me a visit in my office at LSU, a meeting he'd requested the previous week. A tall man with short hair, he had two other officials with him, and he got straight to the point. How can we sort out our rela-

tionship with the LSU people? I explained the history, and described the opposition we had encountered from the day we first stated that the overtopping scenario was transparently wrong. I told him how we'd had to bring in the big guns from the media (Michael Grunwald with the *Washington Post*, specifically) to listen to our thinking and go to the Corps with the story. I told the colonel that we were thinking of the people of Louisiana, trying to understand the causes of the flooding and the impacts. We don't enjoy being on opposite sides of the table, I said, but we felt the need to get the information and the investigation out in the open. So does the state of Louisiana. I explained that if we had wanted to be completely anti-Corps we could have made much more of an issue of the breaches at the Industrial Canal.

The levees along the east side of this large navigation canal, the ones that had failed and flooded and basically destroyed the Lower Ninth Ward, had been overtopped at about 6:50 A.M. Monday morning, but only for three hours, and by only a foot and a half of water. This water began to erode the outside of the earthen embankments (the scouring effect that is so absent on the inner-city canals). The head in the canal pushed four sections of the flood walls outward. As they tilted, cracks developed at the base on the canal side, with water percolating down and then under the sheet piling. At these breaches the levee was built on a layer of organic marsh and peat with very soft clays ten feet thick—the dredge material from the original 1920 excavation of the canal. Like the soils at the drainage canals, this is a very weak medium. Fifteen feet below the top of the embankment is a layer of soft clays with silt and sand lenses—more poor material. Based on the design memorandum that we found in the files of the DOTD, the pilings at the breach extended to a depth of ten feet below sea level. (This we knew from the exposed sheet piling in the breached areas, but we checked elsewhere with our sonar testing.) The canal is dredged to a depth of thirty-six feet below sea level. Thus there was a linear depth of twenty-six feet of canal that was not blocked by sheet piling, allowing for a potential lateral flow of water under the pilings from the canal. Local residents adjacent to the canal had often said that their

backyards were at times quite wet, even during dry spells. This suggests serious seepage from the canal in the best of times. At the very least, this sheet piling should have been sunk to minus-70 feet. Every engineer in the region knows that this wide, deep canal is on the receiving end of all the water and pressure coming out of the Funnel, which I derided earlier as one of the world's best storm-surge delivery systems. This woefully insufficient steel could not hold the static loading from the surge, nor was it deep enough to form an effective hydrologic barrier against seepage below. Around 7:45 A.M., a little less than an hour after the overtopping began, the levees at two sections along the eastern side of the Industrial Canal succumbed to the enormous pressure, the scouring, the substandard soils, and the insufficiently deep sheet piling and failed explosively and catastrophically.

The geotechnical collapse was aided by the overtopping and the scouring, but it was not caused by it. Nor was it caused by the barge that ended up inside the failed section. (In the reflooding of the Lower Ninth from Rita, the barge moved again and landed on the front of a small yellow school bus. Six months later it was still there.) A cursory examination showed that something had knocked nine inches off the top of about forty feet of the southern sections of the concrete flood wall. Initially the Corps speculated that the drifting barge did this while the wall was still upright and intact, but closer inspection revealed that this segment was damaged after it had already tilted to a 45-degree angle. The wall failure was prior to the impact from the barge, which floated into the breach well after the major failure.

In a way we were giving the Corps a bit of a break regarding the Industrial Canal failures and the terrible flooding and loss of life that resulted in these eastern neighborhoods. This design and construction were every bit as bad as on the drainage canals in the Orleans Metro Bowl. I told the colonel this. When his turn came the colonel explained that no one in Washington really understood the extent of the problem here. I got the impression that he was isolated and frustrated with the lack of progress and the lack of cooperation

from Washington. He was having to clean up a mess that he hadn't caused with little help from his superiors, who wanted to ignore it. He used his hands a lot as he talked. I felt a lot of emotion coming from him. He was really expressing his feelings. I understood that he had found himself in a very tough situation, newly arrived in Louisiana—a month before the disaster—from an assignment in Korea. There was no way he could have been up to speed on the status of the Corps's work in just New Orleans, much less throughout his region. His background expertise is in environmental science and forestry. I pointed out that we at LSU have bureaucracies just like everyone else, and that he had my commitment to work together.

Of course, I emphasized the problems with the data—how we'd been battling to get the basic facts that the Corps had at its fingertips. The other investigators were getting hundreds of boxes of stuff, but we had to go through the media. I even had a new example handy. Just the night before a reporter with the *New York Times* had directed me to a Web page that the district uses to solicit bids from contractors. One of these bid documents had the boring data that we'd been trying to get from the Corps for two weeks! Without any communication from the Corps, how were we supposed to know about it? I assumed that someone in the Corps had tipped the *Times* reporter. Wagenaar knew about some of these problems, because he had in his hand an e-mail in which Paul Kemp had let fly his frustration about the FOIA request and everything else. He had even brought with him the water-level data Paul had requested! He invited me to call him directly with any other problems.

I wanted to make sure the colonel knew about all the goodies that we could contribute to the cause—the surge modeling, geotechnical work, water sampling, sediment sampling, and mortality studies. What we weren't doing ourselves, we could find. I don't think he had known all of that. I couldn't resist the opportunity to present my spiel about the need for a Gulf Coast Reconstruction Authority, a new Tennessee Valley Authority–type entity headed by a czar empowered to make decisions—informed decisions, advised by scien-

feasance discussion did seem, to my mind, to concentrate on the contractors. When it was my turn I said that the one breach at the 17th Street Canal and the two at the London Avenue Canal had been geotechnical engineering failures, period: bad soils. The same conclusion can be made for the Industrial Canal levees, I said, although surge overtopping no doubt enhanced their collapse. Regardless, most of the flooding of New Orleans was due to "man's follies." Society owes an apology to those who lost their lives. It owes an apology to those three hundred thousand who lost their livelihoods and their possessions, and it needs to step up and rebuild their homes and compensate for their lost means of employment. New Orleans is one of our nation's crown jewel cities. Not to have given the residents the security of proper levees is inexcusable.

The next day the malfeasance suggestion got all of the headlines. This surprised and disturbed me, and I sent around a note asking reporters to make sure that the malfeasance argument did not distract from the larger point. Even assuming, as the Berkeley engineers testified, that contractors or even individuals may have shortchanged their responsibilities, were such actions the main reasons the levees failed, or did they fail because of much more basic errors of conception and design? According to the Corps's design manuals for the levees on the canals, a safety factor of 30 percent was built into the calculations. That is, the design should have withstood forces 30 percent higher than the highest anticipated. That's a joke. They were doing well to handle forces 30 percent *lower* than anticipated. Both our Billy Prochaska and Bob Bea of the Cal Berkeley team have determined that the factor of safety in the levees is less than 1. Simply put, it had a very high probability of failure. It was a disaster waiting to happen, which is what I told the Senate committee in early November. But even the 30 percent safety factor is actually low for any dynamically loaded structure exposed to rapidly shifting forces such as storm surge; for a structure built on questionable soils; for a structure defending the very life of a major city and the hundreds of thousands of individuals within that city. That low safety factor caught the attention of every investigating engineer.

And all to save a few bucks? If not this explanation, what? We're not going to stop investigating until we know the answer, so it doesn't happen again.

The following week, Friday, November 11, two LSU vice chancellors called me into one of their offices and asked that I henceforth pass all media requests through the university's public affairs office. They told me that my critical remarks to the media about the levees were hurting LSU's quest for federal funding across the board. They also said the university had received complaints about my presenting myself as an engineer and talking about engineering issues. Since I am on the faculty of the Department of Civil and Environmental Engineering, I can certainly see how a reporter could assume that I am one, but I have never so claimed, and I always correct anyone who seems to have that misimpression. Moreover, I said, my nonengineer status did not seem to worry the College of Engineering at Rice University, for example, where I'd been invited to talk. No issue with those folks about my talking as a geologist about geotechnical (soil) issues and foundation failures. Other engineering departments had also requested such talks, and a number wanted to team up with our LSU group to apply for funding, with me directing the effort. In short, I said, I hadn't been made aware of any academic institution having a problem with the scope of my activities.

The gag order, as I referred to it, created a few problems with reporters, who now had to obtain permission to talk to me. They thought this was pretty silly, and so did I. Naturally I objected to the university and asked for clarification. The following Wednesday it backed off and set me free.

At this writing the five investigations of the levee failures in New Orleans are still under way. Various preliminary findings have been released, but the definitive conclusions will not be available until well into 2006. That said, we know the broad outline of what happened in each case. No report will contradict them. At the three breaches on the 17th Street and London Avenue canals, overtopping

was not a factor at all, as the Corps eventually admitted, so these failures did not reflect the scouring that aided (not caused, aided) the failure of the Industrial Canal levees. Otherwise, the mechanism of the catastrophic structural failure was similar in each case.

In December 2005, we learned that the semiannual inspections of the levees by the Corps and the various levee boards and state agencies had consisted of a five-hour tour of the levee system. In the *Livingston Parish News,* my hometown newspaper, the headline on the story about this inspection read A DRIVE-BY SHOOTING OF NEW ORLEANS. In the *Times-Picayune* one subhead read: "Lunch, not levees." Elsewhere I saw a sneering reference to beignets and coffee. These attacks were perhaps unfair as they related to the levee boards and the state agencies. From the ground the levees looked fine, given what they were. The problems were with basic design and construction, and the problems were underground. No visual inspection was going to reveal them, and they were *not* the responsibility of the local boards or state agencies, who had no good way to even know about them. They were the responsibility of the only agency that had designed them and then supervised their construction: the Army Corps of Engineers.

This fact was driven home hard right at the end of the year, when the *Times-Picayune,* under Bob Marshall's byline, published incendiary documents showing that a design review in the Corps's Vicksburg, Mississippi, office had found errors in the New Orleans District's assessment of soil strength for the 17th Street levees, errors that had led in turn to "overly optimistic" conclusions about the overall strength of the design. As the *Times-Picayune* reported, this had been discovered in 1990, a couple of years before the concrete flood walls were added to these levees, plenty of time in which to make changes. In fact, the Vicksburg officials directed the local engineers in New Orleans to make necessary changes. The *Times-Picayune* pointed out that Eugene Tickner, then chief engineer of the New Orleans District, cited "engineering judgment" and overruled those instructions. Vicksburg backed off. (It remains to be seen exactly how these documents correlate with the others about the erroneous cross section.)

In a letter to the New Orleans District dated August 8, 1990, the chief of the Engineering Division in Vicksburg questioned the designed depth of the steel-sheet piling. Noting the critical nature of the project and the proximity of the adjacent canal, he questioned the validity of the calculations in the lateral-stability analysis—that is, will the wall fail due to the lateral pressure of the water when the surge comes into the canal? This question didn't surprise me. Billy Prochaska had already shown us that the soil strengths used in the design of the 17th Street levees were too high. The designers had averaged the data for weaker and stronger layers, a no-no in the geotechnical engineering of levees. Where the pertinent 1982 borehole data had strengths as low as 100 pounds per square foot, the designers had used strengths as high as 320 pounds per square foot. Standard practice in levee design is to model based on the soil strengths in the weakest layers. Weakest layer, weakest link, common sense. Also, the New Orleans District used soil data from locations over a mile apart. In this part of Louisiana, where the land is the product of delta switching and channel growth and abandonment cycles, one after the other, one on top of the other, we can have a dramatic change in the geology in one mile.

To my mind, these Vicksburg documents are the worst of the smoking guns in the levee investigation to date, although I won't be surprised by anything that follows in the months and years to come. It's sickening to think about this, especially since our analysis at the Hurricane Public Health Center shows that almost nine hundred of the deaths and the great preponderance of the property damage in New Orleans and Louisiana as a whole were in the neighborhoods flooded by these drainage canal flood wall failures.

Toward the middle of February 2006, the *New York Times* informed us that the Corps was spending more than three hundred thousand dollars to create a $\frac{1}{15}$-size physical model of Lake Pontchartrain and environs (basically a pond such as kids sail model boats on in parks), where they intended to simulate the waves and surge during Katrina. Well, good luck. I have worked with such scale models in South Africa and there are real problems with "scaling" water depths, waves, and so on. How do you hope to create a revolving

Case 2:05-cv-04182-SRD-JCW   Document 460-2   Filed 05/26/06   Page 19 of 20

tists and engineers who really know Louisiana. I wouldn't go with the National Science Foundation or the National Academy of Sciences, because they don't know Louisiana. How could they? But the Army Corps of Engineers does know Louisiana. It's really the only game in town. If the Corps would join us we could reach out to the governor's office and the congressional delegation and bring some of the environmental groups on board and make something happen. What about the mayor? Wagenaar asked. Yes, someone from the mayor's office must be close to the action. He said he would contact Major General Strock in Washington about this idea.

So far, so good. I thought it was a productive meeting, and we proceeded down the hallway to meet with the dean of the College of Engineering and the chair of Department of Civil Engineering. I immediately got the feeling that the dean thought that Wagenaar had come to LSU in order to raise hell about us. I tried to correct that false impression. I'm not sure I succeeded. Wagenaar said that he and I had tried to sort out the disagreements—not quite the way I viewed the meeting, but so be it—and that the meeting had been fruitful. Anyway, we'd see what happened next—which happened to be a phone call from Brigadier General Don Riley at the Pentagon, who had been briefed by his colonel about the meeting at LSU. The general apologized for my banning from the meeting in early October. No problem, I said. Let's move forward. Some of the Senate staffers whom I'd met in New Orleans would later suggest that this call from the D.C. brass was most likely because they knew I was going to testify before the Senate Homeland Security Committee on November 2. I wanted to believe instead that the colonel and the brigadier general were really interested in moving forward in Louisiana, not just engaging in damage control.

In the days before the Senate committee hearing, I heard reports that the team representing the American Society of Civil Engineers in the field was being urged by the ASCE to go slowly. Then I heard talk from some ASCE folks about "malfeasance" on the part of the levee contractors, later repeated in testimony to the Senate committee by the Berkeley engineering team. At the hearing itself the mal-

wind field such as a hurricane? I really don't know what the Corps hopes to achieve here, even though it is spending almost twice the money our whole team had for all its levee work. As the *Times* article points out, the process was immediately attacked by critics as an expensive attempt to deflect the blame from the Corps.