FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JUN -5 AM 10: 43

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MAUREEN O'DWYER, ET AL. | * | CIVIL ACTION NO. |
| VERSUS | * | 05-0481 |
| UNITED STATES OF AMERICA, ET AL. | * | SECTION " " |
| | * | MAGISTRATE |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF DISCOVERY MOTION(S) AND
MOTION(S) TO COMPEL PRODUCTION OF EVIDENCE,
RECORD DOCUMENT NOS. 220, 295, 361 and 368**

**MAY IT PLEASE THE COURT:**

**Was perjury committed on May 2, 2006 in Magistrate Wilkinson's Courtroom?**

Black's Law Dictionary defines perjury as follows: "The willful assertion as to a matter of fact, opinion, belief, or knowledge, made by a witness in a judicial proceeding as part of his evidence, either upon oath or in any form allowed by law to be substituted for an oath, whether such evidence is given in open court, or in an affidavit, or otherwise, such assertion being material to the issue or point of inquiry and known to such witness to be false." Perjury is a federal crime. 18 U.S.C. §1621, et seq. Perjury also is a crime in the State of Louisiana. LSA-R.S. 14:123.

-1-

__ Fee____
__ Process____
X Dktd____
V CtRmDep____
__ Doc. No____

The Court will recall that one of the Government witnesses who testified under oath on May 2, 2006, before Magistrate Wilkinson was Dr. Paul M. Mlakar, an employee of the U.S. Army Corps of Engineers at the Corps' Engineering Research and Development Center in Vicksburg, Mississippi. Dr. Mlakar also is a member of the Corps of Engineers-organized Interagency Performance Evaluation Task Force. The undersigned has not yet requested a certified transcript of Dr. Mlakar's testimony, but recalls the substance of the testimony from his notes as follows:

> The load is carried by the concrete and steel sheet piles. We have not seen any evidence that the concrete panels or steel sheet piles were damaged in the event (Katrina) itself. We have not preserved any water stops because we do not believe they played any role in the critical failures, and our (IPET's) reviewers agree. We have not done any original testing of the connection between the sheet piles and the concrete monoliths.

It is respectfully submitted from the undersigned's memory of the testimony, that Dr. Mlakar led the Court and counsel to believe that the joints between concrete monolith panels, and their water stop systems, which consisted of flimsy concrete lips which housed rubberized water stops, were not load-bearing members, because the load was designed to be carried by the connection between the tops of the steel sheet piles and the concrete forming the panels themselves. It is respectfully submitted that what Dr. Mlakar should have said, if he had been entirely candid with the Court and counsel, was that when the retaining walls were originally designed by the Corps of Engineers, it was <u>INTENDED</u> that the joints between panels, including the concrete lips housing the water stops and the water stops themselves, would not be load-bearing members. That they

-2-

were indeed load-bearing members, because of the defective design of the retaining walls by the Corps of Engineers is patently obvious from the available photographic evidence which is now in the pubic domain and/or which has only been made available to undersigned counsel for plaintiffs since Dr. Mlakar testified on May 2, 2006. That Dr. Mlaker may have misled the Court and counsel, whether intentionally, negligently, or otherwise, is patently clear from examination of the following photographic evidence:

EXHIBIT NO. 1

These two (2) photographs, which are the earliest known images of the breach at the 17th Street Canal site, were taken at 11 a.m. on Monday, August 29, 2005, by New Orleans Fire Department Captain Paul Helmers, and were published on the front page of the New Orleans Times Picayune on Wednesday, May 3, 2006, the day after Dr. Mlakar testified. Looking from right to left, the Court should be able to plainly see to the "V" formed by the failure of the joints between two (2) monolith panels and, proceeding leftward on both photographs, another much larger separation of the joints between concrete monolith panels. It appears from the photographs that the single panel in the right center of the two (2) photographs has "hinged", with its top towards the land, whereas the larger series of monolith panels "had their feet swept out from under them", indicating a possible soils failure.[1] Thus, not only were the joints between the panels visible in the photographs load-bearing, they failed! In

---

[1] This might indicate "multiple failure mechanisms", which is a term the U.S. Army Corps of Engineers wants to avoid at all costs, since it demonstrates such gross engineering incompetence.

addition, the "hinge" effect postulated by plaintiffs' expert, Mr. Pazos, is clearly visible in one (1) panel.

EXHIBIT NO. 2.

This photograph which appears to have been taken not long after the hurricane, while efforts were still being made through the use of helicopters to close the breach, depicts the South breach at the London Avenue Canal. The photograph was first provided to undersigned counsel for plaintiffs when it was received as an attachment to Record Document No. 300, filed by the Government, as part of the Final Draft of an April 24, 2006 Interim Report by IPET, allegedly containing analysis of the London Avenue Canal I-wall breaches.[2] Looking from right to left, the Court will note four separate gaps visible between concrete monolith panels, as well as several panels, presumably three (3) in number, being "missing" and not visible in the photograph, because they have "hinged", with their tops towards the land, and are under water. Thus, it is respectfully submitted that it is readily apparent from the photograph that the joints between panels, including the concrete lips and water stops, were not only load-bearing, they failed, just as has been postulated by Mr. Pazos! Additionally, it is respectfully submitted that the hinge effect of the three missing panels can be reasonably deducted from the photograph, although we will know for sure when the monolith panels at the London Avenue South breach site are excavated, presumably within the next week

---

[2] Plaintiffs respectfully submit that, in this civil litigation for money damages, they are entitled to preservation of evidence which will permit independent analysis of the cause(s) of the breaches, rather than to be forced to rely on what IPET has concluded, internally.

to ten (10) days. Since the photograph, Exhibit No. 2, was page 15 of a 40-page Final Draft of the IPET Interim Report of April 24, 2006, then Dr. Mlakar had to have knowledge of this photograph when he testified in Judge Wilkinson's Courtroom on May 2, 2006.

### EXHIBIT NO. 3.

This photograph, which comes from the same IPET Interim Report, depicts the scene at the London Avenue North breach site, and also is believed to have been taken shortly after the hurricane. One can tell from the water trails along the downed floodwalls in the breach area that water is still draining into the City from the outfall canal. Looking from right to left, the Court will plainly see obviously displaced concrete monoliths and openings between monolith panels, clearly demonstrating not only that the concrete lips and waters stops were load-bearing, but that they failed, just as Mr. Pazos has postulated! Additionally, an undetermined number of concrete monolith panels are missing from the photograph, because they hinged towards the land, just as Mr. Pazos has postulated. Again, since this photograph was page 16 of the 40-page IPET Interim Report of April 24, 2006, Dr. Mlakar had to have knowledge of the photograph when he testified in Magistrate Wilkinson's Courtroom on May 2, 2006.

### EXHIBIT NO. 4.

This photograph, which was taken by Times Picayune Staff Photographer Ellis Lucia sometime after the hurricane clearly shows the failure of one of the concrete monolith panel joints at the London Avenue North breach

site. Looking from right to left, the Court will duly note that the concrete is clearly broken along the left edge of the joint. It is respectfully submitted that the original photograph also will show damage to the concrete on the right edge of the joint. Whether the rubberized water stop is still in the joint or not will have to await examination of original photograph. What is important is the fact that, not only did this joint bear a load, it failed, just as Mr. Pazos has postulated! The photograph also clearly depicts the "hinging" of the monolith panel, with the top towards the land, postulated by Mr. Pazos. This photograph first appeared on page 6 of The Times Picayune on Tuesday, May 16, 2006.

Thus, rather than being non-load bearing, as suggested under oath by Dr. Mlakar, when loads were actually applied to the concrete monolith panels, their joints, etc., they failed. Yet, the Court apparently remains "hung up" on examination of the credentials of forensic engineering experts like Mr. Pazos, who admittedly is not a levee or floodwall designer, but who can dig a proper ditch and analyze engineering failures in structural materials. He also knows an incompetent design engineer when he sees one, not to mention a defectively designed structure. Dr. Mlakar's testimony about the joints being non-load bearing was sophistry at best, and possibly something else, that the Court will have to decide, at worst.

## CONCLUSION

When we were kids, we all played "sticks and stones". Everyone knows that steel beats concrete and that concrete beats rubber. The Court will have to decide whether

-6-

water beats concrete and/or rubber. However, it doesn't take a genius to figure out that the weakest link in the U.S. Army Corps of Engineers' designed and constructed retaining walls was the rubberized water stop material, and that the next weakest link were the concrete lips in the joints of the concrete panels. What part(s) of the structure does the Court think would fail first, the rubber and/or the concrete and/or the steel? Notwithstanding the fact that, eventually, soils failures may have contributed to the catastrophic breaching of the floodwalls, what does the Court think failed first, and set in motion the "parade of horribles" which the U.S. Army Corps of Engineers, and others, managed to visit on the citizenry of the Greater New Orleans Metropolitan Area?

Respectfully submitted,

**LAW OFFICES OF
ASHTON R. O'DWYER, JR.**
Counsel for Plaintiffs

By: _____
Ashton R. O'Dwyer, Jr.
In Proper Person
Bar No. 10166
One Canal Place
365 Canal Street
Suite 2670
New Orleans, LA 70130
Telephone: (504) 561-6561
Facsimile: (504) 561-6560

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record via E-mail this 18th day of May 2006.

_____