**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

COLLEEN BERTHELOT ET AL

VERSUS

BOH BROTHERS CONSTRUCTION
CO., L.L.C. ET AL

CIVIL ACTION

NO. 05-4182

SECTION "K" (2)
CONS. KATRINA CANAL

**THIS DOCUMENT RELATES TO:**

| | | | |
|---|---|---|---|
| 05-4182 "K" (2) | (Berthelot) | 06-0020 "K" (2) | (Tauzin) |
| 05-5237 "K" (2) | (Vodanovich) | 06-0886 "K" (2) | (Finney) |
| 05-6073 "K" (2) | (Kirsch) | 06-2346 "K" (2) | (Fitzmorris) |
| 05-6314 "K" (2) | (Ezell) | 06-2228 "K" (2) | (Christenberry) |
| 05-6324 "K" (2) | (Brown) | 06-2287 "K" (2) | (Sanchez) |
| 05-6327 "K" (2) | (LeBlanc) | | |

**DECLARATION OF MICHAEL G. JACKSON**

The declaration of Michael G. Jackson, made in accordance with 28 U.S.C. 1746, under penalty of perjury, avers as follows:

(1)     My name is Michael G. Jackson and I am 57 years old.  I was a resident of Orleans Parish Louisiana until Hurricane Katrina; and presently I reside at 5373 Courtyard Drive, Gonzales, Louisiana 70737.

(2)     I am Executive Vice President of Burk-Kleinpeter, Inc. ("BKI"), and have been for 15 years.

(3)     I am a registered professional engineer, Louisiana Registration No. 15148. I am also a registered engineer in the states of Texas and Florida. I graduated from the Louisiana State University in Baton Rouge with a B.S. in Civil Engineering in 1971. I also have a masters degree in Civil Engineering, from Tulane University in 1980. I was hired by Burk & Associates (B&A), predecessor to BKI on July 14, 1975 as a civil engineer.

(4)     Thereafter, in November 1990, the corporate structure of B&A was changed, and BKI was formed and became the corporate successor to the rights and obligations of B&A.

(5)     BKI is the corporate successor of B&A, and is an engineering firm with considerable experience in public works, particularly drainage, since the 1950s; and BKI is licensed to practice in Louisiana.

(6)     I have been continuously employed by B&A, and then by BKI, since I was hired in 1975. I started as a staff engineer from 1975 to 1979, when I was promoted to be an Associate, with supervisory authority over some specific projects. In 1990 I was promoted to Executive Vice President and Chief Engineer for the entire company.

-2-

## INDUSTRIAL CANAL, 17TH STREET CANAL AND MRGO

(7)     Neither BKI nor any of its personnel had anything at all to do in the design, construction, construction administration or inspection of construction, of any floodwalls or levees which failed along the 17th Street or Industrial Canals in New Orleans during Hurricane Katrina.  Nor was BKI involved in design or construction of the MRGO.

### LONDON AVENUE CANAL

(8)     In 1984, the Orleans Levee Board (OLB or Levee Board) as governing authority of the Orleans Parish Levee District, awarded to Burk & Associates (B&A), an "Engineering Agreement for Professional Services;" under that Agreement B&A agreed, when later requested and authorized, to perform engineering services for OLB for the design and during construction of storm protection structures along the London Avenue Canal (London Canal Project).   Initially these services might have included design, preparation of plan specifications and other contract documents, services in contract bidding and construction administration services, had B&A been requested to perform such services. A copy of that contract is Exhibit 1 to this Affidavit.  However, prior to 1990, B&AI was not asked to, and did not perform any engineering service except (a) a draft General Design Memorandum, submitted in the mid-1980's, which was never approved by OLB, or

–3–

used to design any improvements; and (b) a General Design Memorandum for Interim Levee and Floodwall Improvements.

(9)    In 1984, I was assigned as the Associate to oversee B&A's engineering work related to the levees/floodwalls on the London Avenue Canal.

(10)    In 1989, the flood protection work on the London Avenue Canal (sometimes "the Canal") was divided into three contracts, numbered Contracts I, II and III. Contracts I and II covered the upstream (south) end of the canal, from the Sewerage & Water Board pump station No. 3 at N. Broad and Agriculture Streets to Mirabeau Avenue. BKI did not perform any engineering work on this stretch of the Canal, all of which was eventually performed by the U.S. Army Corps of Engineers (CoE).

(11)    Contract III was to include the flood protection structures on either side of the Canal from Mirabeau Avenue north, to Robert E. Lee on the west side of the Canal, and Leon C. Simon Blvd. on the east side of the Canal. It was in the work of Contract III where the failures later occurred during Hurricane Katrina, one on the east side and one on the west side.

(12)    From the initial contract dated December 26, 1984, I was the Associate in responsible charge for any B&A or BKI performance on the London Project. All of the

documents herein are from the business records of BKI, and were either generated by BKI, were sent to BKI by its client, OLB or were agreements to which BKI (or predecessor, B&A) were parties.

(13)   Starting in 1984 B&A began to prepare an initial General Design Memorandum (GDM) for levee and floodwall improvements for the Canal.  A draft GDM was submitted in April 1986; but BKI did no plans or specifications based on this GDM.

(14)   Between 1984 and 1991, B&A and BKI also did considerable design work under the London Avenue Contract and on Contract III, including draft of a design memorandum for interim flood wall improvements (Interim Flood Protection GDM), which was submitted in May 1990.  The BKI/B&A work on the original GDM before 1991 was presented to the OLB was not used, except to the extent that it was a reference point for later work.

(15)   Most of the cost for the London Avenue Project (officially sometimes called "Orleans Parallel Protection Levees" ) was to be paid by the U.S. government through the U.S. Army Corps of Engineers (CoE).  The London Avenue Parallel Protection Levees are a part of the Lake Pontchartrain Vicinity Hurricane Protection System.  The federal funding required a 30% matching fund from the local sponsor, and that the CoE control of design

–5–

and construction.  Thus the design and construction of the London Canal Project had, of necessity, to be a cooperative effort.

(16)    In the early 1980's there was a difference of opinion, which was the subject of considerable public debate, about how the New Orleans drainage canals would be protected from hurricanes .  All canals which drain the City, drain into Lake Pontchartrain; and the problem was, and is, how  to prevent high hurricane surge water in Lake Pontchartrain from flooding the City through the drainage canals.  The CoE favored building flood gates at the hurricane levees, where each canal entered into the Lake, to close the canals to storm surge.  Local officials, including the OLB and Sewerage and Water Board (S&WB) were concerned that such gates might restrict pumping hurricane rains out, thus causing flooding.  Thus, local officials favored building and raising the height of the parallel flood control floodwalls/levees structures along each side of each canal, high enough to hold back storm surge.  This plan, known as the Parallel Protection Plan, would let storm water into the drainage canals, but not let that water into the City.

(17)    By November 1991, the CoE had decided to proceed with design and construction of the Parallel Protection Plan, i.e. to build levees and floodwalls along each side of each drainage canal to the lake.

--6--

(18)    Having acceded to OLB's desire for Parallel Protection, the CoE's conditions

for proceeding with design and construction of Parallel Protection for London Avenue

Canal, were apparently stated in a letter of October 29, 1991 from the CoE to the Orleans

Levee District. BKI does not have a copy of this letter, but one must infer from the OLB's

response of November 18, 1991 (Exhibit 2).  In that response OLB acknowledged the

October 29th CoE letter, the CoE's plan for "implementation of parallel protection for the

above referenced outfall canals [London and Orleans] as part of the Lake Pontchartrain

Hurricane Protection Project."  That November 18 letter also provided that

> with respect to the London Avenue Canal, it is my understanding that your
> [CoE] staff will complete the design and construction of said parallel
> protection in its entirety, excluding the ongoing interim protection works.
> OLD will transfer to you [CoE] any data, survey results, studies, etc. that may
> assist you in this effort which is presently under contract by OLD with [BKI].

(19)    The "interim protection works" referred to in Exhibit 2 were strictly temporary

and short term, consisting only of uncapped steel sheet piles driven on the east side

between Prentiss Avenue and Leon C. Simon, to a top height of 10.0 MSL; and they were

intended to give temporary protection against what was then defined as a "100 year storm."

All of these interim piles were removed and replaced by the Phase III work described

below, so that none of the structural failures during Katrina involved any of the interim

protections work all of which had been removed and replaced by permanent structures.

(20)    The November 18 letter (Exhibit 2) went on to say that "with the completion of

the [interim protection] works as set forth above [the OLB] relinquishes and hereby

abandons all further design and construction of the London Avenue Canal Parallel

Protection Project to the [CoE] under its Federal Mandate to complete said project." In

other words OLB ceded to the CoE responsibility for, and control of, the design and

construction of the London Avenue Canal Parallel Protection from Mirabeau Ave. to the

Lake, which included areas where the failures occurred.

(21)    To comply with Exhibit 2, OLB wrote BKI on November 25, 1991 (Exhibit 3)

directing that BKI:

> discontinue any further studies, design and/or engineering activities with
> respect to the London Avenue Outfall Canals, except as related to the on
> going (sic) interim protection construction contracts.

That letter effectively terminated BKI's 1984 contract (assumed from B&A).

(22)    But in a March 5, 1992, OLB Memo to Colonel Diffley, CoE District Engineer,

(Exhibit 4), OLB proposed rescinding its earlier abandonment of design responsibility for

the London Avenue Canal.  The memorandum proposed that BKI "be retained pursuant to

–8–

a supplement to their existing contract for Contract Nos. 1 and 2," and that the OLB "select

and contract with private sector firms [for the London Avenue design contracts] as provided

in your proposed schedule dated 21 February, 1992 for design services and for, partial

resident inspection services."

     (23)   By a letter of March 16, 1992 (Exhibit 5)  OLB amplified the suggestion, and

referred to the OLB's November 18, 1991 letter, and stated that OLB had:

> reviewed the plan, the proposed transfer and abandonment of the project by
> the [OLB], the mandate of Congress and the directives to the Corps' District
> from higher authority dated October 29, 1991, along with local participation
> requirements and goals.

The letter further reported that the OLB had reviewed local technical capability, and that

OLB determined "that the private engineering sector has the expertise required to provide

the technical engineering and design talent to implement the parallel protection program."

And the letter informed that OLB "will provide the requisite design services and resident

inspection through local firms under contract to the" [OLB].  The letter specifically rescinded

the Board's November 18, 1991 letter by which the OLB had ceded the project to the CoE.

     (24)   By and on April 2, 1992 letter, (Exhibit 6), the CoE demurred to OLB's March

16 letter (Exhibit 5), stating CoE "would continue [its] designs on Contracts 1 and 2 on the

London Avenue outfall canal" (which are south of Mirabeau Avenue and are not germane to the Katrina flooding); and the letter went on

> As far as contracts on 3 and 4 on London Avenue Canal are concerned, we will consider using A-E('s) . . . as I said in our meeting . . . If A-E's will allow us to step up the schedule, that's the way to go.

With respect to BKI doing construction administration and inspection, however, the letter was emphatically negative:

> "If we [CoE] are to build the flood protection, we will provide full construction management.    Any other construction management does not seem necessary, therefore its cost is not a proper project cost and thereby not creditable to the non-Federal share."

Finally, the letter closed with the ultimate federal threat "if you feel design and construction management is best done by your board then the construction might be more efficiently done by your board."

(25)    Thereafter, after further discussions the CoE agreed to let a local engineer hired by OLB prepare plans and specifications for London Avenue, but only for Contract 3 of the London Avenue Project, the north of Mirabeau.  Thus by OLB's October 22, 1992 letter to BKI (Exhibit 7), OLB resurrected its contract with BKI, and rehired BKI for work on the London Avenue Canal.  The letter provided:

> The Board of Commissioners, Orleans Levee District (OLD), has accepted a recommendation that you proceed with the necessary engineering services for the levees and floodwalls - Mirabeau Avenue to Leon C. Simon Boulevard and East Bank (sic) and Mirabeau Avenue to Robert E. Lee Boulevard West Bank levees and floodwalls. As discussed a supplemental agreement to your contract will be negotiated.

But that letter made clear the engagement was circumscribed by BKI's complete submission to CoE authority:

> The work that you will do requires compliance with the U.S. Army Corps of Engineers (USACE) standards for design, plans and specifications, and cost estimates including your fees. At this point in time, <u>construction management will be by the USACE</u>. Overall coordination of the scheduling and interfacing with other work will be by Design Engineering, Inc. (DEI), OLD coordinating consultant. (Emphasis supplied.)

(26) Earlier in January 1989, the CoE had generated and published its own General Design Memorandum 19A (GDM19A, cover sheet is Exhibit 8), GDM19A was a long and detailed document which laid out the specific design for the London Avenue Parallel Protection, including type of structure, length and strength of piles, depth of piles, and all other decisions affecting strength of the constructed improvement. Thus, by October 22, 1992, CoE had very specific design requirements from GDM19A, for the London Avenue Canal, including types of structures and the length and size of piles.

–11–

(27)   After Hurricane Andrew, in the summer of 1992, there was heightened interest in flood protection of New Orleans, resulting in increased pressure to construct flood protection for New Orleans drainage canals quickly, that would resist the feared hurricane storm surge.

(28)   OLB confirmed BKI's rehiring by OLB Board resolution of October 21, 1992, (Exhibit 9) which was based upon CoE's Agreement to accept "in-kind services from OLB," as fulfillment of the OLB's 30% contribution of costs.   That resolution confirmed and authorized hiring BKI for London Avenue. Contract 3: "Levees and Floodwalls; Mirabeau to Leon C. Simon and East Bank and Mirabeau to Robert E. Lee, West Bank Levees and Floodwalls."   Thereafter BKI and OLB negotiated a Supplemental Agreement to BKI's earlier contract, which OLB transmitted to BKI by letter of January 4, 1993 (Exhibit 10), under which BKI was to "develop preliminary and final plans and specifications for the construction of floodwalls from Mirabeau Ave. to Robert E. Lee Blvd. on the west side and from Mirabeau Ave. to Leon C. Simon Blvd. on the east side."   The resolution particularly stipulated adherence to CoE Design Memorandum No. 19A.

(29).   CoE's March 16, 1993 letter to OLB (Exhibit 11), agreed "that Burk-Kleinpeter, Inc. continue with the design for Contract 3 to completion," subject to certain

schedule conditions; and also decreed that "to provide the most efficient communication between us and the designer, Burk-Kleinpeter, Inc. shall coordinate their work directly with us [CoE] while keeping your [OLB's] staff informed as you require for payment, etc."

(30)   OLB's April 13, 1993 letter to BKI (Exhibit 12) informed BKI that it was authorized to complete the plans and specifications and specifically "authorized [BKI] to coordinate directly with the USACE on technical matters with the understanding we will be advised of subject matter." It also made clear that "this design is to be accomplished in accordance with the USACE requirements." This authorization was accompanied by an additional supplement to the scope of services of the BKI contract.  (Exhibit 13)

(31)   With the full knowledge and consent of OLB and CoE, BKI subcontracted with GoTech Inc., a licensed minority engineering firm, for GoTech to prepare the drawings and specifications for the levees and floodwalls on the west bank of the London Avenue Canal.

(32)   Thereafter, BKI requested of OLB that BKI be allowed to continue from completion of the plans through construction administration and resident inspection. OLB forwarded that request to the CoE by letter of September 8, 1993, (Exhibit 14) and requested a meeting with the CoE to discuss this request.

–13–

(33)    The CoE responded by letter of October 25, 1993 (Exhibit 15) that "we [CoE] currently have an A/E firm under contract to give us those services, if we need them, and believe that, if we do need such support, it is better to get it from a firm under contract directly with us." In other words, BKI was specifically excluded from rendering any services on construction administration or inspection; and BKI performed no construction inspection on this project.

(34)    The drawings and specifications for the London Avenue Project required by Exhibit 13 were completed in the spring of 1994, and the CoE issued a solicitation for bids on May 3, 1994, under CoE Solicitation Number DACW29-94-B-007." Exhibit 16 is a copy of Amendment No. 0001 to Solicitation for DACW 29-94-B-007 (the London Avenue Project) showing that bids were originally scheduled to be opened on June 8, 1994.  CoE would not issue an Invitation for Bids until the plans and specifications were complete.

(35)    By the time Katrina hit, BKI's work on the contract plans and specifications had been complete for more than ten years.

(36)    On June 13, 1994, CoE took bids for construction of Contract 3, London Avenue Flood Protection, the structures which later failed in Katrina.  Copy of the CoE's bid tabulation sheet for the London Avenue Flood Protection Projects is Exhibit 17.

(37)    Thereafter on August 15, 1994, OLB and BKI made Supplemental Agreement No. 15 to the BKI contract, (Exhibit 18) in which OLB acknowledged that "the Engineers, [BKI] acting in good faith with the provisions of their contract, have completed 100% plans and publications for Contract No. 3 for Mirabeau Avenue to Robert E. Boulevard."

(38)    That supplement also added three additional services to the BKI contract, (a) one to allow payment for BKI's hiring Eustis Engineers to do additional analysis during preparation of plans, which analysis Eustis Engineering had already completed before completion of the plans; (b) one to do resident pre-construction photographic surveys, before construction began in the summer of 1994; and (c) one to provide vibration monitoring during pile driving.

(39)    The contract for vibration monitoring had nothing to do with inspection of the construction work to insure conformity with plans and specification.  Rather the monitoring was recommended by Eustis Engineering, a geotechnical engineering consultant, to monitor the vibrations from the pile driving and other construction equipment on private property adjacent to the construction site, record vibration at adjacent structures off the construction site.   This service had been recommended by the Eustis Engineering geotechnical report, excerpt copy is Exhibit 19.  It had nothing to do with the inspection of

–15–

the adequacy of construction of the London Avenue Flood Improvements, but was to protect adjacent structures, and to protect OLB from any later claims by adjacent property owners.

(40)   BKI subcontracted the work to Delta Testing, which work consisted of placing vibration monitors, (sort of mini-seismographs) which detected and continuously recorded pile driving vibrations.  The technician who does the monitoring is not on the site inspecting the construction itself, but is off the site recording the vibration from construction.

In accordance with 28 U.S.C. 1746, I declare under the penalty of perjury, under the laws of the United States that the forgoing is true and correct.

Signed on this **24** day of **MAY**_____, 2006.


MICHAEL G. JACKSON

--16--