

ENGINEERING AGREEMENT FOR
PROFESSIONAL SERVICES

State of Louisiana
Parish of Orleans

This Agreement is made and entered into on this 26th
day of _December_____, 1984, by and between the Board of
Commissioners, Orleans Levee District by and through the
Board, hereinafter called "OWNER", represented by Emile W.
Schneider, President, duly authorized to act pursuant to
provisions to Resolution No. _11-032184_____, adopted the
_21st___ day of ____March_____, 1984, and
___Burk and Associates, Inc._____, in the State of
Louisiana, hereinafter called the "ENGINEER".

All work shall be under the direction of the Chief
Engineer of the OWNER and all plans, specifications,
selecting of testing laboratory, etc. shall be submitted to
him and all approvals and administration of this contract
shall be through him.

At the OWNER'S option, the scope of services for this
contract may be limited to any phase of approved work or may
be expanded as provided below.

Section 1 - The Project

The OWNER hereby contracts with the ENGINEER to perform
all necessary professional services in connection with the
Project defined as follows:

LONDON AVENUE CANAL FLOODWALLS AND LEVEES

Section 2 - Basic Services of Engineer

The ENGINEER shall provide all basic services required
to complete the project, including all necessary services
described herein or usually implied as a prerequisite for
performance of the services whether or not specifically
mentioned in this contract, including attendance by the
ENGINEER at project conferences and public hearings.

2.1. Design Memorandum Phase

After written authorization to proceed ENGINEER
shall:

2.1.1. Meet with OWNER to clarify and define
the extent of OWNER's requirements for the
project.

2.1.2. Obtain from OWNER and from other
agencies available project data and report to the
OWNER and OWNER'S representative on the source of
information and content.

2.1.3. Advise OWNER as to the necessity of
OWNER providing or obtaining from others
additional data or services.

BKI EXHIBIT 1

2.1.4.   Prepare necessary scopes of services for topographical surveys, hydrographical surveys, geotechnical engineering investigations and aerial photography as required for the project and prepare proposals for OWNER'S approval. The scope of service for each sub-consultant shall be reviewed and approved by the OWNER and/or OWNER'S representative prior to execution of any sub-agreement. The cost for these services shall be added to the Agreement by Amendment and paid for as a separate item of work directly to sub-consultant. It is the OWNER'S intent that this work commence during this phase of the project. However, any such services can be performed by the ENGINEER, if qualified.

2.1.5.   Prepare a Design Memorandum containing schematic layouts, sketches, drawings and conceptual design criteria with appropriate exhibits to indicate clearly the considerations involved and the alternative solutions available to the OWNER and setting forth ENGINEER'S findings and recommendations with opinions of probable Total Project Cost and the project schedule.

For purposes of this contract, the Construction Cost (C.C.) shall be established in this phase and shall include the Estimated Construction Cost (E.C.C.), Contingencies and Design Fees.

The Project Cost (P.C.) will include the Construction Cost (C.C.), allowances for charges for geotechnical engineering services, testing, surveying and Resident Inspection.

2.1.6.   Coordinate with OWNER and/or OWNER'S representative as required.

2.1.7.   Attend meetings, conferences or presentations as may be required by OWNER or its representative. During the course of this work effort meetings with the following agencies may be required:

Louisiana Department of Transportation and Development; U.S. Army Corps of Engineers; New Orleans Sewerage and Water Board; Department of Streets and other relative public entities. All work efforts shall be coordinated with OWNER and/or its representative.

2.1.8.   Furnish to OWNER such conceptual documents and conceptual design data as may be required for, and assist in the preparation of, the required documents so that OWNER may apply for preliminary approvals of such governmental authorities as have jurisdiction over design criteria applicable to the Project, and assist in obtaining such approvals by participating in submissions to appropriate authorities.

2.1.9.   Furnish ten (10) copies of the bound Report and present and review it in person with OWNER and/or OWNER'S representative.

2.1.10   ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.2. Preliminary Design Phase

After written authorization to proceed with the Preliminary Design Phase, ENGINEER shall:

2.2.1.   In consultation with OWNER and its representative, and on the basis of the accepted Design Memorandum, determine the extent of the Project and determine the amount of compensation for this phase as provided in Section 8.

2.2.2.   Prepare preliminary design documents based on the approved design memorandum criteria, preliminary drawings and outline specifications.

2.2.3.   Based on the information contained in the preliminary design documents, submit a revised opinion of probable Project costs.

2.2.4.   Revise permit applications as necessary and resubmit for approval to Local, State and Federal agencies as applicable.

2.2.5.   Revise the Design Memorandum to reflect any newly developed information.

2.2.6.   Identify those areas of work which may require additional right-of-way and discuss with the OWNER and/or OWNER'S authorized representative.

2.2.7   Furnish ten (10) copies of the Preliminary Plans and present and review them in person with the OWNER and/or OWNER'S representative.

2.2.8   Such preliminary design documents should be suitable for partial inclusion in the Final Design Phase.

2.2.9   ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.3. Final Design Phase

After written authorization to proceed with the Final Design Phase, ENGINEER shall:

2.3.1.   Prepare complete detailed construction plans, specifications and contract documents. These plans are to include locations of all utilities affected, and ownership and taking lines for rights-of-way where required. At the earliest time at which the state of completion of the plans

3

will allow an effective review of the design work, a set of plans shall be furnished the OWNER for examination. Upon receipt by the ENGINEER of comments by the OWNER, the ENGINEER shall revise and complete the plans.

2.3.2.    Finalize and prepare necessary permit applications and submit to local, state and Federal authorities, as applicable, for approval.

2.3.3.    Advise OWNER of any adjustments to the latest opinion of probable Project Cost caused by changes in extent or design requirements of the Project or Construction Costs and furnish a revised opinion of probable Project Cost based on the Drawings and Specifications.

2.3.4.    Prepare for review and approval by OWNER, his legal counsel and other advisors contract agreement forms, general conditions and supplementary conditions, and bid forms, invitations to bid and instructions to bidders, and assist in the preparation of other related documents.

2.3.5.    Furnish ten (10) copies of the above documents and present and review them in person with OWNER and/or OWNER'S representative.

2.3.6    ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.4. Bidding Phase

After written authorization to proceed with the Bidding Phase, ENGINEER shall:

2.4.1.    Assist OWNER in obtaining bids for the project.

2.4.2.    Consult with and advise OWNER as to the acceptability of subcontractors and other persons and organizations proposed by the prime contractor (hereinafter called "Contractor") for those portions of the work as to which such acceptability is required by the bidding documents.

2.4.3.    Consult with and advise OWNER as to the acceptability of substitute materials and equipment proposed by Contractor when substitution prior to the award of contracts is allowed by the bidding documents.

2.4.4.    Assist OWNER in evaluating bids or proposals and in assembling and awarding contracts.

2.4.5    ENGINEER shall not proceed beyond this phase without the express written authorization of the OWNER. It shall be OWNER'S option to

4

terminate this contract at the conclusion of this phase upon full payment to the ENGINEER for services provided in accordance with OWNER'S direction.

2.5. Construction Phase

During the Construction Phase ENGINEER shall:

2.5.1.   Consult with and advise OWNER and act as his representative as provided in the General Conditions of the Construction Contract. All of OWNER'S instructions to Contractor will be issued through ENGINEER who will have authority to act on behalf of OWNER to the extent provided in the General Conditions except as otherwise provided in writing.

2.5.2.   Make visits to the site at intervals appropriate to the various stages of construction to observe as an experienced and qualified design professional the progress and quality of the executed work of Contractor and to determine in general, if such work is proceeding in accordance with the Contract Documents. ENGINEER shall not be required to make exhaustive or continuous on-site inspections to check the quality of such work. ENGINEER shall not be responsible for the means, methods, techniques, sequences or procedures of construction selected by Contractor or the safety precautions and programs incident to the work of Contractor. ENGINEER'S efforts will be directed toward providing a greater degree of confidence for OWNER that the completed work of Contractor will conform to the Contract Documents, but ENGINEER shall not be responsible for the failure of Contractor to perform the work in accordance with the Contract Documents. During such visits and on the basis of on-site observations ENGINEER shall keep OWNER informed of the progress of the work, shall endeavor to guard OWNER against defects and deficiencies in such work and may disapprove or reject work failing to conform to the Contract Documents.

2.5.3.   Review and approve (or take other appropriate action in respect of) Shop Drawings (as that term is defined in the aforesaid General Conditions) and samples, the results of tests and inspections and other data which each Contractor is required to submit, but only for conformance with the design concept of the Project and compliance with the information given in the Contract Documents (but such review and approval or other action shall not extend to means, methods, sequences, techniques or procedures of construction or to safety precautions and programs incident thereto); determine the acceptability of substitute materials and equipment proposed by Contractor; and receive and review (for general content as required by the Specifications) maintenance and operating instructions, schedules, guarantees, bonds and certificates of inspection which are to be assembled by Contractor in accordance with the Contract Documents.

2.5.4.   Issue all instructions of OWNER to Contractor; issue necessary interpretations and clarifications of the Contract Documents and in connection therewith prepare change orders as required; have authority, as OWNER'S representative, to require special inspection or testing of the work; act as initial interpreter of the requirements of the Contract Documents and judge of the acceptability of the work thereunder and make decisions on all claims of OWNER and Contractor relating to the acceptability of the work or the interpretation of the requirements of the Contract Documents pertaining to the execution and progress of the work; but ENGINEER shall not be liable for the results of any such interpretations or decisions rendered by him in good faith.

2.5.5.   Based on ENGINEER's on-site observations as an experienced and qualified design professional and on review of applications for payment and the accompanying data and schedules, determine the amounts owing to Contractor and recommend in writing payments to Contractor in such amounts; such recommendations of payment will constitute a representation to OWNER, based on such observations and review, that the work has progressed to the point indicated, that, to the best of ENGINEER's knowledge, information and belief, the quality of such work is in accordance with the Contract Documents (subject to an evaluation of such work as a functioning Project upon Substantial Completion, to the results of any subsequent tests called for in the Contract Documents, and to any qualifications stated in his recommendation), and that payment of the amount recommended is due Contractor; but by recommending any payment ENGINEER will not thereby be deemed to have represented that continuous or exhaustive examinations have been made by ENGINEER to check the quality or quantity of the work or to review the means, methods, sequences, techniques or procedures of construction or safety precautions or programs incident thereto or that ENGINEER has made an examination to ascertain how or for what purposes any Contractor has used the moneys paid on account of the Contract Price, or that title to any of the work materials or equipment has passed to OWNER free and clear of any lien, claims, security interests or encumbrances, or that Contractors have completed their work exactly in accordance with the Contract Documents.

2.5.6.   Conduct an inspection to determine if the Project is substantially complete and a final inspection to determine if the work has been completed in accordance with the Contract Documents and if each Contractor has fulfilled all of his obligations thereunder so that ENGINEER may recommend, in writing, final payment to each Contractor and may give written notice to OWNER and the Contractor that the work is acceptable (subject to any conditions therein expressed), but any such recommendation and notice shall be subject to the limitations expressed in paragraph 2.5.5.

2.5.7   Establish construction monuments and bench marks as necessary.

2.5.8.   Coordinate with owners of utilities for relocation of their facilities to clear construction.

2.5.9.   Prepare monthly progress reports for the OWNER and/or OWNER'S representative. This progress report should accompany Contractor's request for payment

2.5.10.   ENGINEER shall not be responsible for the acts or omissions of any Contractor or subcontractor, or any of the Contractor's or subcontractors' agents or employees or any other persons (except ENGINEER's own employees and agents) at the site or otherwise performing any of the Contractor's work; however, nothing contained in paragraphs 2.5.1. through 2.5.10. inclusive, shall be construed to release ENGINEER from liability for failure to properly perform duties undertaken by him in the Contract Documents.

2.6   Record Drawings Phase

Prepare for OWNER, a set of reproducible prints of drawings showing those changes made during the construction process based on the marked up prints, drawings and other data furnished by Contractor to ENGINEER.

2.7   Resident inspection by a full time inspector and supporting staff.

If resident inspection is required to be furnished by the ENGINEER, the OWNER shall so direct him in writing. The ENGINEER shall assign personnel acceptable to the OWNER, at a fee acceptable to the OWNER. The fee shall be on the basis of the actual time of personnel used at the then currently approved hourly payroll rates times a multiplier of 2.5 plus expenses, but in no case shall the total payment for resident inspection exceed 2-1/2% (percent) of the cost of construction. The resident inspection may be discontinued at any time upon thirty days notice by the OWNER to the ENGINEER, in writing.

Section 3 - Documents

The ENGINEER shall furnish to the OWNER three (3) sets of drawings, specifications and contract documents for checking and approval and Ten (10) sets for the OWNER'S records.

The ENGINEER shall also furnish sufficient sets of plans, specifications and contract documents for the receipt of competitive bids and the construction of the project.

All data collected by the ENGINEER and all documents, notes, drawings, tracings and files shall remain the property of the ENGINEER except as otherwise provided in Section 10 of this Agreement. The ENGINEER shall furnish to the OWNER reproducible copies of any project documents requested by the OWNER.

The OWNER shall furnish without charge all standard plans and specifications and any other information which the OWNER now has in its files which may be of use to the ENGINEER.

## Section 4 - Supplementary Services

The ENGINEER shall provide when requested in writing by the OWNER, supplementary services, not included in the basic services. The OWNER reserves the right to select other consultants for services enumerated below and other services not specifically identified.

Such supplementary services shall include the following:

4.1. Geotechnical engineering services.

4.2 Topographical surveys, hydrological surveys and aerial photography.

4.3 Laboratory inspection of materials and equipment.

4.4 Right-of-way, easement and property acquisition surveys, plats, maps and documents.

4.5 Property Abstracting services.

4.6 Preparation of applications and supporting documents for governmental grants, loans or advances in connection with the Project; preparation or review of environmental assessments and impact statements; review and evaluation of the effect on the design requirements of the Project of any such statements and documents prepared by others; and assistance in obtaining approvals of authorities having jurisdiction over the anticipated environmental impact of the Project.

4.7 Services resulting from significant changes in extent of the Project or its design including, but not limited to, changes in size, complexity, OWNER'S schedule, or character of construction or method of financing; and revising previously accepted studies, reports, design documents or Contract Documents when such revisions are due to causes beyond ENGINEER'S control.

4.8 Providing renderings or models for OWNER'S use.

4.9 Preparing documents for alternate bids requested by OWNER for Contractor's work which is not executed or documents for out-of-sequence work.

4.10 Investigations involving detailed consideration of operations, maintenance and overhead expenses; providing Value Engineering during the course of design; the preparation of feasibility studies,

cash flow and economic evaluations, rate schedules and appraisals; assistance in obtaining financing for the Project; evaluating process available for licensing and assisting the OWNER in obtaining process licensing; detailed quantity surveys of material, equipment and labor; and audits or inventories required in connection with construction performed by OWNER.

4.11 Services resulting from the award of more separate prime contracts for construction, materials, equipment or services for the Project than were previously agreed to with the OWNER, and services resulting from the arranging for performance by persons other than the principal prime contractors of services for the OWNER and administering OWNER'S contracts for such services.

4.12 Services in connection with change orders to reflect changes requested by OWNER if resulting change in compensation for Basic Services is not commensurate with the additional services rendered, services after the award of each contract in evaluating substitutions proposed by Contractor, and in making revisions to Drawings and Specifications occasioned thereby, and services resulting from significant delays, changes or price increases occurring as a direct or indirect result of material, equipment or energy shortages.

4.13 Services during out-of-town travel required of ENGINEER other than visits to the site as required by Section 2.

4.14 Additional or extended services during construction made necessary by (1) work damaged by fire or other cause during construction, (2) a significant amount of defective or neglected work of Contractor, (3) prolongation of the contract time of any prime contract by more than sixty days, (4) acceleration of the progress schedule involving services beyond normal working hours, and (5) default by Contractor.

4.15 Preparation of operating and maintenance manuals; protracted or extensive assistance in the utilization of any equipment or system(such as initial startup, testing, adjusting and balancing); and training personnel for operation and maintenance.

4.16 Services after completion of the Construction Phase, such as inspections during any guarantee period and reporting observed discrepancies under guarantees called for in any contract for the Project.

4.17 Preparing to serve or serving as a consultant or witness for OWNER in any litigation, public hearing or other legal or administrative proceeding involving the Project.

4.18 Additional services in connection with the Project, including services normally furnished by OWNER and services not otherwise provided for in this Agreement.

9

The compensation to the ENGINEER for the above supplemental services, when performed by the ENGINEER'S force, shall be in the form of a lump sum which is mutually agreeable to the OWNER and to the ENGINEER.

If the parties hereto are unable to agree upon a lump sum for such additional work, the ENGINEER shall be paid on the basis of the actual time of personnel used at the then currently approved hourly payroll rates times a multiplier of 2.5 plus reimbursable expenses. Each claim for additional compensation shall state the authority for performing such additional services, and shall include a description of the work done and, if applicable, give the number of drawings affected.

Payments to ENGINEER for Supplementary Services shall be made monthly upon presentation of the invoice for work performed during the proceeding month.

Section 5 - Owner's Responsibility

It is mutually understood and agreed that the OWNER will furnish, as required for the work and not at the expense of the ENGINEER, the following items:

5.1 Property, boundary, easement, right-of-way property descriptions when such information is required.

5.2 All maps, drawings, records, annual reports, and other data that are available in the file of the OWNER and which may be useful in the work involved under this agreement.

5.3 Access to public and private property, as necessary, when required in conduct of field surveys.

5.4 Charges for review of drawings and specifications by government agencies, if any.

Section 6 - Period of Service

6.1 The provisions of this Section and the various rates of compensation for ENGINEER's services provided for elsewhere in this Agreement have been agreed to in anticipation of the orderly and continuous progress of the Project. ENGINEER's obligation to render services hereunder will extend for a period which may reasonably be required for the design, award of contracts and construction of the Project including extra work and required extensions thereto. The ENGINEER shall provide the required services within the time period established by the OWNER for the Project. The Project time shall be compatable with the schedule established in the Bond Issue Final Offering Memorandum.

6.2 The services called for in the Design Memorandum Phase will be completed and the Design Memorandum submitted within ___6___ months, after written

authorization to proceed with that phase of services.

6.3   After acceptance by OWNER of the Design Memorandum Phase documents indicating any specific modifications or changes in the extent of the Project desired by OWNER, and upon written authorization from OWNER, ENGINEER shall proceed with performance of the services called for in the Preliminary Design Phase, and shall submit preliminary design documents and a revised opinion of probable Project Cost to the OWNER. The period of completion for the Preliminary Design Phase shall be agreed upon at the conclusion of the Design Memorandum Phase and set forth in the OWNER'S authorization to proceed.

6.4   After acceptance by OWNER of Preliminary Design Phase documents and revised opinion of probable Project Cost, indicating any specific modifications or changes in the extent of the Project desired by OWNER, and upon written authorization from OWNER, ENGINEER shall proceed with the performance of the services called for in Final Design Phase; and shall deliver Contract Documents and a revised opinion of probable Project Cost to the OWNER. The period of completion for the Final Design Phase shall be agreed upon at the conclusion of the Design Memorandum Phase and set forth in the OWNER'S authorization to proceed.

6.5   ENGINEER's services under the Design Memorandum Phase, Preliminary Design Phase and Final Design Phase shall each be considered complete at the earlier of (1) the date when the submissions for that phase have been accepted by OWNER or (2) thirty days after the date when such submissions are delivered to OWNER for final acceptance, plus such additional time as may be considered reasonable for obtaining approval of governmental authorities having jurisdiction over design criteria applicable to the Project.

6.6   After acceptance by OWNER of the ENGINEER's Drawings, Specifications and other Final Design Phase documentation including the most recent opinion of probable Project Cost and upon written authorization to proceed, ENGINEER shall proceed with performance of the services called for in Bidding Phase. This Phase shall terminate and the services to be rendered thereunder shall be considered complete upon commencement of the Construction Phase.

6.7   The construction Phase will commence with the execution of the contract to be executed for the work of the Project or any part thereof, and will terminate upon written approval by ENGINEER of final payment on the contract.

6.8   If OWNER has requested significant modifications or changes in the extent of the project, the time of performance of ENGINEER's services and his various rates of compensation shall be adjusted appropriately.

11

6.9  The ENGINEER will be given time extensions for delays beyond his control or for those caused by tardy approvals of work in progress by various official agencies, but additional compensation shall be allowed only if specifically requested by the ENGINEER in a timely manner and agreed to by OWNER.

## Section 7 - Notice to Proceed

The President of the Orleans Levee Board, through its Chief Engineer, shall notify the ENGINEER in writing to undertake the services stated in Section 2 of this agreement.  The Section 2 services shall commence as follows:

7.1  The ENGINEER shall proceed with the Design Memorandum Phase of the work within 10 days of a written notice to proceed.

7.2  The ENGINEER shall proceed with the remaining phases of the work as stipulated in Section 6 of this agreement.

## Section 8 - Compensation

The OWNER shall pay and the ENGINEERS agree to accept as full compensation for Engineering services to be performed under this Contract a fee for each phase of work as indicated below.  It shall be the OWNER'S option to limit or expand the scope of services provided under this Contract.

8.1  Design Memorandum Phase:

Based on the proposal provided by the ENGINEER and agreed to by the OWNER for Design Memorandum services as outlined in Section 2, the OWNER shall pay the ENGINEER the Lump Sum amount ~~of~~ *as agreed to by the parties.* Payment of the fee shall be on monthly installments proportionate to the progress of the ENGINEER.

8.2  Design, Bidding, Construction, and Record Drawings Phases:

For the remaining Section 2 services, the owner shall pay the Engineer a Lump Sum fee based on a percentage of the Construction Cost as established in Section 2.1 of this Agreement.

Said Lump Sum shall be developed from one of the following methods as indicated by his initials below:

| Engineer | Owner | | |
|---|---|---|---|
| /KW/ | EWS | 1. | Curve A from the American Society of Civil Engineers Manual and Reports on Engineering Practice No. 45; |
| ——— | ——— | 2. | Curve B from the American Society |

of Civil Engineers Manual and
Reports on Engineering Practice No.
45; or

3. $\text{Fee Percentage} = \dfrac{40}{\text{Log of the (Construction Cost)*}}$

*Construction Cost = Estimated Construction Cost +
Contingencies + Design Fees

For purposes of calculating the fee using method 1
and 2 above the Estimated Construction Cost +
Contingencies will establish the base contract
amount.

8.3 Payments of the Lump Sum Fees as determined above,
shall be according to the following schedule:

| Phase | Payments as a % Lump Sum |
|---|---|
| Design Memorandum Phase | 100% of Design Memo Fee |
| Preliminary Design Phase | 30% of Design Fee |
| Final Design Phase | 45% of Design Fee |
| Bidding Phase | 5% of Design Fee |
| Construction Phase | 15% of Design Fee |
| Record Drawings Phase | 5% of Design Fee |

It shall be OWNER'S option to limit or expand the
scope of this Contract at the conclusion of each
phase. The OWNER may terminate this Contract at
the conclusion of payment for each phase.

No payment shall be made to the ENGINEER for any
work not authorized by OWNER in writing.

8.4. Payment to the ENGINEER shall become due and
payable as follows:

Design Memorandum Phase:

In monthly installments proportionate to the
progress of the Engineer.

Final Design Phase:

In monthly installments proportionate to the
progress of the ENGINEER. It is mutually agreed
that these monthly payments are for the ENGINEER'S
convenience only, and they do not imply acceptance
by the OWNER of any work performed by the
ENGINEER.

Bidding Phase:
In monthly installments proportionate to the
progress of the ENGINEER.

Construction Phase:

Monthly based on the percentage of the total cost
of the construction work completed during the
preceding month.

Record Drawing Phase:

Upon receipt of approved reproducible "Record Drawings."

Section 10 - Termination or Suspension

The terms of this contract shall be binding upon the parties hereto until the work has been completed and accepted by the OWNER and all payments required to be made to the ENGINEER have been made; but his contract may be terminated under any or all of the following conditions:

1. At anytime by mutual agreement and consent of the parties hereto.

2. At anytime by the OWNER as a consequence of the failure of the ENGINEER to comply with the terms, progress or quality of work in a satisfactory manner, proper allowance being made for circumstances beyond the control of the ENGINEER.

3. At anytime by either party upon failure of the other party to fulfill its obligation as set forth in this contract.

4. By satisfactory completion of all services and obligations described herein.

5. At anytime in the event of the abandonment of the project by the OWNER.

6. At the conclusion of any phase of the work identified in Section 2 and/or Section 8 above, it shall be the OWNER'S option to terminate this Contract upon payment of compensation due to the ENGINEER for said phase completed.

Upon termination the ENGINEER shall be paid for actual work performed prior to the notice of termination on a pro-rata share of the basic fee based on the phase or percentage of the work actually completed on a given phase.

Upon termination the ENGINEER shall deliver to the OWNER all Original documents , notes, drawings, tracings and files, except the ENGINEER'S personal and administrative files.

Should the OWNER desire to suspend the work, but not definitely terminate the contract, this may be done by sixty (60) days notice given by the OWNER in writing to that effect, and the work may be reinstated and resumed in full force and effect upon receipt from the OWNER of sixty (60) days notice in writing in that effect.

This section shall serve as the definition of termination wherever that word appears in this contract.

Section 11 - Insurance

The ENGINEER agrees to provide the following Insurance Coverages as initialed below. The OWNER agrees to the

required Insurance Coverage as indicated by his initial below.

Initial

Engineer    Owner

A. __Workers Compensation and Employer Liability__

Statutory Workers compensation. Employer's Liability coverage, in the limit of $500,000.00 each accident. In the event this Contract involves work on, or adjacent to, navigable streams or bays, ENGINEERS' Certificate shall show coverage in complaince with provisions of the Federal Longshoreman's and habor Workers' Compensation laws. If any Watercraft and/or Amphibian is used for work under this contract, coverage must be provided for Employer Maritime Liability (including, but not limited to the Jones Act and the Voluntary Compensation Endorsement) for the limits of $250,000.00 One Employee, and a Total Limit of $500,000.00 for Two or More Employees.

Engineer    Owner



B. __Comprehensive General Liability__

(1) Coverage shall be on an Occurrence Basis

(2) Bodily Injury Limits shall be not less than $500,000.00 per occurance.

(3) Property Damage Limits shall be not less than $100,000.00 per Occurance and $500,000.00 Aggregate. Property Damage shall include Coverage for Crafts or Trades which are subject to normal policy exclusions of :

(a) Blasting or explosion

(b) Collapse

(c) Damage to underground property (wires, conduits, and the like) and injury to, or destruction of any property resulting therefrom.

(4) Coverage shall include Completed Operation and Products along with Contractual Liability.

Engineer   Owner

*[signatures]*       C.   Comprehensive Automobile Liability

(1) Bodily        Injury        Limits
$100,000.00        each        person
$500,000.00 each Occurence.
(2) Property    Damage    Liability
Limits shall be not less  than
$100,000.00 each Occurence.
(3) Coverage shall include:

(a)  Owned Vehicles

(b)  Hired or Leased Vehicles

(c)  Non-owned Vehicles

Engineer   Owner

*[signatures]*       D.   Owners and Engineers
Protective(Contingent Liability

(1) This shall be in the name  of,
and  for  protection of,  the
Owner.
(2) Bodily Injury Limits shall  be
not less than $500,000.00  per
Occurence.
(3) Property  Damage  Limits  shall
be  not  less than  $100,000.00
per Occurence and  $500,000.00
Aggregate.

Engineer   Owner

———     ———     (E)  Aviation Liabiltiy Insurance
(applicable if  aircrafts are  used
in operations)

(1) Bodily Injury Limits shall  be
not less than $100,000.00  per
person and  $500,000.00    per
accident, excluding  passenger
hazard.

(2) Passenger hazard Bodily Injury
Limits shall be not less  than
$100,000.00    per    aircraft
passenger seat.

(3) Property  Damage  Limits  shall
be not  less than  $100,000.00
per accident.

(4) Coverage  shall  include    all
leased,  hired    or    other
non-owned aircraft.

Engineer   Owner

*[signatures]*       (F)  Marine Insurance (applicable if
watercrafts and/or  amphibeans  are
used in operations)

(1) Protection and Indemnity Insurance on all vessels owned and/or charted with Limit of Liability up to value of vessel or $500,000.00 single limit whichever is greater.

Engineer   Owner

(G) Architects And/Or Engineers Professional Liability

Limit of Liability:
1,000,000.00   per claim of liability (Including Claim Expense).
1,000,000.00   Aggregate Limit of Liability (Including Claim Expense).

Engineer   Owner

(H) Hold-Harmless Agreement

The Contractor shall indemnify, and hold and save harmless the Board from all loss, liability or expense to which the Board may be subjected as a result of the operations, acts or omission of the Contractor, or any Subcontractor, and the Contractor shall effect and maintain an Insurance Policy with a contractual endorsement to insure the Board's protection, as to bodily injury and property damage. The limits of liability to be applicable under the foregoing indeminity shall be the same limits required under Item B "Comprehensive General Liability".

All certificates of insurance shall be furnished to the Owner and shall provide that insurance shall not be cancelled without ten (10) days prior written notice to the Owner. The Owner may examine the policies. This insurance shall be placed with reliable insurance carriers, satisfactory to the Board, who are authorized to do business in the State of Louisiana.

Section 12 - General

While in the performance of services or carrying out other obligations under this Agreement, the ENGINEER shall be acting in the capacity of independent contractors and not as employees of the OWNER. The OWNER shall not be obligated to any person, firm or corporation for any obligations of the ENGINEER arising from the performance of their services under this Agreement.

The ENGINEER warrants that he has not employed or retained any company or person, other than a bona-fide employee working solely for the consultant, to solicit or secure this contract, and that they have not paid or agreed to pay any company or person, other than bona-fide employees working solely for the consultant, any fee commission,

percentage brokerage fee, gifts, or any other consideration, contingent upon or resulting from the award or making of this contract. For breach of violation of this warranty, the OWNER shall have the right to annul this contract without liability.

This Agreement shall be binding upon the successors and assigns for the parties hereto. This agreement being for the personal services of the ENGINEER shall not be assigned or subcontracted in whole or in part by the ENGINEER as to the services to be performed hereunder without the written consent of the OWNER.

Section 13 - Execution of Agreement

This Agreement is executed in _____ 6 ____ originals. IN TESTIMONY WHEREOF, they have executed this Agreement, the day and year first above written.

WITNESSES:

BOARD OF COMMISSIONERS
ORLEANS LEVEE DISTRICT

EMILE W. SCHNEIDER
President

Burk & Associates, Inc.

By: William R. Burk, III

18

243-4000

# The Board of Commissioners

OF THE

## Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

### New Orleans, La.

70125

PROTECTING <u>YOU</u>
AND <u>YOUR</u> FAMILY

November 18, 1991

Colonel Michael Diffley
District Engineer
U.S. Army Engineer District, New Orleans
P. O. Box 60267
New Orleans, LA 70160

RE:  PARALLEL PROTECTION, LONDON AND ORLEANS AVENUE OUTFALL CANALS

Dear Colonel Diffley:

Please reference your letter of October 29, 1991 (copy enclosed for your convenience) which set forth the U.S. Army Corps of Engineers plan for implementation of parallel protection for the above referenced outfall canals as part of the Lake Pontchartrain Hurricane Protection Project.

As requested, our staffs have met to discuss the transfer of design and construction responsibilities, in accordance with the above referenced letter.  Before I address the results of our staff's efforts there is one matter that causes me great concern.

As you know, we are proceeding with the execution of the Test Pile Program (100% OLB Funding) which is critical to the design and construction of the outfall canals.  I view with serious consternation the decision to withhold all construction on parallel protection until some later date, as yet unannounced.

As you also know, we have been proceeding with design of Phase IIB of the Orleans Avenue Outfall Canal with the previous understanding that the New Orleans District would let the construction package for bid during this fiscal year.  Now we understand that funds are being withheld to execute this construction even if you were to receive approval by your headquarters to proceed with parallel construction.

Please pass on my concern to your headquarters and seek authorization/funds to continue with the construction of Phase I and IIB as previously planned.

BKI EXHIBIT 2

Board of Commissioners
 Orleans Levee District

Colonel Michael Diffley
Page -2-
November 18, 1991

As I mentioned earlier, our staffs have met and arrived at
what I consider to represent a reasonable plan for the transfer of
design and construction responsibilities.

First, with respect to the Orleans Avenue Outfall Canal we
agree with your staff as follows:

1.   Phase I & II - The Orleans Levee District (utilizing the
     service of Design Engineering Inc.) (DEI), who is
     presently under contract to the OLD, will complete the
     design so as to be ready for bidding by the U.S. Army
     Corps of Engineers.  The U.S. Army Corps of Engineers
     will be responsible for the construction/contract
     administration (bidding, construction, resident
     inspection, and record drawing phases, etc.)
     of Phase I & II. (Please see enclosed project status
     report for breakdown by phase).

2.   Phase III - The U.S. Army Corps of Engineers will take
     over the ongoing design and construction of
     Phase III in its entirety.  OLD will transfer all
     existing data, designs, studies, etc. presently available
     on Phase III to the New Orleans District which phase is
     presently under design by DEI.

3.   Test Pile Program - OLD utilizing the services of DEI and
     Eustis Engineering will continue with the execution of
     the test pile program and make results available to the
     New Orleans District.

4.   Right of Way (R/W) Acquisition - OLD will provide R/W
     Acquisition as needed.

Upon completion of final design of Phase I & II, assumption of
Phase III design by the U.S. Army Corps of Engineers, and
completion of the Test Pile Program the Orleans Levee District
relinquishes and hereby abandons to the U.S. Army Corps of
Engineers under its Federal Mandate to provide parallel hurricane
protection all further design and construction/contract
administration (bidding, construction, resident inspection, and
record drawing phases, etc.) for the Orleans Avenue Canal Parallel
Flood Protection Project except for engineering and design support
as requested by the U.S. Army Corps of Engineers on a case by case
basis during construction of the Orleans Avenue Outfall Canal
parallel protection project.

Board of Commissioners
Orleans Levee District

Colonel Michael Diffley
Page -3-
November 18, 1991

Second, with respect to the London Avenue Canal, it is my understanding that your staff will complete the design and construction of said parallel protection in its entirety, excluding the ongoing interim protection works. OLD will transfer to you any data, survey results, studies, etc. that may assist you in this effort which is presently under contract by OLD with Burk-Kleinpeter. OLD will of course be available to assist and answer any question on data furnished.

As with the Orleans Avenue Canal Outfall Works the Orleans Levee District with the completion of the works as set forth above relinquishes and hereby abandons all further design and construction of the London Avenue Canal Parallel Protection Project to the U.S. Army Corps of Engineers under its Federal Mandate to complete said project.

Please be assured that we plan to cooperate with you on this most important effort and are committed to early completion of parallel protection of the Orleans and London Avenue Outfall Canals. In this view, I again seek your support to reinstate federal construction/funding of the Orleans Avenue Outfall Canal parallel protection to specifically include Phase I and II.

Sincerely,

Robert S. Maloney
President

RSM:HDC:bd/difI&II

xc:  H.B. Lansden
     R. McGinity
     Eugene Tickner
     Dan Judlin

# The Board of Commissioners

OF THE

## Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

### New Orleans, La.

70126

PROTECTING YOU
AND YOUR FAMILY



November 25, 1991

Mr. George C. Kleinpeter, Jr. P.E.
Burk-Kleinpeter, Inc.
4175 Canal Street
New Orleans, LA  70119

RE: LONDON AVENUE CANAL
    OLB PROJECT NO. 24902

Dear Mr. Kleinpeter:

   Enclosed please find a copy of President Maloney's letter to Colonel Diffley concerning the U. S. Army Corps of Engineers ("Corps") assumption of the design and construction of parallel protection for the London and Orleans Avenue Outfall Canals.

   The Corps has advised that they plan to meet with us in early December to discuss the schedule for the completion of the parallel protection work.  I will advise you as soon as the Corps proposes a date for said meeting.

   In the interim this letter will serve to advise you to:

       1. Continue with the interim protection construction contracts that are presently underway.

BKI EXHIBIT 3

FILE COPY

**Board of Commissioners**
  Orleans Levee District

Page 2
November 25, 1991
Mr. George Kleinpeter

2. Discontinue any further studies, design and/or engineering activities with respect to the London Avenue Outfall Canals, except as related to the on going interim protection construction contracts.

Sincerely,

Harry D. Collins, P.E.
Chief Engineer

HDC:drb-R-38

Encl: a/s

xc: Robert S. Maloney
    H.B. Lansden
    Richard McGinity
    Finance
    Linda Leyer
    Eugene Tickner
    Dan Judlin
    Design Engineering, Inc.
    Eustis Engineers

# MEMORANDUM

TO:      Colonel Michael Diffley

FROM:    Orleans Levee Board

RE:      Implementation of Flood Control Systems along the
         London Avenue and Orleans Avenue Canals

DATE:    March 5, 1992

## London Avenue Canal

- Burk-Kleinpeter, Inc. will be retained pursuant to a supplement to their existing contract for Contract Nos. 1 and 2.

- The Orleans Levee district will select and contract with private sector firms for Contract Nos. 3, 4 and 5 as provided in your proposed schedule dated 21 February, 1992 for design services and for partial resident inspection services for presence on the job site by the design consultant and Levee Board representative.

- The U. S. Army Corps of Engineers will contract for all construction pursuant to federal procurement procedures and will provide contract administration to ensure construction conformity to the plans and specifications. However, it is understood that the services from the private sector will be retained by the Orleans Levee Board through completion of the project.

- The U. S. Army Corps of Engineers will provide necessary topographical surveying through its resources.

- Right-of-way surveys shall be provided through the Orleans Levee District using its resources.

BKI EXHIBIT 4

246-4000

# The Board of Levee Commissioners
### of the
## Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

### New Orleans, La.

70126
March 16, 1992

RECEIVED
APR  3 1992

D. E. I.
PROTECTING YOU
AND YOUR FAMILY

Colonel Michael Diffley
District Engineer
U. S. Army Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160-0267

    Re:  Parallel Protection and the Louisiana Lake
          Pontchartrain and Vicinity Hurricane and
          Flood Protection Plan, the High Level Plan

Dear Colonel Diffley:

On November 18, 1991, Mr. Robert S. Maloney corresponded with your agency regarding a plan proposed by your staff and the Board's staff to implement the parallel protection plan for the London Avenue and Orleans Avenue Canals. We have reviewed the plan, the proposed transfer and abandonment of the project by the Orleans Levee District, the mandates of Congress, and the directives to the Corps' District from higher authority dated October 29, 1991, along with local participation requirements and goals.

We also have reviewed our local technical capabilities to properly and effectively manage engineering and construction contracts using private firms. We have determined that the private engineering sector has the expertise required to provide the technical engineering and design talent to implement the parallel protection program.

To ensure that our committed participation level required in our agreement with the United States of America is expended in the local private sector and to ensure our agreements are not perceived as diminishing the interest and involvement of the private sector design firms, this shall serve to inform that we will provide the requisite design services and resident inspection through local firms under contract to the Orleans Levee District. We, of course, seek your engineering and construction management capabilities to

**BKI EXHIBIT 5**

FILE 100 5-19
DISTRIBUTION:

Colonel Diffley
Page 2

protect the Federal interest and to compliment the expertise of our agency. Thus, we will be using private firms as the primary source for providing engineering services but look to the Corps to aid us in this endeavor. We want to work closely with your staff in ensuring that throughout the plan development and construction process the Federal and local interest is protected. All plans will be prepared to meet Corps' bidding requirements.

As before, we look forward to the U. S. Army Corps of Engineers being the construction contracting authority with implementation through your agency. We will provide, accordingly, all necessary rights-of-way, payment for necessary relocation and of course our share of the first cost of construction through cash and/or credits for in-kind construction and/or services.

Please consider this correspondence a rescission of Mr. Robert S. Maloney's proposal of November 18, 1991. By this correspondence I am also authorizing the Orleans Levee Board's engineering staff and project coordinator to meet with your staff to develop an appropriate plan using private sector firms for design, and, to the extent possible, construction inspection by the private firms.

At your convenience I would be pleased to meet and discuss what steps must now be taken to, expeditiously construct the remaining Hurricane and Flood Protection Project. The attached memorandum provides our method of implementation.

I trust this clarifies our earlier discussion with you on February 19, 1992.

Very truly yours,

Robert G. Harvey
President

Enclosure

cc:  The Honorable James P. Huey
        Chairman, Engineering Committee
     Mr. Alan Francingues, Interim Chief Engineer
     Mr. H. Baylor Lansden, Managing Director
     Mr. Richard McGinity, General Counsel

```
bc:    The Honorable Lambert Boissiere
       The Honorable Patricia Harris
       The Honorable Richard Sackett
       The Honorable Robert Ramelli
       The Honorable Roy Rodney
```



## DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

April 2, 1992

Project Management Office

Robert G. Harvey, President
The Board of Levee Commissioners
  of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Dear Mr. Harvey:

This is in response to your March 16, 1992 letter, your reference "Parallel Protection and the Louisiana Lake Pontchartrain and Vicinity Hurricane and Flood Protection Plan (sic), the High Level Plan".

Your letter does not agree with my understanding of our February 19, 1992 meeting.  I left the meeting with the understanding that we agreed to move toward completion of the parallel flood protection on the London Avenue and Orleans Avenue outfall canals as quickly as we can.  This meant that your Architect - Engineer (A-E) would continue with designs on the Orleans outfall canal and we would continue our designs on contracts 1 and 2 on the London Avenue outfall canal.  We will complete draft plans and specifications in August 1992 on contract 1 and in October 1992 on contract 2.   This is in conflict with your enclosed memorandum proposing that your board furnish A-E designs for these contracts.

As far as contracts 3 and 4 on London Avenue Canal are concerned, we will consider using A-E's as I said in our meeting.  We want the city protected as quickly as we can.  If A-E's will allow us to step up the schedule, that's the way to go.  I understood that we were going to see how we both progressed on the first contracts and let that guide us on the best way to continue on our goal.

I am also concerned that your plan may duplicate effort, mainly in the area of design of contracts 1 and 2 on London Avenue Canal and on construction management.  If we are to build the flood protection, we will provide full construction management.  Any other construction management does not seem

BKI EXHIBIT 6

necessary, therefore its cost is not a proper project cost and thereby not creditable to the non-Federal share.   This also applies to any duplication of design effort.

If you feel design and construction management is best done by your board then the construction might be more efficiently done by your board.  I know we have agreed to construct your A-E's design on reaches I and II of Orleans Avenue Canal as the designs are nearly complete and that is the best way to achieve our goal.   I don't know that such an arrangement beyond that is in the best interest of the project.  If your concern is work by A-E's versus work done by our staff in-house, I can only repeat what I said at our last meeting--we have plenty to do without the work on London Avenue and Orleans Avenue Canals and we can contract the designs to A-E contractors using our selection procedures and have them work directly with us as we are doing the construction and construction management.

Through the Levee Board Secretary, we have scheduled a meeting for 1:30 p.m. on April 14, 1992, here in my office to discuss these matters.

Sincerely,

Michael Diffley
Colonel, U.S. Army
District Engineer

Copy Furnished:

Mr. James P. Huey, Chairman
  Engineering Committee
The Board of Levee Commissioners
  of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. Alan Francingues, Interim Chief Engineer
The Board of Levee Commissioners
  of the Orleans Levee District
Suite 202 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. H. Baylor Lansdon, Managing Director
The Board of Levee Commissioners
 of the Orleans Levee District
Suite 203 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. Richard McGinity, General Counsel
The Board of Levee Commissioners
 of the Orleans Levee District
Suite 203 Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

243-4000



## The Board of Commissioners
### OF THE
## Orleans Levee District
SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

### New Orleans, La.
70126

PROTECTING <u>YOU</u>
AND <u>YOUR</u> FAMILY

October 22, 1992

Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

     RE:  Consultant Selection
          London Avenue Canal

Gentlemen:

The Board of Commissioners, Orleans Levee District (OLD), has accepted a recommendation that you proceed with the necessary engineering services for the levees and floodwalls - Mirabeau Avenue to Leon C. Simon Boulevard and East Bank, and Mirabeau Avenue to Robert E. Lee Boulevard, West Bank levees and floodwalls. As discussed, a supplemental agreement to your contract will be negotiated.

The work which you have been selected to accomplish is part of the overall high level parallel protection project for the London Avenue Canal. In addition to yourself, there will be six other engineering firms working on this project.

The work that you will do requires compliance with U. S. Army Corps of Engineers (USACE) standards for design, plans and specifications, and cost estimates including your fees. At this point in time, construction management will be by the USACE. Overall coordination in the scheduling of work and interfacing with other work will be by Design Engineering, Inc. (DEI), OLD coordinating consultant.

## BKI EXHIBIT 7

Board of Commissioners
  Orleans Levee District

   Burk-Kleinpeter, Inc.
   October 22, 1992
   Page Two


        By copy of this letter, DEI is requested to coordinate a meeting
   between our consultants and the USACE so that all will understand the
   standards to which they will be working to meet.

                                        Sincerely,

                                        F. P. Mineo
                                        Acting Chief Engineer

   FPM:pns

   xc:  James P. Huey
        H. B. Lansden
        Walter Baudier, DEI
        W. T. Tickner, USACE



LAKE PONTCHARTRAIN, LA.
AND VICINITY
LAKE PONTCHARTRAIN
HIGH LEVEL PLAN

PROPERTY OF D. E. I.

# DESIGN MEMORANDUM NO. 19A
# GENERAL DESIGN

# LONDON AVENUE
# OUTFALL CANAL

ORLEANS PARISH

IN TWO VOLUMES
## VOLUME I



US Army Corps
of Engineers
New Orleans District

DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS

NEW ORLEANS, LOUISIANA

JANUARY 1989

BKI EXHIBIT 8          SERIAL NO.

MOTION:

RESOLUTION:

BY:   Commissioner James P. Huey
      Engineering Committee

SECONDED BY:  Commissioner Patricia Harris

October 21, 1992

## RESOLUTION

WHEREAS, by Resolution No. 5-042292, the Board of Commissioners Orleans Levee District (Board) authorized it's Engineering Committee through its Chairman to notify the U.S. Army Corps of Engineers (USACE) of its desire to utilize the services of private sector firms to design high level parallel protection for the Orleans Parish Outfall Canals, and

WHEREAS, the USACE has agreed that the Board's 30% contribution can include in-kind services, and

WHEREAS, as directed a list of available consultants was reviewed to determine their ability to perform the scope of services required by the USACE and the insurance requirements of the Board, and

WHEREAS, the assignment of consultants with the Chief Engineer's concurrence to accomplish the London Avenue Canal project Contracts No. 3, 4, 5, and 7 is recommended as follows:

Firms presently under contract and to be given authorization to proceed:

Burk-Kleinpeter:     Contract No. 3; Levees and
                     Floodwalls; Mirabeau to Leon C.
                     Simon and East Bank and Mirabeau to
                     Robert E. Lee, West Bank Levees and
                     Floodwalls

Firms meeting Orleans Levee Board insurance requirements and recommended for selection:

**BKI EXHIBIT 9**

Modjeski & Masters:    Contract No. 5; Revisions to Design
                       Mirabeau Avenue, Filmore Avenue,
                       and Leon C. Simon Bridges.

Linfield, Hunter       Contract No. 4, Gentilly Boulevard
Junius:                Bridge, associated roadway
                       and structure,
                       Design Memorandum, plans
                       and specifications

Pepper & Associates:   Contract No. 7, Frontal protection
                       Pumping Station No. 3.  Plans and
                       Specifications.

Firms recommended for the accomplishment of work described as

Contract 5 subject to meeting Orleans Levee Board insurance

requirements and other technical matters:

Hartman                Mirabeau Bridge Plans and
Engineering:           Specifications.

C.E. Meyer and         Leon C. Simon Bridge Plans and
Associates:            Specifications.

G-T Associates:        Filmore Bridge.  Plans and
                       Specifications.

Firms recommended as Sub-Consultants for which the Board

will not be a part of any contractual relationship, but

will provide overall coordination and guidance.

GOTECH Engineers:      Contract No. 3;
                       Subscontractors to Burk-Kleinpeter.

Sam Scandaliato        Contract 7; Subcontractor to
and Associates:        Pepper and Associates, Inc.; Pumping
                       Station No. 3

     WHEREAS, all work including fees will be reviewed by

USACE to insure compliance with their construction management

requirements and Board project cost contributions.

          BE IT HEREBY RESOLVED, That negotiations begin and

a contract be awarded to each of the prime contractor firms

listed above who meet all Orleans Levee District requirement

for the work described and that the President and/or Chief

Engineer be authorized to sign any and all documents necessary

to carry out the above.

AYES:

NAYS:

ABSENT:

RESOLUTION ADOPTED:

THE FOREGOING IS CERTIFIED TO
BE A TRUE AND CORRECT COPY.

H. B. LANSDEN, SECRETARY
THE BOARD OF COMMISSIONERS OF
THE ORLEANS LEVEE DISTRICT

243-4000

# The Board of Commissioners
### OF THE
# Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

## New Orleans, La.

70126

PROTECTING YOU
AND YOUR FAMILY

January 4, 1993

Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, LA 70119

RE:   OLB Project No. 24902
      London Avenue Canal

Gentlemen:

        For your files we are enclosing a fully signed and executed
copy of your Supplemental Agreement for the London Avenue Canal
Contract No. 3, East Bank Levees and Floodwalls - Mirabeau to Leon
C. Simon; West Bank Levees and Floodwalls – Mirabeau to Robert E.
Lee.

        Payment will be made on a monthly basis, proportionate to the
amount of work performed.  All invoices and other correspondence
must contain the above-referenced OLB Project Number.

        You are authorized to proceed in the preliminary phase of this
work and the fee for this phase is not to exceed $387,221.00.

                                        Sincerely,

                                        F. P. Mineo
                                        Acting Chief Engineer

FPM:GG:pns
Enclosure

xc:   H. B. Lansden
      Finance Department (w/original)
      Gerry Gillen (w/file copy)

BKI EXHIBIT 10

*Board of Commissioners*
*of the*
*Orleans Levee District*

Scope of Services for
*London Ave Canal Floodwalls Contract No. 3*

---

*General:*   This Scope of Services describes the tasks which shall be completed by Burk-Kleinpeter, Inc. (BKI) for the *Board of Commissioners of the Orleans Levee District* in connection with design services for the improvements to *London Ave Canal Floodwalls Contract No. 3*. These tasks shall include those services required to produce preliminary and final construction plans and specifications for the construction of those improvements. The remainder of the proposed levees and floodwalls along the London Avenue Canal are excluded from this scope of services as the Orleans Levee District has selected other consultants to perform the design services for that work.

General :   BKI will develop preliminary and final plans and specifications for the construction of floodwalls from Mirabeau Ave to Robert E. Lee Blvd. on the west side and from Mirabeau Ave. to Leon C. Simon Blvd. on the east side.

A.    General design criteria is stipulated in **Design Memorandum No. 19A** on London Avenue Outfall Canal, developed by the U.S. Army Corps of Engineers dated January 1989.   This memorandum delineates the section between Mirabeau Ave and Robert E. Lee Blvd. on the west side will consist of an I-wall with a gross design grade of 14.4 MSL and 13.9 MSL net grade. The section between Mirabeau Ave and Robert E. Lee Blvd. on the east side will consist of an inverted T-wall with a net design grade of 13.9 MSL. The section between Robert E. Lee Blvd. and Leon C. Simon Blvd. on the east side will consist of an I-wall with a gross design grade of 14.1 MSL and 13.6 MSL net grade. Construction cofferdam for the T-Wall section will be based on a lake level of 4.0 MSL with full nominal pumping capacity from both S&WB drainage pump stations into the London Ave. Canal. Exceptions will be made at all bridge crossings with a transition floodwall to tie into flood protection at the new bridge structures designed by others.

B.    Final topographic survey information necessary to detail plans for the project will be performed as supplemental services.

---

Scope of Services for
*London Ave. Canal Floodwalls Contract No. 3*

C.  Right - Of - Way  surveys and mapping necessary for any real
estate acquisition will be performed under supplemental
services.

D.  Preliminary and final design and detailing of all plans and
specifications for the project will conform to the following
submittal schedule.  Four plan submittals will be performed
(preliminary (35%), design progress (65%) draft final plans
(95%), and final bid documents (100%)).  Preliminary and final
construction cost estimates will be provided in addition to all
design calculations for review by the OLB and USACE.

E.  The OLB through the USACE will provide standard plans and
symbols in AutoCad or Intergraph format.

F.  BKI will provide to the OLB, one set of AutoCad (Release 11)
diskettes and one set of Intergraph Micro Station PC (version
4.0) diskettes converted from AutoCad.

G.  The OLB through the USACE will provide BKI with all
geotechnical data/criteria as well as current topographic
survey data.

H.  The estimated construction cost for Contract 3 is $22,292,500.
Based on this construction cost estimate the lump sum
engineering fees for Preliminary Plans are $387,221.00 and
Final Plans are $580,831.00 as per Section 8.2 of the
Engineering Agreement between the Orleans Levee Board and
Burk-Kleinpeter, Inc. dated December 26, 1984.

I.  The attached progress schedule details the completion of the
tasks associated with this contract. Final completion of plans
and specifications is scheduled to be complete within 13
months from notice to proceed, including 4 months for review.


RECOMMENDED BY:                    ACCEPTED BY:


*Frank Mineo*                      *Robert G. Harvey*
_____          _____
Frank Mineo                        Robert G. Harvey
Acting Chief Engineer              President
Orleans Levee Board                Orleans Levee Board


Date: _Jan. 4, 1992_               Date: _January 4, 1993_

London Ave Canal Levees and Floodwalls Contract 3

| Activity Name | Start Date | Finish Date | 1992 Dec | 1993 Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 1994 Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Notice to Proceed Contract 3 | 12/14/199 | | ◆ | | | | | | | | | | | | | |
| Preparation of Preliminary P & S | 12/14/199 | 4/14/1993 | | | | | | | | | | | | | | |
| Submit 35% Review P & S | 4/15/1993 | | | | | | ◆ | | | | | | | | | |
| Local Review of 35% Progress Prints | 4/15/199 | 5/15/1993 | | | | | | | | | | | | | | |
| Preparation of Final P & S | 5/15/199 | 10/15/199 | | | | | | | | | | | | | | |
| Submit 65% Progress Prints | 7/31/1993 | | | | | | | | | ◆ | | | | | | |
| Submit 95% Review P & S | 10/15/199 | | | | | | | | | | | | ◆ | | | |
| Local Review of 95% P & S | 10/15/199 | 12/14/199 | | | | | | | | | | | | | | |
| Revisions to Final Plans & Specs | 12/15/199 | 12/30/199 | | | | | | | | | | | | | | |
| Final O&M & USACE Review of P & S | 1/1/1994 | 1/14/1994 | | | | | | | | | | | | | | |
| Submit Final P & S | 1/15/199 | | | | | | | | | | | | | | | ◆ |

Prepared By: Burk-Kleinpeter, Inc.   O&M Project No. 24968.   ..-T No. 8497

December 3, 1992



# DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

March 16, 1993

Programs and Project
 Management Division

Mr. Robert G. Harvey, President
The Board of Levee Commissioners
Orleans Levee District
Suite 202 ~ Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Dear Mr. Harvey:

This is in response to your March 5 and March 10, 1993 letters concerning Burk-Kleinpeter, Inc. doing the design on Contract 3 for London Avenue outfall canal parallel protection.

Since you entered into a formal agreement with Burk-Kleinpeter, Inc. on January 4, 1993 and they were working as of my letter of February 18, 1993, I agree that Burk-Kleinpeter, Inc. continue with the design for Contract 3 to completion.

I do however make the following stipulations:

1.  We meet with Burk-Kleinpeter and your in-house staff to agree on a degree of completion as of that meeting.

2.  Your agreement with Burk-Kleinpeter, Inc. conforms to our established project schedule.

3.  To provide the most efficient communication between us and the designer, Burk-Kleinpeter, Inc. shall coordinate their work directly with us while keeping your staff informed as you require for payment, etc.

Let's work together to get a quality product on time.

Sincerely,

Michael Diffley
Colonel, U.S. Army
District Engineer

**BKI EXHIBIT 11**

2

Copies Furnished:

Chairman, Engineering Committee
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Chief Engineer
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

Mr. H. Baylor Lansden
Managing Director
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana  70126

243-4000

# The Board of Commissioners

#### OF THE

## Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

### New Orleans, La.

70126



BURK · KLEINPETER

PROTECTING YOU
AND YOUR FAMILY

April 13, 1993

Mr. Bill Giardina
Burk-Kleinpeter, Inc.
4176 Canal Street
New Orleans, La 70119

RE: OLD Project No. 24902
Contract 3
London Avenue Canal

Dear Mr. Giardina:

Enclosed is a copy of the letter dated March 16, 1993 from the U. S. Army Corps of Engineers (USACE) accepting the proposal that you complete the design of Contract 3 London Avenue Canal. This design is to be accomplished in accordance with USACE requirements and in particular those requirements for the preparation of documents to be used for USACE construction.

You are authorized to coordinate directly with the USACE on technical matters with the understanding that we will be advised of subject matter. Any work requiring a change in the scope of your contract with the Orleans Levee District (OLD) shall be brought to my attention prior to proceeding with any work particular if it involves additional funding.

Sincerely,

Stevan G. Spencer, P.E.
Chief Engineer

SGS:FPM:pns
Enclosure

xc: H. B. Lansden
Eugene Tickner, USACE
Dan Judlin, USACE

ORIG COPR 8407
cc DIFF- CCR- ~~WHITE~~- BILL
4-16-93

**BKI EXHIBIT 12**

*Board of Commissioners
for the
Orleans Levee District*

Supplement to Scope of Services for
*London Ave Canal Contract No. 3*

*General:* This Scope of Services describes the supplemental tasks involved with the surveying and drafting of the Right-Of-Way drawings for acquiring additional servitudes for the construction of the flood protection project. Included in this scope is additional geotechnical analyses necessary for the completion of the final plans and specifications.

Task 1     *PROPERTY OWNERSHIP*

Data provided to BKI from the Orleans Levee Board and the Corps of Engineers will be reviewed and analyzed for use as documentation for the Right-of-way plans.

Task 2     *RIGHT-OF-WAY PLANS*

Boundary monuments will be field surveyed and plans will be developed that show the location of the existing monuments relative to the existing Corps of Engineers baseline. Permanent and temporary required servitudes will also be shown on the plans .

Task 3     *CONSTRUCTION ACCESS*

Locations for construction access will be determined and drafted on the plans.

Attached is an additional scope to provide geotechnical engineering analyses for the study and design of the I-walls and T-walls to be included in this scope of services.

The total lump sum fees for this supplement including geotechnical engineering and surveying and mapping is $78,210.13.

RECOMMENDED BY:                    ACCEPTED BY:

_____          _____
Frank Mineo                       Robert G. Harvey
Acting Chief Engineer             President
Orleans Levee Board               Orleans Levee Board

Date: 3/09/93                     Date: 4-6-93

**BKI EXHIBIT 13**

*Bill Giardina* 243-4000

Rec'd 9/8/93
debrief

# The Board of Commissioners
## OF THE
## Orleans Levee District

SUITE 202 — ADMINISTRATION BUILDING
NEW ORLEANS LAKEFRONT AIRPORT

New Orleans, La.

70126

September 8, 1993

E Bill
F.S.
Sen
fib

PROTECTING YOU
AND YOUR FAMILY

8407

Colonel Michael Diffley
District Engineer
U. S. Army Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160-0267

RE:   London Avenue Canal
      Contract 3
      Construction Administration
      and Resident Inspection
      Services

Dear Colonel Diffley:

Our consultant on the London Avenue Canal Contract 3, Burk-
Kleinpeter, Inc., has requested that their firm be allowed to
continue from completion of the plans through construction
administration and resident inspection.  After discussing this
with them, I feel that there are compelling reasons for the Corp
of Engineers to allow the Orleans Levee Board to have them
proceed with this work at the appropriate time.  I would like
very much to meet with you to discuss these reasons; however, for
clarification, I would like to enumerate them, as follows:

*    The Orleans Levee Board's present and active contract with
     its consultant includes responsibility for the referenced
     services.

*    As you know, Burk- Kleinpeter, Inc.'s performance during the
     design of Contract 3 has been very professional.  All work
     items have been delivered on or before the scheduled dates.

*    The consultant has successfully performed construction
     administration and resident inspection services for many
     major flood protection projects.  In fact, until recently,
     Burk-Kleinpeter, Inc. was under contract to the New Orleans
     District Corp of Engineers to provide similar inspection
     services for major flood protection projects in your
     district; therefore, their qualifications are beyond
     question.

**BKI EXHIBIT 14**

\*   The Orleans Levee Board has recently awarded construction
management assignments to other design firms on the London
Avenue Canal project; therefore, how can we justify to this
consultant that he cannot continue with this project to
completion.

\*   I think that you will agree that it would be best, from a
technical standpoint, to have the consultant continue from
this point to construction administration and resident
inspection of the work his staff designed.

I feel very strongly that this consultant, which has proven
itself over the last eight months or so, should be allowed to
continue its work through completion of construction.

I personally would find it very difficult to justify the
termination of this firm's services when construction
administration and resident inspection are yet to be done.  They
should be allowed to bring this project to completion.

For these reasons, I am requesting a meeting with you so that we
can sit down face to face and resolve this very important issue.

Sincerely,

Robert G. Harvey, Sr.
The Board of Commissioners of the
Orleans Levee Board

cc:  Stevan G. Spencer, P.E.
     Mr. H. Baylor Landsen

OCT-26-1993  14:40  FROM  D L B  ENGINEERING          TO          4081714  P.02



**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267



REPLY TO
ATTENTION OF:                    October 25, 1993

Programs and
 Project Management Division

Robert G. Harvey, President
Board of Levee Commissioners
Orleans Levee District
Suite 202, Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Dear Mr. Harvey:

This is in reply to your September 8, 1993 letter requesting a meeting with Colonel Diffley to discuss allowing Burk-Kleinpeter, Inc. to do the construction management for London Outfall Contract 3. This contract is a part of the Lake Pontchartrain, Louisiana and Vicinity hurricane protection project.

Colonel Diffley is out of town. He will return November 1st. He asked that I reply in his absence. Colonel Diffley will be glad to meet with you after he returns. Please have your secretary get with his secretary, Rea Dutton, at 862-2077 to arrange a good time for your meeting.

I appreciate you giving us your reasons for requesting Burk-Kleinpeter, Inc. to continue after the design phase into construction management. Let us share with you our feelings on this matter.

We do not disagree with Burk-Kleinpeter, Inc.'s ability to do the inspection services; however, we currently have an A-E firm under contract to give us these services, if we need them, and believe that, if we do need such support, it is better to get it from a firm under contract directly with us.

Burk-Kleinpeter is coordinating their design work with our designers. We feel confident there is a good connection between the design and construction management. It would be prudent, however, to have Burk-Kleinpeter remain under contract during the construction period to provide design advice.

Sincerely,

James V. Hall
Lieutenant Colonel, U. S. Army
Deputy District Engineer

**BKI EXHIBIT 15**

OCT-26-1993  14:40   FROM O L B ENGINEERING       TO        4881714  P.03

Copies Furnished:

Chairman, Engineering Committee
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Stevan G. Spencer
Chief Engineer
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

Managing Director
Orleans Levee District
Suite 202 - Administration Building
New Orleans Lakefront Airport
New Orleans, Louisiana 70126

TOTAL P.03

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE OF PAGES<br>1    6 |
|---|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO.<br>0001 | 3. EFFECTIVE DATE<br>05/26/94 | 4. REQUISITION/PURCHASE REQ. NO.<br>ED0000-4031-0144 | | 5. PROJECT NO. (If applicable)<br>dek |
| ISSUED BY                CODE    ISSUE1 | | 7. ADMINISTERED BY (If other than Item 6)   CODE    ADMIN1 | | |

ISSUED BY:
US ARMY ENGR DIST  NEW ORLEANS
PO BOX 60267
NEW ORLEANS LA 70160-0267

Molly M. Block          SC2(504) 862-2879

ADMINISTERED BY:
US ARMY ENGR DIST, NEW ORLEANS
ATTN CELMN-CT
PO BOX 60267
NEW ORLEANS LA 70160-0267

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)   Vendor ID: 00000000

|  | (X) | 9A. AMENDMENT OF SOLICITATION NO.<br>DACW29-94-B-0047 |
|---|---|---|
|  | X | 9B. DATED (SEE ITEM 11)<br>05/03/94 |
|  |  | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
|  |  | 10B. DATED (SEE ITEM 13) |

CODE    OHR68          FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS SEE BELOW

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [X] is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning ___1___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (X) | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
|  | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
|  | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
|  | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:    Contractor [ ] is not,   [ ] is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Plans and Specifications covering Lake Pontchartrain, Louisiana and
Vicinity, High Level Plan, London Avenue Outfall Canal, Parallel
Protection, Mirabeau Avenue to Robert E. Lee Blvd., West Bank; Mirabeau
Avenue to Leon C. Simon Blvd., East Bank Floodwall, Orleans Parish,
Louisiana, are hereby amended as follows:
BID OPENING
Bid Opening Date and Time of 8 June 1994, 2:00 P. M., LOCAL TIME AT
PLACE OF BID OPENING, remains unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | | BY    (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

BKI EXHIBIT 16

## BIDDING SCHEDULE

Delete page B-1 in its entirety and substitute revised attached page B-1 therefor.  A double asterisk (**) denotes a modification.

## SECTION C - TECHNICAL PROVISIONS

1.  <u>Page C2C-1, Paragraph C2C-2</u>.  Delete item (2), <u>Excavation</u>, in its entirety, and substitute the following:

"(2)  <u>Excavation</u>.  Check grade, slopes, and dimensions for compliance with design sections.  The Contractor shall have an option to degrade the existing landside levee to elevation 3.0 N.G.V.D. at any time to improve the accessibility for construction in the following reaches:

Station 69+15 to 73+00 EB/L
Station 85+20 to 100+00 EB/L

The Contractor shall have an option to degrade the existing landside levee only during non-hurricane season with a maximum water elevation of 6.75 N.G.V.D. in the following reaches:

| Reach | Degraded Levee Elevation |
|---|---|
| 70+50 to 84+50 WB/L | 3.0 |
| 85+60 to 99+15 WB/L | 3.5 |
| 100+40 to 119+85 WB/L | 3.0 |
| 73+00 to 84+60 EB/L | 3.0 |
| 102+30 to 119+40 EB/L | 3.0 |
| 120+18 to 126+88 EB/L | 4.0 |

The Contractor's hurricane plan shall include provisions for returning the levees to their original heights if new floodwall construction is not complete by the beginning of hurricane season. During hurricane season, the Contractor shall be prohibited to degrade existing levee until the new floodwall is complete and the concrete has attained a compressive strength of 3,000 psi.".

2.  <u>Page C2G-6</u>.

a.  Add a following new paragraph after existing paragraph C2G-8.4, which begins on existing page C2G-5:

"C2G-8.4.1  <u>Pull and Clean Existing AZ-18 Steel Sheet Piling</u>. From Sta. 99+73.36 EB/L to Sta. 99+91.07 EB/L, the Contractor shall pull and clean existing AZ-18 steel sheet piling up to elevation 14.40 as shown on the drawings.  The pulled portion of the piles shall be cleaned with a jet of water.  The Contractor shall repair any damaged protective coating on AZ-18 sheet piling. For paint requirements, see Section C9A, "PAINTING.".

SOLICITATION NO. DACW29-94-B-0047
AMENDMENT NO. 0001
PAGE 3 OF 6

b. <u>Paragraph C2G-8.5</u>. In the third (3rd) line, change "AZ-10" to "RZ-10".

3. <u>Page C2G-10</u>.

a. <u>Paragraph C2G-11.1.5</u>. Add the following sentence after the last sentence: "No separate measurement will be made for approximately eighteen (18) linear feet of existing AZ-18 steel sheet piling to be pulled and cleaned up to elevation 14.40.".

b. <u>Paragraph C2G-11.1.6</u>. In the second (2nd) line, after "AZ-18", add ",RZ-10 and PZ-27".

4. <u>Page C2G-11, Paragraph C2G-11.2.6</u>. In the second (2nd) and third (3rd) lines, after "AZ-18", add ",RZ-10 and PZ-27".

5. <u>Page C2J-3</u>.

a. Add the following new paragraph after existing paragraph C2J-4.3:

"C2J-4.4 <u>Concrete Slope Pavement</u>. The Contractor shall remove and dispose of existing slope pavement on west bank as indicated on Contract Drawings and as specified herein.".

b. <u>Paragraph C2J-6.2</u>. In the third (3rd) line, add "concrete slope pavement," after "sheet piling," .

6. <u>Page C16B-5, Paragraph C16B-12.1</u>. In the third (3rd) line, change "0.040"" to "0.032"".

7. <u>Page C16B-7, Paragraph C16B-13.3.3</u>. Change lines 9 and 10, which currently read "The thickness of the extruded screen shall be 50 mils with an 80% minimum point." to read as follows: "The thickness of the extruded screen shall have 32 mills minimum point.".

8. <u>Page C16B-11, Paragraph C16B-16.1.1</u>:

a. Delete the second (2nd) sentence in its entirety and substitute the following revised sentence: "From stations 99+91.07 EB/L to 100+17.54 EB/L, the Contractor shall have an option to keep the underground existing cable in its existing position or temporarily relocate the cable from its existing position into a trench in case of any conflict which may occur during the construction".

b.  In the ninth (9th) line, after "relocate cable", add "either from its original position or".

c.  Add the following new sentence at the end of the paragraph: "Notching of steel sheet piling and split steel sleeves will be required to cross the cables thru sheet piling at approximate station 100+04.79 EB/L as shown on the drawings"

9.  Page C16B-12.

a.  Paragraph C16B-16.1.3.

(1)  Beginning on the second (2nd) line and continuing onto the third (3rd) line, change "its existing position on" to "existing sheet pile to".

(2)  Delete the second (2nd) sentence in its entirety and substitute the following revised sentence: "From stations 99+88.47 EB/L to sta. 100+17.54 EB/L the Contractor shall have an option to keep the underground existing cable in its existing position or temporarily relocate the cable from its existing position into a trench in case of any conflict which may occur during construction".

(3)  In the third (3rd) sentence, add "In case of insufficient cable length," before "Splices" (change the capital "S" in splices to a small "s").

10.  Page C16B-12, Paragraph C16B-16.1.4.  Add the following new sentence at the end of the existing paragraph: "Notching of steel sheet piling and split steel sleeves will be required to cross the cables through the sheet piling at approximate station 101+38.90 WB/L and station 100+04.79 EB/L as shown on the drawings".

SECTION H - SPECIAL CLAUSES

Page H-24, Paragraph H-26b(1).  In the first (1st) line, add "2,500,000.00" after "$".

DRAWINGS

1.  Delete existing Drawing (Dwg.) No. 37 of 73, File No. H-4-40295 in its entirety, and substitute revised attached Dwg. 37 of 73, File No. H-4-40295 therefor.

2.  Please make the following pen-and-ink changes:

a.  Drawing (Dwg.) No. 6 of 73, File No. H-4-40295.  In the table entitled "EXISTING FACILITIES", add "(  .)" after "NA" in the "DISPOSITION" column for item FL-432.

b. <u>Dwg. No. 13 of 73, File No. H-4-40295</u>. In the "WEST PROFILE (CANAL SIDE ELEVATION)", the elevation of the bottom of new sheet piling from Sta. 100+27.61 to Sta. 101+66.95 is -20.0.

c. <u>Dwg. No. 19 of 73, File No. H-4-40295</u>. In the detail entitled "SHEET PILE SPLICE AT TC-1, ST-1 & DT-1", change "STA. 100+42 WB/L FOR TC-1" to "STA. 100+47 WB/L FOR TC-1"; "STA. 101+27 WB/L FOR ST-1 & DT-1" to "STA. 100+34 WB/L FOR ST-1 & DT-1"; "STA. 100+58 WB/L FOR TC-1" to "STA. 100+52 WB/L FOR TC-1"; and "STA. 100+51 WB/L FOR ST-1 & DT-1" to "STA. 101+55 WB/L FOR ST-1 & DT-1".

d. <u>Dwg. No. 32 of 73, File No. H-4-40295</u>. In the leftmost "SECTION A", change "APPROX. STA. 70+57.00 to 84+64.72 WB/L" to "APPROX. STA. 70+47.00 to 84+54.72 WB/L".

e. <u>Dwg. No. 32a of 73, File No. H-4-40295</u>. In the center of the drawing, in the Table entitled "LIMITS OF FRACTURED FIN TEXTURE ON THE CANAL SIDE OF THE FLOODWALL", delete "70+47.00 TO 72+52.33 WB/L" and "70+26.77 TO 72+32.10 EB/L". Fracture fin texture will not be applied within these limits.

f. <u>Dwg. No. 42 of 73, File No. H-4-40295</u>. In "SECTION B-B", change "16'-6"" to "21'-0"".

g. <u>Dwg. No. 48 of 73, File No. H-4-40295</u>.

(1) Change "PLAN" to "DETAIL $\frac{4}{46|48}$ ".

(2) On the right side of the drawing, change "EXISTING FL-340 TO FL-422 TO REMAIN" to "EXISTING FL-340 AND FL-422 TO REMAIN".

(3) The location of existing FL-432 from the fence corner to P.S. No. 4 is shown incorrectly. FL-432 turns right at the fence corner below the existing concrete slab.

h. <u>Dwg. No. 49 of 73, File H-4-40295</u>. Please make the following changes to the "NOTES":

(1) In third (3rd) line of Note 2.", change " Є ЄAA" to ""AA"" and " Є ЄBB" to ""BB"".

(2) In the second (2nd) line of Note 4, change " Є ЄBB" to ""BB"".

SOLICITATION NO. DACW29-94-B-0047

BIDDING SCHEDULE
(To be attached to Bid Form)
LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY, HIGH LEVEL PLAN
LONDON AVE. OUTFALL CANAL, PARALLEL PROTECTION,
MIRABEAU AVE. TO LEON C. SIMON BLVD. FLOODWALL,
ORLEANS PARISH, LOUISIANA

| Item No. | Description | Estimated Quantity | Unit | Unit Price | Est. Amt. |
|---|---|---|---|---|---|
| 0001. | Mobilization and Demobilization | Lump Sum | LS | | |
| 0002. | Clearing and Grubbing | Lump Sum | LS | | |
| 0003. | Selective Demolition | Lump Sum | LS | | |
| 0004. | Pedestrian Bridge Demolition | Lump Sum | LS | | |
| 0005. | Embankment, Semicompacted Fill | Lump Sum | LS | | |
| 0006. | Structural Excavation and Backfill | Lump Sum | LS | | |
| 0007. | Fertilizing, Seeding, and Mulching | 8 | AC | | |
| 0008. | Cutting Off Existing AZ-18, RZ-10 and PZ-27 Sheet Piling | Lump Sum | LS | | |
| 0009. | Pull, Clean, Salvage and Deliver Existing AZ-18 Steel Sheet Piling | Lump Sum | LS | | |
| 0010. | Redrive Existing AZ-18 Steel Sheet Piling | Lump Sum | LS | | |
| 0011. | Piling, Steel Sheet, Type PZ-22 | 187,844 | SF | | |
| 0012. | Piling, Steel Sheet, Type PSA-23 | 997 | SF | | |
| 0013. | Painting | Lump Sum | LS | | |
| 0014. | Reinforced Concrete Floodwalls | Lump Sum | LS | | |
| 0015. | Concrete Slope Pavement | 188 | SY | | |
| 0016. | Utility Modifications | Lump Sum | LS | | |

B-1

BKI-03624

| ABSTRACT OF BIDS - CONSTRUCTION | LINED-C 1 PAGE 6 OF 8 | BID NO. 6 | | | BID NO. 7 | | | BID NO. 8 | | | BID NO. 9 | | | BID NO. 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| "17" LAKE PONTCHARTRAIN, LA & VIC., HPK. LOUISIANA AVE., OUTFALL CANAL, PARALLEL PROTECTION, FORWARD ARE TO LEOK C, STATN N ROBERT E. LEE BLVD. | COMMITMENT NO. M-8-0047 DATE OPENED: JUNE 13, 1994 | ANGELINA CONSTR. METAIRIE, LA. | | | BOH BROS. NEW ORLEANS, LA. | | | JT L JAMES NEW ORLEANS, LA. | | | R & R CONTRACTING HATTIESBURG, MS. | | | | |
| ITEM NO. | DESCRIPTION OF BID ITEM & QUANTITY | ESTIMATED UNIT PRICE | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT |
| 1 | EROSION CONTROL 13,470LF | $5.00/LF | $4.70/LF | 57,014.00 | $4.00/LF | 54,149.00 | | $3.00/LF | 42,490.00 | | $5.25/LF | 34,677.30 | | | |
| 2 | TIDAL END 64,670 2,700LF | $3.00/LF | $3.00/LF | 8,104.00 | $4.70/LF | 12,690.00 | | $3.00/LF | 8,100.00 | | $3.25/LF | 8,775.00 | | | |
| 3 | TEMPORARY FLOOD PROTECTION AND COFFERDAM 1LUMP SUM XLS | $443,533.00 | $395,775.00 | $65,533.00 | $85,000.00 | $95,775.00 | | $339,000.00 | 334,000.00 | | $47,000.00 | 47,000.00 | | | |
| 4 | MISCELLANEOUS METALS 1LUMP SUM XLS | $14,690.00 | $27,838.00 | $14,490.00 | $110,000.00 | 27,838.00 | | $10,080.00 | 10,000.00 | | $10,000.00 | 10,000.00 | | | |
| | TOTAL | $3,191,582.526 | | $3,485,436.685 | | 4,665,364.00 | | | 4,577,815.681 | | | 5,100,000.00 | | | 5,381,617.50 |
| | % NATIVE LOW | | | | | | 11,462,240 LOW | | | -11.462 | | | 9,521.50 LOW | | | -.27% |

BKI EXHIBIT 17

BKI-03625

ABSTRACT OF BIDS - CONSTRUCTION

| DESCRIPTION OF BID ITEM | ESTIMATED QUANTITY | UNIT | BID NO. 6 | | BID NO. 7 | | BID NO. 8 | | BID NO. 9 | | BID NO. 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT |

BK1-03626

| ABSTRACT OF BIDS - CONSTRUCTION | LMNED-C | PAGE 2 OF 4 | | | | | | BID NO. 1 | | | BID NO. 2 | | | BID NO. 3 | | | BID NO. 4 | | | BID NO. 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | J.B. & K CONST. | | | HIGHWAY | | | SCHINDLER/ATL. | | | LOFRANCK BROS. | | | DRIVER PILE CONST. | |
| | | | | | | | | | | | COLUMBUS, GA. | | | MEMPHIS, LA. | | | BRENHAM, LA. | | | INNERSVILLE, LA. | |
| NO. | DESCRIPTION OF BID ITEM | QUANTITY | ESTIMATED UNIT PRICE | ESTIMATED AMOUNT | | | TOTAL | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT | | UNIT PRICE | ESTIMATED AMOUNT |
| 19 | EROSION CONTROL | 10,420 SF | $3.00 | $32,010.00 | | | | $3.00 | $21,344.00 | | $4.00 | $21,344.00 | | $4.00 | $42,680.00 | | $2.00 | $21,000.00 | | | |
| | | 2,700 SF | $3.00 | $8,100.00 | | | | $2.00 | $5,400.00 | | $3.20 | $5,400.00 | | $2.50 | $9,450.00 | | $2.00 | $5,400.00 | | | |
| 20 | TEMPORARY FLOOD PROTECTION AND | 1 LUMP SUM | $65,254.00 | $65,254.00 | | | | $5,000.00 | $5,000.00 | | $44,004.00 | $60,004.00 | | $44,700.00 | $44,700.00 | | $25,000.00 | $25,000.00 | | | |
| | DIFFERENCE | | | | | | | | | | | | | | | | | | | | |
| 21 | MISCELLANEOUS METALS | 1 LUMP SUM | $14,490.00 | $14,490.00 | | | | $21,500.00 | $21,500.00 | | $20,004.00 | $20,000.00 | | $26,000.00 | $26,000.00 | | $10,000.00 | $10,000.00 | | | |
| | GRAND | TOTAL | | $5,191,084.50 | | | | | $4,254,500.00 | | | $3,914,168.00 | | | $5,374,178.00 | | | $5,413,132.00 | | | $5,196,044 |
| | 25% MAXIMUM | | | $4,699,071.00 ALLOWED BIDDER | | | | | -12.1% | | | $8.4% | | | 3.1% | | | 4.6% | | | .1% |

ABSTRACT OF BIDS - CONSTRUCTION — LUMP-2 — PAGE 1 OF 4 — LOCATION NO. 94-B-XXX

| ITEM NO. | DESCRIPTION OF BID ITEM | APPROX. QUANTITY | UNIT | BID NO. 1 — XX & K CONST, THIBODAUX, LA | | BID NO. 2 — (LANGUART), DILLINGS, MS | | BID NO. 3 — NORTHEAST, MEMPHIS, TN | | BID NO. 4 — LAUNCH BROS, HOMER, LA | | BID NO. 5 — RIVER RING CONST, NAPOLEONVILLE, LA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT | UNIT PRICE | ESTIMATED AMOUNT |
| 1 | MOBILIZATION AND DEMOBILIZATION | | LUMP SUM | | | | | | | | | | |
| 2 | CLEARING AND GRUBBING | | LUMP SUM | | | | | | | | | | |
| 3 | SELECTIVE DEMOLITION | | LUMP SUM | | | | | | | | | | |
| 4 | ADDITIONAL BRIDGE DEMOLITION | | LUMP SUM | | | | | | | | | | |
| 5 | EARTHWORK, UNCOMPACTED FILL | | LUMP SUM | | | | | | | | | | |
| 6 | EARTHWORK, EXCAVATION & BACKFILL | | LUMP SUM | | | | | | | | | | |
| 7 | STRUCTURAL EXCAVATION & BACKFILL | | LUMP SUM | | | | | | | | | | |
| 8 | FERTILIZING, SEEDING & MULCHING | | LUMP SUM | | | | | | | | | | |
| 9 | COTTON OFF GLISTEN AT-14, A4-H ... | | LUMP SUM | | | | | | | | | | |
| 10 | WALL, DIKE, SLUICE, AND DRAINS ... | | LUMP SUM | | | | | | | | | | |
| 11 | CONCRETE LINING A4-H STEEL SHEET PILING | | LUMP SUM | | | | | | | | | | |
| 12 | PILING, STEEL SHEET, TYPE PS-27 | | LUMP SUM | | | | | | | | | | |
| 13 | PILING, STEEL SHEET, TYPE PSA-23 | | LUMP SUM | | | | | | | | | | |
| 14 | MATCHING | | LUMP SUM | | | | | | | | | | |
| 15 | REINFORCED CONCRETE FLATWORK | | LUMP SUM | | | | | | | | | | |
| 16 | CONCRETE SLOPE BLANKET | | LUMP SUM | | | | | | | | | | |
| 17 | BANDFILTER MODIFICATION | | LUMP SUM | | | | | | | | | | |
| 18 | TEMPORARY RELOCATION OF FEEDER LINE | | LUMP SUM | | | | | | | | | | |
| 19 | PERMANENT RELOCATION OF FEEDER LINE | | LUMP SUM | | | | | | | | | | |
| | SUBTOTAL | | | | | | | | | | | | |

BKI-03627

SUPPLEMENTAL AGREEMENT NO. 15
TO
OLB PROJECT NO. 24902
LONDON AVENUE CANAL FLOODWALLS AND LEVEES


THIS SUPPLEMENTAL AGREEMENT, made and entered into this 15th day of August, 1994, by and between the BOARD OF COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT, hereinafter styled the "BOARD", acting through its duly instituted President, Robert G. Harvey; and Burk-Kleinpeter, Inc., Consulting Engineers, hereinafter referred to as the "ENGINEERS":

WHEREAS, the Board and the Engineers entered into an Agreement on the 21st day of March, 84, to provide Engineering Services for the design of London Avenue Floodwalls and Levees, and

WHEREAS, the Engineers, acting in good faith with the provisions of their contract, have completed 100% plans and publications for Contract No. 3 from Mirabeau Avenue to Robert E. Lee Boulevard, and

WHEREAS, in accordance with the provisions of their Contract under Section 4, Supplementary Services the Engineers are entitled to be compensated for additional services in connection with the project including preparation of additional drawings and geotechnical engineering analysis, vibration monitoring and resident pre-construction surveys, and

WHEREAS, pursuant to provisions of Resolution No. 11-032184, dated March 21, 1984, the Chief Engineer has accepted the Lump Sum Fee of $6,023.11 for additional drawings and geotechnical analysis and $56,185.00 for vibration monitoring and resident surveys as stated in a proposal letter to the Chief Engineer's office dated March 31, 1994 and June 20, 1994, attached hereto and made part hereof as Exhibit "R".

NOW, THEREFORE, it is hereby agreed between the parties hereto that the original contract dated March 21, 1984 be hereby modified and amended as follows:


SCOPE OF WORK

To perform all work to complete additional drawings and geotechnical engineering analysis, as outlined in letter dated March 31, 1994, and to provide vibration monitoring and pre-construction resident surveys for Contract No. 3, as outlined in letter dated June 20, 1994, attached hereto as Exhibit "R" and made part hereof.


BKI EXHIBIT 18

COMPENSATION

For all work as described in the above-referenced Exhibit "R",
which project budget was previously approved by the Orleans Levee
Board, the Engineers agree to perform these services for the lump
sum fee of $64,481.59 itemized as follows:

| | |
|---|---|
| Additional Drawings and Geotechnical Investigations | $ 8,296.59 |
| Vibration Monitoring and Pre-Construction Resident Surveys | $56,185.00 |
| Total: | $64,481.59 |

All requirements of the aforesaid contract dated March 21, 1984
shall remain in full force and effect.

IN WITNESS WHEREOF, the President of the Board of Commis-
sioners of the Orleans Levee District, has subscribed his name and
the Engineer has also subscribed his name as of the day and year
first above written.

WITNESSES:

_____          THE BOARD OF COMMISSIONERS OF THE
_____          ORLEANS LEVEE DISTRICT

                                 BY: _____
                                              President

_____          BURK-KLEINPETER, INC.
_____
                                 BY: _____

- 2 -

# ADDITIONAL GEOTECHNICAL ANALYSES

## LONDON AVENUE OUTFALL CANAL

## PROPOSED I-WALLS AND T-WALLS

## MIRABEAU AVENUE TO LEON C. SIMON BOULEVARD

## NEW ORLEANS, LOUISIANA

FOR
BURK-KLEINPETER, INC.
ENGINEERS, PLANNERS & ENVIRONMENTAL SCIENTISTS
NEW ORLEANS, LOUISIANA

**19 MAY 1993**



# EUSTIS ENGINEERING
GEOTECHNICAL ENGINEERS
3011 28th Street · Metairie, Louisiana 70002 · 504-834-0157

## BKI EXHIBIT 19

Jetting operations should be performed under the supervision of an experienced individual knowledgeable in jetting/pile installation techniques. Jetting should not be permitted for installation of steel H piles.

22.   Vibrations.   Pile driving operations will cause vibrations which may affect nearby structures, roadways, residences, and underground utilities. All adjacent facilities should be carefully inspected by a registered structural engineer prior to pile driving operations to evaluate the potential effects of vibrations. This inspection should include photographs and videotapes of all existing damage to these facilities.   Vibrations transmitted to adjacent facilities should be monitored using a seismograph to record their magnitude. A peak particle velocity of 0.25 of an inch per second as measured by the seismograph is generally regarded as a vibration level uncomfortable to human perception. A peak particle velocity of 0.5 of an inch per second or greater measured at a structure may induce vibratory damage to the structure. Additionally, a peak particle velocity of 0.25 of an inch per second may densify near surface cohesionless soils. Such densification would result in potential settlement of surface founded structures or structures supported on piles driven into the sand. Therefore, if sustained peak particle velocity levels in excess of 0.25 of an inch per second are measured at adjacent structures of concern, pile driving operations should be terminated and pile installation procedures revised.

23.   Excavations.   Excavations required to degrade the levee crown to the finished grade should begin at the highest elevation and proceed down toward the toe of the slope. Spoil material should not be stockpiled and instead should be immediately removed from the site.

Additional Geotechnical Services

24.   In order to provide continuity between the investigation, design and construction phases, Eustis Engineering may be retained to provide additional geotechnical services which may include consultation during design and construction, vibration

## SOIL PARAMETERS

| ST. NO. | SAT. WEIGHT PCF | "Q" C-PSF | "Q" $\phi$-DEG | "S" $\phi$-DEG |
|---|---|---|---|---|
| 1 | 109 | 700 | 0 | 23 |
| 2 | 96 | 400 | 0 | 23 |
| 3 | 102 | 320 | 0 | 23 |
| 4 | 117 | 200 | 15 | 30 |
| 5 | 122 | 0 | 30 | 30 |
| 6 T | 108 | 850 | 0 | 23 |
| 6 B | 115 | 1380 | 0 | 23 |

T = TOP OF STRATUM; B = BOTTOM OF STRATUM

* 108 ABOVE -70; 115 BELOW -70

REACH 1: STA. 70+00 TO STA. 85+50
STA. 95+00 TO STA. 115+00

REACH 2: STA. 85+50 TO STA. 95+00
STA. 115+00 TO STA. 127+00

TOP OF SHEETS: EL 13.9

STILL WATER LEVEL: EL 11.9

TAIL WATER LEVEL: EL 0.0

SOIL REACHES



ELEVATION IN FEET - NGVD

### SOIL REACHES & PARAMETERS

LONDON AVENUE OUTFALL CANAL
PROPOSED I-WALLS AND T-WALLS
NEW ORLEANS, LOUISIANA

EUSTIS ENGINEERING CO., INC.

FIGURE 1