

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION**

| | | |
|---|---|---|
| **COLLEEN BERTHELOT, et al.** | * | **CASE NO.** |
| **VERSUS** | * | **NO. 05-4182** |
| **BOH BROTHERS CONSTRUCTION CO., et al.** | * | **SECTION " K "** |
| | * | **MAG. NO. "2"** |

**This pleading pertains to
Civil Action No. 06-1885
and to MRGO and Levee cases**
* * * * * * * * * * * * * * * * *'

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO DISMISS**

**MAY IT PLEASE THE COURT:**

No doubt emboldened by a recent factually incorrect and legally wrong decision of The Chief Judge of This Honorable Court in a related case (Civil Action No. 05-4419, Record Document No. 161), which is now on appeal to the Fifth Circuit, the Government has filed a Motion to Dismiss pertaining to Civil Action No. 06-1885, alleging that plaintiffs have not complied with the literal provisions of the Federal Tort Claims Act, by the terms of which a plaintiff is required to "first [present his or her] claim to the appropriate Federal agency . . ." 28 U.S.C. §2675(a).  A similar Motion is pending in Civil Action No. 05-4181 (See Record Document Nos. 97, 147, 158, 168 and 181).

Plaintiffs respectfully submit that the Government's Motion(s) should be denied for the following reasons:

1.      Plaintiffs in Civil Action No. 06-1885 have asserted admiralty and maritime claims against the Government, falling within this Court's admiralty and maritime jurisdiction, and the Government has waived sovereign immunity pursuant to the provisions of the Suits in Admiralty Act, which does not require exhaustion of administrative remedies as a prerequisite to filing suit.

2.      In the alternative, plaintiffs effectively presented the "functional equivalents" of valid administrative claims to the involved agency, the U.S. Army Corps of Engineers, on October 12, 2005, and plaintiffs were, therefore, entirely justified in bringing this action six months and one day later, on April 13, 2006.

3.      Further in the alternative, the involved agency, the U.S. Army Corps of Engineers, effectively denied plaintiffs' administrative claims by letter from Assistant District Counsel Randall D. Merchant to undersigned counsel for plaintiffs dated March 22, 2006.

4.      Further in the alternative, equity, justice, judicial economy, and common sense dictate that plaintiffs' claims should not be dismissed, since the reasons for the administrative claims requirements in the Federal Tort Claims Act would not be furthered by dismissal in this particular instance.

**A.      PLAINTIFFS IN CIVIL ACTION NO. 06-1885 HAVE ASSERTED ADMIRALTY AND MARITIME CLAIMS AGAINST THE GOVERNMENT, FALLING WITHIN THIS COURT'S ADMIRALTY AND MARITIME JURISDICTION, AND THE GOVERNMENT HAS WAIVED SOVEREIGN IMMUNITY PURSUANT TO THE PROVISIONS OF THE SUITS IN ADMIRALTY ACT, WHICH DOES NOT REQUIRE EXHAUSTION OF ADMINISTRATIVE <u>REMEDIES AS A PREREQUISITE TO FILING SUIT</u>**

> If blood be the price of admiralty,
> Lord God, we ha' paid in full!
> Rudyard Kipling, "<u>Song of the Dead</u>" (1896).

It is entirely fitting that *this Court's admiralty and maritime jurisdiction is being* invoked in a case in which the ineptitude of the People's Own Government visited such misery and destruction upon the entirely innocent citizenry of the Greater New Orleans Metropolitan Area. Plaintiffs filed Civil Action No. 06-1885 six months and one day after they delivered to the United States Army Corps of Engineers what plaintiffs maintain were the "functional equivalents" of valid administrative claims for damages. For that reason, the Complaint in this case was styled: "Verified, Protective, Refiled Complaint for Compensatory and Exemplary Damages, and for Reasonable Attorney's Fees and Taxable Costs in a Class Action Lawsuit". Plaintiffs also gave notice to the United States of America that they would re-file new "protective actions" in this Court on each six months and one day anniversary of the presentation of other, later-presented administrative claims, asserted on behalf of other named individuals, soon to be additional parties plaintiff.

The specific "at issue" jurisdictional allegation contained in plaintiffs' Verified, Protective, Refiled Complaint in No. 06-1885 reads as follows:

> . . . this Court has jurisdiction of the claims herein asserted pursuant to 28
> U.S.C. §1333 (1), and pursuant to the Suits in Admiralty Act (46 U.S.C.
> §741, et seq.), by virtue of the defendant's negligent dredging of navigable
> waterways, failure to contain navigable waters of the United States in the
> Mississippi River Gulf Outlet, the Gulf Intracoastal Waterway, the Inner
> Harbor Navigation Canal (a/k/a "The Industrial Canal"), the London
> Avenue Canal and the Seventeenth Street Canal, and by virtue of
> defendant's defective and negligent design, construction, inspection,
> maintenance and operation of an entire navigable waterway system,
> including the water bodies identified, supra, which resulted in death,
> injury and damage to plaintiffs, and to those similarly situated, on land.
> Complaint, Article V.

The waterway which is the primary, but not the only, focus of plaintiffs'

Complaint is the Mississippi River Gulf Outlet, which is described in some detail in

plaintiffs' Complaint.  See Articles VII, VIII, IX and X.  What the MRGO did to the

citizenry of the Greater New Orleans Metropolitan Area and their property is specifically

addressed in certain "Findings" of the United States Senate Committee on Homeland

Security and Governmental Affairs in a comprehensive report issued on May 2, 2006,

entitled:  "Hurricane KATRINA:  A Nation Still Unprepared".  In that report, the U.S.

Senate Committee concluded as follows with respect to the increased flooding and

greater damage caused by the MRGO:

> 10. Changes in Louisiana's coastal landscape, including wetlands loss and
> subsidence, have made New Orleans and coastal Louisiana more
> vulnerable to hurricanes and may have contributed to damage from
> Hurricane Katrina.  These changes are in large part an unintended
> consequence of human activities that have altered the natural flow of the
> Mississippi River and other coastal processes.

> 11. Until addressed, the continued subsidence, loss of wetlands, and other
> changes to the coastal landscape will make New Orleans and other
> regions of the Louisiana deltaic plain increasingly vulnerable to
> hurricanes.

> 12. The building of the Mississippi River Gulf Outlet (MRGO) and the
> combined Gulf Intracoastal Waterway (GIWW)/MRGO channel resulted
> in substantial environmental damage, including a significant loss of

wetlands which had once formed a natural barrier against hurricanes threatening New Orleans fro the east.

13. MRGO and the combined GIWW/MRGO provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much grater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure. As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from hurricane Katrina. <u>U.S. Senate Committee Report on Homeland Security and Government Affairs</u>, entitled: Hurricane KATRINA: A Nation Still Unprepared", Findings.

The entire U.S. Senate Committee comprehensive report is printable at http://hsgac.senate.gov/_files/Katrina/FullReport.pdf.

Attached to this Memorandum and marked for identification as Exhibit No. 1 is the narrative portion of the U.S. Senate Committee comprehensive report and, more particularly, that portion of the report entitled: "The Contribution of the Mississippi River Gulf Outlet to Damage from Hurricane KATRINA". It is respectfully submitted that a review of Exhibit No. 1 will reflect that there already is general scientific agreement "that the presence of the MRGO destroyed wetlands that otherwise would have provided additional defenses" to the Greater New Orleans Metropolitan Area. The excerpt from the U.S. Senate Committee's Report includes the following quotation from the National Academy of Sciences to the effect that the MRGO resulted in:

"tremendous environmental damage, including salt water intrusion, land loss, and worsening the effects of wave damage during hurricanes and storms."

The excerpt from the Senate Committee's report, Exhibit No. 1, concludes as follows:

The building of MRGO and the combined GIWW/MRGO resulted in substantial environmental damage including a significant loss of wetlands that had once formed a natural barrier against hurricanes threatening New Orleans from the east. MRGO and the GIWW/MRGO provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure. As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from hurricane Katrina.

In short, and to paraphrase and to borrow from other writers, the MRGO became a "funnel", a "hurricane highway", a "superhighway for surge", and/or the "Crescent City Trojan Horse", aimed straight at the heart of New Orleans and surrounding parishes.

It is respectfully submitted that Your Honor should take judicial notice of the fact that the MRGO was constructed and became operational in 1965, and has since been operated and maintained by the U.S. Army Corps of Engineers, as a result of DREDGING activity. This DREDGING was conducted from vessels floating on navigable waters, namely dredges, which performed a traditional maritime activity on those navigable waters, namely DREDGING. The construction of the MRGO actually involved the DREDGING of 60 million more cubic yards of earth than the dredging of

The Panama Canal.[1]  Maintenance <u>DREDGING</u> in the MRGO cost the taxpayers over $15 million annually prior to KATRINA.[2]

One of the primary functions of the United States Army Corps of Engineers relates directly to navigation:

> **U.S. Army Corps of Engineers (USACE).**  The U.S. Army Corps of Engineers has charge of the improvement of the rivers and harbors of the United States and of miscellaneous other civil works which include the administration of certain Federal laws enacted for the protection and preservation of navigable waters of the United States; the establishment of regulations for the use, administration, and navigation of navigable waters; the establishment of harbor lines; the removal of sunken vessels obstructing or endangering navigation; and the granting of permits for structures or operations in navigable waters, and for discharges and deposits of dredged and fill materials in these waters.  <u>United States Coast Pilot 5</u>, 2003 (30[th]) Edition, p. 6.

An entire section of the Code of Federal Regulations, 33 C.F.R. §207, is entitled "Navigation Regulations", and contains the Corps of Engineers' and the Government's regulations for navigation on navigable waterways falling under the Corps' jurisdiction, including the Mississippi River, the Gulf Intracoastal Waterway, and tributaries.  Indeed, each of the bodies of water relevant to this case fall squarely within the definition of "navigable waters of the United States" as that term is used to define the authority of the Corps of Engineers.

33 C.F.R. 329, <u>et seq.</u> defines "navigable waters of the United States", as follows:

> "Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign

---

[1]  U.S. Army Corps of Engineers Project Fact Sheet(s), Mississippi River Gulf Outlet.
[2]  Page 4-28 of the Berkeley-led "Independent Levee Investigation Team" report, entitled: "*Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane KATRINA*", available at http://www.CE.Berkeley.edu/~new_orleans/.  Since Hurricane KATRINA all dredging activity in the MRGO has been halted, and permanent closure of the waterway is under consideration by Congress.

commerce.  A determination of navigability, once made, applies laterally over the entire surface of the water body, and is not extinguished by later actions or events which impede or destroy navigable capacity."

The United States Court of Appeals for the Fifth Circuit has characterized the Mississippi River Gulf Outlet, which this action involves, as "a navigation aid project". Graci v. United States, 456 F.2d 20 (5th Cir. 1971).  As is indicated, supra, the Gulf Intracoastal Waterway, which this action also involves, is a navigation project regulated by the Corps of Engineers, for which the Corps has promulgated "Navigation Regulations". 33 C.F.R. §207, et seq.  The very name of the Inner Harbor Navigation Canal (a/k/a "the Industrial Canal") defines its purpose as a navigation project which connects the Mississippi River with Lake Pontchartrain, and also the Mississippi River Gulf Outlet and the Gulf Intracoastal Waterway.  Appended to this Memorandum in Opposition and marked for identification as Exhibit No. 2 is the first page of a Notice of Public Hearing issued by the United States Army Corps of Engineers on February 26, 1981, on the application of the New Orleans Sewerage and Water Board for dredging of the 17th Street Canal.  The Court will note that, in the Public Notice, the Corps of Engineers stated, quite unequivocally, as follows:

<u>Legal and Regulatory Authority</u>

A Department of the Army permit is required for dredging in navigable waters of the United States under Section 10 of the River and Harbor Act of 3 March 1899 (30 Stat. 1151;  33 USC 403).  Since the Seventeenth Street Canal, also known as the Metairie Relief Canal, is a navigable water of the United States, dredging of that canal requires a Section 10 permit.

The London Avenue Canal serves the same purpose as the 17th Street Canal, and likewise qualifies as a navigable water of the United States, if for no other reason that it is subject

to the ebb and flow of the tide. 33 C.F.R. §329.4. The London Avenue Canal also was used in the past for maritime commerce.

Plaintiffs want to be sure that the Court is aware of the fact that all of the waterways involved in this case, which formed part of an entire navigable waterway system, were and are "navigable waters of the United States" since consideration of navigable waters, navigability and the craft that play them, particularly dredges, are all part of "the stuff of admiralty".

In addition to plaintiffs' invocation of admiralty and maritime jurisdiction by virtue of the Government's negligent dredging of navigable waterways, failure to contain navigable waters of the United States, and defective and negligent design, construction, inspection, maintenance and operation of an entire navigable waterway system, plaintiffs have pleaded the following additional specific factual allegations against the United States in this case:

XI.

During Hurricane KATRINA, the "intensification" described in the preceding Article permitted storm surge to overtop levees and retaining wall structures, leading to scouring on the landward side of the levees, which in turn undermined the earthen levees along the MRGO, the Gulf Intracoastal Waterway and the Industrial Canal, and which resulted in inundation by water of Orleans, Jefferson and St. Bernard Parishes that would not have occurred but for the existence of and deteriorated condition of the MRGO and the inadequacies of the levee and retaining wall structures along the MRGO, the Gulf Intracoastal Waterway and the

-9-

Industrial Canal, all of which were defectively and negligently designed, constructed, inspected, maintained and operated by the U.S. Army Corps of Engineers in violation of acts of Congress and in violation of the Corps of Engineers' own regulations, manuals and procedures.

## XII.

Plaintiffs specifically aver that the United States of America, its agencies, instrumentalities and their employees, negligently, and with malfeasance, misfeasance and nonfeasance, failed in its duty to ensure the competent design, construction, inspection, maintenance and operation of an entire navigable waterway system, consisting of the Mississippi River Gulf Outlet, the Gulf Intracoastal Waterway, the Inner Harbor Navigation Canal (a/k/a "The Industrial Canal"), the London Avenue Canal, and the Seventeenth Street Canal, and their environs and levees, which were defectively and negligently designed, constructed inspected, maintained, operated and dredged, the result being that the United States of America negligently failed to contain navigable waters of the United States, in violation of acts of Congress and in violation of the U.S. Corps of Engineers' own regulations, manuals and procedures, and in so doing also breached the implied warranty of workmanlike performance which was owed each inhabitant of the Greater New Orleans Metropolitan Area by the U.S. Army Corps of Engineers and its employees.

These allegations are not the figment of someone's colorful imagination. The referenced U.S. Senate Committee comprehensive report has documented the extensive loss of wetlands caused by the dredging of the MRGO. The report also documented the increase, in both height and velocity, of the surge generated by the storm, particularly at the junctions of the MRGO and GIWW. Plaintiffs aver that the same increase in water height and velocity occurred where the GIWW enters the IHNC (a/k/a "The Industrial Canal"). The havoc this "intensified" water caused to already under-designed levees and retaining walls has been described by the "Independent Levee Investigation Team" led by Professors at the University of California at Berkeley as "the single most costly catastrophic failure of an engineered system in history". See "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane KATRINA", which is available at http://www.CE.Berkeley.EDU/~New_Orleans/.

Although plaintiffs' factual allegations of liability are, in most respects, quite specific, Rule 8's dispensation from "technical forms of pleadings" provides some room for interpretation:  or in other words "pleadings which conform to the evidence". Accordingly, the allegation of "negligent dredging" may (and probably will) include allegations that the Corps of Engineers (a) should not have used dredged material from the MRGO channel to construct levees, because that material was woefully unsuitable for levee construction, or (b) should have deposited the spoil from dredging activity in the channel into the surrounding marshes, rather than dumping it in the Gulf of Mexico, since dredging the navigation channel and dumping the spoil in the Gulf caused, contributed to and exacerbated the loss of the wetland hurricane "buffer".

It is in this factual framework that plaintiffs now turn to the law governing the exercise of admiralty and maritime jurisdiction.

It is axiomatic that the United States Constitution extends Federal judicial power "to all cases of admiralty and maritime jurisdiction." U.S. Constitution, Article III, Section II. Congress has embodied that power in 28 U.S.C. §1333, which provides that Federal Courts have "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction". The most recent expression by the Fifth Circuit on the issue of admiralty and maritime jurisdiction is believed to be Scarborough v. Clemco Industries, Inc., 391 F.3d 660 (5th Cir. 2004), cert denied 2005 U.S. LEXIS 3546 (April 25, 2005). In Scarborough, supra, the Court quoted from the Supreme Court opinion in Jerome B. Grubart, Inc. v. Great lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043 (1995), as follows:

> After Sisson, then, a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. §1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved," to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."

Precisely the same test for whether a party may invoke federal admiralty jurisdiction over a tort claim pursuant to 28 U.S.C. §1331 was also set forth by Your Honor's Sister-on-the-Bench, Judge Mary Ann Vial Lemmon, in Porche vs. St. Tammany Parish Sheriff's Office, 67 F.Supp. 2d 631, 636 (E.D. La. 1999).

The Suits in Admiralty Act (46 U.S.C. §741, et seq.) constitutes a waiver of sovereign immunity by the United Stats and provides subject matter jurisdiction for claims against the United States which are otherwise justifiable in admiralty. Trautman v. Buck Steber, Inc., 693 F.2d 40 (5th Cir. 1982). More particularly, the Suits in Admiralty Act permits suits to be filed in Federal Court against the United States of America pursuant to the Federal Court's admiralty and maritime jurisdiction in virtually the same manner "if a private person or property were involved: 46 U.S.C. §742 specifically provides, in pertinent part, as follows:

> "In cases where . . . if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate non-jury proceeding in personam may be brought against the United States . . . such suits shall be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States . . . In case the United States . . . shall file a libel in rem or in personam in any district, a cross libel in personam may be filed or a set-off claimed against the Untied States . . . with the same force and effect as if the libel had been filed by a private party." 46 U.S.C. §742.

It is respectfully submitted that the case at bar includes a plethora of factors which mandate the conclusion that admiralty and maritime jurisdiction exists for plaintiffs' claims against the Government: navigable waters, design and construction of an entire navigable waterway system, negligent failure to operate and maintain that navigable waterway system through "maintenance dredging", and failure to contain navigable waters throughout the navigable waterway system.

The causes of the retaining wall failures which flooded our area are still under investigation by various bodies. However, attached to this Memorandum, and marked for identification as Exhibit No. 3, is a series of graphics from the Times Picayune of March

11, 2006, drawn by Graphic Artist Emmett Mayer III, which accompanied a story by *Staff Writer Bob Marshall, which illustrates* but one suggested mechanism of failure, which it is respectfully submitted demonstrates that not only did the "tort" in this case occur <u>on</u> navigable waters, but <u>in</u> and <u>under</u> those waters as well. Generally, admiralty jurisdiction in tort matters depends, first, on locality, because: "A tort is deemed to occur not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action." <u>Watz v. Zapata Off-Shore Company</u>, 431 F.2d 100 (5th Cir. 1970) quoting from <u>McCall v. Susquehanna Electric Company</u>, 278 F.Supp. 209, 211 (D. Md. 1968). Additionally, ". . . *for purposes* of admiralty jurisdiction, controlling case law holds that the tort occurs where the negligence "takes effect," not where the negligent act occurred." <u>Butler v. American Trawler Company, Inc.</u>, 887 F.2d 20 (1st Cir. 1989). The Fifth Circuit, as recently as 1987 discussed the concept of feeling the impact of a tort on navigable waters, by citing the First Circuit in <u>Carroll v. Protection Maritime Ins. Co.</u>, 512 F.2d 4 (1st Cir. 1975), saying, "In <u>Carroll</u> . . ., the First Circuit noted that a tort may be maritime if its effects are felt on navigable waters." <u>Wiedemann & Fransen, APLC v. Hollywood Marine, Inc.</u>, 811 F.2d 864 (5th Cir. 1987).

In considering whether admiralty and maritime jurisdiction exists for plaintiffs' claims against the Government, plaintiffs respectfully refer the Court back to the simple word: <u>DREDGING</u>. The MRGO was constructed by dredging. Since 1965 maintenance dredging has been taking place virtually continuously in the waters in and around the MRGO and its tributaries, including the Gulf Intracoastal Waterway. This activity has directly caused, or at the very least contributed to, the loss of the wetlands, which

formerly protected Orleans and St. Bernard Parishes, as well as to the "funnel effect" at the MRGO/GIWW and GIWW/IHNC junctions, all of which joined together during KATRINA to increase the surge and water velocity which caused plaintiffs' damages.[3] Can the Court really read what the U.S. Senate Committee on Homeland Security and Government Affairs has already said about the Mississippi River Gulf Outlet, the Gulf Intracoastal Waterway, etc., and respond with anything but a resounding "YES" to the following questions which the Court in Scarborough posed (by analogy) for whether "the connection test" for the invocation of Federal admiralty jurisdiction is satisfied:

1.   Was the activity of designing, constructing and maintaining (including dredging and "maintenance dredging") the Mississippi River Gulf Outlet and its tributaries of a sort with potential to disrupt maritime commerce?

2.   Did the general character of the construction and maintenance activities which caused the loss of the wetlands, as well as the "funnel effect", which increased the damage to the Greater New Orleans Metropolitan Area, bear a substantial relationship to particularly maritime activity, i.e., navigation and commerce, including navigation and commercial activities by floating dredges, which were vessels in navigation?

Another way in which the Court might approach the question of whether admiralty and maritime jurisdiction exists in this case would be to pose a hypothetical question: "Would the general maritime law, even prior to the passage of the Admiralty

---

[3] "These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure. As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from hurricane Katrina". U.S. Senate Committee comprehensive report, Exhibit No. 1 appended hereto, p. 9-6.

Extension Act (46 U.S.C. §740), have supported claims by the Federal Government for damage to its levees and retaining wall structures, if the damage was caused by vessels?" The case which answers that rhetorical question in the affirmative is <u>United States v. Matson Navigation Co.</u>, 201 F.2d 610 (9th Cir. 1953). There, a Government-owned and maintained dike on the Columbia River in the State of Oregon was damaged by a tug and tow in December 1946, prior to the enactment of The Admiralty Extension Act in 1948. The Government sued in admiralty for damages and penalties recoverable under the Rivers and Harbors Act of 1899 (33 U.S.C. §407, <u>et seq.</u>). The <u>Matson</u> Court described the Government dike, even addressing such subtle distinctions like whether the dike was a structure to be considered an "aid to navigation", as opposed to a structure "which aids in the navigability of waters", and concluded that the dike "was an extension of land". However, the Court then analyzed a long line of cases which had addressed damage to land structures by ships and concluded: "While the exercise of the admiralty jurisdiction by the United States Courts did not extend to injuries caused by ships to land structures prior to the passage of the Admiralty Extension Act in 1948, <u>we are of the opinion that such accidents are both reasonably and historically within the concept of maritime affairs, and were, therefore, within the admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted.</u>'" (citations omitted). (emphasis supplied).

The United States Supreme Court specifically addressed the 1960 amendments to the Suits in Admiralty Act, which included the insertion of the words "if a private person or property were involved", in <u>United States vs. United Continental Tuna Corp.</u>, 425 U.S.

164, 96 S.Ct. 1319 (1976).  In <u>United Continental Tuna Corp.</u>, supra, the Court addressed

the effect of adding that language to the Suits in Admiralty Act as follows:

> Two amendments were designed to clarify the jurisdictional language of the Suits in Admiralty Act.  First, the committee added language authorizing suits against the United States where a suit would be maintainable "if a private person or property were involved."  The prior version of the Act had authorized suits against the United States only when suits would be maintainable if the "vessel" or "cargo" were privately owned, operated, or possessed, and that language had generated considerable confusion. N14.
>
> > N14 Senate Report 5, citing *Ryan Stevedoring Co. v. United States*, 175 F.2d 490 (CA2), cert. denied, 338 U.S. 899 (1949).  Compare *Lykes Bros. S.S. Co. v. Untied States*, *supra*, with States Marine Corp. v. United States.
>
> This amendment, which has no bearing on this case, has generally been held to require that those maritime tort claims that were previously cognizable only on the law side of the district courts under the Federal Tort Claims Act now be brought on the admiralty side of the district courts under the Suits in Admiralty Act. (citations omitted).[4]

This view of the effect of the addition of the words "if a private person or

property were involved" to the suits in Admiralty Act also is the view of the Fifth Circuit.

In <u>McCormick vs. United States</u>, 680 F.2d 345 (5th Cir. 1982) the Fifth Circuit stated:

> In 1960, however, Congress amended section 2 of the SAA, which now provides that the SAA applies not only in cases where government vessels and cargo are involved, but also "(i)n cases where . . . if a private person or property were involved, a proceeding in admiralty could be maintained. . ." [FN7] 46 U.S.C. s 742.  Every circuit to address the effect of this amendment, including our own, has held that the language "if a private person or property were involved" extended the coverage of the SAA to include all maritime tort claims against the United States where the plaintiff would have an action in admiralty were the defendant a private person rather than the government. (citations omitted).

---

[4] The second change to the Suits in Admiralty Act made in 1960, deleting prior language requiring that a vessel be "employed as a merchant vessel" does not concern the issues in the case at bar.

<u>FN7</u>. The amended s 742 provides in pertinent part as follows:

In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . .

Plaintiffs do not argue with the Government's assertion that the Federal Tort Claims Act (28 U.S.C. §2671, <u>et seq.</u>), requires exhaustion of administrative remedies as a prerequisite to filing suit against the Government.   Indeed, 28 U.S.C. §2675(a) specifically provides that "An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."  However, the arguments made by plaintiffs in support of their assertion that this action should not be dismissed are:

(a)      because the Court has admiralty and maritime jurisdiction over plaintiffs' claims,

(b)      the Suits in Admiralty Act governs the United States' waiver of immunity in admiralty actions, and

(c)      the Suits in Admiralty Act does not require exhaustion of administrative remedies as a prerequisite to filing suit.[5]

Plaintiffs find themselves in the unenviable position of having to argue a <u>sine-qua-non</u>, because the provisions of the Suits in Admiralty Act simply include no specific prerequisite for exhaustion of administrative remedies, such as that found in the Federal

---

[5]   Plaintiffs also advance several additional arguments, discussed <u>infra</u>, in the alternative, including asserting that they presented the U.S. Army Corps of Engineers with the functional equivalents" of administrative claims, and that their claims have, in effect, been denied, in addition to other arguments.

Tort Claims Act. The legal authorities for the proposition that the Suits in Admiralty Act does not require exhaustion of administrative remedies as a prerequisite to filing suit against the Government are scarce. However, they do exist. See Drake Towing Co., Inc. v. Misner Marine Construction Company, 765 F.2d 1060 (11th Cir. 1985) and cases cited therein.

**B.   IN THE ALTERNATIVE, PLAINTIFFS EFFECTIVELY PRESENTED THE "FUNCTIONAL EQUIVALENTS" OF VALID ADMINISTRATIVE CLAIMS TO THE U.S. ARMY CORPS OF ENGINEERS ON OCTOBER 12, 2005, AND PLAINTIFFS WERE, THEREFORE, ENTIRELY JUSTIFIED IN BRINGING THIS ACTION SIX MONTHS AND ONE DAY LATER, ON APRIL 13, 2006**

"The more laws, the less justice."
Marcus Tullius Cicero, "De Officiis" (44 B.C.).

The law in the Fifth Circuit with respect to presentation of administrative claims as a prerequisite to filing suit against the Government pursuant to the provisions of the Federal Tort Claims Act[6] can be succinctly summarized as follows:

As a jurisdictional prerequisite to bringing a lawsuit under the Federal Tort Claims Act, a plaintiff is required to first present his or her claim to the appropriate federal agency. Congress instituted the presentation requirement to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims against the United States. 28 U.S.C. §2675(a) is satisfied, therefore, if the claimant gives the agency written notice of his or her claim sufficient to enable the agency to thoroughly investigate its potential liability and to conduct settlement negotiations with the claimant.

---

[6]   If there is admiralty and maritime jurisdiction over plaintiffs' claims, with the Government's waiver of sovereign immunity under the Suits in Admiralty Act, then there is no administrative claims requirement.

The cases which developed the foregoing succinct summary of the law in the Fifth Circuit with respect to administrative claims are the following:

1)    <u>Molinar v. United States</u>, 515 F.2d 246 (5th Cir. 1975).

2)    <u>Adams v. Untied States</u>, 615 F.2d 284 (5th Cir. 1980).

3)    <u>Gregory v. Mitchell</u>, 634 F.2d 199 (5th Cir. 1981).

4)    <u>Crow v. Untied States</u>, 631 F.2d 28 (5th Cir. 1980).

5)    <u>Williams v. United States</u>, 693 F.2d 555 (5th Cir. 1982).

6)    <u>Wardsworth v. United States</u>, 721 F.2d 503 (5th Cir. 1983).

7)    <u>Martinez v. United States</u>, 728 F.2d 694 (5th Cir. 1984).

8)    <u>Frantz v. United States</u>, 29 F.3d 222 (5th Cir. 1994).

It is respectfully submitted that it is extremely important for the Court to distinguish between and among the literal language used by Congress in 28 U.S.C. §2672, as contrasted with that used in 28 U.S.C. §2675(a), as contrasted with that used in 28 U.S.C. §2675(b), and as contrasted with that found in the Attorney General's regulations. It also is important to note that nowhere in the provisions of the Federal Tort Claims Act itself is there any requirement that the claimant supply a "sum certain" in the presentation of his or her administrative claim. Rather, the sum certain "requirement" addressed by many of the Courts which have interpreted the provisions of the FTCA is to be found <u>only</u> in the Attorney General's regulations, and more particularly, <u>only</u> in 14 C.F.R. §14.2. One panel of the Fifth Circuit has said the following concerning the sum certain "requirement", citing Zillman, Presenting a Claim under the Federal Tort Claims Act, 43 La. L. Rev. 961, 972-75 (1983):

"The exaltation into a jurisdictional basis of the non-statutory administrative requirement of a sum certain in the administrative claim has been criticized as beyond the statutory intent and unnecessarily harsh and unnecessary in instances, especially where no administrative purpose is served by requiring an obviously inflated "sum certain", where there is honest uncertainty as to the amount of the claim." Martinez v. United States, 728 F.2d 694 (5th Cir. 1984), m. 5, at p. 697.

The author cited by the Fifth Circuit in Martinez v. United States, supra, rationalized the harshness of dismissing the lawsuits of genuinely honest claimants for their failure to include a "sum certain" in the presentation of their administrative claims thusly:

"Nevertheless, several of the sum certain cases decided against the claimant appear unjust. Claimants have asked for redress and provided sufficient information for the government to begin an assessment of their case. The fact that the dollar amount of damages is left open reflects honest uncertainty rather than an attempt to evade government investigation. The government is not in a substantially better position when they are given an obviously inflated "sum certain" than if the item is left blank at the time of filing a claim. Government investigation can proceed in either case. At some point, the claimant must offer an exact dollar figure, but it is doubtful whether the failure to do so at the time of filing the claim should result in the heavy penalty of an expired statute of

limitations". Zillman, Presenting a Claim Under the Federal Tort Claims Act, 43 La. L.Rev. 961, 974-75 (1983).

In short, it is respectfully submitted that the Court, in evaluating the efficacy of an administrative claim, and particularly the claims discussed infra, should ask the question: "Did the information given by the claimant to the agency contain sufficient information to permit the agency to evaluate the underlying merits of the claim in order to decide whether to settle or to litigate?"

Appended to this Memorandum in Opposition, and marked for identification as Exhibit No. 4, is an Affidavit from the undersigned reflecting what transpired during his meeting with the Corps of Engineers Deputy District Counsel, Randall D. Florent, and Assistant District Counsel, Randall Merchant, at the Corps' offices at the Foot of Prytania Street at the Mississippi River on October 12, 2005. The Court will note that the purpose of the meeting was multi-fold: to introduce himself and establish rapport with "brothers at the bar"; to also identify by name each of the plaintiffs he was representing in litigation asserting claims for negligence and breach of duty against the United States of America, through its agency and instrumentality, the U.S. Army Corps of Engineers, arising out of Hurricane KATRINA and its aftermath; to inform them that litigation had already been instituted in the United States District Court for the Eastern District of Louisiana, but that he was perfectly willing to open a dialog in order to discuss the prospect of amicable settlement; and to deliver a detailed Freedom of Information Act request to the Corps of Engineers. Indeed, the FOIA request clearly states what the undersigned said and gave in writing to Messrs. Florent and Merchant:

-22-

I am a local attorney, and a named plaintiff in two pieces of litigation involving The United States of America, acting by and through its agency and instrumentality, the U.S. Army Crops of Engineers.  I attach copies of the Original Complaints in each action, both filed in the United States District Court for the Eastern District of Louisiana, one bearing Civil Action No. 05-4181, and the other bearing Civil Action No. 05-4237. (emphasis supplied).

It is respectfully submitted that the discussions during the meeting with Messrs. Florent and Merchant, and the delivery to them of the filed Complaints in the two referenced Civil Actions, coupled with the assertion of claims for money damages by a large number of people arising out of the Corps' fault, neglect and breach of duty, and an invitation to discuss amicable settlement, constituted the "functional equivalents" of valid administrative claims on behalf of the named plaintiffs.  This suit, Civil Action No. 06-1885, was filed exactly six months and one day after the presentation of the functional equivalents of administrative claims to the U.S. Army Corps of Engineers through those gentlemen on October 12, 2005.  Accordingly, it is respectfully submitted that the Verified, Protective Refiled Complaint was timely, and should not be dismissed.

**C.   THE GOVERNMENT HAS, ESSENTIALLY, ALREADY DENIED PLAINTIFFS' ADMINISTRATIVE CLAIMS BY VIRTUE OF A LETTER DATED MARCH 22, 2006, FROM RANDALL MERCHANT, ASSISTANT DISTRICT COUNSEL, TO THE UNDERSIGNED, SO THIS SUIT IS TIMELY**

Assuming the undersigned is correct in asserting that his October 12, 2005 handwritten, hand-delivery, with attachments, to the United States Army Corps of Engineers was specific enough to put the Corps of Engineers on notice of the plaintiffs' claims, then the 6 month anniversary of that submission has already passed, and more

particularly occurred on Wednesday, April 12, 2006, the day before plaintiffs, filed their "sanitized" new lawsuit against the United States of America, bearing Civil Action No. 06-1885.

However, even if undersigned counsel is wrong in asserting that his October 12, 2005 handwritten hand-delivery, with attachments, constituted the "functional equivalents" of properly presented administrative claims, the Government's Motion to Dismiss should still be denied by This Honorable Court because the Corps of Engineers has, essentially, already denied plaintiffs' claims in writing by certified mail on March 22, 2006.  See 28 U.S.C. §2675.

Even before receipt of the Government's Motions to Dismiss plaintiffs' claims for lack of subject matter jurisdiction, the undersigned addressed other correspondence to the Corps of Engineers on behalf of individuals other than those identified in the October 12, 2005 handwritten, hand delivery, with attachments.   Counsel's subsequent correspondence to the Corps was dated January 10 and 20, and February 17, 2006, but remained unanswered until March 28, 2006.

On March 28, 2006, the attached letter, marked for identification as Exhibit No. 5, namely a certified return-receipt-requested letter dated March 22, 2006, from Randall C. Merchant, Esq., Assistant District Counsel of the COE's New Orleans District, and addressed to the undersigned, was received.  Incredibly, notwithstanding this and other litigation which has been instituted against the United States of America, acting by and through its agency and instrumentality, the U.S. Army Corps of Engineers, in This Honorable Court, and notwithstanding the submission of written claims in several different formats, Mr. Merchant's letter advised:

"None of the individuals named in your letters has submitted valid FTCA
tort claims. . ."

Mr. Merchant's letter goes on to state, "Your clients have not filed a valid FTCA
administrative claim until they each provide the above requested information within two
years from the date of the incident giving rise to their alleged claims." The "requested
information" included the following, none of which is required by the plain language of
the only statute cited by Mr. Merchant in his letter, 28 U.S.C. §2401(b):

"Proof that you legally represent each individual listed as a claimant".

"Appropriate testamentary letters".

"Adequate information that would allow us to thoroughly investigate their
alleged claims".

Mr. Merchant was present during the face-to-face meeting in the Corps' offices
on October 12, 2005. He knows about the claims asserted in the pending litigation
involving death, injury, damage to property, both real and personal, pain, suffering,
mental anguish, etc. He knows about plaintiffs' theories of liability, because that topic
was specifically discussed during the October 12, 2005 meeting and was written in the
Complaints handed to him and to Mr. Florent. Although no disrespect is intended
towards Mr. Merchant, he must have been "living on the moon" since August 29, 2006, if
he or his principals require further explanation for why residents and former residents of
the Greater New Orleans Metropolitan Area have the Federal Government and U.S.
Army Corps of Engineers in their sights. In short, it should be painfully obvious to the
Court that the Government and its agency not only reads the Federal Tort Claims Act as
requiring that administrative claims should be filed, but they also reserve the right to
critique each claim-presentation and dictate what they want included in each claim before

they will acknowledge that the claim has any legal effect on the ticking-of-the-clock! This view of statutory construction has been specifically rejected by the Courts. In <u>Avery v. United States</u>, 680 F.2d 608 (9th Cir. 1982), the Court stated:

> "Section 2675(a) was not intended to allow an agency to insist on proof of a claim to its satisfaction before the claimant becomes entitled to a day in court. To so hold would permit federal defendants to be judge in their own cause by the initial determination of a claim's insufficiency. The result would not be consistent with the congressional purpose of "providing for more fair and equitable treatment of private individuals and claimants when they deal with the Government." 680 F.2d at p. 611 (citation omitted).

Accordingly, on the same date that Mr. Merchant's letter was received, March 28, 2006, the undersigned transmitted the following facsimile to Mr. Merchant, with a copy to the DOJ Attorney representing the Government, Ms. Finnegan:

> Dear Randy:
>
> This acknowledges receipt of your certified letter of March 22[nd], which was received today, 6 days after posting. So much for the efficiency of the U.S. Postal Service. Please don't take it personally, but my clients and I view your letter as insulting. Does the U.S. Army Corps of Engineers really believe that I would risk criminal prosecution by representing to you that I have authority to speak on behalf of people who have not authorized me to do so, either directly or through a duly-authorized family representative? Ask me anything you or the COE might want to know about any claimant, and I will respond to your request(s) for additional information in due course. In the meantime, my clients and I are treating your letter as constituting formal denial of our claims by the Corps of Engineers, and we intend to so inform Judge Duval.
>
> Yours very truly,
>
>
> Ashton R. O'Dwyer, Jr., on
> his own behalf
> and as Agent for, Attorney-
> in-Fact and Legal
> Representative of the

previously identified I
Individual Claimants

AROD/vtb
cc:    Ms. Tess Finnegan (via facsimile)

A copy of that facsimile is appended hereto and marked as Exhibit No. 6.

Plaintiffs respectfully submit that the Court should call Mr. Merchant's letter what it really is:  "A DENIAL IN WRITING BY CERTIFIED MAIL OF PLAINTIFFS' CLAIMS AGAINST THE USA THROUGH ITS AGENCY THE COE."  28 U.S.C. §2675.

**D.  EQUITY, JUSTICE, JUDICIAL ECONOMY AND COMMON SENSE DICTATE THAT THE CLAIMS OF PLAINTIFFS, ETC., SHOULD NOT BE DISMISSED SINCE THE REASONS FOR THE ADMINISTRATIVE CLAIMS REQUIREMENTS IN THE FEDERAL TORT CLAIMS ACT WOULD NOT BE FURTHERED BY DISMISSAL IN THIS INSTANCE**

The reasons for the administrative claims procedure in the Federal Tort Claims Act are succinctly set forth in the "lead" case cited by the Government in support of dismissal for lack of subject-matter jurisdiction, namely McNeil v. United States, 508 U.S. 106, 113 S.Ct. 1980 (1993):[7]

> "Prior to 1966, FTCA claimants had the option of filing suit in federal court without first presenting their claims to the appropriate federal agency. Moreover, federal agencies had only limited authority to settle claims. (Citations omitted). Because of the vast majority of claims ultimately were settled before trial, the Department of Justice proposed that Congress amend the FTCA to require all claims to be presented to the appropriate agency for consideration and possible settlement before a Court action could be instituted. This procedure would make it possible for the claim first to be considered by the agency whose employee's activity allegedly caused the damage. The agency would have the best

---

[7]  Incidentally, the plaintiff in McNeil was a federal prisoner, who was an inmate at a federal penitentiary. Does the Government really equate plaintiffs in this action with a convicted felon?

information concerning the activity which gave rise to the claim. Since it is the one directly concerned, it can be expected that the claims which are found to be meritorious can be settled  more quickly without the need for filing suit and possible expensive in time-consuming litigation.   (Citations omitted).   The Senate Judicial Committee further noted that "the improvements contemplated by [the 1966 amendments] *would not only benefit private litigants, but would also be beneficial to the Courts, the agencies, and the Department of Justice itself.*" (Citations omitted). McNeil, supra, Fn. 7.

The McNeil Court went on to explain that the administrative claims procedure would "reduce congestion in the Courts", because "every premature filing of an action under the FTCA imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions". 113 S.Ct. at p. 1984.  It is respectfully submitted that if any parties have been "burdened" as a result of *KATRINA litigation, it is the plaintiffs (and their counsel) who have been burdened by multiple motions, memoranda, supplemental memoranda, reply memoranda, and the like, filed by the Government, not only in Civil Action No. 06-1885, but in Civil Action Nos. 05-4181 and 05-4237, as well.  In other words, if the Department of Justice has felt any increased "burden" due to KATRINA cases, then the DOJ's "burden" has been entirely self-inflicted.*

The Fifth Circuit also has weighed in, emphasizing that the administrative claims procedure makes it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.  Gregory v. Mitchell, 634 F.2d 499 (5th Cir. 1981).  If "the fair settlement of tort claims" is really of interest to the Government in this case, then why hasn't the Government "reached out" to plaintiffs with firm proposals to pay them just compensation for the damages which they have sustained as a result of the Peoples' Own Government's ineptitude and malfeasance?

In <u>Erxleben v. United States</u>, 668 F.2d 268 (7th Cir. 1981), the Court stated:

> The legislative history underlying the statutory claim requirement of section 2675 demonstrates that although the procedure is intended to promote government efficiency, it should also provide for "more fair and equitable treatment of private individuals and claimants when they deal with the Government. . . " (citation omitted). The statute is "intended to provide a framework conducive to the administrative settlement of claims, not to provide a basis for a regulatory checklist which, when not fully observed, permits the termination of claims regardless of their merits" (citation omitted). 668 F.2d at p. 273.

Plaintiffs respectfully submit that requiring dismissal and re-filing under the circumstances of this case would further no real legal purpose whatsoever.

Appended to this memorandum and marked for identification as Exhibit No. 7 is another piece of correspondence from Mr. Merchant, namely his April 5, 2006 missive to the undersigned in which he advised that:

> ". . . this office does not have the authority to deny your clients' potential claims.   That authority resides with the United States Army Claims Service, Fort George G. Meade, Maryland."

The Court will recall that the Supreme Court, in <u>McNeil v. United States</u>, 508 U.S. 106, 113 S.Ct. 1980 (1993), explained that the administrative claim procedure enacted by Congress in 1966 as an amendment of the Federal Tort Claims Act, represented an "improvement" which would "not only benefit private litigants, but would also be beneficial to the Courts, the agencies, and the Department of Justice itself":

> This procedure would make it possible for the claim first to be considered by the agency whose employee's activity allegedly caused the damage. The agency would have the best information concerning the activity which gave rise to the claim.  Since it is the one directly concerned, it can be expected that the claims which are found to be meritorious can be settled more quickly without the need for filing suit and possible expensive in time-consuming litigation. (Citations omitted).

However, Exhibit No. 7 makes abundantly clear that the agency whose employees' activities allegedly caused plaintiffs' damages, the United States Army Corps of Engineers, could really give a "hoot" about Plaintiffs' claims, and have referred plaintiffs' claims to the U.S. Army Claims Service, who have never contracted plaintiffs or their counsel to discuss amicable settlement or anything else:

> This letter responds to your March 28, 2006, letter wherein you state that you are treating the Army Corps of Engineers' March 22, 2006, letter as a denial of your clients' claims.  Please be advised that the Army's letter is a request for additional information regarding your clients' potential claims.  Your clients' potential claims have not been denied because they have not been validly presented to the Army.  <u>Further, this office does not have the authority to deny your clients' potential claims.  That authority resides with the United State Army Claims Service, Fort George G. Meade, Maryland.</u>  (emphasis supplied).

Thus, it should be crystal clear, that nothing which was considered by Congress, as interpreted by the Supreme Court, in connection with the 1966 amendments to the Federal Tort Claims Act, is being advanced by anything which the Government is causing to "happen" here in New Orleans, either at the administrative or judicial levels. In short, if the Government or its agency had any intention of responsibly addressing plaintiffs' claims, they would have and should have done so by now.  Since they have not, plaintiffs respectfully submit that they are entirely justified in treating Mr. Merchant's letters, Exhibit Nos. 6 and 7, as constituting a denial of plaintiffs' claims by the involved Government agency, the U.S. Army Corps of Engineers.

## CONCLUSION

Plaintiffs in Civil Action No. 06-1885 respectfully submit that they have properly invoked the admiralty and maritime jurisdiction of This Honorable Court, and that under the statute waiving the Government's sovereign immunity for admiralty and maritime

claims, the Suits in Admiralty Act, there is no administrative claims requirement as a prerequisite to filing suit. In the alternative, plaintiffs respectfully submit that they have satisfied the jurisdictional requirements of the Federal Tort Claims Act by the presentation, on October 12, 2005, of the "functional equivalents" of valid administrative claims, so that this suit, filed six months and one day later, was timely. Further in the alternative, plaintiffs aver that the Government has, essentially, already denied plaintiffs' claims, and has refused to even seriously discuss the prospect of amicable settlement, so that the purposes behind the administrative claims procedure in the FTCA would not be furthered by requiring dismissal in this particular instance.

In closing, plaintiffs simply point out to the Court that the Fifth Circuit, in <u>Adams</u> <u>v. United States</u>, 615 F.2d 2874 (5th Cir. 1980), approvingly cited the Sixth Circuit, which had observed "The purpose of the [mandatory administrative claims procedure] was not to make recovery from the Government technically more difficult". 615 F.2d at p. 289, n. 8. Plaintiffs respectfully submit that the Court should put a stop to endless argument over ancillary procedural details and let's get on with the merits of this litigation.

The Government's Motion to Dismiss should be denied.


Respectfully submitted,

LAW OFFICES OF
ASHTON R. O'DWYER, JR.

By: _____
     Ashton R. O'Dwyer, Jr.
     In Proper Person
     Bar No. 10166
     One Canal Place
     365 Canal Street

**Suite 2670**
**New Orleans, LA 70130**
**Telephone: (504) 561-6561**
**Facsimile: (504) 561-6560**

## CERTICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been served upon all counsel of record via E-mail, this 22ND day of June 2006.