In the long-term, New Orleans and other regions of the Louisiana deltaic plane cannot be protected without taking proper account of the tremendous change that is continuing to occur to Louisiana's coastal landscape.

*The Contribution of the Mississippi River Gulf Outlet to Damage from Hurricane Katrina*

Congress authorized construction of the Mississippi River Gulf Outlet (MRGOMRGO) in 1956 to facilitate commercial shipping access to the Port of New Orleans from the Gulf of Mexico. Upon its completion in 1965, the MRGOMRGO provided a route 40 miles shorter than the alternative up the Mississippi River. The MRGOMRGO also provides a connection from the Gulf of Mexico to the Gulf Intracoastal Waterway (GIWW), which is a recreational and commercial waterway running east-west from Texas to Florida. Though the MRGOMRGO produced commercial benefits, those benefits came at a cost to the environment. The Corps estimates that the construction of the channel led to substantial loss of wetlands, which, as noted above, help slow and decrease the power of storms before they hit populated areas.

The MRGOMRGO also contributed to a potential "funnel" for storm surges emerging from Lake Borgne and the Gulf into the New Orleans area.[30] The "funnel" was created by the intersection of the MRGO from the southeast and the GIWW from the northwest into the confined channel, referred to as the GIWW/MRGO that separates New Orleans East and the Ninth Ward/St. Bernard Parish. The levees on the south side of the MRGO and the levees on the north side of the GIWW converge from being about 10 miles apart where they straddle Lake Borgne to a few hundred yards apart where the MRGO merges into the GIWW.[31] The western part of the "funnel" is a 6 mile-long section of the combined GIWW/MRGO which was enlarged by a factor of three when the MRGO was built in order to expand from a barge channel to accommodate oceangoing vessels.[32]

Prior to Hurricane Katrina, many warned that the potential funnel would accelerate and intensify storm surges emerging from Lake Borgne and the Gulf into the downtown New Orleans area. The funnel had been described as a "superhighway" for storm surges or the "Crescent City's Trojan Horse" that had the potential to "amplify storm surges by 20 to 40 percent," according to some storm modeling.[33] Researchers at LSU believed that in creating this funnel, "the US Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system – nothing less – to bring this mass of water with simply tremendous 'load' – potential energy – right into the middle of New Orleans."[34]

The extent to which MRGO, and the funnel it helped create actually contributed to the hurricane's damage is still being investigated, but there have been some preliminary findings. A recent report issued by the Corps' IPET concluded that the portion of MRGO running from the GIWW to the Gulf (called "Reach 2") did not significantly impact the height of Katrina's storm surge, not because the "funnel" effect was nonexistent, but because the storm was so great it nullified the impact of either the wetlands or the intersection of the MRGO and the GIWW – the funnel – at the height of the surge.[35]


EXHIBIT NO. 1

Chapter 9-4

While the IPET report concluded that the Reach 2 portion of MRGO had little impact on Katrina's storm surge, it did find that the 6-mile combined section of the GIWW/MRGO (called "Reach 1") carried the storm surge from Lake Borgne into New Orleans. The combined GIWW/MRGO served as a link between Lake Borgne and Lake Pontchartrain, enabling the storm surge in one lake to affect the storm surge in the other. During Katrina, a 14 to 17-foot surge coming from Lake Borgne into the funnel between MRGO and the GIWW was as much as 10 feet above water levels in Lake Pontchartrain.[36] This large difference in the water levels between the two lakes increased the flow of water in the direction of the city and eventually into Lake Pontchartrain.

To address this problem, the IPET report recommended that flow through the combined channels "must be dramatically reduced or eliminated," either by a permanent closure or a structure that can be selectively used to block storm surges flowing between Lakes Pontchartrain and Borgne along the combined GIWW/MRGO.[37]

Researches at the LSU Hurricane Center who have looked at models of Katrina have concluded that it is not just the volume of water that is important, but also the velocity. These researchers found that the "funnel" accelerated the speed of the water when the larger volume in the "funnel," and especially the water in the MRGO, was forced into the single merged GIWW/MRGO channel.[38] The increased velocity of the water as it made its way through the channel pounded on the floodwalls lining the sides,[39] weakening them and making them more vulnerable to the overtopping and scouring that occurred. Maximum current velocities in the combined GIWW/MRGO channel were greater than 8 feet per second, which is nearly three times the velocity necessary to cause serious potential for erosion in the soils of the adjacent levee.[40]

Investigations continue into MRGO's contribution to damage caused by Katrina, but there is general agreement that the presence of the MRGO destroyed wetlands that otherwise would have provided additional defenses. This happened because the MRGO served as a conduit for saltwater from the Gulf of Mexico to intrude into the freshwater wetlands. The saltwater damaged and destroyed wetlands, which resulted in the loss of land that had served as part of the city's defenses against hurricanes and other storms.[41] According to the National Academy of Sciences, MRGO has resulted in "tremendous environmental damage, including saltwater intrusion, land loss, and worsening the effects of wave damage during hurricanes and storms."[42]

Over the past 40 years, the erosion from the saltwater has contributed to the widening of the MRGO from 600 feet to 2,000 feet, an average of 35 feet per year, and the loss of more than 19,000 acres of land.[43] Had there been no wetlands at all east of the MRGO and the GIWW, preliminary storm modeling has shown, the Katrina storm surge may have been anywhere from three to six feet higher along St. Bernard Parish/Ninth Ward and New Orleans East.[44] Continued wetland loss will increase the vulnerability of the city, making overtopping by storm surges even more likely in the future.[45]

The building of MRGO and the combined GIWW/MRGO resulted in substantial environmental damage, including a significant loss of wetlands that had once formed a natural barrier against hurricanes threatening New Orleans from the east. MRGO and the GIWW/MRGO provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure. As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from hurricane Katrina.

---

[1] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 8.

[2] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 8.

[3] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 8.

[4] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 9.

[5] Greg Brouwer, "The Creeping Storm," Civil Engineering Magazine, June 2003, p. 10.

[6] A study by the United States Geological Survey "forecasts that an additional 448,000 acres could be lost by 2050 if no further actions are taken to halt or reverse current processes." 448,000 acres is the equivalent of 700 square miles. U.S. Library of Congress. Congressional Research Service. Coastal Louisiana: Attempting to Restore an Ecosystem, by Jeffrey Zinn. October 25, 2004, p. 5.

[7] National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 11.

[8] National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 22-27. Tons converted to square miles using 1.5 tons per cubic yard. Source: Gagliano, Sherwood M, "The Life and Times of Mississippi River Sediment," presented at the Workshop on river Resources Management in the 21st-century, Feb. 20, 2003.

[9] U.S. Library of Congress. Congressional Research Service. 9.

[10] U.S. Library of Congress. Congressional Research Service. Coastal Louisiana: Attempting to Restore an Ecosystem, by Jeffrey Zinn. Washington: The Service, October 25, 2004, p. 5.

[11] U.S. Library of Congress. Congressional Research Service. Coastal Louisiana: Attempting to Restore an Ecosystem, by Jeffrey Zinn. Washington: The Service, October 25, 2004, p. 5. See also: National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 31; Burkett, Virginia, David B. Zilkoski, and David A. Hart. Sea-Level Rise and Subsidence: Implications for Flooding in New Orleans, Louisiana. Abstract, p. 64.

[12] Day, John W., Jr, Gary P. Shaffer, Louis D. Britsch, Denise J. Reed, Suzanne R. Hawes, Donald Cahoon. Pattern and Process of Land Loss in the Louisiana Coastal Zone: An Analysis of Spatial and Temporal Patterns of Wetland Habitat Change. Estuarine Research Federation, 1999, p. 193-200.

[13] National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 30.

[14] U.S. Library of Congress. Congressional Research Service. Coastal Louisiana: Attempting to Restore an Ecosystem, by Jeffrey Zinn. Washington: The Service, October 25, 2004, p. 5.

[15] U.S. Geological Survey. Wetland Subsidence, Fault Reactivation, and Hydrocarbon Production in the U.S. Gulf Coast Region, by Robert A. Morton and Noreen A. Purcell. Washington: USGS Fact Sheet FS-091-01, 2001.

[16] U.S. Environmental Protection Agency. The Probability of Sea Level Rise, by James G. Tituse and Vijay K. Narayanan, Sept. 1995, p. iii. According to the Environmental Protection Agency, "[t]here is new and stronger evidence that most of the warming over the last 50 years is attributable to human activities" and that the "warmer temperatures are expected to raise sea level by expanding ocean water, melting

mountain glaciers, and melting parts of the Greenland Ice Sheet." Sources: http://Yosemite.epa.gov/OAR/globalwarming.nsf/content/climate.html. Accessed Apr. 17, 2006. http://yosemite.epa.gov/OAR/globalwarming.nsf/content/ClimateFutreClimate.html. Accessed Apr. 17, 2006.

[17] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 9; U.S. Library of Congress. Congressional Research Service. Protecting New Orleans: From Hurricane Barriers to Floodwalls, by Nicole T. Carter. Washington, The Service, January 26, 2006, p. 10.

[18] U.S. Library of Congress. Congressional Research Service. Protecting New Orleans: From Hurricane Barriers to Floodwalls, by Nicole T. Carter. Washington, The Service, January 26, 2006, p. 10.

[19] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 15.

[20] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 15.

[21] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 16.

[22] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 15.

[23] Wave heights measured by National Oceanographic Atmospheric Administration buoys, www.noaa.gov.

[24] The Times Picayune, "Studies Abound on Why the Levees Failed. But Researchers Point out that Some Levees Held Fast Because Wetlands Worked as Buffers During Katrina's Storm Surge." Bob Marshall, March 23, 2006.

[25] "Performance Evaluation Status and Interim Results, Report 2 of a Series – Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System," Interagency Performance Evaluation Task Force, U.S. Army Corps of Engineers, March 10, 2006, p. III-6.

[26] "Performance Evaluation Status and Interim Results, Report 2 of a Series – Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System," Interagency Performance Evaluation Task Force, U.S. Army Corps of Engineers, March 10, 2006, p. I-2.

[27] Burkett, Virginia, David B. Zilkoski, and David A. Hart. Sea-Level Rise and Subsidence: Implications for Flooding in New Orleans, Louisiana. Abstract, p. 63.

[28] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006.

[29] National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 38.

[30] U.S. Army Corps of Engineers. Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. Washington: Interagency Performance Evaluation Task Force, March 10, 2006, p. E-7.

[31] van Heerden, Ivor, Paul Kemp, Wes Shrum, Ezra Boyd, and Hassan Mashriqui. Initial Assessment of the New Orleans' Flooding Event During the Passage of Hurricane Katrina. Unpublished paper available from Center for the Study of Public Health Impacts of Hurricanes, Louisiana State University, Baton Rouge, LA 70803. 2006, p. 4.

[32] van Heerden, Ivor, Paul Kemp, Wes Shrum, Ezra Boyd, and Hassan Mashriqui. Initial Assessment of the New Orleans' Flooding Event During the Passage of Hurricane Katrina. Unpublished paper available from Center for the Study of Public Health Impacts of Hurricanes, Louisiana State University, Baton Rouge, LA 70803. 2006, p. 4.

[33] Washington Post, "Canal May Have Worsened City's Flooding; Disputed Project Was a 'Funnel' for Surge, Some Say", Michael Grunwald, 9/14/05, A21

[34] van Heerden, Ivor, Paul Kemp, Wes Shrum, Ezra Boyd, and Hassan Mashriqui. Initial Assessment of the New Orleans' Flooding Event During the Passage of Hurricane Katrina. Unpublished paper available from Center for the Study of Public Health Impacts of Hurricanes, Louisiana State University, Baton Rouge, LA 70803. 2006 p. 4.

[35] U.S. Army Corps of Engineers. Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. Washington: Interagency Performance Evaluation Task Force, March 10, 2006, p. E-7.

[36] van Heerden, Ivor, Paul Kemp, Wes Shrum, Ezra Boyd, and Hassan Mashriqui. Initial Assessment of the New Orleans' Flooding Event During the Passage of Hurricane Katrina. Unpublished paper available from Center for the Study of Public Health Impacts of Hurricanes, Louisiana State University, Baton Rouge, LA 70803. 2006, p. 4.

[37] U.S. Army Corps of Engineers. Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. Washington: Interagency Performance Evaluation Task Force, March 10, 2006, p. E-7.

38 Mashriqui, H.S., Kemp, G.P., van Heerden, I.Ll., Ropers-Huilman, B.D., Hyfield, E., Young, Y., Streva, K., and Binselam, Submitted (& Accepted) 2006. Experimental Storm Surge Simulations For Hurricane Katrina, in 2006 Annual Meeting & International Conference, "Challenges in Coastal Hydrology and Water Quality", American Institute of Hydrology (AIH), May 21-24, 2006, Baton Rouge, Louisiana, USA.

39 Mashriqui, H.S., Kemp, G.P., van Heerden, I.Ll., Ropers-Huilman, B.D., Hyfield, E., Young, Y., Streva, K., and Binselam, Submitted (& Accepted) 2006. Experimental Storm Surge Simulations For Hurricane Katrina, in 2006 Annual Meeting & International Conference, "Challenges in Coastal Hydrology and Water Quality," American Institute of Hydrology (AIH), May 21-24, 2006, Baton Rouge, Louisiana, USA. Pp. 3-85. The Times-Picayune, "MRGO'ing, going, gone? Most everyone wants to close the shipping channel. But how closed is close?" Matthew Brown, Nov. 27, 2005.

40 Mashriqui, H.S., Kemp, G.P., van Heerden, I.Ll., Ropers-Huilman, B.D., Hyfield, E., Young, Y., Streva, K., and Binselam, Submitted (& Accepted) 2006. Experimental Storm Surge Simulations For Hurricane Katrina, in 2006 Annual Meeting & International Conference, "Challenges in Coastal Hydrology and Water Quality", American Institute of Hydrology (AIH), May 21-24, 2006, Baton Rouge, Louisiana, USA. p. 5.

41 National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 30.

42 National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, p. 38.

[43] National Academy of Sciences. Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, pp. 38-39.

[44] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 16.

[45] Working Group for Post-Hurricane Planning for the Louisiana Coast. A New Framework for Planning the Future of Coastal Louisiana after the Hurricanes of 2005. January 26, 2006, p. 16.



DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P. O. BOX 60267
NEW ORLEANS, LOUISIANA  70160

LMNOD-SP (Seventeenth Street Canal)2            26 February 1981

## PUBLIC HEARING ON PERMIT APPLICATION BY SEWERAGE AND WATER BOARD OF NEW ORLEANS FOR DREDGING IN THE SEVENTEENTH STREET CANAL

The public is invited to attend a public hearing concerning a permit application by the Sewerage and Water Board of New Orleans for dredging in the Seventeenth Street Canal. The hearing, scheduled by the US Army Corps of Engineers' New Orleans District Engineer, will be held on 31 March 1981, at 7:00 p.m. in the Council Chambers, New Orleans City Hall, 1300 Perdido Street.

The hearing has been scheduled to obtain information to assist the District Engineer and his staff in evaluating the permit application and determining whether it is in the overall public interest to issue or to deny a permit.

Any interested person, group, or agency will be allowed an opportunity to provide information and to insure that such information is included in the record of this permit application.

### Legal and Regulatory Authority.

A Department of the Army permit is required for dredging in navigable waters of the United States under Section 10 of the River and Harbor Act of 3 March 1899 (30 Stat. 1151; 33 USC 403). Since the Seventeenth Street Canal, also known as the Metairie Relief Canal, is a navigable water of the United States, dredging of that canal requires a Section 10 permit.

### Authority for Conducting a Public Hearing:

Department of the Army permit regulations prescribe the conditions or situations whereby District Engineers may or must conduct public hearings. Particular sections of the regulations applicable to public hearings are published in Part 325.2 and Part 327 of Title 33, Code of Federal Regulations.

In the case of dredging the Seventeenth Street Canal the District Engineer has determined that a public hearing should be conducted. The hearing, though not required, has been scheduled to allow full opportunity for the public to provide information about the proposed project.

### Purpose of the Public Hearing:

Public hearings on permit applications are conducted primarily to gather information and evidence for use in evaluating the applications. To this end, the public is allowed full opportunity to present its views, opinions, suggestions, objections, and other information. Public hearings also provide

EXHIBIT NO. 2

# Report: Levee failure could not be foreseen

*Task force says 'unique forces breached 17th Street canal*

## FOUR STEPS TO DISASTER

How the report for the Army Corps of Engineers says the 17th Street Canal floodwall came down

### 1. WATER EXERTS PRESSURE

LAKEVIEW

Sheet pilings

Levee

Floodwall

High water and waves push on the floodwall, causing it to bend toward Lakeview

### 2. A GAP OPENS

A gap opens between the wall and the levee



HURRICANE

EXHIBIT NO. 3

## SEPARATION IS DEEPER THAN EXPECTED



Toe of the levee

The gap widens toward the bottom of the floodwall and sheet piling with it, flooding the city

Clay layer below toe of levee slips, pulling floodwall and sheet piling with it, flooding the city

Source: Army Corps of Engineers

STAFF GRAPHIC BY EMMETT MAYER III

## THE WALL COMES DOWN

**By Bob Marshall**
Staff writer

A unique combination of stresses that engineers could not have predicted caused the 17th Street Canal floodwall to fail and flood thousands of homes and businesses during Hurricane Katrina, according to an interim report of the task force investigating the disaster for the Army Corps of Engineers.

The report also points to soil subsidence that left floodwalls and levees lower than design specifications as contributing to the other failures and breaches that helped flood 80 percent of New Orleans and killed more than 1,100 residents in August.

Although independent analysts have blamed the 17th Street Canal failure on faulty engineering, including flawed soil investigations by local firms, the Interagency Performance Evaluation Task Force, composed of experts from academia and industry as well as state and federal agencies, said evidence points to forces that came together in a combination unique to the science and thus could not have been anticipated by the system's design teams.

"I would say it's certainly going to come as a surprise to many people, if not most people," said Ed Link, University of Maryland professor and task force project director.

The group said the causes of the London Avenue canal floodwall collapses are not yet known and emphasized that its findings are preliminary.

Bob Bea, a University of California professor who is part of a National Science Foundation investigation into the failures, said the task force's explanation

See REPORT, A-12



EXHIBIT

STATE OF LOUISIANA

PARISH OF ORLEANS

    **BEFORE ME**, the undersigned authority, personally came and appeared:

### ASHTON R. O'DWYER, JR.

who, being first duly sworn, did depose and say as follows:

    He is an attorney practicing law in New Orleans, Louisiana; he has been a member of the Louisiana Bar since 1971; for the past thirty-five (35) years the vast majority of his practice has been in the field of admiralty and maritime law and, for that reason, most of his cases have been litigated in the United States District Court for the Eastern District of Louisiana; he remained in New Orleans during and after Hurricane KATRINA, and began framing legal issues arising out of the storm and its aftermath almost before the storm had passed through the City; he filed the first "Victims of KATRINA" lawsuit against the United States of America, and others, being Civil Action No. 05-4181 on the docket of this Court, on September 19, 2005; thereafter, on September 26, 2005, he filed a separate lawsuit involving the retaining wall failures on the East side of the Industrial Canal, being Civil Action No. 05-4237 on the docket of this Court; in early October, 2005, he was visited at his home in New Orleans by his primary liability expert, Hector V. Pazos, who spent several days in the City to inspect levee breach sites in order to attempt to determine the causes of the breaches; at the time of Mr. Pazos' inspections, representatives of the U.S. Army Corps of Engineers were still publicly stating that the levee breaches were caused by "a storm which exceeded the design" and by "overtopping"; since Mr. Pazos reported that vital evidence was being destroyed and covered up by the Corps of Engineers on a daily basis, he knew he needed


EXHIBIT NO. 4

to get a Freedom of Information Act Request and a written demand to preserve evidence into the hands of the Corps of Engineers so there could be no mistake about what needed to be preserved for evaluation in the litigation; accordingly, early on the morning of October 12, 2005, he and Mr. Pazos jointly prepared a detailed FOIA request, which is appended hereto and marked for identification as Exhibit "A"; that he theb scheduled a face-to-face meeting with Randy Florent, the Corps of Engineers' Deputy General Counsel, and visited him in his office that same morning; that the purpose of the meeting with Mr. Florent was not only to deliver the FOIA request, but also to make the agency specifically aware, in writing, that he was asserting claims against the agency for money damages on behalf of a large number of individuals, arising out of the fault, neglect and breach of duty on the part of the Corps of Engineers in connection with Hurricane KATRINA; and for that reason, he attached conformed copies of the above-referenced Complaints to his FOIA request, specifically stating on page 1 of the FOIA request that:

> I am a local attorney and a named plaintiff in two pieces of litigation involving the United States of America, acting by and through its agency and instrumentality, the U.S. Army Corps of Engineers. I attach copies of the original Complaint to each action, both filed in the United States District Court for the Eastern District of Louisiana, one bearing Civil Action No. 05-4181, and the other bearing Civil Action No. 05-4237.

After amenities, and discussing the purposes of his visit to the Corps' offices and the factual bases of the claims being asserted, Mr. Florent called in his colleague, the Corps' Assistant District Counsel, Randall Merchant, who was introduced to him as the local attorney "in charge of litigation matters"; he specifically raised the prospect of amicable settlement of his clients' claims with Messrs. Florent and Merchant, who were entirely noncommittal about the Corps' accepting liability for his clients' KATRINA losses, saying that conceding liability, and positions to be taken in litigation, would most likely

become the responsibility of one or another office of the U.S. Department of Justice and that they, the local lawyers with the Corps, probably would "not even be in the loop"; that neither Mr. Florent nor Mr. Merchant ever said that they or their agency needed to know a specific dollar amount of any claim being asserted by his clients against the United States of America, and did not tell him that a specific dollar amount, or "sum certain", was jurisdictional in nature; Mr. Merchant broadly outlined the "requirement" of completing a Government Form 95 on behalf of each individual claimant, and provided him with a sample copy of a Form 95, following which he remembers thinking, "So this is your game?  Fill out the form wrong and we will deem your claim as not validly submitted.  Well, I'm not going to play your game." And that, if either Mr. Florent or Mr. Merchant had asked him to put a dollar amount on each claim, or on the total of all claims, then he would have done so; but that this would have been vain and useless, and would have served no purpose, because the overall impression he was left with as a result of his meeting with Messrs. Florent and Merchant was that the United States Government was not going to be at all receptive to amicable settlement of any tort claims arising out of Hurricane KATRINA, and that a very long, and hard-fought, legal battle would ensue.

**Sworn to and subscribed before me,**

this 22 day of JUNE, 2006.

NOTARY PUBLIC ID# 20191

D. WHIDDEN

NOTARY PUBLIC, Orleans Parish, La.

-3-



DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF

March 22, 2006

CERTIFIED MAIL -- RETURN RECEIPT REQUESTED

CEMVN-OC

Mr. Ashton R. O'Dwyer, Jr.
One Canal Place
365 Canal Street
Suite 2670
New Orleans, Louisiana 70130-1193

Dear Mr. O'Dwyer:

This letter responds to your January 10, January 20 and February 17, 2006, letters wherein you attempt to file claims under the Federal Tort Claims Act (FTCA) for several hundred individuals for various alleged damages resulting from Hurricane Katrina. None of the individuals named in your letters has submitted valid FTCA administrative tort claims for the following reasons:

1. Proof that you legally represent each individual listed as a claimant was not provided with your letters. 28 C.F.R. § 14.2(a). Further, for any individual asserting a claim for wrongful death or survival actions, appropriate testamentary letters granting that individual the authority to file a claim on behalf of the decedent or their heirs must be submitted with their claim. 28 C.F.R. § 14.3(c).

2. Listed individuals have failed to submit to this Agency adequate information that would allow us to thoroughly investigate their alleged claims. Specifically, your letters state that individuals are claiming for loss or damage to their real and/or personal property. However, no evidence was provided that: (a) identifies the address of the real property or location of the personal property that was damaged or destroyed; (b) demonstrates the lawful owner of the real or personal property; (c) identifies exactly what was damaged or destroyed; and (d) specifically explains how the Army caused the individuals' real and/or personal property losses or damages. Further, for the alleged death of an individual, you must state the circumstances of the death and how the Army was responsible for that individual's death. 28 C.F.R. § 14.4.

Your clients have not filed a valid FTCA administrative claim until they each provide the above requested information within two years from the date of the incident giving rise to their alleged claims. 28 U.S.C. § 2401(b).

Sincerely,

Randall C. Merchant
Assistant District Counsel

EXHIBIT
No. 5



March 28, 2006

**<u>VIA FACSIMILE</u>**
The United States Army Corps of Engineers
c/o Its Assistant District Counsel
Randall C, Merchant, Esq.
Foot of Prytania Street at the
  Mississippi River
New Orleans, LA 70118

        Re:    Maureen O'Dwyer, et al.
                  vs. The United States of America, et al.
                  No. 05-4181 "K"(5)

Dear Randy:

      This acknowledges receipt of your certified letter of March 22nd, which was received today, 6 days after posting. So much for the efficiency of the U.S. Postal Service. Please don't take it personally, but my clients and I view your letter as insulting. Does the U.S. Army Corps of Engineers really believe that I would risk criminal prosecution by representing to you that I have authority to speak on behalf of people who have not authorized me to do so, either directly or through a duly-authorized family representative? Ask me anything you or the COE might want to know about any claimant, and I will respond to your request(s) for additional information in due course. In the meantime, my clients and I are treating your letter as constituting formal denial of our claims by the Corps of Engineers, and we intend to so inform Judge Duval.

                                            Yours very truly,

                                            Ashton R. O'Dwyer, Jr., on his own behalf
                                            and as Agent for, Attorney-in-Fact and
                                            Legal Representative of the previously
                                            identified Individual Claimants

AROD/vtb
cc:    Ms. Tess Finnegan (via facsimile)



EXHIBIT No. 6



**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF

April 5, 2006

<u>CERTIFIED MAIL -- RETURN RECEIPT REQUESTED</u>

CEMVN-OC

Mr. Ashton R. O'Dwyer, Jr.
One Canal Place
365 Canal Street
Suite 2670
New Orleans, Louisiana 70130-1193

Dear Mr. O'Dwyer:

   This letter responds to your March 28, 2006, letter wherein you state that you are treating the Army Corps of Engineers' March 22, 2006, letter as a denial of your clients' claims. Please be advised that the Army's letter is a request for additional information regarding your clients' potential claims. Your clients' potential claims have not been denied because they have not been validly presented to the Army. Further, this office does not have the authority to deny your clients' potential claims. That authority resides with the United States Army Claims Service, Fort George G. Meade, Maryland.

Sincerely,

Randall C. Merchant
Assistant District Counsel

Certified Mail Receipt No. 7004 1350 0005 5696 3167

EXHIBIT
No. 7