UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| COLLEEN BERTHELOT, ET AL. | * | CIVIL ACTION NO. 05-4182 |
| | * | |
| Plaintiffs | * | SECTION "K" |
| | • | |
| VERSUS | * | |
| | • | JUDGE DUVAL |
| BOH BROTHERS CONSTRUCTION CO., | * | |
| L.L.C., ET AL. | * | |
| | • | MAGISTRATE NO. 2 |
| Defendants | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | MAGISTRATE WILKINSON |
| LEVEE CASES: | * | |
| 05-4181, 05-4182, 05-5237, 05-6073, 05-6314, | * | |
| 05-6324, 05-6327, 06-0020, 06-225, 06-886, | * | |
| 06-2278, 06-2287, 06-2545, 06-2346 | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OMNIBUS MEMORANDUM IN OPPOSITION TO GOVERNMENT DEFENDANTS',
THE BOARD OF COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT, AND
THE SEWERAGE AND WATER BOARD OF NEW ORLEANS, FED. R. CIV. P. 12(B)(6)
JOINT MOTION TO DISMISS, AND SEWERAGE AND WATER BOARD OF NEW
ORLEANS' MOTION TO DISMISS PURSUANT TO FED.R.CIV.P 12(b)(6)**

MAY IT PLEASE THE COURT:

The defendants Sewerage and Water Board (SWB), and the Board of Commissioners of

the Orleans Levee District (OLD) have filed a joint motion seeking dismissal from cases

numbered 05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, 06-0020, 06-225, 06-886, 06-2278, 06-2287, 06-2545, and 06-2346 under Fed.R.Civ.P 12(b)(6). (Record Doc. 573). In addition, SWB has filed its own Federal Rule 12(b)(6) motion seeking dismissal from cases numbered 05-4181, 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, 06-0225, 06-0886, 06-2278, 06-2287, 06-2346, and 06-2545. (Record Doc. 563). Plaintiffs now file this omnibus memorandum in opposition to the referenced motions, and for the reasons as set forth herein both the joint motion of the OLD and SWB, and the separate motion of the SWB lack merit and must be denied.

I.

INITIAL STATEMENT

Plaintiffs respectfully suggest that dismissals of either SWB or OLD are premature at this time. Both the OLD and the SWB claim that their status gives rise to no duty that would allow for a finding of liability against them, and both OLD and SWB further claim in any event to enjoy immunity from liability under Louisiana's Homeland Security and Emergency Assistance Act. However, before either the status/liability, and immunity issues can be ruled upon there is discovery to be done. Examples of pertinent discovery issues include:

- All dredging or other improvement activities undertaken by either in the 17th Street or London Avenue canals;

- Interference by both defendants with USACE's desire to install tidal gates and pumps at the drainage canal outfalls along Lake Pontchartrain in the 1960's and thereafter;

- Information concerning the permit the SWB received from the Corps of Engineers in 1988 to deepen and widen the 17th Street Canal;

2

- Information concerning any other permits for works that SWB and OLD received from the Corps of Engineers for either canal;

- S&WB's investigation of complaints of water ponding in the backyards of residents on Bellaire Drive adjacent to the 17th Street Canal flood wall, their determination that the water was not the result of any leaking potable water supply pipes, its conclusion that the water ponding in the residents back yards was seeping there from the canal, and the steps they took, if any, to inform any other entity.

- Information concerning the periodic inspections undertaken by the agencies, those agencies understanding of their obligation, and the steps they undertook took to fulfill those obligations, if any.

In addition, even if the Louisiana Homeland Security and Emergency Assistance Act were applicable in this case as is suggested by both OLD and SWB (which plaintiffs do not concede), the Act would be inapplicable if the defendants' activities constituted fraud or willful misconduct. While there has as yet been no pleading of an allegation of fraud or willful misconduct, the reason is that plaintiffs are mindful that such allegations must be pled with particularity and that discovery on those issues, including the discovery outlined above, are necessary before plaintiffs can ethically make such allegations and stay within the bounds of Federal Rule 11.

Finally, plaintiffs note that not all Complaints have stated their allegations in the same manner and with the same language, and against all of the same defendants, and as a result some Complaints have been more artfully drafted than others. Such drafting flaws should not give rise to dismissal. Indeed, the law is clear that Plaintiffs should be given every opportunity with

3

which to state a claim.

> As a general guide to the interpretation of the Federal Rules of Civil Procedure,
> the Supreme Court has stated: **The federal rules reject the approach that
> pleading is a game of skill in which one misstep by counsel may be decisive to
> the outcome and accept the principle that the purpose of pleading is to
> facilitate a proper decision on the merits.** *Conley v. Gibson*, 355 U.S. 41, 48,
> 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). **It is the well-established policy of the
> federal rules that the plaintiff be given every opportunity to state a claim.**[1]

In order to facilitate a proper decision on the merits, Plaintiffs should be allowed to

amend Plaintiffs' pleadings *vis a vis* a Master Complaint to reflect the proper parties and proper

allegations as to each of them.  In doing so, Plaintiffs will ameliorate the uncertainty which

currently exists.

II.

LAW AND ARGUMENT

## A.    PURPOSE OF 12(B) (6) MOTIONS

"[A] complaint should not be dismissed [under Rule 12(b)(6) ] for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief".[2]  "[T]he complaint is construed in the light most favorable to

plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable

inferences in plaintiff's favor."[3]  For purposes of the Motion to Dismiss, material allegations of

the complaint are taken as "admitted" and the complaint is to be liberally construed in favor of

---

[1]*Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).  **(Emphasis added.)**

[2]*Lovick v. Ritemoney, Ltd.,* 378 F.3d 433, 437, (5th Cir.2004) *citing Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

[3]*Lovick, id.,* 438.

4

the Plaintiff.[4]

Plaintiffs' allegations in their complaints, if accepted as true as they must be for purposes of the 12(b)(6) motion, have adequately stated claims upon which relief can be granted.  The Motion must be denied.

**B.      Homeland Security and Emergency Assistance Immunity–Building and Maintaining the Levees and Floodwalls.**

The defendants argue in favor of immunity arising from Louisiana's Homeland Security and Emergency Assistance Disaster Act.[5]  The Act provides for immunity from liability for injury, death, or property damage (except when there is wilful misconduct) when a state, political subdivision, or agency is engaged in homeland security and emergency preparedness activities. Reliance on the immunity afforded by the Act is misplaced.

First, the defendants misinterpret the Act by suggesting that the building of the levees and flood walls in and around New Orleans are "emergency preparedness activities" as defined by the Act.  This argument is absurd.  Emergency preparedness activities are those activities performed in "the mitigation of, preparation for, response to, and recovery from emergencies or disasters."[6] Clearly, the Act contemplates that there actually be an impending emergency or an emergency in progress and that immunity is afforded for injuries arising from activities in the mitigation of, preparation for, response to, and recovery from that emergency.  Hurricane Katrina was not bearing down on New Orleans when OLD built the shoddy levees and flood walls that were

---

[4]*Jenkins v. McKiethen*, 89 F. Ct. 1843, 395 U.S. 411, 23 L. Ed. 2nd 404, re-hearing denied 90 F. CT35, 396US869, 24L. Ed. 2D 123.

[5]LSA–R.S. 29:721, *et seq.*

[6]LSA–R.S. 29:723(3)

5

supposed to be protecting our city. The building of the levees and flood walls can not be considered by any stretch of the imagination an "emergency preparedness activity."

In its effort to support its argument that the building of a levee is an act of emergency preparedness, OLD cites but a single case; *Hontex enterprises, Inc. v. City of Westwego*[7]. In *Hontex*, Tropical Storm Frances bearing down on the Louisiana coast pushing an enormous amount of water into the bayous and canals of the west bank of Jefferson Parish. Hontex Enterprises, a seafood processing plant located outside of the hurricane protection system, began to take on water due to the storm surge. Located within the hurricane protection system is Hontex Enterprises pump station that pumps water from the plant into the Mississippi River. A pipe from this system was spilling water onto property adjacent to the plant, and in response to this flooding, the City of Westwego built a ring levee around the pump station to prevent further damage to the adjacent property. As a result of the ring levee, the pump station flooded and became inoperable, causing the plant to flood, in turn causing the plants freezers to short out and Hontex's inventory of seafood to be ruined. The trial court, after hearing the testimony of nine witnesses, granted summary judgment to the City on the basis of immunity afforded by the Louisiana Homeland Security and Emergency Assistance Disaster Act. The Louisiana Fifth Circuit agreed. The decision to build the levee in the *Hontex* case, however, was a tactical decision made in the face of a threat of flood from the tropical storm. In the instant case, no such immediate threat of flood existed when the levees and floodwalls were built. As such, the defendants cannot shield themselves from liability by virtue of the immunities afforded by the

---

[7]*Hontex enterprises, Inc. v. City of Westwego*, 02-506 (La. App. 5 Cir. 12/11/2002); 833 So.2d 1234, *writ den*, 2003-0505 (La.9/0/2003); 852 So.2d 1051.

6

Louisiana Homeland Security and Emergency Assistance Disaster Act.

C.    **Homeland Security and Emergency Assistance Immunity–Design, Construction and Maintenance of Levees and Floodwalls.**

As with the previous argument, OLD's reliance on the Homeland Security and
Emergency Assistance Act is misplaced. Just as there is no immunity for building levees, there is
no immunity afforded under the Act for the defendants' testing as to whether the design,
construction and maintenance of the levees and flood walls were adequate, nor is there immunity
under the Act for failures to repair damaged levees and flood walls. OLD attempts to re-frame
plaintiffs allegations as suggesting that plaintiffs are alleging that OLD's failure to properly test,
design, and maintain is tantamount to failure to take steps to prepare for Hurricane Katrina, and
therefore allows them immunity under the Act. Again, the immunity applies to acts taken in the
face of an impending emergency, not for things done, or not done, years before. As such, the
defendants cannot shield themselves from liability by virtue of the immunities afforded by the
Louisiana Homeland Security and Emergency Assistance Disaster Act.

D.    **Old's Statutory Obligations**

The Orleans Levee District has statutory obligations which plaintiffs allege have been
breached giving rise to OLD's liability.

Title 38, § 181. Construction and maintenance of levees; expropriation of lands

Cities and towns incorporated under the laws of this state may build and maintain levees
within the limits of the municipality, or in its immediate vicinity, for protection from overflow or
from the high waters of streams affecting them and may expropriate any lands within or without
the corporation necessary for construction of levees.

7

Title 38, § 301. Construction and maintenance of levees and drainage; care and inspection of levees; measure of compensation; right of entry; bicycle paths and walkways

A. (1) The levee boards and levee and drainage boards of this state may construct and maintain levees, drainage, and levee drainage, and do all other things incidental thereto.

B. The care and inspection of levees shall devolve on resident commissioners, assisted by such inspectors and watchmen as may be appointed pursuant to regulations which the boards are hereby authorized to adopt. Each resident commissioner and any inspector or watchman who may be appointed shall attend once during his term of office an educational training program conducted by the office of public works or its successor.

Title 38, § 307. Orleans Levee District; powers of board of commissioners

A. (1) The board of commissioners of the Orleans Levee District shall have and exercise all and singular the powers now conferred upon that board by law, as well as such powers as are herein granted. The board shall have full and exclusive right, jurisdiction, power, and authority to locate, relocate, construct, maintain, extend, and improve levees, embankments, seawalls, jetties, breakwaters, water-basins, and other works in relation to such projects and to conduct all dredging operations necessary in connection therewith or incidental thereto along, over, and on the shores, bottom, and bed of Lake Pontchartrain in the parish of Orleans from its western boundary to the boundary line separating township 11 south, range 12 east, from township 11 south, range 13 east, at a distance not to exceed three miles from the present shore line, as the board may determine, and along and on the shores adjacent to the lake and along the canals connected therewith. The levees, embankments, seawalls, jetties, breakwaters, waterbasins, and other works shall be of such character and extent and of such height, width, slope, design, and

8

material as the board determines, with power and authority to improve and to protect the same

with such other structures as are deemed necessary and proper by the board. All final plans and

specifications covering and relating to works of a permanent nature shall be submitted to the

office of public works or its successor for approval as to soundness of engineering practice and

feasibility, but not as to form, extent of area, or detail and such plans and specifications shall be

approved by the office of public works prior to their adoption by the levee board.

A Levee Board, in the discharge of its duty and responsibility in protecting the public

against the danger of floods need not wait until the danger is imminent. Its duty is rather to

maintain the levees at all times in such condition of repair as to avoid all possibility of danger.[8]

Title 38, § 315. Dedication of artificial waterways as public navigable waterways;

approval              .

Wherever there presently exists or may hereafter be created within the territorial limits of

any levee district or levee and drainage district in the state of Louisiana, except in the parish of

Orleans, any canal or other artificial waterway created by any levee district or levee and drainage

district for the purpose of constructing a levee or other public work and where said canal or other

artificial waterway is navigable in fact and connects with or enters into any lake, river, stream,

bayou, or other navigable waters, the governing authority of said levee district or levee and

drainage district shall have the authority, with the approval of the office of public works of the

Department of Transportation and Development and with the concurrence of the U.S. district

engineer, to dedicate and declare said canal or other artificial waterway, in whole or in part, as a

waterway subject to the free and unrestricted navigation by the public; however, nothing herein

---

[8]*Board of Levee Com'rs of Orleans Levee Dist. v. Kelly*, 73 So.2d 299 (La. 1954).

9

shall be construed as authorizing the taking of private property, except as now provided by the constitution and laws of this state.

Title 38, § 325. Scope of activities

A. Levee boards shall engage in any activities related directly to:

1) Flood protection.

(2) Construction and maintenance of levees.

The well settled principle that a levee district is a creature or agency of the state was confirmed by the 1974 Louisiana Constitution. The levee districts which previously had been recognized in the jurisprudence as state agencies were continued as organized and constituted. La.Const. 1974, Art. VI, § 38(A). The 1974 Constitution affirmed the legislature's power by law to create, consolidate, divide, or merge levee districts. d. 38(A)(1) and (2). However, the numerous detailed provisions of the 1921 Constitution relating generally to levee district board membership, fiscal affairs, taxes and compensation for property and particular sections pertaining to the Orleans levee district board of commissioners and its powers were deleted from the constitution and continued as statutes. Const. 1974 Art. XIV, § 16(A)(12); La.Const. 1921, Art. XVI, §§ 1, 4, 6, 7, 8, and 8(A). Thus, the legislature's power to control and regulate a levee district in the performance of its function of providing flood protection was not diminished, but to some extent enhanced, by our most recent constitution.

As a "special district" of the state, the Orleans Levee District is a political subdivision under this definition. *See also* La. R.S. 38:281(6) defining "Levee district" as "a political subdivision of this state organized for the purpose and charged with the duty of constructing and

maintaining levees, drainage, and all other things incidental thereto within its territorial limits."[9]

It is expected that the evidence will show that OLD breached the above listed statutory duties. Plaintiffs have made allegations that OLD's negligence and its failures over the years resulted in shoddy, inappropriate, and inefficient levees and floodwalls, and that as a result the levees and floodwalls failed causing the plaintiffs' damages. OLD cannot say, at least in the context of a 12(b)(6) Motion to Dismiss, that it bears no responsibility, or that it is immune under the Louisiana Homeland Security Act for its acts or failures to act. Whether liability may ultimately be visited upon OLD will depend upon the facts, facts which can only be developed over time through discovery. Certainly, plaintiffs have stated a cause of action, and the motion to dismiss under Fed.R.Civ.P. 12(b)(6) must be denied.

E.    **Sewerage and Water Board**

I.    **History Indicates That Plaintiff's Allegations Are Not Conclusory Allegations**

Historically, the S&WB has been responsible for the drainage of the City of New Orleans. Evidence will indicate that by at least 1896 the Louisiana legislature authorized the Drainage Commission of New Orleans, which then began preparing a comprehensive drainage plan for the City, including the funding of such work. In 1897, the Drainage Commission began issuing contracts for new pumping stations, an electric power generation station, and the construction of additional feeder canals into the existing network of drainage canals. In June 1899, voters passed a municipal bond referendum in a special election which allowed a property tax of two mils per dollar to fund municipal waterworks, sewerage and drainage.

---

[9]*Wynat Development Co. v. Board of Levee Com'rs For Parish of Orleans*, 710 So.2d 783 (La.,1998)

11

With this mechanism in place, the Sewerage & Water Board of New Orleans was thereafter established in 1899 by the state legislature to furnish, construct, operate and maintain a water treatment and distribution system and sanitary sewerage system. In 1900, the Drainage Commission began re-aligning and shifting the existing system of drainage canals; and by 1903 the S&WB was merged with the Drainage Commission to consolidate operations under one agency for more efficient operation. The combined agency retained the name "Sewerage and Water Board," the name it retains today.

By 1905, the S&WB had completed 40 miles of drainage canals and provided drainage for approximately 34 ½ miles of city area. Just prior to Hurricane Katrina, it is believed that the S&WB was responsible for draining 95.3 miles of city area. In order to do so, the S&WB maintains 90 miles of covered drainage canals, 82 miles of open channel canals, and several thousand miles of storm sewer lines feeding into their system.

Federal involvement in the City's drainage canals (i.e. the United States Corp of Engineers) began in 1955 with the approval of the Lake Pontchartrain and Vicinity Hurricane Protection Project by Congress. The Corps had several non-federal partners in this project, including the Orleans and Jefferson Levee Boards and the S&WB of New Orleans. In 1960, the Corps issued an initial report detailing a plan to remedy the ongoing problems with the slowly sinking drainage canals. It is believed that the Corps wanted to install tidal gates and pumps at the drainage canal outfalls along Lake Pontchartrain, but that the local levee districts and the S&WB opposed these plans. In particular, the S&WB feared that the tidal gates would malfunction, inhibiting the outflow of pumped storm water, which would in turn cause flooding. As a result, the faulty system in place just prior to Hurricane Katrina was fostered.

12

The S&WB's involvement with the drainage canals is seen in more recent events.  In the early 1980's, the S&WB concluded after scientific study that the 17th Street Canal's flow levels were not appropriate due to the canal being floored in materials of relatively low permeability.  In 1988, the S&WB received a permit from the Corps of Engineers to deepen and widen the 17th Street Canal. It has been alleged that the Corps warned the S&WB that dredging might weaken the stability of the canal, but a system of monitoring pore water (groundwater) pressures adjacent to the canal was not undertaken and the canal was substantially enlarged.

Fast forward to one year before Hurricane Katrina struck, when residents on Bellaire Drive adjacent to the 17th Street Canal flood wall complained to the S&WB of standing (and to some degree flowing) water in their back yards.  It has been reported, and pled, that the S&WB investigated these complaints, determined that the water was not the result of any broken or leaking potable water supply pipes, and concluded that the water ponding in the residents' back yards was seeping from the canal.

It is expected that evidence will indicate that the surge against the southern edge of Lake Pontchartrain elevated the water levels within the three drainage canals at the northern edge of the metropolitan New Orleans basin.  The USACE has claimed that it has tried for many years to obtain authorization to install floodgates at the north ends of the three drainage canals that could be closed to prevent storm surges from raising the water levels within the canals; however, the efforts of the Levee Board and S&WB prevented the installation of these gates, forcing many miles of these canals to be lined with levees and flood walls.  The requirement of lining these canals with levees and flood walls proved especially challenging due to the difficult local geology of the foundation soils and the narrow right of way for these levees due to the close

13

proximity of established residential neighborhoods.

Ultimately, water flowed from Lake Pontchartrain through the outfall canals into the city, canals historically under the control of the S&WB, which resulted in the catastrophic flooding of over 80% of the City of New Orleans.  Clearly, these three drainage canals should not have been accessible to the storm surge; and evidence will establish that the S&WB not only failed to fulfill its' statutory duty to maintain the canals at issue, but in fact directly weakened the flood wall structures.

ii.    **The Sewerage & Water Board Was Statutorily Obligated to Protect the City from the Very Scenario Which Occurred**

Since the early 1900's, the S&WB has been entrusted with the duty to maintain the drainage systems of the City of New Orleans.  Currently, the S&WB is statutorily organized by LSA-R.S. 33:4071 and charged with the construction, control, maintenance and operation of the public water, sewerage and drainage systems.[10]  The Sewerage and Water Board of New Orleans

---

[10]A. (1) The public water system, the public sewerage system, and the public drainage system of the city of New Orleans shall be constructed, controlled, maintained, and operated by a sewerage and water board to be composed as follows:

(a) The mayor;

(b) The two at large members of the council;

(c) One of the district councilmen selected by the council;

(d) Two members of the board of liquidation, city debt, to be appointed by the mayor on the recommendation of the board of liquidation, city debt; and

(e) Seven citizens, to be appointed by the mayor, with the advice and consent of the city council, as follows:

(i) Two from the city at large and
(ii) One from each of the five councilmanic districts of the city.

(2) The terms of office of board members shall be nine years. However, the citizens who are members of the board on July 31, 1984, shall retain their membership until the expiration of their terms unless sooner vacated by resignation or otherwise.

is an unattached board which has the attributes of a corporation and is capable of suing and being

sued.[11] In the <u>Eschete</u> case, the Fourth Circuit, and ultimately the La. Supreme Court, recognized

that the S&WB is "the sole agency charged with the construction, control, maintenance and

operation of the drainage system of the City of New Orleans." <u>Id.</u>, at 726.

The outfall canals at issue in the present case are the 17th Street and London Avenue

_____

B. Each of the citizen members must be a registered voter in the area from which he is appointed, and he must have been a resident of the area for two years previous to his appointment.

C. (1) All vacancies occurring in the membership of the board under appointment by the mayor shall be filled in the manner prescribed by this Part for the original appointment.

(2) In the event any appointed member of the sewerage and water board is elected to any office or removes his residence from the area from which he was appointed, his membership on the board shall be ipso facto vacated, and his successor shall be immediately appointed.

(3) Should councilmanic redistricting occur as required by the city charter which results in more than one appointed member or no appointed member residing in a councilmanic district, the existing members, regardless of the district in which they reside, shall retain their membership until expiration of their terms unless sooner vacated by resignation or otherwise.

D. No person who is a stockholder or bondholder in any sewerage or waterworks company or who holds any public office yielding emoluments to the holder other than those specified in this Part shall be eligible for appointment to the board.

E. The board shall make rules fixing its own meetings and procedure, and these rules may be changed only by a vote of nine members at a regular meeting.

[11]*Eschete v. City of New Orleans,* 231 So.2d 725 (La. App. 4 Cir.1970), *writ issued*, 234 So.2d 193, *reversed on other grounds*, 245 So.2d 383. (La. 1971).

Canals. Both of these canals are necessary conduits to drain water from the city into Lake

Pontchartrain. Defendant's assertion that it's responsibility ends at the inland pumping stations

miles inland ignores over 100 years of a historical duty to maintain the drainage canals.

Additionally, it is well settled that the drainage of the city must reach Lake Pontchartrain to have

any appreciable effect in maintaining a dry city. It is therefore incumbent upon the S&WB to

maintain the full extent of these canals.

### iii.   The SWB's Actions May Very Well Have Been a Direct Contributing Factor to the Levee Failure

Part and parcel with the S&WB's duty to maintain the drainage canals is its' duty not to

diminish the structural integrity of the drainage system. The S&WB has failed to disclose any of

its involvement with the maintenance of the canals at issue; but a review of the pertinent history

is significant in that it reveals not only the scope of the S&WB's duty but also activities which

diminished the effectiveness of the drainage system.

In Kelly v. Boh Bros. Const. Co., Inc., 694 So.2d 463 (La.App. 5 Cir.,1997), the S&WB

participated in a joint venture with the Orleans Levee District in the 17th Street Canal in which

they hired Boh Bros. to perform dredging operations, which upon information and belief were

undertaken to improve the drainage capacity of the canal. In that case, the factual findings

accepted by the Louisiana Fifth Circuit indicate that two individuals "were injured on November

3, 1990 in the 17th Street canal when the small boat they were in collided with an unmarked wire

or cable attached at one end to a crane boom high above the water line and at the other end to a

heavy bucket, being used as an anchor, at the bottom of the waterway. The crane was situated on

a barge owned by Boh Brothers Construction Company, Inc., **which was doing dredging work**

**in the canal for the Orleans Levee Board and the Orleans Sewerage and Water Board.**"[emphasis added]. Id., at. 466.  It has since been reported in the Times Picayune that such a dredging operation may be a significant contributing factor of the levee failure at the 17th Street Canal.

Because this matter is in the early stages of discovery, it has not yet been determined whether any similar such operation were undertaken by the S&WB in the London Avenue Canal. However, it is known that the S&WB had a statutory obligation to maintain the London Avenue Canal as well, and that canal's levees failed at points where construction activity had recently taken place.  The S&WB would be hard pressed to show that it adequately maintained the integrity of that drainage canal.  Nonetheless, allegations sufficient to state a claim have been set forth in the various Complaints, and as such they must be deemed "admitted" for purposes of this motion

     iv.    **S&WB's Argument Assigning Blame to Another Party Is Wrong**

S&WB asserts that both the Corps of Engineers and the Orleans Levee District are statutorily responsibly for maintaining the levees, and in so doing, cites 33 U.S.C.A. 702 as dispositive.  However, this statute authorizes the Corps to perform flood-control work on the Mississippi River to control the regular floods of the Mississippi River and to continue levee improvements from the Head of the Passes to the mouth of the Ohio River.  The statute then sets forth that once the Mississippi River levee is completed, that the levee is to be turned over to the levee district protected thereby for maintenance thereafter.[12]

————————————

[12]  **33 U.S.C.A. § 702. Mississippi River**

Clearly, 33 U.S.C.A. 702 is inapplicable, and S&WB's argument must fail.

The S&WB next asserts that the Southeast Louisiana Flood Control Project (SELA) establishes a federally mandated legal responsibility concerning the subject levees. However, this program, attributed in great part to the efforts of the late Mike Yenni following the May 1995 flood, provides for the engineering, design and construction projects for flood control and improvements to rainfall drainage systems, which are to be undertaken with Orleans and Jefferson Parishes ("non-federal sponsors") pursuant to Project Cooperation Agreements. The S&WB has presented no authority which establishes the intent of the federal government to preempt this field (because there is no such intent), and has failed to attach a copy of a relevant Project Cooperation Agreement, which would define the scope of the Corps involvement in the project.

---

**Authorization of flood-control work.** For controlling the floods of the Mississippi River and continuing its improvement from the Head of the Passes to the mouth of the Ohio River the Secretary of the Army is empowered, authorized, and directed to carry on continuously, by hired labor or otherwise, the plans of the Mississippi River Commission, prior to March 3, 1923, or thereafter adopted, to be paid for as appropriations may from time to time be made by law.

**Allotments for improvement of watercourses connected with Mississippi River.** The watercourses connected with the Mississippi River to such extent as may be necessary to exclude the flood waters from the upper limits of any delta basin, together with the Ohio River from its mouth to the mouth of the Cache River, may, in the discretion of said commission, receive allotments for improvements under way March 1, 1917, or thereafter to be undertaken.

**Maintenance of levees constructed for flood control.** Upon the completion of any levee constructed for flood control under authority of this section, said levee shall be turned over to the levee district protected thereby for maintenance thereafter; but for all other purposes the United States shall retain such control over the same as it may have the right to exercise upon such completion.

The S&WB's failure to attach a copy of a relevant Project Cooperation Agreement should be viewed with great skepticism by the Court. The S&WB has been involved with projects associated with SELA, as evidenced in <u>Boh v. James Indus. Contractors</u>, L.L.C., 868 So.2d 180 (La.App. 4 Cir.,2004). In that case, plaintiffs alleged that they suffered damages attendant to activities related to a SELA drainage improvement project which was allegedly initiated and instituted by the S&WB. In response to the many of the allegations, the S&WB disclosed that it was involved in several separate SELA projects involving numerous separate contracts and subcontracts spread over a number of years.

Both the Lake Pontchartrain and Vicinity Hurricane Protection Project and SELA Project authorize the Corps of Engineers to provide their services in enabling better drainage and flood protection to the New Orleans area. However, both are designed to enable the Corps interact with local agencies to facilitate these ends. Neither project sets forth the intent to preempt control of the area, and in fact the S&WB's history is indicative of the fact that S&WB has not allowed the Corps to wrest control of S&WB's statutory duty to maintain the drainage systems of the City of New Orleans. As such, the S&WB's assertion that some other entity is at fault for the failures alleged in the plaintiffs's Complaints must fail.

v.    **The Court must Not Consider SWB's "Fundamental Undisputed Material Facts"**

The S&WB presented nine (9) points in its supporting memorandum that it alleges are "fundamental undisputed material facts." For reasons discussed above concerning the purpose of Fed. R. Civ. P. 12(b)(6) motions, it is inappropriate to argue points which fall outside the parameters of the Complaint.

19

However, it must be pointed out that some of the assertions are erroneous, and would be insufficient evidence to meet the burden of proof of a summary judgment motion even if they were contained in an affidavit. As discussed above, a historical review of the S&WB, as well as an examination of the jurisprudence examining the S&WB's statutory obligations clearly contradicts S&WB's assertions that it does not have *garde* of the outfall canals.

## III.

## CONCLUSION

For all of the above and foregoing reasons, both the SWB's and OLD's Motions to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted should be denied.

     . Respectfully submitted,

     BRUNO & BRUNO, LLP

     BY:_____

          JOSEPH M. BRUNO, Esq.( La. Bar No. 3604)
          DAVID S. SCALIA, Esq. (La. Bar No. 21369)
          L. SCOTT JOANEN, Esq. (La. Bar No. 21431)
          855 Baronne Street
          New Orleans, Louisiana 70113
          Telephone: (504) 525-1335
          **LIAISON COUNSEL**
          **ON BEHALF OF THE LEVEE**
          **BREACH LITIGATION GROUP**

          AND

          Daniel E. Becnel, Jr., Esq. La Bar No. 2926
          Calvin Fayard, Esq. La Bar No. 5486
          Hugh P. Lambert, Esq., La Bar No. 7933
          Gerald E. Meunier, Esq. La Bar No. 9471
          **EXECUTIVE COMMITTEE OF THE LEVEE**

**BREACH LITIGATION GROUP**

AND

Walter C. Dumas, Esq. La Bar No. 5163
F. Gerald Maples, Esq. La Bar No. 25960
Ashton R. O'Dwyer, Jr., Esq. La Bar No. 10166

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing pleading upon all counsel of record by placing same in the United States mail, properly addressed and with first class postage prepaid, or by hand delivery, or by facsimile, e-mail, or other electronic means, this 29 day of June, 2006.

_____
Joseph M. Bruno

21