UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | § § § § | CIVIL ACTION NO. 05-4182 "K" (2) JUDGE DUVAL MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § § | |

**DEFENDANT UNITED STATES' MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS**

i

# **TABLE OF CONTENTS**

FACTS .................................................................. 9

ARGUMENT ............................................................ 16

    I.     THIS ACTION IS BARRED BY THE FLOOD CONTROL ACT OF 1928 ............. 16

    II.    THIS ACTION MUST BE DISMISSED BECAUSE IT CHALLENGES TWO
          CATEGORIES OF CONDUCT TO WHICH THE FEDERAL TORT CLAIMS
          ACT DOES NOT APPLY: (1) CONDUCT AUTHORIZED BY STATUTE
          OR REGULATION AND (2) DISCRETIONARY ACTS OR OMISSIONS
          THAT ARE GROUNDED IN CONSIDERATIONS OF POLICY ..................... 28

          A.    THE "DUE CARE" EXCEPTION BARS CLAIMS OF INHERENT
                PROBLEMS IN MR-GO ........................................ 31

          B.    THE DISCRETIONARY FUNCTION EXCEPTION BARS CLAIMS
                THAT THE CORPS NEGLIGENTLY FAILED TO ADD CERTAIN
                FEATURES NOT DESCRIBED IN THE DIVISION ENGINEER'S PLAN ....... 37

# **TABLE OF AUTHORITIES**

## CASES

*ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n,*
    36 F.3d 409 (5th Cir. 1994) ........................................ 39

*Andrade v. Chojnacki,*
    338 F.3d 448 (5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004) ................ 40

*Bailey v. United States,*
    35 F.3d 118 (7th Cir. 1994) ........................................ 18

*Baldassaro v. United States,*
    64 F.3d 206 (5th Cir. 1995), *cert. denied,* 517 U.S. 1207 (1996) .............. 38, 40

*Berkovitz v. United States,*
    486 U.S. 531 (1988) .............................................. 38

*Boudreau v. United States,*
    53 F.3d 81 (5th Cir. 1995), *cert. denied,* 516 U.S. 1071 (1996) ............... 19, 20

*Brown v. Williams,*
   850 So.2d 1116 (La. Ct. App. 2003) .................................. 35

*Buchanan v. United States,*
   915 F.2d 969 (5th Cir. 1990) ....................................... 29, 31

*Cantrell v. U.S. Dept. of Army Corps of Eng'rs,*
   89 F.3d 268 (6th Cir. 1996) ........................................... 19

*Central Green Co. v. United States,*
   531 U.S. 425 (2001) ............................................... passim

*Dalehite v. United States,*
   346 U.S. 15 (1953) ................................................ passim

*Dauzat v. Thompson Const. Co., Inc.,*
   839 So. 2d 319 (La. Ct. App. 2003) .................................. 35

*Department of the Army v. Blue Fox, Inc.,*
   525 U.S. 255 (1999) .................................................. 29

*FDIC v. Meyer,*
   510 U.S. 471 (1994) .................................................. 29

*Florida E.C. Rwy. v. United States,*
   519 F.2d 1184 (5th Cir. 1975) ........................................ 24

*Graci v. United States,*
   301 F. Supp. 947 (E.D. La. 1969) .................................. 3, 21

*Graci v. United States,*
   435 F. Supp. 189 (E.D. La. 1977) .......................... 3, 22, 23, 24

*Graci v. United States,*
   456 F.2d 20 (5th Cir. 1971) .......................................... 24

*Guile v. United States,*
   422 F.3d 221 (5th Cir. 2005) ......................................... 39

*Honda v. Clark,*
   386 U.S. 484 (1967) .................................................. 29

*James v. United States,*
   740 F.2d 365 (5th Cir. 1984) .................................................. 16

*James v. United States,*
   760 F.2d 590 (5th Cir. 1985) ................................ 16, 18, 19, 21

*Kennedy v. Texas Utils.,*
   179 F.3d 258 (5th Cir. 1999) ........................................... 20, 21

*King of Hearts v. Walmart Stores, Inc.,*
   660 So.2d 524 (La. Ct. App. 1995) .................................... 35

*Laird v. Nelms,*
   406 U.S. 797 (1972) ........................................................... 35

*Lane v. Pena,*
   518 U.S. 187 (1996) ........................................................... 29

*LeSoeur v. United States,*
   21 F.3d 965 (9th Cir. 1994) ................................... 39, 40, 44

*Lively v. United States,*
   870 F.2d 296 (5th Cir. 1989) ............................................. 29

*Macharia v. United States,*
   334 F.3d 61 (D.C. Cir. 2003), *cert. denied,* 540 U.S. 1149 (2004) .............. 40

*Mayeux v. Marmac Acquisition, L.L.C.,*
   900 So.2d 976 (La. Ct. App. 2005) .................................... 35

*Mocklin v. Orleans Levee District,*
   877 F.2d 427 (5th Cir. 1989) ............................................. 19

*National Fire Ins. v. United States,*
   115 F.3d 1415 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998) .......... 44, 45, 46

*Rich v. United States,*
   119 F.3d 447 (6th Cir. 1997), *cert. denied,* 523 U.S. 1047 (1998) .............. 39

*Smith v. Johns-Manville Corp.,*
   795 F.2d 301 (3d Cir. 1986) .............................................. 40

*United States v. Gaubert,*
    499 U.S. 315 (1991) ............................................. 38, 39, 40, 42

*United States v. James,*
    478 U.S. 597 (1986) ............................................. 2, 16, 17, 18

*United States v. Orleans,*
    425 U.S. 807 (1976) ............................................. 29

*United States v. Varig Airlines,*
    467 U.S. 797 (1984) ............................................. 38

*Welch v. United States,*
    409 F.3d 646 (4th Cir. 2005), *cert. denied,* 126 S.Ct. 1431 (2006) ............... 31

*Williams v. United States,*
    957 F.2d 742 (10th Cir. 1992) ..................................... 19

## STATUTES

La. Civ. Code Ann. art. 2317 (2006) ..................................... 35

Pub. L. No. 455, 70 Stat. 65 (1956) ..................................... passim

28 U.S.C. § 1346(b) ............................................. 5, 28, 29

28 U.S.C. §§ 2679(b)(1) ............................................. 29

28 U.S.C. §§ 2671-2680 ............................................. 28, 29

28 U.S.C. § 2680(a) ............................................. 5, 28, 29

33 U.S.C. § 426i(a) ............................................. 14

33 U.S.C. § 426i(c) ............................................. 43

33 U.S.C. § 541 ............................................. 43, 46

33 U.S.C. § 702c ............................................. passim

## CONGRESSIONAL REPORTS

H.R. Doc. No. 46 (1930) ................................................. 10, 33

H.R. Doc. No. 231 (1965) ............................................... passim

H.R. Doc. No. 245 (1951) ............................................... passim

## MISCELLANEOUS

Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana (Mar. 1976) ............................................................... 15

MR-GO Design Memorandum 1-A (Rev. Jul. 1957) ...................... 10, 12, 13

MR-GO Design Memorandum 1-B (Rev. May 1959) ........................ 12, 13

Lake Pontchartrain and Vicinity Hurricane Protection Project Reevaluation Study, Main Report ...................................................... 11, 15

Lake Pontchartrain and Vicinity Hurricane Protection Project Reevaluation Study, map dated 30 Sept. 1995 ........................................... 15

1988 MR-GO Reconnaissance Report ..................................... passim

1994 MR-GO Reconnaissance Report ..................................... passim

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| | § | |

### DEFENDANT UNITED STATES' MEMORANDUM
### IN SUPPORT OF MOTION TO DISMISS

In their Complaint, the plaintiffs ask that the United States be held liable for the "unfathomable losses" they allegedly suffered in the wake of Hurricane Katrina. Complaint ¶ 1. According to the plaintiffs, these harms were not caused by Katrina itself but were instead caused by the negligent design, construction, maintenance, and operation of the Mississippi River Gulf Outlet ("MR-GO"). They theorize that MR-GO intensified and accelerated the storm surge set in motion by Katrina, transforming what "would have been an endurable event" into "the obliterating force" that overwhelmed and destroyed the hurricane protection system that the United States was building to forestall a disastrous flood. *Id.* ¶¶ 1-3.

1

Although the flooding caused by Hurricane Katrina was tragic, the United States is not liable for the damages that the plaintiffs seek. Foremost, Congress has determined that the United States cannot be held liable for *any* damages resulting from floods or flood waters. In the Flood Control Act of 1928, Congress provided that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. As the Supreme Court has observed, this provision "outlines immunity in sweeping terms . . . . It is difficult to imagine broader language." *United States v. James*, 478 U.S. 597, 604 (1986) (footnote omitted) *("James III")*. The relevant damages in this case indisputably resulted from "floods or flood waters." This action must therefore be dismissed.

In their Complaint, the plaintiffs assert that § 702c does not mean what it says. Rather, they claim that the statute only immunizes damages related to flood control projects. Complaint ¶¶ 39-40. Not only is this argument foreclosed by the "sweeping terms" of § 702c, but it is contrary to the Supreme Court's own reading of them. "The scope of the immunity [is determined] not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage . . . ." *Central Green Co. v. United States*, 531 U.S. 425, 434 (2001). Whenever damages result "'from or by floods or flood waters,'" the United States is absolutely immune. *Id.*

Even if the plaintiffs were correct in asserting that § 702c does not apply unless there is a nexus between the alleged damages and a flood control project, their action would still be barred by it. According to the plaintiffs, the judicial findings made in

2

connection with lawsuits brought in the wake of Hurricane Betsy in the 1960s establish that MR-GO is "a 'navigation aid', as opposed to a flood control project," and that the government can be held liable for flood damage attributable to negligence in connection with non-flood control projects such as MR-GO. *See* Complaint ¶¶ 39-40 (citing *Graci v. United States*, 301 F. Supp. 947 (E.D. La. 1969); *Graci v. United States*, 435 F. Supp. 189 (E.D. La. 1977)). To the extent that *Graci* and its progeny focus on whether the challenged conduct is related to flood control or a flood control project, they are at odds with the teaching of *Central Green*, which redirects the focus back to the relationship between the damage and the waters that caused the damage.

Further, the plaintiffs' reliance on *Graci* is misplaced because the federal flood works that now ring greater New Orleans were non-existent when Betsy struck. The Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP" or "HPP") was still on the drawing boards when the area was flooded by Betsy. In light of the massive investments made by the federal government in connection with the LPVHPP after Hurricane Betsy, *Graci*'s holding has no relevance to this case. The flood at issue in *Graci* was not one that involved a federal flood control project; the flood at issue here is one that did. Even though the Complaint focuses on dangers allegedly created by MR-GO, the Katrina flood is certainly a flood that the LPVHPP was devised to prevent, and the floodwaters that caused the relevant damages were waters that the flood control project failed to contain. Indeed, the Complaint itself advances allegations that, if taken as true, reveal the centrality of the federal flood control works in the events from which the plaintiffs' claims arose. The flood occurred when Katrina's storm surge overtopped

3

the levees and caused both levees and floodwalls to "collapse." Complaint ¶ 75. "[I]t was the fact that the floodwalls were subjected 'to pressures [they were] not designed to handle' that caused them to fail and caused the resulting flooding." *Id.* ¶ 80.

The Complaint is correct in acknowledging that MR-GO and the LPVHPP are inherently and inextricably intertwined. The MR-GO waterway forms a constituent element of the hydrologic system that the flood control project was designed to contain. It is no mere happenstance that LPVHPP levees were built on the banks of MR-GO. Moreover, LPVHPP planners called for construction of a dual-purpose lock at Seabrook to remedy certain unintended consequences of MR-GO that were recognized while MR-GO was under construction. Serving both flood-control and navigation purposes, the lock was intended to prevent waters conveyed by MR-GO into the Industrial Canal from entering Lake Pontchartrain and to reduce currents that MR-GO had accelerated in the Industrial Canal and which were hazardous to navigation and harbor developments. The levees and floodwalls that surrounded the plaintiffs' properties were federal flood control structures, and the floodwaters that allegedly harmed the plaintiffs were waters that these federal works failed to contain.

Indeed, as the Complaint avers, concerns about the waterway's influence on the hydrologic system were raised repeatedly over the course of many years. The Seabrook lock was the first of many solutions proposed to mitigate unintended and untoward consequences of MR-GO. The erosion and concomitant loss of wetlands caused by wave-wash from ships passing through the channel were long recognized as not merely an environmental problem, but also a potential threat to the LPVHPP because wetlands

4

can provide a buffer against storm surge. The plaintiffs' attempt to avoid the sweeping immunity provided by the Flood Control Act by founding their action exclusively on MR-GO's supposed involvement in the Katrina flood is futile: MR-GO's involvement in the Katrina flood cannot be analyzed apart from its impact on the LPVHPP works that failed. Inasmuch as the plaintiffs' alleged damages resulted from floodwaters that the flood control project failed to control, the immunity afforded by § 702c applies notwithstanding the purported involvement of MR-GO in causing the flood.

The Complaint must also be dismissed for a second, independent reason: this action is beyond the purview of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"). As the Complaint recognizes, Congress charged the Army Corps of Engineers with designing, constructing, operating, and maintaining MR-GO. Complaint ¶ 95. MR-GO exists where it is and as it is because Congress decided to put it there and told the Army Corps of Engineers to build it and maintain it; the Corps had no choice but to comply with the congressional mandate — as the Complaint itself acknowledges. *See id.* ¶ 35. To the extent that this action is founded on "problems" with MR-GO that are "inherent," as the Complaint alleges in its second paragraph, the action must be dismissed because "inherent problems" in Congress's mandate cannot form a basis of liability under the FTCA. In drafting the FTCA, Congress included a provision to prevent the Act from functioning as a vehicle by which federal statutes and regulations might be challenged. Codified at 28 U.S.C. § 2680(a), the "due care" exception excludes from the FTCA's purview suits that attempt to impose liability for the acts or omissions that occur during the execution of a statute or regulation with due

5

care. When an action is founded on such conduct, it is barred by the due care exception notwithstanding generalized claims of "negligence." In the absence of any specific deviation from the statutory mandate, generalized claims of negligence are nothing less than an indirect challenge to the statute whose dictates were being carried out.

Thus, the FTCA's due care exception forecloses the general claim that MR-GO was negligently "designed, constructed, operated, and maintained." This generalized claim is repeated in paragraph after paragraph — without any specific allegation of deviation from the MR-GO plan that was approved by Congress. *See* Complaint ¶¶ 1, 2, 5, 6, 29, 30, 74, 93, 102. That this is an indirect challenge to the law that authorized MR-GO can be most plainly seen in paragraph 95, where the allegation that MR-GO's design, construction, operation and maintenance were mandatory functions appears cheek-by-jowl with a claim that these functions were negligent because they created a waterway that "pose[d] a threat to residents like Plaintiffs and serve[d] as a 'hurricane highway' for surge water directed at Orleans and St. Bernard Parishes." *Id.* ¶ 95.

Indeed, a fair reading of the Complaint confirms that the plaintiffs believe their alleged damages can be traced to the project authorized by the legislature, for the waterway itself (*i.e.*, the very existence of the waterway) is said to be problematical, quite apart from any "negligence" that may have attended the Corps's execution of the congressional mandate: "From its conception over 40 years ago, the MR-GO was riddled with *inherent* problems that have steadily worsened over the years . . . ." *Id.* ¶ 2 (emphasis added). "From the outset, . . . the MR-GO project . . . was riddled with serious problems." *Id.* ¶ 34. "[T]he MR-GO has been a colossal failure on multiple

6

levels from the start." *Id.* ¶ 43. The design and construction are said to have been inherently flawed because the very presence of a waterway in the location where Congress mandated that it be built poses a danger of flooding: "The MR-GO is a straight arrow pointed at New Orleans with no barriers or other means to slow down storm-driven surges"; it "creates a funnel effect where the MR-GO intersects the Gulf Intracoastal Waterway ('GIWW'), furiously accelerating the power and force of the storm surge while channeling it directly into the Industrial Canal . . . . This funnel effect caused the inundation of New Orleans East, St. Bernard Parish, and the Lower Ninth Ward." Complaint ¶ 3. "The MR-GO's design was flawed in . . . [its] fail[ure] to take account of the waterway's inherent and known capability of serving as a funnel or conduit for . . . storm-driven surges which would magnify the storm surge's force against levees and spoilbanks in New Orleans and St. Bernard Parish . . . ." *Id.* ¶ 49. MR-GO is "'a shotgun pointed straight at New Orleans.'" *Id.* ¶ 62. It is "a deadly 'hurricane highway.'" *Id.*

Even if these allegations were true, the United States could not be held liable. The Corps may have developed the plan, but Congress approved it and told the Corps to prosecute it. Thus the "shotgun," the "arrow pointed straight at New Orleans, "the 'hurricane highway,'" and the infamous "funnel" are but inflammatory descriptions of a "flaw" attributable to the legislation that directed the building of this project where and as it was built. The path of the channel through the marshes and bogs along Lake Borgne—the course approved by Congress—is also challenged as a design flaw: "The design and construction of the waterway . . . failed to account for the devastation of the

7

wetlands that the MR-GO, by its design, would facilitate." *Id.* ¶ 50; *see also id.* ¶ 53 ("The negligent design of the MR-GO invited destruction of the surrounding wetlands."). But as Congress was informed before it approved this course, "[a]n east-bank outlet from New Orleans necessarily traverses marshlands" on its way to the Gulf of Mexico. H.R. Doc. No. 245 (1951) (Army submission re MR-GO) (Exh. 1), at 33.

To the extent that this action is founded on decisions and choices that were properly the Corps's to make within the framework of the law that mandated MR-GO's construction, it is barred by the FTCA's discretionary function exception, which is also codified at 28 U.S.C. § 2680(a). This exception prevents the United States from being held liable for discretionary conduct (*i.e.*, conduct involving choice or judgment) if the conduct is susceptible to policy analysis. Four broad allegations assert that the Army Corps of Engineers negligently failed to include certain flood-control related features in the design, construction, and maintenance of the waterway. The first allegation, mentioned only in passing, is that MR-GO was constructed "with no barriers or other means to slow down storm-driven surges." Complaint ¶ 3. The final three allegations relate to the loss of wetlands that occurred as waves generated by passing ships eroded the adjacent marshland: failure to (1) "'armor' levees on both banks of the MR-GO," *id.* ¶ 49; (2) effect other "'erosion stabilization measures,'" *id.* ¶ 56; and (3) "properly dredge" to the "originally designed 36-foot depth," *id.* ¶¶ 51-53.

The reports submitted to Congress were silent as to the building of barriers or levees or the taking of other bank stabilization or surge-mitigation measures. To the extent that such structures and measures would have been compatible with the project

8

as authorized, whether to build or employ them was within the Corps's discretion. The problem of erosion was recognized by the Corps long before Katrina, *see, e.g.,* Complaint ¶¶ 51-56, and the Corps examined various remedial measures. And while it is true that the studies did not lead to measures that eliminated erosion entirely, that is because whether and how to remedy the situation involved the weighing of alternatives, including their costs and benefits, against other objectives and priorities that were competing for available funds. The discretionary function exception therefore bars this action insofar as it challenges those policy-driven decisions.

## FACTS

On March 29, 1956, President Eisenhower signed into law a bill authorizing construction of the MR-GO. Complaint ¶ 42; *see also* Pub. L. No. 84-455, 70 Stat. 65, 65 (1956) (Exh. 2). The bill modified an existing public project, Mississippi River, Baton Rouge to the Gulf of Mexico, to provide for an additional outlet to the Gulf from the Port of New Orleans. *See* Pub. L. No. 84-455 (Exh. 2). The roots of the bill extended back more than a decade, to a time of war, to resolutions of House and Senate committees requesting that the Army investigate "the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce." H.R. Doc. No. 245 (Exh. 1), at 4. The soil in which the project took root was soil that had been cultivated at the behest of Congress during the years between the twentieth century's two world wars by the publication of various reports of studies that the Army had conducted to determine the advisability of constructing "'an outlet to deep water in the Gulf of Mexico by the most practicable route for a

permanent channel.'" H.R. Doc. No. 71-46 (1930) (Exh. 3), at 3 (quoting a 1929 resolution of the House Committee on Rivers and Harbors). The first round of studies had led the War Department to inform Congress in 1930 that there was "no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two [main Mississippi River] passes is now assured." *Id.* at 2; *see also id.* at 3-7, 49.

When the Department of the Army revisited the matter in the 1940s, after being instructed to do so by a war-time Congress, the circumstances had changed. Accordingly, under cover of a letter from the Secretary of the Army, a collection of reports and comments was transmitted to Congress recommending construction of a seaway to supplement the Mississippi River passes into the Gulf . *See* H.R. Doc. No. 245 (Exh. 1), at 1-2. Congress accepted the Army's recommendation and authorized the construction of MR-GO. *See* Pub. L. No. 84-455 (Exh. 2). According to the plan approved by Congress, MR-GO would be a deep-draft "seaway canal" extending eastward along the GIWW for about eight-and-one-half miles before striking a southeasterly course "on tangents and easy curves . . . to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound" before entering into the Gulf of Mexico. H.R. Doc. No. 245 (Exh. 1), at 5; *accord id.* at 38, 43; *see also* MR-GO Design Memorandum No. 1-A (Rev. Jul. 1957) (Exh. 4), Plate 1 (Project Location).

Construction began in March of 1958. MR-GO Reconnaissance Report on Channel Bank Erosion (Feb. 1988) (Exh. 5) at 14. By mid-1961, the project was 20

10

percent complete. H.R. Doc. No. 89-231 (1965) (Exh. 6), at 53. Although the MR-GO channel would not be opened to traffic until mid-1963 and would not be enlarged to its full project dimensions until 1968, *id.*, the Corps of Engineers quickly discovered that the channel was having undesirable impacts on the Industrial Canal, *see id.* at 8, 55-57, 60, 232. By mid-1963, the Corps had taken note of increased current velocities in the Industrial Canal, which were causing erosion even as construction of MR-GO was in progress. *Id.* at 8; *see also id.* at 17-18.

Even before these problems became apparent—indeed, even before construction of MR-GO began—the Corps, in response to congressional resolutions, was preparing plans for the construction of a hurricane protection system that would encircle New Orleans and adjacent parishes. *See* H.R. Doc. No. 89-231 (Exh. 6) at vii, 1-12; LPVHPP Reevaluation Study (Main Report Vol. I, Jul. 1984) (hereinafter "LPVHPP Re-eval.") (Exh. 7) Plate 9 (high-level plan map showing LPVHPP flood works). In 1965, three years before MR-GO would attain its authorized dimensions, Congress authorized the Lake Pontchartrain and Vicinity, Louisiana, Hurricane Protection Project, which was to result in a comprehensive hurricane protection system for the metropolitan New Orleans areas lying between the Mississippi River and the lake, including New Orleans East, the Lower Ninth Ward, and most of St. Bernard Parish. *See* LPVHPP Re-eval. (Exh. 7) at 1 & Plate 3 ("Authorized Plan"). Construction of the LPVHPP flood works would not commence until 1966, LPVHPP Re-eval. (Exh. 7) at 1, but because the MR-GO waterway formed a constituent element of the hydrologic system that the hurricane protection system was being designed to contain, the LPVHPP planners studied the role

11

of MR-GO in the system. For example, through modeling that was designed to gauge the hydraulic impact of the flood control project's barrier plan (which would eventually be abandoned in favor of the high-level plan), they learned that "upon completion of the MR-GO project, presently under construction, salinities in Lake Pontchartrain will be increased significantly by way of tidal exchange direct from the Gulf of Mexico through the Inner Harbor Navigation Canal." *Id.* at 8; *accord id.* at 57.

The LPVHPP planners recognized even before MR-GO was complete that storm surges would contribute to the "enormous volumes of water pass[ing] in both directions through" the channel. *Id.* at 101. Nevertheless, the design memoranda included no structures or mechanisms to impede the flow of water through MR-GO, *see* MR-GO Design Mem. 1-A (Exh. 4), at 2-9 & Plate 2; MR-GO Design Mem. 1-B (Rev. May 1959) (Exh. 8), at 3 & Plates 2-9. Because it was thought that "the new channel w[ould] be of no consequence" in affecting water surface elevations for major storms and hurricanes, MR-GO Design Mem. 1-B (Exh. 8), at 3, it was constructed "with no barriers or other means to slow down storm-driven surges," Complaint ¶ 3.

The Corps planned to correct the "adverse conditions resulting from construction of the MR-GO" (*i.e.*, the problems of which it was aware—erosion in the Industrial Canal and the GIWW, saline intrusion into Lake Pontchartrain, and hazardous currents in the Industrial Canal) by constructing a lock and dam at Seabrook, near the north end of the Industrial Canal. H.R. Doc. No. 89-231 (Exh. 6), at 60; *accord id.* at vii, ix. The flood control project plan called for strengthening and enlarging the lock so that it would also serve a flood control purpose, preventing storm surge from

12

entering Lake Pontchartrain after passing through the MR-GO and the Industrial Canal. *See id.* at 17, 63, 232. The dual-purpose lock would serve to "control hurricane inflows into the lake as well as to limit objectionable salinity intrusion into the lake and tidal currents in the canal now developing from construction of the MR-GO," *id.* at 17; *accord id.* at vii, ix, and "prevent velocities hazardous to navigation in the canal," *id.* at 2. Because the facility would serve both flood control and navigation purposes, the Bureau of the Budget proposed to allocate its cost equally between navigation and hurricane protection. *Id.* at vii.

As originally designed, no channel protection (*e.g.*, levees or dikes) was recommended for the western-most reaches of the seaway, even though "erosion due to wave wash in open areas" was "expected." MR-GO Design Mem. 1-A (Exh. 4), at 7; MR-GO Design Mem. 1-B (Exh. 8), at 5. It was anticipated that channel protection could "be provided if and when the need for it becomes necessary." *Ibid.* Over the years, waves generated by ships and other vessels caused the expected erosion of MR-GO's banks. Between 1968 and 1987, the top width of the 41-mile-long land cut increased from 650 feet to an average of 1,500 feet. 1988 MR-GO Recon. Rep. (Exh. 5) at 26. "Passage of [large] vessels cause[d] very large quantities of water to be displaced from the channel into the adjacent marsh, followed by rapid return flow into the channel. The tremendous forces exerted by these rapid and extreme fluctuations cause[d] the relatively soft marsh adjacent to the channel to break up and be swept into the waterway." *Id.* Between 1968 and 1993, bank erosion caused a loss of 4,200 acres of marsh adjacent to the channel. MR-GO Bank Erosion Reconnaissance Report (Jan. 1994)

13

(Exh. 9) at 1. That this had made the "developed areas adjacent to [MR-GO] . . . more susceptible to flooding" was understood. *See id.* at 28. In recognition of the baleful effects of erosion, the Corps studied various alternatives for stabilizing the banks. *See id.* at 35-71; 1988 MR-GO Recon. Rep. (Exh. 5) at 30-62. Some shore stabilization plans were disfavored because they were "prohibitively expensive." 1988 Recon. Rep. (Exh. 5) at 34. Others lacked the necessary local support. *See* 1994 MR-GO Recon. Rep. (Exh. 9) at 1-2, 70-71; *cf.* 33 U.S.C. § 426i(a) (authorization to "implement . . . measures for the prevention or mitigation of shore damages attributable to Federal navigation works" is contingent upon "a non-Federal public body['s] agree[ing] to operate and maintain such measures").

Even as it was being built, MR-GO formed a major component of the hydrologic system that had to be contained to prevent floods from wreaking havoc on Orleans and St. Bernard Parishes. *See* H.R. Doc. No. 89-231 (Exh. 6), at 4-5, 7-9, 12, 17-18, 28, 58, 60, 63-66, 84-85, 94, 100-101. Accordingly, LPVHPP planners specified that flood control levees be built on MR-GO's southern shores and that those levees be extended across St. Bernard Parish to the Mississippi River, where they would tie into the flood control levees built to contain the river. . *Id.* at 2, 9, 18, 64-65, 81, 84, 224 & Plate A-1 (which follows page 138); *cf. id.* at 8, 54-55 (representatives of Orleans and St. Bernard Parishes requested construction of levee), 58 (MR-GO system of levees found to be most "practicable"). As constructed, this levee extended east and south along the bank of MR-GO for several miles beyond Bayou Dupre before turning west across St. Bernard Parish, to meet the internal St. Bernard levee and, beyond that, the Mississippi River

14