levee. *See* LPVHPP Map (30 Sept. 1995) (Exh. 11) ; LPVHPP Re-eval. (Exh. 7) Plate 9 (high-level plan works).

Construction of the LPVHPP levee on the south bank of MR-GO required the dredging of MR-GO to obtain materials. *See* Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana (Mar. 1976) (Exh. 10) § 1.05(b)(2)(a), at I-8. This dredging "significantly reduced" the amount of maintenance dredging that occurred along the reaches where the LPVHPP dredging took place. 1988 MR-GO Recon. Rep. (Exh. 5) at 16; *accord* 1994 MR-GO Recon. Rep. (Exh. 9) at 11.

On August 29, 2005, federal flood control levees completely surrounded the places where the plaintiffs allegedly were residing. *Compare* LPVHPP Map (30 Sept. 1995) (Exh. 11) *with* Complaint ¶¶ 10-25 (identifying plaintiffs' residences).

On August 29, 2005, storm surge generated by Hurricane Katrina was allegedly intensified by MR-GO and funneled into the Industrial Canal, causing the federal flood control works to "collapse" under "'pressures [they were] not designed to handle.'" *See* Complaint ¶¶ 3, 75, 80. The earthen levees that line the MR-GO and the GIWW were overtopped by a surge far higher than was anticipated for a Category 3 storm, sending floodwaters rushing into St. Bernard Parish, as well as New Orleans East, and the Lower Ninth Ward. *See id.* ¶¶ 75 (including graphic text), 77.

# ARGUMENT

## I. THIS ACTION IS BARRED BY THE FLOOD CONTROL ACT OF 1928.

In the Flood Control Act of 1928, Congress provided that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. As the Supreme Court observed, this provision "outlines immunity in sweeping terms: 'No liability of *any* kind . . . for *any* damage from or by floods or flood waters at *any* place.' (Emphasis added [by Court].) It is difficult to imagine broader language." *United States v. James*, 478 U.S. 597, 604 (1986) (footnote omitted) *("James III")*.

The Supreme Court first construed this provision in *James III*. There it reviewed a decision of the Fifth Circuit in which a sharply divided court, sitting *en banc*, held that the United States could be liable for injuries suffered by recreational boaters who were injured by floodwaters being discharged from a reservoir. *See James v. United States*, 740 F.2d 365, 367 (5th Cir. 1984) (panel opinion) *("James I")*, *overruled*, 760 F.2d 590, 604 (5th Cir. 1985) (en banc) *("James II")*, *rev'd*, 478 U.S. at 599-600. In reaching its decision, the Court of Appeals had concluded that application of § 702c hinged not on the character of the waters that caused the plaintiffs' injuries but on the nature of the conduct that caused them. The court had reasoned that § 702c provides immunity only "[i]f a producing cause of the damage or injury is a government employee's negligence in . . . acts strictly for the purpose of controlling floods or floodwaters." 760 F.2d 603. If the harm resulted from an act or omission not directly aimed at controlling floods or

16

floodwaters, § 702c would not apply, even if "the presence or movement of water for flood control purposes . . . furnishes a condition of the accident." *Id.*

Finding nothing in either the statutory text or the legislative history that would "justif[y] departure from the plain words of the statute," the Supreme Court reversed. 478 U.S. 606. "We have repeatedly recognized that '[w]hen . . . the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances.' In the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'" *Id.* (citations omitted). Not only did "Congress' choice of the language '*any* damage' and 'liability of *any* kind' . . . undercut[] a narrow construction" of § 702c, the "plain words" *floods* and *flood waters* left no doubt that the plaintiffs' injuries were within the scope of the immunity they described:

> "the terms 'flood' and 'flood waters' [do not] create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry floodwaters. It is thus clear that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.

*Id.* at 605.

The legislative history of § 702c "confirm[ed] that it was intended to reaffirm sovereign immunity" in order to "limit[] the Federal Government's financial liability to expenditures directly necessary for the construction and operation of various projects." *Id.* at 607. Numerous "statements [by legislators] show that the sweeping language of § 702c was no drafting inadvertence. Congress clearly sought to ensure beyond doubt

17

that sovereign immunity would protect the Government from 'any' liability associated with flood control." *Id.* at 608 (internal citation omitted). To this end, Congress employed "'the broadest and most emphatic language'" to describe the Government's immunity. *Id.* (quoting *National/Mfg. Co. v. United States,* 210 F.2d 263, 270 (8th Cir. 1954)).[1] Based on this analysis, the Supreme Court rejected the Court of Appeals' attempt to restrict the immunity to "acts strictly for the purpose of controlling floods or floodwaters." 760 F.2d 603.

However, in commenting on the reach of § 702c, the *James* Court included dicta stating that the statutory phrase "floods or flood waters" "appl[ies] to all waters contained in or carried through a federal flood control project for purposes of or related to flood control." 478 U.S. 597. This dictum was not recognized as such by the lower courts and, because of its overbreadth, gave rise to a welter of conflicting constructions of § 702c as courts struggled to define the scope of the immunity it confers. The Seventh Circuit, for example, discerned that § 702c requires a causal nexus between the asserted injury and flood control activities: § 702c applies if (and only if) flood control activities made the plaintiff's injuries more likely than they would have been in the absence of those activities. *Bailey v. United States,* 35 F.3d 118, 1122 (7th Cir. 1994). The Sixth Circuit agreed that § 702c immunity required a causal nexus and that the "focus" should be "on

---

[1] In this sentiment the Court was consciously echoing the words of Circuit Judge Gee, who, writing in dissent for himself and four of his colleagues in the *en banc* minority, had unsuccessfully "sought to devise a form of words that would more plainly rule out liability than does the Congressional language." *James v. United States,* 760 F.2d 590, 604 (5th Cir. 1985) (Gee, J., dissenting) ("*James II*").

18

the particular tortious act for which the plaintiff is trying to hold the government liable," but they concluded that "the proper standard . . . is whether the plaintiff can recover without holding the government liable for a privileged activity—*i.e.*, an activity (or a physical phenomenon caused by an activity) somehow necessary in the government's battle to control floods." *Cantrell v. U.S. Dept. of Army Corps of Eng'rs*, 89 F.3d 268, 273-74 (6th Cir. 1996). The Tenth Circuit did not adopt the analysis of either of these courts but instead kept its focus on the nature of the project and the "nexus between the operation of that project and the . . . injury." *Williams v. United States*, 957 F.2d 742, 744-45 (10th Cir. 1992); *see also id.* at 744; (rejecting "[a]n approach that elevate[s] the character of the water over the purpose of the dam or levee").

The Fifth Circuit, too, struggled to find the limits of § 702c. In *Mocklin v. Orleans Levee District*, the court relied on the misleading *James* dictum in deciding that the drowning of the plaintiffs' son was "'from or by' 'flood water.'" [sic] 877 F.2d 427, 429 (5th Cir. 1989). The boy drowned in a flotation channel that "properly c[ould] be said to contain water related to flood control," because it was dredged to allow equipment and materials to be delivered to reinforce levees to prevent floods. *Id.* Inasmuch as the water was "related to flood control" and "causally did contribute to the drowning," the court concluded that § 702c applied. *Id.* at 430. The court rejected an argument by the plaintiffs that their injury was "wholly unrelated" to a flood control project inasmuch as the flotation channel had been designed for navigation. Even if the drowning was "wholly unrelated" to flood control, the nexus between the dredging and flood control was adequate to sustain application of § 702c. *Id.* n.6. Similarly, in *Boudreau v. United*

19

*States*, the court found a "sufficient association" between the challenged conduct and flood control to warrant application of the provision. 53 F.3d 81, 84 (5th Cir. 1995), *cert. denied*, 516 U.S. 1071 (1996). Even though the Coast Guard was arguably engaged in "water safety management" when it attempted to aid the plaintiff who was stranded on "a flood control lake," the court found a sufficient association between the challenged activity and flood control because it could not "say that Boudreau's injury ha[d] 'nothing to do with management of flood waters.' His injury resulted from a *boating* accident *on flood control waters* involving the *Government's patrol of those waters*." *Id.* at 82, 86 (emphasis in original).

The decision of the panel majority in *Boudreau* drew a sharply worded dissent from Judge Smith, who did not see an adequate causal nexus between the water on which the plaintiff was stranded and the injury, which occurred when a line snapped as an anchor was being lifted. In Judge Smith's opinion, the causal connection between water and the injury was too tenuous to sustain application of § 702c. *See id.* at 86-87. Following a similar line of reasoning, the Court of Appeals later ruled that the provision did not apply to an injury that occurred on a beach when a visitor stepped on an electrical line and was electrocuted. *See Kennedy v. Texas Utils.*, 179 F.3d 258, 263 (5th Cir. 1999). The court thought it significant that the injury occurred on land, not water: "the ordinary and common meaning of 'from or by floods or flood waters' does not, in our view, extend to an injury occurring on land apart from water and as the result of a use of the land itself." *Id.* at 261. Even assuming that "all the waters in Joe Pool Lake" were "flood waters" when the plaintiff visited the lake, it could not rightly be said that

20

her "injuries were 'from or by' such flood waters. Her injuries were caused by an electrical cable which was not installed or maintained by the United States, and which served no flood control purpose whatsoever. The alleged liability is not, in our view, 'associated with flood control[]' or 'clearly related to flood control.'" *Id.* at 262-63 (footnote omitted). Although the court did not express criticism of its earlier application of the immunity provision in *Boudreau*, its emphasis on the importance of a clear causal nexus between floodwaters and the relevant injury echoed Judge Smith's *Boudreau* dissent. Because "the only relation to 'flood waters' is that Kennedy would not have gone to the park but for the existence of the lake, and that her injury occurred on a patch of land that is within the flood stage pool," the court declined to apply § 702c. The court ruled that the "alleged nexus with flood waters . . . is too attenuated to hold that Kennedy suffered 'damage from or by' such waters under § 702c." *Id.* at 263.

Less than two years after the Fifth Circuit decided *Kennedy*, the Supreme Court took responsibility for the confusion evident in the Courts of Appeals' conflicting constructions of § 702c. The Court clarified that "the phrase 'related to flood control'" in *James* was, in fact, dictum. *Central Green Co.*, 531 U.S. 430. The Court in *Central Green* made it clear that *James* had not conferred the status of "flood waters" upon waters whose only relationship to floods and flood control was that they happened to be contained in or carried through a flood control project. Rather, "the phrase 'floods or flood waters,'" as it applies to waters that passes through flood control structures, encompasses two subsets of such waters: (1) "those waters that a federal project is

21

unable to control" and (2) "waters that are released for flood control purposes when reservoired waters are at flood stage." *Id.* at 431.

The significant nexus, or association, that is relevant to § 702c immunity is the causal relationship between water—specifically "floods or flood waters"—and the plaintiff's damages. *See id.* at 434. It is "the character of the waters that cause the relevant damage," not "the character of the federal project or the purposes it serves," that determines whether § 702c applies. *Id.*

Remarkably, the plaintiffs simply ignore the "سweeping terms" of § 702c and rely on lower court decisions that were decided prior to *Central Green* and *James III* and which hold that § 702c does not apply unless there is a nexus between the relevant damages and a flood control project. *See* Complaint ¶¶ 39-40 (citing *Graci v. United States*, 301 F. Supp. 947, 949 (E.D. La. 1969) and *Graci v. United States*, 435 F. Supp. 189, 192 (E.D. La. 1977)). On the basis of this analysis, the plaintiffs reason, "this action is not barred by any of the immunity provisions of the Mississippi Flood Control Act of 1928," because the MR-GO is not a flood control project. *See* Complaint ¶ 39. This argument is clearly contrary to the express language of § 702c, which immunizes the United States to liability for "any damage from or by floods or flood waters at any place." But it also depends upon legal reasoning that the Supreme Court has rejected and upon a factual predicate that has not existed for nearly 40 years. The *Graci* cases involved liability for flooding in 1965 from Hurricane Betsy. The waters that covered New Orleans East, the Lower Ninth Ward, and St. Bernard Parish in September of 1965 were not "waters that a federal project [wa]s unable to control." *Central Green*, 531 U.S. at 431. No federal flood

22

works lined MR-GO, the Industrial Canal, the GIWW, or the shores of Lake Pontchartrain when Betsy stormed ashore. The levees and floodwalls in those locations that were overtopped and that failed to withstand Katrina's onslaught were still on the LPVHPP planners drawing boards in 1965. Thus, even if the statutory phrase "floods or flood waters" extends only to the two categories of water mentioned in *Central Green*, *i.e.*, "those waters that a federal project is unable to control" and "waters that are released for flood control purposes when reservoired waters are at flood stage," *id.* at 431, Katrina's waters were "flood waters" even though Betsy's were not. Indisputably, the waters that caused the relevant damage in the present case were "flood waters" within the meaning of § 702c, and under *Central Green* that causal nexus requires application of the immunity provision and dismissal of this case. Even "narrowly confined," "the phrase 'floods or flood waters'" denotes "those waters that a federal project is unable to control." *Id.* 431. It is undisputed that the waters that washed over St. Bernard Parish, New Orleans East, and the Lower Ninth Ward of Orleans Parish and caused the plaintiffs' alleged damages were floodwaters that the LPVHPP works were unable to control.[2] Undoubtedly, the plaintiffs rely on *Graci* and the now discredited "flood control project" argument to divert attention from the fact that their asserted damages resulted from "floods or flood waters."

Dismissal would also be necessary even if it were to be assumed that § 702c applies only if the relevant damages are "'related to flood control,'" 531 U.S. 430, rather

---

[2]*See* Complaint ¶¶ 73, 75 (including graphic text), 77, 80, 82, 83, 102.

23

than the "character" of the water involved. *Graci's* holding has no relevance to this case because it was based on a finding that the challenged conduct was "*unconnected with flood control projects,*" *Graci v. United States*, 456 F.2d 20, 26 (1971) (emphasis in original),[3] and such a finding is incompatible with the conduct at issue here. The Complaint itself reveals that a flood control project was not merely "involved" here but was an undeniably central and essential element in the chain of causative events that allowed Katrina's storm surge to become a flood. Although no federal flood control works were involved in the Betsy flood, the United States soon after began to build the flood control works that now line MR-GO, the GIWW, the Industrial Canal, the shores of Lake Pontchartrain, and the outfall canals. Since *Graci* was decided, the United States has invested hundreds of millions of dollars in flood control projects in southeastern Louisiana.

All of the harms cited in the Complaint are from waters that federal flood control works failed to contain. Indeed, the fundamental theory of the plaintiffs' case is that the flood control structures were unable to contain Katrina's storm surge because the surge was intensified and accelerated by MR-GO. Although the plaintiffs found their case on certain acts and omissions related to the MR-GO, the plain and substantial nexus between their alleged damages and the federal flood works cannot be masked; there is

---

[3]The Court of Appeals later reiterated the centrality of this fact to the *Graci* holding when it characterizing *Graci* as involving "drainage facilities . . . , navigation projects, and government conduct 'wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control, or any act taken pursuant to such authorization.'" *Florida E.C. Rwy. v. United States*, 519 F.2d 1184, 1191 (5th Cir. 1975) (footnote omitted).)

24

nothing "tenuous" about the relationship between these damages or this conduct and the LPVHPP. *See* Complaint ¶¶ 73, 75 (including graphic), 77-80, 82-83. Thus, even under the approaches employed by the Fifth Circuit prior to *Central Green*, there is a "sufficient association" between the plaintiffs' alleged damages and flood control *and* between flood control and the challenged conduct to warrant application of § 702c.

MR-GO began to have an impact on the LPVHPP almost as soon as it was opened to traffic, in 1963. The flood control project was still in the design phase and it would be five more years until the navigation channel was dredged to its authorized dimensions, but the flood control planners were aware, even at that early date, that MR-GO was playing a significant role in the hydrological system that the LPVHPP was being designed to contain. Though formally separate (largely, if not entirely, owing of the appropriations process), the two projects were physically and functionally related. Consequently, in the papers submitted to Congress seeking approval of the flood control project, "provision for modifying the authorized MR-GO navigation project, which is currently under construction" was described, even though the reports were "concerned primarily with providing protection against hurricane water levels." H.R. Doc. No. 89-231 (Exh. 6), at 4. In fact, the papers submitted to Congress recommending authorization of the LPVHPP were filled with references to MR-GO and described its involvement in the hydrologic system that the LPVHPP was designed and intended to restrain. For example, it was reported that water levels in Lake Pontchartrain "vary according to . . . tidal movements from the Gulf of Mexico through the . . . MR-GO project." *Id.* at 5; *accord id.* at 94. Indeed, it was reported that "enormous volumes of

25

water pass in both directions through the Rigolets, Chef Menteur Pass, Lake Borgne, Mississippi Sound, IHNC, and MR-GO. With so many variables operating on the several elements of the system, the current patterns are continually changing." *Id.* at 101. "Diluted saline gulf water enters Lake Pontchartrain from Lake Borgne via the Rigolets and Chef Menteur Pass and the MR-GO and IHNC in large quantities and mixes with the freshwater inflow." *Id.* at 100. To "limit objectionable salinity intrusion into the lake and tidal currents in the canal [then] developing from construction of the MR-GO," the Board of Engineers for Rivers and Harbors recommended "[t]hat the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, Louisiana, as modified by the MR-GO, be further modified to provide for the construction of a dual-purpose lock at the lakeward terminous of the IHNC in the vicinity of Seabrook." *Id.* at 17-18; *see also id.* at vii, ix, 85. This "barrier" would "control of hurricane flows into the lake as well as" impede saline intrusion. *Id.* at 17. The reports proposed that the Seabrook Lock "be maintained and operated by and at the expense of the United States as a feature of the MR-GO project." *Id.* at 66; *accord id.* at 10. The impact of the LPVHPP on Lake Pontchartrain's salinity was modeled in two ways—initially, without taking MR-GO into account and then including the new channel among the various waterways being studied. *See id.* at 60.

The reports identified two problems that required solutions: (1) the introduction of saline water into Lake Pontchartrain from the Gulf via MR-GO and the Industrial Canal, and (2) increased current velocities, which posed threats to navigation and to bridges and harbor developments. *See id.* at xvi, 2, 9-10, 55-57, 60, 69, 80-81.

26

Construction of the flood control levees affected the maintenance of MR-GO. The construction of the LPVHPP levees was accomplished by dredging the MR-GO channel to obtain material from the channel bottom. 1994 MR-GO Recon. Rep. (Exh. 9) at 11; 1988 MR-GO Recon. Rep. (Exh. 5) at 16. This entailed "[a] significant amount of dredging," and "[t]he extraction of this quantity of fill material . . . significantly reduced" the dredging that was needed to maintain MR-GO at its authorized depth in the reaches from which the material was taken. *Ibid.*

The Complaint itself makes plain the significant inter-relatedness of the two projects. It alleges that MR-GO enhanced and accelerated storm surges—*all* storm surges, not merely the Katrina surge: "During past hurricanes, as well as Katrina, the MR-GO contributed greatly to the storm surge effect by channeling and accelerating water into both New Orleans and St. Bernard Parishes." Complaint ¶ 43; *accord id.* ¶¶ 49 (citing "the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees and spoilbanks in New Orleans and St. Bernard Parish"), 50 ("by its design," MR-GO "altered adversely storm surge dynamics with respect to hurricanes such as Katrina"), 71 (MR-GO is "'a freeway to New Orleans for any hurricane that happens to come from the right direction'" . . . "surges from a Category 3 hurricane would be 'funneled' by MR-GO, flooding surrounding areas" . . . MR-GO is "'a superhighway for storm surge'" and it created a "funnel[]" that "would amplify storm surges by 20 to 40 percent").

27

If these claims are true, they serve to emphasize the inter-relationship between MR-GO and the flood control project. Assuming for purposes of this motion their truth, they reveal a strong association between the challenged activities and flood control. The failure to build barriers to stop storm surges from accelerating through Reach 1, *see* Complaint ¶ 3, and the failure to build "armored" levees along both banks of MR-GO, *see id* ¶¶ 49, 78, 79, 84, 111, or to take other "protective stabilization measures" to prevent the loss of surge-inhibiting marshlands, *see id.* ¶¶ 58, 84, 85, 111 — are activities that pertain to flood control and if taken would have served flood control purposes; none would have served a navigational purpose. Even dredging, which is said to have been done negligently, and which one would intuitively associate with navigation, is a flood control activity. *See id.* ¶ 52. Accordingly, the plaintiffs' attempt to avoid § 702c by challenging the MR-GO project is pointless. The "waters that caused the relevant damage" were "flood waters" and the alleged negligent acts and omissions were flood control activities innately related to (if not formally part of) a flood control project. Accordingly, 33 U.S.C. § 702c bars this action, and it must be dismissed for lack of subject-matter jurisdiction.

> II. **THIS ACTION MUST BE DISMISSED BECAUSE IT CHALLENGES TWO CATEGORIES OF CONDUCT TO WHICH THE FEDERAL TORT CLAIMS ACT DOES NOT APPLY: (1) CONDUCT AUTHORIZED BY STATUTE OR REGULATION AND (2) DISCRETIONARY ACTS OR OMISSIONS THAT ARE GROUNDED IN CONSIDERATIONS OF POLICY.**

The plaintiffs have cited the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, as establishing the Court's jurisdiction over this case. *See* Complaint ¶ 7. The

FTCA is a limited waiver of sovereign immunity and the exclusive means by which plaintiffs can sue the United States for money damages for causes of action sounding in tort. 28 U.S.C. §§ 1346(b), 2679(b)(1); *United States v. Orleans,* 425 U.S. 807, 814 (1976); *Honda v. Clark,* 386 U.S. 484, 501 (1967). The terms of the FTCA define the extent of this Court's jurisdiction over the claims. *FDIC v. Meyer,* 510 U.S. 471, 477 (1994). The Act's terms and conditions must be strictly observed and construed favorably to the defendant. *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 261 (1999); *Lane v. Pena,* 518 U.S. 187, 192 (1996).

With certain exceptions, the Federal Tort Claim Act gives the district courts jurisdiction of civil actions on tort claims against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Two pertinent exceptions are codified in 28 U.S.C. § 2680(a), which provides that the provisions of § 1346(b) "shall not apply to —

> Any claim *based upon* an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon* the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). Each exception begins with "based upon" and is separated from the other by "or," and thus the section sets forth two independent exceptions. *Buchanan v. United States,* 915 F.2d 969, 970 (5th Cir. 1990) (citing *Lively v.*

*United States*, 870 F.2d 296, 297 (5th Cir. 1989)); *accord Dalehite v. United States*, 346 U.S. 15, 32-33 (1953).

Both of these exceptions apply to this action. Some of the Complaint's averments imply that MR-GO was a bad idea *ab initio*, and the project described in the division engineer's plan should not have been approved by Congress. "*From its conception* over 40 years ago, the MR-GO was riddled with inherent problems . . . ." Complaint ¶ 2 (emphasis added). "*From the outset*, . . . the MR-GO project . . . was riddled with serious problems . . . ." *Id.* ¶ 45 (emphasis added). To the extent that this action is premised on the fulfillment of the mandate contained in Public Law 455, 70 Stat. 65 (1956), it is barred by the "due care" exception and must be dismissed. Congress approved construction of a wide and deep channel heading due east from New Orleans for several miles before turning southeast and cutting through wetlands on its way to the Gulf. Inasmuch as Congress mandated this project and funded its operation and maintenance from that time until after the Katrina flood, the Corps's prosecution of the project cannot in and of itself form a basis of liability under the FTCA.

To be sure, not every aspect of the construction of MR-GO was mandated by law. The discretionary function exception applies to the omission of specific features that the plaintiffs say should have been added to the project as precautions against floods. They say a barrier should have been built to keep storm surge from entering the Industrial Canal; they say levees or other bank stabilization measures should have been taken to protect the wetlands; and they say more dredging should have been done, to knock down storm surge. None of these features or activities was specified by the plan

30

approved by Congress. Whether to include them involved the consideration of their costs and benefits, the public purposes to be served, and their feasibility within the funding provided by Congress. Congress left these matters to the discretion of the Corps, within the framework of the approved plan, and the plaintiffs' claims are therefore barred by the discretionary function exception.

### A. THE "DUE CARE" EXCEPTION BARS CLAIMS OF INHERENT PROBLEMS IN MR-GO.

The "due care" exception protects acts and omissions that occur while carrying out the dictates of a statute or regulation, if the "carrying out" has been accomplished with the requisite care. *Dalehite*, 346 U.S. at 33; *Buchanan*, 915 F.2d at 970-71. "It bars tests by tort action of the legality of statutes and regulations." *Dalehite*, 346 U.S. at 33. Accordingly, unless some deviation from the mandatory directive is alleged, general allegations of "negligence" are insufficient to prevent application of the "due care" exception. *See Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005), *cert. denied*, 126 S.Ct. 1431 (2006). Even if the challenged conduct could be deemed negligent or wrongful under state law, the "due care" exception prevents application of that label to statutorily prescribed conduct, for allowing a judicial inquiry into the propriety of such conduct would impermissibly second-guess Congress's policy decisions.

On March 29, 1956, Congress directed that the MR-GO project be "prosecuted . . . substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Number 245, Eighty-Second Congress . . . ." Pub. L. No. 84-455 (Exh. 2). The Chief's report responded to resolutions by Senate and House

31

committees asking the Board of Engineers for Rivers and Harbors to determine "the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel . . . from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands." H.R. Doc. No. 245 (Exh. 1), at 4.

The Chief recommended that the outlet be constructed "generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable." *Id.* at 5. The Division Engineer's plans called for

> construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Island at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep and 500 feet wide extending westerly along the Intracoastal Waterway from the turning basin to the Industrial Canal . . . .

*Id.; accord id.* at 38, 43.

As this description reveals, the colorful metaphors used by the plaintiffs—the "straight arrow pointed at Greater New Orleans," the "shotgun pointed straight at New Orleans," Complaint ¶ 3, the "'hurricane highway,'" *id.* ¶ 95—denote an inherent

32

characteristic of the plan, and they find their genesis in the Corps's "execution of" Public Law 455. Reach 1 of MR-GO took the route of and enlarged the GIWW from its entrance into the Industrial Canal due east to a point near the northwest shore of Lake Borgne because Congress adopted the Division Engineer's plan and told the Corps to "prosecute[]" it. The plan prescribed "a seaway canal 36 feet deep and 500 feet wide extending . . . along the Intracoastal Waterway from the turning basin [near Lake Borgne] to the Industrial Canal." H.R. Doc. No. 245 (Exh. 1), at 5. Moreover, to the extent that the plaintiffs allege damages that resulted from the destruction of wetlands, those claims too are barred insofar as wetlands loss was an unavoidable consequence that flowed from Congress's adoption of the division engineer's plan. As Congress was informed prior to its authorization of the project, "[a]n east-bank outlet from New Orleans necessarily traverses marshlands . . . ." H.R. Doc. No. 245 (Exh. 1), at 33.

Essentially, MR-GO exists where it is and as it is because Congress told the Corps to build this waterway rather than others that had been proposed. As early as 1929, Congress asked the Corps of Engineers to "determin[e] the advisability of constructing" "an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel." H.R. Doc. No. 71-46 (Exh. 3), at 1. At that time the Corps examined nine different routes, but found such a project to be unnecessary because the Mississippi River outlets were adequate. *See id.* at 3-5, 44. Twenty-four years later, Congress again asked the Corps to "investigat[e]" and reconsider the need for a seaway from New Orleans to the Gulf. H.R. Doc. No. 245 (Exh. 1), at 1. After reviewing the nine routes previously studied, the Corps "selected two plans of improvement for

33

detailed investigation," an east-bank outlet and a west-bank outlet. *Id.* at 11; *see also id.* at 33. An analysis of the anticipated costs and benefits showed only the east-bank outlet to be economically justified. *See id.* at 39. The east-bank plan recommended by the Corps and adopted by Congress was "substantially that proposed by" the Board of Commissioners for the Port of New Orleans. *Id.* at 43. The Corps then built, operated, and maintained the seaway, all as mandated by Public Law 455.

The due care exception therefore bars the claim that MR-GO "was riddled with inherent problems" "[f]rom its conception," Complaint ¶ 3, or "[f]rom the outset," *id.* ¶ 34. Congress could have rejected the Corps's plan and directed that a west-bank outlet be built instead. Congress could have chosen not to authorize an outlet. Instead, it authorized construction of an east-bank outlet that would "necessarily" cut through marshlands en route to the Gulf. H.R. Doc. No. 245 (Exh. 1), at 33; *cf.* Complaint. ¶ 56 ("Forty-three miles of the MR-GO fall within a 'landcut' through low-lying marshland, most of which traverses the ecologically sensitive wetlands of St. Bernard Parish."). To the extent that the Complaint implies that the project should not have been approved in the form that it was, and seeks damages resulting from the Corps's very prosecution of the approved plan, this action is barred by the due care exception, 28 U.S.C. § 2680(a).

Like the metaphors used to ridicule MR-GO, the unelaborated claim that MR-GO was negligently designed, constructed, operated, and maintained constitutes an attack on the Corps's prosecution of the project in obedience to the command of Congress. That this is the crux of these allegations is apparent from the lack of any allegation that

34