the relevant damages were caused by the Corps's deviation from the approved plan.[4] *See, e.g.,* Complaint ¶ 1; *see also id.* ¶¶ 2, 5, 6, 29, 30, 74, 93, 102. Another indication of the nature of these claims can be found in the Complaint's "strict liability" allegations, set forth in Count Two.[5] *See* Complaint ¶¶ 109-14. This count is based on Louisiana Civil Code articles 2317 *et seq.*, which set forth the concept of *garde*. *Garde* exists when someone has ownership or custody of property, and the law holds him responsible for damage caused by the property. *See* La. Civ. Code Ann. art. 2317 (2006). For purposes of liability under article 2317, however, a "defect" must either be permanently attached to the thing or somehow inherent as one of the thing's permanent qualities. *See King of Hearts v. Walmart Stores, Inc.,* 660 So. 2d 524, 527 (La. Ct. App. 1995); *Dauzat v. Thompson Const. Co., Inc.,* 839 So. 2d 319, 322-23 (La. Ct. App. 2003). A temporary condition is not a defect under 2317. *See Dauzat,* 839 So. 2d at 323. The assertion of claims based on

---

[4] Although the "tangent" ultimately taken passed through Breton Sound rather than Chandeleur Sound, it was the prescribed departure from the Intracoastal Waterway on a route "southeasterly along the south shore of Lake Borgne," H.R. Doc. No. 245 (Exh. 1), at 5, that created the so-called "funnel" that is said to have "accelerat[ed] the power and force of the storm surge while channeling it directly into the Industrial Canal," Complaint ¶ 3.

[5] Labeling this count "strict liability" is a misnomer. In 1996, the Louisiana legislature revised the statute by enacting Article 2317.1 to eliminate strict liability. *See Mayeux v. Marmac Acquisition, L.L.C.,* 900 So.2d 976, 979 (La. Ct. App. 2005); *Brown v. Williams,* 850 So.2d 1116, 1126 (La. Ct. App. 2003) (concurrence). If the label were not a misnomer, this count would be beyond the purview of the FTCA, for it "precludes the imposition of liability if there has been no negligence or other form of 'misfeasance or nonfeasance' on the part of the Government." *Laird v. Nelms,* 406 U.S. 797, 799 (1972).

*garde* underscores that these claims challenge the MR-GO project itself and not merely the Corps's prosecution of it.

But as the Complaint acknowledges, MR-GO was "constructed under the authority of Public Law 455 . . . *substantially in accordance with the recommendations of the Army Corps's Chief of Engineers as contained in House Document 245*, 82nd Congress, 1st Session." Complaint ¶ 35 (emphasis added). The Corps's supposedly negligent "design, construction, operation, maintenance, and repair of MR-GO" were directed by Congress." *Id.* ¶ 95. Plainly, if the "flaws" in the design, construction, operation, and maintenance of MR-GO are *inherent* flaws (*i.e.,* problems that necessarily resulted from compliance with the Congressional mandate and could not have been avoided without departing from the approved plan), they are barred by the FTCA's due care exception.

By challenging the problems that plaintiffs claim are "inherent" in implementation of MR-GO, including its design, construction, operation, and maintenance, the plaintiffs are attacking the execution of a federal law. Yet, the FTCA expressly cannot be used to test the validity of a federal statute or regulation, even if the law is fundamentally flawed or even unconstitutional. Accordingly, the claims that MR-GO was inherently flawed must be dismissed.

### B. THE DISCRETIONARY FUNCTION EXCEPTION BARS CLAIMS THAT THE CORPS NEGLIGENTLY FAILED TO ADD CERTAIN FEATURES NOT DESCRIBED IN THE DIVISION ENGINEER'S PLAN.

Although the Complaint alleges that MR-GO was constructed "substantially in accordance with the recommendations of the Army Corps's Chief of Engineers," pursuant to Public Law 455 and avers that "the Army Corps['s] compliance with this Congressional mandate did not involve acts of a discretionary function," Complaint ¶¶ 35, 95, the Complaint also appears to challenge the Army's decision not to add certain features that were not within the plan that the Chief recommended and Congress approved. For example, the claim that "MR-GO is a straight arrow pointed at Greater New Orleans with no barriers or other means to slow down storm-driven surges," Complaint ¶ 3, could be construed as a claim that the Corps's failure to include barriers or a functional equivalent was a negligent omission that caused the plaintiffs' alleged damages. Likewise, the suggestion that the "fail[ure] to 'armor' levees on both banks of the MR-GO" "contribut[ed] to the drowning of New Orleans," Complaint ¶ 49, appears to challenge the decision not to include armored levees in the canal's design, *see also id.* ¶¶ 78-79 ("proper armoring" would have prevented overtopping and breaching of LPVHPP levees), 84 ("no armoring on [MR-GO's] fragile banks . . . contributed to the flooding . . . by vastly accelerating the destruction of [protective] coastal habitat"), 112 ("lack of armoring on the MR-GO's banks" is a "vice[] and/or defect[] in the MR-GO"). The assertion that "[t]he northeast shore junction of the MR-GO and the GIWW . . . never received adequate stabilization measures," Complaint ¶ 58, similarly implies that something should have been added to the division engineer's plan.

These claims all challenge decisions that were properly the Army's to make, based on the Army's weighing of the costs and benefits of such features and the competing interests of promoting commerce versus protecting "ecologically sensitive wetlands." Complaint ¶ 56; *see also* 1988 MR-GO Recon. Rep. (Exh. 5) at 26-28. Whether to contain hurricane-driven floodwaters by building bigger and higher levees and floodwalls or to combat them by preserving protective wetlands (or to employ either or both, or to take other measures to control floodwaters) were decisions driven by numerous policy considerations.

By virtue of the second exception codified at 28 U.S.C. § 2680(a), the FTCA does not apply to claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception reflects a congressional intent to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984); *accord Baldassaro v. United States*, 64 F.3d 206, 211 (5th Cir. 1995), *cert. denied,* 517 U.S. 1207 (1996). Construing this provision in a quartet of cases, *United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988); *Varig Airlines*; and *Dalehite v. United States*, 346 U.S. 15 (1953), the Supreme Court has construed "discretionary conduct" as consisting of conduct which, by its very nature, involves choice or judgment: "A discretionary act is one that involves choice or judgment . . . ." *Gaubert*, 499 U.S. at 325; *see also id.* at 322; *accord Baldassaro*, 64 F.3d at

38

208. "The requirement of choice or judgment is not satisfied if a 'federal statute, regulation, or policy *specifically prescribes a course of action* for an employee to follow ....'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). If there is no prescribed course of conduct or action, then an employee acting pursuant to a federal statute, regulation, or policy must exercise judgment and choice. *See Rich v. United States*, 119 F.3d 447, 450 (6th Cir. 1997), *cert. denied*, 523 U.S. 1047 (1998). "[A]lleg[ing] only some generalized failures to follow mandatory rules" without "point[ing] to even one relevant mandatory limitation on ... statutory discretion ... [is] insufficient to defeat the first part of the *Gaubert* test." *ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n*, 36 F.3d 409, 411-12 (5th Cir. 1994). Unless a statute, regulation, or policy gives "specific direction," it does not eliminate discretion. *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005).

In order to be shielded by the discretionary function exception, conduct must also satisfy a second criterion: it must be conduct of a sort that can plausibly be grounded in public policy. *See Gaubert*, 499 U.S. at 322-25. This criterion is qualified by the word *plausibly* because it is the nature of the conduct, not the individual Government employee's motivation, that governs whether the exception applies. *Id.* at 325. The focus of the inquiry is not on the employee's subjective intent in exercising discretion, but on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* (footnote omitted); *see also LeSoeur v. United States*, 21 F.3d 965,

39

968 (9th Cir. 1994); *cf. id.* at 969 (inasmuch as focus is on nature of actions, court need not examine decision-making process behind actions).[6]

Actions taken in executing a statutory or regulatory program can usually be analyzed in terms of the social, economic, or political policies that gave rise to the program: "Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception." *Gaubert*, 499 U.S. at 323.

The protection extends beyond "the initiation of programs and activities" to "include[] determinations made by executives or administrators in *establishing plans, specifications or schedules of operations.*" *Dalehite*, 346 U.S. at 35-36 (emphasis added; footnote omitted). It also extends to "the actions of subordinates in carrying out the

---

[6]There need not even be an actual decision to review. If the nature of such a decision reveals that had one been made it would have involved considerations of public policy, then the exception applies. *See Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003), *cert. denied*, 541 U.S. 935 (2004); *Smith v. Johns-Manville Corp.*, 795 F.2d 301, 308-09 (3d Cir. 1986) ("The test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of discretion."); *cf. Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003) (application of exception does not require "evidence that decision makers actually considered social, economic, or policy considerations"), *cert. denied*, 540 U.S. 1149 (2004). "[T]o survive a motion to dismiss based on the discretionary function exception, a complaint 'must allege facts which would support a finding that the challenged actions are not the kind of conduct that could be said to have been grounded in considerations of policy.'" *Baldassaro*, 64 F.3d at 209 (quoting *Gaubert*, 499 U.S. at 324-25).

operations of government in accordance with official directions." *Id.* at 36. The Court emphasized that the protection must cover the conduct of subordinates, for "[i]f it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." *Id.* The nature of the conduct, not the status of the actor, governs whether the exception applies. *Gaubert*, 499 U.S. at 322.

Here, the conduct challenged by the plaintiffs was committed to the Corps's discretion and involved consideration of public policy. From the outset of the project, decisions about features and details of the authorized east-bank outlet were left by Congress to the discretion of the Army. As the authorizing statute itself stated, "the existing project for Mississippi River, Baton Rouge to the Gulf of Mexico, is hereby modified to provide for the Mississippi River-Gulf Outlet *to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers . . . ."* Pub. L. No. 84-455, 70 Stat. 65 (Exh. 2) (emphasis added). And while this prosecution was to be "substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245," *id.*, the Chief's recommendation further elaborated the discretion that was afforded him and the Secretary of the Army in effecting the Division Engineer's plan. In the report that he submitted to Congress, his description of the planned seaway concluded with this telling clause: "all generally in accordance with the plans of the division engineer and *with such modifications thereof as*

41

*in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable . . . ."* H.R. Doc. No. 245 (Exh. 1), at 5 (emphasis added).

To be sure, the Army could not, under the authority of Public Law 245, reverse course and build a west-bank outlet (or even any of the seven other east- or west-bank routes to the Gulf that the Corps had studied). See *supra,* pp. 30-35 (explaining Corps's implementation of congressionally mandated project is protected by due care exception). But it could decide whether to modify the Division Engineer's plan by, for example, striking a slightly more southerly course through the marshes south of Lake Borgne, so that the seaway passed through Breton Sound rather than Chandeleur. Whether to build barriers to impede storm surge, to stabilize the shoreline by building levees or by other means, and whether and how much to dredge were decisions that Congress left in the hands of the Army.

The lack of stable banks and the concomitant erosion that the Complaint details were not problems that escaped the notice of the Corps. Indeed, the virtually continuous dredging of the canal was necessitated by the erosion of banks, as the soils formed shoals that threatened to make the seaway impassable. *See* 1988 MR-GO Recon. Rep. (Exh. 5) at 15 ("Where the MR-GO traverses marsh areas . . . maintenance dredging in these reaches results almost exclusively from erosion of the channel banks."). In 1988, the Corps evaluated a number of structural and non-structural alternatives for abating erosion. *See id.* at 34-43. The analysis of benefits to be obtained by controlling erosion explicitly included an evaluation of the "storm surge reduction" to be obtained by implementing the various alternative measures that were under consideration. *See*

42

*id.* at 40. The environmental effects of alternative plans were evaluated in detail. *See id.* at 51-54. Some alternatives that could have provided effective erosion control were "evaluated and determined to be prohibitively expensive." *Id.* at 34. The Corps was authorized to evaluate all of these policy considerations and to take them into account before deciding how to solve the problem. *See* 33 U.S.C. § 541.

Even though the Corps recognized in 1988 that "severe erosion is occurring along the banks of the MR-GO," it saw a need for "[d]etailed hydraulic and hydrologic engineering investigations, design and cost engineering investigations, and geotechnical investigations" before settling on a course of action. 1988 Recon. Rep. (Exh. 5) at 54. The District Engineer who authored the report recommended that it "be used as a basis to proceed with more detailed studies." *Id.* at 62.

Additional study led to issuance of a second reconnaissance report, in January of 1994, describing the results of the continued investigation of bank erosion and erosion-related problems. This report, like its predecessor, presented the Corps's analysis of the numerous considerations that were factored into the decision of how best to combat the problems. Based on discussions with the various stakeholders, the "most favorable" plan was one that entailed "the construction of 30 miles of rock dike along the north bank of the MR-GO"; it carried a construction price tag of nearly forty million dollars, with continuing annual costs of more than ten million dollars. *See* 1994 MR-GO Recon. Rep. (Exh. 9) at 1-2, 70-71. The Corps could not prosecute such a costly plan without congressional authorization. *See* 33 U.S.C. § 426i(c).

The 1994 report concluded with the District Engineer's recommendation that the study of bank protection measures be continued into the feasibility phase. It noted the "unique mix of project outputs . . . involving both Federal maintenance savings and environmental restoration and preservation." *Id.* at 72. Cost sharing between federal and non-federal entities was proposed for both the continuing studies and the project construction. *Id.* Matters negotiated with non-federal governmental entities "are precisely the type of political policy decisions that courts do not review." *LeSoeur v. United States,* 21 F.3d at 969 (decision not to regulate tribal river tours protected by discretionary function exception).

Fraught as it was with numerous policy considerations, the Corps's decision to obtain more information before settling on a course of action is just the sort of discretionary conduct that is not subject to judicial review under the FTCA. In recognition of this, the courts have applied the discretionary function exception to bar challenges to conduct similar to that which is at issue here. "For about half a century, the Army Corps of Engineers . . . developed and improved King Harbor, in Redondo Beach, California[,] . . . by building a fourteen foot breakwater, which was completed in 1958." *National Fire Ins. v. United States,* 115 F.3d 1415, 1417 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998). In consequence of this, the city of Redondo Beach developed the harbor into an entertainment, recreation, and residential destination that raised rents for the city. After portions of the breakwater were raised to 22 feet to protect boats from winter storms, continued property losses to storm damage prompted the Corps to study the benefits of raising the entire breakwater to the higher level.

44

During this study, the Corps discovered that "[t]he breakwater was not as high as it was supposed to be. The 14 foot section . . . was only 12 feet high . . . because the seafloor had subsided as a result of oil extraction. Because its measuring devices were out of date, and it had not considered the potential for subsidence, the Corps had failed to discover the growing nonconformity of the breakwater to its design." *Id.*

> The Corps now had to decide whether to do nothing, raise the subsided portion of the breakwater back to fourteen feet, or await the results of an on-going study to decide whether to raise the breakwater in one larger project to 22 feet. Raising the breakwater a couple of feet was a major, not a trivial, engineering project. The Corps decided to leave the breakwater as it was, while it proceeded with studies directed toward more substantial improvement.

*Id.*

As it happened, this was the wrong decision: "A huge storm, the kind that hits Redondo Beach only once every sixty or seventy years, caused waves [that]. . .swept over the breakwater and caused" millions of dollars of damage to the plaintiff's restaurant. *Id.* The Corps's decision to continue to study the situation rather than to take protective measures "was essentially a gamble on the weather. The Corps threw the dice, and the businesses on shore lost." *Id.* Even though the Court of Appeals assumed that the "decision to put off the small improvement which would have raised the breakwater to design specifications, while it studied a much larger improvement, was a mistake in judgment and a failure to exercise reasonable care," the court "conclude[d] that the discretionary function exception applies." *Id.* at 1418.

As in the present case, the issue for the Corps in *National Union Fire Insurance* "was what if anything to do about" a potential problem, "and when." *Id.* Repairing to

45

"[t]he Corps' statute," 33 U.S.C. § 541, the Court of Appeals observed that "the Corps is required by this statute to make a judgment balancing these sometimes conflicting considerations: (1) how much commerce benefits from the project; (2) what kind of commerce; (3) how much the project will cost; (4) how necessary is the work; (5) should the work be built, continued or maintained by the federal government, or some other entity." 115 F.3d at 1419. Even though the government, having built the breakwater, "was under a duty to maintain it in a safe condition," the Court of Appeals recognized that the case had to be dismissed, because the government had "reserved to itself the right to act without liability for misjudgment and carelessness in the formulation of policy." *Id.* at 1422. No statute, regulation, or policy required the Corps to begin raising the breakwater to the design elevation. On the contrary, Congress statutorily gave the Corps discretion about whether to do so. *Id.*

The factual and legal contexts in the present case parallel those described above. The law that authorized MR-GO did not specify every detail but instead left considerable room for the Army to weigh numerous considerations in deciding how to design, build, operate, maintain, and repair the waterway. Deciding whether, how, and when to modify MR-GO to combat erosion and to remedy other conditions that, the plaintiffs contend, should have been abated before Hurricane Katrina flooded New Orleans were matters accorded to the Army. Whether the Corps simply studied these problems, took steps to remedy them, or did nothing whatsoever is irrelevant to the application of the discretionary function exception. The Corps's response, if any, is

46

irrelevant because the nature of the challenged acts and omissions reveals that they are innately discretionary and are readily susceptible to policy analysis.

Making the changes that the plaintiffs say should have been made—building armored levees extending for many miles on both banks of the channel, constructing a retractable barrier across a 500-foot-wide deepwater channel—would have been major undertakings that would have required the weighing of costs, benefits, and alternatives. Whether to address erosion by dredging or by stabilizing banks was within the Corps's ken. Indeed, the Complaint does not even allege that the Corps violated a statute or regulation in designing, constructing, operating, and maintaining MR-GO. Their allegations merely assert negligence—an abuse of discretion in deciding how to prosecute the approved plan. Inasmuch as Congress left the weighing of these matters to the discretion of the Secretary of the Army and the Army's Chief of Engineers, the plaintiffs' claims challenging those acts and omissions are barred by the discretionary function exception and must therefore be dismissed for lack of subject-matter jurisdiction.

## CONCLUSION

For these reasons, the United States' motion to dismiss should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

PAUL F. FIGLEY
Deputy Director, Torts Branch
Civil Division

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

     I, Robin D. Smith, hereby certify that on July 24, 2006, I served a true copy of Defendant United States' Memorandum in Support of Motion to Dismiss upon the following parties by ECF, electronic mail, facsimile, or first class mail:

William Aaron
waaron@goinsaaron.com
Neil Abramson
abramson@phelps.com
Jonathon Beauregard Andry
jandry@andrylawfirm.com
Thomas P. Anzelmo
tanzelmo@mcsalaw.com
Judy Barrasso
jbarrasso@barrassousdin.com
Daniel E. Becnel, Jr.
dbecnel@becnellaw.com
Robert Becnel
ROBBECNEL@aol.com
Kelly Cambre Bogart
kbogart@duplass.com
Terrence L. Brennan
tbrennan@dkslaw.com
Joseph Bruno
jbruno@brunobrunolaw.com
Thomas Darling
tdarling@grhg.net
Kevin Derham
kderham@duplass.com
Walter Dumas
wdumas@dumaslaw.com
Lawrence Duplass
lduplass@duplass.com
Calvin Fayard
calvinfayard@fayardlaw.com
Thomas Francis Gardner
gardner@bayoulaw.com
Thomas Gaudry
tgaudry@grhg.net

Joseph Guichet
jguichet@lawla.com
Jim S. Hall
jodi@jimshall.com
Robert Harvey
rgharvey@bellsouth.net
Herman C. Hoffmann, Jr.
hhoffmann@spsr-law.com
David Blayne Honeycutt
DBHoneycutt@aol.com
Ralph Hubbard
rhubbard@lawla.com
Tamara Kluger Jacobson
tkjacobson@aol.com
Michael Courtney Keller
kellerm@ag.state.la.us
Stephen Kreller
sskreller@gmail.com
Hugh Lambert
hlambert@lambertandnelson.com
John M. Landis
jlandis@stonepigman.com
Mickey Landry
mlandry@landryswarr.com
Wade Langlois
wlanglois@grhg.net
Wayne J. Lee
wlee@stonepigman.com
F. Gerald Maples
federal@geraldmaples.com
Ben Louis Mayeaux
bmayeaux@ln-law.com
Gordon McKernan
gemckernan@mckernanlawfirm.com

49

Gerald A. Melchiode
jmelchiode@gjtbs.com
Gerald Edward Meunier
dmartin@gainsben.com
James Bryan Mullaly
jamesmullaly1@hotmail.com
Betty Finley Mullin
bettym@spsr-law.com
J. Wayne Mumphrey
jwmumphrey@mumphreylaw.com
John Francis Nevares
jfnevares-law@microjuris.com
James L. Pate
jpate@ln-law.com
Ronnie Penton
rgp@rgplaw.com
Drew A. Ranier
dranier@rgelaw.com
Michael R.C. Riess
mriess@kingsmillriess.com
Camilo Kossy Salas
csalas@salaslaw.com
David Scott Scalia
DAVID@brunobrunolaw.com
George Simno
gsimno@swbno.org
Randall A. Smith
rasmith3@bellsouth.net
Christopher Kent Tankersley
ctankersley@burglass.com
Sidney Torres
storres@torres-law.com
William Treeby
wtreeby@stonepigman.com
Richard John Tyler
rtyler@joneswalker.com
Gregory Varga
gvarga@rc.com
Jesse L. Wimberly
wimberly@nternet.com
Bob Wright
bobw@wrightroy.com
Ashton R. O'Dwyer, Jr.

arod@odwyerlaw.com
Victor Elbert Stilwell, Jr.
vstilwell@dkslaw.com
Charles F. Seemann, Jr.
cseemann@dkslaw.com
Christopher W. Martin
martin4@mdjwlaw.com
Martin R. Sadler
sadler@mdjwlaw.com

David R. Simonton
dsimonton@sonnenschein.com
John Herr Musser
jmusser@bellsouth.net
Dennis Phayer
dphayer@burglass.com
Julia E. McEvoy
jmcevoy@JonesDay.com
George T. Manning
gtmanning@jonesday.com
Wystan M. Ackerman
wackerman@rc.com
Adrian Wagerzito
adrianwagerzito@jonesday.com
Andy Greene
agreene@sonnenschein.com
Jerry McKernan
jemckernan@mckernanlawfirm.com
Belhia Martin
belhiamartin@bellsouth.net
James Rather
jrather@mcsalaw.com
Seth Schmeeckle
sschmeeckle@lawla.com
Matthew D. Schultz
mschultz@levinlaw.com
Clay Mitchell
cmitchell@levinlaw.com
ksmith@levinlaw.com
Nina D. Froeschle
nfroeschle@osmlaw.com
Thomas V. Girardi
tgirardi@girardikeese.com

John W. deGravelles
deidson@dphf-law.com
Craig Frank Holthaus
fholthaus@dphf-law.com
Samuel Gabb
sgabb@lundydavis.com
James Roussel
jroussel@bakerdonelson.com
Arthur Gordon Grant, Jr.
ggrant@monbar.com
Clayton Morris Connors
cconnors@mumphreylaw.com
William Larzelere
blarzelere@lpw-law.com
Andre J. Mouledoux
amouledoux@mblb.com
James A. Cobb, Jr.
jac@ecwko.com
William Everard Wright, Jr.

wwright@dkslaw.com
Lawrence D. Wiedemann
FAX: 504-581-4336


Deborah Louise Wilson
317 Magazine Street
New Orleans, LA 70130

Joseph W. Hecker
619 Europe Street, 2nd Floor
Baton Rouge, LA 70806

Vernon Palmer Thomas
1524 N. Claiborne Ave.
New Orleans, LA 70116

      /s/ Robin D. Smith
        Robin D. Smith