# EXHIBIT 1

| 82D CONGRESS | HOUSE OF REPRESENTATIVES | DOCUMENT |
| 1st Session | | No. 245 |

# MISSISSIPPI RIVER-GULF OUTLET

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, UNITED STATES ARMY, DATED MAY 5, 1948, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND AN ILLUSTRATION ON A REVIEW OF REPORTS ON, AND A PRELIMINARY EXAMINATION AND SURVEY OF, THE MISSISSIPPI RIVER-GULF OUTLET AND THE MOBILE TO NEW ORLEANS INTRACOASTAL WATERWAY, REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES, ADOPTED ON MAY 5, 1943, AND THE COMMITTEE ON COMMERCE, UNITED STATES SENATE, ADOPTED ON APRIL 19, 1943, AND ALSO AUTHORIZED BY THE RIVER AND HARBOR ACT APPROVED ON MARCH 2, 1945

OCTOBER 1, 1951.—Referred to the Committee on Public Works and ordered to be printed, with one illustration

## LETTER OF TRANSMITTAL

DEPARTMENT OF THE ARMY,
*Washington 25, D. C., September 25, 1951.*

The SPEAKER OF THE HOUSE OF REPRESENTATIVES.

DEAR MR. SPEAKER: I am transmitting herewith a report dated May 5, 1948, from the Chief of Engineers, United States Army, together with accompanying papers and an illustration, on a review of reports on, and a preliminary examination and survey of, the Mississippi River-Gulf outlet. This investigation was requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted on May 5, 1943, and the Committee on Commerce, United States Senate, adopted on April 19, 1943, and also authorized by the River and Harbor Act approved on March 2, 1945.

In accordance with section 1 of Public Law 14, Seventy-ninth Congress, the views of the Governor of the State of Louisiana are set forth in the enclosed communication.

89600—51——1

1

The Bureau of the Budget makes certain comments on the report and advises that there is no objection to authorization of the recommended works, with the understanding, however, that no appropriation for construction of the project will be sought until such time as the budgetary situation clearly makes possible the initiation of such improvements. The complete views of the Bureau of the Budget are contained in the attached copy of its letter.

Sincerely yours,

FRANK PACE, Jr.,
*Secretary of the Army.*

## COMMENTS OF THE BUREAU OF THE BUDGET

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington 25, D. C., September 17, 1951.*

The honorable the SECRETARY OF THE ARMY.

MY DEAR MR. SECRETARY: Reference is made to Secretary Royall's letter dated May 12, 1948, submitting the proposed report of the Chief of Engineers on the Mississippi River-Gulf outlet, requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted May 5, 1943, and the Committee on Commerce, United States Senate, adopted April 19, 1943, and also authorized by the River and Harbor Act approved March 2, 1945.

The Chief of Engineers recommends modification of the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, to provide for construction of two new features:

> (1) A seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut from Micheaud southeasterly to Lake Borgne, and across Chandeleur Sound to the 38-foot contour in the Gulf of Mexico, with protective jetties, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required.
>
> (2) An inner tidewater harbor consisting of a 1,000- by 2,000-foot turning basin 36 feet deep at the landward end of the seaway canal, and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal.

The plan also provides for the future construction of a channel and a lock at Meraux to furnish an additional connection between the tidewater harbor and the river. The results of this project would be, therefore, a new harbor at New Orleans and a new entrance channel entirely separate from the Mississippi River. The new harbor and channel would supplement but not replace the present port facilities at New Orleans and the present entrance channel in the river.

The Federal cost of the recommended project is estimated on the basis of 1948 prices at $67,000,000 for construction, with annual charges of $4,004,000, including $1,000,000 for maintenance. The estimated non-Federal cost is $610,000 with annual charges of $23,000.

The prospective tangible annual benefits total $5,835,000. These include $3,250,000 savings in ship turn-round time; $950,000 savings due primarily to relief of congestion at existing general cargo terminals and in the landward access facilities to the present wharves; and

REPORT OF THE CHIEF OF ENGINEERS, UNITED STATES ARMY

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, D. C., May 5, 1948.*

Subject: Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.

To: The Secretary of the Army.

1. There is submitted herewith for transmission to Congress the report of the Board of Engineers for Rivers and Harbors in response to resolution of the Committee on Commerce of the United States Senate, adopted April 19, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands; and also a resolution of the Committee on Rivers and Harbors of the House of Representatives, adopted May 5, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands. It is also in review of the report of the division engineer on a ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, La., to the Gulf of Mexico, by way of the best available route or routes, authorized by the River and Harbor Act approved March 2, 1945.

2. I concur in general in the views and recommendations of the Board. It is noted that the conditions of local cooperation prescribed by the Board include among other requirements that local interests make necessary highway changes. The existing project for the Gulf Intracoastal Waterway provides, however, for the United States to construct a highway bridge over this section of that waterway. Since existing congressional authority specifically provides for the construction of a highway crossing by the United States, it is considered that the project for the ship channel should carry similar authority.

3. I recommend modification of the existing project for Mississippi River, Baton Rouge, to the Gulf of Mexico, to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Island at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide and 2,000 feet long; and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal, including construction of a suitable highway bridge with approaches to carry Louisiana State Highway 61 over the channel; all generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $67,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to initiation of construction, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when and as required for subsequent maintenance; furnish assurances satisfactory to the Secretary of the Army that they will accept ownership of the highway bridge and approaches upon completion of construction, together with maintenance, operation, and future replacement, or alteration as may be required; will provide and maintain any other bridges required over the waterway, and accomplish all necessary utility and other highway relocations and alterations and the maintenance thereof; will hold and save the United States free from all claims for damages due to construction, maintenance, and operation of the project; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port.

R. A. WHEELER,
*Lieutenant General,*
*Chief of Engineers.*

Case 2:05-cv-04182-SRD-JCW   Document 822-4   Filed 07/26/06   Page 6 of 10

contemplates expenditure of $30,000,000 for further development of east-bank-harbor facilities but no definite offer of local cooperation has been received in connection with the proposed west-bank development. Interests using the inland waterways suggest the expansion of lock facilities for light-draft traffic. Petroleum interests state their aversion to side channel outlets and advise that they prefer to use the improved river channel.

11. The division engineer has conducted surveys and studies of the existing and authorized improvements in the Mississippi River and pass channels and of the available sites for a tidewater harbor at New Orleans with essential connecting channels including the several available alinements for a seaway canal to the Gulf. He reports that the usual hazards encountered in restricted channels and their outlets attend navigation of the river and its passes and, under provisions made for their control, they are only minor. New Orleans enjoys equality with other major Gulf and Atlantic ports on rates for vessel and cargo insurance and pilotage charges. The division engineer finds that the river and its improved outlets afford seagoing vessels direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial-Canal lock, hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

12. After consideration of the alternative locations and routes for an additional outlet, the division engineer selected two plans of improvement for detailed investigation. One plan provides for creation of a tidewater harbor on the east bank of the Mississippi River, generally as advocated by the Board of Commissioners of the Port of New Orleans, by construction of a channel 36 feet deep and 500 feet wide along the Gulf Intracoastal Waterway from the existing Industrial Canal to a turning basin south of Micheaud; the turning basin 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut on tangents and easy curves from the turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Chandeleur Islands at or north of Errol Island, to deep water in the Gulf of Mexico. Provision is included for a permanent retention dike along the canal across Chandeleur Sound; for parallel jetties from Chandeleur Islands to the 20-foot contour in the Gulf with a wing dike along the islands as required; and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. The plan provides for the future construction of a channel and a lock at Meraux on the left bank of Mississippi River at mile 86, to furnish a connection from the tidewater harbor to the river additional to the existing industrial canal and lock when such construction is warranted by prospective commerce. Costs of the foregoing east-bank improvements, exclusive of the future connecting channel and lock, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $400,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Corresponding annual carrying charges are estimated at $3,270,000, of which $3,240,000, including $810,000 for maintenance, are Federal and $30,000 are non-Federal. The

### X. ADDITIONAL OUTLETS

48. Consideration was given to nine alternative outlets in reports contained in House Document No. 46, 71st Cong., 2d sess. The route outlined in authorizing resolutions and those proposed at and subsequent to the public hearing for this review (fig. 1 [1]) generally correspond to those discussed in reference reports as Chandeleur, Lake Borgne, and Barataria routes. Comparative estimates under uniform postulates (table 6 [1]) indicate that relatively slight difference in over-all cost of east-bank outlets and appurtenances results from change in alinement between common termini.

49. An east-bank outlet from New Orleans necessarily traverses marshlands and open waters (Lake Borgne, Mississippi, Chandeleur, or Breton Sounds) to the Gulf of Mexico. Construction and maintenance of inland sections of such a channel involve only routine dredging operations. Offshore sections, however, present more complex problems. Departmental experience in developing and maintaining harbors along the Gulf coast has shown it to be difficult to maintain deep channels in open shoal waters, particularly if alinement transverses prevailing winds and currents unless dikes of some type are provided. A nearby project, pertinent to a Mississippi east-bank outlet, is that for Gulfport-Ship Island Pass across Mississippi Sound. Here the authorized 26- by 220-foot channel, substantially in line with prevailing southeast winds but transverse to tidal currents through the sound, has been maintained by dredging alone since 1934 at an average annual cost of about $10,000 per mile, it being noted that shoals may consist of soft mud even though the dredged bottom is sand (reference, H. Doc. No. 692, 69th Cong., 2d sess, p. 25).

50. Construction work near New Orleans, notably that at the Industrial Canal lock where quicksand was encountered, and in the Gulf Intracoastal Waterway, indicates that subsurface strata in this part of the lower Delta comprise variable thicknesses of humus, clay, sand, and silt, and mixtures thereof. Borings in Chandeleur and Breton Sounds indicate that similar materials would be encountered there (plates 4 and 5 [1]).

51. The proposed west-bank outlet, as outlined in the brief (exhibit LXXIV-A [1]), leaves the river at or near mile 103, crosses the Texas & Pacific Railroad and then veers to a tangent extending southerly to and through Caminada Bay and Pass to the Gulf of Mexico west of Grand Isle. This route offers the obvious advantage that exposed shoal water is encountered only in Caminada Bay and at the Gulf entrance where protection works would be necessary.

52. *Sea level harbor basins.*—Proponents of east-bank outlets stressed the advantage of a tidewater channel and the benefits resulting from reclamation of marshlands for use in development of a tidewater port (par. 27). Generally tidewater harbor basins serve ports, such as London, Antwerp, and Le Havre, located on waterways where great tidal fluctuations make it advisable to provide constant level terminal basins connected with the tideway through locks. Use of such basins reduces foundation uncertainties and facilitates handling of cargoes at shipside. At New Orleans the range of tide

---
[1] Not printed.

60. *East-bank improvements.*—These include complementary features as follows:

(a) *Tidewater harbor and connecting channels.*—Supplementing facilities provided by the existing projects "Mississippi River, Baton Rouge to the Gulf of Mexico" and "Gulf Intracoastal Waterway," this feature provides for creation of a tidewater harbor by construction of a 36- by 500-foot channel from the existing inner-harbor canal to a turning basin south of Micheaud. Provision is also made for an eased entrance channel 36 feet deep from the left bank of the Mississippi River near Meraux (mile 86) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide, with a depth of 40 feet on the sills; a landside forebay and mooring basin leading into a connecting harbor channel 36 feet deep and 500 feet wide when such construction is warranted by prospective commerce.

(b) *Outlet (seaway).*—This feature provides for construction of a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Michaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of 70 miles. Provision is included for a permanent retention dike across the sound and for parallel jetties from Chandeleur Islands to the 20-foot-depth contour in the Gulf, with a wing dike along the islands, as required, the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

61. *Costs.*—Estimated costs and annual charges for proposed east bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| Tidewater harbor and outlet (seaway) | 53.00 | 0.50 | 3.24 | 0.03 |

62. *West-bank improvements.*—These include complementary features as follows:

(a) *Lock and appurtenances.*—This feature provides for construction of an eased entrance channel 36 feet deep from the right bank of the Mississippi River near Westwego (mile 103) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; and a landside forebay and turning basin suitable for development as a tidewater terminal harbor as proposed by its sponsors. The plan involves readjustment of the Mississippi River main west-bank levee; relocation or reconstruction of highways, railways, and utilities; and construction of a movable railway and highway bridge.

(b) *Outlet (seaway).*—This feature provides for a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from the terminal turning basin (feature (a)) to and through the Barataria marshes and Caminada Bay and Pass to deep

---

[1] Not printed.

water in the Gulf of Mexico, a distance of 55 miles. Provision is included for parallel jetties from Caminada Pass to the 20-foot-depth contour in the Gulf; the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

63. *Costs.*—Estimated costs and annual charges for west bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| (a) Lock, access channel, and turning basin | 26.0 | 0.2 | 1.40 | 0.01 |
| (b) Outlet (seaway) | 27.0 | 0.3 | 1.44 | 0.02 |
| Total | 53.0 | 0.5 | 2.84 | 0.03 |

64. *Résumé of estimates of costs and benefits.*—As shown above, estimated costs for proposed east-bank improvements (tidewater harbor and additional deep-draft outlet to the Gulf with connecting channel to the inner harbor) are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way. Attendant total annual charges, $3,270,000, are commensurate with annual benefits to commerce reasonably to be expected, $5,260,000 (table 8 [1]). The economic ratio is 1.61. Estimated costs for proposed west bank improvements (tidewater terminal and deep-draft outlet to the Gulf) are $53,000,000 for Federal construction and $300,000 for non-Federal expenditures for rights-of-way. Attendant annual charges, $2,870,000, are considerably in excess of benefits to commerce reasonably to be expected, $1,690,000 (table 8 [1]). The economic ratio is 0.59.

### XIII. SPECIAL SUBJECTS

65. *Shore line changes.*—Construction of a deep-draft channel across Chandeleur Sound with dredged material deposited seaward of a retention dike, as contemplated by the plan of improvement, will create a continuous barrier across the sound to intercept prevailing southeast seas, will reduce the magnitude of feeble rotary currents which obtain in the sound, and cause no material change in the mainland shore line. Aids to navigation have not been defined but the local commandant of the United States Coast Guard service collaborated in preparation of cost estimates for navigation aids. The proposed west-bank outlet, land-locked inshore from Caminada Bay, likewise would cause no material change on the mainland shore. Aids to navigation for the proposed channel have not been defined.

### XIV. DISCUSSION

66. The Board of Commissioners for the Port of New Orleans, the legally constituted agency of the State of Louisiana for operation of the port, together with civic and political organizations and financial, industrial, and shipping interests of the city, State, and alluvial

---
[1] Not printed.

ment Association also concurs, but favors construction priority for the outlet channel in preference to the lock and access channel; and the chief engineer of the Board of Commissioners for the Port of New Orleans advises that the plan is substantially that proposed by that agency.

## XV. CONCLUSION AND RECOMMENDATION

81. *Conclusion.*—Taking cognizance of the favorable economic aspect of the proposed additional deep-draft outlet from New Orleans to the Gulf of Mexico seaward of the Chandeleur Islands if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities; the division engineer considers it advisable to adopt a long-range development program for the port of New Orleans as a major feature of existing projects for "Mississippi River, Baton Rouge to the Gulf of Mexico," and "Gulf Intracoastal Waterway," to be prosecuted in cooperation with the local port authority, the Board of Commissioners of the port of New Orleans, as agent for the State of Louisiana. He finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes, will permit expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port as the gateway to the Mississippi Valley and its improved inland waterways, with resulting benefits to present and prospective seagoing and inland-waterway navigation and commerce considerably in excess of charges for construction and operation. He also considers that the proposed improvement will greatly enhance the capacity of the port for emergency war service, since it provides for wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.

82. *Recommendation.*—The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank, deep-draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil-