# EXHIBIT 3

Rec'd. Late.

7146

| 71ST CONGRESS <br> 2d Session | COMMITTEE ON RIVERS AND HARBORS, <br> HOUSE OF REPRESENTATIVES U. S. | DOCUMENT <br> No. 46 |
|---|---|---|

# MISSISSIPPI RIVER—GULF OUTLET

## LETTER

FROM

## THE CHIEF OF ENGINEERS, UNITED STATES ARMY

TRANSMITTING

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS ON REVIEW OF REPORTS HERETOFORE SUBMITTED ON MISSISSIPPI RIVER—GULF OUTLET AND NEW ORLEANS INDUSTRIAL CANAL

WAR DEPARTMENT,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, June 11, 1930.*

Hon. S. WALLACE DEMPSEY,
   *Chairman Committee on Rivers and Harbors,*
      *House of Representatives, Washington, D. C.*

MY DEAR MR. DEMPSEY: 1. Referring to letter of the chairman of the Committee on Rivers and Harbors of the House of Representatives, dated February 27, 1929, inclosing a copy of a resolution of the committee of the same date, requesting the Board of Engineers for Rivers and Harbors to review the reports on Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to a provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways, I inclose herewith the report of the board in response thereto.

2. Recommendation was made in the reports under review that no modification be made of the existing projects, since adequate facilities were already provided for deep-draft vessels between New Orleans and the Gulf of Mexico. The particular improvement now desired is that the Federal Government take over the New Orleans Industrial

118819—R. and H. Doc. 46, 71-2——1

Canal for use in connection with an additional outlet to the Gulf or provide a toll-free route for the intracoastal canal.

3. A large commerce moves through the passes of the Mississippi River, the tonnage in 1928 having been 17,107,959 tons, exclusive of cargoes in transit, amounting to 2,384,788. The foreign commerce amounted to 11,738,614 tons. The total number of ocean vessels arriving at and departing from New Orleans was 6,228, the maximum draft being about 32 feet.

4. An artificial waterway between New Orleans and the Gulf would have to be not less than 500 feet wide and 35 feet deep. Duplicate locks would be necessary to overcome the difference in the elevation of the water in the Mississippi and in the Gulf and to facilitate shipping. Nine possible routes for such a waterway have been given consideration, the estimated costs ranging from about $19,400,000 to about $41,000,000. Some of these routes would be exceedingly difficult to maintain. The most advantageous is probably one passing through Barataria Bay, which is somewhat shorter to western points than the routes via the passes. Allowing 50 minutes for passing through the lock, however, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. Vessels bound from New Orleans to eastern points would find the route via South Pass more advantageous than any of those considered.

5. The industrial canal is already part of the existing intracoastal route between the Mississippi River and New Orleans. The commerce on this route is increasing and the district engineer believes that the industrial canal has some prospective value as part of the inland waterway system. Reimbursement of the owners for the cost of the canal is not considered advisable by him, since the improvement has been carried out on a much more extensive scale than is required for the intracoastal service. The owner might be reimbursed, in the opinion of the district engineer, in an amount equivalent to the cost of constructing a 9 by 100 foot canal with a suitable lock, the estimated cost of which is $2,270,000, assuming that all rights of way and highway bridges were furnished at local expense. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied, the district engineer considers it preferable to consider the question of the industrial canal in connection with that report. He finds no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two passes is now assured. He therefore recommends that no further steps be taken toward providing such a route or toward the acquisition of the industrial canal at the present time.

6. The division engineer concurs in the opinion of the district engineer. He points out that the toll charge for the movement of inland waterway traffic through the industrial canal is 5 cents per gross ton, and that the total payments made by the Federal barge line average less than $10,000 annually. The cost to the United States, in interest charges alone, of providing a toll-free canal, should such be possible by the payment of $2,270,000 to the owners, would be nearly 10 times the toll charges now paid by the Federal barge line.

7. The board finds that the improvement of the mouths of the Mississippi has now reached a point where dependable channels can be assured indefinitely. The cost of maintaining these channels,

including the extension of the jetties, which may be necessary within 50 years, is less than the annual carrying charges on any of the auxiliary channels considered. While there are some dangers and hazards to navigation through the passes, it is not to be expected that any more favorable conditions would be found in the restricted side channels which have been considered. The two improved passes have a capacity of several times the present commerce of New Orleans, and there is no necessity for another deep-water outlet, either for emergencies or to provide for increasing commerce. The question of making the industrial canal an integral part of the intracoastal waterway extending eastward from New Orleans has been given consideration in connection with recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The traffic moving over this route is small and there appears to be no justification for the United States to take over the industrial canal, reimbursing the owners for its cost. That privately owned waterway is a much more extensive improvement than is considered necessary for an inland waterway; and, should further consideration be given in the future to its acquisition by the Federal Government, it would not appear equitable for the United States to assume the total expense. The board recommends that the expenditures made in constructing the industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

8. After due consideration of the above mentioned reports, I concur in the recommendation of the board.

Very truly yours,

LYTLE BROWN,
*Major General, Chief of Engineers.*

---

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

WAR DEPARTMENT,
THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS,
*Washington, D. C., May 27, 1930.*

Subject: Mississippi River outlets to the Gulf of Mexico.
To: The Chief of Engineers, United States Army.

1. This report is submitted in response to the following resolution, adopted February 27, 1929:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the rivers and harbors act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

2. In the reports under review it was recommended that no modification be made in the existing projects, which provide adequately

for the movement of deep draft vessels between New Orleans and the Gulf of Mexico. The improvement now desired has particular reference to the acquisition of the industrial canal and its use in connection with an additional deep-water outlet to the Gulf, or in connection with the intracoastal waterway between New Orleans and the East. It is claimed that during high-river stages vessels are greatly delayed in making a trip up the river, and that a ship canal would at times be of great value. The industrial canal, being owned by New Orleans, charges tolls on all intracoastal traffic, and local interests believe that a free waterway should be provided by the Federal Government.

3. The commerce moving through the passes of the Mississippi River in 1928 amounted to 17,107,959 tons, exclusive of cargoes in transit, which are reported to have been 2,384,788 tons. The foreign commerce amounted to 11,738,614 tons, and the domestic to 5,369,345 tons. This traffic was handled in vessels drawing up to 32 feet, the total number of arrivals and departures having been 6,228.

4. The district engineer states that the importance of the commerce of New Orleans justifies the provision of adequate channel facilities. At the time the original request for a study of an additional outlet to the Gulf was brought to the attention of Congress, there was a feeling on the part of local interests that the maintenance of a satisfactory channel in South Pass or Southwest Pass was open to question. Since that time the channels through the passes have been so stabilized that full project depth of 30 feet is available in the South Pass, and full project depth of 35 feet is available in the Southwest Pass. These conditions have now continued for about five years. Narrow channels of greater depth are available through each pass. These routes have sufficient capacity to handle all prospective New Orleans traffic. Conditions are now such that there is no reason to expect that both of the improved channels would be out of commission at one time. It must be expected, however, that at some time in the future, which the district engineer estimates may be within the next 50 years, it will be necessary to extend the jetties. Taking this extension into account, together with the cost of maintaining the channels, the annual cost is estimated at $250,000 for the South Pass, and $400,000 for the Southwest Pass. This work can be carried on without interfering with navigation.

5. In the study now presented consideration is given to nine possible routes between the Mississippi and the Gulf, in addition to South Pass and Southwest Pass. It is considered by the district engineer unnecessary to provide an alternate route for emergencies, but if the maintenance of the passes were to be abandoned an improvement would be required which would take care of the entire commerce of the port of New Orleans. Adequate facilities in a side channel for this purpose would necessitate the construction of duplicate locks and a channel not less than 500 feet wide and 35 feet deep.

6. The most advantageous route of those considered is one passing through Barataria Bay. For vessels bound from New Orleans to eastern ports, the route via South Pass is about 7 miles shorter than the Barataria route, while the route via Southwest Pass is about 13 miles longer. Allowing 50 minutes for passage through the lock, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. The sailing time to Atlantic ports by the South Pass is less than by any of the canal routes discussed.

The estimated annual cost of the Barataria route is $1,441,700, while the estimated annual cost of maintaining both the South and Southwest Passes, including the possible extension of the jetties at each pass, is $650,000. The following table gives a comparison of the several routes considered:

| Route | Distance by river from New Orleans to canal entrance | Length of route | Estimated cost [1] | Approximate cost of operation and maintenance |
|---|---|---|---|---|
| | *Miles* | *Miles* | | |
| Fort St. Philip | 82 | 19.0 | $19,369,700 | $500,000 |
| Fort Jackson | 72 | 15.3 | 40,912,300 | 600,000 |
| Barataria Bay | 29 | 30.8 | 29,944,300 | 375,000 |
| Chandeleur | 0 | 67.0 | 40,070,700 | 1,500,000 |
| Chandeleur, optional | 10 | 60.5 | 34,251,300 | 850,000 |
| Lake Borgne | 0 | 73.8 | 31,911,700 | 2,300,000 |
| Lake Borgne, south shore | 10 | 64.0 | 35,673,200 | 800,000 |
| Lake Pontchartrain | 0 | 75.0 | 31,966,800 | 2,775,000 |
| Lake Borgne, north shore | 0 | 73.0 | 33,392,400 | 1,930,000 |

[1] Including locks and dredging, together with bulkheads and jetties where required.

7. Traffic moving over the inland waterway between the Mississippi River and Mobile traverses the entire length of the industrial canal. Commerce on this route is increasing, and still greater increase is expected when the Louisiana and Texas waterway is completed. The district engineer believes that the industrial canal has a present and prospective value as part of the inland waterway system, and thinks that it would be proper to provide a toll-free route between New Orleans and Mississippi Sound. In lieu of purchasing the entire improvement, he states that the owner of the industrial canal might be reimbursed in an amount equivalent to the cost of constructing a 9-foot by 100-foot canal with a suitable lock. The estimated cost of this work is $2,270,000, on the assumption that local interests would contribute all rights of way and would bear the expense of all highway bridges. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied and consideration can be given to the value of the industrial canal as a part of the system, the district engineer does not recommend further study in connection with this report. With regard to the question of providing a new route to deep water in the Gulf of Mexico, he recommends that no further steps in that direction be taken at the present time.

8. The division engineer agrees with the district engineer that, in view of the adequacy, reliability, and low maintenance cost of the channels at South and Southwest Passes, no other deep-water outlet from the Mississippi River to the Gulf of Mexico is necessary. The industrial canal forms part of the present intracoastal waterway between the Mississippi River and Mississippi Sound. It is possible that when the volume of inland waterway traffic has assumed larger proportions, the United States might take steps to free this traffic from the payment of tolls. The toll rate on inland waterway traffic is 5 cents per gross ton, and the payments made by the Federal barge line average less than $10,000 annually. Should the owners of the industrial canal, which is understood to have cost approximately $22,000,000, be paid $2,270,000 on the basis of the estimate of the

district engineer to provide a toll-free canal for inland waterway traffic, the annual interest on that amount would be nearly ten times the toll charges now paid by the Federal barge line. The division engineer concludes that the burden of tolls is not of such magnitude as to be of large national significance calling for Federal relief.

9. Interested parties were advised of the tenor of the district engineer's report and given an opportunity to present their views. No communications on the subject have been received.

## CONCLUSIONS OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

10. The improvement of the mouths of the Mississippi has been complicated by the difficulty encountered in regulating the flow through the several outlets in proportion to the requirements of the projects. This and other features have now been worked out on a basis which appears to assure dependable channels in South Pass and in Southwest Pass. There has been no serious difficulty in maintaining adequate channels during the past five years, and conditions are now such that it is believed that continued maintenance on a reasonable basis is assured. Eventually it will be necessary to extend the jetties farther into the Gulf, as otherwise the cost of maintaining a channel to deep water will become excessive. During extreme floods surface velocities through the passes may reach a maximum of over 5 miles per hour, but the average strength of flow at such times is somewhat less. Under these conditions the speed of vessels moving upstream is somewhat reduced, but this loss is largely compensated by the more rapid passage downstream. There are some dangers and hazards to navigation through the passes, some damage to vessels and Government works having occurred, but the aggregate losses on this account, as compared to the total value of the traffic handled, have been exceedingly small. It could not be expected that restricted side channels would be any less hazardous. The two passes have a capacity of several times the present commerce of New Orleans, and there is no apparent necessity for another deep-water outlet, either for emergency or to provide for an increase in commerce.

11. The question of making the industrial canal an integral part of the intracoastal waterway extending to the eastward from New Orleans was considered in connection with the recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The section of the intracoastal waterway east of the industrial canal passes through natural waterways, so that the necessary improvement can be provided at small expense. The traffic moving over this route has not yet developed to a point where it appears advisable for the United States to take over the industrial canal, reimbursing the owners for its cost. Should some action of this nature appear advisable in the future, it would not appear equitable to reimburse the city for its total expenditures, which cover a much larger improvement than is considered necessary for an inland waterway. The board recommends that the expenditures made in constructing the industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

For the board:

HERBERT DEAKYNE,
*Brigadier General, Assistant Chief of Engineers,*
*Senior Member.*

## REEXAMINATION OF THE OUTLETS OF THE MISSISSIPPI RIVER, INCLUDING ADVISABILITY OF REIMBURSING OWNERS FOR COST OF THE INDUSTRIAL CANAL, LOUISIANA

### SYLLABUS

The permanency of the navigable passes of the Mississippi River and the probable maintenance costs of these passes are discussed. Various routes are considered for a permanent channel of a depth not exceeding 35 feet from the Mississippi River to Gulf of Mexico. The value of the industrial canal and lock as a part of inland waterway between New Orleans and Mississippi Sound is also considered. The district engineer reports that both South and Southwest Passes provide adequate and reliable navigable channels which can be maintained at reasonable costs. All other routes will involve the use of locks, will have the disadvantage of constricted channels and consequent slow ship speed and be more expensive both in first cost and for maintenance. There being no apparent need of a deep-water route to the Gulf of Mexico other than those provided by South and Southwest Passes, the industrial canal has no value as part of a deep-water outlet. The advisability of the United States reimbursing the present owners of the industrial canal for a portion of the cost of that canal will depend on whether any part of this canal is authorized as a part of the proposed inland waterway between New Orleans, La., and Columbus, Ga.

WAR DEPARTMENT,
UNITED STATES ENGINEER OFFICE,
*New Orleans, La., September 14, 1929.*

Subject: Review of previous reports on the outlets of the Mississippi River to deep water in the Gulf of Mexico.

To: The Chief of Engineers, United States Army (through the division engineer).

### I. GENERAL

1. The river and harbor act of June 5, 1920, calls for a preliminary examination and survey of:

Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet.

2. This report was submitted by Col. C. McD. Townsend, district engineer, on August 25, 1924.

3. On February 27, 1929, the Committee on Rivers and Harbors of the House of Representatives passed the following resolution:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the river and harbor act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel to a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

Case 2:05-cv-04182-SRD-JCW   Document 822-6   Filed 07/26/06   Page 6 of 7

## XII. Comparison of Existing Routes With the Most Advantageous Canal Route

158. Since the existing routes are staisfactory and may be expected to continue so, there is no need for an auxiliary route. The Barataria route must therefore justify itself as a substitute for the passes. In making this comparison the following points are considered:

(1) *Capacity.*—The existing routes have sufficient capacity to handle the traffic into New Orleans for all time. A canal 500 by 35 feet and having double locks could handle twice the existing traffic although there would at times be some delay. It is expected that still a third lock would be necessary eventually.

(2) *Ease of navigation.*—At ordinary river stages, the navigation of existing routes is comparatively easy and, provided existing regulations are complied with, there is little cause for accidents. The navigation of a canal 500 feet in width should be comparatively safe. While the canal would reduce ship speeds, it must be realized that the speed of ships moving up the Mississippi River is considerably reduced. However, the loss coming up is gained going down. The navigation of a lock is always open to some danger but with two locks available, this feature should not be a serious objection.

(3) *Future increase in depth.*—Judging from the performance of Southwest Pass during the last few years, it is reasonable to suppose that a depth of 40 feet could be maintained with the exception of such periods as the river stage exceeds 12 feet on the Carrollton gage. By a further contraction at the ends of the jetties and more intensive dredging at the Head of the Passes, it is probable that a depth of 40 feet could be maintained almost continuously. Were the locks and canal for the Fort St. Philip route constructed for only a 35-foot draft, an increase in draft would involve the building of a new lock and the dredging of the entire length of channel.

(4) *Economic comparison.*—The estimated annual cost of maintenance of both passes covering a period of the next 50 years is $650,000 which includes the cost of the possible extension of the jetties of each pass during this period. Since the estimated annual cost of the Barataria route is $1,441,700, it is evident that the existing routes are much more economical.

(5) *Sailing distance.*—For vessels bound from New Orleans to eastern ports, the route via South Pass is about 7 miles shorter than the Barataria route, while the route via Southwest Pass is about 13 miles longer than the latter route. Allowing 50 minutes for passage through the lock, Southwest Pass is placed on an equal footing with the Barataria route in sailing time. Taking into account the time for lockages, the sailing time from New Orleans to Atlantic ports is less via South Pass, than via any of the canal routes discussed in this report.

(6) *Conclusions concerning deep-water routes.*—From the above comparisons, it appears that the existing routes afford more advantages to shipping than the Barataria route or any other canal route considered. Since both South and Southwest Passes have adequate and reliable channels, it would appear inadvisable to provide another route to deep water in the Gulf of Mexico.

## XIII. The Industrial Canal

159. This canal is admirably located with respect to a connection between the port of New Orleans and an inland waterway eastward thereof. The navigation route now in use traverses the entire length of this canal between the Mississippi River and Lake Pontchartrain. Commerce on this route is increasing, and still greater increase is expected to result from completion of the Louisiana and Texas inland waterway. Should a more satisfactory route than the one now in use be adopted and improved, it is highly probable that a part of the industrial canal, including its lock, will serve as a link in the route. It is, therefore, believed that the industrial canal has a present and prospective value as part of the inland waterway system. In line with the common policy of the United States to have all important inland waterway routes free of tolls, it would appear proper that a toll-free route should be provided between New Orleans and Mississippi Sound. If such course should be adopted, it is believed that the owner of the industrial canal should be reimbursed in the amount equivalent to the cost of the necessary connection to the river if it had been made by the United States. This may be accomplished by purchasing from the State of Louisiana an equity in that part of the industrial canal which would be a part of the route. The value of this equity should be based on the estimated cost of constructing a 9 by 100 foot canal and a suitable lock. Plans for a new lock at Harvey, La., as part of a waterway with the same dimensions, have progressed to such extent that the value of this equity may be estimated with considerable accuracy. Following is the estimated cost of the essential features of the connection which would be required:

| | |
|---|---:|
| Lock, 75 by 420 feet with 12-foot depth over miter sill | $1,721,200 |
| 2 miles of canal, 9 by 100 feet, and suitable approaches to lock, 2,578,667 cubic yards, at 15 cents | 386,800 |
| Fenders, 700 feet long on each side, at each approach | 37,000 |
| 1 railroad bridge, single-track, 75-foot horizontal clearance | 125,000 |
| Total | 2,270,000 |

The estimate is based on the assumption that local interests would contribute all rights of way and would bear the expense of all highway bridges; these conditions having been specified in the acts which authorized construction of the Louisiana and Texas inland waterway. As the industrial canal and adjacent lands will continue to be used and developed as an inner harbor, there appears to be no good reason why reimbursement should be made for rights of way already acquired by the State. If it should be decided that the entire industrial canal should be used as a connection between Lake Pontchartrain and the Mississippi River, the above estimate should be increased by the following amount:

| | |
|---|---:|
| 3½ miles of canal, 9 by 100 feet, 820,000 cubic yards, at 15 cents | $123,000 |
| Two railroad bridges, single-track, 75-foot horizontal clearance | 250,000 |
| Total | 373,000 |

### XIV. Terminal Facilities

160. The terminal facilities available are substantially the same as described in Port Series No. 5, Port of New Orleans, La., published

*Port of New Orleans, La., calendar year 1928, summary*—Continued

| Class of commodities | Domestic | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Coastwise | | Other domestic | | | |
| | Tons | Value | Tons | Value | Tons | Value |
| Animals and animal products | 15,767 | $2,628,640 | 103,963 | $4,022,757 | 187,631 | $23,239,129 |
| Vegetable food products | 373,425 | 44,449,319 | 509,435 | 40,482,285 | −3,855,027 | −253,404,026 |
| Other vegetable products | 12,314 | 10,597,221 | 27,579 | 15,014,546 | 190,299 | 49,596,633 |
| Textiles | 32,316 | 13,442,638 | 151,954 | 67,016,922 | 718,269 | −269,253,493 |
| Wood and paper | 199,472 | 14,614,435 | 133,849 | 5,601,487 | −1,477,923 | 55,520,780 |
| Nonmetallic minerals | 1,858,096 | 21,442,841 | 1,680,348 | 9,704,441 | −7,774,907 | −111,787,704 |
| Ores, metals, and manufactures of | 68,598 | 10,240,763 | 554,038 | 35,221,613 | −1,148,881 | −56,460,362 |
| Machinery and vehicles | 17,952 | 7,012,678 | 26,521 | 9,156,435 | −93,823 | 29,746,999 |
| Chemicals | 333,770 | 3,255,014 | 33,983 | 7,430,697 | 429,906 | 28,834,216 |
| Unclassified | 258,193 | 45,229,748 | 95,372 | 13,880,524 | 362,508 | 62,195,267 |
| Total | 2,867,963 | 175,913,297 | 3,347,042 | 208,461,710 | −16,248,172 | −940,038,609 |

| | | | | | Short tons | Value |
| --- | --- | --- | --- | --- | --- | --- |
| Cargoes in transit | | | | | 6,591,617 | $223,894,703 |
| Ferry traffic | | | | | 17,356,549 | 4,956,879,135 |

## PORT OF NEW ORLEANS, LA.

### VESSEL CLASSIFICATION, 1928

170. Under the columns "American" and "Foreign" are given the totals of entries and clearances. Under the columns "Net registered tonnage" is given the net vessel tonnage for the total number of entries and clearances.

| Classes of vessels | American | Foreign | Total | Net registered tonnage |
| --- | --- | --- | --- | --- |
| Arrivals (registered): | | | | |
| Steamers | 717 | 1,435 | 2,152 | 5,118,742 |
| Coastwise steamers | | | 932 | 2,935,018 |
| Total arrivals | 717 | 1,435 | 3,084 | 8,053,760 |
| Departures (registered): | | | | |
| Steamers | 636 | 1,333 | 1,969 | 4,691,946 |
| Coastwise steamers | | | 1,175 | 3,448,055 |
| Total departures | 636 | 1,333 | 3,144 | 8,140,001 |
| Total arrivals and departures | 1,353 | 2,768 | 6,228 | 16,193,761 |

NOTE.—No record of vessels not entered or cleared at customhouse.

Number and draft of vessels paying pilotage during the year 1928 is as follows:

MISSISSIPPI RIVER—GULF OUTLET                49

| Draft | Trips, inbound steamers | Trips, outbound steamers | Draft | Trips, inbound steamers | Trips, outbound steamers |
| --- | --- | --- | --- | --- | --- |
| 30 to 32 feet | 3 | 109 | 16 to 18 feet | 651 | 520 |
| 28 to 30 feet | 68 | 115 | 14 to 16 feet | 450 | 423 |
| 26 to 28 feet | 187 | 285 | 12 to 14 feet | 358 | 243 |
| 24 to 26 feet | 198 | 333 | 10 to 12 feet | 108 | 168 |
| 22 to 24 feet | 390 | 291 | | | |
| 20 to 22 feet | 395 | 262 | Total | 3,792 | 3,297 |
| 18 to 20 feet | 463 | 368 | | | |

171. *Recommendations.*—The survey of a new route to deep water in the Gulf of Mexico is not recommended. Since the original report on the inland waterway between New Orleans, La., and Columbus, Ga., is now being reviewed, a survey to determine the value of the industrial canal as a part of the inland waterway system is not recommended in connection with this report.

R. F. FOWLER,
*Major, Corps of Engineers,*
*District Engineer.*

[First indorsement]

OFFICE DIVISION ENGINEER,
GULF OF MEXICO DIVISION,
*New Orleans, La., November 14, 1929.*

To the CHIEF OF ENGINEERS, UNITED STAMES ARMY:

1. I agree with the conclusions of the district engineer that, in view of the adequacy, reliability, and low maintenance cost of the channels at South and Southwest Passes, no other deep-water outlet from the Mississippi River to the Gulf of Mexico is necessary.

2. The industrual canal is now a link between the Mississippi River and the intracoastal and inland waterway route between New Orleans, Mobile, and Warrior River points. It is believed that the lock and a portion, if not all, of the canal will form an integral part of any new connection between the Mississippi River and Mississippi Sound that might be adopted as a result of other studies now pending.

3. It might be that as the volume of inland waterway traffic using the industrial canal assumes larger proportions the United States should take steps to free this traffic from the payment of tolls, but it is not believed that conditions warrant this action at present.

4. The toll rate on the industrial canal for inland waterway traffic is 5 cents per gross ton. The total tolls from inland water vessels using canal for the five years from September 1, 1924, to August 31, 1929, amounted to $120,216.47, or an annual average during this period of $24,043.29.

5. The gross tonnage of inland waterway vessels using the canal from September 1, 1927, to August 31, 1929, was 3,417,782. The Federal barge line's gross tonnage using the canal during this period was 396,730, the tolls on which amounted to $19,836.50, or $9,918.25 per annum.

6. The district engineer estimates the cost of providing a lock and canal connection between the intracoastal waterway and the Missis-