# EXHIBIT  5



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

CELMN-PD-FC

February 1988

MISSISSIPPI RIVER-GULF OUTLET,

ST. BERNARD PARISH, LOUISIANA

RECONNAISSANCE REPORT

ON

CHANNEL BANK EROSION

The project also provides for replacement of the existing IHNC lock or an additional lock with suitable connections when economically justified by obsolescence of the existing IHNC lock or by increased traffic.

The project was modified in August 1969 under the discretionary authority of the Chief of Engineers. The project modification provided for, as a mitigation measure, protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO. This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO.

Construction of the deep-draft channel was initiated in March 1958. An interim channel 36 by 250 feet (bottom width) was opened to traffic in July 1963. Enlargement to project dimensions was completed in January 1968. The turning basin at the intersection of the MR-GO with the IHNC and a high level bridge at Paris Road have been completed. Jetties extending from the seaward end of the land cut to the six-foot contour in Chandeleur Sound and a south jetty extension to mile 20.2 in Chandeleur Sound have been completed also.

A study is in progress to determine the feasibility of replacing the existing IHNC lock.

Foreshore protection along the north bank of the MR-GO and for 13 miles along the south bank from Bayou Bienvenue to the end of the leveed reach, as authorized by the August 1969 project modification, has been completed. Foreshore protection on the south bank from Bayou Bienvenue to the IHNC is indefinitely deferred until the need arises.

Of the 66 miles of waterway between Chandeleur Island and the IHNC approximately 25 miles are through the shallow bay of Chandeleur Sound. About 41 miles are through land and water area. Along the south/southwest shore of the MR-GO the 18 miles of leveed area have been provided foreshore protection. A dredged material disposal area

14

approximately 0.5 miles wide extends along the remaining 23 miles of the MR-GO south bank.

## Current MR-GO Channel Maintenance Requirements

Although some project features were still under construction until 1968, maintenance of the MR-GO channel was initiated in 1965. On average, at least one reach of the inland portion of the waterway, selected on the basis of annual reconnaissance surveys, is dredged for maintenance purposes every two years. The most frequently dredged reaches of the inland portion of the waterway since inception of channel maintenance are as follows:

[] mile 24 to mile 27, dredged four times, 6.0 million cubic yards total,

[] mile 38 to mile 42, dredged four times, 4.2 million cubic yards total, and

[] mile 33 to mile 38, dredged three times, 3.6 million cubic yards total.

Most of the the other reaches of the inland portion of the MR-GO have been dredged once for maintenance since 1970. Reaches of the waterway corresponding to mile 30 to 32, mile 43 to 50, and mile 53 to mile 60 have never been dredged for maintenance purposes.

Where the MR-GO traverses marsh areas in the land cut reaches (mile 23 to mile 60), the average shoaling rate is approximately 40,000 cubic yards per mile per year (cu yd/mi/yr) based on maintenance dredging records. Required maintenance dredging in these reaches results almost exclusively from erosion of the channel banks. Little sediment enters the system from other sources.

Erosion along both the north and south banks of the land cut portion of the channel is significant. The average rate of bank retreat is about 15 feet per year for each bank. The south bank of the MR-GO along the Chalmette loop of the Lake Pontchartrain and Vicinity Hurricane Protection levee (mile 47 to mile 59) is protected with a rock foreshore dike. However, no erosion protection measures exist along the MR-GO north bank or on the south bank between mile 23 and mile 47.

Based on maintenance dredging records, shoaling rates in the land cut reaches are significantly less than in the open water area of Breton Sound. Records indicate that maintenance dredging can vary between 350,000 cu yd/mi/yr and 1 million cu yd/mi/yr in the portion of the channel in Breton Sound. Records from the first and second maintenance dredging periods after the channel was completed, indicate that shoaling varied between 700,000 and one million cu yd/mi/yr in Breton Sound. However, a large percentage of the shoaling was attributed to recirculation of dredged material from disposal areas that were located too close to the channel.

Substantially more dredging in the inland reaches of the MR-GO has been performed for other purposes than for channel maintenance. A significant amount of dredging has been performed to obtain construction material for the Lake Pontchartrain and Vicinity Hurricane Protection levees. Between 1968 and 1983 an estimated 100 million cubic yards of dredged material (33 million cubic yards of in-place levee fill) was removed from the MR-GO for use in levee construction. The extraction of this quanity of fill material has significantly reduced maintenance dredging requirements between mile 47 and mile 60. Thus, channel maintenance requirements have been masked by fill extraction for levee construction.

## Significant Environmental Resources

Environmental resources considered to be significant in the MR-GO study area include coastal marshes, cultural resources, and recreational resources. Table 2 presents the basis for significance.

16

## Cultural Resources

Cultural resources will continue to subside, degrade, and probably be further altered by wave wash produced by vessel movements.

## Recreation Resources

Conversion of wetlands to open water will continue. The loss of ecologically important wetland habitat translates into a less productive habitat area for those species sought after by sportsmen. Losses due to increased salinities would result in a loss in the preferred habitat of the area and, in turn, a loss in the man-day usage by sportsmen hunting and fishing the area.

## PROBLEMS, NEEDS, AND OPPORTUNITIES

Since its completion in 1968, the top width of the 41 mile long land cut has increased from 650 feet to an average of 1,500 feet, in 1987, due to erosion. Much of the bank erosion is caused by wave-wash and drawdown from large displacement vessel traffic. The MR-GO channel was designed for a relatively small general cargo vessel (freighter). However, ship sizes have increased and larger container vessels move over the MR-GO to and from several container facilities located in New Orleans. The wave-wash and drawdown caused by these large vessels moving over the restrictive channel have eroded its banks beyond the limits of the channel rights-of-way in some areas. Passage of these vessels causes very large quantities of water to be displaced from the channel into the adjacent marsh, followed by rapid return flow into the channel. The tremendous forces exerted by these rapid and extreme water level fluctuations cause the relatively soft marsh adjacent to the channel to break up and be swept into the waterway.

The MR-GO was constructed in recognition of the need for a shorter and safer outlet from the Mississippi River to the Gulf of Mexico and for the potential benefit of national defense. Maintenance of the outlet

26

channel is required to assure that these needs of the shipping industry and the national defense continue to be satisfied. Unabated bank erosion will substantially increase channel maintenance requirements. Controlling bank erosion will provide an opportunity to minimize channel maintenance requirements and allow the channel's purpose and function to remain unimpaired.

The most easily quantified biological resource problem resulting from bank erosion is the continuing loss of highly productive habitat. The diminution of fish and wildlife resources is a less easily quantifiable, but equally important, consequence of unabated bank erosion. Such losses, in an area where many depend on these resources for their livelihood, suggest a problem requiring urgent attention. Erosion of the channel banks has caused an average loss of 211 acres of marsh per year during the 20 year period between 1968 and 1987. Most of the lost acreage is in the marsh/estuarine area along the northeast bank. Undeniably, overall fish and wildlife productivity and recreational hunting in the study area have been diminished by the loss of this approximate 4,220 acres of marsh.

Saltwater intrusion also contributes significantly to marsh loss in the study area. Subsidence and lack of sediment deposition affect marsh loss to a lesser degree. Erosion and disintegration of the banks of the MR-GO has created many additional routes for saltwater to intrude into formerly less saline interior marshes. Consequently, salinity in the marshes has increased significantly in the last 20 years. High salinity levels of recent years have reduced the amount of three-cornered grass and, thus, muskrat populations in the marshes adjacent to the MR-GO. Other wildlife species that prefer less saline conditions have declined as well. Winter waterfowl populations within the marshes have also declined because of increased salinities. The less saline vegetation which is most attractive to waterfowl has been greatly reduced by saltwater intrusion. Thus, the recreational value of the overall area for waterfowl hunting has diminished.

Minimizing bank erosion and marsh loss affords an opportunity to avoid the potential disturbance and loss of known and yet unidentified sites of historic significance. Much of the immediate study area is considered to have high probability for cultural resource site occurrence. The exposure of significant sites by bank erosion allows wave battering and the elements to exact a potentially heavy toll in terms of irretrievable cultural resource losses. The desirability of preventing such losses is apparent.

The loss of recreation opportunities is not easily quantified, but is nonetheless an important and apparent consequence of unabated bank erosion. Minimizing bank erosion and marsh loss affords an opportunity to limit the loss of recreational opportunities. Controlling bank erosion and marsh loss will benefit recreationalists utilizing the marshes adjacent to the MR-GO and those that derive their livelihood from servicing recreation activities in the study area.

It is apparent that the identified current and potential future channel maintenance, biological, cultural, and recreation resources problems all follow from the ongoing bank erosion occurring along the MR-GO. Opportunities available for solution of the bank erosion problem will, to varying degrees, provide redress of other erosion-related problems experienced in the study area.

## PLAN FORMULATION

Plan formulation is the process of conceiving and developing specific plan features to satisfy specific objectives. Combinations of measures are then integrated to form comprehensive alternative plans. Alternative plans consist of systems of structural and/or non-structural measures, strategies, or programs. These strategies are selected to alleviate specific problems or take advantage of specific opportunities associated with water and related land resources in the study area.

MANAGEMENT MEASURES

Both structural and non-structural measures are available to arrest bank erosion on the MR-GO.

Structural measures include enlarging the MR-GO channel to minimize effects of wave activity, constructing temporary earthen retention dikes and depositing maintenance dredged material on the unprotected channel banks, and constructing a bank protection structure along selected reaches or the entire inland length of the waterway.  Although widening and deepening the MR-GO would make it a less restrictive channel and thus reduce bank erosion, this measure was not evaluated in this study. Additionally, the concept of disposal of maintenance dredged material on the unprotected channel banks is only qualitatively assessed in the present study.

Non-structural measures include restricting vessel size and/or transit speed in the MR-GO.   The authority to implement and enforce such restrictions is vested with the U.S. Coast Guard.[1]

PRESENTATION AND ECONOMIC EVALUATION OF ALTERNATIVE PLANS

No Action

The unleveed banks of the MR-GO will continue to erode in the absence of remedial action.  Currently, banks of the unleveed reaches are retreating at rates varying from five to over 40 feet per year.  The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway is about 15 feet per year.

-----------------------------

[1] A group of land owners, and others, filed a petition with the U.S. Coast Guard in October 1987 requesting that some restrictions be imposed on the waterway.  The petition requested that safety zone regulations be imposed on that portion of the MR-GO in St. Bernard Parish.   Action on the petition was pending at the date of this report.   A copy of the petition is shown in Appendix B.

Failure to reduce bank erosion will result in a significant increase in the required maintenance dredging of the waterway in the future. Annual average maintenance dredging requirements are projected to increase six-fold within the next 15 years (by the year 2002). The dredged material disposal area located on the MR-GO south bank between mile 23 and mile 27 could be exhausted by the year 2017. An estimated 970 additional acres of disposal area would be required on the MR-GO north bank. The preliminary assessment of this additional maintenance dredged material disposal area requirement is shown on Plate 4.

Structural Bank Protection

North Bank Disposal Area Options

These options would involve purchasing a suitable quantity of marsh area adjacent to the north bank of the MR-GO for disposal of material from channel maintenance. The options are structural only in the sense that construction of temporary earthen dikes would be required to contain dredged material deposited in the dedicated disposal areas. Possible plans include purchasing and dedicating marsh acreage at specific locations or along the entire inland portion of the waterway.

Local experience has shown that, ideally, dredged material disposal areas should be a minimum of 2,000 feet wide perpendicular to the channel. This minimum width has proven to be near optimal for the existing south bank disposal area. Smaller, more restrictive disposal areas increase disposal costs, impair liquid-solids separation, and make control of the quality of effluent returned to adjacent waterways more difficult.

New Disposal Areas Option 1--MR-GO Critical Reaches--Three reaches of the inland portion of the waterway have been identified as having critical erosion trends. Two of these three reaches correspond to portions of the waterway that have been dredged most frequently for maintenance purposes. The third critical reach is in a portion of the waterway where extensive dredging has been performed to obtain construction fill for the

31

Lake Pontchartrain and Vicinity Hurricane Protection levees. Marsh acreage would be purchased and dedicated as dredged material disposal areas at these three locations: mile 51 to mile 56, mile 38 to mile 45, and mile 23 to mile 30. Two of the dredged material disposal areas would be roughly 7 miles long by 2,000 feet wide perpendicular to the channel, and the other about 5 miles long by 2,000 feet wide. These critical reaches correspond to those proposed for structural bank protection in Structural Option 1 discussed in a subsequent section.

New Disposal Areas Option 2--MR-GO North Bank mile 60 to mile 23--For this option marsh acreage would be purchased for a dedicated dredged material disposal area approximately 37 miles long by 2,000 feet wide. The area would extend along the entire north bank of the inland portion of the waterway similar to the disposal area presently located on the south bank. The portion of the waterway that would be affected by this option is the same as that proposed for structural bank protection in Structural Option 2 discussed in a subsequent section.

Costs associated with these options would include the following:

   [] disposal easement acquisitions

   [] constructing temporary earthen retention dikes, and

   [] possibly, mitigation costs for oyster lease damage.

Benefits associated with these options are difficult to assess but could include the following:

   [] avoiding substantially increased future maintenance dredging quantities, and

   [] reducing, to some extent, marsh loss with attendant recreation, fish and wildlife, and cultural resources preservation benefits.

The major difficulty with the potential effectiveness of these options, in terms of reducing marsh loss, is the lack of an annual maintenance dredging requirement in the inland reaches of the MR-GO. On average, only one reach of the waterway is dredged for maintenance purposes every two years. No single or any combination of reaches require maintenance dredging annually. Actual intervals between maintenance dredging of the same reach are highly variable. Even the most frequently maintenance dredged reaches of the waterway have only been dredged four times between 1970 and the present, or on average, about once every four or more years.

The situation is paradoxical in that in order to have enough material from channel maintenance to create a relatively stable disposal area on the north bank of the MR-GO, the north bank would have to be allowed to erode away. The south bank disposal area owes most of its stability to the vast quantities of material deposited there from the initial excavation of the navigation channel. If the restrictive waterway were made deeper and wider, large quantities of material would be available for use in stabilizing the channel north bank.

Even though disposal areas could be purchased and dedicated on the north bank, the unprotected banks of these areas would continue to retreat at the present or an accelerated rate until material from channel maintenance was available for disposal. After the disposal operations were completed the unconsolidated disposal material would erode at some rate substantially higher than the present average (about 15 feet per year) until the next dredging cycle. Required dredging frequency would increase. At best, the scenario envisaged would consist of a continuing cycle of dredging-disposal-redredging and redisposal of essentially the same material. Even if the obvious inefficiency of this scenario were ignored, it is unlikely that dredged material deposition could outpace, or keep pace with, retreat of channel banks that have not yet been subject to erosion.

An alternative to reliance on material from channel maintenance would be to dredge as much material as deemed necessary to produce relatively stable continuous disposal areas at the critical locations or along the entire waterway.   This concept was evaluated and determined to be prohibitively expensive.

Bank Protection Structure Options

Plans for structural bank erosion abatement were developed for three lengths of application along the MR-GO:  the "critical reaches" of the north bank, the entire north bank from mile 60 (its intersection with the GIWW) to mile 23 (the jetties at Breton Sound), and the unleveed north bank from mile 60 to mile 23 and south bank from mile 47 to mile 23.

Structural Option 1—MR-GO North Bank Critical Reaches—Three reaches along the north bank have been designated "critical" based on the potential for eminent loss of the buffering marsh between the MR-GO and Lake Borgne.  These reaches total about 19 miles and extend from mile 51 to mile 56 (5 miles), mile 38 to mile 45 (7 miles), and mile 23 to mile 30 (7 miles).  Mile 38 to mile 45, and mile 23 to mile 30 are the reaches of the inland portion of the waterway that have been most frequently dredged for channel maintenance.  The "critical reaches" are indicated on Plate 5.

Structural Option 2—MR-GO North Bank mile 60 to mile 23—The entire north bank (including the reaches in Option 1 above) was considered for application of structural bank protection measures.  Structural bank protection would be provided for a distance of roughly 37 miles as indicated on Plate 6.  The bank protection structure would parallel the current bank as much as possible.  Major streams and bayous would remain open; however, many small waterways which enter the marsh areas on the north bank of the MR-GO would be closed.

Structural Option 3—All Unleveed Reaches of the MR-GO—All unleveed reaches of the MR-GO:  the north bank from mile 60 to mile 23 (Option 2

above) and the south bank from mile 47 to mile 23, were evaluated for application of structural bank protection (Plate 7). The unleveed MR-GO south bank, from mile 47 to mile 23 fronts a dredged material disposal area which parallels the channel and is approximately 2000 feet deep (roughly 6,000 total acres). Bank erosion in this reach appears to be less severe than that occurring on the north bank of the channel. However, the apparent smaller rate of bank retreat compared to the north bank results from the periodic placement of dredged material in the south bank disposal area.

Four erosion abatement structure designs were developed as described in Table 3 and shown on Plates 8 through 11. For each of the three options described above, any one of the four conceptual structure designs could be applied. Consequently, a total of 12 structural alternatives were developed for initial evaluation.

TABLE 3

| Design Designation | Description and Preliminary Cost Estimate* |
|---|---|
| 1 | Concrete block/rock armor-high profile ($226/lf; $1.20 million/mile) |
| 2 | Concrete block/rock armor-low profile ($213/lf; $1.12 million/mile) |
| 3 | Single row timber piles/geotextile wall with rock aprons ($146/lf; $0.77 million/mile) |
| 4 | Stone-armored shell-core dike ($164/lf; $0.86 million/mile) |

*Cost of structural components only.
lf=linear foot

35

Bank nourishment, i.e., placing earth fill behind the erosion control structure, was initially included as a component of the bank protection structure designs. The structure designs were subsequently modified to exclude bank nourishment as a component of initial construction. However, provision for bank nourishment using dredged material from periodic channel maintenance was retained. Cost estimates include provision to increase the current right-of-way by an additional 500 feet for construction of a bank protection structure and for placement of bank nourishment (real estate cost estimates are shown in Appendix C). Including 200 feet of bank nourishment as a component of the initial structure construction would increase the various structure costs by from about 34 to 52 percent. The same objective will be accomplished at less cost by the productive use of material from periodic channel maintenance. The increased cost of using this material to provide bank nourishment is accounted for as a reduction in the savings in future maintenance dredging costs over the life of the project.

The eventual strip deposition of material from maintenance dredging to an elevation approximating 2.0-feet NGVD is an integral part of each structure design. The typical marsh elevation at Shell Beach (near mile 40) is about 1.5-feet NGVD. Placement of dredged material to about 0.5-feet above this typical marsh elevation would allow for settlement. It should be emphasized that currently there is no annual dredging requirement for the entire waterway. On average, only one or two reaches of the waterway are dredged each year. Consequently, bank nourishment would be accomplished as opportunities to do so occur.

Costs associated with the structural bank protection plans include the following:

[] the cost of the structure components and construction

[] structure maintenance and replacement

[] real estate costs associated with additional rights-of-way, and

[] the incremental cost to deposit material from maintenance dredging behind the bank protection structure in lieu of in the existing disposal area.

Benefits of the structural bank protection plans include the following:

[] avoiding significantly increased maintenance dredging over the 50 year planning horizon

[] reducing marsh loss with attendant recreation, fish and wildlife, and cultural resource preservation benefits, and

[] avoiding additional future disposal area purchases

Potential average annual maintenance dredging quantities are shown on Table 4 for each of the plans evaluated. These data provide a measure of the average annual quantities of material expected to be available for use as bank nourishment. It should be noted that a cubic yard of dredged material is not equivalent to a cubic yard of bank nourishment. Typically, pumping three to five cubic yards of dredged material might be required to obtain one cubic yard of relatively well drained material for bank nourishment. The data of Table 4 are shown graphically on Plates 12 through 15. These plates show idealized representations of potential maintenance dredging savings over the 50-year planning horizon. Estimated marsh acreage savings are indicate on Table 5.

Costs include the following: structural components, flotation access, mobilization/demobilization, 25 percent contingency, 6 percent engineering and design (E&D), 8 percent supervision and administration (S&A), and real estate. Average annual structure maintenance costs are estimated as 2.8 percent of initial construction costs.

37

TABLE 4

ESTIMATED AVERAGE ANNUAL MAINTENANCE DREDGING QUANTITIES

| Reach mile no. | Distance miles | Remarks | Present Without Bank Protection (cu yd/yr) | Future 1/ Without Bank Protection (cu yd/yr) | Future With 2/ | | | 10 MPH 3/ Speed Limit Imposed (cu yd/yr) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Critical Reaches Protected (cu yd/yr) | North Bank Protected (cu yd/yr) | North and South Bank Protected (cu yd/yr) | |
| 56 to 60 | 4 | | 0 | 520,000 | 100,000 | 0 | 0 | 0 |
| 51 to 56 | 5 | critical reach no. 1 | 45,000 | 1,750,000 | 50,000 | 50,000 | 50,000 | 100,000 |
| 45 to 51 | 6 | | 24,000 | 780,000 | 150,000 | 60,000 | 60,000 | 120,000 |
| 38 to 45 | 7 | critical reach no. 2 | 357,000 | 2,450,000 | 70,000 | 175,000 | 70,000 | 140,000 |
| 30 to 38 | 8 | | 416,000 | 1,040,000 | 320,000 | 200,000 | 80,000 | 160,000 |
| 27 to 30 | 3 | critical reach no. 3 | 93,000 | 390,000 | 75,000 | 75,000 | 30,000 | 60,000 |
| 23 to 27 | 4 | critical reach no. 3 | 484,000 | 1,000,000 | 100,000 | 100,000 | 40,000 | 400,000 |
| Totals | 37 | | 1,419,000 | 7,930,000 | 865,000 | 660,000 | 330,000 | 980,000 |

1/  Maintenance dredging quantities will approach 50 percent of the estimates shown in 10 years (1997) and 100 percent in 15 years
    (2002) if no speed limitation is imposed for large vessel traffic.
    Maintenance dredging quantities will approach 50 percent of the estimates shown in 15 years (2002) and 100 percent in 20 years
    (2007) if a 10 mph speed limit is imposed and enforced.

2/  These rates are assumed to be achieved at the end of the construction period and maintained through the year 2040.

3/  These rates that are assumed to increase to "future-without-bank-protection" rates as indicated in the first note
    above.

TABLE 5

POTENTIAL MARSH ACREAGE SAVINGS FOR ALTERNATIVE PLANS

| Period | Extent of Structural Bank Protection | | | | | | SPEED LIMIT OPTION | |
| | OPTION 1 Critical Reaches Only | | OPTION 2 North Bank Only | | OPTION 3 North Bank and South Bank | | | |
| | Per Period | Cumulative | Per Period | Cumulative | Per Period | Cumulative | Per Period | Cumulative |
|---|---|---|---|---|---|---|---|---|
| 1990 | | | | | | | | |
| 2000 | 345 | 345 | 673 | 673 | 1,109 | 1,109 | 277 | 277 |
| 2010 | 345 | 690 | 673 | 1,346 | 1,109 | 2,218 | 277 | 555 |
| 2020 | 345 | 1,035 | 673 | 2,019 | 1,109 | 3,327 | 277 | 832 |
| 2030 | 345 | 1,380 | 673 | 2,692 | 1,109 | 4,436 | 277 | 1,109 |
| 2040 | 345 | 1,725 | 673 | 3,365 | 1,109 | 5,545 | 277 | 1,386 |

The value of savings in channel maintenance dredging is estimated as $0.50 per cubic yard. This component accounts for 85 to 94 percent of the total estimated monetary benefits for the various alternatives. Marsh savings are valued at $3,500 per acre. This number represents the estimated composite of the real estate, commerical fish and wildlife, and storm surge reduction values of a typical acre of marsh. Marsh acres potentially saved by project implementation range from 27.7 acres per year to 110.9 acres per year for the various scenarios evaluated. The monetary benefit attributable to avoiding future dredged material disposal area purchases is taken as the real estate value of the acreage required.

Estimates of average annual costs and benefits are based on an 8-5/8 percent interest rate amortized over the 50-year life of the project. The base year for comparing all plans is 1990. Costs were compounded or discounted, as appropriate, and all benefits were discounted to this base year for comparison.

Benefit-to-cost (B/C) ratios greater than unity were produced for Structural Option 1, i.e., protecting the MR-GO north bank critical reaches. For this structural option, B/C ratios greater than unity were obtained for two conceptual designs for erosion abatement structures: design designations 3 and 4. Estimated costs, benefits, and B/C ratios for Structural Option 1 using these two coneptual designs are shown on Table 6.

Benefit-to-cost ratios greater than 0.6 were obtained for Structural Option 2, i.e., protecting the entire MR-GO north bank (mile 60 to mile 23), using these same two conceptual structure designs.

Imposition of Speed Limitation

One non-structural alternative was evaluated to determine its erosion abatement potential. This alternative involves imposing a 10 mile per

TABLE 6

SUMMARY OF AVERAGE ANNUAL COSTS, BENEFITS, AND B/C RATIOS
($1,000s)

| Structural Option 1 | Design Designation | |
|---|---|---|
| | 3 | 4 |
| **Costs** | | |
| Interest on Initial Cost | $1,911 | $2,122 |
| Amortization | 31 | 34 |
| Average Annual Maintenance Costs | 57 | 63 |
| Total Average Annual Costs | $1,999 | $2,219 |
| **Benefits** | | |
| Maintenance Dredging Savings | $2,105 | $2,105 |
| Marsh Loss Reduction Savings | 121 | 121 |
| Avoiding Future Disposal Area Purchases | 2 | 2 |
| Total Average Annual Benefits | $2,228 | $2,228 |
| Benefit-Cost Ratio | 1.11 | 1.00 |

hour speed limit for large displacement vessel traffic within the 37 miles between mile 60 and mile 23.   Currently, vessel transit speeds average about 14 miles per hour in this reach of the channel. A 10 mile per hour speed limit would diminish the wave-wash and drawdown effects produced by large displacement vessels that cause erosion of the unprotected channel banks.

Costs associated with this plan include: increased vessel operating cost due to a reduction in average transit speed, and speed limit enforcement costs.   However, only vessel operating cost were considered in the evaluation of this plan.

Benefits of the speed limitation include the following:

   [] increased safety for small commercial and recreational craft

   [] reduced wave activity, and thus, a reduction in the rate of bank erosion and rate of marsh loss

   [] savings in average annual maintenance dredging for at least a portion of the planning horizon—1990 to 2040, and

   [] avoiding additional future disposal area purchases.

Shippers would face higher operating costs if forced to observe a speed limit of 10 statute miles per hour along the 37 mile portion of the waterway under study.   For the without-project (i.e., no speed limit) condition, transit time for vessels averaging 14 statute miles per hour is 2.642 hours.  Under with-project conditions (i.e., with a 10 mph speed limit), the transit time would be increased to 3.70 hours, a difference of 1.058 hours.  Since hourly operating costs for vessels vary according to size, type, and flag of registration, the speed limit would impose unequal costs to individual vessels of the fleet.  Estimated incremental costs are based on the array of operating costs for 1985 and the number

of deep draft vessel trips through the MR-GO in the same year. Based on these data, the total incremental annual costs to shippers, should a 10 mile per hour speed limit be imposed, would be $1,973,000. Assuming no change in either the number of vessel trips or the fleet distribution during the project life, the $1,973,000 figure serves as the average annual cost attributable to a compulsory reduction in speed along the channel.

Estimated average annual saving from consequent reduced maintenance dredging requirements is $651,000. Marsh losses would be reduced by an estimated 25 percent during the 50-year period 1990 to 2040 with this plan. Estimated benefits from reduced marsh losses would amount to approximately $97,000 annually and avoiding the purchase of an additional small disposal area in the year 2017, about $2,000 annually.

The estimated B/C ratio for this plan (with enforcement cost not quantified) is <0.38.

Comparative Summary of Economic Data

Maintenance dredging requirements and costs for critical years, annual average dredging costs, and savings in annual average maintenance dredging costs for the three structural and one non-structural options are summarized in Table 7. These four options are designated as scenarios 1 through 4.

Average annual marsh acres saved and corresponding monetary values are summarized in Table 8. Savings associated with avoiding future dredged material disposal area purchases are summarized in Table 9. A summary of average annual benefits is shown in Table 10. First costs, present values, and average annual costs for the four scenarios and for the four conceptual structure designs are displayed Table 11. Average annual benefits and costs, and benefit-costs ratios for the four scenarios and the four conceptual structure designs are summarized in Table 12.

TABLE 7

AVERAGE ANNUAL MAINTENANCE DREDGING QUANTITIES, COSTS
AND SAVINGS
(CUBIC YARDS AND DOLLARS) *
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

| YEAR | WITHOUT PROJECT | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|------|------|------|------|------|------|
| ANNUAL MAINTENANCE DREDGING QUANTITIES AND COSTS | | | | | |
| 1990 | | | | | |
| (CY) | 2,182,800 | 2,182,800 | 2,182,800 | 2,182,800 | 980,000 |
| ($) | 1,091,400 | 1,266,000 | 1,266,000 | 1,266,000 | 490,000 |
| 1993 | | | | | |
| (CY) | 2,946,600 | 865,000 | 1,530,000 | 1,677,000 | 1,726,000 |
| ($) | 1,473,300 | 501,700 | 887,400 | 972,660 | 863,000 |
| 1997 | | | | | |
| (CY) | 3,965,000 | 865,000 | 660,000 | 1,004,000 | 2,721,000 |
| ($) | 1,982,500 | 501,700 | 382,800 | 582,320 | 1,360,500 |
| 2001 | | | | | |
| (CY) | 7,137,000 | 865,000 | 660,000 | 330,000 | 3,716,000 |
| ($) | 3,568,500 | 501,700 | 382,800 | 191,400 | 1,858,000 |
| 2002 | | | | | |
| (CY) | 7,930,000 | 865,000 | 660,000 | 330,000 | 3,965,000 |
| ($) | 3,965,000 | 501,700 | 382,800 | 191,400 | 1,982,500 |
| 2007 | | | | | |
| (CY) | 7,930,000 | 865,000 | 660,000 | 330,000 | 7,930,000 |
| ($) | 3,965,000 | 501,700 | 382,800 | 191,400 | 3,965,000 |
| 2040 | | | | | |
| (CY) | 7,930,000 | 865,000 | 660,000 | 330,000 | 7,930,000 |
| ($) | 3,965,000 | 501,700 | 382,800 | 191,400 | 3,965,000 |
| AVERAGE ANNUAL MAINTENANCE DREDGING COSTS | | | | | |
| ($) | 2,724,000 | 619,000 | 627,000 | 596,000 | 2,073,000 |
| SAVINGS IN AVERAGE ANNUAL MAINTENANCE DREDGING COSTS | | | | | |
| ($) | | 2,105,000 | 2,097,000 | 2,128,000 | 651,000 |

* $0.50 per cubic yard for "Without Project" scenario and Scenario 4, and
  $0.58 per cubic yard for Scenarios 1, 2, and 3.

TABLE 8

AVERAGE ANNUAL QUANTITY AND VALUE OF MARSH SAVINGS
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| ACRES SAVED PER YEAR | 34.5 | 67.3 | 110.9 | 27.7 |
| VALUE PER ACRE ($) | 3,500 | 3,500 | 3,500 | 3,500 |
| AVERAGE ANNUAL VALUE ($) | 121,000 | 236,000 | 388,000 | 97,000 |

TABLE 9

AVERAGE ANNUAL SAVINGS FROM AVOIDING
FUTURE DISPOSAL AREA PURCHASES
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| AMOUNT ($) | 257,000 | 257,000 | 257,000 | 257,000 |
| PRESENT VALUE IN YEAR 2017 ($) | 27,000 | 27,000 | 27,000 | 27,000 |
| AVERAGE ANNUAL VALUE ($) | 2,000 | 2,000 | 2,000 | 2,000 |

TABLE 10

SUMMARY OF AVERAGE ANNUAL BENEFITS BY CATEGORY

(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

SAVINGS IN AVERAGE ANNUAL MAINTENANCE DREDGING COSTS

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| ($) | 2,105,000 | 2,097,000 | 2,128,000 | 651,000 |

VALUE OF AVERAGE ANNUAL MARSH ACRES SAVED

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| ($) | 121,000 | 236,000 | 388,000 | 97,000 |

AVERAGE ANNUAL SAVINGS RESULTING FROM AVOIDANCE OF ADDITIONAL FUTURE
DISPOSAL AREA PURCHASES

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| ($) | 2,000 | 2,000 | 2,000 | 2,000 |

TOTAL AVERAGE ANNUAL BENEFITS

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 | SCENARIO 4 |
|---|---|---|---|---|
| ($) | 2,228,000 | 2,335,000 | 2,518,000 | 750,000 |

TABLE 11

SUMMARY OF FIRST COSTS, PRESENT VALUE OF FIRST COSTS,
AND AVERAGE ANNUAL COSTS
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

| STRUCTURAL DESIGN 1 | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 |
|---|---|---|---|
| FIRSTS COSTS | $34,523,000 | $67,226,000 | $110,426,000 |
| PRESENT VALUE | $33,200,000 | $55,417,000 | $ 78,731,000 |
| AVERAGE ANNUAL COSTS | | | |
| INTEREST | $ 2,863,000 | $ 4,780,000 | $ 6,791,000 |
| AMORTIZATION | $    46,000 | $    78,000 | $    110,000 |
| OPERATION AND MAINTENANCE | $    85,000 | $   165,000 | $    271,000 |
| TOTAL | $ 2,994,000 | $ 5,023,000 | $ 7,172,000 |

| STRUCTURAL DESIGN 2 | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 |
|---|---|---|---|
| FIRST COSTS | $32,550,000 | $63,384,000 | $104,092,000 |
| PRESENT VALUE | $31,302,000 | $52,250,000 | $ 74,215,000 |
| AVERAGE ANNUAL COSTS | | | |
| INTEREST | $ 2,700,000 | $ 4,507,000 | $ 6,401,000 |
| AMORTIZATION | $    44,000 | $    73,000 | $    104,000 |
| OPERATION AND MAINTENANCE | $    80,000 | $   156,000 | $    255,000 |
| TOTAL | $ 2,824,000 | $ 4,736,000 | $ 6,760,000 |

TABLE 11 (Cont'd)

SUMMARY OF FIRST COSTS, PRESENT VALUE OF FIRST COSTS,
AND AVERAGE ANNUAL COSTS
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

| STRUCTURAL DESIGN 3 | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 |
|---|---|---|---|
| FIRSTS COSTS | $23,036,000 | $44,857,000 | $73,548,000 |
| PRESENT VALUE | $22,153,000 | $36,977,000 | $52,438,000 |
| AVERAGE ANNUAL COSTS | | | |
| INTEREST | $ 1,911,000 | $ 3,189,000 | $ 4,523,000 |
| AMORTIZATION | $ 31,000 | $ 52,000 | $ 73,000 |
| OPERATION AND MAINTENANCE | $ 57,000 | $ 110,000 | $ 181,000 |
| TOTAL | $ 1,999,000 | $ 3,351,000 | $ 4,777,000 |

| STRUCTURAL DESIGN 4 | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 |
|---|---|---|---|
| FIRST COSTS | $25,581,000 | $49,813,000 | $81,718,000 |
| PRESENT VALUE | $24,600,000 | $41,063,000 | $58,263,000 |
| AVERAGE ANNUAL COSTS | | | |
| INTEREST | $ 2,122,000 | $ 3,542,000 | $ 5,025,000 |
| AMORTIZATION | $ 34,000 | $ 57,000 | $ 82,000 |
| OPERATION AND MAINTENANCE | $ 63,000 | $ 122,000 | $ 201,000 |
| TOTAL | $ 2,219,000 | $ 3,721,000 | $ 5,308,000 |

TABLE 11 (Cont'd)

SUMMARY OF FIRST COSTS, PRESENT VALUE OF FIRST COSTS,
AND AVERAGE ANNUAL COSTS
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

NON-STRUCTURAL ALTERNATIVE (10 MILE PER HOUR SPEED LIMIT)

| INCREASED VESSEL OPERATING COSTS | SCENARIO 4 |
|---|---|
|  | $ 1,973,000 |
| TOTAL | $ 1,973,000 |

TABLE 12

SUMMARY OF AVERAGE ANNUAL BENEFITS AND COSTS, AND BENEFIT
COST RATIOS
(OCTOBER 1987 PRICE LEVELS, 8-5/8% INTEREST RATE, BASE YEAR-1990)

|  | SCENARIO 1 | SCENARIO 2 | SCENARIO 3 |
|---|---|---|---|
| TOTAL AVERAGE ANNUAL BENEFITS |  |  |  |
| ($) | $2,228,000 | $2,335,000 | $2,518,000 |
| TOTAL AVERAGE ANNUAL COSTS |  |  |  |
| DESIGN 1 | $2,994,000 | $5,023,000 | $7,172,000 |
| BENEFIT-COST RATIO | 0.74 | 0.46 | 0.35 |
| DESIGN 2 | $2,824,000 | $4,736,000 | $6,760,000 |
| BENEFIT-COST RATIO | 0.79 | 0.49 | 0.37 |
| DESIGN 3 | $1,999,000 | $3,351,000 | $4,777,000 |
| BENEFIT-COST RATIO | 1.11 | 0.70 | 0.53 |
| DESIGN 4 | $2,219,000 | $3,721,000 | $5,308,000 |
| BENEFIT-COST RATIO | 1.00 | 0.63 | 0.47 |

| SPEED LIMIT OPTION |  |  | SCENARIO 4 |
|---|---|---|---|
| TOTAL AVERAGE ANNUAL BENEFITS |  |  | $   750,000 |
| TOTAL AVERAGE ANNUAL COSTS |  |  | $1,973,000 |
| BENEFIT-COST RATIO |  |  | <0.38 |

EVALUATION OF ENVIRONMENTAL EFFECTS OF ALTERNATIVE PLANS

## No Action

At the current average rate of bank retreat, approximately 210 acres of intermediate/brackish marsh, mostly adjacent to the north bank of the MR-GO, are being converted to open water annually. The eventual loss of the buffering marsh adjacent to the MR-GO north bank will increase occurrences and the duration of periods of saltwater intrusion into the marsh surrounding Lake Borgne and that of the Biloxi State Wildlife Management Area

## Structural And Non-structural Alternatives

Effects On Water Quality

The implementation of bank erosion reduction measures along the MR-GO is unlikely to significantly alter general water quality conditions. Temporary increases in turbidity and suspended solids concentrations will occur during construction. Temporary pH changes and dissolved oxygen deficits may also occur during construction. The future condition of the stabilized banks will significantly reduce rates of erosion, and result in lowered amounts of nonpoint pollution from that source, thereby improving water quality.

Effects On Bank Erosion and Marsh Loss

The overall effect of implementation of bank erosion abatement measures will be to substantially reduce erosion and marsh loss. However, where structural bank protection measures are discontinuous, erosion could be intensified due to wave diffraction from the structures. The ends of the bank protection structures must be engineered to counter this effect.

Navigation gaps would be provided in the bank protection structure at the locations of major waterways, such as Bayous Dupre, Bienvenue, and Ycloskey. Wave action and surges from passing vessels will be transmitted to the backshore areas at these locations, and could be intensified by the navigation openings. Erosion of these bayous could increase, and material may be drawn into the MR-GO through the openings.

## Effects On Biological Resources

The deposition of dredged material would be beneficial in that it would provide materials from which the marsh was originally created. Although the existing marsh would be covered by dredged material and the existing inhabitants forced to evacuate the area, any replenishing of the rapidly diminishing resource in this subsiding area would provide more diversity and thus increased habitat for a variety of organisms. The area would be utilized after vegetation is established as feeding, refuge, and nesting area for both birds and mammals.

Construction of a protective dike or pile supported structure would result in adverse impacts through coverage of existing habitat. However, placement of rip-rap or similar materials would create numerous micro-environments similar to jetties that, particularly below the typical marsh level, are utilized by various marine organisms. Organisms using jetties commonly include the sea anemone, barnacle, and sea roach. Molluscs, such as periwincles, slipper shells, dove shells, oyster drills, mussels, and oysters are present. Decapods, such as fiddler, hermit, stone, and blue crabs are common inhabitants of jetties. These organisms, which are all at an intermediate position in the marine food web, would be beneficially impacted by an alternative that involved rock placement as a construction feature. Those alternatives that involve the deposition of dredged material over a large area would also cause adverse impacts through coverage of existing habitat, but would also insure the

existence of a quantity of the diminishing marsh resource and thus would be more positive than negative.

The alternative of vessel speed reduction would result in no adverse environmental impacts in the traditional sense. However, neither would it provide the beneficial impact of marsh nourishment from the eventual placement of a 200-foot or more strip of dredged material.

Effects On Cultural Resources

Implementation of a structural alternative would affect existing and as yet unidentified cultural resources. Definition of project effects (both direct and indirect) must await selection of feature placement and impact zone definition. Project effects on Ft. Proctor must be considered. The determination of whether project effects are adverse to cultural resources would be ascertained from feature placement, impact zones, and cultural resource assessments of significance. From a point near Shell Beach and southeast, cultural resource work would be in consonance with the Southeast Louisiana Cultural Resource Management Plan. Project areas northwest of Shell Beach would be addressed in consonance with existing cultural resource regulation and law.

Effects On Recreation Resources

Alternatives that will reduce bank erosion or restore eroded marsh should benefit fish and wildlife and in turn sport hunting and fishing activities that are dependent on marsh habitats. With the eventual placement of dredged material behind linear bank retaining dikes, marsh would be created. It is possible that areas would exist that would trap rainwater and form marsh impoundments of value to waterfowl and marsh-oriented wildlife. Development of these retaining dikes would reduce bank erosion and saltwater intrusion which are adversely affecting the recreational environment. Additional bank erosion and possible large breaches of the buffering marsh between the MR-GO and Lake Borgne would be prevented.

53

Recreational hunting and fishing activities would benefit from the rebuilding of these productive marsh habitat types.

CONCLUSION

Findings of this study indicate that severe erosion is occurring along the banks of the MR-GO. The current bank erosion problem will become a major channel maintenance problem in the future. An estimated six-fold increase in required average annual maintenance dredging of the MR-GO could be realized by the year 2002. Wave-wash and drawdown effects produced by large vessel traffic are causing highly productive marsh to be converted to open water. Saltwater intrusion into marsh that remains has significantly modified the former fresh/intermediate marsh character of much of the study area. Recreational hunting and fishing resources have been diminished and cultural resources are threatened by the currently unabated bank erosion.

From preliminary analysis of potential structure design effectiveness, reliability, and survivability; costs; benefits; and impacts; one structural option and four conceptual structure designs are recommended for detailed investigation.

Greater than 85 percent of the quantifiable potential benefits of implementing structural bank erosion reduction measures would accrue to navigation in the form of savings in channel maintenance. Consequently, additional studies should be conducted via preparation of a supplement to the General Design Memorandum for the Mississippi River-Gulf Outlet navigation project.

**REQUIREMENTS FOR FURTHER STUDY**

ENGINEERING STUDIES

Detailed hydraulic and hydrologic engineering investigations, design and cost engineering investigations, and geotechnical investigations will be

54

required.   The tasks to be completed for the engineering studies requirements are summarized below.

Surveys

Detailed surveys will be performed to help determine the optimal location and design of the proposed erosion abatement structures.

Hydraulic And Hydrologic Engineering

Hydraulic model studies will be conducted to determine sediment transport quantities from Lake Borgne to the MR-GO.

A narrative description of coastal engineering studies conducted will be prepared for the GDM Supplement.  These studies will include analyses of erosion trends; local wave, current, and littoral drift patterns; water level fluctuations; and relationships between ship traffic, erosion, and navigation channel design.   Additional work will include determining optimal bank protection structure alignments, and maintenance dredging, bank nourishment, and right-of-way requirements.

A narrative description of existing water quality will be prepared to include the latest data from the Environmental Protection Agency water quality data base, "STORET".  Literature searches will be conducted to define the impact of erosion and marsh loss on water quality.  Tables and plates will be prepared for inclusion in the text.

Water quality sampling and analyses will be performed for each reach of the study.  Samples will be analyzed for priority pollutants in water, sediment, and elutriate phases.  These data will be evaluated and a report will be prepared.

A narrative description of hydrology and climatology will be prepared including the latest meteorological data from government sources. Literature searches will be conducted to link hydrometeorological events

55

to erosion and marsh loss. Tables and plates will be prepared for inclusion in the text.

## Design And Cost Engineering

The reconnaissance investigations indicate that several erosion abatement structure design alternatives are worthy of further consideration. These structure designs will be further evaluated based on design integrity and estimated performance. Modifications and improvements to these preliminary designs will also be investigated.

Cost estimates will be refined for the structure design alternatives. The cost analysis will include any modifications or improvements made to the designs as well as updated unit prices.

Additional work may be required to assess present and to estimate future maintenance dredging quantities. Also, research to identify future disposal areas for maintenance dredged material from the MR-GO navigation project may be required.

## Geotechnical Investigations

The GDM Supplement tasks include geologic and land-loss mapping, subsurface investigations along the MR-GO channel, soil testing/ foundations investigations and design for the structure alternatives, and producing a narrative description of the geotechnical investigations performed.

## SOCIO-ECONOMIC STUDIES

Socio-economic studies will be required to accurately document existing conditions and to evaluate alternative plans. Economic evaluations will require projecting economic activity in the study area over the 50-year planning horizon. Land use, recreation, and commercial activities will be analyzed, alternatives will be evaluated, and benefit-cost ratios will be developed.



ENVIRONMENTAL STUDIES

The tasks to be completed for the environmental studies requirements are summarized below.

Biological Resources Studies

The following studies and analyses will be required to assure compliance with both environmental and administrative procedures.

1) Endangered Species Assessment
2) Section 404 (b) (1) Evaluation
3) Coastal Zone Management (CZM) Consistency Determination
4) Environmental Impact Statement
5) Water Quality Certification

Cultural Resources Studies

None of the existing and known cultural resources, with the exception of Ft. Proctor have had their significance evaluated. A study will be required to relocate known sites, assess their significance, and assess project impacts. The results of this study must be coordinated with the State Historic Preservation Officer (SHPO)-Louisiana Department of Culture, Recreation, and Tourism. If any sites are found to be significant and are to be adversely affected by the project then a mitigation plan must be developed and coordinated with the SHPO and Advisory Council on Historic Preservation (ACHP). The approved mitigation plan must then be implemented and a report written. This report must also be coordinated with the SHPO and ACHP.

Excavation for flotation access channel and feature placement should also be monitored and a report written on the results.

Recreation Resources Studies

In the event a portion of the acreage lost to bank erosion is replenished, the potential exists for additional hunting success and increased use by sportsmen. This additional hunting benefit must be quantified. Therefore, a recreational hunting and fishing man-day analysis must be conducted.

REAL ESTATE INVESTIGATIONS

Detailed real estate investigations will be required. Reconnaissance phase real estate cost estimated will be updated or revised as necessary. Real estate cost estimates include estimates for lands and damages, contingencies, acquisition costs and Public Law 91-646 costs. Field work will consist mainly of comparable sales research and research concerning the number of ownerships affected by the proposed project.

Additionally, field inspections will be required to determine whether there are improvements located within the proposed project rights-of-way.

STUDY PARTICIPATION AND COORDINATION

Public involvement is an important part of this study. Through public notices, meetings, and local and interagency coordination, people are encouraged to participate in and contribute information to the study effort.

A Notice of Study Initiation, which included a map indicating the extent of the study area, was published in April 1987. This notice announced the initiation of the reconnaissance study. The two-phase study process was briefly described and Federal funding for the reconnaissance study and local cost-sharing requirements for potential feasibility phase studies were indicated. Further, the notice requested that information, questions, concerns and views that could pertain to the study scope be

forwarded to the District Engineer. The notice was sent to approximately 300 correspondents: individuals; the print and electronic news media; libraries; local, state, and Federal government officials and agencies; and various interest groups. The study mailing list is shown in Appendix D.

Several interagency meetings were held between the NOD and the Louisiana Department of Natural Resources (LDNR) to explore the level of interest and support of non-Federal interests in finding potential solutions to the bank erosion problems. Representatives of the LDNR were requested to review a preliminary draft of the reconnaissance report and comment on plan formulation, environmental and economic analyses, and the study findings. Comments of the LDNR were considered in preparing the reconnaissance report.

Study efforts have been closely coordinated with the U.S. Fish and Wildlife Service (USFWS). The USFWS has indicated support of the study efforts. The USFWS Planning Aid Letter is shown as Appendix E.

Subsequent to distribution of the Notice of Study Initiation, a reporter from WDSU TV Channel 6, New Orleans, requested and was granted an interview with the study manager. The interview covered the definition of the nature and extent of the erosion and erosion-related problems in the study area, the probable consequences of not arresting the erosion on the MR-GO, and some of the potential solutions that were being evaluated. The interview was aired in June 1987.

Two field trips were conducted in May 1987 to meet with a representative of a land owner that would be affected by implementation of structural erosion abatement measures. These meetings in the field allowed the land owner's representative to express the unique concerns of the land owners to environmental resources specialists, the study manger, and other members of the NOD interdisciplinary study team.

In August 1987 an additional field reconnaissance was conducted by three members of the Lower Mississippi Valley Division (LMVD) interdisciplinary planning team assigned to the study and the NOD study manager.  The LMVD planning team's study manager, economist, and biologist toured the areas of critical bank erosion, and were briefed on the status and direction of the NOD study efforts.

## GDM SUPPLEMENT COST ESTIMATE

Additional studies should be conducted via preparation of a supplement to the General Design Memorandum (GDM) for the Mississippi River-Gulf Outlet navigation project.  The estimated cost to complete the supplement to the MR-GO GDM is $991,000 as is shown in Table 13.  The GDM supplement will require 18 months of work effort for submission to LMVD and a total of 24 months to complete.

TABLE 13

GDM SUPPLEMENT COST ESTIMATE

| General Design Memorandum Task | First Fiscal Year | Second Fiscal Year | Total GDM Cost |
|---|---|---|---|
| **Engineering Investigations:** | | | |
| Surveys | $137,000 | ------- | $137,000 |
| Field Investigations & Testing | 95,000 | ------- | 95,000 |
| Hydraulic Model Studies and Data Collection | 135,000 | ------- | 135,000 |
| Hydraulic Design | 40,000 | 23,000 | 63,000 |
| Geology | 38,000 | 24,000 | 62,000 |
| Foundation Design | 22,000 | 21,000 | 43,000 |
| Design Studies & Cost Estimates | 13,000 | 23,000 | 36,000 |
| Study Management & Coordination | 15,000 | 14,000 | 29,000 |
| Total Engineering Investigations | 495,000 | 105,000 | 600,000 |
| **Environmental Studies:** | | | |
| EIS | 45,000 | 23,000 | 68,000 |
| USFWS | 14,000 | 2,000 | 16,000 |
| Cultural Resources | 76,000 | 9,000 | 85,000 |
| Recreation | 16,000 | 4,000 | 20,000 |
| Total Environmental Studies | 151,000 | 38,000 | 189,000 |
| Economic & Social Analyses: | 30,000 | 7,000 | 37,000 |
| Real Estate Investigations: | 10,000 | 5,000 | 15,000 |
| Contingencies: | 119,000 | 31,000 | 150,000 |
| Totals | $805,000 | $186,000 | $991,000 |

**RECOMMENDATION**

I recommend that this Reconnaissance Study Report on Mississippi River-Gulf Outlet Bank Erosion be approved.  The report should be used as a basis to proceed with more detailed studies.

Lloyd K. Brown
Colonel, Corps of Engineers
District Engineer