pumping systems for interior drainage; a levee for protection of the Chalmette area extending southeasterly from the Inner Harbor Navigation Canal to Bayou Dupre, and thence westward to the Mississippi River levee, drained partly by pumps and partly by floodgates; a 6-foot seawall 1.5 miles along the lakefront at Mandeville on the north shore; and the Inner Harbor Navigation Canal 30 feet deep and 125 to 300 feet wide, extending northward from the Mississippi River, 2.9 miles below Canal Street, to Lake Pontchartrain, together with a lock 75 feet wide and 640 feet long. All of the non-Federal improvements are operated and maintained by local interests except that part of the Inner Harbor Navigation Canal, including the lock, which is part of the Gulf Intracoastal Waterway.

7. <u>Area subject to flooding</u>.--Because of the configuration of the bodies of water in the area and the characteristics of hurricanes, no one hurricane would cause critical flooding in all shore areas. Accordingly, for design purposes, a hurricane having forces that may be expected from the most severe combination of meteorological conditions reasonably characteristic of the region was routed along several likely paths, at different speeds of translation for each, to determine the conditions critical to each shore. This resulted in three design hurricanes, each approaching from a different direction and having a different speed of translation. The area subject to flooding is considered to be that within the envelope of areas which would be flooded by these design hurricanes. It consists of about 700,000 acres, or 1,100 square miles. About 240,000 acres are along the shores of Lake Borgne extending from near the mouth of Pearl River to the southerly limits of the Chalmette levee in St. Bernard Parish. This area contains the Louisville and Nashville Railroad, United States Highway 90, the Gulf Intracoastal Waterway, the Mississippi River-Gulf Outlet, fishing camps and residences near Chef Menteur Pass, numerous industrial plants between the levees along the Inner Harbor Navigation Canal, and a planned Florida-type development west of Chef Menteur Pass to consist of residential, commercial, and industrial areas. Of the remaining 460,000 acres, about 82,000 are within the leveed areas in Jefferson, Orleans, and St. Bernard Parishes, 600 in Mandeville, 29,600 in St. Charles Parish, 338,000 acres in marsh and swamp, and the remainder in scattered residential, commercial, and pasture lands mainly along the north shore. All of the leveed areas contain residential, commercial, industrial, and other improvements, except in the eastern part of Orleans Parish where construction of streets and utilities is planned. In addition, there is room for expansion in each, except in New Orleans proper where about 95 percent of the area is occupied.

8. The Lake Pontchartrain area has in the past been subject to frequent and devastating hurricanes. However, it has not been subjected to hurricanes of more than moderate forces in the last 20 years. Damage surveys following recent hurricanes indicate the following losses for conditions and price levels at that time: September 1947, $6.6 million; and September 1956, $1.5 million. It is estimated that the occurrence of the design hurricane critical to the south shore of Lake Pontchartrain would cause water damages in excess of $475 million. Average annual damages for present development are estimated at $11 million, of which about $10.7 million would occur in the leveed areas.

9. Improvements desired.--Local interests on the north shore of Lake Pontchartrain are concerned with a shore erosion problem which is aggravated during hurricanes, and have proposed a seawall. Those in Mandeville desire a new seawall. Interests in St. Charles Parish desire a lakeshore levee between the Bonnet Carre Spillway guide levee and the Jefferson Parish line. Officials of Jefferson Parish desire continued Federal maintenance of the lakeshore levee. Local interests in New Orleans desire additional shorefront protection and have suggested a breakwater extending the full length of the existing seawall. Representatives of Orleans and St. Bernard Parishes have requested consideration of a levee extending eastward from the Inner Harbor Navigation Canal along the south side of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet to Bayou Dupre and thence westward to the existing Chalmette levee to provide protection to an additional area of approximately 31 square miles.

10. Related problem.--As a part of the investigation, a model was constructed and operated to determine the effects of barrier structures in the passes on the established salinity and circulation patterns and the ecology in the lakes. The model included Lakes Maurepas, Pontchartrain, Borgne, and a part of the Mississippi Sound. It was found that, upon completion of the Mississippi River-Gulf Outlet navigation project, presently under construction, salinities in Lake Pontchartrain will be increased significantly by way of tidal exchange direct from the Gulf of Mexico through the Inner Harbor Navigation Canal. In addition, it was found that the increased tidal exchange will cause erosive velocities, with corresponding navigation difficulties, in the Inner Harbor Navigation Canal. Current velocities in the canal have increased notably, causing scour problems, as construction of the Gulf Outlet has progressed.

11. *Improvements proposed*.--The reporting officers find that the most suitable plan for controlling salinity exchange and velocity of flow in the Inner Harbor Navigation Canal, caused by construction of the Gulf Outlet, would be by construction of a lock at Seabrook, on the lake end of the canal. It would be 84 feet wide, 800 feet long, with the gate sills 15.8 feet below mean sea level. All components of the lock would have crest elevations at 7.2 feet, except the control houses which would have floor elevation of 12.2 feet, and would be tied to the existing structures along the canal. The first cost of the lock and the annual cost of its maintenance and operation, shown in Table 1 hereto, would be Federal and are mitigating costs of the Gulf Outlet project.

12. For protection from hurricane flood levels, the reporting officers find that the most suitable plan would consist of a barrier extending generally along United States Highway 90 from the easternmost levee to high ground east of the Rigolets, together with floodgates and a navigation lock in the Rigolets, and flood and navigation gates in Chef Menteur Pass; construction of a new lakeside levee in St. Charles Parish extending from the Bonnet Carre Spillway guide levee to and along the Jefferson Parish line; extension upward of the existing riprap slope protection along the Jefferson Parish levee; enlargement of the levee landward of the seawall along the 4.1-mile lakefront, and construction of a concrete-capped sheet-pile wall along the levee west of the Inner Harbor Canal in New Orleans; raising the rock dikes and landward gate bay of the planned Seabrook Lock; construction of a new levee lakeward of the Southern Railway extending from the floodwall at the New Orleans Airport to South Point; enlargement of the existing levee extending from United States Highway 90 to the Gulf Intracoastal Waterway, thence westward along the waterway to the Inner Harbor Canal, together with riprap slopes along the canal; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal between the Gulf Intracoastal Waterway and the New Orleans Airport; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the Gulf Intracoastal Waterway; construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre, thence westward to the Mississippi River levee at Violet, together with riprap slope protection along the navigation channel and floodgates; and strengthening of the existing floodwall at Mandeville on the north shore. The improvements are designed to provide protection from hurricane flood levels and wave runup having an estimated frequency of occurrence of about once in 200 years. Because of adverse foundation conditions, the embankment must be

constructed by lifts or stages, with a minimum interval of 2 years between lifts. The cost of construction and annual charges together with benefits and benefit-cost ratios for the plan, based on price levels of December 1961, are given in Table 1 hereto. The cost apportionment is based on that adopted by Congress in the 1958 Flood Control Act for hurricane projects at New Bedford, Massachusetts; Narragansett Bay, Rhode Island; and Texas City, Texas. Subject to certain requirements of local cooperation, the District Engineer recommends authorization for construction of his plan. The Division Engineer concurs.

13. <u>Public notice</u>.--The Division Engineer issued a public notice stating the recommendations of the reporting officers and affording interested parties an opportunity to present additional information to the Board. Several communications were received, one of which suggested eastward extension of the levee system to the vicinity of Chef Menteur Pass. Careful consideration has been given to the communications received.

<u>Views and Recommendations of the Board of Engineers for Rivers and Harbors.</u>

14. <u>Views</u>.--The Board of Engineers for Rivers and Harbors concurs in general in the views and recommendations of the reporting officers. The Board believes that the proposed improvements for hurricane flood protection are economically justified, that they are adequate for the purpose, and that the requirements of local cooperation are appropriate. The possibility of modifying the levee alignment to protect additional lands should be examined during preconstruction planning. The Board is cognizant of the report of the Mississippi River Commission dated 30 January 1963, concurring in the views and recommendations of the reporting officers relative to the proposed work under the jurisdiction of the Commission in St. Charles and Jefferson Parishes. The Board believes that the Seabrook Lock is needed to prevent loss to the fishery in Lake Pontchartrain, and extensive erosion and vessel damages in the Inner Harbor Navigation Canal. It concurs in the view that construction of the Seabrook Lock is to correct detrimental effects not previously foreseen and that the first-stage and annual costs are properly chargeable as mitigating costs to the Gulf Outlet project.

15. <u>Recommendations</u>.--Accordingly, the Board recommends:

  a. That the barrier plan for protection from hurricane floods of the shores of Lake Pontchartrain and the separate plan for protection of the Chalmette area be authorized for construction,

10

to include the features shown in Table 1 hereto, and described in the report of the District Engineer, generally in accordance with the plans of the District Engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable at estimated costs to the United States for the barrier plan of $41,200,000 for construction and $125,000 annually for operation and maintenance of the Rigolets lock, and for the Chalmette plan of $10,600,000 for construction: Provided that prior to construction of each separable independent feature local interests furnish assurances satisfactory to the Secretary of the Army that they will, without cost to the United States:

   (1) Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas, necessary for construction of the project;

   (2) Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities made necessary by the construction works;

   (3) Hold and save the United States free from damages due to the construction works;

   (4) Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (1) and (2) above and a cash contribution presently estimated at $14,384,000 for the barrier plan and $3,644,000 for the Chalmette plan, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined;

   (5) For the barrier plan, provide an additional cash contribution equivalent to the estimated capitalized value of operation and maintenance of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

(6) Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(7) Maintain and operate all features of the works in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and channel and the modified dual-purpose Seabrook Lock; and

(8) Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly;

Provided that construction of any of the separable independent features of the plan may be undertaken independently of the others, whenever funds for that purpose are available and the prescribed local cooperation has been provided; and

b. That the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, Louisiana, as modified by the addition of the Mississippi River-Gulf Outlet, be further modified to provide for the construction of a dual-purpose lock at the lakeward terminus of the Inner Harbor Navigation Canal in the vicinity of Seabrook, Louisiana, generally in accordance with the plans of the District Engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $4,980,000 for construction, and $120,000 annually for operation and maintenance in addition to that now required: Provided that prior to construction, local interests furnish assurances satisfactory to the Secretary of the Army that they will:

(1) Provide without cost to the United States and upon request of the Chief of Engineers, all lands, easements, and rights-of-way, including borrow and spoil-disposal areas, required for construction, operation, and maintenance of the project; and

(2) Hold and save the United States free from damages due to the construction works.

FOR THE BOARD:

*[signature]*

R. G. MacDONNELL
Major General, USA
Chairman

# REPORT OF THE DISTRICT ENGINEER

## HURRICANE STUDY
## INTERIM SURVEY REPORT
## LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY

### SYLLABUS

The lowlands in the Lake Pontchartrain tidal basin are subject to tidal overflow. The Greater New Orleans Metropolitan area which lies in this basin will continue its rapid economic development in the near future even though severe damages have resulted from several hurricanes in the recent past. Hurricane damages result from surges entering Lake Pontchartrain from Lake Borgne through natural tidal passes at Rigolets and Chef Menteur Pass and through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal. The surges are intensified by local wind effects, and the combination of waves and surges causes overtopping of the protective works along the shores of the lake. The eastern portion of the area is also subject to flooding by surges and waves that move directly from Lake Borgne and overtop the existing inadequate protective system seaward of the developed land areas. As a result, residences and industrial and commercial establishments suffer damage, business activities are disrupted, lives endangered, and hazards to health created. Hurricanes much more severe than any of record are possible. In the event of the occurrence of such a severe hurricane, catastrophic property damage and loss of human life would be experienced. Local interests have requested protection against these threats to life and property. Another and related problem exists in the area. The Mississippi River-Gulf Outlet provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain, with resultant adverse effect on fishery resources in the area. The Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Canal, creating a hazard to navigation and causing serious scour and damage, particularly in constricted areas at bridge crossings. These adverse effects can be greatly alleviated by construction of a lock for navigation and salinity control at the lake end of the Inner Harbor Navigation Canal at Seabrook. This lock is properly chargeable as a feature of the Gulf Outlet project. A low level lock to the height of the existing protective works will serve the needs of the Gulf Outlet project. By increasing the grade of the rock dike and the landward gate bay section and gates, this structure will also serve as an essential part of a hurricane barrier plan by preventing the entry of hurricane surges into Lake Pontchartrain through the Gulf Outlet. The incremental cost of raising the lock to serve the dual purpose of excluding hurricane surges is properly a charge to the hurricane plan.

The recommended protection plan for the Lake Pontchartrain basin consists of a barrier at the east end of the lake to exclude hurricane tides, coupled with construction or enlargement of protective works fronting developed or potentially developable areas. The barrier would comprise enlarged embankments along the seaward levee system, new embankment extending to high ground on the north side of the Rigolets with regulating tidal and navigation structures in the Rigolets and Chef Menteur Pass, and a dual purpose navigation lock in the Inner Harbor Navigation Canal at Seabrook for control of hurricane inflows into the lake as

well as to limit objectionable salinity intrusion into the lake and tidal currents in the canal now developing from construction of the Mississippi River-Gulf Outlet. Additional protective works along the shores of the lake consist of new lakeshore levees in St. Charles Parish, Citrus, and New Orleans East, and the enlargement or strengthening of existing protective works in Jefferson and Orleans Parishes, and at Mandeville. Gravity drainage facilities are included as integral parts of all new levees. Costs of these features and distribution of costs between navigation and hurricane protection are given in the pertinent data table.

The plan of protection recommended for the Chalmette area provides for the improvement of the existing levee along the Inner Harbor Navigation Canal and construction of new levees along the south side of the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre and thence along the bayou to Violet. Gravity drainage structures are included as an essential part of the plan.

For the Lake Pontchartrain barrier plan and for the Chalmette area, local interests will be required to provide all lands, easements, rights-of-way, and relocations without cost to the United States; to maintain and operate the project and all drainage facilities after completion except as described below; to hold and save the United States free from damages due to the construction works; to contribute 30 percent of the first costs in cash or equivalent work necessary to accomplish approved construction schedules, said 30 percent to include fair market values of lands and relocations, unless they exceed the value of the 30 percent contribution; to acquire adequate easements or other interests in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly without cost to the United States; and to provide all interior drainage and pumping plants required for reclamation and development of the protected areas. Local interests also will provide, at the time of construction of the hurricane protection works, an additional cash contribution equal to the capitalized value of the annual cost for the operation and maintenance of the Rigolets lock and navigation canal, said operation and maintenance to be undertaken by the United States.

Local interests will be required to provide for the Mississippi River-Gulf Outlet lock project at Seabrook all lands, easements, and rights-of-way without cost to the United States, and hold and save the United States free from damages due to the construction works.

Additional protection from hurricane tides can be afforded by local interests to residents of low-lying coastal communities by the establishment of building codes and zoning regulations, provision of adequate havens of refuge, and organization of hurricane preparedness committees to formulate plans for effective preventive measures, evacuation and rescue work, all at no cost to the United States.

     3. **Citrus.** The section between the Inner Harbor Navigation Canal and the levee along Paris Road and the slip at Michoud, extending from the lake to the Gulf Intracoastal Waterway, is designated Citrus. It is partially protected from tidal overflow. The area south of U. S. Highway 90 (Chef Menteur Highway) is composed generally of low-lying undeveloped swamp, woodland, and marsh, with an average elevation of about 1.5 feet, and is largely undrained. The area north of the highway, drained by pumping for many years, has subsided as much as 7 feet below mean sea level in the low areas. The Gulf Intracoastal Waterway joins the Inner Harbor Navigation Canal in this area.

     4. **New Orleans East.** The remaining area to the east of the Citrus area is known as New Orleans East. It is partially protected from tidal overflow and consists of low-lying undeveloped marshland, with an average elevation of about 1.5 feet. The Mississippi River-Gulf Outlet, a tidewater channel, connects with the Gulf Intracoastal Waterway in this area.

     5. The remainder of the area to the east of New Orleans East is unprotected tidal marsh with an elevation of 1.5 feet. Dominant features are the Rigolets, a tidal channel approximately 3,500 feet wide, 28 feet deep, and about 9 miles long, connecting Lake Pontchartrain with Mississippi Sound; and Chef Menteur Pass, a tidal channel approximately 1,000 feet wide, 43 feet deep, and about 7 miles long, connecting Lake Pontchartrain with Lake Borgne, an embayment of brackish water having access to the gulf by way of Mississippi Sound in the north. U. S. Highway 90, which crosses the marsh from the south shore levee system to the north shore escarpment, ranges in elevation between 5 and 12 feet.

     (d) **Chalmette.** The sections of St. Bernard and Orleans Parishes, between the Mississippi River and the Mississippi River-Gulf Outlet, extending from the Inner Harbor Navigation Canal to Bayou Dupre, is designated Chalmette. The higher segment along the river (about 35% of the total) is protected from tidal overflow by a locally built back levee. The area west of Paris Road is drained by pumping and the remainder by gravity. The remainder of the area fronting on the Gulf Outlet consists mainly of undeveloped marshland unprotected and undrained with an average elevation of about 1.5 feet.

     (2) **North shore.** The north shore, comprising the area in St. Tammany Parish, is composed of low-lying marsh and swamp at an elevation of about 1.5 feet, and the adjacent higher land comprising the edge of the escarpment. The principal tributaries of the area, which drain directly into Lake Pontchartrain, are the Tchefuncta River and Bayous Lacombe, Liberty, Bonfouca, and Castine.

b. The Mississippi River-Gulf Outlet, La., authorized by Public Law 455, 84th Congress, 2d Session, as a modification of the Mississippi River, Baton Rouge to the Gulf of Mexico, La. project (described in appendix I) will provide a tidewater channel 36 feet deep and 500 feet wide, extending from the Inner Harbor Navigation Canal in New Orleans to the Gulf of Mexico. As of 30 June 1961 the project was 20 percent complete and the funds expended for construction were $18,912,713.

c. The Gulf Intracoastal Waterway project extending from Florida to Brownsville provides a channel 12 feet deep by 125 feet wide through this area, except in the section between Lake Borgne and New Orleans which has a width of 150 feet. The project provides for a 9-foot channel from the Inner Harbor Navigation Canal across Lake Pontchartrain and through the Rigolets. The costs for these improvements are not separable from the total cost of the project within Louisiana. For further details on this project, see the "Annual Report of the Chief of Engineers, U. S. Army, on Civil Works Activities, 1961."

d. The following additional Corps of Engineers' projects within the study area are described in appendix I:

(1) Mississippi River, Baton Rouge to the Gulf of Mexico, La.

(2) Pass Manchac, La.

(3) Bayous La Loutre, St. Malo, and Yscloskey, La.

(4) Chefuncte River and Bogue Falia, La.

(5) Tangipahoa River, La.

(6) Bayou Lacombe, La.

(7) Bayou Bonfouca, La.

(8) Amite River and Bayou Manchac, La.

(9) Amite River and Tributaries, La.

(10) Tickfaw, Natalbany, Ponchatoula, and Blood Rivers, La.

14. IMPROVEMENTS BY OTHER FEDERAL AND NON-FEDERAL AGENCIES

a. Federal. No other Federal water resource projects exist in the study area.

b. <u>Non-Federal</u>. All of the protective works and drainage facilities described in par. 4.e., exclusive of those outlined in par. 13.a., were constructed through the combined efforts of the State of Louisiana, local levee and drainage districts, and parish police juries, and all excepting the Mississippi River and Bonnet Carre levees are being maintained by local interests.

## SECTION III - PROBLEMS UNDER INVESTIGATION

15. IMPROVEMENTS DESIRED

a. <u>Public hearings</u>. Three public hearings were held to obtain data on hurricane problems and the views of local interests relative to their solution. The hearings at New Orleans, Morgan City, and Lake Charles, Louisiana, on 13, 15, and 20 March 1956, respectively, were attended by about 50 representatives of business, transportation, industrial interests, civic organizations, and Federal, state, and local agencies. Reflecting the preponderance of local opinion, local interests and the State of Louisiana, Department of Public Works, requested that maximum consideration be given to the provision of protective works required to safeguard lives and property from hurricane damage and to the development of an adequate warning system, and indicated that they would actively support the studies. A transcript of the public hearings is presented in supplement 2, published separately. Subsequent to the public hearings and hurricane "Flossy" in September 1956, letters requesting studies of protective measures and commenting on proposed plans of improvement were received from local governmental offices, civic associations, sportsmen's organizations, and residents. A number of meetings and conferences were held with representatives of state agencies as the details of the plans were developed.

b. <u>Proposals by local interests</u>. Local interests in New Orleans suggested an offshore breakwater extending the full length of the existing seawall. St. Charles Parish interests proposed the construction of a lakeshore levee between Bonnet Carre Spillway and the Jefferson Parish boundary, coupled with the establishment of a drainage district. Representatives of Jefferson Parish requested a continuance of levee maintenance. Residents and local officials of the north shore of Lake Pontchartrain were concerned with a shore erosion problem which is accelerated during the occurrence of hurricanes. Construction of a seawall was proposed as a possible solution. Interests in Mandeville requested a new seawall. Local interests in Orleans and St. Bernard Parishes requested the construction of a levee along Paris Road, between the Mississippi River-Gulf Outlet and the Chalmette back levee, and along the Gulf Intracoastal Waterway to provide protection to approximately 9 square miles of undeveloped lands west of Paris Road. Interests in St. Bernard Parish also informally requested the construction of levees along the Mississippi River-Gulf Outlet from Paris Road to Bayou Dupre and