thence along the bayou to the Chalmette back levee to provide protection to an additional area of approximately 22 square miles of undeveloped lands.

16. HURRICANE FLOOD PROBLEMS, RELATED PROBLEMS, AND SOLUTIONS CONSIDERED

   a. <u>Hurricane flood problems</u>. The area surrounding Lake Pontchartrain is susceptible to flooding from wind-driven hurricane tides from the lake. This condition is aggravated by increases in lake level resulting from the influx of surges from Lake Borgne and the Gulf of Mexico that accompany hurricanes from the southeast, south, and southwest. Historical hurricanes have produced recorded stages up to 13 feet on the southwest shore of the lake, 6.2 feet at the south shore, 7.1 feet at the southeast shore, and 7.7 feet at the north shore. Overtopping of protective works and flooding of developed areas have occurred several times during recent hurricanes. The 1947 hurricane caused extensive flooding in Jefferson Parish when a lakeshore embankment that was in a poor state of repair proved inadequate to prevent overtopping, even though the stage was only about 5 feet. Considerable overtopping of the New Orleans seawall occurred during this storm and about 9 square miles of residential area were flooded. In 1956, the New Orleans seawall was again overtopped, resulting in the flooding of about 2.5 square miles of residential and commercial area in the lakefront area, fig. 3. On the north shore in 1915, the 7.7-foot stage flooded a considerable area of the land. Wave action during moderate to high lake stages has undercut the existing seawall at Mandeville causing the backfill which was subsequently developed into a public park to slump and the seawall to become hazardous as a hurricane protective structure. The 13-foot stage experienced at the southwest shore during the 1915 storm caused extensive flooding in the marsh to the west of Lake Maurepas. On several occasions, the marsh area between Lake Pontchartrain and Lake Borgne has been flooded by stages up to 11 feet. Much of the developed area in New Orleans and Jefferson Parishes is below lake level, some land being as low as 7 feet below mean sea level, with a considerable portion lower than 2 feet below mean sea level. Flooding as deep as 16 feet above ground level could result from severe overtopping. Stages attending a standard project hurricane would cause overtopping of all existing protective works by several feet and ponding in the developed areas. The pumping system on which removal of all flood waters is dependent would be inoperable for an extended period of time. This prolonged inundation would cause enormous damage to private and public property, create serious hazards to life and health, disrupt business and community life, and require immense expenditure of public and private funds for evacuation and subsequent rehabilitation of local residents.

   b. <u>Related problem</u>. Prior to the initiation of construction of the Mississippi River-Gulf Outlet the interchange of tidal flow between Lake Pontchartrain and Lake Borgne was through the Rigolets, Chef Menteur Pass, and the Gulf Intracoastal Waterway-Inner Harbor Navigation Canal channel. Salinities of the incoming tides from Lake Borgne were controlled primarily by fresh water flows from the Pearl River basin and brackish water outflows from Lake Pontchartrain.

55



Photo Courtesy of The Times-Picayune

Aerial view of general inundation in Gentilly Area of New Orleans behind Lakefront, looking west from Peoples Ave., between Inner Harbor Navigation Canal and London Ave., 24 Sept. 1956.



Photo Courtesy of The Times-Picayune

View of typical residential flooding at St. Roch Ave. and Vienna St. in Gentilly Area, 24 Sept 1956.

Fig. 3  56

Upon completion of the Gulf Outlet, tidal flows also will enter Lake Pontchartrain directly through the Inner Harbor Navigation Canal via the enlarged Gulf Outlet channel to Breton Sound and to the Gulf of Mexico without first passing through Lake Borgne. Thus, salinities in the lake will be increased significantly. Current velocities in the Inner Harbor Navigation Canal have increased notably as construction of the Gulf Outlet progresses with a corresponding increase in navigation difficulties and the creation of major scour problems along existing bridges and harbor developments. The restricted section through the Seabrook Bridge has enlarged greatly since the initiation of construction of the Gulf Outlet. These conditions will worsen as the channel approaches completion.

c. Protective measures considered.

(1) General. Preliminary studies indicated that the extensive marsh, swamp areas, and water bottoms experience a minor degree of damage from hurricane tides and that protective works are impracticable and uneconomical. Hence, detailed studies were not made of these areas. These preliminary studies revealed that justification could be established for the highly developed and inhabited portions of the study area on the north and south shores of Lake Pontchartrain and in the vicinity of Chalmette, and that solution of the problems created by the Mississippi River-Gulf Outlet was required.

(2) Protective structures.

(a) The problems of excessive current velocity and scour in the Inner Harbor Navigation Canal and increased salt water intrusion into Lake Pontchartrain caused by the Mississippi River-Gulf Outlet can be solved only by construction of a lock in the system which can also be utilized to regulate salinity intrusion. The logical site for such a structure is at the Lake Pontchartrain end of the Inner Harbor Navigation Canal at Seabrook. This structure, if raised to the required height, will also serve as an essential part of the barrier plan by preventing the entry of hurricane surges from the lake through the Gulf Outlet.

(b) Protection plans for the areas bordering Lake Pontchartrain were of two types. One plan, the high level plan, contemplated raising, strengthening, and extending the existing protective systems to meet design hurricane requirements. The other plan, the barrier-low level plan, involved the control of hurricane stages in Lake Pontchartrain by construction of a barrier along the east shore of the lake together with a lesser modification of protective works fronting the lake. Protective systems facing Lake Borgne, including the levees along the Inner Harbor Navigation Canal, the Gulf Intracoastal Waterway, and the Gulf Outlet were high level, being unaffected by the barrier. The high level plan, estimated to cost approximately $100 million, was determined to be much more costly than the barrier-low level plan and to require a much longer construction period in view of the

required height of levees and poor foundation conditions. Therefore, detail study was limited to the barrier-low level plan.

(c) An offshore breakwater was considered for the New Orleans reach to alleviate the erosion problem behind the New Orleans seawall. It was found that such a structure, while effectively reducing wave action at the seawall, would not prevent overtopping of the seawall and its appurtenant back levee by major hurricane tides. In the meantime, local interests have repaired the erosion damage in such a manner as to prevent its recurrence, and they now consider that erosion is no longer a major problem and that such a breakwater is unnecessary and undesirable. A letter expressing the views of the Board of Levee Commissioners of the Orleans Levee District is presented in appendix G.

(d) Several plans were studied for the Chalmette area. One contemplated the enlargement of the existing Chalmette back levee. Another envisioned construction of the hurricane protective system along the south bank of the Gulf Outlet, extending from the Inner Harbor Navigation Canal to Bayou Dupre with gravity drainage structures in Bayou Bienvenue and Bayou Dupre. The existing Chalmette back levee and drainage system would remain in effect. An intermediate plan, extending the expanded protective system only to Paris Road, was also studied. The Gulf Outlet levee system protecting the maximum area was found to be most practicable. Its cost was essentially no higher than the lesser protective systems and it offered substantial additional benefits for the future.

(e) Replacement of the existing seawall at Mandeville by a new wall along the present alignment or offshore was found to be excessive in cost. The wall alone would cost about $850,000. It was found that strengthening the existing wall in conjunction with the Lake Pontchartrain barrier would provide adequate hurricane protection. The addition of a levee landward of the wall to increase the height of protection was not justified.

(f) The provision of an offshore seawall for Citrus in lieu of the levee at this location also was investigated, but excessive construction costs precluded detail study of this proposal.

(g) The erosion problem along unprotected reaches of the north shore of Lake Pontchartrain was found to be primarily one of beach erosion control which can be studied under other existing legislation and which is not within the purview of the hurricane study authority, hence a detailed study was not made. Erosion control studies of these reaches will require appropriate resolution from the Public Works Committee of either the U. S. House of Representatives or Senate as provided by Section 110 of Public Law 87-874. This Act provides for surveys of coastal areas of the United States in the interest of beach erosion control, hurricane protection, and related purposes.

(h) Local interests requested that the barrier levee be located along the Gulf Intracoastal Waterway from the existing levee to and across Chef Menteur Pass, in order to protect a larger

58

d.  Model study.

(1) The control structures in the Rigolets and Chef Menteur Pass as elements of the barrier plan were early recognized as potentially hazardous to the established salinity and circulation patterns in Lake Pontchartrain. In order to determine the economical proportions and design of these structures and evaluate their effect on the ecology of the lake a model study of the problem was determined to be necessary. The model included Lakes Pontchartrain, Maurepas, and Borgne and a portion of Mississippi Sound, to scales of 1:2000 horizontally and 1:100 vertically. Tests were run to verify the salinity and flow patterns under existing conditions. The model was then altered to include the Mississippi River-Gulf Outlet. Tests were made to determine the severity of any increase in salt water intrusion into Lake Pontchartrain, the extent of change in salinity gradient in the lake, the increase in channel velocities that ultimately will result from construction of the project, and the effect of prolonged closure of any structure upon the salinity of the lakes and the channel areas. Tests were then run with barrier structures of several sizes for representative years of low and high rainfall inflow into the area, and with the Bonnet Carre Spillway in operation during a flood year. Storm effects were excluded as being impracticable of model determination. A description and the results of this model study are presented in supplement 3 to this report, published separately. A description of the program for the collection of prototype data, and the data are presented in supplement 4 to this report, published separately.

SECTION IV - PROPOSED SOLUTIONS AND PROJECT FORMULATION

17. PLANS OF PROTECTION

a. General. The most effective plan to protect the developments and the navigation along the Inner Harbor Navigation Canal from high velocities, and to prevent excessive saltwater intrusion into Lake Pontchartrain involves a lock and dam at Seabrook. This feature is necessary to correct the adverse conditions resulting from construction of the Mississippi River-Gulf Outlet. The most effective plan for the control of hurricane tides along the shores of Lake Pontchartrain involves the construction of a barrier along the eastern boundary of the lake with navigation and hurricane control gates in Chef Menteur Pass and the Rigolets. These protective works, together with the strengthening and extension of existing protective works and the raising of the Seabrook Lock and dam will afford full protection to the south shore from Bonnet Carre Spillway to the eastern limit of the city of New Orleans. Levees along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal, and a new back levee for the Chalmette area would complete the protective system. Strengthening of the existing seawall at

elevation at -14 feet as shown on plates 6 and 8. Gates will be 60-degree radial type. The chamber walls are composite type with concrete sheet piles to elevation -2 feet mounted by buttress walls and stabilized by concrete batter piles. Chamber bottom is riprap on a shell blanket. The west gate bay along the barrier alignment will have a crest elevation at 14 feet, and the chamber and east gate a crest elevation at 6 feet. Connecting channels will have bottom widths of 100 feet at an elevation of -14 feet. A minor relocation of U. S. Highway 90 is required.

(d) Seabrook. A dual purpose control structure is required to complete the Lake Pontchartrain barrier system and prevent the entry of hurricane tides through the Mississippi River-Gulf Outlet. The Seabrook Lock, required as a feature of the Mississippi River-Gulf Outlet and described in par. 17.d.(1) above, may be utilized for this purpose by increasing the grade of the rock dike and the landward gate bay to an elevation of 13.2 feet, as shown on plate 9.

(e) St. Charles Parish. The plan provides for the construction of a new levee 5.5 miles in length along the St. Charles Parish lakeshore from the Bonnet Carre Spillway to the east St. Charles Parish boundary. The levee, shown on plate 10, will have a crown elevation of 10 feet and a crown width of 20 feet with slope protection on the lakeside extending from 15 feet beyond the toe to elevation 6.5 feet. A lateral return levee will extend 3.8 miles along an existing canal adjacent to the east St. Charles Parish line to the Illinois Central Railroad. The levee grade will be elevation 8 feet and the crown width 15 feet, as shown on plate 11. Interior drainage ditches will be provided along the entire length of both levees, as shown on plate E-1, appendix E. A drainage structure, as shown on plate 12, will be constructed at the lake end of the lateral levee, equipped with flapgates to provide maximum drainage with tidal fluctuations in the lake, and obviate the employment of operating personnel at the inaccessible site. Additional details related to the hydraulic design for interior drainage are shown in appendix A. Alteration of one 16-inch pipeline crossing will be required.

(f) Jefferson Parish. The grade and section of the existing Jefferson Parish levee system are adequate. The existing riprap slope protection along the lakefront will be extended upward to elevation 6.5 feet. Length of the improvement is 9.7 miles. A typical section is shown on plate 10.

(g) New Orleans. The existing low levees landward of the seawall in this 4.1-mile reach will be raised to an elevation of 11.5 feet, as shown on plate 10. The ramping of streets will be required at 12 locations of levee crossings, as shown in appendix E. The levee along 5.8 miles of the Inner Harbor Navigation Canal can be raised only by construction of a

63

sheet piling wall with concrete cap at elevation 13 feet in the crown of the existing levee. Stoplog structures will be provided at an elevation of 13 feet for crossings of the Southern Railway at Seabrook and Florida Avenue, and of the Louisville and Nashville Railroad. Low bridge crossings over London Avenue at Robert E. Lee Boulevard and Gentilly Boulevard will require minor sandbagging for the occurrence of a design hurricane.

(h) Citrus. A levee 4.5 miles in length will be constructed lakeward of the existing railroad embankment with a crest elevation of 11 feet and a crown width of 20 feet, as shown on plate 10. Riprap slope protection will be provided on the lakeside slope below elevation 6.5 feet. Incorporation of the railroad embankment in the protective levee was impracticable because of the heterogeneous nature of the fill and because of adverse effects on the railroad facilities. Other features include a stoplog structure at the entrance to Lincoln Beach, modification of the existing Citrus pumping station outfall, and the Lincoln Beach protection walls. The Inner Harbor Navigation Canal levee on the east side, 3.1 miles in length, will be raised by sheet pile construction similar to that described for the west side. Stoplog structures also will be required for the three railroad crossings on the east side similar to those previously described for the west side. The Citrus back levee, 7.4 miles along the Gulf Intracoastal Waterway, will be enlarged to an elevation of 13 feet west and 16 feet east of Paris Road, as shown on plate 11. Riprap foreshore protection against erosion by wave wash from shipping will be provided.

(i) New Orleans East. A levee 6.3 miles long will be required lakeward of the railroad embankment. It will have a crest elevation of 10 feet and a crown width of 20 feet, and riprap slope protection on the lakeside below elevation 6.5 feet, as shown on plate 10. Other features include modification of two pipeline crossings and alteration of an existing drainage culvert. The existing levee from South Point to U. S. Highway 90 is adequate. From this point to the Gulf Intracoastal Waterway, and thence along the waterway the levee will require enlargement for a distance of 9.3 miles to a crest elevation of 16 feet with a crown width of 10 feet, as shown on plate 11. Riprap foreshore protection against wave wash from shipping is required. Other features include a stoplog structure for the Louisville and Nashville Railroad crossing and modification of two pipeline crossings.

(j) Mandeville. The existing seawall at Mandeville will be strengthened by the placement of a shell backfill to an elevation of 5 feet and a riprap blanket along the toe in the lake to an elevation of 1 foot along the entire length of the existing wall, and construction of 200 feet of concrete sheet pile wall to an elevation of 6 feet (see plate 10).

(3) Chalmette protection plan. The plan provides for the construction of a new levee 13.5 miles in length along the south

shore of the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the west bank of the bayou for a distance of 3.8 miles to Violet. The levee, shown on plate 11, will have a crown width of 10 feet and a grade of 13 feet west of Paris Road and 16 feet east of Paris Road. Riprap foreshore protection against erosion by wave wash from shipping will be provided. A sheet piling wall with concrete cap, with crest elevation of 13 feet and similar to that for the New Orleans reach, will be required for a distance of 1 mile along the Inner Harbor Navigation Canal levee. Gravity drainage structures will be required in the levee at Bayou Bienvenue and at Bayou Dupre. These will be of the sector gate type designed to pass small boats and tidal flows. Other features include alteration of five pipeline crossings and the construction of a stoplog structure at the Florida Avenue crossing of the Southern Railway.

    e.  <u>Construction</u>. The generally adverse foundation conditions and the methods of construction that must be utilized will require that the levees be built in from one to as many as six stages or lifts, with a minimum interval of 2 years between lifts. Levees requiring four lifts or less will be based in one lift and require only the shaping of the fill in place to accomplish the succeeding lifts. Levees requiring five or more lifts will be constructed by multiple castings of fill and shapings. Adequate allowances have been made for shrinkage and settlement during and after construction. Typical sections shown on plates 5, 6, 7, 10, and 11 are representative for the various reaches.

    f.  <u>Operation and maintenance</u>.

        (1) The control structures will be operated to maintain a mean lake level not exceeding 2 feet during periods of hurricane hazard, as defined by advisories and forecasts from the U. S. Weather Bureau. The gates will be kept closed during hurricane periods and until stages return to normal. At all other times the control gates at the Rigolets and at the Chef Menteur Pass will remain open. The lock structures at the Rigolets and at Seabrook will be operated as necessary to permit navigation until the lock chamber walls are overtopped by rising hurricane tides, at which time the higher level gate will be closed and remain closed until tides recede. Under normal tide conditions, the Rigolets Lock can be left open whenever velocities are not excessive. The Seabrook Lock will be operated in cooperation with the U. S. Fish and Wildlife Service to control the salinity in Lake Pontchartrain and in the Mississippi River-Gulf Outlet area provided such operation will not interfere with navigation.

        (2) The physical operation and maintenance of all project features, with the exception of the two lock structures

and the Rigolets navigation channel, will be the responsibility of local interests. The Seabrook Lock will be maintained and operated by and at the expense of the United States as a feature of the Mississippi River-Gulf Outlet project. The Rigolets lock and channel will be maintained and operated by the United States in the public interest but the costs for operation and maintenance will be contributed by local interests as a feature of local cooperation of the hurricane project.

18. OTHER DESIRABLE IMPROVEMENTS

　　a. Hurricane preparedness plans. Each coastal community should organize a permanent committee of parish and local officials essentially in accordance with the recommendations outlined in the U. S. Weather Bureau report, National Hurricane Research Project, Report No. 28, March 1959. The committee would establish a preparedness plan; direct a public educational program on the hazards of hurricanes and the need for desirable protective measures; maintain preparations for a hurricane emergency; and direct evacuation when authorized, and rescue work when necessary. The committee would utilize and coordinate the resources and efforts of state and Federal agencies.

　　b. Refuge shelters. An inventory should be made and plans developed for the use of buildings suitable for shelters of refuge and these should be incorporated in the preparedness plan. The data should be reviewed and revised periodically to insure the availability of all shelters, such as courthouses, schools, churches, and other suitable buildings. All public buildings to be constructed in the future should be designed to withstand anticipated wind and wave forces and with the upper floor grades of sufficient elevation to serve as an emergency shelter in addition to its principal purpose. Agreements with owners of non-public buildings should be incorporated in the preparedness plan in advance of any required emergency use.

　　c. Zoning regulations and building codes. One of the important functions of the preparedness committee would be to recommend appropriate building codes and zoning regulations for exposed communities, to review codes and regulations in effect, and to recommend desirable revisions.

SECTION V - ECONOMIC ANALYSIS

19. ESTIMATES OF FIRST COST

The costs of the Mississippi River-Gulf Outlet and the proposed lock at Seabrook, and the costs of the two hurricane

<u>Mississippi River-Gulf Outlet</u>
(recommended modification)

| Item | Federal | Non-Federal | Total |
|---|---|---|---|
| Interest | $ 2,853,300 | $ 337,600 | $ 3,190,900 |
| Amortization | 228,700 | 11,200 | 239,900 |
| Maintenance and operation | 1,747,500 | 62,000 | 1,809,500 |
| Replacements | 4,000 | - | 4,000 |
| TOTAL | $ 4,833,500 | $ 410,800 | $ 5,244,300 |

b. <u>Lake Pontchartrain barrier plan.</u>

| Item | Federal | Non-Federal | Total |
|---|---|---|---|
| Interest | $ 1,284,500 | $ 718,600 | $ 2,003,100 |
| Amortization | 80,000 | 44,700 | 124,700 |
| Economic loss on land | - | 79,500 | 79,500 |
| Maintenance and operation | 125,000 | 96,800 | 221,800 |
| Replacements | - | 106,500 | 106,500 |
| TOTAL | $ 1,489,500 | $ 1,046,100 | $ 2,535,600 |

c. <u>Chalmette.</u>

| Item | Federal | Non-Federal | Total |
|---|---|---|---|
| Interest | $ 348,600 | $ 149,400 | $ 498,000 |
| Amortization | 21,700 | 9,300 | 31,000 |
| Economic loss on land | - | 2,700 | 2,700 |
| Maintenance | - | 29,000 | 29,000 |
| Replacements | - | 11,500 | 11,500 |
| TOTAL | $ 370,300 | $ 201,900 | $ 572,200 |

21. ESTIMATES OF BENEFITS

    a. <u>Mississippi River-Gulf Outlet, Seabrook Lock.</u> Benefits attributable to the basic low level lock at Seabrook are primarily corrective in nature. The lock will facilitate navigation of an increasing annual tonnage between the Inner Harbor Navigation Canal and Lake Pontchartrain currently estimated at approximately 3,000,000 tons annually. The structure will prevent serious salt water intrusion and adverse effect on fishery values in Lake Pontchartrain which will otherwise result from the Gulf Outlet project. As modified for the hurricane project the lock forms an integral element of the hurricane barrier to exclude hurricane surges from Lake Pontchartrain. Its benefits for this purpose are not separable.

area is tidal marsh remote from any developments and its protection is impracticable and uneconomical. The partially protected areas along the south shore of the lake, including the Greater New Orleans Metropolitan area, along the north shore of Mandeville, and along the Mississippi River at Chalmette, as well as contiguous areas of potential development in St. Charles Parish and in the Chalmette area, are feasible of protection. A related problem exists, in that observations during the construction of the Mississippi River-Gulf Outlet, supplemented by the model studies made in connection with the hurricane study, show that current conditions in the Gulf Outlet and in the Inner Harbor Navigation Canal will be hazardous to navigation and will further and seriously impair the safety of structures along and across these waterways, particularly the existing major traffic bridge across the Inner Harbor Navigation Canal. The Gulf Outlet will, by reason of its direct connection to the Gulf of Mexico, greatly increase the salinity regimen of Lake Pontchartrain and in the area contiguous to the canal. Provision of a low level lock at the lakeward terminus of the Inner Harbor Navigation Canal is necessary to alleviate the adverse effects on navigation and on the ecology of the area affected by the Mississippi River-Gulf Outlet. Benefits of the existing project are sufficient to justify the additional authorization of the proposed lock. The lock required as a corrective measure for navigation can be readily incorporated in a plan for a hurricane barrier to a higher elevation. The incremental cost of raising the lock walls and gates as necessary to complete the barrier and exclude hurricane surges from Lake Pontchartrain is properly a charge to the hurricane plan.

  b.  <u>Lake Pontchartrain barrier plan.</u> The plan found most suitable for the protection of the shores of Lake Pontchartrain from flooding by hurricane tides is the barrier plan. This plan provides for the construction of a barrier along the east side of Lake Pontchartrain, a levee along the St. Charles Parish lakefront, a new levee along the Citrus and New Orleans East lakeshores, the improvement or enlargement of existing protective works on the south and north shores of the lake, along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal including a dual-purpose lock at Seabrook, and necessary modifications to roads, pipelines, pumping stations, and drainage facilities. The project is amply justified.

  c.  The Gulf Intracoastal Waterway was formerly routed from the Inner Harbor Navigation Canal through Lake Pontchartrain and thence through the Rigolets to connect with the existing route east of the Rigolets. Thus, the Rigolets is a segment of an authorized navigation channel. Increased channel velocities through the Rigolets barrier structure would make navigation hazardous for the heavy commercial traffic that uses the pass. Therefore, a lock is necessary at this location. The proposed lock in the Rigolets is a feature of the hurricane protective plan and its maintenance and operation are properly chargeable to local interests. However, it is deemed appropriate in the public interest that physical operation and maintenance be kept