area is tidal marsh remote from any developments and its protection is impracticable and uneconomical. The partially protected areas along the south shore of the lake, including the Greater New Orleans Metropolitan area, along the north shore of Mandeville, and along the Mississippi River at Chalmette, as well as contiguous areas of potential development in St. Charles Parish and in the Chalmette area, are feasible of protection. A related problem exists, in that observations during the construction of the Mississippi River-Gulf Outlet, supplemented by the model studies made in connection with the hurricane study, show that current conditions in the Gulf Outlet and in the Inner Harbor Navigation Canal will be hazardous to navigation and will further and seriously impair the safety of structures along and across these waterways, particularly the existing major traffic bridge across the Inner Harbor Navigation Canal. The Gulf Outlet will, by reason of its direct connection to the Gulf of Mexico, greatly increase the salinity regimen of Lake Pontchartrain and in the area contiguous to the canal. Provision of a low level lock at the lakeward terminus of the Inner Harbor Navigation Canal is necessary to alleviate the adverse effects on navigation and on the ecology of the area affected by the Mississippi River-Gulf Outlet. Benefits of the existing project are sufficient to justify the additional authorization of the proposed lock. The lock required as a corrective measure for navigation can be readily incorporated in a plan for a hurricane barrier to a higher elevation. The incremental cost of raising the lock walls and gates as necessary to complete the barrier and exclude hurricane surges from Lake Pontchartrain is properly a charge to the hurricane plan.

b. <u>Lake Pontchartrain barrier plan.</u>  The plan found most suitable for the protection of the shores of Lake Pontchartrain from flooding by hurricane tides is the barrier plan. This plan provides for the construction of a barrier along the east side of Lake Pontchartrain, a levee along the St. Charles Parish lakefront, a new levee along the Citrus and New Orleans East lakeshores, the improvement or enlargement of existing protective works on the south and north shores of the lake, along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal including a dual-purpose lock at Seabrook, and necessary modifications to roads, pipelines, pumping stations, and drainage facilities. The project is amply justified.

c. The Gulf Intracoastal Waterway was formerly routed from the Inner Harbor Navigation Canal through Lake Pontchartrain and thence through the Rigolets to connect with the existing route east of the Rigolets. Thus, the Rigolets is a segment of an authorized navigation channel. Increased channel velocities through the Rigolets barrier structure would make navigation hazardous for the heavy commercial traffic that uses the pass. Therefore, a lock is necessary at this location. The proposed lock in the Rigolets is a feature of the hurricane protective plan and its maintenance and operation are properly chargeable to local interests. However, it is deemed appropriate in the public interest that physical operation and maintenance be kept

under the jurisdiction of the United States. Accordingly, a lump sum
contribution of $4,092,000, representing the capitalized annual costs
of $125,000, should be made by local interests during the construction
period. At Chef Menteur Pass, the traffic is local in nature and will
be adequately served by a floodgate structure with long approach chan-
nels. The Chef Menteur structure is designed to permit expansion to
a lock should conditions in the future indicate the need for such a
facility.

d.   Chalmette. The Chalmette area can be afforded adequate pro-
tection against hurricane flooding by construction of a new levee along
the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal
to Bayou Dupre, thence along the bayou to Violet and the improvement
of existing protective structures along the Inner Harbor Navigation
Canal, including necessary modifications to railroads, pipelines, and
drainage facilities. Benefits are sufficient to justify authorization
of the project.

e.   The plans described above for prevention of flooding by hurri-
cane tides, and for corrective action to alleviate the adverse effects
of the Mississippi River-Gulf Outlet on navigation and on the ecology
of the area are based on thorough and careful analysis of experienced
and potential flood situations. Protective works will provide dependa-
ble protection to a high degree and will result in major reduction in
average annual damage, in damage resulting from flooding by the
standard project hurricane, and in damage to navigation and conservation
interests.

f.   Effects on other interests. The proposed plans will have
negligible effect on other interests in the area. The barrier will
not modify the salinity regimen or ecology of the Lake Pontchartrain
area and fishery values will undergo little or no change. The improve-
ment of existing protective works will not affect wildlife values.
The plans will in no way hamper business and industrial operations,
or agricultural activities. The plans of protection make adequate
provision for preserving existing navigation facilities. The dual
purpose Seabrook Lock makes adequate provision for existing and future
traffic between the Inner Harbor Navigation Canal and Lake Pontchartrain.

g.   Local measures. Further protection of human life and proper-
ty can be afforded by the more widespread dissemination of information
relative to potential hurricane tide elevations and limits of flooding.
This can be accomplished through the organization of a hurricane pre-
paredness committee in each community. Such a committee would establish
a continual preparedness plan, conduct public educational programs,
formulate plans for use of buildings as hurricane shelters, recommend
desirable zoning regulations and building codes, and direct evacuation
and rescue work when necessary. Zoning regulations and building codes
should be established and enforced where not presently in effect. All
of these measures will be undertaken by local interests at no cost to
the United States.

(f) Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(g) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and its appurtenant navigation channels and the modified dual purpose Seabrook Lock; and

(h) Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly.

b.   Chalmette.

(1) It is further recommended that a plan for hurricane protection of the Chalmette area be authorized for construction to provide for a levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.

(2) The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at an estimated cost to the United States of $10,600,000 for new work.

(3) Construction of the project shall be subject to the conditions that prior to initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(a) Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(b) Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(c) Hold and save the United States free from damages due to the construction works;

(d) Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be

paid either in a lump sum prior to initiation of construction or in
installments at least annually in proportion to the Federal appropria-
tion prior to start of pertinent work items, in accordance with
construction schedules as required by the Chief of Engineers or, as
a substitute for any part of the cash contribution, accomplish in
accordance with approved construction schedules items of work of
equivalent value as determined by the Chief of Engineers, the final
apportionment of costs to be made after actual costs and values have
been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---|---|---|---|
| Chalmette | $4,543,000 | $ 899,000 | $3,644,000 |

(e)  Provide all interior drainage and pumping plants
required for reclamation and development of the protected areas;

(f)  Maintain and operate all features of the project
in accordance with regulations prescribed by the Secretary of the
Army, including levees, floodgates and approach channels, drainage
structures, drainage ditches or canals, floodwalls, and stoplog
structures;

(g)  Acquire adequate easements or other interest in
land to prevent encroachment on existing ponding areas unless substi-
tute storage capacity or equivalent pumping capacity is provided
promptly.

c.  Mississippi River-Gulf Outlet, Seabrook Lock.

(1)  It is further recommended that the existing project
for the Mississippi River, Baton Rouge to the Gulf of Mexico, La.,
project, authorized by the River and Harbor Act of 2 March 1945,
Public Law No. 14, 79th Congress, 1st Session, and modified by the
addition of the Mississippi River-Gulf Outlet, authorized by the
River and Harbor Act of 29 March 1956, Public Law No. 455, 84th
Congress, 2d Session, be further modified to provide for the con-
struction of a dual purpose lock at the lakeward terminus of the Inner
Harbor Navigation Canal in the vicinity of Seabrook, La.

(2)  The proposed plan shall be generally in accordance
with the plan of improvement described herein and as shown on the
accompanying plates and with such modification thereof as in the
discretion of the Chief of Engineers may be advisable, at estimated
costs to the United States of $4,980,000 for new work, and $120,000
annually for operation and maintenance, in addition to that now re-
quired for the authorized Mississippi River-Gulf Outlet.

A-2   HYDROLOGIC REGIMEN

a.   General.   The water level in Lake Pontchartrain is subject
to variations from direct rainfall, tributary inflow, wind driven water
movements, and translation through the Rigolets, Chef Menteur Pass,
Lake Borgne, Mississippi Sound, Inner Harbor Navigation Canal, and
Mississippi River-Gulf Outlet by tidal variations originating in the
Gulf of Mexico.   Infrequently, it is affected by Mississippi River
diversions through Bonnet Carre Spillway.   The combinations of these
factors determine the salinity regimen in the lake.   Locations and
periods of record of hydrologic stations are shown in tables A-5 and
A-6.

b.   Runoff and stream flow.   Runoff from the 4,700 square miles
north and west of Lakes Pontchartrain and Maurepas drains into the
lakes via the Amite, Tickfaw, Natalbany, Tangipahoa, and Tchefuncta
Rivers; and Bayous Lacombe, Bonfouca, and Liberty.   Streamflow records
are available at five locations on these streams for the periods of
record listed in table A-7.   New Orleans and adjacent parishes are
drained by outfall canals that discharge directly into Lake Pontchar-
train.   Yearly fresh water inflow records show considerable variation,
as shown in table A-7.

    c.    <u>Stages, salinities, waves, and tides.</u>

      (1)  <u>Lake stages.</u>

          (a)  The Bonnet Carre Spillway is operated as required during the high water season on the Mississippi River to divert flows through Lake Pontchartrain in order to insure that a stage of 20 feet above mean sea level is not exceeded at New Orleans. Studies indicate that the operations of the spillway resulted in the raising of the lake level about 0.8 foot in 1937, 1.5 feet in 1945, and 1.0 foot in 1950. These variations are small when compared to stage increases produced by hurricanes.

          (b)  The maximum recorded stage in Lake Pontchartrain of 13.0 feet above mean sea level occurred at Frenier on 29 September 1915. The minimum of minus 2.2 feet occurred at West End (New Orleans) on 26-27 January 1938. The mean lake stage for the period from 1949 through 1958 is 1.0 foot. Plate A-2 shows the monthly mean stages in Lake Pontchartrain from 1941 through 1959.

          (c)  Maximum stages occur in Lake Pontchartrain during hurricane activity in the vicinity. A list of recorded high stages is presented in table A-8.

TABLE A-8
MAXIMUM STAGES - LAKE PONTCHARTRAIN

| Location | Date | Stage-ft.m.s.l. | |
|---|---|---|---|
| Mandeville | 20 Sept. 1909 | 8.0 | |
| West End | 20 Sept. 1909 | 6.2 | |
| Frenier | 29 Sept. 1915 | 13.0 | |
| West End | 29 Sept. 1915 | 6.0 | |
| West End | 19 Sept. 1947 | 5.4 | |
| Mandeville | 19 Sept. 1947 | 6.8 | |
| New Orleans | 4 Sept. 1948 | 4.9 | |
| Frenier | 24 Sept. 1956 | 6.8) | |
| Little Woods | 24 Sept. 1956 | 7.0) | "Flossy" |
| West End | 24 Sept. 1956 | 5.3) | |

      (2)  <u>Salinities.</u> Diluted saline gulf water enters Lake Pontchartrain from Lake Borgne via the Rigolets and Chef Menteur Pass and the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal in large quantities and mixes with the freshwater inflow. The resultant salinity in Lake Pontchartrain averages about 1,500 parts per million of chloride ion, ranging seasonally from a low of about 450 in the spring to a high of 5,300 in the late fall. It is subject to considerable variation with respect to location, seasonal trends, and short term fluctuations. More extensive data on salinities, tides, and currents in Lake Pontchartrain and vicinity will be shown in the U. S. Army Engineers Waterways Experiment Station (WES)

100

report relative to a model study of the Lake Pontchartrain area, which is supplement 3, and published separately to this report.

(3) Waves.  In August 1957, two wave gages were install-ed on the east side of the Greater New Orleans Expressway Bridge, Station Ten at the north end, and Station Four on the south end.  Both are approximately one-quarter mile from shore.  In 1958, Station Nine was established at Frenier, with the gage on a tower approximately 1,200 feet from shore.  Locations are shown on plate A-1.  Pertinent observed data are listed in table A-9.

TABLE A-9
WAVE DATA

| Station | Significant Waves Range ft. | Maximum Waves | | |
|---|---|---|---|---|
| | | Wind m.p.h. | Height ft. | Date |
| 4 | 0.1 to 4.9 | 30 | 8.3 | 9 October 1958 |
| 9 | 0.1 to 4.9 | 29 | 7.8 | 9 October 1958 |
| 10 | 0.1 to 5.3 | 40 | 9.0 | 10 May 1959 |

(4) Tides.  The normal tide has general ranges of one-half foot in Lake Pontchartrain and 1 foot in Lake Borgne, and is diurnal in nature.  However, wind effects usually mask the daily ebb and flood variations.  Because of the annual volume of freshwater inflow (estimated to average 5 million acre-feet), tides, and storm surges, enormous volumes of water pass in both directions through the Rigolets, Chef Menteur Pass, Lake Borgne, Mississippi Sound, Inner Harbor Navigation Canal, and Mississippi River-Gulf Outlet.  With so many variables operating on the several elements of the system, the current patterns are continually changing.

A-3   DESCRIPTION AND VERIFICATION OF PROCEDURES

a.  Hurricane memorandums.  The Hydrometeorological Section (HMS), U. S. Weather Bureau, cooperated in the development of hurricane criteria for experienced and potential hurricanes in the study area.  The HMS memorandums provided frequency data, isovel and rainfall patterns, pressure profiles, hurricane paths, and other parameters required for the hydraulic computations.  Those relative to experienced hurricanes are based on reevaluation of historic meteorologic and hydrologic data.  Those relative to potential hurricanes contain generalized estimates of hurricane parameters that are based on the latest research and concept of hurricane theory.  Memorandums pertinent to the study area are listed in Section III, Bibliography.

b.  Historical storms used for verification.  Three observed storms, with known parameters and effects, were used to establish and verify procedures and relationships for determining surge heights, wind tide levels (WTL's), inflow into Lake Pontchartrain, overtopping

.101



**UNITED STATES
DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
BUREAU OF SPORT FISHERIES AND WILDLIFE**
PEACHTREE-SEVENTH BUILDING
ATLANTA 23, GEORGIA

October 22, 1962

District Engineer
U. S. Army, Corps of Engineers
New Orleans, Louisiana

CE-LM-po

Dear Sir:

Your letter of September 11, 1962, advised that you are consider-
ing a modification of the Lake Pontchartrain hurricane protection
plan in response to a local interests' request. Comments on this
modification, by the U. S. Fish and Wildlife Service, to supple-
ment our report of March 13, 1962, were requested by October 15,
1962.

It is our understanding, on the basis of your September 11 letter
and additional information obtained from your office by our field
representatives, that the project modification would consist of an
extension of the protected area to include additional lands north
of Chalmette, Louisiana.

The modified plan would provide for the construction of new levees
along the south side of the Gulf Intracoastal Waterway from the
Inner Harbor Navigation Canal eastward to Paris Road, thence along
the south side of the Mississippi River-Gulf Outlet to Bayou Dupre,
thence southward along Bayou Dupre or Lake Borgne Canal (Violet
Canal) to Violet, Louisiana. The hurricane levee along the south
side of the Mississippi River-Gulf Outlet between Paris Road and
Bayou Dupre, constructed on top of the existing spoil bank, would
cross and permanently close two openings through the spoil reten-
tion area designed to maintain the channels of Bayou Villere and
a navigable pipeline canal.

In order to provide for interior drainage and water exchange, two
hurricane sector-gated structures would be installed along the
Mississippi River-Gulf Outlet levee alignment. One floodgate would
be constructed on Bayou Bienvenue; the other would be located on an
outlet to Bayou Dupre.

The present back-dike canal, paralleling the landward side of the
Mississippi River-Gulf Outlet spoil area, would be maintained or
enlarged to connect the two floodgate openings, thereby serving
as a collection ditch for interior drainage and providing for an
interchange of tidal flow. You propose that the two floodgates
remain open except during the occurrence of a hurricane in the
vicinity.

224

ATTACHMENT

HURRICANE STUDY

LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY

INFORMATION CALLED FOR BY
SENATE RESOLUTION 148, 85th CONGRESS
ADOPTED 28 JANUARY 1958

1.   PROJECT DESCRIPTION AND ECONOMIC LIFE

     a.   **Description.**  The plan proposed to eliminate excessive
velocities in the Inner Harbor Navigation Canal and excessive
salinity in Lake Pontchartrain and the Mississippi River-Gulf
Outlet channel area provides for the construction of a lock at the
Lake Pontchartrain terminus of the Inner Harbor Navigation Canal.
The proposed plans of protection against flooding by hurricane
tides in the areas studied provide for construction of new levees;
enlargement or improvement of presently existing protective works;
construction of control structures, floodgates, and locks; modifica-
tion of the above proposed Mississippi River-Gulf Outlet Seabrook
Lock; necessary construction and alteration of drainage facilities;
and alteration of road and oil and gas pipeline crossings as re-
quired.  New levee construction will provide protection for one area
which is presently unprotected.

     b.   **Economic life.**  The costs and benefits of the above
described improvements are based on an economic life of 100 years.

2.   PROJECT COSTS

     The following tables give the estimated first costs and annual
economic costs for the proposed plans of improvement, based on
December 1961 prices and an economic life of 100 years.

232



12690