# EXHIBIT  9

*Joey Wagner*
*(504) 362-1662*



**US Army Corps
of Engineers**

New Orleans District

# Mississippi River−Gulf Outlet
# St. Bernard Parish, La.

## Bank Erosion

## Reconnaissance Report

**January 1994**

# INTRODUCTION

This report presents the findings of a reconnaissance study of bank erosion and erosion-related problems in the vicinity of the Mississippi River-Gulf Outlet (MR-GO) channel in Orleans and St. Bernard Parishes, Louisiana. The report includes six appendixes: Appendix A--Climatological and Hydrologic Data; Appendix B--Environmental Resources; Appendix C--Mississippi River-Gulf Outlet Maintenance Analysis; Appendix D--Cost and Benefit Estimates; Appendix E--Real Estate Cost Estimates; Appendix F--U.S. Fish and Wildlife Service Planning Aid Letter. Information on the follow-on feasibility phase study is contained in a separate document, the Draft Feasibility Study Cost Sharing Agreement and Initial Project Management Plan (IPMP). The draft agreement outlines the obligations, responsibilities, and relationships between the Federal government and the non-Federal sponsor for the feasibility phase. The IPMP is comprised of the study schedule, scope of work, a breakdown of study tasks and responsible organizations, and time and cost estimates.

## STUDY AUTHORITY

The study was authorized by a resolution adopted September 23, 1982, by the Committee on Public Works and Transportation of the United States House of Representatives at the request of Representative Robert L. Livingston, Louisiana 1st Congressional District. The resolution is as follows:

> "Resolved by the Committee on Public Works and Transportation of the House of Representatives, United States, that the Board of Engineers for Rivers and Harbors is hereby requested to review the report of the Chief of Engineers on the Mississippi River Gulf Outlet, Louisiana, published as House Document No. 245, 82nd Congress, 1st Session, and other pertinent reports, with a view to determining whether, in light of extensive erosion which has been occurring in St. Bernard Parish along the unleveed banks of the Gulf Outlet Channel, any modifications to the recommendations contained therein are advisable at this time with reference to the feasibility of bank protection measures."

## STUDY PURPOSE AND SCOPE

This study is in response to the study resolution and will be conducted in two phases: a reconnaissance phase and a feasibility phase. This report contains the results of the reconnaissance phase studies.

The purpose of the reconnaissance phase is to accomplish the following objectives:

- define the extent of erosion and erosion-related problems projected to occur in the study area;
- identify opportunities to implement potential solutions to the defined problems;
- appraise the Federal interest in potential solutions to defined problems by evaluating the costs, benefits, and environmental effects of the potential solutions;
- determine, based on the appraisal of Federal interest, whether planning should proceed beyond the reconnaissance phase into more detailed feasibility phase investigations;
- estimate the time and cost required to complete feasibility phase studies, if Federal interest is indicated; and
- assess the level of interest and support of non-Federal interests in the identified potential solutions to defined problems.

Study efforts in the reconnaissance phase include the use of available information and data, ground reconnaissance of the study area, limited field surveys, and office studies. Existing conditions and projected conditions with and without Federal improvements are assessed. Problems and opportunities are identified. The feasibility and performance of potential improvements are determined. Social, cultural, economic, and environmental impacts are evaluated.

The study area is located in southeast Louisiana in Orleans and St. Bernard Parishes. The study specifically addresses a segment of the Mississippi River-Gulf Outlet navigation channel. The study area is shown on Plate 1.

## MISSISSIPPI RIVER-GULF OUTLET PROJECT

The Mississippi River-Gulf Outlet, Louisiana, project was authorized by the Rivers and Harbors Act of 29 March 1956 (Public Law 84-455) substantially in accordance with recommendations of the Chief of Engineers in House Document No. 245, 82nd Congress, 1st Session, entitled, Mississippi River-Gulf Outlet, Louisiana. The project is located in southeast Louisiana, in Orleans, St. Bernard, and Plaquemines Parishes and provides for deep-draft navigation access to the Inner Harbor Navigation Canal from the Gulf of Mexico via a new tidewater channel. Features of the project are:

- a 76-mile channel with a project depth of 36 feet Mean Low Gulf (MLG) and a 500-foot bottom width extending from the Inner Harbor Navigation Canal in New Orleans to the Chandeleur Islands and increasing gradually to a width of 600 feet and a depth of 38 feet to the -38-foot contour in the the Gulf of Mexico;
- a turning basin with a project depth of 36 feet MLG, a width of 1,000 feet, and a length of 2,000 feet at the junction of the new channel and the Inner Harbor Navigation Canal in New Orleans;
- a suitable bridge over the new channel for Louisiana Highway 47;

2

Substantially more dredging in the inland reaches of the MR-GO has been performed for purposes other than for channel maintenance. A significant amount of dredging has been performed to obtain construction material for the Lake Pontchartrain and Vicinity Hurricane Protection levees. Between 1968 and 1983 an estimated 100 million cubic yards of dredged material (33 million cubic yards of in-place levee fill) were removed from the MR-GO for use in levee construction. The extraction of this quantity of fill material has reduced maintenance dredging requirements between mile 47 and mile 60.

An analysis of the feasibility of providing continued maintenance for the MR-GO under increasing shoaling conditions is shown in Appendix C. The analysis clearly shows that it is in the Federal interest to continue maintenance of the channel for commercial navigation, even under conservative (no growth) deep-draft traffic projections and high channel shoaling rates.

Commerce. The MR-GO, along with the Mississippi River, provides deep-draft navigation access to the Port of New Orleans. In 1990 the traffic through the Port of New Orleans totaled 61.2 million tons. This included 54.1 million tons of traffic on the Mississippi River between channel miles 81 and 115, and 7.1 million tons of traffic on the MR-GO. In 1990, ocean-going cargo over the Mississippi River-Gulf Outlet totaled approximately 5.6 million tons, including crude materials, chemicals, and general cargo. Ocean-going cargo and internal cargo moving over the Mississippi River-Gulf Outlet during the period, 1977 through 1990, are presented in Table 1.

Vessel Traffic. The Mississippi River-Gulf Outlet is utilized by both ocean-going and shallow-draft vessels comprising a wide range of sizes and types. Shallow-draft vessels include barge tows, commercial fishing boats, oil field crew and supply boats, offshore drilling vessels, and pleasure craft. The deep-draft vessels include dry bulk carriers, tankers, and general cargo vessels, including container ships. Vessel trips and drafts for the period 1977 through 1989 are shown in Table 2.

General Cargo Facilities on the MR-GO. In 1986, 2.7 million tons (360,000 twenty-foot equivalent units) of container cargoes were handled by the four main berths that make up the MR-GO's 351-acre France Road Complex. This amounted to more than 80 percent of the port's total container traffic. While several container handling wharves exist on the Mississippi River, their container capacity is limited. This is particularly true with respect to marshaling yard space. The other major facilities along with the France Road Complex that handle the bulk of deep-draft traffic on the MR-GO are the Jourdan Road Terminal and the Public Bulk Terminal. Jourdan Road is designed for roll on-roll off (ro-ro), container and general cargo operations. The Public Bulk Terminal handles bulk cargoes and Galvez Street handles primarily general cargo. All facilities have public access. Approximately 35 percent of the port's

## WATER RESOURCES

Future improvements in the treatment of wastewater before discharge to receiving waters are expected to more than compensate for anticipated increases in wastewater discharge rates. Consequently, future improvements to general water quality in the MR-GO are expected. The Bonnet Carré Freshwater Diversion Project was assumed to be in place under without-project conditions. This project would provide slight freshening in the the study area.

## LAND RESOURCES

The buffering marsh between the MR-GO and Lake Borgne is eroding at approximately 15 feet per year, and this reach of the MR-GO north bank is dangerously close to being breached. However, only a 3.5-mile section of the MR-GO north bank includes erosion protection measures. Consequently, the vast majority of bank continues to erode rapidly. At the current average rate of bank retreat, approximately 55 acres of intermediate/brackish marsh, adjacent to the north bank of the MR-GO, are being converted to open water annually. MR-GO bank erosion, if left unchecked, will result in the loss of approximately 2,700 acres of coastal marsh between the years 2000 and 2050. The projected location of the MR-GO north bank by the year 2050 is shown on Plate 2.

As the marsh within the project area diminishes, significant losses to marsh dependent fish and wildlife species will also occur. Increases in water levels, resulting from the general rise in sea level and subsidence of the land will enlarge land/water interface, and accelerate saltwater intrusion. The precise effects of vessel traffic on channel erosion were not considered in this study.

## ECONOMY AND HUMAN RESOURCES

In the future, the Port of New Orleans will likely continue to be a dominant factor in the economy of the New Orleans area and that of the state as a whole. The Port has added millions of dollars annually to the state's treasury and provided thousands of jobs through the many services needed to carry on domestic and foreign trade. Overall economic and employment growth in domestic and foreign trade activities in the study area are expected to continue. Fish and wildlife harvests and recreational activities are expected to decline as a result of habitat losses. Without the buffering effect of the marsh, developed areas adjacent to the study area would be more susceptible to flooding. The increased flood hazards would restrict growth in the affected area.

- reduce the rate of loss of valuable coastal wetlands adjacent to the MR-GO channel, and

- restore, to the extent practicable, wetlands previously converted to open water as a result of bank erosion and saltwater intrusion.

## PLAN FORMULATION RATIONALE

Both structural and non-structural measures were considered for reducing bank erosion and/or restoring adjacent wetlands along the MR-GO. Structural measures included the construction of bank protection structures, such as rock dikes, along the channel; and the enlargement of the channel to increase its cross-sectional area. Each of these measures would reduce effects of wave draw-down and subsequent run-up caused by deep-draft vessels. The bank stabilization measures would also provide a means for protecting maintenance dredged material to facilitate the creation of wetlands.

Non-structural measures include the closure of the MR-GO navigation channel to deep-draft navigation and the imposition of speed limits on vessels using the channel. Both of these non-structural measures would significantly reduce the erosion and thereby the maintenance requirements of the navigation channel, and would reduce the loss of wetlands, but they would not restore or facilitate the restoration of wetlands along the MR-GO navigation channel.

These structural and non-structural plans and the rationale on whether they were addressed further during the reconnaissance phase are discussed below.

## STRUCTURAL MEASURES

Bank Protection Structures. Bank protection structures, such as rock dikes, could be constructed along limited reaches of the MR-GO navigation channel or along the entire channel. These structures could preclude most of the wave run-up and subsequent draw-down that causes the erosion of the channel bank and the associated higher maintenance dredging requirements and wetlands loss along the channel. They would also assist in the retention and protection of dredged material for creating wetlands by protecting the earthen dikes that will be constructed to retain dredged material during normal scheduled maintenance. Since bank protection structures address all three planning objectives and would not adversely affect navigation, they were further evaluated to determine their potential feasibility.

Enlargement of the MR-GO Navigation Channel. The enlargement of the cross-sectional area of the critical reaches of the MR-GO navigation channel would reduce the height of the wave pushed up in front of deep-draft vessels and

thereby reduce the effects of vessel movements on the erosion of the banks of the MR-GO along these reaches. Because this measure would only partially address the planning objectives of reducing maintenance dredging and reducing the loss rate of wetlands and would not address the third objective of wetland restoration, it was not considered further.

## NON-STRUCTURAL MEASURES

Closure of the MR-GO. The MR-GO could be closed to deep-draft vessel traffic which would address the bank erosion and consequent loss of wetlands resulting from vessel-generated wave wash. If this channel were closed to deep-draft traffic, the alternative courses of action would include 1) diverting this traffic to the Mississippi River, 2) diverting this traffic to an alternative port, and 3) constructing a deep-draft lock to connect the Mississippi River and the existing facilities along the MR-GO. In 1989, New Orleans District prepared an analysis of the economic feasibility of continued channel maintenance. Based solely on the costs of continued maintenance and the costs associated with the three alternatives, continued channel maintenance is economically justified as shown below; additional information is provided in Appendix C.

| Option | Average Annual Cost  ($1,000) |
|---|---|
| Continue Channel Maintenance | $9,319 |
| Divert Traffic to Mississippi River | $13,384 |
| Divert Traffic to an Alternative Port | $15,140 |
| Construct a Deep-Draft Lock | $89,692 |

This option would not restore or facilitate the restoration of wetlands along the MR-GO navigation channel. Additionally, this option would not be supported by the navigation interests, the potential local sponsor for feasibility phase studies of this problem. Therefore, this alternative was not considered further in this reconnaissance phase study.

Speed Limits on Vessels. A speed limit alternative imposing a 10 mile per hour speed limit for large displacement vessel traffic within the 37 miles between mile 60 and mile 23 was previously evaluated. Currently, vessel transit speeds average about 14 miles per hour in this reach of the channel. A 10 mile per hour speed limit would diminish the wave-wash and drawdown effects produced by large displacement vessels that cause erosion of the unprotected channel banks.

Costs associated with this plan include increased vessel operating cost due to a reduction in average transit speed and speed limit enforcement costs. However, only vessel operating costs were considered in the evaluation of this plan.

Benefits of the speed limitation include the following:
- increased safety for small commercial and recreational craft
- reduced wave activity, and thus, a reduction in the rate of bank erosion and rate of marsh loss
- savings in average annual maintenance dredging for at least a portion of the planning horizon-2000 to 2050.

Shippers would face higher operating costs if forced to observe a speed limit of 10 statute miles per hour along the 37 mile portion of the waterway under study. For the without-project (i. e., no speed limit) condition, transit time for vessels averaging 14 statute miles per hour is 2.6 hours. Under with-project conditions (i. e., with a 10 mph speed limit), the transit time would be increased to 3.7 hours, a difference of 1.1 hours. Based on these data, the total incremental annual costs to shippers should a 10 mile per hour speed limit be imposed would be on the order of $2 million (with enforcement cost not quantified). Because this measure would only partially address the planning objectives of reducing maintenance dredging and reducing the loss rate of wetlands and would not address the third objective of wetland restoration, it was not considered further in this reconnaissance phase study. Additionally, this option would not be supported by the navigation interests, the potential local sponsor for feasibility phase studies of this problem. However, it is practicable to consider speed limit restrictions on vessels either separately or in combination with structural measures during the follow-on feasibility phase.

## DEVELOPMENT AND DESCRIPTION OF PLANS

### PLANS CONSIDERED FURTHER

As discussed in the plan formulation rationale section, bank protection structures were the only measures considered further in this reconnaissance phase study. Alternative locations of bank protection structures along the MR-GO were developed; alternative structural designs for the plans were developed, evaluated, and screened; and alternative plans were formulated and evaluated based on the results.

### ALTERNATIVE BANK PROTECTION PLANS

Four options were developed for the protection of the banks along the MR-GO. A slight variation on one of the options was also considered; therefore, a total of five plans was evaluated. Each of the alternative plans was similar except for

37

their location and the time frames for implementation. Each plan provided for the construction of a similar rock dike section along the -3-foot National Geodetic Vertical Datum (NGVD) contour of the MR-GO channel and for the placement of dredged material behind the dike during maintenance dredging of the MR-GO. The placement of earthen material specifically dredged to fill behind the rock dikes was considered as a feature of each plan, but was eliminated due to its high cost. The plans, their locations, and implementation times are described below. More detailed information on the rock dikes is presented in subsequent sections.

• Option 1--MR-GO Critical Reaches. Option 1 provides for bank protection for three reaches along the MR-GO which have been designated "critical" based on the potential for eminent loss of the buffering marsh between the MR-GO and Lake Borgne. They also include the most frequently maintenance dredged sections of the inland portion of the waterway. These reaches total about 10 miles and would take about one year to construct. Reach 1 extends approximately 2 miles along the north bank from mile 56 to 54. Structural protection was recently constructed along the north bank between miles 54 and 51. The second reach extends a total of approximately 3 miles along the north bank from mile 43 to mile 38.5 with a 1.5-mile gap between miles 40.5 and 39. The third reach extends from mile 29.5 to mile 23 with a 1.5-mile gap between miles 28.5 and 27. Bank protection would be placed on the north bank from mile 29.5 to mile 28.5 and on the south bank from mile 27 to mile 23. The critical reaches are indicated on Plate 3.

• Option 2--MR-GO North Bank mile 60 to mile 27, South Bank mile 27 to mile 23. Option 2 provides for the construction of bank protection dikes along the unprotected length of the north bank between miles 60 and 27, and the south bank from mile 27 to 23. The reason for locating the structure along the south bank for this 4-mile section is that for this reach the channel is significantly deeper along the north bank and the cost of placing a structure here would be correspondingly higher. The north bank currently has protection constructed from mile 54 to 51. Structural bank protection would be provided for a distance of roughly 34 miles as indicated on Plate 4. This option would take 5 years to construct. The bank protection structure would parallel the current bank as much as possible. Major streams and bayous would remain open; however, many small waterways which enter the marsh areas on the north bank of the MR-GO would be closed.

• Option 3--All Unleveed Reaches of the MR-GO. Option 3 would provide for the construction of bank protection structures along the north bank of the MR-GO from mile 60 to mile 23, with the exception of miles 54 to 51 which already have structural protection in place, and along the south bank from mile 47 to mile 23. This plan would essentially provide bank stabilization measures along both banks along the entire length of the MR-GO where erosion problems exist. The location of option 3 is shown on Plate 5. This option would take eight years

to construct. The unleveed MR-GO south bank, from mile 47 to mile 23 fronts a dredged material disposal area which parallels the channel and is approximately 2,000 feet deep and approximately 6,000 total acres in area. Bank erosion on the south bank in this reach is less severe than on the north bank. The lower erosion rate of bank relative to the north bank results from the periodic placement of dredged material in the south bank disposal area. Because the northern side of the channel is significantly deeper from mile 27 to mile 23, an Option 3A which would not include structural protection along these four miles of the north bank was also evaluated.

• Option 4--MR-GO North Bank mile 60 to mile 27. This option would be the same as the north bank portion of Structural Option 2 and would take 5 years to construct. Option 4 would not include protection along the south bank. This option was considered because, although protecting miles 27 to 23 of the south bank would reduce the channel shoaling rate, it would not contribute to the reduction in marsh loss rates due to the distance between existing marsh and the channel bank in this area (Plate 6).

DESIGN OF BANK PROTECTION STRUCTURES

Five alternative bank protection structures were developed for this study. Each provided for the construction of a rock or a concrete block/rock dike adjacent to the bank of the MR-GO. Information on the development of the various designs is presented in the following paragraphs. For this reconnaissance-scope analysis, the alternative designs were evaluated and screened solely on the basis of cost-effectiveness. The engineering and design, construction, and maintenance costs for each alternative structure were converted to an equivalent present value, using the current interest rate for water resources development projects, to determine the most cost-effective design. Each of the designs was assumed to provide the same level of bank protection; therefore, the benefits associated with reduced channel maintenance, and the restoration and protection of wetlands were assumed to be the same.

Wind and and Wave Design Considerations. Wind-generated waves were found to be limited by the width of the channel except during extreme storm conditions such as hurricanes. By observation, it was determined that ship waves would control and that a 4.0-foot wave was appropriate for design conditions. Ships create large drawdowns with resulting return flows and are thus the most severe design criteria. These waves occur during normal stages and weather conditions along the MR-GO. Observation of large ships transiting the channel shows that the drawdown approaches 4 feet below the existing stage and that the return flow produces a rise in the existing stage of 2 feet. The total effect of the transverse ship wave which is perpendicular to the ship is a 6-foot change in water level traveling at about the speed of the ship. This produces velocities approaching 18 to 20 feet per second. Using the 4-foot wave criteria

39

traveling along the stern of the ship in an oblique angle in a series of waves or using velocity criteria created by the transverse 6-foot ship wave (drawdown and return flow) will require graded stone design with a median weight of approximately 400 pounds.

Two of six structural designs previously tested showed satisfactory results. However, protection constructed along the south bank of the MR-GO using one of the two designs deteriorated rapidly. A heavier stone was used to maintain the dikes and has not exhibited excessive deterioration. This gradation of stone armor protection is recommended for revetment or dike construction and is listed below in Table 7. This gradation would require an armor thickness of 3 feet.

### Table 7. Recommended Gradation of Stone Armor Protection for Dike Construction

| Percent Lighter By Weight | Weight (in pounds) |
| --- | --- |
| 100 | 900-2200 |
| 50 | 440-930 |
| 15 | 130-460 |

<u>Dike Alignment and Other Considerations</u>.  The alignment of bank protection will be as parallel to the channel as practicable and will generally follow the -3.0-foot NGVD contour. All alternatives will require the excavation of a flotation channel to facilitate construction. They will also require settlement plates/marker pipes every 500 feet on center and at all points of inflection (P.I.'s). All alternatives presented include allowances for construction settlement and tolerance. A shell substitute, with similar lightweight properties, will be allowed whenever shell is specified.

The placement of dredged material from channel maintenance operations is a feature of each design. There are no increased costs associated with depositing material from maintenance dredging behind the bank protection structure in lieu of in the existing disposal areas. The typical marsh elevation along the MR-GO is approximately 1.5 feet NGVD. Dredged material would be placed to an elevation of 4.0 feet NGVD to allow for settlement to the existing marsh elevation.

Navigation gaps would be provided in the bank protection structure at the locations of major waterways, such as Bayous Dupre, Bienvenue, and Yscloskey. Wave action and surges from passing vessels will be transmitted into these

natural bayous and material may be drawn into the MR-GO through the openings. Small waterways which enter the marsh would be closed off, but major streams and bayous would remain open so that some tidal exchange would occur.

Maintenance. To maintain the dike crown elevation, the dike will be supplemented 2 years after initial construction is completed because rapid settlement is anticipated. Subsequent maintenance will be based primarily on settlement rather than hydraulic (wave or flow-related) losses. The remaining maintenance cycles would be at years 5, 10, 20, 30, and 40 after initial construction. Total project life would be approximately 50 years.

The alternative bank protection structure designs are described below:

• Design 1. Concrete Block/Rock Armor High Profile Dike. This design includes the installation of a foundation filter fabric, placement of a shell core to an elevation of 2.0 feet National Geodetic Vertical Datum (NGVD) and covered by a separator filter fabric, and placement of a concrete block mat covered by a 3-foot armor stone layer (to elevation 5.0 feet NGVD). A design cross-section is shown on Plate 7.

• Design 2. Concrete Block/Rock Armor Low Profile Dike. This design is similar to Design 1, except that the crown of the dike will be to an elevation of only 2.5 feet NGVD. A design cross-section is shown on Plate 8.

• Design 3. All Rock-Armored Dike. This design includes the installation of a foundation filter fabric and placement of armor stone with a crown elevation at 3.0 feet NGVD. An internal filter fabric on the landside of the dike would prevent dredged fill from permeating through the dike. A design cross-section is shown on Plate 9.

• Design 4. Rock-Armored Shell Core Dike. This design includes the installation of a foundation filter fabric, placement of a shell core to an elevation of 2 feet NGVD, and placement of a 3-foot armor stone layer (to an elevation of 5 feet NGVD) over separator filter fabric. A design cross-section is shown on Plate 10.

• Design 5. Rock-Armored Shell Core Low Profile Dike. This design includes installation of a foundation filter fabric, placement of a shell core to an elevation of 0.0 NGVD, and placement of a 3-foot armor stone layer (to an elevation of 3.0 feet NGVD) over a separator filter fabric. A design cross-section is shown on Plate 11.

A summary of the analysis of the unit costs for the implementation and operation, maintenance, replacement, repair, and rehabilitation (OMRR&R) of the five designs is presented in Table 8. The most cost-effective was determined

to be Design 5, the rock-armored, shell core low profile dike; therefore, it was selected as the basis for the development and evaluation of the alternative implementation plans. However, due to its low profile and minimum stone armor, the effectiveness of this design will require more scrutiny during the follow-on feasibility study.

Table 8.  Cost Comparison of Alternative Structure Designs
(in dollars per linear foot)

| | | OMRR&R Cost | | Total Present |
| | First Cost [1] | One Operation [2] | Present Value [3] | Value [4] |
|---|---|---|---|---|
| Design 1 | 662 | 113 | 261 | 923 |
| Design 2 | 591 | 56 | 130 | 721 |
| Design 3 | 348 | 169 | 393 | 741 |
| Design 4 | 688 | 149 | 345 | 1,033 |
| Design 5 | 244 | 131 | 303 | 547 |

[1] First costs include construction costs, planning, engineering, and design costs, and supervision and inspection costs.

[2] Costs of each structure maintenance operation.

[3] Sum of present values of the costs of each structure maintenance operation conducted at years 2, 5, 10, 20, 30, and 40 based on an interest rate of 8-1/4 percent.

[4] Sum of the first cost (based on a 1-year implementation period) and the present value of maintenance.

COSTS OF ALTERNATIVE PLANS

A summary of the costs of each of the options considered is presented in Table 9. These costs are based on the construction of each of the plans (options)   More detailed estimates of construction and real estate costs are presented in Appendixes D and E, respectively.

A cost estimate for a sixth design (Design 6) is provided in Appendix D for the relatively deep water reaches of the north bank between miles 23 and 27. This design, due to its high cost, is only practicable for this reach of the MR-GO and was used in Option 3 only.

Cost estimates include provisions to increase the current right-of-way by an additional 500 feet for construction of a bank protection structure and for placement of bank nourishment. Since including 200 feet of bank nourishment as a component of the initial structure construction would increase the various structure costs by from about 34 to 52 percent, bank nourishment during

### Table 9.  Summary of Costs of Alternative Plans
(In $1,000 Dollars)

| Base Year | Option 1 2001 | Option 2 2005 | Option 3 2008 | Option 3A 2008 | Option 4 2005 |
|---|---|---|---|---|---|
| **FIRST COSTS** | | | | | |
| Real Estate | $109 | $395 | $668 | $585 | $356 |
| Construction | 12,900 | 43,860 | 131,860 | 69,660 | 38,700 |
| Total First Cost | $13,009 | $44,255 | $132,528 | $70,245 | $39,056 |
| Gross Investment 1/ | $13,017 | $52,857 | $195,352 | $95,125 | $45,718 |
| **ANNUAL COSTS** | | | | | |
| Interest | $1,074 | $4,361 | $16,117 | $7,848 | $3,772 |
| Amortization | 21 | 84 | 312 | 152 | 73 |
| OMRR&R | 1,356 | 5,470 | 19,575 | 9,892 | 4,725 |
| Total Avg. Ann. Cost | $2,451 | $9,915 | $36,004 | $17,892 | $8,570 |

1/ Gross Investment includes Total First Cost plus Interest During Construction

construction does not appear to be feasible.  The same objective will be accomplished at less cost by the productive use of material from periodic channel maintenance.

Project costs were analyzed with the cost of real estate easements, necessary for the first year of construction, incurred at the end of January of the first year of construction.  Each option under study involves a similar amount of construction in the first year.  All other real estate costs were assumed to be incurred at the end of the first year of construction.

Construction costs were proportioned according to the number of miles of construction which is scheduled to take place each year, as a proportion of the whole length of construction in miles.

In most cases, operation and maintenance and all other costs are discounted from the end of the year.

## MAINTENANCE DREDGING QUANTITIES

Potential average annual maintenance dredging quantities under with- and without-project conditions are shown on Table 10 for each of the plans evaluated. These data provide a measure of the average annual quantities of material expected to be available for use as bank nourishment. It should be noted that a cubic yard of dredged material is not equivalent to a cubic yard of bank nourishment. Typically, pumping three to five cubic yards of dredged material might be required to obtain one cubic yard of relatively well drained material for bank nourishment. The MR-GO was used as borrow material for construction of the Lake Pontchartrain and Vicinity Hurricane Protection levees. This was considered when historical data were evaluated to determine future annual maintenance dredging requirements.

## EVALUATION OF ENVIRONMENTAL EFFECTS OF PLANS

### INTRODUCTION

As discussed in the preceding sections, several alternative bankline protection plans along the MR-GO have been evaluated in order to address the specific problems, opportunities, and planning objectives identified for this study. These plans consist of variations in both length of channel bank they protect (option) as well as the type of structure (design). The designs consist of various combinations and elevations of a filter fabric foundation, shell core, filter stone layer, armor stone layer, concrete block mat, and a separator filter fabric. For the purposes of this reconnaissance study, the environmental impact of each of the designs would be similar, except that some designs have a slightly larger

**Table 10. Estimated Average Annual Maintenance Dredging Quantities**

| Reach | Length | Remarks | Present Without Project | Future Without Project | (Future With Bank Protection 1/ 2/) Option 1 Critical Reaches | Option 2 North Bank and Partial South Bank | Option 3 North and South Banks | Option 3A North and South Banks | Option 4 North Bank |
|-------|--------|---------|------------------------|------------------------|-----------------|-----------|-----------|-----------|-----------|
| 56 to 60 | 4 | non-critical | 260,000 | 325,000 | 232,000 | 92,000 | 92,000 | 92,000 | 92,000 |
| 54 to 56 | 2 | transitional | 130,000 | 162,500 | 90,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| 52 to 54 | 2 | reach no. 1 | 130,000 | 162,500 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 |
| 51 to 52 | 1 | transitional | 65,000 | 81,250 | 45,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| 47 to 51 | 4 | non-critical | 260,000 | 325,000 | 192,000 | 52,000 | 32,000 | 32,000 | 52,000 |
| 45 to 47 | 2 | non-critical | 100,000 | 125,000 | 86,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| 43 to 45 | 2 | transitional | 100,000 | 125,000 | 82,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| 42 to 43 | 1 | reach no. 2C | 50,000 | 62,500 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| 41.5 to 42 | 0.5 | transitional | 25,000 | 31,250 | 20,500 | 6,000 | 3,000 | 3,000 | 6,000 |
| 40.5 to 41.5 | 1 | reach no. 2B | 85,000 | 106,250 | 23,000 | 23,000 | 18,000 | 18,000 | 23,000 |
| 39 to 40.5 | 1.5 | transitional | 127,500 | 159,375 | 52,500 | 9,000 | 9,000 | 9,000 | 9,000 |
| 38.5 to 39 | 0.5 | reach no. 2A | 42,500 | 53,125 | 11,500 | 11,500 | 9,000 | 9,000 | 11,500 |
| 38 to 38.5 | 0.5 | transitional | 42,500 | 53,125 | 17,500 | 3,000 | 3,000 | 3,000 | 3,000 |
| 30 to 38 | 8 | non-critical | 680,000 | 850,000 | 448,000 | 136,000 | 48,000 | 48,000 | 136,000 |
| 29.5 to 30 | 0.5 | transitional | 42,500 | 53,125 | 25,000 | 5,500 | 4,000 | 4,000 | 5,500 |
| 28.5 to 29.5 | 1 | reach no 3B | 85,000 | 132,813 | 23,000 | 23,000 | 10,000 | 23,000 | 23,000 |
| 27 to 28.5 | 1.5 | transitional | 127,500 | 239,063 | 75,000 | 31,500 | 16,500 | 31,500 | 31,500 |
| 23 to 27 | 4 | reach no. 3A | 400,000 | 1,000,000 | 624,000 | 624,000 | 224,000 | 624,000 | 1,000,000 |
| Totals1 | 37 | | 2,752,000 | 4,047,000 | 2,079,000 | 1,106,000 | 558,000 | 986,000 | 1,482,000 |

1/ Dredging quantities are in cubic yards. Totals are rounded to the nearest 1,000 yards.

2/ These rates are assumed to be achieved at the end of the construction period and maintained through the project life for each option.

45

footprint than others and that low level dikes would be more susceptible to wave overtopping than high level dikes. Among the alternatives, the environmental effects of the plans vary mostly by the length and location of bank they protect (option). Generally, the greater the extent of bank protection provided along the north bank, the greater the environmental beneficial effect. Bank protection along the south bank, while reducing erosion, does not provide significant environmental benefits. Nevertheless, the potential adverse environmental impacts of dike construction on either the north or south banks appear to be insignificant. A more detailed discussion of environmental effects and benefits is provided in Appendix B--Preliminary Environmental Evaluation.

For each alternative, the alignment of the bankline protection would be parallel to the channel and would follow the -3.0 foot NGVD contour. If necessary, flotation channels would be excavated between this contour and the MR-GO channel for barge access to place the rock. Bankline protection would prevent existing marsh from being eroded into the MR-GO. Approximately 18 acres of marsh on the north bank would be saved per mile of protection every 10 years. During future maintenance dredging, dredged material would be selectively placed between the eroded north bank and the bankline protection structure. This would create an average of 18 acres of marsh per mile of protection along the north bank of the MR-GO.

The overall effect of implementation of bank erosion abatement measures would be overwhelmingly positive. The measures would substantially reduce erosion and marsh loss and allow for restoration of marsh with dredged material during maintenance of the channel. Some minor adverse impacts are possible; for example, where structural bank protection measures are discontinuous, erosion could be intensified due to wave diffraction from the structures. During the feasibility phase study, consideration will be given to engineering the ends of the bank protection structures to counter this effect and reduce other potential adverse impacts.

## WATER QUALITY

The implementation of bank erosion reduction measures along the MR-GO is not likely to significantly alter general water quality conditions. Temporary increases in turbidity and suspended solids concentrations would occur during construction. Temporary pH changes and dissolved oxygen deficits might also occur during construction. The future condition of the stabilized banks would significantly reduce rates of erosion, and result in lowered amounts of nonpoint pollution from that source, thereby improving water quality.

## WETLANDS

The proposed alternatives would affect wetlands by reducing the current rate of bankline retreat which averages 15 feet per year. Bank protection would save approximately 18 acres of wetlands, per mile of protection, every 10 years. Dredged material would be selectively placed between the eroded north bank and the bankline protection structure. This would create an average of 18 acres of wetlands per mile along the north bank of the MR-GO and would partially alleviate the problem of subsidence.

Erosion of wetland habitats would not take place as rapidly because the bankline protection would reduce the water movement caused by diurnal tides, wind driven tides, and ship wakes. Subsidence of these wetlands would continue to occur, but not as rapidly because underlying sediments would not be lost to the MR-GO channel.

The deposition of maintenance dredged material would be beneficial to nourish the marsh and fill in open water areas. Although portions of the existing marsh would be covered by dredged material and the existing fauna buried or forced to evacuate the area, the additional sediment in this subsiding area would provide more diversity and increased habitat for a variety of species.

## WILDLIFE

The proposed alternatives would directly benefit wildlife by reducing the current rate of bankline retreat. The reduction in bankline retreat would slow interior marsh break up and the conversion of wetlands to open water. Wildlife would benefit from the stabilization of brackish and saline marsh, as well as scrub/shrub habitats. Migratory waterfowl and wading birds, utilizing interior marsh ponds, would benefit from stabilized water levels and reduced saltwater inundation which would promote the growth of aquatic vegetation. The greater the extent of bank protection, the greater the beneficial effect on wildlife.

Interior marsh pond habitat would be partially isolated from fluctuating water levels caused by tidal and wind action because the bank protection would close off many of the small waterways which provide direct access to these interior ponds. Drastic salinity changes would be reduced and aquatic vegetation requiring low salinities would colonize. Many of the interior marsh ponds adjacent to the critical reaches could be dominated by freshwater from rainfall rather than saltwater from tidal fluctuation. Migratory waterfowl and wading birds, utilizing the interior marsh ponds, would benefit from stabilized water levels and the growth of aquatic vegetation.

Bankline retreat, that is occurring along the north bank of the MR-GO, causes scrub/shrub habitat to become marsh habitat and marsh habitat to become

shallow open water habitat. The gradual reduction in habitats with higher elevations results from erosion and subsidence. Bank protection would retain sediments which would normally be carried into the MR-GO channel. Small waterways which enter the marsh would be closed off which would reduce the water movement, within the marshes and wetland habitats, caused by tidal fluctuation and ship wakes.

FISHERIES

The proposed alternatives would directly benefit fisheries by reducing the current rate of erosion of nursery fisheries habitat. The break-up of marsh and the conversion of marsh to open water creates more access routes, for larval and juvenile fishes, into the marsh. This process increases the nursery habitat available for estuarine species, but after prolonged marsh break-up and erosion, the amount nursery habitat decreases. Bank stabilization would reduce the bankline retreat rate which would slow interior marsh break-up and the conversion of wetlands to open water. Fisheries would benefit from the stabilization of brackish and saline marsh. Fish which utilize interior marsh ponds would benefit from stabilized water levels and reduced saltwater inundation. Fisheries access into nursery marsh habitats would be hindered by the closure of many of the small waterways which lead into the marsh; however, the reduction in water flow through the marsh would reduce the rate of marsh breakup and prolong the existence of the marsh.

Portions of the interior marsh pond habitat would be partially isolated from fluctuating water levels and saltwater influence. Drastic salinity fluctuations would be reduced and aquatic vegetation favoring lower salinities would colonize, creating cover for fish and shellfish species. Many of the interior marsh ponds would become isolated from estuarine species; however, the major streams and waterways would remain open for access by estuarine species. The construction of bank protection structures along the MR-GO would decrease the frequency of maintenance dredging and the associated minor turbidity increases. Less dredging corresponds to a decrease in the turbidity impacts to fisheries.

The construction of a bank stabilization structure would result in adverse impacts through coverage of existing benthic habitat. However, placement of rip-rap or similar materials would create numerous micro-environments similar to jetties that, particularly below the typical marsh level, are utilized by various marine organisms. Organisms using jetties commonly include the sea anemone, barnacle, and sea roach. Mollusks, such as periwinkles, slipper shells, dove shells, oyster drills, mussels, and oysters are present. Decapods, such as fiddler, hermit, stone, and blue crabs are common inhabitants of jetties. These organisms, which are all at an intermediate position in the marine food web, would be beneficially impacted by the rock placement as a construction feature. The excavation of flotation channels between the -3.0-foot NGVD contour and

the MR-GO channel would disrupt benthic habitat for fish and shellfish species. The deposition of dredged material from the flotation channels would smother benthic habitat; however, recolonization would occur within a short period of time. The deposition of dredged material over a large area of open water would cause adverse impacts through coverage of existing habitat, but would also insure the existence of a quantity of the diminishing marsh resource and thus would be more positive than negative.

## THREATENED AND ENDANGERED SPECIES

The proposed alternatives would benefit threatened and endangered species by decreasing the rate of bankline erosion and by improving wetlands habitat along the MR-GO. Bank protection would slow interior marsh break up and the conversion of wetlands to open water. Threatened and endangered species would benefit from the increased stabilization of brackish and saline marsh which act as productive feeding habitats for brown pelicans, Arctic peregrine falcons, and bald eagles.

While recognizing the possibility that some species of sea turtles forage in the proposed project area, the turtles should be able to escape any of the short term impacts that the project would produce. Short term impacts would include increased turbidity and a reduction in benthic habitat from the placement of the bankline protection and from the excavation of flotation channels. While these impacts could cause a temporary problem for benthic and planktonic organisms, mobile organisms such as sea turtles would be able to escape the area during dredging operations. Sea turtles are rare in Louisiana's inshore waters. Most reported occurrences of sea turtles in Louisiana are in offshore waters. The benefits of bankline protection include decreased shoaling rates and the creation of additional sea turtle foraging habitat from the placement of hard substrate along the bankline. Decreased shoaling rates correspond to less frequent dredging of the MR-GO. This would further reduce the minor potential for impacts on sea turtles and their prey items.

## CULTURAL RESOURCES

Implementation of a structural alternative could affect existing and as yet unidentified cultural resources. Definition of project effects (both direct and indirect) must await selection of construction plans and impact zone definition. Project effects on Fort Proctor and other significant sites must be considered. The determination of whether project effects are adverse to cultural resources would be ascertained from construction plans and impact zones as well as cultural resource assessments of significance of archeological sites located in the project area. All cultural resource work will be conducted in consonance with Federal

cultural resource laws and regulations such as the Natural Historic Preservation Act, as amended in 1992.

## RECREATION RESOURCES

Alternatives that would reduce bank erosion or restore eroded marsh should benefit fish and wildlife and in turn, sport hunting and fishing activities that are dependent on marsh habitats. With the eventual placement of dredged material behind linear bank retaining dikes, marsh would be created. It is possible that areas would exist that would trap rainwater and form marsh impoundments of value to waterfowl and marsh-oriented wildlife. Development of these retaining dikes would reduce bank erosion and saltwater intrusion which are adversely affecting the recreational environment. Additional bank erosion and possible large breaches of the buffering marsh between the MR-GO and Lake Borgne would be prevented. Recreational hunting and fishing activities would benefit from the rebuilding of these productive marsh habitat types.

## HAZARDOUS, TOXIC, AND RADIOACTIVE WASTES

Based on a cursory review of aerial photography, the potential for the presence of hazardous, toxic, and radioactive waste (HTRW) along the MR-GO is low. While aerial photography reveals the presence of industry adjacent to the study area along the Inner Harbor Navigation Canal and in the Chalmette-Arabi area, no industry exists along the banks of the MR-GO in the areas where bank stabilization is proposed. These wetland areas do not appear to have historically undergone any industrial development. An initial assessment of HTRW will be conducted during the feasibility phase. The initial assessment will determine the likelihood of HTRW in the project area through an analysis of historical records, including any records of maritime accidents in the area which could have resulted in the release of hazardous, toxic, and radioactive wastes. The assessment will also include analysis of land use studies, and aerial photography.

## BENEFIT CATEGORIES EVALUATED

This report contains an evaluation of benefits in three categories: maintenance savings, marsh creation, and marsh preservation. The monetary value of these benefits has been quantified and under the section EVALUATION OF ECONOMIC BENEFITS beginning on page 53. The non-monetary values of marsh creation and marsh preservation were also evaluated, and are described under the section entitled NON-MONETARY BENEFITS OF WETLANDS on page 51.

The maintenance savings were calculated simply by comparing with- and without-project maintenance costs. The monetary value of marsh creation and marsh preservation was taken from a previous study of coastal wetlands conducted by the U.S. Army Corps of Engineers, New Orleans District, entitled "Land Loss and Marsh Creation, St. Bernard, Plaquemines, and Jefferson Parishes, Louisiana" and dated May 1993. Non-monetary benefits for the creation and preservation of marsh were derived from the Wetland Value Assessment (WVA) procedure that has been developed by a team of Federal biologists. This procedure is a tool to determine the quality and quantity of wetlands protected or created by wetland restoration projects. Under this procedure, the quality and quantity of wetlands is displayed in Average Annual Habitat Units or AAHU's.

More details on the quantified non-monetary environmental benefits resulting from the alternatives are provided under the following sections of this report: NON-MONETARY BENEFITS OF WETLANDS (below) and Appendix B-- Environmental Resources.

## NON-MONETARY BENEFITS OF WETLANDS

Wetland Value Assessment. The Wetland Value Assessment (WVA) is a tool to determine the quality and quantity of wetlands protected or created by a wetland restoration project. It was developed by a team of Federal biologists led by the U.S. Fish and Wildlife Service. The following variables were assumed to characterize a typical marsh: percent vegetated wetlands, percent submerged aquatic vegetation, interspersion of marsh and water, percent equal to or less than 1.5 feet deep, salinity, and fishery access. A suitability graph for each variable expresses the relationship between the measured variable and a suitability index of 0 to 1.0. The suitability indices for each variable were then combined into a single value of habitat quality called Habitat Suitability Index (HSI). To determine the net benefits to vegetated wetlands, two scenarios, future conditions with and future conditions without the project, were compared. Predictions were made as to what model variables would be at various target years with and without the project. HSI were calculated for each target year for each scenario. These HSI's were multiplied by acres of the benefitted area to produce Habitat Units (HU's) for each target year. These HU's represent a combination of habitat quality (HSI) and quantity (acres). The HU's were annualized over the project life for each scenario, and then compared to determine the net benefit of the project in Average Annual Habitat Units (AAHU's). A detailed explanation of the calculations used by USFWS to compute AAHU's is contained in Appendix B.

The 1993 version of the WVA indicated that a net of 2,786 AAHU's would be produced by Options 2, 3, 3A, and 4, which protect at least 30 miles of bankline along the north bank of the MR-GO. As stated previously, the protection that

Option 3 would provide for the north bank from channel mile 23 to mile 27 would not preserve additional marsh. The WVA for Option 1 indicated that a net of 557 AAHU's would be created for 6 miles of bankline in the critical reaches of the MR-GO. These AAHU's represent a mixture of habitat quality and quantity.

Marsh Benefits. The greatest benefit provided by a marsh is probably the dead or decaying organic matter that is contributed to estuarine systems. Half of the organic matter, detritus, that is produced by a marsh is consumed within the marsh and half enters the water (Teal 1962, Golley et al. 1962). The detritus in an estuary can be separated into suspended material and material that has settled on the bottom, but this separation constantly fluctuates depending on the water turbulence (Day et al. 1973). In the case of the marsh along the MR-GO channel, this detritus eventually finds its way into larger inland water bodies and the Gulf of Mexico through the bayous and canals that drain the marshes. Studies have shown that biomass peaks of zooplankton, larval shrimp, and larval fishes are fueled by the high loss rate of detritus from the marsh (Kirby 1972). In the estuary and in the open gulf, productivity is increased in areas where detritus, carrying nutrients, enters the system. The entire food chain is dependent, in one way or another, on the marsh and the nutrients it produces.

Food Chain Benefits. Many of the lower trophic levels of the food chain are not measurable in terms of recreational, commercial, or esthetic contributions. The protection of wetlands and the creation of additional marsh along the MR-GO would contribute to the base of the food chain from which all higher trophic levels are dependent.

Wildlife Benefits. Migratory shorebirds, wading birds, ducks, and geese utilize marshes in the study area, enroute to northern breeding grounds and to Central and South American wintering grounds. Puddle ducks generally concentrate in fresh and intermediate marshes, although diving ducks prefer brackish and saline open water habitats. The only waterfowl species which is a permanent resident of the coastal marshes along the MR-GO is the mottled duck. Many nongame species of seabirds and wading birds, such as ibises, ospreys, hawks, and gulls establish nesting colonies in the brackish and saline marshes adjacent to the MR-GO. Bankline protection, which regulates the hydrological regime of an area, may seasonally diminish the abundance of some prey species and intensify both inter-specific and intra-specific competition for resources in adjacent unprotected bankline wetland areas.

Fisheries Benefits. The large expanse of saline, brackish, and intermediate marshes in the study area allows a buffer zone to develop between fresh water and high salinity gulf water where fish, shrimp, oysters, and crabs can find the proper salinity to live throughout their larval, juvenile, and sub-adult stages. The stability within the interior marsh provides a nursery habitat favorable to the production of estuarine organisms. Some species (spotted seatrout and black

drum) spawn in the MR-GO and in the deep bayous which enter the MR-GO. The larvae of many offshore spawners (redfish, Atlantic croakers, blue crabs, and brown and white shrimp) migrate, either freely or by currents, into marshes to live and grow throughout their life stages. Marsh which is created along the MR-GO would prolong the abundance of certain species and create additional habitat for increased numbers of shrimp, fish, and crabs.

Other Environmental Benefits. Marshes provide hurricane and storm surge buffering capacity. Coastal wetlands absorb large amounts of wave energy and hold large quantities of water that would otherwise allow storms to do much more damage inland. The long-term climatic change which is expected to occur due to global warming will cause sea-level rising. Wetlands also provide natural flood control by detaining and by slowing floodwaters which reduces the intensity and destructiveness of flooding. Wetland vegetation anchors shorelines and reduces the amount of erosion that would normally take place along an unvegetated bankline.

## EVALUATION OF ECONOMIC BENEFITS

### METHODOLOGY

The period of analysis, or project life, used for each alternative is 50 years. Benefits and costs are discounted or compounded as appropriate to base years and then converted to average annual equivalent values using the current Federal discount rate of 8-1/4 percent. In every case, the first year of construction is taken to be the year 2000. Due to the different construction periods required for the various options, the base year for comparing them ranges from 2001 for Option 1 to 2008 for Options 3 and 3A.

Options 1, 2, 3, 3A, and 4 were analyzed first, in combination with each of the designs 1, 2, 3, 4, and 5. Design 6 was analyzed as part of Option 3 because it applied to a particular reach within the project area. As discussed in the previous section of this report, the most cost effective design was determined to be Design 5, the rock-armored, shell core low profile dike. Therefore, Design 5 was selected as the basis for evaluating the alternative implementation plans, and for the following presentation of economic benefits and costs. Supporting data for the economic benefit and cost analysis for the other designs are shown in Appendix D, Part II.

### ECONOMIC BENEFIT CATEGORIES

The economic benefits analyzed are divided into three categories:

53

1)  The monetary value of marsh saved from erosion by the reduction of wave action caused by passing ships.

2)  The monetary value of marsh created on the north bank of the channel by placing dredged material on the marsh side of dikes.

3)  Savings in maintenance dredging costs.

Due to the preliminary nature of this study, the monetary value of marsh created or saved by the plans was taken from the U. S. Army Corps of Engineers, New Orleans District's draft feasibility report entitled "Land Loss and Marsh Creation, St. Bernard, Plaquemines, and Jefferson Parishes, Louisiana" (LLMC), dated May 1993.  A detailed reevaluation of marsh acre values will be conducted for the follow-on MR-GO feasibility study.

In the LLMC study, four components of marsh value were found to be readily quantifiable in economic (monetary) terms: commercial fisheries, real estate, recreation, and commercial wildlife.  These four components make up the value of $4,471 used in the LLMC study for an acre of brackish marsh (1992 price levels). The value of saline marsh is similar.  Commercial fisheries account for 87.4 percent of that value, commercial wildlife 1 percent, recreation 6 percent, and real estate accounts for 5.6 percent of the total value.

Table 11 displays the average annual marsh acres saved after construction is completed and the average annual value of this acreage.

The marsh acres created are specified in Table 12.  The amount of open water available for marsh creation between the dike and existing marsh would average approximately 18 acres per mile of dike.  For each channel reach the year marsh would be created is dependant on the year of the first required maintenance dredging of the reach subsequent to the dike construction.  A lag time of two years was then applied to the first subsequent dredging cycle to account for the time it takes such land to become a fully functional wetland.

The savings in annual maintenance dredging costs which occur during and after construction are summarized in Table 13.  Note in this table that the average annual dredging costs under without-project conditions are different for each option.  The reason for the variation is as follows: 1) due to the varying lengths of construction periods, the base year ranges from 2001 for Option 1 to 2008 for Options 3 and 3A,  2) project lives are assumed to be 50 years subsequent to substantial completion of a project, in this case, the base year, 3) project costs and partial benefits that accrue from the first year of construction (2000) to the base year are compounded forward to the base year and included in the present values of costs and benefits for each option, 4)  to keep the time frames of each option equal for comparison purposes, the without-project dredging costs between the year 2000 and the respective base year for each option are compounded forward

to the base year and then amortized over the 50-year project life. Therefore, an increase in the project construction period increases the period of without project dredging compounded forward and the average annual without-project costs for that particular comparison.

A summary of total monetary benefits is in Table 14. Table 15 presents the totals of average annual costs and monetary benefits for Options 1, 2, 3, 3A, and 4. Note that in Table 15 the absolute value of the net benefits must be covered by the non-monetary benefits, in accordance with ER 1105-2-100, para. 4-36 (d) and Section 907, Public Law 99-662. The environmental value given to non-monetary project benefits is described in the succeeding sections of this report.

### Table 11.

#### AVERAGE ANNUAL QUANTITY AND VALUE OF MARSH ACRES SAVED

RATE OF INTEREST=    8.25%              1992 VALUE PER ACRE=    $4,471

|  | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 |
|---|---|---|---|---|---|
| BASE YEAR EACH OPTION: | 2001 | 2005 | 2008 | 2008 | 2005 |
| ACRES SAVED PER YEAR AFTER CONSTRUCTION | 10.8 | 54 | 54 | 54 | 54 |
| AVERAGE ANNUAL VALUE | $48,287 | $241,434 | $241,434 | $241,434 | $241,434 |

## Table 12

### AVERAGE ANNUAL QUANTITY AND VALUE OF MARSH ACRES CREATED

RATE OF INTEREST =        8.25%           1992 VALUE PER ACRE =        $4,471

| | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 |
|---|---|---|---|---|---|

SCHEDULE OF ACRES CREATED BY CONSTRUCTION & DREDGING WITH 2 YEAR LAG TIME

| YEAR | | | | | |
|---|---|---|---|---|---|
| 2002 | 18 | 23.5 | 23.5 | 23.5 | 18.6 |
| 2004 | | | | | 74.5 |
| 2005 | 9 | | | | |
| 2006 | | 187.8 | 187.8 | 187.8 | |
| 2006 | 36 | | | | |
| 2013 | | 47.0 | 47.0 | 47.0 | 37.2 |
| 2015 | 18 | | | | |
| 2017 | | | | | 28.0 |
| 2018 | 27 | | | | |
| 2018 | | 11.7 | 11.7 | 11.7 | 9.3 |
| 2019 | | 35.2 | 35.2 | 35.2 | 28.0 |
| 2021 | | 47.0 | 47.0 | 47.0 | 37.2 |
| 2022 | | 35.2 | 35.2 | 35.2 | |
| 2023 | | | | | 9.3 |
| 2026 | | | | | 149.0 |
| 2026 | | 93.9 | 93.9 | 93.9 | 74.5 |
| 2033 | | 11.7 | 11.7 | 11.7 | |
| 2043 | | | | | 37.2 |
| 2048 | | 47.0 | 47.0 | 47.0 | 37.2 |

Note: See next page for continuation of Table 12

**Table 12**   continued

AVERAGE ANNUAL QUANTITY AND VALUE OF MARSH ACRES CREATED

RATE OF INTEREST=        8.25%          1992 VALUE PER ACRE=        $4,471

|  | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 |
|---|---|---|---|---|---|
| BASE YEAR EACH OPTION: | 2001 | 2005 | 2008 | 2008 | 2005 |

SCHEDULE OF DISCOUNTED ACRERAGE VALUES CREATED BY CONSTRUCTION & DREDGING

| BASE YEAR EACH OPTION: | 2001 | 2005 | 2008 | 2008 | 2005 |
|---|---|---|---|---|---|
| YEAR BENEFIT IS TAKEN |  |  |  |  |  |
| 2002 | $68,679 | $123,006 | $156,031 | $156,031 | $97,557 |
| 2004 |  |  |  |  | $333,012 |
| 2005 | $27,071 |  |  |  |  |
| 2006 |  | $716,646 | $909,051 | $909,051 |  |
| 2006 | $100,032 |  |  |  |  |
| 2013 |  | $102,861 | $130,477 | $130,477 | $81,579 |
| 2015 | $24,505 |  |  |  |  |
| 2017 |  |  |  |  | $44,707 |
| 2018 | $28,978 |  |  |  |  |
| 2018 |  | $17,300 | $21,945 | $21,945 | $13,721 |
| 2019 |  | $47,945 | $60,817 | $60,817 | $38,152 |
| 2021 |  | $54,554 | $69,201 | $69,201 | $43,267 |
| 2022 |  | $37,797 | $47,945 | $47,945 |  |
| 2023 |  |  |  |  | $9,231 |
| 2026 |  |  |  |  | $116,433 |
| 2026 |  | $73,403 | $93,111 | $93,111 | $58,217 |
| 2033 |  | $5,268 | $6,682 | $6,682 |  |
| 2043 |  |  |  |  | $7,564 |
| 2048 |  | $6,416 | $8,139 | $8,139 | $5,508 |
| TOTAL PRESENT VALUE | $249,265 | $1,185,197 | $1,503,398 | $1,503,398 | $848,948 |
| AVERAGE ANNUAL VALUE | $20,963 | $99,672 | $126,432 | $126,432 | $71,394 |

* Benefits for this acreage do not begin to accrue to the project until two years after the marsh
is created, due to the time needed for the marsh to become fully funtional. This marsh is created
after the first dredging cycle in each reach on the north bank.

Table 13.  Average Annual Maintenance Dredging Costs and Savings[1]

| | AVERAGE ANNUAL DREDGING COSTS W/O PROJECT | AVERAGE ANNUAL DREDGING COSTS W/PROJECT | AVERAGE ANNUAL DREDGING SAVINGS |
|---|---|---|---|
| Option 1 | $4,865 | $2,769 | $2,096 |
| Option 2 | $6,722 | $2,751 | $3,971 |
| Option 3 | $8,541 | $2,540 | $6,001 |
| Option 3A | $8,541 | $3,368 | $5,173 |
| Option 4 | $6,722 | $3,278 | $3,444 |

[1] / The without project average annual costs vary due to the different project period for each option. To keep the time frames equal to each option for comparison purposes, the without-project dredging costs between the year 2000 and the respective base year for each option are compounded forward to the base year and then amortized over the 50-year project life.  Therefore, an increase in the project construction period increases the period of without-project dredging compounded forward and the average annual without-project costs for that particular comparison.

**Table 14.  Summary of Average Annual Benefits by Category**
(1993 Price Levels, 8-1/4% Interest Rate)

| | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 |
|---|---|---|---|---|---|
| Base Year | 2001 | 2005 | 2008 | 2008 | 2005 |
| SAVINGS IN AVERAGE ANNUAL MAINTENANCE DREDGING COSTS | | | | | |
| | $2,096,170 | $3,970,672 | $6,000,517 | $5,172,993 | $3,443,540 |
| VALUE OF AVERAGE ANNUAL MARSH ACRES SAVED | | | | | |
| | $48,396 | $241,979 | $241,979 | $241,979 | $241,979 |
| VALUE OF AVERAGE ANNUAL MARSH ACRES CREATED | | | | | |
| | $21,010 | $99,897 | $126,717 | $126,717 | $71,555 |
| TOTAL AVERAGE ANNUAL BENEFITS | | | | | |
| | $2,165,576 | $4,312,548 | $6,369,213 | $5,541,689 | $3,757,074 |

**Table 15.  Summary of Average Annual Benefits and Costs (Design 5)**

| | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 |
|---|---|---|---|---|---|
| TOTAL AVERAGE ANNUAL COSTS | | | | | |
| | $2,451,000 | $9,915,000 | $36,004,000 | $17,892,000 | $8,570,000 |
| TOTAL AVERAGE ANNUAL MONETARY BENEFITS | | | | | |
| | $2,166,000 | $4,313,000 | $6,369,000 | $5,542,000 | $3,757,000 |
| NET MONETARY BENEFITS [1] | | | | | |
| | ($286,000) | ($5,603,000) | ($29,636,000) | ($12,351,000) | ($4,814,000) |
| NET MONETARY BENEFITS--COMMON BASE YEAR (2010) | | | | | |
| | ($584,000) | ($8,328,000) | ($34,728,000) | ($14,473,000) | ($7,156,000) |

[1]  The absolute value of the net monetary benefits reflects the magnitude of the average annual costs that must be covered by non-monetary benefits, in accordance with ER 1105-2-100, para 4-36 (d) and Section 907, Public Law 99-662.

## CONSIDERATION OF A MORE AFFORDABLE PLAN—OPTION 4A

The purpose of considering this option is to evaluate a plan which would be more affordable to a potential non-Federal sponsor. This option would provide the same extent of channel protection as Option 4, that is the unprotected length of the north bank between miles 60 and 27. The north bank currently has protection constructed from mile 54 to mile 51. However, for Option 4A the planned construction period was extended from the 5 years scheduled for Option 4 to 10 years for this alternative. The base year would be 2010. As noted previously, Design 5 was determined to be the most cost effective design. A summary of the costs for this option is presented in Table 16.

Over the 50-year project life this option would reduce the average annual maintenance dredging cost by $4,367,000. As is the case with Option 4, implementation of Option 4A would result in the creation of 540 acres of marsh. Option 4A would preserve an additional 2,938 acres (including 238 acres preserved during the 10-year construction period) for a total of 3,478 acres of marsh created or preserved over the life of the project. As noted previously non-monetary benefits must cover the difference between total average annual project costs and total average annual benefits (see Table 15, page 59). The monetary benefits are summarized in Table 17.

### Table 16. Summary of Costs for Option 4A, Design 5
(In $1,000)

#### FIRST COSTS

| Real Estate | Construction | Total First Cost | Gross Investment |
|---|---|---|---|
| $356 | $38,700 | $39,056 | $57,343 |

#### ANNUAL COSTS

| Interest | Amortization | Operation & Maint. | Total Avg. Ann. Cost |
|---|---|---|---|
| $4,731 | $92 | $5,951 | $10,773 |

Table 17.  Option 4A, Design 5 Summary of Average Annual Benefits by Category

**MONETARY BENEFITS**

| | |
|---|---:|
| Savings in Maintenance Dredging Costs | $4,367,200 |
| Value of Acres of Marsh Saved | 355,300 |
| Value of Acres of Marsh Created | 115,700 |
| TOTAL MONETARY BENEFITS | $4,838,200 |
| Rounded | $4,838,000 |

## SUMMARY OF ECONOMIC AND ENVIRONMENTAL BENEFITS AND COSTS

The costs and benefits for a total of six options (Option 1, 2, 3, 3A, 4, and 4A) were evaluated to determine which, if any, should be carried over to a feasibility phase study.  Each of the options would provide a degree of savings to maintenance dredging of the MR-GO navigation channel.  Each of the options would also provide a degree of wetland restoration and preservation.

The monetary benefits due to maintenance savings as well as marsh restoration and preservation were analyzed.  Since the marshes along the MR-GO channel also have an inherent non-monetary value, this value too was quantified. In order to measure the non-monetary quality and quantity of wetlands protected and restored by the plans, the Wetland Value Assessment (WVA) was used. Under the WVA, wetland values are expressed as Average Annual Habitat Units (AAHU's).  These AAHU's were then compared to the average annual costs remaining after subtracting the value of the average annual monetary benefits. This remaining average annual cost is the cost that must be covered by non-monetary benefits. Table 18 displays a summary of the average annual cost, AAHU's , and cost per AAHU for the six plans.

The plans were then evaluated to determine: 1) the extent to which they would provide and account for all necessary investments or other actions to ensure the realization of planned effects, 2)  the extent to which they would alleviate the problems of increased channel shoaling, maintenance dredging costs, and marsh loss, 3) the cost effectiveness of each plan in alleviating the specified problems and achieving the opportunities, and 4) their implementability in terms of

identifying a local sponsor willing and able to share costs of further study and implementation of the recommended plan.

### Table 18,  Summary of Costs and Non-Monetary Benefits

| Option | 1 | 2 | 3 | 3A | 4 | 4A |
|---|---|---|---|---|---|---|
| Partial Environmental Avg. Ann. Costs ($1,000)[1] | $286 | $5,603 | $29,636 | $12,351 | $4,814 | $5,935 |
| AAHU's [2] | 557 | 2,786 | 2,786 | 2,786 | 2,786 | 2,786 |
| Partial Environmental Avg. Ann. Costs ($1)/AAHU | $510 | $2,010 | $10,640 | $4,430 | $1,730 | $2,130 |

[1] Partial environmental average annual costs in this table reflect the absolute value of the net monetary benefits from Table 15, which is the magnitude of average annual costs that must be covered by non-monetary benefits.

[2] Except for Option 1, over a 50-year project life, each of the options considered would create an equal number of acres of marsh and would also preserve an equal number of acres of marsh. The time value of marsh is not considered in determining AAHU's; therefore, the length of the construction period does not impact the AAHU's that a project would generate.

Option 1 would provide protection along only 6 miles of the north bank of the MR-GO and would, therefore, only partially realize the objectives of reducing channel maintenance dredging costs and preserving the marsh. Options 3 and 3A would provide the most protection along the south bank. However, because of the distance between this bank and the existing marsh, the added protection would reduce the rate of channel shoaling but not increase AAHU's. Therefore, the cost per AAHU is significantly higher for these options.

Except for channel miles 27 to 23 along the north bank where structures would be prohibitively expensive due to the channel depth, Option 2 would provide a comprehensive solution to the problem of the eroding marsh. Deleting structural bank protection from miles 47 to 27 along the south bank would result in an increase in with-project channel dredging costs but no decrease in AAHU's provided by the project. Therefore, the cost per AAHU would be significantly less with this plan. Also, providing protection to the entire north bank from

mile 60 to mile 27 would be more acceptable to local interests and provide the minimum desired magnitude of environmental outputs.

As noted previously, including protection along the south bank does not increase the AAHU's provided by an alternative. Therefore, Option 4 (no protection along the south bank) would provide the same environmental benefits as Option 2, 3, or 3A, but at a lower cost. This plan would be constructed over a period of 5 years and the first costs would be $39,056,000. The costs to a local sponsor payable over this period would be $5,858,000 (rounded). Therefore, Option 4A, which includes a 10-year construction period, was considered. The longer construction period would increase the cost of interest during construction and, therefore, the cost per AAHU. However, the payment during construction required of the local sponsor would decrease from approximately $1,172,000 to $586,000 per year. Table 19 shows the overall summary of economic and environmental benefits and costs.

## REAL ESTATE SECTION

The most favorable plan, Option 4A, would require acquisition of a Rock Armored Structure Easement (also referred to as Bank Stabilization Easement in the cost estimates) and a Perpetual Disposal Easement. The Rock Armored Structure Easement would be placed on 912 acres of marshland on the banks of the Mississippi River Gulf Outlet; the Perpetual disposal Easement would be placed on 912 acres of adjacent marshland. Seventy ownerships are affected by construction of the project.

There are no improvements within the right-of-way. No compensable Interest Report has been written regarding utilities that may be located within the right-of-way. At this time, it is estimated that no P.L. 91-646 benefits are applicable.

The Real Estate Cost Estimates, the Initial Real Estate Cost Estimate report, and the Chart of Accounts are in Appendix E.

## PRELIMINARY FINANCIAL ANALYSIS AND COST SHARING PROPOSAL

## INTRODUCTION

As shown on Table 20, 40 percent of the quantifiable monetary benefits for Option 4 are due to savings in maintenance dredging costs for the MR-GO navigation project. Since the majority of the project monetary benefits are maintenance savings, and maintenance dredging costs of the MR-GO channel are borne 100 percent by the Federal government, a case could be made that the

Table 19. Summary of Economic and Environmental Costs and Benefits

| Option | 1 | 2 | 3 | 3A | 4 | 4A [2/] |
|---|---|---|---|---|---|---|
| **COSTS ($1,000)** | | | | | | |
| Total First Costs | $13,009 | $44,255 | $132,528 | $70,245 | $39,056 | $39,056 |
| Gross Investment | $13,017 | $52,857 | $195,352 | $95,125 | $45,718 | $57,343 |
| Total Average Annual Costs | $2,451 | $9,915 | $36,004 | $17,892 | $8,570 | $10,773 |
| **BENEFITS ($1,000, unless otherwise indicated)** | | | | | | |
| Savings in Average Annual Maintenance Dredging Costs | $2,096 | $3,971 | $6,001 | $5,173 | $3,443 | $4,367 |
| Monetary Value of Average Annual Marsh Acres Saved | $48 | $241 | $241 | $241 | $241 | $355 |
| Monetary Value of Average Annual Marsh Acres Created | $21 | $100 | $126 | $126 | $71 | $116 |
| Total Average Annual Benefits | $2,165 | $4,311 | $6,368 | $5,541 | $3,756 | $4,838 |
| Net Monetary Benefits (Partial Environmental Average Annual Costs)[1/] | $286 | $$5,603 | $29,636 | $12,351 | $4,814 | $5,935 |
| Average Annual Habitat Units (AAHU's) | 557 | 2,786 | 2,786 | 2,786 | 2,786 | 2,786 |
| **COST-BENEFIT COMPARISON OF NON-MONETARY ENVIRONMENTAL OUTPUTS** | | | | | | |
| Environmental Average Annual Costs ($1)/AAHU | $510 | $2,010 | $10,640 | $4,430 | $1,730 | $2,130 |

[1/] Partial environmental average annual costs in this table reflect the absolute value of the net monetary benefits from Table 15, which is the magnitude of average annual costs that must be covered by non-monetary benefits.

[2/] The $1,082,000 difference in average annual benefits between Options 4 and 4A is partially due to the difference in base years (2005 for Option 4 and 2010 for Option 4A) and to $14,600,000 maintenance dredging required in 2009 under without project conditions. The lengthened construction period for Option 4A results in increased present worth for the acres of marsh saved and created during this period and also for the $14,600,000 without project dredging cycles.

feasibility phase study, project construction, and operation and maintenance of bank stabilization features should also be 100 percent Federal. However, at this point, project implementation cannot be assured based on the justification of maintenance savings alone; both monetary and non-monetary environmental benefits, as well as maintenance savings, are needed to justify further Federal involvement. Therefore, as described in the following section, it is proposed herein that cost sharing for the remaining phases of the project be based upon prorating the costs according to the project outputs of the most favorable plan identified in this report, as described in the following sections.

## RECOMMENDED FEASIBILITY COST SHARING

The recommended feasibility phase cost sharing is based on the distribution of estimated project benefits for Option 4A. This plan is the minimum plan that is implementable and presents a sufficiently complete solution to the problem of bank erosion and marsh loss. The current estimate of benefits achievable from implementation of this bank protection measure falls in three basic categories: (1) maintenance savings to the existing Mississippi River-Gulf Outlet project due to reduced dredging requirements, (2) monetary benefits associated with environmental restoration and preservation, and (3) non-monetary benefits associated with environmental restoration and preservation. The total first cost of the plan is estimated to be $39,100,000, total average annual costs are $10,800,000, and total average annual monetary benefits are $4,800,000.

The average annual monetary benefits are comprised of savings in maintenance dredging ($4,370,000) and the value of marsh saved and created ($470,000) as a result of the bank stabilization measures. Non-monetary benefits cover approximately $6,000,000 in average annual costs. Total project benefits for the purpose of this calculation are equal to the sum of these values ($6,000,000 + $470,000 + $4,370,000 = $10,840,000). Consequently, the savings in maintenance cost represents approximately 40 percent of the total project benefits ($4,370,000/$10,840,000 = 0.4). Thus, sixty percent of the benefits would be related to environmental outputs (1 - 0.4 = 0.6), in accordance with ER 1105-2-100, para. 4-36 (d).

Costs associated with studies to determine the savings in project maintenance costs are to be borne 100 percent by the Federal government. The Federal share of study costs associated with environmental outputs would be 50 percent. Based on these criteria, the Federal and non-Federal cost sharing for the feasibility phase is recommended to be the following:

Federal Cost = 1.0 x 0.4 (Maintenance Savings Portion) +
0.5*0.6 (Environmental Benefits Portion) = 0.7, or 70 percent

Non-Federal Cost = 1.0 - 0.7 = 0.3, or 30 percent.

Up to one-half of the non-Federal share may be in-kind services (15 percent of the total study cost).

RECOMMENDED PROJECT IMPLEMENTATION AND OMRR&R COST SHARING

Similarly, project implementation and operation, maintenance, repair, replacement, and rehabilitation (OMRR&R) cost-sharing requirements would be based on the distribution of estimated project benefits.

The current estimate of monetary benefits achievable from implementation of structural bank protection measures fall in two basic categories: (1) benefits to navigation, and (2) environmental restoration/preservation. As is indicated in Table 20, for Option 4A, Design 5, about 40 percent of the project benefits would accrue to navigation and about 60 percent to environmental restoration/preservation. These benefit proportions are used in the preliminary assessment of how project implementation costs would be apportioned. Navigation costs are to be borne 100 percent by the Federal government. The Federal share of environmental restoration and preservation costs for initial construction would be 75 percent. The Federal share of costs associated with the OMRR&R of the bank stabilization structure would be 100 percent of maintenance savings costs and 0 percent of the environmental restoration/preservation costs. OMRR&R costs associated with channel dredging for the navigation project, however, would remain 100 percent federally funded. The Federal and non-Federal shares are estimated as follows:

Let   X = Total Construction Costs

Then,

$$\text{Federal cost} = 1.0 * 0.4X + 0.75 * 0.6X = 0.85X, \text{ or } 85\%$$

$$\text{Non-Federal cost} = 1.0X - 0.85X = 0.15X, \text{ or } 15\%$$

Let   Y = Total OMRR&R Costs (Per Maintenance Cycle)

Then,

$$\text{Federal cost} = 1.0 * 0.4Y + 0.0 * 0.6Y = 0.4Y, \text{ or } 40\%$$

$$\text{Non-Federal cost} = 1.0Y - 0.40Y = 0.6Y, \text{ or } 60\%$$

Lands, easements, relocations, and rights-of-way are to be obtained at Federal expense. The local sponsor shall hold and save the Government free from all damages arising from the construction, operation, and maintenance of the project, except for damages due to the fault or negligence of the Government or its contractors.

Preliminary results of the reconnaissance study, a draft feasibility cost-sharing agreement, and a draft initial project management plan have been provided to the potential non-Federal sponsor, the Port of New Orleans.

## STUDY COORDINATION

A public notice was published in April 1987 announcing the initiation of the reconnaissance-scope studies of bank stabilization along the MR-GO. The notice was sent to approximately 300 correspondents: individuals; the print and electronic news media; libraries; local, state, and Federal government officials and agencies; and various interest groups. Subsequent to distribution of this notice, a reporter from WDSU TV Channel 6, New Orleans, interviewed the study manager concerning erosion and erosion-related problems in the study area. The interview was aired in June 1987. Two field trips were conducted during 1987 to meet with a representative of a land owner that would be affected by implementation of structural erosion abatement measures.

Several inter-agency meetings were held between the NOD and the Louisiana Department of Natural Resources (LDNR) to explore the level of interest and support of non-Federal interests in finding potential solutions to the bank erosion problems. Representatives of the LDNR were requested to review a preliminary draft of the reconnaissance report and comment on plan formulation, environmental and economic analyses, and the study findings. Comments of the LDNR were considered in the reconnaissance report and will be considered further in any future feasibility phase studies. The LDNR has expressed an interest in cost-sharing feasibility studies of bank erosion and erosion-related problems of the study area.

Study efforts have been closely coordinated with the U. S. Fish and Wildlife Service (USFWS). The USFWS has indicated support of the study efforts. The USFWS Planning Aid Letter is shown as Appendix F.

The status of this reconnaissance study was discussed at meetings held on the Pontchartrain Basin in connection with the Coastal Wetlands, Planning, Protection, and Restoration Act as well as at meetings involving St. Bernard Parish, State of Louisiana officials and the Federal Coast Pilot Association.

### Table 20.  Summary of Average Annual Benefits for Design 5 by Category

|  | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 3A | OPTION 4 | OPTION 4A |
|---|---|---|---|---|---|---|
| **NAVIGATION BENEFITS** | | | | | | |
| SAVINGS IN AVERAGE ANNUAL MAINTENANCE DREGING COSTS | $2,096,000 | $3,971,000 | $6,001,000 | $5,173,000 | $3,444,000 | $4,367,000 |
| PERCENT OF TOTAL | 86 | 40 | 17 | 29 | 40 | 40 |
| **ENVIRONMENTAL RESTORATION AND PRESERVATION BENEFITS** | | | | | | |
| VALUE OF AVERAGE ANNUAL MARSH ACRES SAVED OR CREATED | $69,000 | $341,000 | $367,000 | $367,000 | $312,000 | $471,000 |
| AVERAGE ANNUAL COSTS COVERED BY NON-MONETARY BENEFITS | 286,000 | 5,603,000 | 29,636,000 | 12,351,000 | 4,814,000 | 5,935,000 |
| SUB-TOTAL | $355,000 | $5,944,000 | $30,003,000 | $12,718,000 | $5,126,00 | $6,406,000 |
| PERCENT OF TOTAL | 14 | 60 | 83 | 71 | 60 | 60 |
| **TOTAL AVERAGE ANNUAL BENEFITS** (100%) | $2,451,000 | $9,915,000 | $36,004,000 | $17,891,000 | $8,570,000 | $10,773,000 |

89

## REQUIREMENTS FOR FURTHER STUDY

A feasibility report and Environmental Impact Statement will be prepared to determine the level of Federal involvement in bank erosion control measures and comply with National Environmental Policy Act requirements. A detailed description of the feasibility study scope of work and schedule is provided in the Initial Project Management Plan (IPMP), developed as a companion document to this report. The feasibility report will: 1) provide a complete presentation of study results and findings so that readers can reach independent conclusions regarding the reasonableness of recommendations; 2) indicate compliance with applicable statutes, executive orders and policies; and 3) provide a sound and documented basis for decision makers at all levels to judge the recommended solution(s). The feasibility report will include baseline design and cost estimates of the recommended plan. Plans will first be optimized on monetary benefits associated with channel maintenance savings, marsh creation, and marsh preservation. Then, an incremental cost analysis of project costs and non-monetary benefits will be performed to ensure the identification of the most efficient, effective, and complete plan, in accordance with ER 1105-2-100, para. 4-36 (d). A baseline design and cost estimate would then be provided for the tentatively selected plan.

The incremental analysis will involve nine steps: 1) impact assessment and cost estimate, 2) identification of reasonably combinable environmental measures, 3) calculation of the outputs and costs for combinations of measures 4) elimination of economically inefficient combinations. (Plans that are not "least cost" for the same level of output will be eliminated. This step will also involve the ranking of combinations in ascending order of outputs and ascending order of costs.), 5) elimination of economically ineffective combinations (combinations will be deleted that will produce less output at equal or greater cost than subsequently ranked combinations), 6) graphically analyze output vs. cost relationships, 7) calculate per unit incremental cost, 8) graph incremental costs, and 9) interpret incremental cost graph to select a reasonably efficient, effective, and complete plan that is implementable. Note that this procedure will not necessarily result in the selection of the plan which has the lowest cost per unit of output or the lowest incremental cost per unit of output.

The feasibility study will also include hydraulic and hydrologic engineering, design and cost engineering, geotechnical investigations, socio-economic studies, biological resources studies, cultural resources studies, recreation resources studies, real estate investigations, plan formulation, public involvement, study management and coordination, and other miscellaneous investigation such as analyses of risk, uncertainty, and sensitivity of parameters and variables to outcomes.

Besides the rock dike designs evaluated in this reconnaissance study, the feasibility study will consider the alternative of placing dredged material, allowing the material to consolidate and later placing an armor stone layer over a foundation filter fabric. Other designs that will be considered in future studies include pile-panel walls, sheet pile walls, "Target" concrete blocks, and timber bulkheads.

## CONCLUSIONS

The results of this preliminary analysis indicate that construction of bank stabilization measures along the MR-GO may be warranted. Based on an evaluation of project costs and monetary and non-monetary benefits, continuation into the feasibility phase is advisable.

The need for bank stabilization measures along the MR-GO is evident. Severe erosion is occurring along the banks of the channel. Without Federal action, the current bank erosion problem would produce large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound. The communication these breaches will create between the open water and the channel will significantly increase the cost of channel maintenance dredging in the future. Additionally, wave-wash and drawdown effects produced by large vessel traffic are causing highly productive marsh to be converted to open water.

Based on an analysis of the erosion problem, three objectives of constructing measures along the MR-GO were identified: 1) to control bank erosion to minimize channel maintenance requirements, 2) to reduce the rate of loss of valuable coastal wetlands adjacent to the channel, and 3) to restore, to the extent practicable, wetlands previously converted to open water as a result of bank erosion and saltwater intrusion.

In order to justify bank stabilization measures, consideration of both monetary and non-monetary project outputs is required. Early studies evaluated the costs and benefits of such measures, based solely on the National Economic Development benefits that would be generated by the reduced costs to maintain the channel. These measures were not economically justified. However, justification does exist when non-monetary benefits are incorporated. These non-monetary benefits are generated by restoring acres of marsh which have converted to open water and by preserving remaining marsh in the study area. The benefits are quantified using a Wetland Value Assessment and are described in Average Annual Habitat Units (AAHU's).

The most favorable plan identified in the reconnaissance study involves the construction of 30 miles of rock dike along the north bank of the MR-GO to

provide protection against erosion (Option 4A, Design 5).  Smaller plans may be more efficient at meeting the objectives, but are not supported by potential non-Federal sponsors or do not provide the desired magnitude of environmental outputs. The total first costs to construct this plan would be $39,056,000, and the total average annual costs, including approximately $5,951,000 for operation and maintenance, would be $10,773,000.

This plan would reduce the average annual costs of maintenance dredging by $4,367,000.  Additionally, the implementation of this plan would result in the creation of 540 acres of marsh and would preserve an additional 2,938 acres for a total of 3,478 acres of marsh created or preserved over the life of the project. The average annual monetary value of this preservation and restoration is $357,000. When the Wetland Value Assessment is applied consistent with Coastal Wetlands Planning, Protection, and Restoration Act projects, the total non-monetary benefits are 2,786 AAHU's.

The results of the study also indicate that cost-sharing percentages for the feasibility study, project implementation, and project OMRR&R (operation, maintenance, repair, replacement, and rehabiliation), should be based on project outputs.  Prorating the Federal and non-Federal shares according to project outputs for the most favorable plan yields Federal shares for these three phases, respectively, of 70 percent, 85 percent, and 40 percent.

## RECOMMENDATIONS

I recommend this reconnaissance report be approved and that the study of bank protection measures along the Mississippi River-Gulf Outlet navigation channel be continued into the feasibility phase. In light of the unique mix of project outputs identified for these measures, involving both Federal maintenance savings and environmental restoration and preservation, I also recommend the consideration of the following exemptions to existing policy on water resources development projects: 1) that the cost sharing of the feasibility phase be 70 percent Federal and 30 percent non-Federal, with the provision that up to one-half of the non-Federal share may be in the form of in-kind services, 2) that the cost sharing of project construction be 85 percent Federal and 15 percent non-Federal, and 3) that the cost sharing for operation, maintenance, repair, replacement, and rehabiliation (OMRR&R) of the bank stabilization projects be 40 percent Federal and 60 percent non-Federal. I further recommend that item 1) above be approved along with the reconnaissance report and items 2) and 3) above be tentatively approved now, with the condition that cost sharing for both project construction and OMRR&R shall be adjusted according to the project outputs identified in the feasibility study and calculated in the manner described in this reconnaissance report.

Michael Diffley
Colonel, U. S. Army
District Engineer