

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   AUG 2 1 2006

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER: 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  MRGO, *Robinson,* (No. 06-2268) | |

## PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S

## MOTION TO DISMISS

Fee_____
Process_____
X  Dkt_____
CtRmDep_____
Doc. No_____

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................   2

II.     ON THEIR FACE, PLAINTIFFS' WELL-PLED ALLEGATIONS IN
        THE COMPLAINT DEFEAT THE GOVERNMENT'S MOTION TO
        DISMISS FOR LACK OF JURISDICTION. .........................................   8

III.    FACTS .........................................................................   15

        A.   The Complaint Alleges In Detail Two Fundamental Defects
             In The MR-GO Attributable To The Army Corps'
             Negligence .................................................................   16

        B.   Plaintiffs' Complaint Alleges That The MR-GO Was Not
             A Federal Flood Control Project .........................................   18

        C.   Plaintiffs' Complaint Alleges That The MR-GO, And Not
             Any Federal Flood Control Facilities, Caused Their
             Damages...................................................................   19

        D.   Plaintiffs Are Not Challenging The Legislation Authorizing
             The MR-GO .................................................................   24

        E.   The Army Corps Violated Two Federal Statutes When
             Planning, Designing, and Constructing the Waterway ..............   26

        F.   The Government's Documents Fail to Establish That Any of the
             MR-GO Levees or the Seabrook Dam and Lock Were Actually
             Constructed. .............................................................   28

             1.   The Phantom Seabrook Lock Was Never Constructed..   28

             2.   The Government Also Does Not Establish Whether or
                  Where Actual Flood Control Levees Along the MR-GO
                  Were Ever Built.................................................   30

IV.     THE MISSISSIPPI FLOOD CONTROL ACT OF 1928 AFFORDS NO
        IMMUNITY TO THE UNITED STATES .........................................   34

        A.   The Fifth Circuit in *Graci v. United States* Dispositively
             Decided That Section 702c Immunity Does Not Attach To The
             Governments' Tortious Acts Arising From The MR-GO. .........   35

i

B.    From Its Inception, FCA Immunity Was Strictly Limited To
      Flood Control Projects. .................................................................    39

C.    The United States Supreme Court in *James III* Reinforced the
      Fifth Circuit's Conclusions in *Graci*. ..........................................    43

D.    The United States Supreme Court in *Central Green* Further
      Confirmed The Fifth Circuit's Conclusions in *Graci*. ...............    46

E.    The Lake Pontchartrain And Vicinity Hurricane Protection
      Project Has No Bearing On This Case.......................................    48

      1.    Plaintiffs' Negligence Claims Are Not Predicated Upon
            The Failure Of Levees.....................................................    49

      2.    There Are Numerous Disputed Issues of Fact
            Concerning Whether The MR-GO Has Any Flood
            Control Features ...............................................................    50

V.    THE GOVERNMENT LACKS IMMUNITY UNDER THE
      FEDERAL TORT CLAIMS ACT FOR PLAINTIFFS' NEGLIGENCE
      CLAIMS.....................................................................................    53

VI.   CONCLUSION ...........................................................................    68

## TABLE OF AUTHORITIES

Pages(s)

### CASES

*Alabama Electric Cooperative, Inc. v. United States,*
769 F. 2d 1523 (11th Cir. 1985)............................................................. 7, 65

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................................ 14

*Ayala v. U.S.,*
980 F. 2d 1342 (10th Cir. 1992)............................................................. 64

*Becker v. Tidewater, Inc.,*
405 F. 3d 257 (5th Cir. 2005)................................................................. 20

*Bell v. Hood,*
327 U.S. 678 (1945)........................................................................ 2, 9, 10

*Beneficial Nat. Bank v. Anderson,*
539 U.S. 1 (2003).................................................................................... 20

*Berger v. United States,*
295 U.S. 78 (1935).................................................................................... 5

*Berkovitz v. United States,*
486 U.S. 531 (1988)........................................................... 6, 58, 63, 64

*Berthelot v. Boh Brothers Constr. Co., L.L.C , et al.*
(O'Dwyer 054191) Order dated July 19, 2006 (Duval, J.)........................... 8

*Binderup v. Pathe Exchange,*
263 U.S. 291 (1923)................................................................................... 9

*Bonin v. Ferrellgas, Inc.,*
877 So. 2d 89 (La. 2004).......................................................................... 22

*Boyd v. United States,*
881 F. 2d 895 (10th Cir. 1989)............................................................... 44

*Buchanan v. U.S.,*
915 F. 2d 969 (5th Cir. 1990)................................................................. 58

*Carr v. City of Baton Rouge,*
314 So.2d 527 (La.App.1975).................................................................. 38

Page(s)

*Central Green Co. v. United States,*
   531 U.S. 425 (2001) .................................................................................... passim

*Collins v. United States,*
   783 F. 2d 1225 (5th Cir. 1986) .................................................................. 62

*Commerce and Indus. Ins. Co. v. Grinnell Corp.,*
   280 F. 3d 566 (5th Cir. 2002) .................................................................... 6

*Conley v. Gibson,*
   355 U.S. 41 (1957) ..................................................................................... 20

*Cope v. Scott,*
   45 F. 3d 445 (D.C. Cir. 1995) ................................................................... 64

*Crowe v. Henry,*
   43 F. 3d 198 (5th Cir. 1995) ...................................................................... 10

*Dalehite v. United States,*
   346 U.S. 15 (1953) ................................................................................. 6, 55

*Dewitt Bank & Trust Co. v. United States,*
   878 F. 2d 246 (8th Cir. 1989) .................................................................... 44

Eubanks v. McCotter,
   802 F.2d 790 (5th Cir.1986) ...................................................................... 3

Fisher Bros. Sales, Inc. v. U.S.,
   46 F. 3d 279 (3rd Cir. 1995) ..................................................................... 64

*Fontenot v. Upjohn Co.,*
   780 F. 2d 1190 (5th Cir. 1986) .................................................................. 14

*Graci v. United States,*
   301 F. Supp. 947 (E.D. La. 1969) ..................................................... passim

*Graci v. United States,*
   435 F. Supp. 189 (E.D. La. 1977) ..................................................... passim

*Graci v. United States,*
   456 F. 2d. 20, (5th Cir. 1971) ............................................................ passim

Hayes v. United States,
   585 F. 2d 702 (4th Cir. 1978) .................................................................... 46

Hiersche v. United States,
   503 U.S. 923 (1992) ................................................................................... 42

Page(s)

*Home Builders Assn. of Miss., Inc. v. City of Madison, Miss.,*
  143 F. 3d 1006 (5th Cir. 1998)...................................................................... 9

*Indian Towing Co. v. United States,*
  350 U.S. 61 (1955)..................................................................................... 63

*James v. United States,*
  790 F. 2d 590 (5th Cir. 1985).............................................................. 40, 43

*James v. United States,*
  478 U.S. 597 (1986).................................................................................. 43

*Kiska Const. Corp. v. Washington Metropolitan,*
  321 F. 3d 1151 (D.C. Cir. 2003) ............................................................... 59

*Maxwell v. First Nat. Bank of Monroeville,*
  638 F. 2d 32 (5th Cir. 1981)...................................................................... 11

*McClaskey v. United States,*
  386 F. 2d 807, n.1 (9th Cir. 1967)............................................................. 37

*McWaters v. F.E.M.A.*
  2006 WL 1851473 (E.D. La., June 16, 2006) ........................................... 10

Mocklin v. United States,
  877 F. 2d 427 (5th Cir. 1989)................................................................... 40

*Montez v. Dept. of Navy,*
  392 F.3d 147 (5th Cir. 2004)........................................................... 2, 8, 12

*Morici Corp. v. United States,*
  681 F. 2d 645 (9th Cir. 1982)................................................................... 49

*Moyer v. Martin Marietta Corp.,*
  481 F. 2d 585 (5th Cir. 1973)................................................................... 64

*National Fire Ins. v. United States,*
  115 F. 3d 1415 (9th Cir. 1997)................................................................. 66

*O'Toole v. United States,*
  295 F. 3d 1029 (9th Cir. 2002)........................................................... 65, 67

*Peterson v. United States,*
  367 F. 2d 271 (9th Cir. 1966)............................................................. 37, 45

*Pouncy v. Temple, Royal Indem. Co., Intervenor,*
  41 So. 2d 139 (La. Ct. App. 1949) ............................................................ 22

Page(s)

*Ramming v. United States,*
    281 F. 3d 158 (5th Cir. 2001)............................................................................ 9

*Sanko Steamship Co., Ltd. v. United States,*
    272 F. 3d 1231 (9th Cir. 2001).................................................................. 5, 47

Savoy v. United States,
    Civ. Action No. 06-3552, (E.D. La. 2006).................................................. 26

*Seaboard Coast Line Railroad Co. v. United States,*
    473 F. 2d 714 (5th Cir. 1973)................................................................ 37, 64

*Smith v. United States,*
    507 U.S. 197 (1993) .............................................................................. 42, 54

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...................................................................................... 10

Stelly v. U.S.,
    644 F. Supp. 107 (W.D. La. 1986)............................................................... 39

*Suthoff v. Yazoo County Indus. Dev. Corp.,*
    637 F. 2d 337 (5th Cir. 1981)...................................................................... 11

*Swafford v. Templeton,*
    185 U.S. 487 (1902) ...................................................................................... 9

*United States ex rel. Laird v. Lockheed Martin Eng'g. and Sci. Servs. Co.,*
    336 F. 3d 346 (5th Cir. 2003)................................................................... 3, 11

*United States v. Gaubert,*
    499 U.S. 315 (1991) ...................................................................... 55, 58, 63

*United States v. Hunsucker,*
    314 F. 2d 98 (9th Cir. 1962)....................................................................... 65

*United States v. James,*
    478 U.S. 497 (1986) ................................................................................. 5, 40

*United States v. Nordic Village, Inc.,*
    503 U.S. 30 (1992) ...................................................................................... 42

*United States v. S.A. Empresa de Viacao Aerea Rio Gransense ("Varig Airlines"),*
    467 U.S. 797 (1984)..................................................................................... 63

Page(s)

*United States v. Sponenbarger,*
    308 U.S. 256 (1939) ................................................................................................... 39

*United States v. Yellow Cab Co.,*
    340 U.S. 543 (1951) ................................................................................................... 42

*Valentin v. Hosp. Bella Vista,*
    254 F. 3d 358 (1st Cir. 2001) ............................................................................. 10, 13

*Whisnant v. U.S.,*
    400 F. 3d 1177 (9th Cir. 2005)................................................................................. 64

*Williamson v. Tucker,*
    645 F. 2d 404 (5th Cir. 1981)............................................................................... 8, 10

## STATUTES

16 U.S.C. § 662 ............................................................................................................ 6, 59

28 U.S.C. § 2671 et seq................................................................................................... 34

28 U.S.C. Section 2571 et seq......................................................................................... 11

28 U.S.C.A. § 2680(a).................................................................................................... 55

33 U.S.C. § 702c ............................................................................................................. 34

Flood Control Act of 1928, 33 U.S.C. § 702c ............................................................... 34

## OTHER AUTHORITIES

Hofmann, *An Enduring Anachronism:  Arguments for the Repeal of the §*
    *702c Immunity Provisions of the Flood Control Act of 1928,*  79 Tex. L.
    Rev. 791 (2001)....................................................................................................... 44

John M. Barry, *Rising Tide:  The Great Mississippi Flood of 1927 and*
    *How It Changed America* (Touchstone 1998) .......................................................... 39

River and Harbor Act of 1945 (P.L. 79-14, 50 Stat. 10 (March 2, 1945) ...................... 26

S. Doc. No. 91, 70th Cong., 1st Sess. 1 (1928) (Conference Report).............................. 41

The River and Harbor Act and Flood Control Act of 1965, P.L. 89-298, 79
    Stat. 1073 (October 27, 1965) ................................................................................ 29

LSA C.C. Art. 667 .......................................................................................................... 38

Page(s)

The River and Harbor Act of 1945,  P.L. 79-14, 50 Stat. 10 (March 2,
      1945) ............................................................................................................. 25

12 Wright & Miller, *Federal Practice & Procedure Civil,* Sections 1271,
      1357, 3155 (2006) ......................................................................... 10, 13, 23

## I.   INTRODUCTION

> This Court has jurisdiction over the parties and
> under 28 U.S.C. Section 1346 [Defendant United
> States] and 28 U.S.C. Section 2571 et seq. (Federal
> Tort Claims Act) *has subject matter jurisdiction*
> *over this suit by plaintiffs against the United States*
> *for damages allegedly received as a result of*
> *defendant's construction of the MRGO.*

*Graci v. United States*, 435 F. Supp. 189, 195 (E.D. La. 1977) (emphasis added).

The United States Army Corps of Engineers and the United States of America

(collectively, the "Government") have brought a Motion to Dismiss ("Motion") on exactly

the set of negligence claims over the Mississippi River-Gulf Outlet ("MR-GO") navigation

project that this Court and the Fifth Circuit have entertained for decades. *See Graci v.*

*United States,* 301 F. Supp. 947, 949 (E.D. La 1969); *Graci v. United States*, 435 F. Supp.

189, 195 (E.D. La. 1977); *Graci v. United States, 456* F. 2d 20 (5th Cir. 1971).  Now, as

then, the Government's Motion is improper and should fare no better than it has before.

Indeed, nothing has occurred in the intervening three decades that would affect this Court's

subject matter jurisdiction under the legal authority of these cases.

The Government's motion is fatally flawed on both procedural and substantive

grounds.  Procedurally, the Government's Motion fails for two separate reasons:

*First*, the Government has filed an improper motion aimed straight at the merits of

Plaintiffs' case under the guise of a Rule 12(b)(1) motion to dismiss for lack of subject

matter jurisdiction.  The Fifth Circuit and this Court have held, on numerous occasions,

that "we follow our general rule in holding that a jurisdictional attack intertwined with the

merits of an Federal Tort Claims Act ("FTCA") claim should be treated like any other

intertwined attack, thereby making resolution of the jurisdictional issue on a 12(b)(1)

motion improper." *Montez v. Dept. of Navy*, 392 F. 3d 147, 150 (5th Cir. 2004); *see also Bell v. Hood*, 327 U.S. 678, 683-84 (1945) (reversing Court of Appeals' dismissal under Rule 12(b)(1) because "the complaint does in fact raise serious questions, both of law and fact, which the district court can decide only after it has assumed jurisdiction over the controversy."). Instead, "[w]hen the basis of federal jurisdiction is intertwined with the plaintiff's federal cause of action, the court should assume jurisdiction over the case and decide the case on the merits." *United States ex rel. Laird v. Lockheed Martin Eng'g. and Sci. Servs. Co.*, 336 F. 3d 346, 350 (5th Cir. 2003) (quoting *Eubanks v. McCotter*, 802 F. 2d 790, 792-93 (5th Cir.1986)) (emphasis added). Without question, the Motion is fatally defective on purely procedural grounds, and the Court should deny it solely for that reason.

*Second*, the Government has attempted to buttress its motion to dismiss by raising a host of factual issues that for the most part have remarkably little bearing on the question presented under a Rule 12(b)(1) motion: whether this Court has subject matter jurisdiction to hear the claim. What is certainly not permissible at this stage is to argue the factual merits of the claim — before the Government has even answered the Complaint, produced a single document, or offered a single witness for deposition. There is a time and place for factual disputes whether at summary judgment or trial. A motion to dismiss, however, is one that must assume the facts alleged, not a complete set of new factual claims paraded as a 12(b)(1) motion.

When the Motion is properly construed as a motion for summary judgment under Rule 56, it must also fail at the outset because it ignores the well-pled allegations of the Complaint and instead seeks to have the Court resolve numerous factual issues relating to the merits of Plaintiffs' case that are, at the very least, hotly disputed. Indeed, the

Government has offered its own "factual renditions" — a telling sign that this matter is not proper for resolution at this point. The Motion is unaccompanied by any Request for Judicial Notice of over a thousand pages in eleven exhibits or by any affidavit purporting to establish the Government's version of the facts. In addition, the arguments about the facts in the Motion are based on pure speculation and incomplete and often misleading snippets of information extracted from isolated pages of a massive amount of unauthenticated documents that are not amenable to judicial notice even if the Government had so requested.

One example alone illustrates the impropriety of the proffered motion to dismiss. The Government's claim that there is no subject matter jurisdiction is defeated by this Court's and the Fifth Circuit's prior determination to entertain FTCA claims against the MR-GO project in the *Graci* cases. The Government must therefore find a way of evading this seemingly controlling law of the Circuit. The Government's ploy is to raise a series of complicated factual claims by which the *Graci* holdings are no longer good law because the Army Corps after Hurricane Betsy built the "Seabrook Lock" — a storm barrier supposedly planned for the confluence of the mouth of the MR-GO and Lake Pontchartrain. Therefore, according to the Government, this post-1965 measure transformed the MR-GO into an immune "flood control project" rather than the nonimmune navigational waterway as determined in the *Graci* opinions.

This is a desperate move. The complicated factual assertion about the new as opposed to former purposes of the MR-GO project is exactly the type of contested factual issue that must be resolved at trial, or perhaps at summary judgment if the record were as clear as claimed. At a minimum, Rule 56(f) requires denial of the motion and the

opportunity for discovery by Plaintiffs.  Worse yet, what the Government neglects to

inform this Court is that the Seabrook Lock was *never built*!  Similarly, the Government

claims that new "levees" were constructed, conveniently ignoring the fact that the Army

Corps itself admitted that as late as 1988 the south side of Reach 2 of the MR-GO was

"unleveed."  We have a right to expect a lot more candor from the Department of Justice

whose mission is not merely to win cases, but to see that justice is done.  *Cf. Berger v.*

*United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative

not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern

impartially is as compelling as its obligation to govern at all; and whose interest, therefore,

. . . is not that it shall win a case, but that justice shall be done.").

　　　　If the Court chooses to reach the legal issues raised by the Motion, it will see that

the Government's arguments about immunity under the Mississippi River Flood Control

Act of 1928 ("FCA") and the discretionary function doctrine exception to the FTCA are

untenable.

　　　　*First*, the FCA does not cloak the Government with blanket immunity for tort

claims arising from its faulty design, construction, operation, and maintenance of a

navigational waterway such as the MR-GO.  The *Graci* decisions squarely hold that the

FCA immunity provision does not apply to the MR-GO because it is a navigational

waterway.  No intervening cases by the Fifth Circuit or the Supreme Court have altered the

inapplicability of the FCA to a federal navigational waterway with no flood protection

purpose.  The only decisions cited by the Government concern the extent of immunity for

the negligent maintenance or operation of *flood control projects* that results in harms

unrelated to flooding.  *See Central Green Co. v. United States*, 531 U.S. 425 (2001)

(flooding caused by subsoil seepage of water from flood control project); *United States v. James*, 478 U.S. 497 (1986) (recreational boating injury on federal flood control waterway). *Indeed, the effect of Central Green was to contract, not expand governmental FCA immunity. See Sanko Steamship Co., Ltd. v. United States*, 272 F. 3d 1231, 1232 (9th Cir. 2001) (The Supreme Court in *Central Green* "established a more restrictive test for determining sovereign immunity").

*Second*, the Government has misconstrued the facts pled in Plaintiffs' Complaint to attempt to convince the Court that Plaintiffs' case must be dismissed under the "due care exception" to the FTCA. The Supreme Court has held that the purpose of this alleged "due care" exception is to "bar[ ] tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953). Plaintiffs do not challenge the legality of the statutes authorizing the investigation, design, or construction of the MR-GO. Instead, the Complaint alleges that the Army Corps failed to satisfy the express provisions of the 1946 and 1958 amendments to the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662, in the administrative process of presenting the MR-GO project to Congress for approval and in implementation of the legislative authorization. Plaintiffs therefore allege that the Government's noncompliance with statutory laws created the hazards of the MR-GO and caused Plaintiffs' damages. Since Plaintiffs never challenge the legality or constitutionality of the MR-GO-related legislation, the "due care exception" is inapplicable.

*Third*, the Army Corps' reliance on the discretionary function exception to the FTCA is likewise misplaced. In *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), the Supreme Court expressly stated that "the discretionary function exception *will not apply*

*when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.*  In this event, the employee has no rightful option but to adhere to the directive." (Emphasis added); *accord Commerce and Indus. Ins. Co. v. Grinnell Corp.,* 280 F. 3d 566, 572 (5th Cir. 2002).  Since Plaintiffs allege that their damages were due to the Army Corps' failure to comply with statutory mandates, the Government is barred from raising the discretionary function exception as a defense to Plaintiffs' claims.

*Fourth,* even if the Government could rely on the narrowly construed exception to the broad waiver of sovereign immunity in the FTCA, the Congressional decision to build the MR-GO was the only discretionary function exercised in this case.  In contrast, the manner in which the Army Corps satisfied the Congressional directives—including decisions about route, design, materials, soil erosion prevention and protection of marshlands—involved engineering and scientific judgment not protected by the discretionary function exception to the FTCA.  *See Ala. Elec. Coop., Inc. v. United States,* 769 F. 2d 1523, 1531 (11th Cir. 1985).  The discretionary function exception therefore provides no refuge for the Government to escape liability for its negligent acts with respect to the MR-GO.

*Finally,* it bears noting that the Government has simply retread the same untenable arguments about the due care and discretionary function exceptions from its unsuccessful motion to dismiss in *Graci* back in 1966.  Those arguments were categorically rejected by Judge Herbert Christenberry who determined, after a careful analysis of the "narrowly" interpreted discretionary function exception, that "[i]n the present state of the record, this is not a proper case to be disposed of on a motion to dismiss." *See* Froeschle Decl., ¶ 123;

Exhibit N.N.  Like its predecessor, this Court should reject the Government's resurrected discretionary and due care exception arguments.

## II.    ON THEIR FACE, PLAINTIFFS' WELL-PLED ALLEGATIONS IN THE COMPLAINT DEFEAT THE GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION.

In its Motion to Dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), the Government violates a cardinal rule of federal pleadings practice that from the outset dooms its attempted dismissal.  Realizing that the detailed Complaint on its face amply establishes federal subject matter jurisdiction under the FTCA, the Government impermissibly seeks to attack the merits of Plaintiffs' cause of action by raising claims of immunity based on the Mississippi Flood Control Act of 1928 and the alleged "due care" and discretionary function exceptions to the FTCA.  Further realizing that these immunity claims are contradicted by specific allegations in the Complaint, the Government resorts to alleging facts outside the Complaint—and offering exhibits in support—in its attempt to persuade the Court on the merits of its immunity claims.  Under long-established Supreme Court and Fifth Circuit precedent, the Court must deny the Motion on procedural grounds alone.

The Government's failure to discuss the applicable legal standard for deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is understandable in light of the fact that the Government has impermissibly sought (1) to challenge the existence of a federal cause of action and (2) to convert a Rule 12(b)(1) motion into a Rule 56 motion for summary judgment by introducing facts outside the allegations in the Complaint and arguing the merits of Plaintiffs' case.  *Montez*, 392 F. 3d at 150.  ("'This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides . . . a

greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place greater restrictions on the district court's discretion. "') (quoting *Williamson v. Tucker*, 645 F. 2d 404, 415 (5th Cir. 1981)). On this basis alone, the motion must be denied under controlling Supreme Court and Fifth Circuit jurisprudence. *See Berthelot v. Boh Brothers Constr. Co., L.L.C. et al.* (O'Dwyer 05-4191), Order dated July 19, 2006 (Duval, J.) ("The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursing a claim in a court that does have jurisdiction.") (quoting *Ramming v. United States*, 281 F. 3d 158,161 (5th Cir. 2001)).

A motion to dismiss for lack of subject matter jurisdiction can be granted only if it appears certain that the plaintiff cannot prove *any set of facts* in support of his claim that would entitle plaintiff to relief. *Home Builders Assn. of Miss., Inc. v. City of Madison, Miss.*, 143 F. 3d 1006, 1010 (5th Cir. 1998) (emphasis added). The Supreme Court has enunciated a strict standard for dismissals for lack of subject matter jurisdiction when the basis of jurisdiction is also an element in the plaintiff's federal cause of action. *See Bell v. Hood*, 327 U.S. at 683-84 (reversing Court of Appeals' dismissal under Rule 12(b)(1) because "the complaint does in fact raise serious questions, both of law and fact, which the district court can decide only after it has assumed jurisdiction over the controversy."). In *Bell*, the Supreme Court held unequivocally:

> *Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.* Whether the complaint

9

> states a cause of action on which relief could be granted is a
> question of law and just as issues of fact it must be decided
> after and not before the court has assumed jurisdiction over the
> controversy.  If the court does later exercise its jurisdiction to
> determine that the allegations in the complaint do not state a
> ground for relief, then dismissal of the case would be on the
> merits, not for want of jurisdiction.

*Id.* at 682; (emphasis added); *accord Binderup v. Pathe Exchange*, 263 U.S. 291, 305-08

(1923); *Swafford v. Templeton*, 185 U.S. 487, 493-94 (1902).  More recently, the Supreme

Court reaffirmed its holding in *Bell*:  "It is firmly established in our cases that the absence

of a valid (as opposed to arguable) cause of action does not implicate subject-matter

jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case." *Steel*

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in the original).

      Citing *Bell*, the Fifth Circuit has firmly avowed that "as a general rule a claim

cannot be dismissed for lack of subject matter jurisdiction because of the absence of a

federal cause of action." *Williamson*, 645 F. 2d at 416.  "Where the defendant's challenge

to the court's jurisdiction is also a challenge to the existence of a federal cause of action,

the proper course of action for the district court . . . *is to find that jurisdiction exists* and

deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* at 415

(emphasis added).

      As this Court has recently noted, "[a] motion to dismiss pursuant to Rule 12(b)(1)

for lack of subject matter jurisdiction is analyzed under the same standard as a motion to

dismiss under Rule 12(b)(6)." *McWaters v. F.E.M.A.* 2006 WL 1851473, *7 (E.D. La.,

June 16, 2006).  Thus, in the context of Rule 12(b)(1) motion based on a "facial attack,"

the complaint is construed in the light most favorable to the plaintiff,  its well-pled

allegations must be accepted as true, and all reasonable inferences must be drawn in the

plaintiff's favor. *See Crowe v. Henry*, 43 F. 3d 198, 203 (5th Cir. 1995); 5B Wright & Miller, *Federal Practice & Procedure,* Section 1357 (2006).   As stated by the First Circuit in *Valentin v. Hosp. Bella Vista*, 254 F. 3d 358, 363 (1st Cir. 2001):

> The first way is to mount a challenge which accepts the
> plaintiff's version of jurisdictionally-significant facts as true
> and addresses their sufficiency  . . . . In performing this task,
> the court must credit the plaintiff's well-pleaded factual
> allegations (usually taken from the complaint, but sometimes
> augmented by an explanatory affidavit or other repository of
> uncontested facts), draw all reasonable inferences from them
> in her favor, and dispose of the challenge accordingly.

On its face, the Complaint alleges federal jurisdiction under the FTCA. *See* Complaint, ¶ 7. That is all that needs to be alleged to defeat this motion to dismiss. *See Maxwell v. First Nat. Bank of Monroeville,* 638 F. 2d 32, 35 (5th Cir. 1981) ("In order to determine whether the claim arises under the  . . .  laws of the United States, we must look to the plaintiff's complaint unaided by anticipated defenses *and with due regard to the real nature of the claim*.") (emphasis added); *Suthoff v. Yazoo County Indus. Dev. Corp.,* 637 F. 2d 337, 339 (5th Cir. 1981) ("[W]e must sustain federal jurisdiction if, construed in the light of the pleader's purposes, the claim is based upon the federal  . . . statutes . . . .").

Nearly 30 years ago, the District Court for the Eastern District of Louisiana—in a FTCA suit for damages from flooding by the MR-GO during Hurricane Betsy—concluded as a matter of law:

> This Court has jurisdiction over the parties and under 28
> U.S.C. Section 1346 [Defendant United States] and 28 U.S.C.
> Section 2571 et seq. (Federal Tort Claims Act) *has subject
> matter jurisdiction over this suit by plaintiffs against the
> United States for damages allegedly received as a result of
> defendant's construction of the MRGO.*

*Graci v. United States*, 435 F. Supp. 189, 195 (E.D. La. 1977) (emphasis added).  Once again, in this FTCA case similarly alleging hurricane-related damages caused by the MR-GO, the proper course is to find federal jurisdiction and allow the case to proceed to discovery.

The Complaint sets forth three categories of allegations relevant to the pending motion:

(1) the Army Corps was negligent in the design, planning, construction, maintenance, and operation of the MR-GO; *see* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102;

(2) the flooding of Plaintiffs' homes and business was caused by the defective MR-GO, and there are no allegations that Plaintiffs' damages were caused by inadequate or failed federal flood control facilities; *see* Complaint, ¶¶ 12, 14-15, 17, 20, 24, 43, 50, 55, 59, 74 – 77, 94, 102, 104-108, and 110-113; and

(3) the Army Corps violated federal law in the planning, investigation, design, and construction of the MR-GO; *see* Complaint, ¶ 63.

As detailed below, these allegations on their face defeat the Motion to Dismiss as a matter of law, and the Court should proceed no further.

Similarly, the Government—in the guise of an attempted dismissal for lack of federal jurisdiction under Rule 12(b)(1)—cannot defeat the Plaintiffs' right to seek discovery and a trial on the merits by making what is in reality a motion for summary judgment.  All of the Government's "evidence"[1] must be disregarded at this early stage if

---

[1] Plaintiffs object to all but one of the exhibits that the Government has cited in its Motion. *See* Plaintiffs' Evidentiary Objections to Government Exhibits.

the resolution of the jurisdictional question is dependent upon the resolution of factual

questions (*i.e.*, the validity of the immunity defenses) going to the merits of the FTCA

cause of action. *Montez, supra*, 392 F. 3d at 150. Therefore, this Court "must assume

jurisdiction and proceed to the merits." *Id.*[2]

Alternatively, if the Court treats the motion to dismiss as a "factual" attack on

federal jurisdiction because it goes beyond the allegations in the Complaint and offers

extrinsic evidence, the motion must still be denied. *Valentin, supra*, 254 F. 3d at 363. As

demonstrated below, the Government has offered an extraordinarily selective rendition of

the critical facts bearing on the immunity issues, has misled the Court on material facts,

---

[2] Moreover, the Government has improperly used Rule 12(b)(1) to assert an affirmative
defense of immunity with respect to the FCA claim. In the recent decision of *Arbaugh v.
Y&H Corp.*, the Supreme Court articulated a bright line standard as to whether the
assertion of sovereign immunity is an element of plaintiff's claim making it inappropriate
for a 12(b)(1) motion:

> If the Legislature clearly states that a threshold limitation on
> a statute's scope shall count as jurisdictional, then courts and
> litigants will be duly instructed and will not be left to wrestle
> with the issue. *But, courts should treat the restriction as
> nonjurisdictional in character when Congress does not rank
> a statutory limitation on coverage as jurisdictional.*
> Applying that readily administrable bright line here yields
> the holding that Title VII's 15-employee threshold *is an
> element of a plaintiff's claim for relief, not a jurisdictional
> issue.*

*Arbaugh v. Y&H Corp*, 126 S. Ct. 1235, 1237 (2006) (emphasis added); *see also* 5B
Wright & Miller, *Federal Practice & Procedure*, Section 1271 at 594-604 & n.57 (2006).
("As far as the judicial precedents are concerned, the following matters have been held by
federal courts to be affirmative defenses under Rule 8(c) . . . various forms of immunity.")
(citing *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F. 3d 134, 150-51 (2d
Cir. 2003) (defense based on implied repeal doctrine is type of immunity that must be pled
affirmatively rather than lack of subject matter jurisdiction that can be raised any time)).
Under *Arbaugh*, the fact that Congress did not state in the FCA that immunity is a
jurisdictional issue renders it a *defense*, and therefore barred as a basis for a Rule 12(b)(1)

and has ignored clearly contrary evidence. At a minimum, Plaintiffs establish that numerous material facts are genuinely disputed, thereby precluding the Court from resolving these factual differences at this preliminary stage. Plaintiffs have an absolute right to move forward with discovery, at the end of which the Government can bring its motion for summary judgment. *See* Plaintiffs' Request for Discovery. For now, however, the well-pled allegations of the Complaint are more than sufficient to defeat a properly-construed Rule 12(b)(1) motion.

To the extent that the Court decides to consider the Government's *de facto* motion for summary judgment, the Government has utterly failed to establish the requisite absence of disputed issues of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("The movant has the burden of showing that there is no genuine issue of fact . . . ."); *Fontenot v. Upjohn Co.*, 780 F. 2d 1190, 1195 (5th Cir. 1986) ("Rule 56 requires the movant to establish in some fashion the absence of any issue of material fact . . . .").

As demonstrated by the discussion of the facts below, Plaintiffs—even without the benefit of formal discovery—can establish the existence of numerous genuine issues of disputed fact. Among other things, the Government has not been candid with the Court about the legislative history of the MR-GO; the manner in which the commercial waterway was planned, designed, and constructed; the proper characterization of the MR-GO; the total absence of any flood control purpose or features in its original incarnation; the existence, nature, and location of federal flood control measures built after 1965 in the vicinity of the MR-GO; and the violation of federal statutes in the planning, investigation,

---

motion. Thus, this presents yet another basis for the Court to deny the Motion as to the Government's claim of immunity under the FCA based on its procedural impropriety.

design, and construction of the MR-GO.   In light of Plaintiffs' absolute right to discovery

before any summary judgment motion is decided[3] and the intensely factual nature of

these immunity issues,[4] the Court must deny the motion to dismiss on this additional ground.[5]

## III.    FACTS

The 45-page Complaint sets forth in detail the basis for Plaintiffs' claims against the

Army Corps concerning the design, construction, maintenance, and operation of the MR-

GO.  In the discussion below, we highlight certain factual allegations that on the face of

the Complaint defeat the Government's immunity claims.  In addition, assuming the Court

decides to address the merits of the Government's "factual attack" on the FTCA cause of

action, we discuss additional information that is relevant to the resolution of the immunity

issues and demonstrate that the Court should deny the motion because of the existence of

substantial disputed issues requiring discovery.[6]

---

[3] *See* Rule 56(f); *Anderson., supra,* 477 U.S. at 257; *Brown v. Miss. Valley State Univ.,* 311 F. 3d 328, 333 (5th Cir. 2002).

[4] In *Central Green Co. v. United States,* 531 U.S. 425 (2001), the most recent Supreme Court opinion on the Mississippi Flood Control Act of 1928 immunity, the Court remanded the case to the District Court to conduct a *factual inquiry* into the nature of the water which damaged the plaintiff's property. *See Central Green,* 531 U.S. at 437. Likewise, with respect to the FTCA and a claim of discretionary function, the Sixth Circuit has stated: "In some cases, . . . fact-finding on the nature of the acts complained of may be necessary before the court has an adequate basis to decide whether they are 'discretionary'." *Miller v. United States,* 583 F. 2d 857, 866 (6th Cir. 1978).

[5] The Government has not asserted that the Plaintiffs failed to exhaust their administrative remedies, and they have adequately alleged compliance in Paragraphs 10, 13, 14, 18, 21, and 22. Since"[i]t is well-settled that these limitation periods are jurisdictional," *Flory v. United States,* 138 F. 3d 157, 159 (5th Cir. 1998), the Government has waived any jurisdictional challenge on this ground. *See e.g., Davila-Alvarez v. Escuela de Medicina Universidad Central del Caribe,* 257 F. 3d 58, 67 (1st Cir. 2001) ("[T]he exhaustion requirement is, in all events, intended for the government's protection, and, like most other exhaustion requirements, can be waived by the intended beneficiary.").

[6] In the accompanying Declaration of Nina Froeschle ("Froeschle Decl.") and the Declaration of Dr. Paul Kemp ("Kemp Decl."), Plaintiffs summarize the evidentiary basis

15

A.   **The Complaint Alleges In Detail Two Fundamental Defects**
     **In The MR-GO Attributable To The Army Corps' Negligence**

The Complaint clearly alleges that the Army Corps was negligent in the design,

construction, maintenance, and operation of the Mississippi River-Gulf Outlet ("MR-GO")

and that this negligence created

> two fatally defective conditions known by [the Army Corps]
> for decades:  (1) the destruction of the marshlands
> surrounding the MR-GO that intensified a huge east-west
> storm surge resulting in the inundation of most of  New
> Orleans; and (2) the funnel effect stemming from the MR-
> GO's faulty design that accelerates the force and strength of
> the storm surge to lethal proportions.

Complaint, ¶ 1; *see also* Kemp Decl., ¶¶ 11-31; Froeschle Decl., ¶¶ 83-92 and 96-98.

The Complaint details the nature and effect of these two defective conditions.

*First*, with respect to the MR-GO destroying over 101 square miles of marshlands that

acted as a natural barrier against storm surge from the Gulf of Mexico:

> Equally important, in the design and construction of the
> waterway, the Army Corps failed to account for the
> devastation of the wetlands that the MR-GO, by its design,
> would facilitate.  In a vicious cycle, destruction of the
> surrounding wetlands not only altered adversely storm surge
> dynamic with respect to hurricanes such as Katrina, but
> denuded a critical natural buffer against storm surge . . . .

Complaint, ¶ 50.

The Complaint further contends the Army Corps failed to coordinate its

investigation and planning of the MR-GO with the Fish and Wildlife Service of the United

States Department of Interior ("DOI"), *as required by statute*, and the Army Corps ignored

the DOI's pointed warnings about the MR-GO's significant adverse effect on the adjacent

---

for their serious factual disputes with the Government bearing on the immunity issues and
the need for discovery as authorized by Rule 56(f).

marshlands. Specifically, Paragraph 63 references an April 1958 DOI report to the Army

Corps, entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi

River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*

(the "*Fish & Wildlife Report*"):

> The U.S. Fish and Wildlife Service initiated preliminary
> studies on the project in 1957. Secretary Seaton, Department
> of the Interior, in a letter of September 23, 1957, informed
> the Secretary of the Army that . . . *the project plans had not
> been investigated by fish and wildlife conservation agencies,
> as contemplated in the Wildlife Coordination Act of August
> 14, 1946* (60 Stat. 1080), and requested the Corps of
> Engineers to bring all phases of project planning into
> balance.

Complaint at ¶ 63 (emphasis in the original); *see also* Froeschle Decl., ¶¶ 83-92.

The next five paragraphs of the Complaint describe the *Fish & Wildlife Report's*

predictions concerning the MR-GO's destructive impact on the marshlands. *See*

Complaint, ¶¶ 64-69. Despite the DOI's request for "further study" of the MR-GO's effects

on this ecologically-valuable property, "the Army Corps never gave the DOI the

opportunity to conduct such additional testing, but rather continued with the construction

of the MR-GO." *Id.*, ¶ 69. In addition, "[i]n 1958 *it was well known by the Army Corps

and others that the wetlands served as nature's protective buffer against storm-driven

water surges threatening New Orleans and its environs.*" *Id.*, ¶ 70 (emphasis added). As it

turned out, the Army Corps' rush to construct the MR-GO destroyed "over 65,000 acres of

hurricane buffering wetlands . . . ." *Id.*, ¶ 57.

*Second*, the Complaint also alleges details about "the funnel effect stemming from

the MR-GO's faulty design that accelerated the force and strength of the storm surge to

lethal proportions." Complaint, ¶ 1; *see also*, Kemp Decl., ¶¶ 11-19. Thus, at Paragraph

17

49, Plaintiffs allege "[t]he MR-GO's design was flawed . . . [because] the Army Corps

failed to take account of the waterway's inherent and known capability of serving as a

funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the

storm surge's force . . .  ."   Plaintiffs further explain the manner in which this design

defect contributed to the flooding of the New Orleans area:

> As was predicted long before Katrina, the MR-GO amplified
> Katrina's surge speed and force, much as the nozzle of a
> water hose funnels a wide flow of water into a bottleneck,
> creating a vastly accelerated and more forceful jet from an
> otherwise slow and limpid flow of water.

Complaint, ¶ 73.

As a result of this negligent design, the "MR-GO is a straight arrow pointed at

Greater New Orleans with no barriers or other means to slow down the storm-driven

surges." *Id.* ¶ 3; *see also* Kemp Decl., ¶¶11-19.

### B.   Plaintiffs' Complaint Alleges That The MR-GO Was Not A Federal Flood Control Project

In direct contravention of the Government's claim that the MR-GO is a federal

flood control project (Motion at 27-28), the Complaint unequivocally alleges that the MR-

GO was never planned, authorized, or designed to be anything other than "a navigable

waterway," "a deep-water channel," " a navigable alternative to the sometimes unnavigable

Mississippi River," and "a navigable waterway for vessels of all types . . . requiring access

to the docks on the Industrial Canal."  Complaint, ¶¶ 35, 36, 38.  Indeed,

> [T]he United States Government has acknowledged that the
> purpose of the MR-GO is that of a 'navigation aid,' as
> opposed to a flood control project *See Graci v. United States*,
> 301 F. Supp. 947, 949 (E.D. La. 1969) (*'Graci I'*).
> Consequently, this action is not barred by any of  the
> immunity provisions of the Mississippi Flood Control Act of
> 1928 . . . .

18

Complaint, ¶ 39

Paragraph 40 also alleges that nearly 30 years ago, this Court made a "binding" finding of fact in *Graci v. United States*, 435 F. Supp. 189, 192 (E.D. La. 1977) ("*Graci IV*") that "the Army Corps constructed the MR-GO as an aid to navigation (distinguished from a flood control project) pursuant to a legislative mandate of the U.S. Congress . . . ." *See also* Complaint, ¶ 98 ("The MR-GO was built as an aid to navigation, not as, or in connection with, a flood control project, and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO as was admitted by Defendants and determined by the Fifth Circuit in *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971))."

Paragraphs 38 through 42 describe the navigational and commercial purposes served by this waterway. Simply put, the MR-GO was never intended to serve a flood control function. Complaint, ¶ 41 ("A 1951 report submitted by the Army Corps to the House of Representatives concerning the proposed MR-GO reflects the purely commercial interests driving this project while excluding any discussion of flood control purposes."); *id.*, ¶ 42 ("Contemporaneous comments during the Senate debate focus on the project's potential commercial benefits while again omitting any reference to flood control."). *See also* Froeschle Decl., ¶¶ 4-7 and 62-76. Not only do these allegations refute any argument that the MR-GO was authorized as a flood control project, the Government's extrinisic evidence does not contravene these allegations.

**C.    Plaintiffs' Complaint Alleges That The MR-GO, And Not Any Federal Flood Control Facilities, Caused Their Damages**

The Government has conveniently ignored the fact that Plaintiffs have alleged that the cause of their damages was the MR-GO, not the failure of the Army Corps' levees or flood control protection system. As specifically alleged in the Complaint:

> Defendant United States, through Defendant Army Corps, was responsible for the design, construction, operation, maintenance, upkeep, and repair of the MR-GO . . . . The Defendants breached that duty by negligently designing, constructing, maintaining, and repairing the MR-GO . . . . The Defendants' breach of their duties foreseeably and proximately caused, and was a substantial contributing factor in, destruction and damage suffered by residents of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, specifically including the damages suffered by Plaintiffs to this action as described above.

Complaint, ¶¶ 91-94; *see also id.*, ¶¶ 1, 6, 10, 76.[7]

To the extent the Government claims that Plaintiffs' case hinges on allegations concerning the failure of federal flood control facilities, this is a mischaracterization of Plaintiffs' case. A plaintiff is the master of her complaint, including the factual and legal theories. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003) ("'The [well-pleaded-complaint] rule makes the plaintiff the master of the claim . . . '.") (citations omitted); *Becker v. Tidewater, Inc.*, 405 F. 3d 257, 259 (5th Cir. 2005) ("[I]t is well settled that the plaintiff is master of his complaint . . . ."). Indeed, as the Supreme Court observed in *Conley v. Gibson*, 355 U.S. 41, 48 (1957), "[t]he Federal Rules reject the approach that

_____

[7] Plaintiffs make numerous other allegations that Plaintiffs' damages were caused only by the MR-GO. *See, e.g.*, Complaint, ¶ 1 ("This action results from one of the most predictable and preventable catastrophes in American history . . . caused by the United States Army Corps of Engineers' negligent design, construction, maintenance, and operation of the Mississippi River Gulf Outlet . . . ."); *id.*, ¶ 6 ("The Plaintiffs' losses were suffered as a direct result of the Defendants' breach of their legal duty to adequately design, construct, maintain, and operate the MR-GO."); *id.* ¶ 10 ("NORMAN ROBINSON . . . owned and resided in a house . . . destroyed by floodwaters from the MR-GO . . . ."); *id.*, ¶ 76 ("[T]he Army Corps reluctantly acknowledged . . . the possibility that MR-GO's design exacerbated Katrina's storm surge and subsequent flooding.").

pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

Nowhere does the Complaint describe or characterize the MR-GO as a navigable waterway that also includes federal levees, floodwalls, or other flood control facilities that were negligently designed or constructed or were otherwise defective or did not perform to design standards during Katrina.[8]  Instead, the gravamen of the Complaint is the direct contribution of storm-driven surge waters in the MR-GO to the flooding of Plaintiffs' neighborhoods.  In other words, regardless of the supposed presence of any levees and floodwalls along the MR-GO,[9] or whether these storm protection systems were adequately designed, constructed, and maintained, Plaintiffs' homes and business would still have been devastated by the surge waters from the MR-GO.  *See* Kemp Decl., ¶¶ 4-32. Plaintiffs intend to prove that the flooding of Plaintiffs' neighborhoods would have occurred regardless of the presence or absence of federal flood control structures and that it was the MR-GO's storm-driven waters that caused their losses.  *See* Kemp Decl., ¶¶ 4-32, Froeschle Decl., ¶ 105-118.

This point is made crystal clear in the very first paragraph of the Complaint:

> *Absent the exacerbating effect of the MR-GO*, aptly named the 'Hurricane Highway,' Katrina would have been an endurable event in New Orleans history rather than the

---

[8] In fact, the Complaint notes that the Army Corps maintains that "the design and function of New Orleans' floodwalls were adequate."  Complaint, ¶ 80.

[9] As discussed in Section III.F, *infra*, there are numerous issues of seriously-disputed facts about the existence, nature, and location of any federal flood control works in the vicinity of the MR-GO, not to mention whether any such hurricane protection systems are even part of the MR-GO.  *See* Froeschle Decl., ¶ 9-19 and 105-116.

> obliterating force that destroyed lives and businesses,
> displaced thousands of people, and devastated much of a
> great American city known for its historic grace and
> beauty.[10]

Complaint, ¶ 1; *see also* Kemp Decl., ¶ 4-32.

The quintessence of Plaintiff's case is further summarized in Paragraph 74:

> Eyewitness accounts as well as scientific studies indicate that
> the MR-GO contributed significantly to the drowning of
> large portions of Greater New Orleans. The *flawed design,*
> *poor construction, and inadequate repair and maintenance*
> *of the MR-GO—as well as the resulting destruction of the*
> *protective adjoining wetlands*—was a substantial factor in
> causing the flooding. Indeed, *but for the Army Corps'*
> *negligence*, most or all of the severe flooding of the
> Plaintiffs' neighborhoods would not have occurred.

Complaint, ¶ 74 (emphasis added).

It is therefore indisputable that the Complaint alleges that the MR-GO "foreseeably

and proximately caused, and *was a substantial contributing factor* in, the widespread

destruction and damage . . . suffered by Plaintiffs . . . ." Complaint, ¶ 94 (emphasis added).

That there may have been other concurring causes that were substantial contributing

factors in causing flooding (such as breaches of levees or floodwalls) does not negate that

fact that the MR-GO itself was a legal cause. Under Louisiana law, there can be more than

one legal cause of injury or loss so long as each was—as Plaintiffs have alleged about the

---

[10] Similarly, Plaintiffs allege that "the MR-GO contributed to the flooding of Plaintiffs'
neighborhoods *by vastly accelerating* the destruction of the coastal habitat protecting
Greater New Orleans." Complaint, ¶ 84 (emphasis added); *see also id.*, ¶ 85 ("The
destruction of that bulwark [against storm surge] by the Army Corps altered storm surge
dynamics in Lake Borgne and compromised the area's natural ability to mitigate the
destructive power of storm surge, *thus further exacerbating* the MR-GO's already perilous
'funneling' effect."(emphasis added); *id.*, ¶ 88 (The Army Corps' "engineers had actual
notice from the outset of constructing MR-GO that its design *would only exacerbate* a
hurricane's power and destructive effect.") (emphasis added).

MR-GO—a substantial contributing factor. *See Bonin v. Ferrellgas, Inc.*, 877 So. 2d 89, 94 (La. 2004) ("[W]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.").[11] Accordingly, Plaintiffs are not seeking damages for any Army Corps negligence with respect to any breaches or failures of levees, floodwalls, or other flood control structures.

In the course of recounting what happened that tragic day in the aftermath of Hurricane Katrina, the Complaint refers to some facts about the failure, breaches, and overtopping of levees and floodwalls in New Orleans and St. Bernard Parish. *See, e.g.,* Complaint, ¶ 75 (collapse of "earthen levees" by overtopping); ¶¶ 77-79 ("overtopping led to many of the levee breaches"); ¶ 80 (failure of floodwalls due to storm surge acceleration); ¶ 102 (breaches and failures of the spoil banks, floodwalls, and/or levees along the MR-GO). As demonstrated above, however, Plaintiffs are not alleging that their damages were caused by negligently designed, constructed, or maintained federal flood control works, and the references to failures and overtopping of levees was not intended to assert a basis for the Army Corps' liability. To avoid any confusion on this issue, however, Plaintiffs, with the Court's permission, will file a First Amended Complaint omitting these references after the anticipated denial of the Motion to Dismiss.[12]

---

[11] Under Louisiana Law, even if levee failures were involved in causing Plaintiffs' damage to some degree, "an intervening cause will not serve to relieve from liability where prior negligence was the efficient cause of the injury, nor where the intervening cause is set in operation by an original wrongful act, nor where the intervening cause need reasonably have been anticipated." *Pouncy v. Temple, Royal Indem. Co., Intervenor*, 41 So. 2d 139, 146 (La. Ct. App. 1949).

[12] Plaintiffs could file a First Amended Complaint as a matter of right in lieu of this Opposition to the Motion to Dismiss since the motion is not a responsive pleading. *See* Federal Rule of Civil Procedure 15 (a) ("A party may amend the party's pleading once as a matter of course before a responsive pleading is served."); *McKinney v. Irving Indep.*

23

**D.      Plaintiffs Are Not Challenging The Legislation Authorizing The MR-GO**

According to Defendants, "the Complaint acknowledges MR-GO was 'constructed under the authority of Public Law 455' . . . . By challenging the problems that plaintiffs' claim are 'inherent' in implementation of MR-GO, including its design, construction, operation, and maintenance, the plaintiffs are attacking the execution of a federal law." Motion at 36. In sum, the Government contends that the Complaint is an *implied* attack on the statute authorizing MR-GO's construction. This is simply not true.

The Government's argument is based on a misreading, instead of the actual language, of the Complaint.[13] Nowhere do Plaintiffs challenge the legislation authorizing MR-GO's construction or Congress' authority to legislate on this subject.

Not only are Plaintiffs not attacking the federal law by which the MR-GO was authorized, the Government's argument is predicated on an inaccurate and misleading

---

*School Dist.*, 309 F. 3d 308, 315 (5th Cir., 2002). However, since these and any other changes would be minor and solely for the purposes of clarification, they would not materially alter the allegations concerning federal jurisdiction or afford the Government any additional arguments that have not already been advanced in the pending Motion. Therefore, in the interests of judicial economy and saving precious time for Plaintiffs, who are eager to get a determination of their damages claims on the merits, Plaintiffs urge the Court to determine these fully-briefed immunity issues at this time. *See* Fed. R. Civ. Proc. 83 (b) ("A judge may regulate practice in any manner consistent with federal law [and federal rules] . . . ."); 12 Wright & Miller, *Federal Practice & Procedure Civil*, Section 3155 (2006) ( Federal judge has discretion "to decide the unusual or minor procedural problems that arise in any system of jurisprudence in light of the circumstances that surround them and of the justice of the case . . . .").

[13] Paragraph 95 of the Complaint alleges: "Congress charged the Army Corps with the task of the design, construction, operation, maintenance, and repair of MR-GO, and *the Army Corps compliance with this Congressional mandate* did not involve acts of a discretionary function. Moreover, the Army Corps had *an obligation to design, construct, operate, maintain, and repair the channel in such a way as to avoid having it pose as threat to residents like Plaintiffs and serve as a 'hurricane highway' for surge water directed at Orleans and St. Bernard Parishes.* (Emphasis added.)

discussion of the procedure by which this project was authorized. *See* Froeschle

Decl., ¶¶ 42-56, 62-66, and 77. Simply put, Congress asked the Army Corps to use its

engineering judgment to investigate the possibility of constructing "a" waterway between

the Mississippi River and the Gulf of Mexico, the Army Corps returned with its proposal

for the navigation channel, and Congress approved the Army Corps' recommendation.

Congress authorized the Corps to investigate and report on the viability of a waterway

between the Mississippi River and the Gulf of Mexico "*by the most practicable route.*" [14]

In response, the Army Corps prepared two reports. *See* H. R. Doc. No. 71-46 (1930)

(Froeschle Decl., Exhibit I) and H. R. Doc. No. 245 (1951) (Froeschle Decl, Exhibit N).

Thereafter, Congress passed the Act of March 29, 1956 to "Authorize Construction of the

Mississippi River Gulf-Outlet," Pub. L. 84-455, 70 Stat. 65 (1956) (Froeschle Decl.,

Exhibit T), which simply provided for "the Mississippi River-Gulf outlet to be prosecuted

under the direction of the Secretary of the Army and supervision of the Chief of Engineers,

substantially in accordance with the recommendation of the Chief of Engineers contained

in House Document Numbered 245." *See* Froeschle Decl., Exhibit U.

---

[14] To the extent that the Army Corps claims that Congress dictated the route of the MR-GO, there is a serious factual dispute on this issue. Section 2 of the River and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945)—known as the MR-GO Planning Law—directed that the Army Corps coordinate its efforts with federal and state environmental agencies and investigate and report to Congress "the best available route or routes" for the proposed waterway. See Froeschle Decl., ¶¶ 53-56, Exh. L at 11-12 & 30. There is also substantial evidence that the Army Corps did not build the MR-GO according to the route that it told Congress would be followed. For example, instead of building a channel *parallel* to the Gulf Intracoastal Waterway ("GIWW"), it tied the upper Reach 2 stretch of the MR-GO directly into the GIWW, thereby enhancing the storm surge effect and pressure. In addition, the waterway did not proceed from the GIWW to Chandeleur Sound but rather deviated significantly to Breton Sound. See Froeschle Decl., ¶¶ 31-35, 64-65, and 67 and Exhibits O at 43; P at 5; and MM at 9.

Thus, the MR-GO's legislative history reveals that Congress asked the Army Corps to use its professional acumen to find the best route for a navigable channel between the Mississippi River and the Gulf of Mexico.  As alleged in the Complaint (*see* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102*)*, and as further reflected in the documents referenced in this Opposition, Plaintiffs' negligence claims are predicated *solely* on the Army Corps' incompetence during the project's investigation, planning, construction, maintenance and operational phases.  *See* Froeschle Decl., ¶¶ 4-41.  None of these allegations of negligence are predicated on the authority of Congress to enact legislation for the creation of a shipping canal; nor do any implicate any flood control activities of the Government.

### E.      The Army Corps Violated Two Federal Statutes When Planning, Designing, and Constructing the Waterway

The Complaint alleges that the Army Corps violated federal law in the planning, investigation, design, and construction of the MR-GO.  Specifically, the Army Corps did not defer the MR-GO's construction to allow the U.S. Fish and Wildlife Service ("FWS") to conduct the environmental study required by the Fish and Wildlife Coordination Act of 1946.  *See* Complaint, ¶¶ 63-64.[15]  This study was essential because the FWS, in its preliminary assessment, warned of permanent damage to the precious marshlands "from construction and continuous maintenance operations" of the MR-GO.  *Id.*, ¶ 67.

---

[15] The Fish and Wildlife Coordination Act, as amended at 16 U.S.C. Section 662, required that the Army Corps allow the FWS to conduct environmental studies on the effects of the MR-GO, mitigation measures, and alternatives. Froeschle Decl., ¶ 57-61 and 81-82.  The evidence will show that the FWS wanted to conduct a four-year ecological study before any construction on the MR-GO, but the Army Corps refused to wait for the legally-mandated study. The FWS, like the Louisiana Wild Life and Fisheries Commission, urged that the Army Corps change the route through the vulnerable wetlands, but the

In addition, since the filing of the Complaint, Plaintiffs' counsel have learned, and discovery will show, that the Army Corps violated a second federal statute in its haste to build the MR-GO. *See* Froeschle Declaration, ¶¶ 26 and 62-63; Exhibits L at 55 and O at 22 (Class Action Complaint for Injunctive and Declaratory Relief in *Savoy v. United States,* Civ. Action No. 06-3552, ¶¶ 73-80, 117-30, 167-190). This law—the River and Harbor Act of 1945 (P.L. 79-14, 50 Stat. 10 (March 2, 1945)—required the Army Corps to involve each of the "affected states" in the investigation and planning phases of the MR-GO and to coordinate its investigations and planning with the U.S. Department of Interior (the "DOI"). Under the FWCA, the Army Corps was also required to consult with the LWLFC. The evidence will show that the Army Corps violated the express terms of the River and Harbor Act of 1945 and the FWCA by not securing the assistance, input, advice and recommendations, suggestions or coordination from, of, or with the DOI or LWLFC before launching construction of the MR-GO. *See* Froeschle Decl., ¶¶ 62-63; Exhibit O at 62-63.[16]

---

recommendation fell on deaf ears. *See* Froeschle Decl., ¶¶ 83-98; Exhibits Y at 22-23, AA, BB at 1 and CC at 4, 11.

[16] As the evidence will show, both the federal and state wildlife and fisheries agencies urged that the Army Corps not pursue the proposed route through the environmentally-sensitive wetlands, but the Army Corps totally ignored these pleas, thereby creating a salinity influx and erosion that caused the loss of massive amount of surge-buffering wetlands that Plaintiffs allege significantly contributed to the flooding of their neighborhoods. *See* Froeschle Decl., ¶¶ 83-98; Exhibits Y at 22-23, AA, BB at 1 and CC at 4, 11; Kemp Decl., ¶¶ 20-30.

**F.**     **The Government's Documents Fail to Establish That Any of the MR-GO Levees or the Seabrook Dam and Lock Were Actually Constructed.**

The Government argues that decisions rendered by this Court and the Fifth Circuit in the post-Hurricane Betsy *Graci* cases[17] — holding that Government is not immune from liability for flood damages caused by the MR-GO — no longer apply because federal "levees" were built along the MR-GO in the intervening 40 years. *See* Motion at 22-23.  It further contends that the MR-GO was intended to serve as an integral part of a flood control plan from its inception because of the proposed construction of the Seabrook Lock at the confluence of Lake Pontchartrain and the Industrial Canal.  Motion at 4.  However, the Government's exhibits do not establish that such structures were ever actually built, and in any event, there are substantial issues of disputed fact about any post-1965 federal flood control works along the MR-GO.  *See* Froeschle Decl., ¶¶ 9-25.

**1.**     **The Phantom Seabrook Lock Was Never Constructed**

The Government claims that the MR-GO was, in reality, a flood control project at least after 1965.  The linchpin of this argument is its claim that Congress approved Army Corps plans in 1965, while the MR-GO's construction was being completed, to construct "a lock and dam at Seabrook, near the north end of the Industrial Canal."  Motion at 12.  This assertion is not only dispelled by the location of the lock — *i.e.*, at the "north end of the Industrial Canal" rather than in the MR-GO itself — but it is totally refuted by the Government's own evidence revealing that *this proposed flood control structure was never constructed.  See* Froeschle Decl., ¶¶ 16 & 118; Exhibit LL at 4.

---

[17] *See Graci v. United States*, 301 F. Supp. 947 (E. D. La. 1669) ("*Graci I*"); *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971) ("*Graci II*"); *Graci v. United States*, 472 F. 2d 124 (5th Cir. 1973) ("*Graci III*"); and *Graci v. United States*, 435 F. Supp. 189 (E.D. La. 1977) ("*Graci IV*").

Specifically, at page 12 of its Motion, the Government asserts:

> The Corps planned to correct the 'adverse conditions
> resulting from construction of the MR-GO' (*i.e.*, the
> problems of which it was aware -- erosion in the Industrial
> Canal and the GIWW, saline intrusion into Lake
> Pontchartrain, and hazardous currents in the Industrial
> Canal) *by constructing a lock and dam at Seabrook*, near the
> north end of the Industrial Canal. . . . The flood control
> project plan called for strengthening and enlarging the lock
> so that it *would also serve a flood control purpose*,
> preventing storm surge from entering Lake Pontchartrain
> after passing through the MR-GO and the Industrial Canal.
> (Emphasis added).[18]

The Seabrook flood control facility is so important to the Government's desperate attempt

to escape *Graci's* binding holdings that it is referred to no less than seven times in four

pages. Motion at 4, 12, 13 and 26.

Remarkably, the Government never discloses to the Court in its Motion whether

the Corps actually built this lock and dam.[19]  In the complete submission of the

Government's Exhibit 7, the *Lake Pontchartrain, Louisiana, and Vicinity Hurricane*

---

[18] In support of this statement, the Government cites the H. R. Doc. No. 89-231 (Exhibit 6
to Defendant's Motion) at 17, 60, 63 and 232.  However, H. R. Doc. No. 89-231 (1965)
(the "*Lake Pontchartrain Report*") is only the plan for the Lake Pontchartrain and Vicinity
Hurricane Flood Protection Project (the "Lake Pontchartrain Project") submitted to
Congress for authorization. (Froeschle Decl., ¶103-104; Exhibit EE at 25 & 41).

[19] There is no mystery that Congress did not authorize the Seabrook Lock. The River and
Harbor Act and Flood Control Act of 1965, P.L. 89-298, 79 Stat. 1073 (October 27, 1965)
states:

> The project for hurricane-flood protection on Lake Pontchartrain,
> Louisiana is hereby authorized substantially in accordance with the
> recommendations of the Chief of Engineers in House Document
> Numbered 231, Eighty-ninth Congress, *except that* the recommendations
> of the Secretary of the Army in that document shall apply with respect to
> *the Seabrook Lock feature of the project*.

Froeschle Decl., ¶ 124 (emphasis added).

29

*Protection Project: Reevaluation Study* plainly shows that this the Seabrook Lock *was not constructed*. The full text states at page 2:

> As presented herein, the most feasible plan for providing hurricane protection was determined to be a high level plan. The plan would provide for . . . *deferring construction of the proposed Seabrook lock* until its feasibility as a feature of the Mississippi River-Gulf Outlet *navigation project* can be determined.

(Froeschle Decl., ¶ 16; Exhibit LL at 4) (emphasis added).[20]

If the Government was not candid with the Court about the fact that the Army Corps never built the Seabrook Lock, what does this say about its other assertions concerning flood control structures allegedly built along the MR-GO after 1965?

### 2. The Government Also Does Not Establish Whether or Where Actual Flood Control Levees Along the MR-GO Were Ever Built

According to the Government, the Lake Pontchartrain Project also provided for the construction of "levees" along the MR-GO in the years between Hurricane Betsy and Hurricane Katrina. Specifically, the Defendants assert that the Lake Pontchartrain Project "planners specified that flood control levees be built on MR-GO's southern shores . . . ." Motion at 14. In support of this statement, the Government cites pages 2, 9, 18, 64-65, 81, 84, 224 and Plate A-1 of the original 1965 *Lake Pontchartrain Report*, stating that such levee construction was authorized. For example, page 2 of the *Lake Pontchartrain Report*—the second page of the Chief Engineer's report—states "[f]or the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of

---

[20] This portion of Exhibit 7 – containing the crucial information that the Seabrook Lock was deferred, rather than constructed – not only was not acknowledged in the Government's Motion, but also was not even contained within the selected portion of Exhibit 7 that was electronically filed. The Court could discover this information only by going to the complete copy of Exhibit 7 – a 259-page document – that was provided via mail and reading through it.

*new and enlarged levees* extending generally along the southerly banks of the Gulf

Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou

Dupre . . . ." Exhibit EE at 26; Froeschle Decl., ¶ 104 (emphasis added). Similarly, the

Government also refers to "[t]he earthen levees that line the MR-GO and the GIWW . . . ."

Motion at 15.

The Army Corps itself, however, has admitted that as late as 1988 the south side of

Reach 2 of the MR-GO was "unleveed." *See* Exhibit 5 to Defendant's Motion (*Mississippi*

*River Gulf Outlet, St. Bernard Parish, Louisiana: Reconnaissance Report on Channel*

*Bank Erosion*) at 10 & 35 ("Most of the Mississippi River-Gulf Outlet is experiencing

severe erosion along its *unleveed banks*. . . . The *unleveed MR-GO south bank*, from mile

47 to mile 23, fronts a dredged material disposal area whch parallels the channel and is

approximately 2000 feet deep (roughly 6,000 total acres.") (emphasis added). This

devastating admission creates a significant factual issue. Moreover, the Government's

papers, however, fail to establish that these "new and enlarged levees" along the south side

of the MR-GO were ever constructed. Likewise, there is a serious factual issue whether

any "earthen levees" along the MR-GO were built as flood control measures. *See*

Froeschle Decl., ¶¶ 9-15, 105-116.

The Government also blithely concludes that "*[a]s constructed*, this levee extended

east and south along the bank of MR-GO for several miles beyond Bayou Dupre . . . ."

Motion at 14.[21] To substantiate this statement, the Government refers to Exhibit 7 (Plate 9)

───────────────

[21] The Government also alleges that at the time of the Katrina flooding "federal flood
control levees completely surrounded the places where the plaintiffs allegedly were
residing. *Compare* LVHPP Map (30 Sept. 1995) (Exhibit 11) . . . ." Motion at 15.
However, there is no identification of the source of the map identified as Exhibit 11 and no
foundation whatsoever. Even more telling is the fact that the black lines on Exhibit 11 that

and Exhibit 11, which are nothing more than two maps (from 1982 and 1995) purporting to show "levees" along the MR-GO.  However, the Government includes no sworn statements or documents authenticating the accuracy of these maps or establishing that such "levees" were actually constructed.  The silence on this issue is deafening.

Indeed, there is evidence suggesting that much of the putative "levee" system along most of the MR-GO is made of sandy spoil dredged over the years from the bottom of the MR-GO during construction and maintenance cycles.  Thus, in its 1957 plan for the MR-GO, submitted and ratified by Congress, the Army Corps provided for the above-ground construction of a "dyke" along the MR-GO made of excavated spoil dug from the soggy marshland through which the waterway was constructed.  Froeschle Decl., ¶¶ 68-69, Exhibit P at 5-7).  *This "dyke" was not a flood control measure, but rather served to protect ship navigation by retarding currents and waves in the MR-GO.  Id.*  Since the Government has produced no documents evincing the construction of actual "flood control levees" along the southern banks of the MR-GO after the completion of the waterway's construction in 1968, there is no evidentiary basis for determining whether the "earthen levees" that it now claims as flood control measures were in fact these original nonflood-control dikes or some other later added features.  Moreover, the existence, location, and nature of any post-Hurricane Betsy flood control facilities in the vicinity of the MR-GO is seriously disputed and will be the subject of active discovery. *See* Froeschle Decl., ¶¶ 9-19.

---

the Government alleges in its Motion are "flood control levees" are merely identified in the Legend as "Improvements completed."  Moreover, we are furnished with no description or explanation of what those "Improvements" in fact entail.  In truth, Plaintiffs believe that discovery will show that for substantial stretches along most of the MR-GO there were no actual "flood control levees" built after 1965.  Froeschle Decl., ¶¶ 9-15, 105-116.

In fact, the Government's own documents show that it is highly likely that the alleged "levees" along the southern bank of the MR-GO were little more than the Army Corps' dumping ground for dredged material during routine maintenance of the channel depths excavated over decades in order to facilitate ship navigation and not for any flood control purposes. Exhibit 10 to the Government's Motion is a 1976 Army Corps document entitled *Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana* (the "*1976 EIS*"). The complete copy of this several hundred page document provides further proof that the MR-GO was never a flood control project, and the earthen mounds along the MR-GO were not the "levees" called for under the Lake Pontchartrain Project.[22]

The *1976 EIS* notes that "[t]he project described in this report is the operation and maintenance (O&M) of the Mississippi River-Gulf Outlet (MR-GO). . . . O&M work includes dredging to maintain the *established navigation channels*, disposition of dredged material, and surveillance and repair of dredged containment dykes." (Exhibit FF at 13; Froeschle Decl., ¶ 106) (emphasis added). With respect to the disposal of this dredged material, the *1976 EIS* further adds:

> A diked disposal area, 2,000 feet wide, is *adjacent to the southwest side of the channel through the land area of the MR-GO* . . . . Deposited material spreads over the existing vegetation with each dredging operation. As the material flows outward from the pipeline and dries, *a flat, cone like mound is created.*

(Exhibit FF at 21; Froeschle Decl., ¶ 106) (emphasis added).

---

[22] This is another instance in which the electronically-filed Exhibit 10, comprising only a cover page and two pages of text, did not contain crucial information. Although the complete document was provided to the Court by mail, the critical information discussed above was immersed within hundreds of pages and never mentioned in the Motion.

Thus, the present record strongly suggests that these supposed "levees"—which the Army Corps does not identify as "flood control levees" in the *1976 EIS*—may very well be only the material dredged from the bottom of the MR-GO during regular maintenance cycles over more than 40 years.  In any event, the Government has clearly provided no testimony or documents showing that the "new and enhanced levees" required under the Lake Pontchartrain Project were ever constructed.   At a minimum, the true nature and purpose of the earthen mounds lining the MR-GO remains a question of fact requiring denial of the motion and discovery.

## IV.  THE MISSISSIPPI FLOOD CONTROL ACT OF 1928 AFFORDS NO IMMUNITY TO THE UNITED STATES

Contrary to the Government's convoluted argument, the Mississippi Flood Control Act of 1928 ("FCA")[23] does not—and was *never* intended to—grant the Government blanket immunity for tort claims arising from its faulty design, construction, operation, and maintenance of a navigational waterway such as the MR-GO.  The Fifth Circuit conclusively decided this issue 35 years ago:

> These three consolidated cases present the single question whether the immunity clause contained in § 3 of the federal Flood Control Act of 1928, 33 U.S.C. § 702c, applies to these actions under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., for floodwater damage allegedly caused by the negligence of the United States in the construction of the *Mississippi River-Gulf Outlet, a navigation project* that provided a short-cut from the Gulf of Mexico to New Orleans. *We conclude that § 3 does not bar these suits and affirm the judgment of the district court denying the Government's motion to dismiss.*

---

[23]  The terse provision states in relevant part that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c ("Section § 702c").

*Graci II*, 56 F. 2d at 21-22 (emphasis added).

Nothing since *Graci* affects this holding.  The two subsequent Supreme Court decisions discussed below involved flood control projects.  The Supreme Court has never held that a federal navigable waterway that overflows during a storm is subject to FCA immunity.

The Government's misguided theory that it is immune for its negligent acts with respect to the MR-GO is founded on misinterpretations of the following:  (1) the legislative history of the FCA and its immunity provision; (2) the reasoning and analysis of the Supreme Court in *Central Green Co. v. United States*, 531 U.S. 425 (2001) and its impact on other precedent; and (3) the Lake Pontchartrain and Vicinity Hurricane Protection Program ("LPVHPP").  As demonstrated below, none of these three arguments provides any credible support for the Government's assertion that this Court has no subject matter jurisdiction over Plaintiffs' lawsuit because the Army Corps is immunized from liability for the massive damage caused by the MR-GO during Hurricane Katrina as alleged in the Complaint.

> **A.**    **The Fifth Circuit in *Graci v. United States* Dispositively Decided That Section 702c Immunity Does Not Attach To The Governments' Tortious Acts Arising From The MR-GO.**

This issue has already been resolved against the Government.  Both the U.S. Court of Appeals for the Fifth Circuit and the District Court for the Eastern of Louisiana have found that the MR-GO is a navigational waterway, not a flood control project, and therefore does not meet the threshold requirements for immunity under Section 702c.  Try as it might, the Government has not and cannot offer any plausible reason to ignore the

conclusions of fact and law in the *Graci* opinions. These rulings are dispositive and binding in this case.

In *Graci*, homeowners filed a claim under the FTCA alleging their properties were damaged by floodwaters from Hurricane Betsy resulting from the Government's negligent design, construction, operation, and maintenance of the MR-GO. *Graci II*, 456 F. 2d at 22. The District Court denied a motion to dismiss asserting that Section 702c barred suits against the Government for damages resulting from floods or floodwater. *Graci I*, 301 F. Supp. 947, 954 (E.D. La. 1969).[24] The Fifth Circuit affirmed the lower court's ruling, holding that "the immunity clause of Section 702c did not bar a claim against the government under the FTCA for floodwater damage caused by the negligent and wrongful acts of its employees that were *unconnected with any flood control project*." *Graci II*, 456 F. 2d at 23 (emphasis added).[25]

In *Graci I*, the District Court was presented with a motion for rehearing with respect to an earlier motion to dismiss filed by the Government. In reaffirming the prior judge's decision to deny the motion to dismiss, the court first balanced the broad scope of the immunity waiver contained within the FTCA against the underlying purpose of the FCA immunity provisions:

> Section 3 [of the Flood Control Act of 1928] does represent a
> reasonable public policy determination to secure the government

---

[24] The District Court in *Graci I* held unequivocally that "[i]nsofar as provisions for federal nonliability for floodwater damage under 3 is totally dissociated from federal involvement in flood control programs, it should be held *superseded by the general liberal waiver of immunity of the Federal Tort Claims Act*." *Graci I*, 301 F. Supp. 947, 954 (emphasis added).

[25] The Government did not seek Supreme Court review of the Fifth Circuit's holding in *Graci II*.

> from liability for floodwater damage connected with flood control projects; but *we hold that it should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects*, and that *insofar as § 3 is to be interpreted, it stands on a less crucial basis and is superseded by the general waiver of immunity of the Federal Tort Claims Act.*

*Graci I*, 301 F. Supp. at 951 (emphasis added).

In *Graci II*, 456 F. 2d 20, the Fifth Circuit affirmed the District Court's ruling:

> These cases, and what little legislative history there is, strongly support the view that *the purpose of* § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs. . . . *The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees unconnected with flood control projects. Judge Heebe answered that it would not be reasonable so to conclude.* . . . Our analysis of another group of § 3 cases leads us to agree.

*Graci II*, 456 F. 2d at 26 (emphasis added).[26]

The Fifth Circuit (per Judge Wisdom) categorically rejected the very same

argument made by the Government in our case:

> When . . . plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States *unconnected with any flood control project*, § 3 of the Flood Control Act of 1928 does not bar an action against the United States under the Federal Tort Claims Act.

---

[26] The Firth Circuit in *Graci II* discussed a series of other decisions supporting its conclusion. *Graci II*, 456 F. 2d at 26-27. *See Peterson v. United States*, 367 F. 2d 271, 275 (9th Cir. 1966) (The United States Air Force engineers' decision to dynamite an ice-jam causing a sudden discharge of water that damaged the plaintiff's property was not immunized under Section 702c because the negligent act was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization."); *McClaskey v. United States*, 386 F. 2d 807, 808, n.1 (9th Cir. 1967) ("It does not follow that the mere happening of a flood insulates the Government from all damage claims flowing from it.")

*Graci II*, 456 F. 2d at 27; (emphasis added); *accord Seaboard Coast Line Railroad Co. v United States*, 473 F. 2d 20 (5th Cir. 1973) (no FCA immunity for flooding of plaintiff's property caused by construction of drainage canal defect at federal aircraft maintenance center).

In *Graci IV*, the District Court, six years after the Fifth Circuit's ruling, issued findings of fact regarding the MR-GO, including findings confirming its indisputable status as a navigational aid project:

> [Finding of Fact No.]15. The MR-GO is a *navigable waterway* constructed under the authority of Public Law 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendation of the Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session, at an estimated cost of $88,000,000. 70 Stat. 65.
>
> [Finding of Fact No.]19. *The MR-GO was constructed by the U.S. Corps of Engineers as an aid to navigation (distinguished from a flood control project) pursuant to legislative mandate of the U.S. Congress.*

*Graci IV*, 435 F. Supp. at 192 (emphasis added).[27]

The Court's conclusions of law in *Graci IV* provide further support that a damages claim against the Government based on the faulty design, construction, operation, and maintenance of MR-GO is not within the grant of immunity under Section 702c:

> [Conclusion of Law No.] 7. The United States as grantee of the right of way, builder and maintainer of the MR-GO assumed a high standard of care with relations to damages caused by the works to

---

[27] Documentation regarding the conception, planning, operation and use of the MR-GO consistently confirms that the purpose for the MR-GO was to function as a *navigational waterway. See* Froeschle Decl., ¶¶ 62-76. None of these documents states, or even suggests, that the MR-GO was a flood control project or part of any flood control program.

> neighboring lands and individuals. LSA C.C. Art. 667; *Carr v. City of Baton Rouge*, 314 So.2d 527 (La.App.1975).
>
> [Conclusion of Law No.] 10. The MR-GO *was built as an aid to navigation, not as or in connection with a flood control project*; and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO. *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971).

*Graci IV*, 435 F. Supp. at 195-96 (emphasis added).

These *Graci* opinions provide a well reasoned and logical interpretation of the legislative history of Section 702c: the Government's statutory immunity relates solely to its flood control efforts. Moreover, the *Graci* opinions hold unequivocally that Section 702c does not apply to a navigational project and that MR-GO was constructed as a navigational aid. *Graci II*, 456 F. 2d at 26; *Graci IV*, 435 F. Supp. at 192; *see also Stelly v. U.S.*, 644 F. Supp. 107, 107 -108 (W.D. La. 1986) ("If a *producing cause of the damage or injury is a government employee's negligence in omissions or commissions that diverge from acts strictly for the purpose of controlling floods or floodwaters*, and the presence or movement of water for flood control purposes merely furnishes a condition of the accident, there is no section 702c immunity.") As discussed below, the legislative history and purpose of the FCA — as well as post-*Graci* decisions, including a recent Supreme Court opinion — confirm that the Government's negligent acts with respect MR-GO are not shielded by Section 702c immunity.

**B.    From Its Inception, FCA Immunity Was Strictly Limited To Flood Control Projects.**

The roots and rationale for the FCA – which the United States has mysteriously omitted from its Motion to Dismiss – provide illuminating insight into the circumstances and public policy reasons for the FCA's governmental immunity provision.  In 1927, the

Mississippi River flooded the Mississippi River Valley area in what Justice Hugo Black called "the most disastrous of all recorded floods." *United States v. Sponenbarger*, 308 U.S. 256, 261 (1939); *see generally* John M. Barry, *Rising Tide: The Great Mississippi Flood of 1927 and How It Changed America* (Touchstone 1998). Proposed the following year as Congress' response to the calamity, the FCA "provided for a comprehensive ten-year program for the entire valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds." *Sponenbarger*, 308 U.S. at 262; *accord United States v. James*, 478 U.S. 497, 604 (1986) ("*James III*"); *Mocklin v. United States*, 877 F. 2d 427, 429 (5th Cir. 1989).

Viewed in the context of its conception, the intent of the FCA becomes instantly understandable: to grant the United States immunity for its role and expenditures in providing flood control protection. In *James v. United States*, 790 F. 2d 590 (5th Cir. 1985) (en banc) ("*James II*"), *rev'd*, 478 U.S. at 599-600, one of two Court of Appeals opinions preceding the Supreme Court opinion in *James III*,[28] the court examined the legislative history of the FCA, including the remarks of then President Calvin Coolidge commenting on the massive governmental flood program to be constructed following the Mississippi River Valley Flood:

---

[28] The three *James* opinions addressed the issue of whether Section 702c immunized the Government from liability for the drowning deaths of recreational users of reservoirs when they were swept through retaining structures that had been opened to release waters in order to control flooding. *James v. United States*, 740 F. 2d 365, 367 (5th Cir. 1984) ("*James I*") was a panel opinion holding the Government had immunity from liability for the drowning deaths of two men under Section 702c. The Fifth Circuit, sitting en banc, overruled that opinion in *James II*. In turn, the Supreme Court in *James III* reversed the finding of the Fifth Circuit in *James II*, holding Section 702c would protect the Government from "any liability *associated with flood control*." *James III*, 478 U.S. at 608 (emphasis added).

> In a message to Congress, President Coolidge stated that it was "axiomatic that states and other local authorities should supply all land and assume all pecuniary responsibility *for damages that may result from the execution of the project*." S. Rep. No. 619, 70th Cong. 1st Sess. at 11 (1928) (emphasis added).

*James II*, 740 F. 2d at 372, n.5 (additional emphasis added). After reviewing the legislative history of Section 702c, the court in *James II* noted:

> We think, however, that section 3 [Section 702c] must be read in its entirety to determine Congress' true intent. The legislative history reveals that Congress was concerned with allocating the costs of a major public works program between the federal government and the state and local interests in the wake of a financial, administrative and engineering debacle. Having assumed greater financial responsibility than initially proposed by effectively waiving state and local contribution, *Congress sought in conference to adjust its outlays for construction by excepting from its share the costs of the items considered to be "damages"* – acquisition of property for flowage rights, construction of spillways, and destruction of property *in conjunction with the construction of the flood control projects*.

*Id.* at 372-73 (emphasis added).

In a Conference Committee version, Section 3 of the FCA was modified, in amendment 14, to state:

> The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: Provided, that in all cases *where the execution of the flood control plan herein adopted* results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid.
> No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place . . . .

S. Doc. No. 91, 70th Cong., 1st Sess. 1 (1928) (Conference Report) (emphasis added).

The legislative history confirms what this Court and the Fifth Circuit have already concluded: the Government's right to immunity under Section 702c is contingent upon its role in undertaking a public flood control program *and* bearing the costs of that program to protect citizens and their property in the wake of a flood. Granting the Government immunity under Section 702c therefore promoted important public policy concerns rooted in public safety. The underlying rationale was that the Government would be motivated to implement flood control programs if it could be assured *immunity for any failure of the flood control measures that it had created*. In this case, however, the Government's utter failure to do anything to protect the citizens of Greater New Orleans from the known hazards of the MR-GO fulfills no such public policy goals and therefore affords no rationale for statutory immunity.[29]

_____

[29] While some courts have applied Section 702c immunity to FTCA cases with respect to tort claims arising from flood control measures undertaken by the Government, many courts during the past 15 years have come to view such application of this archaic law with extreme disfavor. In 1992, Justice Stevens sharply criticized FCA immunity:

> The statute at issue here [Section 702c] is an anachronism. It was enacted 18 years before the Federal Tort Claims Act . . . waived the Federal Government's sovereign immunity from liability for personal injuries. At the time of its enactment, no consideration was given to the power generation, recreational, and conservation purposes of flood-control projects, or to their possible impact on the then nonexistent federal liability for personal injury and death caused by the negligent operation of such projects. *Today this obsolete legislative remnant is nothing more than an engine of injustice.* Congress, not this Court, has the primary duty to confront the question whether any part of this harsh immunity doctrine should be retained.

*Hiersche v. United States*, 503 U.S. 923, 926 (1992) (Stevens, J., concurring in denial of certiorari); (emphasis added); *see also Smith v. United States*, 507 U.S. 197, 210 (1993) ("Exceptions to the '"sweeping"' waiver of sovereign immunity in the FTCA should be, and have been, 'narrowly construed.'") (quoting *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992)); *accord United States v. Yellow Cab Co.*, 340 U.S. 543, 547 (1951).

If anything, the same public policy reasons that support immunizing the Government from liability when it actually constructs flood control projects are also a compelling basis to hold the Government liable for its negligent design, construction, operation, and maintenance of the MR-GO. This is particularly true in this case when the Government's negligent acts in constructing the MR-GO are compounded by its admitted failure to take any measures to ameliorate the resulting and long known dangers created by its negligence.[30] Indeed, if the Court decided that the Government was somehow immunized for its gross negligence with respect to the MR-GO, such a decision could be viewed as a carte blanche for the Government, without fear of reprisal, to wantonly ignore—and fail to ameliorate—obvious and grave risks to public safety and property posed by federal public works projects like the MR-GO.

**C.     The United States Supreme Court in *James III* Reinforced the Fifth Circuit's Conclusions in *Graci*.**

The Supreme Court in *James v. United States*, 478 U.S. 597 (1986) ("*James III*") examined the issue of Section 702c immunity for the first time, concluding (just as the Fifth Circuit concluded in the *Graci* cases) that Section 702c was enacted to protect the Government from liability stemming from flood control projects that it had expended funds and effort to construct. Although the Supreme Court's opinion in *James III* caused some confusion over the proper application of Section 702c in circumstances involving

---

[30] The Government openly admits that the Army Corps knew for decades about the serious risk of massive flooding posed by the MR-GO. *See* Motion at 11 ("Although the MR-GO channel would not be opened to traffic until mid-1963 and would not be enlarged to its full project dimensions until 1968, *id.*, the Army Corps *of Engineers quickly discovered that the channel was having undesirable impacts on the Industrial Canal, see id.* at 8, 55-57, 60232. *By mid-1963, the Army Corps had taken note of increased current velocities in the Industrial Canal, which were causing erosion even as construction of MR-GO was in progress. Id.* at 8, *see also id.* at 17-18.") (emphasis added).

flood control projects constructed and paid for by the Government, the Supreme Court was crystal clear that Section 702c applied only to the Government's negligent acts related to *flood control projects* that it has constructed. 478 U.S. at 605 ("The Act concerns flood control projects designed to carry floodwaters."). Nowhere in *James III* did the Supreme Court extend Section 702c to apply to non-flood control related projects such as the MR-GO.

Relying on the legislative history of Section 702c and its strong public policy underpinnings, the Supreme Court stated:

> The Act [FCA] concerns flood control projects designed to carry floodwaters. It is thus clear that the terms "flood" and "flood waters" apply to all waters contained in or carried through *a federal flood control project* for purposes of or related to flood control as well as to waters that such projects cannot control.

*James III*, 478 U.S. 597, 605 (emphasis added).[31]

---

[31] The phrase "related to flood control" in *James III* generated conflicting opinions among the Courts of Appeals. During the period between *James III*, and the clarification provided in *Central Green Co. v. United States*, 531 U.S. 425 (2001), the federal circuits struggled to interpret the scope of immunity provided to the Government in connection with federal flood control projects. *See* Hofmann, *An Enduring Anachronism: Arguments for the Repeal of the § 702c Immunity Provisions of the Flood Control Act of 1928*, 79 Tex. L. Rev. 791, 796 (2001) ("Several circuits have followed the Supreme Court's very broad interpretation of 702c, even while expressing misgivings about the harshness of the rule. Other circuits have attempted to formulate tests that could ameliorate those harsh effects."). An expansive "wholly unrelated" standard was adopted by the Third and Eighth Circuits. *See Dawson v. United States*, 894 F. 2d 70, 73 (3rd Cir. 1990) ("Based on the broad immunity recognized by the Supreme Court in *James*, we conclude that the only recovery not barred by Section 702c post-James is for injuries cause by government activities wholly unrelated to flood control."); *accord Dewitt Bank & Trust Co. v. United States*, 878 F. 2d 246 (8th Cir. 1989). Other Circuits, such as the Tenth, declined to ascribe such an all encompassing meaning to the Supreme Court's view of terms "flood" and "flood waters." *See Boyd v. United States*, 881 F. 2d 895, 900 (10th Cir. 1989) (The court held that Section 702c immunity did not apply, reasoning that "[s]uch a connection between flood control activity and recreational injuries is too attenuated to warrant the invocation of § 702c. . . . We believe Congress' concern was to shield the government from liability associated with flood control operations, . . . not liability associated with

Indeed, the Supreme Court in *James III* carefully noted that "both District Courts found[] the waters here clearly fall within the ambit of the statute," and then provided a lengthy footnote distinguishing circumstances in which the negligent acts were without relation to the operation of a waterway as a federal flood control project. *Id.*[32] In that same footnote, the Supreme Court stated unequivocally:

> We have noted that here the District Court in each case [referencing the two underlying cases prior to consolidation at the Court of Appeals level in *James I and II*] found that the *waters were being released from federal flood control facilities to prevent flooding.* (citations omitted).

In its Motion, the Government here has provided no authority or reasoning to rebut the clear limitations for Section 702c immunity articulated by the Supreme Court in *James III* as encompassing only those "*waters carried through a federal flood control project for purposes of or related to flood control.*" Since it is indisputable that the waters in the MR-GO are for navigational purposes, the Government has attempted to recharacterize the

---

operating a recreational facility.")  In our case, under either the strict or more nuanced interpretation of *James III,* Section 3 does not apply since the MR-GO is a navigational waterway and is not related to flood control.

[32]  In footnote 7 of *James III* , the Supreme Court carefully distinguished the following cases as those in which Section 702c immunity would *not* apply since they did not involve negligent acts related to flood control projects:

> *See Morici Corp. v. United States,* [681 F. 2d 645] at 647-648 [9th Cir. 1982] ("no immunity for flooding if inundation 'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization'"), quoting *Peterson v. United States,* 367 F. 2d 271 (9th Cir. 1966); *Hayes v. United States,* 585 F. 2d 702, 702-03 (4th Cir. 1978 ("If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility *without relation to the operation of the dam as a flood control project,* he would avoid the absolute bar of § 702c").

*James III,* 478 U.S. at 605, n.7 (emphasis in original).

navigational waters of the MR-GO as related to flood control.  However, the only support

for this fanciful proposition is the *abandoned* plan back in 1965 for building a lock that

would help control the high velocities of currents during storms and the construction of

mostly dirt embankments along the borders of the MR-GO.

Even if the Government could establish that the MR-GO had some limited flood

control features, the Supreme Court has drawn a sharp distinction between a federal project

which has a dual purpose of flood control and something else and whether the flooding had

any connection to the purpose unrelated to flood control.  Thus, in *James III,* the opinion

cited approvingly *Hayes v. United States,* 585 F. 2d 702, 702-03 (4th Cir. 1978) for the

proposition that "[i]f the plaintiff could prove damage to his farm as a result of a dam's

operation as a recreational facility *without relation to the operation of the dam as a flood

control project,* he would avoid the absolute bar of § 702c." (Emphasis added).  In our

case, the FCA similarly does not apply because the flooding was related to the operation of

a navigational waterway and not "flood control projects *designed to carry floodwaters.*"

*James III,* 470 U.S. at 605 (emphasis added).

### D.     The United States Supreme Court in *Central Green* Further Confirmed The Fifth Circuit's Conclusions in *Graci.*

Similarly, in *Central Green Co. v. United States,* 531 U.S. 425 (2001), the Supreme

Court clarified its view of the terms "flood" or "flood waters" used in the FCA for purposes

of defining the scope of the Government's immunity for harms caused by its maintenance

of a flood control project.  In *Central Green,* the Supreme Court held that the character of

the waters should be the focus in order to determine whether immunity should be applied:

> Accordingly, the text of the statute directs us to determine the
> scope of the immunity conferred, not by the character of the

federal project or the purposes it serves, *but by the character of the waters that cause the relevant damage and the purposes behind their release. Id.* at 434 (emphasis added).

As noted above, the Supreme Court in *Central Green* restricted rather than enlarged the scope for immunity in connection with waters related to a federal flood control project.[33]  *Central Green* did not address waters not related to flood control such as navigational waters.

Unlike here, *Central Green* involved an irrigation canal that was part of a larger flood control project known as the Central Valley Project ("CVP"). *Id.* at 432-33.  Thus, unlike the MR-GO which exclusively serves a navigational purpose and was not "designed to carry floodwaters," *James III,* 470 U.S. at 605, the irrigation canal in *Central Green* served the dual purpose of irrigation and flood control.  In *Central Green,* the CVP was originally conceived as a flood control measure to curb occasional flooding caused by the Sacramento and San Joaquin Rivers in the California Central Valley.  531 U.S. at 432. The CVP had the additional purpose of distributing water to farms throughout the Central Valley area and using the detoured water as a source of hydro-electric power generation. *Id.* at 433.

The plaintiff in *Central Green* sued the Government for damages caused by subsurface flooding of his farmland resulting from the irrigation canal that was part of the

---

[33]  The Ninth Circuit has noted that the effect of *Central Green* was to restrict, not expand, the scope of sovereign immunity. *See Sanko Steamship Co., Ltd. v. United States,* 272 F. 3d 1231, 1232 (9th Cir. 2001) (The Ninth Circuit, relying on *Central Green,* noted that "[s]ince the time that the district court issued its decision, however, the United States Supreme Court reversed *Central Green* and established *a more restrictive test* for determining sovereign immunity.") (Emphasis added).

CVP. *Id.* The issue presented therefore was the extent of the Government's immunity for harms caused by waters retained as part of a flood control project, even if the immediate source of the harm was not flood control. At no point in *Central Green* did the Court address or even consider the claim in the present case: whether the Government can claim immunity under the FCA for harms caused independent of any flood control project.

In its Motion, the Government has misconstrued the Supreme Court's analysis in *Central Green* to apply to "floodwaters" irrespective of whether those waters bear any relation to a federal flood control project. Nothing in *Central Green* suggests that the Supreme Court was viewing the term "floodwaters" in isolation. To the contrary, the Supreme Court in *Central Green* focused on the essential fact that the character of the waters could be related to flood control purposes because the canal at issue was the arm of a flood control project. If, as here, no flood control project existed, then immunity under the FCA would not apply. If this were not the case, the Government would enjoy blanket immunity for all negligent acts if they bore some tangential relationship to floodwaters. Such an inequitable result is in direct contravention of the policy reasons behind the FTCA and clearly was not intended by the Supreme Court in *Central Green.*

### E.    The Lake Pontchartrain And Vicinity Hurricane Protection Project Has No Bearing On This Case.

Realizing the it cannot overcome the *Graci* holdings, the Government weaves out of whole cloth an argument that the MR-GO, while authorized and built as a navigational waterway, was later transformed into a flood control project. The Government's contention about the post-*Graci* flood control projects authorized by the Lake

Pontchartrain and Vicinity Hurricane Protection Project—and particularly the Seabrook Lock and "levees" allegedly built along the MR-GO—is a red herring for two reasons.

*First*, the Complaint does not predicate the Government's liability on the failure of any levees along the MR-GO.  In other words, the flooding of the Plaintiffs' homes was "'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act taken pursuant to such authorization.'"  *Morici Corp. v. United States,* 681 F. 2d 645, 647 (9th Cir. 1982) (citations omitted).

*Second*, at a minimum, there are numerous disputed issues of fact about whether the Army Corps ever built the alleged Seabrook Lock, levees, and other flood control works pursuant to Congressional authorization, thereby requiring discovery and denial of the motion.

### 1.    Plaintiffs' Negligence Claims Are Not Predicated Upon The Failure Of Levees

In its attempt to escape the stranglehold of the *Graci* holding that the MR-GO was a navigational as opposed to a flood control project, the Government argues that "it was based on a finding that the challenged conduct was '*unconnected with flood control projects.*'  *Graci v. United States*, 456 F. 2d 20, 26 (1971) (emphasis in original)."  Motion at 24.  As demonstrated in Section III. C, *supra*, however, this argument begs the question.  Plaintiffs are not predicating the Government's liability upon the failure or inadequacy of any flood control measures.  The Complaint clearly alleges that Plaintiffs' damages were caused by the MR-GO, not the failure of the Army Corps' levees, floodwalls, or any other flood control features.  *See* Complaint, ¶¶ 91-94.

For purposes of Plaintiffs' factual theory of their case, nothing has changed since *Graci*.  The Government's liability here—in the Government's own words—

> "depends upon . . . [the same] factual predicate that . . .
> existed . . . nearly 40 years ago.  The *Graci* cases involved
> liability for flooding in 1965 from Hurricane Betsy. The
> waters that covered New Orleans East, the Lower Ninth
> Ward, and St. Bernard Parish in September of 1965 were
> not 'waters that a federal project [wa]s unable to control.'
> *Central Green*, 531 U.S. at 431."

Motion at 22.

Similarly, Plaintiffs here are claiming that it was the MR-GO itself—and its over-

flowing navigational waters—that caused the flooding of their neighborhoods.  For

purposes of proving their case, Plaintiffs will not argue that failed levees were a cause of

their losses, *i.e.,* "the waters that washed over St. Bernard Parish, New Orleans East, and

the Lower Ninth Ward of Orleans Parish and caused the plaintiffs' alleged damages were

floodwaters that the LPVHPP works were unable to control."  Motion at 23.  In other

words, Plaintiffs expect to prove that the flooding would have occurred regardless of the

presence or absence of federal flood control structures and that their losses were caused by

the MR-GO's storm-driven navigational waters.  *See* Kemp Declaration ¶¶ 16-17, 19, 30,

32.

> ## 2. There Are Numerous Disputed Issues of Fact Concerning Whether The MR-GO Has Any Flood Control Features

The Complaint alleges that the MR-GO was never a federal flood control project.

*See* Section III.B, *supra.*  The Government attempts to overcome these well-pled

allegations by offering a hodge-podge of unauthenticated exhibits about post-Betsy efforts

by the Army Corps to beef up hurricane protection around New Orleans.  *See* Motion at 24

("[T]he United States soon after [Betsy] began to build the flood control works that now

line MR-GO, GIWW, the shores of Lake Pontchartrain, and the outfall canals.")  As

demonstrated in Section III.F., *supra*, however, the Government's claims are either false or seriously disputed. These factual clashes alone defeat the motion to dismiss.

Despite the MR-GO's legislative history, the Government's prior position in the *Graci* case, the Fifth Circuit and District Court's findings in *Graci*, the actual use of the MR-GO, and the fact that the existing "levees" are comprised mainly of heaps of compressed dirt along sections of its embankments that existed before 1965, the Government nevertheless contends that the MR-GO after 1965 was converted from a navigable waterway into an integral part of a massive flood control scheme called the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHHP"). Motion at 9-15, 22-29. In truth, the Government's claim that the MR-GO became part of the LPVHHP is flawed on many fronts, including a disturbing failure to provide accurate and complete information to the Court.

First, the Government has proffered misleading "evidence" and omitted to inform the Court of essential facts that are devastating to their argument that MR-GO is a component of the LPVHHP. In its Motion, the Government relies heavily on its argument that the "Seabrook Lock"—an above surface barrier planned for construction at the confluence of the Industrial Canal and Lake Pontchartrain—was one of the essential elements that converted the MR-GO from a navigational waterway into a flood control project. Incredibly, the Government failed to inform the Court that, although it referenced the Seabrook Lock seven separate times in its Motion as a flood control measure for the MR-GO,[34] *the Seabrook Lock was never built. See* Froeschle Decl., ¶ 16; Exhibit LL, p. 4.

---

[34] *See* Motion at 4, 12, 13, and 26.

Second, as summarized in Section III. F, *supra*, beside the Government's mythology about the Seabrook Lock, there are numerous factual disputes about whether flood control structures were actually built along the MR-GO, what Congress authorized (if anything), the design criteria and materials used for any so-called "levees," the purpose of any putative "levees," whether the navigational purpose of the MR-GO was ever modified by Congress, and many others.  A partial list of contested factual issues requiring discovery include the following:

- What is a "flood control project";

- Whether the construction of the Seabrook Lock was authorized by Congress;

- Whether the Seabrook Lock was ever built;

- Whether the Seabrook Lock was considered a flood control project;

- Whether if the Seabrook Lock was considered a flood control project, it altered the purpose of the MR-GO as a navigational waterway;

- What is the definition of a "levee";

- What is the definition of a "flood wall";

- Whether "levees" were placed along the MR-GO as part of the LPVHPP;

- If structures or spoilbanks were placed along the MR-GO, did those structures or spoilbanks meet the specifications and objective criteria for "levees" set by professional standards and/or the Army Corps;

- Assuming there are "levees" along the MR-GO, what was the purpose of the "levees" (*i.e.*, to assist in navigation or to protect against flooding or was there a dual purpose of both navigation and flood control); and

- Whether any "levees" along the MR-GO were built and financed by state or local government.

At the dawn of this lawsuit and before any discovery, it would be fundamentally unfair to require Plaintiffs to present evidence as to any of these factual issues or to "prove" that there were no (or sporadic) flood control measures along the 76-mile stretch of the MR-GO. Indeed, at this time, it is premature to expect the Plaintiffs to know what all the issues of material fact will be. But one thing is certain: the Seabrook Lock myth demonstrates that the Government cannot be trusted to present a fair and balanced portrayal of what flood control devices were in fact built as part of the MR-GO after 1965. Elementary justice—as well as the Federal Rules of Civil Procedure—compel the denial of the Motion for this additional reason.

## V.   THE GOVERNMENT LACKS IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT FOR PLAINTIFFS' NEGLIGENCE CLAIMS

The Government argues that the Army Corps' alleged negligence in the design, construction, maintenance, and operation of the MR-GO is protected by two exceptions to the FTCA's sovereign immunity waiver. First, the Government claims that its employees exercised "due care" in following the dictates of the legislation authorizing the MR-GO, thereby depriving them of any choice or discretion in how to design and build the navigable waterway. Motion at 31-36. Second, even if there were some latitude for the Army Corps in planning and implementing the Congressional authorization, the federal employees' decisions were allegedly the type of social, political, and economic policy judgments insulated from liability under the FTCA. As demonstrated below, neither argument is meritorious.

With respect to the "due care" exception, the Government's argument is trumped by the well-pled allegations that the Government's employees did not exercise due care and violated federal law in planning and building the MR-GO. As for the "discretionary function" exception, the Army Corps, as alleged in the Complaint, was exercising professional engineering judgment that is classically unprotected by the discretionary function exception. Finally, disputed issues of fact about the implementation of the Congressional mandate preclude resolution of these immunity questions on a motion to dismiss under Rule 12(b)(1).[35]

Significantly, the Government's argument fails to address two of the four activities that Plaintiffs allege were negligently performed with regard to the MR-GO. Its papers do not claim that the Army Corps' decisions with regard to *the ongoing maintenance and operation* of the MR-GO—activities that Plaintiffs allege were negligently performed and contributed significantly to the MR-GO's dangerous condition that caused the flooding during Katrina—are protected by either of these exceptions. The Motion claims immunity only for decisions regarding *design and construction*, particularly the alleged negligent failure of the Army Corps "to add certain features that were not within the plan that the Chief [of Engineers] recommended and approved." Motion at 37. Since Plaintiffs' have

---

[35] Forty years ago, these very same arguments were raised by the Government in the FTCA damages action alleging flooding caused by the MR-GO during Hurricane Betsy. In *Graci v. United States* (Case Nos. 65-15962, 65-15976, 65-16091), the United States also filed a motion to dismiss asserting its immunity under the "due care" and "discretionary function" FTCA exceptions. On June 13, 1967, Judge Herbert Christenberry refused to dismiss plaintiffs' case. "In the present state of the record, this is not a proper case to be disposed of on a motion to dismiss." Froeschle Decl., ¶ 123; Exhibit NN (Order of June 13, 1967 at p. 8). In reaching this conclusion, Judge Christenberry quoted *Smith v. United States*, 113 F. Supp. 131, 136 (D. Del. 1953): "At this stage of the proceedings . . . , I cannot rule out plaintiff's claims . . . because the allegations are fully as consistent with non-discretionary functions as they are with discretionary functions . . . ." *Id.*

alleged negligence in both maintenance and operations (*see., e.g.,* Complaint ¶¶ 1, 2, 5, 6, 29, 30, 34, 43, 51-60, 71, 74, 84, 85, 91-93, 95), the motion to dismiss must be denied.

**A.      The "Due Care" Exception Does Not Apply Because Plaintiffs Are Not Challenging the Legislation Authorizing the Construction of the MR-GO.**

According to the Government, "the Complaint acknowledges MR-GO was 'constructed under the authority of Public Law 455' . . . .  By challenging the problems that plaintiffs' claim are 'inherent' in implementation of MR-GO, including its design, construction, operation, and maintenance, the plaintiffs are attacking the execution of a federal law."  Motion at 36.  In sum, the Government contends the Complaint is an *implied* attack on the statute authorizing MR-GO's construction barred under the "due care" exception to Governmental liability under the FTCA.

The Government's argument fails for two reasons:  (1) the Government cannot point to a single allegation in the Complaint questioning the validity of a federal statute, and (2) its argument incorrectly assumes that Congress told the Army Corps where and how to build the MR-GO within a single statute.

The "due care" exception to governmental liability under the FTCA arises from the first sentence of 28 U.S.C.A. § 2680(a) exempting the federal government from liability for any claim "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid . . . ."  As the Government recognizes, the exception exists to prevent a plaintiff from challenging the validity of a statute under the guise of a tort action. *See United States v. Gaubert*, 499 U.S. 315, 337 (1991) (Scalia, J. dissenting) ("We have taken this to mean that regulations '[can]not be attacked by claimants under the Act'."); *Dalehite v. United States*, 346 U.S. 15, 42 (1953) ("The immunity of a decision as to

labeling, in fact, is quite clearly shown by the fact that the ICC's regulations, for instance, could not be attacked by claimants under the Act by virtue of the first phrase of section 2680(a).").[36]

The Government does not identify a single allegation in the Complaint where Plaintiffs have objected to the statute authorizing the construction of the MR-GO. Indeed, none exist. *See* Section III.D, *supra*. Instead, the Complaint challenges "the Army Corps compliance with this Congressional mandate" to design, build, operate and maintain the MR-GO. Complaint, ¶ 95. This is why the Government has relied on its conjectural interpretation of Plaintiffs' Complaint, rather than on the actual text of the pleading. *See* Froeschle Decl., ¶¶ 125-127. In short, the Government's "due care" argument must fail because it is based on a factually incorrect and unsubstantiated interpretation of Plaintiffs' allegations.

Not only are Plaintiffs not attacking the federal law by which the MR-GO was authorized, the Government's argument is predicated on an inaccurate and misleading discussion of the procedure by which this project was authorized. *See* Froeschle Decl., ¶¶ 42-56, 62-66, 77. In its section addressing the "due care" exception to the FTCA, the Government asserts "MR-GO exists where it is and as it is because Congress told the Corps to build this waterway rather than others that had been proposed." Motion at 33.

---

[36] Section 2680(a) presumes adherence to statutory mandates, and an agency's failure or refusal to comply with a federal statute establishes a prima facie example of a lack of "due care" under the FTCA *See, e.g., U.S. v. Second Nat'l Bank of N. Miami*, 502 F. 2d 535, 549 (1974) ("The words 'due care' point to the issue of whether a party's conduct complies with or violates a duty owed to another . . . ."). Here, Plaintiffs have alleged the Army Corps' failure to comply with federal statutes, and provided this Court with further evidence of the Army Corps' non-compliance with statutory requirements. Plaintiffs therefore have alleged the Army Corps' lack of "due care." federal statute establishes, ipso facto, lack of "due care" under the FTCA.

The underlying assumption here is the existence of a single statute by which Congress instructed the Army Corps how and where to build the MR-GO.  The assumption is absurd on its face because taken to its logical conclusion there would be no need for the Army Corps' supposed expertise.  Congress could simply draw up the technical plans for any canal and hire a contractor to build the waterway.

In fact, the process was more complicated than described by the Government. Simply put, as discussed in Section III.D, *supra*, Congress asked the Army Corps to use its engineering judgment to investigate the possibility of constructing "a" waterway between the Mississippi River and the Gulf of Mexico, the Army Corps returned with its proposal for the navigation channel, and Congress approved the Army Corps' recommendation.  *See* Froeschle Decl., ¶¶ 52-53, 56, 62, 64.  In this case, Congress authorized the Corps to investigate and report on the viability of a waterway between the Mississippi River and the Gulf of Mexico "*by way of the best available route.*"  *See* Froeschle Decl., ¶¶ 43, 56, Exhibit H at 2; K at 17, 23.  In response, the Army Corps prepared two reports in 1930 and 1951. Froeschle Decl., ¶¶ 45-51, 62-66.  Thereafter Congress passed the Act of March 29, 1956 to "Authorize Construction of the Mississippi River Gulf-Outlet," Pub. L. 84-455, 70 Stat. 65 (1956) (Froeschle Decl., ¶ 77, Exhibit U), which simply provided for "the Mississippi River-Gulf outlet to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245."  *Id.*

The MR-GO's legislative history reveals that Congress asked the Army Corps to use its professional acumen to find the best route for a navigable channel between the Mississippi River and the Gulf of Mexico.  Where and how the canal would be constructed

57

would therefore be for the Army Corps to determine based on its *non-immunized* engineering judgment to be exercised within the confines of federal statutory law and prevailing professional standards. Plaintiffs' negligence claims are predicated *solely* on the Corps' incompetence during the project's investigation, planning, construction, maintenance and operational phases. *See* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102). In *Buchanan v. U.S.*, 915 F. 2d 969, 970-71 (5th Cir. 1990), the Fifth Circuit noted that "[t]he first clause, exempting actions mandated by statute or regulation, *applies only if the actor has exercised due care.*" (Emphasis added). Here, where Plaintiffs have adequately alleged the Army Corps' negligence and lack of "due care" in fulfilling Congressional directives, the "due care" exception is inapplicable.

**B.    The Discretionary Function Exception Does Not Immunize the United States Since the Army Corps Violated Federal Law in the Investigation, Planning and Construction of the MR-GO.**

Under well-established law, if a statute prescribes an agency's actions and the prescribed course of conduct is not followed, the discretionary function exception does not apply. As stated by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, 322 (1991) "[t]he exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice' . . . . The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive'." (Citations omitted). *See also Berkovitz v. United States*, 486 U.S. 531, 536 (1986) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.").

Where a federal agency violates federal law, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324. Thus, violation of a statutory mandate defeats the discretionary function exception since "'sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct.'" *Kiska Const. Corp. v. Washington Metropolitan*, 321 F. 3d 1151, 1159 (D.C. Cir. 2003) (citations omitted). The Army Corps here violated several federal statutes causing the damages alleged by Plaintiffs, and these breaches of federal law, coupled with Plaintiffs' consequential injuries, preclude application of the discretionary function exception.

  1. **The Army Corps' Violation of Federal Law Substantially Contributed to the Destruction of Valuable Southern Marshland That Otherwise Would Have Protected Greater New Orleans From Flooding.**

As discussed at length in the accompanying Declaration of Nina Froeschle, the River and Harbor Act of 1945, authorizing the Army Corps to investigate the MR-GO, required "the Chief of Engineers . . . [to] give to the Secretary of the Interior, during the course of investigations, information developed by the investigations and also opportunity for consultation regarding plans and proposals . . . ." Froeschle Decl., ¶¶ 55-56, Exhibit L at 1. Likewise, the 1946 version of the Fish and Wildlife Coordination Act ("FWCA"), as codified at 16 U.S.C. § 662, mandated Army Corps' consultation and coordination with the Department of Interior, Fish and Wildlife Service (the "FWS") and the former Louisiana Department of Wild Life and Fisheries (the "LDWLF") during the investigation, planning and design phases of any water resource project such as the MR-GO. Froeschle Decl., ¶¶ 57-61; Exhibit M at 1-3. The statute further provided that any reports submitted to Congress include "the reports and recommendations of the Secretary of the Interior and

of the head of the agency exercising administration over the wildlife resources of the State."

In the Army Corps' report on the MR-GO submitted to Congress in 1951 (the "*1951 MR-GO Report*"), the Army Corps stated that it had "coordinated" with the "director of the Louisiana Department of Public Works, designee for the Governor of Louisiana," but did not mention any contact with the FWS or LDWLF, as required by law. (Froeschle Decl., ¶¶ 62-66; Exhibit O at 22, ¶ 80). This omission would prove to have drastic consequences for Greater New Orleans because, as discussed below, both of these agencies foresaw with eerie clarity the destruction of the southern marshlands that had served as a storm surge buffer.

On August 24, 1957, the Secretary of the Interior wrote the Secretary of the Army, unequivocally informing him of the Army Corps' failure to comply with the terms of the FWCA with respect to the MR-GO and stating "[t]he project plans have not been investigated by fish and wildlife conservation agencies as contemplated in the Wildlife Coordination Act of August 14, 1946 (60 Stat. 1080)." (Exhibit W at 1-2; Froeschle Decl., ¶¶ 78-80). Secretary Seaton further added:

> We urge that detailed planning for the project consider fully the effects on fish and wildlife resources of constructing the canal and that your Department accept reasonable modifications in alignment of the canal and in the plan for deposition of spoil to hold to a minimum the destructive effects on these resources, even though this may increase project costs to some degree.

(Exhibit W at 1).[37]

--------

[37] As alleged in Plaintiff's Complaint at Paragraphs 63 through 69, this correspondence was referenced in a 1958 FWS report sent to the Army Corps entitled "*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*" (the "*Fish & Wildlife Report*"). This same *Fish & Wildlife Report* predicted that the MR-GO, as planned by the

In short, the Army Corps was required—but clearly failed—to consult with the FWS and the LDFWL. At a minimum, the FWCA required the Army Corps to present the FWS's concerns to Congress, allowing Congress to make the decision concerning the appropriate alignment of the MR-GO. Instead, the Army Corps unilaterally usurped Congress' decision making power in violation of federal law. The result—the *predicted* death of valuable surge busting marshland—led inexorably to the deadly flooding of Greater New Orleans. *See* Complaint, ¶ 3; Kemp Decl., ¶¶ 20-30.

   **2. The Army Corps Further Violated Federal Law By Failing to Construct the MR-GO According to the *1951 MR-GO Report*, Creating the "Funnel" That Exacerbated the Katrina Storm Surge.**

The Division Engineer who compiled the *1951 MR-GO Report* recommended the "*the construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin* south of Micheaud, and a channel . . . as a land and water cut . . . to deep water in the Gulf of Mexico.*" (Exhibit O at 22 (emphasis added); Froeschle Decl., ¶ 64). By its terms, the proposal called for the construction of a new and distinct canal connecting the MR-GO to the Industrial Canal. It

---

Army Corps, would lead to massive destruction of southern marshland, and the report requested that the construction be delayed until further testing could be performed by the FWS. A September 24, 1959 FWS memorandum reflected the Army Corps' flat refusal to delay construction until the FWS could perform the requested testing, and its rejection of the FWS' recommendation to change the course of the MR-GO. Froeschle Decl., ¶ 93; Exhibit 2 at 1. The Army Corps' decision was all the more egregious since its own Board of Engineers in the 1951 MR-GO Report had recommended further study as to the appropriate alignment of the waterway: "The Board is of the opinion that the exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board." Froeschle Decl., ¶ 67, Exhibit O at 8.

did not suggest using the Gulf Intracoastal Waterway (the "GIWW") as a conduit for connecting the MR-GO to the Industrial Canal.[38]

Rather than constructing this separate canal as set forth in the complete text of the Government's Exhibit 4—the July, 1957 Army Corps' *Mississippi River – Gulf Outlet Louisiana: Design Memorandum No. 1-A* (the "*MR-GO Design Memorandum*")—the MR-GO was tied into the GIWW and the new combined GIWW/MR-GO was widened to handle the increased shipping traffic. Froeschle Decl., ¶ 122; Exhibit M. By failing to construct Reach 1 of the MR-GO in accordance with the recommendations contained in the *1951 MR-GO Report, as approved by Congress*, the Army Corps created the "funnel" through which storm surge from the GIWW and the MR-GO merged into a powerful storm surge delivery system directly aimed at Greater New Orleans. *See* Kemp, Decl., ¶¶ 11-19.

Each one these statutorily mandated omissions created the dangerous conditions causing Plaintiffs' damages. Thus, as a matter of law, the discretionary function exception does apply.[39]

**C.      The Army Corps' Lack of Professional Engineering Competence Is Not Protected by the FTCA.**

---

[38] This conclusion is bolstered by comments made by former Army Corps Deputy Chief, Civil Works for Rivers and Harbors, Colonel W. D. Milne during his September 18, 1951 testimony before the Subcommittee of Rivers and Harbors of the House Committee on Public Works. Specifically, Colonel Milne stated "[t]he recommendation of the Chief of Engineers calls for a canal connecting the present industrial canal of New Orleans, and calls for a canal 36 feet in depth and 500 feet in width running . . . into a turning basin . . . ." Froeschle Decl., ¶ 67; Exhibit P at 5.

[39] Even if the Army Corps had attempted to comply with statutory directives, it cannot hide behind a technical compliance with a law, while blindly ignoring the damaging effects that its actions would have on the people of Greater New Orleans. As noted by the Supreme Court in *Hatahley v. U.S.*, 351 U.S. 173, 181 (1956): "'Due care' implies at least some minimal concern for the rights of others. Here, the agents proceeded with complete disregard for the property rights of the petitioners."

Even if the Government is correct in asserting that the Army Corps had discretion, the Government is not immune from liability for the Army Corps' flawed exercise of professional judgment based on prevailing engineering standards.

The discretionary function doctrine "has traditionally been narrowly construed by the courts." *Collins v. United States*, 783 F. 2d 1225, 1231 (5th Cir. 1986). Originally, the Supreme Court tied a discretionary function to the level within an administrative hierarchy at which a decision is made. For example, in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955) a tugboat operator sued the United States, claiming that a shipping accident was caused by an out of commission lighthouse negligently maintained by the United States Coast Guard. The Supreme Court concluded that "[t]he question is one of liability for negligence at what this Court has characterized the 'operational level' of governmental activity." *Id*. at 64.

Later, the Supreme Court shifted away from the level of the decision making to the nature of the discretion exercised. *See Berkovitz v. United States*, 486 U.S. 531 (1988). As the Supreme Court held in *United States v. S.A. Empresa de Viacao Aerea Rio Gransense ("Varig Airlines")*, 467 U.S. 797 (1984), "it is the nature of the conduct, *rather than the status of the actor*, that governs whether the discretionary function exemption applies in a given case." *Varig Airlines*, 467 U.S. at 813 (emphasis added). In *Berkovitz, Varig*, and *U.S. v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court refined the methodology used to assess the "nature of the conduct" by holding only governmental policy decisions based on economic, political or social factors fall within the discretionary function exemption. *See Gaubert*, 499 U.S. at 322-23.

Under any formulation of the discretionary function test, the allegations in the Complaint negate any immunity because Plaintiffs are seeking recovery for the Army Corps' operational level execution of Congressional directives that called upon the Army Corps to prudently exercise scientific and engineering based judgment based on professional standards. Such judgment does not implicate social, political or economic issues, and as explained further below, falls far outside the protected immunity sphere of the discretionary function exception.

The prevailing law is that "matters of scientific and professional judgment – particularly judgments concerning safety – are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. U.S.*, 400 F. 3d 1177, 1181 (9th Cir. 2005); *Fisher Bros. Sales, Inc. v. U.S.*, 46 F. 3d 279, 290 (3rd Cir. 1995) ("[J]udgment guided purely by scientific or other objective principles does not involve discretion for purposes of the discretionary function exception."); *Cope v. Scott*, 45 F. 3d 445, 452 (D.C. Cir. 1995) ("The 'engineering judgment' the government relies on is no more a matter of policy than were the 'objective scientific principles' that the [Supreme Court in *Berkovitz v. United States*, 486 U.S. 531 (1988)] distinguished from exempt exercises of policy judgment."); *Ayala v. U.S.*, 980 F. 2d 1342, 1349-1350 (10th Cir. 1992) ("We fail to see how the determination in this case can be labeled a policy decision. The choice was governed, as plaintiffs contend, by 'objective principles of electrical engineering'."). *Moyer v. Martin Marietta Corp.*, 481 F. 2d 585, 598 (5th Cir. 1973) (no discretionary immunity for negligent design and construction decisions).

The Fifth Circuit has reached the same conclusion, holding the Government liable for damages caused by the negligent design or construction of a canal or waterway.  In

*Seaboard Coast Line Railroad Co. v. United States*, 473 F. 2d 714 (5th Cir. 1973), the

plaintiff's train and railroad tracks were damaged in a derailment caused by flooding from

a drainage ditch on a nearby military base.  The District Court found that "the actions of

the government *in designing the drainage system* were negligent and that *the floods*

*resulting therefrom* constituted an actionable trespass and a nuisance." 473 F. 2d at 715

(emphasis added).  Echoing the Supreme Court in *Indian Towing Co.*,[40] the Fifth Circuit

affirmed the District Court's decision:

> Once the government decided to build a drainage ditch, it
> was no longer exercising a discretionary policy-making
> function and it was required to perform *the operational*
> *function of building the drainage ditch* in a non-negligent
> manner.

*Id.* at 716 (emphasis added); *see also Alabama Electric Cooperative, Inc. v. United States*,

769 F. 2d 1523, 1531 (11th Cir. 1985) ["T]he Corps' engineers must be held to the same

professional standards of reasonableness and due care that a private engineer faces when

he plies his trade."); *O'Toole v. United States*, 295 F. 3d 1029, 1036 (9th Cir. 2002) ("We

hold that an agency's decision to forego, for fiscal reasons, the routine maintenance of its

---

[40]  The Supreme Court has held that the discretionary function exception does not apply to
maintenance and operation of a federal facility:

> The Coast Guard need not undertake the lighthouse service.
> But once it exercised its discretion to operate a light . . . and
> engendered reliance on the guidance afforded by the light, it
> was *obligated to use due care to make certain that the light*
> *was kept in good working order*; and, if the light did become
> extinguished, then the Coast Guard was *further obligated to*
> *use due care to discover this fact and to repair the light or*
> *give warning that it was not functioning.*  If the Coast Guard
> failed in its duty and damage was thereby caused to
> petitioners, the United States is liable under the Tort Claims
> Act.

*Indian Towing,* 350 U.S. at 69 (emphasis added).

property – maintenance that would be expected of any other landowner – is not the kind of policy decision that the discretionary function exception protects."); *United States v. Hunsucker*, 314 F. 2d 98, 105 (9th Cir. 1962) (United States is not immunized from liability for "its failure to take reasonable precautions to prevent [flood] damage to appellee's land" from a drainage ditch).[41]

Each of these cases supports Plaintiffs' claims against the Army Corps for liability *predicated solely on the negligent exercise of scientific and engineering judgment.* At Paragraph 49 of the Complaint, Plaintiffs allege that "the Army Corps failed to take account of the waterway's inherent and known capability of serving as funnel or conduit for rapidly-accelerated, storm driven surges . . . ." Likewise, at Paragraph 49, Plaintiffs allege "the Army Corps failed to account for the devastation of the wetlands that the MR-GO, by its design, would facilitate." These claims are solely based on the Army Corps' failure to properly exercise its discretion as engineers—consistent with "professional standards of reasonableness and due care"—in the design and construction of the MR-GO.

Finally, in a last ditch attempt to shield the Army Corps from the consequences of its alleged negligence, the Government invokes the Army Corps' supposed right to investigate *ad nauseam,* but never actually undertake remedial measures to fix a troubled water resource project. From this illogical premise, the Government then argues the

---

[41] The Government's suggestion that it could not undertake urgently needed measures to ameliorate severe bank erosion and related problems along the MR-GO—estimated to cost nearly $40 million-–because there was no Congressional authorization begs the question. Like so many other safety measures that the Corps studied exhaustively, the Government has provided no evidence that Army Corps ever requested the funding. In any event, if the Army Corps' negligence causes loss of life and property, and regardless of whether Congress sees fit to appropriate the money to remedy known safety hazards, the Government is liable. *See O'Toole v. United States,* 295 F. 3d at 1036.

applicability of the Ninth Circuit's discretionary function opinion in *National Fire Ins. v. United States*, 115 F. 3d 1415 (9th Cir. 1997). *See* Motion at pp. 44-47. The gravamen of the Ninth Circuit's decision was that the Army Corps had the discretion to decide whether *to repair* a faulty harbor breakwater located in a man-made harbor in Redondo Beach, California.

The fatal flaw with the Army Corps' reliance on *National Fire Ins.* is that the Complaint here challenges the adequacy of the Army Corps' engineering judgment in the course of "designing, planning, constructing or maintaining" the MR-GO.[42] The Government fails to point to a single allegation in Plaintiffs' Complaint where Plaintiffs question the Corps discretion with respect to "repairs" to the MR-GO. In any event, controlling Supreme Court and Fifth Court precedent discussed above bar the application of the discretionary function exception to engineering decisions regarding design, construction, maintenance and operation of federal projects.

Notwithstanding the Government's attempts to recast the Plaintiffs' Complaint, the Army Corps is not immune from negligent acts for its failure to comply with federal law or for its defective exercise of engineering judgment. Plaintiffs therefore respectfully that this Court reject the Government's due care and discretionary function exception arguments.

---

[42] Moreover, *National Fire Ins.* is not dispositive in the factual context of a case like ours alleging negligent maintenance and repair of a canal as evidenced by the Ninth Circuit's subsequent decision in *O'Toole v. United States*, holding the Government liable for failure to remove debris from an irrigation canal, *i.e.*, "routine maintenance of its property." 295 F. 3d at 1036.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion to Dismiss be denied in its entirety.

Dated:  August 21, 2006

Respectfully submitted,

**O'Donnell & Mortimer LLP**

By: _P. O'Donnell_

Pierce O'Donnell (*pro hac vice*)
Nina D. Froeschle (*pro hac vice*)
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile:  (213) 532-2020

**The Andry Law Firm, LLC**

By: _Jonathan B. Andry_

Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile: (504) 585-1788

**Bruno & Bruno**

Joseph M. Bruno (LSBA No. 3604)
David S. Scalia (LSBA No. 21369)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

68

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085

**Attorneys for Plaintiffs**

70

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August, 2006, I served a true copy of the

Plaintiffs' Opposition to the Government's Motion to Dismiss upon counsel for the United

States of America by electronic mail, facsimile, or first class mail.

JONATHAN B. ANDRY