UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER: 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO: MRGO, *Robinson* (No. 6-2268) | |

## PLAINTIFFS' APPENDIX OF NON-FEDERAL AUTHORITIES IN SUPPORT OF

## OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucille Franz, hereby attach true and correct copies of all non-federal authorities in support of Plaintiffs' Opposition to the Government's Motion to Dismiss.

**TAB**:

    A.  5 Wright & Miller, *Federal Practice & Procedure*, Section 1271 (2006).

    B.  5B Wright & Miller, *Federal Practice & Procedure,* Section 1357 (2006).

    C.  12 Wright & Miller, *Federal Practice & Procedure*, Section 3155 (2006).

    D.  *Bonin v. Ferrellgas, Inc.*, 877 So. 2d 89 (La. 2004)

E.  *Carr v. City of Baton Rouge*, 314 So.2d 527 (La. Ct. App.1975).

F.  *Pouncy v. Temple, Royal Indem. Co., Intervenor*, 41 So. 2d 139 (La. Ct. App. 1949).

Dated:  August 21, 2006

Respectfully submitted,

**O'Donnell & Mortimer LLP**

By: _____

Pierce O'Donnell (*pro hac vice*)
Nina D. Froeschle (*pro hac vice*)
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile:  (213) 532-2020

**The Andry Law Firm, LLC**

By: _____

Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Bruno & Bruno**

Joseph M. Bruno (LSBA No. 3604)
David S. Scalia (LSBA No. 21369)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August, 2006, I served a true copy of the Plaintiffs' Appendix of Non-Federal Authorities in Support of Opposition to the Government's Motion to Dismiss upon counsel for the United States of America by electronic mail, facsimile, or first class mail.

JONATHAN B. ANDRY

TAB "A"

Westlaw.

5 FPP § 1271
5 Fed. Prac. & Proc. Civ.3d § 1271

Page 1

**Federal Practice & Procedure**
**Federal Rules Of Civil Procedure**
**Current through the 2006 Update**

The Late Charles Alan Wright[FNa6], Arthur R. Miller[FNa7]

**Chapter 4. Pleadings and Motions**
**Rule 8. General Rules Of Pleading**
**F. Affirmative Defenses**

§ 1271 Affirmative Defenses--Defenses Not Mentioned in Rule 8(c)

**Primary Authority**

Fed. R. Civ. P. 8

**Forms**

West's Federal Forms § § 2060 to 2200

The list of nineteen affirmative defenses in Federal Rule 8(c) discussed in the preceding section is not intended to be exhaustive. The draftsmen of the original federal rules recognized that certain defenses other than those enumerated in Rule 8(c) should be set forth affirmatively by the defendant in order to provide the plaintiff and the district court with sufficient notice that the matter has been put in issue. Therefore the federal rule provides that any "matter constituting an avoidance or affirmative defense" also must be affirmatively asserted in the responsive pleading. An extensive jurisprudence has developed under this provision, as the case citations in the note below illustrate.[FN1] However, Rule 8(c) does not elaborate on how to determine what is covered by this catchall statement and thus it offers very little assistance in defining what constitutes "an avoidance or affirmative defense."

Generally speaking, the rule's reference to "an avoidance or affirmative defense" encompasses two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer.[FN2] As a result, a pleader, in order to avoid waiving an otherwise valid defense,[FN3] often will decide to set up affirmatively matter that technically may not be an affirmative defense but nonetheless might fall within the residuary clause of Rule 8(c). Normally, that pleader will not be penalized for exercising caution in this fashion even when affirmative pleading proves to be unnecessary.

In spite of the lack of guidance in the rule itself, it is possible to formulate some working principles for determining what constitutes a defense contemplated by the final clause in Rule 8(c).[FN4] To begin with, whether a party is obliged to plead a particular defense affirmatively depends on several factors. Under the codes, the common law precedents dealing with the confession and avoidance practice were given great weight in deciding what defenses should be affirmatively pleaded and, in a similar fashion, there is no doubt that history plays a significant role in applying Rule 8(c).[FN5] Thus, prior decisions of federal courts, including some cases antedating the federal rules, have been relied upon as indicative of what should be considered "an avoidance or affirmative defense."[FN6]

Also relevant, most typically in diversity of citizenship cases, is the pleading practice of the state in which the federal court is sitting. State statutes and decisions often are utilized by federal courts in deciding whether certain defensive matters should be pleaded affirmatively.[FN7] These precedents are not binding on the federal courts but occasionally provide useful analogies for the district judge. Examples of defenses under state law that federal courts have treated as affirmative defenses for purposes of Rule 8(c) are the availability of a remedy under another state's law, [FN8] the agency doctrine of apparent authority,[FN9] the existence of something in the nature of a limitation or bar to the action in state law, [FN10] the occurrence of a bona fide purchase by the defendant,[FN11] the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's breach of various insurance policy provisions,[FN12] the discharge of an obligation through the extension of time for payment,[FN13] the applicability of the doctrine of election of remedies,[FN14] the claim by an insurer that the loss suffered by the insured was excepted by the policy's terms,[FN15] the existence of authority and imputed liability among joint venturers and coventurers,[FN16] the multiplicity of suits and the pendency of another action,[FN17] the principle of prescription,[FN18] that there was probable cause for the plaintiff's arrest in an action for false imprisonment,[FN19] the availability and applicability of the remedy of rescission,[FN20] the defense of retraction in a libel action,[FN21] the plaintiff's failure to give timely notice of a claim before bringing a tort action against a municipality,[FN22] the defenses of truth, privilege, fair comment, and consent as justification in an action for defamation,[FN23] the unconstitutionality of a statute relied on by the plaintiff,[FN24] the principle of volenti non fit injuria,[FN25] the plaintiff's possible recourse to worker's compensation in an action against an employer for damages, [FN26] and New Jersey's unique entire-controversy doctrine, which has significant similarities to a res judicata defense.[FN27]

In other diversity of citizenship cases, the federal courts have held various matters to be affirmative defenses without expressly relying on state law. These include: the applicability of a business custom requiring the return of defective merchandise,[FN28] the availability of an exclusive remedy under worker's compensation,[FN29] the existence of authority among coventurers, [FN30] the presence of multiple suits,[FN31] the prematurity of the actions,[FN32] the doctrine of election of remedies,[FN33] the remedy of rescission,[FN34] and the plaintiff's failure to engage in mitigation of damages.[FN35]

It should be noted, however, that the federal courts are not bound to treat a matter that is considered or specifically identified as an affirmative defense under forum state law as an affirmative defense for purposes of pleading under Rule 8(c), even in diversity of citizenship cases; the matter is governed by federal pleading principles.[FN36] Indeed, although state precedents are persuasive when the federal case has factual circumstances similar to the state precedents, in many instances the cases within a particular jurisdiction may not be consistent in their determination of what constitutes an affirmative defense or it is possible that the courts of the state may not have considered the matter at all.

In nondiversity cases, federal precedents and statutes, if any exist, are helpful and often determinative. One statutory defense that has been considered an affirmative defense is justification for price discrimination under the Robinson-Patman Act.[FN37] Another matter that has been considered in the nature of an affirmative defense by the Supreme Court is the defense provided in Section 1828(c)(5)(B) of the Bank Merger Act of 1966[FN38] to an action for an alleged violation of the antitrust laws.[FN39] In what appears to be one of the relatively few instances to date of congressional legislation on a procedural matter governed by the federal rules, the 1952 revision of the Patent Act makes invalidity and noninfringement of a patent affirmative defenses and provides for the manner in which they must be raised.[FN40]

As far as the judicial precedents are concerned, the following matters have been held by federal courts to be affirmative defenses under Rule 8(c) in nondiversity cases and are illustrated by the cases cited in the notes below: the defendant is a bona fide purchaser for value,[FN41] breach of warranty as a justification for nonpayment,[FN42] the applicability of a warranty disclaimer,[FN43] the plaintiff's claim falls within an exemption from statutory coverage,[FN44] the ownership by another of the property at issue in an action for condemnation of goods,[FN45] the pleader is entitled to a set-off against the plaintiff's claim,[FN46] the insufficiency of a claim for a tax refund,[FN47] the barring effect of certain defenses to trademark infringement actions,[FN48] a trustee's objection to a creditor's claim on the ground that the creditor had received a voidable preference,[FN49] the assertion of collateral source payments having been made to the plaintiffs, [FN50] the defendant's conduct was justified because of the existence of a greater hazard,[FN51] the defendant acted pursuant to a bona fide seniority system,[FN52] the defendant was a buyer in the ordinary course,[FN53] the challenged conduct was pursuant to or necessary for compliance with governmental regulations,[FN54] the unconstitutionality of a statute relied upon by the plaintiff,[FN55] the applicability of federal preemption, [FN56] various forms of immunity,[FN57] the relevance of after-acquired evidence,[FN58] the existence of a statutory bar to recovery,[FN59] the plaintiff's failure to exhaust available administrative remedies,[FN60] the defendant acted with due diligence with regard to the alleged securities fraud, [FN61] and vicarious liability for Title VII sexual harassment cases. [FN62]

Not everything falls within the rule's residuary clause, however. The following matters have been held to be defenses that can be raised by a general denial and need not be pleaded affirmatively under Rule 8(c): the assertion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 FPP § 1271
5 Fed. Prac. & Proc. Civ.3d § 1271

Page 21

defense that it no longer was obligated to respect terms of collective bargaining agreement because NLRA or LMRA superseded agreement, termination of status quo conditions pursuant to agreement violated NLRA or LMRA, and plaintiff's violations of agreement's provisions prevented plaintiff from enforcing those provisions).

   In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colorado, on November 15, 1987, D.C.Colo.1988, 721 F.Supp. 1185.

[FN55] Unconstitutionality


   Holland v. Cardiff Coal Co., D.C.W.Va.1997, 991 F.Supp. 508 (defendant argued that Coal Act violated Takings Clause).

[FN56] Preemption


   Saks v. Franklin Covey Co., C.A.2d, 2003, 316 F.3d 337 (ERISA preemption), citing Wright & Miller.

   Brannan v. United Student Aid Funds, Inc., C.A.9th, 1996, 94 F.3d 1260, certiorari denied 117 S.Ct. 2484, 521 U.S. 1106, 138 L.Ed.2d 992.

   Wolf v. Reliance Standard Life Ins. Co., C.A.1st, 1995, 71 F.3d 444 (ERISA preemption).

   Williams v. Ashland Engineering Co., D.C.Mass.1994, 863 F.Supp. 46, citing Wright & Miller, affirmed C.A.1st, 1995, 45 F.3d 588, certiorari denied 116 S.Ct. 51, 516 U.S. 807, 133 L.Ed.2d 16.

   Kenepp v. American Edwards Labs., D.C.Pa.1994, 859 F.Supp. 809.

   Kennan v. Dow Chem. Co., D.C.Fla.1989, 717 F.Supp. 799.

   In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colorado, on November 15, 1987, D.C.Colo.1988, 721 F.Supp. 1185.

   "The court holds here that preemption is an "avoidance or affirmative defense" that must be pleaded pursuant to [Rule 8(c)]." DIRECTV, Inc. v. Barrett, D.C.Kan.2004, 311 F.Supp.2d 1143 (VanBebber, J.).

[FN57] Immunity


   In re Stock Exchanges Options Trading Antitrust Litigation, C.A.2d, 2003, 317 F.3d 134 (defense based on implied repeal doctrine is type of immunity that must be pled affirmatively rather than lack of subject matter jurisdiction that can be raised at any time).

   Ringuette v. City of Fall River, C.A.1st, 1998, 146 F.3d 1 (qualified immunity).

   Ironside v. Simi Valley Hosp., C.A.6th, 1996, 103 F.3d 482.

   Collyer v. Darling, C.A.6th, 1996, 98 F.3d 211, certiorari denied 117 S.Ct. 2439, 520 U.S. 1267, 138 L.Ed.2d 199.

   Hafley v. Lohman, C.A.8th, 1996, 90 F.3d 264, certiorari denied 117 S.Ct. 1081, 519 U.S. 1149, 137 L.Ed.2d 216 (qualified immunity).

   Bentley v. Cleveland County Bd. of Comm'rs, C.A.10th, 1994, 41 F.3d 600

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Gagan v. Norton, C.A.10th, 1994, 35 F.3d 1473, certiorari denied 115 S.Ct. 1175, 513 U.S. 1183, 130 L.Ed.2d 1128.

English v. Dyke, C.A.6th, 1994, 23 F.3d 1086 (qualified immunity).

Estate of Sorrells v. City of Dallas, D.C.Tex.2000, 192 F.R.D. 203 (qualified immunity).

New York State Nat. Organization for Women v. Pataki, D.C.N.Y.1999, 189 F.R.D. 286.

Swanson v. Van Otterloo, D.C.Iowa 1998, 177 F.R.D. 645.

Reynolds v. Alabama Dep't of Transportation, D.C.Ala.1997, 976 F.Supp. 1431.

Estate of Rosenbaum by Plotkin v. City of New York, D.C.N.Y.1997, 975 F.Supp. 206.

Turiano v. Schnarrs, D.C.Pa.1995, 904 F.Supp. 400.

Aldrich v. Knab, D.C.Wash.1994, 858 F.Supp. 1480 (qualified immunity).

Stein v. Forest Preserve Dist. of Cook County, Illinois, D.C.Ill.1993, 829 F.Supp. 251, 257, quoting Elliott v. Thomas, C.A.7th, 1991, 937 F.2d 338, 345, certiorari denied 112 S.Ct. 973, 502 U.S. 1074, 117 L.Ed.2d 138.

[FN58] After-acquired evidence

Red Deer v. Cherokee County, Iowa, D.C.Iowa 1999, 183 F.R.D. 642.

[FN59] Statutory bar to recovery

Sanderson-Cruz v. U.S., D.C.Pa.2000, 88 F.Supp.2d 388 (statutory bar to recovering non-economic damages is affirmative defense).

[FN60] Failure to exhaust administrative remedies

Recognizing a split among the circuits on the question of whether the failure to exhaust administrative remedies under the Prison Litigation Reform Act constitutes a specific pleading requirement or an affirmative defense, the Ninth Circuit followed the majority of the circuits in holding that it constitutes an affirmative defense. Wyatt v. Terhune, C.A.9th, 2003, 315 F.3d 1108.

Ray v. Kertes, C.A.3d, 2002, 285 F.3d 287.

Foulk v. Charrier, C.A.8th, 2001, 262 F.3d 687.

Massey v. Helman, C.A.7th, 1999, 196 F.3d 727, certiorari denied 121 S.Ct. 2214, 532 U.S. 1065, 150 L.Ed.2d 208.

Simmons v. Ellena, D.C.Ill.2002, 2002 WL 31176161.

Lewis v. Cook County Corrections Officers, D.C.Ill.2002, 2002 WL 31133175.

Anderson v. XYZ Correctional Health Servs., Inc., C.A.4th, 2005, 407 F.3d 674 (under Prison Litigation Reform Act failure to exhaust is affirmative defense to be pleaded by defendant).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB "B"

Westlaw.

5B FPP § 1357                                                                                    Page 1
5B Fed. Prac. & Proc. Civ 3d § 1357

Federal Practice & Procedure
Federal Rules Of Civil Procedure
Current through the 2006 Update

The Late Charles Alan Wright[FNa10], Arthur R. Miller[FNa11]

Chapter 4. Pleadings and Motions
Rule 12. Defenses And Objections--When And How Presented--By Pleading Or
Motion--Motion For Judgment On The Pleadings
C. Presentation of Defenses and Objections

§ 1357 Motions to Dismiss--Practice Under Rule 12(b)(6)

**Primary Authority**

Fed. R. Civ. P. 12

**Forms**

West's Federal Forms § § 2450, 2525 to 2535

In determining whether to grant a Federal Rule 12(b)(6) motion, district courts primarily consider the allegations in the complaint. The court is not limited to the four corners of the complaint, however. Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.[FN1]

A motion made under Rule 12(b)(6) that raises the defense of failure to state a claim upon which relief may be granted must be made before the service of a responsive pleading, but according to Rule 12(h)(2) the defense is preserved and may be raised as late as trial.[FN2] Technically therefore, a post-answer Rule 12(b)(6) motion is untimely and the cases indicate that some other vehicle, such as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the plaintiff's failure to state a claim for relief.[FN3]

Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties.[FN4] Since the motion to dismiss under subdivision (6) raises only an issue of law,[FN5] the court has no discretion as to whether to dismiss a complaint that it determines is formally or substantively insufficient.[FN6] However, as will be discussed later in this section, the court has considerable leeway under the liberal pleading standards of the federal rules in deciding when a complaint is formally insufficient and whether to permit leave to replead.[FN7] Federal law governs whether a complaint in a federal court action states a claim for relief with the requisite particularity.[FN8]

An interesting problem involves the question whether a district judge may assign a case to a magistrate judge appointed under the 1968 United States Magistrates Act[FN9] for a ruling on a motion to dismiss. The Seventh Circuit in TPO, Incorporated v. McMillen,[FN10] held that the court has no power to delegate motions to dismiss to magistrates. It based its decision on the fact that motions to dismiss involve ultimate decision-making under Article III of the Constitution and that under the Act, magistrates have no power to engage in such decision-making in civil cases; they only may aid the court in managing the pretrial and discovery proceedings.

A proposition that is at the heart of the application of the Rule 12(b)(6) motion, and one that is of universal acceptance, as evidenced by the myriad of illustrative cases cited in the note below--drawn from throughout the federal court system, including the Supreme Court--is that for purposes of the motion to dismiss, (1) the complaint is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5B FPP § 1357                                                                                                                Page 2
5B Fed. Prac. & Proc. Civ.3d § 1357

construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader.[FN11] Although Rule 12(b)(6) also has been used to enforce the special heightened pleading requirements for fraud and mistake prescribed by Rule 9(b),[FN12] the district court's inquiry typically is directed simply to the question whether the allegations constitute a statement of a claim for relief under Rule 8(a). The numerous cases in the note below illustrate the way the federal courts treat that rule's statement of claim requirement.[FN13] All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.[FN14]

However, it is clear that the district judge does not have to accept each and every allegation in the complaint as true in considering its sufficiency. Courts have used varying language to draw the line between what is admitted for purposes of a Rule 12(b)(6) motion to dismiss and what is not considered admitted. For example, federal courts have said that they accept the truth of a pleading's "facts,"[FN15] "factual allegations,"[FN16] "material facts,"[FN17] "material allegations,"[FN18] "well-pleaded facts,"[FN19] "well-pleaded factual allegations,"[FN20] and "well-pleaded allegations." [FN21] Nothing appears to turn on the differences in these semantic formulations of the standard.

Conversely, a number of federal courts also have said that there are other types of allegations that need not be accepted as true on a Rule 12(b)(6) motion. Various phrases have been used by the federal courts to express this point. Among these are that the district court is not bound by a pleading's "legal conclusions,"[FN22] or its "unsupported conclusions," [FN23] or its "unwarranted inferences,"[FN24] or its "unwarranted deductions,"[FN25] or its "footless conclusions of law,"[FN26] and its "sweeping legal conclusions cast in the form of factual allegations."[FN27] Once again, these different verbalizations can be considered more or less synonymous in terms of the judicial application of Rule 12(b)(6).

This occasional judicial reliance on some of the nomenclature of the code pleading regime,[FN28] such as "facts" and "conclusions," reflects the difficulty of phrasing in abstract terms a rule of construction of pleadings that is relatively simple in actual operation. Although the pleading requirements of Rule 8(a) are very liberal and easily satisfied, many federal courts have made it clear that more detail often is required than the bald statement by the plaintiff that she has a valid claim of some legally recognizable type against the defendant.[FN29] Moreover, if the allegations in the complaint, taken as true, do not effectively state a claim for relief, the added assertion by the plaintiff that they do state a claim will not save the complaint.

Basically what this means, and it clearly is borne out by the case law is that the district judge will accept the pleader's description of what happened to him or her along with any conclusions that can reasonably be drawn therefrom. [FN30] However, the court will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself.[FN31] Thus one plaintiff's conclusory allegation that he had been deprived of his "property and personal rights and professional status, contrary to the Constitution and laws of the United States," and therefore had a right of action under the Civil Rights Act of 1964, was not accepted as true, since the plaintiff's more specific allegations that the defendant had uttered a derogatory word in reference to him indicated that at best he had an action for slander under state law.[FN32] In another case, the plaintiff's allegation that there was a conspiracy in violation of the Sherman Antitrust Act was not accepted, inasmuch as the complaint itself indicated that only one business entity was involved and a conspiracy claim requires at least two parties.[FN33]

For many years after the promulgation of the Federal Rules of Civil Procedure the motion to dismiss for failure to state a claim was viewed with disfavor and was rarely granted; in many cases and in many courts, that restrained approach to the use of the motion continues to be the norm.[FN34] In more recent years, however, a number of federal courts, as has been true with summary judgment motion practice, have been more willing to dismiss under Rule 12(b)(6), particularly in certain substantive contexts such as securities litigation. There probably are several contributing factors that have motivated this development. These are discussed in connection with Rule 8 [FN35] What is troublesome is that in certain cases the federal court seems to have exceeded the "limited" judicial function that is appropriate on a Rule 12(b)(6) motion. Perhaps this tendency will be restrained somewhat by the recent Supreme Court decisions relating to simplified pleading under Rule 8 discussed later in this section.[FN36]

The basic principles underlying practice on a Rule 12(b)(6) motion are relatively straightforward and have been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

TAB "C"

Westlaw.

12 FPP § 3155                                                                                                Page 1
12 Fed. Prac. & Proc. Civ.2d § 3155

Federal Practice & Procedure
Federal Rules Of Civil Procedure
Current through the 2006 Update

The Late Charles Alan Wright[FNa60], Arthur R. Miller[FNa61], Richard L.
Marcus[FNa62]

Chapter 13. General Provisions
Rule 83. Rules By District Courts; Judge's Directives

§   3155 Matters Not Provided for by Rule

**Primary Authority**

   Fed. R. Civ. P. 83

   As adopted in 1938,[FN1] the final sentence of Rule 83 said that in all cases not provided for by rule, the district courts could regulate their practice in any manner not inconsistent with these rules. One of the members of the Advisory Committee said that this provision was

   one of the most important and salutary in the entire set of rules. It closes all gaps in the rules. It puts an end to the whole of the Conformity Act, and it permits judges to decide the unusual or minor procedural problems that arise in any system of jurisprudence in the light of the circumstances that surround them and of the justice of the case without the complications and injustice that must attend attempts to forecast the situations and to regulate them in advance either by general or by local rule.

   * * *

   I am interested in this subject because I have heard a rumor--yes, more than a rumor--that some district courts are making too many rules. I hope that the district judges will realize the significance of this last sentence of Rule 83 and understand that local district court rules on other than purely local matters of detail may impair the useful power intended to be vested in them by that sentence.[FN2]

   The continuation of the Conformity Act after adoption of the Rules Enabling Act in 1934 was necessary, of course, to perpetuate the existing practice until a new set of federal civil rules could be drafted. Once those rules were adopted, the Supersession Clause of the Rules Enabling Act[FN3] nullified the Conformity Act as to any matters covered by the rules. But the rules as drafted did not attempt to cover every detail that was modeled on state law under the Conformity Act. Hence, Rule 83's enabling provisions regarding local rules provided needed authority for district courts to deal with such matters, and to insulate district judges against the argument that they were required by the Conformity Act to follow state practice on matters not governed by the civil rules.

   The Conformity Act was repealed in 1948,[FN4] so this impetus behind the formal authority for local rules has vanished. Explicit reliance in reported decisions on the power granted by the final sentence of Rule 83 has been relatively rare.[FN5] Moreover, some districts even adopted a local rule saying that the procedure in the state courts should govern in the absence of any controlling civil rule.[FN6] Provisions of that kind destroyed the power intended to be granted by the final sentence of Rule 83 and were at least a vestigial return to the era of conformity with state procedure that it was a principal purpose of the Civil Rules to end.[FN7]

   The 1985 and 1995 amendments to the rule, and the 1988 statutory amendments,[FN8] continue the authority to promulgate local rules without deference to state practice, and the tendency to conformity with state practice seems to have abated. Indeed, about half of the states have emulated the Civil Rules for their own courts.[FN9] For the present, the greater concern is that local rules may deviate from national rules, or may even stray beyond the proper area of procedure and intrude into substantive matters that are governed by state law.[FN10] At least in some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

districts things did not turn out as desired by the Advisory Committee member quoted above[FN11] due to the mushrooming of local rules, and the recent amendments may spur a change back toward limiting local rules to "purely local matters of detail."

§ § 3156-3160 are reserved for supplementary material.

[FNa60] Charles Alan Wright Chair in Federal Courts, The University of Texas.

[FNa61] Bruce Bromley Professor of Law, Harvard University

[FNa62] Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law.

[FN1] 1938 version

See footnote 1 to Rule 83 above.

[FN2] Importance of last sentence

Statement of Edgar Tolman, Proceedings, Washington Institute on the Federal Rules, 1938, p. 129.

See also

"The first and last sentences of the rule grant two distinct powers; they will here be called the rule-making power and the decision-making power. * * * The rule-making power was expected to be used infrequently, most often in areas not covered at all by the Federal Rules. Much greater reliance was to be placed on the decision-making power; escape from difficult, case-by-case adjudication is contrary to the spirit and purpose of the Federal Rules." Note, Rule 83 and the Local Federal Rules, 1967, 67 Col.L.Rev. 1251.

[FN3] Supersession clause

28 U.S.C.A. § 2072(b): "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."

[FN4] Conformity Act repealed

Act of June 25, 1948, c. 646 § 39, 62 Stat. 992.

[FN5] Reliance on power

In absence of procedural rules specifically covering situation, the court may, pursuant to its inherent power and decisionmaking power under this rule, fashion a rule not inconsistent with the Federal Rules. Franquez v. U.S., C.A.9th, 1979, 604 F.2d 1239.

District courts have the authority to prescribe rules for the conduct of their business in any manner not inconsistent with the Federal Rules or acts of Congress. U.S. v. Warren, C.A.9th, 1979, 601 F.2d 471.

Court may be regulated by local rule when not provided for in these rules, and then only in a manner not inconsistent with these rules. First National Bank v. Small Business Administration, C.A.5th, 1970, 429 F.2d 280.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Since the rules fail to provide a method of service on a foreign government, the court may determine in a particular case how service is to be made. Petrol Shipping Corp. v. Kingdom of Greece, Ministry of Commerce, Purchase Directorate, C.A.2d, 1966, 360 F.2d 103, certiorari denied 87 S.Ct. 291, 385 U.S. 931, 17 L.Ed.2d 213. See vol. 4A, § 1111.

A district court, in all cases not provided for by the Federal Rules of Civil Procedure or by local rules, may regulate the practice to be followed in the proceedings properly before it in any manner not inconsistent with the federal rules or with statute, and the manner and enforcement of those regulations rests in the district court's sound discretion and will not be interfered with by an appellate tribunal in the absence of a showing of arbitrariness or fundamental unfairness. In re United Corp., C.A.3d, 1960, 283 F.2d 593.

Court had power under the final sentence of Rule 83 to require the use of separate counts in compliance with Rule 10(b). Hare v. Family Publications Serv., Inc., D.C.Md.1972, 342 F.Supp. 678.

When the rules did not specifically authorize discovery of the amounts on defendants' liability coverage, insurance or bond, but Rule 26 did not specifically prohibit that discovery, the district court, under the authority of Rule 83, pertaining to the decision-making power of the district courts, would hold that the amounts were discoverable. Cuellar v. Hamer, D.C.Mich.1968, 45 F.R.D. 245. This subject was dealt with in Rule 26(b)(2), as amended in 1970.

Motion for rehearing following a final determination in habeas-corpus matters is not established by statute or rule but is recognized in the exercise of the inherent powers of the United States District Court for the Northern District of California, Northern Division. Hardison v. Dunbar, D.C.Cal.1966, 256 F.Supp. 412.

While it is desirable that the rules of court be set out expressly in written form, a court rule enforced by a long established practice and continued usage will be given the same effect. MacNeil v. Hearst Corp., D.C.Del.1958, 160 F.Supp. 157.

In the absence of any rule requiring security for costs, the court chose not to require plaintiff to give security. Newell v. O. A. Newton & Son Co., D.C.Del.1950, 95 F.Supp. 355.

**Compare**

In the absence of Congressional authorization for extraterritorial service of process in actions brought under the Commodity Exchange Act, the Court would not fill in the "interstices in the law" Congress had left. Even if the Court had authority to adopt such a rule, it would not do so. Omni Capital International v. Rudolf Wolff & Co., 1987, 108 S.Ct. 404, 484 U.S. 97, 98 L.Ed.2d 415.

[FN6] Follow state procedure


Fischer v. Karl, D.C.N.Y.1946, 6 F.R.D. 268.

Under local rule in the Southern District of New York, before the court in its discretion may apply the procedure of the state courts it must appear that the federal statutes, the Civil Rules, and the former equity practice fail to furnish parallels or analogies. Stella v. Kaiser, D.C.N.Y.1948, 81 F.Supp. 807.

[FN7] Return to conformity


Note, Rule 83 and the Local Federal Rules, 1967, 67 Col.L.Rev. 1251, 1261 n. 55.

See vol. 4, § 1030.

Criminal Rule 57(b) is similar to the final sentence of Civil Rule 83. In its Note to that provision, the Advisory Committee on Criminal Rules said in part: "One of the purposes of this rule is to abrogate any existing requirement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 FPP § 3155                                                                    Page 4
12 Fed. Prac. & Proc. Civ.2d § 3155

of conformity to State procedure on any point whatsoever."

[FN8] Amendments

    See § 3152 at notes 12-27.

[FN9] Emulated Civil Rules

    See Oakley & Coon, The Federal Rules in State Courts: A Survey of State Court Systems of Civil Procedure, 1986, 61 Wash.L.Rev. 1367.

[FN10] Deviate from national rules

    See § § 3152; 3153.

[FN11] Quoted above

    See above at note 2.

© 2006 Thomson/West

12 FPP § 3155
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB "D"

Westlaw.

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

Page 1

**H**

Supreme Court of Louisiana.
Michael BONIN, et al.
v.
FERRELLGAS, INC., et al.
No. 2003-C-3024.

July 2, 2004.

**Background:** Tenants of vacation cabin, who were severely burned in fire caused by propane gas leak, and their family members brought personal injury action against landlord, gas distributor for cabins at time of leak, and others. Gas distributor at time of leak and related parties settled under Mary Carter agreement, and tenants added previous gas distributor and its insurers. The Thirty-Eighth Judicial District Court, Parish of Cameron, No. 178,704,H. Ward Fontenot, J., granted defendants' motions for summary judgment. Plaintiffs appealed. The Court of Appeal, Woodard, J., 741 So.2d 34, affirmed in part, reversed in part, and remanded. On remand, the Ninth Judicial District Court, Parish of Rapides, Nos. 202,595 to 202,600, Donald T. Johnson, J., dismissed landlord on directed verdict and entered judgment on jury verdict in favor of remaining defendants. Appeal was taken. The Court of Appeal, Woodard, J., 855 So.2d 781, reversed and rendered. Certiorari was granted.

**13Holding:** The Supreme Court, Victory, J., held that evidence supported conclusion that initial distributor's failure to properly inspect the entire gas system was not a substantial factor in causing fire.

Reversed; trial court judgment reinstated.

West Headnotes

**[1]** Negligence 272 ⟨⟩202

272 Negligence
    272I In General
        272k202 k. Elements in General. Most Cited Cases
The determination of liability under the duty/risk analysis usually requires proof of five separate

elements: (1) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).

**[2]** Negligence 272 ⟨⟩379

272 Negligence
    272XIII Proximate Cause
        272k374 Requisites, Definitions and Distinctions
            272k379 k. "But-For" Causation; Act Without Which Event Would Not Have Occurred. Most Cited Cases
Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct.

**[3]** Negligence 272 ⟨⟩380

272 Negligence
    272XIII Proximate Cause
        272k374 Requisites, Definitions and Distinctions
            272k380 k. Substantial Factor. Most Cited Cases

Negligence 272 ⟨⟩421

272 Negligence
    272XIII Proximate Cause
        272k420 Concurrent Causes
            272k421 k. In General. Most Cited Cases
Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.

**[4]** Negligence 272 ⟨⟩1713

272 Negligence
    272XVIII Actions
        272XVIII(D) Questions for Jury and Directed Verdicts
            272k1712 Proximate Cause
                272k1713 k. In General. Most Cited

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cases
Whether the defendant's conduct was a substantial factor in bringing about the harm and, thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder.

[5] Appeal and Error 30 ⌫1008.1(5)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1008 Conclusiveness in General
                    30k1008.1 In General
                        30k1008.1(5) k. Clearly Erroneous Findings. Most Cited Cases

    Appeal and Error 30 ⌫1008.1(7)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1008 Conclusiveness in General
                    30k1008.1 In General
                        30k1008.1(7) k. Manifest or Obvious Error. Most Cited Cases
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong.

[6] Appeal and Error 30 ⌫1008.1(7)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1008 Conclusiveness in General
                    30k1008.1 In General
                        30k1008.1(7) k. Manifest or Obvious Error. Most Cited Cases
Under the "manifest error" standard of review, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.

[7] Appeal and Error 30 ⌫1008.1(3)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1008 Conclusiveness in General
                    30k1008.1 In General
                        30k1008.1(3) k. Substituting Reviewing Court's Judgment. Most Cited Cases

    Appeal and Error 30 ⌫1012.1(2)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1012 Against Weight of Evidence
                    30k1012.1 In General
                        30k1012.1(2) k. Province of Trial Court. Most Cited Cases
On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.

[8] Appeal and Error 30 ⌫1008.1(1)

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)3 Findings of Court
                30k1008 Conclusiveness in General
                    30k1008.1 In General
                        30k1008.1(1) k. In General. Most Cited Cases
The reviewing court must give great weight to factual conclusions of the trier of fact.

[9] Appeal and Error 30 ⌫996

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)1 In General
                30k996 k. Inferences from Facts Proved. Most Cited Cases

    Appeal and Error 30 ⌫1011.1(6)

30 Appeal and Error
    30XVI Review

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

30XVI(I) Questions of Fact, Verdicts, and Findings
   30XVI(I)3 Findings of Court
      30k1011 On Conflicting Evidence
         30k1011.1 In General
            30k1011.1(6) k. Credibility and Number of Witnesses. Most Cited Cases
Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

**[10] Appeal and Error 30 ☜987(4)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General
            30k987 Power and Duty to Review
               30k987(4) k. Duty to Review. Most Cited Cases
The Court of Appeal and Supreme Court have a constitutional duty to review facts.

**[11] Appeal and Error 30 ☜987(4)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General
            30k987 Power and Duty to Review
               30k987(4) k. Duty to Review. Most Cited Cases

**Appeal and Error 30 ☜1008.1(5)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)3 Findings of Court
            30k1008 Conclusiveness in General
               30k1008.1 In General
                  30k1008.1(5) k. Clearly Erroneous Findings. Most Cited Cases

**Appeal and Error 30 ☜1010.2**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)3 Findings of Court
   30k1010 Sufficiency of Evidence in Support
      30k1010.2 k. Total Failure of Proof. Most Cited Cases
To properly perform its constitutional duty to review facts, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support.

**[12] Appeal and Error 30 ☜1011.1(7)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)3 Findings of Court
            30k1011 On Conflicting Evidence
               30k1011.1 In General
                  30k1011.1(7) k. Clear, Plain, or Manifest Error. Most Cited Cases
When two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.

**[13] Gas 190 ☜20(2)**

190 Gas
   190k15 Injuries from Escape or Explosion of Gas
      190k20 Actions
         190k20(2) k. Evidence. Most Cited Cases
Evidence supported jury's conclusion that propane distributor's failure to properly inspect the entire gas system was not a substantial factor in causing fire at cabin with uncapped line several years after distributor had ended deliveries and a subsequent distributor began supplying gas; the jurors could have reasonably believed that landlord had previously disconnected an appliance and plugged the line at his mother's house and was not being truthful when he disclaimed any knowledge of the necessity to cap or plug the gas line in cabin when he removed the space heater, and uncontradicted testimony from subsequent distributor's employees indicated that the distributor would have discovered and remedied the uncapped line had it conducted the required inspections.

*90 Louis C. LaCour, Jr., Robert Markle, Adams & Reese, New Orleans; Steven G. Emerson, Thomas H. Davis, Stinson, Morrison, Hecker; John E. McElligott, Jr., Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette; Larry A. Stewart,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

Page 4

Stafford, Stewart & Potter, Alexandria; David R. Frohn, Frohn & Thibodeaux, Lake Charles, Counsel for Applicant.

Jennifer A. Jones, Jennings B. Jones, III, Patrick K. Hebert, Jones Law Firm, Cameron; Philip G. Hunter, Hunter & Morton, Alexandria; John W. deGravelles, deGravelles, Palmintier, Holthaus & Fruge, Baton Rouge; Daniel K. Wall, Marcantel, Marcantel, Wall & Pfeiffer, Jennings; Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles; Peter B. Derouen, Michael C. McMullen, Michael J. Remondet, Jr., Jeansonne & Remondet, Lafayette; Michael L. Hyman, Edgar D. Gankendorff, Provosty, Sadler, Delaunay, Fiorenza & Sobel, Alexandria; Scott H. Fruge, Baton Rouge, Bruce D. Beach, Nora M. Stelly, Allen & Gooch, Lafayette, Counsel for Defendant.

VICTORY, J.

We granted this writ to determine whether the court of appeal misapplied the *91 manifest error/clearly wrong standard of review in reversing a jury verdict in favor of the defendant, Empiregas, Inc. of Lake Charles ("Empiregas"). After a review of the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the trial court judgment in favor of Empiregas.

## FACTS AND PROCEDURAL HISTORY

In August of 1995, six young adults staying in a rental cabin, Cabin R-6, at the "Richard Cabins" in Holly Beach, Cameron Parish, Louisiana, were severely burned when their cabin caught fire. The fire department's investigation discovered an open and uncapped propane gas line located along the cabin's south wall.[FN1] The fire was caused by propane gas that had leaked from the open, uncapped gas line valve. Defendant Lawrence Lanclos ("Lanclos") owned and operated the Richard Cabins, comprising ten units, which he purchased in 1986. Propane gas for all of the cabins was originally provided by a single, red propane tank. Beginning in July of 1986, shortly after Lanclos acquired the property, Empiregas began servicing and providing propane gas to the cabins. Empiregas made ten deliveries of propane gas to the Richard Cabins, beginning on July 16, 1986 and ending on December 11, 1987. During this time period, Empiregas did not inspect the entire propane gas system at the cabins as required by law.[FN2] However, the gas line in Cabin R-6 was neither open nor uncapped during this time period as a space heater was attached to the outlet.

FN1. The gas line had a valve with a short handle which was located at the end of the line.

FN2. The jury was instructed as to the regulations applicable to the Louisiana Liquefied Petroleum Gas industry as follows:

1.2 Bonded Dealers, (m): A dealer shall not serve any liquefied petroleum gas system which the dealer knows or should know is not installed pursuant to the Liquefied Petroleum Gas Commission Regulations or is in a dangerous condition. All new installations or reinstallations must be checked by the dealer for tightness of lines, poor workmanship, use of unapproved pipe or appliances or use of poor piping design. All improper installation shall be corrected before the dealer services such installation or reinstallation with fuel for the first time. Any subsequent servicing dealer shall not be responsible for unauthorized changes in or failures of an existing system or connected appliances.

(n): Each dealer shall transmit a notice once a year to each customer stating that liquefied petroleum gas systems are potentially dangerous, that a leak in the system could result in a fire or explosion, and that systems should be inspected periodically.

5.10: Piping, Tubing and Fittings, (a) Piping Material: Piping shall be wrought iron or steel (black or galvanized), brass or copper pipe, or seamless copper, brass or steel.

(f) Cap Outlets: Each outlet, including a valve or cock outlet shall be securely closed gas-tight with a positive threaded plug or a cap if appliance is not to be connected. When an appliance is removed from an outlet, and the outlet is not to be reconnected at that time, it shall be securely closed gas-tight. In no case shall the outlet be closed within tin caps, wooden plugs, corks, etcetera.

5.14: Transfer of Liquids, (g) Must Not Serve Illegal Installations: Bonded dealers must not serve any liquefied petroleum gas containers installed illegally in the state of Louisiana or posted by the Liquefied Petroleum Gas commission. Ignorance will not be accepted as an excuse, as it is the duty of the dealer to investigate before

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

Page 5

serving any doubtful liquefied gas container.

Lanclos had no records of receiving propane gas service from anyone after December of 1987 until a delivery was made by Ferrellgas, Inc. ("Ferrellgas") on May 12, 1989. Ferrellgas remained the sole servicing dealer for more than six years, including the time period when the fire occurred. Ferrellgas's last delivery of *92 propane gas to the cabins was one week before the accident. When Ferrellgas began servicing the account, it also failed to inspect the entire propane gas system at the cabins.

In addition, when the 1995 accident occurred, propane was being supplied by Ferrellgas to Cabin R-6 from a silver propane tank, which Lanclos himself had installed five months earlier. Lanclos had determined that the red tank was no longer safe, so he bought and installed the silver tank. This silver tank replaced the red propane tank that supplied gas to the cabins at the time Ferrellgas began servicing the cabins in 1989. Ferrellgas knew that the swap-out of the tank required an inspection of the entire system, but it failed to perform the inspection.

The record reflects that had Ferrellgas conducted the required inspections, it would have discovered the uncapped line in Cabin R-6. Lanclos testified that sometime in 1988, he removed the space heater that was attached to the outlet but failed to cap it. This occurred after Empiregas had ceased servicing the account, but before Ferrellgas began servicing the account.

The victims of the fire, Michael Bonin, Brent Benoit, William John "Billy" Britt, John Perez, Jeffrey Kebodeaux, and Angela Thibodeaux, along with their respective parents and/or children ("plaintiffs"), all filed suit for their injuries against Lanclos and Ferrellgas. These suits were later consolidated. On June 27, 1996, plaintiffs and Ferrellgas entered into a "Mary Carter" settlement for $18,000,000.00. The terms of the agreement required plaintiffs to sue Empiregas and to pay Ferrellgas, its insurer, and its counsel 56% of the first $18,000,000.00 recovered from Empiregas. Ferrellgas then aligned itself with plaintiffs and agreed to help them prosecute their claims against Empiregas.

Empiregas moved for summary judgment on the grounds that the risk that led to the accident, the uncapped valve in Cabin R-6, did not exist when Empiregas provided propane service to the cabins. Empiregas established this fact through several depositions given by Lanclos. Plaintiffs then

produced an affidavit from Lanclos stating that after reviewing matters with plaintiffs' counsel, he wished to recant his testimony. The trial court granted Empiregas's motion for summary judgment. The Third Circuit reversed on the grounds that the trial court had based its decision on Lanclos's testimony. *Thibodeaux v. Ferrellgas, Inc.*, 98-0862 (La.App. 3 Cir. 1/6/99), 741 So.2d 34. The court found that the "apparent contradictions and Lanclos's explanations ... are arguable and best left to the jury." *Id.* at 42.

Trial on the merits went forward in the 9th JDC on November 6-16, 2001. [FN3] The jury returned a verdict in favor of Empiregas, answering "No" to Jury Interrogatory # 1, which asked "Was Empire Gas, Inc., Empire Gas of Lake Charles, Inc., its agents, servants or employees negligent, and, if so, was such negligence a proximate *93 cause of [each plaintiff's] burn injuries?" [FN4] The trial judge entered judgment in accordance with the verdict and also granted motions for directed verdict dismissing Lawrence Lanclos.

FN3. The week before trial, a purported public service announcement aired on a local television station, showing pictures of the propane tank, a raging house fire, and a woman being loaded into an ambulance. The trial court interrogated potential jurors and determined that the announcement would prejudice jurors against Empiregas, and on Empiregas's motion, ordered that venue be changed to the 9th Judicial District Court for the Parish of Rapides, a parish outside the station's viewing area. The Third Circuit reversed that order, but this Court vacated the Third Circuit's judgment and reinstated the trial court's change of venue order. *Thibodeaux v. Ferrellgas, Inc.*, 00-2635 (La.9/20/00), 767 So.2d 707.

FN4. On the issue of causation, the jury was instructed as follows:
As to the requirement that plaintiff's injury be caused by defendant's conduct, I do not mean that the law recognizes only one cause of any injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things may operate at the same time, either independently or together, to cause injury or damage. You should resolve this question by deciding whether plaintiff would probably not have suffered the claimed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injuries in the absence of defendant's conduct.

If plaintiff probably would have suffered those injuries regardless of what the defendant did, then you must conclude that the injuries were not caused by the defendant, and render a verdict for that defendant.

If, on the other hand, plaintiff probably would not have suffered the claimed injuries in the absence of defendant's conduct, then you must conclude that defendant's conduct did play a part in plaintiff's injuries, and you must proceed to the next element.

...

An original tort feasor will not be relieved of the consequences of its negligence, unless the intervening cause superseded the original negligence and, alone, produce the injury.   If the original tort feasor could or should reasonably foresee the incident that might occur, he will-he will be liable notwithstanding the intervening or superseding cause.

The Third Circuit reversed, finding no "reasonable basis upon which the jury could have reached the conclusion that Empire was relieved of all liability for the injuries Plaintiffs sustained." *Bonin v. Ferrellgas, Inc., 02-1031 (La.App. 3 Cir. 8/6/03), 855 So.2d 781, 799.* The court of appeal found that Empiregas breached its duty to inspect the entire Richard Cabins propane gas system before initially servicing the account, and that this duty extended to those who rented the cabins even after Empiregas had ceased servicing that account. *Id. at 795-96.* Then, recognizing that even if Empiregas was negligent, it would be excused from liability "if an intervening cause superseded the original negligence and, alone, produced the injury," the court of appeal found that "the entire cause-in-fact inquiry turns on Mr. Lanclos' knowledge of whether he needed to cap the valves." *Id. at 797.*   The court of appeal dismissed the argument that Empiregas's failure to inspect the cabins was not a substantial factor contributing to the fire, even though at the time of Empiregas's service, the line in Cabin R-6 was not uncapped due to the existence of a space heater.   Instead, the court of appeal reasoned that if Empiregas had performed an inspection of the entire system, it would have discovered uncapped gas lines in other cabins and should have informed Lanclos of these defects, refusing to service the system until he corrected the defects by capping the lines, which would also have had the effect of notifying Lanclos that lines had to

be capped, which would have prevented Lanclos from leaving the line in Cabin R-6 uncapped several years later. *Id. at 798.*   The court of appeal found that the testimony of Lanclos was "uncontradicted" and failed to show that he knew a line with a valve had to be plugged or capped. *Id. at 799.*   Thus, the court of appeal apportioned 65% of the fault to Ferrellgas and 35% of the fault to Empiregas, and fixed damages at more than $21,000,000.00, resulting in the imposition of more than $8,000,000.00 in damages against Empiregas.

We granted Empiregas's writ application to consider whether the Third Circuit misapplied the manifest error/clearly *94 wrong standard of review. *Bonin v. Ferrellgas, Inc., 03-3024 (La.2/13/04), 866 So.2d 805.*

## DISCUSSION

[1] Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis. The determination of liability under the duty/risk analysis usually requires proof of five separate elements:  (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);   (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element);   and (5) proof of actual damages (the damages element).   *Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606, 611; Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230* (citing David W. Robertson, et al., *Cases and Materials on Torts,* 83-84 (1989); *Fowler v. Roberts, 556 So.2d 1 (La.1989)* (on original hearing)).

[2][3][4] Empiregas argues that the court of appeal erred by reversing the jury's findings on the issue of causation.   Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. *Id.* However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.   In this case, more than one party's conduct allegedly caused the fire, i.e., Ferrellgas, Empiregas, and Lanclos.   In considering the substantial factor test, this Court has

stated that cause-in-fact clearly exists when the plaintiff's harm would not have occurred absent the specific defendant's conduct. *Perkins, supra* at 612 (citing *Graves v. Page, 96-2201 (La.11/7/97), 703 So. 566, 570).* This Court has considered "whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause." *Perkins, supra* at 612 (citing *Graves, supra*). Also considered is "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm." *Id.* (Quoting *LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978)).* Whether the defendant's conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder. *Perkins, supra* at 612; *Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1310.*

[5] A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Id.* Although we have spelled out the appropriate standard of review under the manifest error standard on numerous occasions, it bears repeating, because the court of appeal in this case improperly applied this standard. As this Court has recently stated, the manifest error/clearly wrong standard is "now well-established doctrine." *Henderson v. Nissan Motor Corp., 03-0606 (La.2/6/04), 869 So.2d 62.*

[6][7][8][9] Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) *95 further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).* On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221.* In sum:

[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, *even though the appellate court may feel that its own evaluations and*

*inferences are as reasonable.* The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. (Emphasis added.)

*Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Ambrose, supra* at 224 n. 1 (Lemmon, J., concurring).

[10][11][12] However, this Court clarified in *Ambrose* that our purpose in *Stobart* was not "to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset." *Perkins, supra* at 613 (citing *Ambrose, 639 So.2d at 221).* Recognizing that great deference should be accorded to the fact finder, the court of appeal and this Court have a constitutional duty to review facts. *Id.* To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. *Id.* That being said, we reiterate that when two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.

[13] The key issue in this case is whether the jury's finding, that Empiregas's failure to properly inspect the entire gas system at the Richard Cabins in July of 1986 was not a substantial factor [FN5] in causing the accident, was clearly wrong based on the evidence or clearly without evidentiary support. The record clearly reflects that had Empiregas inspected all the cabins at that time they would have discovered uncapped lines in some of the cabins, but not Cabin R-6 where the fire occurred, because a space heater was connected to the line during that time. In addition, evidence presented at trial established two other possible causes of this accident: (1) that Lanclos knew that an open valve needed to be capped from his prior experience with such valves at his mother's house and from his experience in installing and connecting an entire new propane gas tank at the Richard Cabins; and (2) that Ferrellgas breached its duty to inspect the propane gas system at the Richard Cabins on at least two subsequent occasions, upon which they would have discovered the uncapped line in Cabin R-6.

FN5. As stated on pages 92-93, *supra*, the jury verdict form asked whether Empiregas's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negligence was a "proximate cause" of the accident, although the jury was instructed as to the law regarding causation under the "substantial factor" test.

While the Third Circuit characterized Lanclos's testimony as "uncontroverted," the record reveals that it was not. The Third Circuit relied on trial testimony which, in their view, "demonstrated that Mr. Lanclos knew that an 'open valve' was dangerous and believed that a valve was *96 sufficient to close it and, thus, prevent a leak. However, Empiregas failed to show that he knew a valve had to be capped or plugged." 855 So.2d at 799. However, upon further review of the record, it is clear that there was a conflict in Lanclos's testimony about whether he knew an open line needed to be capped or plugged and that Lanclos's credibility suffered as a result of his cross-examination, where he testified as follows:

Q. Do you remember testifying on numerous occasions, that R-6 had a heater in the cabin when you bought it?

A. Well, I might have said that that day because, you know.

Q. You might have said it?

A. But-but, now, you know, when I go back, I mean, I'm not positive it was in there.

Q. Do you remember giving four depositions in this case?

A. I know. But now, I don't remember if, you know, if-if it was in there, or I put it out there. I can't-I don't remember, you see.

Q. Mr. Lanclos, you remember giving four depositions in this case?

A. Yeah, at that time.

Q. And do you remember you gave your first deposition when Ferrellgas was a defendant?

A. Yes, I remember that, too.

Q. And, then you gave three more depositions after Empire-after Ferrellgas sued, and then after Ferrellgas settled with the plaintiffs, ...

A. Yeah. Uh-huh.

Q. ... you gave three more depositions after ...

A. Yeah.

Q. ... Ferrellgas sued Empire.

A. Yeah. Uh-huh.

Q. And you remember, in every one of those depositions, we spent a lot of time talking about the space heater in R-6.

A. Yeah, I remember that.

Q. Okay. And do you remember testifying over, and over, and over, again, that when you bought the Richard Cabins, there was a space heater connected to the line in Cabin R-6?

A. I-I-I-I told-I said that, but-

Q. You said it probably thirty times?

A. Maybe more, you know.

Q. During the four different.

A. Yeah.

Q. And are you now going to change that testimony?

A. It's not changed. I don't remember.

Q. Now you don't remember. Have you met with anybody since you gave your last deposition?

A. I just met them a while ago, you know. I ...

Q. Who-

A. ... talked with them.

Q. Who did you meet with?

A. With my lawyer and Mr. Jones [plaintiff's counsel].

Q. I see. And did you meet with Mr. Jones today?

A. Yeah, I-I met with him today.

Q. Okay. And Mr. Jones is suing you, is that correct? His clients are suing you?

A. I know. Yeah.

Q. Okay. Did you meet with Mr. Jones about two weeks ago, also?

A. I-I-Mister-my lawyer told me to go meet them where that thing had burned.

Clearly, this testimony put Lanclos's credibility at issue. Lanclos was further cross-examined on his knowledge and experience*97 in working with propane gas systems, including the fact that he himself had disconnected and replaced the red propane tank with the silver propane tank. Lanclos was also cross-examined about installing a gas heater at his mother's house, testifying as follows:

Q. And when you-when you took your mother-the heater out of your mother's house, you put a cap on that gas line, didn't you?

A. No, I didn't put no cap on it.

Q. You didn't?

A. No.

Q. Okay, the gas line was just opened?

A. No, it had a-a valve on it.

Q. Okay. Didn't you testify that the gas line did not have a valve on it, in your depositions?

A. Oh, no. But you can't-

Q. Okay. Do you remember testifying that there was a gas line coming out of the floor at your mother's house?

A. Yeah.

Q. And did I-did-were you asked this question, at Page 40 line 8, "Did it have a valve on it?" And do you remember giving the answer, "I don't think so." Do you remember?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

Page 9

A. Maybe I said it, but-you can't have a line without no something on it.   I would have burned the house.
Q. Uh-huh. And what-it didn't have a valve on it, so you put a cap on it.   Isn't that the truth?
A. A valve on it.   You know, a valve.   Something you can open and close.
Q. Do you remember testifying that you put a plug in that line at your mother's house several years before this accident?
A. Well, it could be, you know.

...

Q. Do you remember me asking you this question, "When you took mom's gas stove off the system, did you put a cap on that line so gas wouldn't escape?" "If it had a valve, or whatever you call it, but I took the valve, and I put a plug on it to put the line on it." Do you remember giving me that answer?
A. Well, I'd have to see the valve, you know.
Q. You remember?
A. I'll have to see if-what's on it now, you know.
Q. Okay, do you remember telling ...
A. I-
Q ..... us, under oath, you put a-you screwed a plug into the line?
A. Well, I didn't go see, you know.   I didn't go see the-I'd have to go see it to-to know exactly what's on it.
Q. Okay. Do you remember ask-me asking you these questions, and you giving this answer?   This is on Page 20, counsel, on Line 5:
"Q. What did you just tell me about the plugs, Mr. Lanclos?
A. You can't leave an open line.   The gas is going to leak.
Q. And you knew that?
A. Yes.
Q. So you put a plug on it.   Is that right?
A. Yeah."
Do you remember giving those answers to those questions?
A. I might have gave you that answer, but ...
Q. Was it true?
A..... I didn't go see the pipe, what's on it, you know.
Q. Where those-were those answers truthful when I asked you those questions?   Did you tell me the truth?
*98 A. Well, the truth in my knowledge.   But I don't

...

Q. Okay.
A.... I don't know if it's right, or what.
Q. And you put that plug on that line in your mother's house, that gas line, before, years before this accident happened in Holly Beach, didn't you?
A. Yeah. Uh-huh.
Q. Okay. It was before the fire at Holly Beach that

you knew that you had to put a plug in an opened line, correct?
A. I didn't know you had to put a plug.
Q. But you did that at your mother's house, correct?
A. Well, I have to go see the house to see if it's there, what it is, if it's a plug, or-or if it's alive.   I don't-I don't know.

In light of this testimony, the jurors could have reasonably believed that Lanclos had previously disconnected an appliance and plugged the line at his mother's house, and was not being truthful when he disclaimed any knowledge of the necessity to cap or plug the gas line in Cabin R-6 when he removed the space heater.   Lanclos's credibility was clearly at issue, and the jury was in the best position to decide whether Lanclos was telling the truth.   *See Lasyone v. Kansas City Southern R.R.*, 00-2628 (La.4/3/01), 786 So.2d 682, 693 (when findings are based on determinations regarding witness credibility, the manifest error/clearly wrong standard demands great deference to trier of fact's findings); *Henderson, supra* (where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong).   As we have stated numerous times, "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Perkins, supra* (numerous citations omitted).   The issue is not whether the jury's determination was right or wrong, but whether it was reasonable.

The court of appeal also ignored uncontradicted testimony from Ferrellgas employees that established that Ferrellgas, who supplied gas to the cabins from 1989 up to, and including, the time of the fire, should have inspected the propane system at least twice during that time period, once upon beginning service and again when the new silver propane tank was installed, and that it would have discovered and remedied the uncapped gas line in Cabin R-6 had it conducted either of these required inspections. Whereas there was never an uncapped gas line in Cabin R-6 while Empiregas delivered propane to the cabins, the line in Cabin R-6 was uncapped during the entire time that Ferrellgas serviced them.   One employee even testified that it would have been "stupid" for Ferrellgas's employees to rely on an inspection Empiregas might have done years earlier in light of Ferrellgas's independent safety inspection obligations.   Finally, unlike Empiregas, whose last

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

877 So.2d 89
877 So.2d 89, 2003-3024 (La. 7/2/04)
(Cite as: 877 So.2d 89)

Page 10

delivery of propane gas was nine years before the accident, Ferrellgas delivered propane gas to the cabins as late as one week before the accident.

The evidence presented enabled the jury to reasonably conclude that the accident was not caused by Empiregas as they reasonably could have inferred that Lanclos knew that an open gas line needed to be capped, yet failed to do so. If he already had that knowledge, Empiregas's failure to inspect the system in 1986 and advise Lanclos that open gas lines needed to be capped would not have prevented the accident. Further, the jury could have reasonably concluded based on the evidence presented that Ferrellgas had an independent*99 duty to inspect the entire propane gas system at the Richard Cabins at the time they started providing propane gas in 1989 and again in 1995 when Lanclos installed the new propane gas tank. The jury could have reasonably concluded that, because an inspection at either of these times would have disclosed the uncapped valve in Cabin R-6, Empiregas's breach did not cause the accident.

CONCLUSION

We find that the court of appeal erred in reversing the jury's verdict in favor of Empiregas under the manifest error standard of review. Analyzing this case properly under that standard and considering the testimony of Lanclos and the Ferrellgas employees, we hold that the jury's finding in favor of Empiregas was supported by the evidence and not clearly wrong.

DECREE

For the reasons stated herein, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.

**REVERSED; TRIAL COURT JUDGMENT REINSTATED.**

La.,2004.
Bonin v. Ferrellgas, Inc.
877 So.2d 89, 2003-3024 (La. 7/2/04)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB "E"

LEXSEE 314 SO.2D 527

**ROBERT H. CARR ET UX., Plaintiffs–Appellees v. PARISH OF EAST BATON ROUGE ET AL., Defendants–Appellants**

**No. 10,261**

**Court of Appeal of Louisiana, First Circuit**

*314 So. 2d 527; 1975 La. App. LEXIS 3893*

**May 21, 1975**

**SUBSEQUENT HISTORY: [**1]**

Rehearing Denied June 30, 1975.  Writ Refused September 17, 1975.

**PRIOR HISTORY:**  ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT IN AND FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, HONORABLE STEVE A. ALFORD, JR., JUDGE PRESIDING.

**COUNSEL:**

John R. Sheppard, Asst. City–Parish Atty., and Joseph F. Keogh, City Parish Atty., Baton Rouge, for Defendants–Appellants.

Charles S. McCowan, Jr., Baton Rouge, for Plaintiffs–Appellees.

**JUDGES:**

Sartain, Ellis and Barnette, JJ.

**OPINIONBY:**

SARTAIN

**OPINION:**

[*528] Defendants bring this appeal from a judgment rendered in favor of plaintiffs for damages sustained by them as a result of the backup of sewer effluent into their home on October 26, 1972.  Plaintiffs have answered the appeal asking that the award be increased.  We affirm as to liability and amend to increase the award.

On the night of the incident giving rise to this litigation, Mrs. Carr and her neighbor complained to the Sanitary Sewer Division of the Department of Public Works of the City of Baton Rouge and the Parish of East Baton Rouge, that they were experiencing difficulty with their commodes which were overflowing.  Mr. David

Gomez, Maintenance Foreman in the Sewer Division, [**2] was dispatched to plaintiffs' home to ascertain and rectify the difficulty.  He determined that the problem was in the main sewer line located to the rear of plaintiffs' home.

A crew from the Department was called by Mr. Gomez.  Under his supervision a high pressure water nozzle was employed in an effort to dislodge the obstruction.  This procedure proved unsuccessful and Mr. Gomez decided to wait until the next morning because it was going to be necessary to dig up the line and physically remove the obstruction.  When he returned to his home Mrs. Carr called to report that her problem had worsened.

The next morning Mr. Gomez's crew dug up a portion of Oakley Drive and discovered that a section of the main sewer line beneath the street was completely crushed.  Oakley Drive is located one block west of plaintiffs' property.

Plaintiffs contend that the use of the water nozzle and the placing of three thousand [*529] gallons of water in the main sewer line under the existing conditions constituted negligence under *C.C. Art. 2315*; and, alternatively, plaintiffs are entitled to damages under the theory of liability without fault found in *C.C. Arts. 660 and 667*.

Defendants argue [**3] that the action of Mr. Gomez was proper and that the evidence in the record dictates that plaintiffs failed to prove that the water from the high pressure water nozzle caused the damage complained of.  Defendants did not address themselves to the applicability of *C.C. Art. 667*.

The trial judge, in his oral reasons for judgment, stated that even in the absence of negligence, plaintiffs were entitled to recover under *C.C. Art. 667*.

We are of the opinion that *C.C. Art. 667* is applicable and warrants judgment in favor of the plaintiffs.  The record does not support a holding founded on negligence.  Mr. Gomez inserted the water nozzle in an empty manhole

314 So. 2d 527, *529; 1975 La. App. LEXIS 3893, **3

west of plaintiffs' home. He chose this manhole because the one east of plaintiffs' home was full of sewerage. He correctly calculated that the blockage in the main line was between plaintiffs' home and the empty manhole. Further, because of the crushed condition of the main line, very little, if any, water could have gotten into the full line thereby causing or even aggravating the situation.

*C.C. Art. 667* provides:

"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which [**4] may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

The main line with which we are concerned is situated on an eight foot servitude located along plaintiffs' rear property line. The operation and maintenance of this line is admittedly the responsibility of defendants. Thus, they are proprietors within the intent of *C.C. Art. 667*. *Sharon v. Connecticut Fire Insurance Company, 270 So.2d 900* (1st La.App., 1973), writs refused, *275 So.2d 788*, and *Hamilton v. City of Shreveport, 180 So.2d 30 (2 La.App., 1965)* writs refused, *248 La. 700, 181 So.2d 399 (1966)*.

While the record does not contain any evidence as to who actually constructed the main sewer line, we must conclude that it became a *work* of the defendants when, if not built by them, the same was accepted and maintained by the defendants. A plat of the sanitary sewer system for the subdivision in which plaintiffs reside is contained in the record and clearly denotes the servitude and prescribes the requirements which must be adhered to when individual property owners connect their own lines to the main line.

As stated in *Lombard v. Sewerage & Water Board* [**5] *of New Orleans, 284 So.2d 905* (La., 1973), the burden of proving a causal relation between the work of the proprietor and the damage to a neighbor rests with the neighbor. It is obvious that the crushed line caused plaintiffs' damage.

In considering this relation we are mindful of Professor Ferdinand Fairfax Stone's comment *(40 T.L.R. 701 at 705–6)*:

"The important thing is that these are only illustrations of the type of 'works' which at the time of the adoption of the Code could be expected to damage one's neighbor. The listing was never intended to be exclusive. The list grows as the society develops. The

world of the Romans or that of Domat did not contemplate the use of dynamite in conducting geophysical explorations, the use of pile–driving equipment to prepare a foundation for buildings, the operation of jet–planes over residential areas, the dusting of crops by airplanes, the operation of huge factories, the storing or use of radioactive materials. *As man's ingenuity* [*530] *in creating works upon his lands and in conducting operations thereon has increased, so has his capacity to cause harm to his neighbors, with the corresponding necessity for regulation* [**6] *in the interest of the good of all.*

Thus the Louisiana courts have extended the protection of article 667 to such post-1825 activities as the operation of railway terminal facilities, pile–driving operations, subterranean explosions in connection with oil exploration and production, and the aerial dusting of crops with insecticides."

It is equally apparent to us that the operation of a sanitary sewer system in an urban society was not contemplated.

Professor Stone, recognizing that *C.C. Art. 667* should be adapted to conditions as they exist today, states that some consideration should be given to the defenses available to a proprietor, *40 T.L.R. 701, 713*. Our jurisprudence is silent on the subject because the issue has yet to be presented for appellate review.

The record in this cause contains many examples of conditions which create stoppages within an existing sewer system. It is for this reason that we address ourselves to the issue of defense. This issue can best be resolved on a case by case method where the facts of a given case will dictate the result. Recognizing that a particular set of facts may warrant a finding for the proprietor, the proprietor should [**7] bear the burden of proof to justify his exculpation.

In the case at bar, plaintiffs have satisfied the requirements of proof imposed upon them to–wit: The defendants, as proprietors, and plaintiffs are *neighbors*; the *work* (the main sewer line) is an activity of the proprietors; and, plaintiffs have established a causal relation between *damage* to their home and the defendants' *work*. *Lombard v. Sewerage & Water Board of New Orleans, supra.*

On the other hand, defendants have failed to establish any facts which would tend to relieve them from liability.

We now turn to the question of damages. As stated

314 So. 2d 527, *530; 1975 La. App. LEXIS 3893, **7

above, the plaintiffs answered the appeal asking that the judgment of the district court be amended to award them damages for "mental anguish, worry, tension and inconvenience" in the amount of $1,000.00 for Mr. Carr and $1,500.00 for Mrs. Carr. The trial judge awarded plaintiffs the sum of $956.30, which is the actual amount it cost to remove the old carpet and replace it with carpet of similar quality. He obviously rejected their demands for mental anguish, etc. Mrs. Carr testified in detail as to the ordeal which ensued and the efforts on her part to cope with [**8] the problem. She mopped and endeavored to clean up the effluent in her home until two or three o'clock the next morning. It was a very trying and unpleasant experience. Under these circumstances, we think she is entitled to the sum of $500.00. Mr. Carr did not testify

in these proceedings and his claim for such damages is rejected. See Professor A. N. Yiannopoulos' "Violations of the Obligations of Vicinage: Remedies Under Articles 667 and 669", *34 L.L.R. 475, 479.*

Accordingly, for the above reasons, the judgment of the district court is amended to award Mrs. Ruth G. Carr, individually, the sum of Five Hundred and 00/100 ($500.00) Dollars, together with legal interest thereon from the date of judicial demand, until paid. In all other respects, the judgment is affirmed.

All such costs as are permitted by law are to be borne by the defendants.

AMENDED AND AFFIRMED.

TAB "F"

Westlaw.

**C**

Court of Appeal of Louisiana, Second Circuit.
POUNCY
v.
TEMPLE et al. (ROYAL INDEMNITY CO.,
intervenor).
No. 7275.

April 29, 1949.
Rehearing Denied June 6, 1949.

Appeal from First Judicial District Court, Parish of Caddo; Henry F. Turner, Judge.

Personal injury action by Thurmon Pouncy against A. H. Temple and others. The Royal Indemnity Company intervened. From the judgment, plaintiff and intervenor appeal.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⟶999(1)**

30 Appeal and Error
   30XVI Review
     30XVI(I) Questions of Fact, Verdicts, and Findings
       30XVI(I)2 Verdicts
         30k999 Conclusiveness in General
           30k999(1) k. In General. Most Cited Cases
The Court of Appeal will give jury's findings of fact the same weight as is accorded trial judge's findings of fact, and will carefully scrutinize and examine jury's findings of fact, but will not disturb them except for manifest error.

**[2] Evidence 157 ⟶11**

157 Evidence
   157I Judicial Notice
     157k11 k. Historical Facts. Most Cited Cases
The scarcity of iron and steel in the fall of 1946 is a matter of common knowledge.

**[3] Products Liability 313A ⟶42**

313A Products Liability

313AI Scope in General
   313AI(B) Particular Products, Application to
     313Ak42 k. Buildings and Building Components and Materials. Most Cited Cases
      (Formerly 272k134(11))
In action against defendant fabricating fire escapes for retail store for injuries sustained by store employee when balance arm buckled and store employee was thrown to ground while working on the balancing of fire escape under direction of store superintendent, evidence warranted denial of recovery on ground that sole, direct and proximate cause of accident was due to negligence of superintendent in overloading ballast drum, and that balancing of fire escape was not obligation of defendant, but was independent operation undertaken by superintendent.

**[4] Negligence 272 ⟶1653**

272 Negligence
   272XVIII Actions
     272XVIII(C) Evidence
       272XVIII(C)5 Weight and Sufficiency
         272k1651 Degree of Proof
           272k1653 k. Preponderance of Evidence. Most Cited Cases
      (Formerly 272k134(2))
Plaintiff must establish his claim of negligence of defendant by a preponderance of the evidence.

**[5] Negligence 272 ⟶431**

272 Negligence
   272XIII Proximate Cause
     272k430 Intervening and Superseding Causes
      272k431 k. In General; Foreseeability of Other Cause. Most Cited Cases
      (Formerly 272k62(1))
An intervening cause will not relieve from liability where prior negligence was efficient cause of injury, nor where intervening cause is set in operation by original wrongful act, nor where intervening cause need reasonably have been anticipated.

**[6] Products Liability 313A ⟶15**

313A Products Liability
   313AI Scope in General
     313AI(A) Products in General
      313Ak15 k. Proximate Cause and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 So.2d 139
41 So.2d 139
(Cite as: 41 So.2d 139)

Foreseeable Injury;  Intended or Foreseeable Use.
Most Cited Cases
          (Formerly 272k56(1))
A manufacturer's negligence in fabrication of product does not justify recovery where negligence and resulting defect do not cause or contribute to occurrence of accident.

[7] Products Liability 313A ⟍⟋42

313A Products Liability
     313AI Scope in General
          313AI(B) Particular Products, Application to
          313Ak42  k.  Buildings  and  Building Components and Materials. Most Cited Cases
          (Formerly 272k27)
A fire escape is not inherently dangerous, as respects liability of manufacturer for injuries sustained by plaintiff on fire escape.

Appeal and Error 30 ⟍⟋999(1)

30 Appeal and Error
     30XVI Review
          30XVI(I) Questions of Fact, Verdicts, and Findings
               30XVI(I)2 Verdicts
                    30k999 Conclusiveness in General
                    30k999(1) k. In General. Most Cited Cases
On appeal, the same weight should be given findings of a jury on questions of fact as is accorded those of a trial judge;  and findings of fact evidenced by verdict should be carefully scrutinized on appeal but should not be disturbed except in instances of manifest error.

*140 Irion & Switzer, Harry A. Johnson, Jr., and C. C. Burton, Jr., all of Shreveport, for appellants.
Blanchard, Goldstein, Walker & O'Quin and Morgan, Baker & Skeels, all of Shreveport, N. M. Ferris, for appellee.
HARDY, Judge.
Plaintiff brought this suit for $132,776 damages resulting from personal injuries sustained in a fall from a fire escape. The defendants are A. H. Temple, his insurer, the Fidelity & Casualty Company of New York, and the J. A. Johnson Erection Company. The last named defendant has been eliminated as a party to the suit upon admissions of counsel for plaintiff. The Royal Indemnity Company intervened in the suit, as compensation insurer of Grayson's, asserting its right to recover payments made to the plaintiff, in the event of his recovery in this action. After trial by jury there was a verdict in favor of the defendants

and judgment was signed rejecting the demands of both plaintiff and intervenor, which parties have brought this appeal.

Sometime during the summer or fall of 1946, Grayson's Shops, Inc. (hereinafter referred to as Grayson's), lessee of a building located at 504 Texas Street in the City of Shreveport, owned by the Katzenstein family, engaged in an expansion and improvement program which involved certain remodeling work on the building, particularly the preparation for the use and occupancy of the second floor thereof in connection with the retail merchandising business in which Grayson's was engaged.  The Superintendent of this construction work, employed by Grayson's, was one Fred A. Baggett. During the process of the remodeling work Mr. Baggett was notified by the proper authorities of the City of Shreveport that before a certificate of occupancy could be issued and the second floor opened to use of the public the erection of a fire escape was required.  It was determined that this appurtenance should be erected at the rear of the building and should be designed to lead from the second floor to the alleyway.

Baggett contacted several iron and steel construction concerns and finally reached a verbal agreement with the defendant, Temple, who contracted to build the fire escape for a consideration of $275.  There is considerable conflict of testimony as to just what additional work Temple agreed to do with respect to the hanging, erection and balancing of the fire escape, with which points we will deal later in this opinion.

Temple's shop foreman, E. S. Regan, inspected and measured the premises, prepared sketches and superintended the fabrication of the fire escape.  The only part of the construction which is concerned in this action is the balance arm, which was a cantilever type affixed by a pin to the axis where it joined the stairway or ladder portion of the fixture.  Each of the cantilever arms was fabricated of two pieces of flat iron, three inches in width by one-fourth inch in thickness, welded edge to edge.  The arms were joined by pieces of three-inch tubing, twenty inches in length, called spacers.  Two diagonal pieces of bar iron on the upper plane of the balance arm were used as braces and at the end of the arm was affixed a 55 gallon oil drum, which was intended to be used as a receptacle for such ballast material as might be employed in balancing the ladder portion of the fire escape in order to hold the said portion at a proper distance above the floor of the alleyway when not in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

use. For the purpose of receiving the ballast material a hole had been cut in the upper side of the drum about the center thereof.

It is important to note that the term 'balancing' is employed in its exact sense. In order to permit the proper use of the fire escape it was necessary that sufficient ballast be introduced into the receptacle provided to counteract the weight of the ladder section to the extent of lifting the same, when unoccupied by a person or persons required to descend in the event of an emergency. Yet it was also essential that *141 the receptacle be not over ballasted to such degree as would prevent the descent of the ladder section to the floor of the alley at and upon the introduction of a reasonable weight thereupon. In other words, the ballast had to be heavy enough to support the weight of the ladder section yet light enough to permit the lowering of the ladder section when and if its descent became necessary by any person or persons.

After completing the construction of the fire escape it remained at Temple's shop for some considerable period of time until Baggett requested its installation. In response to this request Temple advised Baggett that because of labor trouble he could not hang, that is install, the fire escape. At this particular time the J. A. Johnson Erection Company was doing some work for Grayson's and it was ascertained that the fire escape could be installed by this concern. Temple notified Baggett that this would necessitate an increase of $25 over and above his contract price of $275, and, after some negotiations between the parties, this additional amount was approved. Thereupon Temple delivered the fire escape to the alleyway in the rear of Grayson's establishment and it was installed by employees of the Johnson Company.

Some two days after installation Baggett undertook to balance the fire escape, and selected concrete for use as ballast material. With the aid of the plaintiff, Pouncy, concrete was poured into the opening of the ballast receptacle, the 55 gallon drum, to which reference has been made above. This operation was apparently undertaken on or about November 7th. It being believed that sufficient weight had not been provided, more concrete was poured into the drum on the morning of November 8, 1946, and, after this second operation, Baggett decided that too much weight had been added. Accordingly, he instructed the plaintiff, Pouncy, to take a hammer and chisel, clean off the concrete that had spilled on the outside, and begin the removal of some of the concrete that had been poured into the drum. While engaged in

this operation, and during Baggett's absence, the balance arm buckled at a point near the axis and the plaintiff, Pouncy, was violently precipitated to the pavement of the alleyway. Plaintiff sustained serious skull injuries which necessitated the immediate removal of portions of the skull, imbedded fragments thereof and a portion of the front part of the left lobe of the brain. There can be no question as to the serious, painful and permanently disabling character of plaintiff's injuries, and the fact that he lived at all is a tribute to modern medical science and the skill of the surgeon who attended him.

The above are the material facts involved in the case, none of which are seriously disputed, save and except the extent of Temple's obligations under his contract and the amount of concrete which was introduced into the ballast drum by Baggett.

Plaintiff predicates his right to recovery upon certain specified charges of negligence on the part of the defendant, Temple, in the fabrication of the fire escape, namely, the use of weak, inferior material, the insufficient bracing of the balance arm, and the use of an improper ballast receptacle. After interposition of preliminary exceptions overruled by the trial Court, which do not apear to have been insisted upon before this Court, defendants answered, denying negligence on the part of Temple and asserting the contributory negligence of the plaintiff.

[1] As above observed plaintiff requested and was granted a trial by jury which found for the defendants. Plaintiff zealously urges that this Court refrain from according any considerable weight to the findings of the jury. It is our view that the same weight, no more and no less, should be given the findings of a jury on questions of fact as is accorded those of a trial Judge. The findings of fact evidenced by the verdict of a jury should be carefully scrutinized and examined on appeal but should not be distrubed except in instances of manifest error. It is the province and obligation of this Court to carefully examine the facts as well as the law, which duty we have attempted to discharge in this case with painstaking care.

Careful examination of the record, which comprehends almost 500 pages of testimony, *142 indicates that there are four principal factors to be considered in connection with a determination of this case, which may be set forth as being:

1. The material used.

41 So.2d 139
41 So.2d 139
(Cite as: 41 So.2d 139)

2. The bracing of the balance arm.

3. The placing of a stop arrestor, and,

4. The weight introduced into the ballast receptacle.

[2]  Plaintiff charges that the defendant, Temple, was negligent in using flat or bar iron for the construction of the arms of the balance section, and contends that Temple was obligated to use channel iron for this purpose. This claim is supported by testimony to the effect that the fire inspector who first advised Grayson's as to the requirement of a fire escape, pointed out the fire escape in the rear of the building occupied by the McCrory Company, next door to the Katzenstein building, and stated that the fire escape should be 'like that'; that Baggett, according to his own testimony, advised Temple that the structure should be made of channel iron, to which requirement Temple agreed.  This testimony of Baggett is directly contradicted by the testimony of Temple who stated that channel iron was not available at the time (the fall of the year 1946). The scarcity of iron and steel at the time in question is a matter of common knowledge, but additionally it is uncontrovertibly established by the testimony of numerous witnesses, particularly the experts who testified on behalf of plaintiff.

We do not find it necessary to burden this opinion with detailed descriptions of the several designs of iron and steel which are used in the fabrication of structures similar to the one under consideration here. It suffices to observe that the designs of steel and iron in order of preference, because of structural strength and corresponding safety elements, are designated as 'I-beam', 'channel', 'angle' and 'flat'. Unquestionably the best engineering practices indicate the use of I-beam or channel iron. But it is established in this case that channel iron was not readily procurable and it was necessary for Temple to use iron of another design.  In connection with this point we think plaintiff has failed to establish an agreement on the part of Temple to use channel iron. The only testimony on this point was that of Baggett and of Temple, one of which fully offsets the other, and when we consider the fact that the procurement of channel iron at the time was exceedingly difficult it would seem unreasonable to conclude that a man engaged in the business of fabricating steel structures would have agreed to use such a design.

There is a further point worthy of note in this connection, namely, that Baggett inspected the fire escape before it was delivered for installation; he was

present on the premises during its installation and he proceeded to the work of balancing the structure without a word of objection or complaint, so far as the record discloses, to the use of flat instead of channel iron, although this fact was apparent.  If the agreement had required the use of channel iron, certainly Baggett would have objected and would have refused to accept the substituted design. Baggett's strenous insistence that he specified and required channel iron is contradicted by the testimony of both Temple and Regan.

At this point we think it proper to comment on the fact that counsel for the respective parties have seen fit in oral argument and briefs to attack the credibility of both Baggett and Temple. Unquestionably there are striking inconsistencies in the testimony of both of these individuals but we choose to regard these variances as being due to faulty recollection rather than any unworthy intent.  We think this view was well expressed in the testimony of Mr. Baggett when he stated: 'You know it has been two years since it happened and I can't remember that far back everything that happened.'

It is for this reason that we are inclined to attach more than usual weight and importance to the actions of the parties at the time.

The charges of negligence against the defendant, Temple, are summarized as follows:

*143 (a)  Failing to use a known structural member in the stringers of the balance portion of the fire escape;

(b)  If known structural members were not available, he was negligent in failing to combine the available metal so as to produce a known structural member;

(c)  Failing to use lattice or double lattice type bracing and failing to use adequate spacers, or cross braces;

(d)  Failing to submit detailed plans to the State Fire Marshal in accordance with accepted practice among the members of his trade;

(e)  Failing to follow the standards of safety established by the City of Shreveport;

(f)  Using too large a container for the concrete ballast, and then leaving, without instructions, to inexperienced persons, the putting in of the concrete.

Specifications (d) and (e) may be eliminated for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

reason that they are not only ultra petitionem but are entirely irrelevant.

Specifications (a), (b) and (c) may be considered under one head and all will be disposed of by the finding of fact as to the proximate and efficient cause of the accident.

Plaintiff presented the testimony of a number of expert witnesses in support of the charges of negligence due to structural insufficiency; Mr. C. R. Minor, a graduate structural engineer from the University of Texas, who has been practicing his profession in Shreveport for some 10 or 12 years; Dr. Frank J. Germano, Associate Professor of Engineering Mechanics, Louisiana State University, whose major field of teaching is 'Strength of Materials'; Dr. Roy T. Sessums, Dean of Engineering and Professor of Civil Enginnering, Louisiana Polytechnic Institute; and Mr. J. W. Davenport, a broker dealing in steel structures, of long practical experience.

All of the distinguished witnesses above named were agreed on the proposition that the use of the materials and the design employed by Temple in the fabrication of the fire escape were not in accordance with the best engineering practices, and all of them, with the exception of Mr. Davenport, testified that they would not have used such material or design. Additionally there was considerable testimony on the part of these experts as to the margin of safety. Mr. Minor's testimony was to the effect that this margin should be in the ratio of 1 1/2 to 2. Dr. Germano said it should be 4 to 1, and Dr. Sessums that it should be 3 to 1. However, in commenting on this factor Mr. Minor appeared to make it clear that the strength of the materials used could be considered in arriving at a calculation with respect to this ratio. This factor of strength of materials does not appear to have been so closely discussed in the testimony of Drs. Germano and Sessums, and while each of these gentlemen testified that the strength should be calculated on a weight bearing basis they did not attempt to testify directly as to the weight bearing strength of the materials actually used.

In answer to the direct question 'what would you say caused it to collapse?' Mr. Minor unhesitatingly answered: 'The fact that there was too much load on it'.

Mr. Davenport testified that the use of flat iron in the construction of similar structures was not uncommon and further testified that it was 'too much weight' and

'not the stringers that failed'. Elaborating on this point he stated: 'They fail regardless of what this is if you put too much back of them; if you overload it'.

The experts were in close agreement as to the calculation of weights, and, using the minimum figures in round numbers. we think the following facts have been definitely established:

The weight of the stairway section or exit ladder, which was, of course, the main member of the fire escape, designed to be used for passage, is fixed at approximately 770 pounds.  The weight of the balance ladder was shown to be approximately 215 pounds plus the weight of the ballast drum of some 25 pounds, giving a total of 240 pounds.

At this point in the computation of weights we are faced with the necessity of reaching a finding as to the amout of the concrete which was actually placed by Baggett in the ballast drum.  According to *144 the uniform testimony the weight of concrete is fixed at 20 pounds per gallon.  Baggett testified that he first put 20 gallons of concrete in the drum and the following morning added 2 1/2 gallons.  This would give a total weight of 450 pounds.  On the very face of the established facts it is evident that Baggett's testimony on this point is woefully in error because it is obvious that a weight of 450 pounds of concrete plus 240 pounds, the weight of the structure and drum, giving a total of 690 pounds, would not counter balance a weight of 770 pounds.  Yet, according to Baggett's own testimony, he did have too much weight, and it was for this reason that he found it necessary to attempt to lighten the ballast which he had introduced into the drum.

As opposed to Baggett's testimony on the amount of concrete used, by reason of which he stated that the drum was less than one-half full, we have the testimony of Regan and the welder, Russell, who came to the scene after the accident for the purpose of cutting loose the twisted debris of the balance member, that the drum lacked only about two or three inches of being completely full, and the testimony of an apparently disinterested third party, one Thompson, that he estimated the barrel to be about three-fourths full.

On the basis of this testimony we hold it to be established that the ballast drum contained some 1000 pounds of concrete at the time of the accident. Adding this figure and an additional 150 pounds representing the weight of the plaintiff, Pouncy, we find that the balance arm was subjected to a total

41 So.2d 139
41 So.2d 139
(Cite as: 41 So.2d 139)

Page 6

weight of 1390 pounds.

It must be borne in mind that the balance arm was designed for one purpose alone, namely to permit the operation of the suspended step section, the exit way of the escape. As a practical proposition, to fulfill this purpose it was necessary that the design and fabrication be planned for the support of a weight only slightly in excess of the proposed weight of the step section. According to the testimony of the experts this excess weight should have been only some 30 to 40 pounds. And, as logically contended by plaintiff, the additional acommodation of the weight of a workman who might enter upon the balance arm for the purpose of necessary repairs, painting, etc., should have been provided. Computing the necessary weight bearing support of the balance arm in consideration of these factors, we find that it was required to support a maximum weight of 770 pounds, being the weight of the step section, plus 30 pounds, the excess for the purpose of maintaining a balance and permitting operation, plus, say 200 pounds, an arbitrary allowance for the weight of a workman, or a total of 1,000 pounds.

It follows that when Baggett filled the ballast drum with some 1000 pounds of concrete he far exceeded the necessary weight and subjected the structure to an excessive and unreasonable strain. The added weight of plaintiff, Pouncy, was 'the straw that broke the camel's back'.

[3] Under these findings of fact, which evidently accord with the conclusions at which the jury arrived on trial, we are firmly of the opinion that the sole, direct and proximate cause of the accident was due to the negligence of Baggett in overloading the ballast drum.

Even conceding, solely for the purpose of argument, that the design, construction and material used were all inferior, plaintiff has completely failed to establish by a preponderance of the evidence that any of these factors caused or contributed to the failure of the structure. On the contrary it appears clear to us that the weight of the evidence conclusively establishes the proposition that the failure was due entirely to over ballasting.

There is another element which has been injected into the charges of negligence with respect to the placing of the stop arrestor. For the reason immediately above set forth we are of the opinion that the position of this arrestor, with respect to the safety factor, is irrelevant. Nevertheless, our careful consideration of

this point leads us to the conclusion that the position of the arrestor was determined by Baggett. It is quite true that the arrestor was placed by one of Temple's employees, the welder, Russell, but we *145 think plaintiff has failed to establish his contention that the welder selected the point at which the arrestor was fixed. The only testimony on this item was that of Baggett and Russell, the former asserting that Russell placed the arrestor and the latter as strenuously avowing that it was placed at Baggett's specific direction. Under this direct conflict it cannot be found that plaintiff's claim is entitled to greater weight that the denial of defendant's witness. Additionally, we note the facts that the material for the arrestor was supplied by Baggett and that Temple made an extra charge for the services of the welder in connection with the operation of placing the arrestor, which charge was paid without objection by Grayson's. Certainly then, this service was not included in Temple's agreement and the circumstance pointed out is indicative of the fact that the welder was at the time under the direction of Baggett and not Temple.

We now approach the consideration of the only remaining material question, namely, whether the balancing of the structure was an obligation of the defendant, Temple, under his agreement. Here again we are confronted with a direct and irreconcilable conflict. Baggett testifies unequivocally that Temple agreed to fabricate, install and balance the structure. Temple testifies equally as positively that his only obligation was to fabricate and deliver the fire escape. Temple's position is substantiated by the established facts. The installation was made not by Temple but by a third party who was paid by Temple, necessitating an additional charge which was made to and paid by Grayson's. It is unimportant whether this was done because the original contract did not obligate Temple to install the structure or whether it transpired as the result of intervening labor difficulties which made it impossible for Temple to carry out this obligation, since the incident is entirely distinct and apart from the balancing operation.

[4] Plaintiff is under the compulsion of establishing his claim by a preponderance of the evidence. In this he has failed because the only evidence in support of his contention is the testimony of Baggett which is denied by the testimony of Temple. Again turning to a consideration of established facts it does not seem logical that Baggett would have voluntarily assumed the responsibility of the balancing operation about which he knew absolutely nothing, and that he would have used his time and that of the plaintiff, both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 So.2d 139
41 So.2d 139
(Cite as: 41 So.2d 139)

Page 7

being employees of Grayson's in carrying out an obligation which was part of Temple's agreement. The testimony of Baggett himself impresses us with the casual manner in which he undertook to balance the structure.  He called Temple, so he testified, discussed the materials available, and determined on the use of concrete because the sand, gravel and cement were at hand.   Careful analysis of the testimony of the two witnesses and evaluation of their contemporary actions has firmly convinced us that the balancing was not an obligation of Temple but was an independent operation undertaken by Baggett and for the result of which he must bear full responsibility.

There is one further point which we have omitted to discuss but which is insisted upon in briefs on behalf of plaintiff, namely, that Temple was negligent in providing a 55 gallon container which was far in excess of the actual need and which negligent action in effect constituted an invitation to over ballast.  We point out, in passing, that this argument is thoroughly inconsistent with plaintiff's contention that the balancing was an operation requiring performance by Temple under his agreement.  If, as contended, Temple had obligated himself to balance the structure is must perforce be assumed that he would know what materials and what quantities thereof would be used for ballast and therefore it would be of no moment and of no concern to Grayson's or its employees whether the receptacle would hold 10 gallons or 100 gallons.

We further point out that plaintiff's insistence of negligence in this connection is untenable since, according to the uncontradicted testimony in the record, any *146 number of materials varying in weight and volume might be used for ballasting purposes.

We are indebted, and we wish here to acknowledge our obligation to diligent counsel for the parties plaintiff and defendant who have exerted every effort to lighten the labors of the Court by filing exhaustive, well prepared and able briefs dealing with every phase of this case.

[5]  In our consideration of counsel's briefs we do not find any substantial differences on propositions of law wth respect to the questions here involved.  The issues presented have involved almost exclusively questions of fact.  We concede the general principles asserted on behalf of plaintiff to the effect that an intervening cause will not serve to relieve from liability where prior negligence was the efficient

cause of the injury, nor where the intervening cause is set in operation by an original wrongful act, nor where the intervening cause need reasonably have been anticipated.  But, under the facts which we have found in this case, we do not think these principles are applicable.

[6][7]  We know of no law, nor have we been cited to any, which would justify a holding that a manufacturer's negligence in the fabrication of a product would justify recovery in an instance where the negligence and the resulting defect neither caused nor contributed to the occurrence of an accident.  Nor do we perceive that there is anything inherently dangerous in a fire escape.  The danger which came into being in the instant case was not the result of any negligence of the defendant Temple, but was created solely and entirely by the negligence of another party who had no connection with the defendant.

It is entirely conceivable that an automobile might be afflicted with a number of defects occasioned by negligence in design, fabrication or assembly of a manufacturer.  But in order for a driver to recover for injuries sustained in an accident it would be incumbent upon him to allege and prove that these defects or one of them was the proximate, moving and efficient cause of the accident.

In view of the conclusions reached we find it unnecessary to consider the question of the application of insurance coverage under the contract of insurance between the defendant, Temple, and the defendant, Fidelity & Casualty Company of New York.

For the reasons assigned, the judgment appealed from, rejecting the demands of the plaintiff and the intervenor, is affirmed at appellants' cost.

La.App. 2 Cir. 1949
Pouncy v. Temple, Royal Indem. Co., Intervenor
41 So.2d 139

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.