UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER: 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO: MRGO, *Robinson* (No. 6-2268) | |

**DECLARATION OF NINA D. FROESCHLE IN SUPPORT OF PLAINTIFFS'**

**REQUEST TO CONDUCT ADDITIONAL DISCOVERY PURSUANT**

**TO FED. R. CIV. P. 56(f)**

1.     I am an attorney licensed to practice before the Courts of the State of

California. I am of counsel at the firm of O'Donnell Mortimer LLP, co-counsel of record for

Plaintiffs; and I have been admitted to practice before this Court *pro hac vice* in connection with

this action. As such, I have personal knowledge of the matters set forth herein, except for those

matters stated on information and belief, and as to those matters, I am informed and believe them

to be true. If called as a witness, I could and would testify competently to the following:

## A.        Introduction

2.      This declaration is submitted in support of Plaintiffs' Request for Discovery pursuant to Fed. R. Civ. P. 56(f) and *McAllister v. F.D.I.C.*, 87 F.3d 762, 766 (5th Cir. 1996) ("When a district court makes factual determinations decisive of a motion to dismiss for lack of jurisdiction, it must give plaintiffs an opportunity for discovery and a hearing that is appropriate to the nature of the motion to dismiss."). Plaintiffs' Opposition filed concurrently herewith argues that (1) Defendants' motion to dismiss (the "Motion"), while purporting to be filed pursuant to Rule 12 (b)(1) for lack of subject matter jurisdiction, is in reality a *de facto* motion for summary judgment under Rule 56 that inappropriately contests the merits of Plaintiffs' case; (2) substantial disputed issues of material fact are evident from Defendants' Motion and its unauthenticated evidence; and (3) Plaintiffs are entitled to conduct discovery before any determination of disputed facts raised in the Motion. Plaintiffs therefore request that the Motion be denied, or, in the alternative, that any ruling on the Motion be held in abeyance until Plaintiffs have had a reasonable opportunity to conduct discovery with respect to the controverted facts discussed below.

3.      The first part of this Declaration will describe the factual controversies and the second part references Plaintiffs' evidence supporting the existence of the contested facts, as well as the authenticated sources for this proof. The documents contained in the accompanying volumes of exhibits are true and correct copies of the documents identified and referenced herein. Several of these exhibits include several methods of pagination within the same document. Thus, for the Court's ease of reference, Plaintiffs have separately paginated each exhibit at the bottom of each page.

**B.      Disputed Facts**

*Whether the MR-GO was a Navigation Waterway  Constructed to Promote Commerce or – as the Government Now Asserts – a Flood Control Project.*

4.      The Government contends that the MR-GO was actually a flood control project connected with the Lake Pontchartrain and Vicinity Hurricane Flood Protection Project (the "Lake Pontchartrain Project) authorized by Congress in 1965 while the MR-GO was still being built.  At page 25 of the Motion, the Government claims that "[t]hough formally separate (largely, if not entirely owing of (sic) the appropriations process), the two projects were physically and functionally related."  The contention is refuted by the Congressional record, including contemporaneous statements made by Army Corps personnel.

5.      During the 1940s and 1950s, flood control projects were authorized in "flood control acts" and all other navigation and water resource projects were covered in "river and harbor acts."  (Exhibits F & G; ¶ 42).   The Army Corps was twice authorized to investigate and provide design proposals for the MR-GO in the *River and Harbor Act of 1920* and the *River and Harbor Act of 1945* (Exhibits H, I, K & L; ¶¶ 43-44 and 52-53).  From its inception and throughout the legislative process leading up to Congressional authorization in 1956, the MR-GO was not considered to be a flood control measure.

6.      In the Army Corps' 1951 report to Congress containing its findings and recommendations with respect to the MR-GO (the "*1951 MR-GO Report*") (Exhibit O, ¶¶ 62-66), and throughout three related Congressional Hearings and two Congressional Reports, the perceived economic advantages to be gained from the canal was the motivating force behind the project.  (Exhibits P through T; ¶¶ 67-76).

7.      Flood control was never considered to be -- even tangentially – a purpose for building the waterway.  Indeed, the Army Corps Division Engineers' comments concerning the

MR-GO, contained in the *1951 MR-GO Report,* unequivocally states that the navigational and economic benefits from the canal were the primary criteria for assessing whether to build a canal between the Mississippi River and the Gulf of Mexico (though the factors involved in the method of construction, or the route taken, would involve scientific engineering considerations). Specifically, the Division Engineer stated:

> The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected (sic) in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal traffic, together with savings on construction and operation costs of terminal facilities, and benefits due to enhancement of property values incident to creation of tidewater harbors.

(Exhibit O at 7). As discussed in paragraphs 71 and 72 below, former Louisiana Senator Allen J. Ellender -- in his written statement submitted to the Subcommittee on Rivers and Harbors of the House of Representatives Committee on Public Works in connection with September 18, 1951 hearings on the MR-GO – observed that "the deep water channel you are now contemplating will prove an invaluable asset to shipping and commerce throughout our entire national maritime economy." Likewise, former New Orleans Mayor de Lesseps S. Morrison stated in his written statement to the same September 18, 1951 House Subcommittee hearing "[t]he purpose of this tide water canal is to achieve for New Orleans and for the mid-continent region of our Nation, a quicker, safer, and more dependable route to the sea . . . ." Numerous additional references to the commercial navigation purposes behind the MR-GO are described in paragraphs 62 through 76.

    8.    A question of fact therefore exists as to the true nature of the MR-GO: was it a flood control project as the Government claims or a navigable waterway as reflected in the Congressional record.

### *Whether the Army Corps Constructed Levees Along the Southern Bank of the MR-GO.*

9.      At page 14 of the Government's Motion, it asserts that the planners of the Lake Pontchartrain Project "specified that flood control levees be built on MR-GO's southern shores . . . ." Because of these professed levees, the Government contends the MR-GO was a flood control project, and it is immune from liability under the Flood Control Act of 1928. Motion at 28. As noted in Plaintiff's Opposition, however, the Government has provided no evidence that these putative levees were truly constructed. Opposition at 32. Indeed, the presently available evidence -- obtained from public sources and without any discovery -- supports the opposite conclusion.

10.      First, the Army Corps itself, however, has admitted that as late as 1988 the south side of Reach 2 of the MR-GO was "unleveed." *See* Exhibit 5 to Defendant's Motion (*Mississippi River Gulf Outlet, St. Bernard Parish, Louisiana:  Reconnaissance Report on Channel Bank Erosion*) at 10 & 35. ("Most of the Mississippi River-Gulf Outlet is experiencing severe erosion along its *unleveed banks*. . . . The *unleveed MR-GO south bank*, from mile 47 to mile 23 fronts a dredged material disposal area whch parallels the channel and is approximately 2000 feet deep (roughly 6,000 total acres.") (emphasis added). The *1951 MR-GO Report* as well as related Congressional testimony by Army Corps officials concerning the MR-GO establish that the plans for the proposed canal included the erection of an above-ground "dyke" along the section of the waterway to be built through the southern marshland for the purpose of deflecting winds that could generate waves and currents within the canal, thereby interfering with ship navigation. (¶¶ 68-69). The Government's documents also indicate that the south bank of the MR-GO was used as a disposal area for sediment dredged over the years of operation from the bottom of the MR-GO during periodic maintenance. (Exhibit FF at 21).  Thus, the structures which the Government now calls "levees" were most likely the dyke, or the Army Corps'

dumping ground for material dredged from the MR-GO: neither of which can properly be classified (and which the Army Corps did not classify) as a "flood control" levee.

11.   This conclusion is further substantiated by a 1958 Army Corps' soils report on the area through which the MR-GO was to be built (the "*1958 MR-GO Soils Report*") (Exhibit GG), and Section 2 of the 2006 report by the prestigious National Science Foundation Independent Levee Investigation Team ("*2 ILIT Report*") (Exhibit HH). The *1958 Soils Report* concluded that land in the area of MR-GO Reach 2 was mainly comprised of sandy and organic soils. Similarly, almost 50 years later, the *2 ILIT Report* noted that the earthen structures along the MR-GO Reach 2 in St. Bernard Parish were made of the same types of soil (Exhibit HH at 7; ¶ 111). These facts indicate that the Army Corps dredged material from the bottom of the MR-GO during normal channel maintenance, and dumped it along the southern side of the canal. In other words, no actual "levees" along the south bank of the MR-GO along Reach 2 were ever constructed by the Army Corps at any time before Hurricane Katrina.

12.   More importantly, the 2000 version of the Army Corps' publication Design and Construction of Levees unequivocally states that "[a]lmost any soil is suitable for constructing levees, *except very wet, fine grained soils or highly organic soils.*" This is the very type of soils found at the bottom of the MR-GO and in the earthen mounds along Reach 2. This evidence strongly suggests that the Army Corps never constructed the "new and enlarged" levees along the southern side of the MR-GO called for under the 1965 report on the Lake Pontchartrain Project (the "*Lake Pontchartrain Report*") submitted by the Army Corps to Congress. (Exhibit EE at 33, 42, 108). Instead, the Army Corps used the MR-GO's embankments as a waste disposal site for sandy and organic soils excavated from the MR-GO during normal maintenance cycles. Such a "trash bin" does not even satisfy the Army Corps' own definition of "levee,"

which is "defined as an embankment whose primary purpose is to furnish flood protections from seasonal high water . . . ." *Design and Construction of Levees* at 1.1 (Exhibit II at 11). At a minimum, the true nature of these dirt piles, and whether they can properly be called "levees," is an unresolved question of fact.

13.    There is additional evidence demonstrating that "levees" were ever built along most the southern banks of Reach 2 of the MR-GO. Accompanying this Declaration as Exhibit KK is a copy of a December 1984 report prepared by Coastal Environments, Inc., an applied sciences consulting firm, for the U.S. Department of Commerce, National Oceanic and Atmospheric Administration and the St. Bernard Parish Police Jury. The document entitled *The Mississippi River Gulf Outlet: A Study of Bank Stabilization* (the "*Coastal Environments Report*") states at p. 36 that "[w]ork commenced in detail planning of the MRGO in July 1956. . . . Total channel excavation was estimated to be 3 billion yd3 . . . All dredged material in the landcut was to be used to build a 4,000-ft wide, 10-ft high *spoil bank* on the southwest shore of the canal." (emphasis added).

14.    The *Coastal Environment Report* further states "[m]arsh vegetation blankets 90: of the study area. . . . These deposits, on the average, are 65% organic, and their cohesive strength is very low. In addition, water content ranges from 80 to 800 % in dry weight. . . . In short, marsh deposits are an extremely weak, highly saturated, and highly vulnerable, vast surface deposit." *Id.* at 2-10.

15.    Accompanying this Declaration as Exhibit DD is a copy of Section 4 of the May 22, 2006 report by the Independent Levee Investigation Team entitled *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* ("4 ILIT Report"). The following graphic from the aforementioned *Coastal Environment*

*Report* was included in 4 ILET Report as illustration 4.32. The drawing shows the marshy areas through which the MR-GO was constructed, and the caption notes that "[m]uch of this material was unsuitable for using (sic) in the adjoining levee embankments."



**Figure 4.32:** Portion of a map of the upper MRGO channel adjacent to Lake Borgne from the report by Coastal Environments, Inc. (1984). This shows the major soil subdivisions they identified: soft marsh, firm marsh, and swamp substrate. Much of this material was unsuitable for using in the adjoining levee embankments.

The following two illustrations from the 4ILIT Report show the area of supposed levee failure along the MR-GO and graphically depict the manner in which these reputed "levees" simply washed away under the Hurricane Katrina storm surge.



**Figure 4.33:** Area where the southwest bank of the MRGO channel levee within two miles southeast of Bayou Dupree was completely swept away by overtopping from Lake Borgne.



Topographic map from Topozone.com

**Figure 10.26:** A U.S.G.S. topographic map showing the presence of "spoils" along the MRGO. As seen in Figure 10.28, the levee materials to the southeast of the Bayou Bienvenue Control Structure performed poorly.

Clearly, the nature of these berms remains requires additional discovery to assess whether they can truly be called levees.

### *Whether the Seabrook Lock was Actually Constructed.*

16.    The Government also claims that the MR-GO was part of the Lake Pontchartrain Project because "[t]he Corps planned to correct the 'adverse conditions resulting from construction of the MR-GO' . . . by constructing a lock and dam at Seabrook . . . ." Motion at 12. Defendants fail to inform this Court, however, that this lock was never constructed.

Defendants' Exhibit 7 contains portions of a Army Corps document entitled *1984 Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection Project: Reevaluation Study.* The complete document, accompanying this declaration as Exhibit LL, states:

> As presented herein, the most feasible plan for providing hurricane protection was determined to be a high level plan. The plan would provide for . . . *deferring construction of the proposed Seabrook lock* until its feasibility as a feature of the Mississippi River-Gulf Outlet navigation project can be determined.

(Exhibit LL at 4; ¶ 118) (emphasis added).

17.   Thus, whether this structure was actually erected – as the Government now claims - - is also a disputed question of fact.

### Whether the Seabrook Lock Would Have Been a Part of the MR-GO if it Had Been Built.

18.   Accompanying this declaration as Exhibit MM is the complete copy of Exhibit 4 to the Government's Motion entitled *Mississippi River – Gulf Outlet: Design Memorandum No. 1-A,* June 1957 (the "*MR-GO Design Memorandum*"). Page 9 of this document describes how the MR-GO was "tied-in" to the Gulf Intracoastal Waterway (the "GIWW") at a point near Paris Road, and the westward stretch of the GIWW between this intersection and the Industrial Canal was widened to handle the increased traffic, thereby becoming in the process the combined GIWW/MRGO. (Exhibit MM at 9; ¶ 119). Thus, the MR-GO extended from the Gulf of Mexico to the intersection of the conjoined GIWW/MR-GO and Westward to the Industrial Canal.

19.   Defendants' Motion, however, states that the Seabrook lock was to be located "near the north end of the Industrial Canal." Motion at 12. Since the lock, if it had been built, would have been situated at the mouth of the Industrial Canal at Lake Pontchartrain, a factual dispute exists as to whether the Seabrook lock could have been properly considered part of the MR-GO –

as the Government now claims – because no part of this lock would have been located at, or on, any part of the MR-GO even if it had been constructed.

### Whether the Lake Pontchartrain Project was "Devised to Prevent the Hurricane Katrina Flooding."

20.     The Government contends that it is immune from liability because "the Katrina flood is certainly a flood that the [Lake Pontchartrain Project] was devised to prevent, and the floodwaters that caused the relevant damages were waters that the flood control project failed to contain." Motion at 3. The Government's contention is belied by the history of hurricane flooding in Greater New Orleans, the intended purpose of the Lake Pontchartrain Project, and the manner in which Greater New Orleans flooded in late August 2005 during Hurricane Katrina.

21.     Historically, the greatest storm threat to Greater New Orleans was from Lake Pontchartrain to the north. (Exhibit DD at 9-12; ¶¶ 99-102). The express purpose of the Lake Pontchartrain Project was to combat this northern threat. (Exhibit EE; ¶¶ 103-104). Indeed, in a 1965 transmittal letter to the Secretary of the Army accompanying the Lake Pontchartrain Report, the Army Corps Chief of Engineers wrote "[t]he District and Division Engineers find that the most suitable plan *for protecting the partially developed areas bordering Lake Pontchartrain* would consist of two parts . . . ." (Exhibit EE at 25; ¶ 104) (emphasis added). None of the contemporaneous documents suggest that the Lake Pontchartrain Project was designed to prevent flooding by or from the MR-GO. Based on these facts, Plaintiffs believe that before the construction of the MR-GO, Greater New Orleans would not normally suffer flooding from the south because this area had been protected from hurricane-induced storm surge emanating from the Gulf of Mexico by a contiguous ring of protective southern marshland.

22.     In his recent book *The Storm* (Viking 2006), Ivor van Heerden, Director of the Louisiana State University Center for the Study of Health Impacts of Hurricanes, and Deputy

Director of the LSU Hurricane Center, described the destructive effects the MR-GO had on the

marshland, and its weakening of the Greater New Orleans flood protection system.  Specifically,

Professor van Heerden stated:

> MR-GO . . . was built by the Corps to provide shipping with a
> straight shot into the Gulf of Mexico . . . .  The Department of the
> Interior stated that "excavation could result in major ecological
> change with widespread and severe ecological consequences."
> That's exactly what has happened. . . . Contiguous marshlands
> have been severely damaged, if not ruined. . . . [L]evees protected
> by healthy marshes are much less likely to fail.  Simply put, MR-
> GO has devastated the protective marsh structures immediately
> east of New Orleans, and by ruining these adjacent marshes it has
> made its own levees that much more susceptible to erosion and
> failure.

*The Storm* at 79-80 (Exhibit A).

    23.   Likewise, in his recent book *The Great Deluge* (William Morrow 2006), Tulane

History Professor Douglas Brinkley noted:

> [T]he 75-mile-long MRGO . . . was built to shepherd oceangoing
> vessels as expeditiously as possible to the Gulf. . . .  [I]n trying to
> entice more traffic, officials forced through improvements that saw
> the MRGO grow in some places from 500 to 2000 feet wide.  The
> result was the same as if a team of top-flight engineers had been
> assigned to build an instrument for the quick and effective flooding
> of New Orleans, they could not come up with a better design than
> the MRGO.

*The Great Deluge* at 219 (Exhibit B).

    24.   The MR-GO radically diminished this security zone.  The evidence obtained through

discovery will establish that the first indication that the MR-GO had "opened the back door" to a

flanking attack from a hurricane was the devastating flooding caused Hurricane Betsy in 1965.

*See* Michael D. Grunwald, *Canal May Have Worsened City's Flooding*, Washington Post,

September 14, 2005 at A.21 (Exhibit C) ("On May 19, Hassan Mashriqui . . . a computer modeler

at Louisiana State University's Hurricane Center, singled out the Mississippi River Gulf Outlet . .

. . Mashriqui had warned that the confluence of the MRGO and the Gulf Intracoastal Waterway created a funnel that would direct storm surges into the New Orleans Industrial Canal and on into St. Bernard Parish. . . . 'That funnel was a back door into New Orleans.' Said G. Paul Kemp, an oceanographer at the LSE Hurricane Center."); James Gill, *Mississippi River Gulf Outlet, the Washout*, Times-Picayune, February 29, 2004 (Exhibit D) ("Without the wetlands to absorb its impact, Hurricane Betsy came roaring up Mr. Go, flooding homes and killing some 110 people. And that was when Mr. Go had just been dug and was a slim 600 feet. Next time everyone in sight could float away."); Matthew Brown, *Corps Rethinking Floodgate Plans*, Times-Picayune, August 13, 2006 (Exhibit E) ("Located at the confluence of Lake Borgne, the Intracoastal Waterway and the Mississippi River Gulf Outlet, the funnel proved disastrous during Katrina. After the storm's violent surge bottled up at this confluence, it picked up speed passing through the funnel's narrow neck and then smashed into the confines of the Industrial Canal shipyards. . . . [D]uring construction of the MR-GO, many in St. Bernard worried the waterway would be an opening to storm surge from the Gulf. Those fears were realized in 1965, when the parish flooded during Hurricane Betsy."). The manner in which Greater New Orleans flooded in 2005 further evinces the deadly consequences for Plaintiffs and their neighbors from "opening of the back door" by the destruction of the southern protective marshland by the MR-GO built by the Army Corps, and the creation of an effective storm surge delivery system through the "funnel effect" formed by the confluence of the GIWW and the MR-GO.

    25.    These facts raise several interrelated questions of fact: (1) was the Lake Pontchartrain Project intended to protect against all of Katrina related flooding, since much of the damage was caused by inundation from the south, when by its terms the Lake Pontchartrain Project was designed only to confront storm surge from Lake Pontchartrain to the north; and (2)

to what extent should the Government be allowed to use a flood control project purposed to combat northern flooding to immunize liability for flooding from the south when the Government's construction of a flawed waterway was the major, if not sole, cause of this gaping hole in the Greater New Orleans southern flood defenses. The Government may be immunized for flood control projects, but it must be held liable for what effectively amounted to a flood *assurance* program.

### Whether the Army Corps Violated Federal Law During its Investigation, Planning and Design of the MR-GO.

26.    As explained in more detail below (Exhibits N & X; ¶¶ 57-61 and 81-82), the 1946 and 1958 amendments to the Fish and Wildlife Coordination Act and the River and Harbor Act of 1945 required the Army Corps to consult and coordinate with the United States Fish and Wildlife Serve (the "FWS") and the Louisiana Department of Wild Life and Fisheries (the "LDWLF") during the investigation, planning and design of the MR-GO. (*Id*). Moreover, any reports submitted to Congress with respect to the MR-GO in 1957 had to include the comments and concerns of the FWS and the LDWLF with respect to the MR-GO. (*Id*). The *1951 MR-GO Report* submitted to Congress clearly shows that the Army Corps failed to comply with these laws. (Exhibit at 22; ¶ 62).

27.    When the Secretary of the Interior informed the Army Corps of this omission (Exhibit W; ¶¶ 78-80), the record shows that the Army Corps refused to halt construction until the FWS could complete the four-year testing and study program that it considered was necessary to fully assess the predicted significant adverse environmental affects of the MR-GO on the St. Bernard Parish marshland (Exhibits Y at 22-23 and Z; ¶¶ 92-93); the Army Corps refused to consider changing the alignment of the canal to avoid the damage to the southern surge quelling marshland predicted by the FWS and LDWLF (Exhibit Z; ¶¶ 93), even though the

Army Corps' own Board of Engineers recommended further study as to the appropriate alignment for the canal (Exhibit O at 8; ¶ 62); and there is no evidence that the Army Corps made any effort to bring these serious concerns to the attention of Congress.

28.   A question of fact therefore exists as to the extent that the Army Corps violated federal law in the investigation, planning, design and construction of the MR-GO.

### Whether Congress Instructed the Army Corps to Build the MR-GO Along the Exact Route along Which it Presently Lies.

29.   The Government insists the "MR-GO exists where it is and as it is because Congress told the Corps to build this waterway rather than others that had been proposed." Motion at 33.  This is simply not true.  The River and Harbor Act of 1945 (Exhibit L at 17 and 23; ¶ 56) authorized the Army Corps to investigate and report on the MR-GO, stating "[t]he following works of improvement of rivers, harbors, and other waterways are hereby adopted and authorized . . . : . . . Ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, Louisiana, to the Gulf of Mexico, by way of the best available route or routes." (*Id.*) (emphasis added).

30.   When Congress authorized the construction of the navigable waterway, it stated that it approved the project described in the *1951 MR-GO Report* without any reference to the precise location of the canal.  (Exhibit U; ¶ 77).  In sum, Congress told the Army Corps that it wanted "a" canal between the Mississippi River and the Gulf of Mexico.  It expected that the Army Corps would use its best engineering and scientific judgment to recommend the best way to achieve this goal *within the confines of existing federal law* and prevailing professional standards.  Nor did Congress waive any legal requirements imposed by federal law.  Clearly, Congress could not have expected—and did not authorize--the Army Corps to violate federal statutes during its investigation and planning for the project.  Yet, as explained below, this is just

16

what the Army Corps did.  In any event, whether "Congress told the Corps to build this waterway rather than others that had been proposed" is a disputed question of fact in light of such countervailing evidence.

### Whether the MR-GO Was Constructed and Maintained According to the Project Specifications and Dimensions Approved by Congress.

31.   The *1951 MR-GO Report* submitted to Congress proposed the construction of a channel between the Mississippi River and the Gulf of Mexico, which would be 36 feet deep and 500 feet wide.  (Exhibit O at 43; ¶ 64).  In addition, the MR-GO was supposed to connect with the Industrial Canal via an independent channel, separate and distinct from the GIWW.  (*Id.*; Exhibit P at 5; ¶ 67).  The Gulf end of the waterway was also to pass through Chandeleur Sound. (Exhibit O at 43).

32.   The *MR-GO Design Memorandum* unquestionably states that the MR-GO was connected to the Industrial Canal by way of a "tie-in" to the GIWW, which was broadened to handle the expected extra ship traffic, rather then via the discrete channel provided for in the *1951 MR-GO Report*.  (Exhibit MM at 9).  The Government further concedes "that the seaway passed through Breton Sound rather than Chandeleur" (Motion at 42), and the present width of the MR-GO exceeds the 500 foot width approved by Congress by at least 1,000 feet.  ("Between 1968 and 1987, the top width of the 41 mile-long land cut increased from 650 feet to an average of 1,500 feet.").  Motion at 13.

33.   Several questions of fact arise from the foregoing evidence.  First, there is the extent to which the Army Corps violated federal law by constructing and maintaining a waterway that did not comport with the project dimensions and specifications ratified by Congress.  Second, and more importantly, there is the Government's liability for creating the "funnel effect" by connecting the MR-GO to the Industrial Canal by intersecting the MR-GO

with the GIWW, rather than constructing a separate connecting channel according to the project proposal submitted to, and approved by, Congress.

34.    Even the 2006 report by the Interagency Performance Evaluation Team, commissioned by the Army Corps, conceded that the way in which the MR-GO was designed and constructed significantly increased storm surge to dangerous levels., The report observed that "Reach 1 (the combined GIWW/MRGO section) and the IHNC, together, provide a hydraulic connection between Lake Borgne and Lake Pontchartrain. . . . To prevent storm surge in Lake Borgne from reaching the IHNC or GIWW/MRGO sections of waterway, flow through Reach 1 channel *must be dramatically reduced or eliminated . . . ."* (Exhibit JJ at 6; ¶¶ 114-115).

35.    Again, at a minimum, questions of fact exist as to whether the Army Corps failed to build or maintain the MR-GO within the project dimensions approved by Congress, and whether these deviations from the prescribed plan caused or exacerbated the flooding that have left Plaintiffs so devastated.

### *Whether the Army Corps Truthfully Presented the Facts Related to the MR-GO to Congress in 1951.*

36.    The Government concedes that in 1930, the Army Corps reported to Congress (the "*1930 MR-GO Report*") that "there was 'no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two [main Mississippi River] passes is now assured." Motion at 10.  The Government adds that Army Corps recommended the construction of the MR-GO to Congress in the *1951 MR-GO Report* because "circumstances had changed" (Motion at 10), but the Government fails to specify the changed circumstances.

37.   In the *1951 MR-GO Report*, the Division Engineer claimed:

> Existing outlets through the improved passes suffice to serve
> present commerce but accelerating (sic) shoaling of the Southwest
> Pass bar indicates that expensive jetty extension and bar channel
> relocation will be necessary in the early future, in connection with
> operations required, but not initiated, to secure and maintain
> project channel dimension now authorized. An additional outlet,
> not subject to the vagaries of the river, obviously will provide
> added assurance of uninterrupted access to the sea for deep-draft
> shipping.

(Exhibit O at 21).

38.   Yet, in its *1930 MR-GO Report*, the Army Corps concluded there would be no

difficulty in maintaining the proper depth through the Mississippi River passes, and jetties could

be built over 50 years. *See* Exhibit J at 2; ¶ 51 ("The board finds that the improvement of the

mouths of the Mississippi has now reached a point where dependable channels can be *assured*

*indefinitely*. The cost of maintaining these channels, including the extension of jetties, *which*

*may be necessary within 50 years*, is less than the annual carrying charges on any of the auxiliary

channels considered.") (Emphasis added).

39.   The Board of Engineers in the *1951 MR-GO Report* also noted "annual benefits of

$5,260,000 as being reasonably prospective from the proposed improvements on the east side of

the Mississippi River, as a result of reduction in sailing and turn-round time and navigation

hazards for deep-draft cargo vessels, savings in terminal handling and annual wharf charges, and

enhancement of water front property." (Exhibit O at 7). These observations contradict the Army

Corps' earlier observations that a new channel would not save much in sailing time or improve

safety. (*See* Exhibit J at 22-23) ("All things considered, the Barataria route seemed more

advantageous than any other canal route considered . . . . Allowing 50 minutes for passage

through the lock, Southwest Pass is placed on equal footing with the Barataria route in sailing

time"); (Exhibit J at 4) ("There are some dangers and hazards to navigation through the passes . .

., but the aggregate losses on this account, as compared to the total value of the traffic handled, have been exceedingly small. It could not be expected that restricted side channels would be any less hazardous.").

40.   Nowhere in the *1951 MR-GO Report* is there any discussion of the "circumstances" which had changed to justify the construction of a navigation project which the Army Corps concluded was unnecessary just 21 years prior. Thus, this raises a question of fact as to the Army Corps' truthfulness in presenting this project to Congress, and the true nature of the discretion exercised by the Army Corps in investigation, planning, designing, and constructing the MR-GO.

41.   In the remaining paragraphs, I identify the evidence supporting the existence of factual disputes that require discovery and denial of the *de facto* motion for summary judgment.

**C.     Plaintiffs' Evidence Supporting the Existence of Factual Disputes.**

  **1.     Statutory Mechanism for Approving Army Corps Investigation
  of Flood Control and Navigation Projects.**

42.   Prior to 1974, Congressional authorization for investigation, reports or surveys for flood control projects were contained with "Flood Control Acts." U.S. Fish and Wildlife Service, *Water Resource Development Acts available at* http://www.fws.gov/habitatconservation/wrda.htm (last accessed on August 16, 2006) (Exhibit F). Likewise, projects dealing with navigable waterways and harbors were addressed in "Rivers and Harbors Acts." *Id.* After 1974, both types of projects were included in "Water Resource Development Acts" generally enacted on a biennial bases. *Id. See also* Congressional Research Service, *Army Corps of Engineers Water Resources Activities: Authorization and Appropriations* (February 4, 2005) Doc. No. RL32064 (Exhibit G).

2.    **MR-GO Related Legislation and Agency Documents Between 1920 and 1943.**

43.    Section 2 of the River and Harbor Act of 1920, P.L. 66-263, ch. 252, 41 Stat. 1009 (June 5, 1920) authorized and directed the Secretary of War "to cause preliminary examinations and surveys to be made at the following localities . . . : Mississippi River, Louisiana with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding thirty-five feet." (Exhibit H at 2).

44.    Similarly, the House Committee on Rivers and Harbors issued a February 27, 1929 resolution requesting that the "Board of Engineers for Rivers and Harbors . . . review the reports on the Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route . . . . (Exhibit I at 1).

45.    On June 11, 1930, the Army Corps' report on the proposed Mississippi River-Gulf Outlet was submitted to the House Committee on Rivers and Harbors. *See* H. R. Doc. No. 71-46 (1930) (Exhibit J). The District Engineer examined nine possible routes for the MR-GO: (1) Fort St. Philip Route; (2) Fort Jackson Route; (3) Barataria Bay Route; (4) Lake Borgne Route; (5) Lake Borgne South Shore Route (6) Lake Pontchartrain Route; (7) Lake Borne North Shore Route; (8) Chandeleur Route and (9) Chandeleur Optional Route. (*Id.* at 17-22).

46.    The District Engineer compared the various routes and found "[a]ll things considered the Barataria route seems more advantageous than any other canal considered." (*Id.* at 22). The Barataria Bay Route required the construction of a lock at Myrtle Grove, 29 miles from New Orleans. "The upper 15 miles of the route would follow the existing Wilkenson (private) canal . . . . The next 12 ½ miles would be in Barataria Bay . . . . Then 1 ½ miles through Barataria (or Grand) Pass . . . ." (*Id.* at 19). The District Engineer based his decision on costs of

construction, maintenance, and route length. (*Id.* at 22.)

47.     Notwithstanding this conclusion, the Army Corps' District Engineer, Division

Engineer, Board of Engineers and Chief of Engineers in 1930 found that construction of a

waterway between New Orleans and the Gulf of Mexico was not warranted and *would not be*

*necessary in the future*. Specifically, the District Engineer observed:

> Since the existing routes are satisfactory and may be expected to
> continue so, there is no need for an auxiliary route. . . . The
> existing routes have sufficient capacity to handle the traffic into
> New Orleans for all time. . . . At ordinary river stages, the
> navigation of the exiting routes is comparatively easy and,
> provided existing regulations are complied with, there is little
> cause for accidents. . . . Judging from the performance of
> Southwest Pass during the last few years, it is reasonable to
> suppose that a depth of 40 feet could be maintained with the
> exception of such periods as the river exceeds 12 feet on the
> Carrollton gage.

(*Id.* at 23.)

48.     The District Engineer added:

> The estimated annual cost of maintenance of both passes covering
> a period of the next 50 years is $650,000 which includes the cost of
> possible extension of the jetties of each pass during this period.
> Since the estimated annual cost of the Barataria route is
> $1,441,700, it is evident that the existing routes are much more
> economical. . . . Taking into account the time for lockages, the
> sailing time from New Orleans to Atlantic ports is less via South
> Pass, than via any of the canal routes discussed in this report.

(*Id.*)

49.     The District Engineer concluded his comments by stating:

> Conclusions concerning deep-water routes – From the above
> comparisons, it appears that the existing routes afford more
> advantages to shipping than the Barataria route or any other canal
> route considered. *Since both South and Southwest Passes have*

> *adequate and reliable channels, it would appear inadvisable to*
> *provide another route to deep water in the Gulf of Mexico.*

(*Id.*) (emphasis added).

50.     Moving up the Army Corps chain of command, the Division Engineer "agree[d]

with the district engineer that, in view of the adequacy, reliability, and low maintenance cost of

the channels at South and Southwest Passes, *no other deep-water outlet from the Mississippi*

*River to the Gulf of Mexico is necessary.*" (*Id.* at 3) (emphasis added).   The Board of Engineers

also commented, "[t]here are some dangers and hazards to navigation through the passes . . . , but

the aggregate losses on this account, as compared to the total value of the traffic handled, have

been exceedingly small.  It could not be expected that restricted side channels would be any less

hazardous.  The two passes have a capacity of several times the present commerce of New

Orleans, and *there is no apparent necessity for another deep-water outlet, either for emergency*

*or to provide for an increase in commerce.*"  *Id.* at 4 (emphasis added).

51.     The Chief of Engineers submitted the Army Corps report to the Congressional

Committee with the following comments:

> [The District Engineer] finds no necessity for an auxiliary route
> between the Mississippi River at New Orleans and the Gulf, as the
> continued maintenance of reliable channels in the two passes is
> now assured.  He therefore recommends that no further steps be
> taken toward providing such a route . . . ..  The board finds that the
> improvement of the mouths of the Mississippi has now reached a
> point where *dependable channels can be assured indefinitely*.  The
> cost of maintaining these channels . . . is less than the annual
> carrying charges or any of the auxiliary channels considered.
> While there are some dangers and hazards to navigation through
> the passes, it is not to be expected that any more favorable
> conditions would be found in the restricted side channels which
> have been considered. . . .  After due consideration of the above
> mentioned reports, I concur in the recommendation of the board.

(*Id.* at 2).

### 3.    1943 House and Senate Resolutions.

52.    The Senate Committee on Commerce and the House Committee on Rivers and

Harbors issued resolutions on April 19, 1945 and May 5, 1945, respectively, directing "the Board

of Engineers for Rivers and Harbors . . . to review the reports on Mississippi River-Gulf outlet

submitted in . . . Document numbered 46 . . . with a view to determining whether any

modification of the recommendations contained therein is advisable at this time . . . ." (Exhibit

K at 1).

### 4.    River and Harbor Act of March 2, 1945 Authorizing the Army Corps to Investigate and Plan the MR-GO.

53.    The River and Harbor Act of 1945, Pub. Law 79-14, 50 Stat. 10 (March 2, 1945)

(the "MR-GO Planning Law") (Exhibit L) authorized the Army Corps to begin more detailed

investigation and planning for the MR-GO.  The law also clearly directed the Army Corps to

coordinate their investigation and planning efforts with Louisiana officials and the United States

Department of Interior (the "DOI").  The first paragraph of the MR-GO Planning Law read:

> [I]t it is hereby declared to be the policy of the Congress to
> recognize the interests and rights of the States in determining the
> development of the watersheds within their borders and likewise
> their interests and rights in water utilization and control, as herein
> authorized to preserve and protect to the fullest possible extent
> established and potential uses, for all purposes, of the waters of the
> Nation's rivers; to facilitate the consideration of projects on a basis
> of comprehensive and coordinated development; and to limit the
> authorization and construction of navigation works to those in
> which a substantial benefit to navigation will be realized therefrom
> and which can be operated consistently with appropriate and
> economic use of the waters of such rivers by other users.

*Id.* at 1.

54.    The next paragraph provided: "[i]n conformity with this policy . . . [p]lans,

proposals, or reports of the Chief of Engineers . . . for any works of improvement for navigation

or flood control not heretofore or herein authorized, shall be submitted to the Congress only upon

compliance with the provisions of this paragraph." (*Id.*). With respect to Army Corps

cooperation with individual states, the statute provided:

> *Investigations* which form the basis of any such plans, proposals, or
> reports *shall be conducted in such a manner as to give to the affected
> State or States,* during the course of the investigations, information
> developed by the investigations and also *opportunity for consultation
> regarding plans and proposals*, and, to the extent deemed practicable
> by the Chief of Engineers, opportunity to cooperate in the
> investigations.

(*Id.*) (emphasis added).

55.    The MR-GO Planning Law further required the same degree of consultation with

the DOI:

> If such investigations in whole or part are concerned with the use
> or control of waters arising west of the ninety-seventh meridian,
> the Chief of Engineers shall give to *the Secretary of the Interior,*
> during the course of the investigations, information developed by
> the investigations and also *opportunity for consultation regarding
> plans and proposals,* and to the extent deemed practicable by the
> Chief of Engineers, opportunity to cooperate in the investigations.

(*Id.*) (emphasis added).

56.    Section 2 of the MR-GO Planning Law contained the specific provision

authorizing the Army Corps to investigate and report, stating "[t]he following works of

improvement of rivers, harbors, and other waterways are hereby adopted and authorized . . . : . .

. Ship canal to extend from the Mississippi River at a point at or near the city of New Orleans,

Louisiana, to the Gulf of Mexico, by way of the best available route or routes." (*Id.* at 17 & 23).

###        5.        The Federal Fish and Wildlife Coordination Act,
###                   16 U.S.C. § 662.

57.    The Fish and Wildlife Coordination Act (the "FWCA") was first passed by

Congress on March 10, 1934, though its official name would not be applied until 1958. *See* Law

of March 10, 1934, ch. 55, § 1, 48 Stat. 401 (1934) (codified at 16 U.S.C. § 662) (Exhibit M).

The FWCA was substantially amended in 1946 to require "coordination" between any federal

agency proposing to "impound," "divert," or "control" a waterway, or body of water, on the one

hand, and the United States Department of Interior, Fish and Wildlife Service and the State

agency with jurisdiction over wildlife resources, on the other.  *See* Act of August 14, 1946, § 1,

ch. 965, 60 Stat. 1080 (1946) (Exhibit N).  Specifically, the revised law provided:

> Whenever the waters of any stream or other body of water are
> authorized to be impounded, diverted, or otherwise controlled for
> any purpose whatever by any department or agency of the United
> States, . . . *such department or agency first shall consult with the
> Fish and Wildlife Service and the head of the agency exercising
> administration over the wildlife resources of the State* wherein the
> impoundment diversion, or other control facility is to be
> constructed *with a view to preventing loss of and damage to
> wildlife resources . . . .*

*Id.* at 1 (emphasis added).

58.    The law further stated:

> [T]he reports and recommendations of the Secretary of the Interior
> and of the head of the agency exercising administration over the
> wildlife resources of the State, . . . *shall be made an integral part
> of any report* submitted by any agency of the Federal Government
> responsible for engineering surveys and construction of such
> projects.

*Id.* (emphasis added).

59.    With respect to covered projects, section 3 of the FWCA mandated that "adequate

provision consistent with the primary purposes of such impoundment, diversion, or other control

shall be made for the use thereof, together with any areas of land, or interest therein, acquired or

administered in connection therewith, *for the conservation, maintenance, and management of

wildlife, resources thereof, and its habitat thereon.*"  (*Id.* at 2) (emphasis added).  Section 3

further provided:

> In accordance with general plans, covering the use of such waters and other interests for these purposes, *approved jointly by the head of the department or agency exercising primary administration thereof, the Secretary of the Interior, and the head of the agency exercising administration over the wildlife resources of the State wherein the waters and areas lie*, such waters shall be made available without cost for administration . . . .

(*Id.*) (emphasis added).

60.      Section 8 also added that "[t]he terms 'wildlife' and 'wildlife resources' as used herein include birds, fishes, mammals, and all other classes of wild animals and *all types of aquatic and land vegetation upon which wildlife is dependent.*" (*Id.* at 3) (emphasis added).

61.      Congress enacted additional revisions to the FWCA in 1958 which apply to the MR-GO (*see* ¶¶ 81-82, *infra*). Nevertheless, as of 1946, the FWCA required that (1) the Army Corps consult with the DOI and the Louisiana Department of Wild Life and Fisheries (the "LDWLF") during the investigation, planning, construction and operation of the MR-GO; (2) any comments or concerns raised by the DOI or the LDWLF had to be integrated into the Army Corps' planning and design of the MR-GO, and *into any reports submitted to Congress*; (3) plans for the MR-GO had to include "adequate provision . . . *for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon*;" and (4) such plans had to be approved jointly by the Army Corps, the DOI and the LDWLF.

**6.      September 25, 1951 Submission of May 5, 1948 Report From the Army Chief of Engineers to the House of Representatives (H. Doc. No. 245).**

62.      On September 25, 1951, the Army Corps submitted to Congress its report (the "*1951 MR-GO Report*") prescribed by the MR-GO Planning Law. *See* H. Doc. No. 245 (Exhibit O). At Paragraph 80 of the Division Engineer's Report, under the heading "*Coordination with other agencies,*" the Division Engineer notes that the "director of the Louisiana Department of

Public Works, designee for the Governor of Louisiana, expressed full concurrence with findings presented . . . ." *Id.* at 22.

63.    There is no mention in the document of any coordination or consultation with the Department of Interior, the Fish and Wildlife Service or the Louisiana Department of Wild Life and Fisheries as required by law.

64.    The Division Engineer who compiled the main report stated:

> The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank deep draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement (sic), and dimensions as may be approved by the Chief of Engineers . . . .

*Id.* at 22.

65.    The Division Engineer's comments in the *1951 MR-GO Report* show that his approval of the MR-GO project was based on the supposed increased commerce that would result from the MR-GO:

> The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected (sic) in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal traffic, together with savings on construction and operation costs of terminal facilities,

and benefits due to enhancement of property values incident to creation of tidewater harbors.

*Id.* at 7.

66.    The report made this final observation:

The Board is of the opinion that the exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alinement (sic) of the canal should further studies show that a more suitable location is available.

*Id.* at 8.

**7.    September 18, 1951 Hearings on the MR-GO Before the Subcommittee on Rivers and Harbors of the House of Representatives Committee on Public Works.**

67.    The September 18, 1951 hearings before the House Subcommittee on Rivers and Harbors of the House Committee on Public Works with respect to the Mississippi River Gulf outlet and the Mobile to New Orleans Intracoastal Waterway" (Exhibit P) included testimony from Colonel W. D. Milne, Army Corps Deputy Chief, Civil Works for Rivers and Harbors. Colonel Milne gave the following description of the proposed project:

The recommendation of the Chief of Engineers calls for a canal connecting the present industrial canal of New Orleans, and calls for a canal 36 feet in depth and 500 feet in width running in this general direction [indicating], and then into a turning basin 1,000 feet wide and 2,000 feet long: also, the construction over the canal of a modern highway bridge. The canal then will extend from the turning basin in a general southeast direction for approximately 70 miles . . . .

*Id.* at 5.

68.    With respect to a dike to be constructed along the longer Reach 2 portion of the MR-GO, Colonel Milne stated:

> The purpose of the retention dike would be to prevent the waves
> from storms or general wind from the southwest in this area from
> setting up excessive currents and wave motion in the tidewater
> canal.

*Id.* at 5.

69.     During questioning, Colonel Milne explained that the need to reduce these

currents and wave motion was to protect ship navigation in the channel.  Specifically, Colonel

Milne stated, "the primary purpose of the retention dike is *to form a protective wall against the*

*wave wash and the storms coming from the southwest that would have an adverse effect on*

*navigation.*" *Id.* at 7 (emphasis added).  There was no mention of any flood protection purpose

for the retention dike.  As reflected in the contemporaneous justification for federal tax dollars

being spent on this project, the purpose of the MR-GO was always to promote business and

commerce by providing a reliable alternative navigable waterway to the Mississippi River outlet

to the Gulf of Mexico.

70.     Colonel Milne also emphasized the alleged economic need for the MR-GO,

stating:

> For some number of years now there has been a great deal of
> congestion in the port of New Orleans. . . . So, in our studies, we
> looked into a way that the terminal facilities could be expanded to
> provide an efficient operation.  Our studies led us to the conclusion
> that the tidewater canal, coming in this direction, would enable an
> expansion of these general-cargo terminal facilities.  We feel that
> the development of such a canal would enable about 7 ½ million
> tons of general cargo to be handled by the port of New Orleans.

*Id.* at 5.

71.     In a written statement placed into the record, Louisiana Senator Allen J. Ellender

added:

> The project with which your committee now concerns itself would
> alleviate the difficulties that have confronted the port of New
> Orleans from earliest times. . . . New Orleans trades with the

> world, and the deep-water channel you are now contemplating will
> prove an invaluable asset to shipping and commerce throughout
> our entire national maritime economy.

*Id.* at 8.

72.     New Orleans Mayor, de Lesseps S. Morrison, commented in his written

statement:

> The purpose of this tidewater canal is to achieve for New Orleans
> and for the midcontinent region of our Nation, a quicker, safer, and
> more dependable route to the sea – and the elimination of the long-
> winding, dangerous, and expensive (from the maintenance
> standpoint) of the present river route through the present passes
> into the Gulf. . . . The construction of this proposed tidewater
> channel, halving the distance and providing a safe, straight
> channel, would at long last give the port of New Orleans an
> opportunity to build real terminal facilities.  . . . As one who has
> operated a port, I can assure you of the very important savings in
> time, money, and operation of this slip type of port terminal as
> compared to the present type now in use.

*Id.* at 10.

### 8.     Two Additional Congressional Hearings Provide Evidence of the Commercial Nature of the Mississippi River-Gulf Outlet.

73.     The record of the July 21, 1955 hearings before the House Committee on Public

Works with respect to H.R. 6181 and 6309 (the "1955 House Hearings") (Exhibit Q) included a

July 11, 1955 correspondence from Ohio Governor Frank J. Lausche where he stated: "Ohio

industry uses many products from every section of the globe. . . . Ohio needs every possible

transportation adjunct to grow and prosper. Certainly the Mississippi River-Gulf outlet would be

of great help." (*Id.* at 6). Alabama Governor James E. Folsom wrote in a June 9, 1955 letter that

"[w]e feel that the future growth and expansion of our State will be considerably aided by this

proposed new and shorter route to the sea from the port of New Orleans." (*Id.*). Mississippi

Governor Hugh White added in his June 10, 1955 missive: "[t]he entire western border of our

State . . . is a part of American's great inland waterway system. . . . For this reason Mississippi

has a direct interest in obtaining a second gulf outlet to the sea, insuring a year-round

uninterrupted flow of commerce." (*Id.* at 7-8).

74.     Similarly, Louisiana Senator Allen J. Ellender prognosticated doom for the

Louisiana economy if the MR-GO was not constructed during January 19 and 20, 1956 hearings

before the Senate Subcommittee on Flood Control – Rivers and Harbors of the Committee on

Public Works on H.R. 6309 (the "1956 Senate Hearings") (Exhibit R):

> My frank opinion – and it is an opinion shared by all of the
> organizations and individuals I have enumerated – that much
> precious time has already been lost in initiating work on the outlet.
> . . . *It is my judgment that unless the Mississippi River-Gulf outlet
> is quickly constructed, the industrial development of the growing
> Mississippi Valley, the agricultural economy of the area, and the
> foreign trade which presently flows down the valley and through
> New Orleans will soon be strangled.*

*Id.* at 4 (emphasis added).

### 9.     Two Congressional Reports Likewise Emphasized the Supposed Commercial Need for the MR-GO.

75.     The July 26, 1955 Report to the House of Representatives from the House

Committee on Public Works on H. R. 6309 (Exhibit S) stated:

> The project will . . . provide for expansion of general cargo terminal
> facilities and permit lifting of the present limits and embargo
> imposed by the presently congested wharf facilities and allow for the
> full flow of commerce available to the port. The bulk of the savings
> would be realized through faster loading and unloading with
> resultant saving of ship time in port and of terminal handling
> charges.

*Id.* at 3.

76.     Likewise, the March 7, 1956 Report to the Senate from the Committee on Public

Works (Exhibit T) noted:

> The proposed project consisting of a tidewater terminal connected
> to the gulf through a tidewater channel, will permit adequate port,
> expansion and relieve present congestion, and provide a channel
> free of the hazards and expense connected with the present
> channel. It will provide new terminal areas and permit full flow of
> commerce available to the port from foreign and domestic sources.

*Id.* at 7.

### 10.     The Authorization of, and Appropriation of Funds for, the MR-GO.

77.     Congressional approval of the MR-GO came with the passage of the Act of

March 29, 1956 to "Authorize Construction of the Mississippi River Gulf-Outlet," Pub. L. 84-

455, 70 Stat. 65 (1956) (Exhibit U).  Construction funds were appropriated a year later in the

Public Works Appropriation Act of 1958, P. L. 85- 167, 71 Stat. 416 (August 26, 1957) (Exhibit

V).

### 11.     September 23, 1957 Letter from the Secretary of the Interior to the Secretary of the Army Requesting that the Corps Comply with the FWCA.

78.     On August 24, 1957, United States Secretary of the Interior, Fred A. Seaton,

wrote Army Secretary Wilber M. Bruckner about the proposed canal.  (Exhibit W).  Secretary

Seaton first stated:

> We have noted with a *good deal of concern* the action of the
> Congress in providing funds for initiating construction on the
> Mississippi River-Gulf Outlet Project in Louisiana. . . . The
> proposed construction of this canal is of *great concern* to fish and
> wildlife conservationists, including the commercial fishing
> industry.  Dredging and disposition of spoil involved in the
> construction of this project may be *highly destructive* to important
> producing areas for shrimp and other shellfish, nursery areas for
> finfishes, and highly valuable waterfowl marshes.

*Id.* at 1 (emphasis added).

79.     Secretary Seaton then observed that "[t]he project plans have not been

investigated by fish and wildlife conservation agencies as contemplated in the Wildlife

Coordination Act of August 14, 1946 (60 Stat. 1080)." *Id.* He also noted:

> We urge that *detailed planning for the project* consider fully the
> effects on fish and wildlife resources of constructing the canal and
> that your Department *accept reasonable modifications in
> alignment of the canal and in the plan for deposition of spoil* to
> hold to a minimum the destructive effects on these resources, even
> though this may increase project costs to some degree.

*Id.* (emphasis added)

80.     Secretary Seaton closed his letter with the following request:

> It will be apparent that the fish and wildlife investigations are far
> behind the stage reached in the engineering investigations. We
> trust, therefore, that the Corps of Engineers will take the necessary
> steps to bring the investigations of all phases of this project into
> balance.

*Id.* at 2.

### 12.     August 12, 1958 Amendments to the Fish and Wildlife Coordination Act.

81.     Congress approved changes to the FWCA on August 12, 1958, and the law

became officially known as the "Fish and Wildlife Coordination Act." *See* Fish and Wildlife

Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958) (the "1958 Amendments") (Exhibit X).

The statutory revisions applied to the MR-GO project and mirrored the terms of the 1946 version

of the law requiring consultation and coordination with the DOI (§ 2(a)), the incorporation of any

DOI concerns into the planning and design of any proposed water resource project (§ 2(b)), and

inclusion of the DOI's findings into any report submitted to Congress (§ 2(b)).  The 1958

Amendments also explicitly required the formulation of a plan to mitigate any adverse

environmental effects of any proposed water resource project.  Specifically, Section 2(b) stated:

34

> The reporting officers in project reports of the Federal agencies
> *shall give full consideration to the report and recommendations of*
> *the Secretary of the Interior and to any report of the State agency*
> *on wildlife aspects of such projects* and the project plan shall
> include such justifiable means and measures for wildlife purposes
> as the reporting agency finds should be adopted to obtain
> maximum overall project benefits.

*Id.* at 2 (emphasis added).

82.      Section 2(g) of the 1958 Amendments provided that they were applicable to any

project "authorized before or after the date of enactment of the Fish and Wildlife Coordination

Act for planning or construction" except those projects for which "sixty percent or more of the

estimated construction cost has been obligated for construction." *Id.* at 3-4. According to a 1959

draft correspondence from the Secretary of the Interior to the Secretary of the Army (Exhibit

AA), the invitation for bids on Reach 2 of the MR-GO were issued on January 30, 1959, after the

1958 Amendments were enacted. Since no construction contracts had been entered into for this

major portion of the project as of January, 1959, 60% of the "estimated construction cost" could

not have been "obligated for construction" on the date the 1958 Amendments were enacted, and

the 1958 Amendments governed all phases of the MR-GO project.

13.      **1958 Report from the Secretary of Interior to the Army Corps About**
         **Damage to Wetlands Caused by the MR-GO.**

83.      In 1958, the Department of Interior sent the Army Corps a preliminary report

specifying its concerns with the MR-GO's effects on the surrounding marshland. The report,

entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf*

*Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies* (the "*1958*

*Interior Report*") (Exhibit Y). The 1958 Interior Report first noted the 1957 letter from DOI

Secretary Seaton to Army Secretary Bruckner. (*Id.* at 4).

84.     This report predicted that the construction of the MR-GO would cause massive damage to the eco-system of the marshland adjacent to the waterway.  Initially, the authors of the *1958 Interior Report* observed that "[W]hile there is sufficient knowledge to indicate a trend toward project-occasioned effects on the fish and wildlife resources, the degree and/or magnitude of ecological changes can only be established by detailed investigations." (*Id.* at 18) (emphasis added).

85.     The *1958 Interior Report* first assessed potential changes to water circulation patterns in the marshland adjacent to the MR-GO and its effect on salinity levels, *i.e.*, the percentage of salt absorbed in the marshland water.  In this regard, the *1958 Interior Report* observed:

> Water salt . . . coupled with the intricate physical relationship of interspersed water and flat marsh environ surrounded by fresh-to-saline large open waters, creates a delicately balanced fish and wildlife habitat. . . . Water movement is a continuous changing phenomenon . . . . These combined forces establish and maintain the zones of salinity by mixing fresh water from the Mississippi River, Lake Pontchartrain, and Pearl River with Gulf waters.

*Id.* at 18.

86.     The *1958 Interior Report* further added:

> [O]f spectacular importance are the hydrological aspects which maintain a brackish vegetative environ highly suitable to waterfowl and fur animals.  This flora has a narrow salinity range; therefore, desirable production must result from exacting conditions.

*Id.* at 19.

87.     The report then proceeded to describe the harmful effects which would be caused by the MR-GO, stating:

> With the proposed channel, *certain quantitative changes* are apparent.  The 36-foot-deep cut will result in *direct changes of*

36

> salinity conditions adjacent to the canal.  ...  *[T]he effect of the*
> *cut and the spoil upon existing water circulation patterns*, if
> considered only from the physical aspects, *appears consequential.*

*Id.* at 19 (emphasis added).

88.     The *1958 Interior Report* next addressed "sedimentation patterns" And "direct

urial" of vegetation and "turbidity." *Id.* at 20.  Turbidity refers to the amount of soil or sediment

floating freely in the water, or, in other words, the "murkiness" of the water.  The report

observed that "direct burial by sedimentation of oyster bottoms, nursery grounds, and vegetative

areas is a self-explanatory feature easily observed from dredging operations in other estuarine

areas." *Id.*

89.     With respect to turbidity, the report first noted that temporary turbidity is

normally a short-term phenomenon, but "[i]t is . . . probable that construction or continuous

maintenance operations would produce a temporary turbidity type for sufficient duration to

accrue *long-term damaging ecological changes*." *Id.* (emphasis added).  Moreover, "[i]t is

conceivable also that a permanent turbidity type would prevent reestablishment of destroyed . . .

vegetation zones in certain areas." *Id.* at 21.

90.     The *1958 Interior Report* also observed that increased turbidity would have

certain harmful byproducts.  Flocculation, or the accumulation of soil and sediment clumps, "will

result in establishment of false bottoms or ooze areas, destroying the present bottom productive

potential and creating the continuous hazard of turbid conditions by only minor water agitation."

*Id.*  In addition, "[a]ny turbidity resulting in a plant kill can have further indirect effects by loss

of important mechanical and chemical stabilizing effects that plants provide against bottom

agitation." (*Id.*)

91.    The *1958 Interior Report* concluded that "it is apparent that detailed

investigations, coordinating hydrological, vegetative, fish and wildlife findings, and a model

study will be a prerequisite to predictions of project effects and establishment of mitigatory

measures." *Id.* at 22.  Furthermore, the report added:

> The effect of the channel and its impact on the industries that are
> dependent on the fish harvest can hardly be speculated.  It is
> causing great concern among commercial fisheries, industries and
> national organizations associated with these industries and it is felt
> that this concern is justified to the extent that *this project should be
> thoroughly investigated from the biological standpoint before
> construction through the marshes below Paris Road and the Sound
> is undertaken.*

*Id.* at 22-23 (emphasis added).

92.    The investigations urged by the DOI included a four-year regime of testing and

study to adequately assess the MR-GO's impact on the marshland.  Specifically, at pages 22-23,

the *1958 Interior Report* stated:

> A four-year study at a total cost of $504,000 has been outlined and
> attached at Appendix A. . . . Completion of all field studies and
> contract work is scheduled in Fiscal Year 1962 and results of these
> studies will be available for use in preparation of the detailed fish
> and wildlife report.  Major effort during this period will be given
> analysis of program findings and report finalization.

*Id.* at 25.

> **14.    Additional DOI Records Reveal the Environmental Agencies'
>        Frustration With the Army Corps Steadfast Unwillingness to Comply
>        with the FWCA.**

93.    In a September 24, 1959 memorandum from F. C. Gillett, Acting Regional

Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife

Service in Washington, D.C. (Exhibit Z), Mr. Gillett outlines the recommendations made to the

Army Corps, and the Army Corps' response to these recommendations.  While the Army Corps

agreed to several minor points, it unilaterally rejected major project changes.  The first

recommendation was "[c]onstruction of the canal from Paris Road through the marsh and sound areas be delayed until fish and wildlife studies are completed," and the fifth was "Lake Borgne alignment." (*Id.* at 1-2). The reference to "Lake Borgne alignment" was the DOI's recommendation that the MR-GO be routed away from the valuable marshland. The Army Corps rejected both recommendations. (*Id.*)

94.     A subsequent draft letter from the Secretary of the Interior to the Secretary of the Army reflected the DOI's near desperation in attempting to convince the Army Corps to comply with its statutory obligation. This correspondence, obtained from Department of Interior documents maintained at the National Archives (Exhibit AA), states:

> Thank you for your letter of February 2 commenting on the proposal made in our letter to you of July 30, 1958, that the route for the Mississippi River-Gulf Outlet Canal be realigned through Lake Borgne to preserve the fish and wildlife values of the adjacent marshes which would be destroyed by the planned route. As we advised you in September 1957, we anticipate that recommendations for the preservation of fish and wildlife in connection with the project would result in some increases in project costs.
>
> We note that your letter of February 2 states that invitation for bids on the segment of the channel which would pass through the marshes adjacent to Lake Borgne were issued January 30, 1959. We trust that this invitation will not irrevocably commit you Department to continue with construction through these marshes.
>
> *Before the contract for this segment is issued, we urge that there be opportunity for policy-making officials of this Department to discuss this matter with their counterparts in the Department of the Army.* We are hopeful that the Corps of Engineers will not proceed with firm commitments on this matter until the issue is settled through the medium of such a conference.

*Id.* at 1.

95.     After the Army Corps' rejection of these recommendations, the record reflects the DOI's attempts to ameliorate the consequences of the Army Corps ill-considered and illegal

decisions.  In a May 4, 1959 correspondence to the Army Corps District Engineer (Exhibit BB),

W. L. Towns, Acting Regional Director for the Fish and Wildlife Service wrote:

> The U. S. Fish and Wildlife Service has reviewed the design data
> attached to your letter of February 26, 1959, for dredging 11.4
> miles of access channel (140 ft. x 20 ft.) from Bayou Dupre to
> Bayou Yscloskey, a feature of the Mississippi River – Gulf Outlet
> Project.  The recommendations contained herein are based on the
> design data as provided and are intended to minimise the loss of
> fish and wildlife habitat, in the event this project segment is
> constructed.  They do not imply concurrence by this Service in the
> channel alignment which you presently propose for this project.

*Id.* at 1.

### 15. May 31, 1979 Letter from the Department of Interior to the Director-Secretary of the St. Bernard Parish Planning Commission Describing the History of the MR-GO and its Negative Effects on the Surrounding Marshland.

96.     On May 31, 1979, Cary W. Kerlin, Field Supervisor for the United States Fish

and Wildlife Service in Lafayette, Louisiana wrote Jack A. Stephen, Director-Secretary of the St.

Bernard Parish Planning Commission in response to a written request for information concerning

the MR-GO's effects on "St. Bernard Parish's wetlands and water bodies."  (Exhibit CC).  Mr.

Kerlin first noted:

> The MR-GO is one of the largest channelization projects to be
> constructed through such an extensive area of high-value fish and
> wildlife habitat. . . .  The Louisiana Wildlife Biologists
> Association predicted that the project would create *a 44-mile-long
> swath of destruction.*

*Id.* at 1 (emphasis added).

97.     Mr. Kerlin added:

> The possible effects of the project on the high-value area southwest
> of Lake Borgne were of great concern. . . . [Louisiana Wildlife
> and Fisheries Commission ("LWFC")] estimates indicated that
> channel excavation and spoil disposal would eliminate 6,200 acres
> of shallow open water and 17,400 acres of marsh. . . . *The
> alignment ultimately constructed through the high-value marsh*

> *area south of Lake Borgne was strongly opposed by conservation
> agencies, particularly the LWFC.*  That agency recommended two
> alternate routes through Lake Borgne considered much less
> destructive to fish and wildlife resources than channel construction
> through highly valuable marshland.

*Id.* at 4 (emphasis added).

98.   Finally, Mr. Kerlin observed:

> Despite the existence of other factors . . ., we believe that the
> construction of the MR-GO and the associated drastic increase in
> water salinities have been the primary causes of habitat
> degradation in St. Bernard Parish.

*Id.* at 11.

### 16.   Prior to Construction of the MR-GO, the Primary Threat for Hurricane Related Flooding Came from Lake Pontchartrain to the North of Greater New Orleans.

99.   Section 4 of the May 22, 2006 report by the Independent Levee Investigation

Team entitled *Investigation of the Performance of the New Orleans Flood Protection Systems in*

*Hurricane Katrina on August 29, 2005 ("4 ILIT Report")* (Exhibit DD) included a history of

hurricane flooding in the New Orleans area showing that historically, the greatest hurricane flood

danger before the construction of the MR-GO came from Lake Pontchartrain.  Specifically, the

*4 ILIT Report* states:

> Since 1759, 172 hurricanes have struck southern Louisiana
> (Shallat, 2000).  Of these, 38 have caused flooding in New
> Orleans, usually via Lake Pontchartrain. . . . In 1722 a hurricane
> destroyed most of embryonic New Orleans . . . . . . . The parade
> ground at Fort St. Phillip was inundated by 8 feet of water and the
> shoreline along Lake Pontchartrain was similarly inundated.

*Id.* at 9.

100.   The *4 ILIT Report* further observed:

> In June 1821 easterly winds surged off Lake Pontchartrain and
> pushed up Bayou St. John . . . .  It was an ominous portent of

things to come. . . .   In 1871 three hurricanes caused localized
flooding . . . .  which proved difficult to drain.  Flooding
emanating from storm surges on Lake Pontchartrain during these
storms overtopped the Hagan Avenue drainage canal . . . .

*Id.* at 10.

101.    The authors of *4 ILIT Report* added:

Prior to Katrina's landfall in 2005, the most damaging hurricane to
impact New Orleans was the Grand Isle Hurricane of September
29, 1915 . . . .  The storm surge on Lake Pontchartrain rose to 13
ft, easily overtopping 6-foot high shoreline levee, destroying the
lakefront villages of Bucktown . . ., West End, Spanish Fort, and
Lakeview . . . .  This storm overwhelmed the City's defenses so
quickly that 275 people were killed, mostly in the Lake
Pontchartrain shoreline zone.

*Id.* at 11.

102.    Finally, the *4 ILIT Report* stated:

On September 19, 1947 an unnamed hurricane made landfall near
the Chandeleur Islands . . . .  This was the first significant
hurricane to strike New Orleans which generated a large body of
reliable storm surge data, which was subsequently used in design
of flood protection works by the Corps of Engineers.  . . . After
the 1947 storm, hurricane protection levees were heightened along
the south shore of Lake Pontchartrain and extended westward,
across Jefferson Parish . . . . In addition, the embankments along
the old drainage canals were raised by earthfill to protect the
Orleans and Jefferson Parishes from future storm surges off Lake
Pontchartrain.

*Id.*

**17.    The Purpose of the Lake Pontchartrain and Vicinity Hurricane
Flood Protection Project was to Protect Against Hurricane
Induced Flooding from Lake Pontchartrain.**

103.    As its name suggests, the Lake Pontchartrain and Vicinity Hurricane Flood

Protection Project was intended to protect against flooding from Lake Pontchartrain, rather than

from the areas to the southeast of Greater New Orleans.  This program was not designed or

intended to fortify protection against wind-driven surge coming up the MR-GO and off of Lake Borgne. For example, there were no funds appropriated for restoration of the surge-buffering, but rapidly vanishing, wetlands destroyed by the construction and operation of the MR-GO. Nor were there any barriers authorized for the MR-GO. Available records indicate that the Army Corps never asked Congress for funding sufficient to ameliorate known and severe bank erosion, wetlands degradation, and other safety problems along the MR-GO.

104.    Accompanying this declaration as Exhibit EE is a complete copy of the H. R. Doc. 89-231 (1965) repeatedly cited by the Army Corps in its Motion. In his transmittal letter to the Secretary of the Army, the Army Corps Chief of Engineers noted that "[t]he District and Division Engineers find that the most suitable plan for protecting the partially developed areas bordering Lake Pontchartrain would consist of two parts . . . ." (*Id.* at 25). Likewise, on the first page of the syllabus for the District Engineer's report, he observes "[t]he recommended protection plan for the Lake Pontchartrain basis consists of a barrier at the east end of the lake to exclude hurricane tides, coupled with construction or enlargement of protective works fronting developed or potentially developable areas." (*Id.* at 41).

### 18.    The Evidence Supports the Conclusion that Levees Were Never Built Along the Southern Bank of the MR-GO.

105.    As explained in Paragraphs 68-69 of this Declaration, the original plans for the construction of the MR-GO called for the fabrication of an above ground dyke along the length of Reach 2 for the purpose of quelling waves and currents within the MR-GO that could impede *ship navigation.*

106.    Moreover, Exhibit 10 to the Government's Motion is a 1976 Army Corps document entitled *Final Composite Environmental Statement for Operation and Maintenance*

*Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana* (the "*1976 EIS*"). The complete copy of this document (Exhibit FF) notes that "[t]he project described in this report is the operation and maintenance (O&M) of the Mississippi River-Gulf Outlet (MR-GO) . . . . O&M work includes *dredging to maintain the established navigation channels*, disposition of dredged material, and *surveillance and repair of dredged containment dykes.*" (*Id.* at 13) (emphasis added). With respect to the disposal of this dredged material, the *1976 EIS* further adds:

> A diked disposal area, 2,000 feet wide, is adjacent to the southwest side of the channel through the land area of the MR-GO . . . . Deposited material spreads over the existing vegetation with each dredging operation. As the material flows outward from the pipeline and dries, a flat, cone like mound is created.

*Id.* at 21 (emphasis added).

107.   What the Government now calls "levees" were most likely the dredged material excavated from the bottom of the MR-GO for construction of the aforementioned dyke, or spoil excavated from the canal over the years during normal maintenance and simply dumped along the southern bank of the MR-GO, creating what are commonly called "spoil banks." There is no evidence that these earthen dykes or spoil banks were designed to be, or were later transformed into, "levees" for the purpose of flood protection.

108.   This conclusion is further buttressed by the fact that the earthen mounds along the southern MR-GO were made of the same sandy or organic material lining the bottom of the MR-GO, and the Army Corps' own documents clearly state that levees should never be fabricated from this type of soil. *See* Paragraphs 109-112, *infra*.

109.   Accompanying this Declaration as Exhibit GG is a copy of a 1958 Army Corps soil report prior to construction of the MR-GO, entitled *Geological Investigation of the*

*Mississippi River-Gulf Outlet* (the "*MR-GO Geology Report*"). The report was a "geological study made for the outlet channel . . . ." *Id.* at 4.

110.   The *MR-GO Geology Report* noted that "[n]earshore gulf deposits and buried beaches are characterized by sandiness." *Id.* at 8. "Nearshore gulf deposits will be encountered in the bottom of the channel excavation near New Orleans, and buried beaches may be encountered almost anywhere along the proposed channel." *Id.* at 10. The study authors further noted that "[m]arsh and swamp deposits cover most of the land within the study area." *Id.* at 15. Moreover, "[s]edimentation within the marsh is predominantly organic." *Id.* at 17. Thus, according to the *MR-GO Geology Report*, most of the soil through which the MR-GO was constructed consisted of either sandy or organic soil.

111.   According to Section 2 of the recent 2006 ILIT Report ("*2 ILIT Report*"), the supposed levees "along the 'MRGO' frontage at the northeast edge of the St. Bernard Parish/Ninth Ward protected area . . . were constructed using locally available soils, including dredged spoils from the excavation of the adjacent MRGO channel." (Exhibit HH at 7). The *2 ILET Report* further noted that these purported "levees"

> [a]long this MRGO frontage section (along the northeastern edge
> of the St. Bernard protected area) were . . . constructed using large
> volumes of the spoil material excavated during the dredging of the
> adjacent MRGO shipping channel, and they contain unusually
> large quantities of highly erodeable sandy soils.

*Id.*

112.   Army Corps' documents state that levees must not be constructed from such sandy or organic materials. The 2000 edition of the Army Corps publication *Design and Construction of Levees* states: "Almost any soil is suitable for constructing levees, *except very wet, fine grained soils or highly organic soils.*" (Exhibit II at 32) (emphasis added).

113.     All of the foregoing documents clearly substantiate the following facts: (1) the MR-GO was constructed through marshland consisting of sandy or organic soil; (2) the earthen mounds along the MR-GO were comprised of the same material; (3) the Army Corps used the southern bank of the MR-GO as a "garbage dump" for the spoil dredged from the MR-GO during regular maintenance over the life of the MR-GO; and (4) the Army Corps' manual on levee construction pointedly states that such material is not suitable for levee construction. Clearly, these "earthen structures" do not satisfy the Army Corps definition of a "levee": "The term levee as used herein is defined as an embankment whose primary purpose is to furnish flood protection from seasonal high water and which is therefore subject to water loading for periods of only a few days or weeks a year." *Id.* at 11.

114.     I have been informed and understand that one of the steps normally taken by the Army Corps when planning any type of Congressionally authorized project is to prepare a design memorandum for the project.  Presently, Plaintiffs are not in possession of the design memorandum, thus requiring additional discovery to obtain a copy of this document from Defendants.

115.     At a minimum, based on the information in Plaintiffs' possession thus far, the true nature of these piles of dirt remains a disputed question of fact that can only be resolved by a trial on the merits.

116.     Other disputed issues related to the nature of these edifices along the MR-GO include (1) whether these soil deposits along the MR-GO correspond to the criteria contained in the design memorandum; (2) the manner in which soil from the bottom of the MR-GO was deposited on the south shore of the MR-GO – *i.e.* was it "vacuumed" from the bottom the canal with a barge mounted dredging machine, or was it scooped from the base of the waterway with

some type of back hoe – issues which I am informed and understand impact the usability of soil in levee fabrication; and (3) the standards used by the Corps for levee construction in 1965 when the Lake Pontchartrain Project was approved by Congress, and the guidelines actually used by the Army Corps to design and construct these "levees."

> **19.     The IPET Report Sponsored by the Army Corps Recognized the Inherent Danger of the "Funnel Effect" Created by the Merging of the GIWW and the MR-GO.**

117.    Accompanying this declaration as Exhibit JJ is a copy of Section IV, Appendix 6 of the 2006 Report by the Interagency Performance Evaluation Taskforce *("IV-6 IPET Report")* sponsored by the Army Corps. The authors of *IV-6 IPET Report* noted "[t] he critical section of the MRGO is Reach 1, the combined GIWW/MRGO. It is through this section of channel that Lake Pontchartrain and Lake Borgne are hydraulically connected to one another via the IHNC. . . . The Reach 1 GIWW/MRGO section of channel is very important in determining the magnitude of storm surge that reaches the IHNC from Lake Borgne and Breton Sound." *(Id.* at 2).

118.    The authors of *IV-6 IPET Report* further observed:

> Reach 1 (the combined GIWW/MRGO section) and the IHNC, together, provide a hydraulic connection between Lake Borgne and Lake Pontchartrain. As a result of this connection, the storm surge experience within the IHNC and Reach 1 (GOWW/MRGO) is a function of storm surge in both Lakes . . . . This is true for both low and high storm surge conditions. To prevent storm surge in Lake Borgne from reaching the IHNC or GIWW/MRGO sections of waterway, flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity. The presence of an open channel is the key factor.

*Id.* at 6-7 (emphasis added)

119.    As noted by the authors of the *IV-6 IPET Report*, the connection of the MR-GO to the GIWW created or exacerbated a threat to the New Orleans East and the Upper and Lower Ninth Ward by causing a dangerous increase in water value within the combined MR-GO/GIWW waterway.

120.    Accompanying this Declaration as Exhibit KK is a true and correct copy of a December 1984 report prepared by Coastal Environments, Inc., an applied sciences consulting firm, for the U.S. Department of Commerce, National Oceanic and Atmospheric Administration and the St. Bernard Parish Police Jury, entitled *The Mississippi River Gulf Outlet: A Study of Bank Stabilization.*

121.    Accompanying this Declaration as Exhibit LL is the complete text of Exhibit 7 to the Government's Motion to Dismiss entitled *1984 Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection Project: Reevaluation Study.*

122.    Accompanying this Declaration as Exhibit MM is the complete text of Exhibit 4 to the Government's Motion to Dismiss entitled *Mississippi River-Gulf Outlet, Louisiana: Design Memorandum No. 1-A.*

123.    Accompanying this Declaration as Exhibit NN is a true and correct copy of the order and opinion of the Hon. Herbert Christenberry denying the United States' Motion to Dismiss in *Graci v. United States*, Case Nos. 15962, 15976 and 16091 (September 30, 1966; June 15, 1967.

124.    There is no mystery that Congress did not authorize the Seabrook Lock. The River and Harbor Act and Flood Control Act of 1965, P.L. 89-298, 79 Stat. 1073 (October 27, 1965) states:

48

> The project for hurricane-flood protection on Lake Pontchartrain, Louisiana is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress, except that the recommendations of the Secretary of the Army in that document shall apply with respect to the Seabrook Lock feature of the project.

125.   A review of the Government's rendition of the plead facts also reveals that the Government has either misquoted Plaintiff's Complaint or taken the true language completely out of context.  For example, the Government quotes Plaintiffs' pleading and states:

> '*From its conception* over 40 years ago, the MR-GO was riddled with inherent problems . . . .'  Complaint ¶ 2 . . . .  '*From the outset*, . . . the MR-GO project . . . was riddled with serious problems . . . .' *Id.* ¶ 45 . . . .  To the extent that this action is premised on the fulfillment of the mandate contained in Public Law 455 . . . , it is barred by the 'due care' exception and must be dismissed.

Motion at 30 (emphasis in the original).

126.   Similarly, the Government asserts at page 34, "[t]he due care exception therefore bars the claim that MR-GO '*was riddled with inherent problems*' '*[f]rom its conception.*' Complaint ¶ 3, or '[f]rom the outset,' *id.* ¶ 34."  Paragraphs 3 and 45 of Plaintiffs' Complaint, however, do not contain the phrases "riddled with inherent problems," "from its conception" or "from the outset."  Indeed, paragraph 45 merely recounts some of the MR-GO's history (""Construction of the deep draft channel was initiated in March 1958. An interim channel 36 by 250 feet (bottom width) was opened to traffic in July 1963. Enlargement to project dimensions was completed in January 1968.").

127.   More importantly, the full text of paragraph 2 of the pleading reads "[f]rom its conception over 40 years ago, the MR-GO was riddled with inherent problems that worsened steadily over the years *due to the Army Corps' neglect*;" and the complete paragraph 34 states

49

"[f]rom the outset, . . . the MR-GO project . . . was riddled with serious problems *that the Army Corps either ignored entirely or dealt with in a cursory and negligent manner.*" (Emphasis added). Read in its full context, as required for a motion to dismiss, these allegations charge the Army Corps with negligence *in the manner in which the Army Corps executed* a Congressional mandate; these allegations do not even "imply" a challenge to a federal statute. The Government has simply taken snippets of Plaintiffs' Complaint, totally out of context, to fabricate a specious argument out of whole cloth.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 21st day of August, 2006 in Los Angeles, California.

Nina D. Froeschle

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August, 2006, I served a true copy of the Declaration of Nina D. Froeschle in Support of Plaintiffs' Request to Conduct Additional Discovery Pursuant to Fed. R. Civ. P. 56(f) upon counsel for the United States of America by electronic mail, facsimile, or first class mail.

_____
JONATHAN B. ANDRY