FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA   2006 AUG 29  PM 3: 14

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| STATE OF LOUISIANA, THROUGH ATTORNEY GENERAL CHARLES C. FOTI, JR., ST. BERNARD PARISH,  CHARLES "PETE" SAVOY, MARK MADARY, CYNTHIA WILLARD-LEWIS, PAMELA BRUNO NEVLE, GERARD BERNARD NEVLE, PAM DASHIELL, SHAWN TRAN, AND NGA TRAN, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CIVIL ACTION<br><br>NUMBER: 06-3552<br><br>SECTION:  "K" (2) |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA, THE UNITED STATES ARMY CORPS OF ENGINEERS, and FRANCIS J. HARVEY, THE SECRETARY OF THE ARMY | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE  RELIEF TO REQUIRE REMEDIAL MEASURES TO PREVENT THE MISSISSIPPI RIVER-GULF OUTLET FROM CAUSING FURTHER DESTRUCTION OF HUMAN LIFE AND PROPERTY

Plaintiffs State of Louisiana, through Attorney General Charles C. Foti, Jr., St. Bernard Parish, Charles "Pete" Savoy, Mark Madary, Cynthia Willard-Lewis, Pamela Bruno Nevle, Gerald Bernard Nevle, Pam Dashiell, Shawn Tran, and Nga Tran, individually, and on behalf of all others similarly situated, for their Complaint, with respect state the following:

## INTRODUCTION

1.     This case is literally about life or death.  Plaintiffs seek to assure the survival of Greater New Orleans by protecting tens of thousands of residents and billions of dollars of public and private property from a repetition of the devastating flooding caused by the Mississippi River-Gulf Outlet ("MR-GO") during Hurricane Katrina. Without decisive and prompt judicial intervention, the extremely hazardous conditions of the MR-GO that contributed substantially to the flooding of the Upper and Lower Ninth Wards, New Orleans East, and St. Bernard Parish ("Greater New Orleans")—conditions which the U.S. Army Corps of Engineers ("Army Corps") has steadfastly refused to take any steps to ameliorate—continue to pose a clear and present danger to persons and property of causing a repeat of this monstrous calamity.  The Army Corps has allowed the MR-GO to harm and threaten hundreds of citizens and to destroy billions of dollars of property.  Given that hurricane season 2006 has only just begun, the time has come to put an end to this egregious dereliction of duty before the MR-GO precipitates another catastrophe.

2.     Plaintiffs seek to prevent a recurrence of one of the most predictable and preventable catastrophes in American history, namely the tragic flooding and devastation of homes and lives during Hurricane Katrina caused by the MR-GO.  The people have been betrayed by federal officials who had reason to know for over four decades that the MR-GO would one day cause massive, lethal flooding of metropolitan New Orleans but have been nevertheless unwilling to remedy its deadly effects.  Forsaken and alone, the survivors seeking to rebuild their shattered lives must fend for themselves by enlisting the protection of the federal courts.  Since no one has taken decisive legal action to require

the Army Corps to undertake remedial measures to prevent the MR-GO from further endangering human life and property, this class action citizens' lawsuit may very well represent the best and only chance for the residents and businesses of Greater New Orleans to protect themselves and their homes, schools, and livelihoods.

3.      Plaintiffs request a declaration that the Army Corps has violated several significant federal statutes in the design, construction, maintenance and operation of the MR-GO, including the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662; the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945); the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C); and the Water Resources Development Act of 1990 ("WRDA"), 33 U.S.C. §§ 2316 and 2317.  The Army Corps has acted arbitrarily and capriciously in flagrantly failing to obey the law.

4.      Plaintiffs also request a declaration that the Army Corps, as the proprietor of the MR-GO, has violated La. Civ. Code art. 667 (2005) by creating a nuisance that has deprived and imminently threatens to deprive those living in neighboring parishes of the enjoyment of their property in the inevitable event of the next hurricane.  Plaintiffs further request a declaration that the Army Corps, as the owner and operator of the MR-GO, has breached its federal common law duty to avoid creating a hazardous condition that harms and imminently threatens to harm the lives and property of nearby residents in the event of a hurricane.  Unless enjoined, this continuing nuisance threatens to cause future irreparable harm to neighboring landowners and residents.

5.      The net result of the Army Corps' malfeasance has been the creation of one of the nation's most environmentally disastrous public works projects.  Indisputably, the MR-GO has caused the loss of tens of thousands of acres of precious wetlands that

3

are vital resources for Southeast Louisiana and provide essential natural buffers to

hurricane-driven surge waters. In its present unremediated condition, the MR-GO has

caused and continues to threaten to cause massive damage to human life and property.

Indeed, this tragic truth was acknowledged by the Army Corps in 1988 when it correctly

concluded that the closure of the MR-GO would "*reduce the possibility of catastrophic*

*damage to urban areas by a hurricane surge coming up [the MR-GO].*" Comments by

the U.S. Army Corps of Engineers, Lower Mississippi Valley District, with respect to the

Mississippi River Gulf Outlet Bank Erosion Reconnaissance Report (1988), at p. 1 (the

"1988 Erosion Report Comments"). Therefore, in addition to declaratory relief, this

Court should also issue a permanent injunction requiring that the Army Corps undertake

immediate measures to remedy these dangerous conditions. In the interim, Plaintiffs

request that the Court appoint a Special Master and a panel of distinguished scientists to

devise a MR-GO Remediation Plan to be implemented pursuant to an order of this Court.

6.       As demonstrated below, the critical facts and law are not in serious

dispute.

7.       The epic destructive forces of the MR-GO during Hurricane Katrina—and

the flooding of Greater New Orleans—were foreseeable consequences of three fatally

defective conditions known by the Army Corps and many other agencies and

organizations for decades, specifically: (1) the destruction of the marshlands surrounding

the MR-GO that enabled a huge east-west storm surge, to inundate much of Greater New

Orleans; (2) the faulty design of the MR-GO, essentially aiming the direction and full

force of the waterway directly at Greater New Orleans with no barriers to break the

crushing strength and speed of storm surges; and (3) the additional "funneling effect"

4

created from MR-GO's intersection with the Gulf Intracoastal Waterway ("GIWW") that accelerated the force and strength of the storm surge to lethal proportions. Absent the exacerbating effect of the MR-GO, aptly nicknamed the "Hurricane Highway," Katrina would have been an endurable event in New Orleans' history rather than the obliterating force that destroyed lives and businesses, displaced thousands of people, and devastated much of a great American city known for its historic grace and beauty.

8. Since 1958, the Army Corps and others were on written notice that the MR-GO posed a serious threat to human life and property in Greater New Orleans. Repeated warnings from knowledgeable experts and public officials over the next 47 years before Katrina—including the Army Corps own report in 1988 recommending closure of the MR-GO—fell on deaf ears. No one did anything to mitigate or prevent the very calamity that occurred during Katrina.

9. For decades, many experts, government agencies, environmental organizations, and citizens have demanded the closure and/or remediation of the MR-GO, including the St. Bernard Parish Council, Louisiana Senators Mary Landrieu and David Vitter, the Lake Pontchartrain Basin Foundation, the Louisiana Landowners Association, the Gulf Restoration Network, the Coalition to Close the Mississippi River Gulf Outlet, the Coalition to Restore Coastal Louisiana, the Technical Committee of the Coastal Wetland Planning Preservation and Restoration Act, American Rivers, the Sierra Club, the Louisiana Environmental Action Network, and the Holy Cross Neighborhood Association. Most recently, Louisiana Governor Kathleen Babineaux Blanco, in a June 2, 2006 letter to the Army Corps expressing the state's official policy, urged "the immediate closure of this channel" because "[o]ver the years, MRGO has compromised

the safety of countless communities and contributed to the loss of vital coastal marsh

areas.  The closure of the MRGO must ensure the communities are safe and our

ecosystems are protected from further saltwater intrusion and coastal land loss."

10.     From the very outset, the Army Corps did not follow clear federal statutes

and regulations designed to provide safeguards for human life, property, and

environmental resources.  Harold L. Ickes, the distinguished Secretary of the Interior

under President Franklin D. Roosevelt, summed up the agency's attitude toward external

controls on its actions:  "No more lawless or irresponsible Federal group than the Corps

of Army Engineers has ever attempted to operate in the United States either outside of or

within the law."  Harold L. Ickes, Foreword in Arthur Maass, *Muddy Waters:  The Army*

*Engineers and The Nation's Rivers* (Harvard University Press 1951) at p. xiv.

11.     In April 1958, the United States Department of Interior, in a draft report to

the Army Corps, revealed that the agency had not satisfied the provisions of the Federal

Fish and Wildlife Coordination Act ("FWCA") when it proceeded to construct the MR-

GO without first consulting with the Department of Interior.  The report then predicted

vast ecological damage from the MR-GO, including numerous observations concerning

the negative impact that the MR-GO would have on the surrounding marsh eco-system.

The report further recommended a four year regime of testing to be conducted *before* the

construction of the channel.  Rather than perform the recommended studies, the Army

Corps proceeded to build the MR-GO and caused the very ecological disaster predicted

by the Department of Interior in 1958.

12.     Similarly, the Army Corps refused to heed the plea of the Louisiana Wild

Life and Fisheries Commission in 1958 urging that the route for the MR-GO be modified

6

in order to avoid the destruction of "highly productive estuarine water and marsh areas." *See, e.g.*, May 31, 1979 correspondence from Cary W. Kerlin, Field Supervisor, U.S. Department of Interior, Fish and Wildlife Service to Jack A. Stephens, Director-Secretary St. Bernard Parish Planning Commissions (the "1979 FWS Letter"). The Army Corps rejected this recommendation because a more environmentally-responsible alignment "would increase the construction and maintenance cost by going through the lower part of Lake Borgne . . . ." *Id.*

13.     In building the MR-GO, the Army Corps ignored well known facts about the science of the area through which it was planning to build a major waterway. The southeast coast of Louisiana is part of "one of the most complex, dynamic, and productive environments of the United States, with an underlying geology shaped by tectonic forces and sedimentation processes, varied estuarine and coastal ecosystems, and a turbulent climate." American Geophysical Union, *Hurricanes and the U.S. Gulf Coast: Science and Sustainable Rebuilding*, June 19, 2006 ("*AGU Report*") at p. 6. As in so many other ecologically-sensitive areas throughout the nation, the Army Corps' hydraulic dredging pillaged the Louisiana wetlands by constructing the MR-GO in a manner that appears to have been designed to inflict the maximum measure of environmental devastation.

14.     As Greater New Orleans struggles for its life—almost 50 years after the Army Corps ignored the Department of Interior's and the State of Louisiana's warnings about the dire consequences of the MR-GO construction—the Army Corps continues to violate federal statutes and regulations designed to provide essential safeguards for the environment as well as human life and property. Specifically, without any environmental

assessment, the Army Corps announced recently its unilateral decision to forego dredging the bottom of the MR-GO. The decision to stop dredging has potential for damage to human life and property because the rapid build up of sediment—over 20 feet alone as a result of Katrina—may increase the speed of any storm surge traversing up the MR-GO and into Greater New Orleans.

15.      The Army Corps' decision to stop dredging the MR-GO not only holds the potential for even more devastation to Greater New Orleans, but it is also in direct violation of NEPA. NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") with respect to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Army Corps' decision to forego dredging is a "major Federal action significantly affecting the quality of the human environment," and the failure to prepare an EIS places the Army Corps in clear violation of NEPA.

16.      Moreover, the Army Corps' decision to stop dredging the MR-GO is also in direct violation of WRDA. WRDA requires that "[t]he Secretary [of the Army] shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." 33 U.S.C. § 2316(a). WRDA further requires the Secretary of the Army to "utilize all appropriate authorities, including those to restore and create wetlands, in meeting the interim and long-term goals," and commands the Secretary of the Army to develop a "wetlands action plan" with the EPA, the Fish and Wildlife Service and other Federal agencies. 33 U.S.C. § 2317(a)(3). The Army Corps' decision to stop dredging is in direct violation of the WRDA since it further diminishes

environmental protection, involved no known coordination with the EPA, the Fish and Wildlife Service and other federal agencies, and will inevitably cause even greater harm to the wetlands.

17.     The Administrative Procedure Act ("APA"), set forth in 5 U.S.C. §§ 701-706, waives sovereign immunity of the United States in actions where, as here, agencies of the United States have failed to satisfy their statutory and common law duties. The Army Corps violated the FWCA and the River and Harbor Act of 1945 when it failed in 1958 to take action with respect to the recommendations of the Department of Interior for further testing and studies before the construction of the MR-GO. The Army Corps also violated NEPA when it failed to prepare an EIS in reference to stopping dredging. Likewise, the Army Corps' failure to consider the environmental implications of its decision to forego dredging, especially the potential for accelerated marshland damage, violates its statutory directive to protect the environment and marshland mandated by Congress in the WRDA. Such violations constitute actionable claims under the APA.

18.     To this end, Plaintiffs seek declaratory and injunctive relief through the Court's appointment of a Special Master and an independent panel of preeminent scientific experts (nominated by the parties and selected by the Court) to prepare a study and advise the Court as to a MR-GO Remediation Plan, and, assuming approval, a Court order mandating the necessary measures to implement that plan. An objective, independent evaluation is necessitated by the simple fact that the Army Corps cannot be trusted to remedy the serious problems with the MR-GO that it created and then ignored for nearly a half century. This action seeks therefore to draw upon the collective knowledge of our nation's most preeminent scientists, engineers, and environmental

specialists to find a cost-effective remedy for the continuing dangerous conditions of the MR-GO.

19.     Plaintiffs therefore respectfully ask the Court to provide declaratory and injunctive relief by:  (1) appointing a Special Master to preside over a panel of distinguished experts to examine the dangers of the MR-GO; (2) directing the panel to prepare a study for the Court containing a recommendation for a MR-GO Remediation Plan that identifies the public health and safety and environmental problems posed by the MR-GO as well as the remedial measures necessary to afford reasonable protection for human life and property and the environment in Greater New Orleans; (3) directing the Special Master presiding over the scientific panel to make periodic reports to the Court on the panel's progress and final recommendations, and to monitor the implementation of any remedial measures ordered by the Court; and (4) ordering the implementation of a MR-GO Remediation Plan based upon the panel's findings and recommendation.

20.     In light of the grave risk of injury and death and the destruction of public and private property and the sensitive environment posed by the unremediated MR-GO now facing the rapidly approaching hurricane season, Plaintiffs request expedited discovery and the soonest possible trial of this action.

## JURISDICTION

21.     This Court maintains subject matter jurisdiction over this action pursuant to 5 U.S.C. § 706 (the APA), 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1346(b) (Defendant United States), 28 U.S.C. § 2201 (Declaratory Relief), and 28 U.S.C. § 2202 (Further Relief - Injunctive).

## VENUE

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' legal wrongs occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, and Plaintiffs all reside in the Eastern District of Louisiana.

## PARTIES

### Plaintiffs

23.     The following are the named plaintiffs:

a.      The State of Louisiana, through Attorney General Charles C. Foti, Jr. ("State of Louisiana"), a state of the United States of America, represents the People of Louisiana. The State of Louisiana and its residents have suffered devastating losses, including loss of lives and property, from the flooding of the MR-GO during Hurricane Katrina.  The State of Louisiana has been a strong advocate of implementing remedial measures to protect the citizens of Louisiana from the imminent and ongoing dangers posed by the MR-GO.  In October 2004 – almost two years before the tragic losses caused by the MR-GO during Hurricane Katrina – the Louisiana Legislature passed a resolution urging closure of the MR-GO and immediate implementation of remedial measures to address the risks posed by the MR-GO and "more drastic tidal surges and more prolonged flooding as a result of tropical storms and hurricanes."  On June 2, 2006 – facing the tragic aftermath of the vast destruction caused by the MR-GO during Hurricane Katrina – Louisiana Governor Kathleen Babineaux Blanco sent a letter urging the Army Corps to close and remediate the MR-GO.  In particular, Governor Blanco demanded "a more precise plan for closure, restoration of the extensive wetlands lost as a

direct result of the MRGO, and the integration of this closure into the comprehensive hurricane protection plan."

        b.      St. Bernard Parish ("St. Bernard"), a parish located in Louisiana with a portion comprising part of Greater New Orleans, was one the communities hardest hit by the flooding of the MR-GO on August 29, and 30, 2005.   Of the more than 6,000 homes in St. Bernard, *only four houses did not suffer catastrophic damage* from the flooding of the MR-GO during Katrina.  Following the flooding, the population of St. Bernard shrunk from 70,000 to fewer than 7,000 residents, many of whom still live in temporary housing.   St. Bernard and its residents now live in the shadow of imminent danger if the MR-GO causes massive flooding once again as it did during Hurricane Katrina.  Over the years, St. Bernard has vigorously and actively opposed the MR-GO as a threat to public safety.  Starting in April 1958, the St. Bernard Policy Jury passed a resolution opposing the MR-GO, stating that "[d]uring times of hurricane conditions the existence of the channel will be an enormous danger to the heavily populated areas of the parish."  During the following years, St. Bernard continued its campaign against the dangers posed by the MR-GO, including passing other resolutions to stop the destructive forces of the MR-GO, conducting numerous studies exposing MR-GO's potential for causing devastating harm to St. Bernard and the surrounding area of Greater New Orleans and testifying before governmental committees about the problems of the MR-GO.  In the fall of 1998, St. Bernard Parish Council unanimously adopted a resolution to close the MR-GO because it constituted a threat to public health and safety.

        c.      Charles "Pete" Savoy, an individual, is an adult who owned and resided in a house located in St. Bernard Parish.  His home was damaged by five to six

feet of floodwaters from the MR-GO on August 29 and 30, 2005. A 52-year resident of St. Bernard Parish, Mr. Savoy continues to live there, although he is now housed in a FEMA trailer. He has been a long-time advocate of closing the MR-GO. For 17 years, Mr. Savoy was president of the St. Bernard Sportsman Society and regularly attended public meetings involving the MR-GO. He currently serves on the Coastal Zone Advisory Commission.

   d. Mark Madary, an individual, is an adult who owned and resided in a house located in St. Bernard Parish, Louisiana. His home was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005, and he barely escaped with his life from the raging floodwaters. Mr. Madary continues to live in St. Bernard Parish at another location, and his current residence and family are in harm's way if the MR-GO once again causes massive flooding like it did during Hurricane Katrina. Mr. Madary is an elected member of the St. Bernard Parish Council who has repeatedly urged the closure and/or remediation of the MR-GO.

   e. Cynthia Willard-Lewis, an individual, is an adult who owned and resided in a house located in New Orleans East, Louisiana. Her home was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005. Ms. Willard-Lewis formerly represented New Orleans East in the Louisiana State Legislature, is now a New Orleans City Councilmember for Council District E comprising the Lower Ninth Ward, Desire, and New Orleans East, and is also a member of the New Orleans Sewerage and Water Board. Ms. Willard-Lewis is a mother and grandmother who resided in a home in New Orleans East filled with mementos of her children, family, and her years of public service. Her home and the homes of her parents and five of her siblings were totally

destroyed by the floodwaters and the homes of two more siblings were substantially damaged. Ms. Willard-Lewis currently resides in a surrounding parish with her children. Ms. Willard-Lewis has long understood the damage the MR-GO could cause the residents of the Lower Ninth Ward and New Orleans East. Ms. Willard-Lewis represents the thousands of her constituents who lost their lives, homes and property because of the Army Corps' negligence.

   f. Pamela Bruno Nevle, an individual, is an adult who owned and resided in a house in St. Bernard Parish, Louisiana. Her home was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005, and she was forced to relocate to a rented apartment in the French Quarter of New Orleans. Ms. Nevle is a founder of St. Bernard Citizens for Environmental Quality. She has been a resident of St. Bernard Parish for 52 years and a civic activist for 30 years. Ms. Nevle was a member of the St. Bernard Parish Coastal Zone Advisory Board from 1990 to 1994. In connection with her duties on the Board and as a concerned citizen and activist, Ms. Nevle for years has advocated the closure and/or remediation of the MR-GO. Among many other things, she has traveled to Baton Rouge to attend meetings in which she addressed the State Legislature urging for the closure of the MRGO.

   g. Gerard Bernard Nevle, an individual and husband of Pamela Nevle, is an adult who owned and resided in a house in St. Bernard Parish, Louisiana. The Nevle family home was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005, and Mr. Nevle, along with his wife, was forced to relocate to a rented apartment in the French Quarter of New Orleans. Mr. Nevle for years has advocated the closure and/or remediation of the MR-GO. As a concerned citizen, Mr. Nevle has

attended meetings regarding the hazards of the MR-GO and the potential benefits of closure of the MR-GO.

h.    Pamela Dashiell, an individual, is an adult who resided in a house in the Holy Cross Section of the Lower Ninth Ward in New Orleans, Orleans Parish, Louisiana.  All of her property was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005, and Ms. Dashiell was forced to relocate to a rented dwelling elsewhere in New Orleans.  Ms. Dashiell had been a resident of and had raised her family in the Holy Cross Section of the Lower Ninth Ward for fifteen years.  She would like to return to her former neighborhood and is committed to returning, but not until there is some commitment and understanding of the dangers involved in doing so.  Ms. Dashiell was President of the Holy Cross Neighborhood Association for five years, was a founding member of Citizens Against Widening the Industrial Canal, and has been a longtime advocate of closing the MR-GO.

i.    Shawn Tran, an individual, is an adult who owned and resided in a home in Oak Island located in New Orleans East, Louisiana.  Mr. Tran's home was submerged under eight feet of water by the floodwaters from the MR-GO on August 29 and 30, 2005, and Mr. Tran and his family were forced to relocate to a rented dwelling in Slidell.  Mr. Tran and his wife also owned three businesses, a Crystal Palace restaurant and two Captain Sal's restaurants,  prior to the time of Hurricane Katrina.  The Tran family's three restaurants were also damaged by the floodwaters from the MR-GO on August 29 and 30, 2005.  The floodwaters that submerged Oak Island remained for 45 days, long after the rest of New Orleans was dry.

j.      Nga Tran, an individual and wife of Shawn Tran, is an adult who owned and resided in a home in Oak Island located in New Orleans East, Louisiana. Ms. Tran's home was submerged under eight feet of water by the floodwaters from the MR-GO on August 29 and 30, 2005, and Ms. Tran and her family were forced to relocate to a rented dwelling in Slidell. Ms. Tran and her husband also owned three businesses, a Crystal Palace restaurant and two Captain Sal's restaurants, prior to the time of Hurricane Katrina. The Tran family's three restaurants were also damaged by the floodwaters from the MR-GO on August 29 and 30, 2005. The floodwaters that submerged Oak Island remained for 45 days, long after the rest of New Orleans was dry.

### Defendants

24.     The UNITED STATES OF AMERICA is a sovereign government amenable to suit for declaratory and injunctive relief in accordance with the APA, 5 U.S.C. §§ 701-706.

25.     The UNITED STATES ARMY CORPS OF ENGINEERS is a division of the United States Government under the direct jurisdiction of the Department of the Army.

26.     FRANCIS J. HARVEY, the Secretary of the Army, is the federal officer responsible for the Army Corps' compliance with federal laws and regulations.

### CLASS ACTION ALLEGATIONS

27.     The plaintiff class consists of tens of thousands of persons who live and work in Greater New Orleans and whose lives, property, businesses, schools, and surrounding environment are placed in imminent danger of another catastrophic recurrence of flooding caused by the MR-GO.

28.     Plaintiff class members reside in the following areas:  St. Bernard Parish, New Orleans East, and the Lower Ninth Ward, all located in or near metropolitan New Orleans in the State of Louisiana.

29.     Plaintiffs bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and all similarly situated persons.

30.     The class of plaintiffs is so numerous that joinder of all members is impracticable.

31.     There are questions of law and fact common to the class because each member of the class lives in jeopardy of losing life and property and suffering from the further degradation and destruction of the environment due to the dangerous hazards of the MR-GO.

32.     Claims of the named Plaintiffs are typical of the claims of the class members because both the named plaintiffs and class members seek declaratory and injunctive relief under the APA for Defendants' violations of the FWCA, the River and Harbor Act of 1945, NEPA, WRDA, and nuisance under the common law.

33.     Specifically, the named Plaintiffs and members of the class share the following  common issues of law and fact for which they seek declaratory and injunctive relief, including:

a.  Whether Defendants have violated, and will continue to violate, the FWCA by refusing to coordinate with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, by intentionally refusing to consult with these agencies, or refusing to take into consideration the observations, comments or recommendations of those agencies into account when investigating, planning, or designing the MR-GO.

b.   Whether Defendants have violated, and will continue to violate, the River and Harbor Act of 1945 by refusing to coordinate with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, by intentionally refusing to consult with these agencies, or refusing to take into consideration the observations, comments or recommendations of those agencies into account when investigating, planning, or designing the MR-GO.

c.   Whether Defendants have violated, and will continue to violate, NEPA by failing to prepare or issue an EIS, an EA, or a FONSI in connection with their decision to terminate dredging of the MR-GO.

d.   Whether Defendants have violated, and will continue to violate the WRDA, 33 U.S.C. § 2316, by deciding to forego the dredging of the MR-GO without considering any environmental effects which would, or could, flow from its decision.

e.   Whether Defendants have violated, and will continue to violate the WRDA, 33 U.S.C. § 2317, by deciding to forego the dredging of the MR-GO without deciding whether this decision would, or could, have a substantially harmful effect on the wetlands surrounding the MR-GO and, by so doing, Defendants will cause the loss of valuable wetlands.

f.   Whether Defendants' actions with respect to all aspects of the MR-GO constitute a continuing nuisance in violation of Louisiana and federal common law.

g.   Whether the MR-GO is a hazard to human life and property of Plaintiffs and their neighbors, the environment, and the economic recovery of Greater New Orleans.

h.      Whether prompt action must be undertaken to remediate the hazardous conditions of the MR-GO.

34.     The representative parties will fairly and adequately protect the interests of the class since they have suffered enormous losses due to the MR-GO and face the imminent danger of a recurrence of the flooding caused by the MR-GO during Hurricane Karina unless a plan for remediation is developed and implemented.

35.     The prosecution of separate actions by individual members of the class could create a risk of inconsistent or varying adjudications with respect to the individual members of the class, which would establish incompatible standards of conduct for the Defendants.

36.     The Defendants have acted, or refused to act, on ostensible grounds generally applicable to the class, thereby making appropriate the requested declaratory and final injunctive relief through the Court's appointment of a Special Master and a panel of preeminent experts (nominated by the parties and selected by the Court) to prepare a study and advise the Court as to a MR-GO Remediation Plan, and, if it approves the panel's recommendation, through the Court's issuance of a permanent injunction mandating the necessary measures to implement that plan.

37.     Questions of law or fact common to the members of the class predominate over any questions affecting only individual members of the class, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

## FACTUAL ALLEGATIONS

### Katrina And The Devastation Caused by Defendants' Actions and Omissions

38.    On August 28, 2005, Hurricane Katrina hit the Gulf Coast with cruel and devastating force.  Though the hurricane was one of the most ferocious ever seen, it largely spared Greater New Orleans, which fortunately lay in Katrina's rapidly deteriorating western eyewall.  The result was that Katrina laid waste to virtually everything in its path along the Mississippi Gulf Coast, but in New Orleans and St. Bernard Parishes, Katrina's winds—barely reaching 100 miles per hour—did not even register as a Category 3 on the Saffir-Simpson scale.

39.    The MR-GO was not properly designed, constructed, maintained, and/or operated, causing massive inundation, which killed more than 1,577 men, women and children, and left several thousand people missing.  Several hundred thousand residents have been displaced, and at least 160,000 homes have been destroyed or rendered uninhabitable.  The preliminary estimate of property damages alone exceeds $100 billion. The toll in human misery—especially among the most vulnerable poor, children, elderly, and infirm—is incalculable.

40.    A thriving metropolis of 470,000 before the storm, historic New Orleans—now more resembling a ghost town than the nation's 35th largest city—has become a struggling, divided community that now is home to barely 100,000 people. With its tax base virtually destroyed, public utilities in disarray, citizens fleeing the city, hospitals closed, few public schools reopened, police and fire facilities severely compromised, sewage and water systems inoperable, a critical shortage of safe and

20

affordable housing, and countless businesses shuttered, New Orleans teeters on the brink of bankruptcy.

41.     A few miles east of downtown New Orleans, St. Bernard Parish has been similarly ravaged and remains uninhabitable.  Only four out of 26,000 homes survived the raging floodwaters and winds of Katrina.  Of 70,000 residents before Katrina, only 7,000 remain—and they must live in temporary housing.  Its economy has been devastated.

42.     If the MR-GO had been properly designed, constructed, operated, and maintained, Katrina would today be just a footnote in the archives of the city and the nation, another hurricane that caused some sporadic flooding in some areas but no wide scale inundation or tragic loss of life.  Combined with the deadly defects of the MR-GO, however, Katrina has earned its rank as one of the most devastating catastrophes in the history of the United States.  New Orleans, for all its splendid past, lies largely in ruins.

43.     The Plaintiffs in this case resided in Greater New Orleans before Hurricane Katrina devastated their homes and neighborhoods. Their suffering—and that of their many neighbors—was not caused by Hurricane Katrina alone.  More than anything else, their suffering may be laid directly at the feet of the United States of America and the Army Corps who erred epically in designing, constructing, maintaining, and operating the MR-GO during the past half century.

44.     Moreover, the Army Corps behaved unlawfully when it blatantly disregarded federal statutes and regulations by (1) failing to consult with the Department of Interior before the MR-GO's construction; (2) failing to conduct intensive testing and studies of the MR-GO to determine the serious potential hazards to the environment and

the dangers to human lives and property that its construction and use could cause; and
(3) failing to file an EIS with respect to its recent decision to stop dredging the MR-GO.
The Army Corps further breached its duties under Louisiana and federal common law by
creating a continuing nuisance with the MR-GO that threatens imminent injury to the
lives and property of its neighbors.

### The MR-GO: A Navigation Project Gone Terribly Wrong

45.      Congress approved the construction of the MR-GO and charged the Army
Corps with its design, construction, operation, and maintenance.  From the outset, as
described below, the MR-GO project—a vision of increased prosperity, trade, and
industry gone sour—was riddled with serious problems that the Army Corps either knew
and ignored entirely, or dealt with in a cursory and negligent manner.



Source:  Interagency Performance Evaluation Task Force, Army Corps of Engineers,
*Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane
Protection System*, at IV-134, Figure 93 (June 2006).

46.     As depicted above, the MR-GO is a navigable waterway constructed under the authority of Public Law 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendations of the Army Corps' Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session.

47.     A deep-water channel constructed by the Army Corps in the late 1950s and early 1960s at an estimated cost of $88 million, the MR-GO channel is approximately 76 miles long, including 46 miles of land cut, and runs generally in a northwest direction from Breton Sound in the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans, connecting with the Gulf Intracoastal Waterway ("GIWW") and the Inner Harbor Navigational Canal ("Industrial Canal"). The outlet allegedly enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a savings of sixty miles. It also allegedly provides a navigable alternative to the sometimes unnavigable Mississippi River.

48.     The MR-GO was authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet. The Army Corps altered the original route, redirecting the MR-GO toward Breton Sound instead of Chandeleur Sound.

49.     The main purpose of MR-GO was to provide a navigable waterway for vessels of all types, including boats for shrimping, oystering, oil service and recreation and even ocean-going ships requiring access to various docks on the Industrial Canal.

50.     Completed forty years ago under the supervision and control of the Army Corps, the MR-GO from its very inception has been a colossal failure on multiple levels. During past hurricanes, including Betsy and Katrina, the MR-GO contributed greatly to

the enhancement of storm surge by channeling and accelerating water into both Orleans and St. Bernard Parishes. As the waterway's use diminished, its potential to cause catastrophic damage to Greater New Orleans intensified. While keenly aware of the MR-GO's increasingly dangerous tendencies, the Army Corps did nothing to remedy the problem and failed to follow federal statutes and regulations and to honor their Louisiana and federal common law duties. If the Army Corps had obeyed the law, the channel's faulty design and construction—as well as other inappropriate decisions with respect to the MR-GO—would have been exposed and remedied long ago.

### The MR-GO's Faulty Design and Construction

51.     The MR-GO navigation channel was designed and constructed under the auspices of the Army Corps. The navigation channel was to extend from the Industrial Canal in eastern New Orleans approximately six miles eastward coincident with the GIWW. The channel was then to veer to the southeast as a new land and water cut approximately 60 miles to Chandeleur Island. From Chandeleur Island, the project channel was to increase gradually to a bottom width of 600 feet and a depth of 38 feet in the Gulf of Mexico. Prospective jetties were to be provided at the channel entrance.

52.     Construction of the deep draft channel was initiated in March 1958. An interim channel 36 by 250 feet (bottom width) was opened to traffic in July 1963. An enlargement to project dimensions was completed in January 1968. As part of this enlargement, the turning basin at the intersection of MR-GO with the Industrial Canal, a high level bridge at Paris Road, and jetties extending from the seaward end of the land cut to the six-foot contour in Chandeleur Sound were all completed.

53.     In August 1969, under the authority of the Army Corps' Chief of Engineers, the project was modified. As a mitigation measure, the project modification provided for protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection Project structures and the MR-GO. This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO.

54.     Foreshore protection along the north bank of MR-GO and for the 13 miles along the south bank from Bayou Bienvenue to the end of that reach, as authorized by the August 1969 project modification, was completed. However, foreshore protection on the south bank from Bayou Bienvenue to the Industrial Canal was indefinitely deferred.

55.     Of the 66 miles of waterway between Breton Island and the Industrial Canal, approximately 25 miles pass through the shallow bay of Breton Sound. About 41 miles are through land and water area. Along the south/southwest shore of the MR-GO, the 18 miles of earthen structures have been provided as foreshore protection. A dredged material disposal area approximately a half mile wide extends along the remaining 23 miles of the MR-GO south bank.

56.     The MR-GO's design was flawed in several respects, at least three of which proved critical in contributing to the flooding of Greater New Orleans: (1) the Army Corps failed to take account of the waterway's inherent and known capacity for accelerating storm-driven surges which would magnify the storm surge's force; (2) the intersection of the MR-GO with the GIWW created a "funneling effect" that drove the force and speed of storm surges to a deadly conclusion; and (3) the Army Corps failed to "armor" both banks of the MR-GO.

57.     The leading scientists of our age have long warned of the imminent

hazards of the design and placement of the MR-GO:

> *The US Army Corps of Engineers had inadvertently designed an excellent*
> *storm surge delivery system – nothing less – to bring this mass of water*
> with simply tremendous 'load' – potential energy – right into the middle
> of New Orleans.

Ivor L. van Heerden, G. Paul Kemp, Wes Shrum, Ezra Boyd and Hassan Mashriqui,

Initial Assessment of the New Orleans' Flooding Event During the Passage of Hurricane

Katrina, at p. 4 (2006) (emphasis added).

58.     In May 2006, the Senate Committee for Homeland Safety and

Governmental Affairs concluded:

> *The building of MRGO and the combined GIWW/MRGO resulted in substantial*
> *environmental damage,* including a significant loss of wetlands that had once
> formed a natural barrier against hurricanes threatening New Orleans from the east.
> MRGO and the GIWW/MRGO provided a connection between Lake Borgne and
> Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow
> into both New Orleans and Lake Pontchartrain. *These channels further increased*
> *the speed and flow of the Katrina surge into New Orleans East and the Ninth*
> *Ward/St. Bernard Parish, increasing the destructive force against adjacent levees*
> *and contributing to their failure.* As a result, MRGO and the combined
> GIWW/MRGO resulted in increased flooding and greater damage from hurricane
> Katrina.

U.S. Senate Committee of Homeland Security and Governmental Affairs, *Hurricane*
*Katrina: A Nation Still Unprepared,* at Chapter 9-6 (May 2006) (emphasis added).

59.     Equally important, the Army Corps—in the design, route selection, and

construction of the waterway—failed to account for the devastation of the wetlands that

the MR-GO would inevitably facilitate.  In a vicious cycle, destruction of the surrounding

wetlands not only adversely altered adversely storm surge dynamics with respect to

hurricanes such as Katrina, but denuded a critical natural buffer against storm surge,

thereby exacerbating the "funneling effect" created by the MR-GO's design.

60.     As predicted by the U.S. Fish and Wildlife Service in *An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies* (the "*1958 Interior Report*"), the MR-GO's construction—particularly by breaching the natural east-west ridges between fresh/brackish and salt water—introduced salt water into the marshlands and destroyed tens of thousands of acres of mature cypress trees, wetlands, and other sensitive biota.

**The Army Corps Has Announced That It Will No Longer Dredge The MR-GO, But Failed To Do an Environmental Assessment Of Its Potential Adverse Effects**

61.     The Army Corps is responsible for the maintenance of the MR-GO, including protecting the safety of its neighbors.  This ongoing responsibility includes dredging the bottom of the waterway to remove deposited soil and silt and to retain its originally designed 36-foot depth.  From its very inception, silting and sediment build-up has been a major problem for the MR-GO.  In fact, the first ship to navigate the MR-GO in March 1957 ran aground and was stuck for two days.

62.     Proper dredging of the MR-GO is a safeguard for the citizens of Greater New Orleans since it ameliorates the "funneling effect" of the waterway.  In November 2005, dredging of the MR-GO *was suspended indefinitely*.  The Army Corps held no public hearings on this action, and it undertook no assessment of the environmental implications of this decision.

63.    Recently, the Army Corps announced that it was *no longer going to conduct any dredging* of the MR-GO. The inevitable result will be that silt and sediment—over 20 feet alone deposited as a result of Katrina—will continue to fill the MR-GO, rendering it unusable for large ships but potentially enhancing its "funneling effect" to an even greater potential for destruction than existed at the time of Hurricane Katrina.

## Under The Army Corps' Supervision, MR-GO Has Evolved
## From An Environmental Hazard To An Environmental Nightmare

64.    For decades, there has been massive and widely publicized damage to the environment caused by the MR-GO, particularly the incalculable loss of precious wetlands that act effectively as nature's "surge buster" during hurricanes—a phenomenon known for decades by the Army Corps. The rapid loss of thousands of acres of marshlands due to the MR-GO—also known for decades by the Army Corps—contributed significantly to the flooding of Greater New Orleans, including each of the Plaintiffs' respective properties. In a "NOVA" series episode entitled *Hurricane Katrina, Storm That Drowned A City*, airing on the Public Broadcasting System on November 22, 2005, Professor Ivor van Heerden, the Deputy Director of the Louisiana State University Hurricane Center, stated: "The ultimate key to Louisiana's survival and reducing the impacts of surges is to restore our coastal wetlands. These wetlands knock down the

surge and they also reduce wind energy as the storms pass over them." Professor van Heerden sounded the same warning in his recent book *The Storm: What Went Wrong and Why During Hurricane Katrina—The Inside Story From One Louisiana Scientist* (Viking 2006) at pp. 169-71.

65.     Forty-three miles of the MR-GO fall within a "landcut" through low-lying marshland, most of which traverses the ecologically sensitive wetlands of St. Bernard Parish. Even the Army Corps—in its *MR-GO Bank Erosion Reconnaissance Report* ("*Corps Erosion Report*") published in 1988—was forced to admit that the MR-GO has accelerated the "loss of marshes, ridges, bayous, ponds, aquatic grass beds and shorelines needed for the Lake Borgne, Lake Pontchartrain and Breton Sound statuaries." In that same *Corps Erosion Report*—published almost two decades ago—the Army Corps characterized MR-GO as one of the eight areas in south Louisiana where "erosion stabilization measures are urgently needed."

66.     The numbers are unfathomable. Over 65,000 acres of hurricane buffering of wetlands—some 101 square miles—have been obliterated or impaired because of the MR-GO. More than 27,000 acres of wetlands have been destroyed since the opening of the MR-GO, while some 38,000 more acres have undergone much change in habitat. The banks of the MR-GO have eroded so extensively that the width of the channel has grown nearly threefold from 650 to more than 2,000 feet, sharply increasing its potential to serve as a conduit for wind-driven water surges during hurricanes. As illustrated below in a

March 2006 *Times-Picayune* graphic, that is precisely what happened during Katrina.



67.    The northeast shore juncture of the MR-GO and the GIWW is particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels. Yet this critical area has never received adequate protective stabilization measures. Erosion on the northeast shore of the MR-GO between 1965 and 1981 ranged from 100 feet to 600 feet of direct shoreline recession, with rates of erosion measured between six to 26 feet per year; and the volume of erosion is calculated at 9,333,000 cubic yards during this period, or 583,000 cubic yards per year.

68.    Six years before Katrina, the *Times-Picayune* summarized a widely held view of MR-GO's legacy:

> But the [MR-GO] has not fulfilled its earlier promise of bringing port-related development along it in St. Bernard parish. *It has instead become an environmental and economic disaster.* Its original width was to be 500 feet, but it has eroded in some places to 2,000 feet. It has changed the salinity of the marsh, leading to further erosion and ruining oyster beds. *But worse it has threatened lives, acting as a pathway for hurricane storm surges and even surges from storms short of hurricane force.*

Editorial, "Light at the End of the Channel," *Times-Picayune*, June 1, 1999, at p. B-6 (emphasis added).

69.    After its completion in 1965, use of the MR-GO steadily increased until 1978. At its peak in 1978, 9.4 million tons of cargo and other goods were transported. After 1978, its utilization began to taper off steadily. Shipping fleets were replaced with larger vessels with drafts too deep for the MR-GO, and several terminals along the Industrial Canal were closed. By 2004, only 226 deepwater ships passed through the channel—an average of slightly more than four ships per week. These ships carried only 1.3 million tons of cargo, roughly equal to tonnage figures when the channel opened in 1963. At the time Katrina struck, the MR-GO had become a seldom used relic, serving no important commercial purpose but retaining its potential for causing devastating floods due to the Army Corps' refusal to acknowledge its serious design flaws and to properly maintain the waterway.

### From the Outset, The Army Corps Has Been On Notice Of
### MR-GO's Potential For Disaster

70.    In 1988, the Army Corps—in its *Corps Erosion Report*—warned specifically of the grave consequences if no immediate remedial action were taken with regard to the MR-GO:

The unleveed banks of the MR-GO will continue to erode in the absence of remedial action. Currently, banks of the unleveed reaches are retreating at rates from five to over 40 feet per year. The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway is about 15 feet per year. Failure to reduce bank erosion will result in a significant increase in the required maintenance dredging of the waterway in the future. Annual average maintenance dredging requirements are projected to increase six-fold within the next 15 years (by the year 2002). The dredged material disposal area located on the MR-GO south bank between mile 23 and mile 27 could be exhausted by year 2017.

*Corps Erosion Report, supra*, at pp. 30-31.

71.     MR-GO has been correctly characterized by Matthew Brown of the *Times-Picayune* as "the most potent symbol of all that was wrong in earlier efforts to tame Louisiana's marshlands"—natural protection which stood for centuries as a protective bulwark for Greater New Orleans against hurricanes and their storm surge. A prescient forewarning of the MR-GO's imminent dangers came from proponents of the outlet's closing. In June 2002, critics described the MR-GO as "a shotgun pointed straight at New Orleans, should a major hurricane approach from that angle." The MR-GO's checkered history of protests, studies, models, and controversy—all detailing in one way or another the system's susceptibilities for disaster—dates as far back as the Eisenhower administration.

72.     Left to their own devices, the Army Corps will continue to temporize, obfuscate, and delay in remediating the hazardous MR-GO. The time for more studies, surveys, and assessments is over. Now is the time for decisive action to prevent further degradation—and to begin the aggressive restoration—of the vital but vanishing marshlands that once protected Greater New Orleans.

**The Army Corps Ignored Warnings of Vast Ecological Damage in 1958**

73.     In April 1958, the United States Department of Interior, through its

Branch of River Basins Office in Vicksburg, Mississippi, and at the request of the District

Engineer for New Orleans, prepared a draft preliminary report for the Army Corps

pursuant to the Wildlife Coordination Act of 1946 predicting vast ecological damage

from the MR-GO. In the opening section of this report, entitled *An Interim Report on*

*Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project,*

*Louisiana and an Outline of Proposed Fish and Wildlife Studies* (the "*Fish & Wildlife*

*Report*"), the authors noted with respect to plans for the MR-GO project:

> The U.S. Fish and Wildlife Service initiated preliminary studies on the project in
> 1957. Secretary Seaton, Department of the Interior, in a letter of September 23,
> 1957, informed the Secretary of the Army that *the project is of great concern to*
> *fish and wildlife conservationists*, including the commercial fishing industry. The
> Secretary noted *the project plans had not been investigated by fish and wildlife*
> *conservation agencies, as contemplated in the Wildlife Coordination Act of*
> *August 14, 1946* (60 Stat. 1080), and requested the Corps of Engineers to bring all
> phases of project planning into balance.

*Fish & Wildlife Report* at 1. (emphasis added).

74.     Despite the fact that the Army Corps did not afford the U.S. Fish and

Wildlife Service a sufficient opportunity to study the MR-GO project—and recommend

mitigation measures and feasible alternatives—before construction began, the *Fish &*

*Wildlife Report* contained numerous observations concerning the MR-GO waterway's

negative impact on the surrounding marsh eco-system. First, the document states:

> Wildlife is frequently referred to as a [product] of edges; *this area is an edge of*
> *magnificent proportion.* The marsh and estuarine area associated with the
> distributaries of the Mississippi River is about 70 miles wide and extends for
> about 150 miles along the coast. The climate is favorable, with a long growing
> season and abundant rainfall. This, coupled with other physiographic conditions,
> permits a biological succession which results *in an inconceivably large supply of*
> *living plants and animal organisms* – the fundamental food supply of our fresh

and salt water food fishes, turtles, alligators, shrimp, oysters, fur-bearing animals, ducks, and other birds. *These in the aggregate constitute perhaps the densest and richest wild fauna in the world*, considered both from the commercial and recreational values.

*Id.* at 8 (emphasis added).

75.   The *Fish & Wildlife Report* then described the extreme sensitivity of

coastal marshland to salinity levels:

> *The critical factors of circulation patterns and salinity* are easily recognizable here . . . *Also of spectacular importance are the hydrological* aspects which maintain a brackish vegetative environment highly suitable to waterfowl and fur animals. This flora has a narrow salinity range; therefore, desirable production must result from *exacting conditions*. . . . With the proposed channel, certain quantitative changes are apparent. The 36-foot-deep cut will result in direct changes of salinity conditions adjacent to the canal. Being a sea level channel, some drainage or reduction and/or increase in water levels in certain areas must be anticipated.

*Id.* at 16 (emphasis added).

76.   The *Fish & Wildlife Report* further predicted the harmful effects of MR-

GO on existing water circulation patterns:

> *[T]he effect of the cut and the spoil upon existing water circulation patterns*, if considered only from the physical aspects, *appears consequential.* A bisecting cut and spoilage through the center of the marsh, Chandeleur Sound and Island chain will interrupt the net circulation of waters flowing at right angles to the channel alignment. It is entirely probable that *both the direct and indirect effect of this change will be hydrographically manifested throughout the tentatively established appraisal area.*

*Id.* at 17 (emphasis added).

77.   As for the MR-GO's effect on subsurface soil and "turbidity," a cloudy

condition in water due to suspended silt or organic matter, the *Fish & Wildlife Report*

noted:

> Direct burial by sedimentation of oyster bottoms, nursery grounds, and vegetative areas is a self-explanatory physical feature easily observed from dredging operation in other estuarine areas. . . . Turbidity, whether temporary or

permanent, because of associated hydrological complexies is more difficult to predict.  The usual condition, however, is for temporary turbidity to have adverse short-lived effects on submerged vegetation over an extensive area.  *It is therefore probable that construction or continuous maintenance operations would produce a temporary turbidity type for sufficient duration to accrue long-term damaging ecological changes.*

*Id.* at 18 (emphasis added).

78.     The *Fish & Wildlife Report* further cautioned that MR-GO could

permanently destroy the vegetation in the marshland areas:

> It is conceivable also that a *permanent turbidity type would prevent reestablishment of destroyed animal and vegetation zones in certain areas.*  Hydraulic dredging, in particular, tends to separate bottom soils into individual particles which have a long suspension duration.  Certain clays and organic soil particles produce a serious and persistent turbidity unless flocculated [the creation of soil lumps or masses] by sea salts. There is a risk that flocculation will result in the establishment of false bottoms or ooze areas, destroying present bottom productive potential and creating the continuous hazard of turbid conditions by only minor water agitation . . . .  Any turbidty resulting in a plant kill can have further indirect effects by loss of the important mechanical and chemical stabilizing effects that plants provide against bottom agitation.

*Id.* at 18 (emphasis added).

79.     Finally, under the section entitled "Need for Further Study," the authors

reported: "Having established conditions that are responsible for the production of fish

and wildlife, methods will have to be devised for determining changes in production that

will result from construction of the project." *Id.* at 19.  Plaintiffs are informed and

believe and based thereon allege that the Army Corps *never* gave the Department of

Interior the opportunity to conduct such additional testing or studies, but rather continued

with the construction of the MR-GO.

80.     In 1958, it was well known by the Army Corps and others that the

wetlands served as nature's protective buffer against storm-driven water surges

threatening New Orleans and its environs.

35

**The Army Corps Ignored Repeated and Pointed Warnings About**

**The MR-GO's Threat to Greater New Orleans**

81.    In addition to the *Fish & Wildlife Report*, a review of the record indicates that long before Katrina's deadly landfall, the Army Corps had actual notice of numerous and pointed warnings, predictions, and studies about the MR-GO serving as a deadly "hurricane highway" for hurricane-driven water from the Gulf of Mexico to inundate metropolitan New Orleans.  The following are representative examples of the Army Corps' actual knowledge that it was designing, constructing, operating, and/or maintaining a navigable waterway of enormous potential for severe widespread flooding of Greater New Orleans with lethal consequences.

**April 1958**:  The St. Bernard Police Jury passes a resolution opposing the MR-GO channel, stating that "[d]uring the times of hurricane conditions the existence of the channel will be an enormous danger to the heavily populated areas of the parish."

**September 1965**:  Hurricane Betsy destroys St. Bernard Parish and the Lower Ninth Ward.  Residents blame flooding on the MR-GO but the Army Corps insists the channel is not responsible.

**1970**:  Respected Louisiana coastal scientist, Dr. Sherwood Gagliano, warns the Army Corps that the disappearing wetlands just east of MR-GO will intensify storm surges and create "deathtraps."

**1972**:  Data from the National Oceanic and Atmospheric Administration documents the urgent need to raise levee heights in anticipation of strong hurricanes, but the Army Corps ignores the findings.

**1979**:  The National Weather Service issues a report detailing the need for stronger storm estimates.

**1988:**  As detailed below, the Army Corps acknowledges that closure of the MR-GO would "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [the MR-GO]."

**September 1998**:  Hurricane Georges hits New Orleans, filling the MR-GO channel with silt, thereby reducing its depth to just 25 feet and contributing to sporadic flooding.  Local residents again call for the closing of the dangerous MR-GO, but the Army Corps begins dredging immediately, ultimately spending $42 million.

**October 1998**:  National Hurricane Center Director Jerry Jarrell depicts a nightmare scenario concerning a Category 4 or 5 hurricane that, after destroying islands in the Caribbean and parts of Florida, intensifies over the Gulf of Mexico and "assail[s] New Orleans with a storm surge that overwhelms the city's levee system."

**Fall 1998**:  Following extensive expert studies, the St. Bernard Parish Council unanimously adopts a resolution to close MR-GO because it constitutes a threat to public health and safety.

**December 1998**:  The Army Corps acknowledges MR-GO's shortcomings and adopts a coastal restoration plan calling for the canal's eventual closure.  Bending under Congressional pressure, however, the Army Corps balks at closing down the MR-GO, instead initiating a re-evaluation study to gauge the environmental and economic implications of closing the channel or keeping it open.

**2001**:  In his critically-acclaimed book, *Holding Back The Sea: The Struggle for American's Natural Legacy on the Gulf Coast* (Harper Collins 2001), Christopher

Hallowell warns that "erosion from ships and storms has gouged it [the MR-GO] 2,000 feet wide and made it a freeway to New Orleans for any hurricane that happens to come from the right direction . . . . The surrounding marsh, now vulnerable to storms and salt water, has all but died as a result, along with 40,000 acres of mature cypress trees.  Now, storm surges can invade the marsh through the straight arrow channel and smash into New Orleans."

**October 2001**:  *Scientific American* magazine publishes an article entitled "Drowning New Orleans" that predicts "[a] major hurricane could swamp New Orleans under 20 feet of water, killing thousands.  Human activities along the Mississippi River have dramatically increased the risk, and now only massive reengineering of southeastern Louisiana can save the city."

**June 2002**:  The Army Corps acknowledges their own safety estimates of MR-GO—created in the 1960s with tools that are low-tech and unsophisticated by modern standards—are antiquated and unreliable.   Local engineer Lee Butler estimates the risk of MR-GO overtopping in St. Bernard Parish may be double the Army Corps' original estimates.   In addition, the Army Corps agrees that MR-GO is a "weak spot" and more likely to be affected by a hurricane storm surge than other areas because of its proximity to the Gulf of Mexico.

**July 2004**:  Hurricane Pam—a federally-funded hurricane simulation drill—prophetically concludes that surges from a Category 3 hurricane would be "funneled" by MR-GO, flooding surrounding areas and killing tens of thousands of people in Greater New Orleans.

**July 2004**: Louisiana Representative W.J. "Billy" Tauzin testifies in support of funding for the Louisiana coastal restoration project, stating: "We'll be faced someday with thousands of our citizens drowned and killed, people drowned like rats in the city of New Orleans . . . [O]ur paradise is about to be lost."

**October 2004**: The Louisiana Legislature passes a resolution urging closure of the MR-GO and immediate implementation of remedial measures to address the risk posed by the MR-GO and "more drastic tidal surges and more prolonged flooding as a result of tropical storms and hurricanes."

**October 2004**: *National Geographic* publishes an article entitled "The Incredible Shrinking Bayou" that states "[e]ven the Red Cross no longer opens hurricane shelters in New Orleans claiming the risk to its workers is too great."

**May 2005**: A hydrodynamic model from Louisiana State University's Hurricane Center further exposes MR-GO as a "superhighway for storm surge" and predicts that a "funnel" created by MR-GO would amplify storm surges by 20 to 40 percent.

### The MR-GO Becomes A Prime Culprit In Drowning Greater New Orleans

82.     Of all these prescient warnings, the prognostication about the MR-GO's "funneling effect" on a hurricane-generated storm surge proved to be deadly accurate. The Louisiana State University's Hurricane Center presented hurricane scenarios to the Army Corps in May 2005, predicting devastating flooding as a result of MR-GO's design. According to civil engineers from the Hurricane Center, if MR-GO had not been defectively designed and constructed, a modeled storm surge similar to that actually experienced with Katrina would have resulted in minimal overtopping of storm control structures and occasional flooding—but not a disaster on a Biblical scale largely

submerging an entire city.  Without the "funneling effect," "you would have had maybe 2 to 3 feet of flooding at the max, but not everybody's house underwater.  It's still flooding, but one is significant and one is catastrophic,"  a civil engineer from the Hurricane Center was quoted in a *Times-Picayune* article published on October 24, 2005.

83.    As was predicted long before Katrina, the MR-GO amplified Katrina's surge speed and force, much as the nozzle of a water hose funnels a wide flow of water into a bottleneck and creates a vastly accelerated and more forceful jet from an otherwise slow and limpid flow of water.  Predictably, then, the MR-GO significantly intensified Katrina's surge amplitude and velocity, overwhelming and contributing to the scouring that undermined the earthen structures along the MR-GO and the Industrial Canal.  In November 2005, an in-depth field investigation—funded by the National Science Foundation and performed by prestigious teams from the University of California at Berkeley and the American Society of Civil Engineers—concluded that the MR-GO was a prime culprit in Katrina's unprecedented inundation of the city.  As illustrated below, the MR-GO's "funneling effect" resulted in widespread overtopping of the earthen structures  which in turn undermined soil stability on the "land-side" of the structures and contributed to their ultimate collapse.



Source: *Times-Picayune*, Dec. 8, 2005, available at
http://www.nola.com/katrina/graphics/.

84.     Faced with mounting evidence concerning MR-GO's prominent role in the

flooding of the Upper and Lower Ninth Ward, New Orleans East, and St. Bernard Parish,

the Army Corps reluctantly acknowledged—at least initially—the possibility that MR-

GO's design exacerbated Katrina's storm surge and subsequent flooding.  John Paul

Woodley Jr., the assistant Army secretary who oversees the Army Corps, responded to

statements concerning MR-GO's contribution to the Katrina tragedy with: "I've heard

those concerns, and I wouldn't discount them."



Source: Mark Schleifstein, "Coastal Restoration Could Help Protect Against Storms," *Times-Picayune*, January 9, 2006.

     85.    The restoration of marshlands along the MR-GO is a well known, integral,

and urgently-needed feature of any comprehensive set of remedies for protecting against

a future MR-GO flood disaster. As depicted above in the "Multiple Lines of Defense"

graphic prepared by *The Times-Picayune*, a combination of man-made protections along

with the restoration of natural environmental barriers—such as restoring coastal areas,

vegetation, and the natural ridges—would provide much needed protection to Louisiana

from future storm surges. Aptly echoing the sentiments of environmentalists for over

half a century, the Executive Director of the respected Lake Pontchartrain Basin

Foundation observed: "We will never be able to rebuild the coast we had 50 years ago,

but the wetlands still out there can be preserved . . . . If we do nothing, the gulf will be

lapping at the edges of New Orleans in future decades. . . [a]nd if the MRGO stays open,

you might as well put a bull's-eye on the city and tell everybody to clear out on June 1

when the hurricane season starts." R.B. Seed, et al., Investigation of the Performance of

the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2006, at F-

68 (May 22, 2006) ("Final Seed Report") (quoting Carlton Dufrechou).

     86.     Viewing the MR-GO as two discrete sections helps to explain its

powerful storm surges during Hurricane Katrina:

- **Reach 1:** the east-west oriented section running between the

Industrial Canal and the confluence of the GIWW and MR-GO near Paris Road Bridge.

It is through this critical section that Lake Pontchartrain and Lake Borgne—in the words

of one recent study commissioned by the Army Corps—are "hydraulically connected to

one another via the IHNC [Industrial Canal]." Interagency Performance Evaluation Task

Force, Performance Evaluation Status and Interim Results, Report 2 of a Series;

Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane

Protection System (June 2006) ("IPET Performance Evaluation"), Vol. IV, Appendix 6 at p. 134.

- **Reach 2:** the much longer northwest-southeast section extending from just east of the Paris Road Bridge down through Breton Sound into the Gulf of Mexico.

87.     Deviating from the Congressionally-authorized plan, the Army Corps interconnected Reach 1 of MR-GO with the GIWW in 1957, thereby joining together the well-known storm surge potentials of Lake Borgne and Lake Pontchartrain within the Industrial Canal.  During Katrina, the resulting powerful combined stream surged from this junction and overwhelmed the banks along Reach 1 and the Industrial Canal.

88.     Even the Army Corps' own commissioned evaluation on the Louisiana hurricane protection system—by the Interagency Performance Evaluation Task Force ("IPET")—recently found that the majority of the flooding of the Lower Ninth Ward and St. Bernard Parish resulted from overtopping and two breaches along the Industrial Canal and Reach 1 of MR-GO.  *See* IPET Performance Evaluation, at p. IV-192.  Significantly, these are precisely the locations that experts predicted would be overcome by MR-GO's deadly storm surge "funneling effect."  Moreover, an urgent recommendation from IPET is a telling admission about the serious, continuing threat of the Reach 1 surge to public health and safety.  The Army Corps' consulting experts state unequivocally: "Flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity."  IPET Performance Evaluation at Appendix 6, pp. 6-7.

**The Soil Erosion Caused By MR-GO Increased The Power Of The Storm Surges**

89.     Besides a defective design and no armoring on its fragile banks, the MR-GO contributed to the flooding of Plaintiffs' neighborhoods by vastly accelerating the destruction of the coastal habitat protecting Greater New Orleans.  In 1988, the *Corps Erosion Report* specifically analyzed MR-GO's impact on bank erosion in St. Bernard Parish.  The extensive government study recognized the marshland between Lake Borgne and St. Bernard Parish acted as a natural buffer to hurricane storm surge.  The Army Corps acknowledged that between 1968 and 1987, severe bank erosion—caused mostly by human-induced channelization and shipping traffic—had resulted in approximately 4,200 acres of "highly productive marsh adjacent to MR-GO" to vanish.

90.     Today, the vanishing marshlands—nature's sturdy barrier against storm surge from hurricanes—have been largely destroyed by the MR-GO.  It is well know that each mile of marshland absorbs a significant amount of storm surge.  The destruction of that bulwark by the Army Corps altered storm surge dynamics in Lake Borgne and compromised the area's natural ability to mitigate the destructive power of storm surge, thus further exacerbating the MR-GO's already perilous "funneling effect."

91.     As the 1988 *Corps Erosion Report* detailed, there was a need to study potential benefits of completely closing MR-GO.  Indeed, the Army Corps' Lower Mississippi Valley Division ("LMVD") suggested prophetically:

> [A complete closure]...will control all future channel maintenance problems by controlling bank erosion, prevent[] the associated biological resources problem...[and] *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO]* . . . .

LMVD Comments to the *Corps Erosion Report*, at 1 (emphasis added). The Army Corps ignored its own predictions to the peril of Plaintiffs and tens of thousands of their neighbors.

92.     As demonstrated by the reports and testimony of Army Corps officials noted above, MR-GO's "funneling effect" was well known to the Army Corps from past hurricanes, scientific studies, and a simulated "Hurricane Pam" conducted in 2004. In the PBS "NOVA" episode entitled *Hurricane Katrina: Storm That Drowned A City*, referenced earlier, Professor van Heerden stated: "[a]t the Hurricane Pam exercise we had a number of [federal government] officials who basically scoffed at us."

93.     This haughty disdain for civilian engineers' opinions and reflexive dismissal of criticism are hallmarks of the Army Corps as an institution over the past two centuries. As highly-respected Senator Paul H. Douglas once observed: the Army Corps engineers have an engrained mindset of "strong resistance to change and a deep-rooted dislike for civilian initiative and authority," as well as "shunting aside of originality and the critical appraisal of alternatives"—tragic flaws that have been "responsible for the Corps' many failures." Paul H. Douglas, Introduction in Arthur E. Morgan, *Dams and Other Disasters: A Century of the Army Corps of Engineers in Civil Works* (Porter Sargent 1971) at p. ix.

## The MR-GO Planning Law Required The Army Corps To Coordinate
## Its Plans For The MR-GO With the State of Louisiana and
## the United States Department of Interior

94.     On April 19, 1945 and May 5, 1945, the United States Senate and the House of Representatives, respectively, issued resolutions directing the Army Corps to

commence initial investigations into the construction of a ship channel from the Industrial Canal to the Gulf of Mexico.

95.     Congress also passed the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945) (the "MR-GO Planning Law") authorizing the Army Corps to begin more detailed investigation and planning for the Mississippi River-Gulf Outlet (the "MR-GO").

96.     The MR-GO Planning Law reflected a clear Congressional intent to involve each of the "affected states" in the investigation and planning phases of the numerous water resource projects specified in the statute, and it also directed the Army Corps to "coordinate" its investigations and planning with the United States Department of Interior (the "DOI").

**The Fish and Wildlife Coordination Act Likewise Directed**

**the Army Corps To Work With the State of Louisiana and**

**DOI With Respect To The MR-GO Project**

97.     The Fish and Wildlife Coordination Act (the "FWCA") was first enacted by Congress on March 10, 1934, though the official name would not be applied to the law until 1958. *See* Law of March 10, 1934, ch. 55, § 1, 48 Stat. 401 (1934) (codified at 16 U.S.C. § 662).  The FWCA was substantially amended in 1946 and 1958 to require "coordination" between any federal agency proposing to "impound," "divert," or "control" a waterway, or body of water and the United States Department of Interior, Fish and Wildlife Service. *See* Act of August 14, 1946, § 1, ch. 965, 60 Stat. 1080 (1946) and Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958).  The MR-GO constituted a "waterway" and/or a "body of water" as contemplated by the FWCA.