98.     This statute and its amendments required the Army Corps to consult with officials from the State of Louisiana and the DOI during all phases of the MR-GO project, including, but not limited to, investigation, planning and construction.  Under the FWCA, the Army Corps was further directed to incorporate any of the observations or concerns raised by these state and federal agencies into any plans and specifications for the design and construction of the MR-GO.

### The 1951 Army Corps Report to Congress Proposing
### The Construction of the MR-GO

99.     On September 25, 1951, the United States Army submitted a report to Congress with its recommendations for the construction of the MR-GO (the "MR-GO Authorization Report").  *See* House Doc. No. 245.

100.    The MR-GO Authorization Report contained an introductory letter from the former United States Army Chief of Engineers, General R. W. Wheeler, recommending the proposed construction of a "tidewater canal" between the Port of New Orleans and the Gulf of Mexico which would be connected to the Industrial Canal by its own separate canal running parallel to the GIWW.  MR-GO Authorization Report at 5.

101.    As actually built, however, the MR-GO materially deviated from the authorized route and was instead connected to the GIWW east of the Industrial Canal, and the stretch of the GIWW between the connection with the MR-GO and the Industrial Canal was deepened and widened to handle the increased shipping traffic from both waterways.

102.    The Army Corps' unilateral decision not to follow the Congressionally-authorized route, but instead to tie the MR-GO to the GIWW, produced significantly

adverse hydrologic consequences which substantially contributed to the flooding of New

Orleans during Katrina.

103.    The MR-GO Authorization Report also included an additional report from

the Army Corps' Board of Engineers recommending further studies into the MR-GO's

potential impact on the Louisiana coast.  Specifically, the Board of Engineers noted:

> The Board is of the opinion that *the exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies* of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for *modifications of the location and alignment of the canal should further studies show that a more suitable location is available.*

MR-GO Authorization Report at 14 (emphasis added).

104.    Upon formation and belief, Plaintiffs allege that no studies of "sand

movement, wave action, and local currents" were ever undertaken by the Army Corps to

assess the extent to which the location and alignment of the MR-GO proposed by the

Army Corps—directly through environmentally-sensitive wetlands and cypress forests—

presented a threat to the Louisiana coastal environment.  Plaintiffs are further informed

and believe and based thereon allege that the Army Corps did not consider alternatives to

the proposed location and alignment that would be less destructive of the region's highly

vulnerable natural resources.

105.    Finally, the Army Corps' report contained an additional report from the

Army Corps' Division Engineer of the Lower Mississippi Valley Division (the "Division

Engineer's Report").  Under the section of the Division Engineer's Report entitled

"Coordination with other agencies," the Division Engineer wrote that "the director of the

Louisiana Department of Public Works, designee for the Governor of Louisiana,

expressed full concurrence with findings presented; the president of the New Orleans

Tidewater Development Association also concurs, but favors construction priority for the outlet channel in preference to the lock and access channel; and the chief engineer of the Board of Commissioners for the Port of New Orleans advises that the plan is substantially that proposed by that agency." MR-GO Authorization Report at 42-43.

106.   According to paragraph (a) of the MR-GO Planning Law, "[t]he relations of the Chief of Engineers with any State under this paragraph (a) shall be with the Governor of the State or such official or agency of the State as the Governor may designate." Thus, by law, the Army Corps' was required to communicate with only the Louisiana Governor or designee—in this case, the Louisiana Department of Public Works.

107.   The Army Corps' consultations with the New Orleans Tidewater Development Association and the Chief Engineer of the Board of Commissioners for the Port of New Orleans were not statutorily mandated and were therefore undertaken on the Army Corps' own initiative. Yet the Army Corps scrupulously avoided talking to the one Louisiana state agency which could identify the potential for disaster stemming from the MR-GO: the Louisiana Wild Life and Fisheries Commission.

108.   Moreover, the Army Corps did not "coordinate" its efforts with the DOI, even though such cooperation was mandated by the MR-GO Planning Law and the FWCA.

### Congressional Hearings on the Construction of the MR-GO

109.   Several hearings were convened before committees and sub-committees of the Senate and House of Representatives with respect to the proposed "tidewater channel," as the MR-GO was called during these proceedings. These included the

following: (1) September 18, 1951 hearings before the House Subcommittee on Rivers and Harbors of the House Committee on Public Works with respect to the Mississippi River-Gulf Outlet and the Mobile to New Orleans Intracoastal Waterway (the "1951 House Subcommittee Hearings"); (2) July 21, 1955 hearings before the House Committee on Public Works with respect to H.R. 6181 and 6309 (the "1955 House Hearings"); and (3) January 19 and 20, 1956 hearings before the Senate Subcommittee on Flood Control – Rivers and Harbors of the Committee on Public Works on H.R. 6309 (the "1956 Senate Hearings") .

110.    Reports to the House and Senate were then prepared summarizing the substance of these hearings. *See* July 26, 1955 Report to the House of Representatives from the House Committee on Public Works on H. R. 6309 (the "1955 House Report") and March 7, 1956 Report to the Senate from the Committee on Public Works (the "1956 Senate Report").

111.    These legislative records reveal several important facts about the proposed MR-GO project. *First*, they confirm that the MR-GO was supposed to be connected to the Industrial Canal via its own canal which was to run parallel to the GIWW. *Second*, dredged material from the MR-GO was supposed to be deposited along side the length of "Reach 2" to form a long "dike" which would reduce the effects of Gulf winds and wave action on the waters within the MR-GO, thereby facilitating ship navigation in the MR-GO.

112.    The final construction of the MR-GO, which connected the MR-GO to the Industrial Canal via the GIWW, had disastrous consequences for New Orleans during Katrina because increased water volume and pressure in this part of the expanded GIWW

caused the "overtopping" and breaching of flood control structures in New Orleans East, resulting in the loss of human life and property.

113.    The construction of the "dike" along Reach 2 was also related to the later flooding plaguing Greater New Orleans, especially St. Bernard Parish.  In 1965, after New Orleans was partially flooded in the aftermath of Hurricane Betsy, the Army Corps realized that the manner in which it built the MR-GO opened a "back door" to storm surge flooding from the southeast, which had not existed before.  Michael Grunwald, "Canal May Have Worsened City's Flood," *Washington Post*, September 14, 2005, at A-21.

114.    The Army Corps would try to close this "back door" with earthen structures  built on top of the dike along Reach 2, even though they were  composed of unstable, dredged material.  The earthen structures built upon the dredged material offered no flood control protection and were destined to fail since they were  constructed on top of unstable soil.  *See* Final Seed Report at Chapter 10, pp. 16-19.

115.    Congress finally authorized the construction of the MR-GO in 1956.  *See* Act of March 29, 1956, P.L.- 455, 70 Stat. 65 (1956).

116.    The record therefore discloses that besides not conducting further studies about the route, alignment, and potential adverse environmental effects, the Army Corps also did not follow the Congressionally-authorized route or design for the MR-GO—all unlawful acts that contributed directly to the MR-GO's tragic role in the flooding of Greater New Orleans.

**Report of the DOI on the Harm to the Marshlands Caused by the MR-GO**

117.     As noted earlier, despite the Army Corps' failure to coordinate its investigation, planning, and construction efforts with the DOI, the agency submitted a report to the Army Corps' in 1958 specifying its concerns with the effects of the MR-GO on the surrounding marshland.  The *1958 Interior Report* first referenced a letter from the Secretary of Interior to the Secretary of the Army, dated September 23, 1957, informing him that the MR-GO project was not in compliance with the FWCA.  1958 *Interior Report* at 1.

118.     As noted above, this report then predicted that the construction of the MR-GO would cause massive damage to the ecosystem of the marshlands adjacent to the waterway.  In sum, the DOI warned the Army Corps that the MR-GO would effectively kill massive tracts of marshland to the south and southeast of New Orleans.  Of course, that is precisely what happened.

119.     The *1958 Interior Report* concluded that "it is apparent that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, and a model study will be a prerequisite to predictions of project effects and establishment of mitigatory measures." *1958 Interior Report* at 19.  Furthermore, the report added:

> The *effect of the channel* and its impact on the industries that are dependent on the fish harvest *can hardly be speculated.  It is causing great concern* among commercial fisheries, industries and national organizations associated with these industries and it is felt that this concern is justified to the extent that *this project should be thoroughly investigated from the biological standpoint before construction through the marshes below Paris Road and the Sound is undertaken.*

*1958 Interior Report* at 19-20 (emphasis added).

120.    The investigations proposed by the DOI included *a four year regime of testing and study* to assess adequately the impact of the MR-GO on the marshlands before constructing Reach 2. The Army Corps, however, ignored the DOI's request and proceeded to build Reach 2—dredging through "the marshes below Paris Road and the Sound"—without waiting for the completion of the essential investigations  urged by the DOI.

121.    Based on the foregoing facts, several undisputed conclusions are self-evident:  (a) the MR-GO Planning Law and the FWCA required the Army Corps to consult with the DOI in all phases of the MR-GO project, including investigation, planning, design, and construction; (b) since construction commenced in 1958, and the DOI report to the Army Corps was submitted in 1958, the Army Corps had not consulted with the DOI when investigating, planning, designing, or constructing the MR-GO; (c) the Army Corps' own Board of Engineers was concerned about the potential effects of the MR-GO on the Louisiana Coast and recommended that further studies be conducted before the location for the MR-GO was fixed and built; (d) the DOI predicted devastating consequences to the marshland southeast of New Orleans if the MR-GO was built; (e) the DOI recommended that a series of tests and studies be performed before the construction of Reach 2 which would take four years to complete; (f) the tests and studies recommended by the Board of Engineers and the DOI were not performed before the planning, design, or construction of the MR-GO, or, at a minimum, the construction along Reach 2 of the MR-GO, which crossed and ravaged the fragile marshland; (g) the Army Corps ignored the DOI and its own Board of Engineers and continued to pursue construction of this project according to its own original faulty plans and specifications;

54

and (h) the Army Corps did not follow the Congressionally-authorized route or design for the MR-GO.

### The Army Corps' Refusal to Heed the Warnings of the
### DOI and the Louisiana Wild Life and Fisheries
### Commission Before Construction Commenced

122.    On May 31, 1979, Carry W. Kerlin, a Field Supervisor with the Department of Interior, Fish and Wildlife Service ("FWS"), wrote Jack A. Stephens, Director-Secretary of the St. Bernard Parish Planning Commission (the "1979 FWS Letter"). The 1979 FWS Letter was in response to a January 25, 1979 correspondence from Mr. Stephens "requesting summary technical information pertaining to the impact of the Mississippi River-Gulf Outlet on St. Bernard Parish's wetlands and water bodies." 1979 FWS Letter at 1.

123.    Mr. Kerlin's letter noted the Army Corps' refusal in the 1950s to reroute the MR-GO away from the fragile marshland despite the protests of the FWS and the Louisiana Wild Life and Fisheries Commission. *See* 1979 FWS Letter at 4.

124.    Mr. Kerlin, the expert with the FWS, further concluded that the MR-GO was the primary culprit in the death of the marshlands adjacent to St. Bernard Parish. 1979 FWS Letter at 11.

125.    Plaintiffs are informed and believe and based thereon allege that there are numerous other documents, in the files of federal, state, and local agencies—including but not limited to the FWS, Army Corps, Department of Justice, Environmental Protection Agency, Office of Management and Budget, Louisiana Wild Life and Fisheries Commission, and St. Bernard Parish—that further document violations of federal and state

law by the Army Corps in the planning, design, construction, maintenance, and operation

of the MR-GO.

### The Unheeded Warnings of the Louisiana Wild Life and Fisheries Commission

126.    In the case of the MR-GO, the Army Corps blatantly ignored the warnings

and recommendation of not only the DOI but also the Louisiana Wild Life and Fisheries

Commission ("LWLFC"), the lead state agency with environmental expertise.  Before

ground was broken, the LWLFC realized that the MR-GO's proposed route "bisects highly

productive estuarine water and marsh areas," causing the department to be

> [G]reatly concerned about the influence on fish and wildlife resources.  In
> addition to the immediate influence on the annual fish and wildlife value of 10 to
> 14 million dollars and direct losses to valuable habitat, we anticipate considerable
> indirect losses due to changes in currents, saltwater intrusion, drifting of spoil into
> adjacent areas and other project associated factors.

Louisiana Wild Life and Fisheries Commission 1958-1959, *Eighth Biennial Report* at p.
39.

127.    Based on these genuine fears, the LWLFC urged the Army Corps to

modify "channel alignment to minimize damages to [the marsh areas]." *Id.* at 40.  "This

proposed realignment would have bypassed high quality waterfowl marshes and oyster

water bottoms, and confined the middle section of the new channel within the natural

levees of Bayou La Loutre, thereby making available more suitable material for retention

dikes." *Id.*  Unfortunately, the Army Corps spurned the LWLFC's advice in part "because

it would increase the construction and maintenance cost by going through the lower part

of Lake Borgne . . . ." *Id.*

128.    The LWLFC was understandably perturbed by the Army Corps' cavalier

disregard of the dire environmental consequences of the route selected for the MR-GO.

The LWLFC criticized the federal government's engineers for failing to prepare "a

careful benefit-cost study . . . of this proposal" and continued "to question whether their cursory review justified the incurrence of valuable habitat losses . . . ." *Id.*

129.    The Army Corps proceeded to build the MR-GO across the vulnerable wetlands.  The route cut through four natural ridges in the marshes of St. Bernard Parish—Bayou Bienvenue, Bayou La Loutre, Bayou Ycloskey, and ridge at the Violet Canal.  These ridges historically helped to protect communities in St. Bernard Parish and adjacent areas from flooding because they were interlaced and any storm surge had to go over one ridge and then the next ridge, thereby slowing down and dissipating the storm surge.  In addition, the cutting of the ridges increased significantly the saltwater intrusion and the resulting loss of cypress trees and other vegetation in the marshes.  Before the MR-GO's construction, saltwater could not enter the freshwater/brackish water of the marshlands.

130.    The Army Corps' decision to situate the MR-GO's route directly through environmentally-sensitive wetlands—and to dredge without any regard for the ecological devastation—was hardly extraordinary.  The agency has a penchant for dredging projects like the MR-GO that notoriously destroy vast areas of marine life and aquatic vegetation. *See* Marine, *America The Raped:  The Engineering Mentality and Devastation of a Continent, supra* (Between 1954 and 1964, 4,635 acres of Long Island wetlands in Nassau County alone were destroyed.)  The Army Corps prides itself on being the nation's preeminent engineering organization, but fortified by the fiasco of the MR-GO and the resulting loss of over 100 square miles of wetlands and the avoidable flooding of Greater New Orleans during Katrina, the agency must also be viewed  as "a public enemy, a diligent destroyer of wetlands, a military aristocracy, a lobby that can't be

licked." Todd Shallat, *Structures in the Stream: Water, Science, and the Rise of the U.S. Army Corps of Engineers* (University of Texas 1994) at p. 1. The visionary administrator of the Tennessee Valley Authority, who battled with the Army Corps for decades, lambasted the agency as a myopic, archaic, negligent, and insensitive institution striving to foster an image of accomplishment regardless of the costs and oblivious of the consequences. *See Dams and Other Disasters, supra.* Tragically, the MR-GO—"the monster that ate New Orleans" in the words of local fisherman Frank Campo—is the child of this seriously flawed institution.

### The Arrogant Army Corps' Failure To Follow The Law:
### A Prescription for Environmental Disaster

131.    The Army Corps' failure to consult with the federal and state agencies possessing the most environmental expertise was neither accidental nor inadvertent. The Army Corps has a long and notorious history of spurning civilian authorities and disrespect for the environment.

132.    Shortly after its founding in 1802, the Army Corps was charged by Congress to exercise exclusive federal control over waterway improvements, including deepening river channels, building ports and harbors, and designing and constructing new inland water channels, as well as sole dominion over federal flood protection projects, including planning and building levees, locks, dams, spillways, and reservoirs. For most of the nation's history, these military engineers have exercised this authority with an iron-willed determination that brooks no civilian criticism and relies on the protection of an uncritical Congress eager to bring home to their states and districts expensive, pet civil works (commonly referred to as "pork barrel") projects. Over time, the agency has

grown more and more powerful—and less and less accountable to Congress and the

President—as it sought to expand its budget and mission, always eager "to please

corporate customers and congressional patrons, [and thereby] helping to 'create an

atmosphere where objectivity in its analyses [of projects] was placed in jeopardy.'"

Michael Grunwald, "Pentagon Rebukes Army Corps," *Washington Post*, December 7,

2000 at p. A.1 (quoting a report by the U.S. Army Office of Inspector General concluding

that the agency had engaged in misconduct).

133.   The Army Corps—despite some colossal engineering failures on its

projects—has rarely been rebuked.  It is little wonder therefore why Congress has failed

to exercise any meaningful or sustained oversight with regard to requiring remedial

measures for the MR-GO.  The legislators have been co-opted by the Army Corps.  As

one critic trenchantly noted:

> The annual 'rivers and harbors' bill . . . is the 'pork barrel' bill for
> Congressmen.  The Corps of Engineers is the most nearly untouchable
> empire in the United States, as powerful in its field as the FBI or CIA
> and as difficult to oppose.

Gene Marine, *America The Raped:  The Engineering Mentality and the Devastation of a

Continent* (Avon Books 1969) at pp. 51-52.

134.   Virtually every Congressional District has at least one Army Corps'

project.  This year alone, Congress appropriated $4.7 billion for Army Corps' projects

throughout the United States.  Even the Army Corps' own self-congratulatory history

admits that "[w]hile the Corps had authority only to recommend a project based on its

own merits, it did seem to support projects that were politically feasible and not

necessarily urgently required." U.S. Army Corps of Engineers, The History of the U.S.

Army Corps of Engineers (Office of History 1998) at p. 129.  Former Secretary of the

Interior Harold K. Ickes, who battled the Army Corps for 13 years on behalf of President Franklin D. Roosevelt, condemned the self-described "engineer consultants and contractors of the Congress" for corrupting the legislative branch by "the toporific effect of the pork barrel."

> The amazing phenomenon, the pork barrel, emerged in complete and functioning order from the teeming Corps of Army Engineers. [The carrot of local economic development allows the Corps] to maintain its control of that body by building, or promising to build, more or less justifiable or downright unjustifiable projects in the various states and districts for which senators and representatives may claim credit during the next election campaign. What matters it if many of these projects are against the wishes of, or even in defiance of orders from, the President himself? An Army Corps 'Operation Santa Claus' is a two-pronged affair—the Engineers lobbying directly for an appropriation by the Congress while inciting local constituencies to bring pressure to bear upon their senators and representatives.

Harold L. Ickes, *Muddy Waters*, *supra*, at pp. xi, xiv.

135.    Water resources projects like the MR-GO have been favorite Congressional pork barrel projects. As the Army Corps itself admits, "[t]he history of federal water resources development in the third quarter of the 20[th] century [was marked by] the continuation of pork barrel politics to determine actual project authorizations." U.S. Army Corps of Engineers, *The History of the U.S. Army Corps of Engineers* (Office of History 1998) (the "*Army Corps History*") at 132.

136.    During the period when the MR-GO was being proposed and authorized, the Army Corps in many respects was not subject to any meaningful executive branch control. Since World War II, "the secretaries of the Army were quite content to leave such matters as dams, floodwalls, and levees to the Corps and its friends on Capitol Hill." *Army Corps History* at 133. The agency's co-dependent relationship with Congress—characterized by the Army Corps' support for "pork barrel" projects while Congress turns

a blind eye to the Corps' noncompliance with the law and a travesty like the MR-GO—led one senior Department of the Army official in the Kennedy Administration to observe: "Although, like other military organizations in the United States, . . . the Corps was under civilian control, 'in its case the controlling civilians were on the Hill' rather than in the Pentagon." *Army Corps History* at 134.

137.    Again, as Secretary of Interior Ickes observed: "the Corps of Engineers has not coordinated its activities with those of other agencies of the executive branch. . . . Not only have the Army Engineers long regarded themselves as above civilian control . . .; to an amazing measure they are above such controls." Harold L. Ickes, *Muddy Waters*, *supra*, at pp. x, xiii.

### Hurricane Betsy Provides the First Concrete Evidence That The MR-GO Had Opened an Avenue to Hurricane Storm Surge Flooding From the Southeast

138.    For nearly two centuries, the Army Corps has boasted that its engineers have the most expertise and experience with regard to designing, constructing, and maintaining flood control systems.  Thus, more than any other civil engineering organization, the Army Corps knew (or should have known) of the dangers inherent in creating opportunities for a flanking attack by an enemy—in this case flood waters from the nearby Gulf of Mexico.  Yet this was precisely the result of the Army Corps' flawed decision to build the MR-GO while ignoring the warnings and recommendations for further study provided to the Army Corps by the DOI, the Army Corps' own Board of Engineers, and the LWLFC.

139.    In the June 2006 report on the New Orleans levee failures conducted by the Interagency Performance Evaluation Task Force at the Army Corps' request (the

"Final IPET Report"), the authors noted that New Orleans had historically experienced hurricane related flooding from Lake Pontchartrain located north of the city.  Before the MR-GO's devastating effect on the marshlands and vegetation along its boundaries, storm surge from the south and southeast was never a major concern since the contiguous and healthy marshland provided a natural buffer against storm surge directly flowing from the Gulf of Mexico.

140.    The Flood Control Act of 1965, P.L. 89-298, 79 Stat. 1073 (October 27, 1965), reflected this lack of concern over flooding from the southeast.  This legislation approved a program of levee construction providing only for levees to be built along the Jefferson Parish/Lake Pontchartrain coastline, as set forth in the Mississippi River and Tributaries Project ("MRTP").  A report on the MRTP was produced as part of a massive investigation during the 1950s and early 1960s by the Army Corps and the Mississippi River Commission into flood control measures along the Mississippi River and its tributaries as well as levee construction in the New Orleans area.  The MTRP report was submitted to Congress on May 11, 1964.

141.    In 1965, New Orleans was inundated by storm surge from Hurricane Betsy.  A large portion of the storm surge flooding the city came from the southeast and through the MR-GO.  Thus, the Army Corps was provided with concrete evidence that it had recklessly exposed the southeastern flank of New Orleans to flooding directly from the Gulf of Mexico.

142.    The Army Corps attempted to remedy this problem by building mainly earthen structures on the protective "dike" along the MR-GO after Hurricane Betsy.  *See* Report of the Comptroller General to the United States Congress on Cost, Schedule and

Performance Problems of the Lake Pontchartrain and Vicinity, Louisiana, Hurricane Protection Project (August 1976).

143.    The earthen structures built along the MR-GO, however, were an ill-considered, quick fix to protect the now vulnerable southeast flank of New Orleans since they were built with inherently unstable dredged "spoil" from the MR-GO which undermined their stability and strength.  As noted in the Final Seed Report, "[t]he levees along this frontage were unusually vulnerable to erosion as they were 'sand core' levees, constructed largely using material available from the adjacent MR-GO channel excavation.  Given the nature of the local soils at this location, much of that excavated material consisted of sands and lightweight shell sands.  These materials have a low intrinsic resistance to erosion, and this led to a hazardous condition."  Final Seed Report at p. 6-3.

144.    Moreover, under Section 2 of the Flood Control Act of 1965, any additional flood control measures costing more than $10,000,000 had to be approved by Congress after the Army Corps conducted an appropriate investigation.   The cost of constructing the mainly earthen structures along Reach 2 substantially exceeded $10,000,000.  *Yet the Army Corps never performed the required investigation, it never submitted a relevant report to Congress, and it never received Congressional authorization to construct levees.*

145.    Between 1965 and 2005, officials from St. Bernard Parish, local public interest groups, and individual citizens repeatedly asked the Army Corps to close the MR-GO, remediate the increased storm surge corridor created by the waterway, and/or

repair the damaged wetlands.  The Army Corps neither undertook any of the requested

actions nor pressed Congress for any such urgent remedial measures.

### The Army Corps Has Admitted That The MR-GO

### Is Responsible for Massive Wetlands Destruction

146.    By 2004, the Army Corps had admitted that the MR-GO had devastated

the marshland to the southeast of New Orleans, and that this marshland served as a

natural hurricane storm surge buffer.  In a November 2004 report from the Army Corps,

entitled *Louisiana Coastal Area, Ecosystem Restoration Study* (the "*2004 Corps*

*Ecosystem Report*"), the Army Corps noted:

> After the MRGO was completed, significant habitat shifts occurred because the
> impacted area converted to a higher salinity system with the influx of saltwater
> through ridges and marsh systems that were severed or destroyed during channel
> construction. *Continued operation of the MRGO results in high rates of shoreline
> erosion from ship wakes, which destroy wetlands and threaten the integrity of and
> adjacent communities, infrastructure, and cultural resources.*

*2004 Corps Ecosystem Report* at Section 4, p. 18, (emphasis added).

147.    The *2004 Corps Ecosystem Report* further acknowledged the prophylactic

role played by this marshland in suppressing hurricane storm surge:

> The past and continued loss of Louisiana's coastal wetlands will significantly
> affect the ecology, society, and economy of the region and the Nation.  *The
> capacity of the coastal wetlands to buffer storm surges from tropical storm events
> will diminish*, which will increase the risk of significant damage to oil, gas,
> transportation, water supply and other private and public infrastructure and
> agriculture lands and urban areas.

*2004 Corps Ecosystem Report*, Executive Summary at pp. iii-iv (emphasis added).

### The Army Corps Has Admitted The Urgent Need For

### Remedial Measures Along Reach 1 of the MR-GO

148.    In an attachment to the Final IPET Report, the Army Corps' panel of

experts also emphasized the danger to Greater New Orleans presented by the feeding of

navigation canals like the IHNC (Industrial Canal) into the widened Reach 1/GIWW

canal adjacent to New Orleans East.  Specifically, in Appendix 6, the authors note:

> The critical section of the MRGO is Reach 1, the combined GIWW/MRGO.  It is
> through this section of the channel that Lake Pontchartrain and Lake Borgne are
> hydraulically connected to one another via the IHNC.  . . .  The Reach 1
> GIWW/MRGO section of channel is very important in determining the magnitude
> of storm surge that reaches the IHNC from Lake Borgne and Breton Sound.

Final IPET Report, June 1, 2006, Vol. IV, Appendix 6, pp. 2-3.

149.    The Final IPET Report also urged immediate remedial measures along

Reach 1 of the MR-GO to deal with the hazards of an open channel:

> Reach 1 (the combined GIWW/MRGO section) and the IHNC, together, provide
> a hydraulic connection between Lake Borgne and Lake Pontchartrain.  As a result
> of this connection, the storm surge experienced within the IHNC and Reach 1
> (GIWW/MRGO) is a function of storm surge in both Lakes; a water level gradient
> is established within the IHNC and Reach 1 that is dictated by the surge levels in
> the two lakes.  . . .  *To prevent storm surge in Lake Borgne from reaching the*
> *IHNC or GIWW/MRGO sections of waterway, flow through the Reach 1 channel*
> *must be dramatically reduced or eliminated, either by a permanent closure or*
> *some type of structure that temporarily serves to eliminate this hydraulic*
> *connectivity.  The presence of an open channel is the key factor.*

Final IPET Report, dated June 1, 2006, Vol. IV, Appendix 6, pp. 6-7 (emphasis added).

150.    Of all the prescient warnings about the MR-GO serving as a hurricane

superhighway pointed at Greater New Orleans, the most relevant for Katrina turned out to

be those about the "funneling effect" that the MR-GO could have on a hurricane-

generated storm surge.  As previously noted, Professor Hassan Mashriqui, a civil

engineer from Louisiana State University, presented hurricane scenarios to the Army

Corps in May 2005 predicting devastating flooding as a result of MR-GO's fatally-flawed

design.  Mashriqui's computer simulations demonstrated that during a strong hurricane,

the MR-GO is capable of creating a "funnel" effect which would amplify storm surges by

20 to 40 percent.  This is precisely what happened during Hurricane Katrina.

151.   Notwithstanding the Army Corps' refusal to comply with federal law by forestalling construction of the MR-GO until proper studies and testing could be completed; despite all of the deadly accurate warnings of impending disaster caused by the channel's inherently faulty design and construction; and in defiance of its own repeated, long-time observations and conclusions about the destructive consequences of the waterway, the Army Corps has steadfastly refused to close the MR-GO and/or to correct any of its glaring deficiencies.  Recently, Louisiana Governor Kathleen Babineaux Blanco urged the Army Corps to close and remediate the MR-GO.  In particular, she demanded "a more precise plan for closure, restoration of the extensive wetlands lost as a direct result of the MRGO, and the integration of this closure into the comprehensive hurricane protection plan."

152.   The urgency of devising and implementing a MR-GO Remediation Plan cannot be overstated in light of the known, indisputable facts about its significant role in causing the flooding of Greater New Orleans.  On August 29, 2005, all of the dire prophecies were fulfilled in a manner highlighting the MR-GO's flaws and the urgent need for effective remedial measures which, if they had been in place, would have prevented the catastrophic flooding caused by the MR-GO.  With the hurricane season again upon us, the people of Greater New Orleans remain in harm's way even as these words are being read.

153.   It is now undisputed that in the early morning of August 29, 2005, as predicted, the main storm surge washed across the now decimated marshlands from the southeast, overwhelming the earthen structures constructed by the Army Corps along the Reach 2 dikes and flooding St. Bernard Parish.  Next, the storm surge was concentrated

by the "funnel" into the GIWW, and the water levels within the Reach 1/GIWW channel rose dramatically and rapidly, overtopping the banks along the south side of New Orleans East.  The increased water pressure within the Reach 1/GIWW channel further overwhelmed the banks in four places along the Upper and Lower Ninth Wards of New Orleans.  Finally, later in the day, after the eye of Hurricane Katrina advanced far enough north from the Louisiana Coast so that the western portion of the storm could affect the water in Lake Pontchartrain, the southerly blowing winds pushed the Lake Pontchartrain waters south into New Orleans itself through several canals, including the Army Corp's Industrial Canal.   Depicted below are graphics prepared by *The Times-Picayune* illustrating the course of Hurricane Katrina over a three hour period:







154.    All of the worst fears, predictions, and warnings of local public officials, scientists, engineers, environmental organizations, and private citizens were fully realized on August 29, 2005. The ticking time bomb exploded. The MR-GO killed hundreds of residents and devastated billions of dollars of public and private property. The Army Corps' conduct reflects a callous disregard for its sworn duty to protect citizens from flooding.

155.    The record is now clear:  if the MR-GO had not been so arbitrarily and capriciously designed, constructed, maintained, and operated in a manner which directly contravened federal, the massive flooding in New Orleans East, St. Bernard Parish, and the Lower and Upper Ninth Wards of New Orleans would have never occurred.

### The Army Corps and Congress Refused to Take Any Action to Protect
### Against the MR-GO's Admittedly Dangerous Conditions

156.    The Army Corps' adamant refusal to take any action to correct the hazardous conditions of the MR-GO is all the more inexplicable because the agency possessed abundant evidence that continued operation of the waterway was not justified on a cost-benefit basis. (The agency has a documented history of manipulating the cost-benefit analysis for waterway navigation systems. *See* Michael Grunwald, "Army Engineers Reforms Are Set," *Washington Post*, March 30, 2000 at p. A19.) The Army Corps has known for a long time that the MR-GO substantially failed to provide the economic benefits to New Orleans ballyhooed in the Army Corps' 1951 report to Congress while it continues to pose a clear and present danger of catastrophic damage to human life and property in Greater New Orleans.  This abject failure by public officials to

protect the public constitutes a gross dereliction of duty of nearly unprecedented proportions.

157.    Members of House of Representatives and the Senate have also long known of the MR-GO's hazardous conditions.  Yet there have been no Congressional investigations or hearings of any import.   What is perhaps most disconcerting is that even after Hurricane Katrina and hundreds of deaths and billions of dollars of property damage caused by the MR-GO, Congress has still not taken any decisive action.

158.    Nor has the Secretary of the Army, Secretary of Defense, or the President publicly criticized or disciplined any Army Corps' senior officers in the wake of the flooding of Greater New Orleans.  The citizens of Greater New Orleans are still waiting for a coordinated plan from Congress and the White House to remediate the MR-GO. Indeed, Plaintiffs believe and based thereon allege that the President has recently decided not to support the closure/remediation of the MR-GO.

159.    With this conspicuous failure of leadership by the executive and legislative branches of the federal government and the Army Corps's repeated but unredressed violations of law, the people must resort to the judiciary for redress of their grievances.  This Court is their best and last hope for a comprehensive set of remedial measures to prevent the MR-GO from another rampage.

## The Urgent Need For A Multi-Faceted MR-GO
## Remediation Plan Devised By Distinguished Experts

160.    Any effective hurricane flooding protection system must be multi-faceted and address the fundamental systemic defects in the design, construction, maintenance, and operation of the MR-GO.  Among other things, any remediation plan must include:

(a)     barriers functioning as "speed bumps" in the MR-GO;

(b)     protection of the marshlands against any further destruction;

(c)     aggressive restoration of the wetlands; and

(d)     armoring of the MR-GO's banks.

As the prestigious American Geophysical Union recently concluded:

> "Rebuilding the region in an environmentally and economically sustainable fashion will require integrated planning, investment, and management that recognizes the forces of nature, the need to protect communities, the value of natural resources and ecosystem services, and financial constraints."

*AGU Report, supra,* at p. 21.

161.    Devising the remedies for the MR-GO cannot be left to the very institution responsible for the problems.  Nor can the solution be compromised by politics, wasteful pork barrel funding unrelated to necessary remedies, and half-baked measures.  The public interest demands that the best scientific minds devise the best remedial measures.  Again as the American Geophysical Union urged in its recent report:  "Successful and sustainable reconstruction of New Orleans and the Gulf Coast and effective planning for future hurricane events must incorporate the best available science."  *AGU Report, supra,* at p. 5.  Thus, the Court should appoint a scientific advisory panel comprised of the most knowledgeable scientists, engineers, and other experts to prepare a MR-GO Remediation Plan.

162.    In light of the Army Corps' admissions about the systemic failures in its flawed New Orleans supposed "levees" and the contribution of Reach 1 of the MR-GO to the flooding and the agency's failure to undertake comprehensive remedial measures despite knowing about the waterway's defects for decades, the Army Corps cannot be

trusted to prescribe the remedies for the MR-GO in a professional and timely manner. The agency simply lacks objectivity and credibility to tackle the job. The residents and businesses of Greater New Orleans have justifiably lost faith in these government engineers. While the Army Corps should be consulted in devising the MR-GO Remediation Plan, an independent panel of the nation's preeminent experts should be entrusted with this top priority mission.

163.    An independent scientific panel is particularly necessary in this case because of the mounting evidence of the Army Corps' inability to undertake competently, efficiently, and lawfully a substantial project such as the closure and/or remediation of the MR-GO. *See, e.g.,* Press Release, U.S. Office of Special Counsel, February 28, 2000 (finding "a substantial likelihood that officials in the Corps have engaged in violations of law, rule or regulation and a gross waste of funds."). The evidence is overwhelming that "many Corps projects are not based on the best available science, economics, or engineering, and that the Corps often ignores the views of the public, civic leaders and scientists." Testimony of S. Elizabeth Birnbaum, Vice President for Government Affairs, Before the House of Representatives Government Reform Committee's Energy and Resources Subcommittee, March 15, 2006.

164.    A study by the prestigious National Academy of Sciences—mandated by Congress in the wake of scandals over manipulating cost-benefit analyses on water resource projects—concluded that the Army Corps' water resources planning studies needed to be reviewed by independent, external experts not including Army Corps staff or panelists selected by the agency. *See* National Academy of Sciences, *U.S. Army Corps of Engineers Water Resources Planning: A New Opportunity for Service* (2004) at p. 15.

And in the aftermath of Katrina, the calls for greater civilian oversight of the Army Corps' water resource projects have intensified. *See, e.g.,* Testimony of Loyola Law School Professor Robert R.M. Verchick Before the Senate Committee on Environment and Public Works, November 17, 2005 ("A new hurricane protection vision should incorporate a formal mechanism by which an independent, scientific board regularly assesses the design, condition, and performance of hurricane protection features . . . ."); Testimony of S. Elizabeth Birnbaum, Vice President for Government Affairs of American Rivers Before the House of Representatives Government Reform Committee's Energy and Resources Subcommittee, March 15, 2006 ("Corps project planning clearly contributed to the post-Katrina devastation of New Orleans. . . . Regrettably, all evidence to date supports the New Orleans *Times Picayune's* description of the Corps as the "agency whose mistakes led to the deaths of more than 1,000 residents of this metro area.")

165.    The paramount need for expediting the formulation and implementation of a MR-GO Remediation Plan cannot be overstated in light of the known, indisputable facts about its significant role in causing the flooding of Greater New Orleans and the inevitability that some day another destructive hurricane like Katrina will strike Greater New Orleans. *See AGU Report, supra* at p. 11 ("The Gulf Coast will continue to be affected by hurricanes for the foreseeable future. Indications are the effects will worsen.") On August 29, 2005, all of the dire prophecies were fulfilled in a manner highlighting the MR-GO's flaws and the urgency of implementing effective remedial measures which, if they had been in place, would have prevented the catastrophic flooding caused by the MR-GO.

166.    Time is of the essence.  The tragedy of Hurricane Katrina was unbearable; failing to learn from history and fix the MR-GO is unthinkable.

## FIRST CLAIM FOR RELIEF

**Defendants' Failure to Comply with the Fish and Wildlife Coordination Act**

**(By Plaintiffs Against All Defendants)**

167.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 166 as if fully set forth herein.

168.    Plaintiffs are "persons" pursuant to the APA, 5 U.S.C. § 701(b)(2) and 5 U.S.C. § 511(2).

169.    Plaintiffs have standing to pursue this action under the APA, and they are entitled to judicial review of the Defendants' failure to act, because they are Plaintiffs who are persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ."  5 U.S.C. § 702.

170.    Defendant Army Corps is an "agency" as defined in 5 U.S.C. § 701(b)(1). Defendant Francis J. Harvey, in his official capacity as Secretary of the Army, is the federal officer personally responsible for the compliance of the Army Corps with federal statutes, rules, and regulations as set forth in 5 U.S.C. § 702.  The Army Corps is a division of Defendant United States, and therefore is also accountable for the failure to act of Defendant United States.

171.    The Defendants' failure to comply with the terms and conditions of the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662, is an "agency action" as set forth in § 701(b)(2) and 5 U.S.C. § 511(14).  Defendants' noncompliance

with the foregoing statute is also a "final agency action" pursuant to 5 U.S.C. § 704,

reviewable by a United States District Court because there is no adequate remedy at law

for Plaintiffs' harm, or potential harm, and there is no procedural mechanism within the

agency for review of the Defendants' failure to act.

172.   Plaintiffs have no adequate remedy at law, and will suffer irreparable

harm, because by investigating, planning, designing, constructing, and/or maintaining the

MR-GO, without the assistance, input, advice, recommendations, suggestions or

coordination from, of or with the Department of Interior, or the Louisiana Wild Life and

Fisheries Commission, the Army Corps has violated the express terms and conditions of

the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662.

173.   Likewise, Plaintiffs have no adequate remedy at law, and will suffer

irreparable harm, because by investigating, planning, designing, constructing, and/or

maintaining the MR-GO, without the assistance, input, advice, recommendations,

suggestions or coordination from, of, or with the Department of Interior or the Louisiana

Wild Life and Fisheries Commission, as mandated by the Fish and Wildlife Coordination

Act, as amended at 16 U.S.C. § 662, the Army Corps has constructed a waterway which

presents a real, tangible and imminent threat to human life and property.

174.   Specifically, the conditions created by the MR-GO, which would not have

existed had the Army Corps properly coordinated with the Department of Interior and/or

the Louisiana Wild Life and Fisheries Commission, have made flooding from hurricane

induced storm surges from the Gulf of Mexico into New Orleans East, St. Bernard Parish,

and the Upper and Lower Ninth Wards of New Orleans a dangerous hazard threatening

human life, property, the environment, and the ability of Greater New Orleans to regain its economic prosperity.

175.    Defendants' actions were arbitrary and capricious because they were fully aware of the statutory requirements for coordination with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, but intentionally refused to consult with these agencies, or intentionally refused to take into consideration the observations, comments or recommendations of those agencies when investigating, planning, designing, constructing, and/or maintaining the MR-GO, in contravention of the requirements set forth in the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662.

176.    Defendants' actions were further arbitrary and capricious because the Army Corps' own Board of Engineers recognized the fact there were potentially serious problems with the MR-GO, and the Board of Engineers recommended additional studies to protect against harm to the Louisiana coastline.  Defendants, however, unlawfully refused to conduct such studies.

177.    Each of these actions, or inactions as the case may be, were taken by the Army Corps to commence construction of the MR-GO at the earliest possible date, regardless of the threats to human life, property, and the environment posed by the flawed MR-GO design.

178.    Consequently, Plaintiffs seek an order of the Court compelling Defendants to restore the status quo by returning the area southeast of New Orleans to the conditions existing before Defendants failed to comply with the aforementioned law and before the construction of the MR-GO.  Towards this end, Plaintiffs further seek an order appointing

a Special Master and a panel of scientific experts to assess the best, safest, and most expeditious remedies for restoring the status quo and to recommend to the Court a MR-GO Remediation Plan.

## SECOND CLAIM FOR RELIEF

### Defendants' Failure to Comply with the River and Harbor Act of 1945

### (By Plaintiffs Against All Defendants)

179.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 178 as if fully set forth herein.

180.    Plaintiffs are "persons" pursuant to the APA, 5 U.S.C. § 701(b)(2) and 5 U.S.C. § 511(2).

181.    Plaintiffs have standing to pursue this action under the APA, and they are entitled to judicial review of the Defendants' failure to act, because they are Plaintiffs who are persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702.

182.    Defendant Army Corps is an "agency" as defined in 5 U.S.C. § 701(b)(1). Defendant Francis J. Harvey, in his official capacity as Secretary of the Army, is the federal officer personally responsible for the compliance of the Army Corps with federal statutes, rules, and regulations as set forth in 5 U.S.C. § 702.  The Army Corps is a division of Defendant United States, and therefore is also accountable for the failure to act of Defendant United States.

183.    The Defendants' failure to comply with the terms and conditions of the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945) is an "agency

action" as set forth in § 701(b)(2) and 5 U.S.C. § 511(14).   Defendants' noncompliance with the forgoing statutes is also a "final agency action," pursuant to 5 U.S.C. § 704, reviewable by a United States District Court because there is no adequate remedy at law for Plaintiffs harm, or potential harm, and there is no procedural mechanism within the agency for review of the Defendants' failure to act.

184.    Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because by investigating, planning, designing, constructing, and/or maintaining the MR-GO, without the assistance, input, advice, recommendations, suggestions or coordination from, of, or with the Department of Interior, or the Louisiana Wild Life and Fisheries Commission, the Army Corps has violated the express terms and conditions of the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945).

185.    Likewise, Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because by investigating, planning, designing, constructing, and/or maintaining the MR-GO, without the assistance, input, advice, recommendations, suggestions or coordination from, of, or with the Department of Interior or the Louisiana Wild Life and Fisheries Commission, as mandated by the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945), the Corps has constructed a waterway which presents a real, tangible and imminent threat to human life and property.

186.    Specifically, the conditions created by the MR-GO, which would not have existed had the Army Corps properly coordinated with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, have made flooding from hurricane induced storm surges from the Gulf of Mexico into New Orleans East, St. Bernard Parish,

and the Upper and Lower Ninth Wards of New Orleans a dangerous hazard threatening human life, property, the environment, and the very survival of Greater New Orleans.

187.    Defendants' actions were arbitrary and capricious because they were fully aware of the statutory requirements for coordination with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, but intentionally refused to consult with these agencies, or intentionally refused to take into consideration the observations, comments or recommendations into account when investigating, planning, designing, constructing, and/or maintaining the MR-GO, as required by the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945).

188.    Defendants' actions were further arbitrary and capricious because the Army Corps' own Board of Engineers recognized the fact there were potential problems with the MR-GO, and the Board of Engineers recommended additional studies to protect against harm to the Louisiana coastline. Defendants, however, unlawfully refused to conduct such studies.

189.    Each of these actions, or inactions as the case may be, were taken by the Army Corps to commence construction of the MR-GO at the earliest possible date, regardless of the threats to human life, property, and the environment inherent in the faulty MR-GO design.

190.    Consequently, Plaintiffs seek an order of the Court compelling Defendants to restore the status quo by returning the area southeast of New Orleans to the conditions existing before Defendants failed to comply with the aforementioned law and before the construction of the MR-GO. Towards this end, Plaintiffs further seek an order appointing a Special Master and a panel of scientific experts to assess the best, safest, and most

expeditious remedies for restoring the status quo and to recommend to the Court a MR-GO Remediation Plan.

### THIRD CLAIM FOR RELIEF

### Defendants' Failure to Comply with the National Environmental Policy Act of 1969

### (By Plaintiffs Against All Defendants)

191.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 190 as if fully set forth herein.

192.    Plaintiffs are "persons" pursuant to the APA, 5 U.S.C. § 701(b)(2) and 5 U.S.C. § 511(2).

193.    Plaintiffs have standing to pursue this action under the APA, and they are entitled to judicial review of the Defendants' failure to act, because they are Plaintiffs who are persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ."

194.    Defendant Army Corps is an "agency" as defined in 5 U.S.C. § 701(b)(1), Defendant Francis J. Harvey, in his official capacity as Secretary of the Army, is the federal officer personally responsible for the Army Corps' compliance with federal statutes, rules, and regulations as set forth in 5 U.S.C. § 702.  The Army Corps is a division of Defendant United States, and therefore is also accountable for the failure to act of Defendant Army Corps.

195.    The Defendants' decision to cease dredging operations in the MR-GO was a "major Federal action[ ] significantly affecting the quality of the human environment" as defined in 42 U.S.C. § 4332(C).  Specifically, the amount of sediment deposited at the

bottom of the MR-GO directly affects the water level within the MR-GO and the GIWW. In turn, the water level, as demonstrated above, has a direct bearing on the amplitude of storm surge from the Gulf of Mexico.

196.    Before undertaking a "major Federal action [ ] significantly affecting the quality of the human environment," Defendants were required by law to prepare an "environmental impact statement" ("EIS") pursuant to 42 U.S.C. § 4332(C) assessing any impacts to the environment caused by the Army Corps' decision to discontinue dredging.

197.    Pursuant to NEPA, the Council on Environmental Quality (42 U.S.C. § 4342) was also authorized to issue regulations interpreting NEPA which apply to all federal agencies.  40 C.F.R. § 1500.3 (2005).  As an alternative to an EIS, a federal agency may produce an "environmental assessment" ("EA") where the agency's proposed action neither is categorically excluded from the requirement to produce an EIS, nor would clearly require the production of an EIS.  40 C.F.R. § 1501.3 (2005).  If the agency determines, based upon the EA, that its project will significantly affect the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4 (2005).  Finally, if an agency finds there is no significant environmental impact, it must issue a formal "finding of no significant impact" ("FONSI"). 40 C.F.R. §§ 1501.3(e) & 1508.13.

198.    Plaintiffs are informed and believe and based thereon allege that Defendants issued neither an EIS, an EA nor a FONSI in connection with its decision to cease dredging operations in the MR-GO.

199.    Defendants' failure to comply with the terms and conditions of NEPA and its concomitant regulations are "agency actions" as set forth in 5 U.S.C. §§  701(b)(2) and (14).  Defendants' noncompliance with the forgoing statutes and regulations is also a

"final agency action," pursuant to 5 U.S.C. § 704, reviewable by a United States District Court because there is no adequate remedy at law for Plaintiffs' harm, or potential harm, and there is no procedural mechanism within the agency for review of the Defendants' failure to act.

200.   Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because by failing to prepare or issue an EIS, an EA or a FONSI in connection with their decision to terminate dredging, Defendants failed to consider whether their actions would exacerbate the already dangerous conditions created by the MR-GO.  For example, Defendants failed to assess whether their decision would increase the already high probability of flooding within the Greater New Orleans area caused by the Defendants' design, construction, maintenance, and operation of the MR-GO.

201.   Likewise, Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because an increased probability of hurricane storm surge flooding caused by the MR-GO presents a real, tangible and imminent threat to human life and property.

202.   Defendants' actions were arbitrary and capricious because Defendants were fully aware of the statutory and regulatory mandate for the issuance of an EIS, an EA, or a FONSI before terminating dredging operations, but they chose to ignore these requirements, in part, because the investigation might force them to address and remedy the pre-existing dangers caused by the defective planning, design, construction, maintenance, and operation of the MR-GO.

## FOURTH CLAIM FOR RELIEF

### Defendants' Failure to Comply with

### The Water Resources Development Act of 1990, 33 U.S.C. § 2316

### (By Plaintiffs Against All Defendants)

203.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 202 as if fully set forth herein.

204.    Plaintiffs are "persons" pursuant to the APA, 5 U.S.C. § 701(b)(2) and 5 U.S.C. § 511(2).

205.    Plaintiffs have standing to pursue this action under the APA, and they are entitled to judicial review of these agencies' failure to act, because they are persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702.

206.    Defendant Army Corps is an "agency" as defined in 5 U.S.C. § 701(b)(1). Defendant Francis J. Harvey, in his official capacity as Secretary of the Army, is the federal officer personally responsible for the compliance of the Army Corps with federal statutes, rules, and regulations as set forth in 5 U.S.C. § 702. The Army Corps is a division of Defendant United States, and therefore is also accountable for the failure to act of Defendant United States.

207.    Pursuant to 5 U.S.C. § 706(1), "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." In addition, 5 U.S.C. § 706(2) provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

208.    Pursuant to the Water Resources Development Act of 1990, "[t]he Secretary [of the Army] shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." 33 U.S.C. § 2316(a).

209.    Plaintiffs are informed and believe and based thereon allege that Defendants "unlawfully withheld agency action" by deciding to forego the dredging of the MR-GO without considering any environmental effects which would, or could, flow from its decision, in contravention of 33 U.S.C. § 2616.

210.    Plaintiffs are further informed and believe and based thereon allege that in deciding to forego the dredging of the MR-GO without considering any environmental effects which would, or could, flow from its decision, in contravention of 33 U.S.C. § 2616, the Defendants acted in a manner which was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and that the Defendants' decisions and actions were "unlawful."

211.    Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because the environmental impact of the Defendants' decision not to continue dredging the MR-GO will include (1) the continued deterioration of the marshland surrounding the MR-GO which serves as a natural buffer against hurricane induced storm surge arising from the Gulf of Mexico; and (2) an increase in storm surge potential within canals intersecting the MR-GO, especially the GIWW and the Industrial Canal. The loss of wetlands and the increase of storm surge potential in the GIWW and Industrial Canal have been proven to substantially elevate the risk of flooding within St. Bernard Parish and elsewhere.

212.    This increased risk of flooding creates an immediate, tangible, and probable threat to Plaintiffs' physical health and well-being as well as an imminent, real and present threat of damage to Plaintiffs' real property and the environment.

213.    Plaintiffs thus seek an order of the Court compelling Defendants to resume dredging operations within the MR-GO, or, in the alternative, to take immediate action to restore the condition of the wetlands surrounding the MR-GO to the condition which existed prior to the construction of the waterway.

## FIFTH CLAIM FOR RELIEF

### Review of Defendants' Failure to Comply with

### The Water Resources Development Act of 1990, 33 U.S.C. § 2317

### (By Plaintiffs Against All Defendants)

214.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 213 as if fully set forth herein.

215.    Plaintiffs are "persons" pursuant to the APA, 5 U.S.C. § 701(b)(2) and 5 U.S.C. § 511(2).

216.    Plaintiffs have standing to pursue this action under the APA, and they are entitled to judicial review of these agencies' failure to act, because they are persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702.

217.    Defendant Army Corps is an "agency" as defined in 5 U.S.C. § 701(b)(1). Defendant Francis J. Harvey, in his official capacity as Secretary of the Army, is the federal officer personally responsible for the compliance of the Army Corps with federal statutes, rules, and regulations as set forth in 5 U.S.C. § 702. The Army Corps is a

division of Defendant United States, and therefore is also accountable for the failure to

act of Defendant United States.

218.    Pursuant to 5 U.S.C. § 706(1), "[t]he reviewing court shall . . . compel

agency action unlawfully withheld or unreasonably delayed."  In addition, 5 U.S.C. §

706(2) provides that the "reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."

219.    The Water Resources Development Act of 1990 established the following

laudatory goals with respect to wetland restoration:

> There is established, as part of the Corps of Engineers water resources
> development program, an interim goal of no overall net loss of the Nation's
> remaining wetlands base, as defined by acreage and function, and a long-term
> goal to increase the quality and quantity of the Nation's wetlands, as defined by
> acreage and function.

33 U.S.C. § 2317(a)(1).

220.    Towards this end, 33 U.S.C. § 2317(a)(2) directed the Secretary of the

Army to "utilize all appropriate authorities, including those to restore and create

wetlands, in meeting the interim and long-term goals."  33 U.S.C. § 2317(a)(3) also

commands the Secretary of the Army to develop a "wetlands action plan" with the EPA,

the Fish and Wildlife Service, and other federal agencies.

221.    Plaintiffs are informed and believe and based thereon allege that

Defendants' decision to forego the dredging of the MR-GO would, or could, have a

substantially harmful effect to the wetlands surrounding the MR-GO.  Consequently, the

Defendants actions, in refusing to dredge the MR-GO, was in direct violation of the goals

and procedures specified in 33 U.S.C. § 2317 because as a direct consequence of the Defendants' actions and decisions, Defendants will cause the loss of valuable wetlands.

222.   Plaintiffs therefore are further informed and believe and based thereon allege that Defendants have "unlawfully withheld or unreasonably delayed" agency action, as defined in 5 U.S.C. § 706(1), and that the Defendants actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and therefore "unlawful" according to 5 U.S.C. § 706(2).

223.   Plaintiffs have no adequate remedy at law, and will suffer irreparable harm, because by causing loss to the wetlands surrounding the MR-GO, Defendants are reducing a natural barrier to storm surge emanating from the Gulf of Mexico, appreciably increasing the likelihood of hurricane induced storm surge flooding.  The increased probability of hurricane related flooding stemming from Defendants' decision creates an immediate, tangible, and probable threat to Plaintiffs' physical health and well-being as well an imminent, real and present threat of damage to Plaintiffs' real property and the environment.

224.   Consequently, Plaintiffs seek an order of the Court compelling Defendants to resume dredging operations within the MR-GO, or, in the alternative, to take immediate action to restore the condition of the wetlands surrounding the MR-GO to the condition which existed prior to the construction of the waterway.

## SIXTH CLAIM FOR RELIEF

### Creating a Nuisance In Violation of Louisiana and Federal Common Law

### (By Plaintiffs Against All Defendants)

225.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 224 as if fully set forth herein.

226.   As the proprietor of the MR-GO, the Army Corps had a duty pursuant to Louisiana Civil Code article 667 to refrain from creating a nuisance with respect to the MR-GO that has deprived, and threatens imminently to deprive, those living in neighboring parishes from the enjoyment of their property in the event of a hurricane. Defendants have violated this state statutory duty by creating the MR-GO's hazardous conditions.

227.   As the owner and operator of the MR-GO, the Army Corps also had a federal common law duty to avoid creating a hazardous condition that harms, and threatens imminently to harm, the lives and property of nearby residents in the event of a hurricane.  Defendants have violated this federal common law duty by allowing the MR-GO to become a lethal threat to human life, property, and the environment.

228.   Unless enjoined, this continuing nuisance posed by the unremediated MR-GO threatens to cause irreparable harm to neighboring residents and land owners.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Order the certification of the Plaintiff Class;

B.      Adjudge and declare that the Defendants have violated, and will continue to violate, the Fish and Wildlife Coordination of Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945), by refusing to coordinate with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, by intentionally refusing to consult with these agencies, or by refusing to take into consideration the observations, comments or recommendations of those agencies into account when investigating, planning, or designing the MR-GO.

C.      Adjudge and declare that the Defendants have violated, and will continue to violate, the River and Harbor Act of 1945, P. L. 79-14, 50 Stat. 10 (March 2, 1945), by refusing to coordinate with the Department of Interior and/or the Louisiana Wild Life and Fisheries Commission, by intentionally refusing to consult with these agencies, or by refusing to take into consideration the observations, comments or recommendations of those agencies into account when investigating, planning, or designing the MR-GO.

D.      Adjudge and declare that the Defendants have violated, and will continue to violate, the National Environmental Policy Act of 1969 by failing to prepare or issue an EIS, an EA, or a FONSI in connection with their decision to terminate dredging of the MR-GO.

E.      Adjudge and declare that the Defendants have violated, and will continue to violate, the Water Resources Development Act of 1990, 33 U.S.C. § 2316  by deciding

to forego the dredging of the MR-GO without considering any environmental effects which would, or could, flow from its decision.

F.     Adjudge and declare that the Defendants have violated, and will continue to violate, the Water Resources Development Act of 1990, 33 U.S.C. § 2317 by deciding to forego the dredging of the MR-GO without deciding whether this decision would, or could, have a substantially harmful effect on the wetlands surrounding the MR-GO and, by so doing, Defendants will cause the loss of valuable wetlands.

G.     Adjudge and declare that the Defendants' actions with respect to all aspects of the MR-GO constitute a continuing nuisance in violation of Louisiana and federal common law.

H.     Adjudge and declare that the MR-GO is a hazard to human life and property of Plaintiffs and their neighbors, the environment, and the economic recovery of Greater New Orleans.

I.     Adjudge and declare that prompt action must be undertaken to remediate the hazardous conditions of the MR-GO.

J.     Appoint a Special Master and a panel of distinguished scientific experts (nominated by the parties and selected by the Court) to examine the dangers of the MR-GO and to prepare a study for the Court containing a MR-GO Remediation Plan that recommends a comprehensive set of remedial measures for the MR-GO's hazardous conditions.

K.     Appoint a Special Master to preside over the work of the scientific panel, to make periodic progress reports to the Court, and to monitor for the Court the implementation of the remedial measures ordered by the Court.

L.    Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and
disbursements associated with this action according to common law and the Equal Access
to Justice Act, 28 U.S.C. § 2412.

M.    Grant such additional relief as the Court may deem just and appropriate.

Dated:  August 29, 2006                    Respectfully  submitted,

**State of Louisiana, through Attorney
General Charles C. Foti, Jr.**

By:_____
     Charles C. Foti, Jr.
     Attorney General of the State of
     Louisiana
P.O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6705
Facsimile (225) 326-6797

**Attorneys for Plaintiff the State of
Louisiana, through Attorney General
Charles C. Foti, Jr.**

**O'Donnell & Mortimer LLP**

By:_____
     Pierce O'Donnell (*pro hac vice*)
     Nina D. Froeschle (*pro hac vice*)
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: (213) 532-2000
Facsimile:  (213) 532-2020

**The Andry Law Firm, LLC**

By:_____
     Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

91

**Bruno & Bruno**

Joseph M. Bruno (LSBA No. 3604)
David S. Scalia (LSBA No. 21369)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085

**Attorneys for Plaintiffs St. Bernard Parish,
Charles "Pete" Savoy, Mark Madary,
Cynthia Willard-Lewis, Pamela Bruno
Nevle, Gerald Bernard Nevle, Pam
Dashiell, Shawn Tran, and Nga Tran**