UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| COLLEEN BERTHELOT, WIFE OF, | * | Civil Action |
| and JACKIE BERTHELOT, ET AL, | * | No. 05-4182 |
| | * | |
| Plaintiffs, | * | Section "K" |
| | * | |
| v. | * | New Orleans, Louisiana |
| | * | May 24, 2006 |
| BOH BROTHERS CONSTRUCTION | * | |
| COMPANY, LLC, ET AL, | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * *


MOTION HEARING
BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Interim Plaintiffs'          Law Offices of Daniel Becnel, Jr.
Management Committee:            By:  DANIEL E. BECNEL, JR., ESQ.
                                 106 W. Seventh Street
                                 P.O. Drawer H
                                 Reserve, Louisiana 70084

                                 Lambert & Nelson
                                 By:  HUGH P. LAMBERT, ESQ.
                                 701 Magazine Street
                                 New Orleans, Louisiana 70130

                                 Bruno & Bruno
                                 By:  DAVID S. SCALIA, ESQ.
                                 855 Baronne Street
                                 New Orleans, Louisiana 70113

                                 Salas & Co., L.C.
                                 By:  CAMILO K. SALAS III, ESQ.
                                 650 Poydras Street, Suite 1650
                                 New Orleans, Louisiana 70130

**APPEARANCES CONT'D.**

For Consol Plaintiff         Ashton R. O'Dwyer, Jr., Attorney
Dawn Bundy, 05-4181:          at Law
                             By:  ASHTON R. O'DWYER, JR., ESQ.
                             One Canal Place, Suite 2670
                             New Orleans, Louisiana 70130

For Defendant Boh Bros.:      Kingsmill Riess, LLC
                             By:  MICHAEL R. C. RIESS, ESQ.
                             201 St. Charles Ave., Suite 3300
                             New Orleans, Louisiana 70170

For Defendant B&K             Simon, Peragine, Smith &
Construction Co., Inc.:        Redfearn, LLP
                             By:  HERMAN HOFFMANN, JR., ESQ.
                             Energy Centre
                             1100 Poydras Street, 30th Floor
                             New Orleans, Louisiana 70163

For the United States of    U.S. Department of Justice
America:                    Torts Branch, Civil Division
                             (BY TELEPHONE)
                             By:  TRACI L. COLQUETTE, ESQ.
                             By:  ROBIN SMITH, ESQ.
                             By:  CATHERINE J. FINNEGAN, ESQ.
                             Benjamin Franklin Station
                             P.O. Box 888
                             Washington, DC 20044

Court Audio Operator:       Cindy Usner

Transcriptionist:           Dorothy Bourgeois
                             c/o U.S. District Court
                             500 Poydras Street, Room C151
                             New Orleans, Louisiana 70130
                             (504) 589-7721

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

**I N D E X**

PLAINTIFF O'DWYER EXHIBITS:                    Marked      Received

No. 1   Photograph                              23          23

No. 2   Photograph                              23          23

4

```
 1                    P R O C E E D I N G S

 2                  (Wednesday, April 19, 2006)

 3                  (Call to Order of the Court)

 4            THE COURT:  Good afternoon.  The Government is going

 5   to be participating by phone.

 6            All right.  Can you hear us?

 7            MS. COLQUETTE:  Yes, we can.

 8            THE COURT:  All right.  We're about to start.

 9            All right.  Sheena, do you want to announce the case?

10            THE CLERK:  Yes.  This is Civil Action 05-4182,

11   Section "K", Berthelot v. Boh Brothers, et al.

12            THE COURT:  Okay.  Do you want to make our

13   appearances, please.

14            MR. BECNEL:  Daniel Becnel on behalf of the

15   Plaintiffs' Management Committee, Interim.

16            MR. LAMBERT:  And Hugh Lambert, Your Honor, on behalf

17   of the Committee.

18            THE COURT:  Okay.

19            MR. SCALIA:  David Scalia on behalf of the Committee,

20   Your Honor.

21            THE COURT:  Thank you.

22            MR. O'DWYER:  Ashton O'Dwyer for Plaintiffs in 05-

23   4181, Your Honor.

24            THE COURT:  Thank you.

25            MR. RIESS:  Good afternoon, Your Honor, Michael Riess
```

1   on behalf of Boh Brothers.  I was asked to attend by a phone

2   call from your law clerk.

3            THE COURT:  Yes.

4            MR. RIESS:  So I'm here today.

5            THE COURT:  Yes.

6            MR. RIESS:  On behalf of Boh Brothers in the cases

7   where Boh Brothers is a named Defendant in these cases.

8            THE COURT:  Yes, thank you.  Anyone else?

9            Would the Government make its appearance, please?

10           MS. COLQUETTE:  Thank you, Your Honor.  Traci

11  Colquette on behalf of the United States.  Also with me here on

12  the call are Robin Smith, Cat Finnegan and an intern from our

13  office, Katie Schlear (phonetic).

14           THE COURT:  Thank you.  The Court -- first I want to

15  state that Judge Wilkinson who has been handling discovery very

16  ably in my opinion, has been ill and is still ill.  We thought

17  he might have to have surgery but we are hoping that that won't

18  have to occur.  He is presently at home and that is the reason

19  that I'm conducting these hearings.

20           I am allowing the Government to appear telephonically

21  because of the expedited nature of these hearings -- of this

22  hearing and because of obviously the remote location.  The

23  reason I did an expedited hearing is because it's a Motion to

24  Vacate and we wanted to determine if the motion because of

25  mootness, and we wanted to determine if the matter was actually

1    moot, and apparently -- and I wanted to determine who agreed

2    and who didn't agree.  I know that Mr. O'Dwyer -- we didn't

3    give him a lot of time but he did file an opposition which I

4    have read.  I had a conference and I have read it.

5           I read it very quickly, Mr. O'Dwyer, just to let you

6    know.  I perhaps need to read it in a little more detail.

7           At this point what we are really talking about as I

8    understand it, the motion that we're attempting to vacate is a

9    Motion to Compel with reference to the 17th Street Canal

10   breach.  That's Mr. O'Dwyer's motion.

11          Is that everybody's understanding, just to make sure

12   I'm on the same page?

13          MS. COLQUETTE:  Yes, Your Honor.  The United States

14   had moved to vacate the hearing on Mr. O'Dwyer's Motion to

15   Compel evidence at the 17th Street site.

16          THE COURT:  All right.  Yes, sir, Mr. O'Dwyer?

17          MR. O'DWYER:  Your Honor, I just want to make a

18   subtle distinction.  I think the Motion to Vacate is directed

19   to the hearing rather than to the merits of the motion.  In

20   other words, we won't know what evidence is at 17th Street

21   still until we go back and see what Boh Brothers actually

22   starts doing.  Obviously, my clients' rights with respect to

23   that evidence are preserved until such time as it is either

24   shown to us or not shown to us.

25          THE COURT:  Okay.  I'm just trying to determine the

1   scope of the -- why doesn't the Government articulate what it

2   has in its memorandum but for the record what is the Government

3   attempting to vacate?

4           MS. COLQUETTE:  Your Honor, the Motion to Vacate was

5   directed at the hearing.  Mr. O'Dwyer filed a Motion to Compel

6   evidence at the 17th Street site.  We responded to that in

7   Document Number 357 opposing that motion for three grounds but

8   primarily because we believe that it's moot.  We then filed

9   Docket Number 358 which is a Motion to Vacate the hearing that

10  was set to discuss Mr. O'Dwyer's Motion to Compel evidence at

11  the 17th Street site.

12          We would disagree with Mr. O'Dwyer though that the

13  Motion to Compel cannot be decided at this time.  We have

14  responded to that and feel that the motion itself is moot.

15          THE COURT:  Just to reiterate what the motion states,

16  Mr. O'Dwyer's motion:  He sought to produce the following

17  evidence for observation and inspection by the Plaintiff's

18  Counsel and his expert, or singular or plural:  The concrete

19  monolith panels currently at the site and particularly the left

20  and right edges of those concrete panels and the bottoms of the

21  panels where the concrete makes contact with the sheet piles.

22  That's number one.

23          Number two:  The concrete monolith panels which were

24  excavated and removed from the site some time prior to May 2nd,

25  2006.

8

1          Number three:  The poly vinyl chloride water stops

2   which were installed between concrete monolith panels at the

3   17th Street Canal breach site.

4          And four:  The in place sheet piles, many of which

5   are currently buried by mud and riff-raff at the 17th Street

6   Canal breach site.

7          All of the aforegoing evidence has been described by

8   Counsel for the Government.  Those are the four things he's

9   talking about.

10          It's my further understanding that a protocol has

11   been proposed at least, that would relate to all of this.

12   Whether it's satisfactory or not, I kind of want to get on the

13   record to the Plaintiff's Committee and then to get precisely

14   from Mr. O'Dwyer on the record, he has filed an opposition, but

15   to get on the record what his opposition is, relative or why

16   this motion or the hearing, why the hearing is not moot.  Let's

17   talk about the hearing first of all.  The hearing is not moot.

18          So, it's the Government's position as I understand it

19   that the hearing is moot and let me make sure I state your

20   position correctly.  If I do not, please correct me then we can

21   have other people speak.  It's my understanding that the

22   Government says number one is moot, that that's the concrete

23   monolith panels currently at the site and the edges and the

24   bottoms, because there is an agreement and the protocol so

25   provides that that specific request can be accommodated.  It's

 1   my understanding.

 2            MS. COLQUETTE:  Your Honor, that is basically correct

 3   there.  I would break that request down into two sections.  One

 4   I think addresses the edges of the monoliths and I think that

 5   and I don't -- I haven't submitted the 17th Street protocol to

 6   memory but I believe it is feasible to allow Mr. O'Dwyer and

 7   whoever else wants to go see the edges to do that.

 8            The second part of the request would be to see the

 9   bottoms and as is set out in great detail in the 17th Street

10   protocol, we set forth what we believe can feasibly be done to

11   accommodate that request.  But I think there's no guarantee

12   that that request can be (inaudible).

13            THE COURT:  Okay.  So request number -- in looking at

14   the protocol, request number one when we talk about the edges

15   and the sides, that's one thing.  And I'm looking at the

16   protocol.  Can the connections of the existing concrete

17   monoliths where they meet the existing sheeting at the 17th

18   Street Canal be made available for inspection and

19   photographing?

20            And there is some equivocation in the protocol there

21   as to whether that is feasible.  An attempt will be made to do

22   that and it's rather elaborate.  Is that what you're talking

23   about, part two of the protocol?  Number two of the protocol?

24   Or do you have it with you?

25            MS. COLQUETTE:  I do have it with me, Your Honor.  I

1    believe that is correct.  I think Mr. Riess is also present?

2              THE COURT:  He is.  He is present and he's standing.

3              MS. COLQUETTE:  Okay.  And he can probably addresses

4    this --

5              THE COURT:  All right.

6              MS. COLQUETTE:  -- probably far better than I can.

7              THE COURT:  All right.

8              MS. COLQUETTE:  But I believe what you just said was

9    correct.

10             THE COURT:  All right.  Mr. Riess.

11             MR. RIESS:  Sure.

12             THE COURT:  And we're going to let everybody -- we

13   have enough time for everybody.  Go ahead, Mr. Riess.

14             MR. RIESS:  Sure, Your Honor, Michael Riess on behalf

15   of Boh Brothers.

16             Your Honor, pursuant to my verbal response and report

17   back to the Court on May 12th when we had the joint session

18   between all Defense Counsel --

19             THE COURT:  Yes.

20             MR. RIESS:  -- and Judge Wilkinson and yourself, I

21   agreed to confirm in writing that which we had called a work

22   protocol for the inspection of certain evidence that the

23   Plaintiffs' Committee through Mr. Lambert and through

24   Mr. O'Dwyer wanted to see and inspect at the current 17th

25   Street Canal breach site and current work that's ongoing there.

1          I think I can summarize it.  You're obviously looking

2  at a copy of my report.

3          THE COURT:  I am, sir.

4          MR. RIESS:  Which is dated May 16, 2006.  I think,

5  and I'll ask you and Mr. O'Dwyer to confirm this, with respect

6  to item number one, the opportunity to inspect the edges and

7  the sides of the concrete monoliths at the 17th Street Canal;

8  the answer was as I verbally said and confirmed it in writing:

9  Yes, that could be made available.  That's not an issue of

10  dispute.

11          Is that correct?

12          MR. LAMBERT:  That's correct, Your Honor; Hugh

13  Lambert on behalf of the Committee.

14          THE COURT:  Thank you.

15          MR. O'DWYER:  My clients and I will be satisfied if

16  Boh Brothers does what it says it's going to do with respect to

17  the still existing monoliths and joints between monoliths, part

18  one.

19          THE COURT:  Thank you.

20          MR. RIESS:  Okay.  And Your Honor, then I would --

21  we'll skip over number two but I'm going to come back to that,

22  meaning the second question raised or second topic item in my

23  letter of work protocol:  There is an agreement I believe,

24  Your Honor, but again I'll ask Mr. Lambert and Mr. O'Dwyer, who

25  I conferred with and as per the Court's directive:  Please send

1   this and try to come to a joint agreement.

2           I believe that we came to a joint agreement as I

3   reference in the paragraph immediately after the section three.

4   This will be the framework under which Plaintiffs'

5   representatives shall be permitted to inspect and view any

6   demolition removal excavation of the failed eye wall system is

7   what we call is.  And I believe there is an agreement on items

8   three and four of the work protocol.

9           Mr. Lambert?

10          MR. LAMBERT:  That's correct, Your Honor.  And that

11  includes notification of work that's been accomplished and

12  then as we discussed when Your Honor and Judge Wilkinson were

13  also --

14          MS. COLQUETTE:  Hello?

15          THE COURT:  Yes, can you hear us?

16          If you could speak up, maybe speak into the

17  microphone, please.

18          MR. LAMBERT:  Yes, sir.

19          THE COURT:  So that Counsel can hear on the

20  telephone.

21          MR. RIESS:  Can you hear me here, Your Honor?  Or do

22  I need to go over there?

23          THE COURT:  No, no.  I think you -- I believe you

24  can.  Can you hear Mr. Riess?  Could the Government hear

25  Mr. Riess when he spoke?

1          MS. COLQUETTE:  We could hear Mr. Riess.

2          THE COURT:  All right.  Here is Mr. Lambert.

3          MS. COLQUETTE:  Mr. Lambert cut out there for a

4   second.

5          THE COURT:  Okay, all right.

6          MR. LAMBERT:  All right.  Can you hear me now?  Is

7   this better?

8          MS. COLQUETTE:  We can hear him now.

9          THE COURT:  Okay.

10          MR. LAMBERT:  Okay.  The protocol calls for

11   notification of work performed, that's been performed on the

12   day before.  And then on a forward looking three to five days,

13   depending on the scheduling that Boh Brothers is able to

14   provide us with, which includes how they marshal their

15   equipment and what they plan to do; and that's perfectly

16   acceptable.

17          On the 17th Street Canal, and I was looking through

18   your letter just a second ago, I know we had agreed on four

19   people for the Plaintiffs and --

20          MR. RIESS:  Four Plaintiffs' attorneys and four

21   representatives, eight total.

22          MR. LAMBERT:  Right.  Four Plaintiffs, that's

23   correct.

24          And I had a discussion with both Ms. Finnegan as well

25   as -- let's see, another attorney from the U.S., who wanted to

14

1    limit it to three on the London Avenue Canal, but that might

2    not have to do with this hearing.  And I just want to give you

3    a heads up, we need four.

4                THE COURT:  Okay.

5                MR. LAMBERT:  But the point is, is that yes, that's

6    been agreed to and clearly we reserve our rights if there's a

7    problem in connection with either the scheduling or with the

8    execution --

9                THE COURT:  Certainly.

10               MR. LAMBERT:  -- to come into court and argue an

11   enforcement, but we haven't given that up.

12               THE COURT:  Right.

13               MR. LAMBERT:  But I mean we're clear on the protocol.

14               THE COURT:  Right.

15               MR. RIESS:  And Your Honor, that's in my conclusion

16   section.

17               MR. LAMBERT:  It is.

18               MR. RIESS:  If either party is not happy --

19               THE COURT:  Right.

20               MR. RIESS:  -- they deserve the right to come back

21   and say --

22               THE COURT:  Or if the Plaintiff brings out 15 people,

23   certainly.  It works both ways.

24               MR. LAMBERT:  Exactly.

25               THE COURT:  The protocol is simply a protocol.

1              MR. LAMBERT:  That's exactly.

2              THE COURT:  It's not a -- now, let me ask you a

3    question.  I want to tie this into Mr. O'Dwyer's -- and I'm

4    going to let you speak too, Mr. O'Dwyer -- to Mr. O'Dwyer's

5    Motion to Compel.  We talked about number one and we haven't --

6    we talked about number one in his motion and we didn't talk

7    about the bottoms, in essence.

8              Number two is the concrete monolith panels which were

9    excavated and removed from the site some time prior to May 2nd.

10   It's my understanding that these are destroyed?

11             MS. COLQUETTE:  That is correct, Your Honor.

12             THE COURT:  All right.  So, there's nothing to

13   observe.

14             MR. LAMBERT:  We don't want to look at the rubble.

15             THE COURT:  All right.

16             MS. COLQUETTE:  That's correct.

17             THE COURT:  All right.  Number three was the water

18   stops.  Now, how does that relate to what you've talked about,

19   Mr. Riess?

20             MR. RIESS:  Sure.  Right now there are either 12 or

21   13, I'm not really sure of the exact count, monoliths still

22   intact at the site.  They are in 30 foot sections and either

23   there are 12 or 13 left.  Some are buried so you can't really

24   tell but that's the best guess.  And in between some of these

25   monoliths, which quite honestly some of them are still standing

1  in the air and you can see, they have the water stops which

2  nothing more than the edge between these monoliths --

3          THE COURT:  Right.

4          MR. RIESS:  -- at the point above -- I won't go into

5  any further detail.  It's the edges.  It's between the concrete

6  monoliths.

7          THE COURT:  So, if one can see the edges one can see

8  the water stops?

9          MR. RIESS:  Exactly.

10         THE COURT:  Now Mr. O'Dwyer, may I ask you -- ask you

11 that:  Do you have any problem, complaint or --

12         MR. O'DWYER:  No, sir.  We're in basic agreement on

13 item one of the protocol, and I've said that on the record.

14         THE COURT:  And then you --

15         MR. O'DWYER:  If he does what he says his client will

16 do, we will be satisfied.

17         THE COURT:  And does that also -- and so your Motion

18 to Compel insofar as it relates to the water stops; if he

19 complies with what he's done in that Motion to Compel, would be

20 allayed?

21         MR. O'DWYER:  It will be satisfied assuming the water

22 stops that were removed from the north and south ends of the

23 breach have indeed been destroyed.  If they still exist, I

24 expect the Government to tell me where I can go look at them.

25         THE COURT:  Right.  I understand.  I don't know what

1    exists and what doesn't, but all right.  Number three was in

2    the in sheet -- in place sheet piles buried by mud and riff-

3    raff.  How does that relate to what we're talking about in the

4    protocols and what we have agreed to do?

5            MR. RIESS:  I believe that covers my item number two,

6    Ashton, which is -- do you want to see the connections?  Is

7    that the description?

8            MR. O'DWYER:  Your Honor, before we get to the sheet

9    piles, we have to get to the bottoms of the panels where the

10   concrete has the sheet piles embedded in it.  And if Your Honor

11   wishes to take that matter up, I have a photograph that could

12   probably illuminate the issue for you.

13           THE COURT:  I am going to take that matter up, I'm

14   just going to set the stage right now.  So I understand it,

15   your request number one which asks for the bottom of the panels

16   is discrete from your request number four which relates to the

17   actual in place sheet piles?

18           MR. O'DWYER:  Correct, Your Honor.

19           THE COURT:  And as I understand it, Mr. Riess and to

20   the Government and Plaintiffs' Counsel, the protocol envisions

21   I'm assuming the bottom of the panel and the in place sheet

22   piles being viewed as one.  Explain that to me a little bit.

23           MR. RIESS:  Sure.  Item number two covers both

24   topics.

25           THE COURT:  Of the protocol, yes, sir.

1          MR. RIESS:  Of my work protocol; and when I say "my

2    work protocol," of the protocol that we reported back to the

3    Court.  And I put in here so there's no issue, Mr. Lambert and

4    Mr. O'Dwyer did not agree to my version, if you will, of

5    reporting back to the Court that which we think, when I

6    explained to Your Honor, I think that we can preserve the

7    connections.  I think we can expose the connections.  Let me

8    elaborate.

9          But to answer your question directly, yes, that's the

10   issue.  That is what we, Boh Brothers, will try to do is to

11   expose the connections.  As part of my job we must destroy the

12   old monoliths and remove the old sheeting and necessarily to do

13   that you have to dig down to get it.  Here is how it's going to

14   be done.  I have reconfirmed this with Boh Brothers this

15   morning.  The Corps' contract requires Boh Brothers to put and

16   install coffer dams in 70 foot sections.  The breach site is

17   about 600 feet.  We have about 12 to 13 monoliths still left.

18         In the 70 foot sections we have to install a coffer

19   dam to parallel 17th Street Canal waterway.  We'll put a box

20   around the area to be quote, excavated.  So a 65 feet into the

21   Lakeview area there's going to be the other side of the coffer

22   dam.  We're going to put metal struts as per our contract and

23   directive through the monoliths, so we necessarily have to

24   compromise the integrity of the monoliths at that point in

25   time.

1        The reason for it is we have to stabilize it.

2   Mr. Guinn (phonetic), who is with Eustis Engineering is very

3   concerned that if we don't build this 70 foot coffer dam and do

4   it in roving 70 foot sections and install the struts through

5   the monoliths, these concrete struts, that the entire area may

6   fail and we may flood Lakeview again, which of course nobody

7   wants any part of.  I see Ms. Daly over here and I see --

8        THE COURT:  No question.

9        MR. RIESS:  And so that's the concern and so that's

10  why we're building the coffer dams.  The next procedure we will

11  do as per the work protocol is we have the 6,000 pound

12  vibration hammer.  And we will break down the monoliths to that

13  area past the struts.  The struts will remain in place, you've

14  got to hold that coffer dam in place so nothing is moved, the

15  soil doesn't move, and we will get down to that level by way of

16  the vibration hammer and a backhoe digging out to get to that

17  point where the connections are.

18        The steel sheeting has been poured years ago and made

19  a part of the existing sheeting.  It's two separate jobs but

20  now they were one.

21        MR. LAMBERT:  You mean the sheeting was there and

22  then the monolith was poured?

23        MR. RIESS:  Exactly.  I'm sorry, yes.  The concrete

24  monolith was poured on top of the sheeting and so that's what

25  will be done.  We will do our best, but with a 6,000 pound

1   vibration hammer, to expose the connections.

2            THE COURT:  So as I understand it, going back to

3   Mr. O'Dwyer's Motion to Compel, the part of number one, his

4   Motion to Compel number one, the bottom of the monolith in

5   essence?

6            MR. RIESS:  Yes.

7            THE COURT:  And number --

8            MR. RIESS:  Or the connection.

9            THE COURT:  And number four are the connection --

10  number four, the sheet piles; you are attempting protocol --

11  number two of the protocol would relate to both of those

12  requests?

13           MR. RIESS:  Yes.

14           THE COURT:  Mr. Lambert?

15           MR. LAMBERT:  Yes.  My understanding of this process

16  is that we'll be informed when it's going to occur?

17           MR. RIESS:  Yes.

18           MR. LAMBERT:  We'll be invited and welcome to attend?

19           MR. RIESS:  Yes.

20           MR. LAMBERT:  And that when we get to the point of

21  the exposure of this union between the cement monolith and the

22  steel sheet pile, if it's possible at that point?

23           MR. RIESS:  Yes.

24           MR. LAMBERT:  Without compromising the safety of

25  either the individuals or the project, we'll be given an

1    opportunity to inspect and photograph the bottom of the sheet

2    -- I'm sorry.

3              MR. RIESS:  The edges.

4              MR. LAMBERT:  -- the bottom of the monolith and the

5    top of the sheet pile, the connection where it comes together,

6    and then that will be done in these 70 foot sections and then

7    the coffer dam is intended to do two things:  Stabilize and

8    then also to provide for this area to be drained because it's

9    constantly filling up with water?

10             MR. RIESS:  De-water it, right.

11             THE COURT:  And I'm going to ask a question that will

12   again --

13             MR. RIESS:  Mr. Lambert is correct.

14             THE COURT:  -- that will again show my abysmal

15   knowledge of the engineering required to do this.  But the

16   sheet piles that are in place, the in place sheet piles; what

17   is going to happen to them?

18             MR. RIESS:  They would pull them out.

19             THE COURT:  They're going to pull them out?

20             MR. LAMBERT:  Eventually, they will be pulled.

21             THE COURT:  So that there's no reason why Mr. O'Dwyer

22   or anyone else couldn't expect the sheet piles intact?

23             MR. LAMBERT:  After they come out.

24             MR. RIESS:  They will be intact.

25             THE COURT:  All right.

1          MR. RIESS:  The sheet pile --

2          MR. LAMBERT:  The point at --

3          MR. RIESS:  The sheet point will absolutely be

4    intact.

5          MR. LAMBERT:  Yeah.  The point is, is that this sheet

6    pile that we're --

7          THE COURT:  But the conjoining is the problem?

8          MR. LAMBERT:  Yeah.

9          THE COURT:  The conjoining?

10         MR. LAMBERT:  Yes.

11         MR. RIESS:  It's just concrete.

12         MR. LAMBERT:  The sheet pile that we're talking about

13   is not straight up and down any more, it's distorted in terms

14   of its position and as is the wall, obviously.  And so, after

15   they're exposed, inspected then separated in the demolition

16   process then the sheet pile itself will be removed and we can

17   inspect it, after it's out of the hole.

18         MR. RIESS:  Your Honor, you'll probably remember back

19   in December, 12/13, when there was an initial site visit there.

20   Sheets at the northern and southern ends were pulled -- the

21   northern and the southern end of the breach site were pulled

22   and measured because there was an issue about the length of the

23   sheet piles being 23 feet, three inches in length which were 23

24   feet, three inches in length.  And so they will be pulled, they

25   will be measured and they will be photographed.

1          THE COURT:  Okay.  Mr. O'Dwyer, since it's your

2   Motion to Compel which is attempting to be -- the hearing of

3   which it's attempting to be vacated, you might tell me your

4   argument reference the protocol and any problems that you're

5   having.

6          MR. O'DWYER:  Yes, sir, I'll try to be very brief,

7   concise and to the point.  Each word is pregnant with meaning.

8   Your Honor --

9          THE COURT:  Do you want to hand that up to me?

10         MR. O'DWYER:  Notwithstanding a lot of quote

11  "whooping and hollering," I hand Your Honor Exhibit O'Dwyer

12  Number 2 which is the only connection between sheet pile and a

13  concrete monolith panel that the Plaintiffs in this case have

14  been shown since August 29, 2005.

15         Every other connection has either been buried as is

16  depicted in photograph Exhibit O'Dwyer Number 1, so that the

17  connection is under riff-raff and debris and therefore

18  invisible, or they have been destroyed by the United States of

19  America and its agency and instrumentality, the Corps of

20  Engineers under the guise of levee repair.

21         Your Honor, Mr. Riess' statements on the record about

22  what Boh Brothers intends to do, we respectfully disagree with.

23  If Your Honor please, and if you look at the photograph O'Dwyer

24  Number 1, you will see --

25         THE COURT:  I am looking at it.

1     MR. O'DWYER:  -- a coffer dam in place in the

2  background.  That coffer dam -- and there's a conflict in my

3  mind here.  I don't know whether the sheet pile themselves are

4  65 feet long, driven to a depth of 50 feet, or whether the

5  sheet piles are in excess of 65 feet long and were actually

6  driven down 65 feet.  There is absolutely no reason why another

7  coffer dam need be constructed at 17th Street.  There is one

8  already in place as Your Honor can see from that photograph.

9     I have been required by Your Honor and Magistrate

10  Wilkinson, and this was a good idea and I think it's fine, to

11  submit evidence in forms of affidavits from my experts,

12  Mr. Bartlett and Mr. Pazos (phonetic).  That, I have done.

13  Anything we get from the Government filtered through Mr. Riess'

14  office working for Boh Brothers as a government contractor is

15  not an affidavit form.  Where does this motion of another

16  coffer dam come from?

17     And the objection that we have to part two of the

18  work protocol, as I articulated in a two page letter to

19  Mr. Riess dated May the 18th which is appended to my papers, is

20  you are going to destroy these monoliths under the guise of

21  preserving evidence and denying me the right to see the

22  connections before the monoliths are destroyed.  That's my

23  fear, that's what I'm reserving rights about.

24     THE COURT:  And I know you've set it forth in your

25  papers but what is your proposal to do that in a feasible

1   fashion?

2          MR. O'DWYER:  All right.

3          THE COURT:  In other words, you're concerned that the

4   methodology being utilized by Boh Brothers is going to destroy

5   the connection before you get to see it?

6          MR. O'DWYER:  Destroy the concrete.  Once you start

7   busting concrete, it's going to go to hell, all right

8   Your Honor.  Would you mind looking at -- I believe it's

9   photograph number one.

10         THE COURT:  I'm looking at it.

11         MR. O'DWYER:  The one that shows the patterns with

12  the coffer dams.

13         THE COURT:  I'm looking at it.

14         MR. O'DWYER:  And the coffer dam in the background.

15  That's it.  Your Honor, all that has to be done is to excavate

16  with men using shovels, about three or four feet of soil along

17  the edges of those concrete monolith panels to expose where

18  they join the sheet pile, where the concrete panels join the

19  sheet piles.

20         And the point that I made that maybe is so simple it

21  was lost on everybody; in order to pull the sheet piles after

22  the monoliths are destroyed, they've got to dig that hole and

23  move that dirt anyway, so what's the big deal?

24         THE COURT:  Okay, I understand.

25         MR. O'DWYER:  It's very simple.  It's not rocket

1   science.  We're not building the Aswan Dam.  I'm asking them to

2   dig a ditch.

3            THE COURT:  All right.

4            MR. O'DWYER:  And my experts say it can be done

5   safely and Mr. Pazos submitted an affidavit.  Mr. Bartlett's is

6   in letter form, but I could submit that to the Court in

7   affidavit form if Your Honor pleases.

8            THE COURT:  Thank you, sir.

9            Okay, any response to that?  Mr. Riess, the

10  Government?  Mr. O'Dwyer says it's feasible and we wouldn't

11  have the risk of --

12           MR. O'DWYER:  Destroying evidence under the guise of

13  preserving it.

14           THE COURT:  Well, I'm not saying that.  I'm assuming

15  everybody's an officer of the court and I'm assuming in good

16  faith --

17           MR. RIESS:  That's going to come up later too,

18  Your Honor.

19           THE COURT:  Yes, I understand it.  So we need to be

20  very careful about that.  We don't want to impinge people's

21  honor unless we have very, very, very, very significant

22  evidence.

23           Go ahead, sir.

24           MR. RIESS:  Your Honor, I would be in breach of my

25  contract, Boh Brothers contract with the Corps, if I quote "dug

1   a ditch" which is quote "not feasible, not safe."  It won't de-

2   water.  It will create a safety hazard.  It will delay the

3   project not weeks, not days, not -- it will delay it months.

4          THE COURT:  Well, what about Mr. O'Dwyer saying men

5   with shovels could do this in a few days?  Just tell me your --

6          MR. RIESS:  The monoliths are basically at zero grade

7   right now.  The connections are between minus 13 and minus 20

8   approximately.  It's not a question of two, three, five, ten,

9   20 people digging down a span of 20 feet.

10          THE COURT:  Even in O'Dwyer Number 1?  You've seen

11   this picture?

12          MR. RIESS:  Yes, he showed it to me before the

13   hearing.

14          THE COURT:  Right.

15          MR. RIESS:  Yes, sir.

16          THE COURT:  All right.

17          MR. RIESS:  It's not a question of digging down a

18   couple of shovels of dirt or even two, three, five hours with a

19   20 man crew.  You can't do it, it's not safe.  You need the

20   coffer dam.  That's why Mr. Guinn of Eustis Engineering, who is

21   the Corps consultant on this issue said, "I am very concerned

22   about the stability of the soil.  Build, excavate, demolish and

23   remove in 70 foot sections installing this coffer dam."  And

24   it's not a -- there's not a coffer dam out there.  There's a

25   temporary patch out there.  A coffer dam by definition is a

28

1    box.

2              MR. LAMBERT:  Okay.  That --

3              THE COURT:  Mr. Lambert is speaking.

4              MR. LAMBERT:  Excuse me, Your Honor.  I think that

5    maybe -- and I don't know --

6              THE COURT:  Well, I was going to ask what the

7    Plaintiffs' appointed Committee, what its view on this is, if

8    any?

9              MR. LAMBERT:  I do have a view and it has to do with

10   definitions, and I think maybe that's the problem.  What is in

11   the background in this photograph is literally the wall that

12   keeps the canal water in the 17th Street Canal out of the

13   neighborhood.  In other words, it's a temporary wall.  That's

14   not a coffer dam.  In other words, I think that there's a

15   problem with terms.  The coffer dam is another device, another

16   additional dam which is going to be built in small sections 70

17   feet long.  And I don't know how long this courtroom is, but

18   I've got a feeling that it's probably around 70 feet.

19             THE COURT:  At least.

20             MR. LAMBERT:  And so the point is, is that in a

21   smaller area than this there's going to be this box and the

22   reason for it is because when you dig down much further than

23   where this photograph shows the bottom of these panels, it

24   fills with water.  And so this box is intended to allow the

25   stabilization of this thing, as I understand it, and the de-

1    watering of it.  If I thought that it was possible to do this,

2    and as you know, we have to rely on the representations being

3    made.

4            I think the solution may be this:  We have

5    photographers and videographers.  If we go out to this site

6    after the coffer dam is constructed --

7            MR. RIESS:  You'll be advised when the coffer dam is

8    constructed.

9            MR. LAMBERT:  Exactly.

10           MR. RIESS:  In fact, you can go see the coffer dam

11   being constructed.

12           MR. LAMBERT:  No, I understand.

13           MR. RIESS:  Because that's going to be --

14           MR. LAMBERT:  But -- I understand.

15           MR. RIESS:  -- quote "work on the eye wall system."

16           MR. LAMBERT:  But here's what -- I'm just

17   interpreting what I'm being told.  But what I'm saying is, is

18   that if we go out there with our video equipment and our

19   photographers and the coffer dam is in place in the 70 foot

20   section, you're right.  I think the width of this room is more

21   like the 70 feet.

22           THE COURT:  Yes, the width would be slightly less

23   than 70 feet.

24           MR. LAMBERT:  Right.

25           THE COURT:  But the length is a great deal more.

1          MR. RIESS:  You're not a golfer, you don't know

2    distances.

3          MR. LAMBERT:  No, I'm really not doing well with

4    these distances.  But the point is, Your Honor, if this dam is

5    in place, the new one, the coffer dam, which is like a box and

6    the situation is de-watered, then really what is going to occur

7    is we're going to be allowed more access I think to the bottom

8    of those panels than we would if we did it with a shovel.

9          THE COURT:  So let me ask you this, Mr. Lambert:

10   From the Plaintiffs' Committee standpoint; and Mr. O'Dwyer is

11   not bound by that.

12         MR. LAMBERT:  No, he's not.

13         THE COURT:  And I understand that.  But I'm

14   interested in everybody's view.  From your standpoint is the

15   protocol suggested by Mr. Riess in reference number two, which

16   would relate to Mr. O'Dwyer's Motion to Compel numbers one and

17   four; does that seem to you a reasonable methodology as we

18   speak?

19         MR. LAMBERT:  Yes.  Based on what I've been told by

20   Boh Brothers through its Counsel and I have every reason to

21   believe it, and what I would ask that the Court do is simply

22   keep an open ear and if at the point in time when the

23   excavation takes place there's not the opportunity to view this

24   union between the bottom of the panels and the top the wall,

25   as we believe there will be, then at that point in time there

1  may be -- and then there's several of these so it's not like

2  there's just one, we should be able to come in on an expedited

3  basis.  Mr. O'Dwyer should have the ability to photograph this

4  and if he doesn't have it for some reason, I think there's an

5  opportunity to ask the Court to intervene.

6            THE COURT:  All right.

7            MR. RIESS:  No objection to that, Your Honor.  That's

8  the whole part of my conclusion.

9            THE COURT:  And would the Government like to say

10 anything or is Mr. Riess' comments sufficient?

11           MS. COLQUETTE:  Your Honor, we concur with Mr. Riess'

12 comments.  On May 10th there was a hearing in front of Judge

13 Wilkinson which addressed a number of these same issues.  At

14 the conclusion of that hearing Judge Wilkinson asked Counsel

15 for the United States and Mr. Riess who was present at that

16 hearing to report to the Court at a status conference on May

17 12th about what could be done to reasonably and feasibly

18 accommodate Mr. O'Dwyer.  I feel like we've done that.  The

19 17th Street protocol does that and the Mirabeau protocol, which

20 we're not talking about today, but we've done that in both

21 instances.  And these suggestions being made by Mr. O'Dwyer are

22 simply not feasible.

23           THE COURT:  Thank you.

24           Mr. O'Dwyer, I think that you have something.

25           MR. O'DWYER:  Yes, sir.  I can tell which way the

1    wind is blowing and I'll be very brief.  As long as my clients'

2    rights are preserved once we get out there, I would recall for

3    Your Honor's recollection what I said in my last sentence of my

4    memorandum, namely:  Plaintiffs respectfully submit that the

5    Government's Motion to Vacate should be denied and that

6    Plaintiff's Motion to Compel production of evidence should be

7    granted or held in abeyance until we can see what we can see or

8    can't see at 17th Street later this week.

9              My parting shot to my worthy opponents in this case

10   would be the following three sentences from Mr. Pazos in his

11   affidavit.

12             THE COURT:  Yes, sir.

13             MR. O'DWYER:  Quote:  "At the present time a coffer

14   dam installed since Katrina under the control of the United

15   States Army Corps of Engineers protects the area of the 17th

16   Street Canal breach site.  Therefore the presumption should be

17   that it is safe to excavate materials that were placed in the

18   breach site as a temporary patch post Katrina.  Unless the

19   USCAE has issued some sort of warning regarding possible

20   unsuitability of the existing coffer dam, which they ordered

21   constructed, there should be no need to construct a separate

22   new coffer dam as the work protocol is suggesting.

23   Furthermore, Boh Brothers must stick down with the connection

24   in order to remove the sheet piles, hence why does the work

25   protocol indicate concern quote "maybe" closed quote, regarding

1    the availability of the connections for simple inspection and

2    photographing, closed quote.

3            I got no countervailing affidavit either from the

4    Government or from Boh Brothers, Your Honor.

5            THE COURT:  Thank you, Mr. O'Dwyer.

6            Does anyone else have anything to say --

7            MR. BECNEL:  Let me just --

8            THE COURT:  -- or we're going to render something

9    very quickly.

10           MR. BECNEL:  Judge, Daniel Becnel.  We had an

11   opportunity yesterday to listen to the independent panel's

12   presentation for a number of hours at the Sheraton.

13   Mr. O'Dwyer was there and Mr. Meunier and myself and a number

14   of the interested lawyers.  There is a 500 page document that

15   was just downloaded and can be downloaded by anyone to read.  A

16   number of us met with the Professor B who was one of the

17   paneled authors.  A lot of it has to do with 17th Street Canal

18   and London and MRGO, the whole nine yards.

19           I've told Mister -- Mr. Bruno's office is making

20   copies of those.  We will give Mr. O'Dwyer a copy because you

21   need to download it with a PDF file and all kinds of things and

22   I think maybe after reading some of that, it might be

23   enlightening for all parties.  And so hopefully, I will get him

24   that today and then he can read it.

25           MR. LAMBERT:  Provide one to the Court.

1          MR. BECNEL:  Pardon?

2          MR. LAMBERT:  Provide one to the Court.

3          MR. BECNEL:  If the Court wants a copy.

4          THE COURT:  Certainly, certainly.

5          MR. BECNEL:  We can provide it to the Court.

6          THE COURT:  It will save me the time, I would

7    appreciate it.

8          MR. BECNEL:  And in fact, I've got some being made

9    now in Mr. Lambert's office right now because we've had the

10   machines working.

11         THE COURT:  That would be -- we certainly welcome any

12   additional information.

13         MR. BECNEL:  I would like at least to -- none of

14   these experts have worked for us as of today.  That may change

15   now.

16         THE COURT:  All right.  I understand.

17         MR. BECNEL:  Okay?

18         THE COURT:  All right.

19         MR. BECNEL:  So I'm just putting the parties on

20   notice --

21         THE COURT:  All right.

22         MR. BECNEL:  -- that that probably will change.

23         THE COURT:  All right.

24         MR. BECNEL:  Thank you.

25         THE COURT:  Thank you.

1          Question Mr. O'Dwyer?

2          MR. O'DWYER:  Your Honor, there is one last point

3   before we part company, and that is I wish to recall for

4   Your Honor's attention the fact that there are some missing

5   sheet pile at 17th Street.  The sheet piles are driven with an

6   interlocking mechanism on each edge.  And if you think of what

7   you think of when you think of a Chinese wall, think of

8   something rigid where the sheet pile meets the concrete an then

9   think of the interlocking of the sheet pile with each other.

10  And then if everything works the way the design has intended it

11  to work, think of the concrete panels as being non-load bearing

12  because the load is theoretically supposed to be borne by the

13  connection between the sheet pile and the concrete.

14          Well, if everything had worked as intended, then even

15  with a soils failure you might have gotten a little heave of

16  the wall, but it would have stayed together.  This wall came

17  completely apart in 58 different places in the Greater New

18  Orleans metropolitan area.  Something is seriously wrong here.

19  And the mechanical connection sheet piles both at the north and

20  south end of the breach are mysteriously missing.  Where are

21  they?  One of them, I know the number of, it's 23-1.  I've told

22  the Government we're looking for it and nobody can tell me

23  where they are.

24          THE COURT:  So I assume is that something that is

25  already before Judge Wilkinson?

1           MR. O'DWYER:  Yes, that's part of my 17th Street

2    Canal motion and that is a big question mark which we don't

3    have an answer to.  I didn't want my silence to think that --

4    to make -- to cause Your Honor to think that I'm still not

5    interested in those missing sheet piles.

6           THE COURT:  I understand completely.  With that, we

7    will take -- does anyone have anything else to say?

8           MR. RIESS:  Your Honor, I do.  And I reluctantly

9    stand but Your Honor, as an officer of the court I'm going to

10   phrase -- use your exact phraseology:  I have to bring to the

11   attention to the Court certain -- I'm going to directly quote

12   rather than paraphrase.  Mr. O'Dwyer's letter writing, the

13   brief writing and written correspondence in this case, I'm not

14   making a motion, I am asking the Court to admonish Mr. O'Dwyer

15   to please follow the rules of professional conduct, to please

16   try to get along with all Counsel in this case.  And you can

17   give me the same admonishment right back, and I'm happy to take

18   it.

19          But Your Honor, when Mr. O'Dwyer writes in Document

20   421, quote Page 7, "In Plaintiffs' supplemental memorandum in

21   support of their Motion for Leave to Amend undersigned Counsel

22   gave Magistrate Wilkinson the opportunity to be a gentleman

23   about the matter.  Magistrate -- Judge Wilkinson chose another

24   course."  That's in a pleading that was filed two days ago with

25   this Court.

1        The reason that I bring this up is after May 12th

2    hearing, on May 15th I received an e-mail from Mr. O'Dwyer that

3    reads in part:  "Are we going to see evidence before it is

4    destroyed or will Boh Brothers be complicit with the Corps of

5    Engineers in denying us the opportunity to see the evidence

6    before it is destroyed?  The proof of the pudding will be in

7    the eating.  I am serving you and Boh Brothers notice.  You had

8    better not damage any concrete where the monolith panels made

9    contact with the sheet pile before we have the opportunity to

10   inspect.  You may have pulled the wool over Duval's and

11   Wilkinson's eyes and confused what really is a simple issue but

12   you can't trick me."

13       Then in a subsequent e-mail Mr. O'Dwyer writes to me

14   and he says, quote:  "17th Street Canal and London Avenue South

15   are the only remaining locations where this evidence still

16   exists to my knowledge and what you have proposed to submit in

17   writing to the Magistrate is part of the Corps of Engineers,

18   quote, "cover up, closed quote of evidence even though you may

19   be used unwittingly as a tool or a foil for the Corps of

20   Engineers.  Let me raise another issue for you to think about,

21   Mr. Riess, I don't know whether you represent Boh Brothers or

22   Boh's insurers" -- excuse me, Boh Brothers underwriters -- "it

23   may be that Boh Brothers corporate interest in following Corps

24   of Engineers orders and telling you what to write are in

25   conflict with the interests of Boh Brothers liability

1   underwriters.  Think about that, Mike."

2        Your Honor, if I have interpreted Mr. O'Dwyer's

3   comments he has suggested in not so subtle terms that when I

4   was in this court on May 12th, I pulled the wool over two

5   federal judges' eyes.  He has raised the conflict issue that I

6   am not -- I have a conflict and I guess I should put my

7   malpractice carrier on notice.  I do not believe that the rules

8   of this Court would condone such practices of writing those

9   types of letters and writing that type of pleading.  And quite

10  honestly, after conferring with my client, they have asked me

11  to bring this to the attention of the Court.

12       Thank you, Your Honor.

13       THE COURT:  Okay.  Mr. O'Dwyer, is there anything

14  you'd like to say since you've been --

15       MR. O'DWYER:  I don't have anything to say,

16  Your Honor.  I haven't done anything I'm ashamed of and I

17  haven't done anything in violation of any rules, ethics, or

18  professional guidelines.

19       THE COURT:  All right.  The Court would --

20       MR. O'DWYER:  We're all big boys.

21       THE COURT:  The Court -- we are.  And I'll say this:

22  Too much vitriol and vituperativeness, you might as well be

23  writing your briefs in Chinese.  And if it gets too much or too

24  outlandish, I demand professionalism.  And today has been very

25  professional.  Today has been a fine hearing which everybody

1    made their points.  But I can tell you if I see too much

2    demonizing -- I'm going to assume all of you are demons, sir.

3    I only go, as I said earlier, facts and law.  So too much

4    vitriol is unprofessional, it aggrandizes one's own narcissism,

5    it is indulgence and unpersuasive.

6           It's okay to make a literary metaphor I guess if the

7    Judge is in Plato's cave.  And if the Judge has a sense of

8    humor and a sense of literary irony and Greek mythology -- well

9    not mythology actually it's -- it's actually written by an

10   unmythical person, Plato.  And the Judge has read Plato's

11   Republic about a year ago for the second time, so I'm familiar

12   with it.  But it's not flattering, sir.  There's probably a

13   less self-indulgent way to make that point, because -- but I

14   don't take that as mean spirited, Mr. O'Dwyer.

15          MR. O'DWYER:  Thank you, Your Honor.

16          THE COURT:  A cumulative amount of it would

17   ultimately get under my neck, get under my skin, but I don't

18   think it was intended that way.  But some of the things

19   Mr. Riess has said, one could take umbrage at.  So, I think

20   it's a very good point because if you want to persuade this

21   Court, and by the way this Court is going to be the Court in

22   that the recusal order has been denied by the Fifth Circuit.

23   The Motion to Recuse and the mandamus, both of which have been

24   denied.

25          MR. BECNEL:  That's been denied.

1          MR. RIESS:  Right.

2          THE COURT:  So I'm here for a while.

3          MR. BECNEL:  Judge, I think -- I think we would like

4    to report to the Court that not only will we meet with any and

5    all lawyers, we just haven't had a chance to get everybody in a

6    big room.  Mr. Lambert yesterday met with Mr. Cummings, who I

7    don't think has filed a suit yet but is one of the interested

8    parties.  We're even going to meet with people who want to

9    contribute and are not even on file yet.

10          THE COURT:  Our umbrella -- our tent is not yet full

11   and I understand that.  And I'm sure everybody is acting in

12   what they think is their best interest and the best interest of

13   their clients but we have to be zealous, no question.  But

14   civility is far more persuasive than incivility.

15          With that, and we thank the Government for

16   participating.

17          MR. RIESS:  Could I --

18          THE COURT:  We are adjourned --

19          MR. RIESS:  Could I bring one issue?

20          THE COURT:  All right.

21          MR. RIESS:  I'm just going to frame one issue for

22   Your Honor --

23          THE COURT:  Yes.

24          MR. RIESS:  -- if I can, please?

25          THE COURT:  Yes, please.

1          MR. RIESS:  Okay.

2          THE COURT:  I don't want to adjourn prematurely.  Go

3     ahead.

4          MR. RIESS:  I am going to be sending to Plaintiff's

5     liaison counsel and which you please told me to send it to, to

6     frame the issue.  Boh Brothers has preemption motions it would

7     like to file before it gets the Government contractor immunity

8     and other motions to lockset the motions because we don't

9     believe there is going to be discovery on quote "preemption

10    motions."  I believe Mr. Hoffmann's client, myself and maybe

11    Majeski, Masters & Eustis and B&K, five total.

12         MR. HOFFMANN:  I think there are five.

13         MR. RIESS:  There will be five total preemption

14    motions of the whole enchilada of Defendants in this case, is

15    my understanding.  I could be off by one or two.  And what we

16    would like to do is present to you a motion so we can represent

17    to the Court there's no objection to permitting those

18    Defendants who have preemption motions to file first.  And you

19    don't have to give an answer, but I'm just saying I'm sending

20    them to you.

21         MR. LAMBERT:  No, I understand.  And I'd like for you

22    to send it to Joe Bruno's office and to mine.

23         MR. RIESS:  Okay.  I'll send it to you, Mr. O'Dwyer,

24    as well.

25         MR. LAMBERT:  And Mr. O'Dwyer.

1              MR. RIESS:  Okay.

2              THE COURT:  All right.

3              MR. LAMBERT:  And we'll distribute them.

4              MR. BECNEL:  And Your Honor, the preemption motion is

5    only because we just addressed it for months in both the <u>Guiden</u>

6    and <u>Metronics</u> cases and have extensive discovery ordered by two

7    MDL judges dealing with preemption.  We don't think they should

8    be decided prior to two things:  One, initial discovery dealing

9    with the preemption issue; and two, oral argument to this Court

10   on preemption because that's a big enchilada.

11             THE COURT:  Well, we're certainly going to have oral

12   argument.  That's --

13             MR. BECNEL:  You've already stated that.

14             THE COURT:  Oh, absolutely.  With that, I'm going to

15   -- let me rule on this matter while the Government is here.

16   I'm going to grant the Motion to Vacate based on all the

17   evidence I've heard here today.  Based on the fact that in good

18   faith representations are made to at least, except for the

19   evidence that has been destroyed and that will have to be dealt

20   with at a later time if it's relevant at all.  But insofar as

21   the evidence that's extant that's in Mr. O'Dwyer's Motion to

22   Compel and part of the protocol, the Court is going to vacate

23   the hearing on the Motion to Compel.

24             But I'm not going to dismiss the Motion to Compel.

25   I'm going to -- the Motion to Compel will be -- remain, and I'm

43

1  going to -- I may set it for like two months from now so that

2  if Mr. O'Dwyer does not feel like, I think it would be

3  premature to dismiss it.  If Mr. O'Dwyer does not feel like the

4  motion has been produced we can actually move on the Motion to

5  Compel.  So, we'll do a minute entry setting it at some future

6  date.  All right?

7          MR. RIESS:  Thank you, Your Honor.

8          MR. O'DWYER:  Thank you, Your Honor.

9          MR. LAMBERT:  Thank you, Your Honor.

10         THE COURT:  All right, thank you.

11         MS. COLQUETTE:  Thank you, Your Honor.

12         THE COURT:  Thank you.  All right.  We're adjourned.

13                  *   *   *   *   *

14              (Hearing is Concluded)

15

16

17

18

19

20

21

22

23

24

25

44

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceeding in the

above-entitled matter.

**/s/Dorothy M. Bourgeois**                    **_9/6/06_**
**Dorothy M. Bourgeois**                       **Date**