**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION** | § **CIVIL ACTION**<br>§ **No. 05-4182 "K"(2)**<br>§<br>§ **JUDGE DUVAL**<br>§ **MAG. WILKINSON**<br>§ |
| **PERTAINS TO: MRGO, *Reed*, No. 06-2152**<br>**MRGO, *Ackerson*, No. 06-4066** | §<br>§<br>§<br>§ |

**MEMORANDUM OF LAW IN SUPPORT OF THE DREDGING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(c)**

Defendants Bean Dredging, L.L.C.; C.F. Bean L.L.C.; Bean Stuyvesant, L.L.C.; Stuyvesant Dredging Company; Stuyvesant Dredging, Inc.; Royal Boskalis Westminster N.V., in their own right and as successors to Bean Dredging Corporation; C.F. Bean Corporation; Bean Horizon Corporation; Bean Horizon L.L.C.; Gulf Coast Trailing Company; T.L. James & Company, Inc.; TLJIC, L.L.C., on its on behalf and as successor by merger to T.L. James Marine, Inc. and T.L. James Marine, L.L.C.; Great Lakes Dredge & Dock Company; Great Lakes Dredge & Dock Company, L.L.C. of Louisiana; Great Lakes Dredge & Dock Corporation of Delaware; Natco Dredging Limited Partnership; Great Lakes Trailing Company; Weeks Marine, Inc.; Mike Hooks, Inc.; Luhr Bros. Inc.; Pine Bluff Sand and Gravel Company; and



NO NMS 122409 v1
2902907-000001

King Fisher Marine Service, L.P. (collectively the "Dredging Defendants") submit this memorandum of law in support of their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(c).[1]

Plaintiffs' claims against the Dredging Defendants in the *Reed* (No. 06-2152) and *Ackerson* (No. 06-4066) actions[2] are barred by multiple forms of government contractor immunity.

First, Plaintiffs' claims must be dismissed pursuant to Rule 12(b)(1) because they challenge Congress's decision to construct and maintain the Mississippi River Gulf Outlet ("MRGO"), and the implementation of that decision by the United States Army Corps of Engineers ("COE") and its contractors. This Court lacks jurisdiction to entertain such claims. Congress ordered the COE to construct, operate, and maintain the MRGO. The COE and its contractors—including the Dredging Defendants—cannot be sued for their actions.

Second, the Flood Control Act and discretionary function exception both bar Plaintiffs' claims. The Flood Control Act provides absolute immunity for flood damages, and Plaintiffs expressly and repeatedly allege that their damages were caused by flood waters.[3] In addition, sovereign immunity precludes suit for damages caused by the Government's performance of discretionary functions, including the COE's undertaking of navigational improvements in the MRGO and hiring contractors like the Dredging Defendants. The Dredging Defendants share the Government's sovereign immunity because they dredged the MRGO under the authority and

---

1 The Dredging Defendants advise the Court that they are considering whether to file proceedings pursuant to the Limitation of Liability Act.

2 The *Reed* and *Ackerson* Complaints are identical in all respects relevant to this motion, including the numbering of all cited paragraphs. As such, this Memorandum includes a single citation ("Compl. ¶__") to refer to the relevant paragraphs in both Complaints.

3 *See* Compl. ¶¶ 1, 2, 21-23.

direction of the COE. Because the Court cannot review Congress's decision, Plaintiffs' claims should be dismissed for lack of jurisdiction.

Finally, even if Plaintiffs' claims were not jurisdictionally barred, the Dredging Defendants should be dismissed from this case under Rule 12(c) because government contractors are immune from suit for defects in plans or specifications provided by the Government. Plaintiffs' allegations establish that the Dredging Defendants performed their contracts as per requirements provided by the COE. As such, even if the Government is potentially liable in this suit, the Dredging Defendants are not. Plaintiffs' claims should be dismissed.

**BACKGROUND**

Plaintiffs bring suit to recover "damages suffered by Plaintiffs and the class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the Defendants' maritime activities in the Mississippi River Gulf Outlet ("MRGO") from 1958 through August 29, 2005."[4] The Complaints allege that Plaintiffs and residents of the "four protected basins or 'Polders' that make up the flood protection system of the New Orleans region" sustained damage "by waters that flooded the New Orleans metropolitan area."[5] Plaintiffs complain that the MRGO "intensified the initial [storm] surge by 20%, raised the height of the wall of water about three feet, and increased the velocity of the surge from 3 feet per second to 8 feet per second" because it was designed in such a way that it created a funnel through which the storm surge approached the city of New Orleans.[6] Plaintiffs further allege "this contributed to the scouring that

---

4 *See* Compl. ¶¶ 1, 2, 8-22 (emphasis added).

5 *Id.* ¶¶ 2, 23.

6 *Id.* ¶ 22.

undermined the levees and floodwalls along the MRGO and the Industrial Canal" and "without MRGO" the "complete devastation of St. Bernard Parish and areas of Orleans Parish would not have occurred."[7]

Plaintiffs claim that the "negligence of the United States of America arises out of its maritime activities, connected to the construction, continuing dredging and maintenance of the MRGO as a navigable channel, and carried out by the United States of America's own fleet of dredging vessels and by fleets of dredging vessels owned by the other Defendants, pursuant to maritime dredging contracts between them."[8] Plaintiffs allege that the construction, dredging and maintenance of MRGO by the COE and its contractors as specifically legislated by Congress in the Rivers and Harbors Act of 1956 and subsequent legislation, constituted negligence, breach of an implied warranty, concealment and a violation of the Federal Water Pollution Control Act.[9]

Plaintiffs do not claim, however, that the Dredging Defendants designed or constructed the MRGO. Plaintiffs merely allege that they performed maintenance dredging on behalf of the COE between 1993 and 2005 pursuant to specific government contracts.[10]

**STANDARD OF REVIEW**

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) should be granted when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."[11] When deciding a 12(b)(1) motion, a

---

7 *Id.*

8 *Id.* ¶ 4.

9 *Id.* ¶¶ 7, 31-45.

10 *Id.* ¶¶ 16-17.

11 *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

court may rely upon the complaint, undisputed facts in the record, and disputed facts resolved by the court.[12] "[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."[13] As the proponent of jurisdiction, Plaintiffs bear the burden of proof.[14]

As with Rule 12(b)(1), a judgment of dismissal on the pleadings pursuant to Rule 12(c) should be granted when, construing the complaint in the light most favorable to plaintiff and taking the allegations therein as true, it appears certain that plaintiff cannot prove any set of facts that would entitle him to relief.[15] However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[16] "[A] plaintiff must plead specific facts, not mere conclusory allegations."[17]

---

12 *Id.*; *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981).

13 *Williamson*, 645 F.2d at 412-13.

14 *Ramming*, 281 F.3d at 161.

15 *Oppenheimer v. Prudential Securities, Inc.*, 94 F.3d 189, 194 (5th Cir. 1996); *Bolen v. Dengel*, No. 00-783, 2004 WL 2984330 at *9 (E.D. La. Dec. 16, 2004); *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312-13 & n.8 (5th Cir. 2002) (Rule 12(b)(6) standards apply to Rule 12(c) motion seeking dismissal for failure to state a claim).

16 *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

17 *Bolen*, 2004 WL 2894330, at *9.

## ARGUMENT

### I. Plaintiffs Cannot Challenge the Will of Congress by Suing the Dredging Defendants.

The Court lacks jurisdiction to entertain Plaintiffs' challenges to Congress's decision to order the construction, operation, and maintenance of the MRGO. Plaintiffs do not allege that any Dredging Defendant failed to perform its contractual obligations, or that the dredging contracts deviated in any way from congressional directive. Rather, Plaintiffs are suing the Government and its contractors because they executed orders dispatched from Congress. Because Congress acted pursuant to its constitutional authority to regulate interstate commerce and provide for the common defense, the challenge to congressional will posed by these suits is barred by *Yearsley v. W. A. Ross Constr. Co.*[18]

The COE and its contractors constructed, operated and maintained the MRGO pursuant to a series of express congressional directives. Congress authorized the channel in the Rivers and Harbors Act of 1956, as Plaintiffs' own Complaints recognize.[19] In that Act, Congress directed that the MRGO be constructed in accordance with the detailed specifications found in House Document Number 245, which was prepared for Congress by the Secretary of the Army.[20] This House Document, and therefore the Act itself, expressly provided the specifications for the MRGO's construction that Plaintiffs allege constitute negligence, including its location and

---

18 309 U.S. 18 (1940).

19 *See* Compl. ¶ 7.

20 *See* Mississippi River Gulf Outlet-Construction, Pub. L. No. 84-455, 1956 U.S.C.C.A.N. 83 (March 29, 1956) ("The existing project for Mississippi River, Baton Rouge to the Gulf of Mexico, is hereby modified to provide for the Mississippi River-Gulf Outlet to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document numbered 245 . . . ."); *see also Graci v. United States*, 435 F. Supp. 189, 192-93 (E.D. La. 1977) (examining history of the MRGO).

depth.[21] Congress provided funding for the construction and maintenance of the project, which was nearly complete by 1965.[22]

Congress has regularly provided supplemental directions and appropriations to guide the COE in operating and maintaining the MRGO. For example, Congress funded the MRGO dredging for constructing the Lake Pontchartrain and Vicinity Hurricane Protection Project. "Between 1968 and 1983 an estimated 100 million cubic yards of dredged material . . . was removed from the MR-GO for use in levee construction" for flood control.[23] In 1991, Congress directed the Secretary of the Army to "construct and maintain bank stabilization measures" for the MRGO.[24] And, of particular salience here given Plaintiffs' claims against the Dredging Defendants, Congress has appropriated funds expressly earmarked for maintenance dredging of the MRGO.[25]

---

21 House Document Number 245 also provided for Congress's consideration a detailed assessment of the economic and national defense benefits flowing from a new outlet for the Mississippi River and dispersed facilities. *See* H.R. Doc. No. 245at 2, 82d Cong., 1st Sess. (1951)(analyzing savings per ship voyage versus project *cost*); *id.* at 12 ("The ratio of estimated benefits to annual carrying charges is 1-61 under the plan providing for the supplementary outlet eastward of the Mississippi River and under the alternate plan for the west-bank outlet, therefore, the division engineer finds that the improvements to provide the eastward outlet all economically justified. . . . He also notes that the improvements would greatly enhance the capacity of the port for emergency war service by provision of an additional outlet and wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.").

22 See Compl. ¶ 7.

23 *See* United States Army Corps of Engineers Design Memorandum and Reconnaissance Report, 100th Cong., 2nd Sess. (1988). Congress authorized the Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection Project in the Flood Control Act of 1965, Pub. L. No. 89-298, § 204, 79 Stat. 1073, 1077 (Oct. 27, 1965) (substantially in accordance with the letter from the Secretary of the Army dated 6 July, 1965 printed in H.R. Doc. No. 231, 89th Cong., 1st Sess.).

24 *See* Pub. L. 102-104, 105 Stat. 510 (Aug. 17, 1991) (appropriating $3.5 million for bank stabilization for miles 49.9 - 56.1 of MRGO); *see also* Pub. L. 104-46, 109 Stat. 402 (Nov. 13,1995); H.R. Rep. 104-149, to *accompany* H.R. 1905 (June 20, 1995); Pub. L. 107-66, 15 Stat. 486 (Nov. 12, 2001); H.R. Rep. 107-112 to accompany H.R. 2311.

25 *See, e.g.* Pub. L. 104-206, 110 Stat. 2984 (Sept. 30, 1996) (congressional appropriation of $12.828 million for MRGO maintenance dredging); Pub. L. 108-7, 117 Stat. 11 (February 20, 2003) (congressional appropriation of $13.061 million for MRGO maintenance dredging).

The Dredging Defendants cannot be held liable for executing Congress's will as Plaintiffs allege because, for more than a century, the federal courts have held that they have no authority to interfere with valid exercises of congressional power like these. In *Wisconsin v. Duluth*,[26] the Supreme Court first rejected a challenge to federal navigational projects by local interests near Duluth, Minnesota. The projects involved constructing piers and levees to constrict water flow and thereby deepen the channel through scouring by the accelerated currents. Just as it did with the MRGO, Congress had specifically "adopted, recognized, and taken charge of this work" by providing for the project through the Act's appropriations legislation and by delegating the specific development of the project to the War Department.[27] As such, the Supreme Court held that it had no authority to interfere:

> If, then, Congress, in the exercise of a lawful authority, has adopted and is carrying out a system of harbor improvements at Duluth, this court can have no lawful authority to forbid the work. If that body sees fit to provide a way by which the great commerce of the lakes and the countries west of them, even to Asia, shall be securely accommodated at the harbor of Duluth by this short canal of three or four hundred feet, can this court decree that it must for ever pursue the old channel, by the natural outlet, over water too shallow for large vessels, unsafe for small ones, and by a longer and much more tedious route? When Congress appropriates $10,000 to improve, protect, and secure this canal, this court can have no power to require it to be filled up and obstructed. While the engineering officers of the government are, under the authority of Congress, doing all they can to make the canal useful to commerce, and to keep it in good condition, this court can owe no duty to a State which requires it to order the city of Duluth to destroy it.[28]

A plaintiff may not circumvent this rule by seeking damages from the Government contractors who undertake to execute congressional projects like the MRGO. This is precisely

---

26 96 U.S. 379 (1877).

27 *Id.* at 386.

28 *Id.* at 387-88.

the holding of *Yearsley v. W. A. Ross Constr. Co.*[29] In *Yearsley*, a property owner brought suit against a contractor for damage caused by dredging to improve Missouri River navigation. The Court ruled that the contractor's actions had been "directed by the government of the United States" and held that "it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."[30]

*Yearsley* governs this case. It has been applied consistently to public works performance contracts, like the dredging contracts at issue in this case, "where a contractor acts under the authority and direction of the United States."[31] There is no question that Congress has ample constitutional authority to undertake navigational projects,[32] and, as discussed above, Congress exercised that power in authorizing and appropriating money for the construction, operation, and maintenance of the MRGO. Plaintiffs' claims against the Dredging Defendants must be dismissed under Rule 12(b)(1) for lack of jurisdiction.

## II. The Dredging Defendants Share the Government's Sovereign Immunity.

Even if these suits were not a direct challenge to the duly-enacted policies of the United States Congress, they would have to be dismissed nonetheless because the Dredging Defendants

---

29 309 U.S. 18 (1940).

30 *Id.* at 20-21 (citing *Murray's Lessee v. Hoboken Land & Impr. Co.*, 59 U.S. (18 How.) 272, 283 (1856); Lamar *v. Browne*, 92 U.S. 187, 199 (1856)); *see also Mocklin v. Orleans Levee Dist.*, 690 F. Supp. 527, 534 n. 8 (E.D. La. 1988) (noting that where the authority for a navigational or dredging project comes directly from an Act of Congress, the project constitutes a protected discretionary function of Government).

31 *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989); *see also Boyle v. United Tech. Corp.*, 487 U.S. 500, 506 (1988) (reaffirming the vitality of *Yearsley* as the foundation of the modern "military contractor defense").

32 *See, e.g., Scranton v. Wheeler*, 179 U.S. 141, 159 (1900); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196, 197 (1824).

share the Government's immunity under the Flood Control Act and the discretionary function exception. Plaintiffs repeatedly and expressly allege that their damages were caused by flood waters,[33] and the Flood Control Act provides absolute immunity for flood damages.[34] In addition, the Government retains sovereign immunity for claims arising from its performance, or failure to perform, discretionary functions. The Government—and by extension, the Dredging Defendants—cannot be held liable for Plaintiffs' damages because, even if not directly attributable to Congress as discussed above, Plaintiffs' damages arise from discretionary functions undertaken by the COE in the MRGO.

**A. The Dredging Defendants share the Government's immunity.**

The doctrine of "shared immunity" provides public works contractors like the Dredging Defendants the protection of the Government's sovereign immunity. Also referred to as a "defense," shared immunity "derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government."[35]

The shared immunity doctrine is essential to prevent erosion of the Government's own immunity. "Without the defense, the government's own tort immunity for its discretionary

---

33 *See* Compl. ¶¶ 1, 2, 21-23.

34 *See* 33 U.S.C. § 702c.

35 *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989) (citing *Yearsley*); *see also, e.g.*, *Bynum v. FMC Corp.*, 770 F.2d 556, 564 (5th Cir. 1985) (a public works contractor can share sovereign immunity if it is an agent of the government); *Ward v. Humble Oil & Refining, Co.*, 321 F.2d 775, 780 (5th Cir. 1963) (holding that if suit against the Government is barred, so is suit against the Government's contractors); *Portis v. Folk Constr., Co.*, 694 F.2d 520, 524 (8th Cir. 1982) (recognizing the shared immunity doctrine and applying Arkansas law); *Right of Contractor with Federal, State, or Local Public Body to Latter's Immunity from Tort Liability*, 9 A.L.R.3d 382, 386. (In this lawsuit, Plaintiffs do not allege that the Dredging Defendants exercised control over the design, construction, or decisions regarding maintenance dredging of the MRGO, therefore the agency relationship discussed in *Bynum* in the context of a manufacturer in a product liability action is irrelevant.)

functions would be undermined. Contractors held liable for design defects that were the subject of discretionary approval by the government would predictably pass on the costs of the liability, ultimately imposing costs on the government that its immunity was intended to preclude."[36] Shared immunity also is a matter of fairness to the contractor.[37] Because the Government is immune from suit in this case, Plaintiffs' claims against the Dredging Defendants also are barred.

**B. Plaintiffs' claims are barred by the Flood Control Act.**

The Flood Control Act provides immunity from Plaintiffs' claims. Section 3 of the Act, codified at 33 U.S.C. § 702c, provides in relevant part, "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." Plaintiffs allege that the Suits in Admiralty Act waives the sovereign immunity of the Government and its contractors under the Flood Control Act.[38] Plaintiffs are mistaken.[39] Section 702c bars Plaintiffs' claims for flood damage caused by the flood waters that inundated the city after several flood control projects failed.

Plaintiffs are also mistaken in their reliance on *Graci v. United States*,[40] which arose out of flooding during Hurricane Betsy in 1965, for the proposition that "[t]he United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act . . . does not immunize the United States of America for its maritime activities (including dredging activities) conducted

---

36 *Harduvel*, 878 F.2d at 1315 (citing *Boyle*, 487 U.S. at 511).

37 *See*, *Bynum*, 770 F.2d at 566 ("principles of fairness dictate that an innocent contractor should not be ultimately liable for a dangerous design when the responsibility properly lies elsewhere").

38 Compl. ¶ 6.

39 *See Mocklin v. Orleans Levee District*, 877 F.2d 427, 428 (5th Cir. 1989) (where the broad and absolute immunity of the Flood Control Act applies there is no need to consider the discretionary function exception).

40 456 F.2d 20 (5th Cir. 1971).

in the MRGO."[41] *Graci* does not hold that when Hurricane Katrina struck in August 2005—40 years after Hurricane Betsy—the MRGO remained solely an isolated navigational project. In *Graci*, the United States conceded that, at that time, the MRGO was a "navigational aid project" that was "unconnected with flood control projects."[42] The court held, therefore, that the Government's sovereign immunity under the Flood Control Act did not extend to the construction of the MRGO.[43]

Plaintiffs' reliance on *Graci* in this case fails for two independent reasons. First, the Supreme Court in *Central Green v. United States*,[44] superseded the *Graci* court's analysis. In *Central Green*, the Supreme Court rejected the argument that the nature of the project was decisive, holding that "in determining whether Flood Control Act immunity attaches, courts should consider *the character of the waters* that cause the relevant damage rather than the relation between that damage and a flood control project."[45] Here, the Complaints allege that the character of the waters causing damage were "waters that flooded the New Orleans metropolitan area" as a result of Hurricane Katrina's "storm surge."[46] Because the Complaints expressly allege that storm-driven *flood waters* caused the damage, as a matter of law, these suits

---

41 Compl. ¶ 6.

42 456 F.2d at 22.

43 *Id.* at 27.

44 531 U.S. 425 (2001).

45 *Id.* at 437 (emphasis added).

46 *See* Compl. ¶¶ 2, 21 & 22 (alleging that Plaintiffs' homes and property were damaged by the waters that flooded New Orleans, and that the levee failures were caused by overtopping as the "storm surge" rose over tops of levees and produced erosion that subsequently led to failures and breaches of the levees).

against the Government and its contractors arising from these flood waters and the failure of the New Orleans "flood protection system"[47] are barred by the Flood Control Act.

Second, the Flood Control Act bars Plaintiffs' claims even under the obsolete *Graci* analysis. Plaintiffs allege damages due to flood waters from multiple levee failures of "three levee systems," all of which were built for flood control purposes.[48] Congress expressly authorized the levees protecting the New Orleans area in the Flood Control Act of 1965 to prevent hurricane-induced flood damage of the type experienced during Hurricane Betsy in 1965.[49] In *Mocklin v. Orleans Levee District*,[50] the Fifth Circuit distinguished *Graci*. *Mocklin* involved the reinforcement of Lake Pontchartrain's levees to address "damages due to hurricanes and past flooding."[51] The Fifth Circuit explained that to escape the absolute immunity provision of the Flood Control Act, the project or operation at issue must be "wholly unrelated" to flood control.[52] Here, the Complaints allege flooding because of failures of "three levee systems," and flooding of "Polder No. 1" when the Lake Pontchartrain levee system failed along the 17th Street Canal, Orleans Avenue Canal, and the London Avenue Canal.[53] Not only do Plaintiffs concede that they were injured by flood waters, they concede that those waters flowed from failed levees. Their claims are barred by Section 702c and should be dismissed for lack of jurisdiction.

---

47 *Id.* ¶¶ 1, 22, 23.

48 *Id.* ¶¶ 1, 22, 23 (alleging twenty breaches of MRGO levees, three breaches of Industrial Canal levees, and flooding of Polder 1 by the 17th Street and London Avenue canals).

49 *See* Pub. L. No. 89-298, § 204, 79 Stat. 1073, 1077 (October 27, 1965).

50 877 F.2d 427 (5th Cir. 1989).

51 *Id.* at 428.

52 *Id.* at 430.

53 Compl. ¶ 23.

### C. Plaintiffs' claims are barred by the discretionary function exception.

A second sovereign immunity rule, the "discretionary function exception," also bars Plaintiffs' claims against the Government—and by extension, the Dredging Defendants. As put in the Federal Tort Claims Act, federal law forbids suit for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[54] The Government's decisions to undertake navigational improvements performed by contractors—including decisions to dredge a channel, to dredge a certain depth or width, to place dredge spoils in a specific place, or not to take precautions—are discretionary functions.

For example, in *Payne v. United States*,[55] the Eleventh Circuit held that the redesign and dredging of the Tombigbee River, which allegedly damaged a land owner, was a discretionary function. In *Mocklin v. Orleans Levee District*,[56] the court held that the COE's decision to use flotation channels to construct dikes was a discretionary function. Likewise, in *Dolphen Gardens v. United States*,[57] the court rejected a suit against the Government and its dredging contractor for depositing dredge spoils ashore, where the plaintiff alleged that the spoils emitted damaging fumes. The court explained the plaintiff's attempt to avoid the discretionary function bar:

---

54 28 U.S.C. § 2680(a); *see also Wiggins v. United States*, 799 F.3d 962, 964-66 (5th Cir. 1986) (holding that the discretionary function exception is implicit in the Suits in Admiralty Act).

55 730 F.2d 1434 (11th Cir. 1984).

56 690 F. Supp. 527 (E.D. La. 1988).

57 243 F. Supp. 824 (D. Conn. 1965).

> The Plaintiff does not suggest that responsibility for the damage rests in the decision to dredge the channel, for it is established that such determinations are "discretionary functions" within the meaning of § 2680(a). Rather, it is argued that the "negligence for which the Government is liable lies in the decision to dump the spoil onto the particular shore-side vacant lots instead of carrying it out to sea, and in the failure to take precautions to prevent the escape of fumes."[58]

Nonetheless, the court held that the decision to dredge a channel is *inseparable* from decisions about how to dredge it and what precautions to take.[59] Moreover, embracing the shared immunity principle on which the Dredging Defendants rely in this case, the court in *Dolphen Gardens* also dismissed the claims against the contractor:

> To impose liability on the contractor under such circumstances would render the Government's immunity for the consequences of its acts in the performance of a "discretionary function" meaningless, for if the contractor was held liable, contract prices to the Government would be increased to cover the contractor's risk of loss from possible harmful effects of complying with decisions of the executive officers authorized to make policy judgments.[60]

Likewise, the Dredging Defendants cannot be sued for their role in the Government's exercise of its discretionary functions in the MRGO. As a result, Plaintiffs' claims should be dismissed for lack of jurisdiction under Rule 12(b)(1).

## III. The Dredging Defendants Are Immune as Government Contractors.

Finally, even if this Court has jurisdiction—and even if sovereign immunity does not bar Plaintiffs' claims against the Government—the Dredging Defendants are immune in their own right. They should be dismissed from this case under Rule 12(c) because Plaintiffs' allegations establish that the Dredging Defendants did no more than perform their contracts as per

---

58 *Id.* at 826 (internal citations omitted).

59 *Id.* (citing *United States v. Gregory*, 300 F.2d 11 (10th Cir. 1962), and *F&M Schaefer Brewing Co. v. United States*, 121 F. Supp. 322 (E.D.N.Y. 1954) (decision to dredge and to do so to a certain depth held discretionary acts)).

60 *Id.* at 827.

requirements provided by the COE, and government contractors are not liable for defects in plans or specifications provided by the Government.

Where "the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications."[61] That is, contractors cannot be held liable for performing contracts in conformity with the Government's specifications, provided the contract is carried out with due care and absent negligence.[62] The "primary purpose behind the formulation of the government contractor defense [is] to 'prevent the contractor from being held liable when the government is actually at fault . . . .'"[63]

In *Jemison v. The Dredge Duplex*,[64] for example, the court held that the Government had negligently designed the dredging project because its plans called for dredging below the level of wharf pilings. But, the court also held that the dredging contractors were not liable because they followed the Government plans and specifications and used due care.[65]

Government contractor status is a complete defense to liability where: (1) the

---

61 *United States v. Spearin*, 248 U.S. 132, 136 (1918) (government contractor recovers fees for dry dock construction where defects were attributable to plans supplied by the United States).

62 *Hercules Inc. v. United States*, 516 U.S. 417, 421-22 (1996); *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511-12 (1988).

63 *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 245 (5th Cir. 1990 ) (quoting *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989)).

64 163 F. Supp. 947 (S.D. Ala. 1958).

65 *Id.* at 950; *see also Ernst v. Gen'l Refractories Co.*, 202 F.2d 485 (6th Cir. 1953) (contractors are not liable for damage to plaintiff's property resulting from relocation and construction of state highway where such work was conducted pursuant to contract specifications and without negligence); *Roland v. Jumper Creek Drainage Dist.*, 4 F.2d 719 (S.D. Fla. 1925) (dismissing complaint against dredging contractor for damages from overflow of drainage canals and ditches because the contractor performed pursuant to the plans and specifications under the supervision of the Government drainage district engineer).

Government approved reasonably precise specifications; (2) the contractor conformed to those specifications; and (3) the Government knew about the dangers of contract performance.[66] Plaintiffs' Complaints establish all three of these elements. Plaintiffs allege that the Dredging Defendants dredged the MRGO pursuant to specific Government contracts.[67] Plaintiffs allege that the Government approved reasonably precise specifications with which the Dredging Defendants conformed.[68] And Plaintiffs allege that the Government knew of the potential harmful effects of the MRGO.[69]

Conclusory assertions of law aside, there is no indication whatsoever in any of Plaintiffs' allegations that the Dredging Defendants did anything but fulfill their contractual obligations to the COE; Plaintiffs' allegations cannot support an inference that any of the Dredging Defendants failed to exercise due care.[70] The gravamen of Plaintiffs' Complaints is that the Government's decisions to construct, operate, and maintain the MRGO—foremost, the congressional authorization to build the channel in the first place—were unwise. Plaintiffs' complaint is with the Government, not the Dredging Defendants. All claims against the Dredging Defendants must be dismissed.

## CONCLUSION

For the foregoing reasons, the Dredging Defendants respectfully request that the Court dismiss all claims against the Dredging Defendants for lack of jurisdiction, or in the alternative,

---

66 *Boyle*, 487 U.S. at 512; *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001).

67 Compl. ¶¶ 13-17.

68 *See id.* ¶¶ 7, 14, 16-17.

69 *Id.* ¶ 9.

for failure to state a claim on which relief may be granted, and award the Dredging Defendants any further relief that the Court deems just and proper.

Respectfully submitted,

James H. Roussel (Bar Roll No. 11496)
Nyka M. Scott (Bar Roll No. 28757)
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Ave., Ste. 3600
New Orleans, LA 70170
Telephone: (504) 566-5278
Facsimile: (504) 636-3978
jroussel@bakerdonelson.com
nscott@bakerdonelson.com

Attorneys for Great Lakes Dredge & Dock Company

/s/William E. Wright, Jr.
William E. Wright, Jr. (Bar Roll No.8564)
Terrence L. Brennan (Bar Roll No. 3434)
Kelly E. Theard (Bar Roll No. 29445)
of
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Facsimile: (504) 566-1201
wwright@dkslaw.com
tbrennan@dkslaw.com
kthread@dkslaw.com

Attorneys for Bean

/s/ Samuel B. Gabb
Samuel B. Gabb (Bar Roll No. 22378)
Thomas P. LeBlanc (Bar Roll No. 22832)
Lundy & Davis
501 Broad St.
P. O. Box 3010
Lake, Charles, LA 70602-3010
Telephone: (337) 439-0707
Facsimile: (337) 439-1029
sgabb@lundydavis.com

Attorneys for Mike Hooks, Inc.

70 *See Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) (conclusory allegations and allegations of law will not avert dismissal for failure to state a claim); *Bolen v. Dengel*, No. 00-783, 2004 WL 2984330 at *9 (E.D. La. Dec. 16, 2004).

/s/ James A. Cobb, Jr.
James A. Cobb, Jr. (Bar Roll No. 4213)
Emmett, Cobb, Waits & Henning
1515 Poydras St., Suite 1950
New Orleans, LA 70112
Telephone:(504) 581-1301)
Facsimile: (5040 581-6020)
jac@ecwko.com

Attorneys for Weeks Marine, Inc.

/s/ A. Gordon Grant, Jr.
A. Gordon Grant, Jr. (Bar Roll No. 6221)
Philip S. Brooks, Jr. (Bar Roll No. 21501)
Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P.
Energy Centre - 1100 Poydras St.
Suite 3200
New Orleans, LA 70163-3200
Telephone: (504) 585-7681
Facsimile: (504) 200-8981
ggrant@monbar.com

Attorneys for Gulf Coast Trailing Company; T.L. James & Company, Inc.; TLJIC, L.L.C., on its on behalf and as successor by merger to T.L. James Marine, Inc. and T.L. James Marine, L.L.C.

/s/ Richard A. Cozad
Richard A. Cozad (Bar Roll No. 4537)
Michael L. McAlpine (Bar Roll. No. 9195)
Emma A. Mekinda (Bar Roll No. 28151)
McAlpine & Cozad
365 Canal Street, Suite 3180
New Orleans, LA 70130
Telephone:(504) 561-0323
Facsimile: (504) 528-9442
emmamekinda@yahoo.com

Attorneys for King Fisher Marine Service, L.P.

/s/ Andre J. Mouledoux
Andre J. Mouledoux (Bar Roll No. 9788)
C. William Emory (La Bar #20179)
Daniel J. Hoerner (La Bar #21706)
Jacques P. DeGruy (La Bar #29144)
Mouledoux, Bland, Legrand & Brackett
701 Poydras St. - Suite 4250
New Orleans, LA 70139
Telephone: (504) 595-3000
Facsimile: (504) 522-2121
amouledoux@mblb.com

Attorneys for Pine Bluff Sand & Gravel Co.

/s/ William Larzelere
William J. Larzelere, Jr. (Bar Roll No. 8057)
T. Justin Simpson (Bar Roll No. 18437)
Angie L. Arceneaux (Bar Roll No. 26786)
Larzelere, Picou, Wells, Simpson & Lonero
3850 N. Causeway Blvd. - Ste. 1100
Two Lakeway Center
Metairie, LA 70002
Telephone:(504) 834-6500
Facsimile: (504) 834-6565
blarzelere@lpw-law.com
jsimpson@lpw-law.com
aakers@lpw-law.com

Attorneys for Luhr Bros., Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 15th day of September, 2006, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

1) jfnevares-law@microjuris.com

2) dbecnel@becnellaw.com

3) csalas@salaslaw.com

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

1) A.J. Rebaneck