**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MR-GO, *Robinson* (06-2268) | § | |
| | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

ARGUMENT................................................................................................................ 6

    I.      The motion to dismiss should be granted because this is a suit for damages caused by the Hurricane Katrina flood and the United States is immune to damages "from or by floods or flood waters."........... 6

    II.     Congress did not waive sovereign immunity in the FTCA for the actions at issue in the Complaint........................................................... 14

         A.    The Due Care Exception bars this action............................................ 15

         B.    The Discretionary function exception bars this action because the Corps of Engineers exercised judgment and choice in deciding how to design, construct, operate, and maintain MR-GO, and its decisions are susceptible to policy analysis.................................................................... 19

             1.    The Corps consulted with appropriate state and federal agencies ............................................................... 22

             2.    Decisions about where to build MR-GO and whether to design or add features to combat storm surge and erosion are susceptible to policy analysis .................... 24

## TABLE OF AUTHORITIES

### CASES

*Autery v. United States,*
    992 F.2d 1523 (11th Cir. 1993)  ............................................... 32

*Ayer v. United States,*
    902 F.2d 1038 (1st Cir. 1990) ................................................. 32

*Bailey v. McDonnell-Douglas Corp.,*
    989 F.2d 794 (5th Cir. 1993) ................................................. 28

*Baldassaro v. United States,*
    64 F.3d 206 (5th Cir. 1995) ............................................. 30, 33

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.,*
    1998 WL 113935 (E.D. La. 1998) ............................................ 33

*Boston Edison Co. v. Great Lakes Dock and Dredge,*

423 F.2d 891 (1st Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Boyle v. United Technologies*,
487 U.S. 500 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27, 28

*Canadian Pacific (Bermuda) Ltd. v. United States*,
534 F.2d 1165 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Central Green Co. v. United States*,
531 U.S. 425 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 11, 14

*Chaffin v. United States*,
176 F.3d 1208 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*Dalehite v. United States*,
346 U.S. 15 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 31

*Duckworth v. State Admin. Bd. of Election Laws*,
332 F.3d 769 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*Dunaway v. United States*,
1999 U.S. Dist. LEXIS 13800 (E.D. La., Sept. 2, 1999) . . . . . . . . . . . . . . . . . . . . . . .   33

*Dynamic Image Techs., Inc. v. United States*,
221 F.3d 34 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*E. Ritter & Co. v. Dep't of the Army*,
874 F.2d 1236 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Eazor Exp., Inc. v. United States*,
611 F.Supp. 197 (E.D. N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Fisher Brothers Sales, Inc. v. United States*,
46 F.3d 279 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31, 32

*F&M Schaefer Brewing Co. v. United States*,
121 F.Supp. 322 (E.D. N.Y. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Graci v. United States*,
456 F.2d 20 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12, 13

*Harrell v. United States*,
443 F.3d 1231 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32, 33

*James v. United States*,
478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12, 14

*Kapps v. Torch Offshore, Inc.,*
    379 F.3d 207 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kennewick Irrigation District v. United States,*
    880 F.2d 1018 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Kommanvittselkapet Harwi v. United States,*
    305 F.Supp. 882 (E.D. Pa. 1969), *aff'd,* 467 F.2d 456 (3rd Cir. 1970) . . . . . . . . . . . . . . . . . 33

*Limar Shipping Ltd. v. United States,*
    324 F.3d 1 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Lloyd's Leasing Ltd.,*
    764 F.Supp. 1114 (S.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Manns v. United States,*
    945 F.Supp. 1349 (D. Or. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Miller v. Diamond Shamrock Co.,*
    275 F.3d 414 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*National Union Fire Ins. v. United States,*
    115 F.3d 1415 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Orthopedic Bone Screw Prod.Liab. Lit.,*
    264 F.3d 344 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Patterson v. Dietze, Inc.,*
    764 F.2d 1145 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

*Savoy v. United States,*
    No. 06-3552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Thames Shipyard and Repair Co. v. United States,*
    350 F.3d 247 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Trudeau v. Fed. Trade Com'n,*
    456 F.3d 178 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Gaubert,*
499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 32

*United States v. Varig Airlines,*
    467 U.S. 797 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Vantive Corp. Securities Litigation*,
  283 F.3d 1079 (9th 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Welch v. United States*,
  409 F.3d 646 (4th Cir. 2005), *cert. denied,* 126 S.Ct. 1431 (2006) . . . . . . . . . . . . . . . . . . . . 19

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Evid. 201 (b)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

H.R. Doc. No. 46 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 26

H.R. Doc. No. 245 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Pub. L. No. 14, 59 Stat. 10 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Pub. L. No. 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Mississippi River-Gulf Outlet and the Mobile to New Orleans Intracoastal Waterway: A
Hearing on H.R. 5218 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

1958 amendment of the Wildlife Coordination Act, Pub. L. No. 624, 72 Stat. 463 . . . . . . . . . . . 23

28 U.S.C. §2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. §§ 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

33 U.S.C. § 426i(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 702c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## MISCELLANEOUS

MR-GO Design Mem. No. 1-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

MR-GO Design Mem. No. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MR-GO Design Mem. No. 1-C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

1994 MR-GO Recon. Rep. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1988 Recon. Rep. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

James Wm. Moore et al., *Moore's Federal Practice* (3d ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MR-GO, *Robinson* (06-2268) | § | |
| | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO DISMISS**

This is a suit to recover damages caused by the Katrina flood and its floodwaters.  Upon this undisputed fact alone, the present motion can be decided, because the Flood Control Act, 33 U.S.C. §702c, provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  Even if the statutory phrase "floods or flood waters" were to be (inappropriately) limited to those waters that a federal project is unable to control, it is indisputable here that the alleged damages were caused by floodwaters that federal works failed to control.  First, it is an averment set forth in the Complaint.  Second, it is a fact commonly known by the residents of New Orleans, and the Court can therefore take judicial notice of it.  Third, it is evidenced by self-authenticating official documents.  So great is the plaintiffs' fear of this fact that they now feign ignorance of it.  While the plaintiffs now say they are unaware of the

1

existence of these federal flood control structures, the Complaint and other judicially cognizable documents unambiguously establish their existence.

The Complaint should also be dismissed because the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680, did not waive sovereign immunity for the actions challenged by the plaintiffs.  The Complaint attacks, albeit implicitly, the law that authorized the Mississippi River Gulf Outlet ("MR-GO").  By claiming that MR-GO caused their alleged damages by forming a funnel and accelerating storm surge into the Industrial Canal, they are challenging the decision of Congress, embodied in law, to build *this* waterway rather than others that had been proposed and studied.  The law required the Corps to "prosecute" the plan submitted to Congress.  That plan described the waterway at issue here, the deep-draft canal that the Corps designed, constructed, operated, and maintained "substantially in accordance with the recommendations" submitted to Congress.  Complaint ¶ 35.  To avoid dismissal on the basis of the FTCA's "due care" exception, 28 U.S.C. § 2680(a), the plaintiffs try to back away from their Complaint's assertion that MR-GO was *inherently* flawed "[f]rom its conception"—long before the first spade of dirt was turned.  But by now challenging decisions made by the Corps before Congress enacted the law that required MR-GO's construction, the plaintiffs are implicitly challenging the law itself, for the law *ratified* the antecedent decisions that led to the selection of *this* route from New Orleans to the Gulf of Mexico.

To avoid dismissal under the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), the plaintiffs attempt to transform their broad allegations of neglect into narrower claims about scientific and engineering judgments, which they say would not be susceptible to analysis in terms of the broad public policies that led to MR-GO's creation.  The attempt fails because both the initial design and the subsequent decisions not to change it are "susceptible to policy analysis":  they can be analyzed in terms of the policies implicated by those decisions.  The plaintiffs challenge the decision not to add design elements to combat storm surge and prevent erosion.  Such elements

would have been ancillary to the navigational purpose for which the project was authorized and

funded.  Inasmuch as adding such design elements would not have served the project's purpose,

whether to divert funds to serve other ends plainly was a *policy* judgment, not a judgment based

exclusively, if at all, on "professional engineering judgment."  Indeed Congress *did* approve a project

designed to combat hurricane-induced storm surge: the Lake Pontchartrain and Vicinity Hurricane

Protection Project ("LPVHPP").  Whether to combat storm surge by adding design elements to the

MR-GO project or to combat it by building a hurricane protection system was a policy decision

protected by the discretionary function exception.

      The plaintiffs posit that the discretionary function exception does not apply because the

Corps failed to consult with the Fish and Wildlife Service or with the Louisiana Wildlife and

Fisheries Commission.  They are mistaken.  The Corps consulted with both.  The evidence that the

proper federal and state agencies were consulted is in the record, in self-authenticating official

government documents.  Based on this unassailable evidence, the Court can find that consultation

occurred and that the discretionary function exception therefore protects the challenged design

decisions.

      The Court can grant the pending motion based on the facts alleged in the Complaint; it need

not resolve any factual disputes.  And even if that were not the case, the putative existence of factual

disputes would not prevent the Court from granting the motion or require that the motion be

deemed a motion for summary judgment.  It is well established that the court is authorized to review

the evidence and resolve disputed facts if subject matter jurisdiction turns on contested facts.  Here,

however, the facts that the plaintiffs would contest are beyond dispute.  Before the plaintiffs realized

their legal significance, they pled them.  Now, facing a motion to dismiss based on those facts, they

would renounce and dispute them.  They have not amended their Complaint, however, in tacit

recognition that doing so would be futile.  The existence of federal levees and floodwalls

surrounding New Orleans East and the Lower Ninth Ward and St. Bernard Parish is too well known to be disputed.  Their crucial involvement in the Katrina flood is equally known.

To distract the Court from these unassailable facts, the plaintiffs posit factual disputes that are spurious, irrelevant, or both.  There is no dispute over the "phantom" Seabrook Lock: it was not built, and whether it was ever built is irrelevant.  The *proposal to build* the Seabrook Lock is only mentioned in the defendant's opening brief because construction of the lock was proposed by the Corps to remedy some of the undesirable hydrologic effects of the MR-GO.  The *proposal* shows that the LPVHPP project and the MR-GO project are not unrelated. The fact that the lock was *proposed* is *not* disputed.  Whether the LPVHPP and the MR-GO project were sufficiently related to support application of Flood Control Act immunity to the MR-GO project is disputed, but this is a legal, not factual, dispute.  Whether the Corps chose to remediate the hydrological impact of MR-GO by building the Seabrook Lock or by placing armored levees along both banks of MR-GO or, as the Corps ultimately chose, by building new and larger levees along Lake Pontchartrain's shores is immaterial.  Instead, the fact that the LPVHPP was a federal flood control project intended, at least in part, to control waters carried by MR-GO unambiguously shows that the plaintiffs' damages were caused by flood waters that a flood control project could not control and are thus barred by 33 U.S.C. § 702c.

Similarly, the plaintiffs posit a dispute over whether MR-GO was built according to the plans submitted to Congress.  But the claim that the plans submitted to Congress called for a "separate and distinct" canal running parallel to the Gulf Intracoastal Waterway ("GIWW") is spurious.  It is refuted by the "Plan of Improvement" map that was submitted to and approved by Congress.  The map depicts the proposed MR-GO taking the route of the GIWW, not lying parallel to it.  And while it is true that the design of the reach extending into the Gulf did alter the course so that it passed closer to Breton Island than the Chandeleur Islands, there is no dispute about this fact.  The

4

fact, however, is irrelevant:  the alteration occurred many miles away from the "funnel" that supposedly focused storm surge and beyond the buffering marshes that might have protected New Orleans East and St. Bernard Parish from storm surge.

Finally, the plaintiffs contend there are numerous "contested factual issues requiring discovery," but plaintiffs fail to identify any disputed issue of material fact relevant to the determination of subject matter jurisdiction.  The motion to dismiss accepts the truth of the Complaint's factual allegations.  It accepts the unverified allegation that MR-GO intensified storm surge in the Industrial Canal; it accepts the claim that MR-GO diminished the buffer that wetlands provided against Katrina's storm surge; it accepts the claim that MR-GO was a navigation project. Contrary to the plaintiffs' assertions, the United States does not contend that the MR-GO has flood control features, nor does the United States contend that MR-GO ever became anything other than what it always was: a navigation project.  The United States does contend, and the uncontroverted facts are, that there were flood works along portions of the MR-GO and along the Industrial canal, *as features of the LPVHPP* and that MR-GO, a navigation channel, became a constituent element of the hydrological system that the LPVHPP was specifically designed to control.  Thus §702c bars the plaintiffs' action because their harms all flow from floodwaters that these flood control structures did not control.

In this regard, the agreed-upon fact that the two projects had different purposes poses no impediment to the granting of this motion.  The law does not support the plaintiffs' argument that Flood Control Act immunity applies *only* to acts and omission that occur within a flood control project, thereby allowing the plaintiffs to show that negligence with respect to MR-GO was the legal "cause" of their injuries.  As noted, the immunity expressly provided by §702c does not even require such a relationship – it immunizes the United States from all damages caused "from or by floods or floodwaters."  Further, all of the cases recognize that when acts and omissions are *related to* a flood

control project, they cannot form a basis of liability when damages result from a flood.  Under any reading of the law, the existence of a relationship between the challenged conduct and a flood control project is sufficient to render 33 U.S.C. § 702c applicable when damages result from a flood. The alleged negligent acts and omissions in the design, construction, operation, and maintenance of MR-GO were *not* wholly unrelated to the LPVHPP, which indisputably *was* a flood control project designed to prevent the waters flowing through MR-GO from flooding greater New Orleans.  Thus, when the Complaint challenges acts and omissions related to MR-GO, it is challenging acts and omissions related to a flood control project, as the Complaint itself avers.

## ARGUMENT

I. THE MOTION TO DISMISS SHOULD BE GRANTED BECAUSE THIS IS A SUIT FOR DAMAGES CAUSED BY THE HURRICANE KATRINA FLOOD AND THE UNITED STATES IS IMMUNE TO DAMAGES "FROM OR BY FLOODS OR FLOOD WATERS."

The Complaint reveals that the plaintiffs are attempting to hold the United States liable for damages from the Katrina flood.  Complaint ¶¶ 10 (plaintiff presented a claim for damages arising out of the destruction of his home "by floodwaters . . . on August 29 and 30, 2005"), 13 (plaintiff's house trailer "was destroyed by floodwater . . . on August 29 and 30, 2005"), 14 (plaintiff business "was destroyed by floodwater . . . on August 29 and 30, 2005"), 17 (same), 18 (plaintiff presented a claim "for damages arising out of the incident described above"), 21 (same), 22 (same), 24 (floodwaters caused damage to plaintiffs on August 29 and 30, 2005).  Under these facts, subject-matter jurisdiction simply does not exist, because "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.

The plaintiffs contend that § 702c "applie[s] only to the Government's negligent acts related to *flood control projects,*"  Plt. Mem. 44 (emphasis by plaintiffs).  This claim is foreclosed by the plain statutory language and *Central Green*'s construction of it.  To be sure, before *Central Green,* "some

courts ha[d] focused on whether the damage relates in some, often tenuous, way to a flood control project, rather than whether it relates to 'floods or flood waters.'" *Central Green Co. v. United States,* 531 U.S. 425, 430 (2001) (footnote omitted). But *Central Green* pointed out that "[t]he text of the statute does not include the words 'flood control project.' Rather, it states that immunity attaches to 'any damage from or by floods or flood waters . . . .'" *Id.* at 434. "It is . . . the text of the statute . . . [that] determine[s] whether the water . . . that allegedly caused the damage . . . is covered by § 702c." *Id.* at 431 (citation omitted).

Because the text of the statute bars their claims, the plaintiffs give it short shrift, relegating it to a footnote, and constructing an argument based on the "roots and rationale," Plt. Mem. 39, the legislative history, *id.* at 40-42, and the "public policy underpinnings," *id.* at 43-44. They begin their "analysis" by distorting the teaching of *Central Green,* citing an axiomatic statement—"[t]he [Flood Control Act of 1928] concerns flood control projects designed to carry floodwaters"—as direct support for their claim that *Central Green* "was crystal clear that Section 702c applied only to the Government's negligent acts related to *flood control projects* . . . ." Plt. Mem. 44. If *Central Green* is "crystal clear" about anything, it is that "the scope of the immunity conferred" is determined "*not by the character of the federal project* or the purposes it serves, but by the character of the waters that cause the relevant damage." 531 U.S. 434 (emphasis added).

The plaintiffs argue that "*Central Green* did not address waters not related to flood control . . . ," and that *Central Green* did not "address or even consider . . . whether the Government [is] immun[e] under the FCA for harms caused independent of any flood control project." Plt. Mem. 47-48. But the Court's opinion emphasized the plain text of the statute, noted the text's focus on "the character of the waters that cause the relevant damage," and concluded that the scope of immunity is *not* determined by "the character of the federal project or the purposes it serves." 531 U.S. 434.

But even plaintiffs' own dubious interpretation of the statute is not sufficient to enable them to avoid dismissal.  Plaintiffs recognize that, even under their own theory, dismissal is appropriate unless their asserted "harms [were] caused independent of any flood control project," Plt. Mem. 48. To satisfy this standard, the plaintiffs proceed to rewrite history and their Complaint.  They now assert that "the alleged 'levees' along the southern bank of the MR-GO were [likely] little more than the Army Corps' dumping ground for dredged material during routine maintenance of the [MR-GO] channel . . . to facilitate ship navigation and not for any flood control purposes."  Plt. Mem. 33. They assert that "the existence . . . of any post-Hurricane Betsy flood control facilities in the vicinity of the MR-GO is seriously disputed . . . ."  *Id.* at 32.  They posit that "[i]n our case, . . . the flooding was . . . *not* [related to] 'flood control projects' . . . ."  *Id.* at 46 (emphasis added).  Remarkably, plaintiffs go so far as contending that the flooding *could* not have been related to a flood control project, for "no flood control project existed."  *Id.* at 48.

As is well-known, certainly within the territorial jurisdiction of this Court, New Orleans East, the Lower Ninth Ward, and St. Bernard Parish were flooded when federal floodwalls and levees constructed as part of the LPVHPP were overwhelmed by floodwaters whipped up by Hurricane Katrina.  The Court can take judicial notice of this fact without being asked.  *See* Fed. R. Evid. 201 (b), (c).  Indeed, this fact is so well known that the plaintiffs' disavowal of it is striking.[1] The Complaint itself takes the existence of the levees for granted.  It alludes to them not fewer than *20 times* and specifically alleges that "the storm surge acceleration produced by the MR-GO" "trigger[ed] the collapse of . . . much of the levee system."  Complaint ¶ 80.  The Complaint includes a map that depicts more than a score of "storm induced" levee breaches along MR-GO and the

---

[1]The opinion of Paul Kemp, who professes to have spent "much of my professional career . . . considering issues of storm surges and environmental impact caused . . . by the MR-GO," Kemp Decl. at 1, is entitled to no weight, given his ignorance of "whether certain earthen structures constructed by the Army Cops [sic] along portions of the MR-GO are 'levees,'" *id.* at 3 n.1.

Industrial Canal.  *See* Complaint at 5.  Another map, reproduced from a local newspaper, asserts that "[l]arge sections of the MR-GO levee . . . disintegrated" during Hurricane Katrina.  Id. ¶ 57, at 22.[2]  According to the Complaint, "overtopping led to many of the levee breaches that caused the most serious flooding during Katrina, including large sections of the MR-GO levees that sent floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded homes in East New Orleans [sic] and the Lower Ninth Ward."  *Id.* ¶ 77.  "MR-GO significantly intensified Katrina's surge height and velocity, contributing to the scouring that undermined the spoilbanks and levees along the MR-GO and the Industrial Canal."  *Id.* ¶ 73.  The section of the Complaint under the caption "MR-GO Was A Substantial Factor In Causing The Flooding" is mainly devoted to describing how "MR-GO's powerful impact on the levees," *id.* ¶ 81, "contributed to their ultimate collapse," *id.* ¶ 75.  The Complaint confirms that these levees were part of the LPVHPP.[3]  *See* Complaint ¶ 46.

This case is ripe for dismissal based on the Complaint alone, because the Complaint reveals that this is an action for "damage from or by . . . flood waters."  The present motion accepts the truth of the Complaint's allegations about the MR-GO.  *See, e.g.,* Def. Opening Mem. at 4, 7-9, 12-

---

[2]These maps are averments pled by the plaintiffs and can be relied on in ruling on the motion to dismiss.  *See Trudeau v. Fed. Trade Com'n,* 456 F.3d 178, 193 (D.C. Cir. 2006) ("appropriate" for court to examine material attached to complaint in ruling on Rule 12(b)(6) motion); *Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 213 & n.7 (5th Cir. 2004) (affirming dismissal, under Rule 12(b)(6), based on facts set forth in chart included in amended complaint); *Duckworth v. State Admin. Bd. of Election Laws,* 332 F.3d 769, 777 (4th Cir. 2003) (affirming dismissal under Rule 12(b)(6) based on facts established by maps in pleadings); *In re Vantive Corp. Securities Litigation,* 283 F.3d 1079, 1091 (9th 2002) (affirming dismissal based on facts established by graph provided by plaintiffs).

[3]The plaintiffs acknowledge that "the Complaint refers to some *facts* about the failure, breaches, and overtopping of levees and floodwalls in New Orleans and St. Bernard Parish."  Plt. Mem. 23 (emphasis added).  The plaintiffs' proposed method of dealing with these "facts" is to delete them from an amended complaint, as though they were detritus. *Id.* at 23 & n. 12.  But even if the plaintiffs actually amended their Complaint, as explained, the court can take judicial notice of the established fact that federal flood control structures were built to protect greater New Orleans.

13, 42-43.[4]   Accordingly, the Court can grant the motion to dismiss without even considering the

United States' exhibits.  The exhibits merely provide background information about MR-GO and

the LPVHPP levees that were obliterated by Katrina's onslaught.[5]  Even if the statutory phrase

"floods or flood waters" is "confined to those waters that a federal project is unable to control[] and

---

[4]Rather than challenge the Complaint's assertion that the waterway was negligently "designed, constructed, operated, and maintained" because it formed a conduit that funneled storm surge and led to erosion of wetlands, *see* Complaint ¶ 1, the present motion accepts these allegations as true and establishes that jurisdiction is absent because (1) the plaintiffs' alleged damages were caused by floodwaters (as the Complaint alleges, *see e.g., id.* ¶¶ 10, 12, 14, 15, 17, 24, 25); (2) MR-GO was "constructed under the authority of Public Law 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendations of the Army Corps' Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session," *id.* ¶ 35; and (3) the alleged decisions to "d[o] nothing to correct the faulty design," *id.* ¶ 3, and to "d[o] nothing to mitigate or prevent" erosion and accelerated storm surge, *id.* ¶ 4, were decisions susceptible to policy analysis.  This jurisdictional challenge is wholly separate and distinct from a challenge to the merits of the plaintiffs' claim.

[5]The United States' introduction of supplemental materials for the purpose of revealing the absence of subject matter jurisdiction does not convert this motion into one for summary judgment.  *See Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); *see also Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000) ("The court without conversion [of a motion made pursuant to Fed. R. Civ. P. 12(b)(1) to a motion for summary judgment], may consider extrinsic materials and, to the extent it engages in jurisdictional fact-finding, is free to test the truthfulness of the plaintiff's allegations."); 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.30[4] (3d ed. 2004).  All of the United States' exhibits are self-authenticating and may be properly considered by the Court.  *See* the United States' Opposition to the Plaintiffs' Motion to Strike the Government's Exhibits, which is being filed simultaneously with this brief.

The plaintiffs have attempted to establish disputed facts through the submission of 40 exhibits and the declarations of Nina Froeschle and Dr. Paul Kemp.  These documents, however, do not establish factual disputes because they do nothing more than repeat the allegations in the Complaint, which the United States already has accepted as true for purposes of its motion.  Moreover, even if the Court should find a genuine dispute about facts relevant to the motion, it can resolve them and grant the motion.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (It is well established in this circuit that the district court has power to dismiss pursuant to Rule 12(b)(1) on any one of three separate bases: (1) the Complaint alone; (2) the Complaint supplemented by undisputed facts evidenced in the record; or (3) the Complaint supplemented by undisputed facts plus the court's resolution of disputed facts.).

. . . waters that are released for flood control purposes when reservoired waters are at flood stage," *Central Green,* 531 U.S. at 431, it is clear, even without any reference to the United States' exhibits, that the relevant damages here were "from or by . . . flood waters." By alleging that their purported damages were caused by floodwaters set loose by the collapse of the LPVHPP levees and floodwalls, Complaint ¶¶ 10, 13, 14, 24, 46, 75, 80, the plaintiffs have supplied sufficient facts to defeat jurisdiction.[6]

The plaintiffs try to surmount these facts by positing that § 702c does not prevent the United States from being liable for flood damages if "there [is] more than one legal cause of injury or loss." Plt. Mem. 22. They say the United States can be held liable for "damage from or by floods or flood waters" if they can prove that their damages resulted not only from floodwaters but also from "the MR-GO itself." *Id.* They suggest that, even if it is true that their damages resulted from floodwaters that federal flood works failed to control, that fact is just plain irrelevant, because "Plaintiffs expect to prove that the flooding would have occurred regardless of the presence or absence of federal flood control structures and that their losses were caused by the MR-GO's storm-driven navigational waters."[7] *Id.* at 50.

But even the most strained reading of the case law on §702c immunity cannot adduce support for such a proposition. As an initial matter, §702c broadly immunizes the government

---

[6]The plaintiffs argue that they need to discover more facts about the levees, for instance, their nature and their locations. But for purposes of this motion, the nature, location, and other specific information about the levees is irrelevant. The relevant fact is that the LPVHPP levees failed to control the floodwaters that caused the relevant damages, and this fact is undisputed. Accordingly, the plaintiffs' request for discovery should not be granted. *See Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147-48 (5th Cir. 1985) (affirming district court dismissal because discovery sought by plaintiff was "irrelevant to the jurisdictional issue").

[7]The plaintiffs' position on this issue shifts throughout their filing. By turns they assert, first, that the levees did not exist, Plt. Mem. 46 (in our case, flooding was not related to a flood control project), 48 ("here, no flood control project existed"); second, that the levees are irrelevant, *id.* ("The Lake Pontchartrain and Vicinity Hurricane Protection Project Has No Bearing On This Case"); and third, that the levees "will be the subject of active discovery," *id.* at 32.

"from or by floods or flood waters," regardless of whether the floodwaters were caused or exacerbated by a non-flood control project.  This is reinforced by *Central Green*'s observation that the immunity provided by §702c is not "determined by the character of the federal project or by the purpose it serves, but by the character of the waters that cause the relevant damage."  531 U.S. at 434.  Regardless of how many legal causes of the damage, the United States is immune from any harm from floods or floodwaters.  Here, there is no doubt that the waters the federal flood control project failed to contain were floodwaters.

The plaintiffs' argument also fails under their own crabbed reading of *Central Green*, in which immunity turns on whether the allegedly "negligent acts *relate[]* to flood control projects."  Plt. Mem. at 44 (emphasis altered).  As noted, the LPVHPP was designed to protect greater New Orleans from any hydrological impact of MR-GO.  If, then, the LPVHPP works were overtopped and destroyed because MR-GO diminished the buffering wetlands and intensified Katrina's storm surge, as the Complaint avers, this supposed causal relationship between MR-GO and the failure of the federal flood works is sufficient to make § 702c applicable to this action.

Because under any reading of *Central Green* the involvement of federal flood works in a flood brings §702c to bear whenever damages are caused by floodwaters, the plaintiffs attempt to distort the facts in order to base their claim on a case that was decided 35 years ago:  *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971).  *See* Plt. Mem. 34-35.  For *Graci* to control here, the plaintiffs purport to distinguish "[t]he two subsequent Supreme Court cases," *Central Green* and *James v. United States,* 478 U.S. 597 (1986), as cases that "involved flood control projects."  *Id.* at 35.  Although plaintiffs are correct that *James* and *Central Green* involved flood control projects, they are incorrect that this distinguishes those cases and establishes that the scope of §702c immunity turns on the involvement of a flood control project.  The factual distinction relied upon by the plaintiffs has no support in the express language of the statute and is inconsistent not only with the Supreme Court's observation

that "the words 'flood control project'" do not appear in § 702c but also, and most importantly, the

Court's conclusion that immunity turns on "the character of the waters that cause the relevant

damage" *rather than* "the character of the federal project or the purpose that it serves."  531 U.S. at

434.

      Ultimately the court need not resolve this issue, because even plaintiffs tacitly acknowledge

that "flood water" damage for which the government is immune under § 702c includes damage

caused by "'waters that [flood control] projects cannot control.'"  531 U.S. at 430 (citation omitted);

*see* Plt. Mem. 50 ("Plaintiffs here are claiming that it was . . . overflowing navigational waters . . . that

caused the flooding . . . . Plaintiffs will not argue that . . . 'the waters that . . . caused the plaintiffs'

alleged damages were floodwaters that the LPVHPP works were unable to control.'"); *cf. id.* at 45-46

("the Government has attempted to recharacterize the navigational waters of the MR-GO as related

to flood control").  Thus, even under the plaintiffs' reading of the law, the salient question is

whether this is a case involving a flood control project.  The plaintiffs claim that "nothing since

*Graci* affects its holding," *id.* at 35, because "no flood control project existed," *id.* at 48, and thus

"the [Katrina] flooding was . . .  not [related to]  'flood control projects designed to carry

floodwaters.'"  *Id.* at 46.  Notwithstanding these assertions, it cannot seriously be disputed that this

case involves a flood control project and waters that a flood control project could not control.  The

Complaint avers these facts, and they are too well known to be the subject of any genuine dispute.

Had they not been pled, the Court could surely take judicial notice of them.  The plaintiffs have

argued that these facts do not dispose of their case, because they have chosen to found their action

on the alleged involvement of MR-GO as a cause of the flood.  But there is no support in the text of

§702c or in the case law for their conclusion that they can recover damages "from or by floods or

flood waters" if they can find an causal act that occurred outside the confines of the flood control

project that failed to control the floodwaters.

Although the plaintiffs' theory of liability is founded on acts and omissions that occurred within a navigation project, the facts show that the challenged acts and omissions were related to (*i.e.,* were not "wholly unrelated to") a flood control project.  Here, again, no fact-finding is required. The plaintiffs have pled the relevant facts, alleging that the acts and omissions of the Corps with respect to MR-GO caused the failure of the LPVHPP flood works and thereby caused their alleged damages.  And inasmuch as the Complaint alleges that the United States was aware of the flood danger posed by MR-GO for many years, the Complaint implicates the LPVHPP as well as MR-GO, even though, for obvious reasons, the plaintiffs say the legal cause of the relevant damages is the MR-GO rather than the failure of the LPVHPP.  The "sweeping" immunity provided by Congress in 33 U.S.C. § 702c cannot be evaded by the tactic of excluding incontestable facts about flood control from one's pleadings.  *James,* 478 U.S. at 608.  Courts must "consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project."  *Central Green,* 531 U.S. at 437.  "[I]t is the text of § 702c, as informed by [the Supreme Court's] holding in *James,* . . . that governs the scope of the United States' immunity from liability for damage caused 'by floods or flood waters.'"  *Id.*  The waters that surged into New Orleans East, the Lower Ninth Ward, and St. Bernard Parish on August 29, 2005, were not "navigational waters."  They were "flood waters."  The motion to dismiss should be granted.

II.  Congress did not waive sovereign immunity in the FTCA.

In our opening brief, we explained that this action also is barred by two provisions of the Federal Tort Claims Act, the "due care" and "discretionary function" exceptions, which are codified at 28 U.S.C. § 2680(a).  The plaintiffs' response confirms that their cause of action is not cognizable under the FTCA and that this Court therefore lacks subject-matter jurisdiction.

14

A.   The Due Care Exception bars this action.

Recognizing that the due care exception "'bars tests by tort action of the legality of statutes,'" Plt. Mem. 6 (quoting *Dalehite v. United States,* 346 U.S. 15, 33 (1953)), the plaintiffs argue that their attempt to recover in tort under Louisiana law for alleged "inherent problems" in MR-GO, Complaint ¶ 2, does not amount to a test of the statute that authorized the project.  In their brief, however, they make their implicit challenge explicit by arguing that the route ratified by the law was responsible for their alleged damages.  They challenge reports prepared by the Corps in 1930 and 1951 that laid the basis for the law that authorized the construction of MR-GO.  By arguing that the Corps's selection of a bad route for the waterway provides the basis for an award of damages under Louisiana law, they reveal that this tort action tests the legality of Public Law No. 455, which *required* that it be built "substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress."[8]  Pub. L. No. 455, 70 Stat. 65 (1956) (Exh. 2) at 65.

The argument that Congress did not tell "the Army Corps where . . . to build the MR-GO within a single statute," Plt. Mem. 55, does not withstand scrutiny.  The law incorporated by reference the very detailed descriptions of the route by the Chief of Engineers and the district engineer in House Document No. 245.  That document contains this recommendation by the Chief of Engineers:

> I recommend modification of the existing project . . . to provide for construction of a seaway canal . . . extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Island at or north of Errol Island . . . ; a turning basin at the landward end of the seaway canal . . . ; and a connecting channel . . . extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal . . . ; all generally in accordance with the plans of the division

---

[8]The Complaint avers that MR-GO was so constructed.  *See* Complaint ¶ 35.

engineer and with such modifications thereof as in the discretion of the Secretary of
the Army and the Chief of Engineers may be desirable . . . ."

H.R. Doc. No. 245 (1951) (Exh. 1A) at 4; *cf. id.* at 43 (division engineer's recommendation) & Plate 2

("Plan of Improvement" map, which follows page 44).

In these words lie a description that entails almost every "flaw" identified in the Complaint.

By specifying that the channel "extend[] westerly along the Gulf Intracoastal Waterway . . . to the

Industrial Canal," the Chief was prescribing the construction of the very waterway that the plaintiffs

characterize as "a straight arrow pointed at New Orleans," Complaint ¶ 3, and "'a shotgun pointed

straight at New Orleans.'"  *Id.* ¶ 62.  The Chief of Engineers recommended a waterway that would

connect the Industrial Canal and the Gulf of Mexico, forming what the Complaint describes as a

"conduit for . . . storm-driven surges."  *Id.* ¶ 49.  The Chief recommended a route that branched

from the GIWW at "Micheaud" (Michoud), which allegedly created a "funnel," that focused and

accelerated storm surge. *Id.* ¶¶ 1, 49; *see also* Plt. Mem. 16.

Congress authorized the Corps to design, construct, operate, and maintain MR-GO

"substantially in accordance with the recommendation of the Chief of Engineers contained in

House Document Numbered 245, Eighty-second Congress."  Pub. L. No. 455, 70 Stat. 65 (Exh. 2)

at 65.  Therefore, by challenging the waterway's "inherent" characteristics – especially, by alleging

that these were "inherent problems" from MR-GO's "conception," Complaint ¶ 2 – the plaintiffs

are clearly challenging Pub. L.  No. 455.  That law ratified the Chief's selection and recommendation

of *this* route, which the plaintiffs contend formed a conduit for storm-driven surges and a funnel

that intensified and accelerated the surge.  If the Chief's recommendation was "flawed," then by

implication, the law that required construction "substantially in accordance with" the

recommendation was equally flawed.

By claiming that the Corps acted negligently in formulating the recommendation that was

presented to Congress, they confirm that it is *the project itself* that they deem hopelessly flawed.  For

example, in their brief the plaintiffs point out that "Congress asked the Army Corps to use its professional acumen to find the best route for a navigable channel between the Mississippi River and the Gulf of Mexico"—implying that the route selected was *not* the best. *Id.* at 57. But as their allusion to reports prepared in 1930 and 1951 makes clear, this is a challenge to acts and decisions that occurred *before* the enactment of Pub. L. No. 455. These acts and decisions formed the basis of the Chief's recommendation, which was ratified by Congress through the law's enactment.

Thus, while it is true that "Congress asked the Army Corps to use its engineering judgment to investigate the possibility of constructing 'a' waterway between the Mississippi River and the Gulf of Mexico," Plt. Mem. 57, it is also true that "*Congress approved* the Army Corps' recommendation" that a particular waterway be built, *id.* (emphasis added)—specifically, the one that began to be constructed in 1958 "extending from the inner harbor canal to a turning basin south of Micheaud, and . . . extending as a land and water cut on easy curves . . . southeasterly to and along the south shore of Lake Borgne," H.R. Doc. No. 245 (Exh. 1A) at 43. Because Congress ratified the Corps's recommendation that *this* waterway be built, rather than any of the eight other waterways that the Corps studied and rejected, *see* H.R. Doc. No. 46 (1930) (Exh. 3A) at 4, 32-41, and because Congress embodied its ratification of the Corps's recommendation in Public Law No. 455, the plaintiffs' putative negligence claims implicitly "challeng[e] the validity of a statute under the guise of a tort action." Plt. Mem. 55.[9]

The plaintiffs mistakenly suppose that they can escape the bar posed by the due care exception by adding a "negligence" label on their claims. *See* Plt. Mem. 58 (exception "'*applies only if the actor has exercised due care.*' . . . Plaintiffs have adequately alleged . . . negligence and lack of 'due

---

[9]In tacit acknowledgment that they believe the project itself to have been misguided *ab initio,* the plaintiffs cite a parallel case in this consolidated litigation, *Savoy v. United States,* No. 06-3552, in which the relief sought is the closure of the waterway itself. *See* Plt. Mem. 27. The plaintiffs here, like the *Savoy* plaintiffs, apparently believe that the project is so thoroughly flawed that it is beyond remedy.

care'"). The vagueness of the claims, which is evident in the Complaint's persistent repetition of the amorphous phrase "design, construction, operation, and maintenance" without any concrete examples suggests what is made plain in the plaintiffs' brief: they are not complaining about any specific defects in the MR-GO, they are complaining about what they see as the bad consequences that attended its "construction, operation, and maintenance."

Specifically, the brief alludes to "two fatally defective conditions." Plt. Mem. 16. Yet these "conditions" are not "conditions" of the MR-GO itself but rather are alleged *consequences* of MR-GO: "(1) the destruction of the marshlands surrounding the MR-GO . . . and (2) the funnel effect stemming from the MR-GO's faulty design." *Id.* It is as though, entirely lacking any evidence of negligence or lack of due care, the plaintiffs resort to res ipsa loquitur and assert that there must have been a lack of due care because "look what happened." Yet "what happened" is alleged to have resulted not because MR-GO was poorly engineered but, if the Complaint is to be credited, because MR-GO was built eastward from the Industrial Canal along the GIWW to a point where it veered off from that waterway, creating a sort of "funnel," and these supposed "flaws" are said to have been "inherent" from the project's "inception."

Plaintiffs' allegations are thus focused on MR-GO itself, and necessarily implicate the "Act authorizing construction of the Mississippi River - Gulf Outlet," Pub. L. 455. The plaintiffs do not claim that the Corps deviated from the Act's mandate, which required only "substantial accord[] with" the Chief's recommendation.[10] To the extent that the plaintiffs are correct that the

---

[10]The Complaint does allege that the Corps "altered the original route, redirecting the MR-GO toward Breton Sound instead of Chandeleur Sound." *Id.* ¶ 37; *see also* Plt. Mem. 25 n.14. The alteration of the most southerly reach is irrelevant, as it occurred beyond the wetlands adjacent to Lake Borgne, well south of the levees along MR-GO, and far from the supposed "funnel" formed by the junction of MR-GO and the GIWW. The original route can be seen on Plate 1 of the MR-GO Design Memorandum No. 1-A (Exh. 4A). By comparing the original route, which passed through Chandeleur Sound, with the revised route, which runs through Breton Sound, *see* Plate 1 of the MR-GO Design Memorandum No. 1-C (Exh. 12), it can be seen that the reaches of the waterway that passed through the wetlands along Lake Borgne were unchanged. The alteration

construction of MR-GO destroyed surrounding marsh and created a "funnel effect," that would be

a necessary consequence of the law Congress passed telling the Corps to build MR-GO along the

route recommended by the Chief of Engineers in the report transmitted to Congress.  In light of the

foregoing, it cannot be said that the Corps acted with anything other than due care.  *See Welch v.*

*United States,* 409 F.3d 646, 652 (4th Cir. 2005, *cert. denied*, 126 S.Ct. 1431 (2006).

> B.   THE DISCRETIONARY FUNCTION EXCEPTION BARS THIS ACTION BECAUSE
> THE CORPS OF ENGINEERS EXERCISED JUDGMENT AND CHOICE IN
> DECIDING HOW TO DESIGN, CONSTRUCT, OPERATE, AND MAINTAIN MR-
> GO, AND ITS DECISIONS ARE SUSCEPTIBLE TO POLICY ANALYSIS.

The plaintiffs say the discretionary function exception does not apply because the Corps

failed to comply with laws that required consultation with the U.S. Fish and Wildlife Service, the

State of Louisiana, and appropriate state agencies.  *See*  Plt. Mem. 59-61.  They also say the

discretionary function exception does not apply because they are challenging engineering decisions

---

begins at mile 36.43, where MR-GO crosses Bayou La Loutre.  From that point, the channel takes a
more southerly course than originally planned, so that it passes closer to Breton Island than to the
Chandeleur Islands.  As this reach is more than three miles beyond Lake Borgne and more than 23
miles from the junction with the GIWW, this alteration is wholly irrelevant to the claims that MR-
GO caused loss of wetlands and created a funnel effect.  Although the plaintiffs have submitted a
detailed declaration describing the alleged impact of MR-GO on the LPVHPP levees, it describes
effects that occurred adjacent to the northwestern part of what it labels Reach 2 and contains no
claim that the Gulfward end of this reach played any role in the Katrina flood.  *See* Kemp Decl. at 14
("GRAPHIC 3").  The plaintiffs' bald assertion that the redirection of the waterway was
"significant[]" cannot sustain their cause.  *See Ramming v. United States,* 281 F.3d at 161.

In addition, it should be noted that the original design specified that the GIWW be enlarged
eastward from the Industrial Canal.  *See* Design Mem. No. 1-A (Exh. 4A) at 2 & Plate 1 ("Project
Location").  The plaintiffs' assertion that the Chief's recommendation called for construction of a
"new and distinct," "separate canal," Plt. Mem. 61-62,  "parallel" the GIWW, *id.* 25 n.14, is not
correct.  The route proposed by the District Engineer, set forth in the report that was transmitted to
Congress recommending construction, followed the GIWW until departing from it and striking a
southeasterly course along the southwestern shores of Lake Borgne en route to the Gulf.  *See* H.R.
Doc. No. 245 (Exh. 1A), Plate 2 ("Plan of Improvement").  Likewise, the original design called for
an enlargement of the GIWW.  *See* MR-GO Design Mem. No. 1-A (Exh. 4A) at 2 ("the route
follows the existing Gulf Intracoastal Waterway and the selection is largely a matter of determination
of the centerline of the proposed channel with respect to the existing waterway centerline") & Plate
1 ("Project Location").

that are not be susceptible to policy analysis.  *See* Plt. Mem. 62-66.  Both of these assertions are wrong.  The Corps *did* consult with the Fish and Wildlife Service and with the Louisiana Wildlife and Fisheries Commission, in addition to other state agencies.  Indeed, the very documents cited by the plaintiffs establish this fact.  Likewise, the decisions challenged by the plaintiffs are *not* engineering decisions; they are quintessential policy decisions. The decisions challenged in this case were, first, where to build the waterway and, second, whether to design, build, operate, and maintain it in ways that would combat storm surge.  The decision to build the waterway was based on a broad economic analysis that showed this route to be economically justified because of the commerce and local development it would promote.

Preliminarily, before turning to plaintiffs' "substantive" arguments, we address their conviction that their complaint sets forth active theories of liability that were ignored in the Motion to Dismiss.  Specifically, although the plaintiffs have argued that "the Government's argument fails to address two of the four activities that the Plaintiffs allege were negligently performed," Plt. Mem. 54, it must be noted that *there are no substantive allegations of negligent operation in the Complaint.*  The word "operation" appears 16 times in the Complaint.  Tellingly, in all but one of these appearances it is simply a "place-holder" in the formulaic phrase "design, construction, operation, and maintenance."  *See* Complaint at 1 (caption), and ¶¶ 1, 2, 5, 6, 29, 30, 34, 71, 91, 93, 95, 97, 99, 102.  In none of these instances is any content given to the word "operation."[11]  As used in the Complaint, then, the word is nothing more than meaningless verbiage, apparently included for "completeness," in supposed furtherance of the Complaint's broad indictment of the MR-GO project as a whole.  If the word is to be given any import whatsoever, it must be drawn from the specific allegation that the project was inherently flawed from its conception, so that any operation of it would necessarily be

---

[11]In the lone instance in which the word is not part of the mantra, it appears in a quotation from a 1958 report prepared by the U.S Fish and Wildlife Service.  *See id.* ¶ 67.

20

"negligent."[12]  Inasmuch as there are no substantive allegations that MR-GO was negligently operated, the claim must be seen as a mere appendage of the negligent "design," "construction," and "maintenance" allegations, and it is therefore barred by 28 U.S.C. § 2680(a), for the reasons previously set forth in the United States' opening brief.

The suggestion that the motion to dismiss does not encompass the negligent maintenance claim is also without foundation.  Again, recourse to the Complaint reveals that the negligent maintenance claim is ill-defined and imports almost all of its substance from the negligent design and construction claims.  For example, the first factual allegation under the "Faulty Maintenance" caption is that "the first ship to navigate the MR-GO in March 1957 ran aground and was stuck for two days."  Complaint ¶ 51.  This is not a "faulty maintenance" claim.  It is nothing more than a continuation of the negligent design and construction claim, whose theme is that the project was doomed from the start.  The only distinct substantive element in the "negligent maintenance" claim is the allegation that the Corps "failed to properly dredge the canal."  *Id.* ¶ 53.  In conclusory fashion, the allegation is made that "proper dredging would ameliorate the 'funneling effect' of the waterway."  *Id.* ¶ 52.  It is difficult to reconcile this claim with the claim that the funnel effect was a product of the design and construction.  *See, e.g., id.* ¶¶ 1 ("the funnel effect stemm[ed] from the MRGO's faulty design"), 3 ("faulty design" created "funnel effect"), 49 ("design was flawed" in its "fail[ure] to take account of the waterway's inherent and known capability of serving as a funnel").

The remainder of the "faulty maintenance" allegations also depend on the "faulty design and construction" claim.  In essence, the so-called "faulty maintenance" is nothing more a shorthand for the Corps' alleged failure to remedy the alleged design flaws.  In a nutshell, the claim appears in

---

[12]In their brief, the plaintiffs appear to view it as a mere synonym of "maintenance," which itself is largely undefined in the Complaint.  This appears to be the implication of the reference to paragraphs 51-60 of the Complaint, which are captioned "Faulty Maintenance," and contain no distinct allegations about "operations."  *See* Plt. Mem. 55.

paragraph 54:  "As alleged above, the negligent design of the MRGO invited destruction of the surrounding wetlands.  The Army Corps' ongoing negligent maintenance . . . ensured it."  The ensuing paragraphs 55 through 60 merely allege that MR-GO's design caused the loss of marshlands, which the Corps recognized but failed to remedy.  *See, e.g., id.* ¶¶ 56 (in 1988 the Corps "was forced to admit that MRGO ha[d] accelerated the 'loss of marshes'"), 58 ("critical" shoreline "never received adequate protective stabilization"), 60 (MRGO "retain[ed] its potential for causing devastating floods due to the Army Corps' refusal to acknowledge its serious design flaws and to properly maintain the waterway").  As such, the "negligent maintenance" claim is nothing more than a reiteration of the claim that the project was "riddled with inherent problems" "[f]rom its conception," *id.* ¶ 2, that were never corrected.  For the reasons set forth in the opening brief and discussed below, this claim is barred by the discretionary function exception.

1.   THE CORPS CONSULTED WITH APPROPRIATE STATE AND FEDERAL
AGENCIES.

The plaintiffs' own submission, which they quote selectively in their brief, shows that the Corps not only *consulted* with the U.S. Fish and Wildlife Service but also *funded a study* by the Fish and Wildlife Service to investigate the ecological impact of MR-GO.  Plaintiffs' Exhibit W is a letter from the Secretary of the Interior to the Secretary of the Army dated September 23, 1957.  The letter reveals that "[t]he U.S. Fish and Wildlife Service . . . *is now initiating* . . . investigations" "as contemplated in the Wildlife Coordination Act of August 14, 1946 (60 Stat. 1080)" "using funds transferred by the Corps of Engineers."[13]  Exh. W at 1 (emphasis added).  The letter "urge[d] that

---

[13]Plaintiffs' Exhibit W disposes of the claim that the Corps "sandbagged" Congress by not including the Fish and Wildlife Service study in the papers  that were submitted in 1951 (H.R. Doc. No. 245), recommending construction of MR-GO.  *See* Plt. Mem. 61.  Obviously, if the Fish and Wildlife Service did not initiate studies until 1957, a year *after* Congress authorized the project, the Corps did not violate the Wildlife Coordination Act by failing to include those studies in 1951.  The law did not require the Corps to postpone its submission while the Fish and Wildlife Service studied the project.  In all events, this is legally irrelevant because the FTCA does not waive sovereign immunity for implementation of legislation enacted by Congress, regardless of what testimony Congress had

detailed planning for the project consider fully the effects on fish and wildlife resources."[14]  *Id.*  To allow consideration of the views of the Fish and Wildlife Service and the Louisiana Wildlife and Fisheries Commission, the Corps "deferr[ed] submission of the general design memorandum."  MR-GO Design Mem. No. 1-B, Endorsement of Norman R. Moore, Chief Engineering Div., dated Oct. 24, 1958 (Exh. 8A).  The views of these two agencies are specifically addressed in Design Memoranda Nos. 1-B, 2, and 1-C, and the Corps took the recommendations of these agencies into account in the design of the project.  *See* MRGO Design Mem. No. 1-B (Exh. 8A) ¶¶33, 35; MRGO Design Me. No. 2 (Exh. 15)[15] at 4, 6, 7, 10, 14-15, 22, 24, & app. I, at 9, app. II, at 2, 9, 15, app. III, at 1-9, 11-12; MRGO Design Mem. No. 1-C (Exh. 12)[16] ¶ 25, at 9; *see also id.* app. I, at 2.[17]

---

or did not have before it.

[14]It should be noted that the Wildlife Coordination Act ("WCA") did not require the Corps to "consider fully" the effects of MR-GO on fish and wildlife resources, nor did it require the Corps to "accept reasonable modifications in the alignment of the canal," Exh. W at 1.  In fact, the WCA put no binding constraints on the Corps's exercise of discretion.  The Act provided only that the Corps "consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the impoundment [of waters] . . . is to be constructed with a view to preventing loss of and damage to wildlife resources . . . ."  Pub. L. No. 732, 60 Stat. 1080 (1946) (Exh. N).  *A fortiori,* the Act did *not* "require[] that the Army Corps allow the FWS to conduct environmental studies on the effects of the MR-GO."  Plt. Mem. 26 n.15.  Moreover, the 1958 amendment of the Wildlife Coordination Act, Pub. L. No. 624, 72 Stat. 463, merely "authorized" the Corps to modify the MR-GO project in order to accommodate recommendations of the Fish and Wildlife Service.  Nothing in the law required more than the Corps did.

[15]DM02 GMD - MRGO (Sep 1959).pdf, available at https://ipet.wes.army.mil, published to the website on September 18, 2006.  Once at the website go to "Pre-Katrina" then to "MRGO - Mississipi River Gulf Outlet" then to "Design Memoranda (DM) and Reconnaissance Report" then to the referenced document.

[16]DM01C - Channels Mile 0 to 36.43 (Bayou La Loutre) Mile 0 to -9.75 (38 ft contour) (Nov 1959), available at https://ipet.wes.army.mil, published to the website on February 15, 2006.  Once at the website go to "Pre-Katrina" then to "MRGO - Mississippi River Gulf Outlet" then to "Design Memoranda (DM) and Reconnaissance Report" then to the referenced document.

[17]Long before the project was approved, the Corps was consulting with the State and the U.S. Fish and Wildlife Service.  At the August 5, 1943, public hearing held in New Orleans, Governor Jones testified that "appear[ed] on behalf of the State of Louisiana which, in all of its departments and

Given the consultations reflected in the design memoranda, the "length[y]" discussion of the River and Harbor Act of 1945 in the Declaration of Nina Froschle, and the citation of it in the plaintiffs' brief are pointless.  *See* Plt. Mem. 27, 59.  The State of Louisiana was so involved in the planning of the MR-GO that Governor Davis sent a telegram in 1948 advising the Corps's Chief of Engineers that he (the Governor) was "familiar with the provisions of th[e] proposed report [on MR-GO] and thoroughly concur[red] in the views and recommendations expressed therein."  H.R. Doc. No. 245 (Exh. 1A).  The telegram, which was among the papers submitted to Congress, went on to report that the State's "support . . . for a tidewater canal on the eastern side of the Mississippi River is well shown by Concurrent Resolution No. 18 of the Louisiana Legislature of 1944, in which it was resolved that the Governor of Louisiana be specifically empowered to aid and assist the Federal Government in obtaining and completing such a project."  *Id.* at 3.

   2.   DECISIONS ABOUT WHERE TO BUILD MR-GO AND WHETHER TO DESIGN OR
        ADD FEATURES TO COMBAT STORM SURGE AND EROSION ARE SUSCEPTIBLE
        TO POLICY ANALYSIS.

The Complaint broadly alleges that the Corps designed, built, operated, and maintained a waterway that posed a potential threat to people living in the vicinity, a threat that the Corps recognized but *chose not to address* (at least, not in the way the plaintiffs say it should have been addressed).[18]  The Corps allegedly built the waterway in the wrong place and then did nothing to

---

agencies, urges the approval of the project."  MRGO Record of Public Hrg. No. 10.  The list of invitees to the hearing included the Fish and Wildlife Service.  *See* MRGO Hrg. List of Invitees 1.  These documents have been published by the Army Corps of Engineers at https://ipet.wes.army.mil.  They are accessed from that URL through the "Pre-Katrina," "MRGO," and "Reports" tabs.

[18] *See* Complaint ¶¶ 2 ("inherent problems" were "neglect[ed]"), 3 (Corps "was well aware of—but did nothing to correct" "faulty design"), 4 ("Despite repeated warnings . . . Corps did nothing to mitigate or prevent . . . calamity"), 5 (effects of MR-GO were "disregard[ed]"), 34 (problems were "ignored entirely"), 49 ("Corps failed to take account of" alleged dangers posed by MR-GO), 50 ("Corps failed to account for" wetlands loss), 52-53 ("Corps knew . . . that proper dredging . . . would ameliorate the 'funneling effect' . . . [but] failed to properly dredge"), 56 (Corps recognized that "'erosion stabilization measures'" were needed), 61 (same), 63-70 ("report . . . predicted vast

ameliorate the "fatally defective conditions" that are said to have resulted from having "interconnected Reach 1 of MR-GO with the GIWW . . . thereby joining together the well-known storm surge potentials of Lake Borgne and Lake Pontchartrain within the Industrial Canal." *Id.* ¶ 82; *cf.* Plt. Mem. 25 n.14 (route proposed to and approved by Congress was "*parallel* to" GIWW), 61-62 (route proposed to and approved by Congress would have been "separate and distinct" from GIWW).

As explained above, the plaintiffs are here largely attacking Congress's policy judgment concerning the construction of MR-GO itself and the basic route that MR-GO should travel. Such claims are clearly barred by the due care exception. But even to the extent that Congress could be said to have been silent on these points, where to build MR-GO and whether to devote resources to combating wetlands loss and storm surge were, at bottom, policy decisions.[19] While engineering considerations played a role, these were "big picture" decisions more likely than not to have been driven by policy. These were decisions for policymakers charged with deciding how to allocate available resources. Because the challenged acts and omissions were not proscribed by any statute

---

ecological damage" and "it was well known by the Army Corps . . . that the wetlands served as nature's protective buffer against storm-driven water surges"), 78 ("overtopping would have been prevented if . . . Corps had implemented a well-known process called 'armoring on the MR-GO's banks"), 84 ("Corps acknowledged that between 1968 and 1987 . . . bank erosion—caused mostly by human-induced channelization and shipping traffic—resulting in" loss of marsh), 88 (Corps "had actual notice from the outset . . . that its design would . . . exacerbate" storm surge, but "such notice was . . . ignored"); *cf.* Plt. Mem. 42 (alleging "Government's utter failure to do anything to protect the citizens of Greater New Orleans"), 66 ("Government . . . never actually undert[ook] to fix a troubled water resource project").

[19]Although the plaintiffs advance the proposition that "the Corps did not build the MR-GO according to the route that it told Congress would be followed," Plt. Mem. 25 n.14, they do not argue that this supposed divergence renders the discretionary function inapplicable. Doing so would be contrary to their argument that the Corps was free to select an alternate route even after enactment of Pub. L. No. 455, which directed that the plan submitted to Congress be "prosecute[d]."

or regulation[20] and were therefore matters requiring the exercise of judgment and choice informed by considerations of policy, this action is barred by the discretionary function exception.

Decisions about where and how to build MR-GO were not made in an engineer's vacuum nor were they exclusively "based on prevailing engineering standards."  Plt. Mem. 63.  Social, economic, and political forces were at play long before the first blueprint was drawn and the first shovel of dirt was turned.  Louisiana's elected and unelected leaders lined up behind the project.  *See* Mississippi River-Gulf Outlet and the Mobile to New Orleans Intracoastal Waterway: A Hearing on H.R. 5218 Before the House Committee on Public Works, 82nd Congress 53 (1951) (Exh. 13).  Where to build it was a matter of intense interest to local groups, which had competing economic interests in where the project would be built.  For example, the City of New Orleans and the Port of New Orleans favored the east-bank route that was eventually authorized, while Jefferson Parish and the "Mississippi Valley Seaway Canal Association and other interests on the west bank . . . propose[d] construction . . . on the west bank . . . southward to the Gulf in the vicinity of Grand Isle."[21]  At the same time, the Corps concluded that "[a]ll canal routes are considered practicable from a construction standpoint . . . ."  H.R. Doc. No. 46 (1930) (Exh. 3A) at 41.   Economic considerations, not engineering formulas, led to the ultimate choice of the route along which MR-GO was eventually constructed.[22]

---

[20]To the contrary, they were largely *mandated* by statute.

[21]*See* H.R. Doc. No. 245 (1951) (Exh. 1A) at 10; *see also id.* ("Proponents of each route cite the availability of large areas of adjacent land for development of a tidewater port . . . . Proponents of the west-bank route state that it . . . would facilitate construction of a canal-bank highway to Grand Isle to open up the area and enhance values of adjacent lands.").

[22]*See also* H.R. Doc. No 46 (Exh. 3A) at 41-42 (comparing construction costs and distances to other ports).  In 1951 the Corps told Congress that only the east-bank route was economically justified. *See* H.R. Doc. No. 245 (1951) (Exh. 1A) at 12 ("The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal port traffic, together with savings on

26

The plaintiffs' assertion that engineering malfeasance led the Corps to select the wrong route to the Gulf, *see* Plt. Mem. 25-26, 57, 61-63, cannot be credited.  When Congress tasked the Corps with selecting  "the best available route or routes," Pub. L. No. 14, 59 Stat. 10, (1945) (Exh. 14) at 30, it *was* asking the Corps "to prudently exercise scientific and engineering . . . judgment based on professional standards," Plt. Mem. 64.  But the conclusion drawn from this by the plaintiffs is based on a false premise.  The plaintiffs reason that the Corps's selection of the east-bank route could not have been influenced by policy considerations because it was a product of engineering expertise.  *See* Plt. Mem. 64.  This conclusion rests on the faulty assumption that decisions cannot be influenced by *both* engineering *and* policy considerations.  Of course they can, and here they were.  As 1930 and 1945 reports to Congress show, the Corps considered the feasibility of various routes from not only an engineering standpoint but also an economic standpoint that took far more than "professional standards" of engineering into account.  Indeed, the selection of the east-bank route over the west-bank route was based on the supposed *economic* superiority of the east-bank route.  *See* H.R. Doc. No. 245 (1951) (Exh. 1A) at 41 ("the proposed west-bank outlet is not economically justified at this time"), 43 ("Taking cognizance of the favorable economic aspect of the proposed" east-bank outlet, "[t]he division engineer recommends that the existing project . . . be modified to provide for an additional east bank, deep-draft outlet . . . .").

If, as the Complaint alleges, the design was defective, this claim is barred by the discretionary function exception even if the design decisions were based on engineering principles.  The case law recognizes that in situations like this, the discretionary function exception protects the acts and

---

construction and operation costs of terminal facilities, and benefits due to enhancement of property values incident to creation of tidewater harbors."), 35-44 (setting forth economic aspects or project, comparing costs and benefits of east-bank and west-bank routes, and recommending east-bank route because of "the favorable economic aspect of the proposed additional deep-draft outlet . . . if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities"); *cf. id.* Plate 2 ("Plan of Improvement") (showing both recommended and rejected routes).

decisions that have an economic or political component, notwithstanding the scientific or technical underpinnings. Perhaps the clearest illustration that policy concerns can influence the application of engineering principles is to be found in *Boyle v. United Technologies,* 487 U.S. 500 (1988). The suit was brought against a government contractor after a military helicopter crashed. The personal representative of the estate and heirs of the co-pilot, who died in the crash, claimed that the contractor had defectively designed the helicopter's copilot emergency escape-hatch system. Applying principles borrowed from the FTCA's discretionary function exception, the Supreme Court ruled that the government contractor would be immune from suit if it could establish that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512; *see also Miller v. Diamond Shamrock Co.,* 275 F.3d 414 (5th Cir. 2001).

The first two of these prerequisites were imposed to assure that the design selected by the contractor was susceptible to policy analysis—notwithstanding the technical nature of the design process. *See Boyle,* 487 U.S. at 512. As the Court explained, "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511; *Miller,* 275 F.3d at 422 n.5. The immunity enjoyed by government contractors reflects that the government may, for reasons of policy, specify that a product be designed in a manner that would be considered defective under state law. *See Bailey v. McDonnell-Douglas Corp.,* 989 F.2d 794, 800 n.13 (5th Cir. 1993). In like fashion, here the design of a ship channel that allegedly funneled and accelerated storm surge and eroded wetlands is protected because it may have been the product of "not merely engineering

28

analysis but judgment as to" a variety of economic and political policies.  Building a separate canal

running parallel to the GIWW would have entailed destruction of additional wetlands and consumed

additional land, rendering it incapable of development.  Constructing shoreline protection would

have added considerable cost to the project.  Accordingly, these decisions are protected by the

discretionary function exception, even if they did entail the application of engineering expertise.

The Ninth Circuit's decision in *Kennewick Irrigation District v. United States,* 880 F.2d 1018 (9th

Cir. 1989), provides another example of this principle.  There, the Court of Appeals properly applied

the discretionary function exception to a claim that an irrigation canal had been defectively designed,

despite allegations that engineering judgments were involved.  As the court explained, the essence of

the claim was that government "officials had *no discretion* to violate certain engineering standards."

*Id.* at 1025 (emphasis in original).  The implication of such as claim was that engineering standards

"operate to remove discretion from a governmental actor."  *Id.* at 1026.  The court rejected this

contention as a general matter.  While "a safety or engineering standard operates to remove

discretion under the FTCA when it is embodied in a *specific and mandatory* [federal] regulation or

statute," engineering standards alone do not remove discretion.  *See id.* at 1026-27 (emphasis in

original); *see also Chaffin v. United States,* 176 F.3d 1208, 1211 (9th Cir.1999) (even negligent design

decisions are discretionary, precluding government liability).  Inasmuch as no regulation, statute, or

policy foreclosed the government's specification of the specific design defect alleged by the

irrigation district, the court of appeals found that the first prong of the discretionary function

exception test was met.[23]  *See Kennewick Irr. Dist.,* 880 F.2d at 1027.

---

[23]Because the project required local funding, the Court found that a decision to adopt a less expensive design was the sort of decision that the discretionary function exception was intended to protect.  880 F.2d at 1028 ("For construction of these projects to occur, water users must agree to pay the Bureau for construction costs.  This system inherently calls for the use of discretion by Bureau officials to consider construction costs and the water users' ability to repay those costs. [Therefore,] the engineers' decision not to line fully the canal was rooted in economic policy judgments.").  *Cf.* 1994 MR-GO Recon. Rep. (Exh. 9A) at 1-2, 70-71 (some shore stabilization plans

When specific design decisions occur within the context of a project or program established to further particular policy goals, those specific decisions can readily be analyzed in terms of the goals that guide the project.  In *Baldassaro v. United States,* 64 F.3d 206 (5th Cir. 1995), the question was whether the discretionary function exception protected alleged negligence in failing to secure a bunk-bed railing on a vessel that had been assigned to the National Defense Reserve Fleet.  The plaintiff seaman, who had been injured when the detachable rail at the foot of his bunk separated from the bunk, maintained that the decision to equip the bunks with detachable rails was not a protected discretionary function.  *Id.* at 207-08.  Because it is "to [be] presume[d] that the discretionary acts flowing from a policy-based statute are grounded in the same policy considerations that underlie the statute," the Court of Appeals readily concluded that the design decision to use detachable bunk rails was "capable of being influenced by policy considerations."  *Id.* at 210-11.

In sum, the proposition advanced by the plaintiffs, namely, that scientific decisions cannot fall within the discretionary function exception, is unsound.  "[S]ome scientific determinations or measurements may not implicate policymaking discretion," true.  *In re Orthopedic Bone Screw Prod.Liab. Lit.,* 264 F.3d 344, 364 (3rd Cir. 2001) (footnote omitted).  But it cannot truly be said "that science-based decisions never involve policymaking."  *Id.*  As the Supreme Court noted in *United States v. Gaubert,* 499 U.S. 315 (1991), "[i]t may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations," but even

---

were rejected because they lacked the necessary local support); 1988 Recon. Rep. (Exh. 5A) at 34 (some shore stabilization plans were "prohibitively expensive"; 33 U.S.C. § 426i(a) (authorization to "implement . . . measures for the prevention or mitigation of shore damages attributable to Federal navigation works" is contingent upon "a non-Federal public body['s] agree[ing] to operate and maintain such measures").  The design decision in *Kennewick* was protected because "[i]t was the type of decision which by nature 'rested upon practical considerations, including the vital item of cost . . . .'"  880 F.2d 1927-28 (quoting *E. Ritter & Co. v. Dep't of the Army,* 874 F.2d 1236 (8th Cir. 1989) (design of flood control ditch under cost-sharing scheme protected by discretionary function exception)).

actions that involve the "application of technical skills" may also "involve[] the kind of policy judgment that the discretionary function exception was designed to shield."  499 U.S. at 331-32; *see also Dalehite v. United States,* 346 U.S. 15, 38-42 (1953) (negligent specifications for manufacture of fertilizer were protected decisions).

The decisions challenged here were decisions that involved more than mathematical calculations.  They involved deciding whether one route would be more economically advantageous than another.  They involved deciding whether to combat hurricane-induced storm surge, and if so, whether to do so by building levees and floodwalls or by protecting wetlands, or both.  These decisions are of the nature and quality that the discretionary function was intended to protect.  They implicate broad political and economic concerns that transcend the underlying technical analysis that informs them. Because no statute or regulation specifically prescribed a course of conduct as to these matters, and because the decisions involved considerations of policy, they are protected by the discretionary function exception.

The plaintiffs also complain that the Corps merely studied the erosion problem rather than undertaking to remedy it.  *See* Plt. Mem. 66.  But whether and when to take action is a protected discretionary function, even when the decision is based on scientific or technical analysis.  *See, e.g., National Union Fire Ins. v. United States,* 115 F.3d 1415, 1418 (9th Cir. 1997); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 285-87 (3rd Cir. 1995) (en banc).  In *Fisher Brothers,* the plaintiffs were injured by decisions to bar Chilean fruit from entry into the United States and to encourage consumers to destroy Chilean fruit in their possession and to instruct grocers to remove Chilean fruit from their shelves.  After the FDA Commissioner was furnished with conflicting laboratory results concerning the presence of cyanide in Chilean grapes, he faced a decision whether to wait for more testing or to take action to protect the public.  *Id.* at 285.  He chose to act, and the plaintiffs, who included Chilean growers and exporters, shippers, and American importers and distributors,

sued claiming that the laboratory workers who reported finding traces of cyanide had failed to follow proper procedures to allow verification of their results. *See id.* at 283. The Court of Appeals readily found that the Commissioner's decision to act rather than wait for additional information was a protected policy decision:

> A critical part of the policymaking process was the Commissioner's decision to make a decision in the early morning hours of March 13, rather than to await more surveillance and testing. If he had waited, the plaintiffs might not have suffered the injury of which they complain. . . . The point, however, is that the decision about when the data were sufficient to permit responsible decisionmaking involved questions of 'social, economic, and political policy.'

*Id.* at 285 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 814 (1984). As the court observed, "every policy decision involves an exercise of the policymaker's judgment about the reliability, adequacy, and significance of the information available to him." *Id.* at 287.

Finally, it should be noted that the discretionary function exception applies equally to claims of operational negligence as to claims of negligent design. The plaintiffs' citation of *Indian Towing* is indicative of their mistaken understanding of the law. As is widely recognized, *Indian Towing* did not involve the discretionary function exception and the United States did not even assert the defense. *See, e.g., Harrell v. United States,* 443 F.3d 1231, 1237-38 (10th Cir. 2006); *Thames Shipyard and Repair Co. v. United States,* 350 F.3d 247, 255 (1st Cir. 2003); *Autery v. United States,* 992 F.2d 1523, 1527 (11th Cir. 1993). The application of the discretionary function exception turns on the nature of the particular conduct that is at issue. Operational decisions, like engineering decisions, can be informed by policy considerations. As the First Circuit has observed, the discretionary function exception would have applied to the conduct at issue in *Indian Towing* if it had involved social, political, or economic policies. *See Thames Shipyard and Repair,* 350 F.3d at 255; *Ayer v. United States,* 902 F.2d 1038, 1042 (1st Cir. 1990); *cf. United States v. Gaubert,* 499 U.S. 315, 336 (1991) (Scalia, J., concurring) ("there could conceivably [have] be[en] policy reasons for" conducting cursory inspections). It is simply untrue that the discretionary function exception applies only to initial policy decisions and

not to subsequent operational decisions.  *See Harrell,* 443 F.3d 1237-38; *Limar Shipping Ltd. v. United States,* 324 F.3d 1, 9-10 (1st Cir. 2003).

The only operational or maintenance activity challenged in this case is the alleged "fail[ure] to properly dredge the canal."  Complaint ¶ 53.  In a wide variety of circumstances, courts have found that dredging activities are discretionary functions.  *See Boston Edison Co. v. Great Lakes Dock and Dredge,* 423 F.2d 891, 896-97 (1st Cir. 1970); *Dunaway v. United States,* 1999 U.S. Dist. LEXIS 13800 at *29 (E.D. La., Sept. 2, 1999); *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.,* 1998 WL 113935 (E.D. La. 1998); *Manns v. United States,* 945 F.Supp. 1349, 1352-53 (D. Or. 1996); *In re Lloyd's Leasing Ltd.,* 764 F.Supp. 1114, 1137 (S.D. Tex. 1990); *Eazor Exp., Inc. v. United States,* 611 F.Supp. 197, 202 (E.D. N.Y. 1985); *Kommanvittselkapet Harwi v. United States,* 305 F.Supp. 882 (E.D. Pa. 1969), *aff'd,* 467 F.2d 456 (3rd Cir. 1970); *F&M Schaefer Brewing Co. v. United States,* 121 F.Supp. 322 (E.D. N.Y. 1954); *cf. Canadian Pacific (Bermuda) Ltd. v. United States,* 534 F.2d 1165, 1169-71 (5th Cir. 1976) (authorization to maintain a waterway does not constitute general undertaking to conduct dredging activities at any particular time or location).

Whether and when to dredge any particular location in the MR-GO waterway can be analyzed in terms of the broad policies that led Congress to authorize the project and that informed the project's design and construction.  Whether decisions about dredging were based on the navigational ends of MR-GO itself or on the alleged collateral impact of MR-GO on adjacent wetlands is immaterial.  Indeed, to the extent there is the potential for such impact, that "fact" confirms the decisions on dredging implicate substantial policy concerns.  Inasmuch as dredging decisions were "capable of being influenced by policy considerations," it must be presumed that they are grounded in the same policy considerations that underlie Public Law No. 84-455, which authorized MR-GO's construction.  *See Baldassaro v. United States,* 64 F.3d 206, 210-11 (5th Cir. 1995).

Apart from the prescribed selection of the route that the waterway would take, the challenged "design, construction, operation, and maintenance" decisions were not cabined by statute or regulation and are susceptible to policy analysis.  They are therefore protected discretionary functions.

CONCLUSION

For these reasons, the United States' motion to dismiss should be granted.

Respectfully submitted,

 PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

34

## CERTIFICATE OF SERVICE

I, Robin D. Smith, hereby certify that on September 18, 2006, I served a true copy of Defendant United States' Reply Memorandum in Support of Motion to Dismiss upon all counsel of record by ECF, electronic mail, or first class mail.


 _/s/ Robin D. Smith_____
         Robin D. Smith