# Exhibit 1A

| 82D CONGRESS | HOUSE OF REPRESENTATIVES | DOCUMENT |
|---|---|---|
| 1st Session | | No. 245 |

# MISSISSIPPI RIVER-GULF OUTLET

## LETTER

FROM

# THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, UNITED STATES ARMY, DATED MAY 5, 1948, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND AN ILLUSTRATION ON A REVIEW OF REPORTS ON, AND A PRELIMINARY EXAMINATION AND SURVEY OF, THE MISSISSIPPI RIVER-GULF OUTLET AND THE MOBILE TO NEW ORLEANS INTRACOASTAL WATERWAY, REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES, ADOPTED ON MAY 5, 1943, AND THE COMMITTEE ON COMMERCE, UNITED STATES SENATE, ADOPTED ON APRIL 19, 1943, AND ALSO AUTHORIZED BY THE RIVER AND HARBOR ACT APPROVED ON MARCH 2, 1945

OCTOBER 1, 1951.—Referred to the Committee on Public Works and ordered to be printed, with one illustration

## LETTER OF TRANSMITTAL

DEPARTMENT OF THE ARMY,
*Washington 25, D. C., September 25, 1951.*

The SPEAKER OF THE HOUSE OF REPRESENTATIVES.

DEAR MR. SPEAKER: I am transmitting herewith a report dated May 5, 1948, from the Chief of Engineers, United States Army, together with accompanying papers and an illustration, on a review of reports on, and a preliminary examination and survey of, the Mississippi River-Gulf outlet. This investigation was requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted on May 5, 1943, and the Committee on Commerce, United States Senate, adopted on April 19, 1943, and also authorized by the River and Harbor Act approved on March 2, 1945.

In accordance with section 1 of Public Law 14, Seventy-ninth Congress, the views of the Governor of the State of Louisiana are set forth in the enclosed communication.

1

89660—51——1

REPORT OF THE CHIEF OF ENGINEERS, UNITED STATES ARMY

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, D. C., May 5, 1948.*

Subject: Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.
To: The Secretary of the Army.

1. There is submitted herewith for transmission to Congress the report of the Board of Engineers for Rivers and Harbors in response to resolution of the Committee on Commerce of the United States Senate, adopted April 19, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands; and also a resolution of the Committee on Rivers and Harbors of the House of Representatives, adopted May 5, 1943, requesting the Board to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document No. 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Ala., to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, La., eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands. It is also in review of the report of the division engineer on a ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, La., to the Gulf of Mexico, by way of the best available route or routes, authorized by the River and Harbor Act approved March 2, 1945.

2. I concur in general in the views and recommendations of the Board. It is noted that the conditions of local cooperation prescribed by the Board include among other requirements that local interests make necessary highway changes. The existing project for the Gulf Intracoastal Waterway provides, however, for the United States to construct a highway bridge over this section of that waterway. Since existing congressional authority specifically provides for the construction of a highway crossing by the United States, it is considered that the project for the ship channel should carry similar authority.

3. I recommend modification of the existing project for Mississippi River, Baton Rouge, to the Gulf of Mexico, to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Island at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide and 2,000 feet long; and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal, including construction of a suitable highway bridge with approaches to carry Louisiana State Highway 61 over the channel; all generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $67,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to initiation of construction, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when and as required for subsequent maintenance; furnish assurances satisfactory to the Secretary of the Army that they will accept ownership of the highway bridge and approaches upon completion of construction, together with maintenance, operation, and future replacement, or alteration as may be required; will provide and maintain any other bridges required over the waterway, and accomplish all necessary utility and other highway relocations and alterations and the maintenance thereof; will hold and save the United States free from all claims for damages due to construction, maintenance, and operation of the project; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port.

R. A. WHEELER,  
*Lieutenant General,*  
*Chief of Engineers.*

9. Extensive terminal and transfer facilities for both deep- and shallow-draft traffic are located along the Mississippi River at Baton Rouge and downstream to the Head of Passes with the greatest concentration being at New Orleans. Terminal facilities on the east bank of Mississippi River at New Orleans form an almost continuous quay for 10 miles. Terminals on the west bank opposite the city are located at Westwego, Gretna, and Algiers. A United States naval dry dock is at Algiers. Four lateral slips and marginal wharves are located along the Industrial Canal. Most of the wharf area of the port of New Orleans is connected by rail, principally by the New Orleans Public Belt Railway. Public terminal business is controlled by the Board of Commissioners of the Port of New Orleans through supervision of public wharves owned by the State of Louisiana and covering about 62 percent of the improved water front. Port facilities at New Orleans also include a free port area for transshipment of foreign commerce without clearing through customs. Space for additional terminal facilities is available along the river banks but river-stage fluctuation and attenuation of surface-transportation facilities are restrictive factors on additional river-front developments. Industrial and terminal facility sites are available also along the Intracoastal Waterway east of New Orleans but rail and highway connections are limited.

10. Local interests desire provisions for the expansion of tidewater terminal facilities at New Orleans to serve further increase in waterborne commerce incident to continuing development of the Mississippi Valley and of New Orleans as a premier world port. They estimate that expansion of harbor space and general cargo handling facilities is required to provide an additional annual capacity of at least 3,000,000 tons. The Board of Commissioners of the Port of New Orleans proposes enlargement of the inner harbor to provide for expansion of harbor facilities, construction of a new lock for access to the Mississippi River, and construction of a seaway initially 500 feet wide and 36 feet deep from the Industrial Canal to the Gulf east of Chandeleur Islands. The Mississippi Valley Seaway Canal Association and other interests on the west bank of Mississippi River at New Orleans propose construction of a tidewater harbor and terminal facilities on the west bank near Westwego, connection with the river through duplicate deep-draft locks and construction of a seaway 600 feet wide and 40 feet deep from the proposed harbor southward to the Gulf in the vicinity of Grand Isle. Proponents of each route cite the availability of large areas of adjacent land for development of a tidewater port, the freedom of a seaway channel from shoaling due to river-borne sediment as is encountered in the improved channel through the Mississippi River and passes, the freedom from fog induced by the difference in temperature of river and gulf water at their junction, the advantage of the direct alinement as compared to the bends in the river channel, and the reduction in the congestion of river traffic within the existing port limits which would be provided by an additional outlet. Proponents of the west-bank route state that it provides the shortest distance between New Orleans and the Gulf, traverses unimproved lands rather than open water, and would facilitate construction of a canal-bank highway to Grand Isle to open up the area and enhance values of adjacent lands. It is stated that the Board of Commissioners, Port of New Orleans,

contemplates expenditure of $30,000,000 for further development of east-bank-harbor facilities but no definite offer of local cooperation has been received in connection with the proposed west-bank-development. Interests using the inland waterways suggest the expansion of lock facilities for light-draft traffic. Petroleum interests state their aversion to side channel outlets and advise that they prefer to use the improved river channel.

11. The division engineer has conducted surveys and studies of the existing and authorized improvements in the Mississippi River and pass channels and of the available sites for a tidewater harbor at New Orleans with essential connecting channels including the several available alinements for a seaway canal to the Gulf. He reports that the usual hazards encountered in restricted channels and their outlets attend navigation of the river and its passes and, under provisions made for their control, they are only minor. New Orleans enjoys equality with other major Gulf and Atlantic ports on rates for vessel and cargo insurance and pilotage charges. The division engineer finds that the river and its improved outlets afford seagoing vessels direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial-Canal lock, hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

12. After consideration of the alternative locations and routes for an additional outlet, the division engineer selected two plans of improvement for detailed investigation. One plan provides for creation of a tidewater harbor on the east bank of the Mississippi River, generally as advocated by the Board of Commissioners of the Port of New Orleans, by construction of a channel 36 feet deep and 500 feet wide along the Gulf Intracoastal Waterway from the existing Industrial Canal to a turning basin south of Micheaud; the turning basin 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut on tangents and easy curves from the turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Chandeleur Islands at or north of Errol Island, to deep water in the Gulf of Mexico. Provision is included for a permanent retention dike along the canal across Chandeleur Sound; for parallel jetties from Chandeleur Islands to the 20-foot contour in the Gulf with a wing dike along the islands as required; and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. The plan provides for the future construction of a channel and a lock at Meraux on the left bank of Mississippi River at mile 86, to furnish a connection from the tidewater harbor to the river additional to the existing industrial canal and lock when such construction is warranted by prospective commerce. Costs of the foregoing east-bank improvements, exclusive of the future connecting channel and lock, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $400,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Corresponding annual carrying charges are estimated at $3,270,000, of which $3,240,000, including $810,000 for maintenance, are Federal and $30,000 are non-Federal. The

alternate plan provides for improvements on the west bank of Mississippi River, substantially as proposed by the Mississippi Valley Seaway Canal Association and other west-bank interests, to consist of an eased entrance channel 36 feet deep from the right bank of Mississippi River near Westwego at mile 103, leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; a landside forebay and turning basin suitable for development as a tidewater terminal harbor; a seaway canal, 36 feet deep and 500 feet wide, extending 55 miles as a land and water cut on tangents and easy curves from the terminal turning basin southerly to and through the Barataria marshes and Caminada Bay and Pass to deep water in the Gulf of Mexico; and readjustment of the Mississippi River main west-bank levee, relocation or reconstruction of highways, railways, and utilities, and construction of a movable railway and highway bridge. Provision is included for parallel jetties from Caminada Pass to the 20-foot contour in the Gulf and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. Costs of the improvements under the alternate plan, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $300,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Annual carrying charges are estimated at $2,870,000.

13. The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal port traffic, together with savings on construction and operation costs of terminal facilities, and benefits due to enhancement of property values incident to creation of tidewater harbors. He notes that the proposed outlets at New Orleans would not benefit river terminals and installations above and below the port nor be utilized by petroleum interests now using the river channel in view of their aversion to locks and side channels. He estimates annual benefits of $5,260,000 as being reasonably prospective from the proposed improvements on the east side of Mississippi River, as a result of reduction in sailing and turn-round time and navigation hazards for deep-draft general-cargo vessels, savings in terminal handling and annual wharf charges, and enhancement of water-front property. The annual benefits from comparable items of savings to commerce and from land enhancement attributable to the alternate west-bank improvements are estimated to total $1,690,000. The ratio of estimated annual benefits to annual carrying charges is 1.61 under the plan providing for the supplementary outlet eastward of Mississippi River and 0.59 under the alternate plan for the west-bank outlet, therefore, the division engineer finds that the improvements to provide the eastward outlet are economically justified and those for the west-bank outlet lack economic justification. He also notes that the improvements would greatly enhance the capacity of the port for emergency war service by provision of an additional outlet and wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense. The division engineer recommends modification of the existing project "Mis-

(d) *Relation of outlets to sections of the port.*—For seagoing vessels, the river and its improved outlets afford direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial Canal lock. Proposed additional outlets would serve terminals on new tidewater terminal basins primarily with access to marginal river wharves through deep-draft locks. Hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

(e) *Costs.*—As of June 30, 1945, costs of the existing project were about $25,000,000 for new work and $21,000,000 for maintenance, and modification to secure a 40-foot channel in Southwest Pass is authorized at an estimated cost of $4,200,000. Approved estimates for annual maintenance costs are $1,169,000 (pars. 19 and 20). Proposed additional plans of improvement on the east and west banks are estimated to cost $53,000,000 each (table 7 [1]).

## XI. ECONOMIC ASPECT

56. Major expansion of seagoing commerce in postwar years is expected by local interests, estimates of increase range from 50 percent suggested by shipping interests (exhibit LVII-A [1]) to 200 percent of previous peak years suggested by economists (p. 4, appendix B of exhibit LVII-A [1]). The United States Maritime Commission noted that total foreign and coastwise commerce doubled in the 17 years ending in 1940 and stated that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents but suggested that New Orleans should share in expansion of foreign trade expected by the Department of Commerce. The division engineer believes that continuing increase in seagoing commerce reasonably may be expected but notes that petroleum interests expressed their aversion to locks and side channels (par. 37). Accordingly he considers that a 50 percent increase in seagoing general cargo traffic of recent years (excluding war years, 1942–44), pertinent to specific sections of the port to be served directly by proposed outlets, is a reasonable expectancy. On this basis prospective annual commerce related to east and west bank proposals is estimated at 10,000,000 and 3,000,000 tons, respectively (pars. 37 and 38). Creation of a tidewater harbor on either bank at New Orleans effecting material economies in terminal-handling costs would tend to divert traffic to the improvement. However, the Board of Commissioners of the Port of New Orleans, a legally constituted agency of the State of Louisiana, has jurisdiction of the port and is a dominant factor in its development. Hence, assumption of a common percentage increase in commerce recorded for specific sections of the port directly affected by proposed improvements is a fair basis for estimating prospective commerce for the west-bank proposal and ultra conservative for the east-bank proposal sponsored by the dock board. Because traffic diversion that may result from provision of a tidewater harbor is unpredictable, prospective commerce for and the economic aspect of each of the proposed outlets is evaluated by extrapolating recorded traffic movements of recent years, war years excluded.

57. Economies adduced by proponents of additional outlets (seaways) and tidewater harbors include (a) savings in sailing time and attendant transportation costs; (b) reduction in hazards to navigation on the river and passes; (c) savings in port costs, including land transportation, pilotage, stevedoring, and maintenance charges on terminal wharves; (d) enhancement of land values; and (e) savings in

---

[1] Not printed.

Case 2:05-cv-04182-SRD-JCW   Document 1183-1   Filed 09/18/06   Page 9 of 18

36                    MISSISSIPPI RIVER-GULF OUTLET

cost and maintenance of Federal projects. With respect to economies adduced (table 8 [1]) it is considered that—

(a) Calculated savings in sailing time, based on traffic between New Orleans and Mobile, Pensacola, or Panama City (5,500 hours, p. 20, exhibit LVII–B [1]), adduced for an east-bank outlet, must be discounted as coastwise vessels do not necessarily make all ports of call. Reasonably not more than 50 percent of such savings in sailing time (say 2,500 hours) may be accepted. Similar saving in sailing time for coastwise traffic between New Orleans and Lake Charles, the Sabine ports or Galveston is applicable to a west-bank outlet. Sailing distance differentials for foreign commerce (between New Orleans and Florida Strait or Yucatan Channel and points beyond) are relatively inconsequential. A major saving incident to proposed east-bank improvements, adduced by east-bank proponents and accepted by analysts of the United States Maritime Commission, is reduction in turn-around time (time required in port, i. e., in-bound pratique to out-bound clearance). Reasonably up to 10,000,000 tons of prospective commerce may be expected to use proposed east-bank-harbor facilities, involving, at trip tonnage rates indicated by traffic through the passes (pars. 29 and 35), upward of 2,000 vessel trips annually. Reduction in turn-around time, to be effected by installation and operation of modern terminal equipment "made possible by location in tidewater with central railroad yard service," is estimated at 1¼ days per trip (pp. 12 and 13, exhibit LVII–B [1]). Resulting savings in time (60,000 hours) are attributable to proposed east-bank improvements; i. e., tidewater harbor access and outlet channels. Similar reduction in turn-around time on 3,000,000 tons of prospective traffic involving 600 vessel trips would apply to proposed west-bank outlet and access channels if implemented by similar facilities with proportional savings in time (18,000 hours). Sailing time of general cargo vessels is currently valued at $65 per hour.

(b) Reduction in navigation hazards adduced by proponents of an east-bank outlet, some $120,000 (p. 30, exhibit LVII–B [1]), are applicable to side channels on either bank but must be discounted in amount because navigation accidents may be expected in any restricted channel and in the open seas. It is considered that not more than 25 percent of savings adduced may be accepted in support of proposed improvements on either bank.

(c) Savings in port costs adduced by east-bank proponents include several items found by analysts of the United States Maritime Commission to be exaggerated so only 50 percent of these savings (say $700,000) may be accepted in support of the proposal. Savings in pilotage may be disregarded since pilotage charges at New Orleans are in line with those at other Gulf and Atlantic ports. Savings in annual charges on wharves on a tidewater harbor as compared with those on the river ($750,000) may be accepted but such savings are attributable to both channel and terminal improvements and only 50 percent ($370,000) are accepted in support of the channel. Proportionate savings under this category are applicable to proposed west bank improvements.

(d) Proposed east-bank improvements would render adjacent lowlands suitable for development as terminal and industrial sites on the water front. Resulting increase in land values varies from $300

[1] Not printed.

to $800 per acre with corresponding enhancement estimated at $100,000 per year. Similar enhancement for proposed west-bank improvements is estimated at $30,000 per year.

(e) Proposed east-bank improvements include provision for a connecting channel for the Intracoastal Waterway to complete the section from Mobile to New Orleans and obviate the need for continued lease of Industrial Canal facilities. Appropriate allocation of cost for the connection is indicated by the comparable alternate west-bank connection authorized by the River and Harbor Act approved March 2, 1945 (S. Doc. No. 188, 78th Cong., 2d sess.); i. e., $8,000,000 for Federal construction and $100,000 for non-Federal expenditures for rights-of-way, with estimated annual Federal and non-Federal charges of $500,000 and $30,000, respectively. Corresponding Federal costs for leased facilities on the east bank now cost about $450,000, including annual rental payment of $240,000 which may be eliminated on termination of the lease. However, as only 2 percent of present commerce would be unable to use this existing lock, its replacement in the immediate future is not essential. Completion of the section of the Intracoastal Waterway west of the river provided for by existing authorizations is under construction, and the proposed west-bank outlet cannot be substituted for authorized features thereof. Proposed outlets on either bank would supplement but not replace navigation facilities provided by the river and its improved passes, so savings thereon may not be adduced in support of additional outlets.

58. In summary, annual benefits reasonably to be expected from alternative additional outlets outlined herein, implemented by effective operation of superior modern terminal facilities, are estimated at $5,260,000 for east-bank or $1,690,000 for west-bank outlets (table 8 [1]).

### XII. PLANS OF IMPROVEMENT

59. *General.*—Proponents of additional deep-draft outlets have assumed that such channels can be secured and maintained by dredging, but departmental experience in maintenance and improvement of Gulf-coast entrance channels does not support such assumption where shallow exposed coastal lakes or sounds are encountered. It has been demonstrated repeatedly that such channels should be sited through land cuts or provided with effective barriers to preclude return of dredged spoil into dredged channels. Hence the plan of improvement presented herein for an east-bank outlet and tidewater harbor provides for maximum use of land cuts, for a permanent retention dike across the sound and for jetties at the Gulf entrance. The proposed west-bank outlet would be land-locked so requires protection works (jetties) only at its Gulf entrance. Under criteria set forth in table 6,[1] plans of improvement are set forth below and shown on plates 1-5 [1] for additional deep-draft outlets to the Gulf on the east and west bank alternately. Each includes provision for access and outlet channels, lock with forebays, and turning basins. East-bank improvements outlined constitute a tidewater harbor and seaway outlet substantially as sponsored by the Board of Commissioners of the Port of New Orleans. Those for the west bank are substantially as proposed by the Mississippi Valley Seaway Canal Association, an organization of west-bank interests.

---

[1] Not printed.

60. *East-bank improvements.*—These include complementary features as follows:

(a) *Tidewater harbor and connecting channels.*—Supplementing facilities provided by the existing projects "Mississippi River, Baton Rouge to the Gulf of Mexico" and "Gulf Intracoastal Waterway," this feature provides for creation of a tidewater harbor by construction of a 36- by 500-foot channel from the existing inner-harbor canal to a turning basin south of Micheaud. Provision is also made for an eased entrance channel 36 feet deep from the left bank of the Mississippi River near Meraux (mile 86) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide, with a depth of 40 feet on the sills; a landside forebay and mooring basin leading into a connecting harbor channel 36 feet deep and 500 feet wide when such construction is warranted by prospective commerce.

(b) *Outlet (seaway).*—This feature provides for construction of a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Michaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of 70 miles. Provision is included for a permanent retention dike across the sound and for parallel jetties from Chandeleur Islands to the 20-foot-depth contour in the Gulf, with a wing dike along the islands, as required, the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

61. *Costs.*—Estimated costs and annual charges for proposed east bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| Tidewater harbor and outlet (seaway) | 53.00 | 0.50 | 3.24 | 0.03 |

62. *West-bank improvements.*—These include complementary features as follows:

(a) *Lock and appurtenances.*—This feature provides for construction of an eased entrance channel 36 feet deep from the right bank of the Mississippi River near Westwego (mile 103) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; and a landside forebay and turning basin suitable for development as a tidewater terminal harbor as proposed by its sponsors. The plan involves readjustment of the Mississippi River main west-bank levee; relocation or reconstruction of highways, railways, and utilities; and construction of a movable railway and highway bridge.

(b) *Outlet (seaway).*—This feature provides for a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from the terminal turning basin (feature (a)) to and through the Barataria marshes and Caminada Bay and Pass to deep

[1] Not printed.

water in the Gulf of Mexico, a distance of 55 miles. Provision is included for parallel jetties from Caminada Pass to the 20-foot-depth contour in the Gulf; the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

63. *Costs.*—Estimated costs and annual charges for west bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| (a) Lock, access channel, and turning basin | 26.0 | 0.2 | 1.40 | 0.01 |
| (b) Outlet (seaway) | 27.0 | 0.3 | 1.44 | 0.02 |
| Total | 53.0 | 0.5 | 2.84 | 0.03 |

64. *Résumé of estimates of costs and benefits.*—As shown above, estimated costs for proposed east-bank improvements (tidewater harbor and additional deep-draft outlet to the Gulf with connecting channel to the inner harbor) are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way. Attendant total annual charges, $3,270,000, are commensurate with annual benefits to commerce reasonably to be expected, $5,260,000 (table 8 [1]). The economic ratio is 1.61. Estimated costs for proposed west bank improvements (tidewater terminal and deep-draft outlet to the Gulf) are $53,000,000 for Federal construction and $300,000 for non-Federal expenditures for rights-of-way. Attendant annual charges, $2,870,000, are considerably in excess of benefits to commerce reasonably to be expected, $1,690,000 (table 8 [1]). The economic ratio is 0.59.

XIII. SPECIAL SUBJECTS

65. *Shore line changes.*—Construction of a deep-draft channel across Chandeleur Sound with dredged material deposited seaward of a retention dike, as contemplated by the plan of improvement, will create a continuous barrier across the sound to intercept prevailing southeast seas, will reduce the magnitude of feeble rotary currents which obtain in the sound, and cause no material change in the mainland shore line. Aids to navigation have not been defined but the local commandant of the United States Coast Guard service collaborated in preparation of cost estimates for navigation aids. The proposed west-bank outlet, land-locked inshore from Caminada Bay, likewise would cause no material change on the mainland shore. Aids to navigation for the proposed channel have not been defined.

XIV. DISCUSSION

66. The Board of Commissioners for the Port of New Orleans, the legally constituted agency of the State of Louisiana for operation of the port, together with civic and political organizations and financial, industrial, and shipping interests of the city, State, and alluvial

[1] Not printed.

valley, sponsor Federal construction of an additional deep-draft outlet from the Mississippi River at New Orleans to and across Chandeleur Sound to the Gulf of Mexico. They point out that harbor expansion and improved terminals for general-cargo traffic are now urgently required for present and prospective commerce. The board's consultants advise that installation and operation of improved terminals on a tidewater harbor would effect a saving of 1¼ days per vessel trip with coincident economies in port charges and in construction and operation costs of terminal wharves and appurtenances. The board cites its large investment in marginal river wharves and Industrial-Canal facilities and contemplated new improved terminals on a tidewater harbor east of the city as an appropriate measure of local cooperation.

67. West-bank interests, including the Mississippi Valley Seaway Canal Association, request Federal construction of an additional outlet from the west bank of the river to the Gulf south of Caminada Bay. They stress the relatively short distance to the Gulf by the west-bank alinement and suggest that terminal development could be financed by the State of Louisiana.

68. Continued expansion of the great seagoing and inland waterway commerce of the port is assured by its location on the Mississippi River at the junction of the Gulf Intracoastal Waterway, where it constitutes the gateway to the great system of inland waterways of the central valley of the Nation. Obviously adequate outlets to the Gulf of Mexico are essential and expansion and improvement of harbor facilities are necessary to provide economically for the convenience and safety of expanding commerce.

69. Existing outlets through the improved passes suffice to serve present commerce but accelerating shoaling of the Southwest Pass bar indicates that expensive jetty extension and bar channel relocation will be necessary in the early future, in connection with operations required, but not initiated, to secure and maintain project channel dimensions now authorized. An additional outlet, not subject to vagaries of the river, obviously will provide added assurance of uninterrupted access to the sea for deep-draft shipping.

70. Existing riverside wharves normally serve a great volume of commerce, and during war years these terminals were severely overtaxed to move a vast tonnage of military supplies which was not reported in published statistics. Site restrictions incident to the location of marginal wharves on unstable leveed banks riverward of built-up city streets preclude expansion of these facilities to serve additional commerce, so the dock board plans construction of new and improved terminals on a tidewater harbor with direct egress to the sea through the proposed east-bank outlet (seaway).

71. Proposed outlets at New Orleans obviously would not directly benefit river terminals and installations above and below the port. Moreover, petroleum interests, notably the Standard Oil Co. at Baton Rouge, express preference for continued use of the river and aversion to locks and side channels. Hence economic justification for additional outlets is calculated on the basis of economies that may be effected in pertinent present and prospective general-cargo commerce (foreign and coastwise), inland-waterway commerce, and internal-port traffic, together with savings on construction and operation costs of terminal facilities, and on benefits due to enhancement of property

values incident to creation of tidewater harbors. On this basis it is found that the proposed west-bank outlet is not economically justified at this time (pars. 63 and 64).

72. Prospective seagoing commerce, general cargo, pertinent to an east-bank outlet developed as a tidewater harbor is estimated at not less than 10,000,000 tons annually (par. 37). This estimate excludes all seagoing traffic in oil, the dominant commodity of water-borne commerce, and disregards possible diversion of traffic not served by east-bank terminals heretofore. It is considered ultraconservative. Prospective waterway commerce east of New Orleans, greatly expanded in war years, may be expected to decline, but such decline presumably will be offset by diversion of Mississippi River commerce to the authorized Tombigbee-Tennessee waterway (par. 39). The east-bank improvement outlined herein may in the future be amplified, when found justifiable, by the construction of an additional lock and connecting channels to the Mississippi River, which will complete the Mobile-New Orleans section of the Gulf Intracoastal Waterway (which now utilizes leased facilities of the State-owned Industrial Canal) and relieve congestion in the harbor. The improvement, implemented by improved port facilities, will effect reduction in turn-around time for seagoing general-cargo vessels, savings in terminal and transfer charges, and in costs for construction and operation of terminal facilities. Resulting benefits are estimated at $5,260,000 annually (par. 64).

73. Estimated costs for the east-bank improvement are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way (par. 61). Corresponding annual charges, Federal and non-Federal, are $3,240,000 and $30,000, respectively. The indicated ratio of charges to benefits is 1.61.

74. Under established practice, port development is effected cooperatively, with harbor channels and connections (access, outlet and inland waterway channels), turning basins and locks, as well as bridges over land cuts, generally provided by the Federal Government. Rights-of-way and terminal facilities (including slips, piers, warehouses, land transportation, and other port facilities) are responsibilities of port authorities, subject to regulations approved by the Secretary of War to ensure equitable operation. The plan outlined in paragraph 60 supra is predicated on such cooperative development to create a tidewater harbor with alternate outlets to the river and sea. Full utilization of existing river, inner harbor; and Intracoastal Waterway facilities is contemplated. The plan lends itself to step construction, with priorities and definitive location of features fixed in the discretion of the Chief of Engineers to fit into a flexible, long-range program of port development to serve the public through many generations.

75. Comprehensive development of a national port such as New Orleans properly should be planned to facilitate its use for national defense in emergencies. In the recent World War, the port of New Orleans, the Mississippi River, and the system of inland waterways were important factors in deployment of war supplies, but locks and terminals at New Orleans were greatly overtaxed. With continuing growth of population and development of resources of the Mississippi Valley and decentralization of industry, it is believed that the port, the river, and the inland waterways will be used to a still greater extent in another national emergency.

76. Although future technical developments of warfare cannot be foreseen clearly, the basic principle of dispersion undoubtedly will continue to apply to protection of important installations, such as national ports of embarkation. The recent war demonstrated that harbor facilities, if dispersed and provided with unrestricted or alternate exits to the sea, are rendered inoperative by air or sea action with great difficulty, and if damaged can be restored to usable condition quickly, in part if not completely. Hence wide dispersion of harbor facilities should be provided for in any plan for comprehensive port development. New Orleans riverside wharves, of timber construction on long wood piles, cannot be expected to resist destruction by bombing as practiced in the recent war, and attack by atomic bombing is now possible. These terminals, sited on unstable banks subject to shoaling and scour by a river with a 20-foot range of stage, cannot be developed for efficiency and permanence to the degree possible on constant level harbors, so preferably additional installations in the interest of national defense should be located off the river with unrestricted outlet to the sea and access to the river through locks which, from a security standpoint, can be considered as alternate entrances. Locks are attractive targets for aerial bombing and are subject to sabotage unless well guarded. However, recent war experience disclosed that massive lock structures resist bombing attacks and damaged gates can be repaired or replaced, so locked harbors are not easily rendered inoperative by aerial attack. Recourse to alternate locks and access channels ensures the availability of part if not all of a dispersed harbor.

77. No expression as to possible use of proposed port improvements by the United States Navy has been received. Naval officers advise (exhibit III [1]) that the Navy would not construct a base without unobstructed outlet to the sea, but that any aid to shipping would be of value (exhibit XLI [1]).

78. National defense not only involves military installations, but also complete systems of transportation by air, land, and water to facilitate mobilization and deployment of personnel, materials, and supplies. Due to the unpredictable nature of future wars, the hazards inherent in industrial concentrations at coastal ports, and the possibility of attack without warning, it well may be necessary to use national ports of embarkation such as New Orleans to an unprecedented degree, so port-development plans should include provision for potential sites for new facilities required by new emergencies.

79. The improvement outlined in paragraph 60 will provide a tidewater outlet and harbor sufficiently spacious for dispersion of docks and cargo-handling facilities, thus permitting flexible operation of inland and seagoing commerce utilizing the river and passes, the tidewater harbor and outlet, and the Intracoastal Waterway. Provision of such facilities in time of peace so that they may be available for adaptation to the requirements of any emergency is patently in the national interest.

80. *Coordination with other agencies.*—After perusal of the report, the director of the Louisiana Department of Public Works, designee for the Governor of Louisiana, expressed full concurrence with findings presented; the president of the New Orleans Tidewater Develop-

---
[1] Not printed.

ment Association also concurs, but favors construction priority for the outlet channel in preference to the lock and access channel; and the chief engineer of the Board of Commissioners for the Port of New Orleans advises that the plan is substantially that proposed by that agency.

## XV. CONCLUSION AND RECOMMENDATION

81. *Conclusion.*—Taking cognizance of the favorable economic aspect of the proposed additional deep-draft outlet from New Orleans to the Gulf of Mexico seaward of the Chandeleur Islands if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities; the division engineer considers it advisable to adopt a long-range development program for the port of New Orleans as a major feature of existing projects for "Mississippi River, Baton Rouge to the Gulf of Mexico," and "Gulf Intracoastal Waterway," to be prosecuted in cooperation with the local port authority, the Board of Commissioners of the port of New Orleans, as agent for the State of Louisiana. He finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes, will permit expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port as the gateway to the Mississippi Valley and its improved inland waterways, with resulting benefits to present and prospective seagoing and inland-waterway navigation and commerce considerably in excess of charges for construction and operation. He also considers that the proposed improvement will greatly enhance the capacity of the port for emergency war service, since it provides for wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.

82. *Recommendation.*—The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank, deep-draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil-

disposal areas required for initial construction and subsequent maintenance; and furnish assurances, satisfactory to the Secretary of War, that they will hold and save the United States free from claims for damage incident to construction, maintenance, and operation of the improvement; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of War, to ensure its equitable operation in the public interest.

R. W. CRAWFORD,
*Major General, United States Army,*
*Division Engineer.*

---

LIST OF ILLUSTRATIONS MADE IN CONNECTION WITH THE REPORT OF THE DIVISION ENGINEER

(only plate 2 printed)

Plate 1—Index.
Plate 2—Plan of Improvement.
Plate 3—Hydrographic bar surveys and advance of contours, Southwest Pass.
Plate 4—Physical data and tentative sections.
Plate 5—Ship canal termini and locks.

O


