# Exhibit 3A

Y4.R52:
7146
JAN 1 4 1931
Rec'd Late.

| 71ST CONGRESS  <br> 2d Session | COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES U.S. | DOCUMENT <br> No. 46 |
|---|---|---|

# MISSISSIPPI RIVER—GULF OUTLET

## LETTER

FROM

## THE CHIEF OF ENGINEERS, UNITED STATES ARMY

TRANSMITTING

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS ON REVIEW OF REPORTS HERETOFORE SUBMITTED ON MISSISSIPPI RIVER—GULF OUTLET AND NEW ORLEANS INDUSTRIAL CANAL

---

WAR DEPARTMENT,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, June 11, 1930.*

Hon. S. WALLACE DEMPSEY,
*Chairman Committee on Rivers and Harbors,*
*House of Representatives, Washington, D. C.*

MY DEAR MR. DEMPSEY: 1. Referring to letter of the chairman of the Committee on Rivers and Harbors of the House of Representatives, dated February 27, 1929, inclosing a copy of a resolution of the committee of the same date, requesting the Board of Engineers for Rivers and Harbors to review the reports on Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to a provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways, I inclose herewith the report of the board in response thereto.

2. Recommendation was made in the reports under review that no modification be made of the existing projects, since adequate facilities were already provided for deep-draft vessels between New Orleans and the Gulf of Mexico. The particular improvement now desired is that the Federal Government take over the New Orleans Industrial.

118210—H. and H. Doc. 46, 71-2——1

## 2   MISSISSIPPI RIVER—GULF OUTLET

Canal for use in connection with an additional outlet to the Gulf or provide a toll-free route for the intracoastal canal.

3. A large commerce moves through the passes of the Mississippi River, the tonnage in 1928 having been 17,107,959 tons, exclusive of cargoes in transit, amounting to 2,384,788. The foreign commerce amounted to 11,738,614 tons. The total number of ocean vessels arriving at and departing from New Orleans was 6,228, the maximum draft being about 32 feet.

4. An artificial waterway between New Orleans and the Gulf would have to be not less than 500 feet wide and 35 feet deep. Duplicate locks would be necessary to overcome the difference in the elevation of the water in the Mississippi and in the Gulf and to facilitate shipping. Nine possible routes for such a waterway have been given consideration, the estimated costs ranging from about $19,400,000 to about $41,000,000. Some of these routes would be exceedingly difficult to maintain. The most advantageous is probably one passing through Barataria Bay, which is somewhat shorter to western points than the routes via the passes. Allowing 50 minutes for passing through the lock, however, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. Vessels bound from New Orleans to eastern points would find the route via South Pass more advantageous than any of those considered.

5. The industrial canal is already part of the existing intracoastal commerce on this route is increasing and the district engineer believes that the industrial canal has some prospective value as part of the inland waterway system. Reimbursement of the owners for the cost of the canal is not considered advisable by him, since the improvement has been carried out on a much more extensive scale than is required for the intracoastal service. The owner might be reimbursed, in the opinion of the district engineer, in an amount equivalent to the cost of constructing a 9 by 100 foot canal with a suitable lock, the estimated cost of which is $2,270,000, assuming that all rights of way and highway bridges were furnished at local expense. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied, the district engineer considers it preferable to consider the question of the industrial canal in connection with that report. He finds no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two passes is now assured. He therefore recommends that no further steps be taken toward providing such a route or toward the acquisition of the industrial canal at the present time.

6. The division engineer concurs in the opinion of the district engineer. He points out that the toll charge for the movement of inland waterway traffic through the industrial canal is 5 cents per gross ton, and that the total payments made by the Federal barge line average less than $10,000 annually. The cost to the United States, in interest charges alone, of providing a toll-free canal, should be possible by the payment of $2,270,000 to the owners, would be nearly 10 times the toll charges now paid by the Federal barge line.

7. The board finds that the improvement of the mouths of the Mississippi has now reached a point where dependable channels can be assured indefinitely. The cost of maintaining these channels,

## MISSISSIPPI RIVER—GULF OUTLET   3

including the extension of the jetties, which may be necessary within 50 years, is less than the annual carrying charges on any of the auxiliary channels considered. While there are some dangers and hazards to navigation through the passes, it is not to be expected that any more favorable conditions would be found in the restricted side channels which have been considered. The two improved passes have a capacity of several times the present commerce of New Orleans, and there is no necessity for another deep-water outlet, either for emergencies or to provide for increasing commerce. The question of making the industrial canal an integral part of the intracoastal waterway extending eastward from New Orleans has been given consideration in connection with recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The traffic moving over this route is small and there appears to be no justification for the United States to take over the industrial canal; reimbursing the owners for its cost. That privately owned waterway is a much more extensive improvement than is considered necessary for an inland waterway; and, should further consideration be given in the future to its acquisition by the Federal Government, it would not appear equitable for the United States to assume the total expense. The board recommends that the expenditures made in constructing the industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

8. After due consideration of the above mentioned reports, I concur in the recommendation of the board.

Very truly yours,

LYTLE BROWN,
*Major General, Chief of Engineers.*

## REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

WAR DEPARTMENT,
THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS,
*Washington, D. C., May 27, 1930.*

Subject: Mississippi River outlets to the Gulf of Mexico.
To: The Chief of Engineers, United States Army.

1. This report is submitted in response to the following resolution, adopted February 27, 1929:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the rivers and harbors act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

2. In the reports under review it was recommended that no modification be made in the existing projects, which provide adequately

## 4   MISSISSIPPI RIVER—GULF OUTLET

for the movement of deep draft vessels between New Orleans and the Gulf of Mexico. The improvement now desired has particular reference to the acquisition of the industrial canal and its use in connection with an additional deep-water outlet to the Gulf, or in connection with the intracoastal waterway between New Orleans and the East. It is claimed that during high-river stages vessels are greatly delayed in making a trip up the river, and that a ship canal would at times be of great value. The industrial canal, being owned by New Orleans, charges tolls on all intracoastal traffic, and local interests believe that a free waterway should be provided by the Federal Government.

3. The commerce moving through the passes of the Mississippi River in 1928 amounted to 17,107,959 tons, exclusive of cargoes in transit, which are reported to have been 2,384,788 tons. The foreign commerce amounted to 11,738,614 tons, and the domestic to 5,369,345 tons. This traffic was handled in vessels drawing up to 32 feet, the total number of arrivals and departures having been 6,228.

4. The district engineer states that the importance of the commerce of New Orleans justifies the provision of adequate channel facilities. At the time the original request for a study of an additional outlet to the Gulf was brought to the attention of Congress, there was a feeling on the part of local interests that the maintenance of a satisfactory channel in South Pass or Southwest Pass was open to question. Since that time the channels through the passes have been so stabilized that full project depth of 30 feet is available in the Southwest Pass, and full project depth of 35 feet is available in the South Pass. These conditions have now continued for about five years. Narrow channels of greater depth are available through each pass. These routes have sufficient capacity to handle all prospective New Orleans traffic. Conditions are now such that there is no reason to expect that both of the improved channels would be out of commission at one time. It must be expected, however, that at some time in the future, which the district engineer estimates may be within the next 50 years, it will be necessary to extend the jetties. Taking this extension into account, together with the cost of maintaining the channels, the annual cost is estimated at $250,000 for the South Pass, and $400,000 for the Southwest Pass. This work can be carried on without interfering with navigation.

5. In the study now presented consideration is given to nine possible routes between the Mississippi and the Gulf, in addition to South Pass and Southwest Pass. It is considered by the district engineer unnecessary to provide an alternate route for emergencies, but if the maintenance of the passes were to be abandoned an improvement would be required which would take care of the entire commerce of the port of New Orleans. Adequate facilities in a side channel for this purpose would necessitate the construction of duplicate locks and a channel not less than 500 feet wide and 35 feet deep.

6. The most advantageous route of those considered is one passing through Barataria Bay. For vessels bound from New Orleans to eastern ports, the route via South Pass is about 7 miles shorter than the Barataria route, while the route via Southwest Pass is about 13 miles longer. Allowing 50 minutes for passage through the lock, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. The sailing time to Atlantic ports by the South Pass is less than by any of the canal routes discussed.

## MISSISSIPPI RIVER—GULF OUTLET   5

The estimated annual cost of the Barataria route is $1,441,700, while the estimated annual cost of maintaining both the South and Southwest Passes, including the possible extension of the jetties at each pass, is $650,000. The following table gives a comparison of the several routes considered:

| Route | Distance by river from New Orleans to canal entrance | Length of route | Estimated cost | Approximate cost of operation and maintenance |
|---|---|---|---|---|
| | Miles | Miles | | |
| Fort St. Philip | 82 | 10.0 | $19,398,700 | $590,000 |
| Fort Jackson | 72 | 15.3 | 40,012,300 | 600,000 |
| Barataria Bay | 28 | 30.8 | 29,944,300 | 375,000 |
| Chandeleur | 0 | 67.0 | 34,070,700 | 1,500,000 |
| Chandeleur, optional | 10 | 60.6 | 34,251,300 | 1,650,000 |
| Lake Borgne | 0 | 73.8 | 31,911,700 | 2,250,000 |
| Lake Borgne, south shore | 0 | 64.0 | 35,473,200 | 850,000 |
| Lake Borgne, north shore | 0 | 73.0 | 31,965,800 | 2,775,000 |
| Lake Pontchartrain | 0 | 73.0 | 33,392,400 | 1,930,000 |

¹ Including locks and dredging, together with bulkheads and jetties where required.

7. Traffic moving over the inland waterway between the Mississippi River and Mobile traverses the entire length of the industrial canal. Commerce on this route is increasing, and still greater increase is expected when the Louisiana and Texas waterway is completed. The district engineer believes that the industrial canal has a present and prospective value as part of the inland waterway system, and thinks that it would be proper to provide a toll-free route between New Orleans and Mississippi Sound. In lieu of purchasing the entire improvement, he states that the owner of the industrial canal might be reimbursed in an amount equivalent to the cost of constructing a 9-foot by 100-foot canal with a suitable lock. The estimated cost of this work is $2,270,000, on the assumption that local interests would contribute all rights of way and would bear the expense of all highway bridges. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied and consideration can be given to the value of the industrial canal as a part of the system, the district engineer does not recommend further study in connection with this report. With regard to the question of providing a new route to deep water in the Gulf of Mexico, he recommends that no further steps in that direction be taken at the present time.

8. The division engineer agrees with the district engineer that, in view of the adequacy, reliability, and low maintenance cost of the channels at South and Southwest Passes, no other deep-water outlet from the Mississippi River to the Gulf of Mexico is necessary. The industrial canal forms part of the present intracoastal waterway between the Mississippi River and Mississippi Sound. It is possible that when the volume of inland waterway traffic has assumed larger proportions, the United States might take steps to free this traffic from the payment of tolls. The toll rate on inland waterway traffic is 5 cents per gross ton, and the payments made by the Federal barge line average less than $10,000 annually. Should the owners of the industrial canal, which is understood to have cost approximately $22,000,000, be paid $2,270,000 on the basis of the estimate of the

## 6   MISSISSIPPI RIVER—GULF OUTLET

district engineer to provide a toll-free canal for inland waterway traffic, the annual interest on that amount would be nearly ten times the toll charges now paid by the Federal barge line. The division engineer concludes that the burden of tolls is not of such magnitude as to be of large national significance calling for Federal relief.

9. Interested parties were advised of the tenor of the district engineer's report and given an opportunity to present their views. No communications on the subject have been received.

### CONCLUSIONS OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

10. The improvement of the mouths of the Mississippi has been complicated by the difficulty encountered in regulating the flow through the several outlets in proportion to the requirements of the projects. This and other features have now been worked out on a basis which appears to assure dependable channels in South Pass and in Southwest Pass. There has been no serious difficulty in maintaining adequate channels during the past five years, and conditions are now such that it is believed that continued maintenance on a reasonable basis is assured. Eventually, it will be necessary to extend the jetties farther into the Gulf, as otherwise the cost of maintaining a channel to deep water will become excessive. During extreme floods surface velocities through the passes may reach a maximum of over 5 miles per hour, but the average strength of flow at such times is somewhat less. Under these conditions the speed of vessels moving upstream is somewhat reduced, but this loss is largely compensated by the more rapid passage downstream. There are some dangers and hazards to navigation through the passes, some damage to vessels and Government works having occurred, but the aggregate losses on this account, as compared to the total value of the traffic handled, have been exceedingly small. It could not be expected that restricted side channels would be any less hazardous. The two passes have a capacity of several times the present commerce of New Orleans, and there is no apparent necessity for another deep-water outlet, either for emergency or to provide for an increase in commerce.

11. The question of making the industrial canal an integral part of the intracoastal waterway extending to the eastward from New Orleans was considered in connection with the recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The section of the intracoastal waterway east of the industrial canal passes through natural waterways, so that the necessary improvement can be provided at small expense. The traffic moving over this route has not yet developed to a point where it appears advisable for the United States to take over the industrial canal, reimbursing the owners for its cost. Should some action of this nature appear advisable in the future, it would not appear equitable to reimburse the city for its total expenditures, which cover a much larger improvement than is considered necessary for an inland waterway. The board recommends that the expenditures made in constructing the

---

## MISSISSIPPI RIVER—GULF OUTLET   7

industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

For the board:

HERBERT DEAKYNE,
*Brigadier General, Assistant Chief of Engineers,*
*Senior Member.*

### REEXAMINATION OF THE OUTLETS OF THE MISSISSIPPI RIVER, INCLUDING ADVISABILITY OF REIMBURSING OWNERS FOR COST OF THE INDUSTRIAL CANAL, LOUISIANA

#### SYLLABUS

The permanency of the navigable passes of the Mississippi River and the probable maintenance costs of these passes are discussed. Various routes are considered for a permanent channel of a depth not exceeding 35 feet from the Mississippi River to Gulf of Mexico. The value of the industrial canal and lock as a part of inland waterway between New Orleans and Mississippi Sound is also considered. The district engineer reports that both South and Southwest Passes provide adequate and reliable navigable channels which can be maintained at reasonable costs. All other routes will involve the use of locks, will have the disadvantage of constricted channels and consequent slow ship speed and be more expensive both in first cost and for maintenance. There being no apparent need of a deep-water route to the Gulf of Mexico other than those provided by South and Southwest Passes, the industrial canal has no value as part of a deep-water outlet. The advisability of the United States reimbursing the present owners of the industrial canal for a portion of the cost of that canal will depend on whether any part of this canal is authorized as a part of the proposed inland waterway between New Orleans, La., and Columbus, Ga.

WAR DEPARTMENT,
UNITED STATES ENGINEER OFFICE,
*New Orleans, La., September 14, 1929.*

Subject: Review of previous reports on the outlets of the Mississippi River to deep water in the Gulf of Mexico.
To: The Chief of Engineers, United States Army (through the division engineer).

### I. GENERAL

1. The river and harbor act of June 5, 1920, calls for a preliminary examination and survey of:

Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet.

2. This report was submitted by Col. C. McD. Townsend, district engineer, on August 25, 1924.

3. On February 27, 1929, the Committee on Rivers and Harbors of the House of Representatives passed the following resolution:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the river and harbor act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel to a depth, not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.

## XI. Canal Routes

### FORT ST. PHILIP ROUTE

131. *Location.*—This route as considered in the previous reports would join the left bank of the river at a point about 7 miles below Fort St. Philip, or 82 miles below New Orleans. This route was suggested in 1832, unfavorably reported on in 1858, and surveyed and favorably reported in 1871-72.

Another route, leaving the river 2 miles farther upstream and passing through the deep water in Breton Island Sound, would require considerably less excavation although it would be nearly 2½ miles longer than the other route. (See Coast and Geodetic Survey Charts Nos. 194 and 1272.)

132. *Lock.*—The estimated cost for a double lock at this locality, based on usable dimensions 80 by 640 feet, 35 draft, is $10,384,000. A lift of 6¼ feet would be sufficient for the maximum flood stage of the river, but the lock should be designed to withstand occasional hurricane tides of 8 to 10 feet above low water. When the levee system on the left bank of the river is not maintained, annual floods submerge this bank to a depth of about 1 foot. Plans which were recommended in 1872 included embankments on both sides of the canal and a guard gate near the shore line for storm protection.

133. *Foundation for locks.*—It is reasonably certain that a dependable foundation can be had at this location. Borings made in 1872, indicate a satisfactory formation for supporting the lock as then proposed, even without pile and grillage foundation. At the forts very heavy monolithic concrete batteries are supported by piles and grillage, and the subsidence, while considerable, has not been excessive. Sixty-foot pine piles were generally used. On these piles, 12 by 12 inch yellow-pine timbers were placed for caps and two layers of close grillage laid at right angles, the whole being drift-bolted to form as rigid foundation as practicable. At both forts a sand stratum 4 feet thick was encountered at a depth of 22 feet, and similar strata are commonly found along the lower river. Test piles have been driven to a depth of 120 feet and the penetration per blow remained nearly constant after passing through the sand stratum. Where a pile is allowed to stand a few hours, much hammering is required to start it again. No attempt has been made to unwater a pit at this locality to the depth required for a lock, but it is not anticipated that insurmountable construction difficulties would be encountered.

134. *Canal and approach.*—Channel widths of 500 feet and side slopes of 3 on 1 are used in the estimates herein for 35-foot depths at all locations. The Fort St. Philip route, perpendicular to the river, would lie about N. 52½° E, for a distance of 8.3 miles, as follows:

One and five-tenths miles through sea marsh and lagoons; 1.5 miles through sheltered bay, 1 foot deep, without jetties; 3 miles through open water, 1 to 3 feet deep, to former Bird Islands; 2.3 miles through open water, increasing evenly from 1 to 30 feet in depth.

The outer 5½ miles of this section would require jetties. The approach channel, bearing about S. 68° E, would follow the axis of the channel which leads from Breton Island Pass to deep water in the

Gulf of Mexico. Natural depths in this channel, seaward from the ends of the proposed jetties, are as follows:

Thirty to twenty-four feet, decreasing evenly, in the first 3.5 miles; 24 to 50 feet, increasing evenly, in the next 2.4 miles; 33 feet average depth in the outer 5 miles; length of approach, 10.7 miles.

The estimated cost of this route is $19,309,700.

135. *Maintenance.*—The cost of maintaining this route would be comparatively light. Due to the low elevation and natural drainage, it would not be necessary to empty the lock into the canal; hence there would be no shoaling from the river sediment. With both banks protected by levees and jetties as far out as the former Bird Islands, shoaling would result only from sloughing of the sides of the cut, and this would be minimized by using a flat slope, 3 on 1. Maintenance of the jetties in this section would consist of repair of occasional storm damage and building up at long-time intervals to offset subsidence. From Bird Islands to the angle in the route, little redredging would be required, but the jetties would suffer frequent damage from wave action. By using an easy curve instead of an angle, it might be found economical to shorten the jetties about one-half mile in the deep water and depend on frequent dredging to maintain the channel in the first mile outside of the jetties. The 10.7 miles of approach channel, lying fair with the tidal currents, would require very little redredging. Without attempting actual estimates, it is believed that maintenance and operation of the two locks on this route would cost about $500,000 per year.

136. *Permanence.*—The river bank in this locality has changed very little in the last hundred years, hence there would be no danger of the lock being undermined. When this route was considered in 1872, the east bank of the river was narrow all the way from abreast of Breton Island Pass down to Pass a l'Outre. The Bird Islands were a chain of sand reefs extending 9.7 miles along the west side of the natural channel below Breton Island Pass. Since then, the Baptiste Collette delta has filled up Bird Island Sound, and Cubits Gap delta has built out to a distance of 10 miles from the river, with mud flats extending out another mile. The Baptiste Collette land is still building outward slowly. This would not interfere with the proposed route, but, on the other hand, it would give added protection on the exposed side. The Cubits Gap land has built outward at an average rate of 900 feet per year, but, due to the choking of other outlets in this delta, the mouth of Main Pass is now advancing at the rate of 0.2 mile (1050') per year, and it is only 1¼ miles from the axis of the proposed route. Comparison with the Coast and Geodetic Survey chart of 1874 shows that the mouth of Main Pass, which has curved northward, is now one-fourth mile southwest of the thalweg line at that time. Between 1874 and 1917, the 18' depth contour at this locality has been moved 6 miles away from the river. This has caused a narrowing and a 15° orientation of the deep channel leading to Breton Island Pass, with practically no change in the maximum depths. The 18' depth contour on the opposite or northerly side of this channel has changed very little. At first glance, this appears to controvert the belief expressed in the report of the 1872 survey, that Breton Island and the shoals adjacent thereto would shift northeastward

11681º—R. and H. Doc. 46, 71-2——3

as new land was formed near the river bank. It is probable, however, that such shifting will not become apparent until the cross-sectional area of the lower end of this channel becomes the same as that of Breton Island Pass. As these islands and shoals are of coast barrier formation, it is reasonable to assume that they will erode or shift position when the tidal currents become sufficiently strong. The disappearance of nearly all of the Bird Islands supports this theory. Because of the large size of Breton Sound, it is very likely that the ebb and flow through its southern outlet will maintain a permanent channel comparable in size to the present Breton Island Pass. This sound has not decreased in size since the earliest surveys were made. While true that the 11-mile spillway along the Mississippi River now discharges into the sound, the spillway flows only at bank-full stage, and most of the sediment is deposited on the existing land. It therefore appears that, although conditions are changing in the vicinity of this proposed navigation route, there will always be an easily maintained approach to it from the Gulf of Mexico.

## FORT JACKSON ROUTE

137. *Location.*—A definite location for a locked-canal route has never been selected or surveyed. At Triumph, 0.5 mile above the Reddick Light and 72 miles by river below New Orleans, the distance from river to shore of the Gulf of Mexico is shorter than at any other point. A canal on this route, except the approach to it in the open Gulf, would be excavated through marshland. A highway along the right bank of the river would require a bridge. The lock would be in the finest orange-producing section along the river, and the adjacent land is quite valuable. This land is protected by a local drainage system which extends one-half to three-quarters mile back from the river. The canal would cross Dry Cypress Bayou and would skirt the eastern side of Skipjack Bay. The waters in this vicinity are highly productive of fine oysters, and other sea foods are also abundant. The land is owned by various parties in small parcels. The first mile from the Gulf coast is in land which had been reserved "for military purposes" by the United States, but it is believed that this land was either released or sold some 2 or 3 years ago. (See Coast and Geodetic Survey charts Nos. 196 and 1272.)

138. *Locks.*—The same dimensions of locks and canal as for the Fort St. Philip route are herein considered. The locks should have a lift of 8 feet for maximum river floods, but less protection from storm tides would be needed. Twin locks at this site estimated to cost $10,382,000. As the site now considered is 3 miles upstream from the forts, it is believed that the conditions affecting foundation for a lock would be found similar to and as satisfactory as those of the Fort St. Philip route.

139. *Canal and approach.*—From river to seashore the canal would be 8 miles long. After the first half-mile from the river the route would be through typical sea marsh, which is about 1½ feet above mean low tide. The existence of a large lagoon near the river in this vicinity in which there were many old cypress stumps of large size indicates the possibility of encountering an old cypress forest on the route. As Dry Cypress Bayou was formerly an outlet of the river, higher and firmer ground and possibilities of old stumps may be

expected in the half-mile adjacent to the crossing of this bayou. Extensive deposits of oyster and clam shell are common along the seashore in this vicinity. Since 1845 there has been almost no change in the location of the seashore on this proposed route. Seaward from the shore line, the distance to the 30-foot depth is about 6 miles, and to the 35-foot depth is 7.3 miles. The surface material of the Gulf bottom is fine, easily shifting sand for about 2½ miles off shore, then changing to fine sand and blue mud and finally to soft mud at the 35-foot depth. The estimated cost of this route, including 6 miles of jetties extending to the 30-foot contour, is $40,912,300.

140. *Maintenance and permanence.*—At this locality it would not be difficult to avoid emptying the lock into the canal, hence there would be no silting to require redredging. The inshore portion of the route would be permanent, but the approach in the Gulf presents a large problem. The above estimates include $23,070,500 as the cost of constructing jetties out to the 30-foot depth. The cost of jetties extending only to the 18-foot contour would be $4,803,200, and it is probable that economy might be effected by the shorter length of jetties. For purpose of estimate both lengths of jetties are herein considered. Jetties for the Fort Jackson route would be very much exposed and should be substantially built. The annual cost of lock operation, maintenance by dredging, and upkeep of jetties is roughly estimated as $600,000. Maintenance of the approach channel in the Gulf without jetties would, if practicable at all, probably require constant dredging. Should it be found possible to maintain the approach channel by dredging alone, the estimated expenditure for constructing jetties might not be justified.

141. *Optional routes in vicinity.*—If this canal route were located anywhere within the next 2½ miles west, or upstream, from the route just considered, practically the same conditions would be encountered except that nearly half the length of the canal would lie in the inland bays which are about 4 feet deep. This would result in smaller construction cost. There would be no difference in the approach channel. If located in the next 4½ miles upstream, which is above Buras, the conditions would be the same, but the canal would be about one-half mile longer, and bridges would be required for a railroad as well as a highway. As shown on Coast and Geodetic Survey chart No. 196, there is another near-by route which is worthy of consideration. Grand Bayou, a large tidal stream, parallels the river from opposite Pointe a la Hache down to Home Place, then flows south to the Gulf at the western side of Bastian Bay. Home Place is 57 miles by river from New Orleans and is above the bend around Sixty Mile Point. The route now suggested would lock from the river at Home Place, run 1¾ miles southwest to Grand Bayou, and follow Grand Bayou 11 miles to its mouth. This bayou is fairly straight, and its average width is believed to be about 350 feet. It is understood that depths of 20 to 30 feet may be found in the upper reaches, but the mouth is badly obstructed by a large shell reef, and depths as low as 1½ feet are found in the lower 2 miles. Deep water in the Gulf is nearer to the mouth of Grand Bayou than to the shore line on the Fort Jackson route, being 4.6 miles and 6.4 miles, respectively, from the 30 and 35 foot depths to the mouth of Grand Bayou. While this route appears to compare favorably with the Fort Jackson route, its feasibility

should be investigated further before attempting an estimate of the cost of its improvement.

## BARATARIA BAY ROUTE

142. *Location.*—This route contemplates a lock at Myrtle Grove, 29 miles by river from New Orleans, thence nearly due south through Marsh and Barataria Bay to the Gulf of Mexico at Fort Livingston. The upper 15 miles of the route would follow the existing Wilkinson (private) canal, which has dimensions about 5 by 40 feet. The next 12½ miles would be in Barataria Bay, where the average depth is 5 feet. Then 1½ miles through Barataria (or Grand) Pass, where the channel depth is more than 35 feet. From the shore line it is 1.9 miles to a 6½-foot depth on the crest of the bar, then 1.9 miles to the 30-foot depth and then 0.8 mile to the 35-foot depth. Jetties built out from the shore would be in water not over 12 feet deep for 2.5 miles, then 12 to 30 feet deep in the next 1.4 miles. (See Coast and Geodetic Survey charts 196 and 1271.)

143. *Locks.*—The locks would require a lift of 13½ feet for the highest river stage. It would be near the Myrtle Grove sugar refinery, and provision would have to be made for a highway and a railroad crossing. The cultivated land extends back about one-half mile. No great difficulty of lock foundation is anticipated, and the estimated cost of two locks is $9,030,000. The total estimated cost of this route, including about 12 miles of bulkheads through Barataria Bay and jetties to the 30-foot contour, is $29,944,300.

144. *Maintenance and permanence.*—Disposal of lockage water without discharging it into the canal is of doubtful feasibility, hence occasional removal of silt from the canal would be expected. The estimate includes an item for construction of a bulkhead along the east side of the 12 miles of channel through Barataria Bay, to protect it from shoaling by wave wash, and the cost of this bulkhead is estimated at $500,000. Omission of this bulkhead would add probably $50,000 for dredging to the annual maintenance. Conditions outside of Barataria Pass are favorable to the construction of jetties. The pass is about 1,800 feet wide. Convergent jetties could be built for a distance of 1.9 miles from shore and continued parallel for a further distance of 0.5 mile, without being in a depth greater than 8 feet. The remaining 1.5 miles to the 30-foot depth present no great difficulty to jetty construction. The ebb and flow to the large expanse of Barataria Bay and adjacent waters would maintain a jetted channel with a minimum amount of dredging. It is therefore believed that the annual cost of maintaining and operating the Barataria Bay route would be about $375,000 if the interior bulkhead is constructed, or $425,000 without this bulkhead.

145. *Optional routes in vicinity.*—Deflection of the channel so as to skirt around the western side of the open water of Barataria Bay would add a little more than 1 mile to the length of the route, but the increased cost of excavation would be a little less than the cost of the bulkhead which would be dispensed with. This route around the bay would change direction and run straight to Barataria Pass. If it were continued straight, it would reach the Gulf shore at Caminada Pass, and the canal would be 3½ miles longer. From Caminada Pass the distance to the 30 and 35 foot depth is 1½ miles less than from

Barataria Pass, but this advantage would be offset by the greater depth of water in which the jetties would have to be built. The scouring effect of the tidal flow would also be very much less at Caminada than at Barataria Pass. The length of the Barataria Bay route, as considered, would be, from river to coast, 27 miles, and from Myrtle Grove to Harvey the airline distance is another 20 miles. From Harvey to Barataria Pass the distance is 45 miles by airline, or 60 miles by the present navigation route. A slip canal route from Harvey to Barataria Pass would, therefore, be 47 to 60 miles in length, and some excavation could be saved by following the existing waterways. The upper 15 miles could be made to coincide with the Intracoastal Waterway route, the additional width of channel required being cared for by the appropriations for the Intracoastal route. The proposed Intracoastal Lock at Harvey will cost $1,400,000, and $9,930,000 is the estimated cost of a double lock for 35-foot draft at Myrtle Grove. The combined cost of these two locks would be $11,330,000, while the cost of one double lock for 35-foot draft at Harvey is estimated at $10,338,000. This saving of $992,000 would go far toward constructing the additional 20 to 33 miles of canal. This route would connect with the river at New Orleans, dispensing with the 29 miles of distance by river to Myrtle Grove. The principal disadvantage of the route would be the congestion of both land and water traffic at the Harvey Lock.

## CHANDELEUR ROUTE

146. *Location.*—This route, as considered in Colonel Townsend's report, would lie on a straight line nearly east from the Industrial Canal, New Orleans, to deep water north of Chandeleur Islands. The 67 miles of the length of this route would be classed as follows:

Ten miles in swamp and marsh, Industrial Canal to Lake Borgne.
Twenty miles in Lake Borgne in depth of 6 to 10 feet.
Twenty-two miles in broken marsh, about half lagoons.
Fifteen miles in exposed Chandeleur Sound, 0 to 35 feet deep.

This route is shown on Coast and Geodetic Survey charts Nos. 1267, 1268, and map of Bayou Bienvenue.

147. *Locks.*—The existing industrial canal lock, however, could not be used and a new lock with 36 feet over the miter sill would be necessary. A pair of locks at the Lake Borgne, Capal, considered in connection with an optional route, has been estimated to cost $10,338,000.

148. *Canal and approaches.*—The westerly 10 miles of the route would be on the general line of Bayou Bienvenue. This bayou is tortuous, having a length of 15 miles, and is used as the outfall of the New Orleans drainage system. Along its upper half the bayou is bordered with timbered swamps, while the lower half is in open sea marsh. There are no bridges at present, but a State highway to cross the bayou about at right angles is now being surveyed. The lower 3½ miles of the bayou has a depth of 20 feet and a width of more than 300 feet. The next 20 miles, in Lake Borgne, would be in water with an average depth of 7 feet with soft, sticky mud bottom. The next 22 miles would be in marsh 1½ feet high and bays 3 feet deep, to the shore line at Door Point. In Chandeleur Sound, the depth is 4 to 12 feet for a distance of 9 miles, then increases evenly

to 35 feet. The bottom of the sound is soft and sticky. The estimated cost of jetties extending to the 30-foot contour in Chandeleur Sound is about $32,000,000, making their use prohibitive. The estimated cost of this route without jetties but including bulkheads through Lake Borgne is $40,070,700.

149. *Maintenance and practicability.*—Maintenance of the inland sections of this route would not be difficult or expensive. Upkeep of the jetties, 14.4 miles long, would probably cost $500,000 per year, and $100,000 would be required for redredging the route. Maintenance by dredging without jetties has been estimated at $975,000 per year, so the cost of the jetties is not justified. The section in Lake Borgne would be a difficult problem, and maintenance of it without bulkheads to protect the channel would involve such extensive and continuous redredging as to make the cost prohibitive and the route undesirable. In the maximum depth in the lake, the cross-section area to be excavated for a 500-foot channel, 35 feet deep and with 5:1 side slopes, would be 15,940 square feet. If half of this material were deposited on each side of the channel, the quantity of excavated material would be equivalent to an embankment with a 5:1 side slope and a crown 500 feet wide and 4.5 feet above the water surface. This would amount to a substantial double dam entirely across the lake. The material, being soft, would naturally spread and shoal a considerable area in the lake. In Sabine Lake, Galveston Bay, and other localities where conditions are similar to those in Lake Borgne, it has been found impracticable to maintain a deep channel in a large expanse of open water. The direct Chandeleur route, as considered above, is therefore believed to be not feasible.

### CHANDELEUR OPTIONAL ROUTE.

150. This route as considered would leave the river 10 miles below New Orleans at Violet, La., and extend almost due east across the narrow portion of Lake Borgne, Bay Boudreau, and Chandeleur Sound to the 35-foot contour in the Gulf south of Ship Island. This is the shortest and most direct route to deep water in the Gulf of all the routes leaving the river near New Orleans. The length of the lake crossing would be 7 miles as against 20 miles for the Chandeleur route. The same objection exists to the excavation of the channel through Lake Borgne as explained for the Chandeleur route, although the crossing length is reduced by 13 miles. For reasons explained under the Lake Pontchartrain route and others, jetties and bulkheads were considered for this route, but are not included in the estimate. The maintenance cost of this route is high but the route is feasible since there are no unreasonable difficulties in its construction. The estimated cost of this route is $34,251,300.

### LAKE BORGNE ROUTE

151. Consideration has been given to a route connecting with the industrial canal at New Orleans, thence extending due east through the marsh to Lake Borgne and along the north shore of this lake to deep water in the Gulf via Grand Pass and the Cat Island Channel. There is the same objection to the excavation of this channel through Lake Borgne as explained for the Chandeleur route and it is also ex-

posed to the movement of littoral sand in Mississippi and Chandeleur Sounds. There is, however, a tidal action between the Gulf and Lake Pontchartrain which could be utilized along this route to materially reduce the cost of maintenance. Interest on the cost of bulkheads along the lake channel and jetties along the Grand Pass-Cat Island Channel so far as exceeds the estimated yearly cost of maintenance by dredging that these two items were not included in the estimated cost for this route as shown on the tabulated comparison of canal routes. The estimated cost of this route is $31,911,700.

### LAKE BORGNE SOUTH SHORE ROUTE

152. Further deflection so as to skirt the southwestern shore of Lake Borgne would avoid the open-water section in the lake, but the length of the route would be increased 3 miles. As shown on Const. and Geodetic Survey chart No. 1271, it would then be preferable to connect the route with the river at the Lake Borgne Canal (Violet, La.). There would be a highway and a railroad crossing near the river, but there are no unsurmountable obstacles in this route, and its length would be 61 miles. The cost of this route is estimated at $35,673,200. In the tabulated comparison of canal routes the cost of jetties has been omitted since the interest charge on the investment exceeds the cost of maintenance by dredging. From Violet, La., to the 35-foot depth in the Gulf, the distance is the same, 61 miles, by the Lake Borgne south shore route just considered and by another route which would run southeast near the mouth of Bayou Terre aux Boeufs and through Breton Island Pass. This is shown by Coast and Geodetic Survey charts Nos. 1271 and 1272. The outer 10.7 miles of the latter route would be identical with the approach to the Fort St. Philip route, which it is believed could be maintained without jetties. Twenty-two miles of channel across Breton Sound would require bulkheading, this being analogous to the Chandeleur route crossing of Lake Borgne. The shorter length, the favorable direction for navigation, and the large saving in the cost of jetties combine to make this Lake Borgne Canal-Breton Island Pass route much preferable to the Chandeleur route. On the other hand, this southeastern route is nearly parallel with the Mississippi River to the Fort St. Philip route, and the large expenditure for its construction would be wholly unjustified.

### LAKE PONTCHARTRAIN ROUTE

153. This route begins at the Lake Pontchartrain end of the industrial canal and follows the south shore of Lake Pontchartrain to the south draw of the New Orleans & Northeastern Railroad trestle. From this draw span the route crosses the shoal or middle grounds to the westerly end of the Rigolets, and then follows the Rigolets. From the easterly end of the Rigolets the route passes through Grand Island Pass and Cat Island Pass to the 35-foot contour in the Gulf of Mexico south of Ship Island. The total distance is about 75 miles.

154. United States Coast and Geodetic Survey charts Nos. 190 and 191 show the depths which will be encountered along this route, and an examination indicates that along the south shore of Lake Pontchartrain the bottom is covered with a layer of fine compact

sund. Between the south draw span of the New Orleans & Northeastern Railroad trestle and the Rigolets the bottom is alternately soft sand, stiff clay, shell, and sand. Through the Rigolets a natural depth of over 35 feet exists. From the easterly end of the Rigolets to deep water in the Gulf the bottom is generally soft, and in several sections sand and shell reefs abound. The conditions of the lake bed appear to be no more favorable for the maintenance of a channel than that found either at Mobile, Gulfport, or in the Houston Channel across Galveston Bay, and it is believed that the cost of maintenance dredging would be very heavy. Aside from the great cost of the route, one of the most objectionable features is that it is crossed by a total of eight bridges, four of which would offer considerable hazard to navigation because of wave action and tidal currents. Interest on the cost of bulkheads for the lake section of the canal and jetties from the east end of the Rigolets to the 35-foot contour in the Gulf so far exceeds the estimated cost of maintenance by dredging that these items were omitted from the tabulated comparison of canal routes. The cost of this route is $31,966,800.

## LAKE BORGNE NORTH SHORE ROUTE

155. This route traverses the marshes south of the Louisville & Nashville Railroad. As laid out, its length is about 27 miles from the industrial canal to the Rigolets, and the distance from the railroad track is about 1 mile. This route is identical with the Lake Pontchartrain route from the Rigolets to deep water in the Gulf of Mexico. It involves the removal of a greater yardage than either the Lake Borgne or Lake Pontchartrain routes, but the cost of maintenance would be less than in the open waters of either lake. There is also more uncertainty as to the character of the material which would be dredged along this route. In excavating the industrial canal, layers of cypress stumps were found to depths of 15 feet below gulf level and greatly increased the cost of dredging, and there is a possibility that material of a similar character may be found for several miles along this route. This route would have five bridges less than the Pontchartrain route, and navigation through the three bridges on this route would not be made difficult by wave action or adverse currents. The estimated cost of this route is $33,302,400, most of which would be for dredging. As in the case of the Lake Pontchartrain route, the construction of jetties is not contemplated.

156. The table below gives the records of average maintenance per mile for the past five years for Mobile, Gulfport, and Houston Ship Channel. It is believed that the conditions at Mobile more nearly approach those to be found in Lake Pontchartrain, Lake Borgne, and Barataria Bay.

| Channel | Annual maintenance, cubic yards per mile | Channel dimensions |
|---|---|---|
| Mobile Channel | 156,000 | 300 by 30 feet. |
| Gulfport Channel | 172,000 | 250 by 19 feet. |
| Houston Ship Channel | 40,000 | 250 by 30 feet. |

A study of the above table shows that in maintenance there could be expected an annual removal of about 200,000 cubic yards per mile for a channel 300 by 30 feet and possibly 350,000 cubic yards per mile for a channel 500 by 35 feet.

## COMPARISON OF CANAL ROUTES

157. (a) All canal routes are considered practicable from a construction standpoint although there is some question as to the permanence of Breton Island Pass, a part of the Fort St. Philip route. It is believed that the excessive cost of maintenance makes the routes traversing Lake Pontchartrain and Lake Borgne impracticable.

(b) Records show that 70 per cent of the traffic to and from New Orleans uses South Pass, indicating that at least this percentage of traffic is bound for ports located in an easterly direction.

Table of distances

| | New Orleans, La., to— | |
|---|---|---|
| | Key West, Fla. | Colon, Panama | Galveston, Tex. |
| Southwest Pass | 673 | 1,624 | 481 |
| South Pass | 653 | 1,616 | 463 |
| Barataria | 650 | 1,615 | 442 |
| Fort Jackson | 670 | 1,632 | 497 |
| Fort St. Philip | 638 | 1,615 | 514 |
| Chandeleur (optional) | 552 | 1,649 | 525 |
| Lake Borgne (South Shore route) | 663 | 1,651 | 517 |
| Lake Borgne (North Shore route) | 652 | 1,657 | 521 |
| Lake Pontchartrain | 672 | 1,662 | 523 |

Distances are approximate and are measured in statute miles from Canal Street, New Orleans, La.

A perusal of the above table shows that the existing route through South Pass provides as short a route for eastbound traffic as any canal route considered, while the Barataria route alone offers any advantage for traffic bound for Panama. The Barataria and Fort Jackson routes offer some advantage for westbound traffic, but all routes utilizing the Ship Island Channel are very disadvantageous for this class of traffic. Of the practicable canal routes the Barataria route seems to offer the most advantages in sailing distance.

(c) General.—The preceding table gives the estimated costs of the various routes. The routes using the industrial canal Pontchartrain, Lake Borgne-North Shore, Lake Borgne, and Chandeleur, are dropped from further comparison due to their unfavorable direction for westbound traffic, great length, excessive cost for construction and maintenance, and traffic interference and congestion, which would result from shipping using the industrial canal. The latter canal is now crossed by 4 drawbridges, 3 for railroad crossings, and 1 for pedestrian, vehicular, and street-car traffic. Should New Orleans continue to grow as a world port, which is a reasonable assumption, traffic both through and over the industrial canal would increase correspondingly and result in greater congestion and delays to the several lines of traffic as the years pass. Also shipping waiting at the

river end of the canal for passage would result in an ever-present menace to navigation in the river at this point.

The Chandeleur optional and the Lake Borgne-South Shore routes would not use the industrial canal but their length, unfavorable direction for westbound traffic, and cost of construction and maintenance are believed sufficient to exclude them from further comparison.

Considering the costs of construction and maintenance the Barataria, Fort Jackson, and Fort St. Philip routes are the most desirable, the latter route having the advantage in this respect. Of these three routes, the Barataria route offers the greatest advantage in sailing distances.

Since the soil formation at Myrtle Grove is older and more stable than at Fort St. Philip, it is believed that fewer difficulties in lock construction would be encountered on the Barataria route. All things considered the Barataria route seems more advantageous than any other canal route considered.

| Route | Distance by river from New Orleans | Length of route | | | Estimated costs | | | | | With allowance for contingencies | Approximate cost of operation and maintenance | Interest on invested capital at 4½ per cent | Total annual cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Canal | Approach | Total | New locks | Dredging 35 by 500 | Bulkheads | Jetties | Total | | | | |
| | Miles | Miles | Miles | Miles | | | | | | | | | |
| Fort St. Philip, 35-foot channel | 52 | 8.3 | 10.7 | 19.0 | $10,384,000 | $3,005,800 | | $4,443,500 | $18,403,300 | $19,370,700 | $500,000 | $871,600 | 1,371,600 |
| Fort Jackson, 35-foot channel | 72 | 8.0 | 7.3 | 15.3 | 10,382,000 | 4,911,500 | | {[5] 23,670,500<br>{[4] 4,803,000 | 38,964,000<br>20,090,600 | 40,912,300<br>21,101,430 | 600,000<br>800,000 | 1,841,000<br>949,600 | 2,441,000<br>1,749,600 |
| Barataria Bay, 35-foot channel | 20 | 25.9 | 4.9 | 30.8 | 9,930,000 | 10,008,400 | $500,000 | 7,390,000 | 23,516,400 | 28,944,300 | 375,000 | 1,347,500 | 1,722,500 |
| Chandeleur, 35-foot channel [1] | 0 | 52.0 | 15.0 | 67.0 | [2] 10,338,000 | 25,617,300 | 2,112,000 | | 38,067,300 | 40,070,700 | 1,500,000 | 1,803,200 | 3,303,200 |
| Chandeleur, optional | 10 | 45.5 | 15.0 | 60.5 | 10,338,000 | 21,006,300 | 1,276,000 | | 32,620,300 | 34,251,300 | 850,000 | 1,558,800 | 2,408,800 |
| Lake Borgne [1] | 0 | 62 | 21.8 | 73.8 | 10,335,000 | 20,054,100 | | | 30,392,100 | 31,911,700 | 2,300,000 | 1,436,000 | 3,736,000 |
| Lake Borgne-South Shore | 10 | 49.5 | 14.5 | 64 | 10,338,000 | 23,636,500 | | | 33,974,500 | 35,673,200 | 800,000 | 1,605,300 | 2,405,300 |
| Lake Pontchartrain [1] | 0 | 22 | 53 | 75 | 10,338,000 | 20,100,600 | | | 30,444,600 | 31,966,800 | 2,775,000 | 1,438,500 | 4,213,500 |
| Lake Borgne-North Shore [1] | 0 | 36 | 37 | 73 | 10,338,000 | 21,464,300 | | | 31,502,300 | 33,392,400 | 1,030,000 | 1,502,700 | 3,432,700 |
| South Pass | 94 | | 13 | 107 | | | | | | | 250,000 | | [5] 250,000 |
| Southwest Pass | 94 | | 20 | 114 | | | | | | | 400,000 | | [5] 400,000 |

[1] The Chandeleur, Lake Borgne, Lake Pontchartrain, and Lake Borgne-North Shore routes all would use the industrial lock and canal which were constructed at a cost of about $18,000,000. While the above estimates include $5,169,000 for the cost industrial canal lock, no provision is made for reimbursement to the owners for the canal, bridges, etc.
[2] For lock at Lake Borgne Canal.
[3] 30-foot contour.
[4] 18-foot contour.
[5] These estimates include as maintenance the extension of jetties of both passes at some time during the next 50 years. Since present investment can not be withdrawn, interest is not included.