Exhibit  15

U. S. ARMY, CORPS OF ENGINEERS

MISSISSIPPI RIVER-GULF OUTLET
LOUISIANA

DESIGN MEMORANDUM NO. 2

GENERAL DESIGN

PREPARED IN THE OFFICE OF THE DISTRICT ENGINEER
U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
NEW ORLEANS, LA.

JUNE 1959



present additional information to the Board of Engineers for Rivers
and Harbors.  At the request of local interests the Board of Engineers
held a public hearing in New Orleans on 5 and 6 March 1947 to further
develop the views of the interested parties.  In general the opinions
expressed at the hearing were that an outlet was necessary for the
expansion of port facilities and for relief of congestion at the public
terminals and to provide for efficient and economical trans-shipment
of the expanding commerce.  They pointed out the obsolescence and
difficulty of maintenance of some of the existing river terminals and
the lack of suitable space on the river front for necessary expansion.
They claimed that the development of new water-front areas was neces-
sary to encourage industrial expansion at New Orleans.  There were
divergent views, however, as to whether the Outlet should be located
on the east bank or west bank of the river.  The Board of Commissioners
of the Port of New Orleans reiterated its willingness and ability to
provide the necessary local cooperation in the project as recommended
by the Division Engineer.  No definite offer of local cooperation on
the west bank improvement was received.  The Board recommended the
adoption of the east bank route, with the following provision...."the
exact location of the Outlet to the Gulf and the alignment of the
seaway should be determined after more complete studies of sand move-
ment, wave action, and local currents are made in cooperation with the
Beach Erosion Board.  Hence, if the improvement is authorized, ample
provision should be made for modifications of the location and align-
ment of the canal should further studies show that a more suitable
location is available."

    8.  Investigations Made Subsequent to Project Authorization.
Engineering studies leading to the preparation of this design memo-
randum were begun with the initial allotment of planning funds for
the project in Fiscal Year 1957.  The investigations included:

        a.  Aerial and topographic surveys of the proposed channel
alignment.

        b.  Soil borings along channel alignment and over a large
reconnaissance area in Chandeleur Sound and Gulf.

        c.  Geological investigation of area.

        d.  Test pits for determination of shoaling rates in
Chandeleur Sound and Gulf.

        e.  Current direction and velocity and tide studies in
Chandeleur Sound and Gulf.

        f.  Visual observations of wave height and direction in
Chandeleur Sound.

        g.  Salinity and suspended sediment sampling and testing.

        h.  Fish and Wildlife studies for documentation of existing
conditions and mitigation of possible losses to resources.

Orleans Levee Board, and the Department of Public Works; the U. S. Army Engineer District, New Orleans and the New Orleans Public Service.  To consider various items evolved by the construction of the project, the committee set up the following sub-committees:  Location of levees; Vehicle Crossings of Channel; Relocation of Bayou Bienvenue; Power and Gas; Roads and Streets; Sewerage, water and drainage; Laying out of industrial sites; Filling of land; Laterals and turning basins; Railroad service; and Coordination with St. Bernard and Plaquemine Parishes.

The Board of Commissioners and its engineering committee were informed of various features of the project and were furnished survey, soil and other technical data, as the planning progressed. The Board at an early stage of the planning signified approval of the general plans for the project and furnished the necessary local support as required by the authorizing act.  No public hearings were held subsequent to authorization.

12.  Views of Local Interests.  Since its inception, the Mississippi River-Gulf Outlet project has received the active support of the responsible citizens in the affected area.  Local opinion has prevailed at all times that the project would prove of enormous benefit to the New Orleans area, to the Mississippi Valley, and to the nation as a whole.  The wording of the project document, and preliminary cost studies referred to in paragraph 8-k and included in Appendix IV provided conclusive evidence that the route skirting the south shore of Lake Borgne to the vicinity of Bayou La Loutre crossing was most feasible and economical.  However, some question as to the best possible route across Chandeleur Sound arose in post-authorization planning. Three routes, designated "B", "D" and "E-6" constituting minor departures from the document alignment seaward of Bayou La Loutre (see Plate 2 - Location Map), were developed and presented to the Board of Commissioners of the Port of New Orleans for comment.  In a letter report dated 5 March 1959, the Board of Commissioners, acting as coordinating agency of the views of interested parties, reported as follows: ...."Various aspects of this problem have been considered, including those pertaining to acquisition of rights-of-way, navigation, steamship operations, fish and wildlife values, development of terminal facilities and industrial sites, as well as engineering features.  The number of other planning groups and interests have been consulted including experienced pilots, steamship organizations, fish and wildlife interests, civic organizations, and other state agencies.  The facts and opinions obtained from these sources unanimously and strongly favor the selection of Route "D"."  The Board considers that Route "D" represents the least hazardous channel approach from the open sea, offers a reasonable sailing distance to the focal points of the major navigation routes, results in lowest real estate costs to local interests, and in the least damage to fish and wildlife values.  The Board registers opposition to the selection of Routes "B" or "E-6" for the following reasons:  Route "E-6" represents greater sailing distances than either of the other routes or the existing South Pass and Southwest Pass channels, with associated increased cost to navigation; Route "E-6" passes through a multiple ownership, partially developed

section that will cause real estate acquisition to be difficult and costly; Route "B", while somewhat shorter to major traffic lanes, is considered the most hazardous to navigation of the three proposed routes because of the sand bar formations in Breton Sound; the lights of the drilling rigs associated with the extensive oil and gas activity in Breton Sound along Route "B" alignment will prove confusing to pilots and introduce an additional navigational hazard; Route "B" will cause serious damage to seed oyster beds and will interfere with the oil and gas production in the Breton Sound area.

Accompanying the report of the Board of Commissioners of the Port of New Orleans were letters from other interested parties. In a letter dated 17 February 1959, from the Special Port Captains Committee of the New Orleans Steamship Association the following views were expressed....."In the unanimous opinion of this Committee, Route "D" is by far the most preferable of the three shown on the aforementioned map. Proposed Route "D", our Committee feels, has much safer approaches from sea than the other two. The anchorage areas at this Route are good beyond the ten fathom curve, thus providing vessels with more sea room. In connection with this Route it will be noted that shallow water lies close in to Curlew Island and it is, in addition, a more direct route to the Gulf than the other two routes. Moreover, our Committee believes that less fog should develop along Route "D" than would exist at the more southerly Route "B" due to the latter's closer proximity to the river passes and the cold water being discharged into the Gulf from the Mississippi River."

In a letter dated 20 February 1959, the American Merchant Marine Institute, Inc., New York, N.Y., stated....."As a result of consultation with our member companies which plan to operate ocean going vessels through the Mississippi River-Gulf Outlet Channel from New Orleans to the Gulf of Mexico when it is completed, the Institute strongly urges that Route "D" be recommended for selection by the District Engineer."

A letter dated 16 February 1959 from the New Orleans Tidewater Development Association reads in part ...."In our opinion, Route "B" should be discarded from further consideration. It is probably the most objectionable to Fish and Wild Life interests. Its distance through open water in the Sound is the greatest and its entrance to the Gulf of Mexico north of Breton Island makes it the least desirable. There is much to be said in favor of Route "E-6". That route entering the Gulf at deep water might obviate the necessity for jetties. In my opinion, the decision between Route "D" and Route "E-6" is one to be determined by engineering analyses, and also the consideration of Fish and Wild Life interests."

The St. Bernard Council, St. Bernard Parish, La., stated in a letter dated 19 February 1959...."Attached hereto is a copy of the third interim report of the Subcommittee of the Executive Committee of the St. Bernard Council, on the Mississippi River-Gulf Outlet."...."it would appear that Route "D" is to be preferred because the route crosses more continuous land area than the others, thereby affording

7

at the Inner Harbor Navigation Canal, also a tidewater channel, which canal connects to the Gulf of Mexico through the existing Gulf Intracoastal Waterway and also via Lake Pontchartrain and Lake Borgne. The proposed channel traverses approximately 32.6 miles of open water in the Gulf of Mexico and Chandeleur Sound and 43 miles of marsh and swampland between Chandeleur Sound and the City of New Orleans. A relatively small area of land lying on the north side of the existing Gulf Intracoastal Waterway and within the limits of the City of New Orleans is leveed and drained. Disposal of initial dredge spoil is planned in general accordance with the desires of local interests and Fish and Wildlife agencies to preserve existing drainage patterns to the extent practicable.

20. **Tides.** Normal tides in the gulf range from 1 to 2 feet. Wind and storm tides reach levels of 6 to 8 feet above sea level, and infrequent hurricane surges produce heights of 12 feet or more along the coast line.

a. **Inner Harbor Navigation Canal.** Gage records are available on the Inner Harbor Navigation Canal since it was excavated in 1922. These records provide a good indication of the water elevations that may be expected in the proposed channel. Hydrographs showing the annual highwater and annual low water for the Inner Harbor Navigation Canal are shown on Plate 4. An all-time high of 7.2 ft. m.l.g. at this gage occurred during the passing of Hurricane "Flossy" in 1956. The low for the period of record was -0.7 ft. m.l.g. during 1939.

b. **Vicinity Highway No. 47 (Paris Road).** For the 10-year period, 1948 to 1958, tide gage records on the Gulf Intracoastal Waterway at a location in the vicinity of Highway 47 (Paris Road) are available and the annual high water and low water stages appear in the hydrograph shown on Plate 4. The highest stage, 8.35 m.l.g. was recorded in 1956 during the passing of Hurricane "Flossy" and the lowest stage, -0.5 m.l.g., was recorded in 1954.

c. **Bayou Yscloskey.** From 1948 to 1958 records are also available from a gage located in Bayou Yscloskey at Shell Beach, La. The annual high water and low water stages are presented in the hydrograph on Plate 4. The highest stage, 11.32 m.l.g., occurred in 1956 during the passing of Hurricane "Flossy" and low stage, -0.84 m.l.g., was also recorded in 1956.

d. **North Pass and Breton Island.** Also shown on Plate 4 is the tidal variation at North Pass from 1942 to 1953 and at Breton Island for 1956 and 1957. This hydrograph shows, in addition, the high and low stage recordings which occurred during the 1957-1958 period in the Breton Sound area.

The locations of the above gages are shown on Plate 1.

21. **Currents.** A network of hydrologic data collection stations was established in January 1957 and operated through December 1958

     c.  Retention dikes should be initially provided landward of approximately 6 feet depth in Chandeleur Sound.

     d.  Dredge spoil should be deposited north of the channel in Chandeleur Sound at the maximum distance practicable without increase in cost by loss of dredge production (probably about 4,000 feet).

     e.  Consideration should be given to utilizing an "overboard disposal" dredge of the "Sealanes" type for channel maintenance in Chandeleur Sound.

    33.  **Fish and Wildlife Studies and Recommendations.**  When planning on the project was initiated, representatives of the State and Federal Fish and Wildlife Agencies and other local groups expressed concern over the potential damage to fish and wildlife resources. Funds were made available from the project to U. S. Fish and Wildlife Service for initiation of a comprehensive study of the project and the surrounding areas. This study is under way but completion is not anticipated for several years. In the meanwhile the advice and assistance of the Service is utilized to the extent practicable in the development of detail plans, particularly with regard to disposal of spoil and marsh drainage, and in documenting existing ecological conditions. By teletype dated 5 June 1959 the U. S. Fish and Wildlife Service stated...."Studies to date indicate Route D would be significantly less detrimental to fish resources within marsh area than Routes B or E-6 provided....(1) spoil is placed on north side of alignment from Bayou La Loutre to Chandeleur Sound and (2) reasonable features to reduce silting effect and maintain present water circulation patterns are included in your contract specifications....". In November 1957 the Louisiana Wildlife and Fisheries Commission expressed a preference for Route D, which was reiterated by letter dated 2 March 1959.

     The views of the Fish and Wildlife agencies as well as the report by Dr. Gordon Gunter, a consultant biologist engaged by this office to prepare a report on the possible biological effects of the various proposed routes, are presented in Appendix III, "Views of Fish and Wildlife Agencies."

    34.  **Route Preference of Local Interests.**  Since local cooperation is required by the project, the Board of Commissioners of the Port of New Orleans, the assuring agency, was requested to determine a preference for one of the routes. The replies to the Board were unanimous in favor of Route "D". The views of local interests are reproduced in Appendix II.

    35.  **Federal Project Cost Studies.**  In order to evaluate the merits of Routes B, D, E-6 and Alternate E-6, a detail cost estimate for each route was prepared. A summary of the Federal cost for the various routes are given in Table 1. The shoaling rates for maintenance purposes are shown, using both the Beach Erosion Board's estimated

rates and the rates considered by this District to be applicable, based upon experience in maintaining other projects in this District and information received from other Districts which have comparable channels along the Gulf of Mexico. This table indicates that the first cost of Route B is the least of the routes considered with Routes E-6, Alternate E-6 and D, following in order. The annual Federal cost of Route E-6 is the least with routes Alternate E-6, B and D, following in order. The table also indicates the cost of the various routes with a deferred retention dike (-6 ft. to -20 ft. contours in Chandeleur Sound) included as a project feature. Similar to the above, the cost of Route B is the least with Routes E-6, Alternate E-6 and D following in order. The deferred retention dike is included as an item in order that it may be constructed at a future date if, from actual maintenance experience, it is demonstrated that the channel cannot be maintained by dredging alone or that it is more economical to construct the dikes.

36.  <u>Non-Federal Project Cost Studies</u>. A non-Federal cost comparison for the various routes is given in Table 2. This table reveals that there is no significant difference in the cost of the various routes; however, the cost of Route B is least and Routes D, E-6 and Alternate E-6 follow in order.

37.  <u>Navigation Cost Studies</u>. As indicated on Plate 17, the distances to the two focal points of the foreign shipping lanes (Dry Tortugas and Cape San Antonio) differ with the various routes selected. This difference in distances results in different travel time between the focal points and the City of New Orleans. A comparison of the costs of ship operation over the various routes shows that Route B will effect an annual saving of $162,750 over Route D, $1,169,010 over Route E-6 and $1,313,005 over Alternate Route E-6. Details are given in Appendix VI.

38.  <u>Comparative Federal Costs</u>. Table 3 shows the overall economic comparision of the various routes on an annual basis. Route B is indicated to be the lowest in total annual cost by more than $400,000 over the next lower alignment, Route D. The non-Federal charges shown in Table 2 make no significant change in the indicated differences  in favor of Route B.

39.  <u>Project Route Selection</u>. On the basis of these cost data Routes E-6 and Alternate E-6 may be discarded from further consideration. Route B is clearly indicated to be the most economical overall on the basis of tangible costs alone. Route B has the disadvantage however of being near Main Pass of the Mississippi River as shown on Plate 18. The shore line has built out to the east approximately 12.1 miles in the last 96 years. Encroachment of the Pass may become a factor adversely affecting the maintenance of the project toward the end of its 50 year economic life. This effect cannot be evaluated at this time. The unanimous preference for Route D of all of the local interests including the assuring agency and the Fish and Wildlife agencies, both Federal and State, constitutes a further serious disadvantage to Route B. On the other hand Route D which is favored

15

```
Spoil disposal distance in Chandeleur Sound-------2000 to 4000 ft.
                                                   from channel
Spoil disposal in Gulf----------------------------In deep water by
                                                   hopper dredge
Bridge Design-------------------------------------AASHO-1957
Live Loading--------------------------------------H20-S16-44 Modified
     Roadways-------------------------------------2-28 ft. roadways
     Design Speed---------------------------------50 MPH, 350' SSD
     Clearances-----------------------------------400 ft. horizontal
                                                   156 ft. vertical
                                                   (open)
                                                   50 ft. vertical
                                                   (closed)
```

47.  **Channel Protection.**  Stability analyses of general type
and undisturbed borings showed that the toe of the spoil should be
not closer than 420 feet from the channel centerline and that the
channel slopes should be cut not steeper than 1 on 2.  The channel
will be excavated generally with a berm of approximately 630 ft.,
thus providing an adequate factor of safety for surface widening due
to erosion.  Bank protection works to prevent this anticipated
erosion is not recommended as a project feature, nor included in the
costs.

48.  **Channel Overdepth.**  It is proposed to excavate the channel
2 feet below the authorized project depth for advance maintenance.
An allowance overdepth up to a maximum of 2 feet will also be permitted
in order to care for inaccuracies in dredging operations and tidal
fluctuations.

49.  **Spoil disposal.**  Excavated material will be deposited in
leveed disposal areas south and west of the channel.  Below Bayou
La Loutre the spoil disposal areas may be shifted to north and west
of the channel if warranted by Fish and Wildlife studies now under
way.

## SOURCES OF CONSTRUCTION MATERIALS

50.  **Concrete Aggregate and Stone.**  Approved sources of sand
and gravel for concrete are located in Baton Rouge, Alexandria,
Turkey Creek, and Minden, all in Louisiana and within economical
shipping distance of the project.  The nearest known supply of accept-
able stone for riprap is in southwestern Arkansas, Alabama and Ken-
tucky.

51.  **Cement.**  Portland cement, conforming to Federal Specifica-
tions SS-C-192b may be obtained from plants in New Orleans and
Baton Rouge, La., and Birmingham, Ala.

52.  **Steel.**  Fabricated steel will be obtained from local
jobbers or mills in Alabama and Texas.  Reinforcing steel is avail-
able in large quantities from warehouses in New Orleans.

61. **Fish and Wildlife Agencies.** When it became known that initial planning funds for the Gulf Outlet would be made available in Fiscal Year 1957, the Federal and State Fish and Wildlife agencies were promptly notified by letter. Intense public interest in the project followed initial press releases showing the proposed alignment, and many objections to the alignment were registered with the Fish and Wildlife agencies. In a conference in August 1957, the U. S. Fish and Wildlife Service and the Louisiana Wildlife and Fisheries Commission were fully appraised of the status of planning. An initial sum of $5,000 was allocated to the Service for Fiscal Year 1958 and in April 1958 a preliminary report was submitted by the U. S. Fish and Wildlife Service. The report made certain general recommendations for mitigation of losses to fish and wildlife values and proposed an extensive regional study to fully document existing values over a wide area of the Gulf of Mexico. As a result of a number of conferences the scope of the studies was curtailed to permit completion within a reasonable period that would permit utilization of the study data and recommendation in the detail project planning. On this basis the additional amount of $64,400 was made available to the U. S. Fish and Wildlife Service for Fiscal Year 1959. By letter dated 5 January 1959, the U. S. Fish and Wildlife Service furnished an interim report on the reach between Highway 47 (Paris Road) and Bayou Dupre. The recommendations are listed in Design Memorandum No. 1-B previously submitted and were essentially complied with in the plan for construction. Studies are continuing and it is anticipated that additional recommendations for mitigating losses, if any, will be incorporated in future project plans. Both the Federal and State agencies have advocated Route "D" as the preferable crossing of the marsh land and Chandeleur Sound. Details of their views are given in Appendix III, "Views of Fish and Wildlife Agencies."

62. **City Planning Commission of New Orleans.** The City Planning Commission of New Orleans submitted a report in September of 1958 concerning the proposed channel crossing at Highway 47 (Paris Road). The report contained detailed vehicular traffic predictions extending to the year 1995. This report indicated that the Planning Commission was strongly in favor of a channel crossing that would provide uninterrupted vehicular movement along Paris Road.

63. **Mineral Board, State of Louisiana.** The Mineral Board of the State of Louisiana was informed of the status of project planning in a letter dated 10 October 1957 and was asked to comment on the proposed routes. To date no reply to this letter has been received.

## REAL ESTATE REQUIREMENTS

64. **General.** Under the provisions of the authorizing Act, local interests are responsible for providing all lands, easements, and rights of way necessary for the project. Local interests have furnished satisfactory assurances that they will provide the necessary rights of way and other items of local cooperation as required. To date, rights of way from the Inner Harbor Navigation Canal to Bayou

approximately 3 miles, it would practically eliminate traversing open water within the marshes thus minimizing the shoaling potential and possible detrimental effect upon fish and wildlife.

16.  Geological data.  The Waterways Experiment Station Miscellaneous Paper No. 3-259, February 1958, and comments made in a letter from the Director, W.E.S. to the Division Engineer 7 March 1958 transmitting the report, have been carefully reviewed.  All statements in the latter paper are concurred in except the last sentence in paragraph 10, quoted as follows: "And finally, judging from the direction of movement of the North and Freemason Groups of islands during the last 100 years, the spoil should be placed on the south side of the channel."  It cannot be established with certainty that the change in area and position of these islands is truly a migration in the sense of indicating the direction of sediment transport within the Sound.  It could be hypothesized that the changes might occur entirely as a result of infrequent severe storms or that the combined effects of subsidence and sediment accretion from the south could produce the changes in area and position of the islands. Surficial sediment would be transported primarily by wave induced currents whereas suspended sediments in deeper water would be less sensitive to wave direction than to the mass circulation pattern of the waterway.  It is believed that available evidence more strongly supports a general northward dispersion of sediment within the Sound and for that reason disposal of spoil to the north would more probably minimize channel shoaling from dredged spoil.  Statements contained in paragraphs 13 and 14 of the above-referenced letter have been particularly noted as being in complete accord with the findings of this report.

17.  Dredging methods.  Existing depths on any route through Chandeleur Sound would necessitate the use of shallow draft dredging equipment over a major portion of the route.  It is presumed that conventional pipeline dredging equipment would be the only suitable plant where the existing depth is less than 12 feet.  With such plant it is believed desirable to dispose of the dredged material as far north of the channel as may be economically practicable which should be at least 4,000 feet for any large modern dredge.  For areas exceeding 12 feet in depth and for all maintenance dredging in open water, it is recommended that consideration be given to an overboard-disposal dredge of the "Sealanes" type.  The "Sealanes", a converted T-2 tanker with twin pumps and drag-heads comparable to those on the "Essayons", has a dredging capability of about 5,000 cubic yards per hour in mud and discharges through a pipe boomed 250 feet off the side of the vessel.  Productivity is dependent upon the proportion of material placed in suspension which is carried away from the channel by transverse currents and it is therefore most effective when the dredged material contains little or no sand. The "Sealanes" has just completed a channel 22 miles long, 34 feet deep and 400 feet wide through a bar composed almost entirely of silt and clay at the mouth of the Orinoco River.  The original depth over a major portion of the route averaged 11 feet.  The effective production rate of the dredge cannot be accurately determined since the shoaling rate from fresh riverborne sediment is not yet known but it was probably in excess

9

BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS
(An Agency of the State of Louisiana)
2 Canal Street
Post Office Box 46
New Orleans (6), La.

March 5, 1959

District Engineer
U.S. Army Engineer District, New Orleans
P.O. Box 267
New Orleans, Louisiana.

Dear Sir:

Reference is made to your letter, file No. LMNGY, dated
February 3, 1959, requesting comments of this Board and other
planning groups and interests, concerning the proposed routes
for the Mississippi River-Gulf Outlet from Bayou La Loutre to
the Gulf of Mexico. Reference is also made to the conference on
this subject in your office on February 25, 1959.

Various aspects of this problem have been considered, in-
cluding those pertaining to acquisition of rights-of-way, navi-
gation, steamship operations, fish and wildlife values, de-
velopment of terminal facilities and industrial sites, as well
as engineering features. A number of other planning groups
and interests have been consulted including experienced pilots,
steamship organizations, fish and wildlife interests, civic or-
ganizations, and other state agencies. The facts and opinions
obtained from these sources unanimously and strongly favor the
selection of Route "D".

Route "D" represents decided advantages to navigation, in-
dustrial and other user interests. It will minimize the damage
to fish and wildlife values. It will pass through an area
through which the acquisition of rights-of-way unquestionably
will be feasible. The selection of Route "D" would be consistent
with the recommendations of the Chief of Engineers, as contained
in House Document No. 245, 82d Congress, 1st Session. Accordingly,
this Board recommends Route "D".

No advantages can be attributed to Route "E-6" by any of the
agencies having cognizance of this project. To the contrary, the
route presents serious disadvantages which militate strongly
against its selection. The acquisition of rights-of-way would
be more expensive and difficult. Over a portion of this route the
ability of this Board to acquire timely the right-of-way is seriously
questioned. Fish and wildlife values would be damaged to a serious
degree. Navigation would be penalized by higher costs of operation

Appendix II

2

NEW ORLEANS TIDEWATER DEVELOPMENT ASSN.
P. O. Box 340
New Orleans, Louisiana

February 16, 1959

Colonel William H. Lewis
Planning Coordinator
Board of Commissioners of the Port of New Orleans
P. O. Box 46
New Orleans (6), Louisiana

Dear Colonel Lewis:

Your letter of February 9, 1959, together
with the map attached thereto, dealing with
possible routes of the Mississippi River-Gulf
Outlet generally east of Bayou La Loutre has
received our interested attention.

In our opinion, route "B" should be
discarded from **further** consideration.  It
is probably the most objectionable to Fish
and Wild Life interests.  Its distance through
open water in the Sound is the greatest and its
entrance to the Gulf of Mexico north of Breton
Island makes it the least desirable.  There is
much to be said in favor of route "E-6".  That
route entering the Gulf at deep water might
obviate the necessity for jetties.  In my opinion,
the decision between route "D" and route "E-6"
is one to be determined by engineering analyses,
and also the consideration of Fish and Wild Life
interests.

Sincerely,

George S. Dinwiddie
Acting President

EXHIBIT "C"

Appendix II

9

Major General William A. Carter

selection of Route "E-6". This favoring of Route "E-6", which is most difficult for practical shipping men to understand, has also had the recent attention of the Association's Port Captains Committee, with the result that they feel that the selection of Route "E-6" would completely negate any time and distance advantages the Gulf Outlet might have over the natural Mississippi River route.

This Gulf Outlet has long been considered as a shortcut to the Gulf, but the selection of Route "E-6" would simply nullify most if not all shortcut features, thus destroying to a large extent any incentive for vessels to use the canal. As a matter of fact, should Route "E-6" be selected, it would be shorter for vessels coming up through the Yucatan Channel or around the Forida Straits to use either South or Southwest Pass. "E-6" would be of advantage only to those vessels proceeding to or from the Gulf Ports located to the East of New Orleans -- and this is about the only point we can think of in favor of its selection.

The approaches from sea to either "E-6" or "D" are about on a par insofar as the depths and underwater contours are concerned. Thus, it is doubtful whether any entrance construction or maintenance features or advantages would inherently exist at one entrance to the exclusion of the other.

We are informed that Route "E-6" presents substantial difficulties in terms of acquisition of channel right-of-way as multi-owner problems are involved at one point along this route, and, as indicated above, it is the longest of the three routes. Moreover, we understand that damage to seed oyster beds and to other forms of fish and wild life will probably be more extensive if Route "E-6" were selected than would be the case along either of the other two routes.

Undoubtedly, the District Engineer in his report to you will discuss in detail all of the points touched on in this letter and others as well, including those contained in our earlier letter. By no means are we attempting in this letter to present complete arguments favoring the selection of Route "D" over the other two. We are merely mentioning some additional points not covered in our earlier letters.

We would, however, submit that from the standpoint of navigation and ship operation, there can be only one correct answer to the question of which of the three routes is best -- and this is Route "D". We sincerely trust you will arrive at the same conclusion following completion of your study of the problem.

We are sending copies of this letter to Senators Ellender and Long and Representatives Boggs and Hebert so that they may know the views of this Association on this vitally important matter.

Yours very truly,

NEW ORLEANS STEAMSHIP ASSOCIATION
McVey F. Ward
Executive Secretary

U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
Foot of Prytania Street
New Orleans 9, Louisiana

LMNGY                                              3 February 1959


Regional Director
United States Department of the Interior
Fish and Wildlife Service
Peachtree-Seventh Building
Atlanta 23, Georgia


Dear Sir:

     Reference is made to letter of 22 October 1957 from this
District requesting a review of Routes "B" and "D" on the Missis-
sippi River Gulf Outlet, and your views or preference for one of
the routes.

     Route "E-6" on the inclosed map, File No. J-15-21423, has now
been determined to have merit and is being considered for the
channel alignment.

     It is requested that you inform this District if you know of
any impediments to this route, as well as your views or preference
for one of the routes from a fish and wildlife point of view.

                                        Sincerely yours,



1 Incl.                                 DUANE W. ACKERSON
    Map, File J-15-21423                Lt. Col., CE
                                        Acting District Engineer






                              1                         APPENDIX III

U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
Foot of Prytania Street
New Orleans 9, Louisiana

LMNGY                                              3 February 1959

The Director
State of Louisiana
Wild Life and Fisheries Commission
Civil Courts Bldg.
New Orleans, Louisiana

Dear Sir:

　　　Reference is made to letter of 22 October 1957 from this
District requesting a review of Routes "B" and "D" on the Missis-
sippi River Gulf Outlet, and your views or preference for one of
the routes and your reply dated 13 November 1957 in which you
expressed the opinion that Route "D" would be less detrimental
than Route "B".

　　　Route "E-6" on the inclosed map, File No. J-15-21423, has
now been determined to have merit and is being considered for
the channel alignment.

　　　It is requested that you inform this District if you know
of any impediments to this route, as well as your views or
preference for one of the routes from a fish and wildlife point
of view.

　　　　　　　　　　　　　　　　　Sincerely yours,

1 Incl.
　　Map, File J-15-21423                DUANE W. ACKERSON
　　　　　　　　　　　　　　　　　Lt. Col., CE
　　　　　　　　　　　　　　　　　Acting District Engineer

2                                         APPENDIX III

STATE OF LOUISIANA

WILD LIFE AND FISHERIES COMMISSION
126 Civil Courts Bldg.
New Orleans 16, La.

March 2, 1959

Colonel G.M. Cookson
District Engineer, U.S. Army
Engineer District, New Orleans
P.O. Box 267
New Orleans, La.

Dear Colonel Cookson:

Reference is made to your letter of February 3, 1959 relative
to the Mississippi River-Gulf Outlet Project.

In this letter you requested that we inform your office of any
impediments to route "E-6", as well as our views or preference for
one of the routes described on the attached location map, Mississippi
River-Gulf Outlet, Louisiana, February 1959, File No. J-15-21423,
specifically routes "B", "D" and "E-6" from a fish and wildlife point
of view.

These proposed routes have been considered as was done previously
in our letter to you dated November 13, 1957.  It is our opinion, based
on the fish and wildlife resources of the overall area and without the
benefit of biological studies or general engineering data, that route
"D" would be the best alignment of the three alignments suggested.
Previously, it has been established that the area south of route "D"
which would be crossed by route "B", is an important oyster-seed ground
area, and that the area north of Route "D", which would be crossed by
route "E-6, is an important oyster bedding ground area.  Thus, it is the
consensus of opinion of our staff that the advantages offered by route
"D" generally following the Bayou La Loutre Channel and its natural
levees geologically derived as a distributary of the Mississippi River,
would provide the most suitable materials for confining the anticipated
salt water intrusion.

It is requested that your office furnish us with engineering data
concerning route "E-6" when additional consideration is given for the
channel alignment.

Sincerely yours,

FLC:iw                                   F. L. CLEMENT
cc:  Regional Director Bureau of Sport   Director
       Fisheries & Wildlife
     Regional Director, Bureau of Commercial Fisheries
     Director, La. Dept. of Public Works

3                              APPENDIX III

TELETYPE

NO AT 14 I-SFW

    ATLANTA GA 6-5-59 0950R

DIST ENGINEER U S ARMY ENGINEER DIST NEW ORLEANS

    FOOT OF PRYTANIA ST  NO

    REUR INQUIRY OUR PREFERENCE OF ROUTES B' D' AND E-6' MISSISSIPPI
RIVER-GULF OUTLET PROJECT.  STUDIES TO DATE INDICATE ROUTE D WOULD BE
SIGNIFICANTLY LESS DETRIMENTAL TO FISH RESOURCES WITHIN MARSH AREA
THAN ROUTES B OR E-6' PROVIDED../1/ SPOIL IS PLACED ON NORTH SIDE
OF ALIGNMENT FROM BAYOU LA LOUTRE TO CHANDELEUR SOUND' AND /2/
REASONABLE FEATURES TO REDUCE SILTING EFFECT AND MAINTAIN PRESENT
WATER CIRCULATION PATTERNS ARE INCLUDED IN YOUR CONTRACT SPECIFICATIONS
IN CONSEQUENCE' WE PREFER ROUTE D' WITH CONSTRUCTION AS GENERALLY
QUALIFIED ABOVE.  THE REGIONAL DIRECTOR' BUREAU OF COMMERCIAL FISHERIES'
ST PETERSBURG BEACH' FLORIDA' CONCURS IN THIS STATEMENT.  PLEASE ADVISE
IMMEDIATELY IF YOU ARE UNABLE TO RECOMMEND ROUTE D WITH NORTH SIDE
SPOIL BANK

    W L TOWNS' ACTG REGL DIR BUREAU OF SPORT FISHERIES AND WILDLIFE
FJ 0953R

4

APPENDIX III

A REPORT TO THE U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
ON THE POSSIBLE BIOLOGICAL EFFECTS OF VARIOUS PROPOSED
ROUTES OF THE MISSISSIPPI RIVER-GULF OUTLET

BY

GORDON GUNTER

## INTRODUCTION

The proposed canal starts at a point where it connects with the
Inner Harbor Navigation Canal of New Orleans, the "Industrial Canal"
of the New Orleanian.  From there it runs almost due east for about
5 miles following the Intracoastal Waterway.  From this point on to
where the channel will connect with waters of the open Gulf, several
alternate routes have been considered and proposed by various groups
and interests along the Mississippi and Louisiana coasts, as well as one
State Government and one branch of the Federal Government.

A dozen or so individual routes have been suggested and appraised,
at least in part, from the engineering standpoint.  Various statements
have been made with regard to the biological effects.  By and large
these are bald assertions or opinions backed by little supporting data or
information.  This is due to the intrinsic nature of the problem, namely,
that no one knows precisely what will happen to the hydrographic and
sedimentary regime of the region when the channel is dug, and no one
can know until after the fact.  The writer's ideas are subject to the
same limitations.  My general knowledge and acquaintance with the area
involved are set forth in Appendix I.

### The Area Involved

In shortest possible terms the areas which will be affected may be
described as a tongue of marshy islands and interconnecting waters, of
indescribable cartographic complexity, extending northwestward from the
lower east bank of the Mississippi River, and the waters on either side.
This area of some few thousand islands and interconnecting waters is
known as the "Louisiana" marsh.  Lying generally northwestward, between
this marsh and the mainland shores of Louisiana and Mississippi are Lake
Borgne with Mississippi Sound connecting on the east.  To the south
and east of the marsh are Breton and Chandeleur sounds, which extend
from the lower river, in a slight arc, northeastward, and connecting
with Mississippi Sound, and the open Gulf to the north.  This is actually
one large sound, with no geographic separation.  It is partially separated
from the Gulf of Mexico to the east by a chain of islands running in a
gentle arc northward, known as the Chandeleur Islands.

In general the waters of Lake Borgne and the western part of
Mississippi Sound are brackish or low salinity, and on rare occasions they

5

APPENDIX III

may be fresh, Cf. Gunter (1953) and Butler (1952).  Data in the New Orleans office taken from seven stations in the eastern part of Lake Borgne in 1957 and 1958 show that the salinity ranged from less than 2 to less than 11 parts per thousand.

Similar stations in the inner marsh, south of Lake Borgne, show a range of salinity from 0.5 (fresh water) to 14.5 per mille. In the outer marsh, east of Lake Borgne, the salinity ranges were 2.3 to 26.0.  Nine stations in Chandeleur and Breton Sounds showed a salinity range of 9.5 to 35.0 (sea water).  In eastern Mississippi Sound the salinities are roughly equivalent to those of Chandeleur and Breton.

Lake Borgne and similar low salinity areas are prime nursery grounds for small white shrimp, blue crabs, croakers, menhaden, and several other common Gulf fishes.  In general the salinity is too low for oysters.  In west Mississippi Sound the salinity is higher and oyster reefs are present.

In Breton and Chandeleur Sounds the salinities are too high generally for oysters, probably because it is optimum for their enemies such as the oyster borer.  In general, shrimp and fishes migrate into this area as they grow up, from the marsh and such low salinity waters as Lake Borgne.  Thus, it is an excellent fishing area for menhaden and trash fish boats and for shrimp.

The Louisiana marsh is the primary seed oyster area of the State of Louisiana and it is also the chief producer of oyster canning stock for the Mississippi plants.  It has some trapping value for muskrat and other fur producers.  It also contains some 50,000 to 60,000 acres of so-called fresh water marsh along the southern shores of Lake Borgne. This is a prime hunting ground for several types of ducks (Cf. Resolution of Louisiana Wild Life and Fisheries Commission, May 29, 1957).

<u>Appraisal of the Routes Suggested</u>

a.  <u>Introductory remarks concerning evaluations.</u>

Fishery production for the areas involved are given in Appendix II.  They are not sharply separated by areas and it is impossible to say what percentage would be directly involved in the basic mile wide strip of the channel, resultant spoil, retaining dykes, etc.  Furthermore, the matter is of little importance in comparison to hydrographic and sedimentary changes which could conceivably have both good and bad effects over a much wider area, or a predominance of one or the other. Here again we bump into the basic consideration that no one can prognosticate with much surety concerning hydrographic and sedimentary changes which will be brought about by the new channel.

In this connection, one general criticism of the channel should

be discussed.  It has been stated by some officials of the Louisiana Wild Life and Fisheries Commission that the deep channel will permit and enhance the encroachment of high salinity water into normally low salinity areas where it will cause considerable damage, such as killing out the fresh water marsh, the oysters, etc.  However, no one else seems to be greatly disturbed by this possibility and neither am I, because the chances seem to be rather remote.  The salinity of Chandeleur Sound is now as high as sea water at times.  High salinity water would encroach as a tongue along the bottom of the channel and would not become mixed with the lighter surface water except by heavy storms such as hurricanes, which force in much larger volumes of high salinity water over the marsh.  Furthermore, any alignment of the channel which would lead to deep (high salinity) water would have the same general effect except that the longer routes would permit less encroachment and would possibly be more desirable from the wildlife and fisheries standpoint.  Thus, we are not involved with this question in evaluating the different alignments proposed.

An examination of the map will show that none of the marsh area south of Bayou Terre aux Boeufs ridge would be affected by any proposed alignment of the channel.  This comprises about one third of the total marsh area.

All of the several routes alternately proposed or considered for various reasons may be divided roughly into three and treated under those headings, because they coincide in general features and differ in only three ways so far as known probable biological effects are concerned.

b.  The proposed outlet

This route skirts the southwestern shore of Lake Borgne to Bayou la Loutre.  From there two or three alternate routes are under considera- tion.  One would traverse the Bayou la Loutre ridge, as suggested by the Louisiana Wild Life and Fisheries Commission.  One would go to the south of this and the other would go across the marsh to the northward to end south of Cat Island.  Since the chief effect of these routes would be in bisecting the sound with spoil banks or retaining dykes, and the differ- ences between an effect in one part of the sound as compared to another is unknown, there seems to be little to choose from with regard to the three outlets.

The first part of the channel, skirting Lake Borgne, is a different matter.  The Louisiana Commission has pointed out that it will cut through 60,000 acres of the finest fresh water duck marsh in the State.  At a minimum the mile wide channel and dyke, twenty miles long, will destroy about 13,000 acres of this marsh and ensuing industrial development will take some more.  On the other hand, it has been pointed out that the growth of New Orleans will encroach upon this area within the next fifteen years or so.

7

APPENDIX III

Some minimization of damages may be effected by the judicious selection of cuts through the dykes, as recommended by the State biologists, to permit as normal flow of water as possible. Similarly, fresh water locked out of the river through the Industrial Canal may tend to prevent salt water encroachment. In addition, it should be feasible to pump large amounts of fresh water out at this point, as has already been suggested for other points along the lower river.

c.  The Louisiana Wild Life and Fisheries Commission proposal.

With the hope of avoiding damage to the above mentioned duck marsh, the Commission Biologists suggested a channel differing from the proposed one as follows: The channel would continue eastward a few miles on the Intracoastal Waterway and then turn southward across the southwestern part of Lake Borgne, across Proctor Point and connecting with the proposed channel along the Bayou la Loutre ridge. Secretary of the Interior Fred H. Seaton, in letters dated 30 July 1958 and 13 October 1958, to Secretary of the Army Wilbur M. Brucker indicated his approval of the State of Louisiana proposal, and requested that this route be adopted. This proposal has the disadvantage that it traverses water in an area of soupy, uncompacted sediments and will be very hard to hold without virtually complete retaining dykes along both sides. This would cut off fresh water flow from Lake Pontchartrain and the Pearl River, which are very important influences on the salinity of Lake Borgne and the marshes to the south. If such an eventuality develops then the duck marsh as well as the remainder of the marsh to the south may be seriously damaged rather than helped. On the other hand, if construction and maintenance costs are not prohibitive and if suitable openings can be maintained consonant with channel maintenance, the proposal is worth consideration. The question is closely related to engineering problems, outside of my purview. In any case, this proposal is not the simple answer to the problem that it might at first appear to be.

d.  The Mississippi proposal

Various private interests in Mississippi have proposed various northerly routes for the channel. These would entail the utilization of the Intracoastal Waterway eastward to Shell Point or the Rigolets and thence eastward by various routes across Lake Borgne or Mississippi Sound to deep water north of Chandeleur Sound.

This has nothing biologically to recommend it so far as I can see. The spoil or silt from the channel would endanger, if not destroy, Half Moon and Grand Bank reefs in Louisiana and St. Joe reef in Mississippi, the last producing reef in the State but one.

The channel would cross water for a large portion of its length and the spoil or dykes would materially affect the present hydrography, most probably by shunting the Pontchartrain and Pearl River flows to the eastward. This would doubtless benefit the reefs off Pass Christian,

8                                   APPENDIX III

but it would certainly harm the "Louisiana Marsh" oysters from which most Mississippi production has come for years.  It would have similar effects on the shrimp and menhaden producing areas in the marsh, as well as the duck marsh, and in the long run the State of Mississippi would be harmed.

The so-called E-6 route of the Engineers would satisfy other aims of the Mississippians without running the chance of great damage and biologically, it is much to be preferred.

Respectfully submitted,

January 8, 1959

Gordon Gunter
Consultant

9

APPENDIX III

APPENDIX I

The writer began work on the Gulf of Mexico with the Shrimp Investigations of the former U. S. Bureau of Fisheries in July 1931, and has more or less been at it ever since.  The attached sheets outline the general professional activities.

My present position is director of the Gulf Coast Research Laboratory. I also carry nominal appointments as Professor of Biology in Mississippi Southern College, Professor of Zoology in Mississippi State University, and Professor of Biology in the University of Mississippi.

I am currently a member of the Committee on Marine Mammals of the American Society of Mammalogists, a member of the Committee on Water Pollution of the American Fisheries Society, and a member of the Board of Governors of the American Society of Ichthyologists and Herpetologists. With Dr. J. E. McKee, Professor of Sanitary Engineering in the California Institute of Technology, I am a member of a two-man board appointed by the Water Pollution Control Commission of the State of Washington to set up a water use standard with relation to the oyster and pulp mill industries.  I am also a member of various committees of the Gulf States Marine Fisheries Commission.

The writer has kept up with the general situation regarding the Mississippi-Gulf Outlet through discussions at the meetings of the Gulf States Marine Fisheries Commission.  In addition, I have recently discussed all phases of the biological situation with almost all of the State and Federal biologists now involved.  In general they are of the same mind as the writer.  They do not know precisely what will happen, but they are collecting basic data to compare with future, so that they can determine with some precision what does take place.  This is a matter of considerable importance and this biological work should be continued during the time and after the outlet is dug.

11                                                 APPENDIX III

APPENDIX II

Due to the short period of time involved, we have not been able to collect fishery statistics from all of the areas involved. However, as the writer has stated above, these figures are not as important as they might at first appear because the influences that cause them to vary may be considerably restricted, or by the same token, widely extended, in ways that are completely unknown.

The following figures are furnished by the New Orleans office of the U. S. Fish and Wildlife Service and they constitute the best available information. These are the heads off or tail weight of shrimp. For conversion to heads on weight these figures should be multiplied by 1.68.

| Area | 1956 | 1957 | Jan-Jun,1958 |
|---|---|---|---|
| Inside Chandeleur Island | 59,402 | 16,261 | - |
| Chandeleur & Breton Sounds | 2,469,632 | 1,279,126 | 95,305 |
| Mississippi Sound, Western Area | 523,889 | 638,211 | 202,875 |
| Lake Borgne | 8,492 | 202,875 | 141,861 |

12                                    APPENDIX III