UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

XAVIER UNIVERSITY OF LOUISIANA                CIVIL ACTION NO. 06-0516

VERSUS                                                            SECTION "R" MAG "2"

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA
**********************************************************************

MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Plaintiff, Xavier University of Louisiana ("Xavier"), respectfully requests that this Honorable

Court grant its Motion for Partial Summary Judgment and hold, as a matter of law, that damage to

Xavier's campus caused by ground water which came from the 17th Street Canal and the London

Avenue Canal breaches is covered under the "all risks" policy of insurance issued to Xavier by

defendant Travelers Property Casualty Company of America ("Travelers"). Travelers, in its Answer,

pled in the Eighth Affirmative Defense that coverage was excluded, in part, for damages caused by

a "flood" as that term is defined in the policy. *See* Record Doc. No. 9. While Travelers contends

that the so-called "flood exclusion" in its policy excludes coverage for ground water that caused

damage, this exclusion is inapplicable. Xavier submits that the term "flood" must be construed, like

1

all insurance exclusions, narrowly and interpreted in a manner consistent with the other terms in the exclusion. That is, "flood" should mean only a natural occurrence, not the effect of ground water intrusion resulting from man-made causes as was the case here. Simply put, if a fire fighting helicopter had erroneously dropped hundreds of gallons of water on Xavier's buildings or a tanker truck carrying water had driven into one of these buildings spilling thousands of gallons of water, coverage would be provided for these damages. In the same manner, Xavier has coverage in this instance as the damage was caused by the Corps, not a natural occurrence. Alternatively, Xavier submits that the "flood exclusion" is ambiguous as a matter of law and, therefore, should be read in favor of coverage.

As detailed below, by its own admission, the United States Army Corps of Engineers, the federal agency responsible for the levees protecting the City of New Orleans failed in its obligations. As a result of the Corps' actions, the levee systems around New Orleans failed in the aftermath of Hurricane Katrina on August 29, 2005. That failure caused most of Xavier's buildings to become inundated with several feet of ground water. The Corps admits that it made inaccurate assumptions, that it took insufficient soil samples and that the floodwalls failed before the waters reached their tops. In other words, the water glass that was designed to be filled and protect the City of New Orleans failed when only partially full. The ground waters that filled New Orleans were not caused by a naturally occurring "flood," but by man-made events.

Xavier, in order to protect itself against the risk of various damages, including damages caused by a third party, procured an "all risks" policy of insurance from Travelers. After the storm, Xavier made timely demand on Travelers for coverage, but Travelers unreasonably and in bad faith failed to pay a single penny to Xavier until after this lawsuit was filed, which was five months after

the loss.  Further, although some funds have been received since suit was filed, Travelers continues to insist that certain losses are excluded from coverage.  This motion for partial summary judgment addresses one of the exclusions Travelers claims is applicable – the purported "flood" exclusion. For the following reasons, Xavier submits that summary judgment in its favor is appropriate:

- The United States Army Corps of Engineers has conceded that the failure of the levee protection systems at the 17th Street Canal and the London Avenue Canal was caused by the levees' inadequate design, planning, and construction.

- The only ground water to inundate the first floor of Xavier's campus came from said levee breaches.

- The Travelers policy is an "all risks" policy of insurance and, as such, provides coverage for any damage to covered property unless caused by an excluded cause of loss, and Travelers cannot prove that Xavier's damages were caused by an excluded cause of loss;

- Under the well-established contractual interpretation doctrines of *ejusdem generis* and *noscitur a soccis*, the term "flood" must be interpreted in light of the other terms contained in the exclusion and the terms used refer to naturally occurring events; therefore "flood" does not apply to ground water inundation resulting from man-made causes; and

- The flood exclusion is ambiguous as a matter of law because it fails to distinguish between naturally occurring and man-made events.

## I.    FACTS AND PROCEDURAL HISTORY

Xavier University of Louisiana was founded in 1915, through the efforts of St. Katharine Drexel and the Sisters of the Blessed Sacrament, who established the coeducational secondary school from which Xavier evolved. In 1925 Xavier University became a reality when the College of Liberal Arts and Sciences was established. The first degrees were awarded three years later. In 1927, a College of Pharmacy was opened. Recognizing the University's need for a separate identity and room to expand, St. Katharine bought a tract of undeveloped land for a campus on the corner of Palmetto and Pine Streets in 1929. Construction of the U-shaped, gothic administration building (now a city landmark) was completed in 1933.

As the nation's only institution of higher learning that is historically Black and Catholic, Xavier's purpose from its founding has been to help create a more just and humane society. Xavier offers opportunities in education and leadership development to the descendants of those who had been historically denied the opportunity for higher learning.

On August 29, 2006, Xavier's campus sustained serious damage as a result of Hurricane Katrina's strong winds. The buildings were further damaged when the levees surrounding the City of New Orleans – which had been constructed to protect the city in the event of a hurricane – failed resulting in a spread of ground water that eventually covered approximately 80% of the city, including Xavier's campus.

Xavier procured from Travelers a property policy bearing number Y-630-528d9763-TIL-04 ("the Policy") (Exhibit "1"). The Policy contained a Deluxe Property Coverage Form that provided "all risks" coverage "for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss." The Policy defined Covered Causes of Loss as:

Risks of **DIRECT PHYSICAL LOSS** unless the loss is: Excluded in Section B., Exclusions; Limited in Section C., Limitations; or Excluded or limited in the Declarations or by endorsements.

(Emphasis added.)

To repair its property and prepare its campus to re-open in January 2006, Xavier made demand on Travelers to fulfill its obligations under the Policy, but Travelers failed to pay Xavier a single penny in coverage until the commencement of this lawsuit on February 2, 2006. Thereafter, Travelers answered the lawsuit alleging a number of coverage exclusions as affirmative defenses.

In its Eighth Affirmative Defense pled in Travelers' Answer, the defendant contends that the following exclusion precludes coverage for at least part of Xavier's damages:

1.    We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that has contributed concurrently or in sequence to the loss.
. . .
g.    Water
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mudflow;
(3) Water under the ground surface pressing on, or flowing or seeping through:
(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings.

As set forth below, the All Risk Policy's exclusion for "flood" is not applicable because it applies only to naturally occurring phenomena and not to an event caused by man-made acts. The ground water inundation of Xavier's campus resulted solely from the breach of the levees and floodwalls along the 17th Street Canal levees and/or the London Avenue Canal. None of the ground water intrusion resulted from street flooding caused by rains accompanying Hurricane Katrina.

The United States Army Corps of Engineers ("Corps") has recently conceded that the failure of the levee protection systems was caused by its inadequate design, planning, and construction. Following Hurricane Katrina, the Corps undertook a massive investigation of the reason for the failures. The investigation was coordinated by the Interagency Performance Evaluation Taskforce ("IPET"). On June 1, 2006, IPET issued its Draft Final Report concerning the Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System ("IPET Draft Final Report"). A copy of the complete report may be found at https://ipet.wes.army.mil/. Relevant excerpts of the various volumes of the IPET Draft Final Report are attached to this supporting memorandum where indicated.

IPET was created by the Chief of the Corps to evaluate the New Orleans hurricane protection system in light of Hurricane Katrina. *See* Vol. I, IPET Draft Final Report, at I-iii (Exhibit "2"). IPET consisted of government, academic, and private sector scientists and engineers with extensive experience in the field of civil engineering. The report was consistently peer reviewed prior to publication. For these reasons, Xavier submits that the IPET Final Draft Report is inherently reliable and trustworthy as the report of a public agency.

The IPET Draft Final Report provides extensive background regarding the construction of the hurricane protection system and reveals that, almost from the start, levee construction was based on inaccurate assumptions and calculations. At the outset of the construction of the levees, the Corps needed to establish vertical datums, or a reference system by which points of elevation can be determined. *See* IPET Draft Final Report, Vol. II, Geodectic Vertical and Water Level Datums, at II-7 (Exhibit "3"). The datums are based either on geodectic (land) or hydraulic (water) based references. *Id.* The Corps designed the hurricane protection system for southeast Louisiana based

6

on a water-level reference datum, but the actual construction of the system was constructed with reference to a geodectic vertical datum. *Id.* at II-1. The Corps incorrectly assumed that the two datums would be equivalent or constantly offset for the entirety of the project. *Id.* As a result of this miscalculation, IPET found there were protection system "deficiencies throughout the region." *Id.* at II-2. These deficiencies were evident in IPET's assessment of the Lake Pontchartrain outfall canals at London Avenue ("the London Avenue Canal") and 17th Street ("the 17[th] Street Canal"), both of which, IPET concluded resulted in an elevation below design specifications. *Id.* at II-88, 97.

The 17th Street Canal and the London Avenue Canal are earthen levees capped with a cantilevered I-wall that ties into the levees surrounding Lake Pontchartrain. *See* IPET Final Draft Report, Vol. III– The Hurricane Protection System, at III-75, 80 (Exhibit "4"). IPET determined that the soil forming the 17th Street Canal consisted of a levee fill material on top of a layer of marsh material. Beneath the marsh is a lacustrine clay layer, which was on top of a layer of sand. IPET Draft Final Report, Vol. V – The Performance – Levees and Floodwalls, at V–25 (Exhibit "5"). It is these weak soil foundations that caused problems in the construction of the levees, as noted in the following admission:

> Foundation soil strengths were derived from relatively widely spaced borings and at times using average values that may not capture the high variability inherent in this type of geology. ***The decision to use uniform shear strengths, based on the greater strengths of the soils under the center line of the 17[th] Street Canal levee, resulted in an overestimation of the subsurface strength at the levee toe. Coupled with the use of average values obtained from widely spaced samples in a geology with highly variable conditions, the structure was left with a marginal factor of safety.*** This same assumption was not made in other sections of the system where more conservative strength values were used.

IPET Draft Final Report, Vol. I at I-5 (emphasis added) (Exhibit "2").

7

All of these factors contributed to breaches of the 17th Street Canal and London Avenue Canal levees and floodwalls. IPET concluded that the breach at the 17th Street Canal began to develop at approximately 6:00 a.m. on Monday, August 29, 2005, and was fully developed in the next three hours. IPET Draft Final Report, Vol. 5 at V-38, attached as Exhibit 5. The breach was caused by "instability caused by shear failure within the clay in the foundation beneath the levee and the I-wall, with a rupture that extended laterally beneath the levee, and exited upward through the marsh layer." *Id.* Essentially, a gap formed between the floodwall and the levee fill allowing water pressure to be exerted on the wall underneath the levee's surface. *Id.* The stability of the wall decreased, and the levee failed. *Id.* at V-27.

The London Avenue Canal levee experienced a similar fate. Ground water inundation from the London Avenue Canal resulted from the failure of two I-walls. *Id.* at V-39. At both locations, the levees and I-walls were founded on a layer of marsh overlaying sand. *Id.* The northern-most failure occurred no later than 7:30 a.m. on August 29, and the southern-most failure occurred between 6:00 a.m. and 7:00 a.m. *Id.* at V-52. IPET gave the following description of the failures:

> Field evidence, analysis, and physical model tests show that the breaches were due to the effects of high water pressures within the sand layer beneath the levee and I-wall, and high water loads on the walls. . . . At both the 17th Street Canal and the London Avenue Canal, formation of a gap allowed high water pressures to act on the wall below the surface of the levee, severely loading the wall. At the London Avenue Canal, an additional effect of the gap was that water flowed down through the gap into the underlying sand. High water pressures in the sand uplifted the marsh layer on the landside of the levee, resulting in concentrated flow and erosion, removing material and reducing support for the floodwall.

*Id.*

IPET concluded that the Corps failed to consider this mechanism of failure and recommended that, in the future, the Corps consider a broader range of potential failure scenarios. *Id.* at V-81. In

particular, IPET noted that "I-walls should be designed to be stable with a gap between the wall and the levee on the water side of the wall with hydrostatic pressure acting through the depth of the gap." *Id.*

Overall, IPET summed up its analysis of the hurricane protection system with the concession that its "performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy." Vol. I of IPET Draft Final Report at I-3 (Exhibit "2"). Volume I of the IPET Draft Final Report made the following overall conclusions regarding the failure of the levees:

- First, *the magnitude of the subsidence and adjustments to the datums were not fully considered in the design and construction* of the Hurricane Protection System. *Id.* at I-4.

- Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodectic vertical datum *incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation. Id.* at I-5.

- Sections of the system were built below specified design elevations due to the *use of an inaccurate relationship between the geodectic datum and mean sea level datum. Id.* at I-5.

- Coupled with the *use of average values* obtained from widely spaced samples in a geology with highly variable conditions, the structure was left *with a marginal factor of safety. Id.* at I-5.

- The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection. *Id.* at I-5.

- *Four breaches*, all in the outfall canals and IHNC [Inner Harbor Navigational Canal, known as the Industrial Canal] and all involving I-walls, *occurred before water levels reached the top of the floodwalls. All were caused by foundation failures* induced by the formation of a gap along the canal side of the floodwall. . . . *This failure mechanism*, in particular the gap

9

formation, *was not considered in the original design of the structures.* *Id.* at I-7.

The Declaration of Marion B. Bracy, Xavier's Vice President in charge of Facility Planning and Management is offered in support of Xavier's contention that any ground water intrusion on the first floor of Xavier's campus resulted from the levee breaches and not rainwater. *See* Exhibit "6." Mr. Bracy was on the Xavier campus during and after Hurricane Katrina. *See id.* Mr. Bracy witnessed the conditions as Hurricane Katrina approached and moved over the Xavier campus. *Id.* When the heavy winds and rains ceased, he did not observe any standing water on the grounds of the Xavier campus or in the first floor of any of the buildings. *Id.* Mr. Bracy did not observe any standing water on the campus or in the buildings until the afternoon of August 29, 2005, after the rains and heavy winds had ceased and after he had heard radio reports of levee breaches in the city. *Id.*

## II.   LAW & ANALYSIS

### A.   STANDARD FOR MOTION FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C). "Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) *(*citing, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

The party moving for summary judgment bears the initial responsibility of identifying the basis for its motion and the parts of the record that support its claim that no genuine issue of material fact exists. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir. 1999). The party moving for summary judgment "is not required to negate elements of the nonmoving party's case." *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

Once the moving party satisfies this initial burden, the burden then shifts to the non-moving party to demonstrate that the court should not grant summary judgment. *Ragas*, 136 F.3d at 458. To do so, the non-moving party must "go beyond the pleadings" to identify specific facts that establish a genuine issue for trial. *Celotex*, 477 U.S. at 324. Rule 56 expressly requires that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

FED. R. CIV. P. 56(e) (emphasis added).

Therefore, a party opposing a summary judgment motion must present "significant probative evidence" to defeat the motion. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (quotation omitted). "[U]nsubstantiated assertions" do not suffice to defeat a motion for summary judgment. *Ragas*, 136 F.3d at 458. Similarly, if the non-moving party submits evidence that is "merely colorable" or "not significantly probative" or establishes only a "metaphysical doubt," the movant is entitled to summary judgment. *Hawking v. Ford Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000); *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977, 980 (5th Cir. 1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

In a case such as this one, when the non-moving party will bear the burden of proof at trial on a particular issue, the burden on the moving party may be discharged by "showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The non-movant, the defendant in the present case, must then "adduce evidence which establishes a material fact concerning each of the essential elements of its case for which it will bear the burden of proof at trial." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).

## B.   WELL ESTABLISHED PRINCIPLES OF INSURANCE POLICY INTERPRETATION UNDER LOUISIANA LAW.

As this Court's subject matter jurisdiction is based on the diversity of the parties' citizenship, this Court is *Erie*-bound to apply Louisiana law to the interpretation of the Policy. In *Crabtree v. State Farm Insurance Co.*, 632 So. 2d 736 (La. 1994), the Louisiana Supreme Court set forth the following general principles guiding interpretation of an insurance policy:

> An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. If the words of the policy are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and the agreement must be enforced as written. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. The policy should be construed as a whole and one portion thereof should not be construed separately at the expense of disregarding another. If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of the insured.

*Id.* at 741 (internal citations omitted).

In the construction of the policy, "the specific controls the general." *Smith v. Burton*, 928 So. 2d 74, 79 (La. App. 1st Cir. 2005). In other words, the meaning of general terms in the policy

will be restricted by other specific or more descriptive terms on the same subject. *See Baton Rouge Oil and Chemical Workers Union v. Exxonmobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002); *Breaux v. Rimmer & Garrett, Inc.*, 320 So. 2d 214, 219 (La. App. 3d Cir. 1975).

> C.   **THE TRAVELERS POLICY IS AN "ALL RISKS" POLICY OF INSURANCE AND, AS SUCH, PROVIDES COVERAGE FOR ANY DAMAGE TO COVERED PROPERTY UNLESS CAUSED BY AN EXCLUDED CAUSE OF LOSS, AND TRAVELERS CANNOT PROVE THAT XAVIER'S DAMAGES WERE CAUSED BY AN EXCLUDED CAUSE OF LOSS.**

The Policy issued to Xavier is an "all risks" policy. An "all risks" policy is defined as one that "creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud unless the policy contains a specific provision expressly excluding the loss from coverage." *Dow Chem. Co. v. Royal Indem. Co.*, 635 F2d 379, 386 (5th Cir. 1981). *See also Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 n.11 (5th Cir. 1990). The burden of proving an exclusion from coverage rests on Travelers. *See Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000) ("On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy."); *Dawson Farms, L.L.C. v. Millers Mutual Fire Ins. Co.*, 794 So. 2d 949, 951 (La. App. 2d Cir. 2001) ("Under Louisiana law, it is the insurance company's burden to prove that a loss comes within a policy exclusion.").

Accordingly, Xavier's losses for ground water damage to its campus are presumed to be covered under the Policy. Travelers must prove that coverage is excluded based on the exclusionary language of the policy. Thus, to defeat this motion for partial summary judgment, Travelers must point the Court to the existence of a material facts demonstrating any ground water inundation resulted from sources of ground water other than the levee breaches at the 17th Street Canal and the

London Avenue Canal.  In the present motion, Xavier seeks a partial summary judgment from this

Court that, as a matter of law, Travelers cannot sustain its burden of proving that its purported "flod

exclusion, as pled in the Eighth Affirmative Defense, applies to preclude coverage for any of

Xavier's losses arising out of Hurricane Katrina because the term "flood," construed consistent with

the other terms of the flood exclusion refers only to naturally occurring events.

> **D.  UNDER THE CONTRACTUAL INTERPRETATION DOCTRINES OF *EJUSDEM GENERIS* AND *NOSCITUR A SOCCIS*, THE TERM "FLOOD" MUST BE INTERPRETED IN LIGHT OF THE OTHER TERMS CONTAINED IN THE EXCLUSION AND THE TERMS USED REFER TO NATURALLY OCCURRING EVENTS; THEREFORE, "FLOOD" DOES NOT APPLY TO GROUND WATER INNUNDATION RESULTING FROM MAN-MADE ACTS.**

This policy analysis begins, where it must, with the pertinent language of the "flood"

exclusion, which is repeated here for the Court's ease of reference:

> 1.  We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that has contributed concurrently or in sequence to the loss.
>     . . .
> g.  Water
>     (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
>     (2) Mudslide or mudflow;
>     (3) Water under the ground surface pressing on, or flowing or seeping through:
>          (a) Foundations, walls, floors or paved surfaces;
>          (b) Basements, whether paved or not; or
>          (c) Doors, windows or other openings.

The term "flood" as used in the Policy does not apply to the ground water infiltration that

inundated Xavier's campus following Hurricane Katrina.  As set forth above, it is uncontroverted

that the ground water came from the breaches at the 17th Street Canal and the London Avenue Canal

14

and that the failure of the levee and floodwall at those locations resulted from the improper construction of the levees and floodwalls by the Corps. As demonstrated by the Declaration of Marion B. Bracy, there is no evidence that any ground water that inundated the covered properties on Xavier's campus came from storm surge, an overtopped levee, or rainwater that did not drain properly. Rather, the Xavier ground water resulted from collapse and breach of levees and floodwalls, a man-made event. Here, the ground water inundation of the campus was caused by the equivalent of the Corps' driving a truck-load of water into the middle of Xavier's campus – an event that is clearly not a "flood" within the meaning of the policy.

The exclusion uses the term "flood" in conjunction with the terms "waves," "tides," "tidal waves," and "overflow of any body of water." Each of these terms refers to naturally occurring events. Nothing in the language of the policy indicates that "flood" applies to man-made events. Exclusions from coverage are to be afforded a narrow construction, and, where there are two plausible interpretations of an exclusion, the court should find in favor of the interpretation that supports rather than withholds coverage. *See Reynolds v. Select Properties, Ltd. v. Transcontinental Ins. Co.*, 634 So. 2d 1180, 1183 (La. 1994) ("Thus, a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied."); *Adams v. Arceneaux*, 809 So. 2d 190, 195 (La. App. 1st Cir. 2001); *Korossy v. Sunrise Homes, Inc.*, 653 So. 2d 1215, 1227 (La. App. 5th Cir. 1995) (same). Because under the wording of the flood exclusion, "flood" applies only to naturally caused events not those caused by third party fault, the Travelers Policy should be interpreted in favor of coverage for Xavier's losses.

A plain reading of the exclusion in its entirety demonstrates that the term "flood" applies only to naturally occurring events because the other excluded events – waves, tides, tidal waves, overflow of any body of water, or their spray – are solely naturally occurring events. As discussed above, in the construction of an insurance policy, "the specific controls the general." *Smith v. Burton*, 928 So. 2d 74, 79 (La. App. 1st Cir. 2005). In other words, the meaning of general terms in the policy will be restricted by other specific or more descriptive terms on the same subject. *See Baton Rouge Oil and Chemical Workers Union v. Exxonmobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002). These principles are reflected in the contractual interpretation doctrines of *ejusdem generis*[1] and *noscitur a socciis*.[2]

In several instances, courts have applied these doctrines to insurance policy exclusions and found that coverage existed for certain causes of loss. For example, in *Peach State Uniform Service, Inc. v. The American Insurance Co.*, 507 F.2d 996 (5th Cir. 1975), the U.S. Fifth Circuit Court of Appeals applied these principles to an "earth movement" exclusion and concluded that coverage should be afforded for the insured's losses. The loss at issue arose when the plaintiff's building collapsed following heavy rainstorms; it was subsequently determined that the collapse resulted from

---

[1] "In the construction of laws, wills, and other instruments, . . . where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 517 (6th ed. 1990). In *Sommers v. State Farm Fire and Cas. Co.*, 765 So. 2d 87 (La. App. 4th Cir. 2000), the court applied the principle of *ejusdem generis* even though the specific term preceded the general term. *See id.* at 91.

[2] "It is known from its associates. The meaning of a word is or may be known from accompanying words. . . . [T]he meaning of questionable or doubtful words may be ascertained by reference to the meaning of other words or phrases associated with it." Black's Law Dictionary, *supra*, at 1060.

16

run-off of rain water washing away un-compacted fill dirt beneath the building foundation. The insurer invoked the earth movement exclusion to deny coverage, and, at trial, the jury found in favor of the insurer. The Fifth Circuit reversed the trial court's judgment and, looked at the specific occurrences which would result in application of the exclusion – "earthquake, volcanic eruption, landslide." The court, upon consideration of this language, held that "earth movement" was applicable only to events or occurrences taking place within the earth itself, absent some clearly expressed intent to the contrary, and "not to the merely superficial effects of external forces, such as erosion by run-off rainwater." *Id.* at 1000. Finding no contrary intent expressed in the policy, the court held that the district court erred in denying plaintiff's motion for a judgment notwithstanding the verdict. *Id.* at 1000.

The West Virginia Supreme Court's interpretation of an analogous earth movement exclusion in *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1 (W. Va. 1998), further illustrates that Travelers' reliance on the flood exclusion is misplaced because the terms of the policy, when read in their entirety, excluded damage for losses caused by naturally occurring events, not man-made events. In *Murray*, the insureds' houses were damaged when rocks and boulders fell off a highwall above their house causing damage to their properties. One theory for the falling boulders was that the highwall was negligently constructed and that the rock fall could have been prevented with proper construction. The insureds filed claims with their homeowners insurers, which denied coverage on several grounds, including a policy exclusion for "earth movement" that was similar to the exclusion before the Fifth Circuit in *Peach State Uniform Service*. The trial court granted the insureds' motion for summary judgment, and the insurers appealed.

17

Two of the tools at the *Murray* court's disposal were the contractual interpretation doctrines of *ejusdem generis* and *noscitur a sociis*. Application of both terms, the court stated, meant "that in an ambiguous phrase mixing general words with specific words, the general words are not construed broadly but are restricted to a sense analogous to the specific words." *Id.* at 9. Applying these precepts to the earth movement exclusion, the court held that, since the exclusion included events that could only arise from natural occurrences and events that could be both natural and man-made, the exclusion had to be limited to apply only to natural occurrences. *Id.* at 10.

Following the *Murray* court's interpretation of an earth movement exclusion, the Supreme Court of Appeals of West Virginia, in *Change, Inc. v. Westfield Insurance Co.*, 542 S.E.2d 475 (W. Va. 2000), considered whether a flood exclusion identical to the one contained in the Travelers Policy applied only to events caused by man-made acts. In *Change, Inc.*, the insured's property was damaged when a municipal water main broke. The insured made a claim on its commercial property carrier, which denied coverage on the basis of the flood exclusion because the water had come into the building from under its foundations. The trial court granted summary judgment in favor of the insurer, and the insured appealed.

The court reversed, noting that the exclusion contained an exception for damages caused by sprinkler leakages, a man-made cause, while excluding natural causes, such as damages caused by surface water, waves, and tides. Invoking the principles of *noscitur a sociis* and *ejusdem generis*, the court held that the general terms must be construed in light of the specific terms and, therefore, the insured's losses were covered for damages arising out of a man-made event. *See id.* at 479.

Later, in *Fayad v. Clarendon National Insurance Co.*, 899 So. 2d 1082 (Fla. 2005), the Supreme Court of Florida was called upon to determine "whether damages caused by blasting are

18

covered under an all-risk insurance policy that expressly excludes damage caused by earth movement from coverage." *Id.* at 1084. The insureds complained that nearby blasting activities caused structural damage to their home and made a claim on their homeowner's insurer, Clarendon. Clarendon denied coverage for the claim and filed a declaratory judgment action seeking a determination that it did not owe coverage. Thereafter, Clarendon moved for summary judgment claiming that the policy's earth movement exclusion was applicable.

The policy contained a lead-in clause identical to the one found in the Travelers' Policy in this case and noted that coverage was excluded for "'[e]arth movement, meaning earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth; sinking, rising or shifting . . .'" The trial court found that coverage was excluded, and the intermediate appellate court affirmed the decision. The Florida Supreme Court reversed.

The court noted the "all risks" nature of the policy and held that it was the insurer's responsibility to clearly set forth damages excluded from coverage. *See id.* at 1086. Considering the earth movement exclusion, the court made a distinction between losses caused by natural events and those caused by man-made events for which an opportunity existed for the insurer, via a subrogation action, to recover damages from the negligent party. *Id.* Reviewing case law from other jurisdictions discussing the earth movement exclusion, the court noted that "the overwhelming majority of courts interpreting earth movement exclusions that do not contain lead-in language precluding coverage for damage from earth movement 'regardless' of its cause have concluded that

19

such exclusions apply only to earth movement that arises from natural events. *Id.* at 1087 & n.3 (citing cases).[3]

Thus, the court concluded that, absent specific limiting language, earth movement exclusions apply only to naturally caused events. The court's holding was further supported by other, more specific terms in the exclusion: "earthquake," "landslide," and "mudflow," all of which were naturally caused events. Such a finding, the court observed, was consistent the principle of *ejusdem generis. Id.* at 1087-88. Thus, to the extent the insured could prove that his losses arose as a result of third party negligence, his losses were covered.

Travelers' wording of its own earth movement exclusion makes clear that Travelers was aware of the distinction between natural and man-made events. That earth movement exclusion provides:

> ***Any earth movement (other than "sinkhole collapse") <u>whether natural or man-made, including but not limited to</u>*** earthquake, mine subsidence, landslide, or earth sinking, rising or shifting. But if earth movement results in fire, or explosion, we will pay for the loss or damage caused by that fire or explosion.

Deluxe Property Coverage Form, Section B(1)(b)(1) (emphasis added). The "flood" excluson contains no similar wording.

Thus, Travelers was aware that an earth movement exclusion needed to clearly define the difference between natural and man-made occurrences. Travelers' use of "whether natural or man-made" was due, no doubt, to the predominance of case law, discussed below, affording a narrow construction to the earth movement exclusions not containing such wording. Thus, Travelers wrote

---

[3]Some lead-in clauses precluded coverage "regardless of the cause of the excluded event." *Fayard,* 899 So. 2d at 1087. In contrast, the lead-in clause before the *Fayard* court contains no such limiting language concerning the cause of the excluded event. The Travelers Policy's lead-in clause is identical to that before the *Fayard* court.

an exclusion specifying man-made causes were excluded. Travelers, however, did not include man-made events in the flood exclusion, despite clearly understanding how to write exclusions applicable to both man-made and naturally occurring incidents. As such, this Court should hold that the flood exclusion only applies to natural events and that the Policy provides coverage for all of Xavier's losses caused by the Corps' actions and resulting ground water from the 17th Street Canal and the London Avenue Canal.

As support for this proposition, Xavier refers this Court to *Nautilus Ins. Co. v. Vuk Builders, Inc.*, 406 F. Supp. 2d 899 N.D. Ill. 2005), in which the district court held that the insurer's earth movement exclusion was ambiguous because it failed to distinguish between man-made and naturally occurring earth movements; in particular, the court noted that the insurer could have written a broader exclusion similar to other policies but failed to do so. The court noted: "Additionally, because plaintiff is in the business of insurance and easily could have specifically defined excluded causes of subsidence or excluded earth movement, "regardless of cause," we consider its omission to be significant." *Id.* at 905. In the present case, Travelers could have written a flood exclusion specifically excluding man-made events, and the earth movement exclusion is direct evidence that it knew how to do so. Such knowledge is a strong indication that the flood exclusion was not intended to apply to man-made events.

For the reasons articulated by the courts in *Peach State Uniform Service*, *Murray*, *Change, Inc.*, and *Fayard*, Xavier respectfully requests that this Court hold that "flood," as that term is used in the Policy exclusion, must be interpreted in light of the other terms in the exclusion – waves, tides, tidal waves, overflow of any body of water, or their spray and applies only to naturally occurring "floods." The more specific terms refer only to naturally occurring events. Thus, "flood" should be

likewise defined to mean only a naturally occurring event. The exclusions to the Policy must be narrowly construed, and, in this case, as a matter of law, Travelers cannot meet its burden of proving that the ground water that inundated the first floor of the covered buildings was a "flood" as that term is defined in the Policy because there is no proof that the ground water intrusion resulted from a naturally occurring event. Rather, the evidence is clear that such ground water intrusion was caused by the Corps.

### E. THE FLOOD EXCLUSION IS AMBIGUOUS AS A MATTER OF LAW BECAUSE IT FAILS TO DISTINGUISH BETWEEN NATURALLY OCCURRING AND MAN-MADE EVENTS.

The Louisiana Supreme Court has recognized that a broadly worded coverage exclusion susceptible of multiple interpretations is ambiguous as a matter of law and should be interpreted in a manner that supports rather than defeats coverage. In *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119 (La. 2000), the court had to determine whether a "total pollution exclusion" in an "all risks" policy could defeat coverage for damages caused by the release of hydrocarbons into a parish-wide water system. The total pollution exclusion provided that no coverage was available for any damage "'which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.'" *Id.* at 122. Applying the above-referenced principles of policy interpretation, the court concluded that the exclusion was so broadly worded that it could apply to "anything from the release of chlorine gases by a conglomerate chemical plant to the release of carbon monoxide from a small business owner's delivery truck." *Id.* at 124. Continuing, the court noted that even a slip and fall in a puddle of spilled gasoline at a gas station would not be covered by the total exclusion. *See id.* Such a literal and broad reading would result in absurd consequences that would operate to defeat coverage, a result contrary to

22

Louisiana insurance law. *See id.*   As a result, the court held that the policy was ambiguous and should be interpreted narrowly and in an effort to afford, not deny, coverage. *Id.* at 124-25.

Similarly, in this case the purported "flood exclusion," if read literally, could potentially apply to any condition resulting from ground water intrusion. The "all risks" policy was meant to afford coverage for damages caused by man-made causes.  Travelers' proffered reading of the exclusion would defeat that expectation and impermissibly expand the narrow limits of the exclusion. Consistent with the *Doerr* court's holding that a release of hydrocarbons into a drinking system does not constitute pollution, this Honorable Court should likewise hold, as a matter of law, that the term "flood" is inapplicable to ground water intrusion resulting from the fault of a third person.  Xavier's motion for partial summary judgment in this regard should be granted.

This issue was highlighted by the West Virginia Supreme Court of Appeals' decision in *Murray, supra.*  The court found that policy to be ambiguous because it was subject to multiple interpretations.  Reviewing the terms of the exclusion, the court held:

> On the one hand, the exclusions cited in defendants' policies could bar coverage for solely *natural* events such as earthquakes, volcanic eruptions, and sinkholes.  On the other hand, the same exclusions refer to events which could be *man-made*, such as subsidence or earth movement caused by equipment or a broken water line.  Or, as alleged in this case, earth movement could be caused by *both man-made and nature* over a period of time, such as landslides, mudflows, or the earth shrinking, shifting, or settling.  ***Because the policy language is reasonably susceptible to different meanings, we believe that the earth movement exclusion in the insurance policies at issue are ambiguous, and must have a more limited meaning than that assigned to it by the defendants.***

*Murray*, 509 S.E.2d at 9 (emphasis added).

The "flood exclusion" in the Travelers policy should also be read in the same reasonable manner. The exclusion simply is not clear when it comes to determining whether the term "flood"

refers only to naturally occurring or man-made events. As it is susceptible of either interpretation, the exclusion is, therefore, ambiguous as a matter of law.

For these reasons, Xavier urges this Court to find the flood exclusion is susceptible to two or more reasonable interpretations. The term "flood" could mean either (1) a naturally occurring event; (2) one resulting from the man-made acts; or (3) both. The Policy is unclear as to the factual circumstances in which it applies; thus, the exclusion must be construed narrowly and in favor of coverage for Xavier. In addition, Travelers knew how to write an exclusion to specify the factual circumstances in which no coverage would exist, but it failed to do so – particularly when Travelers did so in the same insurance policy in the earth movement exclusion.

As a result, the flood exclusion is ambiguous, and the well established law of Louisiana requires this Court to construe the exclusion narrowly and in favor of coverage. As the uncontroverted facts in this case demonstrate, the ground water that inundated Xavier's campus resulted from man-made causes.

## III.   CONCLUSION

For the foregoing reasons, Xavier respectfully requests that this Honorable Court grant its motion for partial summary judgment and hold, as a matter of law, Honorable Court enter partial summary judgment in its favor and against Travelers and hold, as a matter of law, that the Travelers' Policy's "flood" exclusion is inapplicable to Xavier's damages arising from Hurricane Katrina.

Respectfully Submitted:

JAMES M. GARNER, #19589
DARNELL BLUDWORTH, #18801
TIMOTHY B. FRANCIS, #14973
KEVIN M. MCGLONE, #28145
**SHER GARNER CAHILL RICHTER**
**KLEIN & HILBERT, L.L.C.**
909 Poydras St., 28th Floor
New Orleans, LA 70112
Telephone: 504-299-2100
Facsimile: 504-299-2300
COUNSEL FOR XAVIER UNIVERSITY
OF LOUISIANA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing Memorandum in Support of

Motion for Partial Summary Judgment has been served upon:

        Ralph S. Hubbard, III
        Simeon B. Reimonenq, Jr.
        601 Poydras St., Suite 2775
        New Orleans, LA 70130
        Attorneys for Travelers Property Casualty Company of America

by placing same in the United States Mail, postage prepaid, this 24 day of August 2006.

JAMES M. GARNER