

**US Army Corps
of Engineers®**

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume I – Executive Summary and Overview

June 2006



**FINAL DRAFT**
(Subject to Revision)

EXHIBIT

2

# Preface

This report is the result of an intense performance evaluation of the New Orleans and Southeast Louisiana hurricane protection system during Hurricane Katrina. It was conducted by the Interagency Performance Evaluation Task Force, a distinguished group of government, academic, and private sector scientists and engineers who dedicated themselves solely to this task from shortly after Katrina struck through the start of the next hurricane season. Created by the Chief of Engineers, U.S. Army Corps of Engineers and peer reviewed literally on a weekly basis by an equally distinguished external review panel of the American Society of Civil Engineers, the group applied some of the most sophisticated capabilities available in civil engineering to understand what happened during Katrina and why. Their purpose was not just new knowledge, but application of that knowledge to the repair and reconstitution of protection in New Orleans as well as improvement to engineering practice and policies. The results of their work are largely already in the ground, having been transferred and applied prior to the completion of this report. The bulk of the information and documents used or generated by the Task Force has been placed on a public Web site, *https://IPET.wes.army.mil*, as they became available. At the time of the distribution of this draft report, there were well over 4300 documents on this site.

There are nine volumes in the final report, designed to provide a detailed documentation of the technical analyses conducted and their associated findings. They are organized around major technical tasks that together provided an in-depth, system-wide assessment of the behavior of the hurricane protection system and lessons learned that have been incorporated into the immediate repairs and are integrated into the continuing efforts to improve the system and assessing approaches for higher levels of protection. The volumes and their individual focus areas are as follows:

- Volume I: Executive Summary and Overview – Summary of findings and lessons learned. Overview of performance evaluation activities and reports.

- Volume II: Geodetic Vertical and Water Level Datums – Update of geodetic and water level references for the region and determining accurate elevations for all critical structures.

- Volume III: The Hurricane Protection System – Documentation of the character of the hurricane protection system, including the design assumptions and criteria, as built and maintained condition.

- Volume IV: The Storm – Determining the surge and wave environments created by Katrina and the time history and nature of the forces experienced by protection structures during the storm.

- Volume V: The Performance – Levees and Floodwalls – Understanding the behavior of individual damaged structures and development of criteria for evaluation of undamaged sections. Providing input to repairs and ongoing design and planning efforts.

## Overarching Findings

The System did not perform as a system: the hurricane protection in New Orleans and Southeast Louisiana was a system in name only. Flood protection systems are an example of a series system—if a single levee or floodwall fails, the entire area is impacted. It is important that all components have a common capability based on the character of the hazard they face. Such systems also need redundancy, an ability for a second tier of protection to help compensate for the failure of the first tier. Pumping may be the sole example of some form of redundancy; however, the pumping stations are not designed to operate in major hurricane conditions. The system's performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy. Incomplete sections of the system resulted in sections with lower protective elevations or transitions between types and levels of protection that were weak spots. Inconsistent levels of protection were caused by differences in the quality of materials used in levees, differences in the conservativeness of floodwall designs, and variations in structure protective elevations due to subsidence and construction below the design intent due to error in interpretation of datums. The presence of closure gates such as those for the CSX railroad that must function as a part of the system, but are separately controlled, add to the inherent risk in the system. Redundancy was simply not included. Continuity of pumping could have significantly reduced at least the duration of flooding and in some areas the extent. Armoring the back sides and crests of levees and the protected side of floodwalls would have added significant redundancy and reduced breaching. Surge gates at the mouths of the outfall canals are an excellent example of providing redundancy. The combination of the surge protection for the canals and resilient levee-floodwall systems will dramatically reduce risk in Orleans East Bank.

The storm exceeded design criteria, but the performance was less than the design intent: sections of the hurricane protection system were in many ways overwhelmed by the conditions created by Hurricane Katrina. This is particularly true for the sections of the Gulf Intracoastal Waterway (GIWW) along New Orleans East, and the levees in St. Bernard and Plaquemine Parishes where the combination of record high surge and long period waves exceeded the design conditions and devastated the levees. This devastation, however, was aided by the presence of incomplete protection, lower than authorized structures, and levee sections with erodible materials. While overtopping and extensive flooding from Katrina were inevitable, a complete system at authorized elevations would have reduced the losses incurred. The designs were developed to deal with a specific hazard level, the Standard Project Hurricane as defined in 1965; however, little consideration was given to the performance of the system if the design event or system requirements were exceeded.

Within two of the three outfall canals in Orleans Parish, and at one site within the Inner Harbor Navigation Canal (IHNC), foundation failures occurred prior to water levels reaching the design levels of protection, causing breaching and subsequent massive flooding and extensive losses. These failures were all associated with I-wall structures and a common failure mode involving the formation of a gap on the canal side of the floodwall that precipitated and accelerated the failure in the foundation materials. The designs for these structures were marginal with respect to practice and the uncertainty inherent in the variable geological conditions and the hurricane hazard for the area. The duration of flooding could have been

reduced if the pumping capability had been able to continue, but the pumping systems were not designed to operate in severe hurricane conditions.

Two other sites within the IHNC experienced I-wall breaches due to overtopping and scour behind the walls which reduced the stability of the structures. These breaches added to the flooding in Orleans (East Bank) and the Lower Ninth Ward. The storm surge levels in the IHNC exceeded the design levels, and lower structure elevations, reduced over 2 ft by 35 years of subsidence, contributed to the amount of overtopping that occurred. Reduced protection elevations at transitions between structure types and incomplete sections of the system similarly reduced protection levels and increased flooding. Another site on the west side of the IHNC breached from overtopping and scour of a levee. The elevation of the levee was lower than adjacent areas, which added to its vulnerability.

The flooding and the consequences of the flooding were pervasive, but also concentrated. Consequences of the flooding and the associated losses were greater than any previous disaster in New Orleans and, in themselves, create a formidable barrier to recovery. Loss of life was concentrated by age, with more than 75 percent of deaths being people over the age of 60. Loss of life also correlated to elevation, in terms of depth of flooding, especially with regard to the poor, elderly and disabled, the groups least likely to be able to evacuate without assistance.

The majority, approximately two-thirds by volume, of the flooding and half of the economic losses can be attributed to water flowing through breaches in floodwalls and levees. Losses and in many respects recovery can also be directly correlated to depth of flooding and thus to elevation. In some areas flooded by Katrina, where water depths were small, recovery has been almost complete. In areas where water depths were greater, little recovery or reinvestment has taken place.

Another concentration of consequences is in the nature of the losses. Twenty five percent of residential property values were destroyed by Katrina and this loss represents 78 percent of all direct property damages. Non-residential properties suffered a 12 percent loss in total value or half the rate of residential. Clearly residential areas were more prone to flooding.

The repaired sections of the hurricane protection system are likely to be the strongest parts of the systems until the remaining sections can be similarly upgraded and completed. Since there are many such areas where the protection levels will be the same as before Katrina, the New Orleans metropolitan area remains vulnerable to any storm creating surge and wave conditions that rival those from Katrina.

## Synopsis of Principal Findings

### Geodetic Vertical and Water Level Datum (Volume II)

The variable and considerable subsidence in the New Orleans area was reflected in the performance of the system in Katrina in two ways. First, the magnitude of the subsidence and adjustments to the datums were not fully considered in the design and construction of the Hurricane Protection System. Spatial and temporal variations of 0.2 to 3 ft were found between

the geodetic datums and water level reference datums. Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodetic vertical datum incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation. In at least one case, the Corps made a deliberate decision not to re-examine elevations of existing project structures after datum adjustments were made. Second, updating of the reference elevation points for the region, although underway, was not completed and left decision makers without an accurate understanding of the actual elevations of the hurricane protection. The IHNC structures, for example, are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project.

## Hurricane Protection System (Volume III)

There was no evidence of government or contractor negligence or malfeasance. With the exceptions noted below, the system was generally built as designed, and design approaches were consistent with local practice. However, several factors described below significantly impacted the system's performance during Katrina. Sections of the system were built below specified design elevations due to the use of an inaccurate relationship between the geodetic datum and mean sea level. While varying across the system, this elevation difference can be as much as 1 to 2 ft. Foundation soil strengths were derived from relatively widely spaced borings and at times using average values that may not capture the high variability inherent in this type of geology. The decision to use uniform soil shear strengths, based on the greater strengths of the soils under the center line of the 17th Street Canal levee, resulted in an overestimation of the subsurface strength at the levee toe. Coupled with the use of average values obtained from widely spaced samples in a geology with highly variable conditions, the structure was left with a marginal factor of safety. This same assumption was not made in other sections of the system where more conservative strength values were used.

The original design criteria developed through use of the Standard Project Hurricane (SPH) in 1965 and used for the outfall canals in the late 1980s, was not representative of the hurricane hazard at the time of the design. While updates in original 1959 definition of the SPH for the New Orleans area were made by the National Oceanographic and Atmospheric Administration (NOAA) in 1979, the Corps chose to continue to use the 1965 and 1966 original definitions developed for the Lake Pontchartrain and Vicinity and New Orleans to Venice Projects.

The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection. Four slightly different SPH's were used, and the designs for specific structures were influenced by the local conditions. For example, the levee and I-wall system designed for the Orleans Canal was more conservative than that for the 17th Street Canal. The Orleans levee was broader and the I-wall freeboard less (height above the levee crest). Soil strength assumptions were also more conservative, using the weaker values at the toe instead of the stronger values under the centerline as assumed for the 17th Street levees.

Sections that are not completed represent anomalously low areas, more vulnerable to overtopping and failure. The majority of the pump stations are not designed to provide capability

**Performance (Volumes V and VI)**

Of the 50 major breaches experienced by the hurricane protection system during Katrina, all but four were due to overtopping and erosion. For floodwalls, the overtopping caused erosion behind the walls that eventually caused instability and wall failure. For levees, the scour eroded the back sides and tops of the levees due to high velocities of the overtopping waves in areas of erosion-susceptible soils creating breaching. The value of added erosion resistance was clear, an attribute that could also be provided by measures such as armoring. Areas with high quality levee materials performed reasonably well in the face of water conditions that exceeded their design criteria. Structures at authorized design elevations would have reduced the amount of overtopping. There was no evidence of systemic breaching caused by erosion on face or water sides of the levees exposed to surge and wave action.

Four breaches, all in the outfall canals and IHNC and all involving I-walls, occurred before water levels reached the top of the floodwalls. All were caused by foundation failures induced by the formation of a gap along the canal side of the floodwall. All of these structures were built over a layer of marsh sediments, in two cases underlain by clays and in the other two underlain by relict beach sand deposits. The subsurface conditions dictated the specific mechanics that, coupled with the high hydrostatic pressures introduced to depth by the gap along the face of the sheet pile, led to instability and failure. The sites underlain by sand experienced significant seepage and in one case a massive piping of subsurface sand from under the levee to the protected side, undermining the floodwall. The formation of the gap and the associated hydrostatic pressures introduced at depth resulted in a significant reduction in the factor of safety of the structure. This failure mechanism, in particular the gap formation, was not considered in the original design of these structures.

Transitions between types and levels of protection and between protection structures and other features created vulnerabilities to erosion and breaching and reduced the effectiveness of the protection. Some of the transitions are associated with changes in the organization responsible for the structures, some are due to incompletion of the authorized construction, and others are associated with necessary penetrations through the levee/floodwall system.

In spite of being subjected to design-exceeding conditions and forces, many sections of the hurricane protection system performed well. These tended to be sections with materials resistant to erosion and more conservative designs.

Flooding from Katrina covered approximately 80 percent of the New Orleans metropolitan area. Approximately two-thirds of that flooding can be attributed to water flowing through breaches. The one-third due to overtopping and the very large amount of rainfall would itself have caused a significant level of interior flooding.

The three foundation failures associated with flooding in Orleans East Bank were responsible for approximately 70 percent of the flooding in that area. The remainder was due to the heavy rainfall (up to 14 in. in 24 hr) and some overtopping-induced breaching along the west side of the IHNC.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.



**US Army Corps
of Engineers**

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume II – Geodetic Vertical and Water Level Datums

1 June 2006





**FINAL DRAFT**

(Subject to Revision)

**EXHIBIT**

tabbies'

3

# Executive Summary

An interagency team to study vertical reference datums was formed consisting of U.S. Army Corps of Engineers (USACE) and U.S. Department of Commerce National Oceanic and Atmospheric Administration (NOAA) personnel. The primary purpose was to define and evaluate a vertical reference datum for the Southeastern Louisiana area that would be compatible with concurrent Interagency Performance Evaluation Task Force (IPET) teams performing hydraulic model studies in the region. A secondary purpose was to evaluate the designed, constructed, and pre-Katrina elevations of flood control and hurricane protection structures in the region. This team also provided significant field topographic surveying support to the IPET for various physical and numerical models.

The NOAA National Geodetic Survey (NGS) participants on this IPET team developed a new (October 2005) time-stamped vertical reference framework for this high subsidence region—termed North American Vertical Datum of 1988 NAVD88 (2004.65). The NOAA Center for Operational Oceanographic Products and Services (CO-OPS) participants were included on this study team given their expertise in tidal datums and defining water level-based references consistent with hydrodynamic models of the region.

A spatial and temporal variation was found to exist between the geodetic datums and the water level reference datums used to define elevations for regional hydrodynamic conditions. This 0.2-ft to 3.0-ft variation is critical in relating measurements of wave heights and water level elevations, high-resolution hydrodynamic conditions, water elevations of hydrostatic forces and loadings at levees and floodwalls, elevations of pump station inverts, and related elevations of flood inundation models deriving drainage volumes or first-floor elevations in residential areas. Flood control structures in this region were authorized, designed, and numerically modeled relative to a water level reference datum (e.g., mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. These varied datums, coupled with redefinitions and periodic readjustments to account for the high subsidence and sea level variations in this region, significantly complicated the process of obtaining a basic reference elevation for hydrodynamic modeling, risk assessment, and design, construction, and maintenance of flood control and hurricane protection systems. An IPET follow-on study by intergovernmental teams is recommended to refine the relationships between the various datums that are numerically compatible with the varied hydraulic, hydrodynamic, geodetic, and flood inundation models such as those used by the Federal Emergency Management Agency (FEMA).

To the maximum extent possible, topographic surveys of flood control and hurricane protection structures, interior drainage regions, hurricane surge, and high water marks used in various high-resolution hydrodynamic models were performed relative to the updated geodetic vertical datum developed by the NGS for this region—NAVD88 (2004.65). Some older geospatial datasets acquired for this project were obtained from a variety of federal, state, regional, parish, and private entities. Many of these datasets had unverifiable vertical datum references and were of uncertain reliability or had not been ground-truthed. They were converted to the newer vertical datum framework, with mixed results and varying levels of confidence.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Overview of Vertical Datums

Vertical datums typically represent a terrestrial or earth-based surface to which geospatial coordinates (such as elevations) are referenced. Elevations of points may be referred to local or regional reference planes. These may be either geodetic or hydraulic based reference planes. These reference planes are not necessarily "planar" and may deviate spatially over a region, due to a variety of reasons. They may also have temporal deviations due to land subsidence, sea level changes, or geodetic readjustments. Thus, it is impossible to define a truly consistent, non-varying, terrestrial-based, vertical geodetic framework for coastal areas such as the New Orleans study region. Recent (i.e., over the last 20 years) implementation of GPS satellite reference systems does provide potential mechanisms for establishing an external reference framework from which vertical datums can be related spatially and temporally. Such a framework was developed by NOAA in October 2005 and used for this IPET project.

The following discussion is intended to be a brief overview of terrestrial and hydraulic-based reference datums used in the Southeastern Louisiana region. More comprehensive treatments on geodesy specific to vertical datums can be found in NOAA, USACE, ASCE, and academic publications.

### Geodetic Datums

A geodetic vertical datum is a reference system whereby heights are consistently determined above some reference surface. Previously the reference surface for a vertical datum has been some approximation of local mean sea level, but this is not a strict requirement. By 1900, the vertical control network for the United States had grown to 21,095 km of geodetic leveling. A reference surface was determined in 1900 by holding elevations referenced to local mean sea level (LMSL) fixed at five tide stations. Data from two other tide stations indirectly influenced the determination of the reference surface. Subsequent readjustments of the leveling network were performed by the US Coast and Geodetic Survey (USC&GS) in 1903, 1907, and 1912.

Since 1929, only two official national vertical datums have been established. Due to subsidence and other factors, several readjustments have been made to the published heights in these datums in areas such as Southern Louisiana. The first of these national datums was the Sea Level Datum of 1929 (SLD29). It was created by the USC&GS as the datum to adjust all vertical control to in North America. The SLD29 is defined by 26 tide stations, held fixed to Local Mean Sea Level; 21 tide stations in the United States; and 5 tide stations in Canada. When it was established in 1929, SLD29 was believed to be a "mean sea level" datum. However, over time, with sea level rise and other factors, it was no longer considered a "mean sea level" datum. In 1973 the name of SLD29 was changed to the National Geodetic Vertical Datum of 1929 (NGVD29).

In the early 1990s, the NOAA NGS established a new geodetic vertical datum for North America—the North American Vertical Datum of 1988 (NAVD88). NAVD88 is defined by a single tidal benchmark at Father Point/Rimouski, an International Great Lakes Datum of 1985 (IGLD85) water level station at the mouth of the Lower St. Lawrence River in Quebec, Canada. This Rimouski benchmark elevation was held fixed in a minimally constrained, least square adjustment, which isn't distorted by constraints of local mean sea level in different areas, as was

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

# Data Analysis and Impacts: London Avenue Outfall Canal Construction Reference Datums

### Summary of Findings

This Section covers the evaluation of the constructed and current elevations on flood protection structures along the London Avenue Outfall Canal. The floodwalls on the east and west banks were found to be constructed approximately 1.7 foot below their intended design elevations. This was caused by using a superseded (1965) geodetic elevation reference instead of an up-to-date hydraulic-based (sea level) reference datum. Pre-Katrina and current flood protection elevations in the canal floodwalls are approximately 2 feet below design when related to the latest tidal epoch.

### Reference Documents

The following construction drawings and Design Memorandums were reviewed as part of this assessment:

- DACW29-94-C-0079 (94-B-0047) As Built Mark Up—London Ave. Outfall Canal Parallel Protection— Mirabeau Ave.-to R.E. Lee Blvd (West Bank)—Mirabeau Ave. to Leon C. Simon Blvd. (East Bank)

- DACW29-02-C-0013 (01-B-0092) London Ave. Outfall Canal Parallel Protection—Floodproofing Mirabeau and Filmore Ave. Bridges

- DACW29-94-C-0003 (93-B-0080) As-Built London Ave. Outfall Canal Parallel Protection—Pump Station 3 to Mirabeau Ave. Floodwall

- DACW29-99-C-0005 (98-B-0060) As-Built London Ave. Outfall Canal Parallel Protection—Floodproofing Gentilly Blvd. Bridge

- DACW29-98-C-0082 (98-B-0065) As-Built London Ave. Outfall Canal Parallel Protection— Floodproofing Leon C. Simon Blvd. Bridge

- GDM 19A (Vol I and II) London Ave. Outfall Canal (1989)

- GDM 20 (Draft) London Ave. Canal Floodwalls and Levees—Orleans Levee District—Apr1986; and Revised GDM 20 (May 1990)

- DM01 Part III Hydrology and Hydraulic Analysis—Lake Pontchartrain & Vicinity-Lakeshore (Sep 1968)

### Design Elevation Parameters

Parallel protection elevations in GDM No. 19A, GDM 20, and on various contract plans, state the design SPH stillwater surface elevation of Lake Pontchartrain is 11.5 ft NGVD or MSL. This base elevation was used in subsequent HEC-2 models to compute required floodwall elevation on each side of the canal and at the bridges. As in other Lake Pontchartrain projects, the "NGVD" elevation is assumed to be MSL or LMSL—e.g., "Lake Pontchartrain Normal Water Level = 0.0 ft MSL." Design Memorandum No. 1, Part III (1968) notes that "average high tide" in Lake Pontchartrain is 0.7 ft. It also states the average tidal range in Lake

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

# Data Analysis and Impacts: 17th Street Outfall Canal Construction Reference Datums

## Summary of Findings

This Section covers the evaluation of the constructed and current elevations on flood protection structures along the 17th Street Outfall Canal. The high level plan floodwalls on the east and west banks were found to be constructed nearly 2 feet below their intended design elevations. This was caused by using a geodetic elevation reference instead of a hydraulic (sea level) reference datum and the likely use of a disturbed benchmark to set floodwall construction grades. Pre-Katrina and current flood protection elevations in the canal floodwalls are 2.0 to 2.3 feet below the intended design when related to the latest tidal epoch.

## Reference Documents

The following construction drawings and Design Memorandums were reviewed as part of this assessment:

- Contract 92-1 Board of Levee Commissioners of East Jefferson Levee District -17th Street Canal West Side Levee Improvements

- Orleans Levee District (OLD) Contract 02043-0489 As Built—17th Street Canal Phase IB—Hammond Hwy to Southern RR 1990

- DACW29-93-B-0025 Excavation and Flood Protection 17th St Canal—Capping of Floodwalls—East Side Levee Improvements

- DACW29-95-C-0093 (95-B-0095) As Built Markup—17th St Outfall Canal-Metairie Relief—Floodproofing Veterans Blvd Bridges

- GDM 20 Vol I & II-17th St Outfall Canal (Metairie Relief) Orleans Parish & Jefferson Parish 1990

- DM01 Part III Hydrology and Hydraulic Analysis—Lake Pontchartrain & Vicinity-Lakeshore (Sep 1968)

## Design Elevation Parameters for 17th Street Canal

The following paragraphs containing design parameters are extracted from the various design memorandums and construction documents listed above.

### EAST SIDE LEVEE IMPROVEMENTS—FLOODWALL CAPPING (DACW29-93-B-0025)

Floodwall cap elevations:
Southern Railway Sta 126+02 to I-10 Bridge Sta 97+52     elev 15.0 ft NGVD
I-10 Bridge Sta 94+17 to Vet Hwy Sta 81+52                        elev 14.5 ft
Vet Hwy Sta 80+00 to Hammond Hwy Sta 8+49                  elev 14.0 ft
Hammond Hwy Sta 7+03 to Sta 0+00                                   elev 14.0 ft
Plans state normal water surface 1.5 to 2.0 ft NGVD (source of hydrograph

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.



**US Army Corps
of Engineers.**

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume III — The Hurricane Protection System

June 2006

**FINAL DRAFT**
(Subject to Revision)



**EXHIBIT**

4

In all cases, the earth pressure was assumed to be balanced.

Three methods of analysis were used to check the pile foundations. They are as follows:

- "Analysis of Pile Foundations with Batter Piles", by A. Hrennikoff, Transactions, ASCE Vol. 115 (1950). Used for checking all layouts.)

- "Design of Pile Foundations", by G. Vetter, Transactions, ASCE Vol. 104 (1939). (Used for checking the layout with two batter piles.)

- "Culmann's method for the Design of Pile Foundations" from "Theoretical Soil Mechanics" by K. Terzaghi. (Used for checking the two layouts with one vertical and two batter piles.)

These studies indicate that a foundation consisting of two piles battered in opposite directions is the most suitable and economical for the for the T-type walls.

### 3.2.1.5.3.3.7. 17th Street Outfall Canal (Metairie Relief) – Reference 2

**General.** As constructed, the 17th Street Outfall Canal hurricane protection system consists of earthen levee with capped cantilevered I-wall tying into geotextile-reinforced earthen levee of the Jefferson Lakefront Levee hurricane protection on the west side of the canal and the Orleans Marina hurricane protection on the east side of the canal. In addition, there is one pile founded swing gate at Orpheum Avenue; two pile-founded floodproofed bridges (Veterans Boulevard and Old Hammond Highway); and fronting protection of New Orleans Sewerage and Water Board Drainage Pumping Station #6. All hurricane protection construction was completed along the canal.

Fronting protection of the Canal Street Pumping Station in Jefferson parish consists of butterfly valves to prevent water backflow through the pumps when pump operation ceases due to high water levels in Lake Pontchartrain. Fronting protection of the I-10/Metairie Road Underpass Pump Station consists of a combination siphon and valves to prevent water backflow through the pumps when pump operation ceases due to high water levels in Lake Pontchartrain. Work at both stations was performed by local interests and is not covered by design documents.

The basic data relevant to the design of the protective works are shown in the following table:

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

**West Sluice Gate Monoliths**

- Case I (Construction) Site Dewatered, Dead Load, Construction Live Load, Wind Load, Backfill on Monolith, Uniform Uplift Pressure (75% forces used).

- Case II (Still Water Level) HW Elevation = 12.6, TW1 Elevation = 12.6, Gate Closed with Water in Tube, TW2 Elevation = 5.0', Dead Load, Live Load, Wind Load, Backfill on Monolith, Uniform Uplift Pressure (100% forces used).

- Case III (Normal Operating) HW Elevation = 2.0', TW1 Elevation = 2.0', Gate Open, Dead Load, Live Load, Backfill on Monolith, Uniform Uplift Pressure (1 00% force used).

- Case IV (Maintenance) HW Elevation = 2.0', TW1 Elevation = 2.0', Stop Logs in Place, Monolith Dewatered, Dead Load, Live Load, Backfill on Monolith, Uniform Uplift Pressure (75% forces used).

- Case V (2' Above Still Water Level) HW Elevation = 14.6', TW1 Elevation = 14.6', Gate Closed with Water in Tube, TW2 Elevation = 5.0', Dead Load, Live Load, Wind Load, Backfill on Monolith, Uniform Uplift Pressure (75% forces used).

The ground water elevation causing uplift at the west monoliths shall be the same as the flood side since flood waters are allowed to surround these monoliths.

**East I-Wall at East Monolith (2' Above SWL).** HW = 14.6', TW1 = 3.8' Ground Elevation 3.8' on FS and PS

**West I-Wall at East Monolith (Min. Water with Backfill).** HW = 3.0' Ground Elevation 3.0' on FS, Ground Elevation 14.0 on PS

**3.2.1.5.3.3.9. London Avenue Outfall Canal - Reference 5, Supplemented by References 35 and 75**

**General.** As constructed, the London Avenue Outfall Canal hurricane protection system consists of earthen levee which ties into the Orleans Lakefront Levee hurricane protection project on both sides of the canal, and earthen levee with capped cantilevered I-wall tying into In addition, there are two pile-founded railroad swing gates; four pile-founded floodproofed bridges (Gentilly Boulevard, Mirabeau Avenue, Filmore Avenue, Leon C. Simon Avenue); and fronting protection of New Orleans Sewerage and Water Board Drainage Pumping Station #4. Fronting protection of PS#4 consists of pile-founded sluice gates to prevent water backflow through the pumps when pump operations cease due to high water levels in Lake Pontchartrain. Floodproofing of the Robert E. Lee Bridge and fronting protection of New Orleans Sewerage and Water Board Drainage Pumping Station #3 have not been constructed.

**Structural Design**

**Design Criteria**

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.



**US Army Corps
of Engineers.**

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume V — The Performance — Levees and Floodwalls

2006

weather.usfc.nasa.gov
29 Aug 2005
11:45 UTC

**FINAL DRAFT**
(Subject to Revision)

**EXHIBIT**
5
tabbies

# Floodwall and Levee Performance Analysis

On Monday, August 29, 2005, Hurricane Katrina struck the U.S. Gulf Coast. The effects of the storm were being felt in the New Orleans area during the early morning hours. The storm produced a massive surge of water on the coastal regions that overtopped and eroded away levees and floodwalls along the lower Mississippi River in Plaquemines Parish, along the eastern side of St. Bernard Parish, along the eastern side of New Orleans East, and in locations along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal. Surge water elevated the level of Lake Pontchartrain, and shifting storm winds forced the lake water against the levees and floodwalls along its southern shores and New Orleans outfall canals, and resulted in high surge levels in the Inner Harbor Navigations Canal, the Mississippi River Gulf Outlet, the Gulf Intracoastal Waterway, and the Mississippi River.

Information regarding the performance of the floodwalls and levees making up the hurricane protective system for the New Orleans area, including St. Bernard Parish and Plaquemines Parish during Hurricane Katrina is presented in this volume. The focus of the effort was to assess the performance of floodwalls and levees throughout the system, to investigate the most likely causes of the damage and failure of the levees and floodwalls in the system, to compare the damaged components with similar sections or reaches where the performance was satisfactory, and to understand the mechanisms that led to the breaches in order to assess likely future performance of the un-breached reaches of the flood-protection system, and to provide a basis for design of improvements capable of providing protection against future storms of even greater destructive power than Katrina.

The performance of levees and floodwalls varied significantly throughout the New Orleans area. The investigation described here shows that the two main causes of breaches in the floodwall and levee system were erosion due to overtopping and instability due to soil foundation failure. The investigation has looked at the most likely causes of the damage and failure of the levees and floodwalls in the system and compares them with similar sections or reaches where the performance was satisfactory. It is important to understand in detail the most likely mechanisms that led to the breaches along the reaches in order evaluate the likely future performance of the un-breached reaches of the flood-protection system.

The investigation described here involved: (1) comprehensive assessment of the background information and examination of the entire levee system to identify reaches that performed satisfactorily and those that suffered damage; (2) characterization of the damaged reaches based on the breach mechanism, the surge height, and the wave action; (3) detailed analyses to ensure that site conditions and breach mechanisms are well understood; (4) use of this information to evaluate future performance of the flood-protection system.

Breaches due to instability of floodwalls occurred at one location on the 17th Street Canal, at two locations on the London Avenue Canal, and at one location on the Inner Harbor Navigation Canal (IHNC). Breaches due to erosion as a result of overtopping occurred at three locations on the Inner Harbor Navigation Canal and at many locations on the Mississippi River Gulf Outlet, the Gulf Intracoastal Waterway, and the Mississippi River levees. Figure 1 shows in red the extent of the damage to the levees and floodwalls. Of the 284 miles of levees and floodwalls,

The data available from previous and new studies in the 17th Street Canal area were used to develop a shear strength model, called here the "IPET strength model," for use in analyzing the stability of the I-wall in the breach and adjacent areas.

The levee fill is compacted CL or CH material, with an average liquid limit of about 45%. Beneath the fill is a layer of marsh 5 ft to 10 ft thick. The marsh is composed of organic material from the cypress swamp that occupied the area, together with silt and clay deposited in the marsh. The average moist unit weight of the marsh is about 80 pcf. Beneath the marsh is a lacustrine clay layer, with an average liquid limit of about 95%. The clay is normally consolidated throughout its depth, having been covered and kept wet by the overlying layer of marsh.

The measured shear strengths of the levee fill scatter very widely, from about 120 psf to more than 5,000 psf, and cannot be interpreted without applying judgment. The values used are based on the combined judgment of the IPET team to make the most reasonable interpretation of the scattered data. Placing the greatest emphasis on data from UU tests on 5-in.-diameter samples, which appear to be the best-quality data available, $s_u = 900$ psf is a reasonable value to represent the levee fill. This strength can be compared to a value of 500 psf for the levee fill used in the design analyses. The marsh (or peat) deposit is stronger beneath the levee crest where it was consolidated under the weight of the levee, and weaker at the toe of the levee and beyond, where it less compressed. The measured shear strengths of the marsh scatter very widely, from about 50 psf to about 920 psf. Values of $s_u = 400$ psf beneath the levee crest and $s_u = 300$ psf beneath the levee toe appear to be representative of the measured values. These strengths can be compared to a value of 280 psf at all locations that was used in the design analyses.

The clay (which has been found to be the most important material with respect to stability of the I-wall and levee) is normally consolidated. Its undrained shear strength increases with depth at a rate of 11 psf per foot of depth. This rate of increase of strength with depth corresponds to a value of $s_u /p' = 0.24$. There is very little scatter in the results of the CPTU tests, and these values provide a good basis for establishing undrained strength profiles in the clay. The undrained strength at the top of the clay is equal to 0.24 times the effective overburden pressure at the top of the clay. With this model, the undrained shear strength of the clay varies with lateral position, being greatest beneath the levee crest where the effective overburden pressure is greatest and least at the levee toe and beyond where the pressure is lowest, and varying with depth, increasing at a rate of 11 psf per foot at all locations.

The design analyses used undrained strengths for the levee fill, the marsh, and the clay, and a drained friction angle to characterize the strength of the sand layer beneath the clay, as does the strength model described above. Thus, the strengths are directly comparable. Strengths from the IPET strength model are compared to the design strengths in Table 2:

for the design cross-section geometry and shear strengths, using Spencer's method and the computer program, SLIDE[1].  The SLIDE analysis results were checked using UTEXAS4[2].

It was found that:

- The calculated factors of safety decreased as the elevation of the water level on the canal side of the wall increased, and

- Smaller factors of safety were calculated when it was assumed that a gap existed between the wall and the soil on the canal side of the wall, with hydrostatic water pressures acting within this gap, increasing the load on the wall.

It seems likely that, as the water level in the canal rose, the I-wall deflected towards the land side, causing it to pull away from the levee fill. When the resulting gap between the fill and the wall filled with water, the increased hydrostatic pressure became a significant factor in decreasing the wall stability.

The results of the analyses are consistent with the performance of the I-wall in the breach area. Calculated water levels for factors of safety equal to 1.0 for the condition with a gap behind the wall vary from 9.8 ft to 10.6 ft, as compared with a water level of 7 ft to 8 ft at the time failure began based on an eyewitness report. It appears that wave effects might raise the effective water level by 1 to 2 ft, to as much as 10 ft. In addition, it was found that using non-circular slip surfaces reduced the calculated factors of safety by about 5% as compared with those calculated using circular slip surfaces. Thus, considering the influence of waves increasing the effective average water level, and non-circular slip surfaces resulting in lower factors of safety, it is apparent that the results of the stability analyses are in close agreement with the observed performance.

The calculated factors of safety are about 25% lower when it is assumed that a separation or gap develops between the wall and the levee fill on the canal side of the wall. The results calculated assuming that a gap formed and full hydrostatic water pressure acted in the gap, are consistent with field observations, indicating that it is highly likely that a gap did form in the areas where the wall failed. It seems likely that when a gap formed and the portion of the wall below the levee crest was loaded by water pressures, the factor of safety would have dropped quickly by about 25%. Soil-structure interaction analyses and centrifuge model tests have confirmed this mode of behavior.

The New Orleans District Method of Planes[3] used for the design analyses is a conservative method of slope stability analysis. All other things being equal, the factor of safety calculated

---

[1] Available from Rocscience Inc., 31 Balsam Avenue, Toronto, Ontario, Canada M4E 3B5
[2] Available from Shinoak Software, 3406 Shinoak Drive, Austin, TX 78731
[3] A study of the Method of Planes, undertaken by IPET at the request of the New Orleans District Task Force Guardian, indicates that the Method of Planes gives lower factors of safety than more accurate methods of analysis, such as Spencer's method.  The magnitude of the difference between the two varies from case to case.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.



Figure 27.  Critical Circle for 17th Street Canal Station 10+00 – Water Elevation 10 ft, With a Water-Filled Gap Behind the Wall

A more complete description of the finite element soil-structure interaction is contained in the Appendix, "17th Street SSI Station 10+00."

## Summary of 17th Street Canal Breach Assessment

Eye-witness reports indicate that the breach began to develop about 6:00 AM on Monday, 29 August 2005, and was fully developed before 9:00 AM. Field evidence, analyses, and physical model tests show that the breach was due to instability caused by shear failure within the clay in the foundation beneath the levee and the I-wall, with a rupture surface that extended laterally beneath the levee, and exited upward through the marsh layer. A key factor in the failure was the formation of a gap between the wall and the levee fill on the canal side of the wall, allowing water pressure to act on the wall below the surface of the levee. Another important factor was the low shear strength of the foundation clay beneath the outer parts of the levee and beyond the toe of the levee.

These two important factors in the mechanism of failure have significant system-wide implications because gap formation and lateral variation of shear strength beneath the levee must be considered for other locations throughout the system when geologic conditions are similar to those at the 17th Street Canal.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Assessment of London Avenue Canal Breaches

Two I-wall failures resulting in breaches occurred at the London Avenue Canal during Hurricane Katrina, one on the east side of the canal at Mirabeau Avenue (the south breach), and the other on the west side of the canal at Robert E. Lee Boulevard (the north breach). At both locations, the levees and I-walls were founded on a layer of marsh material overlying sand. In addition, the I-wall on the east side, across the canal from the north breach, moved and tilted, but did not breach.

The south breach, shown in Figure 28, occurred about 6:00 AM to 7:00 AM on August 29th, when the water level in the canal was 7.1 ft to 8.2 ft NAVD88. The breach was narrower than the breach at the 17th Street and the London Avenue north breach. A deep scour hole formed due to the inrush of water, and a large amount of eroded sand was deposited in the neighborhood inland of the breach. It appears that the breach was quite narrow when it formed, and subsequently widened to about 60 ft as wall panels adjacent to the initial breach were undermined by scour, and tilted into the scour hole.



Figure 28. South Breach, London Avenue Canal

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

**Summary of Assessment of the London Avenue Canal Breaches**

The breach on the London Avenue Canal near Mirabeau Avenue (the south breach) occurred at 6:00 AM to 7:00 AM on Monday, 29 August 2005. The breach on the London Avenue Canal near Robert E. Lee Boulevard (the north breach) occurred by 7:30 AM. Field evidence, analyses, and physical model tests show that the breaches were due to the effects of high water pressures within the sand layer beneath the levee and I-wall, and high water loads on the walls. The London Avenue Canal breaches had a key factor in common with the 17th Street Canal breach – formation of a gap between the wall and the levee fill on the canal side of the wall. At both the 17th Street Canal and the London Avenue Canal, formation of a gap allowed high water pressures to act on the wall below the surface of the levee, severely loading the wall. At the London Avenue Canal, an additional effect of the gap was that water flowed down through the gap into the underlying sand. High water pressures in the sand uplifted the marsh layer on the landside of the levee, resulting in concentrated flow and erosion, removing material and reducing support for the floodwall.

Analyses of the south breach showed that erosion is most likely the principal mode of failure, with sliding instability occurring after significant volumes of sand and marsh had been removed by erosion and piping. Without alteration of the south breaches cross section by erosion and piping on the landside of the levee, the calculated factors of safety with respect to sliding instability are greater than 1.0, indicating that alteration of the cross section by erosion and piping probably played an essential role in the failure at this location.

Field observations at the north breach indicate that the canal-side levee crest remained intact after the breach, and a playhouse on the property adjacent to the breach was heaved upward as the ground beneath it heaved upward during the failure. The analyses described in this report show that conditions for erosion and piping were present at the north breach, but the more likely cause of the failure was sliding instability. High uplift pressures likely resulted in a rupture through the marsh layer and the underlying thin layer of clay. At this location, however, the high pore pressures within the sand would reduce passive resistance sufficiently to result in sliding instability without significant alteration of the cross section.

It seems reasonable to assume that the wall on the opposite side of the canal from the north breach, which moved and tilted, must have been close to failure, but this location has not been analyzed in detail.

# Assessment of Inner Harbor Navigation Canal Breaches

Four breaches occurred on the IHNC (Inner Harbor Navigation Canal) during Hurricane Katrina on the morning of August 29th. Two of the breaches occurred on the east bank between the Florida Avenue Bridge and the North Claiborne Avenue Bridge adjacent to the 9th Ward, and two on the west bank, just north of the intersection of France Road and Florida Avenue. The locations of theses breaches are shown in Figure 43. Three of the breaches involved failures of floodwalls on levees, and one involved failure of a levee due to overtopping erosion.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

Where the foundation soil was permeable sand, water flowing down through the gaps increased the water pressure in the sand, reduced the capacity of the foundation to resist load, and increased the likelihood of erosion and piping.

In sections where the foundation soils were clay, the shear strength of the clay was smaller beneath the levee slopes and beyond the toe than beneath the crest where the clay was compressed under higher pressures, and was therefore stronger.

No levee breaches occurred without overtopping. The degree of erosion and breaching of overtopped levees was directly related to the character of the in-place levee materials and the severity of the surge and wave action. Hydraulically filled levees with higher silt and sand content in the embankment material that were subjected to high overtopping surge and wave action suffered the most severe damage. Rolled clay levees performed well, even when overtopped.

I-walls throughout the hurricane protection system (HPS) that were subjected to overtopping suffered extensive erosion and scour of the foundation of the wall on the protected side. The only exceptions were walls that had paved surfaces adjacent to the walls on the protected side.

Significant scour and erosion occurred at many transitions between concrete structures and earthen levees.

While overtopping of the I-walls led to significant scour and damage in many cases, overtopping of T-walls did not lead to extensive scour and erosion, because the base of the inverted T-wall sections extended over the protected side.

T-walls performed well during Katrina. Because of their pile foundations, they are better able to transfer high lateral water loads into stronger underlying foundation materials.

## Lessons Learned

Floodwall design criteria should consider a broad range of potential failure modes.

I-walls should be designed to be stable with a gap between the wall and the levee on the water side of the wall, with hydrostatic pressure acting through the depth of the gap.

Both horizontal and vertical variation of the strengths of clay foundation soils with overburden pressure should be considered in evaluations of levees and I-walls.

Water pressures in sand foundations beneath levees and I-walls should be evaluated by means of seepage analyses that reflect very conservative assumptions regarding hydraulic boundary conditions, and seepage control measures should be included in design as needed to reduce the potential for erosion and piping.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

XAVIER UNIVERSITY OF LOUISIANA          CIVIL ACTION NO. 06-0516

VERSUS                                  SECTION "R" MAG "2"

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA
**************************************************************

## DECLARATION OF MARION B. BRACY PURSUANT TO 28 U.S.C. § 1746

1.      I am the Vice President, in charge of Facility Planning and Management

for Xavier University of Louisiana ("Xavier").

2.      I was part of Xavier administration responsible for overseeing the

preparation of the university for the approach of Hurricane Katrina in

August 2005.

3.      On August 27, 2005, I moved on to the campus to oversee preparations of

the university buildings and facilities.

4.      I was present on Xavier's campus from this date and throughout the

duration of Hurricane Katrina.  I personally observed the weather

conditions associated with Hurricane Katrina and the effect of those

conditions on the Xavier campus.

5.      I observed the heavy rains and winds associated with Hurricane Katrina,

which began during the evening hours of August 28, 2005.

6.      These conditions lasted until sometime into the early morning hours of

Monday, August 29, 2005.

1



7.     Following the cessation of the rain and wind, I observed no standing water on the first floor of the Xavier campus buildings.

8.     Following the cessation of the heavy rains and winds, I did not observe any standing water on the grounds of the Xavier campus.

9.     I did not notice standing water entering the first floor of campus buildings until sometime in the afternoon of August 29, 2005, when water began rising rapidly.

10.     I did not notice standing water entering the first floor of campus buildings until sometime in the afternoon of August 29, 2005, after the rains had ceased.

11.     I did not notice standing water entering the first floor of the campus buildings until after he heard radio reports that levees had breached.

12.     Under penalty of perjury, I declare that the above and foregoing statements are true and correct and within my personal knowledge.

Executed in New Orleans, Louisiana, on this 18th day of August, 2006.

MARION B. BRACY

2