

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES <br> CONSOLIDATED LITIGATION <br> ─────────────────────────── <br> PERTAINS TO: INSURANCE, <br> *Xavier Univ. of La.*, No. 06-0516 | * CIVIL ACTION <br> * NO.: 05-4182 "K"(2) <br> * JUDGE DUVAL <br> * MAGISTRATE JUDGE WILKINSON <br> * <br> * <br> * <br> * |

### DEFENDANT TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S SURREPLY MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### PRELIMINARY STATEMENT

The Louisiana Supreme Court has recognized that, at the time of Hurricane Katrina, "flood waters swamped large portions of the City" of New Orleans.[1] It is so clear that what occurred was a "flood" that Judge Vance of this Court held that insureds had no possibility of recovering against their insurance agents for allegedly misrepresenting that hurricane-related flooding would be covered.[2] Notwithstanding that, Xavier University of Louisiana ("Xavier") claims that "there has been no 'flood' as that term is ordinarily understood" because the broken levees "can be analogized to a broken water main causing damage to Xavier's campus." (Xavier Addt'l Reply Memo., at 3-4.) To the contrary, the massive inundation of New Orleans when

---

[1] State v. All Property & Cas. Ins. Carriers, 2006 WL 2498196, at *1 (La. Aug. 25, 2006) (emphasis added).

[2] Dobson v. Allstate Ins. Co., 2006 WL 2078423, at *11 (E.D. La. July 21, 2006) (Vance, J.).

levees failed during a hurricane with unprecedented force was nothing like a broken water main. Courts have repeatedly held that a large-scale deluge caused by the failure of a levee, dam or dike is a "flood," and have distinguished large-scale inundations from a water main break or broken water pipe. Xavier's strained analogy telegraphs the weakness of its position.

Xavier does not dispute that it knew that it was required to buy separate coverage for flood. Xavier bought flood insurance for 25 buildings (Hubbard Aff., Exs. B, C), and has likely collected substantial sums from the National Flood Insurance Program for flood damage to those buildings.[3] Xavier now seeks to change the meaning of "flood" in its quest for millions of dollars of coverage for which it never paid a penny of premium.

1.  **The Flooding of New Orleans Cannot Be Compared to a Broken Water Main**

Xavier filed a second reply memorandum purportedly to bring to the Court's attention four "newly discovered" cases that were decided as long ago as 1975. These cases all involve water main breaks or the bursting of a pipe, which courts have recognized are far different events from a large-scale inundation caused by the failure of a levee, dam or dike.

In Ebbing v. State Farm Fire & Cas. Co., 1 S.W.3d 459 (Ark. Ct. App. 1999), the insureds' home was damaged by water from a water main that burst. The opinion does not indicate that any other homes were damaged as a result of this event. Id. at 461. In concluding that this loss was not caused by "flood," the Ebbing court relied exclusively on Ferndale v. Great Am. Ins. Co., 527 P.2d 939, 940 (Colo. Ct. App. 1974), in which a valve on a city water main broke, causing damage to portions of the insureds' buildings. The Colorado Supreme Court later distinguished Ferndale in Kane v. Royal Ins. Co., 768 P.2d 678 (Colo. 1989), which involved a dam failure that impacted several properties. In Kane, the court explained that "a water main is not so clearly a 'body of water,'" and "the amount of water released [in Ferndale] was less

---

[3] Xavier improperly objected to interrogatories seeking precisely that information.

clearly an 'inundation' or 'deluge,'" but "in the context of the facts of this case, there is no doubt that this large-scale inundation of water was a 'flood.'" Kane, 768 P.2d at 681 (emphasis added). See also Bartlett v. Continental Divide Ins. Co., 697 P.2d 412, 413 (Colo. Ct. App. 1984), aff'd, 730 P.2d 308 (Colo. 1986) (distinguishing Ferndale in case involving a dam failure). Here, the damage to Xavier's property was caused by a massive inundation that impacted vast portions of New Orleans and surrounding communities, a deluge with a scale of magnitude far exceeding what occurred in Kane. See also Wallis v. Country Mut. Ins. Co., 723 N.E.2d 376, 383 (Ill. App. Ct. 2000) (distinguishing between rupture of water main and overflow of man-made creek); 11 Lee R. Russ, Couch on Insurance § 153:51 (noting that "water derived from a leaking bathroom supply pipe" and "a flood which ravages entire areas of a state" are "very different events").

The other cases cited by Xavier are even further off the mark. Mellon v. Hingham Mut. Fire Ins. Co., 472 N.E.2d 674 (Mass. App. Ct. 1984) involved a broken drainage pipe directly underneath the insureds' home, and there was no contention that the event was a "flood." The court interpreted a different exclusion for "water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through . . . basement . . . floors." Id. at 675.

In Popkin v. Security Mut. Ins. Co., 367 N.Y.S.2d 492 (N.Y. App. Div. 1975), another case involving a water main break, the court explained that "[g]iven its ordinary meaning, the term 'flood' . . . does not encompass water damage sustained as the result of a broken water main," but rather "[i]t connotes an inundation; a deluge." Id. at 495 (emphasis added). Six years after Popkin, a New York appellate court held that a large-scale inundation caused by a dike failure was a "flood." E.B. Metal & Rubber Indus., Inc. v. Federal Ins. Co., 444 N.Y.S.2d 321, 322 (N.Y. App. Div. 1981).[4]

---

[4] In Ender v. National Fire Ins. Co., 563 N.Y.S.2d 85 (N.Y. App. Div. 1991), another case involving a water main break that is cited by Xavier, the court simply followed Popkin with little explanation. Id. at 86.

1

### 2. Courts Have Repeatedly Held That Water Released By A Broken Levee, Dam or Dike is a "Flood"

Courts have repeatedly held that a large-scale inundation resulting from the failure of a levee, dam or dike is a "flood," even if human acts or omissions caused or contributed to the event. TNT Speed & Sport Ctr., Inc. v. American States Ins. Co., 114 F.3d 731, 733 (8th Cir. 1997); Pakmark Corp. v. Liberty Mut. Ins. Co., 943 S.W.2d 256, 261-62 (Mo. Ct. App. 1997); E.B. Metal, 444 N.Y.S.2d at 321-22; Kane, 768 P.2d at 681; Bartlett, 697 P.2d at 413. Xavier attempts to distinguish TNT and Pakmark on the ground that the opinions do not indicate that the insureds in those cases made the "natural versus man-made" argument that Xavier proffers here. In TNT, however, the Eighth Circuit cited Kane, in which the "natural versus man-made" argument was raised and rejected. See TNT, 114 F.3d at 773 (citing Kane); Kane, 768 P.2d at 680 (court rejected insured's argument that "since 'flood' is not defined in the policy and no distinction is made between naturally and artificially caused floods, it is reasonable for property owners to associate the term with natural events, not artificial disasters"). Thus, the court in TNT was almost certainly aware of the "natural versus man-made" argument and did not deem it worthy of discussion. The insured in Pakmark may also have thought the argument not worthy of raising.

In E.B. Metal, which involved water released from a canal as a result of the failure of a man-made dike, the court rejected the insured's argument that the policy should provide coverage because "the damage . . . was caused by improper construction and maintenance of the dike . . . ." E.B. Metal, 444 N.Y.S.2d at 321. Xavier attempts to distinguish E.B. Metal on the grounds that the policy language at issue was slightly different because it included "breaking of

2

boundaries" of bodies of water in the definition of a "flood."[5] Id. at 322. That is a distinction without a difference. Xavier's position is that an exclusion must specifically state that it applies to both natural and man-made events. There was nothing in the exclusion in E.B. Metal specifically stating that the exclusion would apply to "breaking of boundaries" as a result of human acts or omissions. Notwithstanding the absence of such policy language, the court held that "[i]t is irrelevant that a defect in the dike may have also contributed to the break." Id.

Xavier tries to distinguish Kane on the basis that, in that case, the insured argued that "the dam was a man-made object, rather than a naturally occurring object." (Xavier's First Reply Memo., at 6.) Xavier suggests that the argument it is pressing is distinguishable from the arguments raised in Kane because "the levees failed because of man-made failures to ensure their [sic] the integrity of the levees." (Id.) In Kane, however, as noted above, the insureds also argued that the term "flood" should be construed as applying only to "natural" events. Kane, 768 P.2d at 680. The insureds also argued in Kane that "third party negligence," a covered peril, was the cause of the dam failure. Id. at 684. The court rejected both of these arguments, holding that "there is no doubt that this large-scale inundation of water was a 'flood,'" and that, under the plain terms of the policy, "flood is excluded regardless of the existence of any other contributing cause." Id. at 680-86.

Tellingly, Xavier makes no attempt to distinguish Bartlett, a case involving a dam failure in which the insureds, like Xavier, urged the court "to distinguish between natural and artificial causes" of a flood. Bartlett, 697 P.2d at 413. The court squarely addressed and rejected this argument, holding that "there is no such distinction in the contract, and the event in question falls well within the ordinary use of the term ['flood']; therefore, to make such a distinction would be

---

[5] The policy excluded loss caused by "'flood' meaning waves, tidal water or tidal wave, rising (including overflowing or breaking of boundaries) of lakes, reservoirs, rivers, streams or other bodies of water, whether driven by wind or not." Id.

3

to rewrite terms of the policy, and that is beyond our power." Id. (emphasis added). Bartlett is directly on point.

### 3. The Policy Language Does Not Support Xavier's Contention That a "Flood" Must Be A Purely Natural Event

Xavier continues to argue that "flood" must be limited to purely "natural" events because the terms "surface water, waves, tides, tidal waves, overflow of any body of water" purportedly describe only "natural" events. (Xavier's First Reply Memo., at 2-3.) As an initial matter, this type of interpretive exercise is inappropriate. The Louisiana Civil Code makes clear that "[t]he words of a contract must be given their generally prevailing meaning," and, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code arts. 2046, 2047; Edwards v. Daugherty, 883 So. 2d 932, 940-41 (La. 2004). See also Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 584 (La. 2003) (applying these principles, holding that "relative" in an uninsured motorist policy had a generally prevailing meaning); Schroeder v. Board of Supervisors of La. State Univ., 591 So. 2d 342, 343 (La. 1991) (applying La. Civ. Code arts. 2046 and 2047, concluding that the term "borrow" as used in an auto insurance policy had a generally prevailing meaning). Here, "flood" has a plain and ordinary meaning -- the inundation of normally dry land. Florida E. Coast Ry. Co. v. United States, 519 F.2d 1184, 1192 (5th Cir. 1975).[6]

Even if the type of analysis that Xavier engages in were appropriate, it is simply not true that the words "surface water, waves, tides, tidal waves, [or] overflow of any body of water" apply only to purely "natural" events. Xavier ignores that the Policy excludes "surface water," which can often be diverted by man-made structures or have human acts or omissions as contributing causes. In Smith v. Union Auto. Indem. Co., 752 N.E.2d 1261 (Ill. App. Ct. 2001),

---

[6] The online dictionary cited by Xavier defines "flood" as including "an overwhelming quantity or volume." (Xavier's First Reply Memo., at 3.)

4

the court rejected the insured's argument that the meaning of "surface water" should be limited to water that was unaffected by man-made structures:

> It seems to us that if we did adopt plaintiffs' proposed definition, it would be nearly impossible for surface water to exist, given the highly developed state of our society and the fact that few places without roads or other man-made structures exist today. This causes us to conclude that plaintiffs' proposed definition of "surface water" does not reflect the popular and ordinary meaning of the term. The average reasonable person would not limit surface water to water whose flow has not been altered in any way by paved surfaces, buildings, or other structures.

Id. at 1267. See also Sherwood Real Estate & Investment Co. v. Old Colony Ins. Co., 234 So. 2d 445, 447 (La. Ct. App. 1 Cir. 1970) (holding that rainwater that collected on roof was "surface water"); Sunshine Motors, Inc. v. New Hampshire Ins. Co., 530 N.W.2d 120, 121 (Mich. Ct. App. 1995) (loss was excluded where it was caused by "heavy rainfall creating surface water that failed to drain away because of debris blocking the drainage system"); Front Row Theatre, Inc. v. American Mfr. Mut. Ins. Cos., 18 F.3d 1343, 1347 (6th Cir. 1994) (similar).

Waves can also be produced by "man-made" causes, such as boats. In O'Meara v. American States Ins. Co., 268 N.E.2d 109 (Ind. Ct. App. 1971), the insured and insurer stipulated that damage to a seawall resulted from "the agitated water flowing from and behind passing motorboats." Id. at 111. The insured contended that the term "waves" in the water damage exclusion was limited to "natural" rather than "artificial" causes. Id. The Indiana Court of Appeals rejected this argument and affirmed summary judgment for the insurer. The court stressed that "[w]e are constrained to give the words of an insurance policy their plain and ordinary meaning," and "we are bound to hold that the term 'waves' given its popular and ordinary meaning is a generic term which encompasses both those waves which are motivated by natural forces and those motivated by artificial forces." Id. at 111-12.

5

The "overflow of any body of water" also clearly encompasses the overflow of a man-made body of water, as well as an overflow that might be caused by malfunction of a man-made water pump or blockage of a man-made drain. Xavier's contention that all of the words following "flood" refer only to exclusively "natural" events is, therefore, simply wrong.

Moreover, as Travelers previously argued, the word "flood" would be superfluous if it meant only a natural event. It is difficult to imagine a natural event resulting in a large-scale inundation of water that would not consist of surface water, tidal water, or overflow of a body of water, or some combination of those three. (Opp. at 11.) In response to this argument, Xavier contends that "an accumulation of 'an overwhelming quantity or volume' of rain water in the street following heavy thunderstorms" would be a "flood." (Xavier's First Reply Memo., at 3.) Such an accumulation of water in a street, however, would clearly fall within the definition of "surface water." See Sherwood Real Estate, 234 So. 2d at 447 (defining "surface water" to include water "derived from falling rain . . . [that] is defused over the surface of the ground"); Smith, 752 N.E.2d at 1268 (holding that rainwater accumulating during heavy rainstorm was "surface water").

Xavier's argument that an accumulation of water in a street would be a "flood" also undermines its position that a "flood" must be solely a "natural" event. The accumulation of water in a street is often substantially affected by human acts or omissions, such as the size and location of impervious surfaces and the effectiveness of any drainage system in place. Xavier's hypothetical demonstrates that a distinction between "natural" and "man-made" causes of flood would be unworkable, particularly given that "few places without roads or other man-made structures exist today." Smith, 752 N.E.2d at 1267.

6

### 4. There Is No Merit to Xavier's New Arguments

Xavier also makes several new arguments in its second reply memorandum. First, Xavier contends that the inundation of New Orleans was not a "flood" because the water came from "man-made drainage canals" with "man-made floodwalls." (Xavier Addt'l Reply Memo., at 3.) To the contrary, courts have recognized that "[s]imply because the watercourse from which the water escapes was originally man-made is of no consequence" in applying the water damage exclusion "if the watercourse has a defined bed, visible banks, and a recurrent water flow." Wallis, 723 N.E.2d 376, 383 (Ill. App. Ct. 2000) (water escaped from man-made creek). Accord Kane, 768 P.2d at 681 (holding that it made no difference that dam was "man-made"); Valley Forge Ins. Co. v. Hicks Thomas & Lilienstern, L.L.P., 174 S.W.3d 254, 259 (Tex. App. 2004) (water damage exclusion applied where water flowed through man-made structures prior to reaching insured premises); Industrial Enclosure Corp. v. Northern Ins. Co., 2000 WL 1029192, at *6 (N.D. Ill. July 26, 2000) ("[A] flood does not become something else simply because its source is water that was contained (in its most recent form) in an artificial structure.").[7]

There is also no merit to Xavier's contention that the "Windstorm or Hail Deductibles" Endorsement in the Policy purportedly provides coverage for all damage occurring during a hurricane, including flood damage. (Xavier Addt'l Reply Memo., at 4-5.) At oral argument in Vanderbrook, the Court agreed with the defendants that hurricane deductible endorsements in homeowners' policies, similar to the endorsement in Xavier's Policy, plainly do not indicate that

---

[7] Xavier also argues that Black's Law Dictionary suggests that "flood" should mean only a "natural" event because the dictionary lists "Act of God" as a synonym of "flood," and defines "Act of God" as an exclusively natural event. (Xavier Addt'l Reply Memo., at 3.) Xavier is again grasping at straws. The definition of "floodwaters" in Black's Law Dictionary that is cited in numerous cases -- i.e., "water that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel" -- is clearly not limited to a purely "natural" event. See, e.g., Wallis, 723 N.E.2d at 381 (quoting Black's Law Dictionary 1585 (7th ed. 1999)).

7

the policies provide coverage for water damage. (Vanderbrook Transcript, at 116.) The endorsement in Xavier's Policy provides, in pertinent part, as follows:

> The Windstorm or Hail Deductible, as shown in the Declarations, applies to loss or damage to Covered Property or Business Income caused directly or indirectly by Windstorm or Hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage. If loss or damage from a *covered* weather condition other than Windstorm or Hail occurs, and that loss or damage would not have occurred but for the Windstorm or Hail, such loss or damage shall be considered to be caused by a Windstorm or Hail occurrence.
>
> The Windstorm or Hail Deductible applies whenever there is an occurrence of Windstorm or Hail.
> . . .
> **2. Blanket Insurance**
> In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to 1% . . . of the value(s) of the property that has sustained loss or damage. The value(s) to be used are those shown in the most recent Statement of Value on file with us.
> . . .
> 4. We will not pay for loss or damage until the amount of the loss or damage exceeds the Deductible. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limits of Insurance.
>
> (Policy, Windstorm or Hail Deductibles Endorsement, at p. 1 (Hubbard Aff., Ex. A) (emphasis added).)

This endorsement addresses only the amount of the loss for which the insured will be responsible, i.e., the deductible. A special deductible applies to "loss or damage . . . caused directly or indirectly by Windstorm or Hail," and to "loss or damage from a covered weather condition other than Windstorm or Hail" where "that loss or damage would not have occurred but for the Windstorm or Hail . . . ." (Emphasis added.) This endorsement is not a coverage provision and clearly does not override or modify any of the exclusions contained in the main policy form.[8] There is nothing in this endorsement that suggests that the policy provides

---

[8] Xavier focuses on the phrase "regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage." This phrase, when read in context, simply makes clear that the deductible applies to loss caused by windstorm or hail regardless of whether there is any other covered damage occurring at the same

8

coverage for loss caused by water damage during a hurricane. Courts have held that similar endorsements do not extend coverage where coverage does not otherwise exist.[9]

### 5.     The IPET Report is Both Inadmissible and Inconclusive

Xavier provides no support for its contention that draft government reports are admissible evidence. Every page of the IPET Draft Report states that it is a draft document and does not contain any final conclusions. (See Hubbard Aff., Ex. D.) As the Eleventh Circuit has held, Fed. R. Evid. 803(8) does not apply to "tentative or interim reports subject to revision and review." Toole v. McClintock, 999 F.2d 1430, 1435 (11th Cir. 1993).

In any event, the IPET Draft Report did not reach any conclusion that the cause of the levee breaches on the 17th Street or London Avenue Canals was exclusively "man-made." The report clearly does not conclude that the levees would have failed even if no hurricane had occurred. In a section of the report entitled "Floodwall and Levee Performance Findings and Lessons Learned," which contains the overarching conclusions of the draft report, it states that "[n]o levee breaches occurred without overtopping" and "[t]he degree of erosion and breaching of overtopped levees was directly related to the character of the in-place levee materials and the severity of the surge and wave action."[10] (IPET Draft Report, at V-81.) The report also concludes that in all of the canals "local wave and water level conditions exerted very large

---

time, to which a different deductible might apply if that damage would have occurred in the absence of windstorm or hail.

[9] See Maine Drilling & Blasting, Inc. v. Insurance Co. of N. Am., 665 A.2d 671, 675 (Me. 1995) (holding that endorsement addressing a deductible "by its plain language does not extend coverage where coverage did not exist, but provides for a deductible where coverage does exist"); cf. Shoreline Towers Condo. Owners Ass'n. v. Zurich Am. Ins. Co., 196 F. Supp. 2d 1210, 1216 (S.D. Ala. 2002) (holding that insured's "contention that the [windstorm] deductible should be applied to the loss caused by both covered and excluded causes of loss is contrary to plain language of the insurance contract and results in a tortured interpretation of the Policy"); General Star Indem. v. W. Fla. Vill. Inn, Inc., 874 So. 2d 26, 33 (Fla. Dist. Ct. App. 2004) (similar).

[10] Xavier incorrectly suggests that these conclusions are in a section of the report entitled "Assessment of Inner Harbor Navigation Canal Breaches." (Xavier's First Reply Memo., at 9.) That is incorrect. (See IPET Draft Report, at V-ii (table of contents) and V-80-81.)

forces on the flood protection system," and, at the 17th Street Canal and London Avenue Canal breaches, "contributions due to <u>waves</u> could be significant in causing gap formation in these locations." (<u>Id.</u>, at IV-3-4 (emphasis added).)

Dated this 13th day of October, 2006.

Respectfully submitted,

*J B Reimoneq*

Ralph S. Hubbard III, T.A., La. Bar. # 7040
Simeon B. Reimonenq, Jr., La. Bar. #19755
Seth A. Schmeeckle, La. Bar #27076
LUGENBUHL, WHEATON, PECK,
　　RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:　(504) 568-1990
Facsimile:　(504) 310-9195

Stephen E. Goldman (pro hac vice)
Wystan M. Ackerman (pro hac vice)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, Connecticut 06103-3597
Telephone:　(860) 275-8255
Facsimile:　(860) 275-8299

Attorneys for Travelers Property Casualty Company of America

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Defendant Travelers Property Casualty Company of America's Surreply Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment has been served upon all known counsel of record by placing same in the United States mail, postage prepaid and properly addressed, this 13th day of October, 2006.

*J B Reimoneq*

10