

# Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray, J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber, M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks, S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund, A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**

Berkeley Engineering

   

In addition, erosion occurred at the juncture between the railroad embankment fill and the fill supporting an adjacent roadway passing over the earthen federal levee at this location, as shown in Figure 8.5. This roadway passed over the levee crest to provide access to port facilities on the outboard (water) side of the Federal levee system. This is shown in Figure 8.5, which is a view from the inboard side of this breach showing the erosion of the roadway fill. The elevated I-10 highway bridge is at the left of this photo, and the CSX railroad is just to the left (north) of the roadway. The roadway fill at this location was comprised largely of highly erodeable lightweight "shell sand" fill; a material not suitable for levee fill in a levee protecting a large population (especially without sheetpile cutoff or similar features to prevent erosion.) The flow appears to have passed initially through the pervious gravel ballast supporting the train rails (which is the "low point" at this complicated location), and then undermined the less competent fill beneath the roadway. The resulting flow through the eroded breach then passed to the inboard (protected) side and made its way into the adjacent neighborhood.

The erosion and scour at this conjoined pair of breach locations did not erode the base (lips) of these breach features to a level below mean sea level. Accordingly, although flow passed through this pair of features for a number of hours, the flow eventually ceased as the storm surge (water level rise in the IHNC) eventually subsided.

The failure at this site is an excellent example of a failure produced by multiple adjoining jurisdictions, and a lack of overall coordination of the various system elements constructed and operated by each. The Federal levee system was "penetrated" here by both the railway and the Port roadway, and the interactions of the pervious railway ballast and the highly erodeable roadway fill combined to fail the overall flood protection system at this location. Lack of coordination, and lack of authoritative oversight, of these disparate organizations and their disparate system components was a critical problem here.

It should be further noted that this same site had also failed catastrophically in 1965 during hurricane Betsy, so that the re-failure of this same location represents a daunting case of lack of progress and learning over the intervening 40 years. As discussed in Chapter 7, the east bank CSX rail crossing, which also failed during hurricane Katrina, was also a "repeat" failure (as it, too, had failed during hurricane Betsy in 1965.) The continued failure to recognize and suitably address the hazards associated with these complex "penetrations", despite their demonstrated history of previous failure, is difficult to understand.

In addition, it is interesting to note that the steel gate was allowed to be removed for repair, rather than requiring it to be fixed in place until a suitable replacement gate (or at least interim replacement gate) could be fabricated and be brought in, so that trains could continue to operate. This created an obvious potential hazard to the safety of the very large community inboard of this rail crossing; placing the safety of many at increased risk. In hindsight; that was a decision that is difficult to justify.

8.2.3 Breaches and Distressed Sections at the Port of New Orleans

Three breaches occurred to the south of the CSX railroad breach on the west side of the IHNC at the main Port of New Orleans. Several additional levee and floodwall sections

overtopping or through-erosion (erosion due to through-flow prior to full overtopping.) In the absence of an eyewitness, it was not possible to discern from evidence at this site whether the embankment was actually overtopped, or whether flow through this highly erodeable fill caused progressive erosional failure prior to full overtopping.

Figure 8.15 shows a second large erosional breach, less than 50 yards from the breach shown in Figures 8.13 and 8.14. This embankment section was also comprised largely of highly erodeable shell-sand fill. A large scour hole can be seen to the right, immediately inboard of this large breach. The massive flows have rippled the asphalt tarmac, and detritus from the eroded shell sand fill is scattered over a large area. As shown in this photo, some of this shell sand detritus has been scooped back into the breach as part of the initial repair.

Although these two adjacent erosional breaches were both of good size, they were both located some distance inboard from the IHNC channel, and neither eroded a pathway all the way back to the IHNC channel that was continuously below sea level. As a result, although both breaches admitted significant volumes of water into the adjacent neighborhoods, flows through these two breaches eventually ceased as the storm surge subsequently subsided.

8.2.4 Summary and Findings

The breaches along the west bank of the IHNC were each "non catastrophic" as none of them eroded or scoured to such depth that their lip dropped below mean sea level. Accordingly, although they admitted significant volumes of floodwaters into the greater Orleans East Bank (downtown) protected area, these flows eventually ceased as the storm surge subsided. Together, these features appear to have contributed approximately 10% to 20% of the overall volume of floodwaters that eventually flowed into the Orleans East Bank (downtown) protected area.

Although they were each "non-catastrophic", these features each had the potential to cause significant localized flooding and damage. They were also each the result of engineering lapses and/or lapses in oversight during design and construction; none of the failures in this area should have occurred at the storm surge and wind/wave loadings produced at these locations by Hurricane Katrina had proper design and construction features been included.

The removal of the steel floodgate at the CSX Railroad crossing, and the inadequate sandbagging of the resulting "gap" in the overall regional flood protection system should not have been permitted. The steel gate should have been immediately replaced with a suitable and serviceable temporary replacement until the original gate could be repaired and returned. Instead it was missing for approximately three months of the hurricane season. In view of the events during Katrina, it is difficult to justify the decision to remove the gate and thus maintain the "operability" of the railroad line when it placed the "operability" of the flood protection system, and the safety of the community, at risk.

Similarly, the confluence of the CSX railroad embankment and the adjacent roadway both passing over/through the Federal levee system immediately to the south of the I-10

bridge represents one of many "transitions" between disparate flood protection system elements that performed poorly as an apparent result of lack of appropriate oversight and/or poor design with regard to how abutting elements of the system joined at their edges. In addition, highly erodeable shell sand fill was used at this roadway location without suitable cut-off by means of sheetpiles, etc., representing a hazardous condition that should have been caught and remedied prior to Katrina's arrival.

The erosional "distress" that occurred at the junctures of structural I-wall sections and the structural T-wall gate structure at the rail yard behind the Port of New Orleans represent additional examples of inadequate attention to details at "transitions" between adjacent sections of differing type and geometry.

The two large erosional breaches at the south end of the Port of New Orleans were clearly the result of use of inappropriate fill materials (highly erodeable lightweight shell-sand fill) in earthen embankment sections with no suitable provisions to reduce the obvious risk of catastrophic erosion and breaching. This, too, should have been spotted and remedied prior to Katrina's arrival. It is not clear whether these two breach sections were overtopped by the rising storm surge, or whether the embankment sections eroded as a result of "through flow" prior to full overtopping as the waters rose within the IHNC.

Finally, the I-wall section breach behind the Port of New Orleans was largely the result of overtopping and subsequent erosion at the base of the inboard toe of the concrete I-wall. This failure could have been prevented, at relatively little incremental cost, by installation of concrete splash pads or other erosion protection at the inboard toe of this floodwall. In addition, there was ample right of way available to construct a somewhat wider (and heavier) levee embankment on the inboard side of this I-wall. The incremental cost of doing so would have relatively small, and that too would likely have prevented this failure.

## 8.3 The Canal District Failures

### 8.3.1 Introduction

As the eye of the hurricane began to pass to the northeast of New Orleans, the counterclockwise swirl of the storm winds caused a surge in water levels along the southern end of Lake Pontchartrain. The storm surge along the Pontchartrain lakefront (which peaked at about 9:00 to 9:30 a.m. at an elevation of about +10 feet, MSL) did not produce water levels sufficiently high as to overtop the crests of the concrete floodwalls atop the earthen levees lining the three drainage canals that extend from just north of downtown to Lake Pontchartrain; the 17th Street Canal, the Orleans Canal, and the London Avenue Canal. Three major breaches occurred along these canals, however, and these produced catastrophic flooding of large areas within the Orleans East Bank protected area (as shown in Figure 8.2.)

The first major breach along the drainage canals occurred near the south end of the London Avenue canal, between about 7:00 to 8:00 a.m. The second breach occurred near the north end of the London Avenue canal, and the best current estimates of the timing of this breach are between about 7:30 to 8:30 a.m. The third major breach occurred near the north

Site #5a was the west bank of the CSX railroad crossing. The failure at this site is particularly galling, as this site also failed during hurricane Betsy in 1965, so the repeat failure represents a very disconcerting failure to learn.

The rail crossing is part of a complex "penetration" through the federal IHNC frontage levees, as an adjacent roadway serving outboard side Port facilities crosses over the top of the federal frontage levee adjacent to the railroad line. Our investigation team was unable to learn just exactly who was overall in charge at this complex site with multiple overlapping jurisdictions; and that is a problem.

The rail line passes through a concrete T-wall structure with a rolling steel floodgate, so that the floodgate can be closed during storms to complete the perimeter frontage protection. Unfortunately, the steel gate had been damaged by a railroad accident several months prior, and it had been taken away for repairs. Accordingly, a temporary "sandbag levee" was erected across the missing floodgate opening; this washed away at some stage during hurricane Katrina. It is not clear who was in authority here, but the decision to remove the steel floodgate and allow trains to continue to operate, rather than affixing the damaged gate in place until it could be replaced, placed the entire community of the main (downtown) New Orleans protected basin (a population of approximately 250,000+) at risk. In hindsight, this was a difficult decision to justify.

Fortunately, the missing gate was not a principal source of flooding for the main (downtown) protected area. The main breach at this location was actually the result of composite action of the railroad embankment and the adjacent roadway section. Water appears to have passed first through the pervious gravel ballast at the top of the railroad embankment (representing the local "low spot" with regard to stopping flow), and it then eroded and undermined the adjacent roadway, resulting in a full breach. The levee embankment underlying the roadway appeared to consist in part of highly erodeable sands and shell-sands, and the presence of such highly erodeable soils without cut-off or other provisions to prevent catastrophic erosion was very ill-advised.

Lessons here include:

15. *Someone needs to be overall in charge at "penetrations" and "transitions" where multiple groups and functions intersect, and where overlapping responsibilities result. Whoever is in charge needs both to be made responsible for the overall situation, and they need to be granted adequate authority as to successfully execute that responsibility.*

16. *The continued operation of trains cannot be allowed to be considered more important than the safety of major urban populations.*

*(7, repeated.) Highly erodeable embankment (and foundation) materials represent an intrinsic hazard, and their use should be avoided in flood protection systems defending significant populations.*

*(8, repeated.) When the use of such materials cannot be avoided, then great care should be taken to protect the sections by means of internal cut-offs, filters, and slope face protection (armoring) on the front and back faces and on the crest as well. Even then, the use of erosion-resistant soils is to be preferred if at all possible.*

The catastrophic erosion of these two critical levee frontages need not have occurred. These frontages could instead have been constructed using well compacted clay fill with good resistance to erosion, and they could have been further armored in anticipation of the storm surge and wave loading from Lake Borgne. The levee at the northeast edge of St. Bernard Parish could have been completed in a more timely manner. The result would have been some overtopping, but not catastrophic erosion and uncontrolled breaching of these critical frontages. Some flooding and damage would have been expected, but it need not have been catastrophic.

The storm surge swollen waters of Lake Borgne next passed laterally along the east-west trending GIWW/MRGO channel to its intersection at a "T" with the north-south oriented IHNC channel, overtopping levees along both banks to a limited degree. This produced an additional breach of a composite earthen levee and concrete floodwall section (at a transition to a full earthen levee section) along the southern edge of New Orleans East, adding additional uncontrolled inflow to this protected basin. This failure could have been prevented at little incremental cost if erosion protection (e.g. a concrete splash pad, or similar) had been emplaced along the back side of the concrete floodwall at the levee crest, but the USACE felt that this was precluded by Federal rules and regulations regarding authorized levels of protection.

The surge next raised the water levels within the IHNC channel, and produced a number of failures on both the east and west banks. Two major failures occurred on the east side of the IHNC, at the west edge of the Ninth Ward. Overtopping occurred at both of these locations, but this was not the principal cause of either of these failures. Both failures were principally due to underseepage flows that passed beneath the sheetpile curtains supporting the concrete floodwalls at the crests of the levees. Like many sections of the flood protection system, these sheetpiles were too shallow to adequately cut off, and thus reduce, these underseepage flows. The result was two massive breaches that devastated the adjacent Ninth Ward neighborhood, and then pushed east to meet with the floodwaters already rapidly approaching from the east from St. Bernard Parish as a result of the earlier catastrophic erosion of the Lake Borgne frontage levees.

Several additional breaches also occurred farther north on the east side of the IHNC fronting the west side of New Orleans East, but these were relatively small features and they just added further to the uncontrolled flows that were now progressively filling this protected basin. These breaches occurred mainly at junctures between adjoining, dissimilar levee and floodwall sections, and represented good examples of widespread failure to adequately engineer these "transitions" between sections of the regional flood protection system.

Several breaches occurred on the west side of the IHNC, and these represented the first failures to admit uncontrolled floodwaters into the main metropolitan (downtown) protected area of New Orleans. These features did not scour and erode a path below sea level, however, so they admitted floodwaters for a number of hours and then these inflows ceased as the storm surge in the IHNC eventually subsided. Only 10% to 20% of the floodwaters that eventually inundated a majority of the main (downtown) New Orleans protected basin entered through these features.

These failures and breaches on the west side of the IHNC all appear to have been preventable. One failure was the result of overtopping of an I-wall, with the overtopping flow then eroding a trench in the earthen levee crest at the inboard side of the floodwall. This removal of lateral support unbraced the floodwall, and it was pushed over laterally by the water pressures from the storm surge on the outboard side. Here again the installation of erosional protection (e.g. concrete splash pads or similar) might have prevented the failure.

The other failures in this area occurred at "transitions" between disparate levee and floodwall sections, and/or at sections where unsuitable and highly erodable lightweight shell sand fills had been used to construct levee embankments. Here, again, these failures were as much the result of design choices and/or engineering and oversight issues as the storm surge itself.

Particularly frustrating were a pair of failures on the east and west banks of the IHNC where the CSX railroad crossed the IHNC. These two sites both breached as a result of improper detailing of the intersections between the railroad tracks and their support gravel ballast, and adjacent roadways also crossing the federal levees at these same two locations. These represented additional examples of repeated problems associated with coordination, design, and oversight of complex "intersections" wherein multiple agencies and utilities (including roadways, rail lines, etc.) intersect the protective levee system. Frustratingly, it is noted that these same two rail crossings at the east and west sides of the IHNC had also failed and breached in 1965, during hurricane Betsy.

As the eye of the hurricane next passed to the northeast of New Orleans, the counterclockwise swirl of the storm winds produced a storm surge against the southern edge of Lake Pontchartrain. This produced additional temporary overtopping of a long section of levee and floodwall at the west end of the lakefront levees of New Orleans east, behind the old airport, adding further to the flows that were progressively filling this protected basin.

The surge against the southern edge of Lake Pontchartrain also elevated the water levels within three drainage canals at the northern edge of the main metropolitan (downtown) New Orleans protected basin, and this would produce the final, and most damaging, failures and flooding of the overall event.

The three drainage canals should not have been accessible to the storm surge. The USACE had tried for many years to obtain authorization to install floodgates at the north ends of the three drainage canals that could be closed to prevent storm surges from raising the water levels within the canals. That would have been the superior technical solution. Dysfunctional interaction between the local Levee Board (who were responsible for levees and floodwalls, etc.) and the local Water and Sewerage Board (who were responsible for pumping water from the city via the drainage canals) prevented the installation of these gates, however, and as a result many miles of the sides of these three canals had instead to be lined with levees and floodwalls.

The lining of these canals with levees topped with concrete floodwalls was rendered very challenging due to (a) the difficult local geology of the foundation soils, and (b) the narrow right of way (or available "footprint") for these levees. As a result of the decision not

**E. RESUME OF KEY PERSONNEL PROPOSED FOR THIS CONTRACT**
*(Complete one Section E for each key person.)*

| 12. NAME | 13. ROLE IN THIS CONTRACT | 14. YEARS EXPERIENCE a. TOTAL | b. WITH THIS FIRM |
|---|---|---|---|
| **David J. Rosenberg** | Engineering Expert | | |

15. FIRM NAME and LOCATION *(City and State)*

| 16. EDUCATION *(Degree and Specialization)* | 17. CURRENT PROFESSIONAL REGISTRATION *(State and Discipline)* |
|---|---|
| B.S. Civil Engineering (1996)<br>Commercial Air Diver (1997) | PE, California – Civil Engineer (2004) |

18. OTHER PROFESSIONAL QUALIFICATIONS *(Publications, Organizations, Training, Awards, etc.)*
CPR & First Aid Trained

**19. RELEVANT PROJECTS**

**a.**
(1) TITLE and LOCATION *(City and State)*: Richmond- San Rafael Bridge Retrofit, San Rafael CA
(2) YEAR COMPLETED — Professional Services: 2001-2002; Construction:
(3) BRIEF DESCRIPTION (Brief scope, size, cost, etc.) and SPECIFIC ROLE — ☒ Check if project performed with current firm

Scope: Working directly for the owner CalTrans, provided on-site Quality Assurance for a major bridge retrofit project. Special inspection duties included inspection of underwater work using surface-supplied commercial diving, evaluation of underwater site conditions including existing structures, bottom profiles, and other potential changes, preparation of weekly reports summarizing findings and conformance with project plans and specifications.
Cost: Inspection contract value $5M +, Diving Construction Work: $50M + Role: Engineer-Diver

**b.**
(1) TITLE and LOCATION *(City and State)*: Inspection of Marine Structures various locations, CA and HI
(2) YEAR COMPLETED — Professional Services: 2003; Construction:
(3) BRIEF DESCRIPTION (Brief scope, size, cost, etc.) and SPECIFIC ROLE — ☒ Check if project performed with current firm

Scope: Inspection of marine structures at Pearl Harbor Naval Shipyard, Port of Long Beach, City of Seal Beach, and City of San Diego including underwater and above water work in accordance with the ASCE *Standard Practice Manual for Underwater Investigations.*
Cost: $25K/ ea. Role: Engineer- Diver

**c.**
(1) TITLE and LOCATION *(City and State)*: Marina Dredging and Rehabilitation, City of Vallejo, CA
(2) YEAR COMPLETED — Professional Services: ; Construction: 2001
(3) BRIEF DESCRIPTION (Brief scope, size, cost, etc.) and SPECIFIC ROLE — ☒ Check if project performed with current firm

Scope: Maintenance dredging and rehabilitation project for a municipal marina in the San Francisco Bay Area. Prepared project submittals including US Army Corps of Engineers Dredging Plan and Disposal Site Verification logs, as well as general project support.
Cost: $1M Role: Project Engineer

**d.**
(1) TITLE and LOCATION *(City and State)*: Maintenance and Repair of Hydroelectric Facilities, various locations, CA
(2) YEAR COMPLETED — Professional Services: ; Construction: 2004
(3) BRIEF DESCRIPTION (Brief scope, size, cost, etc.) and SPECIFIC ROLE — ☒ Check if project performed with current firm

Scope: Working under a service contract for the Pacific Gas & Electric Company, projects included maintenance and repair work at PG&E facilities in northern california including excavation and inspection of rock traps at the Potter Valley fish separation facility, work on intake structures at the Upper Bear Reservoir, and repair of a hydraulic gate valve operator at Balch Camp in water depths up to 90 feet.
Cost: Role:

**e.**
(1) TITLE and LOCATION *(City and State)*: Oil & Gas Underwater Services, US Gulf of Mexico
(2) YEAR COMPLETED — Professional Services: ; Construction: 1997-2001
(3) BRIEF DESCRIPTION (Brief scope, size, cost, etc.) and SPECIFIC ROLE — ☒ Check if project performed with current firm

Scope: Inspection, maintenance, and repair of offshore platforms, floating structures, and pipelines. Deepwater commissioning, flexible lines and coiled tube pipelines, remote intervention using Remote-Operated Vehicles (ROV) & Atmospheric Diving Suits (ADS).
Cost: Role: Engineer, Diver, Diver's Tender

I am unable to add a "field" with the following:

Consulting Engineering Evaluation and Inspection of Marine Facilities. New Orleans, LA 2005-2006
Scope: Marine shipping terminals (petrochemical, bulk/ grain products, port facilities) evaluation and inspection including static vessel mooring analysis using industry-recognized software and standards.