UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * | CIVIL ACTION NO. 05-4182 "K" (2) |
| PERTAINS TO LEVEE: | * * | JUDGE DUVAL |
| PAUL, NO. 06-7682 | * * * | MAG. WILKINSON |

**MEMORANDUM IN SUPPORT OF
CSX TRANSPORTATION, INC.'S MOTION FOR DISMISSAL
UNDER RULE 12(b)(6) OR, IN THE ALTERNATIVE,
<u>SUMMARY JUDGMENT UNDER RULE 56</u>**

Plaintiffs' allegations against CSX Transportation, Inc. ("CSXT") stem from a derailment that occurred on September 11, 2004, almost one year before Hurricane Katrina. The Petition in *Paul* maintains that the derailed railcar damaged Flood Gate W-30, and that "Hurricane Katrina's huge surge poured into New Orleans" through the "gap" left by the derailment. But, in fact,

- CSXT did not cause the derailment;

- The derailment did not occur on CSXT tracks; and

- Another entity – the New Orleans Public Belt Railroad Commission ("NOPB"), not CSXT – operated the train that derailed. Nor can these facts be disputed,

since the involved party has come forward and paid for the cost of repairing the damaged gate.

Plaintiffs' entire theory against CSXT is thus premised on a misunderstanding. CSXT cannot be held culpable in tort for a derailment it did not produce.

Two additional and independent grounds doom plaintiffs' sole claim against CSXT, both as a matter of the pleadings. *First,* in their Petition, plaintiffs offer no allegations giving rise to a legally enforceable duty owed by CSXT to plaintiffs – an essential element of their negligence claim – nor could they. By definition, CSXT did not owe a duty for the derailment of a train it did not operate and that originated on tracks it did not own. Nor does the Petition suggest facts that could impose on CSXT any duty on CSXT's part to repair the resulting damage to Flood Gate W-30 – which is not surprising, since federal and state government actors are responsible for flood control measures in New Orleans, including the maintenance and repair of the Flood Gate in question.

*Second,* in asking this Court to instruct CSXT on how to "operat[e]," "repair," "control," and "perform appropriate maintenance" of its track and train cars, the Petition runs headlong into the preemptive effect of two separate railroad regulatory schemes – the Interstate Commerce Commission Termination Act of 1995 and the Federal Railroad Safety Act. Plaintiffs' sole claim of negligence is preempted by these federal railroad laws.

For these reasons, CSXT respectfully requests that its motion to dismiss, or, in the alternative, its motion for summary judgment, be granted, and that plaintiffs' claim against CSXT be dismissed.

## FACTS

The facts material to this motion are as follows:

928315-1

1. The Petition's factual allegations against the Railroad Defendants[1] all pertain to a train derailment that occurred on September 11, 2004. The Petition's references to CSXT, and its alleged role in the derailment, are notably sparse. In a section titled "Facts," plaintiffs mention CSXT a total of two times. Specifically, plaintiffs assert:

> 22. On or about September 11, 2004, a train owned by Burlington Northern and Sante [sic] Fe Company and *operated by employees of CSX Transportation Inc.*, derailed at the location of Flood Gate W-30.
> 23. This derailment began on tracks owned by the City of New Orleans and/or the New Orleans Public Belt Railroad Commission, and *extended to tracks owned by CSX Transportation, Inc.*

Class Action Petition for Damages (Aug. 28, 2006) ¶¶ 22-23 ("Petition") (06-9738, Dkt. No. 1) (emphasis added). Subsequent paragraphs of the "Facts" section discuss the alleged damage to Flood Gate W-30 caused by this derailment.

2. The Petition rests its sole claim against CSXT – a claim for negligence -- on these two allegations of "fact." Specifically, under the section "Negligence of the 'Railroad Defendants,'" plaintiffs allege the Railroad Defendants "were negligent" in:

> A. Failing to maintain control of the locomotive and train cars;
> B. Failing to take steps necessary to avoid derailment;
> C. Operating the locomotive with disregard for the current circumstances and conditions;
> D. Failing to keep the tracks under proper repair;
> F. [sic] Failing to perform appropriate maintenance; and
> G. Failing to timely replace the damaged gate so as to prevent entry of storm surges into the adjacent community.

Petition ¶ 38. Thus, the negligence claim against CSXT pivots entirely on the notion that CSXT was operating a train that derailed.

---

[1] The three railroad entities named as defendants are CSXT, NOPB, and Burlington Northern and Santa Fe Railway Company ("Railroad Defendants").

3. This factual premise is wrong. CSXT was not operating the train that derailed, a point made crystal-clear in publicly available sources and confirmed in the attached declarations of Jim Bridger, General Manager at NOPB, and the declaration of Tom T. May, Terminal Manager – New Orleans for CSXT. Affidavit of Jim Bridger in Support of NOPB's Motion for Summary Judgment (Sept. 6, 2006) ¶ 3 ("Bridger Affidavit"), attached hereto as Exhibit 1; Declaration of Tom T. May in Support of CSXT's Motion for Dismissal, or, in the alternative, Motion for Summary Judgment (Nov. 6, 2006) ¶ 3 ("May Declaration"), attached hereto as Exhibit 2.

4. And, while the derailment caused part of the derailed train to be dragged onto CSXT track, the derailment itself occurred on NOPB track. May Decl. ¶ 3 (Ex. 2).

5. The 2004 derailment in question caused damage to a New Orleans flood gate, Flood Gate W-30. Bridger Aff. ¶ 4 (Ex. 1).

6. NOPB, as the responsible entity, promptly paid the Orleans Levee Board in full for the estimated cost to repair the damage to Flood Gate W-30. Bridger Aff. ¶¶ 8-9 (Ex. 1).

7. The New Orleans Levee Board "has the statutory responsibility to develop, construct and maintain flood control systems and structures within the City of New Orleans, including, . . . floodgates . . .". *See* Petition for Damages, *Board of Commissioners of the Orleans Levee District v. City of New Orleans,* No. 2004-17143 (La. Dist. Ct. filed Dec. 3, 2004) ("OLD Petition") § III, attached hereto as Exhibit 3; *see also* Order and Reasons (Sept. 13, 2006) (Dkt. No. 1133) *(*as this Court has noted, "the Board of Commissioners of the Orleans Levee District has the full and exclusive right and jurisdiction over the levees" and the levee districts have "the right to maintain the levees") (citing La. Rev. Stat. 38:307 and 38:301 and granting 12(b)(6) motion filed by City of New Orleans).

928315-1

4

## ARGUMENT

The Court is familiar with the standards governing this motion. A 12(b)(6) motion to dismiss is granted when the pleadings fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A district court dismisses pursuant to Rule 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir. 1995). As part of a Rule 12(b)(6) analysis, the court accepts well-pled facts in the complaint as true and construes factual allegations in plaintiffs' favor. *Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir. 1999). However, in this Circuit, as elsewhere, "'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (citation omitted).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may show that there is no genuine issue of material fact by pointing out the lack of evidence supporting the non-moving party's case. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992). Summary judgment is entered against "'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"In order to defeat a properly supported motion for summary judgment, the non-moving party must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a 'fair-minded jury' that it is entitled to a verdict in its favor."

*ContiCommodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995). Allegations in a complaint do not and cannot defeat summary judgment: the non-movant must identify specific evidence in the record and articulate the "precise manner" in which that evidence supports his or her claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

### I. Plaintiffs' Derailment Theory Against CSXT Is Factually Erroneous.

The premise of the claim against CSXT is straightforward: CSXT "operated" a train that derailed on September 11, 2004. If that premise is in error, the Petition asserts no viable claim against CSXT, for absent this allegation the Petition is silent as to CSXT.

As shown in the Facts Section, *supra*, the premise is in error indeed. Given this most basic error, each of the Petition's enumerated allegations of negligence as to CSXT (*see* Petition ¶ 38) falters:

#### A. "Failing to Maintain Control of the Locomotive and Train Cars."

As explained in the attached affidavit of Jim Bridger,[2] the General Manager (Chief Executive Officer) of the Public Belt Railroad Commission for the City of New Orleans, it was NOPB -- and not CSXT -- which was operating the train that derailed on September 11, 2004. Bridger Aff. ¶ 3 (Ex. 1). Specifically, Mr. Bridger declares that "[o]n September 11, 2004, some

---

[2] This Affidavit, and accompanying exhibits, were attached to NOPB's Memorandum in Support of Summary Judgment and filed in state court on September 7, 2006. For the Court's convenience, NOPB's Summary Judgment Motion and Memorandum is attached hereto as Exhibit 4.

928315-1                                6

of the railcars in a train *operated by Public Belt employees derailed* near the Industrial Canal in New Orleans, Louisiana." *Id.* ¶ 3 (Ex. 1) (emphasis added). CSXT cannot "fail" to "maintain control" of a train that was operated by others.

B.   **"Failing to Take Steps Necessary to Avoid Derailment."**

The derailment occurred of a train not operated by CSXT, but operated by NOPB employees on NOPB track. CSXT cannot be negligent "for failing to take steps necessary to avoid derailment" of a train that it did not operate.

C.   **"Operating the Locomotive With Disregard for the Current Circumstances and Conditions."**

CSXT was not operating the derailed train and, thus, could not have "disregarded" anything.

D.   **"Failing to Keep the Tracks Under Proper Repair."**

The derailment in question occurred on NOPB track. May Decl. ¶ 3 (Ex. 2). The Petition does not allege (nor could it) that CSXT was negligent for the condition of tracks it does not own.

E.   **"Failing to Perform Appropriate Maintenance."**
CSXT does not know what plaintiffs mean by this statement. But the Petition suggests no obligation on CSXT's part to "maintain" track owned and operated by others.

F.   **"Failing to Timely Replace the Damaged Gate so as to Prevent Entry of Storm Surges into the Adjacent Community."**

That leaves, finally, the Petition's theory regarding damage to Flood Gate W-30. The Petition does not assert that Flood Gate W-30 was railroad property, over which CSXT may assert authority – since that would be untrue. Flood Gate W-30 is a component of New Orleans' flood protection system. If CSXT had damaged Flood Gate W-30 – which undisputed evidence

shows it did not – the most it could have done was pay the Orleans Levee District ("OLD") for resulting damages.

The Petition nonetheless accuses CSXT of "failing to repair." As a matter of law, Flood Gate W-30 could be repaired only by the Orleans Levee District and/or its agent. *See* OLD Petition § III (Ex. 3). This is why OLD brought a lawsuit after the derailment – to obtain monetary relief so that OLD could proceed to fix the damaged floodgate. NOPB received an estimate of the damage caused by the derailment from OLD, and remitted a check to OLD for the full amount. Bridger Aff. ¶¶ 8-9 (Ex. 1). NOPB and OLD agreed that if the cost of the repairs exceeded the $427,387.96 paid by NOPB, then NOPB would pay the difference. Bridger Aff. ¶ 10 (Ex. 1). A private entity such as CSXT could not have independently repaired property under the authority of the state and federal governments. Thus, no liability can attach on a theory (for which plaintiffs offer no factual or legal authority) that CSXT – a private entity – did not "timely replace the damaged gate."

CSXT cannot be held liable in tort for a derailment it did not cause. The factual premise of the sole claim against CSXT is false. There is no genuine dispute of material fact on this score. Accordingly, summary judgment should be entered in CSXT's favor.

## II.     CSXT Does Not Have A Duty In Tort, Nor Is It Permitted, To Repair Flood Gate W-30.

The Petition seeks to blame CSXT, a private railroad not in the business of flood protection, for not repairing and maintaining a component of New Orleans' flood protection system – namely, Flood Gate W-30. What establishes this alleged legal duty owed by CSXT is unclear. The totality of the Petition's allegation of legal duty on CSXT's part is as follows: "These Defendants breached duties owed to Plaintiffs and the putative class." Petition ¶ 41.

Conclusory duty allegations of this sort are not sufficient. As the Court knows, duty is an essential and threshold element of any claim of negligence in Louisiana. Allegations suggesting a legal duty must be explicitly set forth by a pleading, and must derive from some legally recognized relationship between these plaintiffs and CSXT. *See Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006). In Louisiana, plaintiffs cannot rest on the mere hope that a duty may attach: "The inquiry is whether ***the plaintiff has any law*** (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.* (emphasis added).

Here, plaintiffs in *Paul* do not allege that they were damaged by the September 2004 derailment itself, and they do not allege that they have some ownership interest in the floodgate that was damaged. Instead, they allege that a failure to replace the damaged floodgate prior to Hurricane Katrina caused them harm. Yet plaintiffs themselves acknowledge that the parties responsible for inspecting, maintaining, and repairing the levees are specific government entities – and not CSXT. *See, e.g.,* Petition ¶¶ 4, 31 [sic], 34, 40. This includes, according to the Petition, the Board of Commissioners of the Port of New Orleans, which allegedly "[f]ail[ed] to prompt [sic] 'plug the gap' created by the missing repair [sic] Flood Gate W-30." *Id.* ¶ 34(C). CSXT is not obliged or allowed to repair or maintain Flood Gate W-30. Therefore, even accepting plaintiffs' allegations as true, CSXT owed no duty to anyone, let alone plaintiffs, to repair Flood Gate W-30, and any damages resulting from a failure to repair Flood Gate W-30 before Hurricane Katrina cannot be imposed upon CSXT.[3]

---

[3] Indeed, read literally, the Petition in effect faults CSXT for not engaging in a trespass of government property. If Person A drove a car into the home of Person B, Person C cannot show

(continued...)

928315-1                                                    9

Of course, there are duties to maintain flood gates. Those duties happen not to fall upon private actors like CSXT, but instead are police power functions exercised by specific government entities. As OLD confirms in its Petition for Damages following the September 11, 2004 derailment, "OLD has the statutory responsibility to develop, construct and maintain flood control systems within the City of New Orleans, including . . . floodgates . . . ." OLD Petition § III (Ex. 3). And the United States Congress has for several decades fixed upon a single entity – the Army Corps of Engineers – the responsibility to protect the United States population from floods. *See* 33 U.S.C. §§ 701 *et seq.* ("[I]mprovements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army.") The federal and state legislatures have in no uncertain terms placed the duty for New Orleans flood protection upon the Orleans Levee District and the Army Corps of Engineers, and plaintiffs cannot have those duties transferred to CSXT.

Under no set of facts could plaintiffs allege that CSXT breached a duty it does not have. CSXT cannot be held liable for not repairing Flood Gate W-30 (which it did not damage) when it is not permitted to do so. Accordingly, plaintiffs' claim against CSXT should be dismissed.

### III.  The Claim Against CSXT Is Preempted By Federal Railroad Law

The Petition faults CSXT for its "control of the locomotive and train cars"; for not taking "steps . . . to avoid derailment;" for how CSXT "[o]perate[d]" the railcars; for failing to repair the tracks; and for "[f]ailing to perform appropriate maintenance." Petition ¶ 38. Putting aside

---

(continued)

up at Person B's house and repair it. CSXT was not and is not permitted to repair or otherwise interfere with a damaged flood gate owned by others.

for a moment that plaintiffs have not alleged and cannot allege facts sufficient to hold CSXT liable, such claims are preempted by two separate federal regulatory railroad schemes.

### A. Federal railroad law broadly and expressly preempts state regulation.

The doctrine of federal preemption is rooted in the Supremacy Clause of the Constitution: "[T]he laws of the United States . . . shall be the Supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Supremacy Clause authorizes Congress to preempt state law in the legitimate exercise of its legislative authority: "Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law. . . ." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368-69 (1986). "Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)).

Railroads have always been subject to the regulatory authority of Congress under the Commerce Clause. *See, e.g., Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives Ass'n,* 491 U.S. 490, 510 (1989); *Houston, E & W Tex. Ry. Co. v. United States,* 234 U.S. 342, 350-52 (1914). The United States Supreme Court "repeatedly has recognized the preclusive effect of federal legislation" in the area of railroad regulation. *City of Auburn v. United States,* 154 F.3d 1025, 1029 (9th Cir. 1998).

Congress initially asserted federal authority over the railroad industry by enacting the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which has been acknowledged as "'among the most pervasive and comprehensive of federal regulatory schemes.'" *City of Auburn,* 154 F.3d at 1029 (citation omitted). Federal regulation of the railroad industry, already sweeping, expanded further in 1995 when Congress enacted the Interstate Commerce

928315-1

11

Commission Termination Act of 1995, 49 U.S.C. §§ 10101 *et seq.* ("ICCTA"), including within ICCTA an express preemption of state "regulation of rail transportation."

In addition, Congress enacted the Federal Railroad Safety Act, 49 U.S.C. §§ 20101 *et seq.* ("FRSA"), to promote safety in all areas of railroad operations. The Act broadly regulates rail safety, and like ICCTA contains a sweeping express preemption clause. If the "subject matter" of a lawsuit "covers" railroad safety, with limited exception FRSA and its supporting regulations preempt the action.

    **B.**    **The Claim Against CSXT Is Preempted By The FRSA.**

Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA vests in the Secretary of Transportation broad powers to prescribe regulations for *"every area* of railroad safety." 49 U.S.C. § 20103(a) (emphasis added). With the FRSA Congress sought nationwide uniformity in the area of rail safety: "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. Nevertheless, Section 20106 further provides:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security *until* the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order *covering the subject matter* of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order –
> (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
> (3) does not unreasonably burden interstate commerce.

*Id.* (emphasis added). With limited exceptions pertaining to purely local rail safety or security hazards, therefore, a state law or lawsuit is preempted by the FRSA whenever the Act's implementing regulations "cover" or "substantially subsume" the subject matter of the state law or action. *See, e.g., CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661, 675 (1993) (maximum railroad-speed regulations "cover" the subject-matter of train speed and therefore preempt a jury verdict that a train was traveling at an excessive speed).

FRSA preemption occurs when federal rail safety regulations "cover[] the same subject matter" or "substantially subsume the subject matter" of the relevant state law. *Easterwood*, 507 U.S. at 662-64 (FRSA preempts state law where "the Secretary of Transportation has issued regulations covering the same subject matter. . . ."). When this is the case, the preemptive sweep of the statute is "broad." *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 261 (8th Cir. 1996). Thus, where the Secretary of Transportation has issued regulations covering an aspect of railroad safety, those regulations preempt any state "law, rule, regulation, order, or standard" covering the same subject matter, 49 U.S.C. § 20106, and the state law claim "is considered . . . to raise a federal claim and therefore arises under federal law." *Id.* at 260-61.

The Petition alleges that "[o]n or about September 11, 2004, a train owned by Burlington Northern and Santa Fe Company and operated by employees of [CSXT], derailed." Petition ¶ 22. According to the Petition, "[t]his derailment began on tracks owned by the City of New Orleans and/or the New Orleans Public Belt Railroad Commission, and extended to tracks owned by [CSXT]." *Id.* ¶ 23. The Petition contends that this derailment created "a 32.5-foot wide gap in the Inner Harbor Navigation Canal's west sea wall," *id.* ¶ 24, which allowed Hurricane Katrina's storm surge to enter eastern Gentilly and the Upper Ninth Ward areas of New Orleans, allegedly causing damage to Plaintiffs and "those similarly situated." *Id.* ¶ 26.

The Petition claims that the Railroad Defendants were negligent, *inter alia,* in "[f]ailing to keep the tracks under proper repair," "[f]ailing to perform appropriate maintenance," and "[f]ailing to take steps necessary to avoid derailment." *Id.* ¶ 38. The Petition seeks relief on behalf of plaintiffs and "all those similarly situated." *Id.* ¶ 454 [sic].

The United States Department of Transportation has in fact issued regulations that speak directly to the subject matter of the allegations in the Petition concerning track inspection, repair, and maintenance. Part 213 of the Federal Railroad Administration's regulations, promulgated under FRSA, covers all aspects of "Track Safety Standards" and contains an express statement of preemption. 49 C.F.R. § 213.2 (2005) (express preemption); § 213.63 (maintenance of track surfaces); § 213.233 (track inspections). Part 215 in turn governs "Railroad Freight Car Safety Standards," including pre-departure (§ 215.13) and periodic (§ 215.15) inspection of freight cars. By its plain terms, the Petition seeks to hold the Railroad Defendants negligent for "[f]ailing to keep the tracks under proper repair" and for "[f]ailing to perform appropriate maintenance." Petition ¶ 38. The Petition thus falls squarely within the "coverage" of federal safety regulations.

In addition, plaintiffs' claim would "unreasonably burden interstate commerce." In evaluating this burden, courts consider "the practical and cumulative impact were other States" to take similar actions. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005). The court in *Williams* thus weighed the burden of a proposed local ban on a railroad's shipment of certain types of freight, considering the effect not only of that one jurisdiction's ban but also the possibility of multiple, varying bans throughout the country. As the D.C. Circuit observed in *Williams*, "[i]t would not take many similar bans to wreak havoc with the national system of hazardous materials shipment." *Id.* (citation omitted). So here, the prosecution of civil actions nationwide seeking monetary awards to discipline how a railroad "repair[s]," "maintain[s]" and

"control[s]" their rail lines and rail cars would create anything but nationwide uniformity, and would "wreak havoc" on our nation's system of rail transportation.

The Petition's claims as to the Railroad Defendants' supposed failure to "repair," "maintain," and "control" their rail lines and rail cars, Petition ¶ 38, are subsumed by FRSA and the Department of Transportation's preemptive regulations. For purposes of preemption analysis, state law causes of action, such as those alleged in the Petition, are a form of regulation, and thus come within FRSA's preemptive reach. *Easterwood,* 507 U.S. at 664 ("Legal duties imposed on railroads by the common law fall within the scope of these broad phrases.").

C.   **The Claim Against CSXT Is Preempted by ICCTA.**

With its enactment of ICCTA, Congress intended to federalize many aspects of railroad regulation that had previously been reserved to the states. With ICCTA Congress established the Surface Transportation Board as an agency within the United States Department of Transportation with authority to regulate all aspects of railroad operations. *See* 49 U.S.C. §§ 701(a), 702 (2000).

Congress intended to grant to the Surface Transportation Board *exclusive* jurisdiction over a broad range of railroad action:

> In enacting the ICCTA, Congress sought to deregulate the railroad industry. Recognizing that the over regulation of the surface transportation industries had led to financial problems for the rail industry, Congress intended for the ICCTA to significantly reduce state and local regulation of railroads . . . . In furtherance of this intended purpose, the jurisdictional section of the ICCTA grants the Surface Transportation Board ("STB") exclusive jurisdiction over nearly all matters of rail regulation.

*Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836, 839 (E.D. Ky. 2004). Specifically, Section 10501 of the ICCTA reserves for the STB, and only the STB, jurisdiction over:

928315-1                                15

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, . . . .

49 U.S.C. § 10501(b). Removing any doubts, Section 10501 concludes that STB's jurisdiction over this broad sweep of rail operations *is "exclusive"* and *"preempt[s] the remedies provided under Federal or State law."* *Id.* (emphasis added).

Courts have long recognized the exceedingly broad reach of ICCTA preemption. "It is clear that the ICCTA has preempted *all* state efforts to regulate rail transportation." *Wisconsin Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wisc. 2000) (emphasis added); *see also CSX Transp., Inc. v. Georgia Publ. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) ("[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."); *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 443 (5th Cir. 2001) ("[T]he plain language of the statute itself, and in particular its preemption provision, is so certain and unambiguous as to preclude any need to look beyond that language for congressional intent"). Courts have applied ICCTA to preempt state regulation of rail transportation in a wide variety of settings, covering the broadest array of attempts at state regulation. *See, e.g., Friberg,* 267 F.3d at 439 (ICCTA held to preempt common law negligence claim); *City of Auburn*, 154 F.3d at 1031 (ICCTA held to preempt state and local environmental laws); *South Dakota ex rel. South Dakota R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919 (D.S.D. 2003) (ICCTA held to preempt state law claims for punitive damages and tortious interference); *Burlington N. Santa Fe Co. v. Anderson,* 959 F. Supp. 1288 (D. Mont. 1997) (ICCTA held to preempt state closure authority).

928315-1

As noted above, the Petition in this action finds fault with CSXT's maintenance of its "tracks" as well as the "operat[ion] [of its] locomotive." Petition ¶ 38. Plaintiffs complain, in other words, about the "remedies provided . . . with respect to . . . [CSXT's] routes" and the "construction, acquisition, [and] operation" of "spur, industrial, team, switching, or side tracks, or facilities . . . ." 49 U.S.C. § 10501. Through a state law tort action, plaintiffs are asking a court to dictate how CSXT maintains its rail track and how it operates its railroad. According to the clearly expressed will of Congress, only the Surface Transportation Board has jurisdiction over such an action.

The sole claim against CSXT is thus preempted by ICCTA.

## CONCLUSION

CSXT's Motion to Dismiss or, in the alternative, Motion for Summary Judgment should be granted.

Respectfully submitted,

_s/ Jonathan C. McCall_
BRENT A. TALBOT (#19174)
JONATHAN C. MCCALL (#9227)
MICHAEL D. SPENCER (#27649)
  -of-
**CHAFFE McCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
Telephone: (504) 585-7000
Facsimile: (504) 585-7075

and

ROY J. RODNEY, JR. (#02079)
JOHN K. ETTER (#25042)
   -of-
RODNEY & ETTER, L.L.C.
1232 Camellia Boulevard, Suite "C"
Lafayette, Louisiana 70508
Telephone: (337) 981-5293
Telefax: (337) 988-6918

**ATTORNEYS FOR CSX TRANSPORTATION, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of November, 2006, a copy of the foregoing pleading has been filed with the United States District Court for the Eastern District of Louisiana by electronic case filing/case management. All counsel of record are being served this filing by either the court's electronic filing system or by telefaxing and/or placing a copy of same in the United States mail, properly addressed and with adequate postage affixed thereon.

                               s/ Jonathan C. McCall