



This policy is one of the broadest forms available today, and provides you with outstanding value for your insurance dollars. However, we want to point out that every policy contains limitations and exclusions. Please read your policy carefully, especially "Losses Not Insured" and all exclusions.





EXHIBIT

"A"

loss is the direct and immediate cause of the collapse of the building.

This coverage does not increase the limit applying to the damaged property.

12. **Locks.** We will pay the reasonable expenses you incur to re-key locks on exterior doors of the dwelling located on the **residence premises**, when the keys to those locks are a part of a covered theft loss.

No deductible applies to this coverage.

## INFLATION COVERAGE

The limits of liability shown in the **Declarations** for Coverage A, Coverage B and, when applicable, Option ID will be increased at the same rate as the increase in the Inflation Coverage Index shown in the **Declarations.**

To find the limits on a given date:

1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then

2. multiply the resulting factor by the limits of liability for Coverage A, Coverage B and Option ID separately.

The limits of liability will not be reduced to less than the amounts shown in the **Declarations.**

If during the term of this policy the Coverage A limit of liability is changed at your request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change.

## SECTION I - LOSSES INSURED

### COVERAGE A - DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

### COVERAGE B - PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I - LOSSES NOT INSURED:**

1. **Fire or lightning.**

2. **Windstorm or hail.** This peril does not include loss to property contained in a building caused by rain, snow, sleet, sand or dust. This limitation does not apply when the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles,** meaning impact by a vehicle.

7. **Smoke,** meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief,** meaning only willful and malicious damage to or destruction of property.

9. **Theft,** including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

This peril does not include:

a. loss of a precious or semi-precious stone from its setting;

b. loss caused by theft:

(1) committed by an **insured** or by any other person regularly residing on the **insured location.** Property of a student who is an **insured** is covered while located at a residence away from home, if the theft is committed by a person who is not an **insured;**

(2) in or to a dwelling under construction or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

10. F
e
w
C

11. W
p

# CURRENT TOPICS IN FEDERAL SUBJECT MATTER JURISDICTION
## BASED ON DIVERSITY OF CITIZENSHIP:
## "MINIMAL DIVERSITY", THE CURRENT MEANING OF
## *ERIE RAILROAD v. TOMPKINS* AND RELATED ISSUES

**H. Alston Johnson**
**Member of the Louisiana Bar**
**Adjunct Professor of Law, Louisiana State University**
**Partner, Phelps Dunbar LLP**

**Summer School for Lawyers**
**Louisiana State Bar Association**
**Sandestin, Florida**
**June 7, 2006**

Way, way back in time when we were mere law students, we all learned certain immutable principles about federal subject matter jurisdiction based on diversity of citizenship. One of the most fundamental principles was that "diversity" in the statutory implementation of Article III's general statement of the judicial power of the United States[1] meant "complete diversity," *i.e., that **all** of the plaintiffs must be of diverse citizenship from **all** of the defendants.* The opinion in *Strawbridge v. Curtiss*[2] is usually credited (or blamed) with this interpretation of the provision of the Judiciary Act of 1789[3] that contained the initial statute on the diversity jurisdiction of the federal courts.

---

[1] *In pertinent part, Article III, Section 2 of the United States Constitution provides very simply that the judicial power of the United States "shall extend . . . to controversies between citizens of different states . . . ."* Some authorities have contended that this is a constitutional mandate for "complete diversity." *See* McGovney, *A Supreme Court Fiction: Corporations in the Diverse Citizenship Jurisdiction of the Federal Courts,* 56 Harv. L. Rev. 853, 1090, 1103-11 (1943). But this seems to stretch the simple language beyond its plain meaning.

[2] 7 U. S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

[3] *Section 11 of the Judiciary Act of 1789,* 1 Stat. 79, authorized the exercise of jurisdiction when the "matter in dispute" exceeded the sum of $500 and (1) an alien was a party or (2) the suit was between a citizen of the state where the action was brought and a citizen of another state. In other words, statutory subject matter jurisdiction based on diversity of citizenship was considerably more limited than the constitutional reach of judicial power, and in fact, where fellow citizens were concerned, only extended to disputes between a citizen of the forum state and a citizen of a diverse state.


EXHIBIT
"B"

That opinion itself, even more cryptic than the customary Chief Justice Marshall opinion, consisted of four short paragraphs. The gist of the opinion is in the third paragraph, in which the court refers to the statutory language and observes that it "understands these expressions to mean, that each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued in the federal courts" and that "where the interest is joint, each of the persons concerned in that interest must be competent to sue, or liable to be sued, in those courts." *Strawbridge* itself involved a suit by co-executors as the plaintiffs, one of whom was of the same citizenship as several of the defendants. Apparently, under the prevailing law governing procedural capacity, neither executor could sue without the other joining as a plaintiff, so their interest could truly be called "joint"—almost the equivalent of having one plaintiff with "dual" citizenship.

An extension of the holding in that case, concerning as it did an interest held jointly by two individuals, to cases in which there were multiple individuals but arguably none holding a "joint" interest, was not inexorable. Justice Marshall seemed to indicate as much in the fourth paragraph of the opinion, in which he said that the court "does not mean to give an opinion in the case where several parties represent several distinct interests, and some of those parties are, and others are not, competent to sue, or liable to be sued in the courts of the United States." Be that as it may, the "rule" of complete diversity took hold and persisted as the statutory grant of diversity jurisdiction morphed into its modern wording.

We also learned as young legal scholars that although Article III did not announce any monetary threshold before the judicial power over controversies involving diverse citizens could be exercised, Congress has always imposed such a threshold—a sort of "gravitas" measurement

2

before the federal judicial system could be bothered with a dispute.   It began at a sum in excess of $500 and has gradually risen over the years to a sum in excess of $75,000.

We also were taught on the basis of the opinion in *Erie Railroad Co. v. Tompkins*[4] many decades later that when a federal district court is exercising diversity subject matter jurisdiction, there is no "general federal common law"[5] to provide the substantive rule of decision.  The district court must use as its rule of decision on substantive law issues the rule that would be applied by the highest court of the state in which it sits.[6]  In time, we learned that *Erie* apparently required that the federal court apply state statutes of limitation when sitting in diversity jurisdiction.[7]  We also discovered that the Federal Rules of Evidence—no doubt driven by *Erie*— specified that state rules of privilege in evidentiary matters governed in diversity cases where they differed from federal rules.[8]  But federal courts sitting in diversity were to apply their own purely procedural rules such as those outlining service of process[9] or imposing sanctions on counsel or parties for misconduct.[10]  We were told that these refinements were required because the "twin aims" of *Erie* (discouraging forum-shopping and avoiding "inequitable administration of the laws") were meant to assure that "the outcome of the litigation in the federal court should

---

[4] 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

[5] Although many years later, we found out in *Semtek International, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001) that the res judicata effect of a federal court opinion—even when the court is exercising diversity jurisdiction—is determined by federal common law. Federal common law might in most instances "borrow" state law on issue preclusion, but it would be federal common law that is determinative in the final analysis.

[6] The "would be applied" concept reflects the subsequent decision in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that *Erie* also required that a federal district court sitting in diversity use the choice-of-law methodology of the highest court of the state in which it sits. Thus it is not quite accurate to say, as many do, that a federal district court is required to apply "the law of the state in which it sits." Rather, it is required to apply the law that "would be applied" by the highest court of the state in which it sits, thus accounting for that state's choice-of-law methodology.

[7] *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

[8] *See* Rule 501 of the Federal Rules of Evidence, announcing a general rule that the "principles of the common law" of evidence are to govern matters of evidentiary privilege in the federal courts but providing an exception when "State law supplies the rule of decision" in a case. In that instance, "the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

[9] *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

[10] *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

*whatever [* state cannot a state elected judge cannot give same even handed justice as fed judge*

be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."[11] But, somewhat incongruously, we learned that an issue forbidden to be tried by jury in a state court might nonetheless be tried by jury in the federal court.[12]

And, as we all quickly realized, there was also a certain usually unspoken premise underlying diversity jurisdiction that somehow a state forum could not be trusted to provide the same evenhanded quality of justice as that which might be dispensed in a federal forum with a life-tenure Article III jurist. This premise effectively meant that the dividing line between a state forum and a federal forum was fairly clear and well-defined; and if a defendant elected to use the device of removal, the federal court was fairly well obligated to exercise the subject matter jurisdiction that had been given to it.

Well, unlearn some of this. And be prepared perhaps to unlearn much of the rest of it. The times, they are a-changin', and this basis of jurisdiction once called "historically the single most important grant of national court jurisdiction embodied in the [First Judiciary] Act"[13] is changing with them. And with those changes under way, it is time to ask whether it makes sense for the consequences of *Erie* to remain the same, or whether there is a possibility that "general federal common law" might possibly enjoy a revival after being essentially banned from diversity jurisdiction cases seventy years ago in *Erie*.[14]   That is the theme of these remarks.

First, we should review the basics.   After decades of refusing to do anything to modify diversity jurisdiction and particularly the "complete diversity" concept of *Strawbridge v. Curtiss*,

---

[11] Frankfurter, J., in *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

[12] *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525 (1958).   But apparently control by appellate judges of jury awards in diversity cases should be governed by state law standards.   *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996).

[13] Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49 (1923).

[14] It should not pass without mention that in *Erie*, the Supreme Court essentially accused itself of having been engaged in an unconstitutional process in using "federal general common law" as substantive rules of decision in diversity cases. This of course should prompt the question whether Congress and the Supreme Court may constitutionally require—albeit indirectly—the application of federal general common law in "minimal diversity" cases that it now authorizes to be heard in federal court.

the Congress in 2002 enacted a concept which had apparently been floating around since the late 1970s: "minimal diversity" jurisdiction and a determination of "gravitas" sufficient to justify federal subject matter jurisdiction other than a sum of money. The so-called Multiparty, Multiforum Trial Jurisdiction Act of 2002 now appears in 28 U.S.C. §1369 and §1441(e). Section 1369(a) declares that a federal district court has original jurisdiction of any civil action "involving minimal diversity" (as subsequently defined) that "arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location"[15] if any one of three circumstances is established. The first of these is that a defendant resides in a given state and a "substantial part of the accident" took place outside the state, regardless of whether that defendant is also a resident of the state where a substantial part of the accident took place.[16] The second is that any two defendants reside in different states, regardless of whether such defendants are also residents of the same state. And the third is that substantial parts of the accident took place in different states. Under the statute, the "minimal diversity" upon which such a cause of action may be based exists between adverse parties "if any party is a citizen of a State and any adverse party is a citizen of another State" or of a foreign state or actually is a foreign state.[17] *any of them & any of other*

---

[13] At an earlier state in the long legislative process that led to the enactment of the MMTJA, the measurement of the gravity of the incident sufficient to justify the exercise of federal subject matter jurisdiction based on minimal diversity was whether at least 25 people died or were injured. See Offenbacher, *The Multiparty, Multiforum Trial Jurisdiction Act: Opening the Door to Class Action Reform*, 23 The Review of Litigation 177, 190 (2004). This explains the inclusion in the act as passed in 2002 of a definition of "injury," which no longer has any relevance to anything in the Act, since the word "injury" is not used anywhere except in the definition of the term. See Adomett, *The Station Nightclub Fire and Federal Jurisdictional Reach: The Multidistrict, Multiparty, Multiforum Jurisdiction Act of 2002*, 25 W. New England L. Rev., 243, 248-49 (2003). By the time of final passage, the Act had been narrowed so that jurisdiction was granted only when at least 75 people died, no matter how many might have been injured.

[16] In this first circumstance and in the second, it should be noted that residency rather than citizenship is the term used in the statute.

[17] 28 U.S.C. §1369(c)(1) (emphasis supplied). In turn, a corporation is deemed to be a citizen of any state in which it is incorporated or has its principal place of business, and is deemed to be a "resident" of any state in which it is incorporated or licensed to do business or is doing business. 28 U.S.C. §1369(c)(2).

5

*no monetary requirement*

The term "accident" in the statute is given a fateful definition.  It is said to mean a "sudden accident, or a natural event culminating in an accident, that results in death incurred at a discrete location by at least 75 natural persons . . . ."[18]  Think Hurricane Katrina.[19]  An "accident" as statutorily defined takes the place of a sum of money as the measure of sufficient "gravitas" or importance to justify a federal forum.  Assuming the requisites of the jurisdictional statute are otherwise satisfied, jurisdiction is not based upon an "amount in dispute" in excess of $75,000.  Rather it is based upon whether the accident in question resulted in "at least 75 deaths at a discrete location."[20]  But—very significantly—once a statutorily-defined "accident" has occurred and has resulted in "at least 75 deaths at a discrete location," the federal court's jurisdiction vests even though the claim is not for the deaths, nor even for personal injuries that did not result in death.  The statute says simply that the jurisdiction is over "any civil action . . . that arises from a single accident" in which the requisite number of deaths has occurred.

The early commentators are unanimous in concluding that this language means exactly what it says.[21]  Indeed, one commentator presciently observed that "a contract suit against or between insurers regarding coverage related to a qualifying accident could come into federal

---

[18] 28 U.S.C. §1369(c)(4).

[19] Commentators are in agreement that the MMTJA is not limited to an airplane crash, a train derailment or a 9/11 catastrophe. *See* Offenbacher, *The Multiparty, Multiforum Trial Jurisdiction Act: Opening the Door to Class Action Reform,* 23 The Review of Litigation 177, 192 (2004): "Congress included the 'natural event' language to encompass events caused by natural forces over time, such as long-term flooding or shifting foundations, even if they are not sudden." *And see* Raforth, *Congress and the Multiparty, Multiforum Trial Jurisdiction Act of 2002: Meaningful Reform or a Comedy of Errors,* 54 Duke L. J. 255, 263 (2004): "Additionally, the explicit inclusion of accidents resulting from natural disasters indicates that Congress was more concerned with accident characteristics likely to affect subsequent litigation than with the nature of the causes behind covered accidents."

[20] The term "discrete location" is not defined.  There would be a plausible argument that the term should be interpreted narrowly.  In *Passa v. Derderian,* 308 F.Supp.2d 43 (D.R.I. 2004), the term was easily satisfied because more than 100 deaths occurred in a nightclub.  But the statute itself belies such an interpretation.  One of the grounds for jurisdiction is "if substantial parts of the accident took place in different States."  It seems then that a "discrete location" might actually include several states.  The term likely refers to a causal determination rather than geographic.  Moreover, the statute actually speaks in terms of the deaths occurring at a discrete location, not the accident or natural event.

[21] *See* Offenbacher, *supra* note 14, at 193-194: "Aside from the estates of the seventy-five killed, the statute allows injured parties and people who suffered property damage to file suit as an original matter, as long as they have minimal diversity and their injuries arises from the requisite accident." *And see* Andomett, *supra* note 14, at 248 and Raforth, *supra* note 18, at 263.

court under section 1369 even absent the kinds of common issues that arise when multiple victims bring separate suits."[22]   Think suits by Louisiana homeowners against in-state and out-of-state insurers relative to whether property damage during Hurricane Katrina is covered or not. The only reported opinion interpreting 28 U.S.C. §1369, *Passa v. Derderian*,[23] extended subject matter jurisdiction to claims involving death, personal injury, property damage and even the preservation of evidence.  In one Louisiana putative class action brought by homeowners against in-state and out-of-state insurers involving post-Katrina insurance coverage issues, a federal district judge has recently held that there is subject matter jurisdiction under 28 U.S.C. §1369.[24]

Under another section of the MMTJA now appearing as 28 U.S.C. §1441(e), a defendant is also given the right to remove a case which could have been brought under 28 U.S.C. §1369.[25] Because the right is given to "a defendant in a civil action" and not to "the defendant or the defendants" as in the general removal provisions in 28 U.S.C. §1441(a), the concurrence of other defendants to a removal under 28 U.S.C. §1441(e) is not required.  And the fact that the removing defendant is a forum-state defendant otherwise forbidden to remove a diversity case under 28 U.S.C. §1441(b) is also of no consequence, since 28 U.S.C. §1441(e) begins with the phrase "[n]otwithstanding the provisions of subsection (b) of this section . . . ."  And finally—and once more a matter of some importance—a defendant in a pending action under 28 U.S.C. §1369 may remove **other actions in state court** arising out of the same accident, "even if the

---

[22] Raforth, *supra* note 18, at 264.
[23] 308 F.Supp.2d 43 (D.R.I. 2004).
[24] *Chehardy, et al.   v. Louisiana Commissioner of Insurance, et al.*, Civil Action No. 05-CV-1140 (M.D. La., ruling of March 16, 2006) (case subsequently transferred to Eastern District).
[25] Under 28 U.S.C. §1441(e)(5), an action that is removed on the basis that it could have been brought under 28 U.S.C. §1369 is deemed to come under the authority of 28 U.S.C. §1407 (transfers under the orders of the panel on multidistrict litigation), 28 U.S.C. §1697 (nationwide service of process) and 28 U.S.C. §1785 (nationwide service of subpoenas).

action to be removed could not have been brought in a district court as an original matter."[26] This is a type of special supplemental jurisdiction[27] tucked away within a removal provision, to implement the Congressional objective of consolidating in a federal forum all claims arising out of an accident or natural event so serious as to have caused at least 75 deaths "at a discrete location."[28]   An action removed under these provisions, however, also contains a species of discretionary remand for calculation of damages once liability has been determined.[29]

As if all of this were not enough, a federal court is directed to abstain from exercising the granted jurisdiction if "the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens" and "the claims asserted will be governed primarily by the laws of that State."[30]   While abstention is certainly a recognized concept in the

[26] 28 U.S.C. §1441(e)(1)(B). Even more startling, a defendant named in an action under 28 U.S.C. §1369 after a state court action was initiated could still remove the state court action before its trial to federal court under 28 U.S.C. §1441(e)(1) within thirty days of the initiation of the later federal court suit, or even "at a later time with leave of the [federal] district court."

[27] The fact that this supplemental jurisdiction does not find an explicit place in the general supplemental jurisdiction grant in 28 U.S.C. §1367 is probably of no consequence. Apart from the fact that the Congress is completely authorized to enact other bases of supplemental jurisdiction within Article III beyond that stated in 28 U.S.C. §1367, the Supreme Court has on several occasions suggested that there are grounds for "ancillary jurisdiction" beyond the supplemental jurisdiction contained in 28 U.S.C. §1367. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994); Peacock v. Thomas, 516 US. 349 (1996).

[28] The United States Fifth Circuit so held very recently in Wallace, et al. v. Louisiana Citizens Property Insurance Corporation, et al., No. 06-00009 (March 31, 2006), saying that Congress was "piggy-backing jurisdiction on the district court original jurisdiction" in another case under 28 U.S.C. §1369.

[29] 28 U.S.C. §1441(e)(2). Curiously, 28 U.S.C. §1369 itself does not contain such a possibility, perhaps in part because plaintiff has chosen a federal forum in the first instance for her litigation. This species of remand contains a time delay, however. The remand order is not effective for sixty days after the order determining liability is issued and the district court has "certified its intention" to remand the action for determination of damages by the state court. During that sixty-day period, an appeal may be taken from the liability determination, and thus the remand is presumably ineffective until such an appeal is resolved. Once the remand is effective, no further review of liability is permitted. If the district court decides to enter such a remand-for-damages-determination order, its decision in that regard is "not reviewable by appeal or otherwise." 28 U.S.C. §1441(e)(4). This is consistent with the general treatment of remand orders based on "defects" in removal procedure. 28 U.S.C. §1447(d).

[30] 28 U.S.C. §1369(b). The term "primary defendants" is not defined, and the absence of a definition is a glaring omission in the statute. It is fair to ask whose choice-of-law principles will determine whether the claims asserted will be governed primarily by the laws of the state in which the substantial majority of all plaintiffs are citizens. The call is to be made by the federal court, presumably. Normally in diversity cases, it is directed to apply the choice-of-law methodology that the highest court of the state in which it sits would use. See Klaxon, supra note 6. But given that this is no longer complete diversity but minimal diversity, and given that the whole point of the exercise seems to be to interject a federal presence into litigation involving a large-scale disaster, should this issue be determined by "federal common law"? In simpler terms, does Erie apply to minimal diversity cases, and in particular to this type of minimal diversity case?

federal judicial system, it is rare to find the concept codified in a statute. This introduces an element of fuzziness in the exercise of jurisdiction which may prove to be nettlesome.

The MMTJA could include a class action, but it is not limited to class actions. In theory, at least, it could apply to an action by a single plaintiff against two defendants, one of diverse citizenship from the plaintiff and one not—so long as the other requisites of the statute are satisfied. More likely, many plaintiffs and many defendants would be involved in the typical suit which would fall under the MMTJA, and often certification of a class action would be sought.

But once the "minimal diversity" concept was accepted by Congress and once the measure of "gravitas" was freed from the $75,000 general jurisdictional amount requirement, there was considerable expectation that the proposed so-called "Class Action Fairness Act" might be next on the Congressional agenda. Three more years would pass, however, until that legislation was finally enacted. There were some familiar themes in the Class Action Fairness Act of 2005: minimal diversity (although the term itself was not used); a very substantial monetary measurement of "gravitas" sufficient to invoke federal subject matter jurisdiction; "primary defendants," still undefined; and mandatory abstention. But there were some new themes as well: class actions were the exclusive focus of the legislation and "discretionary abstention" also made an appearance. Just for good measure, "significant relief" and "significant basis" for the claims were tossed in. Permit Hurricane Katrina to stir these ingredients vigorously, and a truly remarkable mixture appears.

The intricate details of the Class Action Fairness Act[31] (colloquially referred to as CAFA), now appearing as 28 U.S.C. §1332(d) with a companion removal provision under 28

---

[31] CAFA is specifically declared to be prospective only, applying to "any civil action commenced on or after the date of enactment of this Act," which was February 18, 2005.

BR.437631.1

U.S.C. §1453, are somewhat beyond the focus of these particular remarks.  But here is a very brief summary.  By adding a subsection to 28 U.S.C. §1332, CAFA grants federal subject matter jurisdiction over a class action as defined,[32] if the matter in controversy exceeds $5 million,[33] exclusive of interest and costs; and is a class action in which (a) **any member** of a class of plaintiffs is a citizen of a state different from **any defendant**; or (b) **any member** of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and **any defendant** is a citizen of a state; or (c) **any member** of a class of plaintiffs is a citizen of a state and **any defendant** is a foreign state or a citizen or subject of a foreign state.

*1332 (d)*
*1453 → removal —*

Obviously, the first type of class action is the *most* common factual situation in which this new basis of subject matter jurisdiction will be invoked.  Notice that considering the citizenship of a class **member** rather than simply looking at the citizenship of the class representatives introduces the novel concept of measuring jurisdiction by the citizenship of a **non-party**.  Members of a class, as such, are not **parties** to the litigation once the class is certified.  One of the most important aspects of the class action device is that when the class is properly defined and certified, a judgment determines the rights of **non-parties** to the litigation (the class members) as well as parties.

CAFA then proceeds to establish discretionary and mandatory abstention grounds.  Reduced to its essence, the discretionary abstention provision states that the court may decline to exercise jurisdiction when more than a third of the class members but less than two thirds and the "primary defendants" are citizens of the forum state and certain other statutory considerations are

---

[32] The definition is in 28 U.S.C. §1332(d)(1)(B).  Certain types of class actions are specifically exempt from the Act, such as certain securities actions and corporate internal governance disputes.  *See* 28 U.S.C. §1332(d)(9).  Later provisions of the Act generally equate "mass actions" with "class actions."  28 U.S.C. §1332(d)(11)(B)(i).  Presumably this was thought to be necessary because some states, such as Mississippi, do not recognize class actions.

[33] Aggregation of the claims of all class members is specifically authorized to determine this sum.  28 U.S.C. §1332(d)(6).

BR 437631.1

present.[34]  The court must decline to exercise jurisdiction when more than two thirds of the class members are citizens of the forum state and at least one defendant is also a citizen of that state, "significant relief" is sought from that defendant and its conduct "forms a significant basis" for the claims; and "principal injuries" resulting from the conduct of each defendant were incurred in the forum state.[35]  In addition, the court is required to abstain if two thirds or more[36] of all class members, and the "primary defendants" are citizens of the forum state.[37] *no defendants*

In a separate part of the same Public Law enacting CAFA now appearing as 28 U.S.C. §1453, Congress provided for removal of class actions without regard to several of the longstanding restrictions on removal.  The one-year period for removal which has been a feature of diversity removals for about the last fifteen years does not apply; the in-state defendant bar to removal does not apply; and the consent of all defendants is not required.[38]  Moreover, the prohibition against appellate review of remand orders found in 28 U.S.C. §1447(d) is substantially modified by the statement that an appellate court "may accept an appeal from an order of a district court granting or denying a motion to remand" such a class action "if application is made to the court of appeals less than 7 days after entry of the order."[39]

As the foregoing paragraphs imply, both the MMTJA and CAFA have been invoked very recently by insurer defendants in putative class actions asserting under various theories that Katrina-caused property damages should be covered by homeowners' insurance.  Suits initiated

---

[34] 28 U.S.C. §1332(d)(3).

[35] 28 U.S.C. §1332(d)(4)(A).

[36] Yes, that is not the same standard as the earlier "greater than two thirds."

[37] 28 U.S.C. §1332(d)(4)(B).

[38] All of this is in 28 U.S.C. §1453(b).

[39] 28 U.S.C. §1453(c)(1).   The U. S. Fifth Circuit recently interpreted the permissive appeal portion of 28 U.S.C. §1453 to apply only to class actions under CAFA, although the wording of the provision does not expressly require that result. *See Wallace, et al. v. Louisiana Citizens Property Insurance Corporation, et al.,* 06-00009, U.S. Fifth Circuit (March 31, 2006).  But the Fifth Circuit also held in *Wallace* that an appeal will lie from the granting of an order to remand following a removal under 28 U.S.C. §1441(e)(1)(B) of an MMTJA case as a "collateral order" sufficiently final to permit an appeal under 28 U.S.C. §1291, if the remand order was based on the abstention provisions of 28 U.S.C. §1369.

in state courts have been removed to federal courts, and the decisions of the federal judiciary in these matters will go a long way toward shaping the meaning of these two recent Congressional enactments. Since there are very few prior published opinions, it will fall to the Louisiana federal district judges and then the U. S. Fifth Circuit to sketch the general detail of the reach of these statutes. That process is already under way, and the results as of the time of preparation of this paper may be found in the margin.[40]

But interesting as that debate is, it too is beyond the theme of these particular remarks. The preamble to CAFA brings that theme into sharp focus. Preambles to legislation are fundamentally of no great value in pure statutory exegesis. Courts understandably prefer to interpret what the legislating body said, rather than to consult its pronouncement of why it found it necessary to speak at all. But the preamble to CAFA is probably important both to help us understand what Congress might say next and whether there is some reason for these most recent legislative changes in diversity jurisdiction to have a wider impact than might first be imagined.

In the preamble to CAFA, Congress declared that class actions are an important and valuable part of the legal system, but that in the past decade, there have been "abuses" of the device that have "harmed class members with legitimate claims and defendants that have acted responsibly." These "abuses" have "adversely affected interstate commerce" and have "undermined public respect for our judicial system." Congress further declared that plaintiff

---

[40] As stated in previous footnotes, a motion to remand was denied in *Chehardy, et al. v. Louisiana Commissioner of Insurance, et al.,* 05-CV-1140 (M. D. 3/16/06). The removal had been based upon both CAFA and the MMTJA, and the court confirmed its subject matter jurisdiction under each. The court also concluded that it had subject matter jurisdiction under complete diversity principles, since the only named policyholder plaintiffs were insured by out-of-state insurers. A motion to remand was also recently denied in *Craddock, et al. v. Safeco Insurance Co.,* Civil Action No. 05-6365 (E.D.La.); the removal was primarily on the basis of CAFA. And in *Wallace, et al. v. Louisiana Citizens Property Ins. Corp., et al.,* 06-00009, the U. S. Fifth Circuit vacated an order of remand on March 31, 2006, in a case removed under 28 U.S.C. §1441(e)(1)(B), on the ground that the district judge had abstained under 28 U.S.C. §1369 when his jurisdiction was actually under 28 U.S.C. §1441(e)(1)(B), which did not permit abstention. Other removals—especially in Mississippi—on the basis of federal question jurisdiction under the National Flood Insurance Program have not fared as well.

BR.437651.1

class members have often received "little or no benefits from class actions," or are sometimes harmed by them, because "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value," "unjustified awards are made to certain plaintiffs at the expense of other class members," and "confusing notices are published that prevent class members from being able to fully understand ~~the~~ *and* effectively exercise their rights." These abuses are declared by the Congress to undermine the "national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution" because "State and local courts" are "keeping cases of national importance out of Federal court,"[41] "sometimes acting in ways that demonstrate bias against out-of-State defendants" and "making judgments that impose their view of the law on other States and bind the rights of the residents of those States." Now there is a lot in that preamble, *no matter what* one thinks about the wisdom of the Act itself.

There would appear to be no doubt from this preamble and from the enactment of the MMTJA and CAFA that Congress is expressing its disapproval of the treatment being given to certain kinds of cases in the judicial systems of the respective states. This should probably come as no surprise. But how far should one expect this expression of disapproval to extend? One of the fundamental premises upon which *Erie* seems to rest is that "forum-shopping" is a substantial evil that would be eliminated if the "result" to be obtained in a federal district court would be more or less the same as that which would be obtained in a state court across the street. It is sometimes said that with removal of a diversity case (or initial choice of a federal forum when the state and federal systems have concurrent jurisdiction), one is only changing the judge and

---

[41] This expression seems somewhat disingenuous. It is crystal clear that state law cannot control or inhibit the privilege of removal granted by federal statute. *Chicago, R. I. & P. R. Co. v. Stude*, 346 U.S. 574, 74 S.Ct. 290 (1954). Federal law exclusively governs the grant of federal subject matter jurisdiction and the right of a defendant to remove a case. Thus it is something of a mystery how "State and local courts" might be "keeping cases of national importance out of Federal court."

BR_437631.1

the courtroom, not the law and the probable result.  Yet here we have Congress almost expressly declaring that it **does** seek a different **result**, or at least some different rules of the game.  Might this cause the United States Supreme Court one day to conclude in one of these "minimal diversity" cases that "federal common law" should return as the rule of decision rather than the substantive law of the state in which the federal district court sits?

Consider the following not-so-hypothetical situation.  Suppose that individuals in the extreme southeastern part of Louisiana and the extreme southwestern part of Mississippi (on either side of the "second landfall" of Hurricane Katrina at the state line) who suffered property damage and personal injury from Hurricane Katrina bring suit in a federal district court sitting in Mississippi.  Further suppose that the defendants include both quasi-governmental entities (say, the Corps of Engineers and FEMA, just to name a couple of random possibilities) and insurance companies, some diverse to all of the plaintiffs and some not.  Assuming the other requisites of jurisdiction could be satisfied (in particular the notion of an accident "at a discrete location"[42]) the MMTJA would permit the exercise of federal subject matter jurisdiction over those claims.[43]

If this were an ordinary "complete diversity" subject matter jurisdiction case, the federal district court in Mississippi would be required by *Erie* and *Klaxon* to apply the substantive law that would be applied by the Mississippi Supreme Court to such an action if it had been filed in Mississippi state court.  Presumably, that would lead the federal district court in Mississippi to consider Mississippi's choice of law methodology, which might possibly cause Louisiana substantive law to the claims of Louisiana domiciliaries and Mississippi substantive law to the

---

[42] See discussion in note 20, *supra*.
[43] This seems very apparent on a number of different grounds.  Under 28 U.S.C. §1369(a)(1), a defendant could reside in one state and a "substantial part of the accident" might have taken place in another state.  Or, under 28 U.S.C. §1369(a)(2), "any two defendants" might reside in different states.  Or, under 28 U.S.C. §1369(a)(3), "substantial parts of the accident" might have taken place in different states.  Any one of these situations can be the basis for subject matter jurisdiction under 28 U.S.C. §1369, so long as there is minimal diversity and at least 75 persons died.

claims of Mississippi domiciliaries (assuming the substantive laws of Mississippi and Louisiana were different).    The conventional wisdom would probably be that these "complete diversity" rules should be extended to "minimal diversity" cases as well.

But this result is not inexorable.  If it is "hard" to get into federal court in a "complete diversity" case, can this be taken to be some kind of statement of Congressional intent that any case short of "complete diversity" really "belongs" in state court and therefore it is only appropriate that even the few cases that successfully run the gauntlet of "complete diversity" and make it to federal court should be resolved by state substantive law?  And if that is true, can we now say that "minimal diversity" jurisdiction makes it "easier" to get into federal court and therefore perhaps Congress is telling us it is less important for state law to govern such cases? Indeed, in the preamble to CAFA, what are we to make of the expressions that "abuses" of the class action device (presumably in state courts) have "undermined" the "national judicial system . . . and the concept of diversity jurisdiction as intended by the framers" of the Constitution? And what does it mean to say that state courts are "making judgments that impose their view of the law on other States and bind the rights of the residents of those States"?   In our not-so-hypothetical case in the Mississippi federal district court, suppose that the court, following *Erie* and *Klaxon,* decides that Mississippi choice-of-law methodology would lead to the application of Mississippi substantive law to all of the pending claims before it?  Would that not be a "judgment" that imposed Mississippi's law "on other States" and bound "the rights of the residents of those States"?

Perhaps it is too early to tell what changes the acceptance of "minimal diversity" jurisdiction for the federal courts might make in this respect.  For one thing, we cannot now know whether Congress will expand the concept of "minimal diversity" into other grants of

subject matter jurisdiction on the basis of the diversity of citizenship of the parties. But it would be foolish to ignore the thinly-veiled Congressional message inherent in the acceptance of the concept of "minimal diversity." The message appears to be: we find the experience with mass disasters, class actions and "mass actions" in state court to be unsatisfactory in some instances. As a result, we want to make a federal forum more accessible. Having a federal forum more accessible will not necessary yield a different result if the substantive law of the forum state still applies. Indeed, the frank objective of *Erie* was to assure that the same result **would** obtain in most cases. But if some different "result" is now desired (as evidenced by the remarks in the preamble that accompanied this modest expansion of federal subject matter jurisdiction), is *Erie* now at odds with that desire?

We are just beginning on this road. Considering that almost a century passed between *Swift v. Tyson*[44] which enshrined "federal common law" as the rule of decision in federal diversity cases and *Erie* which replaced it with the substantial law that would be applied by the highest court in the forum state, we probably have a very long way to go. But, as the Chinese are reputed to say, "A journey of a thousand miles begins with a single step."

---

[44] 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842).

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MINUTE ENTRY
March 16, 2006
DISTRICT JUDGE FRANK J. POLOZOLA

GLADYS CHEHARDY, ET AL.

VERSUS                                    CIVIL ACTION

                                          NO. 05-1140-FJP-CN
J. ROBERT WOOLEY, ET AL.

CONSOLIDATED WITH

GLADYS CHEHARDY, ET AL.

                                          CIVIL ACTION
VERSUS
                                          NO. 05-1162-FJP-CN
J. ROBERT WOOLEY, ET AL.

CONSOLIDATED WITH

GLADYS CHEHARDY, ET AL.

                                          CIVIL ACTION
VERSUS
                                          NO. 05-1163-FJP-CN
J. ROBERT WOOLEY, ET AL.


This matter came on this day for oral argument on subject
matter jurisdiction and the motion to remand. All parties present
signed the attached sign-in sheet.

Counsel present arguments.

For oral reasons assigned, the Court declines to exercise
jurisdiction over the counterclaim[1] of defendant, The Standard Fire
Insurance Company, under 28 U.S.C. §1367; therefore, the

_____
[1] Rec. Doc. No. 18.

Doc#43131


EXHIBIT
C

counterclaim is hereby DISMISSED without prejudice.

The Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a), 28 U.S.C. §1332(d) and 28 U.S.C. §1369.  Therefore:

IT IS FURTHER ORDERED that plaintiffs' motions to remand[2] are hereby DENIED.

IT IS FURTHER ORDERED that plaintiffs' claim against the Louisiana Insurance Commissioner is hereby DISMISSED, without prejudice.

IT IS FURTHER ORDERED that plaintiffs' claims against all defendants, except for State Farm Fire and Casualty Company, Allstate Indemnity Company, Allstate Insurance Company and American Insurance Company, are hereby DISMISSED without prejudice.

IT IS FURTHER ORDERED that the remaining issues in this matter shall be TRANSFERRED to the Eastern District of Louisiana.

Should it be later found on appeal that this Court did not have  jurisdiction, the Court reserves the right to the Eastern District to transfer this matter back to this Court for remand.

The Court reserves its right to supplement its oral reasons given this day with written reasons should it become necessary.

******

Reporter: E. Champion

C: CV 25b; T: 2:00

---

[2] Rec. Doc. Nos. 59 and 61.

Doc#43004                                    2

 **America's Newspapers**

Interface lar

Help / About |

Skip navigation

**SEARCH SHORTCUTS:**
- Advocate, The
- Alexandria Daily Town Talk
- CityBusiness North Shore Report
- Daily Advertiser, The
- Daily World
- New Orleans CityBusiness
- News-Star, The
- Times, The
- Times-Picayune, The
- North America
- Create Custom List

**FOLDERS**
- Searches this Session
- Saved Articles

**MORE RESOURCES**
- America's News Magazines
- Special Reports
- Hot Topics

**SEARCHING:  Times-Picayune, The (New Orleans, LA)**

for:  where they died          [ **SEARCH** ]    · Advanced Search

return:  Most recent matches first

○ timeframe:    all years

◉ custom date:  10/23/05

**Search Hints:**
To find an exact match or phrase, use quo
example: Jan 1, 2000 - Feb 3, 2000.

Record 1 of 4                          Back To Results | Pri

Email this Article To|enter valid email address here..   [ SEND EMAIL ]

***WHERE THEY DIED -***
***When it came to choosing its victims, Hurricane Katrina***
***spared few neighborhoods. In fact, Gentilly and the***
***lakefront may have suffered as many deaths as the***
***Lower 9th.***

*Times-Picayune, The (New Orleans, LA)*
*October 23, 2005*
*Author: Coleman Warner*
*and Robert Travis Scott*
*Staff writers*

*Estimated printed pages: 8*

**Quick Links**
Find more art
Find more fror
"NATIONAL"
Find all article

**EXHIBIT**
D

Although Hurricane Katrina's deaths are widely believed to have been concentrated in and eastern New Orleans, new estimates show large numbers of bodies were found Industrial Canal to the 17th Street Canal.

And more than a few people **died** in Mid-City, Central City and Uptown.

The new report, posted by the Louisiana Department of Health and Hospitals on a W shows that the largest numbers of bodies were found in ZIP codes 70117, covering the some neighborhoods to the east bordering St. Claude Avenue, and 70122, including neighborhoods between Old Gentilly Road and the Lakefront.

Between 31 and 75 bodies were recovered in each of the two ZIP codes, inclu devastated by water rushing from levee breaks. The map didn't reflect deaths at hospi and other medical facilities, or bodies that lacked a reliable geographic record. State o why they used wide ranges for body counts.

The estimates show that even in areas where nearly everyone was believed to I evacuate, including mostly white, affluent neighborhoods, the hurricane had deadly effec

Data on the causes of death during the Aug. 29 storm are still unavailable through mo sources, but coroners and other local officials are beginning to offer a varied portrait.

Among the findings:

-- In Orleans Parish, accounting for more than 700 of 1,056 bodies recovered by Fri exacerbated medical conditions were leading causes, with the dividing line between the discern.

-- In St. Bernard Parish, swept by a storm surge estimated at more than 20 feet, drown cause of death for nearly all of 123 victims recovered so far, but in Jefferson Paris poisonings, suicides, accidents and drownings were cited in 22 Katrina-related deaths, c

-- The relatively small numbers of Katrina deaths reported in other parishes, including se

Case 2:05-cv-01382-SRD-JCW    Document 1623-1    Filed 11/17/06    Page 26 of 5

and three in Plaquemines, were attributed by local officials mostly to drowning and storm

The age factor

Age has emerged as a central theme in early post-Katrina death analyses. Victims unable or unwilling to travel and, in many cases, suffering from medical problems tha they would drown or succumb to heat exhaustion, experts said.

At least 60 percent of the dead identified so far were 61 or older, according to state data

"You had a combination of devastating flood waters and elderly and infirm populations w That equals fatalities," said Dr. Juliette Saussy, director of Emergency Medical Service: Orleans and one of those who fielded desperate cell phone calls from New Orleanians tr

Although many drowned, she said, others couldn't stand the sweltering conditions w "You either died from heat, dehydration, or you were overcome by exacerbation of y condition and the lack of attention to that."

Saussy recalled one frantic call from an eastern New Orleans woman who asked for ir an oxygen tank an elderly relative needed to stay alive. The coaching didn't work, and S if rescuers made it to the home in time.

"She couldn't get it," Saussy said. "I couldn't talk her through it."

St. Bernard Parish Coroner Bryan Bertucci said the vast majority of victims in his parish late 60s and 70s, with only one child among the bodies found in the parish.

"A lot of the victims had medical conditions and were less likely to be able to swim to saf

Dr. Louis Cataldie, medical incident commander for the recovery of Katrina dead, offere to questions about victims: "It's primarily folks who I think could not or would not h couldn't drive."

Details scarce

Details about the causes and locations of hurricane deaths have been scarce, as state along with Orleans Parish Coroner Frank Minyard, decline to respond to many specific ir

Federal Emergency Management Agency spokesman Kim Pease referred questic Mortuary Operational Response Team, a federal agency charged with gathering volun bodies found so far across the metro area. DMORT in turn deferred to the Louisiana D and Hospitals and said the state agency could make public any information it sees fit.

Documents on the deaths have been requested under state public records laws from Mi they have not turned the records over.

So far, the state agency has furnished the name, gender, race and parish of residence c bodies have been turned over to relatives, plus some general demographic and ge names have not been released on eight additional identified bodies.

Jefferson Parish has released the name and demographic information on 18 additional v

Top New Orleans officials in recent days, including Mayor Ray Nagin, said they still h about how and where people died.

"We're just in a mode where it's so difficult to retrieve medical information and data," Cynthia Willard-Lewis, who represents eastern New Orleans and the Lower 9th Ward.

Although he has drawn national media attention since Katrina hit, Minyard said he and are too busy conducting autopsies at a processing center in St. Gabriel to assemble dat: That center is handling the victims from Orleans and St. Bernard parishes, which accou percent of the deaths from the storm in Louisiana.

Minyard said a computer data base that may allow for retrieving certain informatio authorities who "go to great lengths to avoid the press."

DHH has gathered extensive data on the dead. Seventy percent of the individuals found exact geographic coordinates, DHH spokesman Bob Johannessen said. But the agen

the data, saying it doesn't yet consider it reliable.

Cataldie said 328 of the individuals at St. Gabriel, a group not reflected in the ZIP c
recovered from health care facilities, including nursing homes and hospitals. Some of th
storm, so as officials verify the data, those people will be removed from the official count
Friday, the state health agency noted eight such individuals.

Also, some bodies from other parishes whose deaths were not related to the storm have
Gabriel. Those individuals also will be removed from the official storm death count.

As of Friday, 354 bodies at St. Gabriel were unidentified.

Of the approximately 500 bodies at St. Gabriel that have been identified so far, 42 j
American, 37 percent are white and 3 percent are Hispanic, according to data released
health agency. A racial or ethnic designation hasn't been applied to about 18 percent of t

Although he had no sense of where bodies were found, Minyard said his impression is
were elderly people with little access to transportation or money. About six of 10 fatalitie
African-Americans, he said.

Few of the victims had visible injuries, he said.

"Most of the people died from natural causes -- heart conditions, liver problems, strol
these conditions before the hurricane. The stress of the hurricane just brought them
worse, and these people died," Minyard said. "We do know lots of people drowned, bu
difficult diagnosis to make two, three, four weeks after it happens, unless you find them i
river or something. . . . The decomposition was so bad on most of these people."

In many cases, the exact cause of death will never be known, Minyard said. When a bod
outside a building, drowning is listed as the cause of death. When there was no sign
may have been long-term medical problems at work, the death is simply listed as hurrica

Exceptions to the rules

As family members are crying out for information on missing loved ones, the main objec
at the St. Gabriel center is identifying the dead, Minyard said.

But exceptions have been made in the case of bodies recovered from nursing ho
Attorney General Charles Foti has called for criminal investigations into deaths at such in

The investigation, requiring autopsies and medical lab tests, stemmed from allega
Medical Center doctors considered putting frail patients to death in the days after the sto
of St. Rita's Nursing Home in St. Bernard Parish were negligent in the deaths of c
Medical center officials and the nursing home owners have denied the charges.

Lab results in those cases are pending, Minyard said.

New Orleans homicide detectives will look into at least eight Orleans Parish deaths
gunshot wounds, Minyard said. Cataldie said one or two of those deaths might have bee

Gathering intelligence on how someone died is difficult in nearly every case because po
witnesses when they locate a corpse, said Capt. Tim Bayard, a narcotics and vice unit c
spent weeks in body-recovery efforts and still oversees such an effort in the Lower 9th W

Bayard, who works closely with the contract firm Kenyon International, said bodies fo
typically were in an advanced stage of decomposition, in some cases no more than skel

He also noted that the fate of some victims may never be known because they floated a

"There's a lot of bodies that went out with the current that we'll never find," he said.

Though Bayard and others said most deaths seemed concentrated on the east side of
the new state map depicts a city in which almost no section was spared. The Lakevi
accounted for between 21 and 30 bodies, for example, and 70115, including riverfront
that didn't flood, had between 11 and 20 bodies, the map shows.

Gruesome scenes

In St. Bernard Parish, where water rose to six feet or more in almost every house, Ka spread from one end of the parish to the other.

An analysis of the locations where bodies were found and discussions with officials abo of the dead indicate that age and frail health, more than geography, sealed the fate victims recovered in the parish as of Friday.

The official cause of death is being determined as victims undergo autopsies at the morgue, but Bertucci said for 99 percent of the victims in St. Bernard, drowning was death. Some, he said, suffered heart attacks, but it's not clear whether they drowned be condition or suffered the heart attacks as they realized they were drowning.

Although deaths in St. Bernard were widely dispersed, there were some gruesome Nursing Home near Poydras, 34 elderly patients died inside the home, many drownir wheelchairs as they hoped in vain for a rescue. Another body with a feeding tube in it wa behind the home, and officials suspect it was another patient.

For some households, the losses were overwhelming. Four bodies were recovered the at a Fable Drive home in Meraux, though officials would not say if all the victims be family.

Although Jefferson Parish handled more than 170 bodies during and after the storm, categorized as Katrina-related deaths, Coroner Robert Treuting said.

Included in that number are three bodies picked up in New Orleans at the reque: Minyard's office was out of commission.

The Jefferson deaths were widely dispersed and divided almost equally between Ea: West Bank, according to statistics compiled by the coroner's office. Almost a third of deaths were due to carbon monoxide poisonings. Six people are believed to have generators inside a residence.

Two men drowned in the storm's aftermath, and another two were electrocuted, inclu man working to restore power in Kenner. A New Orleans teenager waiting to board buse was killed on Causeway Boulevard near Interstate 10 in Metairie after being hit by a car.

Jefferson was spared a higher death toll because the parish didn't take the brunt of t worst of the rapid flooding from levee breeches, officials said.

Included in the Jefferson figures are three suicides. Although he acknowledged that pec might have taken their lives even if the storm had not occurred, Treuting said Katrina w that apparently prompted them to act.

Missing from the Jefferson tally are at least eight bodies found inside the parish but team in St. Gabriel. Treuting said they were people who could not be identified and li Orleans.

"St. Gabriel would be better able to handle identification -- that, and relatives would pro to look for their loved ones' remains," he said.

. . . . . . .

Coleman Warner can be reached at (504) 826-3311 or cwarner@timespicayune.com. can be reached at (225) 342-4197 or rscott@timespicayune.com. St. Bernard Bureau ( and staff writer Michelle Hunter contributed to this story.

Caption:
STAFF PHOTO BY ALEX BRANDON

Capt. Timothy Bayard, a narcotics and vice unit commander, leads his body-recovery ur Ward. Bayard said bodies found typically are in an advanced stage of decomposition. [1:

STAFF PHOTO BY MICHAEL DeMOCKER

The body of Alcede Jackson rests on the porch of a home in the 4700 block of Laurel S sign on the window says she died Aug. 31, and the painted '1B' on the house indic: found one body. [1840493]

## WHERE THEY WERE FOUND

State and local officials are slowly releasing information about **where** Hurricane Katrina some parishes like St. Bernard and Jefferson, provide *detailed information that pinp* were. Orleans Parish so far has released only *information grouping victims by zip code.*

### STAFF MAP BY DAN SWENSON

*Section: NATIONAL*
*Page: 01*

*Copyright, 2005, The Times-Picayune Publishing Corporation. All Rights Reserved. Used by News Permission.*

*Record Number: 420801555*

*OpenURL Article Bookmark (right click, and copy the link location):*
*WHERE THEY DIED*

IE USERS, CLICK
HERE TO BOOKMARK

**Record 1 of 4**                                                    **Back To Results | Pri**
_____

Email this Article To|enter valid email address here..    [SEND EMAIL]                    [

# Vital Statistics of All Bodies at St. Gabriel Morgue
## 2/23/2006

**Status:**

| Process | # | % |
|---|---|---|
| RELEASED | 727 | 82% |
| Coroner's case; death not storm-related | 23 | >1% |
| Ready to be released - Contacting Family Members | 74 | 8% |
| UNKNOWN Identity | 86 | 9% |
| | 910 | |

**Demographic Information for the 824 Victims Identified**
**(see first three "Status" categories above) :**

**Gender:**

| Gender | # | % |
|---|---|---|
| Unknown | 0 | 0% |
| Male | 415 | 50% |
| Female | 409 | 50% |
| TOTAL | 824 | |

**Race:**

| Race | # | % |
|---|---|---|
| Unknown | 37 | 4% |
| African American | 427 | 52% |
| Asian Pacific | 6 | 1% |
| Caucasian | 328 | 40% |
| Hispanic | 17 | 2% |
| Native American | 4 | >1% |
| Other | 5 | >1% |
| TOTAL | 824 | |

**Age:**

| Age | # | % |
|---|---|---|
| 0 to 5 | 1 | >1% |
| 6 to 10 | 1 | >1% |
| 11 to 15 | 5 | >1% |
| 16 to 20 | 5 | 1% |
| 21 to 30 | 10 | 2% |
| 31 to 40 | 23 | 3% |
| 41 to 50 | 72 | 8% |
| 51 to 60 | 114 | 14% |
| 61 to 75 | 191 | 25% |
| > 75 | 377 | 39% |
| UNKNOWN | 25 | 6% |
| | 824 | |



EXHIBIT

E

## Deceased Katrina Victims  Released to Families  Updated
## February 23, 2006

| Last | First | Gender | Race | Age | Parish of Residence |
|------|-------|--------|------|-----|---------------------|
| Aaslestad | Wayne | M | C | 64 | Orleans |
| Acosta | Bertha | F | C | 85 | Orleans |
| Alexander | Estrella | F | AP | 76 | Orleans |
| Alexander | Dale | M | A | 55 | Orleans |
| Alexis | Cecile | F | A | 92 | Orleans |
| Alford | Hollis | M | A | 66 | St Bernard |
| Allen | James | M | A | 72 | Orleans |
| Ancar | Evelyn | F | N.Am | 74 | St Bernard |
| Andrews | Brenda | F | A | 51 | Orleans |
| Andrews | Ferdinand | M | A | 87 | Orleans |
| Anthony | Ruby | F | A | 75 | Orleans |
| Arcement | Irma | F | C | 75 | Orleans |
| Arceneaux | Betty | F | C | 65 | St Bernard |
| Arceneaux | Douglas | M | C | 69 | St Bernard |
| Archer | Gregory | M | A | 39 | Orleans |
| Ares | Jose | M | C | 83 | Orleans |
| Armstrong | Lydia | F | A | 89 | Orleans |
| Arnold | James | M | C | 87 | Orleans |
| Ashbey | Rosemary | F | C | 83 | Orleans |
| Ashley | Frank | M | A | 81 | Orleans |
| Asmore | Edna | F | A | 82 | Orleans |
| August | Gertrude | F | A | 84 | Orleans |
| August | Joseph | M | A | 82 | Orleans |
| Augustin | Theresa | F | A | 90 | Orleans |
| Austin | Winona | F | C | 80 | Orleans |
| Babin | Beverly | F | C | 82 | Orleans |
| Babin, Jr | Justin | M | C | 68 | Jefferson |
| Bacino | Frank | M | C | 82 | Orleans |
| Baham | Christiana | F | C | 71 | Orleans |
| Baham | Warren | M | A | 82 | Orleans |
| Balthazar | Earl | M | C | 72 | Orleans |
| Banks | Joseph | M | A | 81 | St Bernard |
| Banta | Lillian | F | C | 88 | St Bernard |
| Barcellona | Walter | M | C | 62 | St Bernard |
| Barnes | Samuel | M | A | 73 | Orleans |
| Batieste Jr | Arthur | M | A | 78 | Orleans |
| Batiste | Lawrence | M | A | 84 | Orleans |
| Batiste | Shirley | F | A | 73 | Orleans |
| Baulden | Irene | F | A | 79 | Orleans |
| Baumgartner | George | M | C | 95 | Orleans |
| Baxter | William | M | C | 60 | Orleans |
| Beard | Ella | F | A | 94 | Orleans |
| Beard | Sonia | F | A | 50 | Orleans |
| Beason, Sr | Arzell | M | A | 78 | Orleans |

| Beatty | Gladys | F | C | 84 | Orleans |
|---|---|---|---|---|---|
| Benjamin | Mary | F | A | 63 | Orleans |
| Benjamin | Nercile | M | A | 82 | Orleans |
| Benjamin | Sterling | M | A | 38 | Orleans |
| Bennett | Carmen | F | H | 56 | St Bernard |
| Bennett | Edith | F | C | 84 | Orleans |
| Berger | Harry | M | C | 84 | Orleans |
| Betzer | Carol | F | C | 72 | Orleans |
| Bilich | Inez | F | C | 87 | Orleans |
| Blackwell | Katherine | F | C | 76 | Orleans |
| Blanchard | Herbert | M | A | 82 | Orleans |
| Blancher | Lawrence | M | C | 79 | Orleans |
| Blancher | Marjorie | F | C | 80 | Orleans |
| Blappert | Gloria | F | C | 81 | Orleans |
| Blutcher | Nettie | F | A | 94 | Orleans |
| Bohnet | Gloria | F | C | 80 | Orleans |
| Bonono | Anna Mae | F | C | 85 | Orleans |
| Bonono | Luke | M | C | 80 | Orleans |
| Boone | Willie | F | A | 80 | Orleans |
| Borges | Errol | M | C | 64 | Jefferson |
| Borne | Samuel | M | A | 73 | Orleans |
| Bosarge | Sarah | F | C | 81 | St Bernard |
| Boss | Bulah | F | A | 51 | Orleans |
| Bourgeois | Joe Lynn | F | C | 57 | Jefferson |
| Bournes | Rayfield | M | A | 54 | Orleans |
| Bowie | Xavier | M | A | 57 | Orleans |
| Bowser | Gloria | F | A | 61 | Orleans |
| Boyd | Arthur | M | A | 48 | Orleans |
| Boyd | Loretta | F | C | 77 | St Tammany |
| Boyle | Eugenie | F | C | 40 | St Bernard |
| Breaux | Eunice | F | C | 76 | St Bernard |
| Breckenridge | Helen | F | A | 77 | Orleans |
| Bridges | Chris | M | A | 34 | Orleans |
| Brinston | Johnny | M | A | 67 | Orleans |
| Brossette | Joseph | M | C | 81 | Orleans |
| Brouchard | Alma | F | C | 83 | Orleans |
| Brouwer | Mabel | F | C | 70 | Orleans |
| Brown | Gerald | M | A | 48 | Orleans |
| Brown | Laurence | M | A | 79 | Orleans |
| Brown | Roosevelt | M | A | 78 | Orleans |
| Brumfield, Sr. | Danny | M | A | 45 | Orleans |
| Brumfield | Mattie | F | A | 70 | Orleans |
| Buckner | Selina | F | A | 97 | Orleans |
| Buras | Lloyd | M | C | 92 | Orleans |
| Burgess | Jannie | F | A | 79 | Orleans |
| Burke | Mary | F | C | 81 | Orleans |
| Burke | Thomas | M | C | 48 | St Bernard |
| Burns | Evelyn | F | C | 97 | St Bernard |
| Burns | Winnie | F | A | 91 | Orleans |
| Buse | Owen | M | C | 68 | Orleans |

| Butler | Alex | M | A | 68 | Orleans |
| Butler | Benny | M | A | 72 | St Bernard |
| Butler | Leroy | M | A | 59 | St Bernard |
| Byrd | June | M | A | 72 | Orleans |
| Caixeta | Benilda | F | H | 55 | Orleans |
| Caliste | Frank | M | A | 81 | Orleans |
| Campieri | Joseph | M | C | 88 | Orleans |
| Capetillo | Patsy | F | H | 94 | Orleans |
| Carpenter | Claude | M | C | 61 | Jefferson |
| Carson | Nathaniel | M | A | 49 | Orleans |
| Casby | James | M | A | 52 | Jefferson |
| Casimire | Louise | F | N.Am | 83 | Orleans |
| Castle | Issac | M | A | 58 | Orleans |
| Cevasco | Irma | F | C | 74 | Orleans |
| Chambers | Frank | M | C | 72 | St Bernard |
| Charles | Donald | M | A | 52 | Orleans |
| Cherrie | Onelia | F | A | 91 | Orleans |
| Chester | Ricky | M | A | 45 | Jefferson |
| Clifton | Warren | M | A | 71 | Orleans |
| Coleman | Arnecker | F | A | 35 | Orleans |
| Coleman | Darrel | M | A | 54 | Orleans |
| Coleman | Johnnie | M | A | 76 | Orleans |
| Coleman | Thomas | M | A | 80 | Orleans |
| Collins | Ethel | F | A | 85 | Orleans |
| Collins | Lytton | M | A | 60 | Orleans |
| Comes | Guy | M | C | 91 | Orleans |
| Common | Clarence | M | A | 85 | Orleans |
| Cooley | Wilmer | M | A | 80 | Orleans |
| Cook | Myrtle | F | A | 58 | Orleans |
| Cosse | Walter | M | C | 30 | St Bernard |
| Cotham | Donna | F | C | 41 | Jefferson |
| Cousins | Adele | F | C | 81 | St Bernard |
| Cowsill | Barry | M | C | 50 | Orleans |
| Couvillion | Ned | M | C | 53 | St Bernard |
| Cox | Frances | F | C | 77 | St Bernard |
| Cox | Ronald | M | C | 72 | Orleans |
| Cronan | George | M | C | 74 | Orleans |
| Cronan | Mary | F | C | 78 | Orleans |
| Crutchfield | Wessie | F | A | 73 | Washington |
| Cummings | Norman | M | A | 75 | Orleans |
| Cuquet | Nicholas | M | C | 79 | Orleans |
| Dabon | Stella | F | A | 68 | Orleans |
| D'Arcangelo | Frank | M | C | 66 | Orleans |
| Daigle | Irene | F | C | 83 | St Bernard |
| Dalier | Amelie | F | C | 81 | Orleans |
| Dang | Kan Thi | F | AP | 95 | Orleans |
| Darsam | Mary | F | C | 83 | St Bernard |
| Davis | Calvin | M | A | 77 | Orleans |
| Davis | Donise | F | A | 28 | Orleans |
| Davis | George | M | A | 69 | Orleans |

| Davis | John | M | A | 59 | Orleans |
|---|---|---|---|---|---|
| Davis | Rosemary | F | C | 78 | St Bernard |
| Davis | Tanner | M | A | 84 | Orleans |
| Dawson | Elaine | F | A | 59 | Orleans |
| Day | Duffey | M | A | 72 | Orleans |
| Deadman | William | M | C | 71 | Orleans |
| Deamer | Ella | M | A | 72 | Orleans |
| Deamer | Leslie | M | A | 92 | Orleans |
| Dear | Herman | M | A | 57 | Orleans |
| Deblanc | Elva | F | C | 92 | Orleans |
| Decour | Evangeline | F | A | 76 | Orleans |
| Dees | Clinton | M | A | 60 | Orleans |
| Delafosse | Robert | M | C | 39 | St Bernard |
| Delatte | Zerelda | F | C | 72 | St Bernard |
| Delaune | Alan | M | C | 51 | St Bernard |
| Deluca | John | M | C | 77 | Orleans |
| Denley | Jane | F | C | 80 | St Bernard |
| Dennis | Maggie | F | A | 89 | Orleans |
| Depascual | Agnes | F | C | 81 | St Bernard |
| Dexter, Jr. | Robert | M | C | 63 | Orleans |
| Dickerson | Lawrence | M | A | 22 | Orleans |
| Dieck | Milton | M | C | 85 | Orleans |
| Dimambro | Roger | M | C | 63 | Orleans |
| Dinwiddie | Blanche | F | A | 71 | Jefferson |
| Dorsey | Kerney | F | A | 85 | Orleans |
| Dreher | Katie | F | C | 90 | Orleans |
| Drury | Rita | F | C | 49 | Orleans |
| Ducre | Margaret | F | A | 82 | Orleans |
| Dugar | Ethel | F | A | 61 | Orleans |
| Dugas | Edward | M | C | 80 | St Bernard |
| Duhon | Harrison | M | C | 84 | St Bernard |
| Duhon | Septeme | M | A | 68 | Orleans |
| Dunn | John | M | A | 49 | Orleans |
| Dupas | Harold | M | A | 77 | Orleans |
| Dupor | Gladys | F | A | 51 | Orleans |
| Duvernay | Lorraine | F | A | 79 | Orleans |
| Dyer | Mary | F | A | 72 | Orleans |
| Eaton | Patsy | F | C | 58 | St Bernard |
| Ebanks | Kemron | M | A | 74 | Orleans |
| Edwards | Harry | M | A | 64 | East Baton Rouge |
| Edwards | Joseph | M | A | 45 | Orleans |
| Edwards | Lorraine | F | A | 58 | Orleans |
| Edwards | Marjorie | F | A | 85 | Orleans |
| Eleby | Clementine | F | A | 78 | Orleans |
| Ellis | Amelia | F | A | 71 | Orleans |
| Embry | Russell | M | C | 54 | St Bernard |
| Emerson | Joan | F | C | 57 | St Bernard |
| England | Robert | M | A | 56 | Orleans |
| Estarlich | Michael | M | H | 80 | Orleans |
| Ester | Edward | M | A | 76 | Orleans |

| Ester | Feado | M | A | 87 | Orleans |
|---|---|---|---|---|---|
| Estes | Gregory | M | A | 35 | Orleans |
| Evans | Daniel | M | A | 86 | Orleans |
| Everett | Emmett | M | A | 61 | Orleans |
| Ewale | Tesfaldet | M | A | 66 | Orleans |
| Fahrenholtz | Helen | F | C | 91 | St Bernard |
| Falcone | Michael | M | C | 56 | Jefferson |
| Falley | George | M | A | 90 | Orleans |
| Falley | Shirley | F | A | 73 | Orleans |
| Farzande | Ervin | M | AP | 44 | St Bernard |
| Farzande | John | M | AP | 48 | St Bernard |
| Fazande | Alvin | M | A | 78 | Orleans |
| Fazande | Bernadette | F | A | 78 | Orleans |
| Ferguson | Shelly | F | C | 50 | Orleans |
| Flemming | Clarence | M | C | 64 | Orleans |
| Flint | Prosper | M | A | 77 | Orleans |
| Ford | Alma | F | A | 46 | Orleans |
| Forrest | Hubert | M | C | 86 | Orleans |
| Francis | Ella | F | A | 94 | Orleans |
| Francois | Benjamin | M | A | 99 | Orleans |
| Frazier | Ruby | F | A | 76 | Orleans |
| Freeman | Ethel | F | A | 91 | Orleans |
| Frischertz | Maxine | F | C | 84 | St Bernard |
| Fuhrmann | Caroline | F | C | 92 | Jefferson |
| Funk | Robert | M | C | 60 | Jefferson |
| Gabriel | Eldridge | M | A | 95 | Orleans |
| Gagliano | Charles | M | C | 81 | St Bernard |
| Gagliano | Shirley | F | C | 71 | St Bernard |
| Gaillourd | Wallace | M | C | 76 | Orleans |
| Galatas, Jr | Arthur | M | C | 81 | St Bernard |
| Galiodoro | Tufanio | M | C | 82 | St Bernard |
| Gardener | Mario | M | C | 54 | St Bernard |
| Garrison | Marguerite | F | A | 88 | Orleans |
| Gastinell | Ellery | M | A | 45 | Orleans |
| Gauthier | Ruby | F | A | 80 | Orleans |
| Gayle | Shirley | F | A | 73 | Orleans |
| Gibson | Robert | M | A | 85 | Orleans |
| Gilmore | Ernest | M | A | 51 | Orleans |
| Giuffre | Vincent | M | C | 87 | Orleans |
| Godwin | Catherine | F | C | 61 | St Bernard |
| Godwin | Thelma | F | C | 81 | St Bernard |
| Goffner | Preston | M | A | 59 | Orleans |
| Gonzalez | Dulce Maria | F | H | 80 | Orleans |
| Gonzalez | Maria Delos Angeles | F | H | 52 | Orleans |
| Gonzalez | Rosa | F | H | 74 | Orleans |
| Gordon | Mary | F | C | 51 | Orleans |
| Gourgues | Mary | F | C | 81 | St Bernard |
| Grant | Marcus | M | A | 57 | Orleans |
| Greathouse | David | M | C | 48 | Jefferson |
| Green | Joyce | F | A | 73 | Orleans |

| Green | Marion | F | A | 69 | Orleans |
|---|---|---|---|---|---|
| Green | Rita | F | C | 84 | St Bernard |
| Green | Shanai | F | A | 3 | Orleans |
| Gregg | William | M | C | 76 | St Bernard |
| Griffith | Lorraine | F | A | 64 | Orleans |
| Grimes | Ayrie | M | A | 93 | Orleans |
| Grunik | George | M | C | 72 | St Bernard |
| Gueydan | John | M | C | 81 | Orleans |
| Guillory | Robert | M | A | 51 | Orleans |
| Gulotta | Charles | M | C | 74 | Orleans |
| Gulotta | Dorothy | F | C | 63 | Orleans |
| Gurtner | Ura | F | C | 85 | St Bernard |
| Hackett | Gertrude | F | A | 69 | Orleans |
| Hains | Gilda | F | A | 50 | Orleans |
| Hall | Azemo | M | A | 78 | Orleans |
| Hall | Carrie | F | A | 78 | Orleans |
| Hall | Raymond | M | A | 89 | Orleans |
| Hamilton | Mary | F | A | 79 | Orleans |
| Hardeman | Iris | F | A | 51 | Orleans |
| Harold | Rosa | F | C | 65 | Orleans |
| Harris | Pearl | F | A | 100 | Orleans |
| Harris | Rudulph | M | A | 73 | Orleans |
| Hart | Martha | F | C | 64 | Orleans |
| Hartdegend | Shirley | F | C | 78 | St Bernard |
| Harvey | Oliver | M | A | 100 | Orleans |
| Hawkins | Mary | F | A | 78 | Orleans |
| Haynes | Paul | M | A | 78 | Orleans |
| Haywood | Mattie | F | A | 85 | Orleans |
| Hebert | Isabelle | F | A | 52 | Orleans |
| Hebert | Wilbur | M | C | 67 | St Bernard |
| Henry | Edmond | M | A | 97 | Orleans |
| Henry | Gladys | F | A | 83 | Orleans |
| Henry | Janice | F | A | 53 | Orleans |
| Henry | Thomas | M | A | 55 | Orleans |
| Herbert | Ethel | F | A | 82 | Orleans |
| Herndon | Rosemary | F | C | 75 | St Bernard |
| Heyl | Norris | F | C | 79 | Orleans |
| Hilborn | Jules | M | C | 86 | Orleans |
| Hilliard | Kevin | M | A | 43 | Orleans |
| Hingle | Celeste | F | C | 85 | Plaquemines |
| Hingle | Dorothy | F | C | 83 | St Bernard |
| Hinkel | Audrey | F | C | 72 | Orleans |
| Holland | Dorothy | F | C | 80 | Orleans |
| Holloman | Dorothy | F | A | 68 | Orleans |
| Holloway | Delia | F | A | 82 | Orleans |
| Holmes | Vincent | M | A | 47 | Orleans |
| Holton | Alma | F | A | 95 | Orleans |
| Hose | Amelia | F | C | 102 | Orleans |
| Hotard | Bonafacia | F | H | 77 | Jefferson |
| Howard | Lethea | F | A | 57 | Orleans |

| Howley | John | M | C | 44 | Jefferson |
|---|---|---|---|---|---|
| Huard | George | M | C | 91 | St Bernard |
| Humphrey | Adelia | F | H | 89 | Orleans |
| Humphrey | Daisy | F | A | 89 | Orleans |
| Humphrey | Lloyd | M | A | 93 | Orleans |
| Husband | Herman | M | A | 47 | Orleans |
| Hutcherson, Jr. | George | M | C | 78 | Orleans |
| Hymel | Daryl | M | C | 50 | Orleans |
| Hymel | Edgar | M | C | 50 | Orleans |
| Hutzler | Alice | F | C | 90 | St Bernard |
| Jachim | Robert | M | C | 83 | Orleans |
| Jacko | Karnettia | F | A | 26 | Orleans |
| Jackson | Alcede | M | A | 83 | Orleans |
| Jackson | Antonia | F | A | 90 | Orleans |
| Jackson | Eddie | M | A | 97 | Orleans |
| Jackson | Elizabeth | F | A | 81 | Orleans |
| Jackson | Emelda | F | A | 78 | Orleans |
| Jackson | Ernestine | F | A | 64 | Orleans |
| Jackson | Gladys | F | A | 95 | Orleans |
| Jackson | James | M | A | 75 | Orleans |
| Jackson | James | M | A | 47 | Jefferson |
| Jackson | Myrtle | F | A | 75 | Orleans |
| Jackson | Rocksey | F | A | 65 | Orleans |
| Jackson | Rosa | F | A | 86 | East Baton Rouge |
| Jackson | Royal | M | A | 80 | Orleans |
| Jackson | Russell | M | A | 63 | Orleans |
| Jacksn-Daly | Nora | F | A | 83 | Orleans |
| Jacques | Dorothy | F | A | 87 | Orleans |
| James, Sr | Arthur | M | A | 54 | Orleans |
| James | Geneva | F | A | 98 | Jefferson |
| James | Gertie | F | A | 87 | Orleans |
| James | Keith | M | A | 47 | Orleans |
| James | Michael | M | A | 31 | Orleans |
| Jefferson | Aleria | F | A | 69 | Orleans |
| Jenkins | Georgia | F | C | 57 | St Bernard |
| Jenkins | Joseph | M | C | 57 | St Bernard |
| Jenkins | Thomas | M | A | 64 | Orleans |
| Johns | Delores | F | A | 45 | Orleans |
| Johns | Lydia | F | C | 82 | Orleans |
| Johnson | Althea | F | A | 60 | Orleans |
| Johnson | Gerald | M | A | 34 | Orleans |
| Johnson | Geraldine | F | A | 57 | Orleans |
| Johnson | James | M | A | 47 | Orleans |
| Johnson | John | M | A | 76 | Orleans |
| Johnson | Mabel | F | C | 88 | St Bernard |
| Johnson | Mary | F | A | 68 | Orleans |
| Johnson | Preston | M | A | 25 | Unknown |
| Johnson | Willie | M | A | 59 | Orleans |
| Johnston | Anthony | M | C | 96 | Orleans |
| Jolly | Thomas | M | C | 85 | Orleans |

| | | | | | |
|---|---|---|---|---|---|
| Jones | Anthony | M | A | 32 | Orleans |
| Jones | Elia | F | C | 80 | Orleans |
| Jones, Sr | Cornelius | M | A | 79 | Jefferson |
| Jones | George | M | A | 86 | Orleans |
| Jordan | Vicki | F | C | 36 | St Bernard |
| Joseph | Mayola | F | A | 47 | Orleans |
| Joseph | Ruby | F | A | 94 | Orleans |
| Kafoed | Malcolm | M | C | 88 | Jefferson |
| Keelen | Salvadore | M | A | 62 | Orleans |
| Keiffer, Sr | Armstead | M | A | 62 | Orleans |
| Keller | Darryl | M | A | 51 | Orleans |
| Keller | Raymond | M | A | 52 | Orleans |
| Kennerson | Joey | M | A | 13 | Orleans |
| Kessner | John | M | C | 60 | St Bernard |
| Kinard | Shelton | M | A | 55 | Orleans |
| Kingston | Nathaniel | M | A | 83 | Orleans |
| Kinsey | Gretta | F | A | 61 | Orleans |
| Knight | Iris | F | C | 76 | St Bernard |
| Knight | Jimmie | M | A | 75 | Orleans |
| Kramer | Mildred | F | C | 85 | Orleans |
| Krause | Claris | F | C | 87 | St Bernard |
| Krennerich | Edith | F | C | 84 | St Bernard |
| Kuyt | Peter | M | C | 75 | Orleans |
| Labanca | Carmen | F | C | 95 | Orleans |
| LaBasse | Daniel | M | C | 78 | Orleans |
| Labat | Mary | F | C | 84 | St Bernard |
| LaCarbiere | John | M | A | 46 | Orleans |
| Lachney | Clifton | M | C | 71 | Orleans |
| Lachney | Jeffrey | M | C | 28 | Orleans |
| LaCoste | Althea | F | A | 73 | Orleans |
| Laddin | Ronald | M | C | 64 | Orleans |
| Lafayette | James | M | A | 97 | Orleans |
| Lagasse | Merle | F | C | 76 | Orleans |
| Lainez | Albertine | F | A | 86 | Orleans |
| Lala | Athea | F | C | 76 | Orleans |
| Lala | George | M | C | 74 | Orleans |
| Landry | Carla | F | A | 44 | Orleans |
| Landry-Prevost | Lilitha | F | A | 39 | St John |
| Landry | Muronda | F | A | 34 | Orleans |
| Landry | Neomi | F | A | 78 | Orleans |
| Larive | Lurnice | M | A | 83 | Orleans |
| Larive | Leroy | M | C | 85 | Orleans |
| Larmeu | Elvera | F | C | 84 | Orleans |
| Larre | Helen | F | C | 91 | St Bernard |
| Lastie | Cynthia | F | A | 48 | Orleans |
| Latino | Marie | F | A | 20 | Orleans |
| Laudumiey | Mathilde | F | C | 55 | Orleans |
| Laur | John | M | C | 85 | Orleans |
| Lawrence | Willie | M | A | 47 | Orleans |
| Lawrence | Wesley | M | A | 49 | Orleans |

| | | | | | |
|---|---|---|---|---|---|
| Leblanc | Gladys | F | C | 89 | St Bernard |
| LeBourgeois | Julia | F | C | 75 | Orleans |
| Lee | Simon | M | C | 88 | Orleans |
| Levasseur | Carl | M | C | 49 | Orleans |
| Lewis | Doneika | F | A | 14 | Orleans |
| Lewis | Nicole | F | A | 36 | Orleans |
| Lewis | Patricia | F | A | 53 | Orleans |
| Lewis | Rickie | M | A | 53 | Orleans |
| Lind | Mary | F | C | 91 | St Bernard |
| Liuzza | Dominique | F | C | 53 | St Bernard |
| Long | James | M | C | 56 | Orleans |
| Lonon | Mary | F | C | 87 | Orleans |
| Lopez | Frank | M | C | 60 | Orleans |
| Lopez | Todd | M | H | 42 | St Bernard |
| Lott | Shirley | M | C | 93 | St Bernard |
| Louper | Edmund | M | A | 75 | Orleans |
| Louros | Harry | M | C | 90 | St Bernard |
| Love, Sr | Herbie | M | A | 45 | Orleans |
| Lozes | Martha | F | C | 85 | Orleans |
| Lucas | Gregory | M | A | 48 | Orleans |
| Lurie | Linda | F | C | 72 | Orleans |
| Lynch | Elizabeth | F | C | 87 | Orleans |
| Lyons | Leola | F | A | 71 | Orleans |
| Madison | Ronald | M | A | 40 | Orleans |
| Mahaney | Peggy | F | C | 74 | St Bernard |
| Major | Frankie | M | A | 47 | Orleans |
| Major | Joseph | M | A | 39 | St Bernard |
| Mancuso | Mary | F | C | 87 | Orleans |
| Manuel | Jacqueline | F | A | 65 | Orleans |
| Marcellas | Willia | F | A | 90 | Orleans |
| Mares | Shirley | F | C | 81 | St Bernard |
| Maurino | Louise | F | C | 45 | Orleans |
| Marks | George | M | A | 74 | Orleans |
| Marsala | Edna | F | C | 95 | Orleans |
| Marshall, Jr | John | M | A | 66 | Orleans |
| Martin | Cecile | F | C | 95 | Orleans |
| Martin | Mary | F | A | 68 | Orleans |
| Martin | Plummie | F | A | 92 | Orleans |
| Martinez | Willie | M | A | 84 | Orleans |
| Martinolich | August | M | C | 68 | St Bernard |
| Masino | Joyce | F | C | 82 | Orleans |
| Mason | Arthur | M | C | 88 | Orleans |
| Matthews | Rendy | F | A | 86 | Orleans |
| May | Jessie | F | A | 79 | Orleans |
| Mayfield | Irvin | M | A | 64 | Orleans |
| Mayfield | Lee | M | A | 41 | Orleans |
| Mc Caddy | Paul | M | A | 69 | Orleans |
| Mc Cray | William | M | A | 71 | Orleans |
| Mc Donald | Matthew | M | C | 41 | Out Of State |
| Mcguire | Joyce | F | C | 77 | St Bernard |

| Mc Manus | Wilda | F | A | 70 | Orleans |
|---|---|---|---|---|---|
| McWilliams | Darrell | M | A | 48 | Orleans |
| Mejia | Lidia | F | O | 84 | Orleans |
| Melancon | Ethel | F | C | 90 | Jefferson |
| Melerine | Lucille | F | C | 85 | St Bernard |
| Meyer | Earl | M | C | 80 | St Bernard |
| Meyer | Helen | F | C | 79 | St Bernard |
| Meyer | Shirley | F | C | 83 | St Bernard |
| Migliore | Rose | F | C | 80 | Orleans |
| Milanez | George | M | A | 59 | Orleans |
| Miller, Sr | Arthur | M | A | 78 | St Bernard |
| Miller | Willie | M | A | 82 | Orleans |
| Montalbano | Helen | F | C | 85 | St Bernard |
| Moore | Mary | F | A | 64 | Orleans |
| Mora | Edward | M | A | 56 | Orleans |
| Morales | Laureta | F | C | 92 | St Bernard |
| Morang | Robert | M | C | 70 | Orleans |
| Morant | Mary | F | A | 52 | Orleans |
| Moreland | Ned | M | A | 81 | Orleans |
| Morrow | Curtis | M | A | 60 | St Bernard |
| Mortellaro | Helen | F | C | 83 | Orleans |
| Mosby | Veola | F | A | 79 | Orleans |
| Mosgrove | Stephen | M | C | 60 | St Bernard |
| Moss | Roy | M | A | 55 | Orleans |
| Muhoberac | Matthew | M | C | 79 | St Bernard |
| Mullen | Matilda | F | C | 78 | Orleans |
| Mumphrey | Joel | F | C | 76 | St Bernard |
| Muse | Johnathan | M | A | 18 | Orleans |
| Napoleon | William | M | A | 60 | Orleans |
| Navis | Frances | F | C | 80 | St Bernard |
| Neely | Michael | M | C | 52 | Orleans |
| Nelson | Elaine | F | C | 90 | Jefferson |
| Nettles | Ashley | F | A | 10 | Orleans |
| Nicholas | Joseph | M | A | 83 | Orleans |
| Nora | Edward | M | A | 66 | Orleans |
| Northon | Olga | M | C | 92 | Orleans |
| Norwood | Mary | F | A | 71 | Orleans |
| O'Connor | Fabiola | F | C | 85 | St Bernard |
| Olivier | Helen | F | C | 82 | Orleans |
| Olsen | Mary | F | C | 78 | Orleans |
| Orduna | Louis | M | C | 90 | Orleans |
| Owney | Bernadine | F | A | 61 | Orleans |
| Pace | Maria | F | C | 79 | Orleans |
| Parker | George | M | A | 56 | Orleans |
| Parker | Janet | F | C | 88 | St Bernard |
| Parker | Margaret | F | C | 62 | St Tammany |
| Parker | Rose | F | C | 83 | Orleans |
| Parr | Carol Ann | F | C | 59 | St Bernard |
| Parr | Norman | M | C | 69 | St Bernard |
| Perkins | George | M | A | 78 | Orleans |

| Pelitere | Peter | M | C | 70 | Jefferson |
|---|---|---|---|---|---|
| Pereira | Yvette | F | C | 54 | Orleans |
| Perret | Helen | F | C | 90 | St Bernard |
| Peters | Jerry | M | A | 64 | Orleans |
| Peters | Reynette | F | A | 87 | Orleans |
| Peyton | Virginia | F | C | 68 | Orleans |
| Phillips | Beverly | F | A | 65 | Orleans |
| Phillips | Winston | M | A | 81 | Orleans |
| Pichon | Dorothy | F | C | 76 | Orleans |
| Pierre | Ernest | M | A | 68 | Orleans |
| Pierre | Juanita | F | A | 69 | Orleans |
| Pinkney | Thelma | F | C | 76 | Orleans |
| Pino | Rosemary | F | C | 83 | St Bernard |
| Platt | Louise | F | C | 63 | Orleans |
| Poissenot | Emile | M | C | 89 | St Bernard |
| Poladura | Helen | F | C | 86 | Orleans |
| Polmer | Rachel | F | C | 64 | Orleans |
| Ponseti | Marvin | M | C | 75 | Orleans |
| Porter | William | M | A | 75 | Orleans |
| Preston | Leon | M | A | 70 | Orleans |
| Price | Douglas | M | A | 43 | Orleans |
| Price | Julius | M | A | 22 | Orleans |
| Prima | Joseph | M | C | 86 | Orleans |
| Prusinski | Jerome | M | C | 86 | Orleans |
| Rambo | Glenn | M | C | 34 | St Bernard |
| Randall | Gladys | F | C | 81 | St Bernard |
| Randolph | Isaac | M | A | 81 | Orleans |
| Ransom | Verina | F | A | 49 | Orleans |
| Rashkin | Janet | F | C | 80 | St Bernard |
| Rasmussen | Muriel | F | C | 90 | Orleans |
| Ray | Eddie | M | A | 59 | Orleans |
| Reacord | Althea | F | A | 78 | Orleans |
| Reeves | Olampia | F | A | 87 | Orleans |
| Reysack | Richard | M | C | 81 | St Bernard |
| Richard | Edward | M | A | 83 | Orleans |
| Richard | Sandra | F | C | 58 | Orleans |
| Richards | Milton | M | A | 62 | Orleans |
| Richburg | LeJohn | M | A | 60 | Orleans |
| Rickie | Jeanne | F | C | 93 | Orleans |
| Riehm | Elizabeth | F | C | 82 | Jefferson |
| Riehms | Clarise | F | C | 75 | Plaquemines |
| Risper | Leonard | M | A | 74 | Orleans |
| Rivers | Rufus | M | C | 77 | St Bernard |
| Rizzo | Virginia | F | C | 98 | Orleans |
| Roark | Rebecca | F | C | 61 | St Bernard |
| Roberts | Dana | F | C | 43 | Out Of State |
| Robertson | Arthur | M | A | 88 | Orleans |
| Robertson | Ethel | F | A | 84 | Orleans |
| Robichaux | Edward | M | A | 61 | Orleans |
| Robichaux | John | M | A | 91 | Orleans |

| Robichaux | Virgie | F | A | 86 | Orleans |
|---|---|---|---|---|---|
| Robin | Jean | F | C | 78 | Orleans |
| Pizzuto-Robino | Bernice | F | C | 80 | St Bernard |
| Robinson | Bessie | F | A | 64 | Orleans |
| Robinson | Pearl | F | A | 82 | Orleans |
| Rocha | Alberto | M | H | 87 | Orleans |
| Rock | Edgar | M | A | 81 | Orleans |
| Rodgers | Zola | F | C | 77 | Orleans |
| Rodrigue | Eva | F | C | 93 | St Bernard |
| Rodriguez | Jose | M | H | 78 | Orleans |
| Roessler | Guadalupe | F | H | 79 | Orleans |
| Romero | Manuel | M | H | 84 | Orleans |
| Romero | Margarita | F | H | 88 | Orleans |
| Roquevert | Louis | M | C | 79 | Orleans |
| Ross | Elizabeth | F | C | 55 | St Bernard |
| Roy | Eddie | M | A | 63 | Orleans |
| Rulh | Ruth | F | C | 75 | Orleans |
| Russell | John | M | C | 80 | St Bernard |
| Russell | Robert | M | A | 37 | Orleans |
| Ryan | Georgia | F | C | 82 | St Bernard |
| Ryan | Van | M | C | 84 | St Bernard |
| Ryburn | Alma | F | C | 83 | Unknown |
| Seia | Darlene | F | C | 54 | St Bernard |
| Sanfilippo | Antonia | F | C | 79 | St Bernard |
| Sauter | Fritz | M | C | 48 | Orleans |
| Savoca | Nicholas | M | C | 75 | Orleans |
| Savoie | Rose | F | C | 91 | St Bernard |
| Scariano | Louise | F | C | 88 | Orleans |
| Schielder | Anna | F | C | 75 | St Bernard |
| Schiro | Cynthi | F | C | 50 | St Bernard |
| Schiro | Delores | F | C | 87 | St Bernard |
| Schiro, Jr. | Jake | M | C | 54 | St Bernard |
| Schneider | Catherine | F | C | 81 | Orleans |
| Schultz | Irma | F | C | 76 | Orleans |
| Schultz | John | M | C | 78 | Orleans |
| Scott | Austin | M | A | 66 | Orleans |
| Scott | Bereita | F | A | 87 | Orleans |
| Seeger | Elaine | F | C | 90 | Orleans |
| Seifker | Henry | M | C | 70 | St Bernard |
| Sennette | Janie | F | A | 93 | Orleans |
| Serou | Gordon | M | C | 67 | Orleans |
| Serpas | Nellie | F | C | 87 | Orleans |
| Sevalia | Barbara | M | A | 55 | Orleans |
| Sevalia | Victoria | F | A | 93 | Orleans |
| Shanks | Isaac | M | A | 43 | Jefferson |
| Shannon | Edna | F | C | 90 | Orleans |
| Shaw | Jerry | M | A | 46 | Orleans |
| Shaw | William | M | A | 82 | Orleans |
| Shepherd | Walter | M | A | 48 | Orleans |
| Sherman | Lillian | F | C | 92 | Orleans |

| Sherman | Rose | F | A | 88 | Orleans |
|---|---|---|---|---|---|
| Sherman | Scott | M | C | 54 | Orleans |
| Sherrod | Naomi | F | C | 84 | Orleans |
| Signal | Pamela | F | A | 41 | Orleans |
| Simmons | Arthur | M | A | 91 | Orleans |
| Simmons, Jr | Levie | M | A | 69 | Orleans |
| Simon | Richard | M | A | 53 | Orleans |
| Simpson | Mary | F | C | 60 | St Bernard |
| Sindibaldi | Albert | M | C | 87 | Orleans |
| Singagliese | Brian | M | A | 34 | Out Of State |
| Singelmann | Pauline | F | C | 84 | Orleans |
| Singleton | Bennie | M | A | 74 | Orleans |
| Sires | Louise | F | C | 93 | St Bernard |
| Smallwood Jr | Matthew | M | A | 62 | St Bernard |
| Smith | Darren | M | A | 44 | Orleans |
| Smith | Elvira | F | H | 66 | Orleans |
| Smith | Freddie | M | A | 61 | St Bernard |
| Smith | John | M | A | 48 | Orleans |
| Smith | Lincoln | M | A | 80 | Orleans |
| Smith | Marsha | F | C | 57 | Jefferson |
| Smooth | Ersell | F | A | 33 | Orleans |
| Smith | Velzie | F | A | 84 | Orleans |
| Smooth | Kendra | F | A | 16 | Orleans |
| Smooth | Kendricka | F | A | 18 | Orleans |
| Snowden | Cynthia | F | C | 46 | Orleans |
| Sparks | Edward | M | A | 54 | Orleans |
| Sparks | Susie | F | A | 46 | Orleans |
| Spichiger | Jean | M | H | 69 | Orleans |
| St Pe | Robert | M | C | 60 | Orleans |
| Stafford, Sr | Henry | M | C | 63 | St Bernard |
| Stafford | Joseph | M | A | 65 | Orleans |
| Stafford | Mary | F | C | 78 | Orleans |
| Starks | Edward | M | A | 58 | Orleans |
| Sterns | Marian | F | C | 56 | St Bernard |
| Stevens | Eleanor | F | C | 84 | Orleans |
| Stewart | Charles | M | C | 68 | Orleans |
| Stewart | Karl | M | A | 39 | Orleans |
| Stewart | Onita | F | A | 70 | Orleans |
| Stieber | Marian | F | C | 79 | Orleans |
| Stieber | Raymond | M | C | 89 | Orleans |
| Stipelcovich | Betty | F | C | 51 | Plaquemines |
| Strong | Nelia | F | A | 87 | Orleans |
| Sullivan | John | M | C | 37 | St Bernard |
| Sutton | Edith | F | A | 85 | Orleans |
| Swan | Alvin | M | C | 68 | Jefferson |
| Swiber | Madeline | F | C | 69 | Orleans |
| Sylvester | Patricia | F | A | 50 | Orleans |
| Tate | Allen | M | A | 56 | Orleans |
| Taitt | Herman | M | A | 83 | Orleans |
| Tappan | Donald | M | C | 73 | Orleans |

15

| Taylor | Ronald Lee | M | A | 51 | Unknown |
| Temple | Tommie | M | A | 68 | Orleans |
| Thibodeaux | Emma | F | C | 0 | St Tammany |
| Teno | Joseph | M | A | 62 | Orleans |
| Thomas | Earl | M | A | 87 | Orleans |
| Thomas | Meddie | M | A | 61 | Orleans |
| Thomas | Rodney | M | A | 82 | Orleans |
| Thomas | Shelly | M | A | 52 | Orleans |
| Thomason | Michael | M | C | 51 | St Bernard |
| Thomopolous | Donna | F | C | 62 | St Bernard |
| Thompson | Charles | M | A | 58 | Orleans |
| Thompson | Minnie | F | C | 80 | Orleans |
| Thornton | Lillie | F | A | 99 | Orleans |
| Thrift | Carl | M | A | 57 | Orleans |
| Tidwell | Rosalie | F | C | 83 | Orleans |
| Tidwell | Roy | F | C | 82 | Orleans |
| Tobias | Daisy | F | A | 53 | Orleans |
| Torrence | George | M | C | 43 | St Bernard |
| Toups | Alice | F | C | 82 | Orleans |
| Toups | Beulah | F | C | 94 | Jefferson |
| Name withheld at the family's request. | | M | C | 92 | Orleans |
| Tran | Hong | M | AP | 71 | Orleans |
| Trentecosta | Mary | F | C | 77 | St Bernard |
| Turner | Ebert | M | A | 74 | Orleans |
| Turner | John | M | C | 63 | Orleans |
| Turner | Meaher | M | C | 85 | Orleans |
| Ulmer | James | M | A | 70 | Orleans |
| Urquhart | Anna | F | C | 75 | Orleans |
| Valteau | Wendell | M | A | 58 | Orleans |
| Varnado | Aden | F | A | 74 | Orleans |
| Varnado | Willa Mae | F | A | 67 | Orleans |
| Vaughn | Pamela | F | A | 53 | Orleans |
| Veal | Mable | F | A | 74 | Orleans |
| Venison | Lee | M | A | 65 | Orleans |
| Verret | Almeda | F | C | 73 | St Bernard |
| Vidrios | Inez | F | C | 81 | St Bernard |
| Wagner | Mary | F | C | 94 | Orleans |
| Walker | Shirley | F | C | 65 | Orleans |
| Walker | Willie | M | A | 78 | Orleans |
| Waller | Genevieve | F | C | 48 | Jefferson |
| Warden | Rita | F | C | 83 | Orleans |
| Warren | James | M | A | 67 | Orleans |
| Washington | Celina | F | A | 70 | Orleans |
| Washington | James | M | A | 60 | Orleans |
| Washington | Rita | F | A | 82 | Orleans |
| Watson | Iretha | F | A | 89 | Orleans |
| Watson | Monroe | M | A | 69 | Orleans |
| Watts | Wilbur | M | C | 84 | Orleans |
| Weathers | James | M | C | 29 | Orleans |
| Weathersby | Mary | F | A | 96 | Orleans |

16

| Weathersby | Maurice | M | A | 50 | Orleans |
|---|---|---|---|---|---|
| Weaver | James | M | C | 83 | Orleans |
| Webster | Phyllis | F | A | 60 | Orleans |
| Webster | Thomas | M | A | 77 | Orleans |
| Wesley | Harrison | M | A | 92 | Orleans |
| White | Helen | F | A | 54 | Orleans |
| Wickem | Joan | F | A | 60 | Jefferson |
| Wilder | James | M | A | 72 | Orleans |
| Williams | Audrey | F | A | 71 | Orleans |
| Williams | Clarence | M | A | 56 | Orleans |
| Williams | David | M | A | 74 | Orleans |
| Williams | George | M | A | 77 | Orleans |
| Williams | Joseph | M | A | 73 | Orleans |
| Williams | Lawrence | M | A | 56 | Orleans |
| Williams | Lionel | M | A | 49 | Orleans |
| Williams Jr | Paul | M | A | 60 | Orleans |
| Williams | Rosetta | F | A | 79 | Orleans |
| Williams | Roy | M | A | 19 | Orleans |
| Williams | Walter | M | A | 61 | Orleans |
| Williams | Yolanda | F | A | 50 | Orleans |
| Wilson | Madge | F | A | 83 | Orleans |
| Wilson | Raymond | M | A | 63 | Orleans |
| Wimberly | Hattie | F | A | 65 | Orleans |
| Woods | Alphonse | M | A | 77 | Orleans |
| Woods | Samuel | M | A | 72 | Orleans |
| Wright | Joseph | M | C | 89 | Orleans |
| Young | Elzie | M | A | 80 | Orleans |
| Young | Gloria | F | C | 79 | St Bernard |
| Young | John | M | A | 44 | Orleans |
| Young | Lynus | M | C | 85 | Orleans |
| Young | Robert | M | A | 85 | Orleans |
| Youngblood | Carolyn | F | A | 42 | Orleans |
| Zumpe | Walter | M | C | 85 | Orleans |

-end-