does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to a person eligible to receive any benefits required to be provided or voluntarily provided by an **insured** under a workers' compensation, non-occupational disability, or occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy is also an insured under a nuclear energy liability policy or would be an insured but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors.

3. Coverage M does not apply to **bodily injury**:

a. to a **residence employee** if it occurs off the **insured location** and does not arise out of or in the course of the **residence employee's** employment by an **insured**;

b. to a person eligible to receive any benefits required to be provided or voluntarily provided under any workers' compensation, non-occupational disability or occupational disease law;

c. from nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these;

d. to a person other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

# SECTION II - CONDITIONS

1. **Limit of Liability**. The Coverage L limit is shown in the **Declarations**. This is our limit for all damages from each **occurrence** regardless of the number of **insureds**, claims made or persons injured.

The Coverage M limit is shown in the **Declarations**. This is our limit for all medical expense for **bodily injury** to one person as the result of one accident.

2. **Severability of Insurance**. This insurance applies separately to each **insured**. This condition shall not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss**. In case of an accident or **occurrence**, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

a. give written notice to us or our agent as soon as practicable, which sets forth:

(1) the identity of this policy and **insured**;

(2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

(3) names and addresses of any claimants and available witnesses;

b. immediately forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

c. at our request, assist in:

(1) making settlement;

(2) the enforcement of any right of contribution or indemnity against a person or organization who may be liable to an **insured**;

(3) the conduct of suits and attend hearings and trials; and

(4) securing and giving evidence and obtaining the attendance of witnesses;

d. under the coverage - **Damage to Property of Others**, exhibit the damaged property if within the **insured's** control; and

e. the **insured** shall not, except at the **insured's** own cost, voluntarily make payments, assume obligations or incur expenses. This does not apply to expense for first aid to others at the time of the **bodily injury**.

FP-7955

4. **Duties of an Injured Person - Coverage M**. The injured person, or, when appropriate, someone acting on behalf of that person, shall:

   a. give us written proof of claim, under oath if required, as soon as practicable;

   b. execute authorization to allow us to obtain copies of medical reports and records; and

   c. submit to physical examination by a physician selected by us when and as often as we reasonably require.

5. **Payment of Claim - Coverage M**. Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us**. No action shall be brought against us unless there has been compliance with the policy provisions.

   No one shall have the right to join us as a party to an action against an **insured**. Further, no action with respect to Coverage L shall be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured**. Bankruptcy or insolvency of an **insured** shall not relieve us of our obligation under this policy.

8. **Other Insurance - Coverage L**. This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND SECTION II - CONDITIONS

1. **Policy Period**. This policy applies only to loss under Section I or **bodily injury** or **property damage** under Section II which occurs during the period this policy is in effect.

2. **Concealment or Fraud**. This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

3. **Liberalization Clause**. If we adopt any revision which would broaden coverage under this policy without additional premium, within 60 days prior to or during the period this policy is in effect, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions**. A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination shall not waive any of our rights.

5. **Cancellation**.

   a. You may cancel this policy at any time by notifying us in writing of the date cancellation is to take effect. We may waive the requirement that the notice be in writing by confirming the date and time of cancellation to you in writing.

   b. We may cancel this policy only for the reasons stated in this condition. We will notify you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. Proof of mailing shall be sufficient proof of notice:

      (1) When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect. This condition applies whether the premium is payable to us or our agent or under any finance or credit plan.

      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason. We may cancel by notifying you at least 10 days before the date cancellation takes effect.

      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

         (a) if there has been a material misrepresentation of fact which, if known to us, would have caused us not to issue this policy; or

FP-7955

(b) if the risk has changed substantially since the policy was issued.

We may cancel this policy by notifying you at least 30 days before the date cancellation takes effect.

(4) When this policy is written for a period longer than one year, we may cancel for any reason at anniversary. We may cancel by notifying you at least 30 days before the date cancellation takes effect.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded. When you request cancellation, the return premium will be based on our rules for such cancellation. The return premium may be less than a full pro rata refund. When we cancel, the return premium will be pro rata.

d. The return premium may not be refunded with the notice of cancellation or when the policy is returned to us. In such cases, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Nonrenewal**. We may elect not to renew this policy. If we elect not to renew, a written notice will be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. The notice will be mailed or delivered at least 30 days before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

7. **Assignment**. Assignment of this policy shall not be valid unless we give our written consent.

8. **Subrogation**. An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** shall:

a. sign and deliver all related papers;

b. cooperate with us in a reasonable manner; and

c. do nothing after a loss to prejudice such rights.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death**. If any person shown in the **Declarations** or the spouse, if a resident of the same household, dies:

a. we insure the legal representative of the deceased. This condition applies only with respect to the premises and property of the deceased covered under this policy at the time of death;

b. **insured** includes:

(1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

10. **Conformity to State Law**. When a policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State will apply.

## OPTIONAL POLICY PROVISIONS

Each Optional Policy Provision applies only as shown in the **Declarations** and is subject to all the terms, provisions, exclusions and conditions of this policy.

**Option AI - Additional Insured**. The definition of **insured** is extended to include the person or organization shown in the **Declarations** as an Additional Insured or whose name is on file with us. Coverage is with respect to:

1. Section I - Coverage A; or

2. Section II - Coverages L and M but only with respect to the **residence premises**. This coverage does not apply to **bodily injury** to an employee arising out of or in the course of the employee's employment by the person or organization.

This option applies only with respect to the location shown in the **Declarations**.

**Option BP - Business Property**. The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item b., for property used or intended for use in a **business**,

FP-7955

including merchandise held as samples or for sale or for delivery after sale, is changed as follows:

The $1,000 limit is replaced with the amount shown in the **Declarations** for this option.

**Option BU - Business Pursuits. SECTION II - EXCLU-SIONS**, item 1.b. is modified as follows:

1. Section II coverage applies to the **business** pursuits of an **insured** who is a:

   a. clerical office employee, salesperson, collector, messenger; or

   b. teacher (except college, university and professional athletic coaches), school principal or school administrator;

   while acting within the scope of the above listed occupations.

2. However, no coverage is provided:

   a. for **bodily injury** or **property damage** arising out of a **business** owned or financially controlled by the **insured** or by a partnership of which the **insured** is a partner or member;

   b. for **bodily injury** or **property damage** arising out of the rendering of or failure to render professional services of any nature (other than teaching or school administration). This exclusion includes but is not limited to:

      (1) computer programming, architectural, engineering or industrial design services;

      (2) medical, surgical, dental or other services or treatment conducive to the health of persons or animals; and

      (3) beauty or barber services or treatment;

   c. for **bodily injury** to a fellow employee of the **insured** injured in the course of employment; or

   d. when the **insured** is a member of the faculty or teaching staff of a school or college:

      (1) for **bodily injury** or **property damage** arising out of the maintenance, use, loading or un-loading of:

(a) draft or saddle animals, including vehicles for use with them; or

(b) aircraft, **motor vehicles**, recreational motor vehicles or watercraft, airboats, air cushions or personal watercraft which use a water jet pump powered by an internal combustion engine as the primary source of propulsion;

owned or operated, or hired by or for the **insured** or employer of the **insured** or used by the **insured** for the purpose of instruction in the use thereof; or

      (2) under Coverage M for **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured**.

**Option FA - Firearms.** Firearms are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown, wear and tear, gradual deterioration;

   b. insects or vermin;

   c. any process of refinishing, renovating, or repairing;

   d. dampness of atmosphere or extremes of temperatures;

   e. inherent defect or faulty manufacture;

   f. rust, fouling or explosion of firearms;

   g. breakage, marring, scratching, tearing or denting unless caused by fire, thieves or accidents to conveyances; or

   h. infidelity of an **insured's** employees or persons to whom the insured property may be entrusted or rented;

2. our limit for loss by any Coverage B peril except theft is the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

3. our limits for loss by theft are those shown in the **Declarations** for this option. These limits apply in lieu of the Coverage B theft limit; and

4. our limits for loss by any covered peril except those in items 2. and 3. are those shown in the **Declarations**.

**Option HC - Home Computer.** The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item i., for electronic data processing system equipment and the recording or storage media used with that equipment is increased to be the amount shown in the **Declarations** for this option.

**Option ID - Increased Dwelling Limit.** We will settle losses to damaged building structures covered under **COVERAGE A - DWELLING** according to the **SECTION I - LOSS SETTLEMENT** provision shown in the **Declarations**.

If the amount you actually and necessarily spend to repair or replace damaged building structures exceeds the applicable limit of liability shown in the **Declarations**, we will pay the additional amounts not to exceed:

1. the Option ID limit of liability shown in the **Declarations** to repair or replace the Dwelling; or

2. 10% of the Option ID limit of liability to repair or replace building structures covered under **COVERAGE A - DWELLING, Dwelling Extension.**

**Report Increased Values.** You must notify us within 90 days of the start of any new building structure costing $5,000 or more; or any additions to or remodeling of building structures which increase their values by $5,000 or more. You must pay any additional premium due for the increased value. We will not pay more than the applicable limit of liability shown in the **Declarations**, if you fail to notify us of the increased value within 90 days.

**Option IO - Incidental Business.** The coverage provided by this option applies only to that incidental **business** occupancy on file with us.

1. **COVERAGE A - DWELLING, Dwelling Extension**, item 2.b. is deleted.

2. **COVERAGE B - PERSONAL PROPERTY** is extended to include equipment, supplies and furnishings usual and incidental to this **business** occupancy. This Optional Policy Provision does not include electronic data processing system equipment or the recording or storage media used with that equipment or merchandise held as samples or for sale or for delivery after sale.

The Option IO limits are shown in the **Declarations**. The first limit applies to property on the **residence premises**. The second limit applies to property while off the **residence premises**. These limits are in addition to the **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability** on property used or intended for use in a **business**.

3. Under Section II, the **residence premises** is not considered **business** property because an **insured** occupies a part of it as an incidental **business**.

4. **SECTION II - EXCLUSIONS**, item item 1.b. of Coverage L and Coverage M is replaced with the following:

   b. **bodily injury** or **property damage** arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply:

   (1) to activities which are ordinarily incident to non-**business** pursuits or to **business** pursuits of an **insured** which are necessary or incidental to the use of the **residence premises** as an incidental **business**;

   (2) with respect to Coverage L to the occasional or part-time **business** pursuits of an **insured** who is under 19 years of age;

   (3) to the rental or holding for rental of a residence of yours:

      (a) on an occasional basis for exclusive use as a residence;

      (b) in part, unless intended for use as a residence by more than two roomers or boarders; or

      (c) in part, as an incidental **business** or private garage;

   (4) when the dwelling on the **residence premises** is a two family dwelling and you occupy

FP-7955

one part and rent or hold for rental the other part; or

  (5) to farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

5. This insurance does not apply to:

  a. **bodily injury** to an employee of an **insured** arising out of the **residence premises** as an incidental **business** other than to a **residence employee** while engaged in the employee's employment by an **insured;**

  b. **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured;**

  c. liability arising out of any acts, errors or omissions of an **insured**, or any other person for whose acts an **insured** is liable, resulting from the preparation or approval of data, plans, designs, opinions, reports, programs, specifications, supervisory inspections or engineering services in the conduct of an **insured's** incidental **business** involving data processing, computer consulting or computer programming; or

  d. any claim made or suit brought against any **insured** by:

    (1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:

      (a) any **insured;**

      (b) any employee of any **insured;** or

      (c) any other person actually or apparently acting on behalf of any **insured;** or

    (2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:

      (a) any **insured;**

      (b) any employee of any **insured;** or

      (c) any other person actually or apparently acting on behalf of any **insured.**

    Coverage M does not apply to any person indicated in (1) and (2) above.

    This exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age.

**Option JF - Jewelry and Furs.** Jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones, gold other than goldware, silver other than silverware and platinum are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

  1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

    a. mechanical breakdown, wear and tear, gradual deterioration;

    b. insects or vermin;

    c. inherent vice; or

    d. seizure or destruction under quarantine or customs regulations;

  2. our limit for loss by any Coverage B peril except theft the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

  3. our limits for loss by theft are those shown in the **Declarations** for this option; and

  4. our limits for loss by any covered peril except those items 2. and 3. are those shown in the **Declarations** for this option.

FP-79

**Option OL - Building Ordinance or Law.**

1. **Coverage Provided.**

The total limit of insurance provided by this Building Ordinance or Law provision will not exceed an amount equal to the Option OL percentage shown in the **Declarations** of the Coverage A limit shown in the **Declarations** at the time of the loss, as adjusted by the inflation coverage provisions of the policy. This is an additional amount of insurance and applies only to the dwelling.

2. **Damaged Portions of Dwelling.**

When the dwelling covered under **COVERAGE A - DWELLING** is damaged by a Loss Insured we will pay for the increased cost to repair or rebuild the physically damaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.

3. **Undamaged Portions of Damaged Dwelling.**

When the dwelling covered under **COVERAGE A - DWELLING** is damaged by a Loss Insured we will also pay for:

a. the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs; and

b. loss to the undamaged portion of the dwelling caused by enforcement of any ordinance or law if:

(1) the enforcement is directly caused by the same Loss Insured;

(2) the enforcement requires the demolition of portions of the same dwelling not damaged by the same Loss Insured;

(3) the ordinance or law regulates the construction or repair of the dwelling, or establishes zoning or land use requirements at the described premises; and

(4) the ordinance or law is in force at the time of the occurrence of the same Loss Insured; or

c. the legally required changes to the undamaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.

4. **Building Ordinance or Law Coverage Limitations.**

a. We will not pay for any increased cost of construction under this coverage:

(1) until the dwelling is actually repaired or replaced at the same or another premises in the same general vicinity; and

(2) unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years.

b. We will not pay more for loss to the undamaged portion of the dwelling caused by the enforcement of any ordinance or law than:

(1) the depreciated value of the undamaged portion of the dwelling, if the dwelling is not repaired or replaced;

(2) the amount you actually spend to replace the undamaged portion of the dwelling if the dwelling is repaired or replaced.

c. We will not pay more under this coverage than the amount you actually spend:

(1) for the increased cost to repair or rebuild the dwelling at the same or another premises in the same general vicinity if relocation is required by ordinance or law; and

(2) to demolish and clear the site of the undamaged portions of the dwelling caused by enforcement of building, zoning or land use ordinance or law.

FP-7955

We will never pay for more than a dwelling of the same height, floor area and style on the same or similar premises as the dwelling, subject to the limit provided in paragraph 1. **Coverage Provided** of this option.

**Option SG - Silverware and Goldware Theft.** The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item h., for theft of silverware and goldware is increased to be the amount shown in the **Declarations** for this option.

IN WITNESS WHEREOF, this Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois.

*Kim M. Brunner*                    Secretary                    *Edward B Rust Jr*                    President

The Board of Directors, in accordance with Article VI(c) of this Company's Articles of Incorporation, may from time to time distribute equitably to the holders of the participating policies issued by said Company such sums out of its earnings as in its judgment are proper.

25

FP-7955

**CURRENT TOPICS IN FEDERAL SUBJECT MATTER JURISDICTION
BASED ON DIVERSITY OF CITIZENSHIP:
"MINIMAL DIVERSITY", THE CURRENT MEANING OF
*ERIE RAILROAD v. TOMPKINS* AND RELATED ISSUES**

**H. Alston Johnson**
**Member of the Louisiana Bar**
**Adjunct Professor of Law, Louisiana State University**
**Partner, Phelps Dunbar LLP**

**Summer School for Lawyers**
**Louisiana State Bar Association**
**Sandestin, Florida**
**June 7, 2006**

Way, way back in time when we were mere law students, we all learned certain immutable principles about federal subject matter jurisdiction based on diversity of citizenship. One of the most fundamental principles was that "diversity" in the statutory implementation of Article III's general statement of the judicial power of the United States[1] meant "complete diversity," *i.e.,* that **all** of the plaintiffs must be of diverse citizenship from **all** of the defendants. The opinion in *Strawbridge v. Curtiss*[2] is usually credited (or blamed) with this interpretation of the provision of the Judiciary Act of 1789[3] that contained the initial statute on the diversity jurisdiction of the federal courts.

---

[1] In pertinent part, Article III, Section 2 of the United States Constitution provides very simply that the judicial power of the United States "shall extend . . . to controversies between citizens of different states . . . ." Some authorities have contended that this is a constitutional mandate for "complete diversity." *See* McGovney, *A Supreme Court Fiction: Corporations in the Diverse Citizenship Jurisdiction of the Federal Courts,* 56 Harv. L. Rev. 853, 1090, 1103-11 (1943). But this seems to stretch the simple language beyond its plain meaning.

[2] 7 U. S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

[3] Section 11 of the Judiciary Act of 1789, 1 Stat. 79, authorized the exercise of jurisdiction when the "matter in dispute" exceeded the sum of $500 and (1) an alien was a party or (2) the suit was between a citizen of the state where the action was brought and a citizen of another state. In other words, statutory subject matter jurisdiction based on diversity of citizenship was considerably more limited than the constitutional reach of judicial power, and in fact, where fellow citizens were concerned, only extended to disputes between a citizen of the forum state and a citizen of a diverse state.

DEFENDANT'S EXHIBIT B

That opinion itself, even more cryptic than the customary Chief Justice Marshall opinion, consisted of four short paragraphs.  The gist of the opinion is in the third paragraph, in which the court refers to the statutory language and observes that it "understands these expressions to mean, that each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued in the federal courts" and that "where the interest is joint, each of the persons concerned in that interest must be competent to sue, or liable to be sued, in those courts." *Strawbridge* itself involved a suit by co-executors as the plaintiffs, one of whom was of the same citizenship as several of the defendants.  Apparently, under the prevailing law governing procedural capacity, neither executor could sue without the other joining as a plaintiff, so their interest could truly be called "joint"—almost the equivalent of having one plaintiff with "dual" citizenship.

An extension of the holding in that case, concerning as it did an interest held jointly by two individuals, to cases in which there were multiple individuals but arguably none holding a "joint" interest, was not inexorable.  Justice Marshall seemed to indicate as much in the fourth paragraph of the opinion, in which he said that the court "does not mean to give an opinion in the case where several parties represent several distinct interests, and some of those parties are, and others are not, competent to sue, or liable to be sued in the courts of the United States." Be that as it may, the "rule" of complete diversity took hold and persisted as the statutory grant of diversity jurisdiction morphed into its modern wording.

We also learned as young legal scholars that although Article III did not announce any monetary threshold before the judicial power over controversies involving diverse citizens could be exercised, Congress has always imposed such a threshold—a sort of "gravitas" measurement

before the federal judicial system could be bothered with a dispute.   It began at a sum in excess of $500 and has gradually risen over the years to a sum in excess of $75,000.

We also were taught on the basis of the opinion in *Erie Railroad Co. v. Tompkins*[4] many decades later that when a federal district court is exercising diversity subject matter jurisdiction, there is no "general federal common law"[5] to provide the substantive rule of decision   The district court must use as its rule of decision on substantive law issues the rule that would be applied by the highest court of the state in which it sits.[6]  In time, we learned that *Erie* apparently required that the federal court apply state statutes of limitation when sitting in diversity jurisdiction[7] We also discovered that the Federal Rules of Evidence—no doubt driven by *Erie*— specified that state rules of privilege in evidentiary matters  governed in diversity cases  where they differed from federal rules.[8]  But federal courts sitting in diversity were to apply their own purely procedural rules such as those outlining service of process[9] or imposing sanctions on counsel or parties for misconduct.[10]  We were told that these refinements were required because the "twin aims" of *Erie* (discouraging forum-shopping and avoiding "inequitable administration of the laws") were meant to assure that "the outcome of the litigation in the federal court should

---

[4] 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

[5] Although many years later, we found out in *Semtek International, Inc. v. Lockheed Martin Corp.*,  531 U.S. 497 (2001) that the res judicata effect of a federal court opinion—even when the court is exercising diversity jurisdiction—is determined by federal common law.  Federal common law might in most instances "borrow" state law on issue preclusion, but it would be federal common law that is determinative in the final analysis.

[6] The "would be applied" concept reflects the subsequent decision in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that *Erie* also required that a federal district court sitting in diversity use the choice-of-law methodology of the highest court of the state in which it sits.  Thus it is not quite accurate to say, as many do, that a federal district court is required to apply "the law of the state in which it sits."  Rather, it is required to apply the law that "would be applied" by the highest court of the state in which it sits, thus accounting for that state's choice-of-law methodology.

[7] *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

[8]  *See* Rule 501 of the Federal Rules of Evidence, announcing a general rule that the "principles of the common law" of evidence are to govern matters of evidentiary privilege in the federal courts but providing an exception when "State law supplies the rule of decision" in a case.  In that instance, "the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

[9] *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d  8 (1965).

[10] *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

3

be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."[11]  But, somewhat incongruously, we learned that an issue forbidden to be tried by jury in a state court might nonetheless be tried by jury in the federal court.[12]

And, as we all quickly realized, there was also a certain usually unspoken premise underlying diversity jurisdiction that somehow a state forum could not be trusted to provide the same evenhanded quality of justice as that which might be dispensed in a federal forum with a life-tenure Article III jurist.  This premise effectively meant that the dividing line between a state forum and a federal forum was fairly clear and well-defined; and if a defendant elected to use the device of removal, the federal court was fairly well obligated to exercise the subject  matter jurisdiction that had been given to it.

Well, unlearn some of this.  And be prepared perhaps to unlearn much of the rest of it.  The times, they are a-changin', and this basis of jurisdiction once called "historically the single most important grant of national court jurisdiction embodied in the [First Judiciary] Act"[13] is changing with them.  And with those changes under way, it is time to ask whether it makes sense for the consequences of *Erie* to remain the same, or whether there is a possibility that "general federal common law" might possibly enjoy a revival after being essentially banned from diversity jurisdiction cases seventy years ago in *Erie*.[14]  That is the theme of these remarks.

First, we should review the basics.  After decades of refusing to do anything to modify diversity jurisdiction and particularly the "complete diversity" concept of *Strawbridge v. Curtiss*,

---

[11] Frankfurter, J., in *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

[12] *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525 (1958).  But apparently control by appellate judges of jury awards in diversity cases should be governed by state law standards.  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996).

[13] Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49 (1923).

[14] It should not pass without mention that in *Erie*, the Supreme Court essentially accused itself of having been engaged in an unconstitutional process in using "federal general common law" as substantive rules of decision in diversity cases.  This of course should prompt the question whether Congress and the Supreme Court may constitutionally require—albeit indirectly—the application of federal general common law in "minimal diversity" cases that it now authorizes to be heard in federal court.

the Congress in 2002 enacted a concept which had apparently been floating around since the late 1970s: "minimal diversity" jurisdiction and a determination of "gravitas" sufficient to justify federal subject matter jurisdiction other than a sum of money. The so-called Multiparty, Multiforum Trial Jurisdiction Act of 2002 now appears in 28 U.S.C. §1369 and §1441(e). Section 1369(a) declares that a federal district court has original jurisdiction of any civil action "involving minimal diversity" (as subsequently defined) that "arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location"[15] if any one of three circumstances is established. The first of these is that a defendant resides in a given state and a "substantial part of the accident" took place outside the state, regardless of whether that defendant is also a resident of the state where a substantial part of the accident took place.[16] The second is that any two defendants reside in different states, regardless of whether such defendants are also residents of the same state. And the third is that substantial parts of the accident took place in different states. Under the statute, the "minimal diversity" upon which such a cause of action may be based exists between adverse parties "if **any** party is a citizen of a State and **any** adverse party is a citizen of another State" or of a foreign state or actually is a foreign state.[17]

---

[15] At an earlier state in the long legislative process that led to the enactment of the MMTJA, the measurement of the **gravity** of the incident sufficient to justify the exercise of federal subject matter jurisdiction based on minimal diversity was whether at least 25 people died or were injured. *See* Offenbacher, *The Multiparty, Multiforum Trial Jurisdiction Act: Opening the Door to Class Action Reform,* 23 The Review of Litigation 177, 190 (2004). This explains the inclusion in the act as passed in 2002 of a definition of "injury," which no longer has any relevance to anything in the Act, since the word "injury" is not used anywhere except in the definition of the term. *See* Adornett, *The Station Nightclub Fire and Federal Jurisdictional Reach: The Multidistrict, Multiparty, Multiforum Jurisdiction Act of 2002,* 25 W. New England L. Rev., 243, 248-49 (2003). By the time of final passage, the Act had been narrowed so that jurisdiction was granted only when at least 75 people died, no matter how many might have been injured.

[16] In this first circumstance and in the second, it should be noted that residency rather than citizenship is the term used in the statute.

[17] 28 U.S.C. §1369(c)(1) (emphasis supplied). In turn, a corporation is deemed to be a citizen of any state in which it is incorporated or has its principal place of business, and is deemed to be a "resident" of any state in which it is incorporated or licensed to do business or is doing business. 28 U.S.C. §1369(c)(2).

BR.437631.1

The term "accident" in the statute is given a fateful definition.  It is said to mean a "sudden accident, or a natural event culminating in an accident, that results in death incurred at a discrete location by at least 75 natural persons . . . ."[18]  Think Hurricane Katrina.[19]  An "accident" as statutorily defined takes the place of a sum of money as the measure of sufficient "gravitas" or importance to justify a federal forum.  Assuming the requisites of the jurisdictional statute are otherwise satisfied, jurisdiction is not based upon an "amount in dispute" in excess of $75,000.  Rather it is based upon whether the accident in question resulted in "at least 75 deaths at a discrete location."[20]  But—very significantly—once a statutorily-defined "accident" has occurred and has resulted in "at least 75 deaths at a discrete location," the federal court's jurisdiction vests even though the claim is not for the deaths, nor even for personal injuries that did not result in death.  The statute says simply that the jurisdiction is over "any civil action . . . that arises from a single accident" in which the requisite number of deaths has occurred.

The early commentators are unanimous in concluding that this language means exactly what it says.[21]  Indeed, one commentator presciently observed that "a contract suit against or between insurers regarding coverage related to a qualifying accident could come into federal

---

[18] 28 U.S.C. § 1369(c)(4).

[19] Commentators are in agreement that the MMTJA is not limited to an airplane crash, a train derailment or a 9/11 catastrophe.  *See* Offenbacher, *The Multiparty, Multiforum Trial Jurisdiction Act: Opening the Door to Class Action Reform*, 23 The Review of Litigation 177, 192 (2004): "Congress included the 'natural event' language to encompass events caused by natural forces over time, such as long-term flooding or shifting foundations, even if they are not sudden."  *And see* Raforth, *Congress and the Multiparty, Multiforum Trial Jurisdiction Act of 2002: Meaningful Reform or a Comedy of Errors*, 54 Duke L. J. 255, 263 (2004): "Additionally, the explicit inclusion of accidents resulting from natural disasters indicates that Congress was more concerned with accident characteristics likely to affect subsequent litigation than with the nature of the causes behind covered accidents."

[20] The term "discrete location" is not defined.  There would be a plausible argument that the term should be interpreted narrowly.  In *Passa v. Derderian*, 308 F.Supp.2d 43 (D.R.I. 2004), the term was easily satisfied because more than 100 deaths occurred in a nightclub.  But the statute itself belies such an interpretation.  One of the grounds for jurisdiction is "if substantial parts of the accident took place in different States."  It seems then that a "discrete location" might actually include several states.  The term likely refers to a causal determination rather than geographic.  Moreover, the statute actually speaks in terms of the **deaths** occurring at a discrete location, not the accident or natural event.

[21] *See* Offenbacher, *supra* note 14, at 193-194: "Aside from the estates of the seventy-five killed, the statute allows injured parties and people who suffered property damage to file suit as an original matter, as long as they have minimal diversity and their injuries arises from the requisite accident."  *And see* Andomett, *supra* note 14, at 248 and Raforth, *supra* note 18, at 263.

6

court under section 1369 even absent the kinds of common issues that arise when multiple victims bring separate suits."[22]  Think suits by Louisiana homeowners against in-state and out-of-state insurers relative to whether property damage during Hurricane Katrina is covered or not. The only reported opinion interpreting 28 U.S.C. §1369, *Passa v. Derderian,*[23] extended subject matter jurisdiction to claims involving death, personal injury, property damage and even the preservation of evidence.  In one Louisiana putative class action brought by homeowners against in-state and out-of-state insurers involving post-Katrina insurance coverage issues, a federal district judge has recently held that there is subject matter jurisdiction under 28 U.S.C. §1369.[24]

Under another section of the MMTJA now appearing as 28 U.S.C. §1441(e), a defendant is also given the right to remove a case which could have been brought under 28 U.S.C. §1369.[25] Because the right is given to "a defendant in a civil action" and not to "the defendant or the defendants" as in the general removal provisions in 28 U.S.C. §1441(a), the concurrence of other defendants to a removal under 28 U.S.C. §1441(e) is not required.   And the fact that the removing defendant is a forum-state defendant otherwise forbidden to remove a diversity case under 28 U.S.C. §1441(b) is also of no consequence, since 28 U.S.C. §1441(e) begins with the phrase "[n]otwithstanding the provisions of subsection (b) of this section . . . ."  And finally— and once more, a matter of some importance—a defendant in a pending action under 28 U.S.C. §1369 may remove **other actions in state court** arising out of the same accident, "even if the

---

[22] Raforth, *supra* note 18, at 264.

[23] 308 F.Supp.2d 43 (D.R.I. 2004).

[24]  *Chehardy, et al.  v. Louisiana Commissioner of Insurance, et al.,*  Civil Action No. 05-CV-1140 (M.D. La., ruling of March 16, 2006) (case subsequently transferred to Eastern District).

[25]  Under 28 U.S.C. §1441(e)(5), an action that is removed on the basis that it could have been brought under 28 U.S.C. §1369 is deemed to come under the authority of 28 U.S.C. §1407 (transfers under the orders of the panel on multidistrict litigation), 28 U.S.C. §1697 (nationwide service of process) and 28 U.S.C. §1785 (nationwide service of subpoenas).

action to be removed could not have been brought in a district court as an original matter."[26]
This is a type of special supplemental jurisdiction[27] tucked away within a removal provision, to
implement the Congressional objective of consolidating in a federal forum all claims arising out
of an accident or natural event so serious as to have caused at least 75 deaths "at a discrete
location."[28]   An action removed under these provisions, however, also contains a species of
discretionary remand for calculation of damages once liability has been determined.[29]

As if all of this were not enough, a federal court is directed to abstain from exercising the
granted jurisdiction if "the substantial majority of all plaintiffs are citizens of a single State of
which the primary defendants are also citizens" and "the claims asserted will be governed
primarily by the laws of that State."[30]   While abstention is certainly a recognized concept in the

---

[26] 28 U.S.C. § 1441(e)(1)(B).  Even more startling, a defendant named in an action under 28 U.S.C. § 1369 after a state court action was initiated could still remove the state court action before its trial to federal court under 28 U.S.C. § 1441(e)(1) within thirty days of the initiation of the later court suit, or even "at a later time with leave of the [federal] district court."

[27] The fact that this supplemental jurisdiction does not find an explicit place in the general supplemental jurisdiction grant in 28 U.S.C. § 1367 is probably of no consequence.  Apart from the fact that the Congress is completely authorized to enact other bases of supplemental jurisdiction within Article III beyond that stated in 28 U.S.C. § 1367, the Supreme Court has on several occasions suggested that there are grounds for "ancillary jurisdiction" beyond the supplemental jurisdiction contained in 28 U.S.C. § 1367.  See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994); Peacock v. Thomas, 516 US. 349 (1996).

[28] The United States Fifth Circuit so held very recently in Wallace, et al. v. Louisiana Citizens Property Insurance Corporation, et al., No. 06-00009 (March 31, 2006), saying that Congress was "piggy-backing jurisdiction on the district court original jurisdiction" in another case under 28 U.S.C. § 1369.

[29] 28 U.S.C. § 1441(e)(2).  Curiously, 28 U.S.C. § 1369 itself does not contain such a possibility, perhaps in part because plaintiff has chosen a federal forum in the first instance for her litigation.  This species of remand contains a time delay, however.  The remand order is not effective for sixty days after the order determining liability is issued and the district court has "certified its intention" to remand the action for determination of damages by the state court.  During that sixty-day period, an appeal may be taken from the liability determination, and thus the remand is presumably ineffective until such an appeal is resolved.  Once the remand is effective, no further review of liability is permitted.  If the district court decides to enter such a remand-for-damages-determination order, its decision in that regard is "not reviewable by appeal or otherwise."  28 U.S.C. § 1441(e)(4).  This is consistent with the general treatment of remand orders based on "defects" in removal procedure. 28 U.S.C. § 1447(d).

[30] 28 U.S.C. § 1369(b).  The term "primary defendants" is not defined, and the absence of a definition is a glaring omission in the statute.  It is fair to ask whose choice-of-law principles will determine whether the claims asserted will be governed primarily by the laws of the state in which the substantial majority of all plaintiffs are citizens.  The call is to be made by the federal court, presumably.  Normally in diversity cases, it is directed to apply the choice-of-law methodology that the highest court of the state in which it sits would use.  See Klaxon, supra note 6.  But given that this is no longer complete diversity but minimal diversity, and given that the whole point of the exercise seems to be to interject a federal presence into litigation involving a large-scale disaster, should this issue be determined by "federal common law"?  In simpler terms, does Erie apply to minimal diversity cases, and in particular to this type of minimal diversity case?

BR.437631.1

federal judicial system, it is rare to find the concept codified in a statute.  This introduces an element of fuzziness in the exercise of jurisdiction which may prove to be nettlesome.

The MMTJA could include a class action, but it is not limited to class actions.  In theory, at least, it could apply to an action by a single plaintiff against two defendants, one of diverse citizenship from the plaintiff and one not—so long as the other requisites of the statute are satisfied.   More likely, many plaintiffs and many defendants would be involved in the typical suit which would fall under the MMTJA, and often certification of a class action would be sought.

But once the "minimal diversity" concept was accepted by Congress and once the measure of "gravitas" was freed from the $75,000 general jurisdictional amount requirement, there was considerable expectation that the proposed so-called "Class Action Fairness Act" might be next on the Congressional agenda.  Three more years would pass, however, until that legislation was finally enacted.  There were some familiar themes in the Class Action Fairness Act of 2005: minimal diversity (although the term itself was not used); a very substantial monetary measurement of "gravitas" sufficient to invoke federal subject matter jurisdiction; "primary defendants," still undefined; and mandatory abstention.  But there were some new themes as well: class actions were the exclusive focus of the legislation and "discretionary abstention" also made an appearance.  Just for good measure, "significant relief" and "significant basis" for the claims were tossed in.   Permit Hurricane Katrina to stir these ingredients vigorously, and a truly remarkable mixture appears.

The intricate details of the Class Action Fairness Act[31] (colloquially referred to as CAFA), now appearing as 28 U.S.C. §1332(d) with a companion removal provision under 28

---

[31] CAFA is specifically declared to be prospective only, applying to "any civil action commenced on or after the date of enactment of this Act," which was February 18, 2005.

U.S.C. §1453, are somewhat beyond the focus of these particular remarks.  But here is a very brief summary.  By adding a subsection to 28 U.S.C. §1332, CAFA grants federal subject matter jurisdiction over a class action as defined,[32] if the matter in controversy exceeds $5 million,[33] exclusive of interest and costs; and is a class action in which (a) **any member of** a class of plaintiffs is a citizen of a state different from **any defendant**; or (b) **any member** of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and **any defendant** is a citizen of a state; or (c) **any member** of a class of plaintiffs is a citizen of a state and **any defendant** is a foreign state or a citizen or subject of a foreign state.

Obviously, the first type of class action is the most common factual situation in which this new basis of subject matter jurisdiction will be invoked.  Notice that considering the citizenship of a class **member** rather than simply looking at the citizenship of the class representatives introduces the novel concept of measuring jurisdiction by the citizenship of a **non-party.**  Members of a class, as such, are not **parties** to the litigation once the class is certified.  One of the most important aspects of the class action device is that when the class is properly defined and certified, a judgment determines the rights of **non-parties** to the litigation (the class members) as well as parties.

CAFA then proceeds to establish discretionary and mandatory abstention grounds.  Reduced to its essence, the discretionary abstention provision states that the court may decline to exercise jurisdiction when more than a third of the class members but less than two thirds and the "primary defendants" are citizens of the forum state and certain other statutory considerations are

---

[32] The definition is in 28 U.S.C. §1332(d)(1)(B).  Certain types of class actions are specifically exempt from the Act, such as certain securities actions and corporate internal governance disputes.  *See* 28 U.S.C. §1332(d)(9).  Later provisions of the Act generally equate "mass actions" with "class actions."  28 U.S.C. §1332(d)(11)(B)(i).  Presumably this was thought to be necessary because some states, such as Mississippi, do not recognize class actions.

[33] Aggregation of the claims of all class members is specifically authorized to determine this sum.  28 U.S.C. §1332(d)(6).

BR.437631.1

present.[34]  The court must decline to exercise jurisdiction when more than two thirds of the class

members are citizens of the forum state and at least one defendant is also a citizen of that state,

"significant relief" is sought from that defendant and its conduct "forms a significant basis" for

the claims; and "principal injuries" resulting from the conduct of each defendant were incurred in

the forum state.[35]  In addition, the court is required to abstain if two thirds or more[36] of all class

members, and the "primary defendants" are citizens of the forum state.[37]

     In a separate part of the same Public Law enacting CAFA now appearing as 28 U.S.C.

§1453, Congress provided for removal of class actions without regard to several of the

longstanding restrictions on removal.  The one-year period for removal which has been a feature

of diversity removals for about the last fifteen years does not apply; the in-state defendant bar to

removal does not apply; and the consent of all defendants is not required.[38]  Moreover, the

prohibition against appellate review of remand orders found in 28 U.S.C. §1447(d) is

substantially modified by the statement that an appellate court "may accept an appeal from an

order of a district court granting or denying a motion to remand" such a class action "if

application is made to the court of appeals less than 7 days after entry of the order."[39]

     As the foregoing paragraphs imply, both the MMTJA and CAFA have been invoked very

recently by insurer defendants in putative class actions asserting under various theories that

Katrina-caused property damages should be covered by homeowners' insurance.  Suits initiated

---

[34] 28 U.S.C. § 1332(d)(3).

[35] 28 U.S.C. § 1332(d)(4)(A).

[36] Yes, that is not the same standard as the earlier "greater than two thirds."

[37] 28 U.S.C. § 1332(d)(4)(B).

[38] All of this is in 28 U.S.C. §1453(b).

[39] 28 U.S.C. §1453(c)(1).   The U. S. Fifth Circuit recently interpreted the permissive appeal portion of 28 U.S.C. §1453 to apply only to class actions under CAFA, although the wording of the provision does not expressly require that result.  *See Wallace, et al. v. Louisiana Citizens Property Insurance Corporation, et al.,* 06-00009, U.S. Fifth Circuit (March 31, 2006).  But the Fifth Circuit also held in *Wallace* that an appeal will lie from the granting of an order to remand following a removal under 28 U.S.C. §1441(e)(1)(B) of an MMTJA case as a "collateral order" sufficiently final to permit an appeal under 28 U.S.C. §1291, if the remand order was based on the abstention provisions of 28 U.S.C. §1369.

BR.437631.1

in state courts have been removed to federal courts, and the decisions of the federal judiciary in these matters will go a long way toward shaping the meaning of these two recent Congressional enactments. Since there are very few prior published opinions, it will fall to the Louisiana federal district judges and then the U. S. Fifth Circuit to sketch the general detail of the reach of these statutes. That process is already under way, and the results as of the time of preparation of this paper may be found in the margin.[40]

But interesting as that debate is, it too is beyond the theme of these particular remarks. The preamble to CAFA brings that theme into sharp focus. Preambles to legislation are fundamentally of no great value in pure statutory exegesis. Courts understandably prefer to interpret what the legislating body said, rather than to consult its pronouncement of why it found it necessary to speak at all. But the preamble to CAFA is probably important both to help us understand what Congress might say next and whether there is some reason for these most recent legislative changes in diversity jurisdiction to have a wider impact than might first be imagined.

In the preamble to CAFA, Congress declared that class actions are an important and valuable part of the legal system, but that in the past decade, there have been "abuses" of the device that have "harmed class members with legitimate claims and defendants that have acted responsibly." These "abuses" have "adversely affected interstate commence" and have "undermined public respect for our judicial system." Congress further declared that plaintiff

---

[40] As stated in previous footnotes, a motion to remand was denied in *Chehardy, et al. v. Louisiana Commissioner of Insurance, et al.*, 05-CV-1140 (M. D. 3/16/06). The removal had been based upon both CAFA and the MMTJA, and the court confirmed its subject matter jurisdiction under each. The court also concluded that it had subject matter jurisdiction under complete diversity principles, since the only named policyholder plaintiffs were insured by out-of-state insurers. A motion to remand was also recently denied in *Craddock, et al. v. Safeco Insurance Co.*, Civil Action No. 05-6365 (E.D.La.); the removal was primarily on the basis of CAFA. And in *Wallace, et al. v. Louisiana Citizens Property Ins. Corp., et al.*, 06-00009, the U. S. Fifth Circuit vacated an order of remand on March 31, 2006, in a case removed under 28 U.S.C. §1441(e)(1)(B), on the ground that the district judge had abstained under 28 U.S.C. §1369 when his jurisdiction was actually under 28 U.S.C. §1441(e)(1)(B), which did not permit abstention. Other removals—especially in Mississippi—on the basis of federal question jurisdiction under the National Flood Insurance Program have not fared as well.

BR.437631.1

class members have often received "little or no benefits from class actions," or are sometimes

harmed by them, because "counsel are awarded large fees, while leaving class members with

coupons or other awards of little or no value," "unjustified awards are made to certain plaintiffs

at the expense of other class members," and "confusing notices are published that prevent class

members from being able to fully understand the effectively exercise their rights." These abuses

are declared by the Congress to undermine the "national judicial system, the free flow of

interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the

United States Constitution" because "State and local courts" are "keeping cases of national

importance out of Federal court,"[41] "sometimes acting in ways that demonstrate bias against out-

of-State defendants" and "making judgments that impose their view of the law on other States

and bind the rights of the residents of those States." Now there is a lot in that preamble, no

matter what one thinks about the wisdom of the Act itself.

There would appear to be no doubt from this preamble and from the enactment of the

MMTJA and CAFA that Congress is expressing its disapproval of the treatment being given to

certain kinds of cases in the judicial systems of the respective states. This should probably come

as no surprise. But how far should one expect this expression of disapproval to extend? One of

the fundamental premises upon which *Erie* seems to rest is that "forum-shopping" is a substantial

evil that would be eliminated if the "result" to be obtained in a federal district court would be

more or less the same as that which would be obtained in a state court across the street. It is

sometimes said that with removal of a diversity case (or initial choice of a federal forum when

the state and federal systems have concurrent jurisdiction), one is only changing the judge and

---

[41] This expression seems somewhat disingenuous. It is crystal clear that state law cannot control or inhibit the privilege of removal granted by federal statute. *Chicago, R. I. & P. R. Co. v. Stude,* 346 U.S. 574, 74 S.Ct. 290 (1954). Federal law exclusively governs the grant of federal subject matter jurisdiction and the right of a defendant to remove a case. Thus it is something of a mystery how "State and local courts" might be "keeping cases of national importance out of Federal court."

13

the courtroom, not the law and the probable result. Yet here we have Congress almost expressly declaring that it **does** seek a different **result**, or at least some different rules of the game. Might this cause the United States Supreme Court one day to conclude in one of these "minimal diversity" cases that "federal common law" should return as the rule of decision rather than the substantive law of the state in which the federal district court sits?

Consider the following not-so-hypothetical situation. Suppose that individuals in the extreme southeastern part of Louisiana and the extreme southwestern part of Mississippi (on either side of the "second landfall" of Hurricane Katrina at the state line) who suffered property damage and personal injury from Hurricane Katrina bring suit in a federal district court sitting in Mississippi. Further suppose that the defendants include both quasi-governmental entities (say, the Corps of Engineers and FEMA, just to name a couple of random possibilities) and insurance companies, some diverse to all of the plaintiffs and some not. Assuming the other requisites of jurisdiction could be satisfied (in particular the notion of an accident "at a discrete location"[42]) the MMTJA would permit the exercise of federal subject matter jurisdiction over those claims.[43]

If this were an ordinary "complete diversity" subject matter jurisdiction case, the federal district court in Mississippi would be required by *Erie* and *Klaxon* to apply the substantive law that would be applied by the Mississippi Supreme Court to such an action if it had been filed in Mississippi state court. Presumably, that would lead the federal district court in Mississippi to consider Mississippi's choice of law methodology, which might possibly cause Louisiana substantive law to the claims of Louisiana domiciliaries and Mississippi substantive law to the

---

[42] *See* discussion in note 20, *supra*.
[43] This seems very apparent on a number of different grounds. Under 28 U.S.C. §1369(a)(1), a defendant could reside in one state and a "substantial part of the accident" might have taken place in another state. Or, under 28 U.S.C. §1369(a)(2), "any two defendants" might reside in different states. Or, under 28 U.S.C. §1369(a)(3), "substantial parts of the accident" might have taken place in different states. Any one of these situations can be the basis for subject matter jurisdiction under 28 U.S.C. §1369, so long as there as minimal diversity and at least 75 persons died.

BR.437631.1

claims of Mississippi domiciliaries (assuming the substantive laws of Mississippi and Louisiana were different).   The conventional wisdom would probably be that these "complete diversity" rules should be extended to "minimal diversity" cases as well.

But this result is not inexorable.  If it is "hard" to get into federal court in a "complete diversity" case, can this be taken to be some kind of statement of Congressional intent that any case short of "complete diversity" really "belongs" in state court and therefore it is only appropriate that even the few cases that successfully run the gauntlet of "complete diversity" and make it to federal court should be resolved by state substantive law?  And if that is true, can we now say that "minimal diversity" jurisdiction makes it "easier" to get into federal court and therefore perhaps Congress is telling us it is less important for state law to govern such cases?  Indeed, in the preamble to CAFA, what are we to make of the expressions that "abuses" of the class action device (presumably in state courts) have "undermined" the "national judicial system . . . and the concept of diversity jurisdiction as intended by the framers" of the Constitution?  And what does it mean to say that state courts are "making judgments that impose their view of the law on other States and bind the rights of the residents of those States"?   In our not-so-hypothetical case in the Mississippi federal district court, suppose that the court, following *Erie* and *Klaxon,* decides that Mississippi choice-of-law methodology would lead to the application of Mississippi substantive law to all of the pending claims before it?  Would that not be a "judgment" that imposed Mississippi's law "on other States" and bound "the rights of the residents of those States"?

Perhaps it is too early to tell what changes the acceptance of "minimal diversity" jurisdiction for the federal courts might make in this respect.  For one thing, we cannot now know whether Congress will expand the concept of "minimal diversity" into other grants of

BR.437631.1