

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 NOV 21  PM 4: 44

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | § § § § § § § § § § § | CIVIL ACTION<br>NO.  05-4182 "K" (2)<br>JUDGE DUVAL<br>MAG. WILKINSON |
| PERTAINS TO:<br><br>MRGO, *Reed*, No. 06-2152 | | |

## **MEMORANDUM SUBMITTED BY *REED* PLAINTIFFS IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (FED.R.CIV. 12(b)(1))**

MAY IT PLEASE THE COURT:

NOW COMES Phillip Reed, on behalf of himself and all others similarly situated, who is the plaintiff in Civil Action No. 06-2152 ("Plaintiff"), and respectfully submits this memorandum in opposition to the Motion to Dismiss for Lack of Subject Matter Jurisdiction (Fed.R.Civ.P. 12(b)(1)) filed by defendant, United States of America (the "Government").

___ Fee_____
___ Process_____
_X_ Dktd _____
_✓_ CtRmDep_____
___ Doc. No_____

## I.  **INTRODUCTION**.

*Reed* is a class action, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, to recover damages suffered by Plaintiffs and the Class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the Dredging Defendants' and the Government's maritime activities in the Mississippi River Gulf Outlet ("MRGO").

These maritime activities are described in the *Reed* Complaint where Plaintiffs allege that both the Government (using its own dredge) and the Dredging Defendants (using several vessels that have now been identified)1/ have dredged the MRGO: "Since 1993 the Corps of Engineers has dredged the MRGO using the Dredge Wheeler…. [which] is operated by the New Orleans District of the Corps of Engineers." Reed Complaint ¶ 15. "From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352, 636, 430 cubic yards of dredge material. Many of those contracts were awarded to the [Dredging] Defendants." Reed Complaint ¶ 16. "In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the [Dredging] Defendants dredged the following amounts of dredge material from the MRGO under contracts with Corps of Engineers: [the

---

1/ Hopper Dredges Newport and Bayport, Dredges Tom James, George D. Williams, II (a/k/a Geo D. Williams), Ouachita, Marion, Leonard M. Fisher, Everett Fisher, B. E. Lindholm, George D. Williams, BT 208 and Weeks 262, Spud Barge L-1101, Spud Barge L-1103, M/V Michael A and M/V Michael B.

amounts are then listed in a chart]." Dredging, of course, is a traditional maritime activity.

According to the *Reed* Complaint these <u>dredging</u> activities by the Government and the Dredging Defendants have had the following effects:

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes. Since the construction of the MRGO, several basic impacts on the region have become evident. These include wetland loss caused by excavation of the channel, soil erosion and shifts in habitat type because of increased salinity. The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh. More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered. Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, where the MRGO is perceived as a "superhighway for storm surge" because of the channel's susceptibility to inundation by tropical storms and hurricanes.

(Reed Complaint ¶ 8)

**Prior Knowledge of Potential Harmful Effects**

Before excavation of the MRGO, state and federal resource agencies expressed concern about the project's apparent lack of ecological consideration. Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat. Local concerns mounted as the project's "ecological footprint" expanded and economic benefits failed to emerge. Concerns expanded with a growing perception that the project had dramatically increased the region's vulnerability to

3

hurricanes and tropical storms. By the 1990's, the project was widely characterized as an environmental disaster, although adverse environmental impacts from the MRGO were evident as early as the late 1960's. In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.

(Reed Complaint ¶ 9)

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain. This combined water storage and braking action lowers flood heights and reduces erosion. The holding capacity of wetlands helps control floods. Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

(Reed Complaint ¶ 10)

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet. The sides of the original channel were at a 25 degree angle. Because the soft soils on the sides of the original channel would not stand up at such a steep angle, the soil began to slide or "slough-off" into the bottom of the channel. This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the

4

surface. This "sloughing-off" of the soft sides along the channel banks only partially explains why the MRGO's banks have eroded from 650 feet wide to over 2,000 feet wide today.

(Reed Complaint ¶ 11)

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug. This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks. The MRGO has thus created an environmental disaster. Tidal flows, and the wave action, suction, and propeller backwash from passing ships *and other marine vessels erode the soil from the MRGO channel* banks and it settles into the bottom of the channel.

(Reed Complaint ¶ 12)

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks which settles in the bottom of the channel impedes the movement of ships. In order to maintain *the depth of the channel to allow ships to pass, the Corps of* Engineers, using its own fleet of dredge vessels and through maritime dredging contracts with the other Defendants, continuously dredge soil from the bottom of the channel. The Corps of Engineers and all the Defendants use hopper dredges and other types of dredges, such as the Wheeler Dredge, the Newport Dredge, the Manhattan Island Dredge, the Eagle I Dredge, the Bayport Dredge, the Struyvesant Dredge, the Padre Island Dredge, the Ouachita Dredge, the McFarland Dredge and others, to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico. Some of the dredged soil is piled on spoil banks along the channel, but very little is used

5

beneficially to restore the wetlands the channel has destroyed.
In fact, piling of dredged soil along spoil banks causes further
damage to the wetlands behind the spoil banks.

(Reed Complaint ¶ 13)

The Corps of Engineers does not mitigate or compensate for the
damage it causes to the wetlands. Each year, the United States
of America pays the other Defendants, pursuant to maritime
dredging contracts, about $22 million to dredge the bottom of
the MRGO channel and dump the soil (originally from St.
Bernard Parish's wetlands) into the Gulf of Mexico. Making
matters worse, the Corps of Engineers and its subcontractors
(the other Defendants) do advance maintenance dredging to the
channel to a depth of 41 feet. With each dredging, the MRGO
channel grows wider and wider.

(Reed Complaint ¶ 14)

The jurisdictional allegations in the *Reed* Complaint are:

This Court has jurisdiction over this class action pursuant to (1)
28 U.S.C. § 1332(d)(2), as amended by the Class Action
Fairness Act of 2005, Pub. L. 109-2, because the matter in
controversy exceeds the sum or value of $5,000,000, exclusive
of interest and costs, and it is a class action brought by a citizen
of a State that is different from the State where at least one of
the Defendants is incorporated or does business; (2) the Suits in
Admiralty Act, 46 U.S.C. §§ 741-52, (in personam) because the
negligence of the United States of America arises out of its
maritime activities, connected to the construction, continuous
dredging and maintenance of the MRGO as a navigable channel,
and carried out by the United States of America's own fleet of
dredging vessels and by fleets of dredging vessels owned by the
other Defendants, pursuant to maritime dredging contracts
between them; (3) the Public Vessels Act, 46 U.S.C. §§ 781-90,
because this matter involves damage caused by one or more

6

public vessels of the United States of America (including the
Dredge Wheeler) which have conducted maritime dredging
operations for the construction and maintenance of the MRGO
during the past sixty years; and (4) 28 U.S.C. § 1331, because
some of the claims asserted herein arise under the laws of the
United States of America, including the Water Pollution Control
Act, 33 U.S.C. § § 1251, *et. seq.*

(Reed Complaint ¶ 4)

## II. ARGUMENT.

**A.**      **Standard applicable to Rule 12(c) motions.**

Federal courts have followed a fairly restrictive standard in ruling on motions for

judgment on the pleadings.  Federal Judges are unwilling to grant a motion under Rule 12(c)

unless the movant clearly establishes that no material issue of fact remains to be resolved and

that he is entitled to judgment as a matter of law.   Wright & Miller, *Federal Practice*

*Procedure, Civil 3d* § 1368.  As it is for a motion under Rule 12(b)(6), for purposes of a Rule

12(c) all of the well pleaded factual allegations in the adversary's pleadings are assumed to

be true and all contravening assertions in the movant's pleadings are taken to be false. *In re:*

*Complaint of Dann Marine Towing, L.C.*, 2004 WL 744881 (E.D. La. 2004); *Voest-Alpine*

*Trading USA Corp. v. Bank of China*, 142 F. 3d 887 (5th cir. 1998) (parties had not conducted

discovery); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th

Cir. 2002).

**B.**   **Plaintiffs have invoked the Public Vessel Act and the Suits in Admiralty Act as bases for jurisdiction and the Government's waiver of sovereign immunity.**

The Public Vessel Act, 46 U.S.C. app. § 781 ("PVA") states that "[a] libel *in personam* in admiralty may be brought against the United States… for damages caused by a pubic vessel of the United States…"  It allows recovery of personal and property damages "caused by a public vessel of the United States and subjects the United States to the same the same liability imposed under admiralty law upon private parties in the same or similar circumstances. *Coumou v. United States of America*, 107 F.3d 290, 294 (5th Cir. 1998).

The availability of a maritime remedy under the PVA brings the claim outside the Federal Tort Claim Act ("FTCA"), 28 U.S.C. § 2680(d). *American Stevedores, Inc. v. Porello*, 330 U.S. 446 (1947).

The consent to suit embodied in the PVA includes cases where actionable injury is caused by the conduct of the personnel or crew of a public vessel and not by the vessel itself. *Canadian Aviator, Ltd. V. United States*, 324 U.S. 215 (1945).

Moreover, the PVA contains no statutory requirement that claims be administratively exhausted before being filed in court.  46 U.S.C. app. § 781.

Here, Plaintiffs have invoked jurisdiction under the PVA for their claims against the Government arising out its operation of and damage caused by the Dredge Wheeler——— the only vessel owned and/or operated by the Government.  Therefore, the PVA provides a basis

8

of jurisdiction for Plaintiffs' claims against the Government.

Plaintiffs have also invoked jurisdiction under the suits in Admiralty Act ("SAA"), 46 U.S.C. app. § 742, for all other claims against the Government. These admiralty claims are for damage resulting from the dredging performed under the maritime dredging contracts between the Government and the Dredging Defendants. Pursuant to those contracts the Dredging Defendants dredged the MRGO at the Government's request. The 1960 amendments to the SAA were "intended to bring all admiralty claims against the United States within the ambit of the [Suits in Admiralty Act], whether or not involving government cargoes or vessel(s)." *Williams v. Central Gulf Lines*, 874 F.2d 1058, 1062 (5th Cir. 1989). Clearly the SAA provides jurisdiction and a waiver of the Government's sovereign immunity for these admiralty claims.

Moreover, since the SAA "contains no statutory requirement that claims be administratively exhausted before being filed in court" (*see, In the Matter of the Complaint of Ingram Barge Company*, Case No. 05-4372, Order, Docket No. 161, cited by the Government at p. 3 of its memorandum) (hereinafter "Judge Berrigan's Order"), Plaintiffs' claims have been properly filed in this Court without waiting for their administrative resolution.

9

**C.**   **There is no failure to exhaust administrative remedies under the Admiralty Extension Act because plaintiffs have not yet invoked jurisdiction thereunder.**

The Government' main argument is that even when jurisdiction is invoked under the PVA or the SAA, the Admiralty Extension Act ("AEA"), 46 U.S.C. app. § 740 requires that Plaintiffs first exhaust their administrative remedies, which they have not done. The Government is wrong.

First, the Government's motion is premature because Plaintiffs have not yet invoked jurisdiction under the AEA.

Second, the AEA provides that "[n]o suit shall be filed against the United States until there shall have expired a period of six months after the claim has been presented in writing to the Federal agency owning or operating the vessel causing the injury or damage." 46 U.S.C. app. § 740. However, in our case this requirement can only be directed to the injury or damage caused by the Dredge Wheeler, which is the only vessel owned or operated by a Federal agency (the Corps of Engineers). All the other vessels involved in dredging the MRGO (Hopper Dredges Newport and Bayport, Dredges Tom James, George D. Williams, II (a/k/a Geo D. Williams), Ouachita, Marion, Leonard M. Fisher, Everett Fisher, B. E. Lindholm, George D. Williams, BT 208 and Weeks 262, Spud Barge L-1101, Spud Barge L-1103, M/V Michael A and M/V Michael B.) are owned and/or operated by the Dredging Defendants, some of whom have filed limitation actions. Plaintiffs are not required to

exhaust any administrative remedies for the damage caused by those vessels because <u>there is</u> <u>no Federal agency that owned or operated these vessels to whom an administrative claim could have been presented</u>. Therefore, the AEA's administrative resolution requirement does not apply to the claims for the damage done by the vessels owned or operated by the Dredging Defendants.

Third, as acknowledged by the Government, Plaintiffs filed an administrative claim with the Corps of Engineers on June 9, 2006. The six-month period will run on December 9, 2006, at which time Plaintiffs will amend to invoke application of the AEA to the claims asserted under the PVA and SAA against the Government. This administrative claim will then satisfy the administrative exhaustion requirement of the AEA and the Government's motion will become moot prior to December 15, 2006, the date assigned for hearing on the Government's motion.

**D.    <u>The court has admiralty jurisdiction over the claims for damage caused by vessel dredging — a traditional maritime activity.</u>**

Plaintiffs have invoked the PVA and SAA as conferring jurisdiction over their claim against the Government for the damage caused by vessel dredging — — a traditional maritime activity. "Determining whether a claim arises under the SAA or FTCA involves application of a standard admiralty jurisdictional analysis, such as set forth in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995)"  Judge Berrigan's

Opinion at p. 4.

Judge Berrigan has already held that "barge-related" claims fall within the Court's admiralty jurisdiction. *See* Judge Berrigan's Opinion at pp. 5-7.  Moreover, Judge Berrigan held that claims made pursuant to the SAA under the Court's admiralty jurisdiction *do not require administrative exhaustion.*

Here, Plaintiffs have asserted claims under the SAA for the damage caused by <u>vessel</u> <u>dredging</u> — <u>a</u> <u>traditional</u> <u>maritime</u> <u>activity</u>.  These "dredge-related" claims *fall within the Court's admiralty jurisdiction and do not require administrative exhaustion.*

Plaintiffs have also asserted claims under the PVA (not involved in the case before Judge Berrigan) for the damage caused by the Government's own dredge.  Claims under the PVA *like those under the SAA do not require administrative exhaustion.* Therefore, none of the maritime claims asserted by Plaintiffs, under the SAA or the PVA, require administrative exhaustion.

Furthermore, as stated above, *Plaintiffs have not yet invoked jurisdiction under the* AEA.  This will be done on December 9, 2006, when the six-month administrative period runs.  At that point Plaintiffs' maritime claims will have a third basis for jurisdiction and the Government's motion will become moot.

The Government incorrectly states at page 3 of its memorandum that "[i]t has recently been held by Judge Berrigan that such a claim [as alleged in ¶ 4 of Plaintiffs' Complaint] fall

outside of this Court's admiralty jurisdiction…." This is not correct.

What Judge Berrigan held was that "[t]he <u>non-barge</u> <u>related</u> <u>claims</u> — —defective *design of the various levees and waterway system*…." did not fall within the Court's admiralty jurisdiction. The reason for this holding was that those claims (as pled in <u>that</u> Complaint) <u>were</u> <u>not</u> <u>caused</u> <u>by</u> <u>any</u> <u>vessel</u>: "Here, the proximate cause of a damage is <u>unrelated</u> <u>to</u> <u>any</u> <u>vessel</u>…" "*The Court is then faced with the relatively novel question of* whether admiralty jurisdiction could somehow extend to include claims involving land-based damage <u>without</u> <u>any</u> <u>involvement</u> <u>of</u> <u>a</u> <u>vessel</u>." "This jurisdictional analysis separates the *various claims made by the claimants, as one must, and this particular portion assumes <u>no</u>* <u>vessel</u> <u>involvement</u> in the injuries sustained." Judge Berrigan's Opinion at p. 8.

Unlike the case decided by Judge Berrigan, here Plaintiffs specifically allege that the damage was caused by <u>vessels</u> — — *the Dredges owned by the Government* and those owned by the Dredging Defendants (who conducted dredging pursuant to contracts with the Government).

Indeed, that *Plaintiffs' claims fall within the Court's admiralty jurisdiction is made* very clear by the fact that the Dredging Defendants recently filed limitation of liability actions — — which are exclusively maritime in nature — — to limit their liability for the claims asserted by Plaintiffs for the damage caused by *their vessels (which were dredging* pursuant to the maritime contracts with the Government). Even the Dredging Defendants

agree that Plaintiffs' claims fall within the Court's admiralty jurisdiction.  *See* Dredging Defendants' Motion to Dismiss Pursuant to Suits in Admiralty Act and Fed.R.Civ.P. 12(c), at pp. 3-9.

In sum, the Plaintiffs' claims for the damage caused by the dredges' activities — — which are traditional maritime activities — — fall within the Court's admiralty jurisdiction.

## E.    <u>Plaintiffs' claims under the Clean Water Act</u>.

Plaintiffs have asserted a claim for violation of the Water Pollution Control Act (the "Clean Water Act"), 33 U.S.C. §§ 1251, *et. seq.* and have requested an injunction against the Government.  Plaintiffs agree that the 90-day notice required by the Clean Water Act was not given and therefore this Court did not acquire jurisdiction over that claim.  Therefore, Plaintiffs do not oppose a dismissal without prejudice of that claim, which may be re-filed after proper notice.

## <u>CONCLUSION</u>.

For all the reasons stated above, the Government's motion to dismiss should be denied except with respect to the claims under the Clean Water Act, which should be dismissed without prejudice.

Respectfully Submitted:

Camilo K. Salas III (Louisiana Bar No. 11657)
SALAS & Co., L.C.
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone:  504-799-3080
Fax:  504-799-3085
E-Mail:  csalas@salaslaw.com

_____
CAMILO K. SALAS III
Attorneys for Phillip Reed, on behalf of himself
and all others similarly situated


## CERTIFICATE OF SERVICE

I hereby certify that I have on this 21st day of November, 2006 served a copy of the

foregoing pleading on all parties to this proceeding via facsimile, e-mail or U. S. Mail.

_____
CAMILO K. SALAS III