FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 NOV 21   PM 4: 43

LORETTA G. WHYTE
CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES § <br> CONSOLIDATED LITIGATION § <br> § <br> § <br> § <br> _____ § <br> § <br> PERTAINS TO: § <br> § <br> MRGO, *Reed*, No. 06-2152 § <br> MRGO, *Ackerson*, No. 06-4066 § <br> § <br> § | CIVIL ACTION <br> NO. 05-4182 "K" (2) <br> JUDGE DUVAL <br> MAG. WILKINSON |

### MEMORANDUM SUBMITTED BY *REED* AND *ACKERSON* PLAINTIFFS IN OPPOSITION TO THE DREDGING DEFENDANTS' MOTION TO DISMISS PURSUANT TO SUITS IN ADMIRALTY ACT AND FED.R.CIV. 12(c)

MAY IT PLEASE THE COURT:

NOW COME Phillip Reed, on behalf of himself and all others similarly situated, who is the plaintiff in Civil Action No. 06-2152, and Fellosea Ackerson, et al., who are all the plaintiffs in Civil Action No. 06-4066 (collectively "Plaintiffs"), and respectfully submit this memorandum in opposition to the Motion to Dismiss Pursuant to the Suits in Admiralty Act and Fed.R.Civ.P. 12(c) filed by defendants, Bean Dredging, L.L.C.; C.F. Bean L.L.C.; Bean Stuyvesant, L.L.C.; Stuyvesant Dredging Company; Stuyvesant Dredging, Inc.; Royal Boskalis Westminster N.V., in their own right and as successors to Bean Dredging

Fee_____
Process_____
X Dktd_____
CtRmDep_____
Doc. No_____

Corporation; C.F. Bean Corporation; Bean Horizon Corporation; Bean Horizon L.L.C.; Gulf Coast Trailing Company; T.L. James & Company, Inc.; TLJIC, L.L.C., on its own behalf and as successor by merger to T.L. James Marine, Inc., and T.L. James Marine, L.L.C.; Great Lakes Dredge & Dock Company; Great Lakes Dredge & Dock Company, L.L.C. of Louisiana; Great Lakes Dredge & Dock Corporation of Delaware; Natco Dredging Limited Partnership; Great Lakes Trailing Company; Weeks Marine, Inc.; Mike Hooks, Inc.; Luhr Bros. Inc.; Pine Bluff and Gravel Company; and King Fisher Marine Service, L.P. (collectively the "Dredging Defendants").

## I. INTRODUCTION.

*Reed* and *Ackerson* are class actions, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, to recover damages suffered by Plaintiffs and the Class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the Dredging Defendants' and the Government's <u>maritime activities</u> in the Mississippi River Gulf Outlet ("MRGO").

These maritime activities are described in the *Reed* and *Ackerson* Complaints where Plaintiffs allege that <u>both</u> the Government (using its own dredge) <u>and</u> the Dredging Defendants (using several vessels that have now been identified)1/ have <u>dredged</u> the MRGO:

---

1/ Hopper Dredges Newport and Bayport, Dredges Tom James, George D. Williams, II (a/k/a Geo D. Williams), Ouachita, Marion, Leonard M. Fisher, Everett Fisher, B. E. Lindholm, George D. Williams, BT 208 and Weeks 262, Spud Barge L-1101, Spud Barge L-1103, M/V Michael A and M/V Michael B.

"Since 1993 the Corps of Engineers has dredged the MRGO using the Dredge Wheeler.... [which] is operated by the New Orleans District of the Corps of Engineers." Reed Complaint ¶ 15; Ackerson Complaint ¶ 15. "From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352, 636, 430 cubic yards of dredge material. Many of those contracts were awarded to the [Dredging] Defendants." Reed Complaint ¶ 16; Ackerson Complaint ¶ 16. "In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the [Dredging] Defendants dredged the following amounts of dredge material from the MRGO under contracts with Corps of Engineers: [the amounts are then listed in a chart]." Dredging, of course, is a traditional maritime activity.

According to the *Reed* and *Ackerson* Complaints these <u>dredging</u> activities by the Government and the Dredging Defendants have had the following effects:

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes. Since the construction of the MRGO, several basic impacts on the region have become evident. These include wetland loss caused by excavation of the channel, soil erosion and shifts in habitat type because of increased salinity. The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh. More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered. Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior

portions of St. Bernard Parish, where the MRGO is perceived as a "superhighway for storm surge" because of the channel's susceptibility to inundation by tropical storms and hurricanes.

(Reed Complaint ¶ 8; Ackerson Complaint ¶ 8)

**Prior Knowledge of Potential Harmful Effects**

Before excavation of the MRGO, state and federal resource agencies expressed concern about the project's apparent lack of ecological consideration. Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat. Local concerns mounted as the project's "ecological footprint" expanded and economic benefits failed to emerge. Concerns expanded with a growing perception that the project had dramatically increased the region's vulnerability to hurricanes and tropical storms. By the 1990's, the project was widely characterized as an environmental disaster, although adverse environmental impacts from the MRGO were evident as early as the late 1960's. In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.

(Reed Complaint ¶ 9; Ackerson Complaint ¶ 9)

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain. This combined water storage and braking action lowers flood heights and reduces erosion. The holding capacity of wetlands helps control floods. Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

(Reed Complaint ¶ 10; Ackerson Complaint ¶ 10)

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet. The sides of the original channel were at a 25 degree angle. Because the soft soils on the sides of the original channel would not stand up at such a steep angle, the soil began to slide or "slough-off" into the bottom of the channel. This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the surface. This "sloughing-off" of the soft sides along the channel banks only partially explains why the MRGO's banks have eroded from 650 feet wide to over 2,000 feet wide today.

(Reed Complaint ¶ 11; Ackerson Complaint ¶ 11)

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug. This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks. The MRGO has thus created an environmental disaster. Tidal flows, and the wave action, suction, and propeller backwash from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel.

(Reed Complaint ¶ 12; Ackerson Complaint ¶ 12)

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks which settles in the bottom of the channel impedes the movement of ships. In order to maintain

the depth of the channel to allow ships to pass, the Corps of Engineers, using its own fleet of dredge vessels and through maritime dredging contracts with the other Defendants, continuously dredge soil from the bottom of the channel. The Corps of Engineers and all the Defendants use hopper dredges and other types of dredges, such as the Wheeler Dredge, the Newport Dredge, the Manhattan Island Dredge, the Eagle I Dredge, the Bayport Dredge, the Struyvesant Dredge, the Padre Island Dredge, the Ouachita Dredge, the McFarland Dredge and others, to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico. Some of the dredged soil is piled on spoil banks along the channel, but very little is used beneficially to restore the wetlands the channel has destroyed. In fact, piling of dredged soil along spoil banks causes further damage to the wetlands behind the spoil banks.

(Reed Complaint ¶ 13; Ackerson Complaint ¶ 13)

The Corps of Engineers does not mitigate or compensate for the damage it causes to the wetlands. Each year, the United States of America pays the other Defendants, pursuant to maritime dredging contracts, about $22 million to dredge the bottom of the MRGO channel and dump the soil (originally from St. Bernard Parish's wetlands) into the Gulf of Mexico. Making matters worse, the Corps of Engineers and its subcontractors (the other Defendants) do advance maintenance dredging to the channel to a depth of 41 feet. With each dredging, the MRGO channel grows wider and wider.

(Reed Complaint ¶ 14; Ackerson Complaint ¶ 14)

The jurisdictional allegations in both Complaints are:

This Court has jurisdiction over this class action pursuant to (1) 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub. L. 109-2, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by a citizen of a State that is different from the State where at least one of

the Defendants is incorporated or does business; (2) the Suits in Admiralty Act, 46 U.S.C. §§ 741-52, (in personam) because the negligence of the United States of America arises out of its maritime activities, connected to the construction, continuous dredging and maintenance of the MRGO as a navigable channel, and carried out by the United States of America's own fleet of dredging vessels and by fleets of dredging vessels owned by the other Defendants, pursuant to maritime dredging contracts between them; (3) the Public Vessels Act, 46 U.S.C. §§ 781-90, because this matter involves damage caused by one or more public vessels of the United States of America (including the Dredge Wheeler) which have conducted maritime dredging operations for the construction and maintenance of the MRGO during the past sixty years; and (4) 28 U.S.C. § 1331, because some of the claims asserted herein arise under the laws of the United States of America, including the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*

(Reed Complaint ¶ 4; Ackerson Complaint ¶ 4)

There are no allegations in the Complaints regarding (1) the contents of the dredging contracts between the Government and the Dredging Defendants or (2) the level of control exercised by the Government over the activities of the Dredging Defendants. Furthermore, Plaintiffs do not allege that the Dredging Defendants operated any of the Government's dredges.

## II. ARGUMENT.

### A.   Standard applicable to Rule 12(c) motions.

Federal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings. Federal Judges are unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and

that he is entitled to judgment as a matter of law. Wright & Miller, *Federal Practice Procedure, Civil 3d* § 1368. As it is for a motion under Rule 12(b)(6), for purposes of a Rule 12(c) all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false. *In re: Complaint of Dann Marine Towing, L.C.*, 2004 WL 744881 (E.D. La. 2004); *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F. 3d 887 (5th cir. 1998) (parties had not conducted discovery); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002).

B.   **The Dredging Defendants have not established that they are agents of the Government. At the very least there are material issues of fact concerning the type of relation (agency or otherwise) between the Government and the Dredging Defendants that prevent entry of judgment in their favor.**

In an attempt to avoid liability, the Dredging Defendants argue they are <u>agents</u> of the Government and, therefore, should be dismissed pursuant to the exclusive remedy provisions of the Suits in Admiralty Act, 46 U.S.C. app. §§741-752 ("SAA"). They make this argument even though there is <u>no evidence</u> in the record, or allegations in the *Reed* and *Ackerson* Complaints, to establish that the Government exercised <u>control</u> over the Dredging Defendants — — a basic requirement to establish agency even under the cases cited by the Dredging Defendants at p. 9 of their memorandum.

The Dredging Defendants previously notified the Court and all counsel that they did not intend to file any motions that required discovery. As a result, the Court's order

prohibiting discovery has remained in place and no one has conducted any discovery of any fact relative to the issue of "agency." Plaintiffs respectfully submit that the issue of "agency" as it pertains to the SAA is not ripe for adjudication and the Dredging Defendants' motion should be denied without prejudice, or at least should be continued until such time as the parties are allowed to conduct discovery. Fed.R.Civ.P. 12(c).

If the Court feels this issue can be decided at this time, Plaintiffs respectfully submit that the record is devoid of any evidence that supports the Dredging Defendants' argument that they are agents of the Government within the meaning of the SAA. Therefore, their motion should be denied.

Section 745 of the SAA provides, in part:

> Suits as authorized by this chapter may be brought only within two years after the cause of action arises; Provided, That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the <u>agent</u> or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim: .... (emphasis added)

Because the SAA's exclusivity clause applies <u>only to agents and employees</u> of the Government, 46 U.S.C. §745; *Favorite v. Marine Personnel and Provisioning*, 955 F.2d 382, 388 (5th Cir. 1992); *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 997 (9th Cir. 1997), the Dredging Defendants must establish their status as agents of the Government to take advantage of it. They have failed to make that showing.

In *Favorite* the Fifth Circuit first held that the vessel was a "public vessel" within the

meaning of the SAA because it was bareboat chartered to the Government and the Government continued to exercise "possession, command, and control." The Court then reviewed the contract between the Government and its own operator, which stipulated that the operator would be subject to the "[G]overnment's overall control and direction." On that basis, the Court concluded that the operator was an agent of the Government.

In *Dearborn*, the Ninth Circuit held that "in order to find that a charterer is an agent of the United States, (1) the United States must exercise significant control over the charterer's activities — either day to day control or overall control and direction of the mission, and (2) the charterer must be engaged in conducting the business of the United States." 113 F.3d at 997-98. The Court noted that "agent" may in some cases include entities properly defined as "independent contractors" when acting for the principal, with the principal's consent and subject to the principal's overall control and direction, but that in some other contexts "agent" and "independent contractor" are mutually exclusive. The Court then examined the contract between the Government and the charterer and, because the Government maintained "substantial [G]overnment oversight and supervision — i.e., significant overall control and direction," held that the charterer was an agent of the Government. *See also Farnsworth v. Sea-Land Service, Inc.*, 1989 WL 20544 (E.D. La. 1989) ("Because it is manifest that Sea-Land Service operated the [vessel] for and at the direction of the United States, Sea Land Service is an agent of the United States and protected from liability by the PVA."); *Smith v. United States*, 346 F.2d 449 (4th Cir. 1965) ("…we think the relevant portion of the

agreement <u>clearly</u> <u>demonstrate</u> that the United States remained in <u>control</u> of the vessel at all times...")' *Stiward v. United States,* 2005 WL 3543736 (E.D. La. 2005) ("....recovery against an agent of the United States <u>operating a government owned vessel</u> is precluded on any claim for which either the SAA or the PVA provides a remedy."); *Doyle v. Bethlehem Steel Corporation,* 504 F.2d 911 (5th Cir. 1974) (Based on testimony of witnesses the Court concluded that the agent operated the vessel for the Government but was not in control).

In the *Reed* and *Ackerson* Complaints there are (1) no allegations that the Dredging Defendants operated any Government vessel; (2) no allegations that the Government exercised <u>any</u>, much less significant control over the Dredging Defendants' activities; and (3) no allegations concerning the contents of the dredging contracts between the Government and the Dredging Defendants. Therefore, it is not possible to determine as a matter of law — —based on the allegations of the Complaints — — the type of relationship (agency or otherwise) that existed between the Government and the Dredging Defendants.

C.  **The Court has not yet determined if Plaintiffs have valid admiralty claims against the Government. Therefore, the Dredging Defendants' assertion of a defense under Section 745 of the SAA is premature.**

In order for the Dredging Defendants to take advantage of the exclusivity defense of Section 745, "there must be a remedy [ ] provided by the [SAA] ..." 46 U.S.C. app. § 745.

Although Plaintiffs have asserted admiralty claims against the Government, pursuant to the SAA (and the Public Vessels Act, 46 U.S.C. app. § 781), the Government has contested them in a Motion to Dismiss for Lack of Jurisdiction currently before the Court.

Before the Dredging Defendants can invoke a Section 745 defense, this Court must first decide if the Government <u>does</u> in fact owe Plaintiffs a remedy provided by the SAA. Until that decision is made, the Dredging Defendants cannot even assert a defense based on Section 765.

Plaintiffs agree with the Dredging Defendants' argument that Plaintiffs' claims against the Government fall within the Court's admiralty jurisdiction and that those claims even arise from maritime contracts that involve dredging activities — — which are traditional maritime activities. Plaintiffs also agree with the Dredging Defendants' contention that the SAA allows Plaintiffs to assert admiralty claims against the Government for the damages they have suffered. But it is the Court that must make the decision — — not the Dredging Defendants. Until and unless the Court holds that the Government owes Plaintiffs a remedy provided by the SAA, the Dredging Defendants cannot assert a defense under Section 745.2/

Therefore, the Dredging Defendants' assertion of immunity under Section 745 is premature, has no basis in law, and should be denied.

---

2/ Furthermore, while Plaintiffs also agree with the Dredging Defendants' statement that the Admiralty Extension Act, 46 U.S.C. app. § 740, provides additional basis for admiralty jurisdiction, Plaintiffs have not <u>yet</u> invoked it because of the six-month notice requirement, which will be up the first week of December, 2006, at which time Plaintiffs' Complaints will be amended.

## III. CONCLUSION.

For all the reasons set forth above, the Dredging Defendants' motion should be (1) continued until discovery can be conducted; (2) denied without prejudice until discovery is conducted; or (3) denied.

Respectfully Submitted:

Camilo K. Salas III (Louisiana Bar No. 11657)
SALAS & Co., L.C.
650 Poydras Street, Suite 1650
New Orleans, LA 70130
Telephone: 504-799-3080
Fax: 504-799-3085
E-Mail: csalas@salaslaw.com

_____
CAMILO K. SALAS III
Attorneys for Phillip Reed, on behalf of himself
and all others similarly situated in *Reed*,
No. 06-2152

And

A. J. Rebennack (Louisiana Bar No. 18677)
2202 Avenue B
Metairie, Louisiana 70001
Telephone: 504-792-0512
Fax: 504-831-1203
E-Mail: rebennacks@cox.net
Attorney for all the plaintiffs in *Ackerson*,
No. 06-4066

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 21st day of November, 2006 served a copy of the foregoing pleading on all parties to this proceeding via facsimile, e-mail or U. S. Mail.

CAMILO K. SALAS III