# Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

Final Report
July 31, 2006






In addition, erosion occurred at the juncture between the railroad embankment fill and the fill supporting an adjacent roadway passing over the earthen federal levee at this location, as shown in Figure 8.5. This roadway passed over the levee crest to provide access to port facilities on the outboard (water) side of the Federal levee system. This is shown in Figure 8.5, which is a view from the inboard side of this breach showing the erosion of the roadway fill. The elevated I-10 highway bridge is at the left of this photo, and the CSX railroad is just to the left (north) of the roadway. The roadway fill at this location was comprised largely of highly erodeable lightweight "shell sand" fill; a material not suitable for levee fill in a levee protecting a large population (especially without sheetpile cutoff or similar features to prevent erosion.) The flow appears to have passed initially through the pervious gravel ballast supporting the train rails (which is the "low point" at this complicated location), and then undermined the less competent fill beneath the roadway. The resulting flow through the eroded breach then passed to the inboard (protected) side and made its way into the adjacent neighborhood.

The erosion and scour at this conjoined pair of breach locations did not erode the base (lips) of these breach features to a level below mean sea level. Accordingly, although flow passed through this pair of features for a number of hours, the flow eventually ceased as the storm surge (water level rise in the IHNC) eventually subsided.

The failure at this site is an excellent example of a failure produced by multiple adjoining jurisdictions, and a lack of overall coordination of the various system elements constructed and operated by each. The Federal levee system was "penetrated" here by both the railway and the Port roadway, and the interactions of the pervious railway ballast and the highly erodeable roadway fill combined to fail the overall flood protection system at this location. Lack of coordination, and lack of authoritative oversight, of these disparate organizations and their disparate system components was a critical problem here.

It should be further noted that this same site had also failed catastrophically in 1965 during hurricane Betsy, so that the re-failure of this same location represents a daunting case of lack of progress and learning over the intervening 40 years. As discussed in Chapter 7, the east bank CSX rail crossing, which also failed during hurricane Katrina, was also a "repeat" failure (as it, too, had failed during hurricane Betsy in 1965.) The continued failure to recognize and suitably address the hazards associated with these complex "penetrations", despite their demonstrated history of previous failure, is difficult to understand.

In addition, it is interesting to note that the steel gate was allowed to be removed for repair, rather than requiring it to be fixed in place until a suitable replacement gate (or at least interim replacement gate) could be fabricated and be brought in, so that trains could continue to operate. This created an obvious potential hazard to the safety of the very large community inboard of this rail crossing; placing the safety of many at increased risk. In hindsight; that was a decision that is difficult to justify.

8.2.3  Breaches and Distressed Sections at the Port of New Orleans

Three breaches occurred to the south of the CSX railroad breach on the west side of the IHNC at the main Port of New Orleans. Several additional levee and floodwall sections

overtopping or through-erosion (erosion due to through-flow prior to full overtopping.) In the absence of an eyewitness, it was not possible to discern from evidence at this site whether the embankment was actually overtopped, or whether flow through this highly erodeable fill caused progressive erosional failure prior to full overtopping.

Figure 8.15 shows a second large erosional breach, less than 50 yards from the breach shown in Figures 8.13 and 8.14. This embankment section was also comprised largely of highly erodeable shell-sand fill. A large scour hole can be seen to the right, immediately inboard of this large breach. The massive flows have rippled the asphalt tarmac, and detritus from the eroded shell sand fill is scattered over a large area. As shown in this photo, some of this shell sand detritus has been scooped back into the breach as part of the initial repair.

Although these two adjacent erosional breaches were both of good size, they were both located some distance inboard from the IHNC channel, and neither eroded a pathway all the way back to the IHNC channel that was continuously below sea level. As a result, although both breaches admitted significant volumes of water into the adjacent neighborhoods, flows through these two breaches eventually ceased as the storm surge subsequently subsided.

### 8.2.4 Summary and Findings

The breaches along the west bank of the IHNC were each "non catastrophic" as none of them eroded or scoured to such depth that their lip dropped below mean sea level. Accordingly, although they admitted significant volumes of floodwaters into the greater Orleans East Bank (downtown) protected area, these flows eventually ceased as the storm surge subsided. Together, these features appear to have contributed approximately 10% to 20% of the overall volume of floodwaters that eventually flowed into the Orleans East Bank (downtown) protected area.

Although they were each "non-catastrophic", these features each had the potential to cause significant localized flooding and damage. They were also each the result of engineering lapses and/or lapses in oversight during design and construction; none of the failures in this area should have occurred at the storm surge and wind/wave loadings produced at these locations by Hurricane Katrina had proper design and construction features been included.

The removal of the steel floodgate at the CSX Railroad crossing, and the inadequate sandbagging of the resulting "gap" in the overall regional flood protection system should not have been permitted. The steel gate should have been immediately replaced with a suitable and serviceable temporary replacement until the original gate could be repaired and returned. Instead it was missing for approximately three months of the hurricane season. In view of the events during Katrina, it is difficult to justify the decision to remove the gate and thus maintain the "operability" of the railroad line when it placed the "operability" of the flood protection system, and the safety of the community, at risk.

Similarly, the confluence of the CSX railroad embankment and the adjacent roadway both passing over/through the Federal levee system immediately to the south of the I-10

bridge represents one of many "transitions" between disparate flood protection system elements that performed poorly as an apparent result of lack of appropriate oversight and/or poor design with regard to how abutting elements of the system joined at their edges. In addition, highly erodeable shell sand fill was used at this roadway location without suitable cut-off by means of sheetpiles, etc., representing a hazardous condition that should have been caught and remedied prior to Katrina's arrival.

The erosional "distress" that occurred at the junctures of structural I-wall sections and the structural T-wall gate structure at the rail yard behind the Port of New Orleans represent additional examples of inadequate attention to details at "transitions" between adjacent sections of differing type and geometry.

The two large erosional breaches at the south end of the Port of New Orleans were clearly the result of use of inappropriate fill materials (highly erodeable lightweight shell-sand fill) in earthen embankment sections with no suitable provisions to reduce the obvious risk of catastrophic erosion and breaching. This, too, should have been spotted and remedied prior to Katrina's arrival. It is not clear whether these two breach sections were overtopped by the rising storm surge, or whether the embankment sections eroded as a result of "through flow" prior to full overtopping as the waters rose within the IHNC.

Finally, the I-wall section breach behind the Port of New Orleans was largely the result of overtopping and subsequent erosion at the base of the inboard toe of the concrete I-wall. This failure could have been prevented, at relatively little incremental cost, by installation of concrete splash pads or other erosion protection at the inboard toe of this floodwall. In addition, there was ample right of way available to construct a somewhat wider (and heavier) levee embankment on the inboard side of this I-wall. The incremental cost of doing so would have relatively small, and that too would likely have prevented this failure.

## 8.3 The Canal District Failures

### 8.3.1 Introduction

As the eye of the hurricane began to pass to the northeast of New Orleans, the counterclockwise swirl of the storm winds caused a surge in water levels along the southern end of Lake Pontchartrain. The storm surge along the Pontchartrain lakefront (which peaked at about 9:00 to 9:30 a.m. at an elevation of about +10 feet, MSL) did not produce water levels sufficiently high as to overtop the crests of the concrete floodwalls atop the earthen levees lining the three drainage canals that extend from just north of downtown to Lake Pontchartrain; the 17th Street Canal, the Orleans Canal, and the London Avenue Canal. Three major breaches occurred along these canals, however, and these produced catastrophic flooding of large areas within the Orleans East Bank protected area (as shown in Figure 8.2.)

The first major breach along the drainage canals occurred near the south end of the London Avenue canal, between about 7:00 to 8:00 a.m. The second breach occurred near the north end of the London Avenue canal, and the best current estimates of the timing of this breach are between about 7:30 to 8:30 a.m. The third major breach occurred near the north

Site #5a was the west bank of the CSX railroad crossing. The failure at this site is particularly galling, as this site also failed during hurricane Betsy in 1965, so the repeat failure represents a very disconcerting failure to learn.

The rail crossing is part of a complex "penetration" through the federal IHNC frontage levees, as an adjacent roadway serving outboard side Port facilities crosses over the top of the federal frontage levee adjacent to the railroad line. Our investigation team was unable to learn just exactly who was overall in charge at this complex site with multiple overlapping jurisdictions; and that is a problem.

The rail line passes through a concrete T-wall structure with a rolling steel floodgate, so that the floodgate can be closed during storms to complete the perimeter frontage protection. Unfortunately, the steel gate had been damaged by a railroad accident several months prior, and it had been taken away for repairs. Accordingly, a temporary "sandbag levee" was erected across the missing floodgate opening; this washed away at some stage during hurricane Katrina. It is not clear who was in authority here, but the decision to remove the steel floodgate and allow trains to continue to operate, rather than affixing the damaged gate in place until it could be replaced, placed the entire community of the main (downtown) New Orleans protected basin (a population of approximately 250,000+) at risk. In hindsight, this was a difficult decision to justify.

Fortunately, the missing gate was not a principal source of flooding for the main (downtown) protected area. The main breach at this location was actually the result of composite action of the railroad embankment and the adjacent roadway section. Water appears to have passed first through the pervious gravel ballast at the top of the railroad embankment (representing the local "low spot" with regard to stopping flow), and it then eroded and undermined the adjacent roadway, resulting in a full breach. The levee embankment underlying the roadway appeared to consist in part of highly erodeable sands and shell-sands, and the presence of such highly erodeable soils without cut-off or other provisions to prevent catastrophic erosion was very ill-advised.

Lessons here include:

15. *Someone needs to be overall in charge at "penetrations" and "transitions" where multiple groups and functions intersect, and where overlapping responsibilities result. Whoever is in charge needs both to be made responsible for the overall situation, and they need to be granted adequate authority as to successfully execute that responsibility.*

16. *The continued operation of trains cannot be allowed to be considered more important than the safety of major urban populations.*

(7. repeated.) *Highly erodeable embankment (and foundation) materials represent an intrinsic hazard, and their use should be avoided in flood protection systems defending significant populations.*

(8. repeated.) *When the use of such materials cannot be avoided, then great care should be taken to protect the sections by means of internal cut-offs, filters, and slope face protection (armoring) on the front and back faces and on the crest as well. Even then, the use of erosion-resistant soils is to be preferred if at all possible.*

The catastrophic erosion of these two critical levee frontages need not have occurred. These frontages could instead have been constructed using well compacted clay fill with good resistance to erosion, and they could have been further armored in anticipation of the storm surge and wave loading from Lake Borgne. The levee at the northeast edge of St. Bernard Parish could have been completed in a more timely manner. The result would have been some overtopping, but not catastrophic erosion and uncontrolled breaching of these critical frontages. Some flooding and damage would have been expected, but it need not have been catastrophic.

The storm surge swollen waters of Lake Borgne next passed laterally along the east-west trending GIWW/MRGO channel to its intersection at a "T" with the north-south oriented IHNC channel, overtopping levees along both banks to a limited degree. This produced an additional breach of a composite earthen levee and concrete floodwall section (at a transition to a full earthen levee section) along the southern edge of New Orleans East, adding additional uncontrolled inflow to this protected basin. This failure could have been prevented at little incremental cost if erosion protection (e.g. a concrete splash pad, or similar) had been emplaced along the back side of the concrete floodwall at the levee crest, but the USACE felt that this was precluded by Federal rules and regulations regarding authorized levels of protection.

The surge next raised the water levels within the IHNC channel, and produced a number of failures on both the east and west banks. Two major failures occurred on the east side of the IHNC, at the west edge of the Ninth Ward. Overtopping occurred at both of these locations, but this was not the principal cause of either of these failures. Both failures were principally due to underseepage flows that passed beneath the sheetpile curtains supporting the concrete floodwalls at the crests of the levees. Like many sections of the flood protection system, these sheetpiles were too shallow to adequately cut off, and thus reduce, these underseepage flows. The result was two massive breaches that devastated the adjacent Ninth Ward neighborhood, and then pushed east to meet with the floodwaters already rapidly approaching from the east from St. Bernard Parish as a result of the earlier catastrophic erosion of the Lake Borgne frontage levees.

Several additional breaches also occurred farther north on the east side of the IHNC fronting the west side of New Orleans East, but these were relatively small features and they just added further to the uncontrolled flows that were now progressively filling this protected basin. These breaches occurred mainly at junctures between adjoining, dissimilar levee and floodwall sections, and represented good examples of widespread failure to adequately engineer these "transitions" between sections of the regional flood protection system.

Several breaches occurred on the west side of the IHNC, and these represented the first failures to admit uncontrolled floodwaters into the main metropolitan (downtown) protected area of New Orleans. These features did not scour and erode a path below sea level, however, so they admitted floodwaters for a number of hours and then these inflows ceased as the storm surge in the IHNC eventually subsided. Only 10% to 20% of the floodwaters that eventually inundated a majority of the main (downtown) New Orleans protected basin entered through these features.

These failures and breaches on the west side of the IHNC all appear to have been preventable. One failure was the result of overtopping of an I-wall, with the overtopping flow then eroding a trench in the earthen levee crest at the inboard side of the floodwall. This removal of lateral support unbraced the floodwall, and it was pushed over laterally by the water pressures from the storm surge on the outboard side. Here again the installation of erosional protection (e.g. concrete splash pads or similar) might have prevented the failure.

The other failures in this area occurred at "transitions" between disparate levee and floodwall sections, and/or at sections where unsuitable and highly erodable lightweight shell sand fills had been used to construct levee embankments. Here, again, these failures were as much the result of design choices and/or engineering and oversight issues as the storm surge itself.

Particularly frustrating were a pair of failures on the east and west banks of the IHNC where the CSX railroad crossed the IHNC. These two sites both breached as a result of improper detailing of the intersections between the railroad tracks and their support gravel ballast, and adjacent roadways also crossing the federal levees at these same two locations. These represented additional examples of repeated problems associated with coordination, design, and oversight of complex "intersections" wherein multiple agencies and utilities (including roadways, rail lines, etc.) intersect the protective levee system. Frustratingly, it is noted that these same two rail crossings at the east and west sides of the IHNC had also failed and breached in 1965, during hurricane Betsy.

As the eye of the hurricane next passed to the northeast of New Orleans, the counterclockwise swirl of the storm winds produced a storm surge against the southern edge of Lake Pontchartrain. This produced additional temporary overtopping of a long section of levee and floodwall at the west end of the lakefront levees of New Orleans east, behind the old airport, adding further to the flows that were progressively filling this protected basin.

The surge against the southern edge of Lake Pontchartrain also elevated the water levels within three drainage canals at the northern edge of the main metropolitan (downtown) New Orleans protected basin, and this would produce the final, and most damaging, failures and flooding of the overall event.

The three drainage canals should not have been accessible to the storm surge. The USACE had tried for many years to obtain authorization to install floodgates at the north ends of the three drainage canals that could be closed to prevent storm surges from raising the water levels within the canals. That would have been the superior technical solution. Dysfunctional interaction between the local Levee Board (who were responsible for levees and floodwalls, etc.) and the local Water and Sewerage Board (who were responsible for pumping water from the city via the drainage canals) prevented the installation of these gates, however, and as a result many miles of the sides of these three canals had instead to be lined with levees and floodwalls.

The lining of these canals with levees topped with concrete floodwalls was rendered very challenging due to (a) the difficult local geology of the foundation soils, and (b) the narrow right of way (or available "footprint") for these levees. As a result of the decision not



Figure 8.5: View from the inboard side of the CSX Railroad breach site from Figure 8.4 showing scour of the roadway fill adjacent to the railway embankment fill.



Photograph by Rune Storesund

Figure 8.4: Concrete storm gate at the west bank of the CSX Railroad crossing of the IHNC, after Hurricane Katrina, showing the steel floodgate missing.

8-52

[5, 6] Furthermore, the principle for which the relators cite the *Moresi* opinion is not absolute. Although Louisiana does not recognize an independent tort of negligent infliction of emotional distress, a plaintiff may recover for unintentional or negligent infliction of emotional distress unaccompanied by physical injury where the defendant's negligent conduct is deemed to be outrageous. See *Succession of Harvey v. Dietzen*, 1997-2815, p. 8 (La. App. 4 Cir. 6/24/98), 716 So.2d 911, 916. In order to recover, the plaintiff must show the existence of an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Moresi*, 567 So.2d at 1096.

[7] In the present case, plaintiffs' petition alleges that they fear confidential medical information was and will continue to be released to the public. While the plaintiffs do not specify the precise theory on which they base their claim, the clear implication of the petition is that the relators breached their duty to the plaintiffs, who were alleged to be their patients, by the negligent disposal of confidential medical records.

[8] Our inquiry is not whether the plaintiffs will be able to prove the damages they claim. The question therefore is whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief. *Rutledge*, 2000-0674, p. 2, 808 So.2d at 766. A petition should not be dismissed on an exception of no cause of action merely because the plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the petition to determine if the allegations provide relief on any possible theory." *Id.*

The plaintiffs have alleged the essential elements of a negligence claim under La. C.C. art. 2315. According to the petition, the relators breached their duty to their plaintiffs, and that breach of duty was the cause in fact of the plaintiffs' damages. We cannot say at this stage of the proceedings, applying the foregoing standard of review, that the plaintiffs have not alleged damages caused in fact by conduct constituting a breach of the relators' duty as custodian of the plaintiffs' medical records.

For the foregoing reasons, we affirm the judgment of the trial court insofar as it denied the relators' peremptory exception of no cause of action.

**WRIT GRANTED; JUDGMENT AFFIRMED.**



2004-1370 (La.App. 4 Cir. 7/13/05)

Justin MILLER, husband of/and Darla Miller, individually and on behalf of their minor children, Brayden Miller and Wyatt Miller

v.

ENTERGY SERVICES, INC., Entergy Corporation, Entergy New Orleans, Inc. and Entergy Louisiana, Inc.

No. 2004–CA–1370.

Court of Appeal of Louisiana, Fourth Circuit.

July 13, 2005.

**Background:** Employee of subcontractor hired by maintenance contractor for electric utility to paint electrical transmission towers sued utility, parent holding company, and related subsidiaries for damages arising from injury sustained in the course

EXHIBIT 2

of his employment. Utility moved for summary judgment. The District Court, Orleans Parish, No. 2003–5484, Lloyd J. Medley, J., entered summary judgment for utility. Employee appealed.

Holdings: The Court of Appeal, Love, J., held that:

(1) genuine issue of whether principal/mandatary relationship existed to make utility liable for negligence of related utility precluded summary judgment, and

(2) genuine issue of whether holding company and subsidiaries were single business enterprise precluded summary judgment.

Reversed and remanded.

**1. Appeal and Error** ⇐893(1)

Review of a grant or denial of a motion for summary judgment is de novo.

**2. Judgment** ⇐181(33)

Genuine issue of material fact existed as to whether a principal/mandatary relationship existed between public utility holding company and its subsidiaries by a general operating agreement for contracted services, under which public utility subsidiary could be liable for injuries of employee of subcontractor hired under authority of agreement to paint electrical transmission tower owned by another subsidiary, which precluded summary judgment in employee's negligence action. LSA–C.C.P. art. 966, subd. B.

**3. Corporations** ⇐1.5(1)

The "single business enterprise doctrine" is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources in operations to achieve a common business purpose, and when corporations represent precisely the same single interests, a court is free to disregard their separate corporate identity.

    See publication Words and Phrases for other judicial constructions and definitions.

**4. Judgment** ⇐185.3(5, 21)

Genuine issue of material fact existed as to whether public utility holding company and its subsidiaries were a single business enterprise jointly liable for injury sustained by employee of subcontractor hired to paint electrical transmission tower, which precluded summary judgment in employee's negligence action; employee provided factual evidence that parent and subsidiaries shared the same logo and colors, had common directors or officers, common employees, co-mingled funds, shared common offices, and were under unified administrative control, and employee provided evidence that subsidiaries were undercapitalized. LSA–C.C.P. art. 966, subd. B.

**5. Corporations** ⇐1.7(2)

A party seeking to establish that two corporations were in fact a single business enterprise, such that liability imposed on one corporation would be imposed upon the other, must prove the existence of a single business enterprise by clear and convincing evidence.

**6. Judgment** ⇐185(5)

Although mere assertions are insufficient to establish genuine issue of material fact for purposes of summary judgment, assertions substantiated with factual support sufficient to establish that the evidentiary burden of proof is able to be satisfied at trial do raise genuine fact issues. LSA–C.C.P. art. 966.

---

Michael D. Parks, McAlester, OK, and Brian D. Katz, Russ M. Herman, James C. Klick, Herman, Herm[an...] L.L.P., New Orleans, [ap]pellant.

Kenneth P. Carter[...] Savoye, New Orlean[s...] dant/Appellee.

(Court composed of [...] BAGNERIS SR., Judg[e...] KIRBY, Judge TERR[I...]

TERRI F. LOVE, [...]

This appeal arises f[rom...] judgment granting M[...] Judgment in favor of [...] Corporation and Ent[ergy...] Inc.

**FACTUAL BACKGR[OUND...] CEDURAL HISTOR[Y]**

In November 1990[...] entered into a Genera[l...] ment for Contracted [...] Inspection, Inc. ("Tow[...] tablishing a continui[ng...] which Tower Inspect[ion...] Louisiana Power & Li[ght...] ana) and New Orleans [...] tergy New Orleans) [...] work, pursuant to C[...] Contract Change Orde[r...]

In July 2002, Enter[gy...] half of Entergy Loui[siana...] New Orleans, execut[ed...] Number CHC0464-00[...] Tower Inspection, the [...] form specific maintenan[ce...] Harahan, Louisiana [...] Crossing Tower ("Cros[sing...] Entergy Louisiana ass[oci]ates and controls. A [...] National Steel Erector[s...] tional Steel"), a subc[ontractor...] Inspection, was worki[ng...] electrical transmission [...] Miller ("Mr. Miller"), [...] by National Steel, was [...]

Klick, Herman, Herman, Katz & Cotlar, L.L.P., New Orleans, LA, for Plaintiff/Appellant.

Kenneth P. Carter, Margaret Jenkins Savoye, New Orleans, LA, for Defendant/Appellee.

(Court composed of Judge DENNIS R. BAGNERIS SR., Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE).

|₁TERRI F. LOVE, Judge.

This appeal arises from the trial court's judgment granting Motions for Summary Judgment in favor of defendants, Entergy Corporation and Entergy New Orleans, Inc.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In November 1990, Entergy Services entered into a General Operations Agreement for Contracted Services with Tower Inspection, Inc. ("Tower Inspection") establishing a continuing relationship in which Tower Inspection would provide Louisiana Power & Light (Entergy Louisiana) and New Orleans Public Service (Entergy New Orleans) with maintenance work, pursuant to Contract Orders and Contract Change Orders.

In July 2002, Entergy Services, on behalf of Entergy Louisiana and Entergy New Orleans, executed Contract Order Number CHC0464-00, which designated Tower Inspection, the contractor, to perform specific maintenance/painting work in |₂Harahan, Louisiana on the Harahan Crossing Tower ("Crossing Tower"), which Entergy Louisiana asserts it owns, operates and controls. A crew employed by National Steel Erectors Corporation ("National Steel"), a subcontractor to Tower Inspection, was working on the 431-foot electrical transmission tower when Justin Miller ("Mr. Miller"), a painter employed by National Steel, was injured from contact with an energized surge arrestor on the electrical transmission tower. Mr. Miller was injured in the course and scope of his employment with National Steel and in conjunction with the work performed as provided in the contract between Entergy Services and Tower Inspection.

Mr. Miller and his wife, Darla Miller, individually and on behalf of their two minor children (collectively referred to as "the Millers"), filed suit against Entergy Corporation, Entergy Louisiana, Entergy New Orleans, and Entergy Services, alleging that the Entergy defendants, as either owners of the Crossing Tower and/or as entities that transmit high voltage electricity, were negligent and/or at fault for the injuries and damages sustained because the Entergy defendants failed to properly protect Mr. Miller from electrical contact.

Entergy Corporation and Entergy New Orleans filed a Motion for Summary Judgment asserting that neither Entergy Corporation, nor Entergy New Orleans owns, maintains, or has custody of the Crossing Tower. Defendants, Entergy Services, Entergy Corporation, Entergy New Orleans and Entergy Louisiana, also filed a third party demand, naming American International Group and Royal Insurance Company of America as third party defendants, asserting that as such, the third party defendants are liable to the Entergy defendants for any amounts that they may be found liable for in the claims filed by the Millers.

|₃The Millers filed a supplemental and amending petition for damages asserting that the Entergy defendants acted as a single business enterprise and alter egos of each other and as such, are liable for the acts of the other. On April 17, 2004, the trial court issued a written judgment granting defendants', Entergy Corporation and Entergy New Orleans, Motion for Summary Judgment and declaring the

judgment as final and appealable, pursuant to La. C.C.P. art. 1915. The Millers filed a Motion for New Trial asserting that the judgment appears clearly contrary to the law and evidence and that genuine issues of material fact exist. The trial court denied the Millers' Motion for New Trial and the Millers timely filed this appeal, asserting that the trial court erred in granting Entergy Corporation and Entergy New Orleans Summary Judgment.

*Standard of Review*

[1] Our review of a grant or denial of a motion for summary judgment is *de novo*. *Schroeder v. Board of Supervisors of Louisiana State University*, 591 So.2d 342, 345 (La.1991). Factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor. *Willis v. Medd*, 00-2507, p. 2 (La.12/18/00), 775 So.2d 1049, 1050. If the pleading, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law, a motion for summary judgment will be granted. La. C.C.P. art. 966(B).

In the case *sub judice*, this Court must conduct *de novo* review to determine whether the trial court committed error in granting summary judgment in favor of Entergy New Orleans and Entergy Corporation. In conducting our review, this Court must construe any factual inferences drawn from the evidence in favor of the |₄Millers, who are opposing the motions for summary judgment. Further, this Court cannot make any determination on the merits of the Millers' claims, make any credibility determinations, or evaluate the weight of the evidence. See *Independent Fire Insurance Co. v. Sunbeam*, 99-2181, 99-2257 (La.02/29/00), 755 So.2d 226; *Knowles v. McCright's Pharmacy, Inc.*, 34,559 (La.App. 2 Cir. 4/4/01), 785 So.2d 101. To determine whether the trial court erred in granting the motion for summary judgment in favor of Entergy Corporation and Entergy New Orleans, we must determine whether there are any genuine issues of material fact.

## ENTERGY NEW ORLEANS

The Millers assert that the trial court erred in finding that Entergy New Orleans was not a proper party to the instant suit, granting their motion for summary judgment and dismissing the Millers' claims against them. The Millers aver that the contractual language of the agreement under which Mr. Miller was employed clearly demonstrates Entergy New Orleans was a proper party and therefore, the trial court was precluded from granting their motion for summary judgment, insofar as genuine issues of material fact existed.

Entergy Corporation, formerly known as Middle South Utilities, is an integrated energy company engaged primarily in electric power production, retail distribution operations, energy marketing and trading, and gas transportation. Entergy Corporation owns and operates power plants and delivers electricity to customers in Louisiana. The business of Entergy Corporation traditionally operates through its regulated utility subsidiaries in its respective state service territories.

Entergy Louisiana, a subsidiary of Entergy Corporation, is a regulated public utility that provides electric generation, transmission and distribution |₅service in the state of Louisiana. Entergy New Orleans, also a subsidiary of Entergy Corporation, is a regulated public utility that provides electric generation transmission and distribution service exclusively within the Parish of Orleans. Entergy Services is a service company pursuant to the Public Utility Holding Co[...] (PUHCA), 15 U.S.C. § [...] as an agent for the [...] companies.

[2] Entergy Corpor[...] System Agreement wit[...] & Light, which is prese[...] tergy Louisiana; New [...] vice, which is presently [...] New Orleans; and Mid[...] which is presently know[...] vices, declaring that t[...] were to be considered [...] Operating Companies [...] Entergy Services shall [...] or more of the Enterg[...] nies whenever appropri[...] Entergy Louisiana and [...] leans.[1]

The record establish[...] entered into by Tower [...] tergy Services, expre[...] Entergy Services was "[...] as agent for each other [...] as defined in the [...] Agreement for Contrac[...] General Operating A[...] tracted Services was a[...] between Louisiana Pow[...] gy Louisiana's success[...] leans Public Service, [...] leans' successor.

Based upon our rev[...] between the parties an[...] positions, we conclude t[...] ine issues of material [...] Entergy New Orlean[...] action of Entergy Lo[...] Entergy Corporation's [...] principal—mandatary [...] its contract. This Co[...] evidence in the recor[...] find the trial court err[...]

---

1. Entergy Corporation, [...]
   of Entergy Louisiana, [...]

lic Utility Holding Company Act of 1935 (PUHCA), 15 U.S.C. § 79 *et seq.* that acts as an agent for the Entergy operating companies.

[2] Entergy Corporation entered into a System Agreement with Louisiana Power & Light, which is presently known as Entergy Louisiana; New Orleans Public Service, which is presently known as Entergy New Orleans; and Middle South Services, which is presently known as Entergy Services, declaring that the aforementioned were to be considered Entergy System Operating Companies and reiterated that Entergy Services shall act as agent for one or more of the Entergy operating companies whenever appropriate, which included Entergy Louisiana and Entergy New Orleans.[1]

The record establishes that the contract entered into by Tower Inspection and Entergy Services, expressly provides that Entergy Services was "acting for itself and as agent for each other Entergy companies as defined in the General Operating Agreement for Contracted Services." The General Operating Agreement for Contracted Services was a contract perfected between Louisiana Power & Light, Entergy Louisiana's successor; and New Orleans Public Service, Entergy New Orleans' successor.

Based upon our review of the contract between the parties and the corporate depositions, we conclude that there are genuine issues of material fact as to |₆whether Entergy New Orleans is liable for the action of Entergy Louisiana based upon Entergy Corporation's attempt to create a principal—mandatary relationship within its contract. This Court is bound by the evidence in the record; accordingly, we find the trial court erred in granting summary judgment as it relates to Entergy New Orleans.

### ENTERGY CORPORATION

[3] The Millers also aver that the trial court erred in granting Entergy Corporation's motion for summary judgment because genuine issue of material fact exists as to the liability of Entergy Corporation for acts of its subsidiaries through the single business enterprise theory. In their supplemental and amending petition for damages, the Millers assert that defendants, Entergy Corporation, Entergy Services, Entergy Louisiana, and Entergy New Orleans are liable for the acts of the other because Entergy Corporation, Entergy Services, Entergy Louisiana and Entergy New Orleans acted as a single business enterprise and are alter egos of each other. We mirror our brethren of the First Circuit Court of Appeal in opining that:

> The single business enterprise doctrine is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources in operations to achieve a common business purpose. (citations omitted). Thus, when corporations represent precisely the same single interests, a court is free to disregard their separate corporate identity. *Grayson v. R.B. Ammon and Associates, Inc.*, 99–2597, p. 17 (La.App. 1 Cir. 11/3/33), 778 So.2d 1, 14.

*Commercial Union Insurance Company v. CBC Temporary Staffing Services, Inc. and GAN Insurance Company*, 04–0854, p. 5 (La. 1 Cir. 11/3/04), 897 So.2d 647, 651.

[4] In seeking summary judgment and asserting that the Millers were not entitled to recover under the single business entity

---

1. Entergy Corporation, the parent company of Entergy Louisiana, Entergy New Orleans and other utility suppliers, owns 100% of the common stock of these corporations.

theory, Entergy Corporation averred that it was a publicly-traded utility holding company and that the Millers' attempt to impute liability pursuant to this theory of recovery was inappropriate considering the highly regulated environment in which Entergy Corporation and its subsidiaries operate. Entergy Corporation further averred that the Millers' contention that the Entergy defendants were liable under the single business entity theory was unnecessary, as Entergy Louisiana was an adequately capitalized and solvent company and acknowledged ownership of the Crossing Tower. Entergy Corporation and Entergy New Orleans attested that the Millers could not possibly satisfy their burden of proof at trial, establishing that the corporate structure of Entergy Corporation and its subsidiaries is inadequate or improper because the structure is a Public Utility Holding Company pursuant to the PUHCA, 15 U.S.C. § 79 *et seq.*, it is regulated by Federal law and Federal law preempts state law on the matter.

[5] Because Louisiana considers the concept of the corporation beneficial, the principal that the corporation is a separate entity should be disregarded only in a very limited manner. The party seeking to establish that two corporations were in fact a single business enterprise, such that liability imposed on one corporation would be imposed upon the other, must prove the existence of a single business enterprise by clear and convincing evidence. *Grayson v. R.B. Amman & Associates, Inc.*, 99-2597, p. 16 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, 14. As such, the Millers bear the burden, by clear and convincing evidence, to establish that special circumstances and/or factors exist, which establish a single enterprise among Entergy Corporation, Entergy Louisiana, Entergy New Orleans, and Entergy Services.

This Court In Re *New Orleans Train Car Leakage Fire Litigation*, 96–1677, pp. 2–3 (La.App. 4 Cir. 3/5/97), 690 So.2d 255, 256–257 addressed at length the single business entity theory. This Court opined:

> Corporations are generally recognized as distinct legal entities, separate from the individuals who comprise them. *Riggins v. Dixie Shoring Company, Inc.*, 590 So.2d 1164 (La.1991). The legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it a mere instrumentality or adjunct of another corporation. If one corporation is wholly controlled by another, the fact that it is a separate entity does not relieve the latter from liability. In that situation, the former corporation is considered to be the alter ego or business conduit of the latter. Courts can pierce the veil of a corporation in order to reach the "alter egos" of the corporate defendant. *Green v. Champion Insurance Company*, 577 So.2d 249 (La.App. 1st Cir.1991), *writ denied*, 580 So.2d 668 (La.1991).
>
> When two or more corporations operate a single business, the courts have been unwilling to allow affiliated corporations that are not directly involved to escape liability simply because of the business fragmentation. *Green; Lucey Manufacturing Corporation v. Oil City Iron Works*, 15 La.App. 12, 131 So. 57 (La. App. 2nd Cir.1930).
>
> Where a single corporation has been fragmented into branches that are managed by a dominant or parent entity, or have interlocutory directorates, the courts have held the dominant or parent corporation is liable for the obligation of its branches whenever justice requires protection of the rights of third persons. *Johnson v. Kinchen*, 160 So.2d 296 (La. App. 1st Cir.1964). The single business enterprise theory has been employed to extend liability beyond a separate entity. *Green*, 577 So.2d at 258. In determining

whether a corporation can be classified as a [...] ty, this Court, in *Le[...] Center of Florida*, [...] App. 4 Cir. 11/17/04 [...] citing *Green v. C[...] Company*, 577 [...] discussed the list of [...] dressed by the First [...] be considered to eith[...] party's argument reg[...] single business entity [...] enumerated in *Gree[...]* 258, and discussed b[...] 889 So.2d at 322, wa[...] an exhaustive list o[...] should consider in de[...] corporation and its [...] classified as a single [...] *v. Clinical Research* [...] 04–0428, p. 6 (La.App[...] So.2d 317, 322.

Reiterating our dis[...] regarding the trial [...] summary judgment [...] New Orleans, the re[...] the contract entered i[...] tion and Entergy Ser[...] vides that Energy Ser[...] itself and as agent for[...] companies as defined [...] ating Agreement for C[...]

The Millers aver tha[...] enterprise theory fact[...]

2. 1. corporations with [...] identity of ownership, [...] sufficient stock to giv[...] trol; 2. common direc[...] fied administrative co[...] whose business functio[...] plementary; 4. directo[...] corporation act indepe[...] of that corporation; 5. [...] another corporation; [...] zation ("thin incorpora[...] causing the incorporati[...] corporation; 8. corpor[...] ries and other expense[...] corporation; 9. receiv[...]

whether a corporation and its subsidiaries can be classified as a single business entity, this Court, in *Lee v. Clinical Research Center of Florida,* 04–0428, pp. 5–6 (La. App. 4 Cir. 11/17/04), 889 So.2d 317, 322 citing *Green v. Champion Insurance Company,* 577 So.2d at 257–258, $\downarrow_9$discussed the list of possible factors addressed by the First Circuit, which may be considered to either support or refute a party's argument regarding existence of a single business entity.[2] However, the list enumerated in *Green,* 577 So.2d at 257–258, and discussed by this Court in *Lee,* 889 So.2d at 322, was not intended to be an exhaustive list of factors the courts should consider in determining whether a corporation and its subsidiaries can be classified as a single business entity. *Lee v. Clinical Research Center of Florida,* 04–0428, p. 6 (La.App. 4 Cir. 11/17/04), 889 So.2d 317, 322.

Reiterating our discussion of the record regarding the trial court's granting of summary judgment in favor of Entergy New Orleans, the record establishes that the contract entered into by Tower Inspection and Entergy Services, expressly provides that Energy Services was "acting for itself and as agent for each other Entergy companies as defined in the General Operating Agreement for Contracted Services."

The Millers aver that the single business enterprise theory factors are applicable to the case *sub judice.* In addressing the factors as provided in *Green* and acknowledged by this Court in *Lee,* we are required to view the evidence in a light most favorable to the Millers. As evidenced by the record before us, the Millers' assertions that Entergy Corporation and Entergy New Orleans are corporations with identity or substantial identity of ownership, providing that all of $\downarrow_{10}$the Entergy subsidiaries share the same logo and colors; that Entergy Louisiana, Entergy New Orleans, and Entergy Services have common directors or officers, as that of Entergy Corporation, the parent corporation; that all the Entergy defendants share common employees, co-mingle funds; engagement in business fragmentation by the Energy Corp.; undercapitalization; centralized accounting; common offices; and unified administrative control and other conduct, create genuine issues of material fact.

[6] Although mere assertions are insufficient to establish genuine issue of material fact; assertions substantiated with factual support sufficient to establish that the evidentiary burden of proof is able to be satisfied at trial, raise genuine issues of material fact. This Court's decision is not a determination on the merits of the Millers' claims, nor does it involve any credibility determinations, or evaluations of

---

2. 1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations. *Green,* 577 So.2d at 257–258.

weight of the evidence. This Court's decision is based on the record before us, and we find that the Millers provide a factual basis upon which a finder of fact may make a determination that the Entergy Corporation and its wholly owned subsidiaries constitute a single business enterprise such that liability of one of its subsidiaries constitutes the liability on the part of the other subsidiaries and its parent corporation.

Based on the foregoing, we conclude that after reviewing the facts in a light more favorable to the Millers, the party opposing the motions for summary judgment, the Millers have successfully raised issues of material fact as to whether Entergy Corporation and its subsidiaries constitute a "single business enterprise." Accordingly, the trial court erred in granting summary judgment in favor of Entergy Corporation and Entergy New Orleans and we, therefore, reverse the trial |₁₀court's judgment granting summary judgment and remand this case to the trial court for further proceedings.

**REVERSED AND REMANDED.**



2004-2220, 2004-1884 (La.App. 4 Cir. 7/13/05)

STATE of Louisiana

v.

Robert L. COSEY.

State of Louisiana

v.

Robert L. Cosey.

Nos. 2004-KA-2220, 2004-K-1884.

Court of Appeal of Louisiana, Fourth Circuit.

July 13, 2005.

**Background:** Defendant was convicted in a bench trial in the Criminal District Court, Orleans Parish, No. 420-560, Section E, Calvin Johnson, J., of simple burglary of an inhabited dwelling, for which he was sentenced to 12 years' imprisonment, the trial court having found defendant not guilty of being a habitual offender. State appealed.

**Holding:** The Court of Appeal, James F. McKay III, J., held that evidence was sufficient to establish defendant's status as fourth-felony habitual offender.

Reversed and remanded.

**1. Sentencing and Punishment** ⟐1381(6)

Evidence was sufficient to establish that defendant was fourth-felony habitual offender subject to enhanced sentencing for instant burglary conviction; with respect to each of the three predicate convictions, all burglary and theft-related offenses, officer testified that, despite different name or alias under which defendant had been previously convicted, he matched defendant's thumbprints to thumbprints on arrest registers reflecting defendant's convictions, with other charging information and documents relevant to guilty pleas and sentences. LSA-R.S. 15:529.1.

**2. Sentencing and Punishment** ⟐1378

To obtain a habitual offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony.

**3. Sentencing and Punishment** ⟐1381(6)

Not only are fingerprints on the bill of information not necessary to establish that a defendant charged as a habitual offender is the same p[erson whose] fingerprints ar[e ...] prove identity.

**4. Sentencing** ⟐1381(6)

In determi[ning whether] an habitual off[ender ...] defendant's fing[erprints ...] an arrest regist[er ...] arrest register [...] dencing a convi[ction ...] lish that the de[fendant was] previously convi[cted ...]

**5. Sentencing** a[nd Punishment]

A trial cour[t ...] a defendant not [...] offender where [...] quate evidence t[...]

Eddie J. Jord[an, District Attorney] of Orleans Paris[h, ...] tant District At[torney, ...] Fungai Muzorew[a, Assistant Dis-] trict Attorney of [Parish of Or-] leans, Louisiana,

William R. Ca[mpbell, Ap-] pellate Project, [New Orleans,] and Clarke D. [Beljean, Indigent] Defender Progra[m, New Orle-] ana, for Defenda[nt.]

(Court compose[d of Judge] RIVET MURRA[Y, Judge] McKAY III, Judg[e] KIRBY).

|₁JAMES F. M[cKAY III, Judge.]

**STATEMENT O**[F THE CASE]

The defendant [...] James L. Knight[on ...]

1. *State v. Cosey,* [La.App.] 4 Cir. 3/30/04).