

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    AUG 2 1 2006

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION
NUMBER: 05-4182 "K"(2)
JUDGE DUVAL
MAG. WILKINSON

PERTAINS TO:  MRGO, *Robinson,*
(No. 06-2268)

## PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S

## MOTION TO DISMISS



EXHIBIT

1

Fee_____
Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No._____

1

## TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................   2

II.    ON THEIR FACE, PLAINTIFFS' WELL-PLED ALLEGATIONS IN
       THE COMPLAINT DEFEAT THE GOVERNMENT'S MOTION TO
       DISMISS FOR LACK OF JURISDICTION. ........................................   8

III.   FACTS ...............................................................................................   15

       A.   The Complaint Alleges In Detail Two Fundamental Defects
            In The MR-GO Attributable To The Army Corps'
            Negligence ................................................................................   16

       B.   Plaintiffs' Complaint Alleges That The MR-GO Was Not
            A Federal Flood Control Project .............................................   18

       C.   Plaintiffs' Complaint Alleges That The MR-GO, And Not
            Any Federal Flood Control Facilities, Caused Their
            Damages......................................................................................   19

       D.   Plaintiffs Are Not Challenging The Legislation Authorizing
            The MR-GO .................................................................................   24

       E.   The Army Corps Violated Two Federal Statutes When
            Planning, Designing, and Constructing the Waterway ..............   26

       F.   The Government's Documents Fail to Establish That Any of the
            MR-GO Levees or the Seabrook Dam and Lock Were Actually
            Constructed. ..............................................................................   28

            1.   The Phantom Seabrook Lock Was Never Constructed..   28

            2.   The Government Also Does Not Establish Whether or
                 Where Actual Flood Control Levees Along the MR-GO
                 Were Ever Built.................................................................   30

IV.    THE MISSISSIPPI FLOOD CONTROL ACT OF 1928 AFFORDS NO
       IMMUNITY TO THE UNITED STATES ...........................................   34

       A.   The Fifth Circuit in Graci v. United States Dispositively
            Decided That Section 702c Immunity Does Not Attach To The
            Governments' Tortious Acts Arising From The MR-GO. ..........   35

i

                                                                              Page

B.    From Its Inception, FCA Immunity Was Strictly Limited To
      Flood Control Projects. .............................................................    39

C.    The United States Supreme Court in *James III* Reinforced the
      Fifth Circuit's Conclusions in *Graci*. .........................................    43

D.    The United States Supreme Court in *Central Green* Further
      Confirmed The Fifth Circuit's Conclusions in *Graci*. ...............    46

E.    The Lake Pontchartrain And Vicinity Hurricane Protection
      Project Has No Bearing On This Case.......................................    48

      1.    Plaintiffs' Negligence Claims Are Not Predicated Upon
            The Failure Of Levees...................................................    49

      2.    There Are Numerous Disputed Issues of Fact
            Concerning Whether The MR-GO Has Any Flood
            Control Features............................................................    50

V.    THE GOVERNMENT LACKS IMMUNITY UNDER THE
      FEDERAL TORT CLAIMS ACT FOR PLAINTIFFS' NEGLIGENCE
      CLAIMS............................................................................................    53

VI.   CONCLUSION................................................................................    68

## TABLE OF AUTHORITIES

Pages(s)

### CASES

*Alabama Electric Cooperative, Inc. v. United States,*
    769 F. 2d 1523 (11th Cir. 1985)............................................................................ 7, 65

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................... 14

*Ayala v. U.S.,*
    980 F. 2d 1342 (10th Cir. 1992)........................................................................... 64

*Becker v. Tidewater, Inc.,*
    405 F. 3d 257 (5th Cir. 2005)............................................................................... 20

*Bell v. Hood,*
    327 U.S. 678 (1945) ................................................................................... 2, 9, 10

*Beneficial Nat. Bank v. Anderson,*
    539 U.S. 1 (2003) .............................................................................................. 20

*Berger v. United States,*
    295 U.S. 78 (1935).............................................................................................. 5

*Berkovitz v. United States,*
    486 U.S. 531 (1988)................................................................................. 6, 58, 63, 64

*Berthelot v. Boh Brothers Constr. Co., L.L.C , et al.*
    (O'Dwyer 054191) Order dated July 19, 2006 (Duval, J.)............................................ 8

*Binderup v. Pathe Exchange,*
    263 U.S. 291 (1923)............................................................................................ 9

*Bonin v. Ferrellgas, Inc.,*
    877 So. 2d 89 (La. 2004)...................................................................................... 22

*Boyd v. United States,*
    881 F. 2d 895 (10th Cir. 1989)............................................................................. 44

*Buchanan v. U.S.,*
    915 F. 2d 969 (5th Cir. 1990)............................................................................... 58

*Carr v. City of Baton Rouge,*
    314 So.2d 527 (La.App.1975)............................................................................... 38

**Page(s)**

*Central Green Co. v. United States,*
    531 U.S. 425 (2001) .................................................................................... passim

*Collins v. United States,*
    783 F. 2d 1225 (5th Cir. 1986).............................................................. 62

*Commerce and Indus. Ins. Co. v. Grinnell Corp.,*
    280 F. 3d 566 (5th Cir. 2002)................................................................... 6

*Conley v. Gibson,*
    355 U.S. 41 (1957) ................................................................................ 20

*Cope v. Scott,*
    45 F. 3d 445 (D.C. Cir. 1995) .............................................................. 64

*Crowe v. Henry,*
    43 F. 3d 198 (5th Cir. 1995)................................................................. 10

*Dalehite v. United States,*
    346 U.S. 15 (1953)...........................................................................6, 55

*Dewitt Bank & Trust Co. v. United States,*
    878 F. 2d 246 (8th Cir. 1989)............................................................... 44

Eubanks v. McCotter,
    802 F.2d 790 (5th Cir.1986)................................................................... 3

Fisher Bros. Sales, Inc. v. U.S.,
    46 F. 3d 279 (3rd Cir. 1995) ............................................................... 64

*Fontenot v. Upjohn Co.,*
    780 F. 2d 1190 (5th Cir. 1986)............................................................. 14

*Graci v. United States,*
    301 F. Supp. 947 (E.D. La. 1969) .................................................. passim

*Graci v. United States,*
    435 F. Supp. 189 (E.D. La. 1977) .................................................. passim

*Graci v. United States,*
    456 F. 2d. 20, (5th Cir. 1971)......................................................... passim

Hayes v. United States,
    585 F. 2d 702 (4th Cir. 1978)............................................................... 46

Hiersche v. United States,
    503 U.S. 923 (1992) ............................................................................ 42

Page(s)

*Home Builders Assn. of Miss., Inc. v. City of Madison, Miss.,*
143 F. 3d 1006 (5th Cir. 1998)..................................................................... 9

*Indian Towing Co. v. United States,*
350 U.S. 61 (1955) ..................................................................................... 63

*James v. United States,*
790 F. 2d 590 (5th Cir. 1985)............................................................... 40, 43

*James v. United States,*
478 U.S. 597 (1986) ................................................................................... 43

*Kiska Const. Corp. v. Washington Metropolitan,*
321 F. 3d 1151 (D.C. Cir. 2003) ............................................................... 59

*Maxwell v. First Nat. Bank of Monroeville,*
638 F. 2d 32 (5th Cir. 1981)....................................................................... 11

*McClaskey v. United States,*
386 F. 2d 807, n.1 (9th Cir. 1967).............................................................. 37

*McWaters v. F.E.M.A.*
2006 WL 1851473 (E.D. La., June 16, 2006) ........................................... 10

*Mocklin v. United States,*
877 F. 2d 427 (5th Cir. 1989)..................................................................... 40

*Montez v. Dept. of Navy,*
392 F.3d 147 (5th Cir. 2004)............................................................. 2, 8, 12

*Morici Corp. v. United States,*
681 F. 2d 645 (9th Cir. 1982)..................................................................... 49

*Moyer v. Martin Marietta Corp.,*
481 F. 2d 585 (5th Cir. 1973)..................................................................... 64

*National Fire Ins. v. United States,*
115 F. 3d 1415 (9th Cir. 1997).................................................................. 66

*O'Toole v. United States,*
295 F. 3d 1029 (9th Cir. 2002).............................................................. 65, 67

*Peterson v. United States,*
367 F. 2d 271 (9th Cir. 1966)................................................................ 37, 45

*Pouncy v. Temple, Royal Indem. Co., Intervenor,*
41 So. 2d 139 (La. Ct. App. 1949) ............................................................ 22

v

Page(s)

*Ramming v. United States*,
    281 F. 3d 158 (5th Cir. 2001)..................................................................... 9

*Sanko Steamship Co., Ltd. v. United States*,
    272 F. 3d 1231 (9th Cir. 2001)............................................................. 5, 47

Savoy v. United States,
    Civ. Action No. 06-3552, (E.D. La. 2006).................................................. 26

*Seaboard Coast Line Railroad Co. v. United States*,
    473 F. 2d 714 (5th Cir. 1973)............................................................... 37, 64

*Smith v. United States*,
    507 U.S. 197 (1993)........................................................................... 42, 54

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).................................................................................. 10

Stelly v. U.S.,
    644 F. Supp. 107 (W.D. La. 1986)............................................................ 39

*Suthoff v. Yazoo County Indus. Dev. Corp.*,
    637 F. 2d 337 (5th Cir. 1981)................................................................... 11

*Swafford v. Templeton*,
    185 U.S. 487 (1902)................................................................................. 9

*United States ex rel. Laird v. Lockheed Martin Eng'g. and Sci. Servs. Co.*,
    336 F. 3d 346 (5th Cir. 2003)................................................................ 3, 11

*United States v. Gaubert*,
    499 U.S. 315 (1991)..................................................................... 55, 58, 63

*United States v. Hunsucker*,
    314 F. 2d 98 (9th Cir. 1962).................................................................... 65

*United States v. James*,
    478 U.S. 497 (1986)............................................................................. 5, 40

*United States v. Nordic Village, Inc.*,
    503 U.S. 30 (1992)................................................................................. 42

*United States v. S.A. Empresa de Viacao Aerea Rio Gransense ("Varig
Airlines")*,
    467 U.S. 797 (1984)............................................................................... 63

<u>Page(s)</u>

*United States v. Sponenbarger,*
    308 U.S. 256 (1939) ............................................................................... 39

*United States v. Yellow Cab Co.,*
    340 U.S. 543 (1951) ............................................................................... 42

*Valentin v. Hosp. Bella Vista,*
    254 F. 3d 358 (1st Cir. 2001) ...................................................... 10, 13

*Whisnant v. U.S.,*
    400 F. 3d 1177 (9th Cir. 2005) .............................................................. 64

*Williamson v. Tucker,*
    645 F. 2d 404 (5th Cir. 1981) ........................................................ 8, 10

## STATUTES

16 U.S.C. § 662 ......................................................................................... 6, 59

28 U.S.C. § 2671 et seq. ............................................................................... 34

28 U.S.C. Section 2571 et seq. ..................................................................... 11

28 U.S.C.A. § 2680(a) .................................................................................. 55

33 U.S.C. § 702c ........................................................................................... 34

Flood Control Act of 1928, 33 U.S.C. § 702c ........................................... 34

## OTHER AUTHORITIES

Hofmann, *An Enduring Anachronism: Arguments for the Repeal of the §*
    *702c Immunity Provisions of the Flood Control Act of 1928,* 79 Tex. L.
    Rev. 791 (2001) ..................................................................................... 44

John M. Barry, *Rising Tide: The Great Mississippi Flood of 1927 and*
    *How It Changed America* (Touchstone 1998) ..................................... 39

River and Harbor Act of 1945 (P.L. 79-14, 50 Stat. 10 (March 2, 1945) ....... 26

S. Doc. No. 91, 70th Cong., 1st Sess. 1 (1928) (Conference Report) ............... 41

The River and Harbor Act and Flood Control Act of 1965, P.L. 89-298, 79
    Stat. 1073 (October 27, 1965) .............................................................. 29

LSA C.C. Art. 667 ...................................................................................... 38

Page(s)

The River and Harbor Act of 1945,  P.L. 79-14, 50 Stat. 10 (March 2,
    1945) ................................................................................................................. 25

12 Wright & Miller, *Federal Practice & Procedure Civil,* Sections 1271,
    1357, 3155 (2006) ...................................................................................... 10, 13, 23

## I.    INTRODUCTION

> This Court has jurisdiction over the parties and
> under 28 U.S.C. Section 1346 [Defendant United
> States] and 28 U.S.C. Section 2571 et seq. (Federal
> Tort Claims Act) *has subject matter jurisdiction*
> *over this suit by plaintiffs against the United States*
> *for damages allegedly received as a result of*
> *defendant's construction of the MRGO.*

*Graci v. United States*, 435 F. Supp. 189, 195 (E.D. La. 1977) (emphasis added).

The United States Army Corps of Engineers and the United States of America

(collectively, the "Government") have brought a Motion to Dismiss ("Motion") on exactly

the set of negligence claims over the Mississippi River-Gulf Outlet ("MR-GO") navigation

project that this Court and the Fifth Circuit have entertained for decades.  *See Graci v.*

*United States,* 301 F. Supp. 947, 949 (E.D. La 1969); *Graci v. United States*, 435 F. Supp.

189, 195 (E.D. La. 1977); *Graci v. United States, 456* F. 2d 20 (5th Cir. 1971).  Now, as

then, the Government's Motion is improper and should fare no better than it has before.

Indeed, nothing has occurred in the intervening three decades that would affect this Court's

subject matter jurisdiction under the legal authority of these cases.

The Government's motion is fatally flawed on both procedural and substantive

grounds.  Procedurally, the Government's Motion fails for two separate reasons:

*First,* the Government has filed an improper motion aimed straight at the merits of

Plaintiffs' case under the guise of a Rule 12(b)(1) motion to dismiss for lack of subject

matter jurisdiction.  The Fifth Circuit and this Court have held, on numerous occasions,

that "we follow our general rule in holding that a jurisdictional attack intertwined with the

merits of an Federal Tort Claims Act ("FTCA") claim should be treated like any other

intertwined attack, thereby making resolution of the jurisdictional issue on a 12(b)(1)

2

motion improper." *Montez v. Dept. of Navy*, 392 F. 3d 147, 150 (5th Cir. 2004); *see also*

*Bell v. Hood*, 327 U.S. 678, 683-84 (1945) (reversing Court of Appeals' dismissal under

Rule 12(b)(1) because "the complaint does in fact raise serious questions, both of law and

fact, which the district court can decide only after it has assumed jurisdiction over the

controversy."). Instead, "[w]hen the basis of federal jurisdiction is intertwined with the

plaintiff's federal cause of action, the court should assume jurisdiction over the case and

decide the case on the merits." *United States ex rel. Laird v. Lockheed Martin Eng'g. and

Sci. Servs. Co.*, 336 F. 3d 346, 350 (5th Cir. 2003) (quoting *Eubanks v. McCotter*, 802 F.

2d 790, 792-93 (5th Cir.1986)) (emphasis added). Without question, the Motion is fatally

defective on purely procedural grounds, and the Court should deny it solely for that reason.

     *Second*, the Government has attempted to buttress its motion to dismiss by raising a

host of factual issues that for the most part have remarkably little bearing on the question

presented under a Rule 12(b)(1) motion: whether this Court has subject matter jurisdiction

to hear the claim. What is certainly not permissible at this stage is to argue the factual

merits of the claim — before the Government has even answered the Complaint, produced

a single document, or offered a single witness for deposition. There is a time and place for

factual disputes whether at summary judgment or trial. A motion to dismiss, however, is

one that must assume the facts alleged, not a complete set of new factual claims paraded as

a 12(b)(1) motion.

     When the Motion is properly construed as a motion for summary judgment under

Rule 56, it must also fail at the outset because it ignores the well-pled allegations of the

Complaint and instead seeks to have the Court resolve numerous factual issues relating to

the merits of Plaintiffs' case that are, at the very least, hotly disputed. Indeed, the

Government has offered its own "factual renditions" — a telling sign that this matter is not proper for resolution at this point. The Motion is unaccompanied by any Request for Judicial Notice of over a thousand pages in eleven exhibits or by any affidavit purporting to establish the Government's version of the facts. In addition, the arguments about the facts in the Motion are based on pure speculation and incomplete and often misleading snippets of information extracted from isolated pages of a massive amount of unauthenticated documents that are not amenable to judicial notice even if the Government had so requested.

One example alone illustrates the impropriety of the proffered motion to dismiss. The Government's claim that there is no subject matter jurisdiction is defeated by this Court's and the Fifth Circuit's prior determination to entertain FTCA claims against the MR-GO project in the *Graci* cases. The Government must therefore find a way of evading this seemingly controlling law of the Circuit. The Government's ploy is to raise a series of complicated factual claims by which the *Graci* holdings are no longer good law because the Army Corps after Hurricane Betsy built the "Seabrook Lock" — a storm barrier supposedly planned for the confluence of the mouth of the MR-GO and Lake Pontchartrain. Therefore, according to the Government, this post-1965 measure transformed the MR-GO into an immune "flood control project" rather than the nonimmune navigational waterway as determined in the *Graci* opinions.

This is a desperate move. The complicated factual assertion about the new as opposed to former purposes of the MR-GO project is exactly the type of contested factual issue that must be resolved at trial, or perhaps at summary judgment if the record were as clear as claimed. At a minimum, Rule 56(f) requires denial of the motion and the

opportunity for discovery by Plaintiffs. Worse yet, what the Government neglects to inform this Court is that the Seabrook Lock was *never built*! Similarly, the Government claims that new "levees" were constructed, conveniently ignoring the fact that the Army Corps itself admitted that as late as 1988 the south side of Reach 2 of the MR-GO was "unleveed." We have a right to expect a lot more candor from the Department of Justice whose mission is not merely to win cases, but to see that justice is done. *Cf. Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, ... is not that it shall win a case, but that justice shall be done.").

If the Court chooses to reach the legal issues raised by the Motion, it will see that the Government's arguments about immunity under the Mississippi River Flood Control Act of 1928 ("FCA") and the discretionary function doctrine exception to the FTCA are untenable.

*First*, the FCA does not cloak the Government with blanket immunity for tort claims arising from its faulty design, construction, operation, and maintenance of a navigational waterway such as the MR-GO. The *Graci* decisions squarely hold that the FCA immunity provision does not apply to the MR-GO because it is a navigational waterway. No intervening cases by the Fifth Circuit or the Supreme Court have altered the inapplicability of the FCA to a federal navigational waterway with no flood protection purpose. The only decisions cited by the Government concern the extent of immunity for the negligent maintenance or operation of *flood control projects* that results in harms unrelated to flooding. *See Central Green Co. v. United States*, 531 U.S. 425 (2001)

5

(flooding caused by subsoil seepage of water from flood control project); *United States v. James*, 478 U.S. 497 (1986) (recreational boating injury on federal flood control waterway). *Indeed, the effect of Central Green was to contract, not expand governmental FCA immunity. See Sanko Steamship Co., Ltd. v. United States*, 272 F. 3d 1231, 1232 (9th Cir. 2001) (The Supreme Court in *Central Green* "established a more restrictive test for determining sovereign immunity").

*Second*, the Government has misconstrued the facts pled in Plaintiffs' Complaint to attempt to convince the Court that Plaintiffs' case must be dismissed under the "due care exception" to the FTCA. The Supreme Court has held that the purpose of this alleged "due care" exception is to "bar[ ] tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953). Plaintiffs do not challenge the legality of the statutes authorizing the investigation, design, or construction of the MR-GO. Instead, the Complaint alleges that the Army Corps failed to satisfy the express provisions of the 1946 and 1958 amendments to the Fish and Wildlife Coordination Act, as amended at 16 U.S.C. § 662, in the administrative process of presenting the MR-GO project to Congress for approval and in implementation of the legislative authorization. Plaintiffs therefore allege that the Government's noncompliance with statutory laws created the hazards of the MR-GO and caused Plaintiffs' damages. Since Plaintiffs never challenge the legality or constitutionality of the MR-GO-related legislation, the "due care exception" is inapplicable.

*Third*, the Army Corps' reliance on the discretionary function exception to the FTCA is likewise misplaced. In *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), the Supreme Court expressly stated that "the discretionary function exception *will not apply*

*when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.* In this event, the employee has no rightful option but to adhere to the directive." (Emphasis added); *accord Commerce and Indus. Ins. Co. v. Grinnell Corp.,* 280 F. 3d 566, 572 (5th Cir. 2002). Since Plaintiffs allege that their damages were due to the Army Corps' failure to comply with statutory mandates, the Government is barred from raising the discretionary function exception as a defense to Plaintiffs' claims.

*Fourth,* even if the Government could rely on the narrowly construed exception to the broad waiver of sovereign immunity in the FTCA, the Congressional decision to build the MR-GO was the only discretionary function exercised in this case. In contrast, the manner in which the Army Corps satisfied the Congressional directives—including decisions about route, design, materials, soil erosion prevention and protection of marshlands—involved engineering and scientific judgment not protected by the discretionary function exception to the FTCA. *See Ala. Elec. Coop., Inc. v. United States,* 769 F. 2d 1523, 1531 (11th Cir. 1985). The discretionary function exception therefore provides no refuge for the Government to escape liability for its negligent acts with respect to the MR-GO.

*Finally,* it bears noting that the Government has simply retread the same untenable arguments about the due care and discretionary function exceptions from its unsuccessful motion to dismiss in *Graci* back in 1966. Those arguments were categorically rejected by Judge Herbert Christenberry who determined, after a careful analysis of the "narrowly" interpreted discretionary function exception, that "[i]n the present state of the record, this is not a proper case to be disposed of on a motion to dismiss." *See* Froeschle Decl., ¶ 123;

7

Exhibit N.N.  Like its predecessor, this Court should reject the Government's resurrected discretionary and due care exception arguments.

## II.  ON THEIR FACE, PLAINTIFFS' WELL-PLED ALLEGATIONS IN THE COMPLAINT DEFEAT THE GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION.

In its Motion to Dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), the Government violates a cardinal rule of federal pleadings practice that from the outset dooms its attempted dismissal.  Realizing that the detailed Complaint on its face amply establishes federal subject matter jurisdiction under the FTCA, the Government impermissibly seeks to attack the merits of Plaintiffs' cause of action by raising claims of immunity based on the Mississippi Flood Control Act of 1928 and the alleged "due care" and discretionary function exceptions to the FTCA.  Further realizing that these immunity claims are contradicted by specific allegations in the Complaint, the Government resorts to alleging facts outside the Complaint—and offering exhibits in support—in its attempt to persuade the Court on the merits of its immunity claims.  Under long-established Supreme Court and Fifth Circuit precedent, the Court must deny the Motion on procedural grounds alone.

The Government's failure to discuss the applicable legal standard for deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is understandable in light of the fact that the Government has impermissibly sought (1) to challenge the existence of a federal cause of action and (2) to convert a Rule 12(b)(1) motion into a Rule 56 motion for summary judgment by introducing facts outside the allegations in the Complaint and arguing the merits of Plaintiffs' case.  *Montez*, 392 F. 3d at 150.  ("'This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides . . . a

8

greater level of protection to the plaintiff who in truth is facing a challenge to the validity

of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . .

both of which place greater restrictions on the district court's discretion. '") (quoting

*Williamson v. Tucker*, 645 F. 2d 404, 415 (5th Cir. 1981)). On this basis alone, the motion

must be denied under controlling Supreme Court and Fifth Circuit jurisprudence. *See*

*Berthelot v. Boh Brothers Constr. Co., L.L.C. et al.* (O'Dwyer 05-4191), Order dated July

19, 2006 (Duval, J.) ("The court's dismissal of a plaintiff's case because the plaintiff lacks

subject matter jurisdiction is not a determination of the merits and does not prevent the

plaintiff from pursing a claim in a court that does have jurisdiction.") (quoting *Ramming v.*

*United States*, 281 F. 3d 158,161 (5th Cir. 2001)).

　　　　A motion to dismiss for lack of subject matter jurisdiction can be granted only if it

appears certain that the plaintiff cannot prove *any set of facts* in support of his claim that

would entitle plaintiff to relief. *Home Builders Assn. of Miss., Inc. v. City of Madison,*

*Miss.*, 143 F. 3d 1006, 1010 (5th Cir. 1998) (emphasis added). The Supreme Court has

enunciated a strict standard for dismissals for lack of subject matter jurisdiction when the

basis of jurisdiction is also an element in the plaintiff's federal cause of action. *See Bell v.*

*Hood*, 327 U.S. at 683-84 (reversing Court of Appeals' dismissal under Rule 12(b)(1)

because "the complaint does in fact raise serious questions, both of law and fact, which the

district court can decide only after it has assumed jurisdiction over the controversy."). In

*Bell*, the Supreme Court held unequivocally:

> *Jurisdiction, therefore, is not defeated as respondents seem to*
> *contend, by the possibility that the averments might fail to*
> *state a cause of action on which petitioners could actually*
> *recover. For it is well settled that the failure to state a proper*
> *cause of action calls for a judgment on the merits and not for a*
> *dismissal for want of jurisdiction.* Whether the complaint

> states a cause of action on which relief could be granted is a
> question of law and just as issues of fact it must be decided
> after and not before the court has assumed jurisdiction over the
> controversy. If the court does later exercise its jurisdiction to
> determine that the allegations in the complaint do not state a
> ground for relief, then dismissal of the case would be on the
> merits, not for want of jurisdiction.

*Id.* at 682; (emphasis added); *accord Binderup v. Pathe Exchange*, 263 U.S. 291, 305-08

(1923); *Swafford v. Templeton*, 185 U.S. 487, 493-94 (1902). More recently, the Supreme

Court reaffirmed its holding in *Bell*: "It is firmly established in our cases that the absence

of a valid (as opposed to arguable) cause of action does not implicate subject-matter

jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel*

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in the original).

Citing *Bell*, the Fifth Circuit has firmly avowed that "as a general rule a claim

cannot be dismissed for lack of subject matter jurisdiction because of the absence of a

federal cause of action." *Williamson*, 645 F. 2d at 416. "Where the defendant's challenge

to the court's jurisdiction is also a challenge to the existence of a federal cause of action,

the proper course of action for the district court . . . *is to find that jurisdiction exists* and

deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* at 415

(emphasis added).

As this Court has recently noted, "[a] motion to dismiss pursuant to Rule 12(b)(1)

for lack of subject matter jurisdiction is analyzed under the same standard as a motion to

dismiss under Rule 12(b)(6)." *McWaters v. F.E.M.A.* 2006 WL 1851473, *7 (E.D. La.,

June 16, 2006). Thus, in the context of Rule 12(b)(1) motion based on a "facial attack,"

the complaint is construed in the light most favorable to the plaintiff, its well-pled

allegations must be accepted as true, and all reasonable inferences must be drawn in the

plaintiff's favor. *See Crowe v. Henry*, 43 F. 3d 198, 203 (5th Cir. 1995); 5B Wright &

Miller, *Federal Practice & Procedure*, Section 1357 (2006).   As stated by the First Circuit

in *Valentin v. Hosp. Bella Vista*, 254 F. 3d 358, 363 (1st Cir. 2001):

> The first way is to mount a challenge which accepts the
> plaintiff's version of jurisdictionally-significant facts as true
> and addresses their sufficiency . . . . In performing this task,
> the court must credit the plaintiff's well-pleaded factual
> allegations (usually taken from the complaint, but sometimes
> augmented by an explanatory affidavit or other repository of
> uncontested facts), draw all reasonable inferences from them
> in her favor, and dispose of the challenge accordingly.

On its face, the Complaint alleges federal jurisdiction under the FTCA. *See*

Complaint, ¶ 7. That is all that needs to be alleged to defeat this motion to dismiss. *See*

*Maxwell v. First Nat. Bank of Monroeville*, 638 F. 2d 32, 35 (5th Cir. 1981) ("In order to

determine whether the claim arises under the  . . .  laws of the United States, we must look

to the plaintiff's complaint unaided by anticipated defenses *and with due regard to the real*

*nature of the claim*.") (emphasis added);   *Suthoff v. Yazoo County Indus. Dev. Corp.*, 637

F. 2d 337, 339 (5th Cir. 1981) ("[W]e must sustain federal jurisdiction if, construed in the

light of the pleader's purposes, the claim is based upon the federal  . . . statutes . . . .").

Nearly 30 years ago, the District Court for the Eastern District of Louisiana—in a

FTCA suit for damages from flooding by the MR-GO during Hurricane Betsy—concluded

as a matter of law:

> This Court has jurisdiction over the parties and under 28
> U.S.C. Section 1346 [Defendant United States] and 28 U.S.C.
> Section 2571 et seq. (Federal Tort Claims Act) *has subject*
> *matter jurisdiction over this suit by plaintiffs against the*
> *United States for damages allegedly received as a result of*
> *defendant's construction of the MRGO.*

11

*Graci v. United States*, 435 F. Supp. 189, 195 (E.D. La. 1977) (emphasis added). Once again, in this FTCA case similarly alleging hurricane-related damages caused by the MR-GO, the proper course is to find federal jurisdiction and allow the case to proceed to discovery.

The Complaint sets forth three categories of allegations relevant to the pending motion:

(1) the Army Corps was negligent in the design, planning, construction, maintenance, and operation of the MR-GO; *see* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102;

(2) the flooding of Plaintiffs' homes and business was caused by the defective MR-GO, and there are no allegations that Plaintiffs' damages were caused by inadequate or failed federal flood control facilities; *see* Complaint, ¶¶ 12, 14-15, 17, 20, 24, 43, 50, 55, 59, 74 – 77, 94, 102, 104-108, and 110-113; and

(3) the Army Corps violated federal law in the planning, investigation, design, and construction of the MR-GO; *see* Complaint, ¶ 63.

As detailed below, these allegations on their face defeat the Motion to Dismiss as a matter of law, and the Court should proceed no further.

Similarly, the Government—in the guise of an attempted dismissal for lack of federal jurisdiction under Rule 12(b)(1)—cannot defeat the Plaintiffs' right to seek discovery and a trial on the merits by making what is in reality a motion for summary judgment. All of the Government's "evidence" [1] must be disregarded at this early stage if

---

[1] Plaintiffs object to all but one of the exhibits that the Government has cited in its Motion. *See* Plaintiffs' Evidentiary Objections to Government Exhibits.

the resolution of the jurisdictional question is dependent upon the resolution of factual

questions (*i.e.,* the validity of the immunity defenses) going to the merits of the FTCA

cause of action. *Montez, supra,* 392 F. 3d at 150. Therefore, this Court "must assume

jurisdiction and proceed to the merits." *Id.*[2]

     Alternatively, if the Court treats the motion to dismiss as a "factual" attack on

federal jurisdiction because it goes beyond the allegations in the Complaint and offers

extrinsic evidence, the motion must still be denied. *Valentin, supra,* 254 F. 3d at 363. As

demonstrated below, the Government has offered an extraordinarily selective rendition of

the critical facts bearing on the immunity issues, has misled the Court on material facts,

---

[2] Moreover, the Government has improperly used Rule 12(b)(1) to assert an affirmative
defense of immunity with respect to the FCA claim. In the recent decision of *Arbaugh v.
Y&H Corp.,* the Supreme Court articulated a bright line standard as to whether the
assertion of sovereign immunity is an element of plaintiff's claim making it inappropriate
for a 12(b)(1) motion:

> If the Legislature clearly states that a threshold limitation on
> a statute's scope shall count as jurisdictional, then courts and
> litigants will be duly instructed and will not be left to wrestle
> with the issue. *But, courts should treat the restriction as
> nonjurisdictional in character when Congress does not rank
> a statutory limitation on coverage as jurisdictional.*
> Applying that readily administrable bright line here yields
> the holding that Title VII's 15-employee threshold *is an
> element of a plaintiff's claim for relief, not a jurisdictional
> issue.*

*Arbaugh v. Y&H Corp,* 126 S. Ct. 1235, 1237 (2006) (emphasis added); *see also* 5B
Wright & Miller, *Federal Practice & Procedure,* Section 1271 at 594-604 & n.57 (2006).
("As far as the judicial precedents are concerned, the following matters have been held by
federal courts to be affirmative defenses under Rule 8(c) . . . various forms of immunity.")
(citing *In re Stock Exchanges Options Trading Antitrust Litig.,* 317 F. 3d 134, 150-51 (2d
Cir. 2003) (defense based on implied repeal doctrine is type of immunity that must be pled
affirmatively rather than lack of subject matter jurisdiction that can be raised any time)).
Under *Arbaugh,* the fact that Congress did not state in the FCA that immunity is a
jurisdictional issue renders it a *defense,* and therefore barred as a basis for a Rule 12(b)(1)

13

and has ignored clearly contrary evidence. At a minimum, Plaintiffs establish that numerous material facts are genuinely disputed, thereby precluding the Court from resolving these factual differences at this preliminary stage. Plaintiffs have an absolute right to move forward with discovery, at the end of which the Government can bring its motion for summary judgment. *See* Plaintiffs' Request for Discovery. For now, however, the well-pled allegations of the Complaint are more than sufficient to defeat a properly-construed Rule 12(b)(1) motion.

To the extent that the Court decides to consider the Government's *de facto* motion for summary judgment, the Government has utterly failed to establish the requisite absence of disputed issues of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("The movant has the burden of showing that there is no genuine issue of fact . . . ."); *Fontenot v. Upjohn Co.*, 780 F. 2d 1190, 1195 (5th Cir. 1986) ("Rule 56 requires the movant to establish in some fashion the absence of any issue of material fact . . . .").

As demonstrated by the discussion of the facts below, Plaintiffs—even without the benefit of formal discovery—can establish the existence of numerous genuine issues of disputed fact. Among other things, the Government has not been candid with the Court about the legislative history of the MR-GO; the manner in which the commercial waterway was planned, designed, and constructed; the proper characterization of the MR-GO; the total absence of any flood control purpose or features in its original incarnation; the existence, nature, and location of federal flood control measures built after 1965 in the vicinity of the MR-GO; and the violation of federal statutes in the planning, investigation,

---

motion. Thus, this presents yet another basis for the Court to deny the Motion as to the Government's claim of immunity under the FCA based on its procedural impropriety.

design, and construction of the MR-GO.   In light of Plaintiffs' absolute right to discovery

before any summary judgment motion is decided[3] and the intensely factual nature of

these immunity issues,[4] the Court must deny the motion to dismiss on this additional ground. [5]

## III.   FACTS

The 45-page Complaint sets forth in detail the basis for Plaintiffs' claims against the

Army Corps concerning the design, construction, maintenance, and operation of the MR-

GO.  In the discussion below, we highlight certain factual allegations that on the face of

the Complaint defeat the Government's immunity claims.  In addition, assuming the Court

decides to address the merits of the Government's "factual attack" on the FTCA cause of

action, we discuss additional information that is relevant to the resolution of the immunity

issues and demonstrate that the Court should deny the motion because of the existence of

substantial disputed issues requiring discovery.[6]

---

[3] *See* Rule 56(f); *Anderson., supra,* 477 U.S. at 257; *Brown v. Miss. Valley State Univ.,* 311
F. 3d 328, 333 (5th Cir. 2002).

[4] In *Central Green Co. v. United States,* 531 U.S. 425 (2001), the most recent Supreme
Court opinion on the Mississippi Flood Control Act of 1928 immunity, the Court
remanded the case to the District Court to conduct a *factual inquiry* into the nature of the
water which damaged the plaintiff's property.  *See Central Green,* 531 U.S. at 437.
Likewise, with respect to the FTCA and a claim of discretionary function, the Sixth Circuit
has stated: "In some cases, . . . fact-finding on the nature of the acts complained of may be
necessary before the court has an adequate basis to decide whether they are 'discretionary'."
*Miller v. United States,* 583 F. 2d 857, 866 (6th Cir. 1978).

[5] The Government has not asserted that the Plaintiffs failed to exhaust their administrative
remedies, and they have adequately alleged compliance in Paragraphs 10, 13, 14, 18, 21,
and 22. Since"[i]t is well-settled that these limitation periods are jurisdictional," *Flory v.
United States,* 138 F. 3d 157, 159 (5th Cir. 1998), the Government has waived any
jurisdictional challenge on this ground.  *See e.g., Davila-Alvarez v. Escuela de Medicina
Universidad Central del Caribe,* 257 F. 3d 58, 67 (1ˢᵗ Cir. 2001) ("[T]he exhaustion
requirement is, in all events, intended for the government's protection, and, like most other
exhaustion requirements, can be waived by the intended beneficiary.").

[6] In the accompanying Declaration of Nina Froeschle ("Froeschle Decl.") and the
Declaration of Dr. Paul Kemp ("Kemp Decl."), Plaintiffs summarize the evidentiary basis

**A.      The Complaint Alleges In Detail Two Fundamental Defects
In The MR-GO Attributable To The Army Corps' Negligence**

The Complaint clearly alleges that the Army Corps was negligent in the design,

construction, maintenance, and operation of the Mississippi River-Gulf Outlet ("MR-GO")

and that this negligence created

> two fatally defective conditions known by [the Army Corps]
> for decades: (1) the destruction of the marshlands
> surrounding the MR-GO that intensified a huge east-west
> storm surge resulting in the inundation of most of New
> Orleans; and (2) the funnel effect stemming from the MR-
> GO's faulty design that accelerates the force and strength of
> the storm surge to lethal proportions.

Complaint, ¶ 1; *see also* Kemp Decl., ¶¶ 11-31; Froeschle Decl., ¶¶ 83-92 and 96-98.

The Complaint details the nature and effect of these two defective conditions.

*First*, with respect to the MR-GO destroying over 101 square miles of marshlands that

acted as a natural barrier against storm surge from the Gulf of Mexico:

> Equally important, in the design and construction of the
> waterway, the Army Corps failed to account for the
> devastation of the wetlands that the MR-GO, by its design,
> would facilitate. In a vicious cycle, destruction of the
> surrounding wetlands not only altered adversely storm surge
> dynamic with respect to hurricanes such as Katrina, but
> denuded a critical natural buffer against storm surge . . . .

Complaint, ¶ 50.

The Complaint further contends the Army Corps failed to coordinate its

investigation and planning of the MR-GO with the Fish and Wildlife Service of the United

States Department of Interior ("DOI"), *as required by statute*, and the Army Corps ignored

the DOI's pointed warnings about the MR-GO's significant adverse effect on the adjacent

---

for their serious factual disputes with the Government bearing on the immunity issues and
the need for discovery as authorized by Rule 56(f).

marshlands. Specifically, Paragraph 63 references an April 1958 DOI report to the Army

Corps, entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi*

*River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*

(the *"Fish & Wildlife Report"*):

> The U.S. Fish and Wildlife Service initiated preliminary
> studies on the project in 1957. Secretary Seaton, Department
> of the Interior, in a letter of September 23, 1957, informed
> the Secretary of the Army that . . . *the project plans had not*
> *been investigated by fish and wildlife conservation agencies,*
> *as contemplated in the Wildlife Coordination Act of August*
> *14, 1946* (60 Stat. 1080), and requested the Corps of
> Engineers to bring all phases of project planning into
> balance.

Complaint at ¶ 63 (emphasis in the original); *see also* Froeschle Decl., ¶¶ 83-92.

The next five paragraphs of the Complaint describe the *Fish & Wildlife Report's*

predictions concerning the MR-GO's destructive impact on the marshlands. *See*

Complaint, ¶¶ 64-69. Despite the DOI's request for "further study" of the MR-GO's effects

on this ecologically-valuable property, "the Army Corps never gave the DOI the

opportunity to conduct such additional testing, but rather continued with the construction

of the MR-GO." *Id.*, ¶ 69. In addition, "[i]n 1958 *it was well known by the Army Corps*

*and others that the wetlands served as nature's protective buffer against storm-driven*

*water surges threatening New Orleans and its environs.*" *Id.*, ¶ 70 (emphasis added). As it

turned out, the Army Corps' rush to construct the MR-GO destroyed "over 65,000 acres of

hurricane buffering wetlands . . . ." *Id.*, ¶ 57.

*Second*, the Complaint also alleges details about "the funnel effect stemming from

the MR-GO's faulty design that accelerated the force and strength of the storm surge to

lethal proportions." Complaint, ¶ 1; *see also*, Kemp Decl., ¶¶ 11-19. Thus, at Paragraph

17

49, Plaintiffs allege "[t]he MR-GO's design was flawed . . . [because] the Army Corps

failed to take account of the waterway's inherent and known capability of serving as a

funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the

storm surge's force . . . ."  Plaintiffs further explain the manner in which this design

defect contributed to the flooding of the New Orleans area:

> As was predicted long before Katrina, the MR-GO amplified
> Katrina's surge speed and force, much as the nozzle of a
> water hose funnels a wide flow of water into a bottleneck,
> creating a vastly accelerated and more forceful jet from an
> otherwise slow and limpid flow of water.

Complaint, ¶ 73.

As a result of this negligent design, the "MR-GO is a straight arrow pointed at

Greater New Orleans with no barriers or other means to slow down the storm-driven

surges." *Id.* ¶ 3; *see also* Kemp Decl., ¶¶ 11-19.

### B.  Plaintiffs' Complaint Alleges That The MR-GO Was Not A Federal Flood Control Project

In direct contravention of the Government's claim that the MR-GO is a federal

flood control project (Motion at 27-28), the Complaint unequivocally alleges that the MR-

GO was never planned, authorized, or designed to be anything other than "a navigable

waterway," "a deep-water channel," " a navigable alternative to the sometimes unnavigable

Mississippi River," and "a navigable waterway for vessels of all types . . . requiring access

to the docks on the Industrial Canal."  Complaint, ¶¶ 35, 36, 38.  Indeed,

> [T]he United States Government has acknowledged that the
> purpose of the MR-GO is that of a 'navigation aid,' as
> opposed to a flood control project *See Graci v. United States*,
> 301 F. Supp. 947, 949 (E.D. La. 1969) ('*Graci I*').
> Consequently, this action is not barred by any of the
> immunity provisions of the Mississippi Flood Control Act of
> 1928 . . . .

18

Complaint, ¶ 39

Paragraph 40 also alleges that nearly 30 years ago, this Court made a "binding" finding of fact in *Graci v. United States*, 435 F. Supp. 189, 192 (E.D. La. 1977) ("*Graci IV*") that "the Army Corps constructed the MR-GO as an aid to navigation (distinguished from a flood control project) pursuant to a legislative mandate of the U.S. Congress . . . ." *See also* Complaint, ¶ 98 ("The MR-GO was built as an aid to navigation, not as, or in connection with, a flood control project, and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO as was admitted by Defendants and determined by the Fifth Circuit in *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971))."

Paragraphs 38 through 42 describe the navigational and commercial purposes served by this waterway. Simply put, the MR-GO was never intended to serve a flood control function. Complaint, ¶ 41 ("A 1951 report submitted by the Army Corps to the House of Representatives concerning the proposed MR-GO reflects the purely commercial interests driving this project while excluding any discussion of flood control purposes."); *id.,* ¶ 42 ("Contemporaneous comments during the Senate debate focus on the project's potential commercial benefits while again omitting any reference to flood control."). *See also* Froeschle Decl., ¶¶ 4-7 and 62-76. Not only do these allegations refute any argument that the MR-GO was authorized as a flood control project, the Government's extrinisic evidence does not contravene these allegations.

**C.     Plaintiffs' Complaint Alleges That The MR-GO, And Not Any Federal Flood Control Facilities, Caused Their Damages**

19

The Government has conveniently ignored the fact that Plaintiffs have alleged that the cause of their damages was the MR-GO, not the failure of the Army Corps' levees or flood control protection system. As specifically alleged in the Complaint:

> Defendant United States, through Defendant Army Corps, was responsible for the design, construction, operation, maintenance, upkeep, and repair of the MR-GO . . . . The Defendants breached that duty by negligently designing, constructing, maintaining, and repairing the MR-GO . . . . The Defendants' breach of their duties foreseeably and proximately caused, and was a substantial contributing factor in, destruction and damage suffered by residents of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, specifically including the damages suffered by Plaintiffs to this action as described above.

Complaint, ¶¶ 91-94; *see also id.*, ¶¶ 1, 6, 10, 76.[7]

To the extent the Government claims that Plaintiffs' case hinges on allegations concerning the failure of federal flood control facilities, this is a mischaracterization of Plaintiffs' case. A plaintiff is the master of her complaint, including the factual and legal theories. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003) ("The [well-pleaded-complaint] rule makes the plaintiff the master of the claim . . . '.") (citations omitted); *Becker v. Tidewater, Inc.*, 405 F. 3d 257, 259 (5th Cir. 2005) ("[I]t is well settled that the plaintiff is master of his complaint . . . ."). Indeed, as the Supreme Court observed in *Conley v. Gibson*, 355 U.S. 41, 48 (1957), "[t]he Federal Rules reject the approach that

---

[7] Plaintiffs make numerous other allegations that Plaintiffs' damages were caused only by the MR-GO. *See, e.g.*, Complaint, ¶ 1 ("This action results from one of the most predictable and preventable catastrophes in American history . . . caused by the United States Army Corps of Engineers' negligent design, construction, maintenance, and operation of the Mississippi River Gulf Outlet . . . ."); *id.*, ¶ 6 ("The Plaintiffs' losses were suffered as a direct result of the Defendants' breach of their legal duty to adequately design, construct, maintain, and operate the MR-GO."); *id.* ¶ 10 ("NORMAN ROBINSON . . . owned and resided in a house . . . destroyed by floodwaters from the MR-GO . . . ."); *id.*, ¶ 76 ("[T]he Army Corps reluctantly acknowledged . . . the possibility that MR-GO's design exacerbated Katrina's storm surge and subsequent flooding.").

20

pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

Nowhere does the Complaint describe or characterize the MR-GO as a navigable waterway that also includes federal levees, floodwalls, or other flood control facilities that were negligently designed or constructed or were otherwise defective or did not perform to design standards during Katrina.[8] Instead, the gravamen of the Complaint is the direct contribution of storm-driven surge waters in the MR-GO to the flooding of Plaintiffs' neighborhoods. In other words, regardless of the supposed presence of any levees and floodwalls along the MR-GO,[9] or whether these storm protection systems were adequately designed, constructed, and maintained, Plaintiffs' homes and business would still have been devastated by the surge waters from the MR-GO. *See* Kemp Decl., ¶¶ 4-32. Plaintiffs intend to prove that the flooding of Plaintiffs' neighborhoods would have occurred regardless of the presence or absence of federal flood control structures and that it was the MR-GO's storm-driven waters that caused their losses. *See* Kemp Decl., ¶¶ 4-32, Froeschle Decl., ¶ 105-118.

This point is made crystal clear in the very first paragraph of the Complaint:

> *Absent the exacerbating effect of the MR-GO,* aptly named the 'Hurricane Highway,' Katrina would have been an endurable event in New Orleans history rather than the

---

[8] In fact, the Complaint notes that the Army Corps maintains that "the design and function of New Orleans' floodwalls were adequate." Complaint, ¶ 80.

[9] As discussed in Section III.F, *infra*, there are numerous issues of seriously-disputed facts about the existence, nature, and location of any federal flood control works in the vicinity of the MR-GO, not to mention whether any such hurricane protection systems are even part of the MR-GO. *See* Froeschle Decl., ¶ 9-19 and 105-116.

> obliterating force that destroyed lives and businesses,
> displaced thousands of people, and devastated much of a
> great American city known for its historic grace and
> beauty.[10]

Complaint, ¶ 1; *see also* Kemp Decl., ¶ 4-32.

The quintessence of Plaintiff's case is further summarized in Paragraph 74:

> Eyewitness accounts as well as scientific studies indicate that
> the MR-GO contributed significantly to the drowning of
> large portions of Greater New Orleans. The *flawed design,
> poor construction, and inadequate repair and maintenance
> of the MR-GO—as well as the resulting destruction of the
> protective adjoining wetlands*—was a substantial factor in
> causing the flooding. Indeed, *but for the Army Corps'
> negligence*, most or all of the severe flooding of the
> Plaintiffs' neighborhoods would not have occurred.

Complaint, ¶ 74 (emphasis added).

It is therefore indisputable that the Complaint alleges that the MR-GO "foreseeably

and proximately caused, and *was a substantial contributing factor* in, the widespread

destruction and damage . . . suffered by Plaintiffs . . . ." Complaint, ¶ 94 (emphasis added).

That there may have been other concurring causes that were substantial contributing

factors in causing flooding (such as breaches of levees or floodwalls) does not negate that

fact that the MR-GO itself was a legal cause. Under Louisiana law, there can be more than

one legal cause of injury or loss so long as each was—as Plaintiffs have alleged about the

---

[10] Similarly, Plaintiffs allege that "the MR-GO contributed to the flooding of Plaintiffs'
neighborhoods *by vastly accelerating* the destruction of the coastal habitat protecting
Greater New Orleans." Complaint, ¶ 84 (emphasis added); *see also id.*, ¶ 85 ("The
destruction of that bulwark [against storm surge] by the Army Corps altered storm surge
dynamics in Lake Borgne and compromised the area's natural ability to mitigate the
destructive power of storm surge, *thus further exacerbating* the MR-GO's already perilous
'funneling' effect."(emphasis added); *id.*, ¶ 88 (The Army Corps' "engineers had actual
notice from the outset of constructing MR-GO that its design *would only exacerbate* a
hurricane's power and destructive effect.") (emphasis added).

MR-GO—a substantial contributing factor. *See Bonin v. Ferrellgas, Inc.*, 877 So. 2d 89,

94 (La. 2004) ("[W]here there are concurrent causes of an accident, the proper inquiry is

whether the conduct in question was a substantial factor in bringing about the accident.").[11]

Accordingly, Plaintiffs are not seeking damages for any Army Corps negligence with

respect to any breaches or failures of levees, floodwalls, or other flood control structures.

In the course of recounting what happened that tragic day in the aftermath of

Hurricane Katrina, the Complaint refers to some facts about the failure, breaches, and

overtopping of levees and floodwalls in New Orleans and St. Bernard Parish. *See, e.g.,*

Complaint, ¶ 75 (collapse of "earthen levees" by overtopping); ¶¶ 77-79 ("overtopping led

to many of the levee breaches"); ¶ 80 (failure of floodwalls due to storm surge

acceleration); ¶ 102 (breaches and failures of the spoil banks, floodwalls, and/or levees

along the MR-GO). As demonstrated above, however, Plaintiffs are not alleging that their

damages were caused by negligently designed, constructed, or maintained federal flood

control works, and the references to failures and overtopping of levees was not intended to

assert a basis for the Army Corps' liability. To avoid any confusion on this issue, however,

Plaintiffs, with the Court's permission, will file a First Amended Complaint omitting these

references after the anticipated denial of the Motion to Dismiss.[12]

---

[11] Under Louisiana Law, even if levee failures were involved in causing Plaintiffs' damage to some degree, "an intervening cause will not serve to relieve from liability where prior negligence was the efficient cause of the injury, nor where the intervening cause is set in operation by an original wrongful act, nor where the intervening cause need reasonably have been anticipated." *Pouncy v. Temple, Royal Indem. Co., Intervenor*, 41 So. 2d 139, 146 (La. Ct. App. 1949).

[12] Plaintiffs could file a First Amended Complaint as a matter of right in lieu of this Opposition to the Motion to Dismiss since the motion is not a responsive pleading. *See* Federal Rule of Civil Procedure 15 (a) ("A party may amend the party's pleading once as a matter of course before a responsive pleading is served."); *McKinney v. Irving Indep.*

### D.   Plaintiffs Are Not Challenging The Legislation Authorizing The MR-GO

According to Defendants, "the Complaint acknowledges MR-GO was 'constructed under the authority of Public Law 455' . . . . By challenging the problems that plaintiffs' claim are 'inherent' in implementation of MR-GO, including its design, construction, operation, and maintenance, the plaintiffs are attacking the execution of a federal law." Motion at 36. In sum, the Government contends that the Complaint is an *implied* attack on the statute authorizing MR-GO's construction. This is simply not true.

The Government's argument is based on a misreading, instead of the actual language, of the Complaint. [13] Nowhere do Plaintiffs challenge the legislation authorizing MR-GO's construction or Congress' authority to legislate on this subject.

Not only are Plaintiffs not attacking the federal law by which the MR-GO was authorized, the Government's argument is predicated on an inaccurate and misleading

---

*School Dist.,* 309 F. 3d 308, 315 (5th Cir., 2002). However, since these and any other changes would be minor and solely for the purposes of clarification, they would not materially alter the allegations concerning federal jurisdiction or afford the Government any additional arguments that have not already been advanced in the pending Motion. Therefore, in the interests of judicial economy and saving precious time for Plaintiffs, who are eager to get a determination of their damages claims on the merits, Plaintiffs urge the Court to determine these fully-briefed immunity issues at this time. *See* Fed. R. Civ. Proc. 83 (b) ("A judge may regulate practice in any manner consistent with federal law [and federal rules] . . . ."); 12 Wright & Miller, *Federal Practice & Procedure Civil,* Section 3155 (2006) ( Federal judge has discretion "to decide the unusual or minor procedural problems that arise in any system of jurisprudence in light of the circumstances that surround them and of the justice of the case . . . .").

[13] Paragraph 95 of the Complaint alleges: "Congress charged the Army Corps with the task of the design, construction, operation, maintenance, and repair of MR-GO, and *the Army Corps compliance with this Congressional mandate* did not involve acts of a discretionary function. Moreover, the Army Corps had *an obligation to design, construct, operate, maintain, and repair the channel in such a way as to avoid having it pose as threat to residents like Plaintiffs and serve as a 'hurricane highway' for surge water directed at Orleans and St. Bernard Parishes.* (Emphasis added.)

discussion of the procedure by which this project was authorized. *See* Froeschle

Decl., ¶¶ 42-56, 62-66, and 77. Simply put, Congress asked the Army Corps to use its

engineering judgment to investigate the possibility of constructing "a" waterway between

the Mississippi River and the Gulf of Mexico, the Army Corps returned with its proposal

for the navigation channel, and Congress approved the Army Corps' recommendation.

Congress authorized the Corps to investigate and report on the viability of a waterway

between the Mississippi River and the Gulf of Mexico "*by the most practicable route.*" [14]

In response, the Army Corps prepared two reports. *See* H. R. Doc. No. 71-46 (1930)

(Froeschle Decl., Exhibit I) and H. R. Doc. No. 245 (1951) (Froeschle Decl, Exhibit N).

Thereafter, Congress passed the Act of March 29, 1956 to "Authorize Construction of the

Mississippi River Gulf-Outlet," Pub. L. 84-455, 70 Stat. 65 (1956) (Froeschle Decl.,

Exhibit T), which simply provided for "the Mississippi River-Gulf outlet to be prosecuted

under the direction of the Secretary of the Army and supervision of the Chief of Engineers,

substantially in accordance with the recommendation of the Chief of Engineers contained

in House Document Numbered 245." *See* Froeschle Decl., Exhibit U.

---

[14] To the extent that the Army Corps claims that Congress dictated the route of the MR-GO, there is a serious factual dispute on this issue. Section 2 of the River and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945)—known as the MR-GO Planning Law—directed that the Army Corps coordinate its efforts with federal and state environmental agencies and investigate and report to Congress "the best available route or routes" for the proposed waterway. See Froeschle Decl., ¶¶ 53-56, Exh. L at 11-12 & 30. There is also substantial evidence that the Army Corps did not build the MR-GO according to the route that it told Congress would be followed. For example, instead of building a channel *parallel* to the Gulf Intracoastal Waterway ("GIWW"), it tied the upper Reach 2 stretch of the MR-GO directly into the GIWW, thereby enhancing the storm surge effect and pressure. In addition, the waterway did not proceed from the GIWW to Chandeleur Sound but rather deviated significantly to Breton Sound. *See* Froeschle Decl., ¶¶ 31-35, 64-65, and 67 and Exhibits O at 43; P at 5; and MM at 9.

Thus, the MR-GO's legislative history reveals that Congress asked the Army Corps to use its professional acumen to find the best route for a navigable channel between the Mississippi River and the Gulf of Mexico. As alleged in the Complaint (*see* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102*), and as further reflected in the documents referenced in this Opposition, Plaintiffs' negligence claims are predicated *solely* on the Army Corps' incompetence during the project's investigation, planning, construction, maintenance and operational phases. *See* Froeschle Decl., ¶¶ 4-41. None of these allegations of negligence are predicated on the authority of Congress to enact legislation for the creation of a shipping canal; nor do any implicate any flood control activities of the Government.

### E.   The Army Corps Violated Two Federal Statutes When Planning, Designing, and Constructing the Waterway

The Complaint alleges that the Army Corps violated federal law in the planning, investigation, design, and construction of the MR-GO. Specifically, the Army Corps did not defer the MR-GO's construction to allow the U.S. Fish and Wildlife Service ("FWS") to conduct the environmental study required by the Fish and Wildlife Coordination Act of 1946. *See* Complaint, ¶¶ 63-64.[15] This study was essential because the FWS, in its preliminary assessment, warned of permanent damage to the precious marshlands "from construction and continuous maintenance operations" of the MR-GO. *Id.*, ¶ 67.

---

[15] The Fish and Wildlife Coordination Act, as amended at 16 U.S.C. Section 662, required that the Army Corps allow the FWS to conduct environmental studies on the effects of the MR-GO, mitigation measures, and alternatives. Froeschle Decl., ¶ 57-61 and 81-82. The evidence will show that the FWS wanted to conduct a four-year ecological study before any construction on the MR-GO, but the Army Corps refused to wait for the legally-mandated study. The FWS, like the Louisiana Wild Life and Fisheries Commission, urged that the Army Corps change the route through the vulnerable wetlands, but the

In addition, since the filing of the Complaint, Plaintiffs' counsel have learned, and discovery will show, that the Army Corps violated a second federal statute in its haste to build the MR-GO. *See* Froeschle Declaration, ¶¶ 26 and 62-63; Exhibits L at 55 and O at 22 (Class Action Complaint for Injunctive and Declaratory Relief in *Savoy v. United States*, Civ. Action No. 06-3552, ¶¶ 73-80, 117-30, 167-190). This law—the River and Harbor Act of 1945 (P.L. 79-14, 50 Stat. 10 (March 2, 1945)—required the Army Corps to involve each of the "affected states" in the investigation and planning phases of the MR-GO and to coordinate its investigations and planning with the U.S. Department of Interior (the "DOI"). Under the FWCA, the Army Corps was also required to consult with the LWLFC. The evidence will show that the Army Corps violated the express terms of the River and Harbor Act of 1945 and the FWCA by not securing the assistance, input, advice and recommendations, suggestions or coordination from, of, or with the DOI or LWLFC before launching construction of the MR-GO. *See* Froeschle Decl., ¶¶ 62-63; Exhibit O at 62-63.[16]

---

recommendation fell on deaf ears. *See* Froeschle Decl., ¶¶ 83-98; Exhibits Y at 22-23, AA, BB at 1 and CC at 4, 11.

[16] As the evidence will show, both the federal and state wildlife and fisheries agencies urged that the Army Corps not pursue the proposed route through the environmentally-sensitive wetlands, but the Army Corps totally ignored these pleas, thereby creating a salinity influx and erosion that caused the loss of massive amount of surge-buffering wetlands that Plaintiffs allege significantly contributed to the flooding of their neighborhoods. *See* Froeschle Decl., ¶¶ 83-98; Exhibits Y at 22-23, AA, BB at 1 and CC at 4, 11; Kemp Decl., ¶¶ 20-30.

**F.      The Government's Documents Fail to Establish That Any of the MR-GO Levees or the Seabrook Dam and Lock Were Actually Constructed.**

The Government argues that decisions rendered by this Court and the Fifth Circuit in the post-Hurricane Betsy *Graci* cases[17] — holding that Government is not immune from liability for flood damages caused by the MR-GO — no longer apply because federal "levees" were built along the MR-GO in the intervening 40 years. *See* Motion at 22-23. It further contends that the MR-GO was intended to serve as an integral part of a flood control plan from its inception because of the proposed construction of the Seabrook Lock at the confluence of Lake Pontchartrain and the Industrial Canal. Motion at 4. However, the Government's exhibits do not establish that such structures were ever actually built, and in any event, there are substantial issues of disputed fact about any post-1965 federal flood control works along the MR-GO. *See* Froeschle Decl., ¶¶ 9-25.

**1.      The Phantom Seabrook Lock Was Never Constructed**

The Government claims that the MR-GO was, in reality, a flood control project at least after 1965. The linchpin of this argument is its claim that Congress approved Army Corps plans in 1965, while the MR-GO's construction was being completed, to construct "a lock and dam at Seabrook, near the north end of the Industrial Canal." Motion at 12. This assertion is not only dispelled by the location of the lock — *i.e.*, at the "north end of the Industrial Canal" rather than in the MR-GO itself — but it is totally refuted by the Government's own evidence revealing that *this proposed flood control structure was never constructed.* *See* Froeschle Decl., ¶¶ 16 & 118; Exhibit LL at 4.

---

[17] *See Graci v. United States*, 301 F. Supp. 947 (E. D. La. 1669) ("*Graci I*"); *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971) ("*Graci II*"); *Graci v. United States*, 472 F. 2d 124 (5th Cir. 1973) ("*Graci III*"); and *Graci v. United States*, 435 F. Supp. 189 (E.D. La. 1977) ("*Graci IV*").

Specifically, at page 12 of its Motion, the Government asserts:

> The Corps planned to correct the 'adverse conditions
> resulting from construction of the MR-GO' (*i.e.*, the
> problems of which it was aware -- erosion in the Industrial
> Canal and the GIWW, saline intrusion into Lake
> Pontchartrain, and hazardous currents in the Industrial
> Canal) *by constructing a lock and dam at Seabrook*, near the
> north end of the Industrial Canal. . . . The flood control
> project plan called for strengthening and enlarging the lock
> so that it *would also serve a flood control purpose*,
> preventing storm surge from entering Lake Pontchartrain
> after passing through the MR-GO and the Industrial Canal.
> (Emphasis added).[18]

The Seabrook flood control facility is so important to the Government's desperate attempt

to escape *Graci's* binding holdings that it is referred to no less than seven times in four

pages. Motion at 4, 12, 13 and 26.

Remarkably, the Government never discloses to the Court in its Motion whether

the Corps actually built this lock and dam.[19] In the complete submission of the

Government's Exhibit 7, the *Lake Pontchartrain, Louisiana, and Vicinity Hurricane*

---

[18] In support of this statement, the Government cites the H. R. Doc. No. 89-231 (Exhibit 6
to Defendant's Motion) at 17, 60, 63 and 232. However, H. R. Doc. No. 89-231 (1965)
(the "*Lake Pontchartrain Report*") is only the plan for the Lake Pontchartrain and Vicinity
Hurricane Flood Protection Project (the "Lake Pontchartrain Project") submitted to
Congress for authorization. (Froeschle Decl., ¶103-104; Exhibit EE at 25 & 41).

[19] There is no mystery that Congress did not authorize the Seabrook Lock. The River and
Harbor Act and Flood Control Act of 1965, P.L. 89-298, 79 Stat. 1073 (October 27, 1965)
states:

> The project for hurricane-flood protection on Lake Pontchartrain,
> Louisiana is hereby authorized substantially in accordance with the
> recommendations of the Chief of Engineers in House Document
> Numbered 231, Eighty-ninth Congress, *except that* the recommendations
> of the Secretary of the Army in that document shall apply with respect to
> *the Seabrook Lock feature of the project*.

Froeschle Decl., ¶ 124 (emphasis added).

29

*Protection Project: Reevaluation Study* plainly shows that this the Seabrook Lock *was not constructed*. The full text states at page 2:

> As presented herein, the most feasible plan for providing hurricane protection was determined to be a high level plan. The plan would provide for . . . *deferring construction of the proposed Seabrook lock* until its feasibility as a feature of the Mississippi River-Gulf Outlet *navigation project* can be determined.

(Froeschle Decl., ¶ 16; Exhibit LL at 4) (emphasis added).[20]

If the Government was not candid with the Court about the fact that the Army Corps never built the Seabrook Lock, what does this say about its other assertions concerning flood control structures allegedly built along the MR-GO after 1965?

### 2. The Government Also Does Not Establish Whether or Where Actual Flood Control Levees Along the MR-GO Were Ever Built

According to the Government, the Lake Pontchartrain Project also provided for the construction of "levees" along the MR-GO in the years between Hurricane Betsy and Hurricane Katrina. Specifically, the Defendants assert that the Lake Pontchartrain Project "planners specified that flood control levees be built on MR-GO's southern shores . . . ." Motion at 14. In support of this statement, the Government cites pages 2, 9, 18, 64-65, 81, 84, 224 and Plate A-1 of the original 1965 *Lake Pontchartrain Report*, stating that such levee construction was authorized. For example, page 2 of the *Lake Pontchartrain Report*—the second page of the Chief Engineer's report—states "[f]or the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of

---

[20] This portion of Exhibit 7 – containing the crucial information that the Seabrook Lock was deferred, rather than constructed – not only was not acknowledged in the Government's Motion, but also was not even contained within the selected portion of Exhibit 7 that was electronically filed. The Court could discover this information only by going to the complete copy of Exhibit 7 -- a 259-page document – that was provided via mail and reading through it.

*new and enlarged levees* extending generally along the southerly banks of the Gulf

Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou

Dupre . . . ." Exhibit EE at 26; Froeschle Decl., ¶ 104 (emphasis added). Similarly, the

Government also refers to "[t]he earthen levees that line the MR-GO and the GIWW . . . ."

Motion at 15.

The Army Corps itself, however, has admitted that as late as 1988 the south side of

Reach 2 of the MR-GO was "unleveed." *See* Exhibit 5 to Defendant's Motion (*Mississippi

River Gulf Outlet, St. Bernard Parish, Louisiana: Reconnaissance Report on Channel

Bank Erosion*) at 10 & 35 ("Most of the Mississippi River-Gulf Outlet is experiencing

severe erosion along its *unleveed banks*. . . . The *unleveed MR-GO south bank,* from mile

47 to mile 23, fronts a dredged material disposal area whch parallels the channel and is

approximately 2000 feet deep (roughly 6,000 total acres.") (emphasis added). This

devastating admission creates a significant factual issue. Moreover, the Government's

papers, however, fail to establish that these "new and enlarged levees" along the south side

of the MR-GO were ever constructed. Likewise, there is a serious factual issue whether

any "earthen levees" along the MR-GO were built as flood control measures. *See*

Froeschle Decl., ¶¶ 9-15, 105-116.

The Government also blithely concludes that "*[a]s constructed*, this levee extended

east and south along the bank of MR-GO for several miles beyond Bayou Dupre . . . ."

Motion at 14.[21]   To substantiate this statement, the Government refers to Exhibit 7 (Plate 9)

_____

[21] The Government also alleges that at the time of the Katrina flooding "federal flood
control levees completely surrounded the places where the plaintiffs allegedly were
residing. *Compare* LVHPP Map (30 Sept. 1995) (Exhibit 11) . . . ." Motion at 15.
However, there is no identification of the source of the map identified as Exhibit 11 and no
foundation whatsoever. Even more telling is the fact that the black lines on Exhibit 11 that

and Exhibit 11, which are nothing more than two maps (from 1982 and 1995) purporting to show "levees" along the MR-GO. However, the Government includes no sworn statements or documents authenticating the accuracy of these maps or establishing that such "levees" were actually constructed. The silence on this issue is deafening.

Indeed, there is evidence suggesting that much of the putative "levee" system along most of the MR-GO is made of sandy spoil dredged over the years from the bottom of the MR-GO during construction and maintenance cycles. Thus, in its 1957 plan for the MR-GO, submitted and ratified by Congress, the Army Corps provided for the above-ground construction of a "dyke" along the MR-GO made of excavated spoil dug from the soggy marshland through which the waterway was constructed. Froeschle Decl., ¶¶ 68-69, Exhibit P at 5-7). *This "dyke" was not a flood control measure, but rather served to protect ship navigation by retarding currents and waves in the MR-GO. Id.* Since the Government has produced no documents evincing the construction of actual "flood control levees" along the southern banks of the MR-GO after the completion of the waterway's construction in 1968, there is no evidentiary basis for determining whether the "earthen levees" that it now claims as flood control measures were in fact these original nonflood-control dikes or some other later added features. Moreover, the existence, location, and nature of any post-Hurricane Betsy flood control facilities in the vicinity of the MR-GO is seriously disputed and will be the subject of active discovery. *See* Froeschle Decl., ¶¶ 9-19.

---

the Government alleges in its Motion are "flood control levees" are merely identified in the Legend as "Improvements completed." Moreover, we are furnished with no description or explanation of what those "Improvements" in fact entail. In truth, Plaintiffs believe that discovery will show that for substantial stretches along most of the MR-GO there were no actual "flood control levees" built after 1965. Froeschle Decl., ¶¶ 9-15, 105-116.

In fact, the Government's own documents show that it is highly likely that the alleged "levees" along the southern bank of the MR-GO were little more than the Army Corps' dumping ground for dredged material during routine maintenance of the channel depths excavated over decades in order to facilitate ship navigation and not for any flood control purposes. Exhibit 10 to the Government's Motion is a 1976 Army Corps document entitled *Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana* (the "*1976 EIS*"). The complete copy of this several hundred page document provides further proof that the MR-GO was never a flood control project, and the earthen mounds along the MR-GO were not the "levees" called for under the Lake Pontchartrain Project.[22]

The *1976 EIS* notes that "[t]he project described in this report is the operation and maintenance (O&M) of the Mississippi River-Gulf Outlet (MR-GO). . . . O&M work includes dredging to maintain the *established navigation channels*, disposition of dredged material, and surveillance and repair of dredged containment dykes." (Exhibit FF at 13; Froeschle Decl., ¶ 106) (emphasis added). With respect to the disposal of this dredged material, the *1976 EIS* further adds:

> *A diked disposal area*, 2,000 feet wide, is *adjacent to the southwest side of the channel through the land area of the MR-GO* . . . . Deposited material spreads over the existing vegetation with each dredging operation. As the material flows outward from the pipeline and dries, *a flat, cone like mound is created.*

(Exhibit FF at 21; Froeschle Decl., ¶ 106) (emphasis added).

---

[22] This is another instance in which the electronically-filed Exhibit 10, comprising only a cover page and two pages of text, did not contain crucial information. Although the complete document was provided to the Court by mail, the critical information discussed above was immersed within hundreds of pages and never mentioned in the Motion.