Thus, the present record strongly suggests that these supposed "levees"—which the Army Corps does not identify as "flood control levees" in the *1976 EIS*—may very well be only the material dredged from the bottom of the MR-GO during regular maintenance cycles over more than 40 years. In any event, the Government has clearly provided no testimony or documents showing that the "new and enhanced levees" required under the Lake Pontchartrain Project were ever constructed. At a minimum, the true nature and purpose of the earthen mounds lining the MR-GO remains a question of fact requiring denial of the motion and discovery.

## IV.   THE MISSISSIPPI FLOOD CONTROL ACT OF 1928 AFFORDS NO IMMUNITY TO THE UNITED STATES

Contrary to the Government's convoluted argument, the Mississippi Flood Control Act of 1928 ("FCA")[23] does not—and was *never* intended to—grant the Government blanket immunity for tort claims arising from its faulty design, construction, operation, and maintenance of a navigational waterway such as the MR-GO. The Fifth Circuit conclusively decided this issue 35 years ago:

> These three consolidated cases present the single question whether the immunity clause contained in § 3 of the federal Flood Control Act of 1928, 33 U.S.C. § 702c, applies to these actions under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., for floodwater damage allegedly caused by the negligence of the United States in the construction of the *Mississippi River-Gulf Outlet, a navigation project* that provided a short-cut from the Gulf of Mexico to New Orleans. *We conclude that § 3 does not bar these suits and affirm the judgment of the district court denying the Government's motion to dismiss.*

---

[23] The terse provision states in relevant part that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c ("Section § 702c").

34

*Graci II*, 56 F. 2d at 21-22 (emphasis added).

Nothing since *Graci* affects this holding. The two subsequent Supreme Court decisions discussed below involved flood control projects. The Supreme Court has never held that a federal navigable waterway that overflows during a storm is subject to FCA immunity.

The Government's misguided theory that it is immune for its negligent acts with respect to the MR-GO is founded on misinterpretations of the following: (1) the legislative history of the FCA and its immunity provision; (2) the reasoning and analysis of the Supreme Court in *Central Green Co. v. United States*, 531 U.S. 425 (2001) and its impact on other precedent; and (3) the Lake Pontchartrain and Vicinity Hurricane Protection Program ("LPVHPP"). As demonstrated below, none of these three arguments provides any credible support for the Government's assertion that this Court has no subject matter jurisdiction over Plaintiffs' lawsuit because the Army Corps is immunized from liability for the massive damage caused by the MR-GO during Hurricane Katrina as alleged in the Complaint.

### A. The Fifth Circuit in *Graci v. United States* Dispositively Decided That Section 702c Immunity Does Not Attach To The Governments' Tortious Acts Arising From The MR-GO.

This issue has already been resolved against the Government. Both the U.S. Court of Appeals for the Fifth Circuit and the District Court for the Eastern of Louisiana have found that the MR-GO is a navigational waterway, not a flood control project, and therefore does not meet the threshold requirements for immunity under Section 702c. Try as it might, the Government has not and cannot offer any plausible reason to ignore the

conclusions of fact and law in the *Graci* opinions. These rulings are dispositive and binding in this case.

In *Graci*, homeowners filed a claim under the FTCA alleging their properties were damaged by floodwaters from Hurricane Betsy resulting from the Government's negligent design, construction, operation, and maintenance of the MR-GO. *Graci II*, 456 F. 2d at 22. The District Court denied a motion to dismiss asserting that Section 702c barred suits against the Government for damages resulting from floods or floodwater. *Graci I*, 301 F. Supp. 947, 954 (E.D. La. 1969).[24] The Fifth Circuit affirmed the lower court's ruling, holding that "the immunity clause of Section 702c did not bar a claim against the government under the FTCA for floodwater damage caused by the negligent and wrongful acts of its employees that were *unconnected with any flood control project.*" *Graci II*, 456 F. 2d at 23 (emphasis added).[25]

In *Graci I*, the District Court was presented with a motion for rehearing with respect to an earlier motion to dismiss filed by the Government. In reaffirming the prior judge's decision to deny the motion to dismiss, the court first balanced the broad scope of the immunity waiver contained within the FTCA against the underlying purpose of the FCA immunity provisions:

> Section 3 [of the Flood Control Act of 1928] does represent a reasonable public policy determination to secure the government

---

[24] The District Court in *Graci I* held unequivocally that "[i]nsofar as provisions for federal nonliability for floodwater damage under 3 is totally dissociated from federal involvement in flood control programs, it should be held *superseded by the general liberal waiver of immunity of the Federal Tort Claims Act.*" *Graci I*, 301 F. Supp. 947, 954 (emphasis added).

[25] The Government did not seek Supreme Court review of the Fifth Circuit's holding in *Graci II*.

> from liability for floodwater damage connected with flood control projects; but *we hold that it should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects*, and that *insofar as § 3 is to be interpreted, it stands on a less crucial basis and is superseded by the general waiver of immunity of the Federal Tort Claims Act.*

*Graci I*, 301 F. Supp. at 951 (emphasis added).

In *Graci II*, 456 F. 2d 20, the Fifth Circuit affirmed the District Court's ruling:

> These cases, and what little legislative history there is, strongly support the view that *the purpose of §.3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs. . . . The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees unconnected with flood control projects. Judge Heebe answered that it would not be reasonable so to conclude. . . .* Our analysis of another group of § 3 cases leads us to agree.

*Graci II*, 456 F. 2d at 26 (emphasis added).[26]

The Fifth Circuit (per Judge Wisdom) categorically rejected the very same

argument made by the Government in our case:

> When . . . plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States *unconnected with any flood control project*, § 3 of the Flood Control Act of 1928 does not bar an action against the United States under the Federal Tort Claims Act.

------

[26] The Firth Circuit in *Graci II* discussed a series of other decisions supporting its conclusion. *Graci II*, 456 F. 2d at 26-27. *See Peterson v. United States*, 367 F. 2d 271, 275 (9th Cir. 1966) (The United States Air Force engineers' decision to dynamite an ice-jam causing a sudden discharge of water that damaged the plaintiff's property was not immunized under Section 702c because the negligent act was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization."); *McClaskey v. United States*, 386 F. 2d 807, 808, n.1 (9th Cir. 1967) ("It does not follow that the mere happening of a flood insulates the Government from all damage claims flowing from it.")

*Graci II*, 456 F. 2d at 27; (emphasis added); *accord Seaboard Coast Line Railroad Co. v*

*United States*, 473 F. 2d 20 (5th Cir. 1973) (no FCA immunity for flooding of plaintiff's

property caused by construction of drainage canal defect at federal aircraft maintenance

center).

In *Graci IV*, the District Court, six years after the Fifth Circuit's ruling, issued

findings of fact regarding the MR-GO, including findings confirming its indisputable

status as a navigational aid project:

> [Finding of Fact No.]15. The MR-GO is a *navigable waterway*
> constructed under the authority of Public Law 455, 84th Congress,
> 2nd Session, approved March 29, 1956, substantially in accordance
> with the recommendation of the Chief of Engineers as contained in
> House Document 245, 82nd Congress, 1st Session, at an estimated
> cost of $88,000,000. 70 Stat. 65.

> [Finding of Fact No.]19. *The MR-GO was constructed by the U.S.
> Corps of Engineers as an aid to navigation (distinguished from a
> flood control project) pursuant to legislative mandate of the U.S.
> Congress.*

*Graci IV*, 435 F. Supp. at 192 (emphasis added).[27]

The Court's conclusions of law in *Graci IV* provide further support that a damages

claim against the Government based on the faulty design, construction, operation, and

maintenance of MR-GO is not within the grant of immunity under Section 702c:

> [Conclusion of Law No.] 7. The United States as grantee of the
> right of way, builder and maintainer of the MR-GO assumed a high
> standard of care with relations to damages caused by the works to

_____

[27] Documentation regarding the conception, planning, operation and use of the MR-GO
consistently confirms that the purpose for the MR-GO was to function as a *navigational
waterway. See* Froeschle Decl., ¶¶ 62-76. None of these documents states, or even
suggests, that the MR-GO was a flood control project or part of any flood control program.

neighboring lands and individuals. LSA C.C. Art. 667; *Carr v. City of Baton Rouge*, 314 So.2d 527 (La.App.1975).

[Conclusion of Law No.] 10. The MR-GO *was built as an aid to navigation, not as or in connection with a flood control project*; and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO. *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971).

*Graci IV*, 435 F. Supp. at 195-96 (emphasis added).

These *Graci* opinions provide a well reasoned and logical interpretation of the legislative history of Section 702c: the Government's statutory immunity relates solely to its flood control efforts. Moreover, the *Graci* opinions hold unequivocally that Section 702c does not apply to a navigational project and that MR-GO was constructed as a navigational aid. *Graci II*, 456 F. 2d at 26; *Graci IV*, 435 F. Supp. at 192; *see also Stelly v. U.S.*, 644 F. Supp. 107, 107 -108 (W.D. La. 1986) ("If a *producing cause of the damage or injury is a government employee's negligence in omissions or commissions that diverge from acts strictly for the purpose of controlling floods or floodwaters*, and the presence or movement of water for flood control purposes merely furnishes a condition of the accident, there is no section 702c immunity.") As discussed below, the legislative history and purpose of the FCA — as well as post-*Graci* decisions, including a recent Supreme Court opinion — confirm that the Government's negligent acts with respect MR-GO are not shielded by Section 702c immunity.

**B.     From Its Inception, FCA Immunity Was Strictly Limited To Flood Control Projects.**

The roots and rationale for the FCA – which the United States has mysteriously omitted from its Motion to Dismiss – provide illuminating insight into the circumstances and public policy reasons for the FCA's governmental immunity provision. In 1927, the

39

Mississippi River flooded the Mississippi River Valley area in what Justice Hugo Black

called "the most disastrous of all recorded floods." *United States v. Sponenbarger*, 308

U.S. 256, 261 (1939); *see generally* John M. Barry, *Rising Tide: The Great Mississippi*

*Flood of 1927 and How It Changed America* (Touchstone 1998). Proposed the following

year as Congress' response to the calamity, the FCA "provided for a comprehensive ten-

year program for the entire valley, embodying a general bank protection scheme, channel

stabilization and river regulation, all involving vast expenditures of public funds."

*Sponenbarger*, 308 U.S. at 262; *accord United States v. James*, 478 U.S. 497, 604 (1986)

("*James III*"); *Mocklin v. United States*, 877 F. 2d 427, 429 (5th Cir. 1989).

Viewed in the context of its conception, the intent of the FCA becomes instantly

understandable: to grant the United States immunity for its role and expenditures in

providing flood control protection. In *James v. United States*, 790 F. 2d 590 (5th Cir.

1985) (en banc) ("*James II*"), *rev'd*, 478 U.S. at 599-600, one of two Court of Appeals

opinions preceding the Supreme Court opinion in *James III*,[28] the court examined the

legislative history of the FCA, including the remarks of then President Calvin Coolidge

commenting on the massive governmental flood program to be constructed following the

Mississippi River Valley Flood:

---

[28] The three *James* opinions addressed the issue of whether Section 702c immunized the
Government from liability for the drowning deaths of recreational users of reservoirs when
they were swept through retaining structures that had been opened to release waters in
order to control flooding. *James v. United States*, 740 F. 2d 365, 367 (5th Cir. 1984)
("*James I*") was a panel opinion holding the Government had immunity from liability for
the drowning deaths of two men under Section 702c. The Fifth Circuit, sitting en banc,
overruled that opinion in *James II*. In turn, the Supreme Court in *James III* reversed the
finding of the Fifth Circuit in *James II*, holding Section 702c would protect the
Government from "any liability *associated with flood control*." *James III*, 478 U.S. at 608
(emphasis added).

> In a message to Congress, President Coolidge stated that it was "axiomatic that states and other local authorities should supply all land and assume all pecuniary responsibility *for damages that may result from the execution of the project.*" S. Rep. No. 619, 70th Cong. 1st Sess. at 11 (1928) (emphasis added).

*James II,* 740 F. 2d at 372, n.5 (additional emphasis added).  After reviewing the legislative history of Section 702c, the court in *James II* noted:

> We think, however, that section 3 [Section 702c] must be read in its entirety to determine Congress' true intent.  The legislative history reveals that Congress was concerned with allocating the costs of a major public works program between the federal government and the state and local interests in the wake of a financial, administrative and engineering debacle.  Having assumed greater financial responsibility than initially proposed by effectively waiving state and local contribution, *Congress sought in conference to adjust its outlays for construction by excepting from its share the costs of the items considered to be "damages"* – acquisition of property for flowage rights, construction of spillways, and destruction of property *in conjunction with the construction of the flood control projects.*

*Id.* at 372-73 (emphasis added).

In a Conference Committee version, Section 3 of the FCA was modified, in amendment 14, to state:

> The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: Provided, that in all cases *where the execution of the flood control plan herein adopted* results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid.
> No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place . . . .

S. Doc. No. 91, 70th Cong., 1st Sess. 1 (1928) (Conference Report) (emphasis added).

41

The legislative history confirms what this Court and the Fifth Circuit have already concluded: the Government's right to immunity under Section 702c is contingent upon its role in undertaking a public flood control program *and* bearing the costs of that program to protect citizens and their property in the wake of a flood. Granting the Government immunity under Section 702c therefore promoted important public policy concerns rooted in public safety. The underlying rationale was that the Government would be motivated to implement flood control programs if it could be assured *immunity for any failure of the flood control measures that it had created.* In this case, however, the Government's utter failure to do anything to protect the citizens of Greater New Orleans from the known hazards of the MR-GO fulfills no such public policy goals and therefore affords no rationale for statutory immunity.[29]

---

[29] While some courts have applied Section 702c immunity to FTCA cases with respect to tort claims arising from flood control measures undertaken by the Government, many courts during the past 15 years have come to view such application of this archaic law with extreme disfavor. In 1992, Justice Stevens sharply criticized FCA immunity:

> The statute at issue here [Section 702c] is an anachronism. It was enacted 18 years before the Federal Tort Claims Act . . . waived the Federal Government's sovereign immunity from liability for personal injuries. At the time of its enactment, no consideration was given to the power generation, recreational, and conservation purposes of flood-control projects, or to their possible impact on the then nonexistent federal liability for personal injury and death caused by the negligent operation of such projects. *Today this obsolete legislative remnant is nothing more than an engine of injustice.* Congress, not this Court, has the primary duty to confront the question whether any part of this harsh immunity doctrine should be retained.

*Hiersche v. United States*, 503 U.S. 923, 926 (1992) (Stevens, J., concurring in denial of certiorari); (emphasis added); *see also Smith v. United States*, 507 U.S. 197, 210 (1993) ("Exceptions to the '"sweeping"' waiver of sovereign immunity in the FTCA should be, and have been, 'narrowly construed.'") (quoting *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992)); *accord United States v. Yellow Cab Co.*, 340 U.S. 543, 547 (1951).

If anything, the same public policy reasons that support immunizing the Government from liability when it actually constructs flood control projects are also a compelling basis to hold the Government liable for its negligent design, construction, operation, and maintenance of the MR-GO. This is particularly true in this case when the Government's negligent acts in constructing the MR-GO are compounded by its admitted failure to take any measures to ameliorate the resulting and long known dangers created by its negligence.[30] Indeed, if the Court decided that the Government was somehow immunized for its gross negligence with respect to the MR-GO, such a decision could be viewed as a carte blanche for the Government, without fear of reprisal, to wantonly ignore—and fail to ameliorate—obvious and grave risks to public safety and property posed by federal public works projects like the MR-GO.

### C. The United States Supreme Court in *James III* Reinforced the Fifth Circuit's Conclusions in *Graci*.

The Supreme Court in *James v. United States*, 478 U.S. 597 (1986) ("*James III*") examined the issue of Section 702c immunity for the first time, concluding (just as the Fifth Circuit concluded in the *Graci* cases) that Section 702c was enacted to protect the Government from liability stemming from flood control projects that it had expended funds and effort to construct. Although the Supreme Court's opinion in *James III* caused some confusion over the proper application of Section 702c in circumstances involving

---

[30] The Government openly admits that the Army Corps knew for decades about the serious risk of massive flooding posed by the MR-GO. *See* Motion at 11 ("Although the MR-GO channel would not be opened to traffic until mid-1963 and would not be enlarged to its full project dimensions until 1968, *id.*, the Army Corps *of Engineers quickly discovered that the channel was having undesirable impacts on the Industrial Canal, see id.* at 8, 55-57, 60232. *By mid-1963, the Army Corps had taken note of increased current velocities in the Industrial Canal, which were causing erosion even as construction of MR-GO was in progress. Id.* at 8, *see also id.* at 17-18.") (emphasis added).

flood control projects constructed and paid for by the Government, the Supreme Court was crystal clear that Section 702c applied only to the Government's negligent acts related to *flood control projects* that it has constructed. 478 U.S. at 605 ("The Act concerns flood control projects designed to carry floodwaters."). Nowhere in *James III* did the Supreme Court extend Section 702c to apply to non-flood control related projects such as the MR-GO.

Relying on the legislative history of Section 702c and its strong public policy underpinnings, the Supreme Court stated:

> The Act [FCA] concerns flood control projects designed to carry floodwaters. It is thus clear that the terms "flood" and "flood waters" apply to all waters contained in or carried through *a federal flood control project* for purposes of or related to flood control as well as to waters that such projects cannot control.

*James III*, 478 U.S. 597, 605 (emphasis added).[31]

---

[31] The phrase "related to flood control" in *James III* generated conflicting opinions among the Courts of Appeals. During the period between *James III*, and the clarification provided in *Central Green Co. v. United States*, 531 U.S. 425 (2001), the federal circuits struggled to interpret the scope of immunity provided to the Government in connection with federal flood control projects. *See* Hofmann, *An Enduring Anachronism: Arguments for the Repeal of the § 702c Immunity Provisions of the Flood Control Act of 1928*, 79 Tex. L. Rev. 791, 796 (2001) ("Several circuits have followed the Supreme Court's very broad interpretation of 702c, even while expressing misgivings about the harshness of the rule. Other circuits have attempted to formulate tests that could ameliorate those harsh effects."). An expansive "wholly unrelated" standard was adopted by the Third and Eighth Circuits. *See Dawson v. United States*, 894 F. 2d 70, 73 (3rd Cir. 1990) ("Based on the broad immunity recognized by the Supreme Court in *James*, we conclude that the only recovery not barred by Section 702c post-James is for injuries cause by government activities wholly unrelated to flood control."); *accord Dewitt Bank & Trust Co. v. United States*, 878 F. 2d 246 (8th Cir. 1989). Other Circuits, such as the Tenth, declined to ascribe such an all encompassing meaning to the Supreme Court's view of terms "flood" and "flood waters." *See Boyd v. United States*, 881 F. 2d 895, 900 (10th Cir. 1989) (The court held that Section 702c immunity did not apply, reasoning that "[s]uch a connection between flood control activity and recreational injuries is too attenuated to warrant the invocation of § 702c. . . . We believe Congress' concern was to shield the government from liability associated with flood control operations, . . . not liability associated with

Indeed, the Supreme Court in *James III* carefully noted that "both District Courts found[] the waters here clearly fall within the ambit of the statute," and then provided a lengthy footnote distinguishing circumstances in which the negligent acts were without relation to the operation of a waterway as a federal flood control project. *Id.*[32] In that same footnote, the Supreme Court stated unequivocally:

> We have noted that here the District Court in each case [referencing the two underlying cases prior to consolidation at the Court of Appeals level in *James I and II*] found that the *waters were being released from federal flood control facilities to prevent flooding.* (citations omitted).

In its Motion, the Government here has provided no authority or reasoning to rebut the clear limitations for Section 702c immunity articulated by the Supreme Court in *James III* as encompassing only those "*waters carried through a federal flood control project for purposes of or related to flood control.*" Since it is indisputable that the waters in the MR-GO are for navigational purposes, the Government has attempted to recharacterize the

---

operating a recreational facility.") In our case, under either the strict or more nuanced interpretation of *James III,* Section 3 does not apply since the MR-GO is a navigational waterway and is not related to flood control.

[32] In footnote 7 of *James III*, the Supreme Court carefully distinguished the following cases as those in which Section 702c immunity would *not* apply since they did not involve negligent acts related to flood control projects:

> *See Morici Corp. v. United States,* [681 F. 2d 645] at 647-648 [9th Cir. 1982] ("no immunity for flooding if inundation 'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization'"), quoting *Peterson v. United States,* 367 F. 2d 271 (9th Cir. 1966); *Hayes v. United States,* 585 F. 2d 702, 702-03 (4th Cir. 1978 ("If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility *without relation to the operation of the dam as a flood control project,* he would avoid the absolute bar of § 702c").

*James III,* 478 U.S. at 605, n.7 (emphasis in original).

navigational waters of the MR-GO as related to flood control.  However, the only support for this fanciful proposition is the *abandoned* plan back in 1965 for building a lock that would help control the high velocities of currents during storms and the construction of mostly dirt embankments along the borders of the MR-GO.

Even if the Government could establish that the MR-GO had some limited flood control features, the Supreme Court has drawn a sharp distinction between a federal project which has a dual purpose of flood control and something else and whether the flooding had any connection to the purpose unrelated to flood control.  Thus, in *James III*, the opinion cited approvingly *Hayes v. United States*, 585 F. 2d 702, 702-03 (4th Cir. 1978) for the proposition that "[i]f the plaintiff could prove damage to his farm as a result of a dam's operation as a recreational facility *without relation to the operation of the dam as a flood control project,* he would avoid the absolute bar of § 702c."  (Emphasis added).  In our case, the FCA similarly does not apply because the flooding was related to the operation of a navigational waterway and not "flood control projects *designed to carry floodwaters.*" *James III,* 470 U.S. at 605 (emphasis added).

### D.    The United States Supreme Court in *Central Green* Further Confirmed The Fifth Circuit's Conclusions in *Graci.*

Similarly, in *Central Green Co. v. United States*, 531 U.S. 425 (2001), the Supreme Court clarified its view of the terms "flood" or "flood waters" used in the FCA for purposes of defining the scope of the Government's immunity for harms caused by its maintenance of a flood control project.  In *Central Green*, the Supreme Court held that the character of the waters should be the focus in order to determine whether immunity should be applied:

> Accordingly, the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the

46

federal project or the purposes it serves, *but by the character of the waters that cause the relevant damage and the purposes behind their release. Id.* at 434 (emphasis added).

As noted above, the Supreme Court in *Central Green* restricted rather than enlarged the scope for immunity in connection with waters related to a federal flood control project.[33]  *Central Green* did not address waters not related to flood control such as navigational waters.

Unlike here, *Central Green* involved an irrigation canal that was part of a larger flood control project known as the Central Valley Project ("CVP").  *Id.* at 432-33.  Thus, unlike the MR-GO which exclusively serves a navigational purpose and was not "designed to carry floodwaters," *James III,* 470 U.S. at 605, the irrigation canal in *Central Green* served the dual purpose of irrigation and flood control.  In *Central Green,* the CVP was originally conceived as a flood control measure to curb occasional flooding caused by the Sacramento and San Joaquin Rivers in the California Central Valley.  531 U.S. at 432.  The CVP had the additional purpose of distributing water to farms throughout the Central Valley area and using the detoured water as a source of hydro-electric power generation.  *Id.* at 433.

The plaintiff in *Central Green* sued the Government for damages caused by subsurface flooding of his farmland resulting from the irrigation canal that was part of the

---

[33]  The Ninth Circuit has noted that the effect of *Central Green* was to restrict, not expand, the scope of sovereign immunity.  *See Sanko Steamship Co., Ltd. v. United States,* 272 F. 3d 1231, 1232 (9th Cir. 2001) (The Ninth Circuit, relying on *Central Green,* noted that "[s]ince the time that the district court issued its decision, however, the United States Supreme Court reversed *Central Green* and established *a more restrictive test* for determining sovereign immunity.") (Emphasis added).

47

CVP. *Id.* The issue presented therefore was the extent of the Government's immunity for harms caused by waters retained as part of a flood control project, even if the immediate source of the harm was not flood control. At no point in *Central Green* did the Court address or even consider the claim in the present case: whether the Government can claim immunity under the FCA for harms caused independent of any flood control project.

In its Motion, the Government has misconstrued the Supreme Court's analysis in *Central Green* to apply to "floodwaters" irrespective of whether those waters bear any relation to a federal flood control project. Nothing in *Central Green* suggests that the Supreme Court was viewing the term "floodwaters" in isolation. To the contrary, the Supreme Court in *Central Green* focused on the essential fact that the character of the waters could be related to flood control purposes because the canal at issue was the arm of a flood control project. If, as here, no flood control project existed, then immunity under the FCA would not apply. If this were not the case, the Government would enjoy blanket immunity for all negligent acts if they bore some tangential relationship to floodwaters. Such an inequitable result is in direct contravention of the policy reasons behind the FTCA and clearly was not intended by the Supreme Court in *Central Green*.

### E.    The Lake Pontchartrain And Vicinity Hurricane Protection Project Has No Bearing On This Case.

Realizing the it cannot overcome the *Graci* holdings, the Government weaves out of whole cloth an argument that the MR-GO, while authorized and built as a navigational waterway, was later transformed into a flood control project. The Government's contention about the post-*Graci* flood control projects authorized by the Lake

Pontchartrain and Vicinity Hurricane Protection Project—and particularly the Seabrook Lock and "levees" allegedly built along the MR-GO—is a red herring for two reasons.

*First*, the Complaint does not predicate the Government's liability on the failure of any levees along the MR-GO. In other words, the flooding of the Plaintiffs' homes was "'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act taken pursuant to such authorization.'" *Morici Corp. v. United States,* 681 F. 2d 645, 647 (9th Cir. 1982) (citations omitted).

*Second*, at a minimum, there are numerous disputed issues of fact about whether the Army Corps ever built the alleged Seabrook Lock, levees, and other flood control works pursuant to Congressional authorization, thereby requiring discovery and denial of the motion.

### 1.    Plaintiffs' Negligence Claims Are Not Predicated Upon The Failure Of Levees

In its attempt to escape the stranglehold of the *Graci* holding that the MR-GO was a navigational as opposed to a flood control project, the Government argues that "it was based on a finding that the challenged conduct was '*unconnected with flood control projects.*' *Graci v. United States,* 456 F. 2d 20, 26 (1971) (emphasis in original)." Motion at 24. As demonstrated in Section III. C, *supra*, however, this argument begs the question. Plaintiffs are not predicating the Government's liability upon the failure or inadequacy of any flood control measures. The Complaint clearly alleges that Plaintiffs' damages were caused by the MR-GO, not the failure of the Army Corps' levees, floodwalls, or any other flood control features. *See* Complaint, ¶¶ 91-94.

For purposes of Plaintiffs' factual theory of their case, nothing has changed since *Graci*. The Government's liability here—in the Government's own words—

> "depends upon . . . [the same] factual predicate that . . .
> existed . . . nearly 40 years ago. The *Graci* cases involved
> liability for flooding in 1965 from Hurricane Betsy. The
> waters that covered New Orleans East, the Lower Ninth
> Ward, and St. Bernard Parish in September of 1965 were
> not 'waters that a federal project [wa]s unable to control.'
> *Central Green*, 531 U.S. at 431."

Motion at 22.

Similarly, Plaintiffs here are claiming that it was the MR-GO itself—and its over-

flowing navigational waters—that caused the flooding of their neighborhoods. For

purposes of proving their case, Plaintiffs will not argue that failed levees were a cause of

their losses, *i.e.,* "the waters that washed over St. Bernard Parish, New Orleans East, and

the Lower Ninth Ward of Orleans Parish and caused the plaintiffs' alleged damages were

floodwaters that the LPVHPP works were unable to control." Motion at 23. In other

words, Plaintiffs expect to prove that the flooding would have occurred regardless of the

presence or absence of federal flood control structures and that their losses were caused by

the MR-GO's storm-driven navigational waters. *See* Kemp Declaration ¶¶ 16-17, 19, 30,

32.

**2.    There Are Numerous Disputed Issues of Fact Concerning**
**Whether The MR-GO Has Any Flood Control Features**

The Complaint alleges that the MR-GO was never a federal flood control project.

*See* Section III.B, *supra.* The Government attempts to overcome these well-pled

allegations by offering a hodge-podge of unauthenticated exhibits about post-Betsy efforts

by the Army Corps to beef up hurricane protection around New Orleans. *See* Motion at 24

("[T]he United States soon after [Betsy] began to build the flood control works that now

line MR-GO, GIWW, the shores of Lake Pontchartrain, and the outfall canals.") As

demonstrated in Section III.F., *supra*, however, the Government's claims are either false or seriously disputed. These factual clashes alone defeat the motion to dismiss.

Despite the MR-GO's legislative history, the Government's prior position in the *Graci* case, the Fifth Circuit and District Court's findings in *Graci*, the actual use of the MR-GO, and the fact that the existing "levees" are comprised mainly of heaps of compressed dirt along sections of its embankments that existed before 1965, the Government nevertheless contends that the MR-GO after 1965 was converted from a navigable waterway into an integral part of a massive flood control scheme called the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHHP"). Motion at 9-15, 22-29. In truth, the Government's claim that the MR-GO became part of the LPVHHP is flawed on many fronts, including a disturbing failure to provide accurate and complete information to the Court.

First, the Government has proffered misleading "evidence" and omitted to inform the Court of essential facts that are devastating to their argument that MR-GO is a component of the LPVHHP. In its Motion, the Government relies heavily on its argument that the "Seabrook Lock"—an above surface barrier planned for construction at the confluence of the Industrial Canal and Lake Pontchartrain—was one of the essential elements that converted the MR-GO from a navigational waterway into a flood control project. Incredibly, the Government failed to inform the Court that, although it referenced the Seabrook Lock seven separate times in its Motion as a flood control measure for the MR-GO,[34] *the Seabrook Lock was never built. See* Froeschle Decl., ¶ 16; Exhibit LL, p. 4.

---

[34] *See* Motion at 4, 12, 13, and 26.

Second, as summarized in Section III. F, *supra*, beside the Government's mythology about the Seabrook Lock, there are numerous factual disputes about whether flood control structures were actually built along the MR-GO, what Congress authorized (if anything), the design criteria and materials used for any so-called "levees," the purpose of any putative "levees," whether the navigational purpose of the MR-GO was ever modified by Congress, and many others.  A partial list of contested factual issues requiring discovery include the following:

- What is a "flood control project";

- Whether the construction of the Seabrook Lock was authorized by Congress;

- Whether the Seabrook Lock was ever built;

- Whether the Seabrook Lock was considered a flood control project;

- Whether if the Seabrook Lock was considered a flood control project, it altered the purpose of the MR-GO as a navigational waterway;

- What is the definition of a "levee";

- What is the definition of a "flood wall";

- Whether "levees" were placed along the MR-GO as part of the LPVHPP;

- If structures or spoilbanks were placed along the MR-GO, did those structures or spoilbanks meet the specifications and objective criteria for "levees" set by professional standards and/or the Army Corps;

- Assuming there are "levees" along the MR-GO, what was the purpose of the "levees" (*i.e.*, to assist in navigation or to protect against flooding or was there a dual purpose of both navigation and flood control); and

- Whether any "levees" along the MR-GO were built and financed by state or local government.

At the dawn of this lawsuit and before any discovery, it would be fundamentally unfair to require Plaintiffs to present evidence as to any of these factual issues or to "prove" that there were no (or sporadic) flood control measures along the 76-mile stretch of the MR-GO. Indeed, at this time, it is premature to expect the Plaintiffs to know what all the issues of material fact will be. But one thing is certain: the Seabrook Lock myth demonstrates that the Government cannot be trusted to present a fair and balanced portrayal of what flood control devices were in fact built as part of the MR-GO after 1965. Elementary justice—as well as the Federal Rules of Civil Procedure—compel the denial of the Motion for this additional reason.

## V.     THE GOVERNMENT LACKS IMMUNITY UNDER THE FEDERAL TORT CLAIMS ACT FOR PLAINTIFFS' NEGLIGENCE CLAIMS

The Government argues that the Army Corps' alleged negligence in the design, construction, maintenance, and operation of the MR-GO is protected by two exceptions to the FTCA's sovereign immunity waiver. First, the Government claims that its employees exercised "due care" in following the dictates of the legislation authorizing the MR-GO, thereby depriving them of any choice or discretion in how to design and build the navigable waterway. Motion at 31-36. Second, even if there were some latitude for the Army Corps in planning and implementing the Congressional authorization, the federal employees' decisions were allegedly the type of social, political, and economic policy judgments insulated from liability under the FTCA. As demonstrated below, neither argument is meritorious.

With respect to the "due care" exception, the Government's argument is trumped by the well-pled allegations that the Government's employees did not exercise due care and violated federal law in planning and building the MR-GO. As for the "discretionary function" exception, the Army Corps, as alleged in the Complaint, was exercising professional engineering judgment that is classically unprotected by the discretionary function exception. Finally, disputed issues of fact about the implementation of the Congressional mandate preclude resolution of these immunity questions on a motion to dismiss under Rule 12(b)(1).[35]

Significantly, the Government's argument fails to address two of the four activities that Plaintiffs allege were negligently performed with regard to the MR-GO. Its papers do not claim that the Army Corps' decisions with regard to *the ongoing maintenance and operation* of the MR-GO—activities that Plaintiffs allege were negligently performed and contributed significantly to the MR-GO's dangerous condition that caused the flooding during Katrina—are protected by either of these exceptions. The Motion claims immunity only for decisions regarding *design and construction*, particularly the alleged negligent failure of the Army Corps "to add certain features that were not within the plan that the Chief [of Engineers] recommended and approved." Motion at 37. Since Plaintiffs' have

---

[35] Forty years ago, these very same arguments were raised by the Government in the FTCA damages action alleging flooding caused by the MR-GO during Hurricane Betsy. In *Graci v. United States* (Case Nos. 65-15962, 65-15976, 65-16091), the United States also filed a motion to dismiss asserting its immunity under the "due care" and "discretionary function" FTCA exceptions. On June 13, 1967, Judge Herbert Christenberry refused to dismiss plaintiffs' case. "In the present state of the record, this is not a proper case to be disposed of on a motion to dismiss." Froeschle Decl., ¶ 123; Exhibit NN (Order of June 13, 1967 at p. 8). In reaching this conclusion, Judge Christenberry quoted *Smith v. United States*, 113 F. Supp. 131, 136 (D. Del. 1953): "At this stage of the proceedings . . . , I cannot rule out plaintiff's claims . . . because the allegations are fully as consistent with non-discretionary functions as they are with discretionary functions . . . ." *Id.*

alleged negligence in both maintenance and operations (*see., e.g.,* Complaint ¶¶ 1, 2, 5, 6,

29, 30, 34, 43, 51-60, 71, 74, 84, 85, 91-93, 95), the motion to dismiss must be denied.

**A.    The "Due Care" Exception Does Not Apply Because Plaintiffs Are Not Challenging the Legislation Authorizing the Construction of the MR-GO.**

According to the Government, "the Complaint acknowledges MR-GO was

'constructed under the authority of Public Law 455' . . . . By challenging the problems that

plaintiffs' claim are 'inherent' in implementation of MR-GO, including its design,

construction, operation, and maintenance, the plaintiffs are attacking the execution of a

federal law." Motion at 36. In sum, the Government contends the Complaint is an *implied*

attack on the statute authorizing MR-GO's construction barred under the "due care"

exception to Governmental liability under the FTCA.

The Government's argument fails for two reasons:  (1) the Government cannot

point to a single allegation in the Complaint questioning the validity of a federal statute,

and (2) its argument incorrectly assumes that Congress told the Army Corps where and

how to build the MR-GO within a single statute.

The "due care" exception to governmental liability under the FTCA arises from the

first sentence of 28 U.S.C.A. § 2680(a) exempting the federal government from liability

for any claim "based upon an act or omission of an employee of the Government,

exercising due care, in the execution of a statute or regulation, whether or not such statute

or regulation be valid . . . ." As the Government recognizes, the exception exists to

prevent a plaintiff from challenging the validity of a statute under the guise of a tort action.

*See United States v. Gaubert,* 499 U.S. 315, 337 (1991) (Scalia, J. dissenting) ("We have

taken this to mean that regulations '[can]not be attacked by claimants under the Act'.");

*Dalehite v. United States,* 346 U.S. 15, 42 (1953) ("The immunity of a decision as to

55

labeling, in fact, is quite clearly shown by the fact that the ICC's regulations, for instance, could not be attacked by claimants under the Act by virtue of the first phrase of section 2680(a).").[36]

The Government does not identify a single allegation in the Complaint where Plaintiffs have objected to the statute authorizing the construction of the MR-GO. Indeed, none exist. *See* Section III.D, *supra*. Instead, the Complaint challenges "the Army Corps compliance with this Congressional mandate" to design, build, operate and maintain the MR-GO. Complaint, ¶ 95. This is why the Government has relied on its conjectural interpretation of Plaintiffs' Complaint, rather than on the actual text of the pleading. *See* Froeschle Decl., ¶¶ 125-127. In short, the Government's "due care" argument must fail because it is based on a factually incorrect and unsubstantiated interpretation of Plaintiffs' allegations.

Not only are Plaintiffs not attacking the federal law by which the MR-GO was authorized, the Government's argument is predicated on an inaccurate and misleading discussion of the procedure by which this project was authorized. *See* Froeschle Decl., ¶¶ 42-56, 62-66, 77. In its section addressing the "due care" exception to the FTCA, the Government asserts "MR-GO exists where it is and as it is because Congress told the Corps to build this waterway rather than others that had been proposed." Motion at 33.

---

[36] Section 2680(a) presumes adherence to statutory mandates, and an agency's failure or refusal to comply with a federal statute establishes a prima facie example of a lack of "due care" under the FTCA *See, e.g., U.S. v. Second Nat'l Bank of N. Miami*, 502 F. 2d 535, 549 (1974) ("The words 'due care' point to the issue of whether a party's conduct complies with or violates a duty owed to another . . . ."). Here, Plaintiffs have alleged the Army Corps' failure to comply with federal statutes, and provided this Court with further evidence of the Army Corps' non-compliance with statutory requirements. Plaintiffs therefore have alleged the Army Corps' lack of "due care." federal statute establishes, ipso facto, lack of "due care" under the FTCA.

The underlying assumption here is the existence of a single statute by which Congress instructed the Army Corps how and where to build the MR-GO. The assumption is absurd on its face because taken to its logical conclusion there would be no need for the Army Corps' supposed expertise. Congress could simply draw up the technical plans for any canal and hire a contractor to build the waterway.

In fact, the process was more complicated than described by the Government. Simply put, as discussed in Section III.D, *supra*, Congress asked the Army Corps to use its engineering judgment to investigate the possibility of constructing "a" waterway between the Mississippi River and the Gulf of Mexico, the Army Corps returned with its proposal for the navigation channel, and Congress approved the Army Corps' recommendation. *See* Froeschle Decl., ¶¶ 52-53, 56, 62, 64. In this case, Congress authorized the Corps to investigate and report on the viability of a waterway between the Mississippi River and the Gulf of Mexico "*by way of the best available route.*" *See* Froeschle Decl., ¶¶ 43, 56, Exhibit H at 2; K at 17, 23. In response, the Army Corps prepared two reports in 1930 and 1951. Froeschle Decl., ¶¶ 45-51, 62-66. Thereafter Congress passed the Act of March 29, 1956 to "Authorize Construction of the Mississippi River Gulf-Outlet," Pub. L. 84-455, 70 Stat. 65 (1956) (Froeschle Decl., ¶ 77, Exhibit U), which simply provided for "the Mississippi River-Gulf outlet to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245." *Id.*

The MR-GO's legislative history reveals that Congress asked the Army Corps to use its professional acumen to find the best route for a navigable channel between the Mississippi River and the Gulf of Mexico. Where and how the canal would be constructed

would therefore be for the Army Corps to determine based on its *non-immunized* engineering judgment to be exercised within the confines of federal statutory law and prevailing professional standards. Plaintiffs' negligence claims are predicated *solely* on the Corps' incompetence during the project's investigation, planning, construction, maintenance and operational phases. *See* Complaint, ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102). In *Buchanan v. U.S.*, 915 F. 2d 969, 970-71 (5th Cir. 1990), the Fifth Circuit noted that "[t]he first clause, exempting actions mandated by statute or regulation, *applies only if the actor has exercised due care*." (Emphasis added). Here, where Plaintiffs have adequately alleged the Army Corps' negligence and lack of "due care" in fulfilling Congressional directives, the "due care" exception is inapplicable.

**B.     The Discretionary Function Exception Does Not Immunize the United States Since the Army Corps Violated Federal Law in the Investigation, Planning and Construction of the MR-GO.**

Under well-established law, if a statute prescribes an agency's actions and the prescribed course of conduct is not followed, the discretionary function exception does not apply. As stated by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, 322 (1991) "[t]he exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice' . . . . The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive'." (Citations omitted). *See also Berkovitz v. United States*, 486 U.S. 531, 536 (1986) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.").

Where a federal agency violates federal law, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324. Thus, violation of a statutory mandate defeats the discretionary function exception since "'sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct.'" *Kiska Const. Corp. v. Washington Metropolitan*, 321 F. 3d 1151, 1159 (D.C. Cir. 2003) (citations omitted). The Army Corps here violated several federal statutes causing the damages alleged by Plaintiffs, and these breaches of federal law, coupled with Plaintiffs' consequential injuries, preclude application of the discretionary function exception.

### 1. The Army Corps' Violation of Federal Law Substantially Contributed to the Destruction of Valuable Southern Marshland That Otherwise Would Have Protected Greater New Orleans From Flooding.

As discussed at length in the accompanying Declaration of Nina Froeschle, the River and Harbor Act of 1945, authorizing the Army Corps to investigate the MR-GO, required "the Chief of Engineers . . . [to] give to the Secretary of the Interior, during the course of investigations, information developed by the investigations and also opportunity for consultation regarding plans and proposals . . . ." Froeschle Decl., ¶¶ 55-56, Exhibit L at 1. Likewise, the 1946 version of the Fish and Wildlife Coordination Act ("FWCA"), as codified at 16 U.S.C. § 662, mandated Army Corps' consultation and coordination with the Department of Interior, Fish and Wildlife Service (the "FWS") and the former Louisiana Department of Wild Life and Fisheries (the "LDWLF") during the investigation, planning and design phases of any water resource project such as the MR-GO. Froeschle Decl., ¶¶ 57-61; Exhibit M at 1-3. The statute further provided that any reports submitted to Congress include "the reports and recommendations of the Secretary of the Interior and

59

of the head of the agency exercising administration over the wildlife resources of the

State."

In the Army Corps' report on the MR-GO submitted to Congress in 1951 (the

"*1951 MR-GO Report*"), the Army Corps stated that it had "coordinated" with the "director

of the Louisiana Department of Public Works, designee for the Governor of Louisiana,"

but did not mention any contact with the FWS or LDWLF, as required by law.  (Froeschle

Decl., ¶¶ 62-66; Exhibit O at 22, ¶ 80).  This omission would prove to have drastic

consequences for Greater New Orleans because, as discussed below, both of these agencies

foresaw with eerie clarity the destruction of the southern marshlands that had served as a

storm surge buffer.

On August 24, 1957, the Secretary of the Interior wrote the Secretary of the Army,

unequivocally informing him of the Army Corps' failure to comply with the terms of the

FWCA with respect to the MR-GO and stating "[t]he project plans have not been

investigated by fish and wildlife conservation agencies as contemplated in the Wildlife

Coordination Act of August 14, 1946 (60 Stat. 1080)."  (Exhibit W at 1-2; Froeschle Decl.,

¶¶ 78-80).  Secretary Seaton further added:

> We urge that detailed planning for the project consider fully the effects on
> fish and wildlife resources of constructing the canal and that your
> Department accept reasonable modifications in alignment of the canal and
> in the plan for deposition of spoil to hold to a minimum the destructive
> effects on these resources, even though this may increase project costs to
> some degree.

(Exhibit W at 1).[37]

---

[37] As alleged in Plaintiff's Complaint at Paragraphs 63 through 69, this correspondence
was referenced in a 1958 FWS report sent to the Army Corps entitled "*An Interim Report
on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project,
Louisiana and an Outline of Proposed Fish and Wildlife Studies*" (the "*Fish & Wildlife
Report*").  This same *Fish & Wildlife Report* predicted that the MR-GO, as planned by the

In short, the Army Corps was required—but clearly failed—to consult with the FWS and the LDFWL. At a minimum, the FWCA required the Army Corps to present the FWS's concerns to Congress, allowing Congress to make the decision concerning the appropriate alignment of the MR-GO. Instead, the Army Corps unilaterally usurped Congress' decision making power in violation of federal law. The result—the *predicted* death of valuable surge busting marshland—led inexorably to the deadly flooding of Greater New Orleans. *See* Complaint, ¶ 3; Kemp Decl., ¶¶ 20-30.

2. **The Army Corps Further Violated Federal Law By Failing to Construct the MR-GO According to the *1951 MR-GO Report*, Creating the "Funnel" That Exacerbated the Katrina Storm Surge.**

The Division Engineer who compiled the *1951 MR-GO Report* recommended the "*the construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel . . . as a land and water cut . . . to deep water in the Gulf of Mexico.*" (Exhibit O at 22 (emphasis added); Froeschle Decl., ¶ 64). By its terms, the proposal called for the construction of a new and distinct canal connecting the MR-GO to the Industrial Canal. It

---

Army Corps, would lead to massive destruction of southern marshland, and the report requested that the construction be delayed until further testing could be performed by the FWS. A September 24, 1959 FWS memorandum reflected the Army Corps' flat refusal to delay construction until the FWS could perform the requested testing, and its rejection of the FWS' recommendation to change the course of the MR-GO. Froeschle Decl., ¶ 93; Exhibit 2 at 1. The Army Corps' decision was all the more egregious since its own Board of Engineers in the 1951 MR-GO Report had recommended further study as to the appropriate alignment of the waterway: "The Board is of the opinion that the exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board." Froeschle Decl., ¶ 67, Exhibit O at 8.

did not suggest using the Gulf Intracoastal Waterway (the "GIWW") as a conduit for connecting the MR-GO to the Industrial Canal.[38]

Rather than constructing this separate canal as set forth in the complete text of the Government's Exhibit 4—the July, 1957 Army Corps' *Mississippi River – Gulf Outlet Louisiana: Design Memorandum No. 1-A* (the "*MR-GO Design Memorandum*")—the MR-GO was tied into the GIWW and the new combined GIWW/MR-GO was widened to handle the increased shipping traffic. Froeschle Decl., ¶ 122; Exhibit M. By failing to construct Reach I of the MR-GO in accordance with the recommendations contained in the *1951 MR-GO Report, as approved by Congress*, the Army Corps created the "funnel" through which storm surge from the GIWW and the MR-GO merged into a powerful storm surge delivery system directly aimed at Greater New Orleans. *See* Kemp, Decl., ¶¶ 11-19.

Each one these statutorily mandated omissions created the dangerous conditions causing Plaintiffs' damages. Thus, as a matter of law, the discretionary function exception does apply.[39]

## C.    The Army Corps' Lack of Professional Engineering Competence Is Not Protected by the FTCA.

---

[38] This conclusion is bolstered by comments made by former Army Corps Deputy Chief, Civil Works for Rivers and Harbors, Colonel W. D. Milne during his September 18, 1951 testimony before the Subcommittee of Rivers and Harbors of the House Committee on Public Works. Specifically, Colonel Milne stated "[t]he recommendation of the Chief of Engineers calls for a canal connecting the present industrial canal of New Orleans, and calls for a canal 36 feet in depth and 500 feet in width running . . . into a turning basin . . . ." Froeschle Decl., ¶ 67; Exhibit P at 5.

[39] Even if the Army Corps had attempted to comply with statutory directives, it cannot hide behind a technical compliance with a law, while blindly ignoring the damaging effects that its actions would have on the people of Greater New Orleans. As noted by the Supreme Court in *Hatahley v. U.S.*, 351 U.S. 173, 181 (1956): "'Due care' implies at least some minimal concern for the rights of others. Here, the agents proceeded with complete disregard for the property rights of the petitioners."

Even if the Government is correct in asserting that the Army Corps had discretion, the Government is not immune from liability for the Army Corps' flawed exercise of professional judgment based on prevailing engineering standards.

The discretionary function doctrine "has traditionally been narrowly construed by the courts." *Collins v. United States*, 783 F. 2d 1225, 1231 (5th Cir. 1986). Originally, the Supreme Court tied a discretionary function to the level within an administrative hierarchy at which a decision is made. For example, in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955) a tugboat operator sued the United States, claiming that a shipping accident was caused by an out of commission lighthouse negligently maintained by the United States Coast Guard. The Supreme Court concluded that "[t]he question is one of liability for negligence at what this Court has characterized the 'operational level' of governmental activity." *Id.* at 64.

Later, the Supreme Court shifted away from the level of the decision making to the nature of the discretion exercised. *See Berkovitz v. United States*, 486 U.S. 531 (1988). As the Supreme Court held in *United States v. S.A. Empresa de Viacao Aerea Rio Gransense* ("*Varig Airlines*"), 467 U.S. 797 (1984), "it is the nature of the conduct, *rather than the status of the actor*, that governs whether the discretionary function exemption applies in a given case." *Varig Airlines*, 467 U.S. at 813 (emphasis added). In *Berkovitz*, *Varig*, and *U.S. v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court refined the methodology used to assess the "nature of the conduct" by holding only governmental policy decisions based on economic, political or social factors fall within the discretionary function exemption. *See Gaubert*, 499 U.S. at 322-23.

Under any formulation of the discretionary function test, the allegations in the Complaint negate any immunity because Plaintiffs are seeking recovery for the Army Corps' operational level execution of Congressional directives that called upon the Army Corps to prudently exercise scientific and engineering based judgment based on professional standards. Such judgment does not implicate social, political or economic issues, and as explained further below, falls far outside the protected immunity sphere of the discretionary function exception.

The prevailing law is that "matters of scientific and professional judgment – particularly judgments concerning safety – are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. U.S.*, 400 F. 3d 1177, 1181 (9th Cir. 2005); *Fisher Bros. Sales, Inc. v. U.S.*, 46 F. 3d 279, 290 (3rd Cir. 1995) ("[J]udgment guided purely by scientific or other objective principles does not involve discretion for purposes of the discretionary function exception."); *Cope v. Scott*, 45 F. 3d 445, 452 (D.C. Cir. 1995) ("The 'engineering judgment' the government relies on is no more a matter of policy than were the 'objective scientific principles' that the [Supreme Court in *Berkovitz v. United States*, 486 U.S. 531 (1988)] distinguished from exempt exercises of policy judgment."); *Ayala v. U.S.*, 980 F. 2d 1342, 1349-1350 (10th Cir. 1992) ("We fail to see how the determination in this case can be labeled a policy decision. The choice was governed, as plaintiffs contend, by 'objective principles of electrical engineering'."). *Moyer v. Martin Marietta Corp.*, 481 F. 2d 585, 598 (5th Cir. 1973) (no discretionary immunity for negligent design and construction decisions).

The Fifth Circuit has reached the same conclusion, holding the Government liable for damages caused by the negligent design or construction of a canal or waterway. In

64

*Seaboard Coast Line Railroad Co. v. United States*, 473 F. 2d 714 (5th Cir. 1973), the

plaintiff's train and railroad tracks were damaged in a derailment caused by flooding from

a drainage ditch on a nearby military base. The District Court found that "the actions of

the government *in designing the drainage system* were negligent and that *the floods*

*resulting therefrom* constituted an actionable trespass and a nuisance." 473 F. 2d at 715

(emphasis added). Echoing the Supreme Court in *Indian Towing Co.*,[40] the Fifth Circuit

affirmed the District Court's decision:

> Once the government decided to build a drainage ditch, it
> was no longer exercising a discretionary policy-making
> function and it was required to perform *the operational*
> *function of building the drainage ditch* in a non-negligent
> manner.

*Id.* at 716 (emphasis added); *see also Alabama Electric Cooperative, Inc. v. United States*,

769 F. 2d 1523, 1531 (11th Cir. 1985) ["[T]he Corps' engineers must be held to the same

professional standards of reasonableness and due care that a private engineer faces when

he plies his trade."); *O'Toole v. United States*, 295 F. 3d 1029, 1036 (9th Cir. 2002) ("We

hold that an agency's decision to forego, for fiscal reasons, the routine maintenance of its

---

[40] The Supreme Court has held that the discretionary function exception does not apply to
maintenance and operation of a federal facility:

> The Coast Guard need not undertake the lighthouse service.
> But once it exercised its discretion to operate a light . . . and
> engendered reliance on the guidance afforded by the light, it
> was *obligated to use due care to make certain that the light*
> *was kept in good working order;* and, if the light did become
> extinguished, then the Coast Guard was *further obligated to*
> *use due care to discover this fact and to repair the light or*
> *give warning that it was not functioning.* If the Coast Guard
> failed in its duty and damage was thereby caused to
> petitioners, the United States is liable under the Tort Claims
> Act.

*Indian Towing,* 350 U.S. at 69 (emphasis added).

property – maintenance that would be expected of any other landowner – is not the kind of policy decision that the discretionary function exception protects."); *United States v. Hunsucker,* 314 F. 2d 98, 105 (9th Cir. 1962) (United States is not immunized from liability for "its failure to take reasonable precautions to prevent [flood] damage to appellee's land" from a drainage ditch).[41]

Each of these cases supports Plaintiffs' claims against the Army Corps for liability *predicated solely on the negligent exercise of scientific and engineering judgment.* At Paragraph 49 of the Complaint, Plaintiffs allege that "the Army Corps failed to take account of the waterway's inherent and known capability of serving as funnel or conduit for rapidly-accelerated, storm driven surges . . . ." Likewise, at Paragraph 49, Plaintiffs allege "the Army Corps failed to account for the devastation of the wetlands that the MR-GO, by its design, would facilitate." These claims are solely based on the Army Corps' failure to properly exercise its discretion as engineers—consistent with "professional standards of reasonableness and due care"—in the design and construction of the MR-GO.

Finally, in a last ditch attempt to shield the Army Corps from the consequences of its alleged negligence, the Government invokes the Army Corps' supposed right to investigate *ad nauseam,* but never actually undertake remedial measures to fix a troubled water resource project. From this illogical premise, the Government then argues the

---

[41] The Government's suggestion that it could not undertake urgently needed measures to ameliorate severe bank erosion and related problems along the MR-GO—estimated to cost nearly $40 million—because there was no Congressional authorization begs the question. Like so many other safety measures that the Corps studied exhaustively, the Government has provided no evidence that Army Corps ever requested the funding. In any event, if the Army Corps' negligence causes loss of life and property, and regardless of whether Congress sees fit to appropriate the money to remedy known safety hazards, the Government is liable. *See O'Toole v. United States,* 295 F. 3d at 1036.

applicability of the Ninth Circuit's discretionary function opinion in *National Fire Ins. v. United States*, 115 F. 3d 1415 (9th Cir. 1997). *See* Motion at pp. 44-47. The gravamen of the Ninth Circuit's decision was that the Army Corps had the discretion to decide whether *to repair* a faulty harbor breakwater located in a man-made harbor in Redondo Beach, California.

The fatal flaw with the Army Corps' reliance on *National Fire Ins*. is that the Complaint here challenges the adequacy of the Army Corps' engineering judgment in the course of "designing, planning, constructing or maintaining" the MR-GO.[42] The Government fails to point to a single allegation in Plaintiffs' Complaint where Plaintiffs question the Corps discretion with respect to "repairs" to the MR-GO. In any event, controlling Supreme Court and Fifth Court precedent discussed above bar the application of the discretionary function exception to engineering decisions regarding design, construction, maintenance and operation of federal projects.

Notwithstanding the Government's attempts to recast the Plaintiffs' Complaint, the Army Corps is not immune from negligent acts for its failure to comply with federal law or for its defective exercise of engineering judgment. Plaintiffs therefore respectfully that this Court reject the Government's due care and discretionary function exception arguments.

---

[42] Moreover, *National Fire Ins*. is not dispositive in the factual context of a case like ours alleging negligent maintenance and repair of a canal as evidenced by the Ninth Circuit's subsequent decision in *O'Toole v. United States*, holding the Government liable for failure to remove debris from an irrigation canal, *i.e.*, "routine maintenance of its property." 295 F. 3d at 1036.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion to Dismiss

be denied in its entirety.

Dated:  August 21, 2006                              Respectfully submitted,

**O'Donnell & Mortimer LLP**

By: _____

Pierce O'Donnell (*pro hac vice*)
Nina D. Froeschle (*pro hac vice*)
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone:  (213) 532-2000
Facsimile:  (213) 532-2020

**The Andry Law Firm, LLC**

By: _____

Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Bruno & Bruno**

Joseph M. Bruno (LSBA No. 3604)
David S. Scalia (LSBA No. 21369)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

68

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile: (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile: (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile: (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August, 2006, I served a true copy of the

Plaintiffs' Opposition to the Government's Motion to Dismiss upon counsel for the United

States of America by electronic mail, facsimile, or first class mail.

JONATHAN B. ANDRY