UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ITELD, BERNSTEIN & ASSOCIATES, L.L.C. | * | CIVIL ACTION |
| | * | |
| | * | NO. 06-3418 |
| VERSUS | * | |
| | * | SECTION "R" |
| THE HANOVER INSURANCE GROUP; | * | |
| MASSACHUSETTS BAY INSURANCE | * | MAG. DIV. 1 |
| COMPANY; MOSES SWENT; EUSTIS | * | |
| INSURANCE, INC., ABC INSURANCE  CO. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

Defendants The Hanover Insurance Group ("Hanover") and Massachusetts Bay Insurance Company ("Mass. Bay") (collectively, the "Removing Defendants"), but not Defendants Moses Swent ("Swent") and Eustis Insurance, Inc. ("Eustis"), all of whom were served, removed this case from the 34th Judicial District for the Parish of St. Bernard, State of Louisiana. Plaintiff, Iteld, Bernstein & Associates, L.L.C. ("IBA" or "Plaintiff"), requests remand of this case back to the 34th Judicial District Court for the Parish of St. Bernard, for the following reasons, to-wit:

**I.     FACTUAL BACKGROUND**

IBA operated a single business providing medical services from two offices, one located at 9000 Patricia Street in Chalmette, and the other about 9 miles away, at 6040 Bullard Avenue, Suite 2, in New Orleans. The two locations were never operated separately, but as a single entity. Doctors were not relegated to one office or the other; rather, all IBA physicians provided services in both locations.  Patients who were seen in one location were often referred to the other office for follow-up or other treatment or testing. A single administrative office provided services to the entire business.  IBA was run as a single unit, and neither income nor patients were segregated between the offices for tax and financial statement purposes.

Defendants Swent and Eustis acted as IBA's agents and were charged with securing full coverage in the event IBA sustained damage that interrupted its business income. The coverage for lost business income was never intended to be dichotomized or segregated between the two

1

offices because income was not accounted for separately at each office and patients were treated sometimes at both locations. Eustis/Swent secured coverage for IBA, but never notified IBA that the coverage provided was not the coverage IBA sought. Further, the Policy (**Exh. C**), as written by Defendants and by its express wording, seemed to provide the coverage requested:

> *We will pay for the actual loss of Business Income* you sustain *due to* the necessary *suspension of your operations*" during the period of restoration". *The suspension must be caused by direct physical loss of or damage to property at the described premises.* The loss or damage must be caused by or result from a Covered Cause of Loss... (Policy, **Exhibit C**)

So, in order to recover their "*actual loss of Business Income*", IBA had to prove direct physical loss or damage to property at the "described premises". "Described Premises" was defined as:

> "<u>Described Premises</u>:
> No. 1  9000 Patricia Street, Chalmette, LA 70043
> No. 2  6040 Bullard Avenue Ste 2, New Orleans, LA 70127"

Per the <u>express</u> terms of the policy, a Covered Cause of Loss only had to occur ***somewhere*** at the "Described Premises", meaning somewhere at <u>either</u> Patricia Street or Bullard Avenue, to trigger coverage for <u>all</u> <u>actual</u> lost Business Income. Although Defendants, writers of the Policy, could have specifically limited coverage in the event that damage occurred only at one office to <u>income Defendants then arbitrarily attributed to the damaged office,</u>[1] Defendants did not do so. The Policy merely provided that covered damage must have occurred somewhere on the "Described Premises", meaning covered damage anywhere at the Described Premises obligated Defendants to pay IBA for any and all actual business income it lost. This is because IBA did not account for income separately between the two offices on its financial statements and tax returns- so, if one office sustained a <u>non-covered</u> loss, as occurred here, IBA could have routed its patients to its other office ten minutes away, without any real loss of income. But in this case, IBA's "other office" suffered a <u>covered</u> cause of loss, and IBA could not re-route its patients. The covered cause of loss triggered coverage under the policy for IBA's lost business income.

As further evidence of the parties' intent in confecting this Policy, the Declarations page

---

[1]Defendants would have had to artificially attribute income to a particular office because IBA did not differentiate between income earned at one location or the other.

described the business of the Insured as "Office" (<u>not plural</u>). The Businessowners Declaration page described the Insured as "Iteld, Bernstein & Assoc LLC DBA Louisiana Heart Center", <u>a single entity</u>, and the Property Coverage and Limits of Insurance as follows:

| Property Coverage | Limits of Insurance | | | | | |
|---|---|---|---|---|---|---|
| | Loc No 001 | Bldg No 001 | Loc No 002 | Bldg No 001 | Loc No | Bldg No |
| Deductible Amt | $1,000 | | $1,000 | | $ | |
| Business Amount Valuation | $ 0 | | $ 0 | | $ | |
| Bus Personal Prop Valuation | $ 3,778,100 RC | | $ 491,715 RC | | $ | |
| *Business Income* | *Actual Business Loss Sustained not exceeding 12 consecutive months* | | | | | |
| Business Income Waiting Period | None/ 24 hour / 48 hour / 72 hour NONE | | | | | |

Thus, coverage for <u>property</u> losses (as opposed to <u>lost business income</u>) was differentiated in the Policy between the two offices because each office had different property, equipment and furniture. But significantly, there was no differentiation or dichotomy for lost business income because the income and patients flowed between the two offices. And again, Defendants could have specified that lost business income was limited to the office that sustained the physical damage, but they did not. It was incumbent upon Defendants, writers of the Policy, to be sure the Policy was unambiguous, or the ambiguity is construed against them.

On August 29, 2005, Hurricane Katrina hit the metropolitan New Orleans area. The damage to the Bullard Avenue office was caused by the hurricane's wind/wind-driven rain, clearly "Covered Causes of Loss" under the Policy. But the damage to the Patricia Drive office was primarily due to flooding, although some damage may have been caused by wind/wind-driven rain. It is undisputed that damage due to a Covered Cause of Loss (wind/wind-driven rain) occurred at the "Described Premises" (the Bullard Avenue office), which is the only requisite in the Policy to trigger payment under the Policy for all actual lost business income. Because the two offices were only 9 miles apart, and because they operated merely as two branches of the same office, with patients being seen and doctors working interchangeably out of both offices, patients who could not be seen at the Patricia Drive office could have easily been seen, and many had been seen in the past, at the Bullard Avenue office, but for the destruction of the office

by a Covered Cause of Loss. The loss was sustained when IBA could not see all patients at the Bullard Avenue office, which suffered a Covered Cause of Loss, creating a total loss of income.

IBA entered into the Policy at issue herein on **June 1, 2005.** However, according to the Removing Defendants, the Policy allegedly was initially issued on **June 1, 2003**, and then it was renewed twice, the last time being on June 1, 2005. The last renewal is the policy that provides coverage for the claims herein. The loss occurred on **August 29, 2005.** Suit was filed in the 34th Judicial District Court for the Parish of St. Bernard, on **May 12, 2006**–which significantly is within:

(1)     **three years of the issuance of the original policy on June 1, 2003**;

(2)     **one year of the issuance of the policy that provides coverage herein (June 1, 2005);**

(3)     **one year of the damage sustained due to Hurricane Katrina (August 29, 2005);**

(4)     **one year of the date of discovery of Defendants' interpretation of the Policy (March 2006) - for the first time dichotomizing between the two offices notwithstanding the Policy's language,** and disagreeing with the contract as IBA had always understood it.

## II.     BURDEN AND STANDARDS OF PROOF

The Removing Defendants bear the burden of establishing the existence of federal jurisdiction at the time of removal and of proving that the removal was proper. *Zahn v First Union Comm. Corp.,* 2004 WL 2195575 (2004); *LeBoeuf v. Shell Oil Co.,* 2004 WL 1920943 (E. D. La. 2004). The removing parties alleged jurisdiction based on diversity and further alleged that non-diverse parties were fraudulently joined, and it is the removing parties who bear the burden of proving those allegations to sustain federal jurisdiction. *LeBoeuf, supra,* 2004 WL 1920943 at 2.

Further, any failure to comply with the removal statute warrants remand. *Henderson v. Holmes*, 920 F.Supp. 1184 (D.Kan. 1996). The Fifth Circuit in *Carpenter v. Wichita Falls Ind. Sch. Dist.,* 44 F. 3d 362, 365-6 (5th Cir. 1995) held that because the effect of removal is to deprive a state court of a state law action properly before it, removal raises significant federalism concerns which mandate strict construction of removal statutes. Removal statutes are designed to afford defendants a federal forum, but not to prevent state judges from hearing state claims. *Zahn, supra.* Removal is purely statutory and should be construed strictly in favor of state court jurisdiction. *Naef v. Masonite Corp.* 923 F.Supp.1504 (S. D. Ala. 1996). The jurisdictional facts

supporting removal are examined as of the time of removal. *Zahn, supra.*

Finally, *McKee v. Kansas City Southern Rlwy. Co.*, 358 F.3d 329, 333 (5th Cir. 2004) held:

> The Court... must take all unchallenged factual allegations, including those alleged in the petition, in the light most favorable to plaintiffs...***Any contested issues of fact and any ambiguities of state law are to be resolved in Plaintiff's favor***... Finally, if the right to remove is doubtful, the case should be remanded...

## III.   PROCEDURAL DEFECTS IN THE REMOVAL - FAILURE TO JOIN ALL DEFENDANTS

### A.   Did All Defendants have to Consent to Removal And Is It Too Late to Consent Now?

The Removing Defendants failed to join or secure the timely consent of the two other Defendants, Swent and Eustis, to the removal. Generally, a Notice of Removal fails unless all defendants join in it (the "unanimity rule").   It is well-settled that all served defendants must join in a Notice of Removal. *Doe v. Kerrwood*, 969 F.2d 165,167 (5th Cir.1992); *Sciortino v. Nat'l R.R. Passenger Corp.*, 2005 WL 1431697 (E.D. La. 2005). As further evidence that the two non-diverse Defendants do not agree to the removal, after the time the Notice of Removal was filed, Swent and Eustis filed an Answer to IBA's Petition *in the state court proceeding.* **(Exhibit "B")**

If all defendants do not join in the removal, the removing parties must prove an exception to the joinder rule applies. *Brigham v. Pennywise RV Sales & Svc.,Inc.*, 2005 WL 435260 (W.D. La. 2005). And because Defendants filed their Notice of Removal on the 30th day after the first Defendant was served, it is too late now to add the non-diverse Defendants' consent or attempt to join them.  *Aucoin v. Gulf South Pipeline Co., L.P.*, 2004 WL 1196980 (E.D. La. 2004) held:

> *...in neither case was there any written filing...prior to the expiration of the thirty-day limit that satisfactorily indicates the consent of all defendants to removal...A defect of this nature in the removal petition is not curable by amendment...*the Notices of Removal...were defective due to their failure to include adequate allegations of the consent of all defendants... *[B]ecause the thirty-day period mandated by §1446 has passed, defendants may not amend the notices to cure the defects...*[T]hese matters must be remanded...

In any event, it is clear Eustis/Swent do not and will not consent to the removal, as is obvious from the fact that they filed responsive pleadings in the state court suit. Further, the statutory time limitation is mandatory and must be strictly complied with; it cannot be extended by stipulation or order of the court. *Sciortino, supra,* 2005 WL 1431697 at 1-2.

5

**B.**    **The Heavy Burden Placed On the Removing Defendants to Prove Improper Joinder**

The Removing Defendants apparently realize that including Eustis and Swent herein

would deprive this Court of diversity jurisdiction under 28 U.S.C. §1332. To avoid this problem

(and the problem of the lack of timely consent of both Eustis and Swent to the removal), the

Removing Defendants claim Eustis and Swent were improperly joined or "fraudulently misjoined"

herein.[2] But again, the Removing Defendants bear the burden of proving the existence of fraud:

> Ashland Oil 'must show...*there is no possibility..the plaintiff would be able to establish a cause of action against the in-state defendant* in state court; or that there has been outright fraud in the...pleadings of jurisdictional facts.

> In determining whether joinder of parties was fraudulent, *the...court 'must evaluate all of the factual allegations in the light most favorable to the plaintiff*, resolving all contested issues of substantive fact in favor of the plaintiff.' *If there is 'arguably a reasonable basis for predicting that..state law might impose liability on the facts involved,'...there is no fraudulent joinder.*

*Jernigan, supra. McDonal v. Abbott Labs.*, 408 F. 3d 177, 183 (5th Cir. 2005) held:

> The *improper joinder doctrine constitutes a narrow exception to the rule of complete diversity*. We have previously stated, but it bears emphasizing again ...the *'burden of demonstrating [improper] joinder is a heavy one.'...the party seeking removal must demonstrate either '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court..'* Under this second prong, *we examine 'whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant*, which stated differently means that *there is no reasonable basis for the...court to predict...the plaintiff might be able to recover against an in-state defendant.'*

And, as explained by the Fifth Circuit in *Travis v. Irby*, 326 F. 3d 644, 647 (5th Cir. 2003):

> [T]he question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved.  If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham, is not colorable and is not fraudulent in factor in law...

*See also, Gertrude Gardner, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2004 WL 1488668 (E.D.La.

2004) ("'The burden of persuasion upon those who cry 'fraudulent joinder' is indeed a heavy

one.'...*All* disputed questions of fact and *all* ambiguities in controlling state law are resolved in

---

[2]There is some support for the proposition that if parties are improperly or fraudulently joined, the consent of the improperly joined parties to removal is not required because removal "is based on the contention that no other proper defendant exists". *Jernigan v. Ashland Oil, Inc.* 989 F. 2d 812, 815-6 (5th Cir. 1993).

favor of the non-removing plaintiffs...")

**C.**     <u>**Is It Possible to Recover Against Eustis/Swent, Or Are All Claims Perempted?**</u>

The Removing Defendants do <u>not</u> argue that there is no liability under Louisiana law on

the part of insurance agents/brokers (i.e. Eustis/Swent), for their failure to procure insurance as

they represented they would do or had done. They also do <u>not</u> argue there can be no liability

on the part of Swent personally for failing to procure the requested insurance coverage[3] or for

failing to convey Defendants' interpretation of the Policy provisions.  Defendants only argue that:

38.     To establish that a non-diverse defendant has been improperly joined to
defeat diversity jurisdiction, the removing party must show that the plaintiff
cannot establish a cause of action against the non-diverse defendant.

39.     La. Rev. Stat. 9:5606 provides in pertinent part:

***No action for damages against any insurance agent,
broker..whether based upon tort, or breach of contract, or
otherwise***, arising out of an engagement to provide insurance
services ***shall be brought unless filed*** in a court of competent
jurisdiction...***within one year from the date of the alleged act,
omission, or neglect, or within one year from the date that the
alleged act, omission, or neglect is discovered or should have
been discovered.***  However, even as to an action filed within one
year from the date of such discovery, in all events, such action shall
be filed at the latest within three years from the date of the alleged
act, omission, or neglect.

43.     ...to the extent that Swent or Eustis failed to procure the coverage that IBA
allegedly requested...***this deficiency has existed since the Policy was
first issued, in June 2003.  IBA had a duty to read the Policy upon its
receipt in June 2003, and thus was charged with knowledge of the
Policy terms*** and the alleged deficiencies in the Policy's Business Income
coverage.  Nevertheless, ***IBA filed this Petition on May 12, 2006, almost
two years too late.***  Accordingly, IBA's claims against Swent and Eustis
are preemptively and prescriptively barred.

(Notice of Removal, arts. 38-43, p. 10-1) Although the Removing Defendants argue that IBA's

claims are "preemptively and prescriptively barred", they only cite R.S. §9:5606.  §9:5606 only

provides preemptive, not prescriptive, periods for suits against insurance agents.  The question

---

[3]"The law is settled that if an employee of a corporation through his own fault injures
another to whom he owes a personal duty, whether or not the act culminating in the injury
is committed by or for the corporation, the employee is liable personally to the injured third
person; it does not matter that liability might [also] attach to the corporation.  La. Civ.Code
art. 2315; *Canter v. Koehring...,* 283 So. 2d 716".  *Bourne, supra,* 2005 WL 2998914 at 3.

then, is, do the peremptive periods apply here to preclude IBA's suit against Eustis/Swent?

Because three years did not elapse from the date the first policy was issued (June 2003) before suit was filed (May 2006), the 3-year peremptive period in 9:5606 does not bar suit here. Apparently, Defendants' only claim is that IBA's claims against Eustis/Swent are perempted by the running of one year - but not one year from the date IBA **actually** discovered Defendants' interpretation of the Policy which excludes coverage (March 2006). Rather, Defendants aver one year elapsed from the date IBA **should have** discovered Defendants' interpretation of the Policy - which interpretation Defendants themselves did not disclose until March 2006. Defendants aver that IBA **should have** discovered their interpretation of the Policy two years before Defendants actually disclosed it, and IBA could have done that simply by reading the Policy. As a result, Defendants contend IBA's claims are perempted under §9:5606 and thus, IBA cannot reasonably recover against Eustis/Swent. Therefore, Defendants aver the consent of Eustis/Swent ostensibly did not have to be obtained before removal.

But to determine if the claims against Eustis/Swent are in fact perempted, the following must be resolved: on what date does the 1-year peremptive period of §9:5606 begin to run: the date the first policy was issued (June 2003) as Defendants aver, or the date IBA actually discovered its claim (March 2006)? To resolve that issue, two other questions must be addressed:

(1)    Did IBA have a legal duty to read the Policy? And if so,

(2)    Did a simple reading of the Policy trigger the running of peremption, as Defendants aver? And, if a simple reading of the Policy did not disclose the interpretation Defendants place on it now, did IBA have a duty to predict in advance of a loss what Defendants' interpretation of the Policy would be and file suit for failing to receive the proper coverage when the Defendants themselves did not reveal their interpretation of the Policy until 2006, or does peremption run from the date IBA actually discovered it had a claim?

1.    The Removing Defendants Bear the Burden of Proving Peremption

The burden of proving prescription or preemption, like the burden of proving that removal is proper, rests with the party pleading it (the Removing Defendants). *Clayborn Timber Co., Inc.*

. *V. Butler Ins. And R.E., Inc.,* 690 So.2d 940, 941 (La.App.2[nd] Cir. 1997) All doubts, in the case of prescription and removal, are resolved in the plaintiff's favor.   Prescription/peremption statutes, like statutes governing removal, are strictly construed in the plaintiff's favor.  *Id.*

Defendants' arguments are premised on the fact that IBA had a duty to read the Policy and that a simple reading of the Policy would have disclosed Defendants' interpretation of it. The problem with the argument is two-fold: under the facts of this case, IBA had no duty to read the Policy, and second, since Defendants' *interpretation* of the Policy is not found in the Policy's express words, a simple reading of the Policy does not give the reader Defendants' "spin" on it now to avoid coverage.  The Policy does     <u>not</u> state that only lost business income which Defendants artificially attribute to the office that sustained a covered loss (and not all of IBA's actual lost business income), will be recoverable in the event of a covered loss at only one location, but a non-covered loss at the other. Rather, the Policy expressly says Defendants will pay for <u>all</u> of IBA's <u>actual lost business income</u> if a covered loss is sustained anywhere on the described premises. Defendants' interpretation of the Policy's actual words is very different from IBA's interpretation of the Policy after reading its plain language.

2.    <u>Did IBA Have A Duty to Read the Policy Under the Circumstances of This Case?</u>

Defendants' entire argument is based first on the unsupported claim that IBA had a <u>duty to read the Policy</u> (but not only to read it - to also somehow figure out Defendants' contrived interpretation of it - some two years before any loss occurred and two years before Defendants themselves disclosed their interpretation).   Defendants cite nothing to support their initial premise that IBA had a duty in this case to read the Policy in the first place. *La. Home Builders' Assoc. Self-Insurers' Fund v. Adjustco, Inc.,* 633 So.2d 630 (La.App.1[st]Cir. 1993) held:

> ..*plaintiff did <u>not</u> have a duty to read the policy...because plaintiff had a close, trusting relationship with defendant, it relied on defendant for insurance expertise, and it paid defendant for this expertise...*

> Plaintiff's suit was filed well within one year of the date it first discovered the existence of the MLF [minimum loss fund]..we overrule [the] exception of prescription..

In this case, IBA had an ongoing relationship with the individual Defendants and relied on them

for their insurance expertise. Thus, IBA had no duty to read the Policy as Defendants now claim.

Like in *Adjustco,* suit was filed within one year of the date IBA discovered its claim.

3.    <u>Even if IBA had a Duty to Read the Policy, Could a Simple Reading of the Policy Trigger the Running of One-Year Peremption Under La. R.S.§9:5606?</u>

Because a simple reading of the Policy would not have afforded IBA the opportunity to

learn of Defendants' "interpretation", prescription should not run from 2003, when IBA allegedly

got  its first policy *Sonnier v. La. Farm Bur. Mut. Ins. Co.,* 924 So.2d 419 (La. 3rd Cir.2006) held:

> Kenneth... Sonnier purchased homeowners insurance from...Farm Bureau ...They requested replacement coverage but were informed by their agent, Herb Doucet, that replacement cost coverage was not available...Each year at renewal, they again requested replacement coverage and were told it was unavailable.

> ...their home became infested with black mold...At the...settlement, the Sonniers were informed that Farm Bureau did...offer replacement cost coverage...the Sonniers filed suit against Doucet...for failure to inform them of the...coverage...

> *Doucet contends...his failure to notify the Sonniers of the availability of coverage occurred in 1998 and is, therefore, preempted. The Sonniers' petition, however, indicates that they were not notified that coverage was available until January of 2003. The last time the policy was renewed was 2002, and therefore, in 2002, they allege Doucet's misrepresentation deprived them of the coverage they desired. The Sonniers filed suit on January 2, 2004.*

> *...The Sonniers contend..it is not a continuing tort but..each time they sought replacement coverage at renewal and were denied is a separate act. We agree. The...contract is subject to renewal or cancellation each year...the... misrepresentations each year by Doucet impacted the...decision whether to reenter the contractual relationship and constituted a separate act.*

> *...to defeat Doucet's claim of peremption, the Sonniers must have filed suit within one year of finding out about the availability of the coverage in January of 2003 and within three years of Doucet's last failure to notify them of the coverage in 2002. The..January 2, 2004 filing falls within both periods..*

Pursuant to *Sonnier,* IBA had to file suit within 1 year of finding out about the lack of coverage

(within a year of March 2006) and within 3 years of the <u>last</u> policy, not the first as Defendants

contend (i.e., within a year of June 2005).  On both counts, IBA satisfied those requirements.[4]

_____

⁴ The date from which §9:5606 peremption runs in the case of renewal policies was addressed again in *Alliance Gen. Ins. Co. v La. Sheriff's Auto. Risk Prgrm.,*52 F.Supp.2d 711(E.D. La. 1999):

> Alliance issued the policies for the coverage years July 1992-July 1993..,July 1993 -July 1994, and July 1994-July 1995...

.   IBA filed suit within one year of the date it discovered its claim, within one year of the date it

sustained loss, and even within 3 years of the issuance of the first Policy (June 2003).This claim

is not perempted. *See also, Schwartz v. Chubb, infra.* If the claims against Eustis/Swent are not

perempted, they had to agree to removal before the case was removed. As consent cannot be

timely obtained now, this case must be remanded to state court.

   More importantly, it is incumbent upon the Removing Defendants to prove there is *no

possibility* that IBA could recover against Eustis/Swent. At the very best, what the Removing

Defendants could establish is that there is a genuine issue of material fact as to when IBA should

have discovered their claim - an issue of fact as to whether a reading of the Policy would have

disclosed the interpretation Defendants adopt now. The existence of a genuine issue of material

fact precludes this Court's finding that there is no possibility that IBA could establish a claim

against Eustis/Swent. *Argonaut Great Central Ins. Co. V. Hammett,* 887 So. 2d 704 (La. App.

2d Cir. 2004) also addressed a similar situation and held:

> *...the one-year peremptive period commences on the date the plaintiff
> discovered or should have discovered the alleged act, omission, or neglect,*
> which, in this case, is Powell's erroneous issuance of the binder reflecting hired
> and non-owned coverage in favor of Podnuh's in May, 1995. *The specific issue,
> therefore, is when Argonaut discovered or should have discovered Powell's
> erroneous issuance of the binder.*
>
> Hammett/Davenport argues that the deposition testimony of Roger Hughes clearly
> establishes that Argonaut knew of the issuance of the first erroneous binder in May
> 1995. There is some evidence to suggest that Argonaut may have been made
> aware of the issuance of the first erroneous binder...
>
> ...however, there is no evidence of when the certificates were received by
> Argonaut ...We cannot conclude as a matter of law, that this constitutes
> constructive knowledge on the part of Argonaut. Simply put, *factual disputes
> exist as to when Argonaut learned of the binders and when, if at all,
> Argonaut could be charged with constructive knowledge of Powell's error.
> The determination of these factual issues will necessarily include credibility
> calls and the weighing of conflicting evidence.*

---

> Considering...Alliance...is seeking rescission of three complete policies, the
> only applicable prescriptive date would be the date...the last policy became
> effective because Alliance was apprised of the pattern of unreported losses
> before any policies were renewed....July 1994 would be the applicable date.

*Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge or malice...*

Because there are factual issues as to when IBA should have known of its claims against Eustis/Swent, summary dismissal would be improper, and it cannot be said that Plaintiff has no reasonable basis of recovery against Eustis/Swent. Therefore, the consent of Eustis and Swent had to be obtained prior to removal, and the failure of the Removing Defendants to secure that consent is fatal to the jurisdiction of this Court now. *See also, Schwartz v. Chubb, infra.*

**D.      Are Eustis/Swent Misjoined Because of Improper Cumulation of Unrelated Claims?**

The Removing Defendants also argue that the claims against Eustis/Swent are based in tort, while the claims against them are contractually based, and as a result, "Massachusetts Bay has been fraudulently misjoined with Swent and Eustis." (Notice of Removal, art. 44-5, p. 11) Mass. Bay avers that the claims against it and its agents[5], Eustis/Swent, "have no connection at all to one another". Defendants cite a decade-old Eleventh Circuit decision *Tapscott v. MS Dealer Serv. Corp.*, 77 F. 3d 1353 (11th cir. 1996), in support of their claims.

This Court has addressed *Tapscott* and virtually identical allegations to those made here in *Schwartz v. Chubb & Sons, Inc.*, 2006 WL 980673 (E.D. La. April 11, 2006) and held:

> Plaintiffs Charles Schwartz, Jr. ('Judge Schwartz') and Priscilla M. Schwartz ('Schwartz')...filed this lawsuit in Louisiana state court, seeking to recover under a homeowners' insurance policy for Hurricane Katrina-related damages...They named as Defendants Chubb & Sons, Inc., Great Northern Insurance Company ... and Eagan Insurance Agency, Inc. ('Eagan'). Plaintiffs allege in their state court petition that they and Eagan are all Louisiana citizens. Chubb...is diverse...
>
> Chubb removed this case based on diversity jurisdiction, contending that the court can disregard Eagan's citizenship because it has been improperly joined... Plaintiffs moved to remand based on absence of complete diversity...
>
> 'When a defendant removes a case to federal court on a claim of improper joinder, *the district court's first inquiry is whether the removing party has carried its heavy burden of proving that the joinder was improper.*'...
>
> *Chubb...contends...the only claim...plaintiffs have...against Eagan is for professional negligence in failing to inform them properly of...all coverages. Chubb posits that any such claim...against Eagan is untenable because the peremptive period for claims against insurance agents has expired...*

---

[5]  Mass. Bay is Hanover's wholly-owned subsidiary(*see* Corp. Disclosure Statement)

*..Chubb asserts that §9:5606 applies to Eagan because it is an insurance agency.* It maintains that the one-year/three-year peremptive period began when plaintiffs purchased their initial homeowners insurance policies in 1991 and 1994...

..Plaintiffs..filed..the affidavit of Schwartz, in which she avers that, on receiving written notice that her father's flood policy was expiring, she contacted Eagan in April 2005 to inquire whether any additional coverage was available, because the monetary limits were significantly less than the property value. She states...Eagan advised her there were no additional..coverages available. *Even if the court were to consider these competing affidavits, they would merely demonstrate the existence of a fact issue regarding whether Eagan's alleged act, omission, or neglect occurred within the one-year/three-year peremptive period.*

*The purpose of the court's summary inquiry...is 'only to identify the presence of discrete and undisputed facts that would preclude [plaintiffs'] recovery against the in-state defendant.' The date of Eagan's alleged act, omission, or neglect is disputed, and the court must resolve contested issues of fact in plaintiff's favor...the court would be unable to conclude that plaintiffs could prove no set of facts consistent with the allegations in their state court petition that would entitle them to relief. Chubb has...failed to carry its heavy burden of proving that Eagan was improperly joined...*

*Chubb also contends that Eagan's citizenship should be disregarded for diversity purposes because plaintiffs' claims against it are completely unrelated to the ones against Chubb.* It posits that plaintiffs' claims against Chubb and Eagan do not arise out of the same transaction, occurrence...and do not involve a common question of law or fact. Chubb essentially asserts improper joinder of parties under Rule 20(a).

*Chubb relies on <u>Tapscott v. MS Dealer Service Corp.</u>, an Eleventh Circuit case ... Plaintiffs posit that <u>Tapscott</u> predates and is contrary to the Fifth Circuit's en banc decision in <u>Smallwood</u>* [v.Ill. Cent. R.R. Co., 385 F.3d 568 (5th Cir. 2004)(en banc)]

*...Plaintiffs' contention that Tapscott is inconsistent with Smallwood... appears to have merit. The Eleventh Circuit has identified the circumstances in Tapscott - 'i.e., where a diverse defendant is joined with a nondiverse defendants as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant' - as a 'third situation of fraudulent joinder'* in addition to the two types of fraudulent joinder identified in *Smallwood.* *Because <u>Smallwood</u>... identifies only the first two types of fraudulent joinder - i.e., actual fraud in the pleading of jurisdictional facts and inability of the plaintiffs to establish a cause of action against the non-diverse defendant in state court - <u>Tapscott</u>-type fraudulent misjoinder may not be recognized in the Fifth Circuit...*

The court need not resolve this issue...because *even if there was Rule 20-type improper joinder...it is not sufficient to constitute fraudulent joinder under <u>Tapscott</u> or improper joinder under this circuit's precedents. Plaintiffs allege that defendants should have paid all the damages they sought in their proof of loss for damages from Hurricane Katrina and that Eagan was professionally negligent by failing to inform them properly of the available*

*insurance coverages...*

*Moreover, the relevant question is not whether plaintiffs properly joined Eagan and Chubb under Rule 20(a) but whether they were properly joined under Louisiana law. If Chubb has a basis under Louisiana law to establish that it has been improperly joined with Eagan, Chubb can seek a severance in state court after the case has been remanded. If the severance is granted, and assuming that removal is still timely, Chubb can then remove the case on the ground that it was not initially removable but became removable...*

If there was any doubt as to the complete lack of merit of the Removing Defendants' arguments

in this regard, this Court once again addressed the issue in *Radlauer v. Great Northern Ins. Co.,*

2006 WL 1560791 (E.D. La. May 16, 2006), and held:

*...Defendants contend....the joinder was improper because 'the allegations against Insurance Underwriters are in no way related to the allegations against Great Northern...They contend...Plaintiff joined Insurance Underwriters solely to defeat diversity and deny the other defendants a federal forum...*

*Plaintiff contends that Defendants have improperly relied on 11' Circuit case law (namely, Tapscott....) which is not controlling, to remove this case..*

*..the Eleventh Circuit..clarified..it was not holding that 'mere misjoinder is fraudulent joinder'..[U]nder the circumstances...in that case, the attempt to join the parties was 'so egregious'...it amounted to fraudulent joinder.*

*Plaintiff and the removing defendants dispute whether the Fifth Circuit recognizes the 'fraudulent misjoinder' theory set forth in Tapscott...*

*The court need not resolve this dispute, as the joinder of the defendants in this case does not constitute 'fraudulent joinder' even under... Tapscott... As previously noted by another section of this court, 'the joinder in Taspcott was particularly egregious, i.e. fraudulent, because it involved an attempt to join claims brought by one class of plaintiffs against one set of defendants with another group of factually unrelated claims brought by a second class of plaintiffs against a second group of defendants with no connection between the two groups.' Here, there aren't two groups of plaintiffs suing two groups of defendants..There is only one Plaintiff. He is suing an insurance company, one of its adjustors, and the seller of the...policy issued by the insurance company...[A]lthough Plaintiff alleges different grounds of recovery against these parties, he seeks recovery for the same injury the lack of receipt of insurance proceeds to pay for the damage to his home...'[d]istrict courts in this circuit have declined to find that claims and parties have been fraudulently misjoined if there is a 'palpable connection' between the claims and parties joined..it cannot be said..there is not a palpable or real connection between the claims and..parties joined..Because there has been no fraudulent joinder, this matter must be remanded.*

In *this* district, Defendants' claim that the joinder of Eustis/Swent was fraudulent is devoid of

merit. Thus, because Defendants failed to obtain the consent of Eustis/Swent before this matter

was removed, and because their consent cannot be timely obtained now, this matter must be remanded, and this Court need not reach the substantive issues regarding removal pursuant to the MMTJA, as the removal was procedurally improper.  However, in an abundance of caution, the substantive issues will be addressed below.

## IV.   **SUBSTANTIVE DEFECTS**

IBA again strenuously avers that  this Court need not reach the substantive removal issues  presented by the Multiparty, Multiforum Trial Jurisdiction Act ("MMTJA") ,28 U.S.C. §§ 1369 and 1441(e)(1), because the removal was procedurally improper, and the case must be remanded on that basis.  However, if this Court addresses the substantive removal issues, the question becomes: is there original federal subject matter jurisdiction under 28 U.S.C. 1369(a)? If not, is there supplemental federal subject matter jurisdiction under 28 U.S.C. §1441(e)(1)?

## A.   **Is There Original Removal Jurisdiction under 28 U.S.C. §1369(a)?**

It is to be remembered that all federal removal statutes must be strictly construed. *Healy v. Ratta,* 292 U.S. 263, 270, 54 S. Ct. 700, 78 L. Ed. 1248 (1934); *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108, 61 S. Ct. 868, 872, 85 L. Ed. 1214 (1941); *Syngenta Corp. Prot., Inc. v. Henson,* 537 U.S. 28, 32, 123 S.Ct. 366, 369, 154 L. Ed. 2d 368 (2002). Therefore, using strict construction principals to examine original federal jurisdiction under §1369 (a), it provides:

> (a) **In general.** - The district courts shall have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from *a single accident*, where at least 75 natural persons have died in the accident *at a discrete location*, if -
>
> > (1) a defendant resides in a State and a substantial part of the accident took place in another state, regardless of whether that defendant is also a resident of the State where...the accident took place;
> >
> > (2) any two defendants reside in different States, regardless of whether such defendants are...residents of the same State...

Therefore, to determine if original removal jurisdiction exists under §1369, one must determine:

> (1) if a "*single accident*" occurred; and, if so
>
> (2) if 75 persons died as a result of the "accident" *at a discrete location*.

The definition of an "accident" is provided by 28 U.S.C. §1369( c)(4):

(4)    the  term 'accident' means a sudden accident,    ***or a natural event culminating in an accident***, that results in death incurred ***at a discrete location*** by at least 75 natural persons...

IBA submits that this was a natural event, but <u>not</u> a "natural event culminating in an accident" as required by 28 U.S.C.§1369. Defendants ignored the language in the statute which requires ***not just a natural event***, but a natural event ***that culminates in an accident***.  There was no accident at all here, only a natural event-a storm with high wind and wind-driven rain. The natural event itself caused the damage here. It did not spawn an accident which then caused the damage. And, because removal statutes must be strictly construed, this statute does not apply.

The accident also had to result in the death of at least 75 people **"at a discrete location"**. This makes sense as the MMTJA had its origins in the 1970's as a statute aimed at giving federal courts original jurisdiction over airplane accident cases. Although the statute evolved before it was ultimately enacted over two decades later, this requirement stayed.

In this case, although Hurricane Katrina was responsible for hundreds of deaths, they did not occur at a discrete location. It is not believed that 75 natural persons died in any one, discrete location as a result of the storm. Certainly, 75 people did not die at the IBA offices (no one did). In any event, any deaths associated with the storm which did occur have nothing to do with this case.  Because the storm did not result in 75 human deaths "at a discrete location", and because removal statutes must be strictly applied, there is no subject matter jurisdiction here.

This statute was apparently spawned from the need for a single forum in the event of a transportation or building accident that kills many people residing in several states. <u>Choice of Law Under the Multiparty, Multiforum Trial Juris. Act,</u>17 Regent U.L.Rev.157 (2004) explained:

> ...the litigation must have 'arise[n] from a single accident.'...The scope of section 1369 is limited to cases arising from single catastrophic events and does not include progressive or multiple tort cases...

> ...at least seventy-five deaths must have taken place 'at a discrete location'... ***'Discrete location' clearly refers to an individual geographic site.***  The only possible ambiguity is the question of what must have occurred at the discrete location.  The structure of the sentence indicates that ***the seventy-five, or more, deaths must have occurred at an individual location.***     The accident, by contrast, is not restricted to a discrete location...

IBA submits that because the MMTJA must be strictly construed, it does not provide a basis for original removal jurisdiction here because although seventy-five people died as a result of Hurricane Katrina, they did not die in a discrete location and further, their deaths have nothing to do with the issues before the Court in this case. In addition, Hurricane Katrina does not fit the definition of "accident" provided by the statute.

Defendants cited *Wallace v. La. Citizens Prop. Ins. Corp.*, 444 F. 3d 697 (5th Cir. March 31, 2006) claiming the "Fifth Circuit recently held...a District Court erred in remanding a case dealing with insurance claims arising from the Hurricane Katrina catastrophe where removal was based on the MMTJA...<u>As in *Wallace*,</u> the jurisdictional requirements of the MMTJA are satisfied here. There is minimal diversity because Massachusetts Bay and Hanover are citizens of New Hampshire and Massachusetts..while IBA is a citizen of Louisiana". (Removal Notice, art. 29-30)

However, this is a misrepresentation of what the Fifth Circuit actually had before it, and what the Fifth Circuit found, in *Wallace*. Significantly, the Fifth Circuit did *not* determine that the jurisdictional requirements of the MMTJA were satisfied in *Wallace*. The only thing before the Fifth Circuit was the question of whether the mandatory abstention principles contained in the MMTJA (28 U.S.C. §1369(b)) should apply to *supplemental* jurisdiction provided by 28 U.S.C. §1441(e)(1)(B). The *Wallace* defendants had relied on the *supplemental* jurisdiction provided by 28 U.S.C.§1441 (e)(1)(B), *not* on original federal removal jurisdiction provided by 28 U.S.C.§ 1369(a). But in any event, there was no determination by the Fifth Circuit that jurisdiction under §1369(a) or §1441(e) applied, only a determination that the district court was not required to abstain, <u>if there was in fact supplemental jurisdiction (a question not resolved on appeal)</u>, and <u>there was never any issue pertaining to original jurisdiction under the MMTJA (§1369(a)) at all</u>:

> Farm Bureau...removed to the United States District Court...asserting that subject matter jurisdiction over the case existed under §1441(e)(1)(B)..[which] provides..
>
> > [A] defendant in a civil action in a State court may remove the action to the district court..*if..the defendant is a party to an action which is* or could have been brought ...under section 1369 *in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.*

Thus, as to Defendants' arguments regarding <u>original</u> jurisdiction under the MMTJA, 28 U.S.C.

§1369(a), *Wallace* does not apply at all, and it certainly does <u>not</u> provide support to Defendants'

arguments that this Court has original jurisdiction over this Hurricane-Katrina related case under

the definition of "accident" in the MMTJA. As to supplemental jurisdiction, the Court continued:

> *Petitioners [Defendants] contend...they meet the requirements of §1441(e)(1) (B) because they are* parties to a separate class action based on 28 USC. § 1369 ('the <u>Chehardy</u> action') which arises from the same accident (Hurricane Katrina) as the instant case...Petitioners are *defendants in a currently-pending class action suit in the U.S. District Court for the Middle District of Louisiana, Chehardy...[T]hey aver that because the District Court for the Middle District may exercise subject matter jurisdiction under 28 U.S.C. § 1369(a) over the Chehardy suit,* a case that also deals with insurance claims flowing from Hurricane Katrina, the *District Court for the Eastern District may exercise supplemental subject matter jurisdiction over..Wallace..under §1441.*

> *The district court remanded...reasoning that the mandatory abstention provisions of §1369(b) did not permit the suit to be heard in federal court*...

> The district court based its remand on §1369(b), stating...'this court must abstain from exercising jurisdiction over'..*Wallace..The..court held that even if subject matter jurisdiction..exist[s] under §1441(e),.abstention principles of §1369(b) still..barred the..court* from hearing the case. *Plaintiffs argue..the remand was not abstention-based but..based on..lack of subject matter jurisdiction...*

> Although the subsequent order states that the remand was based on lack of subject matter jurisdiction, *the original remand order plainly refers to abstention under §1369(b)...1369(b) is an abstention provision. It assumes subject matter jurisdiction under §1369(a), but abstains where 'the substantial majority' of the plaintiffs and the 'primary defendants' are citizens of the same state and the claims at issue are 'governed primarily by the laws of that State'.* It does not deprive federal courts of subject matter jurisdiction, but...acts as a limitation upon the exercise of jurisdiction...in §1369(a).

> Abstention implies that there is subject matter jurisdiction but for some other policy reason, a court refrains from exercising that power...

> ...although jurisdiction is otherwise proper under §1369(a)...§1369(b) instructs district courts to abstain from hearing [these cases]...

> ..*[Defendants] argue...the district court erred by applying §1369(b) to a case removed under §1441(e)(1)(B).* Although the district court recognized that Farm Bureau removed under § 1441(e)(1)(B)*the court did not determine whether the defendants met the requirements of § 1441(e)(1)(B)*...stating that even if the defendants could meet those requirements, the abstention provisions of 1369(b) prevented the case from being heard in..federal courts.

> *The district court misapplied mandatory §1369(b) abstention to the exercise of supplemental jurisdiction established by §1441(e)(1)(B). Section 1369(b) applies only to original jurisdiction under §1369(a)...Thus, it is proper for a*

*district court to abstain from hearing a case brought as an original matter under §1369(a), when the exceptions listed in §1369(b) apply. In contrast, §1441(e)(1)(B) permits removal in those situations where original federal subject matter jurisdiction does not exist* .  In so allowing, §1441(e)(1)(B) establishes supplemental jurisdiction over the   *Wallace* action, piggy-backing jurisdiction on the district court's original jurisdiction under §1369 (a) over the pending *Chehardy* action*.  **When the requirements of §1441(e)(1) (B) are met, defendants need not establish the existence of independent subject matter jurisdiction under any other provision, including under §1369 (a), because supplemental jurisdiction has been established.  Consequently, §1369(b) is not an independent bar to the exercise of jurisdiction over a case removed pursuant to §1441(e)(1)(B), as it applies only to the exercise of original jurisdiction under §1369(a)...***

The bottom line: the Fifth Circuit found that if there is original jurisdiction under the MMTJA, 28 U.S.C.§1369(a), the district court must abstain from exercising that original jurisdiction if the "substantial majority" of plaintiffs and the "primary defendants" are all citizens of a single state, and that state's laws will primarily govern the suit.  However, the Fifth Circuit found that if the Court does not have original jurisdiction under the provisions of the MMTJA, but rather is exercising supplemental, or "piggy-back", jurisdiction under 28 U.S.C. §1441(e)(1)(B), the abstention exceptions to jurisdiction (found in §1369(b)) do <u>not</u> apply.

And that is all the Fifth Circuit found.  The fact that the Fifth Circuit remanded the case to the district court for proceedings not inconsistent with the decision, and the fact that the Fifth Circuit clearly recognized that the district court had <u>not</u> determined that supplemental jurisdiction under §1441 existed, clearly implies that the case was returned to the district court specifically for a determination of whether "piggy-back" jurisdiction could and did apply to this Katrina claim.

More importantly, the Fifth Circuit did <u>not</u> determine whether the MMTJA (§1369(a)) applied to Katrina claims. Nor did the Fifth Circuit decide whether "Hurricane Katrina" was an "accident" as that term is used in the statute, or whether the storm had caused 75 deaths "at a discrete location".  The Fifth Circuit did   not even determine if the supplemental jurisdiction provided by §1441(e)(1)(B) applied to Katrina claims (since the original  case already in federal court on which piggy-back jurisdiction is based must arise from the same "accident", and IBA avers that Hurricane Katrina does not fulfill the definition of "accident" provided in the statute).

In summary, as to Defendants' invocation of this Court's original jurisdiction under the

MMTJA, U.S.C. §1369(a), §1369(a), like all removal statutes, must be strictly construed. Original jurisdiction does not apply because there is no "accident" or "natural event culminating in an accident"; rather there was only a natural event, with no accident.  Further, original jurisdiction does not apply because there were not 75 deaths *in a discrete location*.

**C.      Is There Supplemental, Or "Piggyback" Jurisdiction under 28 U.S.C§1441(E)(1)?**

Since supplemental jurisdiction under 28 U.S.C. §1441(e)(1)(B) requires that the action already pending in federal court involving the Removing Defendants (       *Vanderbrook* or *Chehardy*) arise "*from the same accident* as the action in State Court", Defendants must prove that the other federal court action (*Vanderbrook* or *Chehardy*), is or could have been brought under §1369. Again, this requires the Removing Defendants *prove* that "Hurricane Katrina" is an "accident" as that term is defined by the statute, and that it resulted in 75 deaths "at a discrete location". IBA avers the Removing Defendants cannot bear this heavy burden of proof.

IBA further submits that the Fifth Circuit did not clearly consider, in *Wallace* or any other case, the ramifications of consolidating case after case in federal court where issues are completely diverse: some Katrina-related claims deal with property damage, some deal with lost business income, some deal with flood versus wind coverage, some deal with coverage issues *per se*, some deal with euthanized patients in hospitals, and some deal with malpractice and negligence on the part of nursing homes or others.  The list is almost endless and the issues are as diverse as the list.   But jurisdiction under §1441(e) involves a case dealing with the same "accident" as the case already in federal court and contemplates consolidating these cases in a single action in federal court. Choice of Law Under the Multiparty, Multiforum Trial Jurisdiction Act, 17 Regent U.L. Rev. 157; Congress and the Multiparty, Multiforum Tiral Jurisdiction Act of 2002, 54 Duke L.J. 255 (2004)  Such a consolidation, if all of its ramifications are clearly considered, is completely untenable, and would result in hundreds of multiple mini-trials on issues having no relationship to each other, save some connection in some way with the storm.

If, on the other hand, this Honorable Court allows the removal of this case, but does not consolidate it with *Chehardy* and/or *Vanderbrook* (both of which, on information and belief, deal

with homeowners' insurance policies and residential property issues, not loss of business income, and neither of which share any factual issues in common with this case other than the occurrence of the storm), the result would be equally untenable.  If this case is removed but not consolidated, a division of this Court would be faced with trying a case over which it has no independent, original subject matter jurisdiction simply because jurisdiction was exercised in another case - but this case (if not consolidated) would likely be tried in another division, at a different time, with different factual and legal issues, to a different jury, with possibly a different result. It is very possible  such a removal might result in a constitutionally infirm judgment.

And, under such a scenario, a court that lacks independent, original subject matter jurisdiction may also lack the ability to transfer the case to a division or court that is already hearing a Katrina-related claim. *Grimsley v. United Engineers & Constructors, Inc.,* 818 F. Supp. 147, 148 (D.S.C. 1993). If this case and others against insurance companies providing coverage for Katrina-related claims are removed, the inevitable result very well may be disastrous in and of itself.  Either there will be hundreds, if not thousands, of mini-trials in a single trial, with all of the trials having few if any issues in common other than the occurrence of the storm (an unworkable situation), or this and other cases will be removed but not consolidated, resulting in divisions of court hearing cases over which they have no independent jurisdiction (another unworkable result).  Obviously, the appropriate course is to return this case to state court.

Further, if this case is allowed to remain in federal court pursuant to supplemental jurisdiction under §1441, the question then becomes - which federal court?  There are similar cases in Mississippi against these defendants.  Should this Louisiana case involving a Louisiana contract of insurance with damages occurring in Louisiana be tried in Mississippi?  Which law should govern?  If it is consolidated with Mississippi Katrina-related claims, should part of the trial be governed by Mississippi law and part by the laws of Louisiana - again, a nightmarish result.

Finally, it is important for this Court to note that even if the thousands of diverse claims (whose only connection is the fact they are somehow related to Hurricane Katrina) are removed to this Honorable Court and consolidated for a determination of the liability of hundreds (if not

thousands) of defendants, some of which are insurers, some of which are not, the suits will all be remanded back to the state courts from which they came for purposes of damage determination. 28 U.S.C.§1441(e)(2). This will involve two juries for each of the thousands of claims, not one.  This is the antithesis of judicial economy and a gross waste of the resources of the courts of both systems.  Logic and reason mandates that these cases not be removed and consolidated in federal court.

## IV.   ATTORNEYS' FEES

If it appears that the court lacks subject matter jurisdiction, the case must be remanded. The Court may also "require the payment of just costs and any actual expenses, including attorneys' fees, incurred as a result of the removal... if it finds that the decision to remove was legally improper." *Brigham, supra,* 2005WL 435260 at 2.  Once the Court finds that the removal was legally improper, the court may award the "fees and costs incurred in federal court that would not have been incurred had the case remained in state court." *Id.*  IBA avers that since this Honorable Court has already ruled not once but twice on almost the identical arguments made by Defendants herein, ruling adversely upon the very cases cited by Defendants herein, and on both occasions this Court remanded the cases to state court - yet Defendants failed to cite to this Court the controlling precedent in this Circuit, instead relying upon non-controlling, outdated jurisprudence, the IBA is entitled to an award of all attorneys' fees and costs incurred herein.

**WHEREFORE,** Plaintiff, Iteld, Bernstein, & Associates, L.L.C., prays that this matter be remanded back to the state district court where it was originally commenced and that it be

awarded all costs and attorneys' fees it has incurred in this matter.

RESPECTFULLY SUBMITTED:

LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ZATZKIS, McCARTHY & ASSOCIATES, L.L.C.
650 Poydras Street, Suite 2750
New Orleans, Louisiana 70130
Telephone:  (504) 523-2266
Facsimile: (504) 593-9921
Email: Lanny@Zatzkis.com,
Karen@Zatzkis.com and Yvette@Zatzkis.com
COUNSEL FOR PLAINTIFF

23

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ITELD, BERNSTEIN & ASSOCIATES, L.L.C. | * | CIVIL ACTION |
| | * | |
| | * | NO. 06-3418 |
| VERSUS | * | |
| | * | SECTION "R" |
| THE HANOVER INSURANCE GROUP; | * | |
| MASSACHUSETTS BAY INSURANCE | * | MAG. DIV. 1 |
| COMPANY; MOSES SWENT; EUSTIS | * | |
| INSURANCE, INC., ABC INSURANCE | * | |
| COMPANY; | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has been served upon all parties, through counsel of record:

Ralph S. Hubbard, III
Kristopher T. Wilson
Joseph P. Guichet
Seth A. Schmeeckle
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Telephone number: (504) 568-1990

Kevin P. Kamraczewski
Paul E. B. Glad
David Simonton
Sonnenschein, Nath & Rosenthal, L.L.P.
7800 Sears Tower
Chicago, IL 60606
Telephone number: (312) 876-8000

Max J. Cohen
James T. Busenlener
Lowe, Stein, Hoffman, Allweiss, & Hauver, L.L.P.
701 Poydras Street, Suite 3600
New Orleans, Louisiana 70139-7735

via facsimile, hand delivery, express courier, and/or U.S. Mail, postage prepaid and properly addressed, this 21st day of July, 2006.