## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ITELD, BERNSTEIN & ASSOCIATES, LLC** | * | |
| | * | |
| **Plaintiff,** | * | **Civil Action No.:  06-3418** |
| | * | |
| | * | **Section:  R** |
| **Versus** | * | |
| | * | **Judge:  Hon. Sarah S. Vance** |
| **THE HANOVER INSURANCE GROUP;** | * | |
| **MASSACHUSETTS BAY INSURANCE** | * | **Magistrate Division:  1** |
| **COMPANY; MOSES SWENT; EUSTIS** | * | |
| **INSURANCE, INC.; ABC INSURANCE** | * | |
| **COMPANY;** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM IN OPPOSITION
### TO PLAINTIFF'S MOTION TO REMAND

Defendants, The Hanover Insurance Company (incorrectly named in the caption as "The Hanover Insurance Group," and erroneously sued herein) and Massachusetts Bay Insurance Company (hereinafter collectively "Massachusetts Bay"), hereby submit this opposition to the Motion to Remand filed by plaintiff, Iteld Bernstein & Associates ("IBA").

- 1 -

I.      **Introduction and Summary of Argument.**

Massachusetts Bay removed this action on two separate, independent grounds.  First, original jurisdiction exists under the Multiparty, Multiforum Trial Jurisdiction Act ("MMTJA"), 28 U.S.C. sections 1369 and 1442(e), because this case arises from Hurricane Katrina, which is an "accident" falling within the scope of the statute.  Second, diversity jurisdiction exists under 28 U.S.C. section 1332, because IBA's tort claims against the non-diverse defendants – its insurance agents – were fraudulently and improperly joined.

In its Motion to Remand, IBA attacks these two grounds for removal through three primary arguments.  As discussed below, none of IBA's arguments has merit.

First, IBA contends that removal is improper under both the MMTJA and the diversity statute because Massachusetts Bay failed to obtain consent from the other defendants, Eustis Insurance, Inc. ("Eustis") and Moses Swent ("Swent").  IBA is mistaken.  Removal under the MMTJA does *not* require the non-removing defendants' consent.  Further, as IBA acknowledges in a footnote, the Fifth Circuit has held that consent is unnecessary where, as here, the removing defendant alleges fraudulent or improper joinder.  Massachusetts Bay thus had no obligation to obtain the consent of Eustis or Swent before removing the case to this Court.[1]

Second, IBA argues the MMTJA does not apply here because Hurricane Katrina is not  an "accident" within the meaning of the statute – or, alternatively, because the storm failed to kill more than 75 people in a "discrete location."  IBA's argument fails on both counts.  The Fifth Circuit already has determined that Hurricane Katrina qualifies as an "accident" for the purposes of the

---

[1] IBA does not contend that Massachusetts Bay needed to obtain the consent of defendant ABC Insurance Company. This, no doubt, is because "ABC Insurance Company" is a fictional defendant, whose consent is unnecessary for removal, and whose domicile is disregarded for the purposes of diversity jurisdiction.

MMTJA.  There is, thus, no reason for the Court to revisit the issue.  If the Court does so, however, it will find that the plain meaning of the statutory language leads to the same conclusion the Fifth Circuit reached:  that Hurricane Katrina is an "accident" that claimed the lives of more than 75 people at a "discrete location."  As a result, removal jurisdiction exists under the MMTJA.

Third, with regard to diversity jurisdiction, IBA contends that its tort claims against Eustis and Swent were properly joined in this action, and that their presence destroys diversity.  Once again, IBA's arguments lack merit.  IBA has had at least constructive notice of the allegedly negligent conduct by Eustis and Swent since June 2003, but did not sue until May 2006.  Under Louisiana's one-year peremption period, IBA's claims against Eustis and Swent are thus time-barred, and should be disregarded for diversity purposes.  Alternatively, those claims should be disregarded because they are based in tort, and involve entirely different legal theories than IBA's claims against Massachusetts Bay, which are based in contract.  IBA cannot join these two entirely different types of claims together, simply to defeat diversity jurisdiction.

For these reasons, Massachusetts Bay's removal was proper, under either the MMTJA or the diversity jurisdiction statute.  The Court, therefore, should deny IBA's Motion to Remand.

## II.   **IBA's "Factual Background" is Irrelevant.**

IBA spends nearly four pages of its brief discussing how it believes its policy should be interpreted.  In ruling on IBA's Motion to Remand, the Court may ignore this discussion, because it has no bearing on the issues at bar.  For our current purposes, all the Court needs to know is that the parties' dispute centers on whether the policy's "Business Income" provision affords coverage for the income that IBA lost from closing both its New Orleans office and its Chalmette office, or only the income it lost from the New Orleans office.  IBA contends the former, while Massachusetts Bay

contends that no coverage exists for income lost from the Chalmette office, because that office was closed in response to flood damage, which is excluded from coverage.

### III.   Massachusetts Bay Had No Duty to Obtain the Other Defendants' Consent.

According to IBA, Massachusetts Bay's removal is procedurally defective because the other defendants (Eustis and Swent) did not consent to the removal.  IBA's attempt to hide behind this perceived formal defect is misguided.

For good reason, removal under the MMTJA does *not* require the other defendants' consent. Subsection (e) of 28 U.S.C. section 1441 "exempts [MMTJA] removal actions from the traditional requirements, *which include the consent of all defendants* and, in diversity cases, restrictions on defendants' citizenship.  Congress did not want plaintiffs to avoid the possibility of removal under § 1369 simply by suing defendants who are citizens of the forum state, even though the parties had minimal diversity."[2]

Furthermore, as IBA concedes at footnote 2 of its brief, the Fifth Circuit has held that consent is unnecessary when the removing defendant contends the other defendants were improperly or fraudulently joined.[3]  As the Fifth Circuit explained, this exception makes imminent sense:  "[i]n cases involving alleged improper or fraudulent joinder of parties . . . application of [the consent] requirement to improperly or fraudulently joined parties would be nonsensical, as removal in those cases is based on the contention that no other proper defendant exists."[4]

Notably, this latter exception does not require that the other defendants *actually be found* to

---

[2] Laura Offenbacher, *The Multiparty, Multiforum Trial Jurisdiction Act: Opening the Door to Class Action Reform*, 23 Rev. Litig. 177, 195 (2004) (emphasis added) (*citing* H.R. Rep. No. 102-373, at 12 (1991) and S. Rep. No. 106-420, at 29 (2000).)

[3]  *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir.), *cert. denied*, 510 U.S. 868 (1993).

[4] *Id.*

have been fraudulently or improperly joined.  Rather, in the words of the Fifth Circuit, no consent is required if there is an "*alleged* improper or fraudulent joinder[.]"[5]  How the Court ultimately rules on the issue is thus irrelevant.  Because Massachusetts Bay's notice of removal *alleged* that the other defendants were fraudulently joined, it had no duty to obtain their consent.

A contrary rule would place Massachusetts Bay in an awkward, untenable position.  On one hand, it would be alleging that the other defendants have no possible liability to IBA and in fact never should have been sued.  At the same time, however, Massachusetts Bay would have to allege that the other defendants consented to removal – which implicitly suggests that those other defendants *would* continue to be part of the litigation, and that their input should be taken into account.  The Fifth Circuit has recognized that such double-speak is unnecessary.

In sum, Massachusetts Bay had no duty to obtain the other defendants' consent because the removal was based on the MMTJA and allegations of improper joinder.  Massachusetts Bay's removal was thus procedurally proper.

## IV.   <u>Removal is Proper Under the MMTJA.</u>

According to IBA, its action against Massachusetts Bay is not the type of lawsuit that Congress intended to make removable under the MMTJA.  IBA's discussion, however, avoids focusing on the literal wording of the relevant statutes, 28 U.S.C. sections 1369 and 1441(e), or Congress' intent in enacting the MMTJA.  Instead, IBA simply relies on the general proposition that removal statutes should be "strictly construed," and then encourages the Court to adopt narrow, restrictive interpretations of certain words used in the MMTJA, such as "accident" and "discrete location."  IBA's arguments fail, for numerous reasons.

---

[5] *Id.* (emphasis added).

First, while removal statutes are subject to "strict construction," this does not mean the Court should read the words of the statute in a restrictive fashion, or try to whittle down the scope of its jurisdictional authority.  Rather, as the cases IBA cites make clear, the "strict construction" standard only means that courts should "scrupulously confine their own jurisdiction to the precise limits which the statute has defined."[6]  Stated otherwise, it is the "statutory *procedures* for removal . . . [that] are to be strictly construed," to ensure that removal is allowed only in cases where Congress intended for it to be available.[7]

Here, IBA is not asking the Court to strictly enforce the statutory *procedures* for removal outlined in the MMTJA.  It instead is asking the Court to restrictively interpret the *words* that Congress used in the statute, so as to limit the *scope* of jurisdiction granted by the MMTJA.  This is not the proper role of the Court in statutory construction.  To the contrary, the Court's primary mission is to "give effect to the *literal application* of the language of a statute, . . . except in the rare case where such application will produce absurd or unreasonable results."[8]

The literal language used in the MMTJA fully supports its applicability to this case.  The MMTJA's general jurisdictional provision, 28 U.S.C. § 1369(a), reads as follows:

> a)   In General.— The district courts shall have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location, if
>
> > (1)   a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether

---

[6] *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109, 61 S. Ct. 868, 85 L. Ed. 1214 (1941) (quoting *Healy* v. *Ratta*, 292 U.S. 263, 270, 54 S. Ct. 700, 78 L. Ed. 1238 (1934)).

[7] *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32, 123 S. Ct. 366, 154 L. Ed. 2d 368 (2002).

[8] *See Pumphrey v. City of New Orleans*, 925 So. 2d 1202, 1211 (La. 2006) (emphasis added) (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989).)

that defendant is also a resident of the State where a substantial part of the accident took place;

(2)    any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or

(3)    substantial parts of the accident took place in different States.

The MMTJA's general rule, then, consists of four requirements for the federal court to have original jurisdiction. The first three requirements are conjunctive: there must be (1) "minimal diversity" between the adverse parties arising from (2) a "single accident" that (3) claimed at least 75 lives at a "discrete location." The fourth and final element is disjunctive. It is satisfied when any one of three conditions is satisfied: (a) one defendant resides outside the state where the accident occurred; (b) any two of the defendants reside in different states; or (c) substantial parts of the accident took place in different states.

IBA does not dispute that this case meets the first and fourth requirements – *i.e.*, that there is "minimal diversity" between the parties, and that at least two defendants reside in different states.[9] IBA instead focuses on the second and third elements, arguing that Hurricane Katrina is not an "accident" that killed at least 75 people at a "discrete location." For the reasons discussed below, IBA's position has no merit.

## A.    <u>The Fifth Circuit Already Has Decided the Issue.</u>

In its zeal to distinguish the Fifth Circuit's holding in *Wallace*,[10] IBA overlooks a key aspect of that decision. IBA is correct that, in *Wallace*, the Fifth Circuit did not expressly opine whether the *Wallace* litigation itself was subject to original jurisdiction under 28 U.S.C. section 1369. Rather, the *Wallace* case had been removed under the supplemental

---

[9] Under section 1369, "minimal diversity" exists so long as at least one plaintiff is domiciled in one state, and at least one defendant is domiciled in a different state or is not a United States citizen at all, or vice versa. This condition is plainly met here, as Massachusetts Bay is a citizen of New Hampshire and Massachusetts, while IBA is a Louisiana citizen.

[10] *Wallace v. Louisiana Citizens Prop. Ins. Corp.*, 444 F. 3d 697 (5th Cir. 2006).

jurisdiction afforded by 28 U.S.C. section 1441(e)(1)(B), and the precise question before the Fifth

Circuit was whether the mandatory abstention provisions of section 1369 applied to actions brought

under section 1441(e)(1)(B).

What IBA fails to address, however, is that supplemental (or "piggyback") jurisdiction

cannot exist under section 1441(e)(1)(B) unless the defendant is a party to another action in federal

court that "is or could have been brought . . . under section 1369," and which "arises from the same

accident" at issue in the action to be removed.[11] Stated differently, a defendant cannot "piggyback"

an action into federal court under section 1441(e)(1)(B) unless there is another pending federal court

action that *does* satisfy the original jurisdictional requirements of section 1369.  Otherwise, there is

no original jurisdiction on which to "piggyback."

As such, while the primary question in *Wallace* concerned supplemental jurisdiction under

section 1441(e)(1)(B), the Fifth Circuit's entire discussion of that issue would have been moot

unless the removing defendants were parties to another action that satisfied the original jurisdiction

requirements of section 1369, and which arose from the "same accident."  In *Wallace*, the insurers

contended that there was such another action:  namely, the *Chehardy* action, which was then pending

in the Middle District of Louisiana.  Specifically, the insurers claimed the MMTJA provided

supplemental jurisdiction over *Wallace* because the Middle District had exercised original

jurisdiction over *Chehardy*, which "arises from the same accident (Hurricane Katrina) as the instant

case" and which "also deals with insurance claims flowing from Hurricane Katrina[.]"[12]

With respect to this issue, the Fifth Circuit expressly found that the *Chehardy* action – an

---

[11]  28 U.S.C. §1441(e)(1)(B).

[12]  *Id.* at 699.  *See also Chehardy v. State Farm Fire & Cas. Co.*, Case No. 05-01140 (M.D. La. 2005), Minute Entry dated March 16, 2006, attached as Exhibit "**A**" hereto.

insurance coverage case arising from Hurricane Katrina – was subject to original jurisdiction under section 1369.  In no uncertain words, it held the MMTJA "establishes supplemental jurisdiction over the *Wallace* action" as a result of "the district court's original jurisdiction under § 1369(a) over the pending *Chehardy* action."[13]  The Fifth Circuit thus concluded that section 1369 provided original jurisdiction over the *Chehardy* action – a case which, like this case, dealt with insurance claims arising from Hurricane Katrina.  As the Fifth Circuit explained, "the MMTJA was designed to ameliorate the restrictions on the exercise of federal jurisdiction that ultimately forced parties in multiple suits arising from the same disaster to litigate in several fora."[14]

In light of the above, IBA's efforts to distinguish *Wallace* are misguided.  Irrespective of what the Fifth Circuit may have held (or not held) with respect to the *Wallace* case itself, it unambiguously held that the *Chehardy* action was subject to original jurisdiction under section 1369.  By necessity, this means the Fifth Circuit determined that *Chehardy* arose from a "single accident" that killed at least 75 people at a "discrete location."   And since *Chehardy* is a case involving property insurance claims flowing from Hurricane Katrina, it is beyond question that Hurricane Katrina is an "accident" falling within the scope of the MMTJA.  Otherwise, there would be no basis for the Fifth Circuit's jurisdictional findings with respect to *Chehardy*.

In short, the Fifth Circuit has already resolved whether the MMTJA is applicable to claims against insurers arising out of Hurricane Katrina, and it answered the question in the affirmative.

### B.    Hurricane Katrina Was An "Accident."

Even if the Court chooses to disregard *Wallace*, and decide for itself whether Hurricane

---

[13]  *Wallace*, 444 F.3d at 702.

[14]  *Id.*

Katrina is an "accident" within the meaning of the MMTJA, it should come to the same conclusion as the Fifth Circuit.  The MMTJA provides that "the term 'accident' means a sudden accident, or a natural event culminating in an accident."  Black's Law Dictionary defines "accident" as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated."[15]

Under this literal interpretation of the statutory language, Hurricane Katrina and the subsequent flooding qualify as "accidents."  Indeed, under an analogous statutory definition, one Louisiana court has noted that "[t]here was no question that Hurricane Andrew met the definition of 'accident.'"[16]  IBA's unsupported argument that "[t]here was no accident at all here, only a natural event – a storm with high wind and wind-driven rain," thus misses the point.[17] The storm *itself* qualifies as an "accident" under the plain meaning of the MMTJA.  And even if it did not, the event that produced the damage at issue here – the flooding in the aftermath of Hurricane Katrina – unquestionably would.

---

[15]  Black's Law Dictionary 15 (8th ed. 2004).

[16]  *Quillin v. Calcasieu Marine Nat'l Bank*, 690 So. 2d 802, 804 (1996) (discussing La. Rev. Stat. § 23:1021(1), which defines "accident" as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.").

[17]  *See* IBA's Memo., at p. 16.

### C.   At Least 75 Persons Died in the Accident at a "Discrete Location."

Citing two paragraphs from a law review article, IBA argues that the term "discrete location" must be interpreted as "an individual geographic site."  According to IBA, this means Hurricane Katrina falls outside the scope of the MMTJA, because "it is not believed that 75 natural persons died in any one, discrete location as a result of the storm."[18]

As before, this argument fails for the simple reason that the Fifth Circuit already has determined that insurance litigation arising from Hurricane Katrina falls within the ambit of the MMTJA.  This Court, therefore, need not concern itself with the proper interpretation of "discrete location," or whether Hurricane Katrina killed 75 or more people at such a location.  The Fifth Circuit already has resolved those issues in *Wallace*.

Still, if the Court looks past *Wallace*, it should reject the limited reading of "discrete location" that IBA advances.  IBA contends the term "discrete" means the same thing as "small," or "geographically limited in size."  It does not.  Black's Law Dictionary (8th ed. 1999) defines discrete as "Individual; separate; distinct."  Similarly, Webster's Ninth New Collegiate Dictionary (1989 Merriam-Webster, Inc.) defines discrete, in part, as "1 : constituting a separate entity : individually distinct[.]"  The American Heritage College Dictionary (3rd ed. 1997, Houghton Mifflin Co.) contains a similar definition:  "1. Constituting a distinct thing."

As these dictionary definitions make evident, the literal meaning of "discrete" is not the same as "small."  It instead means "distinct" or "separate."  Indeed, the foregoing definitions place no size limitations whatsoever on the meaning of "discrete."  The term "discrete location" therefore should be interpreted to mean a location that is distinct and separate from other locations, regardless of its

---

[18] *See id.*

- 11 -

geographic size.

This reading finds support in analogous federal statutory language. Under 16 U.S.C. section 1433, the Secretary of Commerce may designate "any discrete area of the marine environment as a national marine sanctuary." The statute does not expressly define the term "discrete area," and apparently no cases have interpreted it. However, one of the factors the Secretary must consider in deciding whether to designate a particular area is the area's "ability to be identified as a discrete ecological unit *with definable boundaries*."[19] Notably, the *size* of a potential marine sanctuary is a *separate and independent factor* under the statute. As such, Congress has recognized that whether an area is "discrete" is a different question from its geographic size, and that "discrete" only means capable of being separately bounded, with no spatial requirement.

Here, the "accident" at issue – Hurricane Katrina – ravaged thousands of miles along the Gulf Coast. Its span of destruction extended to numerous states, most prominently Louisiana and Mississippi. Of the decedents, the Louisiana Department of Health and Hospitals reports that at least 554 resided in Orleans Parish and 129 resided in St. Bernard Parish.[20]

In the context of this case, then, Massachusetts Bay submits that the Parishes where the damage at issue occurred – namely, Orleans and St. Bernard – qualify as "discrete locations." Indeed, because Hurricane Katrina affected multiple states, the entire State of Louisiana could be

---

[19] 16 U.S.C. § 1433(b)(1)(F) (emphasis added).

[20] Pursuant to Federal Rule of Evidence 201, Massachusetts Bay requests that the Court take judicial notice that (1) at least 75 natural persons who were residents of St. Bernard Parish died as a result of Hurricane Katrina and the subsequent flooding; and (2) at least 75 natural persons who were residents of Orleans Parish died as a result of Hurricane Katrina and the subsequent flooding. The facts are not subject to reasonable dispute, in that they are both generally known within the territorial jurisdiction of this Court and are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. For example, according to the Louisiana Department of Health and Hospitals, as of January 11, 2006, the persons who died as a result of Hurricane Katrina and the subsequent flooding had been identified to include 449 residents of Orleans Parish and 109 residents of St. Bernard Parish. *See* Exhibit "**B**" hereto. In an updated report dated February 23, 2006, the Louisiana Department of Health and Hospitals reported that the Hurricane

seen as a "discrete location."  Either way, it is undeniable that more than 75 people died in each and every one of these geographically distinct locations.  Hurricane Katrina, therefore, satisfies the jurisdictional requirements of the MMTJA:  it was an "accident" that killed more than 75 people in a "discrete location."[21]

A contrary reading would undermine the theoretical underpinnings of the MMTJA. Although the MMTJA is separate from the traditional diversity jurisdiction statute, 28 U.S.C. section 1332, it still requires that there be "minimal diversity" among the adverse parties.  In effect, the MMTJA provides for an expanded form of diversity jurisdiction, where *complete* diversity is not required, so long as there is an accident that kills more than 75 people.  One of Congress' primary goals in creating diversity jurisdiction was to provide non-resident defendants with recourse to federal courts, so as to avoid any passions or prejudices that might exist in state court.  It is difficult to imagine an event causing more distress in a local community than a single accident that claims the lives of more than 75 people.  That distress, however, will be equally present and severe if the 75 deaths occur in a single city, or within the bounds of a single Parish, as opposed to an individual building.  Restricting the term "discrete location" to a single geographic site, as IBA proposes, would arbitrarily deny non-resident defendants the ability to remove many actions that arise from horrific tragedies that have traumatized the local community.  Such a result simply does not accord with the Congressional  intent behind diversity jurisdiction.

Finally, the Court should reject IBA's suggestion that the MMTJA was only designed to

---

Katrina victims had been identified to include 554 residents of Orleans Parish and 129 residents of St. Bernard Parish. *See* Exhibit "**C**."

[21]  As IBA acknowledges, the MMTJA does not require that the "*accident*" itself be "discrete" or occur in a "discrete location."  Rather, the "discrete location" limitation only applies to where the 75 deaths must have occurred. (*See* IBA's Memo., at p. 16 ["The accident, by contrast, is not limited to a discrete location . . . ."].)

apply "in the event of a transportation or building accident," and is inapplicable unless the resulting deaths form part of "the issues before the Court in this case."[22]  Essentially, IBA contends that the MMTJA only provides jurisdiction over wrongful death lawsuits arising from specific types of mass torts.   The only authority IBA cites for this proposition is a law review article.   That article, however, merely opines that "[t]he scope of section 1369 is limited to cases arising from *single catastrophic events* [sic]," not certain *types* of catastrophes, such as airplane crashes or hotel fires.[23] It does not support the dramatic limitations IBA seeks to impose on the MMTJA.

Furthermore, the actual text of section 1369(a) unambiguously states that the Court's jurisdiction extends to "*any* civil action . . . that *arises* from a single accident, where at least 75 natural persons have died."  Massachusetts Bay submits that when Congress said "any" civil action, it meant "any" civil action, not just particular types of actions involving particular types of accidents.  Furthermore, section 1369(a) only requires that the action "arise from" a single accident that kills at least 75 people.  It does not require that the action itself seek damages for the deaths of those people, or even relate to those deaths.

In short, as the Fifth Circuit already has held, litigation over insurance claims arising out of Hurricane Katrina – such as this case – properly fall within the Court's original jurisdiction under section 1369.  Massachusetts Bay's removal was thus proper, and the Court should deny IBA's Motion to Remand.

### D.      Supplemental Jurisdiction Exists Under Section 1441(e)(1)(B).

For the reasons stated above, this Court has original jurisdiction under section 1369, and thus

---

[22] *See* IBA's Memo., at pp. 16-17.

[23] *See Choice of Law Under the Multiparty, Multiforum Trial Jurisdiction Act*, 17 Regent U.L. Rev. 157 (2004).

need not consider whether supplemental jurisdiction exists under section 1441(e)(1)(B).  If the Court chooses to reach that issue, however, it will find an independent, alternative ground supporting Massachusetts Bay's removal.

As noted above, under section 1441(e)(1)(B), a defendant can remove an otherwise unremovable case to federal court if the defendant is a party to another action pending in federal court that "is or could have been brought . . . under section 1369," and which "arises from the same accident" as the action to be removed.  Here, IBA does not dispute that Massachusetts Bay has been named as a defendant in other actions pending in the Eastern District of Louisiana that also arise from Hurricane Katrina.  Under the plain terms of the MMTJA, Massachusetts Bay therefore can avail itself of the supplemental, "piggyback" jurisdiction provided by section 1441(e)(1)(B), and remove this case to federal court based thereon.

In response, IBA argues, without citation to authority, that Massachusetts Bay cannot "piggyback" jurisdiction onto the other lawsuits currently pending in this Court, because this case raises different factual issues from the other cases.  IBA is mistaken.  The "piggyback" jurisdiction provision of section 1441(e)(1)(B) is not limited to situations where the action to be removed arises from a *factually identical* chain of events as a lawsuit already pending in federal court.  Rather, the statute only requires the cases must arise from the "same accident."[24]  For the reasons discussed above, Hurricane Katrina plainly qualifies as an "accident" under the MMTJA.  Because this action undeniably arises from Hurricane Katrina, it therefore can piggyback onto the other Katrina-related cases currently pending before this Court.

Contrary to IBA's assertions, moreover, this case shares several common issues and facts

---

[24] 28 U.S.C. § 1441(e)(1)(B).

with the other Katrina lawsuits pending against Massachusetts Bay.  For example, both *Vanderbrook* and this case involve first-party property insurance claims following Hurricane Katrina.  In both cases, the scope of coverage available will be greatly affected by the manner in which the Court interprets and applies the policy exclusion for "Water" (or, alternatively, "Water Damage"), which includes damage caused by "flood."  Needless to say, this issue is perhaps the single most important legal question raised by Hurricane Katrina litigation, and it plays a prominent role in nearly every (if not every) such case.  The MMTJA's goals of judicial economy and consistency will be furthered by having this critical issue decided solely by the Judges of this Court, as opposed to a bevy of different Louisiana state court judges, spread out across different Parishes.

IBA's next response is to set forth a "parade of horribles," arguing that if the Court exercises supplemental jurisdiction over this case, it will have to consolidate and preside over "hundreds of numerous mini-trials," each involving different parties and different facts.[25]  There is no reason, however, why the Court would need to descend into the logistical quagmire that IBA imagines.  Nothing in the MMTJA *requires* the Court to consolidate an action removed on the basis of supplemental jurisdiction with the other cases on which it "piggybacked."  If judicial economy would be served by keeping this case separate and unconsolidated, the Court certainly would be within its power to do so.

Anticipating this argument, IBA responds by claiming that holding separate trials in the Hurricane Katrina cases would be "disastrous in and of itself," and could result in a "constitutionally infirm judgment."[26]  Massachusetts Bay fails to understand these concerns.  In its wisdom, Congress

---

[25] IBA's Memo., at pp. 20-21.

[26] *Id.*, at pp. 21.

- 16 -

has decided that a defendant who is already being sued in federal court over an accident that killed more than 75 people should be able to invoke federal jurisdiction if it is sued again over the same accident, even if the other suits would not, by themselves, be removable. Congress concluded that having all these suits litigated in federal court is a better result than having some litigated in federal court and others in state court. While IBA might disagree, its desire to proceed in state court cannot override Congress' intent, as expressed in the MMTJA.

Finally, IBA is disingenuous in asserting that this case (or any other Hurricane Katrina cases) would need to be remanded back to the state court for a determination of damages in the event liability is found. Section 1441(e)(2) expressly allows the federal court to hear the damages phase of the litigation if it "finds that, for the convenience of parties and witnesses and in the interest of justice, the action should be retained for the determination of damages." Simply put, if it will be more convenient and economical for this Court to hear both the liability and damage phases of the case, it has the authority to do so, and no remand will be necessary later.

## V.   <u>Removal Is Proper Under the Diversity Statute.</u>

As discussed above, this Court has original jurisdiction over this action by virtue of the MMTJA. In addition, there is a separate and independent basis for jurisdiction:  namely, the traditional diversity statute, 28 U.S.C. section 1332.

IBA does not dispute that the amount in controversy exceeds the statutory minimum ($75,000.00 exclusive of interest and costs). Instead, IBA's challenge to diversity jurisdiction is based solely on the fact that it has sued its agents, Eustis and Swent, who are both Louisiana residents. According to IBA, the presence of these non-diverse defendants destroys diversity jurisdiction.

As discussed below, this argument fails for two separate reasons.  First, IBA's claims against Eustis and Swent were improperly joined because those claims are perempted under Louisiana law.  Second, IBA cannot defeat diversity by misjoining its tort claims against Eustis and Swent with its contract-based claims against Massachusetts Bay.

### A.    IBA's Claims Against Its Agents Are Peremptively Barred.

Under the doctrine of improper joinder, the presence of non-diverse defendants will not defeat diversity jurisdiction if the removing defendant demonstrates that the plaintiff cannot state a cause of action against the non-diverse defendants.[27]   In evaluating a claim of improper joinder, the Court must look to whether there is a reasonable basis for predicting that state law might impose liability on the non-diverse defendants.[28]  As the Fifth Circuit has explained, "[t]his means that there must be a *reasonable* possibility of recovery, not merely a *theoretical* one."[29]

Here, Massachusetts Bay maintains there is *no* reasonable possibility of recovery against Eustis and Swent because IBA's claims against those defendants are peremptively time-barred under Louisiana law.  As IBA correctly notes, Massachusetts Bay's peremption argument is based on the one-year time period set forth La. Rev. Stat. section 9:5606.  According to IBA, this one-year peremptive period does not bar its claims against Eustis and Swent, for two reasons:  (1) IBA had no duty to read its policy; and (2) IBA could not have learned of Eustis' and Swent's alleged omission until March 2006, when Massachusetts Bay communicated its "interpretation" of the policy language.  Neither argument has merit.

---

[27] *Ross v. Citifinancial, Inc.*, 344 F. 3d 458, 461 (5th Cir. 2003).

[28] *Id.* at 462-463; *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F. 3d 305, 312 (5th Cir. 2002).

[29] *Ross*, 344 F. 3d at 462 (emphasis in original).

First, IBA is simply wrong in claiming it had no duty to read its policy.  Under Louisiana law, an insured is generally responsible for reading his policy and is presumed to know its provisions.[30]  As the Fifth Circuit put it, an insured is "considered responsible for . . . reading the clear provisions of the insurance policy."[31]  IBA, therefore, cannot seek to avoid the one-year peremptive period by claiming it had no idea what its policy said.

The lone case IBA cites on this issue, *Louisiana Home Builders v. Adjustco*,[32] is entirely inapposite.  Unlike the case here, *Adjustco* did not involve a standard form commercial property policy, nor did it involve a normal insurance agency, such as Eustis.  *Adjustco* instead involved a specialized group self-insurance fund that was managed by a service agent with particular expertise in that field of insurance.[33]  The expert testimony adduced at trial indicated that self-insurance fund managers generally were not expected to read policies issued to the fund, but instead would typically rely on their service agents.[34]  Furthermore, in *Adjustco*, the court found the self-insurance fund "had a close, trusting relationship with [the service agent], it relied on [the service agent] for insurance expertise, and it paid [the service agent] for this expertise."[35]  Nothing in the affidavit of Bruce Iteld suggests that IBA had this type of close, fiduciary-like relationship with Eustis or Swent.  To the contrary, it appears their relationship was no more "close" or "trusting" than that which exists

---

[30] *See, e.g., Stephens v. Audubon Ins. Co.*, 665 So. 2d 683, 686 (La. App. 1996) ("An insured is presumed to know the provisions of his policy."); *Matthews v. Business Men's Assurance Co.*, 478 So. 2d 634, 637 (La. App. 1985) (same); *Perkins v. Shelter Ins. Co.*, 540 So. 2d 488, 490 (La. App. 1989) (same); *Kieran v. Commercial Union Ins. Co.*, 271 So. 2d 889, 892 (La. App. 1973) ("We find no negligence or fault on the part of [the agent].  On the contrary, the fault, if any, was on the [the insured's] part . . . in not reading the clear provisions of [the] policy.").

[31] *Motors Ins. Co. v. Bud's Boat Rental*, 917 F. 2d 199, 205 (5th Cir. 1990)

[32] *Louisiana Home Builders Assoc. Self-Ins. Fund v. Adjustco, Inc.*, 633 So. 2d 630 (La. App. 1993).

[33] *Id.* at 631.

[34] *Id.* at 635.

[35] *Id.*

between every insured and his or her agent.

Accordingly, under Louisiana law, IBA must be deemed to have known the contents of its policy when that policy was first issued, on June 1, 2003.  (*See* Affidavit of Mary Engler, ¶¶ 4-5, Exh. "A.")  IBA does not dispute that the policy, as originally issued, contained the *exact same language* at issue in this case – *i.e.*, the same language that IBA contends gives rise to Business Income coverage for both of its offices, and which Massachusetts Bay contends segregates coverage between the two offices.  As of June 2003, then, IBA must be deemed to have known that its policy contains the language that gave rise to the current dispute.

In response, IBA claims this knowledge was insufficient to trigger the one-year peremptive period because IBA did not know how Massachusetts Bay would "interpret" the policy language until March 2006, when Massachusetts Bay communicated its coverage position.  IBA's argument is clever, but unavailing.  Under Louisiana law, when policy language is clear, it must be enforced as written, and unambiguous restrictions on coverage must be given effect.[36]  Accordingly, if Massachusetts Bay's reading of IBA's policy is correct, such that the policy only provides Business Income coverage for one of IBA's two offices, this necessarily would mean that Massachusetts Bay's "interpretation" of the policy accords with the plain, unambiguous, and literal terms of the policy itself.  As noted above, however, Louisiana law automatically charges IBA with knowledge of the "clear provisions" of its policy.[37]  Hence, if Massachusetts Bay's "interpretation" of the policy is correct, IBA must be charged with knowledge of that fact, as a matter of law.

In short, if Eustis and Swent were guilty of any negligent conduct in procuring IBA's policy,

---

[36] *See, e.g.*, *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994); *Livingston Parish Sch. Bd. v. Fireman's Fund Amer. Ins. Co.*, 282 So. 2d 478, 481 (La. 1973).

[37] *Motors Ins.*, 917 F. 2d at 205.

IBA has had at least constructive knowledge of that negligence since June 1, 2003. Under Louisiana law, a peremptive or prescriptive period will begin to run when the injured party has constructive knowledge of the facts that would entitle him to bring suit.[38]   In this case, then, the one-year peremptive period of La. Rev. Stat. section 9:5606  began to run on June 1, 2003, and expired on June 1, 2004.  Since this suit was not filed until May 2006, nearly two years late, IBA's claims against Eustis and Swent are perempted under Louisiana law.  Accordingly, those claims should be disregarded for diversity purposes, as they were improperly joined.

### B.    IBA Cannot Join Tort Claims With Contract Claims.

As a final ground for removal, Massachusetts Bay submits that the presence of Eustis and Swent should be disregarded under the doctrine of "fraudulent misjoinder."  This doctrine, as announced by the Eleventh Circuit in *Tapscott v. MS Dealer Serv. Corp.*,[39] prohibits a plaintiff from attempting to defeat diversity jurisdiction by combining unrelated claims against a local defendant with separate and distinct claims against a non-resident defendant.[40]  The Fifth Circuit has cited this rule with approval, most recently in *In re Benjamin Moore & Co.*[41]

In response, IBA contends that *Tapscott* is inapplicable to the situation here, based on two

---

[38] *See Campo v. Correa*, 828 So.2d 502, 510 (La. 2002) (prescriptive period commences upon constructive knowledge); *Atlas Iron & Metal Co. v. Ashy*, 918 So.2d 1205, 1210 (La. App. 2006) (one-year peremptive period for legal malpractice claim commences at time constructive knowledge obtained).

[39] 77 F.3d 1353, 1359-60 (11th Cir. 1996) ("The court will not allow these Plaintiffs to defeat the Defendants' right to have their claims determined in a federal forum by the artifice of joining their claims with totally separate claims of other non-diverse parties") *overruled on other grounds sub nom, Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000).

[40] *See also Crockett v. R.J. Reynolds Tobacco Co.*, 436 F.3d 529, 533 (5th Cir. Jan. 13, 2006) (noting that joinder still can be improper even where "the plaintiff does have the ability to recover against each of the defendants"); *Polk v. Lifescan, Inc.*, No. 4:03CV020, 2003 WL 22938056, at *5 (N.D. Miss. Sept. 22, 2003); *Mallard v. Prudential Ins. Co. of Am.*, No. 95-908, 1996 WL 170126, at *3 (M.D. Ala. Mar. 29, 1996); *Turpeau v. Fid. Fin. Servs., Inc.*, 936 F. Supp. 975 (N.D. Ga. 1996), aff'd, 112 F.3d 1173 (11th Cir. 1997); *see also* Fed. R. Civ. P. 20.

[41] 309 F.3d 296, 298 (5th Cir. 2002).

cases from the Eastern District of Louisiana, *Schwartz v. Chubb & Sons*[42] and *Redlauer v. Great Northern*.[43]   However, IBA fails to note that, in *Schwartz*, the Court expressly noted that, under *Tapscott* and *Benjamin Moore*, "it might be concluded that misjoinder . . . should not be allowed to defeat diversity jurisdiction."[44]  Also, *Redlauer* is distinguishable because, unlike the current case, there apparently was no issue whether the plaintiff had timely brought suit against its agent.  In and of themselves, then, the claims against the agent in *Redlauer* were legally viable.

Moreover, Massachusetts Bay submits that the weight of authority supports the application of *Tapscott* to preclude fraudulent misjoinder of claims against non-diverse insurers and diverse tortfeasors.  Most recently, in *Berthelot v. Boh Bros. Const. Co., L.L.C.*, [45] a case arising from Hurricane Katrina, the plaintiffs sued the Orleans Levee District, a non-diverse defendant, as well as a number of insurance companies, which were of diverse citizenship. The claims against the Levee District sounded in negligence, whereas the claims against the insurance defendants were premised on the contractual interpretation of plaintiffs' policies.  Relying on *Tapscott*, Judge Duval found the claims against the Levee District were parallel and separate from, and unrelated to, the claims against the insurance defendants, and thus were improperly joined.  Judge Duval then remanded the claims against the Levee District, but denied the motion to remand as to the insurance companies.

Similarly, in *Smith v. Nationwide Mutual Ins. Co.*,[46] the plaintiffs sued the driver of a mower whom they alleged caused an automobile accident in which one of the plaintiffs was injured. The

---

[42] *Schwartz v. Chubb & Sons, Inc.*, 2006 U.S. Dist. LEXIS 18174 (E.D. La. 2006).

[43] 2006 U.S. Dist. LEXIS 29839 (E.D. La. 2006).

[44] 2006 U.S. Dist. LEXIS 18174, *4 (E.D. La. 2006).

[45] C.A. 05-4182, 2006 WL 1984661 (E.D. La. Jun. 01, 2006) (finding fraudulent joinder and maintaining jurisdiction where plaintiffs alleged separate claims against separate insurers and Insurance Commissioner).

[46] 286 F. Supp. 2d 777, 781 (S.D. Miss. 2003) (claims against tortfeasor allegedly causing injury not properly joined with contract claim against insurer).

plaintiffs also brought claims against diverse insurance companies, alleging that the insurers failed to make medical payments for the plaintiffs' injuries resulting from the automobile accident. Citing *Tapscott* and *Benjamin Moore*, the court held that the plaintiffs had combined unrelated lawsuits resulting in fraudulent joinder of claims sufficient to defeat diversity jurisdiction. The court explained that because the claims against the non-diverse defendants were based on negligence relating to the accident, while the claims against the diverse insurers sounded in contract based on the failure to pay benefit claims, the claims were unrelated and improperly joined.[47]

Also, in *Juneau v. Ducote*,[48] the plaintiffs, who alleged they were exposed to high levels of lead, sued their employer, a supervisor, and several insurance companies.[49] After deciding there was no possibility of recovery against the supervisor and on several counts against the employer, the court decided that the remaining viable claims were misjoined.  Citing Federal Rule of Civil Procedure 20, the court explained that "the matters sued upon do not arise from the same transaction or occurrence and present no common questions of law or fact."[50]  The court further explained that "[h]ere, as in *Tapscott*, plaintiffs' attempt to join the resident defendant is so egregious a violation of Rule 20 as to constitute fraudulent joinder."[51]

Like the claims in *Tapscott*, *Berthelot*, *Smith*, and *Juneau*, the claims against Eustis and Swent in the present case are wholly distinct and separate from the claims against Massachusetts Bay. These two categories of claims are brought against different persons, assert different

---

[47] *Id.* at 780-81.

[48] No. 9409789, 2005 WL 2648861, at *4-5 (W.D. La. Oct. 17, 2005) (plaintiffs' claim against non-diverse defendant to enforce right to access records of exposure to toxic materials was misjoined with plaintiffs' claim against diverse defendant alleging exposure to toxic materials).

[49] *Id.* at *3.

[50] *Id.* at *4.

[51] *Id.*

allegations, and arise out of different relationships.  On the one hand, IBA claims that Massachusetts Bay failed to pay sums due under its insurance policy, and on the other hand, IBA alleges that Eustis and Swent negligently breached a professional duty.  The basis underlying these claims, the facts from which they arise, and the legal analyses the Court will employ in determining a proper resolution are all different.

This is a case where IBA included claims against Eustis and Swent for the sole purpose of defeating removal.  This is precisely the type of "egregious" misjoinder *Tapscott* and its progeny have found insufficient to defeat removal jurisdiction.  Accordingly, joinder of these defendants is improper, and the Court should disregard the citizenship of Eustis and Swent.

## VI.    <u>In No Event Are Sanctions Warranted.</u>

Even if the Court should disagree with Massachusetts Bay, and grant IBA's motion, it should decline IBA's request for sanctions.  Whether to award attorneys' fees and costs under section 1447(c) lies within the Court's sound discretion.[52]  In deciding whether to exercise that discretion, the Court should take into consideration the propriety of the defendant's decision to remand and the merits of that decision.[53]

Here, by no stretch of the imagination could Massachusetts Bay's decision to remove this action be called frivolous or improper.  The Fifth Circuit already has ruled that insurance cases arising from Hurricane Katrina are subject to the MMTJA, and the plain language of the MMTJA supports that determination.  In addition, Massachusetts Bay had alternative grounds for removal, based on fraudulent and improper joinder.  While IBA notes that two cases from the Eastern District undercut Massachusetts Bay's argument based on *Tapscott*, that was only one of many arguments Massachusetts Bay raised, and other recent cases (including one from the Eastern District) have

---

[52]  *See Miranti v. Lee*, 3 F.3d 925, 928 (5th Cir. 1993).

[53]  *Id.*

- 24 -

followed *Tapscott*.  By no means, then, could sanctions possibly be warranted here.

**VII.    Conclusion.**

IBA apparently has a strong desire to proceed with this action in Louisiana state court.

This preference, however, does not override the jurisdictional provisions of the MMTJA.  Nor

does it allow IBA to avoid removal by improperly joining perempted, time-barred tort claims

against its agents.  Accordingly, the Court should deny IBA's Motion to Remand and leave this

case where it belongs, in federal court.

Respectfully submitted,


**_____s/ Kristopher T. Wilson_____**
**RALPH S. HUBBARD III, #7040**
**KRISTOPHER T. WILSON, #23978**
**LUGENBUHL, WHEATON, PECK, RANKIN &**
**HUBBARD**
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Telephone:  (504) 568-1990

OF COUNSEL:
**KEVIN P. KAMRACZEWSKI**
**PAUL E. B. GLAD**
**DAVID R. SIMONTON**
**SONNENSCHEIN NATH & ROSENTHAL LLP**
7800 Sears Tower
Chicago, Illinois 60606
Telephone:  (312) 876-8000


**Attorneys for Massachusetts Bay Insurance Company**
**and The Hanover Insurance Company (erroneously**
**sued herein and erroneously named in caption as "The**
**Hanover Insurance Group")**

**CERTIFICATE OF SERVICE**

I hereby certify that on 15 August, 2006 a copy of the foregoing Memorandum in Opposition to Plaintiffs' Motion to Remand was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to:

Ralph Shelton Hubbard, III                Lanny R. Zatzkis

by operation of the court's electronic filing system.  I also certify that I have mailed by United States Postal Service, this filing to the following non-CM/ECF participants:

No Manual Notices.


s/ Kristopher T. Wilson
**Kristopher T. Wilson, La. Bar No. 23978**
**Attorneys for Massachusetts Bay Insurance**
**Company and The Hanover Insurance Company**
**(erroneously sued herein and erroneously named in**
**caption as "The Hanover Insurance Group")**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:        504-568-1990
Facsimile:        504-310-9195
e-mail:           kwilson@lawla.com