Westlaw.

Slip Copy
Slip Copy, 2006 WL 2375593 (E.D.La.)
(Cite as: Slip Copy)

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
Charlene Joseph FLINT, et al
v.
LOUISIANA FARM BUREAU MUTUAL
INSURANCE COMPANY.
**Civil Action No. 06-2546.**

Aug. 15, 2006.

Shawn C. Reed, Amy C. Yenari, D. Douglas Howard, Jr., Hope Elizabeth Normand, Howard, Reed & Taylor, Covington, LA, for Plaintiffs.
H. Alston Johnson, Phelps Dunbar, LLP, Baton Rouge, LA, Andrew Lane Plauche, Jr., Plauche, Maselli, Landry & Parkerson, LLP, New Orleans, LA, for Defendant.
STANWOOD R. DUVAL, JR., District Judge.

*1 Before the Court is Plaintiff's Motion to Remand (Rec.Doc. No. 8) this case to the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana. This Motion was set for hearing on July 14, 2006, with oral argument. The Court, having considered the record, the arguments of the parties, the evidence submitted, and the law and applicable jurisprudence, is fully advised in the premises and ready to rule.

### ORDER AND REASONS

### I. BACKGROUND

Plaintiffs brought this action against Louisiana Farm Bureau Mutual Insurance Company ("Farm Bureau") seeking damages for Farm Bureau's denial of Plaintiffs' insurance claims for property damage due to Hurricane Katrina. Specifically, the insurance claims that were denied by Farm Bureau dealt with loss of trees, shrubs, grass, sod, flowering and green plants and for the removal of accumulated brush and debris. This case was originally filed in the 22nd Judicial District Court for the Parish of St. Tammany Parish, State of Louisiana on April 19, 2006. Subsequently, on May 17, 2006, Farm Bureau removed this action to federal court pursuant to 28 U.S.C. § 1441(e)(1)(B). Farm Bureau argues that this action was properly removed to federal court under § 1441(e)(1)(B) because at the time of removal Farm Bureau was a party to *Craddock v. Safeco Insurance Company, et al,*[FN1] which could have been brought under 28 U.S.C. § 1369(a).

> FN1. *Craddock v. Safeco Insurance Company, et al,* Civil Action No. 05-6365, was removed to the United States District Court, Eastern District of Louisiana, on December 5, 2005. The plaintiff in *Craddock* filed a Motion to Remand, which was denied by this Court because the Court found that jurisdiction existed under 28 U.S.C. § 1367, the Class Action Fairness Act (CAFA). After oral argument on Plaintiff's Motion for Voluntary Dismissal on July 14, 2006, this action has been dismissed and is no longer pending in this Court.

### II. *Multiparty, Multiforum, Trial Jurisdiction Act-28 U.S.C. § 1369 and 28 U.S.C. § 1441(e)(1)(B)*

28 U.S.C. § 1369(a) states:
The district courts shall have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location, if-
(1) a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether that defendant is also a resident of the State where a substantial part of the accident took place;
(2) any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT
A

Slip Copy                                                                                              Page 2
Slip Copy, 2006 WL 2375593 (E.D.La.)
**(Cite as: Slip Copy)**

(3) substantial parts of the accident took place in different States.

"Minimal diversity" is present under § 1369 if any plaintiff and any defendant are diverse. 28 U.S.C. § 1369(c)(1). An "accident" under § 1369 is defined as "a sudden accident, or natural event culminating in an accident, that results in death incurred at a discrete location by at least 75 natural persons." 28 U.S.C. § 1369(c)(4).

However, 28 U.S.C. § 1369(b) requires a federal court to abstain from exercising its § 1369(a) jurisdiction if (1) a substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and (2) the claims asserted will be governed primarily by the laws of that State.

Under 28 U.S.C. § 1441(e)(1)(B),
*2 a defendant in a civil action in State court may remove that action to the district court of the United States for the district and division embracing the place where the action is pending if—
(A) the action could have been brought in the United States district court under section 1369 of this title; or
(B) the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

## IV. *COURT'S ANALYSIS*

In order for Farm Bureau to establish federal supplemental jurisdiction over *Flint,* it must show that *Craddock* could have been brought under § 1369(a). To establish § 1369(a) jurisdiction, Farm Bureau must show that: (1) there is minimal diversity between adverse parties in *Craddock;* (2) *Craddock* arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location; (3) a defendant in *Craddock* resides in a State and a substantial part of the accident took place in another State, or any two defendants in *Craddock* reside in

different States, or substantial parts of the accident took place in different States; and (4) the Court is not required to abstain from exercising its § 1369(a) jurisdiction over *Craddock* under § 1369(b).

If all of the § 1369 elements are satisfied, then the Court must determine whether *Flint* was properly removed pursuant to § 1441(e)(1)(B). Removal of *Flint* is proper under § 1441(e)(1)(B) if Farm Bureau establishes that (1) *Flint* could have been brought under § 1369; or (1) Farm Bureau was a defendant in *Craddock* at the time *Flint* was removed to federal court; (2) *Craddock* could have been brought under § 1369; and (3) *Craddock* arises from the same accident as *Flint.*

Because the plaintiff in *Craddock* is a citizen of Louisiana, and Safeco Insurance Company, a defendant in *Craddock,* is a citizen of Washington, minimal diversity exists in *Craddock.*[FN2] Further, Safeco resides in Washington and a substantial part of the accident took place in another state, Louisiana. Therefore, the first and third requirements of § 1369(a) are satisfied.

> FN2. See Notice of Removal, *Craddock v. Safeco Insurance Company* (Civil Action No. 05-6365).

However, the main issue is whether or not *Craddock* arises from an a single accident, where at least 75 natural person have died in the accident in a discrete location. Farm Bureau argues that Hurricane Katrina was the "natural event culminating in an accident" and at least 75 deaths occurred as a result of the Hurricane in a discrete location. Farm Bureau further contends that Hurricane Katrina was classified as an "accident" under § 1369 in *Chehardy v. State Farm Fire and Casualty Company, et al*[FN3] by Judge Polozola. Farm Bureau argues that in *Chehardy,* Judge Polozola determined that this case met the requirements of § 1369 and that determination "necessarily included findings that Hurricane Katrina satisfied the definition of an accident under 28 U.S.C. § 1369." [FN4] In Judge Polozola's Order transferring *Chehardy* to this Court, the Judge noted that jurisdiction existed in *Chehardy* under 28 U.S.C. § 1369. However, Judge Polozola's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 3
Slip Copy, 2006 WL 2375593 (E.D.La.)
**(Cite as: Slip Copy)**

Order does not explain the basis for this conclusion and therefore, this Court does not agree with Farm Bureau's conclusion that Hurricane Katrina was deemed a § 1369 "accident" by *Chehardy*.

> FN3. *Chehardy v. State Farm Fire & Casualty Company, et al*, Civil Action Nos. 06-1672, 06-1673, 06-1674, was filed in the United States District Court for the Middle District of Louisiana and subsequently, transferred to the Eastern District of Louisiana. *Chehardy* is currently pending in Section "K."

> FN4. However, Judge Polozola never made written reasons for his conclusion that *Chehardy* met the § 1369 requirements. Therefore, the conclusion that defendant reaches that Hurricane Katrina was classified a § 1369 accident is only speculation. As noted by plaintiff, *Chehardy* arose from a levee break, which may have been the accident that triggered the § 1369 designation.

*3 Further, Farm Bureau also suggests that the Fifth Circuit defined Hurricane Katrina as a § 1369 "accident" in *Wallace v. Louisiana Citizens Property Insurance Company*, 444 F.3d 697 (5th Cir.2006).[FN5] While the Fifth Circuit notes the petitioners in *Wallace* argue that Hurricane Katrina is the "accident," the Court never actually reaches this conclusion in its decision. 444 F.3d at 699. Additionally, *Wallace* does not directly deal with the application of § 1369(a) jurisdiction, but rather it merely concludes that the abstention provision of § 1369(b) does not apply to cases removed under § 1441(e)(1)(B). Therefore, this Court does not conclude that Hurricane Katrina has been deemed an "accident" under § 1369(a) in *Wallace*.

> FN5. *Wallace* was removed to federal court based on § 1441(e)(1)(B) and § 1369 jurisdiction over *Chehardy* because Louisiana Farm Bureau Mutual Insurance Company and Louisiana Farm Bureau Casualty Insurance were defendants in *Chehardy* and *Wallace*. In other words, *Wallace* piggybacked on the §

1369 original jurisdiction in *Chehardy*. The *Wallace* defendants removed *Wallace* to federal court under § 1441(e)(1)(B). *Wallace* was, however, remanded to state court, but the Fifth Circuit, according to defendants, recognized that § 1441(e)(1)(B) "established supplemental jurisdiction over the *Wallace* action, piggy-backing jurisdiction on the district court's original jurisdiction over the pending *Chehardy* action."

However, regardless of whether there is current non-binding legal authority establishing that Hurricane Katrina is a § 1369 "accident," this Court is required to make that determination in this case. Farm Bureau argues that a case can be classified as § 1369 case, even if the case is not based on deaths that resulted from the accident, but can apply to a case dealing with mere property damage that resulted from the accident in which there were at least 75 deaths at a discrete location. Further, Farm Bureau argues that *Craddock* arose from a single accident, Hurricane Katrina, which was a "sudden accident, or a natural event culminating in an accident, that results in death incurred at a discrete location by at least 75 natural persons." Farm Bureau argues that this statutory language does not require that the "accident" occur at a discrete location, but only that the 75 deaths occur at a discrete location."

Plaintiffs contend that *Craddock* could not have been brought under § 1369. Plaintiffs state that *Craddock* is an action wherein individuals suffered property damage at their individual residences and not in a single discrete location. Additionally, plaintiffs point out that *Chehardy* was an action that arose from a levee break that resulted in many deaths. Therefore, the "accident" in *Chehardy* was not the Hurricane itself, but the specific levee break. Further, plaintiffs argue that *Craddock* and *Flint* are not related to the levee break, nor do these cases allege any deaths as a result of the denial of their property damage claims. Plaintiff argues that the levee break [FN6] was the accident that resulted from the natural event, Hurricane Katrina, but Hurricane Katrina itself was not an accident under § 1369. Conversely, *Craddock* and *Flint* arose out the "accident" of falling of trees at the homeowner's various residences and Hurricane Katrina was not the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2006 WL 2375593 (E.D.La.)
**(Cite as: Slip Copy)**

"accident." Therefore, the accident in *Craddock* and *Flint* did not occur at a discrete location, but at many locations in Louisiana and so, *Craddock* could not have been brought under § 1369.

> FN6. Plaintiffs note that the levee break occurred at a discrete location and caused 75 deaths of natural persons.

This Court has determined that Hurricane Katrina has not been classified as a § 1369 "accident" by any court and therefore, this Court declines to interpret the statutory definition of "accident" so broadly. *Chehardy* arises from a levee break that caused both loss of life and property damage. Therefore, the Court concludes that § 1369 jurisdiction exists in *Chehardy* because the levee break is the requisite accident that caused the death of at least 75 natural persons at a discrete location.[FN7] *Craddock* does not arise from a levee break. Thus, the only possible accident in *Craddock* is Hurricane Katrina, which caused wind resulting in the loss of trees and debris on the property of many Louisiana citizens. However, Hurricane Katrina was the "natural event" under § 1369 that culminated in many accidents, but there is no single accident in *Craddock* that resulted in the death of at least 75 natural persons at a discrete location. Therefore, *Craddock* could not have been brought under § 1369.[FN8]

> FN7. In other words, Hurricane Katrina was the natural event that culminate in the levee break that caused at least 75 deaths at a discrete location. Therefore, the levee break, not Hurricane Katrina, was the § 1369 accident.

> FN8. Because the Court has concluded that *Craddock* could not have been brought under § 1369(a), it is not necessary to determine whether the abstention provision of § 1369(b) would apply to *Craddock*.

*4 Because *Craddock* could not have been brought under § 1369, *Flint* could not have been removed pursuant to 28 U.S.C. § 1441(e)(1)(B). An action can

be removed under § 1441(e)(1)(B), only if the defendant is a party to an action which is or could have been brought under § 1369. Therefore, in the absence of a § 1369 action, Farm Bureau has no vehicle by which to remove *Flint* to federal court.

## V. CONCLUSION

Because the Court has concluded that *Craddock* could not have been brought under 28 U.S.C. § 1369(a), *Flint* was improperly removed to federal court pursuant to 28 U.S.C. § 1411(e)(1)(B). Therefore, this Court lacks subject matter jurisdiction over *Flint* and this case should be remanded.

Accordingly,

**IT IS ORDERED** that this the Plaintiff's Motion to Remand (Rec .Doc. No. 8) is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana (Docket No. 2006-11642, Division C).

E.D.La.,2006.
Flint v. Louisiana Farm Bureau Mut. Ins. Co.
Slip Copy, 2006 WL 2375593 (E.D.La.)

Briefs and Other Related Documents (Back to top)

• 2:06cv02546 (Docket) (May 17, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# THE HYDROLOGIC EFFECTS OF HURRICANE KATRINA
# ON THE FLOODING OF THE MURPHY OIL REFINERY

Turner, et al, vs. Murphy Oil USA, Inc.
United States District Court for the Eastern District of Louisiana
Docket No. 05-4206

Prepared by

Joseph N. Suhayda, Ph. D.
Coastal Hydrologist
285 Sunset Blvd.
Baton Rouge, LA 70808

August 8, 2006

EXHIBIT
B

SCANNED

# TABLE OF CONTENTS

|  | Page |
|---|---|
| 1. INTRODUCTION | 1 |
| 2. HURRICANE FLOOD PROTECTION SYSTEM | 2 |
| 3. METEOROLOGICAL CHARACTERISTICS OF HURRICANE KATRINA | 4 |
| 3.1. STORM HISTORY | 4 |
| 3.2. STORM CENTRAL PRESSURE AND WINDS | 5 |
| 4. HYDROLOGIC CHARACTERISTICS OF HURRICANE KATRINA | 8 |
| 4.1. STORM SURGE | 8 |
| 4.2. STORM WAVES | 9 |
| 5. ANALYSIS OF HYDROLOGIC EFFECTS OF HURRICANE KATRINA | 10 |
| 5.1. LEVEE OVERTOPPING | 10 |
| 5.2. FLOODING AT THE MURPHY REFINERY SITE | 11 |
| 6. CONCLUSIONS | 12 |
| 7. REFERENCES | 13 |
| 8. APPENDIX | 15 |
| 9. TABLES | 16 |
| 10. FIGURES | 19 |

1

# 1. INTRODUCTION

The purpose of this report is to present opinions concerning the hydrologic effects of hurricane Katrina on the flooding of the Murphy Oil Refinery. The refinery is located in St. Bernard Parish, Louisiana, in an area surrounded by several federal and state flood control levees. The refinery site was flooded during Hurricane Katrina; the floodwaters reaching an elevation of about 10 feet. In this report the factors that determined the amount of flooding at the site are examined in detail, and it is concluded that it was the failure of the federal levees along the Mississippi River Gulf Outlet (MRGO) that caused the extreme flooding that occurred at the site and not the intensity of Hurricane Katrina.

Based upon this detailed analysis several facts are evident. The U. S. Army Corps of Engineers (COE) was authorized by Congress to provide flood protection for St. Bernard Parish from the most severe combination of meteorological conditions that area considered characteristic of the region. The prevention of hurricane flooding in St. Barnard Parish depended solely on the protection provided by the COE levees. However, the levees designed and built by the COE contained many errors, deficiencies, and shortcomings. These included the fact that the flood protection system as authorized by Congress was never completed and levees were substantially below project grade at the time of Katrina. Overtopping and breaching of the levees were recognized possibilities and yet the COE failed to determine the susceptibility of their levees designs to breaching. No evaluation was conducted to determine the impact of levee breaching on the increase of the flooding threat to public safety. As a consequence of these problems the storm surge produced by Hurricane Katrina was able to overtop and breach the levee system along MRGO that was to protect St. Bernard Parish and caused extensive flooding of the parish. Thus, the magnitude of the flooding that occurred at the Murphy Oil Refinery during the hurricane was the direct result of the failure of the COE levees along MRGO and not the result of the intensity of Hurricane Katrina.

The opinions expressed herein are based upon a review of the extensive technical data base that has been presented in several review documents, design reports, and scientific articles that addressed all aspects of the hurricane and the performance of the levee systems protecting the refinery. Of particular importance are the documents prepared as part of the Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. This evaluation was prepared by the Interagency Evaluation Task Force (IPET) and a series of reports have been prepared. These reports include new data, methodologies and calculations that have been used extensively in forming my analysis. I personally visited the levees along MRGO during the spring of 2005, during which time I photographed and examined the various hydrologic features of the levees. Finally, my opinions are also based upon my 30 years professional experience in analyzing hydrologic processes, particularly hurricane flooding, in southern Louisiana. The various types of reference materials used for this report are presented in the REFERENCES section of this report.

2

## 2. HURRICANE FLOOD PROTECTION SYSTEM

Southeastern Louisiana has been and is subject to numerous hurricanes of various intensities. In order to cope with the flooding threat posed by these hurricanes, a hurricane flood protection system was authorized by the U. S. Congress. The characteristics of the hurricane flooding threat and the hurricane flood protection system developed to protect against this threat are reviewed in this chapter.

The COE was authorized by congress to provide flood protection for St Bernard Parish through the Lake Pontchartrain and Vicinity Project in 1965. The project was designed to provide protection for St. Bernard Parish against the Standard Project Hurricane (SPH). The SPH is a hurricane that may be expected from the most severe combination of meteorological conditions that are considered characteristic of the region involved. The SPH selected for the MRGO levee design had a central pressure of 27.6 inches of Mercury, maximum gradient winds of 100 mph, a radius to maximum winds of 30 nautical miles, a forward speed of 11 knots, and approaching the site from the east. By comparison, the probable maximum hurricane (PMH) for the site had a central pressure of 26.9 inches of Mercury with maximum gradient wind speed of 114 knots. The SPH was considered to be equivalent to a fast moving Category 3 hurricane. The selected SPH produced a still water elevation outside of the MRGO levees of about 12.5 to 13.0 feet. The SPH wave height was 4.7 feet, with wave run-up of 4.5 feet. These two factors, the storm surge and wave run-up, set the elevation of the levee structure that was required to protect from the SPH at 17.5 feet mean sea level. Even at this elevation some wave overtopping was expected, however the COE concluded that as a result of this overtopping no material flooding would result. The SPH was updated to a more intense storm by the National Weather Service and by the COE following Hurricane Katrina, indicating that the SPH used in the design of the COE levees was invalid and outdated.

The hurricane flood protection project developed by the COE consists of about 120 miles of levees, floodwalls and floodgates, surrounding the New Orleans area, with about 12 miles of these structures being along the MRGO. Figure 1 shows the levee system designed to protect St. Bernard Parish. The levees along MRGO were to be at a uniform elevation of 17.0 feet. There is a small drainage control levee, referred to as the 40 Arpent levee, inside of the parish that parallels the MRGO levee and has a height of 6 to 8 feet. However this levee was not intended to provide hurricane surge protection. Thus the protection from hurricane flooding for St. Bernard Parish depended solely on the protection provided by the COE levees by the levee along MRGO. However, these levees had many deficiencies, and shortcomings that were noted by the COE. First, the flood protection system authorized by Congress was never completed due to budget restrictions. In May of 2005, it was estimated that the project would be completed in 2015. This is about 35 years later than originally planned. The pre-Katrina levee elevations were not a uniform 17.0 feet, but were as low as 12 to 13 feet in a few places and were less than 16 feet in elevation for about one half the length of the levee along the MRGO. Thus the levees would be significantly overtopped and breached by the surge and waves resulting from the Standard Project Hurricane. However, no analysis of the breaching of the levees under these circumstances was conducted and so the COE did not determine the susceptibility of their levees to breaching. Furthermore, no evaluation was conducted to determine the increased flooding that would result from levee breaching and the subsequent increase in the flood threat to public safety.

3

        In fact, the levees along MRGO were severely eroded and damaged during Hurricane
Katrina, as indicated in Figure 2. The levee crest elevation was reduced to less than 12 feet for
most of the southern half of the levee, with some sections being reduced to less than 9 feet. This
failure of the levees allowed floodwaters to enter St. Bernard Parish that were well in excess of the
amount indicated by the COE in their design analysis.  In particular, the levees failures caused the
elevation of the floodwater at the Murphy Oil Refinery site to be much higher than it would have
been if the levees had performed as designed, as will be shown in a later section.

4

## 3. METEOROLOGICAL CHARACTERISTICS OF HURRICANE KATRINA

Katrina was a powerful hurricane that caused widespread damage and loss of life. It was the costliest and one of the five deadliest hurricanes to ever strike the United States. In this section the storm history of the storm and meteorological characteristics are reviewed.

### 3.1. STORM HISTORY

The "best track" of the path of the center of Katrina is displayed in Figure 3. Katrina is estimated to have reached hurricane status near 2100 UTC 25 August, less than two hours before its center made landfall on the southeastern coast of Florida. The center of Tropical Storm Katrina then emerged into the southeastern Gulf of Mexico at approximately 0500 UTC on 26 August just north of Cape Sable. Once back over water, Katrina quickly regained hurricane status at 0600 UTC with maximum sustained winds of 65 knots. Katrina embarked upon two periods of rapid intensification (defined as a 30 kt or greater intensity increase in a 24-h period) between 26 and 28 August. An eye became clearly evident in infrared satellite imagery early on 27 August, and Katrina became a Category 3 hurricane with 100 kt winds at 1200 UTC that morning about 365 n mi southeast of the mouth of the Mississippi River. Accompanying the intensification and the subsequent deterioration of the inner eyewall was a significant expansion of the wind field on 27 August. Katrina nearly doubled in size on 27 August, and by the end of that day tropical storm-force winds extended up to about 140 n mi from the center. Katrina strengthened from a low-end Category 3 hurricane to a Category 5 in less than 12 h, reaching an intensity of 145 kt by 1200 UTC 28 August. Katrina attained its peak intensity of 150 kt at 1800 UTC 28 August about 170 n mi southeast of the mouth of the Mississippi River. The wind field continued to expand on 28 August, and by late that day tropical storm-force winds extended out to about 200 n mi from the center, and hurricane-force winds extended out to about 90 n mi from the center, making Katrina not only extremely intense but also exceptionally large.

Structural changes likely contributed to the rapid weakening that was observed prior to final landfall. Katrina turned northward, toward the northern Gulf coast early on 29 August. The hurricane then made landfall, at the upper end of Category 3 intensity with estimated maximum sustained winds of 110 kt, near Buras, Louisiana at 1110 UTC 29 August. Katrina continued northward and made its final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border, still as a Category 3 hurricane with an estimated intensity of 105 kt. The rapid weakening of Katrina, from its peak intensity of 150 kt to 110 kt during the last 18 h or so leading up to the first Gulf landfall, appears to have been primarily due to internal structural changes, specifically the deterioration of the inner eyewall without the complete formation of a new outer eyewall. However, Katrina remained very large as it weakened, and the extent of tropical storm-force and hurricane-force winds was nearly the same at final landfall on 29 August as it had been late on 28 August. An unpublished study by the National Hurricane Center (NHC) reveals that, during the past 20 years, all 11 hurricanes having a central pressure less than 973 mb 12 h before landfall in the northern Gulf of Mexico weakened during these last 12 h. Katrina weakened rapidly after moving inland over southern and central Mississippi, becoming a Category 1 hurricane by 1800 UTC 29 August.

5

## 3.2. STORM CENTRAL PRESSURE AND WINDS

The wind and pressure histories for Katrina are shown in Figures. 4 and 5, respectively. The peak gusts over the north central Gulf Coast are shown in Figure 6. Katrina continued to strengthen on 26 August. On 28 August, the central pressure of Katrina decreased at a very rapid rate. The central pressure fell 32 mb in 12 h, to 909 mb by 1200 UTC 28 August. The first wind observation to support Category 5 intensity was a peak 700 mb flight-level wind of 153 kt at about 1100 UTC 28 August, which corresponds to about 138 kt at the surface. The strongest flight-level wind measurement in Katrina was 166 kt near 1400 UTC that day, corresponding to about 150 kt at the surface. Dropwindsondes on 28 August provided surface wind estimates, derived from the mean wind over the lowest 150 m of the sounding that were no greater than about 130-135 kt, but a few of these sondes directly measured 140-143 kt winds at 10 m. However, none of these sondes were released precisely from the point where flight-level winds were 166 kt, and it is also not likely that any of these sondes measured the maximum surface wind in the circulation.

The central pressure in Katrina fell to 902 mb near 1800 UTC 28 August. This pressure was (at the time) the fourth lowest on record in the Atlantic basin, behind 888 mb in Gilbert (1988), 892 mb in the Labor Day Hurricane of 1935, and 899 mb in Allen (1980). However, it has since quickly fallen to sixth lowest, following an observation of 897 mb in Hurricane Rita in September 2005 and the new record of 882 mb in Hurricane Wilma in October 2005. Based on the 902 mb pressure, and on the earlier 166 kt flight-level wind, the peak best track intensity of 150 kt is estimated to have occurred at 1800 UTC 28 August.

The structure of Katrina changed dramatically from 28 to 29 August as it approached the northern Gulf coast. The central pressure gradually rose to 920 mb by the time of the initial Louisiana landfall near Buras at about 1110 UTC 29 August. Maximum 700 mb flight-level winds were still 130-135 kt east of the eye around that time and were the basis for the operationally assessed intensity of 120 kt at the Buras landfall and at 1200 UTC. The aircraft data from 29 August indicate that the structural changes in Katrina were associated with its rapid weakening to a high-end Category 3 hurricane just before landfall in Louisiana. The strongest surface (10 m) wind measured by dropwindsonde on the morning of 29 August was 99 kt from two separate sondes. The maximum surface wind estimate from a dropwindsonde, derived from the mean wind over the lowest 150 m of the sounding using an average adjustment derived from profiles in several storms, was 98 kt. However, analysis of several dropwindsonde profiles from 29 August suggests that a slightly different adjustment could have been valid that day. This difference would result in 10 m wind estimates derived from the lowest 150 m of the dropwindsonde profiles being 3-5 kt stronger, or up to about 103 kt. The maximum surface wind measured by the SFMR on 29 August was 96 kt just after 1200 UTC. The best track intensity of Katrina at 1200 UTC 29 August, shortly after the initial Louisiana landfall when the central pressure was 923 mb, has been adjusted downward in post-storm analysis to 110 kt from the operationally assessed value of 120 kt. The Buras, LA landfall intensity about one hour earlier has also been estimated at 110 kt, when the central pressure was only slightly lower at 920 mb. This estimate is still about 10% greater than the maximum surface winds from the dropwindsondes and SFMR, accounting for the possibility that these instruments did not sample the maximum wind. It is worth noting that Katrina was likely at Category 4 strength with maximum sustained winds of about 115 kt near 0900 UTC 29 August, a couple of hours before the center made landfall near Buras, LA. Due to the large (~25-

6

30 n mi) radius of maximum winds, it is possible that sustained winds of Category 4 strength briefly impacted the extreme southeastern tip of Louisiana in advance of landfall of the center.

The estimated Buras landfall intensity of 110 kt, just beneath the threshold of Category 4, is quite low relative to many other hurricanes with a comparable minimum central pressure. In fact, the central pressure of 920 mb is now the lowest on record in the Atlantic basin for an intensity of 110 kt, surpassing Hurricane Floyd (1999) that at one point had a central pressure of 930 mb with an intensity of 110 kt. The 920 mb pressure is also the third lowest at U. S. landfall on record, behind only Hurricane Camille in 1969 (909 mb) and the 1935 Labor Day hurricane that struck the Florida Keys (892 mb). The relatively weak winds in Katrina for such a low pressure are the result of the broadening pressure field on 29 August that spread the pressure gradient over a much larger than average distance from the center, as confirmed by both surface and aircraft observations. The generally weakening convection likely also reduced momentum mixing down to the surface, contributing to surface winds being less than what the usual 90% adjustment from flight level winds would dictate. Katrina exemplifies that there is not simply a direct one-to-one relationship between the central pressure and the maximum sustained winds in a hurricane.

The central pressure in Katrina continued to gradually rise during the next few hours leading up to its final landfall near the Louisiana/Mississippi border at 1445 UTC, when the pressure had reached 928 mb. The eastern eyewall of the hurricane remained too distant from the NWS Slidell WSR-88D radar during this period for the radar to provide near-surface wind estimates where the strongest winds were occurring. However, all available data from aircraft indicate that Katrina's winds weakened only slightly between the first and last Gulf coast landfalls. Just prior to final landfall, surface (10 m) winds measured by dropwindsonde were as strong as 99 kt, adjustment to the surface of the mean wind speed in the lowest 150 m of dropwindsonde profiles yielded surface winds of 90-95 kt, and SFMR winds were as strong as 91 kt. Making a similar assumption, as for the Buras landfall intensity, that the available data did not sample the maximum wind in the circulation, Katrina is estimated to have made final landfall at an intensity of 105 kt, 5 kt less than what was assessed operationally.

The strongest sustained wind measured from a fixed location at the surface on the morning of 29 August was 76 kt at 0820 UTC by the C-MAN station at Grand Isle, LA. This station's anemometer, at 16 m elevation, failed at about 0900 UTC, about two hours before closest approach of the eye. The Southwest Pass, LA C-MAN station (30 m elevation) measured a sustained wind of 71 kt at 0420 UTC, before the station failed at about 0500 UTC due to storm surge, about four hours prior to closest approach of the eye. The strongest reported wind gust, although unofficial, was 117 kt in Poplarville, MS at the Pearl River County Emergency Operations Center (EOC). A gust to 108 kt was reported in Pascagoula, MS at the Jackson County EOC. The strongest gust from an official reporting station was 99 kt at the Grand Isle C-MAN station at 0838 UTC 29 August, about 2.5 hours prior to the Buras, LA landfall.

While the intensity of Katrina was Category 3 as the center of the eye made its closest approach (about 20 n mi) to the east of downtown New Orleans, the strongest winds corresponding to that intensity were likely present only over water to the east of the eye. The sustained winds over all of metropolitan New Orleans and Lake Pontchartrain likely remained weaker than Category 3 strength. The strongest sustained wind in New Orleans is subject to speculation since observations are sparse, due in part to the power failures that disabled ASOS stations in the area before peak wind conditions occurred. However, the NASA Michoud

7

Assembly Facility in eastern New Orleans measured a 1-minute sustained wind of 84 kt (at an elevation of about 12 m) near 1100 UTC 29 August. Also, a few instrumented towers placed in various locations in the metropolitan area by the Florida Coastal Monitoring Program (FCMP) and by Texas Tech University measured sustained winds in the range of 61-68 kt. The Mid-Lake Pontchartrain NWS site (16 m elevation), located along the Lake Pontchartrain Causeway about 8 n mi north of the south shore of the lake, also measured a one-minute sustained wind of 68 kt. Even though these various sites likely did not experience the maximum wind in the area, the Mid-Lake Pontchartrain site had open marine exposure, unlike most locations in the city of New Orleans. It appears likely that most of the city experienced sustained surface winds of Category 1 or Category 2 strength.

The pattern of hurricane wind speeds, as presented in the IPET report, over Southeastern Louisiana derived from a COE Advanced Circulation (ADCIRC) computer model are shown in Figures 7 through 12. The computer model shows winds directed toward the MRGO levees were consistently from the east, as was assumed in the SPH analysis.

8

# 4. HYDROLOGIC CHARACTERISTICS OF HURRICANE KATRINA

The characteristics of Hurricane Katrina that affected the flooding of the Murphy Oil Refinery site were the storm surge and waves. Factual information concerning storm surge and wave action produced by Hurricane Katrina is presented in this section.

## 4.1. STORM SURGE

A precise measurement of the storm surge produced by Katrina along the northern Gulf coast is complicated by many factors, including the widespread failures of tide gauges. Additionally, in many locations, most of the buildings along the coast were completely destroyed, leaving few structures within which to identify still-water marks. An unofficial storm tide (actual level of sea water) observation of 28 feet at the Hancock, Mississippi Emergency Operations Center suggests that the storm surge produced by Katrina was as high as about 27 feet at that location. The surge appears to have penetrated at least six miles inland in many portions of coastal Mississippi and up to 12 miles inland along bays and rivers. The surge crossed Interstate 10 in many locations. Katrina produced a lesser but still very significant storm surge along the eastern Gulf coast of Mississippi and along the coast of Alabama. Observations suggest the storm surge was about 10 feet as far east as Mobile, Alabama where Katrina caused flooding several miles inland from the Gulf coast along Mobile Bay.

Although the storm surge was higher to the east of the path of the eye of Katrina, a very significant storm surge also occurred west of the path of the eye, but the height of the surge is uncertain, in part because tide gauge observations along the southeastern coast of Louisiana were very limited and incomplete. As the level of Lake Pontchartrain rose, several feet of water were pushed into communities along its northeastern shore from Slidell to Mandeville, Louisiana. Several of the levees and floodwalls were overtopped and/or breached at different times on the day of landfall. The surge overtopped large sections of the levees during the morning of 29 August east of New Orleans, in Orleans Parish and St. Bernard Parish, and it also pushed water up the Intracoastal Waterway and into the Industrial Canal.

The storm surge produced by Katrina, even though it had weakened from Category 5 intensity the previous day to Category 3 at landfall in Louisiana, can be generally explained by the huge size of the storm. Katrina had on 29 August a large (about 25-30 n mi) radius of maximum winds and a very wide swath of hurricane force winds that extended at least 75 n mi to the east from the center. Even though Hurricane Camille (1969) was more intense than Katrina at landfall while following a similar track, Camille was far more compact and produced comparably high storm surge values along a much narrower swath. Also, Katrina had already generated large northward-propagating swells, leading to substantial wave setup along the northern Gulf coast, when it was at Category 4 and 5 strength during the 24 hours or so before landfall. In fact, buoy 42040, operated by the National Data Buoy Center (NDBC) and located about 64 n mi south of Dauphin Island, Alabama, reported a significant wave height (defined as the average of the one-third highest waves) of 30 feet as early as 0000 UTC 29 August. This buoy later measured a peak significant wave height of 55 feet at 1100 UTC that matches the largest significant wave height ever measured by a NDBC buoy. Overall, Katrina's very high water levels are attributable to a

9

large Category 3 hurricane's storm surge being enhanced by waves generated not long before by a Category 5 strength storm.

Precipitation amounts during the landfall along the northern Gulf coast were greatest along and just west of the track of the center. A large swath of 8-10 inches of rain fell across southeastern Louisiana and southwestern Mississippi, with a small area of 10-12 inches over eastern Louisiana, including 11.63 inches reported at the Slidell, LA NWS office. Katrina produced rainfall amounts of 4-8 inches well inland over Mississippi.

The maximum storm surge elevation for the north central Gulf Coast as hindcast by the ADCIRC model is shown in Figure 13. Figure 14 shows the same data for metropolitan New Orleans. Also, the previous Figures 7 through 12 show the pattern of the storm surge produced by Katrina as it made landfall. The observed high water marks, the computed high water marks and the design high water marks for the areas outside of the St. Bernard levees are shown in Figure 15. The observed high water marks for areas inside of the St. Bernard levees are shown in Figure 16. The data shows that Katrina produced storm surge having a height of from 16 and to over 18 feet along the MRGO levees. The SPH design storm surge elevation along MRGO was 12.7 feet. The rise of the water level within the Lower Ninth Ward and Chalmette is shown in Figure 17. The water level at Chalmette apparently rose very rapidly from less than 2 foot elevation at 0830 to about 8 feet less than 1 hour later.

## 4.2. STORM WAVES

The storm waves produced by Hurricane Katrina were hindcast by the COE, since no coastline measurements are available. The COE used the WAM and STWAVE models to compute the significant wave height and period for the study area. The results of the hindcasts are shown in Figures 17, 18, and 19. Wave heights along the MRGO levees reached a computed maximum height of about 5.2 feet with a period of 16.3 seconds. The design wave height was 7.0 feet with a wave period of 6.4 seconds. While the Katrina wave height was smaller than the design wave height, the wave period was much greater. This longer wave period contributed to a greater amount of wave overtopping than was estimated for the design conditions.

10

## 5. ANALYSIS OF HYDROLOGIC EFFECTS OF HURRICANE KATRINA

The results of my study indicate that the flooding of the Murphy Oil refinery was a direct result of the fact that the COE levees along MRGO were extensively breached during Hurricane Katrina. This breaching allowed much more water to enter St. Bernard Parish than if the levees had held. Hurricane Katrina storm water and waves would have, to some degree, overtopped the levee system protecting St. Bernard Parish without any breaching. However, the magnitude, as will be shown, would have produced no flooding the Murphy Oil Refinery site. Instead the flood water would have been confined to the marsh area between the 40 Arpent levee and the COE levee, and would not have flooded the Murphy Oil Refinery. However, breaching of the levees allowed a vastly greater amount of water to enter St. Bernard Parish. This increased amount of water was enough to overtop the 40 Arpent levee and flood the Murphy Refinery site. If the COE levees had held, the Murphy Oil Refinery site would not have been flooded by surge. The magnitude of the flooding that occurred at the Murphy Oil Refinery during hurricane Katrina was the direct result of the failures of the COE levees along MRGO.

### 5.1. LEVEE OVERTOPPING

The amount of floodwater passing over and through the MRGO levees was calculated using the same methodology employed by the U. S. Army Corps of Engineers in conducting their own assessment of the flooding impacts of the levee failures presented in the IPET report. A set of formulas were developed for this assessment based upon combining the effects of still water and waves on the overtopping volume. The formulas are as follows;

$$q = 0 \qquad \text{for } (h_s - h_c) < -1.76$$

$$q = 1.42 (h_s - h_c) + 2.5 \qquad \text{for } -1.76 < (h_s - h_c) < 0.0$$

$$q = 2.8 (h_s - h_c)^{1.5} + 2.5 \qquad \text{for } (h_s - h_c) > 0.0$$

where q is the overtopping discharge of water in $ft^3/s/ft$, $h_s$ is the surge elevation and $h_c$ is the crest elevation of the levee.

The COE presented in the IPET report an analysis of the amount of water that overtopped the MRGO levees. Pre-Katrina and post-Katrina levee elevations were used in the analysis. The amount of overtopping was estimated to be in the range of 13.7 to 15.0 billion cubic feet of water. These are respectively 314,000 to 344,000 acre-feet of water. This mount of water when confined to the marsh area between the 40 Arpent canal and the MRGO levees, and south of Paris Road, an area of about 24,000 acres, would flood the area to an average elevation of about 13 feet. This is well above the height of the 40 Arpent levee, hence his levee was also overtopped. Once the flood waters overtopping the MRGO levee spread over the area inside of the 40 Arpent levee, creating a total area of flooding of about 74 square miles (47,000 acres), the average amount of flooding became about 7 feet above ground. The actual observed elevation of the water inside the 40 Arpent levee was about 9 to 10 feet, or about 7 to 8 feet above ground.

12

# 6. CONCLUSIONS

Based upon a careful review of existing technical data, reported field observations, the application of standard hydrologic analytical methods, and my personal experience analyzing coastal hydrologic and flooding processes for over 30 years, it is my opinion that:

1)  Southeastern Louisiana has been and is subject to hurricanes of various intensities.

2)  The COE was authorized by congress to provide flood protection for this threatened area for the most severe meteorological conditions that were considered characteristic of the area. The protection from hurricane flooding depended solely on the COE levees.

3) The COE designed and built levees which protected St. Bernard Parish contained many errors, deficiencies, and shortcomings including;

a. The flood protection system authorized by Congress was never completed,

b. The built levees were substantially below project grade at the time of Katrina and had many know deficiencies,

c. Breaching of the levees was an acknowledged possibility and yet the COE failed to determine the susceptibility of their levees designs to breaching,

d) No evaluation was conducted to determine the impact of levee breaching on increased flooding and the threat to public safety.

4)  Hurricane Katrina overtopped and breached the COE levee system protecting St. Bernard Parish causing extensive flooding of the parish.

5) The magnitude of the flooding that occurred at the Murphy Oil Refinery during hurricane Katrina was the direct result of the breaching of the levees along MRGO.

6) I reserve the right to modify my conclusions in the case that new or additional information becomes available in the future.

11

## 5.2. FLOODING AT THE MURPHY REFINERY SITE

The amount of flooding that would have occurred at the Murphy Oil refinery had the MRGO levees been built to their authorized or "design" elevations, and not been breached, is computed in this section of the report. This is contrast to the actual amount of flooding that occurred because the levees failed. This issue is critical to evaluating the effect of the breaching itself had on the amount of flooding at the Murphy Oil Refinery site. The design elevations for the levees along MRGO were 17.0 ft. This was several feet above the actual pre-Katrina elevations.

Storm surge data contained in the IPET report was used to calculate the volume of water that would have overtopped the MRGO levees if they had maintained at an elevation of 17.0 ft throughout the storm. These data were used with the COE formula to calculate the total volume of overtopping that would have occurred along the MRGO levee. Two values of storm surge were addressed in the analysis. An roughly 18 foot case used by the COE in their analysis and a second case with the storm surge 2 feet higher. This second case is a conservative estimate of the maximum amount of overtopping that would have occurred. Table 3 gives an example of the type of calculation that was performed. The Table gives the amount of overtopping for hour 0715 for the entire length of the MRGO levee. The Table gives the calculation for several stations along the levee. The table shows the station number, the surge elevation, the height of overtopping, the discharge per foot, and the total discharge for 1 hour. When the surge elevation along the levee was lower for other time periods less overtopping would be produced. As shown in the Table, the total volume of water that would have overtopped the MRGO levees was 1,235 million cubic feet or 28,290 acre-feet for the 0715 condition. Including all of the overtopping during the storm, the total volume of overtopping water for the 18 foot surge was 33,180 acre-feet. For the case of the 20 foot surge, the total volume of overtopping was 125,000 acre-feet.

The marsh area between the 40 Arpent levee, the MRGO levee and south of Paris road has an area of about 37.8 sq miles or about 24,200 acres. Therefore the depth of flooding that would have occurred in this area for the 18 foot surge would have been about 1.4 feet and for the higher surge, about 5.2 feet. These values are both well below the height of the 40 Arpent levee and indicates no surge flooding would have occurred in the area inside of the 40 Arpent levee for the levees at the design grade. Thus the area surrounding the Murphy Oil Refinery would not have been flooded if the levees along MRGO had been built to the authorized design elevations and not been breached.

The Murphy Refinery site was also subject to storm waves. During the period of peak storm surge the wind direction at the site was from the west. The wind speed is estimated to be about 55 mph during this time. For a water depth of 10 feet, the forecast average wave height would have been about 2 feet. The significant wave height would have been as high as 3.5 feet. These storm waves were able to affect the refinery because of the storm surge that flooded the site.

13

# 7. REFERENCES

## LEGAL DOCUMENTS

Class Action Administrative Master Complaint, Turner v. Murphy Oil USA, Inc, Docket No. 05-4206, Filed November 28, 2005.

## TECHNICAL REPORTS AND DATA

Knabb, R., J. Rhome and D. Brown, Tropical Cyclone Report – Hurricane Katrina 23-30 Au8gust 2005, National Hurricane Center, 20 December 2005.

Seed, R, et al, Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005, Report No. UCB/CITRIS-05/01, November 17, 2005.

Seed, R, et al, Investigation of the Performance of the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2005, Report No. UCB/CCRM-06/01, May 22, 2006.

Powell, Nancy, Impact of Hurricane Katrina, Hurricane Workshop, ERDC, Vickburg, Mississippi, December 20, 2005.

U. S. Army Corps of Engineers, New Orleans District, Lake Pontchartrain, Louisiana and Vicinity, Design Memorandum No. 1, hydrology and Hydraulic Analysis, Part I – Chalmette, August 1966.

U. S. Army Corps of Engineers, New Orleans District, Lake Pontchartrain, LA. and Vicinity Hurricane Protection Project, March 1, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southwest Louisiana, Hurricane Protection System, Report 2 of a Series, 10 March 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southwest Louisiana, Hurricane Protection System, 1 June 2006.

U. S. Army Corps of Engineers, 2006 Louisiana Coastal Protection and Restoration, Report to United States Congress, July 2006.

Coastal Engineering Research Center, Shore Protection Manual, Volume I, Department of the Army, 1984.

## MAPS

United States Geological Survey, Chalmette Quadrangle, 1998.

United States Geological Survey, Martello Castle Quadrangle, 1979.

14

United States Geological Survey, New Orleans East Quadrangle, 1998.

United States Geological Survey, Black Bay 30 x 60 Minute Quadrangle, 1983.

United States Geological Survey, New Orleans 30 x 60 Minute Quadrangle, 1983

15

# 8. APPENDIX

## ATTACHMENT A - List of recent publications.

Suhayda, J. N. Barrier shoreline feasibility study, Phase 1, Steps A-K and Final Report, Louisiana Department of Natural Resources, March, 1999.

Suhayda, J. N., M. Alawady, and V. Aravamuthan.  Hydrologic modeling of the Barataria-Terrebonne estuary, Barataria-Terrebonne National Estuaries Program, July, 2000.

Suhayda, J. N. and C. Willson.  Climatological and hydrologic conditions and trends in the upper Pontchartrain basin, Lake Pontchartrain Basin Foundation, August , 2000.

Suhayda, J. N., et al, Wetland Nourishment Module, Louisiana Coastal Area Study, Department of Natural Resources, State of Louisiana, August, 2003.

Suhayda, J. N., et al, Predicting Land Building in the Mississippi Delta, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 30, 2004.

## ATTACHMENT B - Prior testimony in last 5 years.

I was an expert witness for Castex Energy in the case of Terrebonne Parish School Board vs Castex Energy, in the 32nd JDC Docket No. 126752.  I testified at trial on June 18, 2001.

I was an expert witness at trial for the defendant in the case of Allen R. Jaeger vs Certain Underwriters at Lloyd's, London, in the 24nd JDC Docket No. 538-551. I testified on October 31, 2001.

16

## 9. TABLES

Table 1. Best track for Hurricane Katrina, 23-30 August 2005.

| Date/Time (UTC) | Latitude (°N) | Longitude (°W) | Pressure (mb) | Wind Speed (kt) | Stage |
|---|---|---|---|---|---|
| 23 / 1800 | 23.1 | 75.1 | 1008 | 30 | tropical depression |
| 24 / 0000 | 23.4 | 75.7 | 1007 | 30 | " |
| 24 / 0600 | 23.8 | 76.2 | 1007 | 30 | " |
| 24 / 1200 | 24.5 | 76.5 | 1006 | 35 | tropical storm |
| 24 / 1800 | 25.4 | 76.9 | 1003 | 40 | " |
| 25 / 0000 | 26.0 | 77.7 | 1000 | 45 | " |
| 25 / 0600 | 26.1 | 78.4 | 997 | 50 | " |
| 25 / 1200 | 26.2 | 79.0 | 994 | 55 | " |
| 25 / 1800 | 26.2 | 79.6 | 988 | 60 | " |
| 26 / 0000 | 25.9 | 80.3 | 983 | 70 | hurricane |
| 26 / 0600 | 25.4 | 81.3 | 987 | 65 | " |
| 26 / 1200 | 25.1 | 82.0 | 979 | 75 | " |
| 26 / 1800 | 24.9 | 82.6 | 968 | 85 | " |
| 27 / 0000 | 24.6 | 83.3 | 959 | 90 | " |
| 27 / 0600 | 24.4 | 84.0 | 950 | 95 | " |
| 27 / 1200 | 24.4 | 84.7 | 942 | 100 | " |
| 27 / 1800 | 24.5 | 85.3 | 948 | 100 | " |
| 28 / 0000 | 24.8 | 85.9 | 941 | 100 | " |
| 28 / 0600 | 25.2 | 86.7 | 930 | 125 | " |
| 28 / 1200 | 25.7 | 87.7 | 909 | 145 | " |
| 28 / 1800 | 26.3 | 88.6 | 902 | 150 | " |
| 29 / 0000 | 27.2 | 89.2 | 905 | 140 | " |
| 29 / 0600 | 28.2 | 89.6 | 913 | 125 | " |
| 29 / 1200 | 29.5 | 89.6 | 923 | 110 | " |
| 29 / 1800 | 31.1 | 89.6 | 948 | 80 | " |
| 30 / 0000 | 32.6 | 89.1 | 961 | 50 | tropical storm |
| 30 / 0600 | 34.1 | 88.6 | 978 | 40 | " |
| 30 / 1200 | 35.6 | 88.0 | 985 | 30 | tropical depression |
| 30 / 1800 | 37.0 | 87.0 | 990 | 30 | " |
| 31 / 0000 | 38.6 | 85.3 | 994 | 30 | extratropical |
| 31 / 0600 | 40.1 | 82.9 | 996 | 25 | " |
| 31 / 1200 | | | | | merged with front |
| 28 / 1800 | 26.3 | 88.6 | 902 | 150 | Maximum wind and minimum pressure |
| 25 / 2230 | 26.0 | 86.1 | 984 | 70 | FL landfall at Broward/Miami-Dade County line |
| 29 / 1110 | 29.3 | 89.6 | 920 | 110 | Landfall near Buras, LA |
| 29 / 1445 | 30.2 | 89.6 | 928 | 105 | Landfall near LA/MS border |

17

Table 1. Best track for Hurricane Katrina, 23-30 August 2005.

| Date/Time (UTC) | Latitude (°N) | Longitude (°W) | Pressure (mb) | Wind Speed (kt) | Stage |
|---|---|---|---|---|---|
| 23 / 1800 | 23.1 | 75.1 | 1008 | 30 | Tropical depression |
| 24 / 0000 | 23.4 | 75.7 | 1007 | 30 | " |
| 24 / 0600 | 23.8 | 76.2 | 1007 | 30 | " |
| 24 / 1200 | 24.5 | 76.5 | 1006 | 35 | tropical storm |
| 24 / 1800 | 25.4 | 76.9 | 1003 | 40 | " |
| 25 / 0000 | 26.0 | 77.7 | 1000 | 45 | " |
| 25 / 0600 | 26.1 | 78.4 | 997 | 50 | " |
| 25 / 1200 | 26.2 | 79.0 | 994 | 55 | " |
| 25 / 1800 | 26.2 | 79.6 | 988 | 60 | " |
| 26 / 0000 | 25.9 | 80.3 | 983 | 70 | Hurricane |
| 26 / 0600 | 25.4 | 81.3 | 987 | 65 | " |
| 26 / 1200 | 25.1 | 82.0 | 979 | 75 | " |
| 26 / 1800 | 24.9 | 82.6 | 968 | 85 | " |
| 27 / 0000 | 24.6 | 83.3 | 959 | 90 | " |
| 27 / 0600 | 24.4 | 84.0 | 950 | 95 | " |
| 27 / 1200 | 24.4 | 84.7 | 942 | 100 | " |
| 27 / 1800 | 24.5 | 85.3 | 948 | 100 | " |
| 28 / 0000 | 24.8 | 85.9 | 941 | 100 | " |
| 28 / 0600 | 25.2 | 86.7 | 930 | 125 | " |
| 28 / 1200 | 25.7 | 87.7 | 909 | 145 | " |
| 28 / 1800 | 26.3 | 88.6 | 902 | 150 | " |
| 29 / 0000 | 27.2 | 89.2 | 905 | 140 | " |
| 29 / 0600 | 28.2 | 89.6 | 913 | 125 | " |
| 29 / 1200 | 29.5 | 89.6 | 923 | 110 | " |
| 29 / 1800 | 31.1 | 89.6 | 948 | 80 | " |
| 30 / 0000 | 32.6 | 89.1 | 961 | 50 | tropical storm |
| 30 / 0600 | 34.1 | 88.6 | 978 | 40 | " |
| 30 / 1200 | 35.6 | 88.0 | 985 | 30 | tropical depression |
| 30 / 1800 | 37.0 | 87.0 | 990 | 30 | " |
| 31 / 0000 | 38.6 | 85.3 | 994 | 30 | Extratropical |
| 31 / 0600 | 40.1 | 82.9 | 996 | 25 | " |
| 31 / 1200 | | | | | merged with front |
| 28 / 1800 | 26.3 | 88.6 | 902 | 150 | Maximum wind and minimum pressure |
| 25 / 2230 | 26.0 | 86.1 | 984 | 70 | FL landfall at Broward/Miami-Dade County line |
| 29 / 1110 | 29.3 | 89.6 | 920 | 110 | Landfall near Buras, LA |
| 29 / 1445 | 30.2 | 89.6 | 928 | 105 | Landfall near LA/MS border |

18

Table 2. Surge elevations and overtopping calculations along the MRGO levees for 0715 on August 29.

| Station Number (ft) | Surge (ft) | $h_{ot}$ (ft) | q ($ft^3$/ft/s) | 1 Hour Volume (million $ft^3$) |
|---|---|---|---|---|
| 0 | 17.2 | .2 | 2.75 | 24.7 |
| 5 | 17.7 | .7 | 4.14 | 74.5 |
| 10 | 17.7 | .7 | 4.14 | 74.5 |
| 15 | 17.7 | .7 | 4.14 | 74.5 |
| 20 | 17.8 | .8 | 4.50 | 81.0 |
| 25 | 17.9 | .9 | 4.89 | 88.0 |
| 30 | 18.1 | 1.1 | 5.73 | 103.0 |
| 35 | 18.2 | 1.2 | 6.18 | 112.0 |
| 40 | 18.2 | 1.2 | 6.18 | 112.0 |
| 45 | 18.2 | 1.2 | 6.18 | 112.0 |
| 50 | 18.2 | 1.2 | 6.18 | 112.0 |
| 55 | 18.2 | 1.2 | 6.18 | 112.0 |
| 60 | 18.7 | 1.7 | 8.71 | 125.4 |
| 63 | 18.0 | 1.0 | 5.30 | 28.6 |

Total Volume =  1,235 million $ft^3$
28,290 acre-ft

19

## 10. FIGURES

20

Figure 1. Lake Pontchartrain and Vicinity hurricane protection project map indicating a design elevation of 17.0 feet.

CHALMETTE.GIF (GIF Image, 686x390 pixels)

http://www.mvn.usace.army.mil/pao/response/MAPS/CHALMETTE.GIF

8/11/2006 9:18 PM



updated July 2003

1 of 1

21

Figure 2. Map of the damage to the authorized hurricane protection levee along MRGO, indicating areas of breaching.



22

**Figure 3. Best track position of Hurricane Katrina.**



Figure 1.    Best track positions for Hurricane Katrina, 23-30 August 2005.

35

23

Figure 4. Wind observations for Hurricane Katrina.