

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

C

Briefs and Other Related Documents
Bank of Louisiana v. D & A Funding Corp.E.D.La.,1997.Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
BANK OF LOUISIANA
v.
D & A FUNDING CORPORATION
and Bank of Louisiana
v.
Donald Weiner, et al.
Nos. Civ.A. 97-1315, Civ.A. 97-1988.

Oct. 15, 1997.

DUVAL, J.
*1 Before the Court is D & A Funding Corporation's ("D & A") Motion to Dismiss in C.A. No. 97-1913 and defendants' [FN1] Motion to Dismiss in C.A. No. 97-1988.[FN2] The Court entertained oral argument on both of these motion and has reviewed the extensive pleadings, memoranda and relevant law. As the underlying facts of these two cases are interrelated, they are salient to both motions and the issues presented herein. Thus, the Court will first highlight the factual background of the instant cases. It will then take up the substance of the motion in C.A. No. 97-1315. Finally, the Court will address the merits of the motion filed in C.A. No. 97-1988.

> FN1. The named defendants are Donald Weiner ("Weiner"), Barbara Weiner, Arthur Gins ("Gins"), Edith Gins, D & A Funding Corporation, Kenwin Shops, Inc. ("Kenwin"), Kenneth Sauer ("Sauer") and Christopher S. Rooney ("Rooney"). Barbara Weiner and Edith Gins have been dismissed by plaintiff.

> FN2. The Court has received a copy of a Transfer Order in MDL Docket No. 1193, *In re Bank of Louisiana/Kenwin shops, Inc., Contract Litigation,* which orders the transfer pursuant to 28 U.S.C. § 1407 of *Kenwin Shops, Inc. v. Bank of Louisiana,* S.D. New York, C.A. No. 1:97-907 and *D & A Funding Corp. v. Bank of Louisiana,* S.D. New York, C.A. No. 1:97-3703 for coordinated or consolidated pretrial proceedings with the above captioned actions pending in this district. As that order is not final until the docketing in this Court of that order, the Court will rule on these motions under the original E.D.La. captions.

## I. BACKGROUND

### A. The Charge Account Plan

On September 29, 1995, Bank of Louisiana ("BOL") entered into a "Charge Account Plan/ Merchant-Member Sale/Assignment of Accounts Receivable" contract ("the Charge Account Plan") with a group of merchants including Kenwin Shops, Inc. d/b/a Kenwin Shops, d/b/a/ Dress for Less, d/b/a/ Kenwin Shops/Dress for Less ("Kenwin").[FN3] (C.A. No. 97-1988, Complaint, Exh. 1). Kenwin apparently operates approximately 79 retail stores featuring moderately priced women's and children's apparel in the southeastern part of the United States. [FN4] (C.A. NO. 97-1988 Complaint, ¶ 6). It is alleged that generally the customers of these stores who charge the merchandise purchased are accustomed to making payments on their accounts at the stores, rather than remitting the payment by mail.

> FN3. Also noted as parties to this contract were Kenwin Shops of Georgia, Inc., Kenwin Shops of Martin, Inc. Kenwin Shops of Crockett, Inc. Kenwin Shops of Homer, Inc., Kenwin Shops of Enterprises, Inc., Kenwin Shops of Andalusia, Inc. Kenwin Shops of Live Oaks, Inc., Kenwin Shops of Grenada, Inc., Kenwin Shops of Bennettsville, Inc., Kenwin Shops of Henryetta, Inc. Of the Kenwin entities, only Kenwin Shops, Inc. has been made party to C.A. No. 97-1988.

> FN4. Its stores are in Alabama, Arkansas, Georgia, Louisiana, Mississippi, south Carolina and Texas.

Under the terms of the Charge Account Plan, Kenwin [FN5] sold to BOL all of its past charge account accounts receivable ("Original Purchased Accounts") and its future accounts receivable ("New Purchased

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

Accounts") which are called collectively "Purchased Accounts" in the contract. Thus, BOL basically bought and agreed to run Kenwin's credit department.

> FN5. Apparently, Kenwin was in bankruptcy at the time this contract was consummated.

In exchange for the purchase price of the accounts, BOL was to receive the payments made by the individual customers to Kenwin as well as payments made by mail. A 19.8% per annum service charge paid by Kenwin customers would go to BOL. Kenwin benefitted in that it would receive immediately (1) the purchase price of the Original Purchased Accounts less an amount to go into a "reserve account" and (2) 96% of the purchase price of all "new" charged merchandise which was to be placed in an "operating account."

In this same Charge Account Plan, BOL agreed to process and approve or decline all new accounts. (C.A.97-1988, Complaint, Exh. 1, ¶ H(a). BOL also had, *inter alia,* some of the following duties for all purchased accounts:
(1) handle customer service complaints and relations;
(2) handle collections in an efficient and businesslike manner;
(3) provide necessary account information to Kenwin;
(4) arrange to separately identify Kenwin accounts on BOL records in order to assure precise scheduling of collection work and application of payments;
*2 (5) handle billing; and
(6) at the time of each purchase, pay to Kenwin by crediting its bank account the "net amount" of such purchase (that is the 96% discussed above).

(C.A. No. 97-1988, Complaint, Exh. 1, ¶ H(BOL)(b)- (q)).

With respect to the "operating account" Kenwin apparently had the right to withdraw finds at any time "from time to time." (C.A. No. 97-1988, Complaint, Exh. 1, ¶ H("UNDERSIGNED") (h)). To facilitate that arrangement, a Wire Transfer Agreement authorized BOL to wire the proceeds directly to Kenwin's account at the Sterling National Bank & Trust Company of New York ("Sterling"). (C.A. No. 97-1988, Complaint, Exh. 2).

A "preserve account" was set up so that any of the accounts that became delinquent (accounts 6 months past due, in bankruptcy or deceased) would be "charged back" against that reserve account. BOL also reserved the right to access the operating account when the reserve allocation was inadequate. (C.A. No. 97-1988, Complaint, Exh. 1, ¶ E). The contract contains a formula for the establishment of the reserve account and its maintenance. In relevant part that paragraph states:

In order to accommodate charge backs, a reserve shall be established, which reserve will equal the dollar amount of the Purchased Accounts which are ninety (90) days and more past due or ten percent (10%) of the outstanding balance of Purchased Accounts, whichever is the greater. The reserve shall be established as set forth in Paragraph A and maintained by deducting 2.0% from the amount of each sale on a Purchased Account and crediting it to the reserve.... In the event the funds in the reserve do not equal the reserve requirements set forth herein, BOL may debit any of the accounts maintained by [[[Kenwin] for such funds as are needed to cause the reserve to be maintained at the required amount, or make demand upon [Kenwin] for payment of sufficient funds to cause the reserve to be equal to the required amount. The debit will be made, either at the scheduled semi-annual adjustment dates in January and July, or, if the funds in the reserve are more than $20,000 below the reserve requirements set forth herein, at any time within the sole discretion of BOL, provided, however, that BOL may debit no more than seventy-five percent (75%) of the total amount of any such accounts maintained by [Kenwin] for such funds at any one adjustment.

(C.A. No. 97-1988, Complaint, Exh. 1, ¶ E).

BOL in November and December of 1995 filed UCC-1 Financing Statements in all states that Kenwin operates in order to perfect its security interest in the credit card accounts. Also, in order to facilitate the credit arrangement, a Verifone electronic system was provided by BOL which aided the parties in maintaining payment records electronically and clearing purchases.

As noted above, under the terms of the Charge Account Plan, BOL made certain "adjustments" to the reserve and operating accounts in order to comply with the terms of the agreement. These transactions began in April of 1996 wherein BOL allegedly reduced Kenwin's reserve account and transferred $208,426 to Kenwin's operating account based on the "overage that existed as of March 29, 1996." (C.A. No. 97-1988, Complaint, ¶ 20). It is alleged that the relationship between BOL and Kenwin and the debits and credits to these various accounts continued

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-04182-SRD-JCW    Document 2189-2    Filed 12/12/06    Page 3 of 13

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)  
(Cite as: Not Reported in F.Supp.)

Page 3

without incident until late summer/early autumn of 1996.

*3 The Charge Account Agreement provides that it is deemed to be a contract made under and "constructed" in accordance with the laws of State of Louisiana. With respect to venue, it provides as follows:

THE PARTIES FURTHER AGREE THAT, SINCE A PART OF THE PERFORMANCE DUE HEREUNDER IS PERFORMABLE AT THE OFFICES OF BOL, THAT VENUE FOR PURPOSES OF BRINGING ANY ACTION HEREUNDER SHALL BE PROPER AT THE ELECTION OF BOL, IN EITHER THE COUNTY OF NEW YORK, NEW YORK CITY, NEW YORK OR THE PARISH OF JEFFERSON, METAIRIE, LOUISIANA; PROVIDED, HOWEVER, THAT IF BOL DOES NOT ELECT TO THE CONTRARY, VENUE SHALL ONLY BE PROPER IN THE COUNTY OF NEW YORK, NEW YORK CITY, NEW YORK; PROVIDED, HOWEVER, THAT UNTIL THE ENTRY OF A FINAL, NON-APPEALABLE ORDER CLOSING THE CHAPTER 11 CASE OF UNDERSIGNED, VENUE SHALL ALSO BE PROPER IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

(C.A. No. 97-1988, Complaint, Exh. 1, ¶ I).

### B. D & A Funding Corporation

Allegedly on July 31, 1996, defendant D & A was incorporated. It is apparently controlled by individual defendants, Donald Weiner and Arthur Gins. Both of these individuals allegedly have come to be part of a Schedule 13D SEC Regulation "control group" which controls 526,956 shares, or 58.08% of the outstanding common stock of Kenwin. *See* C.A. No. 97-1988, Complaint, ¶ 7 & 9.

### C. Stock Purchase

According to Kenwin's own filing with the SEC, which is attached to BOL's Memorandum in Opposition to Motion to Dismiss, Exh. "C" at p. 79 of 160, on August 16, 1996 the following occurred:

Ira Abramson, at the time Chairman, Chief Executive Officer, Vice President and Assistant Secretary of the Company, Robert Schwartz, at the time a director and President of the Company, and Richard Moskowitz, at the time Vice President, Secretary and a director of the Company, and members of their immediate families, entered into an agreement with D & A Funding Corporation ("D & A"), which provided for D & A's purchase from such persons of an aggregate of 83,978 shares of common stock of the Company. The principal owners of D & A are Donald Weiner, Chairman and Chief Executive Officer of the Company and Arthur Gins, a director of the Company. The Purchase price of the shares acquired by D & A was $.50 per share plus successive payments equal to 10% of the per share net income before taxes of the Company, totaling not more than an additional $4.00 per share. D & A received irrevocable proxies to vote an additional 83,978 shares of common stock owned by these persons.

*Id.* Thus, D & A came to control Kenwin.

### D. Management Agreement

On August 15, 1996, a Management Agreement was entered into between D & A and Kenwin.[FN6] Under the terms of the contract, Kenwin is referred to as "Company" and D & A as "Manager." As such, D & A was engaged to manage the "day to day business of the Company." *See* C.A. No. 97-1988, Complaint, Exh. 6, ¶ 1. These duties included the administrative function in connection with the management of the business as the Kenwin Board would request; negotiating and preparing all agreements with respect to lenders, "including, without limitation, any amendments to existing purchase agreements, loan agreements, security documents, leases" to which the Company is a party obligor. *See* C.A. No. 97-1988, Complaint, Exh. 6, 1.1(b). Weiner was noted in the Management Agreement as the "acting chief executive officer of the Company" in same paragraph in which apparently D & A agreed to provide his services to Kenwin. (C.A. No. 97-1988, Complaint, Exh. 6, 1.1(e)).[FN7] For these services, D & A was to be paid an annual fee of $50,000 per annum, plus, for the warehousing services provided, "an amount equal to 2% of the aggregate original cost of goods shipped to the company during the immediately preceding week." (C.A. No. 97-1988, Complaint, Exh. 6, 3.(a)). The contract also provides:

FN6. Ira Abramson signed for Kenwin Shops, Inc. as Chairman of the Board. Donald Weiner signed as President of D & A.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

FN7. The salient paragraph reads:
(e) the provision of the services of Mr. Donald Weiner ("Weiner") as the acting chief executive officer of the Company, to whom all officers and employees of the Company shall report, and such other officers and other staff of suitable skills and experience from among the members of the staff of the Manager as may be necessary in order to properly perform the services referred to herein;

*4 In addition, in consideration for the Manager's providing services to the Company specified in this Agreement, the Company shall issue to the Manager all of the company's authorized but unissued stock and treasury stock currently held in treasury by the Company, aggregating 443,650 shares of the common stock, par value $1.00 per share of the Company at a price of one cent per share all of which shall be fully paid and nonassessable upon such issuance. In the event that the manage (sic) terminates this agreement within one year from the date hereof, all such shares shall be returned to the Company.
(C.A. No. 97-1988, Complaint, Exh. 6, 3.(a)).

With respect to the "Relationship of the Parties", the contract provides that:
... the manager shall have no responsibility hereunder, direct or indirect, with regard to the formulation or implementation of the business plans, policies, management or strategies (financial, tax, legal or otherwise) of the Company. The Company shall set corporate policy independently through its own Board and nothing contained herein shall be construed to relieve the directors or officers of the Company from the performance of their respective duties or to limit the exercise of their powers.

(C.A. No. 97-1988, Complaint, Exh. 6, 4.(a)). In the next paragraph the Manager is to have no liability for errors of judgment or any act of omissions, negligent, tortious or otherwise, unless such act or omission on the part of the Manager constitutes negligence or willful misconduct. (C.A. No. 97-1988, Complaint, Exh. 6, 4.(b)). In subparagraph (d), it provides that:[i]n all activities under this Agreement the Manager shall be an independent contractor. Nothing in this Agreement shall be deemed to make the Manager, or any of its subsidiaries or employees, the agent, employee, joint venturer or partner of the Company or create in the Manager the right or authority to incur any obligation on behalf of the Company or to bind the Company in any way whatsoever except as may be expressly provided in this Agreement.

The effective date of the Agreement provided as follows:[t]his Agreement shall become effective upon the execution of all other agreements (including but not limited to stock purchase agreements, consulting agreements for Ira Abramson and employment agreements for Richard Moskowitz) between D & A Funding Corp. and Kenwin Shops, Inc. and the relevant officers and directors of Kenwin Shops, Inc. which are contemplated to transfer control of Kenwin Shops, Inc. Said other agreement shall be executed within seven (7) days of the date hereof. If said other agreements are not executed within seven (7) days of the date hereof, either party shall have the option to terminate this Agreement. However, the Company may not terminate this Agreement if the stock purchase agreement is not signed by any of the stockholders.

(C.A. No. 97-1988, Complaint, Exh. 6, ¶ 10). This contract is to be interpreted under New York law.

### E. The Consignment Sale Agreement

*5 Also on August 15, 1996, a Consignment Agreement was entered into between Kenwin (as "Buyer") and D & A Funding (as "Seller").[FN8] Under the agreement, Kenwin agreed to "purchase" 75,000 ladies garments. (C.A. No. 97-1988, Complaint, Exh. 7). The price of each garment was to be $12.00 to be resold at $21.99. (C.A. No. 97-1988, Complaint, Exh. 7, ¶ 2). Specifically the contract provides:

FN8. Again, Ira Abramson signed as Chairman of the Board of Kenwin and Donald Weiner signed as President of D & A.

Title to the goods is reserved in Seller as security until sale of the goods by Buyer whereupon title to the proceeds of such sale shall vest in Seller and shall be held in trust for Seller and delivered by Buyer to Seller, subject to the first priority lien, if any, of the Sterling National Bank & Trust Company.
(C.A. No. 97-1988, Complaint, Exh. 7, ¶ 2). Kenwin executed and delivered to D & A UCC-1 financing statements covering the sales of the garments on consignment, and D & A was authorized to file them in each jurisdiction in which Kenwin does business. (C.A. No. 97-1988, Complaint, Exh.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

7, ¶ 6). This agreement to is governed by New York law.

### F. Mr. Gins Goes to New Orleans

On August 21, 1996, it is contended that Arthur Gins, Ira Abramson and Evelyn Cohn met with representatives of BOL at BOL's offices. (C.A. No. 97-1315, Memorandum in Opposition to Motion to Dismiss, Affidavit of G. Harrison Scott). Abramson, at least as of August 15, 1996, was chairman of the board of Kenwin. Gins, allegedly, is a principal of D & A as well as a director as of November 21, 1996, of Kenwin. (C.A. No. 97-1988, Complaint, ¶ 9). According to Scott's affidavit, Abramson announced at that meeting that the management and control of Kenwin "was being taken over by Gins." (C.A. No. 97-1315, Memorandum in Opposition to Motion to Dismiss, Affidavit of G. Harrison Scott, ¶ 4). Ostensibly, the meeting was to discuss BOL's handling of the Kenwin credit card portfolio and to assure the new management that no changes would take place. Scott also maintains that Donald Weiner subsequently confirmed that he was controlling the management of Kenwin. (C.A. No. 97-1315, Memorandum in Opposition to Motion to Dismiss, Affidavit of G. Harrison Scott, ¶ 10).

### G. The Unraveling of the Relationship

BOL contends that with the "takeover" of Kenwin's business by D & A, the relationship between Kenwin and BOL rapidly deteriorated. First a demand letter was sent to BOL on August 26, 1996 from Donald Weiner as Chief Executive Officer of Kenwin Shops, Inc. (C.A. No. 97-1988, Complaint, Exh. 8). In it, Weiner contends that BOL owed Kenwin $239,175.86, which was made up of $132,934.07 (initial write off), $56,295.00 (March 1996 write offs) and $49,946.79 (April 1996 write offs), because the write-offs were allegedly improper. This demand letter was withdrawn on September 11, 1996. (C.A. No. 97-1988, Complaint, Exh. 13).

Around this same time period, changes in leadership were being cemented at Kenwin. In the November 21, 1996 report, two months after the stock sale to D & A, Kenwin announced the resignations of the former board which included Ira Abramson and Robert Schwartz as directors and the election of Donald Weiner, Arthur Gins, Barbara Weiner, Edith Gins, and Richard Moskowitz as directors of Kenwin. At that time, the Kenwin board apparently also elected Donald Weiner, Chairman and Chief Executive Officer, Kenneth Sauer, Treasurer, and Richard Moskowitz, President. The report noted that on December 3, 1996, Richard Moskowitz resigned as president and director, and the Board elected Kenneth Sauer to serve as interim President and director. Also, on November 21, 1997, the Management Agreement was a approved at the Kenwin stockholders' meeting. (BOL's Memorandum in Opposition to Motion to Dismiss, Exh. "C" at p. 84 of 160).

*6 Meanwhile, with respect to the BOL/Kenwin relationship, apparently, because of the provisions with respect to the minimum required balance in the Kenwin reserve account and BOL's contractual permission to debit the Kenwin operating account when a deficit occurred, certain disagreements with respect to the moneys in both accounts sprouted. (C.A. No. 97-1988, Complaint, Exhs. 10, 11, and 12,). BOL made demands with respect to alleged deficiencies. Then on January 12, 1997, Kenwin demanded reinstatement of moneys claiming that it had been double-billed in certain respects.

Another friction point dealt with BOL allegations that Kenwin made a "practice of 'forcing sales' " in September with the practice continuing, even though BOL requested an end to it early on, through December. (*See* C.A. No. 97-1988, Complaint, ¶ 30 and Exh. 15). Apparently, sales were made on delinquent accounts without the bank's approval.

Again, by January 20, 1997, BOL alleges that it learned that no sales were being were being processed or credit applications were being submitted from Kenwin to Bank of Louisiana. (C.A. No. 97-1988, Complaint, Exh. 20). As a result because only payments and refunds were being processed, BOL alleges that Kenwin was overdrawn on its accounts. Consequently, BOL ordered the the withdrawal of the Verifone system. *Id.* BOL then requested that all payments made directly in cash to Kenwin be forwarded to BOL.

The acrimony escalated and confusion multiplied. Suffice it to say that allegations of name-calling, threatening criminal prosecution, tortious interference with business relationships and the like started to mount. Kenwin maintains that it was not being supplied with the proper back-up paperwork for the charge backs. As a result, by January 30, 1997, Kenwin hired counsel and demanded materials in order for its own "forensic accountants" to review all of the records. (*See* C.A. No. 97-1988, Complaint,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)  
**(Cite as: Not Reported in F.Supp.)**

Page 6

Exh. 22).

By February, litigation became the order of the day. At 3:37 p.m. CST on February 10, 1997, BOL filed the first suit by fax [FN9] in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, C.A. No. 505-020 with respect to the Charge Account Agreement. At 4:22 p.m. CST on February 10, 1997, Kenwin Shops, Inc. filed its suit in the United States District Court for the Southern District of New York, C.A. No. 97 CIV. 0907. In this suit, Kenwin claimed breach of contract, conversion, defamation of trade, and tort.

> FN9. Defendants contend that this facsimile filing did not have force and effect and that the appropriate filing date for this suit is February 11, 1997. However, this position is without merit.
> Under La.Rev.Stat. 13:850(a), any paper may be filed by facsimile transmission, and the filing shall be deemed complete at the time that the facsimile transmission is received, and a receipt of transmission has been transmitted to the sender by the clerk of court. The facsimile when filed has the same force and effect as the original. Under subsection (b), within five days, the party filing the document must forward (1) the original signed document, (2) the applicable filing fee, if any, and (3) a transmission fee of five dollars.
> Plaintiff BOL has submitted Xeroxed copies of documents which indicate to the Court that it has complied with these provisions. Thus, it would appear that the first filed suit was indeed that one filed in Jefferson Parish on February 10, 1997 at 3:37 a.m. EST. The New York counterpart was filed on the afternoon of February 10, 1997 at 4:22 p.m. EST.

### H. The "Sequestered Funds"

On March 30, 1997, in an SEC report, Kenwin stated: On February 10, 1997, the Company brought action against the Bank of Louisiana seeking damages in the amount of $750,000 for breach of contract and defamation of trade name. The Bank of Louisiana is countersuing claiming damages in an unspecified amount for the company's alleged breaches of the agreement. Due to the early stages of this litigation, it is not possible to predict the outcome or estimate a potential contingency or gain from the suit.

*7 The Company has been making collections on the accounts receivable which were sold to the Bank of Louisiana. Until the suit is settled, the collections are shown as a liability on the balance sheet. At March 30, 1997, the amount collected and due to the Bank of Louisiana was $462,016.

(C.A. No. 97-1988, Complaint, Exh. 33).

On April 21, 1997, BOL's counsel wrote to confirm a conversation that allegedly occurred with Kenwin's counsel with respect to these funds. Basically, in the letter BOL demanded that the moneys be turned over, and it considered the sequestration a conversion of its funds. Counsel at this point threatened that this issue would be addressed in his responsive pleadings in the already pending suits. Counsel for Kenwin apparently promised to advise counsel for BOL by that afternoon "(a) of the amount [he had] ascertained belongs to BOL, (b) whether [his] client [would] forward BOL's funds to BOL and (c) whether [his] client [would] disclose the identity of the bank account where the funds [were] presently sequestered." (C.A. No. 97-1988, Complaint, Exh. 23).

In response, a day later, the same counsel for Kenwin, apparently on behalf of D & A, claimed that BOL owed D & A $736,175 because of its allegedly superior security interest in the clothing sold under its Consignment Agreement with Kenwin. Under UCC law, D & A gave BOL three days to turn over the subject funds, or face litigation. BOL, contending that it never had any knowledge of the other lien, filed the above noted C.A. No. 97-1315 seeking a declaration that its security interest primes that of D & A. On April 28, 1997, D & A filed *D & A Funding Corporation v. Bank of Louisiana,* Index No. 107678/1997 in the Supreme court of the State of New York, County of New York seeking the amount of money allegedly converted by BOL by through its "diversion" of moneys from the bank accounts by BOL. That case was removed to federal court in the Southern District of New York.

The final volley in this litigation fusillade came with the filing in this Court of *Bank of Louisiana v. Donald Weiner, Barbara Weiner, Arthur Gins, Edith Gins, D & A Funding Corporation, Kenneth Sauer and Christopher S. Rooney,* C.A. No. 97-1988. In this suit, BOL alleges various violations of the Securities Act of 1933, violations of the Securities Act of 1934, wrongful interference with contract rights, entitlement to punitive damages, breach of contract, abuse of process, disgorgement, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

injunctive relief.[FN10]

> FN10. Indeed, a hearing on the preliminary injunction was scheduled for hearing on October 3, 1997; however, a stipulation was reached mooting this issue.

With this as background, the Court will now address the merits of the motion filed in C.A. No. 97-1315 which is the declaratory judgment suit.

### II. D & A'S MOTION TO DISMISS IN C.A. NO. 97-1315

On June 16, 1997, D & A moved to dismiss the complaint for declaratory judgment pursuant to Fed.R.Civ.P. 12(b) based on (1) lack of jurisdiction over the person of D & A and (2) BOL'S allegedly improper use of the Federal Declaratory Judgment Act.

#### A. Personal Jurisdiction

*8 A federal district court sitting in diversity may exercise personal jurisdiction only to the extent permitted a state court under applicable state law. *Allred v. Moore & Peterson,* 117 F.3d 278, 281 (5th Cir.1997). The Louisiana long-arm statute extends personal jurisdiction to the maximum limits permitted by due process. *Pedelahore v. Astropark, Inc.,* 745 F.2d 346, 348 (5th Cir.), *reh. denied, en banc,* 751 F.2d 1258 (5th Cir.1984). Due process advances a two-pronged test in order for the Court to exercise jurisdiction: (1) the nonresident must have minimal contacts with the forum state and (2) subjecting the nonresident to jurisdiction must be consistent with traditional notions of fair play. *Id.* at 348; *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

It is irrefutable that that the plaintiff bears the burden of making a prima facie showing of sufficient contacts to establish jurisdiction over the nonresident defendant. *Bullion v. Gillepsie,* 895 F.2d 213, 217 (5th Cir.1990). In doing so, however, the Court must accept the allegations of the complaint as true except as controverted by the defendant's affidavits, and conflicts in the affidavits are resolved in plaintiff's favor. *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784 (5th Cir.1990).

Minimum contacts with the forum state can arise incident to either "specific jurisdiction" or "general jurisdiction." As noted in *Felch v. Tranportes Lar-Mex Sa Da CV,* 92 F.3d 320 (5th Cir.1996):

The "minimum contact" prong of the inquiry may be further subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. Specific jurisdiction is appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. General jurisdiction, however, will attach, even if the nonresident defendant's contacts with the forum state are not directly related to the cause of action, if the defendant's contacts with the forum state are both continuous and systematic.

*Id.* at 324, citing *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.), *cert. denied,* 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994). Indeed, "[a] single act, by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 417 (5th Cir.1993). Thus, where a non-resident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of it laws, and that "purposeful availment" is such that the defendant "should reasonably anticipate being hailed into court" in the forum state the "minimum contact" prong for specific personal jurisdiction purposes is satisfied. *Id.* at 419.

D & A's contacts with Louisiana certainly are sufficient to satisfy the "specific personal jurisdiction" requirements. First, under its Consignment Contract with Kenwin, title of the goods sold in Louisiana passes directly to the Louisiana purchaser; title of those goods, under the language of the Consignment Contract, never vests in Kenwin. *See Command-Aire Corp. v. Ontario Mech. Sales and Serv. Inc.,* 963 F.2d 90, 94 (5th Cir.1992) (the place at which title to goods passes is deemed relevant for **general** personal jurisdiction questions). Indeed, D & A filed UCC-1 Financing Statements in each jurisdiction in which Kenwin sold clothes in order to perfect D & A's lien. Louisiana was included in those filings. (Complaint, *D & A Funding Corporation v. Bank of Louisiana,* Index No. 107678/1997, ¶ 6).

*9 While this factor is recognized for "general" personal azjurisdiction purposed, the Court sees no reason why this inidice would be no less relevant in this **specific** jurisdiction inquiry. Here, apparently

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)  
**(Cite as: Not Reported in F.Supp.)**

Page 8

title for the merchandise purchased passed from D & A to the Louisiana purchaser in Louisiana, since Kenwin never had title thereto. Arguably, the right to the funds so generated apparently arises in Louisiana for those goods so purchased. At oral argument, the Court asked for counsel's views on these issues and was not provided a satisfactory explanation why title would not pass in Louisiana.

However, an equally important factor in this analysis is the fact that but for the Charge Account Plan entered into between BOL and Kenwin, and of which D & A certainly was aware and benefitted, there would have been no "payment" to which the "security interest" at issue could have attached. D & A cannot take advantage of that agreement and deny that it creates a relationship that provides sufficient contacts with Louisiana, the center of activity for BOL.

This analysis is further supported by the other contracts entered into by D & A and Kenwin. The stock purchase virtually vests in D & A the ownership and management of Kenwin.[FN11] The Management Contract provisions outlined above certainly underscore that relationship particularly with respect to the provisions concerning D & A's administrative functions including the provision for it to negotiate amendments to loan agreements and security documents to which Kenwin is a party obligor. Indeed, making all inference in favor of plaintiff as is required at this stage of the proceedings, Mr. Gins' visit underscores D & A's involvement in the Kenwin relationship with BOL. Indeed, where there is intentional and allegedly tortious actions expressly aimed at Louisiana, the tortfeasor must " 'reasonably anticipate being haled in court there .' " _Calder v. Jones_, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (citations omitted). It is alleged that D & A committed wrongful acts in Louisiana. Taking the allegations as true, specific jurisdiction is further supported.

FN11. The Court recognizes that:  
_Dalton v. R & W Marine, Inc.,_ 897 F.2d 1359, 1363 (5th Cir.1990). In the case before the court, there is no proof other than the three contracts discussed with regards to the control by D & A over Kenwin. Indeed, there has been no "alter-ego" allegations by BOL; it has not sought to pierce the corporate veil of Kenwin to get to D & A. This footnote is not meant to raise this specter.
Nonetheless, the Court notes that the facts before the Court are distinct from those presented in _Dalton_ where the Court found the parent sufficiently separate from its subsidiary so that jurisdiction did not attach over the parent to find general personal jurisdiction. The contacts here all arise in the context of the harm alleged.

Thus, considering all of these factors, the Court finds that it may exercise specific jurisdiction over D & A. The Court is unpersuaded by D & A's remonstrations that it has no physical contacts here. It runs a company as its manager and benefits substantially from that company's business in Louisiana. Arguably, title to its clothes passes in Louisiana. As manager of Kenwin, D & A, through Gins, came to Louisiana to discuss and negotiate with BOL. These facts demand the Court exercise jurisdiction.

The Court now turns to the second prong of the due process inquiry, that is whether exercising jurisdiction comports with "fair play and substantial justice". As stated in _Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.,_ 85 F.3d 201 (5th Cir.1996):
When determining the fundamental fairness issue this court will normally examine (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*10 _Id._ at 207 (citations omitted).

D & A has taken over the management of Kenwin which it knew had entered into this Louisiana contract with BOL and indeed renegotiated the certain terms thereof for Kenwin. It did not find it burdensome to come to Louisiana to check into that contract; it should not find it burdensome to litigate its claim of priority here. Much of the proof lies in this state and Louisiana would have an interest in determining the priority of competing liens based on UCC filings in this state. BOL is located in Louisiana and its personnel and documents will be found here. Thus, this forum would provide BOL with convenient and effective relief. With respect to efficiency, the Judicial Panel on Multidistrict Litigation has found that this is the preferable forum for this litigation. (See Transfer Order, MDL Doc. No. 1193, filed on October 1, 1997). Obviously, then, the shared interest of the several states in furthering fundamental substantive social policies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 9
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

would be served in entertaining jurisdiction over D & A in this matter. Based on the foregoing, the Motion to Dismiss based on lack of personal jurisdiction over D & A is **DENIED**.

### B. Improper Use of the Federal Declaratory Judgment Act

The second ground for dismissal that D & A presents to the Court is that this case is an "anticipatory suit" "seeking to preemptively shape the litigation that was to follow and improperly gain primacy in time and in forum. This suit, C.A. No. 97-1315 was indeed filed as one based on the Declaratory Judgment Act, 28 U.S.C. § 2201. Because that act confers "a discretion on the courts rather than an absolute right upon the litigant" to bring such a suit, the defendant urges the Court to dismiss this matter. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995).

There are a number of factors to be in considered when a district court seeks to make that determination. As this Court has previously stated, these factors are:
1) whether there is a pending state action in which all of the matters in controversy may be fully litigated; [FN12]

FN12. *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 29 (5th Cir.1989).

2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; [FN13]

FN13. *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 (5th Cir.1983).

3) whether the plaintiff engaged in forum shopping in bringing the suit; [FN14]

FN14. *Rowan Cos., Inc.*, 876 F.2d at 29.

4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist; [FN15]

FN15. *Id.*

5) whether the federal court is a convenient forum for the parties and witnesses; [FN16] and

FN16. *Mission*, 706 F.2d at 602.

6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy. [FN17]

FN17. *Travelers Ins. Co. v. Louisiana Farm Bureau Federation Inc.*, 996 F.2d 774 (5th Cir.1993).

*Ruth's Chris Steak House Franchise, Inc. v. Brown*, 1996 WL 39406 (E.D.La. Jan.31, 1996) *citing Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995).

D & A contends that this particular suit, C.A. No. 97-1315, was filed in anticipation of a related suit being filed in New York-that is the one with respect to the alleged priming security interest arising out of D & A's Consignment Agreement with Kenwin. However, this argument ignores the context of the dispute's genesis and the chronology of litigation filed. This Court will not look at each of these cases in a vacuum. To do so would belie the realities at work herein. Considering (1) the circumstances surrounding this dispute, (2) that BOL has alleged that the security interest position was a response to the previously filed suit concerning the BOL Charge Account Agreement, and (3) that without that agreement, no money would have been available to D & A, the Court believes that it is not in the interest of justice at this point to dismiss this suit.

*11 The one case which has not been removed was the first filed suit in Gretna, Louisiana which was filed by BOL. From BOL'S subsequent filing of C.A. No. 97-1988, it would appear that it has chosen this forum to resolve this conflict. All of the cases pending in the federal court system have now been transferred to this venue for pre-trial disposition. Considering that this Court has determined that it has jurisdiction over D & A, it is in the best interest of all of the parties to allow this action to go forward and adjudicate the merits of all of these disputes in this forum. Accordingly, the Motion to Dismiss based on the improper use of the Declaratory Judgment Act is **DENIED**.

### III. DEFENDANTS' MOTION TO DISMISS IN C.A. NO. 97-1988

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

The named defendants Donald Weiner ("Weiner"), Barbara Weiner, Arthur Gins ("Gins"), Edith Gins, D & A Funding Corporation, Kenwin Shops, Inc.("Kenwin"), Kenneth Sauer ("Sauer") and Christopher S. Rooney ("Rooney") filed the subject Motion to Dismiss in C.A. No. 97-1988.[FN18] First, all defendants but Kenwin seek dismissal based on the Court's alleged lack of personal jurisdiction over them. Second, with respect to certain allegations concerning securities law violations, the complaint fails to state a claim on which relief can be granted. Third, because there are other actions already pending, defendants seek a stay in or dismissal of C.A. No. 97-1988.

> FN18. Barbara Weiner and Edith Gins have been dismissed by plaintiff, and thus as this motion seeks dismissal of the claims against them it is moot.

### A. Personal Jurisdiction

The Court has previously set forth the criteria under which it could exercise jurisdiction over D & A. For those same reasons, the Court finds that it has jurisdiction over D & A in this suit. However, with respect to Weiner, Gins, Sauer and Rooney there is no basis in fact or in law presented to this Court for it to exercise personal jurisdiction over these other defendants.

The actions at issue are those taken by corporate entities-D & A, Kenwin, and BOL-through corporate representatives.[FN19] It is hornbook law that generally actions taken by a person acting on behalf of a corporate entity do not create personal liability or give rise to jurisdiction over that person.

> FN19. For instance, in paragraph 25 of the Complaint, the "arbitrary demand" was made by Weiner **acting as the CEO of Kenwin.** At paragraph 33, a demand was made by Kenwin **through its than-president Kenneth Sauer.** Rooney is counsel representing both D & A and Kenwin.

It appears that the corporation ordinarily will insulate the individuals from the court's personal jurisdiction. Thus, jurisdiction over individual officers and employees of a corporation may not be predicated on the court's jurisdiction over the corporation itself, unless the individuals are engaged in activities within their jurisdiction that would subject them to the coverage of the state's long-arm statute. However, if the corporation is not a viable one and the individuals in fact are conducting personal activities and using the corporate form as a shield, a court may pierce the corporate veil and permit the assertion of personal jurisdiction over the individuals.
4 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 1069 at 370-74 (1987). See *Stuart v. Spademan,* 772 F.2d 1185, 1197 (5th Cir.1985) (jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation).

**\*12** At this juncture, there is no evidence of any theory which would make Weiner, Sauer, Gins or Rooney **personally** liable. There are no allegations that the Court should pierce the corporate veil of D & A or Kenwin to create personal liability. The allegations that Weiner and Gins were "aided and abetted by Rooney" and have controlled D & A's actions are insufficient to create personal liability as they were ostensibly acting on behalf of corporate entities. (C.A. No. 97-1988, ¶ 50).

Accordingly, the Motion to Dismiss for lack of personal jurisdiction is **GRANTED** with respect to Weiner, Gins, Sauer and Rooney.

Barbara Weiner and Edith Gins have been dismissed by plaintiff, and thus to the extent this motion seeks dismissal of the claims against them, it is **MOOT.**

### B. Dismissal of the Securities Law Claims

As mentioned previously, this complaint sets out the following "counts" or allegations of wrongdoing:
1. Violation of the Securities Act of 1933;
2. Violation of the Securities Act of 1934;
3. Wrongful Interference with Contract Rights in Alabama, Arkansas, Georgia, Louisiana, Mississippi, South Carolina, and Texas;
4. Punitive Damages under the law of Alabama, Arkansas, Georgia, Mississippi, South Carolina and Texas;
5. Breach of Contract by Kenwin;
6. Abuse of Process under New York law;
7. Disgorgement based upon the SEC laws; and
8. Injunctive Relief.

The remaining defendants seek to have the securities claims dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because the Charge Account Plan is simply not a security under the definition of either the Securities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-04182-SRD-JCW   Document 2189-2   Filed 12/12/06   Page 11 of 13

Not Reported in F.Supp. Page 11
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

Act of 1933, 15 U.S.C. § 77a, *et seq.* or the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* Thus, no claim can be stated under these security laws. The Court concurs with this position.

"When considering a motion to dismiss for failure to state a claim, the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." *Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993). However, conclusory allegation or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. *Id.* Indeed, a complaint should not be dismissed for failure to state a claim unless it appears "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 285 citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Here, however, because the Charge Account Plan cannot be considered a security under any circumstances, all claims based on the security laws have no merit.

Plaintiff in its Complaint relies on the requirements for a "security" as defined in *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as the basis for its security law violation allegations. In *Howey,* the legal issue before the Supreme Court was whether a land sales contract, a warranty deed and a service contract together would constitute a "security" under the Securities Act. In reaching its decision that these contracts that allowed persons to contribute money and to share in profits of a large citrus fruit enterprise through the confection of the noted agreements constitute a security, the Court announce the test to determine whether an "investment contract" would constitute a "security" under the Act. That test is whether the scheme involves (1) the investment of money (2) in a common enterprise, (3) with the expectation that the investors would earn a profit (4) solely through the efforts of the promoter or of some one other than the investors themselves. *Id., * 328 U.S. at 298, 66 S.Ct. at 1103.

*13 The terms of the Charge Account Plan certainly do not fit this definition. BOL was primarily responsible for collecting its "profits"-the interest due on each credit account for goods purchased at Kenwin stores. It borders on ludicrous to contend that BOL expected to earn a profit "solely through the efforts" of Kenwin. BOL simply purchased the past and future accounts receivable of Kenwin. Thus, based on its own theory of the case, BOL's allegations based on the Charge Account Plan being a "security" fail because it is not an "investment contract" as contemplated under the Securities Act.

Defendants contend that *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) overturns *Howey* and provides a different test for whether the Charge Account Plan is considered a security. *Reves* concerns whether demand promissory notes were a security under the 1934 Securities Exchange Act. The appellate court in *Reves* had used the *Howey* test, that is a test to determine whether an instrument is an "investment contract," to determine whether the instruments at issue were "notes." That court found that the notes were not securities under the 1934 Act or Arkansas law, and that the statutes' anti-fraud provision therefore did not apply.

However, the Supreme Court rejected the application of the *Howey* test to "notes." Thus, to the extent that BOL would contend that the Charge Account Plan constituted a "note" which is a security under the the 1933 and 1934 Acts, the *Reves* test, rather than the *Howey* test, would apply.

The Fifth Circuit in *Trust Company of Louisiana v. N.N.P. Inc.,* 104 F.3d 1478 (5th Cir.1997) has recognized that the Supreme Court established the "family resemblance" test in *Reves* to determine whether a note is a security within the meaning of the Securities Acts. It stated:
A note is presumed to be a "security," and that presumption maybe preliminarily rebutted by a showing that it more closely resembles the "family" of instruments found not to be securities. *Reves,* 494 U.S. at 67, 110 S.Ct. at 952. That family includes:
the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.
*Reves,* 494 U.S. at 65, 110 S.Ct. at 951. Then, if the instrument is not sufficiently similar to an item on the family resemblance list, four factors are examined to determine whether the instrument at issue is in another category that should be added to the list of nonsecurities. *Reves,* 494 U.S. at 67, 110 S.Ct. at 952.

*Trust Company of Louisiana,* 104 F.3d at 1489.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-cv-04182-SRD-JCW    Document 2189-2    Filed 12/12/06    Page 12 of 13

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

Page 12

The four factors which are considered attributes common to most securities are:
*14 (1) the motivations that prompted the transaction;
(2) whether the plan of distribution of the instruments indicates that they are commonly used for speculation or investment;
(3) the public's perception as to whether the transaction involves a security; and
(4) whether the risk involved in the instrument is lessened by some form of regulation rendering application of the Securities Acts unnecessary.

Reves, 494 U.S. at 66-67, 110 S.Ct. at 952.

With regard to the first indice, the Supreme Court stated:
If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchange to facilitate the purchase and sale of a minor asset or consumer good, **to correct for the seller's cash-flow difficulties, to advance some other commercial or consumer purpose,** on the other hand the note is less sensibly described as a security.

Reves, 494 U.S. at 66, 110 S.Ct. 952 (emphasis added). This explanation indicates to the Court that the Charge Account Plan is "less sensibly described as a security" and thus fails this first indice to find it a "security."

Certainly, the plan of distribution, which basically entailed collecting on the consumer credit granted by **BOL** to Kenwin's customers does not demonstrate that "there is a 'common trading for speculation or investment." " *Id.* (citations omitted). With respect to the third factor, the reasonable expectation of the investing public would not see this transaction as a security-that is the purchase of common stock or the like. Finally, there is another regulatory scheme which controls the transaction-Articles 3 and 9 of the Uniform Commercial Code as enacted in those states where BOL filed financing statements will control the outcome of this controversy. Thus, the Charge Account Plan is not a "note" constituting a "security" for purposes of actions alleged under the Securities Acts.

Thus, the Court finds that the transaction-the entering into of the Charge Account Plan-is a commercial transaction, controlled by those laws. It simply cannot be seen to have any relation to or be subject to the application of the Securities Acts of 1933 or 1934. Thus, the Motion to Dismiss Counts 1, 2 and 7 are **GRANTED.**

### C. Dismissal or Stay Because of Duplicative Nature of Case

Because all of the pending federal actions in this matter have been transferred to this venue by the Multidistrict Litigation Panel, the Court believes that it is not in the best interest of judicial economy to stay this action. Rather, the Court believes that now having ruled on the personal jurisdiction issues herein, that a status conference is now required to determine how these cases are to now proceed. Accordingly,

**IT IS ORDERED** that:
(1) D & A's Motion to Dismiss filed in C.A. No. 97-1315 is **DENIED;** and
*15 (2) D & A's Motion to Dismiss filed in C.A. No. 97-1988 is **GRANTED in part and DENIED in part.**
As the Court has found that it has no personal jurisdiction over Donald Weiner, Arthur Gins, Kenneth Sauer and Christopher S. Rooney, the motion is granted as to those parties, and they are **DISMISSED** from this suit.
Furthermore, Counts 1, 2, and 7 are dismissed from the suit pursuant to Fed.R.Civ.P. 12(b)(6) as the allegations fail to state a claim because the Charge Account Plan is not a security.[FN20]

> FN20. Considering the findings with regard to the Charge Account Plan not being a security, the Court invites defendants to file a Motion to Dismiss for Failure to State a Claim regarding BOL's Amended Complaint which is likewise premised on the Charge Account Plan being a security.

The motion to dismiss for lack of personal jurisdiction is **DENIED** with respect to Kenwin and D & A.
The motion to dismiss or stay because of duplicative litigation is **DENIED.**
The mere existence of a parent-subsidiary relationship will not support the assertion of jurisdiction over a foreign parent, there may be instances in which the parent so dominates the subsidiary that "they do not in reality constitute separate and distinct corporate entities...." *Hargrave*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 13
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

*v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir.1983) (citations omitted); *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763 (5th Cir.1988).

E.D.La.,1997.
Bank of Louisiana v. D&A Funding Corp.
Not Reported in F.Supp., 1997 WL 639012 (E.D.La.)

Briefs and Other Related Documents (Back to top)

• 2:97CV01988 (Docket) (Jun. 25, 1997)
• 2:97cv01315 (Docket) (Apr. 25, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.