**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION**

| | |
|---|---|
| **IN RE: KATRINA CANAL BREACHES** * | **CIVIL ACTION** |
| **CONSOLIDATED LITIGATION** * | |
| | **NO. 05-4182 "K" (2)** |
| _____ | * |
| **PERTAINS TO LEVEE:** * | **JUDGE DUVAL** |
| **O'DWYER, NO. 06-1885** | |
| **NO. 06-5771** | |

**MEMORANDUM IN OPPOSITION TO UNITED STATES'
MOTION TO DISMISS UNDER 12(b)(6)**

   **NOW INTO COURT,** through undersigned counsel, comes the Plaintiffs in Case No. 06-5116 (Sims), Case No. 06-5118 (Richard), Case No. 06-5142 (Augustine), Case No. 06-5132 (Ferdinand), Case No. 06-5131 (Bourgeois), Case No. 06-5134 (Christophe), Case No. 06-5137 (Williams), Case No. 06-5127 (DePass), Case No. 06-5128 (Adams), and Case No. 06-5140 (Porter), to file this Amicus in Opposition to the Motion to Dismiss filed by the United States in this matter, pursuant to Order on Motion for Leave to File.

BACKGROUND

   Your *amici* are property owners and residents of the Greater New Orleans Area asserting claims in cases consolidated herein for redress for damage to property and for personal injuries particular to their geographic areas, and the floodwaters from particular waterways, to-wit:

   (1)  The Oak Island, Lake Carmel, Village de L'est, Little Woods, and Michoud plaintiffs' (No. 06-5128, Adams) MRGO, IWW and the Michoud Canal;

(2)  The East Gentilly (No. 06-5134, Christophe) MRGO, IWW and Intercoastal Waterway;

(3)  Kenilworth, Lake Bullard and Lakefront (No. 06-5137, Williams) from Lake Pontchartrain and Inner Harbor Navigational Canal;

(4)  The Eastover Subdivision(No. 06-5118, Richard) from MRGO and IWW;

(5)  Lake Barrington, Lake Forest, Huntington, Fairway Estates (No. 06-5142, Augustine).

(6)  The Old Metairie residents (No. 06-5127, DePass) seek redress for damages from the 17th Street canal closure, the flooding of the 17th Street canal south of Pumping Station Six, from the Palmetto and Florida Avenue Canals, and the Hoey Canal;.

(7)  The Lakeview, Carrollton and Hollygrove plaintiffs (No. 06-5116, Adams), the failure of the 17th Street drainage canal westbank, from the flooding of the 17th Street canal south of Pumping Station Six, from the Palmetto and Florida Avenue Canals,

(8)  The Bywater and Mid City plaintiffs (No. 06-5132, Ferdinand) seeks redress from the failure to repair Gate I-W 30 and the consequent failure of the Industrial Canal west bank flood system.

(9)  The Old Gentilly and Lake Terrace (No. 06-5131, Bourgeois), Industrial Canal, New London Canal;

(10)  Lower 9th extended (No. 06-5140, Porter), Industrial Canal east bank, IWW and MRGO.

You *amici* asserts claims against the Orleans Levee District and the Port of New Orleans, the Orleans Levee District, the East Jefferson Levee District, and the Sewerage and Water Board, the latter under various Acts of Assurance given by those local political subdivision in favor of

the United States Army Corps of Engineers, as an inducement to cause the latter to undertake the federal flood and navigation[1] works.  Unique to the claim of residents in Old Metairie and Lakeview, Carrollton and Hollygrove communities, those residents also asserted design, construction and maintenance claims against the East Jefferson Levee Board, and the Parish of Jefferson and Sewerage and Water Board.  Federal Tort Claims Act claims have been filed with the Corps and most have matured sufficiently to enable your *amici* to file Amended Complaints in each of the cases to assert those claims against the United States, and it will seek leave to do so in due course.

Your *amici* residing on the east bank cite flooding from the drainage "outfall" canals:  the 17th Street Canal and the Orleans and New London outfall canals, particularly the portion of the outfall canals south of the pumping station and from other non-federal drainage canals, the Hoey and Palmetto Canals.  See New Orleans Lakefront Outfall Canals, Plate 5, Reproduced as Appendix I.  Complainants in New Orleans East cite flooding from the Michoud Canal, the IWW and the Industrial Canal, directly, and from MRGO.  All these waterways pre-existed the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project.[2]  In fact, the Lake Plan adopted in 1966 contemplated the closure of the Lake's three tidal passes at the Rigolets, the Chef and Seabrook (Inner Harbor Navigational pass) "the latter said to be a feature of the MRGO Navigation Project".  See 1994 Lake Pontchartrain & Vicinity Reevaluation Plan[3].  P. 34.  In 1966, "the return levees paralleling the canals to the pumping stations were considered adequate." *Id.* P. 39.  No work was commissioned on the return levees in the 1966 Plan.  The 1984 Reevaluation Study abandoned the Barrier Plan in favor of the High Level Plan and

---

[1] The Port's Act of Assurances is limited to the MRGO.  The remaining Acts of Assurance related to all or a portion of the other federal works.
[2] PL 89-298, 27 Oct. 1965, House Doc. 231, 8th Cong. 1st Session.
[3] The Reevaluation Plan is included in the Rule of Evidence 201 Submission filed herewith.

3

included portions of these return levees in the plan, calling for elevating their heights, and "installing auxiliary pumping stations . . . at the lake to provide pumping capability when the flood gates were closed." The portions of the outfall canals or return levees inside of the pumping station were not incorporated in the Lake Plan nor was the expenditure of federal funds for their improvement authorized. It is from the flooding from the return levees south of the pumping stations, entirely state "designed and operated", that these East bank residents seek redress.

The MRGO, the Michaud Canal, the Gulf Intercoastal Waterway, the Industrial Canal were not part of the Mississippi River Levee System.[4] The Gulf Intercoastal Waterway east of New Orleans (IWW) was authorized in 1942 and MRGO was authorized in 1951. None of the three were authorized by or made part of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Project constructed in 1966 or 1984 Reevaluation Plan. They were all man-made and all pre-existed the Plan. Pertinent to the claims of the residents whose harm derives from waters from these sources, however, is that the Lake Pontchartrain and Vicinity Plan did not call for change in "design or operation" of these existing waterways on which *Central Green* made immunity depend. The works contemplated by the Lake Pontchartrain Plan were designed and operated to lessen the risk from their creation, design, construction, operation and maintenance of the Industrial Canal, the IWW and MRGO highways of commerce, the risk of which Hurricane Betsy illustrated.

## SUMMARY OF THE ARGUMENT

Section 702 (c) Immunity does not attach to floodwaters emanating from state designed and operated drainage "outfall" canals, the 17th Street, New London Canal and Orleans Avenue

---

[4] House Document 90. 70th Cong. 1st Ses. Submitted 8 December 1927 and adopted in the Flood Control Act of 1928.

4

Canals, proximately caused by the defective design and operation of federal portion of those canals.  Nor does immunity attach to flooding from the Michaud Canal, the MRGO, the Intercoastal Waterway or the Industrial Canal, as they were not "designed or operated . . . for flood control purposes."  By rejecting the more stringent "not wholly unrelated test" and testing immunity on the "character of the water that caused the relevant damage," *Central Green* excluded from §702(c) immunity harm (i) from floodwaters emanating from state canals, even harm proximately caused by the failure of the federal flood works, and (ii) for flood waters resulting from the failure of federal water was not "designed or operated for flood control purposes".  That the state drainage works failed because of failure of federal "designed and operated" flood works, did not alter "the character of the waters."[5] Nor did the subsequent inclusion of portions of MRGO, IWW and Industrial Canal in the Lake Pontchatrain and Vicinity Hurricane Protection Plan, indisputably, make "all waters" that flow through them "designed and operated, at least in part for federal flood control purposes"  *Graci v. United States*, 456 F2d (5 Cir.; 1971) instructs us otherwise.

      Thus considered, in view of the fact that the absolute immunity is an affirmative defense, not raised by the complaint and not suitable for disposition in FRCP 12(b)(6) Motion, the United States' Motion should be denied.

---

[5] *Central Green,* 531 U.S. 425, 837 (2001)  itself defined the "character of the waters" as "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes".

LAW & ARGUMENT

Introduction

This matter, if not this case, will turn on the Court's reading of the Supreme Court's opinion in *Central Green Co. v. United States,* 531 U. S. 425 (2001).  There, the property owner sued for damages to a pistachio farm allegedly caused by subsurface flooding from the Madera Canal, a federally owned canal, one of the purposes of which is to direct flood waters from the San Joaquin River.  Allegedly the defective design, construction and maintenance of the canal caused subsurface flooding and increased cost of operating the orchids, although a serious river flood in 1997 may have also damagedthe farm.

The case was before the Court because the Court's earlier opinion in *United States v. James*, 478 U. S. 597 (1986) had generated conflicting opinions among the Circuit Courts of Appeals that §702(c) immunity attached "to all waters carried through federal flood control projects for purposes of or *related to flood control*".  *Id*. 429.  The italicized phase was singled out by the Court as particularly troublesome.  "(T)he narrow question presented" was said to be whether "§702(c) immunity attaches to *all waters* that flow through a federal facility that was designed and is operated, at least in  part for flood control purposes." (Emphasis Added)  *Id.* 427.  The Ninth Circuit had concluded that immunity attached, citing the "not wholly unrelated" standard, commenting that there "would seem to be no set of facts where the government is not immune for damages arising from water that at one time passed through part of the Central Valley or other flood control project." *Id.* 482.  The Supreme Court granted certiorari, reversed and remanded.

The conflicting opinion cited *Fryman v. United States,*901 F2d 79 (7th Cir. 1990)*, Boyd v. United States,* 881 F2d 895 (10 Cir., 1989), and *Hayes v. United States,* 585 F2d 701 (4 Cir.,

6

1978), circuits "requiring a nexus between the flood control activities and the harm". Id. 1008. The Ninth Circuit singled these out particularly as circuits in which a different result would have been reached. The Ninth Circuit, the Supreme Court noted, had held that "although the water in the Madera Canal was not held for purposes of flood control, because it was part of the Central Valley Project, it was "not wholly unrelated" to flood control, stressing the particular phase from its earlier opinion in *James*. Id. 482.

The United States reads the *Central Green* opinion to say more. It implies that "all waters" includes the waters from the state designed and operated drainage canals which poured over as a consequence of the closure of the Pumping Station No. 6, in the case of the 17th canal flooding, for instance. It implies that the same can be said of the flooding from the non-federal portion of the New London and Orleans Avenue Canals. It argues that in dispensing with the requirement that the waters be "related to flood control", the Supreme Court discarded with the requirement that the waters be carried through a federal flood control project as well. It overlooks the fact that by remanding to "consider the character of the water that caused the relevant damage", the Supreme Court was requiring a finding of facts, i.e., determination of the part of the whole of the damage which had occurred gradually by subsurface seepage and the damage attributable to the 1997 San Joaquin flood. The United States persists, however, arguing that the "threshold prong," the relationship between the harm and the federal flood control facility had been entirely abandoned.

Respectfully we disagree. The ultimate holding in *Central* Green, that the harm must be attributed to the flood waters emanating from a federal project the court was announcing a rule required a nexus between the waters and the harm, i.e., "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes". The "threshold

7

prong" to use the phrase coined by *Williams v. United States,* 957 F2d, 742, 743 (10 Cir., 1978), that the waters pass through a federal flood central facility was not disturbed. Nor was it disputed. The "Madera Canal was part of the Front Division of the Central Valley project and flood control was one of the purposes of the project". *Id*. 428. The relationship between the damage and the federal flood project was a given. The District Court judgment on the pleading under the "not wholly unrelated test" was predicated on that concession. The Supreme Court said as much in characterizing the split among circuits prompting its review of the decision in *United States v. James*, *supra*. "All other Courts of Appeal that have interpreted §702c and prior to this case, the Court of Appeal for the Fifth Circuit, see N. 2, *supr*a, has held the §702(c) grants immunity cased by flood waters from a federal flood control project". *Id.* 429.

Furthermore, nexus between the damages and the federal flood control activity was present in each of the decisions of the other circuits in conflict with the decision of the Ninth Circuit. *Fryman v. United States,* 901 F2d 79 (7th Cir. 1990)*,* (the death of diver on Lake Shelbyville in Illinois created between 1963 and 1970 as part of a flood-control project) and *Boyd v. United States,* 881 F2d 895 (10 Cir., 1989) (a boat speeding through the Tenkiller Lake, which was the jurisdiction of the United States Army Corps of Engineers-- struck and killed a snorkeler); *Hayes v. United States,* 585 F2d 701 (4 Cir., 1978) (the damage to a farm, allegedly caused by operation of the flood gates of the Kerr Scott Dam, a flood control facility.) Finally, *Central Green* evidences no intention to abandon the Court's declarative in *James* that "the Act concerns flood control projects designed to carry floodwaters". 478 U. S at p. 604.

Finally, Justice Stevens, the author of the opinion in *Central Green,* had authorized both the denial of *certiorari* in *Hiersche v. United States,* 503 U. S. 923 (1992), and the dissenting opinion in *James.* In *Hiersch*e, Justice Stevens called §702(c) an "acronymism", and "absolute

remnant . . . nothing more than an engine of injustice." He dissented to the holding in *James,* that §702(c) immunity precluded claims for personal injuries, as well as property damages, in the course of which he offered this comment on the Mississippi Flood Control Act, tying damage to federal flood control project: "There is a sentence stating that no liability of any kind shall attach upon the rest of the United States from any damage form or by flood waters at any place." "The text of Section 3 read as a whole irresistibly implies that the sentence in question was intended merely to place a limit on potential liability of the United States from the direction to the Secretary of War and Chief of Engineers concerning the overflow damage to land". 478 U. S. at 617. It is unlikely that Justice Stevens would have departed from his prior writings linking harm and federal flood control project without saying more.

*Central Green* evidences no intention to depart from the line of cases beginning with *Peterson v. United States,* 367 F2d 271 (9 Cir.; 1966) which had held that "the alleged act of negligence was wholly unrelated to the Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to such authorization." At p. 275. In *Peterson,* the damage occurred as a result of the engineers attached to Ladd Air Force Base dynamiting an ice jam. The distinction drawn in *Peterson* was acknowledged by the Second Circuit in *Parks v. United States,* 370 F2d 92 (2 Cir.; 1966) and by the Ninth Circuit in *McClaskey v. United States,* 386 F2d 807 (9 Cir.; 1967). ("It does not follow that the mere happening of the flood constitutes the formation from all damage claims flowing from it.") *Cf. Valley Calle Co. v. United States*, "(allowing recovery against the United States for flood damages caused by negligent maintenance of streams and culverts as part of the construction of an oil field." *Cf. Williams v. United States, supra* N. 7 (10 Cir., 1978). Because the dam was not part of a flood control project, the government did not enjoy immunity under §702(c).

9

As an alternative, the United States cites the Lake Pontchartrain and Vicinity Project, with the evident intent of offering the nexus between the harm and a federal flood control project, and satisfying the threshold prong.  In doing so, it ignores the fact that each of the flood producing waterways involved:  the Mississippi River Gulf Outlet, the Intracoastal Waterway, the Industrial Canal, the 17th Street Canal, the London Canal and the Orleans Canal, all existed, in substantially their present form, before being enveloped into the Lake Pontchartrain and Vicinity Plan.  In fact, the Fifth Circuit had already held that MRGO was not a federal flood control project for purpose of §702(c) and the United States not immune from suits on that account.  *Graci v. United States*, 456 F2d (5 Cir.; 1971).  In addition, until argued here, it has been generally accepted that damage from flood waters form overflow from drainage canals was redressable under the Federal Tort Claim Act.  *Seaboard Coast Line R. R. Co. v. United States,* 473 F2d 714 (5th Cir. 1973), and *United States v. Hunsucker,* 314 F2d 98 (9th Cir. 1962) (negligence in construction and design of drainage systems).

This case will turn on whether redress from damage from waters emanating from the MRGO, a navigation canal alleged to be defectively designed, constructed and maintained by the United States Army Corps of Engineers, and the others, is precluded by its subsequent inclusion of the Lake Pontchartrain & Vicinity Flood project.  The same can be said of the failures at the Intercoastal waterway and the Industrial Canal.  *Central Green* suggests that findings of fact are required to determine whether the inclusion was tantamount to a "design and operation at least in part of a federal flood control purposes".

Much of the London Avenue, Orleans Canal and 17th Street Canal flooding lacks the requisite nexus to a federal project, the threshold proxy for §702(c) immunity.  These flood waters did not emanate from "federal facilities designed and operated . . . for flood control

10

purposes". Finally, the flood of the federal portions of those drainage canals may be due to negligence issuance of dredging permits and the nexus between the harm and federal flood project may be found wanting the outfall. Did their subsequent inclusion in the Lake Pontchartrain and Vicinity absolve the Corps? The outfall canals were not "designed and operated" as flood control facility. Respectfully, findings of fact are required to answer such question.

> 1. ABSOLUTE IMMUNITY IS AN AFFIRMATIVER DEFENSE, NOT APPARENT ON THE FACE OF THE COMPLAINT; FRCP 12(B)(6), DISMISSAL UNDER THE "MORE STRINGENT STANDARD" IS INAPPROPRIATE.

Where, as here, the defendant raises a affirmative defenses via Rule 12(b)(6) Motion, in this case §702(c) immunity, the burden is even more stringent than the usual FRCP 12b6 burden. "The availability of the defense as a matter of law, then, turns on whether the plaintiff could possibly prove any set of facts that would undermine the objective reasonableness of defendants' actions. In other words, the defense must be "based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir., 2004)(internal quotation marks omitted). Also *Brooks v. City or Winston Salem,*85 F.3d 178, 181 (4th Cir; 1996) (observing that an affirmative defense may also be raised in a pre-answer motion pursuant to Rule 12(b)(6) of the Federal Rules "when the face of the complaint clearly reveals [its] existence"). "The defense faces a formidable hurdle when advanced on such a motion." *Cohn v. New Paltz Cent. School Dist.,* 171 Fed.Appx. 877 (2d. Cir, 2006).

For examples of cases applying the more stringent rule to defense. See *Nicholas* v. *Goord*, 430 F.3d 652, 658 n. 8 (2d. Cir., 2005) (stating that a Rule 12(c) motion for judgment on the pleadings is "evaluated under the same standard as a Rule 12(b)(6) motion"). To prevail on a motion for qualified immunity in this early stage of the proceedings, "[n]ot only must the facts

11

supporting the defense appear on the face of the complaint, but ⋯ the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna,* 386 F.3d at 436 (internal quotation marks and citation omitted).

*Brody v. Hankin* 145 Fed.Appx. 768 (3rd Cir., 2005.) (reversing a decision in granting a motion to dismiss under Rule 12(b)(6) grounds of *res judicata*, or claim preclusion. " Because *res judicata* is an affirmative defense, and the basis for dismissing this case on *res judicata* grounds was not apparent on the face of the complaint". At 770, 771*)*

*Terranova v. New York,* 144 Fed.Appx. 143 (2nd. Cir.; 2005.)" [W]e have permitted the defense to be successfully asserted in a Rule 12(b)(6) motion," *id.,* where " 'the complaint itself establishe[d] the circumstances required as a predicate to a finding of qualified immunity.' " *Green v. Maraio*, 722 F.2d 1013 , 1018(2nd Cir.,1983).

2.  A NEXUS BETWEEN THE HARM AND THE FEDERAL FLOOD CONTROL PROJECT, IS PREDICATE TO A FINDING OF IMMUNITY FROM FLOOD WATERS UNDER §702(C).

The decision of the Courts of Appeal cases confirm:  §702(c) grants immunity to the Federal Government from damages caused by flood waters from a flood control project.  See *Hayes v. United States, supra,* 4th Cir., *Fryman, supra.*  See*, e. g*., *Potis v. Folk Construction Co.,* 694 F2d 520, 522 (8 Cir., 1982) (purpose of 702(c) is to "assure the government of absolute immunity for flood control projects") and *Burleson v United States,* 627 F2d 119 (8th Cir., 1980) on which *Potis* relied ("there can be no serious question that the alleged negligent acts of the Army Corps of Engineers was in connection with the flood control project") at 121.  *Morci Corp. v. United States,* 681 F2d 645, 647-8 (9th Cir., 1982), ("(I)f the plaintiffs inquiry resulted from the operation of [a] flood control project for flood control purposes, governmental immunity is

12

complete)". *Cf. Purci v. United States*, 650 F2d 202 (9th Cir.; 1981).  *Calloway v. United States,* 568 F2d 684, 686-7, (10th Cir.; 1978) (rejecting arguments that §702(c) does not apply to flood damage resulting from the operation of a flood control project in view of "broad and emphatic language of §702(c))"; *Parks v. United States,* 370 F2d 92, 93 (2nd Cir; 1966); *Graci v. United States,* 456 F2d (5 Cir., 1971).  *Florida East Coast Railway Company v. Central and So. Florida Flood Central District,* 519 F2d, 1185 (5th Cir., 1975).

>   3.      CENTRAL GREEN MUST BE READ TO EXTEND IMMUNITY TO "FLOODWATERS CAUSED BY THE GOVERNMENT'S NEGLIGENT DESIGN OF AN INTEGRAL PART OF A FLOOD CONTROL PROJECT " AND NO FURTHER, READ WITHOUT THE THRESHOLD PRONG DEPARTS FROM THE STATUTE, IS NON PERSUASIVE DICTA.

The holding of Central Green is expressed in these two portions of the Court's opinion:

> "(T)he narrow question presented" was said to be whether "§702(c) immunity attaches to all waters that flow through a federal facility that was designed and is operated, at least in  part for flood control purposes."

> For present purposes, we merely hold that it was error to grant the Government's motion for judgment on the pleadings and that it is the text of §§ 702c, as informed by our holding in *James,* rather than the broad dictum in that opinion, that governs the scope of the United States' immunity from liability for damage caused "by floods or flood waters." Accordingly, in determining whether §§ 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project.

The United States is wrong when it suggests that the Court abandoned the requirement of a nexus between the harm and the federal flood control facility.  In fact, the Court framed the question, the very question presented, in terms of whether "all waters that flow through a federal facility that was designed and operated at least in part for flood control purposes."  Further, the Plaintiff conceded that Madera Canal was a federal flood control project, the opinion below was predicated on that concession, and nexus was not at issue.  When the court instructs one to

consider "the character of the waters that cause the relevant damage" it is requiring nexus between the harm and the waters that were carried by on passed through the federal facility for flood control.

In addition, *Central Green* also instruct one "to resort to the text of the [702(c)] statute . . . . rather than an isolated comment"' in its opinion, "to determine whether the water flowing through the Madera Canal that allegedly caused the damage . . . is covered by §§702(c)". It cites *Humphrey's Executor v. United States*, 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) for the proposition that its own "dicta 'may be followed if sufficiently persuasive' but (is) not binding." In Humphrey's Executors, Justice Sutherland, in announcing the rule quoted no less authority than Chief Justice Marshall, who delivering the opinion in the *Cohens* v. *Virginia*, 6 Wheat, 264, 399, 5 L.Ed. 257, had said:

> 'It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.'

And Justice Marshall added, that the general expressions in the case of *Marbury v. Madison* were to be understood with the limitations put upon them by *Cohens*

> 4.(a) GRACI v. UNITED STATES, SUPRA, HELD MRGO TO BE A NAVIGATION CANAL, CLAIMS FOR DAMAGES FROM THE DEFECTIVE DESIGN, CONSTRUCTION AND MAINTENANCE OF WHICH WAS NOT PRECLUDED BY THE IMMUNITY PROVIDED IN 702(c).

The Fifth Circuit has held that floodwater damage caused by the negligence of the United States in constructing the MRGO "a navigation project that provided a short cut from the Gulf of Mexico to New Orleans" are not barred by §702(c). *Graci v. United States*, 456 F2d, 2022 (5th

14

Cir.; 1971). In that case the hurricane-driven waters which overflowed the MRGO flooded proportions in Orleans and St. Bernard Parishes. The case had been assigned to Judge Herbert Christenberry initially. Judge Christenberry held the MRGO was not a flood control project and that Section 3 of the Flood Control Act of 1928 did not apply. The matter was reheard by Judge Heebe, and the Motion was again denied. *Graci v. United States,* 301 F. Supp. 947 (Ed. Dist. La. 1969). Judge Heebe cited a comment of a House member "to the effect that in engaging in flood control works, the government should not lay itself open to suits for flood damage." *Id.* 23.

Citing early "nexus" cases, *National Manufacturing v. United States,* 210 F2d 263, *Stover v. United States,* 332 F2d 204 (9th Cir., 1964), and *Graci v. United States,* 301 F. Supp. 947 (Ed. Dist. La. 1969), the Fifth Circuit held:

> The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for negligent and wrongful acts of its employees *unconnected with flood control projects.* Judge Heebe answered that it would not be reasonable so to conclude. 301 F.Supp. at 952. Our analysis of another group of § 3 cases leads us to agree.
>
> (b) THE INTERCOASTAL WATERWAY, THE INDUSTRIAL CANAL, THE MICHOUD CANAL WERE ALL NAVIGATIONAL CANALS OR WATERWAYS OF COMMERCE AND WERE NOT DESIGNED, CONSTRUCTED OR OPERATED PURSUANT TO MISSISSIPPI FLOOD CONTROL ACT OF 1928, AS AMENDED OR ANY OTHER FLOOD PROJECT.

The MRGO was neither "designed nor operated as a federal flood control project", to paraphrase *Central Green*. House Document No. 245, 82nd Cong. 1st. Sess., submitted 25 Sept., 1951, result in the authorization of the Mississippi River Gulf Outlet project by the River and Harbor Act of 1951. The existing project for the Gulf Intercoastal Waterway east of New Orleans was based in House Document No. 95, 76th Cong., 1st Session, submitted May 19, 1942.

15

The Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection Project was authorized by Public Law 89-298, 27 Oct. 1965, House Doc. 231, 89th Congress 1st Session.

The Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project commenced construction in 1966.  It did not result in the redesign of any of these waterways.  It merely incorporated features previously constructed  As initially conceived and approved it consisted of two basic elements, barrier complexes at the three main tidal entrances to Lake Pontchartrain and levee floodwalls.  The barrier complexes would have permitted closure of the Lake Pontchartrain tidal passes, keeping water levels low and reducing the required height of the floodwall and levees' heights.

Portions of MRGO were included in the Lake Pontchartrain and Vicinity Plan*, i. e*., Seabrook Pass Barrier and Chalmette, but Seabrook was abandoned and the Chalmette inclusion was not a redesign to MRGO.  The inclusion did not alter the fact that MRGO was designed and operated as a highway of commerce.  The same can be said of the Michoud Canal, the Intercoastal Waterway and the Inner Harbor Navigational Canals.  None of them were "designed or operated for flood control purposes".  In fact, it was the risk they posed that prompted their inclusion.

> (c)  THE ORLEANS, NEW LONDON AND 17TH STREET CANALS WERE DRAINAGE 'OUTFALL' CANALS, NOT DESIGNED, CONSTRUCTED OR MAINTAINED BY THE UNITED STATES CORP OF ENGINEERS, PURSUANT TO THE MISSISSIPPI FLOOD CONTROL ACT OF 1928, AS AMENDED, OR ANY OTHER FLOOD PROJECT.

New Orleans had three outfall canals to accommodate the discharge of water via pumping stations at the 17th Street, Orleans and New London Canals.  These were designed and constructed by local interests with no federal involvement.  The pumping stations were State owned - set back from the Lakefront to better accomplish their purpose, the discharge of water

16

wjhich might collect inside the GNO Basin. At the time of the adoption of the Lake Pontchartrain Plan, they were said to be adequate. Whether the adequacy determination was based on the assumption that the Barrier Plan had been adopted is unstated. "The Reevaluation Study published in July 1984: abandoned the Barrier Plan and authorized the High Leven Plan, the return levees would no longer be benefited by control of the level of lake waters afforded by the Barrier Plan. The outfall canals on the Lake side of the pumping station would be exposed to elevated levels of the substitute High Level Plan and their heights were elevated.

## Conclusion

Section 702(c) immunity does not preclude claims of residents and property owners which derive from waters emanating from the non-federal portions of the outfall canals, proximately caused by a breach in the federal portion. Arguablly it does not attach to waters emanating from the federal portion of the outfall canals, as they were not "designed and operated" for federal control purposes. So to, the claims of residents and property owners emanating from the Michoud Canal, the Gulf Intercoastal Waterway, the Inner Harbor Navigational Canal, Industrial Canal and MRGO are not precluded as these waterways were not "designed and operated" for federal flood control purposes.

*Central Green* held that whether immunity attaches depends on the "character of the waters", which it defined as "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes". Under these facts, the immunity defense cannot be sustained.

                                              Respectfully submitted,

OF COUNSEL:
MILLING BENSON WOODWARD L.L.P.   \_\_\_/s/ William C. Gambel_____
                                          William C. Gambel (LA Bar No. 5900)
                                          909 Poydras Street, Suite 2300

                          New Orleans, LA  70112-1010  
                          Telephone:  (504) 569-7000  
                          Telecopy:  (504) 569-7001  
                          wgambel@millinglaw.com

John J. Cummings, III (LA Bar No. 4652  
Cummings, Cummings & Dudenhefer  
416 Gravier Street  
New Orleans, LA  70130  
Telephone:  (504) 569-0000  
Telecopy:  (504) 586-8423

CERTIFICATE OF SERVICE

      I hereby certify that on this  20th  day of December, 2006, a copy of the foregoing pleadings have been filed with the United States District Court for the Eastern District of Louisiana, and all counsel of record are being served this filing by either the court's electronic filing system or by telefaxing and/or placing a copy of same in the United States mail, properly addressed to the parties on the attached list, and with adequate postage affixed thereon.

                                                              /s/ William C. Gambel

W355822