Dissolved oxygen, pH, and fecal coliform violations are expected to continue along the southern shore of Lake Pontchartrain. Jefferson Parish has proposed to construct a regional wastewater treatment facility which will have an outfall in the Mississippi River rather than in a storm water drainage canal leading to the lake. The southern portion of Lake Pontchartrain has been identified as eutrophic, and the condition is expected to worsen.

In the IHNC and GIWW, a continuation of fecal coliform violations is expected, and occasional dissolved oxygen violations are anticipated. Fecal coliform violations can be reduced by disinfecting municipal waste and storm water from the New Orleans area. Occasional violations of dissolved oxygen, pH, and fecal coliform would occur in the MR-GO, caused by inadequate treatment of municipal wastes, urban storm water runoff, wastes from camps and individual homes, and/or solid wastes. Coliform violations are of particular concern because of the numerous connections with Lake Borgne. As with most other water bodies in the area, Lake Borgne is expected to have occasional dissolved oxygen, pH, and coliform violations. These are expected to continue until measures are taken to improve water quality in the MR-GO, Lake Pontchartrain, and Lake St. Catherine.

BOTANICAL AND ZOOLOGICAL RESOURCES. The most significant change in vegetation would be loss of marsh habitat, which would result in a decrease in the wildlife and fishing resources of the area. Most of this loss would be through the conversion of these productive marshes to less productive open water through subsidence and erosion. Marsh would also be converted to levees, disposal and developed areas, scrub shrub forest and upland developed habitat types. At the present time, there are 2,417 acres of brackish-saline marsh in the area subject to potential construction impact by the authorized plan or alternatives developed to that plan. By the year 2100, there would be only an estimated 857 acres remaining.

While the projected loss rate is numerically not as high as that associated with marshes, the forested habitats also will be decreased mainly at the expense of a gain in the upland developed habitat type through urban growth.    These forested habitats, especially the bottomland hardwoods, are very important to wildlife due to the limited existence of such resources.    The continued loss of these resources would result in a significant reduction of fish and wildlife resources in the study area.  There are presently 41 acres of bottomland hardwoods and 213 acres of cypress tupelo in the area of potential construction impact.  By the year 2100, these acreages are estimated to be 3 and 56, respectively.    Additional  information  concerning  biological  and zoological resources can be found in the EIS.

If one or several hurricanes struck the project area, there would be some damage to the cypress-tupelo forests because of the saline waters that the hurricane would push inland.  Fresh marsh could also be adversely impacted by saline waters; it might become a more brackish type or become open water.  Some wildlife would be drowned by hurricane tides.  Fisheries would probably not be impacted by hurricanes.

CULTURAL RESOURCES. The National Register properties and districts located within the present and proposed levee system would be vulnerable to hurricane-related flood damage.    Other historic properties not presently listed in the National Register would be subject to the same effects.

The Mandeville seawall is subject to collapse during hurricane or other storm-generated wave action.    Such a collapse could lead to erosion and flood damages to the historic town of Mandeville.    In particular, the three National Register properties located on Lakeshore Drive and the proposed historic district would be adversely affected by failure of the seawall.

The many archeological sites located throughout the marshes and swamps of the study area would continue to be adversely affected, as a result of the urban growth, industrialization and related development which will continue to expand into presently undeveloped low-lying areas. The shoreline retreat and the destructive natural forces of subsidence and erosion also will continue.

RECREATIONAL RESOURCES. If no Federal action is taken, the proposed project area will continue to experience an increase in urban population. Current facilities are now being used extensively by residents of the Greater New Orleans area. Newly constructed boat launches and park areas along Lake Pontchartrain in Jefferson Parish are of ample size and quality to lessen the pressure on current needs; however, future expanded populations will require additional recreational facility development as well as improvement and expansion of existing facilities.

The Jefferson Parish Recreation Department has developed a Recreation Master Plan dated March 1982. Contained in this plan are four sites along the lakefront identified for future recreational development. These include the proposed Bucktown Park with marina, increased development of the linear park system, the proposed Causeway Center development, and a recreational development adjacent to the new Williams Boulevard boat launch.

Orleans Parish also will experience increased demand for recreational facilities, especially in the vicinity of Lake Pontchartrain. The existing green spaces and "pocket parks" adjacent to the existing levee on the batture side are at times utilized to their maximum capacity for activities such as picnicking, jogging, walking for pleasure, sightseeing, and field sports. Fishing, crabbing, and sightseeing are primary activities which occur close to the lake's edge.

St. Bernard and St. Charles Parishes do not have the intensity of recreational development existing in Jefferson or Orleans Parishes. Land- and water-related recreational activities coexist in this area, and are dominated by fishing and hunting. These areas will continue to provide an attractive base for future use, and an increasing demand will be placed on existing recreational facilities in the area. As the existing recreational areas will not satisfy the additional recreational demand, increased development of facilities will be required.

**PROBLEMS, NEEDS, AND OPPORTUNITIES**

The primary problems, needs, and opportunities identified in this study relate to the adequacy of the existing level of hurricane protection for the Metropolitan New Orleans area.

PROBLEMS CONCERNING IMPROVED HURRICANE PROTECTION. Because of the extent and types of existing development, limitations on the times for advance flood-forecasting, and limitations on the capacities of hurricane evacuation routes, development of strictly nonstructural measures would not be responsive to the problems and needs of the area related to the threat of hurricane flooding. Conversely, the nature of the area's natural environment and degree of existing development dictate that any feasible structural measures probably would result in some environmental losses and/or social disruptions. The projected decline in marsh acreage in the absence of additional Federal action could increase wave surge damages since the marshes would no longer be there to attenuate such surges.

NEEDS AND OPPORTUNITIES FOR IMPROVED HURRICANE PROTECTION. As it currently exists, the ongoing project provides varying degrees of protection to the populated areas of Jefferson, Orleans, and St. Bernard Parishes. As yet, no protection to St. Charles and St. Tammany Parishes has been accomplished under the project. However, there is a

recognizable potential for the occurrence of hurricane flooding events
which would exceed the existing levels of protection.    Projections
indicate the population in the study area will continue to increase with
an attendant increase in economic investments in the area.    The
potential loss of life and property damage from a hurricane will
escalate accordingly.    There is a need to provide adequate hurricane
protection in the study area.    The opportunity exists to increase the
levels of protection to those areas which currently enjoy some degree of
hurricane protection, and also to extend hurricane protection to
surrounding areas which do not now enjoy any such protection.

    The reevaluation study provides the opportunity to assess methods
of reducing adverse environmental impacts.    Measures such as levee
realignments and alternative construction methods will be investigated.

IMPROVEMENTS DESIRED.    The controversy surrounding the originally
conceived project which culminated in the 1977 court injunction
indicated that, while the general public and special interest groups are
in support of urban hurricane protection for the study area, there is a
widespread desire that potential adverse project impacts upon the
natural and social environment be minimized.    The input received at the
21 November 1981 and the 12 April 1984 meetings held in New Orleans
confirmed these basic public concerns.    In particular, environmental
interests are opposed to the enclosure of wetland areas by levees and
the use of hydraulic fill from Lake Pontchartrain.    The project as
conceived at the time of congressional authorization has legal
assurances from local sponsors.    The local sponsors still desire
hurricane protection against SPH flooding; however, some of the sponsors
have expressed concerns that modifications to the existing plan of
improvement might increase their financial responsibilities.

## PLANNING CONSTRAINTS

Legislative and executive authorities have specified the range of impacts to be assessed, and have set forth the planning constraints and criteria which must be applied when evaluating alternative plans. Plans must be developed with due regard to the benefits and costs, both tangible and intangible, as well as associated effects on the ecological, social, and economic well-being of the region. Federal participation in developments also should insure that any plan is complete within itself, efficient and safe, economically feasible in terms of current prices, environmentally acceptable, and consistent with local, regional, and state plans. As far as practical, plans should be formulated to maximize the beneficial effects and minimize the adverse effects of the considered improvements. Adverse environmental impacts will be mitigated to the extent justified on a monetary and non-monetary basis.

The project, as originally conceived and authorized by Congress, is being built to provide SPH protection. Total flooding resulting from the occurrence of a SPH event in the New Orleans area would be potentially catastrophic in terms of loss of human life and in human suffering. Current Corps of Engineers planning criteria for urban flood protection states that when the potential for catastrophic loss of life exists SPH should be the minimum level of protection recommended unless there are other overriding considerations. Since no such considerations can be identified, provision for SPH protection as a minimum level of protection was assumed to be the primary planning constraint.

## PLANNING OBJECTIVES

The following planning objectives were established in response to the identified problems, needs, and opportunities.

o   provide more adequate hurricane protection for the east bank of the Metropolitan New Orleans area;

o   maximize the project's contribution to the Nation's economic development by reducing hurricane-related flood damages;

o   minimize adverse impacts to the natural environment and social well-being.

The following paragraphs present the planning rationale and the results of study efforts in delineating, combining, evaluating and assessing measures and plans, to meet the primary planning objective-- improved hurricane protection for the New Orleans metropolitan area.

## MANAGEMENT MEASURES

Management measures considered for providing improved hurricane protection for the New Orleans metropolitan area were limited to those such as levees, floodwalls, and floodgates to reduce flooding from hurricane-driven surges.   These structural barrier measures include those which provide direct protection to developed areas and those which reduce flooding to developed areas along Lake Pontchartrain by preventing hurricane-driven surges from entering the lake.

Nonstructural measures such as flood-forecasting, combined with evacuation, and the national flood insurance program are currently employed in the study area and will continue to be employed over the period of analysis, with or without further Federal action.   There are no other practicable nonstructural measures for improving hurricane protection to the study area.

**PLAN FORMULATION RATIONALE**

Alternative plans for providing improved hurricane protection for the New Orleans metropolitan area were limited to those which would provide, as a minimum, SPH protection. The SPH is a theoretical event; that is, a design concept which represents a composite of storm parameters estimated from historic events. Alternatives were not designed to protect against a specific historic hurricane; instead, the hurricane(s) used in the design of alternative plans were based upon the estimated probabilities of various hurricanes occuring with given magnitudes of certain important storm parameters such as central barometric pressure, wind speeds, forward translation speeds, storm tracks, etc. The selection of the value(s) of the parameters are based on historic data and experience. The alternative plans are not based upon one theoretical SPH event, but upon several SPH events, each of which would be critical to a given project reach. Levees along the New Orleans lakefront were designed to protect against the worst probable hurricane likely to occur in terms of flood threat to that specific area. For example, levees along the Jefferson Parish lakefront were designed against a similar type event, but not necessarily the same event considered critical to the New Orleans lakefront. Thus, alternative comprehensive plans were designed to protect against several theoretical worst probable hurricanes. While a SPH event does not have a specific frequency, the design SPH storm for protection bordering Lake Pontchartrain has a return frequency of approximately 300 years. The return frequency of the design SPH critical to the Chalmette, Inner Harbor, Citrus Back, and New Orleans East Back Levees is approximately 200 years.

Protection from the SPH was the minimum level of protection considered appropriate for recommendation due to the catastrophic impacts which would result from the overtopping of levees and floodwalls protecting such a densely-populated urban area. Extensive property

damage and risk to human life would occur if structures providing lower levels of protection experienced significant overtopping during a hurricane more severe than the design storm.

There are two purposes of the studies presented herein. One purpose was to develop sufficient data to allow a rational decision on the best way to complete the project; that is, the economic costs and benefits and environmental impacts which already have been incurred as a result of prior project construction were not factors in plan formulation purposes, and are not reflected in the main report. The second purpose was to analyze previous impacts as well as those which might occur as a result of detailed plans. This data has been used to prepare the accompanying EIS supplement and to determine the amount of mitigation necessary. (A separate Mitigation Report/EIS is presently being prepared.)

As construction of the authorized hurricane protection project is ongoing, and the analyses required for this study are time consuming and cannot be continuously adjusted as construction progresses, it was necessary to freeze construction activities at some point in time. For purpose of economic analysis, existing conditions are defined as 1 October 1979 conditions. Accordingly, costs-to-complete reflect costs beginning 1 October 1979. Costs incurred before that date are the same for all plans, and do not affect plan selection. Costs reflect 1 October 1981 price levels, and the annual discount rate used for formulation was the rate in effect when construction funds for the project were first appropriated, 3 1/8 percent. The economic period of analysis (project life) used was 100 years beginning in 1993 for the barrier plan and 1988 for the high level plan. These years represent

the point of beneficial completion defined as achievement of 100-year level of protection. Environmental impacts which already have occurred or can be reasonably expected to occur in the near future, based upon current construction scheduling, can be quantified through 1983. Therefore, existing conditions for environmental analysis are defined as 1984 conditions.

Incremental analysis of the separable project areas and the sensitivities of variations in levels of protection, annual discount rates, and design methods will be discussed in the recommended plan section and in Appendix B, Economic Analysis.

**PLANS CONSIDERED IN PRELIMINARY PLANNING**

Two design concepts formed the basis for the formulation of all preliminary planning alternatives. One concept would utilize barrier structures at the lake's main tidal passes in conjunction with levee/floodwall works. Plans based upon this concept, which are similar to the authorized plan, are hereafter referred to as barrier plans. The other concept would depend solely upon raising levees and floodwalls. Plans based upon this design concept are hereafter referred to as high level plans.

Alternative levee alinements were considered for the New Orleans East and St. Charles Parish areas with both the barrier and high level design concepts. The other areas are completely developed and/or have existing levee systems developed to an extent that make alternative alinements impracticable. Work on levees and floodwalls for the authorized plan (the barrier design concept) has progressed to a stage that precludes alternative construction methods for these features. With the high level design concept, these levee and floodwalls would be significantly higher in some reaches and a sufficient amount of work remains to allow the development of alternative construction methods.