The next levee reach screened with respect to alternative methods of construction for Plan 10 was the New Orleans Lakefront. None of the three considered alternatives would affect any wetlands or lake bottoms, and indirect environmental impacts would be identical. All alternatives would be a modification of the existing levee, the alinement of which runs through an area which is heavily urbanized (primarily residential) to the landside and heavily used for recreational purposes (primarily green space) to the lakeside. Therefore, the social impacts of each of the three alternatives could vary and was a screening consideration. The estimated first costs of the three alternatives considered is displayed in Table 19.

TABLE 19

SUMMARY COMPARISON OF FIRST COSTS OF PRELIMINARY ALTERNATIVES TO COMPLETE THE NEW ORLEANS LAKEFRONT LEVEE REACH FOR HIGH LEVEL PLANS
($1,000,000's, October 1981 Price Levels)

| TYPE OF CONSTRUCTION | FIRST COSTS[1] |
|---|---|
| Hauled Clay Fill | 224 |
| I-Wall on Levee | 221 |
| I-Wall on Levee with Barge Berm | 216 |

[1] Includes $124,000,000 for a solution to deficient return levees along New Orleans' three main canal outfalls for cost comparison purposes.

The two factors which were used to screen the New Orleans Lakefront levee reach alternatives were first costs and social impacts. First costs for work not common to all alternatives (work not related to the outfall canals), would vary from $92,000,000 to $100,000,000 (first costs less $124,000,000 for outfall canal work). Potential differences in social impacts would relate to levee configurations (heights and widths). Levee elevations would vary from 14.5 to 17.5 feet, and it was determined that differences between net levee elevations would have

89

minimal impacts with regards to affecting residents' view of the lakefront. Levee base widths would vary from about 140 to 230 feet, and increases would result in a reduction of green space. Of the three alternatives, the I-wall with barge berm would be the least expensive in terms of first cost. The width of the barge berm greatly reduces the required depth of the sheet piling. The reduction in steel sheet piling required offsets the increased fill costs thus, the I-wall with barge berm is less expensive than the I-wall without barge berm. In terms of levee rights-of-way, the two I-wall alternatives would be the least disruptive. A further consideration was that once construction was completed, the I-wall with barge berm feature would offer the greatest potential for recreational use and beautification. Considering all aspects, the I-wall with barge berm was chosen as the preferred method of construction for the New Orleans Lakefront levee reach.

The final levee reach to be considered with regard to construction method screening was the Jefferson Parish Lakefront levee reach. The existing Federal levee has a design grade of 10 feet. Work by local interests, not to Corps of Engineers standards for design integrity, has raised the levee grade to 14 feet. The high level plan design grade would be 14 feet, built to Corps standards. Nine alternatives were developed for completion of the levee to provide high level SPH protection. Table 20 presents the first costs associated with the nine alternatives.

Six of the nine alternatives were eliminated on the basis of first costs. The three alternatives not initially eliminated were the all earthen levee, hydraulic fill without ponding area ($123,000,000); I-wall on levee with barge berm, hydraulic fill without ponding area ($156,000,000); and I-wall on levee, hauled clay fill ($167,000,000). All three alternatives would have similar direct environmental impacts in terms of acres of lake bottoms which would be converted to levee rights-of-way. Environmental impacts would vary, as the hydraulic fill

TABLE 20

SUMMARY COMPARISON OF FIRST COSTS OF PRELIMINARY ALTERNATIVES TO COMPLETE THE JEFFERSON PARISH LAKEFRONT REACH FOR HIGH LEVEL PLANS
($1,000,000's, October 1981 Price Levels)

| TYPE OF CONSTRUCTION | FIRST COSTS |
|---|---|
| All Earthen Levee | |
|    Hauled Clay Fill (straddle) | 524 |
|    Hauled Clay Fill | 249 |
|    Hydraulic Fill without Ponding Area | 123 |
|    Hydraulic Fill with Ponding Area | 244 |
| I-Wall on Levee With Barge Berm | |
|    Hauled Clay Fill | 285 |
|    Hydraulic Fill without Ponding Area | 156 |
|    Hydraulic Fill with Ponding Area | 276 |
| I-Wall on Levee Without Barge Berm | |
|    Hauled Clay Fill | 167 |
| T-Wall (hauled clay fill) | 658 |

construction methods would result in short term turbidity during construction of the first lift(s). Alternatives also would vary in terms of design integrity, i.e., I-wall on levee without barge berm would be subject to potential barge impacts.

In comparing the three alternatives, the hydraulic fill methods were first compared. Both alternatives would be comparable in terms of design integrity. The I-wall alternative would result in slightly less short term turbidity during construction and take slightly less time to construct. These positive considerations were considered minor compared to the greater cost ($33,000,000), and it was eliminated from further consideration.

Finally, the all earthen levee, hydraulic fill without ponding area alternative was compared to the I-wall on levee, hauled clay fill alternative. Of the two alternatives, the I-Wall alternative would cost $44,000,000 more and have a lesser degree of design integrity; conversely, the I-wall alternative would not result in any short term turbidity during construction and would take less time to construct. In comparing differences between the two alternatives it was decided that the all earthen levee, hydraulic fill without ponding area was the preferred method of construction for completing the Jefferson Lakefront levee reach.

The selected method of construction would impact 573 acres of lake bottom through construction of borrow pits up to 60 feet deep. The adverse environmental impacts associated with these holes could be eliminated by the use of hauled material at a cost of at least $249 million. The potential impacts are not severe enough to warrant the additional expenditure of $126 million more than the selected alternative.

In summary, Plan 2 and a variation of Plan 10 were selected for more detailed evaluation and all other plans were eliminated. Both plans incorporate the same basic levee alinement. For ease of presentation, Plan 2 is henceforth referred to as the Barrier Plan, and Plan 10 is henceforth referred to as the High Level Plan. The Barrier Plan is shown on Plate 8 and the High Level Plan is shown on Plate 9.

## PLAN ASSESSMENT AND EVALUATION

Information presented in the following paragraphs describes in detail each of the two plans considered. Significant beneficial and adverse impacts and an evaluation also are discussed. Responsibilities for implementation are presented for each of the detailed plans.

## THE BARRIER PLAN

PLAN DESCRIPTION. This plan would provide SPH protection to the major urban areas in and immediately adjacent to New Orleans. The main features of the plan consist of barrier structures at Lake Pontchartrain's main tidal passes, improvement of the existing system of levees and floodwalls, and extension of the existing levee system to encompass the populated portion of the east bank of St. Charles Parish. The general location of the plan's proposed features are shown on Plate 8. Details of individual plan features are discussed in subsequent paragraphs.

Barrier Features. The primary features of this plan would be barrier complexes at Lake Pontchartrain's three main tidal passes: The Rigolets, Chef Menteur Pass, and Seabrook. The purpose of these complexes is to control inflows to the lake during times of approaching hurricanes to keep lake levels from rising, thereby reducing the need to raise levees and floodwalls.

The Rigolets complex would consist of barrier levees, a control structure, a navigation lock with approach channels, and a closure dam. The complex would provide a barrier against tidal influx through The Rigolets into Lake Pontchartrain under hurricane conditions, yet provide continuous tidal interchange and navigation movement under nonhurricane conditions. The cost estimate used in plan formulation is based upon a gated control structure, 1,088 feet long, which would provide a cross-sectional area of flow equal to approximately 35 percent of the natural cross-section, and allow for passage of over 90 percent of the natural tidal prism. As normal tidal interchange would occur through the control structure, and since tidal exchange is a critical factor to the ecology of the lake, costs for control structures with lengths of 1,564 feet and 2,856 feet, which would provide 50 percent and 90 percent, respectively, of the natural cross-section, also were

93

developed. (The costs of these alternate designs are presented in Tables 12 and 14.) Regardless of the size of the control structure, the navigation lock would be 110 by 800 feet. An artist's conceptual view of The Rigolets complex with the 35 percent opening is shown on Figure 4.

The Chef Menteur complex would consist of a closure dam astride the existing natural channel, barrier levees, a bypass channel for the GIWW channel (the only barrier complex feature which has been built), a control structure astride a new channel cut, and a navigation structure with approach channels. The complex would provide a barrier against tidal influx through Chef Menteur Pass into Lake Pontchartrain under hurricane conditions, and also provide for continuous tidal interchange and navigation movement during nonhurricane conditions. The cost estimate used for plan formulation purposes is based upon a gated control structure 612 feet long which would provide a cross-sectional area of flow equal to approximately 43 percent of the natural cross-sectional area of the pass, and allow for passage of over 90 percent of the natural tidal prism. Costs for control structures with lengths of 748 feet and 1,360 feet which would provide 50 percent and 90 percent, respectively, of the natural cross-section, also were developed. (The costs of these alternate designs also are presented in Tables 12 and 14.) The navigation structure would consist of a floodgate with guidewalls. An artist's conceptual view of the Chef Menteur complex with the 43 percent opening is shown on Figure 3.

The Seabrook complex would consist of a navigation lock, a control structure, and a closure dam. The complex would serve three functions: (1) during hurricane conditions, the lock and control structure would be closed to provide a barrier against tidal influx into Lake Pontchartrain; (2) during normal conditions the complex would provide a means for regulating salinity levels in Lake Pontchartrain which are affected by the MR-GO; and, (3) the lock would provide safe

passage in an area where currents are a hazard to navigation. Because of this multi-purpose nature, the 1965 authorizing legislation mandated that the first costs of the complex be apportioned equally between the hurricane protection project and the MR-GO navigation project. Therefore, only 50 percent of the first costs of the Seabrook complex are reflected in Tables 12 and 14. (Due to the nature of the Seabrook complex, alternative sizes of the control structure are not feasible.) An artist's conceptual view of the Seabrook complex is shown on Figure 2.

Chalmette Area Levee. The Barrier Plan includes an extensive levee system, which has been divided into logical reaches for analysis. One of these is a large ring levee system which would encompass and protect that portion of Orleans Parish located on the east bank of the Mississippi River, south of the GIWW and west of the MR-GO; the populated areas of St. Bernard Parish (located primarily along the east bank of the Mississippi River); and a large area of undeveloped wetlands in St. Bernard Parish. The levee system, known as the Chalmette Area Plan, is independent of the barrier structures, as the threat of tidal flooding to the area originates from Lake Borgne rather than Lake Pontchartrain, and the barrier structures would have little effect upon water levels in Lake Borgne. The levee system, which is under construction, makes use of the existing Mississippi River levee to the west. The northern and eastern portions of the system utilize existing dredged material disposal banks along the south bank of the GIWW and west bank of the MR-GO. The southern portion of the system is a new levee.

The northern levee reach, which fronts the GIWW, is an all earthen levee being constructed by means of hydraulic fill. The levee length is 5.6 miles and the final levee elevation and base width will be 14.0 feet and 500 feet, respectively. The eastern portion of the levee system, which fronts the MR-GO, is an all earthen levee also being constructed

by means of hydraulic fill. The length of this levee is 14.0 miles and the final levee elevation and bottom width will be 17.5 feet and 500 feet, respectively. There are two navigable floodgates in place at Bayou Bienvenue and at Bayou Dupre along the eastern portion of the levee system. These normally remain open and allow navigation, gravity drainage, and tidal exchange to the inclosed wetlands. The southern portion of the system is an all earthen levee being constructed by means of a combination of hydraulic fill and hauled clay fill. The levee is 10.1 miles long, the elevation will vary from 16.5 to 17.5 feet, and the base widths will vary from 250 to 500 feet. A gravity drainage structure is under construction at Creedmore Canal in the southern portion of the levee system.

Additional Independent Levee Reaches. There are four other levee reaches which are independent of the barrier structures: the IHNC East Bank Levee and IHNC West Bank Levee which parallel the IHNC, the Citrus Back Levee which runs along the northern bank of the GIWW and forms the southern boundary of the Citrus area, and the New Orleans East Back Levee which runs along the northern bank of the GIWW and forms the southern boundary of the New Orleans East Area. These levees protect against tidal surges originating from Lake Borgne and traveling via the MR-GO, GIWW, and/or IHNC.

The IHNC East Bank Levee, under construction and nearing completion, is basically I-type floodwalls driven into a hauled clay levee base, with some short sections of all earthen levee. The net grades of the levee/floodwall vary from 13 to 14 feet, and levee base widths vary from 50 to 55 feet. Total levee length is about 3.0 miles.

The IHNC West Bank Levee, near completion, also is basically I-type floodwalls driven into a hauled clay levee base with short sections of all earthen levee. The net grades of the levee/floodwall varies from 13 to 14 feet while levee base width is 20 feet. Total levee length is about 5.0 miles.

The Citrus Back Levee is built upon a locally constructed levee paralleling the GIWW. The all earthen levee is currently under construction by means of hydraulic fill and hauled clay fill. The levee is about 4.1 miles long, and will have a final grade of 14.0 feet and a base width of 300 feet.

The New Orleans East Back levee is also built upon a locally constructed levee paralleling the GIWW. This levee incorporates floodwalls surrounding the Michoud Canal which vary in net grade from 20 to 22 feet. With the exception of these floodwalls, the levee is all earthen and is currently under construction by means of hydraulic fill. Total levee length is 4.5 miles and the net design grade is 17.5 feet. The levee will have a final width of 500 feet for a length of 2.2 miles, and a final base width of 300 feet for a length of 2.5 miles.

South Point-to-GIWW Levee. The South Point-to-GIWW Levee is built upon a low locally constructed levee and is complete except for the Highway 90 crossing. The levee is an all earthen design built by means of hauled clay fill. Total levee length is 8.3 miles, and final net grades will vary from 12.5 to 14.0 feet. The base widths vary from 70 to 146 feet. There are four small gravity drainage structures located within the levee. These structures normally are controlled on the lakeside by flapgates which only allow drainage from the inclosed area to the lake. These flapgates are usually kept in the closed position. Each drainage structure has a vertical sluice gate to insure adequate control during times of hurricane occurrences.

Lakefront Levees. The New Orleans East Lakefront levee parallels the south shore of Lake Pontchartrain, connecting the South Point-to-GIWW levee with the Citrus Lakefront levee. It is located just to the landside of the Southern Railroad embankment. The levee, which is

complete except for foreshore protection, is an all earthen embankment constructed by the method of hydraulically placed sand core with a hauled clay fill cover. The levee length is 6.2 miles, the final net levee grade will be 14.0 feet and the final base width will be 190 feet.

The Citrus Lakefront levee parallels the south shore of Lake Pontchartrain between the New Orleans East Lakefront levee and the IHNC East levee. It also lies on the landside of the Southern Railroad embankment. The levee, which is complete except for foreshore protection, has a total length of 5.0 miles; about 0.7 miles of which consists of completed floodwalls and 4.3 miles of earthen levee embankment. The completed floodwall work consists of about 1/2-mile of floodwall located to the landside of the New Orleans Lakefront Airport, which is at the western terminus of the levee reach, and about 1/4 mile of floodwall located in front of Lincoln Beach, a once popular recreational area located near the eastern terminus of the levee reach. The net grade of the floodwalls (I-walls) is 11.0 feet. The remaining 4.3 miles of uncompleted earthen embankment will have a final design grade of 13.5 feet and a base width of 85 feet.

The New Orleans Lakefront levee extends from the IHNC West levee to the Jefferson/Orleans Parish line. This feature is a combination of earthen levee and floodwall (I-wall). Five sections of floodwall, ranging in length from 550 feet to 5,000 feet, would be constructed at various locations. The rest of the 6.9-mile long levee system, will consist of an all earthen section, having a final net design grade of 12 feet and a base width of 60 feet. Local interests have decided to raise portions of the levee to 16 feet as a means of interim protection. As previously discussed, the main outfall canals for New Orleans Parish constitute a weak link in the levee system. An acceptable solution to this problem has not been finalized; however, a solution representing the upper limit of reasonable cost ($124,000,000) has been included in analysis of this levee reach.

The existing Jefferson Parish Lakefront levee, which extends from the Orleans Parish line to the St. Charles Parish line, is adequate in terms of height and section, if barrier structures are in place. Cost estimates for this item include the costs for frontage (rip rap) protection along the 10.3-mile levee reach. Local interests presently are correcting structural inadequacies at pumping stations located within the levee itself (frontage protection), and will be given cost-sharing credit for this work.

To complete the hurricane protection works for Jefferson Parish, it would be necessary to construct a levee along the Jefferson/ St. Charles Parish boundary. This levee would extend from the Jefferson Parish Lakefront levee to the North of Airline Highway levee in St. Charles Parish. This feature is necessary to protect highly developed Jefferson Parish from hurricane-induced flooding of the St. Charles Parish wetlands north of Airline Highway.

St. Charles Parish Levee. This plan includes providing protection to existing developed areas on the east bank of St. Charles Parish to the Bonnet Carre' Spillway. Protection would be accomplished by a combination of levees and floodwalls, which would extend from the Jefferson-St. Charles Parish boundary levee, and basically parallel the Airline Highway to the north, terminating at the east guide levee of the Bonnet Carre' Spillway. The levee/floodwall system will have an average elevation of about 11.5 feet, vary between 147 and 180 feet in base width, and be approximately 9.9 miles long.

Mandeville Seawall. The Mandeville seawall has a net grade of 6 feet, and runs along the lakefront of the town of Mandeville, located on the north shore of Lake Pontchartrain, for a distance of 1.5 miles. The seawall originally was constructed in 1915 and improved under a Works Progress Administration project in the late 1930's. Presently it is in a poor state of repair. Repair and rehabilitation of the seawall was

part of the original plan of protection, but no legal assurances of local cooperation ever have been executed. To insure proper consideration in the event such assurances are received, a cost for repair of the seawall is included in the cost estimate for the Barrier Plan.

OTHER CONSIDERATIONS. Although no construction is currently being performed on the barrier complexes, all other project features are being constructed to be compatible with those complexes. However, once it was determined that under present conditions a high level design might be competitive with a barrier design, a decision was made by the New Orleans District not to pursue any work which would not be compatible with either a barrier or high level plan. This policy will continue until a decision is made regarding final plan selection.

COST ESTIMATES OF PLAN FEATURES. Summary listings and cost estimates of the Barrier Plan's features are presented in Table 21. Detailed cost estimates of each feature are contained in Appendix A, Engineering Investigations.

ECONOMIC ANALYSIS. Details of the economic analysis of the Barrier Plan are contained in Appendix B, Economic Analysis, and only will be summarized herein. The gross investment necessary to complete construction of the plan is estimated to be $874,238,000. Based on a 3 1/8 percent rate of return and a 100-year project life, the average annual charges for this amount are $28,640,000. Estimated annual operation, maintenance, and replacement costs are $1,764,000. Other costs which are included are annualized fish and wildlife losses estimated to be $75,000. The total of these annual charges is $30,479,000, with 1993 used as base year (the year the project is substantially completed).

100

## TABLE 21

### SUMMARY OF COSTS TO COMPLETE THE BARRIER PLAN
($1,000's, October 1981 Price Levels
3 1/8 Percent Annual Discount Rate and a 100-Year Project Life)[1]

| FEATURE | FIRST COST | ANNUAL OPERATION AND MAINTENANCE COSTS[2] |
|---|---|---|
| CHALMETTE AREA PLAN | 65,925 | 249 |
| CITRUS-NEW ORLEANS EAST AREA | | |
|   Citrus Back Levee | 5,050 | 27 |
|   New Orleans East Back Levee | 17,087 | 17 |
|   South Point to GIWW levee | 585 | 24 |
|   New Orleans East Lakefront Levee | 12,185 | 15 |
|   Citrus Lakefront Levee | 8,571 | 57 |
|   IHNC East Bank Levee | 3,423 | 30 |
| WEST NEW ORLEANS AREA | | |
|   IHNC West Bank Levee | 33,324 | 30 |
|   New Orleans Lakefront Levee[3] | 188,150 | 256 |
| EAST BANK OF JEFFERSON PARISH AREA | | |
|   Jefferson Parish Lakefront Levee | 8,871 | 39 |
| JEFFERSON-ST. CHARLES PARISH BOUNDARY LEVEE | 9,248 | 8 |
| EAST BANK OF ST. CHARLES PARISH AREA | | |
|   North of Airline Highway Levee | 37,498 | 34 |
| MANDEVILLE SEAWALL | 2,378 | 1 |
| BARRIER COMPLEXES | | |
|   Seabrook (50% of First Costs) | 45,725 | N/A |
|   Chef Menteur Pass | 109,301 | 135 |
|   The Rigolets | 195,501 | 842 |
| TOTAL CONSTRUCTION COST | 742,822 | 1,764 |

TABLE 21 (Continued)

SUMMARY OF COSTS TO COMPLETE THE BARRIER PLAN

| FEATURE | FIRST COST |
|---|---|
| GROSS INVESTMENT COST-BASE YEAR 1993[4/] | 874,238 |

Annual Costs ($1,000's)

Interest and Amortization on Investment Costs (I&A) =

$874,238 X 0.03276 = $28,640

| I&A | $28,640 |
|---|---|
| O&M | 1,764 |
| TOTAL | $30,404 |

[1/] Costs to complete from 1 October 1979.

[2/] Includes annualized costs of replacements and O&M on completed work.

[3/] Includes $124,000,000 for solution to outfall canals' problems.

[4/] Present worth of all expenditures expressed at the base year.

The benefits attributable to completion of the project under the Barrier Plan are estimated to average $101,407,000 annually, and include benefits to existing and future development. Benefits also accrue from a reduction in the cost of emergency operations required during hurricane-induced flooding. A breakdown of these benefits shows $93,303,000 would accrue to existing development, $6,699,000 to future development, and $1,405,000 to reduction in costs of emergency operations.

The average annual net benefits (benefits less costs) are $70,928,000, and the ratio of average annual benefits to average annual

costs is 3.3 to 1. If only benefits to existing developments are considered, average annual net benefits are $62,824,000 and the average annual benefits to average annual cost ratio is 3.1 to 1. Thus, the project is economically justified on the basis of protection to existing development.

IMPACT ASSESSMENT. This section summarizes the impacts projected to occur if this alternative is selected. More detailed discussions are contained in the EIS.

Environmental Impacts. The following paragraphs discuss impacts for various environmental concerns. These impacts are those projected to occur (or acreages of habitats affected) by completion of the Barrier Plan.

  Biological Resources. Constructing the Barrier Plan would result in the direct loss or alteration of approximately 2,363 acres of brackish/saline marsh, 28 acres of lake bottom, 870 acres of river/canal bottoms, 41 acres of bottomland hardwoods, and 164 acres of cypress tupelo forest. The loss of this marsh area and lake and canal bottoms would result in a moderate reduction of fish and wildlife resources within the project area. The importance of these habitats as nursery and feeding areas for both fish and wildlife must not be overlooked or underrated.

  The direct impact of the placement and operation of the barriers is difficult to quantify. Recent research has shown that the tidal passes are utilized as migration routes by many adult, juvenile, and larval estuarine and marine organisms. While it is difficult to quantify biological and nutrient transport through these passes, it can be reasonably assumed that some of this transport would be interrupted, altered or reduced through the placement of barrier structures. Changes in bottom hydrography due to sill heights, along with reduction in the

size of the natural opening of the passes, would be factors affecting such biological and nutrient transport.

The Seabrook outlet structure could be operated as a control structure to regulate salinities in certain portions of the lake or adjacent marshes, as appropriate to manage fish and wildlife resources. This would help mitigate the salinity effects of the MR-GO to Lake Pontchartrain.

If the Barrier Plan is implemented, the construction of proposed levees in St. Tammany Parish near White Kitchen could result in disturbance of endangered species habitat, i.e., eagle nesting areas.

In summary, conversion of natural habitats including marshes, swamps, and lake bottoms to levees, borrow sites, or structures would occur as a result of the project. Barrier construction in the tidal passes of Lake Pontchartrain would induce additional but unquantifiable impacts through reduction of detrital and biological transport into the lake from adjacent marshes and coastal waters. Additional discussion of impacts is given in Appendix C, Section V.

Cultural Resources. The Chef Menteur and Rigolets barrier structures, as designed in 1978, and associated levees in St. Tammany Parish have been surveyed to inventory cultural resources. No cultural resources listed on or eligible for inclusion on the National Register are located in the direct construction impact areas. However, Forts Pike and Macomb, properties listed on the National Register of Historic Places, are located adjacent to the Rigolets and Chef Menteur complexes, respectively, and visual impacts are therefore possible.

Numerous cultural resource surveys of the Chalmette area have revealed two archeological sites of possible National Register significance located near the levee rights-of-way. Both sites, 16OR40

104

and 16OR41, were reported as deeply buried shell middens located during dredging operations. In conjunction with the proposed construction of a dock facility adjacent to the levee rights-of-way, the Port of New Orleans recently (1982) conducted a deep coring study in an attempt to locate site 16OR40. No _in situ_ cultural stratum was located, and it was concluded that the site probably was destroyed during construction of the MR-GO in 1960-1962. The New Orleans District undertook a similar study to assess the impacts of the project on site 16OR41 in early 1983. Again, no _in situ_ cultural stratum was located and it was calculated that the site was probably destroyed when dredged in 1964.

Except for the completed floodwalls along the IHNC, the Citrus-New Orleans East levee system has been covered by cultural resource surveys. The surveys included architectural evaluations of the pier camps and other standing structures located on and within 120 feet of the shoreline along the Citrus and New Orleans East Lakefront levees. The evaluations found none of the structures eligible for inclusion in the National Register. No other significant cultural resources were located in the area.

The New Orleans Lakefront levee is located almost entirely on post-1930 land fill and no cultural resources are affected. The possible impacts of the Bayou St. John closure on significant cultural resources were addressed through the permit process. No National Register or Register-eligible property will be adversely affected by the Bayou St. John closure. As no solution to the New Orleans outfall canal problems has been determined, possible impacts can not be fully addressed. However, no properties currently listed on the National Register or determined eligible for listing would be impacted by the alternative solutions under consideration. However, the three pumping stations associated with the outfall canals have the potential for National Register significance. A cultural resources survey of the Jefferson Parish Lakefront levee and the Jefferson Parish/St. Charles

Parish return levee was recently completed, and located no significant cultural resources.

As the tentatively recommended St. Charles Parish levee is only in a preliminary level of design, there has been no cultural resources survey conducted. There are no cultural resources presently recorded in the area of the proposed North of Airline Highway levee alinement.

The proposed renovation of the Mandeville seawall is presently under study to determine possible impacts to buried cultural remains and to the historic buildings and proposed district along the lakefront. Although the study is not yet complete, current data indicate no significant remains would be impacted.

A remote sensing survey of the Howze Beach offshore borrow area has been conducted. A magnetometer and sub-bottom profiler were used to locate possible historic shipwrecks and prehistoric sites which might be affected by the borrow area. Three anomaly clusters were located in the Howze Beach borrow area which may represent significant historic remains. The feasibility of avoiding project impacts to these clusters by delineation of avoidance areas in the proposed borrow area is under study. If avoidance is not feasible, the anomalies will be tested to determine whether they are significant and require further mitigative effort.

Recreational Resources. Implementation of the Barrier Plan would adversely affect water-oriented recreation in the vicinity of The Rigolets and Chef Menteur barrier complexes. Short term localized turbidity would be evident in the vicinity of each barrier complex during construction, adversely affecting the fisheries resource. Within the vicinity of the structures, recreational boaters would at times encounter a possible delay in passage due to narrow openings in the barrier structures and heavy boat traffic. These obstructions would

impact the ease of boat movement between Lake Pontchartrain and Lake Borgne. In addition, tidal exchange would be decreased. As a result, sport fishing, shrimping, and crabbing in Lake Pontchartrain would not maintain its current level. A reduction of 16,793 man-days of sport fishing valued at $65,493 and of 922 man-days of sport hunting valued at $9,526 would result from implementation of this plan. See the USFWS Final Coordination Act Report Volume II, Section XIV, Table 8.

Water Quality. The Barrier Plan's potential water quality impacts primarily relate to Lake Pontchartrain. Lake Pontchartrain's water quality is essentially controlled by three factors; input from tributary area runoff and municipal and industrial discharges, tidal flux, and water circulation primarily caused by wind. Some increased development could be expected to accompany the plan, resulting in increases in runoff and discharges. Conversely, it is anticipated that over the project life there would be improvements in wastewater treatment methods, continuation of the Clean Water Act, adoption of more stringent regulations, development of better enforcement procedures, and a resultant long term improvement of the quality of runoff and discharges received by Lake Pontchartrain.

Construction of The Rigolets closure dam feature would result in increased turbidity during its construction. The operation of both The Rigolets complex and Chef Menteur complex would result in a slight decrease in the normal tidal flux (prism) on the order of 5 percent. Operation of the Seabrook complex would be expected to decrease salinities in the lake. The large scale water circulation patterns within Lake Pontchartrain are primarily controlled by winds, and would not be affected by the project. However, operation of the barrier complexes would have localized effects on water velocities in the tidal passes, thereby affecting water quality in those areas. Operation of The Rigolets complex and the Chef Menteur complex would increase water velocities whereas operation of the Seabrook complex would decrease

water velocities. Water quality in the deep borrow pits remaining after construction generally would be poor.

Water Conservation. The implementation of the Barrier Plan would not have any significant effects on water conservation.

Social Impacts. A primary impact of the Barrier Plan on social well-being would be to assure adequate protection against SPH flooding to residents of the Metropolitan New Orleans area residing within the existing levee system, and residents living on the East Bank of St. Charles Parish south of Airline Highway. This plan would protect human lives and property and provide a sense of security. The plan also would provide a lesser degree of protection to populated areas along the north shore of Lake Pontchartrain. Some induced development throughout the study area would result in a minor increase in property values in the study area. No relocations of residences would be necessary. Project construction would result in minor short term reductions of land-based recreational and esthetic values, especially along the New Orleans Lakefront and Jefferson Lakefront levee reaches. Reductions in the long term environmental values of Lake Pontchartrain would result in a similar reduction of commercial and sports fisheries values in the lake. The barrier complexes at The Rigolets and Chef Menteur Pass would have some adverse impacts upon navigation interests, whereas the Seabrook complex would have beneficial impacts on navigation interests.

SUMMARY EVALUATION. This plan fulfills the primary planning objective of providing more adequate hurricane protection for the Metropolitan New Orleans area. The plan is complete for implementation and is not reversible. In terms of completion, the plan is estimated to have a cost of $874,238,000, a benefit-to-cost ratio of 3.3 to 1 and would have annual excess benefits over costs of $70,928,000.