that portion of the Barrier Plan which is the responsibility of that levee district. These assurances were approved on behalf of the United States on 7 December 1977. Supplemental assurances required by Public Law 91-646 were received as follows:

   a. Orleans Levee District: supplemental assurances were executed on 21 September 1973.

   b. Pontchartrain Levee District: supplemental assurances were executed on 15 October 1973.

   c. St. Tammany Parish Police Jury: the assurances executed by the Governor on 8 May 1972 included Public Law 91-646 requirements.

The Mandeville Seawall portion of the project is not covered by any existing assurances.

The assurances listed as items b and c above have not been accepted on behalf of the Government due to lack of supporting data; however, substitute assurances incorporating the deferred payment plan authorized by Public Law 93-251 and Public Law 91-646 have been executed by these levee districts. These assurances were approved on behalf of the United States on 7 December 1977.

The Water Resources Development Act of 1974 (Public Law 93-251) enacted 7 March 1974, provided that local assuring agencies for this project (both plans) could, if they so chose, repay their cash obligation using a deferred payment plan. New assurances have been executed by local interests incorporating such a deferred payment plan. These assurances were approved by the Secretary of the Army on 7 December 1977. Local interests have been making payments under this plan since fiscal year 1977 and are current in payment.

Local interests have cooperated in all efforts to date and have given assurances that all requests for additional cooperation will be expedited. However, they have delayed granting rights-of-way as scheduled on certain items due to lawsuits brought by landowners and challenges made in court by environmental concerns. Some local interests are constructing items of flood protection works at vulnerable locations as work in-kind in lieu of cash contribution. They will be given credit only for the portion meeting project requirements. This work has been closely coordinated with the New Orleans District.

All negotiations for relocations are the responsibility of local interests and are on schedule.

On 1 January 1979, the State of Louisiana formed the Jefferson Levee District and assigned to it the responsibility of the Pontchartrain levees on the east bank of the Mississippi River. (These levees previously were the responsibility of the Pontchartrain Levee District.) Revised assurances are being sought from the Pontchartrain Levee District to cover the St. Charles portion of the project, and new assurances are being sought from the Jefferson Levee District for the Jefferson Parish segment of the project.

# STUDY PARTICIPANTS AND COORDINATION

The District Engineer, New Orleans District, Corps of Engineers, had the responsibility for conducting and coordinating the study, consolidating information from other agencies and interested parties, formulating the plan and associated recommendations, and preparing the report. Coordination was maintained with the US Environmental Protection Agency, US Fish and Wildlife Service, National Marine Fisheries Service, Louisiana Department of Transportation and Development (Office of Public Works), Jefferson Levee District, Lake Borgne Basin Levee District, Orleans Levee District, Pontchartrain Levee District, St. Bernard Parish Police Jury, and other Federal, state, and local agencies.

A public meeting for this study was held on 21 November 1981 in New Orleans, Louisiana, to discuss the plans under consideration. Attendees included representatives of Federal, state, and local agencies, the state legislature, parish offices, special interest groups, and the news media, as well as members of the affected public. Most testimony at the meeting was in favor of the High Level Plan. A representative of the Jefferson Levee District expressed concern about the high cost of the Jefferson Parish protection under the High Level Plan. The executive attorney of Save Our Wetlands Inc., an environmental interest group, expressed support for the High Level Plan but was opposed to the protection of any wetland areas which might be developed in the future. As a general conclusion, the testimony at the meeting supported the High Level Plan.

A second public meeting was held on 12 April 1984 in New Orleans, Louisiana, to present the tentatively selected plan to the public.

Representatives from various government agencies, special interest groups, the news media, and the general public attended. Attendees clearly preferred the High Level Plan to the Barrier Plan, but reservations over environmental issues were also expressed. In addition to the opposition expressed at the first meeting to the protection of wetland areas, concern was expressed over the size of the proposed borrow pits in Lake Pontchartrain required to construct the Jefferson Parish lakefront levee. Comments also addressed the quantity and timing of mitigation.

A draft of this report was transmitted to all agencies, groups and individuals who normally receive such documents, and to additional agencies, groups and individuals who have expressed an interest in the project. Their comments were considered in the preparation of the final report.

# FINAL SUPPLEMENT I TO THE ENVIRONMENTAL IMPACT STATEMENT

## LAKE PONTCHARTRAIN, LOUISIANA, & VICINITY HURRICANE PROTECTION PROJECT

### PARISHES

ST. BERNARD
ORLEANS
JEFFERSON
ST. CHARLES
ST. JOHN
  THE BAPTIST
TANGIPAHOA
ST. TAMMANY

### ABSTRACT

New Orleans and adjacent municipalities are located in southeastern Louisiana. The New Orleans District has investigated public concerns relating to the needs and opportunities to provide hurricane flood protection. Of the 16 plans considered, two were selected for detailed study. The Barrier Plan provides for barriers to control inflows to Lake Pontchartrain and levees and floodwalls around developed areas. Inflows to the lake would be regulated by control structures and associated barriers and locks in the main tidal passes of the lake: the Inner Harbor Navigation Canal, The Rigolets, and Chef Menteur Pass. The resulting lower lake levels would reduce the height and cost of levees along the south shore of the lake. A new levee system would be constructed in St. Charles Parish. The Barrier Plan would provide a high level of hurricane protection for those urban areas located generally between the Mississippi River and Lake Pontchartrain. Completion of this plan would destroy 2,363 acres of highly productive marsh and result in an unquantified reduction in tidal transport of nutrients and biota which could affect fisheries. The High Level Plan proposes to provide basically the same hurricane flood protection as the Barrier Plan but no barriers would be built; instead, existing levees would be raised, new levees would be built in St. Charles Parish and floodwalls provided where necessary. Completion of the High Level Plan would cause the loss of approximately 54 acres of marsh and would be less costly to implement than the Barrier Plan. This plan is the most efficient from the viewpoint of national economic development and would be the least environmentally damaging. Because of strong opposition to the Barrier Plan and no known significant opposition to the High Level Plan, implementation of this plan is more feasible. The High Level Plan more nearly meets all planning objectives. Thus, the High Level Plan has been selected as the Recommended Plan.

Send your comments to OCE, ATTN: DAEN-CWP by

If you would like further information on this statement, please contact Mr. Larry Hartzog, U. S. Army Corps of Engineers, New Orleans, P. O. Box 60267, New Orleans, Louisiana. 70160.
Commercial telephone: (504) 838-2524

### JULY 1984

LEAD AGENCY   U.S. ARMY CORPS OF ENGINEERS DISTRICT
NEW ORLEANS, LOUISIANA

NOTE   *Information, displays, maps, etc. discussed in the Main Report and Appendixes are incorporated by reference in the EIS.*

**Intentionally Blank**

**Page EIS - 2**

# 1. SUMMARY

## 1.1. INTRODUCTION

1.1.1. New Orleans and its suburbs are bordered by water on three sides: Lake Pontchartrain lies to the north, Lake Borgne to the east, and the Mississippi River to the south (see Plate 1). This densely populated low-lying area is susceptible to heavy damage and faces high risk to human life from hurricane-induced flooding. In 1965, Congress authorized the US Army Corps of Engineers (Corps) to construct a hurricane protection system for the New Orleans metropolitan area. Part of the authorized plan included features to prevent an increase in water levels in Lake Pontchartrain as a hurricane approached. This was to have been accomplished by placing barrier structures in the Rigolets and Chef Menteur tidal passes and the Inner Harbor Navigation Canal. The structures at Chef Menteur and the Rigolets would remain open except immediately prior to, and during, hurricanes. In addition to the barrier complexes, levees would be built along the entire lakefront from the Bonnet Carre' Spillway to South Point, with back levees around the Citrus and New Orleans East areas and a ring levee in the Chalmette area (see Plate 3).

1.1.2. A final Environmental Impact Statement (EIS) on the authorized plan (Barrier Plan) was filed with the Council on Environmental Quality in 1975. In 1977, the EIS was ruled inadequate and a court injunction was issued to stop all construction of the Chef Menteur and Rigolets barrier structures, pending preparation of a legally adequate EIS. In the interim, the court allowed construction of the levee portion of the plan to continue. Project reevaluation studies pursuant to the court-ordered revision of the EIS have led to the selection of an alternative to the Barrier Plan. This alternative, called the High Level Plan, would provide hurricane protection by raising and strengthening levees and floodwalls to a higher elevation than required by the Barrier Plan and would have no requirements for the barriers. Since the 1975 final EIS was considered to be adequate in terms of describing impacts of the levees, this EIS supplement will analyze only post-1984 impacts; i.e., the additional impacts that would be incurred by completing either the Barrier or High Level Plan. Construction impacts prior to 1984 are addressed only to determine the amount of mitigation necessary.

## 1.2. MAJOR CONCLUSIONS AND FINDINGS

### 1.2.1. RATIONALE FOR THE NATIONAL ECONOMIC DEVELOPMENT (NED) PLAN

The Barrier Plan would provide maximum total benefits because it would protect not only all areas protected by the High Level Plan, but also some populated areas along the north shore of Lake Pontchartrain. However, the High Level Plan is the least expensive and would provide maximum excess benefits over costs and was designated the NED Plan.

### 1.2.2.  RATIONALE FOR THE RECOMMENDED PLAN

1.2.2.1.  The High Level Plan would result in the least environmental damage in terms of direct construction impacts. It would destroy 54 acres of marsh as opposed to 2,363 acres impacted by the Barrier Plan. Although the High Level Plan would have wider based levees, the Barrier Plan would require more miles of levees to connect the barrier structures. Raising the Jefferson Parish Lakefront levees to the height necessary for the High Level Plan would create short-term turbidity in the lake adjacent to the levee. The short-term turbidity caused by construction of the barrier structures (especially the damming of Chef Menteur Pass) would be more significant, because it would occur in areas more valuable to the ecosystem. Construction of the Barrier Plan would necessitate dredging approximately 512 acres to a depth of 20 to 40 feet below existing bottoms. The High Level Plan would entail deepening 573 acres of lake bottoms to 60 feet below existing bottoms. Although this facet of the High Level Plan may be more environmentally damaging than the Barrier Plan, the other environmental impacts of the Barrier Plan are far more significant. The Barrier Plan also would have potential adverse impacts on an endangered species, the bald eagle. Additionally, the Barrier Plan would restrict the transport of biota and nutrients through the tidal passes and result in a long-term reduction in the productivity of Lake Pontchartrain and reduce its export to other systems.

1.2.2.2.  In terms of social impacts, however, the High Level Plan is the least acceptable. During raising of the levees for the High Level Plan along the Orleans and Jefferson Parish lakefronts, esthetic values would be greatly reduced because of noise, dust, and movement of equipment. Recreational values would be diminished as the existing linear recreational green spaces in Jefferson and Orleans Parishes are destroyed; however, levees would be designed to preserve and protect the recently developed Williams Boulevard and Bonnabel Boulevard boat launch complexes. Once construction is complete, the new levees would provide continuous green spaces that could be landscaped and redeveloped for recreation. The barriers in The Rigolets and Chef Menteur Pass would increase water velocities, and thereby adversely affect navigation (including small fishing boats and sail boats). The barriers also would reduce the biological productivity of Lake Pontchartrain, which would decrease the harvest of sport and commercial fish and shellfish. In terms of implementation, the Barrier Plan would be strongly opposed by a broad spectrum of interests. Opposition to the High Level Plan is much less. In summary, the High Level Plan comes closest to meeting all planning objectives. It provides adequate hurricane protection to the east bank of the New Orleans metropolitan area, is most effective in terms of NED, minimizes adverse impacts on the natural environment and social well-being, and exploits some project-related opportunities to enhance social well-being. Thus, the High Level Plan was selected as the Recommended Plan.

### 1.2.3. CONCLUSIONS OF THE SECTION 404 EVALUATION PROCESS

Concerns involving Section 404 of the Clean Water Act initially were discussed in public notices dated 29 November 1974 and 22 January 1975, in a 22 February 1975 public meeting, and in a 25 August 1975 Statement of Findings. Only the barrier complexes, New Orleans East levees, and Chalmette area levees were considered in this process. Three new Section 404(b)(1) Evaluations were prepared in 1982. They document findings specified in the Revised Guidelines for Specification of Disposal Sites for Dredged or Fill Material published in the "Federal Register" on 24 December 1980. These evaluations concluded: that no practicable alternative to the High Level Plan exists which would have less adverse impacts to the aquatic ecosystem, that applicable state and Federal water quality standards would not be violated, that the discharge would not contribute to a significant degradation of the waters of the United States, and that appropriate and practicable steps have been taken to minimize adverse impacts to the aquatic ecosystem. A Section 404 Public Notice was sent to the agencies and the public at the same time that the draft of this EIS supplement was released. A State Water Quality Certificate was received on 29 June 1984. All Section 404(b)(1) Evaluations are included in Appendix C, Sections VII to IX.

### 1.2.4. FINDINGS RELATING TO EXECUTIVE ORDER 11990 (PROTECTION OF WETLANDS)

1.2.4.1. This Executive Order states that Federal agencies should not alter wetlands unless there is no practicable alternative. Of the two plans considered, the High Level Plan would destroy the fewest acres of wetlands. The South Point to Gulf Intracoastal Waterway (GIWW) levee alinement in New Orleans (see Plate 6) incloses 13,000 acres of wetlands; however, as a result of levees constructed by local authorities, these wetlands have been inclosed and removed from tidal exchange with Lake Pontchartrain since 1958. Raising the levees would increase the developmental potential; however, no development in these wetlands can occur without a Section 404 Permit from the Corps of Engineers. An application for a permit to develop 9,800 acres of this area has been made (see Plate 6), and the applicant is preparing an EIS on his proposal. Since the fate of these wetlands is dependent upon regulatory decisions, their potential loss is not attributed to this hurricane protection project. Mitigation for any loss of these wetlands will be addressed at the time the permit is processed.

1.2.4.2. In St. Charles Parish, a somewhat similar situation exists concerning the wetlands south of Airline Highway. Approximately 4,000 acres of cypress tupelo swamp are presently partially isolated from the wetlands north of Airline Highway by locally constructed railroad and highway embankments. The proposed hurricane protection levee would preserve the existing hydraulic connections between the wetlands south of Airline Highway and the area outside the levee.

1.2.4.3. Although the tentatively selected plan would provide an additional level of flood protection, the 4,000 acres would remain wetlands. No development in these wetlands could occur under Federal regulations without a Section 404 permit from the Corps of Engineers. Thus, development of these wetlands would be determined by the permit process and not by levee placement. Mitigation for any fish and wildlife losses incurred through development would be addressed at the time a specific permit is processed.

1.2.5. **FINDINGS RELATING TO EXECUTIVE ORDER 11988 (FLOOD PLAINS)**

The proposed action would occur within a flood plain. Practicable alternatives have been identified and are discussed in Section 4 of the EIS, and no reasonable nonflood plain alternatives exist. Section 6 of the EIS describes the beneficial and adverse impacts of each alternative and describes any expected losses of flood plain benefits. Views of the general public have been obtained at several public meetings, the most recent on 12 April 1984. The Recommended Plan preserves the most flood plain benefits derived from socioeconomic and environmental values and still provides flood protection.

1.2.6. **FINDINGS OF THE ENDANGERED SPECIES ASSESSMENT**

A 1982 Endangered Species Assessment concluded that the High Level Plan would not adversely impact any endangered species nor their critical habitat. The US Fish and Wildlife Service (FWS) concurred with this assessment. Subsequently, an eagle nest was discovered near the levee alinement in St. Charles Parish. We have determined that the High Level Plan would not impact this nest. This information is contained in a revised assessment. The revised assessment and correspondence with FWS is contained in Appendix C, Section I.

1.2.7. **COASTAL ZONE MANAGEMENT CONSISTENCY DETERMINATION**

A Consistency Determination was prepared to determine if the High Level Plan is consistent with the Louisiana Coastal Zone Management Act. It determined that the plan is consistent with all applicable guidelines to the maximum extent practicable. This Determination was sent to the Louisiana Department of Natural Resources (DNR) who stated in a 19 June 1984 letter that all features are consistent with the Louisiana Coastal Resources Program to the maximum extent practicable, except the alinement in New Orleans East. The DNR maintains that the New Orleans East alinement may not be consistent, while the Corps believes that our alinement is consistent to the maximum extent practicable. We are pursuing informal consultation with DNR and believe the conflict can be resolved. The Consistency Determination is contained in Appendix C, Section X. Correspondence with DNR is contained in Appendix D, Public Views and Responses.

## 1.3. AREAS OF RESOLVED CONTROVERSY

The major resolved controversy involves the Barrier Plan. This plan was opposed by several Federal agencies, environmental groups, and some citizens of the north shore of Lake Pontchartrain because of unquantifiable, but significant, impacts on the biology and hydrology of the lake, and the potential to increase north shore flooding. Detailed investigations for this study indicated that the High Level Plan was more feasible considering both environmental and economic aspects. Thus, the High Level Plan is the Recommended Plan.

## 1.4. UNRESOLVED ISSUES

1.4.1. The plan described in the 1975 EIS included a levee alinement along the lakefront in St. Charles Parish. There was extensive environmental opposition to such an alinement because it would inclose 25,000 acres of wetlands north of Airline Highway and impact another 1,000 acres of wetland by construction (see Plate 3). Because of environmental considerations, this alinement was put in an indefinitely deferred status in the early 1970's. A suit to force construction of the levee was entered in the same court which enjoined construction of the barrier features. This suit is being held in abeyance pending submission of the final EIS supplement for this project.

1.4.2. The FWS recommends that the St. Charles Parish levee segment be eliminated; but if it is determined that the levee is in the public interest, they recommend a levee alinement immediately adjacent to Airline Highway. They suggest that the exact location be determined jointly by the New Orleans District (NOD), FWS, National Marine Fisheries Service (NMFS), and the Louisiana Department of Wildlife & Fisheries (LW&F) during the advance engineering and design stage. In addition, it was recommended that the Corps should maintain complete control of the gated water control structures to be incorporated in the alinement. The Corps has determined that the levee is in the public interest and the Recommended Plan includes an alinement just north of Airline Highway. The aforementioned agencies will be consulted during preparation of the General Design Memorandum for this levee segment.

1.4.3. A second unresolved issue involves the levee alinements in the New Orleans East area described in paragraph 1.2.5. above. Environmental groups claim that raising the South Point-to-GIWW levee to high level specifications would make development of the inclosed wetlands more attractive. These wetlands have been inclosed for more than 2 decades. Although raising the levee to Standard Project Hurricane (SPH) level of protection would increase potential for development of the 13,000 acres of wetland, any filling operations would be regulated under the permit authority of Section 404. Decisions on such operations are based on public interest and the District Engineer will make an independent decision on the matter.

1.4.4. Another unresolved issue, ancillary to that discussed in paragraph 1.4.3., concerns tidal exchange between the inclosed wetlands and Lake Pontchartrain. Since 1958, the only exchange has been drainage through four flapgates in the South Point to GIWW levee. These remain in the closed position except after a heavy rain. Environmental groups and natural resource agencies desire that tidal exchange be reestablished to preserve the viability of the marsh, to allow it to again function as an estuarine nursery area for fish and shellfish, and to again export nutrients and detritus to the adjacent estuary. Such a resumption of tidal exchange is considered to be infeasible for several reasons; the most significant is that such an action would necessitate purchase of flooding easements and could require the elevation of Interstate 10. Easements would require Congressional authorization and incur additional costs to the local sponsors, who are opposed to such action. (For further discussion of this matter, see paragraphs 4.2.10. and 4.2.11.)

1.4.5. The FWS recommends that nondevelopment easements be purchased over the 9,700-acre wetland area in New Orleans East and that the water control structures in the South Point to GIWW levee be modified to reestablish tidal exchange. It is NOD's position that the proper solution to the problem of development in New Orleans East is via the permit process. However, one alternative we are studying in our preliminary mitigation plan is to restore tidal exchange to New Orleans East and purchase perpetual flowage easements where appropriate.

1.4.6. There still remains some disagreement over the source of fill material for the high level levee along the Jefferson Parish lakefront. The most economical method of obtaining and placing the fill material is by the proposed hydraulic dredging of the lake bottom adjacent to the lakefront alinement. This method would result in creation of a submarine borrow pit approximately 60 feet in depth and 500 feet in width for a distance of approximately 9 miles. The FWS objects to this method of obtaining fill material and recommends either utilization of hauled fill or development of a method of dredging that would alleviate water quality and biological productivity problems. The Corps has analyzed various other methods of obtaining fill material including hauled fill (including barge transport) and a combination of hauled fill and hydraulic fill. None of these methods was found to be cost effective. Further discussion of this analysis is contained in the main report on pages 90 to 92.

1.4.7. No agreement has been reached with the numerous environmental interests concerning the issue of concurrent mitigation. The Corps has agreed to mitigate for all construction impacts from project initiation to project completion. However, to finalize detailed mitigation plans and costs, further scoping, evaluation, and interagency coordination are required. Therefore, the mitigation plan will be prepared as a separate report which will be accompanied by an EIS and Fish and Wildlife Coordination Act Report. Environmental intrests and the FWS would like

the finalized mitigation plan to accompany the present EIS. The draft mitigation report is scheduled for public release in the summer of 1985 and should be finalized by early 1986. Project construction will not be completed by this date and mitigation plans will be initiated upon approval to obtain mitigation as concurrently as practicable with the remaining construction.

## 1.5. RELATIONSHIP OF PLANS TO ENVIRONMENTAL REQUIREMENTS

Table 1.5 indicates the relationship of each plan to Federal and state environmental protection statutes and other environmental requirements.

FC = Full Compliance
PC = Partial Compliance
N/A = Not Applicable

Table 1.5

RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR
OTHER ENVIRONMENTAL REQUIREMENTS

|  | HIGH LEVEL | BARRIER |
|---|---|---|
| **FEDERAL STATUTES** | | |
| 1. Preservation of Historical Archeological Data Act of 1974. Completion of the ongoing and planned cultural resource studies will bring project into full compliance. | PC | PC |
| 2. Clean Air Act, as Amended. | FC | FC |
| 3. Clean Water Act of 1977. | FC | F |
| 4. Coastal Zone Management Act of 1972, as Amended. | FC 1/ | PC |
| 5. Endangered Species Act of 1973, as Amended. Compliance will be achieved upon receipt of a Biological Opinion from FWS regarding our ammended Biological Assessment. | PC | PC |
| 6. Estuary Protection Act. | FC | FC |
| 7. Federal Water Project Recreation Act. | FC | FC |
| 8. Fish and Wildlife Coordination Act. | FC | FC |
| 9. Land and Water Conservation Fund Act. | FC | FC |
| 10. Marine Protection Research and Sanctuaries Act of 1972, as Amended. | N/A | N/A |
| 11. National Historic Preservation Act. Completion of ongoing and planned cultural resource studies will bring the project into full compliance. | PC | PC |

1/ The Corps considers inself to be in full compliance with this feature, DNR does not concur.

Table 1.5 (Continued)

RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR
OTHER ENVIRONMENTAL REQUIREMENTS

|  |  | HIGH LEVEL | BARRIER |
|---|---|---|---|
| 12. | National Environmental Policy Act. Compliance requires signature of the Record of Decision. | PC | PC |
| 13. | River and Harbor Act. | FC | FC |
| 14. | Watershed Protection and Flood Prevention Act. | N/A | N/A |
| 15. | Wild and Scenic Rivers Act. | FC | FC |

EXECUTIVE ORDERS

|  |  | HIGH LEVEL | BARRIER |
|---|---|---|---|
| 1. | Executive Order 11988, Floodplain Management. | FC | FC |
| 2. | Executive Order 11990, Protection of Wetlands. | FC | FC |
| 3. | Executive Order 12114, Environmental Effects Abroad of Major Federal Action. | N/A | N/A |
| 4. | Executive Memorandum, Analysis of Impacts on Prime or Unique Agricultural Lands in Implementing NEPA. | FC | FC |
| 5. | Executive Order 11593, Protection and Enhancement of the Cultural Environment. Completion of ongoing and planned cultural resource studies will bring the project into full compliance. | PC | PC |

STATE AND LOCAL POLICIES

|  |  | HIGH LEVEL | BARRIER |
|---|---|---|---|
| 1. | Air Control Law. | FC | FC |
| 2. | Archaeological Treasure Act. | FC | FC |
| 3. | Historic Preservation Districts Act. | N/A | N/A |
| 4. | Louisiana Natural and Scenic Streams Act. | FC | FC |

## Table 1.5 (Continued)

### RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR OTHER ENVIRONMENTAL REQUIREMENTS

|  | HIGH LEVEL | BARRIER |
|---|---|---|
| 5. Protection of Cypress Trees (EO 1980-3). | FC | FC |
| 6. Water Control Law. | FC | FC |
| **LAND USE PLANS** | | |
| 1. Louisiana Coastal Zone Management Plan. | FC [1/] | FC |
| 2. Land Use Element of the Area-Wide Comprehensive Plan (Jefferson, Orleans, St. Bernard, and St. Tammany Parishes). | FC | FC |

### REQUIRED FEDERAL ENTITLEMENTS

None are required.

## 2. TABLE OF CONTENTS

| Title | Page |
|---|---|
| Cover Sheet | EIS-1 |
| 1. SUMMARY | EIS-3 |
|    1.1. INTRODUCTION | EIS-3 |
|    1.2. MAJOR CONCLUSIONS AND FINDINGS | EIS-3 |
|    1.3. AREAS OF RESOLVED CONTROVERSY | EIS-7 |
|    1.4. UNRESOLVED ISSUES | EIS-7 |
|    1.5. RELATIONSHIP OF PLANS TO ENVIRONMENTAL REQUIREMENTS | EIS-9 |
| 2. TABLE OF CONTENTS | EIS-13 |
| 3. NEED FOR AND OBJECTIVES OF ACTION | EIS-15 |
|    3.1. STUDY AUTHORITY | EIS-15 |
|    3.2. PUBLIC CONCERNS | EIS-15 |
|    3.3. PLANNING OBJECTIVES | EIS-15 |
| 4. ALTERNATIVES | EIS-17 |
|    4.1. DEVELOPMENT OF ALTERNATIVES | EIS-17 |
|    4.2. PLANS ELIMINATED FROM FURTHER STUDY | EIS-18 |
|    4.3. FUTURE WITHOUT ADDITIONAL FEDERAL ACTION | EIS-21 |
|    4.4. PLANS CONSIDERED IN DETAIL | EIS-22 |
|    4.5. COMPARATIVE IMPACTS OF ALTERNATIVES | EIS-27 |
| 5. AFFECTED ENVIRONMENT | EIS-31 |
|    5.1. ENVIRONMENTAL CONDITIONS | EIS-31 |
|    5.2. SIGNIFICANT RESOURCES | EIS-32 |
|    5.3. SECTION 122 ITEMS | EIS-48 |
| 6. ENVIRONMENTAL EFFECTS | EIS-51 |
|    6.1. SIGNIFICANT RESOURCES | EIS-51 |
|    6.2. SECTION 122 ITEMS | EIS-65 |
| 7. LIST OF PREPARERS | EIS-69 |
| 8. PUBLIC INVOLVEMENT | EIS-71 |
|    8.1. PUBLIC INVOLVEMENT PROGRAM | EIS-71 |
|    8.2. REQUIRED COORDINATION | EIS-72 |
|    8.3. STATEMENT RECIPIENTS | EIS-72 |
|    8.4. PUBLIC VIEWS AND RESPONSES | EIS-78 |
| 9. LITERATURE CITED | EIS-79 |

**Intentionally Blank**

**Page EIS - 14**

## 3. NEED FOR AND OBJECTIVES OF ACTION

### 3.1. STUDY AUTHORITY

3.1.1. The ongoing hurricane protection project was authorized by Public Law 89-298, 27 October 1965, House Document 231, 89th Congress, 1st Session (the Flood Control Act of 1965) generally in accord with recommendations contained in a report from the Chief of Engineers. Upon receipt of funds in 1966, construction of the hurricane protection project began.

3.1.2. In response to the National Environmental Policy Act of 1969, the US Army Corps of Engineers prepared an Environmental Impact Statement (EIS) and filed it with the Council on Environmental Quality in January 1975. Shortly thereafter, the adequacy of the EIS was challenged in court. On 30 December 1977, major portions of the project were enjoined from further construction by United States District Court, Eastern District of Louisiana, New Orleans Division. Subsequently, in March 1978, the injunction was modified to allow construction to continue on all portions of the project except the barrier complexes at Chef Menteur Pass and The Rigolets. Studies to support a legally adequate EIS have been in progress since the injunction.

### 3.2. PUBLIC CONCERNS

The primary public concern relates to the adequacy of the existing hurricane protection in the New Orleans metropolitan area. Although varying levels of protection exist, there remains a potential for significant hurricane-induced flooding to exceed present low levels of protection. Such flooding could result in extensive property damage and loss of human life. The controversy surrounding the originally conceived project indicates that, while the public supports hurricane protection, there is widespread concern about possible adverse environmental and social impacts from the project.

### 3.3. PLANNING OBJECTIVES

The following planning objectives were established in response to the identified problems, needs, and opportunities: provide more adequate hurricane protection for the east bank New Orleans area; maximize the project's contribution to the Nation's economic development; minimize adverse impacts on the environment and social well-being; and exploit project-related opportunities to enhance the environment and social well-being.

**Intentionally Blank**

**Page EIS - 16**