## 4. ALTERNATIVES

### 4.1. DEVELOPMENT OF ALTERNATIVES

4.1.1. Alternative plans were limited to structural measures because all feasible nonstructural measures are in use, but do not provide adequate hurricane protection. Two basic design concepts were considered--high level and barrier. Under each concept, various levee alinements in New Orleans East and St. Charles Parish were possible. Using combinations of these elements, 16 alternative plans were formulated (see Table 4.1).

TABLE 4.1

ALTERNATIVE PLANS

| PLAN | BARRIERS | NEW ORLEANS EAST ALINEMENT | ST. CHARLES PARISH ALINEMENT |
|------|----------|----------------------------|------------------------------|
| 1    | Yes      | Existing                   | Lakefront                    |
| 2    | Yes      | Existing                   | North Airline                |
| 3    | Yes      | Existing                   | South Airline                |
| 4    | Yes      | Existing                   | Boundary Levee               |
| 5    | Yes      | Maxent Canal               | Lakefront                    |
| 6    | Yes      | Maxent Canal               | North Airline                |
| 7    | Yes      | Maxent Canal               | South Airline                |
| 8    | Yes      | Maxent Canal               | Boundary Levee               |
| 9    | No       | Existing                   | Lakefront                    |
| 10   | No       | Existing                   | North Airline                |
| 11   | No       | Existing                   | South Airline                |
| 12   | No       | Existing                   | Boundary Levee               |
| 13   | No       | Maxent Canal               | Lakefront                    |
| 14   | No       | Maxent Canal               | North Airline                |
| 15   | No       | Maxent Canal               | South Airline                |
| 16   | No       | Maxent Canal               | Boundary Levee               |

4.1.2. The barrier concept involves controlling inflows to Lake Pontchartrain during approaching hurricanes, thus reducing the required heights of levees and floodwalls which would protect the New Orleans area. Inflow would be controlled by construction of barrier complexes at Lake Pontchartrain's three main tidal passes: the Inner Harbor Navigation Canal (IHNC), The Rigolets, and Chef Menteur. Each barrier complex would consist of a gated control structure, a closure dam, a navigational structure and approach channels, and any necessary tie-ins to adjacent levees (see Figures 2, 3, and 4). The high level concept proposes to provide hurricane protection by raising existing levees and constructing new levees in St. Charles Parish.

4.1.3. The New Orleans East area levees inclose 13,000 acres of wetlands (see Plate 6). Concerns have been expressed that development of these wetlands would not be in the public interest. Thus, an alternative alinement along the Maxent Canal was formulated to protect developed lands, but exclude these wetlands.

4.1.4. The east bank of St. Charles Parish is not protected from tidal flooding from Lake Pontchartrain. A levee along the lakefront was part of the original plan; however, because of environmental considerations, a decision was made in the early 1970's to indefinitely defer construction of this feature. Three alternative levee alinements have been developed. The North of Airline alinement would extend along the existing return levee at the St. Charles-Jefferson Parish line to just north of Airline Highway, then turn west and parallel the highway to the Bonnet Carre' Spillway (see Plate 7). The South of Airline alinement is a modification of the previous alinement that would veer south of the highway to avoid inclosing about 3,000 acres of wetlands. The St. Charles-Jefferson Parish Boundary alinement would consist of strengthening and lengthening the existing return levee, along the St. Charles-Jefferson Parish line. This would provide protection to Jefferson Parish from high water caused by flooding of the St. Charles Parish wetlands, but would not provide any protection to developed areas of St. Charles Parish.

## 4.2. PLANS ELIMINATED FROM FURTHER STUDY

4.2.1. For a detailed rationale of the process of screening alternative plans, see pages 72 to 92 of the Main Report.

4.2.2. **PLAN 1** consists of the barrier complexes, the existing alinement in New Orleans East, and the Lakefront alinement in St. Charles Parish (see Table 4.1). This plan would inclose 28,000 acres of wetlands in St. Charles Parish, but would allow for limited tidal exchange between these wetlands and the lake during normal conditions. An additional 1,000 acres of wetland would be lost to levee and borrow. However, sheet flow interchange would be eliminated, reducing the biological productivity of the wetlands and the lake. Further analysis indicated there was no discernable need to develop these wetlands during

the project life. Cost analyses showed the Lakefront alinement had the highest first cost to protect St. Charles Parish. For both environmental and economic reasons, Plan 1 was eliminated.

4.2.3. **PLAN 3** consists of the barrier complexes, the existing New Orleans East levee, and the South of Airline alinement in St. Charles Parish. This plan avoids inclosing approximately 3,000 acres of wetlands south of Airline Highway. However, these forested wetlands are subject to tidal exchange only through culverts under Airline Highway. The North of Airline alinement would include similar culverts; thus, when these two alinements are compared, neither would alter the existing hydrology as long as the culverts remain open. Since the South of Airline alinement is approximately 2.5 miles longer, it would cost substantially more. Thus, Plan 3 was eliminated, mainly for economic reasons.

4.2.4. **PLAN 4** consists of the barrier complexes, the existing New Orleans East levee, and the Boundary Levee alinement for St. Charles Parish. This plan would provide no hurricane protection to the east bank of St. Charles Parish, but would serve to complete hurricane protection for highly developed Jefferson Parish. Since analysis showed that there was a potential for extensive damage and loss of life from hurricane-induced flooding in the developed portion of the east bank of St. Charles Parish, Plan 4 was eliminated.

4.2.5. **PLAN 5** consists of the barrier complexes, the Maxent Canal alinement in New Orleans East, and the Lakefront alinement in St. Charles Parish. The Maxent Canal alinement would avoid increasing the height of levees which now inclose approximately 13,000 acres of wetlands. (These wetlands have been inclosed since 1958 by a system of railroad embankments and levees.)

4.2.6. The Maxent Canal alinement is much shorter than the existing levee system to the east; however, it would be a new levee on a poor foundation as opposed to an existing levee in an advanced stage of construction. Thus, it would cost $70,000,000 more to build the Maxent Canal alinement than to complete the existing levee alinement, and, in addition, costs and plans must be developed to prevent flooding of Interstate 10. The number of acres of land required to build the Maxent Canal alinement is approximately equal to the number needed to finish the existing levee.

4.2.7. At the time of project authorization, it was assumed that the 13,000 acres of wetlands would be developed and project benefits for urban expansion were claimed. Subsequently, national policy changed to support preservation of wetlands. In this study, no benefits are claimed for future urban development in these wetlands.

4.2.8. Recently, the New Orleans District received a permit request (under authority of Section 404 of the Clean Water Act of 1977) from a

private developer. New Orleans East, Inc., proposes to develop approximately 9,800 of the 13,000 acres, and is preparing an Environmental Impact Statement on the proposed development. Subsequent to submittal of the EIS, the District Engineer will make a decision to approve or deny the permit. This decision will be based on national interest.

4.2.9. A consideration related to the Maxent Canal alinement is the possibility of tidal exchange between the 13,000 acres of wetlands and Lake Pontchartrain. To drain the area to the west of the South Point to GIWW levee, local authorities built four small gravity drainage structures with flap gates in the late 1950's. These structures have been improved and floodgates added as a part of Federal work on the project. At the present time, the floodgates are open, but the drainage structures remain closed because of the flap gates. Thus, there has been no tidal exchange between these wetlands and Lake Pontchartrain in over 2 decades.

4.2.10. Environmental groups, the NMFS, and the FWS have suggested that tidal exchange be reestablished to increase the productivity of the wetlands for waterfowl, furbearers, and estuarine fish and shellfish. By rejoining these wetlands and the lake, the normal exchange of nutrients and detritus could occur and the marsh would be available as a nursery area for fish and shellfish. This reconnection is opposed by several interests. The local levee board claims that landowners granted rights-of-way for the preproject levee system with the understanding that the inclosed area would be drained and developed. The levee board is concerned that implementing a plan counter to the original goals would open them to legal liability. They also claim that reopening the area to tidal exchange would require acquisition of expensive flowage easements. This is beyond the original authority of the project, and a purpose for which they did not agree to provide assurances. Further, it could increase their financial burden. Therefore, they do not wish to participate in such an action. The local authority responsible for operating and maintaining drainage in an adjacent housing development fears that increased water levels would lead to further infiltration into the forced drainage system and raise costs. The local mosquito control authority is concerned that tidal interchange might increase breeding habitat for mosquitoes near populated areas. In addition, reestablishment of tidal exchange could cause flooding of Interstate 10, a major route through the area; therefore, costs and plans must be developed to prevent such flooding. Restoration of tidal interchange to all or part of New Orleans East will be further investigated during mitigation studies.

4.2.11. The Maxent Canal alinement does not increase the existing hurricane protection to the wetland area between Maxent Canal and the existing South Point to GIWW levee, but would preclude development of that area. Future national or local policies and needs may make such development desirable, and project completion using the existing levee

could accomodate such policy changes without future additional costs for hurricane protection. Because of this consideration and the excessive costs of the Maxent Canal alinement compared to the existing alinement, Plan 5 was eliminated.

4.2.12. **PLANS 6, 7, AND 8** consist of barrier complexes, the Maxent Canal alinement, and various alinements in St. Charles Parish. The Maxent Canal alinement was determined to be infeasible for reasons discussed in paragraphs 4.2.5. through 4.2.11. above. Plans 6, 7, and 8 were eliminated from further study.

4.2.13. **PLAN 9** utilizes the high level concept with the existing alinement in New Orleans East and the Lakefront alinement in St. Charles Parish. The Lakefront alinement is undesirable from both environmental and economic viewpoints as described in paragraph 4.2.2, so Plan 9 was eliminated.

4.2.14. **PLAN 11** utilizes the high level concept with the existing levee alinement in New Orleans East and the South of Airline alinement. Because of the undesirability of the South of Airline alinement as described in paragraph 4.2.3., Plan 11 was eliminated.

4.2.15. **PLAN 12** has the high level concept, the existing levee in New Orleans East, and the Jefferson-Orleans Parish Boundary levee alinement in St. Charles Parish. Plan 12 was eliminated for reasons discussed in paragraph 4.2.4. In this case, the trade-off analysis indicated the incremental cost of Plan 10 over Plan 12 (about $56,000,000) was justified.

4.2.16. **PLANS 13, 14, 15, AND 16** all include the high level concept, the Maxent Canal alinement, and varying alinements in St. Charles Parish. They were eliminated mainly because of the undesirability of the Maxent Canal alinement, as discussed in paragraphs 4.2.5. through 4.2.11.

## 4.3. FUTURE WITHOUT ADDITIONAL FEDERAL ACTION

4.3.1. This project is ongoing and this EIS supplement includes only work from 1984 to 2100. In a strict sense, no future without-project exists; instead it is the future with no additional Federal action.

4.3.2. Significant improvement in the overall quality of project area surface waters is not anticipated. The water quality of Lake Pontchartrain is expected to improve slightly as a result of the planned cessation of municipal wastewater discharge from the south shore. However, pumping of bacteria-laden storm waters into the lake will continue, and the growth of the Port of New Orleans will increase opportunities for hazardous material spills. Much of the remaining marsh of the study area will convert to water, scrub shrub, or upland developed habitat (see Tables 4.3 and 6.3). Forested areas will be cleared and

developed. The continued loss of these habitats will decrease the fish and wildlife resources of the area. Recreational development will continue, especially in Orleans and Jefferson Parishes.

4.3.3. Hurricane-induced flooding could also affect numerous acres of wildlife habitat by increasing salinities.

4.3.4. The rising floodwaters could additionally cause drowning of terrestrial wildlife or isolation of these animals from their food base or feeding areas.

4.3.5. Population growth in the economic area will continue. In recent years, the largest volume of growth has taken place in Jefferson Parish. Most of the new residential expansion in Orleans Parish has occurred in the eastern part of the city. The east bank section of St. Charles Parish also is projected to grow at a rapid rate. People, dwellings, and businesses in the New Orleans metropolitan area will continue to be threatened with loss of life and property from hurricanes. This could discourage future economic growth in undeveloped areas and could delay construction of such proposed developments as the Almonaster-Michoud Industrial Development. In addition, land-use density in the more protected portions of the area will increase, raising the costs of such valuable lands.

## 4.4. PLANS CONSIDERED IN DETAIL

### 4.4.1. BARRIER PLAN

4.4.1.1. This plan would provide barrier complexes at the three tidal passes. Levees would protect the east banks of St. Charles and Jefferson Parishes, Orleans Parish, and portions of St. Bernard Parish. (For a detailed description of plan features, see the Plan Assessment and Evaluation Section in the Main Report.) The Rigolets complex would consist of barrier levees, a 110- by 800-foot navigational lock, a closure dam, and a gated control structure 1,088 feet long with riprapped approach channels and a sill at present bottom depth (see Figure 4). The complex would provide a cross-sectional area of flow equal to about 35 percent of the natural cross section and would allow for passage of over 90 percent of the natural tidal prism. The Chef Menteur complex would consist of an earthen closure dam across the existing channel, barrier levees, a bypass channel for the GIWW, a navigational floodgate on a new channel, and a 612-foot gated control structure astride another new channel (see Figure 3). The sill of the control structure would be 10 feet above the floor of the approaches. The control structure would provide a cross-sectional area of flow equal to approximately 43 percent of the natural cross section of the pass and would allow for passage of over 90 percent of the natural tidal prism. The Seabrook complex would consist of a navigational lock, a control structure, and a closure dam (see Figure 2). The only work that has been accomplished on the barrier complexes is the GIWW bypass channel.

4.4.1.2. The Chalmette Area Plan is a levee system which would protect the populated areas of St. Bernard Parish and inclose 16,312 acres of marsh (see Plate 4). All first lifts of this levee system have been completed except a short portion near Florida Avenue which is under construction. Table 4.2 shows the height and width of the various levee reaches and describes the method of construction. There are existing navigable floodgates in Bayous Bienvenue and Dupre which normally remain in the open position to allow navigation, gravity drainage, and tidal exchange to the inclosed marshes. A gravity drainage structure is planned at Creedmore Canal. Borrow material for construction would be taken from the Mississippi River-Gulf Outlet (MR-GO), the GIWW, and existing pits along the south reach of the levee.

4.4.1.3. The levees protecting the IHNC are described in Table 4.2. All first lifts have been completed.

4.4.1.4. The New Orleans East area, shown on Plate 6, would be protected by levees with dimensions described in Table 4.2. This system inclosed 13,000 acres of marsh. All first lifts are completed. There are four small gravity drainage structures with both flap and sluice gates in the South Point to GIWW reach of this levee system. The flap gates are normally closed and only allow drainage out of the inclosed marsh during and immediately after heavy rains. Borrow material for the back levee would be taken from existing pits. Hauled clay probably would come from pits in the Slidell area.

4.4.1.5. The Citrus Back and Lakefront, New Orleans Lakefront, Jefferson Lakefront, and St. Charles levee systems are shown on Plate 8 and described in Table 4.2. "Riprap" foreshore protection will be provided between the IHNC and Paris Road segment of the Citrus lakefront levee and along the Citrus Back. This will require the excavation of shallow, lakeside floatation channels to enable the "riprap" material to be barged in.

4.4.1.6. In Orleans Parish, there are three major outfall canals flanked by return levees which tie into pumping stations at the heads of the canals. These return levees are inadequate in terms of grade and stability. Several alternatives are being considered; however, no specific solution has been finalized with the local agencies.

4.4.1.7. The existing seawall in front of the town of Mandeville would be renovated and strengthened (see Plate 8).

4.4.1.8. IMPLEMENTATION RESPONSIBILITIES. Since the Seabrook complex would not only be part of the hurricane protection project, but is also an authorized feature of the MR-GO navigation project, 50 percent of its first costs and all operation and maintenance costs are allocated to MR-GO. All other features of the Barrier Plan are allocated to the hurricane protection project. The Federal Government would pay 70 percent of the first costs and non-Federal interests would be

TABLE 4.2

LEVEE DIMENSIONS AND TYPE

| REACH | BARRIER PLAN | | | HIGH LEVEL PLAN | | | TYPE OF LEVEE AND PREPROJECT CONDITION OF LAND |
|---|---|---|---|---|---|---|---|
| | Height (feet) | Width (feet) Final Levee | Height (feet) | Width (feet) | | | |
| Chalmette North | 14 | 500 | | 14 | 500 | | Hydraulic fill on existing GIWW dredged material. |
| Chalmette East | 17.5 | 500 | | 17.5 | 500 | | Hydraulic fill on existing MR-GO dredged material. |
| Chalmette South | 16.5-17.5 | 250-500 | | 16.5-17.5 | 250-500 | | Hydraulic and hauled clay fill on existing levee first built for this project. |
| IHNC East and West | 13-14 | 20-55 | | 13-14 | 20-55 | | I-wall on hauled clay base; some hauled clay levee only. Both on IHNC dredged material. |
| New Orleans East Back | 17.5 | 300-500 | | 17.5 | 300-500 | | Hydraulic fill on locally built levee. |
| South Point-GIWW | 12.5-14 | 70-146 | | 13.5-15 | 130-176 | | Hauled clay fill on locally built levee. |
| New Orleans East Lakefront | 14 | 190 | | 16.5 | 272 | | Hauled clay fill on locally built levee. |
| Citrus Lakefront | 13.5 | 85 | | 13.5-15 | 85 | | Hauled clay fill on locally built levee. I-wall on hauled clay base with barge berm.1/ Floodwall at Lincoln Beach. Foreshore protection. |
| Citrus Back | 14 | 300 | | 14 | 300 | | Hydraulic fill on existing levee. Foreshore protection. |
| New Orleans Lakefront | 12 | 60 | | 14.5 | | | Hauled clay fill on existing levee. I-wall on levee with barge berm. 1/ Floodwall at Lakefront Airport, Seabrook Beach, American Standard, Pontchartrain Beach, and Orleans Marina. |
| Jefferson Lakefront | 10 | 180-240 | | 14 | 686 | | Hydraulic fill on existing Federal levee. |
| Jefferson-St. Charles Boundary | 9-11 | | | 14 | 686 | | Hydraulic fill on existing Federal levee. |
| St. Charles at Airline Highway | 11.5 | 180 | | 13.5 | 238 | | Hauled clay fill with floodwall in restricted areas. |

1/ The most recent engineering studies indicate that hauled clay may be less costly than an I-wall with barge berm. If such a design change is made, a Supplemental Information Report will be prepared.

EIS-24

responsible for the remaining 30 percent. All the annual operation and maintenance costs would be borne by non-Federal interests.

4.4.1.9. MITIGATION. Project impacts are being minimized to the greatest degree possible through the following actions: use of existing levee alinements to the maximum extent feasible; use of I-wall, T-wall, or other floodwall type design to minimize levee widths in sensitive areas where feasible; use of silt curtains, turbidity diapers, retainment dikes or other turbidity control devices where possible; and provision of erosion control to intermediate levee lifts. Unavoidable environmental impacts would have to be mitigated by various compensation measures.

4.4.2. HIGH LEVEL PLAN DESCRIPTION

4.4.2.1. This plan would raise levees and floodwalls to a height sufficient to protect against hurricane surges from Lakes Pontchartrain and Borgne. The design for some features (Chalmette Area Plan, IHNC East and West levees, Citrus Back levee, New Orleans East Back levee, and Mandeville Seawall) is identical to that under the Barrier Plan because these features function independently of barrier structures. All other levee reaches for the High Level Plan are similar in alinement to the Barrier Plan, but are higher and wider because the water levels in Lake Pontchartrain would be higher without the barriers. Table 4.2 indicates the elevation, width, and method of construction of each reach. Plate 9 shows the location of the reaches. Only minimal modification of the four existing structures in the South Point-to-GIWW reach is expected. The same problems involving the grade and stability of the outfall canal return levees as described in paragraph 4.4.1.6. would exist. The hydraulic fill for the Jefferson Parish levee would be obtained from an in-lake borrow pit to be located approximately 2,500 feet offshore and parallel to the shoreline. These borrow sites would be discontinuous and approximately 9 miles in length, 500 feet in width, and 60 feet in depth National Geodetic Vertical Datum (NGVD).[1] Recent hydraulic analysis of water movements in Lake Pontchartrain have indicated that, even during extreme weather conditions (hurricanes), the bottom waters of a 60-foot borrow pit would not mix with adjacent Lake Pontchartrain waters. Further consideration will be given to physical configuration, orientation and side slope pitch of the proposed borrow pits in order to expedite filling of the pits and, thereby, reduce the probability of sustained water quality impacts.

---

[1] Unless otherwise noted, all elevations in this report herein are expressed in feet referenced to National Geodetic Vertical Datum, formerly referred to as mean sea level.

4.4.2.2. IMPLEMENTATION RESPONSIBILITY. The legislative authority for this project specifies that the costs be shared, with the Federal Government bearing 70 percent of the first costs and non-Federal interests paying 30 percent. All annual operation and maintenance costs would be the responsibility of non-Federal interests.

4.4.2.3. MITIGATION. As previously noted, to properly estimate mitigation needs, all construction impacts associated with the project (from start to completion) have been considered.

4.4.2.4. The impacts associated with the post-1984 completion of both the Barrier Plan and the High Level Plan are noted in Tables 6.1, 6.2, and 6.3. On an annualized basis, approximately 32 acres of brackish/saline marsh and 106 acres of cypress-tupelo swamp would be lost due to completion of the High Level Plan. Comparable numbers for completion of the Barrier Plan would be 1,283 acres of brackish/saline marsh and 92 acres of swamp. Annualized losses of 740 acres of brackish/saline marsh and 81 acres of fresh/intermediate marsh have already occurred between 1979 and 1984. Thus, to fully mitigate for the Barrier Plan, it would be necessary to mitigate for an annualized loss of 81 acres of fresh/intermediate marsh, 2,023 acres of brackish/saline marsh, and 92 acres of swamp. The High Level Plan would be fully mitigated by replacing the habitat units associated with an annualized loss of 81 acres of fresh/intermediate marsh, 772 acres of brackish/saline marsh, and 106 acres of swamp. In addition, it would be necessary to mitigate for the annualized loss of 431 acres of lake bottoms with the High Level Plan or 279 acres with the Barrier Plan.

4.4.2.5. In order to mitigate these wetland losses, various plans are being developed. One plan would be to manage various marshes in St. Bernard Parish (see Plate 12). Without management, these marshes would deteriorate over time. Mitigation measures would include the construction of a series of shallow water distribution ditches, low-level dikes and water-control structures.

4.4.2.6. Another concept would involve providing protection to marsh immediately adjacent to Lake Pontchartrain in St. Charles Parish, Orleans Parish, and in the Manchac Wildlife Management Area through shoreline stabilization. Management of wetlands in St. Charles Parish will also be considered (see Plate 12). Reestablishment of tidal exchange to all or part of the area of New Orleans East east of the Maxent Canal alinement will be considered. Filling of the Chef Menteur Bypass Channel or similar work in that area will also be studied.

4.4.2.7. While still building the Barrier Plan in 1976, extensive marsh areas near Chef Menteur Pass were diked for future disposal. After the court injunction, these dikes were breached reestablishing tidal exchange. Many of the borrow canals were plugged to prevent erosion. Thus, these areas have been restored to a great extent. In addition, a borrow pit near Yscloskey utilized for levee construction has been

modified to act as a controlled release reservoir to benefit fish and wildlife production when water levels are normally low in the adjacent marshes (see Plate 12).

4.4.2.8. A separate Mitigation Plan/EIS is being prepared. During the summer and early fall of 1984, a series of meetings and workshops will be held with interested parties. The plan should be completed and ready for review by higher authority within the Corps of Engineers by early 1985. Public review is scheduled for the summer of 1985 and filing of the final EIS on mitigation should occur early in 1986. Our goal is to fully mitigate for all construction impacts of the project. One manner in which mitigation needs will be determined is through the Habitat Evaluation Procedure of the USFWS.

## 4.5. COMPARATIVE IMPACTS OF ALTERNATIVES

The following Table 4.3., Comparative Impacts of Alternatives, describes in a comparative form the base and without condition, the impacts of the detailed plans on significant resources, and plan economic characteristics. More detailed information on the impacts described in this table are described in Section 6, Environmental Effects.

4.3 TABLE - COMPARATIVE IMPACTS OF ALTERNATIVES

| ITEM | BASE (1978) [1] | FUTURE WITH NO ADDITIONAL FEDERAL ACTION (2100) | FUTURE WITH HIGH LEVEL PLAN (2100) | FUTURE WITH BARRIER PLAN (2100) |
|---|---|---|---|---|
| CYPRESS-TUPELO | Present in area of potential construction impact: 213 acres. | Remaining [2]: 56 acres. 157-acre loss from base due to nonproject-induced conversion to upland developed. | Remaining: 0 acres. 213-acre loss from base due to levee construction and nonproject-induced conversion to upland developed. 56-acre loss from future with no additional Federal action due to levee construction. | Remaining: 7 acres. 206-acre loss from base due to levee construction and nonproject-induced conversion to upland developed. 49-acre loss from future with no additional Federal action due to levee construction. |
| BOTTOMLAND HARDWOODS | Present in area of potential construction impact: 41 acres. | Remaining: 3 acres. 38-acre loss from base due to nonproject-induced conversion to upland developed. | Same as future with no additional Federal action. | Remaining: 0 acres. 41-acre loss from base due to levee construction. Three-acre loss from future with no additional Federal action due to levee construction. |
| AGRICULTURAL LANDS | Present in area of potential construction impact: 0 acres. | No impact. | No impact. | No impact. |
| MARSH | Present in area of potential construction impact: 2,417 acres. | Remaining: 857 acres. 1,560-acre loss from base due to nonproject-induced conversion to scrub shrub, lake bottom, bayou/canal, and developed. | Remaining: 854 acres. 1,563-acre loss from base: 54 acres to project levees and 1,529 acres to nonproject-induced conversion to scrub shrub, lake bottom, bayou/canal and developed. 20-acre loss from future with no additional Federal action due to conversion to project levees. | Remaining: 20 acres. 2,397-acre loss from base: 2,219 acres to project disposal areas and levees, 178 acres to nonproject-induced conversion to scrub shrub, lake bottom, bayou/canal and developed. 837-acre loss from future with no additional Federal action due to project disposal and levees. |
| LAKE PONTCHARTRAIN AND ADJACENT WATERS | Present in area of potential construction impact: 870 acres of bayou/canal and 1,012 acres of lake bottom. Lake Pontchartrain, MR-GO, IHNC, and GIWW are all hydraulically connected and experience similar water quality problems. Each is subject to sewage contaminated stormwater and domestic and industrial wastewater discharges from the New Orleans metropolitan area. Each is subject to low-level impacts of toxic contaminates from atmospheric washout and fallout, and periodic accidental spills of hazardous wastes. | Present in 2100: 995 acres of bayou/canal and 1,528 acres of lake bottom. 124-acre gain in bayou/canal from base due to oil and gas development. 516-acre gain in lake bottoms due to nonproject-induced marsh erosion and subsidence. Water quality same as Base. | Present in 2100: 993 acres of bayou/canal and 1,091 acres of lake bottom. 124-acre gain of bayou canal and 79-acre gain of lake bottom from base due to nonproject-induced marsh erosion and subsidence. Two-acre loss from future with no additional Federal action of bayou/canal due to less marsh being available to convert to this habitat. Principal water quality impacts relate to elevation of suspended solids and turbidity levels resulting primarily from construction of Jefferson Parish levee. There would also be runoff from fill materials in other areas. It is probable that anoxic water would occur in the borrow pits adjacent to Jefferson Parish during the summer months. However, due to the lack of mixing with adjacent waters, little effect on local water quality is expected. | Present in 2100: 667 acres of bayou/canal and 1,051 acres of lake bottom. 203-acre loss of bayou/canal from base due to project-induced disposal and lack of marsh to convert to this habitat type. 39-acre gain of lake bottoms from base. 327-acre loss of bayou/canal and 477-acre loss of lake bottom from future with no additional Federal action because marsh that would have become water without the barriers was used for disposal. Short-term increased suspended solids and turbidity levels in the tidal passes and adjacent to levees. High potential for dispersion of any contaminants present in the fill material. Potential for long-term impacts due to leaching of contaminants from the levees and the closure of Chef Menteur Pass. Modification of circulation and flow patterns in the passes could potentially produce regions of localized poor water circulation and reduced flushing. |
| FISHERIES [3] | Fisheries resources are commensurate with the extent of marshes within the study area. The estimated commercial catch in 1978 is approximated at a total value of $76,329 for the Lake Pontchartrain/Borgne system. | Marsh loss would reduce catch to 239,065 pounds valued at $66,341 by 2100. | Marsh remaining would produce 252,702 pounds of fish valued at $64,710. Approximately 0.1 percent of the lake bottoms would become 60-foot holes which would effectively remove the area from benthic productivity. | Remaining marsh acreage would produce 5,060 pounds of catch valued at $9,854. |
| WILDLIFE | The wildlife resources are commensurate with the extent of marsh, bottomland hardwood, cypress tupelo, scrub shrub, and open water habitat in the area of potential construction impacts. Wildlife rich and varied in study area. | Wildlife populations would decline due to reduced amount of habitat available. | This plan would result in the average annual loss of 985 habitat units which would reduce habitats for nutria, muskrat, raccoon, shorebirds, deer, puddle ducks, and diving ducks. | This plan would result in the average annualized loss of 2,117 habitat units. |

4.3 TABLE - (CONTINUED)

| ITEM | BASE (1984) [1/] | FUTURE WITH NO ADDITIONAL FEDERAL ACTION (2100) | FUTURE WITH HIGH LEVEL PLAN (2100) | FUTURE WITH BARRIER PLAN (2100) |
|---|---|---|---|---|
| ENDANGERED SPECIES | The only endangered species likely to occur in the project area is the bald eagle. | Cypress tupelo in possible nesting area in St. Charles Parish could be converted to development. Cypress tupelo near St. Tammany nest is protected in a game management area. | The active eagle nest located in St. Charles Parish would not be negatively impacted by the project. | Implementation of this plan would disturb or possibly destroy an active nesting site through project associated construction. |
| BLUE LIST | About 15 of the 28 "Blue listed" species are relatively common in the project area. | Reduction in marsh and forested habitats would cause decline in abundance of most species. | The impacts would be similar to future with no additional Federal action, but could be slightly greater. | Moderate impact to species utilizing marsh habitat due to large marsh losses. Other species impacted similar to future with no additional Federal action. |
| RECREATION | The principal recreational activities existing in the base condition are swimming, bicycling, jogging, boating, picnicking, field sports, hunting, and fishing. It is estimated that 783,421 annual man-days of recreation exist valued at $2,532,799 annually. Included in the 783,421 man-days are 2,039 man-days of sport hunting and at $15,991 and $74,316, fishing valued at $15,991 and $74,316, respectively. Three wildlife management areas are in the project area, none are in areas of potential construction impact. | The increased population and shrinking recreational resource base would increase public demand for the use of existing recreational facilities in the Orleans and Jefferson Parishes study area. The Jefferson Parish Department of Recreation has planned two recreational sites along the shoreline. Wildlife management areas would experience marsh loss at the prevailing rate with subsequent reduction in fish and wildlife value. In Orleans Parish, construction is currently underway on the new 80-acre South Shore Harbor. Also in the Orleans reach along the lakefront, planned improvements include biking and jogging trails, trees and shrubs, benches, and fountain renovation. | This plan would impact facility based recreation. Of the existing 783,421 man-days of recreational use, a potential loss of 318,534 man-days exists (116,661 man-days are located within the construction right-of-way). However, 201,226 man-days would be protected by design modification, i.e., floodwall, for a net loss of 116,661 man-days valued at $375,859. No impact on wildlife management areas. | This plan would impact the hunting and fishing resource. A potential loss of 922 man-days of sport hunting valued at $9,526 and a loss of 16,793 man-days of sport fishing valued at $65,493 would occur. Total man-day losses attributed to this plan are 17,715 valued at $75,019. Facility based recreation would not be affected with development of the Barrier Plan. No impact on wildlife management areas. |
| NATIONAL REGISTER OF HISTORIC PLACES | Numerous study area historic properties and districts, as well as significant cultural resources, are listed in the National Register of Historic Places. | Future research and field investigations should identify additional cultural resources that may be eligible for listing. However, urban growth, industrialization, development, shoreline retreat, subsidence and erosion would continue to adversely affect these resources. | No adverse impacts on presently listed National Register-eligible properties. However, all cultural resource studies are not yet complete. | Possible visual impacts of the Rigolets and Chef Menteur Barrier Complexes on Forts Pike and Macomb, respectively. |
| MINERALS | Mineral production of petroleum and natural gas and, to a lesser extent, extractable clay and sand fill materials are found within the project area. | Petroleum based production would probably be reduced. | Minor disruption in transportation of petroleum products due to the relocation of natural gas pipelines. | Same as future with High Level Plan but to a greater extent due to the number of pipeline relocations involved. |
| AIR QUALITY | Air quality is relatively good. No violations of National Ambient Air Quality Standards except ozone in urban New Orleans area. | Quality would decrease as industrialization and urbanization spread. | Minor, temporary degradation during construction. | Same as future with High Level Plan. |
| NOISE | Noise pollution normally associated with urban life, including traffic, and construction as well noise connected with shipping, oil exploration, and fishing in rural areas. | The continued economic growth of the New Orleans area would result in increased noise pollution. | Completion of the High Level Plan would require construction activities causing temporary noise pollution. | Impacts would be similar to future with High Level Plan. |
| FLOOD CONTROL | The New Orleans metropolitan area is subject to the threat of flood damage caused by frequent hurricanes which pass through the area. | Without completion of the project, the potential for flood damage caused by the surge of a project hurricane would continue. | Completion of the plan is expected to prevent flood damage caused by the surge of a project hurricane. | Impacts would be similar to the High Level Plan; however, this plan would provide protection to the north shore area. |
| PROPERTY VALUES | The value of property protected from flooding is relatively high, the value of unprotected property is lower. | If the project is not completed, areas without adequate protection would be of less value. | Minor increases in property value in areas experiencing project protection. | Similar to future with High Level Plan, but greater because of protection furnished to North Shore area. |

EIS-29

4.3 TABLE - (CONTINUED)

| ITEM | BASE (1978) [1/] | FUTURE WITH NO ADDITIONAL FEDERAL ACTION (2100) | FUTURE WITH HIGH LEVEL PLAN (2100) | FUTURE WITH BARRIER PLAN (2100) |
|---|---|---|---|---|
| BUSINESS AND INDUSTRIAL ACTIVITY | The economic base is centered around the port, transportation, and related commercial activities. | The economic base of the area would probably remain the same, with an increasing trend toward tourist trade, and industrial development in the Almonaster-Michoud Industrial District (A-MID). | Additional flood protection provided to business and industry, A-MID development accelerated. | Impacts would be similar to future with High Level Plan with possible additional development incentive on the north shore. Some perceive that this plan would potentially foreclose water-based development on the north shore. |
| EMPLOYMENT | More than 65 percent of the total employment of the economic area is in services, retail trade, manufacturing, transportation, communications and utilities, and construction. | Employment conditions would generally follow recent trends. | Completion of the project would generate an estimated $4,240,000 in benefits. | Construction-related employment benefits are estimated at $5,360,000. |
| HOUSING | The limited amount of protected land in the New Orleans area has resulted in relatively high housing densities. Pockets of low quality housing, renovation in older neighborhoods. Rapid construction in suburbs. | The without-project condition would probably follow existing trends. | Additional flood protection would benefit approximately 160,000 dwelling units. | About 167,000 dwelling units would receive additional flood protection. |
| ESTHETICS | The esthetics of the study area are generally high. | Esthetics would generally continue to be high. | During construction, esthetics along lakefront would be greatly reduced. After construction, more open spaces would exist. | Esthetics in passes would be temporarily altered during construction. |
| COMMUNITY COHESION | Community generally support plans for improved flood protection. | Without completion of the project, social stresses created by a project hurricane could be more significant. | Community cohesion would be adversely impacted to some degree by construction in highly populated area. Environmental community concerned over potential for project-induced development in New Orleans East. | Community cohesion would be adversely affected to a minor extent during construction. Environmental opposition to plan is strong. |
| FIRST COSTS | N/A | 0 | $627.7 million | $742.8 million |
| AVERAGE ANNUAL COSTS | N/A | 0 | $ 22.8 million | $ 26.4 million |
| BENEFIT-COST RATIO | N/A | 0 | 4.2 | 3.3 |
| NET BENEFITS | N/A | 0 | $ 73.0 million | $ 60.6 million |

[1/] For the purpose of the EIS, only environmental impacts to complete the project will be assessed. 1978 is the base year since this is the year for which habitat acreage losses were computed. The earliest construction could be initiated to complete the project is 1984. Since some Federal action has taken place, the without-project condition is referred to future with no additional Federal action. The area of potential construction impact is the 4,921 acres that would be directly impacted by any project feature.

[2/] Remaining refers to the number of acres of a particular habitat remaining in the area of potential construction impact at the end of project life (2100).

[3/] Open water is classified into two categories: bayou/canal and lake bottoms.

[4/] It is assumed, based on recent studies, that the estuarine dependent fisheries resources are currently being produced and harvested at maximum rate and any loss in marsh habitat would cause a corresponding loss in fishery produce. Basis for fishery economics is the average exvessel price of the landings (as provided by National Marine Fisheries Service) for the 16-year period 1963-1978. The net profit to the fisherman was calculated from exvessel prices adjusted for the cost of harvest.

EIS-30

## 5. AFFECTED ENVIRONMENT

### 5.1. ENVIRONMENTAL CONDITIONS

5.1.1. The project area is located in southeastern Louisiana in the vicinity of New Orleans. It encompasses Lake Pontchartrain and adjacent wetlands to the north and west, the western third of Lake Borgne, and the wetland areas between Lakes Pontchartrain and Borgne (see Plate 11). Climatic conditions within the area are subtropical marine. The dominant topographic feature is Lake Pontchartrain, a shallow body of water (average depth 12 feet) with an area of approximately 640 square miles, lying in the middle of a large estuarine complex with a diurnal tidal regime. The lake drains approximately 4,700 square miles of tributary area. The area to be inclosed by the proposed levee includes all of the east bank of Orleans Parish and portions of St. Bernard, Jefferson, and St. Charles Parishes. The area of potential construction impact includes those acres directly affected by post-1984 project features for either plan. These acreages will be utilized in the impact analysis in the subsequent section.

5.1.2. The major vegetative communities in the study area are fresh-intermediate marsh, brackish-saline marsh, bottomland hardwoods, and cypress-tupelo swamp. These vegetative communities comprise valuable habitat for wildlife including waterfowl, small game, commercially-utilized furbearers, and the American alligator. The waters of Lakes Pontchartrain and Borgne, their shallow shorelines, embayments, and associated marshes provide valuable nursery, spawning, and feeding areas for various species of marine, estuarine, and freshwater fish and shellfish. These open water areas and associated tidal passes are heavily utilized for sport and commercial fishing. Lake Pontchartrain also supports large populations of bottom dwellers and free-floating planktonic forms that are important in the aquatic food chain. Detritus and nutrients from surrounding areas also are important components of this aquatic food web.

5.1.3. The human population of the project area is multi-ethnic and urban. Extensive residential and commercial development exists along the shores of Lake Pontchartrain. Highest population densities are located along the south shore in portions of Orleans, Jefferson, and St. Charles Parishes. Employment in the area is primarily in the manufacturing and transportation industries while communications, utilities, and construction jobs are becoming increasingly important.

5.1.4. Numerous archeological sites and historic districts and properties are located within the present and proposed protective levee system. Because of the heavy utilization of Lake Pontchartrain for transportation by early settlers, numerous shipwrecks are located in the lake.

5.1.5. Many recreational areas currently exist and several are planned for future development. Increasing population will place a heavy demand on such facilities.

5.1.6. Water quality problems within the project area are similar to those experienced in most urban centers. Discharges of process and storm waters from industries, and sanitary waste and storm waters from municipalities have occasionally resulted in degradation of local surface waters used for recreation.

5.1.7. Under future with no additional Federal action conditions, the project area would undergo various changes. Land loss resulting from subsidence and erosion would effectively change or reduce vegetative types along with their associated wildlife habitats. Cultural resources within the levee system would be more vulnerable to hurricane-related flood damage. Archeological sites in the marshes would continue to be adversely affected. Demand for recreational resources would continue to increase. Should the project not be completed, land-use densities would probably increase in the more protected areas of the project and growth would be stimulated in adjacent areas.

## 5.2. SIGNIFICANT RESOURCES

### 5.2.1. GENERAL

A resource is considered to be significant if it is identified in the laws, regulations, guidelines, or other institutional standards of national, regional, and local public agencies; it is specifically identified as a concern by local public interests; or it is judged by the responsible Federal agency to be of sufficient importance to be designated as significant (see Table 5.1). This section discusses each significant resource previously listed in Table 4.3. Appendix C-XIII describes the land-use methodology used in calculating the future with no additional Federal action acreage discussed below.

### 5.2.2. CYPRESS-TUPELO SWAMP

This habitat is typically found at slightly lower elevations than the bottomland hardwoods, and is located primarily in St. Charles Parish. The common vegetation in the wooded swamps includes baldcypress, tupelogum, pumpkin ash, red maple, swamp privet, water hyacinth, and duckweed. This habitat is of moderate value to both wildlife and fish. Fish and crawfish spawn in the swamps and utilize them as a nursery. A total of 181,608 acres of cypress-tupelo swamp occurs in the entire project area, while only 213 acres are in the area of potential construction impact. Under the future with no additional Federal action condition, drainage and subsequent development would reduce this habitat by an estimated 157 acres in the area of potential construction impact. Projections of future gains and losses in habitat were calculated by projecting into the future the actual habitat changes

5.1 TABLE - EQ RESOURCES

| RESOURCE | BIOLOGICAL ATTRIBUTES | CULTURAL ATTRIBUTES | ESTHETIC ATTRIBUTES | INSTITUTIONAL RECOGNITION | TECHNICAL RECOGNITION | PUBLIC RECOGNITION | RESOURCE IS SIGNIFICANT | LIKELY TO BE AFFECTED | TO BE EVALUATED IN EIS |
|---|---|---|---|---|---|---|---|---|---|
| CYPRESS TUPELO | Valuable habitat for fish and wildlife, especially wading birds and furbearers. Nursery area for fish. | Supports the traditional extractive economy of the basin. Also protects archeological and historic sites located within these areas. | Typical Louisiana scenery includes moss-draped cypress. | Coastal Zone Mgmt. Act of 1972, La. State and Local Coastal Resources Mgmt. Act of 1978, EO 11990, EO 11988, Protection of Cypress Trees (LA EO 1980-3). | Habitat for 5 Species of Special Emphasis (USFWS) | Environmental groups desire preservation of this habitat. | Yes | Yes | Yes |
| BOTTOMLAND HARDWOODS | Very valuable habitat for wildlife including game and nongame species. | Supports the traditional extractive economy of the basin. Also protects archeological and historic sites located within these areas. | --- | EO 11990, EO 11988. | Habitat for 5 Species of Special Emphasis. Being lost at rate of 100,000 acres per year in lower Miss. Valley. Fairly rare around Lake Pontchartrain. | Environmental groups desire preservation of this habitat. | Yes | Yes | Yes |
| AGRICULTURAL LAND | --- | --- | --- | CEQ Memorandum of Aug. 11, 1980. | Rare around Lake Pontchartrain | --- | Yes | No | No |
| MARSH | Habitat for fish and wildlife, especially waterfowl, wading birds and furbearers. Prime nursery area for estuarine dependent fish and shellfish. | Supports the traditional extractive economy of the basin. Also protects archeological and historic sites located within these areas. | Typical Louisiana scenery includes ducks in a marsh. | Coastal Zone Mgmt. Act of 1972, La. State and Local Coastal Resources Mgmt. Act of 1978, EO 11990, EO 11988, Estuary Protection Act. | Habitat for 14 Species of Special Emphasis. Approximately 40 square miles being lost per year to coastal Louisiana | Environmental groups and general public desire preservation of marsh. | Yes | Yes | Yes |
| SCRUB-SHRUB | Minor wildlife value. | None | None | None | Minor wildlife value. | None | No | Yes | No |
| UPLAND DEVELOPED | Very minor wildlife value. | None | None | None | Very minor wildlife value | None | No | Yes | No |
| LAKE PONTCHARTRAIN AND ADJACENT WATERS | Habitat for fish and wildlife. Major nursery area for estuarine dependent fish and shellfish. | --- | Biggest open space in New Orleans metropolitan area. Expansive waterfront vistas provided around shoreline. | Clean Water Act of 1977, La. Water Control Law, Estuary Protection Act, Proposed as a special mgmt. area. | Major nursery area. Habitat for 6 Species of Special Emphasis. | Environmental groups and general public desire preservation of Lake Pontchartrain | Yes | Yes | Yes |
| FISHERIES | Numerous species of fish and shellfish utilize project area. | --- | --- | Fish and Wildlife Coordination Act | 1 Species of Special Emphasis in project area | Extensive recreational fishing occurs in project area | Yes | Yes | Yes |
| WILDLIFE | Numerous species of wildlife utilize project area. | --- | --- | Fish and Wildlife Coordination Act | 23 Species of Special Emphasis in project area | Some recreational hunting occurs in project area | Yes | Yes | Yes |
| ENDANGERED SPECIES | Bald eagle nests in project area. | --- | --- | Endangered Species Act. Bald Eagle Act. | --- | --- | Yes | Yes | Yes |
| BIRDS ON AUDUBON SOCIETY BLUE LIST | Showing decline in numbers or decrease in range. | --- | --- | Audubon Society | 1 Species on Blue List is a Species of Special Emphasis | --- | Yes | Yes | Yes |
| RECREATION | Habitat for wildlife, potential for observing and interacting with nature, also conducive to recreational hunting and fishing. | Historic areas: i.e., Old Spanish Fort, Fort Pike, and West End Park are interpretative areas that provide non-consumptive recreational opportunities. | Existing vegetation and landscaping enhance the linear park land adjacent to the shore line. Texture treatments on floodwalls in area are evident. | Land and Water Conservation Fund Act of 1965 | Various facilities exist which currently satisfy 783,421 man-days of recreation annually. | Public desires expansion of lakefront recreation base, i.e., upgrading and expansion of facilities, development of new marinas, and additional boat ramp development. Also a public desire to develop restrictive building ordinances to limit height and type of development. | Yes | Yes | Yes |
| SCENIC STREAMS | --- | --- | Streams generally chosen for scenic attributes. | La. Scenic Streams Act includes 8 streams in project area | --- | Public acknowledges importance of scenic streams | Yes | No | No |
| NATIONAL REGISTER OF HISTORIC PLACES | None | Serves as the Nation's official list of properties worthy of preservation for significance in American history, architecture, archeology, and culture. | Many National Register properties in study area, such as Fort Pike, lighthouses, Madeville, have high esthetic values. | National Historic Preservation Act of 1966, as amended; Reservoir Salvage Act of 1960, as amended (PL 11593), Archaeological Resources Protection Act of 1979. | 20 of the National Register properties are recognized for their national significance by designation as National Historic Landmarks. | Public recognition and support of historic preservation is strong, reflecting national trends. | Yes | Yes | Yes |

that occurred in the 1956-1978 period. It was assumed that the 1956-1978 change rates would remain constant for the project life. These rates were applied to the area of potential construction impact to determine the loss therein. See Appendix C, Section XIII, for more details. All these assumptions are speculative at best, but do allow comparison of impacts. Hurricane flooding will increase salinities in the swamps to a point that impacts from slight damage to mortality could occur depending on range of salinity and duration of flooding.

### 5.2.3. BOTTOMLAND HARDWOODS

The bottomland hardwoods are located on the higher, less frequently flooded areas generally found on the natural levees. Common vegetation includes black willow, bitter pecan, hackberry, American elm, Drummond red maple, sycamore, cottonwood, water oak, and Nuttall oak. This habitat is one of the most productive for game animals, and is equally important for numerous nongame birds. Bottomland hardwoods are being lost at a steadily increasing rate, thus reducing the recreational opportunities this habitat provides. A total of 29,082 acres of bottomland hardwood forest occurs in the project area, of which approximately 41 acres are in the area of potential construction impact. Under the future with no additional Federal action condition, bottomland hardwoods would be reduced by an estimated 38 acres in the area of potential construction impact, primarily as a result of urban development. Based on the expected limits of hurricane induced overflow (Plate 2), there would be a substantial portion of bottomland hardwood inundated north and west of Lakes Pontchartrain and Maurepas. Depending on the salinity of floodwaters and duration of flooding, these habitats could sustain significant damage or at least reduction in growth. Aside from these impacts, the area would be isolated from most wildlife uses until floodwaters have subsided.

### 5.2.4. MARSH

5.2.4.1. The marshes of the study area are classified according to the salinity regime and vegetation. Fresh-intermediate marsh has salinity ranging from 0 to 6.7 parts per thousand (ppt). Brackish-saline marsh has salinity ranging from 8.1 to 15.9 ppt. For the purposes of this study, marsh types are combined because the habitat values of these marsh types are similar in the project area.

5.2.4.2. The predominant vegetation in the fresh-intermediate marshes is bulltongue, deerpea, maidencane, and wiregrass. This fresh-intermediate marsh type covers approximately 64,469 acres in the project area. None of this type of marsh exists in the area of potential construction impact.

5.2.4.3. The most common vegetation associated with the brackish-saline marsh type is wiregrass, oystergrass, blackrush, saltwort, leafy three-square, and saltgrass. A total of 260,377 acres of brackish-saline

marsh occurs in the study area while approximately 2,417 acres are located in the area of potential construction impact.

5.2.4.4. These marshes provide habitats for fish and wildlife, act as storm buffers between the Gulf of Mexico and developed areas of the coastal zone, have the capacity to absorb water pollutants, and provide nutrients and detritus to the productive inland coastal waters.

5.2.4.5. The fresher marsh types function as valuable habitat for waterfowl, furbearers, and the American alligator. Migratory waterfowl heavily utilize the more vegetatively diverse fresher marshes for food, cover, and nesting. The higher salinity marshes provide spawning, feeding, and nursery areas for many commercial and sport fish and shellfish species. Most of the fishery (offshore as well as inshore) is linked to these marshes at some point through dependency on the food base or spawning habitat. In general, the brackish-saline marshes surrounding Lake Pontchartrain exhibit higher biomass and lower species diversity than do the fresh-intermediate marshes (Stone et al, 1980). Nutrient levels are generally higher in the marshes of St. Charles Parish and the impounded marsh of New Orleans East than in other marsh areas surrounding Lake Pontchartrain (Stone et al., 1980). Under the future with no additional Federal action condition, brackish-saline marsh in the area of potential construction impact would be reduced by an estimated 1,560 acres through subsidence, erosion, urban development, and oil exploration activities. Of this lost marsh, approximately 50 percent would become scrub shrub; 33 percent, lake bottoms; 8 percent, bayou/canal; and 9 percent, developed. It is possible that continued subsidence and erosion could cause a higher percentage of the marsh to become aquatic habitat and less to convert to scrub shrub than indicated above. Hurricane flooding could produce either beneficial or detrimental effects on marshes depending on marsh type and duration and salinity of flood waters. It could be expected that moderately saline water (18 ppt) flooding a fresh marsh for a week could probably significantly impact the marsh. The marshes most likely to be affected by an SPH storm surge would be the fresh marshes around the western shore of Lake Pontchartrain and Lake Maurepas.

### 5.2.5. LAKE PONTCHARTRAIN AND ADJACENT WATERS

5.2.5.1. Many saline, brackish, and freshwater bodies of various sizes, depths, and morphology are located within the project area. These include lakes, ponds, canals, and bayous. All are warm, shallow, turbid systems, normally high in nutrients. The major open-water bodies within the project area are Lakes Pontchartrain, Borgne, and Maurepas, which comprise 1,526,807 acres of lake bottom habitat. However, only 1,012 of these acres are located in the area of potential construction impact. The remainder of the water bodies are bayous and man-made canals which are interspersed within the adjacent marshes and have salinities which correspond to the salinities associated with these marshes. Approximately 21,470 acres of these water bodies occur in the study area and 870 acres are in the area of potential construction impact.

5.2.5.2. Lake Pontchartrain is a shallow saucer-shaped estuary which covers approximately 640 square miles and has a natural maximum depth of 15 feet. Depths of up to 90 feet occur in localized areas as a result of man's activities. Dredging to depths greater than 15 feet for Federal levee construction has occurred as follows:

| Date | Location | Area (acres) |
| --- | --- | --- |
| 1950 | Jefferson Parish | 67 |
| 1956 | Jefferson Parish | 230 |
| 1974 | New Orleans East Lakefront | 48 |

Extensive quantities of borrow have been taken from the lake in the New Orleans Lakefront area for land reclamation in the 1930's and for the recent New Orleans Airport runway extension. The acreage of lake bottom affected is not known, and recent surveys indicate that the borrow holes have almost completely filled in.

5.2.5.3. Salinity within the lake increases from west to east, varying from less than 0.5 ppt to nearly 18 ppt near Lake Borgne. The majority of the freshwater input is from the Tickfaw, Amite-Comite, and Tangipahoa Rivers located in the western portion. Lake temperatures closely follow the air temperature throughout the year (Stone et al., 1980). Circulation and tidal influences are wind-induced.

5.2.5.4. The principal submerged aquatics in these lakes consist of wild celery, spikerush, widgeongrass, water primrose, and naiad. These plants are important as a food source for wintering waterfowl. Lake Pontchartrain has approximately 2,000 areas of grass bed dominated by wild celery and widgeon grass. The lake, with its associated grass beds, marshes, food base, and access to the open gulf, provides a crucial link in sustaining the coastal fishery of Louisiana. Important commercial and recreational species dependent on the Pontchartrain complex include shrimp, crab, redfish, spotted sea trout, menhaden, and the brackish water clam. Nutrient transport through the tidal passes assists in providing the input needed to sustain the food base in the deeper, nearshore gulf waters.

5.2.5.5. In addition to being an important natural resource, the lake is a significant recreational resource. It provides flat-water recreation such as swimming, water skiing, pleasure boating, sailing, and fishing for the New Orleans metropolitan area, as well as for many other communities adjacent to the lake.

5.2.5.6. Lake Pontchartrain is an important source of clam shells which are used mainly in road construction. Shell dredging has been, and is still, permitted over approximately one-half of the 403,000-acre area of the lake. Dredging leaves a strip approximately 2 feet deep and 4 to 5 feet wide. This hole generally fills with sediments having a low bulk density. It is possible that shell dredging releases heavy metals to