6.1.5.    **FISHERIES**

6.1.5.1.    HIGH LEVEL PLAN.  The reduction in marsh acreage discussed in paragraph 6.1.3.1. would result in the loss of productive nursery habitat for shrimp, menhaden, and other commercial species including blue crab, red drum, seatrout, Atlantic croaker, and spot.  Turner (1979) reported that the Louisiana commercial inshore shrimp catch is directly proportional to the area of intertidal wetlands, and that the area of inshore water does not seem to be associated with the average shrimp yields.  An analysis by Cavit (1979) determined that yields of menhaden increase in proportion to the ratio of marsh to open water. Marshes contribute vast amounts of organic detritus to adjacent estuarine water (Odum et al., 1973).

6.1.5.2.    As shown in Table 6.4, the annual commercial catch attributable to Lakes Pontchartrain and Borgne in the year 2100 under the High Level Plan would be an estimated 10,296 pounds less than the expected catch under the future with no additional Federal action condition.  This would be approximately $2,644 less compared to the future with no additional Federal action.  The greatest losses would be to the commercial catches of menhaden and shrimp.  The data in Table 6.4 was computed by using commercial landing data for Hydrologic Unit I collected by the NMFS to estimate the average annual estuarine-dependent commercial fishery harvest from the period 1963 to 1978.  The estimates were based on the following assumptions: (1) fish and shellfish production is attributable to the marshes in the project area currently being harvested at or near maximum sustained yield, and (2) that marsh losses associated with project construction would cause a proportional loss in fisheries production.

TABLE 6.4

ESTIMATED HARVEST (POUNDS) PRODUCED FROM AREA OF POTENTIAL CONSTRUCTION IMPACT AND HARVESTED FROM LAKES PONTCHARTRAIN AND BORGNE AND OFFSHORE OF VARIOUS COMMERCIAL SPECIES IN 2100

| FUTURE WITH NO ADDITIONAL FEDERAL ACTION | HIGH LEVEL PLAN | BARRIER PLAN |
|---|---|---|
| 442,103 | 431,807 | 53,295 |

Additional information concerning commercial fishery benefits can be found in Appendix C, Natural Resources, and Appendix B, Economics.

6.1.5.3.  In the 573 acres along the Jefferson Parish lakefront where hydraulic dredging is to be utilized, existing benthic populations would be destroyed.   An additional 411 acres of lake bottoms would be permanently removed from benthic production by burial during fill placement for levee construction.   During fill placement, epibenthic organisms such as shrimp and crab would be able to escape burial, while most sessile or slow-moving organisms such as molluscs would be lost. Turbidities would be increased in the vicinity of the fill, and the major impact would be a reduction in primary production.   The various estuarine fish species inhabiting these water bodies would be mobile enough to avoid direct adverse impacts; however, the localized benthic and planktonic food supplies would be reduced or lost.   Due to construction of levees in successive lifts, the impacts could persist for as long as 12 months in some locations.   As explained in paragraph 6.1.4.4., erosion control measures would be implemented to reduce leaching of the fill material.

6.1.5.4. The proposed 60-foot NGVD depths of the Jefferson Parish borrow areas would create areas that would not receive proper circulation and could become anoxic nutrient sumps.   These could chemically or physically stratify, rendering them unsuitable for benthic organisms for an extremely long time.   These deep holes would possibly attract fish due to the cooler or warmer temperatures, (depending on seasons) and, as a result of these anoxic conditions, could cause fish kills (Pisapia, 1974).

6.1.5.5. While this deeply dredged lake bottom would be removed from benthic production for an extended period of time, it represents only 0.2 percent of the offshore water in Lake Pontchartrain and approximately 0.1 percent of the total lake bottom habitat.   The total abundance of benthic macrofauna in this area is moderate (see benthic distribution map, Appendix C); however, numbers and species diversity is low in comparison to more productive areas in the lake (Bahr and Sikora, 1980).   Levine (in Stone et al., 1980) noted the benthic food web is composed primarily of worms, molluscs, crabs, insect larvae, amphipods and isopods, each of which is utilized by at least 10 fish species within Lake Pontchartrain.   However, this benthic food source is utilized directly by only 12 percent of the fish species in Lake Pontchartrain.   Because the types of benthic macrofauna found in the area of impact are not heavily utilized by the majority of the fish species, and because the area comprises a small amount of the habitat available, the lake bottom excavation is not expected to significantly affect long-term fishery resources; however, localized short-term effects would occur as described in paragraph 6.1.5.4.

6.1.5.6. The  onstruction activity would cause some decline in the freshwater sport and commercial fishery. Since the area of suitable freshwater habitat within the area of direct impact is small and usage difficult to reliably quantify, no numeric estimate of impacts on freshwater fish populations or fisherman usage was attempted.

6.1.5.7.  The USFWS estimates that the marsh and swamp lost due to the High Level Plan would cause an annual loss of 200 man-days of sport fishing valued at $2,800 (see Appendix C, Section XIV).  The most likely sportfish habitat subject to direct construction impact would be found in the nearshore areas where fill activity would occur.  As reported by Rogillio and Brassette (1977), the standing crop for sportfish in the nearshore area averaged approximately 83 pounds per acre.  However, the eastern stations around Highway 11, South Shore, and Bayou Lacombe produced approximately three times as many fish per acre as the western portion of the lake where the fill would occur.  The loss of 408 acres of lake bottom and 54 acres of marsh would slightly decrease the sport fishery.  Aside from the long-term impacts associated with direct loss of lake bottoms, there are the less presistent impacts associated with turbidity and runoff.  In some locations where levee construction is done in successive lifts, the turbidity and runoff are minimal but constant due to leaching until the last lift is in place and erosion control measures are implemented.  Foreshore protection and associated floatation channels could result in temporary degradation of water quality, displacement or elimination of benthic organisms and changes in composition of nearshore fish species.  There could be a slight reduction of bottom feeders and an increase in hard surface feeders (sheepshead).  The benthic organisms which prefer hard surface and wave wash zones would be provided additional habitat by the riprap placement.

6.1.5.8.  BARRIER PLAN.  The Barrier Plan would have much more severe impact on the fishery resources as a result of the loss of 2,363 acres of marsh and 870 acres of bayou/canal habitat due to construction.  The fishery value of the impacted marsh is much higher than that affected by the High Level Plan.  The peripheral location of these marshes makes them easily accessible to migratory species.

6.1.5.9.  The importance of the loss of these marshes can be shown by the projected decline in commercial catch by the year 2100.  While the High Level Plan reduces the estimated commercial catch for the year 2100 by 10,300 pounds, this plan would reduce this catch by an estimated 388,800 pounds and $100,000 compared to the future with no additional Federal action conditions.

6.1.5.10.  The USFWS estimates that loss of marsh and swamp attributed to the Barrier Plan would cause an annual reduction of 16,793 man-days of sport fishing valued at $65,493.  In a survey of the sportfishing of Lake Pontchartrain, Rogillio and Brassett (1977) noted that the most productive areas were located near Highway 11 and Bayou Lacombe, with production ranging from 127 to 88 pounds per acre, respectively.  The large amount of turbidity associated with dredging and fill placement which would occur in the construction areas would result in a potential for significant impact on this fishery.  In addition, access to some of the area might be limited to some fishermen for the short term.  More detailed estimates of commercial and sport fishery values can be found in "Effects of Flood Control Barriers in Passes of Lake Pontchartrain,

Louisiana," Appendix C, Environmental Resources.   Other than these economic impacts, various unquantifiable biological impacts would also result from the implementation of this plan.   The creation of 20- to 50-foot deep holes by dredging would have impacts similar to those discussed in paragraph 6.1.5.4.  New benthic substrates would be created on the riprap on the pass approaches, rock dikes at Seabrook, and unconsolidated sediments.  All of these would support some type of benthic fauna, but might cause changes in fish species in the area as a result of this change in food base.   Reductions would occur in biological, detrital, and nutrient transport through the passes and would limit the populations of pass-dependent commercial and sportfish utilizing Lake Pontchartrain.   Approximately 96 percent of the commercial species are pass dependent (Thompson and Verret, 1980). Approximately 80 percent of the commercial harvest poundage for Lake Pontchartrain is blue crab, which is pass dependent.  Shoal areas of value to various fish and shellfish might be lost by channel deepening or construction of the closure dam.   Migration routes for species limited to the shallow water areas would be blocked by the dam (Davis et al., 1970).   While the quantity cannot be accurately estimated, active migration of fresh crabs, shrimp, and other macro-organisms might also be reduced.   There could be potential adverse fishery impacts associated with the actual operation of the gated barrier structures. While these impacts cannot be readily quantified, it is probable that they would result in short-term, localized changes in the fishery. During closure, marine and estuarine species would be isolated from their feeding and nursery areas within the lake.  A drop in lake salinity would be initiated by structure closure (Tallant and Simmons, 1963).  This salinity change could displace those less adaptable fish species which have preferences for higher salinities.   The more freshwater tolerant species could expand their foraging range, and as a result, an overlap of feeding niches could occur; thus, this would increase competition for the existing food base.  This impact should be only short-term unless the structures are closed for long periods of time.   Additionally, some anadromous fish species utilizing the lake during structure closure would be trapped in the lake and migratory runs would be delayed.

6.1.5.11.  Generally, there would be reductions in the standing crops of forage fish, thus reducing quantity of food available for predator species.  Nursery support for planktonic feeders, such as menhaden, and food for ocean spwners like croaker, seatrout, and drum would be reduced.  Resulting lower salinities in the lake might be less favorable to some molluscs dependent on brackish water.  Opportunistic feeders who feed in waters of higher salinity would find their range compressed within the lake.

6.1.6.   **WILDLIFE**

6.1.6.1.  <u>HIGH LEVEL PLAN</u>.  By 2100, there would be essentially no bottomland hardwoods and very little wooded swamp remaining in the area

of potential construction impact under the future with no additional Federal action conditions, the High Level Plan, or the Barrier Plan; therefore, wildlife dependent on these forested areas would decline, but very little of the decline would be project-induced. Various habitats (54 acres of marsh and 213 acres of cypress-tupelo) would be immediately lost due to construction, instead of slowly disappearing as they would under future with no additional Federal action conditions. Therefore, the decrease in wildlife numbers and diversity would be slightly more rapid under the High Level Plan than it would with no additional Federal action.

6.1.6.2. Construction activities would kill some young or slow-moving wildlife and would force other animals to move to adjacent areas. The majority of these displaced animals would die because of competition with existing residents of the nearby areas.

6.1.6.3. BARRIER PLAN. The Barrier Plan would have a moderate adverse impact on marsh wildlife because of the net loss of 837 acres of marsh. The marsh that would be impacted is extremely valuable for muskrat and waterfowl. Approximately 41 acres of bottomland hardwoods and 164 acres of cypress-tupelo would be lost immediately due to construction. As discussed above, this would cause the minor project-induced wildlife decline to occur slightly more rapidly. Other impacts would occur as discussed in paragraph 6.1.6.2. above. In terms of hurricane-induced flooding, the Barrier Plan would prevent some drowning of wildlife and isolation from feeding areas.

6.1.7.   **ENDANGERED SPECIES**

6.1.7.1. HIGH LEVEL PLAN. As described in Appendix C, Section I, there would be no impact on the St. Charles Parish eagle nest since it is 1.5 miles from the nearest levee construction. The loss of 213 acres of cypress-tupelo would not adversely impact the eagle.

6.1.7.2. BARRIER PLAN. This plan, as presently constituted, would disturb or possibly destroy active bald eagle nesting sites as a result of associated levee construction. For a further discussion, see Appendix C, Section I.

6.1.8.   **"BLUE LIST"**

6.1.8.1. HIGH LEVEL PLAN. Species that utilize the marsh (see Table 5.4) would lose some habitat, but the net loss of 55 acres of marsh by year 2100 would not significantly impact these marsh utilizing species. The timing of the marsh loss could have minor impacts on species numbers. With the High Level Plan, several acres of marsh would be immediately lost due to construction; without the project, there would be a steady decline in marsh acres due to natural and man-made uses. By the end of project life, there would be very little forested habitat left in the project area with the High Level Plan, the Barrier

Plan, or under future with no additional Federal action conditions.
Thus, the High Level Plan should not impact any blue list species that
utilize forested areas; although by 2100, most such species would be
gone from the area of potential construction impact, due to lack of
habitat.

6.1.8.2.  BARRIER PLAN.  Blue list species that use marsh habitat could
be moderately impacted by the net loss of 837 more acres of marsh.  As
described above, species utilizing forested habitat would not be
affected by the Barrier Plan.

### 6.1.9.   RECREATION

6.1.9.1.  HIGH LEVEL PLAN.  Implementation of the High Level Plan would
adversely impact more lakeshore recreation than the Barrier Plan.  The
linear impact zone would disrupt land-based recreational features in
proximity to the shoreline.  Some hunting land would also be affected.
Localized turbidity would impact the sport fishing resource in the
vicinity of work during construction.  The Jefferson Parish lakefront
area would lose the 10.5-mile Jefferson Parish National Recreational
Trail and its associated uses.  Potential project impacts to the
Williams and Bonnabel boat launch complexes would be eliminated with
design modifications, such as constructing a floodwall around the
site.  The existing boat launch in the vicinity of the Jefferson Downs
Race Track would be lost due to construction.  This two-lane boat ramp
is in a state of disrepair and does not justify costly levee
alterations.

6.1.9.2.  Development of the proposed Bucktown and Causeway sites has
not been initiated.  Both sites would be affected by the High Level
Plan, and it can be assumed that the proposed developments would not be
implemented as originally intended unless additional modification to the
levee design is made.

6.1.9.3.  The project would not impact most of the recreational
activities on the New Orleans Lakefront; however, facilities existing in
close proximity to the levee work either would be destroyed or avoided
by design modification of the levee.  There is concern over the future
of one covered picnic shelter in the vicinity of Beauregard Avenue and
Lakeshore Drive.  This facility is located near the existing levee, and
design modification to the levee would be necessary.  Three children's
play areas, two of which are located in an area of tall pine trees,
would be lost due to sloping and grading of the new levee.  The 72
picnic tables are not permanent structures and could be individually
relocated.  The 18 boat launching lanes located at the Seabrook bridge
would not be affected.  In Orleans Parish, activities that occur between
the roadway and the lake's edge, such as picnicking and fishing, would
not be impacted by levee work.  Casual walking on the levee and access
across the crown would be disturbed during construction and circulation
restricted after construction due to the placement of an I-wall in the

levee crown. Many trees in the vicinity of work which have an esthetic value would be lost. The proposed levee in this area includes a barge berm which would have a wide flat crown. Upon completion, the levee crown would have a recreational potential as a jogging or hiking trail. The barge berms offer the potential for landscaping and recreational development. Facilities and unique areas lost due to construction would be restored to their preproject condition.

6.1.9.4. The numerous private summer camps in the Citrus Lakefront area are not located within the levee construction right-of-way and should only be affected by possible restricted access at times. The project would impact the minimal fishing and crabbing in the area during construction (see Volume II, Appendix C, Section XI, Figure 1 for location of existing and proposed recreational facilities).

6.1.9.5. Turbidity due to construction of levees would be minimal and would not significantly impact the fishing experience. The High Level Plan would have a negative impact on potential man-days attributed to recreational fishing. The USFWS has estimated 712 man-days valued at $2,776 and 265 man-days of hunting valued at $2,894 would be lost due to project construction. Consult the USFWS Final Coordination Act report, Volume II, Section XIV, Table 8.

6.1.9.6. Sport hunting and waterfowl hunting would be adversely affected under this plan. In the year 2100, compared with future with no additional Federal action, 86 man-days of small game hunting and 209 man-days of large game hunting, which includes waterfowl hunting, would be lost.

6.1.9.7. Project-induced impacts on recreational man-days would predominately occur in the St. Charles, Jefferson, and Orleans Parishes lakefront areas. Annual man-days of recreation currently total 765,207. Projected annual use for the project life is assumed to remain constant. If no design modifications are made to the levee design, 317,852 annual man-days of recreation would be lost by the year 2100. Design modifications of the levee at Williams Boulevard and Bonnabel Boulevard in Jefferson Parish, and in the vicinity of one picnic shelter in Orleans Parish being investigated would save 201,813 annual man-days. A detailed analysis showing the calculations of these affected man-days is provided in the Environmental Resources Appendix, Section IX.

6.1.9.8. There would be no impact to wildlife management areas or refuges.

6.1.9.9. BARRIER PLAN. Implementation of the Barrier Plan would adversely affect water-oriented recreation in close proximity to the barrier complexes. Construction of navigable structures at the two passes would reduce the channel width, at times creating a bottleneck effect for recreational boats. Depending upon the size of vessels

passing through, it might not be possible for two or more sailboats to pass at the same time.

6.1.9.10.  Short-term localized turbidity would be evident in the vicinity of each barrier complex during and shortly after construction, adversely affecting recreational fishing.  As discussed in paragraph 6.1.5.10., sportfishing, shrimping, and crabbing would not maintain their current levels.  A reduction in the number of man-days attributed to sportfishing and related activities would result.  The Barrier Plan would have a negative impact on potential man-days attributed to recreational fishing.  USFWS has estimated that 16,793 man-days of sportfishing valued at $65,493 and 922 man-days of hunting valued at $9,526 (total 17,715 man-days and $75,019) would be lost due to project construction.  Consult the USFWS Coordination Act Report, Volume II, Section XIV, Table 8.

6.1.9.11.  Small and large game hunting, including waterfowl hunting, would be adversely affected under this plan.  In the year 2100, compared with future with no additional Federal action, 111 man-days of small game hunting would be gained; however, 375 man-days of large game, which includes waterfowl hunting, would be lost.  Additional information dealing with quantification and comparison of plans can be found in the Recreation Section of the Environmental Resources Appendix.

6.1.9.12.  There would be no impact on wildlife management areas or refuges.

6.1.10.  **NATIONAL REGISTER OF HISTORIC PLACES**

6.1.10.1.  HIGH LEVEL PLAN.  Implementation of this plan would have a positive effect on the numerous National Register properties located within the existing and proposed levee system by protecting them from hurricane-related flood damage.  The renovation of the Mandeville seawall would protect it from failure during hurricane or other storm generated wave action and, thus, protect the three National Register properties located on Lakeshore Drive and the proposed National Register district from erosion and flood damages.

6.1.10.2.  The plan would not adversely impact any resource currently listed in or determined eligible for listing in the National Register. Most of the project impact areas have been covered by cultural resources surveys.  The remote sensing survey of offshore borrow areas located three anomaly clusters which may represent significant historic remains in the Howze Beach area and four such anomaly clusters in the Jefferson borrow area.  We are studying the feasibility of avoiding project impacts on these clusters.  If avoidance is not feasible, the anomalies would be tested to determine their significance, and appropriate mitigative steps, if required, would be taken.

6.1.10.3. BARRIER PLAN. Construction of this plan would also have a positive effect on National Register properties located within the levee system by protection from hurricane-related flood damage. Additionally, this plan would reduce flood heights in Lake Pontchartrain and, thus, provide some measure of protection for the numerous National Register properties located along the fringes of the lake. These include the three lighthouses, Forts Pike and Macomb, archeological sites 16ST1 and 16SJB2, and the three properties and proposed district in Mandeville. Protection to Mandeville would also be provided by renovation of the seawall which would protect it from failure during hurricane wave action. The possible adverse effects of this plan would include impacts on the three anomaly clusters located by remote sensing surveys in the Howze Beach borrow area and possible visual impacts of the Rigolets and Chef Menteur barrier complexes on Forts Pike and Macomb, respectively.

## 6.2. SECTION 122 ITEMS

Section 122 of the River and Harbor and Flood Control Act (Public Law 91-611) provides a broad outline of the basic and minimum social, economic, and environmental factors to be considered in evaluating the impacts of water resource development. In addition to natural resources, these impacts include such things as property values, employment, and businesses, esthetic values, and community cohesion. For an additional discussion see Appendix B, Exhibit 2, Socioeconomic Assessment.

### 6.2.1. MINERALS

6.2.1.1. HIGH LEVEL PLAN. Gas pipelines would be relocated to provide passage through hurricane protection levees. This would mean temporary disruption in transport of gas or oil during relocations.

6.2.1.2. BARRIER PLAN. Similar to the High Level Plan.

### 6.2.2. AIR QUALITY

6.2.2.1. HIGH LEVEL PLAN. Emissions from machinery and dust created during construction would slightly degrade air quality from intermittent construction activities during the first quarter of the project. This impact would be minor and temporary.

6.2.2.2. BARRIER PLAN. Direct construction impacts would be similar for this plan.

### 6.2.3. NOISE

6.2.3.1. HIGH LEVEL PLAN. This plan would increase noise levels within the area during construction. Levee construction would take place in segments. Noise impacts would therefore last no longer than a month at any one location. Because most residences are more than 100 feet from

the construction sites, construction noise levels would be decreased by at least 26 decibels inside the houses (Bolt, et al., 1971).

6.2.3.2.  BARRIER PLAN.  Same as impacts noted above.

### 6.2.4.  FLOOD CONTROL

6.2.4.1.  HIGH LEVEL PLAN.  Completion of the project would facilitate the flood protection of existing developments, as well as currently undeveloped areas which have been planned for development by both public and private interest.  In addition, protection would be afforded the east bank of St. Charles Parish south of Airline Highway.  No additional hurricane protection would be provided to the north shore area of Lake Pontchartrain.

6.2.4.2.  BARRIER PLAN.  Similar to the High Level Plan, except some degree of protection would be provided to the north shore area of Lake Pontchartrain.

### 6.2.5.  PROPERTY VALUES

6.2.5.1.  HIGH LEVEL PLAN.  The additional amount of flood protection that would be provided by the project would increase property values within the study area.

6.2.5.2.  BARRIER PLAN.  Impacts would be similar to the High Level Plan; however, additional benefits could be realized from the protection afforded the north shore.

### 6.2.6.  BUSINESS AND INDUSTRIAL ACTIVITY

6.2.6.1.  HIGH LEVEL PLAN.  This plan would provide additional flood protection for existing and anticipated business and industrial activities.  More incentive would exist to accelerate development of the Almonaster-Michoud Industrial District.

6.2.6.2.  BARRIER PLAN.  These impacts would be similar to those for the High Level Plan with additional development incentive for the protected area of the north shore.  Conversely, this plan is perceived by some as foreclosing certain water-based development opportunities on the north shore.

### 6.2.7.  EMPLOYMENT

6.2.7.1.  HIGH LEVEL PLAN.  Construction of the project would generate additional employment, resulting in some employment benefits.  Although such benefits were not included in the economic analysis of the project, they were estimated to provide an indication of this impact on the local economy.  The average annual employment benefits attributable to project construction are estimated at $4,240,000.  Long-term employment benefits are expected to be minor.

6.2.7.2. <u>BARRIER PLAN</u>. Benefits to employment would be similar to the High Level Plan but for a slightly longer term. These construction related employment benefits are estimated on an average annual basis to be $5,360,000.

6.2.8. **HOUSING**

6.2.8.1. <u>HIGH LEVEL PLAN</u>. The level of hurricane and flood protection to the New Orleans metropolitan area would be increased. This would result in benefits to approximately 160,000 dwellings. Future housing developments would receive benefits from hurricane protection. For further detail refer to Appendix B, Economics.

6.2.8.2. <u>BARRIER PLAN</u>. This plan would have similar impacts on housing; however, 167,000 units (including some on the north shore) would receive flood protection benefits.

6.2.9. **ESTHETIC VALUES**

6.2.9.1. <u>HIGH LEVEL PLAN</u>. During construction of this plan, esthetics along the New Orleans and Jefferson Parish lakefronts would be impaired. The scenic vistas along the lakefront as well as greenspaces, parks, and other recreational areas along the shoreline would be temporarily degraded. The esthetics of these areas would be greatly reduced due to unsightly stockpiling of fill material, excavation activities, and other construction activities associated with levee building. Most of these impacts would be temporary and, upon completion of construction and landscaping, should result in additional greenspaces, recreational areas, and scenic vistas.

6.2.9.2. <u>BARRIER PLAN</u>. The esthetics of the natural coastal passes would be temporarily altered through construction activity and permanently affected by the placement of barriers. The bypass channels, borrow, and disposal areas associated with barrier construction would contribute to the degradation of the naturalness of the marsh vistas. The barriers themselves would detract from the natural openness of the passes as well as hinder their navigability. The disposal sites would be greatly elevated above the normal marsh level and would be void of vegetation, resulting in an unpleasing disruption of the panoramic view normally afforded in a marsh vista. However, within a year these areas should become revegetated with plants indicative of more upland areas; therefore, these areas would culminate in a somewhat reduced long-term visual impact.

6.2.10. **COMMUNITY COHESION**

6.2.10.1. <u>HIGH LEVEL PLAN</u>. The environmental community is concerned over the potential project-induced development in New Orleans East beyond the Maxent Canal. The fact that the community generally favors this plan, plus the additional flood protection and eventual increased

recreational space along the lakefront provided by this plan, minimizes the impact on community cohesion.

6.2.10.2.  BARRIER PLAN.  Community cohesion would be increased because of additional flood protection.  Environmental opposition to the Barrier Plan is strong.

# 7. LIST OF PREPARERS

The following people were primarily responsible for preparing this Environmental Impact Statement:

| NAME | DISCIPLINE/EXPERTISE | EXPERIENCE | ROLE IN EIS PREPARATION |
|---|---|---|---|
| Joseph L. Dykes | Civil Engineer | 15 years, planning studies, New Orleans District | Project Manager |
| Lynn Devaul | Civil Engineer | 5 years, planning studies, New Orleans District; 2 years, engineering studies, Metcalf & Eddy | Project Manager |
| Larry Hartzog | Fisheries Biologist | 5 years, environmental studies, New Orleans District; 4 years fisheries research, Florida Game and Freshwater Fish Commission; 2 years, water quality analyst, Hercules Chemical | EIS Coordinator, Sections 5, 6, and 9 of EIS. |
| Robert D. Lacy | Regional Economist | 13 years, economic studies, New Orleans District | Preparation of general descriptions of socio-economic conditions and socioeconomic assessments of items required by Section 122 of the River and Harbor and Flood Control Act of 1970. |
| Nicholas G. Constan | Regional Economist | 15 years, economic studies, New Orleans District | Compiled and completed the economic analysis. |
| Everett K. Johnson, Jr. | Regional Economist | 34 years, economic studies, New Orleans District | Overall preparation of economics portion. |
| Suzanne R. Hawes | Marsh Ecologist | 12 years, environmental studies, New Orleans District | Sections 1, 3, 4, 7, and 8 of EIS, Review of EIS, Land Use projections. |
| E. Scott Clark | Wildlife Biologist | 4 years, environmental studies, New Orleans District | Endangered Species Assessment, Coastal Zone Management Consistency Determination |
| James Warren | Environmental Engineer | 6 years, environmental engineer, New Orleans District | Effects on water quality |
| Stephen F. Finnegan | Landscape Architect | 7 years, landscape architect, New Orleans | Effects on recreation |
| Michael E. Stout | Archeologist | 7 years, archeologist, New Orleans District | Effects on cultural resources |
| Henry P. Glaviano | Technical Writer/Editor | 13 years, technical writer/editor, New Orleans District; 4 years, technical writer/editor, Boeing Company | Review and Editing |

**Intentionally Blank**


**Page EIS - 70**

# 8. PUBLIC INVOLVEMENT

## 8.1. PUBLIC INVOLVEMENT PROGRAM

8.1.1. There has been a long history of public involvement in this project. A formal public meeting was held in New Orleans on 15 March 1956 during formulation of the original plan. Subsequently, the US Army Corps of Engineers has participated in numerous public affairs of various types at which project purposes, features, and impacts have been exposed to widespread public scrutiny and analysis. In 1972, a draft Environmental Impact Statement (EIS) was released to Federal, state, and local agencies, and to the interested public for review and comment. Responses to all comments were published in the 1975 final EIS. When the court enjoined construction of the barriers until impacts were better described, several Federal agencies (the US Fish and Wildlife Service, National Marine Fisheries Services, Louisiana Department of Wildlife and Fisheries, and US Environmental Protection Agency) provided input into the Scope of Work for a baseline study of Lake Pontchartrain and its passes. This study was completed in 1980 by the Louisiana State University (LSU) Center for Wetlands Resources. An environmental consultant for the Corps, Dr. Eugene Cronin, prepared a Scope of Work for a study to characterize the passes to assess barrier impacts. The same agencies approved this Scope of Work. Once the contract was awarded, a Technical Advisory Group composed of these same agencies was formed to help oversee the work of the contractor (LSU Center for Wetlands Resources). In 1981, when the tentative decision was made to choose the High Level Plan instead of the Barrier Plan, the contract was cancelled.

8.1.2. Public meetings to discuss the tentatively selected High Level Plan were held in New Orleans, Louisiana, on 21 November 1981 and 12 April 1984. The four major issues raised at the public meetings concerned the levee alinement in New Orleans East, the levee alinement in St. Charles Parish, the proposed borrow pits in Lake Pontchartrain for the Jefferson Parish Lakefront levee, and mitigation plans.

8.1.3. A number of people stated that they preferred the Maxent Canal alinement to the authorized alinement selected for New Orleans East. Choosing the Maxent Canal alinement would exclude 13,000 acres of wetlands from the protected area at an additional cost of $70 million. The Corps does not feel this aditional expenditure is justified. These wetlands have been excluded from normal tidal exchange by a levee system for over 20 years and the proposed levee would not change the existing drainage patterns.

8.1.4. Concern over the levee alinement in St. Charles centered around the exact location of the levee and the choice of alinements. Some preferred the south of Airline Highway alinement because no wetlands would be inclosed. The south alinement is more costly than the north alinement, however. In addition, the proposed levee north of Airline

Highway would have culverts to maintain the existing flow patterns. The levee alinement north of and parallel to the Airline Highway would be more precisely determined in the design stage. Requests to locate the levee as close to the highway as possible will be considered.

8.1.5. The third item concerned the possible adverse environmental impacts of the borrow pits for the Jefferson Parish levee. Alternative methods of construction and levee designs were considered but were ruled out as too costly or as being of lesser design integrity. The New Orleans District is continuing to investigate ways of minimizing the impacts and will implement measures of reasonable cost.

8.1.6. Many agencies and individuals were concerned that no mitigation plan had been developed to accompany this supplemental EIS. The plan is being developed and an additional public meeting was held in June of 1984; the mitigation report and an accompanying EIS will be complete by early 1986.

## 8.2.  REQUIRED COORDINATION

Circulation of the draft supplement to the EIS in December 1983 accomplished the remaining required coordination with the National Park Service and State Historic Preservation Officer. Circulation to the list of agencies, groups, and individuals mentioned in the following paragraph will satisfy requirements of the National Environmental Policy Act.

## 8.3.  STATEMENT RECIPIENTS

All members of Congress, Federal, state, and local agencies, environmental groups, and libraries listed below have been furnished copies of the draft supplemental main report/EIS (Volume 1) and appendixes. A notice of availability of the draft supplemental main report/EIS has been sent to all others thought to have an interest in the study.

**FEDERAL**

Honorable J. Bennett Johnston, US Senator

Honorable Russell B. Long, US Senator

Honorable Lindy (Mrs. Hale) Boggs, US Congresswoman

Honorable Robert L. Livingston, US Congressman

Honorable William "Billy" Tauzin, US Congressman

Department of the Interior, Office of Environmental Project Review

US Environmental Protection Agency, The Administrator

US Environmental Protection Agency, Regional EIS Coordinator, Region VI

US Department of Commerce, Director, Office of Ecology and Conservation

US Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Southeast Region

National Marine Fisheries Service, Environmental Assessment Branch

US Department of Agriculture, Washington, DC

US Department of Agriculture, Southern Region, Regional Forester, Forest Service

US Department of Energy, Director, Office of Environmental Compliance, Washington, DC

Federal Emergency Management Administration, Washington, DC

Soil Conservation Service, State Conservationist

US Department of Transportation, Deputy Director of Environmental and Policy Review

Federal Highway Administration, Division Administrator

US Department of Health and Human Services, Washington, DC

US Department of Housing and Urban Development, Regional Administrator, Region VI

Advisory Council on Historic Preservation, Washington, DC

Advisory Council on Historic Preservation, Golden, Colorado

**STATE**

Louisiana Department of Health and Human Resources, Office of Health Services and Environmental Quality

Louisiana Department of Transportation and Development, Office of Public Works, Assistant Secretary

Louisiana Department of Highways, Public Hearings and Environmental Impact Engineer

Louisiana Department of Wildlife and Fisheries, Ecological Studies Section

Louisiana Department of Wildlife and Fisheries, Secretary

Louisiana Department of Natural Resources, Coastal Resources Program

Louisiana Department of Natural Resources, Office of Environmental Affairs, Water Pollution Control Division

Louisiana Department of Natural Resources, Division of State Lands

Louisiana Department of Commerce, Research Division

Louisiana Department of Culture, Recreation, and Tourism, State Historic Preservation Officer

Louisiana Department of Culture, Recreation, and Tourism, Office of State Parks

Louisiana Department of Natural Resources, Office of Environmental Affairs

Louisiana Department of Natural Resources, Office of Forestry

Louisiana State Planning Office, Policy Planner

Louisiana State University, Department of Geography and Anthropology, Curator of Anthropology

Louisiana State University, Center for Wetland Resources

Louisiana State University, Coastal Studies Institute, Library

Department of Natural Resources, Division of State Lands

Governors Coastal Protection Task Force

Jefferson Levee District

Orleans Levee District

Lake Borgne Levee District

Pontchartrain Levee District

**LOCAL AGENCIES**

Metropolitan Regional Clearinghouse, New Orleans

President, Plaquemines Parish Commission Council

President, St. Bernard Parish Police Jury

St. Tammany Parish Police Jury

Mayor, City of New Orleans

Mayor, Town of Mandeville

Regional Planning Commission

Ad Hoc Committee on Lake Pontchartrain

**ORGANIZATIONS**

Ecology Center of Louisiana, Inc., President

Orleans Audubon Society, Mr. Barry Kohl

Environmental Defense Fund

Save Our Wetlands, Inc.

Dr. Oliver Houck, Tulane Law School

**ACADEMIC LIBRARIES**

Delgado Junior College

Dillard University

Louisiana State University

Loyola University

Tulane University

University of New Orleans

**PUBLIC LIBRARIES**

Ascension Parish Library

Jefferson Parish Library

Orleans Parish Library

St. Charles Parish Library

St. James Parish Library

St. John the Baptist Parish Library

St. Tammany Parish Library

Tangipahoa Parish Library

## 8.4.   PUBLIC VIEWS AND RESPONSES

8.4.1.    The major public view that influenced this study was oppo-
sition to the Barrier Plan.  Several Federal agencies, environmental
groups, and some citizens on the north shore opposed the barriers
because they either feared the impacts on the biology and hydrology of
Lake Pontchartrain or feared increased flooding on the north shore.
These views were incorporated into the decision making process which
resulted in eliminating consideration of the Barrier Plan and choosing
the High Level Plan as the Recommended Plan.

8.4.2.    Another public view that influenced alternative selection was
the opposition to the St. Charles Parish Lakefront levee which would
have impacted 26,000 acres of wetlands north of Airline Highway.
Environmental groups and the US Fish and Wildlife Service were the major
proponents of preservation of this marsh.  The selected alinement in the
High Level Plan leaves these wetlands in their natural state.

## 8.5.   STATEMENT COMMENTATORS

**FEDERAL**

Department of Commerce, National Oceanic and Atmospheric Administration,
National Ocean Service (24 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Marine Fisheries Service (16 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Marine Fisheries Service (24 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Weather Service (26 January 1984)

Environmental Protection Agency, Region VI

Gulf of Mexico Fishery Management Council

Department of Housing and Urban Development, Fort Worth Regional Office

Department of the Interior, Office of the Secretary, Office of
Environmental Project Review (29 February 1984)

Department of the Interior, Fish and Wildlife Service (8 March 1984)

Department of Transportation, Federal Highway Administration
(18 March 1984)

Department of Transportation, Federal Highway Administration
(22 March 1984)