## STATEMENT OF CONCERNS

We the undersigned scientists have devoted a substantial amount of time—in some cases more than 30 years—to studying the flooding of Orleans and St. Bernard Parishes ("Greater New Orleans") in the aftermath of hurricanes that have hit the southeast Louisiana coast. As such, we feel obligated to express our grave concerns about the failure of the U.S. Army Corps of Engineers to take adequate steps to protect Greater New Orleans from another catastrophic flood caused by the Mississippi River-Gulf Outlet ("MR-GO"). While efforts are underway to remedy the serious design and construction flaws admitted by the Army Corps with respect to the levees along several canals in New Orleans, the federal government has consistently refused to acknowledge, much less take steps to remediate, the significant contribution of the MR-GO to Hurricane Katrina storm surge and flooding in New Orleans East, the Upper and Lower Ninth Ward, and St. Bernard Parish, and the destruction of tens of thousands of acres of wetland habitat. We had hoped that the Congressionally-mandated study would lead to a candid, scientifically sound assessment of the clear and present danger posed by the MR-GO to public safety and property.

Unfortunately, as it has done so many times in the past since Hurricane Betsy, the Army Corps has failed to perform an objective, thorough technical evaluation. The Army Corps has shown yet again an institutional blindness to the destructive effects of its own project—the MR-GO. It is increasingly obvious that Congress and the people of Louisiana cannot rely on the Army Corps to solve the problem that it created.

In the wake of the devastation inflicted on Greater New Orleans from flooding caused by Hurricane Katrina, Congress directed in Public Law No. 109-234 that the

Army Corps develop "a comprehensive plan, at full Federal expense, to de-authorize deep-draft navigation on the Mississippi River-Gulf Outlet . . . ." The Congressional Conference Committee adopted a manager's statement clarifying that

> [t]he plan *shall include* recommended modifications to the existing authorized current use of the Outlet, including what navigation functions, if any, should be maintained and *any measures for hurricane and storm protection.* The plan shall be developed in consultation with St. Bernard Parish, the State of Louisiana, and affected Federal Agencies.

(Emphasis added.)

In an August 29, 2006 letter to the Army Corps, Senator David Vitter of Louisiana, one of the co-authors of the legislation, told the agency that its study must address environmental problems "at the heart of the MR-GO closure discussion."

On December 15, 2006, the Army Corps submitted to Congress its Interim Report concerning the "Mississippi River Gulf Outlet and Deep-Draft De-Authorization" ("Interim Report"). Contrary to the Congressional mandate, the Interim Report fails to provide a comprehensive plan for closing the MR-GO much less any "measures for hurricane and storm protection." The science and engineering conclusions that the MR-GO did not contribute materially to hurricane storm surge during Hurricane Katrina are not only demonstrably erroneous, but they are apparently the reason why the Army Corps fails to recommend any hurricane protective measures along Reach 1 and upper Reach 2 of the MR-GO in the Interim Report. This omission is shocking, yet sadly predictable, given both the Army Corps' historical institutional "blind spot" and the well documented role of the MR-GO in the loss of hundreds of lives and tens of thousands of homes, businesses, schools, hospitals, government facilities and other property. While 30 pages are devoted to economic considerations,

the Interim Report—in direct contravention of Congress' instructions—fails to offer any recommendations for restoring and preserving precious wetlands that are so vital to mitigating hurricane surge and to the overall health of the sensitive ecosystem of southeast Louisiana.

In its Interim Report, the Army Corps highlights as "particularly viable" what it designates as Option 2a—complete closure of the MR-GO to all vessel traffic (shallow and deep-draft) and construction of an armored earthen dam across the MR-GO immediately south of Bayou La Loutre at Hopedale, Louisiana. Whatever may be the merits of this alternative for preventing salinity intrusion, it affords no appreciable hurricane surge protection for Greater New Orleans.[1] *It is along Reach 1 and upper Reach 2 of the MR-GO in the heart of Greater New Orleans—and not more than 24 miles southeast near Bayou La Loutre— that the greatest surge-induced flooding occurs during hurricanes.* That the Interim Report does not discuss —much less offer any options for ameliorating this conspicuous safety problem—is indefensible.

Similarly, constructing a barrier across lower Reach 2 of the MR-GO and closing all vessel traffic does not address the restoration and preservation of wetlands that is so essential to storm surge control and protecting human life and communities. Mere closure of the MR-GO is not the remedy for reversing decades of loss and restoring this vital ecosystem. What is urgently required is a comprehensive, practical strategy. Since the Army Corps apparently does not—or refuses to—understand the problem, it cannot be expected to fashion the solution.

---

[1] One of the Army Corps' studies cited in the Interim Report—*Numerical Modeling of Storm Surge Effect of MRGO Closure* USACE 2003)—can be interpreted to conclude that a barrier across Bayou La Loutre "actually makes the water level higher in the initial stages of the storm (but not by very much) and considerably higher after the storm passage." *Id.* at p. 12.

Inexplicably, the Interim Report lacks any sense of urgency. It is another Army Corps call to inaction, recommending more studies addressing the fundamental threat posed by the MR-GO to human life and the environment. Over the past decade, the Army Corps has prepared three reports on the closure of the MR-GO, none of which have acknowledged the readily-ascertainable dangers from maintaining the waterway in its present condition. The scientific case against the MR-GO is compelling.

We endorse Senator David Vitter's recent statement to the Army Corps that in light of the extremely unfavorable benefits-to-cost ratio and the continuing threat to life and property from the unremediated channel, "the closure of the MR-GO is a foregone conclusion. It is time to move in a definitive, specific, and concrete direction to focus on and advance our long-term goals." In the Fourth Emergency Appropriations Bill, Congress already gave the Army Corps authority and $75 million to be used for "the repair, construction or provision of measures or structures necessary to protect, restore, or increase wetlands, to prevent saltwater intrusion or storm surge." If the Army Corps does not immediately begin to implement this mandate, Congress should direct that the job be undertaken by another responsible federal agency in conjunction with the State of Louisiana.

To assist Congress in evaluating the Interim Report and devising a comprehensive, effective action plan prescribing effective solutions to the multi-faceted problems posed by the MR-GO, we offer the following summary critique of the Interim Report:

1.  **The MR-GO Contributed To Storm Surge Flooding of Greater New Orleans During Hurricanes Betsy and Katrina**

The Interim Report attempts to debunk any relationship between the MR-GO and storm surge. Citing six engineering and hydraulic modeling studies (four of them authored or sponsored by the Army Corps), the Army Corps claims that

> [t]hese studies reached similar conclusions that the inland reach of the MRGO does not contribute significantly to peak storm surges during severe storms because the surrounding wetlands are overwhelmed with water. Studies also demonstrated that the most noticeable effect of the MRGO occurs for small surge events where the surrounding marsh areas are not completely inundated.

Interim Report at p. vi.

The Army Corps' reliance on these studies is seriously misplaced for several reasons.

*First*, empirical data from hurricanes over the past 40 years —as opposed to simulated, after-the-fact modeling[2]—leads to the inexorable conclusion that the MR-GO was a critical factor in the Hurricane Katrina flooding.

---

[2] Five of the six studies cited by the Army Corps to support the proposition that the MR-GO has no appreciable effect on storm surge (Interim Report at pp. 7-8, Appendix 3) were based on hypothetical situations or computer modeling of assumed scenarios, did not rely on actual data from Hurricanes Betsy, Camille, or Katrina, did not evaluate the MR-GO's contribution to storm surge flooding due to destruction of wetlands, and primarily focused on Reach 2—"the long, southeast-trending section of the MR-GO" (Interim Report at Appendix 3, p. 1)—and not the "funnel" in Reach 1 along the GIWW/MR-GO. The Interagency Performance Evaluation Task Force (June 2006) conclusion about the negligible impact of the MR-GO on surge concerned Reach 2, and as noted in the discussion below, this Army Corps sponsored study in fact concluded that storm surge along Reach 1 was sufficiently significant that some form of a surge barrier or closure should be installed. Conspicuously absent from any of these studies is a rigorous, technically sound analysis of the demonstrated contribution of the Reach 1 and upper Reach 2 of the MR-GO—based on real word data—to the substantial enhancement of storm surge height, velocity, and duration or any recommendations about how to remediate this threat to human life and property. As the authors of one of the studies cited by the Army Corps frankly admitted, "no system of equations can really be expected to predict with a great degree of accuracy the complex physical phenomenon of flooding over marshland, bayous, houses, trees, etc." Bretsneider and Collins, *Storm Surge Effects of the Mississippi River-Gulf Outlet*, Nat'l Science Engineering Co. (1966) at p. 62. In short, the Army Corps relies upon inapposite studies that do not address one of the most salient deficiencies in the hurricane protection system surrounding Greater New Orleans.

- *Hurricane Betsy* storm surge data from 1965—gathered from water gauges on the MR-GO at Paris Road (the confluence of the Gulf Intracoastal Waterway (GIWW) and Reach 2 of the MR-GO) and on the Industrial Canal (IHNC) near the opening to Lake Pontchartrain—demonstrates that the 10 foot storm surge that flooded Greater New Orleans in 1965 came from Lake Borgne through Reach 1 of the MR-GO, the backdoor of the hurricane protection system, while the surge on Lake Pontchartrain barely reached 6 feet. (USACE 1965).

- In a 1968 article in the *Monthly Weather Report* published by the National Weather Bureau, the authors wrote:

> The low lying marshes over which the storm surge traveled, and the existence of a wide, deep channel (the Mississippi River to Gulf Outlet), along the path of the surge, assisted in carrying the water far inland. The water borne by the Outlet and carried across the marshes was first recorded in New Orleans as a rapid increase in water level at the Paris Road Bridge gage on the Intracoastal Waterway . . . . Shortly thereafter, the three gages on the River showed very rapid rises. . . . The high river levees in New Orleans easily contained the 10 ft. above normal low water in the River. The levees around the canals and waterways east of the River are not as high as the river levees and could not contain the water.

D. A. Goudeau and W. C. Conner, *Storm Surge Over the Mississippi River Delta Accompanying Hurricane Betsy, 1965*, 96 Monthly Weather Review, No. 2 (1968) at p. 119.

- Empirical data from *Hurricane Camille* in 1969 shows that the highest recorded storm surge elevations in Louisiana—between ten and eleven feet—occurred along the MR-GO funnel from Shell Beach into the Industrial Canal. (USACE 1970). Significantly, the surge attained essentially the same peak elevation in Reach 1 of the MR-GO and the Industrial Canal as it had during Hurricane Betsy four years earlier.

6

*Second*, during Hurricane Katrina, surge elevations peaked in Lake Borgne and the IHNC at higher levels earlier relative to vulnerable levee and floodwall crowns. This would not have occurred had the Army Corps not built the MR-GO and caused the loss of so many thousands of acres of wetland buffer. After a thorough investigation, the U.S. Senate Committee on Homeland Security and Governmental Affairs concluded:

> As the eye approached New Orleans, Katrina shoved a 14 to 17 surge up a "funnel" created by hurricane protection levees at the convergence of the south bank of the MRGO and the north bank of the Gulf Intracoastal Waterway, and focused a torrent of water on the Inner Harbor Navigation Canal.

U.S. Senate Committee on Homeland Security and Governmental Affairs, *HurricaneKarina: A Nation Still Unprepared* (May 2006) at Chapter 4-4 (footnote omitted).

Leading scientists have confirmed the devastating effect of the six-mile long funnel along Reach1 of the MR-GO and its destructive role in causing massive flooding during Hurricane Katrina.

> At the western end [of Reach 1], the funnel focused a jet into the IHNC. The U.S. Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system—nothing less—to bring this mass of water with simply tremendous "load"—potential energy—right into the middle of New Orleans.

Ivor L. van Heerden, G. Paul Kemp, Wes Shrum, Ezra Boyd and Hassan Mashriqui, *Initial Assessment of the New Orleans Flooding Event During the Passage of Hurricane Katrina*, 2006, p. 4

The same conclusion was reached by an investigative team of independent scientists and engineers in an impartial study of the reasons for the catastrophic flooding in the wake of Hurricane Katrina.

> The same storm surge from Lake Borgne that topped and eroded the levees along the "MRGO" frontage also pushed westward over the southeastern corner of the New Orleans East protected section, . . . and this produced overtopping and a number of breaches . . . . This was a principal source of the catastrophic flooding that subsequently made its way across the local undeveloped swamplands and into the populated areas of New Orleans East. . . . This storm surge from Lake Borgne also passed westward into a V-shaped funnel" as it entered the shared GIWW/MRGO channel that separates the St. Bernard and New Orleans East protected areas, and this in turn resulted in an elevated surge of water that passed westward along the waterway to its juncture (at a "T") with the IHNC channel, overtopping a number of levees and floodwalls on both the north and south sides of this east-west trending channel and producing levee distresses and several breaches . . . . After reaching the "T" intersection with the IHNC channel, the surge then passed to the north and south (from the "T") along the IHNC channel, periodically overtopping many (but not all) of the sections of the levees and floodwalls lining the east and west sides of the IHNC, and causing a number of breaches . . . .

R.B. Seed, et al., *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* (July 31, 2006), vol. 1, at p. 2-8.

*Finally*, even the Army Corps-sponsored study by the Interagency Performance Evaluation Task Force (IPET), released earlier this year, concluded that the confluence of the GIWW and the MR-GO created a substantial danger of elevating storm surge levels and water pressure in the Industrial Canal (IHNC) during hurricanes.

> The critical section of the MRGO is Reach 1, the combined GIWW/MRGO. It is through this section of channel that Lake Pontchartrain and Lake Borgne are hydraulically

> connected to one another via the IHNC. . . . *To prevent storm surge in Lake Borgne from reaching the IHNC or GIWW/MRGO sections of the waterway, flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity.*

IPET Report (June 1, 2006), Section IV, Appendix 6 at pp. 6-7 (emphasis added).

The Army Corps' acknowledgement of the MR-GO's capability of enhancing storm surge is hardly a recent development. Almost two decades ago—long before Hurricane Katrina and the federal lawsuits alleging that the MR-GO contributed to catastrophic flooding in Greater New Orleans—the Army Corps recognized the need to study potential benefits of completely closing the MR-GO. Indeed, the Army Corps' Lower Mississippi Valley Division ("LMVD") suggested prophetically:

> [A complete closure]...will control all future channel maintenance problems by controlling bank erosion, prevent[] the associated biological resources problem...[and] *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO]* . . . .

LMVD Comments to the U.S. Army Corps of Engineers, *Mississippi River-Gulf Outlet St. Bernard Parish, La., Bank Erosion Reconnaissance Report* ("Corps Erosion Report") at p. 1 (emphasis added).

Incredibly, the Interim Report does not even acknowledge the proven storm surge dangers posed by Reach 1—much less note that at least two previous Army Corps-sponsored studies—one only seven months ago—*recommended* "either . . a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity." Nothing has changed since the IPET report was released to minimize the serious risks to public safety and property posed by Reach 1 of the MR-

9

GO. The failure of the Interim Report to deal with this critical safety issue is inexcusable.

With tragic consequences, the Army Corps has consistently underestimated and minimized the effect of the MR-GO and GIWW on surge and waves from before Hurricane Betsy right through to the recent IPET Report. Similarly, the Army Corps has systematically downplayed the known and demonstrable effect of accelerated wetland loss in the funnel area as a result of saltwater intrusion, ship-induced wave action eroding the MR-GO's banks, and the depositing of dredged materials in the marshes. This institutional myopia biases the Army Corps' ability to provide objective, scientifically sound evaluations to Congress and the citizens of Louisiana. Therefore, Congress should be highly skeptical when the Army Corps claims that the MR-GO has no material effect on storm surge amplitude, velocity, or duration. The actual, unbiased data is decidedly to the contrary.

### 2. Providing Hurricane and Storm Protection

The most credible scientific and engineering data points to the conclusion that the MR-GO's design was flawed in several respects, three of which materially contributed to the flooding of Greater New Orleans: (1) the Army Corps failed to "armor" and prevent ongoing erosion of both banks of the MR-GO; (2) the Army Corps failed to take account of the waterway's inherent and known capacity for accelerating storm-driven surges which would magnify the storm surge's amplitude, force, and duration; (3) the intersection of the MR-GO with the GIWW created a "funneling effect" that drove the force, height, and speed of storm surges to a deadly conclusion.

The northeast shore juncture of the MR-GO and the GIWW is particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels which in turn leads to loss of marshlands. Yet this critical area has never received adequate protective stabilization measures. Erosion on the northeast shore of the MR-GO between 1965 and 1981 ranged from 100 feet to 600 feet of direct shoreline recession, with rates of erosion measured between six to 26 feet per year; and the volume of erosion is calculated at 9,333,000 cubic yards during this period, or 583,000 cubic yards per year.

In 1988, the Army Corps—in its *Corps Erosion Report*—warned specifically of the grave consequences if no immediate remedial action were taken with regard to the MR-GO:

> The unleveed banks of the MR-GO will continue to erode in the absence of remedial action. Currently, banks of the unleveed reaches are retreating at rates from five to over 40 feet per year. The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway is about 15 feet per year. Failure to reduce bank erosion will result in a significant increase in the required maintenance dredging of the waterway in the future.

*Corps Erosion Report*, *supra*, at pp. 30-31.

This same report specifically analyzed MR-GO's impact on bank erosion in St. Bernard Parish. The extensive Army Corps study recognized the marshland between Lake Borgne and St. Bernard Parish acted as a natural buffer to hurricane storm surge. The Army Corps acknowledged that between 1968 and 1987, severe bank erosion—caused mostly by human-induced channelization and shipping traffic—had resulted in approximately 4,200 acres of "highly productive marsh adjacent to MR-GO" to vanish.

While the Interim Report discusses possible closure of the MR-GO to all navigation by an armored earthen dam just south of Bayou La Loutre, it makes no recommendations for hurricane protection *over 24 miles northwest* in the upper Reach 2 and Reach 1 of the GIWW. This glaring omission is contrary to the Congressional mandate and the urgent need to address the demonstrated dangers posed by storm surge in these sections of the waterway. Several authoritative studies—whose authors were not afforded the same financial resources as the Army Corps and its contractors—have suggested constructive approaches to remedying this problem, and we commend them to Congress' attention. These include the *MRGO Channel Restoration and Mitigation Plan and Addendum* (August 2005; July 2006), prepared by Coastal Environments, Inc. for St. Bernard Parish, Louisiana Department of Natural Resources, Coastal Management Division, and U.S. Environmental Protection Agency; Ivor van Heerden and Mike Bryan, *The Storm: What Went Wrong and Why During Hurricane Katrina—The Inside Story From One Louisiana Scientist* (New York, Viking, 2006) at pp. 264-85; *Mister Go Must Go: A Guide for the Army Corps' Congressionally-Directed Closure of the Mississippi River Gulf Outlet* (December 4, 2006) (authored by Drs. John Day, Mark Ford, Paul Kemp, and John Lopez).

Given its historic state of denial about the MR-GO's contribution to storm surge, the Army Corps cannot be entrusted with the sole responsibility to devise effective hurricane protection features for Reach 1 and upper Reach 2 of the MR-GO that guarantees that this federal waterway will never again serve as a conduit for surge and waves to Greater New Orleans. Accordingly, we urge that Congress, or alternatively the United States District Court for the Eastern District of Louisiana

presiding over the *State of Louisiana v. United States of America* injunction lawsuit, direct the Army Corps appoint a panel of independent scientists and engineers to devise a plan for mitigating storm surge in Reach 1 and upper Reach 2 of the MR-GO. This intervention is all the more necessary since the Army Corps' "Final Report" on the MR-GO will not be submitted to Congress until December 2007 and *it will contain no recommendations, much less any specific engineering plans, for hurricane and storm protection measures along the dangerous reaches of the MR-GO.*

### 3. Restoring and Preserving the MR-GO Ecosystem

Out of the one million acres of wetlands lost over the past decades, more than one-half are directly seaward of Greater New Orleans and the more than one million residents of the region. The loss of so much marshlands and cypress forests–65,000 acres (101 square miles) alone destroyed by the MR-GO—poses a serious threat to human life and property. It is well established that these sensitive wetlands provide a natural and effective buffer (friction) for storm surge by "sapping the strength of the storm winds and quite literally swallowing the brunt of the storm surges." Ivor van Heerden and Mike Bryan, *supra*, p. 170. Even a study cited by the Army Corps in Interim Report concluded that marsh offers three times greater resistance to storm surge than a deep channel. (Bretschneider and Collins (1966))

The prophylactic effect of marshlands is readily demonstrable by comparing areas that were protected and those unprotected by marshlands. During Katrina, four miles of levees exposed to open water along the MR-GO were destroyed and caused enormous destruction in St. Bernard Parish. "By contrast, no Southeast Louisiana levee

13

protected by wetlands or cypress forest failed under Katrina's onslaught." *Mister Go Must Go, supra* at p. 10.

The Army Corps' own scientists have calculated that every three to four miles of healthy marsh reduces storm surge by one foot. Thus, in addition to barrier islands, wetlands offer the strongest and most natural and economical storm surge protection available. And given the rapid rate at which wetlands are being destroyed—a football field every half hour—it is appalling that the Army Corps failed to make any recommendations for immediate wetlands restoration and preservation in the Interim Report.

It is indisputable that the MR-GO has caused enormous environmental problems from its very inception. With the intrusion of salt water and the degradation of the immediate environs, the MR-GO, as the *Times-Picayune* stated in an editorial, is an "environmental cancer" whose cost of remediation dwarfs any putative economic benefits that were derived from its use over more than four decades. In May 2006, the U.S. Senate Committee for Homeland Safety and Governmental Affairs concluded:

> *The building of MRGO and the combined GIWW/MRGO resulted in substantial environmental damage*, including a significant loss of wetlands that had once formed a natural barrier against hurricanes threatening New Orleans from the east. MRGO and the GIWW/MRGO provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. *These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure.* As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from hurricane Katrina.

U.S. Senate Committee of Homeland Security and Governmental Affairs, *Hurricane Katrina: A Nation Still Unprepared*, at Chapter 9-6 (May 2006) (emphasis added).

The restoration of marshlands along the MR-GO is a well known, integral, and urgently-needed feature of any comprehensive set of remedies for protecting against a future MR-GO flood disaster. A combination of man-made protections along with the restoration of natural environmental barriers—such as restoring coastal areas, vegetation, and natural ridges—would provide the best lines of defense for much needed protection to Louisiana from future storm surges. Aptly echoing the sentiments of environmentalists for over half a century, the report by an independent panel of preeminent scientists and engineers aptly observed:

> "We will never be able to rebuild the coast we had 50 years ago, but the wetlands still out there can be preserved . . . . If we do nothing, the gulf will be lapping at the edges of New Orleans in future decades . . . [a]nd if the MRGO stays open, you might as well put a bull's-eye on the city and tell everybody to clear out on June 1 when the hurricane season starts."

R.B. Seed, et al., *Investigation of the Performance of the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2006*, at F-68 (May 22, 2006) ("Final Seed Report") (quoting Carlton Dufrechou, Executive Director, Lake Pontchartain Foundation).

Once again, the Army Corps in its Interim Report has deferred to another day any recommendations for ameliorating the deleterious effects of the MR-GO on wetlands. This chronic lack of a sense of urgency is troubling given the daily, hourly, and monthly toll exacted on the disappearing marshlands. Every year that we defer taking immediate, comprehensive action—to stop the loss and to begin restoration of this vital ecosystem—only exacerbates the problem and makes the solution more

expensive and tenuous. As one recent report concluded: "While MRGO continues to exist, these wetlands continue to degrade and disappear at an alarming rate, further diminishing their capacity to buffer storms, shelter wildlife, and purify." *Mister Go Must Go, supra,* at p. 3. We therefore implore Congress to promptly mandate a fully-integrated plan for flood control for Greater New Orleans that includes (1) closure of the MR-GO, (2) hurricane and surge protection in Reach 1 and upper Reach 2 of the MR-GO, and (3) wetlands restoration and preservation.

Time is of the essence. The tragic devastation of Hurricane Katrina was unbearable. But failing to heed the lessons learned—and immediately remediate the MR-GO—is unimaginable.

Respectfully submitted,

Dr. Robert Bea
University of California at Berkeley

Dr. John Day
Louisiana State University

Dr. Sherwood Gagliano
Louisiana Citizen/Coastal Scientist

Dr. Paul Kemp
Louisiana State University

Dr. Ivor van Heerden
Louisiana State University
