# TIMELINE

**(Revised 1/22/07)**

**MONDAY, AUGUST 29, 2005, AND DURING THE NEXT 2 WEEKS:**

In the aftermath of the storm, which plaintiff's property survived relatively in tact, and as the magnitude of the damages suffered by the citizenry of the Greater New Orleans Metropolitan Area as a result of incompetence, malfeasance and downright criminal and willful misconduct by elected and appointed public officials, at all levels of government, became apparent for the world to see, plaintiff exercised his First Amendment right to express certain opinions to members of the media who solicited his opinion.  Plaintiff also exercised his Second Amendment right to bear arms and to protect his property in the face of a complete breakdown of law and order in the City of New Orleans after the storm.  Had plaintiff not done so, plaintiff avers that his home, and many of his neighbors' homes, would have been looted and/or vandalized, as were so many homes and businesses in the City in the aftermath of the storm. Petition, Article 6.

**SHORTLY PRIOR TO THE WEEKEND OF FRIDAY, SATURDAY AND SUNDAY, SEPTEMBER  9, 10 AND 11, 2005:**

Shortly before or during the course of the September 9, 10 and 11, 2005, weekend, in the face of repeated intimidating, conflicting, confusing and illegal statements from elected and appointed State and local officials, plaintiff became fearful that law enforcement would attempt to forcibly

evict him from his home, which he was legally occupying.[1] Accordingly, he contacted defendant Talley, who was temporarily residing in Houston, Texas, by cellular telephone and requested that he make arrangements for a videographer to stay at plaintiff's residence, so that any attempt to evict plaintiff from his residence could be preserved for posterity on videotape. Talley says he will attempt to do so. Petition, Article 7.

**SUNDAY, SEPTEMBER 11, 2005:**

A meeting is held in Baton Rouge, Louisiana. Among the attendees of the meeting are Associate Justice of the Louisiana Supreme Court, Catherine D. Kimball, the then Louisiana State Bar Association President, Frank Neuner, and Chief Disciplinary Counsel Charles Plattsmier, who works for Kimball. During the meeting, plaintiff's name is mentioned in the context of media interviews. Plaintiff avers, upon information and belief, that during the meeting, Ms. Kimball stated, "Somebody has got to shut that guy up; he's giving us all a bad name", or words to that effect.[2] Plaintiff further avers, upon information and belief, that Mr. Plattsmier stated "I know some of his (plaintiff's) law partners; I'll contact them about him", which he then proceeded to do.

---

[1] Plaintiff's instincts were 100% correct. See entry for Tuesday, September 20, 2005, infra.

[2] Upon information and belief, the "back-pedaling", i.e., the lying, has already begun to occur. Plaintiff avers, upon information and belief, that Justice Kimball recently publicly admitted having said "That guy has got to shut up". Although Ms. Kimball apparently sees a difference between "Somebody has got to shut that guy up" and "That guy has got to shut up", plaintiff avers that it is "a distinction without any difference". If Ms. Kimball simply had wanted plaintiff "to shut up", why didn't she simply call plaintiff and ask him to do so? Why was it necessary for Mr. Plattsmier to contact plaintiff's law partners if all Ms. Kimball wanted was for plaintiff "to shut up" as opposed to "Somebody has got to shut that guy up"?

**MONDAY, SEPTEMBER 12, 2005:**

>Having not heard back from defendant Talley, plaintiff again called defendant Talley, again requesting that he make arrangements for a videographer, which defendant Talley said he would attempt to accomplish. Petition, Article 7.

**WEDNESDAY, SEPTEMBER 14, 2005:**

>Plaintiff is called by defendant Talley, who plaintiff believed was calling him concerning the request for a videographer to stay at plaintiff's residence, so that any attempt to evict plaintiff from his residence could be preserved for posterity on videotape. However, Talley was calling for an entirely different reason, namely, to inform plaintiff that plaintiff had been "suspended from the practice of law." Upon asking defendant Talley, "By whom?", defendant Talley identified Mr. Plattsmier. Plaintiff then asked defendant Talley for what reason(s) plaintiff had been suspended from the practice of law, without notice and without hearing, but defendant Talley said he had no details, but that perhaps another partner, defendant Shea, who he understood had been in communication with Mr. Plattsmier, might be in a position to furnish some details. Defendant Talley further stated that defendant Shea and other unnamed individuals within Lemle & Kelleher, L.L.P., had "influence" with Mr. Plattsmier, and that he (Talley) had been authorized to inform plaintiff that his suspension from the practice of law would be "lifted", and his "ability to earn a living[3] would

---

[3] However, Talley implied, "but not at Lemle & Kelleher."

not be impaired". If plaintiff acceded to the following three specific conditions:

1. Cease and desist from speaking with radio, TV or print journalists;

2. Surrender all weapons at 6034 St. Charles Avenue to lawful authority; and

3. Vacate 6034 St. Charles Avenue.

Plaintiff demurred verbally. Petition, Articles 8 and 9.

**THURSDAY, SEPTEMBER 15, 2005:**

Acting upon instructions from defendant Edwards, another partner of Lemle & Kelleher, William R. Forester, hand delivered to plaintiff a hard copy of the attached facsimile dated September 15, 2005, a copy of which is appended hereto and marked for identification as Exhibit No. 1. Plaintiff did not immediately reply to Exhibit No. 1. Instead, on Friday, September 16, 2005, plaintiff again spoke with defendant Talley by telephone, during which conversation defendant Talley emphasized to plaintiff that Mr. Plattsmier had "required" that the firm transmit Exhibit No. 1 to plaintiff. During said conversation with defendant Talley, plaintiff severed his relationship with the law firm of Lemle & Kelleher. Petition, Article 11.

**SATURDAY, SEPTEMBER 17, 2005:**

Plaintiff is visited at his home by an entourage which included Frank Neuner, the Bar Association President, who had been present at the meeting also attended by Ms. Kimball and Mr. Plattsmier the prior Sunday

in Baton Rouge, as well as Burton Guidry, who is an employee of the Louisiana Department of Justice.[4] The entourage also included a co-employee of Mr. Guidry with the Louisiana Department of Justice. Immediately prior to visiting plaintiff's home at 6034 St. Charles Avenue, which was the first time any of the members of the entourage had ever set foot on plaintiff's property, or attempted social "intercourse" with plaintiff during their lifetime(s), the entourage had been given a "Grand Tour" of the temporary jail facility at the Union Passenger Terminal,[5] where plaintiff ultimately was tortured and illegally detained. See *infra*.

During the visit, plaintiff specifically asked Mr. Neuner if he had heard anything about plaintiff's having been "suspended from the practice of law", to which Mr. Neuner replied that he had no such knowledge.

Plaintiff avers, upon information and belief, that Messrs. Guidry and Neuner were doing someone's else "bidding" by visiting plaintiff at his home, and that Guidry acted as "an advance man" for what ultimately happened to plaintiff during the early morning hours of September 20, 2005, and thereafter, at the hands of the Louisiana State Police, and other employees of the State of Louisiana.

While he was at plaintiff's home, Guidry told plaintiff that complaints had been made about plaintiff "at the highest levels of government", which plaintiff, who had personally experienced the

---

[4] Another employee of the Louisiana Department of Justice is Paul B. Deal, who is a Supervisory Attorney. Mr. Deal also is a former partner of Lemle & Kelleher. Was Deal complicit in Guidry's visit to plaintiff's home?
[5] Plaintiff only learned about the "Grand Tour" of the temporary jail facility quite recently, during an informal telephone conversation with Mr. Neuner.

government's complete incompetence and malfeasance, sloughed off with a "They're the ones who need to worry" attitude.

Just before Guidry departed plaintiff's home, he walked up to plaintiff and said, "Either you're the bravest man I've every known, or you're the dumbest son-of-a-bitch on the face of the earth", then giving plaintiff a blessing with his right hand and saying, "God bless you, brother".  In retrospect plaintiff looks back on that gesture as the equivalent of a Mafia "kiss of death".

**MONDAY, SEPTEMBER 19, 2005:**

Plaintiff files the first "Victims of KATRINA" class action lawsuit in the United States District Court for the Eastern District of Louisiana, which was temporarily sitting in Baton Rouge.  Among the specifically named defendants are the United States of America, the State of Louisiana, Governor Blanco, the City of New Orleans, Mayor Nagin, former Police Superintendent Compass and Sheriff Gusman, among others.

**TUESDAY, SEPTEMBER 20, 2005:**

At 0005 hours on Tuesday, September 20, 2005, within twelve hours of his having filed his class action lawsuit, plaintiff was lawfully occupying his property on St. Charles Avenue in uptown New Orleans, watching television (plaintiff had, by this time, procured a gasoline powered generator), and preparing to retire for the evening when, suddenly and without warning a dark colored sports utility vehicle

emblazoned with Louisiana State Police on the passenger side door blocked plaintiff's driveway, following which three or four individuals believed to be Louisiana State Policemen (they were dressed in dark swat team like uniforms and armed to the teeth with side arms and automatic weapons), approached plaintiff in a very aggressive manner.

Plaintiff told the officers that they were not authorized to be on his property and that they should get back on the sidewalk, which is public property. In response, one of the officers told plaintiff, "Sir, you are coming with us; you can either come with us voluntarily or we will remove you from here by force; now what's it going to be?" Plaintiff replied, "I will not resist, but you will have to remove me from my property by force".

Thereafter, plaintiff was taken to the Union Passenger Terminal where he was tortured and held for 16 ½ hours, following which the persons having plaintiff in custody made a fatal mistake: they released plaintiff, alive. At the time of his release, plaintiff was handed a piece of paper purporting to show that plaintiff had been arrested for the misdemeanor of "public intoxication", which is a lie.

**FRIDAY, SEPTEMBER 23, 2005, APPROXIMATELY 7:00 P.M.**

Dave Winn, the Lemle & Kelleher, L.L.P. Office Administrator, returns messages left for him to call plaintiff's Secretary, Victoria Broussard, by placing a telephone from the Lemle & Kelleher Shreveport office to Mrs. Broussard's home in Jefferson Parish. During this

telephone conversation, Winn tells Mrs. Broussard that "Ashton was arrested and acting crazy; he's been on T.V., talking to the media in a crazed manner." Winn also told Mrs. Broussard that in a telephone conversation with "someone at the jail", Winn had told the someone that "Mr. O'Dwyer is a respected lawyer with the law firm of Lemle & Kelleher, and should be released." Winn also told Mrs. Broussard that if he had not made that representation, then "They were going to take Ashton to Angola."

Plaintiff asks rhetorically, "If Members of Lemle & Kelleher, L.L.P. were not complicit in plaintiff's being in jail, what was their Office Administrator doing talking with `someone at the jail'?" Also, what "power" did the Lemle & Kelleher Office Administrator have over "someone at the jail" to successfully persuade that someone that plaintiff should be released rather than taken to Angola?

**FRIDAY, OCTOBER 7, 2005**

After being informed by the Chief Disciplinary Counsel that he had not been suspended from the practice of law, plaintiff makes a formal disciplinary complaint against three (3) of his former law partners, who plaintiff averred improvidently used the name and stature of the Office of Disciplinary Counsel to cause plaintiff to be falsely advised that he had been suspended from the practice of law, but that the law firm had "influence" with the Disciplinary Counsel and could get the suspension lifted if plaintiff acceded to the demands enumerated, supra.

**FRIDAY, OCTOBER 14, 2005**

While in Baton Rouge on other business, plaintiff stops at the offices of the Louisiana Department of Justice, where H. Burton Guidry works. Plaintiff had made numerous attempts between September 20, 2005 and October 14, 2005 to speak with Mr. Guidry by telephone, but Mr. Guidry never returned any of plaintiff's telephone messages. Although plaintiff was unable to gain an audience with Mr. Guidry, or to speak with him by telephone, Mr. Guidry did make arrangements for two (2) Investigators within the Louisiana Department of Justice to take a recorded statement from plaintiff regarding the events of September 20, 2005. When plaintiff leaves the offices of the LDOJ, although the Investigators said they would have to "check with our Superiors" within the LDOJ, plaintiff believes the LDOJ will seriously investigate the crimes which were committed against him, which plaintiff reported to the Investigators within the LDOJ.

**MONDAY, DECEMBER 12, 2005**

An investigator employed by the Louisiana Department of Justice, to whom plaintiff had reported the crimes committed against him, advises plaintiff that his office would not be pursuing the matter any further.

**FRIDAY, MARCH 17, 2006**

Michael C. Keller, an attorney with the Louisiana Department of Justice, the same State entity that employs defendant Guidry, and who is representing the interests of the State and various State agencies in

"Victims of KATRINA" litigation, threatens plaintiff with physical violence during a telephone conversation. The threat is reported in writing to the Judge presiding over Victims of KATRINA litigation, namely the Honorable Stanwood R. Duval, by letter dated March 20, 2006, in which plaintiff advised Judge Duval as follows:

> "Lastly, I am informing the Court that on Friday, March 17, 2006, I received a telephone call from Michael C. Keller, Esq., counsel for the State of Louisiana and the Governor who, although he couched his conversation in terms of a "friendly telephone call", invoking only the provisions of Rule 11, clearly "threatened" me. I was the victim of a criminal physical attack within twelve (12) hours of my filing the above-styled and numbered cause; I know when I am being threatened. I was threatened by Mr. Keller. I am advising the Court of this matter, so that if any physical harm should befall me, because I am the victim of an unfortunate accident, or of an armed-robbery gone bad, or should I be struck by lightening, the Court can order investigation by the FBI and/or the Department of Justice." See Exhibit No. 2.

**WEDNESDAY, MARCH 29, 2005**

The Chief Disciplinary Counsel, after dodging plaintiff's telephone calls to his office during the preceding 5 to 6 weeks, informs plaintiff that he "has declined to conduct a formal investigation" into the post-KATRINA conduct of his former law partners. In so doing, the Chief Disciplinary counsel writes, "Whether or not you were in fact ever told that you were suspended by any individual of Lemle & Kelleher is unknown, but based upon my preliminary inquiry has been flatly denied."

**THURSDAY, AUGUST 17, 2006**

Charles B. Plattsmier, Chief Disciplinary Counsel for the Louisiana Attorney Disciplinary board, initiates investigation into

"allegations about [plaintiff's] conduct", requiring plaintiff to respond, in writing. The identities of the persons, firms or corporations who complained to the Board about plaintiff's conduct are unknown.

**LATE SEPTEMBER OR EARLY OCTOBER 2006**

One Thursday afternoon, sometime after plaintiff filed his personal lawsuits against the State of Louisiana, and others, plaintiff encounters Paul B. Deal on the steps at the Federal Courthouse in New Orleans. Deal is a former Lemle & Kelleher, L.L.P. partner and is the current "Office Chief" of the New Orleans office of the Louisiana Department of Justice, which is the State agency which employs the Attorney General of the State of Louisiana and all Assistant Attorneys General. Michael C. Keller, supra, works for Deal. When Deal sees plaintiff, Deal walks up to plaintiff and, in the course of conversation, tells plaintiff, "You're lucky you didn't have a broom-stick shoved up your ass."[6] Deal also alludes to certain of plaintiff's "re-filed, protective pleadings", and tells plaintiff, "You'd better watch that; someone might look on that as sanctionable conduct."

**WEDNESDAY, NOVEMBER 29, 2006**

The Louisiana Department of Justice, through Phyllis E. Glazer, an Assistant Attorney General working in Deal's office, threatens plaintiff with sanctions pursuant to Rule 11, Federal Rules of Civil Procedure, and 28 U.S.C. §1927. See Exhibit No. 3.

---

[6] The "broomstick" comment by Deal was particularly upsetting to plaintiff, since one of his "keepers" at the Union Passenger Terminal had referred to plaintiff as a "bitch", saying, "We're going to have fun with this bitch."

**TUESDAY, DECEMBER 12, 2006**

Charles B. Plattsmier, Chief Disciplinary Counsel for the Louisiana Attorney Disciplinary Board notifies plaintiff that ". . . we have dismissed this complaint [the "complaint" of August 17, 2006]."

**FRIDAY, DECEMBER 22, 2006**

The Louisiana Department of Justice, representing many of the same State defendants who he has sued in his personal litigation, files a Motion for Sanctions against Ashton R. O'Dwyer, Jr. in "Victims of KATRINA" litigation, causing plaintiff to ask rhetorically, "Will the latest Motion for Sanctions by the State defendants result in yet another `investigation' of plaintiff's conduct by Chief Disciplinary counsel Plattsmier, who is a State employee?"