# EXHIBIT G

**House Document No. 231 ("Chief's Report")**
**(Excerpts)**

89th Congress, 1st Session - - - - - - - - - - House Document No. 231

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

---

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY, DATED MARCH 4, 1964, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND ILLUSTRATIONS, ON A REVIEW OF THE REPORTS ON, AND AN INTERIM HURRICANE SURVEY OF LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA, REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON PUBLIC WORKS, UNITED STATES SENATE, ADOPTED JANUARY 28, 1949, AND FEBRUARY 4, 1957, AND AUTHORIZED BY THE RIVER AND HARBOR ACT APPROVED MARCH 2, 1945. IT IS ALSO IN PARTIAL RESPONSE TO PUBLIC LAW 71, 84TH CONGRESS, APPROVED JUNE 15, 1955

JULY 6, 1965.—Referred to the Committee on Public Works and ordered to be printed with illustrations

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## REPORT OF THE CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY

HEADQUARTERS
DEPARTMENT OF THE ARMY
OFFICE OF THE CHIEF OF ENGINEERS
WASHINGTON 25, D.C.

IN REPLY REFER TO

ENGCW-PD

4 March 1964

SUBJECT: Lake Pontchartrain and Vicinity, Louisiana

TO: THE SECRETARY OF THE ARMY

1. I submit for transmission to Congress the report of the Board of Engineers for Rivers and Harbors, accompanied by the reports of the District and Division Engineers and the concurring report of the Mississippi River Commission for those areas under its jurisdiction, in response to a resolution of the Committee on Public Works of the United States Senate adopted 28 January 1949 requesting a review by the Board of existing reports on Lake Pontchartrain, Louisiana, concerning navigation, flood control, and shore erosion in Orleans Parish. It is also in review of reports by the District and Division Engineers in response to an item in the River and Harbor Act approved 2 March 1945 authorizing and directing a survey concerning shore erosion and seawall damage at Mandeville, Louisiana; in response to a resolution of the Committee on Public Works of the United States Senate adopted 4 February 1957, requesting a review by the Chief of Engineers of reports on Lake Pontchartrain to determine the advisability of constructing a levee connecting the existing south guide levee of the Bonnet Carre Spillway with the existing Jefferson Parish levee; and in partial response to Public Law 71, Eighty-fourth Congress, first session, approved 15 June 1955, authorizing and directing a survey with a view to determining means for preventing loss of lives and damages to property by hurricanes along the eastern and southern seaboard of the United States.

2. The District and Division Engineers find that the most suitable plan for protecting the partially developed areas bordering Lake Pontchartrain would consist of two parts: a levee and floodwall barrier along the southeast side of the areas to prevent entry of surges from Lake Borgne into the areas and Lake Pontchartrain; and new or enlarged levees along the south shore of Lake Pontchartrain, together with repair and reinforcement of the existing seawall at Mandeville on

the north shore, to prevent entry of lake surges into the areas. The barrier would include a lock and flood gates in the Rigolets, a navigation gate and flood gates in Chef Menteur Pass, and a multiple-purpose lock in the lakeward end of the Inner Harbor Canal. Based upon price levels of December 1961, the reporting officers estimate the first cost of the barrier plan at $64,703,000, the annual charges at $2,535,600, and the average annual benefits at $48,009,000. The benefit-cost ratio is 18.9. The cost apportionment is based upon that adopted by Congress in the 1958 Flood Control Act for similar projects wherein the Federal share is 70 percent of the total project cost and the non-Federal share is 30 percent, including lands, easements, rights-of-way, relocations, and the remainder, if any, in cash. However, the reporting officers consider that operation and maintenance of the Rigolets lock as a part of the hurricane barrier is a local responsibility, but that performance by the Federal Government would be in the public interest. Accordingly, they propose a cash contribution equivalent to the 100-year present worth of this item, presently estimated at $125,000 annually, or a total of $4,092,000. On these bases the Federal share of the first cost is estimated at $41,200,000 and the non-Federal share at $23,503,000, including $18,476,000 in cash. For the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of new and enlarged levees extending generally along the southerly banks of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou Dupre and thence westerly to the Mississippi River levee at Violet. The first cost is estimated at $15,143,000, the annual charges at $572,200, and the average annual benefits at $5,152,000. The benefit-cost ratio is 9.0. The Federal share of the first cost is estimated at $10,600,000 and the non-Federal share at $4,543,000, including $3,644,000 in cash. The reporting officers further find that a lock is required in the Inner Harbor Navigation Canal near Seabrook to prevent velocities hazardous to navigation in the canal, and increased salinity in Lake Pontchartrain, which will occur upon completion of the Mississippi River-Gulf Outlet navigation project, presently under construction. It would serve a dual purpose in controlling tidal exchange into the lake and as an element in the hurricane surge-barrier. The first cost of the lock allocated to the Gulf Outlet project is estimated at $4,980,000 and the annual charges at $278,600, including $120,000 for Federal operation and maintenance in addition to that now required. Inclusion of these costs in those for the Gulf Outlet project decreases the benefit-cost ratio from 1.8 to 1.7. Subject to particular conditions of local cooperation applying to each of the three plans, the reporting officers recommend authorization for construction in accordance with their plans.

3. The Mississippi River Commission concurs in general in the views and recommendations of the reporting officers insofar as they pertain to proposed improvements under the jurisdiction of the Commission in St. Charles and Jefferson Parishes.

ne areas. The
olets, a navi-
multiple-
al. Based upon
timate the
l charges at
00. The
ased upon
or similar
total
cluding
mainder,
er that
of the
rformance
t. Ac-
o the 100-
$125,000
Federal
the non-
ash. For
most
nd enlarged
the Gulf
let channel
ver levee
the annual
$5,152,000.
first cost
$4,543,000,
rther find
anal near
the canal,
occur upon
on project,
pose in
it in the
ocated to
ne annual
ation and
of these
benefit-
tions of
ne reporting
ordance with

neral in the
ar as they
of the Com-

The Board of Engineers for Rivers and Harbors concurs in general in the views and recommendations of the reporting officers pertaining to the three plans. Subject to re-examination of the levee alignment in the preconstruction planning stage with a view to protecting additional lands, and to certain requirements of local cooperation, the Board recommends authorization for construction of the improvements, essentially as planned by the reporting officers, provided that each separable independent feature may be undertaken independently of the others whenever funds for that purpose are available and the prescribed local cooperation has been provided.

5. Application of an interest rate of 3 percent, as recently prescribed, would not change the benefit-cost ratios appreciably for the barrier plan and for the Chalmette area. However, it would reduce the cash contribution for Federal operation and maintenance of the Rigolets lock from $4,092,000 to $3,950,000. The Federal share of the first cost of the barrier plan is presently estimated at $41,342,000 and the non-Federal share at $23,361,000, including $[illegible],334,000 in cash. Application of 3 percent interest rate in the analysis causes no change in the benefit-cost ratio or the cost apportionment for the modified Gulf Outlet project.

6. Subject to these modifications, I concur in the recommendations of the Board of Engineers for Rivers and Harbors.

W. K. WILSON, JR.
Lieutenant General, USA
Chief of Engineers



# REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

**CORPS OF ENGINEERS, U.S. ARMY**
**BOARD OF ENGINEERS FOR RIVERS AND HARBORS**
**WASHINGTON 25, D.C.**

ENGBR

24 July 1963

SUBJECT: Lake Pontchartrain and Vicinity, Louisiana

TO: Chief of Engineers
Department of the Army

1. Authority and scope.--This report is in response to a resolution of the Committee on Public Works of the United States Senate adopted 28 January 1949 requesting a review by the Board of Engineers for Rivers and Harbors of existing reports on Lake Pontchartrain, Louisiana, "with a view to determining if any modifications of recommendations contained therein are advisable at the present time with respect to flood control, navigation, and beach erosion control in Orleans Parish, Louisiana." It is also in review of reports by the District and Division Engineers in response to an item in the River and Harbor Act approved 2 March 1945 authorizing and directing a survey "with a view to the protection of the shoreline and repairs to the existing protective works on Lake Pontchartrain at Mandeville, Louisiana"; a resolution of the Committee on Public Works of the United States Senate adopted 4 February 1957, requesting a review by the Chief of Engineers of reports on Lake Pontchartrain to determine "the advisability of extending the existing levee on the south shore of Lake Pontchartrain in Jefferson Parish, along the lake shore in St. Charles Parish to tie-in with the south guide levee of the Bonnet Carre Spillway, in view of recent changed physical or economic conditions"; and in partial response to Public Law 71, Eighty-fourth Congress, first session, approved 15 June 1955, authorizing and directing a survey with a view to determining means for preventing loss of lives and damages to property by hurricanes along the eastern and southern seaboard of the United States. The authorities are quoted in the report of the District Engineer. This report is concerned primarily with providing protection against hurricane water levels, but includes provision for modifying the authorized Mississippi River-Gulf Outlet navigation project, presently under construction. Several hurricane reports have been submitted and others will be made later. Erosion problems along unprotected reaches of the north shore of Lake Pontchartrain are left for separate investigation under beach erosion control legislation.

2. Description.--Lake Pontchartrain is in southeastern Louisiana north of and adjacent to the city of New Orleans. It is roughly oval in shape, with the long axis extending about 40 miles in an east-west direction, and has a water surface of about 640 square miles. On the east it is connected through the Rigolets and Chef Menteur Pass, and Lake Borgne and Mississippi Sound, to the Gulf of Mexico. On the west it is connected through Pass Manchac to Lake Maurepas, a shallow tidal basin having a surface area of about 90 square miles. The lake has a tributary drainage area of about 4,700 square miles, including the Tangipahoa and Tchefuncta Rivers and Bayous Lacombe, Liberty, Bonfouca, and Castine along its north shore, and the Blind, Amite, Natalbany, and Tickfaw Rivers, which empty into Lake Maurepas. It varies in depth to over 40 feet in Chef Menteur Pass and averages about 12 feet. Water levels in the lake vary according to direct rainfall; tributary inflow; wind-driven water movement; tidal movements from the Gulf of Mexico through the Rigolets, Chef Menteur Pass, and the Inner Harbor Canal by way of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet project; and infrequently by diversion of the Mississippi River through the Bonnet Carre Spillway. Although the lake is subject to very high and damaging levels during hurricanes, it has an average level of one foot above mean sea level. The tidal range is about one foot in Lake Borgne and about 0.5 foot in Lake Pontchartrain. Wind effects, with wind velocities as low as 5 miles per hour, frequently dominate the normal tidal effects on lake levels. The salinity gradient in the lakes is fairly uniform, increasing from near-fresh water in Lake Maurepas progressively through Lake Pontchartrain to near-Gulf concentrations in the western part of Lake Borgne. Discharge of fresh water from Pearl River acts to dilute western Lake Borgne waters. The United States Fish and Wildlife Service reports that the existing salinity gradient supports a valuable fishery resource in nursery stock and sport and commercial species. It further reports that any major shift in the salinity gradient could have significant effect upon the fishery resources in the lake and adjacent areas.

3. The study area, referred to as the Pontchartrain Basin, is a shallow depression which lies between the alluvial ridge of the Mississippi River and gulfward-sloping uplands on the north and west. A low alluvial ridge, known as the Metairie-Gentilly Ridge, marking the position of an ancient distributary of the river, extends northeastward from Jefferson Parish through Orleans Parish toward the uplands and subdivides the basin. The lakes were originally separated from the uplands and ridges by marsh and swamp lands, except in the vicinity of Mandeville on the north shore of Lake Pontchartrain where the uplands border the lake. However, a large part of the south and southeastern shores of Lake Pontchartrain have been partially protected by levees and floodwalls and drained for development by pumping. Because of drainage in these areas, the highly organic surface soils have shrunk and land settlement has occurred to as much as 7 feet below mean sea

ise to a reso- ates Senate l of Engineers hartrain, ons of recom- t time with control in orts by the n the River ecting a sur- repairs to andeville, s of the a review by to determine south shore e shore in of the Bonnet onomic condi- -fourth ing and di- eventing loss eastern and are quoted concerned er levels, ssippi nstruction. will be made north shore under beach

level. In addition to local settlement, regional subsidence is occurring in the New Orleans area at the rate of about 0.4 foot per century.

4. The area under study is in a subtropical latitude having mild winters and hot, humid summers. Precipitation averages about 60 inches annually, practically all in the form of rainfall. However, annual precipitation may vary plus or minus 50 percent from the averag and several stations have recorded no rainfall in a calendar month while others at different times have recorded as much as 25 inches.

5. The 1960 population in the study area was about 772,000, essentially all urban, of which about 99 percent was in the four parishes south of Lake Pontchartrain. The main activities in the area relate to manufacture and/or processing of food products, hardware, prefabricated metal products, basic chemicals, petroleum products, building materials, ships and boats, and wearing apparel. These industries accounted for about 95 percent of the value added by manufac ture, which was in excess of $466 million in 1958. Indications are that the New Orleans metropolitan area will have a population of abou 2 million by the year 2010, which is expected to occupy areas progres sively westward in Jefferson and St. Charles Parishes and eastward in Orleans and St. Bernard Parishes.

6. Existing and planned improvements.--Federal improvements in the area consist of: the Mississippi River and Tributaries project for flood control which includes, among other features, the east bank Mississippi River levee, the Bonnet Carre Spillway guide levees, and the lakefront levee in Jefferson Parish; the 40-foot navigation proje Mississippi River, Baton Rouge to the Gulf of Mexico, Louisiana, and modification thereto, the Mississippi River-Gulf Outlet project 36 fe deep and 500 feet wide extending through a land and water cut from th Inner Harbor Navigation Canal in New Orleans southeasterly to the Gul of Mexico, presently under construction; a section of the Gulf Intracoastal Waterway 12 feet deep and 150 feet wide extending through a land cut from Lake Borgne near the Rigolets to the Inner Harbor Navigation Canal in New Orleans, and a 9-foot alternate route from the Inner Harbor Navigation Canal across Lake Pontchartrain and through the Rigolets; and several shallow-draft navigation projects connectin the lakes and north shore tributary streams. Non-Federal improvement consist of: levees, seawalls, and about 11.5 miles of Southern Railway embankment along the lakefront extending eastward from the Jefferson-Orleans Parish line to South Point, northwest of Chef Mente Pass, thence levees only extending southeasterly to the Gulf Intracoastal Waterway, thence westerly along the waterway to the Inner Har bor Navigation Canal, together with several cross levees, canals, and

mping systems for i
almette area extend
on Canal to Bayou I
ver levee, drained
foot seawall 1.5 m
rth shore; and the
5 to 300 feet wide
9 miles below Cana
ck 75 feet wide an
nts are operated a
the Inner Harbor
rt of the Gulf Int

7. Area subje
e bodies of water
one hurricane wou
cordingly, for des
expected from the
tions reasonably c
al likely paths, s
termine the condit
ree design hurrica
d having a differe
ooding is conside
uld be flooded by
0,000 acres, or 1,
e shores of Lake I
ver to the southe
rish. This area
ited States Highw
ppi River-Gulf Ou
nteur Pass, numer
e Inner Harbor Na
east west of Chef
d industrial area
e within the leve
rishes, 600 in Ma
res in marsh and
mmercial, and pas
e leveed areas co
her improvements,
ere construction
ere is room for e
ere about 95 perc

systems for interior drainage; a levee for protection of the area extending southeasterly from the Inner Harbor Navigation Canal to Bayou Dupre, and thence westward to the Mississippi levee, drained partly by pumps and partly by floodgates; a seawall 1.5 miles along the lakefront at Mandeville on the north shore; and the Inner Harbor Navigation Canal 30 feet deep and 300 feet wide, extending northward from the Mississippi River, miles below Canal Street, to Lake Pontchartrain, together with a feet wide and 640 feet long. All of the non-Federal improvements are operated and maintained by local interests except that part of the Inner Harbor Navigation Canal, including the lock, which is part of the Gulf Intracoastal Waterway.

7. Area subject to flooding.--Because of the configuration of the bodies of water in the area and the characteristics of hurricanes, no hurricane would cause critical flooding in all shore areas. Accordingly, for design purposes, a hurricane having forces that may be expected from the most severe combination of meteorological conditions reasonably characteristic of the region was routed along several likely paths, at different speeds of translation for each, to determine the conditions critical to each shore. This resulted in three design hurricanes, each approaching from a different direction and having a different speed of translation. The area subject to flooding is considered to be that within the envelope of areas which would be flooded by these design hurricanes. It consists of about 700,000 acres, or 1,100 square miles. About 240,000 acres are along the shores of Lake Borgne extending from near the mouth of Pearl River to the southerly limits of the Chalmette levee in St. Bernard Parish. This area contains the Louisville and Nashville Railroad, United States Highway 90, the Gulf Intracoastal Waterway, the Mississippi River-Gulf Outlet, fishing camps and residences near Chef Menteur Pass, numerous industrial plants between the levees along the Inner Harbor Navigation Canal, and a planned Florida-type development west of Chef Menteur Pass to consist of residential, commercial, and industrial areas. Of the remaining 460,000 acres, about 82,000 are within the leveed areas in Jefferson, Orleans, and St. Bernard Parishes, 600 in Mandeville, 29,600 in St. Charles Parish, 338,000 acres in marsh and swamp, and the remainder in scattered residential, commercial, and pasture lands mainly along the north shore. All of the leveed areas contain residential, commercial, industrial, and other improvements, except in the eastern part of Orleans Parish where construction of streets and utilities is planned. In addition, there is room for expansion in each, except in New Orleans proper where about 95 percent of the area is occupied.

8. The Lake Pontchartrain area has in the past been subject to frequent and devastating hurricanes. However, it has not been subjected to hurricanes of more than moderate forces in the last 20 years. Damage surveys following recent hurricanes indicate the following losses for conditions and price levels at that time: September 1947, $6.6 million; and September 1956, $1.5 million. It is estimated that the occurrence of the design hurricane critical to the south shore of Lake Pontchartrain would cause water damages in excess of $475 million. Average annual damages for present development are estimated at $11 million, of which about $10.7 million would occur in the leveed areas.

9. Improvements desired.--Local interests on the north shore of Lake Pontchartrain are concerned with a shore erosion problem which is aggravated during hurricanes, and have proposed a seawall. Those in Mandeville desire a new seawall. Interests in St. Charles Parish desire a lakeshore levee between the Bonnet Carre Spillway guide levee and the Jefferson Parish line. Officials of Jefferson Parish desire continued Federal maintenance of the lakeshore levee. Local interests in New Orleans desire additional shorefront protection and have suggested a breakwater extending the full length of the existing seawall. Representatives of Orleans and St. Bernard Parishes have requested consideration of a levee extending eastward from the Inner Harbor Navigation Canal along the south side of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet to Bayou Dupre and thence westward to the existing Chalmette levee to provide protection to an additional area of approximately 31 square miles.

10. Related problem.--As a part of the investigation, a model was constructed and operated to determine the effects of barrier structures in the passes on the established salinity and circulation patterns and the ecology in the lakes. The model included Lakes Maurepas, Pontchartrain, Borgne, and a part of the Mississippi Sound. It was found that, upon completion of the Mississippi River-Gulf Outlet navigation project, presently under construction, salinities in Lake Pontchartrain will be increased significantly by way of tidal exchange direct from the Gulf of Mexico through the Inner Harbor Navigation Canal. In addition, it was found that the increased tidal exchange will cause erosive velocities, with corresponding navigation difficulties, in the Inner Harbor Navigation Canal. Current velocities in the canal have increased notably, causing scour problems, as construction of the Gulf Outlet has progressed.

t been subject
has not been
in the last
s indicate the
that time:
.5 million.
rricane criti-
ause water
amages for
which about

the north shore
sion problem
osed a seawall.
in St. Charles
arre Spillway
s of Jefferson
akeshore levee.
refront protec-
ull length of
l St. Bernard
ending eastward
th side of the
-Gulf Outlet to
nette levee to
ately 31 square

gation, a model
s of barrier
and circulation
cluded Lakes
ississippi Sound
l River-Gulf
ion, salinities
y by way of
n the Inner Har-
t the increased
orresponding
ion Canal. Cur-
causing scour
gressed.

11. Improvements proposed.--The reporting officers find that the most suitable plan for controlling salinity exchange and velocity of flow in the Inner Harbor Navigation Canal, caused by construction of the Gulf Outlet, would be by construction of a lock at Seabrook, on the lake end of the canal. It would be 84 feet wide, 800 feet long, with the gate sills 15.8 feet below mean sea level. All components of the lock would have crest elevations at 7.2 feet, except the control houses which would have floor elevation of 12.2 feet, and would be tied to the existing structures along the canal. The first cost of the lock and the annual cost of its maintenance and operation, shown in Table 1 hereto, would be Federal and are mitigating costs of the Gulf Outlet project.

12. For protection from hurricane flood levels, the reporting officers find that the most suitable plan would consist of a barrier extending generally along United States Highway 90 from the eastern-most levee to high ground east of the Rigolets, together with floodgates and a navigation lock in the Rigolets, and flood and navigation gates in Chef Menteur Pass; construction of a new lakeside levee in St. Charles Parish extending from the Bonnet Carre Spillway guide levee to and along the Jefferson Parish line; extension upward of the existing riprap slope protection along the Jefferson Parish levee; enlargement of the levee landward of the seawall along the 4.1-mile lakefront, and construction of a concrete-capped sheet-pile wall along the levee west of the Inner Harbor Canal in New Orleans; raising the rock dikes and landward gate bay of the planned Seabrook Lock; construction of a new levee lakeward of the Southern Railway extending from the floodwall at the New Orleans Airport to South Point; enlargement of the existing levee extending from United States Highway 90 to the Gulf Intracoastal Waterway, thence westward along the waterway to the Inner Harbor Canal, together with riprap slopes along the canal; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal between the Gulf Intracoastal Waterway and the New Orleans Airport; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the Gulf Intracoastal Waterway; construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre, thence westward to the Mississippi River levee at Violet, together with riprap slope protection along the navigation channel and floodgates; and strengthening of the existing floodwall at Mandeville on the north shore. The improvements are designed to provide protection from hurricane flood levels and wave runup having an estimated frequency of occurrence of about once in 200 years. Because of adverse foundation conditions, the embankment must be

50-264 O-65—3

constructed by lifts or stages, with a minimum interval of 2 years between lifts. The cost of construction and annual charges together with benefits and benefit-cost ratios for the plan, based on price levels of December 1961, are given in Table 1 hereto. The cost apportionment is based on that adopted by Congress in the 1958 Flood Control Act for hurricane projects at New Bedford, Massachusetts; Narragansett Bay, Rhode Island; and Texas City, Texas. Subject to certain requirements of local cooperation, the District Engineer recommends authorization for construction of his plan. The Division Engineer concurs.

13. Public notice.--The Division Engineer issued a public notice stating the recommendations of the reporting officers and affording interested parties an opportunity to present additional information to the Board. Several communications were received, one of which suggested eastward extension of the levee system to the vicinity of Chef Menteur Pass. Careful consideration has been given to the communications received.

## Views and Recommendations of the Board of Engineers for Rivers and Harbors

14. Views.--The Board of Engineers for Rivers and Harbors concurs in general in the views and recommendations of the reporting officers. The Board believes that the proposed improvements for hurricane flood protection are economically justified, that they are adequate for the purpose, and that the requirements of local cooperation are appropriate. The possibility of modifying the levee alignment to protect additional lands should be examined during preconstruction planning. The Board is cognizant of the report of the Mississippi River Commission dated 30 January 1963, concurring in the views and recommendations of the reporting officers relative to the proposed work under the jurisdiction of the Commission in St. Charles and Jefferson Parishes. The Board believes that the Seabrook Lock is needed to prevent loss to the fishery in Lake Pontchartrain, and extensive erosion and vessel damages in the Inner Harbor Navigation Canal. It concurs in the view that construction of the Seabrook Lock is to correct detrimental effects not previously foreseen and that the first-stage and annual costs are properly chargeable as mitigating costs to the Gulf Outlet project.

15. Recommendations.--Accordingly, the Board recommends:

a. That the barrier plan for protection from hurricane floods of the shores of Lake Pontchartrain and the separate plan for protection of the Chalmette area be authorized for construction,

to include the features shown in Table 1 hereto, and described in the report of the District Engineer, generally in accordance with the plans of the District Engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable at estimated costs to the United States for the barrier plan of $41,200,000 for construction and $125,000 annually for operation and maintenance of the Rigolets lock, and for the Chalmette plan of $10,600,000 for construction: Provided that prior to construction of each separable independent feature local interests furnish assurances satisfactory to the Secretary of the Army that they will, without cost to the United States:

(1) Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas, necessary for construction of the project;

(2) Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities made necessary by the construction works;

(3) Hold and save the United States free from damages due to the construction works;

(4) Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (1) and (2) above and a cash contribution presently estimated at $14,384,000 for the barrier plan and $3,644,000 for the Chalmette plan, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined;

(5) For the barrier plan, provide an additional cash contribution equivalent to the estimated capitalized value of operation and maintenance of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

(6) Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(7) Maintain and operate all features of the works in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and channel and the modified dual-purpose Seabrook Lock; and

(8) Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly;

Provided that construction of any of the separable independent features of the plan may be undertaken independently of the others whenever funds for that purpose are available and the prescribed local cooperation has been provided; and

b. That the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, Louisiana, as modified by the addition of the Mississippi River-Gulf Outlet, be further modified to provide for the construction of a dual-purpose lock at the lakeward terminus of the Inner Harbor Navigation Canal in the vicinity of Seabrook, Louisiana, generally in accordance with the plans of the District Engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $4,980,000 for construction, and $120,000 annually for operation and maintenance in addition to that now required: Provided that prior to construction, local interests furnish assurances satisfactory to the Secretary of the Army that they will:

(1) Provide without cost to the United States and upon request of the Chief of Engineers, all lands, easements, and rights-of-way, including borrow and spoil-disposal areas, required for construction, operation, and maintenance of the project; and

(2) Hold and save the United States free from damages due to the construction works.

FOR THE BOARD:

R. G. MacDONNELL
Major General, USA
Chairman

Table 1
($1,000 units)

| Item | Construction cost: Federal | Construction cost: Non-Federal: Cash | Construction cost: Non-Federal: Other | Construction cost: Non-Federal: Total | Construction cost: Total | Annual charges: Federal | Annual charges: Non-Federal: OM&R | Annual charges: Non-Federal: Other | Annual charges: Non-Federal: Total | Annual charges: Total | Annual benefits | BCR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|