### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES                          CIVIL ACTION
CONSOLIDATED LITIGATION

                                                      NO. 05-4182

PERTAINS TO: *Robinson v. United States*             SECTION "K"(2)
              C.A. No.  06-2268

### ORDER AND REASONS

Before the Court are:

1)    Defendant United States' Motion to Dismiss Pursuant to Rule 12(b)(1) of the
      Federal Rules of Civil Procedure (Doc. 822);

2)    Defendant United States' Motion for Leave to Supplement Record (Doc. 2288);

and various evidentiary objections which are :

3)    Plaintiffs' Evidentiary Objections to Government Exhibits;

4)    Defendant United States' Opposition to Plaintiffs' Evidentiary Objections to
      Government Exhibits;

5)    Plaintiffs' Request for Judicial Notice Pursuant to Fed. R. Evid. 201 of Exhibits
      Supporting Plaintiffs' Opposition to the Government's Motion to Dismiss; and

6)    Plaintiffs' Request for Discovery Pursuant to Rule 56(f).

These pleadings have been lodged in *Robinson, et al. v. United States,* in which a

Complaint for Damages Caused by the Design, Construction, Operation and Maintenance of the

Mississippi River Gulf Outlet ("MRGO")[1] (Doc. 1) was filed pursuant to the Federal Tort Claims

---

[1] As it was described  in 1971 in *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971):

> The Mississippi River-Gulf Outlet is a deep water channel constructed
> by the Corps of Engineers in the late 1950's and early 1960's at an estimated cost
> of $88,000,000.00.  The channel is approximately 66 miles long, including 46
> miles of "land cut," and runs from the Gulf of Mexico through the parishes of St.
> Bernard and Plaquemines to New Orleans.  The outlet enables ships from ports
> east of the Mississippi River to head north for New Orleans at Breton Sound,
> many miles east of the river mouth, at a saving of sixty miles.  Ships thus pass

Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* against the United States of America and the United

States Army Corps of Engineers (" Army Corps") by six named plaintiffs[2] living in New Orleans

East, St. Bernard Parish, and the Lower Ninth Ward in Louisiana arising from these areas'

inundation as a consequence of Hurricane Katrina.

It is axiomatic that the United States may not be sued without its consent under the

doctrine of sovereign immunity.  *United States v. Mitchell*, 463 U.S. 206, 212 (1983); however,

the FTCA provides, *inter alia*, that "the United States shall be liable, respecting the provision of

this title relating to tort claims, in the same manner and to the same extent as a private individual

under like circumstances . . . ."  28 U.S.C. § 2674.  Thus, based on this waiver, plaintiffs have

sued the Government contending that the MRGO caused catastrophic damage to the Lower

Ninth Ward, New Orleans East and St. Bernard Parish, and this result was the foreseeable

consequences of at least two defective conditions known by the Army Corps for decades–(1) the

destruction of the marshlands surrounding the MRGO which intensified an east-west storm surge

which resulted in the flooding of much of New Orleans and (2) the funnel effect stemming from

the MRGO's faulty design which accelerated the force and strength of that surge.  In essence,

plaintiffs maintain that but for the MRGO, there would have not been the devastating flooding

which damaged  plaintiffs herein.

---

> from Breton Sound through the outlet into the industrial Canal and then into the
> Mississippi River.

*Id.* at 22.  Since the time of that writing various projects have been undertaken and certain reports thereon are the
basis for the United States' Motion to Supplement the record.

[2]Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr. and Lucille
Franz are the named plaintiffs.

The Government in the instant motion has moved to dismiss this complaint pursuant to Fed. R. Civ. P. 12(b)(1) maintaining that the Court lacks jurisdiction over the subject matter based on the Flood Control Act of 1928 ("FCA") and the exceptions found in the FTCA.  Section 3 of the FCA , 33 U.S.C. § 702c, (hereinafter "§ 702c") provides that  "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c.  As such, the United States maintains it is immune because the waters which damaged plaintiffs were "flood waters", under the provisions of § 702c.  As an alternative position, the Government maintains it is immune because it is indisputable that the damages alleged were caused by floodwaters that federal works failed to control.

In addition, the United States maintains that the FTCA did not waive sovereign immunity for the defalcations alleged by plaintiffs.  Section 2680(a) provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id*. The Government maintains that the "due care" exception and the "discretionary function" exception found in§ 2680(a)  likewise require the dismissal of this suit.

As the motion is denominated as one brought pursuant to Rule 12(b)(1), the first issue the Court must decide is the proper procedural approach to determine whether this suit should be dismissed as a matter of law because the Court lacks subject matter jurisdiction over these claims as the Government contends.

**A.      Standard Applicable**

3

Generally, Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject matter jurisdiction of the district court to hear a case.  The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction.  *Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001).  As the Fifth Circuit has stated:

> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curium).  This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice.  *Id.*  The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursing a claim in a court that does have jurisdiction.  *Id.*

*Ramming*, 281 F.3d at 161.

The United States Court of Appeals for the Fifth Circuit instructed in *Montez v. Department of the Navy*, 392 F.3d 147 (5th Cir. 2004) that generally "the district court can resolve factual disputes in determining jurisdiction pursuant to a Rule 12(b)(1) motion for dismissal." *Id.* at 148.  However, where the dispute is determinative of both the federal jurisdiction question and the underlying federal cause of action, and thus are interdependent, a district court might err where it resolves the disputed factual issue in favor of the Government. *Montez*  arose in the context of a FTCA case which as noted is one of the jurisdictional bases alleged herein.   The Court of Appeals for the Fifth Circuit stated:

> In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. See *Land v. Dollar,* 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson,* 117 F.3d at 904. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in

order to determine whether or not it has jurisdiction to hear the case.

**However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, we have held that the trial court must assume jurisdiction and proceed to the merits. In circumstances where "the defendant's challenge to the court's jurisdiction is also a challenge to <u>the existence of a federal cause of action</u>, the proper course of action for the district court  is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case" under either Rule 12(b)(6) or Rule 56.** *Williamson v. Tucker,* **645 F.2d 404, 415 (5th Cir.1981); see also** *Daigle v. Opelousas Health Care, Inc.,* **774 F.2d 1344, 1347 (5th Cir.1985).**

> As we stated in *Williamson,*
>
> [N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . .  both of which place greater restrictions on the district court's discretion.
>
> 645 F.2d at 415. Therefore, we follow our general rule in holding that a jurisdictional attack intertwined with the merits of an FTCA claim should be treated like any other intertwined attack, thereby making resolution of the jurisdictional issue on a 12(b)(1) motion improper.

*Montez,* 392 F.3d at 149 -150 (emphasis added).

The Government in *Montez* argued that an exception that the court had previously carved out for a Foreign Sovereign Immunities Act ("FSIA") case in  *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994)  applied.  The appellate court rejected that contention noting that in the context of the FSIA:

> The need for special procedures designed to preserve a foreign sovereign's immunity from suit is heightened in FSIA cases, which implicate notions of international comity, a concern that does not exist in FTCA cases against the United States. *See  First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (emphasizing "[d]ue respect for . . .  principles of comity between nations" in asserting jurisdiction under the FSIA); *Arriba,* 962 F.2d at 537 (recognizing that principles

of comity favor the exercise of restraint in asserting jurisdiction over foreign
states under the FSIA).

*Montez*, 392 F.3d at 150-151.  The court continued:

> Two Courts of Appeals have held that an FTCA claim cannot be dismissed for
> lack of subject matter jurisdiction where the disputed jurisdictional facts
> concerning immunity are inextricably intertwined with the merits of the plaintiff's
> claim. Citing our decision in *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981),
> as the controlling precedent on the issue, the Eleventh Circuit specifically has
> held in the context of the FTCA that a claim against the United States may not be
> dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) based upon
> the district court's resolution of the disputed factual question whether an
> employee of the U.S. government was acting within the scope of his employment.
> See *Green v. Hill,* 954 F.2d 694, 698 (11th Cir.1992); *Lawrence v. Dunbar,* 919
> F.2d 1525, 1529 (11th Cir.1990). The Ninth Circuit also has held that an FTCA
> claim cannot be dismissed for lack of jurisdiction under Rule 12(b)(1) where
> resolution of the jurisdictional issue is dependent upon the resolution of factual
> issues going to the merits. See *Augustine v. United States,* 704 F.2d 1074, 1079
> (9th Cir.1983) ("Because the jurisdictional issue [when plaintiff's cause of action
> accrued for purposes of the FTCA] is dependent upon the resolution of factual
> issues going to the merits, it was incumbent upon the district court to apply
> summary judgment standards in deciding whether to grant or deny the
> government's motion."). Therefore, because the Whitts' claim is based on the
> FTCA, and not the FSIA, *Moran* does not apply and the trial court must apply a
> 12(b)(6) or summary judgment standard to resolve issues dispositive of both
> subject matter jurisdiction and the merits.

*Id.* at 151.

Thus, under Fifth Circuit jurisprudence, this Court must  determine whether the United

States' challenge to the court's jurisdiction is also a challenge to the existence of a federal cause

of action.  If so, then the proper course of action for the Court  is to find that jurisdiction exists

and deal with the subject motion as a Rule 12(b)(6) or Rule 56 motion.  Plaintiffs maintain that

indeed, this path is mandated by virtue of the position taken by the Government herein; they

maintain that this motion is a veiled attempt at a Motion to Dismiss based on the actual existence

of a cause of action.  Accordingly,  the Court's first step will be to  examine the allegations of

plaintiffs' complaint for the causes of action alleged and determine whether the defenses raised

by the Government call into question whether a cause of action exists.  The Court will first

examine the FCA challenge to the complaint, and then address the FTCA challenge in turn.

**B.      Does the Immunity found in the FCA Require the Dismissal of this Complaint Concerning the MRGO?**

Plaintiffs contend that the MRGO is not a flood control project but an aid to navigation.

The nub of the issue before the court is whether the MRGO is a flood control project and

whether waters that flow through the MRGO are floodwaters.  Moreover, the Court must

consider the question as to whether §702c immunizes the Government if the damages would

have occurred, in whole or in part, as the result of waters caused by negligent acts  in

constructing and maintaining the MRGO regardless of the existence of flood control project(s).

Plaintiffs argue that they seek damages solely for the defalcations of the Army Corps

with respect to the MRGO, not for any failure of any flood control project ( Complaint, ¶¶ 1, 6,

10, 76, 91-94), thus making § 702c immunity inapplicable.  Neither are there allegations that

MRGO includes flood control elements, nor that the MRGO became part of the Lake

Pontchartrain and Vicinity Hurricane Protection Plan ("LVP") which **is** the legislation that

authorized the flood control projects designed to protect this area from flooding–that is the

levees and flood walls surrounding the City of New Orleans and the vicinity.  Plaintiffs  have

alleged the MRGO was never planned, authorized or designed to be anything other than a

"navigable waterway." (Complaint, ¶¶ 35-36, 38).  Thus, they maintain the immunity sought to

be used to dismiss these claims is inapplicable as the cause of action has nothing to do with any

flood control project.

The Government maintains that the plain language of § 702c clearly means that the United States cannot be liable for damages caused by any floodwaters of any kind occurring anywhere.   They also contend that certain "levees" that were constructed in conjunction with MRGO constitute projects that would be subject to immunity under § 702c.   As noted, in the alternative, they contend since the water at issue was not contained by flood control projects, regardless of the source of those waters, it is likewise immune.   The Court finds that this wholesale approach to immunity in the context of this motion to dismiss is neither supported by the history of the Flood Control Act of 1928, nor in a fair reading of *Central Green Co. v. United States*, 531 U.S.  425 (2001) as the Government contends.

In *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971), the Fifth Circuit examined the history of § 702c immunity in the context of damages allegedly caused by the negligence of the United States in the construction of the  MRGO which allegedly allowed waters driven by Hurricane Betsy in September of 1965 to flood plaintiffs' properties which had previously been free from hurricane-driven waters.   The district court in that case had found that because the MRGO was not a flood control project, § 702c did not bar suits against the United States for floodwater damage resulting from the Government's negligence unconnected with flood control projects.   *Graci*, 456 F.2d at 22.[3]   *See Id.* for procedural history.   On interlocutory appeal, the United States contended, *inter alia,*[4] that § 702c "affords the Government an absolute immunity

---

[3]The district court stated, "Section 3 [§702c] does represent a reasonable public policy determination to secure the government from liability for floodwater damage connected with flood control projects; but we hold that it should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects, and that insofar as 3 is to be interpreted, it stands on a less crucial basis and is superseded by the general waiver of immunity of the Federal Tort Claims Act."   *Graci v. United States*, 301 F. Supp. 947 (E.D. La. 1969).

[4]Also at issue there was whether the Federal Tort Claims Act had in some manner repealed this grant of immunity.  That issue was decided in the negative and is not raised as an issue in this case.

from liability for floodwater damage regardless whether the negligence alleged was in connection with a flood control project or a navigation aid project." *Id.*

In affirming the lower court's decision, the Fifth Circuit noted that the legislative history of § 702c is "singularly unavailing." Nonetheless, it reviewed, *inter alia,* the seminal cases of *National Manufacturing Co. v. United States*, 210 F.2d 263 ( 8th Cir. 1954) and *Clark v. United States*, 218 F.2d 446 (9th Cir. 1954), and found that they:

> strongly support the view that the purpose of [§702c] was to place a limit on the amount of money that Congress would spend in connection with flood control programs. Congress undoubtedly realized that the cost of extensive flood control projects would be great and determined that those costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts. [citations omitted]. As Judge Heebe expressed it, the "immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the area of nationwide flood control programs." 301 F. Supp. at 952.

*Central Green*, 456 F2d at 25-26.

Thus, the Fifth Circuit focused on the precise question put before this Court: "whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects." Id* at 26*.* The Fifth Circuit, in an opinion penned by Judge Minor Wisdom, found unequivocally, concurring with Judge Heebe's district court opinion, that it "would not be reasonable to so conclude." In support of this position, the appellate court relied on *Peterson v. Untied States*, 367 F.2d 271 (9th Cir. 1966), where certain vessels were damaged by the negligent dynamiting of an ice jam in the bend of the Chena River in Alaska by representatives of the Army Corps of Engineers in an attempt to prevent flooding caused by an unusual spring run-off. The vessel owners sought remuneration for damages

9

caused thereby, and the Government contended that § 702c immunity attached since these actions were done solely to "prevent a threatened injury from a force of nature to the Ladd Air Force Base property and to the community of Fairbanks, Alaska." *Peterson v. United States*, 217 F. Supp. 867, 870 (D.C. Ala. 1963).

The district court granted the Government's motion to dismiss; however, the Ninth Circuit reversed.  While recognizing the purpose of §702c, the appellate court noted all of the cases where § 702c had been applied to insulate the  United States from liability were factually distinguishable and that, as the Fifth Circuit in *Graci*  characterized the *Peterson*  holding, "The difference between those cases and *Peterson* was that the decision to dynamite the ice-jam–the alleged act of negligence– was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization."  *Graci,* 456 F.2d  at 26.

The Fifth Circuit then cited *Parks v. United States*, 370 F.2d 92 (2nd Cir. 1966)  where the Second Circuit properly "affirmed a judgment of the district court dismissing on [§702c] grounds a complaint that the United States had negligently constructed, maintained and operated a flood control project and thus damaged the plaintiff's property."  *Graci*, 456 F2d at 26.  Nonetheless, the Second Circuit noted that *Peterson*  was distinguishable on its fact as the flood damage there was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control."  *Id.*

The Fifth Circuit found further support for its position in *Valley Cattle Co. v. United States*, 256 F. Supp. 12 (D. Hawaii 1966) where a court allowed recovery against the United States for floodwater damage caused by the Government's negligent maintenance of a stream and

culverts again noting that the money expended thereon were not appropriated by Congress for flood control purposes.  *Id.*   Thus, the Fifth Circuit concluded, using Judge Heebe's words that it is impossible:

> to accept this immunity provision, reasonably related to government involvement in flood control programs, as an absolute insulation from liability for all wrongful acts in other situations, contrary to the express policy of the Federal Tort Claims Act that the government should be held liable for the wrongful acts of its employees in the same respect as private persons.
>
> 301 F. Supp. at 954.  Thus when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of negligence of the United States unconnected with any flood control project, [§702c] does not bar an action against the United States under the Federal Tort Claims Act.

*Id.*  at 27.

This issue was most recently analyzed in *Central Green Co. v. Untied States*, 531 U.S. 425 (2001), where the Supreme Court grappled with the breadth of immunity granted under section 702c.  In that case, owners of real property sued, *inter alia*, the United States under the FTCA for damage to their pistachio farm allegedly caused by subsurface and surface water flooding from the Madera Canal, a federal facility leased to the Madera Irrigation District (MID). Plaintiffs sought damages from the United States and MID "alleging that their negligence in the design, construction, and maintenance of the canal had caused subsurface flooding resulting in damage to the orchards and increased operating costs for petitioner.  Petitioner did not allege that any physical failure of the dam caused damage to its property."  *Id.* at 427.

This canal was part or a "branch" of a vast federal project known as the  Central Valley Project ("CVP"), which included flood control projects for the Sacramento and San Joaquin Rivers in California.  The various portions of the CVP captures and stores waters of both rivers

and many of their tributaries, in some cases generating electric energy in the diversion, and then

redirects the later to semiarid land below.  As described in *Central Green*:

> The Central Valley basin development envisions, in one sense, an integrated
> undertaking, but also an aggregate of many subsidiary projects, each of which is
> of first magnitude.  It consist of thirty-eight major dams and reservoirs bordering
> the valley floor and scores of smaller ones in headwaters.  It contemplates twenty-
> eight hydropower generating stations.  It includes hundreds of miles of main
> canals, thousands of miles of laterals and drains, electric transmission and feeder
> lines and substations a vast network of structure for the control and use of water
> on two million acres of land already irrigated, three million acres of land to be
> newly irrigated, 380, 000 acres in the delta needing protection from intrusions of
> salt water, and for municipal and miscellaneous purposes including cities, towns,
> duck clubs and game refuges.  These projects are not only widely separated
> geographically, many of them physically independent in operation, but they are
> authorized in separate acts from year to year and are to be constructed at different
> times over a considerable span of years."

*Id.* at 433 *citing United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 733 (1950).

Not unlike the situation confronted by this Court, the United States filed a Rule 12(b)(1)

motion to dismiss in *Central Green*.  The district court granted the motion because the parties

agreed that the Madera Canal was part of the Friant Division of the Central Valley Project, and

that flood control was one of that project's purposes. As such, it found that section 702c

immunity attached.  The Ninth Circuit  affirmed. "It agreed with petitioner that the Madera Canal

'serves no flood control purpose,' but nevertheless held that immunity attached solely because it

is a branch of the Central Valley Project" as such was not wholly unrelated to flood control.

*Central Green*, 531 U.S. at 428 *citing* 177 F.3d 834, 839 (1999).  The Supreme Court of the

United States reversed.

Thus, the Supreme Court squarely confronted *dicta* it had rendered in the first occasion it

had to interpret § 702c, that being  in *United States v. James*, 478 U.S. 597 (1986) which had

"generated conflicting opinions among the Courts of Appeal."  *Id.* at 430.  In *James*, two suits

were consolidated to determine whether §702c barred recovery for personal injuries to

individuals allegedly caused by the negligence of the United States in its failure to warn of

dangers from the release of floodwaters from federal flood control projects.  The injuries at issue

there were caused by "turbulent current generated by unwarned releases of waters from a

reservoir after the Army Corps of Engineers had determined that the waters were at "flood

stage."  *Central Green* 531 U.S. at 430  Thus, the fact that the injuries were caused by "flood

waters" was undisputed.

> In *James*, the Supreme Court stated in *dicta*:

> Nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of
> accidents such as the ones at issue in these cases.  The Act concerns flood control
> projects designed to carry floodwaters.  *It is thus clear from § 702c's plain
> language that the terms 'flood ' and 'flood waters' apply to all waters contained in
> or carried through a federal flood control project for purposes of or related to
> flood control*, as well as to waters that such projects cannot control.  *Id.* at 605,
> 106 S. Ct. 3116 (emphasis added).

*Central Green*, 531 U.S. at 430.  From that statement, many courts focused on whether the

damage related  in some manner to a flood control project  rather than whether it related to

floods or flood waters.  The Supreme Court in *Central Green*, rejected this dicta, and noted that

its holding in *James* was simply that "the phrase 'floods or flood water' is not narrowly confined

to those waters that a federal project is unable to control, and that it encompasses waters that are

released for flood control purposes when reservoired waters are at flood stage." *Id.* at 431

(emphasis added).

Nonetheless, the Supreme Court found that the dismissal of the *Central Green* suit using

the *James* rationale was inappropriate and noted that "[t]he holding in *James* also differs from

the less attenuated and more fact-specific position advanced by the Government, which would

require us to take judicial notice of evidence that the Friant Division of the Central Valley

Project and, indeed, the Madera Canal itself can and do serve flood control purposes."  Thus the

Supreme Court concluded that it could not uphold the Ninth Circuit's dismissal of the suit neither

based on the "broad definition" of flood waters as found in *James*, nor by taking notice that the

canal in *Central Green* from which the water damage flowed was part of a flood control project.

*Id.* at 432.

The Supreme Court then examined the nature of the Central Valley Project as described

above.  It found that the case raised a difficult issue because the property damage at issue was

allegedly caused by continuous or repeated flows occurring over a period of years, rather than by

a single, discrete incident.  *Id.* at 436.  Thus it found that "when damage may have been caused

over a period of time in part by flood waters and in part by the routine use of the canal when it

contained little more than a trickle," it would be error to grant the Government's motion for

judgment on the pleadings.  The Court concluded, "Accordingly, in determining whether § 702c

immunity attaches, courts should consider the character of the waters that cause the relevant

damage rather than the relation between that damage and a flood control project."  *Id.* at 437.

Thus, the concept that the Government might be immune from damage from the effect of some

water and not as to other water is recognized in *Central Green.*

In the case at bar, the Government likewise seeks to have this Court dismiss this suit

taking judicial notice that there were flood control projects–whether constructed using funds

appropriated pursuant to the LVP or to the MRGO–extant and as such, the waters which caused

the damage, were flood waters and the United States Government is thus immune.  However,

this approach ignores the pleadings presented.  Plaintiffs are not seeking damages for the failure

of the levees or flood projects.  Plaintiffs contend that MRGO has absolutely nothing to do with

a flood control project.  Plaintiffs are seeking damages for the effects of the waters in the MRGO

with respect to the decimation of the wetlands over a long period of time which in turn created

the hazard which resulted in flooding which plaintiffs maintain could not have been controlled

by any flood control project.

Furthermore, the Government's position ignores the fact that even the Supreme Court in

*Central Green* opened the possibility of a segregation of damages–those for which the

Government would be immune under § 702c and those for which immunity would not attach.

Indeed, the Government even concurred with this reading at oral argument (See Transcript of

Hearing, October 27, 2006, at 33).  For example, would the United States be immune for all

damages if a Navy vessel lost control and broke through levee where the sole cause of the failure

of that levee was the Navy vessel's negligence?   Thus, contrary to the Government's contention

that *Central Green* broadens the immunity provided by 702c, in reality *Central Green* requires

the Court to identify *the cause of the damage* rather than base a decision on the mere fact that a

flood control project was involved.  *Central Green* does not directly answer the question of what

nexus to a flood control project is required for floodwaters to trigger immunity.

The Government is asking this Court to ignore plaintiffs' pleadings, use Rule 12(b)(1) to

rewrite plaintiffs' complaint, find that all of the projects, levees and activities in that area are

flood control projects, and as a result, because (1) flood waters caused the damage alleged or (2)

because flood waters were not contained by these presumptive flood control projects, find the

Government immune as a matter of law.  There is intense disagreement as to the scope of the

15

"levees" that were created in the dredging of the MRGO–are these spoilbanks or actual flood control projects?  Likewise, there are serious questions as to the relationship between the MRGO and the LVP.  If indeed there was  coordination, it would appear that this would not subsume the cause of action as demonstrated in *Central Green*.   Nonetheless, a complete understanding of the evolution of the MRGO and LVP in these areas is required before any legal determination can be made.   As such, the Court finds that the rationale in *Montez* must prevail and that this Court will not dismiss this suit based on Rule 12(b)(1).  Indeed, this case is very much like that found in *Central Green*; while arguably the immediate cause of the damage was indeed "floodwaters," the causation for such floodwaters force and breadth are alleged to have been the defalcations of the Government with respect to the MRGO.

It is clear that the Federal Tort Claim Act did not eviscerate the immunity found in § 702c. However, it is **not** clear that as a matter of law, should plaintiffs prove their allegations as to **damages caused by MRGO**  and not the failure of the flood control projects, that § 702c will prevent a recovery for the damages caused by MRGO.  Indeed, the lower court decision in *Graci* noted that the MRGO was "totally unrelated to any natural waterway **or the national flood control program**" *Graci*, 301 F. Supp. at 956.  But, it is hotly contested whether this remains the case.

The Government now contends that  that certain "levees" that were constructed in conjunction with MRGO constitute projects that would be subject to immunity under §702c. As such, clearly the viability of the cause of action against the United States is inextricably tied to the basis for the United States' claims of lack of jurisdiction.  This fact is underscored by the requests for supplementation of the record, and the plaintiffs' request for Rule 56 discovery.  As

underscored in *Montez*, the Court finds that it would be legally inappropriate to use a Rule 12(b)(1) approach and dismiss this case at this juncture on the Court's finding of facts based on the record before it.  Thus, the Court must treat this motion as one brought under Rule 12(b)(6). The Court would be extremely precipitous if it decided the underlying facts concerning the appropriations and interrelationship between the LVP and the MRGO now.  It is certainly not clear that the MRGO has morphed into a hybrid flood control project/navigational aid project. The Court will deny this motion and finds that plaintiffs' request for further discovery is well-taken.[5]


**C.     Do the  "Due Care" Exception or the "Discretionary Function" Exception Require the Dismissal of this Suit**?

As noted,  plaintiffs have brought this suit pursuant to the FTCA.  They have that alleged that the Act of March 29, 1956, Pub L. No. 94-455, 70 Stat. 65 (1956) provided for the MRGO to be built.  However, plaintiffs contend that the Corps did not exercise due dare during the project's investigation, planning, design,  construction (Complaint, ¶¶  40-43), maintenance (Complaint ¶¶ 51-60) and operational phases.

In addition, plaintiffs maintain that the Army Corps violated federal law in the investigation, planning and construction of the MRGO because the River and Harbor Act of 1945 ("RHA") required  the Army Corps to give to the Secretary of the Interior, during the course of investigations, information developed by the investigations and also opportunity for consultation regarding plans and proposals.  Also,  the Fish and Wildlife Coordination Act of

---

[5]While the Court indicated at oral argument that it would consider granting certification of this issue for immediate appeal, having thoroughly analyzed the case, the Court finds that clearly it cannot grant the Rule 12(b)(1) motion and that discovery should commence and certification would be premature.

1946 ("FWCA"), also mandated that the Army Corps consult and coordinate with the Department of the Interior, Fish and wildlife Service and the former Louisiana Department of Wild Life and Fisheries with regard to the MRGO's investigation, planning and design.[6] Plaintiffs have alleged that these requirements were not met and that they require further discovery to support these allegations.

Finally, plaintiffs allege that many of errors which provide the basis for this suit constitute action taken that contravenes the Army Corps' internal engineering policies which again requires discovery.

The Government, as previously noted, contends that the due care exception applies because the "flaws" of which plaintiffs complain are "inherent" in the MRGO and as such are barred as the MRGO is the result of the execution by the Army Corps of various Congressional mandates concerning this navigational aid.  With respect to the discretionary function exception, the Government maintains that it complied with the all requirements of the RHA and WFCA and has presented some evidence to that it.  Furthermore, it maintains that the  actions taken by the Army Corps involved making  judgments or choices that  implicated  social, economic and political policy and as such are not subject to suit under the FTCA.

Thus, the question becomes whether the Government's invocation of the due care exception and the discretionary function exception to bar this Court's jurisdiction constitute in reality a challenge to the existence of a federal cause of action.  As more precisely stated in *Montez*, must this Court assume jurisdiction and proceed to the merits because there exists issues

---

[6]As proof, plaintiffs point to a letter from the Secretary of the Interior to the Secretary of the Army dated August 24, 1957, stating that the project plans had not been adequately investigated."  (Opposition to Motion to Dismiss at 60; Plaintiffs Exhibit W at 1-2; Froeschle Decl, ¶¶ 78-80).

of fact that are central to both subject matter jurisdiction and the claim on the merits?  *Montez,* 392 F.3d at 149 -150.  If so, are those issues of fact so myriad and interwoven, that such a motion  cannot be decided in a Rule 12(b)(6) context and discovery must proceed?  The Court will first examine the contours of these two sources of immunity.

### Exceptions to FTCA Claims

Section 2680(a) creates two distinct exceptions to the waiver of sovereign immunity found in the FTCA.  *Lively v. United State*s, 870 F.2d 296 (5th Cir. 1989).  The "due care" exception immunizes the Government from suit with respect to claims based on the execution of a statute or regulation and requires "for its application that the actor have exercised due care." *Id.* at 297; *Buchanan v. United States*, 915 F.2d 969 (5th Cir. 1990).  The "discretionary function exception" excepts "claims based on the performance of a discretionary function and has no such requirement with respect to the exercise of due care."  In fact, the statute specifically dictates that the immunity attaches regardless of whether the discretion is abused.  *Lively*, 915 F.2d at 297.

The discretionary function exception defies precise definition of its contours.  This difficulty was underscored in the Supreme Court's decision in *Berkovitz v. United States*, 486 U.S. 531 (1988).  In that case, a child contracted polio after taking an oral polio vaccine that had been approved for production and distribution by two governmental agencies.  The district court denied a motion to dismiss for lack subject-matter jurisdiction based on the discretionary function exception finding that "neither the licensing of [the vaccine] nor the release of a specific lot of that vaccine to the public was a 'discretionary function' with the meaning of the FTCA." *Id.* at 534.  A divided panel of the Third Circuit Court of Appeals reversed relying on *United States*

*v. Varig Airline,* 467 U.S. 797 (1984)  holding that the licensing and release of polio vaccines were wholly discretionary actions and, as such, could not form the basis for suit against the United States. The Supreme Court reversed.

In *Berkovitz*, the Supreme Court reiterated certain guiding principles.  Citing *Varig*, it noted that "'it is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case.'" *Berkovitz*, 486 U.S. at 536.  The determination requires a two-step process.  First, a court must determine whether the action is "a matter of choice for the acting employee.  This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Id. citing Dalehite v. United States,* 346 U.S. 15, 34 (1953).  The Supreme Court continued:

> Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.  And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Berkovitz*, 486 U.S. at 536. Thus, "if an employee violates a mandatory regulation 'there will be no shelter from liability because there is no room for choice.'"  *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935 (E.D.La. March 10, 1998) *citing United States v. Gaubert*, 499 U.S. 315, 324 (1991).

The second inquiry,  is whether that judgment or choice is based on considerations of public policy.  As state in *Berkovitz*, "The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines* [467 U.S.] at 814."  *Berkovitz* 486 U.S. at 537.  "The

discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."   *Id*.

This position, however, does **not** mean that "if Government activity involves conduct that is rooted in policy, the discretionary function exception bars a cause of action based on that conduct unless the Government employee violated **a mandatory regulation** that restricts his discretion or judgment" as noted by the Fifth Circuit in *Lively*, 870 F.2d at 299.  The exception is not so circumscribed.   Furthermore, the discretionary function exception does not preclude liability for any and all acts arising out of the regulatory programs of federal agencies.

Indeed, in  *Berkovitz,* the Supreme Court precisely rejected that premise and examined the regulatory scheme under which the polio vaccine was placed into commerce.  First, since the government agency had no discretion to issue a license without first receiving the required test data, and plaintiffs in that case alleged that it had not done so, the Supreme Court found that the discretionary function provided no bar.  *Berkovitz*, 486 U.S. at 543.  Furthermore, to the extent that plaintiffs averred that the agency licensed the vaccine without determining whether the vaccine complied with regulatory standards or after determining that the vaccine failed to comply, there was no basis for the imposition of the exception as the agency had no discretion to deviate from the  mandated procedure.  *Id* at 544.  Finally,  the Supreme Court noted that if plaintiffs' claim was that the Government had made a determination in compliance with regulatory standards, but that determination was incorrect, the "question of the applicability of the discretionary function exception requires a somewhat different analysis."  The Supreme Court continued:

> In that event, the question turns on whether the manner and method of
> determining compliance with the safety standards at issue involve agency

judgment of the kind protected by the discretionary function exception. **Petitioners contend that the determination involves the application of objective scientific standards, . . whereas the Government asserts that the determination incorporates considerable "policy judgment."** In making these assertions, the parties have framed the issue appropriately; **application of the discretionary function  exception to the claim that the determination of compliance was incorrect hinges on whether the agency official making that determination permissibly exercised policy choice.** The parties, however, have not addressed this question in detail, and they have given us no indiction of the way in which the DBS interprets and applies the regulations setting forth the criteria for compliance.  Given that these regulations are particularly abstruse, we hesitate to decide the question on the scanty record before us.

*Berkovitz 486 U.S.* at 546-47.  Likewise, with respect to whether the release of the vaccine survived a motion to dismiss, the Supreme Court noted that the discretionary function act did prevent suit for the formulation of policy as to the appropriate way in which to regulate the release of vaccine lots; however, "if the [Government's] policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful." *Id.*

 In the case at bar, plaintiffs have alleged that by virtue of the Government's failure to adhere to the dictates of  the River and Harbor Act of 1945 and the Wildlife and Fisheries Act of 1946 in the construction of MRGO.  Based on that allegation, the discretionary function exception is ineffective as the first prong is not met.  Dueling affidavits have been filed and sufficient questions have been raised in this regard to find that a Motion to Dismiss would be inappropriate at this juncture solely on that basis.

As to the second prong of the discretionary function exception,  the salient issues to consider is whether the Government actor is (1) acting in contravention of its own regulations or standards or (2)  exercising a policy choice.  Considering the allegations  concerning the failure

to armor the banks of MRGO, the failure to properly maintain the MRGO, and the on-going nature of this project, the Court finds that there are substantial questions of fact which make a dismissal at this juncture unavailable.  The MRGO is not a simple one-time, isolated project.  Its history spans more than fifty years and  innumerable Congressional reports and authorization bills.  The Court cannot accept on the record before it that all actions done by the Corps were based on policy determinations.  As *Berkovitz* taught, the Court must determine the **nature** of the Corps conduct, and it is impossible, and improper under *Montez*, to find on this record that all actions taken either were **not** in contravention of the relevant regulations and policies of the Army Corps and/or that **all decisions** made by the Army Corps were policy decisions.  This issue is one which must be examined in discovery.  For instance, was the dredging of the MRGO simple maintenance that was improperly done under standard engineering dictates that were used by the Corps?  Did the Corps violate any of its own engineering policies when it acted?

Another instance, cited by the Supreme Court in *Berkovitz,* as illustrative of the scope of the discretionary function exception, is that found in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955).  It has been noted that the  discretionary function exception was not at issue in *Indian Towing*[7]; nonetheless, it has been used in the analysis of discretionary function exception cases by the Supreme Court.  The Supreme Court characterized  *Indian Towing* as follows:

> The plaintiff sued the Government for failing to maintain a lighthouse in good working order.  The Court stated that the initial decision to undertake and

---

[7]From an analytical standpoint, one could posit that *Indian Towing* constitutes a hybrid  "due care" care application to deny immunity based on the failure of the Coast Guard to exercise due care in the maintenance of a lighthouse which duty it had taken up.  This line of cases has been named the "Good Samaritan" approach in which the Government is held to the same standard where it takes up a duty that is not required and is held to the same standard of any "Good Samaritan" in a normal tort case–that is there is no responsibility to provide aid, but once the decision is made to undertake such a duty, one must do so with due care.  Osborne M. Reynolds, Jr., *The Discretionary Function Exception of the Federal Tort Claims Act:  Time for Reconsideration*, 42 Okla. L. Rev. 459, 467-270 (Fall, 1989).

> maintain lighthouse service was a discretionary judgment. . . . The court held,
> however, that the failure to maintain the lighthouse in good condition subjected
> the Government to suit under the FTCA. . . . The latter course of conduct did not
> involve any permissible exercise of policy judgment.

*Berkovitz*, 486 U.S. at 538 n. 3.  Indeed, the Supreme Court stated eloquently in the *Indian*

*Towing* decision:

> [T]he Coast Guard need not undertake the lighthouse service.  But once it
> exercised its discretion to operate a light. . ., it was obligated to use due care to
> make certain that the light was kept in good working order; and, if the light did
> become extinguished then the Coast Guard was further obligated to use due care
> to discover this fact and to repair the light or give warning that it was not
> functioning.  If the Coast Guard failed in it duty and damage was thereby caused
> to petitioners, the Untied States is liable under the [Federal] Tort Claims Act."

*Indian Towing,* 350 U.S. at 69.  Thus, there are questions as to whether alleged defalcations

concerning  the maintenance of MRGO might fit into the *Indian Towing* rubric; obviously, the

Court cannot make that determination on the record before it using the Rule 12(b)(6) standard.

These questions are underscored by a number of cases. Another instance where the

Government was not shielded by the discretionary function exception can be found in

*Andrulonis v. United States*, 952 F.2d 652 (2nd Cir. 1991).  There, a bacteriologist was severely

and permanently injured when a federal government scientist from the Center for Disease

Control failed to warn about the obvious dangerous conditions he should have noticed in the

laboratory when the rabies virus he had supplied was being used.  Suit was brought against the

Government and the Second Circuit affirmed the court's finding of liability against the

Government.  The appellate court found that the CDC doctor's failure to warn of the dangers

presented were not the type of conduct for which Congress had waived sovereign immunity,

since the doctor's  decision not to act did not implicate any policy consideration.

Another seminal discretionary function exception case, *United States v. Gaubert*, 299 U.S. 315 (1991) was decided by the Supreme Court when the *Andrulonis* suit was on appeal, and the Supreme Court summarily vacated the appellate court's opinion in *Andrulonis* and remanded it for further consideration in light of *Gaubert*.  The Supreme Court in *Gaubert* emphasized that the discretionary conduct is not confined to the policy or planning level and the importance off the regulatory structure in which the government actors worked.  *Andrulonis*, 952 F.2d at 654. This approach was warranted in the Court's opinion because the lower courts had been using that approach–that is looking at the level at which a decision was made–to determine whether a policy decision was implicated.   Quoting *Gaubert*, it noted:

> "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.  *The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.  Id*. at 1274-75.

*Id.*  In its opinion, the Second Circuit focused on *Gaubert'*s clarification of *Indian Towing*.  The Second Circuit noted:

> *Gaubert*'s import lies in its clarification of *Indian Towing* and its rejection of any simplistic reliance on the dichotomy between planning-level actions and operational-level actions.  Policy considerations, however, remain the touchstone for determining whether the discretionary function exception applies.  Indeed the Court carefully reiterated that the exception "'protects only governmental actions and decisions based on *considerations of public policy.'" Gaubert*, 111 S. Ct. at 1274 (emphasis added) (quoting *Berkovitz v. United States*, 486 U.S. 531, 537 , 108 S. Ct. 1954, 1959, 1000 L.Ed.2d 531 (1988)), and further stated that "the actions of Government agents involving the necessary element of choice *and* grounded in the social economic, or political goals of the statute and regulations are protected."

*Andrulonis*, 952 F.2d at 654.

The Government argued in that case that the doctor's decision to allow the experiment to proceed was necessary to fulfill the policy objectives of the CDC and thus should be protected. The appellate court rejected that approach noting that to do so would mean that the CDC would be insulated from liability for its employees actions except "only those where the agent had acted contrary to a clear regulation."  As noted, this scope is too broad.  Thus, the appellate court affirmed its previous decision stating, "The general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad and indefinite to insulate Dr. Baer's negligent conduct in the circumstances of this case.  Thus, Dr. Baer's action "cannot be said to be based on the purposes of the regulatory regime seeks to accomplish."  *Id.* at 655.  In the context of this litigation, the Government's position appears to be likewise overly broad–that is that all actions taken implicated the Government's policy with respect to the construction and maintenance of the MRGO.  Again, on this record, the Court is unwilling to make such a determination.  *See Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (engineering judgment no more matter of policy than objective scientific principles found to be exempt exercise of policy judgment found in *Berkovitz*).

In *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), a commissary operated and maintained by a government agency over the course of three years became infested with mold which by October 2000 was found to be toxic and carcinogenic.  Plaintiff delivered and oversaw employees of his employer who worked there.  Whisnant contracted pneumonia, and experienced other ailments.  He filed suit against the United States alleging that the Government ignored indications of the dangerous condition of the meat department and intentionally or recklessly permitted employees and customers into it.  The district court granted a motion to

26

dismiss based on the discretionary function rule because the agency regulations did not prescribe

a specific course of actions with respect to either mold specifically or inspections generally, and

because the government's choice in selecting an independent contractor was a decision grounded

in policy considerations.

> As characterized by the Ninth Circuit Court of Appeals:

> The court rejected Whisnant's argument that the discretionary exception did not
> apply because he was suing on the basis of the government's negligence in
> inspecting the premises rather than the government's negligence in selecting
> Johnson Controls as its maintenance contractor:  according to the court,
> Whisnant's 'allegations of negligence are irrelevant' to the jurisdictional question.
> the Court also rejected Whisnant's claim that the government's conduct fell
> outside of the exception because it occurred at the 'operational' rather than the
> 'planning or policy-making' level:  the court found that the Supreme Court had
> abolished the operational-planning distinction.

*Whisnant*, 400 F.3d 1177, 1180 (9th Cir. 2005).  In extremely thorough treatment of the second-

prong of the discretionary function exception, the appellate court reversed the district court.

The court began by noting that government action "can be classified along a spectrum,

ranging form those 'totally divorced from the sphere of policy analysis,' such as driving a car, to

those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Id.* at

1181 *citing Gaubert,* 499 U.S. at 325 n. 7.  The determination of where on that spectrum a set of

the facts rests is the challenge the court faces.  Reviewing Ninth Circuit jurisprudence, the court

then posited that there were two "trends" in the case law.  One dominant theme being the need to

distinguish between design and implementation–design being shielded; implementation not. The

second trend is where professional judgment–particularly judgments concerning safety–are

rarely considered to be susceptible to social, economic or political policy.  *Id.*  The court then

reviewed the case law as follows:

Thus, for example, in a suit alleging government negligence in the design and maintenance of a national park road, we held that designing the road without guardrails was a choice grounded in policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis. *See ARA Leisure Servs. v. United States,* 831 F.2d 193, 195 (9th Cir.1987). Similarly, in a suit alleging government negligence in the design and construction of an irrigation canal, we held that the decision not to line the canal with concrete was susceptible to policy analysis, but the failure to remove unsuitable materials during construction was not. *See Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027-28, 1031 (9th Cir.1989). In three cases concerning injuries resulting from the government's failure to post warnings concerning hazards present in national parks, we held that the government's decision not to post signs warning of obvious dangers such as venturing off marked trails to walk next to the face of a waterfall, and the government's decision to use brochures rather than posted signs to warn hikers of the dangers of unmaintained trails, involved the exercise of policy judgment of the type Congress meant to shield from liability, *Valdez v. United States,* 56 F.3d 1177, 1178, 1180 (9th Cir.1995); *Childers v. United States,* 40 F.3d 973, 976 (9th Cir.1994), but that such policy judgment was absent when the government simply failed to warn of the danger to barefoot visitors of hot coals on a park beach, *Summers v. United States,* 905 F.2d 1212, 1215 (9th Cir.1990). And in an action for the death of a prospective logger "trying out" for a job with a government contractor at a logging site under the management of a government agency, we held that while the government's authorization of the contract was protected under the discretionary function exception, the government's failure to monitor and ensure safety at the work site was not. *Bear Medicine,* 241 F.3d at 1212, 1214, 1217.

*Whisnant,* 400 F.3d at 1181-82.  The Court then noted that these cases comport with the Supreme Court's pronouncement in *Indian Towing*.  The Court reiterated its previous statement, "As we have summarized: 'The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not . . .  [S]afety measures, once undertaken, cannot be shortchanged in the name of policy."  *Id. citing Bear Medicine,* 241 F.3d 1208, 1215, 1216-17 (9th Cir. 2001).

Based on that analysis, the appellate court then found that Whisnant's suit was not barred by the discretionary function exception.  It noted that plaintiff had not alleged the government

was negligent in designing its safety inspection procedures; instead, plaintiff contended that it

was negligent in following through on those procedures by ignoring reports and complaints

describing the unsafe condition of the meat department.  The court continued:

> Like the government's duties to maintain its roads in safe condition, to ensure the use of suitable materials in its building projects, and to monitor the safety of its logging sites, the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers is not a policy choice of the type the discretionary function exception shields. Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy. "Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not susceptible to a policy analysis." *Bear Medicine,* 241 F.3d at 1217 (internal quotation marks omitted); *see also In re Glacier Bay,* 71 F.3d 1447, 1453 (9th Cir.1995) ("Decisions involving the application of objective scientific standards are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy." (quoting *Kennewick,* 880 F.2d at 1030) (alterations omitted)). Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception.

*Id.* at 1183.

The court subsequently noted that the danger with the discretionary function exception is

more pronounced where the government takes on the role of a private landowner.  It noted:

> Every slip and fall, every failure to warn, *every inspection and maintenance decision* can be couched in terms of policy choices based on allocation of limited resources. As we have noted before in the discretionary function exception context, "[b]udgetary constraints underlie virtually all governmental activity." Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly. Instead, in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly. *Id.* (quoting *ARA Leisure,* 831 F.2d at 196) (additional citations omitted) (emphasis added).

29

*Id.* at 1183-84.   Thus, there are questions of fact as to the whether the decisions made with respect to the  maintenance of the MRGO were actually policy based, or whether they were within the purview of *Indian Towing's* dictates.  *See Ayala v. United States*, 980 F.2d 1342 (10th Cir. 1992) (where mining inspector offers technical assistance, technical judgments are not protected by the discretionary function exception where choice was governed by objective principles of electrical engineering);  *Aslakson v. United States*, 790 F.2d 688 (8th Cir. 1986) (decision of governmental agency not to elevate certain power lines running over lake did not involve evaluation of relevant policy factors and thus not subject to the discretionary function exception).

Further support for this position can be found in *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935 (E.D.La. March 10, 1998), where Judge Edith Clement while a district court judge  found that there were material questions of fact preventing summary judgment  on the discretionary function exception.  Suit had been brought against the Army Corps for damages allegedly caused when a dredge dropped a spud on a pipeline that had been improperly marked by the Corps in the contract under which the dredge was operating and where a Quality Insurance inspector was assigned to the dredge.  "Once the Corps takes an action, it must act reasonably with respect to those who are likely to rely upon it.  For this very reason, the Corps has a 'continuing duty' to use due care to make certain that its charts accurately depict the location of pipelines 'once it [takes] it upon itself to indicate the position of one of the pipeline on the chars.' " *Southern Natural Gas Co. v. Pontchartrain Mat.*, 711 F.2d 1251, 1257, n.8 (5th Cir. 1983).

In *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523 (11th Cir. 1985), an electric cooperative brought suit against the Army Corps for costs of stabilizing its tower which had been undermined by erosion allegedly caused by the Army Corps.   The cause of the erosion was described as follows:

> During 1970 and 1971, the Corps prepared plans and specifications for a series of eleven dikes or jetties along the Alabama River, the purpose of which was to reduce dredging costs by narrowing the channel and accelerating the current, which would theoretically wash away more silt. One of these dikes was located about one-half mile upstream from AEC's tower, extending out from the opposite bank. The alleged effect of this dike was to deflect the current toward the east bank and AEC's tower. Erosion increased substantially and in August of 1981, AEC determined that its tower was in danger of being undermined. Accordingly, AEC stabilized the tower by driving pilings around its base at a cost of $576,114.09. AEC subsequently brought this action under the FTCA to recover for the cost of stabilizing the tower

*Id.* at 1525.  During discovery, the Army Corps admitted that it had not intended to affect the banks of the river and that there was no intention to widen the river at the dike location involved in the suit.  A technical report was also produced by Army Corps which had been published by it prior to the design and construction of the dikes.  In that report, factors were noted as relevant in the design and construction of dikes including, among a myriad of things,  the necessity of bank protection to preserve property; the necessity that all engineering factors and variable which affect river channel geometry be considered and understood; the requirement that the river engineer determine the effects of a design in advance.

The Army Corps took the position that even though this work was "a recognized authority on dike design", the responsible engineer did not recall consulting the publication.  Furthermore, it maintained that its engineers were not required by regulation to consider this technical report and that the cooperative had not alleged a specific violation of any specific regulations.  In reality,

the engineers testimony indicated that the techniques used for purposes of construction of the dike at issue fell woefully short of the technical elements indicated as necessary by the Army Corps' own report.

The district court had dismissed the suit finding that the acts of design and construction were discretionary functions exempted from liability.   The Eleventh Circuit reversed finding that the discretionary function exception did not shield the Army Corps from liability for caused by engineering errors.  The appellate court began by examining the "nature of the conduct"as required under *Varig* and *Berkovitz* and  found that it is clear that there is "nothing to suggest that all *design* decisions are inherently 'grounded in social, economy, and political policy.'" *Id*. at 1531.

The court then reviewed various cases where design decisions were found to be nondiscretionary decision and others where the design decisions were found to be discretionary. It started with *Seaboard Coast Line RR Co. v. United States,* , 473 F.2d 714 (5th Cir. 1973).  In that case plaintiff contended that a drainage system negligently designed by the Army Corps diverted water undermining its railroad right-of way.  The Fifth Circuit found that the government made a policy decision when it made the *initial decision* build the drainage system.  However, once that decision was made, it was required to perform  the building of the drainage ditch in a non-negligent manner.  *Id. citing Seaboard Coast*, 473 F.2d at 716.[8] After a painstaking examination of cases,  the court concluded:

---

[8]The 11th Circuit properly noted that as *Alabama Electric* was pre-*Varig*, the finding that the *only* policy decision was in the initial decision to build the drainage system, the approach might have to be reexamined. However, the key is to determine whether whatever decision and construction decisions are alleged to have been negligent were policy driven.  As the facts of the fifty year evolution of the MRGO are simply not ascertainable on the record before the Court, this motion must be denied.

> where the Corps makes a social, economic or political policy decision concerning the design of a particular project, that decision is excepted from judicial review under § 2680(a).  ***In the absence of such a policy decision, the Corps' design decisions are subject to judicial review under the state law tort standards that would normally govern an action for engineering malpractice.***

*Alabama Electric*, 769 F.2d at 1536-37.  Thus, it is clear that considering the plethora of affidavits and reports that have been presented, the law mandates that this Court should not find as a matter of law at this juncture that all the decisions that have been made with respect to the MRGO were grounded in policy.

Thus, based on this analysis, the Court finds, at a minimum,  that plaintiffs' allegations concerning:

(1)    the failure of the Army Corp to consult with the U.S. Fish and Wildlife Service and the Louisiana Department of Wild Life and Fisheries–and to present these agencies' concerns to Congress about the MRGO alignment and the effect thereof on the wetlands–as required by statute;

(2)    the numerosity of the decisions made in constructing and maintaining the MRGO and the inability on this record to characterize such decisions as being grounded in policy;

(3)    the issue of whether there were  non-policy based decisions made that failed to comport with standard engineering practices;

raises issues that are inextricably tied to the gravamen of the plaintiffs' cause of action and are not subject to Rule 12(b)(1) treatment.  Furthermore, applying *Montez*, it is also clear that the entry of a Rule 12(b)(6) dismissal on that basis is impermissible.  This finding is supported by the voluminous exhibits presented by the Army Corps, the affidavits presented by plaintiffs and

plaintiffs' request for discovery pursuant to Rule 56(f).   The Court intends for discovery to commence upon the entering of a Case Management Order so that these issues can be resolved on a full and complete record.

The Court will allow the Army Corps to supplement the record with the latest report generated by as it further demonstrates the quagmire of facts and issues which require examination prior to this Court's ruling on the applicability of the "due care" and "discretionary function" exceptions.   Accordingly,

**IT IS ORDERED** that Defendant United States' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Doc. 822) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant United States' Motion for Leave to Supplement Record (Doc. 2288) is **GRANTED**.

New Orleans, Louisiana, this __2nd__ day of February, 2007.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**