# EXHIBIT  D



33 C.F.R. § 328.3

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
   Title 33. Navigation and Navigable Waters
      Chapter II. Corps of Engineers, Department of the Army
         Part 328. Definition of Waters of the United States (Refs & Annos)

   → **§ 328.3 Definitions.**

For the purpose of this regulation these terms are defined as follows:

(a) The term "waters of the United States" means

   (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

   (2) All interstate waters including interstate wetlands;

   (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

   (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

   (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

   (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

   (4) All impoundments of waters otherwise defined as waters of the United States under the definition;

   (5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

   (6) The territorial seas;

   (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section.

   (8) Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.





© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

(b) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

(c) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands."

(d) The term "high tide line" means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

(e) The term "ordinary high water mark" means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

(f) The term "tidal waters" means those waters that rise and fall in a predictable and measurable rhythm or cycle due to the gravitational pulls of the moon and sun. Tidal waters end where the rise and fall of the water surface can no longer be practically measured in a predictable rhythm due to masking by hydrologic, wind, or other effects.

[58 FR 45036, Aug. 25, 1993]

33 C. F. R. § 328.3, **33 CFR § 328.3**

Current through January 18, 2007; 72 FR 2202

Copr. © 2007 Thomson/West

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

30


40 C.F.R. § 230.3

► **Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter H. Ocean Dumping
            Part 230. Section 404(B)(1) Guidelines for Specification or Disposal Sites for Dredged
            or Fill Material (Refs & Annos)
               Subpart A. General

    → **§ 230.3 Definitions.**

For purposes of this Part, the following terms shall have the meanings indicated:

(a) The term "Act" means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub.L. 92-500, as amended by Pub.L. 95- 217, 33 U.S.C. 1251, et seq.

(b) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are "adjacent wetlands."

(c) The terms "aquatic environment" and "aquatic ecosystem" mean waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals.

(d) The term "carrier of contaminant" means dredged or fill material that contains contaminants.

(e) The term "contaminant" means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants promulgated on January 31, 1978 (43 FR 4109).

(f) to (g) [Reserved]

(h) The term "discharge point" means the point within the disposal site at which the dredged or fill material is released.

(i) The term "disposal site" means that portion of the "waters of the United States" where specific disposal activities are permitted and consist of a bottom surface area and any overlying volume of water. In the case of wetlands on which surface water is not present, the disposal site consists of the wetland surface area.

(j) [Reserved]

(k) The term "extraction site" means the place from which the dredged or fill material proposed for discharge is to be removed.

(l) [Reserved]



(m) The term "mixing zone" means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a discharge point where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water. The mixing zone should be considered as a place where wastes and water mix and not as a place where effluents are treated.

(n) The term "permitting authority" means the District Engineer of the U.S. Army Corps of Engineers or such other individual as may be designated by the Secretary of the Army to issue or deny permits under section 404 of the Act; or the State Director of a permit program approved by EPA under section 404(g) and section 404(h) or his delegated representative.

(o) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by the Atomic Energy Act, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the Act reflects that "radioactive materials" as included within the definition of "pollutant" in section 502 of the Act means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term "pollutant", are radium and accelerator produced isotopes. See Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1 (1976).

(p) The term "pollution" means the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem.

(q) The term "practicable" means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

(q-1) "Special aquatic sites" means those sites identified in Subpart E. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. (See § 230.10(a)(3))

(r) The term "territorial sea" means the belt of the sea measured from the baseline as determined in accordance with the Convention on the Territorial Sea and the Contiguous Zone and extending seaward at a distance of three miles.

(s) The term "waters of the United States" means:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



merce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under this definition.

(5) Tributaries of waters identified in paragraphs (1) through (4) of this section;

(6) The territorial sea;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1)-(6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

(t) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

[58 FR 45037, Aug. 25, 1993]

SOURCE: 45 FR 85344, Dec. 24, 1980, unless otherwise noted.

AUTHORITY: Secs. 404(b) and 501(a) of the Clean Water Act of 1977, (33 U.S.C. § 1344(b) and § 1361(a)).

40 C. F. R. § 230.3, **40 CFR § 230.3**

Current through January 18, 2007; 72 FR 2202

Copr. © 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT   E

Robert E. Lee Blvd.

London Ave. Canal

0.07 Miles

0.036

0

N

34b

Case 2:05-cv-04182-SRD-JCW   Document 3170-2   Filed 02/16/07   Page 10 of 40

CONTI



STAFF PHOTO BY JOHN McCUSKER

Work continues Jan. 26 on the floodgate at the mouth of the 17th Street Canal and the canal levee, which breached after Hurricane Katrina. The White House wants to use money earmarked for the 17th Street Canal on West Bank hurricane protection.

(34c)

# EXHIBIT   F



# SUPREME COURT OF THE UNITED STATES
## GRANTED & NOTED LIST, OCTOBER TERM 2006

**As of January 22, 2007**

**04-1350**     **CFX**   **KSR INTERNATIONAL CO. V. TELEFLEX, INC., ET AL.**
                          Court: USCA-Fed.                    Grant: 6/26/06
                          Argument Date: 11/28/06


**05-85**       **CFX**   **POWEREX CORP. V. RELIANT ENERGY SERVICES, INC.**
                          Court: USCA-9
                                                              Grant: 1/19/07


**05-380**      **CFX**   **GONZALES, ATT'Y GEN. V. CARHART**
                          Court: USCA-8                       Grant: 2/21/06
                          Argument Date: 11/8/06


**05-381**      **CFX**   **WEYERHAEUSER CO. V. ROSS-SIMMONS HARDWOOD LUMBER CO.**
                          Court: USCA-9                       Grant: 6/26/06
                          Argument Date: 11/28/06


**05-493**      **CFH**   **AYERS V. BELMONTES**
                          Court: USCA-9                       Grant: 5/1/06
                          Argument Date: 10/3/06              Decided: 11/13/06
                          Author: J. Kennedy                  Other: Stevens (D)


**05-547 )[1]**  **CFX**  **LOPEZ V. GONZALES, ATT'Y GEN.**
**05-7664)[2]**  **CFY**  **TOLEDO-FLORES V. UNITED STATES**
                          Court: [1]USCA-8; [2]USCA-5         Grant: 4/3/06
                          Argument Date: 10/3/06              Decided: 12/5/06
                          [1]Author: J. Souter                Other: Thomas (D)
                           Result: **REVERSED AND REMANDED**
                          [2]Author: Per Curiam
                          Result: **DISMISSED AS IMPROVIDENTLY GRANTED**


**05-593**      **CFX**   **OSBORN V. HALEY**
                          Court: USCA-6                       Grant: 5/15/06
                          Argument Date: 10/30/06             Decided: 1/22/07
                          Author: J. Ginsburg                 Other: Souter (C/P, D/P);
                                                                     Breyer (C/P, D/P); Scalia (D)
                          Result: **AFFIRMED**



<u>NOTE</u>:   *  Unanimous Court
           ** Unanimous Court in Part
           #  Unanimous in Judgment

# SUPREME COURT OF THE UNITED STATES
## GRANTED & NOTED LIST, OCTOBER TERM 2006

**05-595**   *CFH*   **WHORTON V. BOCKTING**
Court:  USCA-9
Argument Date:  11/1/06                    Grant:  5/15/06

**05-608**   *CFX*   **MEDIMMUNE, INC. V. GENENTECH, INC.**
Court:  USCA-Fed.                          Grant:  2/21/06
Argument Date:  10/4/06                    Decided:  1/9/07
Author:  J. Scalia                         Other:  Thomas (D)
Result:  **REVERSED AND REMANDED**

**05-669**   *CFX*   **BP AM. PROD. CO. V. BURTON**
Court:  USCA-DC                            Grant:  4/17/06
Argument Date:  10/4/06                    Decided:  12/11/06
Author:  J. Alito
Result:  **AFFIRMED**  (Chief Justice & Breyer – no part)

**05-705**   *CFX*   **GLOBAL CROSSING, INC. V. METROPHONES, INC.**
Court:  USCA-9                             Grant:  2/21/06
Argument Date:  10/10/06

**05-746#**   *CSX*   **NORFOLK SOUTHERN RAILWAY CO. V. SORRELL**
Court:  CA-MO, E. Dist.                    Grant:  5/15/06
Argument Date:  10/10/06                   Decided:  1/10/07
Author:  Chief Justice                     Other:  Souter (C); Ginsburg (C/J)
Result:  **VACATED AND REMANDED**

**05-785**   *CFH*   **CAREY V. MUSLADIN**
Court:  USCA-9
Argument Date:  10/11/06                   Grant:  4/17/06
Author:  J. Thomas                         Decided:  12/11/06
                                           Other:  Stevens (C/J); Kennedy (C/J)
                                                   Souter (C/J)
Result:  **VACATED AND REMANDED**

**05-848**   *CFX*   **ENVIRONMENTAL DEFENSE V. DUKE ENERGY CORPORATION**
Court:  USCA-4                             Grant:  5/15/06
Argument Date:  11/1/06



NOTE:   * Unanimous Court
        ** Unanimous Court in Part
        # Unanimous in Judgment

# SUPREME COURT OF THE UNITED STATES
## GRANTED & NOTED LIST, OCTOBER TERM 2006

**05-908**   CFX   *PARENTS INVOLVED IN COMM. SCHS. V. SEATTLE SCH. DIST. NO. 1*
Court: USCA-9                          Grant: 6/5/06
Argument Date: 12/4/06


**05-915**   CFX   *MEREDITH V. JEFFERSON CTY. BD. OF ED.*
Court: USCA-6                          Grant: 6/5/06
Argument Date: 12/4/06


**05-983**   CFX   *WINKELMAN V. PARMA CITY SCHOOL DISTRICT*
Court: USCA-6                          Grant: 10/27/06
Argument Date: 2/27/07


**05-996**   CFX   *MARRAMA V. CITIZENS BANK OF MA*
Court: USCA-1                          Grant: 6/12/06
Argument Date: 11/6/06


**05-998**   CFY   *UNITED STATES V. RESENDIZ-PONCE*
Court: USCA-9                          Grant: 4/17/06
Argument Date: 10/10/06                Decided: 1/9/07
Author: J. Stevens                     Other: Scalia (D)
Result: **REVERSED AND REMANDED**


**05-1056**   CFX   *MICROSOFT V. AT&T*
Court: USCA-Fed.                       Grant: 10/27/06  (CJ – no part)
Argument Date: 2/21/07


**05-1074**   CFX   *LEDBETTER V. THE GOODYEAR TIRE & RUBBER CO.*
Court: USCA-11                         Grant: 6/26/06
Argument Date: 11/27/06


**05-1120**   CFX   *MASSACHUSETTS V. ENVIRONMENTAL PROTECTION AGENCY*
Court: USCA-DC                         Grant: 6/26/06
Argument Date: 11/29/06




NOTE:   * Unanimous Court
        ** Unanimous Court in Part
        # Unanimous in Judgment



# SUPREME COURT OF THE UNITED STATES
## GRANTED & NOTED LIST, OCTOBER TERM 2006

**05-1126**    **CFX**    **BELL ATLANTIC CORP. V. TWOMBLY**
Court:  USCA-2                          Grant:  6/26/06
Argument Date:  11/27/06

**05-1157**    **CFX**    **CREDIT SUISSE SECURITIES V. BILLING**
Court:  USCA-2                          Grant:  12/7/06 (CJ – no part)
Argument Date:  3/27/07

**05-1240**    **CFX**    **WALLACE V. KATO**
Court:  USCA-7                          Grant:  6/19/06
Argument Date:  11/6/06                 Decided:

**05-1256**    **CSX**    **PHILIP MORRIS USA V. WILLIAMS**
Court:  SC-OR                           Grant:  5/30/06
Argument Date:  10/31/06

**05-1272**    **CFX**    **ROCKWELL INTERNATIONAL V. UNITED STATES**
Court:  USCA-10                         Grant:  9/26/06  (SGB – no part)
Argument Date:  12/5/06

**05-1284**    **CFX**    **WATSON V. PHILIP MORRIS CO., INC.**
Court:  USCA-8                          Grant:  1/12/07

**05-1342**    **CFX**    **WATTERS V. WACHOVIA BANK**
Court:  USCA-6                          Grant:  6/19/06  (CT – no part)
Argument Date:  11/29/06

**05-1345**    **CFX**    **UNITED HAULERS ASSN. V. ONEIDA-HERKIMER SOLID WASTE**
Court:  USCA-2                          Grant:  9/26/06
Argument Date:  1/8/07

**05-1382**    **CFX**    **GONZALES, ATT'Y GEN. V. PLANNED PARENTHOOD**
Court:  USCA-9                          Grant:  6/19/06
Argument Date:  11/8/06



(ORDER LIST: 549 U.S.)

FRIDAY, JANUARY 12, 2007

CERTIORARI GRANTED

05-1284     WATSON, LISA, ET AL. V. PHILIP MORRIS CO., INC., ET AL.

06-376      HINCK, JOHN F., ET UX. V. UNITED STATES

06-531      STRUHS, SEC., FL DEPT., ET AL. V. WYNER, T. A., ET AL.

          The petitions for writs of certiorari are granted.

06-413      UTTECHT, SUPT., WA V. BROWN, CAL C.

          The motion of respondent for leave to proceed *in forma pauperis* is granted.  The petition for a writ of certiorari is granted.

# EXHIBIT  G



## William E. O'Neil

**From:**     William E. O'Neil
**Sent:**     Wednesday, January 24, 2007 5:46 PM
**To:**       'jmarkey@gjtbs.com'
**Subject:**  In re Katrina Canal Litigation (Pontchartrain Baptist Church et al)

Dear Jason,

In response to your request for Voluntary Dismissal, in reading your Exhibits E and F, I note that the documents are incomplete.

1) Exhibit E has no signature of your client.

2) You have not provided the reverse side of Standard Form 1442 (REV 4-85) for all pages of Exhibits E and F. Would you kindly email or mail the same.

Additionally, Exhibit E refers to "Project No. DACW29-98-B-0060" and Exhibit F refers to "Project No. DACW29-98-B-0053." Would you kindly email the solicitations and your sealed bids which were presumably accepted for the work on both and filed in the Orleans Parish Mortgage Office, and any other terms and conditions that apply to the above.

Please provide any modifications, change orders, punch lists, and payments received indicating from whom and in what amount and date payments were made on DACW29-99-C-0005 and DACW29-99-C-0012.

Please provide the contracts (or subcontracts) on 17th Street, DACW29-99-C-0018, and on London Avenue/Gentilly Bridge, DACW29-99-C-0005.

You have only provided the "Release of Claims" letters for 0005 and 0012 (Gentilly Blvd. bridge and Pumping Station No. 4). Can you provide me with the Certificate of Substantial Completion or "Acceptance of the Work" duly filed with the Orleans Parish Mortgage Office and the Jefferson Parish Mortgage Office on all works.

Please understand that we do not consider a "Release of Claims" as evidence satisfying the filing of the Certificate of Substantial Completion and/or formal Acceptance of the Work as required under La. R.S. 38:2241.1.

Please provide us with any and all information on the surities and bonds required covering all referenced works.

Additionally, please provide the prime contract and the subcontract with Pierce re DACW29-99-C-0018 and all documents as set forth above.

Are you really taking the position that your subcontract with Pierce is a "contract with a public entity" under the language of 38:2241.1? Do you have case law on that?

Please respond.

Finally, as I am walking out the door I received your email regarding the voluntary dismissal and will review it in the morning.

Regards,
Bill O'Neil

(39)



**William E. O'Neil**

| | |
|---|---|
| **From:** | William E. O'Neil |
| **Sent:** | Thursday, January 25, 2007 3:21 PM |
| **To:** | 'fbarry@dkslaw.com' |
| **Subject:** | Pontchartrain Baptist Church et al, 06-6642 |

Dear Frank,

I have read Conway's affidavit and the attached exhibits to your opposition to PBC's motion to remand.  Nowhere does Conway make any statement about any "works" that M &M was involved, directly or indirectly, in the dredging, preparation, excavation, bridge demolition, or reconstruction at 17th Street (Hammond Highway) or any bridges over London Avenue or Orleans Avenue canals.

Can you kindly clarify if they were involved.

Regards,
Bill O'Neil





## William E. O'Neil

**From:**    William E. O'Neil
**Sent:**    Thursday, January 25, 2007 3:39 PM
**To:**      'mriess@kingsmillriess.com'
**Subject:** Pontchartrain Baptist Church et al, 06-6642

Dear Michael,

I have read your Opposition memorandum, exhibits, and declarations and they do not address the causes of action asserted in the Pontchartrain Baptist Church Peition.

Can you clarify whether your client was involved directly or indirectly in the preliminary dredging work or demolition and reconstruction on any of the bridges crossing the 17th Street, Orleans Avenue, and London Avenue canals.

Regards,
Bill O'Neil



1/25/2007

## William E. O'Neil

**From:**     William E. O'Neil
**Sent:**     Thursday, January 25, 2007 3:55 PM
**To:**       'gmeunier@gainsben.com'
**Cc:**       'drichard@dmrlaw.net'; 'rhubbard@lawla.com'; 'jbruno@brunobrunolaw.com'
**Subject:** Pontchartrain Baptist Church - 06-6642

Dear Gerry,

On January 1, I sent you an email but received no response.  The email had three questions:

1) Am I to report to you and send copies of my replies to opposition memoranda filed last week by Jones and Deutch on the motion to remand?

2) My suit, as you know, does not alledge defective design or workmanship on the levees or floodwalls. It asserts negligent works in connection with the bridges and canals crossing 17th, Orleans, and London. Why is my lawsuit consolidated with the levee suits?

I know there are subcategories on dredging and on admiralty and maritime law (jurisdiction) which are issues in my state court (savings to suitors claims) suit .

3) Is there anything I need to talk to you about before you meet with Wilkinson on January 5?

Am I supposed to be doing anything with the Liason Committee?  Phone calls have not been returned from Ralph Hubbard or Bruno because I assume they are incredibly busy.

Has a discovery schedule been approved by the Court?  If so, can you please send me a copy.  Also, if discovery has commenced, please let me know who has been deposed.

Kind Regards,
Bill


William E O'Neil
The O'Neil Group LLC
701 North Causeway Blvd
Metairie, LA 70001

(504) 833-4770

(42.)



# EXHIBIT  H



SEWERAGE AND WATER BOARD

OF

NEW ORLEANS

SPECIFICATIONS

FOR

EXCAVATION AND FLOOD PROTECTION
OF THE
17TH STREET CANAL

PHASE III
LAKE PONTCHARTRAIN TO HAMMOND HIGHWAY BRIDGE

CONTRACT 4117

PROPOSALS TO BE OPENED
11:00 A.M. LOCAL TIME, FRIDAY, APRIL 15, 1988

(43)

## SECTION 3
## DREDGING, DISPOSAL, AND LEVEE RECONSTRUCTION

3-01   EXCAVATION
   ### 3-01.1 Dredging
   Bucket dredging shall be the only method allowed  within the limits of work shown on the contract drawings.  All soil encountered while dredging is to be placed in an approved disposal area.  No dredging will be permitted while Pump Station No. 6 is in operation. Dredging may resume when the Engineer has determined that all flow of water in the canal has ceased.  Dredging will begin at the Hammond Highway Bridge and proceed to the Lake.

   Dredging will not be permitted from the levees.  Dredging is recommended from a system of flex-float barges.  The Contractor shall obtain approval from the Engineer for the dredging system prior to commencement of work.

   ### 3-01.2  Levee Raising and Degrading
   Levee raising and degrading shall be conducted as described in these Special Specifications in order to reshape the levees to coincide with the contract drawing requirements.

   ### 3-01.3  Excavation For Tied-Back Sheet Pile Wall Anchors
   Excavation for the anchor of the Jefferson tied-back wall bet-ween Station 549+67 and Station 552+35 shall be as shown on Sheet No. 10 of the contract drawings.

   It shall be the Contractor's responsibility to submit a plan for excavation for the remainder of the Jefferson tied-back wall and for the Orleans tied-back wall, for approval by the Engineer.

   ### 3-01.4   Flood Control
   The Contractor is required to maintain flood control during all construction phases of the project.  Any temporary flood protec-tion must be built to a minimum elevation equivalent to that of the existing levees.  The length of temporary flood protection must never exceed 250 feet.  The Contractor must submit his plan for flood pro-tection to the Engineer for approval prior to the commencement of work.

   ### 3-01.5  Silt Screens
   Silt screens shall be placed within 200 feet downstream and upstream of the dredging operation to prevent silt travel, and shall meet approval of Engineer with respect to type, manufacturer, and usage.



3-02   CHARACTER OF MATERIAL TO BE DREDGED
       The material to be removed from the canal within the specified
limits may include sand, silt, clay, shell, logs, stumps, snags,
debris, brush, rip-rap, sunken boats and other obstructions.  Bidders
are expected to examine the site and after investigation decide for
themselves the character of the materials as stated in Paragraph 1-05.

3-03   THEORETICAL SECTION
       3-03.1 After-Dredging Section
       An after-dredging cross-section is herewith established which
shall have a varying bottom width and bottom elevation in accordance
with the contract drawings.  Excavation of six inches of allowable
overdepth below the profile grade will be permitted and side slopes
will be 1 vertical on 3 horizontal unless shown differently on the
plans.  To gain acceptance, sections must be dredged to the specified
profile grade, bottom width and side slopes.  Payment will be made for
the six inches of allowable overdepth below profile grade.  However,
the Contractor will receive no payment for material removed below the
overdepth grade or beyond the required side slopes.

       3-03.2 Levee Degrading and Raising
       In those areas where the required top of levee elevation is
above the existing top of levee elevation, a section of varying top
width and a 3 horizontal to 1 vertical back slope is herewith
established.  Only suitable material for levee-raising may be used and
must meet the approval of the Engineer.  Material removed from
existing levees requiring degradation as indicated on the plans, but
not from canal bottom, may be used to raise levee elevation where
needed.

3-04   DISPOSAL OF EXCAVATED MATERIAL
       3-04.1 Hauling
       All hauling must be done in accordance with Section 1-22 of
this Specification.

       All material dredged from the canal below elevation 22.5'
(Cairo Datum) and all debris shall be hauled in lined trucks to an
approved disposal site.  It shall shall be the Contractor's respon-
sibility to locate an appropriate disposal site and obtain approval of
the site from the U.S. Army Corps of Engineers no later than June 1,
1988.  The disposal site shall be a non-wetland area and if near a
residential area the disposed material shall be covered by one foot of
clean fill.  It is highly recommended that the Contractor contact Mr.
Lloyd Baehr's office (862-2259) of the Army Corps of Engineers for a
judgement on the disposal site prior to bidding.  Canal material below
elevation 22.5' shall not be used for levee fill, nor shall it be
placed at the excess levee material disposal site.

       All excess levee material, above elevation 22.5, is to be
hauled by truck to the designated disposal area site.  This site is
located south of the Civil Defense Shelter between Ponchartrain
Boulevard and West End Boulevard.  The exact placement will be as spe-
cified by the Orleans Levee Board.



2. <u>Self-Propelled Tamping Roller</u> - At the option of the Contractor, self-propelled tamping rollers conforming to the requirements of Paragraph 3-05.2(1) above may be used in lieu of tractor-drawn tamping rollers. Self-propelled rollers exceeding the empty weight requirements may be used provided that, by the substitution of tamping feet having a face area not exceeding 14 square inches, the foot pressure on the tamping feet of the self-propelled roller can be adjusted to approximately the foot pressure of the towed roller for the particular working condition. In no case shall the foot areas for self-propelled tamping rollers be less than those specified for the towed rollers. For self-propelled rollers in which steering is accomplished through the use of rubber-tired wheels, the tire pressure shall not exceed 40 pounds per square inch. The roller shall be operated at a speed of not more than 3.5 miles per hour.

3. <u>Rubber-Tired Rollers</u> - Rubber-tired rollers shall have a minimum of four wheels equipped with pneumatic tires. The tires shall be of such size and ply as to be capable of being operated at tire pressures between 80 and 100 pounds per square inch at a 25,000 pound wheel load. The roller wheels shall be located abreast and so designed that each wheel will carry approximately equal load in traversing uneven ground. The spacing of the wheel will be such that the distance between the nearest edges of adjacent tires will not be grater than 50 percent of the rated tire width of a single tire. The roller shall have a rigid steel frame provided with a body suitable for ballast loading such that the load per wheels may be varied, as directed by the Engineer, from 18,000 to 24,000 pounds. The roller shall be towed at speeds not to exceed 5 miles per hour.

4. <u>Crawler-Type Tractors</u> - Crawler-type tractors used for spreading or compaction shall weigh not less than 20,000 pounds, shall exert a unit tread pressure of not less than 6 pounds per square inch, and shall be operated at a speed not to exceed 3.5 miles per hour.

5. <u>Sprinkling Equipment</u> - Sprinkling equipment shall consist of tank trucks, pressure distributors, or other equipment designed to apply water uniformly and in controlled quantities to variable widths of surface.

6. <u>Miscellaneous Equipment</u> - Scarifiers, disks, spring tooth or spike tooth harrows, spreaders, power tampers, and other equipment shall be of types suitable for construction of levee embankment.

<u>3-05.3 Embankment Foundation Preparation</u>
Immediately prior to the placement of fill material, the entire earth surface on or against which fill is to be placed shall be thoroughly broken to a depth of 6 inches. If for any cause this broken surface becomes compacted in such a manner that, in the opinion of the Engineer, a plane of seepage or weakness might be induced, it shall again be adequately scarified before the depositing of material thereon. All scarifying and breaking of ground surface shall be done parallel to the centerline of the levee. All of the foregoing work shall be completed at least 200 feet in advance of the embankment construction.



3-07   MEASUREMENT AND ACCEPTANCE
        The total amount of work to be paid for under Bid Item 4,
Dredging;   Bid Item 5, Levee Degrading; and Bid Item 6, Levee Raising,
shall be measured in accordance with the Theoretical Sections
described in Paragraph 3-03 of these Specifications.

        Payment at the applicable unit price will be made when it is
determined by the final quantity survey as described in Section 3-06,
that a particular segment has been dredged to the required cross-
section; in addition, profiles will be taken along each required toe
of slope and at the centerline of the required cross-section to insure
that the entire channel has been excavated to the proper elevation.
These profiles are to be performed by the Contractor using electronic
sounding equipment and under the direction of the Engineer's
Representative.   Only after all cross-sections and profiles for a par-
ticular segment are deemed acceptable by the Engineer will payment for
that segment be made.

        In order to insure the integrity of the completed segments, they
will be limited by the following stipulation; the final quantity sur-
vey will not be made for payment on a segment until dredging opera-
tions are a minimum of 100 linear feet from that segment.

3-08   PAYMENT
        3-08.1 Mobilization and Demobilization
        All costs connected with the mobilization and demobilization of
all of the Contractor's plant and equipment will be paid for at the
contract lump sum price for this item, Bid Item No. 1.   Sixty percent
of this amount will be paid to the Contractor upon the completion of
his mobilization at the work site.   The remaining forty percent will
be paid to the Contractor upon completion of his demobilization from
the work site.

        3-08.2 Dredging
        Payment for Bid Item No. 4 will be made at the applicable
contract unit price per cubic yard based upon quantity surveys and
after acceptance of each particular segment.   Payments for the
dredging item will be made in accordance with Paragraphs 55 through
60, in Section A of the General Specifications and Section 3-03.1 of
these Special Specifications.

        3-08.3 Levee Degrading and Raising
        Payment for Bid Item Nos. 5 and 6 will be made at the applicable
contract unit price per cubic yard based upon quantity surveys and
after acceptance of each particular segment.   Payment for the levee
degrading and raising items will be made in accordance with Paragraphs
55 through 60, in Section A of the General Specifications and Section
3-03.2 of these Special Specifications.

        3-08.4 Silt Screens
        There will be no direct payment for silt screens and, as such,
will be included in Bid Item No. 4, Dredging.



9-06   TEMPORARY LOADING DOCK
        9-06.1   General
             It is brought to the Contractor's attention that he must
allow boat traffic in the canal during construction.   In addition, the
Contractor shall provide a temporary loading/unloading dock for
fishing vessels, which shall be a barge measuring 10' X 30' minimum.
The Contractor shall be required to move this barge up and down the
canal so as to be out of the way of construction.   This barge shall
have an access walkway to the dry land meeting OSHA standards and
shall be moored to the Jefferson side of the canal.   The Contractor is
reminded that he must carry the proper maritime insurance for this
action.

             Boats will not be allowed to tie-up in the construction area
except for loading and unloading at the temporary dock.

        9-06.2   Payment
             Payment will be at the contract lump sum price for Bid Item
No.   22, "Temporary Loading Dock", and shall include providing the
barge, moving the barge as required, maintaining a proper level of
safety on the barge, and providing navigation lights (see paragraph
1-36 of the specifications).

48

# EXHIBIT   I





DEC 2 0 2001
1065
RECEIVED

*"RE-BUILDING THE CITY'S WATER SYSTEMS FOR THE 21st CENTURY"*

# Sewerage & Water Board OF NEW ORLEANS

**MARC H. MORIAL, President**
**HENRY A. DILLON, JR., President Pro-Tem**

625 ST. JOSEPH STREET
NEW ORLEANS, LA., 70165 • 585-2000
www.swbnola.org

December 20, 2001

Mr. Stevan G. Spencer, P.E.
Orleans Levee District
New Orleans Lakefront Airport
Administration Bldg. - Room 202
New Orleans, LA  70126

**RE:  Dredging under Hammond Highway Bridge
in the 17th Street Canal**

Dear Mr. Spencer:

In accordance with Mr. Alfred C. Naomi's letter of November 6, 2001, we are attaching herewith $125,000.00 covering the dredging under Hammond Highway Bridge.

Very truly yours,

**GENERAL SUPERINTENDENT**

GJS/J
Attachment: Check
          Letter dated 11/6/01

cc:  Mr. Alfred C. Naomi-USACOE
     Mr. Rudolph St. Germain-S&WB
     Mr. Gary Sarrat-S&WB

(49)

*Members of the Board:* TROY A. CARTER • HENRY A. DILLON, JR. • BENJAMIN L. EDWARDS, SR. • SIDNEY H. EVANS, JR. • NORMA E. GRACE • WILLIAM F. GRACE, Jr.
RONALD C. GUIDRY • BARBARA LAMONT • MARC H. MORIAL • PENELOPE RANDOLPH • EDDIE L. SAPIR • JAMES M. SINGLETON • STAFFORD R. TUREAUD, SR.
*"An Equal Opportunity Employer"*



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267
November 6, 2001

S. & W.B.
GEN. SUPT.

2001 NOV -7 A 9: 29

REPLY TO
ATTENTION OF:

Planning, Programs, and
  Project Management Division
Project Management Branch - East


G. Joseph Sullivan
General Superintendent
Sewerage & Water Board of New Orleans
625 St. Joseph Street
New Orleans, LA 70165

Dear Mr. Sullivan:

This letter is in regard to our future construction contract for the Lake Pontchartrain, Louisiana, and Vicinity, High Level Plan, 17th Street Outfall Canal, Parallel Floodproofing Protection of the Old Hammond Highway Bridge. The work for this contract consists of constructing a new sealed bridge and levee/I-wall systems to provide continuous line of hurricane flood protection. This protection will incorporate reinforced concrete capped steel sheet piling I-walls, cast-in place concrete slab span girders, pile founded reinforced concrete intermediate bents and abutments, reinforced concrete roadway and approach slabs, asphaltic concrete pavement, structural steel access gates and miscellaneous metal work. In addition, the site work will include modifications to existing utilities and surface drainage; some miscellaneous electrical work, miscellaneous excavation; demolition, including removal of the existing bridge; clearing, grubbing and landscaping and various other items of work. One of the bid items included in this contract is to be performed for the benefit of the Sewerage & Water Board of New Orleans (S&WB). This betterment work consists of dredging material from the 17th Street Canal beneath and in the vicinity of the bridge to improve flows in the canal. You have previously advised in your July 27, 1999 letter (enclosed) to the Orleans Levee District that you would pay for these costs.

Because this work constitutes a betterment, funding for this work must be made available prior to contract award. We are currently scheduled to award this contract in December 2001. The cost for performing this work is estimated to be $125,000.00. We request the S&WB submit a payment in the amount of $125,000.00 to the Orleans Levee District prior to the scheduled contract award date. Please note that any additional cost above the actual construction cost associated with this effort will be the responsibility of the S&WB. We will provide you with a final accounting of all cost associated with this effort once the contract is completed.



-2-

Please contact me at (504) 862-2377 if we can be of further assistance and as soon as the payment is submitted to the Orleans Levee District.

Sincerely,

Alfred C. Naomi
Senior Project Manager

Copy Furnish:
Stevan G. Spencer, P.E.
Chief Engineer
Orleans Levee District
Suite 202 - Administration Building
6001 Stars and Stripes Blvd.
New Orleans, LA 70126-8006

51

**Bruneau, Rep. (District Office)**

**Subject:**                    FW: Terry Baker/Agenda


-----Original Message-----
From: Baker, Terrance G [mailto:TBaker@whitneybank.com]
Sent: Monday, September 22, 2003 9:34 AM
To: 'Peggy Gehbauer'
Cc: 'larep094@legis.state.la.us'
Subject: RE: Terry Baker/Agenda

Peggy,
I am sorry to keep contacting you on this, but the construction equipment
around this project is severely impacting the area. Heavy equipment and the
rigs transporting them are a frequent sight on Bellaire, Kenison & Hay. I
was assured by Al Naomi from the Corps of Engineers that these trucks would
be using only Hammond Hwy. access. THIS IS NOT THE CASE. I feel the city
should be more informed since this project is using city streets that were
already in deplorable shape before the Hammond Hwy. bridge project began.

I am copying a representative from Peppi Bruneau's office on this
transmission as well. Perhaps inclusion from the State level is required for
my questions/concerns to be answered or addressed.

I spoke with Marvin Thompson of Public Works. He informed me he sent a
response to your letter to his office in Public Works Dept. Please forward
this letter to me so I may see the status of my issues. (second request)

Once again, I am requesting Mr. Batt to meet with me at the site so he may
see firsthand the impact this project is having in his area.

Regards,
Terry Baker
7009 Bellaire Dr.
(first block from Hammond Hwy.)

----





1

The Board of Commissioners

RECEIVED

of the

AUG 24 1998

Orleans Levee District

8-21-98

Stevan Spencer

Ms O'neal Burnett (283-9151)
PHONE

1773 SEARS ST. called
SERE

stating that her house

is sinking due to the

levee work we did on

London CANAL. I'm sure

you And the USACE ARE

AWARE but thought I'd

PASS it Along

May

New Orleans Lakefront Airport
Administration Bldg., Suite 202
New Orleans, Louisiana 70126
(504) 243-4000
Fax (504) 241-6561



EXHIBIT

24900

**Board of Commissioners**
**Orleans Levee District**

OLD Project No. 24909
London Canal
(Linfield)
1998 file
5 pages

### OFFICE MEMO
### August 24, 1998

Executive Director

Spencer, P. E.
neer

Burnett
Street

nue Canal

    Mr. Frank Mineo called Ms. Burnett to ask about her problem. She started out by saying her house was sinking. She was advised that we did nothing to change the water table in her area. She then said that run off from the levee had increased, and again she was advised that nothing we did changed anything.

    The conversation ended by her stating she would have her attorney contact Mr. Mineo. She was told that he would not be able to respond to a call of this type. The services of an attorney had been engaged because she was never able to get in touch with anyone concerning this matter.

(54)

SGS/FPM/bnv

xc:  Gary Benoit, Senior Counsel
     Carol Kiefer, Auxiliary Services Director



LINFIELD, HUNTER & JUNIUS, INC.
CONSULTING ENGINEERS AND ARCHITECTS

Ralph W. Junius, Jr., P.E.
Frank C. Newell, P.E.
Anthony F. Goodgion, P.E.
Lawrence B. LeBlanc, Architect
Sergio J. Girau, P.E.

3500 North Causeway Blvd./Suite 200
Metairie, Louisiana 70002
(504) 835-9933 fax
(504) 837-1666

David A. Hunter, Jr., 1969-1993
Ashby T. Gibbons, Jr., 1974-1979
R. P. Linfield, 1957-1979

24905

April 11, 1997

Mr. Jim Parker
Principal Civil Engineer
Sewerage and Water Board of New Orleans
8800 S. Claiborne Ave.
New Orleans, LA 70118

RE:   Gentilly Boulevard Bridge over the London
      Avenue Outfall Canal
      Our File No. 92-60

Dear Jim:

This letter is to confirm our conversations at our meeting with you on Thursday, 10 April, 1997. The following relevant items were discussed:

We requested that due to the obstructions to pile driving in the bottom of the canal that we be allowed to use either 30" square precast concrete piles or 30" diameter open end steel pipe piles for the interior pile bents of the bridge. The increase in pile size would also allow for fewer piles driven. You indicated that the six inch increase in pile size is acceptable. You also indicated that the pipe piles is preferable to you for hydraulic reasons.

We discussed the need for underwater repair of the canal bottom. You said that underwater repair of the canal bottom is acceptable. You said we should call for the removal of all debris from the canal bottom and that all forms which are to be left in place be tied to the concrete structures.

We discussed the possibility of constructing a temporary steel sheet pile cofferdam in the canal. You said that it would be okay to do so. We are to get back in touch with you in a few days to get the design parameters for the cofferdam as they relate to cut-off elevations and coordination with pumping station No. 3. You also said that cofferdaming half of the canal at a time would be a preferable option.

We are to contact Jack Herkamp or Bob Moeinian about general contractor coordination with the Sewerage and Water Board during construction.



Mr. Jim Parker
April 11, 1997
Page Two


We are to contact Bob Moeinian about water surface elevations in the canal so that we can include this information on the contract drawings.

You gave us a copy of the Sewerage & Water Board 65% review comments in regard to utilities relocations for the project.

The above summary of our conversation is believed to be true and correct to the best of the undersigned's recollection. If any of the above is in error, please do not hesitate to call.

Thanks again for meeting with us.

Yours very truly,

LINFIELD, HUNTER & JUNIUS, INC.

Anthony F. Goodgion, P.E.
Vice President

AFG/lgm
jobs\9219260\parker.ltr







RECEIVED
MAR 1 2001
47

February 24, 2001

Dear Mr. Mineo;

My name is John Sears, I am the owner and operator of Sears Lawnmower Repair Shop.

We are located at the London Ave Canal. This is the site of your most recent construction project. Due to the driving vibrations of the pile driving machine, damages to the roof of my building have been sustained. Not long ago, just prior to your construction work to the bridge, a new roof was installed. This new roof is not yet 10 yrs. old.

Now it is leaking. We had experienced some water damage to the inside ceilings. However, resulting from the recent construction work, more damages (resulting from the leaks caused by the loosen materials, due to excessive vibrations) have occurred.

I have had two (2) roofing companies to check this roof, none of them seemingly can pinpoint the origin point of the leak(s).

My initial roofer as well as the two (2) additional roofers agree that a new roof would be the best solution.

Having just had this work done, I am not of the opinion that I should do this again, especially since your construction work is basically at fault for the new problems.

Your assistance in correcting this problem is greatly appreciated.

I am looking forward to hearing from you soon.

(56)

John C. Sears
2335 Gentilly Blvd
New Orleans, La. 70122
(504) 282-0077

DEC 19 2002 10:29 FR PUBLIC SECTOR CLAIMS  1800931010    915042833017       P.10/10

**The St.Paul**
Property and Liability Insurance

24909

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY
Suite 105
2700 Ne Loop 410
San Antonio, TX 78217
Telephone:(210) 527-2787

September 11, 2002

Mr. John Sears
2335 Gentilly Blvd.
New Orleans, LA 70122

| | |
|---|---|
| Tracking # | KY01259 |
| Insured: | Orleans Levee District |
| Claim No.: | GP0630092562F008 |
| Date of Loss: | March 3, 2001 |

Dear Mr. Sears:

Please be advised that St. Paul Insurance is the liability carrier for Orleans Levee District.

There is some question as to whether our insured is legally responsible for the damages you allege concerning the above referenced claim. Furthermore, it is my understanding that this loss occurred on or about March 3, 2001.

The Statute of Limitations in the State of Louisiana is one year. This means that you have a fixed time within which you must take judicial action to enforce your rights or else be barred from enforcing them. The statutory time in which an action may be brought has expired. For this reason, we will be unable to assist you in this matter.

Sincerely,

ST. PAUL FIRE AND MARINE INSURANCE COMPANY
JOSEPH M. LATRONICO
Senior Claim Representative
Telephone:(210) 527-2787
Fax:(210) 527-2700
JOE.LATRONICO@STPAUL.COM

