1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3     ****************************************************************
      IN RE:  KATRINA CANAL BREACHES
4

      PERTAINS TO:
5     RECORD DOCUMENT 1508

6

      COLLEEN BERTHELOT, ET AL.
7                                    CIVIL ACTION 05-4182
                                     SECTION "K"(2)
8     V.                             NEW ORLEANS, LOUISIANA
                                     FRIDAY, AUGUST 25, 2006, 9:00 A.M.
9     BOH BROTHERS CONSTRUCTION
      CO., LLC, ET AL.
10

11    ****************************************************************

              TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
12       HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
                      UNITED STATES JUDGE
13

14    APPEARANCES:

15

      FOR THE PLAINTIFFS:            BRUNO & BRUNO
16                                   BY:  JOSEPH M. BRUNO, ESQ.
                                     855 Baronne Street
17                                   New Orleans, LA 70113

18                                   ASHTON R. O'DWYER, JR., ESQ.
                                     One Canal Place, Suite 2670
19                                   New Orleans, LA 70130

20                                   FAYARD & HONEYCUTT
                                     BY:  CALVIN FAYARD, JR., ESQ.
21                                        DAVID B. HONEYCUTT, ESQ.
                                          PEYTON MURPHY, ESQ.
22                                   519 Florida Avenue Southwest
                                     Denham Springs, LA 70726
23

                                     ANDERSON KILL AND OLICK
24                                   JOHN N. ELLISON, ESQ.
                                     1600 Market Street
25                                   Suite 2500
                                     Philadelphia, PA  19103

```
 1   APPEARANCES: (Continued)

 2

 3                                    LAW OFFICES OF TAMARA JACOBSON
                                      TAMARA K. JACOBSON, ESQ.
 4                                    2609 Canal Street
                                      New Orleans, LA  70119
 5

 6

 7   FOR HANOVER INSURANCE COMPANY:   LUGENBUHL, WHEATON, PECK,
                                      RANKIN & HUBBARD
 8                                    BY:  SETH A. SCHMEECKLE, ESQ.
                                      601 Poydras Street, Suite 2775
 9                                    New Orleans, LA 70130

10

11

12   FOR ST. PAUL FIRE & MARINE
     INSURANCE COMPANY:               LUGENBUHL, WHEATON, PECK,
13                                    RANKIN & HUBBARD
                                      BY:  RALPH S. HUBBARD, ESQ.
14                                         MARTIN R. SADLER, ESQ.
                                      601 Poydras Street, Suite 2775
15                                    New Orleans, LA 70130

16

17   FOR STANDARD FIRE INSURANCE
     COMPANY:                         ROBINSON & COLE
18                                    BY:  STEPHEN E. GOLDMAN, ESQ.
                                      280 Turnbull Street
19                                    Hartford, CT 06103-3597

20

21   FOR THE UNITED STATES
     OF AMERICA:                      U.S. DEPARTMENT OF JUSTICE
22                                    CIVIL DIVISION, TORTS BRANCH
                                      BY:  TRACI L. COLQUETTE, ESQ.
23                                    1331 Pennsylvania Avenue, NW
                                      Room 8005N
24                                    Washington, DC 20004

25
```

```
 1    APPEARANCES: (Continued)

 2


 3    FOR STATE FARM FIRE AND
      CASUALTY COMPANY:                    STONE PIGMAN WALTHER WITTMANN
 4                                         BY:  WAYNE J. LEE, ESQ.
                                                STEPHEN BULLOCK, ESQ.
 5                                              LESLI HARRIS, ESQ.
                                           546 Carondelet Street
 6                                         New Orleans, LA 70130-3588


 7
      ALSO APPEARING:
 8
                                  ERIN E. DEARIE, ESQUIRE
 9                                MICHAEL C. RIESS, ESQUIRE
                                  ADRIAN NAEAU, ESQUIRE
10                                THOMAS P. ANZELMO, ESQUIRE

11
                                  GERALD E. MEUNIER, ESQUIRE
12                                HUGH P. LAMBERT, ESQUIRE
                                  DANIEL E. BECNEL, ESQUIRE
13                                PEYTON MURPHY, ESQUIRE

14
                                  D. BLAYNE HONEYCUTT, ESQUIRE
15                                KYLE P. KIRSCH, ESQUIRE
                                  HEATHER LONIAN, ESQUIRE
16                                WILLIAM D. TREEBY, ESQUIRE

17
                                  CHARLES COLVIN, ESQUIRE
18                                TERRANCE BRENNAN, ESQUIRE
                                  HERMAN C. HOFFMAN, JR., ESQUIRE
19                                VICTOR E. STILWELL, ESQUIRE

20
                                  FRANCIS J. BARRY, ESQUIRE
21                                GEORGE R. SIMNO, III, ESQUIRE
                                  THOMAS F. GARDNER , ESQUIRE
22                                ANDREW R. GREENE, ESQUIRE

23
                                  JOHN W. DeGRAVELLES, ESQUIRE
24                                CHARLES F. SEEMANN, JR., ESQUIRE
                                  JAMES F. McCONNON, JR., ESQUIRE
25                                ROBERT SIEGEL, ESQUIRE
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  APPEARANCES: (Continued)

 2
                        NEIL C. ABRAMSON, ESQUIRE
 3                      NEAL J. FAVRET , ESQUIRE
                        MAURA Z. PELLETERI, ESQUIRE
 4                      H. MINOR PIPES, III, ESQUIRE

 5
                        JAMES H. ROUSSEL, ESQUIRE
 6                      MATTHEW SCHULTZ, ESQUIRE
                        N. FRANK ELLIOT, III, ESQUIRE
 7                      JEAN PAUL OVERTON, ESQUIRE

 8
                        MARSTAN FOWLER, ESQUIRE
 9                      KARL F. BUCHLER, ESQUIRE
                        WILL PERCY, ESQUIRE
10                      GREGORY FARENHOLT, ESQUIRE

11
                        THOMAS P. ANZELMO, ESQUIRE
12                      JAIME M. CAMBRE, ESQUIRE
                        E. ALEXIS BEVIS, ESQUIRE
13

14

15

16  OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
17                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7779
18

19

20  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER.
21

22

23

24

25
```

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                   FRIDAY, AUGUST 25, 2006

3                 M O R N I N G   S E S S I O N

4                  (COURT CALLED TO ORDER)

5          THE DEPUTY CLERK:  All rise.

6          THE COURT:  Good morning.  Okay.  Would you call the

7   proceeding.

8          THE DEPUTY CLERK:  This is Civil Action 05-4182,

9   Section K.  This is regarding the levee breach cases, insurance

10  cases, MRGO, several motions.

11         THE COURT:  The parties want to make their appearances

12  and let us know who is going to be arguing the various motions.

13         MR. BRUNO:  Judge, I don't know if you want to, we had

14  scheduled a very brief status conference for this morning, and

15  the only -- Ralph, come forward -- the only issues that we had on

16  the table were the plaintiffs' motion to, for enlargement of time

17  within which to respond to the motions filed in the insurance

18  section, in particular the Chehardy cases.  I think we've agreed

19  to move the hearing to October 24th, and the Court will issue

20  a --

21         THE COURT:  A minute entry to that effect.  And a

22  briefing scheduled accordingly where you will get 10 extra days

23  and the defendant will have 10 extra days to reply.

24         MR. HUBBARD:  I had written in my notes October 27th.

25         THE COURT:  You may be right.

1          THE CLERK:  It's October 27th.

2          MR. BRUNO:  For the benefit of the folks in the

3   courtroom, what's scheduled today for oral argument are those

4   cases which by minute entry the Court had previously advised

5   would be heard today.  All other motions pending we understand,

6   and there are various minute entries to establish the fact that

7   those are under advisement.

8          THE COURT:  That is correct.  And the Court, and for

9   those of you who didn't come earlier, the insurance motions will

10  be taken up this morning.  We will take up the levee motions,

11  which would include the engineers, the contractors, the Sewerage

12  and Water Board, and the Orleans Parish Levee Board, starting at

13  1:00.  And I think the Corps of Engineers is the only other issue

14  on the agenda.

15         MR. HUBBARD:  I think the United States has something

16  for the status conference, Judge.

17         THE COURT:  All right.

18         MS. COLQUETTE:  Good morning, Your Honor.

19  Traci Colquette for the United States.  I'll try to make this as

20  quick as possible because I know the Court has a number of things

21  on its plate this morning.  We wanted to bring to your attention

22  an issue at the 17th Street Canal breach site.

23         They are ready at the work site to begin removing what

24  remains of the old I-walls.  And let me explain a little bit

25  about how the work is to be done and the issues that that may

1  present during litigation.  To excavate the materials from the

2  ground, they construct a temporary retaining system, a TRS, to

3  prevent the walls of dirt from falling in around the workers.

4  There are two types of TRSs involved:  Type 1, which is less

5  expensive, and a Type 2, which is more expensive.  The contract

6  at this site calls for approximately 270 linear feet of the

7  Type 1 and approximately 180 linear feet of the Type 2.  The

8  Type 1 has already been built.  The Type 2 has not yet been

9  built.

10      So at this point, they are ready to begin excavating

11  materials from within the Type 1.  The Type 1 in the contract

12  calls for excavating down to negative 7 feet, putting in a break

13  at negative 6 feet and then dewatering down to negative 6 feet.

14  They did not plan to dewater below the negative 6-feet mark, and

15  so what that means is that they would be pulling out the

16  remaining I-wall materials from underneath the water.

17      The two issues that brings up in this litigation:  One

18  is the marking of the sheet piles.  What has been done in the

19  past, they would dig down to the top of the sheet pile and put a

20  stamp or mark on it noting its exact location and elevation.  But

21  removing them from underneath the water, they would be able to

22  mark them but wouldn't be able to mark them as precisely.  It

23  would make reasonable efforts, however, to mark them.

24      The second issue is, as the Court may recall, some

25  parties in the litigation have expressed interest in seeing the

1  connecting point between the concrete monolith and the sheet

2  pile.  And if the materials are pulled out from underneath the

3  water, it is unlikely that that will happen.  We've asked the

4  Corps what the cost would be to perform the work differently, and

5  it's substantial.  To dewater, to drain the water down to

6  negative 10 feet so that the tops of these sheet piles would be

7  visible would cost a rough estimate of about a half million more

8  dollars to dewater.  If it becomes necessary to drain the water

9  deeper than that, it would cost, anything below negative 13

10 requires this Type 2 TRS, which is more expensive, and that would

11 cost approximately $2 million.  With that in mind, the Corps

12 thought it was reasonable to proceed with the work as the

13 contract called for.

14       What we had initially proposed to do was to, what we

15 initially thought we would do was to send a letter to parties

16 giving them 48 hours to notify us or the Court that they wanted

17 the work to be performed differently and providing a method of

18 payment for that.  The reason we were thinking of proceeding that

19 way is Judge Wilkinson handled an issue involving sheet piles at

20 the Industrial Canal, the Jordan Avenue/Galvez Street sheet

21 piles.  Some of the parties expressed interest in preserving that

22 evidence which the Corps had not planned to keep.

23 Judge Wilkinson ordered that those parties who wanted the

24 evidence preserved would bear the cost of it.  Boh Brothers is

25 the contractor at 17th Street and they had expressed some

1  nervousness about proceeding that way and wanted the issue

2  brought before the Court before we proceeded with the work.  And

3  so, we're here this morning asking for guidance.

4       We have two quick final points:  One is within the Type

5  2 TRS, which is yet to be built.  They will, as part of the

6  contract, excavate down to negative 18 feet and dewater that far

7  down, and so it may still be possible for the materials within

8  the Type 2 for the parties who are still interested in seeing

9  this connection between the monolith and the sheet pile to see it

10  within, for the materials that are containing the Type 2.

11       THE COURT:  Let me tell you, Counsel, the Court, because

12  of my schedule today, I'm really, I am not prepared to deal with

13  this.  I think that Judge Wilkinson has been dealing with this,

14  and is there any way that you and the appropriate parties can

15  meet with Judge Wilkinson some time today and establish a

16  protocol or hearing or something.

17       MR. BRUNO:  Judge, in fact what occurred in connection

18  with the Industrial Canal site was that the parties met at the

19  suggestion of Judge Wilkinson alone.  If we had had any knowledge

20  that this was going to take place, we would have our engineer, we

21  would have our subcommittee in charge of this issue meet with the

22  Corps and work this thing out.

23       Our simple suggestion and simple solution is to have

24  the plaintiffs meet with the Corps of Engineers, with our own

25  hired expert engineer, to see if we can resolve it.  If we can't,

1   we'll take it to Magistrate Wilkinson, no big deal.

2          THE COURT:  What's the time frame on this, Counsel?

3          MS. COLQUETTE:  That was going to be my second point,

4   Your Honor.  The work right now is at a standstill because we're

5   waiting to resolve this issue.  So we'd like to resolve this as

6   quickly as possible.

7          THE COURT:  The best way to resolve something is file

8   papers with this Court.

9          MR. BRUNO:  Judge, with all respect, you're right.  If

10  you wait until the last minute to tell us and then tell us you

11  have 48 hours, that's inappropriate and unfair.  We stand ready

12  and have been ready to work with the Corps of Engineers since

13  this case began.  We will meet with them, we will have expert

14  engineers there.  We will work this thing out.  To the extent we

15  cannot, we'll go to Magistrate Wilkinson.

16         THE COURT:  Again, time is a factor.  I'm going to

17  apprise Judge Wilkinson of this issue this morning when I take a

18  break.  And then it may be at lunch, briefly, we can, right

19  before lunch, if we finish, he can spend 10 minutes or so giving

20  you some guidance as to how he would like to proceed with it.

21         MR. BRUNO:  Judge, again, this afternoon at 1:00, we

22  take up the engineering motions.  My subcommittee in charge of

23  that, Mr. Hugh Lambert and Mr. Gerry Meunier will be arguing

24  these motions.  If, once again, if they had given us this much

25  notice, we would have met with them.  And we will meet with them.

1  Today is not going to be the day.  If they had more than

2  2 seconds to tell us about this and if they would have, we would

3  have met with them already.

4       THE COURT:  What I'm going to do is this:  I'm going to

5  try to carve out about 5 minutes where we're going to have

6  Judge Wilkinson here on this issue, because this is his issue and

7  I've got enough issues, frankly.  So I'm going to spend 5 minutes

8  just so he'll be apprised in open court of it and then I'm going

9  to let him take the ball.

10       MR. BRUNO:  That's fine.  The only thing I don't know is

11  whether --

12       THE COURT:  We'll have him right in here.

13       MR. BRUNO:  I don't know that --

14       THE COURT:  Just one second.

15       MR. BRUNO:  Judge, I don't think we need you to be

16  bothered with this this morning.  We will attempt to locate our

17  expert engineer right now.  We'll try to have him here if we can.

18  We stand ready to meet with the Corps, as I said, if they had

19  given us a little notice, we would be ready right now.  I don't

20  think this should involve you this morning.  We have other

21  issues.  It can't happen this afternoon.

22       But the part of my team handling the motions this

23  afternoon is free this morning.  So we will endeavor to meet with

24  the Corps this morning.  If we cannot get our engineer here, we

25  will need more time.  It's not our fault if this issue is brought

1    at the last moment.  We will do everything that we can, though,

2    to accommodate the Government, but once again, as we've asked a

3    hundred times in the past, give us more notice of these issues so

4    that we can respond fairly and appropriately.

5            THE COURT:  Counsel, you've got about a minute, because

6    time is precious.  And the bird of time is on the wing and has

7    but a very short way to fly.

8            MS. COLQUETTE:  Your Honor, we're happy to meet and

9    discuss this issue today.

10           THE COURT:  Today is a very cumbersome day to do it

11   because we have an all-day argument.

12           MS. COLQUETTE:  I understand, and if the Court would

13   prefer that we do that on Monday, that is fine as well.

14           MR. BRUNO:  Judge, that's much better for us.

15           MS. COLQUETTE:  We just thought that the status

16   conference --

17           THE COURT:  I would prefer that.  I want to make sure

18   Judge Wilkinson is here and ready on Monday because it's going to

19   be in his ballpark.

20           MR. BRUNO:  In the meantime, as I said, Judge, we'll do

21   what we can this morning while we're arguing insurance issues.

22           MS. COLQUETTE:  If possible, we would request to appear

23   by telephone.

24           THE COURT:  I'm sorry?

25           MS. COLQUETTE:  We would request to appear by telephone.

1          THE COURT:  Judge Wilkinson will make that decision.

2          Yes, sir, Mr. O'Dwyer.  We have a short time.

3          MR. O'DWYER:  Your Honor, may I ask a question of the

4   Government, please.

5          THE COURT:  You can ask a question.  They're not

6   compelled to answer.

7          MR. O'DWYER:  Where is the affidavit evidence from the

8   Government supporting what Ms. Colquette just represented to the

9   Court?  Where is the affidavit that we are entitled to by virtue

10  of the order issued by Magistrate Wilkinson?

11         THE COURT:  That's why he should be here.  It's just an

12  issue that I wasn't prepared to take up this morning.

13         MR. BRUNO:  Judge, thank you.

14         THE COURT:  I will alert Judge Wilkinson to this issue.

15  Let's get on with what we scheduled today.

16         MR. BRUNO:  Judge, there is one housekeeping issue that

17  can be taken care of very easily first, before we take up the

18  body of the motion.

19         MR. SCHMEECKLE:  Excuse me, Judge, Seth Schmeeckle, on

20  behalf of the Hanover Insurance Company, and this is directly

21  related to the *Vanderbrook* matter, document number 056323, which

22  is about to commence oral argument.

23         As you may recall at the last hearing, there was an

24  issue regarding a misspelling of one of the policyholder

25  plaintiffs in the *Vanderbrook* matter.

1          THE COURT:  Yes.

2          MR. SCHMEECKLE:  We have been working together with

3     Ms. Tamara Jacobson, who represents the plaintiff and we have

4     successfully obtained the correct policy and policy name for that

5     person.  However, Hanover was unable to prepare a motion directed

6     to this particular plaintiff in time to present it to the Court.

7     By way of stipulation and with this Court's permission,

8     Ms. Jacobson and I would like to stipulate to the corrected name

9     from Sophia Granier, G-R-A-N-I-E-R, to Madelyn Grenier,

10    G-R-E-N-I-E-R.  And with the Court's permission, we would like to

11    offer, file and introduce into evidence policy number HNO

12    6365391, issued to Ms. Grenier, G-R-E-N-I-E-R, and we would also

13    like to stipulate that the motion, the 12(b)(6) motion currently

14    pending and filed by Hanover against Ms. Cappella, Mr. Cappella

15    be adopted and referenced to in the same arguments therein and

16    the memorandum be applied to Ms. Grenier and that her opposition,

17    likewise, would be filed back against us.

18         MS. JACOBSON:  Your Honor, Tamara Jacobson, and we do

19    agree with what Counsel states.

20         THE COURT:  Let it be incorporated into the record and

21    filed into the record, and the stipulation as stated will be

22    applicable.

23         MR. SCHMEECKLE:  Thank you, Judge.  May I approach?

24         THE COURT:  Yes.

25         MR. FAYARD:  Your Honor, Calvin Fayard for the

1  plaintiffs on the insurance side of the motion set for this

2  morning.  I would like to make appearance for the record, Calvin

3  Fayard for the plaintiffs in the Chehardy case, Your Honor.

4       MS. JACOBSON:  Your Honor, Tamara Jacobson, here for the

5  *Vanderbrook* plaintiffs.

6       MR. FAYARD:  Judge, we think it may be appropriate just

7  to discuss a little bit about the protocol.  I'd like to take 30

8  seconds or so, but as I understand it, what is set this morning

9  are the motions and arguments in *Vanderbrook*?

10      THE COURT:  That is correct.

11      MR. FAYARD:  And *Vanderbrook*'s counsel has just made her

12 appearance.  As you know, Mr. Harvey has suffered a very

13 unfortunate chain of events starting with Katrina and is not able

14 to be present today.

15      THE COURT:  Yes, sir.

16      MR. FAYARD:  Now, on the Chehardy side, there are

17 similar but separate issues presented in that petition.  It's not

18 the same as the *Vanderbrook* petition, but we are appearing here

19 today as amicus and making arguments in the, in the *Vanderbrook*

20 case today on behalf of our clients in Chehardy, which I now

21 understand has been moved to the October 27th hearing.

22      THE COURT:  Yes.

23      MR. FAYARD:  So, before we get started, I wanted to make

24 sure the record is clear that Ms. Jacobson is counsel for or

25 standing in for the counsel in the other cases, as, has approved

1   that.

2            And she may have statements to make on her own.  I'm

3   not certain.  But I would assume that we will start first and she

4   will follow up, if that's correct and if that meets with the

5   approval of the Court.

6            THE COURT:  Absolutely.  No objection from anyone else,

7   I take it?  Okay.

8            MR. FAYARD:  It's the defendant's motion.

9            MS. JACOBSON:  Your Honor, just for the record, as

10  counsel for *Vanderbrook* plaintiffs, we do adopt the statements of

11  the amicus attorneys in their argument.  And therefore, we'll let

12  them go first.  If we have any cleanups or further comments, I

13  may say so afterwards, if that's okay with Your Honor.

14           THE COURT:  All right.  Thank you.

15           MS. JACOBSON:  Thank you.

16           MR. FAYARD:  Judge, we have divided up our

17  responsibilities with respect to that.  Mr. John Ellison will

18  make the argument for the plaintiffs, also Mr. Matt Schultz and

19  Mr. Frank Elliott and myself.

20           THE COURT:  All right.  I hope you understand that a lot

21  of your arguments are going to be answering my questions.

22           MR. HUBBARD:  That's the way it always is in this

23  courtroom.

24           May it please the Court, I'm Ralph Hubbard.  I

25  represent Standard Fire Insurance Company, Hartford Insurance

1    Company of the Midwest and Hanover Insurance Company.

2        MR. LEE:  Excuse me, Your Honor, do you want us to make

3    all the appearances first?

4        THE COURT:  We might as well do that.

5        MR. HUBBARD:  And I'm also going to be speaking on

6    behalf of Unitrin Preferred Insurance Company, all of the ISO

7    insurers, which filed a joint brief, and that company is

8    represented by Mr. Abramson and Mr. Fillbrook.

9        And then of course, there was a separate brief filed by

10   State Farm, represented by Mr. Lee.  And in terms of

11   presentations today, I'm going to start.  Mr. Lee is going to

12   follow me at an appropriate time.  We also have with us Marty

13   Sadler, who is national counsel for the Hartford Company from

14   Houston, Texas, who is going to be speaking very briefly with

15   respect to the additional exclusion that Hartford filed a very

16   small brief about.

17       And to the extent that we get into hypothetical

18   questions, I'm going to be joined by national count for Standard

19   Fire Insurance Company, a Travelers Company.

20       THE COURT:  We won't be getting into hypothetical

21   questions because in order to explore whether a clause is

22   ambiguous or not, we need to have a panoply to the logical

23   extremes on both ends to determine if, in fact, it is or isn't

24   ambiguous.

25       MR. HUBBARD:  I understand.  I've brought a ringer in

1   here to help me.  This is Mr. Stephen Goldman from Robinson and

2   Cole in Hartford, Connecticut, who practices nationally and who

3   actually has some experience with mudslides and the like.  We

4   haven't seen a whole lot of those in Louisiana lately.

5          THE COURT:  The Court will welcome any erudition from

6   any side.

7          MR. LEE:  Your Honor, Wayne Lee here.  I will be here

8   with Stephen Bullock and Lesli Harris on behalf of the defendant

9   State Farm.  And I will be presenting the arguments on behalf of

10  State Farm.

11         THE COURT:  Thank you, sir.

12         MR. HUBBARD:  Now, I also was going to speak at this

13  time about how many minutes we're going to divide up.  I think

14  the Court is going to give us a lot of time.  We would like to

15  reserve some time for rebuttal.

16         THE COURT:  This is an issue that is of great

17  consequence to your clients, the insurers.  If I were to find

18  that there was coverage, it would be a significant financial

19  exposure; likewise, it's of great consequence to the plaintiffs

20  because of the number of people involved in this catastrophe.

21  So, the Court wants a robust argument.  I don't want to cut you

22  off from anything you need to say.

23         MR. HUBBARD:  I'm certain we'll have that, Judge, and we

24  certainly recognize that this is important to the community, so

25  we can get this issue behind us one way or the other and

1   New Orleans can continue its efforts to recover from the storm,

2   which impacted every single one of our lives.

3          I have to tell you that this *Vanderbrook* case, in my

4   opinion, is the perfect case for this Court to begin to address

5   the insurance issues.  And specifically with respect to the water

6   damage exclusion in all of this consolidated litigation.  The

7   issue is squarely presented in this case.  The plaintiffs are

8   alleging that there is coverage under their homeowner's policies

9   for damage caused by water entering the streets of New Orleans

10  and homes of plaintiffs when the 17th Street Canal wall broke.

11  It's that simple.

12         And of course, the policies for each of the four ISO

13  companies exclude coverage for water damage, which is precisely

14  what is alleged here in this petition.  And that term is defined

15  in those policies to mean, among other things, flood, surface

16  water or overflow of a body of water, whether or not driven by

17  wind, as the Court is well aware.  And that is precisely what the

18  plaintiffs' claim relies on.  They say that their claim was of

19  water, that, well, actually they argue that water damage was none

20  of this but that or that it doesn't apply to what happened to

21  them because what really happened was that, quote, it was water

22  intrusion caused simply from a broken levee wall.

23         Now, unlike the cases that Judge Senter has been

24  dealing with, with which you're quite familiar, *Buente*, *Tuepker*

25  and *Leonard*, wherein each case there were allegations that there

1    were allegedly covered causes of loss simultaneously appearing in

2    the form of wind and rain.  We don't have any such allegations in

3    this case.

4             THE COURT:  Let me ask you a question, sir.  Isn't

5    third-party negligence covered in all-risk policy?

6             MR. HUBBARD:  Actually third-party negligence is

7    excluded as independent exclusions that aren't subject to the

8    anticoncurrent cause language that appears in the policy for --

9             THE COURT:  Where?

10            I'm looking under section I exclusions.  It's not so

11   much a government action?  Tell me what you're talking about so I

12   can see.  I've read this pretty carefully.

13            MR. HUBBARD:  If you see, Judge, on the right hand side,

14   at the top, under B, well, actually, it's the introductory

15   clause, number 2.  It says, "We do not insure the loss to

16   property described in coverages A and B caused by any of the

17   following.  However, any ensuing loss to property described in

18   coverages A and B not excluded or excepted in this coverage is

19   covered."

20            And then under B, it deals with acts or decisions,

21   including the failure to act or decide of any person, group,

22   organization or governmental body.  And then equally important in

23   paragraph C, it excludes faulty, inadequate or defective, and I

24   won't read it all, but it talks about anything having to do with

25   construction, design, maintenance, and the like.

1      THE COURT:  Now, so you're telling me, let me ask you

2  something about that.  Of course, it does say this exclusion only

3  applies to weather conditions in any way cause concluded in

4  paragraph one -- let me see what I wanted to read.

5      MR. HUBBARD:  Weather condition is a completely separate

6  and independent clause which I can tell you, Judge, even if the

7  anticoncurrent clause language were not in this policy, which it

8  is, you would, the weather conditions exclusion is there to help

9  clarify that if you have another exclusion such as water damage,

10  it's referring to water damage, and the claim is that, you know,

11  the wind pushed the water or the like, the weather conditions

12  exclusion would apply.

13      THE COURT:  I'm not sure if that's what we're dealing

14  with here, but let me -- it says, in number 2, "However, any

15  ensuing loss to property described in coverages A and B are not

16  excluded or excepted in this policy as covered."

17      Tell me what that means.  I've read the cases on

18  ensuing loss.  They seem a bit confounded by it, the Court of

19  Appeal, and they're erudite people.  They seem somewhat confused

20  as to ensuing loss.  Let me get right down to the crux of this.

21  Acts or decisions including the failure to act or decide of any

22  person, group, organization or governmental body, I'm not sure

23  that's applicable at all here.  If they act or decide, we're

24  talking about if the levee breach is a result of negligence, is

25  that covered?  Let's assume -- would that be covered if it

1   weren't a flood?  If the breach somehow caused something else?

2   But generally, let me ask you this question:  Generally

3   third-party negligent acts are covered.  That is, if a person

4   drives their car into my house and hurts it, it's covered.  If an

5   airplane crashes into my house, it's covered, correct?

6        MR. HUBBARD:  I think that's correct.

7        THE COURT:  So, the policy is an all-risk policy

8   contemplating the, under certain circumstances, subject to the

9   exclusions, contemplating that if a negligent act causes physical

10  damage to my dwelling, my dwelling is insured unless otherwise

11  excluded.  I think that's the general principal.

12       MR. HUBBARD:  That may be the general principal, but of

13  course here we're talking about specific types of actions, like

14  if you, if it's a matter of design.  If you fly an airplane,

15  that's one thing.  But if you --

16       THE COURT:  It says faulty or inadequate.  Is that of

17  the house or of what?  Design as to what?  I mean, it doesn't say

18  design, it says, planning, zoning, development, survey, siting,

19  design specification, workmanship; isn't that to the dwelling

20  itself?

21       MR. HUBBARD:  Actually, it says, if you'll notice at the

22  bottom, Judge, it says, "A part or all of any property, whether

23  on or off the resident's premises."  So, it does, if you have

24  something that is put in motion --

25       THE COURT:  Or maintenance, does that apply to, the

1    "or," do you think that clause applies, a part or all of any

2    property whether on or off the resident's premises.

3              MR. HUBBARD:   Judge, I think this clause was written

4    with this case in mind.   It could have well have been because I

5    guess of course we're speculating as to what the plaintiffs might

6    claim, because they made no allegations that there was bad

7    maintenance that caused the levee break.   They have no

8    allegations that it was a poor design.   They have no allegations

9    that it was bad construction.   I know the Court under Rule 12 is

10   looking to all possibilities, and I think that this wraps up all

11   of the possibilities that are out there along those lines, if

12   you're looking for negligence in connection with the levee break

13   because it is an attempt, certainly, to reach every aspect of

14   poor construction and design that results in a failure which

15   leads to a loss.   You know, we cover the automobile running into

16   the house, but that doesn't have to do with maintenance of

17   another structure.

18             THE COURT:   Okay.   If third-party, let me -- let's go

19   back to the ensuing loss.   If third-party negligence is generally

20   covered but then taken out if it's, you're saying if it's a

21   design of anything, what if a car is designed poorly and causes

22   it to steer, go out of control and hit your house?   Does that

23   apply?

24             If you read it literally, wouldn't it apply to a car

25   that was designed appropriately, the steering wheel breaks, it

1   goes into a house.  And you say, Oh, bad design, sorry.

2        MR. HUBBARD:  I think it only, it refers to part of any

3   property, whether on or off the resident's premises.  I think

4   it's not.

5        THE COURT:  Well, you think it's related to -- any

6   property.  Does property mean real property?  I mean, I'm just a

7   poor consumer.

8        MR. HUBBARD:  Let me let Mr. Goldman respond to that,

9   Judge.

10       THE COURT:  Yes, sir.

11       MR. GOLDMAN:  Your Honor, I think the confusion that, or

12  the difficulty Your Honor is having with this is, comes from the

13  fact there is three different sets of exclusions in the policy.

14  And this is, this one, this group of exclusions under this

15  number 2 was the third one.  And the ensuing loss provision

16  refers to when one of these enumerated excluded causes then

17  causes something else to happen -- not anything else to happen

18  but something else to happen which is not excluded.

19       If you look at under number 2, it says, "Any ensuing

20  loss to property described in coverage A and B, not excluded or

21  excepted in this policy."

22       So if, for example, you have a faulty structure, that

23  in turn causes a fire, because there is faulty or faulty

24  workmanship, faulty wiring of a building or house that then has a

25  fire, we don't cover the loss caused by the faulty wiring except

1   that if there is a separate fortuitous event, like a fire that's

2   not otherwise excluded, we cover the fire damage.

3          THE COURT:  So, that's your explanation of the ensuing

4   loss provision.  An ensuing loss that is otherwise covered under

5   the policy.

6          MR. COLDMAN:  That's correct.

7          THE COURT:  So, if the third-party negligence is

8   excepted -- if, in fact, this means that if someone designs

9   something, engages in faulty, inadequate or defective planning,

10  zoning, development, surveys, design specifications, workmanship,

11  repair, construction, renovation, remodeling, grading,

12  compaction, materials used in repair, construction, renovation or

13  remodeling or maintenance, in other words, in your dwelling, is

14  in fact physically injured, as a result of any of those, whether

15  on or off the property, then you don't have coverage.

16          My question again, literally construed since property

17  is not defined, if a car were to run into my house because it's

18  defectively designed and the steering system goes amok, would

19  that not literally be excluded as you've described it?  And tell

20  me why wouldn't it be.

21          MR. GOLDMAN:  I think it wouldn't be because your

22  ensuing loss is the car crash into the house.  You know --

23          THE COURT:  So, the ensuing loss saves you.

24          MR. GOLDMAN:  The ensuing loss --

25          THE COURT:  Here the ensuing loss is the result of

1   flood, which is excluded, it doesn't apply.

2         MR. GOLDMAN:  Precisely.

3         THE COURT:  So I have to then determine if this clause

4   is applicable -- do you have any cases?  Because I read all of

5   these, all your memoranda.  Do you have any cases where that

6   clause is employed in such a fashion as this?

7         MR. GOLDMAN:  I don't at my fingertips, Your Honor, but

8   there are a number of cases, a great number -- that clause has

9   been the subject of a lot of, a lot of case law around the

10  country, and the way it comes up typically is in disputes about

11  when there is water penetration into a defective roof, and the

12  question --

13        THE COURT:  Usually it's intrinsic to the dwelling

14  itself.  I'm talking about when it's extrinsic.  When third-party

15  negligence causes something a mile away to injure you, is that

16  what this clause is really designed to do?

17        MR. HUBBARD:  Well, one case that we did cite is

18  *Waldsmith* out of California in 1991, where there was a landslide

19  as a result of a break in a water main.  A water main broke, the

20  water got into the dirt and caused a landslide.  And it was

21  demonstrated that the water main had been negligently maintained.

22  And the Court held that the negligent maintenance of the water

23  main was squarely within the acts or decisions exclusion as well

24  as the inadequate workmanship, materials and maintenance, and

25  therefore, there was no coverage.

1          THE COURT:  How did the water main break?

2          MR. HUBBARD:  It was because of negligent maintenance.

3   Water was released.

4          THE COURT:  Okay.  I just didn't, the focus of the

5   briefing, frankly, it wasn't --

6          MR. HUBBARD:  That's true.  I think all of our focus may

7   have shifted in the last couple of days.

8          THE COURT:  Yes.

9          MR. HUBBARD:  And so we have been scrambling.  Well, I

10  guess I would like to say that, you know, I gleaned from the

11  Court's questions and so forth, I can, I mean, I could spend a

12  good bit of time here talking about whether or not this was a

13  flood because that was the defendant's, or rather the plaintiff's

14  and the amicus's main thrust.

15         THE COURT:  I think they have an uphill battle there,

16  I'm going to listen to them and I'm going to let you respond to

17  that after.  But you contend that the plain language of the

18  policy is such that any inundation for whatever cause is a flood

19  under the policy?

20         MR. HUBBARD:  Where you have inundation over what was

21  normally dry land, which is the dictionary definition, the common

22  person's definition.  I think everybody in the courtroom agrees

23  that Louisiana law says when a term is not defined, like flood,

24  that you use the ordinary and customary usage of the word.  And I

25  guess I would add to that that everyone in this courtroom has

1    used the word flood to describe what happened along with the news

2    commentators, newspapers and all, and kind of like if it walks

3    like a duck and quacks like a duck.

4              THE COURT:  In the West Virginia case that I know you're

5    familiar with now, but I might point out the Court did a lot of

6    research on its own on this and came up with a, as we feel like

7    we have to do to try to get, in other words, our task is to get

8    it right.  And in the West Virginia case, the Supreme Court case,

9    and I'll give at the cite:  203 W. Va. 477, 509 S.E.2d 1, it's

10   *Murray v State Farm Fire and Casualty Company.*  It was decided on

11   July 21, 1998.  And the Court went through a rather exhaustive

12   analysis, which I'm sure you disagree with, and I understand why,

13   but it found that the term, the earth-moving part of the policy

14   was there as a landslide was ambiguous.  Ambiguous only in this

15   sense.  The Court said and overruled the appellate court.  It is

16   landslide clearly, just like this is a flood, but is the

17   exclusion limited to, does the exclusion take away other

18   coverage?  That is, is it from natural or man-made?  If it's a

19   man-made cause, it still may be a flood but it may not be

20   excluded because you have coverage for negligence in the policy.

21   So, in the West Virginia case, the Court said, this flood

22   definition doesn't say whether caused by man or not or

23   negligence.  It just says flood.  So, it could be a flood, but --

24   and floods, floods are excluded, and I think this is a flood.

25   But is there an ambiguity because it doesn't say flood from

 1   causes other than natural causes?  And the causes do not say

 2   that.  I think one of them says external, and State Farm says

 3   external but that was this very clause here that the West

 4   Virginia court found, and I'll let Mr. Lee talk about that too,

 5   found ambiguous.  So why would it apply?  You could easily say it

 6   in the policy.  Why isn't it ambiguous as it pertains to floods

 7   caused by man-made negligence or man-invoked negligence?

 8              MR. HUBBARD:  Well, I think that the language is

 9   certainly broad enough.  There is no limiting language that says

10   that it only applies to a certain type of flood.  It says applies

11   to flood.  And I guess the question really goes back to where we

12   started.  What is a flood?  And the answer to that is, everybody,

13   everybody knew that the levees broke and flooded the City of New

14   Orleans.  And everybody called that a flood.  And their policy

15   excludes flood.  So there is no, there is no reasonable

16   expectation of the parties' problem here.  It's completely

17   unreasonable for someone to expect that in the event of a levee

18   breaking and there being a flood, in a city that's on a flood

19   plain at 5 feet below sea level, that's not going to come to a

20   shock to anybody.  And that's exactly, Judge, what the West

21   Virginia court, I mean, number 1, that case is in extreme

22   minority.

23              THE COURT:  Well, let me ask you the first question:  Do

24   you agree that Louisiana, if we talk about the anticoncurrent

25   provision, I realize that -- let's put the first argument you

1    made on the side.  Louisiana has not directly affirmed or

2    disaffirmed the anticoncurrent provision.

3             MR. HUBBARD:  Actually we have at least two cases.

4             THE COURT:  The Louisiana Supreme Court, which I have to

5    follow.

6             MR. HUBBARD:  Well, I think you only have to follow the

7    Louisiana Supreme Court.  I will tell you that the Louisiana

8    Second Circuit Court of Appeals and the Eastern District, this

9    Court, Judge Jones, there are two cases out there.  And I don't

10   know whether you want me to talk about West Virginia or that

11   first.

12            THE COURT:  Yes, you agree that the Louisiana Supreme

13   Court, has stated in the literature, has not stated these clauses

14   are valid.

15            MR. HUBBARD:  That's correct.  They have not had

16   occasion to address the question of whether or not anticoncurrent

17   clause language is okay to opt someone out of the efficient

18   proximate cause doctrine, which is what we're really talking

19   about in West Virginia and in the State of Washington.  But I

20   guess the question that this Court is going to have to ask

21   itself, and I'm going to give you some more of the details on

22   this as we get through this argument, the cases in, well, West

23   Virginia and Washington, which are the only two states I think we

24   really need to compare ourselves with --

25            THE COURT:  Wisconsin was on an endorsement.

 1          MR. HUBBARD:  Right.  I don't think -- that wasn't

 2    really an anticoncurrent causes case, I don't think.

 3          THE COURT:  It wasn't as clear as these, I agree.

 4          MR. HUBBARD:  They were trying to take away coverage

 5    that they had granted.  So, I think that's distinguishable from

 6    the type of concept that this Court is worried about.  And I

 7    appreciate the Court's concern, but you can take some comfort

 8    from the fact that at least 17 courts throughout the nation have

 9    expressly held that you could use anticoncurrent clause language

10    to contract out of the efficient proximate cause --

11          THE COURT:  Let's go into some scenarios and see how it

12    works in the real world.  Let's assume flood is excluded.  Okay?

13    And we think is this a flood.  Let me ask you this:  When wind

14    and floodwaters combine to damage a house, i.e., wind weakens the

15    foundation and flood knocks it down, is there coverage?

16          MR. HUBBARD:  I think that the answer to that is that to

17    the extent, I mean, to make sure I understand the facts, but I

18    think that if --

19          THE COURT:  Making them up here, of course.

20          MR. HUBBARD:  If there is supposed wind, if wind arrives

21    before the flood arrives and knocks the house down, there is

22    going to be coverage.

23          THE COURT:  No, it just weakens it.  It's part of the

24    cause.  And wind damage is clearly covered under the policy, even

25    under your faulty, inadequate and defective.  Wind damage is

1   covered.  And isn't the whole purpose of the anticoncurrent

2   clause to prohibit concurrent causes from providing coverage when

3   there is a covered peril and a noncovered peril?  Isn't that the

4   purpose of the clause, which was developed around 1989?  Isn't

5   that the purpose?

6            MR. HUBBARD:  Yes, sir.  In the mid-1980s as a direct

7   result of some --

8            THE COURT:  Judicial decisions.

9            MR. HUBBARD:  Right.

10           THE COURT:  So and I'm asking you again now, with that

11  clause in mind, is there coverage?  The wind weakens the house,

12  the foundation, the flood knocks it down.

13           MR. HUBBARD:  Well, it would seem to me that there would

14  certainly be coverage for all of the wind damage.

15           THE COURT:  Why?  Why?  Why?  It's a concurrent cause.

16  Why?  Where does it say that in the policy?  If you read -- okay.

17  Let's assume you're right.

18           MR. HUBBARD:  I think you read, I think you read that,

19  you know, you know, Judge Senter, Judge Senter has made four

20  decisions in the realm.

21           THE COURT:  I have read them all.

22           MR. HUBBARD:  I know you know them very well.

23           But in each step, he has kind of refined his thinking.

24  In the *Leonard* case, the last case, he made very clear the way he

25  interpreted it, and I don't disagree with his interpretation of

1    what happens when you have concurrent causes.

2            THE COURT:  Well, he did say it was ambiguous, did he

3    not?

4            MR. HUBBARD:  No, I think that ultimately in *Leonard*, I

5    believe that he did say that it would be ambiguous --

6            THE COURT:  If they weren't paying the money.

7            MR. HUBBARD:  Not to pay for a covered peril, such as

8    wind and rain.

9            THE COURT:  Right.

10           MR. HUBBARD:  And when he got to *Leonard*, he said the

11   way he reads that clause -- and we put in our brief that we are

12   not claiming, we don't take the position, it's not relevant here

13   because the *Vanderbrook* plaintiffs did not claim that there was

14   wind damage.

15           THE COURT:  I understand --

16           MR. HUBBARD:  But --

17           THE COURT:  I'm just trying to explore whether the

18   clause is ambiguous.

19           MR. HUBBARD:  We put in there that in a situation where

20   there is both, we would cover the covered peril.

21           THE COURT:  But would you have a right under the

22   anticoncurrent clause not to?

23           MR. HUBBARD:  The way Judge Senter read it was --

24           THE COURT:  I'm asking how were you thinking about it.

25           MR. HUBBARD:  No, it would not.  Not only does it not

1   give you the right to that --

2        THE COURT:  Why not?  Why not?  Let's look at it.  It

3   says, a covered peril, an excluded peril -- that's one of my

4   questions, I apologize.  Let me read it.  I have it in here

5   somewhere.  "We do not insure for loss caused directly or

6   indirectly by any of the following.  Such loss is excluded

7   regardless of any other cause or event contributing concurrently

8   or any sequence to the loss."

9        Literally construed, if you read the English language

10  and you apply the rules of logic, you could argue that there is

11  no coverage under the scenario I gave you.  You could argue it

12  legitimately.  Tell me why.  What about that?

13       MR. HUBBARD:  Because the loss in that language is

14  referring to the water damage.

15       THE COURT:  Where is loss defined in the policy, sir?

16  It's not.

17       MR. HUBBARD:  Well, it says, "We do not insure for loss

18  caused directly or indirectly by any of the following."

19       And we're talking about water damage.  Okay?

20       THE COURT:  Yes.  So -- water damage did cause

21  10 percent of it.

22       MR. HUBBARD:  We do not insure for water damage caused

23  directly or indirectly.  Such water damage is excluded,

24  regardless of any other cause or event contributing concurrently

25  or in any sequence to the water damage.  That's the way you would

1  read it because the loss there is referring to water damage.
2  So --
3          THE COURT:  How do you know that?  How do you know that
4  for a loss caused directly or indirectly?  It means loss to the
5  dwelling.  Where is loss defined?  Where do you pull that
6  definition out?
7          MR. HUBBARD:  You don't need the definition of loss.  It
8  says --
9          THE COURT:  I thought loss was to the dwelling.
10         MR. HUBBARD:  It says by any of the following.  Loss by
11 any of the following, which is loss by water damage.
12         THE COURT:  I understand.  "We do not insure for a loss
13 caused directly or indirectly by water damage.  Such loss is
14 excluded regardless of any other cause or event contributing
15 concurrently or in any sequence to the loss."
16         So how, let me give you this one, let me give you this
17 one:  What if a covered peril and an excluded peril each caused
18 damage to the house and the damage caused by each exacerbates the
19 damage caused by the other.  Also, it cannot be determined what
20 event caused what damage?  How then do you interpret that clause?
21         MR. HUBBARD:  If you can't tell which event caused which
22 damage, I think that you have the question of the burden of proof
23 and then there would be coverage.
24         THE COURT:  Okay.
25         MR. HUBBARD:  Because what you have to do is parse

1   through each of these things to see what is covered and what is

2   not covered, and it can be done and it is being done every day in

3   the streets of New Orleans.

4        THE COURT:  So the loss is my dwelling is gone.  My

5   dwelling is gone.  And let's assume for this testimony it was

6   partially due to wind and partially due to flood.  The wind kind

7   of weakened its foundation and the flood, and the flood, not this

8   flood, and the flood caused it to collapse.  "We do not insure

9   for loss caused directly or indirectly by any of the following."

10  Now, the loss is the house.  The house is gone.  But wind

11  contributed to it.  How do you, I assume the loss of the house;

12  it is not defined in the policy.  So, I'm saying how then do you

13  then, it seems to me you have an option.  Well, I think I'll pay

14  this because it kind of makes sense, but how do you determine?

15       MR. HUBBARD:  In your scenario, the wind came and

16  weakened the house.  You owe for the cost that it would have

17  taken to repair that house.  Just as if there was never any water

18  that showed up.  And if that means, you know, restructuring maybe

19  the whole house, it might be a very large sum of money, it might

20  be a very small sum of money, but whatever the wind caused, the

21  insurance company is going to owe for in that scenario.  When the

22  water damage comes along later and knocks the house down, that is

23  excluded by the water damage exclusion.

24       THE COURT:  You're contending that loss is not defined

25  in the policy.  Do you agree with that?  You say it doesn't have

1  to, but it's not.  Do you agree with that?  In any of the

2  policies?

3        MR. HUBBARD:  I do not think there is a definition in

4  there.

5        THE COURT:  My question was, and you kind of jumped

6  ahead being the good lawyer that you are, does it mean only that

7  loss which is, this is me, I have a note to myself, does it mean

8  only that loss which is jointly caused by a covered and excluded

9  peril or any loss to the dwelling?  Covered or excluded peril or

10  any loss to the dwelling?  It also cannot be determined what part

11  of the dwelling might have -- when it's also damaged concurrently

12  caused by a covered and excluded peril.

13        And what you're telling me is you try to separate them

14  out, and this is what your understanding of the provision means?

15        MR. HUBBARD:  And we do it constantly.

16        THE COURT:  You separate it out and then you, if you

17  can't separate it out, you pay?

18        MR. HUBBARD:  Yes.  And for instance, there is a Fifth

19  Circuit case from, like, 1969, U.S. Fifth Circuit, *Morehead,*

20  where there a hurricane, and a house is on piers, and the house

21  is gone.  Floated away.  And the plaintiff said it was caused by

22  wind, and the insurer said it was caused by water.  And they got

23  witnesses, took testimony, and the Eastern District here decided

24  that in fact it was the water that had raised the house up off

25  its foundation and floated it away.  The Fifth affirmed and said

1  that's what the water damage exclusion applies to.  There was no

2  coverage.  But if it had been the wind that did it, they would

3  have owed the policy limits.

4       THE COURT:  Let me ask, if it's a combination, what

5  happens?

6       MR. HUBBARD:  If it is a combination?  Well, that's

7  going to be in the case --

8       THE COURT:  But you have a combination here of

9  third-party negligence and flood.

10       MR. HUBBARD:  Well, here, number 1, you have the

11  third-party negligence that's going to be excluded because of

12  inadequate design, but I would also say that here, here the

13  third-party negligence is exactly part of what gives rise to the

14  water damage as opposed to third-party negligence that damaged

15  the house.

16       THE COURT:  Wasn't that the same scenario in the West

17  Virginia case, where, you may say they are wrong.  Tell me why

18  they are wrong.

19        In the West Virginia case, it was a landslide or, you

20  know, rocks falling on a house, and the Court said, Yeah, it is

21  the landslide but it's ambiguous as to whether it applies to a

22  landslide occurring naturally or one occurring through

23  negligence.

24       MR. HUBBARD:  But the real reason I think the Court said

25  that in the West Virginia case was because of the reasonable

1    expectations doctrine, which does not exist here.

2         THE COURT:  You don't have a reasonable expectation if

3    somebody does something wrong, negligent, that damages my house,

4    that I have a reasonable expectation that I'm going to get

5    coverage.

6         MR. HUBBARD:  That's exactly what the West Virginia

7    courts went off on.  But the Louisiana courts will tell you --

8         THE COURT:  And they do adopt the reasonable

9    expectation.  Don't Louisiana courts adopt the reasonable

10   expectation concept?

11        MR. HUBBARD:  Only in a case where a clause has already

12   been found to be ambiguous.

13        THE COURT:  As did the West Virginia court find the

14   landslide.

15        MR. HUBBARD:  Well, I think they found it to be

16   ambiguous because they said a person in West Virginia would

17   normally expect third-party negligence to be covered.  And you've

18   got to remember that the reasonable --

19        THE COURT:  Well, that's the same thing in Louisiana, I

20   guess.

21        MR. HUBBARD:  You have to find that the clause is

22   ambiguous before you would ever get to that.  And I guess you

23   would also have to find that it would be that a person,

24   notwithstanding all of that, would expect that a flood, you know,

25   we all, that flood would be covered when they got flood exclusion

1   in their policy.  I don't see how you could ever get there.

2          THE COURT:  Now, let me ask you this:  An airplane the

3   hits a reservoir near a house, flood, coverage?

4          MR. HUBBARD:  No.

5          THE COURT:  You don't think it's a reasonable

6   expectation that if some yo-yo that crashes his airplane right

7   next to me at my house and it's a reservoir that that's not a

8   third-party negligence covered under an all-risk policy?

9          MR. HUBBARD:  That is not the law in Louisiana.  It is

10  the law perhaps in West Virginia.

11         THE COURT:  Why is it not a law in Louisiana?

12         MR. HUBBARD:  Because we are not a reasonable

13  expectation state.

14         THE COURT:  I disagree with you, sir.

15         MR. HUBBARD:  Only if it's been found to be ambiguous

16  and --

17         THE COURT:  That's exactly what the West Virginia court

18  held.  I'm saying, what's not ambiguous about a flood is the

19  flood clause doesn't say, caused by acts of man.  It just says

20  flood.  It doesn't really say -- you can easily write in, easily

21  write in flood caused by any, in some of the clauses, by any

22  definition.  They even have where that State Farm clause in the

23  West Virginia case where they used external and they found that

24  ambiguous, right or wrong.  That doesn't mean I'm going to do

25  that.

 1          MR. HUBBARD:  Here is the answer to your question,

 2     Judge.  Actual facts in the City of New Orleans, there was a

 3     levee break that was, nobody knows but there has been a lot of

 4     speculation about what caused it.  Negligence in design,

 5     negligence in construction, all different kinds of human error

 6     perhaps, and certainly it broke, and it wasn't built to break.

 7     It led to water inundating the City of New Orleans.  What do

 8     people call it?  They call it a flood.  What does the policy say?

 9     Flood.  That's not ambiguous.

10          THE COURT:  Mr. Hubbard, in the West Virginia case, they

11     said this is a landslide.  Landslides are excluded.  They said

12     the landslide clause was ambiguous because it was not clear

13     whether it applied to natural landslides or man-caused

14     landslides.

15          This same analogy precisely could be made here from an

16     intellectually honest standpoint.  So I'm not saying they're

17     right, but that's what they held.

18          MR. HUBBARD:  But I think that what was driving their

19     decision is the fact --

20          THE COURT:  You're going back to the reasonable

21     expectation --

22          MR. HUBBARD:  Right.

23          THE COURT:  -- which is a good argument.

24          MR. HUBBARD:  Because the Court there says that the

25     reasonable expectations doctrine in West Virginia is that the

1   objectively reasonable expectations of applicants and intended

2   beneficiaries regarding the terms of insurance contracts will be

3   honored even though painstaking study of the policy provisions

4   would have negated those expectations.  That's not the law in

5   Louisiana.  You've got to read, you're responsible for having

6   read your policy and knowing what's in your policy.

7        THE COURT:  They did say though, they held, let me read

8   from the West Virginia case footnote 12.

9        "Before the doctrine of reasonable expectations is

10  applicable to an insurance contract, there must be an ambiguity

11  regarding the terms of the contract."

12       And if I find that there is an ambiguity in this

13  contract, then I would go to the reasonable expectation.  Let's

14  assume I would find.  And understand that merely because I'm

15  going through all of this exercise, please don't anybody think

16  that I'm leaning one way or the other.  I am simply having a

17  dialogue.

18       MR. HUBBARD:  I understand.

19       THE COURT:  So if I find there is an ambiguity, you say,

20  Okay, Judge, let's say I find an ambiguity and I might find a

21  reasonable expectation if a plane hits the reservoir but not if

22  the levee breaks.  It conceivable that I could find that in

23  New Orleans.  It's conceivable it could be fact intensive.  But I

24  have to find an ambiguity before I even get to reasonable

25  expectations in Louisiana, West Virginia, et cetera.  And the

 1    ambiguity they found in West Virginia was that the landslide,

 2    which they said was a landslide, just like I'm thinking this was

 3    a flood, it wasn't clear whether it applied to man-made or

 4    naturally occurring landslide.

 5          MR. HUBBARD:  Well, if the definition of a flood

 6    includes breaking levee walls, I don't see how it would be

 7    ambiguous.

 8          THE COURT:  Definition of flood just means there is

 9    water, this is a flood.  But that doesn't mean it excludes

10    necessarily floods caused by third-party negligence.

11          MR. HUBBARD:  Well --

12          THE COURT:  Necessarily unless it says so.

13          MR. HUBBARD:  But the way that term is used by people in

14    the State of Louisiana and in the City of New Orleans includes

15    floods that are caused by third-party negligence like this one.

16    And so, therefore, I don't think that --

17          THE COURT:  Well, I don't know how many times we had an

18    airplane hit the levee.  Let me ask you just a few others:  A car

19    hits an exposed water main during construction right near my

20    house, a big wreck and water gets into my house.  Coverage?

21          MR. HUBBARD:  What caused the water to get in?  I am

22    sorry.

23          THE COURT:  A car, a drunk driver, it's a water main

24    exposed.  They are working on it and it goes into the hole,

25    cracks it and water floods into my house.  An unlikely scenario.

1          MR. HUBBARD:  That's excluded by water damage, Judge.

2          THE COURT:  Do you think a reasonable homeowner would

3     expect that, living in New Orleans or Montana or Canada or

4     anywhere else?

5          MR. HUBBARD:  I think if they read their policy, it

6     would.

7          THE COURT:  If they read it and had the team that you

8     have, maybe.  And I bet you I can confuse them.

9          A tornado knocks over a water tower near a home.  I

10    guess the same thing, right?  A tornado knocks over a water

11    tower.  And the water tower, the tornado doesn't damage me but

12    the water tower, because it floods, it floods my house with a big

13    wind.

14         MR. HUBBARD:  That's correct.

15         THE COURT:  No coverage, right.

16         MR. HUBBARD:  That's correct.

17         THE COURT:  Vandals destroy an above-ground swimming

18    pool in my backyard.  Floods my kitchen.  Coverage?

19         MR. HUBBARD:  That's precisely what happened in a levee

20    break.  A vandal removed sandbags in another state and the court

21    there held that there was no coverage.

22         THE COURT:  Do you think that the average homeowner

23    doesn't have a reasonable expectation to think that if a vandal

24    breaks or destroys his above-ground swimming pool and it floods

25    his house, he's not covered?  It's an all-risk policy, for

1   goodness sake.  Is that what flood means?

2           MR. HUBBARD:  Well, if you approach it from that

3   perspective, but if you read the policy language, that person, it

4   says it excludes water damage.

5           THE COURT:  I don't think so.  Does it say it excludes

6   water damage caused by third-party negligence?  No.

7           MR. HUBBARD:  No.  It says all water damage.

8           THE COURT:  Is it a reasonable expectation flood caused

9   by nature?  Isn't that a reasonable, couldn't a reasonable person

10  believe that?  It doesn't say third-party negligence.  It doesn't

11  say caused by man.  It easily could.  Look at the Hartford policy

12  you so eloquently wrote about.

13          MR. HUBBARD:  All of the cases in the United States that

14  have addressed that type of other kinds of negligence have

15  concluded that the flood exclusion applies.

16          THE COURT:  No, not at all of them.

17          MR. HUBBARD:  When dealing with the flood exclusion to

18  the best of my knowledge, where you have --

19          THE COURT:  What's the difference between a landslide

20  and a flood?  It's the same principal.  You just happen to have

21  more landslides in the west than floods.

22          MR. HUBBARD:  Right.  Well, I can tell you look, the

23  West Virginia case is out there.  You have something to add about

24  the West Virginia case, it's certainly a minority view.

25          THE COURT:  That I understand.

1          MR. GOLDMAN:  If I may, Your Honor, I apologize for

2     interrupting, but I think that what West Virginia is saying

3     that's different from Louisiana is they are using the same label,

4     reasonable expectations, but when you look at what the courts in

5     West Virginia say reasonable expectations means and when you look

6     at what the Louisiana courts say reasonable expectations means,

7     you're using the same label for two very, very different

8     concepts.  Because what West Virginia is saying, when you look at

9     it, and you look at not only the *Murray* case but the cases on

10    which it relies, once you find, there is something that is in the

11    policy that the average policyholder wouldn't expect to be there.

12    And that's the quote that Mr. Hubbard read to you, that even

13    though painstaking study of the policy provisions would have

14    negated these expectations, we're not going to, we're not going

15    to defer to that painstaking reading, we're going to say, Would

16    the average guy on the street expect the policy to say this,

17    regardless what the policy actually says.  That's West Virginia.

18          Louisiana, though, using the same label, reasonable

19    expectations of parties, talks about something very different.

20    In Louisiana, the courts say that we do look to the policy, and

21    if the policy says it's not covered, regardless of whether the

22    average guy on the street would expect the policy to say it's not

23    covered, then we will enforce the policy terms.

24          THE COURT:  Of course you have to find an ambiguity in

25    both Louisiana and West Virginia.  I'm reading from a Supreme

1    Court Louisiana case.  "The reasonable expectation doctrine can

2    be capsulized as follows:  The courts will protect the insured's

3    reasonable expectations regarding the coverage afforded by

4    insurance contracts even though a careful examination of that

5    policy provision indicates that such expectations of the contract

6    are the expressed intent of the insured."

7              That's quoted in *Louisiana Insurance Guarantee*

8    *Association v Green*, and it is a, that is a, I'm sorry, that is

9    a, I think, a, I just looked at these recently, the Supreme

10   Court.  It is the Supreme Court.

11             MR. HUBBARD:  I guess before we move on, I will tell you

12   that in the State of Louisiana, there are flood policies

13   available that will cover every single one of those scenarios

14   that you have just spelled out, if I'm not mistaken.  That

15   coverage is available for someone to buy from the federal

16   government.

17             THE COURT:  You mean under the NFIP?

18             MR. HUBBARD:  That's correct.

19             THE COURT:  Are you saying the NFIP would cover any type

20   of flood, whether it's man-made or not?  Obviously, when a plane

21   hits a water tower, that kind of thing?

22             MR. HUBBARD:  In fact, in this case, in this situation,

23   there are allegations of all kinds of negligence and the federal

24   government has paid, according to the newspaper, millions upon

25   millions of dollars on flood.

1          THE COURT:  Is there a policy argument that some time I

2     am going to ask the plaintiffs about.  I intend to ask them a few

3     questions as well, but I understand your point.

4          MR. HUBBARD:  I can certainly tell you from a reasonable

5     expectations point, if I bought a flood policy from the federal

6     government and the flood policy didn't pay when my house went

7     under water, I would, that would affect my reasonable

8     expectations.

9          THE COURT:  One of the things that concerns me is that

10    the definition of flood does not specify whether it is a flood

11    caused by negligence or not.  I'm simplifying it.  I understand

12    your arguments there.

13         MR. GOLDMAN:  Your Honor, the issue about ambiguity,

14    before we go on beyond the reasonable expectations issue, is and

15    this is some boilerplate black-letter law but it's probably

16    helpful to keep in mind, I know Your Honor is well aware of it

17    that, you know, in order to be ambiguous, a policy provision has

18    to be susceptible to more than one reasonable interpretation.

19         THE COURT:  Absolutely.

20         MR. GOLDMAN:  Then the question becomes, if it is

21    susceptible to more than one reasonable interpretation, which

22    reasonable interpretation does the Court apply?  And then of

23    course, the next step is, well, if in the absence of evidence,

24    the Court construes the language against the drafter.  Now, here

25    the question that the plaintiffs haven't answered and the amicus

1  hasn't answered, is what is the reasonable interpretation in the

2  policy language that would give rise to coverage?

3        THE COURT:  And Counsel, to be fair to you, these cases

4  are not in anybody's brief.  These cases, and this whole concept

5  were, I'm talking about the West Virginia line and the

6  Washington, were, and they are minority, I understand that.

7  These cases were foisted upon you by the Court.  So, I am

8  familiar with that.  Let me ask you a case, though, about a case,

9  and it's not directly analogous but is there an analogy to be

10 drawn?  And all the litigation on the pollution exclusion that

11 ultimately ended up the Supreme Court talked about it in *Doerr v*

12 *Mobil,* which I know you're familiar with, Mr. Hubbard.  You've

13 been very familiar with everything I've asked about, 774 72d 119,

14 and I'm just going to read you a little bit from it.

15        "In this case, the total pollution exclusion

16 purportedly excludes coverage for any injury that 'would not have

17 occurred in whole or in part but for the actual, alleged or

18 threatened discharge, dispersal, seepage, migration, release or

19 escape' of any 'solid, liquid, gaseous, or thermal irritant or

20 contaminant' at any time.  As written, the exclusion can be read

21 to exclude coverage for anything from the release of chlorine

22 gases by a conglomerate chemical plant to the release of carbon

23 monoxide from a small business owner's delivery truck.  It could

24 be read to exclude injuries resulting from a slip and fall on an

25 oil-slicked beach to a slip and fall on spilled gasoline at a

1    corner service station."

2          "Without some limiting principal, the pollution

3    exclusion clause would ... lead to some absurd results.  To take

4    but two examples, reading the clause broadly would bar coverage

5    for bodily injuries suffered by one who slips and falls on the

6    spilled contents of a bottle of Drano," et cetera.

7          So the Court did not apply a literal reading of the

8    pollution exclusion.  And one of my concerns is, a literal

9    reading of the anticoncurrent clause without a definition of the

10   term loss, simply implied, could mean that one could argue that

11   virtually anything is excluded that is even mildly concurrent.

12   It's just a concern I have.  You may want to, if you want to

13   comment on it, that's fine.

14         MR. HUBBARD:  Well, I guess I would have to go back and

15   say that, you know, I didn't agree with the *Doerr* decision,

16   because I don't think that they read, I would have read the

17   pollution exclusion in a more limited way and slipping on an oil

18   slick is like slipping on anything that's slippery.  And the fact

19   that it's a chemical or contaminant would not allow one to invoke

20   the pollution exclusion.  The Court is the Court.  They reached a

21   different result.  But that whole, the whole thrust of that

22   exclusion is that there has to be a polluting quality of the

23   subject in mind.  And so, if you, if you run away with some of

24   these things, and I think they did in that case, you can go

25   beyond what was ever intended.  But I think it's really kind of

1   an unfair twisting and expansion of the words.  And I would

2   respectfully suggest that with the anticoncurrent cause language,

3   it is there for a finite and specific reason.  It's talking about

4   eliminating the possibility where you have water damage that you

5   have to deal with outside negligence or whatever the causation of

6   it is in that particular chain.  And it's not there to, I mean, I

7   see, I see, you know, the wind, this very storm is a great

8   example.  It's really, it's not always easy.  And when it's

9   difficult, the insurance company loses, I think, when you can't

10  tell because of the burden of proof issues.  But you can tell the

11  difference between wind damage and, I mean, there are numerous

12  people that are being paid because their roof was blown off and

13  the rain came into the second floor.  And they're paid for all of

14  that.  It can be very substantial sums of money, millions in the

15  case of commercial buildings downtown.  Many millions and yet

16  they are not being paid for the flood damage, which is a

17  completely separate cause of loss for which they could have

18  purchased flood insurance.

19          THE COURT:  Keeping in mind the fact that I am well

20  aware that the West Virginia case, although thorough, is a

21  minority view.  And I'm trying to make a guess as to what the

22  Louisiana Supreme Court will do.  As in the instant case, where

23  third-party negligence is alleged to be the proximate cause of a

24  loss, which we have here, there is an allegation.  It doesn't

25  mean anything other than there is an allegation.  "Do you believe

1  a policyholder could reasonably expect to be covered under

2  State Farm's policy?"

3          "Only through a painstaking review of the lengthy

4  "Losses Not Included" section would a policyholder discover the

5  language suggesting that, because the negligence occurred in

6  conjunction with an excluded event, the loss would not be

7  covered."

8          "The insureds with all-risk policies likely have

9  heightened expectations because of the comprehensive nature of

10  the coverage and the greater premium rates.  These expectations

11  would not often be given effect if the coverage was denied

12  whenever an exception or exclusion contributed to the loss.  An

13  example of overbreadth of State Farm's position is suggested by

14  the Court in *Wyatt v Northwestern of Seattle*, 304 F.Supp 781, 783

15  (1969), which stated, 'It seems hard to contend that the

16  insurance policy meant to exclude all earth movements where it is

17  difficult to distinguish between a situation where a piece of

18  heavy equipment breaks loose and hits a house causing serious

19  damage and a situation where that equipment instead hits only an

20  embankment next to a house but causes the earth to move and

21  thereby damages the house.  Certainly not all earth movements, or

22  at least those where some human action causes such, are included

23  in the exclusion.'"

24          I could go on, but that's what is driving that case and

25  I'm wondering, it seems like there is some parallel here,

1   especially in some of the examples I gave, you may say, Well, a
2   levee is different than, you say, you've been consistent.
3   Whenever water goes in the house, it's not covered, period.  No
4   matter how it got there.  Whether it's a swimming pool, vandals,
5   a tornado, a water tower, an airplane or a levee break.  I'm
6   wondering where in the policy does it clearly state, you made
7   your argument here, which is a good one, that you started out
8   with, but where does it clearly state that flood caused by any
9   source?

10          We know what a flood is.  They knew what a landslide
11  was.  Flood, landslide.  They agreed that the rock quarry issue,
12  unlike the circuit court, was in fact a landslide under the
13  policy, but they said, What kind of landslide?  Was it one caused
14  by a third-party negligence or one that was just a natural
15  occurrence?  Clearly the naturally occurring is excluded.  So we
16  know what a flood is.  But is it clear in the policy that a flood
17  caused by negligence, not by nature, is excluded by just looking
18  at the flood exclusion?

19          MR. HUBBARD:  Well, and that all goes back to what's the
20  real definition of the word flood.  Is the definition of flood
21  when water inundates land that is not ordinarily covered and
22  there is no intervening negligence?

23          THE COURT:  No, you're missing the point because they
24  said it was a landslide.  They agreed the definition was it was a
25  landslide, but there is not necessarily exclusion of, we don't

 1  know.  It's ambiguous.  Why not say flood caused by any, whether

 2  by negligence, like Hartford did.  That's a lot clearer.  It

 3  makes life a lot easier for judges.

 4       MR. HUBBARD:  I don't think I could shoehorn the West

 5  Virginia court into my interpretation of this policy.  They have

 6  a different point of view, and I think they're wrong.

 7       THE COURT:  I understand that and your point is a lot of

 8  other courts don't agree and I'm trying to determine if they are

 9  right or not by testing whether this policy is ambiguous or not.

10  Then, if I do find it is, I get into reasonable expectations.

11  But you tell me, Judge, forget all of that, go to what I showed

12  you in the beginning of the argument.  And we went.

13       MR. HUBBARD:  That's exactly right, and I'll take --

14       THE COURT:  And I'll let the plaintiffs respond to that,

15  not only in briefing, but I'm going to get a little more briefing

16  on this because I don't think that was, frankly, you got me a

17  little bit here because I didn't focus on that, to be frank with

18  you.  But you make a good argument.

19       MR. HUBBARD:  And I'll tell you, if you, with going back

20  to the reasonable expectations aspect, when I started hunting and

21  pecking through the cases that you were worried about and I

22  turned to Washington State, which is another unusual state --

23       THE COURT:  An outlier as you would say.

24       MR. HUBBARD:  Yes, but even their cases there back in

25  the '80s have been severely questioned by this *Kisch* case and

1   *Findlay*, which are of more recent vintage and in *Kisch*, where

2   there was actually a flood, the Court says that in, this is

3   Washington Supreme Court talking, "Application of the efficient

4   proximate cause rule would circumvent the intentions and

5   expectations of the parties in this case.  Plaintiffs live on a

6   nationally recognized floodplain.  The fact that their particular

7   houses are located on parcels usually not flooded does not

8   detract from this fact.  They knew that flood would be excluded

9   by any insurance policy they purchased as exemplified by the

10  existence of the National Flood Insurance Program, of which the

11  plaintiffs' county was a part."

12          I mean, this is --

13          THE COURT:  I think that's a very good argument, I must

14  say.  And I'm going to be giving the plaintiffs a little bit of a

15  signal.  There is a national flood program that does cover

16  floods, whether one chooses to enter it or not.  And so, from a

17  policy standpoint and from an overall expectations standpoint, I

18  understand your argument, and I'm not going to quibble with you

19  about that.  I think it's an argument that plaintiffs are going

20  to have to talk about and tell me why you're not right.

21          MR. HUBBARD:  Right.  And I guess another thing, if I

22  could move on to, not a different subject, but to hone in on what

23  the Court is thinking, the Court is asking itself whether under

24  these circumstances there should be a declaration in making an

25  eerie guess that Louisiana is an efficient proximate cause state

1  and that Louisiana is such an efficient proximate cause state

2  that it would follow like the West Virginia view, so that

3  efficient proximate cause would trump the language.

4       THE COURT:  I am sorry to interrupt you.  You were

5  talking about whether Louisiana is such an efficient proximate

6  cause state that?  Go ahead.

7       MR. HUBBARD:  That you would trump the anticoncurrent

8  cause language or declare it to be null and void in the policy.

9  Of course, I guess my first comment on that is I think that flood

10 was the efficient proximate cause anyway, and the Court could

11 easily reach the same determination in my favor without the,

12 without necessarily having the anticoncurrent cause language.

13      But before we get to that, I mean, it just seems to me

14 that what the Court has asked itself for this eerie guess is,

15 we're in an unusual state.  You know, we're civilians here, and I

16 guess I would, I think it's important that the source of law here

17 is code.  You know, the source of law here is *Code Civil* and

18 *Las Siete Partidas*.

19      THE COURT:  I, being an LSU graduate, have learned to

20 love the Code.

21      MR. HUBBARD:  Jurisprudence constant.

22      As a result of the coalescence of all of those

23 forces, which I think are important to us here today, you have

24 provisions which, like in the civil code that say that

25 legislation is the, that law is the solemn expression of

1  legislative will.  And that in terms of public policy, because

2  you're talking about a public policy position here that you're

3  testing, in terms of public policy, the source of public policy

4  is the Legislature typically and not the Courts.  And as was said

5  in *Rapp v the City of New Orleans*, Fourth Circuit, the

6  implication of public policy by the Court is not appropriate in

7  those areas where the Legislature has expressed its will.  In a

8  representative democracy, acts of the Legislature are the

9  embodiment of public policy.  And of course, here I would say

10 that the legislative act that we're dealing with is Title 22,

11 section 620(a), in the insurance code, yet another one of our

12 codes where we go for the source of all of our law, it provides

13 that an insurer may insert in its policy any provision or

14 condition not prohibited by any other provision of the code.

15        And, I guess, one final gloss on that, which I find to

16 be interesting, when this type of subject came up, I reminisced

17 about what case, what bills had been introduced in the

18 Legislature this year.  And as you may know, Senate bill 510 --

19        THE COURT:  Hold on one second.  We may need a citation.

20 Go ahead.

21        MR. HUBBARD:  I make this point to show that the

22 Legislature is not unaware of what its possibilities and perhaps

23 responsibilities are because here is a bill, Senate bill 510,

24 which died on the Senate floor, which was an attempt, in my

25 opinion, to eliminate or to consider the elimination of

1    anticoncurrent cause type of language.   It says that the policy

2    won't contain any provision which could be construed to deny

3    coverage, basically, with respect to damages caused by covered

4    peril on the basis that any of the damages to the property was

5    caused by a noncovered peril or a combination of a covered and

6    noncovered peril.

7          Now, that bill, it could have been enacted into law,

8    they could have amended in it any way, shape or form that they

9    saw fit, and it died on the Senate floor.   But that is, that's

10   where we look.   And there is no, there is no statute in the State

11   of Louisiana that suggests that you can't have anticoncurrent

12   clause language.   And if you look, if you look at all of the

13   cases outside of the State of Louisiana, and I think the Court's

14   admitted that this is a minority view that's troubling it, I'm

15   not saying you shouldn't, you know, you've got to look at the

16   minority as well as the majority sometimes, but here we have so

17   many, you know, 17 different courts, which are U.S. Courts of

18   Appeal, United States District Courts and numerous state courts.

19   And the way, when they deal with this anticoncurrent cause

20   language, case after case, because it's not something that they

21   are giving with the back of their hand.   Let me give you one or

22   two quotes.   I'm not going to bore you with this.

23         In the *TNT* case, which was a levee that broke as a

24   result of vandalism, the Court held that, "The plain meaning of

25   the exclusionary language was to directly address and contract

 1   out of the efficient proximate cause doctrine and exclude

 2   coverage for losses caused by water, regardless of the existence

 3   of any other contributing cause in any sequence."

 4         And there are 17 of these cases, all of which, I mean,

 5   the courts are facing this directly head on.  They are saying

 6   there is an efficient proximate cause doctrine that some courts

 7   would use to undermine these exclusions.  And the insurance

 8   company has the right to contract out of that.  The Louisiana

 9   insurance code says that the insurance company has the right to

10   contract out of that.  These policies had to be submitted to the

11   Department of Insurance for their review for reasonability,

12   fairness and so forth.  And they've all passed that muster.  None

13   of these have been called into question by the Department of

14   Insurance, which is another governmental body that serves kind of

15   a public policy purpose that the Court is talking about.  So, you

16   have to ask yourself, would it be appropriate under all of these

17   facts and circumstances, with the source of law being the

18   Legislature, with the Legislature having an opportunity to act on

19   this and choosing specifically not to, would it be appropriate,

20   would the Louisiana Supreme Court, you know, try to inject itself

21   into this fray outside of the scope of what the Legislature is

22   doing?  And then, with that in mind, you also have to consider

23   the *Sweeney and Prytania Park* case.  I think *Sweeney* is very

24   helpful because those are two Louisiana cases that look at the

25   anticoncurrent cause language and found it to be clear and

1    unambiguous on some, you know, perhaps some unusual facts.  I

2    don't know what the parties' expectations were, but in the

3    *Sweeney* case, which is 584 So.2nd 1248, it's a Second Circuit

4    decision in 1991, and it had to do with the ordinance or law

5    exclusion.  But there, they sent the notice to the wrong, you

6    remember the case, sent the notice to the wrong home, and the

7    poor woman's home was destroyed without any notice to her by

8    accident, basically.  And so she said, well, there was negligence

9    involved here.  It wasn't, it wasn't just an action of the City

10   here that had my house knocked down, but it was negligence

11   involved as well.  And the Court acknowledged that Mrs. Sweeney

12   did not receive notice that her property was being demolished and

13   she might have a claim against the City as a result of it.

14           But here is the bottom line.  "However, the exclusion

15   provides that any loss directly or indirectly resulting from

16   enforcement of an ordinance is excluded, regardless of any

17   contributing causes.  It may be true that the negligence of the

18   City employees resulted in Mrs. Sweeney not getting notice and

19   that this negligence contributed to the demolition of the house.

20   However, the exclusion by its own terms still applies."

21           Now, that's, that's the best case that we've got in

22   Louisiana to give guidance to this Court.  It's certainly

23   persuasive authority as to where the actual State of Louisiana is

24   right now on this subject.

25           THE COURT:  Mr. Hubbard, you've made a very excellent

1    argument about this.  My quest is going to be to determine not

2    too much whether it's truly against public policy, but whether it

3    is, in fact, in fact ends up like the pollution exclusion or

4    whether it swallows the whole or whether it's so, read literally,

5    not, that this eviscerates, other portions of the policy any

6    ambiguity.  And those are the things that I'm going to have to

7    talk about, but you certainly covered all of that.  And I just

8    want to point out one thing for the record.  I'm reading from the

9    law and practice of insurance coverage litigation database

10   updated 2006, this is chapter 52, section 36, and it says, "A

11   number of the states which have adopted the efficient proximate

12   cause doctrine have not had occasion to consider the

13   enforceability of the anticoncurrent language."

14        And they mention a bunch:  Connecticut, Delaware,

15   Columbia, District of Columbia, Georgia, Hawaii, Idaho, Illinois,

16   Iowa, Kentucky, Louisiana, Mississippi, Nebraska, Nevada, New

17   Hampshire, New Jersey, Oklahoma, Oregon, Pennsylvania, Puerto

18   Rico, South Carolina, South Dakota, Tennessee.

19        I find this interesting.  But you can get into these

20   sort of esoteric terms as to efficient proximate cause.  There is

21   a federal case out of Illinois, 2000 West Law 1222155, indicating

22   that, "Illinois does not appear to use this doctrine" [the

23   efficient proximate cause doctrine], and holding that "where a

24   policy expressly insured against loss coverage caused by one

25   risk, it excludes loss covered by another risk, coverage is

 1    extended to a loss caused by the insured risk even though the

 2    excluded risk is a contributory cause."

 3              That is a nonefficient proximate cause state.

 4    Apparently Illinois is, according to this.  I am not going into

 5    any depth, but I think we've covered the waterfront pretty well

 6    unless there is something else you want to state.

 7              MR. HUBBARD:  One quick point, Judge, and I appreciate

 8    your time and patience, and I look forward to another opportunity

 9    to speak to you again before we leave today.  And as soon as

10    Mr. Goldman is done, I think Mr. Lee would probably take the

11    stand.

12              MR. GOLDMAN:  Your Honor, just one quick thing to point

13    out with regard to Your Honor's concern as to whether the

14    anticoncurrent cause language somehow swallows all of the

15    possibilities of coverage.  And that is that there are a number

16    of exclusions in the policy, and not all of them have that

17    anticoncurrent cause preamble.  The Court in West Virginia, in

18    fact talked about, Gee, if we enforce this language, nothing

19    would ever be covered.  But when we looked at the, when we looked

20    at the coverage, the first, coverage A, we see the first set of

21    the three sets of exclusions, and that, when you're not, however,

22    insure for a loss, and see here, there is no way affecting

23    concurrent cause language applying to all these exclusions:

24    Freezing, thawing, it goes on, quickly, vandalism, malicious

25    mischief, wear, tear, inherent advice.  A long list of

1    exclusions, none of which the anticoncurrent cause provision

2    applies to.  And then the last section is, except as under

3    section I exclusions.  And those are, there is an additional list

4    that's item 3 of exclusions.  Then we go to the section I

5    exclusions, which we haven't focused on, and that's where the

6    flood exclusion applies with the anticoncurrent cause language.

7    "Such loss is excluded regardless of any other cause," and that

8    includes a very limited number of exclusions.  This is not all

9    the exclusions.

10         THE COURT:  Well, I have them all here.  I think it's

11   the ordinance of law, earth movement, flood, power failure,

12   neglect, war, a nuclear problem or intentional acts.

13         MR. GOLDMAN:  Right.  And then we go further, which we

14   looked at very briefly, in the beginning of the argument to this

15   third set of exclusions, which, and the only reason the third set

16   is separately set from the first set is that that has this

17   ensuing loss provision that we had talked about.  But the only

18   reason I brought this up is there seems to be, in, at least in

19   the West Virginia case some concern, Gee, it's kind of an

20   assumption that this was in every exclusion so nothing could ever

21   be covered but that's not the case here the --

22         THE COURT:  I understand that.  Thank you very much.

23         MR. GOLDMAN:  Thank you.

24         THE COURT:  Mr. Lee.

25         Your policy is the very policy, and we don't have to go

1  over it, your policy, at least the clause that the West Virginia

2  court talked about.

3        MR. LEE:  Yes, Your Honor, thank you for the opportunity

4  to be heard.  I've been listening patiently and squirming in my

5  chair and wishing I could answer some of the questions as they

6  were posed, but I understand.

7        I think, Your Honor, we start with the basic

8  proposition that is clear under Louisiana law that the rule of

9  strict construction, when you're dealing with exclusions does not

10  authorize a perversion of language or the exercise of inventive

11  powers for the purpose of creating an ambiguity where none

12  exists.

13        And I believe, Your Honor, that there isn't an

14  ambiguity in the policy that we're talking about here.  Now,

15  Your Honor, and I think it's important that we are talking about

16  the State Farm insurance exclusion, that you do not lose sight of

17  the first sentence:  "We do not insure under any coverage for any

18  loss which would not have occurred in the absence of one or more

19  of the following excluded events:  Water damage," meaning flood,

20  "surface water, waves, tidal water, overflow a body of water or

21  spray from any of these, all whether driven by wind or not."

22        So if the damage would not have occurred absent this

23  category, and I've just kind of generally referred to that

24  category as flood because we've got the list there, Your Honor,

25  then that's the exclusion.  That's the part that's excluded and

1   not the other stuff that might have happened as well to the

2   premises, to the insured premises.

3           Now, flood, we've cited the cases that say that a flood

4   is the inundation of water on a surface that is not, where it

5   would it would not ordinarily be.  We've cited the cases that

6   have also said that the breach of a dam is also, is a flood.  And

7   has enforced exclusions, even where they have had situations

8   where the plaintiff has claimed that the damage was broken by

9   negligence of a party.

10          Surface water, this clearly is water that was surface

11  water.  It is clearly tidal water.  Lake Pontchartrain, the MRGO,

12  the water from the Gulf are all subject to tidal ties and it was

13  the water that came into the City of New Orleans.  Overflow of a

14  body of water.  We've talked about whether or not there is a,

15  whether this is a situation where you talked about man-made

16  causes or other causes, you know, Your Honor, this is water that

17  is, in some places overtopped and other places it broke through.

18  And to draw a distinction between overtopping and breaking --

19          THE COURT:  I know that the West Virginia court dealing

20  with this specific cause said, "Examining the exclusionary terms

21  used by All-State and State Farm in the context of applying the

22  rule that ambiguities must be resolved in favor of the insured,

23  we conclude that both earth movement exclusions must be read to

24  refer to phenomenon resulting from natural rather than man-made

25  sources," and they had the word external in there as well.

1    That's what they had.

2         MR. LEE:  I understand, Your Honor, and what they said

3    was we're looking at the list of the descriptions there and they

4    focused on volcanic and that.  So, you really can't compare this

5    language with the others, I don't think, Your Honor, when you

6    talk about water damage of any type.

7         THE COURT:  I think it's the same exact language in the

8    policy.

9         MR. LEE:  There weren't, no, they weren't talking about

10   water damage in that instant.

11        THE COURT:  I know, but it's the same concept.  It is in

12   the same portion, earth movement is in the same portion of the

13   policy exclusions that water damage is.  They said, they found it

14   ambiguous because it did not limit itself, it did not define

15   whether it was -- right or wrong, I'm not saying they are right,

16   but that's what they said.  A natural or man-made, and I think

17   when I found that clause in here, it was the, it was the exact

18   clause that is in your policy or not.  I'm just saying, you can

19   tell me, that the, that the West Virginia case is wrong and this

20   is why it's wrong, but it is directly, except for the using the

21   word earth movement rather than flood, it's the same, it's the

22   same clause, at least it appears to me as such.

23        MR. LEE:  Your Honor, in my view, when it says there is

24   a flood and you say that this is a flood, that's the exclusion to

25   say that you are, well, man-made versus other kinds of flood or

1    the --

2         THE COURT:  You don't think a reasonable person thinks a

3    flood is when it rains and water gets high or when a lake comes

4    over or, you know, you think a person thinks a flood is when a

5    plane hits a reservoir or a water tower collapses and floods you?

6    Maybe it should be defined.

7         MR. LEE:  Let me put it this way, Your Honor, I think

8    we're talking about creative distinctions here that define an

9    ambiguity where none exists.  In the first place, one looks at

10   the overflow of a body of water.  I have no doubt what you will

11   hear from a creative plaintiff is, Well, yeah, it overtopped,

12   but, you know, that's a situation where, you know, they should

13   have designed it bigger.  And if you didn't design it bigger,

14   it's a negligent design of the levee, so therefore, it's a

15   negligence case, not another case.  You can always create the

16   exception, and that's why, Your Honor, you can't take it out of

17   context when it also has the language that I've highlighted here.

18   "We do not insure for such loss regardless of, A, the cause of

19   the excluded event."

20         That language is imminently clear.  The cause of

21   excluded event is not subject to confusion.  So if --

22         THE COURT:  Apparently the only, I'm going to read the

23   clause.  In West Virginia, "We do not insure under any coverage

24   for any loss that would not have occurred in the absence of one

25   or more of the following excluded events.  We do not insure for

 1   loss regardless of the cause of the excluded event or other

 2   causes of the loss whether the other cause is acted concurrently

 3   or in any sequence with the excluded event to produce the loss.

 4   Whether the event occurs suddenly or gradually, involves isolated

 5   or widespread damage, arises from natural or external forces, or

 6   occurs as a result of any combination of these." So it was the

 7   same clause.

 8           MR. LEE:  I understand, Your Honor, and as you said, I

 9   may disagree, and I do because to me, the words "regardless of

10   the cause of the excluded event" is --

11           THE COURT:  A flood is a flood is a flood --

12           MR. LEE:  But it also clarifies --

13           THE COURT:  -- to paraphrase Gertrude Stein.

14           MR. LEE:  The point, Your Honor, is if you didn't

15   understand it from the first part that I highlighted, by the

16   simple definition of the word flood, it is explaining that

17   regardless of the cause of the flood, regardless of the cause of

18   the flood, it is not covered.  It is not a covered loss.

19           The other parts of that provision are there to clarify,

20   really, Your Honor, it is kind of a belts and suspenders kind of

21   provision because of the creativeness of the arguments that

22   lawyers make all the time.  Because you have to question, someone

23   will come for sure along just like we said here, the intervenors,

24   look, it's driven by wind.  It's not really flood.  It's driven

25   by wind.  Okay, well, the cause isn't the issue.  Well, then it

 1    really wasn't, the flood, really, the flood was over, and then

 2    something else happened, so that caused it to be a damage.  And

 3    this does happen in Louisiana.  In New Orleans, Your Honor.

 4    You've got a flood.  A street floods, the waters are lapping at

 5    the porch, haven't gotten yet into the house, along comes a

 6    driver who creates a wash, and the wash goes into the house.  The

 7    sequence of those combination of events is what they are saying,

 8    regardless of how it happened, if it's water damage, if it's

 9    water that inundated a surface that would not ordinarily be

10    covered by water, it's excluded.

11            And that's the whole point of that definitional

12    section, that whole section right there.  So standing alone, it's

13    covering what the plaintiffs have, what, actually, it's covering

14    what the intervenors, the amicus lawyers have alleged because the

15    *Vanderbrook* plaintiffs have simply said we've got a breach of the

16    levee.  But any way you look at it, that provision covers,

17    provides the exclusion, whether you, whether it was, whatever the

18    source of the water, whatever pushed it there.  Now, Your Honor

19    raised the concern earlier about the term loss and whether that

20    created an ambiguity.

21            THE COURT:  Yes, I did.

22            MR. LEE:  And frankly, Your Honor, I don't think there

23    is any need for a definition of the term loss.  Let me give you,

24    loss is damage.  And let's take a situation where you've got a

25    house, wind comes along and blows the shingles off because of,

1   you know, it's a big wind and there's damage to the shingles.
2   There is no one in here that would argue about whether or not
3   that is a loss.  It is damage.  Now, change the scenario and you
4   have the wind that comes along, and it causes damage to the
5   shingles.  And then you also have a flood which gets into the
6   house and damages the house.  Whether the house is a total loss,
7   which is a sort of concept, or not, the damage to the shingles is
8   a loss.  It was a loss before the flood, and it's a loss after
9   the flood.  And so that damage is a loss.  It is part of what
10  you're looking at.  And in this policy, it is not a damage that
11  would not have occurred in the absence of, it would have occurred
12  in the absence of the flood, and it would be covered.

13          THE COURT:  Well, Judge Senter said in *Leonard*, "The
14  provisions of the Nationwide policy which purport to exclude
15  coverage of damages caused by a combination of the effects of
16  water and excluded loss, the damage caused by wind or covered
17  loss are ambiguous."

18          And then he said, I'm skipping because we have time
19  problems, the second provision reads to exclude "wind damage that
20  occurs at or near the time of the excluded water damage, the
21  result would be contrary to well-established Mississippi law.
22  This reading of the policy would make the wind protection for
23  those who live in areas where flooding is the greatest.
24  Nationwide seems to recognize this to be a reasonable
25  interpretation of its policy.  It does not invoke this policy to

 1   deny coverage -- everyone recognizes to be wind damage."

 2          But it implies, though, that the clause as written,

 3   could be, and he said it was ambiguous.

 4          MR. LEE:  We have a different clause here, Your Honor.

 5   I don't think the State Farm policy uses the same language as the

 6   Nationwide policy.  I don't think they have got the, do not

 7   insure --

 8          THE COURT:  It says --

 9          MR. LEE:  -- in the absence of the water damage.

10          THE COURT:  It says, "We do not cover loss to any

11   property resulting directly or indirectly to any of the

12   following.  Such loss is excluded regardless of any other cause

13   or event contributing concurrently in any way to cause the loss.

14   The loss, such a loss and the loss referred to in this paragraph

15   is," I'm sorry, looks like you didn't skip.  Because this goes

16   into the judge's opinion.

17          MR. LEE:  Your Honor, the language is a little bit

18   different.  Here, if you wouldn't have had the damage but for the

19   water, then --

20          THE COURT:  You couldn't say the loss is the loss being

21   claimed?  I'm claiming the loss of my house.  My loss.

22          MR. LEE:  And, Your Honor, if the damage would have

23   occurred in the absence of a flood and you can identify --

24          THE COURT:  I would say I have wind damage and I have

25   water damage but I can't separate it, what do I do?

1     MR. LEE:  Well, Your Honor, I can, to the extent, then

2 you have your issue of fact that you've got to try to develop,

3 but it's not a question of coverage.

4     THE COURT:  If I read that clause, you don't think that

5 you could argue that you don't cover at all?

6     MR. LEE:  No, Your Honor.  If you can identify --

7     THE COURT:  Where does it say that?

8     MR. LEE:  Well, Your Honor, what it says is, if it

9 wouldn't have occurred for, in the absence of the water and if

10 the water damage is in combination, yes, then it is excluded.

11 But if at the same time, but if on the other hand, you would have

12 had damage that, it's excluded if it would not have happened but

13 for the water damage.  If on the other hand, it would have been

14 damaged without the water damage, i.e., your scenario with the

15 wind coming and weakening your house --

16     THE COURT:  If it's a concurrent cause, the two combine,

17 then I have no coverage?

18     MR. LEE:  If the wind pushes there and causes, it causes

19 the --

20     THE COURT:  I've got wind damage, if the two combine,

21 combined to what?  How do you find out, how is that possible to

22 find out what did what?

23     MR. LEE:  What's what experts are about.

24     THE COURT:  I think it's more like a magician.

25     MR. LEE:  I can tell you, Your Honor, we've got a

1    situation in the tort case that we're handling up in the Western

2    District in which the engineer specifically found that the house

3    was a constructive total loss from the wind before the house, and

4    all there is is a slab left, and he determined that there was a

5    constructive total loss from the wind, and they've paid it.

6         You've got other situations where you have got the

7    house that's there, and the house may be blown off of its

8    foundation, and you can see that the, that the roof of the house

9    is virtually undamaged.

10        It becomes a question of, Your Honor, there will be,

11   there will be some situations that are difficult.

12        THE COURT:  I realize with this we're not talking about

13   wind damage.  I understand that.  We're talking about, we're

14   talking about, frankly, there is a covered peril, third-party

15   negligence is generally a covered peril unless otherwise

16   excluded.  Does, unless the, this is a flood.  Does this flood

17   clause clearly indicate unambiguously that, and you're making

18   that argument, that it applies to negligent as well as natural

19   acts?

20        MR. LEE:  Your Honor, when it says regardless of the

21   cause, yes, I think it does.  And regardless of, the combination.

22   And, Your Honor, the other part that you picked up on earlier,

23   and you started with, actually, in the argument, was the loss is

24   not insured provision, and this is the State Farm provision, and

25   it is, it does say at the beginning, it specifically refers back

1   to paragraph 2, which is the one we were just looking at, the

2   water damage exclusion.  And what it says, "We do not insure the

3   loss described in paragraphs 1 and 2 immediately above,

4   regardless of one or more of the following, directly or

5   indirectly cause, contribute or aggravate the loss."

6          That's when you get into, okay, you've got the design

7   specification, the alleged negligence and the maintenance,

8   construction or design of the levee.  That combined with the

9   flood is an exclusion.

10         Now, Your Honor, you talked about, you know, the

11  provisions that deal with the efficient proximate cause.  Well,

12  that only applies when the alleged cause, the proximate cause, is

13  indeed a covered cause.  When you've got a situation where it's

14  not, you know, it's like two wrongs don't make a right and two

15  exclusions don't make a covered.

16         THE COURT:  Was the cause the breach of the levee or

17  what happened as a result of the breach in the levee?

18         MR. LEE:  Well, that's the point, Your Honor.  It

19  doesn't matter because you've got two, the two exclusions work

20  together and when, you know, two exclusions don't make a

21  coverage.  And, Your Honor, the question about whether or not one

22  can override the other, whether the efficient proximate cause can

23  override the anticoncurrent clause provisions of the contract, or

24  other provisions of the contract, Louisiana's Supreme Court has

25  indicated that you don't, suggest that you don't do that.  I

1    mean, we cited in the brief, Your Honor, the

2    *Roach-Strayhan-Holland Post Number 20*, *American Legion Club Inc.*

3    *v Continental Insurance Company of New York*.  And they were

4    talking about wind versus other causes.  And they said, in there,

5    they said, "In order to recover upon a wind storm insurance

6    policy not otherwise limited or defined that the wind was the

7    proximate cause of the loss or damage notwithstanding other

8    factors, but upon a wind storm policy not otherwise limited or

9    defined."

10         What they're saying there is, you do have to go back

11   and look at the limitations.  You cannot leap to an efficient

12   proximate cause where you've got specific provisions in the

13   contract that address that.  And that decision was also, that

14   same point was made in the *Kemp v American Universal* case,

15   Your Honor, which is a Mississippi case but also cited the

16   Supreme Court's decision.  And as Mr. Hubbard has already talked

17   about, you know, in the *Sweeney* case, that is what they did.

18   They didn't engage in a proximate cause analysis to determine

19   whether or not, where the alleged negligence of the Government

20   was the cause of the failure to give the notice that led to

21   demolition of the house.

22         THE COURT:  Are you contending that Louisiana is not an

23   efficient proximate cause state?

24         MR. LEE:  No, what I'm saying, Your Honor, is that the

25   efficient proximate cause is a, is in effect the default when

1  there is nothing else in the contract that provides for a

2  specific provision.

3           THE COURT:  I understand.

4           MR. LEE:  And so, here we've got something specific that

5  tells you where to go and how to make the determination.  And it

6  is not a state that overrides that, the provisions of the

7  contract.

8  Now, I also refer the Court to the *Riche* case, *Riche versus State*

9  *Farm,* which is a First Circuit case in which that same language

10 which I just cited from the *Roach-Strayhan* case is cited, you

11 know, the point that you use this in the absence of some other

12 specific provision in the contract.  And what has been, and what

13 has been applied in Louisiana has been the enforcement of these

14 concurrent cause, anticoncurrent clause provisions.  That was

15 what was done both in the *Sweeney* case and in the *Prytania Hotel*.

16 Your Honor, I think the *Prytania Hotel* case was not a state court

17 case.  It is an Eastern District case, but the facts were a

18 situation where there was a fire, there was a repair that was

19 done on the premises, the repairs included an increased cost

20 because of municipal code that required them to add a sprinkler

21 system, and the Court had to deal with the fact that there was a

22 provision that said, well, we don't provide for codal ordinance

23 damages and not withstanding the order or the sequence, and they

24 said, Look, we understand that there was a fire which is a

25 covered event, but we've got a provision that says, you know,

1   we've got, that's an exclusion and it's got this limitation.  We

2   don't go to the efficient proximal, we don't have to engage in

3   analysis of which really led to the need for the sprinkler.

4          THE COURT:  We've got some time problems here because

5   I've got to give the plaintiffs equal time.  But you mentioned

6   *Roach-Strayhan-Holland Post Number 20, American Legion Club, Inc.*

7   *v Continental Insurance Company of New York*, is that the case?

8          MR. LEE:  Yes, Your Honor.

9          THE COURT:  And I'm reading from the 73 Defense Counsel

10  Journal 141, and it says, "If wind is the dominant and efficient

11  cause of loss, even if an uninsured peril contributes to the

12  loss, coverage will be afforded.  In *Roach*, the roof of the

13  insured building collapsed during a severe storm that involved

14  wind, rain, thunder and lightning.  The policy insured damage

15  caused by the windstorm.  The Louisiana Supreme Court found that

16  the policy covered any damage for which wind was the proximate or

17  efficient cause, even where another cause also contributed to the

18  loss.  The Court explained that in most cases, wind is not the

19  sole contributing factor to a loss, and a policy covering wind

20  losses must respond even when other factors contribute to the

21  loss."

22          At least that's how that case was characterized --

23          MR. LEE:  Yes, Your Honor, but there was no provision in

24  the contract, other provision in the contract that imposed any

25  other kind of limitation on the wind storm or the recovery.

1   There was no connecting, no exclusion that was brought into play.

2               The question there was, you had a boat on the water --

3               THE COURT:  That was in *Riche*?

4               MR. LEE:  *Riche*.

5               THE COURT:  I'm talking about *Roach*, not *Riche*.

6               MR. LEE:  Oh, yes, Your Honor.

7               THE COURT:  I think *Riche* is more distinguishable.  You

8   don't need to worry about it.

9               MR. LEE:  Again, Your Honor, there was no provision

10  in --

11              THE COURT:  *Roche* is before the anticoncurrent provision

12  became de rigueur; that is, popular.

13              MR. LEE:  Well, Your Honor, I'm not sure whether

14  de rigueur is --

15              THE COURT:  It came around because the insurance

16  companies were having to pay on concurrent losses, and they tried

17  to get out of it by having an anticoncurrent cause.

18              MR. LEE:  Yes, Your Honor.

19              THE COURT:  Anyone who has a concurrent clause, it's

20  excluded and you get nothing.

21              MR. LEE:  And we have cited in our Exhibit D at least

22  four pages of cases in which there is --

23              THE COURT:  And I have them.

24              MR. LEE:  And, Your Honor, we've got more since you

25  raised the question yesterday that we can provide to the Court,

1   and I won't bore the Court with giving you the citations.  But

2   there are more out there.

3           THE COURT:  All right.

4           MR. LEE:  So, Your Honor, I guess you're hinting at me

5   that --

6           THE COURT:  The plaintiffs do have a, they may want to

7   say something.

8           MR. LEE:  If you have questions for me, I will respond

9   to them.

10          THE COURT:  I do not, sir.  Thank you very much,

11  Mr. Lee.

12          MR. LEE:  Thank you.

13          MR. FAYARD:  Judge, could we have, like, 3 minutes?

14          THE COURT:  That's probably a good idea.

15          MR. SADLER:  Your Honor, we did have the Hartford

16  exclusion.  Are we going to do that after the break?

17          THE COURT:  I'm going to let, we got, how long are you

18  going to take, sir?

19          MR. SADLER:  Two minutes.  One minute.

20          THE COURT:  That's all you need.

21                      (Recess)

22          DEPUTY CLERK:  Court is in session.  Please be seated.

23          THE COURT:  Okay.

24          MR. SADLER:  May it please the Court.  Marty Sadler,

25  representing Hartford Insurance Company of the Midwest.  The

1   Hartford policy covering the Cappella estate claims inside of the

2   *Vanderbrook* pleading is also an ISO policy, and we certainly

3   adopt and agree with all of the arguments that have been made on

4   the water damage claims.  We believe that the claims of the

5   Cappella estate are completely excluded by the water damage

6   exclusion in this case.

7          The reason I'm speaking is that the Cappella estate

8   policy is also contains a separate endorsement called the H-380.

9   The amended endorsement specifically excepted perils.  This

10  endorsement explicitly excepted from coverage any damage directly

11  caused by two aspects:  First the acts, errors and omissions

12  exclusion.  That exclusion exempts from coverage negligent

13  design, specifications, workmanship, repair, construction or

14  maintenance of, and it says levees, dams or other facilities.

15         And the second part, called the collapse, cracking or

16  shifting exclusion, excludes collapse, cracking or shifting of

17  structures or facilities that occurs during earth movement or

18  flood conditions, including any release of water held by a dam,

19  levee or dike or by a water control device.

20         Neither brief provided by the plaintiffs' side,

21  including the amicus brief, offers any argument or authority

22  against application of the H-380 endorsement to preclude coverage

23  for the claims asserted.  The plaintiffs' opposition memorandum

24  doesn't even mention the H-380 endorsement.  The amicus brief

25  mentions the H-380 endorsement for the purpose of saying that it

1  shows that an insurer can easily and expressly exclude from

2  coverage losses caused by water from a ruptured levee or dam.

3          Now, the amicus brief doesn't endorse the endorsement

4  as a valid exclusion but also offers no reason why it's not a

5  valid exclusion.

6          Based on the water damage exclusion and the separate

7  exclusions contained in the H-380 endorsement, we believe the

8  Cappella estate claim should be dismissed as excluded under the

9  policy, separate and apart.

10         We don't believe that there is any connection between

11 these exclusions because the H-380 endorsement expressly

12 preserves all the other provisions in the policy.

13         The first definition of flood under the H-380 is flood,

14 same it as the water damage in the other instance.

15         THE COURT:  The only exceptions I would take with your

16 policy is that you spell levee, L-E-V-Y, which could also be

17 attacked.  But other than that --

18         MR. SADLER:  It's spelled correctly in the other

19 paragraph.  It is the same endorsement.  But I don't do

20 underwriting, I just do coverage disputes.

21         THE COURT:  I have no questions.

22         MR. HUBBARD:  Thank you, Your Honor.

23         THE COURT:  Finally it's your turn.

24         MR. ELLISON:  Thank you.  May it please the Court,

25 Your Honor, John Ellison on behalf of the amicus United

1    Policyholders of America and the Chehardy plaintiffs.

2              I'm going to try and follow the presentation that I had

3    intended to give and work in our responses to a lot of the

4    questions Your Honor has already asked and raised with the other

5    side, and some of the concepts and trying to address them in that

6    manner.

7              But I think sort of the threshold difference between

8    where we are and where they are is how you look at this whole

9    situation.  And I think where we want to start is at the

10   beginning of this transaction, when policyholders are purchasing

11   homeowner's coverage and what it is they think they are getting,

12   and proceed forward from that point as to how does it apply once

13   an event like Hurricane Katrina happens.

14             And I think, Your Honor, a critical point for us, which

15   I'm not even sure anybody on the other side mentioned the word

16   "hurricane" at all during the course of their presentation, is

17   that what we're talking about is damages that flowed from a

18   hurricane, not from a flood, but from a hurricane.  And one of

19   the things that I think is glossed over by the defendants in

20   their motions is the fact that a potential efficient proximate

21   cause of all of these losses here is the wind damage and the wind

22   generated by the hurricane that preceded everything.

23             So whether there was a failure of maintenance that

24   resulted in a rupture of the levee, the wind, but for the wind,

25   that never would have been an issue, but for the hurricane, that

1    never would have been an issue.  So, we look at the definition of

2    hurricane and what that entails.  And then we've just taken that

3    out of the dictionary.  And then we look at the definition of

4    flood and how that's normally defined in the dictionary, because

5    as Your Honor has pointed out, it remains undefined in the, in

6    any of the policies in this case or any of the insurance cases.

7            And then we go to a whole series of other provisions

8    that nobody has talked about on the other side.  Every one of

9    these policies has some form of a hurricane deductible and on

10   every one of these policies on the declarations page there is a

11   specific reference to a hurricane deductible, and on most of

12   them, there is also an additional price that the policyholder is

13   charged with that deductible being added.

14           Now, what does that convey to the normal policyholder?

15   First of all, you got, you got to have some element of covered

16   loss that's caused by a hurricane in order for there to be a

17   deductible that would relate to the hurricane that would come

18   into play if there is a hurricane event.

19           THE COURT:  Let's say wind.

20           MR. ELLISON:  Wind, but then, and, Your Honor, I'll just

21   quickly run through all of these.  Because they are in every one

22   of the policies.

23           THE COURT:  Okay.

24           MR. ELLISON:  So then we have this expectation created

25   in the policy documents itself that if there is a hurricane

1  event, there is at least some coverage available, regardless of

2  all of these other provisions that follow.

3          Now, then we have the event itself, and we have the

4  unique circumstances of Katrina.  And I might add, and this is

5  not meant to be sarcastic, but to suggest that the minority view

6  of the cases that are out there ought to apply here would seem

7  appropriate because if there has ever been an event like Katrina,

8  if this is not the minority event that needs to be interpreted as

9  to how coverage applies to it, I don't know what is.  There has

10 never been anything like this before.  Hopefully there will never

11 be anything like this again, so to suggest that there is a

12 majority view out there that has applied concurrent causation

13 analysis in a series of relatively mundane normal-type losses and

14 that they somehow can be transposed readily to this case, I

15 think, Your Honor, is a dramatic overstatement of what the law is

16 that is out there and how it should be applied here.

17          But we have these doctrines of construction that

18 provisions are supposed to be given, all provisions of policy are

19 supposed to be given effect and meaning, and we think that is

20 particularly appropriate as it relates back to this hurricane

21 deductible endorsement because if there is no coverage available

22 for a hurricane loss, which is, although we've heard some other

23 versions of that position here today, the reality is, on the

24 street, and the reality is in the positions they've taken in

25 other litigations, that they've read that anticoncurrent

1    causation language to exclude anything if there is any water

2    damage involved.

3            And that, I heard both Mr. Hubbard and Mr. Lee back off

4    that this morning to a certain extent, but that is the position

5    that has been taken in many of these claims.

6            We have the other, the next doctrine exclusions of the

7    policy are to be strictly construed.  And if an exclusion could

8    have been written more precisely, and this relates to the

9    Hartford issue, which we've raised in our papers, the provision

10   that was not written as precisely as it could have been, should

11   not be interpreted in an expansion fashion so that it meets the

12   more expanded version that could have been used.  And if there is

13   more than one reasonable interpretation of the policy, it gets

14   construed in favor of the policyholder in a way that maximizes

15   coverage.

16           One other point that I wanted to get to, and I am going

17   to defer some of this discussion to Mr. Fayard at the end of my

18   presentation, but Your Honor raised the *Doerr* case and the

19   concept of how these provisions might be interpreted in the

20   context of that provision and in the context of the Louisiana

21   Supreme Court's approach to some at least analogous overly broad

22   draft, I don't know where that, the "L-Y" goes in that, but

23   overly broadly drafted exclusionary language in an insurance

24   policy.  And right below the portion of the *Doerr* decision that

25   Your Honor looked to during your questioning earlier there are

1   references to multiple civil code provisions that talk about

2   preventing the interpretation of a contract so that there are no

3   observed consequences which result.

4           And Your Honor, our submission to the Court is that an

5   interpretation of this language that they have pointed to, read

6   literally, means that essentially is there is no coverage for

7   anything in an event like Katrina that has the amount of water

8   damage that was caused because if you read the anticoncurrent

9   causation language at the end of all of these policies literally,

10  it takes out coverage for any loss that involves water damage.

11          THE COURT:  That's what I was trying to explore with the

12  defendants.  They say loss means loss caused by the excluded

13  event.  And how do you counter that because it's a legitimate

14  question?

15          MR. ELLISON:  Your Honor, let me just get right to that

16  provision.  The answer to it, Your Honor, I believe is first that

17  the language itself is not nearly as narrow as they suggest it

18  is.  And while it could be read in the manner that they suggested

19  this morning, it can also be read in a far broader manner and in

20  fact has been read in a far broader manner in many instances.  So

21  if we look at the --

22          THE COURT:  The West Virginia case agrees with you.

23          MR. ELLISON:  I know the West Virginia case does agree

24  with me and --

25          THE COURT:  There are others that don't.

1     MR. ELLISON:  There are plenty others that don't, but I

2  think if we're really calculating a balance sheet, it's very

3  difficult to say who has the majority or the minority position in

4  the abstract because there are so many jurisdictions that have

5  yet to comment on this.

6     THE COURT:  I did point that out, as you recall.

7     MR. ELLISON:  I know and I just wanted to reemphasize

8  that because that's a telling point.  Because in many of the

9  jurisdictions that have not addressed this issue to date, they

10  have found coverage in circumstances where there is an efficient

11  cause of loss that is covered originally, that there is some

12  intervening noncovered peril, and therefore, there is coverage.

13  So, the mindset at least in those jurisdictions that have yet to

14  get to the anticoncurrent causation analysis in a particular

15  case, since it has been adopted, would suggest that they are at

16  least leaning in the direction of the analysis of the California

17  court, of the Washington court, of the West Virginia court.  And

18  I know, I know there are some special issues with respect to

19  California because of the statutory provisions there.

20     THE COURT:  Right.

21     MR. ELLISON:  But the early decisions, Your Honor, that,

22  they don't exactly predate the statute's enactment but they talk

23  more in terms of general common-law principals and philosophy and

24  causation analysis, not necessarily with respect to the

25  requirements of the statutory language.  And in fact, in the

1    original case, to address the statutory language, that analysis

2    was generated by arguments raised by the defendant insurance

3    company.

4            (Interruption in the proceedings.)

5            MR. ELLISON:  I've never managed to do that before.

6            THE CLERK:  Welcome to Louisiana.

7            THE COURT:  We lost your PowerPoint here.  We can check

8    it out.

9            Why don't we, I can divert you for a minute while we're

10   doing this.  And we'll talk about that clause.  Some of the

11   clauses, State Farm is a little different, but some of the

12   clauses read as follows.  I'm talking about with the

13   anticoncurrent.  "We to not insure for loss caused directly or

14   indirectly by any of the following."

15           And of course, that's the exclusions.

16           MR. ELLISON:  Right.

17           THE COURT:  "Such loss is excluded regardless of any

18   other cause or event contributing concurrently or in any sequence

19   to the loss."

20           Now, you're arguing that that is, if construed broadly,

21   would mean there is no coverage in any concurrent cause situation

22   loss.

23           MR. ELLISON:  Exactly.

24           THE COURT:  They are making an argument that loss means

25   loss, only the loss that is caused by the excluded peril.  Loss

1  is not defined and they said, Well, Judge, it doesn't need to be.

2  Mr. Lee's argument was a little different in that his clause

3  says, and I'm going right to it, "We do not insure for such loss

4  regardless of the cause of the excluded event."

5        Which then, other causes of the loss, but that's on the

6  cause situation, but you could read these, you're saying, to mean

7  you don't, if it's 10 percent and 90 percent, I still don't owe

8  it because loss could mean the loss; that is, the universal loss.

9        MR. ELLISON:  Right.

10        THE COURT:  That's what you're arguing, and you might

11  want to continue on with that.

12        MR. ELLISON:  Well, Your Honor, I heard Mr. Hubbard's

13  sort of clarification of the language here, at least in the ISO

14  form, and I believe it's language that appears in all of the

15  policy forms for the clients on whose behalf he spoke this

16  morning.

17        THE COURT:  Yes.

18        MR. ELLISON:  The problem is the lack of definition.

19  And to analogize to what the *Doerr* court and the Louisiana

20  Supreme Court was concerned about, there is a dramatic potential,

21  because of the lack of precision, for overapplication, misuse, or

22  mischief to be made in the application of this language to a

23  particular set of facts.  And the lack of definition is a problem

24  that should be borne by the insurance company because they are

25  the people who chose this language and chose how to write it.

1    And it should therefore be construed in a limiting fashion, and

2    if the Court were inclined to interpret that at this point, I

3    think a limitation, like the type Mr. Hubbard acknowledged was a

4    proper interpretation, that loss would not include any event that

5    was triggered by the covered peril would not, the result of that

6    would not be within any of the exclusions that follow.

7         I think that would be a proper interpretation, but the

8    other problem is that this discussion at the moment does not deal

9    with the efficient proximate cause doctrine.

10        THE COURT:  No, sir.

11        MR. ELLISON:  Although I'm the only one that's going to

12   be able to see this, I'm going to switch to that.

13        THE COURT:  I have it on my screen.  Which is really the

14   screen, I have it on mine.  And Counsel, can you --

15        MR. LEE:  Yes.  It's coming out.

16        MR. ELLISON:  But before I go to that, I just wanted to

17   also, I meant to say this at the beginning, put where we are in

18   context.  I understand that these issues sort of pervade

19   everything, but we are at the judgment on the pleadings or Motion

20   to Dismiss stage, depending on whose motion we're talking about.

21   And the policyholders in *Vanderbrook* are entitled to the benefit

22   of all inferences in their favor, and we, to the extent we're

23   getting to the stage where we're talking about potential

24   ambiguities and expectations and things of that nature, those are

25   typically things that warrant discovery, require some discovery.

 1   And while I understand that there may be issues on which the

 2   Court can rule and provide guidance as to how we go forward, we

 3   would just submit to Your Honor that some of this discussion here

 4   portends going forward into a discovery phase.  And I believe as

 5   the cases in Mississippi have gone, that's where they've gone.

 6   Certainly Judge Senter has provided some legal framework on some

 7   of these issues.

 8          THE COURT:  I'm wondering what discovery, though.  I

 9   mean.  I don't want to hear from a thousand different people on

10   what their reasonable expectation was.  I think if I were to

11   find, let's talk about that.  If I were to find that the first,

12   we're going to have to talk about the first thing that he, I'm

13   sure you'll get to that.  The first, right out of the box

14   provision that they provided about design, et cetera.  We'll get

15   to that.

16          MR. ELLISON:  Right.

17          THE COURT:  Right now we're talking about the

18   anticoncurrent provision.  And if I would define it, if I were to

19   find it is ambiguous, then I have to go, the next step, what is a

20   reasonable expectation, then we get into the, and I'll let you

21   comment on this, then we get into the idea, Well, wait a minute,

22   there is a flood program.  And so, the reason there is a flood

23   program is because your insurers, your standard insurers found it

24   unprofitable to the write flood insurance, therefore, the nation

25   took it over and had a flood insurance program.

1          And so from a policy standpoint, they make a compelling

2     argument that, Why am I reasonably expected to be covered by

3     flood of any sort when, when is there a flood program that I can

4     participate in?

5          MR. ELLISON:  Well, I'll address that point specifically

6     and then maybe back out a little more generally.

7          THE COURT:  This is a big subject and we can meander

8     easily.  I'll try not to get you off.

9          MR. ELLISON:  But on that subject, specifically in terms

10    of reasonable expectations and types of evidence that the Court

11    may look at or want to consider, for example, the flood maps that

12    exist for the New Orleans area, all presume that the levees work

13    and the levees remain standing.  That would be something that

14    would suggest, we would submit, that perhaps an event like what's

15    happened here wouldn't be the type that would be within the

16    National Flood Insurance Program, and that a reasonable

17    policyholder might think that that's the type of claim that's

18    going to be covered by my homeowner's policy if the levees fail.

19    That's just one example.

20         Another example might be literature that the insurance

21    companies distribute, either in connection with the sale of a

22    policy explaining how flood coverage might impact or relate to

23    the flood program, whether there is any internal manuals at the

24    insurance companies that discuss those things for underwriting

25    purposes and then claims manuals on the other side about what do

1  you do when you get one of these losses and there is a potential

2  overlap between flood coverage and homeowner's coverage and how

3  does that play out.  Because reasonable expectations doesn't just

4  presume or encompass the expectations of our clients, the

5  policyholders.  There is also expectations on the other side, and

6  the third area, I think, of inquiry that should be put forth for

7  the Court's consideration is what was the regulatory framework

8  and understanding at the insurance department as to what was

9  going on as to how these provisions would work.

10      I don't know, frankly, firsthand if there is even any

11  information like that.  But I think it should be something that

12  should be potentially explored.

13      THE COURT:  As a quick aside, I noticed in the

14  plaintiffs' brief, there was the CFR definition of flood, which,

15  and literally construed, perhaps and they haven't, thank

16  goodness, but the flood insurance program could have said this

17  isn't a flood according to their definition.

18      MR. ELLISON:  Your Honor, we were careful on how we

19  addressed that issue on our amicus brief, but because, I don't

20  want to be the person that's saying anything is not covered.  I

21  may not have a job when I go back to my firm.  But there is an

22  argument, I think, a potential argument out there that this is

23  not something that's within the definition of flood that's in

24  either in the NFIP or in the flood policies.  And I think that

25  that impacts a couple of things.  One, it impacts the

1    expectations issue.  And it also suggests that without further

2    precision in the definition of flood, as used in the policy

3    exclusions by the insurance companies, that there is an argument

4    that we've made and can make that it does not relate "a la" the

5    *Murray* case out of the West Virginia Supreme Court, to an event

6    that's of some man-made variety as opposed to a natural flood

7    event where there is rain and the Mississippi River overflows its

8    banks because we've had a week's worth of rain which causes what,

9    at least in my mind, is a flood.

10              Now, I want to go back to just the efficient proximate

11   cause test itself.  It's been the law of Louisiana since at least

12   the 1950s.  There is a suggestion in some of the briefs, you

13   know, that there would be this gross unfairness here if the Court

14   were to ultimately find coverage of some sort for any water

15   damage that resulted.  While the insurance companies, you know,

16   are free to make that argument, this has been the law.  In some

17   instances, they have tried to contract around it.  They know, as

18   is the case all across the country as represented by the number

19   of cases that are out there on the subject, that these things are

20   always subject to challenge when claims start rolling in.

21              So, whether or not they were successful in getting

22   around the efficient proximate cause doctrine if Louisiana, as

23   Your Honor noted earlier, is an open issue.  And I'll also add

24   that the insurance industry itself has had three of the most

25   profitable years they've ever had in their history, post 9-11,

1    when they were claiming great tragedy.  This industry has

2    capacity.  This industry reserves.  They have regulatory

3    requirements.  This is not the death knell of State Farm or any

4    of the other insurance companies.  And we would just, I'll just

5    leave it at that, but I think that argument is a bit of a red

6    herring.

7        Our position is, and I believe the *Vanderbrook*

8    plaintiffs agree, that if the efficient proximate cause of the

9    loss was the result of a covered peril and in this instance, we

10   that there are two, at least two events that could, that that

11   could be, the wind generation from the hurricane itself, which

12   is, everybody, I think, agrees is a covered peril, or the

13   failure, the third-party, alleged third-party negligence that

14   relates to the levees.

15       While they've inserted these anticoncurrent causation

16   clauses in their policy, there is not authority in Louisiana to

17   date that says that they should be enforced as they have asked

18   the Court to do here.  There is plenty of authority, starting

19   with the *Murray* case and some of the others, and I don't need to

20   list them, which we respectfully submit are the better-reasoned

21   approaches to the analysis, *Sabella Graham* and all of the

22   Washington state cases, as to why it would be effectively against

23   public policy to allow insurance companies to contract around a

24   situation where they tell a policyholder in one instance that

25   there is coverage for wind, and then effectively turn around and

1    take that coverage away because another event that they say is

2    not covered, water damage, happens to coalesce in the same

3    sequence of events.

4            And Mr. Fayard is going to speak to this more at the

5    end, but there is plenty of Louisiana public policy reflected in

6    the *Doerr* decision, reflected in some of the pronouncements that

7    have come out of the Legislature in the wake of Katrina, about

8    what they think coverage should be.  And we would submit, Your

9    Honor, in the policy documents themselves that suggest that there

10   is hurricane-related coverage.  There is more than enough for

11   this Court to at least let this case get beyond the judgment on

12   the pleadings or Motion to Dismiss and into an analysis of

13   expectations and of potential ambiguities in the policy that

14   ultimately we think will require a ruling in the policyholder's

15   favor.

16           So you know, just one point.  In addition to the

17   provisions that are cited in *Doerr*, the civil code provisions,

18   article 2030 talks about any contract is subject to being

19   reviewed on public policy grounds.  There are multiple public

20   policy grounds that I think are even further implicated here when

21   we're talking about individuals and homeowners.  This is not a

22   normal commercial, commercial insured versus a commercial insurer

23   dispute, so the equities, we think, weigh in even greater favor

24   in this instance than they would in some others.  And --

25           THE COURT:  I note that, although not necessarily

1   germane to this, not, really it isn't germane to my decision,

2   there is the Mississippi attorney general has instituted suit to

3   declare certain provisions, I don't know which ones, in certain

4   standard policies null and void.  I do not think that there is a

5   concomitant proceeding brought by the attorney general here.

6          MR. ELLISON:  There has not been.  For sure.

7          I guess we can get into a debate about government,

8   about who speaks on behalf of the state.  As I think Mr. Fayard

9   is going to detail in a moment, there have been an awful lot of

10  pronouncements out of the legislative body in this state at least

11  that have suggested that the extent to which the insurance

12  companies are trying to apply the flood exclusion and other

13  exclusions to eliminate hurricane-related damage is

14  inappropriate, and in their view, contrary to the public policy

15  of this state.  But I will recognize where I come from, and leave

16  those statements to Mr. Fayard.

17         The other point that we have on the anticoncurrent

18  provision, in the event that Your Honor thinks it needs to look

19  to it and apply it here, is that Judge Senter has found that it

20  is ambiguous, especially in the context of a hurricane event like

21  this, where there are other provisions in the policy that suggest

22  there is at least some coverage for a hurricane-related event

23  because of the hurricane deductible, because of the wind

24  coverage.

25         THE COURT:  I'm concerned about the wind provision,

1    especially in Mississippi, where, in one of the cases, it was

2    somewhat in the sense that the insurance company was saying,

3    We're paying for the wind.  We're not taking this position.  He

4    did imply that, he stated that the provision was ambiguous and I

5    think that one could potentially contend that there was no

6    coverage under the anticoncurrent clause.

7         So, the defense talked about that.  And parried my

8    question, but what's your take on it?

9         MR. ELLISON:  Well, we talked about it briefly and,

10   Your Honor, I think there is certainly the opportunity available

11   under language of the breadth that's found in both the ISO form

12   and in State Farm's form, to argue that if there is any damage

13   that is not covered by the policy, no matter whether it's, you

14   know, one percent or one tenth of one percent, that is a

15   sufficient basis on which to deny coverage for the entire claim.

16   And in fact that position has, it has been asserted, it was, I

17   believe, argued by State Farm and the *Tuepker* case, but I may be

18   corrected by Mr. Lee on that.  But in the decision that Judge

19   Senter issued in that case, related to the State farm policy,

20   there was at least the implication in his addressing the issue

21   that an argument was being raised to that effect.

22        THE COURT:  I think I have it right here, Judge Senter,

23   it was a State Farm policy.  He said, "I find the language of the

24   State Farm policy creates ambiguities in the context of damages

25   sustained by the insured during a hurricane.  These provisions

1   purport to exclude coverage for wind and rain damage, both of

2   which are covered losses under this policy, where an excluded

3   cause of loss, e.g., water damage, also occurs."

4           That's what he was talking about.

5           MR. ELLISON:  And the other thing, Your Honor, and I

6   think this was telling in response to some of the hypotheticals

7   you threw out this morning for a response, first of all, although

8   there was a suggestion that they are covered events under the

9   flood insurance program, I was quickly trying to review the

10  version of the flood policy attached to State Farm's policies,

11  and there is certainly an argument that if an event like a water

12  tower is knocked over by an airplane or a car drives into it and

13  floods the adjoining house that that is not the type of event

14  that the flood policy would respond to.  And the suggestion here

15  that that would not be a covered event because it's water damage

16  and water damage is excluded for all purposes, I think shows the

17  extent to which the insurance companies are arguably overreaching

18  in how they are attempting to apply exclusions like the

19  third-party negligence provisions they have pointed to at the end

20  of the exclusion section and the faulty workmanship and the acts

21  or decisions provision.

22          I would note, just switching to that quickly, with

23  respect to the actual decisions in the ISO form, you know, it's

24  our position that that clearly is an inapplicable provision to

25  this type of event.  And I think that that conclusion is only

1   heightened by the fact that Hartford, in their policy, the form

2   380 that counsel spoke about just before I got up, went to the

3   effort of issuing a clarifying endorsement where they

4   specifically talked about acts or decisions that relate to things

5   like levees and dams and things of that nature.

6         I'm starting to sound like Arnold Schwarzenegger.

7   Every time I say things of that nature, that great parody of his.

8   But anyway, I think, Your Honor, the Hartford policy really ends

9   the argument about the acts or decisions for the rest of the

10  insurance companies because they have, consistent with their

11  obligation under Louisiana law, gone to the trouble of clarifying

12  and being more precise and speaking about an event and in fact

13  the circumstances of this event, at least with respect to the

14  argument that the efficient proximate cause was the failure to

15  maintain the levees.

16        THE COURT:  And I don't want to interrupt you if you

17  have some other points, but are you going to direct yourself to

18  the point made under section I exclusions, that is, I'm sorry,

19  section I conditions?  Let me find where it is.  Section I

20  exclusions, where we get to this provision, "We do not insure for

21  loss to property described on coverage A and B caused by any of

22  the following or any ensuing loss to property described under

23  coverage and A and B not excluded."

24        And this is what the defense started out with this

25  morning.  "Weather conditions, however, this exclusion only

1   applies to weather conditions contributing in any way to the

2   causes excluded in paragraph 1, to produce the loss.  Acts of

3   decisions, including the failure to act or decide."

4        And then more pertinent, I think, "planning, zoning,

5   development, surveying, design, specification, workmanship,

6   repair, construction, renovation, remodeling, grading, materials

7   used in repair and construction, renovation or remodeling."

8        This is what they started out with, saying that's a

9   clear exclusion here, I guess as it relates to the design of the

10  levee itself.

11       MR. ELLISON:  Right.  The first response is to the

12  extent that's applicable to any potential efficient proximate

13  cause here.  It relates solely to the levee maintenance or design

14  issue.  The efficient proximate cause is the wind generated by

15  the hurricane.  And this doesn't really come into play as

16  respects that potential efficient proximate cause.

17       But with respect to the other, the other potential

18  efficient proximate cause, which is the failure, the alleged

19  failure to maintain or design the levees properly, there is a

20  couple of problems, we think, with this argument.  One, is again

21  it goes, well, it ties back into the overbreadth of the flood

22  exclusion and the idea that the flood not only encompasses

23  naturally occurring events but also man-made events.  And if you

24  look at it in that context, there is arguably a bootstrap going

25  on here between trying to say we're excluding, arguably now,

1  man-made issues, but then in the ensuing damage provision, where

2  they are giving back coverage, they are still saying, a

3  nonman-made damage is also excluded.  And I think there is an

4  arguable inconsistency in that.  And I would like to draw

5  Your Honor's attention to, there are different versions of the

6  State Farm policy attached to the pleadings.  And the one

7  attached to Exhibit A, which is the policy that was sold to the

8  Silvas, Mary Jane Silva, if you turn to this section of the

9  policy, which is on page 15 of 33, there is a different resulting

10  loss.

11          THE COURT:  Other exclusions.  Maybe, I'm on page 15,

12  but I may be on the wrong policy.

13          MR. ELLISON:  Page 15 of --

14          THE COURT:  Coverages L and M do not apply under

15  exclusions?  Section II exclusions?

16          MR. ELLISON:  I'm not sure if we're on the same page.

17  This is Exhibit A to their.

18          THE DEPUTY CLERK:  Do you want to put on it the ELMO?

19          MR. ELLISON:  Yeah, that's a good idea.

20          THE COURT:  I'm looking on Exhibit A and I am on page 15

21  of the policy.

22          MR. ELLISON:  I'm sorry, it's page 11 of the policy.  I

23  was looking at the number at the top, 15 of 33.

24          THE COURT:  Now we are on the same page.

25          MR. ELLISON:  Okay.  Sorry about that.

1        THE COURT:  Conditions, I got it.  Okay.

2        MR. ELLISON:  And if you note at the end here, it says,

3  there is a different clause at the end.  The one beginning with,

4  "However, we do insure for any resulting loss from items A and B,

5  and this would include the defect weakness inadequacy and all of

6  the design type issues that --"

7        THE COURT:  The resulting loss, that's what they said,

8  when water is a resulting loss.  And so, it's not insured by this

9  section.  That's what they are going to argue.  That's what they

10  have argued.

11        MR. ELLISON:  Right.  But, Your Honor, if you go back to

12  items 1 and 2, I'm sorry, A and B above, the point I'm trying to

13  make here is, the suggestion here is that we don't insure but

14  then there is a resulting loss give-back potentially that could

15  come out of A and B pursuant to the first clause there in the

16  however section.

17        THE COURT:  It only gets into the ensuing loss issue.

18  They don't use the words ensuing loss.  It's the same concept, it

19  appears to be.

20        MR. ELLISON:  Right.  And the point I was trying to make

21  is that there appears to be a lack of clarity here in what

22  exactly, whether there is anything given back by the defect

23  weakness provision subpart B by allowing that to be excepted from

24  the exclusion.  But it's not clear exactly what it is they,

25  whether they are giving anything back because they then say that

1    the loss is not insured by this section.

2          So I think, Your Honor, that one, there is an arguable

3    overapplication of this provision because it is one that is not,

4    first of all, does not make clear that it relates to third-party

5    negligence or whether it's talking about actions of the

6    policyholder itself.  And I think there was also a structural

7    issue as to what the resulting damage provision means and how it

8    applies, and as Your Honor talked about earlier, there is case

9    law all over the place on that issue as to whether or not an

10   ensuing damage provision is ambiguous, et cetera, and there are

11   decisions that go both ways on that.

12         THE COURT:  I'm not sure, frankly, because I haven't

13   focused on this, and I'm going to ask for additional briefing,

14   and I'm going to limit the pages because it's getting to the

15   point, it's extraordinarily important, but I'm not sure I

16   understand the precise context of section I, 3, B.

17         Let me make sure I'm right about that.  No.  Yeah.  It's

18   section.  Right here.  It's under losses not insured, we get to

19   3, Arabic 3, Arabic 3, A, B, A and B.  I'm not sure of the

20   context of that and I really haven't, and frankly we focused on a

21   lot of things, but we might need a little more focus on this to

22   understand where that is in the scheme of things and how it

23   applies.  I'm trying to think of scenarios other than this where

24   it would be applicable.

25         MR. ELLISON:  And just one other structural issue, and

1    this is moving out of the State Farm policy but back to the ISO

2    form.  Some of these forms also include in the list of items that

3    are excluded under this portion of, I guess it's, well, it's

4    exclusions in the ISO form, section one.  There is the first

5    entry is weather conditions.  And again, that issue suggests

6    inconsistency with the coverage for events like lightning and

7    winds and potentially hurricane, if you had the hurricane

8    endorsement, that even though we said that up front and said it

9    in an endorsement because the hurricane deductibles are by

10   endorsement to the policies, we're still going to exclude weather

11   condition events.

12          THE COURT:  That's one of the reasons I am not sure, I

13   don't understand what is really meant by that section, what it's

14   designed to do.  And I'm going to need some amplified briefing.

15          MR. ELLISON:  Well, Your Honor, with that, I would just

16   like to wrap up by saying that, given all of these problems, and

17   Your Honor may, will certainly get some guidance from further

18   briefing, I believe, because there is a lot of other law out

19   there on these sections, but our point is that there is just

20   inherent structural problems with the way these provisions relate

21   to one another that create potential ambiguities that warrant, we

22   submit, some discovery on this topic that should compel a finding

23   at this stage that judgment on the pleadings or Motion to Dismiss

24   is premature and that there are some factual questions here like

25   reasonable expectations and what was meant by this policy and how

1    does the insurance company itself actually communicate internally

2    as to what these things mean.  And we would submit, therefore,

3    that the proper course would be to move on to discovery.

4           You know, going back to sort of the big issue, just to

5    wrap up, before I turn it over to Mr. Fayard, although, although

6    in number they may be the minority position at the moment for the

7    Courts that have looked at this issue, we would submit that the

8    *Murray* case that Your Honor has talked about a fair amount and

9    the decisions out of the Washington state court are the

10   better-reasoned analysis of this question and particularly in the

11   peculiar circumstances that we have here with Katrina, they are,

12   they are most definitely the more on-point analysis than just a

13   simple sort of rote reading of language in the policy that has

14   applied at least in some instances, we would submit, without real

15   thought given to what are the big-picture consequences for that.

16   And with all of the code provisions and the Louisiana Supreme

17   Court's guidance in *Doerr* about looking at the big picture, we

18   would respectfully submit that *Murray* and that genre of decision

19   should be the controlling one.

20          And with that, I'll give it to Mr. Fayard.  And thank

21   you for the opportunity to speak.

22          THE COURT:  Yes, sir.

23          MR. FAYARD:  Judge, Calvin Fayard.  If you have any

24   questions, now is the time to ask Mr. Ellison before he sits

25   down.

1    Judge, I ordinarily wouldn't address you today except

2    for a couple of things that Mr. Hubbard said about public policy.

3    I think everybody in this room has had experience, some more than

4    others, with the Louisiana Legislature and with those that we

5    have elected to direct public policy.

6    Public policy begins with people, like the people in

7    this room and the people in the street.  And sometimes when we

8    can't do it ourselves, we elect people to do it.  The Louisiana

9    Legislature is one of those entities that have been elected by

10    the people, and Mr. Hubbard chose to refer to a Senate bill

11    sponsored by Senator Quinn, a Senator in New Orleans, who felt

12    the wrath of Hurricane Katrina.  That bill did not become an act

13    because it did not pass.  I'm not sure whether it ever came up

14    for a vote.  But there are a couple of things that the

15    Legislature did do.

16    I'm not sure how to use this machine.

17    THE COURT:  Put it on it.

18    MR. FAYARD:  We all know house concurrent resolutions

19    don't have the effect of law, but they are an expression of the

20    will and the sentiment of the Louisiana Legislature which has

21    been elected by people and sometimes directs us to public policy.

22    And it's going to be hard for me to read this but I

23    might could do it.

24    THE COURT:  You can zoom it up and then read it on the

25    screen.

1          MR. FAYARD:  Judge, I'm not going to touch anything.

2          THE COURT:  It takes a lot of skill to punch that

3     button.

4          MR. FAYARD:  Now, this first one is related to

5     homeowner's insurance policies and it says, the resolution,

6     Whereas, August 29th, many portions of southeast Louisiana

7     including Orleans Parish, St. Bernard, Plaquemines, and Jefferson

8     were devastated by the impact of Hurricane Katrina.  And on

9     September 21, 2005, many portions of south Louisiana were

10    devastated by Hurricane Rita, including parishes already hurt by

11    Hurricane Katrina and new parishes in southwest Louisiana;

12    Whereas, now months after the passage of the storms, Louisiana

13    residents are still displaced, some out of state, some in state,

14    in temporary housing, evacuation shelters, mobile trailers, and

15    tents; and Whereas, these people cannot begin to return home to

16    rebuild their destroyed businesses and homes because insurance

17    companies are contesting the validity of the homeowners'

18    insurance policies and stalling or refusing to pay claims; and

19    Whereas, this delay or refusal to pay is detrimental to the

20    citizens of Louisiana and is causing delays in the recovery

21    process.  Therefore, be it resolved that the Legislature of

22    Louisiana," which according to Mr. Hubbard is the public

23    expression of the public policy of this state, "does hereby urge

24    and request the Attorney General, State of Louisiana, the

25    Honorable Charles Foti, to file suit seeking declaratory judgment

1    that provisions of homeowners' insurance policies excluding

2    coverage from damage sustained as a result of wind, hail and

3    hurricanes are null and void as against the public policy of the

4    State of Louisiana.

5         And I'm informed that that passed, Judge.

6         The second one is House concurrent resolution

7    Number 59.  And this is directed to what I think the defendants

8    are now arguing about this design stuff that's in the policy that

9    was never, under the wildest imagination, in my opinion, meant to

10   pertain to design of levees or runaway streetcars or anything

11   else, which is another illustration, I think, we could think of.

12        It says, "Whereas, the citizens of the City of New

13   Orleans have suffered devastating losses of life and property

14   primarily due to the flooding which occurred subsequent to

15   Hurricane Katrina hitting the Louisiana coast and the City of New

16   Orleans; and Whereas, the flooding of New Orleans was the result

17   of the breaching of the levee system, and whereas, according to

18   findings of engineering teams from the University of California,

19   Berkeley, and Louisiana State University, the breaching of the

20   levee system was the result of negligent design and/or

21   construction of the levees and the floodwalls by the Army Corps

22   of Engineers and/or its contractors; and Whereas, due to the

23   negligent design and construction, the flooding of the City of

24   New Orleans was a man-made disaster and not a natural disaster or

25   an Act of God; and Whereas, the determination of this matter may

1  very well have a substantial effect upon the nature and amount of

2  insurance coverage for the citizens affected by this disaster.

3  Therefore, be it resolved that the Legislature of Louisiana does

4  hereby urge and request the Attorney General of the State of

5  Louisiana to file a lawsuit seeking a declaratory judgment

6  holding that the flooding of New Orleans was caused by a design

7  or construction defect, as opposed to an Act of God or a natural

8  flooding caused by Hurricane Katrina."

9         So, maybe a flood is not a flood is not a flood.  Maybe

10  there is a different type of flood.  The Louisiana Legislature

11  certainly thinks so.

12         Now, what has this got to do with this?  It's got

13  everything to do with Chehardy because that's the way Chehardy

14  was first drafted.  Mr. Bruno and I met with the commissioner of

15  insurance and the commissioner of insurance told us that he was

16  very interested in the insurance industry stepping up to the

17  plate and doing what was right.  He thought the best way of doing

18  that was to impose or implement a mediation plan that the

19  industry had proposed to it.

20         He told us that he was not in a position to do much

21  else at that point, and it was not really his power or authority

22  to bring lawsuits or to impose other types of language on the

23  company, that he reviewed the policies as they were submitted.

24  When Chehardy was filed in Baton Rouge, we heard the same story

25  from the commissioner of insurance, and it was of course

1  transferred to Your Honor's court, and we'll talk about it later

2  next month.

3          So what we are talking about here is, if we want to

4  talk about public policy, public policy dictates, as Mr. Ellison

5  said, that we're in the midst of a catastrophic loss here in this

6  city and this state that has never occurred anywhere else before

7  of this nature, of this magnitude, of these confounding factors.

8  And for the industry to walk in and say, Well, here is the

9  contract and this is what it means, is just inappropriate, Judge.

10  It's absolutely inappropriate.

11          And the law is not totally on their side, the law is

12  not totally on our side.  We acknowledge that.  But it's a

13  contract.  It's a contract that needs interpretation.  It is a

14  dispute between a policyholder who paid a premium and who looked

15  at it, and by the way, really, it's not a matter of discretion to

16  have insurance anymore.  You can't drive a car unless you have

17  insurance.  You go to jail.  You can't buy a home unless you pay

18  cash for it unless you get insurance.  You cannot get a loan.  It

19  is not a discretionary act.  These people are in the cat bird

20  seat.  They sit there with a policy and they give it to you and

21  they say this is your premium, and you write the check or you

22  don't get your house.

23          So what this Court has to do, and I don't envy you your

24  task, is you've got to make a decision weighing all of these

25  factors.  We can't just pull out one clause that says, design and

1   defect because now, because of this resolution, we're now going

2   to argue that the Corps of Engineers designed the levee wrong and

3   therefore this design and defect exclusion applies?

4           Judge, that's absurd.  Does that mean that if I live on

5   St. Charles Avenue and there is a streetcar track that has been

6   hurt by the flood, it's redesigned, and the soil is recompacted,

7   and the track is reengineered, and the car gets on the track and

8   the conductor, for some reason, runs it off and runs it into my

9   house and knocks it down that I'm not covered?

10          THE COURT:  My example was the car with the steering

11   system going out of control.

12          MR. FAYARD:  Judge, I got to call my insurance agent.

13   We have to sit down and have a talk.  He just gives me a premium.

14   I pay it and I'm going to ask that question when he's in my

15   living room and I'm going to say, Okay, how about if a garbage

16   truck backs over my gas main and it blows up my house?  Is it not

17   covered?  It's not, right?  Because of a design and defect?  No.

18          THE COURT:  I'm going to need some more law on this.

19          MR. FAYARD:  That's what they are talking about.  So

20   what we've got here, we've got the defendants and, you know,

21   thank goodness we have a Philadelphia lawyer on our side.  We

22   certainly need it because I can't interpret these provisions.

23   And I'm certainly not up here envying your job.  But they are not

24   clear, Judge.  And all we're asking for is that we move forward

25   to the next step.  Let's go forward a little bit.  Nobody is

1   going to get hurt.  The insurance companies can afford the legal

2   representation to come back here a couple of more times.  And

3   let's just see where we go.

4           THE COURT:  Thank you, sir.

5           MR. FAYARD:  Thank you, Judge, we'll be glad to respond

6   to any questions that you would like on our side.

7           THE COURT:  No questions at this point.  I think there

8   was one other person.  Do you care to add anything?

9           MR. SCHMEECKLE:  Your Honor, Ms. Jacobson has departed.

10          THE COURT:  I'll give you, since it's your motion, a

11  little wrap up.

12          MR. HUBBARD:  Thank you, Judge.  I appreciate the

13  opportunity to do that.  While I was watching the presentation by

14  Mr. Ellison, I took the time to hand write one of his notes,

15  which is that if there is more than, this is his interpretation

16  of Louisiana law, if there is more than one reasonable

17  interpretation of an insurance policy, the one maximizing

18  coverage prevails.

19          I just wanted to make sure there wasn't any

20  misunderstanding here.  That if, if the Court looks at the

21  anticoncurrent clause language and thinks that someone might be

22  able to read it in a way that really defeats coverage, or it can

23  be read in another manner so that it provides coverage, it

24  maximizes coverage for the insured, that if the Court were to

25  find it ambiguous, the rule of law is that which you see on the

1  board.  We don't throw the language out the policy.  We don't

2  throw the baby out with the bath water.  We find a reasonable

3  interpretation that maximizes coverage.

4         In this case, that is the interpretation that I

5  suggested to you, and as you see, the underlined words in the

6  actual exclusion, we are talking about a loss, not just any loss,

7  but a loss that is caused directly or indirectly by water damage.

8  It's not just any loss.  It's not the loss that's caused by wind

9  damage.  I mean, I think that's perfectly clear there.  And such

10 loss is referring back again to that water damage loss is

11 excluded, et cetera.  I mean, I made that argument in my opening

12 remarks.

13        But I want to come back to that.  So I think that, that

14 I'll come back to that when I get to the decisions in Mississippi

15 because I think that's exactly what the judge there did.

16        It's not simply a reasonable expectation test.  In

17 other words, you would use the language to find the way to

18 maximize coverage.  I guess I would also like to mention briefly,

19 I'm just going to hit five or six points here and then I'll be

20 done.

21        THE COURT:  Sure.

22        MR. HUBBARD:  In the *Sweeney* case, which I discussed

23 with you at some length, a decision by the Second Circuit Court

24 of Appeals holding that anticoncurrent cause language in

25 Louisiana is acceptable.  That case did have writs denied by the

1    Louisiana Supreme Court, and I just think that the rule which we

2    discussed only briefly is that the federal courts would follow

3    the intermediate courts of the state unless there was good

4    evidence, clear evidence to suggest that the Louisiana Supreme

5    Court would not in fact agree with that interpretation.  So I

6    just wanted to put that in the Court's mind as well, that that is

7    the rule of law because I wasn't very clear on that.

8            THE COURT:  Yes, sir.

9            MR. HUBBARD:  With respect to the hurricane deductible

10   that was talked about briefly, now, I respectfully suggest that

11   this is not the kind of thing that we would necessarily suggest

12   to someone that they've got coverage for hurricanes, whatever

13   that means.

14           THE COURT:  I agree.

15           MR. HUBBARD:  Then I won't waste your time with it.  It

16   is very clear.  It talks about wind.

17           THE COURT:  Remember, I said wind earlier.  I understand

18   what it is.

19           MR. HUBBARD:  Right.  And deductibles of course are in

20   there because if they put a deductible in your policy, you can

21   reduce the premium.

22           THE COURT:  If the wind blows down my entire home, I

23   would be covered, less the hurricane --

24           MR. HUBBARD:  Less the hurricane deductible, for which

25   you got your premium reduced, albeit you get to pay if you

1   actually have a loss.

2          The national flood policy came up, and maybe some

3   question as to exactly what it would and would not cover.  There

4   was a federal regulation that related to the insurance of flood,

5   which is found in section 59.1 of the national flood insurance

6   program.  At some point in time, it was taken out when they redid

7   all of the code of federal regulations.  It was getting too

8   cumbersome.  They took all of them out.  There is no suggestion

9   and never been any suggestion that that regulation which was in

10  place apparently when the definition was first created by

11  Congress has changed in any respect whatsoever.  And what it said

12  was, "Insurance under the National Flood Insurance Program is

13  available only for loss due to flood as defined in section 59.

14  The policy covers damage from a general condition of flooding in

15  the area which results from other than natural causes, such as

16  the breaking of a dam, but does not cover damage which results

17  from causes on the insureds own property or within his control or

18  from any condition which causes damage, which condition is

19  substantially confined to his property."

20          So, I don't think there is, there is no question the

21  federal government itself defined their flood program without

22  saying it in the definition, but they thought that the word flood

23  means that it would cover the breaking of a dam from other than

24  natural causes.  I think that that's huge.  At least we know

25  there is coverage under the federal program and I daresay that

1   that's another indication that at least those people up there in

2   Congress think that the word flood is, means other than natural

3   causes.

4        THE COURT:  Let me get that clarified because I'm

5   looking at what I think is 59.1 now, and it doesn't, where is the

6   language that you've just quoted?  I know it's in the briefing.

7   I'm just trying to summon it back up.

8        MR. HUBBARD:  It was, it has been taken out now, but it

9   was in 44 code of federal regulation 61.4.  In 1987.

10       THE COURT:  Okay.

11       MR. HUBBARD:  And I suggest that once they put that in

12  there, they can't take it away and change the rules without, they

13  didn't come up with some new language or something like that,

14  they merely were -- it's also in my reply brief if you want to

15  look at page 8 and 9.

16       THE COURT:  I remember looking at it, and I looked at

17  the definition of flood in 59.1, which is less comprehensive than

18  what you described.

19       MR. HUBBARD:  Right.  The federal regulations are the

20  gloss on that law and why it got changed is explained in a

21  lengthy footnote, footnote 8, which reflects it was a

22  housekeeping matter and not some intent to change the law as we

23  see it, certainly.

24            There has been a number of discussions about Judge

25  Senter's decisions and what he did and did not say.  And I guess,

1  you know, I have my notes from those cases, which I would like to

2  make a single point about each of them.  In the original *Buente*

3  case, the Court held that the water damage and flood exclusions

4  were valid and enforceable.

5        In the second *Buente* case, he held that tidal water was

6  a flood and the flood exclusion was clear and unambiguous.

7        In the *Tuepker* case, he said that the anticoncurrent

8  cause is ambiguous if it's used to exclude wind and rain where

9  there is water damage, too.  He said that is due in part to a

10  grant of coverage for wind and such under the hurricane

11  deductible.  And then he came back to that same point in *Leonard*,

12  where the same issue was before him and did not say that it was

13  ambiguous, but rather he did what I was suggesting earlier.  He

14  interpreted it in a manner to maximize coverage and said that the

15  anticoncurrent cause of the word loss in the anticoncurrent

16  clause means only regarding water and not wind, which occurs at

17  or near the same time.

18        THE COURT:  I only beg to differ with you in the sense

19  that my memory is fallible but I'm reading from *Leonard* the

20  provisions of the Nationwide policy -- caused by combinations are

21  ambiguous.  It was different because I'm reading from *Leonard*

22  right here.  I've got it.

23        MR. HUBBARD:  That's with respect to weather conditions.

24  He said that the weather conditions were ambiguous.

25        THE COURT:  He said.  "The provisions that purport to

1    exclude coverage for damages caused by a combination of effects

2    and water and damages caused by the effects of wind, the covered

3    losses are ambiguous."

4         MR. HUBBARD:  Right.  I think he's talking, I think he

5    misunderstood what the weather condition --

6         THE COURT:  He may have.

7         MR. HUBBARD:  My reading of it was, because I don't

8    think weather conditions works in that respect, but I would tell

9    you, which is actually the next point in my list of notes here,

10   which is that whether conditions, the way that works is if you

11   have a water damage exclusion and someone argues that it's not,

12   that the efficient proximate cause is wind, you know, which is a

13   covered peril, because it pushed the water, the Court is in a

14   situation like that says, No, you can look at the weather

15   conditions provision, which is in the same area, set of

16   exclusions.  And that serves to clarify that if you have, and it

17   limits, weather conditions only apply to the other exclusions

18   right before it, including water damage.  So, I mean, it is in

19   there so that if someone says, Well, the water damage exclusion

20   shouldn't apply because of weather conditions like rain and the

21   like, or like wind in this case, then there still is no coverage.

22   It is exactly the thing that is directly on point to negate the

23   notion that wind could push the water, water causes the damage.

24        THE COURT:  I understand that.  I assume in Buente,

25   there are two *Buentes*, the 422 F.Supp.2d 690, he talked about

1    exclusion 21 in coverages A and B and/or exclusion 13C, which I

2    think is ambiguous.  Then he talked about exclusion 23 of

3    coverage A and B and exclusion 15 and under coverage C in the

4    context of damages sustained by the damage insured during the

5    hurricane.  These provisions -- wind and rain damage, both of

6    which are covered losses.

7         MR. HUBBARD:  I agree.  What he was saying there is

8    you're going to say that water damage, and there was also weather

9    conditions because the wind blew a hole in the roof and the rain

10   poured in and so you don't owe a dime for that house?  You're out

11   of here.  You're wrong.  We agree with that.  That's not what it

12   is there for.

13        THE COURT:  I think exclusion 23 may be the, I'm not

14   sure if that's the anticoncurrent clause or not.  I am going to

15   have to look, I have a note here it is.  Anyway, I understand

16   your point.

17        MR. HUBBARD:  I'll also tell you that that very

18   provision, the weather condition provision in that kind of

19   context, in a mudslide situation, was applied by the Julian court

20   in California.  The court that has the statute that says that you

21   can't trump efficient proximate cause with an anticoncurrent

22   clause language.  Well, in a land case, where the rain caused the

23   earth movement, the Court applied the weather condition component

24   to the earth movement and held that there was no coverage.  So,

25   and that's California with a statute on the books.

1      Then, I guess, briefly with respect to the public
2  policy remarks of Mr. Fayard, I have to tell you, I think that
3  some of that was done in the heat of battle or in the heat of
4  emotion, I guess, arising out of the tragedy that we have all
5  been through.  I think as Mr. Fayard pointed out, it does not
6  have the force of law, and in fact, to the best of my knowledge,
7  I hope I'm not wrong about this, there have been no such suits
8  that were recommended to the attorney general.  I don't believe
9  any of them have been filed.

10      THE COURT:  I'll let you know that the way I'll decide
11  this case is by a rather clinical method.  That is, examining the
12  policy, examining the allegations of the complaint, determining
13  whether any of the what the policy previsions mean, whether any
14  of them are ambiguous, if so, does the ambiguity, do I construe
15  it in one manner, to maximize coverage so that this isn't a
16  problem or do I construe it such that it's so ambiguous that I
17  write it out of the policy.  And I have to look at, frankly, what
18  you started off with, which I haven't really focused on, which
19  I'm going to ask for a little tiny bit of briefing.

20      MR. HUBBARD:  And actually, Judge, I wouldn't expect
21  anything different than that from you.  That's why we have courts
22  of law, so we get the same result, whether it's a mom and pop
23  store on the corner or one of the nation's largest --

24      THE COURT:  I agree.

25      MR. HUBBARD:  I don't know if you're going to give us a

1  briefing schedule.  That concludes my remarks.  I would beg your

2  indulgence to include in that, if you weren't planning on it, an

3  opportunity for us to very briefly brief reasonable expectations.

4       THE COURT:  Sure.  I just want, I'm going to put a page

5  limit.  I've read a lot of these briefs, and I hate to sound like

6  engaged in sesquipedalia, but if something goes beyond a certain

7  number of pages, we start writing bloviating lucubrations, which

8  is about as clear as some of the policies.

9       MR. HUBBARD:  Why I am laughing?

10      MR. BRUNO:  Because you know it's true.

11      THE COURT:  I would like them to be 25 pages or less.

12 And the things I'm interested in, and by the way, let me

13 complement the arguments.  Mr. Hubbard, you've done an

14 exceptional job of arguing, as did your confreres over there, as

15 did the plaintiffs.  It was a very interesting oral argument,

16 which I wanted it to be.  This is, there is too much consequence

17 not to be fully aired and I think it was.

18      MR. HUBBARD:  Thank you, Judge.

19      THE COURT:  I'm interested because the briefing wasn't

20 as robust on the design portion of the policy that you started

21 out with.  I would like you to brief that.  And anything else you

22 would like to brief in 25 pages.

23      But just tell me the context, et cetera, and then

24 what's a reasonable time to do that in, sir?  Can you do that,

25 tell me what you would like, Mr. Hubbard?

1          MR. HUBBARD:  My team here ought to have some input in
2     it.
3          MR. BRUNO:  Judge, while they are thinking, let me just
4     remind you that we have the double burden of the Chehardy so if I
5     had some sense of --
6          THE COURT:  I've read all of your other stuff, I'm
7     interested in that and the reasonable expectations.
8          MR. HUBBARD:  The shorter briefs are the harder ones to
9     write.
10         THE COURT:  But they are usually clearer.
11         MR. HUBBARD:  We're happy to do it.  Just in terms of
12    how much time we need to get our act together.  Is two weeks --
13         MR. BRUNO:  Our problem is that we have to not only do
14    that but also respond to Chehardy, so if I had some sense of how
15    much time I had for Chehardy, I could be governed accordingly.
16    If we are going to argument on the 27th of October.  We'll
17    have --
18         MR. HUBBARD:  More.
19         THE COURT:  I've got to give Mr. Hubbard time to respond
20    to your brief.
21         MR. BRUNO:  As long as we understand, we will focus on
22    this issue first, and then we'll respond to Chehardy.
23         THE COURT:  We will issue a briefing schedule in
24    Chehardy that will take care of both of them.
25         MR. BRUNO:  Two weeks.  And, Judge, may we have

 1  permission to attach --

 2          MR. ELLISON:  Simultaneously --

 3          THE COURT:  Yes, let's, simultaneous replies, maybe

 4  7 days later?

 5          MR. BRUNO:  Okay.  May we have permission to do some

 6  attachments --

 7          THE COURT:  Mr. Lee, that applies to you as well.

 8          MR. LEE:  Your Honor, I just wanted to make sure I was

 9  trying to determine whether you were talking about 25 pages

10  apiece or --

11          THE COURT:  No, I'm giving you each 25, but you probably

12  don't need it because you're going to be saying a lot of things

13  the same way, especially as to the clause as to the, and the

14  reason I'm asking for that, frankly, I wouldn't burden you with

15  this other than it wasn't the focus of this briefing nor my focus

16  in analyzing.

17          MR. ELLISON:  Do you want a page limit on the replies?

18          THE COURT:  Yes.  Ten pages on the replies.

19          MR. BRUNO:  And may we attach some exhibits?

20          THE COURT:  Yes.

21          MR. HUBBARD:  Judge, thank you.

22          THE COURT:  Thank you very much.  And you really did an

23  excellent job.  Makes my job easier I think.

24          MR. BRUNO:  We told everybody 1:00.  Do you want to push

25  that back?

1           THE COURT:  You need an hour at least, I'm sure.  It's

2    up to you.  Would 1:30 be better for with you?

3           (Whereupon, at 12:26 p.m., on Friday, August 25, 2006,

4    the proceedings were concluded.)

5                         (END OF COURT)

6                        *    *    *

7

8

9                     REPORTER'S CERTIFICATE

10

11      I, Cathy Pepper, Certified Realtime Reporter, Registered

12   Professional Reporter, Certified Court Reporter, Official Court

13   Reporter, United States District Court, Eastern District of

14   Louisiana, do hereby certify that the foregoing is a true and

15   correct transcript, to the best of my ability and understanding,

16   from the record of the proceedings in the above-entitled and

17   numbered matter.

18

19

20                          _____

21                          Cathy Pepper, CCR, RPR, CRR

22                          Official Court Reporter

23                          United States District Court

24

25