## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES            CIVIL ACTION
   CONSOLIDATED LITIGATION

             NO.: 05-4182

             SECTION "K" (2)


FILED IN:  05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
      05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
      06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
      06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
      06-5032, 06-5042, 06-5159, 06-5163, 06-5367,06-5471,
      06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
      07-0993, 07-1284, 07-1286, 07-1288, 07-1289

PERTAINS TO: LEVEE

---

## SUPERSEDING MASTER CONSOLIDATED CLASS ACTION COMPLAINT

NOW COMES THE LEVEE PLAINTIFFS' SUBGROUP LITIGATION COMMITTEE ("LEVEE PSLC"), pursuant to Case Management Order No. 4 and for the purpose of filing this Superseding Master Consolidated Class Action Complaint:

## INTRODUCTION

1.

This Complaint arises out of catastrophic failures of, and deficiencies in, the hurricane protection system surrounding the Parish of Orleans, State of Louisiana, which occurred on and after August 29, 2005. These failures and deficiencies caused and substantially contributed to the flooding and inundation of approximately 80% of the City of New Orleans, causing extensive harm and loss of life, and destroying or rendering uninhabitable approximately 160,000 residences and

buildings.

2.

Numerous actions, including class actions, have been brought as a result of this disaster, which was one of the worst, but most predictable and preventable, human tragedies in the history of this country.  A number of defendants have been named in these proceedings.  The instant Complaint, mandated by Case Management Order No. 4 entered on March 1, 2007, is intended to supersede and replace all class action complaints arising from the catastrophe which previously have been filed in or transferred to this Section of Court, and placed within the "Levee" category of cases.

## PARTIES

3.

Named plaintiffs, **MICHELLE HENNESSEY**, **LAURIE CONIGLIO, LEO MITCHELL, LENNIECE MORRELL, CHARLES MOSES, ALICE MEYER**, **LAURA GREER, GARY GREER, GERTRUDE ESTEVES, STELLA WASHINGTON, JOHN B. WILLIAMS, EMANUEL WILSON, LUCINDA COCO, LESLIE DORANTES, ANITA HARRISON, TRENISE JACKSON, DWAYNE MALLET, DONNA AUGUSTINE, GLADYS LA BEAUD, DAISY INNIS, BETTY JONES, DENISE MEADE, JOELLA CEPHAS, BEATRICE DREW, EDDIE KNIGHTEN, CALVIN LEVY, and NICOLA McCATHEN,** are all majors and citizens of the United States who reside within the jurisdiction of this Court, who, for themselves individually and on behalf of others similarly-situated, seek damages resulting from the above-referenced catastrophe.  The definitions of the proposed class and subclasses to which these named plaintiffs belong and which they seek to represent, are specified *infra* under the heading **CLASS ACTION ALLEGATIONS**.

4.

Named defendants herein are:

(a)     The **United States of America**, a sovereign government amenable to suit for civil liability in accordance with the federal laws and regulations set forth herein; and the **United States Army Corps of Engineers**, a division of the United States Government under the direct jurisdiction of the Department of the Army (both defendants collectively referred to hereafter as "**Corps**");

(b)     The **Board of Commissioners of the Orleans Parish Levee District** (hereafter "**OLD**"), a local government entity created by LSA-R.S. 38:291, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana;

(c)     The **Sewerage and Water Board of New Orleans** (hereafter "**SWB**"), a political subdivision of the State of Louisiana created by La. R.S. 33:4071 *et seq*., amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana;

(d)     The **Board of Commissioners of the East Jefferson Levee District** (hereafter "**EJLD**"), a political subdivision of the State of Louisiana created by LSA-R.S. 38:291, amenable to suit, and domiciled in the Parish of Jefferson;

(e)     The **Board of Commissioners of the Port of New Orleans** (hereafter "**PNO**"), a local government entity created by LSA-R.S. 34:21, amenable to suit, and domiciled in New Orleans, Louisiana;

(f)     **Modjeski & Masters, Inc.** (hereafter "**M&M**"), a foreign corporation doing business in the Parish of Orleans, State of Louisiana;

(g)     **Eustis Engineering Co., Inc.** (hereafter "**Eustis**"), a Louisiana corporation domiciled in the Parish of Jefferson, and doing business in the Parish of Orleans, State of Louisiana;

(h)     **Boh Bros. Construction Company, Inc.** (hereafter "**Boh Bros.**"), a Louisiana Limited Liability Company domiciled in the Parish of East Baton Rouge, and doing business in the Parish of Orleans, State of Louisiana;

(i)     **B&K Construction Company, Inc.** (hereafter "**B&K Construction**"), a Louisiana corporation, formerly known as "B&K Construction Company," domiciled in the Parish of St. Tammany, and doing business in the Parish of Orleans, State of Louisiana;

(j)     **Burk-Kleinpeter, Inc.** (hereafter "**Burk-Kleinpeter**"), a Louisiana corporation domiciled in the Parish of Orleans, and doing business in the Parish of Orleans, State

of Louisiana;

(k) **Burk-Kleinpeter, L.L.C.** (hereafter "**Burk-Kleinpeter**"), a Louisiana Limited Liability Company domiciled in the Parish of Orleans, and doing business in the Parish of Orleans, State of Louisiana;

(l) **Gotech, Inc.** (hereafter "**Gotech**"), a Louisiana corporation domiciled in the Parish of East Baton Rouge, and doing business in the Parish of Orleans, State of Louisiana;

(m) **CSX Transportation Corporation** (hereafter "**CSX**"), a foreign corporation doing business in the Parish of Orleans, State of Louisiana;

(n) **CSX Transportation, Inc.** (hereafter "**CSX**"), a foreign corporation doing business in the Parish of Orleans, State of Louisiana;

(o) **Gulf Group, Inc. of Florida** (hereafter "**Gulf Group**"), a foreign corporation doing business in the State of Louisiana;

(p) **Pittman Construction Co., Inc.** (hereafter "**Pittman**"), a Louisiana corporation domiciled in Orleans Parish, Louisiana, and doing business in the Parish of Orleans, State of Louisiana at all times pertinent herein;

(q) **C. R. Pittman Construction Co., Inc.** (hereafter "**C.R. Pittman**"), a Louisiana corporation domiciled in Orleans Parish, Louisiana, and doing business in the Parish of Orleans, State of Louisiana at all times pertinent herein;

(r) **James Construction Group, Inc.** (hereafter "**James Construction**"), a foreign corporation authorized to and doing business in the State of Louisiana;

(s) **Public Belt Railroad Commission for the City of New Orleans** (hereafter "**PBR**"), an entity amenable to suit and domiciled in the Parish of Orleans, State of Louisiana; and

(t) **St. Paul Fire and Marine Insurance Company** (hereafter "**St. Paul's**"), a foreign insurer authorized to do and doing business as an insurer in the State of Louisiana.

## JURISDICTION

### 5.

The Court has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. §1346(b)(1) as to the defendant Corps. All named plaintiffs have presented to this defendant the written,

administrative claims required by the provisions of the Federal Tort Claims Act, and in all respects have complied with the provisions of this Act.  A period of at least six months has elapsed since the filing of each of these written, administrative claims.

6.

As to the foregoing claims, named plaintiffs reserve the right, both individually and on behalf of all proposed plaintiff class members, to contest the legal and/or jurisdictional necessity of filing administrative claims in this matter.  This right is reserved pursuant to the "futility doctrine," *inter alia*.

7.

The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction), inasmuch as plaintiffs' claims arise under the Constitution and/or laws of the United States, which statutory laws include, without limitation, the Federal Water Pollution Control Act, 33 U.S.C. §§1251 *et seq.*, the Coastal Zone Management Act, 16 U.S.C. §§1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§403 *et seq.*

8.

The Court also has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. §1332(d)(2), which vests original jurisdiction over the class claims asserted herein based upon the Class Action Fairness Act of 2005, 28 U.S.C. §§1711 *et seq.*

9.

The Court also has subject matter jurisdiction over those claims asserted  herein which arise under the Admiralty/Maritime Law of the United States, pursuant to 28 U.S.C. §1333(1) and saving to all plaintiffs as suitors all legal and equitable remedies to which they otherwise are entitled.

10.

The Court also has subject matter jurisdiction as to the defendant Corps pursuant to  46 U.S.C. §§741 & 752 (the Suits in Admiralty Act), and/or 46 U.S.C. §§781-790 (the Public Vessels Act) as applicable, and/or 46 U.S.C. §740 (the Admiralty Extension Act).  All named plaintiffs have presented to this defendant the written, administrative claims required by the provisions of 26 U.S.C. §740.  A period of at least six months has elapsed since the filing of each of these written, administrative claims.

11.

As to the foregoing claims, named plaintiffs reserve the right, both individually and on behalf of all proposed plaintiff class members, to contest the legal and/or jurisdictional necessity of filing administrative claims in this matter.  This right is reserved pursuant to the "futility doctrine," *inter alia*.

12.

The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1367 as to those claims asserted under state law.  These claims are so related to claims within the federal jurisdiction of the Court that they form part of the same case or controversy, within the meaning of Article III of the United States Constitution.

13.

All named defendants have engaged in sufficient conduct within the jurisdiction of this Honorable Court, and/or have sufficient contacts with the jurisdiction of this Honorable Court related to the events complained of herein, to be subject to the Court's *in personam* jurisdiction.

**<u>VENUE</u>**

-6-

14.

Venue is proper pursuant to the provisions of 28 U.S.C. §§1391(b) & 1391(e), inasmuch as a substantial part of the events or omissions giving rise to the claims asserted herein occurred, and a substantial part of the property that is the subject of this action is situated, within this judicial district.

## WAIVER OF SOVEREIGN IMMUNITY

15.

The defendant Corps has waived sovereign immunity in connection with the claims asserted herein pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.* Alternatively, this defendant's immunity has been waived for purposes of the admiralty/maritime claims asserted and the causes of action arising under the statutory laws of the United States, including, without limitation, the Admiralty Extension Act, the Suits in Admiralty Act, the Public Vessels Act, the Federal Water Pollution Control Act, the Coastal Zone Management Act, and the River & Harbors Act.

16.

Any immunity sought by the defendant Corps pursuant to 33 U.S.C. §702c (the Flood Control Act of 1928) is not available to the extent the provisions of this Act do not apply, have not been complied with, and/or the liability of the Corps is not predicated on flood control activity.

## FACTUAL ALLEGATIONS

(A) **History and Construction of the 17th Street Canal**

17.

The canal known today as the "17th Street Canal" forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall Canal," the "Metairie Relief Canal," and the "Upperline Canal."

18.

The 17th Street Canal originated at the start of the 1850's as a canal dug through swampy ground to provide a right-of-way. It was located where the Jefferson and Lake Pontchartain Railway was built, a railway connecting the town once called Carrollton with a shipping port on Lake Pontchartrain in the area today known as "Bucktown."

19.

In 1858 a secondary canal was built, connecting the original canal to the river side of the Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th Street," and thus became known as the "17th Street Canal." The name eventually came to commonly refer to the original, larger canal to which this spur canal connected.

20.

The community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, began more than a hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts; and the canal provided transportation as well as a harbor for fishing boats.

21.

-8-

More substantial development in this area occurred during the mid-19th century, with construction of a commercial wharf and a resort called "Lakeport."  Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard), and at the terminus of the Jefferson and Lake Pontchartrain Railway (where Bucktown is today).

22.

Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats.  The fleet previously had a lease agreement with the defendant SWB.

23.

The 17th Street Canal historically is, and at all times pertinent herein has been, a navigable waterway in New Orleans that flows into Lake Pontchartrain.

24.

The defendant SWB took over the operation of the 17th Street Canal at the end of the 19th century.  The canal was re-dredged in 1897, and again in 1929.  In 1913, the SWB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans through the canal.

(B) **The 17th Street Canal Dredging Project**

25.

On July 15, 1974, the SWB initiated a project to improve drainage through the 17th Street Canal.  Initially, this project called for the dredging of 2.4 miles of the canal from Pump Station No. 6 to Lake Pontchartrain, in order to remove sediment from the canal bottom and reshape the canal cross-section for the improvement of the flow characteristics of the canal as well as the pump capacity of Pump Station No. 6.  The removal of approximately 85,000 cubic yards of bottom

sediment was anticipated.

26.

Since dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to the River & Harbors Act, the SWB filed an application with the defendant Corps for a "Permit to Discharge or Work in Navigable Waters and their Tributaries."

27.

The Operations Division of the defendant Corps is responsible for the issuance of permits to dredge navigable waterways. Hence, the issuance of the dredging permit for the 17th Street Canal was the province of the Corps' Operating Division, and not, for example, the Corps' Engineering Division, which is responsible for flood control.

28.

The permit approval process required the SWB to also obtain approval from, among others, the Louisiana Department of Public Works. In August of 1974, the Louisiana Department of Public Works responded to the 17th Street Canal dredge permit application by stating it could not complete a review of the application because the applicant (SWB) had no soil data substantiating the stability or integrity of the canal's levees.

29.

On May 23, 1977, the Corps returned the application with no action because the SWB had failed to furnish information requested by, among others, the Louisiana Department of Public Works.

30.

In 1978, the SWB retained a civil engineering firm, the defendant M&M, to provide a plan

-10-

for the design and implementation of the dredging project; and, on August 23, 1979, M&M submitted a second dredging permit application on behalf of the SWB.

31.

The latter application was resubmitted on December 29, 1980, after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

32.

On January 28, 1981, M&M responded to inquiries about the impact of the dredging on existing levees, by providing the Corps with its first memorandum addressing the stability of the existing levees and sheet pile wall along the canal.  The memo indicated that on three of the six test locations, the factors of safety <u>fell below the required values set by the Corps</u>.  The handwritten report specifically stated that "two locations yielded low factors of safety due to...the existence of very soft clays...."

33.

On February 6, 1981, M&M provided the Corps with a stability analysis of the existing sheet pile wall along the east side of the canal, north of Hammond Highway.  This report stated that "portions of the wall are extremely unstable as they now stand.  This instability, even under normal water level situations is due to...the soft to very soft clays which make up the soil stratum...."

34.

On March 5, 1981, the Corps issued an internal memorandum addressing the soil stability analyses provided by M&M, which acknowledged that, in connection with the proposed dredging of the canal, factors of safety were substantially below the minimum 1.30 factor of safety, requiring

that the project should be redesigned.

35.

The specific location of the canal's levee system to which the latter memo refers, coincides with the area where the canal levee breached following Hurricane Katrina.

36.

On March 31, 1981, the Corps held a public hearing regarding the 17th Street Canal dredging permit application.  There was discussion at this hearing about whether raising the existing sheet pile wall along the canal, as opposed to the requested dredging to deepen the canal, would provide a greater cross-section and greater pump capacity.  The consulting engineer representing M&M voiced his concerns about widening the canals, and stated that not only were the levees already in violation of the Corps' engineering standards for levee stability, but that dredging attempts to remove material adjacent to the levees would only worsen the stability problem.

37.

On April 20, 1981, in response to concerns that the proposed dredging of the 17th Street Canal would negatively impact the existing canal levee, M&M announced a preliminary plan to install sheet pile walls with concrete caps for the entire length of the dredging project, prior to any dredging or excavation.  The sheet pile walls were to be of a sufficient height to meet all applicable flood protection criteria.

38.

An internal Corps memorandum dated June 16, 1981, based on a review of this proposal by M&M, acknowledged that a number of levee and flood wall stability problems were likely if the SWB permit were granted.

39.

An internal memorandum from the Corps' Engineering Division to the Corps' Operations Division dated February 12, 1982 noted the existence of a stability problem in the canal at a location where excavation would directly tap the sands underlying the levee.  The memo suggested that a stability analysis be done for the land side of the canal, incorporating effects of seepage to determine what corrective action might be needed.  Sands underlay the entire 2.4 miles of the 17th Street Canal, from Pumping Station NO. 6 to Lake Pontchartrain, and the stability problem recognized in the aforementioned memo therefore cannot be confined to any one section of the canal.

40.

On August 23, 1982, Eustis provided M&M with a more comprehensive subsoil investigation report, which in pertinent part recognized that measures "should be taken" because of "the possibility of a blow-out during extreme high water in the canal."  The report also identified "preventive measures," including "the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the land side toe of the levee, and sealing the canal bottom."

41.

These recommendations by Eustis were restricted to only specific areas of the canal, however, and not to the entire canal levee system.

42.

On November 30, 1982, M&M furnished the Corps with copies of the above soil analysis and from Eustis.

43.

On February 22, 1983, the Chief of the Corps' Engineering Division advised the SWB that

-13-

the Corps believed "the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift" of the canal levee's sheet piles.

44.

On May 9, 1983, M&M submitted on behalf of the SWB a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases in to one project, with the project limits being Pump Station No. 6 on the south, and 370.0 feet north of the Bucktown Pedestrian Bridge. The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

45.

On July 27, 1983, Eustis submitted a revised soil stability report, which both confirmed the potential for a blow-out at the land side toe of the levee and extended the area of concern to the pumping station. In this report Eustis recommended dredging a test section in the canal to study the hydrostatic uplift pressure.

46.

From November 29 to December 16, 1983, a test section was dug just south of Interstate 10. Six piezometers were installed on the Jefferson side of the canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis' report concerning the test was submitted to the Corps on January 17, 1984. The report concluded that no relevant changes were monitored by the piezometers when the test section was dug, and that it was, therefore, believed that the possibility of a blow-out during high water conditions in the canal was

probably slight.

47.

The piezometer study of the test section failed to take into account that seepage flow through the permeable soils of the canal already was in progress when the piezometers were installed, so that the study's conclusions as to stability and permeability were unreliable.

48.

On June 13, 1984, the Corps issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge...."

49.

The "Statement of Findings" issued with the permit states that factors considered in issuing the permit included, *inter alia*, "navigation," present and prospective; flood heights and flood plain use; and "other public interests."

50.

The project ultimately was divided into the following phases: Phase I from Pump Station No. 6 to Interstate 10; Phase II-A from Interstate 10 to Hammond Highway - Orleans side; Phase II-B from Interstate 10 to Hammond Highway - Jefferson side; and Phase III from Hammond Highway to Lake Pontchartrain.

51.

Phase I was completed June 1, 1984. However, because the SWB and the defendant OLD could not effect an agreement with defendant EJLD regarding Phase II of the Project, an extension

of the permit work was granted by the Corps on February 20, 1987.

52.

On April 24, 1987 the Corps created a drawing showing a sheet pile design, which located the sheet pile tips 16 feet lower than the bottom of the canal.  Even as the Operations Division of the Corps was addressing the SWB permit, therefore, the defendant's Engineering Division was addressing levee wall design that might incorporate the sheet piles that were permitted under the dredging project.

53.

On August 11, 1988, the SWB issued the work order for Phase III of the project, and the job was completed on December 6, 1989.

54.

The work order for Phase II-A of the permitted SWB dredging project, which included the installation of sheet piles on the Orleans side of the canal, was issued on July 4, 1990, and the job was completed on January 10, 1992.  The contractor for this part of the Project was defendant Boh Bros.

55.

The dredging activity conducted in the 17th Street Canal pursuant to the SWB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. These barges constituted vessels in navigation for the time period during which the dredging occurred.

(C) **Construction of 17th Street Canal Concrete Monoliths**

56.

Without any Congressional authorization or re-authorization, the Corps unilaterally deviated from a Congressionally-authorized "Barrier Plan," which called for the installation of gates at the mouth of the canal (at Lake Pontchartrain). The defendants SWB and OLD had objected to the installation of these gates.

57.

The Corps thereafter proposed a "Parallel Protection Plan" for the 17th Street Canal, which called for increasing the height of the flood barriers on the east and west banks of the canal. This was part of an overall "High Level Plan," which replaced the "Barrier Plan" even though this change was not authorized by Congress.

58.

In connection with this plan, the Corps considered three options: levees, T-walls, or I-walls. It rejected the ideas of levees and T-walls; such construction was impracticable because it was not economically justified.

59.

The I-wall design selected by the Corps called for the construction of a concrete monolith on top of the sheet pile which previously had been permitted pursuant to the dredging project.

60.

Under the auspices of the Corps, acting in coordination with the OLD, levee flood walls for the 17th Street Canal eventually were constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states

that for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

61.

The I-walls on the 17th Street Canal nonetheless were built in concrete sections that rise eleven (11) feet above the ground.

62.

The "I-wall" design consists of steel sheet pilings driven into the compacted dirt atop the levee and then reinforcing steel rods are threaded through the top of the piling. Concrete is then poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections that are linked together by rubbery gaskets which allow the concrete to expand and contract.

63.

Upon information and belief, a soil analysis had been performed in 1981 by the defendant Eustis, which entailed borings along the canal's levee.

64.

The borings revealed alternating layers of soft clay and black humus or peat, a soft, spongy soil comprised of decaying trees and other organic material, occurring from fifteen to twenty-one feet below sea level.

65.

The layer of humus or peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under

pressure from flood water.

66.

Despite the discovery of such soil material, the flood walls of the 17th Street Canal levee were constructed with steel sheet piling driven to a depth that was seventeen (17) feet below sea level.  At such depths, the protective sheet pilings ended above or in the middle of layers of weak soil.

67.

Additionally, the soil adjacent to the 17th Street Canal levee had subsided significantly after construction of the levee and flood wall, thereby significantly reducing the amount of support that the land behind the levee provided against the pressure of flood waters.

68.

In 1993, the defendant Pittman was retained for the construction of the concrete monoliths atop the steel sheet pile wall along the 17th Street Canal.

69.

During the construction of the concrete monoliths, Pittman reported to the Corps that it was encountering major problems: the sheet pile walls with the concrete monolith installed on the top were beginning to lean towards the canal side, because the supporting soil foundation was not of sufficient strength, rigidity and stability.

70.

Despite these concerns and problems, the construction of the I-walls was allowed to proceed, and was completed prior to the events giving rise to this litigation.

71.

Soil studies performed in connection with this construction activity failed to account for the possible weakening of the soil in connection with the affect of subsidence of land alongside the levee, soft soils at the base of the levee, and/or soil that would be weakened if flood waters pushed through the subterranean levels under the levee and flood wall.

72.

In the course of conducting construction activity, defendant Pittman built and placed concrete flood walls on top of sheet piling driven into unstable soil beneath the sheet piling.  The soil conditions were either discovered or discoverable at the time of this activity.

### (D) **Post-Construction Events**

73.

On information and belief, defendant Gulf Group contracted to repair a certain bridge spanning the 17th Street Canal form Old Hammond Highway to Robert E. Lee Boulevard, after the above construction project had ended.  In conducting this activity, this defendant used and placed construction vehicles and other heavy equipment on the portion or portions of the 17th Street Canal levee which eventually failed.  It is believed that the use and placement of these heavy vehicles and/or other heavy construction equipment compromised or damaged the levee and/or flood wall system so as to cause and/or contribute to the ultimate failure of same.

74.

On information and belief, reports of canal water in the yards of homes adjacent to the 17th Street Canal — an indicator of underseepage due to the flawed design and construction of flood walls — were made to the defendant SWB prior to the catastrophe giving rise to this litigation.

-20-

(E) **The History and Construction of the London Avenue Canal**

75.

The London Avenue Canal was constructed in the first half of the 19th century, through an area that was mostly swampland, and later became part of the City of New Orleans.  The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans, and provided for swamp drainage.

76.

The defendant Corps, in coordination with the defendants OLD and SWB, was responsible for the design and construction of the London Avenue Canal's levee system.

77.

A major project of upgrading the flood walls and bridges along the London Avenue Canal was begun in the early 1980's.  In connection with this upgrading project, the defendant OLD contracted several firms for engineering, design, and construction, namely:  defendants B&K Construction, James Construction, Gotech, C.R. Pittman, and Burk-Kleinpeter.

78.

The defendant Corps previously had proposed to provide protection from storm surge by placement of a flood gate at the hurricane levees where the London Avenue Canal entered Lake Pontchartrain.  The defendants OLD and SWB objected to this plan and instead favored building and raising the height of the parallel flood walls and levee structures along each side of the canal (the aforementioned Parallel Protection Plan).  By 1991, the Corps, OLD and SWB had decided to proceed with this plan.

79.

The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design, consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops), intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

80.

The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend. The sands are encountered about 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity of the northern breach which forms part of the catastrophe giving rise to this litigation (station 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

81.

Of primary importance in constructing an I-wall atop an earthen levee are the composition of the soil into which the sheet piles will be driven and upon which the I-wall will rest, and the depth of the sheet piles as dictated by the composition of the soil.

82.

Soil borings of the levee at the site of London Avenue Canal south breach, which contributed to the catastrophe giving rise to this litigation, indicate the presence of sand at a depth of 10 to 15 feet below sea level.

83.

Soil borings of the levee at the site of London Avenue Canal north breach, which also contributed to the catastrophe, indicate conditions similar to those of the south breach site, with the layer of sand present at the north breach site at a depth of 12 feet below sea level, as well as a layer of peat, a highly porous material that shrinks when dry and expands when wet, and makes for highly unstable soil conditions.

84.

The sheet piles supporting the flood wall monoliths at the site of the London Avenue Canal south breach were driven to a depth of 14 feet below sea level.  Thus, the bottom of the sheet piles terminated within a layer of sand.

85.

The flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

86.

The flood walls at the breach sites of the London Avenue Canal, although built with an "I-wall" design, nonetheless have concrete sections that rise to eleven (11) feet above ground surface.

87.

Defendants B&K Construction, James Construction, Gotech, C.R. Pittman and Burk-Kleinpeter either failed to discover and account for the soil and flood wall stability problems

associated with the London Avenue Canal, or proceeded with their engineering, design and construction activity aware of such problems.

88.

Upon information and belief, defendant James Construction contracted to flood-proof the Filmore Avenue Bridge and the Mirabeau Bridge over the London Avenue Canal. Flood-proofing of the bridges required that the original bridges be demolished and replaced with new bridges that have steep concrete sides which continue the flood wall from one side of the canal to the other. It is believed that negligence in the demolition of the old bridges and construction of the new bridges and the use of heavy vehicles and/or other heavy construction equipment in the demolition of the old bridges and construction of the new bridges caused and/or contributed to the eventual breach or breaches in the levee and/or flood wall.

(F) **The Inner Harbor Navigation Canal**

89.

Construction of the Inner Harbor Navigation Canal ("IHNC") commenced on June 6, 1918. Excavation work initiated with the construction of parallel dikes on either side of the canal. The more resistant clay materials that were excavated were dragged up onto the dikes, and were gradually built up to become permanent protective levees.

90.

From the onset, contractors battled problems with slope stability, as the soft oozy soils constantly slid back into the excavation. The defendant Corps was aware of these problems.

91.

The canal excavation was completed in September 1919. The lock structure was completed

-24-

on January 29, 1923, and dedication ceremonies for the entire IHNC were convened on May 5, 1923.

92.

At that time, the water level in the IHNC (at times now called "The Indusrtial Canal") was controlled by the tides in Lake Pontchartrain.

### (G) The Gulf Intracoastal Waterway

93.

The Gulf Intracoastal Waterway ("GIWW") forms a protected shipping lane between Port Isabel, Texas (the Mexican border) and Apalachee Bay, Florida.  It was originally conceived in 1808, but was not authorized by Congress until 1919.  The GIWW was excavated by dredge under Corps authority in the late 1930s, to create a channel size measuring 9-feet deep by 100-feet wide. This later was enlarged to a 12- feet deep by 125- feet wide channel.  The work was officially completed in June 1949.

94.

In 1944, under the authority of the Corps, the GIWW was rerouted to pass through the southern part of the IHNC, creating the first shallow channel through the wetlands to facilitate propagation of hurricane surge from Lake Borgne.  By causing and allowing this to occur, the Corps had created the first part of a "Hurricane Alley," directed into the center of New Orleans.

95.

In 1947, a back protection levee adjacent to the IHNC was overtopped at Tennessee Street during a hurricane, spilling 10 feet of water into the East Side of New Orleans.  Fortunately, the levee did not collapse, the area was undeveloped, and the flooded properties were quickly remediated.  Still, there was flooding in the Metairie and Jefferson Parish areas attributable to even

this temporary overtopping.  The Corps was aware of these events.

(H) **The Mississippi River Gulf Outlet**

96.

From its inception over forty years ago, the Mississippi River Gulf Outlet navigational canal ["MRGO"] has run from the Gulf of Mexico alongside St. Bernard and into the GIWW and the IHNC.

97.

In constructing the MRGO without using a separate canal (parallel to the GIWW) to connect to the IHNC, the Corps unilaterally deviated from a MRGO Authorization Report it submitted to Congress.  This unilateral action significantly deepened and widened the GIWW from the point of connection to the IHNC thus increasing vessel traffic and producing significantly increased hydrologic consequences that caused or substantially contributed to the flooding and inundation complained of herein.

98.

The MRGO Authorization Report of the Corps further recommended studies of the MRGO's impact on the Louisiana coast and opined: "...[t]he exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board.  Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available."

99.

No such studies were done; and, thus, the Corps did not consider alternatives that would be

less destructive to the lands and wetlands of Louisiana.

100.

At all times during its existence, the MRGO has had the inherent and known capability to funnel rapidly-accelerated, storm-driven surges, and magnify such surge force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish.  It also has been known from the outset to be a waterway capable of denuding and destroying a critical natural buffer on the east side of New Orleans against storm surges associated with hurricanes.

101.

The Corps is responsible for the maintenance of the MRGO.  This ongoing responsibility has included dredging the bottom of the waterway to remove deposited soil and silt.  Proper dredging of the MRGO could ameliorate the "funnelings effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in Orleans and St. Bernard Parishes during hurricanes such as Katrina.  The Corps has not caused or allowed this to occur.

102.

The northeast shore juncture of the MRGO and the GIWW is particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels.

103.

The relationship between the MRGO and the IHNC/GIWW was made manifest in the conditions associated with Hurricane Betsy in September 1965.  Both sides of the IHNC experienced breaks and overtopping.  6,560 homes and 40 businesses were flooded in water up to seven feet deep on the west side of the IHNC.  The east side of the IHNC also failed, flooding the west end of St. Bernard's parish.  The Corps' 1965 report on Hurricane Betsy confirmed that both internal levee

failures and overtopping occurred along the IHNC on both the west and east sides.

(I) **The Lake Pontchartrain, Louisiana and Vicinity,**
**Hurricane Protection Project**

104.

The flood control structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain Project").

105.

Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around the Lake Pontchartrain. Although federally authorized, it was a joint federal, state, and local effort with the federal government paying 70% of the costs and the state and local interests paying 30%. The Corps was responsible for project design and construction, and local interests were responsible for maintenance of levees and flood control structures.

106.

The legislatively-mandated overall design criterion of the Lake Pontchartrain Project mandated by Congress was to protect the area from

"the most severe combination of meteorological conditions considered characteristic for the region."

107.

The Corps expected these conditions to occur once in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project Hurricane" ("SPH").

108.

However, the Corps' based its overall design specifications on the 1959 U.S. Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to protect from a 1-in-200 years to a 1-in-300 year hurricane.

109.

Moreover, the 1959 SPH was known to be obsolete by 1972, just as construction of initial parts of the Lake Pontchartrain Project, the flood walls along the IHNC, was getting underway. The 1959 SPH specification of maximum sustained wind speeds of 107 mph was increased by the National Weather Service to 129 mph. An increase of 20% in maximum winds can lead up to a 40% elevation of maximum surge elevation.

110.

In 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the maximum sustained winds again to 140 mph, a category 4 hurricane (Technical Report NWS 23), which further exacerbated the Corps' design deficiencies.

111.

In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation ER 1110-2-1453. The regulation provides direction for the development of SPH and Probable Maximum Hurricane wind fields along the Gulf and east coasts of the United States. The regulation states specifically:

> "5.   Requirements> ER 1110-2-1453 provides direction on the selection of the level of protection to be afforded by Corps flood damage prevention projects in urban areas. All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric

> Administration (NOAA) Technical Report NWS 23
> for specifying meteorological criteria for SPH and
> PMH wind fields along the gulf and east coasts of the
> United States."

112.

Notwithstanding this order to revise all SPH-based analysis to reflect the new understanding of threat, the Corps elected to base its designs for the Lake Pontchartrain Project on the 1959 SPH.

113.

In addition to the application of the wrong SPH, the Corps' elected to base the Project's overall design specifications on the wrong elevation datum.

114.

The Corps applied the National Geodetic Vertical Datum of 1929 ("NGVD29"), even though they were aware of the fact that NGVD29 was not any longer equal to — and interchangeable with — local mean sea level ("LMSL"), and that LMSL was the only relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis.

115.

However, when the Corps' adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29, was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and the flood walls crowns were constructed lower by this margin.

116.

This design flaw was perpetuated in the construction of hurricane protection works when the Corps' New Orleans District adopted a policy in 1985, with the approval of the USACE Lower Mississippi Valley Division (LMVD), to explicitly use the outdated 1929 NGVD29 adjustment for elevation control.

117.

As a result, no provision was made to account for the 3 to 4 feet per century subsidence rates characteristic of the greater New Orleans metropolitan area even though this rate was known at the time of congressional authorization of the Lake Pontchartrain Project.

118.

Crown elevation deficiencies ranging up to 6 feet at the time Katrina struck resulted in prolonged overtopping of flood walls and levees along IHNC that otherwise would have been overtopped only briefly. Prolonged overtopping led to catastrophic breaches into the Orleans Metro area west of the IHNC.

119.

The original and only project design authorized by Congress, known as the "Barrier Plan," included a series of levees along the lakefront, concrete flood walls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook at the northern end of the IHNC. These structures were intended to prevent storm surges from entering Lake Pontchartrain and the IHNC, protecting from overflowing the levees along the lakefront and the flood walls along the IHNC.

120.

The Barrier Plan was selected over another alternative, known as the "High-Level Plan," which excluded the barriers and flood control gates at the Rigolets, Chef Menteur Pass, and Seabrook complexes, and instead employed higher levees and flood protection structures along the lakefront and along the IHNC.

121.

-31-

The Barrier Plan was selected because the High-Level Plan was believed to have many serious drawbacks, including the following:

(a)     High Level Levees would take years longer to construct because of subsidence problems;

(b)     They would be wider, thus requiring more rights of way;

(c)     In some locations flood walls, which are more vulnerable to severe damage and/or rupture by impact of runaway vessels during a hurricane and would virtually destroy the esthetic quality of the lakefront, are required rather than levees;

(d)     More rights of way would result in displacement of more residents, businesses, etc.;

(e)     With higher lake levels, the interior drainage system would be severely hampered;

(f)     The High Level Plan would offer no protection to less densely populated areas such as the Northshore;

(g)     Lakefront Levees would have to be 6 to 9 feet higher than the present design grade; and

(h)     Studies leading to project authorization, the high level plan was determined to cost approximately 50% more than the Barrier Plan.

122.

The estimated completion date for the Barrier Plan was 1978.

123.

The final design memoranda for the flood walls along the IHNC were completed in the late 1960s, and construction was completed in the 1970s.

124.

During the 1970s, the control complexes at the Rigolets and Chef Menteur were facing significant opposition from environmentalists.  This opposition culminated in a December 1977 court decision that enjoined the Corps from constructing the barrier complex and certain other parts

of the Project, until a revised Environmental Impact Statement was prepared and accepted.

125.

After the court-ordered injunction, the Corps was unable to produce a satisfactory Environmental Impact Statement for the Barrier Plan.  In 1984, the Corps finally abandoned the Barrier Plan and elected to implement the High-Level-Plan, even though the High-Level-Plan was believed to have many serious flaws.

126.

No action was taken to adjust the flood walls that were built along the IHNC to the new high-level design, thus leaving them at a considerably lower design.

127.

As of 2005, the Lake Pontchartrain Project was still under construction, forty years after its authorization.  While most public work structures would be scheduled for replacement or rehabilitation after forty years, planning for a more modern system was put off while the original project remained incomplete and continued to fall further behind in achieving a completion date. Design assumptions and policy made in 1965 continue to diminish the Lake Pontchartrain Project today.

### (J) Hurricane Katrina and the Failure of the Hurricane Protection System

128.

Hurricane Katrina made landfall at 6:10 a.m. near Buras, Louisiana, on the morning of Monday, August 29, 2005 with estimated maximum winds of 117 mph.

129.

After its first landfall, Hurricane Katrina followed a track due north that took it across the

Mississippi River to a final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border at about 9:45 a.m. The central pressure rose gradually as the storm was traversing southeast Louisiana. At the time of the Mississippi landfall, pressure had reached 928 mb and Katrina was still a Category 3 hurricane with estimated maximum winds of 105 mph. The hurricane accelerated after its Louisiana landfall from about 13 to 16 mph making it a relatively fast-moving storm. After moving inland over south and central Mississippi, it became a Category 1 hurricane by 1:00 p.m., about three hours after the Mississippi landfall. The National Hurricane Center downgraded Hurricane Katrina to a tropical storm about six hours later, when the remnants of the eye were northwest of Meridian, Mississippi.

130.

The center of Katrina's eye, which was estimated at 25 to 35 miles in diameter, passed about forty miles east of downtown New Orleans, but the city did not experience winds stronger than Category 1 or Category 2 (95 mph) velocities. Katrina's strongest winds were in the right-hand leading quadrant that was almost continually over water. A few instrumented towers placed in various locations in the greater New Orleans metropolitan area measured sustained winds in the range of 71-79 mph.

131.

As Katrina's storm surge increased in intensity, water levels within the MRGO, the GIWW, and the IHNC began to rise.

132.

The first breach within the metropolitan New Orleans Region occurred at approximately 5:00

-34-

a.m. at the CSX train Floodgate W-30 beside the Industrial Canal and immediately to the south of the Interstate-10 overpass. At this location, a steel storm gate on rollers had been damaged by a train several months prior to Hurricane Katrina. In lieu of this missing gate, a sandbag levee crest section had been constructed in the opening left by the missing floodgate. The sandbags completely washed out during Katrina.

133.

At this same site, flow along the juncture between the railroad embankment and the adjacent embankment fill supporting an asphalt paved roadway passing over the levee, resulted in erosion and scour that produced a second breach failure at essentially this same site. The roadway fill at this location was comprised largely of highly erodible lightweight "shell sand" fill, a material not suitable for levee fill, especially without sheet pile cutoff or similar features to prevent erosion.

134.

The defendant PNO's container facility received the full impact of the surge jet entering from the east through the MRGO/GIWW ship channel. This area experienced the highest surge levels in the IHNC, up to 15.4 feet (NAVD88), and more than a foot higher than the 14.2 feet at the south of the IHNC lock gate. The surge diminished by at least 2 feet between the container facility and Lake Pontchartrain.

135.

Two lines of flood protection have been constructed in this area. The original Corps flood walls and levees are set back from the canal bank and follow the south and west sides of the facility. The defendant PNO has been constructing a bank side line of protection that is at least as high as the Corps' hurricane protection system; however, it is incomplete at the northern end of the facility.

-35-

The Corps I-walls and levees that failed at the PNO facility were exposed to surge that came primarily around the north end of the incomplete PNO flood wall.

136.

The first breach at the PNO container facility occurred at the rail yard behind the container facility.  These breaches were the result of overtopping of an I-wall, with the overtopping flow then eroding a trench in the earthen levee crest at the inboard side of the flood wall.  This removal of lateral support unbraced the flood wall, and it was pushed over laterally by the water pressures from the storm surge on the outboard side.  The installation of erosional protection would have prevented the failure.  In addition, the depth of the sheet piles was unusually shallow at this location.  The I-wall failed by toppling laterally to the inboard (protected) side in a "rigid, post-hole" toppling mode as it became progressively unbraced by the erosion of the supporting soil at the inboard toe and, thus, became unable to support the water pressures on the outboard (canal) side due to the storm surge and hydrodynamic force.

137.

The other two large failures in this area occurred at transitions between disparate levee and flood wall sections, and/or at sections where unsuitable and highly erodible lightweight shell sand fills had been used to construct levee embankments.  These two adjacent erosional embankment breaches, which were less than fifty yards apart, occurred at the south end of the Port of New Orleans.  In both of these breaches, the embankment fill material was lightweight shell-sand, a material known to be unusually highly erodible.  This type of shell-sand material performed notably poorly and is a material not suitable for construction of critical flood protection systems protecting large populations.

-36-

138.

A major breach on 17th Street Canal occurred on the Orleans (east) side, between 9:00 and 9:15 a.m. on August 29, 2005.

139.

The breach rapidly scoured to depths below mean sea level, allowing lake and canal water to flow through the New Orleans (east) bank of the canal well after the storm surge had subsided.

140.

The flooding as a result of the breach of the 17th Street Canal was totally catastrophic, and caused at least 588 of the approximate 1,293 deaths attributed to date to the known flood wall failures associated with this event.

141.

Upon information and belief, water began to enter the Gentilly area east of the London Avenue Canal between 7:00 and 8:00 a.m. on August 29, 2005, pouring through a 200-foot wide breach in the levee/flood wall on the east side of the London Avenue Canal, just north of the Mirabeau Avenue bridge.  This breach is referred to as the "south breach" of the London Avenue Canal levee.

142.

The water from this south breach initially inundated the Gentilly area of the City, an area bounded on the west by the London Avenue Canal, on the south by Gentilly Boulevard (the Metairie/Gentilly Ridge), on the east by the Inner Harbor Navigational Canal (the Industrial Canal) and on the north by Lake Pontchartrain.  This water eventually combined with the flood waters from other breaches, which inundated other parts of the City.

143.

Upon information and belief, water began to enter the Gentilly area west of the London Avenue Canal sometime before 9:00 a.m. on August 29, 2005, pouring through a 400-foot wide breach in the levee/flood wall on the west side of the London Avenue Canal, just south of the Robert E. Lee Bridge.  This is referred to as the "north breach" of the London Avenue Canal levee.

144.

The water from the north breach initially inundated the Gentilly area of the city bounded on the west by Bayou St. John, on the north by Lake Pontchartrain, on the east by the London Avenue Canal, and along the southeastern side on a line drawn along Chef Menteur Highway to Gentilly Boulevard to Broad Street where it intersects with Orleans Avenue and then northwest along Orleans Avenue to Bayou St. John.  This water eventually combined with the flood waters from other breaches, which inundated other parts of the City.

145.

The soil underlying London Avenue Canal flood walls formed a highly permeable pathway through which groundwater originating in the canal penetrated and moved below the sheet piles and up into the layer of peat.  This caused the peat to expand and push through the ground on the outside of the canal resulting in a "ground heave," providing a flow path for water undermining the levee, and causing the collapse of the levee and flood wall.

146.

The water in the canal, with the added pressure due to increased water from storm surge, moved through the sand and then moved below the sheet piles and up to the surface on the land side of the levee, eventually undermining the levee and causing the levee and flood wall to collapse.

-38-

147.

The undermining and collapse of the levee and flood wall at the London Avenue breaches could have been prevented by placing the sheet piles to a depth of 50 feet below sea level, where their bottom ends would have terminated in a layer of clay.

148.

The storm surge associated with this hurricane did not overtop the flood walls at the sites of either of the 17th Street Canal breach or the north or south London Avenue Canal breaches. Because the eye-wall of Hurricane Katrina passed dozens of miles east of the City, none of the levee or flood walls experienced storm forces exceeding or even equaling the Category 3 forces for which they were allegedly designed. Further, the maximum sustained winds that would have impacted Lake Pontchartrain were only 95 miles per hour, some 16 miles per hour less than the 111 mile per hour minimum for winds in a Standard Project Hurricane (Category 3 storm).

149.

Even though only Category 2 forces impacted Lake Pontchartrain, the flood walls of which were not overtopped, the 17th Street Canal and London Avenue Canal levees/flood walls failed and allowed waters from Lake Pontchartrain to flood New Orleans. None of the flood wall breaches in question would have occurred under the conditions of nature associated with this event; these breaches occurred due to basic engineering, design, construction, maintenance and oversight failures and deficiencies, respectively and collectively attributable to the named defendants herein.

## CLASS ACTION ALLEGATIONS

150.

This action should be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

151.

Named plaintiffs **MICHELLE HENNESSEY, LAURIE CONIGLIO, LEO MITCHELL, LENNIECE MORRELL, and CHARLES MOSES** are class representatives of a class defined as follows:

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the south by the Mississippi River, to the east by the IHNC, and to the west by the 17th Street Canal running from Lake Pontchartrain south to Metairie Road and then west on Metairie Road to Causeway Boulevard, and then south on Causeway Boulevard to the Mississippi River, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have—or, by a date to be determined by the Court, will have—fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

152.

The proposed class is so numerous that a joinder of all members and a proceeding of the claims individually through such a mass joinder would be impracticable.  Hence, the "numerosity" requirement of Rule 23 is satisfied.

153.

There are common questions of law and fact applicable to both the named plaintiffs and putative class members, including, but not limited to:

(a)    The cause or causes of the breaches and/or failures of the hurricane protection systems associated with the 17th Street Canal, the London Avenue Canal and the IHNC, the MRGO, and the Lake Pontchartrain and Vicinity Hurricane Project;

(b)     The legal duties to plaintiffs owed by each defendant;

(c)     Each defendant's breach of said duties;

(d)     The causal relationship between any such breaches and the failures of the hurricane protection systems at issue; and

(e)     Whether the named defendants may assert certain affirmative defenses applicable to all named plaintiffs and putative class members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

### 154.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above. Hence, the typicality requirement of Rule 23(a) is satisfied.

### 155.

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class. Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation. On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members. Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein. Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

### 156.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein. Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied in this matter.

157.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation. Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court.  Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

158.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

159.

Alternatively, plaintiffs request that this matter be certified as a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, inasmuch as certain defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

160.

In addition to requesting certification of the foregoing, general class as defined, named plaintiffs request pursuant to the provisions of Rule 23(c)(4) that the above class be divided into the following subclasses, each subclass to be treated as a class:

SUBCLASS ONE

161.

Plaintiffs **MICHELLE HENNESSEY, ALICE MEYER, LAURA GREER, GARY GREER** are subclass representatives of a subclass defined as follows:

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the south by Metairie/Gentilly Ridge, to the east by the Orleans Canal, and to the west by the 17th Street Canal, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have—or, by a date to be determined by the Court, will have—fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

162.

There are common questions of law and fact applicable to both the named plaintiffs and putative class members, including, but not limited to:

(a)     The cause or causes of the breaches and/or failures of the hurricane protection system associated with the 17th Street Canal;

(b)     The legal duties to plaintiffs owed by each defendant responsible for said failures;

(c)     Each such defendant's breach of said duties;

(d)     The causal relationship between any such breaches and the failures of the hurricane protection system at issue; and

(e)     Whether the named defendants may assert certain affirmative defenses applicable to all putative subclass representatives and members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

163.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above.  Hence, the typicality requirement of Rule 23(a) is satisfied.

164.

-43-

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class.  Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.  On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members.  Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein.  Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

165.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein.  Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied in this matter.

166.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation.  Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court.  Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

167.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

SUBCLASS TWO

-44-

168.

Plaintiffs **LAURIE CONIGLIO, GERTRUDE ESTEVES, STELLA WASHINGTON,**

**JOHN B. WILLIAMS, and EMANUEL WILSON** are subclass representatives of a subclass

defined as follows:

> All individuals and entities, both private and public and both natural
> and juridical, in the geographic area bounded to the north by Lake
> Pontchartrain, to the south by Gentilly Boulevard running to Broad
> Street, where it intersects with Esplanade Avenue, and then running
> northwest along Esplanade Avenue to City Park Avenue, to Marconi
> Boulevard, and to the Orleans Canal, to the east by the London
> Avenue Canal, and to the west by Bayou St. John, who/which
> sustained damages as a result of the inundation/flooding in this area
> which occurred during and immediately following the landfall of
> Hurricane Katrina on or about August 29, 2005, and who/which, as
> to the defendant Corps only have—or, by a date to be determined by
> the Court, will have—fulfilled whatever administrative claim filing
> requirements this Court deems applicable in this matter.

169.

There are common questions of law and fact applicable to both the named plaintiffs and

putative class members, including, but not limited to:

(a)     The cause or causes of the breaches and/or failures of the hurricane protection
systems associated with the 17th Street and London Avenue Canals;

(b)     The legal duties to plaintiffs owed by each defendant responsible for said failures;

(c)     Each such defendant's breach of said duties;

(d)     The causal relationship between any such breaches and the failures of the hurricane
protection systems at issue; and

(e)     Whether the named defendants may assert certain affirmative defenses applicable to
all putative subclass representatives and members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

170.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above.  Hence, the typicality requirement of Rule 23(a) is satisfied.

171.

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class.  Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.  On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members.  Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein.  Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

172.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein.  Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied in this matter.

173.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation. Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court.  Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

174.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

SUBCLASS THREE

175.

Plaintiffs **LUCINDA COCO, LESLIE DORANTES, ANITA HARRISON, TRENISE JACKSON, and DWAYNE MALLET,** are subclass representatives of a subclass defined as follows:

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the south by Gentilly Boulevard and along Gentilly Boulevard to its intersection with the London Avenue Canal, to the east by the IHNC, and to the west by the London Avenue Canal who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only have—or, by a date to be determined by the Court, will have—fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

176.

There are common questions of law and fact applicable to both the named plaintiffs and putative class members, including, but not limited to:

(a)    The cause or causes of the breaches and/or failures of the hurricane protection system associated with the London Avenue Canal;

(b)    The legal duties to plaintiffs owed by each defendant responsible for said failures;

(c)    Each such defendant's breach of said duties;

(d)    The causal relationship between any such breaches and the failure or failures of the hurricane protection system at issue; and

(e)    Whether the named defendants may assert certain affirmative defenses applicable to

-47-

all putative subclass representatives and members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

177.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above.  Hence, the typicality requirement of Rule 23(a) is satisfied.

178.

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class.  Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.  On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members.  Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein. Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

179.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein.  Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied in this matter.

180.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation.

Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court.  Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

181.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

<u>SUBCLASS FOUR</u>

182.

Plaintiffs **DONNA AUGUSTINE, GLADYS LA BEAUD, DAISY INNIS, BETTY JONES, and DENISE MEADE,** are subclass representatives of a subclass defined as follows:

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Gentilly Boulevard (Gentilly Ridge), to the south by the Mississippi River, to the east by the IHNC, and to the west by Esplanade Avenue, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have—or, by a date to be determined by the Court, will have—fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

183.

There are common questions of law and fact applicable to both the named plaintiffs and putative class members, including, but not limited to:

(a)    The cause or causes of the breaches and/or failures of the hurricane protection systems associated with the IHNC and MRGO;

(b)    The legal duties to plaintiffs owed by each defendant responsible for said failures;

(c)    Each such defendant's breach of said duties;

-49-

(d)     The causal relationship between any such breaches and the failures of the hurricane protection systems at issue; and

(e)     Whether the named defendants may assert certain affirmative defenses applicable to all putative subclass representatives and members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

184.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above.  Hence, the typicality requirement of Rule 23(a) is satisfied.

185.

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class.  Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.   On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members.   Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein. Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

186.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein.  Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied in this matter.

187.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for

the efficient handling and disposition of the issues and claims presented in this litigation. Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court.  Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

188.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

SUBCLASS FIVE

189.

Plaintiffs **JOELLA CEPHAS, BEATRICE DREW, EDDIE KNIGHTEN, CALVIN LEVY, and NICOLA McCATHEN** are subclass representatives of a subclass defined as follows:

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Metairie Road/City Park Avenue, to the south by the Mississippi River, to the west by Causeway Boulevard, and to the east by Esplanade Avenue, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have—or, by a date to be determined by the Court, will have—fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

190.

There are common questions of law and fact applicable to both the named plaintiffs and putative class members, including, but not limited to:

(a)     The cause or causes of the breaches and/or failures of the hurricane protection systems associated with the 17th Street Canal, the London Avenue Canal, the IHNC

-51-

and the MRGO, and the Lake Pontchartrain and Vicinity Hurricane Project;

(b)     The legal duties to plaintiffs owed by each defendant;

(c)     Each defendant's breach of said duties;

(d)     The causal relationship between any such breaches and the failures of the hurricane protection systems at issue; and

(e)     Whether the named defendants may assert certain affirmative defenses applicable to all putative subclass representatives and members.

Hence, the commonality requirement of Rule 23(a) is satisfied.

191.

The claims of the named plaintiffs are typical of all claims similarly situated in the class as defined above.  Hence, the typicality requirement of Rule 23(a) is satisfied.

192.

Named plaintiffs will fairly and adequately represent the interests of the proposed plaintiff class.  Each named plaintiff is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.  On behalf of the named plaintiffs, these counsel may be expected to handle this matter in an expeditious and economical way, serving the interests of all class members.  Moreover, the named plaintiff class member themselves have agreed to enthusiastically and faithfully protect the interests of all absent plaintiff class members, by remaining involved as necessary in the decision-making required on the part of claimants herein.  Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

193.

The aforementioned common questions or issues of fact and law not only exist, but predominant over individualized questions of fact and law herein.  Accordingly, the predominance

requirement of Rule 23(b)(3) is satisfied in this matter.

194.

The class action procedure which plaintiff seeks under Rule 23 offers a superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation. Alternatively, piecemeal litigation would result in a process that would be judicially inefficient, enormously expensive, greatly protracted, time-consuming, and unduly burdensome for the litigants and the Court. Therefore, the superiority requirement of Rule 23(b)(3) also is satisfied.

195.

Based upon the foregoing, plaintiffs specifically request that this matter be certified as a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

## ALLEGATIONS OF FAULT

### COUNT I:
### LEGAL FAULT IN THE DREDGING OF THE 17TH STREET CANAL

196.

Plaintiffs representing and within proposed Subclasses One, Two and Five refer to the preceding allegations of fact which relate to the dredging activity in the 17th Street Canal. All allegations of fault incorporated therein are respectfully re-averred.

197.

The following defendants had the legal responsibility and duty to these plaintiffs to cause, allow, and/or conduct the aforesaid dredging activity in a manner that would not compromise the safety of the canal's levee/flood wall system: the defendants Corps, OLD, EJLD, SWB, M&M, Eustis and Boh Bros. The defendant St. Paul's Fire and Marine Insurance Company is directly liable

to these plaintiffs as the liability insurer of defendant OLD.

198.

The defendant Corps negligently failed to follow federal regulations and its own engineering standards and procedures, in regard to the issuance of a permit to dredge the 17th Street Canal.

199.

The defendant Corps violated federal law to the extent the River & Harbors Act prohibits the granting of a dredging permit that is contrary to the public interest.

200.

Published federal regulations (including 33 CFR §320.4) established general policies for the federal government's evaluation of permit applications, and require that the reasonably expected benefits of the requested dredging be balanced against the reasonably foreseeable harm from same, including possible harm related to detrimental effects on flood control.   The defendant Corps violated this policy in not considering the impact of its approval of the dredging permit for the 17th Street Canal, and in fact disregarded overwhelming evidence to the effect that approval of the permit would dangerously compromise the 17th Street Canal's flood protection levee.

201.

The defendant Corps negligently issued a dredging permit which caused and allowed changes to occur in the 17th Street Canal bottom, leading to subsurface and soil destabilization of the canal levee.

202.

The Corps' fault in connection with the dredging of the 17th Street Canal arises under the Federal Tort Claims Act, under which the Corps is accountable for money damages caused by its

negligence in causing, permitting and allowing the aforesaid dredging activity.

203.

The Corps' negligent fault in connection with the foregoing alternatively is based upon the Federal Maritime/Admiralty Law of the United States, including the provisions of the Admiralty Extension Act.  Plaintiffs in proposed Subclasses One, Two and Five specifically aver that the Corps' dredging permit decision-making and activity relate to traditional maritime matters, activity, and commerce.  Moreover, the flood damage of which plaintiffs in proposed Subclasses One, Two and Five complain, directly resulted from dredging activity involving vessels on navigable water.

204.

The activities undertaken by the Corps in connection with the issuance of the referenced dredging permit are not activities forming part of a federal flood control project; and neither are these actions by the Corps such that they occurred in connection with an authorized federal control project.  Accordingly, the provisions of the Flood Control Act of 1928 [33 U.S.C. §702(c)] are not applicable as a basis for Corps immunity.

205.

The Corps had no discretion to permit the dredging activity in question, since the approved activity constituted damage to the public interest in violation of the defendant's clear statutory duties and obligations, and constituted activity which undermined already-existing flood protection for the benefit of citizens.

206.

The defendant SWB breached its legal responsibilities and duties to plaintiffs in proposed Subclasses One, Two and Five by seeking the dredging permit for the 17th Street Canal, and by

failing to withdraw its application for the permit upon learning of the flood protection dangers which might result from the requested dredging activity.

207.

The defendant SWB was negligent in requesting and causing the 17th Street Canal to be dredged to a depth lower than the sheet piles, to be dredged only in the Orleans Parish side, to be dredged too close to the flood wall on the Orleans Parish side, and to be dredged generally in a manner that would compromise the safety of the canals/levee flood walls.

208.

The defendant SWB was negligent in refusing to agree to the implementation of the Congressionally-authorized "Barrier Plan," which would have reduced the storm surge from Hurricane Katrina and prevented the adoption of a flawed, alternative plan with respect to the 17th Street Canal.

209.

The defendant OLD violated its legal responsibilities and duties to the plaintiffs in proposed Subclasses One, Two and Five by negligently allowing, and/or by negligently failing to challenge and prevent, the aforesaid dredging in the 17th Street Canal.

210.

The defendant OLD is liable to the plaintiffs in proposed Subclasses One, Two and Five for its refusal to agree to the implementation of the "Barrier Plan," which would have reduced the storm surge from Hurricane Katrina and prevented the adoption of a flawed, alternative, plan with respect to the 17th Street Canal.

-56-

211.

The defendants OLD and EJLD both and each negligently failed to conduct appropriate oversight, maintenance and inspection of the 17th Street Canal levee/flood wall system, pursuant to which the safety flaws and discoverable dangers of the system would have been disclosed to the public and/or corrected.

212.

The defendants OLD and EJLD both and each violated legal responsibilities and duties to the plaintiffs in proposed Subclasses One, Two and Five by negligently allowing, and/or by negligently failing to challenge and prevent, the aforesaid dredging in the 17th Street Canal.

213.

Plaintiffs in proposed Subclasses One, Two and Five aver that defendant St. Paul's had in full force and effect a policy of liability insurance affording coverage to the defendant OLD with respect to the matters, risks and things for which this defendant is liable herein, thereby affording plaintiffs the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

214.

Plaintiffs in proposed Subclasses One, Two and Five aver that defendants Eustis and M&M both and each were negligent in the engineering, design, analysis and recommendations regarding critical aspects of the dredging project for the 17th Street Canal.

215.

Defendants Eustis and M&M negligently failed to place proper hydrostatic pressure monitors during the dredging of a test section of the 17th Street Canal in 1983, and specifically placed the

monitoring piezometers on the wrong side of the canal, erroneously concluding that digging the test section resulted in no relevant hydrostatic changes.  These defendants negligently failed to take into account the seepage flow of the permeable soils already in progress when the piezometers were installed.

COUNT II:
LEGAL FAULT IN THE DESIGN AND CONSTRUCTION
OF THE 17TH STREET CANAL LEVEES AND FLOOD WALLS

216.

Plaintiffs representing and within proposed Subclasses One, Two and Five refer to the preceding allegations of fact which relate to the design and construction of the 17th Street Canal levees and flood walls.  All allegations of fault incorporated therein are respectfully re-averred.

217.

The following defendants had the legal responsibility and duty to these plaintiffs to design and construct the levees and flood walls of the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system: the defendants Corps, OLD, EJLD, SWB, M&M, Eustis, Boh Bros., Pittman and Gulf Group.

218.

The 17th Street Canal was not an authorized federal flood control project.  Accordingly, the defendant Corps enjoys no immunity under 33 U.S.C. §702c with respect to the alleged failures and deficiencies in the levees and flood walls of the 17th Street Canal.

219.

The defendant Corps' design of the I-wall for the 17th Street Canal was never authorized by Congress.  The design and construction of these I-walls therefore was not a flood protection project

-58-

authorized by Congress, making the immunity provision of 33 U.S.C. §702c inapplicable.

220.

The defendant Corps knew or should have known that the design and construction of these levees and flood walls were impracticable, unsafe, and subject to overflow and damage, putting plaintiffs' safety and property at risk.

221.

To the extent the Flood Control Act of 1928 does apply, the defendant Corps breached its affirmative duty to institute proceedings to acquire either the absolute ownership of the lands adjacent to the canal which was subject to overflow and damage, or to acquire the floodage rights over such lands, as provided for in 33 U.S.C. §702c.

222.

The defendant Corps negligently abandoned an authorized plan to install floodgates which have lessened the storm surge from Hurricane Katrina, and opted instead for a "parallel" plan under which the 17th Street Canal levee and flood wall system was inadequate as designed and built.

223.

The defendants M&M, Eustis, Boh Bros., and Pittman were negligent in conducting their respective design, and analysis and/or construction activities with respect to the levee/flood wall system of the 17th Street Canal.  These defendants were experts in their fields, and knew or should have known of the risk and dangers associated with the aforesaid design and construction, particularly given the nature of the soil in the area and height and stability of the I-walls. Defendants either negligently failed to discover the unsafe features of this design and construction, or negligently proceeded with same, in spite of their awareness that the system was subject to

-59-

failure.

224.

Defendants M&M and Eustis, as engineering experts, negligently proceeded in their support of and participation in the 17th Street Canal levee and flood wall Project, despite the fact that they knew or should have known of design and stability problems with the Project.

225.

Defendants Boh Bros. and Pittman, as construction experts, negligently proceeded in their support of and participation in the aforesaid project, despite the fact that they knew and should have known of testing, composition, construction and stability problems with the project.

226.

Upon information and belief, soil data was necessary for planning and executing a construction job of this nature. Although its contract with the Corps of Engineers advised prospective bidders that physical data was available upon request, Pittman never asked for that data prior to bid, and was thus unable to have considered it in formulating its construction approach or bid. Pittman was negligent in proceeding with the work without such information.

227.

Upon information and belief, defendant Boh Bros. installed sheet piling and later dredged the 17th Street Canal and thereby exposed layers of unstable peat and soft clays to increased pressures from flood waters, without conducting adequate investigation into the consequences of such dredging and in a manner that was otherwise negligent.

228.

Defendants Boh Bros. and Pittman also were negligent in using and placing heavy equipment

during their construction activity, so as to compromise the ultimate safety and stability of the canal's levee system.

229.

Defendants SWB, OLD and EJLD likewise are negligent in failing to discover through their legal obligations to plaintiffs in proposed Subclasses One, Two and Five, the risks and dangers associated with the design and construction of the 17th Street Canal levee/flood wall system.  These defendants knew or should have known of such dangers, and should have taken all appropriate action to prevent the unsafe design and construction in question, or challenge same.

230.

The defendants SWB, OLD and EJLD are negligent for objecting to the implementation of the "Barrier Plan," which would have reduced the storm surge associated with Katrina and avoided the alternative, flawed plan implemented for the 17th Street Canal.

231.

In addition to their liability cased upon negligent acts of omission and commission, defendants OLD and EJLD had care, custody and control of the 17th Street Canal Levee and flood wall system at all times pertinent herein, and accordingly are answerable under Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the levee and flood wall system which caused the damages of which plaintiffs complain.

232.

Upon information and belief, defendant Gulf Group contracted to repair a bridge which spans the 17th Street Canal from Old Hammond Highway to Robert E. Lee Boulevard.  In doing so, it is believed to have engaged in blasting, demolition and pile-driving activity, which together with the

heavy equipment used and placed by this defendant, weakened the integrity of the 17th Street Canal levees and/or flood walls, directly and/or proximately contributing to the catastrophic breach which occurred on or about August 29, 2005.

233.

Defendant Gulf Group's liability in this regard is based both on negligence and on ultra-hazardous activity for which it is legally accountable in the absence of negligence.

234.

On information and belief, the defendant SWB also failed to properly respond to actual reports of canal water in the yards of homes adjacent to the 17th Street Canal — an indicator of underseepage due to the flawed design and construction of flood walls — which were made to the defendant SWB prior to the catastrophe giving rise to this litigation.

COUNT III:<br>
LEGAL FAULT IN THE DESIGN AND CONSTRUCTION<br>
OF THE LONDON AVENUE CANAL LEVEES AND Flood wallS

235.

Plaintiffs representing and within proposed Subclasses One, Three and Five refer to the preceding allegations of fact which relate to the design and construction of the London Avenue Canal levees and flood walls.  All allegations of fault incorporated therein are respectfully re-averred.

236.

The following defendants had the legal responsibility and duty to these plaintiffs to design and construct the levees and flood walls of the London Avenue Canal in a manner that would not

-62-

compromise the safety of the canal's levee/flood wall system: the defendants Corps, OLD, Burk-Kleinpeter, Gotech, and B&K Construction.

237.

In addition to its liability cased upon negligent acts of omission and commission, defendant OLD had care, custody and control of the London Avenue Canal levee and flood wall system at all times pertinent herein, and accordingly are answerable under Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the leveee and flood wall system which caused the damages of which plaintiffs complain.

238.

Defendant B&K entered into a construction contract to build the London Avenue Canal levee and flood wall system and built the flood walls on both sides of the canal.  In performing its work, B&K was responsible for driving sheet piling into the soil and pouring the concrete monoliths that form the I-walls atop the sheet piles.  B&K negligently constructed the I-walls in question, which faulty construction directly and/or proximately caused and/or contributed to both the north and south breaches of the London Avenue Canal.

239.

Upon information and belief, defendant Burk-Kleinpeter, an engineering company, was contracted to design and/or construct the London Avenue Canal levee and flood wall system. Defendant Burk-Kleinpeter's negligent design and construction directly and/or proximately caused and/or contributed to both the north and south breaches of the London Avenue Canal levee and flood wall system.

240.

Upon information and belief, defendant Gotech, an engineering company, entered into a contract regarding design and/or construction of the London Avenue Canal levee flood wall system. The levees and/or flood walls were negligently designed and/or constructed and that defendant's faulty design and/or construction directly and/or proximately caused and/or contributed to both the north and south breaches in the London Avenue Canal.

241.

Plaintiffs in proposed Subclasses One, Three and Five aver that defendant St. Paul's had in full force and effect a policy of liability insurance affording coverage to the defendant OLD with respect to the matters, risks and things for which this defendant is liable herein, thereby affording plaintiffs the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

COUNT IV:
LEGAL FAULT REGARDING THE MRGO

242.

Plaintiffs representing and within proposed Subclasses Four and Five refer to the preceding allegations of fact which relate to the MRGO.  All allegations of fault incorporated therein are respectfully re-averred.

243.

The following defendants had the legal responsibility and duty to these plaintiffs to protect against the harm and damages alleged herein resulting from the MRGO: the defendants Corps, OLD, and St. Paul's.

244.

The Corps' negligence in designing, engineering and constructing the MRGO, *inter alia*,

included:

    (a)      failing to take account of the waterway's inherent capability to serve as a funnel or conduit for rapidly-accelerated, storm-driven surges, which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans;

    (b)      failing to "armor" levees on both banks of the MRGO, and

    (c)      failing to account for the devastation (through the construction itself as well as salt water intrusion and accelerated erosion) of the wetlands walls and land masses, thus denuding and destroying a critical natural buffer against storm surge, and exacerbating the funnel effect created by MRGO's design.

245.

The Corps also designed, constructed, operated, and maintained the MRGO according to faulty plans and specifications, in violation of the River & Harbors Act, which directed the Corps to "coordinate its investigation and planning with the United States Department of the Interior ["DOI"]. The Corps failed to coordinate with and involve the Governor and the DOI and thus violated its duties and obligations.

246.

The Fish and Wildlife Coordination Act, 16 U.S.C. §662, also required coordination between any federal agency proposing to "impound," "divert," or "control," a waterway or body of water, and the DOI, Fish and Wildlife Service. The MRGO is such a waterway. This statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MRGO project, including investigation, planning, and construction.

247.

The Corps breached these statutory duties to consult and cooperate with State authorities. The defendant negligently and recklessly proceeded to build MRGO without waiting for the completion of an essential four-year study requested by the DOI.

248.

The Corps failed to follow requirements of 33 CFR 335-38, particularly 33 CFR 336.1(c)(4) and 33 CFR 320.4(b) and Executive Order 11990.  The Corps failed to execute MRGO dredging activities in the manner required by 33 CFR 337.5 and 338.2.  Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by CFR 337.2), including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities.

249.

In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance and operation of the MRGO, including the National Environmental Policy Act (NEPA), 42 U.S.C. §4332(c); the Water Resources Development Act of 1990 (NRDA), 33 U.S.C. §§2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. §1452, *et seq.* and the Louisiana State and Local Coastal Resources Management Act, La.-R.S. 49:214.21 *et seq.*  Additionally, the Corps illegally and improperly transported or otherwise disposed of dredge spoil, including, but not limited to in negligent and illegal placement of said spoil as spoilbanks.

250.

As a proximate result of the negligent and reckless acts or omissions of the Corps, the flooding/inundation of which plaintiffs complain was significantly aggravated and made extensive.

251.

Defendant OLD was granted the authority to establish adequate drainage and flood control

in Orleans Parish and other areas within the jurisdiction including the IHNC.  OLD specifically was granted authority to erect flood control works as they relate to tidewater flooding, hurricane protection and saltwater intrusion, and engage in the construction and maintenance of safe levees and/or spoilbanks.   All levee districts and their commissioners, including OLD, have the responsibility for the care and inspection of levees.

252.

The negligence and/or fault of OLD caused or contributed to cause the failure of the levee system which failed in connection with the MRGO.

COUNT V:
LEGAL FAULT REGARDING THE IHNC
PROTECTION SYSTEM ON THE WEST SIDE

253.

Plaintiffs representing and within proposed Subclasses Four and Five refer to the preceding allegations of fact which relate to the IHNC.  All allegations of fault incorporated therein are respectfully re-averred.

254.

The following defendants had the legal responsibility and duty to these plaintiffs to protect against the harm and damages alleged herein resulting from the failure of the IHNC: the defendants Corps, OLD, St. Paul's, CSX, PBR, and PNO.

255

The City of New Orleans is the sole owner of the New Orleans Public Belt Railroad Commission, a non-profit switching railroad which operates switches and terminal services for over 100 miles of track in New Orleans, Louisiana.

256.

On or about September 11, 2004, a New Orleans Public Belt Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30, which is part of the flood wall system situated immediately west of, and running int a north-south direction parallel to, the IHNC north of the Interstate 10 high-rise.

257.

On December 14, 2004, the defendant PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-30, but, on information and belief, both PBR and OLD failed to assure these repairs were made, prior to the August 2005 catastrophe giving rise to this action.

258.

Upon information and belief, defendant CSX designed and constructed a railroad crossing at or near the IHNC's flood protection structures.  In so doing, CSX utilized highly erodible, lightweight, and/or porous materials including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than its surrounding flood protection structures.

259.

Upon information and belief, CSX also failed to install a "sheet pile cutoff" or similar device to prevent or limit erosion of its structure.

260.

Upon information and belief, CSX could have prevented the failure of its structure at minimal additional cost by installing concrete "splash pads" or other erosion protection devices at the base of the "I-walls."

261.

CSX failed to exercise due care in buildings its structure, and its failures directly and/or proximately caused and/or contributed to the breaches of the IHNC on the west side.

262.

The PNO has the full and exclusive right, jurisdiction, power, and authority to govern the Port of New Orleans and is responsible for the maintenance of its wharves, terminals, marshaling yards, cranes, and all transportation infrastructure affecting the regulation of commerce.

263.

The IHNC is a canal connected to the Port of New Orleans and is within the jurisdiction and control.

264.

Upon information and belief, the PNO never tested whether the design, construction, and/or maintenance of the structures and/or appurtenances of the IHNC were adequate, proper, and compliant with requisite standards.

265.

The PNO's failure to ensure the adequacy of the design, composition, construction and maintenance of the IHNC levees' and floodgates' constituted negligence, subjecting the PNO to liability for those flood damages attributable to the failure of these structures.

266.

Further, the levees and floodgates were within the care, custody, control and *garde* of the PNO, and said levees and floodgates contained vices and defects, which were known or should have been known to the PNO.  Accordingly, the defendant PNO's actions render it liable pursuant to Louisiana Civil Code Articles 2317 and 2317.1.

-69-

COUNT VI:
LEGAL FAULT IN CONNECTION WITH THE
ENTIRE NEW ORLEANS LEVEE SYSTEM

267.

Plaintiffs representing the entire, general class, including all subclasses, refer to the preceding factual allegations concerning the entire New Orleans levee and hurricane protection system, and the allegations of legal fault incorporated therein, all of which are respectfully re-averred.

268.

A legal responsibility was owed to these plaintiffs by the defendant OLD, pursuant to this defendant's enabling statues and statutory authority and responsibility.

269.

The defendant OLD negligently failed to inspect, maintain, monitor, protect and repair the levees and flood walls of the New Orleans levee system to ensure against: water seepage or saturated areas, undue settlement affecting the stability of flood walls, encroachment of trees and/or root systems affecting the stability of flood walls and integrity of levees, cracking, chipping or breaks in flood walls.  This negligence caused or substantially contributed to the inundation/flooding of which plaintiffs complain.

270.

In addition to its liability based upon negligent acts of omission and commission, defendant OLD had care, custody and control of the entire New Orleans levee and flood wall system at all times pertinent herein, and accordingly is answerable under Article 2317 and 2317.1 of the

Louisiana Civil Code for the vices and/or defects in the levee and flood wall system which caused the damages of which plaintiffs complain.

271.

The defendant OLD also is liable to plaintiffs for failing to expropriate any and all land adjacent to the New Orleans levee system, as necessary to insure compliance with its responsibility to preserve and maintain a safe levee and flood wall system.

272.

Plaintiffs aver that defendant St. Paul had in full force and effect a policy of liability insurance affording coverage to the defendant OLD with respect to the matters, risks and things for which this defendant is liable herein, thereby affording plaintiffs the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

COUNT VII:
LEGAL FAULT IN CONNECTION WITH THE LAKE
PONTCHARTRAIN VICINITY HURRICANE PROTECTION PROJECT

273.

Plaintiffs representing the entire, general class, including all subclasses, refer to the preceding factual allegations concerning the Lake Pontchartrain Vicinity Hurricane Protection Project, and the allegations of legal fault incorporated therein, all of which are respectfully re-averred.

274.

A legal responsibility was owed to plaintiffs by the defendant Corps, to devise, implement and maintain the Lake Pontchartrain Vicinity Hurricane Protection Project in a manner that afforded

plaintiffs protection against the catastrophic failure and deficiencies giving rise to this litigation.

275.

In regard to its deliberate departures from authorized, current and safe criteria, the defendant Corps instead assured that an inherently flawed Project would exist as of the time of this catastrophe.

276.

The Corps is liable to plaintiffs for its negligence as well as its willful and wanton recklessness in causing or allowing the serious failures and deficiencies of this Project, which in turn caused or substantially contributed to the catastrophic harm suffered by plaintiffs.

COUNT VIII:
NUISANCE IN VIOLATION OF LOUISIANA
AND/OR FEDERAL COMMON LAW

277.

Plaintiffs representing the entire, general class, including all subclasses, refer to the preceding factual allegations, concerning the MRGO, and the allegations of fault incorporated therein, all of which are respectfully re-averred.

278.

As the proprietor of the MRGO, the Corps had a duty pursuant to Louisiana Civil Code Article 667 to refrain from creating a nuisance with respect to the MRGO that would deprive, and threaten the deprivation of, the property use and ownership rights of plaintiffs in the event of a hurricane.  The Corps violated this state statutory duty by creating the MRGO's hazardous conditions.

279.

As the owner and operator of the MRGO, the Corps also had a federal common law duty to

plaintiffs to avoid creating a hazardous condition that would harm, and threaten to harm, the lives and property of nearby residents in the event of a hurricane.  Defendant violated this federal common law duty by allowing the MRGO to become a threat to human life, property, and the environment on the occurrence of Hurricane Katrina.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs individually, and on behalf of the class and subclasses they seek to represent, respectfully ask that judgments be entered in their favor and against the defendants, jointly, individually and *in solido*, to include the following:

(a)     an order certifying the requested class and subclasses;

(b)     an order appointing undersigned counsel as class counsel;

(c)     the award of economic and compensatory damages in amounts to be determined at trial;

(d)     the award of pre-judgment and post-judgment interest as allowed by law;

(e)     the award of attorney fees and costs of litigation pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, the Federal Tort Claims Act, and/or the Equal Access to Judgment Act;

(f)     such other relief to the class representatives and class/subclasses as is available under Louisiana and/or federal law;

(g)     a jury trial as to all issues triable by jury herein; and

(h)     such other relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED:

LEVEE LITIGATION GROUP

JOSEPH M. BRUNO, T.A.  (La. Bar #3604)
DANIEL E. BECNEL, JR.  (La. Bar #2926)
ROBERT BECNEL (La. Bar #22943)

JOHN W. DeGRAVELLES (La. Bar #4808)
WALTER C. DUMAS   (La. Bar #5163)
CALVIN C. FAYARD, JR.  (La. Bar #5486)
JIM S. HALL (La. Bar #21644)
DARLENE M. JACOBS (La. Bar #7208)
HUGH P. LAMBERT (La. Bar #7933)
F. GERALD MAPLES (La. Bar #25960)
STEPHEN WILES ( La. Bar # 17865)
GERALD E. MEUNIER (La. Bar #9471)
PEYTON P. MURPHY (La. Bar #22125)
ASHTON R. O'DWYER, JR.  (La. Bar #10166)
JERROLD S. PARKER
DENNIS C. REICH (Tx. Bar #16739600)
ALBERT REBBENACK (La. Bar # 18677)
J. PATRICK CONNICK (La. Bar # 22219)
ROBERT J. CALUDA (La. Bar # 3804)
KEITH COUTURE (La Bar # 22759)
RICHARD M. MARTIN, JR. (La. Bar # 8998)
FRANK DUDENHEFER, JR. (La. Bar # 5112 )
MICHAEL BURG (Co. Bar # 7143)
JAMES M. GARNER (La. Bar # 19589)
DARNELL BLUDWORTH (La. Bar #18801)
RANDALL A. SMITH (La. Bar # 2117)


BY:   s/Gerald E. Meunier
GERALD E. MEUNIER (La. Bar #9471)
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com
Levee PSLC Liaison Counsel

-and-


BRUNO & BRUNO, L.L.P.
Joseph M. Bruno (#3604)
David S. Scalia  (#21369)
855 Baronne Street

New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile:(504) 581-1493
E-Mail:jbruno@brunobrunolaw.com
Plaintiffs' Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants:

s/Gerald E. Meunier_____
GERALD E. MEUNIER, #9471