```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
     ************************************************************
 3   O'DWYER, ET AL

 4                                     Docket No. 05-CV-4181
     V.                                New Orleans, Louisiana
 5
                                       Friday, October 27, 2006
 6   UNITED STATES OF AMERICA, ET AL
     ************************************************************
 7
     KELLY A. HUMPHREYS
 8
                                       Docket No. 06-CV-0169
 9   V.                                New Orleans, Louisiana

10                                     Friday, October 27, 2006
     ENCOMPASS INSURANCE COMPANY, ET AL
11
     ************************************************************
12
     XAVIER UNIVERSITY OF LOUISIANA
13
                                       Docket No. 06-CV-516
14   V.                                New Orleans, Louisiana

15                                     Friday, October 27, 2006
     TRAVELERS PROPERTY CASUALTY
16   COMPANY OF AMERICA

17   ************************************************************

18   CHEHARDY, ET AL

19                                     Docket No. 06-1672, 1673 &
     V.                                1674
20                                     New Orleans, Louisiana

21                                     Friday, October 27, 2006
     STATE FARM FIRE & CASUALTY
22   COMPANY, ET AL

23   ************************************************************

24

25
```

```
 1                    TRANSCRIPT OF MOTION PROCEEDINGS
              HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
 2                   UNITED STATES DISTRICT JUDGE

 3

 4   APPEARANCES FOR 06-169:

 5   FOR THE HUMPHREYS PLAINTIFFS:       THE CREELY LAW FIRM
                                         BY:  ROBERT G. CREELY, ESQ.
 6                                       1010 Common Street, Suite 2650
                                         New Orleans, LA 70112
 7

 8
     FOR ENCOMPASS INSURANCE COMPANY:    BARRASSO USDIN KUPPERMAN
 9                                       FREEMAN & SARVER
                                         BY:  JUDY Y. BARRASSO, ESQ.
10                                       909 Poydras Street
                                         LL&E Tower - Suite 1800
11                                       New Orleans, LA 70112

12

13

14   APPEARANCES FOR 06-516:

15   FOR XAVIER UNIVERSITY
     OF LOUISIANA:                       SHER GARNER CAHILL RICHTER
16                                       KLEIN & HILBERT
                                         BY:  JAMES M. GARNER, ESQ.
17                                           DARNELL BLUDWORTH, ESQ.
                                         909 Poydras Street
18                                       LL&E Tower - 28th Floor

19

20   FOR TRAVELERS PROPERTY CASUALTY
     COMPANY OF AMERICA:                 LUGENBUHL, WHEATON, PECK,
21                                       RANKIN & HUBBARD
                                         BY:  RALPH S. HUBBARD, III, ESQ.
22                                           SIMEON B. REIMONENQ,JR., ESQ
                                             SETH A. SCHMEECKLE, ESQ.
23                                       601 Poydras Street, Suite 2775
                                         New Orleans, LA 70130
24

25
```

```
 1   APPEARANCES FOR 06-1672, 1673 & 1674:

 2

 3   FOR THE CHEHARDY PLAINTIFFS:        BRUNO & BRUNO
                                         BY:  JOSEPH M. BRUNO, ESQ.
     855 Baronne Street
 4                                       New Orleans, LA 70113

 5
                                         ANDERSON KILL & OLICK
 6                                       BY:  JOHN N. ELLISON, ESQ.
                                         1600 Market Street, Suite 2500
 7                                       Philadelphia, PA 19103

 8
                                         FAYARD & HONEYCUTT
 9                                       BY:  CALVIN C. FAYARD, JR., ESQ.
                                         519 Florida Avenue Southwest
10                                       Denham Springs, LA 70726

11
                                         RANIER, GAYLE & ELLIOT
12                                       BY:  N. FRANK ELLIOT, III, ESQ.
                                         1419 Ryan Street
13                                       Lake Charles, LA 70602-1890

14
                                         LEVIN, PAPANTONIO, THOMAS,
15                                       MITCHELL, ECHSNER & PROCTOR
                                         BY:  MATTHEW D. SCHULTZ, ESQ.
16                                       316 S. Baylen Street, Suite 600
                                         Pensacola, FL 32581
17

18                                       LARRY D. DYESS, ESQ.
                                         4637 Jamestown Avenue, Suite C
19                                       Baton Rouge, LA 70808

20

21
     FOR STATE FARM FIRE & CASUALTY
22   COMPANY:                            STONE, PIGMAN, WALTHER, WITTMANN
                                         BY:  WAYNE J. LEE, ESQ.
23                                            STEPHEN G. BULLOCK, ESQ.
                                         546 Carondelet Street
24                                       New Orleans, LA 70130

25
```

```
1    FOR TRAVELERS INSURANCE COMPANY
     AND STANDARD FIRE INSURANCE
2    COMPANY:                          LUGENBUHL, WHEATON, PECK,
                                       RANKIN & HUBBARD
3                                      BY:  RALPH S. HUBBARD, ESQ.
                                            SIMEON B. REIMONENQ,JR,ESQ.
4                                           SETH A. SCHMEECKLE, ESQ.
                                       601 Poydras Street, Suite 2775
5                                      New Orleans, LA 70130

6

7
     FOR STANDARD FIRE INSURANCE
8    COMPANY:                          ROBINSON & COLE
                                       BY:  WYSTAN M. ACKERMAN, ESQ.
9                                           STEPHEN E. GOLDMAN, ESQ.
                                       280 Turnbull Street
10                                     Hartford, CT 06103-3597

11

12   FOR ENCOMPASS INSURANCE COMPANY,
     ALLSTATE INSURANCE COMPANY AND
13   LIBERTY MUTUAL INSURANCE COMPANY: BARRASSO USDIN KUPPERMAN
                                       FREEMAN & SARVER
14                                     BY:  JUDY Y. BARRASSO, ESQ.
                                            H. MINOR PIPES, III, ESQ.
15                                     LL&E Tower, Suite 1800
                                       909 Poydras Street
16                                     New Orleans, LA 70112

17

18   FOR AMERICAN INSURANCE COMPANY:   DUPLASS ZWAIN BOURGEOIS, MORTON,
                                       PFISTER & WEINSTOCK
19                                     BY:  KELLY C. BOGART, ESQ.
                                       3838 N. Causeway Blvd.,Suite 2900
20                                     Metairie, LA 70002

21

22
     FOR AAA HOMEOWNERS AUTO CLUB
23   FAMILY INSURANCE COMPANY:         JOHNSON, JOHNSON, BARRIOS &
                                       YACOUBIAN
24                                     BY:  ALAN J. YACOUBIAN, ESQ.
                                            NEAL J. FAVRET, ESQ.
25                                     701 Poydras Street, Suite 4700
                                       New Orleans, LA 70139-7708
```

```
1

2    FOR LAFAYETTE INSURANCE COMPANY:    LAW FIRM OF WILLIAM J. WEGMANN
                                         BY:  WILLIAM J. WEGMANN, JR., ESQ
3                                        110 Veterans Memorial Boulevard
                                         Suite 440
4                                        Metairie, LA 70005

5

6    FOR LOUISIANA CITIZENS PROPERTY
     INSURANCE CORPORATION:              BIENVENU, FOSTER, RYAN & O'BANNON
7                                        BY:  GREGOR J. McDONALD, ESQ.
                                         1010 Common Street, Suite 2200
8                                        New Orleans, LA 70112-2401

9

10

11

12

13

14

15   Official Court Reporter:           Karen A. Ibos, CCR, RPR
                                         500 Poydras Street, Room HB-406
16                                       New Orleans, Louisiana 70130
                                         (504) 589-7776
17

18

19       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2                      (FRIDAY, OCTOBER 27, 2006)

3                        (MOTION PROCEEDINGS)

4

5          THE DEPUTY CLERK:  Court's in session, please be seated.

6   This is civil action 05-4182, reference 06-1672, 1673 and 1674.

7          MR. BRUNO:  Good afternoon, your Honor.  Are you all

8   right?

9          THE COURT:  Yeah, I'm all right, I'm just waiting.

10         MR. BRUNO:  I didn't know if you were ready for us or not.

11  Your Honor, Joseph Bruno, liaison counsel.  John Ellison will be

12  arguing for the Chehardy group and Mr. Garner and then Mr. Bob

13  Creely.  We've agreed to split the time.  And all of the plaintiffs

14  will speak first, even though we are defending some motions and

15  proposing some motions, but we figured the best thing to do is let

16  us go first, 30 minutes that side, go 30 minutes this side.

17         MR. HUBBARD:  With no rebuttal.

18         MR. BRUNO:  With no rebuttal.

19         THE COURT:  You can be seated.  I am just going to make a

20  few comments.  One reason for the, at least the way the world have

21  been in this case lately, the truncated time period is that I've had

22  hours of argument on the bulk of these issues and gone over

23  virtually every case that you have cited in a previous argument, so

24  I am familiar with the cases and the policy language.

25          As I see these cases, as we still, the issue, really the

1    key is the policy language of course, as any insurance coverage

2    case.   If I find the policy language to be clear, then I don't think

3    the anti-concurrent clause is really the issue; because if it's

4    clear that means that it excludes water damage caused for any

5    reason, therefore, no reason for the anti-concurrent clause to be

6    analyzed.

7         If I find it ambiguous and construe it in favor of the

8    insured, then again, for the purposes of this motion, the

9    anti-concurrent clause doesn't come into effect because it is a

10   covered peril, therefore, there is not an uncovered peril that

11   relates.

12        Where it might come into effect is when, is if I find, if

13   I rule for the plaintiffs in some of these motions, some or all of

14   these motions.   And the other motions that I have been pending.   It

15   may come into effect because, one, the plaintiff will have to prove

16   negligence; and two, causation.   They get to the causation, then the

17   defendant may urge that uncovered peril, that is flood without

18   negligence, caused this.   It may take the MRGO argument I just heard

19   and said it would have happened anyhow.   Who knows.

20        I'm just saying there is many a slips that covers the lip

21   before we get from here to there.   Just to let everybody know that.

22        And I intend to certify this ruling, and there are a lot

23   of cases being transferred into this court.   Any case involving a

24   levee breach is being put under this umbrella at least for pretrial

25   purposes until I and the executive committee decide, and the en banc

1    court ultimately decides to do something else with it.

2            And so after I make this ruling, which will cover a lot of

3    different policy language cases, after I make this ruling, which

4    should be in the next couple, three weeks, I am going to certify it

5    to the Court of Appeals, stay all motions, all other motions that

6    have not been urged in all of the cases that I am getting until such

7    time as the Court of Appeals rules.

8            Now what I am going to do with discovery, that's something

9    else.  We'll talk about that in a minute.  I am talking about stay

10   the case as to this issue, as to the coverage issue.  As to any

11   motions having to be filed on it because we will be enlightened when

12   the Fifth Circuit rules on this, and really this kind of thing it's

13   imperative that the Fifth Circuit rule with the alacrity hopefully I

14   can't.  I'll ask them in my certification to do so, and they might

15   even want to certify it to the Louisiana Supreme Court.  It's really

16   a uniquely Louisiana law issue.

17           With all of that said, I am ready to hear your arguments.

18           MR. ELLISON:  Good afternoon, your Honor, John Ellison for

19   the Chehardy plaintiffs.

20           THE DEPUTY CLERK:  It's warming up.

21           THE COURT:  It's like all of us, especially after lunch we

22   have to warm up again.

23           MR. ELLISON:  Your Honor, as Mr. Bruno said, we have

24   divided up the topics.  There may be slight overlap, I think we've

25   done a pretty good job of dividing up the subjects.

1          THE COURT:  And I do appreciate that.

2          MR. ELLISON:  We will do our best to cover different

3     issues, but there is a lot of overlap between the cases.

4          An overview of the points that I intend to cover quickly

5     are that we believe that under the governing rules of construction

6     of insurance contracts that the policyholders must win here, and

7     I'll explain that in further detail.

8          We also believe that under the case law that has been

9     cited on behalf of the policyholders collectively, that the water

10    damage/flood exclusions are ambiguous as applied to this factual

11    context, and we should win on that issue with respect to the

12    anti-concurrent causation language.  We talked about this a fair

13    amount last time, I am just going to touch it briefly.  But for the

14    reasons we said before, and again, we believe that that shouldn't

15    apply in this context.  And I'll deal very quickly with the

16    third-party negligence and some of the other exclusions, which have

17    been addressed.

18          Your Honor, I don't need to recite all of these, I've just

19    listed them out.  I know the court is well aware of them and they've

20    been pretty much agreed upon in the papers cited by both of us, but

21    we believe that the application of these principles to the language

22    in these policies as applied to the unique facts created by the

23    levee break mandate a finding that with respect to the water damage

24    flood exclusions that there is a lack of clarity as applied to these

25    facts, that there is ambiguity in how those facts play out under the

1    coverage provided by the policy.

2           And I think it's important to note and emphasize, and I

3    know my cocounsel here is going to do the same thing, we're talking

4    about exclusions to the policy language.  So the burden is on the

5    insurance companies to show clearly and unambiguously that there is

6    no potential for coverage outside that.  And especially where we are

7    procedurally at a motion to dismiss stage under Rule 12 where we

8    have pled efficient proximate causes that are covered perils under

9    the policy, windstorm at least, for sure, and we think also damages

10   flowing from the levee break, as we'll get to in a second, that

11   those motions have to fail at this stage.

12          You've seen many of these definitions of flood.  The one I

13   really wanted to focus on because I think perhaps these people ought

14   to know the most about what a flood is, is the National Weather

15   Service, which talks about overflowing of water from an established

16   water course such as a river, stream or drainage ditch.  That is a

17   description I think that is difficult, if not impossible, to apply

18   to what happened with the water that was released when the levees

19   failed.

20          Now, there are other exclusions in the policies, I am not

21   picking on State Farm or Allstate, but these are fairly

22   representative language that is seen in most, if not all of the

23   policies.

24          THE COURT:  You may want to comment briefly.  The Allstate

25   policy, excuse me, the State Farm policy has a -- by the way, let me

1    divulge, I do have State Farm on my home, I was not flooded, nor had

2    wind damage, nor did I have any damage.

3              MR. ELLISON:  Okay.

4              THE COURT:  Since we still have a writ pending at the

5    Supreme Court level.  So far as I know no one is defending me.

6              MR. BRUNO:  Judge, I wasn't served.

7              THE COURT:  Well --

8              MR. BRUNO:  I'm working on it.

9              THE COURT:  I did get the Solicitor General to change the

10   entry, called the Supreme Court and changed the entry because it

11   looked like, this is an aside, but it looked like the court had

12   acquiesced in it.  The entry made on the docket in the Supreme Court

13   that's being changed.  But nonetheless, getting back to the issue.

14              In the State Farm policy there is discussed in the Murray

15   case, they use the word, and in an intro in essence, part of the

16   anti-concurrent clause was whether caused by external or not.  I

17   know you're familiar with that, Mr. Ellison.

18              MR. ELLISON:  Yes.

19              THE COURT:  Do you think that modifies the language so as

20   to make it clear it would not only be from natural sources but from

21   other sources; in other words, what does external mean.  And I'm

22   sure Mr. Lee, I think you will be arguing that, will comment about

23   that as well.

24              MR. ELLISON:  Well, I am familiar with that language and,

25   no, we don't think it makes a difference.  And I think for the

```
 1   reasons played out and I know it was with respect to the earth
 2   movement exclusion --
 3             THE COURT:  The principle I think is the same.
 4             MR. ELLISON:  Exactly.  The principle we think is exactly
 5   the same.  And as the Murray court ultimately concluded, that wasn't
 6   a sufficient description or clarification of whether or not the
 7   exclusionary language should reach man-made events as well as
 8   natural events.  And we think the same principle applies here.
 9             If you look at the description of terms in the
10   exclusionary language, it talks about a series of really natural
11   events.  Events that one normally would think of, and I think a
12   reasonable homeowner would think, would be an event caused by some
13   force of nature.  And in that circumstance, we think that the
14   exclusions are not sufficiently clear to apply to the unique factual
15   circumstances of the events arising out of the levee breaks.  And we
16   think, and I think this may be important -- that takes the
17   Mississippi cases that have been decided by Judge Senter we think --
18             THE COURT:  I agree.
19             MR. ELLISON:  -- completely out of the question.  This is
20   really an entirely unique scenario.
21             THE COURT:  I agree.  Unless we get into the
22   anti-concurrent clause I agree it really isn't implicated here now.
23   Maybe if I find coverage it may be later on down the line, we may
24   have to deal with that.
25             MR. ELLISON:  And we completely agree with the prefatory
```

```
 1    comments you made about what's in play and what's not with respect

 2    to the issues that need to be decided now.

 3          But because these exclusions don't reference man-made

 4    events, they don't reference third-party activity, they don't define

 5    flood, they are susceptible to multiple reasonable interpretations

 6    of that language.  And under those circumstances and under the

 7    doctrines of construction in this state, that requires a finding in

 8    favor of the policyholder.

 9          And the other thing that I think is important to point

10    out, and my colleague is going to touch on this in a little more

11    detail on the case law point, but there has been significant case

12    law out there making this man-made versus natural occurring event

13    distinction for decades, not just here but around the country.  And

14    many of those cases involve some of the same companies we're talking

15    about here, State Farm --

16          THE COURT:  No question, Murray involved State Farm.  Of

17    course Kane case goes against you.  But there were three judges who

18    dissented in that case, but I think Mr. Garner attempts to

19    distinguish the Kane case, but it certainly isn't a case in your

20    favor, it's one that's being relied on by the defendants for the

21    Colorado Supreme Court when a damn burst.

22          MR. ELLISON:  Right.

23          THE COURT:  Very similar situation.  That analysis is --

24    they chose to choose a broad dictionary definition.  They gave

25    several and chose a broad one, no question.
```

1        MR. ELLISON:  Right.  But, your Honor, knowing that that

2   issue was out there and having had years to address it --

3        THE COURT:  I understand your point.  It's an adhesive

4   contract, why not write it so it's clear.

5        MR. ELLISON:  And I think the point that some other

6   provisions of the policy, like earth movement provisions, have been

7   modified to make it clear that it's both man-made or naturally

8   occurring events suggests that the same remedy to the failure of

9   this language could have been applied here.

10       THE COURT:  If one were to look in the right kind of

11  dictionary, one would find about 30 definitions of flood.  So which

12  one I pick I guess.

13       MR. ELLISON:  Right.  I've already covered this point

14  briefly.  We believe that we have pled covered perils, we've pled

15  wind.  If your Honor agrees with us as to the flood/water damage, I

16  think you said this in the opening comments, then we also have pled

17  a covered peril and that should defeat their motions.

18        I just wanted to touch on again, because I think this is

19  important especially to our claims, the whole efficient proximate

20  clause doctrine and how that plays in.  And I know this might be

21  getting a little ahead of ourselves in terms of the anti-concurrent

22  clauses, but if we plead a covered peril and the damage flows from

23  that, our interpretation of the efficient proximate cause rule is

24  that the damages that then flow whether interrupted by some

25  potentially excluded peril, do not negate coverage in its entirety.

1          That's been the law in the state for decades.  We don't

2   believe the anti-concurrent causation language should change that

3   result.  Judge Senter agreed with that analysis especially in the

4   context of the hurricane.  And in the Tuepker and Leonard cases and

5   I think one of the other cases, too, he reached that result.

6          I wanted to just touch on this briefly because I think I

7   might not have gotten my point across last time about the hurricane

8   deductible endorsement.  I wasn't raising that or we weren't raising

9   that for the proposition that that somehow expanded the coverage

10  provided by the policy.  But the point was that if you accept the

11  defendant's argument now that the anti-concurrent causation clauses

12  essentially eviscerate all coverage, then that runs counter to the

13  idea that the, there is at least some coverage --

14          THE COURT:  I agree with you, but I think Mr. Hubbard in

15  our last argument clearly stated that when it's separable would be

16  covered, I think that's what he said.

17          MR. ELLISON:  I agree that Mr. Hubbard said that, I am not

18  sure that that is a position that's shared by the other insurers.

19          THE COURT:  That I don't know.

20          MR. ELLISON:  But in any event, we think that that points

21  to an ambiguity in the policy because they are -- if you take the

22  position that the anti-concurrent causation clauses wipe out all

23  hurricane coverage if there is some water involved, and I am not

24  aware of a hurricane that didn't ever involve water, then there is

25  an irreconcilable conflict between those provisions and how they

1     would operate in the circumstances of a hurricane event.

2              Just briefly, because I am running out of time.  The other

3     exclusions that have been raised, we focused on these in the paper,

4     but the weather exclusions, if you applied them literally in the way

5     they're being suggested, eliminate all manner of covered perils that

6     are otherwise covered by the policy and render coverage illusory --

7              THE COURT:  And also an excluding loss provision there

8     that it's a covered peril they would be sued, then that's covered

9     would be --

10             MR. ELLISON:  Exactly.

11             THE COURT:  So I understand what you're saying.  I think

12    this court at least right now is focussing on the language of the

13    policy and the water damage exclusion.

14             MR. ELLISON:  Right.  Well, then at least I focused on the

15    right points for my argument.

16             THE COURT:  Yes, sir, you did.

17             MR. ELLISON:  The last point I just wanted to make quickly

18    on the third-party negligence issue, because we spoke about that a

19    little bit last time.  And there was a question about what property

20    are we talking about.  Historically these have been designed to

21    exclude any coverage to repair the property that may have caused

22    some other damage.  In this context that would mean there is no

23    coverage to repair the levee, obviously we are not seeking that.  We

24    think that, therefore, that this is an overreaching and an overbroad

25    application of the policy provisions.

1          So just to sum up my piece here, as I tried to go through

2    quickly and we've done a little better job in the papers, these

3    exclusionary provisions are full of ambiguities we think in this

4    context.  And I think, you know, to be fair, this is a rare event

5    and some of the cases that they have been relying on, and my

6    colleague will talk about this more, while correct in the context in

7    which they were decided, really don't translate to what happened

8    here.  And I think, your Honor, that that is the big difference.

9          I think one of the questions you had raised was whether

10   or not it was for the court to decide the ambiguity issue, we do

11   believe that it's a question of law for the court to resolve and can

12   do so at this stage.

13         Just to go back to where we are in the context of the

14   clients we represent, we're talking about homeowners, and I think in

15   that dynamic, the adhesionary nature of the these contracts and the

16   ambiguity issue has really heightened the importance, not to

17   diminish Xavier's right to raise the ambiguity issue; but for

18   homeowners in particular it is a doctrine that has particular

19   application and we would ask that the court in that context give

20   that perhaps an even closer look than you might otherwise have, but

21   I know you've already looked at everything about as closely as you

22   possibly can.

23         Thanks very much and I'll pass the baton.

24         THE COURT:  I appreciate it.

25         MR. ELLISON:  And thanks for having me back again.

1      THE COURT:  Absolutely.

2      MR. GARNER:  Good afternoon, your Honor, James Garner and

3  Darnell Bludworth.  And before I launch into this for Xavier, I want

4  to thank Kevin McGlone who did a lot of our briefing and research on

5  this starting back in June.  This is my first ride at this rodeo, I

6  thank you for inviting me to the rodeo.

7      THE COURT:  You've added something to the rodeo,

8  Mr. Garner, I've read your briefs.

9      MR. GARNER:  Thank you, your Honor.  The reason I'm saying

10  that is to the extent I talk about something somebody's already

11  talked about, I would beg your forgiveness.  I am going to try to go

12  as quickly as I can.  And I think he is going to walk in as I'm

13  talking, Dr. Norman Francis who I think need no introduction to

14  anybody in this courtroom is coming, he is on route to the

15  courthouse.

16      So, your Honor, our position is a little bit different.

17  We have asked for summary judgment, judgment on the merits directed

18  at Affirmative Defense No. 8, and through the papers they've raised

19  the ensuing loss which in the holding cage you wrote a lot about

20  following the Lake Charles terminal case.  So I would ask to the

21  extent they expanded their opposition or the issues, you apply our

22  summary judgment to both purported exclusions.

23      What do we want you to do?  We think we have coverage for

24  everything.  We don't think the "water exclusion" applies.  We

25  wholeheartedly agree with Murray, I totally think Kane is wrong.  To

1   the extent you can't find it distinguished, I think it's flat out

2   wrong.   But even the Colorado Supreme Court noted that damn was

3   overflowed.   You know, they had a better argument in Kane than any

4   of the insurers here have.

5           One thing is clear in the IPET report, which we put into

6   evidence, they've objected that we can't put it into evidence

7   because it's a draft.   And I read a lot of cases on this going back

8   to Rainey V. Beech Aircraft decided December of 1988 by the U.S.

9   Supreme Court, that said government reports come in, including

10  factual conclusions.   I never saw anybody say you can't get a draft

11  report in.   It's their burden to come forward and show that the

12  report is not trustworthy.   I respectfully submit they have not done

13  that; therefore, the only evidence in the record is the IPET report.

14  And I don't think anybody in good faith with a straight face is

15  going to tell this court that the 17th Street Canal levees or the

16  London Avenue levees overflowed.   There is no evidence in the record

17  on that --

18          THE COURT:   Let me make it clear.   For the purposes of

19  this motion, I am going to assume that they did not.

20          MR. GARNER:   Thank you, your Honor.   And John mentioned, I

21  don't think he meant any disrespect to me because homeowners, I

22  would probably think St. Catherine's rectors in heaven thinking, my

23  God, my poor students and people we're supposed to serve.   We were

24  just as much a victim as the adhesionary contract as the homeowners.

25          We have an all risk policy.   That's not disputed either.

```
 1    And as your Honor is well aware, I've read all of your cases on
 2    this, that creates a special type of coverage.  And the Fifth
 3    Circuit's been really clear about that that absent misconduct or
 4    fraud, meaning bad actors, unless the policy contains a specific
 5    provision expressly excluding the loss of the coverage, we get
 6    coverage.  So unless the policy says we don't cover a break in the
 7    levee caused by the negligence of the Corps of Engineers, we have
 8    coverage.  And I think that's important.
 9            THE COURT:  I don't think you have to go that far.
10            MR. GARNER:  They have to go further than they did.
11            THE COURT:  But anyway, go ahead.
12            MR. GARNER:  So I think that's important to our argument.
13    And as John mentioned, they've got the burden of proof.  I bring the
14    motion for summary judgment, I don't think anybody disputes we have
15    a lot of damage at Xavier, we had a loss, we had a covered event, at
16    least through the wind damage, there was something that triggered
17    this.  The burden shifts to them under the law of the circuit given
18    they're going to have the burden of proof at trial.  They have to
19    come in.
20             And the Murray case is I think helpful here.  I love
21    Murray, more ways than one though.
22            THE COURT:  We have the Kane group and the Murray group.
23            MR. GARNER:  That's correct.
24            THE COURT:  I understand.
25            MR. GARNER:  But what State Farm and Allstate did in
```

1 _Murray_, when those rocks start falling down from the wall, they put

2 in some evidence and contested the fact that it was actually a

3 natural event.  And therefore, the trial judge said, rock falling is

4 not earth movement.  The Court of Appeals rejected that and said,

5 no, no.  We are not going to read the policy that contorted, that

6 includes earth movement; but I find it ambiguous and I'm going to

7 find coverage, but because there is an issue over whether it was

8 man-made or natural there is an issue of fact.

9        I respectfully submit you don't have that in our motion.

10 No one is really arguing this water that got through those levees

11 was a natural event.  There is no affidavit, there is no expert

12 testimony, there is no Rule 56(f) motion that we need more

13 discovery, there is no issue on how this happened.

14        THE COURT:  Certainly for the purpose of this motion and

15 construing the pleadings as I must, there is I think certainly if

16 anything at best is the genuine issue of material fact as to whether

17 an accident occurred or whether it was simply an act of God, so to

18 speak.  I am going to assume that the levees broke and that was the

19 negligence we're talking about.  At this stage of the proceedings.

20        MR. GARNER:  And I think John has talked about this some

21 case law language I like that's in the papers.  You asked, one of

22 your questions was whether you can decide this.  I think the

23 Louisiana Supreme Court says, yes, you can.  When making the

24 determination any ambiguities within the policy must be construed in

25 favor of the insured to effect, not deny, coverage.

```
 1        THE COURT:  I think you're right, I think the civil code
 2   says that even more importantly.
 3        MR. GARNER:  2056, particularly a boilerplate adhesionary
 4   contract.
 5        Quickly answering your questions.  (1) Is the flood
 6   exclusion ambiguous?  Absolutely.  Why?  For all of the reasons John
 7   gave, they don't define it, it's listed in a list of terms that
 8   refer to God, acts of God, natural acts and it doesn't distinguish
 9   between man-made or natural events.
10        THE COURT:  I do notice and I'll be interested -- yes,
11   that's right, you make the point right here, okay.  That's the
12   point.
13        MR. GARNER:  I'm going to use my Ninth Ward Holy Cross
14   High School Latin, ejusdem generis and noscitur a sociis.  I mean,
15   using those two doctrines, which the Murray court used, they said,
16   look.  Surface water -- and surface water, I'm going to show your
17   Honor a second, is precipitation -- waves, tides, tidal waves are
18   all acts of God, natural phenomenon.  There is nothing in any way
19   that implicates man-made events.
20        So using those two doctrines, we construe flood to mean
21   clearly an act of God, not the Corps of Engineers screwing up the
22   levees.  I am not going to go through all of these.  These are all
23   in the papers.
24        Following Murray, which says the great majority, and not
25   that your Honor counts cases, but I respectfully submit the great
```

1    majority of courts have considered earth movement exclusions, have

2    found them to be ambiguous.  Why do I think that's significant?

3    Whether it's a bunch of earth moving or a bunch of water moving, I

4    think the analysis is the same.  I don't think it's any different

5    because it's water here and mud here.

6           THE COURT:  You're saying the overriding issue is man-made

7    or natural and does the policy unambiguously exclude a man-made

8    issue?

9           MR. GARNER:  Exactly.

10          THE COURT:  A man-made catastrophe.

11          MR. GARNER:  Also, I gave copies to Ralph and Steve

12   beforehand.  The distinction between natural and man-made, as John

13   pointed out, this is not some new phenomenon that a bunch of lawyers

14   on this side of the room created.

15          The Change case out of Virginia in 2000 talked about flood

16   surface water, tidal water, tidal waves refers to natural causes or

17   natural phenomenon.  And, therefore, the rupture of a water main,

18   which has some instrument of man, is not excluded.

19          The Adrian Associations case from the Texas Court of

20   Appeals in 1982.  The Broome case from the Georgia Court of Appeals

21   talked about the exclusion applying to natural flooding as opposed

22   to flooding caused by artificial means.  This is the case I was

23   talking about a few minutes ago, the Texas appellate courts,

24   ""surface water" exclusion in a homeowners policy applies to

25   "natural precipitation"".

1          The Peach State case, which is out of the Fifth Circuit 31

2    years ago, has interesting language in it.  That's another earth

3    movement, that was with the erosion.  The Fifth Circuit had no

4    problem reversing the trial court saying, no, this is talking about

5    natural earth movement, not some outside instrumentality.

6          The Fayad v. Clarendon case, also looking in an all risk

7    policy at earth movement, talked about damage caused by a natural

8    phenomenon.  And finally the Nautilus case which goes the same way.

9          I provided your Honor, and I know some of my colleagues

10   adopted our pleadings, there is a series of cases with water mains

11   where this goes, I don't think this is any different than the water

12   main analysis.  I am not going to through those cases, they're all

13   in the papers, but it's not some one case.

14         Let's talk about E.B. Metal case.  We're dealing with a

15   small town where I think everybody knows everything --

16         THE COURT:  We're talking about cases cited by the

17   defendant?

18         MR. GARNER:  Yes.  And I started to say, given there are

19   no secrets in New Orleans, I argued this motion two weeks ago in

20   state court.  They made a big deal out of this case.

21         THE COURT:  By the way, I have talked with Judge Medley,

22   he is going to defer until I rule.

23         MR. GARNER:  They made a big deal out of E.B. Metal, which

24   is against my friends at Chubb.  The difference here is Chubb shows

25   there is a way of writing an exclusion when talking about flood,

1  including overflowing or breaking of a boundary.  They'll jump up

2  and down about this case because --

3           THE COURT:  Boundaries used in some of the policies in the

4  E.B. Metal case, I believe it was.

5           MR. GARNER:  Yes, correct.  So I think this case --

6           THE COURT:  I'm sure you will be arguing that even now,

7  but I mean it shows you that there is another approach.  You might

8  be arguing breaking of boundary, but you would be, in your mind, on

9  less firm ground.

10          MR. GARNER:  If they had that language I would still be

11  arguing, but, right, I would be a little weaker but we don't have to

12  talk about that.

13          THE COURT:  Right.

14          MR. GARNER:  And the cou de gras, my next slide, this is

15  out of the Travelers' policy with Xavier.  The one side has the

16  water exclusion, which we all have memorized; on the right side,

17  I've got the earth movement exclusion.  And what do they do now in

18  the earth movement exclusion?

19          THE COURT:  I see it.

20          MR. GARNER:  Whether natural or man-made.

21          THE COURT:  That makes it easy for the court, I'll say

22  that.

23          MR. GARNER:  Right.  So clearly what they should have done

24  is put the same language in the flood exclusion, but they weren't

25  thinking through that.

1          Question No. 2.  I really don't think the reasonable

2    expectation issue is an issue for me.  I've got an all risk policy.

3    Dr. Francis' reasonable expectation was all risks are covered unless

4    expressly excluded.

5          I talked a little bit about Murray, obviously I love

6    Murray.  And go ahead and pass through this, we already talked about

7    this.

8          THE COURT:  We discussed Murray quite a bit on the last

9    argument.

10          MR. GARNER:  If you find it ambiguous, I think I talked

11    about this already, this is not a jury issue.  If you agree with us

12    it's ambiguous, we win.  If you construe it against the insurance

13    company, you construe it as Doerr says to effect coverage.

14          I threw this case in because I liked some of the language.

15    This is Louisiana Supreme Court 1994, "Under this rule" -- it's

16    talking about -- this language is a little bit different, that's why

17    I threw it in.  "Under this rule, "[e]quivocal provisions seeking to

18    narrow the insurer's obligation are strictly construed against the

19    insurer, since these are prepared by the insurer and the insured had

20    no voice in the preparation.""  That probably applies to everybody

21    before you, so I threw that in today.

22          Question No. 4, the anti-concurrent clause.  I totally

23    agree with the first two statements, it's irrelevant.  So we can go

24    through four and five, I don't think it's any issue with us.

25          Question 6 and 7, and I am going to skip, go to the

1    ensuing loss provision, which they raised in the papers.  Up there

2    with Murray, I love obviously Judge Ruben's Lake Charles terminal

3    case.  When dealing with a similar provision of ensuing loss, Judge

4    Ruben said:  "Patently, the meaning of the exclusion cannot be

5    discerned merely from the words used."  "The exclusion is not

6    designed to insulate an insurance company from liability for major

7    or "catastrophic" loses."  My favorite, "At first glance, the

8    exclusion at issue here appears to be self-contradictory gibberish."

9    "Whatever "ensuing peril" may mean, nothing in the policies

10   indicates that catastrophic damages cannot be included within the

11   term."

12              THE COURT:  As I understand the ensuing peril, if

13   something is covered and the damage ensues by a covered peril,

14   assuming you're right in your water damage argument --

15              MR. GARNER:  You don't even get there, I agree.  I think

16   they try to say because we're claiming the Corps screwed the levees

17   up that's somehow defective design or something, I agree with you,

18   you don't get there; but if you get there, we still win, that's my

19   argument.

20              Let's go find Peach Tree.  This is that Peach Tree case

21   from the U.S. Fifth Circuit.  And I love this language, "Where a

22   stitch or two may have been dropped in executing the exclusionary

23   trim, it goes against the tailor, the insurance company."  So to the

24   extent they missed some stitches --

25              THE COURT:  We don't get many, shall we say, that kind of

1   analogy or metaphor, saying sewing and tailor.

2          MR. GARNER:  That's why I put that one up there.  To the

3   extent they missed some threads, we win.

4           So thank you for letting us participate.  I tried not to

5   be redundant or cover stuff other people have covered.

6          THE COURT:  And we will go over, we have gone over and

7   will go over your power point submissions as well.

8          MR. GARNER:  Thank you, your Honor.

9          MR. CREELY:  Good afternoon, your Honor, Robert Creely on

10  behalf of Kelly Humphreys.  I have a partial motion for summary

11  judgment regarding the hurricane deductible endorsement appended to

12  H03 homeowners policy.

13         THE COURT:  As I understand it, the posture of the Xavier

14  motion and your motion is that you have brought them forth in

15  essence, it's your motion.

16         MR. CREELY:  Correct, your Honor, it is.  I am not as

17  mechanized because I only have four clients that have these

18  particular exclusions, so --

19         THE COURT:  Mechanization is geometrically related to the

20  number and/or size of your client.

21         MR. CREELY:  I understand, your Honor, if somebody can

22  help me turn on this ELMO I would greatly appreciate it.

23         THE COURT:  We can do that.

24         MR. CREELY:  Your Honor, without belaboring the issues

25  that have already been argued, and I agree with Mr. Gather with

1  respect I have raised similar issues regarding sudden and accidental

2  events in my partial motion for summary judgment, and I will not go

3  into those today any further.

4          But in any event, your Honor, and I think your Honor is

5  well aware that a contract of insurance is one of the adhesion.  The

6  policyholder or insured doesn't really have much to say about policy

7  language, it's a take it or leave it kind of situation.  And the

8  only thing that the policyholder can do or the insured is to bargain

9  for endorsements or bargain for riders or attachments to the policy

10  to expand coverage underneath the policy of insurance for issues

11  that are normally excluded.  Obviously an H03 all risk policy, your

12  Honor, the policy, the policy itself excludes rising water

13  pretermiting the argument Mr. Garner made and counsel before

14  Mr. Garner.

15          But assuming, your Honor, that those arguments don't float

16  with the court, so to speak, the argument specifically that I'm

17  arguing on is the hurricane endorsement that appears in the

18  Encompass policy.

19          THE COURT:  I am taking a look at it as we speak.  You

20  have it here and I have it right now.

21          MR. CREELY:  In the papers that Ms. Barrasso filed with

22  the court she basically somehow tries to hook me in with the

23  Allstate endorsement, and I don't believe the Allstate and the

24  Encompass endorsement have the same language nor do they have the

25  same meaning.

1          But in any event, on the declaration sheet on the

2     Humphreys policy on the first page of the declaration sheet, your

3     Honor, they have an item called hurricane peril coverage and there

4     was a $409 charge for this additional coverage that she opted for.

5          If you go to page three of five of the endorsement, your

6     Honor, I mean of the declaration sheet, you can see at the top it

7     has $1,000 deductible for the hurricane deductible, and it says this

8     applies to hurricane losses.  Immediately under that we have an

9     additional $1,000 windstorm deductible, which applies to windstorm

10    or hail damages.  So Humphreys bargained for two additional or

11    optional coverages under her policy, one being hurricane protection

12    and another being hail or windstorm.

13         Now, I will point out, your Honor, in the previous

14    document hurricane peril coverage is not defined anywhere within the

15    Humphreys policy of insurance, and on the page three of five of the

16    endorsement the word hurricane losses is not defined anywhere within

17    her policy of insurance.

18         The endorsement sheet, your Honor, which is my Exhibit 1-C

19    appended to my partial motion for summary judgment, talks about

20    hurricane deductible endorsement and talks about a windstorm or hail

21    deductible.  Now, since hurricane peril coverage is not defined

22    within the policy and since, your Honor, hurricane losses which

23    appear on the dec sheet are not defined within the policy, the only

24    place we can go to try to figure out what is covered, this

25    additional coverage that was purchased appears in the hurricane

1    deductible endorsement language.

2            And this is where it varies somewhat from the Allstate

3    policy, and I am not getting involved in the intricacies of the

4    hurricane deductible endorsement that's cited in the Allstate

5    policy, but I will point out that in the hurricane deductible

6    endorsement that is appended to -- and at top it's hard to read it

7    but I think we can read it, it says your optional coverages, means

8    she is opting to get something that's not contained within the body

9    of her H03 all risk policy.  This is an optional coverage just like

10   the hail and windstorm coverages is an optional coverage that she

11   paid additional premium for in order to receive.

12           So the only way we can define or try to find definitional

13   language for hurricane peril coverage --

14           THE COURT:  Are hurricanes excluded in the policy?

15           MR. CREELY:  Well, your Honor, they don't mention

16   hurricanes in the policy.  I mean, they mention rising water in the

17   policy and we're attempting to suggest to the court is that we're

18   covered for rising water, there is rising water exceptions in the

19   policy and they are in all H03 policies.

20           THE COURT:  All right.

21           MR. CREELY:  So Humphreys paid for additional coverage and

22   the only way we can find out what this hurricane coverage means is

23   look to the endorsement and it says damage caused directly or

24   indirectly by a hurricane as defined below.  And this is how we

25   differ somewhat with the language in the Allstate policy.  It says

```
 1    hurricane means wind, wind gust, hail, rain, tornado, cyclone or
 2    hurricane.
 3            Now the words "or hurricane", your Honor, do not appear in
 4    the Allstate endorsement.  The Allstate endorsement, if you read it,
 5    it's appended to my reply memorandum, and it says something totally
 6    different and I believe there may be some ambiguity between that and
 7    the policy language, but I am not in that case.
 8            THE COURT:  Way this is constructed.  You have a water
 9    damage exclusion in your policy like many of the others, I
10    understand that.  But this policy doesn't exclude hurricanes.  Per
11    se, it excludes water damage as defined in the policy.
12            MR. CREELY:  Correct.
13            THE COURT:  Then you paid $409 to have a deductible, maybe
14    the deductible would have been larger, I am not sure what you're
15    paying for right here, unless wind is excluded for a hurricane you
16    have it anyhow.  So I am not sure why you're getting the
17    endorsement.  I am a little confused by that.
18            MR. CREELY:  That's an issue that's important when
19    interpreting policies and whose burden it is and who the policy
20    should be interpreted by.
21            THE COURT:  Whatever it is she paid $409 extra for this.
22            MR. CREELY:  What we paid the $409 extra for, the
23    Humphreys, not I, was hurricane peril coverage and hurricane losses,
24    your Honor, with a deduction on the second page.  We don't know --
25    that policy doesn't tell us what those mean.
```

```
1          THE COURT:  Generally not supposed to expand, unless it's

2    an endorsement.  Generally what I've seen the hurricane deductible

3    doesn't expand coverage, it simply says if there is a hurricane,

4    wind over X miles an hour, 74, then you have a $10,000 deductible.

5    It doesn't expand coverage, if you don't have coverage for the water

6    damage, this means that wind damages your home it better not damage

7    it for more than $10,000 or they're not paying.  This is different I

8    admit from what I've seen, this is a little different.

9          MR. CREELY:  But the important thing in this policy, your

10   Honor, is that the windstorm and hail coverage, that doesn't turn

11   off during a hurricane.  That endorsement that she paid for and is

12   included in the premium, that doesn't turn off in hurricane.  So

13   during a hurricane she still gets wind and hail storm coverage.  So

14   if her roof blows off, the house is blown over, she is covered.

15         THE COURT:  I thought that would be covered under any all

16   risk policy unless excluded frankly.

17         MR. CREELY:  Well, it is excluded, that's why she bought

18   the windstorm and hail endorsement.

19         THE COURT:  Is there excluding language in this policy?

20         MR. CREELY:  There is a windstorm and hail endorsement

21   which expands her coverage.

22         THE COURT:  I understand the expansion.

23         MR. CREELY:  That's what I was trying to explain to the

24   court.

25         THE COURT:  It's really not that significant.  But if you
```

```
 1   tore up the endorsement, didn't have it, just looked at the policy,

 2   would there be any exclusion for wind damage during a hurricane?

 3             MR. CREELY:  Your Honor, if you take off the windstorm and

 4   hail deduction endorsement --

 5             THE COURT:  No endorsement.  Is there anything in the

 6   policy that excludes wind damage for a hurricane?

 7             MR. CREELY:  Yes -- nothing for a hurricane, it doesn't

 8   say hurricane.

 9             THE COURT:  Anything that would exclude wind damage?

10             MR. CREELY:  It would exclude wind driven rain, wind

11   damage as a result of wind.  The policy excludes it, that's why she

12   bought the endorsement.

13             THE COURT:  The policy does exclude it.

14             MR. CREELY:  That's my understanding, your Honor.

15             THE COURT:  Okay.

16             MR. CREELY:  The point I'm trying to get through to the

17   court is --

18             THE COURT:  I got your point, I just was curious about

19   this endorsement.

20             MR. CREELY:  You never get to this endorsement under this

21   policy if you have the windstorm and hail endorsement that she paid

22   additional premium for, this hurricane deductible endorsement, this

23   hurricane peril coverage, this hurricane loss that's in our dec

24   sheet, you never get there.  There is no way that you can get

25   coverage under this policy for this hurricane deductible
```

```
 1   endorsement.  And that is any damages caused directly or indirectly
 2   by a hurricane.
 3            And that's why she purchased this particular endorsement.
 4   Without this endorsement she still gets coverage for windstorm under
 5   a windstorm and hail endorsement.  So that's why this extra
 6   coverage, and it's called optional coverages, is it was provided to
 7   her.
 8            And, your Honor, the use of the word hurricane as defined
 9   by the National Weather Service includes or incorporates rising
10   water as defined and as discussed by counsel that argued before me.
11   And I would suggest to the court that the motion for summary
12   judgment should be granted.  If the court feels the policy is
13   ambiguous, obviously coverage should be determined in favor of the
14   insureds.  Thank you very much, your Honor.
15            THE COURT:  Thank you, sir.  Before we hear from
16   defendants just give me one second.
17            MR. HUBBARD:  Are we ready to proceed, your Honor?
18            THE COURT:  Yes, sir.
19            MR. HUBBARD:  May it please the court, I am Ralph Hubbard,
20   and I represent the Travelers Property Casualty Company of America
21   in the Xavier suit; and in the Chehardy matter I represent the
22   Standard Fire Insurance Company, a Travelers Company, and the
23   Hanover Insurance Company.  Additionally we filed a joint brief as
24   you requested for all of the ISO carriers in Chehardy, so I think
25   it's fair to say that I'm also speaking on those that join in that
```

```
 1    brief, which would be Lexington, Liberty, the American Insurance

 2    Company, Aegis Security Insurance Company, Auto Club Family

 3    Insurance Company, Lafayette Insurance Company.

 4              THE COURT:  Yes, sir.

 5              MR. HUBBARD:  Got a lot of the ground to cover and a very

 6    little time to do.  But let's a start with the Xavier matter with

 7    respect to the IPET reports and whether there is evidence in the

 8    record that shows the cause of the levee breeches.  The IPET

 9    report --

10              THE COURT:  You're talking about the issue for summary

11    judgment for me to find as a matter.  There is no genuine dispute as

12    to material fact that beyond coverage that if I find coverage they

13    win; is that what you're getting to?

14              MR. HUBBARD:  Yes.  I am saying that there is no evidence

15    properly in the record to show what happened to the 17th Street

16    Canal or the London Avenue Canal.  I don't think it's disputed that

17    the waters came from that area, but as to what happened out there

18    and what caused the levees to fail and even if the levees did fail

19    there --

20              THE COURT:  We're starting off, wait a minute, Judge.

21    Even if you find coverage, which we adamantly disagree with, there

22    is no showing that this was, that there is, in fact, proven --

23    excuse me, that there is no genuine issue to material fact that

24    there was --

25              MR. HUBBARD:  Correct.
```

1          THE COURT:  Because you're saying the only thing in the

2     record is that, although there is no countervailing proof as well.

3          MR. HUBBARD:  We don't need countervailing evidence.  And

4     of course to the extent that it is in, we're going rely on that

5     anyway that's also going to create an issue of material fact, which

6     I'll get to in a second.

7           But first of all, we have a preliminary government report

8     and it's standing on its own two legs, there is nobody vouching for

9     it whatsoever.  In the McClintock case --

10         THE COURT:  That would also, let me just say the posture

11    that case is in, and I certainly have to think about it, but it

12    would since I have a whole protocol here I would be in essence

13    finding, if there's coverage, I would be finding liability for a

14    real trial on the matter of whether there was negligence or not.

15         MR. HUBBARD:  That's correct.

16         THE COURT:  It would have a lot of collateral estoppel in

17    this court, issues in this court.

18         MR. HUBBARD:  The bigger question is what the claim is

19    here before the court in both of these cases that are before it is

20    that the flood exclusion only applies to naturally caused events.

21         THE COURT:  Right.

22         MR. HUBBARD:  Whatever that is, whatever that is.  And of

23    course the IPET report goes on to great length to talk about what

24    kind of pressure the levee in the communities was under because of

25    Hurricane Katrina, a natural event, about the height of the water

1    being at unbelievable heights, about wave action creating all kinds

2    of problems and putting pressure on all of the defenses that this

3    city has.   And I guess I'll go ahead and jump right to there now, if

4    the court were to go down that road and say, well, we have to

5    determine whether it was natural or a man-made event, how do you do

6    that?   You would be making up some new rules because nobody else has

7    done that before.

8              THE COURT:   You mean without a trial?

9              MR. HUBBARD:   Even with a trial.   Without question, I mean

10   the Corps of Engineers has already said in the report that's not

11   properly in the record but that you've seen.   They've said that this

12   was due in large measure to Hurricane Katrina, a purely natural

13   event.   Is it a 60-40 test, is it 75-25, 80-20?

14             THE COURT:   Make sure I understand your argument.   I guess

15   we can agree that if Hurricane Katrina would not have occurred on

16   August 29th, 2005, that the levees probably would not have breached

17   at that time or been overflowed either, I think we can probably say

18   that.

19             MR. HUBBARD:   Exactly.

20             THE COURT:   The question is though if they breach and one

21   overflowed, is that an occurrence -- then we get into is that an

22   occurrence under your all risk policy or not?

23             MR. HUBBARD:   We don't really use the word occurrence, we

24   just pay for damages that are not excluded, and the question is did

25   it create something that's exclude and, yes, it did, it created a

```
 1    flood.

 2         THE COURT:  Now we get back to the original argument which

 3    is certainly more clear.  Let me say, it's unlikely that, very

 4    unlikely that on a summary judgment right here I am going to find

 5    that, yes, this is, I am not sure of the scope of the summary

 6    judgment, but that I am going to render judgment right now for

 7    Xavier even if I find that there may be coverage for a man-made

 8    event.

 9         MR. HUBBARD:  Two things on that, Judge.  The reason that

10    you would be right in doing that is because the Fifth Circuit in

11    Toole v. McClintock in 1983 says that, "Rule 803 makes no exception

12    for tentative or interim reports subject to revision and review."

13    That's a quote from the Fifth Circuit in talking about whether a

14    government report comes in.

15         And in this particular report that's in the record, they

16    put in some and we put in some, on every single page it says, "this

17    is a preliminary report subject to revision."  It does not contain

18    the final conclusions of the U.S. Army Corps of Engineers.

19    Juxtapose that with what the Fifth Circuit says, "803 makes no

20    exception for tentative or interim report subject to revision or

21    review."  So the report is not properly in the record, it's not

22    going to be properly in the record.

23         But it does have something in there for everybody.  And if

24    it were in the record it would support my position that this was,

25    and it is only a fall back position, I don't think I need to get
```

1    there, but this was a naturally occurring event.

2          THE COURT:  I understand your first position is that the

3    flood, that the water damage exclusion in all of policies that you

4    are representing is not ambiguous, clearly excludes flood, which

5    this was, therefore you win.  I understand that's your primary

6    argument.

7          MR. HUBBARD:  And if we could all agree that it was at

8    least partly caused by a naturally occurring event, wouldn't then

9    the anti-concurrent clause language come into play so that even if

10   there was some negligence along the way the flood exclusion still

11   applies?

12         THE COURT:  I think we get there if we find coverage,

13   that's the next step.

14         MR. HUBBARD:  And then one other point, I also, we cited

15   two cases for you from the Fifth Circuit that said that even though

16   we did not file a countervailing motion for summary judgment, if the

17   court concludes as a matter of law that the plaintiffs here are not

18   entitled to relief and there is no disputed issue of fact, that you

19   can then enter summary judgment in our favor, which we would request

20   that the court do as I think you're aware.

21         THE COURT:  Right.

22         MR. HUBBARD:  Putting all of that aside, the real question

23   here is whether or not the term flood is ambiguous.  That's what you

24   want to hear about.

25         THE COURT:  That's the first hurdle.

1            MR. HUBBARD:  And forgive me for this, it's all going to

2    be brief.  You really have to go back to the most basic rules and I

3    want to talk to you about something that you brought up and kind of

4    caught me on a little bit the last time we spent two hours arguing

5    this.  But, you know, you can't get away from the most basic rules

6    on a state-by-state basis of construing a contract.  So here, you

7    know, these are some quick hitting points, it says that you look at

8    the plain, ordinary and generally prevailing meaning.  That's what

9    we're looking for.

10            THE COURT:  I agree.  That's what I'm looking at, that's

11    the way you interpret a policy.  And I guess you're telling me that

12    the word flood, is that manifestly added?

13            MR. HUBBARD:  And I am going to show you some reasons why

14    I believe that.

15            THE COURT:  Are you using it as a verb or a noun?  There

16    are two definitions in the dictionary verb and noun.  The noun

17    definition has about 15 to 20 definitions, the verb definition in a

18    real good dictionary has about six to eight; so I'm just curious.

19    Do you think it's used as a noun in the policy?

20            MR. HUBBARD:  I think it's a noun.

21            THE COURT:  I agree.

22            MR. HUBBARD:  And as we'll see, I think that the word is

23    being unfairly defined to have more than one moving part.  Let me

24    jump ahead to that.  The claim is here that it's ambiguous because

25    we don't know whether flood refers to a natural event that caused

1     the flood or a man-made event that caused the flood or both.  Well,

2     that's a completely in opposite presumption because the word flood

3     does not look to causation, Judge.

4             THE COURT:  No.

5             MR. HUBBARD:  The word flood describes a situation, which

6     is ordinarily dry land which is covered by water.

7             THE COURT:  That's one definition.  A lot of them

8     overflow, tidal surge.

9             MR. HUBBARD:  Those are other terms --

10           THE COURT:  So which one should I pick?  Pick a

11     definition, any definition.

12           MR. HUBBARD:  Those are other terms that are used to

13     define water damage in the policy.

14           THE COURT:  The first term in each dictionary it's not

15     water covering dry land, I haven't found one.  Which one should I go

16     with?  I'm just saying it's an interesting dilemma the court is in.

17     If I am going to use a dictionary to do this, then the dictionary

18     gives a panoply of definitions, and I guess I should probably

19     construe the one that has the most ordinary meaning and how do I

20     determine that.

21           MR. HUBBARD:  Very good point.  I am not suggesting that

22     you use the dictionary.  You could look to the Fifth Circuit in the

23     Florida railroad case which said the definition that I just used,

24     that's a good source because we know where we are headed from here.

25           THE COURT:  Right, no question about that.  They will

1    ultimately define it, that is true.

2         MR. HUBBARD:  But what I would suggest is what you should

3    be using the plain, ordinary and generally prevailing meaning, which

4    I am going to get to in a minute.

5         THE COURT:  I know what the rules of construction are,

6    tell me why that's it.

7         MR. HUBBARD:  Because we all know, it is, what is common

8    usage, Judge?  What is the common usage of the word flood?  And I'm

9    telling you that --

10        THE COURT:  Some people think of Noah when you think of

11   flood.

12        MR. HUBBARD:  I'm sorry, what?

13        THE COURT:  Noah, the biblical flood.

14        MR. HUBBARD:  That's one thing you think.  But I guess the

15   next question is how would --

16        THE COURT:  I think of a flood of cases, I mean my God, I

17   think of lots of cases.

18         Go ahead.  I'm just having a little fun.  It has nothing

19   to do with my ruling.

20        MR. HUBBARD:  But then you have to ask how is it actually

21   used in common usage, and the question is particularly here where if

22   you're assuming that their claims are correct --

23        THE COURT:  What about in the context, you quoted I think

24   some very accurate rules of construction.  But what about in the

25   context of an all risk policy?  You're writing this thing.  Wouldn't

1   it be easy to say natural or man-made like they did in the earth

2   moving exclusion or they did in the Hartford policy?  Wouldn't that

3   be really easy if that's what you intend?  Because if I am shopping

4   for policies and I am looking around at all of these things and look

5   at the Hartford and say, look at this, how am I John Q. Public

6   supposed to know which one provides me what, unless I'm Nostradamus.

7           MR. HUBBARD:  All I can tell you, Judge, is that the

8   Cadwallaer case, which I just had up, by the Louisiana Supreme Court

9   in 2003, said you don't look to other policies to try to figure out

10  whether the one in front of you is ambiguous.  You look at the four

11  corners of what you've got and you deal with that.

12          THE COURT:  Then why do I go to the most expansive

13  definition that exists for flood?  That is water covering land.  Why

14  do I go to that in the context of an all risk policy when I've paid

15  for coverage for third-party negligence?

16          MR. HUBBARD:  Because the test is not whether it's treated

17  differently because it's in an all risk policy, the test is what is

18  the ordinary generally prevailing usage of the word in your

19  community.

20          THE COURT:  I think the Civil Code says you look at

21  context of the contract you're dealing with.

22          MR. HUBBARD:  Well, the Civil Code also says the line

23  about you use the generally prevailing meaning.

24          THE COURT:  You're right.

25          MR. HUBBARD:  And so then you look at what sophisticated

```
 1    people in our community, how have they referred to what we're

 2    dealing with here in the context of perhaps having levees that broke

 3    that resulted in the inundation.

 4            And Judge Africk says that "the property was damaged by

 5    flood waters that inundated New Orleans following Hurricane

 6    Katrina."  Judge Feldman says, "Plaintiff's home flooded during

 7    Hurricane Katrina."  Judge Berrigan says, "the allegations in this

 8    case arise --"

 9            THE COURT:  I agree.  I'll tell you what Judge Duval will

10    say it was a flood.

11            MR. HUBBARD:  Exactly.

12            THE COURT:  There is a flood in the sense that these

13    houses were damaged by water.  But Judge Duval isn't necessarily

14    going to say that the policy when it says flood for the purposes of

15    insurance policy means water damage -- why don't you just put water

16    damage?  Water damage period.  Water damage, any damage by water.

17    That's the end of it, for any cause whatsoever.  I guess that would

18    be pretty clear.  Any damage by water.  So anyway.

19            It's really how you construe this word; if I am looking at

20    it, what does a flood mean in that context.  And I realize that

21    everybody is referred to this as a flood.  I am not saying it's not

22    a flood or the homes weren't flooded.  The homes were flooded, no

23    question.

24            MR. HUBBARD:  I guess what I'm suggesting, Judge --

25            THE COURT:  Water came into the house.
```

1        MR. HUBBARD:  And all I'm saying is that if that's what we

2   all called it, then that's what it is.  And the fact that you put

3   that word into an insurance policy is one reason why we don't have a

4   bunch of definitions for it is because we all know what a flood is.

5   And the word flood is not based on -- it's not a fair approach to

6   say, in my opinion, Judge, to say did you mean naturally causing or

7   did you mean caused by man, because the word flood means all of it.

8        It's like the word fire.  I would suggest the same thing.

9   Fire.  What is fire?  Well, it's combustion.  Is it combustion

10  that's caused by a kid playing with a lighter or is it combustion

11  that's caused by God when your house is hit by lightening?

12       THE COURT:  All of the terms following the word flood are

13  standing out there, some of them would be synonymous with flood, by

14  the way.  All of them are natural acts.  If you look at the terms --

15  let me read it again, I ought to know it by now -- a surface water,

16  why isn't that a flood.

17       Waves, why isn't that a flood?  If waves come into your

18  house.  Tidal waves, overflow of a body of water, all of them.  I

19  mean, why isn't that a flood?  Why does it put the word flood there,

20  that would be simple.  That's it.  Water damage exclusion, flood.

21       MR. HUBBARD:  Because it's a defined word and that's the

22  way -- you can choose to define a word however you wish.

23       THE COURT:  If those are modifiers of the word flood,

24  they're all natural.

25       MR. HUBBARD:  Let's talk about that because that's exactly

1   what, that's exactly what Xavier said in their slide that they put

2   up, and it doesn't fit well on the page, but they neglected to

3   include overflow of any body of water which is one of them.  They

4   whole premise for you --

5           THE COURT:  Overflow, not breach, overflow.  That's a

6   different term, sir.

7           MR. HUBBARD:  Well, the question is --

8           THE COURT:  That's what most people think of a flood, or

9   overflowing.

10          MR. HUBBARD:  That's something in addition to flood

11  because we have flood in there -- you have to give every word its

12  meaning.  You have flood up there, then we have overflow of any body

13  of water, so this definition doesn't have it.

14          THE COURT:  Tidal waves, why wouldn't that be an overflow

15  of water in that came into your house?

16          MR. HUBBARD:  It may serve as a flood.  Let's talk about

17  these particular items, because the whole *ejusdem generis* and

18  *noscitur a sociis* arguments rely on the fact or on the claim that

19  every single one of these words used to define water are natural,

20  totally natural acts, have nothing to do with acts of man involved

21  with it.  While we're sitting here, we've been talking for sometime

22  now about flood and the fact that you can have floods that are

23  caused by acts of man.  So that's one word that certainly doesn't

24  qualify.

25              Now waves.  We cited a case for you where waves from a

1   boat caused damage to a property, a first party property claims was

2   made just like this and the court held that it was excluded.  Those

3   were waves that were caused by man.  You have heard more than once

4   on TV at night when we have a rain caused flood in the city about

5   people driving too fast down flooded streets and waves going into

6   houses that weren't each flooded before causing damage.  That is an

7   act of man.

8           Overflow of any body of water.  This city is completely

9   filled with huge drainage canals.  They overflow all the time and

10  flood homes.  Now, how does that happen?  It's because oftentimes

11  the pumps aren't working.  You'll remember that even in Hurricane

12  Katrina in Jefferson Parish, totally unassociated with the 17th

13  Street Canal disaster, there were homes that flooded because the

14  head of the parish evacuated the pump operators and they never

15  turned on the pumps and there were a lot of really angry citizens.

16  That was an act of man and those canals, which are bodies of water,

17  overflowed.  That has nothing to do with the natural event.  Or

18  their spray.

19          So out of the six terms up, there at least three of them

20  have very much have man-made or natural bits on them.  So it's just

21  not true that you can use this type of test, it was improperly used

22  in Murray case which got a lot of people off on the wrong road.

23          THE COURT:  And you make some good points and I am going

24  to think about everything that you said.  What I am struggling with

25  here is that an all risk policy where the exclusion has to be clear

1   to take it away and it's so easy to make it clearer.  And we are

2   sitting here, and the mere fact that we can have this debate and

3   it's so robust concerns me.  I am just letting you know that that's

4   one of the things I am struggling with.

5            You're allaying some of those but that's, I think that's

6   fair for you to know what I'm struggling with.

7            MR. HUBBARD:  Well, let me keep trying because the

8   court's --

9            THE COURT:  As you have the right to do.

10           MR. HUBBARD:  The courts, Judge, that have led us down

11  this road, it's really a fairly limited type of thing I think.

12           THE COURT:  No question, I agree with you.

13           MR. HUBBARD:  There are a number of courts that looked at

14  the word flood in situations where dikes broke and where damns broke

15  and you read every single one of those cases and people came in and

16  said, oh, no, it has to be a natural event and they said, no, it

17  doesn't, the word flood doesn't mean that.  And so we're going to

18  apply it and so it was applied.  On facts that are just virtually

19  identical to what we're dealing with here.

20           THE COURT:  Mr. Garner distinguished some those cases, at

21  least he attempted to.  How is the time allocated?

22           MR. HUBBARD:  Am I doing all right?

23           THE COURT:  I'll give you some extra time.

24           MR. BRUNO:  Is he the only person arguing this?

25           THE COURT:  Are you the only person arguing?

```
 1          MR. HUBBARD:  No, I have two more.  At least some of them

 2    can be brief.  I think it's important that we wrap this up, that you

 3    and I go down this road if we can.

 4          THE COURT:  I agree with you.  But he distinguished the

 5    E.B., the Pakmark, he attempted to, and Kane to some extent which I

 6    think -- but tell me, he makes some factual distinctions.  Tell me

 7    your take on those and any other case you might want to again bring

 8    to my attention.

 9          MR. HUBBARD:  Well, in our rely brief after that, Judge,

10    we did actually try to distinguish those.

11          THE COURT:  Yes.

12          MR. HUBBARD:  I hope that you have that.

13          THE COURT:  I do.

14          MR. HUBBARD:  I mean, one is the E.B. Metal case where he

15    was talking about breaking of boundaries, that's a different way to

16    define flood that somebody, you could put that and limit it in that

17    sense to breaking of boundaries.  But the point really is, Judge,

18    the question is not about breaking boundaries, it's what their claim

19    is whether it's natural or man-made.  So breaking of boundaries

20    doesn't advance their cause anymore.  You can break a boundary

21    because of a negligent act of man or you can break a boundary

22    because of pressure of a hurricane on a levee.  So I don't think

23    that advances the natural v. man-made --

24          THE COURT:  If the boundary is broken, you're saying if

25    the boundary is broken, you're saying if it were a negligent reason
```

1     the boundary was broken it may not be --

2          MR. HUBBARD:  They would say there is no coverage.  I

3     mean, if there is coverage if it was negligence that did it.  So I

4     don't think that advances their cause.  And I will tell you that in

5     those cases I think they inappropriately said that the question was

6     not raised or incorrectly said that the question was not raised as

7     to whether or not it was, whether or not flood depended on natural

8     versus man-made.  Because in several of those cases that we cited

9     that was met head on, Kane being one of them.

10         THE COURT:  Certainly Kane it was.

11         MR. HUBBARD:  They argued that and the court said, no,

12    they poured them out.  And properly so, because as I said, I think

13    that's the way that we all look at it.

14         Additionally, the *ejusdem generis* argument.  If you look

15    at like the Sommers case cited by them and the Murray case, Murray

16    dealt with earth movement, including but not limited to, and then it

17    had a laundry list of land slide, earthquake and earth kind of

18    movement.  In the Sommers case it was professional services,

19    including but not limited to, and then it has a laundry list.

20         Well, there the appropriate focus for this is, well, is

21    this earth movement.  If water runs underneath your house and washes

22    away the dirt, is that either movement, is that similar to the other

23    lines of things?  Well, if you wanted to compare that to what we

24    have here, we don't have water including but not limited to, we have

25    water with a definition.  And what they want to talk about is flood.

1    Well, flood is just one term of the definition, it's not the general

2    word.

3              THE COURT:  We talked about the dictionary, but that's

4    sure how Kane decided it.

5              MR. HUBBARD:  Yes.

6              THE COURT:  I just want you to know that.

7              MR. HUBBARD:  You can go that road.  But what I'm telling

8    you is I don't think the *ejusdem generis* argument even plays here

9    because we don't have an "included, but not limited to" type of list

10   of items, you know, for flood.  They're telling you, well, you have

11   to compare flood to the words that follow.  No, you don't, we're

12   talking about water and those are different words and each one of

13   them stands on their.

14             THE COURT:  I understand you're saying it's not

15   illustrative of what a flood is, I understand what you're saying.

16             MR. HUBBARD:  Exactly.  And then, of course, the *noscitur*

17   *a sociis*, you're known by your associates, well, here the associates

18   of flood are like flood at least two or three of them, they deal

19   with events that are either man-made or natural.

20             THE COURT:  You've saying not even distant cousins I'm

21   assuming.

22             MR. HUBBARD:  Right.

23             THE COURT:  And Mr. Garner is saying they're siblings, I

24   understand.

25             MR. HUBBARD:  And Mr. Garner didn't even put up overflow

1   of a body of water, which is a key element of this thing.  So, I

2   mean, I don't know how many I have to find that are like flood

3   before you say, well, his associates are all natural or man-made, it

4   can go either way.  But certainly there is no justification to reach

5   the conclusion that they want you to reach based on that.

6        Additionally, the new cases that kind of came up recently

7   were water main breaks, and I have to say that you can't draw an

8   analogy between a water main in downtown New York that floods

9   somebody's basement and Hurricane Katrina and the drainage canals

10  that we're dealing with here which are tied in to Lake

11  Pontchartrain, which is tied in to the Gulf of Mexico which is tied

12  in to the Atlantic Ocean, and what we had here was the rising of

13  water to meet sea level.  I don't think you can compare that to a

14  water main break.

15       Not that I necessarily agree that those cases were

16  properly decided, but I don't think that they really advanced the

17  cause in helping you decide whether or not we had a flood here in

18  New Orleans where 80% of our city went under water.

19       THE COURT:  You realize I am trying to look at this as I

20  think I must, as one insurance company dealing with one consumer.

21  And I realize whatever I do is going to have vast effects on a lot

22  more, I am trying to look at it in isolation.  Whatever I do, the

23  policy is going to be made, it's going to be made at a higher level

24  than here.  I am going to try to interpret the policies.

25       MR. HUBBARD:  Yes.

 1          THE COURT:  Go ahead.  As best I can.

 2          MR. HUBBARD:  Two final points, Judge.  I would remind you

 3    again, you and I had, as you would say, a robust discussion of the

 4    National Flood Insurance Program and how it interplays with all of

 5    this.  We talked about the Kisch case last time where the state of

 6    Washington says everybody knew they lived in a flood plane.  How

 7    could they have any kind of reasonable expectation of coverage in a

 8    policy that said it excluded flood.  They all knew they should have

 9    bought federal flood insurance.  In this case we have evidence in

10    the record that Xavier had federal flood insurance to pay for the

11    flooding of their building upon which they've been paid.

12          So I guess that the reasonable expectation argument is

13    just not going to get you where you want to go or it's certainly

14    not, we never really got to where I actually started when I walked

15    up here, which is Professor Keyton's quote that you read to me last

16    time I was before you where you had some concerns because it seemed

17    to suggest that even if the policy was clear and unambiguous, you

18    could still go to the reasonable expectations like West Virginia did

19    in the Murray case, and that's why I just wanted to put that

20    Cadwallaer stuff up there because that's not the law in Louisiana.

21          THE COURT:  I agree with you, the law in Louisiana is you

22    must find ambiguity before you go to reasonable expectation.

23          MR. HUBBARD:  Right, exactly.  Civil Code Article 2046

24    says, if it's clear and explicit and leads to no absurd

25    consequences, no further interpretation can be made in search of the

1   parties intent.   And I guess the thing that I would leave you with,

2   Judge, the only thing would be absurd here is if you were to apply

3   this natural versus man-made interpretation that's being suggested

4   and you had a situation where the people that lived in Meraux,

5   St. Bernard Parish who are left with nothing but a slab because a

6   tidal type of wave came up over the levee there and flattened their

7   street so that there is nothing left at all don't get a nickel

8   because that's a natural cause.   They have to rely on their national

9   flood insurance.   But everybody in New Orleans who was lucky enough

10   to get flooded by a breach in the levee is going to get paid.   That

11   would be truly an absurd result.   Thank you.

12          THE COURT:   Well, I will know what you think about my

13   decision if I rule against you.   As I would well understand having

14   been an advocate myself.

15          MR. HUBBARD:   Thank you, Judge.

16          MS. BARRASSO:   Good afternoon, Judge, Judy Barrasso, and I

17   am here to speak in the Chehardy case on behalf of Allstate and the

18   Humphreys case.   So I'll start with the Chehardy case.

19          And I do want to point out, Judge, that as you just

20   mentioned this does turn on the policy language, and the plaintiffs

21   in the Chehardy case have yet to address the Allstate policy

22   language, which we submit is a little bit different which is

23   important.

24          The other thing, Judge, I certainly don't want to go back

25   over what you and Mr. Hubbard have been debating, but it is

1    important to figure out, to look to the common and ordinary meaning

2    of the term flood.  And one of the things I was thinking about is

3    what other word could possibly be used to describe what happened

4    here, and as Mr. Hubbard said there isn't one.  And flood is

5    generally defined or used to include both man-made failures, damn

6    collapses, damn failures and any other kind of flood.

7            THE COURT:  What is the source of your authority?

8            MS. BARRASSO:  Well, Judge, I wanted to show you, I was

9    looking to see what else is being used.

10           THE COURT:  If we don't go to the dictionary, what does

11   poor John Q. Public do?  Does he rummage through the federal record

12   or does he go to a dictionary?  I am a poor guy, I buy a policy, I'm

13   wondering what this means.  I wonder if my swimming pool example,

14   what if a vandal cuts my above-ground swimming pool and it floods my

15   kitchen, then I wonder if that's a flood under the terms of the

16   policy.  If I go to the dictionary flood.  Because if it said

17   man-made or natural I certainly would know, that would be clear.

18           MS. BARRASSO:  I think you'll find --

19           THE COURT:  I didn't write these policies.

20           MS. BARRASSO:  When people use the term flood generally,

21   commonly they use flood for both.  They don't distinguish, there is

22   no word that says flood but if it's man-made or water.

23           THE COURT:  I guess when I'm insuring against all risks,

24   the law is I have to be real clear, and you think just the word

25   flood is clear enough, which probably has 50 definitions, is that

```
1    clear?
2              MS. BARRASSO:  Judge, is it and it's significant that it's
3    not limited in any way.  Because, for example, as we discussed, it
4    could mean a damn collapse, a damn failure, as well as a natural
5    flood.  It means both because it's not limited in any way.
6              And Judge, we looked at, and I don't know how well this
7    shows up here.
8              THE COURT:  It shows up well on mine.
9              MS. BARRASSO:  The United States geological survey, which
10   is part of the Department of Interior, one of the tasks that they do
11   is define significant floods during the 20th century.  And they go
12   on, they don't stop at the 20th century.  And of course this flood
13   was in the 21st.
14             But it's significant that if you look at their survey,
15   first of all, they include in their groupings of types of flood damn
16   failure floods, storm surge, flash flood, all of that is considered
17   flood.  And, in fact, they define flood or discuss flood as the
18   result of a multitude of naturally occurring and human induced
19   factors, but they all can be defined as the --
20             THE COURT:  That would be nice if the insurance policy
21   said that.
22             MS. BARRASSO:  Judge, you don't have to define every term.
23             THE COURT:  You don't.
24             MS. BARRASSO:  You couldn't possibly define every term.
25             THE COURT:  You don't have to but sometimes it's smart.
```

1          MS. BARRASSO:  Judge, if you smart defining every term,

2     first of all, think of how thick it would be, and then we would be

3     back here arguing --

4          THE COURT:  Man-made or natural that's really quick.

5          MS. BARRASSO:  But there's other terms, Judge, just like

6     with fire like Mr. Hubbard pointed out.  If you define it for flood

7     man-made or natural, you have to do that for fire, you have to do it

8     for anything else in the policy.

9          THE COURT:  If you're trying to exclude it you better.

10         MS. BARRASSO:  Judge, this shows what the common and

11    ordinary meaning of the term is.  This is how people --

12         THE COURT:  Certainly common and ordinary scientists

13    determining flood, I agree.

14         MS. BARRASSO:  This is the Department of Interior, the

15    government, Judge.  We know FEMA certainly has considered this to be

16    a flood and paid billions of dollars on flood claims arising out of

17    the breach of the 17th Street Canal.

18         THE COURT:  And I think at some point that's going to be a

19    strong argument.  Whether it is to me or not in interpreting these

20    policies, I am not sure.  But it is a strong, it's a strong

21    argument.

22         MS. BARRASSO:  And, Judge, in addition, I think these

23    cases have been cited.  I know in the Aetna case, which is a case

24    that involves the immunity statute, but in considering the immunity

25    statute for the Corps of Engineers in determining what's flood

1   damage and what's a flood, the courts have said it includes man-made

2   failures, it includes damn collapses.

3          THE COURT:  You mean under 702(C)?

4          MS. BARRASSO:  Yes, sir.

5          THE COURT:  Absolutely.

6          MS. BARRASSO:  So I think the court shouldn't torture the

7   word and the instructions on how to interpret a policy say that, you

8   look to what's the common and ordinary meaning.  And everybody uses

9   it to describe both types of flood.

10          Judge, the other comment I want to make, I know that the

11   argument has been made, you need to use these Latin principles of

12   contract interpretation.  I didn't take Latin and I don't want to

13   botch the words.  But the rules there apply when you have a general

14   term following a specific term, and that's not what we have here in

15   these policies.  And if you go back and look at those cases, for

16   example, they were talking about terms were included like other

17   earth movement or other -- something really general that followed a

18   list.  We don't have that kind of catchall.

19          THE COURT:  I understand your point there.  I am more

20   concerned about the Civil Code and that's where I'm going to start

21   from in writing this opinion, first the policy and then the Civil

22   Code.

23          MS. BARRASSO:  I did briefly, Judge, want to just point

24   out, and this is from the Allstate policies at issue, that again a

25   broad, broad water damage exclusion, which includes four different

paragraphs, two of which are applicable here, either one or four,

and it starts out with "consisting of or caused by".  And in the

first paragraph is the flood exclusion, which we've talked about for

hours, and then in paragraph four it's like a catchall, too, "water

or any other substance on or below the surface of the ground

regardless of its source."

            And, Judge, again, these are broad exclusions, broad

paragraphs.  I know in the Vanderbrook hearing you had asked, well,

where does any policy say the source of the water.  Well, this

policy does.  And paragraph four is not limited to surface water,

you have surface water in paragraph one.  It's water or any other

substance on or below the ground that causes damage regardless of

its source.  This is broad enough.  If you have any qualms about the

flood exclusion, which we don't think you should, in paragraph four

it excludes this damage.

            THE COURT:  Okay.

            MS. BARRASSO:  Now, in addition, Judge, the Allstate

policy also is a little different on what we call the faulty

workmanship exclusion.  I'm trying to find my paragraph here.  And

nobody's addressed this, Judge, the plaintiffs haven't addressed it.

            The Allstate policy for the faulty workmanship doesn't

have the ensuing loss qualification.  The Allstate policy broadly

excludes faulty workmanship, planning, faulty, inadequate or

defective planning, zoning, design, specifications, construction,

renovation, materials, maintenance whether on or off the premises by

1    any person or organization.

2              Plaintiffs haven't cited any case, Judge, that limits

3    this.  We don't have the ensuing loss provision, which I know has

4    been discussed at length.  And, Judge, we contend that if somehow --

5    we again think the flood exclusion applies, we think the other water

6    exclusion applies I just showed you.  But if not, this would exclude

7    the water damage caused by the alleged third-party negligence of the

8    Corps or whoever they're claiming.

9              THE COURT:  All right.

10             MS. BARRASSO:  I'm looking over my notes.  Mr. Hubbard

11   covered most of this.

12             And just to comment on some of the cases that have been

13   cited by the plaintiffs, and we got one supplemental memo late

14   yesterday, Judge.

15             THE COURT:  I have not looked at that memo.

16             MS. BARRASSO:  It involves some of the cases Mr. Garner

17   had.

18             But all of the cases they cite, if any of them have said

19   and bought into the natural versus man-made, they involve water

20   mains.  They don't have one case that they can bring to this court

21   where a damn collapsed, a levee breached or something that's dealing

22   with that kind of body of water failed, like we had here, and the

23   court said it didn't apply because it was man-made.  Their cases all

24   involved water mains.

25             And many of the cases went off on the fact that in another

1  part of the policy there was a provision that said we do cover

2  leakage from a sprinkler or other system, and the courts were

3  struggling, well, if you cover it here then this water main may be

4  here.

5            None of that applies here in this case.  We don't have a

6  water main, we don't have a system.  We have a lake and a canal and

7  then a possible breach in the levee, not possible, a breach, and a

8  question of why.  But there is nothing else in the policy that they

9  can hook on to.

10           THE COURT:  Why would a flood from a water main be

11  different from a flood from a broken reservoir or a broken water

12  tower?

13           MS. BARRASSO:  Judge, I am not saying that I agree with

14  those arguments that they made.

15           THE COURT:  It's distinguished in the sense that they're

16  not from a body of water.

17           MS. BARRASSO:  But in the court's mind in those cases

18  there was a distinction.  And if you look at Couchon Insurance it

19  does note that insurers distinguish between floods from bodies of

20  water as opposed to floods from these man-made --

21           THE COURT:  Some brief I saw that somewhere.

22           MS. BARRASSO:  -- from the man-made devices.

23           THE COURT:  Maybe it's from your brief, but I saw it

24  somewhere.

25           MS. BARRASSO:  It's somewhere because man or women want in

1   your house.  And that's the distinction that the water main is that

2   latter type.

3         But more importantly, in those cases there often was this

4   other provision that there was coverage from leakage from a

5   sprinkler or other system.

6         THE COURT:  What about a water main along the street that

7   somebody hits?

8         MS. BARRASSO:  There are many, many cases, Judge that

9   cover that.  I'm sorry, that said it's included within these

10  exclusions.  There is only the few cases they've cited --

11        THE COURT:  Where are the many, many cases?  I didn't see

12  that many, many cases.

13        MS. BARRASSO:  We cited -- we weren't trying to pick out

14  cases on water mains, Judge.  We can give you many cases where the

15  water main burst aren't included under the flood exclusion and not

16  covered.  They've only given to you four or five cases, and believe

17  me those are not the only cases in this country where water mains

18  have burst.

19        THE COURT:  I'm sure they aren't.

20        MS. BARRASSO:  And, Judge, if you want we can give you

21  many more where it was encompassed within the exclusion.

22        Judge, let me move over right now to the Humphreys case

23  because I know Mr. Lee still wants to argue.

24        As you pointed out last time, Judge, and this morning, the

25  hurricane deductible endorsement is just that.  I mean, it's a

1    deductible, it doesn't create coverage and there is nothing

2    different about this one than the ones you've been talking about.

3         THE COURT:  Did she pay the $409 to get the deductible

4    lowered?

5         MS. BARRASSO:  Yes.

6         THE COURT:  That's the only thing that makes sense.

7         MS. BARRASSO:  And we submitted an affidavit to that

8    effect that says that.

9         And in addition, and Mr. Creely is a little bit confused

10   about his entire policy, but the windstorm part coverage he was

11   talking about, it's not windstorm coverage, it's a windstorm

12   deductible.  So in his policy we did provide coverage for windstorm,

13   but it had a higher deductible and then it had a --

14        THE COURT:  Pay a little extra money to get a lower

15   deductible.

16        MS. BARRASSO:  And the same thing for the hurricane

17   deductible, just like every other policy, he decreased his

18   deductible to 1,000 and we submitted an affidavit that points that

19   out.  The going rate was 2% of your home value, he went down to

20   1,000, and that's what we paid for.  And the words of this

21   endorsement nowhere create coverage, nowhere expand it.  And if you

22   look the at windstorm deductible they're the same.

23        THE COURT:  This case will not be resolved on that I

24   promise.

25        MS. BARRASSO:  Thank you, Judge.  I am going to sit down

```
 1   and let Mr. Wayne, Mr. Lee argue.

 2            THE COURT:  All right.

 3            MR. LEE:  Good afternoon, your Honor.  Wayne Lee here on

 4   behalf of the defendants State Farm Fire And Casualty Company in

 5   connection with the Chehardy litigation.

 6             Your Honor, we've been over some of this before and so

 7   I'll try to really kind of cut down the arguments as much as I can.

 8            THE COURT:  Yes, sir.

 9            MR. LEE:  I do want to go back to the one point that the

10   court said that it acknowledges is the case, and that is when trying

11   to determine the interpretation of a policy, the Louisiana Supreme

12   Court says if one does not refine away terms of contract expressed

13   with sufficient clearness to convey the plain meaning of the

14   parties.

15            THE COURT:  That's the $64 question.  Do I find that the

16   word flood in this policy is clear or not, and then you contend that

17   it is, as many of your colleagues have, and other courts have.

18            MR. LEE:  And I agree that that is an important part of

19   the step.  In doing so, your Honor, I also remind the court of the

20   point that the contract, and the basic rule in Louisiana is that you

21   also interpret contracts in a manner that is consistent by

22   construing all of the terms of the contract, not pieces in

23   isolation.

24            THE COURT:  No question.

25            MR. LEE:  So you don't refine, you don't try to take a
```

1    word that has a common meaning and take a razor to it and try to cut

2    it down in pieces and say --

3              THE COURT:  I am not supposed to expand it or restrict it.

4              MR. LEE:  Exactly, your Honor.  And what construing the

5    terms of the contract --

6              THE COURT:  The coverage that is.

7              MR. LEE:  When construing the terms of the contract, in

8    coverage or in exclusion, you look to the entire contract and read

9    it in the manner that's consistent so that you don't read it in a

10   way that has the effect of making a portion, another portion of the

11   contract void or infective.  They have to be read together as a

12   whole to determine what the plain meaning of the contract is.

13             THE COURT:  That's what I'm concerned about, too, about

14   the all risk, the all risk.  Go ahead.

15              I am interested in your specific language, Mr. Lee.  And

16   we have to get it a little smaller here.  Rises from natural or

17   external forces, I know you're going to direct me to that.

18             MR. LEE:  Your Honor, this is the provision of the State

19   Farm policy that we're looking at.  And, your Honor, as we talked

20   about the language at the bottom that talked about where the

21   reference to flood and surface water and tidal waves.  Your Honor, I

22   start with the basic proposition that's already been talked about

23   when it says that we're excluding flood.

24              You said where do we look.  Your Honor, I don't think I've

25   seen a single article in the paper, a statement or a conversation

1    with anyone in this city of New Orleans or anywhere else that has

2    suggested that what happened here in New Orleans was not a flood.

3    Not one person.

4         THE COURT:  Nobody said it's not a flood.

5         MR. LEE:  When the reports started coming out that said we

6    think there may be breaches in the levee, they didn't say it wasn't

7    the flood.  So when it says we exclude flood, without --

8         THE COURT:  You think that means every definition in the

9    dictionary period?  So you go to the most expansive term, where

10   you've agreed to insure every risk, you go to the most expansive

11   term; is that the rule of construction in Louisiana?

12        MR. LEE:  What I believe you do, your Honor, is you look

13   at the facts of the case that you have in front of you --

14        THE COURT:  I've looked at the dictionaries, a lot of

15   them, a lot of them, and none of them, none of them say breach of a

16   levee.  In the beginning.  Some of them say in the verb definition

17   inundation by water.  None of them in the noun definition, I've

18   looked at them all.

19        MR. LEE:  Breach of the levee is the cause, breach of the

20   levee is not what a flood is.

21        THE COURT:  I understand.  You're insuring me against

22   everything except flood, and I'm supposed to know that that is the

23   most expansive definition possible.

24        MR. LEE:  Your Honor, I think the question is --

25        THE COURT:  That's what I have to answer.

1        MR. LEE:  The question is whether this is a flood.  And

2   under any definition that I can find this is a flood.  Regardless of

3   the cause.

4        THE COURT:  You don't think you're obligated in an all

5   risk policy to make it clear that if it floods from any cause

6   whatsoever, if an airplane drops water on your house, if a water

7   tower breaks, that literally, I guess, could be a flood, your house

8   was flooded.  So I am not sure that that really, that that's clear

9   to the ordinary consumer.

10       MR. LEE:  Your Honor, the point that I am making here,

11  your Honor, that's not what we have at hand.

12       THE COURT:  I understand.  But if the word is ambiguous

13  you mean it's not ambiguous to you.

14       MR. LEE:  I think what you have to do, your Honor, is look

15  at the facts of the case and see whether the facts that happened

16  comes within the definition of ordinary terms.

17       THE COURT:  I understand that argument.

18       MR. LEE:  The other part that I want to point out to your

19  Honor is this.  You do have to read it together, the whole contract.

20  And I understand your Honor suggesting that any concurrent cause --

21       THE COURT:  You have the word external there which may

22  mean something.

23       MR. LEE:  Your Honor, I would point out the Castillo v.

24  State Farm case, which we have cited, specifically addressed that

25  point.  It declined to follow the Murray case and --

```
1              THE COURT:  Give mess something extra to grapple with if I
2     don't go flood means everything.
3              MR. LEE:  Exactly, well, that's part of it, your Honor.
4     It says, in that case where it says natural or external forces, the
5     Castillo case says that's what that --
6              THE COURT:  You have a little extra in your policy, Mr.
7     Lee.
8              MR. LEE:  Your Honor, then I'll go further, your Honor.
9     The point that we're talking about here is, what the Murray case did
10    was they sort of jumped into this water damage -- actually it was
11    the earth movement case.
12             THE COURT:  It was earth movement.
13             MR. LEE:  Right.  And they jumped in there and said, okay.
14    We think earth movement can be man-made, can be natural, and they
15    went off on the ejusdem generis; which by the way, the Anita case,
16    the Louisiana case, which involved the State Farm earth movement
17    policy, they didn't cite Murray but they refused to decline to
18    follow ejusdem generis in that case and they applied the State Farm
19    earth movement case in Louisiana where there was a combination of
20    natural forces and man-made intervention.
21              So again, we've talked about why we don't believe the
22    Murray case is valid.
23             THE COURT:  Right.  You think it's wrong.
24             MR. LEE:  I think it's wrong and I have other reasons if
25    we have the time.
```

1          But the other point that I want to point out, your Honor,

2   is they started there and they went back up to the anti-concurrent

3   clause language.  And frankly, your Honor, we referred to this in

4   our briefs before.  That's the lead-in language because it's not

5   written in the code, but one of the things that I think we all learn

6   from the time that we're children, you start at the beginning.  You

7   don't start in the middle.

8          The beginning of the provision says, "We do not insure

9   under any coverage for any loss which would not have occurred in the

10  absence of one or more of the following excluded events."  And

11  before you go to the excluded events, it tells you, "We do not

12  insure for such loss regardless of the cause of the excluded event."

13  So before you ever get to the definition, to that list of excluded

14  events, they've already told you, we are telling you now, and it

15  doesn't matter what the cause of the flood is, it doesn't matter

16  what the cause of the tidal water is, it doesn't matter what the

17  cause of the overflow of the body of water.  We are telling you that

18  up front before you ever know what the exclusions are.  Or the cause

19  of the loss or whether other causes acted concurrently or in

20  sequence with the excluded event to produce the loss.  Or whether

21  the event occurs suddenly or gradually.

22         Your Honor, we are telling you this before you ever get to

23  the exclusion.  So to start at the back and then say, well, we

24  define it here and then go back I think it's improper.  We've set

25  out the parameters for which you're supposed to read this agreement.

1          And so to the extent that if this is a flood, then we've

2    told you up front cause of the flood doesn't matter.  If it's a

3    combination of factors, it doesn't matter because the clause, here

4    we've got the combination of man-made according to their version

5    because man caused the breach of the levee or led to the breach of

6    the levee.  But unquestionably, this thing would not have happened

7    without Hurricane Katrina and the storm that pushed the storm surge.

8          And under this provision, your Honor, starting from the

9    beginning, if there is a combination of man-made and natural events

10   and it causes the flood, it's not covered.  So reading this together

11   and without refining these meanings tortuously, this is excluded.

12          THE COURT:  I understand.

13          MR. LEE:  Now, if the other component, of course, your

14   Honor is the third piece of the puzzle, and I won't even put it up,

15   your Honor, because I know we've talked about the acts and omissions

16   clause, where you have the combination of faulty construction of

17   design and planning and that combined with the water, an exclusion

18   in this section, if there is a combination of one cause or the act

19   of negligence in construction or the design causes the flood it's

20   excluded.

21          Your Honor, what we presented is a scenario that gives

22   effect to all of the provisions.  They can't be read together that

23   way without torturing the meaning and it does not lead to absurd

24   results.  It is the result that led to the federal government

25   passing the National Flood Insurance Protection Act.  It was passed

1    after Hurricane Betsy --

2          THE COURT:  Well, we could have easily said in the policy

3    anything covered by the NFIP is not covered here.  You write them.

4          MR. LEE:  Your Honor, there are a lot of things that

5    aren't covered by NFIP.

6          THE COURT:  I just have to interpret them and thankfully

7    there is another group that's going to interpret it after I do, so.

8          MR. LEE:  My point, your Honor, is simply it doesn't lead

9    to absurd results, and quite frankly I think the other

10   interpretations do lead to absurd results because it does wind up

11   with the situation that Mr. Hubbard pointed out where you've got the

12   person who is in New Orleans East where the section, where the levee

13   got overtopped that they're not covered.  If you're in a portion of

14   lower St. Bernard where there is a topping of the levee or whether

15   it was a straight storm surge, the same water, they are not covered.

16   But when it gets to Orleans Parish, if it overtopped it, if it

17   overflows over the levee it's not covered.  But if the same water

18   breaches the levee it somehow is.

19         THE COURT:  To paraphrase Popeye, it is what it is.

20         MR. LEE:  Your Honor, and that's a result that I believe

21   is a result of refining language beyond its reasonable meaning.

22   Thank you, your Honor.

23         THE COURT:  Thank you.

24         MR. BRUNO:  Judge, the defendants have got about twice as

25   much time, not that we're asking you to sit on the bench anymore.

1        THE COURT:  I don't want anymore briefs.

2        MR. BRUNO:  No, that's what I say, no more briefs.

3        THE COURT:  Let's face it, I am going to certify this

4  thing, whatever I do is going to get looked at by the Fifth Circuit.

5  So I just need to get an opinion out.

6        MR. BRUNO:  That's fine.  If you have any questions.

7        THE COURT:  Do y'all want five minutes to rebut?  You're

8  welcome to have it.

9        MR. BRUNO:  No.  Unless you have a question or anything

10  that they said gives you some pause.

11       THE COURT:  It really boils down to, it's the word flood

12  and the context of all of the risk policy sufficiently clear.

13  That's the question.

14       MR. BRUNO:  Right.  Thank you very much.

15       THE COURT:  All right.  And as to the special clause that

16  y'all have pointed out.  All right.  Thank you very much.  Have a

17  great weekend.  Great arguments.

18       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

19

20

21                    *  *  *  *  *  *

22

23

24

25

1

2                          REPORTER'S CERTIFICATE

3

4        I, Karen A. Ibos, CCR, Official Court Reporter, United States

5    District Court, Eastern District of Louisiana, do hereby certify

6    that the foregoing is a true and correct transcript, to the best of

7    my ability and understanding, from the record of the proceedings in

8    the above-entitled and numbered matter.

9

10

11                          _____

12                          Karen A. Ibos, CCR, RPR

13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25