1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: KATRINA CANAL BREACHES  *   Civil Action
           CONSOLIDATED LITIGATION  *   No. 05-CV-4182
6                                   *
                                    *   Section K
7    _____  *
                                    *   New Orleans, Louisiana
8    PERTAINS TO MRGO:              *   December 15, 2006
                                    *
9    REED, NO. 06-2152              *
     ACKERSON, NO. 06-4066          *
10   DOCUMENT NOs. 1155, 1157,1158  *
     1159, 1160, 1161, 1162, 1163   *
11   and 1176                       *
     *******************************

12

13              HEARINGS ON MOTIONS BEFORE THE
              HONORABLE STANWOOD R. DUVAL, JR.
14              UNITED STATES DISTRICT JUDGE

15

16

   APPEARANCES:
17

18

   For Plaintiff Phillip Reed:      Salas & Co. L.C.
19                                   BY:  CAMILO KOSSY SALAS, III
                                     650 Poydras St.
20                                   Suite 1650
                                     New Orleans, LA 70130
21

22   For Plaintiff Fellosea Ackerson:  Law Offices of Albert J.
                                          Rebennack
23                                   BY: ALBERT JOSEPH REBENNACK,
                                       JR., ESQ.
24                                   2202 Avenue B
                                     Metairie, LA 70001
25

```
 1

 2   For Defendant              U.S. Department of Justice
     United States:             BY: STEPHEN FLYNN, ESQ.
 3                              Assistant Director for Admiralty
                                Torts Branch, Civil Division
 4                              P.O. Box 14271
                                Washington, D.C.  20044
 5

 6   For Defendant Great Lakes: Baker Donelson Bearman Caldwell &
                                  Berkowitz, PC
 7                              BY:  JAMES H. ROUSSEL, ESQ.
                                201 St. Charles Ave.
 8                              Suite 3600
                                New Orleans, LA 70170
 9

10   For Defendant Great Lakes  Montgomery Barnett
     Trailing and T.L. James    BY:  ARTHUR GORDON GRANT, JR.,
11   Company:                     ESQ.
                                Energy Centre
12                              1100 Poydras St.
                                Suite 3200
13                              New Orleans, LA 70163-3200

14

15   For Defendant Manson       Phelps Dunbar, LLP
     Construction Company:      BY:  GEORGE MOORE GILLY, ESQ.
16                              Canal Place
                                365 Canal St.
17                              Suite 2000
                                New Orleans, LA 70130-6534

18

19   For Defendant Bean:        Deutsch, Kerrigan & Stiles LLP
                                BY:  TERRENCE L. BRENNAN, ESQ.
20                              755 Magazine St.
                                New Orleans, LA 70130

21

22   For Defendant Pine Bluff   Mouledoux, Bland, Legrand & Sand
     Sand and Gravel Company:     Brackett, LLC
23                              BY:  ANDRE J. MOULEDOUX, ESQ.
                                ONE Shell Square
24                              701 Poydras St.
                                Suite 4250
25                              New Orleans, LA 70139
```

1
2       Official Court Reporter:       Jodi Simcox, RMR
                                       500 Poydras Street, Room HB-406
3                                      New Orleans, Louisiana 70130
                                       (504) 589-7780
4

5
        Proceedings recorded by mechanical stenography, transcript
6       produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>**PROCEEDINGS**</u>

2                      **(December 15, 2006)**

3           **THE DEPUTY CLERK:**  All rise, please.

4           **THE COURT:**  Good morning.

5           **THE DEPUTY CLERK:**  This is Civil Action 05-4182,

6    referring to 06-2152, 06-4066 here on motions on the dredging.

7           **THE COURT:**  Make your appearances.

8           **MR. REBANECK:**  Good morning, A.J. Rebaneck with

9    Fellosea Ackerson.

10          **MR. SALAS:**  Good morning, Your Honor, may it please

11   the Court, Camilo Salas for Phillip Reed.

12          **THE COURT:**  Thank you.

13          **MR. FLYNN:**  Good morning, Your Honor, Stephen Flynn

14   for the United States.

15          **THE COURT:**  Thank you.

16          **MR. ROUSSEL:**  Good morning, James Roussel for Great

17   Lakes as amicus.

18          **MR. GILLY:**  Good morning, George Gilly for Manson

19   Construction Company.

20          **MR. GRANT:**  Good morning, Your Honor, Gordon Grant

21   for Great Lakes Trailing and T.L. James and Company.

22          **MR. BRENNAN:**  Your Honor, Terry Brennan for the Bean

23   entity.

24          **THE COURT:**  That's it.  Before we start, I'll give

25   you a brief synopsis of my present overview before I'm

 1   illuminated by your verbal erudition.

 2                On the jurisdictional issues, one, it appears to

 3   me that there is no Federal Tort Claim Act when there's a

 4   maritime issue against the United States.  That's supported by

 5   cases, *Schoenbaum*.  So I think for purposes of our discussion,

 6   at least preliminarily, I think the Federal Tort Claim Act is

 7   irrelevant because I think this is, in fact, a maritime claim.

 8                Therefore, the suit against the United States

 9   would be based on the SAA or the PVA through the AEA, the

10   acronyms, of course, on Public Vessels Act, Suits and Admiralty

11   Act and the Admiralty Extension Act.

12                That's my first look at this.  And then the

13   question is:  Does the Admiralty Extension Act, from the United

14   States' standpoint, require the filing of an administrative

15   claim.  The Federal Tort Claim Act and the Admiralty Extension

16   Act does, in fact, have that requirement.

17                And since the suit against the United States is

18   brought either under the Suits and Admiralty Act or under The

19   Vessels Act, not the Federal Torts Claim Act, as I see it,

20   because there is none in the maritime context.

21                Then does the Admiralty Extension Act require,

22   even though those two acts don't require a -- that is, the SAA

23   and the PVA, don't require an administrative filing, but the

24   Admiralty Extension Act does.  Since this occurred on land,

25   must that be complied with in order for us to have appropriate

1  jurisdiction.

2              As to the dredgers, I'll tell the plaintiffs

3  now:  I'm not quite sure what they did that they would be

4  liable for.  So I'll let you know that now.  They dredged.  But

5  I can't see in the complaint where there's any allegation that

6  they dredged, not in accordance with the plaintiff's

7  specifications, but it appears that they simply dredged in

8  accordance with the -- it appears -- in accordance with the

9  instructions that were given to them by the Corps of Engineers.

10             I'm not quite sure.  I know you've alleged

11  negligent concealment, which I'm not sure is a caution of

12  action anywhere, including Louisiana or maritime law.  And the

13  duty -- I think failure to warn or -- I'm not phrasing it

14  correctly.  It's the implied warranty issue.

15             So I'm wondering if I were to grant -- this is

16  down the line -- the order that I ask you to address, but if I

17  grant it, the elmination of the fourth cause of action and the

18  negligent concealment and the implied warranty, what's left?

19             It also appears that under the Ships and

20  Admiralty Act, and I know that there's an argument about

21  whether the dredgers are agents or not.  I'm interested in

22  that.  Because if they're agents, they win.  That's another way

23  to go.

24             But I thought it would be fair for me to tell

25  you in advance so that you can get your wheels turning, in

1    reading the complaint vis-à-vis the dredgers, I find it a very

2    contrived -- and I don't mean this as pejorative -- but you're

3    straining at a cause of action.  That's what it appears to me.

4    As to the United States, my principal concern is:  Does the

5    Admiralty Extension Act, AEA, apply, thereby requiring even the

6    plaintiffs to file an administrative claim?  Those are my

7    primary concerns.

8                    When we get into 9:2772 and whether the maritime

9    law preempts, or whether maritime by local, that's a tangential

10   argument in the sense that I get to those only if I find that

11   there's a cause of action stated on the 12(b)(6), in essence, I

12   guess, the dredgers and the other things you argued don't

13   prevail, including the *Yearsley* case, which I'm interested in

14   as well.  It seems to still be good law.

15                   So I'm letting you know, in advance, the things

16   that concern me.  And with that, I think it's your turn now.

17   It's the -- how are we going to take up the motions?  Does the

18   United States want to go first?

19               **MR. FLYNN:**  That was the order that --

20               **THE COURT:**  Because it involves a little density in

21   the sense of the various acts that are invoked.  And I've read

22   Judge Berrigan's decision, of course.  But I do have some

23   concerns about any discussion about the Federal Tort Claim Act

24   since I don't really think it applies to the United States in a

25   maritime context.

1          **MR. FLYNN:**  Well, I guess the question for another

2     day is that whether this really is a maritime context and

3     whether, as the Court referred to it, is it somewhat contrived

4     to get around the problems that be inherent in it not being

5     within admiralty jurisdiction.

6               But allow me to address the Court's --

7          **THE COURT:**  And I notice you didn't talk about

8     702(c).

9          **MR. FLYNN:**  Well, I was saving that for another day,

10    and I also understood --

11         **THE COURT:**  I agree that that's appropriate.  And we

12    also have a rather substantial 702(c) decision pending, which

13    will not be rendered until after the first of the year.

14         **MR. FLYNN:**  I understand.  And certainly I am in

15    consultation with my colleagues that handled that part of the

16    case.

17         **THE COURT:**  Yes.

18         **MR. FLYNN:**  We've discussed it, and we figured I was

19    better off not broaching that subject one more time.

20               In any event, the Admiralty Extension Act.  The

21    Admiralty Extension Act affects admiralty jurisdiction.  And as

22    you referred to Professor Schoenbaum, he makes it clear that

23    what it affects is the locality part of the admiralty

24    jurisdiction test; and all it does is simply allows those who

25    suffer the impact of the maritime tort ashore, qualify for

1  admiralty jurisdiction.

2              And, on the other hand, the Public Vessels Act

3  and the Suits and Admiralty Act do not of themselves confer

4  admiralty jurisdiction upon the Court.  They simply waive the

5  government's sovereign immunity, if there is such admiralty

6  jurisdiction.

7              So it's the government's position in this matter

8  that merely by pleading artfully that the Public Vessels Act

9  and the Suits and Admiralty Act are relied upon by Mr. Reed and

10  make no mention of the Admiralty Extension Act doesn't allow it

11  to not become an issue before this Court.

12         **THE COURT:**  Well, if this were a case where the

13  injuries were confined to the MR-GO, the waterway itself, that

14  is, if a public vessel of the United States collided with

15  another vessel, then we wouldn't have to go through the

16  Admiralty Extension Act and we wouldn't have an administrative

17  claim.

18              Do you agree with that?

19         **MR. DANIELS:**  Yes.

20         **THE COURT:**  And if this were a claim or an agent of

21  the United States under the Suits and Admiralty Act that was

22  involved in a discreet incident where the harm occurred upon

23  the navigable waterway, then, likewise, we would not have to go

24  through an administrative riddle.  The plaintiffs would not, is

25  that --

1          **MR. FLYNN:**  Yes.

2          **THE COURT:**  Because the injury here occurred on land,

3     then the Admiralty Extension Act is, by its very nature,

4     invoked and, ergo, you argue that then the administrative

5     provisions must apply.

6               In looking at the act itself, and I'm interested

7     in what the plaintiff has to say, is that the maritime

8     jurisdiction -- it says -- I'm reading from the Admiralty

9     Extension Act, and I'll read it briefly:  The admiralty and

10    maritime jurisdiction of the United States shall extend to and

11    include all cases of damage and injury to persons or property

12    caused by a vessel on navigable water notwithstanding -- this

13    is 4674 -- that such damage or injury be done or consummated on

14    land.

15              In such case where any suit may be brought in

16    rem or a personam, according to the principles of the law, then

17    the rules of practice obtaining the cases where the injury or

18    damage has been done and consummated on navigable water.

19    Provided that as to any suit against the United States for

20    damages or injury done or consummated on land by a vessel on

21    navigable waters, i.e., your dredge under the PVA; or your

22    agents, the dredgers, under the SAA.

23              The PVA or the Public Vessels Act or Suits and

24    Admiralty Act is appropriate and shall constitute the exclusive

25    remedies for all causes of action arising after June 19, 1948,

1   and for all causes of action where suit is either to not have

2   been filed under the Federal Tort Claims Act.

3                 Provided further that no suit shall be filed

4   against the United States unless it has been expired for a

5   period of six months after the claim has been presented in

6   writing to the federal agency owning or operating the vessel

7   causing the injury or damage.

8                 And without compliance with the filing

9   provision, the plaintiff cannot invoke the admiralty

10  jurisdiction of the court.

11                So the statute seems to support your argument

12  that whether it's brought under the PVA or the SAA, if it

13  implicates the Admiralty Extension Act, administrative remedy

14  must be applied.  That's what it appears under the plain

15  language of the statute.

16          **MR. FLYNN:**  That is the government's position.

17                If I may, let me spend a moment addressing

18  Mr. Salas' arguments.  He has raised the argument that only one

19  vessel referred to in the complaint, the Dredge Wheeler,

20  actually was owned by the United States.

21          **THE COURT:**  True.

22          **MR. FLYNN:**  And that he makes the argument that

23  because the other vessels were not owned or operated by the

24  United States, that there is no requirement under the AEA to

25  file an admin claim; that the -- that language that's at the

1   end requiring the administrative claim is -- only covers a

2   certain category of actions for which the AEA provides

3   admiralty jurisdiction.

4                Let me just say that the government disagrees

5   with that for two reasons.  One, certainly the most obvious

6   issue is that, as we pointed out in our briefs, there would be

7   no liability for the government unless there is some kind of

8   control or responsibility that the government has for these

9   privately owned dredges.

10               And the government would submit it has no direct

11  control over them; but that if it is going to be held

12  responsible for something they accomplished, which is another

13  day as well, the AEA's requirement for an administrative claim

14  must be complied with.

15          THE COURT:  Let me ask you:  The suit against the

16  United States is either under the, as I understand it, the

17  Public Vessels Act, that's the only way you waive your

18  sovereign immunity, or the Suits and Admiralty Act.

19          MR. FLYNN:  Yes.

20          THE COURT:  So are either of those two, as I read the

21  statute, if it implicates the Admiralty Extension Act, then

22  administrative remedy is required.

23          MR. FLYNN:  That would be our position.

24          THE COURT:  Well, I mean, it looks like that's what

25  the statute says.  I may be reading it incorrectly.  Mr. Salas,

1    I'll wait -- but if you think I'm reading it incorrectly in the
2    nuances, you need to tell me.
3              MR. FLYNN:  I have no disagreement.
4              THE COURT:  And I'm telling you, although it's cited
5    in your brief, it seems to me that the Federal Tort Claim Act
6    is gone as to maritime claims.  That's what *Schoenbaum* says.
7              MR. FLYNN:  Well, I would actually disagree with
8    that.
9              THE COURT:  Okay.  Let me read to you --
10             MR. FLYNN:  Well --
11             THE COURT:  -- right -- the SAA is exclusive and
12   admiralty claim cannot be brought under the Federal Tort Claims
13   Act.
14             MR. FLYNN:  Absolutely.  Those two schemes are
15   mutually exclusive.  If I may make one more point --
16             THE COURT:  So you agree that an admiralty claim
17   cannot be brought against the United States under the Federal
18   Tort Claims Act?
19             MR. FLYNN:  Yes.
20             THE COURT:  That's all I'm trying to establish.  Now,
21   tell me what you were trying to say.  What did you disagree
22   with?
23             MR. FLYNN:  Before I get to the Admiralty
24   jurisdiction argument, let me just make one more point.
25                  In Judge Berrigan's decision, one of the issues

1  against the United States was an allegation that it tortiously

2  did not sink the barge that was alleged to have come through

3  the levee and injure the Parfait plaintiff's property.

4          And the Court held that it was admiralty

5  jurisdiction over that cause of action against the United

6  States, and it required that the AEA's administrative claim

7  file requirement be satisfied.  And that was not a vessel owned

8  by the United States.

9          THE COURT:  Well, I'm not -- to me, the plain

10  language of the act seems to indicate one to two ways to sue

11  under the maritime law:  Either under the Public Vessels Act or

12  the Suits and Admiralty Act.  And then it says if it

13  implicates -- not that plainly, of course -- if it implicates

14  the Admiralty Extension Act, you've got an administrative

15  remedy.

16          That's what it seems to say simply.

17          MR. FLYNN:  Yes, Your Honor.

18          THE COURT:  And it seems to me we don't have any

19  other claim other than admiralty jurisdiction.

20          MR. FLYNN:  Well, let me address one more point.

21  Mr. Salas advised me that he did file an amended complaint

22  yesterday, which I have not --

23          THE COURT:  I've not seen that either.

24          MR. FLYNN:  I have a copy of it on the counsel's

25  table, but I've not read it.  What he's representing, though,

1  to me is that because he did file an administrative claim in
2  June, I believe, it was received --
3           **THE COURT:**  Under the Federal Tort Claims Act.
4           **MR. FLYNN:**  Well, he filed a claim with the Corps of
5  Engineers on June 9th on --
6           **THE COURT:**  So that may cure -- he may argue that --
7  he did argue, at least vis-à-vis the Federal Tort Claims Act,
8  that that -- which I don't think is applicable to this
9  admiralty claim -- that that tolled on December 9th and so he's
10 in.
11           But, of course, we've already ruled that it
12 seems to us, although, it may be a waste of time and duly harsh
13 to the plaintiffs, that suit filed -- that you don't get the
14 benefit because you've to got file it again.
15           **MR. FLYNN:**  Exactly.
16           **THE COURT:**  That's the law.
17           **MR. FLYNN:**  That was the only point I was going to
18 make.
19           **THE COURT:**  Well, that's the law and I've ruled that
20 already.
21           **MR. FLYNN:**  In Berthelot, right, in June.  I
22 understand that's your decision.  And that was under the FTCA
23 specifically, but I can't imagine any policy reason why it
24 would not apply here.
25           **THE COURT:**  Probably correct --

1          **MR. FLYNN:**  Now, the next issue, if the Court --

2          **THE COURT:**  -- so we'll have to come back.  But, I

3    mean, it's agonizingly bureaucratic, but that's, apparently,

4    the law.  Go ahead.

5          **MR. FLYNN:**  That's all, actually, I have to address

6    about the AEA.

7               Now, if the Court wishes, I can move on to

8    whether there is admiralty jurisdiction here, because,

9    respectfully, we disagree.  We think that although plaintiff

10   has artfully pled that it was -- the damage to plaintiff's

11   property was really the result of dredging and very little

12   else, we really think that that's not the heart of his action.

13               And that the heart of his action is the same as

14   in *Robinson* or in these other matters, which are --

15         **THE COURT:**  So where does that take us, then?  If

16   that's so, then that takes us back to the Federal Tort Claims

17   Act.

18         **MR. FLYNN:**  Exactly.  And that's my point.  He would

19   have to file --

20         **THE COURT:**  But it would be the same --

21         **MR. FLYNN:**  That's right.

22         **THE COURT:**  -- result at least right now.

23         **MR. FLYNN:**  Right.

24         **THE COURT:**  That is, no claim filed timely; you don't

25   get the benefit of it tolling; you'd have it file it again.

1          **MR. FLYNN:**  So the easy way to dispose of the

2     government's motion is to rule in our favor, but not determine

3     the issue of admiralty jurisdiction or not.  The hard way is to

4     decide to pick a choice, because it's a much thornier issue.

5          **THE COURT:**  Well, I'll certainly let Mr. Salas argue

6     that as well and give his -- or whomever's arguing for that.

7          **MR. FLYNN:**  Well, since I know there are a lot of

8     other people --

9          **THE COURT:**  So you might be telling me that why you

10    think this is a tort claim -- a FTCA claim shrouded or

11    camouflaged in an admiralty claim, masquerading as an admiralty

12    claim.

13         **MR. FLYNN:**  Yes.

14         **THE COURT:**  Why?

15         **MR. FLYNN:**  Because the dredges -- the role of the

16    dredges here was simply, as the Court has pointed out, was to

17    perform the assignment, the contract, provided by the Corps of

18    Engineers.  The Corps of Engineers tells them the profile or

19    the channel which need be maintained, it tells them the depths

20    to which to dredge, and they go and dredge it.

21              And, frankly, the Corps of Engineers doesn't

22    care whether they use, you know, vessel-borne dredges or

23    anything else.  It's saying:  We're contracting with you to

24    make it look like this.

25              And the -- although it's certainly contemplated

1   by the Corps that the dredges are most likely going to be
2   vessels, because that's the state of technology, and, in fact,
3   the Corps has its own vessel, we don't believe that that is
4   what really is driving the alleged tort of the United States.
5          THE COURT:  So you're trying to get into the psyche
6   of the plaintiff?  I'm wondering how I can make that decision.
7   I've got to look at that complaint.
8          MR. FLYNN:  Well, I understand.  However, I also
9   think that the mere fact that the complaint has been styled to
10  in a very narrow sense, does not change the ultimate analysis
11  that need to be performed under *Grubart*.
12         THE COURT:  I'm very well familiar with *Grubart*.  And
13  I understand that the -- but as I understand it, the activities
14  occurred over -- the pile driving activities occurred over a
15  navigable body of water, but the effect was on the tunnel on
16  land.
17         MR. FLYNN:  Right.  But also in *Grubart*, there was a
18  vessel that allegedly committed a tort here as the Court's --
19         THE COURT:  The bow driving vessel?
20         MR. FLYNN:  Right, here.  There doesn't seem to be
21  anything the dredges did wrong.  In other words --
22         THE COURT:  I am groping with that myself, I admit.
23         MR. FLYNN:  To me that simply points out the whole
24  fallacy of applying admiralty jurisdiction.  There's no need --
25         THE COURT:  What about your vessel, the Wheeler, it

 1  might have done something wrong because it was -- it wasn't

 2  acting under the direction of the Corps, it is the Corps.

 3          MR. FLYNN:  Well, it actually is acting under the

 4  direction of the Corps; but it's doing the same thing, it's

 5  going out there and somebody has told it how to dredge, what

 6  the shape of the channel should look like, and all those people

 7  are sitting on shore.

 8              They're not on the Dredge Wheeler.  They're not

 9  on these private dredges.  And it's their errors that the

10  plaintiff is complaining about.

11          THE COURT:  All right.

12          MR. FLYNN:  Okay.  Let me conclude then.  We simply

13  do not believe that admiralty jurisdiction is provided here by

14  plaintiff's complaint.  However, either way, we believe the

15  government needs to be dismissed at this time.

16          THE COURT:  And just to point out, and I may let

17  you -- because the defendants, one of the things they're going

18  to argue is:  Yes, admiralty jurisdiction applies; and, yes,

19  it's a Suits and Admiralty Act; and, yes, I'm an agent; and I

20  win.

21              So I'm going to be implored by the other side.

22          MR. FLYNN:  And if, Your Honor, needs comment from

23  the United States about that, I'll be here.

24          THE COURT:  I'll allow you to do that.

25          MR. FLYNN:  Thank you.

1          **THE COURT:**  I guess we're going to do this probably

2    have you respond after each one is probably the best way.  And,

3    of course, you can have a general, based on my comments, if you

4    want to make any general comments, you're welcome to do that as

5    well.

6          **MR. SALAS:**  Your Honor, Camilo Salas for the

7    plaintiffs.  Judge, as you point out very well, the dredging

8    defendants all agree that there is admiralty jurisdiction.  In

9    fact, they filed litigation actions under the Court's admiralty

10   jurisdiction.  For purposes of one of their motions, they argue

11   that there is admiralty jurisdiction.

12          We, of course, contend that there's admiralty

13   jurisdiction for the reasons that I'm going to explain in a

14   moment.  In addition, I found a case that was actually cited in

15   one of the footnotes by the dredging defendants, and this is a

16   case -- recent case, 2001, from the Western District of

17   Louisiana involving *Weeks Marine, Inc.*, which is one of the

18   defendants in this case, and this is at 182 F.2d 537.

19          The same issue came before the court and the

20   court found that there is admiralty jurisdiction and that the

21   plaintiffs had a claim against the United States government

22   under the Suits and Admiralty Act for damage caused by

23   dredging, one of the dredges owned by *Weeks Marine, Inc*.

24          So I think you're correct in your explanation

25   and your holding that you seem that you want to make, that

1   there is admiralty jurisdiction.  Now, what I want to talk
2   about is a couple of the things that you're concerned about.
3   First of all, we've alleged that there is admiralty
4   jurisdiction under the PVA, Public Vessels Act, and under the
5   Suits and Admiralty Act, the SAA, independently of the
6   Admiralty Extension Act.
7               We specifically did not invoke the benefit of
8   the Admiralty Extension Act.
9           THE COURT:  You're not trying to limit your damages
10  to that which occurred on the MR-GO, are you?
11          MR. SALAS:  No, let me explain, Judge.  What we were
12  cognizant of the fact that at least under one of the -- under
13  the PVA, there was a 60 day -- we had to file an administrative
14  claim.  We knew that.  And, therefore, we did not invoke the
15  Admiralty Extension Act.
16              But --
17          THE COURT:  But you've alleged damages upon land.  So
18  haven't you invoked it by the nature of your complaint?  And
19  then what do you have -- right now if you don't invoke it,
20  you're not entitled to any damages on land.
21          MR. SALAS:  Well, Judge, as I read the PVA and the
22  Suits and Admiralty Act, here we allege that there was damage
23  to wetlands.  Those wetlands are considered to be navigable
24  waters of the United States by definition, either in the CFR --
25  we haven't cited to the Court, but we'd like to file something

 1    after argument.

 2              **THE COURT:**  Wetlands are navigable waterways of the

 3    United States under the admiralty law?

 4              **MR. SALAS:**  Under all federal regulations they are

 5    considered to be.

 6              **THE COURT:**  This is under admiralty law, that is

 7    under *Grubart* and, you know, that they support commerce,

 8    maritime commerce?

 9              **MR. SALAS:**  Under the code of federal regulations,

10    and I don't have the specific statute right now -- paragraph on

11    that, Judge, wetlands are considered to be navigable waters of

12    the United States.  And, again, we'd be delighted to cite that

13    to the Court.

14              **THE COURT:**  I know some wetlands that that would be

15    an amazing reach, but go ahead.  Go ahead.

16              **MR. SALAS:**  That was where part of the damage

17    occurred, Judge.  And damage to the wetlands is what allowed

18    the hurricane waters to come into New Orleans.

19              **THE COURT:**  So your argument is that no need for the

20    Admiralty Extension Act certainly at this point because you've

21    alleged damage to the wetlands, which, in fact, is on or

22    constitutes a navigable --

23              **MR. SALAS:**  Precisely.  Now, cognizant of the fact

24    that the -- of concern that the Court has expressed, we have

25    now amended, just yesterday, because the six months had run on

 1  our administrative claim.

 2              That claim was made specifically under the

 3  Admiralty Extension Act, Judge.  That was not a Federal Tort

 4  Claim Act administrative claim that we filed.  We have never

 5  invoked Federal Tort Claims Act in this case.

 6          **THE COURT:**  I understand that now.

 7          **MR. SALAS:**  So six months ago, we file an

 8  administrative claim under the Suits and Admiralty Act and the

 9  PVA and the Extension Act with the Corps of Engineers.  They

10  haven't responded.  The six months ran two or three days ago.

11              So we have now filed a motion for leave to amend

12  our complaint for the first time invoking the Admiralty

13  Extension Act.

14          **THE COURT:**  And you're saying then that that would,

15  even if I dismiss this, I would -- I'm trying to think that

16  out.  Because the law -- and I realize it's not very

17  efficient -- but the law is, as I'm reading it at least, that

18  if you file prematurely, that that case is subject to

19  dismissal.

20              And I'm wondering what effect -- if you made a

21  complaint as part of a new filing, then it may not be subject

22  to these defenses, and I understand that.

23          **MR. SALAS:**  Judge, the suit is subject to dismissal

24  when you invoke the Admiralty Extension Act without first

25  filing the administrative claim.  That's not what we did.  We

 1   did not invoke the administrative act until yesterday.

 2           **THE COURT:**  I understand your argument.

 3           **MR. SALAS:**  So, therefore, there is no need -- you do

 4   not have to dismiss my complaint, as you did in the past.

 5   Those having both the Admiralty Extension Act without filing

 6   that administrative complaint.  We are for the first time today

 7   saying there is jurisdiction on the Admiralty Extension Act

 8   because the six months had run.

 9           **THE COURT:**  Okay.  I understand your argument.

10           **MR. SALAS:**  Now, in addition, Judge, the Admiralty

11   Extension Act states that an administrative claim has to be

12   presented to the agency owning or operating the vessels.

13   Owning and operating the vessels.

14               We know that the Corps of Engineers owned the

15   Wheeler, but the other vessels were neither owned nor operated

16   by the Corps of Engineers or by the government.  So, therefore,

17   with respect to the damage caused by every other dredge, there

18   was no need to file an administrative claim.

19           **THE COURT:**  Okay.

20           **MR. SALAS:**  And we did file, out of an abundance of

21   caution, but we did file with respect to the Wheeler, which was

22   owned and operated by the Corps of Engineers.

23               So, Judge, I don't think that you have to

24   dismiss my complaint to be refiled again for the reasons that I

25   stated.  There is jurisdiction, both under the PVA, the Suits

1   and Admiralty Act, and now under the Admiralty Extension Act.

2   We have satisfied the administrative claim requirement under

3   the Extension Act, and we've satisfied just now because it

4   became ripe now.

5              Now, with respect to the arguments about the

6   decision by Judge Berrigan.  I think those are important

7   because the argument is like this Court has already ruled on

8   this thing.  Well, I think the Court is aware of the fact that

9   Judge Berrigan's decision is pleading two sections.

10             **THE COURT:**  Correct.

11             **MR. SALAS:**  And Judge Berrigan said:  Look, with

12  respect to the barge claim, there is admiralty jurisdiction.

13  What happened was that Mr. O'Dwyer, for whatever reason -- and

14  his case is his case -- he never pled any vessel involvement.

15  And Judge Berrigan said it three times in her opinion, the

16  second part of her opinion:  How can I find admiralty

17  jurisdiction when there is no vessel involved?

18             Now, here we are alleging that a fleet of

19  vessels has done this damage.  And we're not doing it just to

20  be punitive, to be narrow or defraud specifically to bring this

21  within the admiralty jurisdiction.  We're doing it because the

22  MR-GO was made by dredging and it is maintained by dredging.

23  That's all the MR-GO is.  Anything that you do to the MR-GO is

24  you dredge it; and if you don't dredge it, we know that it

25  fills up by itself.

1              So anything having to do with the MR-GO is

2    dredging, is dredging related and is vessel related and is an

3    admiralty -- traditional admiralty activity from day one.  This

4    case is going back 200 years ago where dredging was held and

5    they have consistently been held -- being held to be a maritime

6    activity.

7              So, therefore, your Honor, I think that there is

8    admiralty jurisdiction here.  We have satisfied all the

9    requirements under the Admiralty Extension Act, the PVA and the

10   Suits and Admiralty Act and the case should not be dismissed as

11   to the government.

12        **THE COURT:**  Thank you, sir.  Would the government

13   like to have a brief response on that issue?

14        **MR. FLYNN:**  Very brief.

15        **THE COURT:**  In particular, does the fact that he

16   amended his complaint to now allege the AEA, he didn't invoke

17   it before, cure it, but the ultimate result of all of this is

18   if I don't agree with Mr. Salas and I agree with you, he's just

19   going to file another complaint and then we'll be back again.

20              But, you know, I'm going to follow the case law

21   and the statute, whatever it may be.  So what's your position?

22        **MR. FLYNN:**  Well, that is our position.  In other

23   words, we understand Mr. Salas and his client, Mr. Reed, will

24   be back; but we do think that the law is very clear in this

25   area, and we ask that it be dismissed at this time.

 1             THE COURT:  And you think that his original complaint

 2    did not by name, but by claim, invoked the Admiralty Extension

 3    Act by its very nature.

 4             MR. FLYNN:  Yes.  There is one other point that we

 5    will not get to today and, that is, he has filed a claim.

 6    Basically, he stapled his complaint to a claim form on behalf

 7    of the entire class, asked for a large sum of money and sent it

 8    to the Corps of Engineers.  And we are going to address one day

 9    whether that, in fact, satisfies --

10             THE COURT:  You mean, whether he has to file one for

11    each individual claimant?

12             MR. FLYNN:  Exactly, exactly.

13             THE COURT:  But I know the government -- I understand

14    if that's the law, we'll go through that Chinese water torture,

15    if we have to.

16             MR. FLYNN:  Thank you.

17             THE COURT:  But somebody's -- I'm going to be very

18    arrestive during this whole thing, just understand that.

19             MR. FLYNN:  Okay.

20             THE COURT:  And that's a nice word.  What's next?

21             MR. ROUSSEL:  Good morning, Your Honor, James

22    Roussel, representing Great Lakes as amicus, speaking to the

23    motion to dismiss Mr. Salas' claims on the basis of Rule

24    12(b)(1) and Rule 12(c).

25             Your Honor, please, there are essentially four

 1   separate areas of immunity that the dredging contractors are

 2   entitled to.  The first is based on the *Yearsley* case.

 3   *Yearsley v Ross*, a Supreme Court case.

 4            It's very clear from the allegations of the

 5   complaint that the Mississippi River Gulf Outlet was directed

 6   to be built by Congress; that each Congress thereafter

 7   appropriated money in a waterworks bill for the dredging to

 8   take place; and that the Corps of Engineers contracted with the

 9   dredging contractors who are the defendants in this case to

10   conduct the dredging activities.

11            Under the *Yearsley* case, the Supreme Court said:

12   It is clear that this authority to carry out the project was

13   validly conferred.  And, indeed, there's no suggestion in any

14   of the papers in the complaint filed by the plaintiff that it

15   was not validly conferred, that is, what was done was within

16   the constitutional power of Congress.  There is no liability on

17   the part of the contractor for executing the will of the

18   Congress, and that is exactly what the dredging contractors are

19   charged with doing.

20            The second area of immunity is under the Flood

21   Control Act.  And pursuant to an e-mail which we received from

22   the Court, we're not going to discuss the Flood Control Act

23   today.  I know you've had a lot of --

24       **THE COURT:**  And I'm going to be rendering an opinion

25   referencing the Flood Control Act sometime, hopefully, in

 1   January of 2007.

 2          **MR. ROUSSEL:**  Right.  But, however, the sovereign

 3   immunity of the United States also prohibits suits for damages

 4   caused by the government's performance of discretionary

 5   functions, and that would include the Corps of Engineers

 6   undertaking of the maintenance dredging in this case.

 7               Now, I know, Your Honor, said that that's --

 8   that you don't believe that the Federal Tort Claims Act is

 9   applicable here and the discretionary function is found

10   primarily in the Federal Tort Claim Act --

11          **THE COURT:**  It does apply --

12          **MR. ROUSSEL:**  -- but it also applies in the Suits and

13   Admiralty Act so found by Judge Clement in the *Bean Horizon*

14   case and the *Wiggins* case in the Fifth Circuit.

15          **THE COURT:**  And also ducktails with *Yearsley*; but,

16   frankly, it's very close to the same concept.

17          **MR. ROUSSEL:**  It does.

18               And the third area of immunity, Judge, is in the

19   area of the government contractors are immune from -- under the

20   *Spearin Doctrine*, which is the *United States v Spearin*, for

21   essentially performing contracts in accordance with the plans

22   and specifications provided they use due care and were not

23   negligent.

24          **THE COURT:**  Right.

25          **MR. ROUSSEL:**  There has been no suggestion in the

1   complaint that's been filed that we did -- the dredging

2   contractors did anything but follow the plans and

3   specifications.  As a matter of fact, that's laid out very

4   religiously in the program.

5               Now, I know that the Court has heard a lot of

6   testimony over the discretionary function over the construction

7   of the MR-GO, whether they followed what Congress said.

8        THE COURT:  That's the Corps, not the dredgers.  I

9   understand.

10       MR. ROUSSEL:  That's right.  That's the Corps.  But

11  what we're talking about is people who came on the scene 35

12  years later and were authorized to dredge, told where to

13  dredge, how to dredge, when to dredge.

14       THE COURT:  You're not liable simply because you

15  dredged.  Although, the plaintiffs have said -- and you'll get

16  to that a little later -- have some duty -- I understand what

17  you're saying.  There's no allegation that you did anything

18  beyond the authority given to you, or the specifications given

19  to you.

20       MR. ROUSSEL:  And there's no indication that we

21  didn't follow the plans and specifications.  So following the

22  plans and specifications of the Corps of Engineers as given to

23  the dredgers as to where to dredge, how to dredge, is clearly a

24  discretionary function of the Corps of Engineers.

25               And because of the fact that we are contractors

1   of the Corps of Engineers, we get to share in the government's

2   immunity.  The doctrine of shared immunity provides public work

3   contractors, like the dredging defendants, the protection of

4   government's sovereign immunity.

5           So if the government is immune as a result of

6   the Flood Control Act and because of discretionary function

7   defense, it all derives from that principle that where a

8   contractor acts under the authority and direction of the United

9   States, it shares the sovereign immunity that's enjoyed by the

10   government.

11           In fact, it would be a bad thing for the

12   government if the government had immunity, but the contractors

13   could not share in that immunity.  Because then the price of

14   poker would go up in the next contract.

15       **THE COURT:**  The only way you wouldn't share in that

16   immunity you're saying is if there was some allegation -- let's

17   say you were supposed to dredge ten feet and you only dredged

18   four feet or you dredged 20 feet and that then because you

19   didn't follow the specs, that caused an unexpected result,

20   blah, blah, blah.  But there's nothing in there --

21       **MR. ROUSSEL:**  Right.  But there's nothing in the

22   complaint that even suggests that that is, in fact, the case.

23           And insofar as these immunity doctrines are

24   concerned, Judge, the only thing that the plaintiffs have

25   suggested in response to the motion that we filed was that

1   there is no immunity to share, and they cite to *Robinson*.

2   Well, *Robinson* clearly deals with -- the claimants' opposition

3   in *Robinson* clearly states that the government is the one who's

4   solely responsible for this mess, and it doesn't suggest that

5   the dredging contractors did anything wrong.

6           **THE COURT:**  You're not vicariously liable for the

7   government.  I would hope not anyway.

8           **MR. ROUSSEL:**  I would hope not as well.  And we don't

9   want to be liable for FEMA or the Road Home Program.

10              Judge, that is, basically, where we are on those

11  issues.  I'm trying to speed up a little bit because I know we

12  have time constraints.

13              The other issue where we have immunity -- where

14  the dredging contractors have immunity is also under the Suits

15  and Admiralty Act.

16          **THE COURT:**  Right.  And I read your brief on all of

17  this.  In fact, I think, your loyal opposition says:  Well,

18  there's no evidence that you were the agent and you say that

19  was implicit and it's inherent and it's actually explicitly set

20  forth in the way the complaint is read.

21          **MR. ROUSSEL:**  Well, they say we weren't the agent of

22  it.  Yet, if you look at their complaint, if you look at

23  Section 13 -- I mean, Article 13 it says:  The negligence of

24  the United States of America arising out of its maritime

25  activities carried out by the United States of America's own

1   fleet of dredging vessels and by fleets of dredging vessels

2   owned by the other defendants pursuant to maritime dredging

3   contractors between them.

4            And then they say:  The Corps, using its own

5   fleet of dredge vessels and through maritime dredging

6   contracts, continuously dredged the soil.  And the Corps and

7   its subcontractors -- at that point they change and call us

8   subcontractors -- were doing maintenance dredging.  And the

9   Corps -- you know, the complaint is the Corps didn't use the

10  spoil in the proper way.

11           Well, there's clearly a situation where the

12  dredging contractors utilized the spoil and what they were told

13  to do is clearly established by what the Corps told them to do.

14           Now, the issue of whether there's a maritime

15  jurisdiction, admiralty jurisdiction, in this case, it seems to

16  me is somewhat suspect.  But looking at the allegations of the

17  complaint, they basically allege maritime tort caused by a

18  vessel on water.

19           **THE COURT:**  That's how they're here right now.  I

20  mean, at least as pled in their complaint.

21           **MR. ROUSSEL:**  As pled in their complaint.  They do

22  that.  They allege that it had a disruptive impact on maritime

23  commerce.  They allege that the dredging contracts were

24  maritime contracts, which I believe under the Supreme Court in

25  *Super Scoop*, they now sort of go without saying that they're

1    maritime contracts and the dredger's vessels.

2                    So they take that traditional maritime activity.

3    But then the question comes in as to whether or not we are the

4    agent of the government.  And I think it goes to say that the

5    government was the one that was really -- was exercising

6    operational control over what we were supposed to do.

7                    They were in overall control, day-to-day

8    control, overall direction of the mission.  They were saying:

9    Thou shall dredge in this location, thou shall make a bottom

10   contour of this, you shall remove so many yards of fill for

11   which we're going to pay you X.  And they had inspectors out

12   there that made sure that we did what we said we were going to

13   do.

14                    I think under the jurisprudence that we cited in

15   our brief that an agent under Section 745, which gives immunity

16   to the agents, says the sole remedy as against the government

17   clearly applies to the dredging defendants.

18                    I don't think it can be any other result.

19          **THE COURT:**  As you understand it, Mr. Roussel, the

20   way you're at least implicated in this suit is through the SAA,

21   and that is the sole and only way you're implicated in this --

22   as I understand it, the basic jurisdiction over your client is

23   under the Suits and Admiralty Act, as I understand it.

24                    And to some extent --

25          **MR. ROUSSEL:**  Well, they have a myriad of

 1  jurisdictional allegations.

 2           **THE COURT:**  Well, there's CAFA, but I think the

 3  jurisdiction issue, as I recall, or at least -- in other words,

 4  there's nothing in the Public Vessels Act that would implicate

 5  you?

 6           **MR. ROUSSEL:**  No.  But they also -- but they sued us

 7  just under plain admiralty jurisdiction as well.

 8           **THE COURT:**  Right.

 9           **MR. ROUSSEL:**  So all I'm saying is:  If this is an

10  admiralty claim and if the government can be sued under the

11  Suits and Admiralty Act, then that is yet a fourth area of

12  immunity for the dredging contractors.

13           Because if the government can be sued under the

14  Suits and Admiralty Act, then we, as the agent for the

15  government, can't be sued.  So we've got, essentially, just

16  sort of lumping it all together, we've got the *Yearsley* case,

17  which says that this court doesn't have jurisdiction and to

18  review the acts of Congress as to whether it was smart to do it

19  or not smart to do it insofar as the contractor is concerned.

20           We've got the *Spearin* case that says that we

21  followed the plans and specifications, then we can have no

22  liability.  Which there's no suggestion in the complaint

23  anywhere that we didn't do anything but that.

24           We've got the discretionary function test.

25  Which it may not have been a discretionary function to build

 1   it, but it clearly was a discretionary function as to

 2   maintaining it.  And then, fourthly, we've got the Suits and

 3   Admiralty Act.  And between those four, we think there are four

 4   legitimate areas where this Court should grant the motions to

 5   dismiss the dredging contracts.

 6          **THE COURT:**  One question, just as a fine-tuning

 7   question:  If I agree with you on the Suits and Admiralty Act,

 8   and as you pointed out, there is -- there has been just a

 9   general maritime claim against you, does that, in essence,

10   encompass the whole thing if I were to rule on that point?

11          I'm not saying I am.  Do you think that makes

12   the whole case go away, even the admiralty allegation that's

13   separate and apart from the Suits and Admiralty Act?

14          **MR. ROUSSEL:**  I think that if you rule under

15   *Yearsley* --

16          **THE COURT:**  Well, it depends how I rule.

17          **MR. ROUSSEL:**  If you grant the motion on *Yearsley* or

18   you grant the motion on *Spearin*.

19          **THE COURT:**  Or discretionary function.

20          **MR. ROUSSEL:**  Or you grant the motion on

21   discretionary function or the Suits and Admiralty Act, the

22   whole case goes away.  Now, the sole tag along is probably the

23   Clean Water Act allegation against us, which may not go away,

24   but Gordon is going to speak to that.  But there's really no

25   private right of action under the Clean Water Act.

1          **THE COURT:**  I think plaintiff may agree with you

2     there and there's been some injunction thing, but there's

3     activity going on.  But I understand your argument.

4          **MR. ROUSSEL:**  Thank you very much, sir.

5          **MR. REBANECK:**  Your Honor, just for the record,

6     Mr. Salas will be making arguments for us.

7          **MR. SALAS:**  Your Honor, on the immunity motions, the

8     dredging defendants are, essentially, telling the Court, on one

9     point anyway, that they did everything that the government told

10    them to do, and that may very well be true down the line once

11    we do discovery in this case.

12              And they may be able to establish that the

13    government had an inspector on the vessels; that the

14    government's inspector on the vessel was telling him:  Do this,

15    do that, do that, et cetera.  We're not there yet.  As you

16    know, we've not been able to do any kind of discovery in this

17    case.

18         **THE COURT:**  But are you -- I've got to decide this

19    based on the complaint as it reads.  I haven't seen any

20    allegation in the complaint that the dredging defendants did

21    anything other than follow the plans and specifications.  I

22    haven't seen any allegation.

23         **MR. SALAS:**  Well, to be sure -- and I agree with you

24    to a certain extent, Judge.  And to be sure, we do not say in

25    the complaint that the dredging defendants follow the

1    government's specifications.

2                    What we said, the only thing we said, is that

3    the dredging defendants dredged pursuant to dredging contracts,

4    and we never get into what the contract said and what were the

5    duties of the dredging defendants when exercising those

6    contracts.

7                    In other words -- and three cases that I would

8    point out to the Court where the courts rule in favor of the

9    dredging defendants where the court got an opportunity to

10   review the contracts and in the contracts themselves they said,

11   you have to do this, this, this with specificity, so that then

12   the dredging defendants were able to argue:  We did as we were

13   told in the contracts themselves.

14                   But we're not there, Judge.  We haven't gotten

15   the contracts.  We don't know what's in the contracts right

16   now.  And we do not know what they did or did not do.  But on

17   top of that, Judge, there's another very important matter here.

18                   Dredging activities are highly regulated.  They

19   are regulated; not only by the Corps of Engineers, but also by

20   state government.  Dredging activities are done either under

21   national permits that are standing permits out there that the

22   Corps of Engineers puts out every year for certain types of

23   activities.  And in those dredging permits, national dredging

24   permits, there are certain requirements that must be followed

25   and things that must be done.

1          In addition to that, the CFR -- under the CFR

2    regulations, the Corps of Engineers may elect to dredge without

3    following those national permits, and it may impose in itself

4    certain ways of doing it.  Now, those regulations also say that

5    in doing dredging, the people who are doing the dredging, have

6    to follow state regulations.

7          So this is a way where state regulations apply

8    when you do dredging by federal statute.  The Louisiana

9    Administrative Code says, this is Chapter 7, Section 701(g):

10   It is the policy of a coastal resources program to avoid the

11   following adverse impacts.

12         To this end, all uses and activities shall be

13   planned, cited, designed, constructed, operated and maintained

14   to avoid the maximum extent practicable significant destruction

15   or adverse alteration of streams, wetlands, tide passages, et

16   cetera, et cetera.

17         Should also avoid detrimental changes in

18   existing salinity regimes, which is one of the problems with

19   the MR-GO.  It caused a lot of salinities to come in and

20   destroy the wetlands.  It should avoid detrimental discharges

21   of suspended solids into coastal waters, including turbidity

22   resulting from dredging.

23         Then Section 707 specifically talks about

24   guidelines that dredges spoiled deposit.  The spoil shall not

25   be disposed of any manner in which could result in the

1   impounding of draining of wetlands.  And that's exactly what

2   they did here.  They were putting deposits of spoils on the

3   edge so that they were blocking waters from going to the

4   wetlands, thereby killing the wetlands.

5               Now, I am cognizant of the fact that the Court

6   is concerned that, as pled, the complaint does not say

7   specifically, other than the dredging defendants were

8   negligent, that it doesn't say:  You did this, or didn't do

9   that.  I'm cognizant of that.

10              And because of that, in an amended complaint

11  that we filed yesterday, we have specifically pled the

12  following, Judge:

13              The defendants failed to follow the requirements

14  of 33 CFR parts 335 to 38, particularly 33 CFR 336.1(c)(4) and

15  33 CFR 320.4(b) an Executive Order number 11990 made applicable

16  thereby.  Executive Order 11990 was signed by President Jimmy

17  Carter in 1977 specifically requiring the Corps of Engineers to

18  protect the wetlands when performing --

19          **THE COURT:**  Wouldn't that be the liability of the

20  Corps rather than the dredgers?  Why are the dredgers liable?

21          **MR. SALAS:**  Here I go, Judge:  The dredging

22  defendants deviated from and/or failed to execute their

23  dredging activities in the manner required by the Army Corps of

24  Engineers and by the Nationwide Permits, the specific permits,

25  or general authorizations for dredging issued by or obtained by

1   the Army Corps of Engineers pursuant to 33 CFR Sections 337.5

2   and 338.2.  Furthermore, all defendants failed to follow the

3   State requirements made applicable by 33 CFR 337.2, including

4   those contained in Chapter 7, Section 701, 707 of the Louisiana

5   Administrative Code related to dredging activities.

6             So we have, Judge, now that we have had more

7   time to study this thing, we've had time to look at what

8   they've done and we have learned some more about what they did

9   or did not do.  We have alleged a specific deviation by the

10  dredging defendants from what is required by law.

11            And if we ever get to see the contracts, we may

12  be able to allege specific deviations from the requirements of

13  the contracts.  I did not want to make those allegations

14  without having seen the contracts, Judge.  But I have seen the

15  law.  I have seen the regulations.  I have seen what the

16  regulations require.  And, assuming, that the Corps of

17  Engineers told the dredging defendants to follow the

18  regulations, then the work was not done in accordance with the

19  regulations.

20            So I cannot argue right now and I cannot make

21  the allegations without having looked at the contracts that

22  they did not follow the contracts.  But I can make the

23  allegations that they did not follow the law.  Now, on the

24  subject of immunity, Judge, and the argument of discretionary

25  function, there is no discretion when there are specific

 1   statutes that require you to do something.

 2             So they argue that the government had --

 3         **THE COURT:**  Well, aren't you arguing that the Corps

 4   violated those statutes?

 5         **MR. SALAS:**  Well, I'm arguing both, Judge.

 6         **THE COURT:**  Well, if they were told by the Corps to

 7   do it, you're telling me they don't have immunity?  If they did

 8   what the Corps told them to do, why wouldn't they have

 9   immunity?

10             I'm thinking about the *Yearsley* case.  How do

11   you get around the *Yearsley* case?  Of course, again, I'm not

12   being illuminated by your amended complaint because I didn't

13   see it.  I'm looking at the one you filed.

14         **MR. SALAS:**  *Yearsley* said there's no liability for

15   executing the will of Congress, and that implies --

16         **THE COURT:**  Let me ask you this, Mr. Salas:  Has your

17   opponent had a chance to look at your amended complaint?

18   You're arguing things that aren't even before the Court.  How

19   are they going to respond to this?

20             In essence, they have no opportunity to respond

21   because you're making arguments not in the briefs, not in

22   anything.  They're based on a complaint filed yesterday.  So

23   they're kind of in a vacuum, as I am.

24         **MR. SALAS:**  Judge, I realize that.  But I think that

25   Rule 12 says that -- under Rule 12, a complaint should not be

 1   dismissed if there is an opportunity to assert some type of

 2   claim, and that's what we have done.  And I think that I

 3   have --

 4             THE COURT:  Well, I'll tell you --

 5             MR. SALAS:  -- anticipated the concerns of the Corps.

 6             THE COURT:  I know you filed it, but I've heard

 7   enough about it because nobody can respond to it.

 8             MR. SALAS:  All right.

 9             THE COURT:  I'm certainly going to look at it.  All

10   right.  What else?

11             MR. SALAS:  Judge, again, with respect to the

12   immunity defenses, they all assume that they have done the

13   things that they were supposed to do.  And there's no evidence

14   of that.

15             THE COURT:  Well, there's no allegation they didn't.

16   But at any rate -- except for your amended complaint, which

17   I'll be interested to see.  I'm going to let Mr. Roussel speak

18   to that.

19             MR. SALAS:  Your Honor, the argument under the Suits

20   and Admiralty Act, again, I think the Court noted that there is

21   a very critical issue there as to whether or not they were

22   agents of the government.  And that issue goes to the level of

23   control that they exercised over the operations -- the dredging

24   operations.

25                  We don't know exactly what they were doing, what

1    is the level of control they were exercising.  And that's an

2    issue that needs to be discovered.  It may very well be that

3    they win on summary judgment down the line, if we ever get to

4    do some discovery on this issue.  But at this time, that is an

5    issue that can be resolved just based as a matter of law.

6                    That's all I have.

7              **THE COURT:**  Mr. Roussel?  I assume that you have not

8    had a chance to digest the amended complaint filed yesterday.

9    I don't even know if you've seen it.  I don't want to presume

10   whether you have or you haven't.

11             **MR. ROUSSEL:**  Judge, Mr. Salas was kind enough to fax

12   me the complaint yesterday afternoon.  And, frankly, he does

13   reference several CFR sections on the duty imposed on the Corps

14   of Engineers for dredging activities and disposal of soil,

15   either disposal of soil in the open waters, presumably here off

16   the Gulf of Mexico, or disposal of dredge materials in the

17   wetlands.

18                    I didn't see anything in those regulations that

19   I was able to review briefly last night that said anything

20   about what the government's contractors were supposed to do.  I

21   mean, it's basically the internal documents of the Corps of

22   Engineers as to what they're supposed to consider and whether

23   they allow somebody to dump it offshore or dump it in the

24   wetlands.  I don't think that's the case here.

25                    Here the regulator, the Corps of engineers, is

1    the person that's telling us what to do.  Mr. Salas has still

2    not addressed the *Yearsley* case in which Congress says the

3    Mississippi River Gulf Outlet needs to be maintenance dredged.

4    They have to have dredging to do the maintenance.

5              And it's a situation where I dare say I don't

6    believe that the Louisiana State Department is going to

7    interfere with Congress saying that the Mississippi River Gulf

8    Outlet has to be dredged.  If that's the case, the St. Bernard

9    Parish Council would have shut down the Mississippi River Gulf

10   Outlet years ago.

11             **THE COURT:**  Let me ask you this:  Do you want

12   additional briefing on this issue?

13             **MR. ROUSSEL:**  No, sir.  I don't think really it's

14   necessary.

15             **THE COURT:**  So I'm going to, for the purposes of the

16   amended complaint, regard its allegations as true, as I must

17   under Rule 12.

18             **MR. ROUSSEL:**  If you're going to consider those --

19   the amended complaint, remember, is filed --

20             **THE COURT:**  It hasn't even been actually granted yet.

21             **MR. ROUSSEL:**  Well, it's a multiple problem.  There's

22   a motion pending that he filed to allow the amended complaint

23   to be filed.

24             **THE COURT:**  Right.

25             **MR. ROUSSEL:**  Under supplemental Rule F3, most of us,

 1   with the exception of *Bean*, are also limitation plaintiffs

 2   where any action against us shall cease according to the words

 3   of the rules.  So he really has no right to file any further

 4   complaint against us.

 5              Our claim today -- I mean, our motions that we

 6   filed today are based on the well pled allegations of his

 7   complaint.

 8              THE COURT:  And, I guess, putting the limitation over

 9   here, I have to determine, and Mr. Salas is now arguing, but if

10   there's a potential for amendment to make it viable, I must

11   consider that.

12              MR. ROUSSEL:  Well, I think that we would like to

13   address the motion and the amendment.  I think that --

14              THE COURT:  It might be --

15              MR. ROUSSEL:  I really think we have to, at this

16   point.

17              THE COURT:  I agree.

18              MR. ROUSSEL:  And I don't believe -- you know, the

19   issue of discovery is one thing.  But I think he's got an

20   obligation in his complaint to, basically, set forth the deal,

21   the allegations against us that bring him within the authority

22   to sue us.  Just for him to say we're negligent in the

23   stratosphere, I don't believe that that's enough.

24              THE COURT:  I agree.

25              MR. ROUSSEL:  Thank you very much, sir.

1          **THE COURT:**  So would you like an opportunity --

2          **MR. ROUSSEL:**  Yes, sir.

3          **THE COURT:**  And I'll set that up for both of you

4     after the argument and everything else.

5          **MR. SALAS:**  Maybe I'll file something and they can

6     respond so that they can be enlightened about what my

7     allegations are.

8          **THE COURT:**  I'm going to set a time for that.  In

9     fact, I might do it right now.  This can be in the context of

10    the motion for leave to amend.  You can tell me why it's not

11    vain and useless; and you can tell me why it is.  We can do it

12    in that context.

13         **MR. ROUSSEL:**  That's fine.  I mean, it will be

14    helpful for Mr. Salas to explain why he thinks those

15    regulations apply to us.

16         **THE COURT:**  I'm going to ask him to file a brief.

17    How much time would you like, Mr. Salas?

18         **MR. SALAS:**  Can I have three or four days?  Let's

19    see.  Today is Friday.

20         **THE COURT:**  How about the 22nd?

21         **MR. SALAS:**  That will be fine.

22         **THE COURT:**  By the 22nd, you file a brief telling me

23    why your motion for leave to amend is viable, in essence.  How

24    much time would you like?  It's Christmas, I'm going to give

25    you a little bonus.  When would you like?

1          **MR. ROUSSEL:**  It's also my birthday, Judge.

2          **THE COURT:**  Oh, my goodness.  When would you like a

3  chance to respond as to why the motion to amend would be vain

4  and useless?

5          **MR. ROUSSEL:**  How about, say, the 4th of January.

6          **THE COURT:**  Don't forget the Sugar Bowl is the 3rd.

7          **MR. ROUSSEL:**  Who's playing?  Well, in deference to

8  the Court, how about the end of that week until Friday?

9          **THE COURT:**  That's fine.

10         **MR. ROUSSEL:**  Thank you.

11         **MR. SALAS:**  Your Honor, just to note that the motion

12 is presently scheduled to be heard by Magistrate Judge

13 Wilkinson on the 3rd.  So maybe if you want to rule on that

14 because of the way you're setting it.

15         **THE COURT:**  I will tell the judge that I have taken

16 that out of his very busy schedule.  Thank you, Mr. Salas.

17         **MR. FLYNN:**  Excuse me, Your Honor, Steven Flynn once

18 more.  It may be necessary for the United States to respond to

19 this motion to amend as well.  If so, I would presume we would

20 have the same date.

21         **THE COURT:**  Yes.

22         **MR. FLYNN:**  It depends, of course, on the ruling of

23 today's court.

24         **THE COURT:**  Yes.

25         **MR. ROUSSEL:**  Thank you.

1          **THE COURT:**  Thank you.  Okay.

2          **MR. BRENNAN:**  Your Honor, Terry Brennan for the Bean

3   entities, also really speaking on behalf the other dredgers,

4   other than Manson.  I've been here before arguing the

5   preemption on the levee breach cases.

6          **THE COURT:**  And you did very well on those.

7          **MR. BRENNAN:**  I appreciate the result that the judge

8   gave us in that case.  But I do not want to delve into the

9   issue of whether -- you know, how the preemption statute works

10  and all that, because I think you have a clear understanding of

11  that.

12         **THE COURT:**  Hopefully by now.  If not, it's never

13  going to happen.

14         **MR. BRENNAN:**  Right.  I think the issues -- and I'm

15  going to try to be brief here -- this is, obviously, more of a

16  secondary motion.  It's not a complete relief to all the

17  dredgers in this case, because we're arguing that, at least as

18  to 9:2772, any dredging activity that really took place in the

19  last five years from the date that the damage occurred would

20  not be peremptory.

21         **THE COURT:**  Right.  And I know that there is some

22  dredging that took place within the -- within five years prior

23  to the filing of this suit.

24         **MR. BRENNAN:**  That's correct.

25                As you know, the amendment that changed it to

1    five years is going to be triggered by the accrual of the cause

2    of action, and cause of action doesn't accrue until damage

3    occurs and so we're really looking at around the date that

4    Katrina made landfall.

5            **THE COURT:**  And I think we're talking about a

6    maritime, but local issue.

7            **MR. BRENNAN:**  That's correct.  But I wanted to just

8    address briefly the issue about whether this is an improvement

9    or not.  Because they've raised the issue that this --

10           **THE COURT:**  Immoveable.

11           **MR. BRENNAN:**  -- that this waterway is not an

12   immoveable --

13           **THE COURT:**  I think the statute uses the uniquely

14   Louisiana term and, that is, immoveable.

15           **MR. BRENNAN:**  The statute says:  An improvement to

16   immoveable property.  Clearly, land, through the case law, is

17   considered to be an immoveable.  It can be nothing other than

18   immoveable.

19               The digging, the dredging, of a waterway, this

20   is simply a transportation artery.  It's no different than a

21   highway, a railroad, it just happens to be a waterway.  Okay.

22   And there has been other cases that we cited in our brief where

23   dredging of canals, construction of levees and canals are

24   considered to be improvements to immoveable property.

25               The fact that they don't have concrete and steel

1  in them, doesn't mean that they're not improvements to

2  immoveable property.  And there are a couple of cases that we

3  cited.  The Louisiana case is the *Canty* case.

4          **THE COURT:**  I read that out of my illustrious home

5  parish.

6          **MR. BRENNAN:**  That's correct.  And we also cited the

7  *Ewing* case and the *Akins* case.  So in my heart of hearts, I

8  believe that this is clearly an improvement to immoveable

9  property.  The fact that you're changing the profile or

10 defining the profile of a waterway is, in fact, improving the

11 waterway, at least for purposes of this statute.  So enough

12 said on that.

13          Clearly, the opposition has raised the issue

14 about the preemptive nature of maritime law.  And we, of

15 course, are arguing that this is maritime, but local.

16          **THE COURT:**  I know that you and others gave me the

17 four-part test that's been utilized.  The only concern is I'd

18 love to see a case or two that employed that test in this

19 context on your behalf, but I haven't.

20          **MR. BRENNAN:**  Unfortunately, there's not.  But

21 there's really not any case that would render the application

22 of this particular type of statute not within the ambit of

23 maritime, but local.

24          **THE COURT:**  I just find it odd, and I think the

25 plaintiff did cite, that there was no statute of

1    limitations/prescriptive statute that was regarded as maritime
2    by local, that I saw.  But you can enlighten me.

3              MR. BRENNAN:  I couldn't find any either as far as
4    whether there's any kind of what we would consider a state
5    preemption statute being construed as whether it falls within
6    this maritime, but local exception.

7              So maybe the Court will be making new law here.

8              THE COURT:  Well, I hate to say this:  But I'm in a
9    position where I'll be, at least temporarily, making a good bit
10   of law, but go ahead.

11             MR. BRENNAN:  Clearly, we're -- and I think this
12   relates back to some of the discussion you had with the lawyer
13   representing the government here is that even though there's an
14   allegation that this is a maritime tort and so forth, what
15   we're really talking about here is the actual act of Congress
16   to place this canal here and to maintain that canal.

17             And we don't have the typical temporal aspect of
18   a maritime tort occurring as a result of that specific activity
19   within a very short period of time.  We're talking about years
20   and years and years and not a direct link to the damage.

21             But, in any event, we've cited, you know, what
22   we could find as far as the law on this issue.  And I think the
23   judge will have to determine to the extent --

24             THE COURT:  Are you saying, and as I read your brief
25   and understand your argument, that the concept here of what

1   occurred fits into the maritime, but local?  The facts on the
2   ground here, so to speak, are in the water, fit into the
3   concept of the four-part test determining maritime.
4           MR. BRENNAN:  Yes.  And, of course, I've briefed
5   that.  We've emphasized, again, that there is not a really
6   strongly entrenched maritime principle here as it relates to
7   this particular type of claim.
8               But there is, in fact, a strong public policy
9   that's included within this statute as to protect contractors,
10  and to regulate contractors, and to eliminate a cause of action
11  as a result of it by the mere passage of time.
12              So it's, obviously, a difficult concept.  But,
13  you know, again, this activity could in some circumstances
14  could just of easily been done from a land-based piece of
15  equipment, rather than a marine-based piece of equipment.
16              Would the result be any different based upon the
17  interpretation of this particular application?
18          THE COURT:  I mean, if we applied laches?
19          MR. BRENNAN:  Well, you know, laches is --
20          THE COURT:  I know somebody spelled it L-A-T-C-H-E-S.
21          MR. BRENNAN:  I saw that.  I hope we didn't do that.
22          THE COURT:  That's what it feels like sometimes.
23          MR. BRENNAN:  I think there's a true distinction
24  between laches, which I would parallel to a prescriptive period
25  in maritime law, compared to preemption.  Because laches is

1   really dealing with the time frame by which you pursue your

2   remedy as a result of a maritime tort.

3              Whereas, preemption is clearly dealing with the

4   cause of action itself when it accrues and not at the time of

5   the remedy.  So we believe that laches, in this particular

6   situation, wouldn't apply to the compelling state interest

7   here, and policy of preemption should apply so that there's

8   uniformity among all contractors performing work that deals

9   with an improvement to immoveable property.  So, generally

10  speaking, that's the argument.

11             We have another motion, which you put at the

12  very tail end, which is the 95624.  If you would like, I could

13  defer.  I don't plan on speaking but a minute or two on that.

14        **THE COURT:**  Why don't you just do it right now.  A

15  minute or two is about right.

16        **MR. BRENNAN:**  As we briefed, 95624 indicates that

17  when private property is damaged for public purposes, any and

18  all actions for such damages are prescribed by the prescription

19  of two years, which shall begin to run after the completion and

20  acceptance of the public work.

21             Of course, we're arguing that that statute

22  applies; that that is, in fact, public work; that it was for a

23  public purpose; that the consequence -- the damages, are a

24  direct consequence of the project.

25             And, in our opinion, as we included in the

1   brief, the mere fact that there's an allegation of negligence

2   should not affect the application of the statute.  It could be

3   an intended damage, or it could be a necessary consequence of

4   the actual project.

5             And, of course, if you read their pleadings,

6   there's plenty of allegations that indicate this, in fact, was

7   damage that was intended to occur as a result of the project by

8   the simple nature of the project.

9             So we would argue that, of course, this act has

10  been in place since 1950; amended in 1987.  The trigger used to

11  be when the first incident of damage occurred.  They changed

12  that to make the trigger two years from the date of completion

13  of the project.

14            We argue that that really makes it a preemption

15  statute, not really a prescription statute because it

16  doesn't -- it isn't cloaked with the typical prescriptive type

17  of trigger.  And, therefore, anything two years after, at the

18  latest, 1987, would result in this statute eliminating any

19  claims against the dredgers as contractors as a result of this

20  public project.

21            The mere fact that there is continuing

22  maintenance of that waterway, there are some cases that were

23  cited in the brief that indicate that that alone does not then

24  result in a rollover of that period of time indefinitely, that

25  it still relates back to the original two-year period.

1          So those are my brief comments on that.

2          **THE COURT:**  Thank you, sir.  Mr. Salas?

3          **MR. SALAS:**  Your Honor, with respect to the motion

4   based on Louisiana Revised Statute 9:2772, I'm going to make a

5   few comments.  But I find myself in the amiable position of

6   having assistance from one of the defendants.

7          And Mr. Gilly is here and he wrote an excellent

8   brief and, therefore, I'm going to concede some of my time to

9   him and let him argue that, although he's entitled to his own

10  time, I believe.

11         Let me just say a couple of things, Judge, with

12  respect to that.  Basically, the defendants are asking the

13  Court to apply --

14         **THE COURT:**  You and Mr. Gilly are saying this doesn't

15  fit the maritime, but local rule?

16         **MR. SALAS:**  Exactly, exactly.  We're basically

17  arguing the same thing there that this is not a maritime, but

18  local -- does not fit with the admiralty -- maritime, but local

19  rule.

20         Judge, basically, what these defendants are

21  asking the Court is to apply a very strained interpretation of

22  a statute, to do away with a rule of admiralty law that is so

23  well ingrained in the federal maritime law that it really

24  doesn't make sense.

25         Beginning with the latter one, Judge, the

1   Supreme Court has said that there are limits to the extent that

2   a state can affect the general maritime law.  And that has been

3   repeated again more recently by the Supreme Court in the

4   *Chalintis* (phonetically spelled) case and in the *Jemison* case.

5              Remember, that the maritime, but local doctrine

6   was always an attempt to find remedies for estate-based injured

7   people that were not entitled to remedies under the federal

8   maritime laws.

9              **THE COURT:**  As in *Ramming*?

10             **MR. SALAS:**  Exactly.  It was never intended to take

11  away rights that an injured person had under the general

12  maritime law.  That is the basic concept of the maritime, but

13  local doctrine.  And that's what they're asking you to do here

14  is they're asking you to take away the right of these folks to

15  sue within two years under the Suits and Admiralty Act, or

16  within three years under E46 U.S.C., Section 763(a).

17             The Congress has said that we have three years

18  from the day that the cause of action occurred; or under the

19  Suits and Admiralty Act, within two years after the cause of

20  action arises.  That's what Congress has said.  And what they

21  want you to do is to apply this exclusively Louisiana statute

22  that really will abrogate or take away and will directly

23  conflict with its present intent of Congress.

24             **THE COURT:**  I assume you're talking about 9:2772 and

25  9:55 --

1          **MR. SALAS:**  Precisely.

2          **THE COURT:**  -- both of them.

3          **MR. SALAS:**  And I don't think that this Court can do

4    that, Your Honor, without abrogating the Supreme Court's well

5    established rule that began with the latter one.

6                And it's more important, Judge, when they're

7    asking you to apply this rule that deals with improvements to

8    land to something that happens on the water.  The Mississippi

9    River -- I don't know -- it's not considered land, certainly,

10   and neither is the MR-GO.

11               These are activities that happened specifically

12   on the water and they are trying to apply 9:2772, which applies

13   to activities that are improvements on the land.  This is for

14   people building houses and building buildings and things of

15   that nature.  That was the purpose of that statute.  It was

16   never intended for this purpose.

17               The same applies to 9:5624, Judge.  But in

18   connection with that, that statute applies to the construction

19   of public works.  And here we're not talking about

20   construction.  We're talking about maintenance dredging, which

21   is not construction.  Maybe they could have strained it and

22   said:  Well, it applies to the construction of the MR-GO, but

23   certainly not to this maintenance dredging that's been going on

24   for the past 40 years.

25               You've got to remember, Judge, that let's assume

1    that they built the MR-GO 40 years ago.  It would have filled

2    up by itself had it not been dredged.  Remember that.  Because

3    the estimate's are now in the newspaper that in eight years,

4    the MR-GO would fill itself back up if we leave it alone.  It

5    would have been filled over and over and over.  It's the

6    dredging that really took us to where we are right now.

7                    In addition, Judge, 5624 does not apply to

8    damages as a result from negligence.  It applies only when to

9    do a public project, you have to do damage to somebody's

10   property.  As when they build a road, you're going to take the

11   person's house away, or you're going to cut through a person's

12   land, things like that.  You intended to do that; you needed to

13   do that.

14                   And they can't argue that they intended to

15   damage the wetlands when they built the MR-GO.  So I don't

16   think it's applicable.  On that, your Honor, I'll let Mr. Gilly

17   address the Court.

18        **MR. GILLY:**  Good morning.  I'm not addressing 5624,

19   only 27 and 72.  I absolutely agree that you were correct in

20   applying the Louisiana preemption statute to the levee

21   contractors.  I think that was Terry's motion, and I think that

22   was correct.

23                   Also, I very clearly side with the dredging

24   companies.  I think they don't belong in this case.  I think

25   they should be dismissed.  For other motions, you have other

1    considerations, but this is a different situation.  There's

2    nothing more maritime than dredges, vessels dredging a

3    navigation canal.  Certainly, the parties to this motion all

4    agree that maritime law applies.  And, obviously, the key issue

5    is whether the pre-2000 dredging companies can use maritime,

6    but local and Louisiana's 9:2772 to shield themselves from

7    collection.

8              I'm not going to go into the issues about

9    improvements, or maintenance, or immoveables, or any of that.

10   I think this motion be can decided very simply on the

11   circumstance that the uniformity of maritime law and the

12   Constitution supremacy clause would be violated by granting the

13   motion.  It would be violated because laches, which has been

14   around for 130 years, and certainly all the admiralty lawyers

15   in this room would acknowledge as a well entrenched maritime

16   principle would be violated.  You'd be getting around it.

17             Secondly, Congress has passed a statute for

18   maritime injuries and deaths, three years.  There's no way that

19   maritime, but local could ever be used to go around a

20   Congressional statute.  Third, and frankly, the reason I'm

21   arguing against this is the, do away with contribution and

22   indemnity among tortfeasors.

23             Obviously, you know, I'm a 2003 dredger.  Pretty

24   clear.

25             **THE COURT:**  Right.

1       **MR. GILLY:**  I think it's probably come out already,

2   but I'd like to stress that no court addressing a maritime

3   claim has ever used maritime, but local to apply a state

4   preemption statute or a statute of repose, as they're sometimes

5   called, or to apply a state statute of limitations, or to do

6   away with maritime contribution and indemnity.

7            Mr. Salas is correct that maritime, but local

8   has never been used to take away rights from an injured party.

9   It has always and only been used to add rights.  But the rights

10  here, they're trying to take rights away.  I don't think the

11  movers in this motion can credibly say that Louisiana has an

12  interest in taking -- a compelling interest in taking rights

13  away from its citizens after this storm.  Rights they have

14  under the general maritime law.

15           If you polled the Louisiana legislators either

16  now, or when preemption was first passed, or when it was

17  amended, not one of them would say they had any interest or any

18  intent in taking any general maritime law rights that Louisiana

19  citizens have.  Not one.  There can be no doubt.

20           To put it in another context:  If Louisiana law

21  had a longer prescriptive period, do any of us really think

22  that the dredging companies would be here trying to argue the

23  maritime, but local means that a longer prescriptive period

24  should apply?  It just doesn't make sense.  The dredging

25  companies belong out of this case, but not on the basis of this

1   motion.

2              Granting this motion would violate the supremacy

3   clause and it would violate very important aspects of maritime

4   law, and I ask that the motion be denied.

5          **THE COURT:**  Thank you, sir.  I think we have the

6   concealment and implied warranty claims.  Oh, I'm sorry.  Would

7   you like to respond?

8          **MR. BRENNAN:**  I'll respond very briefly, Your Honor.

9   We've already --

10         **THE COURT:**  I will say it's likely my decision's

11  going to hinge on this point -- unlikely, excuse me.  But we

12  never know until it --

13         **MR. BRENNAN:**  I wanted to just re-emphasize a couple

14  of things.  Although, Mr. Gilly says that maritime, but local

15  only and historically has addressed expanding rights.  I would

16  beg to differ on that.  Because as it relates to the

17  application of insurance regulation and interpretation of

18  maritime insurance contracts where there are certain state

19  requirements.

20         **THE COURT:**  I have read your cases on it.

21         **MR. BRENNAN:**  We have cited a case that deals with

22  regulation of admissions of vessels and that is uniquely a

23  state regulation, which is a restriction rather than expansion.

24  Admittedly, there's nothing on a preemption statute, and I

25  don't want to belabor that any further.

 1                     I also want to re-emphasis on 9:5624 that I
 2    cited a case in the brief and I cited the language that
 3    negligence is within the parameters -- an allegation of
 4    negligence that arises out of the construction project for a
 5    public purpose that causes damage fits within the ambit of that
 6    statute.  And he hasn't cited anything that would be contrary
 7    to that.
 8                     So those are the two points I would like to
 9    make.  Thank you.
10          **THE COURT:**  Thank you.  Why don't we get to the
11    concealment and implied warranty claims.
12          **MR. GRANT:**  Your Honor, Gordon Grant for T.L. James
13    and Company.
14          **THE COURT:**  So far I'm on your side, Mr. Grant, but
15    you're welcome to elaborate.
16          **MR. GRANT:**  I just wanted to make a point on the
17    concealment motion, that the allegations of plaintiff's
18    complaint themselves establish that nothing was concealed.
19          **THE COURT:**  Well, they said it was negligent
20    concealment.  Now, I've looked.  I haven't found -- I don't
21    know -- it may be in the real estate aspect somewhere in some
22    state.  I don't know in Louisiana or maritime law of any case
23    of negligent concealment.  It seems like an oxymoron.
24          **MR. GRANT:**  They have cited no case to support the
25    proposition that it even exists.

1      **THE COURT:**  I agree.

2      **MR. GRANT:**  But I would point out whether it was

3  negligent concealment or arguably some other form of

4  concealment, the allegations of the complaint contradict that

5  on its face.

6          I mean, Paragraph 9 alleges that hydrologic

7  models predicted drastic salinity increases and associated loss

8  of interior marsh habitat.  Later on in that paragraph, they

9  allege that local concerns mounted.  Later on in that

10  paragraph, they allege by the 1990s the project was widely

11  characterized as an environmental disaster.

12          Those allegations clearly are admissions by the

13  plaintiffs that are binding on them.  And I think those

14  allegations, in and of themselves, compel the conclusion that

15  that cause of action should be dismissed with prejudice.

16          With regard to the implied warranty cause of

17  action, which is I think cause of action number 2 in the

18  complaint, the plaintiffs don't have a claim for breach of

19  implied warranty because they are not, and they have not

20  alleged, that they are intended beneficiaries of the dredging

21  contracts between the dredging companies and the Corps.

22      **THE COURT:**  Well, it would be under the law of

23  third-party beneficiaries, stipulation part 3, that would be

24  quite a stretch.

25      **MR. GRANT:**  It would be quite a stretch.  And,

 1   although, I would point out that we believe that these dredging
 2   contracts are maritime contracts --
 3            THE COURT:  Louisiana law wouldn't apply anyhow.
 4            MR. GRANT:  That's correct.
 5            So, again, Your Honor, I really don't have
 6   anything much further to add to that.
 7            THE COURT:  You're ahead right now.  Mr. Salas may
 8   come up with something.
 9            MR. GRANT:  I will follow the Kerrigan Rule and I'm
10   already sitting down, but I'll shut up.
11            THE COURT:  Okay.  Mr. Salas, let's see what you can
12   do to dissuade me.
13            MR. SALAS:  Your Honor, in making allegations in a
14   complaint against somebody in a court, lawyers -- at least
15   lawyers who are careful, want to put down facts that they know
16   without making allegations that they have not yet had a chance
17   to discover.
18            We have never alleged or intended to allege that
19   there was any fraudulent activities by these defendants.
20            THE COURT:  You've made that clear in your brief.
21            MR. SALAS:  It may very well be that that comes out.
22   I don't know, Judge.  But we never thought about that.  We
23   never thought of such fraud in a way of having any kind of
24   criminal intent or anything like that.
25            We do believe, however, that there was a

1   concealment in that they failed to disclose to the people of

2   Louisiana what were the effects of the things that they had

3   done.

4          THE COURT:  Well, do you have any case on that in

5   concealment in Louisiana?

6          MR. SALAS:  Well --

7          THE COURT:  I tell you what, Mr. Salas, I'll hear a

8   little bit of this, but I would be wasting all of my time if I

9   spent too much more time on the concealment claim.

10          MR. SALAS:  All I wanted to say, Judge:  This claim

11   is intended to really make allegations that they failed to

12   disclose things that they knew and should have been disclosed

13   to the people of Louisiana with respect to the dangers of --

14          THE COURT:  Any case where a contractor owes a duty

15   to the public to disclose that -- of course, you'd be, again,

16   as Mr. Grant pointed out, that these things have been

17   egregiously obvious for quite a long time.

18          MR. SALAS:  But, Judge, I think that they have -- and

19   maybe they might win on summary judgment later.  But the only

20   purpose of their motion is they say we have to plead with more

21   particularity.  That's all they say.  That we did not plead the

22   fraud with a particularity required by Rule 9.

23          THE COURT:  You've already said in your brief that

24   you're not pleading fraud, you're pleading negligent

25   concealment.

1          **MR. SALAS:**  Right.

2          **THE COURT:**  Move on to implied warranty.

3          **MR. SALAS:**  Judge, with respect to the other

4    argument, they just filed -- they made an argument relying on

5    some cases that there's no implied --

6          **THE COURT:**  What's the duty -- the warranty, we get

7    contractual.  What's the law that says that there's a duty or

8    warranty to the public at large by a contractor who's

9    ostensibly following specifications?

10         **MR. SALAS:**  Well, maritime.

11         **THE COURT:**  Under the maritime law, you're right.

12         **MR. SALAS:**  Under the maritime law, you have a duty

13   of workmen-like performance in anything that you do.  And here,

14   remember, that they were performing a work that was for the

15   public.  This -- the MR-GO was for the public.  They might have

16   been paid by the Corps of Engineers, but this was a public work

17   for vessels, for people, and to do things that affected the

18   people of Louisiana.

19              They had a duty to perform.  There was an

20   implied duty of workmen-like performance, and they had a duty

21   to perform within that standard.  The standard of care under

22   the maritime law.

23         **THE COURT:**  Wasn't that duty to the party with whom

24   they contracted?

25         **MR. SALAS:**  Well, certainly there was a contractual

1  duty to them, but there was also a duty to the beneficiaries of

2  that contract.

3              And here, Judge, we are saying that the people

4  of Louisiana, the people who live near those areas, and the

5  people who use the MR-GO, were intended beneficiaries of the

6  activities that they were performing on the MR-GO and that they

7  had to do it in a workmen-like manner.

8          **THE COURT:**  All right.

9          **MR. GRANT:**  Your Honor, I don't believe there is a

10  general warranty of workmen-like performance recognized in the

11  general maritime law.

12              And I would point out that when you're dealing

13  with government contracts, the fact that the public may be an

14  incidental beneficiary of a government contract, does not give

15  the general public a contractual right to seek recovery from

16  one of the contractors.

17          **THE COURT:**  Thank you, sir.  Next one would be, and

18  last.

19          **MR. GRANT:**  The last cause of action is the --

20          **THE COURT:**  Are you taking that, Mr. Grant?

21          **MR. GRANT:**  Yes, Your Honor.

22              The Clean Water Act.  Basically, Your Honor, as

23  you are already quite aware, the Clean Water Act is a pollution

24  statute that is intended to abate ongoing pollution.

25              If imposes certain effluent limitations on point

1   sources.  A point source is a discernible conveyance from which
2   pollutants are or may be discharged and the act makes it
3   unlawful for a person to discharge a pollutant from a point
4   source without obtaining or complying with a permit.
5                Although it permits a citizen to sue for
6   injunctive relief, important point to remember here, is that it
7   does not provide a basis for a citizen to seek an award for
8   monetary damages.
9         **THE COURT:**  As I read Mr. Salas's brief, he said:
10  Look, we didn't comply with the requirement to file a notice,
11  but we have asked for an injunction and he's implied that he's
12  going to refile that.
13        **MR. GRANT:**  He can't.
14        **THE COURT:**  You're saying:  What's there to enjoin?
15        **MR. GRANT:**  What's there to enjoin?  There's no
16  ongoing pollution event being alleged, and it can't be alleged
17  in good faith.  So the idea that this complaint should be
18  dismissed without prejudice to bring it another day after
19  filing the 60-day notice at some point in the future is an
20  impossibility.
21                So this cause of action should be dismissed with
22  prejudice.
23        **THE COURT:**  You're asking me to dismiss it with
24  prejudice because it can't happen, regardless of the 60-day
25  notice?

1          **MR. GRANT:**  That's correct, Your Honor.

2          **THE COURT:**  All right.  Mr. Salas?

3          **MR. SALAS:**  Your Honor, they've argued that the Court

4    does not have jurisdiction over that claim because we did not

5    file the 60-day notice.  The Court does not have jurisdiction

6    and you cannot dismiss the claim with prejudice because you

7    never acquired jurisdiction on me.

8               And I think that --

9          **THE COURT:**  Good point.

10         **MR. SALAS:**  And I think that if we -- it's not before

11   the Court -- if it's not properly before the Court, that's all

12   you can do.  You cannot go to the merits of the case.  Now --

13   and we may or may not bring it up later.

14         **THE COURT:**  That's your point.  I understand it.

15   Yes, sir?

16         **MR. GRANT:**  I think the problem is he doesn't -- they

17   haven't addressed the substantiative point that we've made,

18   which is that he has not alleged ongoing discharge and,

19   therefore, I think that the inability to allege an ongoing

20   discharge is fatal and we shouldn't have to deal with this

21   issue again.

22         **THE COURT:**  I'll have to look at my jurisdictional

23   constraints as pointed out by Mr. Salas and take that into

24   consideration, which I will.  I'll look at that.

25         **MR. FLYNN:**  Your Honor, we join the arguments made by

1  Mr. Grant.

2          **MR. MOULEDOUX:**  Your Honor, I'm Andre Mouledoux.

3          **THE COURT:**  Yes, sir.

4          **MR. MOULEDOUX:**  Counsel for Pine Bluff Sand Gravel

5  Company.  With respect to the motion by the dredgers on the

6  preemption exception 9:2772, there should have been a footnote

7  in the brief that Pine Bluff, who performed dredging activities

8  within the last five years was not joining that motion on the

9  five-year preemption.

10         So we are neutral on that point and we want to

11 preserve whatever rights we may have --

12         **THE COURT:**  Absolutely.

13         **MR. MOULEDOUX:**  So we just want to make, for the

14 record, that although we joined in the dredge motions, solely

15 with respect to the five-year preemption, Pine Bluff did not

16 join that portion of the motion.  Thank you.

17         **THE COURT:**  Thank you.  Well, I will take this under

18 advisement and, hopefully, with some alacrity, our alacrity is

19 getting attenuated, but we'll do the best we can.

20         **MR. REBANECK:**  Your Honor, if I may.  I'm also on the

21 levee case, A.J. Rebaneck.  One of my co-counsels asked me if

22 they could supply the Court with an amicus brief on the issue

23 of federal versus maritime local jurisdiction.  They feel that

24 may apply to the levee case as well, particularly with the

25 Industrial Canal and also the 17th Street Canal.

1        **THE COURT:**  Let me just say this:  Right now, the

2   engineers and the contractors are dismissed.  So if it's

3   something else that's viable, let me make sure I understand

4   what it is.  File a motion for that.  File a specific motion.

5        **MR. SALAS:**  All right.

6           **(WHEREUPON, the Court was adjourned.)**

7                          *****

8                       <u>CERTIFICATE</u>

9        I, Jodi Simcox, RMR, Official Court Reporter for the

10  United States District Court, Eastern District of Louisiana, do

11  hereby certify that the foregoing is a true and correct

12  transcript, to the best of my ability and understanding, from

13  the record of the proceedings in the above-entitled and

14  numbered matter.

15

16

17                              _____

18                              Jodi Simcox, RMR
                                Official Court Reporter

19

20

21

22

23

24

25

JODI SIMCOX, RMR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA