UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  *      Civil Action No. 05-4182
                               *      Consolidated Litigation
_____*
                               *      Section "K"
PERTAINS TO:                   *
RECORD DOCUMENT 3372           *      New Orleans, Louisiana
                               *      March 15, 2007
* * * * * * * * * * * * * * * *

HEARING
BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.,
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For Plaintiff Liaison          Bruno & Bruno
Counsel:                       By:  JOSEPH M. BRUNO, ESQ.
                               855 Baronne Street
                               New Orleans, Louisiana 70113


For Defendant Liaison          Lugenbuhl, Wheaton, Peck, Rankin
Counsel:                         & Hubbard
                               By:  RALPH S. HUBBARD, III, ESQ.
                               601 Poydras Street, Suite 2775
                               New Orleans, Louisiana 70130


For Defendant State Farm       Stone, Pigman, Walther,
Fire & Casualty Co.:             Wittmann, LLC
                               By:  WAYNE J. LEE, ESQ.
                               546 Carondelet Street
                               New Orleans, Louisiana 70130

2

**APPEARANCES (Cont'd.):**


For Defendant Allstate          Barrasso, Usdin, Kupperman,
Indemnity Co.:                     Freeman & Sarver, LLC
                                 By:  JUDY BARRASSO, ESQ.
                                 909 Poydras Street, Suite 1800
                                 New Orleans, Louisiana 70112


Court Audio Operator:           Cynthia Crawford

Transcriptionist:               Dorothy Bourgeois
                                 c/o U.S. District Court
                                 500 Poydras Street, Room C151
                                 New Orleans, Louisiana 70130
                                 (504) 589-7721


Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

1                       **P R O C E E D I N G S**

2                      (Thursday, March 15, 2007)

3                     (Matter is called by clerk)

4          THE COURT:   Make your appearances.

5          MR. HUBBARD:  Ralph Hubbard, Your Honor, as

6   Defendants Liaison Counsel.

7          THE COURT:  Thank you, sir.

8          MR. BRUNO:  Good afternoon, Your Honor; Joseph Bruno

9   as Plaintiff Liaison Counsel.

10         THE COURT:  Thank you.  Before we -- and we have the

11  Defendants' Motion to Enforce Stay.  But, before we get into

12  the motions, the Court is going to make some statements.

13         First, one purpose of this statement is so that when

14  this goes to the Fifth Circuit again, the circuit will have a

15  clear understanding, at least from the mouth of the Judge,

16  about what this "umbrella" is, which I think is important to

17  understand.

18         This umbrella is a contrivance that the Executive

19  Committee of this Court came up with in order to accommodate

20  you and your clients.  Clearly, all the cases under the

21  umbrella do not fit under our related case rule.  Some of them

22  are not related at all as our related case rule reads.

23         This was done in an effort to accommodate the bar and

24  the many litigants, the many thousands and perhaps hundreds of

25  thousands of potential litigants in this matter, both Plaintiff

1   and Defendant.

2            It was done in an effort to streamline the

3   proceedings, wherever possible eliminate duplicative efforts

4   and to try to come to a common synthesis on the various

5   categories.

6            Obviously, if the umbrella apparently becomes to me

7   -- who is now in control of the umbrella, at least to some

8   degree -- inefficient, I can undo the umbrella or sever it.

9   The umbrella is a contrivance.  It is not a constitutional

10  right.

11           Therefore, if I find it becoming too unwieldy and

12  cases leaching over to other cases by an ersatz -- in essence

13  contrivance, namely the umbrella, and have jurisdiction start

14  applying to cases that really don't have much to do with each

15  other, then I'm going to sever, and you just be out -- let's

16  say the insurance, you can be out on your own.

17           And so I want the court of appeal -- and they may

18  well have a complete understanding of the umbrella -- to

19  understand how it evolved.  Now, the umbrella consists of many

20  things, and the light motif, in essence, is levee breach,

21  although MRGO is somewhat of an anomaly.  It has some

22  tangential reference to a levee breach.

23           We have insurance cases involving the water damage

24  exclusion issue.  We have levee cases involving the 17th,

25  London, Industrial Canals, and maybe others.  We have right now

1   St. Rita, because the United States was third partied.  We have

2   the dredging cases, which I dismissed two days ago, but which

3   are appealed.  And, we have a myriad of other cases that fit

4   under those general categories.

5          And, again, their purpose was so that we'd have

6   common rulings going to the court of appeal, common discovery,

7   knowing the magnitude of this.  And, I dare say there's nothing

8   like it in the United States.  We hope that it will work

9          If I find that it is not efficient, I can undo it,

10  and I am seriously thinking about severing part of it.

11         And, let me tell you what prompts my thinking.

12         When I read the Motion to Enforce Stay Order, I

13  thought it was a really well written brief, good points made,

14  until I got to Page 8, the first full paragraph.  I'm going to

15  tell you my initial reaction and, of course, I'm going to have

16  to argue to me today, but let me first state:  It's the job, by

17  my lights, of a federal district judge to intelligently,

18  efficiently and as expeditiously as possible, giving everyone

19  due process, to get matters resolved so that they can either

20  settle or be appealed.

21         This is an extraordinary case, as I stated, and so we

22  can't move with the normal alacrity with which we would like,

23  but we're doing our best.

24         We've issued a Case Management Order after input from

25  each side.  We reference all cases, excluding the Robinson

1   case, and we issued a separate Case Management Order -- I think

2   yesterday -- today for the Robinson case, in an attempt to

3   intelligently plan it in accordance with my docket and to try

4   to accommodate the rest of my customers, because this isn't the

5   only case that I have.  Although the umbrella has many, many

6   cases, there are other cases I have outside the umbrella.

7          I need to state what I think my job is, and that's

8   why we've come up with Case Management Orders.  It's your job,

9   of course, to do the best for your clients.

10         The Court understands the Motion to Stay.  I denied

11  it, and I understand it quite well.  It was a very good brief,

12  I thought, to the court of appeal; I read it.  And, it was

13  granted -- with the word "granted."

14         And, it's this Court's obligation to follow the

15  mandate of the court of appeal and, perhaps, the spirit of the

16  mandate -- if it makes sense.

17         However, when I got to Page 8 -- and let me say this:

18  This is not directed specifically to Mr. Hubbard.  I have

19  worked with Mr. Hubbard and Mr. Bruno and have found them to be

20  outstanding, and I found Mr. Hubbard to be extraordinarily

21  reasonable, and I know that this is an amalgam of various

22  points of view, and I know Mr. Hubbard will stand by it, since

23  he signed it.

24         But, from Page 8, on, let me tell you how I think of

25  it right now.  I think it is probably the most -- it is about

1   as arrogant and it is the epitome of hubris as anything has

2   been asked for me to do.  I find it grossly overreaching;

3   astonishingly insensitive to the thousands of litigants that

4   have nothing to do with the water damage exclusion.

5         I'm sure it may be, in your mind, asked for in good

6   faith, but it has nothing to do, in my mind, with the stay,

7   with the jurisdiction of this Court.  You don't have a doggone

8   thing to do with the Robinson case and the levee breach cases

9   except you have common discovery.

10        And I might point out the insurers chose to file this

11  Motion to Stay, which is their strategic decision.  But, they

12  knew there would be ongoing discovery in other cases not part

13  of the water damage exclusion.

14        You obviously considered that when you filed your

15  Motion to Stay and, therefore, if there's ongoing discovery in

16  those cases that may affect you, in the event the court of

17  appeal affirms the decision, then you made that choice.

18        I am certainly not going to preclude you from

19  participating in that discovery if you wish.  You may.  I

20  encourage it and I will not let anyone attempt to prevent you

21  from being in that discovery, but if you think for one minute

22  -- unless you make an incredibly persuasive argument today that

23  I must listen to, I am certainly not inclined to stop the

24  depositions.

25        I've got these schedules going in the non-insurance

1    cases.   There is no jurisdiction over them by the court of

2    appeal, and if it gets down to it, I'll just sever this; sever

3    the insurance cases, so it will be clean and clear.  I can do

4    that.

5            To get this case to trial, to get any of these cases

6    to trial in four years takes tremendous -- to trial and

7    decision, four years, it's tremendously difficult.  Four years

8    is a long time.

9            Then we have appeals, and all of those won't be

10   expedited.  We're going to have tons of appeals.  And, we don't

11   know if the decisions are going to be expedited.  And, I might

12   also point out that, although the court of appeal has

13   graciously -- and I think it's a very good thing -- expedited

14   the argument, we don't know when the decision is going to be.

15   I've been on panels that took a year -- hopefully, this panel

16   won't take that long -- on complex questions.

17           They may certify.  I know there's opposition to the

18   certification to the Supreme Court.  We don't know what they're

19   going to do.

20           And so that is an ephemeral guess.  I know there's a

21   60-day period mentioned here, but none of us are Nostradamos or

22   seers that can predict how long the court of appeals is going

23   to take to resolve this case and in what manner they're going

24   to resolve it or whether they will certify it to the Louisiana

25   Supreme Court.

1          Also, we have Louisiana cases going on where this

2    very discovery is taking place, and they're not bound by the

3    Fifth Circuit, the United States Fifth Circuit, as I am.

4          So, with all that said, I thought the brief was

5    extremely well written until Page 8, and I want to hear the

6    Plaintiffs tell me why I shouldn't grant the spirit of the stay

7    and stop them, stop the class certification hearing, stop the

8    filing of the master petition, stop any and all discovery

9    relating to the water damage exclusion in the insurance cases,

10   because I think the argument is well taken.

11         On the other hand, the Defendant, as you can tell

12   now, you've got far more than Everest to climb for me to extend

13   that stay to the other cases, because it's simply egregiously

14   unfair to the litigants in those cases.  Robinson has nothing

15   to do with the water damage exclusion.  It is mentioned in

16   here.  Robinson is one way I can determine, ultimately, the

17   liability of the government and not reference the MRGO.

18         And, one of the first things, we have to have

19   depositions on 702(c) to determine -- because I want a summary

20   judgment on that -- whether the MRGO "levees" are flood control

21   project or not, and then whether 702 applies.  That doesn't

22   have a thing to do with your case.

23         And there are going to be depositions ongoing before

24   the court of appeal makes this decision, I promise you.

25         So, that's my statement.  I want to be fair to

1   everybody, but at the same time being fair to everybody means

2   that some litigants get to go on with their case.

3          They may lose it ultimately, but they get to go on

4   with it, and we'd like it resolved before people who are in

5   their 70s expire.  As I see this, all of this stuff, by the

6   time we get this thing all done, it will be 10 years.  And, I

7   could be wrong about that, but we're going to do our best to do

8   it in less time.  But, that's a long time.  And I need to say

9   this:  Somebody may inherit it from me before it's over with.

10          But, those are my feelings and I think you're

11   entitled to know them.  I think the Fifth Circuit is entitled

12   to know them, and I don't really want to mince my words about

13   that.  I want you to clearly know what I feel.

14          All right.  But, at the same time, you have the right

15   to argue anything you want before me, and am obligated to

16   listen to you.

17          Okay.  It's really Defendants' motion.

18          Yes, sir.

19          MR. HUBBARD:  May it please the Court:  I'm Ralph

20   Hubbard, appearing in my capacity as the Defendants' Liaison

21   Counsel and as counsel of record for Travelers, Hartford,

22   Hanover, USAA and Horace Mann.

23          The motion that's before the Court, insurer

24   Defendants' Motion to Enforce Stay Order issued by the Fifth

25   Circuit on February 28th is, of course, a motion by all of the

1   insurers here and, to the extent that they don't disagree with

2   me, I'm speaking on behalf of all of those insurer Defendants.

3            THE COURT:  Yes, sir.

4            MR. HUBBARD:  I want to thank you for your comments.

5   I've been before you a number of times.  I never had trouble

6   figuring out where you were coming from, and I appreciate your

7   candor, in that I know what hill I have to climb here today.

8            And I guess the one thing I would say is that I have

9   been impressed, since the beginning of this case, with the

10  ability of the insurer Defendants to work together, and to not

11  be mean-spirited, to not be overreaching as litigants in this

12  case, and I think that we've had tremendous success in

13  organizing ourselves and trying to find ways to expedite

14  things.

15           It is not now and never has been our goal to throw a

16  "monkey wrench" into the Court's plans, to try to bring what is

17  a very large umbrella to its knees.  And, that's not what this

18  is about today, and I hope that I can convince you of that.

19           And I guess, finally, with respect to your remarks, I

20  would just like to say that arrogance and hubris are certainly

21  not what we felt in our heart when we filed this motion,

22  because that's not where we were headed, in all seriousness.

23  And I just don't want to let that pass.

24           On the contrary, we spent a great deal of time

25  working together trying to figure out how to approach the

1    question that the Court asked, which was:  How is the Court

2    affected by the stay order that was entered by the Fifth

3    Circuit?  And, in trying to find ways to compromise it.

4              I mean, right out of the box, I guess one thing was:

5    Should we file a Motion to Stay everything?  And, the answer

6    was quickly -- you know, and it was unanimous -- no, that's not

7    really the way to go.

8              THE COURT:  Well, the first thing you get is a

9    severance.

10             MR. HUBBARD:  If we did file that, you mean.

11             THE COURT:  You're out.

12             MR. HUBBARD:  Right.  Well, --

13             THE COURT:  This umbrella is for your convenience.

14   I'm severing it.

15             MR. HUBBARD:  And, that was something that I hadn't

16   considered before I came here today.  I know --

17             THE COURT:  Well, you need to.

18             MR. HUBBARD:  I know that there was some insurers who

19   filed motions --

20             THE COURT:  Because it would --

21             MR. HUBBARD:  -- to be severed before.

22             THE COURT:  -- bring it to its knees.

23             Well, you know, I might grant it.

24             MR. HUBBARD:  Well, I mean, I think they were denied

25   in the past, but I think that they had --

```
 1                THE COURT:  I know, but, you know, hey, --

 2                MR. HUBBARD:  And, you can do it on your own motion.

 3                THE COURT:  Sometimes I'm wrong and I reconsider

 4    myself.

 5                MR. HUBBARD:  Right.

 6                Well, I haven't had a chance to confer with them

 7    about that, and I'm not sure what the ramifications of that

 8    would be, as I stand here today, to be honest with you.

 9                THE COURT:  One ramification is you wouldn't be in

10    this umbrella; you've got your own deal.  This umbrella is

11    contrivance done for the convenience of the parties and I will

12    not let it brought to its knees.

13                MR. HUBBARD:  Right.

14                THE COURT:  Go ahead.

15                MR. HUBBARD:  Well, certainly that's --

16                THE COURT:  At least by my -- if some powers higher

17    than I determine to do it, well that's their prerogative.

18                MR. HUBBARD:  Right.

19                Well, I mean, I would characterize what we're trying

20    to accomplish today as not that we're seeking some kind of

21    stay, but rather we're clarifying the ramifications of what the

22    Fifth Circuit stay, which has been entered -- what

23    ramifications it has on your Case Management Order.

24                THE COURT:  Okay.

25                MR. HUBBARD:  So that's what we're after.
```

14

1           There's no question about just what the Fifth Circuit

2    did.  They stayed completely Chehardy and Vanderbrook, and they

3    gave a partial stay in the Xavier case.  That was the only

4    three cases that were before them --

5           THE COURT:  Right.

6           MR. HUBBARD:  -- on appeal.

7           THE COURT:  And, let me say that -- I'll certainly

8    let you argue it, but I think your argument was compelling --

9    I'm sure Mr. Bruno will disagree -- about the spirit of the

10   stay reference the other cases.  So, to at least say something

11   nice to you today, I thought it was.

12          MR. HUBBARD:  Thank you.  I'll take that to heart.

13          THE COURT:  Sure.

14          MR. HUBBARD:  The other thing that's really important

15   about what the Fifth Circuit did, I think, was that they fixed

16   oral argument and gave us a very tight briefing schedule in

17   this case; fixed oral argument for the week of June 4th.  And,

18   we took that as a very clear message that they understood the

19   importance of this case.  They understood the requirement for

20   speed.  And, we could be wrong, but it's our honest belief that

21   we're looking at a decision by July 15th.

22          THE COURT:  That would be, indeed, remarkable, if

23   that occurred.

24          MR. HUBBARD:  And, I know that you would be happy

25   with that, the Plaintiffs would be happy with that --

1          THE COURT:  We'd all be happy --

2          MR. HUBBARD:  -- and certainly we would be, too.

3          THE COURT:  -- whatever it is.  I mean, some

4    Plaintiffs might not like it, depending on what it is, but I'll

5    be happy.

6          MR. HUBBARD:  Well, you know, I'm betting on it,

7    myself.

8          But, let's take a look at exactly what it is that we

9    are asking for and what we're not asking for.  We're asking for

10   a stay of all claims versus the insurer Defendants, in light of

11   that decision by the Fifth Circuit -- and we'll talk about why

12   in a minute.

13         We did not ask that there be a stay in the levee, in

14   the Mississippi River Gulf Outlet cases, that they would go

15   forward with all of their discovery, which is substantial; with

16   all of the document production and so forth.  And, although as

17   you noted on Page 8, we do ask that there be a stay of certain

18   types of depositions in the class certification hearings in

19   those cases.

20         THE COURT:  Just let me clarify that with you,

21   Mr. Hubbard.  I'm not sure what types of deposition discovery

22   you're talking about there.

23         MR. HUBBARD:  Well, let me explain that, because the

24   first sentence of that paragraph that you pointed to on Page 8

25   says, "For the sake of judicial economy, this Court should also

1   stay or defer any class certification depositions in the levee

2   and MRGO cases."

3            And, this is important, and this was something that

4   went into our calculus in what we're asking for.  The current

5   Case Management Order says that there will be no common issue

6   fact discovery until July 27th.  It also says that there's not

7   going to be any expert discovery, with respect to class

8   certification, because the expert report by the Defendants is

9   due August 10th -- I mean, by the Plaintiffs is due August 10th

10  and by the Defendants August 24th.  Those depositions are going

11  to take place in September.

12            And so we were thinking:  We have a window here.

13            The only thing that's going to go forward,

14  deposition-wise -- and we're not asking, we're specifically not

15  asking that any kind of written discovery by stayed in any

16  respect.

17            THE COURT:  I understood that clearly.

18            MR. HUBBARD:  So, the only depositions that we're

19  talking about in the short-term would be fact depositions with

20  respect to class certification.  Those are the only ones that

21  are permitted, by the Case Management Order, until July 27th.

22            We're shooting --

23            THE COURT:  You didn't know it, but I did issue a

24  separate Case Management Order for the Robinson case.

25            MR. HUBBARD:  Yes, sir.  I didn't know that and I

1    don't know what kind of dates --

2              THE COURT:  You may not have had an opportunity to

3    look at it.

4              MR. HUBBARD:  No, I actually have not.

5              But, those are the depositions we thought we were

6    talking about, which may be very few.  You know, I don't think

7    there would be many that we're even talking about anyway.

8              And we also ask in here that -- while we're asking

9    for a stay, we ask that, in the event that the -- the stay

10   would only last until the Fifth Circuit ruled, and we asked in

11   here that, if the Fifth Circuit hadn't ruled, that we would

12   have a conference with you to see where we are after 120 days,

13   which I think is July 15th -- if I'm not mistaken -- more or

14   less.

15             And, at that time, you know, if the Fifth Circuit is

16   sitting on it and hasn't had an opportunity to make a decision,

17   the Court will see where we are and you can do as you could the

18   day before that, whatever you see fit to do, if it's a stay

19   order that you issued.

20             So, I mean, if you think that we were asking for

21   something broader than that, we were not, and we thought that

22   we were asking for fairly limited --

23             THE COURT:  Well, --

24             MR. HUBBARD:  -- impingement on these other cases.

25             THE COURT:  -- here's what Number 3 says: --

1          MR. HUBBARD:  Sir?

2          THE COURT:  Here's what Number 3 says on Page 9:  "No

3  deposition should be allowed in the Katrina Consolidated

4  Litigation, including, without limitation, Robinson, until the

5  stay is lifted.

6          MR. HUBBARD:  Right.

7          THE COURT:  That's no depositions.

8          MR. HUBBARD:  Well, but --

9          THE COURT:  That's what it seems to me.

10          MR. HUBBARD:  That is true, but there will be no --

11  we thought that Robinson had the same rule -- I thought.  I

12  don't know what everybody else in my group thought.  I was

13  thinking that there would be -- the only Case Management Order

14  I had in front of me was the one that said there's no common

15  issues discovery until July 27th.

16          THE COURT:  No.  Robinson is going to be different.

17          MR. HUBBARD:  I don't know what Robinson --

18          THE COURT:  We're all assuming, when the court of

19  appeal may rule -- and none of us know if -- you may have an

20  inclination or a strong notion, but none of us know, I would

21  assume, whether they're going to certify it to the Louisiana

22  Supreme Court or not, for example, or whether they're going to

23  take six months, whether there's going to be a re-hearing or

24  what.  We don't know.

25          MR. HUBBARD:  And, that's why we specified that the

1  Court take a look at it in 120 days and, of course, on your own

2  motion, you can take a look at it whenever you want, if it got

3  certified.

4          THE COURT:  Can you tell me -- and forgive me --

5  after the Fifth Circuit issues its ruling the Court -- I mean,

6  that's after it issues its ruling.  We don't know, that may not

7  be in 120 days.

8          MR. HUBBARD:  But, the --

9          THE COURT:  You say in the unlikelihood that -- "the

10  Court should hold a status conference to address the trial

11  court and appellate court proceedings."  I'm not sure what I do

12  in 120 days; it's status conference, what do I do?

13          MR. HUBBARD:  Whatever you think is necessary.

14  Whatever you think is necessary, Judge.  I mean, you have that

15  power in your hands.  If you think -- I mean, and like I say, I

16  really hadn't thought about them certifying to the Supreme

17  Court, but if they certified it to the Supreme Court --

18          THE COURT:  Well, the only reason I said that --

19          MR. HUBBARD:  -- and gave us --

20          THE COURT:  Because I'm maybe overly curious, I've

21  read the briefs submitted to the court of appeals.

22          MR. HUBBARD:  Right.  And, we oppose certification,

23  but that doesn't --

24          THE COURT:  Right.  And, you opposed, and I think a

25  few parties asked for it, and who knows what the court of

1    appeals will do.

2              MR. HUBBARD:  Right.  In light of the fact that they

3    gave us an oral argument, I suspect that they are going to keep

4    it, but there is no telling, and certainly --

5              THE COURT:  Is the oral argument strictly on the

6    issue of -- it's not on the certification issue?  Is it just on

7    the -- because that might pretermit that.  Is it just on the

8    merits of the claim, do you know?

9              MR. HUBBARD:  As far as I know, it's on the merits of

10   the claim, because I don't recall seeing any part of the Order

11   that said the motion about certification is carried to the

12   merits --

13             THE COURT:  Okay.

14             MR. HUBBARD:  -- which, I think, is the way they

15   would have entered --

16             THE COURT:  All right.

17             MR. HUBBARD:  -- that Order, if that's what they had

18   in mind.

19             THE COURT:  Thank you.

20             MR. HUBBARD:  So I think that still is yet to be

21   ruled on.

22             So, if the status of the case changed because we got

23   kicked to the Louisiana Supreme Court with an extended briefing

24   schedule, I think that would be a whole different ball of wax

25   and the Court might want to reconsider whatever it was doing at

1   that point.  And, certainly, that's available to you on your

2   own motion at any time.

3           We did suggest that that might result -- more likely

4   than not would result in pushing back the class certification

5   hearings.  Approximately 60 days was, you know, the way we did

6   our calculus.

7           THE COURT:  That's assuming the court -- you mean

8   that's based on the 120 days, --

9           MR. HUBBARD:  Right.

10           THE COURT:  -- assuming the court doesn't rule in 120

11   days?

12           MR. HUBBARD:  That's right.  That's correct.  And, --

13           THE COURT:  Of course, that's assuming the Court's

14   calendar is fungible or --

15           MR. HUBBARD:  Well, --

16           THE COURT:  It may not be.  I don't know when that

17   is, but I'd have to look at it.

18           MR. HUBBARD:  Well, and I guess my last point about

19   this --

20           THE COURT:  Because we take a long time picking these

21   dates and trying to look at our calendar.  As you know, your

22   calendar is probably worse than mine.  It's difficult.

23           But, go ahead, sir.

24           MR. HUBBARD:  Yes, sir.  And, you're right.  I did

25   not check on that and I was not aware of what your

22

```
 1   scheduling --
 2           THE COURT:  Well, certainly, as you couldn't be.  I
 3   understand that.  But, I understand the spirit of your motion.
 4           MR. HUBBARD:  Right.
 5           And, the other thing that I think is that when you
 6   have these class certification hearings would not necessarily
 7   have any impact on the date of the actual underlying trial on
 8   the merits.
 9           THE COURT:  True.
10           MR. HUBBARD:  So, we were thinking that we were not
11   denying litigants an opportunity to complete their case on the
12   same day that you envisioned when you fashioned the Case
13   Management Order.  We were strictly just talking about juggling
14   what is a relatively short period of time around in connection
15   with class certification hearing.  We were not trying to upset
16   the entire apple cart.
17           THE COURT:  You do have, also, expert depositions.
18   The expert depositions would have been completed, normally
19   under our Case Management Order, September 14$^{th}$, and the class
20   certification hearings were to start in November.
21           MR. HUBBARD:  Right.
22           THE COURT:  I'm not sure how much you would actually
23   back it up, and a lot of it depends on the 120 days, if I've
24   issued a stay -- and that is, I must say, a mollifying aspect
25   to this that perhaps I didn't pay enough attention to.  So,
```

1    I'll admit that, too.

2            MR. HUBBARD:   Thank you.

3            THE COURT:   I'm just not sure of the domino effect on

4    the calendar.   Part of the frustration -- and this is not

5    anybody's fault -- is trying to get these calendars.   It is so

6    difficult working with the calendar with this many things going

7    on, and try to fit them all in, and that's part of our

8    frustration, because there's a domino effect that takes place.

9            But, I understand what you're saying.   Go ahead.

10           MR. HUBBARD:   Okay.   That's where we were coming from

11   and that was the way we analyzed -- we didn't see this as a

12   bunch of dominos that were going to kick the trial dates out or

13   something like that, and we had extensive discussions about all

14   of that in our group.

15           So, --

16           THE COURT:   My only concern is -- well, not my only

17   concern.   One of my concerns, and you may want to speak to it

18   briefly, is it does appear to me that the court of appeal has

19   jurisdiction over anything but the insurance case.

20           And, I know that Plaintiffs may make an argument:

21   Well, and it's just those insurance cases.

22           But, I think your point that I precluded the other

23   motions being filed -- I'm going to try to keep with the spirit

24   of it, certainly vis-à-vis the insurance cases.   But, I want to

25   hear from the other side, as well.

24

1          MR. HUBBARD:  Okay.  I appreciate that.  I won't

2   dwell on that point, then, --

3          THE COURT:  All right.

4          MR. HUBBARD:  -- because I see it.  I have you.

5          And I guess that one of the other kind of "givens" in

6   this thing, it seems to me, is that the Fifth Circuit, in

7   staying the Chehardy case, has, as a practical matter,

8   prohibited class certification, for the insurance cases, from

9   going forward.  All of the class actions, to the extent there

10  are others, are subsumed in Chehardy, and I don't think -- I

11  mean, a stay is a stay is a stay.

12         THE COURT:  I understand.

13         MR. HUBBARD:  So, I don't think we can go forward

14  there, and we've cited some authority for it, and I won't waste

15  your time talking about that now.

16         THE COURT:  Right.

17         MR. HUBBARD:  I'm skipping ahead here, because, like

18  I say, we're in agreement on a couple of points here, at least.

19         And, another reason that this is fair and so forth is

20  that the cases that are here are here because of water damage,

21  and there is no stay for cases that don't have water damage,

22  that are in other courts.  You know, we're not suggesting that

23  there should be, but to the extent that there is water damage

24  issues in these cases, there really is a lot of potential

25  prejudice, in terms of substantial -- well, a lot of time being

1   spent on water damage issues that may become unnecessary.  That

2   was the argument that was made in the Fifth Circuit, and that

3   was the argument, I think, that won the day there.

4           And, of course, if the Fifth Circuit were to reverse

5   it, the case here would get rather simple and, if they affirm

6   it, there's no telling what kind of steps they'll take that

7   might give us --

8           THE COURT:  Well, it would be very simple.  I mean,

9   most of you would be -- you would all be transferred back from

10  whence you came and if you haven't settled everything else,

11  you'd have an adjusting case.

12          MR. HUBBARD:  Exactly.  I think that's exactly right.

13          THE COURT:  I say "simple," -- at least relatively

14  simple.

15          MR. HUBBARD:  And, so these cases are all

16  inextricably -- they're not here unless they're inextricably

17  bound up in the water damage issue, which is what's before the

18  Fifth Circuit.

19          And, I guess I would just leave you with this

20  thought:  I mean, you had conceded, I think, in your rulings

21  that there is a duplication of effort and so forth, but your

22  main concern was one of timing.  You said it's not fair -- you

23  were worried about discovery getting stale.

24          THE COURT:  Yes.  I had no idea that -- I'm delighted

25  that the court of appeal granted an expedited hearing, but,

 1  again, there's many a slip betwixt the cup and the lip.  You

 2  may be a brilliant prognosticator and it may be a July 15th

 3  decision, and it may be July 15th, 2008.  You just don't know.

 4  The court of appeals is a busy group and it depends.

 5           But, they've obviously given this priority, which I

 6  do agree.

 7           MR. HUBBARD:  Right.  And, maybe we're just being an

 8  optimist.  But, our thinking was that we probably are going to

 9  have an early decision, and if we don't, we should come back

10  and meet with you and see where we really are --

11           THE COURT:  Well, I understand that, and --

12           MR. HUBBARD:  -- and whose ox is getting gored.  And,

13  I guess I'll --

14           THE COURT:  And, I think that's, as I said earlier,

15  use the same word, a mollifying aspect that I did not

16  accentuate enough.

17           MR. HUBBARD:  Right.

18           One final point:  I've been told that I've actually

19  used the wrong terminology, maybe, here.  The common issue here

20  is really the levee breach, which is what binds this umbrella

21  together --

22           THE COURT:  Oh, what binds the umbrella.

23           MR. HUBBARD:  -- not water damage, per se, but rather

24  -- but in all of these cases where we're dealing with levee

25  breaches, we have water damage, obviously, as well; water

27

```
 1   damage caused by a levee breach, allegedly.

 2            THE COURT:  Yes.

 3            MR. HUBBARD:  So, unless the Court has another

 4   question, I mean, I think that --

 5            THE COURT:  No other questions.  Mr. Hubbard, I want

 6   to continue to say I think you present yourself very well in

 7   court.

 8            MR. HUBBARD:  Thank you, Judge.

 9            THE COURT:  Mr. Bruno.

10            MR. BRUNO:  Yes, Judge, give me a second, please.

11            THE COURT:  Mr. Hubbard softened me up already, after

12   all of that big statement I made.  So, let's see what you have

13   to say.

14            MR. BRUNO:  Judge, we begin by saying to you that,

15   although a lot of folks may not understand this, but the

16   Plaintiffs take this as seriously as we take any motion in this

17   case.

18            The state courts are paralyzed by the fact that

19   motions to recuse have been filed and not yet ruled upon.  This

20   Court is the first court in the south to make an attempt to

21   organize this litigation.  And, interestingly enough, in the

22   past months other judges in this district have decided, almost

23   a year and a half later, to start the business of organization

24   of cases.

25            Now, while it may be true that water damage is the
```

28

1   gravamen of what brings us all together, --

2            THE COURT:  Levee breaches are.

3            MR. BRUNO:  Levee breaches.

4            -- it's not the only thing that you have before you

5   at this point.  You have a lot of issues before the Court.

6   And, the Plaintiffs, for one, applaud and thank you for your

7   efforts to organize.  And we, frankly, feel very -- we're

8   concerned about anything that anybody might do to break apart

9   what we've struggled so hard to put together.

10           Now, the first problem that we have with all of this

11  is this notion of what it is that the Fifth Circuit has done.

12  In their papers, the State Farm Fire and Casualty Company tells

13  the court of appeal, in response to our suggestion, that a stay

14  is not appropriate.  They say this contention ignores the

15  crucial point that Plaintiffs' counsel, me, by counsel for

16  State Farm and other Defendant insurers, are involved in other

17  Katrina related actions that would not be affected by a stay

18  entered here.

19           Any punitive benefit from discovery in those other

20  actions during the next several months would inure to

21  Plaintiffs' counsel just as it would to State Farm and other

22  insurers.

23           Now, you're the Fifth Circuit, now.  Don't be

24  Judge Duval.  You're reading this and you're deciding whether

25  or not to grant the requested stay.  This is the representation

1    that they make to you.

2          What do the other insurance companies say?  Well,

3    here are their papers.  They say -- our argument that, you

4    know, a stay is not good, they say, "This argument is

5    disingenuous --" this is their words "-- given that Plaintiffs'

6    counsel --" once again, me, "-- like Defendants' counsel are

7    involved in other Katrina related cases that would not be

8    halted by a stay imposed here.  Any tangential benefit from

9    discovery in these separate cases over the next few months

10   would inure to Plaintiffs' counsel just as it would to the

11   Defendants."

12         Their words, not mine, and you're the Fifth Circuit,

13   and you're trying to decide whether to do something as

14   substantial as enter a stay order.

15         Well, this is what the Fifth Circuit considered in

16   writing that one word "granted."  These are the representations

17   upon which that one word "granted" was entered.

18         In connection with the <u>Xavier</u> appeal, at least the

19   Travelers Insurance Company made it a little bit more clear as

20   to what they were talking about, because they're the only ones

21   who say:  Well, we don't want a stay --

22         And, this relates to insurance issues and it's very

23   important to this request to stay insurance.

24         They say:  The only thing that we want to stay is the

25   cause of the levee breach.

1       Which is diametrically opposed to what everybody else

2   says in their briefs.

3       Now, Judge, we've worked very, very, very hard to

4   bring some logic to what certainly appears to be on its face a

5   very complex issue.  In fact, the *ides of March* today, in

6   remembrance of a great Julius Caesar, we're here to cross the

7   Rubicon, because what we've done in drafting and filing the

8   Master Complaints which are filed today, is that we've taken

9   all of the -- I should say we've made a great attempt to take

10  all the allegations made by all Plaintiffs counsel, including

11  Ashton -- I don't know if he's here or not -- but, we tried

12  very hard to include all those allegations.

13      And, what we've done is this:  It's been clear to us

14  that the dividing line between the MRGO and the levee

15  allegations is the Industrial Canal.  I make this point,

16  because I want to make certain that you have a little bit of

17  background.  All of the claims against any party, which we

18  believe to be responsible for water damage in this area and

19  this area (indicating) is now a part of the MRGO side of the

20  case.

21      Everybody that we believe to be responsible for water

22  damage on the western side of the Industrial Canal is now a

23  part of the levee case.

24      I make the point because we have moved some

25  Defendants around to make this make some sense to you and,

31

1    candidly, to make it easy for the Defendants to bring their

2    motions, their dispositive motions in the future, so you'll

3    know exactly what we're talking about.

4            Judge, let's talk a little bit about practicality.

5    Let's talk about what it is that the Defendants are trying to

6    accomplish.

7            Well, the first thing that we know is that the final

8    witness list with regard to class certification is due June 27,

9    2007, depositions are to commence between March 30 and July 27.

10           Now, the fundamental question ought to be:  Well,

11   what depositions are we talking about?  This is class

12   certification.  Again, I've given you those two broad areas.

13   This (indicating) is everything to the west, and we'll talk

14   about the east in a moment.

15           THE COURT:  What concerns me, Mr. Bruno, and I want

16   to hear your point, is that although literally the Fifth

17   Circuit stay applies to the cases presented to there, the

18   spirit of it seemingly shuts down all discovery and any action,

19   if you apply the spirit of it --

20           MR. BRUNO:  Sure.

21           THE COURT:  -- to the insurance cases.

22           MR. BRUNO:  Judge, --

23           THE COURT:  And, I don't know if the class

24   certification issues were mentioned at the court of appeal.  I

25   have no idea.

32

1              MR. BRUNO:  They were not.

2              But, here's the subtle point that the Defendants

3    wants to gloss over, and that is:  Mr. Bruno, the depositions

4    that we seek to stay are the depositions that you would take --

5    right?

6              So, the first question ought to be asked:  Well, what

7    depositions do you propose to take?

8              Well, the depositions that I propose to take relate

9    to my burden of proof at the class certification hearing.  What

10   do I have to show?  I've got to show, Judge, that the claims

11   are numerous -- not going to be very hard, number one.

12             Number two, that's an issue that doesn't have

13   anything to do with the issues before the Fifth Circuit, nor is

14   it going to require this duplication of effort, and I'm not

15   taking any deposition.  Indeed, I would think I should be able

16   to ask the government to simply tell me, "How many more than

17   200,000 claims do you have?" -- in connection with numerosity.

18             I have to show adequacy of representation -- that

19   might be tough, but we'll do our best -- whether or not the

20   lawyers on our side are up to the task.

21             Now, when it comes to commonality, what deposition am

22   I going to take?  Well, here is a little preview of the

23   evidence that you are going to see as to commonality, because

24   the issue has nothing to do with what the Defendants did or

25   didn't do.

1           The issue is:  Where did the water go?

2           And, this is what you're going to get.  You're going

3    to get a computer model which shows exactly where the water

4    went -- 17th Street break, London break where the railroad

5    thing is open, the overtopping of the Industrial Canal.

6           This testimony, Your Honor, is all expert testimony,

7    all related to the topography of the city, et cetera,

8    et cetera, et cetera.

9           THE COURT:  The insurers would say, though, "But, if

10   we win in the court of appeal, we don't have to even be at

11   those depositions."

12          MR. BRUNO:  Precisely.  However, let's talk now about

13   the alignment of the parties.  Is there some misalignment

14   between the Washington Group International and the Travelers

15   Insurance Company?  Do they both want the same thing?  Are they

16   going to have to spend a whole bunch of extra money?

17          Indeed, the Defendants have gotten together and hired

18   a high-powered construction person who is going to oversee this

19   whole effort.  And I understand that the Defendants have agreed

20   to contribute shares to this effort.

21          So, the fact of life is, Judge, that this exercise in

22   trying to figure out where the water went is an expert

23   exercise.  It's not going to be a fact intensive exercise.

24   It's not going to require these depositions that the Defendants

25   are so afraid to spend some money on.

1          And just to illustrate, we have the same with regard

2    to St. Bernard, and we'll have the same with regard to the

3    east.

4          Now, let's talk about liability for a moment.  I

5    can't take a fact deposition until July 23rd, 2007, well after

6    the hearing date.  Again, the first question I think that ought

7    to be asked is:  Is there some misalignment of the parties?

8          When I depose the Washington Group, I'm certain that

9    maybe an insurance company lawyer will want to be there, but

10   that insurance company lawyer is going to have access to that

11   witness anyway, because there's no difference of position with

12   regard to the issues.  They are interested in defending the

13   Washington Group.

14          THE COURT:  Let me make sure I understand what you're

15   arguing.  The court of appeal has issued a stay in the

16   insurance cases under this umbrella.  So, we know that a stay

17   is issued and certainly I and all of us, but particularly I

18   have to follow that mandate.

19          MR. BRUNO:  Precisely.

20          THE COURT:  And, tell me why -- it seems to me,

21   clearly, fact depositions would be under the stay.

22          MR. BRUNO:  There's no question but that those

23   particular cases are stayed, although I have to share with you

24   that --

25          THE COURT:  To make sure I understand:  You're trying

1    to convince the Court to follow the literal mandate in the

2    stay, that is, only relating to the cases that were before the

3    court of appeal, rather than all of the other insurance cases

4    in the umbrella?

5            MR. BRUNO:  Actually, Judge, what I was trying to

6    suggest to you is that certainly that is our argument, but I

7    was trying to persuade the Court to look at this issue from

8    more practical perspective, because you made the point that:

9    You know, I'd like to apply the spirit of this thing.  I don't

10   want to do anything that's going to hurt anybody.  I don't want

11   to make anybody spend money unnecessarily.

12           So, the argument that I'm attempting to make now is

13   that, when you think about it, it's not prejudicing anyone,

14   because they are not -- the fact that they have the same

15   position as each Defendant who I would depose in any fact

16   deposition, which I can't take until July, they have access to

17   those witnesses, so they're not required to spend any money.

18           The deponent has no risk of being deposed twice,

19   because the insurance company has access to that same witness.

20   They're aligned.  They're not there to demonstrate that the

21   Washington Group is liable.  Indeed, they're there to

22   demonstrate that the Washington Group is not liable, that the

23   water didn't come from an act of man, but, rather, came from an

24   act of God.

25           So, the problem that I'm having with this whole

1    business is that these guys and these guys (indicating) are on

2    the same page.  And, so there's not any wasting of resources by

3    anybody.  The only person I'd be concerned about wasting

4    resources is me, if I had to take a deposition twice.

5            But, I don't have to take the deposition twice.  I'm

6    going to take one liability deposition, and the Defendants --

7    even if I take it and I'm successful, they have access to that

8    witness.  They can do whatever they want.

9            Here's the worst part about it:  I begged the

10   insurance companies to third party these folks.  They haven't

11   done so.  In other words, their interests are only tangential.

12   If they had chosen to third party the Defendants, as is their

13   right, because under their policies they have a subrogated

14   interest against any person who is responsible for the water.

15   They haven't done that.

16           So what we have here is we've got our claims against

17   the Defendants for causing the water damage and we have this

18   tangential issue, as well.

19           Truth be told, the Plaintiffs, under our policies,

20   have to show that the policy covers.  Well, interestingly

21   enough, it's not my burden.  All I have to show is that I have

22   damage.  It's their burden to show that then exclusion applies.

23   So, they have the burden of showing that it's an act of God not

24   an act of man.

25           So, everything with regard to this whole business of

1    liability changes and the facts that you would actually work to

2    develop are vastly different.

3              THE COURT:  Mr. Bruno, I take it that there's been no

4    motion filed by the Plaintiffs to clarify the stay with the

5    court of appeal.

6              MR. BRUNO:  We have not, Judge, because, frankly, --

7              THE COURT:  No, --

8              MR. BRUNO:  I don't see the need for it because of

9    two things.

10             First, the Defendants make the point that every

11   allegation made in Chehardy is made somewhere else.  I mean,

12   they're out there.  Which I'll talk to in a moment.

13             And, issues sought to be discovered in these cases

14   are currently being discovered in other sections of this court.

15             And, if I may, I want to move to that point right

16   now, and this is what's most troubling.  Because when you get

17   -- it's clear to me that you shouldn't stop any deposition in

18   any levee or MRGO case.  It doesn't make any sense.  The

19   parties are aligned.  They're not prejudiced.  They're not

20   spending any money.  The only issue is where the water went.

21   That's an expert issue and it has nothing to do with anything

22   that they're doing.

23             Now we get to the insurance.  It's very troubling,

24   because, as I pointed out to you, you've got other courts who

25   have now decided -- and I applaud them -- to get organized.

1    They would have you enter a stay while Allstate has filed a

2    motion before Judge Feldman on a very, very important issue

3    relating to law.

4           The hallmark of everything that we've done since the

5    first day is to give every party an opportunity to weigh in on

6    a particular legal issue.  That's --

7           THE COURT:  Hopefully, it doesn't relate to the levee

8    breach issue.

9           MR. BRUNO:  Well, no, it doesn't.  But, because we

10   have insurance cases here and because we have the underlying

11   wind claims, and because we're all about resolving cases, we

12   have to deal with the fact that we have other discovery sought

13   to be accomplished.

14          And, what I'm very troubled by is you come to this

15   Court and ask for a blanket stay -- not a stay of just levee, a

16   blanket stay -- and walk down the hallway --

17          THE COURT:  Not a stay of just insurance, you mean?

18          MR. BRUNO:  No, it's not a stay of just insurance,

19   but everything in insurance.

20          THE COURT:  Right.

21          MR. BRUNO:  And, then you walk down the hall and you

22   file a substantive motion of law, so that you have a different

23   judge in this courthouse ruling on an issue that I am

24   definitely going to ask you to rule on.

25          THE COURT:  Well, I can only be so much.  In other

39

1    words, I can't -- none of us can handle every insurance case

2    here, so the connective tissue here is the levee breach.

3            MR. BRUNO:  Of course, Judge, but --

4            THE COURT:  So, there are going to be other judges --

5    we've tried to be as uniform as possible, but we have not

6    consolidated every potential legal issue, no question.

7            MR. BRUNO:  I understand that, and I realize that and

8    I recognize that, and I even accept that.

9            But, what I will not tolerate and cannot tolerate is

10   the Defendants coming in here and saying, "Okay, Judge Duval,

11   we're going to ask you not to rule on whether or not --" for

12   example "-- the concurrent cause is applicable.  We're going to

13   go down the block and get it done by somebody else."

14           I have a problem with that.  I have a substantial

15   problem with that, because it has nothing to do with any of the

16   issues in this case.

17           THE COURT:  You mean I'm precluded -- your point is

18   that -- in my court, I am precluded, by virtue of the stay, if

19   I extend it to all the cases, if a motion came up saying that

20   the anti-concurrent cause clause is ambiguous and, therefore,

21   should be vitiated, and because of the stay, I'm precluded from

22   hearing it.  However, you could have a non-levee breach case

23   where the anti-concurrent cause clause was operative, and then

24   that court would be able to rule on it.

25           MR. BRUNO:  Sure.  Other courts in this --

40

1          THE COURT:  I understand your point.

2          MR. BRUNO:  My firm has 6,000 cases in front of this

3     Court.  I'm sort of anxious to know what Judge Duval has to

4     say.

5          And, worse than that, -- Judge, you know, you have in

6     your Case Management Order a provision which allows for a

7     bifurcation of issues, which is eminently logical, because when

8     you get down, when you stop all the rhetoric and you get down

9     to what it is that a lawyer has to do and how much money a

10    lawyer is going to have to spend to resolve an issue, I'm going

11    to have to go into a courtroom and I'm going to have to

12    persuade you or some jury how much damage was caused by the

13    wind, how much damage was caused from water damage caused by

14    the wind, and how much water damage was caused by flood.

15         Now, how am I going to do that?  I've got pictures

16    and I've got estimates.  It's the same evidence, and they want

17    to make this into some kind of crazy difficult issue.  It's

18    not.

19         Judge, it would be absolutely -- it would be criminal

20    to stop individual adjusting cases from going to trial, just

21    because they happened to make the claim, as they should if

22    they're good lawyers, that:  You know what, the Chehardy issue

23    is in my case.

24         Now, --

25         THE COURT:  So, to make sure I understand:  Insofar

41

1    as the bifurcation potential -- leaving the water damage issue

2    on the side, but having a jury resolve the adjusting issues and

3    the whole panoply, but bifurcate --

4              MR. BRUNO:  Sure.  And, I'm going to tell you right

5    now, Judge, --

6              THE COURT:  I'm not sure what the position is of the

7    insurers on that issue, and I would like to hear from them

8    after you finish.

9              MR. BRUNO:  Well, as I'm sitting here, what I'm

10   hearing them say is:  Stay everything.

11             And, what I'm dealing with, as I'm arguing to you

12   this afternoon, --

13             THE COURT:  Well, clearly the court of appeal --

14             MR. BRUNO:  -- is a request to stay everything.

15             THE COURT:  The court of appeal apparently stayed

16   everything in the cases before, the cases that were taken up.

17             MR. BRUNO:  Well, thankfully --

18             THE COURT:  And, I've been asked to extend the spirit

19   of that Order to the remainder of my cases, and I guess what

20   I'm interested in is -- and the remainder of the cases are the

21   insurers asking that I, in the spirit of the stay, in other

22   words, shut down the bifurcation aspect of our CMO, as well.

23             And, I understand that.

24             MR. BRUNO:  Well, and here's the bottom line, Judge:

25   You know, again, my approach to this wasn't so much stay or no

1    stay.

2            It was:  How can I work within the framework of what

3    it is that the Defendants are asking?

4            That's why I didn't get up here and say, "Well, the

5    stay only applies to Chehardy," and sit down.  I'm walking

6    through, trying to get clear in my mind where is the problem?

7    And, they haven't done a very good job of defining for you what

8    the problem is.  As I see it, there is no problem.

9            Now, here's the solution:  The solution is

10   Judge Feldman has appointed a special master.  They are in the

11   settlement mode in that court.  I am begging you to appoint a

12   special master.

13           And, let me just advise you that -- I don't have to

14   advise you; you know.  The United States of America has agreed

15   in the Robinson case to the appointment of a special master.

16           THE COURT:  For the purposes of discovery, only.

17           MR. BRUNO:  Exactly.  And, my point is:  Once you

18   make the appointment, it's all about defining the powers and

19   responsibilities.  There's no need for two, no need for three.

20   We ought to have just one.

21           My view is a simple one.  The special master should

22   be charged with -- in insurance, alone -- in evaluating each of

23   these individual cases and to come up with a method.  Because

24   even though you've charged Ralph and I with the obligation of

25   creating a protocol, in view of this motion, it's apparent to

1    me that we're going to need some intervention with regard to

2    determining how to best come up with a procedure, a method for

3    resolution of what I call "the easy stuff."

4            THE COURT:  Now, I assume you're talking about

5    resolving everything other than the water damage exclusion

6    issue.

7            MR. BRUNO:  Of course.  And, there's so much to every

8    case.  You know, let's be realistic about it.  You've got

9    $100,000 policy, you're going to have, you know, $50,000,

10   $60,000 in wind or water or wind related issues.  Yeah, it's a

11   valuable component of the claim, but I still have the problem

12   and the necessity of resolving what I call "the easy part."

13           And, that's why I was pleased to see the Court

14   embrace the idea of bifurcation, because it's practical, it

15   gets the job done.  It doesn't hurt the Defendants, because no

16   one is taking their deposition --

17           Oh, by the way, actually there are people taking

18   their deposition on the wind/water exclusions.  In state court,

19   there are plaintiff lawyers -- in fact, just last month Mike

20   Gertler took the deposition of the Travelers Insurance Company

21   on the issue of wind versus water, and discovered,

22   interestingly enough, that the Travelers Insurance Company has

23   known about the ambiguity of the water/wind issue for quite

24   some time; actually agreed to change the language and had some

25   proposed forms on its table.

44

1              But, let's just leave that aside for the moment.

2              I simply make the point that it's really, really

3    difficult for anybody who is going to get before you and be

4    very honest to illustrate to the Court exactly what it is that

5    is the problem.  And, how do you quantify the problem?  How

6    much money is this going to cost?  What is the true harm to

7    them?

8              And, I can share this with you:  The true harm to the

9    Plaintiffs is beyond measure.  We are breaking our neck to

10   comply with your Orders.  Your Order came out two weeks ago

11   demanding Master Complaints.  We worked our tails off, and they

12   are filed.

13             And, we will comply with every deadline that this

14   Court imposes on us, because we know that we've got to get

15   these cases over with, within some reasonable amount of time.

16             And, I just respectfully suggest to Your Honor that,

17   before any stay, -- the bar for a stay ought to be, and is,

18   extraordinarily high.  They've not met that burden.  They can't

19   meet that burden, and they've given you nothing today that

20   would justify, in any remote sense, a stay of this case.

21             THE COURT:  Thank you.

22             Mr. Hubbard, do you want to have -- Ms. Barrasso.

23             MS. BARRASSO:  Judge, can I just have a brief --

24             THE COURT:  Yes.

25             MS. BARRASSO:  Judy Barrasso for Allstate and Liberty

1    Mutual.

2             I want to respond to something Mr. Bruno said and

3    correct an error.  Judge Feldman has not appointed a special

4    master.  That's simply not true.

5             I think this Court has seen the first version of the

6    Case Management Order entered by Judge Feldman.  That's all

7    that's been done.  And, Professor McGovern has come in to have

8    some discussions, most particularly with Mr. Nielsen on the

9    flood side, but there has been absolutely no agreement, and

10   that is incorrect, Judge.

11            And, Mr. Bruno also suggested or implied we're

12   running off filing motions.  Judge, we have filed many, many

13   motions in every courtroom in this building, and the motions

14   he's referring to are pending before many of your fellow

15   judges, and we've been criticized for not filing our motions

16   quick enough by those judges.

17            And, so it's in no sense we're trying to do something

18   in one court and not another.

19            THE COURT:  I understand.  If it's not part of this

20   -- if it's not here, it's not here.

21            MS. BARRASSO:  It's a non-levee breach --

22            THE COURT:  That's just the way it goes.

23            MS. BARRASSO:  Right.  We have that motion pending

24   before --

25            THE COURT:  And, frankly, I really don't want to

46

1   decide every motion.

2           MS. BARRASSO:  Right.

3           THE COURT:  I've got enough.

4           MS. BARRASSO:  We are extended between four or five

5   judges right now, and some of them criticize us for not doing

6   it quick enough.

7           THE COURT:  We did try to achieve uniformity as best

8   we could, but there's a limit to it.

9           MS. BARRASSO:  In certain issues, like Judge Vance's

10  side of the VPL, but some of these other issues are just coming

11  up in all the cases.

12          THE COURT:  Right.  I understand.  Thank you.

13          Mr. Hubbard.

14          MR. HUBBARD:  Thank you, Judge.

15          Mr. Bruno covered a lot of ground, but I'll try to

16  make this succinct.  I guess first let me tell you that he's

17  mischaracterized the business about Travelers knowing about the

18  ambiguity of the water damage in a deposition.

19          THE COURT:  It's certainly irrelevant to this Court.

20  Tell that to the court of appeal.  I've already made my

21  decision.

22          MR. HUBBARD:  Right.  I just didn't want to leave

23  that out there on the record.

24          And, I guess most important here is that, as you

25  recognize, the question here is not about whether or not we

1   should have a stay of all discovery; rather, the Fifth Circuit,

2   in the cases before it, did stay all discovery.

3          <u>Vanderbrook</u>, of course, is a case with five or six

4   individuals in it.

5          THE COURT:  Right.

6          MR. HUBBARD:  So, I think that they understood that.

7          And, that leads us right into the language from the

8   State Farm and the other brief by the Defendant insurers that

9   was put up with language about what the impact of the stay

10  might be or might not be, and I will well you that the language

11  in that quote that he's talking about referred to discovery

12  materials.  There was a debate about whether or not there would

13  be discovery materials -- not depositions.  And, discovery

14  materials are precisely what we're saying should go forward and

15  can go forward in the levee case and MRGO without even slowing

16  down for one second.

17         You know, I discerned, also -- and, of course, there

18  are many other cases in front of other judges where these same

19  Plaintiffs lawyers are representing the other side.  You know,

20  Mr. Fayard is a liaison counsel in Judge Feldman's court and

21  he's involved in Judge Vance's court, and I don't know the full

22  extent of all the rest of them, but I'm sure they have clients

23  in a lot of different places, not just in this court, where

24  they are busily litigating all of their claims and dealing with

25  all of our defenses, other than the ones that are here, which

1  are levee breach, water damage type claims -- which is what the

2  Fifth Circuit is dealing with.

3          I mean, I think that there was some suggestion that

4  we should not be concerned about the kind of discovery that

5  might go forward in the near term.  But, you know, I'd refer

6  you to Page 12 and 13 of their brief in opposition to this

7  motion, down starting at the bottom of Page 12, where they're

8  talking about class certification being a procedural process

9  that's not really on the merits.  And, the last sentence on

10  Page 12 says:  "Fact deposition testimony that, e.g., 1,500,000

11  evacuated before Hurricane Katrina struck are that 80 percent

12  of New Orleans flooded, are that most, if not all, individual

13  plaintiffs, including the class representatives, suffered

14  property damage or losses --"

15          And then listen to this.

16          "-- or that specific acts of negligence caused the

17  common flooding catastrophe had nothing to do with the validity

18  or invalidity of any insurance policy flood exclusion."

19          Well, I suggest that, based on your ruling, it has

20  everything to do with that.

21          And so they're admitting that that's the kind of

22  discovery that they're talking about going after in the class

23  certification matter, and that's the kind of stuff that we do

24  want to participate in, and we should want to participate in

25  because this Court has told us repeatedly that you don't want

1    duplication of discovery and that everybody is going to be

2    bound.

3            And we all have worked hard to find ways to

4    accomplish that in light of administratively closing cases and

5    things like that.  I mean, the Court and the litigants have

6    been thinking about this issue.

7            So, yes, we're very concerned.  Yes, we do have a dog

8    in the fight.  Yes, the MRGO concerns us, as well, because the

9    Plaintiffs have every intention, we understand, of claiming

10   that MRGO problems led to negligence, which led to flooding for

11   which we should be liable under your theory of the case,

12   perhaps.  And, you never said that in your Opinion, but that's

13   the way they interpret it.

14           So, we are interested in those and that's why we're

15   asking that they be put off a little bit, because you never

16   know where class certification discovery is going to lead.

17           It's not a simple matter, and people do, in

18   determining whether they have claims in common and so forth,

19   and what the causes of action really are there is "merits

20   discovery" that's going on in the class certification process,

21   whether you call it that or not.

22           So, that's what we're worried about and that's why we

23   were asking for this limited kind of postponement, if you will,

24   of those type of issues.

25           THE COURT:  You didn't talk about it specifically,

1   but just to specifically address the bifurcation portion of the

2   CMO, which attempts -- the attempt of the Court was to try to

3   resolve all aspects of insurance claims, other than legally

4   resolving the water damage.  In other words, let that be

5   ongoing, but no water damage discovery -- what I say by "water

6   damage discovery," what caused it, that kind of thing, in those

7   cases.

8           MR. HUBBARD:  Well, I'd be glad to speak to that.

9           THE COURT:  Yes.

10          MR. HUBBARD:  I mean, number one, any kind of stay

11  that you issue does not prevent parties from sitting down and

12  talking about settling all or part of their cases.

13          THE COURT:  No question about that.

14          MR. HUBBARD:  As a matter of fact, there have been a

15  lot of Mr. Bruno's cases that have been settled with multiple

16  insurance companies, and Jim Hall's cases, as well, with

17  respect to every kind of wind damage claim that -- for

18  everything except water damage and maybe they reserve VPL.  You

19  know, but there have been settlement agreements releasing all

20  claims entered in, you know, scores of cases.

21          And the parties have been working hard at finding

22  ways to do that.  I think State Farm was talking to Mr. Bruno

23  about that recently and I know that two or three of my clients

24  have.  They've been at his office as recently as a day or two

25  ago.  So, that's not getting put on the back burner, and it's

51

1    not being shut aside by any kind of stay order.

2              But, it's just not so simple --

3              THE COURT:  But, those individual cases, I'm assuming

4    you would be asking me not to set those for trial or at least

5    for pre-trial, as we set forth in the CMO.  I'm assuming you're

6    asking that.

7              MR. HUBBARD:  Right.

8              THE COURT:  For the individual cases -- not part of

9    the class action, but the individual cases that have made, in

10   addition to other allegations, a water damage exclusion --

11             MR. HUBBARD:  Well, yes.  And, a lot of these are in

12   cases where class action allegations were made, I think like

13   the Abadie case, which hasn't been, but is going to be

14   administratively closed, and Jim Hall's case, I think, if I'm

15   not mistaken.  A lot of named Plaintiffs in there, but maybe

16   some class action allegations, as well.  So, that's going

17   forward, regardless of what happens here.

18             But, where we really had a disconnect, Mr. Bruno and

19   me, is on the notion that you can do all of this discovery on

20   wind damage and it has no effect on what's going on with water

21   damage.  I mean, you're trying to avoid multiple depositions,

22   and I think that -- I don't know whether the Fifth Circuit

23   fully understood all this or not, but they certainly ruled that

24   they were shutting down all discovery.

25             But, if you are going to take the deposition of my

1  wind adjuster, as opposed to trying to settle the case and sit

2  there and talk with him, it's a different matter.  If you're

3  going to try to take his deposition, number one, I mean, in the

4  normal deposition of an adjuster you're going to talk about how

5  he interpreted the policy, what he relied on, why he did what

6  he did, and how much everything is worth, if you're getting the

7  case ready for trial.

8          And so there you're going to have to go to -- instead

9  of asking him what the value it is to repair the shingles that

10 were blown off the roof, if he's preparing that case for trial

11 right now, he's going to be dealing not with just that issue,

12 but he's going to be dealing with the water damage valuations,

13 how much does it cost to replace the flooring that got damaged

14 by the water -- things that many of them hadn't even done,

15 because they went out there and they were going to deny the

16 claim, insofar as water damage was concerned.  They were only

17 going to pay the wind damage.

18         So, it's not true that -- I mean, you're going to

19 wind up with multiple depositions of all these people, because

20 you can only talk to them about wind.  But, there's a whole lot

21 more to be said about water.

22         And, I think what the Fifth Circuit is telling us is

23 that:  We're going to just put that on hold for a little while.

24 We're going to hurry up and decide this case, and then we're

25 going to tell you what you need to worry about and what you

53

1    don't need to worry about.  And that's going to save all of you

2    a lot of money and a lot of time -- on both sides of the bar.

3    Because these Plaintiffs, you know, they're working hard, too.

4    And, it's going to make life a lot simpler for all of us.

5              So, I think that everything that we've asked for is

6    necessary, as a practical matter, and appropriate as a legal

7    matter.

8              THE COURT:  Anything else?

9              Hold on just one second.

10         (PAUSE)

11             THE COURT:  One, maybe, clarification:  Is it the

12    position of the Defendants that -- and we've been slow in this;

13    "we" the Court, because we've had a few other things to do and

14    we just haven't gotten to it.  On the Abadie, et al cases, we

15    were going to sever State Farm, open 600 new cases, and

16    administratively close the others; that was the general -- we

17    haven't done that yet.  Do the Defendants have any objection to

18    us doing that?

19             MR. HUBBARD:  To the best of my knowledge, no.  I

20    think we've discussed that at some length, and -- except for

21    State Farm.  State Farm has noted their objection, I think.

22             THE COURT:  Well, State Farm, I thought we agreed

23    that they would just be severed and they would roll on.

24             MR. HUBBARD:  Mr. Lee is here.

25             THE COURT:  In other words, my understanding was

54

1   State Farm would be not stayed, not administratively closed,

2   and we'd just -- you'd get 600 different numbers and these

3   cases would go ahead.

4           MR. LEE:  Your Honor, that particular --

5           THE COURT:  Subject to the stay, of course, that

6   there are water damage inclusion cases; well then they would be

7   immediately stayed.

8           But, I guess my point is:  It's your contention that

9   we have to hold that in abeyance, as well.

10          MR. LEE:  Your Honor, I guess I'll have to start at

11  the beginning.  Obviously, the discussion with regard to the

12  Abadie case all took place before any action was taken by the

13  Fifth Circuit, in terms of a stay of any of these

14  proceedings.

15          THE COURT:  Right.

16          MR. LEE:  So, at that point, there was no stay of

17  anything.

18          With regard to the Abadie case, we certainly did want

19  to be severed from the other Defendants. --

20          THE COURT:  And, we agreed we were going to do that,

21  absolutely.

22          MR. LEE:  -- That was going to be the course.

23          Now, there was another component of the Abadie case

24  and that is that the Abadie case also involves class

25  allegations, and we had filed a Motion to Strike the class

1   allegations.  But that class allegation is there in the

2   pleadings, and bears upon State Farm.

3            So, to the extent that Abadie has class allegations

4   that are also part of Chehardy, it is, I think, part of that

5   what we've been talking about, the spirit of the stay.  It is a

6   Chehardy class, in effect, --

7            THE COURT:  So, let me get --

8            MR. LEE:  There's just a lot of Plaintiffs.

9            THE COURT:  -- an answer yes or no:  You don't think

10  we can sign the severance in Abadie?

11           MR. LEE:  I guess I'm not sure know that it makes a

12  difference.

13           THE COURT:  Okay.  Well, you know, --

14           MR. LEE:  Because the stay --

15           THE COURT:  I intend to do it, unless some paper is

16  filed with me by next Wednesday by the Defendants.

17           MR. LEE:  Thank you, Your Honor.

18           THE COURT:  Okay.  I'll give you a little chance to

19  think about it.

20           MR. BRUNO:  Judge, may I --

21           THE COURT:  Okay, let me just say I'm about to stop

22  the music here, so if you've got to say something, make sure

23  it's pithy.

24           MR. BRUNO:  It's going to be pithy, and I only rise

25  because I didn't have a chance to address Ralph's --

1           THE COURT:  And I'm going to have to let Mr. Hubbard

2    talk last, since he was the Mover.  So, go ahead.

3           MR. BRUNO:  Certainly, Judge, but he didn't address

4    the issues with regard to the trial of these individual cases,

5    and I need to point out:  It is not correct that for me to try

6    John Doe's case, I need to take the deposition of his claims

7    adjuster to figure out the value of the flood loss.  That is

8    absolutely inaccurate.

9           He's talking about the claim that we may bring with

10   regard to the failure to pay timely, et cetera.

11          Our burden is simply to show that there's damage.

12   I'm going to have to prove how much damage there is.  I'm going

13   to have the burden of doing that.  So, it's really not --

14          THE COURT:  Let me make sure I understand where we

15   are.  We've got cases that are before me under the umbrella

16   that make a water damage exclusion.  That's not the only reason

17   the Plaintiffs are claiming damage.

18          We tried to deal with this as best we could in the

19   Case Management Order, but if you try the case -- tell me what

20   case you're trying.

21          MR. BRUNO:  I'm trying to that State Farm case you

22   just talked about, which the stay would keep me from trying.

23          THE COURT:  Okay.  But, how do you try the water

24   damage exclusion part of that?

25          MR. BRUNO:  Easy.  Because I'm going -- because my

1    burden is to show the quantum of damage.  So, the only thing

2    I've got to do is I agree to bifurcate my claim for them to pay

3    me for any damage that the finder of fact says came from the

4    flood, as opposed to a hole in the roof.

5                Now, so the only harm to them is that I, when I try

6    my case, I'm going to prove to the trier of fact that there was

7    $20 of wind damages, $20 of water damage from a hole in the

8    roof, and $20 from damage from the floor.

9                Now, --

10               THE COURT:  But, the damage from the flood -- let's

11   assume the court of appeal would affirm my decision, and let's

12   assume further, though, that you have to prove that the

13   particular harm involved was, in fact, flooded as a result of a

14   man-made act rather than over-topping or some other reason, and

15   wouldn't that be another trial?

16               I'm just curious about that.

17               MR. BRUNO:  If it does have to be another trial, --

18   it can be another trial, because it's been bifurcated, but

19   here's the deal:  If it's found to be man-made in one case,

20   it's going to be man-made in every case.  You're not going to

21   find -- based upon the water model that you --

22               THE COURT:  But, they shut down discovery on man-

23   made.  I mean -- it's a quagmire.

24               MR. BRUNO:  Well, it doesn't have to be.  I think

25   this:  I think we need the Court to be involved in this

1  process.  I, again, beg you for a special master to find a

2  way --

3          THE COURT:  Right now, I've got the Fifth Circuit to

4  deal with, sir, as do you and --

5          MR. BRUNO:  I know, Judge, but I think this:  The

6  first problem I have to deal with is, if a stay is entered,

7  then what difference does it make whether you sever out the

8  State Farm cases, if I can't try them, if I can't discover

9  them, if I can't push them?

10          What is their motivation to pay me money if I have

11  absolutely nothing to bargain with?

12          THE COURT:  Well, I assume that was argued -- I don't

13  know what was argued before the Fifth Circuit.  All I know is

14  I've got to grant it.

15          And, clearly, I could be a literalist, now, you

16  understand, and say it is limited to those.  I don't think that

17  would be particularly fair to the rest of the parties, but I

18  could do that, in my mind, as a strictly jurisdictional

19  analysis.

20          And then you would have to go back to the Fifth

21  Circuit and try to get it an expanded stay, get them to clarify

22  it, that kind of thing.

23          In other words, the law of the case is the cases that

24  are there.  But, the spirit of it, I think, is a decent

25  argument, and then we get into individual people.

1              You know, I hope you're right, Mr. Hubbard.  I hope

2       that this thing is decided quickly.  That would resolve a lot

3       of things, and everything I hope for comes true.

4              Go ahead, sir.

5              MR. HUBBARD:  Let me leave you with just two final

6       thoughts, and I haven't had an opportunity to talk to State

7       Farm about this, but State Farm won in this court on the water

8       damage question.

9              THE COURT:  Yes.

10             MR. HUBBARD:  I don't see those 500 or 600 State Farm

11      cases as being water damage cases.

12             THE COURT:  Right now, they're in good shape.  I know

13      there's an appeal.

14             MR. HUBBARD:  I think the rest of us are in agreement

15      with you, that we would like to see Abadie administratively

16      closed.  State Farm filed a motion and asked to be taken out of

17      the umbrella, I guess in part for the reasons that I'm saying

18      right now, --

19             THE COURT:  And, which we would do.

20             MR. HUBBARD:  -- and, you know, whatever the Court

21      does, the Court does.  But, I don't see them as being a part of

22      this issue, really.  They're standing alone.

23             THE COURT:  Okay.

24             MR. HUBBARD:  That's my opinion.

25             THE COURT:  That's a good point.

1          MR. HUBBARD:  And, then what Mr. Bruno is talking

2   about is two trials, and that's just -- I think that's exactly

3   what none of us want.  We don't want to have a wind damage

4   trial and the come back and have a water damage trial.

5          And, that's exactly what I'm saying.  If you want to

6   talk to my guy about wind damage, and yet he's going to

7   ultimately be trying a case about water damage, he's, number

8   one, got a lot more work to do and, number two, you're going to

9   be talking two depositions of the same guy and two trials.

10          And, I think, in addition, it's probably

11   unconstitutional to have two separate juries to decide the wind

12   damage and the water damage.

13          THE COURT:  Another interesting point.

14          MR. HUBBARD:  So, it just kind of can't be done.

15          THE COURT:  Another interesting point.

16          Thank you very much.  If you'll wait here about five

17   minutes, I'm going to have my troika discuss this and I'm going

18   to come back and I'm going to rule on this thing.

19       **(Recess from 3:20 p.m. to 3:29 p.m.)**

20          THE COURT:  Please be seated.

21          All right.  The Court is going to rule as follows --

22   and to the extent the Court is not sufficiently articulate, we

23   will reduce this to a very short writing.

24

25

1                    *    *    *    *    *

2                             **RULING**

3                    *    *    *    *    *

4          THE COURT:  First, the Fifth Circuit mandate Order

5    clearly mandates a complete stay of two of the cases pending

6    here and in the Fifth Circuit, the Chehardy case, Civil Action

7    Numbers 06-1672, 06-1673 and 06-1674; Vanderbrook, Civil Action

8    Number 05-6323.  And, there was a limited stay rendered as to

9    Xavier University, Civil Action 06-516.

10         With respect to Xavier, Footnote 4 of the stay motion

11   provides "Travelers Property Casualty America does not seek a

12   stay in Xavier University with respect to matters other than

13   the cause of the levee breaches."

14         So, there's a complete stay in two cases and a

15   partial stay in Xavier.  I mean, that's the mandate of the

16   Fifth Circuit.

17         The Court, in attempting to -- as best it understands

18   it, to comply with the spirit of the Fifth Circuit decision, is

19   going to make the following rulings:

20         First, there will be absolutely no stay with respect

21   to any cases under the levee umbrella or the MRGO umbrella, and

22   Robinson.  The spirit of the Fifth Circuit ruling has no effect

23   on those cases, jurisdictionally or substantively, in this

24   Court's opinion.

25         The Court is going to reserve its decision on whether

62

1    to sever the insurance cases from this umbrella.

2           The Court will extend the stay -- and it isn't

3    extending it, because, literally, if we literally read the

4    mandate, it's not that I'm going to extend the stay to all

5    discovery in the class action insurance cases.

6           I'm going to stay all class certification discovery

7    and all discovery relating to the common liability issues in

8    all insurance cases.

9           Now, in the individual adjusting claims, these are

10   individual cases, we, in the CMO, came up with a, hopefully,

11   carefully crafted language that never set anything for trial,

12   but allowed one of these individual people to seek a trial, and

13   to get on our docket.  When that happened, there can be

14   discovery, as determined by the magistrate judge, on non-levee

15   breach issues; your other issues, other than the water damage.

16   And, there is no stay there and I'm not extending the stay to

17   that.

18          So, that to implement the purpose of our CMO, which

19   is to at least allow these cases maybe to be settled, because

20   as you recall in the CMO, you automatically go to

21   Judge Wilkinson, and you have a settlement conference.  If it

22   can't be settled, we'll have to meet the daunting issue of

23   trial later.  But, if you notice, trial, per se, is not

24   mentioned in the CMO.

25          So, we're hoping -- that's just a path to get some of

1     these individual cases settled, and I'm not going to render the

2     stay as to the discovery in those cases or to act in those

3     cases, except as to common liability issues in the water damage

4     exclusion.

5            In essence, summing up, I'm not going to extend the

6     stay to levee or MRGO, all cases therein.

7            Mr. Bruno, you've filed your Master Complaint and,

8     although Mr. Hubbard and the Defendants sought to prevent that,

9     I'm going to allow that to remain filed, but I'm going to stay

10    and suspend any necessity of any Defendant to respond thereto

11    until further order of this Court, meaning that you are under

12    no obligation to do anything -- "you," the Defendants -- until

13    further order of this Court, and that probably will become when

14    we are enlightened by the court of appeal decision and, of

15    course, any insurance category; that Master Complaint in the

16    insurance category.  The others will go on, as described in the

17    CMO.

18           And, I think any party has a right to come before

19    this Court at any time to file a motion for me -- either the

20    Defendant or the Plaintiff -- for me to clarify, to modify, as

21    long as I am keeping within the mandate of the Fifth Circuit,

22    as I understand it.

23           I think that it is important, since Chehardy is the

24    lead case, for me apply the spirit and to shut down discovery

25    in all of the class action cases with reference to class

1   certification, common liability, the insurance executive,

2   et cetera.  I think that's really in the spirit of the Order.

3           And, we will put it in writing, so that it's

4   relatively, hopefully, clear.  Hopefully, it's clear now.  But,

5   that's my Order.

6           And, don't any of you hesitate, no matter if the

7   Court renders an excoriating diatribe in the beginning -- but I

8   may again, because I did feel like:  Wait a minute, there's no

9   jurisdiction here.

10          And there isn't.  But, you know, as Prosser

11  (phonetic) said in the *Law of Assault*, there's no harm in

12  asking.  So, I guess you really haven't committed an assault.

13          So, with that, we will adjourn for the day and issue

14  something in writing.

15          All right.  We're adjourned.

16                      *    *    *    *    *

17                  (Hearing is Concluded)

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**/s/Dorothy M. Bourgeois**                **3/21/07**
**Dorothy M. Bourgeois**                     **Date**