COURT OF AP...

DEC 0 8 2006

...ORLEANS L...

No. 06-

# 06-00056

IN THE

# United States Court of Appeals for the Fifth Circuit

In Re: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

**PERTAINS TO: INSURANCE**
Chehardy, C.A. Nos. 06-1672, 06-1673, and 06-1674

GLADYS CHEHARDY, et al.,

Plaintiffs-Appellees,

v.

STATE FARM FIRE & CASUALTY CO., et al.,

Defendants-Appellants.

U.S. COURT OF APPEALS
**FILED**

DEC 0 8 2006

**CHARLES R. FULBRUGE III
CLERK**

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 05-4182

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b) BY DEFENDANT-APPELLANT GREAT NORTHERN INSURANCE COMPANY

STEVEN W. USDIN, 12986
EDWARD R. WICKER, JR., 27138
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 589-9700

H. CHRISTOPHER BARTOLOMUCCI
CHRISTOPHER T. HANDMAN
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600

Counsel for Defendant-Appellant Great
Northern Insurance Company

No. 06-_____

IN THE

# United States Court of Appeals for the Fifth Circuit

In Re:  KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

**PERTAINS TO:  INSURANCE**
Chehardy, C.A. Nos. 06-1672, 06-1673, and 06-1674

GLADYS CHEHARDY, et al.,

Plaintiffs-Appellees,

v.

STATE FARM FIRE & CASUALTY CO., et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 05-4182

**PETITION FOR PERMISSION TO APPEAL PURSUANT TO
28 U.S.C. § 1292(b) BY DEFENDANT-APPELLANT
GREAT NORTHERN INSURANCE COMPANY**

STEVEN W. USDIN, 12986
EDWARD R. WICKER, JR., 27138
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone:  (504) 589-9700

H. CHRISTOPHER BARTOLOMUCCI
CHRISTOPHER T. HANDMAN
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Telephone:  (202) 637-5600

Counsel for Defendant-Appellant Great
Northern Insurance Company

## CERTIFICATE OF INTERESTED PERSONS

(1)    In Re: Katrina Canal Breaches Consolidated Litigation, No. 05-4182. Pertains to: Insurance (Chehardy, Nos. 06-1672/1673/1674).

(2)    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs:**
1.    Gladys Chehardy
2.    Daniel Fontanez
3.    Jacquelyn Fontanez
4.    Larry Forster
5.    Glenda Forster
6.    Kenneth Maier
7.    Judith Maier
8.    Randy Gervais
9.    Lori Gervais
10.    Andre Mauberret
11.    Marlin Mauberret
12.    Debbie Strawn
13.    Dave Strawn
14.    Stephanie Boyd
15.    Brad Boyd
16.    New Orleans Flooring Supply, Inc.
17.    Shawn Burst
18.    Angelina Burst
19.    Susan Brown (incorrectly identified as Patricia Brown in Amended Complaint)
20.    Marie Fatheree
21.    Katrina Daniels
22.    Lionel Jones
23.    Edna Jones
24.    Karen Lewis
25.    Shane Sylvester
26.    Austra Zapata
27.    Sabrina Perkins
28.    Eldridge Pollard

29. Michael Peterson
30. Wendell Glation
31. Mack Barham

**Counsel for Plaintiffs:**
32. Joseph M. Bruno
33. David S. Scalia
34. Bruno & Bruno
35. Joseph J. McKernan
36. Gordon J. McKernan
37. Chet Boudreaux
38. McKernan Law Firm
39. Calvin C. Fayard, Jr.
40. Fayard & Honeycutt
41. John N. Ellison
42. Darin McMullen
43. Anderson Kill & Olick, PC
44. Drew Ranier
45. N. Frank Elliot, III
46. Ranier, Gayle & Elliot, L.L.C.

**Defendants and Counsel:**
47. Great Northern Insurance Company
48. Steven W. Usdin
49. Edward R. Wicker, Jr.
50. Barrasso Usdin Kupperman Freeman & Sarver, L.L.C.
51. State Farm Fire & Casualty Company
52. Wayne J. Lee
53. Stephen G. Bullock
54. Sarah House Barcellona
55. Stone, Pigman, Walther, Wittmann, LLC
56. Allstate Insurance Company
57. Allstate Indemnity Company
58. Judy Y. Barrasso
59. Lafayette Insurance Company
60. Howard Bruce Kaplan
61. Bernard, Cassisa, Elliot & Davis
62. Liberty Mutual Fire Insurance Company
63. H. Minor Pipes, III
64. The American Insurance Company

65. Kelly Cambre Bogart
66. Nicole McDaniel Bowen
67. Jamie Michele Cambre
68. Kevin R. Derham
69. Lawrence J. Duplass
70. Duplass, Zwain, Bourgeois, Morton, Pfister & Weinstock
71. AAA Homeowners Auto Club Family Insurance Company
72. Alan J. Yacoubian
73. Neal J. Favret
74. Johnson, Johnson, Barrios & Yacoubian
75. Louisiana Citizens Property Insurance Corporation
76. John William Waters, Jr.
77. Gregory J. McDonald
78. Bienvenu, Foster, Ryan & O'Bannon
79. Traveler's Property Casualty Company of America
80. Stephen E. Goldman
81. Wystan M. Ackerman
82. Robinson & Cole, L.L.P.
83. Ralph Shelton Hubbard, III
84. Seth Andrew Schmeekle
85. Joseph Pierre Guichet
86. Tina L. Garmon
87. Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
88. Lexington Insurance Company
89. Robert I. Siegel
90. John E. Baay, III
91. Daniel Gibbons Rauh
92. Geiger, LaBorde & Laperouse, L.L.C.
93. Richard Doren
94. Anthony Edelstein
95. Daniel W. Nelson
96. Gibson, Dunn & Crutcher
97. Encompass Insurance Company of America
98. Susan M. Rogge
99. AEGIS Security Insurance Company
100. Maura Zivalich Pelleteri
101. Andrea A. Mittleider
102. Amy M. Seltzer
103. Krebs, Farley & Pelleteri, L.L.C.
104. Hanover Insurance Company

105. Paul E.B. Glad
106. David R. Simonton
107. Andrew R. Greene
108. Sonnenschein, Nath & Rosenthal
109. Kristopher T. Wilson
110. LaDonna Grey Wilson
111. H. Christopher Bartolomucci
112. Christopher T. Handman
113. Dominic F. Perella

**District Court Judge Rendering Decision Below**

114. Honorable Stanwood R. Duval, Jr., U.S. District Court for the Eastern District of Louisiana

Christopher T. Handman
HOGAN & HARTSON LLP

Attorney of record for Great
Northern Insurance Company

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

TABLE OF CONTENTS.............................................................................................v

TABLE OF AUTHORITIES ...................................................................................vi

INTRODUCTION ...................................................................................................1

QUESTION PRESENTED.......................................................................................3

STATEMENT OF FACTS ......................................................................................3

REASONS WHY THE APPEAL SHOULD BE ALLOWED ................................6

   I.    THE DISTRICT COURT'S RULING SATISFIES THE
       REQUIREMENTS OF SECTION 1292(b)...................................................7

   II.   THE DISTRICT COURT'S RULING IGNORED THE PLAIN
       MEANING OF THE WORD "FLOOD" AND CONFLICTS
       WITH DECISIONS OF OTHER COURTS ACROSS THE
       COUNTRY .................................................................................................11

       A. "Flood" Means Water Flowing Onto Normally Dry Land,
          Regardless Of Cause ...........................................................................11

       B. The Negligent Planning, Construction, Or Maintenance
          Exclusion Applies To Bar Flood Claims ...............................................18

   III.  THE NATURE OF THIS CASE CUTS STRONGLY IN
       FAVOR OF GRANTING THE PETITION ...............................................19

CONCLUSION AND RELIEF SOUGHT ...............................................................20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

Bartlett v. Continental Divide Ins. Co., 697 P.2d 412
    (Colo. Ct. App. 1984), aff'd, 730 P.2d 308 (Col. 1986),....................................14

Bearry v. Beech Aircraft Corp., 818 F.2d 370 (5th Cir. 1987)................................19

Buente v. Allstate Property & Cas. Ins. Co., 2006 WL 980784
    (S.D. Miss. April 12, 2006) ..........................................................................9, 10

Cadwallader v. Allstate Ins. Co., 848 So. 2d 577 (La. 2003)............................12, 18

Dobson v. Allstate Ins. Co., 2006 WL 2078423
    (E.D. La. July 21, 2006)...................................................................................9

E.B. Metal & Rubber Indust., Inc. v. Federal Ins. Co.,
    444 N.Y.S.2d 321 (App. Div. 1981)................................................................14

Egle v. Allstate Ins. Co., 889 So. 2d 413
    (La. Ct. App. 2004)............................................................................................7

Florida E. Coast Ry.v. United States, 519 F.2d 1184
    (5th Cir. 1975)..................................................................................................12

Fontenot v. Diamond B Marine Servs., Inc., 937 So. 2d 425
    (La. Ct. App. 2006)..........................................................................................12

Garcia v. United States, 469 U.S. 70 (1984)............................................................17

Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970)............................................8

Gibbens v. Whiteside, 915 So. 2d 866 (La. Ct. App.), writ
    denied, 917 So. 2d 1116 (La. 2005)..................................................................7

Harrison v. PPG Indus., Inc., 446 U.S. 578 (1980) .................................................17

Kane v. Roby Ins. Co., 768 P.2d 678 (Colo. 1989)....................................8, 9, 14, 16

Louisiana v. All Property & Cas. Ins. Carriers Authorized &
   Licensed to Do Business In State, 937 So. 2d 313 (La. 2006) ....................2, 3, 8

Mayo v. State Farm Mut. Auto. Ins. Co., 869 So. 2d 96
   (La. 2004).............................................................................................................12

Pakmark Corp. v. Liberty Mut. Ins. Co., 114 F3d 731
   (8th Cir. 1997).......................................................................................................9

Parcel Tankers, Inc. v. Formosa Plastics Corp., 764 F.2d 1153
   (5th Cir.1985).......................................................................................................10

Reynolds v. Select Props.,Ltd., 634 So. 2d 1180 (La. 1994)...................................11

Riverwood Int'l Corp. v. Employers Ins. of Wausau,
   420 F.3d 378 (5th Cir. 2005) ..........................................................................11, 12

Schenkel & Shultz, Inc. v. Homestead Ins. Co.,
   119 F.3d 548 (7th Cir. 1997) ...............................................................................17

Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery
   Assocs., Inc., 86 F.3d 656 (7th Cir. 1996).......................................................8, 10

TNT Speed & Sport Ctr., Inc. v. American States Ins. Co.,
   114 F.3d 731 (8th Cir. 1997) ............................................................................9, 14

U.S. Rubber Co. v. Wright, 359 F.2d 784 (9th Cir. 1966) .......................................19

Wallace v. Louisiana Citizens Prop. Ins. Corp., 444 F.3d 697
   (5th Cir. 2006)...................................................................................................4, 8

Wallis v. Country Mut. Ins. Co., 723 N.E. 2d 376
   (Ill. App. Ct.), appeal denied, 731 N.E. 2d 772 (Ill. 2000)..................................15

STATUTES:

28 U.S.C. § 1292(b) .........................................................................................passim

La. Civ. Code art. 2046 ..........................................................................................11

La. Civ. Code art. 2047 ..........................................................................................11

La. Civ. Code art. 2053 ..........................................................................................12

La. Civ. Code art. 2056 ........................................................................... 12

OTHER AUTHORITIES:

Black's Law Dictionary (5th ed. 1979) ................................................... 16

FEMA Web site on flooding and other hazards, available
    online at http://www.fema.gov/hazard/flood/index.shtm .................. 13

Johnstown Flood Museum Web Site, available online at
    http://www.jaha.org/FloodMuseum/history.html .............................. 13

New York Times (Aug. 30, 2005) .......................................................... 13

Charles A. Perry, "Significant Floods in the United States
    During the 20th Century—USGS Measures a Century of
    Floods," available online at
    http://ks.water.usgs.gov/Kansas/pubs/fact-sheets/fs.024-
    00.html#HDR6 ................................................................................. 13

President Bush's Speech From New Orleans (Sept. 15, 2005),
    available online at
    http://whitehouse.gov/news/releases/2005/09/20050915-
    8html ............................................................................................... 13

Webster's Third New International Dictionary of the English
    Language (2002) .............................................................................. 16

Charles A. Wright & Arthur R. Miller, Federal Practice and
    Procedure § 3929 (1977) ................................................................. 10

## INTRODUCTION

This case is about whether the word "flood" should be accorded its ordinary, plain, and generally prevailing meaning. How this Court resolves that ordinary-sounding question will have extraordinary consequences for homeowners, insurers, and the courts of this Circuit. That is because this case—part of a consolidated and ever-growing litigation docket—arises out of the devastation that Hurricane Katrina unleashed on the Gulf Coast. As in all these cases, plaintiffs have sued an insurance company—here, Great Northern Insurance Company ("Great Northern")—seeking coverage for losses they sustained as a result of the torrential waters that swept through and inundated New Orleans. And like the insurers in each of these cases, Great Northern filed a motion to dismiss, explaining that the policies at issue expressly excluded coverage for <u>all</u> losses "caused by * * * flood."

The District Court, however, denied the motion because it deemed the term "flood" ambiguous. According to the District Court, whether a flood is a "flood" depends on whether it was the result of a natural phenomenon or the product of human negligence. And because Great Northern did not specifically exclude coverage for "floods" of the human-negligence variety—and because plaintiffs suggest that their losses stem from negligence that allowed the levees to break— the District Court refused to apply the policy's exclusion.

The District Court's decision is wrong and should be reversed.  It is wrong because there is nothing ambiguous about the word "flood."  Precedent and commonsense both recognize that a "flood"—regardless of its provenance or cause—is just that:  a flood.  Nor is there any question that what ravaged New Orleans during Hurricane Katrina was a flood.  Indeed, the Louisiana Supreme Court only recently observed that "[i]n the City of New Orleans, where the levees failed, <u>flood waters</u> swamped large portions of the City." <u>Louisiana</u> v. <u>All Property & Cas. Ins. Carriers Authorized & Licensed to Do Business in State</u>, 937 So. 2d 313, 316 (La. 2006) (emphasis added).

The important question in this case must ultimately be answered—and will be answered—by this Court.  The only question is when.  Great Northern—along with the other insurers who participated below—urges this Court to accept the District Court's certification under 28 U.S.C. § 1292(b) and resolve this key question now.  Not only is that question a "controlling" one, but it is one on which there is a "substantial ground for difference of opinion." <u>Id.</u>  Indeed, the District Court's decision not only conflicts with decisions from various federal and state appellate courts, but it has also precipitated an intra-Circuit split with other district courts in this jurisdiction.  This Court should accordingly grant the petition for permission to appeal.

- 2 -

## QUESTION PRESENTED

Is a flood resulting from Hurricane Katrina, which inundated New Orleans

and which was allegedly caused in part by faulty levees, excluded from coverage

under an insurance policy which expressly excludes coverage for (1) damage that

in any way results from flood from any source; (2) damage that in any way results

from overflow of water from a body of water from any source; and (3) loss caused

by faulty planning, construction or maintenance?

## STATEMENT OF FACTS NECESSARY TO UNDERSTAND
## THE QUESTION PRESENTED

Plaintiffs are putative class representatives for residents of the Orleans, St.

Bernard, and Jefferson Parishes whose property sustained flood damage following

Hurricane Katrina. Am. Compl. ¶¶ 26-27 (Docket No. 445). According to

plaintiffs, "the levees around the City and adjoining parishes failed in at least eight

(8) distinct locations," ultimately leaving "six to eight feet of water in the City's

Lower Ninth Ward." Id. ¶¶ 41-43.

As plaintiffs put it, their property was damaged as a direct result of this "vast

amount of water that entered the City of New Orleans." Id. ¶ 46. Of course, this

"vast amount of water that entered the City" is known by a common name:

"flood." After all, the Louisiana Supreme Court just recently emphasized that

"flood waters swamped large portions of the City" when the levees failed. All

Property & Cas. Ins. Carriers, 937 So. 2d at 316 (emphasis added). So too, this

Court has called the "damage due to Hurricane Katrina" exactly what it is: "flood

- 3 -

damage." <u>Wallace</u> v. <u>Louisiana Citizens Prop. Ins. Corp.</u>, 444 F.3d 697, 699 (5th Cir. 2006). And lest there be any doubt about the matter, the District Court itself acknowledged that "[c]ertainly, the damage sued upon was caused by flooding." Slip Op. at 44 (attached as Ex. A).

This is important because Great Northern's policies expressly exclude coverage for all losses caused by "flood." <u>See</u> Great Northern Policy at B-8 (Exhibit to Docket No. 936-2) ("Policy"). As the Policy unambiguously provides:

> **Surface Water.** We do not cover any loss caused by:
> - <u>flood</u>, surface water, waves, tidal water or water borne material from any of these;
> - overflow of water or water borne material from a body of water;
>   * * *
>
> <u>from any source</u>, even if driven by wind.

<u>Id.</u> (emphases added). The Policy also states that the term "caused by" in the above excerpt "means any loss that is contributed to, made worse by, <u>or in any way results from</u> that peril." <u>Id.</u> at B-7 (emphasis added).

Undeterred by the exclusion's plain language, plaintiffs brought suit seeking recovery for the flood-related losses they sustained from Hurricane Katrina, arguing that their losses were not really caused by a "flood." According to plaintiffs, a flood is a flood only when it results from purely natural forces. What caused their damages instead—or so goes the argument—was not natural forces but instead human negligence in failing to adequately construct levees (designed,

- 4 -

of course, to restrain natural forces).  <u>See</u> Am. Compl. at ¶ 3.  But regardless of

whether that theory makes any sense, it would still not be enough to entitle

plaintiffs to coverage under the Great Northern policies.  That is because those

policies also specifically and expressly exclude coverage for damage caused by

negligent design, construction, or maintenance:

> We do not cover any loss caused by <u>the faulty acts, errors
> or omissions of you or any other person in planning,
> construction or maintenance.  It does not matter whether
> the faulty acts, errors or omissions take place on or off
> the insured property.</u>  But we do insure ensuing covered
> loss unless another exclusion applies.

Policy at B-9 (emphasis added).  Given these clear and unambiguous exclusions,

Great Northern filed a motion to dismiss plaintiffs' claims for their Hurricane

Katrina water-based damages.

The District Court denied the motion.  It did so because it concluded that the

word "flood" is actually ambiguous.  Endorsing the same distinction that plaintiffs

urged, the District Court ruled that "flood" could refer either to "naturally

occurring events" or to exclusively "man-made events."  Ex. A at 30.[1]  Thus, by

purporting to unearth an ambiguity in the term "flood," the District Court went on

to hold that even though "the damage sued upon was caused by flooding"—and

---

[1]    The District Court's specific discussion of Great Northern may be found at pp. 77-78 of
its Order.  Most of its legal analysis, however, appears earlier in the Order during its discussion
of <u>Vanderbrook</u>, another case within the Katrina umbrella.  The court incorporated that analysis
into its holding as to Great Northern.  Ex. A at 78.

even though the insurance policies excluded "flood" damage from coverage—the exclusion could not be enforced because it did not "clearly exclude water damage caused by negligent or intentional acts of man." Id. at 44, 77.

The court also refused to enforce the negligence exclusion. It reasoned that plaintiffs' alleged losses were caused not just by negligence but also by the ensuing flooding, that the flooding was an "'ensuing covered loss,'" and that therefore the negligence exclusion did not apply. Id. at 77-78 (quoting Policy at B-9). In sum, then, (1) damage from a "flood" is not covered under the Great Northern Policy, (2) damage from negligence is not covered under the Great Northern Policy, but (3) the District Court nonetheless concluded that damage from negligence that causes a flood is covered by the Great Northern Policy.

Recognizing that its decisions in these consolidated cases "involve a controlling question of law as to which there is a substantial ground for a difference of opinion and an immediate appeal from these orders may materially advance the ultimate termination of the litigation," the District Court sua sponte certified its orders as immediately appealable under 28 U.S.C. § 1292(b). Ex. A at 85. Great Northern timely filed this petition for permission to appeal.

## REASONS WHY THE APPEAL SHOULD BE ALLOWED

This Court should grant the petition for permission to appeal. Not only does the District Court's order satisfy the requirements set forth in Section 1292(b), but

- 6 -

it also concerns a question of exceptional regional—even national—importance.
As the District Court recognized, "the potential impact of [its] decision on
individuals as well as the insurance industry might be considered overwhelming."
Ex. A at 4. And given the hundreds of lawsuits—raising thousands of claims—that
have been filed in this Circuit's district courts, this Court has an especially keen
interest and responsibility in articulating as early as possible a uniform rule of
decision. The Court should therefore let this appeal proceed.

## I.     THE DISTRICT COURT'S RULING SATIFIES THE REQUIREMENTS OF SECTION 1292(b).

To warrant interlocutory appeal under Section 1292(b), the District Court's
order must involve (1) "a controlling question of law," (2) "as to which there is
substantial ground for difference of opinion," and (3) "an immediate appeal from
the order may materially advance the ultimate termination of the litigation." 28
U.S.C. § 1292(b); see Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 205 (1996).
The District Court's order does just that.

1.     The interpretation of an insurance contract, including the question of
whether an insurance contract provision is ambiguous, is a question of law.
Gibbens v. Whiteside, 915 So. 2d 866, 869 (La. Ct. App. 2005); Egle v. Allstate
Ins. Co., 889 So. 2d 413, 415 (La. Ct. App. 2004). And here that question is
controlling because it resolves the central legal issue in the case: whether Great
Northern's policies provide coverage for flood damage. If this Court reverses the

ruling below—and confirms that Great Northern's homeowner policies exclude

flood damage regardless of the cause—then the plaintiffs' claims in Chehardy will

be dismissed. The question presented is thus a controlling question of law, as the

District Court certified. See Garner v. Wolfinbarger, 430 F.2d 1093, 1097 (5th Cir.

1970) ("Review under § 1292(b) is available where decision on an issue would

affect the scope of the evidence in a complex case, even short of requiring

complete dismissal"); Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery

Assocs., Inc., 86 F.3d 656, 659 (7th Cir. 1996) (question may be deemed

controlling "if its resolution is quite likely to affect the further course of the

litigation, even if not certain to do so").

      2.     The District Court also frankly and correctly acknowledged that there

is "substantial ground for a difference of opinion" about whether the term "flood"

can be parsed to mean different things depending on the causes that propel the

flood. Ex. A at 85. Not only have the Louisiana Supreme Court and this Court

already accurately characterized the damage that wracked New Orleans as "flood"

damage, see All Property & Cas. Ins. Carriers, 937 So. 2d at 316; Wallace, 444

F.3d at 699, but the only courts in this Nation that have squarely addressed the

issue that the court below resolved have unanimously taken an approach contrary

to that of the District Court. Thus in Kane v. Royal Insurance Co., 768 P.2d 678

(Col. 1989), the Colorado Supreme Court held that "[t]he generally accepted

meaning of the term 'flood' does not include a distinction between artificial and natural floods." Id. at 680-681.  And given that the Kane court's view has been echoed by the Eighth Circuit[2] and the Missouri Court of Appeals,[3] the District Court was exactly right in finding "substantial ground for a difference of opinion" about the result it reached.  Ex. A at 85.

Moreover, the District Court's holding puts it at odds with at least two other district courts in this Circuit, which have concluded within the past year that flood exclusions just like Great Northern's were "clear and unambiguous."  In Dobson v. Allstate Ins. Co., 2006 WL 2078423 (E.D. La. July 21, 2006), Judge Vance held that a similar flood exclusion was "clearly worded" and that the "clear policy language" indicated that flooding caused by hurricanes is excluded.  Id. at *11. Indeed, the court held that the language was so "clear[]" that an insured could not justifiably rely on an agent's alleged representations that the policy actually covered flood.  Id. at *12.  And in Buente v. Allstate Property & Cas. Ins. Co., 2006 WL 980784 (S.D. Miss. Apr. 12, 2006), Judge Senter held that flood exclusions worded almost identically to Great Northern's were "drawn quite broadly, and they have the clear purpose of excluding damage caused by

---

[2]    See TNT Speed & Sport Ctr., Inc. v. American States Ins. Co., 114 F.3d 731, 732-733 (8th Cir. 1997) (enforcing flood exclusion similar to the one at issue where flood was caused by vandals who had removed sandbags and dirt from the levee).

[3]    See Pakmark Corp. v. Liberty Mut. Ins. Co., 943 S.W.2d 256, 261-262 (Mo. Ct. App. 1997) (enforcing flood exclusion where flood was caused by faulty levee).

inundation." Id. at *1. Declining to find an ambiguity where none existed, Judge Senter emphasized that "[t]he inundation that occurred during Hurricane Katrina was a flood, as that term is ordinarily understood." Id. (citing Mississippi contract principles indistinguishable from Louisiana contract law).

Section 1292(b) provides an ideal mechanism—and this case is an ideal vehicle—for resolving this intra-Circuit split. See Parcel Tankers, Inc. v. Formosa Plastics Corp., 764 F.2d 1153, 1156 (5th Cir. 1985) ("'The discretion afforded the courts of appeal in reviewing petitions for leave to bring § 1292(b) appeals has been likened to that of the Supreme Court in controlling its certiorari jurisdiction.'") (quoting Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3929, at 141 (1977)).  For this reason, and others described in more detail infra, there exists a "substantial ground for difference of opinion" as to the correctness of the District Court's Order.

3.      There is no question that this interlocutory appeal will materially advance the ultimate termination of the case—and countless others all pending on the dockets of this Circuit's lower courts.  If this Court reverses the District Court's decision and holds that the flood-damage exclusion bars coverage for the water damage alleged by plaintiffs, such a ruling will be dispositive. See Sokaogon, 86 F.3d at 659 (holding that "materially advance" criterion under Section 1292(b) was satisfied where a reversal would be dispositive).  Alternatively, even if this Court

- 10 -

were to affirm Judge Duval's ruling in part or in whole, the legal guidance provided by the Court would help expedite proceedings in the lower courts and avoid needless litigation over irrelevant issues. Because the District Court correctly found that all three statutory factors under Section 1292(b) are present here, this Court should grant the petition for permission to appeal.

## II.   THE DISTRICT COURT'S RULING IGNORED THE PLAIN MEANING OF THE WORD "FLOOD" AND CONFLICTS WITH DECISIONS OF OTHER COURTS ACROSS THE COUNTRY.

### A.   "Flood" Means Water Flowing Onto Normally Dry Land, Regardless Of Cause.

Where, as here, the term "flood" is not specifically defined in an insurance policy, it must be given its plain, ordinary, and generally prevailing meaning. See La. Civ. Code art. 2047; Reynolds v. Select Props., 634 So. 2d 1180, 1183 (La. 1994); see also Riverwood Int'l Corp. v. Employers Ins. of Wausau, 420 F.3d 378, 383 (5th Cir. 2005). And "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences," that is the end of the inquiry, for Louisiana law at that point forbids any "further interpretation * * * in search of the parties' intent." La. Civ. Code art. 2046. Although the District Court purported to recognize this, it emphasized that ambiguities in a policy should be resolved against an insurer. Ex. A. at 84. But that tie-breaking rule of contract interpretation kicks in only if the policy is indeed ambiguous. Where there is no ambiguity in the plain language of the policy, the court must not engage in a "perversion of the words or the exercise

- 11 -

of inventive powers to create an ambiguity where none exists." <u>Cadwallader</u> v. <u>Allstate Ins. Co.</u>, 848 So. 2d 577, 580 (La. 2003) (internal citations omitted). <u>See</u> <u>Mayo</u> v. <u>State Farm Mut. Auto. Ins. Co.</u>, 869 So. 2d 96, 99 (La. 2004); <u>Riverwood</u> <u>Int'l</u>, 420 F.3d at 382.

No such ambiguity lurks here. The plain, ordinary, and generally prevailing meaning of the word "flood" is the inundation of normally dry land with water. Indeed, this Court need look no further than its own decision in <u>Florida E. Coast</u> <u>Ry.</u> v. <u>United States</u>, 519 F.2d 1184, 1992 (5th Cir. 1975), to confirm that commonsense view. <u>See id.</u> (for purposes of statutory interpretation, adopting a definition of "flood" as "water which inundates an area of the surface of the earth where it ordinarily would not be expected to be") (quotation marks and citation omitted). The word "flood" does not subsume any notion of causation; a flood is a flood regardless of what triggers the deluge. Indeed, the residents of New Orleans would be surprised to learn that what happened to their city was not a flood. After all, newspaper articles have consistently referred to the disaster as a flood,[4] the President of the United States repeatedly called the New Orleans inundation a

---

[4]    <u>See</u>, <u>e.g.</u>, Joseph B. Treaster & Kate Zernike, "Hurricane Slams Into Gulf Coast," N.Y. Times, Aug. 30, 2005, at A1 (reporting that "[f]loodwaters rose to rooftops in one neighborhood" and that "an estimated 40,000 homes [were] reported flooded in St. Bernard Parish").

flood,[5] and a Google search for the words "Hurricane Katrina" and "flood"
produces 966,000 results.

The word "flood" has never had the narrow meaning that the District Court
ascribed to it. Indeed, the most infamous flood in U.S. history until last year—the
Great Flood of 1889, which swept through Johnstown, Pennsylvania and killed
more than 2,000 people—was caused at least in part by negligence, namely, a
"neglected dam."[6] Moreover, the U.S. Geological Survey's comprehensive study
on "Significant Floods in the United States During the 20th Century" contains an
entire section on "<u>Dam- and Levee-Failure Floods</u>," warning that if a dam or levee
"fails or is washed out, the water behind it is released to become a <u>flash flood.</u>
<u>Failed dams or levees can create floods</u> that are catastrophic to life and property."
(emphasis added).[7]

More importantly, every court to deal squarely with this issue has concluded
that a "flood" includes a man-made event. As we have already explained, the
Colorado Supreme Court in <u>Kane</u> rejected the very contention made by plaintiffs in
this case. It held that "[t]he generally accepted meaning of the term 'flood' does

---

[5]     <u>See</u> President Bush's Speech From New Orleans (Sept. 15, 2005), <u>available online at</u>
http://www.whitehouse.gov/news/releases/2005/09/20050915-8.html.

[6]     <u>See</u> Johnstown Flood Museum Web Site, <u>available online at</u>
http://www.jaha.org/FloodMuseum/history.html.

[7]     <u>See</u> Charles A. Perry, "Significant Floods in the United States During the 20th Century—
USGS Measures a Century of Floods," <u>available online at</u>
http://ks.water.usgs.gov/Kansas/pubs/fact-sheets/fs.024-00.html#HDR6.

- 13 -

not include a distinction between artificial and natural floods. * * * The inundation of insureds' normally dry land falls squarely within [several quoted] generally accepted definitions of the term 'flood.'" Kane, 768 P.2d at 680-681.  Likewise, in Bartlett v. Continental Divide Ins. Co., 697 P.2d 412 (Colo. Ct. App. 1984), aff'd, 730 P.2d 308 (Colo. 1986), "flood" was held to mean "'a body of water * * * overflowing or inundating land not usually covered, and no distinction is made between natural and artificial causes.'" Id. at 413 (citation omitted) (emphasis added).  The court therefore applied the flood exclusion, even though—just like the allegations in this case—the damage resulted from the release of water by a failed dam.  And in TNT Speed & Sport Center, Inc. v. American States Ins. Co., 114 F.3d 731 (8th Cir. 1997), the court enforced a flood exclusion much like the one at issue here after a levee broke because vandals removed sandbags and dirt from the levee.  Id. at 732-733.  See also E.B. Metal & Rubber Indus., Inc. v. Federal Ins. Co., 444 N.Y.S.2d 321, 322 (App. Div. 1981)[8] (after rains caused dike to give way, court found flood exclusion unambiguous, stating that "[a]ll the policy requires is that there be rising waters which break through boundaries and flow upon the insured's land to constitute a flood.  It is irrelevant that a defect in the dike may have also contributed to the break."); Wallis v. Country Mut. Ins. Co., 723 N.E.2d 376, 377 (Ill. App. Ct.) ("flood" is water that "escapes from a watercourse in large

---

[8]       Great Northern is a wholly owned subsidiary of Federal Insurance Company.

volumes * * * ending up in an area where it would not normally be expected"), appeal denied, 731 N.E.2d 772 (Ill. 2000).[9]

Instead of acknowledging the commonsense understanding of the word "flood," or accepting the strong precedential support for such a commonsense definition, the District Court relied on inapposite case law, irrelevant canons of construction, and cherry-picked words from dictionary definitions to conclude that the word "flood" is ambiguous.

As to the case law, the District Court relied almost exclusively on demonstrably distinguishable cases in which water leaked from a pipe and the "flood" exclusion was found not to apply. See Ex. A at 27-29. It is hardly surprising that courts faced with leaking pipes would conclude the damage was not caused by a "flood"; in those cases, unlike this one, the water damage falls outside the plain and ordinary meaning of the word. In addition to these inapposite cases, the District Court relied heavily on the dissenting opinion in Kane, supra, even though it acknowledged that "the majority [in Kane] held that the term 'flood' in

---

[9]     The District Court failed to meaningfully distinguish any of these cases. It argued that some were inapplicable because the distinction between "natural" floods and "man-made" floods was not explicitly raised by the parties. Ex. A at 30. But that does nothing to undercut the import of the cases, which held insurance flood exclusions applicable to both natural and man-made flows of water. Furthermore, the very fact that the distinction was not raised undermines the District Court's notion that a reasonable policyholder would conclude that only "natural" floods are within a flood exclusion. In short, there is a very good reason why these cases did not explicitly raise the distinction between "man-made" and "natural" floods: there is no such distinction.

the insurance policies at issue included both naturally and artificially caused floods." Ex. A at 21.

As to the dictionary definitions, the court ignored the fact that <u>none</u> of the cited definitions—not one—draws any distinction between man-made and artificial floods (or for that matter any distinction based on causation).[10] The District Court focused instead on the word "overflow," contained in some but not all of the cited definitions. <u>See</u> Ex. A at 26 (quoting definition of "flood" as an "overflowing of water onto land that is normally dry"). From there, the District Court concluded that "implicit in these 'overtopping' definitions, a natural event caused by rain or tide is contemplated." <u>Id.</u> Not so. The word "overflow" does not reasonably imply the inclusion of natural events and exclusion of man-made ones.[11] More troubling still, the word "overtop" does not even appear in the cited definitions; in a curious linguistic shift, the District Court simply substituted "overtopping" for

---

[10]     Although this Court need not resort to extrinsic dictionaries to resolve the question presented, not surprisingly they too confirm the generally prevailing and commonsense understanding that what ravaged New Orleans following Hurricane Katrina was indeed a "flood." For example, <u>Webster's Third New International Dictionary of the English Language</u> (2002) defines "flood" as "a rising and overflowing of a body of water that covers land not usu[ally] under water." <u>Id.</u> at 873. And <u>Black's Law Dictionary</u> (5th ed. 1979) defines the word as "[a]n inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be." <u>Id.</u> at 576.

[11]     To the extent the District Court's reasoning was based on the notion that a "man-made" flood would necessarily go through a crumbling barrier, while a "natural" flood would overflow it, the distinction does not work. A "man-made" flood, as the District Court seems to conceive of that concept, could result just as easily result from a levee or other barrier not being built to a sufficient height; in that case, floodwater would "overflow" the barrier, and under the court's logic it would be a "flood" even though human negligence was to blame.

- 16 -

"overflowing."  This is error not just because "overtopping" and "overflowing" are not synonyms, but also because the Great Northern Policy explicitly excludes damage caused by "<u>overflow</u> of water."

Finally, the District Court erred by using the canons of <u>ejusdem generis</u> and <u>noscitur a sociis</u> to artificially limit the word "flood" to natural events.  Resorting to those doctrines was wrong for a very basic reason:  they exist solely to resolve ambiguities, not introduce them.  As the Supreme Court has emphasized, "the rule of <u>ejusdem generis</u> * * * is only an instrumentality for ascertaining the correct meaning of words <u>when there is uncertainty</u>."  <u>Garcia</u> v. <u>United States</u>, 469 U.S. 70, 74 (1984)  (emphasis added) (quoting <u>Harrison</u> v. <u>PPG Industries, Inc.</u>, 446 U.S. 578, 588 (1980)).  But where, as here, the term at issue boasts a clear and unambiguous meaning, it is unnecessary—and legal error—to resort to these canons of last resort.  <u>See</u> <u>Schenkel & Shultz, Inc.</u> v. <u>Homestead Ins. Co.</u>,119 F.3d 548, 551 (7th Cir. 1997) ("We cannot use [<u>noscitur a sociis</u>] to create uncertainty in an otherwise unambiguous term").

### B.     The Negligent Planning, Construction Or Maintenance Exclusion Applies To Bar Flood Claims.

As explained above, plaintiffs attempted to avoid Great Northern's flood exclusion by alleging that their losses were caused not by flood, but by the negligence of third parties who built and maintained the New Orleans levees.  The Great Northern policies, however, expressly exclude losses caused by negligent

- 17 -

"planning, construction or maintenance." Policy at B-9. The District Court nevertheless found that this exclusion also did not apply because the flood was supposedly an "ensuing covered loss"—in other words, that the flood was the cause of the loss, not the negligence. Ex. A at 48.

This is trying to have it both ways. Apart from being internally inconsistent, the District Court's ruling ignores the clear direction of the Louisiana Supreme Court to avoid interpreting policy provisions "in an unreasonable or strained manner * * * to enlarge or to restrict [them] beyond what is reasonably contemplated by unambiguous terms." Cadwallader, 848 So.2d at 580. The Great Northern policies' broad and clearly stated flood exclusion and negligence exclusion—given a commonsense reading—cannot bear the conclusions reached by the District Court: that the Policy excludes floods, and excludes negligence, but does not exclude floods caused by negligence.

## III.   THE NATURE OF THIS CASE CUTS STRONGLY IN FAVOR OF GRANTING THE PETITION.

Courts have long recognized that interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is especially appropriate in important cases, see Bearry v. Beech Aircraft Corp., 818 F.2d 370, 373 (5th Cir. 1987) (recognizing novelty and importance of certified issue as relevant factors), and large, complex cases in which resolution of the certified question would avoid unnecessary, protracted litigation, see U.S. Rubber Co. v. Wright, 359 F.2d 784, 785 (9th Cir. 1966) (Section 1292(b) should

- 18 -

be used in extraordinary cases where decision might avoid protracted and
expensive litigation).  This case and its companions within the In re Katrina
umbrella are, of course, both important and enormous:  Hundreds if not thousands
of similar cases are pending in Louisiana federal courts.  An early, definitive ruling
by this Court on the legal issue of coverage for flood damage will materially
advance resolution not only of this case but also of the "daunting line" of other
cases pending below. Ex. A at 4; see Brown v. Bullock, 294 F.2d 415, 417 (2d Cir.
1961) (noting that leave to appeal was granted under § 1292(b) in part because
issue presented "was likely to have precedential value for a large number of other
suits").  The ruling should be reviewed by this Court before Great Northern, the
other insurers, and plaintiffs are required to engage in expensive and potentially
needless discovery, defend class certification, and prepare for trial—all of which
may be a waste of the District Court's and the parties' time and resources.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Great Northern respectfully requests that this

Court grant the Petition, allow the parties to brief and argue the foregoing issues,

and vacate the District Court's November 27, 2006 Order.

Respectfully submitted,

STEVEN W. USDIN, 12986
EDWARD R. WICKER, JR., 27138
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone:  (504) 589-9700

H. CHRISTOPHER BARTOLOMUCCI
CHRISTOPHER T. HANDMAN
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Telephone:  (202) 637-5600

Counsel for Defendant-Petitioner Great
Northern Insurance Company

- 20 -

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      Fed. R. App. P. 32(a)(7)(B) does not apply to this petition.  <u>See</u> Fed. R. App. P. 5(c); <u>id.</u> 32(c)(2)(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman 14 point font.

Steven W. Usdin
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.

Attorney for Great Northern
Insurance Company

## CERTIFICATE OF SERVICE

I, Steven W. Usdin, hereby certify that a copy of the above and foregoing Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) has been served upon the below listed counsel of record via electronic mail this 8th day of December, 2006.

Counsel for Plaintiffs:
Joseph M. Bruno (jbruno@brunobrunolaw.com)
Joseph J. McKernan (jemckernan@mckernanlawfirm.com)
Calvin C. Fayard, Jr. (calvinfayard@fayardlaw.com)
John N. Ellison (jellison@andersonkill.com)
Drew Ranier (drainer@rgelaw.com)

Counsel for Defendants:
Judy Y. Barrasso (jbarrasso@barrassousdin.com)
Wayne J. Lee (wlee@stonepigman.com)
H. Minor Pipes, III (mpipes@barrassousdin.com)
Howard Bruce Kaplan (hkaplan@bernard-cassisa.com)
Kelly Cambre Bogart (kbogart@duplass.com)
Alan J. Yacoubian (ayacoubian@jjbylaw.com)
John William Waters, Jr. (jwaters@bfrob.com)
Stephen E. Goldman (sgoldman@rc.com)
Ralph Shelton Hubbard (rhubbard@lawla.com)
Robert I. Siegel (rsiegel@glllaw.com)
Richard Doren (rdoren@gibsondunn.com)
Maura Zivalich Pelleteri (mpelleteri@kfplaw.com)
Paul E.B. Glad (pglad@sonnenschein.com)
Kristopher T. Wilson (kwilson@lawla.com)

Steven W. Usdin

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES                          CIVIL ACTION
CONSOLIDATED LITIGATION
                                                       NO. 05-4182

PERTAINS TO INSURANCE                                  SECTION "K"(2)
*Vanderbrook*, C.A. No. 05-6323
*Xavier University*, C.A. No. 06–516
*Chehardy*, C.A. No. 06-1672, 06-1673, and 06-1674

                              and

KELLY A. HUMPHREYS                                    CIVIL ACTION

VERSUS                                                NO. 06-0169

ENCOMPASS INSURANCE COMPANY, ET AL.                  SECTION K(2)
****PRINT TO WEB****

## ORDER

On September 19, 2006, *Berthelot, et al. v. Boh Bros. Construction, et al.*, C.A. No. 05-4182
was filed in the Eastern District of Louisiana. This case began the stream of complaints that have
been filed as a result of damages arising out of all levee breaches which occurred in the aftermath
of Hurricane Katrina.

*Berthelot* was transferred to the undersigned on February 23, 2006. (Doc. 47). It was
subsequently determined by the *en banc* court of the Eastern District of Louisiana that in order to
avoid conflicting decisions among the various sections of the Court, the proper approach would be
to consolidate all such filings for purposes of pretrial discovery and motion practice. As such, what
is now captioned "*In re: Katrina Canal Breaches Consolidated Litigation,*" C.A. No. 05-4182, has
become the umbrella for all cases which concern damages caused by flooding as a result of breaches

or overtopping in the areas of the 17th Street Canal, the London Avenue Canal, the Industrial Canal, and the Mississippi Gulf River Outlet ("MRGO").

The following Orders and Reasons[1] are being entered in four individual cases which are part of the umbrella and all of which have as their centerpiece the issue of insurance coverage. Theses cases are:

*Vanderbrook, et al. v. State Farm Fire & Cas. Co., et al.* C.A. No. 05-6323;

*Xavier University of Louisiana v. Travelers Property Ca. Co. of America*, C.A. No. 06-516;

*Chehardy, et al. v. State Farm, et al.,* C.A. No. 06-1672, 06-1673, and 06-1674; and

*Humphreys v. Encompass Ins. Co.*, C. A. No. 06-169.[2]

Oral argument was conducted with respect to *Vanderbrook* on August 25, 2006, and with respect to *Xavier, Chehardy and Humphreys* on October 27, 2006. Based on the pleadings, memoranda, exhibits, arguments and the relevant law, the Court is prepared to rule on all the motions pending in all four cases.

**IT IS ORDERED** that this document shall be entered onto the docket of the *In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182 referencing all three of the cases noted above and *Humphreys* separately. The Court will begin with the *Vanderbrook* matter.

<div align="center">*****************************</div>

---

[1]The document numbers referred to herein are those as entered in the Consolidated Matter unless otherwise noted; once a case is consolidated in the umbrella, any document filed is entered sequentially, regardless of the case to which it pertains.

[2]*Humphreys* was initially consolidated but at the request of the litigants it was terminated from the umbrella; however, in light of the inter-related nature of this case, the Court will include this case in this consolidated opinion.

**THIS ORDER PERTAINS SPECIFICALLY TO:**

*Vanderbrook, et al. v. State Farm Fire & Cas. Co., et al.* C.A. No. 05-6323;

## ORDER AND REASONS

Before the Court are the following motions filed in this matter:

| | |
|---|---|
| Doc. No. 568 | Motion for Judgment on the Pleadings filed by Hanover Ins. Co. ("Hanover") insurer of plaintiff James Capella and Madeline Grenier;[3] |
| Doc. No. 569 | Motion for Judgment on the Pleadings filed by Standard Fire Ins. Co. ("Standard") insurer of plaintiffs Peter Anthony Ascani, III, Gregory R. Jackson, and Monica Reyes; |
| Doc. No. 570 | Motion for Judgment on the Pleadings filed by State Farm Fire & Cas. Co. ("State Farm") insurer of Mary Jane Silva and Robert G. Harvey; |
| Doc. No. 572 | Motion to Dismiss Party filed by Hartford Ins. Co. of the Midwest ("Hartford") insurer of Jack Capella as the Executor of the Succession of Lillian Capella; |
| Doc. No. 598 | Motion for Judgment on the Pleadings filed by Unitrim Preferred Ins. Co. ("Unitrim") insurer of Richard Vanderbrook. |

These motions were brought in response to the class action suit brought by the "Vanderbrook"

plaintiffs.

The instant petition was initially filed in Civil District Court for the Parish of Orleans on

October 14, 2005. Plaintiffs filed suit seeking coverage for damages caused by the collapse of the

17th St. Canal floodwall and the ensuing water damage as well as claims against the Board of

---

[3]At oral argument on these motions, Hanover orally moved to include in its motion the claims of Madeline Grenier who had been misidentified as Sophia Granier as the insured. This motion was orally granted. Thus, the docket sheet as to this motion does not include her as the subject of the motion; however, the docket sheet should be so amended to reflect that the plaintiff Sophia Granier is actually Madeline Grenier and **IT IS SO ORDERED**. At the time of the hearing, the relevant policy of insurance was introduced and filed into the record.

Additionally, certain of the Defendants are improperly named. The Standard Fire Insurance Company ("Standard Fire") is improperly named as Travelers Insurance Company and St. Paul Travelers Insurance Company. Hartford Insurance Company of the Midwest ("Hartford") is improperly named as Hartford Insurance Company. Unitrin Preferred Insurance Company ("Unitrin") is improperly named as Kemper Insurance Company.

3

Commissioners for the Orleans Levee District ("OLD") for its alleged negligence.  Defendants removed the case to this Court on December 2, 2005.  On June 1, 2006, the Court severed the claims brought against OLD from those filed against the insurers and finding no basis for jurisdiction over OLD, remanded those claims to Civil District Court.  The Court retained diversity jurisdiction over the remaining insurers.

Five different policies of insurance are involved in this case—all Homeowners/All Risk policies.  Oral argument was conducted on August 25, 2006, and supplemental briefing ordered thereafter.  Having reviewed the complaint, memoranda, exhibits, briefing, and the relevant law, the Court is now prepared to deliver its opinion.

It cannot be gainsaid that in approaching these motions, which are the first in a daunting line of litigation concerning insurance coverage for the losses caused by the canal breaches in New Orleans, the potential impact of such a decision on individuals as well as the insurance industry might be considered overwhelming.  However, the Court believes that it is its duty to approach its analysis in a straightforward, judicious manner—that is analyzing the contractual disputes between an individual policy holder and the relevant insurer, sitting as an *Erie* court, using the civilian approach of a Louisiana court, applying the Louisiana Civil Code and seeking guidance from the jurisprudence of the state.

## I.      Civilian Approach as an *Erie* Court

This Court will apply Louisiana law in an attempt to rule as a Louisiana court would if presented with the same issues. *Musser Davis Land Co. v. Union Pacific Resources,* 201 F.3d 561,

4

565 (5th Cir.2000), *citing Erie R. Co. v. Tompkins,* 304 U.S. 64, 79-80, 58 S.Ct. 817, 82 L.Ed. 1188

(1938); *Mozeke v. Int'l Paper Co.,* 856 F.2d 722, 724 (5th Cir.1988). As stated in *Musser:*

> To determine a state law question, we first look to decisions of the Louisiana
> Supreme Court. *See Transcontinental Gas v. Transportation Ins. Co.,* 953 F.2d 985,
> 988 (5th Cir.1992). If the Louisiana Supreme Court has not spoken on the issue, it
> is our duty to determine as best we can what that court would decide. *See id.; Hulin
> v. Fibreboard Corp.,* 178 F.3d 316, 318-19 (5th Cir.1999).

> Under Louisiana's Civil Law tradition, courts look first and foremost to statutory law.
> The Louisiana Civil Code instructs that "[sources of law are legislation and
> custom,]" and that "[l]egislation is a solemn expression of legislative will." "[T]he
> primary basis of law for a civilian is legislation, and not (as in the common law) a
> great body of tradition in the form of prior decisions of the courts." The concept of
> *stare decisis* is foreign to the Civil Law, including Louisiana. Therefore, in cases
> such as this we are guided by decisions rendered by the Louisiana appellate courts,
> particularly when numerous decisions are in accord on a given issue-the so-called
> *jurisprudence constant*-but we are not strictly bound by them.

*Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)

(footnotes omitted). Thus, the Louisiana Civil Code provides the primary source and framework by

which this Court must review the these contracts.  With this in mind, the Court will first examine

the allegations made by the plaintiffs.


## II.    The Petition and Issue Presented

Plaintiffs each own a home in New Orleans which is insured by one of the defendants and

which suffered substantial water damage at the time of Hurricane Katrina.  (Petition, ¶ 7.)  They

allege that "[s]ometime between 10:00 and 11:00 a.m. on August 29, 2005, before the full force of

[Hurricane Katrina] reached the City of New Orleans, a small section of the concrete outfall canal

wall known as the 17th Street Canal, suddenly broke, causing water to enter the streets of the City

of New Orleans and homes of Petitioners," which damaged Plaintiffs' homes. (Id., ¶ 3.) Plaintiffs contend that "said water damage inflicted on the Petitioners' homes and property was not the result of flood, surface water, waves, title [sic] water, tsunami, seiche, overflow of a body of water, seepage under or over the outfall canal wall or spray from any of the above but was water intrusion, caused simply from a broken levee wall." (Id., ¶ 4 (emphasis added).) Plaintiffs claim that defendants improperly failed to pay for the water damage to their homes because it is not an excluded loss. (Id., ¶ 10.) Plaintiffs also contend that the water damage exclusions in the policies are unconscionable and void. (Id., ¶ 11.)

Plaintiffs further allege, separately, that the Levee Board "breached their duty to Petitioners by failing to correct the break [in the canal wall] or warn others including Petitioners of the impending water intrusion . . . ." (Id., ¶ 6.) As noted, these allegations have been severed and remanded to state court.

Plaintiffs contend that because Louisiana employs the "efficient proximate cause doctrine" with respect to coverage and because the third-party negligence of Orleans Levee District is the efficient, proximate cause of the subsequent flooding of plaintiffs' homes, their Homeowners Policies should provide coverage. The defendants maintain that under the clear, unambiguous terms of the policies at issue, they are entitled to judgment as a matter of law.

### III.    Standard for Judgment on the Pleadings

When a defendant attacks the complaint because it fails to state a legally cognizable claim, Rule 12(b)(6) provides the appropriate challenge. The test for determining the sufficiency of a complaint under Rule 12(b)(6) is that "'a complaint should not be dismissed for failure to state a

6

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.'"   *Id. citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Fifth Circuit explained:

> Subsumed within the rigorous standard of the *Conley* test is the requirement
> that the plaintiff's complaint be stated with enough clarity to enable a court or an
> opposing party to determine whether a claim is sufficiently alleged. *Elliott v. Foufas,*
> 867 F.2d 877, 880 (5th Cir. 1989). Further, "the plaintiff's complaint is to be
> construed in a light most favorable to plaintiff, and the allegations contained therein
> are to be taken as true." *Oppenheimer v. Prudential Securities, Inc.* 94 F.3d 189, 194
> (5th Cir. 1996). This is consistent with the well-established policy that the plaintiff
> be given every opportunity to state a claim. *Hitt*, 561 F.2d at 608. In other words,
> a motion to dismiss an action for failure to state a claim"admits the facts alleged in
> the complaint, but challenges plaintiff's rights to relief based upon those facts." *Tel-
> Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992). Finally,
> when considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the
> district court must examine the complaint to determine whether the allegations
> provide relief on any possible theory. *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.
> 1994).

*Id.* at 161-62. Bearing this standard in mind, the court will examine the civilian rules of construction

to aid it in its determination of the viability of defendants' motions.


## IV. Legal Concepts for Contract Interpretation

### A.    Insurance Policy is a Contract and Rules of Construction

"An insurance policy is a conventional obligation that constitutes the law between the

insured and insurer, and the agreement governs the nature of their relationship." La. Civ. Code art.

1983; *Edwards v. Daugherty*, 883 So.2d 932, 940 (La. 2004); *Peterson v. Schimek*, 729 So.2d 1024,

1028 (La. 1999). As such, the general rules of contract interpretation as set forth in the Louisiana

Civil Code guide the Court in interpreting the subject insurance policies. *Peterson*, 729 So.2d at

1028. "The judiciary's role in interpreting insurance contracts is to ascertain the common intent of

7

the parties to the contract. *See* La. Civ. Code art. 2045; *Carbon* [*v. Allstate Ins. Co.,* 97-3085, p. 4

(La. 10/20/98, 719 So. 2d 437, 439]*; Louisiana Ins.* [*Guar. Ass'n v. Interstate Fire & Cas. Co.* 03-

0911, p. 5 (La. 1/14/94)], 630 So.2d 759, 763." *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577 (La.

2003).

In *Cadwallader*, the Supreme Court of the State of Louisiana set forth succinctly the most

important guiding principles:

> Words and phrases used in an insurance policy are to be construed using their
> plain, ordinary and generally prevailing meaning, unless the words have acquired a
> technical meaning. *See* La. Civ Code art. 2047; *Peterson v. Schimek,* 98-1712, p. 5
> (La.3/2/99), 729 So.2d 1024, 1028-29; *Carbon,* 719 So.2d at 440-441; *Reynolds,* 634
> So.2d at 1183. An insurance contract, however, should not be interpreted in an
> unreasonable or strained manner under the guise of contractual interpretation to
> enlarge or to restrict its provisions beyond what is reasonably contemplated by
> unambiguous terms or achieve an absurd conclusion. *Carrier v. Reliance Ins. Co.,*
> 99-2573, p. 11 (La.4/11/00), 759 So.2d 37, 43; *Peterson,* 729 So.2d at 1029. The
> rules of construction do not authorize a perversion of the words or the exercise of
> inventive powers to create an ambiguity where none exists or the making of a new
> contract when the terms express with sufficient clearness the parties' intent.
> *Succession of Fannaly v. Lafayette Ins. Co.,* 01-1355, p. 4 (La.1/15/02), 805 So.2d
> 1134, 1138; *Peterson,* 729 So.2d at 1029.
>    . . .
>
> If the policy wording at issue is clear and unambiguously expresses the
> parties' intent, the insurance contract must be enforced as written. *Fannaly,* 805
> So.2d at 1137; *Louisiana Ins.,* 630 So.2d at 764. Courts lack the authority to alter the
> terms of insurance contracts under the guise of contractual interpretation when the
> policy's provisions are couched in unambiguous terms. *Peterson,* 729 So.2d at 1029;
> *Louisiana Ins.,* 630 So.2d at 764. The determination of whether a contract is clear or
> ambiguous is a question of law. *Louisiana Ins.,* 630 So.2d at 764.

*Cadwallader*, 848 So.2d at 580 (coverage provided by UM policy for resident relative in household

did not include foster children).   In addition, an insurance contract "is construed as a whole and

each provision in the policy must be interpreted in light of the other provisions so that each is given

8

meaning. One portion of the policy should not be construed separately at the expense of disregarding other provisions." La. Civ. Code art. 2050. *Peterson*, 729 So.2d at 1029.

### B.    All-Risks Liability Insurance: Coverage, Exclusions and Ambiguities

A Homeowners Policy is considered a type of "all-risks" insurance. " All-risks insurance is a special type of insurance extending to risks not usually contemplated, and generally allows recovery for all fortuitous losses, unless the policy contains a specific exclusion expressly excluding the loss from coverage." Jane Massey Draper, "Coverage Under All-Risk Insurance", 30 A.L.R.5th 170. The United States Court of Appeals for the Fifth Circuit acknowledged this concept stating, "[a] policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Alton Ochsner Medical Foundation v. Allendale Mut. Ins.*, 219 F.3d 501, 504 (5th Cir. 2000), *citing U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461 (5th Cir.1982) (construing Louisiana law and citing *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 387 (5th Cir.1981) (construing Texas law)).

Thus, in the context of the instant motions, under Louisiana law, unless there is a specific exclusion for the type of water damage that an insured has incurred, coverage is presumed under these policies. The focus of a court's inquiry then is on the relevant exclusions to coverage. "When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. . . . On the other hand, the insurer bears the

9

burden of proving the applicability of an exclusionary clause within a policy." *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000).

With respect to the proper approach concerning the interpretation of an exclusion, they are generally strictly construed. *Bezue v. Hartford Accident and Indem. Co.*, 224 So.2d 76, 77 (La. App. 1st Cir. 1969). *Cadwallader* further amplifies this concept:

> Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. La. Civ. Code art. 2056; *Carrier,* 759 So.2d at 43; *Louisiana Ins.,* 630 So.2d at 764. Under this rule of strict construction, **equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer.** *Carrier,* 759 So.2d at 43.

*Cadwallader*, 848 So.2d at 580 (emphasis added).   This rule of interpretation is based on the fact that these provisions are prepared by the insurer, and the insured had no voice in the preparation. *Louisiana Ins.,* 630 So.2d at 764.  This type of contract is commonly referred to as a contract of adhesion.  Article 2056 states, "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.  A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party."  La. Civ. Code art. 2056; *see Louisiana Ins. Guar. Assoc.,* 630 So.2d at 764 *citing* 15 *Civil Law Treatise, Insurance Law and Practice* § 4 (1986) and W. Freedman, 2 *Richards on the Law of Insurance* § 11:2[f] (6th Ed. 1990) ("*Richards*"). "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Cadwallader*, 848 So. 2d at 580 *citing Carrier,* 759 So.2d at 43-44. (emphasis in original) and *Louisiana Ins. Guar. Assoc.,* 630 So.2d at 770.

The Supreme Court of Louisiana gave further instruction with respect to the interpretation

of an ambiguity in *Louisiana Ins. Guar. Assoc.* stating:

> "Ambiguity will also be resolved by ascertaining how a reasonable insurance policy
> purchaser would construe the clause at the time the insurance contract was entered."
> *Breland v. Schilling,* 550 So.2d 609, 610-11 (La.1989). The court should construe
> the policy "to fulfill the reasonable expectations of the parties in the light of the
> customs and usages of the industry." *Trinity Industries,* 916 F.2d at 269 (5th
> Cir.1990) (citing *Benton,* 379 So.2d at 231 and LSA-C.C. Arts. 2045, 2050, 2053 and
> 2054). In insurance parlance, this is labelled the reasonable expectations doctrine.
> *Richards, supra* at § 11:2[g].

*Louisiana Ins. Guar. Assoc.,* 630 So.2d at 764.   The Louisiana Supreme Court then noted in a

footnote:

> "The reasonable expectations doctrine can be capsulized as follows: "courts will
> protect the [insured's] reasonable expectations . . . regarding the coverage afforded
> by insurance contracts even though a careful examination of the policy provisions
> indicates that such expectations are contrary to the expressed intention of the
> insurer." R. Keeton and A. Widiss, *Insurance Law* § 6.13 (1988).

*Id.* at n. 19.   Thus, if after applying the other general rules of construction, an ambiguity remains,

the ambiguous contractual provision is to be construed against the insurer who furnished the policy's

text and in favor of the insured finding coverage. La. Civ. Code art. 2056. *Peterson,* 729 So. 2d

at 1029. "It is the reasonable interpretation of an insured that governs the legal effect of language

in an insurance contract, and not whether the language chosen by an insurer may constitute a legal

term of art in another context." *Lee v. Unum Life Ins. Co. of America,* 900 So.2d 1021, 1029 (La.

App. 4th Cir. 2005).


**C. Exclusions and Canons of Construction**

The Louisiana Supreme Court in interpreting an exclusion to coverage in the context of a

company's public liability insurance stated:

11

The exclusion clause must necessarily be examined and interpreted in the light of its own design and intent, as well as in view of the objects and purposes of the policy. Once coverage has been extended, as it is quite clearly the purpose of the policy to do and as has been done here, it should be withdrawn only when exclusion is established with certainty. And because comprehensive exclusion is violative of the purpose and intent of policy coverage, exclusion must necessarily be specific and not general. It is specific, as distinguished from comprehensive, when it particularly identifies the insured or insureds intended to be excluded. The exclusion clause, as its name implies, sets forth the traits, characteristics and circumstances that mark an insured for exclusion. And the insured or insureds to be excluded must bear the marks and traits, or conform with the circumstances, described and particularized in the exclusion clause as the basis for exclusion.'

*Pullen v. Employers' Liability Assur. Corp.,* 89 So.2d 373, 377 (La. 1956).

Indeed, in *Anderson v. Indiana Lumbermens Mut. Ins. Co.*, 127 So.2d 304 (La. App. 2nd Cir. 1961), a Louisiana appellate court dealt with a claim made on homeowner policy where "collapse" was a covered peril and there was an exclusion which provided that the insurer would not be liable "for loss caused directly or indirectly by earthquake, **or other earth movements** except landslides." *Id.* at 304 (emphasis added). In the home in question, a crack had appeared in the wall of the house and since that time, the crack had become larger, extending into the ceiling of the living room and cracks had appeared in the walls, at every window and door in the house. The door frames were out of square and the foundation was broken, cracked, fallen and uneven. It was alleged in that case that the cause of damage to the home was (1) the expansion and contraction of the soil which had caused (2) the cracking, breaking and falling of the concrete slab (3) combined with the falling cracking, breaking and unequal settlement of the building (4) thus impairing the basic structural integrity of the building. The insurer maintained that the damage to the house did not constitute a "collapse" and that even if it did, it was excluded as it was caused by "other earth movements."

The appellate court noted that there was no precedent for an interpretation of "collapse" in Louisiana and noted that there were four cases rendered outside of Louisiana where the evidence

12

did not indicate the structure had completely fallen down or caved in–two finding coverage and two

denying coverage based on this exclusion.

The court, after discussing the guidance provided by the Civil Code in determining the

construction of the word "collapse", noted:

> LSA-Civil Code, art. 1955 providing that 'all clauses of agreements are interpreted
> the one by the other, giving to each the sense that results from the entire act' appears
> to be a statement of the 'ejusdem generis' rule of construction, concerning which
> Black's Law Dictionary states:
>
>> 'In the construction of laws, wills, and other instruments, the
>> 'ejusdem generis rule' is, that where general words follow an
>> enumeration of persons or things, by words of a particular and
>> specific meaning, such general words are not to be construed in their
>> widest extent, but are to be held as applying only to persons or things
>> of the same general kind or class as those specifically mentioned.
>> Black, Interp. of Laws, 141; Goldsmith v. U.S., C.C.A.N.Y., 42 F.2d
>> 133, 137; Aleksich v. Industrial Accident Fund, 116 Mont. 69 (127),
>> 151 P.2d 1016, 1021. The rule, however, does not necessarily require
>> that the general provision be limited in its scope to the identical
>> things specifically named. Nor does it apply when the context
>> manifests a contrary intention.
>> 'The maxim 'ejusdem generis', is only an illustration of the broader
>> maxim, 'noscitur a sociis'. State v. Western Union Telegraph Co., 196
>> Ala. 570, 72 So. 99, 100.'
>
> And, in defining the phrase, 'noscitur a sociis', as used in the aforesaid definition the
> following explanation and definition are given:
>
>> 'It is known from its associates, 1 Vent. 225. The meaning of a word
>> is or may be known from the accompanying words. 3 Term R. 87;
>> Broom, Max. 588. Morecock v. Hood, 202 N.C. 321, 162 S.E. 730,
>> 731; Louis Pizitz Dry Goods Co. v. Fidelity & Deposit Co. of
>> Maryland, 223 Ala. 385, 136 So. 800, 801.
>> 'The doctrine means that general and specific words are associated
>> with and take color from each other, restricting general words to
>> sense analogous to less general. Dunham v. State, 140 Fla. 754, 192
>> So. 324, 325, 326.'

*Anderson*, 127 So.2d 306-07; *but see, Nida v. State Farm Fire & Cas. Co.,* 454 So.2d 328 (La. App.

3rd Cir. 1984) (insurance definition of "collapse" in policy at issue revised to deny coverage for

losses against settling). The *Anderson* court eventually found that the insurance at issue therein provided coverage finding that "collapse" would not be given an "abstract, narrow construction." Citing to *Jenkins v. United States Fire Ins. Co.*, 185 Kan. 665, 347 P.2d 417 (Kan. 1959), the court noted that construing on the basis of intention, it would be understood that if the settling, falling, cracking bulging or breaking of the insured building so materially impaired the basic structure, that it would be considered a "collapse." Thus, the Court in interpreting the **risk insured** employed the **expansive** definition.

The court then found that the **exclusion** was to be **narrowly construed** relying on *Pullen.* It found that "other earth movements" is entirely "too general to have application to any degree of certainty" to the causation of the "collapse" of the subject building as the cause of damage would embrace "the same general kind, class or nature of peril as its companion words 'earthquake' and 'landslide.'" *Anderson*, 127 So.2d at 308-09. As such, the concept of the "specific controls the general" was used to find the exclusion limited a more violent earth movement–not just the natural expansion and contraction of the soil that had allegedly caused the damage for which coverage was sought. *See also, Smith v. Burton*, 928 So.2d 74, 79 (La. App. 1st Cir. 2005); *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil* Corp., 289 F.3d 373, 377 (5th Cir. 2002); *Sommers v. State Farm Fire and Cas. Co.*, 764 So.2d 87, 91 (La. App. 4th Cir. 2000) (where general terms precede specific terms, principle is the same: general terms should be construed to encompass things similar or analogous to those in the specific terms). With these precepts in mind the Court will now turn to the specific water damage exclusions at issued before the Court.

V.      **Insuring Language and Exclusions of the Policies at Issue**

14

**a. ISO Policies**

The "ISO policies"[4] issued by Standard Fire, Hartford, Hanover and Unitrin, all contain

identical language. As to the coverage provided, each policy states:

> COVERAGE A - DWELLING and COVERAGE B- OTHER STRUCTURES:
> We insure against risk of direct loss to property described in Coverages A and B
> only if that loss is a physical loss to property.

(Standard Fire Policies, App. at INS 94 and INS 134; Hartford Policy, App. at INS 53; Hanover

Policy, App. at INS 7; Unitrin Policy, App. at INS 169.)[5]    Following the coverage provision, this

exclusion appears:

> (1)    We do not insure for loss **caused directly or indirectly by any of the
> following.** Such loss is excluded regardless of any other cause or event
> contributing concurrently or in any sequence to the loss.[6]
> . . .
> **(c) Water Damage,** meaning:
>        Flood, surface water, waves, tidal water, overflow of a body of water,
>        or spray from any of these, whether or not driven by wind;

(Standard Fire Policies, App. at INS 96 and INS 136; Hartford Policy, App. at INS 56; Hanover

Policy, App. at INS 9; Unitrin Policy, App. at INS 171.)   "Flood" is not defined anywhere in the

policy. this exclusion will be referred to as the ISO exclusion.

---

[4]"ISO" is an acronym for "Insurance Service Office, Inc." which provides products and services help to the insurance industry to measure, manage and reduce risk. It provides standardized insurance policy language such as the policies noted herein. *See,* ISO Homepage at www.iso.com.

[5]These citations refer to the appendix filed in conjunction with the Motion for Judgment on the Pleadings filed by Hanover Ins. Co. (Doc. No. 568) that was used as a joint exhibit containing all of the insurance policies at issue herein.

[6]This provision is generally referred to as an "anti-concurrent cause clause." Its genesis was the result of court decisions utilizing the "concurrent causation doctrine". Under this doctrine, the insurer is obligated to pay for damages resulting from a combination of covered and excluded perils if the efficient proximate cause is a covered peril. To counteract these decisions, insurers began employing the anti-concurrent cause clause to exclude losses if caused in whole or in part, in any sequence of events by an excluded peril. Stephen P. Pate, *Recent Developments in Property Insurance Law,* 33 Tort & Ins. L.J. 659, 663 (1998).

### b. State Farm Policy with "Lead-In" Provision

The State Farm policies note at the outset that "We insure for accidental direct physical loss

to the property described in Coverage A, except as provided in SECTION I-LOSSES NOT

INSURED." They then provide:

> SECTION I -LOSSES INSURED
> Coverage A-Dwelling
> We insure for accidental direct physical loss to the property described in Coverage A, except
> as provided in Section I–LOSSES NO INSURED.
>
> SECTION I - LOSSES NOT INSURED
>
> 2.        We do not insure under any coverage for loss which would not have occurred in the
> absence of one or more of the following excluded events.  We do not insure for such loss
> regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c)
> whether other causes acted concurrently or in any sequence with the excluded event to
> produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or
> widespread damage, arises from natural or external forces, or occurs as a result of any
> combination of these:[7]
>
> c.        (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from
> any of these all whether driven by wind or not;

(Doc. 570, Exhibit A and B, pp. 7 and 10).

### C. Hartford Policy's specific Flood Definition

Of all of these policies, only Hartford includes an "Amendatory Endorsement Specifically

Excepted Perils." (Form H-380).  This two page provision provides in relevant part:

> As used herein, Peril means a cause of physical loss or damage to property.  It has this
> meaning whether or not it is called a Peril or a Cause of Loss in this policy.
>
> Even if any of the terms of this policy might be construed otherwise, the following Perils, as
> described in Paragraphs A. and B. below, are SPECIFICALLY EXCEPTED FROM THIS
> POLICY.  WE DO NOT COVER INSURE AGAINST LOSS OR DAMAGE DIRECTLY OR
> INDIRECTLY CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED
> BY, OR WHICH WOULD NOT HAVE OCCURRED BUT FOR, EITHER OF THESE PERILS:

---

[7]This subsection is known as the "lead-in" provision.

16

A. ACTS, ERRORS OR OMISSIONS

. . .

3. The design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of all or any part of the following:
  b. Roads, water or gas mains, sewers, drainage ditches, levees, dams, or other facilities; . . .

5. The maintenance of any of such property or facilities.

. . .

This exception A. applies whether or not the property or facilities described above are:

1. Covered under this policy; or

2. On or away from the covered premises.

This exception A. does not reduce the insurance for loss or damage caused directly by a Covered Peril.

As used in this endorsement:

1. If this policy is written to cover the risk of loss from specifically named causes, **Covered Peril** means any Peril specifically named as covered;

2. If written to cover the risk of loss without specifying specifically named causes, Covered peril means any Peril not described above and not otherwise excluded or excepted from the causes of loss covered by this policy.

B. COLLAPSE CRACKING OR SHIFTING of buildings, other structures or facilities, or their parts, if the collapse, cracking or shifting:

1. Occurs during earth movement, volcanic eruption or flood conditions or within 72 hours after they cease; and

2. Would not have occurred but for earth movement, volcanic eruption, or flood.

But if loss or damage by a Covered Peril ensues at the covered premises, we will pay for that ensuing loss or damage.

This exception B. applies whether or not there are other provisions in this policy relating to collapse, cracking or shifting of buildings, other structures or facilities, or their parts. Any such provision is revised by this endorsement to include this exception.

But if this policy specifically covers (by endorsement or in any other way) loss or damage caused by one or more of the following Perils:
...
2. Flood:

this exception B. will not reduce that coverage.

As used in this exception B:

17

. . .

6.    flood means:

    a.    Flood, surface water, waves, tides, tidal water, tidal waves, high water, and
        overflow of any body of water, or their spray, all whether driven by wind or
        not;
    b.    Release of water held by a dam, levy (sic) or dike or by a water or flood
        control device; . . .

All other provisions of this policy apply.

(Doc. 568, Hartford Policy, App. at INS 74-75). Thus, Hartford's Amendatory Endorsement

Specifically Excepted Perils defines the term "flood" and specifically includes the release of water

held by a levee or a flood control device.


## VI.    Parties' Contentions

Defendants[8] contend that all water damage caused by the canal breach is excluded from

coverage as these policies exclude coverage for water damage resulting from a "flood" and that

clearly the inundation of the City of New Orleans caused by the failure of its levees was a "flood."

Seeking the broadest possible definition of the term, defendants maintain that "flood" is not limited

to natural events. For this proposition they maintain that under Louisiana law, a court is "required

to interpret the term using its plain, ordinary and generally prevailing meaning" and should not

enlarge insurance coverage beyond that which is reasonably contemplated." *Cadwallader*, 848

So.2d at 583-84.

Defendants rely on *Kane v. Roby Ins. Co.*, 768 P.2d 678, 681 (Colo. 1989) for this

proposition. In *Kane*, plaintiffs' property had been damaged by a flood caused by a dam failure.

---

[8]The Court would note that while a consolidated memorandum was filed on behalf of the insurers as
instructed by the Court, individual arguments were also made. The Court has reviewed these and will only address
those specific arguments when they diverge in a relevant way from the whole.

18

Plaintiffs had in place a certain all-risk policies covering direct physical loss thereto except that

which was excluded.  The water damage exclusion was identical to the ISO policy noted above; it

excepted "flood, surface water, waves, tidal water or tidal waves, overflow of streams or other

bodies of water or spray from any of the foregoing, all whether driven by wind or not." *Id.* at 680.

The insureds maintained in that suit that the term "flood" was ambiguous as it was not defined and

no distinction was made between naturally and artificially caused floods, and as such should have

been limited to natural events.

> A divided Supreme Court of the State of Colorado held for the insurers.  The majority stated:

> > The generally accepted meaning of the term "flood" does not include a
> > distinction between artificial and natural floods. For example, *Webster's New
> > World Dictionary* 535 (2d ed. 1974), defines "flood" as: "[A]n overflowing of
> > water on an area normally dry; inundation; deluge. . . ." *Webster's Ninth New
> > Collegiate Dictionary* 474 (9th ed. 1988), defines the term as: "[A] rising and
> > overflowing of a body of water esp [ecially] onto normally dry land. . . ." *Black's
> > Law Dictionary* (5th ed. 1979), contains a similar definition: "An inundation of
> > water over land not usually covered by it. Water which inundates area of surface
> > of earth where it ordinarily would not be expected to be." The inundation of
> > insureds' normally dry land falls squarely within these generally accepted
> > definitions of the term "flood."[FN2] *See Bartlett v. Continental Divide Ins. Co.,* 697
> > P.2d 412 (Colo.App.1984) (no distinction in insurance policy between natural and
> > artificial causes of flood; to make such distinction would be to rewrite the terms
> > of the policy).

*Id.* at 681.

Thus, the majority rejected the concept that causation–that is the failure of a man-made

object which would cause an "artificial" flood as opposed to a naturally occurring flood–would

influence the interpretation of the exclusion.  In so finding, it distinguished a prior decision,

*Ferndale Development Co. v. Great American Ins. Co.*, 34 Colo. App. 258, 527 P.2d 939 ( Colo.

App.1974), wherein a Colorado appellate court had found the term "flood" ambiguous and found

coverage where a broken city water line caused the "inundation of the footings and foundations

of a partially completed condominiums being constructed by the insured." The majority

reasoned that in *Ferndale*, "the term 'flood' was ambiguous not only because the water was

released from a man-made object, but also because a water main is not so clearly a 'body of

water,'" and because "the amount released was less clearly an 'inundation' or 'deluge'."

Plaintiffs in *Kane* also contended, relying on *Koncilja v. Trinity Universal Ins. Co.* , 528

P.2d 939 (Colo. App. 1974), that even if the flood exclusion applied, the "efficient moving

cause" of their loss was a covered risk, that is the third party negligence leading to the failure of

the Lawn Lake Dam, and coverage should be available.  In *Koncilja,* the damage at issue was

caused by a broken water pipe embedded in the floor of the house which caused the ground

beneath the house to subside which, in turn, caused the house to settle and crack.  The

homeowners' insurance policy at issue insured against "loss occurring as a result of '[accidental

discharge, leakage or overflow of water or steam from within a plumbing . . . system."'  The

claim was initially denied based on an exclusion of losses "'caused by, resulting from,

contributed to, or aggravated by any earth movement [or] water below the surface of the

ground."' *Kane,* 768 P.2d at 684, citing *Koncilja.* at 940.  The *Koncilja* court applied the efficient

proximate cause rule that where there is a concurrency of different causes, the efficient

cause–the one that sets others in motion–is the cause to which the loss is to be attributed, though

the other causes may follow it, and operate more immediately.  *Id.*  The *Koncilja* court noted that

while the excluded settling of earth may have "operated more immediately in producing the

damages, the predominate or efficient proximate cause of the loss was the accidental leakage

from the plumbing system." *Id.*  Thus,  the *Koncilja* court found that as these provisions gave

rise to an ambiguity as to the extent of policy coverage, the contract should be construed in favor

of coverage.

The majority of Colorado supreme court found that there was no such conflict of

provisions of coverage in the *Kane* policies. The majority stated:

> Third party negligence is not a covered risk which creates inconsistency or
> ambiguity between the language of coverage and the language of exclusion.
> Although loss from third party negligence is covered under an "all risk" policy,
> that coverage is expressly subject to the language of the exclusions included in
> the policy. Under the policy language here, the insureds' loss which is caused by,
> resulting from, contributed to or aggravated by a flood is excluded regardless of
> the existence of any other contributing cause. Unlike in *Koncilja*, there is no
> inconsistency or ambiguity in the inclusionary and exclusionary language of the
> insurance policies in this case.
> Moreover, the "efficient moving cause" rule set forth in *Koncilja* does not
> control our decision in this case. We believe that the "efficient moving cause"
> rule, if it were to be adopted by this court, must yield to a well-settled principle of
> law: namely, that courts will not rewrite a contract for the parties. *See, e.g.,*
> *Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988).

*Id.* at 685. Thus, the majority held that the term "flood" in the insurance policies at issue

included both naturally and artificially caused floods.

Other cases cited by the defendants herein for the proposition that the term "flood" in an

insurance policy includes both naturally and artificially caused floods include *Bartlett v. Cont'l*

*Divide Ins. Co.*, 697 P.2d 412, 413 (Colo. Ct. App. 1984) (lower court decision concerning

apparently the same Lawn Lake Dam collapse finding no distinction between natural and

artificial causes where dam failure caused damage); *TNT Speed & Sport Ctr., Inc. v. American*

*States Ins. Co.*, 114 F.3d 731 (8th Cir. 1997) (no coverage where vandals removed sandbags and

dirt from levee causing levee to break); *Pakmark Corp. v. Liberty Mut Ins. Co.*, 943 S.W. 2d

(Mo. Ct. app. 1997) (no coverage where levee broke); *E.B. Metal & Rubber Indus. Inc. v.*

21

*Federal Ins. Co.* , 444 N.Y.S. 2d 321 (N.Y. App. Div. 1981) (no coverage for water damaged caused by improperly constructed and maintained dike that failed).

Plaintiffs maintain that the *Kane* majority is incorrect. They argue that in the context of this exclusion, "flooding" is limited to natural events. The "flooding" was not caused by the overtopping of the levees or by rainwater filling the City with surface water.

Plaintiffs cite to *Riche v. State Farm Fire and Casualty Co.*, 356 So.2d 101 (La. App. 1st Cir. 1978), *writ denied*, 358 So.2d 639 (La. 1978). In this case, plaintiff sought to recover under his homeowner's policy for the loss of his fishing gear which was on the bass boat of a third-party which sank during a windstorm. The plaintiff maintained that his damage was a direct loss of property defined as "unscheduled personal property" caused by a windstorm which was a named peril under his homeowner's policy . The insurer maintained that the loss was instead caused by wind making waves from surface water, waves causing water to flow into the boat, compounded by a defective bilge pump. Thus, the loss was not caused by windstorm, but by the sinking of a boat. *Id.* at 102.

The appellate court noted that the "direct loss" means the dominant and efficient cause of the loss and that as such, relying on *Roach-Strayhan-Holland Post v. Continental Ins. Co.*, 237 La. 973, 112 So.2d 680 (La. 1959) wherein it states "that it is sufficient, in order to recover upon a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate or efficient cause of the loss or damage, notwithstanding other factors contributing thereto." The trial court had held that coverage for the personal property was excluded under the water exclusion provision which provided:

This policy does not insure against loss:

22

> 3.    Caused by, resulting from, contributed to or aggravated by any of the following:
>
> (a) Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. . . "

*Id.* at 103.  The appellate court found that "when read as a whole, [this exclusion] contemplates only such damage caused by water **which has risen over and covered areas not ordinarily covered by water**." *Id.* at 103-04 (emphasis added).  The court found this exclusion was inapplicable to damage caused by a windstorm or resulting waves over a body of water, finding that "this interpretation is in line with the rule of construction that exclusionary clauses are strictly construed.  *See Bezue v. Hartford Acc. and Indem. Co., Hartford Conn.*, 224 So.2d 76 (La. App. 1st Cir. 1969)."

Plaintiffs contend that this case demonstrates that Louisiana courts have construed this water damage exclusion as requiring the **rising over** of water which was not the manner in which the water at issue is alleged to have inundated the insureds' homes.  Rather, they maintain it was the negligence of OLD that caused the canal walls to collapse.

Thus,  the salient question becomes whether, in the context of an all-risk policy where coverage is provided for direct loss to property, these insurance provisions which exclude coverage for water damage caused by "flood" clearly and unambiguously exclude from coverage damages caused by the alleged third party negligence of OLD which plaintiffs contend caused a section of the floodwall at the 17th Street Canal to break causing water to enter the streets of the City of New Orleans and homes of the plaintiffs in this suit.   While words and phrases in insurance polices are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning,  an ambiguity arises where a term

23

is susceptible to two reasonable interpretations.   *Cadwallader*, 848 So. 2d at 580 *citing Carrier,*

*759 So.2d at 43-44.*   Simply put, the question before the court is whether it is reasonable to find

in the absence of further definition or provision in the ISO policy that there are two

interpretations of the term "flood"–one which encompasses both a "flood" which occurs solely

because of natural causes and a "flood" which occurs because of the negligent or intentional act

of man and one which limits itself only to a flood which occurs solely because of natural causes.

## VII.   Definitions and Usage of the Word "Flood" Demonstrate Two Reasonable Interpretations of the Term

The word "flood" can be used as a verb or a noun.  In the context of the exclusionary language[9], it is used as a noun[10]. The complete definition in  Websters' Third New International Dictionary of the English Language Unabridged (1993)  is:

> ı **flood . . .n . . .1** *archaic*: a body of moving water (as a river or stream) esp. when large **2a**: the flowing in of the tide: the semidiurnal swell or rise of water in the ocean ,there is a tide in the affairs of en which, taken at the ~, leads on to fortune–Shak.>– opposed to *ebb*   **b**: the highest point of a tide <the tide is nearly at the ~>  **3a**: *rising and overflowing* of a body of water that covers land not usu. under water:  DELUGE, FRESHET <a covenant never to destroy the earth again by ~ – John Milton> – used with *the* to identify a flood os esp. severity or local interest <still date things around here from the ~, which was about the biggest excitement we ever had> or, usu. cap., the worldwide deluge reported in Gen 7 <the *Flood* in the days of Noah. **b**(1): an outpouring of considerable extent <gave way in a ~ of tears> (2): a great downpour <raining in ~s> **4**:  the element water <the rocky shore that forms a barrier between earth and ~> < willing to go through fire and ~ to gain his objective> **5a** a great stream of something (as light or lava) that flows

----

[9]"Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind" is the exact language of the exclusion.

[10]The verb is likewise defined as:
**2flood. . .vt 1a:** to cover or overwhelm with a flood: INUNDATE, DELUGE <the river ~ed the lowlands> **b:** to cover or cause to be covered with water or other fluid <in some places it is economical to irrigate by ~*ing* the fields at regular intervals> <~the bearings with oil> **2:** to fill more or less completely with water or other fluid: **a:** to increase the elevation of the water in (a channel) esp. in splashing logs in or in nullifying the effectiveness of a fall over a dam; *also*: SPLASH **b:** to supply to (the carburetor of an internal–combustion engine) an excess of fuel sufficient to raise the furl level in the float chamber above the fuel nozzle  **:** to fill (as a compartment of a submarine) with water admitted ffrom the sea **d:** to fill (an oil sand) with water to expel the oil **e:** to apply excessive ink to in printing <the form was ~*ed* and the halftones are too heavy and dark> **3a:** to fill to full capacity or to excess <shoppers ~ed the streets> <afferent impulsed ~ the brain in certain hysteric states> <~*ing* the mails with circulars> **b:** to distribute something in or provide with something in large quantities <~*ing* the country with ads> <the romm was ~*ed* with light> ~ *vi* **1a** To pour or issue like a flood <the milk ~*ed* over the table> **:** OVERFLOW <wine ~*ing* from the glass as her hand shook> **b:** to become filled to excess with some fluid <our cellar ~s after every heavy rain> *of a tide:* to run high <could tell how the tide was ~*ing* – G.W.Brace> **2:** to have an excessive menstrual flow or a uterine hemorrhage after childbirth

25

> in a steady course **b**: a large quantity widely diffused:  SUPERABUNDANCE <a ~ of
> spurious bank notes> >soon had a ~ of invitations> **6**: FLOODLIGHT **syn** see FLOW

Explanatory Note 12.4 which explains the numerical divisions contained in the definition states:

> The system of separating by numbers and letters reflects something of the
> semantic relationship between various senses of a word.  It is only a lexical
> convenience.  It does not evaluate senses or establish and enduring hierarchy of
> importance among them.  The best sense I the one that most aptly it's the context
> of an actual genuine utterance.

*Id.* at 17a.  The Compact Oxford English of Current English Dictionary  (2005) defines "flood"

as "***an overflow*** of a large amount of water over dry land." (emphasis added).

> Other definitions include:

> A general and temporary condition of partial or complete inundation of normally
> dry land areas from (1) ***overflow of inland or tidal waters,*** (2) the unusual
> ***accumulation and runoff*** of surface waters from any source, or (3) abnormal,
> flood-related erosion and undermining of **shorelines**. Flood also means
> inundation from mud flows caused by accumulations of water on or under the
> ground, as long as the mud flow and not a landslide is the proximate cause of loss.

InsWeb Article: Property Insurance Terms provided by BISYS Education Services, Inc.

(emphasis added) *See* http://www.insweb.com/learningcenter/glossary/property-f.htm.  The

American Heritage Dictionary of the English Language: Fourth Edition (2000) defines it as "an

*overflowing* of water onto land that is normally dry. (emphasis added). Cambridge Dictionaries

Online defines it as "a large amount of water covering an area that is usually dry."  *See*

http://dictionary.cambridge.org.  Thus, the majority of the definitions of the noun "flood" found

independently by the Court require an "overflowing" or an "overtopping".

Accordingly, based on these definitions of "flood", it is clear to this Court that implicit in

the "overtopping" definitions, a natural event caused by rain or tide is contemplated.  Thus, these

definitions alone provide evidence that a reasonable interpretation of the term "flood" would be inundation caused by a natural event.

This analysis, however, is further buttressed when examined in the "sense" that is gained by the context of the word as noted in the explanation of definitions contained in *Webster's Unabridged.* The term "flood" is unequivocally contained in an exclusionary clause in the insurance policies at issue. As noted, "once coverage has been extended, . . . , it should be withdrawn only when exclusion is established with certainty." *Pullen v. Employers' Liability Assur. Corp.,* 89 So.2d 373, 377 (La. 1956). Thus, the plethora of insurance case law where the issue of causation is at play with respect to the application of a water damage exclusion is a further demonstration that this term is subject to two reasonable interpretations.

## VIII.  Jurisprudence Further Demonstrates Reasonableness of Alternative Interpretations

### A.    "Flood" is Limited to Naturally Occurring Events

While defendants have cited to a number of cases where courts have found "flood" to be unambiguous and have denied coverage where even negligence or intentional acts have caused the water damage at issue, there are other cases where courts have held that the term "flood" contemplates only a naturally occurring event. In *Popkin v. Security Mut. Ins. Co.* , 48 A.D.2d 46 (N.Y. S.Ct. App. Div. 1975), the court found that the term "flood" did not contemplate water damage sustained as the result of a broken water main. It noted that the term connotes an inundation or deluge. The court continued, basing its reasoning on the *ejusdem generis* rule and *noscitur a sociis,* "Even assuming that the word 'flood' is to be given a more generic meaning as

27