or overtopping in the areas of the 17th Street Canal, the London Avenue Canal, the Industrial Canal, and the Mississippi Gulf River Outlet ("MRGO").

The following Orders and Reasons[1] are being entered in four individual cases which are part of the umbrella and all of which have as their centerpiece the issue of insurance coverage. Theses cases are:

> *Vanderbrook, et al. v. State Farm Fire & Cas. Co., et al.* C.A. No. 05-6323;

> *Xavier University of Louisiana v. Travelers Property Ca. Co. of America*, C.A. No. 06-516;

> *Chehardy, et al. v. State Farm, et al.,* C.A. No. 06-1672, 06-1673, and 06-1674; and

> *Humphreys v. Encompass Ins. Co.*, C. A. No. 06-169.[2]

Oral argument was conducted with respect to *Vanderbrook* on August 25, 2006, and with respect to *Xavier, Chehardy and Humphreys* on October 27, 2006. Based on the pleadings, memoranda, exhibits, arguments and the relevant law, the Court is prepared to rule on all the motions pending in all four cases.

**IT IS ORDERED** that this document shall be entered onto the docket of the *In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182 referencing all three of the cases noted above and *Humphreys* separately. The Court will begin with the *Vanderbrook* matter.

<p style="text-align:center">**************************</p>

---

[1]The document numbers referred to herein are those as entered in the Consolidated Matter unless otherwise noted; once a case is consolidated in the umbrella, any document filed is entered sequentially, regardless of the case to which it pertains.

[2]*Humphreys* was initially consolidated but at the request of the litigants it was terminated from the umbrella; however, in light of the inter-related nature of this case, the Court will include this case in this consolidated opinion.

**THIS ORDER PERTAINS SPECIFICALLY TO:**

*Vanderbrook, et al. v. State Farm Fire & Cas. Co., et al.* C.A. No. 05-6323;

## ORDER AND REASONS

Before the Court are the following motions filed in this matter:

| | |
|---|---|
| Doc. No. 568 | Motion for Judgment on the Pleadings filed by Hanover Ins. Co. ("Hanover") insurer of plaintiff James Capella and Madeline Grenier;[3] |
| Doc. No. 569 | Motion for Judgment on the Pleadings filed by Standard Fire Ins. Co. ("Standard") insurer of plaintiffs Peter Anthony Ascani, III, Gregory R. Jackson, and Monica Reyes; |
| Doc. No. 570 | Motion for Judgment on the Pleadings filed by State Farm Fire & Cas. Co. ("State Farm") insurer of Mary Jane Silva and Robert G. Harvey; |
| Doc. No. 572 | Motion to Dismiss Party filed by Hartford Ins. Co. of the Midwest ("Hartford") insurer of Jack Capella as the Executor of the Succession of Lillian Capella; |
| Doc. No. 598 | Motion for Judgment on the Pleadings filed by Unitrim Preferred Ins. Co. ("Unitrim") insurer of Richard Vanderbrook. |

These motions were brought in response to the class action suit brought by the "Vanderbrook" plaintiffs.

The instant petition was initially filed in Civil District Court for the Parish of Orleans on October 14, 2005. Plaintiffs filed suit seeking coverage for damages caused by the collapse of the 17th St. Canal floodwall and the ensuing water damage as well as claims against the Board of

---

[3]At oral argument on these motions, Hanover orally moved to include in its motion the claims of Madeline Grenier who had been misidentified as Sophia Granier as the insured. This motion was orally granted. Thus, the docket sheet as to this motion does not include her as the subject of the motion; however, the docket sheet should be so amended to reflect that the plaintiff Sophia Granier is actually Madeline Grenier and **IT IS SO ORDERED**. At the time of the hearing, the relevant policy of insurance was introduced and filed into the record.

Additionally, certain of the Defendants are improperly named. The Standard Fire Insurance Company ("Standard Fire") is improperly named as Travelers Insurance Company and St. Paul Travelers Insurance Company. Hartford Insurance Company of the Midwest ("Hartford") is improperly named as Hartford Insurance Company. Unitrin Preferred Insurance Company ("Unitrin") is improperly named as Kemper Insurance Company.

Commissioners for the Orleans Levee District ("OLD") for its alleged negligence. Defendants removed the case to this Court on December 2, 2005. On June 1, 2006, the Court severed the claims brought against OLD from those filed against the insurers and finding no basis for jurisdiction over OLD, remanded those claims to Civil District Court. The Court retained diversity jurisdiction over the remaining insurers.

Five different policies of insurance are involved in this case–all Homeowners/All Risk policies. Oral argument was conducted on August 25, 2006, and supplemental briefing ordered thereafter. Having reviewed the complaint, memoranda, exhibits, briefing, and the relevant law, the Court is now prepared to deliver its opinion.

It cannot be gainsaid that in approaching these motions, which are the first in a daunting line of litigation concerning insurance coverage for the losses caused by the canal breaches in New Orleans, the potential impact of such a decision on individuals as well as the insurance industry might be considered overwhelming. However, the Court believes that it is its duty to approach its analysis in a straightforward, judicious manner–that is analyzing the contractual disputes between an individual policy holder and the relevant insurer, sitting as an *Erie* court, using the civilian approach of a Louisiana court, applying the Louisiana Civil Code and seeking guidance from the jurisprudence of the state.

## I.  Civilian Approach as an *Erie* Court

This Court will apply Louisiana law in an attempt to rule as a Louisiana court would if presented with the same issues. *Musser Davis Land Co. v. Union Pacific Resources,* 201 F.3d 561,

565 (5th Cir.2000), *citing Erie R. Co. v. Tompkins,* 304 U.S. 64, 79-80, 58 S.Ct. 817, 82 L.Ed. 1188

(1938); *Mozeke v. Int'l Paper Co.,* 856 F.2d 722, 724 (5th Cir.1988). As stated in *Musser:*

> To determine a state law question, we first look to decisions of the Louisiana
> Supreme Court. *See Transcontinental Gas v. Transportation Ins. Co.,* 953 F.2d 985,
> 988 (5th Cir.1992). If the Louisiana Supreme Court has not spoken on the issue, it
> is our duty to determine as best we can what that court would decide. *See id.; Hulin
> v. Fibreboard Corp.,* 178 F.3d 316, 318-19 (5th Cir.1999).

> Under Louisiana's Civil Law tradition, courts look first and foremost to statutory law.
> The Louisiana Civil Code instructs that "[sources of law are legislation and
> custom,]" and that "[l]egislation is a solemn expression of legislative will." "[T]he
> primary basis of law for a civilian is legislation, and not (as in the common law) a
> great body of tradition in the form of prior decisions of the courts." The concept of
> *stare decisis* is foreign to the Civil Law, including Louisiana. Therefore, in cases
> such as this we are guided by decisions rendered by the Louisiana appellate courts,
> particularly when numerous decisions are in accord on a given issue-the so-called
> *jurisprudence constant*-but we are not strictly bound by them.

*Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)

(footnotes omitted). Thus, the Louisiana Civil Code provides the primary source and framework by

which this Court must review the these contracts. With this in mind, the Court will first examine

the allegations made by the plaintiffs.


## II.      The Petition and Issue Presented

Plaintiffs each own a home in New Orleans which is insured by one of the defendants and

which suffered substantial water damage at the time of Hurricane Katrina. (Petition, ¶ 7.) They

allege that "[s]ometime between 10:00 and 11:00 a.m. on August 29, 2005, before the full force of

[Hurricane Katrina] reached the City of New Orleans, a small section of the concrete outfall canal

wall known as the 17th Street Canal, suddenly broke, causing water to enter the streets of the City

of New Orleans and homes of Petitioners," which damaged Plaintiffs' homes. (<u>Id.</u>, ¶ 3.) Plaintiffs contend that "said water damage inflicted on the Petitioners' homes and property was <u>not</u> the result of flood, surface water, waves, title [sic] water, tsunami, seiche, overflow of a body of water, seepage under or over the outfall canal wall or spray from any of the above but was water intrusion, caused simply from a broken levee wall." (<u>Id.</u>, ¶ 4 (emphasis added).) Plaintiffs claim that defendants improperly failed to pay for the water damage to their homes because it is not an excluded loss. (<u>Id.</u>, ¶ 10.) Plaintiffs also contend that the water damage exclusions in the policies are unconscionable and void. (<u>Id.</u>, ¶ 11.)

Plaintiffs further allege, separately, that the Levee Board "breached their duty to Petitioners by failing to correct the break [in the canal wall] or warn others including Petitioners of the impending water intrusion . . . ." (<u>Id.</u>, ¶ 6.) As noted, these allegations have been severed and remanded to state court.

Plaintiffs contend that because Louisiana employs the "efficient proximate cause doctrine" with respect to coverage and because the third-party negligence of Orleans Levee District is the efficient, proximate cause of the subsequent flooding of plaintiffs' homes, their Homeowners Policies should provide coverage. The defendants maintain that under the clear, unambiguous terms of the policies at issue, they are entitled to judgment as a matter of law.

## III.    Standard for Judgment on the Pleadings

When a defendant attacks the complaint because it fails to state a legally cognizable claim, Rule 12(b)(6) provides the appropriate challenge. The test for determining the sufficiency of a complaint under Rule 12(b)(6) is that "'a complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.'" *Id. citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Fifth Circuit explained:

> Subsumed within the rigorous standard of the *Conley* test is the requirement
> that the plaintiff's complaint be stated with enough clarity to enable a court or an
> opposing party to determine whether a claim is sufficiently alleged. *Elliott v. Foufas,*
> 867 F.2d 877, 880 (5th Cir. 1989). Further, "the plaintiff's complaint is to be
> construed in a light most favorable to plaintiff, and the allegations contained therein
> are to be taken as true." *Oppenheimer v. Prudential Securities, Inc.* 94 F.3d 189, 194
> (5th Cir. 1996). This is consistent with the well-established policy that the plaintiff
> be given every opportunity to state a claim. *Hitt*, 561 F.2d at 608. In other words,
> a motion to dismiss an action for failure to state a claim"admits the facts alleged in
> the complaint, but challenges plaintiff's rights to relief based upon those facts." *Tel-*
> *Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992). Finally,
> when considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the
> district court must examine the complaint to determine whether the allegations
> provide relief on any possible theory. *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.
> 1994).

*Id.* at 161-62. Bearing this standard in mind, the court will examine the civilian rules of construction

to aid it in its determination of the viability of defendants' motions.

## IV. Legal Concepts for Contract Interpretation

### A.     Insurance Policy is a Contract and Rules of Construction

"An insurance policy is a conventional obligation that constitutes the law between the

insured and insurer, and the agreement governs the nature of their relationship." La. Civ. Code art.

1983; *Edwards v. Daugherty*, 883 So.2d 932, 940 (La. 2004); *Peterson v. Schimek*, 729 So.2d 1024,

1028 (La. 1999). As such, the general rules of contract interpretation as set forth in the Louisiana

Civil Code guide the Court in interpreting the subject insurance policies. *Peterson*, 729 So.2d at

1028. "The judiciary's role in interpreting insurance contracts is to ascertain the common intent of

7

the parties to the contract. *See* La. Civ. Code art. 2045; *Carbon* [*v. Allstate Ins. Co.,* 97-3085, p. 4

(La. 10/20/98, 719 So. 2d 437, 439]*; Louisiana Ins.* [*Guar. Ass'n v. Interstate Fire & Cas. Co.* 03-

0911, p. 5 (La. 1/14/94)], 630 So.2d 759, 763." *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577 (La.

2003).

In *Cadwallader*, the Supreme Court of the State of Louisiana set forth succinctly the most

important guiding principles:

> Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. *See* La. Civ Code art. 2047; *Peterson v. Schimek,* 98-1712, p. 5 (La.3/2/99), 729 So.2d 1024, 1028-29; *Carbon,* 719 So.2d at 440-441; *Reynolds,* 634 So.2d at 1183. An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion. *Carrier v. Reliance Ins. Co.,* 99-2573, p. 11 (La.4/11/00), 759 So.2d 37, 43; *Peterson,* 729 So.2d at 1029. The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent. *Succession of Fannaly v. Lafayette Ins. Co.,* 01-1355, p. 4 (La.1/15/02), 805 So.2d 1134, 1138; *Peterson,* 729 So.2d at 1029.
>
> . . .
>
> If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. *Fannaly,* 805 So.2d at 1137; *Louisiana Ins.,* 630 So.2d at 764. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. *Peterson,* 729 So.2d at 1029; *Louisiana Ins.,* 630 So.2d at 764. The determination of whether a contract is clear or ambiguous is a question of law. *Louisiana Ins.,* 630 So.2d at 764.

*Cadwallader*, 848 So.2d at 580 (coverage provided by UM policy for resident relative in household

did not include foster children).   In addition, an insurance contract "is construed as a whole and

each provision in the policy must be interpreted in light of the other provisions so that each is given

8

meaning. One portion of the policy should not be construed separately at the expense of disregarding other provisions." La. Civ. Code art. 2050. *Peterson*, 729 So.2d at 1029.

### B.    All-Risks Liability Insurance: Coverage, Exclusions and Ambiguities

A Homeowners Policy is considered a type of "all-risks" insurance. " All-risks insurance is a special type of insurance extending to risks not usually contemplated, and generally allows recovery for all fortuitous losses, unless the policy contains a specific exclusion expressly excluding the loss from coverage." Jane Massey Draper, "Coverage Under All-Risk Insurance", 30 A.L.R.5th 170. The United States Court of Appeals for the Fifth Circuit acknowledged this concept stating, "[a] policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Alton Ochsner Medical Foundation v. Allendale Mut. Ins.*, 219 F.3d 501, 504 (5th Cir. 2000), *citing U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.,* 690 F.2d 459, 461 (5th Cir.1982) (construing Louisiana law and citing *Dow Chem. Co. v. Royal Indem. Co.,* 635 F.2d 379, 387 (5th Cir.1981) (construing Texas law)).

Thus, in the context of the instant motions, under Louisiana law, unless there is a specific exclusion for the type of water damage that an insured has incurred, coverage is presumed under these policies. The focus of a court's inquiry then is on the relevant exclusions to coverage. "When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. . . . On the other hand, the insurer bears the

9

burden of proving the applicability of an exclusionary clause within a policy." *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000).

With respect to the proper approach concerning the interpretation of an exclusion, they are generally strictly construed. *Bezue v. Hartford Accident and Indem. Co.*, 224 So.2d 76, 77 (La. App. 1st Cir. 1969). *Cadwallader* further amplifies this concept:

> Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. La. Civ. Code art. 2056; *Carrier*, 759 So.2d at 43; *Louisiana Ins.*, 630 So.2d at 764. Under this rule of strict construction, **equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer.** *Carrier*, 759 So.2d at 43.

*Cadwallader*, 848 So.2d at 580 (emphasis added). This rule of interpretation is based on the fact that these provisions are prepared by the insurer, and the insured had no voice in the preparation. *Louisiana Ins.*, 630 So.2d at 764. This type of contract is commonly referred to as a contract of adhesion. Article 2056 states, "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ. Code art. 2056; *see Louisiana Ins. Guar. Assoc.*, 630 So.2d at 764 *citing* 15 *Civil Law Treatise, Insurance Law and Practice* § 4 (1986) and W. Freedman, 2 *Richards on the Law of Insurance* § 11:2[f] (6th Ed. 1990) ("*Richards*"). "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Cadwallader*, 848 So. 2d at 580 *citing Carrier*, 759 So.2d at 43-44. (emphasis in original) and *Louisiana Ins. Guar. Assoc.*, 630 So.2d at 770.

10

The Supreme Court of Louisiana gave further instruction with respect to the interpretation

of an ambiguity in *Louisiana Ins. Guar. Assoc.* stating:

> "Ambiguity will also be resolved by ascertaining how a reasonable insurance policy
> purchaser would construe the clause at the time the insurance contract was entered."
> *Breland v. Schilling,* 550 So.2d 609, 610-11 (La.1989). The court should construe
> the policy "to fulfill the reasonable expectations of the parties in the light of the
> customs and usages of the industry." *Trinity Industries,* 916 F.2d at 269 (5th
> Cir.1990) (citing *Benton,* 379 So.2d at 231 and LSA-C.C. Arts. 2045, 2050, 2053 and
> 2054). In insurance parlance, this is labelled the reasonable expectations doctrine.
> *Richards, supra* at § 11:2[g].

*Louisiana Ins. Guar. Assoc.,* 630 So.2d at 764.   The Louisiana Supreme Court then noted in a

footnote:

> "The reasonable expectations doctrine can be capsulized as follows: "courts will
> protect the [insured's] reasonable expectations . . . regarding the coverage afforded
> by insurance contracts even though a careful examination of the policy provisions
> indicates that such expectations are contrary to the expressed intention of the
> insurer." R. Keeton and A. Widiss, *Insurance Law* § 6.13 (1988).

*Id.* at n. 19.   Thus, if after applying the other general rules of construction, an ambiguity remains,

the ambiguous contractual provision is to be construed against the insurer who furnished the policy's

text and in favor of the insured finding coverage.  La. Civ. Code art. 2056.  *Peterson,* 729 So. 2d

at 1029.  "It is the reasonable interpretation of an insured that governs the legal effect of language

in an insurance contract, and not whether the language chosen by an insurer may constitute a legal

term of art in another context."  *Lee v. Unum Life Ins. Co. of America,* 900 So.2d 1021, 1029 (La.

App. 4th Cir. 2005).


### C.  Exclusions and Canons of Construction

The Louisiana Supreme Court in interpreting an exclusion to coverage in the context of a

company's public liability insurance stated:

11

> The exclusion clause must necessarily be examined and interpreted in the light of its own design and intent, as well as in view of the objects and purposes of the policy. Once coverage has been extended, as it is quite clearly the purpose of the policy to do and as has been done here, it should be withdrawn only when exclusion is established with certainty. And because comprehensive exclusion is violative of the purpose and intent of policy coverage, exclusion must necessarily be specific and not general. It is specific, as distinguished from comprehensive, when it particularly identifies the insured or insureds intended to be excluded. The exclusion clause, as its name implies, sets forth the traits, characteristics and circumstances that mark an insured for exclusion. And the insured or insureds to be excluded must bear the marks and traits, or conform with the circumstances, described and particularized in the exclusion clause as the basis for exclusion.'

*Pullen v. Employers' Liability Assur. Corp.,* 89 So.2d 373, 377 (La. 1956).

Indeed, in *Anderson v. Indiana Lumbermens Mut. Ins. Co.*, 127 So.2d 304 (La. App. 2nd Cir. 1961), a Louisiana appellate court dealt with a claim made on homeowner policy where "collapse" was a covered peril and there was an exclusion which provided that the insurer would not be liable "for loss caused directly or indirectly by earthquake, **or other earth movements** except landslides." *Id.* at 304 (emphasis added). In the home in question, a crack had appeared in the wall of the house and since that time, the crack had become larger, extending into the ceiling of the living room and cracks had appeared in the walls, at every window and door in the house. The door frames were out of square and the foundation was broken, cracked, fallen and uneven. It was alleged in that case that the cause of damage to the home was (1) the expansion and contraction of the soil which had caused (2) the cracking, breaking and falling of the concrete slab (3) combined with the falling cracking, breaking and unequal settlement of the building (4) thus impairing the basic structural integrity of the building. The insurer maintained that the damage to the house did not constitute a "collapse" and that even if it did, it was excluded as it was caused by "other earth movements."

The appellate court noted that there was no precedent for an interpretation of "collapse" in Louisiana and noted that there were four cases rendered outside of Louisiana where the evidence

did not indicate the structure had completely fallen down or caved in–two finding coverage and two

denying coverage based on this exclusion.

The court, after discussing the guidance provided by the Civil Code in determining the

construction of the word "collapse", noted:

> LSA-Civil Code, art. 1955 providing that 'all clauses of agreements are interpreted
> the one by the other, giving to each the sense that results from the entire act' appears
> to be a statement of the 'ejusdem generis' rule of construction, concerning which
> Black's Law Dictionary states:
>> 'In the construction of laws, wills, and other instruments, the
>> 'ejusdem generis rule' is, that where general words follow an
>> enumeration of persons or things, by words of a particular and
>> specific meaning, such general words are not to be construed in their
>> widest extent, but are to be held as applying only to persons or things
>> of the same general kind or class as those specifically mentioned.
>> Black, Interp. of Laws, 141; Goldsmith v. U.S., C.C.A.N.Y., 42 F.2d
>> 133, 137; Aleksich v. Industrial Accident Fund, 116 Mont. 69 (127),
>> 151 P.2d 1016, 1021. The rule, however, does not necessarily require
>> that the general provision be limited in its scope to the identical
>> things specifically named. Nor does it apply when the context
>> manifests a contrary intention.
>> 'The maxim 'ejusdem generis', is only an illustration of the broader
>> maxim, 'noscitur a sociis'. State v. Western Union Telegraph Co., 196
>> Ala. 570, 72 So. 99, 100.'
>
> And, in defining the phrase, 'noscitur a sociis', as used in the aforesaid definition the
> following explanation and definition are given:
>
>> 'It is known from its associates, 1 Vent. 225. The meaning of a word
>> is or may be known from the accompanying words. 3 Term R. 87;
>> Broom, Max. 588. Morecock v. Hood, 202 N.C. 321, 162 S.E. 730,
>> 731; Louis Pizitz Dry Goods Co. v. Fidelity & Deposit Co. of
>> Maryland, 223 Ala. 385, 136 So. 800, 801.
>> 'The doctrine means that general and specific words are associated
>> with and take color from each other, restricting general words to
>> sense analogous to less general. Dunham v. State, 140 Fla. 754, 192
>> So. 324, 325, 326.'

*Anderson*, 127 So.2d 306-07; *but see, Nida v. State Farm Fire & Cas. Co.*, 454 So.2d 328 (La. App.

3rd Cir. 1984) (insurance definition of "collapse" in policy at issue revised to deny coverage for

13

losses against settling). The *Anderson* court eventually found that the insurance at issue therein provided coverage finding that "collapse" would not be given an "abstract, narrow construction." Citing to *Jenkins v. United States Fire Ins. Co.*, 185 Kan. 665, 347 P.2d 417 (Kan. 1959), the court noted that construing on the basis of intention, it would be understood that if the settling, falling, cracking bulging or breaking of the insured building so materially impaired the basic structure, that it would be considered a "collapse." Thus, the Court in interpreting the **risk insured** employed the **expansive** definition.

The court then found that the **exclusion** was to be **narrowly construed** relying on *Pullen.* It found that "other earth movements" is entirely "too general to have application to any degree of certainty" to the causation of the "collapse" of the subject building as the cause of damage would embrace "the same general kind, class or nature of peril as its companion words 'earthquake' and 'landslide.'" *Anderson*, 127 So.2d at 308-09. As such, the concept of the "specific controls the general" was used to find the exclusion limited a more violent earth movement–not just the natural expansion and contraction of the soil that had allegedly caused the damage for which coverage was sought. *See also, Smith v. Burton*, 928 So.2d 74, 79 (La. App. 1st Cir. 2005); *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil* Corp., 289 F.3d 373, 377 (5th Cir. 2002); *Sommers v. State Farm Fire and Cas. Co.*, 764 So.2d 87, 91 (La. App. 4th Cir. 2000) (where general terms precede specific terms, principle is the same: general terms should be construed to encompass things similar or analogous to those in the specific terms). With these precepts in mind the Court will now turn to the specific water damage exclusions at issued before the Court.

## V.     Insuring Language and Exclusions of the Policies at Issue

### a. ISO Policies

The "ISO policies"[4] issued by Standard Fire, Hartford, Hanover and Unitrin, all contain

identical language. As to the coverage provided, each policy states:

> COVERAGE A - DWELLING and COVERAGE B- OTHER STRUCTURES:
> We insure against risk of direct loss to property described in Coverages A and B
> only if that loss is a physical loss to property.

(Standard Fire Policies, App. at INS 94 and INS 134; Hartford Policy, App. at INS 53; Hanover

Policy, App. at INS 7; Unitrin Policy, App. at INS 169.)[5]    Following the coverage provision, this

exclusion appears:

> (1)    We do not insure for loss **caused directly or indirectly by any of the
> following.** Such loss is excluded regardless of any other cause or event
> contributing concurrently or in any sequence to the loss.[6]
>     . . .
> **(c) Water Damage**, meaning:
>       Flood, surface water, waves, tidal water, overflow of a body of water,
>       or spray from any of these, whether or not driven by wind;

(Standard Fire Policies, App. at INS 96 and INS 136; Hartford Policy, App. at INS 56; Hanover

Policy, App. at INS 9; Unitrin Policy, App. at INS 171.)  "Flood" is not defined anywhere in the

policy. this exclusion will be referred to as the ISO exclusion.

---

[4]"ISO" is an acronym for "Insurance Service Office, Inc." which provides products and services help to the insurance industry to measure, manage and reduce risk. It provides standardized insurance policy language such as the policies noted herein. *See,* ISO Homepage at www.iso.com.

[5]These citations refer to the appendix filed in conjunction with the Motion for Judgment on the Pleadings filed by Hanover Ins. Co. (Doc. No. 568) that was used as a joint exhibit containing all of the insurance policies at issue herein.

[6]This provision is generally referred to as an "anti-concurrent cause clause." Its genesis was the result of court decisions utilizing the "concurrent causation doctrine". Under this doctrine, the insurer is obligated to pay for damages resulting from a combination of covered and excluded perils if the efficient proximate cause is a covered peril. To counteract these decisions, insurers began employing the anti-concurrent cause clause to exclude losses if caused in whole or in part, in any sequence of events by an excluded peril. Stephen P. Pate, *Recent Developments in Property Insurance Law,* 33 Tort & Ins. L.J. 659, 663 (1998).

**b. State Farm Policy with "Lead-In" Provision**

The State Farm policies note at the outset that "We insure for accidental direct physical loss

to the property described in Coverage A, except as provided in SECTION I-LOSSES NOT

INSURED." They then provide:

> SECTION I -LOSSES INSURED
> Coverage A-Dwelling
> We insure for accidental direct physical loss to the property described in Coverage A, except
> as provided in Section I–LOSSES NO INSURED.
>
> SECTION I - LOSSES NOT INSURED
>
> 2.     We do not insure under any coverage for loss which would not have occurred in the
> absence of one or more of the following excluded events. We do not insure for such loss
> regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c)
> whether other causes acted concurrently or in any sequence with the excluded event to
> produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or
> widespread damage, arises from natural or external forces, or occurs as a result of any
> combination of these:[7]
>
> c.     (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from
> any of these all whether driven by wind or not;

(Doc. 570, Exhibit A and B, pp. 7 and 10).

**C. Hartford Policy's specific Flood Definition**

Of all of these policies, only Hartford includes an "Amendatory Endorsement Specifically

Excepted Perils." (Form H-380). This two page provision provides in relevant part:

> As used herein, Peril means a cause of physical loss or damage to property.  It has this
> meaning whether or not it is called a Peril or a Cause of Loss in this policy.
>
> Even if any of the terms of this policy might be construed otherwise, the following Perils, as
> described in Paragraphs A. and B. below, are SPECIFICALLY EXCEPTED FROM THIS
> POLICY.  WE DO NOT COVER INSURE AGAINST LOSS OR DAMAGE DIRECTLY OR
> INDIRECTLY CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED
> BY, OR WHICH WOULD NOT HAVE OCCURRED BUT FOR, EITHER OF THESE PERILS:

---

[7]This subsection is known as the "lead-in" provision.

16

A. ACTS, ERRORS OR OMISSIONS

. . .

3.      The design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of all or any part of the following:

b.      Roads, water or gas mains, sewers, drainage ditches, levees, dams, or other facilities; . . .

5.      The maintenance of any of such property or facilities.

. . .

This exception A. applies whether or not the property or facilities described above are:

1.      Covered under this policy; or

2.      On or away from the covered premises.

This exception A. does not reduce the insurance for loss or damage caused directly by a Covered Peril.

As used in this endorsement:

1.      If this policy is written to cover the risk of loss from specifically named causes, **Covered Peril** means any Peril specifically named as covered;

2.      If written to cover the risk of loss without specifying specifically named causes, Covered peril means any Peril not described above and not otherwise excluded or excepted from the causes of loss covered by this policy.

B.      COLLAPSE CRACKING OR SHIFTING of buildings, other structures or facilities, or their parts, if the collapse, cracking or shifting:

1.      Occurs during earth movement, volcanic eruption or flood conditions or within 72 hours after they cease; and

2.      Would not have occurred but for earth movement, volcanic eruption, or flood.

But if loss or damage by a Covered Peril ensues at the covered premises, we will pay for that ensuing loss or damage.

This exception B. applies whether or not there are other provisions in this policy relating to collapse, cracking or shifting of buildings, other structures or facilities, or their parts. Any such provision is revised by this endorsement to include this exception.

But if this policy specifically covers (by endorsement or in any other way) loss or damage caused by one or more of the following Perils:

...
2. Flood:

this exception B. will not reduce that coverage.

As used in this exception B:

17

. . .

6.      flood means:

   a.      Flood, surface water, waves, tides, tidal water, tidal waves, high water, and
           overflow of any body of water, or their spray, all whether driven by wind or
           not;
   b.      Release of water held by a dam, levy (sic) or dike or by a water or flood
           control device; . . .

All other provisions of this policy apply.

(Doc. 568, Hartford Policy, App. at INS 74-75).  Thus,   Hartford's  Amendatory Endorsement

Specifically Excepted Perils defines the term "flood" and specifically includes the release of water

held by a levee or a flood control device.


## VI.     Parties' Contentions

Defendants[8] contend that all water damage caused by the canal breach is excluded from

coverage as these policies exclude coverage for water damage resulting from a "flood" and that

clearly the inundation of the City of New Orleans caused by the failure of its levees was a "flood."

Seeking the broadest possible definition of the term, defendants maintain that "flood" is not limited

to natural events. For this proposition they maintain that under Louisiana law, a court is "required

to interpret the term using its plain, ordinary and generally prevailing meaning" and should not

enlarge insurance coverage beyond that which is reasonably contemplated." *Cadwallader*, 848

So.2d at 583-84.

Defendants rely on *Kane v. Roby Ins. Co.,* 768 P.2d 678, 681 (Colo. 1989) for this

proposition.  In *Kane*, plaintiffs' property had been damaged by a flood caused by a dam failure.

---

[8]The Court would note that while a consolidated memorandum was filed on behalf of the insurers as
instructed by the Court, individual arguments were also made. The Court has reviewed these and will only address
those specific arguments when they diverge in a relevant way from the whole.

18

Plaintiffs had in place a certain all-risk policies covering direct physical loss thereto except that which was excluded. The water damage exclusion was identical to the ISO policy noted above; it excepted "flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water or spray from any of the foregoing, all whether driven by wind or not." *Id.* at 680. The insureds maintained in that suit that the term "flood" was ambiguous as it was not defined and no distinction was made between naturally and artificially caused floods, and as such should have been limited to natural events.

A divided Supreme Court of the State of Colorado held for the insurers. The majority stated:

> The generally accepted meaning of the term "flood" does not include a distinction between artificial and natural floods. For example, *Webster's New World Dictionary* 535 (2d ed. 1974), defines "flood" as: "[A]n overflowing of water on an area normally dry; inundation; deluge. . . ." *Webster's Ninth New Collegiate Dictionary* 474 (9th ed. 1988), defines the term as: "[A] rising and overflowing of a body of water esp [ecially] onto normally dry land. . . ." *Black's Law Dictionary* (5th ed. 1979), contains a similar definition: "An inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be." The inundation of insureds' normally dry land falls squarely within these generally accepted definitions of the term "flood."[FN2] *See Bartlett v. Continental Divide Ins. Co.,* 697 P.2d 412 (Colo.App.1984) (no distinction in insurance policy between natural and artificial causes of flood; to make such distinction would be to rewrite the terms of the policy).

*Id.* at 681.

Thus, the majority rejected the concept that causation–that is the failure of a man-made object which would cause an "artificial" flood as opposed to a naturally occurring flood–would influence the interpretation of the exclusion. In so finding, it distinguished a prior decision, *Ferndale Development Co. v. Great American Ins. Co.,* 34 Colo. App. 258, 527 P.2d 939 ( Colo. App.1974), wherein a Colorado appellate court had found the term "flood" ambiguous and found coverage where a broken city water line caused the "inundation of the footings and foundations

19

of a partially completed condominiums being constructed by the insured." The majority

reasoned that in *Ferndale*, "the term 'flood' was ambiguous not only because the water was

released from a man-made object, but also because a water main is not so clearly a 'body of

water,'" and because "the amount released was less clearly an 'inundation' or 'deluge'."

Plaintiffs in *Kane* also contended, relying on *Koncilja v. Trinity Universal Ins. Co.* , 528

P.2d 939 (Colo. App. 1974), that even if the flood exclusion applied, the "efficient moving

cause" of their loss was a covered risk, that is the third party negligence leading to the failure of

the Lawn Lake Dam, and coverage should be available. In *Koncilja,* the damage at issue was

caused by a broken water pipe embedded in the floor of the house which caused the ground

beneath the house to subside which, in turn, caused the house to settle and crack. The

homeowners' insurance policy at issue insured against "loss occurring as a result of '[accidental

discharge, leakage or overflow of water or steam from within a plumbing . . . system.'" The

claim was initially denied based on an exclusion of losses "'caused by, resulting from,

contributed to, or aggravated by any earth movement [or] water below the surface of the

ground.'" *Kane,* 768 P.2d at 684, citing *Koncilja.* at 940.  The *Koncilja* court applied the efficient

proximate cause rule that where there is a concurrency of different causes, the efficient

cause–the one that sets others in motion–is the cause to which the loss is to be attributed, though

the other causes may follow it, and operate more immediately.  *Id.*  The *Koncilja* court noted that

while the excluded settling of earth may have "operated more immediately in producing the

damages, the predominate or efficient proximate cause of the loss was the accidental leakage

from the plumbing system." *Id.*  Thus,  the *Koncilja* court found that as these provisions gave

20

rise to an ambiguity as to the extent of policy coverage, the contract should be construed in favor

of coverage.

The majority of Colorado supreme court found that there was no such conflict of

provisions of coverage in the *Kane* policies.  The majority stated:

> Third party negligence is not a covered risk which creates inconsistency or
> ambiguity between the language of coverage and the language of exclusion.
> Although loss from third party negligence is covered under an "all risk" policy,
> that coverage is expressly subject to the language of the exclusions included in
> the policy. Under the policy language here, the insureds' loss which is caused by,
> resulting from, contributed to or aggravated by a flood is excluded regardless of
> the existence of any other contributing cause. Unlike in *Koncilja,* there is no
> inconsistency or ambiguity in the inclusionary and exclusionary language of the
> insurance policies in this case.
>     Moreover, the "efficient moving cause" rule set forth in *Koncilja* does not
> control our decision in this case. We believe that the "efficient moving cause"
> rule, if it were to be adopted by this court, must yield to a well-settled principle of
> law: namely, that courts will not rewrite a contract for the parties. *See, e.g.,*
> *Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988).

*Id.* at 685.  Thus, the majority held that the term "flood" in the insurance policies at issue

included both naturally and artificially caused floods.

Other cases cited by the defendants herein for the proposition  that the term "flood" in an

insurance policy includes both naturally and artificially caused floods include *Bartlett v. Cont'l*

*Divide Ins. Co.*, 697 P.2d 412, 413 (Colo. Ct. App. 1984) (lower court decision concerning

apparently the same Lawn Lake Dam collapse finding no distinction between natural and

artificial causes where dam failure caused damage); *TNT Speed & Sport Ctr., Inc. v. American*

*States Ins. Co.*, 114 F.3d 731 (8th Cir. 1997) (no coverage where vandals removed sandbags and

dirt from levee causing levee to break); *Pakmark Corp. v. Liberty Mut Ins. Co.,* 943 S.W. 2d

(Mo. Ct. app. 1997) (no coverage where levee broke); *E.B. Metal & Rubber Indus. Inc. v.*

21

*Federal Ins. Co.* , 444 N.Y.S. 2d 321 (N.Y. App. Div. 1981) (no coverage for water damaged

caused by improperly constructed and maintained dike that failed).

Plaintiffs maintain that the *Kane* majority is incorrect. They argue that in the context of

this exclusion, "flooding" is limited to natural events. The "flooding" was not caused by the

overtopping of the levees or by rainwater filling the City with surface water.

Plaintiffs cite to *Riche v. State Farm Fire and Casualty Co.*, 356 So.2d 101 (La. App. 1st

Cir. 1978), *writ denied*, 358 So.2d 639 (La. 1978). In this case, plaintiff sought to recover under

his homeowner's policy for the loss of his fishing gear which was on the bass boat of a third-

party which sank during a windstorm. The plaintiff maintained that his damage was a direct loss

of property defined as "unscheduled personal property" caused by a windstorm which was a

named peril under his homeowner's policy . The insurer maintained that the loss was instead

caused by wind making waves from surface water, waves causing water to flow into the boat,

compounded by a defective bilge pump. Thus, the loss was not caused by windstorm, but by the

sinking of a boat. *Id.* at 102.

The appellate court noted that the "direct loss" means the dominant and efficient cause of

the loss and that as such, relying on *Roach-Strayhan-Holland Post v. Continental Ins. Co.*, 237

La. 973, 112 So.2d 680 (La. 1959) wherein it states "that it is sufficient, in order to recover upon

a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate

or efficient cause of the loss or damage, notwithstanding other factors contributing thereto."

The trial court had held that coverage for the personal property was excluded under the water

exclusion provision which provided:

This policy does not insure against loss:

22

3.    Caused by, resulting from, contributed to or aggravated by any of the following:

(a) Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. . . "

*Id.* at 103. The appellate court found that "when read as a whole, [this exclusion] contemplates only such damage caused by water **which has risen over and covered areas not ordinarily covered by water**." *Id.* at 103-04 (emphasis added). The court found this exclusion was inapplicable to damage caused by a windstorm or resulting waves over a body of water, finding that "this interpretation is in line with the rule of construction that exclusionary clauses are strictly construed. *See Bezue v. Hartford Acc. and Indem. Co., Hartford Conn.*, 224 So.2d 76 (La. App. 1st Cir. 1969)."

Plaintiffs contend that this case demonstrates that Louisiana courts have construed this water damage exclusion as requiring the **rising over** of water which was not the manner in which the water at issue is alleged to have inundated the insureds' homes. Rather, they maintain it was the negligence of OLD that caused the canal walls to collapse.

Thus, the salient question becomes whether, in the context of an all-risk policy where coverage is provided for direct loss to property, these insurance provisions which exclude coverage for water damage caused by "flood" clearly and unambiguously exclude from coverage damages caused by the alleged third party negligence of OLD which plaintiffs contend caused a section of the floodwall at the 17th Street Canal to break causing water to enter the streets of the City of New Orleans and homes of the plaintiffs in this suit. While words and phrases in insurance polices are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, an ambiguity arises where a term

23

is susceptible to two reasonable interpretations.   *Cadwallader*, 848 So. 2d at 580 *citing Carrier,*

759 So.2d at 43-44.   Simply put, the question before the court is whether it is reasonable to find

in the absence of further definition or provision in the ISO policy that there are two

interpretations of the term "flood"–one which encompasses both a "flood" which occurs solely

because of natural causes and a "flood" which occurs because of the negligent or intentional act

of man and one which limits itself only to a flood which occurs solely because of natural causes.

## VII. Definitions and Usage of the Word "Flood" Demonstrate Two Reasonable Interpretations of the Term

The word "flood" can be used as a verb or a noun. In the context of the exclusionary language[9], it is used as a noun[10]. The complete definition in Websters' Third New International Dictionary of the English Language Unabridged (1993) is:

> 1 flood . . .*n* . . .1 *archaic*: a body of moving water (as a river or stream) esp. when large **2a**: the flowing in of the tide: the semidiurnal swell or rise of water in the ocean ,there is a tide in the affairs of en which, taken at the ~, leads on to fortune–Shak.>– opposed to *ebb*   **b**: the highest point of a tide <the tide is nearly at the ~> **3a**: *rising and overflowing* of a body of water that covers land not usu. under water:  DELUGE, FRESHET <a covenant never to destroy the earth again by ~ – John Milton> – used with *the* to identify a flood os esp. severity or local interest <still date things around here from the ~, which was about the biggest excitement we ever had> or, usu. cap., the worldwide deluge reported in Gen 7 <the *Flood* in the days of Noah. **b**(1): an outpouring of considerable extent <gave way in a ~ of tears> (2): a great downpour <raining in ~*s*> **4**:  the element water <the rocky shore that forms a barrier between earth and ~> < willing to go through fire and ~ to gain his objective> **5a** a great stream of something (as light or lava) that flows

[9]"Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind" is the exact language of the exclusion.

[10]The verb is likewise defined as:
**2flood**. . .*vt* **1a**: to cover or overwhelm with a flood:  INUNDATE, DELUGE <the river ~ed the lowlands> **b**:  to cover or cause to be covered with water or other fluid <in some places it is economical to irrigate by ~*ing* the fields at regular intervals> <~the bearings with oil> **2**: to fill more or less completely with water or other fluid:  **a**: to increase the elevation of the water in (a channel) esp. in splashing logs or in nullifying the effectiveness of a fall over a dam; *also*:  SPLASH  **b**: to supply to (the carburetor of an internal–combustion engine) an excess of fuel sufficient to raise the furl level in the float chamber above the fuel nozzle  **:**  to fill (as a compartment of a submarine) with water admitted ffrom the sea  **d:**  to fill (an oil sand) with water to expel the oil  **e:**  to apply excessive ink to in printing <the form was ~ed and the halftones are too heavy and dark> **3a**: to fill to full capacity or to excess <shoppers ~ed the streets> <afferent impulsed ~ the brain in certain hysteric states> <~*ing* the mails with circulars> **b**: to distribute something in or provide with something in large quantities <~*ing* the country with ads> <the romm was ~ed with light> ~ *vi* **1a** To pour or issue like a flood <the milk ~ed over the table> **:** OVERFLOW <wine  ~*ing* from the glass as her hand shook> **b**: to become filled to excess with some fluid <our cellar ~*s* after every heavy rain>  *of a tide*: to run high <could tell how the tide was ~*ing* – G.W.Brace> **2**: to have an excessive menstrual flow or a uterine hemorrhage after childbirth

> in a steady course **b:** a large quantity widely diffused:  SUPERABUNDANCE <a ~ of
> spurious bank notes> >soon had a ~ of invitations> **6:** FLOODLIGHT **syn** see FLOW

Explanatory Note 12.4 which explains the numerical divisions contained in the definition states:

> The system of separating by numbers and letters reflects something of the
> semantic relationship between various senses of a word.  It is only a lexical
> convenience.  It does not evaluate senses or establish and enduring hierarchy of
> importance among them.  The best sense I the one that most aptly it's the context
> of an actual genuine utterance.

*Id.* at 17a.  The Compact Oxford English of Current English Dictionary  (2005) defines "flood"

as "*an overflow* of a large amount of water over dry land." (emphasis added).

> Other definitions include:

> A general and temporary condition of partial or complete inundation of normally
> dry land areas from (1) *overflow of inland or tidal waters,* (2) the unusual
> *accumulation and runoff* of surface waters from any source, or (3) abnormal,
> flood-related erosion and undermining of **shorelines**. Flood also means
> inundation from mud flows caused by accumulations of water on or under the
> ground, as long as the mud flow and not a landslide is the proximate cause of loss.

InsWeb Article: Property Insurance Terms provided by BISYS Education Services, Inc.

(emphasis added) *See* http://www.insweb.com/learningcenter/glossary/property-f.htm.   The

American Heritage Dictionary of the English Language: Fourth Edition (2000) defines it as "an

*overflowing* of water onto land that is normally dry. (emphasis added). Cambridge Dictionaries

Online defines it as "a large amount of water covering an area that is usually dry."   *See*

http://dictionary.cambridge.org.   Thus, the majority of the definitions of the noun "flood" found

independently by the Court require an "overflowing" or an "overtopping".

Accordingly, based on these definitions of "flood", it is clear to this Court that implicit in

the "overtopping" definitions, a natural event caused by rain or tide is contemplated.  Thus, these

definitions alone provide evidence that a reasonable interpretation of the term "flood" would be inundation caused by a natural event.

This analysis, however, is further buttressed when examined in the "sense" that is gained by the context of the word as noted in the explanation of definitions contained in *Webster's Unabridged.* The term "flood" is unequivocally contained in an exclusionary clause in the insurance policies at issue. As noted, "once coverage has been extended, . . . , it should be withdrawn only when exclusion is established with certainty." *Pullen v. Employers' Liability Assur. Corp.,* 89 So.2d 373, 377 (La. 1956). Thus, the plethora of insurance case law where the issue of causation is at play with respect to the application of a water damage exclusion is a further demonstration that this term is subject to two reasonable interpretations.

## VIII.   Jurisprudence Further Demonstrates Reasonableness of Alternative Interpretations

### A.   "Flood" is Limited to Naturally Occurring Events

While defendants have cited to a number of cases where courts have found "flood" to be unambiguous and have denied coverage where even negligence or intentional acts have caused the water damage at issue, there are other cases where courts have held that the term "flood" contemplates only a naturally occurring event. In *Popkin v. Security Mut. Ins. Co.* , 48 A.D.2d 46 (N.Y. S.Ct. App. Div. 1975), the court found that the term "flood" did not contemplate water damage sustained as the result of a broken water main. It noted that the term connotes an inundation or deluge. The court continued, basing its reasoning on the *ejusdem generis* rule and *noscitur a sociis,* "Even assuming that the word 'flood' is to be given a more generic meaning as

27

an overflowing abundance or a great quantity, **it must be noted that the other terms utilized in the exclusionary clause containing such word relate to natural phenomena."**[11] *Id.* at 495 (emphasis added). Another New York court, cited *Popkin* concluding that the exclusionary provisions pertain only to damages arising from natural causes. *Ender v. National Fire Ins. Co. of Hartford*, 169 A.D.2d 420, 421 (N.Y. S. Ct. App. Div. 1991).

An Arkansas appellate court likewise found that a similar water exclusion as presented in the State Farm policy contemplated only flooding that results from a natural cause. In *Ebbing v. State Farm Fire & Cas. Co.*, 1 S.W.3d 459 (Ct. App. Ark. Div. III 1999), insureds sought coverage for water damage caused by a burst pipe where their State Farm homeowners policy excluded coverage for water damage "meaning flood, surface water, waves tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not. . . ." The court examined the meaning of both the term "surface water" and "flood". Adopting the Colorado appellate court's reasoning in *Ferndale, supra,* it found that its common usage applies to "water occasioned from natural events rather than a burst water main."

In a Massachusetts case, *Mellon v. Hingham Mut. Fire Ins. Co.*, 472 N.E.2d 674 (Mass. App. Ct. 1984), insureds suffered damages after a drainage pipe beneath a basement broke and were denied coverage. In interpreting an all-risk policy of insurance clause which excluded loss "'caused by, resulting from, contributed to or aggravated by . . . water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through basement . . .

---

[11]That exclusionary clause provided in relevant part that the policy at issue did not insure against "'(l)oss caused by, resulting from, contributed to or aggravated by any of the following: . . . 2. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water or spray from any of the foregoing, all whether driven by wind or not;. . .

.floors,'" the appellate court noted, "An 'all risk' policy is intended to insure against a 'fortuitous'

event. . . .Moreover, such fortuities are insured against even if they are not specified in the

policy. . . As an insurer has the option to exclude from coverage certain risks, . . . it is not

surprising that 'all risk' policies contain specific exclusions." *Id.* at 675 (citations omitted).  The

court continued:

> When we apply the foregoing principles in the instant case the reasons
> why the plaintiffs should prevail become apparent. The plaintiffs may recover if
> the bursting of the drainage pipe is considered a fortuity  and if such fortuity has
> not been specifically excluded. With respect to the former, Hingham concedes
> that the damage was incurred as a result of a fortuity. The trial judge found, and
> we agree, that the "loss was caused by an accidental break rather than a natural
> occurrence." As such, it is the kind of risk an "all risk" policy is designed to
> cover.

*Id.* at 675-76 (footnote omitted). Thus, Massachusetts viewed a similar exclusion as only

excluding damages caused by natural circumstances.

As noted in *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W.Va. 1998):

> A provision in an insurance policy may be deemed to be ambiguous if
> courts in other jurisdictions have interpreted the provision in different ways. **This
> rule is based on the understanding that "one cannot expect a mere layman to
> understand the meaning of a clause respecting the meaning of which fine
> judicial minds are at variance."** C. Marvel, *Division of Opinion among Judges
> on Same Court or among other Courts or Jurisdictions Considering same
> question, as Evidence That Particular Clause of Insurance Policy is Ambiguous*,
> 4 A.L.R.4th 1253 § 2[a] (1981).

*Id.* at 485 n. 5 (emphasis added).  So, this diversion of opinion gives support to the conclusion

that the ISO flood exclusion is ambiguous.


B.       **Distinguishing Factors of Cases in Which "Flood" Included Water Damage
         Caused by Negligent or Intentional Acts from the Case at Bar**

29

Furthermore, the primary cases on which defendants' rely can be distinguished. For instance, with respect to *TNT Speed & Sport center, Inc. v. American States Ins. Co.*, 114 F.3d 731 (8th Cir. 1997), the flood at issue had resulted from an unknown third party's removal of sandbags and dirt from levee surrounding city from rising river. The Eighth Circuit did not consider whether the term "flood" referred only to naturally occurring events or whether it included man-made causes. Rather in that instance it based its analysis on the "anti-concurrent' cause clause finding that it defeated the efficient proximate cause doctrine and thus the plaintiff's damages were excluded under the policy. [12] Thus, the issue as to whether "flood" concerned only natural occurring events was not addressed.

In *Pakmark Corp. v. Liberty Mut. Ins. Co.*, 943 S.W.2d 256 (Mo. Ct. App. 1997), likewise, whether "flood" was limited to naturally occurring events and did not include man-made events was not contemplated. In this case, sewerage backed up into insured's building at the same time water overflowed the Missouri River entering the insured's property. The focus of that case again was the anti-concurrent clause.

In *E.B. Metal & Rubber Ins. Inc. v. Fed. Ins. Co.*, 444 N.Y.S.2D 321 (N.Y. S. Ct. App. 1981), a dike on a canal gave way and water inundated the insured's property. The policy at issue in that case excluded damages caused by "'flood meaning waves, tidal water or tidal wave, rising (including overflowing *or breaking of boundaries)* of lakes, reservoirs, rivers, streams or other bodies of water, whether driven by wind or not. The court there simply found that the

---

[12] As noted, Louisiana courts have recognized the primacy of the efficient proximate cause doctrine and, to this Court's knowledge, having examined the issue for these purposes, no Louisiana courts has directly held that an anti-concurrent cause clause automatically overrides concerns of efficient proximate cause. Nonetheless, that being said, this Court recognizes that parties may contract in any manner they want and could obviously exclude coverage using an anti-concurrent cause clause. However, that exclusion must be clear and unambiguous.

damages were excluded as long as there were "rising waters which break through boundaries and

flow upon the insured's land to constitute a flood." *Id.* at 663 (emphasis added). This specific

language is not present in the ISO policy at issue herein.

C.   **The Dissent in *Kane* Further Demonstrates the Reasonableness of the Two Interpretations**

Another illustration of the ambiguity or tension between these two interpretations of the

term "flood" is contained in the minority opinion found in *Kane* wherein a three-person minority

wrote a stinging dissent.  The dissent stated unequivocally that  the term "flood" as used in the

policy was ambiguous and that the "'all-risk' policies in question cover[ed] damage caused by the

negligent acts of a third party or any other source not specifically excepted from coverage by the

exclusionary clauses of the polices." *Kane*, 768 P.2d at 687.  As to the argument that the

unmodified term "flood" should be interpreted to refer only to inundation caused by natural

conditions or events, the minority noted:

> The plaintiffs argue that "flood" should be interpreted to refer only to
> inundations caused by natural conditions or events. In this case, the term "flood"
> in the exclusionary clauses is found in the context of natural causes of flooding,
> i.e., "flood, surface water, waves, tidal water or tidal waves, overflow of streams
> or other bodies of water, or spray from any of the foregoing, all whether driven by
> wind or not." This in itself indicates that the term "flood" could be interpreted as
> encompassing only natural causes. *Cf. Bly v. Auto Owners Ins. Co.,* 437 So.2d
> 495, 496-97 (Ala.1983) (term "earth movement" in insurance policy encompasses
> only natural phenomena involving earth movement because examples mentioned
> in policy are only natural phenomena); *Ariston Airline & Catering Supply Co. v.
> Forbes,* 211 N.J.Super. 472, 511 A.2d 1278, 1284 (Law Div.1986) ("words 'earth
> movement,' like other language in policies being construed, must be read in the
> light of other words contained in the same exclusion").
>   Several courts have interpreted similar insurance policy provisions in just
> this way. *See, e.g., Robert Dorsen, Inc. v. Aetna Casualty & Sur. Co.,* 562 F.Supp.
> 495, 496 (D.D.C.1983). *See also* 5 J. Appleman, *Insurance Law and Practice* §
> 3145, at 462-63 (1970). Indeed, in the present case the district court initially

31

interpreted the policy provisions to encompass only flooding by natural causes and not to include "a situation of an artificially-impounded or contained body of water that escapes and causes damage." *Kane v. Royal Ins. Co.,* No. 83CV603, slip op. at 2-3 (Dist. Ct. Larimer Co., Feb. 28, 1984) (Dressel, J.) (the district court later reversed this decision since it viewed as binding the Colorado Court of Appeals decision in *Bartlett v. Continental Divide Insurance Co.,* 697 P.2d 412 (Colo.App.1984) ). These authorities, of course, do not compel us to take the same view, but they do provide support for a conclusion that the term "flood" as contained in insurance policies is ambiguous. *See* Annot., *Division of Opinion as Evidence that Particular Clause of Insurance Policy is Ambiguous,* 4 A.L.R. 4th 1253 (1981) (existence of differing interpretations of a term among or within jurisdictions is evidence of ambiguity of the term).

In sum, I believe the term "flood" as contained in the insurance policy is ambiguous. *See Ferndale,* 34 Colo.App. 258, 527 P.2d 939 (1974); *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A.2d 797 (1967) (term "flood" is latently ambiguous when used in an insurance policy). Ambiguous terms in an insurance policy are to be construed most strongly against the insurer. *Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988); *Reed v. U.S. Fidelity & Guar. Co.,* 176 Colo. 568, 572, 491 P.2d 1377, 1379 (1971). Therefore, I would hold that inundation caused by the breakage of a dam is not excluded from coverage by the flood provisions of these policies.

*Id.* at 686-87. Likewise, the minority found that the overruling of *Koncilja* as it concerned the jettisoning of the efficient proximate cause rule incorrect. *See discussion, supra,* at 21 . The minority reasoned:

The majority apparently concedes that third party negligence, such as negligence in the design, construction, or operation of the dam, is covered by the "all risk" policies in this case. However, the majority also concludes that there is no inconsistency because that coverage is "expressly subject to the language of the exclusions included in the policy." Maj. op. at 685. This approach has the effect of treating the events leading up to the damage of the petitioners' place of business as a single cause by implicitly saying that third party negligence is covered under the policy but not if the third party negligence causes flooding. I believe this approach misapprehends the rationale underlying *Koncilja.* There was more than one "cause" of the petitioners' damage in this case. There was third party negligence in the design, construction or operation of the Lawn Lake Dam or some other cause that resulted in failure of the dam, and there was the "flood" which was "caused" or put in motion by the precipitating cause of the breakage of the dam.

In *Hatley v. Truck Insurance Exchange,* 261 Or. 606, 494 P.2d 426

32

(1972), vandals caused flooding of the plaintiffs' place of business. Vandalism was covered by the policy but loss resulting from "flood," "surface water" or "water below the surface of the ground" was excluded from coverage. The Oregon Supreme Court did not hold, as the majority in this case apparently would, that the vandalism that caused flooding was not covered by the policy. Rather, the court, using an analysis very similar to that in *Koncilja*, determined that there were two causes of the plaintiffs' damage and that the policy covered this damage since the vandalism "cause" was the direct or immediate cause of the water damage. *Id.* 494 P.2d at 431-32. *Accord Beauty Supplies, Inc. v. Hanover Ins. Co.*, 526 S.W.2d 75 (Mo.Ct.App.1975); *Franklin Packaging Co. v. California Union Ins. Co.*, 171 N.J.Super. 188, 408 A.2d 448 (App.Div.1979).

I believe that this is also the proper method of analysis under *Koncilja*. Third party negligence or some other source resulting in breakage of the dam was one cause of the damage to the petitioners' place of business and the "flooding" was another cause. However, because the precipitating cause of the failure of the dam set in motion the flooding, the policy should be construed in favor of coverage, if the precipitating cause is not itself excluded from coverage. *See Koncilja*, 35 Colo.App. at 30-31, 528 P.2d at 940-41.

*Id.* at 687-88.

Nonetheless, the Court must note that the issue of efficient proximate cause as it relates to an anti-concurrent cause clause arises only where a covered peril and an excluded peril are present. Thus, if this Court were to find that the "flood" exclusion does not encompass flooding caused by negligent or intentional acts, the issue of efficient proximate cause and/or the applicability of an anti-concurrent cause clause is not triggered at this stage of the litigation. However, the Court does agree that exclusions that are clear may also eviscerate the doctrine of efficient proximate cause. Nonetheless, as this litigation proceeds, if it is shown that an insured premises sustained damage from a covered peril, i.e. wind or water damage caused by a failed levee caused by negligence, and a non-covered peril, i.e. naturally occurring flooding such as overtopping of a levee, then the Court must determine the applicability and enforceability of the anti-concurrent cause clause.

33

**D.    Earth Movement Litigation Provides Further Demonstration of
Reasonableness of Two Interpretations–Natural v. Man-Made**

Additional support for the proposition that exclusions can be limited to natural occurring

incidents as opposed to those caused by the negligent or intentional acts of man can be found in

cases where the earth movement exclusions of all-risk policies are at issue.  In *Murray v. State*

*Farm Fire and Cas.*, 509 S.E.2d 1 (W.Va. 1998), the West Virginia supreme court considered

certain earth movement exclusions where policy holders sought coverage for damages caused by

rocks falling from the highwall of a 40-year old abandoned rock quarry situated next to their

homes.  The insurers initially denied coverage based on exclusions for losses resulting from

"earth movement, including but not limited to . . .landslide . . [or] erosion."  *Id.* at 483.  The

circuit court granted summary judgment in favor of the insurers, and the supreme court reversed.

Evidence in the record demonstrated that negligent construction of the highwall behind the

plaintiffs' residences contributed to the rockfall.  Using the same rules of insurance contract

interpretation as Louisiana, the court noted:

> On the one hand, the exclusions cited in the defendant's policies could bar
> coverage for solely *natural* events such as earthquakes, volcanic eruptions, and
> sinkholes.  On the other hand, the same exclusions refer to events which could be
> *man-made*, such as subsidence or earth movement caused by equipment or a
> broken water line.  Or as alleged in this case, earth movement could be caused by
> *both man and nature* over a period of time, such as landslides, mudflows, or the
> earth sinking shifting or settling.  Because the policy language is reasonably
> susceptible to different meanings, we believe that the earth movement exclusions
> in the insurance polices at issue are ambiguous, and must have a more limited
> meaning than that assigned to it by the defendants.

*Id.* at 485.  The court then applied the two doctrines of *ejusdem generis and noscitur a sociis* to

conclude that both earth movement exclusions at issue therein must be read "to refer only to

phenomena resulting from natural, rather than man-made forces."  *Id.* at 486.  The court stated:

34

Therefore, when an earth movement exclusion in an insurance policy contains terms not otherwise defined in the policy, and the terms of the exclusion relate to natural events (such as earthquakes or volcanic eruptions), which events, in some instances, may also be attributed to a combination of natural and man-made causes (such as landslides, subsidence or erosion), the terms of the exclusion must be read together and limited to exclude naturally-occurring events rather than man-made events.

*Id.*

It should be noted that in *Change, Inc. v. Westfield Ins. Co.*, 542 S.E.2d 475, 479 (W.Va. 2000), the West Virginia supreme court subsequently applied the same analysis to the ISO water exclusion to find that there was coverage provided where a water main owned by the City of wheeling ruptured and damage the offices of the insured.  The court stated:

> The doctrine of *noscitur a sociis* dictates that language should be construed in accordance with the words which are its associates.  The Court observes that the words of the exclusionary language specifically exclude damage by flood, surface water, waves, tides, tidal waves, etc.  these words all refer to water arising from natural causes or from natural disasters.  On the other hand, the language of the exclusionary clause includes in coverage damage by sprinkler leakage, that is, water from a manmade system."

*Id.* at 479.

The Florida supreme court likewise found that an ISO earth movement exclusion applied only to earth movement brought about by natural events and did not apply to damage caused by a man-made event such as blasting.  In *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082 (Fla. 2005), the court utilized the same principles of insurance contract interpretation noting that "if the salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous.  *Id.* at 1086 (citations omitted). It also noted that "exclusionary clauses are construed more strictly against the insurer than coverage clauses." *Id.*

35

In its analysis the court noted the practical differences for the insurer between losses caused by natural occurrences as opposed to man-made occurrences. The insurer would have the right to subrogation against the tort-feasor in the event that the loss was caused by a man-made event, rather than a natural occurrence. This factor from an underwriting standpoint supports the proposition that the insurer was excluding a loss for which it had no recourse. The court also remarked that the exclusion at issue in *Fayad* did not contain the State Farm lead in provision which excludes "regardless of the cause" earth movement, and that the vast majority of the courts found the earth movement provision limited to damage caused by natural phenomena. Since the cause of the insured's loss was blasting, which was not expressly listed as a causal event that would preclude coverage for resulting damage, the court again used the principle of *ejusdem generis* and limited the exclusion to earth movement caused by a natural event.

Finally, it is also important that in *Peach State Uniform Serv. Inc. v. American Ins. Co.*, 507 F.2d 996 (5th Cir. 1975), the appellate court reversed the jury findings of the district court with respect to the applicability of a water exclusion and an earth movement exclusion where the foundation of a building gave way and a portion of the building collapsed after heavy rains. The insurer maintained that the undermining of the foundation was caused by run-off water washing away uncompacted fill dirt from underneath its foundation and thus the damage was excluded from the "all-risk" policy based on the earth movement and water damage exclusions. The insureds maintained that the collapse was caused by the caving in of a portion of a sewer line which ran directly underneath the building in question.

The court in commenting on the water damage exclusion[13] noted, "while the term water damage may be used in the abstract to refer to any sort of damage worked by water or the motion of water, . . here we must take the phrase in context, not in the abstract." *Id.* at 998. The court concluded that "the term water damage in this context constitutes a limitation on the sorts of damages from the enumerated water which were excluded from coverage." It further concluded that the exclusion was ambiguous and found that it was inapplicable to the damages at issue. *Id.* at 999. The court then examined the earth movement exclusion[14] and using the principle of *ejusdem generis* found it applicable to damages caused by actual movement of earth itself, not superficial effects of external forces.

### E.   Distinctions from Civilian Approach Further Demonstrates Inapplicability of *Kane* to the Case at Bar

In considering whether the *Kane* majority approach should guide this court, certain distinguishing facts militate against such a course of decision. In the *Kane* analysis, the fact that the term "flood" was imbedded in an exclusion rather than in the coverage provision, was apparently ignored in that the Court applied the broadest possible definition to flood, rather than narrowly construing an exclusion. It appears that the definition used by the *Kane* court was more akin to the definition of the verb "flood" than the noun "flood." Thus, this analysis ignores

---

[13]The exclusion provided: "This policy does not insure against loss or damage resulting from: . . ."(N) water damage casued by, contributed to, or aggravated by any of the following:

(1)Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing. . . ,

(2) Water which backs up through sewers or drains,

(3) Water below the surface of the ground. . . .

*Id.* at 998

[14] This exclusion provided "this policy does not insure against loss or damage resulting from: (B) Earthquake, volcanic eruption, landslide or other earth movement. . . ." *Id.* at 999.

one basic tenet of Louisiana law–that is an insurance policy is a contract of adhesion and that an

exclusion must be narrowly construed.  Furthermore, another important distinction can be found

in the majority opinion of *Kane.*

> The majority also noted in distinguishing *Ferndale,* as discussed, *supra* at 20 that:

> > In addition to the factual distinction between *Ferndale* and this case, the
> > definition of "flood waters" upon which the *Ferndale* court relied supports our
> > conclusion that the term "flood" is not ambiguous under the facts of this case. The
> > *Ferndale* court quoted from 5 J. Appleman, *Insurance Law and Practice* § 3145
> > (1970), as follows: " 'Flood waters' are those waters above the highest line of the
> > ordinary flow of a stream, and generally speaking they have overflowed a river,
> > stream, or natural water course and have formed a continuous body with the water
> > flowing in the ordinary channel. . . ." *Ferndale,* 527 P.2d at 940.
> > Although leakage from a ruptured city water line does not fall within this
> > definition, **the rising and overflowing of Fall River does**. This definition makes
> > no distinction between naturally and artificially caused floods, **and in this case,
> > the Fall River clearly overflowed "above the highest line of [its] ordinary
> > flow."**

*Kane,* 768 P.2d at 681-82. Thus, it appears that the failure of the Lawn Lake Dam was caused by

overtopping which would factually distinguish it from the facts before the Court where the

allegations are not of flooding caused by the flood wall's failure from overtopping, but rather the

flood walls' collapse when faced with conditions they were allegedly designed to withstand.

Another distinction can be found with respect to the *Kane* majority in its discussion of

*Koncilja, see discussion, supra,* 20-21.  As noted, the Colorado supreme court stated that if the

"efficient moving cause" rule "were to be adopted by this court," it must yield to the "a well-

settled principle of law: namely, that courts will not rewrite a contract for the parties. *See, e.g.,*

*Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988)." *Kane*, 768 P.2d at 685.  This

statement would indicate that at least the Colorado supreme court had not embraced the efficient

38

moving cause principle. However, Louisiana's courts consistently apply the efficient proximate cause rule in resolving coverage issues. *Lorio v. Aetna Ins. Co.*, 255 La. 721, 232 So.2d 490 (La. 1970) which again distinguishes the *Kane* majority approach from the case at hand.

IX.   **Application of Legal Principles to the Policies Before the Court**

A.   **ISO Water Damage Exclusion**

1.   **ISO Water Damage Exclusion Standing Alone Is Ambiguous and Must Be Interpreted Against the Insurer to Find Coverage**

Based on these principles, the Court now examines the "Water Damage Exclusion" in the ISO policies in the context of a Rule 12(b) motion, where the Court is required to take all of the allegations as true. The fundamental argument made by the ISO insurers is that the word "flood" is all encompassing. They point out that the water damage which occurred to homes and businesses in New Orleans has been referred to as a "flood" in newspapers, general reports and many other sources. And thus, the water exclusion applies to the coverage sought by policy holders herein.

As demonstrated earlier, the word "flood" has numerous meanings. It is defined in virtually all dictionaries first as a noun then as a verb. In the policies being examined by the Court it is used as a noun. As noted, most of the definitions of the noun imply encroachment of water caused by an act of nature. Furthermore, this exclusion has been the subject of differing interpretations in the jurisprudence which further demonstrates that it is susceptible of two reasonable interpretations. As such, under Louisiana civilian principles and the *jurisprudence constant*, this Court finds the ISO Water Damage Exclusion ambiguous.

The policies before the Court are "all-risk" policies, and any exclusion must be clear and unambiguous. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code. art 2048. Thus, this Court is required to examine the insurance policies before it in the context of the purpose of the policy including the scope of the risks against which it purports to insure. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Water damage could occur to a home or business for a myriad of reasons and any number of causes. The causes can be natural, *i.e.* overflow of river banks, intense rain, etc., or man-made, *i.e.*, the failure of a dam or levee, a vandal destroying a above ground swimming pool, a vehicle hitting a water main, etc.

As a general rule, insurance policies should be construed to effect, not deny coverage. *Holden v. Connex-Metalna*, 2001 WL 40994 at *2 (E.D.La. Jan. 16, 2001) *citing Breland v. Schilling*, 550 So.2d 609 (La. 1989). Furthermore, as previously noted where the Court finds an ambiguity, it must ascertain how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered and fulfill the reasonable expectations of the insured even though a carful examination of the policy provisions indicate that such expectations are contrary to the expressed intention of the insurer. *Louisiana Ins. Guar. Assoc.*, 630 So.2d at 764 and n. 19.

It is the considered opinion of this Court that because the policies are all-risk, and because "flood" has numerous definitions, it reasonably could be limited to natural occurrences. Simply put, the language of the ISO Water Damage Exclusion chosen by the insurer is unclear. Indeed, the broad definition defendants seek to employ–that is that the term "flood" means the

40

inundation of usually dry land by water– makes the remaining part of the exclusion superfluous.
The ensuing words "waves, tidal water, overflow of a body of water or spray from any of these,
whether or not driven by wind" all are instances relating to **natural** events which can cause
inundation of usually dry land. Thus, to use the broadest definition of the term "flood" in
interpreting this exclusion, would render the rest of the clause useless.

Under the principles of Louisiana law, the Court is constrained to find the language
ambiguous. To find otherwise, leads to absurd results. Once this finding is made, the Court is
further constrained to interpret it against the insurer. "If there is any doubt or ambiguity as to the
meaning of a provision in an insurance policy, it must be construed in favor of the insured and
against the insurer. *See* La. C.C. art. 2056.[15] When the ambiguity relates to an exclusionary
clause, the law requires that the contract be interpreted liberally in favor of coverage." *Arnette v.
NPC services, Inc.* , 808 So.2d 798 (La. App. 1st Cir. 2002) *citing Borden, Inc. v. Howard
Trucking Co., Inc.* 454 So.2d 1081, 1090 (La. 1983). The term "flood" is in the context of an
exclusion and thus must be narrowly construed. "Under this rule of strict construction, equivocal
provisions seeking to narrow an insurer's obligation are strictly construed against the insurer.
*Carrier,* 759 So.2d at 43. " *Cadwallader*, 848 So.2d at 580 (emphasis added); *Calogero v.
Safeway Ins. Co. of La.* , 753 So.2d 170 (La. 2000). *See, generally,* 15 William McKenzie and
H. Alston Johnson, III, *Louisiana Civil Law Treatise: Insurance Law and Practice* § 4 at 6-9
(2d ed. 1996).

---

[15]"A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the
other party." La. Civ. Code. art. 2056.