*Federal Ins. Co.* , 444 N.Y.S. 2d 321 (N.Y. App. Div. 1981) (no coverage for water damaged caused by improperly constructed and maintained dike that failed).

Plaintiffs maintain that the *Kane* majority is incorrect. They argue that in the context of this exclusion, "flooding" is limited to natural events. The "flooding" was not caused by the overtopping of the levees or by rainwater filling the City with surface water.

Plaintiffs cite to *Riche v. State Farm Fire and Casualty Co.*, 356 So.2d 101 (La. App. 1st Cir. 1978), *writ denied*, 358 So.2d 639 (La. 1978). In this case, plaintiff sought to recover under his homeowner's policy for the loss of his fishing gear which was on the bass boat of a third-party which sank during a windstorm. The plaintiff maintained that his damage was a direct loss of property defined as "unscheduled personal property" caused by a windstorm which was a named peril under his homeowner's policy . The insurer maintained that the loss was instead caused by wind making waves from surface water, waves causing water to flow into the boat, compounded by a defective bilge pump. Thus, the loss was not caused by windstorm, but by the sinking of a boat. *Id.* at 102.

The appellate court noted that the "direct loss" means the dominant and efficient cause of the loss and that as such, relying on *Roach-Strayhan-Holland Post v. Continental Ins. Co.*, 237 La. 973, 112 So.2d 680 (La. 1959) wherein it states "that it is sufficient, in order to recover upon a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate or efficient cause of the loss or damage, notwithstanding other factors contributing thereto." The trial court had held that coverage for the personal property was excluded under the water exclusion provision which provided:

This policy does not insure against loss:

22

> 3.    Caused by, resulting from, contributed to or aggravated by any of the following:
>
> (a) Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. . . "

*Id.* at 103. The appellate court found that "when read as a whole, [this exclusion] contemplates only such damage caused by water **which has risen over and covered areas not ordinarily covered by water.**" *Id.* at 103-04 (emphasis added). The court found this exclusion was inapplicable to damage caused by a windstorm or resulting waves over a body of water, finding that "this interpretation is in line with the rule of construction that exclusionary clauses are strictly construed. *See Bezue v. Hartford Acc. and Indem. Co., Hartford Conn.*, 224 So.2d 76 (La. App. 1ˢᵗ Cir. 1969)."

Plaintiffs contend that this case demonstrates that Louisiana courts have construed this water damage exclusion as requiring the **rising over** of water which was not the manner in which the water at issue is alleged to have inundated the insureds' homes. Rather, they maintain it was the negligence of OLD that caused the canal walls to collapse.

Thus, the salient question becomes whether, in the context of an all-risk policy where coverage is provided for direct loss to property, these insurance provisions which exclude coverage for water damage caused by "flood" clearly and unambiguously exclude from coverage damages caused by the alleged third party negligence of OLD which plaintiffs contend caused a section of the floodwall at the 17ᵗʰ Street Canal to break causing water to enter the streets of the City of New Orleans and homes of the plaintiffs in this suit.   While words and phrases in insurance polices are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning,  an ambiguity arises where a term

23

is susceptible to two reasonable interpretations.   *Cadwallader*, 848 So. 2d at 580 *citing Carrier,* 759 So.2d at 43-44.   Simply put, the question before the court is whether it is reasonable to find in the absence of further definition or provision in the ISO policy that there are two interpretations of the term "flood"–one which encompasses both a "flood" which occurs solely because of natural causes and a "flood" which occurs because of the negligent or intentional act of man and one which limits itself only to a flood which occurs solely because of natural causes.

## VII.   Definitions and Usage of the Word "Flood" Demonstrate Two Reasonable Interpretations of the Term

The word "flood" can be used as a verb or a noun.  In the context of the exclusionary language[9], it is  used as a noun[10]. The complete definition in  Websters' Third New International Dictionary of the English Language Unabridged (1993)  is:

> 1 flood . . .*n* . . .1 *archaic*: a body of moving water (as a river or stream) esp. when large **2a**: the flowing in of the tide: the semidiurnal swell or rise of water in the ocean ,there is a tide in the affairs of en which, taken at the ~, leads on to fortune–Shak.>– opposed to *ebb*   **b**: the highest point of a tide <the tide is nearly at the ~>   **3a**: *rising and overflowing* of a body of water that covers land not usu. under water: DELUGE, FRESHET <a covenant never to destroy the earth again by ~ – John Milton> – used with *the* to identify a flood os esp. severity or local interest <still date things around here from the ~, which was about the biggest excitement we ever had> or, usu. cap., the worldwide deluge reported in Gen 7 <the *Flood* in the days of Noah. **b**(1): an outpouring of considerable extent <gave way in a ~ of tears> (2): a great downpour <raining in ~*s*> **4**: the element water <the rocky shore that forms barrier between earth and ~> < willing to go through fire and ~ to gain his objective> **5a** a great stream of something (as light or lava) that flows

---

[9]"Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind" is the exact language of the exclusion.

[10]The verb is likewise defined as:

**2flood**. . .*vt* **1a**: to cover or overwhelm with a flood: INUNDATE, DELUGE <the river ~ed the lowlands> **b**:  to cover or cause to be covered with water or other fluid <in some places it is economical to irrigate by ~*ing* the fields at regular intervals> <~the bearings with oil> **2**: to fill more or less completely with water or other fluid:  **a**: to increase the elevation of the water in (a channel) esp. in splashing logs or in nullifying the effectiveness of a fall over a dam; *also*: SPLASH   **b**: to supply to (the carburetor of an internal–combustion engine) an excess of fuel sufficient to raise the furl level in the float chamber above the fuel nozzle  **:**  to fill (as a compartment of a submarine) with water admitted ffrom the sea  **d**:  to fill (an oil sand) with water to expel the oil **e**: to apply excessive ink to in printing <the form was ~ed and the halftones are too heavy and dark>  **3a**: to fill to full capacity or to excess <shoppers ~ed the streets> <afferent impulsed ~ the brain in certain hysteric states> <~*ing* the mails with circulars> **b**: to distribute something in or provide with something in large quantities <~*ing* the country with ads> <the romm was ~ed with light> ~ *vi* **1a** To pour or issue like a flood <the milk ~ed over the table> **:** OVERFLOW <wine ~*ing* from the glass as her hand shook> **b**: to become filled to excess with some fluid <our cellar ~*s* after every heavy rain> *of a tide*: to run high <could tell how the tide was ~*ing* – G.W.Brace> **2**: to have an excessive menstrual flow or a uterine hemorrhage after childbirth

in a steady course **b:** a large quantity widely diffused:  SUPERABUNDANCE <a ~ of spurious bank notes> >soon had a ~ of invitations> **6:** FLOODLIGHT **syn** see FLOW

Explanatory Note 12.4 which explains the numerical divisions contained in the definition states:

> The system of separating by numbers and letters reflects something of the semantic relationship between various senses of a word.  It is only a lexical convenience.  It does not evaluate senses or establish and enduring hierarchy of importance among them.  The best sense I the one that most aptly it's the context of an actual genuine utterance.

*Id.* at 17a.  The Compact Oxford English of Current English Dictionary  (2005) defines "flood"

as "*an overflow* of a large amount of water over dry land." (emphasis added).

> Other definitions include:

> A general and temporary condition of partial or complete inundation of normally dry land areas from (1) *overflow of inland or tidal waters,* (2) the unusual *accumulation and runoff* of surface waters from any source, or (3) abnormal, flood-related erosion and undermining of **shorelines**. Flood also means inundation from mud flows caused by accumulations of water on or under the ground, as long as the mud flow and not a landslide is the proximate cause of loss.

InsWeb Article: Property Insurance Terms provided by BISYS Education Services, Inc.

(emphasis added) *See* http://www.insweb.com/learningcenter/glossary/property-f.htm.   The

American Heritage Dictionary of the English Language: Fourth Edition (2000) defines it as "an

*overflowing* of water onto land that is normally dry. (emphasis added). Cambridge Dictionaries

Online defines it as "a large amount of water covering an area that is usually dry."   *See*

http://dictionary.cambridge.org.   Thus, the majority of the definitions of the noun "flood" found

independently by the Court require an "overflowing" or an "overtopping".

Accordingly, based on these definitions of "flood", it is clear to this Court that implicit in

the "overtopping" definitions, a natural event caused by rain or tide is contemplated.  Thus, these

definitions alone provide evidence that a reasonable interpretation of the term "flood" would be inundation caused by a natural event.

This analysis, however, is further buttressed when examined in the "sense" that is gained by the context of the word as noted in the explanation of definitions contained in *Webster's Unabridged.* The term "flood" is unequivocally contained in an exclusionary clause in the insurance policies at issue. As noted, "once coverage has been extended, . . . , it should be withdrawn only when exclusion is established with certainty." *Pullen v. Employers' Liability Assur. Corp.,* 89 So.2d 373, 377 (La. 1956). Thus, the plethora of insurance case law where the issue of causation is at play with respect to the application of a water damage exclusion is a further demonstration that this term is subject to two reasonable interpretations.

## VIII.   Jurisprudence Further Demonstrates Reasonableness of Alternative Interpretations

### A.   "Flood" is Limited to Naturally Occurring Events

While defendants have cited to a number of cases where courts have found "flood" to be unambiguous and have denied coverage where even negligence or intentional acts have caused the water damage at issue, there are other cases where courts have held that the term "flood" contemplates only a naturally occurring event. In *Popkin v. Security Mut. Ins. Co.* , 48 A.D.2d 46 (N.Y. S.Ct. App. Div. 1975), the court found that the term "flood" did not contemplate water damage sustained as the result of a broken water main. It noted that the term connotes an inundation or deluge. The court continued, basing its reasoning on the *ejusdem generis* rule and *noscitur a sociis*, "Even assuming that the word 'flood' is to be given a more generic meaning as

27

an overflowing abundance or a great quantity, **it must be noted that the other terms utilized in the exclusionary clause containing such word relate to natural phenomena.**"[11] *Id.* at 495 (emphasis added). Another New York court, cited *Popkin* concluding that the exclusionary provisions pertain only to damages arising from natural causes. *Ender v. National Fire Ins. Co. of Hartford*, 169 A.D.2d 420, 421 (N.Y. S. Ct. App. Div. 1991).

An Arkansas appellate court likewise found that a similar water exclusion as presented in the State Farm policy contemplated only flooding that results from a natural cause. In *Ebbing v. State Farm Fire & Cas. Co.*, 1 S.W.3d 459 (Ct. App. Ark. Div. III 1999), insureds sought coverage for water damage caused by a burst pipe where their State Farm homeowners policy excluded coverage for water damage "meaning flood, surface water, waves tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not. . . ." The court examined the meaning of both the term "surface water" and "flood". Adopting the Colorado appellate court's reasoning in *Ferndale, supra,* it found that its common usage applies to "water occasioned from natural events rather than a burst water main."

In a Massachusetts case, *Mellon v. Hingham Mut. Fire Ins. Co.*, 472 N.E.2d 674 (Mass. App. Ct. 1984), insureds suffered damages after a drainage pipe beneath a basement broke and were denied coverage. In interpreting an all-risk policy of insurance clause which excluded loss "'caused by, resulting from, contributed to or aggravated by . . . water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through basement . . .

---

[11]That exclusionary clause provided in relevant part that the policy at issue did not insure against "'(l)oss caused by, resulting from, contributed to or aggravated by any of the following: . . . 2. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water or spray from any of the foregoing, all whether driven by wind or not;. . .

.floors,'" the appellate court noted, "An 'all risk' policy is intended to insure against a 'fortuitous' event. . . .Moreover, such fortuities are insured against even if they are not specified in the policy. . . As an insurer has the option to exclude from coverage certain risks, . . . it is not surprising that 'all risk' policies contain specific exclusions." *Id.* at 675 (citations omitted). The court continued:

> When we apply the foregoing principles in the instant case the reasons why the plaintiffs should prevail become apparent. The plaintiffs may recover if the bursting of the drainage pipe is considered a fortuity and if such fortuity has not been specifically excluded. With respect to the former, Hingham concedes that the damage was incurred as a result of a fortuity. The trial judge found, and we agree, that the "loss was caused by an accidental break rather than a natural occurrence." As such, it is the kind of risk an "all risk" policy is designed to cover.

*Id.* at 675-76 (footnote omitted). Thus, Massachusetts viewed a similar exclusion as only excluding damages caused by natural circumstances.

As noted in *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W.Va. 1998):

> A provision in an insurance policy may be deemed to be ambiguous if courts in other jurisdictions have interpreted the provision in different ways. **This rule is based on the understanding that "one cannot expect a mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance."** C. Marvel, *Division of Opinion among Judges on Same Court or among other Courts or Jurisdictions Considering same question, as Evidence That Particular Clause of Insurance Policy is Ambiguous*, 4 A.L.R.4th 1253 § 2[a] (1981).

*Id.* at 485 n. 5 (emphasis added). So, this diversion of opinion gives support to the conclusion that the ISO flood exclusion is ambiguous.

**B.** **Distinguishing Factors of Cases in Which "Flood" Included Water Damage Caused by Negligent or Intentional Acts from the Case at Bar**

29

Furthermore, the primary cases on which defendants' rely can be distinguished. For instance, with respect to *TNT Speed & Sport center, Inc. v. American States Ins. Co.*, 114 F.3d 731 (8th Cir. 1997), the flood at issue had resulted from an unknown third party's removal of sandbags and dirt from levee surrounding city from rising river. The Eighth Circuit did not consider whether the term "flood" referred only to naturally occurring events or whether it included man-made causes. Rather in that instance it based its analysis on the "anti-concurrent' cause clause finding that it defeated the efficient proximate cause doctrine and thus the plaintiff's damages were excluded under the policy. [12] Thus, the issue as to whether "flood" concerned only natural occurring events was not addressed.

In *Pakmark Corp. v. Liberty Mut. Ins. Co.*, 943 S.W.2d 256 (Mo. Ct. App. 1997), likewise, whether "flood" was limited to naturally occurring events and did not include man-made events was not contemplated. In this case, sewerage backed up into insured's building at the same time water overflowed the Missouri River entering the insured's property. The focus of that case again was the anti-concurrent clause.

In *E.B. Metal & Rubber Ins. Inc. v. Fed. Ins. Co.*, 444 N.Y.S.2D 321 (N.Y. S. Ct. App. 1981), a dike on a canal gave way and water inundated the insured's property. The policy at issue in that case excluded damages caused by "'flood meaning waves, tidal water or tidal wave, rising (including overflowing *or breaking of boundaries)* of lakes, reservoirs, rivers, streams or other bodies of water, whether driven by wind or not. The court there simply found that the

---

[12] As noted, Louisiana courts have recognized the primacy of the efficient proximate cause doctrine and, to this Court's knowledge, having examined the issue for these purposes, no Louisiana courts has directly held that an anti-concurrent cause clause automatically overrides concerns of efficient proximate cause. Nonetheless, that being said, this Court recognizes that parties may contract in any manner they want and could obviously exclude coverage using an anti-concurrent cause clause. However, that exclusion must be clear and unambiguous.

30

damages were excluded as long as there were "rising waters which break through boundaries and flow upon the insured's land to constitute a flood." *Id.* at 663 (emphasis added). This specific language is not present in the ISO policy at issue herein.

### C.    The Dissent in *Kane* Further Demonstrates the Reasonableness of the Two Interpretations

Another illustration of the ambiguity or tension between these two interpretations of the term "flood" is contained in the minority opinion found in *Kane* wherein a three-person minority wrote a stinging dissent. The dissent stated unequivocally that the term "flood" as used in the policy was ambiguous and that the "'all-risk' policies in question cover[ed] damage caused by the negligent acts of a third party or any other source not specifically excepted from coverage by the exclusionary clauses of the polices." *Kane*, 768 P.2d at 687. As to the argument that the unmodified term "flood" should be interpreted to refer only to inundation caused by natural conditions or events, the minority noted:

> The plaintiffs argue that "flood" should be interpreted to refer only to inundations caused by natural conditions or events. In this case, the term "flood" in the exclusionary clauses is found in the context of natural causes of flooding, i.e., "flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not." This in itself indicates that the term "flood" could be interpreted as encompassing only natural causes. *Cf. Bly v. Auto Owners Ins. Co.,* 437 So.2d 495, 496-97 (Ala.1983) (term "earth movement" in insurance policy encompasses only natural phenomena involving earth movement because examples mentioned in policy are only natural phenomena); *Ariston Airline & Catering Supply Co. v. Forbes,* 211 N.J.Super. 472, 511 A.2d 1278, 1284 (Law Div.1986) ("words 'earth movement,' like other language in policies being construed, must be read in the light of other words contained in the same exclusion").
> Several courts have interpreted similar insurance policy provisions in just this way. *See, e.g., Robert Dorsen, Inc. v. Aetna Casualty & Sur. Co.,* 562 F.Supp. 495, 496 (D.D.C.1983). *See also* 5 J. Appleman, *Insurance Law and Practice* § 3145, at 462-63 (1970). Indeed, in the present case the district court initially

31

interpreted the policy provisions to encompass only flooding by natural causes and not to include "a situation of an artificially-impounded or contained body of water that escapes and causes damage." *Kane v. Royal Ins. Co.,* No. 83CV603, slip op. at 2-3 (Dist. Ct. Larimer Co., Feb. 28, 1984) (Dressel, J.) (the district court later reversed this decision since it viewed as binding the Colorado Court of Appeals decision in *Bartlett v. Continental Divide Insurance Co.,* 697 P.2d 412 (Colo.App.1984) ). These authorities, of course, do not compel us to take the same view, but they do provide support for a conclusion that the term "flood" as contained in insurance policies is ambiguous. *See* Annot., *Division of Opinion as Evidence that Particular Clause of Insurance Policy is Ambiguous,* 4 A.L.R. 4th 1253 (1981) (existence of differing interpretations of a term among or within jurisdictions is evidence of ambiguity of the term).

In sum, I believe the term "flood" as contained in the insurance policy is ambiguous. *See Ferndale,* 34 Colo.App. 258, 527 P.2d 939 (1974); *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A.2d 797 (1967) (term "flood" is latently ambiguous when used in an insurance policy). Ambiguous terms in an insurance policy are to be construed most strongly against the insurer. *Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988); *Reed v. U.S. Fidelity & Guar. Co.,* 176 Colo. 568, 572, 491 P.2d 1377, 1379 (1971). Therefore, I would hold that inundation caused by the breakage of a dam is not excluded from coverage by the flood provisions of these policies.

*Id.* at 686-87. Likewise, the minority found that the overruling of *Koncilja* as it concerned the

jettisoning of the efficient proximate cause rule incorrect. *See discussion, supra,* at 21 . The

minority reasoned:

The majority apparently concedes that third party negligence, such as negligence in the design, construction, or operation of the dam, is covered by the "all risk" policies in this case. However, the majority also concludes that there is no inconsistency because that coverage is "expressly subject to the language of the exclusions included in the policy." Maj. op. at 685. This approach has the effect of treating the events leading up to the damage of the petitioners' place of business as a single cause by implicitly saying that third party negligence is covered under the policy but not if the third party negligence causes flooding. I believe this approach misapprehends the rationale underlying *Koncilja.* There was more than one "cause" of the petitioners' damage in this case. There was third party negligence in the design, construction or operation of the Lawn Lake Dam or some other cause that resulted in failure of the dam, and there was the "flood" which was "caused" or put in motion by the precipitating cause of the breakage of the dam.

In *Hatley v. Truck Insurance Exchange,* 261 Or. 606, 494 P.2d 426

32

(1972), vandals caused flooding of the plaintiffs' place of business. Vandalism was covered by the policy but loss resulting from "flood," "surface water" or "water below the surface of the ground" was excluded from coverage. The Oregon Supreme Court did not hold, as the majority in this case apparently would, that the vandalism that caused flooding was not covered by the policy. Rather, the court, using an analysis very similar to that in *Koncilja,* determined that there were two causes of the plaintiffs' damage and that the policy covered this damage since the vandalism "cause" was the direct or immediate cause of the water damage. *Id.* 494 P.2d at 431-32. *Accord Beauty Supplies, Inc. v. Hanover Ins. Co.,* 526 S.W.2d 75 (Mo.Ct.App.1975); *Franklin Packaging Co. v. California Union Ins. Co.,* 171 N.J.Super. 188, 408 A.2d 448 (App.Div.1979).

I believe that this is also the proper method of analysis under *Koncilja.* Third party negligence or some other source resulting in breakage of the dam was one cause of the damage to the petitioners' place of business and the "flooding" was another cause. However, because the precipitating cause of the failure of the dam set in motion the flooding, the policy should be construed in favor of coverage, if the precipitating cause is not itself excluded from coverage. *See Koncilja,* 35 Colo.App. at 30-31, 528 P.2d at 940-41.

*Id.* at 687-88.

Nonetheless, the Court must note that the issue of efficient proximate cause as it relates to an anti-concurrent cause clause arises only where a covered peril and an excluded peril are present. Thus, if this Court were to find that the "flood" exclusion does not encompass flooding caused by negligent or intentional acts, the issue of efficient proximate cause and/or the applicability of an anti-concurrent cause clause is not triggered at this stage of the litigation. However, the Court does agree that exclusions that are clear may also eviscerate the doctrine of efficient proximate cause. Nonetheless, as this litigation proceeds, if it is shown that an insured premises sustained damage from a covered peril, i.e. wind or water damage caused by a failed levee caused by negligence, and a non-covered peril, i.e. naturally occurring flooding such as overtopping of a levee, then the Court must determine the applicability and enforceability of the anti-concurrent cause clause.

33

**D.      Earth Movement Litigation Provides Further Demonstration of Reasonableness of Two Interpretations–Natural v. Man-Made**

Additional support for the proposition that exclusions can be limited to natural occurring incidents as opposed to those caused by the negligent or intentional acts of man can be found in cases where the earth movement exclusions of all-risk policies are at issue. In *Murray v. State Farm Fire and Cas.*, 509 S.E.2d 1 (W.Va. 1998), the West Virginia supreme court considered certain earth movement exclusions where policy holders sought coverage for damages caused by rocks falling from the highwall of a 40-year old abandoned rock quarry situated next to their homes. The insurers initially denied coverage based on exclusions for losses resulting from "earth movement, including but not limited to . . .landslide . . [or] erosion." *Id.* at 483. The circuit court granted summary judgment in favor of the insurers, and the supreme court reversed. Evidence in the record demonstrated that negligent construction of the highwall behind the plaintiffs' residences contributed to the rockfall. Using the same rules of insurance contract interpretation as Louisiana, the court noted:

> On the one hand, the exclusions cited in the defendant's policies could bar coverage for solely *natural* events such as earthquakes, volcanic eruptions, and sinkholes. On the other hand, the same exclusions refer to events which could be *man-made*, such as subsidence or earth movement caused by equipment or a broken water line. Or as alleged in this case, earth movement could be caused by *both man and nature* over a period of time, such as landslides, mudflows, or the earth sinking shifting or settling. Because the policy language is reasonably susceptible to different meanings, we believe that the earth movement exclusions in the insurance polices at issue are ambiguous, and must have a more limited meaning than that assigned to it by the defendants.

*Id.* at 485. The court then applied the two doctrines of *ejusdem generis and noscitur a sociis* to conclude that both earth movement exclusions at issue therein must be read "to refer only to phenomena resulting from natural, rather than man-made forces." *Id.* at 486. The court stated:

34

> Therefore, when an earth movement exclusion in an insurance policy contains terms not otherwise defined in the policy, and the terms of the exclusion relate to natural events (such as earthquakes or volcanic eruptions), which events, in some instances, may also be attributed to a combination of natural and man-made causes (such as landslides, subsidence or erosion), the terms of the exclusion must be read together and limited to exclude naturally-occurring events rather than man-made events.

*Id.*

It should be noted that in *Change, Inc. v. Westfield Ins. Co.*, 542 S.E.2d 475, 479 (W.Va. 2000), the West Virginia supreme court subsequently applied the same analysis to the ISO water exclusion to find that there was coverage provided where a water main owned by the City of wheeling ruptured and damage the offices of the insured. The court stated:

> The doctrine of *noscitur a sociis* dictates that language should be construed in accordance with the words which are its associates. The Court observes that the words of the exclusionary language specifically exclude damage by flood, surface water, waves, tides, tidal waves, etc. these words all refer to water arising from natural causes or from natural disasters. On the other hand, the language of the exclusionary clause includes in coverage damage by sprinkler leakage, that is, water from a manmade system."

*Id.* at 479.

The Florida supreme court likewise found that an ISO earth movement exclusion applied only to earth movement brought about by natural events and did not apply to damage caused by a man-made event such as blasting. In *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082 (Fla. 2005), the court utilized the same principles of insurance contract interpretation noting that "if the salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous. *Id.* at 1086 (citations omitted). It also noted that "exclusionary clauses are construed more strictly against the insurer than coverage clauses." *Id.*

35

In its analysis the court noted the practical differences for the insurer between losses caused by natural occurrences as opposed to man-made occurrences. The insurer would have the right to subrogation against the tort-feasor in the event that the loss was caused by a man-made event, rather than a natural occurrence. This factor from an underwriting standpoint supports the proposition that the insurer was excluding a loss for which it had no recourse. The court also remarked that the exclusion at issue in *Fayad* did not contain the State Farm lead in provision which excludes "regardless of the cause" earth movement, and that the vast majority of the courts found the earth movement provision limited to damage caused by natural phenomena. Since the cause of the insured's loss was blasting, which was not expressly listed as a causal event that would preclude coverage for resulting damage, the court again used the principle of *ejusdem generis* and limited the exclusion to earth movement caused by a natural event.

Finally, it is also important that in *Peach State Uniform Serv. Inc. v. American Ins. Co.*, 507 F.2d 996 (5th Cir. 1975), the appellate court reversed the jury findings of the district court with respect to the applicability of a water exclusion and an earth movement exclusion where the foundation of a building gave way and a portion of the building collapsed after heavy rains. The insurer maintained that the undermining of the foundation was caused by run-off water washing away uncompacted fill dirt from underneath its foundation and thus the damage was excluded from the "all-risk" policy based on the earth movement and water damage exclusions. The insureds maintained that the collapse was caused by the caving in of a portion of a sewer line which ran directly underneath the building in question.

36

The court in commenting on the water damage exclusion[13] noted, "while the term water damage may be used in the abstract to refer to any sort of damage worked by water or the motion of water, . . here we must take the phrase in context, not in the abstract." *Id.* at 998.  The court concluded that "the term water damage in this context constitutes a limitation on the sorts of damages from the enumerated water which were excluded from coverage."  It further concluded that the exclusion was ambiguous and found that it was inapplicable to the damages at issue.  *Id.* at 999.  The court then examined the  earth movement exclusion[14] and using the principle of *ejusdem generis*  found it applicable to damages caused by actual movement of earth itself, not superficial effects of external forces.

E.      **Distinctions from Civilian Approach Further Demonstrates Inapplicability of *Kane* to the Case at Bar**

In considering whether the *Kane* majority approach should guide this court, certain distinguishing facts militate against such a course of decision.  In the *Kane* analysis, the fact that the term "flood" was imbedded in an exclusion rather than in the coverage provision, was apparently ignored in that the Court applied the broadest possible definition to flood, rather than narrowly construing an exclusion.  It appears that the definition used by the *Kane* court was more akin to the definition of the verb "flood" than the noun "flood."  Thus, this analysis ignores

---

[13]The exclusion provided: "This policy does not insure against loss or damage resulting from: . . ."(N) water damage casued by, contributed to, or aggravated by any of the following:

(1)Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing. . . ,

(2) Water which backs up through sewers or drains,

(3) Water below the surface of the ground. . . .

*Id.* at 998

[14] This exclusion provided "this policy does not insure against loss or damage resulting from: (B) Earthquake, volcanic eruption, landslide or other earth movement. . . ." *Id.* at 999.

37

one basic tenet of Louisiana law–that is an insurance policy is a contract of adhesion and that an

exclusion must be narrowly construed.  Furthermore, another important distinction can be found

in the majority opinion of *Kane.*

> The majority also noted in distinguishing *Ferndale*, as discussed, *supra* at 20 that:

> > In addition to the factual distinction between *Ferndale* and this case, the definition of "flood waters" upon which the *Ferndale* court relied supports our conclusion that the term "flood" is not ambiguous under the facts of this case. The *Ferndale* court quoted from 5 J. Appleman, *Insurance Law and Practice* § 3145 (1970), as follows: " 'Flood waters' are those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the water flowing in the ordinary channel. . . ." *Ferndale,* 527 P.2d at 940.
> > Although leakage from a ruptured city water line does not fall within this definition, **the rising and overflowing of Fall River does**. This definition makes no distinction between naturally and artificially caused floods, **and in this case, the Fall River clearly overflowed "above the highest line of [its] ordinary flow."**

*Kane,* 768 P.2d at 681-82. Thus, it appears that the failure of the Lawn Lake Dam was caused by

overtopping which would factually distinguish it from the facts before the Court where the

allegations are not of flooding caused by the flood wall's failure from overtopping, but rather the

flood walls' collapse when faced with conditions they were allegedly designed to withstand.

Another distinction can be found with respect to the *Kane* majority in its discussion of

*Koncilja, see discussion, supra,* 20-21.  As noted, the Colorado supreme court stated that if the

"efficient moving cause" rule "were to be adopted by this court," it must yield to the "a well-

settled principle of law: namely, that courts will not rewrite a contract for the parties. *See, e.g.,*

*Republic Ins. Co. v. Jernigan,* 753 P.2d 229, 232 (Colo.1988)." *Kane,* 768 P.2d at 685.  This

statement would indicate that at least the Colorado supreme court had not embraced the efficient

moving cause principle. However, Louisiana's courts consistently apply the efficient proximate cause rule in resolving coverage issues. *Lorio v. Aetna Ins. Co.*, 255 La. 721, 232 So.2d 490 (La. 1970) which again distinguishes the *Kane* majority approach from the case at hand.

## IX.   Application of Legal Principles to the Policies Before the Court

### A.   ISO Water Damage Exclusion

#### 1.   ISO Water Damage Exclusion Standing Alone Is Ambiguous and Must Be Interpreted Against the Insurer to Find Coverage

Based on these principles, the Court now examines the "Water Damage Exclusion" in the ISO policies in the context of a Rule 12(b) motion, where the Court is required to take all of the allegations as true. The fundamental argument made by the ISO insurers is that the word "flood" is all encompassing. They point out that the water damage which occurred to homes and businesses in New Orleans has been referred to as a "flood" in newspapers, general reports and many other sources. And thus, the water exclusion applies to the coverage sought by policy holders herein.

As demonstrated earlier, the word "flood" has numerous meanings. It is defined in virtually all dictionaries first as a noun then as a verb. In the policies being examined by the Court it is used as a noun. As noted, most of the definitions of the noun imply encroachment of water caused by an act of nature. Furthermore, this exclusion has been the subject of differing interpretations in the jurisprudence which further demonstrates that it is susceptible of two reasonable interpretations. As such, under Louisiana civilian principles and the *jurisprudence constant*, this Court finds the ISO Water Damage Exclusion ambiguous.

The policies before the Court are "all-risk" policies, and any exclusion must be clear and unambiguous. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code. art 2048. Thus, this Court is required to examine the insurance policies before it in the context of the purpose of the policy including the scope of the risks against which it purports to insure. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Water damage could occur to a home or business for a myriad of reasons and any number of causes. The causes can be natural, *i.e.* overflow of river banks, intense rain, etc., or man-made, *i.e.*, the failure of a dam or levee, a vandal destroying a above ground swimming pool, a vehicle hitting a water main, etc.

As a general rule, insurance policies should be construed to effect, not deny coverage. *Holden v. Connex-Metalna*, 2001 WL 40994 at *2 (E.D.La. Jan. 16, 2001) *citing Breland v. Schilling*, 550 So.2d 609 (La. 1989). Furthermore, as previously noted where the Court finds an ambiguity, it must ascertain how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered and fulfill the reasonable expectations of the insured even though a carful examination of the policy provisions indicate that such expectations are contrary to the expressed intention of the insurer. *Louisiana Ins. Guar. Assoc.*, 630 So.2d at 764 and n. 19.

It is the considered opinion of this Court that because the policies are all-risk, and because "flood" has numerous definitions, it reasonably could be limited to natural occurrences. Simply put, the language of the ISO Water Damage Exclusion chosen by the insurer is unclear. Indeed, the broad definition defendants seek to employ–that is that the term "flood" means the

40

inundation of usually dry land by water– makes the remaining part of the exclusion superfluous. The ensuing words "waves, tidal water, overflow of a body of water or spray from any of these, whether or not driven by wind" all are instances relating to **natural** events which can cause inundation of usually dry land. Thus, to use the broadest definition of the term "flood" in interpreting this exclusion, would render the rest of the clause useless.

Under the principles of Louisiana law, the Court is constrained to find the language ambiguous. To find otherwise, leads to absurd results. Once this finding is made, the Court is further constrained to interpret it against the insurer. "If there is any doubt or ambiguity as to the meaning of a provision in an insurance policy, it must be construed in favor of the insured and against the insurer. *See* La. C.C. art. 2056.[15] When the ambiguity relates to an exclusionary clause, the law requires that the contract be interpreted liberally in favor of coverage." *Arnette v. NPC services, Inc.* , 808 So.2d 798 (La. App. 1st Cir. 2002) *citing Borden, Inc. v. Howard Trucking Co., Inc.* 454 So.2d 1081, 1090 (La. 1983). The term "flood" is in the context of an exclusion and thus must be narrowly construed. "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. *Carrier,* 759 So.2d at 43. " *Cadwallader*, 848 So.2d at 580 (emphasis added); *Calogero v. Safeway Ins. Co. of La.* , 753 So.2d 170 (La. 2000). *See, generally,* 15 William McKenzie and H. Alston Johnson, III, *Louisiana Civil Law Treatise: Insurance Law and Practice* § 4 at 6-9 (2d ed. 1996).

---

[15]"A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ. Code. art. 2056.

41

Support for limiting this exclusion in the context of an all-risk policy is further

demonstrated in the Louisiana supreme court's decision in *Doerr v. Mobil Oil Corp.*, 774 So.2d

119 (La. 2000). In *Doerr*, a refinery discharged hydrocarbons into the Mississippi River which

were drawn into the St. Bernard Parish water system and then distributed to users throughout the

parish. Plaintiffs in that case sought compensation from St. Bernard Parish and its insurers for

personal injuries allegedly sustained from the use and/or consumption of the allegedly

contaminated water. *Id.* at 121.

The Louisiana supreme court examined a total pollution exclusion endorsement in the

policy and analyzed its previous decision in *Ducote v. Koch Pipeline Co.,* 730 So.2d 432 (La.

1999). In *Ducote*, the supreme court had previously held that pollution exclusions were

unambiguous and excluded coverage for injury "which would not have occurred in whole or in

part but for the [dispersal] of pollutants at any time." *Ducote*, 730 so.2d at432, 437. The *Doerr*

court noted that this holding made it irrelevant as to who precipitated the alleged pollution and

re-examined the pollution exclusion itself.

The *Doerr* policy read:

> This insurance does not apply to:
>
> (1) "Bodily injury", "property damage", "personal injury" or "advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.
>
> (2) Any loss, cost or expense arising out of any:
>
> (a)Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
>
> (b) Claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the

42

effects of pollutants. Pollutants means solid liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Water includes material to be recycled, reconditioned or reclaimed.

*Id* at 122-23. The court noted that as written:

[T]he exclusion can be read to exclude coverage for anything from the release of chlorine gases by a conglomerate chemical plant to the release of carbon monoxide from a small business owner's delivery truck. It could be read to exclude injuries resulting from a slip and fall on an oil-slicked beach to a slip and fall on spilled gasoline at a corner service station. As pointed out in *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992):

without some limiting principle, the pollution exclusion clause would . . . lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, on would not ordinarily characterize these events as pollution.

*Id.* at 124.

The court then examined the origin of the Total Pollution Exclusion and concluded that its purpose was to exclude coverage for environment pollution with respect to the active polluter of the environment, not to apply unambiguously "regardless [as the majority stated in *Ducote]* of whether the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." *Doerr* at 126, *citing, Ducote*, 730 So.2d at 437.   The court continued "In fact, to give the pollution exclusion the broad reading found in *Ducote* would contravene the very purpose of a CGL policy, without regard to the realities which precipitated the need for the pollution exclusion–the federal government's war on active polluters." *Doerr* at 126. The court concluded:

43

Commercial General Liability policies are purchased by both large and small business owners in an attempt to protect against losses that may result from unforeseen liability-imposing events or circumstances. As stated in Section I(A)(1)(a) of the policy at issue here, the issuer of a liability policy "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Business owners rely on these policies to protect them against claims and losses which might otherwise force insolvency or prompt serious losses. The insurance company, on the other hand, agrees to absorb liability to which the business might otherwise be exposed in return for a premium which, along with the premiums of other insureds, is designed to adequately spread potential losses among all of the insurer's clients. These businesses come to rely on the liability policies because, without them, a single large claim might force insolvency or an intolerable monetary loss. Consequently, business owners expect that any exclusions within their policy will be read reasonably and with due regard to the intent of the policy as a whole. Giving these pollution exclusions a strictly literal reading without regard to the limited purpose behind their post-CERCLA formation would thwart the very purpose of the comprehensive general liability policy.

Both liability insurers and their insureds have certain expectations regarding issuance of a CGL policy. The liability insurer expects premiums in exchange for a certain level of risk, and the insureds expect to be insulated generally from liability claims. **A literal reading of the total pollution exclusions would alter the general scope and expectation of the parties. Consequently, because the pollution exclusion was designed to exclude coverage for environmental pollution only, it should be interpreted so that the clause "will not be applied to all contact with substances that may be classified as pollutants."** Russ, *supra*, at § 127:6 n. 62 (citing *Stoney Run Co. v. Prudential-LMI Comm. Ins. Co.*, 47 F.3d 34, 37 (2nd Cir.1995)). As *Ducote* conflicts with the intent of the policy exclusion and disrupts the expectations of both insurers and insureds, that opinion will be overruled at this time.

*Doerr*, 774 So.2d at 127-28 ( footnote omitted) (emphasis added).

Likewise, defendants' seeking to employ the broadest possible definition of "flood" in the context of the ISO Water Exclusion would result in the evisceration of what an "all-risk" policy is meant to cover. Certainly the damage sued upon was caused by flooding; but was the flooding caused by negligent acts or omissions excluded by the plain language of the policy?

44

The insurers could have drafted such a clear exclusion with very little effort, but they did not. As discussed herein, this precise issue, natural causes versus man-made causes, has been dealt with by various courts for a number of years. If the insurers, who wrote every word of the respective policies, wanted to make the language clear, that "flood" means water damage caused by negligent acts or omissions, it could have so drafted the policy language. For reasons only known to the insurer, it chose not to do so.

As is discussed, *infra*, in the sections concerning the State Farm policy and the Hartford policy, these insurers succeeded with very little effort in clearly excluding coverage for negligent acts or omissions. Indeed, if a consumer were to actually read the three different policy language presented in this case, one would expect that he or she would choose the ISO policy as it would be reasonable to assume that by comparison, it only excludes coverage for natural acts, unlike the other two policies. To find that the ISO language clearly excludes negligent acts would be to reward and encourage the use of vague language. This determination is underscored by the fact that the tension between natural flooding and flooding caused by negligent or intentional acts has existed for decades; obviously, some insurers made efforts to be clear in their intentions.

Furthermore, the defendant argues if the word "flood" does not include acts of negligence or omission, then the flooding which may occur as result of pumps not working in a heavy rain causing the streets to overflow with water would be covered under the policy. The Court disagrees. In that situation, the efficient proximate cause would be the natural occurrence of rain and the overflowing of the streets, not the failing of the pumps, and there would therefore would be no coverage as the cause efficient proximate cause was a natural act. What must be remembered is that the allegations in this matter revolve around the concept that the flood walls

45

involved collapsed precisely under the conditions that they were designed to withstand.  If the pumps failed at a point which they were designed to handle, then arguably  negligence might be present.

## 2.     Existence of NFIP Does Not Change Analysis

Insurers also argue that the existence of the National Flood Insurance Program ("NFIP") demonstrates that these policies are not meant to cover flooding of any sort.  The existence and scope of the NFIP has no bearing on the rules of contractual interpretation that this Court must apply as to whether an exclusion in a policy is ambiguous.  Moreover,  the Standard Flood Insurance Policy ("SFIP") does not purport to cover all water damage that could occur to a structure.  In the SFIP under the NFIP, "Flood" is defined as follows:

> 1.     A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is your property) from:
>   a.     Overflow of inland or tidal water,
>   b.     Unusual and rapid accumulation or run-off of surface waters from any source,
>   c.     Mudflow.
> 2.     Collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a flood as defined in A.1.a. above.

44 C.F.R. Ch.1 (10-1-04 Edition) Pt. 61, App. A(1).  If an insurer wanted to exclude coverage for damages covered by a national insurance program, it could so state in the relevant exclusion.

Furthermore, "[i]t is the reasonable interpretation of an insured that governs the legal effect of

46

language in an insurance contract, and not whether the language chosen by an insurer may constitute a legal term of art in another context.   *Lee v. Unum Life Ins. Co. of America,* 900 So.2d 1021, 1029 (La. App. 4th Cir. 2005).

The Court also takes note  that as a result of the 100 Year Flood Plane that was in effect at the time of Katrina, some lenders did not required a homeowner to purchase flood insurance where others did.  Some of the predictions with respect to that flooding were apparently incorrect as a result of the alleged failure of the levee system.  An insured may reasonably expect overtopping of a levee, but on the other hand an insured may not reasonably expect  that levees designed and certified by the United States Corps of Engineers would fail as a result of negligent design and construction as has been alleged.

### 3.    Ensuing Loss Provisions of the Act or Decisions Exclusion Render the Exclusion Inapplicable

The insurers also contend that another exclusion would act to deny coverage to any of the instant policy holders.  The policies in the Exclusion Section also provide as follows:

Section 1–Exclusions

2.    We do not insure for loss to property described in Coverages A and B caused by any of the following.  **However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.**

. . .

b.    **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

c.    **Faulty, inadequate or defective:**

    (1)    Planning, zoning, development, surveying, siting;

    (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    (3)    Materials used in repair, construction, renovation or remodeling; or

    (4)    Maintenance;

47

of part or all of any property whether on or off the "residence premises."

(Standard Fire Policies, App, at INS 97 and INS 137; Hartford Policy, App. at INS 56; Hanover Policy, app, at INS 10; Unitrin Policy, App. at INS 172.). As the Court has found there is coverage for the flood damage as alleged, then the losses would be considered "ensuing" and as such, these exclusions would be inapplicable. *See Lake Charles Harbor & Terminal District v. Imperial Cas. & Indem. co.*, 857 F.2d 286 (5th Cir. 1988) (Rubin, J.).

As this Court concerning *Lake Charles Harbor in Holden v. Connex-Metalna*, 2001 WL 40994 (E.D.La. Jan. 16, 2001):

> In *Lake Charles Harbor & Terminal District v. Imperial Casualty and Indemnity Company*, 670 F. Supp. 189 (W.D.La.1987), a cable broke on a shiploader, causing the shuttle portion of the loader to crash into the interior of the loader, resulting in extensive damage. The insurer denied coverage based on a policy exclusion for "[m]echanical or machinery breakdown; unless an insured peril ensues, and then only for the actual loss or damage caused by such ensuing peril." The plaintiff argued that the damage to the shiploader was an excluded peril. *Id.* at 193. It considered the that the purpose of an all risk policy "is to keep the insurer in its proper role as bearer of casualties rather than as warrantor or service contractor of the equipment of the insured. *Id.* at 194. The court held that damages to the ship unloader were covered under the policy, as "[t]he damages to the ship loader were not such as the insured would be expected to bear in the ordinary course of maintenance." *Id.*

> On appeal, the United States Court of Appeals for the Fifth Circuit affirmed, finding the policy language to be so ambiguous that its "words, read literally, are meaningless." *Lake Charles Harbor & Terminal District v. Imperial Casualty & Indemnity Co.,* 857 F.2d 286 (5th Cir.1988). The insurers asserted that "because a mechanical breakdown was the but for cause of the accident··· no insured peril ensued." *Id* at 287. The Court of Appeals rejected such an interpretation. Examining the policy language, Judge Rubin found that "[w]hatever ensuing peril may mean, nothing in the policies indicates that catastrophic damages to a machine caused by its own mechanical breakdown cannot be included within the term." *Id* at 288. Thus, the court interpreted the exclusion to find that "the insurance policies covered all risks except those explicitly excluded from coverage, and excluded coverage for mechanical

48

breakdowns only when "no insured peril ensue[d]." *Id.* at 289.

*Id.* at *5 -6.

### 4.    Anti-Concurrent Cause Clause is Inapplicable

Finally, the Court finds that the Anti-Concurrent Cause Clause[16] is inapplicable to the

ISO water exclusion as there is no "separate" or other cause of damage.  The allegations before

the Court are not analogous to those which the Mississippi federal courts are facing in *Buente v.*

*Allstate Ins. Co.*, 422 F. Supp.2d 690 (S.D. Miss. 2006) and *Tuepker v. State Farm Fire & Cas.*

*Co.*, 2006 WL 1442489 (S.D. Miss. May 24, 2006).  This case does not present a combination of

forces that caused damage such as wind versus water as was present in the natural disaster which

the Mississippi Gulf Coast experienced as a result of Hurricane Katrina.  The undefined term

"flood" in the Water Damage Exclusion is reasonably interpreted to be limited to flooding

caused by natural acts, not those that were man-made.  As such, there is no excluded loss as

alleged in this Complaint.  In this case the "cause" conflates to the flood; it is not wind damage

versus. water damage both of which were totally naturally occurring incidents as in *Buentes*.

But, there may be proof issues which will arise in the context of water damage that may have

been caused by water which naturally overtopped levees.  The court is not striking the anti-

concurrent cause clause, it is simply holding that the term "flood" is ambiguous and that it finds

that "flood" in the ISO Water Exclusion context means simply "flood" caused by natural

occurences such as overtopping.  As previously noted, the issue of the anti-concurrent cause

clause may have to addressed at a later stage of this litigation.

---

[16]This term of art is used to refer to the lead-in clause of the ISO policy which states "We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. (Standard Fire Policies, App, at INS 96 and INS 136; Hartford Policy, App. at INS 55; Hanover Policy, app, at INS 9; Unitrin Policy, App. at INS 171.)

## B.   State Farm Policy's "Lead-In" Provision

The State Farm policies contain a specific lead-in which removes the ambiguity with

regard to causation of flood–that is natural versus man-made.   As previously noted, the State

Farm policies provide:

> SECTION I - LOSSES NOT INSURED
>
> 2.      We do not insure under any coverage for loss which would not have occurred in
> the absence of one or more of the following excluded events.  We do not insure for such
> loss **regardless of: (a) the cause of the excluded event**; or (b) other causes of the loss;
> or (c) whether other causes acted concurrently or in any sequence with the excluded
> event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves
> isolated or widespread damage, arises from natural or external forces, or occurs as a
> result of any combination of these:
>
> c.       (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray
> from any of these all whether driven by wind or not;

(Doc. 570, Exhibit A and B, pp. 7 and 10) (emphasis added).

In the State Farm policy does precisely what the ISO Water Exclusion Policy fails to do.  It

makes it clear that regardless of the **cause** of the flooding, there is no coverage provided for any

flooding "regardless of the cause."  Such language is clear to the Court and as such, the Court

must find that the State Farm policy as written excludes coverage for all flooding.

In so finding, the Court is aware that it is at odds with the decision in *Murray*, 509 S.E.2d

at 489–92.  In its decision, the *Murray* court focused on the "natural or external forces" of the

lead-in clause, and concluded that the lead-in clause operated to defeat the efficient proximate

cause doctrine and the insureds' reasonable expectations.  The court basically excused a policy

holder from a "painstaking review" of the policy.  *Id.* at 490.  The *Murray* court relied

substantially on language contained in certain California cases; however, California has

50

statutorily limited the application of these types of clauses. As noted in David L. Leitner;

Reagan W. Simpson; and John M. Bjorkman, 4 Law and Practice of Insurance Coverage

Litigation § 52:35:

> Three states, California, Washington, and West Virginia, follow the
> efficient proximate cause rule and also refuse to enforce at least some anti-
> concurrent causation policy provision. In addition Wisconsin has found
> ambiguous and construed in favor of the insured the application of an anti-
> concurrent causation clause in a general policy form to an additional coverages
> endorsement. The California courts have concluded that anti-concurrent
> causation policy provisions are contrast to the statutory mandate in that state's
> insurance Code. In Washington, the courts simply have refused to enforce anti-
> concurrent causation provisions regardless of their clarity and have provided little
> rationale for this conclusion. West Virginia's supreme Court has concluded that
> the anti-concurrent cause language conflicts with the insured's reasonable
> expectations and therefore, is unenforceable.

*Id.* Louisiana has not spoken to the issue of whether the doctrine of efficient proximate cause

overrides anti-concurrent cause clauses. As noted, Louisiana has adopted the efficient proximate

cause approach to coverage; however, the courts have not, to this Court's knowledge, squarely

addressed this tension. Nonetheless, from the foregoing citations to the Code and the

*jurisprudence constant* concerning clear language and the ability for parties to a contract to

dictate the terms thereof, it appears that a Louisiana court would enforce the clear contractual

intent to exclude coverage as found in this State Farm lead-in clause.

### C. Hartford Policy's specific Flood Definition

Finally, in the *Vanderbrook* context, the efficacy of Hartford's "Amendatory

Endorsement Specifically Excepted Perils" must be examined. This two page provision provides

in relevant part:

51