# EXHIBIT   A

*Ex. A*

# ALPHA TESTING AND INSPECTION, INC.



2601-A LEXINGTON AVENUE KENNER, LOUISIANA 70062 TEL: 504-467-9694 FAX: 504-467-0166

Report No. 49                     January 16, 2004                     ATI - 3994

**RECEIVED**

| | |
|---|---|
| Description | Report of Vibration Monitoring |
| Project | OLD Project No. 24319<br>USACE Contract DACW 29-02-C-0016<br>Hammond Highway Bridge |
| For | The Board of Commissioners<br>of the Orleans Levee District |
| Contractor | The Gulf Group |
| Reported to | The Board of Commissioners<br>of the Orleans Levee District<br>Suite 202, Administration Building<br>6001 Stars and Stripes Boulevard<br>New Orleans, LA 70126-8006<br>Attn: Mr. Stevan G. Spencer, P.E. |

*Duplicate*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On January 15, 2004, our representative, B. Urquhart & D. Mang, reported to the above project for the purpose of monitoring vibrations from construction operations.

Ground vibration measurements were monitored using a Dallas Instrument, Serial No. 2809-17 BR2-3LF Blast Monitor. This instrument performs a vector summation of one (1) vertical and two (2) horizontal vibrations. Scale range is 0 to 4.0 inches per second (IPS).

Ground measurements were monitored at various locations and distances from the construction. All data are shown on the attached log sheet.

The maximum ground vibration reading today was 0.35 inches per second.

ALPHA TESTING & INSPECTION, INC.

Michael A. Devillier
President

2cc: Client

**A-1**

| Client | The Board of Commissioners of the Orleans Levee District | | Order No. | ATI – 3994 |
|---|---|---|---|---|
| | Suite 202, Administration Building 6001 Stars & Stripes Boulevard | | Date | 1-15-04 |

**Project**    OLD Project No. 24319 USACE Contract DACW 29-02-C-0016 Hammond Hwy. Bridge

**Contractor**    The Gulf Group

| Monitor Type | Dallas Instruments BR2-3LF Blast Monitor(2809-17) | Settings | 0" - 4.0" |
|---|---|---|---|

| Monitor Location | Pile Monitor Distance (Feet) | Time: Start Stop | Max. | Comments |
|---|---|---|---|---|
| Southwest rear corner of apartment #27 at fence corner. | --- | --- | --- | Calibration |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 6:30 a.m. 7:30 a.m. | .00 | Mechanical Problems On Stand – By |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 7:30 a.m. 8:30 a.m. | .00 | Mechanical Problems On Stand – By |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 8:30 a.m. 9:30 a.m. | .00 | Mechanical Problems On Stand – By |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 9:30 a.m. 10:30 a.m. | .00 | Mechanical Problems On Stand – By |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 10:30 a.m. 11:30 a.m. | .22 | Pulling Sheet Piles |
| Southwest rear corner of apartment #27 at fence corner. | 100' – 20' | 11:30 a.m. 12:30 p.m. | .24 | Pulling Sheet Piles |
| Southwest rear corner of apartment #27 at fence corner. | 40' – 80' | 12:30 p.m. 1:30 p.m. | .35 | Pulling Sheet Piles Notified Contractor |
| Southwest rear corner of apartment #27 at fence corner. | 40' – 80' | 1:30 p.m. 2:00 p.m. | .27 | Pulling Sheet Pile Notified Contractor |
| Southwest rear corner of apartment #27 at fence corner | ---- | ---- | ---- | Calibration |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**A-2**

# The Board of Commissioners

OF THE

## Orleans Levee District



SUITE 202 - ADMINISTRATION BUILDING

6001 STARS AND STRIPES BLVD.

### New Orleans, La.

70126-8006

TEL. 504-243-4000

PROTECTING YOU
AND YOUR FAMILY

January 23, 2004

Mr. Alfred Naomi, Sr.
Project Manager
U. S. Army Corps of Engineers, New Orleans
Post Office Box 60267
New Orleans, Louisiana 70160-0267

RE:   OLD Project No. 24316
       Vibration Monitoring at Hammond Hwy Bridge Flood-
       proofing Project

Dear Mr. Naomi:

Attached are copies of two (2) vibration monitoring reports, dated January 16 and 20, 2004, from Alpha Testing and Inspection, Inc., indicating that vibrations exceeded the 0.25 ips threshold stated in the contract.

As you are aware, the contractor is currently working on the demolition of the north portion of the old bridge and soon will start driving piles for the new bents. This area is the closest to any residences, less than 100 ft. It is requested that you furnish us with a report on what actions the contractor is taking to prevent recurrence of these high vibrations.

Sincerely,

Stevan G. Spencer, P.E.
Chief Engineer

SGS:DE:dba

Attachment

xc:   Max L. Hearn, Executive Director
      Gary Benoit, Esq., Senior Counsel w/attachment
      Alan Hunter, Area Engineer, USACE

**A-3**



# ALPHA TESTING AND INSPECTION, INC.



2601-A LEXINGTON AVENUE KENNER, LOUISIANA 70062 TEL: 504-467-9694 FAX: 504-467-0166

Report No. 50 January 20, 2004 ATI - 3994

RECEIVED

| | |
|---|---|
| Description | Report of Vibration Monitoring |
| Project | OLD Project No. 24319<br>USACE Contract DACW 29-02-C-0016<br>Hammond Highway Bridge |
| For | The Board of Commissioners<br>of the Orleans Levee District |
| Contractor | The Gulf Group |
| Reported to | The Board of Commissioners<br>of the Orleans Levee District<br>Suite 202, Administration Building<br>6001 Stars and Stripes Boulevard<br>New Orleans, LA 70126-8006<br>Attn: Mr. Stevan G. Spencer, P.E. |

*Duplicate*

*****************************************************************************

On January 19, 2004, our representative, B. Urquhart, reported to the above project for the purpose of monitoring vibrations from construction operations.

Ground vibration measurements were monitored using a Dallas Instrument, Serial No. 2809-17 BR2-3LF Blast Monitor. This instrument performs a vector summation of one (1) vertical and two (2) horizontal vibrations. Scale range is 0 to 4.0 inches per second (IPS).

Ground measurements were monitored at various locations and distances from the construction. All data are shown on the attached log sheet.

The maximum ground vibration reading today was 0.36 inches per second.

ALPHA TESTING & INSPECTION, INC.

Michael A. Devillier
President

**A-4**

| Client | The Board of Commissioners of the Orleans Levee District | | Order No. | ATI – 3994 |
|---|---|---|---|---|
| | Suite 202, Administration Building 6001 Stars & Stripes Boulevard | | Date | 1-19-04 |
| Project | OLD Project No. 24319 USACE Contract DACW 29-02-C-0016 Hammond Hwy. Bridge | | | |
| Contractor | The Gulf Group | | | |
| Monitor Type | Dallas Instruments BR2-3LF Blast Monitor(2809-17) | | Settings | 0" - 4.0" |

| Monitor Location | Pile Monitor Distance (Feet) | Time: Start Stop | Max. | Comments |
|---|---|---|---|---|
| 30' from Southwest rear corner of apartment #27. | --- | --- | --- | Calibration |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 7:30 a.m. 8:30 a.m. | .30 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 8:30 a.m. 9:30 a.m. | .36 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 9:30 a.m. 10:30 a.m. | .21 | Pulling Sheet Pile |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 10:30 a.m. 11:30 a.m. | .26 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 11:30 a.m. 12:30 p.m. | .28 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' – 70' | 12:30 p.m. 1:30 p.m. | .22 | Pulling Sheet Pile |
| 30' from Southwest rear corner of apartment #27. | --- | --- | --- | Calibration |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**A-5**

**A-6**

# EXHIBIT   B

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

In Re: KATRINA CANAL BREACHES      *      CIVIL ACTION
CONSOLIDATED LITIGATION          *      NO. 05-4182
                                *

_____  *

PERTAINS TO:                 *      SECTION: K (2)
LEVEE (06-6642)             *      JUDGE DUVAL
PONTCHARTRAIN BAPTIST CHURCH  *      MAG WILKINSON
                                *

*    *    *    *    *    *    *    *

## DECLARATION

I, Tracy Gately, declare as follows:

1. I am of full age and majority, and I am competent to make this declaration.

2. I am a forty year old electrician

3. I did not evacuate before Katrina but stayed in my apartment at 1632 Carrolton Avenue, #6 where I still live.

4. After Katrina passed in the morning of Monday, August 29, 2005, around 9:00am, I was standing on the Jefferson Parish side of the Hammond Highway Bridge sidewalk.

5. I looked to my left towards the Lake and saw a huge pile of debris pushed up against the bridge.

6. I looked to my right down the 17th Street Canal and saw a whirlpool spinning in the canal water (like what you see when a toilet bowl flushes) on the Orleans Parish side of the canal near the floodwall and levee. A few minutes later at the same spot, I saw the levee and floodwall on the Orleans side fall over and water pour through the opening.

**B-1**

7. An Orleans Parish Levee District police man came up to me and asked me to leave the Bridge because he though it might be unsafe.

8. I left the Bridge and went back to my apartment unable to believe what I saw.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and based on my personal knowledge and observations.  Executed this ___2___ day of March, 2007.

TRACY GATELY

**B-2**

# EXHIBIT   C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES * | CIVIL ACTION NO. |
| CONSOLIDATED LITIGATION  * | NO. 05-4182 |
| * | |
| * | |
| * | SECTION:  K (2) |
| * | JUDGE DUVAL |
| * | MAGISTRATE WILKINSON |
| * | |
| PERTAINS TO: * | |
| (06-6642) Pontchartrain Baptist Church * | |
| * | |
| *     *     *     *     *     *     * | |

AFFIDAVIT OF HAROLD. J. BOSWORTH, JR., P.E.

STATE OF LOUISIANA

PARISH OF ORLEANS

**BE IT KNOWN**, that on the 15th day of March, 2007, before me, the undersigned

Notary, personally came and appeared:

**HAROLD J. BOSWORTH, JR., P.E.**

To me personally known and who, being duly sworn, did depose and state:

1. That I am of the full age majority and a resident of Orleans Parish, State of Louisiana.

2. That I have earned a Bachelor of Science in Civil Engineering from Louisiana State
   University in Baton Rouge, Louisiana in 1981.

3. That I have been and am currently a registered and licensed Professional Civil
   Engineer with the State of Louisiana since 1986, holding License Number 22131 and
   I am a member of the American Society of Civil Engineers.

**C-1**

4. That my professional accomplishments in the field of civil engineering are set forth in my *Curriculum Vitae*, a copy of which is attached hereto as Exhibit "A."

5. That I am presently employed by Lanier & Associates Consulting Engineers, Inc., 4101 Magazine Street, New Orleans, Louisiana, 70115.

6. That I personally reviewed a letter from the Chief Engineer of the Board of Commissioners of Orleans Levee District, often referred to as the "Orleans Levee Board" dated January 23, 2004 addressed to Mr. Alfred Naomi, Sr. of the U.S. Army Corps of Engineers as well as a letter from Mr. Fredric Chatry of the U.S. Army Corps of Engineers, New Orleans District dated January 4, 1998 addressed to Mr. Barney T. Martin, Jr. of Modjeski & Masters Engineers. Copies of these letters are attached as Exhibit "B" and Exhibit "C".

7. That I personally reviewed and utilized the information contained the July 2006 report by the Independent Levee Investigation Team, sponsored by the National Science Foundation as found on the University of California, Berkeley website.

8. That I have reviewed similar information reported in lectures given by LSU Professor Ivor Van Heerden.

9. That I, as a practicing Professional Engineer, have a substantial knowledge of soils and foundation designs found in south Louisiana.

10. That I am the owner of more than a hundred historical maps. I have a detailed knowledge of the development of New Orleans from a historical, geotechnical and geological perspective.

11. That I have a working knowledge of the interaction of construction operations, their dynamic vibrations and their usual effect on soils, foundations and structures.

**C-2**

12. That based upon the review of the aforementioned documents, it is more likely than not that the canal bank and levee along the east side of the 17th Street Canal was structurally compromised and became less stable by the dredging of the canal and by the ground vibrations from the demolition and construction of the Hammond Hwy. Bridge, which crosses this canal immediately north of the breach site.

13. That the above statements and facts are made based upon my personal knowledge, engineering expertise and review of the referenced data.

14. That my parents lived on Bellaire Drive in New Orleans and are claimants in this action. With candor, I wanted to bring this to the attention of the court.

**HAROLD J. BOSWORTH, JR., P.E.**

SWORN TO AND SUBSCRIBED
BEFORE ME, THIS 23h DAY

OF MARCH 2007.

NOTARY PUBLIC

**C-3**

EXHIBIT "A"

# Harold Joseph Bosworth, Jr. P.E.

## Summary of Background And Activity

1527 South Carrollton Avenue
New Orleans   LA  USA

March 15, 2007

### Engineering Career:

2005 - 2007   Civil- Structural Engineer – Lanier & Associates - New Orleans, LA

2004 - 2005   Civil Structural Engineer – URS Corporation – Metairie, LA

1990 – 2004   Civil-Structural Engineer – Waldemar S. Nelson & Co. – New Orleans

1988 - 1989   Civil – Structural Engineer – Burk & Associates – New Orleans, LA

1985 - 1988   Civil – Structural Engineer – Barnard & Thomas Engineers – Gretna, LA

1982 – 1985   Civil – Structural Engineer – NY & Associates Engineers – Metairie, LA

### Registration, License and Professional Membership:

PROFESSIONAL REGISTRATIONS

 Registered Professional Engineer in the State of Louisiana – License # 22131

PROFESSIONAL MEMBERSHIPS

 American Society of Civil Engineers

### Specific project experience:

See Attached – 4 pages

**C-4**

NAME                HAROLD J. BOSWORTH, JR., P.E.

TITLE                Professional Civil Engineer

EDUCATION       Louisiana State University, 1981
                         B.S. in Civil Engineering

PROFESSIONAL EXPERIENCE - 1981 to Present


Construction administration with inspection of a hurricane flood wall and floodgate complex for the Orleans Levee Board. This was a 3-1/2 million-dollar (1982) civil and structural project, which included large braced excavations, earthwork with mechanical swinging, sliding, and sluice gate floodwater control structures. This complex was also designed to facilitate track stabilization of a portion of Southern Railroad's line, which crossed through the complex and ran parallel to the canal work, which included the sluice gate structure.

Structural construction inspection with design and plan review of the 19-story Lakeway II office building in Metairie, Louisiana.

Design, specification writing, plan preparation, and construction administration for a 6 plus mile series of sewer force mains ranging in size from 18" to 78". The design pipeline route involved extensive work through railroad right of way and work with railroad regulations for work under and through track foundation structures and portions which crossed a railroad switching yard. The routing also involved work through a protective levee of the Mississippi River. These pipelines were constructed in fully populated portions of the East Bank of Jefferson Parish for the Jefferson Parish Department of Public Utilities.

Design, plan preparation, construction administration with inspections for various civil and mechanical projects which include sewer force mains through fully populated urban areas on the Westbank of Jefferson Parish with a total 1985 constructed cost of over $30 million; fluoridation system for the water supply of the City of Gretna, Louisiana; sewerage pump stations with large submersible pumps designed to handle flows which were formerly treated in 1-2 MGD wastewater treatment plants.

Preparation and coordination of traffic routing plans to allow for long term street closures required during utility work. Traffic plans were based on traffic volumes and patterns. Traffic work and studies performed were in populated areas of Jefferson Parish, Louisiana.

Engineering for Morgan City Flood Protection Improvements at industrial sites (1999). Prepared specifications, reviewed design, provided support during construction.

Structural engineering for directing and inspecting repairs of ship and barge alision damage to Domino Sugar wharf in Arabi, Louisiana (1999). Responsible for inspecting contractor's work, reviewing and coordinating invoices and monitoring charges.

Civil and structural engineering and project management for miscellaneous projects at New Orleans Union Passenger Terminal (1996-2002).    Projects included repairs and architectural modifications to terminal building and environmental site cleanup.  Responsible for developing project scopes, plans and specifications, issuing and evaluating bids, and monitoring contractors' work.

Design of two drainage pump stations for the Lake Borgne Basin Levee District located in St. Bernard Parish, using three large propeller type pumps with nominal capacities of 150,000 GPM each.  Wrote specifications for large custom built drainage pumps including detailed descriptions of the manufacture of the pump assemblies, gear reducers, engines and radiators. Specified scale pump model test to be performed by the pump manufacturer.  Also prepared detailed specifications for several pieces of mechanical equipment for the station.

Design and plan preparation of civil projects, which included urban street rehabilitation for the City of New Orleans, Department of Streets; and the rehabilitation of the largest sanitary sewer lift station for the Water and Sewerage Commission of St. Bernard Parish.

Specification writing, document preparation and component design for other mechanical and civil projects including emergency water and power facility for the New Orleans International Airport Aviation Board; sludge thickener tank cover and chemical odor control scrubber for the New Orleans Sewerage & Water Board (NO S&WB); a pretreatment unit for the Algiers Wastewater Treatment Plant for N.O. S&WB; a 20-acre parking facility for Ingall's Shipbuilding which involved a drainage system and significant modifications to a confined disposal facility for dredged material.

Shell Oil Company; Norco Louisiana Complex -- Design, specification writing and construction administration of a pollution prevention project that included the renovation of a stormwater detention / pollution control system with weirs, floating skimmer baffles, aerators and the associated structures for the electrical equipment and controls.

Design and construction of a project to construct a new industrial landfill and cover an existing landfill mound for Shell Oil in Norco.  The new landfill design included a clay liner and a synthetic liner and geo-textiles and related products.

Several phospho-gypsum stack closure projects were engineered to provide dewatering of acidic water in large (2,000 to 5,000 acres) piles of phospho-gypsum.  In addition to dewatering the saturated gypsum, plans were prepared to cover the stacks with HDPE-lined ponds and soil and drain surface storm water from the covered surfaces.  A network of drainage culverts, ponds and ditches to move storm water in a controlled matter to the nearby wetland/swampy areas was also engineered.  These gypsum stacks are located in south Louisiana and southern Iowa and were owned by IMC-Agrico.

Freeport Indonesia Copper/Gold Mining & Resources.  Structural design and civil work for a mine expansion project.    Responsibilities included structural analysis, drawing preparation and foundations design for a gold and copper slurry pump station and very large retaining walls in

mountainous terrain.  Other responsibilities included foundation design for a mill building and civil design for a fuel oil storage and pump station area.

Produced structural steel designs to support items including vessels, buildings, ductwork, walkways, motors, piping, cable trays and equipment for miscellaneous projects for onshore and offshore facilities.  The facilities were owned by Mobil, Shell, Exxon, Texaco, Conoco, GATX, Cytec, AlliedSignal, LOOP, Bridgeline Petroleum and others.

Facility engineering during 1991 for an oil storage terminal owned by GATX in Norco, Louisiana. Design tasks were primarily in association with the facility's renovation of the No.6 oil storage system.   The project included structural rehabilitation of large storage tanks, which included foundation remediation by jacking and grout pumping.  The structural rehabilitation was followed by a redesign of the steam product heating system and the product pumping and pipeline system.

The steam system modifications at GATX involved the installation of finned heating coils, which were routed within the tank having a steam inlet manifold and a condensate outlet configuration and isolation structure.  The large steam distribution piping from the existing boiler house was upgraded with new pipelines routed on existing pipe racks and, in some areas, on newly designed pipe support structures.

The conveyance system of the No. 6 oil at the GATX facility was renovated at the individual 150,000 barrel tanks with a new fill and outlet pipe configuration with new centrifugal pumps, tank nozzles and piping.  Other pipeline segments were modified to facilitate an upgraded pigging operation and other routing changed on new and existing piperacks, which extended from the new manifold to the several existing docks on the east bank of the Mississippi River.  The electrical system was upgraded by the addition of a new MCC and transformer site with cable trays, conduits and aerial installed power cables routed in a congested area on new and existing structures.

Design and plan preparation of structural projects which included cable tray support structures, electrical switchgear building, stormwater impoundment basin and drainage structures for Shell Oil's Norco Manufacturing Complex; small building addition to office building at Shell Oil's Norco Manufacturing Complex; an offshore gas compressor building for Exxon, U.S.A. located in Mississippi Canyon 397 "A";  a specialty sugar building for Amstar Sugar Corporation in Arabi, Louisiana;  a materials handling and storage complex for Kronos Louisiana, Inc. in Lake Charles, Louisiana; structural frame and mechanism to lift a 120' steel hinged door for Avondale Industries' special ship building facility in Gulfport, Mississippi.

Cost estimating for a pollution control project for Jefferson Parish.  This project included the locating of drainage pump stations and drainage force mains to collect the initial flush of drainage from the existing system.  This initial flush was considered to be contaminated by fecal coliform from illegal cross connections and from various domestic animals.  Cost estimates were prepared for the pump lift stations, force mains and for treatment plants of 100-200 MGD.

PGA Tour Headquarters:  Design and construction administration of a variety of items for a championship golf course in Jefferson Parish, Louisiana.  Design tasks included a detailed 5+

million dollar drainage system that is to act as a separate system from the surrounding municipal area.   The project included earthen mounds of soft clay, 19 acres of man-made lakes, three drainage pump stations, small sewer pump stations, miles of drainage piping, and all utilities for a clubhouse, office buildings and maintenance facility with associated parking.

Preparation and research for maps and plans of developments including streets, roads, lakes, pipelines and a cemetery in the City of New Orleans.  Personal library includes numerous maps, surveys, plans and documents dating back to the early 1800's.  A board member of the Louisiana Historical Society and a very active member of the Louisiana Landmarks Society as well as the Preservation Resource Center of New Orleans.   Personally responsible for preparing the only modern map of the Carrollton Cemetery in New Orleans.

U. S. Army – Corps of Engineers:  Design and construction administration of small drainage pump stations in the vicinity of Morgan City, Louisiana.  Performed construction administration for large drainage pump stations in and around the city of New Orleans in 2004.  Project management and coordination of a ship and barge lock replacement project for the Inner Harbor Navigation Canal in New Orleans.

EXHIBIT "B"
PG 1 of 7

# The Board of Commissioners

of the

## Orleans Levee District



Suite 202 – Administration Building,
6001 Stars and Stripes Blvd.

### New Orleans, La.
70126-8906

TEL 504-243-4000

PROTECTING YOU
AND YOUR FAMILY

January 23, 2004

Mr. Alfred Naomi, Sr.
Project Manager
U. S. Army Corps of Engineers, New Orleans
Post Office Box 60267
New Orleans, Louisiana 70160-0267

RE:  OLD Project No. 24316
Vibration Monitoring at Hammond Hwy Bridge Flood-
proofing Project

Dear Mr. Naomi:

Attached are copies of two (2) vibration monitoring reports, dated January 16 and 20, 2004, from Alpha Testing and Inspection, Inc., indicating that vibrations exceeded the 0.25 ips threshold stated in the contract.

As you are aware, the contractor is currently working on the demolition of the north portion of the old bridge and soon will start driving piles for the new bents. This area is the closest to any residences, less than 100 ft. It is requested that you furnish us with a report on what actions the contractor is taking to prevent recurrence of these high vibrations.

Sincerely,

Stevan G. Spencer, P.E.
Chief Engineer

SGS:DE:dba

Attachment

xc:  Max L. Hearn, Executive Director
Gary Benoit, Esq., Senior Counsel w/attachment
Alan Hunter, Area Engineer, USACE

**C-9**



# ALPHA TESTING AND INSPECTION, INC.



2601-A LEXINGTON AVENUE KENNER, LOUISIANA 70062  TEL: 504-467-9694  FAX: 504-467-9166

Report No. 50                         January 20, 2004                         ATI - 3994

RECEIVED

| | |
|---|---|
| Description | Report of Vibration Monitoring |
| Project | OLD Project No. 24319<br>USACE Contract DACW 29-02-C-0016<br>Hammond Highway Bridge |
| For | The Board of Commissioners<br>of the Orleans Levee District |
| Contractor | The Gulf Group |
| Reported to | The Board of Commissioners<br>of the Orleans Levee District<br>Suite 202, Administration Building<br>6001 Stars and Stripes Boulevard<br>New Orleans, LA 70126-8006<br>Attn: Mr. Stevan G. Spencer, P.E. |

*Duplicate*

**************************************************************************************

On January 19, 2004, our representative, B. Urquhart, reported to the above project for the purpose of monitoring vibrations from construction operations.

Ground vibration measurements were monitored using a Dallas Instrument, Serial No. 2809-17 BR2-3LF Blast Monitor. This instrument performs a vector summation of one (1) vertical and two (2) horizontal vibrations.  Scale range is 0 to 4.0 inches per second (IPS).

Ground measurements were monitored at various locations and distances from the construction.  All data are shown on the attached log sheet.

The maximum ground vibration reading today was 0.36 inches per second.

ALPHA TESTING & INSPECTION, INC.

Michael A. Devillier
President

cc: Client

**C-10**

| Client | The Board of Commissioners of the Orleans Levee District | | Order No. | ATD 3994 |
|---|---|---|---|---|
| | Suite 202, Administration Building 6001 Stars & Stripes Boulevard | | Date | 1-19-05 |
| Project | OLD Project No. 24319 USACE Contract DACW 29-02-C-0016 Hammond Hwy. Bridge | | | |
| Contractor | The Gulf Group | | | |
| Monitor Type | Dallas Instruments BR2-5LF Blast Monitor(2809-17) | | Settings | 0" - 4.0" |

| Monitor Location | Pile Monitor Distance (Feet) | Time: Start Stop | Max. | Comments |
|---|---|---|---|---|
| 30' from Southwest rear corner of apartment #27. | --- | --- | --- | Calibration |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 7:30 a.m. 8:30 a.m. | .30 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 8:30 a.m. 9:30 a.m. | .36 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 9:30 a.m. 10:30 a.m. | .21 | Pulling Sheet Pile |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 10:30 a.m. 11:30 a.m. | .26 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 11:30 a.m. 12:30 p.m. | .28 | Pulling Sheet Pile Notified Contractor |
| 30' from Southwest rear corner of apartment #27. | 60' - 70' | 12:30 p.m. 1:30 p.m. | .22 | Pulling Sheet Pile |
| 30' from Southwest rear corner of apartment #27. | ----- | ----- | ----- | Calibration |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**C-11**

C-12



# ALPHA TESTING AND INSPECTION, INC.



2001-A LEXINGTON AVENUE KENNER, LOUISIANA 70062  TEL: 504-467-9694  FAX: 504-467-9166

Report No. 49                    January 16, 2004                              ATI - 3994

RECEIVED

| | |
|---|---|
| Description | Report of Vibration Monitoring |
| Project | OLD Project No. 24319<br>USACE Contract DACW 29-02-C-0016<br>Hammond Highway Bridge |
| For | The Board of Commissioners<br>of the Orleans Levee District |
| Contractor | The Gulf Group |
| Reported to | The Board of Commissioners<br>of the Orleans Levee District<br>Suite 202, Administration Building<br>6001 Stars and Stripes Boulevard<br>New Orleans, LA 70126-8006<br>Attn: Mr. Stevan G. Spencer, P.E. |

*Duplicate*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On January 15, 2004, our representative, B. Urquhart & D. Mang, reported to the above project for the purpose of monitoring vibrations from construction operations.

Ground vibration measurements were monitored using a Dallas Instrument, Serial No. 2809-17 BR2-3LF Blast Monitor. This instrument performs a vector summation of one (1) vertical and two (2) horizontal vibrations. Scale range is 0 to 3.0 inches per second (IPS).

Ground measurements were monitored at various locations and distances from the construction. All data are shown on the attached log sheet.

The maximum ground vibration reading today was 0.35 inches per second.

ALPHA TESTING & INSPECTION, INC.

Michael A. Devillier

Michael A. Devillier
President

cc: Client

**Client**  The Board of Commissioners of the Orleans Levee District          **Order No.**  ATH   1994

           Suite 202, Administration Building 6001 Stars & Stripes Boulevard          **Date**      1-15-04

**Project**    OLD Project No. 23319 USACE Contract DACW 29-02-C-0016 Hammond Hwy. Bridge

**Contractor**  The Gulf Group

**Monitor Type**    Dallas Instruments 4817 SLE Blast Monitor(2809-47)          **Settings**      0° - 4.0°

| Monitor Location | Pile Monitor Distance (Feet) | Time: Start Stop | Max. | Comments |
|---|---|---|---|---|
| Southwest rear corner of apartment #27 at fence corner. | | | --- | Calibration |
| Southwest rear corner of apartment #27 at fence corner | 100'   20' | 6:30 a.m. 7:30 a.m. | .00 | Mechanical Problems On Stand - By |
| Southwest rear corner of apartment #27 at fence corner | 100'   20' | 7:30 a.m. 8:30 a.m. | .00 | Mechanical Problems On Stand - By |
| Southwest rear corner of apartment #27 at fence corner | 100' – 20' | 8:30 a.m. 9:30 a.m. | .00 | Mechanical Problems On Stand - By |
| Southwest rear corner of apartment #27 at fence corner. | 100'   20' | 9:30 a.m. 10:30 a.m. | .00 | Mechanical Problems On Stand - By |
| Southwest rear corner of apartment #27 at fence corner. | 100'   20' | 10:30 a.m. 11:30 a.m. | .22 | Pulling Sheet Piles |
| Southwest rear corner of apartment #27 at fence corner | 100'   20' | 11:30 a.m. 12:30 p.m. | .24 | Pulling Sheet Piles |
| Southwest rear corner of apartment #27 at fence corner | 40'   50' | 12:30 p.m. 1:30 p.m. | .35 | Pulling Sheet Piles Notified Contractor |
| Southwest rear corner of apartment #27 at fence corner. | 40'   50' | 1:30 p.m. 2:00 p.m. | .27 | Pulling Sheet Pile Notified Contractor |
| Southwest rear corner of apartment #27 at fence corner | ----- | ----- | ---- | Calibration |
| | | | | |
| | | | | |
| | | | | |
| | | | | |



C-15

*EXHIBIT "C"*
*PG. 1 OF 15*



## DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF

January 4, 1988

Engineering Division
Structural Design Section

Mr. Barney T. Martin, Jr.
Modjeski and Masters
Consulting Engineers
1055 St. Charles Avenue
New Orleans, Louisiana  70130

Dear Mr. Martin:

Reference is made to your letter dated November 2, 1987 to Mr. Ed Bailey, Chief Engineer of the Orleans Levee District, and to your letter dated November 12, 1987 to this office, in which you requested our review of the in-progress plans and specifications for the 17th Street Canal, Parallel Flood Protection, Phase IB, Hammond Highway to Southern Railway, OLB project number 2043-2047.

We are considering changes in the factors of safety used in determining penetration of I-wall sheet piling and changes in the method of determining I-wall deflections. We will let you know more by the end of January 1988. However, we have reviewed the subject plans and specifications based on present criteria and offer the following comments:

a. **Sta. 636+00 to Sta. 638.31.** Our preliminary analysis indicates that a higher tip penetration for the steel piling in this area can be obtained by applying submerged soil weight on the floodside of the floodwall and also by raising the levee crown to elevation 11.0 National Geodetic Vertical Datum.

b. A transition in sheet pile tip penetration is required for the sections between station 589+00 and station 590+00, station 614+00 and station 615+00, and between station 635+00 and station 636+00.

c. **Station 625+00 to Sta. 635+00.** Our preliminary analysis indicates that a lower tip penetration of the sheet piling than the penetration shown on the plan is required to satisfy the floodwall stability into the canal.

MODJESKI-E2
01208

**C-16**

-2-

d. Based on the information presented in the
typical sections, drawing number 3, a discontinuity in
the sheetpile wall would occur at station 589+00. This
should be clarified.

e. Our stability analysis of the floodwall reaches
described in enclosures 1 through 8, indicates that a
more economical design for the floodwall in those
reaches can be obtained by using the floodwall layout
depicted on the enclosures. It is recommended that you
revise the subject plans to reflect the floodwall
layout shown on the enclosures.

f. Since the dredging of the canal will not extend
into the Jefferson Parish side, the potential for scour
of the levee on this bank of the canal will exist. To
be able to detect such scour, control lines, as shown
on enclosures 9 through 13 will be required. These
control lines should be added to the drawings.
Additionally, survey cross-sections of the existing
levee and canal bank, with initial cross-sections of
the levee and dredged canal immediately after
construction and cross-sectional surveys taken on a
yearly basis thereafter, must be provided to this
office. These surveys are required to detect erosion
into the control lines, which if it occurs, could cause
failure of the subject levee. Should erosion beyond
the control lines occur, the Sewerage and Water Board
of New Orleans will be responsible for taking
corrective action at their own cost.

If there are any questions concerning our
requirements, please let us know.

Sincerely,

Frederic M. Chatry
Chief, Engineering
Division

Enclosures

MODJESKI-E2
01209

**C-17**



STA 553+70 TO STA 568+00
ORLEANS SIDE

SCALE : 1" = 20'

FLOODSIDE TOE SAME AS
MODJESKI + MASTERS PLANS

MODJESKI-E2
01210

Encl. 1
**C-18**



MODJESKI-E2
01211

C-19   Encl. 2



STA 589+00 TO STA 614+00
ORLEANS SIDE

Gross EL 14.1

EL 11.6

L.W.E. -3.0

EL 2.5

EL 18.5

THEORETICAL SECTION

EL -18.4

FLOODSIDE TOE SAME AS MODJESKI + MASTERS PLANS

SCALE: 1" = 20'

Net EL 13.

DEGRADE

NET EL 7.0

EL 3.5

EL -2.6

EL -2.5   TOP EL -14.6

MODJESKI-E2
0J212

C-20   ENCL. 3



STA. 614+00 TO STA. 625+00

ORLEANS, 'DE

FLOODSIDE TOE 3 4E 13 MODESKI & MASTERS PLAN

SCALE: 1" = 0'

THEORETICAL SECTION

MODJESKI-E2
01233

**C-21**  ENCL. F

Encl S

MO0JESKI-E2
01214

STA 625+00 TO STA 635+00
ORLEANS SIDE

WET EL. 141
WET EL. 8.0
WET EL. 75

ACROSS EL. 14.6

FILL
6'

TIP EL. -11.8

THEORETICAL SECTION 2

DEGRADE
EL. 3.5'
17.5'

FLOODSIDE TOE SAME AS MODZESKI & MASTERS PLANS

SCALE: 1"= 20'

EL. 12.1
L.W.E. EL -5.0
EL. -17.7
LEVEE JBK

C-22

STA. 635+00 TO STA. 647+00
ORLEANS SIDE

I-WALL GROSS EL. 15.1' (NET EL. 14.6')
GROSS LEVEE EL. 11.5' (NET EL. 11.0)

EL. 12.6

THEORETICAL SECTION

EL. -5.0 L.W.E.

EL. -16.4

FLOOD SIDE TOE SAME
AS MODJESKI & MASTERS

SCALE: 1" = 20'
ELEVATION IN FEET N.G.V.D.

TIP EL. 0.0

EL. -0.5

MODJESKI-E2
00235

C-23   Encl. 6



STA 647+00 TO STA 663+00

ORLEANS AND JEFFERSON SIDE

Scale : 1" = 20'

Elevations in Feet N.G.V.D.

Crown El 15.1 (Net El 13.6)
Net El 12.0

R-8.5'

TH El 6.7 (Standard)

(1VGN 3.3H)
EL 5.5

Degrade

EL 12.6

BENCH

EL -5.0

THEORETICAL SECTION

EL -16.1

OVER DREDGING

Flood side levee toe same as Modjeski + Masters Plans

EL -1.0

EL -2

(-10)

MODJESKI-E2
03236

C-24   Encl. 7

STA 663+00 TO STA 670+00
ORLEANS SIDE

EL 12.6

LWE -5.0

EL 2.0

EL -16.4

Mon. EL 14.6' Grass EL 15.1

NGT EL 11.5

+ B'-11

TIP EL 0.0

1'-11'-1

SCALE 1" = 20'
ELEVATION IN FEET NGVD

EL 4.5

MODJESKI-E2
01217

C-25   End. 8



STA. 5G8+00   CANAL-SIDE FAILURE

* NOTE: ELEVATIONS REFER TO CAIRO DATUM *



* NOTE: ELEVATIONS REFER TO CAIRO DATUM *

MODJESKI-E2
01219



* NOTE: ELEVATIONS REFER TO CAIRO DATUM *



STA. 61d+00 CANAL-SIDE FAILURE

| STRATA | Y | C_TOP | C_BOT | φ |
|--------|-----|-----|-----|-----|
| 1 | 110 | 500 | 500 | 0 |
| 2 | 103 | 500 | 500 | 0 |
| 3 | 103 | 200 | 280 | 0 |
| 4 | 10.7 | 280 | 280 | 0 |
| 5 | 10.8 | 200 | 580 | 0 |
| 6 | 101 | 380 | 380 | 0 |
| 7 | 122 | 0 | 0 | 120 |

* NOTE: ELEVATIONS REFER TO CAIRO DATUM *

MODJESKI-E2
01221

C-29   Encl. 12



MODJESKI-E2
01222

Encl. 13

# EXHIBIT  D

U.S. Army. Corps of Engineers. New Orleans Distri...

# DEPARTMENT OF THE ARMY

# NEW ORLEANS DISTRICT

# CORPS OF ENGINEERS

## PUBLIC HEARING

### ON

## PERMIT APPLICATION

## BY SEWERAGE AND WATER BOARD OF

## NEW ORLEANS

## FOR DREDGING IN THE

## SEVENTEENTH STREET CANAL

### HELD

## TUESDAY, MARCH 31, 1981

## 7:00 o'clock p. m.

## Council Chambers, City Hall

## New Orleans, Louisiana

Josemary L. Diliberto,
Reporter

Dietrich & Bendix, Inc.
Stenotypists
333 ST. CHARLES AVENUE, SUITE 1221
NEW ORLEANS, LOUISIANA 70130 - 522-3111

*D-1*

P R O C E E D I N G S

COLONEL THOMAS A. SANDS:

    I'm Colonel Tom Sands, the District

        Engineer for the Corps of Engineers,

        New Orleans District.

    We are here this evening to conduct a

        public hearing to gather information

        upon which we, the Corps, can base a

        decision relative to a permit appli-

        cation to dredge the Seventeenth

        Street Canal between Lake Pontchar-

        train and Pumping Station No. 6 by

        the Sewerage and Water Board.

    There a number of members of my Staff here

        this evening and I won't bother to

        list all of their names.  If you

        have any questions at all during

        the proceedings, the Staff -- some

        of the Staff is over at the table

        near the door by which you entered

        and will happy to answer any ques-

        tions which you may have.

    As I indicated, the primary purpose of

        this hearing is for us to gather

        information upon which we can base

11

1   fore, if you get a two year storm or

2   a three year storm you're putting

3   water in the streets and, possibly,

4   in people's homes.  So, consequently,

5   it's necessary to increase this pump-

6   ing station to a capacity of 10,000

7   cubic feet per second.  The canal

8   cannot hold 6,650 cubic feet per

9   second at the present time, so surely

10   it will not take 10,000 cubic feet

11   per second, as we planned.

12   The map also shows some contour lines from

13   the April 13th flood that I would

14   just like to point out to you.  This

15   is from our rainfall maps in the

16   City of New Orleans, and you'll

17   notice that there's a contour here

18   or rain intensity here.  Eight inches

19   of rain fell on April 13th in the

20   City of New Orleans.  When all of

21   the canals were full and the rains

22   -- and the land was completely in-

23   undated.  Eight inches of rain ran

24   off into this area here and down to

25   seven inches of rain in the area

1   across uptown New Orleans.  Six inches

2   here, five inches here, four inches

3   here and three inches here, (indi-

4   cating).  That wasn't a total storm,

5   but this amount of rain fell within

6   four hours.  The first 35 minutes of

7   that period, four inches fell, and

8   that, at this rate, some pumping re-

9   quirement of 16 hours.  Now, when

10  the entire system was full, as it

11  was that morning when we got the

12  eight inches of rain, it added 16

13  hours to the time of collection and

14  discharge into the lake.  So for

15  that reason we are working on the

16  five-year plan.

17  The problem now comes to why we're here

18  tonight, is the fact that in order

19  to put a five-year plan into the

20  uptown section of New Orleans and

21  to improve the canal collection sys-

22  tem and the pumping station system,

23  you must improve the outfall canal.

24  And without the outfall canal at

25  10,000 cubic feet a second there is

D-4

1    no point in going ahead with any of

2    the other projects.

3    The total project cost that we're projec-

4    ting now from a one-year storm to a

5    five-year storm is $138 million.

6    Before this money is spent the canal

7    will have to be established at 10,000

8    cubic feet a second, and that's why

9    I'm asking your favorable approval

10    for the dredging of this canal.

11    And I would like to turn the rest of the

12    presentation over to Modjeski and

13    Masters, our engineering firm that

14    has been doing the studies on the

15    canal for the dredging work.

16    MR. BILL CONWAY:

17    Thank you, Mr. Sullivan.  I'm Bill Conway

18    with Modjeski and Masters, Consulting

19    Engineers.

20    We were and have been engaged by the

21    Sewerage and Water Board to study

22    methods of increasing the capacity

23    of the 17th Street Canal.  As Mr.

24    Sullivan expressed, stated, there is

25    no point in making improvements in

**D-5**

that pump station or in the system

that feeds the pump station if the

outfall canal cannot handle the out-

fall, the effluent from the pump

station.  Therefore, this project

particularly is to improve the out-

fall canal.  And it falls logically

into place; that is, when one im-

proves a system of drainage one

starts at the downstream end and

proceeds upstream.

Now, the outfall canal, the present 17th

Street Canal, is unsatisfactory for

several reasons.  It has obstructions

in it, one reason.  Some of those

obstructions can be taken out, some

cannot.  Bridges are obstructions,

they have to stay in.  It also has

an irregular cross-section, that is

the cross-section does not have in

technical terms what is the least

wetted perimeter.  It is a rough

cross-section.  One can fix that by

smoothing out the cross-section.

And, thirdly, and most importantly

**D-6**

1   man-made obstructions.  This looks

2   like an existing bank line.  It is

3   a man-made obstruction here.  We need

4   to remove those and achieve, again,

5   a relatively uniform canal section

6   that will hydraulically serve the

7   function it was built originally to

8   serve.

9   Now that, in a nutshell, is the permit

10   proposal, dreding 40,000 cubic yards

11   of material south of Hammond Highway,

12   placing it on the walls of the existing

13   levee; dreding another 40,000 cubic

14   yards of material north of Hammond

15   Highway and hauling it away through

16   the City of New Orleans to an upland

17   disposal site.

18   Now I want to say one thing here.  The

19   sections that we showed here are

20   slightly different than those that

21   are in your permit application --

22   our permit application in the public

23   notice.  The reason for that is that

24   we have found some levee stability

25   problems here and we had to slightly

decrease the amount of dredging or we would have problems with this Orleans Levee and the Jefferson Levee. The last thing, I think, that should be said is that this has been submitted for approval from -- by the Corps of Engineers from several of the necessary regulatory authorities. One of these authorities, the Environmental Protection Agency, has written a letter of no objection to this plan as presently proposed.

Thank you very much, Mr. Sullivan.

(APPLAUSE)

COLONEL SANDS:

Ladies and gentlemen, if you have any questions that relate to clarifications of points that were raised in the discussion, we will be happy to entertain them.  And I emphasize clarification of points that were raised by the presentation.

Mr. Colburn.  Jerry, would you -- how about coming up, please, and using the microphone and please identify

MR. CONWAY:

    The more you pump the higher the water rises?

MR. BOUTALL:

    In other words, the canal is a certain cross-section at a certain sea level or a certain level of water.  If you pump more water the water level rises and you have a greater cross-section.  Is that not true?

MR. CONWAY:

    If the water level rises there's a greater cross-section, yes.

MR. BOUTALL:

    Wouldn't the problem be solved by raising the levees slightly so that we could have more capacity in the canal in a vertical manner rather than a hori-zontal manner?

MR. CONWAY:

    One approach to the problem and one that I said we're trying to explore is raising the levees, but we found that -- well, I won't say raising the leveees so much as widening the

canal adjacent to the levee, steepen-

ing their slopes.  We found we can't

do that.  The levees are currently

-- I won't say on the point of emi-

nent collapse, because they're not

-- but they currently violate the

Corps of Engineer standards for levee

stability.  These standards generally

require a 1.3 factor of safety on

what is called slope stability.  They

violate that standard virtually along

the canal.  Any attempt by us to dig

more dirt away adjacent to those

levees tends to worsen that stability

problem.  We're currently investi-

gating this in great detail.  We're

starting a detailed investigation.

MR. BOUTALL:

The levees you're talking about are dirt

levees, aren't they just dirt slopes?

MR. CONWAY:

They're sheet pile and dirt.

MR. BOUTALL:

I'm talking about the levees north of the

Hammond Highway Bridge, south of the

# EXHIBIT   E

Chapter Seven:  Terrestrial LIDAR Imagery of New Orleans Levees Affected by
Hurricane Katrina

## 7.1 Introduction

Preservation of information regarding the magnitude and geometry of structural and geotechnical deformations is paramount for the analysis of levee failure modes.  This chapter describes the areas of focus and methodology used in laser mapping of surface evidence of levee deformation and distress at ten areas within the greater New Orleans area.  The area of focus extends from the 17th Street Canal in the Orleans East Bank area, to the Entergy power plant in the New Orleans East area. The NSF-sponsored investigation team included two researchers from the United States Geological Survey (USGS) who brought to the field area a terrestrial laser mapping tool to perform laser scanning or LIDAR (LIght Detection And Ranging) data collection. The laser mapping effort was conducted over 5 days from October 9-14, 2005.  The objective of the laser scanning effort was to obtain precise measurements of the ground surface to map soil displacements at each levee site, the non-uniformity of levee height freeboard, depth of erosion where scour occurred, and distress in structures at incipient failure.  Toward that end, ten sites were visited for LIDAR scanning (Figure 7.1).  The sites, along with their global position coordinates (WGS84 Datum) and the number of individual scans collected at each site are outlined in Table 7.1.  Because several of the sites are less than one kilometer apart (i.e. Sites 2 & 3, Sites 4 & 5, and Sites 6 & 7), individual scans from each of these site pairs were collected and developed as a single LIDAR model and are listed jointly.

## 7.2 Methodology

The terrestrial LIDAR method, a 3D laser scanning technique, consists of sending and collecting laser pulses from surface objects to build a point file of three-dimensional coordinates.  The time of travel for a single pulse return from a surface is measured along a known trajectory such that the distance from the laser and consequently the exact location can be computed.  In addition, visual data on points located within and outside of the laser range can be obtained through the use of a CCD color sensor.  A unique aspect of the LIDAR method is the rapid rate of data collection.  The USGS laser scanning system can measure the location of up to 8,000 surface points in one second.  Thus within a few minutes, an entire surface, be it a structure or levee, can be imaged efficiently with a point file that contains several million position points.  The point files from collected scans are typically transformed into three-dimensional surfaces so that cross-sections can be generated and volumetric calculations can be performed between consecutively scanned surfaces.

The LIDAR technique has been successfully utilized by members of the reconnaissance team in a wide range of environments, most recently, for studies involving coastal bluff change along the California coast (Collins and Sitar, 2004, 2005), and in earthquake reconnaissance studies (Kayen et al., 2004, Kayen et al., in press).  Complete details of the laser scanning process can be found in these references.

**E-1**

distress and lateral deformation associated with incipient failure of the levee. This movement is along a section of wall diagonally northeast of the west side breach across the canal. In Figure 7.13, an oblique image of the distressed wall can be seen from the south. The wall, preserved in incipient failure, leans toward the levee maintenance road and landside portion of the levee. In the right-hand background, is the bridge abutment on Robert E. Lee Blvd for reference.

Considerable vegetation grows along the banks of the canal side of the levee that are less maintained for growth than the landside neighborhood-side of the levee wall. Thin slices of the point-cloud data orthogonal to the alignment of the levee wall (Figure 7.14) display highly accurate cross sections of the distressed I-wall at London Canal. Segment (a) is toward the south (left) of Figure 7.13 and has a modest 1.9 degree rotational deformation. Near a position of maximum distress, the I-wall has 5.0 degrees of rotational deformation toward the landside of the levee.

The London Canal levee failure (west side) and distressed wall (east side) are both immediately south of the bridge crossing at Robert E. Lee Boulevard. A significant gap in height between the lower un-walled bridge abutment and I-wall prevents water from overtopping these levees. The height gap differs slightly between the walls located north and south of the bridge, due either to differing design heights or differential settlement following construction. At the distressed I-wall section on the southeast corner of the bridge, LIDAR surveys and visual inspection indicated the gap at this location was approximately 1.7 meters (5.6 feet). Therefore, water rising in the canal would overtop the bridge abutment and begin to flood the surrounding community when the water level was 1.7 meters (5.6 feet) below the

the southeast edge of the bridge abutment (Figure 7.15a). On the northeast corner of the bridge abutment near the north levee wall, LIDAR surveys indicate the gap at this location to be approximately 1.51 meters (5.0 feet). Figure 7.16 and 7.17 show this gap, as well as a scour trench at the base of the northeast abutment (Figure 7.17a).

There was no evidence of overtopping of the levee walls or erosion scour anywhere along this section of the canal except at the gap at the bridge. The LIDAR and scour evidence therefore indicate that the floodwalls along the London Canal section, south of the Robert E. Lee Boulevard Bridge were not overtopped prior to failure of the levee wall.

Measurement of displacement along the 17th Street Canal breach can be made by identifying the blocks of ground formerly within the intact levee that slid eastward toward the landside of the levee. Figure 7.18 is an overview image of a portion of the 17th Street point cloud data set consisting of 11 individual scans. In this image, the bridge crossing over the canal at Robert E. Lee Blvd. (also called the Hammond Highway.) is toward the upper left (north). A dense cluster of points is visible at the levee breach in the center of the image as are the houses in the affected area. Close in to the levee breach in Figure 7.19, the remaining I-wall can be seen in alignment with the crest of the replacement structure. Here, a total breach repair width of 142 meters (466 feet) as measured between intact I-wall sections has been calculated directly from the LIDAR data set. A cross section taken through this area is shown in Figure 7.20. A multi-section view is shown, consisting of a section of the intact southern I-wall overlain over the failed section of the levee. The geometry of the emergency repair embankment is clearly visible. The sections also show the magnitude of the

**E-2**

Chapter Two:  The Orleans East Bank (Downtown) Protected Area

2.1  Overview

The location of the Orleans East Bank protected section, or polder, was shown previously in Figure 1.4.  This encompasses the main downtown area of New Orleans, as well as a number of famous historic districts including the French Quarter and the Garden District.

Figure 2.1(a) shows an enlarged view of the principal levees protecting the northern portion of this polder, in the "Canal" district.  The small numbers in Figure 2.1(a) indicate the approximate elevations of the tops of the levees along the lakefront, and the tops of the floodwalls at the crests of the earthen levees along the three main drainage canals.  As shown in this figure, the tops of the lakefront levees were generally on the order of elevation +17.5 to +18 feet, while the tops of the floodwalls along the sides of the three drainage canals were typically at elevations of about +13 to +15 feet.

The storm surge towards the south from Lake Pontchartrain drove both lake waters and waves against the lakefront levees.  Best available field data, and numerical calculations of storm surge, at the time of this writing suggest that the lakefront storm surge in this area rose to about 11 feet, well below the crests of the lakefront levees in this area.  No significant sustained overtopping occurred (only wave splashover at a few locations).

These levees were well-constructed earthen embankments, constructed using apparently cohesive soils, and they generally had good erosion protection on their outboard faces (generally consisting of large stone rip-rap.)  These lakefront levees performed well, and despite some evidence of minor wave overtopping  at a few locations, these lakefront levees safely withstood the storm with only minor evidence of any erosion at the crests and back faces evident after the storm had passed.

The three drainage canals traverse the canal district from south to north, as shown in Figures 1.4 and 2.1.  These drainage canals serve as open channels to carry flow from large pumping stations at their southern ends northwards into Lake Pontchartrain.  They are used to unwater the southern end of this protected polder.  The three drainage canals have a slightly S-shaped entrance configuration at the lake end, so that wind driven waves at the Lake Pontchartrain lakefront will not be fully transmitted southwards into the canals.  Accordingly, they also have slightly lower crest heights (at the tops of their floodwalls) than the Pontchartrain lakefront levees.

The levees along all three drainage canals consist of earthen embankments, topped by concrete floodwalls.  The concrete floodwalls are mainly "I-walls", with the concrete wall section being cast atop a row of sheetpiles driven through the crest of the earthen embankment, as shown in Figure 2.2(a).  These concrete walls get their stability by cantilever action as they and their sheetpiles are supported by the embankment soils.  Some of the floodwalls along these canals appeared to be "T-walls", as shown in Figure 2.2(b).  These wall sections also cap a sheetpile curtain, but they get additional rotational and lateral stability

**E-3**

by nature of their broad concrete base (which forms an inverted "T".) They may also be founded on battered (inclined, reinforced concrete) bearing piles, which can provide significant additional rotational stability.

The three canals did not appear to have equally well-constructed and maintained levee and floodwall protection. The central canal, the Orleans Avenue Canal, generally had visibly wider soil embankment sections, and was also generally better maintained with regard to preventing growth of brush and trees on the land side slope faces.

The other two canals, the 17th Street Canal and the London Avenue Canal, generally had narrower embankments. Brush growth, and even trees, were noted at a number of locations on the land side faces of the levees along both of these canals.

A major breach occurred at the east bank of the 17th Street Canal, near the north end, as shown in Figure 1.4. This produced flooding over a significant area between the 17th Street and Orleans Avenue Canals.

Two additional major breaches occurred on the London Avenue Canal. As shown in Figure 2.1, one of these occurred near the north end of the London Avenue Canal, at the west bank levee, and this breach flooded a significant area between the London Avenue Canal and the Orleans Canal. In addition, significant "distress" occurred directly across the canal from this breach, along the eastern levee embankment and floodwall.

A second major breach occurred farther south along the east bank of the London _____ _____, as ___ __ __ _____ ___. ____ _____ _____ a significant area east of the London Avenue Canal.

## 2.2 The 17th Street Canal Breach

Figure 2.3(a) shows the major breach at the east side of the 17th Street Canal as it is being "plugged" with large sandbags being delivered by military helicopters in the wake of Hurricane Katrina.   This photo is taken looking to the northeast. Figure 2.3(b) shows the same figure, but this time highlighting key features for discussion. The line of grassy soil units in the center of the photo are the inboard half of the southern end of the original levee embankment, and the chain link fence is remnants of the fence that passed along the inboard lip of the crest road, separating the crest from adjacent homeowner's back yards.   The southern end of the embankment has translated to the east, traveling laterally up to about 45 feet away from its original position. The northern end of the breached embankment section was largely eroded by scour after the breach opened.

Figure 2.4 shows a second view of some of the details at this site. The relatively intact southern embankment sections translated laterally approximately 45 feet, and without significant rotation, as the trees and chain link fence remained vertical throughout this displacement.   The laterally translating wedge of embankment (and possibly also some foundation) soil "plowed" into soft soils at the inboard toe, causing them to bulge upwards, heaving the largely collapsed shed and pushing it into the house.

**E-4**

New Orleans Levee Systems
Hurricane Katrina
August 29, 2005

Figure 2.5 shows a view looking east across the zone through which the principal floodwaters flowed. Clearly evident in this photo are large blocks of peat scoured from the eroding foundation by the floodwaters.

Figure 2.6 shows an approximate plan view of this site, highlighting key locations and objects of interest. The overall breach was 465 feet in width at the end of the flooding and scour, and the intact embankments and floodwalls immediately to the north and south of the breached section were largely undamaged.

Figure 2.7 shows a simplified schematic cross-section through the site, roughly along Section A-A' in Figure 2.6. This shows the lateral translation of the inboard portion of the embankment, and the compression and heaving produced at the inboard toe by these movements.

Foundation soils at this site were known to consist of a layer of organic, peaty material. The peats were interbedded with occasional thin, soft clayey layers, probably periodic overbank flood deposits, and one such clay layer within the peat unit was exposed at the southern end of the breach opening, as shown in Figures 2.8 and 2.9. A torvane performed in the field during our visit indicated an undrained shear strength of approximately 200 lb/ft$^2$ for this weak material, which varied in thickness from about 1 to 4 inches over several feet laterally at this location.

Figure 2.10 shows the approximate configuration of the levee, and its sheetpile curtain and concrete floodwall. As shown in Figure 2.10, the sheetpiles do not penetrate very deeply into the poor foundation soils, and they do not provide a full cut-off for underseepage through the pervious foundation soils.

Maximum storm surge water levels within the canal during the Hurricane are not yet known with certainty. There are, however, well-determined water level measurements available from the nearby London Avenue Canal (see Section 2.2), and these match well with current numerical modeling of water levels in this vicinity. These same calculations show peak water levels in the 17th Street Canal to be about 3 to 5 feet below the tops of the floodwalls at this site. In addition, there was no evidence of overtopping-induced scour along unbreached sections of the 17th Street Canal, as shown for example in Figure 2.11, which was taken immediately south of the breach. The bridge crossing the 17th Street Canal at Robert E. Lee bridge, just to the north of the breach site, had not yet had its side walls raised to elevation +14 feet (such raising of these walls had been planned, but not yet implemented), and this bridge thus represented a "low spot" along a canal whose other floodwalls were generally at elevation +13 to +15 feet. Most of the other bridges along all three canals had already had their side walls raised. There was evidence of minor scour from overtopping at the east end of the bridge, suggesting that minor overtopping occurred at this location, which would have placed water levels at this location at an elevation just a bit above elevation +10 feet. Best available evidence to date thus indicates that the 17th Street Canal levee embankment floodwalls did not overtop during the storm, but instead had a maximum storm surge that caused the canal waters to rise to within about 3 to 5 feet from the tops of the concrete floodwalls.

*E-5*

The mechanism of failure at this site appears to have been a stability failure of the foundation soils beneath the earthen embankment. The embankment was pushed sideways, by about 45 feet, by storm surge induced water pressures acting against the front face of the sheetpile/I-wall vertical barrier. The actual depth at which foundation soil shear failure occurred is not yet known, and this remains to be investigated. Also still to be determined is the actual soil unit or strata that provided the weak sliding plane, and the precise mechanism of weakness that was most critical.

Additional soil borings and sampling are currently being performed at this site, under the supervision of the USACE, and additional CPT probes are planned as well. The USACE is also planning additional laboratory testing of the samples obtained. The USACE has agreed to share all results of these additional field and laboratory studies with the various investigation teams involved.

These investigations will provide a basis for better evaluating the subsurface conditions at this site, and for better evaluation of soil shear strength and underseepage flow characteristics at this site. Additional analyses will, of course, follow once this new data becomes available.

At the time of our field teams' initial visit (October 3, 2005) an embankment fill had been placed over the core of large sandbags and large stone used to effect the initial closure. Additional gravelly fill had been placed at the inboard toe to provide a working mat. The conditions at this time are shown in Figure 2.12. The fill used as a covering veneer was a gap graded sandy gravel known locally to be internally unstable with regard to erosion, and our site team noted four sinkholes at the outboard lip of the crest of the temporary levee section, as shown in Figure 2.13. Three of these could be observed to be curving inward toward the center of the embankment section, and running water could be clearly heard in one of these.

The USACE was notified of the apparently unstable condition, with evidence of ongoing internal erosion of the fill, and the section was covered the next day, initially with a three foot thick layer of open graded stone (6-inch to 24-inch stone), which was then covered at the crest by a five to seven foot (uncompacted) lift of better graded silty sand, as shown in Figure 2.14. Both the open-graded stone, and the covering veneer silty sand fill can be clearly seen in this photo. The silty sand was also pushed down the inboard and outboard faces of the embankment providing a covering veneer of several feet on both sides of the emergency embankment section. The USACE was again notified that this did not appear to represent a hydraulically stable (or well filtered) embankment configuration; and the rapid placement of additional competent fill as an inboard berm, to be quickly followed by installation of a sheetpile cut-off wall, was recommended.

An inboard side toe berm was placed on October 11, 2005. On the morning of October 13, 2005 a longitudinal crack approximately 1/8 inch wide opened along the crest of the embankment. The crack widened slightly the next day, and a second, narrower crack opened along the upper inboard face of the embankment. Additional berming on the inboard side was recommended and immediately implemented, and operations are now underway to install a sheetpile cut-off curtain on the outboard side of the emergency closure section.

*E-6*

### 2.3 The London Avenue Canal Breaches and Distressed Section

#### 2.3.1 The North Breach and Distressed Sections at Robert E. Lee Blvd.

A major breach occurred on the west bank of the London Avenue Canal, near the north end of the canal, as shown previously in Figure 1.4. In addition, the levee embankment and floodwall section on the east bank, directly across the canal, suffered major distress and is compromised with regard to its ability to safely retain high water levels in future events.

Figure 2.15 shows the breach at the west side of the canal. The scour patterns inboard (to the west) suggest that the embankment may have initially moved laterally to the west, pulling apart at the transitions between the translating central embankment section and the two intact ends to the north and south, and emitting the strongest scouring water forces at the northern end, with a secondary scour stream near the southern end. There is some evidence of possible vertical uplift at the toe, as the playhouse in Figure 2.16 was originally at the level of the ground at the inboard toe and was elevated to its current position as the embankment movements occurred, but this may also have been the result of "heaving" of the soils at the inboard toe as they were "plowed" or compressed by the lateral embankment movements.

Figures 2.15 and 2.17 show how the sheetpile/concrete floodwalls were pushed back by the elevated canal waters on the outboard sides, and by the reduction of earth pressure support on their inboard sides. Figure 2.17 is taken from the south end of the breach, and the gapping between the floodwalls and the soil of the outboard portion of the earthen levee

sheetpiles were relatively short at this breach site (a design tip elevation of -16 feet), and the floodwalls appear to have toppled backwards away from the canal in a rigid manner ("post-hole toppling failure".)

Significant deposits of sediment occurred inboard of this breach, and these appeared to represent a mix of soils scoured out from the breached embankment section and its foundation soils, as well as sediments from the canal outboard of the failed section (see Figure 2.18.)

Three high water marks, determined to be of high reliability, were found in close proximity to the breach section at this canal by members of our team from COPRI, and these indicate that the maximum water levels at this portion of the canal were at approximately Elev. +11 to +12 feet, or approximately 2 to 3 feet below the tops of the floodwalls at this section. In addition, there was no evidence of overtopping producing erosion at the inboard sides of intact levee floodwalls anywhere along this canal. The sidewalls of the Robert E. Lee bridge had not yet been raised to the elevation of the adjacent I-walls, so the bridge  represented a low spot in the system. There was evidence of minor overtopping at one end of the bridge, but this was slight. As the bridge walls were approximately 4 feet lower than the adjacent I-walls, this would further confirm that the maximum water level at this location in the canal was about 3 feet (or so) below the tops of the I-walls. Best available evidence, and current field-calibrated numerical analyses of storm surge levels, thus indicate that the floodwalls along the London Avenue Canal were not overtopped.

Evidence at this site strongly suggests that the breach occurred as a result of the sheetpile/floodwall being pushed backwards by the elevated water pressures on the outboard side, and that support on the inboard side of the sheetpile/floodwall was reduced as a result of soil failure at or beneath the base of the earthen levee embankment. The severe distress of the similar levee and floodwall directly across the canal (on the east bank), and its similar foundation conditions, provide additional evidence here.

Figure 2.19 shows the floodwall of the "distressed" section directly across the canal, on the east bank. This photo shows the outboard side of the floodwall, which has been pushed laterally, opening an extensional crack as wide as approximately 18 to 28 inches at its original outboard side base contact with soil at the levee embankment crest.

Figure 2.20 shows conditions on the inboard side of the east bank distressed section, directly on the other side of the wall shown in Figure 2.19. The wall has been pushed towards the inboard side, and now leans inwards (to the right) by about 5° off vertical in this photo. Figure 2.21 shows a closeup view of part of a line of sinkholes noted at the inboard toe of the wall, along the section shown in Figure 2.20. These appear to have been related to underseepage and resulting erosion and piping. Figure 2.23 shows the "boil" outlet of one erosional "pipe" at the inboard toe of the embankment at this location.

This does not mean that erosion and piping caused the distress at this levee/floodwall section, nor the failure at the breached section across the canal. Instead, the underseepage and erosion appear to be indicative of massive underseepage flows during the period when the water levels in the canal were elevated by the storm surge. The "distressed" embankment section on the east bank translated slightly inboard, as evinced by a partially eroded overthrust feature that occurred at the inboard toe along a short distance just to the south of the swimming pool shown in Figure 2.22, as well as by lateral bulging (and resultant vertical humping) of the ground and the lateral deflection of backyard chain link fences in this same inboard toe area.

The evidence at the "distressed" east bank section, and at the breached west bank section, would both be consistent with similar failure and "distress" mechanisms. Indeed, the east bank section appears to have been in an incipient failure condition, and failure at the east bank may have been prevented by the drawdown of water levels produced by the failure at the west bank, and also by the failure at the second breached section along the canal further to the south.

The foundation soils at these two sites (the east and west banks) consist of a relatively thick deposit of sands, overlain by a relatively thin top layer of marsh and peat deposits. These marsh and peat deposits vary in thickness between 10 to 15 feet. Based on the available data, the poorly graded Holocene beach sands extend to an elevation of approximately -40 to -50 feet. These sands were underlain by less pervious soils.

Evidence at both sites suggests that massive underseepage passed beneath the relatively short sheetpiles, and this may have weakened the foundation soils beneath the inboard sides of the earthen levee embankments. At the same time, elevated water levels in the canal pushed strongly against the outboard sides of the sheetpile/floodwalls. Soil failure appears to have occurred at or below the base of the inboard half of the earthen levee

embankment on the west bank, and evidence suggests that an incipient failure of similar nature nearly occurred on the other side of the canal. It is also possible that straightforward erosion and piping led to one or both of these situations.

Significant further investigation is needed to better define the actual failure and "distress" mechanisms here. The actual depth at which foundation soil shear failure occurred is not yet known, and this remains to be investigated. Also still to be determined are the actual soil units or strata that provided the weak sliding planes, and the precise mechanism of weakness that was most critical.

Additional soil borings and sampling are currently being performed at this site, under the supervision of the USACE, and additional CPT probes are planned as well. The USACE is also planning additional laboratory testing of the samples obtained. Most importantly, the USACE has agreed to share all results of these additional field and laboratory studies with the various investigation teams involved.

These investigations will provide a basis for better evaluating the subsurface conditions at this site, and for better evaluation of soil shear strength and underseepage flow characteristics at this site.  Additional analyses will, of course, follow once this new data becomes available.

Figure 2.23 shows placement of fill during construction of the emergency repair embankment section at the east-side breach section of the London Avenue Canal (North) site. The progressive evolution of the embankment section at this site closely paralleled that

sinkholes were noted in the temporary embankment section at the time of our teams' site visits. The core of the embankment is, again, large sandbags and stones used to effect the initial emergency closure. Clearly visible in Figure 2.23 are the gap graded sandy gravel fill that covered this irregular core, and the layer of open graded stone that was placed atop the interim crest of the sandy gravel fill. At time of the photo in Figure 2.23, better-graded silty sand fill was being end-pushed without compaction to form the final crest and also to provide a covering veneer on both the inboard and outboard faces of the embankment section. Our field investigation teams formally advised the USACE that this did not represent an internally stable embankment section with regard to internal erosion, and a clayey cap was placed over the silty sand fill and additional inboard side berm fills were rapidly added. In addition, plans are now underway to install a sheetpile cutoff that will extend to a much greater depth (the new sheetpiles design tip elevations are Elevation – 65 feet) than the original sheetpiles of the breached section. The new sheetpiles will have significant lateral overlap with the remaining intact sheetpile curtains at the north and south ends of the repair section.

## 2.3.2   The South Breach at Mirabeau Avenue

A second major breach occurred further to the south, on the east bank of the London Avenue Canal at Mirabeau Avenue, as shown in Figure 1.4.  Figure 2.24 shows an oblique aerial view of this breach site as it appeared during the construction of the temporary repair berm.

**E-9**

Figure 2.25 shows a view looking to the northeast across at the water side of the breached section, after initial closure and interim repair. The sheetpile/I-walls had again toppled inwards towards the land side. Scour was very extensive at this breach, and the scour hole that had to be filled to effect the emergency closure was very large. Much of the breached embankment was eroded away by the scour, and much of what remained was buried by the large closure section required. Significant deposits of soils from the embankment, the foundation, and the canal sediments from just outboard of the breach were deposited in the neighborhood on the land side, as shown in Figure 2.26.

At the time of our field investigations, relatively little remained to be observed at this site, due to the massive scouring erosion produced by the breach, and the massive quantities of fill required in the initial emergency repairs. Accordingly, it is not yet possible to state with certainty the cause of this breach.

Foundation soil conditions at this site were relatively similar to those at the breach site to the north that was described previously in Section 2.3.1. Cross sections of soil conditions along this section show approximately 5 to 10 feet of artificial fill (embankment material). This artificial fill is underlain by 10 to 13 feet of fat clay marsh deposit. These marsh deposits are underlain by a Holocene poorly graded sand beach deposit. As with the breach section farther to the north, the sheetpiles supporting the floodwall did not extend to great depth, and design drawings available to date indicate that the piles had tip elevations at -26 feet. This would not have provided a full cutoff for underseepage through the pervious sands. Photographic evidence immediately after the failure suggests that lateral movements of the levee embankment may have occurred at this site as well, but significant further studies will be required to develop a firm theory as to the cause of failure at this site.

Additional soil borings and sampling are currently being performed at this site, under the supervision of the USACE, and additional CPT probes are planned as well. The USACE is also planning additional laboratory testing on the samples obtained. Our investigation teams have made a number of recommendations and requests regarding some of the details of these ongoing field and laboratory investigations, including investigations of site conditions immediately to the north and south of the heavily scoured breach section, and also across the canal on the west bank side. Most importantly, the USACE has agreed to share all results of these additional field and laboratory studies with the various investigation teams involved.

These investigations will provide a basis for better evaluating the subsurface conditions at this site, and for better evaluation of soil shear strength and underseepage flow characteristics at this site. Additional analyses will, of course, follow once this new data becomes available.

The construction of the emergency closure embankment and the subsequent temporary closure embankment sections at this site largely paralleled those described previously in Sections 2.2 and 2.3.1 for the 17th Street Canal and London Avenue Canal (North) breach sites. Inboard berms are currently in place, and plans are underway for more permanent closure construction, including a sheetpile cutoff that will, again, extend to significantly greater depth than the original (breached) design section. Considerable water flow is still occurring at the inboard toe of this temporary closure section, but some significant portion of that flow has recently been traced to a broken and flowing water line.



Photograph by Brian Collins 10/11/2005

Figure 7.16:  The northeast abutment of the London Avenue Canal bridge on Robert E.
Lee Blvd. in photograph taken from the lower portion of the bridge
approach-fill embankment (a), and corresponding LIDAR scan (b).  The
wall gap here is 1.51 meters (5.0 feet).

**E-11**



Photograph by Lee Wooten

Figure 7.17:  Photograph taken directly south and adjacent to the northeast
abutment of the Robert E. Lee Bridge (a), and corresponding
LIDAR scan of the same location (b).  A scour trench is
clearly visible beneath the abutment.  The wall gap here is
1.51 meters (5.0 feet).

**E-12**



Photograph by Brian Collins 10/11/2005

Figure 7.15: Photograph of the southeast abutment of the London Avenue Canal bridge at Robert E. Lee Blvd (a), and LIDAR scan of the same location (b). New soil and rock apparently fills scour and sink hole erosion beneath the abutment. The relative height gap between the bridge abutment and the flood wall is 1.72 meters (5.6 feet).

*E-13*