**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT**
**OF UNITED STATES' MOTION TO CERTIFY ORDER AND**
**REASONS (R.D. 2994) FOR INTERLOCUTORY APPEAL**

The United States has moved to certify Record Document 2994, the Order and Reasons

denying the United States' Motion to Dismiss, for immediate interlocutory appeal.  The Order

and Reasons should be certified to provide an opportunity for the Court of Appeals to decide

whether the Flood Control Act of 1928 ("FCA"), 33 U.S.C. § 702c, compels dismissal of the

Complaint on the present record.  That statute provides "no liability of any kind shall attach to

or rest upon the United States for any damage from or by floods or flood waters at any place."

Certification is appropriate because the order "involves a controlling question of law as to which

there is substantial ground for difference of opinion" and an immediate appeal will "materially

advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).

1

In making this motion, the United States recognizes that, in its Order and Reasons, this Court stated that it did not intend to certify its order at this time.  O&R at 17 & n.5.  In particular, the Court concluded that FCA immunity might turn on the extent to which there is a nexus between the alleged damages and a flood control project, *id.* at 9, and that discovery was necessary to examine the "relationship" between the Mississippi River-Gulf Outlet ("MRGO") and the Lake Pontchartrain Vicinity Hurricane Protection Plan ("LPVHPP"), *id.* at 16.  Thus, the Court concluded that certification of this issue for immediate appeal would be premature because of a perceived need for further discovery on the "evolution" of MRGO.

But there are interpretations of the FCA that accord with its plain language and the controlling Supreme Court case law under which the scope of the United States' immunity does not depend on those facts and discovery would be unnecessary.  Section § 702c can reasonably be interpreted as providing the United States immunity where:

- plaintiffs' damages are caused by floods or flood waters, irrespective of any involvement of a federal flood control project; or

- plaintiffs' damages are caused by floods or flood waters that a federal flood control project could not contain.

If the first interpretation is correct, then there is no need for any further proceedings, because the plaintiffs themselves allege damage caused by floods or flood waters.  And, as explained below, there is at least a substantial basis for difference of opinion as to whether this reading of the FCA is correct.  This interpretation follows the plain language of the statute and the first rule of statutory interpretation is that "Congress says in a statute what it means and means in a statute what it says there."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).  And the Supreme Court's landmark decision in *Central Green Co.*

*v. United States*, 531 U.S. 425, 434 (2001), confirms that the touchstone for FCA immunity is "the character of the waters that cause the relevant damage" and not the relationship between those waters and a "federal project or the purposes it serves." Even if the prior Fifth Circuit caselaw does not support this interpretation, the Fifth Circuit has not had the opportunity to revisit the issue since *Central Green* clarified the law.

Even if the words of the statute are given a narrower application and are "confined to those waters that a federal project is unable to control," *Central Green,* 531 U.S. at 431, then again there is no need for further factual development. There is no dispute on the present record that the LPVHPP was unable to control the floodwaters of Hurricane Katrina. Indeed, this fact is conceded in the plaintiffs' complaint. And to whatever extent that plaintiffs now (as opposed to in their initial complaint) posit that the LPVHPP does not exist, the existence of the LPVHPP is so well established in this jurisdiction that the court may take judicial notice of it. Thus, on this record, it is uncontested that the waters passing through MRGO did not damage plaintiffs before first going through or around the LPVHPP and the waters that caused the plaintiffs' alleged damages are waters that a federal flood control project failed to contain.

To be sure, plaintiffs dispute these readings of the statute and the Fifth Circuit may ultimately adopt a different standard. But the question § 1292(b) poses is whether there is a "substantial ground for difference of opinion." The reading of the FCA offered by the United States—which is based on the text of the FCA as interpreted by the Supreme Court in *Central Green* and *United States v. James*, 478 U.S. 597, 604 (1986)—more than satisfies this standard. And if the "sweeping" terms of § 702c are found to encompass the claims here, then "the

3

ultimate termination of the litigation" will be "materially advance[d]," for this case (and many others) will be at its end.

Developments since the Court issued its Order and Reasons underscore the propriety of certifying that order.  Although it was known that discovery would be time-consuming and expensive, the magnitude of that task and the extraordinary costs associated with it were not fully understood.  Since that time, the Court has entered case management orders that will result in the expenditure of tens of millions of dollars on discovery.  Additionally, the more than 300,000 claims currently pending with the Army Corps of Engineers and perhaps hundreds of thousands more, yet to be presented, can be expected to ripen into lawsuits that will greatly expand the docket and consume enormous resources of this Court and the parties.  The United States now estimates that its litigation expenses will exceed $40 million, if the pending suits against the United States must be tried in this Court before the Fifth Circuit can clarify the meaning of § 702c.

Although the costs of continuing litigation are not expressly set forth in 28 U.S.C. § 1292(b) as a factor to be considered, they are indirectly referenced in the mandate that courts consider whether an interlocutory appeal will "advance the ultimate termination of the litigation."  *See Castano v. Am. Tobacco Co.*, 162 F.R.D. 112, 116-17 (E.D. La. 1995) (granting motion for certification where court was "faced with . . . thousands, if not millions, of claimants . . . and a substantial number of issues, which, while not overwhelming or incomprehensible, [could not] be resolved without significant time, energy and expense on the part of the Court and the parties").  The extraordinary expenses necessitated by the discovery schedule imposed by the Court's case management orders counsel for careful consideration of whether "there is

4

substantial ground for difference of opinion" as to whether the United States is immune from the floodwater liability that is alleged in this case, and whether an immediate appeal "may materially advance the ultimate termination of the litigation."

Just as the Court was preparing to announce that it would not certify its Order and Reasons for interlocutory appeal, the Court of Appeals accepted an appeal by the *Chehardy, Vanderbrook,* and *Xavier University* defendants from this Court's order denying their motions to dismiss. The vast scope and cost of discovery in this consolidated litigation was cited by the insurer defendants in their appellate briefs as the principal basis for a stay. And although the appellate court's order was unelaborated, the considerable cost of requiring the defendants to proceed during the appeal was undoubtedly a factor in the court's decision. The broad import of this Court's denial of the insurers' motions was certainly a factor in accepting the certification. Similar considerations are implicated in the Court's denial of the United States' motion to dismiss. Inasmuch as *Robinson* has been advanced as a test case, its dismissal under § 702c would likely end the numerous lawsuits already filed seeking to hold the United States liable under the Federal Tort Claims Act (as well as the Admiralty Extension Act).

The United States does not make this motion lightly and has sought to tailor its request to avoid unnecessary disruption and delay. To that end, the United States has sought this Court's permission to certify a single well-defined legal issue—the applicability of 33 U.S.C.§ 702c to claims for Katrina-related flood damages—and has not sought certification with respect to the other grounds upon which the United States moved to dismiss the Complaint. The United States will further seek expedition in the Fifth Circuit if this matter is accepted for interlocutory appeal.

**ARGUMENT**

I.   THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION AS TO WHETHER THIS ACTION IS BARRED BY 33 U.S.C. § 702c.

The first requirement for certification—whether the Order and Reasons "involve[] a controlling question of law as to which there is substantial ground for difference of opinion"— is clearly met here.  There are at least two readings of the statute that comport with its text and Supreme Court precedent that would compel dismissal of the complaint without further factual discovery.  Moreover, certification would give the Fifth Circuit the opportunity to reconcile its decision in *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971) with *Central Green.*

A.   **Both The Plain Text Of The Flood Control Act And The Supreme Court's Decisions In *Central Green* And *James* Evince Substantial Grounds For Concluding That The Action Is Barred By § 702c.**

On its face, the Flood Control Act precludes Plaintiffs' action, accepting all of their allegations as true.  The plain statutory language prohibits courts from imposing liability on the United States "for any damage from or by floods or flood waters at any place."   33 U.S.C. § 702c.   In *United States v. James,* 478 U.S. 597, 604 (1986), the Supreme Court emphasized that "[i]t is difficult to imagine broader language" than that which Congress employed in § 702c. The Court further observed that "Congress rarely speaks more plainly than it has in" the FCA. *Id.* at 612.  Thus, the FCA "safeguard[s] the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language." *Id.* at 608 (quotation omitted).

To be sure, an aspect of *James*—broad dicta upon which we did not rely in our motion to dismiss and do not rely now—was subsequently narrowed by *Central Green*.  Specifically, in *James* the Supreme Court suggested that the FCA would protect "the Government from any

liability associated with flood control."  478 U.S. at 608.  But in narrowing that *dicta* in *Central Green*, the Supreme Court again emphasized the unambiguous words of the statute as setting forth the true measure of immunity:  "it is the text of § 702c . . . that governs the scope of the United States' immunity."  531 U.S. at 437.  Thus, the Court concluded that the problematic *James* dictum was overinclusive because it extended immunity based on the nexus to a flood control project even where the damages were caused by waters that could not properly be characterized as either floods or floodwaters.  *See id.* at 430.  Instead, the plain "text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage."  *Id.* at 434.  In other words, the United States enjoys "immunity from liability for damage caused by floods or flood waters" and courts are *not* to "consider . . . the relation between that damage and a flood control project."  *Id.* at 437.

The plain text of the FCA and the Supreme Court's interpretations of it provide at least a substantial basis for concluding that the FCA bars the complaint.  It is simply undisputed that the damages here were caused by "floods or flood waters."  As such, the United States is immune under 33 U.S.C. § 702c.

There is also a substantial basis for concluding that plaintiffs' complaint is barred by the FCA even under a narrower reading of the statute.  Citing *James*, the *Central Green* Court made clear that this language at least bars suits that involve flood waters "that a federal project is unable to control."  *Central Green*, 531 U.S. at 431.  However plaintiffs characterize MRGO or its relationship to flood control projects, there can be no doubt that plaintiffs allege damage from flood water that a federal project (the LPVHPP) was unable to control.  It is appropriate

that the Fifth Circuit be given the opportunity to consider the Supreme Court's holdings before further proceedings are undertaken.

      **B.**      **Further Discovery Is Not Necessary To Decide Whether To Certify The Order And Reasons.**

      This Court, in its prior ruling, concluded that certification would be premature because greater factual discovery was necessary.  In particular, the Court indicated that under the Fifth Circuit's decision in *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971), FCA liability may turn on the extent to which there is a nexus between the alleged damages and a flood control project. O&R at 9.  The Court concluded that discovery was necessary to elucidate the "evolution" of MRGO and the LPVHPP and the "relationship between" them.  *Id.* at 16. The Court also suggested that *Central Green* could be read such that "the Government might be immune from damage from the effect of some water and not as to other water," *id.* at 14, and damages could be "segregate[ed]" in such a way as to allow liability to be imposed when damage is directly caused by floodwaters, *see id.* at 15-16.

      As we now explain, there is an ample basis for difference of opinion as to whether these conclusions are compelled by the holding of the Court of Appeals in *Graci* or are consistent with the holdings of the Supreme Court.

      1.  Rather than providing a basis for denying certification, the Court's apparent belief (O&R at 16) that *Graci* required further discovery as to the current nature of MRGO is in fact a basis for certifying this appeal.  *See* O&R at 8, 16, 17.  *Graci* preceded the decision in *James* as well as *Central Green*.  The court of appeals should be given the opportunity to resolve any asserted tension between its prior decision and the later Supreme Court decisions.  It should also be given the opportunity to clarify whether *Graci* is consistent with recognizing immunity here.

In this regard, certification is particularly appropriate because, while *Central Green* was decided more than five years ago, there are no Fifth Circuit decisions that apply it.  Indeed, there are no appellate or even district court decisions based on *Central Green* for this Court to consult in construing the critical immunity provision.  Nor can the Court confidently rely on cases decided prior to *Central Green.*  The 2001 opinion rejected much of the jurisprudence that had developed in the case law after the Supreme Court's 1986 *James* decision.  *See Central Green,* 531 U.S. at 430 (some courts erroneously focused on character of federal project rather than character of waters that caused damage).  Consequently, not one of the trilogy of Fifth Circuit decisions following *James—Kennedy v. Texas Utilities,* 179 F.3d 258 (5th Cir. 1999); *Boudreau v. United States,* 53 F.3d 81 (5th Cir. 1995), *cert. denied,* 516 U.S. 1071 (1996); and *Mocklin v. Orleans Levee District,* 877 F.2d 427 (5th Cir. 1989)—is cited or discussed in the Order and Reasons.  The absence of authoritative guidance from the Fifth Circuit and persuasive guidance from other courts leaves substantial ground for difference of opinion as to the scope of § 702c immunity.

Similarly, *Graci* did not consider the relationship between MRGO and flood control measures because no such relationship existed before the LPVHPP was built.  Viewing the impact of MRGO in isolation, the court of appeals rejected the proposition that "'the mere happening of a flood insulates the Government from all damage claims flowing from it.'"  *Graci*, 456 F.2d at 27 (quoting *McClaskey v. United States*, 386 F.2d 807 (9th Cir. 1967)).  That ruling should not bar consideration of the government's argument here or require the type of discovery contemplated by the Order and Reasons.

As noted in our prior filings, in September of 1965, when Hurricane Betsy stormed ashore, there were no federal flood works in New Orleans.  Shortly thereafter, Congress authorized the LPVHPP, and it was signed into law by President Johnson on October 27, 1965. Pub. L. No. 89-298, 79 Stat. 1073, 1077.  The legislative history reveals that MRGO was understood to be related not only to adjacent natural waterways but also to the national flood control program.[1]  *Graci* was thus premised on the fact that in 1965 MRGO was "totally unrelated to any natural waterway or the national flood control program," *Graci*, 301 F. Supp. at 956, and the Fifth Circuit thus did not consider the claims that flood waters in *Graci* were "waters that a federal project [wa]s unable to control," *Central Green*, 531 U.S. at 431.

When Katrina flooded New Orleans, it did so despite the LPVHPP improvements, which ringed New Orleans East, the Lower Ninth Ward, and St. Bernard Parish.  A Corps of Engineers map dated September 30, 1995, shows that LPVHPP "improvements" had been completed around the perimeter of New Orleans East and around the relevant portions of the Lower Ninth Ward and St. Bernard Parish, except where the area was bordered by the Mississippi River (which border was protected by pre-existing levees).  This map, Record Document 822-18, is Exhibit 11 to the United States' motion to dismiss.

_____

[1]The legislative history indicates that Congress was aware both that MRGO had affected flood risks and that the new measures were intended, in part, to address those risks.  House and Senate committees observed that the proposed project would entail "construction of a new levee along the Gulf Outlet Channel [*i.e.,* MRGO] . . . to prevent entry of lake surges into the developed areas."  H.R. Rep. 89-973, at 77 (1965); S. Rep. 89-464, at 121 (1965).  Congress required that the project proceed "substantially in accordance with the recommendations of" the Army's Chief of Engineers as set forth in his report, which described specific measures aimed at mitigating the risks created or magnified by MRGO.  *See infra* at 11 n.2.

Further, even if "[t]here is intense disagreement as to the scope of the 'levees'" that were washed away by Hurricane Katrina, the record is sufficient for a legal determination as to whether MRGO was "totally unrelated to any natural waterway *or the national flood control program*" when Katrina struck.  O&R at 15-16 (emphasis in original).  The Complaint itself alleges that, during Katrina, "the storm surge acceleration produced by the MRGO" "trigger[ed] the collapse of . . . much of the levee system."  Complaint ¶ 80.  By 2005 it was "foreseeable and foreseen," *id.* ¶ 88, that MRGO would funnel floodwaters from the Gulf into the Industrial Canal, and there overwhelm the levees and floodwalls protecting the Lower Ninth Ward and St. Bernard Parish, *see id.* ¶¶ 1, 3, 49, 72, 83.

The relationship between MR-GO and the national flood control program is underscored in the reports that Congress relied on when it authorized the LPVHPP, after Hurricane Betsy. The report of the Army's Chief of Engineers, which is referenced in the post-Betsy law that authorized the LPVHPP, explained in detail that the contemplated levees were intended to guard against flood risk created by MRGO.[2]  In so doing, the report revealed the relationship between the two projects.

---

[2]The Chief's report discussed the problem of "[h]urricane damages result[ing] from surges entering Lake Pontchartrain from Lake Borgne . . . through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal."  H.R. Doc. 89-231, at 17.  The report described a comprehensive system of levees, including "a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre, thence westward to the Mississippi River levee at Violet, together with riprap slope protection along the navigation channel and floodgates."  *Id.* at 9.  The report noted that "[t]he plans described . . . for prevention of flooding by hurricane tides, and for corrective action to alleviate the adverse effects of the Mississippi River-Gulf outlet on navigation and on the ecology of the area are based on thorough and careful analysis of experienced and potential flood situations."  *Id.* at 81.

In short, the facts on which the *Graci* court based its holding no longer obtain.  An immediate appeal would allow the Court of Appeals to decide whether the established relationship between MRGO and the LPVHPP is sufficient to render the United States immune from liability for damage caused by MRGO and afford it an opportunity to determine whether the established relationship between the two projects provides an adequate basis for assessing the immunity of the United States.  At a minimum, an immediate appeal will allow the Court of Appeals to specify what relationship must exist in order for § 702c to apply to the claimed damages.

2.  The Order and Reasons also suggests that further discovery is compelled by faithful application of *Central Green*.  In *Central Green* the Supreme Court held that § 702c immunity applies only to *flood water damage* and, therefore, not necessarily to *all damage* caused by water that flows through a federal flood control project.  *See Central Green,* 531 U.S. at 431.  In its Order and Reasons, this Court correctly observes that "even the Supreme Court in *Central Green* opened the possibility of a segregation of damages—those for which the Government would be immune under § 702c and those for which immunity would not attach."  O&R at 15. The Order and Reasons, however, then goes on to suggest that additional discovery may be necessary in order to distinguish between flood waters that "immediate[ly] cause" the relevant damage and those that indirectly cause it.[3]

---

[3]*See* O&R at 7 ("The nub of the issue before the court is whether the MRGO is a flood control project and whether waters that flow through the MRGO are floodwaters."); *id.* at 14 ("the concept that the Government might be immune from damage from the effect of some water and not as to other water is recognized in *Central Green*"); *id.* at 15 ("Plaintiffs are seeking damages for the effects of the waters in the MRGO with respect to the decimation of the wetlands over a long period of time . . . ."); *id.* at 16 ("while arguably the immediate cause of the damage was indeed 'floodwaters,' the causation for such floodwaters force and breadth are alleged to have been the defalcations of the Government with respect to the MRGO").

The "segregation" suggested by the language of the FCA and *Central Green* is quite different from the distinction suggested by the Court.  The scope of FCA immunity is tied directly to the character of the water that causes the damage and *not* to the character of any acts or omissions that may be said to have caused any injury.  That statute provides "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters in any place."  Thus, the "segregation" required by the statute is whether damages stem from a flood or floodwaters (for which the United States is immune under the FCA) or other types of waters (for which the United States is not immune under the FCA).  Accordingly, under the text of § 702c there are substantial grounds for concluding that, once it is shown that the alleged damage is from floods or floodwaters, it simply does not matter if other acts could be alleged to be a "proximate cause" of the damages, for the United States cannot be held liable regardless of why the flood or flood waters caused the damages.

This reading of the FCA is reinforced, not called into question, by *Central Green*.  There, the Court expressly observed that "the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage."  531 U.S. at 434.  To be sure, further factual inquiry was necessary in *Central Green* because the record did not reveal whether the damage was caused by flood waters that "surged down Madera Canal and harmed petitioner's property," "by the routine use of the canal when it contained little more than a trickle," or by both.  531 U.S. at 436-37.  In other words, the Supreme Court required on remand that the trial court determine whether the damages were caused by floodwaters or non-floodwaters.  This distinction—which flows directly from the FCA's plain text—does not support the proposed

distinction between the floodwaters that "immediate[ly] cause[d]" the relevant damage and floodwaters that are said to have "indirectly" caused the damage.

Indeed, the notion that FCA immunity can be defeated simply by identifying another "cause" of the alleged damages caused by floodwaters is inconsistent with the disposition of the claims at issue in *James* and *Central Green*.  In *James*, the Fifth Circuit held that plaintiffs could proceed on a "failure to warn" theory.  760 F.2d at 604.  Thus, plaintiffs in that case, like plaintiffs here, claimed that they were not challenging any acts having to do with a flood control project but were advancing a separate, independent cause of action.  Yet the Supreme Court concluded that this claim was barred because the plaintiffs' damages were attributable to a flood or floodwaters.  *James*, 478 U.S. at 605.  Similarly, in *Central Green*, plaintiff challenged, in the Court's nomenclature, "defalcations" with regard to an irrigation canal that "serve[d] no flood control purpose."  *Central Green*, 531 U.S. at 427-28; *see also id.* at 427 (noting plaintiffs allegations that the canal was negligently designed, constructed and maintained).  The Supreme Court nonetheless concluded that, notwithstanding plaintiff's claims regarding negligence with respect to the design, construction and maintenance of the canal, plaintiff's claim would be barred on remand if the damages were caused by "flood or flood waters."  *Id.* 436-37.

An interlocutory appeal would allow the Court of Appeals to decide whether "this case is very much like that found in *Central Green*," O&R at 16, and whether the conclusions drawn in the Order and Reasons follow from the Supreme Court's opinion.  If the Court of Appeals determines that § 702c immunity turns on the immediate cause of the damage rather than an antecedent cause, then the admitted fact that plaintiffs' damage was immediately caused by flood waters, *see, e.g.,* Complaint ¶¶ 1-3, 10-24, 49, 71-80, 102, ends this litigation.  At a minimum, certification would afford an opportunity for the Court of Appeals to clarify what, if

any, additional factual predicates must be established to assess the application of § 702c to this case.  Certification is therefore appropriate because there is substantial ground for difference of opinion whether the Flood Control Act and *Central Green* permit liability to be imposed for damage immediately caused "by floods or flood waters."

## II.   AN IMMEDIATE APPEAL WILL ADVANCE THE ULTIMATE TERMINATION OF THE LITIGATION.

The second requisite for an interlocutory appeal is also met because an authoritative construction of § 702c will speed the litigation by either bringing it to an end or focusing and directing discovery.  *APCC Servs., Inc. v. Sprint Commc'ns Co.,* 297 F. Supp. 2d 90, 101 (D.D.C. 2003) (interlocutory review warranted to further interest in avoiding excessively burdensome and expensive litigation).  Without a clear and definitive construction, discovery will necessarily be diffuse.[4]  The MRGO and the LPVHPP are huge federal projects, both in

---

[4]Indicative of this is Plaintiffs' First Set of Requests for Production of Documents, submitted herewith as Exhibit A.  The first request is for "[a]ll documents concerning the planning, authorization, construction, cost, maintenance, and operation of the MR-GO."  Exh. A, at 6.  The second request is for "[a]ll documents concerning the planning, authorization, construction, cost, maintenance, and operation of the levees, spoil banks, floodwalls, or any alleged or putative control measure along the MR-GO."  *Id.*   The third is for "[a]ll documents concerning levees, spoil banks, floodwalls, or any alleged or putative flood control measure build or directed to be built by the Army Corps along all other navigable waterways in the gulf coast region, other than the MR-GO."  *Id.*  The requests are so broadly worded as to encompass virtually every document generated in connection with either MRGO or any of the various flood control projects that the Corps has undertaken in southeastern Louisiana over nearly a century.  *See, e.g., id.* at 7 (no. 5, requesting "[a]ll documents concerning the Lake Pontchartrain and Vicinity Hurricane Protection Plan as it relates to the MR-GO and the IHNC and the construction of levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and the IHNC"), *id.* at 10 (no. 22, requesting "[a]ll documents used in preparing or drafting the 1930 MR-GO Report"), *id.* at 12 (no. 36, requesting "[a]ll documents concerning the types of material or materials used to construct levees, spoil banks, floodwalls, or any alleged or putative flood control measure surrounding Greater New Orleans before Hurricane Katrina), *id.* at 13 (no. 38, requesting "[a]ll documents concerning the 'Orders and Regulations' of the Army Corps in effect between January 1, 1920 and the present").

15

terms of the resources that have been devoted to them and the time over which they have been designed, constructed, operated, and maintained.  There are millions of documents related to them; thousands of engineers, architects, captains, seamen, laborers, managers, supervisors, and administrators have knowledge about them.  Without resolution of the immunity issue, many weeks, if not months, will be required to evaluate the documents that may bear on this issue and to depose the persons with knowledge about these projects.  It is presently estimated that several million pages of documents may be responsive to the Plaintiffs' First Request for Production of Documents.  Producing these documents will cost in excess of $20 million, require tens of thousands of hours, and consume many months.  Affording an opportunity for the Court of Appeals to provide direction at this time "may materially advance the ultimate termination of the litigation" by revealing that much of what Plaintiffs have requested is legally irrelevant and thus need not be produced.

The Court's construction of § 702c necessitates lengthy and substantial discovery aimed at establishing sufficient facts to allow the Court to resolve the controlling issue of law presented by the Flood Control Act's immunity provision.  "[A] complete understanding of the evolution of the MRGO and the LVP" is thought to be necessary "before any legal determination can be made."  O&R at 16.  A complete understanding of  "the relationship between the MRGO and the LVP" is needed because mere "coordination" of the projects "would not subsume the cause of action as demonstrated in *Central Green.*"  *Id.*  It appears, moreover, that resolution of the legal issue is thought to require not only a complete understanding of these two projects but also an understanding of the ecological damage caused by the construction of MRGO and its operation and maintenance stretching over five decades.

*See id.* at 15 ("Plaintiffs are seeking damages for the effects of the waters in the MRGO with respect to the decimation of the wetlands over a long period of time").  Accordingly, Plaintiffs have requested "[a]ll documents concerning the MR-GO's impact on wetlands and marshlands." Exh. A (Plaintiffs' First Set of Requests), at 7.  The "segregation of damages" alluded to in the Order and Reasons appears to require a comparison of the damage that in fact resulted from Katrina's floodwaters and the damage that would have resulted if MRGO had been constructed, operated, and maintained properly.  Whether and how the existence and failure of the flood control system factors into the damage analysis is unclear.  *See id.* at 15 ("Plaintiffs are not seeking damages for the failure of the levees or flood projects.  Plaintiffs are seeking damages for the effects of the waters in the MRGO . . . which resulted in flooding which plaintiffs maintain could not have been controlled by any flood control project."), 16 ("it is *not* clear that as a matter of law, should plaintiffs prove their allegations as to *damages caused by MRGO* and not the failure of the flood control projects, that § 702c will prevent a recovery for the damages caused by MRGO").

An immediate appeal affords an opportunity to bring clarity to these issues—clarity that will surely focus discovery and could quite possibly reveal that these complicated causal analyses play no role in assessing the applicability of § 702c.[5]  If the immunity analysis comprises only an assessment of "the immediate cause of the damage" and whether that cause

---

[5] *APCC Servs., Inc. v. Sprint Commc'ns Co.,* 297 F. Supp. 2d 90, 100 (D.D.C. 2003) (granting defendant's motion for interlocutory appeal where the parties had already expended significant resources, and spent more than $1 million relating to document discovery; the court concluded that "it would be far better for all concerned, including plaintiffs, to have these matters resolved now, as opposed to sometime in the distant future"), *rev'd on other grounds,* 418 F.3d 1238 (D.C. Cir. 2005).

was "floods or flood waters," then the case is at its end—there is no need for any further factual development whatsoever.  If the analysis also comprises an assessment of whether a federal flood control project failed to control the floodwaters, without any consideration of other causal factors, then again the case is at its end.  The Order and Reasons, however, suggests that the analysis also includes an assessment of  "the scope of the 'levees' that were created in the dredging of the MRGO." O&R at 15-16.  The scope of this "scope" assessment is not defined.  The Order and Reasons also suggests that floodwaters must have a "nexus to a flood control project . . . to trigger immunity." *Id.* at 15.  It could be inferred from the Order and Reasons that § 702c applies where there is some relationship between the damages and a flood control project, but the necessary elements of such a qualifying relationship are not identified.  *See id.* at 16-17.

An immediate appeal holds the prospect of an early termination of the case.  If the Court of Appeals determines that § 702c immunity turns on the immediate cause of the damage rather than an antecedent cause, then the admitted fact that Plaintiffs' damages were immediately caused by floodwaters, *see, e.g.,* Complaint ¶¶ 10, 12-15, 17, 24, may provide an adequate predicate for dismissal without further proceedings.  And if the court holds that the scope of immunity is not determined by the character or purposes of MRGO, or its relationship to the LPVHPP, then the litigation will be speeded by avoiding time-consuming and expensive discovery into these areas.  At a minimum, certification will afford an opportunity for the Court of Appeals to clarify what, if any, additional facts must be established to assess the application of § 702c to Plaintiffs' claims.  Allowing the Court of Appeals to say what the law is now, before enormous resources are expended, is in the interest of the parties and the Court.  An

immediate appeal promises to sharpen and shorten the litigation by defining the controlling legal issue of Flood Control Act immunity.

It may well be true that, given a particular construction of 33 U.S.C. § 702c, the record is insufficiently developed to determine whether the United States is immune to liability for the alleged damage.  But there are plausible construction of § 702c that permit a determination as to the immunity of the United States on the present record.  Even if the construction of the immunity provision in the Order and Reasons is ultimately shown to be correct on appeal, the present unsettled state of the law leaves "substantial ground for difference of opinion" and calls for definitive resolution by the Court of Appeals at the earliest opportunity.  As the Court early recognized, and continues to recognize, resolution of this threshold immunity issue may materially advance the ultimate termination of the litigation.  This is reflected in *Robinson* Case Management Order No. 1, which sets out a trial and motion schedule designed to present the issue of § 702c immunity for an early decision.  But what, if any, additional facts must be ascertained in order to decide the threshold issue of § 702c immunity cannot be determined apart from a definitive construction of the immunity provision.  Certifying the Court's ruling for an immediate appeal will, at a minimum, afford the Court and the parties direction as to any necessary discovery.  *See In Re Big Rivers Elec. Corp.*, 266 B.R. 100, 104-05 (W.D. Ky. 2000) (granting interlocutory appeal and observing "[a] growing number of decisions [have] accepted the rule that a question is controlling, even though its disposition might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants"); *see also Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 729 (S.D. Tex. 2002) (certifying "this issue for interlocutory appeal only to implore the Parties to challenge federal

subject matter jurisdiction, if at all, prior to the Parties expending tremendous amounts of

money and resources").

## CONCLUSION

For these reasons, the United States' Motion to Certify should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY
Assistant Director, Torts Branch

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

I certify that on April 20, 2007, a true copy of Defendant United States' Memorandum in

Support of its Motion to Certify was served on all counsel of record by ECF.

<u>s/ Robin D. Smith</u>