UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * CIVIL ACTION |
| | | * NO.: 05-4182 "K" (2) |
| | ——————————————— | * JUDGE DUVAL |
| PERTAINS TO: ALL LEVEE CASES | | * MAGISTRATE WILKINSON |

\*     \*     \*     \*     \*     \*     \*     \*

**REPLY OF EUSTIS ENGINEERING COMPANY, INC.**
**AND MODJESKI & MASTERS, INC.**
**TO PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO THE DISMISSAL OF CERTAIN DEFENDANTS**
**BASED ON THE LOUISIANA LAW OF PEREMPTION**

**MAY IT PLEASE THE COURT:**

Now come Eustis Engineering Company, Inc. ("Eustis") and Modjeski & Masters, Inc. ("Modjeski") in response to plaintiffs' Opposition to Engineers' Motion filed on May 1, 2007, in accordance with Magistrate Wilkinson's Order of April 17, 2007 (Doc. No. 3791).

Plaintiffs' opposition (Doc. No. 4683) argues admiralty law preempts Louisiana peremption law in regard to claims against "Engineers" arising from "dredging" in the 17th Street Canal (hereinafter "Drainage Canal"). This argument has been raised before by plaintiffs in O'Dwyer (C.A. 05-4181) and in Pontchartrain (C.A. 06-6642) and considered by the Court in its two judgments and opinions entered on

December 8, 2006 (Doc. 2142, 2145 and Doc. 2148, 2149), and in the February 1, 2007, motions (Doc. No. 2970, 2974, 2986) taken under submission on March 23, 2007.[1]

Plaintiffs do not dispute that all of the acts and/or omissions regarding "the dredging permit" are perempted under La. R.S. 9:5607, but argue that this Court should not apply La. R.S. 9:5607 and its prior rulings of December 8, 2006, to the Engineers because federal maritime law should be applied and federal maritime law should not enforce La. R.S. 9:5607.   Plaintiffs contend that all Louisiana state law controlling the design and construction of immovables in Louisiana should be displaced by "federal maritime law," which has no body of case law, or of legislative guidance, developed to deal with design and construction of immovables such as levees.

## THE MASTER COMPLAINT'S ASSERTION OF ADMIRALTY JURISDICTION SHOULD BE DISMISSED BY THE COURT *SUA SPONTE*.

On June 1, 2006, in connection with Court ordered dispositive motions, Eustis proved that Eustis completed the last services for the proposed dredging project on April 30, 1987[2].

On or about August 21, 2006, O'Dwyer filed an opposition to the Engineers' Joint Motions contending that maritime law applied, and attempted to invoke general maritime law, claiming that "state peremption statutes are preempted by the general maritime law." O'Dwyer, p. 2.

The putative class action complaints filed before the Engineers' June, 2006, Motion to Dismiss under Rule 12(b) and for Summary Judgment included as plaintiffs all persons sustaining injury as a

---

[1]  Before responding to the argument as to "admiralty preemption" in the 17th Street Canal, Engineers first note that plaintiffs, through their lead liaison counsel, Mr. Bruno, in conformity with the superseding Master Consolidated Class Action Complaint (Doc. No. 3420) pleadings filed by the plaintiffs' counsel's liaison committee on March 15, 2007, do not allege any admiralty jurisdiction or maritime law preemption of state law in regard to the London Avenue Canal, and no longer are prosecuting any claims against the Engineers who are covered by the December 8, 2006, judgments as to the "remote" projects on the 17th Street Canal, or any projects on the London Avenue Canal, and the IHNC (Industrial Canal) other than the land-based piezometer tests and dredging analysis in the 17TH Street Canal.  The claims of plaintiffs are now focused against the "perempted" Engineers solely on the "dredging" activity in the 17th Street canal.

[2]  Index 1, Tables & Exhibits attached to Affidavit of Mr. Bill Gwyn, Exhibit 1.2.  Project 07917 – Sewerage & Water Board of New Orleans, Metairie Relief Canal, Stations 554+00 to 670+00, Orleans and Jefferson Parishes, Louisiana, reflected in Eustis Report to Modjeski , dated 2 November 1981, and Project 08519 – Sewerage & Water Board of New Orleans, Metairie Relief Canal, Stations 617+50 to Station 663+00, Orleans and Jefferson Parishes, Louisiana.

result of the breach of the 17th Street Drainage Canal[3]. O'Dwyer's opposition placed the plaintiffs on notice of a possible maritime theory before the hearing on the Engineers' Joint Motions. However, no plaintiff moved to amend to properly plead maritime subject matter, nor to later open the motion record to argue maritime law.

On December 8, 2006, the Court expressly found that neither O'Dwyer nor any other plaintiff had pleaded or argued maritime jurisdiction. On December 8, 2006, the Court dismissed in a final judgment all claims against the engineers in the cases that were included in their motions. Doc. No. 2148, pp. 16 - 17; 2149.

Although it does not exist, if maritime subject matter jurisdiction did exist, the plaintiffs were aware of that theory of recovery more than two months before the Court required the Engineers to file the June 15, 2006 dispositive motions. On April 13, 2006, a class action complaint[4] attempted to state a maritime claim for dredging in the 17th Street Canal:

> Alternatively, this Court has jurisdiction . . . pursuant to the Suits in **Admiralty Act** . . . by virtue of the defendant's [Corps'] negligent **dredging of navigable waterways**, failure to contain navigable waters of . . . the **Seventeenth Street Canal**.

Doc. No. 1, C.A. 06-01885, ¶V, p. 5 (emphasis supplied).

Additionally, on August 17, 2006, another class action complaint,[5] this one directed to Eustis and Modjeski, was filed alleging a maritime claim before the hearing date on the Engineers' dispositive motions.[6]

---

[3]  Each suit addressed in the December 8, 2006, judgments alleged in substance:
> All residents, domiciliaries, and property owners of the Parishes of Orleans and Jefferson in the State of Louisiana who sustained damages as a result of water intrusion caused by the failure of the hurricane protection levees and flood walls in New Orleans, Louisiana on or about August 29, 2005 and thereafter, such damages including but not limited to damage to real property, damage to personal property, and personal injury. Plaintiffs further propose that the class be divided in to the following five (5) subclass zones:

*See, Beth A. LeBlanc*, C.A. No. 056327 filed December 2, 2005.

[4]  Doc. No. 1, C.A. 06-01885, ¶23.

[5]  Doc. No. 1-1, C.A. 06-04389, ¶ II.

While the Court found that the maritime allegations against the Engineers were conclusory and indecipherable[7], there is no question that, more than eleven months before the plaintiffs filed a Superseding Master Consolidated Class Action Complaint ("MC"), the issue of potential maritime jurisdiction due to the dredging of the 17th Street Canal was attempted to be raised in a pleading. Therefore, if any plaintiff had a basis for pleading a maritime claim against an Engineer on the 17th Street Canal, that subject matter jurisdictional claim should have been properly raised no later than the August 25, 2006, hearing date. March 15, 2007 is too late[8].

On March 15, 2007, the Levee Breach Group, who also represented the putative class action plaintiffs in one or more of the dismissed cases, filed the MC. With the exception of *Conoglio* (07-1289) and *Hennesey* (07-1288), not filed until March 13, 2007, and without adding new plaintiffs to the putative class, for the first time plaintiffs alleged in the MC that maritime jurisdiction applied to the claims against Eustis and Modjeski, based on the alleged services rendered in connection with the proposed dredging project. This new claim and jurisdictional allegation were contrary to the Case Management Order No. 4 because the MC includes new jurisdictional and fact allegations even though the deadline to amend pleadings had elapsed. (Docket No. 3299, p. 13)[9]

This MC allegation of admiralty jurisdiction should be dismissed as not in compliance with the Court's request for a Superseding Master Complaint designed only to consolidate the pleadings pending prior to March 1, 2007, into one document.

---

[6] See Doc. No. 1-1, C.A. 06-04389, ¶IV: Defective and negligent design, construction, operation, inspection and maintenance of an entire **navigable waterway system, including . . . the 17th Street Canal**, their environs and tributaries . . . ; ¶XIII: **Negligently dredging** the navigable waterways identified herein . . . ; ¶XIX: **This is an admiralty and maritime claim . . .** (emphasis supplied).

[7] Orders and Reasons, Doc. No. 2148, p. 15.

[8] Even if maritime subject matter jurisdiction could somehow apply to Eustis and Modjeski (and it does not), admiralty claims are now barred by the *res judicata* effect of this Court's December 8, 2006 Judgment, as discussed hereafter.

[9] "Accordingly, the deadline for amending pleadings is now deemed lapsed, and only answers and responsive motions may now be filed without leave of Court. Except as otherwise provided herein, no further amendments to pleadings, addition of parties, third-party actions, cross-claims and counterclaims will be allowed, except as required by this order or, hereafter, on motion with a proposed order, noticed for hearing, and based on a showing of good cause as required by Fed. R. Civ. P. 16(b)."

## RES JUDICATA BARS BELATED MARITIME THEORIES

The maritime theory in the MC is an improper collateral attack on the final judgments[10] in seventeen civil actions and also violates the well-settled principles of *res judicata*.

> A party may not avoid the preclusive affect [sic.] of *res judicata* by asserting a new theory or a different remedy. The nucleus of facts defines the claim rather than the legal theory posed or recovery sought.

*Matter of Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990), Fn. 10.

In *Howe*, the Fifth Circuit stated the test for *res judicata*: (1) the parties must be identical in both suits, (2) a court of competent jurisdiction rendered the prior judgment, (3) there was a final judgment on the merits in the previous allusion, and (4) the plaintiff raises the same cause of action or claim in both suits.[11] Here the nucleus of "maritime" facts[12] and the assertion of maritime law were both in the record before the June 1, 2006, putative class of plaintiffs had their day in court on August 25, 2006. The June 1, 2006, putative class of plaintiffs, including all of the present plaintiffs, included:

> All residents, domiciliaries and property owners of . . . Orleans and Jefferson . . . affected by the flooding caused by the failure of the hurricane protection levees and flood wall in New Orleans . . . .[13]

*Res judicata* bars all claims that were or could have been advanced in support of the cause of action on the occasion of its former adjudication, not merely those that were adjudicated. *Nilsen v. City of Moss Point*, 701 F.2d 556, 560 (5th Cir. 1983). Therefore, plaintiffs may not now avoid the preclusive effect of *res judicata* by asserting a new theory or a different remedy.

---

[10]   No appeals were taken from the judgment in favor of the Engineers on December 8, 2006. *O'Dwyer* has filed a Notice of Appeal in the judgment in favor of the contractors.

[11]   *See also*, *Rocha v. Texas Alcoholic Beverage Com.*, 38 F.3d 570 (5th Cir. 1994).

[12]   Plaintiffs admit that Eustis's report on the potential dredging project was provided to the Corps on January 17, 1984. M.C. ¶46. The plaintiffs also admit that the dredging work was completed more than four years after Eustis's services were finished, on January 10, 1992. M.C. ¶54. These public records were available to any citizen.

[13]   Ezell, No. 05-6314 (12/1/05, p.13); Finney, No. 06-0886 (2/22/06, p. 13-14); Kirsch, No. 05-6073 (11/23/05, p. 12-13); Leblanc, No. 05-6327 (12/2/05, p. 16-17); Marcello, No. 06-2545 (4/25/06, ¶ 10); Tauzin, No. 06-0020 (1/3/06, p. 6); Vodanovich, No. 05-5237 (10/03/05, p. 5-6); Brown, No. 05-6324 (12/2/05, p.12). Berthelot, No. 05-4182 (p. 4 original), p. 12-13 Amended 11/25/05).

New theories based on old facts are barred by *res judicata*. "Even claims based upon different legal theories are barred provided they arise from the same transaction or occurrence."[14] The same transaction, the engineering services rendered for the proposed dredging project, was squarely before the Court on June 1, 2006. The levee breach occurrence that forms the basis for plaintiffs' claim was also squarely before the Court on June 1, 2006. The instant transaction and occurrence are identical to those originally alleged by the same putative plaintiffs in the cases that the Court dismissed months before the plaintiffs filed the MC. The Court's December 8, 2006, Judgment bars re-litigation of those same facts under a new maritime theory. For these reasons, *res judicata* compels dismissal with prejudice of plaintiffs' maritime theory of recovery.

## PLAINTIFFS' "LAND-BASED" PLEADINGS FAIL TO ALLEGE MARITIME PROXIMATE CAUSE CLAIMS AGAINST EUSTIS OR MODJESKI

Plaintiffs' sole maritime allegation against Eustis or Modjeski is insufficient, as a matter of law, to plead a tort claim. Plaintiffs allege that Eustis issued a report concerning a potential dredging project on July 27, 1983. Master Complaint, ¶ 45. Plaintiffs further allege that in connection with the "dredging" of a test section in the canal, Eustis and Modjeski monitored and evaluated the hydrostatic pressure at six locations on the Jefferson Side of the levee. Master Complaint ¶ 46-47; 215. Plaintiffs' pleadings admit that the allegedly negligent "dredging" services were confined to land. Therefore, plaintiffs' pleadings fail to state how the Engineers' land-based services were a proximate cause of a maritime tort.

As a matter of judicial policy, nothing that Engineers did on land in connection with a potential dredging project could be the proximate cause of a maritime tort. "Proximate causation principles are generally thought to be a necessary limitation on liability." Exxon Co. USA v. Sofec, Inc., 517 U.S. 830, 838 (1996). Even if the plaintiffs had alleged a maritime tort against Eustis and Modjeski, the doctrine of proximate cause compels dismissal of the claims because it is undisputed that:

1. The breach in the levee occurred more than one mile from the Engineers' alleged "dredging activities,"

---

[14] *L-Tec Electronics Corp. v. Cougar Electronic Organization, Inc.*, 198 F.3d 85, 88 (2nd Cir. 1999).

2.    After the test section was installed south of I-10, the services that Eustis rendered in connection with the potential dredging project were all confined to the land side of the levee,

3.    Eustis neither designed nor inspected the actual dredging project,

4.    The actual dredging work was performed by others, not by Eustis or Modjeski, over a period of seven and one-half years (Master Complaint, ¶ 48-54), nearly four years after Eustis finished all services,

5.    The breach in the levee occurred more than **17 years** after Eustis finished all services that were in any way connected with the proposed dredging project,

6.    The breach in the levee occurred more than 16 years after Eustis finished all services with the Levee and Floodwall Projects at the 17th Street Canal.

"Somewhere a point will be reached when courts will agree that the link has become too tenuous- that what is claimed to be consequence is only fortuity." Exxon, 517 U.S. at 838. Plaintiffs offer no fact, case, or theory that links a two-decade-old engineer's report on the ambient water pressure below land to an alleged maritime tort that occurred more than one mile away from the engineer's data point. Even if maritime law applied, space and time have broken the proximate cause link. For these reasons, plaintiffs' maritime tort contention against Eustis and Modjeski should be dismissed.

### PLAINTIFFS' FACTUAL ALLEGATIONS IN THE MASTER COMPLAINT DO NOT MEET THE TEST FOR ADMIRALTY SUBJECT MATTER JURISDICTION

The MC contains few specific factual allegations against Eustis or Modjeski. Those allegations involve projects very remote from the breach site on the Drainage Canal. It is alleged that on July 27, 1983, Eustis submitted a revised Soil Stability Report which discussed the possibility of a blowout at the landside toe of the levee and extended to Pumping Station No. 6. In the Soil Stability Report, Eustis recommended dredging a test section in the Drainage Canal so that Eustis could study the hydrostatic uplift pressure. Between November 29 to December 16, 1983, a test section was dug just south of Interstate 10.

In the MC, the plaintiffs admit that six (6) piezometers were installed by Eustis to monitor changes in the hydrostatic pressures on the Jefferson side of the levee – on land[15]. It is alleged that the report concluded that after the test section was dug no relevant changes were monitored by Eustis' land-based piezometers. Plaintiffs allege that Eustis failed to take into account that seepage flow through the permeable soils of the Drainage Canal while monitoring at the land-based piezometers on the Jefferson side of the levee. It is not alleged that Eustis or Modjeski dredged the test section, or owned or operated any dredge.

Under paragraph 50 of the MC, Phase 2-A is described as dredging from Interstate 10 to the Hammond Highway, Orleans Parish side, and Phase 2-B from Interstate 10 to the Hammond Highway, Jefferson Parish side.

In Paragraph 63 of the MC, it is alleged that a soil analysis had been performed in 1981 by Eustis which entailed borings along the levee. However, there is no allegation that Eustis did anything wrong in taking these borings nor do such averments contain any activity by Eustis of a maritime nature.

Under "Allegations of Fault," Page 53, Paragraph 197, it is alleged that several defendants "had the legal responsibility and duty to these plaintiffs to cause, allow, and/or conduct the aforesaid dredging activity in a manner that would not compromise the safety of the Drainage Canal's levee/floodwall systems." Included are Modjeski, Eustis and Boh Brothers. However, there is no allegation that Eustis or Modjeski engaged in dredging of the Drainage Canal.

In paragraph 214, Page 57, it is averred that Eustis and Modjeski were negligent in the engineering, design, analysis, and recommendations regarding critical aspects of the dredging project for the Drainage Canal. This allegation is clarified in Paragraph 215 – defendants Eustis and Modjeski negligently failed to place proper hydrostatic pressure monitors during the dredging of a test section of the Drainage Canal in 1983 "and specifically placed the monitoring piezometers on the wrong side of the Drainage Canal, erroneously concluding that digging the test section resulted in no relevant hydrostatic

---

[15] Piezometers consist of a PVC 2" pipe with slots on the bottom five feet to allow water inside for the five foot length only. The pipe is inserted into a hole in the ground. A meter on the levee measures the piezometric head pressure. The data is taken to the Eustis office on Metairie Road, plotted, and evaluated.

changes. These defendants negligently failed to take into account the seepage flow of the permeable soils already in progress when the piezometers were installed." MC, ¶ 46[16] However, plaintiffs admit that all of Eustis' hydrostatic pressure monitors or piezometers were installed on land.[17]

There is but one conclusion. The <u>only</u> non-conclusory allegations in the MC are that Eustis and Modjeski failed to properly locate hydrostatic monitors during the dredging of a test section on the Orleans Parish side of the levee, that is, on land; and Eustis improperly monitored the land-based piezometer test and misinterpreted its results because it allegedly failed to take into account seepage on the Orleans Parish side of the levee.

As discussed hereafter, this MC states no maritime cause of action against Eustis or Modjeski. According to the MC, Eustis' sole role was to monitor hydrostatic pressure using piezometers installed on land on the Jefferson side of the levee. The hydrostatic pressure monitoring occurred in 1983, on land adjacent to the south end of the Drainage Canal near the Interstate 10 freeway, and was very remote from the breach site. The site of the monitoring is more than one mile south of the breach site, and the test occurred over seventeen (17) years prior to the breach.

Under the tests enunciated in *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 253, 93 S.C. 493, 497 (1972), the Supreme Court underscored:

> If the wrong occurred on navigable waters, the action is within admiralty jurisdiction. If the wrong occurred on land, it is not.

Here, both the alleged negligent monitoring act and its alleged effect — breach of a levee — with flooding of homes and businesses — occurred on shore. Any dredging was arranged or executed by the Sewerage & Water Board of New Orleans and performed by parties other than the Engineers.

---

[16] Count 2, Page 58, deals with the alleged fault in the design and construction of the Drainage Canal levees and floodwalls. While they involve Eustis and Modjeski, there are no allegations of maritime activity of any kind by either defendant, including, without limitation, dredging. Eustis and Modjeski are not alleged to be at fault with respect to the design and construction of the London Avenue Canal levees and floodwalls in Count 3, or of the MR GO in Count 4.

[17] See *supra* footnote 16.

**ESTABLISHED LAW PRECLUDES ASSERTION OF ADMIRALTY CLAIMS**

Plaintiffs have simply not asserted any admiralty/maritime claims against Eustis or Modjeski arising from breaches/failure of the Drainage Canal levees because:

- The "location test" for jurisdiction over admiralty tort claims against Eustis or Modjeski is not satisfied because no tort is alleged to have occurred on navigable waters and the damages on land were not caused by a vessel; and

- Even if any of the Drainage Canal south of I-10 is held to be navigable water, and even if the location test is satisfied by alleged actions of a vessel, there is no connection to commercial maritime activity.

Without admiralty subject matter jurisdiction, Eustis and Modjeski are subject to the court's discretionary, supplemental jurisdiction, and the claims against it are governed entirely by state law.

**A.    The test for admiralty tort jurisdiction is well established.**

In *Grubart*, the Supreme Court described the test as follows:

A court applying the location test must determine whether the ***tort occurred on navigable water*** or whether the ***injury suffered on land was caused by a vessel on navigable water***. 46 U.S.C. App. § 740. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved . . . to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Grubart*, 513 U.S. at 534 (emphasis added).

To establish admiralty jurisdiction over Eustis or Modjeski, plaintiffs must establish affirmative answers to all questions:

1. Locality –     a.  Did the tort occur on navigable waters? or

                  b.  Was the injury caused by a vessel on navigable water?

2. Connection –   a.  Does the conduct complained of have a potentially disruptive impact on maritime commerce?

                  b.  Does the character of the activity show a substantial connection to "traditional maritime activity"?[18]

---

[18] *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982); *Sisson v. Ruby*, 497 U.S. 358 (1990); and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

**B.**   **Location:  Plaintiffs have not alleged that Eustis or Modjeski committed a tort on navigable waters or caused damage on land from a vessel.**

First, Eustis and Modjeski note that the Drainage Canal between Interstate 10 and Old Hammond Highway is not a navigable water body.  While small commercial and recreational vessels moor in the Drainage Canal north of the Old Hammond Highway Bridge, the bridge inhibits use of the part of the Drainage Canal south of the bridge where both the dredging and breach occurred.  The area of the Drainage Canal where Boh built the "test section" was clearly not navigable, as the low bridges at Veterans Boulevard further precluded commercial navigation.

Plaintiffs claim that Eustis and Modjeski provided an engineering and geotechnical analysis of the water pressure at and adjacent to the land west of the Jefferson levee regarding a potential project for improving the outflow of the Drainage Canal during the time period 1981 through 1984.  There are no allegations that Eustis or Modjeski owned, operated or instructed the dredging equipment that was used to actually dredge the Drainage Canal.

In *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453 (5th Cir. 1999), the Fifth Circuit explained that in cases like this where the effect of the alleged wrong is felt on land, the tort must be caused by a vessel for subject matter admiralty jurisdiction:

> A court applying the location test must determine whether the tort occurred *on navigable water* or whether injury suffered *on land was caused by a vessel on navigable water* . . . in determining whether the tort occurred on navigable water, this court looks to where the alleged wrong took effect rather than to the focus on the allegedly tortious conduct . . .
>
> Under an exception to the general rule that the impact of the tort must be felt on navigable water, the appellants next contend that the location prong has been satisfied because they suffered an injury on land that was caused by a vessel on navigable water. This exception was created with the enactment of the Extension of Admiralty Jurisdiction Act in 1948 . . . (current version at 46 U.S.C. § 740). . . By the Act's express terms, however, the injury must be *caused by a vessel* . . . The Supreme Court has clearly indicated that the Act means the vessel and her appurtenances, and does *not include those performing actions for the vessel* . . . Because the complained of conduct was not caused by the vessel itself or its appurtenances, appellants' claims do not fall under the ambit of 46 U.S.C. § 740.
>
> Thus, because the impact of the alleged tort was felt on land rather than on navigable waters and because the damage was not caused by the vessel or her appurtenances, the location prong of the admiralty jurisdiction inquiry has not been met.

183 F.3d at 456-457 (emphasis added).

Another Katrina case, *In re Ingram Barge Company*, 435 F.Supp. 2d 524, 2006 WL 1539787 (E.D. La. 2006), (Doc. No. 161 in C. A. No. 05-4419) involved flood damages occurring on land.  Judge Berrigan held that the Admiralty Extension Act requires damage to be caused by a vessel or her appurtenances before the "location test" can be satisfied.  Judge Berrigan held that the claims asserted against the United States not related to its ownership or operation of a vessel did *not* satisfy the locality test.

In its Memorandum in Opposition, plaintiffs reference their MC, particularly paragraph 45[19].  They allege that Eustis, in obtaining land-based piezometer readings, failed to take into account that it should have known of seepage through the levee.  From this allegation, plaintiffs attempt to state that Eustis and Modjeski were engaged in dredging operations as a springboard to maritime jurisdiction.  This is not the case either factually or logically.

Eustis did take piezometer readings, but only on land on the Jefferson side of the levee.  These are remote data points taken thousands of yards and across the canal from the breach site.  There is no allegation, nor is there any basis for such allegation, that Eustis or Modjeski owned or operated or controlled the dredge or the dredging operations themselves.  Eustis' role was solely to analyze the hydrostatic properties beneath the ground on the Jefferson side of the levee.  The effect of the alleged tort was on land.  Eustis and Modjeski had nothing to do with any vessel that dredged the canal bottom; therefore, plaintiffs cannot meet the location test.

As noted, under various tests for maritime jurisdiction, any complaint against Eustis  and Modjeski fails to meet each of the separate and compulsory requirements:  (1) navigability, (2) the injury must occur on navigable water or be caused by a vessel owned or operated by Engineers, and (3) under the maritime connection test, there must be a "potential disruptive effect upon maritime commerce and a substantial relationship to traditional maritime activity."[20]

---

[19]  Opposition, ¶C, p. 3.

**C.      Absence of navigability.**

The dredging complained of is south of the Hammond Highway bridge and not between

Hammond Highway and Lake Pontchartrain.  The 13 June 1984 "Statement of Findings" by the Corps of

Engineers, attached to plaintiffs' Opposition, at page 3, states the following:

> H.      Views of the District Engineers on: inset (1) <u>navigation</u>: The 17th Street Canal is
> not used for commercial or recreational navigation; however, the reach of the
> canal between Hammond Highway and Lake Pontchartrain, known as Bucktown,
> is used for mooring of both commercial and sport fishing vessels owned by the
> fishermen of Bucktown.

Eustis underscores that the piezometer services complained of occurred on land at the

south end of the land, and at a great distance from the breach site, which was near the north end

of the canal.

On Page 1, the purpose of the project is described:

> In Jefferson Parish, along Jefferson-Orleans Parish Line.  Dredging to enlarge and
> maintain an existing outfall canal, known as the "Metairie Relief Canal", approximately
> 200 feet wide and 13,000 feet long from and including Pumping Station No. 6 to Lake
> Pontchartrain, to improve the present hydraulic characteristics of the canal to allow the
> pumping rate of Pumping Station No. 6 to be increased to 10,400 cubic feet per second,
> thereby reducing incidences of street and home flooding in the drained area.  The 17th
> Street canal is the main storm water drainage outlet for approximately 7,860 acres of
> urbanized land in Orleans Parish (Uptown, Broadmoor, Carrollton) and approximately
> 2,250 acres of similar area in Jefferson Parish (between Metairie Road and the
> Mississippi River).  The proposed project combines two previously submitted permit
> requests by the Sewerage & Water Board of New Orleans, who alleges ownership of the
> canal.

This information provided by plaintiffs establishes important facts:    (1) the canal is not

considered navigable between the Hammond Highway bridge and Pumping Station No. 6; (2) the canal is

not used for recreational or commercial purposes by watercraft; and (3) while a dredging activity would

---

[20]    The uncontested facts here are significantly different from those in the cases that the plaintiffs rely upon.
*Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.C. 493 (1972), involving an airline that crashed into
navigable waters killing its passengers on navigable waters, or in *Foremost Insurance Company v. Richardson*, 457
U.S. 668, 102 S.C. 2654 (1982), involved a collision between two boats on navigable waters, both of which were
held to have a significant relationship to maritime commerce.  The facts are also significantly different from *Sisson
v. Ruby*, 497 U.S. 358, 110 S.C. 2892 (1990), where a fire aboard a yacht in a marina was found to have maritime
nexus.  Similarly, *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.C. 1043 (1995), involved the
defendant conducting pile driving activity on a barge in the Chicago River and the injury to the tunnel was caused
by the vessel under the Admiralty Extension Act.

ordinarily be considered to increase the depth of a canal for navigational purposes, in this situation

dredging was done in connection with allowing proper drainage of rainwater. It had nothing to do with its

navigational characteristics or with maritime commerce.

Further, in *Board of Commissioners for the Pontchartrain Levee District v. Baron*, 236 La. 846,

109 S.2d 441 (1959), the Supreme Court of Louisiana expressly held:

> The Seventeenth Street Canal is not a navigable river or stream, but is a manmade
> drainage ditch at least 3 miles long. It has its beginning near the rear of New Orleans
> waterworks plant in Orleans Parish and, after practically tracking the dividing line
> between Orleans and Jefferson Parish, empties into Lake Pontchartrain.

In *Baron*, the Levee District was seeking to appropriate land adjoining the Drainage Canal. The

Supreme Court further held:

> The land from which the Levee District seeks to evict Baron, in which the Levee District
> contends has been legally appropriated, is not adjacent to, and does not border on, any
> navigable river or stream, but, as pointed out above, is situated on the Seventeenth Street
> Canal.

The case law is consistent that where structures are present which prevent commercial marine

traffic the water body is not within admiralty jurisdiction. *Guillory v. Outboard Motor Corp.*, 956 F.2d

114, 115 (5th Cir. 1992); *Smith v. Hustler, Inc.*, 514 F.Supp. 1265, 1269-1270 (W.D. La. 1981); *Adams v.

Montana Power Company*, 528 F.2d 437 (9th Cir. 1975)(completely obstructed portion of Missouri

River); *Chapman v. U.S.*, 575 F.2d 147 (7th Cir. 1978)(Kankakee River found not used for commerce);

*Livingston v. U.S.*, 627 F.2d 165 (8th Cir. 1980)(Norfolk River obstructed and incapable of commerce);

*Edwards v. Hurtel*, 717 F.2d 1204 (8th Cir. 1983)(Table Rock Lake found not susceptible of use for

commerce); *Land and Lake Tours, Inc. v. Lewis*, 738 F.2d at 961 (8th Cir. 1984)(Lake Hamilton

obstructed by two dams found non-navigable under admiralty jurisdiction); *Dunham v. Demaine*, 559

F.Supp. 224 (E.D. Ark. 1983)(Lake Hamilton, *supra*.)

Accordingly, the location test for admiralty tort jurisdiction is not met because (1) the Drainage

Canal is not navigable water as held by the Louisiana Supreme Court in *Baron*; (2) according to the Corps

of Engineer findings, it is not used for either commercial or recreational navigation; (3) the Drainage

Canal south of Hammond Highway is certainly not navigable; and (4) even if it was navigable, the land-based piezometer test and analysis did not cause an injury on navigable water.

**D.      The plaintiffs' claims against Eustis and Modjeski do not satisfy the connection test under *Grubart*.**

Eustis' and Modjeski's activities do not constitute a maritime nexus as: (1) the general features of this type of incident do not have a potential disruptive impact on maritime commerce; and, (2) the general character of the activity giving rise to the incident does not show a substantial relationship to traditional maritime activity.[21]  There cannot be "location" and "navigable water" admiralty jurisdiction over the claims asserted against Eustis and Modjeski for damage occurring on land because they did not own, operate or instruct a vessel on navigable waters that committed a tort.  Nonetheless, if the southern end of the Drainage Canal qualifies as navigable water, and assuming that the "location test" is satisfied, the plaintiffs' claims against Eustis and Modjeski still cannot satisfy either *Grubart* test.

In the MC, Eustis is alleged to have provided engineering services limited to monitoring and the analysis of hydrostatic pressure data taken from land-based instruments.  The land-based piezometer tests had no connection with maritime commerce or traditional maritime activity, and there cannot be admiralty jurisdiction.  Modjeski is only alleged to be at fault in its engineering analysis and plans.

This Court has already addressed a similar issue and held that levees are not related to maritime commerce.  In *In re Ingram Barge Company*, Judge Berrigan analyzed the claims ***alleging damage caused by the barge striking the levee*** and held that those claims were sufficient to satisfy the location test of the Admiralty Extension Act.  But, the *Ingram* court further analyzed the "maritime commerce connection" test of admiralty jurisdiction in regard to maritime claims asserted against the United States with respect to the levees and found no maritime jurisdiction:

> A levee is a structure fixed to the land whose fundamental purpose is to protect the land-based community from flood waters . . . Although its existence may have some impact on the nature of the water it confines, it is a stretch to claim that levees are built for reasons substantially related to maritime commerce.
>
> 435 F. Supp. 2d at 530.

---

[21] See *Grubart*, 513 U.S. at 534

The claims against Eustis and Modjeski are exclusively land-based activities related to immovables under Louisiana law, i.e., levees and piezometer tests on land.

This Court's holding in *In re Ingram Barge Company* is consistent with other courts' holdings on analogous subjects.  In *National Union Fire Ins. Co. of Pa. v. United States*, 436 F.Supp. 1078 (M.D. Tenn. 1977), the Court found that the Corps of Engineers' alleged failure to properly control dams on the Cumberland River did <u>not</u> satisfy the "commercial maritime connection" test so as to provide admiralty jurisdiction for claims involving flooding of warehouses on shore.  The Court recognized that the navigability of the river had nothing to do with flooding damage that occurred on land.  State law, rather than admiralty law, was preferable for disposing of the case:

> Thus, while control of the water level does generally involve considerations affecting navigation and commerce upon the water, the only actual impact of concern in this instance is the flooding of a shore-based warehouse.  Viewed in this way, it becomes more difficult to perceive an actual maritime incident for which the unique principles and procedures of admiralty are pertinent . . . [W]here the actual untoward consequence is of a kind which can readily be dealt with by resort to established common law tort principles, it makes no sense to dredge up (no pun intended) a whole body of law whose purpose and history is inextricably bound up in matters concerning maritime commerce. It should not be overlooked that the navigability of the Cumberland, which is a sine qua non of admiralty jurisdiction, had nothing whatever to do with the injuries sustained in this case.  It is not inconceivable that a stopped up storm drain, during an abnormally heavy rainfall, could have resulted in essentially the same damage to the material in the warehouse.  And in such a case, a suit against the municipality (assuming no immunity) alleging negligent failure to keep the sewers cleared of debris could easily be disposed of within the contours of state tort law.  The fact that the alleged culprit in the instant case was the Corps of Engineers and that the destructive force happened to be a navigable stream does not alter the availability, viability, and indeed, the preferability of state law for disposing of this case.

436 F.Supp. at 1083.

Also, in *In Re Silver Bridge Disaster Litigation*, 381 F.Supp. 931, 942-943 (S. D. W.Va. 1974) the court found no maritime connection to support admiralty jurisdiction for claims against the United States alleging a defect in a bridge that collapsed onto navigable waters.  The court applied state law under the Federal Tort Claims Act.

In *Texaco Exploration & Production, Inc. v. Amclyde Engineered Products Co.*, 448 F.3d 760 (5th Cir. 2006) *on rehearing* 453 F.3d 652 (5th Cir. 2006), the Fifth Circuit considered whether or not

admiralty jurisdiction applied to a casualty involving the dropping of a deck module (a part of the Petronius offshore platform being constructed in the Gulf of Mexico) by a derrick barge crane. The Fifth Circuit cited to *Grubart* and found there was no admiralty jurisdiction because constructing an offshore oil and gas facility in the Gulf of Mexico on the Outer Continental Shelf was not related to maritime commerce:

> To the extent that maritime activities surround the construction work underlying the complaint, any connection to maritime law is eclipsed by the construction's connection to the development of the Outer Continental Shelf.

> 448 F3d at 771.

In summary, plaintiffs have not asserted any admiralty/maritime claims against Eustis and Modjeski. First, the "location test" for jurisdiction over admiralty tort claims is not satisfied either because (1) no tort is alleged to have occurred on navigable waters, (2) there is no injury on navigable water and (3) the damages on land were not caused by a vessel or her appurtenances. Second, even if any of the southern most portion of the Drainage Canal is held to be navigable, and even if the location test is satisfied, there is no potential disruption of maritime commerce and no substantial relationship to traditional maritime activity.

**E.     Because there is no admiralty jurisdiction, discretionary Supplemental Jurisdiction allows the Court to hear state-law claims asserted against Eustis and Modjeski, but only state law, including peremption, applies as per this Court's December 8, 2006 Judgment.**

Without admiralty subject matter jurisdiction, the Court may exercise its supplemental jurisdiction to hear non-maritime state law claims against Eustis. However, the law is clear that if an Admiralty Court exercises supplemental jurisdiction over non-admiralty claims, the law governing the non-admiralty claims is *state law* – not federal maritime law[22]. Because state law applies to the claims against Eustis, the Louisiana law of peremption applies as well.

Plaintiffs seem to suggest that federal maritime law governs every claim asserted in its complaint, even the non-admiralty claims. Plaintiffs confuse the issue of whether to apply state law to an *admiralty*

---

[22]   *Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58 (5th Cir. 1994); *Smith v. Nutlof*, 198 F.Supp. 2d 492 (S.D. N.Y. 2002); *National Union Fire Ins. Co. of Pa. v. United States*, 436 F. Supp. 1078 (M.D. Tenn. 1977).

claim with the issue of applying state law to a **non-maritime** claim that could only appear in an admiralty case because of the court's supplemental jurisdiction.   Plaintiffs' suggestion is wrong and must be rejected by the Court.

This point is illustrated in *Ponce Federal Bank F.S.B. v. Vessel LADY ABBY*, 980 F.2d 56 (1st Cir. 1992).   There, a bank asserted a maritime claim to foreclose its mortgage on the ship, and sought a deficiency judgment under Puerto Rican law against the ship's possessor.   The possessor, who bought the ship from the borrower, objected to the bank recovering a deficiency judgment from him.   The First Circuit explained that the non-admiralty Puerto Rican law deficiency claims were sufficiently related to the admiralty foreclosure claim for the court to assert its pendent party jurisdiction over the state law claim.[23]   The First Circuit upheld the district court's judgment under state law.[24]

Plaintiffs incorrectly argue that federal maritime law must apply to everything.   *Grubart* undermines Plaintiffs' premise and shows that Louisiana law may apply to almost all issues in this case.

*Grubart* supports applying state law to non-maritime claims.   Plaintiffs herein are land-based, asserting claims for damage to their person or property.   These non-maritime land-based plaintiffs now seek to impose maritime law against all non-maritime defendants merely because they might have maritime claims against a few colorably maritime defendants.   That is the complete opposite situation from *Grubart*, where non-maritime plaintiffs sought to avoid federal maritime law invoked by a maritime defendant.   In *Grubart*, defendant Great Lakes Dredging defended the claims against it in part by commencing a limitation of liability proceeding in federal court.   The district court dismissed the proceeding for lack of admiralty subject matter jurisdiction, which the Seventh Circuit reversed.[25]   The Supreme Court affirmed the Seventh Circuit, and held that the district court had admiralty jurisdiction

---

[23]   *Id.* at 58.

[24]   *Id.* at 59.

[25]   3 F.3d 225.

over Great Lakes' limitation claim. The Supreme Court did not hold that federal admiralty law must apply to all aspects of the case. Rather, the Court stated the opposite:

> Contrary to what the City suggests . . . exercise of federal admiralty jurisdiction does not result in automatic displacement of state law.[26]

Contrary to plaintiffs' assertion, the *Grubart* Court made it clear that in some cases state law will apply in admiralty courts:

> Thus, the City's proposal to synchronize the jurisdictional inquiry with the test for determining the applicable substantive law would discard a fundamental feature of admiralty law, that federal admiralty courts sometimes do apply state law.[27]

Clearly, *Grubart* does not support plaintiffs' contention that simply because there might be a maritime defendant, maritime law must be applied to non-maritime defendants.

With the Supreme Court making it clear that admiralty jurisdiction does not preclude this Court from applying state law, the *Scarborough v. Clemco Industries*, 391 F.3d 660 (5th Cir. 2004) opinion cannot be read to overrule *Grubart*. In *Scarborough*, the surviving spouse and heirs of a deceased Jones Act seaman sought to recover non-pecuniary damages, contrary to the uniformity principle for seaman cases announced in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 29, 112 L.Ed.2d 275, 111 S. Ct. 317 (1990). The Fifth Circuit properly affirmed the district court's dismissal of the claim for non-pecuniary damages.[28] Contrary to Plaintiffs' unsupported assertion, a case denying a seaman's claim for non-pecuniary damages cannot require that federal admiralty law apply to non-maritime land-based claims against non-maritime defendants.

Noted maritime law scholar Professor David W. Robertson recently explained that it is settled law that state substantive law may apply to non-maritime defendants who happen to be in admiralty court through the Court's supplemental jurisdiction:

---

[26] *Grubart*; 513 U.S. 527, 545; 115 S.Ct. 1043, 1054; 130 L.Ed.2d 1024, 1042 (1995).

[27] *Grubart*, 513 U.S. 527, 545 at 546; 115 S.Ct. at 1054; 130 L.Ed.2d at 1042.

[28] *Id.*

cases against non-maritime tortfeasors – tortfeasors as to whom there is no independent basis for admiralty jurisdiction – cannot be regarded as themselves within the admiralty jurisdiction and _must_ therefore be decided on the basis of state substantive law.[29]

## IF THERE IS ADMIRALTY JURISDICTION, THERE SHOULD BE NO PREEMPTION OF STATE ENGINEERING PEREMPTION LAW

Even if the claims against Eustis or Modjeski were subject to admiralty jurisdiction, state law should still apply. Courts have long recognized that state law may supplement maritime law where maritime law is silent or where a local matter is at issue if it does not conflict with maritime law.[30] State law may be used to fill the gaps in the incomplete system of maritime law if it does not contravene any act of Congress, prejudice the characteristic features of maritime law, or disrupt the harmony it strives to bring to international or interstate relations.[31]

In *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), the Supreme Court noted that no federal admiralty law governed marine insurance policy terms and warranties, and the state insurance law should apply rather than trying to create a uniform law of marine insurance contracts, a matter better suited for Congress.[32]

Further, state law is not preempted when the law regulates behavior in which the state has an especially strong interest, sometimes referred to as a state's "police power."[33] The Fifth Circuit views the "maritime but local" idea as a corollary, where the state's interest is viewed as greater than any maritime concern.[34] While maritime law preempts state law whenever maritime commerce requires a uniform rule, uniformity cannot be viewed as an end within itself.[35] Uniformity is required "only where the essential

---

[29] David W. Robertson, *Admiralty Jurisdiction Over One Co-Tortfeasor Cannot Effectuate Admiralty Jurisdiction Over Another*, 37 J. Mar. L. & Com. 161, 162 (2006) (emphasis in original)

[30] *Coastal Iron Works, Inc. v. Petty Ray Gopyhscial*, 783 F.2d 577, 582 (5th Cir. 1986).

[31] *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 316-17 (5th Cir. 1987).

[32] *Chick Kam Choo*, 817 F.2d at 317.

[33] *Chick Kam Choo*, 817 F.2d at 317.

[34] *Chick Kam Choo*, 817 F.2d at 317.

features of an exclusive federal jurisdiction are required."[36]   Otherwise, maritime law would always

preempt state law.   Maritime law will preempt state law only when it impinges on international or

interstate relations.[37]  Noted maritime law treatises echo this view. [38]

As stated in 1 T. Schoenbaum, <u>Admiralty and Maritime Law</u> §4-2, at pgs. 161, 164 (4th Ed.

2004):

> "The issue of federalism in admiralty and the scope of application of state law in
> maritime cases is one of the most perplexing issues in the law."
>                               *   *   *   *
> "Thus, the actual scope of possible application of state law in admiralty is quite broad;
> there are several theories under which state decisional law or legislation may be applied
> in maritime cases:   (1) Borrowing, (2) Default, (3) Maritime but local, (4)
> Supplementation."

The "maritime but local" rule for application of state law is applied where (1) there is no

applicable admiralty rule, (2) "local and state interests" predominate, and (3) the national uniformity issue

is not crucial.  In <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 739 (1961), the U.S. Supreme Court stated:

> "The fact that maritime law is - in a special sense at least - federal law,
> and therefore supreme by virtue of Article VI of the U.S. Constitution,
> carries with it the implication that wherever a maritime interest is
> involved no matter how slight or marginal it must displace a local
> interest, no matter how pressing or significant.  But the process is surely
> rather one of accommodation, entirely familiar in many areas of
> overlapping state and federal concern or a process somewhat analogous
> to the normal conflict of laws situation where two sovereignties assert
> divergent interests in a transaction as to which both have some concern."

"Supplementation" by state law is deemed proper when state law does not contravene any

admiralty rule.[39]

---

[35]   *Chick Kam Choo*, 817 F.2d at 317.   ·

[36]   *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990).

[37]   *Chick Kam Choo*, 817 F.2d at 317.

[38]   Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §4-4 at 142-45 (2d ed. 1994); Grant Gilmore & Charles
L. Black, Jr., *The Law of Admiralty* § 6-61 at 463 (2d ed. 1975) (where there is state but no federal rule, weigh state
and federal interests and apply whichever predominates).  Schoenbaum observes (1) the application of state law in
admiralty is a default rule where there is no established federal admiralty rule and (2) the application of state law,
including decisional and statutory law, may be allowed where there is no applicable admiralty rule and where local
and state interests predominate and where the uniformity principle is not critical. (Schoenbaum, §4-2, p. 165.)

If the Court were to recognize admiralty jurisdiction over the "levee design claims", then the Court should use federal choice of law rules, governed by the Supreme Court's opinion in Lauritzen v. Larsen, 345 U.S. 571 (1964), to determine which (of competing legal regimes) to apply to particular issues. Here, the only state laws that can be applied are those of Louisiana.

It is common for admiralty courts to apply state law on some claims. In both *Harrison v. Glendel Drilling Company*, 679 F Supp 1413, 1420 - 1421 (W.D. La. 1988) and *Miller v. Griffin-Alexander Drilling Co.*, 685 F. Supp. 960, 964 (W.D. La. 1988), Judge Scott found that malpractice claims against land-based physicians allegedly connected to bodily injury claims within maritime tort jurisdiction have no connection to maritime commerce and that the standards regarding medical malpractice are nationally recognized as a matter of local and state concern, not a matter for "uniformity" or preemption under maritime law. Similarly, maritime law is not interested in usurping the traditional state control of malpractice claims against architects and engineers.

There is no need to create an admiralty rule governing peremption involving engineers' projects for improvement of drainage. Any claim is for negligence under state law in their capacity as engineers. The Court should reject plaintiffs' argument that federal maritime law displaces Louisiana law merely because some vessels might have been used by others in connection with dredging the canal to improve drainage.

There is no established uniform law of admiralty as regards peremption of claims against professional engineers. *Laches* may be the maritime equivalent to prescription or statutes of limitation. But peremption is entirely different as the right is extinguished before the tort arises. Plaintiffs' argument with reference to the doctrine of *laches* is entirely misplaced.

---

[39] In Ham Marine, Inc. v. Dresser Industries, 72 F.3d 454 (5th Cir. 1995) the Court applied Mississippi state law regarding a maritime contract in an action between a shipyard and a contractor.

Admittedly, maritime law *laches* is an entrenched principle and a state statute of limitations conflicting with a maritime statute or with the doctrine of *laches* will not be applied.[40] But *laches* governs the time that an individual has to file a suit after he is injured by a tort. Neither *laches* nor state statutes of limitation govern whether or not the individual has a viable cause of action against a particular defendant at the time of the occurrence.

There is no entrenched admiralty doctrine addressing the extinguishment of a right or cause of action against a particular defendant prior to the existence of an injury. Where there is no federal precedent, the court looks to state law. It is certainly in the interests of the State of Louisiana to regulate whether a cause of action exists against engineers decades after acceptance of a commercial project. The Drainage Canal is entirely within the State of Louisiana. It is not used for any interstate or international navigational or maritime purpose. There is no injury on navigable water. There is no commercial or recreational use of the Drainage Canal south of Hammond Highway. There is no need for an admiralty peremption rule to be fashioned.

For analogous purposes, in *American Dredging Co. v. Miller*, 510 U.S. 443, 114 S.C. 981 (1994), the United States Supreme Court considered the state law of *forum nonconveniens*, it held that the doctrine of *forum nonconveniens* is not a doctrine necessary to maintain the proper harmony of maritime law, and state law was not perempted. State law is allowed to supplement maritime law as long as it does not adversely affect core aspects of maritime law. The breaching of the levee is a local incident not requiring national uniformity. The state statute can be applied.[41]

In *Lam v. Global Medical Systems*, 127 W.N. App. 657, 111 P.3rd 1258 (Wa. App. 2005), which examined the question of whether a state law duty of care should be applied to radio advice by a shoreside physician to shipboard personnel for treatment of a seaman. The court determined there was no federal

---

[40] Nonetheless, in claims for property damage, under *laches*, the admiralty law initially references each state's statute of limitations from which it creates a presumption either that the suit was timely or untimely, thereby shifting the burden of proof either to the claimant or to the defendant. Many states have different statutes of limitations, such as Louisiana's one-year tort statute, Texas' two-year tort statute, and Mississippi's six-year tort statute. Therefore, even *laches* does not operate with uniformity.

[41] *Brockington v. Certified Electric*, 902 F.2d 1523 (11th Cir. 1990).

national rule regarding the standard of care related to medical malpractice and there was no need or desirability to establish such a rule.  Therefore, the law of the state which regulated physicians was applied.[42]

The Fifth Circuit in Exxon Corp. v. Chick Kam Choo, 817 F.2d 307, 317 (5th Cir. 1987) reiterated the Supreme Court's concern in Wilburn Boat, 348 U.S. at 317, 75 S. Ct. at 373, that "more uncertainty would result from the case-by-case creation from whole cloth of a federal maritime insurance law than from the application of a variety of already well-developed state laws."

In Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La. 1992) the Louisiana Supreme Court held that Louisiana state law of strict liability under La. C.C. Art. 2317 applied to a helicopter crash in which passengers were being transported from Louisiana to an offshore oil platform.  The crash occurred on the high seas and the Supreme Court recognized there was concurrent admiralty jurisdiction.  The Supreme Court held that application of the Louisiana Civil Code did not impermissibly conflict with maritime law.  All the parties were Louisiana citizens, a Louisiana company owned and operated the helicopter, and the flight took off from Louisiana and was to return to Louisiana from the offshore platform.  The Louisiana Supreme Court stated: "Thus state law may be applied where the state's interest in a matter is greater than the federal interest," 593 So.2d at 638.

Therefore, just as the state of Louisiana has an interest in regulating insurance, which will not be preempted by federal maritime law unless it contradicts an entrenched maritime insurance principle, Louisiana has the same interest in regulating the licensing and liability of design professionals in the state of Louisiana.  There is no federal maritime statute or judicially created maritime law rule which conflicts with the specific and narrow peremption statutes passed by the Louisiana legislature and interpreted by the Louisiana courts in regards to design professionals rendering land-based services in Louisiana.

---

[42]  Also, *Masherah v. Dettloff*, 968 F.Supp. 336 (E.D. Mich. 1997), a shore side pre-employment examination of a prospective seaman, which failed to diagnose a coronary disorder, did not constitute traditional maritime activity and state law applied.

**CONCLUSION**

This Honorable Court has previously held that the peremption statute applies and dismissed all claims against the Engineers in fourteen civil actions in its final judgment of December 8, 2006. Engineers' Joint Motion as to the remaining suits should be granted on each of several separate bases: *res judicata*, lack of the proximate cause, the absence of federal subject matter jurisdiction, and application of state law under this court's exercise of supplemental jurisdiction of the state law claims.

Respectfully submitted,

FOWLER RODRIGUEZ

/s/ Mat M. Gray, III
MAT M. GRAY, III (La. No. 6264)
ALANSON T. CHENAULT, IV (La. No. 20747)
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130
Telephone: (504) 523-2600
Telecopier: (504) 523-2705
**Attorneys for**
**Eustis Engineering Company, Inc.**

DEUTSCH, KERRIGAN & STILES, L.L.P.

/s/ Francis J. Barry, Jr.
FRANCIS J. BARRY, JR., T.A. (#02830)
FREDERICK R. BOTT (#3285)
KEITH J. BERGERON (#25574)
SCOTT J. HEDLUND (#30549)
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Telecopier: (504) 566-1201
**Attorneys for**
**Modjeski and Masters, Inc.**

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on May 29th, 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Francis J. Barry, Jr.
FRANCIS J. BARRY, JR., T.A. (#02830)
FREDERICK R. BOTT (#3285)
KEITH J. BERGERON (#25574)
SCOTT J. HEDLUND (#30549)
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Telecopier: (504) 566-1201
**Attorneys for**
**Modjeski and Masters, Inc.**

438246v1