**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO CERTIFY**

The United States has moved for an order certifying Record Document 2994 for

interlocutory appeal under 28 U.S.C. § 1292(b).  This document should be certified for an

immediate appeal so that the Court of Appeals has an opportunity to decide whether the Flood

Control Act of 1928, 33 U.S.C. § 702c, compels dismissal on the present record.  An

interlocutory ruling by the Court of Appeals will save time for this Court, and time and expense

for the litigants.  These are the goals of § 1292(b).

The present record provides a sufficient basis for assessing this Court's subject matter

jurisdiction.  The Order and Reasons frames a dispositive legal issue that can be resolved without

any need to resolve factual disputes.  First, on its face § 702c provides immunity for "any damage

from or by floods or flood waters." Plaintiffs have admitted in their Complaint that the relevant damage was caused by flood waters. Second, even if the words of the statute are given a narrower application and are "confined to those waters that a federal project is unable to control," *Central Green Co. v. United States,* 531 U.S. 425, 431 (2001); *United States v. James,* 478 U.S. 597, 605 (1986), then again there is no need for factual development. Plaintiffs do not dispute the existence of the Lake Pontchartrain Vicinity Hurricane Protection Project ("LPVHPP"), or the fact that these flood works—which were designed to protect greater New Orleans—did not contain the flood waters of Hurricane Katrina.

This Court's Order and Reasons, however, could be read to imply that these undisputed facts may *not* be sufficient to determine the applicability of Flood Control Act immunity here. By deferring a decision concerning the applicability of § 702c, the Court has preliminarily indicated that additional facts need to be shown in order for the Court to determine whether the Flood Control Act bars the plaintiffs' claims. Because the Court has permitted discovery that would only be relevant under a reading of the Act that is much narrower than that suggested by the text or by either Supreme Court or Fifth Circuit precedents, there is "substantial ground for difference of opinion" as to the scope of the immunity provided by the Act. 28 U.S.C. § 1292(b). And because dismissal of the Complaint would clearly be appropriate under the controlling legal standard proffered by the United States, interlocutory appeal will "materially advance the ultimate termination of the litigation." *Id.* The standards for certification under 28 U.S.C. § 1292(b) are amply satisfied.

In opposition, the plaintiffs do not come to grips with the requirements of the certification provision but instead try to distract the Court from them by attempting to manufacture a factual dispute concerning the levees along the Mississippi River-Gulf Outlet ("MR-GO")—questioning

whether they were "true" levees, whether they complied with certain criteria established by the Corps of Engineers, how they were related to the MR-GO, and even whether they were ever built. But if the immunity accorded by § 702c applies to flood waters that a flood control project failed to control, as the United States contends, then none of these supposed factual disputes is relevant. Rather, the undisputed fact that the plaintiffs' damages were caused by floods or flood waters that a federal flood control project was unable to control is sufficient to bring § 702c to bear and to render the United States immune. And because there is at least a substantial basis for believing that the Court of Appeals (or the Supreme Court) will ultimately adopt such a construction of § 702c, it is irrelevant for purposes of 28 U.S.C. § 1292(b) whether further factual development might be required under the plaintiffs' preferred reading of the statute.

In all events, even to the extent that the applicability of § 702c immunity here turned on a granular examination of whether there were flood control works specifically along MR-GO (as opposed to the acknowledged general existence of the LPVHPP), there is no factual dispute on that issue. "Factual assertions in pleadings are judicial admissions conclusively binding on the party that made them." *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983); *see also Morales v. Dep't of the Army,* 947 F.2d 766, 769 (5th Cir.1991); *Davis v. A.G. Edwards & Son, Inc.,* 823 F.2d 105, 108 (5th Cir.1987). Plaintiffs' Complaint expressly averred both the existence of LPVHPP levees and floodwalls along MR-GO and that it was these flood control structures that were breached during Hurricane Katrina thereby releasing the flood waters that allegedly caused plaintiffs' damages.

Plaintiffs are likewise wrong that certification would delay rather than expedite the litigation. They speculate that the Court of Appeals would improvidently grant leave to appeal and spend months studying the case before realizing its error and dismissing the appeal. There is

3

no basis for such speculation.  The Court of Appeals is capable of examining the record to ascertain whether an appeal at this time would "advance the ultimate termination of the litigation."  If the Court of Appeals determines that an appeal at this time would be premature, it will deny the application for leave to appeal and there will be no appeal.  Certification will allow the United States to make its application and will allow the Court of Appeals to consider whether an appeal at this time would be likely to hasten the ultimate termination of the litigation.

Certification affords an opportunity for the Court of Appeals to eliminate or clarify issues at an early stage.  It is particularly appropriate and useful when an authoritative decision could end the litigation.  To require the parties to go through enormously burdensome discovery and trial before a court lacking jurisdiction would be senseless if jurisdiction would be lacking under any set of facts that could be proved.  Given the Complaint's averments, it is quite possible that Flood Control Act immunity applies to this case under any set of facts that could be proved.  But without the benefit of guidance from the Court of Appeals, expensive and time-consuming discovery will proceed under the assumption that the details of the relationship between the MR-GO and the LPVHPP are relevant to the immunity issue.

In sum, an interlocutory appeal will, at the very least, minimize the burdens of litigation on the parties and the judicial system by accelerating or at least simplifying future proceedings. It could well result in termination of the litigation.  For these reasons, the United States' motion to certify satisfies 28 U.S.C. § 1292(b) and should be granted.

## ARGUMENT

**I. THE RECORD IS SUFFICIENT TO PERMIT A DETERMINATION OF THE CONTROLLING LEGAL QUESTION OF FLOOD CONTROL ACT IMMUNITY BY THE COURT OF APPEALS.**

The plaintiffs' primary argument in opposition to certification is that factual disputes prevent the "controlling legal question" from being ripe for appellate review—specifically the purported need for discovery to uncover additional facts about the purposes of the MR-GO and its "relationship" to the LPVHPP.  Plt. Opp. at 6-11.  This argument is misdirected; any facts that could be developed through discovery would not have any bearing on the issue presented by the motion to certify.  The question before the Court is whether there is "substantial ground for difference of opinion as to a controlling question of law."  28 U.S.C. § 1292(b).  The question is not whether additional facts would be required if the plaintiffs' asserted "fact-bound" construction of 33 U.S.C. § 702c is correct.  Nor is the question whether additional facts will be required under this Court's ultimate construction of § 702c.  The question under § 1292(b) is whether obtaining a definitive construction of § 702c through an immediate appeal would hasten the end the litigation.  As explained below in Part II, that standard is more than met here.  Indeed, under the interpretations proposed by the United States, no discovery whatsoever is necessary to determine the applicability of § 702c.

But the standard for interlocutory appeal is also met even to the extent that the existence of the MRGO levees *is* relevant to the immunity afforded by § 702c.  In all events, the plaintiffs' argument about factual disputes is foreclosed by their Complaint, which establishes sufficient undisputed facts for a determination of immunity under either the "plain language" construction of § 702c or the narrower view that the plaintiffs say was adopted by the Supreme Court in *James.*  In the Fifth Circuit, it is well established that "[f]actual assertions in pleadings are

judicial admissions conclusively binding on the party that made them." *White,* 720 F.2d at 1396; *see also Morales,* 947 F.2d at 769; *Davis,* 823 F.2d at 108.  Since facts admitted in pleadings "are no longer at issue," *Davis,* 823 F.2d at 108, the plaintiffs are foreclosed from now arguing, contrary to the facts alleged in their Complaint, that LPVHPP levees and floodwalls were not constructed.  And they are foreclosed from arguing that these structures were not breached during Katrina.  These facts are established by the Complaint and confirmed by numerous other documents put into the record by the plaintiffs themselves.

Paragraph 46 of the Complaint describes a modification of the MRGO project in August 1969 in which "a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection Project levees and the MR-GO" was to be protected.  "This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO."  Complaint ¶ 46.  This factual averment constitutes a judicial admission that LPVHPP levees had been constructed for a total distance of at least 24 miles along the MRGO—"six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO."  The Complaint subsequently avers that there were levees along both the MRGO and the IHNC.  Paragraph 73 avers that Katrina's storm surge "scoured" and "undermined the . . . levees along the MR-GO and the Industrial Canal."  Paragraph 9 admits that more than a score of "[s]torm induced" "[l]evee [b]reaches" occurred along the MRGO, the GIWW, and the IHNC.  The same admission appears in paragraph 102:  "floodwalls and/or levees along MRGO and Industrial Canal" were "breach[ed] and fail[ed]."  By virtue of these judicial admissions, the existence of flood control levees and floodwalls along the MRGO, the GIWW, and the IHNC and their failure to control the Hurricane Katrina floodwaters are conclusively established for purposes of assessing whether

the Court has subject matter jurisdiction.  For present purposes, these facts simply "are no longer at issue."  *Davis,* 823 F.2d at 108.

The Complaint's averments are corroborated by an array of evidence in the record—much of it adduced by the plaintiffs and therefore beyond dispute by them.  *See* Fed. R. Evid. 201(b). To begin with, they have adduced a "Statement of Concerns" that was authored by "scientists [who] have devoted a substantial amount of time—in some cases more than 30 years—to studying the flooding of Orleans and St. Bernard Parishes."  Plt. Opp. to U.S. Mo. to Suppl. Rec. (R.D. 2665) Exh. A ("Statement of Concerns") at 1.  These scientists flatly state that "[d]uring Katrina, four miles of levees exposed to open water along the MR-GO were destroyed and caused enormous destruction in St. Bernard Parish."  *Id.* at 13.  Add to this statement the Declaration of Dr. Paul Kemp, who averred under penalty of perjury that he "conducted research on the storm surge impacts of the funnel formed by the convergence of the levees that follow the south bank of the MR-GO and the north bank of the Gulf Intracoastal Waterway (GIWW)." Kemp Declaration (R.D. 1003-4) ¶¶ 1, 4. This declaration describes the breaching of the levees in these terms:  the "assault on the levees along MR-GO's Reach 2" by Katrina's storm surge began at or shortly before 5:00 a.m. on August 29, 2005; the waves then "attacked" "[t]he levees in the infamous 'Funnel,'" and eventually overtopped and breached "[t]he levees on both sides of the Industrial Canal."  *Id.* ¶ 31.  The maps of the LPVHPP adduced by the United States corroborate the facts established by the Complaint and by the plaintiffs' own submissions.  The maps were adduced merely to reveal the full extent of the flood control levees and floodwalls along the MRGO, the GIWW, and the IHNC.  *See* U.S. Mot. to Dismiss Exh. 11 (R.D. 822-18); MRGO 3D Report (R.D. 2288-4) at 6.

In addition to these documents in the record, the Court is entitled to take notice of the full contents of the "Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005" ("Preliminary Berkeley Report").[1]  This report describes the LPVHPP hurricane protection system in great detail and analyzes its performance during Hurricane Katrina.  As the report explains, the "perimeter levee and floodwall defense systems" that surrounded New Orleans East (as a single "protected [geographical] unit") and the Lower Ninth Ward and St. Bernard Parish (as another "protected unit") were "largely designed and constructed under the supervision of the U.S. Army Corps of Engineers in the wake of the catastrophic Hurricane Betsy of 1965, and the flooding that it produced."  Preliminary Berkeley Report at 1-3.  The report states that "[o]vertopping of the flood control levees and floodwalls was observed to have occurred on most sides of the New Orleans East polder."  *Id.* at 3-1.  The report includes a map of "the primary levee system surrounding the St. Bernard Parish and the Lower Ninth Ward polder. The primary levee system, which includes earthen, I-wall, T-wall, and sheet pile sections, was designed and constructed by U. S. Army Corps of Engineers (USACE)."

---

[1]The Court is "entitled to take notice of the full contents of" this report because the map that appears on page 5 of the Complaint was drawn from it.  *Bell Atlantic Corp. v. Twombly,* 510 U.S. — (2007), 2007 WL 1461066, at *13 n.13 (May 21, 2007).  The report was published on the internet and is available at http://www.ce.berkeley.edu/~new_orleans/report/PRELIM.pdf. The map (Figure 1.4) appears on page 1-10 of the report.  As the report explains:

"Figures 1.4 and 1.5 show the locations of most of the levee breaches and severely distressed (but not breached) levee sections covered by these studies. Levee breaches are shown with solid blue stars, and distressed sections as well as minor or partial breaches are indicated by red stars. The original base maps, and many of the stars, were graciously provided by the USACE (2005), and additional stars have been added to the map in Figure 1.4 as a result of the field studies reported herein. We understand that the yellow stars correspond to deliberate breaches utilized to facilitate draining the flooded areas after the storm.

Preliminary Berkeley Report at 1-2.

*Id.* at 4-1.  According to the report, "many portions of the primary levee system located along the western and northern edges of the polder sustained significant damage from the storm surge (Table 4.1).  Two of the most significant breaches occurred along the western edge of the polder bordering the IHNC in the Lower Ninth Ward. Widespread damage to the levee system along MRGO was so severe that the local levees now provide the only flood protection in this area." *Id.* at 4-1.

Despite the express averments of the Complaint and the detailed descriptions of the flood control structures in a source on which the plaintiffs rely in their Complaint and whose accuracy they cannot question, the plaintiffs oppose certification on the ground that "whether any LPVHPP-mandated flood control structures . . . were ever constructed by Defendants adjacent to the MR-GO . . . is a sharply disputed question of fact" that "can be decided only after a full development of, and a trial determining, the facts."  Plt. Opp. at 6-8.  This claim cannot be reconciled with the plaintiffs' Complaint, the other record documents, or the report that they incorporated by reference in their Complaint.  The claim represents nothing more than a desperate attempt to manufacture a factual dispute where none could possibly exist in order to stave off certification.[2]

---

[2]The plaintiffs imply that the United States did not produce evidence of levee construction because the evidence does not exist.  *See* Plt. Opp. at 11.  Yet, it appears that the plaintiffs *now have in their possession* documentary evidence of levee construction.  *See* Exh. 1 (Plaintiffs' Initial Disclosures) at 14 (describing their possession of  "[o]riginal plans, design memoranda and specifications for putative levees and other flood control structures along the MRGO, the Gulf Intracoastal Waterway and the IHNC," as well as documents that show "[t]he planning, authorization, construction, cost, maintenance, and operation of the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MRGO and IHNC" and documents that reveal "[t]he Lake Pontchartrain and Vicinity Hurricane Protection Plan and the construction of levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC").  In truth, they have had, or at least have had access to, the very

(continued...)

This panoply of admissions and evidence makes it plain that the construction of LPVHPP-mandated flood control structures prior to Katrina and their destruction by Katrina are not, and cannot be, "sharply disputed question[s] of fact." Plt. Opp. at 8. Indeed, although not material to the legal theories supporting certification, there is no dispute on this record even as to whether levees were built along the MRGO. Thus, even if the existence of levees along MRGO were material to either the application of the Flood Control Act or the determination of whether the Order and Reasons should be certified—and as explained above, this is not the case—the plaintiffs' judicial admissions show that there is no dispute of fact even on this issue.

## II. IN ITS PRESENT POSTURE, THIS CASE IS RIPE FOR AN INTERLOCUTORY APPEAL BECAUSE THE CRITERIA SET FORTH IN 28 U.S.C. § 1292(b) ARE PRESENT.

At the behest of federal judges, who recognized that a flexible mechanism was needed to avoid the "waste of precious judicial time while [a] case grinds through to a final judgment," Congress enacted 28 U.S.C. § 1292(b). *See Hadjipateras v. Pacifica, S.A.,* 290 F.2d 697, 703 (5th Cir. 1961). The statute allows judges to isolate and identify points of law that, if decided early in litigation, will conserve judicial resources and "advance the ultimate termination of the litigation." *See id.* As the legislative history reveals, the statute is to be applied "on the practical level," with a view to the "saving of time of the district court and of expense to the litigants." *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 755 (3d Cir. 1974). "Section 1292(b) was intended primarily as a means of expediting litigation by permitting appellate consideration during the early stages of litigation of legal questions which, if decided in favor of the appellant, would end

---

[2](...continued)
documentation that they claim ought to have been put into the record by the United States.

the lawsuit.  Examples of such questions are those relating to jurisdiction or a statute of limitations which the district court has decided in a manner which keeps the litigation alive but which, if answered differently on appeal, would terminate the case." *United States v. Woodbury,* 263 F.2d 784, 787 (9th Cir. 1959) (footnotes omitted).

"The determination of what orders are properly reviewable under § 1292(b) must be made by a practical application of those policies, not by a mechanical application of labels . . . ." *Katz,* 496 F.2d at 756.  "Practical considerations . . . show that the standard should be kept flexible." *Johnson v. Burken,* 930 F.2d 1202, 1206 (7th Cir. 1991).  Accordingly, the Fifth Circuit has adopted a "general approach" that takes advantage of the "considerable flexibility" afforded by the statute.  *Hadjipateras,* 290 F.2d at 703.  As the Court of Appeals explained many years ago:

> We do not believe it does any good to echo epithets uttered by others that § 1292(b) is to be sparingly applied.  Following very practical considerations, we have on a number of occasions allowed interlocutory appeals.  Pointing out that each application is to be looked at then in the light of the underlying purpose reflected in the statute, we have allowed full use of this effective device where there is "a controlling question of law" and "an immediate appeal" may "materially advance the ultimate termination of the litigation."

*Ex parte Tokio Marine & Fire Ins. Co.,* 322 F.2d 113, 115 (5th Cir. 1963) (internal citations and quotation marks omitted).

"Section 1292(b) is best used to inject an element of flexibility into the technical rules of appellate jurisdiction established for final judgment appeals under § 1291 and for interlocutory appeals under § 1292(a). The three factors should be viewed together as the statutory language equivalent of a direction to consider the probable gains and losses of immediate appeal."  16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3930.  The statute "is not read literally.  It could not be, because it is never one hundred percent certain in advance that the resolution of a particular question will determine the outcome or even the future course of the

litigation." *Johnson v. Burken,* 930 F.2d 1202, 1205-06 (7th Cir. 1991).  As a rule, then, a question is considered to be "controlling" "'even though its decision might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants.'" *Id.* (quoting 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3930, at pp. 159-60); *see also Hardy v. Federal Express Corp.,* 1998 WL 104686, at *2 (E.D. La. 1998) (Clement, J.).

    The plaintiffs misapprehend the law when they say that § 1292(b) is not to be used except in "the most extraordinary circumstances," Plt. Opp. at 5, and then only when an appeal will result in dismissal, *id.* at 20-21.  Similarly, their assertion that there is a nontextual "fourth qualification" for certifications under § 1292(b), which they dub "the 'exceptional case standard,'" is patently erroneous.  To say that appeals under § 1292(b) are "exceptional" is merely to acknowledge that the procedure is a departure from the ordinary rule that appeals of right follow the entry of a final judgment.  In Fifth Circuit parlance, a case is "exceptional" if "there is substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  *United States v. Garner,* 749 F.2d 281, 286 (5th Cir. 1985); *see also* 16 *Fed. Practice and Procedure* § 3929 ("even a casual survey of the hundreds of appeals decided under § 1292(b) suggests that it is often used in cases that" are not exceptional).  Accordingly, the Fifth Circuit routinely accepts cases under § 1292(b) without any explanation or justification beyond a mere recitation of the terms of the statute.  *See, e.g., Rico v. Flores,* 481 F.3d 234, 238 (5th Cir. 2007); *Halliburton Co. Benefits Comm. v. Graves,* 463 F.3d 360, 369 (5th Cir. 2006); *Belt v. EmCare, Inc.,* 444 F.3d 403, 407 n.6 (5th Cir. 2006); *City of Clarksdale v. BellSouth Telecom., Inc.,* 428 F.3d 206, 210 n.3 (5th Cir. 2005).

The plaintiffs also misstate the law when they say certification requires that the courts be divided over the controlling issue of law. In truth, a paucity of case law is more likely to leave substantial ground for difference of opinion. Indeed, there need not be any case law controversy in order for certification to be appropriate. Thus, in *Spector v. Norwegian Cruise Line Ltd.,* 356 F.3d 641 (5th Cir. 2004), *rev'd on other grounds,* 545 U.S. 119 (2005), the Court of Appeals accepted a certification under § 1292(b) to decide a question of first impression: whether Title III of the Americans with Disabilities Act applies to foreign-flagged cruise ships. The district court had answered the question affirmatively, and the only appellate decision on point had likewise found that Title III applies in certain respects to cruise ships. *See id.* at 648. The absence of any contrary case law did not keep the district court from certifying its order, nor did it keep the Fifth Circuit from accepting the certification. *See id.* at 644-47. Thus, even if the teachings of *James* and *Central Green* could somehow be ignored here, the absence of controlling precedent would not provide a basis for refusing to certify this matter.

### A. THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION CONCERNING THE CIRCUMSTANCES, IF ANY, UNDER WHICH THE UNITED STATES CAN BE LIABLE FOR "DAMAGE FROM OR BY FLOODS OR FLOOD WATERS."

By deferring a decision concerning the application of 33 U.S.C. § 702c to this case, the Court appears to have implicitly decided that there may be some circumstances in which the United States can be liable for damage caused by flood waters. But inasmuch as the plain language of the statute provides plenary immunity, it, at the very least, implies that there *are* no circumstances in which the United States can be held liable for damage caused by flood waters.[3]

---

[3]The statute does more than "imply" that immunity attaches in any and all circumstances.

(continued...)

It therefore defies reason to assert, as the plaintiffs do, that there is not sufficient ground for difference of opinion concerning this legal question.  To avoid grappling with the plain language of the statute, the plaintiffs characterize the legal question as a mere "difference of opinion between the parties over the interpretation of a statute," Plt. Opp. at 12, without acknowledging that the dispute goes to the heart of this Court's jurisdiction and the unambiguous text of the statute.  And to avoid acknowledging that an absence of any controlling case law that forecloses this plain language reading of the Flood Control Act—which by itself makes clear there is substantial room for difference of opinion on this critical issue—they cite briefs filed in other cases, as though positions staked out by parties in other cases could reduce the tension between the Court's ruling in this case and the plain language of the statute.  *See id.* at 15-17.

The plain language of the statute was expressly cited by the Supreme Court when, as a matter of first impression, the Court was called on to construe § 702c.  *See United States v. James,* 478 U.S. 598, 604-06 (1986).  The Court emphasized that the immunity afforded by the Flood Control Act applies to "'*any* damage from or by floods or flood waters at *any* place.'"  *Id.* at 604 (emphasis by Court).  The plain text of the statute led the Court to conclude that "*[o]n its face,* this language covers the accidents here.  Respondents' injuries occurred as a result of the release of waters from reservoirs that had reached flood stage."  *Id.* (emphasis added).  The legal analysis in *James* was not complicated:  "the injuries were caused by the turbulent current generated by unwarned releases of waters from a reservoir after the Army Corps of Engineers had

---

[3](...continued)

But for purposes of showing "substantial ground for difference of opinion," it suffices to say that the statute "implies" what it quite plainly states is the law of the land:  "*no liability of any kind* shall attach to or rest upon the United States *for any damage* from or by floods or flood waters *at any place.*"  33 U.S.C. § 702c (emphasis added).

determined that the waters were at 'flood stage.'  The fact that the injuries were caused by 'flood waters' was undisputed." *Central Green,* 531 U.S. at 429 (footnote omitted).  The legal analysis in *Central Green* was no less direct:  immunity turns *not* on whether "flood control is among the purposes served by the project . . . ." *Id.* at 434.  Such a reading of the statute would "unnecessarily dilute[] the language of the statute." *Id.*  Instead it is "the text of the statute" that determines  "the scope of the immunity conferred." *Id.*  Thus, even if it is true that "'the court of appeals has not applied § 702c without regard to whether a factual nexus exists between the injury in question and the government's flood control activities,'" Plt. Opp. at 17, the fact remains that neither the text of the statute nor the Supreme Court's analysis of it compels the conclusion that a flood control nexus should be read into the statute.  Indeed, if anything, the Supreme Court in *Central Green* foreclosed this notion when it  observed that the touchstone for Flood Control Act immunity is "the character of the waters that cause the relevant damage" and not the relationship between those waters and a "federal project or the purposes it serves."  531 U.S. at 434.  For these reasons, there is substantial ground for difference of opinion as to whether the United States can be held liable for the relevant damages here, which admittedly were caused by flood waters.

To oppose this "plain language" construction of § 702c, plaintiffs also point out that the Supreme Court has construed *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971) as "stand[ing] for the proposition that 33 U.S.C. § 702c 'conferred immunity only for floods or flood waters connected with a flood control project.'" Plt. Opp. at 20 (quoting *James,* 478 U.S. at 601 n.2).  This argument in no way undermines the motion for certification.  Foremost, to the extent that *Graci* must be read in this way, it is clearly in tension with *James* and *Central Green*, which have since held that the "text of the statute directs us to determine the scope of the immunity

conferred, not by the character of the federal project or the purposes it serves, but by the

character of the waters that cause the relevant damage." *Central Green*, 531 U.S. at 434.

Certification is thus appropriate to give the Fifth Circuit the opportunity to reconcile *Graci* with

*Central Green* and to confirm whether *Graci* should be read today as limiting the Flood Control

Act only to damages caused by "floods or flood waters connected with a flood control project."

Plt. Opp. at 20

Further, to the extent that the plaintiffs' characterization of the holding of *Graci* is

correct, they can only avoid dismissal by arguing that the statutory immunity is not conferred

because certain "connections" do not exist.  But neither of the Supreme Court's cases describes

any such limitation on the immunity conferred by § 702c, leaving substantial ground for

difference of opinion as to whether the plaintiffs' reading of the law is correct.  Nor does *Graci*

supply an answer here, as the case involved flooding that pre-dated the LPVHPP.  On the other

hand, if the plaintiffs' reading is incorrect, as we believe is the case, then the case must be

dismissed for lack of subject matter jurisdiction.[4]  Thus, even applying Plaintiffs' own test for

determining where certification is appropriate—whether there is a "dispositive question on FCA

---

[4]Notably, even if a federal flood project "connection" is required, the United States would
enjoy Flood Control Act immunity under any reasonable application of this standard.  For
example, there was a clear "connection" between the LPVHPP and the MR-GO in that the
LPVHPP was designed to protect Greater New Orleans from surrounding waters, including those
contained in the MRGO.  *Compare*  H.R. Rep. 89-973, at 77 (1965) (recommending
"construction of new or enlargement of existing levees along the south shore of Lake
Pontchartrain and the Intracoastal Waterway" and "construction of a new levee along the Gulf
Outlet Channel [i.e. MR-GO] . . . to prevent entry of lake surges into the developed areas") *and*
S. Rep. 89-464, at 121 (1965) (same) *with* Pub. L. No. 89-298, 79 Stat. 1073, 1077 (Oct. 27,
1965) (requiring that project proceed "substantially in accordance with the recommendations of
the Chief of Engineers in [H.R. Doc. 89-231]").  Alternatively, the Fifth Circuit might construe
the "connection" standard as being satisfied where the waters that caused the damage were
"waters that a federal project is unable to control." *Central Green*, 531 U.S. at 431; *James,* 478
U.S. at 605.  As explained above, the Complaint should be dismissed under this standard.

immunity" (*see* Plt. Opp. at 21)—an immediate appeal is necessary to clarify what, if any,

relationship must exist between the flood control project and the flood waters in order for § 702c

to apply.

Alternatively, the plaintiffs assert, and the Court's opinion implies, that the United States

can be held liable for damage "attributable to the MRGO," even though the damage is also to

some extent caused "by flood waters related to 'flood control.'"  *See id.* at 21-22; O&R at 7, 15-

16.  As explained in detail in the United States' initial brief, at 13-14, the proposition that

damages can be "segregated" in this fashion is contrary to the plain text of the statute. That

statute provides "no liability of any kind shall attach to or rest upon the United States for any

damage from or by floods or flood waters in any place."  The "segregation" required by the

statute is therefore whether damages stem from a "flood or flood water" (for which the United

States is immune) or other types of waters (for which the United States is not immune).  Under §

702c, therefore, once it is shown that the alleged damage is from "floods or flood waters," it

simply does not matter if other acts could be alleged to be a "proximate cause" of the damages,

for the United States cannot be held liable regardless of why the flood or flood waters caused the

damages.  Accordingly, as the United States explained in detail in its initial brief, at 14, in

resolving the claims at issue in *James* and *Central Green* the Supreme Court rejected arguments

that were predicated on the notion that one can avoid the terms of the Flood Control Act simply

by identifying another "cause" of the alleged damages beyond the flood waters.[5]

---

[5]The plaintiffs misconstrue the "concession" offered by counsel for the United States during oral argument.  Counsel "conceded" that Flood Control Act immunity does not apply to damage caused by waters that cannot properly be characterized as "floods or flood waters."  Plt. Opp. at 22.  Counsel for the United States acknowledged that the *Central Green* Court remanded because it was not clear whether the relevant damage was caused by flood waters or by irrigation waters.

(continued...)

Indeed, the plaintiffs' argument is fundamentally inconsistent with their reading of *Graci* and reinforces that certification is appropriate in these circumstances.  As noted, the plaintiffs now assert that under *Graci* the Flood Control Act confers immunity for floods or flood waters "connected" with a  flood control project.  But the plaintiffs' "segregation" argument would hold that the United States could be held liable for the alleged damage even where the damage was caused "by flood waters related to 'flood control.'"  Plt. Opp. at 21.  That the plaintiffs cannot even offer an internally consistent reading of the Flood Control Act shows that there is substantial ground for difference of opinion as to the scope of the United States' liability under this statute.

Finally, to avoid this conclusion, the plaintiffs retreat to their primary argument:  that "the existence of 'levees' constructed along the MRGO" is "a sharply disputed, factually intensive

---

[5](...continued)

Counsel also acknowledged that this could be termed a "segregation," dividing damage into two categories:  damage caused by flood waters, as to which the United States would be immune, and damage caused by non-flood waters, as to which the immunity afforded by the Flood Control Act would *not* apply.  *See* Transcript at 32-34.  The Supreme Court's holding that the scope of immunity is determined "by the character of the waters," 531 U.S. at 434, is directed at this very dichotomy.  Immunity protects against liability for damage caused by waters that have the character of flood waters; immunity does not protect against liability for damage caused by waters that do not have the character of flood waters.  The distinction was significant in *Central Green* because it was unclear what kind of waters caused the plaintiff's damage.  The distinction is not significant in this case because it is undisputed that the plaintiffs' alleged damage was caused by a flood.  And in any event, regardless of the proper construction of counsel's comments during oral argument, those comments cannot be construed in any way that impinges on the immunity afforded by 33 U.S.C. § 702c.  *See Irving v. United States,* 162 F.3d 154, 160-61 (1st Cir. 1998).  Plaintiffs are likewise wrong that the United States' arguments here are inconsistent with those made to the Supreme Court in *Central Green*.  Plt. Opp. at 17.  The quoted passage merely reports, correctly, that courts of appeals had typically required a "nexus" between a flood control project and the alleged damages.  As noted, the Supreme Court in *Central Green* held that Flood Control Act immunity should turn on the "character of the waters" causing the damage, not the "character o the federal flood project," and the United States' proposed reading of the Flood Control Act is based on the Supreme Court's reading of the statute in that decision.

issue" that is "inappropriate for interolocutory appellate review." *Id.* at 18.  As an initial matter,

even if there were a "sharp" factual dispute, that would still not be a ground for rejecting

certification given that the United States has advanced interpretations of the Flood Control Act,

supported by its plain text and Supreme Court precedents under which questions about the

existence of levees along the MR-GO are irrelevant to the application of immunity.  As

explained, for purposes of certification, it does not matter if there are some readings of the Flood

Control Act under which further factual development might be necessary.  Rather, certification is

appropriate here because the United States has advanced readings of the Flood Control Act that

are reasonably likely to be adopted by the Court of Appeals and that would result in dismissal of

the Complaint without further factual development.

But in all events, as demonstrated above in Part I, the existence of the LPVHPP levees

along the MR-GO (as well as the GIWW and the IHNC) is an indisputable fact, and thus the

legal position staked out by the plaintiffs is ripe for an immediate interlocutory appeal.  Even if

the United States only enjoys immunity in instances where flood waters overtopped or otherwise

passed through a federal flood control project, there is no dispute here that the relevant damage

was from flood waters that the LPVHPP was unable to contain.

In sum, the plaintiffs' Opposition itself reveals that the scope of the immunity afforded by

the Flood Control Act is a controlling legal question as to which there is substantial ground for

difference of opinion.  The Court's failure to dismiss the Complaint is contrary to the plain

language of the statute, the Supreme Court's decisions in *James* and *Central Green,* as well as

the very interpretation of *Graci* offered by the plaintiffs.  The Court's decision not only prolongs

the litigation by foreclosing an immediate dismissal, it also prolongs the litigation by requiring

the discovery of a plethora of facts that would be irrelevant under reasonable constructions of

that statute.  In its present posture, the case is ripe for a certification of the order denying the United States' motion to dismiss.

## B.   Certification Would Hasten, Not Delay, The End Of The Litigation.

Certification now, before considerable judicial and litigative resources are expended in the voluminous discovery necessitated by the Court's construction of § 702c, promises at a minimum to shorten discovery and the time required for trial.  Certification could result in the termination of the litigation upon the conclusion of the appeal.  These possibilities are so obvious that the plaintiffs can muster no cogent argument to the contrary.  All they can do is suggest that the appellate court might "improvidently grant" an appeal and then be unable to recognize its error until the conclusion of oral argument months later.  *See* Plt. Opp. at 24-25.   As this Court well knows, a certification under § 1292(b) does not set an appeal in motion. After certification, the United States would have to apply to the Court of Appeals for permission to appeal.  An appeal would be discretionary with the Court of Appeals.  The Court of Appeals could reject the United States' application to appeal, in which event there would be no appeal.  *See Patterson v. Dean Morris, L.L.P.,* 444 F.3d 365, 368 -369 (5th Cir. 2006).  The notion that the Court of Appeals would be unable to discern whether there are, as the plaintiffs insist, "many outstanding critical questions of fact," Plt. Opp. at 24, or whether, on the contrary, the law renders them moot is unfounded.

Finally, in tacit acknowledgment that discovery in this case will be extraordinarily expensive, burdensome, and time consuming, the plaintiffs do not attempt to show how it can be streamlined in any way other than through a narrowing of the issues on appeal.  Instead they argue, mistakenly, that considerations of time and expense are irrelevant to the pending motion.

On the contrary, however, § 1292(b) exists for the very purpose of avoiding the huge expense and extreme burden of discovery in a case like this one, which could quite possibly be dismissed upon interlocutory appeal.   As the Supreme Court recently noted, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly,* 20007 WL 141066, at *9  (quoting 5 Wright & Miller § 1216, at 233-234).

As the Court is aware, the plaintiffs have requested every document and all electronically stored information related to two mammoth federal projects that spanned most of the twentieth century and involved thousands of people and millions of documents.  The plaintiffs blithely suggest that the United States should present its concerns about discovery to the magistrate judge.  But as the Supreme Court has very recently pointed out, the magistrate judge will be unable to eliminate these burdens or even to minimize them to the full extent appropriate:  the magistrate judge does not know the details of the case as well as the parties, and "'the parties themselves may not know very well where they are going or what they expect to find.'"  *Id.* (quoting Frank H. Easterbrook, *Discovery as Abuse,* 69 B.U.L.Rev. 635, 638-639 (1989)).  And if the magistrate judge does not know the expected productivity of a given request, then he "'cannot measure the costs and benefits to the requester and so cannot isolate impositional requests.'"  *Id.* (quoting *Discovery as Abuse*).

The *Twombly* Court adverted to the enormous expense entailed in antitrust litigation as a reason why the courts should review carefully, at an early stage, prior to discovery, whether recovery would be possible under any set of facts that could be proved:  "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.*  The same reasoning applies

to this case.  The extraordinary expense of discovery militates against sending the parties into

discovery unless discovery is absolutely necessary.  Given the vast scope of this litigation, given

that the controlling question of law is one which, if decided in favor of the United States, will

end the lawsuit, and given that, even *after* this Court's certification, no appeal can be taken

unless the Court of Appeals grants its permission—the flexible mechanism embodied in

§ 1292(b) should be employed now, to allow an early evaluation as to whether in the given

situation a definitive resolution of the controlling question of law will end or hasten the end of

the litigation.

## CONCLUSION

For these reasons, the United States' motion to certify should be granted.

Respectfully submitted,

 PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2007, a true copy of Defendant United States' Reply

Memorandum in Support of its Motion to Certify was served on all counsel of record by ECF.


    <u>s/ Robin D. Smith</u>

Robin D. Smith