## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182

PERTAINS TO:          SECTION "K" MAG "2"
INSURANCE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT REGARDING COLLATERAL SOURCE

**May it Please the Court:**

The Insurance Plaintiffs' Subgroup Litigation Committee (the "Insurance PSLC"), as the representative of numerous Plaintiffs who have asserted Katrina-related claims against insurance companies (the "Insurers"), submits the following Memorandum in Support of its Motion for Partial Summary Judgment Regarding Collateral Source:

As stated by two separate courts:

The question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall that already exists.[1]

[I]f the question must be resolved on the basis of who gets a windfall, it seems more just that the insured who has paid a premium should get all he paid for rather than that the insurer should escape liability for that for which it has collected a premium.[2]

---

[1] *Gypsum Carrier, Inc. v. Handelsman*, 307 F. 2d 525, 534 (9th Cir. 1962).

[2] *Van Tassel v. Horace Mann Ins. Co.*, 207 N.W.2d 348, 352 (1973) (emphasis added).

The failure of the levee protection system during Hurricane Katrina, described as the greatest engineering failure in American history, created a unique scenario that entitles Plaintiffs to collect funds from the National Flood Insurance Program (the "NFIP") and the commercial and homeowners' insurance policies issued by the defendants insurance companies (the "Insurers").

In other hurricane cases, insurers have contended that, with respect to coverage owed for damage caused by levee and floodwall breaches, they are entitled to a reduction or offset equal to the amounts received by insureds under the NFIP. The Insurance PSLC believes that the Insurers will take the same position here. But such a position violates the "collateral source" rule, and/or the equitable principles involved in the proposed offset.

## OUTLINE OF ARGUMENT

- Under the collateral source rule, payments to a plaintiff from a "collateral source do not reduce the [plaintiff's] recovery against" the defendant.[3]

    - o Louisiana courts recognize that the main reason for the collateral source rule is that "the defendant should not gain an advantage from outside benefits provided to the plaintiff independently of any act of the defendant."[4]

    - o The Insurers will gain an unfair advantage if it can use benefits independently provided by the federal government, and for which Plaintiffs paid premiums, to

---

[3] *Suhor v. Lagasse*, 2000-1628 (La. App. 4 Cir. 9/13/2000), 770 So. 2d 422, 423.

[4] *Louisiana, DODT v. Kansas City S. R.R.*, 2002-2349 (La. 5/2/2003), 846 So. 2d 734, 739 (emphasis added).

reduce their coverage obligations to Plaintiffs.

- The application of the collateral source rule is <u>not</u> limited to tort suits.

  - As noted by the Louisiana Supreme Court, it is "mere happenstance that the collateral source rule has been applied chiefly in the context" of a conventional tort.[5]

  - Courts throughout the country have held that the collateral source rule applies to actions sounding in contract, as well as tort.[6]

  - The collateral source rule "has been applied in connection with breach of contract, when there is a tortious or negligence component to the breach, <u>or when the equitable balance is such that any windfall should not benefit the wrongdoer</u>."[7]

- There are two <u>independent sources</u> of coverage for Plaintiffs' levee-related damages.

  - One source is the policy each Plaintiff purchased from one of the Insurers.

    - If the Insurers receive the benefit of premium-secured emergency payments made under the NFIP, <u>there would effectively be a transfer of funds from the government to the Insurers</u>.

    - An insurer cannot reduce an insured's recovery merely because the insured received payments from a collateral source.

    - In *Protection Sprinkler Co. v. Lou Charno Studio*, a party's obligations, under a "hold harmless" agreement, to defend and indemnify plaintiff were not reduced by defense and indemnity payments made by plaintiff's liability insurer.[8]

    - In *Merchants Medical Insurance Group v. Orthopedic Professional*

---

[5]*Id.* at 741.

[6]*See Hall v. Miller*, 465 A.2d 222 (Vt. 1983); *Hartnett v. Riveron*, 361 So. 2d 749 (Fla. 3d DCA 1978); *In re Emergency Beacon Corp.*, 48 B.R. 341 (D.C.N.Y. 1985).

[7]*LaSalle Talman Bank v. U.S.*, 317 F.3d 1363, 1372 (Fed. Cir. 2003).

[8]888 S.W.2d 422, 424 (Mo. App. Ct. 1994).

> *Association,* an uninsured motorist insurer could not offset payments to insured injured in an employment-related accident by amounts received from a workers' compensation insurer.[9]

- o    The other source is the NFIP, a <u>subsidized</u> government program designed to "alleviate the economic hardships caused by unforeseen flood disasters."[10]

• Application of the collateral source rule notwithstanding, the Insurers still are not entitled to a collateral source <u>credit</u> in the form of an offset.

- o    Plaintiffs will receive <u>no windfall</u> if they are permitted to recover from multiple policies (each of which cost Plaintiffs a separate premium that was dutifully paid year after year).

- o    Regardless of whether plaintiffs receive a windfall, courts have prohibited insurers from using offset principles to obtain <u>defendant windfalls</u>.

In this tragedy, insurers that have agreed to pay for all covered losses should not enjoy a reduction of its obligations because the Plaintiffs had the foresight to purchase additional insurance that might cover the same type of losses. Thus, when the question is who will "receive the benefit of a windfall that already exists," the collateral source rule provides an answer—<u>the Insurers should not receive a windfall at the expense of plaintiffs' bargained-for benefits</u>.

## INTRODUCTION

### I.    The Ambiguous "Flood Exclusion."

Hurricane Katrina spawned thousands of claims in hundreds of lawsuits, many of which have been consolidated before this Court. In many, if not all, the Insurers raised the so-called

---

[9]480 A.2d 840, 844 (1984), *superseded by statute as stated in Rooney v. Fireman's Fund Ins. Co.*, 645 A.2d 52 (N.H. 1994)

[10]*Powers v. United States*, 996 F.2d 1121, 1126 (11th Cir. 1993).

"flood exclusion" as a defense to coverage.  The defective performance of the Southeast Louisiana Hurricane Protection System (the "System") during Hurricane Katrina has been called the greatest engineering failure in American history.  Plaintiffs have argued that the "flood exclusion" in the policies are ambiguous because they do not distinguish between a natural flood and a man-made flood.  In its November 27, 2006 opinion (the "Opinion"), this Court agreed and held that, as a matter of law, the "flood exclusion" ambiguous.[11]   The impact of the opinion is clear—to the extent it is determined that property damage resulted from the conduct of the United States Army Corps of Engineers in designing and maintaining (all or part of) the System, the "all-risk" policies issued to Plaintiffs by the Insurers will cover that damage.

## II.    The National Flood Insurance Program and Katrina.

In 1968, the United States Congress, having found that "flood disasters have created personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources," enacted the National Flood Insurance Act.[12]   The NFIP, which was created in that Act, is not a profit-making entity.[13] It is a subsidized government program, for which the insureds pay premiums, designed to "alleviate the economic hardships" caused by floods.[14]

---

[11]*See* Opinion at 58-59.

[12] 42 U.S.C. § 4001(a).

[13]*See Newton v. Capital Assurance Co.*, 245 F.3d 1306, 1310 (11th Cir. 2001).

[14]*Powers v. United States,* 996 F.2d 1121, 1126 (11th Cir. 1993); *see also Newton,* 245 F.3d at 1310.

The NFIP bases its premiums more on "political and statutory considerations" than "actuarial consideration[s]."[15]  When water burst through the System's levees and floodwalls and destroyed Plaintiffs' properties, Plaintiffs who had purchased insurance from the NFIP received money from the "public treasury," i.e., federal funds, pursuant to the NFIP policies for which they had paid.[16]  In the attached September 21, 2005, memorandum, an official at the Federal Emergency Management Administration ("FEMA"), which administers the NFIP, set forth expedited claims handling processes to address the "unprecedented" flood losses.[17]  Plainly, the federal government made a policy decision to quickly transfer as much as money as possible to as many people as possible who had signed up for the program and paid premiums.  The government made this decision to benefit the public, not the insurance industry.

## III.   **Insurers' Demand for Reduction or Offset.**

This Court has held that, under the extraordinary and terrible facts that led to the destruction of so much property, the levee-related damage Plaintiffs sustained may be covered under the standard insurance policy.  Since this Court issued its Opinion, the Insurers have searched for means to avoid or reduce their obligation to pay for covered losses.

---

[15] *Studio Frames Ltd v. Standard Fire Ins. Co.*, 397 F. Supp. 2d 685, 687 (M.D.N.C. 2005).

[16] *Gowland v. Aetna*, 143 F.3d 951, 955 (5th Cir. 1998).

6

In other Katrina cases, insurers have latched onto the theory that an insured's recovery of funds pursuant to the NFIP limits the amount of money that insureds can recover under their commercial and homeowners' policies. Under this theory, if the levee breach-related damage is a covered loss under the Policy, then insurers would receive a windfall by collecting premiums and then paying a fraction of what they owe.[18] This would thwart the intent of the federal government in streamlining the requirements for payment under the NFIP so that more people could receive more money in a shorter amount of time.

## ARGUMENT

### I. The Collateral Source Rule Applies to Prevent Offset by the Insurers.

#### A. General Collateral Source Principles

The collateral source rule is a common law concept that has become "well-established" in

---

[17]*See* September 21, 2005 memorandum from David I. Maurstad, attached as Exhibit "A."

[18]The Insurers also fail to explain why they should treat their insureds differently. An insured who was covered by the NFIP would have his recovery against the Insurers reduced while another insured who did not have NFIP coverage would recover full benefits from the Insurers. This arbitrarily treats similarly-situated insureds differently while creating a willy-nilly windfall for the Insurers based on circumstances not taken into account when they assessed risk or charged individual premiums. Consider also that the Insurers participating in the NFIP program were paid substantial federal monies to adjust flood claims. Thus, under the Insurers' scheme, they are entitled to a windfall from insureds whose premium dollars were spent paying the Insurers to adjust the flood claims that created the windfall.

Louisiana.[19]  Louisiana courts summarize the effect of the collateral source rule as follows:

> [A] tortfeasor generally is not entitled to a credit for a payments made to the
> plaintiff through collateral sources independent of the wrongdoer's procuration or
> contribution.  Generally, payments to a tort victim from a collateral source do not
> reduce the victim's recovery against the tortfeasor.  Thus, the collateral source
> rule applies to situations where the victim receives compensation for his damages
> from a source independent of the tortfeasor.[20]
> Among the several "public policy" reasons for the collateral source rule, the "reason most

often stated . . . is that the <u>defendant should not gain an advantage from outside benefits provided</u>

<u>to the plaintiff</u> independently of any act of the defendant."  Under this rule, payments received

from an independent source "<u>are not deducted</u> from the award the aggrieved party would

otherwise receive from the wrongdoer."[21]

## B.    The Collateral Source Rule Applies to Breach of Contract Claims.

The Louisiana Supreme Court has rejected the suggestion that the collateral source rule

narrowly applies to tort suits only.  In *Kansas City Southern*, the Louisiana Department of

Transportation ("DOTD") spent million of dollars to remove environmental pollution at a state

construction site.  The United States government, through the Federal Highway Administration

("FHWA"), reimbursed the DOTD 90 percent of the remediation costs.  The DOTD then sued

several defendants as the parties responsible for the clean-up costs pursuant to Louisiana

---

[19]*Louisiana, DODT v. Kansas City S. R.R.*, 2002-2349 (La. 5/2/2003), 846 So. 2d 734, 739 (hereinafter, "*Kansas City Southern*").

[20]*Suhor v. Lagasse*, 2000-1628, (La. App. 4 Cir. 9/13/2000); 770 So. 2d 422, 423.

[21]*Kansas City Southern* 846 So. 2d at 739 (emphasis added).

Environmental Quality Act ("LEQA").[22]

The defendants contended that the DOTD's recovery against them should be limited to the 10 percent of clean-up costs DOTD actually paid, i.e., the defendants claimed an offset for all amounts paid by the FHWA to avoid a so-called "double recovery."[23]  The district court agreed with the defendants and the Louisiana First Circuit Court of Appeals affirmed, finding that the collateral source rule did not apply because it was a "tort based concept."[24]

The Louisiana Supreme Court reversed the rulings of the lower courts.  The Court found that it was "**mere happenstance** that the collateral source rule has been applied chiefly in the context of a conventional [Article 2315] tort."[25]  Analyzing the law nationwide, the Court held that the collateral source rule had been applied in "a range of situations where the collateral source is provided to the plaintiff by a **government agency** or even a gratuitous source."[26]  Here, of course, the collateral source comes by way of insurance benefits Plaintiffs purchased when they paid premiums year after year.

Once the Louisiana Supreme Court ruled that the collateral source rule <u>could</u> apply to the

---

[22]*See id* at 736.

[23]*Id.* at 737.

[24]*Louisiana, DOTD v. Kansas City Southern R.R.*, 36,002 (La. App. 2 Cir. 8/8/2002), 827 So. 2d 443, 461.

[25]*Kansas City Southern*, 846 So. 2d at 741 (emphasis added).

[26]*Id.* at 740 (emphasis added).  The Louisiana Supreme Court observed that, considering the origin of the collateral source doctrine, decisions from other states on the collateral source rule were "persuasive." *Id.* at 742.

DOTD's claim against the defendants, it held that the rule should apply to prevent any offset of the  amounts paid to the DOTD by the FHWA.[27]  The Court reasoned that, even if its decision resulted in a "windfall" for the DOTD, it was preferable to "allowing the liability of the potential wrongdoer under the LEQA to be reduced by the 90 percent federal share."[28]  In other words, as between the victim and the wrongdoer, any windfall should go to the victim.  Accordingly, the Court held that any judgment against defendants "should not be reduced by the ninety percent of the federal share of the remediation funded by the FHWA."[29]

As support for its broad reading of the collateral source doctrine, the Louisiana Supreme Court favorably cited a Vermont case, *Hall v. Miller*, which held that the collateral source rule applies to tort and breach of contract claims.[30]  In *Hall*, plaintiffs purchased cows that were infected with disease.  For promptly destroying the cows, plaintiffs received money from "state and federal indemnification programs."[31]  Plaintiffs then sued the sellers of the cows for breach of warranty.  The sellers responded that plaintiffs' "recovery should be reduced by the amount" received under the indemnification programs.[32]  The sellers contended that the collateral source rule was inapplicable to claims sounding in contract.  The Supreme Court of Vermont disagreed:

---

[27]*Id.* at 744.

[28]*Id.* (emphasis added).

[29]*Id.* at 745.

[30]465 A.2d 222 (1983).

[31]*Id.* at 226.

we think the better rule is that the collateral source rule should apply to actions sounding in contract, as well as tort.  The breaching party in a contract action or, as here, a breach of warranty action, may not be a wrongdoer in the same sense as is a tortfeasor.   Nonetheless, <u>as between the two parties, it is better that the injured plaintiff recover twice than that the breaching defendant escape liability altogether.</u>[33]

In support of its holding, the *Hall* court cited *Roundhouse v. Owens-Illinois*, in which a purchaser of fish brought a breach of warranty suit against the seller for supplying a diseased product.[34]  Similar to *Hall*, the purchaser received $51,000 in compensation from the government for destroying the diseased fish and then sued the seller.[35]  At trial, plaintiff's recovery was reduced by $51,000.  The United States Sixth Circuit Court of Appeals reversed the district court ruling, concluding that, because the source of the compensation was "independent of (collateral to) the wrongdoer," the collateral source rule applied.[36]

Thus, in cases arising under Vermont (*Hall*) and Michigan (*Roundhouse*) law, courts applied the collateral source rule to breach of contract cases where the "independent" funds came from the government.  State and federal courts in Florida,[37] Kansas,[38] Missouri,[39] New York,[40]

---

[32]*Id.*

[33]*Id.* (emphasis added).

[34]604 F.2d 990 (6th Cir. 1979).

[35]*See id.* at 994.

[36]*Id.*

[37]*See Hartnett v. Riveron*, 361 So. 2d 749, 751 (Fla. 3d DCA 1978).

[38]*See Masterson v. Boliden-Allis, Inc.*, 865 P.2d 1031, 1035 (Kan. 1993).

and Rhode Island[41] have likewise held that the collateral source rule sounds in contract as well as tort.

### C.    The Collateral Source Rule Applies

The Insurance PSLC requests that this Court follow *Kansas City Southern* and declare that Plaintiffs' recovery against the Insurers will not be reduced by any payments made pursuant to the NFIP.

The Insurance PSLC has not located a Louisiana case directly addressing this issue. However, given the expansive view of the collateral source rule pronounced in *Kansas City Southern* and its favorable citation of *Hall*, the Louisiana Supreme Court almost certainly would follow *Hall* and apply the doctrine in breach of contract cases. Because the main reason for the collateral source rule is to prevent the wrongdoer from obtaining an "advantage from outside benefits" provided independently to plaintiff, as between the breaching party, i.e., the wrongdoer, and the injured plaintiff, the collateral source rule should protect Plaintiffs.

In *Protection Sprinkler,* Protection Sprinkler Company ("Protection Sprinkler") had initially been sued by Lou Charno Studio, Inc. ("Lou Charno") for damages related to a fire at a studio. The parties ultimately reached an agreement whereby Lou Charno agreed to release

---

[39]*See Protection Sprinkler Co. v. Lou Charno Studio*, 888 S.W.2d 422, 424 (Mo. App. Ct. 1994).

[40]*See In re Emergency Beacon Corp.*, 48 B.R. 341 (D.C.N.Y. 1985).

Protection Sprinkler and "hold it harmless from any other actions."[42]   Lou Charno sued other

parties, who then impleaded Protection Sprinkler as a third-party defendant.   After Lou Charno

failed to pay for attorneys' fees and expenses incurred by Protection Sprinkler in defending the

third-party action, Protection Sprinkler sued Lou Charno.[43]   The district court ruled in favor of

Protection Sprinkler.

On appeal, Lou Charno asserted that, because Protection Sprinkler's insurer paid for all

its fees and expenses in defending the third-party action, Protection Sprinkler was "no worse off

than had Lou Charno not breached the contract."[44]   As argued by Lou Charno, the "trial court's

judgment has put Protection Sprinkler in a better position."[45]   The court, relying on the collateral

source rule,  affirmed the district court's Judgment.   Reasoning that a wrongdoer is "not entitled

to a reduction in damages" because a plaintiff receives funds from a collateral source, the court

concluded that "damages assessed against Lou Charno Studio, the wrongdoer, should not be

offset."[46]

The Plaintiffs here contend that the Insurers breached their policies by, *inter alia*, failing

---

[41]*See Ins. Co. of N. Am. v. Kayser-Roth Corp.*, 1999 WL 813661, at \*43 (R.I. Super. Ct. July 29, 1999).

[42]*Protection Sprinkler*, 888 S.W.2d at 423.

[43]*See id.*

[44]*Id.* at 424.

[45]*Id.*

[46]*Id.* (emphasis added).

to pay for levee-related damages. As the breaching parties, the Insurers are, like Lou Charno Studio in *Protection Sprinkler*, the "wrongdoers." By applying the collateral source rule this Court will ensure that the "wrongdoer" will not benefit from Plaintiffs' receipt of funds from an independent source, the federal government, for which plaintiffs paid separate premiums.

There are three aspects to every collateral source issue: (1) the injured party, (2) the injurer, and (3) a source independent of the injurer who has paid the injured party.[47] If, under the application of the collateral source rule, the injurer pays what he owes without offsetting the amount paid by the independent source, then plaintiff may receive a "double recovery."[48] Forty-five years ago, the United States Ninth Circuit Court of Appeals explained why the collateral source rule does not overcompensate plaintiffs:

> [t]he question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall that already exists. <u>As between the injured person and the tortfeasor, the former's claim is the better</u>. This may permit a double recovery, but it does not impose a double burden. <u>The tortfeasor bears only a single burden for his wrong</u>.[49]

Allowing an insured to recover funds (for which the insured paid premiums) from two sources is preferable to allowing the Insurers to collect a premium and then decline to pay what is owed under the policy because a given insured happened also to have paid premiums to a

---

[47] *See* John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 *Cal. L. Rev.* 56 (Jan. 1983).

[48] As discussed below, the Plaintiffs will receive no "windfall" if this motion is granted.

[49] *Carrier v. Handelsman*, 307 F.2d 525, 535 (9th Cir. 1962).

separate insurer.

**III.    The Insurers Are Not Entitled to a Collateral Source Credit or Offset.**

Alternatively, if this Court finds that the collateral source rule is inapplicable, it does not

follow that the Insurers are thereby entitled to a credit or offset.   As noted by a court in

California:

> [a] court's decision not to grant a defendant collateral source credit does not rely
> on the same legal basis as the decision to apply the collateral source rule. [Even
> though] the collateral source rule has never [in California] been extended to
> breach of contract . . . not granting the [defendant] collateral source credit is well
> within the judge's discretion.   In California, there is no statutory or common law
> precedent in a breach of contract action to give defendants collateral source credit
> for income tax benefits which plaintiffs may have received.[50]

Similarly, Louisiana has no precedent allowing for the type of credit sought by the Insurers.  The

applicability of the collateral source rule notwithstanding, the Insurers are still not entitled to any

offset.

---

[50]*Depalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1539 (Cal. 2 Dist. Ct.
App. 1990).

15

**A.     Courts Have Prohibited Insurers From Using Offset Principles to Obtain a
Windfall.**

Insurers in other hurricane cases have warned that, unless they are permitted to offset amounts owed under the insurance policies, Plaintiffs will receive a "double recovery," i.e., a "windfall." Left unstated is that, if this Court accepts the insurers' arguments, they will have collected premiums from plaintiffs and then avoided the obligation to pay for covered losses.

In this zero sum scenario, some party will benefit from the unique fact that a catastrophic failure by the Army Corps of Engineers entitles plaintiffs to recover under the NFIP and the general homeowners' policies. The Minnesota Supreme Court aptly framed the question, and answer, as follows:

> if the question must be resolved on the basis of who gets a windfall, it seems more than just that the insured who has paid a premium should get all he paid for rather than that the insurer should escape liability for that for which it collected a premium.[51]

It is certainly more just that Plaintiffs, who suffered due to the fault of others, should be paid benefits pursuant to the policies for which they have paid premiums over the years.[52] Anything less would unfairly and unjustifiably result in a windfall to the Insurers.

In *Merchants Mutual*, an employee injured in an accident brought suit against his UM insurer when it relied on policy language to offset amounts owed under the UM policy with

---

[51] *Van Tassel,* 207 N.W.2d at 352 (emphasis added).

[52] *See id.; see also Stout v. AMCO Ins. Co.,* 645 N.W.2d 108, 114 (Minn. 2002) (prohibiting auto insurer from using payments made to plaintiff under state Medicaid system to reduce amounts owed to insured for medical benefits).

workers' compensation benefits received by the employee.[53]  Unlike in *Phelps*, where the court held that a UM insurer could offset workers' compensation benefits because the offset provision was "specifically delineated" in the policy, the court in *Merchants Mutual* held that such a provision was an "invalid restriction of the statutory scope of coverage."[54]

The court reasoned that, if it were to allow the insurer to reduce the amount owed under the policy with the workers' compensation benefits, it "would be creating a windfall for uninsured motorist carriers."[55]  As the court recognized, "this windfall will sometimes be at the expense of plaintiff [who] has paid for these collateral benefits in the form of insurance premiums or concessions in the wages he receives because of such fringe benefits."[56]

## B.  *Griffin* is Distinguishable and the Fear Over "Double Recovery" Is Misplaced.

### (1)  The *Griffin* Case

Insurers seeking to use government payments under the NFIP to reduce their own coverage obligations have focused on a Texas case—*State Farm Fire & Casualty Co. v. Griffin*.[57]  In *Griffin*, plaintiffs had purchased two policies from State Farm, a homeowners'

---

[53]480 A.2d 840, 841-42.

[54]*Id.* at 655.

[55]*Id.* at 656 (emphasis added).

[56]*Id.*  New Hampshire statutory law ultimately was amended to allow UM insurers to offset workers' compensation benefits. *See Rooney v. Fireman's Fund Ins. Co.*, 645 A.2d 52, 54 (N.H. 1994).

[57]888 S.W.2d 150 (Tex. App. Ct. 1994); *see* Allstate Memo. at 7-8.

17

policy that expressly excluded damage due to flood and a flood policy that expressly excluded damage due to fire.[58] Within the effective dates of the policies, plaintiffs sustained a flood loss and, nine months later, a fire loss. After the fire, the adjuster inspected the premises, estimated the amount to replace <u>all</u> the damaged property as $59,547.98, and then subtracted from that amount the value of property that had also been damaged in the flood.[59] State Farm paid the remainder to plaintiffs.

Plaintiffs filed suit, claiming that State Farm improperly deducted the value of flood-damaged property. The appellate court reversed a district court Judgment in plaintiffs' favor. The court stated that the lower court ruling would have "allowed [plaintiffs] to recover twice for a loss they incurred only once [*i.e.,* double recovery] and would have allowed [plaintiffs] to recover under the homeowners' policy for a flood loss, <u>which was a type of loss expressly excluded from coverage under the homeowners' policy</u>."[60]

There are two major differences between *Griffin* and the instant case. First, the policy in *Griffin* specifically excluded flood-related damage from coverage. Here, <u>the policies, as found by this Court, provide coverage for levee breach-related damage</u>. Unlike *Griffin*, permitting Plaintiffs full recovery will not result in a recovery of a "type of loss expressly excluded from

---

[58]*See id.* at 152.

[59]*See id.*

[60]*See id.* at 157 (emphasis added).

coverage under the homeowners' policy."[61]

Second, *Griffin* ignores the central question raised in this motion—who receives the benefit of a windfall that exists because the federal government paid for damage covered by the Policies?   The *Griffin* court expressed concern about plaintiffs' alleged double recovery, but never noted that, under its ruling, State Farm received a windfall in that it "escaped liability for that which it ha[d] collected a premium."[62]  This concern over "double recovery" is, furthermore, premised on the fear that a "moral hazard" is created if an insured is allowed a "recovery in excess of the actual loss."[63]  Obviously, because Plaintiffs have no control over a hurricane (or the hurricane protection system), no moral hazard arises from allowing them to recovery under the NFIP and the Policies; that is to say, an insured cannot create a hurricane or a defective levee in the way he might burn down his home or otherwise attempt to collect a classic "double recovery."  That component of the analysis simply does not apply in these unique circumstances--at least not where the insureds are concerned.

### (2)   Allowing Offsets for NFIP Payments Creates a "Moral Hazard" for Insurers.

It is another matter altogether for the insurers, who would labor under a perilous "moral hazard" should they have their way here.  Unique events like hurricanes combine (1) the somewhat concurrent causation of damage and (2) the influence of private insurers on flood

---

[61]*Griffin*, 888 S.W.2d at 157.

[62]*Van Tassel*, 207 N.W.2d at 352.

payments as WYO carriers.   The first factor provides homeowners' insurers with enough ambiguity to fraudulently attribute wind damage to a "flood," and the second factor gives them the means to do so.  Allowing offsets, then, will tempt homeowners' insurers to shift liability for hurricane claims from their own policies to government-backed flood policies.   Even worse, once a claim were made that an insurer had done so, it would seek to further minimize its private contractual liability by claiming an offset for the public monies paid due to its fraudulent characterization of wind damage as flood damage.   There is not only a  perverse incentive at play, but a vicious cycle of perverse incentives.   It is no wonder the Insurers have fought tooth and nail for this approach.

This moral hazard was convincingly demonstrated in a recent article in the Times Picayune, in which a reporter discovered that quotes Allstate Insurance Company gave for materials like sheetrock differed depending on whether the sheetrock was covered under the homeowners' policy or NFIP policy.[64]  In short, the Insurers clearly will be tempted to overstate the value of a NFIP claim and understate the value of a homeowners' claim.   Permitting the Insurers to reduce their coverage obligations by the amount of NFIP payments will only enhance this temptation.

---

[63] *DeCespedes v. Prudence Mutual Cas. Co. of Chicago, Ill.* 193 So. 2d 224, 226 (Fla. App. 1966).

###### (3)    There Is No Windfall for the Insured in Collateral Source Cases.

The Insurers' argument to offset NFIP payments rests entirely on the concept that insureds should not be allowed a "windfall," i.e., insureds should not be allowed to recover twice for the same loss. Louisiana courts recognize, though, that, particularly in the insurance context, the collateral source rule does not bestow a "windfall" on plaintiffs.

In *Bozeman v. State*, the Louisiana Supreme Court observed that the Louisiana Fourth Circuit Court of Appeal's opinion in *Bryant v. New Orleans Public Service, Inc.*[65] provides a "lucid discussion of the policy reasons supporting the collateral source rule."[66] In *Bryan*, the Fourth Circuit analyzed and refuted the suggestion that application of the collateral source rule results in a windfall for plaintiff.

The court in *Bryan* reasoned that there is no "windfall" or "double dip" in collateral source cases because the "injured party's patrimony was diminished to the extent that he was forced to recover against outside sources."[67] The court then applied its reasoning to the insurance context:

> in the case of insurance purchased by the plaintiff or by deductions made form the plaintiff's paycheck, the plaintiff has paid premiums which are a diminution of his patrimony as that cash would have otherwise been available to him. By going against his own insurance policy, he is diminishing the benefits of that policy

---

[64]*See* Rebecca Mowbray, *Same house. Same repairs. Same insurer.   Why different prices?*, Times Picayune, May 20, 2007.

[65]406 So. 2d 767 (La. App. 4 Cir. 1981).

[66]2003-1016 (La. 7/2/2004), 879 So. 2d 692, 699

[67]*Bryan*, 406 So. 2d at 768.

which would otherwise be available, he has suffered a diminution of the
patrimony by premium payments and his rates will rise providing a third area of
loss.[68]

To the extent, then, that Plaintiffs recover from the Insurers and the NFIP, Plaintiffs are
not receiving a "windfall." Plaintiffs have already diminished its patrimony by sending in the
premiums pursuant to the NFIP. The benefits to be derived from those premiums have also been
diminished.

It may be added that in certain cases—probably most—the insured will realize no cash
"windfall" by recovering under the NFIP and private insurance policies. Government-subsidized
NFIP flood benefits are capped at $250,000. Many insureds carried far less NFIP coverage;
none carried more. The cost of demolishing and rebuilding a 30 year-old home to current code
often vastly exceeds all available insurance, particularly where premiums are based upon
assessed property values and depreciated structures. The true, real-life "loss" to a Plaintiff
whose home was destroyed is not tied in any way to the amount of available insurance. It is a
function of rebuild costs—costs that skyrocket after a catastrophe like Katrina. While the
Insurers may seek to evoke images of greedy insureds socking away "windfall" or "double
recovery" insurance benefits, reality is far more stark.

C.    **Permitting an Offset Would Discourage Early Settlements.**

Permitting the Insurers to offset NFIP payments rewards insurers that delay payment of
valid claims. In *Insurance Company of North America v. Kayser-Roth Corp.*, the court faced an

---

[68]*Id.* (emphasis added).

22

insurer, which had refused to settle its claim, trying to offset the payments received by the insured from settling insurers.[69]  At trial, the district court noted that the insurer's "strategy was quite openly that of waiting out of the settlement process until it could better assess how much [the insured] might reap from other negotiations."[70]

The Rhode Island Supreme Court endorsed the trial court's view that permitting a setoff would encourage carriers "simply to wait each other out in the hope that the claim is paid from the settlements before their own insurance fund can be reached."[71]  Here, the federal government took vigorous steps to pay Katrina-related claims expeditiously.  The Insurers seek now to exploit that goodwill to reduce their own coverage obligations.  It would be patently unfair if the Insurers turned a public policy decision into a windfall for themselves.  And rewarding them for doing so would only exacerbate the problem. The Insurance PSLC submits, as such, that offset is inappropriate in these cases.

---

[69]770 A.2d 403 (R.I. 2001).

[70]*Id.* at 413.

[71]*Id.* (emphasis added).

## CONCLUSION

Plaintiffs paid premiums to the Insurers on the understanding that, when an unforeseen disaster struck, the Insurers would pay for covered losses.  As recognized by this Court, damage caused by breaches in the levee protection system constitutes a covered loss under the policies at issue.  The Insurers now seek to avoid their obligations for these losses by claiming that the amount owed under their policies should be reduced by amounts paid to Plaintiffs from the NFIP, a subsidized government program for which Plaintiffs paid separate premiums.  The Insurance PSLC submits that, in accordance with the well-established collateral source rule, the Insurers are not entitled to such a windfall at the expense of Plaintiffs' bargained-for benefits. Accordingly, the Insurance PSLC moves this Court for a Judgment that payments to plaintiffs under the NFIP do not entitle the Insurers to reduce or offset the amounts owed under the Policy.

**Respectfully Submitted:**

PLAINTIFFS' LIAISON COUNSEL

/s/ Joseph M. Bruno
Joseph M. Bruno (#3604)
THE LAW OFFICES OF JOSEPH M. BRUNO
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
jbruno@jbrunolaw.com
FOR THE INSURANCE PLAINTIFFS
SUBGROUP LITIGATION COMMITTEE

AND

Calvin C. Fayard, Jr. (La. Bar No. 5486)
FAYARD AND HONEYCUTT, APLC
519 Florida Avenue, SW
Denham Springs, LA 70726
Telephone: (225) 664-4193
Facsimile: (225) 664-6925
calvinfayard@fayardlaw.com
LIAISON COUNSEL – INSURANCE PSLC


AND

John N. Ellison, Esq.
ANDERSON, KILL & OLICK, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 568-4202
Facsimile: (215) 568-4375
jellison@andersonkill.com
*Admitted Pro Hac Vice*

AND

James M. Garner (La. Bar No. 19589)
SHER, GARNER, CAHILL, RICHTER, KLEIN,
& HILBERT
909 Poydras Street, Suite 2800
New Orleans, LA 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
jgarner@shergarner.com

AND

25

Joseph J. McKernan (La. Bar. No. 10027)
MCKERNAN LAW FIRM
8710 Jefferson Highway
Baton Rouge, LA 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202
jemckernan@mckernanlawfirm.com

AND

Drew A. Ranier (La. Bar No. 8320)
RANIER, GAYLE and ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218
drainer@rgelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 1st day of June, 2007 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

/s/ Joseph M. Bruno
JOSEPH M. BRUNO