H
Bell Atlantic Corp. v. Twombly
U.S.,2007.
BELL ATLANTIC CORPORATION et al., Petitioners,
v.
William TWOMBLY et al.
No. 05-1126.

Argued Nov. 27, 2006.
Decided May 21, 2007.

**Background:** Consumers brought putative class action against incumbent local exchange carriers (ILECs) alleging antitrust conspiracy, in violation of the Sherman Act, both to prevent competitive entry into local telephone and Internet service markets and to avoid competing with each other in their respective markets. The United States District Court for the Southern District of New York, Gerald Lynch, J., 313 F.Supp.2d 174, dismissed complaint for failure to state a claim upon which relief could be granted. The United States Court of Appeals for the Second Circuit, 425 F.3d 99, reversed. The Supreme Court granted certiorari.

**Holdings:** The Supreme Court, Justice Souter, held that:

(1) stating a claim under Sherman Act's restraint of trade provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made;

(2) an allegation of parallel business conduct and a bare assertion of conspiracy will not alone suffice to state a claim under the Sherman Act;

(3) dismissal for failure to state a claim upon which relief may be granted does not require appearance, beyond a doubt, that plaintiff can prove no set of facts in support of claim that would entitle him to relief, abrogating *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; and

(4) consumers' allegations of parallel conduct were insufficient to state a claim.

Judgment of the Court of Appeals reversed and remanded.

Justice Stevens filed a dissenting opinion in which Justice Ginsburg joined in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T 537**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
29Tk537 k. In General. Most Cited Cases

Because Sherman Act's restraint of trade provision does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[2] Antitrust and Trade Regulation 29T 975**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk973 Evidence
29Tk975 k. Admissibility. Most Cited Cases

While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting an offense under the Sherman Act's restraint of trade provision. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[3] Antitrust and Trade Regulation 29T 537**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
29Tk537 k. In General. Most Cited Cases

Conscious parallelism with respect to business behavior, a common reaction of firms in a concentrated market that recognize their shared

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

economic interests and their interdependence with respect to price and output decisions, is not in itself unlawful under Sherman Act's restraint of trade provision. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[4] Antitrust and Trade Regulation 29T 537**

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
29Tk537 k. In General. Most Cited Cases

An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct on part of defendants is not entitled to a directed verdict. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[5] Antitrust and Trade Regulation 29T 977(2)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk973 Evidence
29Tk977 Weight and Sufficiency
29Tk977(2) k. Restraints and Misconduct in General. Most Cited Cases

Proof of a conspiracy under Sherman Act's restraint of trade provision must include evidence tending to exclude the possibility of independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[6] Federal Civil Procedure 170A 2484**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2484 k. Antitrust and Price Discrimination Cases. Most Cited Cases

At the summary judgment stage, an offer of conspiracy evidence by a plaintiff alleging violation of Sherman Act's restraint of trade provision must tend to rule out the possibility that the defendants were acting independently. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[7] Federal Civil Procedure 170A 673**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(B) Complaint
170AVII(B)1 In General
170Ak673 k. Claim for Relief in General. Most Cited Cases

**Federal Civil Procedure 170A 1772**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)3 Pleading, Defects In, in General
170Ak1772 k. Insufficiency in General. Most Cited Cases

While a complaint attacked by a motion to dismiss for failure to state a claim upon which relief can be granted does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A 1772**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)3 Pleading, Defects In, in General
170Ak1772 k. Insufficiency in General. Most Cited Cases

**Federal Civil Procedure 170A 1835**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1835 k. Matters Deemed Admitted. Most Cited Cases

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A 673**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(B) Complaint
170AVII(B)1 In General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170Ak673 k. Claim for Relief in General. Most Cited Cases
While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant set out in detail the facts upon which he bases his claim, the general rule governing pleadings still requires a showing, rather than a blanket assertion, of entitlement to relief; without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[10] Antitrust and Trade Regulation 29T 972(4)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk972 Pleading
29Tk972(2) Complaint
29Tk972(4) k. Conspiracy or Combination. Most Cited Cases
Stating a claim under Sherman Act's restraint of trade provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made; asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage, but simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[11] Federal Civil Procedure 170A 1773**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)3 Pleading, Defects In, in General
170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases
A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

**[12] Antitrust and Trade Regulation 29T 972(4)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk972 Pleading
29Tk972(2) Complaint
29Tk972(4) k. Conspiracy or Combination. Most Cited Cases
An allegation of parallel business conduct and a bare assertion of conspiracy will not suffice to state a claim under Sherman Act's restraint of trade provision; without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[13] Antitrust and Trade Regulation 29T 972(4)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk972 Pleading
29Tk972(2) Complaint
29Tk972(4) k. Conspiracy or Combination. Most Cited Cases
When allegations of parallel conduct are set out in order to make a claim under the Sherman Act's restraint of trade provision, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[14] Federal Civil Procedure 170A 674**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(B) Complaint
170AVII(B)1 In General
170Ak674 k. Theory of Claim. Most Cited Cases

**Federal Civil Procedure 170A 1773**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)3 Pleading, Defects In, in General
170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases
Dismissal for failure to state a claim upon which relief may be granted does not require appearance,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

beyond a doubt, that plaintiff can prove no set of facts in support of claim that would entitle him to relief, although once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint; abrogating *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[15] Antitrust and Trade Regulation 29T 972(4)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk972 Pleading
29Tk972(2) Complaint
29Tk972(4) k. Conspiracy or Combination. Most Cited Cases

Consumers' allegations that, by virtue of parallel conduct, incumbent local exchange carriers (ILECs) entered into a contract, combination, or conspiracy to prevent competitive entry into their local telephone and Internet service markets, and agreed not to compete with one another, failed to state claim for violation of Sherman Act's restraint of trade provision, as claim essentially rested on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[16] Evidence 157 11**

157 Evidence
157I Judicial Notice
157k11 k. Historical Facts. Most Cited Cases

Where antitrust complaint quoted portion of statement of one defendant's chief executive officer (CEO) to suggest that defendants conspired together, district court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[17] Federal Civil Procedure 170A 31**

170A Federal Civil Procedure
170AI In General
170AI(B) Rules of Court in General
170AI(B)2 Rules of Civil Procedure
170Ak31 k. In General. Most Cited Cases

Broadening of a Federal Rule of Civil Procedure can only be accomplished by the process of amending the Federal Rules, and not by judicial interpretation.

**[18] Federal Civil Procedure 170A 633.1**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak633.1 k. In General. Most Cited Cases

On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than that required by general rule governing pleadings. Fed.Rules Civ.Proc.Rules 8, 9(b-c), 28 U.S.C.A.

**1958 Syllabus* FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The 1984 divestiture of the American Telephone & Telegraph Company's (AT & T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835. It also authorized them to enter the long-distance market. "Central to the [new] scheme [was each ILEC's] obligation ... to share its network with competitive local exchange carriers (CLECs)." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*Held:*

1. Stating a § 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 1963 - 1970.

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273. While a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." *Id.,* at 540-541, 74 S.Ct. 257. The inadequacy of showing parallel conduct or interdependence, without more, *1959 mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. Pp. 1963 - 1964.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a § 1 claim. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel conduct allegation gets the § 1 complaint close to stating a claim, but without further factual enhancement it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with " 'a largely groundless claim' " from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577. It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discovery abuse has been modest. Plaintiffs' main argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley's* statement construing Rule 8: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S.Ct. 99. The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, *1960 and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. Pp. 1964 - 1970.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 1970 - 1974.

425 F.3d 99, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV.

Stephen M. Shapiro, Kenneth S. Geller, Richard J. Favretto, Mayer, Brown, Rowe & Maw LLP, Washington, D.C., Laura J. Coleman, J. Henry Walker, Marc W.F. Galonsky, Ashley Watson, Atlanta, Georgia, for BellSouth Corporation.
Timothy Beyer, Brownstein Hyatt & Farber, P.C., Denver, Colorado, *1961 Cynthia P. Delaney, Denver, Colorado, Counsel for Qwest Communications International Inc.
Michael K. Kellogg, Mark C. Hansen, Aaron M. Panner, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Javier Aguilar, William M. Schur, San Antonio, Texas, for AT&T Inc. (formerly SBC Communications Inc.).
Richard G. Taranto, Farr & Taranto, Washington, D.C., Paul J. Larkin, Jr., David E. Wheeler, Robert J. Zastrow, Arlington, Virginia, Dan K. Webb, Charles B. Molster III, Winston & Strawn LLP, Chicago, Illinois, for Verizon Communications Inc. (successor-in-interest to Bell Atlantic Corporation).
Marc A. Topaz, Joseph H. Meltzer, Schiffrin & Barroway, LLP, Radnor, PA, J. Douglas Richards, Michael M. Buchman, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Respondents.For U.S. Supreme Court briefs, see:2006 WL 2474079 (Pet.Brief)2006 WL 3089915 (Resp.Brief)2006 WL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3265610 (Reply.Brief)

Justice SOUTER delivered the opinion of the Court. Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination ..., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT & T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs] to a host of duties intended to facilitate market entry." *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See 47 U.S.C. § 271.

"Central to the [new] scheme [was each ILEC's] obligation ... to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n. 1. A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,' " or (3) "interconnect[ing] its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra,* at 371, 119 S.Ct. 721 (quoting 47 U.S.C. § 251(c)). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra,* at 410, 124 S.Ct. 872, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) three times revised its *1962 regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Communications Co. v. FCC,* 450 F.3d 528, 533-534 (C.A.D.C.2006) (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services ... from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[FN1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

FN1. The 1984 divestiture of AT & T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint ¶ 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.,* ¶ 48, App. 26.

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth of upstart CLECs. Complaint ¶ 47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs' "compelling common

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motivatio[n]" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs ... from competing effectively ..., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.*, ¶ 50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.*, ¶¶ 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer (CEO) of the ILEC Qwest, that competing in the territory of another ILEC " 'might be a good way to turn a quick dollar but that doesn't make it right,' " *id.*, ¶ 42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information *1963 and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, ¶ 51, App. 27.FN2

> FN2. In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language: "Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act." *Id.*, ¶ 64, App. 30-31.

The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while '[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, ...] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.' " 313 F.Supp.2d 174, 179 (2003) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." 313 F.Supp.2d, at 179. The District Court found plaintiffs' allegations of parallel ILEC actions to discourage competition inadequate because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id.*, at 183. As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "alleg[e] facts ... suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy." *Id.*, at 188.

The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." 425 F.3d 99, 114 (2005) (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a plaintiff to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." Ibid.

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, 547 U.S. ----, 126 S.Ct. 2965, 165 L.Ed.2d 949 (2006), and now reverse.

*1964 II

A

[1][2][3] Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," Theatre Enterprises, 346 U.S., at 540, 74 S.Ct. 257. While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." Id., at 540-541, 74 S.Ct. 257. Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed.2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L.Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy").

[4][5][6] The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, e.g., AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp. 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see Theatre Enterprises, supra; proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B

[7][8][9] This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the *1965 "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[FN3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

see, *e.g.*, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

FN3. The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post*, at 1979 (opinion of STEVENS, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added), Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

[10][11][12][13] In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[FN4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit *1966 of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

FN4. Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.*, 6 Areeda & Hovenkamp ¶ 1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. S. L.Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation-for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint").FN5

FN5. The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

We alluded to the practical significance of the Rule 8 entitlement requirement in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), when we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with " 'a largely groundless claim' " be allowed to " 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Id.,* at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, " 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.,* 114 F.Supp. 643, 645 (D.Hawai 1953)); *see also* Dura, supra, *at 346, 125 S.Ct. 1627;* Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., *289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").*

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. *1967*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." See also *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (C.A.7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y. & U. L.Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post* at 1975, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.,* Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post,* at 1975; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support a § 1 claim. *Dura,* 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps, supra,* at 741, 95 S.Ct. 1917; alteration in *Dura* ).FN6

FN6. The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be " ' 'phased" ' " and "limited to the existence of the alleged conspiracy and class certification." *Post,* at ----24. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not-cannot-know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638-639 (1989).

*1968 [14] Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises, Monsanto,* and *Matsushita,* and their main argument against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing Rule 8. Justice Black's opinion for the Court in *Conley v. Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S.Ct. 99. This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see 425 F.3d, at 106, 114 (invoking *Conley's* "no set of facts" language in describing the standard for dismissal).FN7

FN7. The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp.,* 248 F.2d 319 (C.A.2 1957), that facts indicating parallel conduct alone suffice to state a claim under § 1. 425 F.3d, at 114 (citing *Nagler, supra,* at 325). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

On such a focused and literal reading of *Conley's* "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint *1969 does not set forth a single fact in a context that suggests an agreement. 425 F.3d, at 106, 114. It seems fair to say that this approach to pleading would dispense with any showing of a " 'reasonably founded hope' " that a plaintiff would be able to make a case, see *Dura,* 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps,* 421 U.S., at 741, 95 S.Ct. 1917); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g., Car Carriers,* 745 F.2d, at 1106 ("*Conley* has never been interpreted literally") and, "[i]n practice, a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1155 (C.A.9 1989) (tension between *Conley's* "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. DiGrazia,* 544 F.2d 543, 546, n. 3 (C.A.1 1976) ("[W]hen a plaintiff ... supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional ... action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39, 42-43 (C.A.6 1988) (quoting *O'Brien's* analysis); Hazard, From Whom No Secrets Are Hid, 76 Tex. L.Rev. 1665, 1685 (1998) (describing *Conley* as having "turned Rule 8 on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L.Rev. 433, 463-465 (1986) (noting tension between *Conley* and subsequent understandings of Rule 8).

We could go on, but there is no need to pile up further citations to show that *Conley's* "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan,* 40 F.3d, at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992; *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 249-250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.[FN8]

FN8. Because *Conley's* " 'no set of facts' " language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. *Post,* at 1978. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley.* See *Dura,* 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)) (requiring " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support the claim (alteration in *Dura* )); *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("It is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not ... proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); Wilson v. Schnettler, 365 U.S. 381, 383, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961) ("In the absence of ... an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed ... a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see *post*, at 1979, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley's* "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "[p]etitioners and their amici" as mounting an "attack on *Conley's* 'no set of facts' standard").

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to *Conley's* "no set of facts" language. See *post*, at 1979 - 1981. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, *e.g.*, *Leimer v. State Mut. Life Assur. Co.*, 108 F.2d 302, 305 (C.A.8 1940) (" '[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs ... could, upon a trial, establish a case which would entitle them to ... relief, the motion to dismiss should not have been granted' "); *Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (C.A.3 1942) ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

*1970 III

[15] When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra*, at 1962 - 1963. Although in form a few stray statements speak directly of agreement,[FN9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their ... markets and have agreed not to compete with one another." Complaint ¶ 51, App. 27.[FN10] The nub of the *1971 complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[FN11]

FN9. See Complaint ¶ ¶ 51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

FN10. If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present," *id.*, ¶ 64, App. 30), the pleadings mentioned no specific time, place, or person

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post*, at 1977. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

FN11. The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See 313 F.Supp.2d 174, 182 (S.D.N.Y.2003); 425 F.3d 99, 102-104 (C.A. 2005).

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, see *id.*, ¶ 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.*, ¶ 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." 313 F.Supp.2d, at 184; cf. *Kramer v. Pollock-Krasner Foundation*, 890 F.Supp. 250, 256 (S.D.N.Y.1995) (while the plaintiff "may believe the defendants conspired ..., the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy").[FN12]

FN12. From the allegation that the ILECs belong to various trade associations, see Complaint ¶ 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post*, at 1985 - 1986, 1987 - 1988. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

*1972 Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was supposedly passed in the " 'hop[e] that the large incumbent local monopoly companies ... might attack their neighbors' service areas, as they are the best situated to do so.' " Complaint ¶ 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb.2000)). Contrary to hope, the ILECs declined " 'to enter each other's service territories in any significant way,' " Complaint ¶ 38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.*, ¶ 40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 477-478, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

[16][17][18] In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint ¶ 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[FN13] and *1973 the complaint is replete with indications that any CLEC faced nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.*, ¶ 47; App. 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp ¶ 307d, at 155 (Supp.2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim.[FN14]

FN13. The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it " 'might be a good way to turn a quick dollar.' " ¶ 42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See Fed. Rule Evid. 201.
Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just ... nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p. 1 (cited at Complaint ¶ 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint ¶ 45, App. 23).

FN14. In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished " 'by the process of amending the Federal Rules, and not by judicial interpretation.' " *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Fed. Rules Civ. Proc. 9(b)-(c). Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized]", *ibid.*;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792[, 93 S.Ct. 1817, 36 L.Ed.2d 668] (1973)." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra*, at 512, 122 S.Ct. 992, "transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid Rule 12(b)(6) pleading standard ... would be unwise," Brief for Respondents 39. As the District Court correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized ... that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 313 F.Supp.2d, at 181 (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz*, 534 U.S., at 514, 122 S.Ct. 992. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond *1974 those necessary to state his claim and the grounds showing entitlement to relief. *Id.*, at 508, 122 S.Ct. 992.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

* * *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, with whom Justice GINSBURG joins except as to Part IV, dissenting.

In the first paragraph of its 24-page opinion the Court states that the question to be decided is whether allegations that "major telecommunications providers engaged in certain parallel conduct unfavorable to competition" suffice to state a violation of § 1 of the Sherman Act. *Ante*, at 1961. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), would adequately resolve this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id.*, at 540-542, 74 S.Ct. 257.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. Plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not "plausible" provide a legally acceptable reason for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have refused to permit nonincumbent competitors to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

access their networks. The complaint quotes Richard Notebaert, the former CEO of one such ILEC, as saying that competing in a neighboring ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right." *Id.*, ¶ 42, App. 22. Moreover, respondents allege that petitioners "communicate amongst themselves" through numerous industry associations. *Id.*, ¶ 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* violation of the Sherman Act. See Report*1975 of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises*, a judge ruling on a defendant's motion to dismiss a complaint, "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); see *Overstreet v. North Shore Corp.*, 318 U.S. 125, 127, 63 S.Ct. 494, 87 L.Ed. 656 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery-and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement-the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *ante*, at 1971; that "there was just no need for joint encouragement to resist the 1996 Act," *ante*, at 1971; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante*, at 1972.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante*, at 1970; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of Federal Rule of Civil Procedure 12(b)(6) that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

## I

Rule 8(a)(2) of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule did not come about by happenstance and its language is not inadvertent. The English experience with Byzantine special pleading rules-illustrated by the hypertechnical Hilary rules of 1834 [FN1]-made obvious*1976 the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N.Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

FN1. See 9 W. Holdsworth, History of English Law 324-327 (1926).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

"it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L.Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L.Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law' "). Rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, p. 207 (3d ed.2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' ...").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992 ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules,[FN2] put it thus:

FN2. *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 283, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

"Experience has shown ... that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The *1977 New Federal Rules of Civil Procedure: The Last Phase-Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A.J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C.App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief-namely, the defendant's negligent driving-would have been called a " 'conclusion of law' " under the code pleading of old. See, *e.g.,* Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to the task of general notice-giving and invest[s] the deposition-discovery process with a vital role in the preparation for trial."[FN3] *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see also *Swierkiewicz,* 534 U.S., at 513, n. 4, 122 S.Ct. 992 (citing Form 9 as an example of " 'the simplicity and brevity of statement which the rules contemplate' "); *Thomson v. Washington,* 362 F.3d 969, 970 (C.A.7 2004) (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

FN3. The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," Fed. Rule Civ. Proc. 9(b), neither of which has been alleged in this case. We have recognized that the canon of *expresio unius est exclusio alterius* applies to Rule 9(b). See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

## II

It is in the context of this history that *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), must be understood. The *Conley* plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of Rule 8. *Id.*, at 47-48, 78 S.Ct. 99. In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*, at 45-46, 78 S.Ct. 99.

Consistent with the design of the Federal Rules, *Conley's* "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley's* "no set of facts" language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante*, at 1969, the Court dismisses it as careless composition.

*1978 If *Conley's* "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years," *ibid.*, has been cited as authority in a dozen opinions of this Court and four separate writings.[FN4] In not one of those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.[FN5]

FN4. *SEC v. Zandford*, 535 U.S. 813, 818, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Brower v. County of Inyo*, 489 U.S. 593, 598, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) *(per curiam)*; *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) *(per curiam)*; *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) *(per curiam)*; *Jenkins v. McKeithen*, 395 U.S. 411, 422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 554, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin*, 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (STEVENS, J., dissenting); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 561, n. 1, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 55, n. 6, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (Brennan, J., concurring in judgment).

FN5. See, *e.g.*, *EB Invs., LLC v. Atlantis Development, Inc.*, 930 So.2d 502, 507 (Ala.2005); *Department of Health & Social Servs. v. Native Village of Curyung*, 151 P.3d 388, 396 (Alaska 2006); *Newman v. Maricopa Cty.*, 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App.1991); *Public Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 385-386 (Colo.2001) (en banc); *Clawson v. St. Louis Post-Dispatch, LLC*, 906 A.2d 308, 312 (D.C.2006); *Hillman Constr. Corp. v. Wainer*, 636 So.2d 576, 578 (Fla.App.1994); *Kaplan v. Kaplan*, 266 Ga. 612, 613, 469 S.E.2d 198, 199 (1996); *Wright v. Home Depot U.S.A.*, 111 Hawai'i 401, 406, 142 P.3d 265, 270 (2006); *Taylor v. Maile*, 142 Idaho 253, 257, 127 P.3d 156, 160 (2005); *Fink v. Bryant*, 2001-CC-0987, p. 4 (La.11/28/01), 801 So.2d 346, 349; *Gagne*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

v. Cianbro Corp., 431 A.2d 1313, 1318-1319 (Me.1981); Gasior v. Massachusetts Gen. Hospital, 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); Ralph Walker, Inc. v. Gallagher, 926 So.2d 890, 893 (Miss.2006); Jones v. Montana Univ. System, 337 Mont. 1, 7, 155 P.3d 1247, 1254 (2007); Johnston v. Nebraska Dept. of Correctional Servs., 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); Blackjack Bonding v. Las Vegas Munic. Ct., 116 Nev. 1213, 1217, 14 P.3d 1275, 1278 (2000); Shepard v. Ocwen Fed. Bank, 361 N.C. 137, 139, 638 S.E.2d 197, 199 (2006); Rose v. United Equitable Ins. Co., 2001 ND 154, ¶ 10, 632 N.W.2d 429, 434; State ex rel. Turner v. Houk, 112 Ohio St.3d 561, 562, 2007-Ohio-814, ¶ 5, 862 N.E.2d 104, 105 (per curiam); Moneypenney v. Dawson, 2006 OK 53, ¶ 2, 141 P.3d 549, 551; Gagnon v. State, 570 A.2d 656, 659 (R.I.1990); Osloond v. Farrier, 2003 SD 28, ¶ 4, 659 N.W.2d 20, 22 (per curiam); Smith v. Lincoln Brass Works, Inc., 712 S.W.2d 470, 471 (Tenn.1986); Association of Haystack Property Owners v. Sprague, 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); In re Coday, 156 Wash.2d 485, 497, 130 P.3d 809, 815 (2006) (en banc); Haines v. Hampshire Cty. Comm'n, 216 W.Va. 499, 502, 607 S.E.2d 828, 831 (2004); Warren v. Hart, 747 P.2d 511, 512 (Wyo.1987); see also Malpiede v. Townson, 780 A.2d 1075, 1082-1083 (Del.2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); Canel v. Topinka, 212 Ill.2d 311, 318, 288 Ill.Dec. 623, 818 N.E.2d 311, 317 (2004) (replacing "appears beyond doubt" in the Conley formulation with "is clearly apparent"); In re Young, 522 N.E.2d 386, 388 (Ind.1988) (per curiam) (replacing "appears beyond doubt" with "appears to a certainty"); Barkema v. Williams Pipeline Co., 666 N.W.2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); Pioneer Village v. Bullitt Cty., 104 S.W.3d 757, 759 (Ky.2003) (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004) (per curiam) (holding that a motion for judgment on the pleadings should be granted only " 'if no factual development could possibly justify recovery' "); Oberkramer v. Ellisville, 706 S.W.2d 440, 441 (Mo.1986) (en banc) (omitting the words "beyond doubt" from the Conley formulation); Colman v. Utah State Land Bd., 795 P.2d 622, 624 (Utah 1990) (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); NRC Management Servs. Corp. v. First Va. Bank-Southwest, 63 Va. Cir. 68, 70, 2003 WL 23540085 (2003) ( "The Virginia standard is identical [to the Conley formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

*1979 Petitioners have not requested that the Conley formulation be retired, nor have any of the six *amici* who filed briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process-a rulemaking process-for revisions of that order. See 28 U.S.C. § § 2072-2074 (2000 ed. and Supp. IV).

Today's majority calls Conley's " 'no set of facts' " language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Ante*, at 1969. This is not and cannot be what the Conley Court meant. First, as I have explained, and as the Conley Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts. FN6 The "pleading standard" label the majority gives to what it reads into the Conley opinion-a statement of the permissible factual support for an adequately pleaded complaint-would not, therefore, have impressed the Conley Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the Conley Court had neither need nor want to explicate. Second, it is pellucidly clear that the Conley Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court said without qualification that it was "appraising the *sufficiency* of the complaint." *1980355 U.S., at 45, 78 S.Ct. 99 (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante,* at 1969.

> FN6. The majority is correct to say that what the Federal Rules require is a " 'showing' " of entitlement to relief. *Ante,* at 1965, n. 3. Whether and to what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra,* at 1974. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

We can be triply sure as to *Conley's* meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S.Ct. 99. In the first case, *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass.,* 108 F.2d 302 (C.A.8 1940), the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, " 'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.' " *Id.,* at 305 (quoting *Winget v. Rockwood,* 69 F.2d 326, 329 (C.A.8 1934)).

The *Leimer* court viewed the Federal Rules-specifically Rules 8(a)(2), 12(b)(6), 12(e) (motion for a more definite statement), and 56 (motion for summary judgment)-as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." 108 F.2d, at 306. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer's* admonition in *Continental Collieries, Inc. v. Shober,* 130 F.2d 631 (1942), which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state law. The Court of Appeals reversed, concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer:* "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." 130 F.3d, at 635.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning,* 139 F.2d 774 (C.A.2 1944), the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it-and indeed for an amount equal to the plaintiff's own bid-and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant

"could have disclosed the facts from his point of view, in advance of a trial if he *1981 chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so firmly believes and what for present

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purposes defendant must be taken as admitting." *Id.*, at 775.

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise Rule 8 to require a plaintiff to plead a " 'cause of action.' " See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.*; *Dioguardi* was explicitly approved in *Conley*; and "[i]n retrospect the case itself seems to be a routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer*, *Continental Collieries*, and *Dioguardi*, *Conley's* statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante*, at 1969. It reflects a philosophy that, unlike in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley's* language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*. For example, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized that

"[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.*, at 236, 94 S.Ct. 1683 (emphasis added).

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes*, 471 F.2d 430, 433 (C.A.6 1972). We reversed the Court of Appeals on the ground that "[w]hatever the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the Eleventh Amendment because they were styled as suits against the defendants in their individual capacities. 416 U.S., at 238, 94 S.Ct. 1683.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 954 F.2d 1054, 1057 (1992) (internal quotation marks omitted), by requiring a plaintiff to "state with factual detail and *1982 particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Leatherman*, 507 U.S., at 167, 113 S.Ct. 1160 (internal quotation marks omitted). We found this language inconsistent with Rules 8(a)(2) and 9(b) and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to Rule 9(b) ], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.*, at 168-169, 113 S.Ct. 1160.

Most recently, in *Swierkiewicz*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, *e.g.*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz,* 534 U.S., at 511, 122 S.Ct. 992. We also observed that Rule 8(a)(2) does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.,* at 512, 122 S.Ct. 992; see Brief for United States et al. as *Amici Curiae* in *Swierkiewicz v. Sorema N. A.,* O.T.2001, No. 00-1853, p. 10 (stating that a Rule 12(b)(6) motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)).FN7

FN7. See also 5 Wright & Miller § 1202, at 89-90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

As in the discrimination context, we have developed an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under *Matsushita,* a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a Rule 56 motion, a § 1 plaintiff "must present evidence 'that tends to exclude*1983 the possibility' that the alleged conspirators acted independently.'" *Id.,* at 588, 106 S.Ct. 1348 (quoting *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." 475 U.S., at 588, 106 S.Ct. 1348.

Everything today's majority says would therefore make perfect sense if it were ruling on a Rule 56 motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because-in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior-the claimed conspiracy is "conceivable" but not "plausible," *ante,* at 1974. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra.* But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with Rule 8 and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman,* fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (quoting *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)); see also *Knuth v. Erie-Crawford Dairy Cooperative Assn.,* 395 F.2d 420, 423 (C.A.3 1968) ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League,* 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) ("Congress itself has placed the private antitrust litigant in a most favorable position .... In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to engage in armchair economics at the pleading stage.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The same year we decided *Conley,* Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular.*" Special Pleading in the "Big Case"? in Procedure-The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds.1965) (hereinafter *1984 Clark, Special Pleading in the Big Case) (emphasis added).

In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted.[FN8] While the majority assures us that it is not applying any " 'heightened' " pleading standard, see *ante,* at 1973, n. 14, I shall now explain why I have a difficult time understanding its opinion any other way.

FN8. Our decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id.,* at 347, 125 S.Ct. 1627. Here, the failure the majority identifies is not a failure of notice-which "notice pleading" rightly condemns-but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof,* it should not be answered without first hearing from the defendants (as apart from their lawyers).
Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries *as alleged* were not "the type that the antitrust statute was intended to forestall." *Id.,* at 540, 103 S.Ct. 897; see *id.,* at 526, 103 S.Ct. 897 ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, *e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 526-527, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489-490, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); it also permitted the existing firms to compete with each other and to expand their operations into previously forbidden territory. See 47 U.S.C. § 271. Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, ¶¶ 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court *1985 recognizes, at the motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante,* at 1965.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel conduct. *Ante,* at 1970. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra,* at 1976 - 1977. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in Code Pleading, 35 Yale L.J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Assn. of Chicago,* 347 U.S. 186, 188, 74 S.Ct. 452, 98 L.Ed. 618 (1954) (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader' "); *Brownlee v. Conine,* 957 F.2d 353, 354 (C.A.7 1992) ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, ... so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 3-4 (C.A.9 1963) ("[O]ne purpose of Rule 8 was to get away from the highly technical distinction between statements of fact and conclusions of law ..."); *Oil, Chemical & Atomic Workers Int'l Union v. Delta,* 277 F.2d 694, 697 (C.A.6 1960) ("Under the notice system of pleading established by the Rules of Civil Procedure, ... the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra,* at 1977. Indeed it is less of one.[FN9]

FN9. The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by Rule 8 because it lacks specificity. *Ante,* at 1970 - 1971, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement. See *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Petitioners made no such motion and indeed have conceded that "[o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante,* at 1971, n. 10, is, for our purposes, academic.

Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds.1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint *1986 points not only to petitioners' numerous opportunities to meet with each other, Complaint ¶ 46, App. 23,[FN10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.,* ¶ 42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.,* ¶ 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.,* ¶ 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs' "very apparent non-competition policy" was coordinated).

FN10. The Court describes my reference to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante,* at 1971 - 1972, n. 12. Quite the contrary: an allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with-though not sufficient to prove-the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," *ante,* at 1970, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other quotes from that and other articles and decides that what he meant was that entering new markets as a CLEC would not be a " 'sustainable economic model.' " *Ante,* at 1972 - 1973, n. 13. Never mind that-as anyone ever interviewed knows-a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor.[FN11] See *Allen v. Wright,* 468 U.S. 737, 768, n. 1, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The inference the statement supports-that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to do so were the product of an agreement-sits comfortably within the realm of possibility. That is all the Rules require.

FN11. It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante,* at 1972 - 1973, n. 13. Under Federal Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint *1987 without requiring the defendants to answer the charge that they "have agreed not to compete with one another and otherwise allocated customers and markets to one another."[FN12] ¶ 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

FN12. The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante,* at 1971, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

Respondents in this case proposed a plan of " 'phased discovery' " limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation.[FN13] Given the charge in the complaint-buttressed by the common sense of Adam Smith-I cannot say that the possibility that joint discussions*1988 and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity to prove their claims. See Clark, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof,* and do not need to force the pleadings to their less appropriate function").

FN13. The potential for "sprawling, costly,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and hugely time-consuming" discovery, *ante*, at 1967, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a defendant's Rule 12(e) motion; Rule 7(a) permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); and Rule 23 requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); see *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (C.A.2 2006) (holding that a district court may not certify a class without ruling that each Rule 23 requirement is met, even if a requirement overlaps with a merits issue). Rule 16 invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, "the elimination of frivolous claims or defenses," Rule 16(c)(1); "the necessity or desirability of amendments to the pleadings," Rule 16(c)(2); "the control and scheduling of discovery," Rule 16(c)(6); and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," Rule 16(c)(12). Subsequently, Rule 26 confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See 523 U.S., at 598-599, 118 S.Ct. 1584. Indeed, Rule 26(c) specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.

In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility *vel non* without requiring an answer from the defendant. See *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 206, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) ("Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of a wide array of Rule 11 sanctions. See Rules 11(b), (c) (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (holding that Rule 11 applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer*, 232 F.R.D. 116, 126 (D.D.C.2005) ("As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal").

I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar-among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante*, at 1967-should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules-not our interpretation of them. FN14 See *Swierkiewicz*, 534 U.S., at 515, 122 S.Ct. 992; *Crawford-El v. Britton*, 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Leatherman*, 507 U.S., at 168, 113 S.Ct. 1160.

FN14. Given his "background in antitrust law," *ante*, at 1968, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country-although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority .... If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery-impositional and otherwise." Discovery as Abuse, 69 B.U.L.Rev. 635, 645 (1989).

IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Public School Dist. No. 89 v. Department of Education,* 550 U.S. ----, ----, 127 S.Ct. 1534, --- L.Ed.2d ---- (2007) (SCALIA, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. *Id.,* at 1534, 127 S.Ct. 1534 (STEVENS, J., concurring). This is a case in which the intentions of the drafters of three important sources of law-the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure-all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to respond *1989 to any congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants-who in this case are some of the wealthiest corporations in our economy-from the burdens of pretrial discovery. *Ante,* at --- - ----11-13. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their Rule 12(b) motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners,[FN15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly serious factual allegations, that could account for this stark break from precedent.

FN15. It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See Fed. Rule Civ. Proc. 54(d)(1) ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental-and unjustified-change in the character of pretrial practice.

Accordingly, I respectfully dissent.

U.S.,2007.
Bell Atlantic Corp. v. Twombly
127 S.Ct. 1955

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.