UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182

SECTION "K" (2)

FILED IN:   05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324,
05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152,
06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066,
06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159,
06-5161, 06-5260, 06-5162, 06-5771, 06-5937, 07-0206,
07-0621, 07-1073, 07-1271, 07-1285

PERTAINS TO: MRGO

## POST-HEARING MEMORANDUM

NOW INTO COURT, through undersigned counsel, comes the Plaintiffs in the above referenced actions, who submit a Post-Hearing Memorandum for consideration by the Court.

### I.
### SUMMARY OF ARGUMENTS AND RESPONSES

On May 2, 2007, defendant Washington Group International, Inc. ("WGII") filed two interdependent motions seeking dismissal of the MR-GO Master Consolidated Class Action Complaint (hereinafter the "Master Complaint"): one pursuant to Federal Rules of Civil Procedure, Rule 12(b)(1) arguing the Court lacks subject matter jurisdiction, and a second pursuant to F.R.C.P., Rule 12 ( c) seeking judgment on the pleadings. F.R.C.P., Rule 12 requires

-1-

that the allegations of the Complaint are deemed to be true for each of these Motions. However, WGII argued facts outside the confines of the Complaint, effectively presenting a F.R.C.P. Rule 56 Motion for Summary Judgment which included visual displays and the presentment of case law that was not contained in its original motion or reply brief.

WGII curiously avoided any reference to the Plaintiffs Rule 26 Disclosures that included the Declaration of Dr. Robert Glenn Bea, an expert in the fields of foundation design, construction, and maintenance, as well as reliability assessment and management. It is this evidence that clearly answers the questions posed by the Court at the hearing on the Motions to Dismiss. By way of this post-trial memorandum, Plaintiffs provide to the Court said evidence in the form of a Declaration, already produced to WGII on April 16, 2007 in the Plaintiffs' Rule 26 Disclosures. (See Exhibit A - Declaration of Dr. Robert Glenn Bea).

## II.
## WGII EXCEEDED THE SCOPE OF ITS MOTIONS

WGII chose the procedural methods allowed under Rule 12 to attack the Complaint, admitting at hearing that they were presenting a facial attack of jurisdiction. In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true. Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 731-32 (11th Cir.1982). WGII acknowledged it avoided liability under the defense only "so long as the contractor was not negligent" in carrying out its contractual duties. (Def. Memo. at 1). Plaintiffs alleged that WGII was negligent, and (again, as WGII concedes) those allegations must be taken as true. (Id. at 6.) Rule 12(b)(1) dismissal would thus be improper.

WGII then exceeded the scope of the pleadings to gain tactical advantage by leading the court to believe that sufficient information had been disclosed to the PSLC that there were no facts in dispute and that the governmental contractor defense should be applied to dismiss WGII.

The genesis of this tactic is seen in the May 31, 2006 correspondence referenced by WGII in its Motion for leave to File Exhibits wherein WGII was setting forth the "types of factual proof we expect to rely upon in [its] proposed motion for summary judgment."(Document 4180-3). Nearly one year before filing its Motion to Dismiss, WGII recognized that discovery needed to be taken from both WGII and the Corps of Engineers.

Now WGII has circumvented that proposed discovery by now converting its Motions to Dismiss into a Summary Judgment. In so doing, WGII is violating the mandatory rule that the consideration of extraneous material outside of the Complaint causes a motion to dismiss to be translated into a motion for summary judgment. Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42 (C.A.2 N.Y. 1991), certiorari denied, 112 S.Ct. 1561, 503 U.S. 960, 118 L.Ed.2d 208.

### III.
### THE PSLC HAS SATISFACTORILY PLED THE BASIC TENETS OF NEGLIGENCE LAW

Courts are instructed to proceed cautiously in dismissing claims for lack of subject matter jurisdiction at an early stage if relevant facts are in dispute and pertinent discovery has not been concluded. Mortensen v. First Federal Savings and Loan Association, 549 F.2d 884, 892 (3d Cir.1977). Plaintiffs responded to the Motions that were before the court. In its reply, WGII argued that Plaintiffs failed to meet the basic tenets of negligence law by failing to plead the requisite facts to establish the duty risk analysis, citing the recent Supreme Court case of Bell Atlantic Corp. v. Twombly, 127 S.Ct 1955 (2007).[1] However, disingenuously, WGII failed to mention the Declaration of Dr. Bea that was part of the plaintiffs Rule 26 Disclosures which details information that far exceeds the basic requirements set forth in Twombly.

---

[1] The Court should note that the Twombly decision relied upon by WGII to support its claim was based upon a Rule 12(b)(6) Motion to Dismiss based upon an anti-trust conspiracy in which the plaintiffs did not "nudge their claims across the line from conceivable to plausible." Id., at 1974.

First and foremost it must be noted that the project on the East Bank Industrial Area of the Industrial Canal ("EBIA") was performance specifications contract, not a design specifications contract. A design specifications contract states explicitly how the contract is to be performed and permits no deviation. This is substantially different from a performance specifications contract which specifies the result to be obtained and leaves it to the contractor to determine how to achieve those results.[2]

In the present case, the United States Corps of Engineers awarded a Total Environmental Restoration Contract (via Task Order 26) to WGII's predecessor on July 12, 1999 to perform demolition and site preparation at the EBIA. Through its own efforts and those of various subcontractors, WGII developed the Work Plans that governed the scope of work at the EBIA. (See Exhibit B - as referenced and relied upon in Dr. Bea's Declaration).

WGII commenced work on the project in 2000. Based upon WGII's initial document production, WGII continuously requested modifications to perform additional work. These modification requests only appear to be signed by the Corps' Contracting Officer as approved; after which WGII commenced this work. There is little evidence to indicate that the Corps ever fully evaluated these new modifications; nor is it clear that the project was ever completed and accepted by the Corps or other supervising agencies.[3]

It is WGII's contention that it cannot be held liable under any circumstances for their negligence in performing works on the EBIA because "WGII is immune from liability for executing Congress's will." (WGII Memorandum, p.5). However, Dr. Bea indicates that the failure of the I wall was "due primarily to multiple flaws and defects embedded in the flood

---

[2] J.L. Simmons Co. v. United States, 412 F.2d 1360, 1362 (1969).

[3] Documents indicate that the Orleans Levee District would provide supervision of the work by issuing permits, and that WGII would be required to pass an inspection of the adjacent flood walls upon completion of the project. No evidence of such a final inspection has been identified.

-4-

protection structure." (P.6, pa.9). These flaws and defects included those developed during the design (e.g. failure to properly evaluate soil conditions and characteristics), operation (e.g. failure to provide adequate safe guards to adjacent flood protection structure during IHNC EBIA activities). The information provided by WGII indicates a high degree of correlation in the site remediation work at the EBIA and the two breach locations in the flood protection structure adjacent to the lower 9th Ward.

This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable sub-soils (marsh layers) would have facilitated the under seepage discussed in this declaration.

For remediation, the specifications required the canal bank be excavated to a depth four feet below the existing grade and fifteen feet from the edge of the water onto land. In the majority of cases the canal bank was excavated as required to a depth of four feet, additional observations of contamination prompted excavations to as deep as nine feet. There is no evidence that the Corps provided any careful consideration of these additional activities.

In addition to removal of canal-side soils that had previously provided stability and protection to the flood protection structure, numerous underground storage tanks and debris were removed. At the Saucer site, large underground storage tanks had to be removed. In addition, a buried railroad tank car required construction of a cofferdam so that the tank car could be filled with air, floated free, lifted and transported from the site. At the northern Boland site, a wharf extended along most of the IHNC. Following removal of the wharf materials, the piles comprising the foundation were pulled and transported from the site.

The effects of these site remediation activities clearly could have extended well below the soil excavation levels cited earlier. Removal of barges, piles, and underground storage tanks

could easily have reached to elevations of minus 10 feet to 20 feet; thus intersecting the underlying marsh deposits. (See Figures 6 and 7 of Dr. Bea's Declaration).

The information that is available clearly indicates a high degree of correlation with the site remediation work conducted by WGI at the EBIA sites and the breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure (See Figure 16 of Dr. Bea's Declaration). Removal and disturbance of the surface soils overlying the permeable subsoils (marsh layers) would have facilitated the under seepage discussed earlier in this declaration.

Based on the foregoing developments, it is Dr. Bea's expert opinion that an important contributor to the failure of the flood protection structure adjacent to the Lower 9th Ward potentially was caused by underseepage exacerbated by WGI's East Bank Industrial Area site remediation activities.

## IV.
## WGII WILL NOT PREVAIL IN ITS GOVERNMENT CONTRACTOR DEFENSE

To prevail on the governmental contractor defense, WGII bears the burden of proving all three elements of the Boyle standard.[4] Based upon the limited scope of documentation provided by WGII in its initial disclosures, it is unlikely that WGII will be able to prove any of the following:

(1) that the United States government approved reasonably precise specifications;
(2) that the product conformed to those specifications; and

---

[4] In Boyle v. United Technologies Corp., the Supreme Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

-6-

> (3) the contractor must warn the United States government about dangers associated with the use of the product known to the manufacturer but not to the government.[5]

These three conditions "serve to ensure that the defense operates to immunize the contractor only where the government has actually participated in discretionary design decisions, either by designing a product itself or approving specifications prepared by the contractor." Landgraf v. McDonnell Douglas Helicopter Co., 993 F.2d 558, 560 (6th Cir.1993) (quoting Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1316 (11th Cir.1989), cert. denied, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990)).

This defense was developed in the context of whether private contractors would be held liable for design defects in government-commissioned military equipment. "The government contractor defense, as formulated in 1988 by the Supreme Court in Boyle, generally immunizes government contractors from civil liability arising out of the performance of federal procurement contracts." Bailey v. McDonnell Douglas Corp., 989 F.2d 794, 797 (5th Cir.1993)(citing Boyle, 487 U.S. at 505-06, 108 S.Ct. at 2515). "The defense stems from the immunity enjoyed by the United States from claims based on the performance of so-called 'discretionary functions', pursuant to the [Federal Tort Claims Act], 28 U.S.C. § 2680(a)." Id., at 797-98. "The primary purpose behind the formulation of the government contractor defense was to 'prevent the contractor from being held liable when the government is actually at fault ...' " Mitchell v. Lone Star Ammunition, Inc., 913 F.2d 242, 245 & n. 5 (5th Cir.1990)(quoting Trevino v. General Dynamics Corp., 865 F.2d 1474, 1478 (5th Cir.1989)).

However, the protective shield in favor of the contractor collapses when the actions of the government contractor--and not those of the Government--produce the damaging condition. Mitchell, at 245-46. In such a situation, fairness dictates that a government contractor should not

---

[5] Boyle, *supra.*

-7-

be permitted to escape liability by asserting the sovereign immunity of the Government. Id., at 246. In fact, the Boyle court specifically held that "the government contractor defense does not confer sovereign immunity on contractors. Boyle, *supra*, at 487 U.S. at 505, n.1, 108 S.Ct. 2510.[6]

Additionally, the defense only shields a government contractor from claims arising out of its actions where the government has exercised its discretion and judgment in approving precise specifications to which the contractor must adhere. Malesko v. Corr. Servs. Corp., 229 F.3d 374, 382 (2d Cir.2000), rev'd on other grounds, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). "The affirmative defense applies only if the government exercised significant control over the relevant actions of the contractor." Densberger v. United Techs. Corp., 297 F.3d 66, 75 (2d Cir.2002), cert. denied, 537 U.S. 1147, 123 S.Ct. 876, 154 L.Ed.2d 849 (2003). "Stripped to its essentials," government contractor defense claims that "[t]he Government made me do it." In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir.1990).

## A. IT IS DOUBTFUL THAT THE GOVERNMENT APPROVED REASONABLY PRECISE SPECIFICATIONS

If the government delegates the design discretion to the contractor such as it did in the present case, the exercise of that discretion does not revert to the government by the mere retention of a right of "final approval" of a design, nor by the mere "approval" of the design. There must be a substantive evaluation of the relevant design features to determine that the design complies with the general requirements initially established by the government. The mere signature of a government employee on the "approval line" of a contractor's working drawings, without more, does not establish the government contractor defense.

---

[6] Subsequent interpretations in the Circuit Courts of Appeal confirm the Boyle standard that the government contractor defense does not confer sovereign immunity on contractors. United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall, 355 F.3d 1140, 1146 (9th Cir. 2004).

As discussed above, WGII, not the Corps of Engineers, produced all of the work plans that defined that defined the scope of work for the East bank Industrial Area. The amount of input by the Corps on these original work plans is unknown. However, continuous modifications to the original work plans only received a signature from the Corp's Contracting Officer before the modifications were performed. The trier of fact is entitled to verify the scope of the Corps's exercise of its discretionary function to determine if WGII actually exercised its own discretion in designing and implementing the defective features of the project design.

To determine whether "substantive review" by the Corp occurred, a court must take into consideration a number of factors, including the examination of drawings, periodic evaluations of the progress of the contract, criticism and extensive government testing--a "continuous back and forth" between the contractor and the government. In re Air Disaster at Ramstein Air Base, Germany, 81 F.3d 570, 574 (5th Cir.1996). WGII has not produced sufficient evidence for the Court to make such a determination.

The government contractor defense only pre-empts state tort law when "the state-imposed duty of care that is the asserted basis of the contractor's liability ... is precisely contrary to the duty imposed by the Government contract." Id., 487 U.S. at 509, 108 S.Ct. at 2516. Thus, the "rubber stamp" exception ensures that state tort law is not pre-empted absent an actual policy judgment by federal officials. The rationale behind the "rubber stamp" exception to the government contractor defense is grounded within the parameters of the FTCA's discretionary function exemption:when the government "rubber stamps" a design that a contractor has proposed, government officials have not performed a discretionary function.

If WGII exercised its own discretion in designing and implementing the defective features of the project design, then WGII cannot escape liability via the government contractor defense-the government's rubber stamp on the design drawings notwithstanding. Trevino, *supra*,

at 1474. Based upon the documents produced to date, it appears that WGII exercised its own discretion in determining the scope of the work for the project.

## B. IT IS DOUBTFUL THAT WGII COMPLIED WITH THE SPECIFICATIONS SET FORTH IN ITS OWN WORK PLANS

There is little documentary evidence that WGII took into consideration the effect its underground work would have on the flow of underground water to the flood wall site. However, Dr. Bea's Declaration establishes that the removal of canal bank structures and underground structures caused subsurface soil modifications, which in turn changed the flow of groundwater to flow away from the Industrial Canal towards the flood wall.

## C. IT IS DOUBTFUL THAT WGII WARNED ANY OTHER GOVERNMENTAL AGENCY OF THE DANGERS ASSOCIATED WITH ITS WORKS

The effect of WGII's activities on the flow of ground water is just one aspect that must be considered more fully through discovery before a Motion to Dismiss (or Motion for Summary Judgment) is entertained. If such activity endangered the stability of the nearby flood walls by allowing under-seepage, WGII must prove that it disclosed this information to the appropriate governmental agencies.

Such information is especially important considering the Orleans Levee District's requirement that a "final" inspection be performed upon completion of the works on the EBIA. It is imperative for the Court to learn whether this information was disclosed to the Orleans Levee District in preparation for a "final" inspection.

## V.
## CONCLUSION

For the foregoing reasons, the Court must deny the defendant WGII's Motions to Dismiss.

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL

s/ Joseph M. Bruno
JOSEPH M. BRUNO
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
LA Bar Roll Number: 3604
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: (337) 233-2796

For

MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry (Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles, CA)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above referenced pleading upon all known counsel for all parties via the Court's CM/ECF system, or by placing same in the United States mail, properly addressed and with first class postage prepaid, or by facsimile, e-mail, or other electronic transmission this 25th day of June, 2007.

/s/ Joseph M. Bruno
Joseph M. Bruno