FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2007 FEB -8 PM 1: 15

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LAURA GREER, GARY GREER, GARY BIRD, CYNTHIA BIRD,  THURMAN KAISER, AND PATRICIA MONTELEONE, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | § § § § § § § § § § |
| **Plaintiffs** | § § § |
| VERSUS | § § § § |
| THE UNITED STATES OF AMERICA, DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, | § § § § § |
| **Defendants.** | § § |

CIVIL ACTION

CLASS ACTION

NUMBER **07 - 647**
**SECT. K MAG** 2

SECTION

MAGISTRATE

## COMPLAINT FOR DAMAGES—CLASS ACTION

**NOW INTO COURT,** through undersigned counsel, come Gary and Laura Greer, Gary and Cynthia Bird, Thurman Kaiser, and Patricia Monteleone, individually and on behalf of all others similarly situated, and for their Complaint respectfully state:

Exhibit "A"

Fee $350.
Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No_____

# I.

## INTRODUCTION

1.    In 1984, the United States Army Corps of Engineers ("Army Corps" or "the Corps") issued a dredging permit to the New Orleans Sewerage & Water Board SWB. The permit was issued pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403) for a project to improve the drainage capacity of the canal and Pump Station No. 6, located at the southern end of the canal. The permit approved and authorized the dredging in the 17th Street Drainage Canal ("Improvement Project").   Federal Regulation and internal Corps procedure require that an evaluation of all probable impacts on the public interest, including flood hazards before a permit is approved. The regulations and procedures require that a permit not be issued if it is determined that the proposed activity is contrary to the public interest, including flood damage prevention.  The Corps authorized the work knowing and understanding that the dredged canal bottom would be substantially lower than the sheet pile tips in the flood protection levee.  The fact that the canal bottom was lower than the sheet pile tips allowed seepage of water under the flood protection levee over a long period of time causing it to fail catastrophically and flooding the city.   The SWB dredging project and the activity of the Corps in granting the permit for the work were wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control.

2.   This action results from a predictable and preventable catastrophic engineering disaster caused by the United States Army Corps of Engineers' negligent design and construction of improvements to the 17th Street Drainage Canal, located on the border of Orleans and Jefferson Parishes, State of Louisiana. On August 29, 2005, upon the arrival of Hurricane Katrina, the retaining wall system at the north easterly end of the 17th Street Drainage Canal failed catastrophically, substantially contributing to the drowning of 80 percent of the great City of New Orleans and the inundation of the historic neighborhood of Old Metairie in Jefferson Parish, and in at least 588 of the approximately 1,293 deaths in the event of Hurricane Katrina.

3.   Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class persons similarly situated for damages as a result of the Corp's negligence, strict liability, and fraudulent concealment and failure to warn.

## II.

## PARTIES

### Plaintiffs

4.   **GARY GREER** and **LAURA GREER** are persons of the full age of majority who at all times relevant hereto were residents of the State of Louisiana, Parish of Orleans, owning and residing in their Lakeview neighborhood home located at 5320 Memphis Street, New Orleans, Louisiana 70124, which was destroyed by waters from the 17th Street Drainage

Canal starting on August 29, 2005.  On or about May 8, 2006, they presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  On November 8, 2006, six months had elapsed since the presentation of their claim and the Corps had failed act by either accepting or rejecting the claim, and plaintiffs elect to consider such failure to act as a final denial of the claim.

5.    **GARY BIRD** and **CYNTHIA BIRD** are persons of the full age of majority who at all times relevant hereto were residents of the State of Louisiana, Parish of Orleans, owning and residing in their Lakeview neighborhood home located at 6947 Bellaire Drive, New Orleans, Louisiana 70124, which was destroyed by waters from the 17th Street Drainage Canal starting on August 29, 2005.  On or about April 28, 2006, they presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  On October 28, 2006, six months had elapsed since the presentation of their claim and the Corps had failed act by either accepting or rejecting the claim, and plaintiffs elect to consider such failure to act as a final denial of the claim.

6.    **THURMAN KAISER** is a person of the full age of majority who at all times relevant hereto was a resident of the State of Louisiana, Parish of Orleans, owning and residing in his Lakeview neighborhood home located at 6574–6576 Catina Street, New Orleans, Louisiana 70124, which was destroyed by waters from the 17th Street Drainage Canal starting on August 29, 2005. On or about April 17, 2006, he presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  On

4

17, 2006, six months had elapsed since the presentation of the claim and the Corps had failed act by either accepting or rejecting the claim, and plaintiff elects to consider such failure to act as a final denial of the claim.

7.   **PATRICIA MONTELEONE** is a person of the full age of majority who at all times relevant hereto was a resident of the State of Louisiana, Parish of Orleans, owning and residing in her Lakeview neighborhood home located at 6539 Lakeview Drive, New Orleans, Louisiana 70124, which was destroyed by waters from the 17th Street Drainage Canal starting on August 29, 2005. On or about June 14, 2006, she presented a claim to the Army Corps and the United States for damages arising out of the incident described above. On December 14, 2006, six months had elapsed since the presentation of the claim and the Corps had failed act by either accepting or rejecting the claim, and plaintiff elects to consider such failure to act as a final denial of the claim.

### Defendants

8.   The **UNITED STATES OF AMERICA** is a sovereign government that may be sued for liability in accordance with the federal laws and regulations as set forth herein. The **UNITED STATES ARMY CORPS OF ENGINEERS** is a division of the United States government under the direct jurisdiction of the Department of the Army.

5

## III.

## JURISDICTION

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1333(1) (Federal Admiralty

Jurisdiction), 46 U.S.C. §§ 741 to 752 (Suits in Admiralty Act), and 46 U.S.C. §§ 781 to

790 (Public Vessels Act), as applicable, and in conjunction with 46 U.S.C. § 740

(Admiralty Jurisdiction Extension Act).   All plaintiffs have presented their claims in

writing to the appropriate Federal agency, as provided by 46 U.S.C. § 740, and a period

of six months has expired since said presentment.


10.     In addition, or in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C.

§ 1346(b)(1), 2671-2680 (Federal Tort Claims Act). All plaintiffs have presented their

claims in writing to the appropriate Federal agency, as provided by 28 U.S.C. § 2675(a),

in conjunction with 28 U.S.C. § 2401(b), and a period of six months has lapsed since said

presentment.


11.     In addition, or in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C.

§ 1346(b) (Defendant United States).


## IV.

## VENUE

12.   Venue is proper in the Eastern District of Louisiana pursuant to 28 U. S. C. § 1391,

because the negligent and wrongful actions of the defendant occurred in the Eastern

District of Louisiana, the plaintiffs reside in and do business in the Eastern District of

6

Louisiana, the damages to plaintiffs occurred within the Eastern District of Louisiana, and the applicable facts which form the basis of this lawsuit occurred in the Eastern District of Louisiana.

## V.

### FACTUAL BACKGROUND

### The 17th Street Drainage Canal

13.     The 17th Street Canal is a waterway in New Orleans that flows into Lake Pontchartrain, and, as such, a navigable water of the United States within the meaning of 33 C.F.R. 329.5.

14.     The canal forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal", the "Metairie Outfall Canal", the "Metairie Relief Canal", and the "Upperline Canal."

15.     The 17th Street Canal has its origins at the start of the 1850's as a canal dug through swampy ground as a right-of-way where the Jefferson and Lake Pontchartrain Railway was built. The railway connected the town of Carrollton, Louisiana with a shipping port on Lake Pontchartrain at what became "Bucktown," Louisiana. In 1858, a secondary canal was built in the back of town from Carrollton, with its head at what is now Dublin and Palmetto, connecting to the Railway canal a short distance on the riverside of the Metairie Ridge. The spur canal in the back of Carrollton was beside a projected street

7

numbered "17th Street", and that canal was thus the first to be known as the 17th Street Canal, a name which would later come to commonly refer to the large canal to which this connected.

16.     The railway was discontinued in 1864 due to competing railways and the canal became the boundary line between Orleans Parish and Jefferson Parish. As the canal marked the up-river limit of Orleans Parish, it became known as the Upperline Canal.

17.     The SWB took over the 17th Street Canal at the end of the 19th century. The canal was redredged in 1897, and again in 1929. In 1913, the SWB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans.

18.     Located at the lakefront of the 17th Street Canal is the community of "Bucktown." Bucktown began more than a hundred years ago as a string of fishing and hunting camps lining the 17th Street Canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts. The canal provided harbor for fishing boats. The people who lived along the canal and out on the lake made their living from fishing, crabbing, hunting and trapping, as well as from the rental of boats, the sale of tackle and bait, and the entertainment of vacationers.

19.     More substantial development along this area occurred in the mid-19th century with a commercial wharf and resort called Lakeport. Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Blvd.) and at the terminus of the Jefferson and Lake

8

Pontchartrain Railroad where Bucktown is today. Just across the 17th Street Canal, at Jefferson Parish's East End, the rustic fishing village called Bucktown developed during the late 19th century. Until recent years, the 17th Street Drainage Canal at Bucktown was home to a fleet of approximately one hundred shrimp boats. The fleet previously held a lease in the 17th Street Drainage Canal with the New Orleans S&W Board.

### The 17th Street Canal Dredging Project

20.     On July 15, 1974, the SWB initiated a project to improve drainage from the 17th Street Drainage Basin. Initially, this project called for the dredging of 2.4 miles of the 17th Street Canal from Pump Station No. 6 to Lake Pontchartrain to remove sediment from the canal bottom and to re-shape the canal cross section to improve the flow characteristics of the canal, as well as the pump capacity of Pump Station No. 6. The removal of approximately 85,000 cubic yards of bottom sediment was anticipated which was then supposed to be deposited along the banks of Breakwater Drive and an area of the then proposed Bucktown Dock Facility (West End Park).

21.     Dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403). Accordingly, on July 15, 1974, the SWB filed an application for a "Permit To Discharge Or Work In Navigable Waters And Their Tributaries" with the Corps' New Orleans District.

22.     The Army Corps of Engineers is a Department of the United States Army. It has seven divisions in the United States, one of them being the Mississippi River Valley

9

Division. Each division is divided into districts. The New Orleans District is a district of the Mississippi Valley Division and it is divided into six technical divisions. The technical divisions are: Real Estate, Contracting, Construction New Orleans/Lafayette, Engineering, Planning Program Project Management (PPPMD), and Operations. The Operations division is responsible for navigation and the issuance of permits. Issues regarding flood control come under the aegis of the Engineering division. Thus, the issuance of the permit to dredge was the primary responsibility of the Operations division rather than the Engineering division which is responsible for flood control.

23.    The permit approval process required the SWB to obtain approval from, among others, the Louisiana Department of Public Works.

24.    In August of 1974, the Louisiana Department of Public Works, in response to the permit application, indicated that it could not complete a review of the permit because the applicant had no soil data substantiating the stability or integrity of the levees in question

25.    On May 23, 1977, the Corps returned the application with no action because the SWB failed to furnish information requested by, among others, the Louisiana Department of Public Works.

26.    In 1978, the SWB retained the civil engineering firm Modjeski & Masters to provide a plan for the design and implementation of the dredging project, and, on August 23, 1979,

Modjeski & Masters submitted a second dredging permit application on behalf of the SWB.

27.   The same application was resubmitted on December 29, 1980 after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

### Dredging Impacts Existing Levees

28.   On January 28, 1981, Modjeski & Masters, in response to inquiries about the impact of the dredging on existing levees, provided the Corps with its first memorandum addressing the stability of the existing levees and sheet pile wall along the canal. The memo indicated that on three of the six test locations, the factors of safety fell below the required values set by the Corps. The handwritten report stated:

"These two locations yielded low factors of safety due to two basic causes, (1) the existence of very soft clays with minimal [illegible]. . . ."

29.   On February 6, 1981, Modjeski & Masters provided a stability analysis to the Corps of the existing sheet pile wall along the east side of the canal north of Hammond Highway. This report is difficult to read, but states in pertinent part that:

"This analysis indicates that portions of the wall are extremely unstable as they now stand. This instability, even under normal water level situations is due to several factors: a) the soft to very soft clays which make up the soil stratum. (Illegible). . . ."

11

**30.**   On March 5, 1981, the Corps' Engineering Division issued an internal memorandum addressing the soil stability analyses provided by Modjeski & Masters. Item No. 4 of the memorandum states:

> "The factors of safety at 554+00 and 604+00[1] are substantially below the minimum 1.30 factor of safety, therefore, the design sections should be redesigned."[2]

**31.**   On March 31, 1981, the Corps held a public hearing regarding the dredging permit application. Discussion was had about whether raising the existing sheet pile wall instead of dredging the bottom would provide a greater cross section and greater pump capacity. The consulting engineer of Modjeski & Masters voiced his concerns about widening the canals, stating that the levees were already in violation of the Corps' engineering standards for levee stability and that attempts to dig more dirt away adjacent to the levees would worsen the stability problem.

**32.**   On April 20, 1981, Modjeski & Masters in response to the concerns that the dredging would negatively impact the existing levee submitted on behalf of the SWB another application under the River and Harbor Act, this one specifying a preliminary plan to install sheet pile walls with concrete caps for the entire length of the project, then excavation of the canal. The sheet pile walls were to be of a sufficient height to meet flood protection criteria.

---

[1]These numbers reference points along the Orleans levee bank of the 17th Street Canal, the lower number being closer to the lake, moving higher as one gets closer to the pump station.
[2]The breach along the 17th Street Canal occurred at station 560+00.

33.   An *internal Corps* memorandum dated June 16, 1981, reviewing the April 20, 1981 application referenced in the preceding paragraph, indicated that a number of levee and flood wall stability problems were likely if the SWB plan were implemented.

34.   In addition to their own efforts, Modjeski & Masters hired Eustis Engineering Company to assist with the subsoil investigation at the 17th Street Canal. On October 27, 1981, Eustis submitted its first report entitled "Subsoil Investigation—S&W Board of New Orleans—Metairie Relief Canal" Eustis reported that the natural ground surface consists primarily of extremely soft to medium soft organic clay, humus and wood that continue to elevations between 7 C.D. [Cairo Datum] and 3.5 C.D.

35.   An internal memorandum from the Corps' Engineering Division to the Corps' Operations Division, dated February 12, 1982 noted the existence of a stability problem between sta. 625+00 and sta. 670+00 where excavation of the canal will directly tap the sands underlying the levee.  The memo suggested that a stability analysis be done for the landside of the canal incorporating effects of seepage to determine what corrective action is needed.  In fact sands underlay the entire 2.4 miles of the 17th Street canal from Pumping Station No. 6 to Lake Pontchartrain and as such the stability problem was not confined to any one section of the canal.

36.   On August 23, 1982, Eustis provided Modjeski with a more comprehensive subsoil investigation report. This report states in pertinent part:

"Between Stations 617+50 and 663+00, computations indicate the possibility of a blow-out during extreme high water in the canal. Unless more definite information can be developed regarding the potential hydrostatic uplift pressure at

13

the levee toe through this reach, measures should be taken to prevent a blow-out during extreme high water conditions."

The report then goes on to suggest "preventive measures":

"Preventive measures include the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the landside toe of the levee, and sealing the canal bottom.
24. Seepage Cutoff. The most positive measure to minimize the possibility of a blow-out is the installation o a seepage cutoff, steel sheetpiling and/or a slurry wall should penetrate the sand stratum. Considering that the bottom of the sand stratum is at or near el[evation]   -30 C.D. [Cairo Datum], a 65-ft long cutoff wall would be required." Report, at p. 9.
"25. Relief Wells.   Consideration should also be given to installation of pressure relief wells near the landside toe of the levee. To be effective, relief wells should penetrate close to the bottom of the sand, and, therefore, wells approximately 50 feet deep will be required. For planning purposes, it is estimated that a well spacing of 30 to 45 feet may be necessary." Report, at p. 10.
"Conclusions. Unless a test section can be dredged to develop more definitive information regarding the potential hydrostatic pressure at the landside levee toe, measures should be taken between Stations 617+00 and 663+00 to prevent a possible blowout indicated by theoretical analysis." Report, at p. 11-12.

This report demonstrates that although the problem was well understood, the assumption that it existed at only one section was grossly incorrect.

37.       On November 30, 1982, Modjeski furnished the Corps with copies of the Eustis soils report.

38.   On February 22, 1983, the Chief of the Corps' Engineering Division, Frederic M. Chatry, addressed a letter to Mr. G. Joseph Sullivan, the Superintendent of the SWB. He stated the following in response to Modjeski's recommendations:

"…our problems with the solution selected by your consultant relate to our opinion that a sheet pile cutoff is, in fact, not impermeable, and is therefore not a dependable means of reducing uplift. It is not our policy to specify to applicants the measures to be used in meeting Corps criteria, but we do provide advice and suggestions about such measures. In this instance, we feel that the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift."

39. On May 9, 1983, Modjeski submitted a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases in to one project, with the project limits being Pump Station No. 6 on the south, and 370.0 ft. north of the Bucktown Pedestrian Bridge. The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

40. On July 27, 1983, Eustis submitted a revised soil stability report that confirmed the potential for a blow-out at the land side toe of the levee extending the area of concern from station 617 to the pumping station due to hydrostatic uplift pressure in the underlying stratum. In this report Eustis recommended to dredge a test section in the canal to study the hydrostatic uplift pressure after the test section was dredged. Once again, there was a failure to understand that the problem existed on the entire length of the canal.

41. From November 29, to December 16, 1983, a test section was dug just south of Interstate I-10. Six piezometers were installed on the Jefferson side of the canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis' report concerning the test was submitted to the Corps on January 17, 1984. The report concluded that no relevant changes were monitored by the piezometers when the test section

15

was dug, and that it was, therefore, believed that the possibility of a blow-out during high water conditions in the canal was probably slight.

42. The piezometer study of the test section failed to take into account that the seepage flow through the permeable soils was already in progress when the piezometers were installed and that therefore the conclusions as to stability and permeability were incorrect.

43. On June 13, 1984, the Army Corps issued the Department Of The Army Permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping State No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge..." in spite of the fact that the Corps' internal engineering procedure and good engineering practice mandated that a permit which would allow the canal bottom to be below the sheet pile tips be denied.

44. The "Statement of Findings" issued with the permit states that factors considered in issuing the permit included, *inter alia*:

"navigation, present and prospective; flood heights ... floodplain use; ... other public interests."

Clearly, the federal regulations requiring a determination that the permitted action not negatively impact flood protection was violated.

45. The best evidence of the fact that the inappropriate grant of the dredging permit caused the catastrophic failure is that the failure mechanism included wholesale sliding of the entire levee including the sheetpile wall landward across the sand layer below the ground.

16

46.   The Project was ultimately divided into the following Phases:

    Phase I:        from Pump Station No. 6 to Interstate 10

    Phase II-A:     from Interstate 10 to Hammond Highway – Orleans Side

    Phase II-B:     from Interstate 10 to Hammond Highway – Jefferson Side

    Phase III:      from Hammond Highway to Lake Pontchartrain

47.   The Work Order for Phase I was issued on December 5, 1983, and the job was completed on June 1, 1984.

48.   Because the SWB and the Orleans Levee District ("OLD") could not yet effect an Agreement with the East Jefferson Levee District regarding Phase II of the Project, an extension of the 1984 permit was applied for on February 4, 1987, and granted by the Corps on February 20, 1987.  On April 24, 1987 the Corps created a drawing showing a sheet pile design which located the sheet pile tips 16 feet lower than the bottom of the canal.  While the Operations Division was working on the SWB permit, the Engineering Division was working on a flood wall design that might incorporate the sheet piles that were permitted under the dredging project.

49.   In connection with the consideration of using the sheet piles as the base of a flood wall, on December 23, 1987, the Corps' Mississippi River Commission in Vicksburg issued a memorandum to the Commander of the Corps' New Orleans District relative to sheet pile wall design criteria. This memorandum summarized the results of the Corps' "E-99 Sheet Pile Wall Load Test Report".

17

50.     The "E-99 Sheet Pile Wall Load Test" was a full scale instrumented lateral load test of a
        200-foot long sheet pile wall conducted by the Corps in the Atchafalaya basin in 1985.
        This location in the Atchafalaya basin was chosen because of the close correlation of the
        its soil conditions with those in the New Orleans area.  Test data from the sheet pile wall
        and adjacent supporting soils indicated a gapping behavior (separation of the steel sheet
        piles from the soils) exactly like that which occurred during Hurricane Katrina. From the
        E-99 sheet pile test the Corps learned, among other things that there was potential soil
        separation from the sheet piles (allowing water to penetrate below the ground surface
        between the piles and the soils) and that the calculated safety factor was not reached.  The
        Corps failed to take into consideration the fact that the fundamental purpose of sheet piles
        are to prevent water seepage.  They incorrectly focused on whether the sheet piles could
        support a concrete wall.

51.     All of the information about bad soils and the potential for water seepage was completely
        ignored in connection with the design of the flood walls contemplated to be built on the
        previously permitted sheet pile wall.

52.     On August 31, 1988, Eustis provided another geotechnical report containing the results of
        revised cantilever floodwall analyses and revised slope stability analyses for the proposed
        modifications along the Orleans side of the 17th Street Drainage Canal between Stations
        553+70 and 670+00, the reach where the breach of the canal wall would later occur.  The
        recommended tip depth of the sheet pile wall already permitted to be higher than the canal
        bottom was 12.8 feet, five feet higher than the canal bottom.

53.     On August 11, 1988, the SWB issued the Work Order for Phase III of the Project, and the job was completed on December 6, 1989.

54.     The work order for Phase II-A of the previously permitted SWB dredging project including the installation of sheet piles on the Orleans side of the canal was issued on July 4, 1990, and the job was completed on January 10, 1992. The contractor for that part of the Project was Boh Brothers Construction Co., Inc.

55.     The dredging was done, per the contract, via bucket dredging to be performed from a system of flex-float barges in the canal.

**The Lake Pontchartrain, and Vicinity, Hurricane Protection Project**

56.     The flood control structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain Project").

57.     A federal project on the Jefferson Parish side of the 17th Street Canal existed prior to the Lake Pontchartrain Project which was, upon information and belief, authorized in May 1950.

58.   Congress first authorized construction of the Lake Pontchartrain Project in the Flood
Control Act of 1965—the Congressional response to Hurricane Betsy. The Project was
to provide hurricane protection to areas around the lake in the greater New Orleans area.
Although federally authorized, it was a joint federal, state, and local effort with the
federal government paying 70 percent of the costs and the state and local interests paying
30 percent. The Corps was responsible for project design and construction and local
interests were responsible for maintenance of levees and flood control structures.

59.   The original and only project design authorized by Congress, known as the "Barrier
Plan", included a series of levees along the lakefront, concrete floodwalls along the Inner
Harbor Navigation Canal, and control structures, including barriers and flood control
gates located at the Rigolets and Chef Menteur Pass. These structures were intended to
prevent storm surges from entering Lake Pontchartrain and overflowing the levees along
the lakefront. As such, this plan did not include any flood protection at or on the 17th
Street Canal.

60.   The Barrier Plan was selected over another alternative, known as the "High-Level Plan",
which excluded the barriers and flood control gates at the Rigolets and Chef Menteur
Pass and instead employed higher levees along the lakefront as well as gates at the mouth
of the 17th Street Canal.

61.   The Barrier Plan was selected because the High-Level Plan was believed to have many
serious drawbacks, including the following:

- High Level levees would take years longer to construct because of subsidence problems;

- Levees would be wider, thus requiring more rights of way;

- In some locations floodwalls would be required instead of levees thus destroying the esthetic quality of the lakefront;

- More rights of way would result in displacement of more residences, businesses, et cetera;

- With higher lake levels, the interior drainage system would be severely hampered;

- The High Level Plan would offer no protection to less densely populated areas such as the North Shore;

- Lakefront Levees would have to be 6 to 9 feet higher than the present design grade;

- The high level plan was determined to cost approximately 50 percent more than the Barrier Plan.


62.   During the 1970s, the control complexes at the Rigolets and Chef Menteur were facing
significant opposition from environmentalists. This opposition culminated in a December
1977 court decision that enjoined the Corps from constructing the barrier complexes, and
certain other parts of the project until a revised Environmental Impact Statement was
prepared and accepted.

21

63.   After the court ordered injunction, the Corps was apparently unable to obtain a satisfactory Environmental Impact Statement for the Barrier Plan. The Corps then abandoned the Barrier Plan and elected to implement the High-Level Plan, even though the High-Level Plan was believed to have many serious flaws.

64.   As previously indicated, the high level plan called for the installation of gates at the mouth of the 17th Street Canal.  The SWB strenuously objected to the gates on the grounds that the pumps would not operate, or would not operate efficiently if the gates were closed during a storm. Once again, without any Congressional authorization or re-authorization the Corps unilaterally changed the High Level plan at the 17th Street Canal calling the proposal at the 17th Street Canal the "Parallel Plan".

65.   The Parallel Plan was a plan that called for increasing the height of the flood barrier on the east and west banks of the canal.

66.   The Corps considered three options; first, levees; second, T-walls; and third, I-walls.  The Corps rejected the idea of levees and the idea of a T-wall because in its   estimation construction of a levee or T-wall was impracticable.

**Project Implementation**

67.    The I-wall design selected by the Corps called for the construction of a concrete monolith on

top of the sheet pile previously permitted  pursuant to the dredging project.  In 1993, Pittman

Construction Company, Inc. was retained for the construction of the concrete monoliths atop

the steel sheet pile wall along the 17th Street Canal.


68.    During the construction of the concrete monoliths, Pittman reported to the Corps that it was

encountering major problems.  The sheet pile walls with the concrete monolith installed on

the top began to lean towards the canal side, because the foundation, *i.e.* the supporting soil,

was not of sufficient strength, rigidity, and stability to build upon.


### The Storm

69.    At 6:10 a.m. on August 29, 2005, Hurricane Katrina made landfall near Grand Isle, Louisiana

as a Category 4 hurricane, then made a second landfall a short time later near the Louisiana-

Mississippi border.  As the eye wall of the storm passed dozens of miles to the east of the city

of New Orleans, the maximum sustained winds that would have impacted Lake Pontchartrain

were only 95 miles per hour—the maximum wind speed for a Category 1 storm.


70.    As the eye of the hurricane began to pass to the northeast of New Orleans, the

counterclockwise swirl of the storm winds caused a surge in water levels along the southern

end of Lake Pontchartrain. The storm surge along the Pontchartrain lakefront did not produce

water levels sufficiently high to overtop the I-walls lining the 17th Street drainage canal.

71. A major breach on 17th Street Canal occurred on the Orleans east side between about 9:00 and 9:15 a.m.

72. The breach rapidly scoured to depths well below mean sea level, and continued to allow water into the New Orleans east bank even after the storm surge had subsided.

73. The resulting flooding of the east bank of New Orleans and Old Metairie in Jefferson Parish was catastrophic, and resulted in at least 588 of the approximately 1,293 deaths attributed to date to the floodwall failures in this event.

## VI.

## FIRST CLAIM FOR RELIEF

### CLAIMS ARISING OUT OF THE CORPS OF ENGINEERS GRANT OF A PERMIT UNDER THE RIVER AND HARBOR AT OF 1899 TO THE SEWERAGE AND WATER BOARD TO DREDGE THE 17TH STREET CANAL

74. Plaintiffs re-aver each and every allegation of paragraphs 1–73 as if fully set forth herein, and incorporate same by reference.

75. The defendant United States, through Defendant Army Corps of Engineers is liable to the plaintiffs and the putative class members for the damages that occurred as a result of its

failure to follow federal regulations, failure to follow its own engineering standards and

procedures, and its neglect in the issuing of a dredging permit to dredge the 17th St.

Canal, said damages including but are not limited to:

a.     property loss both movable and immovable,

b.     diminution in property value,

c.     past, present and future personal injury, including death,

d.     past, present and future fear, fright, and emotional distress,

e.     past, present, and future inconvenience,

f.     past present and future bodily injury, and

g.     past present and future business interruption.

h.     deprivation of the opportunity to avoid or take precautions against losses due to

       flooding, including the opportunity to relocate in a flood protected area;

i.     deprivation of the opportunity to protect their homes and property by

       implementing structural improvements including but limited to raising their

       homes to avoid flooding,

j.     deprivation of the opportunity to protect their financial investment in their homes

       and property by purchasing flood insurance.

k.     other damages as may be proven at the trial of this matter.

76.    The United States, through Defendant Army Corps of Engineers, violated Federal law
       because the River and Harbours Act of 1899 (C33 U.S.C. 403) prevents the Corps of
       Engineers from granting a dredging permit that is contrary to the public interest.

77.    Title 33 Section 320.4 establishes general policies for evaluation of permit applications.
       That policy requires that the benefits which reasonably may be expected to accrue from
       the proposal must be balanced against its reasonably foreseeable detriments. Among the
       factors required to be considered are the effect on flood control. The Corps violated this
       policy in not considering the impact of the approval of the permit on flood control and/ or
       if they did, they did so with reckless disregard of overwhelming evidence that the
       approval would in fact damage the flood protection levee.

78.    The Corps did not exercise due care in connection with the evaluation of the dredging
       permit as evidenced by its failure to employ its own engineering guidelines and general
       engineering guidelines in considering the impact of the application on the public interest
       including flood protection.

79.    The United States breached that duty by negligently issuing a permit which permitted
       changes to the canal bottom which resulted in subsurface soil destabilization of the levee.

80.    The plaintiffs' and class members' damages were proximately caused by the negligent acts and/or omissions as described herein.

81.    Each Plaintiff has complied with all conditions precedent to this action.

82.    Pursuant to the federal maritime and admiralty statutes the United States is liable or is responsible to plaintiffs for money damages for negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

83.    In the alternative, pursuant to the Federal Tort Claims Act, the United States is liable or is responsible to plaintiffs for money damages for its negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

84.    The activities for which the Corps of Engineers issued a permit did not involve any activities as part of a federal flood control project.

85.    The United States is not immune from civil liability under the Mississippi Flood Control Act of 1928, as amended, 33 U.S.C. § 702( c ) for its negligence because the actions of the Corps of Engineers were not undertaken in connection with an authorized federal flood control project.

86. This negligence was such that the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

87. The United States had no discretion to permit the dredging and construction associated with the 17th Street Drainage Canal Improvement Project because the approved work damaged the public interest by undermining existing flood protection.

88. The failure of the 17th Street Drainage Canal sheet pile retaining wall, and the resulting inundation of the City of New Orleans and the neighborhood of Old Metairie in Jefferson Parish was directly und proximately caused by the Army Corps' negligence and approval of the SWB proposed dredging of the 17th Street Drainage Canal and its improvements.

89. The permitting of the dredging and attendant construction of the 17th Street Drainage Canal Improvement Project was a substantial contributing factor to the failure of the 17th Street Drainage Canal sheet pile retaining wall, and the resulting inundation of the City of New Orleans and the neighborhood of Old Metairie in Jefferson Parish .

90. The United States knew or should have known that its acts and omissions would proximately cause the damages suffered by the plaintiffs and the class.

28

# VII.

## SECOND CLAIM FOR RELIEF

## CLAIMS ARISING OUT OF THE NEGLIGENT DESIGN AND CONSTRUCTION OF THE I-WALLS ALONG THE EASTERN BANKS OF THE 17TH STREET CANAL

**91.**   Plaintiffs re-aver each and every allegation of paragraphs 1–90 as if fully set forth herein, and incorporate same by reference.

**92.**   The United States is liable to the plaintiffs for the negligent design and construction of the I-walls along the 17th St. Canal.

**93.**   Because the 17th St. Canal was not an authorized federal flood control project The United States has no immunity under 33 U.S.C. 702c.

**94.**   In addition, or in the alternative to the liability of the United States for its negligence in issuing a permit to dredge the 17th St. Canal, and for the negligent design and construction of the I-walls along the 17th St. Canal, the Corps' design of the I-walls was never authorized by Congress.   The design and construction of the I-walls was therefore not a flood protection project authorized by Congress, thus the immunity that may have been afforded to the Corps by 33 U.S.C. 702c is inapplicable.

95.   In addition, or in the alternative to the liability of the Corps as stated above, the Corps knew or reasonably should have known that the construction of levees and flood walls was impracticable, and that the plaintiffs' and putative class members' land and property was subject to overflow and damage.  Despite such knowledge, the Secretary of the Army and the Chief of Engineers breached their affirmative duty in such cases to institute proceedings to acquire either the absolute ownership of the lands so subjected to overflow and damage or to acquire the floodage rights over such lands, as provided by 33 U.S.C. 702c, second sentence.

96.   A result of the Corps' approval of the negligent design and construction of the I-walls along the 17th St. Canal,  as a result of its failure to disclose the inadequacy of the levees and flood walls and their inability to protect against flooding, the plaintiffs and putative class members have suffered damages including but not limited to:

a.        property loss both movable and immovable;

b.        diminution in property value;

c.        past, present and future personal injury;

d.        past, present and future fear, fright, and emotional distress;

e.        past, present, and future inconvenience;

f.        past present and future bodily injury;

g.        past present and future business interruption;

h.    deprivation of the opportunity to avoid or take precautions against losses due to flooding, including the opportunity to relocate in a flood protected area;

i.    deprivation of the opportunity to protect their homes and property by implementing structural improvements including but limited to raising their homes to avoid flooding;

j.    deprivation of the opportunity to protect their financial investment in their homes and property by purchasing flood insurance;

k.    wrongful death;

l.    evacuation expenses; and

m.    other damages as may be proven at the trial of this matter.

## VIII.

## CLASS ACTION

97.    Plaintiffs re-aver each and every allegation of paragraphs 1–96 as if fully set forth herein, and incorporate same by reference.

98.    The proposed class representative and named plaintiff herein seeks to represent the following class:

All residents, domiciliaries, and property owners of the Parishes of Orleans and Jefferson in the State of Louisiana who were damaged by the flooding caused by the failure of the levees and flood wall along the 17th Street Canal on August 29, 2005 in New Orleans, Louisiana and (a) who have sustained any injury or damage thereby, and/or (b) who may suffer such injury or damage in the future as a result thereof, or ( c) who have sustained a justifiable fear of sustaining such injury or

damage in the future as a result thereof; and who have presented their claim to the appropriate federal agency and allowed the passaged of six months from the federal agency's receipt of that claim.

99 . The proposed class is so numerous that joinder of all members is impractical as thousands or hundreds of thousands of individuals throughout Orleans and Jefferson Parish were affected by the events which form the basis of this lawsuit, and the actual number of individuals who or which will elect to maintain their claims through this litigation will better be established as the notification to all absentees that this action is pending; however, the class is believed to number in the thousands or hundreds of thousands of persons

100. The questions of law and fact arising out of the claims made by the proposed class are common and include, but are not limited to, establishing facts to resolve the following questions of law:

a.   Whether the sheet pile retaining walls in question were defective;.

b.   Whether the Corps knew that the sheet pile retaining walls in question were defective;

c.   Whether the defective sheet pile retaining walls caused or contributed to flooding which occurred in Orleans and Jefferson Parish, Louisiana;

d.   Whether the actions and/or inaction of the defendant caused or contributed to the plaintiffs and/or the putative class' damages as outlined above

e.   Whether the design and construction of the levees and flood walls by the defendant were adequate;

    f.      Whether the 17th Street Drainage Canal Improvement Project is defective in design and/or construction;

    g.     Whether the Army Corps knew that the 17th Street Drainage Canal Improvement Project was defective in design and constriction;

    h.     Whether the defective design and construction of the 17th Street Drainage Canal Improvement Project caused or contributed to flooding which occurred in Orleans and Jefferson Parish, Louisiana;

    i.      Whether the Corps is immune from liability under 33 U.S.C. 702c.

    j.      Whether the United States and the Corps breached its duty to acquire ownership of the plaintiffs' and putative class member's land;

    k.     Whether the United States and the Corps breached its duty to acquire ownership of the floodage rights of plaintiffs' and putative class member's land.

**101.** The claims of the proposed class representative are typical of the claims of the proposed class.

**102.** Plaintiff will fairly and adequately represent and protect the interests of all members of the described class. Plaintiff has retained attorneys highly experienced in the prosecution of class actions, including complex litigation, and mass tort class actions, to represent class members herein.

**103.** The common questions of law and fact as shown above predominate over individual questions of causation or individual damages.

104.   Concentrating this litigation in one forum will aid with judicial economy and efficiency
and promote parity among the claims of individual class members as well as judicial
consistency.

105.   A class action is superior to other available methods for the fair and efficient adjudication
of this litigation, since individual joinder of all members of each class is impracticable.
Even if any class members could afford individual litigation, it would be unduly
burdensome to the Courts in which the individual litigation would proceed.  Individual
litigation magnifies the delay and expense to all parties in the court system of resolving
the controversies engendered by defendant' product.  By contrast, the class action device
presents far and fewer management difficulties and provides the benefits of unitary
adjudication, economies of scale, and comprehensive supervision by a single court.
Thousands of individual actions will create unnecessary burdens on and delay to injured
victims in addition to straining the judicial system.  Such individual actions will also
magnify the expense for retaining expert witnesses, and prolong all parties' abilities to
receive a speedy and efficient adjudication of this matter.

106.   Furthermore, class certification is appropriate because the prosecution of separate actions
by individual members of the class would create a risk of adjudications with respect to
individual members of the class which would as a practical matter be dispositive of the
interests of the other members not parties to the adjudications and substantially impair
their ability to protect their interests.

34

107.   Accordingly, class certification is appropriate under the Federal Rules of Civil Procedure,

Rule 23(b)(3)and/or (b)(1)(B), and the class action vehicle is the superior method for

handling this litigation.

## IX.

**W H E R E F O R E,** complainants, individually and on behalf of all those similarly

situated members of the proposed class, prays:

(1)   that the defendant be served with a copy of the complaint and be cited to appear
and answer same;

(2)   for an order certifying the class and any appropriate subclasses thereof under the
appropriate provisions of Federal Rules of Civil Procedure, Rule 23, and
appointing complainants and their counsel to represent the Class;

(3)   after due proceedings are had, that judgment be rendered in favor of plaintiff and
the proposed class and against the defendant in an amount to compensate plaintiff
and each member of the class for all damages to which they are entitled by law;

(4)   for legal interest on all damages awarded from date of judicial demand until paid;

(5)   for the costs of this litigation;

(6)   for such other and further damages and relief as this Court may deem just and
proper.

Respectfully submitted,

BRUNO & BRUNO, L.L.P.

Joseph M. Bruno (#3604)
David S. Scalia (#21369)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 581-1493
E-Mail:   jbruno@brunobrunolaw.com

35

and

LEVEE LITIGATION GROUP

JOSEPH M. BRUNO, T.A.  (La. Bar #3604)
DANIEL E. BECNEL, JR.  (La. Bar #2926)
JOHN W. DeGRAVELLES (La. Bar #4808)
WALTER C. DUMAS   (La. Bar #5163)
CALVIN C. FAYARD, JR.  (La. Bar #5486)
JIM S. HALL (La. Bar #21644)
DARLENE M. JACOBS (La. Bar #7208)
HUGH P. LAMBERT (La. Bar #7933)
F. GERALD MAPLES (La. Bar #25960)
GERALD E. MEUNIER (La. Bar #9471)
PEYTON P. MURPHY (La. Bar #22125)
ASHTON R. O'DWYER, JR.  (La. Bar #10166)
JERROLD S. PARKER
DENNIS C. REICH (Tx. Bar #16739600)
J. PATRICK CONNICK
STEPHEN WILES
ROBERT J. CALUDA
KEITH COUTURE
RICHARD M. MARTIN, JR.
ALBERT REBENNACK