UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES * | Civil Action No. 05-4182 |
| * | Consolidated Litigation |
| _____ * | |
| * | Section "K" |
| PERTAINS TO: * | |
| RECORD DOCUMENT # 4140 * | New Orleans, Louisiana |
| * | June 13, 2007 |
| * * * * * * * * * * * * * * * * | |

MOTION TO DISMISS HEARING
BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.,
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For Consol Plaintiffs:          Bruno & Bruno
                                By:  JOSEPH M. BRUNO, ESQ.
                                By:  L. SCOTT JOANEN, ESQ.
                                855 Baronne Street
                                New Orleans, Louisiana 70113


For Defendant Washington        Stone Pigman Walther Wittmann
Group International, Inc.:       By:  WILLIAM D. TREEBY, ESQ.
                                By:  HEATHER S. LONIAN, ESQ.
                                546 Carondelet Street
                                New Orleans, Louisiana 70130-3588

                                Jones Day (Washington)
                                By:  JULIA E. McEVOY, ESQ.
                                51 Louisiana Avenue, NW
                                Washington, DC 20001

2

APPEARANCES (Cont'd.):


Court Audio Operator:          Bonnie G. Hebert


Transcriptionist:              Dorothy Bourgeois
                               c/o U.S. District Court
                               500 Poydras Street, Room C151
                               New Orleans, Louisiana 70130
                               (504) 589-7721

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

P R O C E E D I N G S

(Wednesday, June 13, 2007)

THE COURT:  Good afternoon.

(All Counsel respond, "Good afternoon, Your Honor.")

THE CLERK:  This is Civil Action 05-4182 and this is

*In Re:  Katrina Canal Breaches Consolidated Litigation*

regarding Defendant Washington Group International's Motion to

Dismiss, and it's Record Document Number 4140.

THE COURT:  Make your appearances, please.

MR. TREEBY:  If Your Honor please, William Treeby of

Stone Pigman for Washington Group International, along with

Julie McEvoy of Jones Day.

MS. McEVOY:  Good afternoon.

THE COURT:  Good afternoon.

MR. BRUNO:  Joseph Bruno for Plaintiffs, Your Honor.

THE COURT:  Thank you.

MR. TREEBY:  And with Heather Lonian's able

assistance.

THE COURT:  Oh, yes.  Thank you.

Before you start, it's the Defendant's motion, maybe

I'll give you just a little overview of where I am, and then of

course you can take your argument where you want.  And I do

appreciate all of you accommodating my schedule and coming this

afternoon and I hope it wasn't too disruptive.

Well, the Reed and Ackerson decisions that I made are

1   somewhat parallel to this, and of course the Defendant has

2   pointed that out in the brief.  I'm well familiar with the

3   Yearsley Doctrine, obviously, from the Reed and Ackerson cases,

4   and in reading the number of cases that I have, there may be a

5   slight distinction between a Yearsley situation and the classic

6   government contract to defense, but there are certainly highly

7   related.  They are at least fraternal and maybe, at the very

8   least.

9        So, to distill this to its essence, I'm familiar,

10  just to let you know that I have -- I think I'm familiar with

11  -- you can't see this, Mr. Treeby, but where the work took

12  place, in essence between Florida and Claiborne on the batture,

13  I'll call it, the 32 acres, I'm familiar where the breach

14  occurred in relation to that.  My concerns are as follows:

15  This is a little different than the Reed and Ackerson in that

16  there are allegations of negligence.  The question is, and we

17  all know that if the contractor were independently negligent,

18  then it takes him out of the Rule 12 motion, at least that's

19  what the Court's thinking is now.

20       But the question is:  Are the allegations sufficient

21  to support that?  Are they conclusory?  And of course, the

22  Defendant's brief states that, and not without some cause.  And

23  that's where the Court is concerned.  There are allegations of

24  specifically how the work was performed and saying you didn't

25  follow procedures; I'm not quite sure which ones.  But you

1   didn't follow regulations; I'm not quite sure which ones.   They

2   do mention that you should have known of the seepage and should

3   have alerted the Corps, which is -- and they do allege that you

4   used a vibration technique, but I don't know what the scope of

5   the work was, what the specs were, what the Government in

6   essence -- did the Government have specs that said, "This is

7   the way you do the work"?   The bottom line is:   Did you do

8   something that you shouldn't have done that deviated from the

9   specifications, or were not in compliance with the

10  specifications, or not in compliance with some regulation.

11          I don't see any specific allegation to that effect

12  and I'm going to of course ask the Plaintiffs about that, but

13  those are my -- but yes, it's more robust allegations than in

14  <u>Reed</u> and <u>Ackerson</u>, and the question is are they robust enough

15  to withstand this Rule 12 motion?   And that's sort of where I

16  am, and Mr. Treeby, you're up.

17          MR. TREEBY:   Thank you, Your Honor.   May it please

18  the Court, William Treeby for Washington Group International.

19  As the Court knows, we are a Defendant, one of the Defendants

20  named in the MRGO master class action complaint filed.   We're

21  named as a Defendant in the subclass for the Lower Ninth Ward

22  and the entirety of St. Bernard Parish.

23          I have introduced to the Court Julia McEvoy of the

24  Washington office of Jones Day, who also represents Washington

25  Group.   She is admitted Pro Hac Vice in this case, and with

6

1    Your Honor's permission we will be sharing the argument of this

2    case.

3            THE COURT:  Certainly.

4            MR. TREEBY:  I'm going to be making the Rule 12(b)(1)

5    motion argument, the jurisdictional argument, and Ms. McEvoy is

6    going to be making the Rule 12(c) argument.  And if issues

7    arise during my portion of the argument, because what she's

8    going to be talking about on the 12(c) argument is that the

9    duty risk analysis requirement under Louisiana law, assuming

10   the Court after evaluating our Rule 12(b)(1) argument believes

11   it has subject matter jurisdiction to even get there.

12           THE COURT:  And Mr. Treeby, one of the things that

13   I'm interested in and neglected to mention is the standard that

14   I would utilize in your 12(b)(1) argument.  Do I use the Montez

15   standard, because the facts are intermingled and therefore use

16   the 12(b)(6) standard?  And I'm interested in what your view is

17   on that?

18           MR. TREEBY:  In that, you know, I try to agree with

19   Plaintiffs every time I can, Your Honor, that's my goal.  And

20   in that regard I would agree with the Plaintiff's opposition

21   that we are making a facial attack under 12(b)(1), and it does

22   not require the Montez evaluation.

23           As the Court is aware, as we mentioned in our

24   memorandum, our intention on behalf of Washington Group, based

25   on the allegations made in the various petitions and complaints

1    that were naming Washington Group prior to the superseding

2    master complaint, was to file a Motion for Summary Judgment

3    based on the Government contract immunity.  And that is still a

4    course of action available to Washington Group should this not

5    succeed.  However, when the master complaint was filed we

6    believe it made a Rule 12 motion available since the facts

7    necessary to support the Rule 12 dismissal have now -- they

8    were not in the past -- but have now been alleged and admitted

9    by Plaintiff in the MRGO master complaint.

10        The crux of our motion, as Your Honor has already

11   indicated it knows is that Washington Group did everything it

12   did pursuant to a contract it performed for the United States

13   Corps of Engineers on a project fully authorized and funded by

14   the United States Congress.  Washington Group performed that

15   contract in accordance with specific detailed daily supervised

16   specifications worked out in advance with the Corps of

17   Engineers, and that work was then inspected and approved by the

18   daily supervision of the Corps of Engineers.  Nothing done by

19   Washington Group is alleged in the master complaint to have

20   been done outside the scope of that work.  In fact, we believe

21   the complaint admits that the work that was done was in the

22   scope of that work.

23        And nothing, and this is a little more tenuous and so

24   I want to admit that going in; but nothing, we believe alleged

25   against Washington Group calls into question the due care

1    Washington Group exercised in fulfilling its contract.  To the

2    contrary, the Plaintiffs allege, and thus admit that what we

3    did was pursuant to that contract, known as Task Order 26 under

4    a standing total environmental restoration contract that

5    Washington Group had with the Corps of Engineers.

6            Simply put, our argument is that the conclusory

7    allegations of negligence made by Plaintiffs in the master MRGO

8    complaint are insufficient to give this Court subject matter

9    jurisdiction, because it is admitted by Plaintiffs that

10   Washington Group was a Government contractor, contracted by the

11   Government to carry out Congressional will, to do a bit of the

12   work required to enlarge and update the Inner Harbor

13   Navigational Canal lock system.  Your Honor is familiar with

14   this, I believe, from the ACORN case that you handled a few

15   years ago.  And in the detailed recital of the work that

16   Washington Group was contracted to do in that regard, there's

17   not one allegation that Washington Group did anything outside

18   the scope of that, of the tasks it was contracted for.

19           If, after poring over 40 boxes of documents

20   describing Washington Group's work Plaintiff's knew of any such

21   facts, they would have alleged them to support their

22   conclusions.  And even though in light of this Court's, we

23   believe, correct ruling in Reed and Ackerson, the Plaintiff's

24   have included Paragraph 45 which is going to be a lot of what

25   we talk about this afternoon in the master complaint.

1          THE COURT:  Yes.

2          MR. TREEBY:  They, describing alleged negligence or

3    fault, those allegations are conclusory and devoid of any

4    specific facts to support them, and as a result this Court does

5    not have subject matter jurisdiction.  I think in a timely way,

6    when we were gratified to see it the Supreme Court about three

7    weeks ago --

8          THE COURT:  I read Twombly.  But believe it or not,

9    Twombly is going to be the featured case in my next argument,

10    because it's an antitrust case.

11          MR. TREEBY:  Right.

12          THE COURT:  So, I'm well familiar with Twombly as a

13    result of not necessarily your case, but because of the next

14    case I have coming out right after this argument.

15          MR. TREEBY:  Right.  It was decided after we filed

16    our memorandum and just before we filed our reply, and we did

17    mention it.  But the Twombly case -- the Plaintiffs have an

18    obligation to -- and in the general part of Twombly.  Twombly

19    does talks about the Sherman Act.

20          THE COURT:  Right.

21          MR. TREEBY:  But before that it talks about the

22    general proposition that came out of the Conley case that had

23    -- that the court decided:  We're going to get rid of that

24    language that has been quoted over and over again, to defeat

25    12(b)(1) rulings, no facts, that rubric.

1           In the Twombly case, a Sherman Act antitrust

2     conspiracy case, the plaintiffs allege that the defendants, as

3     Your Honor knows, had engaged in a conspiracy and restraint of

4     trade and plaintiffs alleged there was an agreement among the

5     alleged conspiring defendants.  But the specific facts alleged

6     consisted of the alleged results of the conspiracy, that all

7     the defendants acted in a parallel manner.

8           Here, the Plaintiffs, we believe, have made the

9     equivalent of Twombly's conclusory allegations, only this time

10    in the context of a Louisiana negligence or fault allegation.

11    Plaintiffs have alleged in conclusory fashion a causal

12    connection, whether true or not is another matter, but for this

13    purposes we have to accept it as true, between the work

14    Washington Group did in compliance with its contract and the

15    August 29, 2005 failure of the levees and floodwall on the east

16    bank of the Industrial Canal during Katrina.

17          But when it comes to Paragraph 45, the fault

18    allegations, the MRGO plaintiffs resort to rote allegations,

19    simple labels and conclusions we think a formulaic recitation

20    of the elements of a cause of action.  And as the Supreme Court

21    in Twombly instructs, that simply will not do.

22          THE COURT:  One of the things that concerns me about

23    Twombly, and it doesn't necessarily mitigate your argument, is

24    that I'm not sure the Supreme Court was instructing the

25    inferior courts to be as parsimonious -- to be as, I'll say

1   legally parsimonious to other cases outside the antitrust

2   context, because there was a lot of reasons about this,

3   including the -- of course, you have discovery as well, but it

4   really was framed in the antitrust context, although there is

5   language about how Rule 8 interfaces with Rule 12 and it has

6   been the law, and I have done so, where something is purely

7   conclusory even before, for.  Twombly, I have not simply

8   regurgitated Conley, but there's enough Fifth Circuit law to

9   support the fact that you simply can't make conclusory

10   allegations.

11          MR. TREEBY:  Right.

12          THE COURT:  And I understand Twombly may add a little

13   oompf to that.

14          MR. TREEBY:  I think what it does is take away that

15   no facts can, you know, there are no facts that can be proved

16   under those allegations that can support it.  They took that

17   language and said:  We're putting that on the shelf, we're

18   getting rid of it.  There are other parts of the Conley case

19   that the Court in fact has continued and will continue no doubt

20   to cite, but not that.

21          But Plaintiffs, we believe, have to allege facts

22   tending to prove at least one of their conclusory propositions

23   and there are four conclusory propositions in Paragraph 45, and

24   I will deal with them one at a time.

25          THE COURT:  Yes, sir.

1              MR. TREEBY:  They must allege facts in support of the

2    conclusion that Washington Group knew or should have known that

3    its demolition and remediation work, remote from the floodwall,

4    remote from the levees, but on the canal banks, so what

5    Your Honor has called the batture, on the canal banks and the

6    canal, was causing damage to the levee and/or floodwall

7    structures.  They have alleged no such facts.  They must allege

8    facts in support of the conclusion that Washington Group in

9    fact, quote, failed to presumably -- and I'm -- I think there

10   was a word left out of the complaint, but I think I understood

11   what they meant -- failed to presumably use or follow proper

12   procedures in performing its work.

13              What facts are there?  What procedures?  They fail to

14   allege facts in support of the third conclusion that Washington

15   Group failed to, quote, comply with appropriate regulations and

16   standards in performing its work.  What regulations and

17   standards?

18              They fail to allege facts in support of the

19   conclusion that Washington Group failed to, quote, notice the

20   damage caused by its work.  Damage not alleged specifically, by

21   the way.  They're talking about damage that we should have

22   noticed during our work, which ended in May of 2005.  We should

23   have noticed some damage to the levee and floodwall.  What

24   damage?  Give us some specific facts that would indicate we

25   should have noticed some damage.

1        The only remaining fault allegations consist of the

2   impermissible, what I call reservation of rights language in

3   the fifth paragraph, any other acts of fault or negligence to

4   be proved in a trial.  That language certainly can't survive

5   Rule 12(b)(1) scrutiny.

6        These allegations by Plaintiff in the MRGO master

7   complaint against Washington Group are the direct equivalent of

8   what was found insufficient to state a viable claim by the

9   Twombly court.  The lack of facts other than conclusions

10  deprives this Court, we believe, of subject matter

11  jurisdiction.  Rule 8(a)(2), as the Twombly court instructed,

12  still requires a showing rather than a blanket assertion of

13  entitlement to relief.  Without some factual allegation in the

14  complaint it's hard to see how a claimant could satisfy the

15  requirement of providing not only fair notice of the nature of

16  the claim, but also grounds on which the claim rests.  That's a

17  quote from Twombly.

18        THE COURT:  Let me ask you a question, sir:  The

19  Plaintiffs allege you used these vibratory techniques to

20  accomplish your work.  Of course, there's an implication there

21  that those techniques may have been harmful, and this is a loop

22  I have to make there.  But I guess I'm asking you:  Were those

23  techniques part of the specs?

24        MR. TREEBY:  Yes, they were part of exactly what the

25  Corps -- the way this job happened was the Corps said first go

14

1   out and study and propose to us exactly how this job was going

2   to be done and let's walk through it, piece by piece, and

3   you're going to do it that way.  Then, day by day, week by

4   week, as they well know from going through 40 boxes of

5   documents that we gave them every document that related to the

6   area which is what we had agreed upon in the initial

7   disclosures, for the area directly in front of the Saucier

8   Marine industrial site, which was where the 800 foot breach

9   later occurred, and every document related to the Boland Marine

10  site, which was directly in front of where the 200 breach

11  occurred.

12          Now, there were six industrial sites; there were just

13  two there.  We agreed, because otherwise there would have been

14  140, probably, boxes of documents too.

15          THE COURT:  And the 32 acres where you worked?

16          MR. TREEBY:  Yes.

17          THE COURT:  At least as I understand the scope of

18  this work; and how many breaches were there, just so I --

19          MR. TREEBY:  Two.

20          THE COURT:  Two.  I know of one, but there was

21  another one.

22          MR. TREEBY:  The two were the 800 foot breach that

23  the barge went through.

24          THE COURT:  If I go from Claiborne --

25          MR. TREEBY:  You're familiar with the one the barge

1   went through?

2            THE COURT:  Yes, yes.

3            MR. TREEBY:  And the other one was at the very north

4   end, near Florida Avenue, near the Florida Avenue end of the

5   area.

6            THE COURT:  Okay, okay.

7            MR. TREEBY:  And it was in front of what was

8   previously the abandoned Boland Marine site.

9            THE COURT:  All right.  And across from that is this

10  large slip area?  Can you see that?

11           MR. TREEBY:  Not really.

12           THE COURT:  And I'm just doing this for my own

13  curiosity.

14           MR. TREEBY:  This is on the -- you're looking at

15  something on the west bank?

16           THE COURT:  I'm going to show you.

17           MS. McEVOY:  Your Honor --

18           THE COURT:  If you wouldn't mind putting it on the

19  ELMO?

20           MS. McEVOY:  Your Honor, I'll save you some

21  difficulty.  We've got a map that I think you can take judicial

22  notice that it should be about the same one.

23           THE COURT:  Okay, good.

24           MR. TREEBY:  Do you want to get it?

25           MS. McEVOY:  Excuse me, yes.

16

```
 1            MR. TREEBY:  Yes, we'll pull it up on the screen
 2   there.  I think it's a map that will show that to you.
 3            THE COURT:  Yes, because that one is very evident
 4   that that's me perusing the internet.
 5            MR. TREEBY:  Yes, as soon as it warms up.  Yes, the
 6   answer is yes.  I'm looking at it on the map and the answer
 7   is --
 8            THE COURT:  Okay.
 9            MR. TREEBY:  No, wait.  No, the answer is not yes,
10   I'm sorry.  No, I'm sorry, the answer is yes.  The answer is
11   yes.
12            THE COURT:  Yes, it's a little hard to --
13            MR. TREEBY:  Yes, you can see it on the screen here.
14            THE COURT:  Yes, I can see it.
15            MR. TREEBY:  If you're seeing what I am seeing on the
16   screen here, which we are trying to get warmed up over here.
17            THE COURT:  All right.
18            MR. TREEBY:  In any case, I believe the answer,
19   Your Honor, is yes, looking at what you provided me.
20            THE COURT:  Okay.
21            MR. TREEBY:  That's the --
22            THE COURT:  That was just a general idea.
23            MR. TREEBY:  That's across from the Boland Marine
24   site.
25            THE COURT:  It's not necessarily significant for this
```

1    motion, but I would just like to get the visual picture, so to

2    speak.

3                MR. TREEBY:  All right.

4                THE COURT:  So, I guess my real question was, and

5    you've answered it, and I'll be interested to hear the other

6    side, but there was a back and forth with the Corps?

7                MR. TREEBY:  Every day.

8                THE COURT:  And the method that you used to, let's

9    say the vibratory technique, I'll call it for lack of a better

10   word or phrase; was that something that was specified to you by

11   the Corps?

12               MR. TREEBY:  Yes.

13               THE COURT:  And I realize --

14               MR. TREEBY:  We -- yes.  That was approved by the

15   Corps.  Now, frankly, to get to that, we're over into our

16   Motion for Summary Judgment, which we'd have to file after

17   this.  We don't -- we're looking just at the allegations.  They

18   allege, and I think what Your Honor's in the paragraphs, I

19   believe what you're talking about is Paragraph 42, which

20   describes the --

21               THE COURT:  Yes, I am.

22               MR. TREEBY:  -- scope of the work.

23               THE COURT:  I am.  Yes, why don't I just frame the

24   question a little better?  I've got it right here.  Just give

25   me a second.

1         (Pause.)

2              THE COURT:  Okay, I'm reading in part from the 42

3    scope:  Demolition of the abandoned industrial -- I can read it

4    right from the complaint.  More specifically, Washington

5    Group's scope of work included, but was not limited to,

6    demolition of abandoned industrial structures on the east side

7    of the canal, removal of underground structures described in

8    Defendant's own recommendation reports as extensive excavation

9    of subsurface activity, abatement of vegetation, clearing off

10   trees, removal of canal side obstructions, removal of the

11   Jordan Street wharf, which included the removal of a concrete

12   deck and support pilings to a depth of 36 feet below mean water

13   level, removal of all electrical, sewer, gas, water and

14   telephone facilities on the site, including Boland's sewer

15   station.

16             Bank removal would include the vibratory extraction

17   of bulkheads along the canal water's edge, and I'll go ahead

18   and read the whole thing.  Removal of more than 50 structures

19   and more than 40 concrete slabs, retrenching of the entire east

20   bank industrial area, removal of ten sunken or partially sunken

21   barges, removal of barges that served as a building foundation,

22   removal of an estimated 3,000 pilings at the site, both on land

23   and in the land by use of a vibratory extractor to a depth of

24   30 feet for land based pilings and 40 to 50 feet for canal

25   water based pilings, grading and high drill mulching of the

1   site and other such work as to be demonstrated through the

2   course of discovery.  All right.

3          And then in 43, they allege, "In performing the work

4   Defendant Washington Group, based on information and belief,

5   undermined the integrity of the levee on a floodwall along the

6   eastern shoreline."  I'm just reading it in part.

7          And then in 44, to get us to 45, "Defendant

8   Washington Group's act of omissions resulted in under seepage

9   induced erosion and other damage to the levee and the

10  floodwall, ultimately causing and contributing to its

11  catastrophic failure.

12         And you are certainly correct that I shouldn't have

13  to extrapolate everything.  I'm just having a robust full

14  argument here.  To extrapolate what do they mean by this; I've

15  got to look at the complaint and see what it says.  And I was

16  just curious about that.  I wasn't sure what they were

17  referring to, necessarily, as to what you did wrong.  The

18  bottom line is if under Yearsley and/or the Government

19  contractor defense; if you did your job according to the Acts

20  of Congress and the Corps' specs, you're not liable.

21         MR. TREEBY:  If Your Honor please, I think it's very

22  revealing, the source of Paragraph 42.  The source of Paragraph

23  42 was the initial statement of the work before it even began,

24  combined with the completion report.  And every step of that

25  was vetted and approved by the Corps.  And all of it, in fact,

1  in the allegation they're saying this was the scope of the

2  work.

3          THE COURT:  I realize that I'm going into summary

4  judgment land, and I don't mean to get there.  I'm just curious

5  about that, because I'm trying to -- I'm going to be asking the

6  Plaintiffs where in here am I -- is there a sufficient

7  allegation to show that the Washington Group either is not

8  covered by Yearsley and/or the Government contractor defense.

9  And I am just getting your input now.

10         MR. TREEBY:  I appreciate that.

11         THE COURT:  Go ahead, sir.

12         MR. TREEBY:  It's hard to know, the Supreme Court, I

13  read the Twombly quote.  When the Supreme Court in Twombly

14  applied those general standards to the plaintiff's claim in

15  that case, the court held that such a claim requires a

16  complaint with enough factual matter, taken as true, to suggest

17  an agreement was made.

18         In this case, it's incumbent for Plaintiffs to have

19  made a complaint with enough alleged factual matter taken as

20  true to suggest that Washington Group really did know or had

21  enough facts so that it can be inferred they should have known

22  that the work they were doing was causing damage to the levees

23  and/or the floodwall structures.  Or it should be incumbent on

24  Plaintiffs to allege that Washington Group did in fact fail to

25  use or follow some specific proper procedures alleging what

1   that proper procedure consisted of.  Or it should be incumbent

2   upon the Plaintiffs to allege that Washington Group did in fact

3   fail to comply with some specific or identified applicable

4   regulations or standards in performing its work.

5           We cited one federal court that's kind of a general

6   principle.  If you're going to cite a statute and say somebody

7   violated it; if you're going to say somebody violated a

8   statute, you need to cite the statute and say what statute they

9   violated.  If it's a regulation, say what regulation they

10  violated.  Or, it should be required that Plaintiffs have

11  alleged that Washington Group saw or should have seen some

12  specifically identified damage caused by its work that it

13  failed to report.  None of those allegations of specific facts

14  are in Plaintiff's complaint, and therefore, we believe it

15  should be dismissed.

16          Even Justice Stevens in his lone dissent in Twombly,

17  partially joined by Justice Ginsberg, gave as one reason for

18  the dissent the fact that in Twombly no discovery had yet been

19  done in the case.  Justice Stevens wrote that had he been the

20  trial judge, he would have precluded massive discovery until

21  there were some facts and circumstances to support the

22  conclusion that there had been an agreement in that case, among

23  the defendants.

24          Here, Plaintiffs are certainly not without discovery.

25  They have been given every document they have asked for on the

1   work done adjacent to the failures in the levee and floodwall

2   structures between North Claiborne and Florida Avenue, in the

3   entire work site.  Not the entire -- those two areas.  And much

4   of the documents, many of the documents relate to the whole

5   area, the work done in the whole area.  All of this discovery

6   was provided prior to the filing of the master complaint by

7   Montz.  Despite this discovery, Plaintiff's allegations are,

8   like Twombly's, devoid of circumstances, occurrences -- and I'm

9   quoting from Twombly -- of circumstances, occurrences, or

10  events in support of the claim presented.  That's in Footnote 3

11  of Twombly.

12          As described in the superseding master complaint,

13  Plaintiff's claims against Washington Group fall, we believe,

14  clearly within the reasoning of this Court in the Reed and

15  Ackerson cases, decided by the Court in March this year.  Here,

16  as there, the Yearsley immunity defense for a contractor simply

17  doing what their contract requires them to do, shields

18  Washington Group from liability for its actions that are,

19  quote, tortuous when done by private parties, but not wrongful

20  when done by the Government, such as causing erosion on private

21  land by building dikes for the Government.

22          Even though in the case of this complaint the

23  Plaintiffs have in a conclusory fashion alleged that Washington

24  Group knew or should have known that its work was causing

25  damage, what is left to speculate about any facts that might

1   support either conclusion that there was damage to the levees

2   or floodwalls during Washington Group's work, or what

3   Washington Group knew or should have known about any such

4   speculative damage.  One can only speculate because the master

5   complaint doesn't allege any facts to support either

6   conclusion.  And here, unlike with the dredgers, Plaintiffs

7   have had many months with all the documentary evidence of the

8   work to try to find any such facts and they have obviously

9   failed to allege any such facts, and I don't believe that's for

10  want of trying.

11          Here, as in <u>Yearsley</u> and in <u>Reed</u> and <u>Ackerson</u>,

12  Washington Group cannot be held liable for performing the

13  contract in conformity with the Government's requirements,

14  provided we carried it out, carried out the contract with due

15  care and absent negligence.  And Plaintiff's allegations here

16  are allegations of conclusions without allegations of facts to

17  support those conclusions.  We believe that therefore that it

18  should be dismissed under Rule 12(b)(1).

19          As the Court knows, in <u>Reed</u> and <u>Ackerson</u>, the

20  Plaintiffs attempted to amend their complaint.  In fact, there

21  was a Motion to Amend, pending.

22          THE COURT:  And I regarded it as -- I found it

23  futile.

24          MR. TREEBY:  Right.  Now here, they have not filed a

25  Motion to Amend, but they have suggested that they ought to be

1    allowed to amend in their opposition.  There, the Court found

2    that the amendment would be futile, because the regulations

3    cited in that attempted amendment were regulations that were

4    guidelines for the Corps of Engineers, not the contractor.

5    Perhaps that is why in their conclusory allegations against

6    Washington Group, when Plaintiffs alleged that Washington Group

7    failed to do work in accord with regulations and standards,

8    none are cited.  Because any Corps of Engineers regulations and

9    standards related to levees and floodwalls had nothing whatever

10   to do with Washington Group's performance of its contract.

11          Washington Group's contract to remediate the east

12   bank industrial area in preparation for the installation of a

13   diversion canal to allow the construction of a new lock in the

14   middle of the existing canal was unrelated to levees and

15   floodwalls.  Washington Group has already been subject, one can

16   say, to a fishing expedition and Plaintiffs, in violation of

17   the admonition of the Court regarding further amendments to

18   their complaint, we believe, should not be allowed to continue

19   throwing out their nets.

20          Washington Group simply performed the work they were

21   contracted by the Corps of Engineers to perform, to accomplish

22   an objective that Congress intended to accomplish, to clear the

23   way for a diversion channel to allow the Corps of Engineers to

24   build a bigger lock in the Industrial Canal to facilitate

25   navigation.  And in order to do that they obviously would have

1    to take and make sure there were no toxics in that, remove any

2    toxics that were in that area, remove any structures that would

3    impede the construction of that canal, remove these pilings

4    that were out there and the wharfs, otherwise they couldn't do

5    that.  It was all part of the contract.  And they worked with

6    the Corps to get the easiest way to do it.

7            It's interesting, and again, this is summary

8    judgment, Joe, but Your Honor seems interested so I'll tell

9    you, and this is clear in the documents.  They put out

10   vibration monitors, because of the ACORN suit and all of the

11   concerns that were expressed down there, they put out vibration

12   monitors all along the outside of that canal wall, and there

13   was never any indication of anything that got outside -- right

14   at the other side of the toe of the levee, because they were

15   trying to do this job in a way that would have the least impact

16   on the neighborhood.  As a result, they didn't even drive

17   through the neighborhood.  They simply went up the Florida

18   Avenue end and over the Florida Avenue bridge.

19           THE COURT:  The Court remembers the concerns the

20   neighborhood had from another matter, as you mentioned the

21   ACORN matter.

22           MR. TREEBY:  Right.  This contract did not obligate

23   Washington Group to involve itself in flood protection.  It

24   didn't obligate Washington Group in any levee or floodwall

25   design.  It didn't obligate them, or they had no duty in levee

1  or floodwall construction or levee and floodwall evaluation, or

2  levee or floodwall maintenance, none of that.  Washington

3  Group, as will be addressed by Ms. McEvoy, had no duty based

4  upon what it was contracted to do and what it did, to involve

5  itself with floodwall design, floodwall construction, floodwall

6  evaluation, inspection or maintenance.

7       Ms. McEvoy will address what is required and what

8  considerations the Court should take into account if this Court

9  believes that they have alleged enough facts to have

10  jurisdiction.  We don't believe they have done so, but if the

11  Court disagrees, we believe that Plaintiffs have not alleged a

12  claim upon which relief can be granted as a matter of Louisiana

13  law.

14       THE COURT:  Thank you, Mr. Treeby.

15       MR. TREEBY:  Thank you.

16       MS. McEVOY:  Good afternoon, Your Honor, Julie McEvoy

17  from Jones Day in Washington, DC.  And if you'll bear with me

18  one minute, I want to make sure we don't have any technical

19  burps here as we go along, to use a term of art.

20       THE COURT:  All right.

21       MS. McEVOY:  We have argued that the complaint failed

22  to articulate any duty required or breached by Washington

23  Group.  I'm going to focus on the question whether the duty

24  posited in Plaintiff's opposition, not in the complaint, would

25  as Plaintiffs argue encompass the risk and harm flowing from

1    variables beyond Washington Group's scope of work, knowledge,

2    or control.

3            THE COURT:  Before the elaborate duty risk formula,

4    and sort of in between Paul's graph and that, there was the

5    foreseeability issue, which is somewhat what you are getting

6    to.

7            MS. McEVOY:  It's interesting that you suggest that,

8    because Mr. Treeby and I have been debating the question of

9    foreseeability and its viability under Louisiana law.  In the

10   Roberts cases, which are really companion cases, if you pull up

11   the cite on the computer you'll see that there was an initial

12   decision and then a second decision revisiting some of the same

13   issues about legal cause, engages in a lengthy discourse.  The

14   Supreme Court engages in a lengthy discourse about the

15   evolution of the Louisiana duty risk analysis, and it says,

16   some people say, foreseeability, and we say duty risk.  We're

17   not really sure where we come out, but the one thing is certain

18   is that each case must be addressed on its own facts and in the

19   context of all of the facts alleged.

20           So, whether you call it foreseeability or whether you

21   look at the related questions of duty and duty risk; under the

22   duty risk rubric, I think we end up in the same place.

23           THE COURT:  So, it seems like you're ready to take

24   the Louisiana Bar exam at least on the tort section.

25           MS. McEVOY:  At least as to duty risk, sir.

1        THE COURT:  Okay.  Well then primarily, that's the

2   tort section.

3        MS. McEVOY:  Yes, indeed.

4        THE COURT:  But go ahead.

5        MS. McEVOY:  At the outset I note that Plaintiffs

6   have not made any argument, any legal argument in response to

7   this duty risk issue raised in our Motion to Dismiss.  Instead,

8   they argued that Washington Group owed them a duty to refrain,

9   quote, from negligently undermining the floodwalls that were

10  designed to protect the very harm that occurred.

11       This unsupported assertion assumes that stating a

12  duty and alleging its breach suffices to state a negligence

13  claim under any of the articles identified in the complaint.

14  Both the Louisiana Supreme Court and the Fifth Circuit have

15  rejected such a remedial rubric for negligence claims.  A

16  plaintiff must also state facts demonstrating that any duty

17  defendant owed to the plaintiff encompassed the risk about

18  which he complains.  This is, in the words of the Louisiana

19  Supreme Court in the Todd case, an important requirement to

20  avoid making a defendant an insurer of all persons against all

21  harms.

22       I want to focus our discussion today on a case that

23  is cited on Page 18 of our opening memorandum, and actually I

24  want to highlight for the Court a recent development in that

25  case.  That's the McLachlan versus New York Life Insurance

1    case.

2             THE COURT:  All right.

3             MS. McEVOY:  And with the Court's permission, I'll

4    approach and provide copies of the slip opinion that the Fifth

5    Circuit recently rendered in that case.

6             THE COURT:  All right.  Does Counsel have a copy, as

7    well?

8             MS. McEVOY:  I will provide them to them, as well.

9             THE COURT:  All right.

10            MS. McEVOY:  We noted in our opening memorandum that

11   Judge Vance had granted New York Life Insurance Company's

12   Motion to Dismiss filed by Mr. McLachlan.  Mr. McLachlan

13   claimed that the insurance company failed a duty to disclose

14   the results of certain blood tests that had been performed in

15   connection with his life insurance application.  Mr. McLachlan

16   alleged that New York Life should have disclosed elevated

17   creatine levels revealed in blood tests performed in connection

18   with the insurance application.  He further contended that if

19   the life insurance company had done so, Mr. McLachlan could

20   have detected and prevented damage that ultimately caused his

21   kidneys to fail.

22            New York Life moved to dismiss the complaint under

23   Rules 12(b)(6) and 12(c), arguing that any duty owed to

24   Mr. McLachlan did not include insurance against kidney failure.

25   Judge Vance agreed, granted the motion and dismissed the

1    complaint.

2            Two weeks ago -- and I apologize, Your Honor that we

3    didn't catch this before we filed our reply brief; but two

4    weeks ago the Fifth Circuit affirmed Judge Vance's decision.

5            THE COURT:  I have read this, because I get them very

6    quickly, so I have read this case.

7            MS. McEVOY:  All right, okay.  The court questioned

8    whether the insurance company which commissioned the blood test

9    for its own underwriting purposes, not for the benefit of

10   Mr. McLachlan, owed a duty to disclose the test results to him.

11   The court determined that it did not, citing a number of

12   factors pertinent to this discussion.  And I'm referring

13   Your Honor in the next few comments that I'm going to make, to

14   the right hand column of Page 5 of the slip opinion that I've

15   handed you.

16           THE COURT:  All right.

17           MS. McEVOY:  The Fifth Circuit observed that the

18   insurance company agreed to evaluate a life insurance

19   application.  It did not agree to perform medical services on

20   the applicant's behalf, or to warn him of any risks detected in

21   connection with the application.

22           Second, the court noted holding the insurance company

23   to the standards of doctors would require expertise that the

24   insurers did not have and were not asked to provide.

25           Third, the court observed that the insurance company

1    did not set Mr. McLachlan's disease in motion.

2         The same considerations underlying the dismissal of

3    Mr. McLachlan's complaint are pertinent here.  First,

4    Washington Group was not asked to work on the levee or

5    floodwall, or to evaluate the integrity or maintenance of those

6    structures.  Rather, according to Paragraph 41 of the

7    complaint, Washington Group was asked by the Corps to, quote,

8    remove the wharfage, salvage, debris and other materials from

9    the Industrial Canal and/or its banks.

10        Second, the complaint leaves responsibility for

11   engineering, evaluation and maintenance of the flood protection

12   structures squarely at the feet of the Corps.  Holding the

13   Washington Group to the standards of the civil engineers for

14   whom Washington Group worked would require expertise that

15   Washington Group was simply not asked to provide.

16        Finally, it's evident from the face of the complaint

17   that Washington Group did not create or set into motion the

18   alleged disease of the defective levees or the confluence of

19   events giving rise to what is a terrible tragedy.  This last

20   point is an especially important one under Louisiana law, which

21   as the Supreme Court observed in Roberts, requires the court to

22   employ logic, reasoning and policy considerations to determine

23   whether liability should be imposed under all the facts

24   alleged.

25        So, I want to look at the Plaintiff's theory of

1  liability that's set forth in the complaint and I was glad to

2  see you pull out a map, Judge, because I'm very much a visual

3  learner myself.  I want to make it clear that what we're

4  illustrating here today is not by any means intended to adopt

5  or illustrate what actually happened on August 29th and

6  subsequently.  Rather, as you'll see, we've tried to break down

7  the Plaintiff's allegations, first against Washington Group,

8  and then in a larger context, to show you -- and for me to

9  educate myself very visually, what is it that Plaintiffs are

10  getting at, and what is the duty they're seeking to impose

11  here?

12           So, we have talked about Paragraph 41 and you'll

13  note, I have put a red circle, Your Honor, between Florida

14  Avenue and the Claiborne Avenue bridges.

15           THE COURT:  Yes.

16           MS. McEVOY:  So you can see the east bank industrial

17  area, relative to everything else that the Plaintiffs have

18  alleged.

19           THE COURT:  Yes.

20           MS. McEVOY:  And as I noted previously, the thrust of

21  Paragraph 41 is that we were asked to and did perform

22  remediation services from the Industrial Canal and/or its

23  banks, not the levee or floodwall.  I won't recite the long

24  laundry list of --

25           THE COURT:  Right.

1          MS. McEVOY:  -- tasks that you have already read for

2    the court to this.

3          THE COURT:  Yes, I have already read it, for the most

4    part.

5          MS. McEVOY:  Yes.  But I want to point out that

6    again, all of these tasks were within the scope of work and

7    resulted in a situation in which Washington Group left the site

8    in May of 2005, having filled in all of the things that it

9    removed from the site.

10          THE COURT:  When did you say the Washington Group

11    left?  I'm sorry.

12          MS. McEVOY:  May of 2005, sir.

13          THE COURT:  May, that's what I thought, in May.

14          MS. McEVOY:  Let me get to the big finale, as

15    Plaintiffs have described it.  They poo-pooed a little bit our

16    arguments about Paragraphs 43 and 44 and say:  But if you

17    really want specifics, Judge, look at Paragraph 45.  And

18    Paragraph 45 is really important to everything that we have

19    been discussing.  Mr. Treeby touched on some of the

20    shortcomings of Paragraph 45 and I want to highlight a few of

21    them for purposes of the McLachlan case.

22          Number one, Washington Group knew or should have

23    known that its work was causing damage.  I note again that

24    Washington Group was not asked to work on the levees.

25    Plaintiffs have not alleged that it did, and they were not

1    asked to perform engineering services.  The fact that they were

2    not asked to perform engineering services makes these

3    allegations about regulations and standards and procedures even

4    more curious, because it's not clear if Washington Group was

5    not performing engineering services, what code of conduct would

6    govern its performance of the contract.  And we certainly have

7    no clue based on this allegation.

8         THE COURT:  Unless they did something that was -- I'm

9    not saying it's alleged, but if you did not perform your work

10   in a workman like way where you did something untoward to

11   accomplish your object that was negligent.  But I'm not saying

12   that you did that, but that's what the Court assumes that they

13   mean.  I'm not saying it has been alleged, at least certainly

14   for the purposes of this motion, sufficiently.

15        MS. McEVOY:  And of course, that is the problem, that

16   we're all making some assumptions here, and struggling to make

17   assumptions and stretching to make assumptions, because there

18   are no facts alleged in the complaint.

19        And finally, I just wanted to point out again in the

20   McLachlan rubric, that this notion that the Washington Group

21   had a duty to inform the appropriate authorities is certainly

22   beyond the scope of what it was asked to do.

23        THE COURT:  Let me ask you this.  There are some of

24   these Government contractor cases where if you know of a danger

25   and the Government doesn't, then the shroud of immunity becomes

1   -- is lifted.  So, they do allege that you failed to notice the

2   damage caused by the work, and I don't -- that's again a broad

3   statement.  I'm not sure what damage you were supposed to

4   notice and whether the Government knew or not.  But for the

5   purposes of this motion, you failed to notice the damage caused

6   by its work, right?

7           If you did fail to notice, it will be a lot -- failed

8   to notice if there was damage, and you failed to notice it, and

9   the Corps didn't know, and you didn't report it; perhaps we

10  would go on to the summary judgment stage.  But I'm more

11  interested really in what the Plaintiff has to say about that,

12  but just, I'm asking you -- and it's sort of hard to ask you

13  that.  I guess you agree as to the general proposition that you

14  have a duty if you see damage -- if you see damage, to at least

15  apprise the Corps?

16          MS. McEVOY:  And that's right.  And Plaintiffs would

17  know from the 40 boxes of documents that we produced that in

18  instances where we had questions about the work being performed

19  or how to do it, we talked about it every single day.  So, to

20  the extent that there were any instances in which there was a

21  question about anything Washington Group saw, it's reflected --

22  it's report is reflected in the documents that we produced to

23  the Plaintiffs.  And still, here we are arguing that there are

24  no facts in this complaint.

25          Now, Roberts requires us to look at this narrow set

1  of allegations against the context of the entire complaint, so

2  I want to spend a few minutes doing that. And let's talk first

3  about the Plaintiff's theory concerning MRGO, Paragraph 23.

4  "The Corps' negligence and/or fault in designing, engineering,

5  inspecting or constructing MRGO, including failing to take

6  account of the waterway's inherent and known capability of

7  serving as a funnel or conduit for a storm surge." I'm going

8  to paraphrase a little bit, just to move things along,

9  Your Honor, but we've got all of the --

10            THE COURT: Yes.

11            MS. McEVOY: -- guts of the allegations in here.

12            THE COURT: Okay. And I've read the complaint.

13            MS. McEVOY: The Corps' negligence also consisted of

14  failing to armor the levees on both banks of the MRGO.

15            And finally, failing to account for the devastation

16  of the wetlands, forest and land masses that served as a buffer

17  to any storm surges.

18            Now, let's look at what the Plaintiffs allege about

19  the levees. The Corps based its overall design specifications

20  on inadequate and obsolete hurricane strength assumptions.

21  Paragraphs 65 and 66: The Corps elected to base the overall

22  design specifications on the wrong elevation datum.

23            Paragraph 71: The levees and floodwalls collapsed or

24  were otherwise compromised or overtopped due to construction by

25  the Corps with porous erodeable lightweight shell fill or other

1    inappropriate material not suitable for levee construction.

2           So, in sum the Plaintiffs have alleged that the Corps

3    made the levees too weak, too short, and too fragile.

4           THE COURT:  I see the area in green is what to your

5    understanding is of where all the levees constructed under the

6    supervision of the Corps existed?

7           MS. McEVOY:  Yes, sir, the ones pertinent to this

8    discussion.

9           THE COURT:  Okay, yes.

10          MS. McEVOY:  And particularly along the Industrial

11   Canal.

12          THE COURT:  Okay.

13          MS. McEVOY:  And that's look finally at Plaintiff's

14   allegations about what happened on August 29th.  First, as a

15   result of the negligence and the fault of the Corps during and

16   immediately after the hurricane, an accelerated enhanced

17   hurricane surge was propelled up the MRGO, rushing through and

18   over the so called levees and I-walls and spoil banks,

19   including but not limited to the Forty Arpent Canal, which

20   Your Honor, is that little green line through the Lower Ninth

21   Ward and St. Bernard Parish.

22          THE COURT:  I see it.

23          MS. McEVOY:  Then said surge further rushed through

24   the MRGO and the Gulf Intracoastal Waterway in an even greater

25   surge, smashing into the I-walls and/or levees along those

1    bodies of water in the Industrial Canal, causing massive

2    inundation of all the class geography.

3            Now, as I said at the outset of my visual,

4    Your Honor, that is not in any way intended to portray the

5    precise spread of the water where it was.

6            THE COURT:  Don't worry, I'm not taking it literally,

7    I'm just eschewing a graphic depiction of the allegation, not

8    necessarily veritae, but at least to give me a concept of what

9    it means.

10           MS. McEVOY:  Absolutely.

11           THE COURT:  I understand.

12           MS. McEVOY:  And to help us all figure out what it is

13   they're getting at here, and the extent to which Washington

14   Group is a piece of the puzzle.

15           THE COURT:  I understand.

16           MS. McEVOY:  We respectfully submit, Your Honor, that

17   the answer to that is no, that Louisiana law would not

18   recognize, and certainly would not extend any duty owed to

19   Plaintiffs to ensure against the acts of the omissions of the

20   Corps and all of the other entities allegedly responsible for

21   the integrity and the maintenance of the levees and floodwalls.

22   Those were tasks well outside that which Washington Group was

23   asked to do, and Washington Group cannot fairly be held to be

24   an insurer of all the risks that flowed from those acts.

25           Thank you very much, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Bruno, just one second.

3          MR. BRUNO:  Yes, Judge.

4      (Pause.)

5          THE COURT:  Mr. Bruno, are you ready, sir?

6          MR. BRUNO:  Yes, I am, Your Honor.

7          THE COURT:  All right.  Please proceed.

8          MR. BRUNO:  Thank you.  Judge, I hope in view of the

9    fact that learned Counsel has agreed with the Plaintiff that

10   this is not a Motion for Summary Judgment, I hope the Court

11   will agree with that position, as well, that this is not a

12   Motion for Summary Judgment.  What we have heard for the past

13   45 minutes is an argument on a Motion for Summary Judgment.

14   Your Honor has asked a variety of questions of fact.  The

15   Defendant has suggested that factual --

16          THE COURT:  Well frankly, Mr. Bruno, I'm trying to

17   see whether I can extrapolate the allegations in this

18   complaint.

19          MR. BRUNO:  I understand that, Judge, but I need to

20   -- I want to make sure we are --

21          THE COURT:  Well, you need to tell me how your

22   complaint -- forget the summary judgment.

23          MR. BRUNO:  Fair enough.

24          THE COURT:  Well what, I know it's not a summary

25   judgment.

40

1            MR. BRUNO:  It's not a summary judgment.

2            THE COURT:  And --

3            MR. BRUNO:  We allege, Judge, that the Washington

4    Group broke the levee.  It's as simple as that.  If this were a

5    case of putting pilings for a foundation, the allegation would

6    be you put pilings --

7            THE COURT:  But do you allege they did it in any way

8    outside the course and scope of their work with the Government?

9            MR. BRUNO:  Well, that's the point, Judge.  There's

10   no facts -- this is not a summary judgment.  You are assuming

11   for the sake of the discussion that there are specific

12   performance requirements, there were none.  This was a

13   performance based contract.  The fundamental mistake I believe

14   we're making here is that the federal contractors' defense is a

15   defense.  It is not a pleading requirement.  I don't have to

16   plead in my complaint that the federal contractors' defense

17   doesn't apply.

18           THE COURT:  But you do --

19           MR. BRUNO:  The Defendant has the burden --

20           THE COURT:  You do have to tell me what they did

21   wrong.

22           MR. BRUNO:  Well, what they --

23           THE COURT:  You can say they broke the levee.  How?

24           MR. BRUNO:  They broke the levee -- I'll tell you

25   how.  They broke the levee by using the vibration equipment, by

41

1    pulling the piles, because when they pulled the piles they left

2    a hole in the ground, the water went through the hole, under

3    the levee, and undermined the levee.

4              Now, we interestingly --

5              THE COURT:  How else are you going to get the piles

6    up?  That wasn't -- you're not arguing that that wasn't part of

7    the specs, are you?

8              MR. BRUNO:  But we haven't seen the specs.  They

9    haven't provided us with any specs.  We have no specs, there

10   are no specifications whatsoever.  Counsel suggests a lot of

11   facts that are not in evidence and are flat-out not true.

12             THE COURT:  Okay.  So, you're telling me you have not

13   looked at the specifications?

14             MR. BRUNO:  No.  And not only that, Judge, we

15   provided -- and here's the problem.  Let me just share with you

16   how this whole thing --

17             THE COURT:  The specifications are not a public

18   record?

19             MR. BRUNO:  Well Judge, even if they are, that's part

20   of their defense.  They may well be.

21             THE COURT:  I just --

22             MR. BRUNO:  But they have the burden of proving a

23   defense.  Let me -- our burden is we have a fact --

24             THE COURT:  And you said vibratory -- is vibratory

25   use negligence, per se?  You haven't told me in the complaint

1   at least.  Tell me where in the complaint it says why that's

2   negligence?

3            MR. BRUNO:  Well, what I say is that the way they did

4   their work resulted in an under seepage of the levee, which in

5   fact breaks the levee.  No one can possibly argue, Your Honor,

6   that the United States of America contracted with these good

7   people to break the levee.  The contract specifications didn't

8   say, "Go break the levee."  What they said was --

9            THE COURT:  No, they told them to remove the pilings.

10           MR. BRUNO:  -- "Go remove the pilings in such a way

11   that you don't break the levees."

12           THE COURT:  What, you're supposed to levitate them

13   out?  I mean, how do you do that?

14           MR. BRUNO:  Well actually, what in fact occurred was

15   they build a cofferdam, and Judge I'm getting ahead of myself

16   because as part of our Rule 26 disclosures we gave them an

17   expert report which details it in its entirety, entirely.  We

18   didn't bring that to you today, because --

19           THE COURT:  Summary judgment.

20           MR. BRUNO:  -- we didn't want to fall into the trap

21   of a summary judgment.

22           THE COURT:  I understand.

23           MR. BRUNO:  Now, I need to give you some background

24   because the way this all went down is a little bit unusual.  If

25   you look at the Attachment A, it's a letter by Mr. Treeby to

1    me.  He's suggesting in that letter that the pleadings before

2    the amendment to the complaint were sufficient to justify a

3    Motion for Summary Judgment.  He doesn't suggest that my

4    deficient pleadings would have entitled him to bring a Rule 12;

5    he suggests that my deficient pleadings required him to bring a

6    Motion for Summary Judgment.

7              And what he does in that correspondence back and

8    forth, he says, "Mr. Bruno," and I'll read it to you, Judge:

9    He says, "We're going to file a summary judgment, Joe.  We are

10   going to file our summary judgment based upon the federal

11   contractors' defense."

12             Now, keep in mind, my previous pleading was vague and

13   no one knew what I was saying and there was no allegations of

14   neglect, but he needs to give me all this information so that I

15   can have the opportunity to do the discovery I might need to

16   deal with a contractor's defense, which he acknowledges is a

17   defense in the exhibit.  Please read the exhibit, because it's

18   all there.  We go back and forth.  I have it listed right here.

19             Okay, Exhibit A, May 31, 2006.  "We are writing to

20   inform you of the general types of factual proof that we expect

21   to rely on in our proposed Motion for Summary Judgment on

22   immunity."  So, he's telling me -- remember, this is before I'm

23   in, where my pleadings are deficient, that he knows enough,

24   that the pleadings are sufficient.  He didn't bring a Rule 12.

25   You'll remember, Judge, you had an order in place.  This

1    Defendant was required to bring his Rule 12 back in -- I forgot

2    when, last year, okay?  He was required to bring any motion

3    that he had on the pleadings back then.  He didn't do it,

4    because he didn't have the right or the basis to do it.  He

5    knew it.

6              So, he starts this dialogue with me about documents.

7    He says, "I am going to do this.  Let me try to beat you to the

8    punch.  I know your response to the Motion for Summary Judgment

9    is you need facts, so I'm going to give you some stuff."

10             I say, "Great, give me some stuff."  I tell him,

11   "This is what I want."

12             The first thing he says, "You can't have it."  He

13   says to me, "This is what I'm going to give you."

14             I say, "Okay, fine.  I'll take what you've got."  In

15   every single correspondence I say, "Listen, I can't evaluate

16   what I need for discovery until such time as you file your

17   motion on the Government contractors immunity," which was never

18   filed, ever.  It didn't occur.  And you'll see there's a whole

19   pile of letters going back and forth.  What's disingenuous and

20   I'm a little offended by it, is this notion that I have had a

21   chance to do discovery.  It didn't quite occur that way.  They

22   didn't comply with Your Honor's order, filing the motion under

23   Rule 12.  And by the way, this particular motion says it's a

24   Rule 12(b)(1), lack of subject matter jurisdiction.

25             And all I can do, Your Honor, with respect, is

1   respond to the allegation in the motion which says you don't

2   have jurisdiction.  So, I look at that issue.  I say, "Well,

3   does this Court have jurisdiction over this billion dollar

4   company in this Court?"

5            And the answer is:  Well, yeah.  They're properly

6   served.  The work was here, and they broke my levee.  End of

7   discussion.

8            The other allegation is:  Rule 12(c), and Rule 12(c)

9   says that after the pleadings are closed, they can move for

10  judgment on the pleadings.  So, again Judge, I say:  Okay, let

11  me look at my pleadings; what have I said?  Well, they did some

12  work.  The work broke the levee and the levee, when it broke,

13  flooded the city.  I have met my pleading requirements.  I have

14  only to plead enough facts to give them notice of my claim.

15           THE COURT:  But they cannot be purely conclusory,

16  sir.

17           MR. BRUNO:  Well, excellent, Judge.

18           THE COURT:  I'm not going to allow millions of

19  dollars to be spent on ephemeral allegations.

20           MR. BRUNO:  Judge, you are absolutely correct and

21  what --

22           THE COURT:  Well, tell me where they are not

23  conclusory.

24           MR. BRUNO:  Well, let me start with an apology to my

25  learned co-Counsel with regard to Reed.  In the Reed case, the

1   allegation was the Government contracted with the dredgers to

2   dredge and the dredging broke the marsh.  Now, the problem with

3   that allegation is in your -- I mean you know, Judge, I hate to

4   -- but you're right, there was no allegation that the dredging

5   itself played a role in breaking the marsh.

6          And so, like Yearsley, which by the way is a takings

7   case, the plaintiff's allegation in Yearsley was you guys took

8   my property and they joined to that action a non governmental

9   agency so as to bring the, I suppose, in front of a district

10  court.  The court held, after a trial by the way, this is not a

11  judgment on the pleadings, after a trial, the judge held,

12  interestingly enough, that that paddlewheel boat didn't do

13  anything wrong.  They weren't guilty of any neglect.

14         So, the only thing that was left in Yearsley was,

15  well, the Government contracts with boat, with paddlewheel to

16  do work.  The work caused consequential flooding, which made it

17  not be a taking.  And as an aside, that's what 702(c) is for,

18  that's the immunity, so therefore, there was no right of action

19  against that subcontractor -- I'm sorry, not subcontractor, but

20  contractor of the Government.  That's the allegation.

21         And now, here, we're saying the Government contracted

22  with Washington Group, this billion dollar company, not to

23  break the levee.  They didn't say, "You guys go put a hole so

24  that water goes under the levee."  What they asked this company

25  to do was to remove the wharfage and the barge and there's a

1    big locomotive.  And in fact, Judge, if we want to talk about

2    facts, here are the facts:  They built a cofferdam to remove

3    the water around this locomotive that was under the ground.

4    They pulled the pile up and didn't fill the hole.  And as a

5    result, there was a tunnel that went straight down, under the

6    levee, and into the community and caused the entire levee to be

7    pushed back.

8              THE COURT:  But that's not in --

9              MR. BRUNO:  Under seepage --

10             THE COURT:  That's not in your pleadings, is it?

11             MR. BRUNO:  I don't have to put it there, Judge.  You

12   see, that's the problem.

13             THE COURT:  Well, why be coy?

14             MR. BRUNO:  Well, I'm not --

15             THE COURT:  You do it at your peril, sir.

16             MR. BRUNO:  No, I'm not, Judge.

17             THE COURT:  You do it at your peril.

18             MR. BRUNO:  Judge, I --

19             THE COURT:  I'm not --

20             MR. BRUNO:  Fair enough, fair enough.

21             THE COURT:  I'm not -- let me --

22             MR. BRUNO:  But in fairness to me, you are right.  In

23   fairness to me, what I do as an advocate is respond to the

24   motion that my opponent brings to the Court.  And if I had been

25   faced with a Motion for Summary Judgment, I would have --

1          THE COURT:  I'm not talking about a summary judgment.

2     You've got -- let's see what you say, and let's look at 45:

3     "Negligent or at fault in the following non-exclusive respects:

4     One, you should have known that its work was causing damage to

5     the levee or floodwall structures and did nothing to correct

6     the problem."

7          MR. BRUNO:  That's not the allegation, Judge.  The

8     allegation is 43.  "In performing the work they undermined the

9     integrity of the levee.  They broke the levee."

10          Number 44:  "Their acts and omissions resulted in

11     under seepage induced erosion, or other damage to the levee

12     and/or floodwall, ultimately causing or contributed to its

13     catastrophic failure."

14          So, this is not -- I mean, Judge, with respect, I

15     don't think this is just a conclusion.  I'm saying what you

16     did, what you were not contracted to do --

17          THE COURT:  Now, how do you know that?

18          MR. BRUNO:  Because I have expert testimony that's

19     going to support that view.  But this is not a summary

20     judgment.

21          THE COURT:  I understand that.  I just hope we're not

22     doing this for summary -- let's assume --

23          MR. BRUNO:  Oh, Judge that --

24          THE COURT:  I mean, if they show they did this

25     according to instructions from the Government, --

1          MR. BRUNO:  Judge, I --

2          THE COURT:  -- they're going to win.

3          MR. BRUNO:  Well Judge, I think you're absolutely

4   correct.  But here's my problem:  They promised me a Motion for

5   Summary Judgment and you are right, I would have loved to have

6   devoted my resources to addressing a Motion for Summary

7   Judgment based upon the federal contractors' defense, which I

8   would have enjoyed doing.  And I would have called my experts,

9   and I would have called -- brought all my facts in here.  I

10  wanted to, you know, they know that they don't have -- we don't

11  have enough discovery to do that.  They know they haven't

12  supplied us with the specifications.  They know it is not a

13  contract with detailed specifications.  They know this is a

14  performance based contract.  They know, by the way, that the

15  Corps did not write this, all of this stuff about the

16  vibration; you know who wrote that?  They wrote that.

17          THE COURT:  Okay.

18          MR. BRUNO:  They wrote all of the details of the

19  contract.  They did all the engineering.  They did all the

20  design.  This is not a situation in where you're hiring

21  somebody to build a jet airplane or a machine gun and the

22  Government says to the contractor, "I want the machine gun

23  built precisely this way."  All they told these guys was, "You

24  know what, we want to put a new lock and we can't put a new

25  lock until you take out all the stuff.  And so, we want you to

1    tell us, the Government, how to do it."

2           THE COURT:  So, your allegation is they took out the

3    stuff negligently and impaired the levee by the allegations

4    you've made; that's what you're alleging?

5           MR. BRUNO:  Which I've got right here in black and

6    white.  You're right.  Judge, as in every lawsuit, you know,

7    sometimes you get criticized.  And I'm going to share with you;

8    you thought our MRGO case had too much in it, it was too long

9    and too wordy and too detailed, and you know, I try.  I really

10   try to find a balance between too much and not enough, and what

11   I find most interesting is, before my amendment it was enough.

12   And after my amendment, it's still not enough, but if I had

13   left it alone it would have been enough.  So, I think we have

14   to --

15          THE COURT:  Well --

16          MR. BRUNO:  We have to stay within the strict

17   confines of the relief which is requested.  This Court --

18          THE COURT:  Go ahead, sir.  I'm listening to you.

19          MR. BRUNO:  All right.  This Court has jurisdiction

20   over this Defendant.  If this Defendant believes it is immune

21   from suit, it has the burden of establishing that it has some

22   immunity.  There's nothing in this record.

23          THE COURT:  Well, let me ask you this, let's move on

24   to -- and then I'll let you wrap up with anything you want.

25   Let's move on to the duty argument.

1          MR. BRUNO:  All right.  Every act of man that causes

2    damage to another obliges him by whose fault it occurred to

3    repair it.  You can't break the levee.

4          THE COURT:  Well, well, there's some -- you know,

5    let's start off with you do however know that there's some

6    things that are sufficiently -- the duty risk formula is not

7    quite that facile.

8          MR. BRUNO:  Judge, I know this, they can't break the

9    levee.  There's not -- I cannot imagine a rule of law -- I

10   can't imagine this Court holding in some form or fashion that

11   this Defendant, even they will tell you and I would ask you to

12   ask them --

13         THE COURT:  Yes, but give me a duty risk argument.

14   You can't just say they broke the levee.  This isn't -- I mean

15   they've got --

16         MR. BRUNO:  Judge, they had a duty not to break the

17   levee.  They had -- this is in the same fashion that when I

18   build my house next door to my friend, and I bring a pile

19   driver onto my lot and I drive a pile, and the vibration from

20   the pile causes the bricks of my neighbor's home to crack, I

21   have a duty not to cause harm to his home.

22         These people had a duty to remove the debris, to

23   remove the wharfage, and do it in such a fashion that --

24         THE COURT:  When you say "break the levee" you mean

25   they weakened the levee?

1          MR. BRUNO:  Yes, I'm being --

2          THE COURT:  Had the levee been broken, perhaps we

3    would have sued -- somebody would have sued then.

4          MR. BRUNO:  Well Judge, maybe --

5          THE COURT:  And I mean broke, I mean the levee, you

6    couldn't -- if it were broken, it was impaired, is what -- it

7    was weakened; is that what you're alleging?

8          MR. BRUNO:  Yes, I --

9          THE COURT:  There wasn't a large gap in the levee as

10   a result of their work?

11         MR. BRUNO:  I can tell you that a levee doesn't do

12   what levees are supposed to do with water going underneath.

13         THE COURT:  I understand that.

14         MR. BRUNO:  And so, I know it sounds like I'm being

15   silly, but it was broken.

16         THE COURT:  But if --

17         MR. BRUNO:  In the same fashion, I might point out --

18         THE COURT:  Well, broken in the sense that it was

19   weakened, okay?

20         MR. BRUNO:  Well, but -- broken in the sense that it

21   couldn't function as a levee, just like the Seventeenth Street

22   Canal could not function as a -- I'm sorry, levee, forgive me,

23   I-wall -- could not function as an I-wall, because water was

24   flowing underneath.  As long as you had flowing underneath, you

25   might as well just tear the darn thing down.  The only way

1    these levees function is if there is a block between the water

2    in the channel and the land on the other side.  When you let

3    water underneath -- in fact, if you look at the history of the

4    Mississippi River system going back to 1927, they talk about

5    sand boils, they talk about, you know, methods of preventing

6    that water from going underneath that levee, you know, and

7    popping up on the other side, because you no longer have a

8    levee.  It cannot perform the way it's intended to perform if

9    water is going underneath.

10            And perhaps the under seepage component is the

11   confusing component here, but when we say under seepage, we

12   truly mean you broke the levee.

13            If you have any more questions, Judge, I'll --

14            THE COURT:  That's it.

15            MR. BRUNO:  Thank you.

16            MR. TREEBY:  Mr. Bruno is very effective at baiting

17   me, Your Honor, but I'm not going to take the bait, the bait

18   that he hasn't seen specifications.  Well, that's nothing to do

19   with this case.  This case has to do with what did he allege.

20   We agree with him, as I said at the beginning, this is a facial

21   attack on his complaint.  It does not allege facts to support

22   the conclusions which are simply a rubric, a formulate rubric

23   that was condemned by the Supreme Court as a way to allege what

24   he needs to allege to allege a cause of action and to allege

25   something that gives --

1          And this, yes, we're not sitting here claiming he

2   doesn't have personal jurisdiction over Washington Group; of

3   course he does.   That's not what we've said.   He doesn't have

4   subject matter jurisdiction.   This Court does not have subject

5   matter jurisdiction, because he has not alleged sufficient

6   facts to give it subject matter jurisdiction.   So, it's not a

7   question of whether we're -- so, of course we got served.   Of

8   course we, subject to this Court's jurisdiction, personally,

9   but he has to allege facts which support the Court's subject

10  matter jurisdiction.

11          The Court interestingly -- Joe said interestingly,

12  you were right when you decided Reed versus Ackerson, that you

13  were right.   And what did he say in that case?   You can't break

14  the wetlands.   What is he saying here?   You can't break the

15  levee.

16          Now, he took a lesson from Your Honor's ruling in

17  Reed versus Ackerson, and he then gave us a formulaic rubric,

18  which alleges no facts except conclusions, just conclusions.

19  And this idea that this -- I frankly think he would be loathe,

20  based on what I have seen of his expert's affidavit that he

21  gave in the initial disclosures, to put a pleading that he

22  signs his name on, that we made a tunnel under the levee, which

23  is what he just said.   If he really believed that, he would

24  have alleged it.   That would have been a fact.   He has not

25  alleged that kind of facts, and on that basis, and certainly

1  he's not giving Your Honor -- I mean Ms. McEvoy may want to

2  speak to this, but he's not giving Your Honor any basis for

3  coming to a different conclusion than we do on the duty risk

4  analysis, not one.

5         And we think this case should be dismissed for lack

6  of subject matter jurisdiction and/or for lack of stating the

7  claim under Louisiana law.

8         THE COURT:  Thank you, Mr. Treeby.

9         MR. TREEBY:  Thank you, Your Honor.

10        THE COURT:  Would you care to have a couple of

11  minutes, Ms. McEvoy?

12        MS. McEVOY:  I can't help but think of our former

13  Defense Secretary, Your Honor, Donald Rumsfield, who famously

14  said:  You go to war with the Army you have, not the one you

15  want.  What happened in this case is that Counsel had 40 boxes

16  of documents.  I'm sure he put an Army of attorneys on looking

17  through those documents and trying to figure out whether there

18  were some facts he could allege in support of his complaint,

19  but he did not.

20        THE COURT:  Thank you.

21        I will take this matter under advisement and

22  hopefully get you a rather quick decision, although we have a

23  lot of business.

24        MR. BRUNO:  Thank you, Your Honor.

25        MR. TREEBY:  Thank you, Your Honor.

56

```
 1              MS. McEVOY:  Thank you, Your Honor.

 2              MR. JOANEN:  Good afternoon, Judge.

 3              THE COURT:  Good afternoon.  How are you, sir?

 4              MR. BRUNO:  Thank you, Judge.

 5                        *   *   *   *   *

 6                     (Hearing is Concluded)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# **C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**/s/Dorothy M. Bourgeois**                                    **6/29/07**
**Dorothy M. Bourgeois**                                        **Date**