# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NO. 05-4182 |
| | SECTION "K" (2) |

**FILED IN:**   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073, 06-6314,
05-6324, 05-6327, 05-6359, 06-0020, 06-1885, 06-0225, 06-0886,
06-11208, 06-2278, 06-2287, 06-2346, 06-062545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931, 06-5032, 06-5042, 06-5159, 06-5163,
06-5367, 06-5471, 06-5771, 06-5786, 06-5937, 06-7682, 07-0206,
07-0647, 07-0993, 07-1284, 07-1286, 07-1288, 07-1289, 07-1349

**PERTAINS TO:     LEVEE AND MRGO**
--------------------------------------------------------------------------------------------------------------------

## LEVEE AND MRGO PLSC'S MEMORANDUM IN OPPOSITION TO
## MOTION TO STRIKE ADMIRALTY CLAIMS AGAINST THE UNITED STATES

**MAY IT PLEASE THE COURT:**

### MRGO PSLC'S SUBMISSION

The Court's Order of June 1, 2007 (Doc. 5435) requested that the United States file an

appropriate motion in respect to the question of whether these actions sound in admiralty.  The

United States therefore has moved to strike, for lack of subject matter jurisdiction, all admiralty

claims set forth in the MR-GO Master Consolidated Class Action Complaint (Doc. 3415)
[hereafter "MR-GO"], and the Superseding Master Consolidated Class Action Complaint (Doc.
3420) [hereafter "Levee"], to the extent those claims are directed against the United States of
America and/or the United States Army Corps of Engineers ["Corps"].

This Court has already dismissed certain alleged maritime claims in related Katrina
Litigation involving alleged deficiencies of the MR-GO.  On March 9, 2007, this Court
dismissed all claims against the "dredging defendants" in *Reed* and *Ackerson* on the ground that
it was not alleged that they themselves, or their vessels, had performed any negligent act or
omission or any intentional act that was beyond the scope of their dredging contracts with the
Corps (Doc. 3365).[1]

With respect to the MR-GO actions, the Corps correctly points out in its memorandum in
support of its motion that the MR-GO allegations relate to decisions made by the Corps over
decades concerning the design, construction, repair, maintenance, inspection and operation of the
waterway, and the Corps' alleged failure to appreciate, or take into account, the hydrologic
effects of the waterway as designed and maintained--specifically, the waterway's effect on storm
surges.  MR-GO  ¶¶23-25.  While there are other claims alleged in the MR-GO Consolidated
Class Action Complaint, the ones above are relevant to the government's motion to strike
"admiralty" as a basis for liability.

---

[1]  In the same Order, this Court in *Reed* dismissed claims brought against the government under the
Admiralty Extension Act, 46 U.S.C. § 30101 (formerly 46 U.S.C. app. § 740) based on lack of subject matter
jurisdiction because the plaintiff had failed to file an administrative claim as required by the Act.  On June
13, 2007, this Court dismissed similar claims raised in *Anderson* for the same reason (Doc. 5551).  However,
the Court did not reach the issue of admiralty jurisdiction *per se.*

The MR-GO PSLC does not dispute the government's contention that the Admiralty Extension Act's language makes it applicable to damage "caused by a *vessel"* (Section 30101(a), emphasis added.)  By extending admiralty jurisdiction only to actions involving "a vessel" as the causative force of land damages, it is submitted the AEA provides jurisdiction only where there is an *identifiable* vessel or vessels, and the only damage for which recovery can be made is damage which is appropriately attributed to *maritime incident* involving *that* vessel or vessels. *See e.g., Egorov v. Terriberry, et al.,* 185 F.3d 453, 456 (5th Cir. 1999) ["By the Act's express terms, . . . the injury must be caused 'by a vessel'."]

The Supreme Court has established a two-part test for admiralty tort jurisdiction. *Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995).  "[A] party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Id.*

The primary concern of the "location" test is "whether the tort occurred on navigable waters  or [pursuant to the AEA] whether the injury suffered on land was caused by a vessel on navigable water." *Id.*  If the damage occurred on land, "[t]he vessel or its defective appurtenances must be the proximate cause of the accident."  *Margin v. Sea-Land Services, Inc.*, 812 F.2d 973, 976 (5th Cir. 1987); see *Grubart,* 513 U.S. 527, 536-7.

Admiralty expertise traditionally focuses on the navigation and operation of vessels on navigable waters, not policy decisions like the design and long-term maintenance of a waterway and flood works resulting in land-based injury.  This concept was elucidated in *National Fire Ins. Co. Of Pa. Vs. United States,* 436 F.Supp. 1078 (M.D. Tenn. 1977), where the court held that admiralty law was not implicated in a case alleging the Corps of Engineers' alleged failure

to control dams on the Cumberland River, a navigable waterway, resulting in flooding of a riverside warehouse. The court noted that "while control of the water level does generally involve considerations affecting navigation and commerce upon the water, the only actual impact of concern in this instance is the flooding of a shore-based warehouse. Viewed in this way, it becomes more difficult to perceive an actual maritime incident for which the unique principles and procedures of admiralty are pertinent . . ." *Id.* at 1083.

For the Court to find that admiralty claims exist relative to the MR-GO itself, there would have to be some requirement of directness of consequence by a specific maritime incident caused by an identifiable vessel in fleet.

## LEVEE PSLC'S SUBMISSION

### I. INTRODUCTION

The Court's Order of June 1, 2007 (Doc. 5435) requested that the United States file an appropriate motion in respect to the question of whether these actions sound in admiralty. In response, the United States filed a motion to strike, for lack of subject matter jurisdiction, all admiralty claims set forth in the Superseding Master Consolidated Class Action Complaint (Doc. 3420), to the extent those claims are directed against the United States of America and/or the United States Army Corps of Engineers. This memorandum is submitted in opposition to the United States "Motion to Strike Admiralty Claims Against the United States" (Doc. 5855).

**A.      The United States has filed a Rule 12 (f) motion to strike which attacks the form of the pleadings.**

Although the Court's Order  invited the United States to file "the appropriate motion" with regard to "whether these actions sound in admiralty," the United States has chosen to file a motion to strike, which is governed by the provisions of Fed.R.Civ.P. 12 (f), and has not filed a Fed.R.Civ.P. 12 (b) motion to dismiss or a Fed.R.Civ.P. 56 motion for summary judgment.  The United States has devotes its brief to challenging the sufficiency of the pleadings *as written* (hence, it filed a motion to strike).  To illustrate this point, the Government argues, *e.g.*, that the Plaintiffs made "no allegation naming a specific or identifiable vessel or vessels" and then it embarks on a discourse of the pleading a claim under the Admiralty Extension Act saying "the AEA provides jurisdiction only where there is an *identifiable* vessel or vessels, and the only damage for which recovery can be made is damage which is appropriately attributed to a *maritime incident* involving *that* vessel or vessels."

Or, *e.g.*, the United States contention that "Plaintiffs have not alleged proper venue under either the PVA or the SAA."

**B.     The motion to strike doesn't challenge maritime jurisdiction, it challenges wording.**

The United States isn't arguing that the Plaintiffs don't have a maritime-based claims, it's arguing that the Plaintiffs' maritime-based claims aren't plead properly. This is a very important distinction, akin to the difference between "lightning" and "lightning bug."  And, just as important as the distinction is the remedy required here: amendment of pleadings and not dismissal.

**C.     The motion to strike does not address the Inner Harbor Navigation Canal claims.**

The Levee PLSC also notes that the United States does not address the maritime issues relating to the Inner Harbor Navigation Canal.  For example, in connection with the USACE's

"Lock Replacement Project," Congress appropriated  $ 780 million in funds in 2002.  That is clearly a navigation project, and not a flood control project.  So maritime jurisdiction clearly applies and immunity under 33 U.S.C. § 702C does not apply.

## II.  THE LEVEE PLSC RESPECTFULLY DISAGREES WITH THE COURT'S JUNE 29, 2007 ORDER AND REASONS.

Plaintiffs have brought claims against various defendants, including the United States, pursuant to the substantive provisions of the general maritime law of the United States and any law supplemental thereto.  In paragraph 9 of the Superseding Master Consolidated Class Action Complaint, plaintiffs specifically invoke subject–matter jurisdiction under "the Admiralty/Maritime Law of the United States, pursuant to 28 U.S.C. § 1333(1). . .."

Certain contractor and engineer defendants including Boh Brothers, Eustis Engineering Company, Modjeski and Masters, and others, concerning the 17th St. Canal, suggested that La. Rev. Stat.  9:5607 perempted the Levee PLSC's claims against them because the work at issue was undertaken at least five years prior to filing of post-Hurricane Katrina suits against them. Dismissals were granted on this basis in certain cases, prior to the filing of the Superceding Master Complaint.

Recently, due to the filing of additional cases not included in this ruling, and the submission of "me too" motions, the Court entered its June 29, 2007 Order and Reasons (Document # 6175) which reaffirmed dismissal of these same defendants on grounds of peremption.  In addition, the Court's Order and Reasons set forth an analysis of maritime jurisdiction which concluded, *inter alia*, that the 17th Street Canal is "a drainage ditch" and

"there is simply no commercial activity involved along this body of water."  While recognizing

the Court's recent Order and Reasons is contrary to their position regarding maritime

jurisdiction, the Plaintiffs respectfully disagree with the Court's maritime analysis and suggest

that maritime jurisdiction does exist.

A.      **The Louisiana Supreme Court's decision in  <u>Board of Commissioners for
        Pontchartrain Levee District v. Baron</u> provides no meaningful guidance**.

        Plaintiffs recognize that in <u>Board of Commissioners for Pontchartrain Levee District v.</u>

<u>Baron</u>, 236 La. 846, 849-50, 109 So.2d 441 (La. 1959), quoted in the Court's Order and Reasons,

the Louisiana Supreme  Court wrote that *"The Seventeenth Street Canal is not a navigable river*

*or stream, but is a man-made drainage ditch at least three miles long.  It has its beginning neat*

*the rear of the New Orleans waterworks plant in Orleans Parish and, after practically tracking*

*the dividing line between Orleans and Jefferson parishes, empties into Lake Pontchartrain."*

However, the Louisiana Supreme Court, in applying the <u>Delaune</u> test,[2]  did not engage in any

maritime law analysis of what makes a waterbody a *navigable* waterbody, much less did it

perform an analysis of maritime jurisdiction. Instead, it stated *in vacuuo*  that because the 17th

Street Canal was not "riparian land" (*i.e.*, land "not adjacent to, and does not border on , any

navigable river or stream..."), it was not subject to a public servitude.  That was a flawed analysis

because a waterbody does *not* have to be riparian to be navigable (*e.g.*, the MRGO).  Further, the

opinion in <u>Board of Commissioners</u> neglects to mention that even in 1959, there had been a

fishing fleet based in the 17th Street canal since the 1800's.

---

[2] <u>Delaune v. Board of Commissioners</u>, 230 La. 117, 87 So.2d 749, 754 (La. 1956).

**B.**  **The Ninth Circuit's decision in <u>In re Paradise Holdings, Inc.</u> is favorable to Plaintiffs.**

In its Order and Reasons, this Court discussed <u>In re Paradise Holdings, Inc.</u>, 795 F.2d 756, 759 (9th Cir. 1986) and at pages 7-8 said "A cruise ship is a commercial vessel.  If it was capable of navigating the waters in which the claimant was killed, clearly then the water was navigable under the *Adams* rationale."  That same logic would seem to hold true for fishing vessels home-ported at the northern terminus of the canal for over 100 years, and also for the present-day commercial crab fishermen plying their vessel-based trade *under and south* of the Old Hammond Highway Bridge   They too are commercial vessels.  If they are capable of navigating the 17th Street Canal, clearly then the water in the canal is navigable.[3]

**C.**  **The surge causing final floodwall failure came through navigable waterways and was exacerbated by dredging of navigable waterways.**

There is, also, the question of where the water came from that caused the breach.  It was not  rainwater being pumped to Lake Pontchartrain through Pumping Station No. 6.  Instead, it was a torrent of water from a navigable lake pouring into the navigable head of the canal, and deflected to the breach site by the configuration of the fishing fleet harbor.  The torrent was made possible, in part, because of dredging activity which extended all the way to Lake Pontchartrain from Pumping Station No. 6.   In other words, due to dredging, a deepened channel extended from what is unquestionably navigable water (the fishing fleet harbor on the 17th Street Canal) up the entire length of the canal to the pumping station.   Because this deepened aperture at the intersection of the canal and the lake was created by a dredging vessel on what was (and

---

[3] *See* Exhibit A, the Declaration of Peter Gericka, which details recent commercial use of the 17th Street Canal.

still is) unquestionably a  navigable location, how can the Court exclude maritime connexity from the breach caused (at least in part) by the enlarged *navigable* aperture?  Isn't this a question of material fact directly liked to breach causation?

Inasmuch as these defendants' tortious conduct arises out of their "dredging" activities on a navigable waterway, *i.e.*, the 17th St. Canal, their activities are inherently maritime in nature. Their conduct also resulted in a potential disruption of commercial activity.  Accordingly, maritime jurisdiction exists, the Plaintiffs' claims fall within this Court's maritime jurisdiction, and the United States' motion should be denied.

## III.  LEGAL ARGUMENT REGARDING "NAVIGABILITY"

**A.    Threshold matters**.

Whether a waterway is navigable is a question of fact that should be addressed pursuant to the test established by *The Daniel Ball*, 77 U.S. 557, 19 L.Ed. 999 (1870).  In *The Daniel Ball*, the United States Supreme Court stated that:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact.  And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.  And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*Id.* at 563.

The threshold requirement under this test is that there be an interstate nexus.  Thus, if a waterbody is *available* as a highway for commerce between ports and places in different states, it is navigable for purposes of maritime jurisdiction.  A completely intrastate waterbody can also

be considered navigable, however, if it can be considered part of an interstate waterway system.
In re Boyer, 109 U.S. 629, 3 S.Ct. 434, 27 L. Ed. 1056 (1884).  In Sanders v. Placid Oil Co., 861
F.2d 1374 (5th Cir. 1988), the court held that navigable waters of the United States are those
waters capable, in fact capable of navigation in interstate travel or commerce, and that
distinctions between natural and man-made bodies of water are immaterial.[4]  Similarly, in
Weatherford v. U.S., 957 F. Supp 830 (M.D. La. 1997), the court held that water bodies are
navigable for purposes of admiralty jurisdiction when, in their ordinary condition, they can serve
as highways for commerce over which trade and travel are or may be conducted in customary
modes.[5]

**B.      Navigability in fact.**

"Navigability-in-fact" is the method of determining the navigability of a waterway.  For a
water body to be navigable-in-fact, it must be capable of sustaining customary modes of trade
and travel on water.  In order to meet this test, proof of present or potential commercial activity
is required.  As well, under the "indelible navigability" doctrine, if a body of water has ever been
part of the navigable waters of the United States, it always remains so, even if any and all
navigation has ceased to exist on the waterway. United States v. Appalachian Elec. Power Co.,
311 U.S. 377, 61 S.Ct. 291, 85 L. Ed. 243 (1940); *see also* Finneseth v. Carter, 712 F.2d 1041
(6th Cir. 1983) (an interstate lake not presently being used as a highway for commerce falls,
nevertheless, within the court's maritime jurisdiction because it is susceptible of future use).

---

[4] This further demonstrates why Board of Commissioners for Pontchartrain Levee District
v. Baron cannot be relied upon in any determination of navigability.

[5] *See* Exhibit B, two aerial photographs showing fishing vessels berthed in the 17th Street
Canal.

In the case at bar, the 17th St. Canal clearly constitutes a navigable waterway within the Court's maritime jurisdiction.  If one travels from the Canal to Lake Pontchartrain, one is on a commercial highway that flows directly to the Gulf of Mexico.  The presence of United States Coast Guard aids to navigation demonstrate that the Canal is a navigable waterway.  Inland navigation is governed by the Inland Navigation Rules, 33 U.S.C. § § 2001-2073.  In fact, a United States Coast Guard's station is located adjacent to the mouth of the Canal.  Therefore, the casualty in the case at bar clearly involved navigable waters.  There is also the matter of a fishing fleet being located in the Canal for over 100 years.

**C.     The definition of "navigable waters."**

The "navigable waters of the United States" are defined in 33 C.F.R. Parts 329.1 and 329.4 as traditional waters where permits are required for work or structures pursuant to sections 9 and 10 of the River and Harbor Act of 1899.  They are also defined as "the waters of the United States, including territorial seas."  33 U.S.C. § 1362(7).  This would include the 17th St. Canal, which traditionally has hosted, and continues to host, a commercial fishing fleet. [6]

"Waters of the United States" are defined in 33 C.F.R. 323.2(a).  These are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Federal Water Pollution Control Act, Amendments of 1972.  *See* Buttery v. United States, 573 F. Supp. 283 (E.D. La. 1983).  That such "waters" are represented by the 17th St. Canal is evidenced by the fact that the Corps of Engineers issued a June 1984 permit to authorize

---

[6] *See* Exhibit C, a post-Katrina photograph depicting a commercial shrimp boat in the 17th St. Canal, appearing with an article on the internet at 17th Street Canal, http://en.wikipedia.org/w/index.php?title=17th_Street_Canal&oldid=128852384).

dredging.[7]  The Corps' "Statement of Findings" with respect to the permit acknowledges that the

dredging work proposed is to occur "in navigable waters of the United States."[8]

**D.      The USACE's definition of  "navigable waters."**

The Corps' own definition of navigability generally tracks the judicial definition.  33

CFR Part 329.4 provides: *"Navigable waters of the United States are those waters that are*

*subject to the ebb and flow of the tide and/or are presently used, or have been used in the past,*

*or may be susceptible for use to transport interstate or foreign commerce.  A determination of*

*navigability, once made, applies laterally over the entire surface of the water body, and is not*

*extinguished by later actions or events which impede or destroy navigable capacity."*  Thus,

even though the actual failure of the seawall on the 17th St. Canal occurred below the Old

Hammond Highway Bridge, the entirety of the Canal is deemed navigable pursuant to federal

regulations.[9]  *See, e.g.*, Complaint of Paradise Holdings, Inc., 795 F.2d 756, 761 (9 Cir.), *cert.*

*denied*, 479 U.S. 1008 (1986) (navigability of tidal waters is assessed via ebb and flow).

**E.      "Navigability" requires only *potential* disruption of commercial activity.**

In Foremost Insurance Company v. Richardson, 457 U.S. 668, 102 S. Ct. 2654, 73 L.Ed.

2d 300  (1982), the U.S. Supreme Court considered a factual scenario in which two pleasure

crafts collided on the Amite River, a navigable waterway within the state of Louisiana.  The

United States Supreme Court rejected the notion that traditional maritime activity necessarily

---

[7] *See* Exhibit D.

[8] *See* Exhibit D at p. 8.

[9] "Navigability" as it relates to admiralty jurisdiction can differ from how it relates to Congress' regulatory authority. *Hardwick v. Pro-Line Boats, Inc.*, 895 F. Supp. 145, 147 (S.D. Tex. 1995).  In the case at bar, however, the regulatory definitions of navigability comport with the jurisprudential test for jurisdiction as related to the 17th St. Canal.

must involve commercial activity.  Instead, the Court required merely a showing of potential

disruption to commercial activity.  The Court reasoned that

> The potential disruptive impact of a collision between boats on navigable waters .
> . . compels the conclusion that this collision between two pleasure boats on
> navigable waters has a significant relationship with maritime commerce.

*Id.* at 675.

Thus, the <u>Foremost</u> Court established that for admiralty tort jurisdiction to exist, the

following criteria must exist:

1.      The requirement that the wrong have a significant relationship to traditional
        maritime activity is not limited to aviation contacts;

2.      The maritime activity need not be an exclusively commercial one so long as it has
        a potential impact on maritime commerce; and

3.      The negligent operation of a vessel on navigable waters – including a pleasure
        boat  – has a significant nexus to traditional maritime activity and thus sustains
        admiralty jurisdiction.

Therefore, the case at bar falls within admiralty jurisdiction in keeping with the dictates of

<u>Foremost,</u> because the dredging performed by defendants certainly occurred on a navigable

waterway, involved activities negligently conducted from barges or vessels that performed the

dredging, and had a potential impact on maritime commerce.  The attached permit effectively

acknowledges the latter point as well, noting that dredging in the Canal "will" have an impact,

for example, on "fish and wildlife" in the (commercially-fished) waters of Lake Pontchartrain. [10]


**F.      Actual disruption of commercial  maritime activity.**

---

[10] *See* Exhibit D at p. 11.

As the Fifth Circuit has held in Scarborough v. Clemco Industries, 391 F.3d 660 (5 Cir. 2004), to invoke federal admiralty jurisdiction, the activity must be of a sort with a potential to disrupt maritime commerce, and the general character of the activity giving rise to the incident should bear a substantial relationship to a particularly maritime activity.  *Id*. at 664. Furthermore, as the Scarborough court maintains, Grubart requires that "as long as one of the putative tortfeasor was engaged in traditional maritime activity, the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second nexus prong."  *Id*. at 665 (*quoting* Grubart, 513 U.S. at 541).

There was a *commercial* fishing fleet berthed in the 17th Street Canal before Hurricane Katrina.  It's not there now (*i.e.*, a disrupted commercial *maritime* activity) because of a chain of events set in motion by the USACE.  The *sine qua non* was USACE's issuance of a dredging permit despite abundant evidence of, *e.g.* a water permeable sand layer underlying the entire 17th Street Canal, and its approval of an unsafe, improper, and wholly inadequate I-wall structure (which was contrary to its own regulations and done despite the disastrous  forewarning given by the E-99 tests on the Atchafalaya River).  This caused the breach which not only flooded large portions of New Orleans, but also has deprived the fishing fleet of its home.   That is a disruption of maritime commerce sufficient to confer maritime jurisdiction over this case.

**G.      The "maritime nexus" requirement is satisfied here.**

In Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed. 2d 292 (1990), a case arising out of a fire that began in the washer/dryer unit of a private yacht moored in a marina, the Supreme Court extended the reach of admiralty jurisdiction. The Court reasoned that such an incident had a potentially disruptive impact upon maritime commerce and thus found there to be

admiralty jurisdiction over the action.  Therefore, when determining whether a maritime nexus

exists, the court must consider the possible impact of the event upon maritime shipping and

commerce, the desirability of a uniform national rule to apply to such matters, and the need for

admiralty expertise in the trial and decision of the case.  Maritime jurisdiction exists even though

maritime commerce is not disturbed as long as a "potential hazard to maritime commerce exists."

*Sisson*, 497 U.S. at 362.  In the case at bar, not only was maritime commerce potentially

impacted at the time of the dredging (*see, supra*), but the court can and should  take judicial

notice of the actual disruption of maritime commerce in the wake of the 17th St. Canal's failure:

the City of New Orleans was mandatorily evacuated for the first time in history, affecting the

port, ship suppliers, stevedores, and other commercial entities.

      Hence, plaintiffs' claims against the defendants in question fall within admiralty

jurisdiction.  These claims result from damages which plaintiffs will relate to inherently

maritime activity (dredging) occurring in a navigable waterway.  The instrumentalities involved

were maritime in nature: barges utilized in dredging.  The causal connexity between the

defendants' dredging and the eventual casualty are classically maritime in nature.  Maritime

commerce was both potentially and actually affected, not only by the dredging itself but by the

flooding which allegedly was due, in part, to the dredging.

**H.     The general character of the dredging activity bore a substantial relationship to
traditional maritime activity.**

      In Grubart v. Great Lakes Dredge and Dock Co., 513 U.S. 527, 115 S. Ct. 1043, 130 L.

Ed. 2d 1024 (1995), the United States Supreme Court rejected an effort to limit admiralty

jurisdiction over land-based injuries caused by a vessel operating on navigable waters.  Grubart

involved a claim arising from the pile-driving activity of a barge operating on the Chicago River.

In upholding the court's admiralty jurisdiction, the Court reaffirmed the validity of the Sisson test, i.e., whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.  As in the case at bar, Grubart involved damages on land caused by the activities of a barge on a navigable waterway.  In the case at bar, since the ramifications of defendants' tortious conduct occurred on navigable water, the tort is considered to have occurred on navigable water.  *See* Wiedemann & Fransen, A.P.L.C. v. Hollywood Marine, Inc., 811 F.2d 864 (5th Cir. 1987); Taylor v. Kennedy Engine, Inc., 861 F.2d 127 (5th Cir. 1988).

The essence of the complaint against the defendants at issue, as well as against other defendants, is that negligent dredging created a deeper channel that allowed seepage of water to weaken the structural walls of the 17th St. Canal, thereby causing the failure that led to catastrophic flooding in New Orleans.  In this respect, the plaintiffs' allegations are quite similar to those in Grubart, Inc. v. Great Lakes Dredge and Dock Co., 513 U.S. 527 (1995).  In Grubart, the complaint alleged the negligent weakening of a tunnel structure located underneath the bed of the Chicago River, into which the defendant had contracted to install pilings.  *Id*. at 529.  The Supreme Court determined that the connection to maritime activity was more than sufficient because the incident resulted from "damage by a vessel in navigable water to an underwater structure."  *Id*. at 539.  In turn, "the general character of the activity was maritime in nature because the work giving rise to the claim was 'repair or maintenance work on a navigable waterway performed from a vessel.'"  Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc., 448 F. 3d 760, 771 (*quoting* Grubart, 513 U.S. at 540).  Thus, the

activity alleged to be maritime in nature at the case at bar–dredging–was the very activity that

the United States Supreme Court found maritime in nature in Grubart.

The Supreme Court in Grubart also noted, with respect to satisfaction of maritime

jurisdiction, that "[t]here is no need or justification for posing an additional jurisdictional

requirement that the damage done must be close in time and space to the activity that caused it.

A nonremoteness requirement is not supported by the Extension of Admiralty Jurisdiction Acts'

language, and the phrase 'caused by' used in the Act indicated that the proper standard is

proximate cause." Grubart, 513 U.S. at 528 (quoting Gutierrez v. Waterman S.S. Corp., 373

U.S. 206, 210 (1963)).

## I.      Dredging is a particularly maritime activity.

Numerous courts have found dredging to be a particularly maritime activity.  Before

discussing some of these cases, Plaintiffs note that the dredging of the 17th Street Canal was

accomplished from vessels.  While this Court, following Board of Commissioners for

Pontchartrain Levee District v. Baron, has called the 17th Street Canal a "drainage ditch," has the

Court considered that this "ditch" was not deepened by land-based back-hoes or caterpillar crane

drag lines?  Has it considered that the too-shallow sheet piles were driven into the ground by

pile-drivers stationed upon barges?  Or that the concrete I-walls were installed from vessels

operating in the canal?  In fact, none of the dredging or flood wall projects were shore-based.  If

these activities weren't wholly maritime, what were they?

In Lakes of Gum Cove Hunting and Fishing, L.L.C. v. Weeks Marine, Inc., 183 F. Supp.

2d 537 (W. D. La. 2001), damage was alleged to have resulted from dredging of the Calcasieu

River Ship Canal and with respect to how the dredge material was disposed.  The plaintiff

claimed that dredged material contained toxic substances and was deposited on its property

without its consent.  Maritime jurisdiction was invoked.  The court noted that as a general rule in

the Fifth Circuit "the impact of torts must 'take effect' on water to satisfy the location test."

Egorov Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancy, 183 F.3d 453, 456 (5 Cir.

1999).  As the court noted, however, "an exception to this general rule is provided by the

Admiralty Extension Act, 46 U.S.C. 740.  According to this statute, "[a]ny injury to property

consummated on land when caused by vessel on navigable waters is within admiralty

jurisdiction."   182 F. Supp at 543.  Accord, Complaint of Ingram Barge Co., 435 F. Supp. 2d

534 (E.D. La. 2006).  The  Lakes of Gum Cove  court held that the activity of the dredging

engineer satisfied the test for admiralty jurisdiction, finding that its activity was analogous to the

circumstances in Grubart, which also involved dredging.  Id. at 544.

     In fact, this same legal principle has been recently validated by another section of this

court in Hurricane Katrina–related litigation.  In re Ingram Barge Company, 05-4419 (E.D.

La. 3/14/2007), the lawsuit claimed damages for injuries to persons and property as a result of

flooding of the Industrial Canal, the Mississippi River Gulf Outlet, and the Gulf Intercoastal

Waterway during Hurricane Katrina.   Among the defendants was L & A, the owner of a

terminal in the Industrial Canal which housed a barge owned by Ingram, that was moored and

secured, but which broke loose as Katrina made landfall.  Judge Ginger Berrigan posited that the

Admiralty Extension Act extends to "all cases of damages . . . to property caused by a vessel on

navigable water, notwithstanding that such damage or injury be done or consummated on land."

Id. at 3; 46 U.S.C. § 740.  In  In re Ingram Barge, L & A claimed that negligent dredging of

certain waterways, as activities separate from the government's maintenance of the levees and

other land based structures, was a cause of damage.  The court looked to <u>Grubart</u> to determine whether the general character of the activity giving rise to the incident bore a substantial relationship to traditional maritime activity.  *Id*. at 5.  In doing so, the court held that "[b]y its very nature, dredging seems to affect maritime commerce as a key motivation for dredging is to keep waterways passable for commercial and other vessels." *Id.*  The court noted that the United States, as a defendant, did not seriously contest whether dredging affects maritime commerce. Distinguishing the construction and maintenance of land–based structures, from the degree to which dredging might impact or undermine land based structures, the court held that dredging, as an activity, bore a substantial relationship to traditional maritime activity.  The court relied upon <u>Grubart</u>, 513 U.S. at 540, which involved "a dredge on navigable waters," and <u>Southern Natural Gas Company v. Pontchartrain Materials, Inc</u>., 711 F.2d 1251 (5 Cir. 1983), which found the Corps liable under the Suits in Admiralty Act for failing to warn dredging vessels of certain pipelines or for failing to prohibit dredging in the area of the pipelines.  The court thus found that a claim alleging damage as a result of the dredging "sounds in admiralty." <u>In re Ingram Barge</u>, 05-4419 at 5.

### IV.  LEGAL ARGUMENT REGARDING THE  MOTION TO STRIKE

Striking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice.  <u>Johnson v. Anhorn</u>, 334 F.Supp.2d 802 (E.D. Pa. 2004).  The purpose of motions to strike is to clean -ip pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.  Fed.R.Civ.P. 12 (f); <u>McInery v. Moyer Lumber and Hardware, Inc.</u>, 244 F.Supp.2d 393 (E.D. Pa. 2002).  A court's authority to strike a pleading should be reserved for a pleading which is so confused, ambiguous, vague or otherwise unintelligible that its true

substance is well-disguised.  Untracht v. Fikri, 368 F.Supp.2d 409 (W.D. Pa. 2005).  Even

allegations based upon "information and belief" should not be stricken absent evidence that the

plaintiff did not make a reasonable inquiry or did not believe the allegations were likely to have

evidentiary support.  U.S. v. Sequel Contractors, Inc., 402 F.Supp.2d 1142 (C.D. Cal.2005).

Here, it is very clear that the Plaintiffs have invested enormous resources of time and

money investigating the cause of the levee breaches, and that their maritime allegations have

evidentiary support.  More to the point, the United States has done nothing beyond presenting

mere argument regarding the pleading of vessel identification.

Although this Court has "liberal discretion" to strike from a pleading any insufficient

defense or any redundant, immaterial, impertinent, or scandalous matter as it deems appropriate,

Intex Recreation Corp. v. Team Worldwide Corp., 390 F.Supp.2d 21 D.D.C. 2005), motions to

strike are disfavored and will usually be denied unless the allegations have *no possible relevance*

to the controversy and may cause prejudice to a party.  Boyd's Bit Service, Inc. v. Specialty

Rental ool & Supply, Inc., 332 F.Supp.2d 838 (W.D. La. 2004); Von Grabe v. Sprint PCS, 312

F.Supp.2d 1285 (S.S. Cal. 2003).  Even where a plaintiff's complaint contains conclusory

allegations, those allegations should not be stricken if they relate to the subject matter of the

litigation and are not redundant, impertinent or immaterial.  Chong v. State Farm Mut. Auto Ins.

Co., 428 F.Supp.2d 1136 (S.D. Cal. 2006).

Here, the Plaintiffs' alternative pleading of maritime jurisdiction does not justify granting

ot a motion to strike.

## V.  CONCLUSION

For the many reasons set forth above, the United States' motion to strike should be

denied.

Respectfully Submitted,
PLAINTIFFS' LIAISON COUNSEL
s/Joseph M. Bruno
JOSEPH M. BRUNO
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
LA Bar Roll Number: 3604
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504)525-1335
Facsimile: (504)561-6775


MR-GO PLAINTIFFS SUB-GROUP LITIGATION
COMMITTEE


s/James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P. O. Box 3668
Lafayette, LA 70502
Telephone: (337)593-4190 or (337)233-3033
Facsimile: (337)233-2796

For

MR-GO PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE
Jonathan Andry (Andry Law Firm, New Orleans,
LA)
Clay Mitchell (Levin, Papantonio et al, Pensacola,
FL)
Pierce O'Donnell (O'Donnell & Associates, Los
Angeles, CA)
James Parkerson Roy (Domengeaux Wright Roy &
Edwards, Lafayette, LA)

-and-

GERALD E. MEUNIER (La. Bar #9471)
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre

1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com
Levee PSLC Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2007, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record who are CM/ECF participants.  I further certify that I mailed the foregoing document and

the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF

participants:

s/Joseph M. Bruno
JOSEPH M. BRUNO #3604