UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES § <br> CONSOLIDATED LITIGATION § <br> § <br> _____§ <br> § <br> PERTAINS TO: LEVEE § <br> § <br> FILED IN: 05-4181, 05-4182, 05-4191, 05-4568, § <br> 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, § <br> 05-6359, 06-0020, 06-1885, 06-0225, 06-0886, § <br> 06-11208, 06-2278, 06-2287, 06-2346, 06-2545, § <br> 06-3529, 06-4065, 06-4389, 06-4634, 06-4931, § <br> 06-5032, 06-5042, 06-5159, 06-5163, 06-5367, § <br> 06-5471, 06-5771, 06-5786, 06-5937, 06-7682, § <br> 07-0206, 07-0647, 07-0993, 07-1284, 07-1286, § <br> 07-1288, 07-1289 § <br> _____§ | CIVIL ACTION <br> NO. 05-4182 "K" (2) <br> JUDGE DUVAL <br> MAG. WILKINSON |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
TO DISMISS COUNTS I–III AND V–VII OF THE SUPERSEDING
MASTER CONSOLIDATED CLASS ACTION COMPLAINT
AND TO STRIKE THE REMAINING COUNTS**

Defendant United States has moved to dismiss this action which arises out of the "catastrophic failures of, and deficiencies in, the hurricane protection system surrounding the Parish of Orleans, State of Louisiana, which occurred on or after August 29, 2005." Complaint ¶ 1. The Complaint seeks to recover damages for these asserted "failures of, and deficiencies in, the hurricane protection system," which allegedly caused the flooding of New Orleans. *Id.* ¶¶ 1, 3. This action is barred by the Flood Control Act of 1928 ("FCA"), 33 U.S.C. § 702c, which

affords the United States plenary immunity "for any damage from or by floods or flood waters at any place."

In addition, Count I of the Complaint, which alleges the negligent granting of a permit to dredge the 17th Street Canal, *see id.* ¶¶ 196-201, is barred by the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). The conduct challenged in Count I—the granting of a permit to dredge a public waterway—requires a consideration of social, economic, and political goals and interests. In the absence of mandatory and specific federal statutes, regulations, or directives that prescribe or proscribe this permitting, it is a "discretionary function," which Congress excepted from the purview of the FTCA, even if, as is alleged, the discretion was abused. *Id.*

Finally, Counts IV and VIII pertain to alleged acts and omissions pertaining to the Mississippi River Gulf Outlet ("MRGO") and should therefore be stricken, pursuant to Case Management Order No. 4 ("CMO 4") which directed Plaintiffs to "file three separate Master Consolidated Class Action Complaints, one for each category"—Levee, MRGO, and Insurance. Record Doc. No. 3299 (CMO 4) at 13. The claims set forth in these counts are redundant of those set forth in the MRGO Master Consolidated Class Action Complaint.

## FACTS

This motion takes the factual allegations in the Complaint as true. As alleged in the Complaint, Hurricane Katrina made landfall in Louisiana early on the morning of August 29, 2005, causing "catastrophic failures of . . . the hurricane protection system surrounding the Parish of Orleans . . . ." Complaint ¶¶ 1, 128. Flooding allegedly occurred when levees and floodwalls adjacent to the Inner Harbor Navigation Canal ("IHNC") and along two outfall canals, the 17th Street Canal and the London Avenue Canal, were breached. *See id.* ¶¶ 132-49. The levees and

floodwalls that allegedly failed were designed and constructed as elements of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP"), the federal flood control project that was built to protect Greater New Orleans from hurricane-induced floods. *Id.* ¶¶ 104-05, 153, 162, 169, 175, 183, 190; Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965); *see also* Pub. L. No. 102-104, 105 Stat. 510, 514 (1991); Pub. L. 102-377, 106 Stat. 1315, 1320 (1992); Pub. L. No. 103-126, 107 Stat. 1312, 1316 (1993).

Allegedly, the plaintiffs' damages were caused by flood waters that were not controlled by the levees and floodwalls built as part of the LPVHPP along the outfall canals and adjacent to the IHNC. *See* Complaint ¶¶ 151-53, 161-62, 168-69, 175-76, 182-83, 189-90, 273. The alleged negligent or wrongful conduct of the United States is said to consist of (1) permitting the dredging of the 17th Street Canal,[1] *see id.* ¶¶ 198-201, 204-205, and (2) designing and constructing levees and floodwalls along the outfall canals and the IHNC, which allegedly were breached during the hurricane, *see id.* ¶¶ 217-219, 222, 236, 254, 274-276.

## DISCUSSION

The United States is immune from suit "save as it consents to be sued," and the terms of the United States' consent "define [a] court's jurisdiction to entertain the suit." *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quotation marks omitted). The "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian,* 453 U.S. 156, 161 (1981). Thus, at the outset of a case in which the United States has been sued, a court must first determine whether the United States has waived its immunity; absent a specific waiver, sovereign immunity bars suit for lack of

---

[1] In 1984 the Corps of Engineers issued a permit that allowed the Sewerage and Water Board to dredge the 17th Street Canal. *See* Complaint ¶¶ 25, 48. The work ensued and was completed in 1992. *See id.* ¶¶ 53-54.

subject matter jurisdiction. *FDIC v. Meyer,* 510 U.S. 471, 475-76 (1994). The burden to establish jurisdiction rests squarely on the plaintiffs, as the party asserting it. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994).

**I. This Action for Flood Damage Is Barred by the Flood Control Act, Which Immunizes The United States from Liability for "Any Damage from or by Floods or Flood Waters At Any Place."**

In sweeping terms, the Flood Control Act of 1928 affords the United States plenary immunity "for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. "It is difficult to imagine broader language." *United States v. James,* 478 U.S. 597, 604 (1986) (footnote omitted). This immunity applies to the present case. The Complaint itself avers that the alleged damages were caused by a flood and by flood waters. Therefore, if the test for immunity is "damage from or by floods or flood waters," then § 702c applies, and this case must be dismissed for lack of subject-matter jurisdiction. Dismissal is likewise appropriate even if the statutory phrase "floods or flood waters" is defined as flood waters that a federal flood control project failed to control. The Complaint avers that the flood waters were not controlled by the LPVHPP levees and floodwalls along two outfall canals and the IHNC. And if a wholly nontextual limitation were to be imposed on § 702c—limiting the immunity to acts and omissions that occur in connection with a flood control project—even then, every Count is barred by the Flood Control Act.

**A. The Text of the Statute Determines the Scope of the Immunity Accorded, and the Text Describes the Immunity in Terms of the Water that Causes the Damage, not The Project that Is at Issue.**

"The starting point in statutory interpretation is the language of the statute itself," and it is to be "assume[d] that the legislative purpose is expressed by the ordinary meaning of the words used." *United States v. James,* 478 U.S. 597, 604 (1986) (brackets by Court, internal quotation

4

marks, and citations omitted).  In keeping with this cardinal principle, the Supreme Court has repeatedly turned to the text of 33 U.S.C. § 702c to delineate the contours of the immunity afforded by the Flood Control Act.  Indeed, the Court has held "that it is the text of § 702c, as informed by our holding in *James*, . . . that governs the scope of the United States' immunity from liability for damage caused 'by floods or flood waters.'"  *Central Green Co. v. United States,* 531 U.S. 425, 437 (2001).

Noting the "sweeping" breadth of the statutory language, the *James* Court recognized that "§ 702c's language 'safeguard[s] the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language.'"  *Id.* at 608 (quoting *Nat'l Mfg. Co. v. United States,* 210 F. 2d 263, 270 (8th Cir. 1954)).  "Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control."  *Id.*  The Court therefore found that, "[o]n its face," the plain language of § 702c applied to the boating accidents at issue in *James,* because the "injuries occurred as a result of the release of waters from reservoirs that had reached flood stage."  *Id.* at 604.

In *Central Green* the Court again found it "appropriate to resort to the text of the statute" to determine whether the waters that allegedly caused the damage were "covered by § 702c." 531 U.S. at 430-31.  In furtherance of its holding that the text of § 702c governs the scope of the United States' immunity, the Court directed the lower courts to "consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project." *Id.* at 436.  The Court emphasized that "the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the

5

purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release." *Id.* at 434.

> **B. FCA Immunity Covers the Claims Against the United States Because the Alleged Damages Were Caused by Flood Waters that a Flood Control Project Failed to Control.**

The Complaint alleges that the plaintiffs' damages resulted from flooding that ensued when the hurricane protection system surrounding the Parish of Orleans failed during Hurricane Katrina.  Complaint ¶¶ 1, 3, 151, 161, 168, 175, 182, 189, 203.  Accordingly, these claims must be dismissed under the plain language of the statute.  If the statutory phrase "floods or flood waters" is read to include "those waters that a federal project is unable to control," *Central Green,* 531 U.S. at 431, then this Complaint must be dismissed as to the United States.  The Complaint expressly alleges that the flood waters that caused the alleged damage were waters that a flood control project, the LPVHPP, was unable to control.  *See* Complaint ¶¶ 1, 132-49.  This project was authorized "for hurricane-flood protection on Lake Pontchartrain."  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965); *see also* H.R. Doc. No. 89-231, at 1-2 (Chief's Report re LPVHPP) (project would "prevent entry of lake surges into" the "partially developed areas bordering Lake Pontchartrain").  Consequently, § 702c requires dismissal if the statute is construed as providing immunity from damages caused by water under the United States' "control or supervision" when (1) the water has "a nexus to a flood control project" and (2) the water is "flood waters."  R.D. 6194 (order denying United States' motion to certify) at 4-5.

Plaintiffs assert that "the liability of the Corps is not predicated on flood control activity." Complaint ¶ 16.  Even apart from the fact that the text of the statute contains no such requirement, this assertion does not withstand scrutiny.  The Complaint repeatedly challenges the design and the construction of the levees and floodwalls.  *See, e.g., id.* ¶¶ 1, 27, 37, 48-49, 60,

63-67, 77-79, 104-05. These are core flood control activities.² Indisputably, the levees and floodwalls were constructed as part of a federal flood control project. *See id.* ¶¶ 1, 104-05, 115-18, 135, 153, 162, 169, 176, 183, 190, 267, 273; Pub. L. No. 102-104, 105 Stat. 510, 514 (1991); Pub. L. 102-377, 106 Stat. 1315, 1320 (1992); Pub. L. No. 103-126, 107 Stat. 1312, 1316 (1993). Indeed, the Court has already held that "[t]he London Avenue and 17th Street Outfall Canals are components of the National Flood Control Program authorized by Congress and implemented by the Army Corps of Engineers." *See Berthelot v. Boh Bros. Constr. Co.,* 2006 WL 1984661 at *2 (E.D. La. June 1, 2006) (R.D. 469); *cf. In re Katrina Canal Breaches Consol. Lit.,* 471 F. Supp. 2d 684, 690 (E.D. La. 2007) (R.D. 2994) (LPVHPP "is the legislation that authorized the flood control projects designed to protect this area from flooding—that is, the levees and flood walls surrounding the City of New Orleans and the vicinity."). The laws that authorized the construction of these levees and floodwalls confirm that these were flood control activities. *See, e.g.,* Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965); Pub. L. No. 99-662, 100 Stat. 4082, 4167 (1986); Pub. L. No. 101-640, 104 Stat. 4604, 4625 (1990); Pub. L. No. 102-104, 105 Stat. 510, 514 (1991); Pub. L. No. 102-580, 106 Stat. 4797 (1992).³

---

²The captions used by the plaintiffs to describe each count in the Complaint confirm that they do seek to hold the United States liable for flood control activities. *See, e.g.,* Complaint at 58 ("Legal Fault in the Design and Construction of the 17th Street Canal Levees and Flood Walls"), 62 ("Legal Fault in the Design and Construction of the London Avenue Canal Levees and Flood Walls"), 67 ("Legal Fault Regarding the IHNC Protection System"), 71 ("Legal Fault in Connection with the Lake Pontchartrain Vicinity Hurricane Protection Project").

³The Complaint alleges that § 702c does not apply because "[t]he 17th Street Canal was not an authorized federal flood control project." Complaint ¶ 218; *cf. id.* ¶ 57 ("Parallel Protection Plan" for the 17th Street Canal . . . was part of an overall "High Level Plan," which replaced the "Barrier Plan" even though this change was not authorized by Congress."). As an initial matter, these conclusions of law are entitled to no weight. *See Jeanmarie v. United States*, 242 F.3d 600, 603 (5th Cir. 2001). But more to the point, they are erroneous. The Court has
(continued...)

7

Plaintiffs also assert that the Corps's permitting of dredging had no connection with a federal project. Complaint ¶ 204. This too is incorrect. The Complaint itself refutes this assertion by revealing that the Corps's evaluation of the proposed dredging centered on its potential impact on the levees along the canal. *See id.* ¶¶ 28-34. Allegedly, a study predicted that the proposed dredging would result in "factors of safety [that] *fell below the required values set by the Corps.*" *Id.* ¶ 32 (emphasis in original). Two factors that were allegedly considered by the Corps in issuing a permit to dredge were "flood heights and flood plain use." *Id.* ¶ 49. Even though the Corps had not yet begun to improve the levees along the canal, protecting against flooding from the canal was at that time an integral part of the LPVHPP, as it was necessary to prevent Lake Pontchartrain's flood waters from overtopping and breaching the existing levees. *See id.* ¶ 105 (Congress authorized Lake Pontchartrain Project in 1965 to provide hurricane protection to areas around Lake Pontchartrain); Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965). Because the dredging had the potential to adversely affect the existing level of flood protection, the permitting process involved an assessment of these factors, within the purview of the LPVHPP.

---

[3](...continued)
already held that the design and installation of floodwalls for the 17th Street Canal was "[i]n accordance with . . . Congressional directives." (citing, *inter alia,* Pub. L. No. 102-104, 105 Stat. 510, 514). *Berthelot,* 2006 WL 1984661 at *2 (E.D. La. June 1, 2006) (R.D. 469, at 4). This is plainly correct. The law directed the Corps to perform the "work necessary to complete an entire parallel protection system." Pub. L. No. 102-104, 105 Stat. 510, 514; *see also.* H.R. Rep. No. 101-966, at 67 (1990) ("the conferees direct the Corps to treat the outfall canals as part of the overall hurricane protection project"). Congress was aware that the switch to the High Level Plan required the Corps "to address the problems associated with outfall canals." *See* H.R. Rep. No. 101-966, at 67. In all events, there is nothing in the FCA that limits the immunity of the United States to "authorized" projects.

Accordingly, even under the plaintiffs' own reading of § 702c, the permitting is protected by the Flood Control Act. *Cf. Graci v. United States,* 456 F.2d 20, 27 (5th Cir. 1971) (§ 702c bars actions for flood damage unless damage results from negligence "unconnected with any flood control project"). Under any analysis, the Flood Control Act immunizes the United States from any liability for these damages, and this action against the United States should therefore be dismissed for lack of subject matter jurisdiction.

## II. The Discretionary Function Exception Bars Count I, Which Alleges Negligent Permitting of Dredging.

Count I, which alleges negligent permitting of dredging, is also barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a). "Congress was careful to except in the Act's broad waiver of immunity several important classes of tort claims" in order to "protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines,* 467 U.S. 797, 808 (1984); *Baldassaro v. United States,* 64 F.3d 206, 211 (5th Cir. 1995), *cert. denied,* 517 U.S. 1207 (1996).[4] When a claim falls within one of the FTCA's statutory exceptions, it must be dismissed for lack of subject matter jurisdiction. *Varig Airlines,* 467 U.S. at 808.

By its terms, the discretionary function exception excludes "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion

---

[4]The discretionary function exception bars claims under the Suits in Admiralty Act ("SAA"), as well as the FTCA. *See Baldassaro,* 64 F.3d at 208. Consequently, the exception applies to Count I even if the claims sound in admiralty. *See* Complaint ¶¶ 9, 10, 15, 203; *cf.* R.D. 5855-3 (U.S. Mem. in Supp. of Mot. to Strike Adm. Claims) at 5 n.6 (SAA is incorporated into the Admiralty Extension Act). *But see* R.D. 6175 (Order and Reasons re engineers' et al. motions to dismiss), at 8-10 & n.2 (outfall canals are not navigable bodies of water).

9

involved be abused." 28 U.S.C. § 2680(a).  The Supreme Court has recognized that this exception is designed to prevent "second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," and has established a two-step test to determine whether it applies.  *United States v. Gaubert,* 499 U.S. 315, 323 (1991) (internal citations omitted); *see also Berkovitz v. United States,* 486 U.S. 531, 536-37 (1988).

The first step of the test requires the court to look to the challenged conduct and consider whether it involves an element of judgment or choice.  *Gaubert,* 499 U.S. at 322; *Berkovitz,* 486 U.S. at 536.  To remove the conduct from the realm of discretion, a statute or regulation must be both mandatory and specific such that there is no "element of judgment or choice" and "[t]he employee has no rightful option but to adhere to the directive."  *Gaubert,* 499 U.S. at 322.  "[A]lleg[ing] only some generalized failures to follow mandatory rules" without "point[ing] to even one relevant mandatory limitation on . . . statutory discretion . . . [is] insufficient to defeat the first part of the *Gaubert* test."  *ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n,* 36 F.3d 409, 411-12 (5th Cir. 1994).  Unless a statute, regulation, or policy gives "specific direction," it does not eliminate discretion.  *Guile v. United States,* 422 F.3d 221, 231 (5th Cir. 2005).

Once a court is satisfied that the challenged conduct involves the exercise of discretion, the second step of the analysis requires that the conduct be based on "considerations of public policy." *Id.* at 323.  This inquiry examines whether the act or omission is "susceptible to policy analysis."  *Gaubert,* 499 U.S. at 325.  It does not, however, require a "fact-based" determination of the subjective intent of the official whose conduct is at issue; "the inquiry hinges instead on whether some plausible policy justification could have undergirded the challenged conduct." *Shansky v. United States,* 164 F.3d 688, 692 (1st Cir. 1999).

There need not even be an actual decision to review. If the nature of such a decision reveals that had one been made it would have involved considerations of public policy, then the exception applies. *See Andrade v. Chojnacki,* 338 F.3d 448, 457 (5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004); *Smith v. Johns-Manville Corp.,* 795 F.2d 301, 308-09 (3d Cir. 1986); *cf. Macharia v. United States,* 334 F.3d 61, 67 (D.C. Cir. 2003) (application of exception does not require "evidence that decision makers actually considered social, economic, or policy considerations"), *cert. denied,* 540 U.S. 1149 (2004). "[T]o survive a motion to dismiss based on the discretionary function exception, a complaint 'must allege facts which would support a finding that the challenged actions are not the kind of conduct that could be said to have been grounded in considerations of policy.'" *Baldassaro,* 64 F.3d at 209 (quoting *Gaubert,* 499 U.S. at 324-25). Decisions are susceptible to policy-related judgment if they involve an "unrestrained balancing of incommensurable values" including a differential allocation of resources among various political objectives. *Bolduc v. United States,* 402 F.3d 50, 60 (1st Cir. 2005). In this regard, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 322 U.S. at 324.

Count I alleges that the Corps "negligently failed to follow federal regulations and its own engineering standards and procedures in regard to the issuance of a permit to dredge the 17th Street Canal," had "no discretion to permit the dredging activity," and "violated federal law . . . [by] granting . . . a dredging permit that is contrary to the public interest" such that the "approval of the permit would dangerously compromise the 17th Street Canal flood protection levee." *See* Complaint ¶¶ 198-201, 205. However, as the statutory and regulatory provisions governing the

issuance of dredging permits expressly indicate, the Corps's decision to issue the permit is quintessentially the sort that involves the exercise of discretion based on considerations of public policy such that § 2680(a) was designed to protect from suit in tort.

The Rivers and Harbors Act, 33 U.S.C. § 403, and the regulations found at 33 C.F.R. § 320.4 govern the issuance of dredging permits for navigable waterways. Neither the statute nor the regulations "specifically prescribe a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536. Instead, they confer considerable discretion. The Act gives the Secretary of the Army authority to prescribe regulations for "the use, administration, and navigation of the navigable waters of the United States *as in his judgment the public necessity may require* for the protection of life and property, or of operations of the United States in channel improvement." 33 U.S.C. § 1 (emphasis added). The Act also gives the Secretary authority to permit the dredging ("excavat[ion]") of "any . . . canal." 33 U.S.C. § 403. The Act did not eliminate the Secretary's discretion in authorizing the dredging of the 17th Street Canal, and the regulations reveal that this discretion was "grounded in policy."

The regulations that guide the issuance of dredging permits allow the Corps to consider the probable impact of the proposed dredging on the public interest. As 33 C.F.R. § 320.4 reveals, the Corps is vested with broad discretion in determining whether to permit dredging. Numerous factors are considered in deciding whether the proposed dredging would be contrary to the public interest:

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a

> proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. . . . [A] permit will be granted unless the district engineer determines that it would be contrary to the public interest.

33 C.F.R. § 320.4(a)(1). As this regulation reveals, the review of a permit application involves a "general balancing process" in which as many as 20 factors—from "aesthetics" to "the needs and welfare of the people"—are considered. The regulations also describe the economic and social policy considerations that factor into the issuance of a permit. *See* 33 C.F.R. § 320.4(e), (q). Thus, the decision to permit dredging is quintessentially the type of discretionary decision grounded in public policy, as evidenced by the broad range and number of considerations that are assessed and weighed before a permit is granted.

As the courts have recognized, the discretionary function exception protects permit decisions in many and varied situations. *See, e.g., Varig Airlines,* 467 U.S. 797 (1984) (certification of aircraft design and manufacture protected); *Lindsay v. United States,* 778 F.2d 1143 (5th Cir. 1985) (denial of patent application protected); *Reed ex rel. Allen v. U.S. Dept. of Interior,* 231 F.3d 501 (9th Cir. 2000) (festival permitting protected); *United States v. Morrell,* 331 F.2d 498 (10th Cir. 1964) (issuance of grazing permit protected); *Faust v. South Carolina State Hwy. Dept.,* 721 F.2d 934, 939 (4th Cir. 1983) (permit for ferry operation protected). The granting of dredging permits in particular has been held protected by the discretionary function exception in various circumstances. *See Boston Edison Co. v. Great Lakes Dredge & Dock Co.,*

13

423 F.2d 891, 896-97 (1st Cir. 1970); *Lynch v. U.S. Dept. of Army Corps of Eng'rs,* 474 F. Supp. 545, 551 (D. Md.), *aff'd,* 601 F.2d 581 (4th Cir. 1979).[5]  Inasmuch as the Corps's decision to permit the dredging of the 17th Street Canal involved an exercise of considerable policy-based judgment, it is protected by the discretionary function exception.  Moreover, contrary to the plaintiffs' suggestion, *see* Complaint ¶ 199, the permitting is protected even if the discretion was "abused," 28 U.S.C. § 2680(a), *i.e.,* was negligent or wrongful.  *Varig Airlines,* 467 U.S. at 820; *Dalehite v. United States,* 346 U.S. 15, 34 (1953).

In any event, even if the discretionary function exception did not apply, Count I would be subject to dismissal for failing to state a claim, because it is premised on violations of federal rather than state law.  *See* Complaint ¶¶ 198-200; 28 U.S.C. § 1346(b)(1); *Johnson v. Sawyer,* 47 F.3d 716, 727 (5th Cir. 1995); *Art Metal-USA, Inc. v. United States,* 753 F.2d 1151, 1159-60 (D.C. Cir. 1985).  And finally, inasmuch as the Corps is vested with exclusive authority to permit the dredging of public waterways, the FTCA's waiver of sovereign immunity does not and could not apply to Count I, as there cannot be a private analog for the challenged conduct.  *See Green Acres Enters., Inc. v. United States,* 418 F.3d 852, 857 (8th Cir. 2005).

For these reasons, the Court lacks jurisdiction over the subject matter of the Superseding Master Consolidated Class Action Complaint, and the United States' motion should be granted.

---

[5]Similarly, dredging operations and related activities have themselves been held to be protected discretionary functions.  *See, e.g., Dunaway v. United States,* 136 F. Supp.2d 576 (E.D. La.1999); *Johnson v. United States,* 2000 WL 1528078 at *3-4, (E.D. La. 2000) (Duval, J.); *Liner v. Draco Basic Materials Co.,* 162 F. Supp. 2d 499 (E.D. La. 2001); *Hood v. United States,* 695 F. Supp. 237 (E.D. La. 1988); *Mocklin v. Orleans Levee District,* 690 F. Supp. 527 (E.D. La. 1988), *aff'd,* 877 F.2d 427 (5th Cir. 1989); *In re Lloyd's Leasing, Ltd.,* 764 F. Supp. 1114, 1137 (S.D. Tex.1990).

**III. Counts IV and VIII Pertain to MRGO and Should Therefore Be Stricken.**

Case Management Order No. 4 placed claims into three categories: Levee, MRGO, and Insurance. *See* CMO 4, at 3. Levee claims are those for damage caused by outfall canal and IHNC breaches. *Id.* MRGO claims are those for "damage caused by the MRGO in the areas of the Upper and Lower Ninth Ward, New Orleans East, and St. Bernard Parish." *Id.* [6] These claims were to be reiterated in "three separate Master Consolidated Class Action Complaints, one for each category." *Id.* at 13.

In violation of this Order, the Levee Master Complaint includes MRGO claims. *See* Complaint at 64-67, 72-73. Count IV alleges "negligence in designing, engineering, and constructing the MRGO." *Id.* ¶ 244. This allegation does not belong in the Levee Master Complaint.[7] Likewise, Count VIII, which alleges that the MRGO was a nuisance, does not belong in the Levee Master Complaint.[8] Accordingly, Counts IV and VIII should be stricken. *See* Fed. R. Civ. P. 16(f).

---

[6]The Order similarly placed the plaintiffs into separate categories. *See id.* at 4.

[7]The allegations in Count IV also appear in the MRGO Master Complaint. *See* R.D. 3415 (MRGO Master Complaint) ¶¶ 23, 26-30.

[8]The allegations in Count VIII also appear in the MRGO Master Complaint. *See* R.D. 3415 (MRGO Master Complaint) ¶¶ 36-37.

## CONCLUSION

For these reasons, the United States' motion to dismiss the Levee Master Complaint and to strike Counts IV and VIII should be granted.

                Respectfully submitted,

                PETER D. KEISLER
                Assistant Attorney General

                C. FREDERICK BECKNER III
                Deputy Assistant Attorney General

                PHYLLIS J. PYLES
                Director, Torts Branch

                JAMES G. TOUHEY, JR.
                Assistant Director, Torts Branch

                /s/ Robin D. Smith
                ROBIN D. SMITH
                Senior Trial Counsel, Torts Branch
                CATHERINE J. FINNEGAN
                Trial Attorney, Torts Branch, Civil Division
                U.S. Department of Justice
                Benjamin Franklin Station, P.O. Box 888
                Washington, D.C.  20044
                (202)-616-4916  /  (202) 616-5200 (Fax)
                tess.finnegan@usdoj.gov
                Attorneys for the United States

CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, a true copy of the foregoing was served on all parties by ECF.

/s/ Robin D. Smith
ROBIN D. SMITH