UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br><br>NO.: 05-4182<br><br>SECTION "K" (2) |

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286, 07-1288, 07-1289

PERTAINS TO: LEVEE

---

### MEMORANDUM IN SUPPORT OF
### LEVEE PSLC' MOTION TO COMPEL DISCOVERY FROM THE UNITED STATES

MAY IT PLEASE THE COURT:

### I. Introduction.

On March 1, 2007, the Court entered Case Management Order No. 4, ("CMO No. 4")

which at § IV (B) (1) (e) directed the Levee PSLC to propound common liability-related

Page -1-

Requests for Admission, Interrogatories, and Requests for Production of Documents to the United States on or before April 30, 2007.

On June 14, 2007, the United States delivered to the Levee PLSC its objections, answers, and/or responses. Upon a review of these objections, answers and responses, the Levee PSLC determined that they were deficient to the degree necessary to convene a Local Rule 37.1 discovery conference with the United States. To this end, by letter of July 2, 2007, the Levee PSLC asked the United States to participate in a discovery conference, which was convened on Monday, July 9, 2007. Unfortunately, despite all reasonable efforts, the outstanding discovery issues could not be resolved.[1] (e.g., Levee PL|SC request for

Therefore, in accordance with the provisions of Fed.R.Civ.P. 37 (a) (1) and (2) (B), the Levee PSLC respectfully moves this Honorable Court for an Order compelling discovery from the United States.[2]

## II. Discovery sought from the United States by the Levee PSLC.

The discovery issues remaining after the July 9, 2007 Local Rule 37 conference between the Levee PSLC and counsel for the United States are set forth below. Attached as Exhibit No.1 is the United States' Responses to the Levee Plaintiffs' First set of Requests for Admission. Attached as Exhibit No. 2 is the United States' Responses to the Levee Plaintiffs' First Set of

---

[1] For example, the Levee PLSC's request for admission no. 3 asked the United States to "ADMIT or DENY that the storm surge from Lake Pontchartrain associated with Hurricane Katrina did not overtop the flood walls at the sites of either the 17th Street Canal or London Avenue Canal." When asked during the Local Rule 37 conference if its denial of this request was intended to mean that the breach sites *were overtopped*, the United States retreated into objections about the word "overtop" being vague.

[2] The Levee PSLC does not seek sanctions pursuant to Fed.R.Civ.P. 37 (a) (4).

Requests for Production. Attached as Exhibit No. 3 is the United States' Responses to the Levee Plaintiffs' First Set of Interrogatories.

1. **Requests for admission.**

With the exception of admitting RFA number 40 (hurricane protection gates at the mouth of the 17th Street. Orleans Avenue, ad London Avenue Canals were never constructed prior to August 29, 2005), all other RFA's were denied. The Levee PLSC's issues regarding RFA responses are as follows:

RFA #1: The issue is whether Lt. Gen. Strock *did or did not affirm* in the April 5, 2006 Hearing before the United States Senate, Committee on Appropriations, Subcommittee on Energy and Water that the failure of the New Orleans Metropolitan Area Hurricane Protection System occurred as a result of the basic design and engineering deficiencies and failures of the United States Army Corps of Engineers. This is simply an evasion of a direct factual question.
Did Lt. Gen. Strock made an affirmative response to a question or did he volunteer the cause of the failure?

RFA #2: By its response, the Levee PLSC is led to believe that the United States contends that the failure of the 17th Street Canal and London Avenue Canal flood walls on August 29, 2005 was due to an "act of God." If this understanding is incorrect in whole or part, in light of Lt. Gen. Strock's April 5, 2006 comments before the United States Senate, Committee on Appropriations, Subcommittee on Energy and Water, please explain the patent inconsistency between the responses to RFA numbers 1 and 2.

RFA #3: The United States denied that the storm surge from Lake Pontchartrain associated with Hurricane Katrina overtopped the flood walls at the breach sites of either of the 17th Street Canal or the London Avenue Canal. This is simply an evasion of a direct factual question. In light of the known heights of I-wall tops (msl) and the known maximum height of water levels in the canals on August 29, 2005, the Levee PLSC contends that this denial was contrary to facts *already possessed* by the United States and should have been admitted.

RFA #4: The United States denied that the storm surge funneled by the Mississippi River Gulf Outlet and the Gulf Intracoastal Waterway into the Inner Harbor Navigation Canal overtopped the majority of flood protection structures along the West Bank of the Inner Harbor Navigation Canal. This is simply an evasion of a direct

factual question. In light of the known heights of I-wall tops (msl) and the known maximum height of water levels in the IHNC on August 29, 2005, the Levee PLSC contends that this denial was contrary to facts *already possessed* by the United States and should have been admitted.

RFA#5: The United States denied that the combined floodwall failures and deficiencies at the various sites caused and substantially contributed to the inundation of approximately 80% of the City of New Orleans. This is simply an evasion of a direct factual question. The United States is already possessed of, e.g., aerial and Putting aside the issue of who is at fault for the failures and deficiencies, the United States can answer whether it is factually correct that approximately 80% of the City of New Orleans flooded as a result of flood wall failures and/or deficiencies.

RFA #6: The United States denied that the USACE's New Orleans District's Engineering Division is responsible for flood control. The word "responsible" is susceptible to different meanings, including legal fault. In this RFA, however, the Levee PLSC did not intend "responsible" to mean "at fault or liable for." Instead, the word "responsible" was intended to mean only "has purview over" federal flood control projects.

RFA #7: The United States denied that the USACE's New Orleans District's Operations Division is responsible for the issuance of permits to dredge navigable waterways. The word "responsible" is susceptible to different meanings, including legal fault. In this RFA, however, the Levee PLSC did not intend "responsible" to mean "at fault or liable for." Instead, the word "responsible" was intended to mean only "has purview over" the issuance of permits to dredge navigable waterways.

RFA #8: The United States admitted that the USACE issued a permit on June 13, 1984, to dredge the 17th Street Canal, but denied that such activity caused and allowed changes to occur in the 17th Street Canal bottom, leading to subsurface and soil destabilization of the canal levee. This is simply an evasion of a direct factual question. First, the United States knows, from the permit application itself, whether the dredging changed the canal bottom (e.g., deepened it). Second, it also knows now, from available studies, whether this dredging destabilized the "levee" supporting the 17th Street Canal I-walls.

RFA #9: The United States denied that the USACE issued internal memoranda which acknowledged that, in connection with the proposed dredging of the 17th Street Canal, factors of safety were substantially below the minimum factor of safety, and that levee and flood wall stability problems were likely if the dredging permit was to be granted. In response, the United States evaded the issue and said that the memorandum would be the best evidence of its terms. This is simply an

|          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |
|----------|---|

evasion of a direct factual question. If such memoranda exist, this RFA cannot be denied.

RFA #10: The United States admitted that the USACE *"possessed information concerning the Mississippi Basin soils,"* but not whether the USACE recognized that marsh and swamp deposits are "treacherous" and highly variable. The USACE has studies and guidelines and can respond candidly to this request.

RFA #11: The United States denied that it disregarded overwhelming evidence to the effect that approval of the dredging permit would dangerously compromise the existing 17th Street Canal's flood protection levee. Avoiding an answer by debating the word "overwhelming" does not change the fact that United States identified (in its answer to Levee PLSC common liability interrogatory number 2) five individuals who *"may have received a copy of the January 1981 soil stability analysis performed by Modjeski and Masters regarding the dredging of the 17th Street Canal."* Similarly, in is answer to Levee PLSC common liability interrogatory number 3, the United States identified the same five individuals as persons who *"may have received a copy of the August 1982 report by Eustis Engineering"* which addressed the possible impact(s) of deepening and enlarging the 17th Street Canal. Does the United States deny it had this evidence?

RFA #12: The United States denied that the USACE had the legal responsibility and duty to assure that the dredging project would not compromise the safety of the 17th Street Canal's levee/flood wall system. The words "legal responsibility" can be interpreted to mean "fault" in the sense of liability for damages in the instant litigation. That meaning is not intended in RFA # 12. Instead, the Levee PLSC's request is limited to whether any promulgated federal law (e.g., U.S. Code section, Code of Federal Regulations section, USACE internal rule or administrative guideline) proactively imposed upon the Army Corps the responsibility and duty to assure that the dredging project would not compromise the safety of the 17th Street Canal's levee/flood wall system.

RFA #13: The United States denied that the USACE failed to follow federal regulations and its own engineering standards and procedures, in regard to the issuance of a permit to dredge the 17th Street Canal. Here, e.g., dredging was permitted to a depth which exceeded the depth of adjacent sheet piles. If that was in derogation from the USACE's own engineering standards and procedures, the United States cannot deny this request for admission.

RFA #14: The United States denied that the Army Corps violated federal law to the extent the River & Harbors Act prohibits the granting of a dredging permit that was contrary to the public interest. Here, e.g., dredging was permitted to a depth which exceeded the depth of adjacent sheet piles. If that was contrary to public

safety interests, the United States cannot deny this request for admission.

RFA #15: The United States denied that the USACE violated published federal regulations (including 33 C.F.R. §320.4) established general policies for the U.S. Army Corps of Engineer's evaluation of permit applications, and required that the reasonably expected benefits of the requested dredging be balanced against the reasonably foreseeable harm from same, including possible harm related to detrimental effects on flood control. Here, e.g., dredging was permitted to a depth which exceeded the depth of adjacent sheet piles. If that was in derogation from published federal regulations, the United States cannot deny this request for admission.

RFA #16: The United States denied that the USACE had no discretion to permit the dredging activity in question, because the approved activity constituted damage to the public interest in violation of the U.S. Army Corps of Engineers' clear statutory duties and obligations. Here, e.g., dredging was planned to a depth which exceeded the depth of adjacent sheet piles. If that plan was in derogation from published federal regulations, the USACE wold not have had discretion to approve the dredging permit and the United States cannot deny this request for admission.

RFA #17: The United States denied that the USACE's dredging permit decision-making and activity relate to traditional maritime matters, activity, and commerce. However, dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to the River & Harbors Act, and in 1974 the New Orleans Sewerage & Water Board filed an application with the USACE for a "Permit to Discharge or Work in Navigable Waters and their Tributaries." This application was submitted to the USACE's Operations Division, which issues permits to dredge navigable waterways. If these factual matters are true, the United Stats cannot deny this request for admission.

RFA #18: The United States denied that the activities undertaken by the USACE in connection with the issuance of the 17th Street Canal dredging permit were not activities undertaken as a result of an authorized federal flood control project. The "Parallel Plan" ha not been authorized on or before June 13, 1984, so what "authorized plan" allowed issuance of the dredging permit and denial of this request for admission?

RFA #19: The United States admitted only that "in 1965 Congress authorized the LPVHPP." It denied that the "LPVHPP" mandated the USACE to provide protection for the Greater New Orleans Metropolitan Area from "a hurricane that may be expected from the most severe combination of meteorological conditions considered

Page -6-

If that language, or similar language, was in the LPVHPP, the United States cannot deny this request for admission.

RFA #20: The United States denied that the USACE used the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane as the equation for "the most severe combination of meteorological conditions considered characteristic of the region." The United States objection is that the Levee PLSC "does not refer to any time frame." However, it is clear contextually that the Levee PLSC refers to the LPVHPP which was developed after 1965's Hurricane Betsy, and that there is no basis for denial of this request for admission.

RFA #21: The United States denied that USACE's New Orleans District Engineering Division deemed the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane to have a re-occurrence/frequency of 1-in-200 years to 1-in-300 years, arguing disingenuously that if a SPH. strikes a *larger* area "such as Louisiana" once every 100 years, "then the probability of it striking a smaller area, like New Orleans, is much lower, e.g., once in 200 or 300 years." The USACE either planned the *Lake Pontchartrain Vicinity* Hurricane Protection Plan with a focus on the immediate *local* area or it did not. It either contemplated a reoccurrence frequency of 1-in-200 to 1-in 300 years or it did not. If the USACE's LPVHPP contemplated a 1-in-200 to 1-in 300 year hurricane reoccurrence frequency in the local New Orleans area ( the name is sort of a giveaway), the United States cannot deny this request for admission.

RFA # 22: The United States denied that the USACE ignored the order of the Chief of Engineers (ER 1110-2-1453) to revise all Standard Project Hurricane-based analysis to reflect the 1979 National Weather Service data. While the United States' objection takes issue with the word "ignore," a common sense reading of this request for admission asks the United States to admit that the USACE did not comply with ER 1110-2-1453. If the USACE did not revise all Standard Project Hurricane-based analysis to reflect the 1979 National Weather Service data, the United States cannot deny this request for admission.

RFA #23: The United States denied that the USACE did not use the National Weather Service SLOSH model for surge prediction, which became available in 1979, which clearly showed that the structures built under the authority of the LPVHPP would be subject to overtopping by many Category 3 hurricanes. Regardless of the Levee PLSC's characterization of what the SLOSH model showed vis-a-vis Category 3 hurricanes, either the USACE did or did not use the 1979 SLOSH If the USACE did not use the 1979 SLOSH model for surge prediction, it cannot deny this request for admission.

RFA # 24:  The United States denied that, as a result of the application of the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane, all levee and floodwall crown elevations of the LPVHPP were at least 4 feet too low. This request contemplates levee and floodwall heights constructed after 1965. In 1972, the 1959 SPH. specification of maximum sustained wind speeds of 107 mph was increased to 129 mph. This increase of 20% in maximum winds can lead to a 40% increase of maximum surge elevation. In 1979, the National Oceanic and Atmospheric Administration ("NAA") raised the maximum sustained winds again to 140 mph, a category 4 hurricane (*see* Technical Report NEWS 23). This increase also lead to another increase in maximum storm surge elevation. In light of these two maximum sustained wind increases, and consequent storm surge height predictions (as well as the Corps' present arguments that the Hurricane Katrina surge would have overtopped levees and floodwalls even if no breaches occurred), this request for admission cannot be denied.

RFA #25:  The United States Denied that numerous storms have affected the Greater New Orleans Metropolitan Area *before and after* the initiation of the LPVHPP in 1965, that were more severe than the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane *i.e.*, 107 mph maximum winds). It is a matter of historical record that before and after the 1965 LPVHPP New Orleans has been struck by hurricanes with winds exceeding 107 mph. For example, the 1909 hurricane had 110mph wind gusts, the 1915 (measured at Tulane University) hurricane had 124 to 140 mph winds, the 1947 a hurricane had 110 mph winds, Hurricane Betsy in 1965 had 105 mph winds, and Hurricane Katrina in 2005 had 125mph winds just east of New Orleans (and the Corps contends it has a "Category 5" surge). The United |States has no factual basis to deny this request for admission.

RFA # 26:  The United States denied that the Army Corps did not use the updated 1972 and 1979 Standard Project Hurricane data adopted by the National Weather Service and, instead, used the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane for the design of floodwalls along the 17th Street, Orleans Avenue, and London Avenue Canals. In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation ER 1110-2-1453 which directed that "All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric Administration (NAA) Technical Report NEWS 23 for specifying meteorological criteria for SPH and P.H. wind fields along the gulf and east coasts of the United States." If the USACE did <u>not</u> comply with ER 1110-2-1453, it cannot deny this request for admission.

RFA #27:  The United States denied that the USACE, New Orleans District, built the levee and floodwall crown elevations 1 to 2 feet low because of the erroneous assumption that an elevation of zero referenced to the National Geodetic Vertical Datum of 1929 (NGVD29) was equal to – and interchangeable with – local mean

sea level. If it is true that when the Corps' adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29, was already between 1.3 and 1.6 feet below LMSL at different parts of the system, the United States cannot deny this request for admission.

RFA #28:   The United States denied that in 1965, zero NGVD29 was 1.3 to 1.6 feet below mean sea level at different parts of the LPVHPP, and levee and floodwall crown elevations were constructed lower by this margin. If it is factually true that subsidence between 1929 and 1965 (*e.g.*, subsidence in the Lakeview area) affected the accuracy of the National Geodetic Vertical Datum of 1929 (NGVD29), the United States cannot deny this request for admission.

RFA #29:   The United States denied that the USACE adopted a policy in 1985 to explicitly use the 1965 NGVD29 adjustment for elevation control. Amazingly, in its answer to Levee PLSC INT # 5, the United States identified the two persons who *"likely would have known about and participated in decisions related to NGVD29."* If the USACE used the 1965 NGVD29 adjustment for elevation control, the United States cannot deny this request for admission.

RFA #30:   The United States denied that provisions were not made to account for the 3 to 4 feet per century subsidence rates characteristic of the greater New Orleans metropolitan area even though this rate was known to the Army Corps at the time of congressional authorization of the Lake Pontchartrain Project. If there is a known 3 to 4 foot per century subsidence rate in the greater New Orleans area, this portion of this request for admission cannot be denied. If this historic subsidence rate was not taken into account vis-a-vis the LPVHPP, the United States cannot deny this request for admission.

RFA #31:   The United States denied that crown elevation deficiencies ranging up to 5 feet at the time Hurricane Katrina struck resulted in prolonged overtopping of flood walls and levees along the Inner Harbor Navigation Canal that otherwise would have been overtopped only briefly. If the United States takes issue with the descriptive word "prolonged," it should nevertheless admit or deny that crown elevation deficiencies lead to overtopping along the IHNC.

RFA # 32:   The United States admitted in part that the "barrier Plan" included a series of levees along the lakefront, floodwalls along the IHNC, and surge control structures at the Rigolets and Chef Menteur Passes. It denied that the "Barrier Plan" was the original and the only project design authorized by Congress. It is beyond any dispute that the "Barrier Plan" was the *original* project design of the LPVHPP, so that must be admitted. If the United States denies that it was the only project design authorized by Congress, its denial should identify which *other* project was authorized and when it was authorized.

Page -9-

RFA #33:    The United States denied that the original and only project design of the LPVHPP authorized by Congress, known as the "Barrier Plan," never included any hurricane protection structures along the 17th Street, Orleans Avenue, and London Avenue Canals. The United States had no basis for denying this request for admission. It's own answer to the Levee PLSC RFA # 32, *supra*, does not mention any structures *along* the three outfall canals  The United States cannot deny this request for admission.

RFA #34:    Th United States denied that an alternative to the Barrier Plan was the so-called "High Level Plan," and that the High Level Plan, in an attachment to the testimony of Colonel Early J. Rush, District Engineer, U.S. Army Engineers District, New Orleans, on January 5, 1978 in a hearing before the U.S. House of Representatives was described to have "many serious drawbacks," including but not limited to: (I) *"[T]he foundation soils in this area are not conductive to certain types of construction.;* (ii) *"In order to construct levees to high levels, it would be necessary to widen the base of each levee, thus requiring more land for rights-of-way. In an urban setting, a demand for more land means higher cost and additional displacement of homes and persons where land areas are congested."*

If the "High Level Plan" was an alternative to the "Barrier Plan," that must be admitted. If, before Congress on January 5, 1975 Col. Rush made the statement that the High Level Plan had "many serious drawbacks," that must be admitted. If Col. Rush described two of those drawbacks as quoted above, the fact of that specific description to Congress must be admitted.

RFA #35:    The United States denied that Colonel Early J. Rush, District Engineer, U.S. Army Engineers District, New Orleans, on January 5, 1978 in a hearing before the U.S. re-authorization." Either Col. Rush made this statement, or he did not. If he did, the United States cannot deny this request for admission.

RFA #36:    The United States denied that in 1984, the USACE changed the design of the Lake Pontchartrain Project from the Barrier Plan to High Level Plan, and that the High Level Plan in 1984 did not include any structures along the 17th Street, Orleans Avenue, and London Avenue Canals. The High Level Plan either included structures *along* the three outfall canals or it did not. If it did, the United States should identify in what document or drawing such structures were included. If not, the United States cannot deny this request for admission.

RFA #37:    The United States denied that Congress never authorized the USACE's change from the Barrier Plan to the High Level Plan. If the change to the High Level Plan was authorized by Congress, the United States should identify when and how that authorization was made. If not, the United States cannot deny this request for admission.

RFA # 38      The United States denied that the 17th Street, Orleans Avenue, and London Avenue Canals were not congressionally authorized federal flood control projects. If they were, the United States should identify the date and nature of their authorization. If not, the United States cannot deny this request for admission.

RFA #39:      The United States denied that the "Parallel Protection Plan" became a part of the "High Level Plan" which provided the installation of hurricane protection gates at the mouth of the 17th Street, Orleans Avenue, and London Avenue Canals. If the High Level Plan provided for protection gates at the mouths of the three outfall canals, this must be admitted. If the"Parallel Protection Plan" became part of the 'High Level Plan," this must be admitted.

RFA #40:      The United States admitted that hurricane protection gates at the mouths of the three outfall canals were never constructed prior to August 29, 2005.

RFA #41:      The United States essentially admitted that in connection with the Parallel Protection Plan along the 17th Street, Orleans Avenue, and London Avenue Canals, the Army Corps considered three options of hurricane protection structures: levees, T-walls, or I-walls. However, its responses said the USACE Considered other option. If no other "options" were actually considered, the United States must admit the request for admission without qualification.

RFA #42:      The United States denied that levees or T-walls were rejected to be built as the main structures along the 17th Street, Orleans Avenue, and London Avenue Canals because the USACE did not want to expropriate land, nor purchase any flood rights adjacent to the Canals. If the USACE did not reject T-walls and levees (and use I-walls) for reasons relating to expropriation or flood rights purchases, it must identify the basis fo its rejection of these types of structures. If it did reject levees and T-walls for these reasons, it must make an unqualified admission.

RFA #43:      The United States denied that the U.S. Army Corps of Engineers' April 30, 2000 *Manual on Engineering, Design and Construction of Levees* states, for stability reasons, that flood walls utilizing the "I-wall" design should rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required. Either the manual says this or it does not. If the manual does says this, the United States cannot deny this request for admission.

RFA #44:      The United States denied that the I-walls on the along the 17th Street, Orleans Avenue, and London Avenue Canals were built above the seven (7) foot height limitations set forth in the U.S. Army Corps of Engineers' April 30, 2000 *Manual on Engineering, Design and Construction of Levees.* The I-walls either exceed that 7-foot height limitation or they did not. If they did, the United States cannot deny this request for admission.

Page -11-

RFA #45: The United States denied that it relied upon the Lane's Weighted Average Creep method for underseepage analysis, which method was recognized in the profession at the time to be inappropriate for final design in a critical life-support structure. If the USACE relied upon the relied upon the Lane's Weighted Average Creep method for underseepage analysis, the United States must admit this fact. If this method was recognized in the profession at the time to be inappropriate for final design in a critical life-support structure, the United States must admit this too.

RFA #46: The United States denied that the failure mode at the 17th Street and London Avenue breaches involved lateral deflection of the concrete floodwall and the sheet piles that supported that floodwall. If the failure mode was "lateral deflection," this must be admitted. If separation occurred between the sheet pilings and the soft soils of the levees, this must be admitted. If the separation process lowered the lateral resistance of the entire structure, this must be admitted.

RFA #47: The United States denied that the USACE knew or should have known about that failure mode (*i.e.* lateral deflection) because in 1985 the USACE conducted a full scale instrumented lateral load testing of a 200-foot long sheet pile wall in the Atchafalaya Basin (called the "E-99 Sheet Pile Tests") which indicated the potential soil separation from the sheet piles, and that the calculated factors of safety would not be reached. Amazingly, the United States denies being aware of its own testing, perhaps because this particular testing resulted in the very same failure mechanism which manifested on the 17th Street and London Avenue Canals. If the USACE conducted the E-99 tests, it cannot deny this request for admission. If it received the results of this testing, it cannot deny this request for admission.

## 2. Responses to requests for production of documents.

The United States has produced no documents or things in response to any of the 100 production requests.[3] Instead, the United States raises general objections that are inapplicable generally to most of the specific production requests. Further, insofar as all of the requested documents relate to publicly-funded projects (*e.g.*, the LPVHPP), there are no "privileged" documents (*i.e.*, no trade secrets, no attorney-client communications, etc.). Suggesting that the

---

[3] For example, the 17th Street canal dredging permit application file hasn't been produced.

reports and documents contained in the IPET website *"may be relevant"* is simply a general evasion, as is the representation that the Levee PLSC's production requests seek *"information and documents that are publicly available and/or obtainable from some other source hat is more convenient, less burdensome, and less expensive."* If the United States has present possession of individual documents responsive to these requests, they must be produced.

### 3. Answers to Interrogatories.

The United States's answers to interrogatories are generally more responsive than its other discovery responses. However, there seems to be pattern where, whenever it is asked to identify a witness to a crucial event, the United States is unable to identify a witness (even when answers to other interrogatories chronologically bracket one where a witness remains unidentified).

INT #4: No witness is identified regarding receipt or authorship of correspondence in response to the August 1982 Eustis Engineering report regarding measures to prevent a landslide blowout related to 17th Street canal dredging activities, yet witnesses are identified in answer to virtually every other interrogatory. .

INT #6: No witness is identified who had knowledge before the end of 1994 that the SWB had dredged the 17th Street Canal to a depth below the bottoms of adjacent sheet pilings. This answer is insufficient insofar as such witnesses would include, *e.g.,* persons who received the dredging permit applications setting forth the proposed dredge-to depth, and/or persons who received the sheet piling depth proposals, and/or persons who received soil study report.

INT #7: Same issue except that it relates to excavation by SWB until canal water touched the Orleans Parish side of the canal wall.

INT #9: The United States avoids identifying who attended annual LPVHPP inspections on its behalf. According to 33 C.F.R, § 222.2 (in effect from 1985 through 1994), the USACE was *required* to conduct inspections. Surely someone was charged with the duty of performing and reporting on these inspections.

INT #19: The United States avoids identifying who received Modjeski & Masters' March 1981 concerns about 17th Street and other outfall canal levees being in violation of the USACE's stability standards. Would this be one of the persons identified in response to INT #s 15, 16,17, 18, and 20 which chronologically overlap with INT # 19?

INT #24:   The United States avoids identifying who knew that sands underlay the entire 17th Street Canal from Pumping Station No. 6 to Lake Pontchartrain. How could it have no answer to this interrogatory while it answered INT # 25 and identified persons who on/about November 30, 1982 received Modjeski & Masters' subsoil investigation report for the 17th Street Canal?

INT #28:   The United States avoids identifying who received Eustis Engineering's July 27, 1983 revised soil stability report, yet in answers to INT #s 27 and 29 it identifies persons who received the May 9, 1983 dredging permit application and Eustis Engineering' January 17, 1984 report regarding the 17th Street Canal.

INT #30:   The United States avoids identifying who evaluated the 1983-94 piezometer study, yet in answer to other interrogatories it identified persons who received chronologically contemporaneous documents.

INT # 32:  The United States avoids identifying who prepared the April 24, 1987 drawing of the sheet piling design for the 17th Street Canal. Isn't review of this drawing part of the process of approving the construction of "I-walls" on the canal? Whose name is on the drawing?

INT # 34:  The United States avoids identifying the supervisory officers or employees who, between June 1984 and 1992 ordered, or approved, or authorized any deviation (s) from the design plans for, and upon which the June 13, 1984 dredging permit for the 17th Street Canal was granted. There is a limited number of persons who could have done so, *see, e.g.,* the United State' answer to INT #38.

INT # 35:  The United States avoids identifying the supervisory officer or employee who was in possession of, or who reviewed, the plans and specifications, progress charts, soundings, quantity of excavated materials, hydrographic surveys and cross-sections before, during, and after 17th Street Canal dredging was carried out. Someone had to be in possession of plans and specifications in order for the permit to be approved and issued, and someone had to monitor the project to insure permit compliance.

INT #37:   The United States avoids identifying the supervisory officer or employee who who, despite Pittman Construction Company's 1993 concerns (*i.e.,* that the sheet pile walls with the concrete monolith installed on the top were beginning to lean towards the canal side because the supporting soil foundation was not of sufficient strength, rigidity and stability), allowed construction of the 17th Street and London Avenue Canals to proceed to completion. Here is a limited universe of persons who, in 1993, would have received Pittman's concerns and who would have been empowered to halt the construction.

INT #38:   The United States partially answers this interrogatory, saying that *"any USACE modifications to the LPVHPP likely would have been authorized by the United States Army Corps' Chief of Engineers, within the discretion authorized by Congress."* The United States nevertheless fails to identify the Chief of Engineers.

INT #39:   Same issue as INT #38. Who is the Chief of Engineers? This answer suggests that the Chief of Engineers, not Congress, "authorized" the High Level Plan. This remains a critical issue the United States must answer. Who was the Chief of Engineers?

INT #40:   This interrogatory asked the United States to identify the USACE officer or employee who ordered, approved, or authorized the Parallel Protection Plan for Answering partially, the United States identified the Chief of the New Orleans District's Engineering Division who recommended Design Memorandum 20 (featuring the Parallel Protection Plan instead of gates at the mouth of the 17th Street Canal) to the Lower Mississippi Valley Division's Chief of Engineering Division. The LMVD' Chief of Engineering Division then forwarded Design Memorandum 20 to the Chief of Engineers for Approval. Who was that Chief of Engineers?

INT #41:   This interrogatory asked the United States to identify the USACE officer or employee who ordered, approved, or authorized the construction of I-walls on the 17th Street Canal. The United States referred to its answer of INT #40, which identified the Chief of the New Orleans District's Engineering Division who recommended Design Memorandum 20 to the Lower Mississippi Valley Division's Chief of Engineering Division, who then forwarded Design Memorandum 20 to the Chief of Engineers for Approval. Who was that Chief of Engineers?

INT #42:   This interrogatory asked the United States to identify the USACE officer or employee who rejected levees and T-walls on the 17th Street Canal. The United States again referred to its answer of INT #40, which identified the Chief of the New Orleans District's Engineering Division who recommended Design Memorandum 20 to the Lower Mississippi Valley Division's Chief of Engineering Division, who then forwarded Design Memorandum 20 to the Chief of Engineers for Approval. Who was that Chief of Engineers,?

INT #43:   This interrogatory asked the United States to identify the USACE officer or employee who authored and approved the design memoranda of the LPVHPP for the 17th Street and London Avenue Canals.

With regard to the 17th Street Canal, the United States again referred to its answer of INT #40, which identified the Chief of the New Orleans District's Engineering

|  |  |
|---|---|
|  | Division who recommended Design Memorandum 20 to the Lower Mississippi Valley Division's Chief of Engineering Division, who then forwarded Design Memorandum 20 to the Chief of Engineers for Approval. Who was that Chief of Engineers? |
|  | With regard to the London Avenue Canal, the United States identified the Chief of the New Orleans District's Engineering Division who recommended Design Memorandum 19A (featuring the Parallel Protection Plan instead of gates at the mouth of the London Avenue Canal) to the Lower Mississippi Valley Division's Chief of Engineering Division. The LMVD' Chief of Engineering Division then forwarded Design Memorandum 20 to the Chief of Engineers for Approval. Who was that Chief of Engineers? |
| INT #44: | The United States avoids identifying the officers or employees who, before Hurricane Katrina struck, knew that the flood walls of the 17th Street and London Avenue Canals were constructed with sheet pilings that ended above or in the middle of layers of weak soil. In its answers to INT #s 27 and 29, the United States identifies persons who received the May 9, 1983 dredging permit application and Eustis Engineering' January 17, 1984 report regarding the 17th Street Canal. The USACE knew what soils underlay the 17th Street Canal and because the USACE had Design Memoranda 19A and 20 (*see, e.g.,* INT #43), it knew whether the sheet pilings ended in layers of sand, and if those layers were considered "weak" for stability purposes. |
| INT #45: | The United States avoids identifying the officers or employees who knew the soil adjacent to the 17th Street and London Avenue Canal had subsided significantly after construction. If the United States has post-construction information regarding any soil subsidence, it can answer this interrogatory. If it did not obtain or receive information regarding subsidence, it should say so. |
| INT #46: | The United States avoids identifying the officers or employees who received proofs of insurance from companies submitting bids to dredge or build levees and floodwalls on the 17th Street and London Avenue Canals. If receipt of such information was part of the process of evaluating a permit applicant, it can answer this interrogatory. For example, was a proof of insurance submitted in connection with the dredging permit received on May 9, 1983? Or on June 13, 1984? |
| INT #47: | The United States avoids identifying the officers or employees who knew of, or participated in, the USACE's decision to continue using the 1959 SPH after being ordered in 1981 to use the most recent data, including the NEWS's 1979 SPH and the SLOSH Surge Model. Someone failed to comply with the Chief of Engineers' 1981 Engineering Regulation ER 1110-2-1453. Who was in charge with regard to the LPVHPP? Whose job was it to comply with ER 1110-2-1453? |

**RESPECTFULLY SUBMITTED:**

**LEVEE LITIGATION GROUP**

BY:   s/Joseph M. Bruno
Joseph M. Bruno (#3604)
The Law Office of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile:(504) 581-1493
E-Mail:jbruno@jbrunolaw.com
Plaintiffs' Liaison Counsel

- and -

GERALD E. MEUNIER (La. Bar #9471)
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com
Levee PSLC Liaison Counsel