MK061407.txt

1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   MARLENE KATZ                CIVIL ACTION
              Plaintiff,         NO. 06-4155
 5
     VS.                         SECTION "R" (2)
 6
     STATE FARM FIRE AND         JUDGE VANCE
 7   CASUALTY COMPANY, AND
     ANTHONY J. CEMO,            MAG. JUDGE WILKINSON
 8   INDIVIDUALLY AND AS
     AGENT OF STATE FARM
 9   FIRE AND CASUALTY
     COMPANY
10           Defendants.
11
12
13
14
15            Deposition of MARLENE L. KATZ, taken
16   in the above-entitled cause, pursuant to the
17   following stipulation, before Dawn H. Hymel,
18   Certified Court Reporter, at the offices of
19   Lestelle & Lestelle, 3421 N. Causeway
20   Boulevard, Suite 602, Metairie, Louisiana, on
21   Thursday, the 14th of June, 2007, commencing
22   at 2:05 p.m.
23
24
25
```



EXHIBIT A

2

MK061407.txt

```
 1    APPEARANCES:

 2    Appearing on Behalf of Marlene L. Katz:

 3         LESTELLE & LESTELLE
           BY:  JEFFERY B. STRUCKHOFF, ESQ.
 4         3421 N. Causeway Boulevard
           Suite 602
 5         Metairie, Louisiana   70002

 6


 7    Appearing on Behalf of State Farm Fire and
      Casualty Company and Anthony J. Cemo:
 8
           STONE PIGMAN WALTHER WITTMANN
 9         BY:  DOUGLAS J. COCHRAN, ESQ.
           2431 South Acadian Thruway
10         Suite 290
           Baton Rouge, Louisiana   70808-2365
11

12

13    REPORTED BY:

14         DAWN H. HYMEL
           Certified Court Reporter #81016
15

16

17

18

19

20

21

22

23

24

25
```

3

MK061407.txt

```
 1                    I N D E X
 2                                              PAGE
 3    EXAMINATION BY:
 4        Mr. Cochran                            4
 5
 6                    E X H I B I T S
 7    Katz
 8    1 In Globo      Photographs                72
 9    2 In Globo      Photographs                77
10    3               Official Contents Log      83
11    4               Check No. 546653           93
12    5               10/6/2005 Check            94
13    6               12/6/2005 Check            94
14    7               10/13/2005 Check           95
15    8               1/3 and 1/9/2006 Letters  107
16    9               Summary                   109
17   10               Photographs               109
18   11               Bellco Estimate           111
19   12               Intercom Estimate         112
20   13               Burglar Alarm Estimate    112
21   14               Air Conditioning Estimate 113
22   15               Photographs               113
23   16               Broker's Price Opinion    121
24
25
```

MK061407.txt

```
1                S T I P U L A T I O N
2            It is stipulated and agreed by and
3    between all parties that this deposition is
4    hereby being taken for all purposes pursuant
5    to the Federal Rules of Civil Procedure.
6            All formalities, with the exception of
7    the reading and signing of the deposition by
8    the witness, are waived.
9            All objections, except those as to the
10   form of the question and the responsiveness of
11   the answer, are reserved until the deposition
12   is used or sought to be used in evidence.
13                       -0-
14           MARLENE L. KATZ, 3831 Northwest Willow
15   Creek Drive, Jensen Beach, Florida, 34957,
16   after having been duly sworn, testified as
17   follows:
18   EXAMINATION BY MR. COCHRAN:
19   Q.   Ms. Katz, my name is Doug Cochran.  I
20   represent State Farm in this matter.
21           Have you ever given a deposition before?
22   A.   Yes, sir.
23   Q.   Okay.  In what types of matters?
24   A.   Divorce and real estate.
25   Q.   Okay.  And depositions in the real
```

                                                    5


```
1    estate, what kind of depositions?
2    A.   I'm going to correct that.  I've attended
```
Page 4

MK061407.txt

17   A.   Yes, sir.

18   Q.   Okay. And in Louisiana, what's the

19   requirement, if you can remember?

20   A.   Most years I think it is eight hours per

21   year. I also did post-licensing in Florida.

22   Q.   Okay. What does that mean, post-

23   licensing?

24   A.   It's a requirement in Florida when you

25   get your license, you have to take additional

13

1   hours besides just getting your license.

2   Q.   Are you currently licensed in Florida as

3   well as Louisiana?

4   A.   Yes, sir.

5   Q.   Are you employed anywhere or are you a

6   real estate agent on your own?

7   A.   I'm an independent contractor.

8   Q.   Okay. Through what -- Through a broker

9   or a brokerage firm or --

10   A.   I'm an independent contractor at RE/MAX.

11   Q.   Okay. And how long have you been at

12   RE/MAX?

13   A.   Since either '93 or '94. I don't

14   remember which year.

15   Q.   Okay. Now, is there a particular RE/MAX

16   business here in Louisiana that you worked out

17   of?

18   A.   Yes, sir.

19   Q.   And what is that?
20   A.   I worked out of RE/MAX, RE/MAX Properties
21   and RE/MAX Real Estate Partners.
22   Q.   And do you currently work for either
23   RE/MAX Properties or RE/MAX Real Estate
24   Partners as an independent contractor
25   currently in Louisiana?

14

1    A.   My license is in a holding company and
2    I'm not sure of the name of it. It's in
3    RE/MAX's holding company, a referral company.
4    Q.   If you could, explain that to me. I'm
5    not following that.
6    A.   I have an active license; however, I'm
7    not a RE/MAX agent in Louisiana, so my license
8    is in their referral company so I could refer
9    it to an agent, any agent here, and receive a
10   referral.
11   Q.   Okay.
12   A.   But I'm not paying RE/MAX fees, so I
13   can't call myself a RE/MAX agent in Louisiana.
14   I'm a RE/MAX agent in Florida.
15   Q.   Okay. Prior to working, well, as an
16   independent contractor with RE/MAX starting in
17   '93, '94, did you work anywhere else?
18   A.   Yes, sir.
19   Q.   Where did you work?
20   A.   I was an independent contractor at LOR

Page 13

MK061407.txt

21   Realty, L-O-R.
22   Q.   L-O-R.  Was that in Metairie or New
23   Orleans?
24   A.   It was in Metairie.
25   Q.   And what time periods did you work there?

15

1    A.   Since I was licensed until I went to
2    RE/MAX.
3    Q.   Okay.  So licensing in around 1987, then
4    around '93 or '94 you went to RE/MAX; is that
5    fair to say?
6    A.   Yes, sir.
7    Q.   Prior to receiving your license in 1987,
8    had you worked anywhere prior to '87?
9    A.   Yes, sir.
10   Q.   Where was that?
11   A.   Grace King High School.
12   Q.   And what did you do at Grace King?
13   A.   I taught.
14   Q.   What did you teach?
15   A.   U.S. history and civics.
16   Q.   And what time period did you teach at
17   Grace King?
18   A.   Approximately, I think, in the Seventies.
19   I don't remember exactly.  For three years,
20   approximately, '72, '73 and '74, somewhere
21   around there, in the Seventies.
22   Q.   Okay.  So that would have been your job

Page 14

MK061407.txt

23  straight out of Tulane?
24  A.   Yes, sir.
25  Q.   Any other jobs either, you know, during

16

1   the summer, et cetera, or otherwise from 1971
2   'til the present?
3   A.   Back in the Seventies, I also taught at
4   night school.
5   Q.   What did you teach?
6   A.   I don't -- I really don't remember.
7   Q.   Okay. We're obviously here to talk
8   about --
9   A.   And I also sold purses, I think, at
10  Maison Blanche.
11  Q.   Okay. We're obviously here to talk about
12  5600 Marcie (sic) Avenue. Is that correct?
13  That's the property that you lived at during
14  the time of Hurricane Katrina?
15  A.   Yes, sir.
16  Q.   When did you move to 5600 Marcie Avenue?
17  A.   Approximately, I don't remember the exact
18  year, approximately 1986 or '87, somewhere
19  around there, sometime in that time period in
20  the Eighties.
21  Q.   Was this a home that you and your
22  husband, former husband lived in or is it a
23  home that you purchased after the divorce?
24  A.   I lived in that home with my husband.

Page 15

MK061407.txt

20   BY MR. COCHRAN:
21   Q.   On your homeowners policy, did you ever
22   sit down and determine or think about how much
23   insurance coverage you wanted or needed on
24   your 5600 Marcia Avenue home?
25   A.   Sometime during the twenty years that I

46

1    owned the house, I discussed with Tony Cemo,
2    my agent, and we adjusted the amount to make
3    it more concurrent with what the house was
4    worth, but as to when I discussed it with him,
5    I really do not remember.
6    Q.   Okay. Now, as far as during that roughly
7    twenty years that you owned the home
8    individually, during that time period, you
9    were a practicing real estate agent?
10   A.   Yes, sir.
11   Q.   Do you feel you had a better knowledge on
12   valuation of the home than Mr. Cemo because of
13   your experience in real estate?
14   A.   Yes, sir.
15   Q.   Do you know how many times you discussed
16   the insurance amount on your home with
17   Mr. Cemo?
18   A.   No, sir, I don't know how many times I
19   discussed it with him.
20   Q.   I'm just trying to clarify. Do you know
21   if it was once or more than once?

MK061407.txt

22  A.   I don't remember how many times that I
23  discussed it with him.
24  Q.   Okay. Did you, during those twenty
25  years, receive items in the mail indicating

47

1   what your coverage was on your home? Do you
2   recall receiving those from State Farm?
3   A.   Yes, sir.
4   Q.   Okay. Do you know how often you would
5   receive those?
6   A.   I really don't remember.
7   Q.   Okay. After receiving any of those
8   mailings from State Farm on the amount of
9   coverage, did you ever call Mr. Cemo or call
10  any other agents regarding insurance?
11  A.   The only person I ever discussed my
12  homeowners insurance with was Tony Cemo.
13  Q.   Now, after receiving the mailings from
14  State Farm indicating what your coverage was,
15  did you ever call Mr. Cemo regarding that
16  amount of coverage?
17  A.   I believe I testified that I did have
18  conversations with him, but I don't remember
19  how many, or do I remember when.
20  Q.   Okay. Now, when did you first buy flood
21  insurance for the 5600 Marcia Avenue house?
22  A.   I don't remember exactly.
23  Q.   And did you buy that from Mr. Cemo?

Page 44

1   A.   I don't recall the date, but it was in
2   September of 2004.
3   Q.   Now, do you have a copy of the check that
4   you mentioned giving to the female?
5   A.   No, I don't have a copy of it.
6   Q.   Have you looked back through any kind of
7   bank records in order to determine a date of
8   that check or anything?
9   A.   No, I have not.
10  Q.   Do you recall what your flood coverage
11  was at the time that you brought in the check
12  to increase the coverage? Do you know what it
13  had been before?
14  A.   It was less than the max. I don't know
15  exactly what it was.
16  Q.   Okay. Do you remember why in September
17  2004 you came about calling Mr. Cemo in order
18  to inquire regarding flood insurance?
19  A.   Yes, sir.
20  Q.   Okay. What was that?
21  A.   There was a storm that September and I
22  was in Houston and I was with my boyfriend,
23  and Randy said, you know, if we ever have a
24  real big one hit, you know, you're going to be
25  in trouble, so you need to see about getting

MK061407.txt

1   additional flood insurance. So when I got
2   back from Houston, I called Tony Cemo, my
3   insurance agent, and I said that I wanted to
4   purchase more coverage because my house was
5   worth 800,000, so -- and I asked him -- and I
6   told him that I heard that you could get it
7   through Lloyd's of London, and he said that I
8   was incorrect, that you couldn't purchase it.
9   Q.   Okay. There was a -- I'm trying to go
10  back on some of the things you'd said in
11  there. The storm that hit, was it one that
12  had hit around New Orleans or you said you
13  were in Houston, that it hit Houston; do you
14  remember?
15  A.   No, it was like -- It looked like it was
16  heading for -- it looked like it was heading
17  for New Orleans and then it turned.
18  Q.   Okay. And your boyfriend Randy, what is
19  his last name?
20  A.   Ducote.
21  Q.   And how do you spell that?
22  A.   D-u-c-o-t-e.
23  Q.   And is he still your boyfriend?
24  A.   Yes, sir.
25  Q.   What's his address? Is he in Florida?

52

1   A.   He's in Palm City.

Page 48

MK061407.txt

2  Q.  Palm City, Florida?

3  A.  Uh-huh.

4  Q.  Now, you were -- Were you in Houston for

5  any specific reason other than some kind of

6  little visit to Houston?

7  A.  Yes, I was there because my daughter had

8  a baby.

9  Q.  Okay. I'm just trying to get a timeline.

10  I'm not prying into your daughter's baby

11  status, but --

12  A.  That's okay.

13  Q.  -- do you know, was that when the baby

14  was being born?

15  A.  Sometime around Labor Day. I don't

16  remember the exact date he was born.

17  Q.  Okay. And so when you came back, you

18  called Tony Cemo stating you wanted more

19  coverage and you had heard Lloyd's of London

20  could provide it. Do you know where you had

21  heard that from?

22  A.  I heard it in a casual conversation with

23  Barbara Pailet.

24  Q.  Pailet, can you spell that for me,

25  please?

53

1  A.  P-a-i-l-e-t.

2  Q.  Okay. And Barbara Pailet is what

3  relation to you, a friend?

Page 49

MK061407.txt

```
 4   A.   Friend.
 5   Q.   Do you know where she lives?
 6   A.   On Beau Lac Lane.
 7   Q.   How do you spell that?
 8   A.   Metairie.
 9   Q.   Metairie?
10   A.   Metairie. Sorry.
11   Q.   Does she still live in Metairie?
12   A.   Yes, sir.
13   Q.   At Beau Lac Lane?
14   A.   Yes.
15   Q.   B-o-l-l-o-c-k?
16   A.   B-e-a-u, Beau, Lac, L-a-c.
17   Q.   Okay.
18   A.   I don't know how you spelled that one.
19   Q.   I flunked on that one. Okay. Here we
20   go. Beau Lac Lane. And do you remember
21   anything more specific about the conversation,
22   of how that occurred?
23   A.   No, it was very casual conversation.
24   Q.   Okay. And when was that conversation?
25   A.   Don't even remember.
```

54

```
 1   Q.   Before you went to Houston or after you
 2   went to Houston?
 3   A.   Don't remember.
 4   Q.   And what, from the best you can recall,
 5   what was -- what did Mr. Cemo tell you --
```

MK061407.txt

```
 6    A.    He said -- I'm sorry.  Go ahead.
 7    Q.    No.  No.
 8    A.    I'm sorry.  I'm sorry.  I didn't
 9    understand.
10    Q.    What did he tell you in regards to you
11    telling him something about only Lloyd's of
12    London could provide it, what were his
13    specific words that you can remember?
14    A.    I asked Mr. Cemo if I could buy
15    additional flood insurance over -- First off,
16    I wanted to increase my policy to the max,
17    which is the 250/100, since I wasn't even at
18    the max, and I asked him the amount that I
19    needed to write out the check, and he told me
20    that.  And I asked him if I could get
21    additional, and he said no.  And I said, I
22    heard you could get it from Lloyd's of London.
23    And he told me, no, you can't get it.
24    Q.    Did you undertake any other inquiries in
25    regards to determining whether or not you
```

55

```
 1    could get more than the $250,000 coverage from
 2    Lloyd's of London?
 3    A.    Well, first off, you know, I relied on my
 4    agent, Tony Cemo, to give me correct insurance
 5    information, so the only thing I did in
 6    addition to that was I called Ken Pailet, who
 7    was Barbara's husband, and I asked him did he
```

Page 51

MK061407.txt

```
 8    have, you know, the additional coverage, and
 9    he said no, he didn't. And that was basically
10    the end of the conversation.
11    Q.   Okay. Now, Ken Pailet, what's his
12    occupation?
13    A.   CPA.
14    Q.   Okay. After talking to Mr. Pailet, did
15    you inquire with anyone else regarding the
16    flood coverage over $250,000?
17    A.   No. My expert, Tony Cemo, told me you
18    couldn't get it.
19    Q.   Okay. In your duties as a real estate
20    agent, what do you discuss with potential
21    sellers and buyers in regards to flood
22    insurance?
23    A.   I recommend that they talk to a qualified
24    insurance agent.
25    Q.   At any of the training to be an insurance
```

56

```
 1    agent, was flood insurance discussed?
 2    A.   I've never been to training to be an
 3    insurance agent.
 4    Q.   I'm sorry. I'm going to rephrase that.
 5    In your training to be a real estate agent,
 6    was there any training or discussions
 7    regarding flood insurance?
 8    A.   Not that I remember.
 9    Q.   In any of your continuing education, real
```

MK061407.txt
10    estate seminars, classes, was there any
11    discussion of flood insurance?
12    A.    I really don't remember any.
13    Q.    Okay. What types of homes, say, a price
14    range, what kind of price range of homes were
15    the typical ones that you sold?
16    A.    I sold cheap up to -- Well, what state
17    are we talking about?
18    Q.    Okay. Let's talk about -- Let's talk
19    about prior to Hurricane Katrina, so let's
20    stick with Louisiana.
21    A.    I sold houses priced from, say, 5,000 up
22    to maybe four, 400,000.
23    Q.    What was the main area that you worked
24    in?  Was it Metairie or the entire New
25    Orleans --

57

1    A.    Metairie, Lakefront, Orleans Parish,
2    Jefferson Parish.
3    Q.    And if anybody that you were representing
4    as a real estate agent asked regarding flood
5    insurance, what would you do?
6    A.    I would tell them that I highly recommend
7    that they get it whether they're in a flood
8    zone or not.
9    Q.    And would you recommend an amount?
10   A.    No, sir. I'm not an insurance agent.
11   Q.    Did anybody else at Mr. Cemo's office

Page 53