UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO.: 05-4182

SECTION "K" (2)

FILED IN:    05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163, 06-5367,06-5471,
06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286, 07-1288, 07-1289

PERTAINS TO: LEVEE

## PLAINTIFFS' OPPOSITION TO DEFENDANT, UNITED STATES' MOTION TO DISMISS COUNTS I-III AND V-VII OF THE SUPERSEDING MASTER CONSOLIDATED CLASS ACTION COMPLAINT AND TO STRIKE THE REMAINING COUNTS

# TABLE OF CONTENTS

PREFATORY REMARKS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.       THE CORPS CANNOT CLAIM IMMUNITY UNDER §702C  . . . . . . . . . . . . 3

     A.    The Plain Language of §702c, the Legislative History Behind It and the
         Jurisprudence Interpreting It Do Not Support A Finding of Immunity  . . . . 6

         1.   The plain language of §702c limits the extent to which the Corps enjoys
             immunity for flooding along the Mississippi River . . . . . . . . . . . . . . . 6

         2.   The legislative history of §702c shows that it was never meant to apply
             to a case like the matter *sub judice*  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         3.   Courts interpreting the reach of §702c have substantially limited the
             extent to which it immunizes Corps actions  . . . . . . . . . . . . . . . . . . . . 13

     B.    A Genuine Issue of Material Fact Exists as to whether the Levee Breaches
         were Caused by Flooding Related to a Flood Control Project . . . . . . . . . . 15

     C.    The Corps Can Only Claim Immunity for Congressionally-authorized Flood
         Control Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     D.    The Corps Did Not Have Authorization for the Actions It Took Relative to
         the Alleged "Flood Control Projects" at Issue Herein . . . . . . . . . . . . . . . 21

         1.   The Chief of Engineers did not have and knew he did not have
             discretionary authority to switch fro the Barrier Plan to the High Level Plan
             without authorization from Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

             a)  Non-discretionary functional changes occurred  . . . . . . . . . . . . . . 23

             b)  Non-discretionary changes in the scope of the project were made . 24

             c)  Changes in legal relationships were required and those changes
                 required Congressional approval  . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.  The Chief of Engineers never reported the PAC from the BP to the HLP
and he thus acted outside the scope of his discretionary authority27

3.  The Corps did not build what it was told to build28

a) The Corps failed to comply with Congress's definition of "parallel
protection" which specifically required "raising of levees" . . . . . . . 28

b) The Corps ignored Congressional directives by refusing to spend the
amounts of money appropriated to it for protection along the outfall
canals and spending far less than its own plans required for protection
from a SPH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II.    THE GOVERNMENT CANNOT CLAIM IMMUNITY FOR THE ISSUANCE
OF DREDGING PERMITS TO THE SEWERAGE AND WATER BOARD  . 36

A.    The History of the Dredging Permit Process Shows the Corps' Failure to
Adhere to a Non-Discretionary Duty  . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.    The United States Lacks Immunity Under The Federal Tort Claims Act For
Plaintiffs' Dredging Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1.  The Discretionary Function Exception Does Not Apply . . . . . . . . . . . 48

a) The Corps' lack of professional engineering competence is not protected by
the FTCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b) The Corps' cited case law is inapposite  . . . . . . . . . . . . . . . . . . . . . 55

2.  The Due Care Exception Does Not Apply . . . . . . . . . . . . . . . . . . . . . 57

III.   THE MR-GO CLAIMS HEREIN DO NOT VIOLATE CASE MANAGEMENT
ORDER NO. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

ii

# TABLE OF AUTHORITIES

## CASES

*Alabama Electric Cooperative, Inc. v. U.S.,*
      769 F.2d 1523 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Allen v. U.S. Dept. of Interior,*
      231 F.3d 501 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Allison v. Froehlke,*
      470 F.2d 1123 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*American Exchange Bank of Madison, Wis. v. U.S.,*
      257 F.2d 938 (7th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Atchison, Topeka & Santa Fe. R. Co. v. Callaway,*
      382 F.Supp. 610 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Ayala v. U.S.,*
      980 F.2d 1342 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bailey v. U.S. Army Corps of Engineers,*
      35 F.3d 1118 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Baldassaro v. U.S.,*
      64 F.3d 206 (5th Cir. 1995), cert. denied, 517 U.S. 1207 (1996) . . . . . . . . . . . . . . 47

*Bell v. Hood,*
      327 U.S. 678 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Berkovitz v. U.S.,,*
      486 U.S. 531 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51-52

*Berthelot v. Boh Bros. Constr. Co.,*
      2006 WL 1984661 (E.D. La. June 1, 2006) (R.D. 469) . . . . . . . . . . . . . . . . . . . . . . . .29, 30

*Boston Edison Co v. Great Lakes Dredge & Dock,*
      423 F.2d 891 (1st Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Bozeman v. Reed,*
   633 So.2d 944 (La.App. 1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Buchanan v. U.S.,*
   915 F.2d 969 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Buttrey v. U.S.,*
   690 F.2d 1170 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49, 51

*Cantrell v. U.S.,*
   89 F.3d 268 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

*Central Green v. U.S.,*
   531 U.S. 425 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5, 13-21

*Collins v. U.S.,*
   783 F.2d 1225 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Cope v. Scott,*
   45 F.3d 445 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Cox v. U.S.,*
   827 F.Supp. 378 (N.D.Va. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dalehite v. United States,*
   346 U.S. 15 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Deltona Corp. v. Alexander,*
   504 F.Supp. 1280 (M.D. Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Dunaway v. U.S.,*
   136 F.Supp.2d 576 (E.D. La. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*E. Ritter & Co. v. Army Corps of Engineers,*
   874 F.2d 1236 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Faber v. U.S.,*
   56 F.3d 1192 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Faust v. South Carolina State Hwy. Dept.,*
   721 F.2d 934 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Fisher Bros. Sales, Inc. v. U.S.,*
    46 F.3d 279 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Folden v. U.S.,*
    379 F.3d 1344 (Fed Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fowler v. Roberts,*
    556 So.2d 1 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Fryman v. U.S.,*
    901 F.2d 79 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18

*Graci v. U.S.,*
    456 F.2d 20 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Graham v. U.S.,*
    18 F.Supp.2d 1137 (E.D.Wash. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gregor v. Argenot Cent. Ins. Co.,*
    851 So.2d 959 (La. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Hiersche v. U.S.,*
    503 U.S. 923 (1992)( J. Stevens dissent from the denial of certiorari). . . . . . . . . . . . 4

*Home Builders Assn. of Miss., Inc. v. City of Madison, Miss.,*
    143 F.3d 1006 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hood v. U.S.,*
    695 F.Supp. 237 (E.D.La. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Katrina Canal Breaches Consolidated Litigation* (pertains to *Robinson v. U.S.*),
    471 F.Supp.2d 684, C.A. Nos. 05-4182, 06-2268 (E.D. La., 2007) . . . . . . 3, 17-18, 56

*In re Lloyd's Leasing, Ltd.,*
    764 F.Supp. 1114 (S.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Indian Towing Co. v. U.S.,*
    350 U.S. 61 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53

*Johnson v. U.S.,*
    2000 WL 1528078 (E.D. La. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*James  v. U.S.,*

478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 13

*Kennedy v. Tx. Utils.*,
179 F.3d 258 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kiska Const. Corp. v. Washington Metropolitan*,
321 F.3d 1151 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*La. P.S.C. v. FCC*,
476 U.S. 355 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lindsay v. U.S.*,
778 F.2d 1143 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Liner v. Draco Basic Materials, Co.*,
162 F.Supp.2d 499 (E.D.La. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Lynch v. U.S. Dept. of Army Corps of Eng'rs*,
474 F.Supp.545 (D.Md.), *aff'd*, 601 F.2d 581(4th Cir. 1979) . . . . . . . . . . . . . . . . . . 56

*McCarthy v. U.S.*,
850 F.2d 558 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Merrill Lynch Bus. Fin. Svcs. v. Nudell*,
363 F.3d 1072 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mocklin v. Orleans Levee District*,
690 F.Supp. 527 (E.D.La. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Moyer v. Martin Marietta Corp.*,
481 F.2d 585 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Oakville Community Action Group v. Plaquemines Parish Council*,
942 So.2d 1152 (La.App. 4 Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*O'Toole v. U.S.*,
295 F.3d 1029 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*Pardue v. Stephens*,
558 So.2d 1149 (La.App. 1 Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Powers v. U.S.*,

996 F.2d 1121 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Price v. Socialist Peoples' Libyan Arab Jamihiriya,*
389 F.3d 192 (D.C.Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rayonier Inc. v. U.S.,*
352 U.S. 315 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Routh v. U.S.,*
941 F.2d 853 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Seaboard Coast Line Railroad Co. v. U.S.,*
473 F.2d 714 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Smith v. United States,*
507 U.S. 197 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*U.S. v. Gaubert*
499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 52, 58

*U.S. v. Hunsucker,*
314 F.2d 98 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*U.S. v. James,*
478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 13

*U.S. v. Land,*
953 F.2d 886 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*U.S. v. Morrell,*
331 F.2d 498 (5th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*U.S. v. Second Nat'l Bank of N. Miami,*
502 F.2d 535 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*U.S. v. Varig Airlines,*
467 U.S. 797 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 54-55

*Virtual Cos., Inc. v. Repub. Of S. Africa,*
300 F.3d 230 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Whisnant v. U.S.,*

400 F.3d 1177 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# STATUTES

CODE OF FEDERAL REGULATIONS,
   33 C.F.R. §320.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-50, 57

FEDERAL TORT CLAIMS ACT,
   28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   28 U.S.C. § 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58
   28 U.S.C. § 2671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

   28 U.S.C. § 2680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58

FEDERAL RULES OF CIVIL PROCEDURE,
   Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3, 47

THE FLOOD CONTROL ACT OF 1928,
   33 U.S.C. § 702c . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 7, 8, 9, 11, 13, 17, 19

LOUISIANA COASTAL WETLANDS CONSERVATION AND RESTORATION ACT,
   La. R.S. 49:214.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

RIVERS & HARBORS ACT,
   33 U.S.C. § 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# OTHER AUTHORITIES

James G. Wilkins & Michael Wascom, *The Public Trust Doctrine in Louisiana*,
   52 La. L. Rev. 861 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**MAY IT PLEASE THE COURT:**

This *Memorandum in Opposition* is respectfully submitted on behalf of the Consolidated

Class Plaintiffs in the captioned cases.

<u>**PREFATORY REMARKS**</u>

This case involves a tragedy of unspeakable proportions wrought upon the people of the

Metropolitan New Orleans area.  Little question exists but that assorted actions by the U.S. Army

Corps of Engineers (hereafter the "Corps") contributed substantially to this tragedy.  Yet the Corps

now seeks to cloak its sins in immunity provisions contained in flood control legislation and in

exceptions to the waiver of sovereign immunity contained in the Federal Tort Claims Act (hereafter

"FTCA").  Even more egregious, the Corps seeks to squelch Plaintiffs' claims for relief without any

significant factual inquiry into the Corps' liability, using the jurisdictional challenge of a Rule

12(b)(1) *Motion* to deny Plaintiffs relief.  The Court should recognize the unsupported nature of the

United States' *Motion* and deny it accordingly.

A motion to dismiss for lack of subject matter jurisdiction can be granted only if it appears

certain that the plaintiff cannot prove *any set of facts* in support of his claim that would entitle

plaintiff to relief.  *Home Builders Assn. of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010

(5th Cir. 1998).  "It is well settled that <u>the failure to state a proper cause of action calls for a judgment</u>

<u>on the merits and not for a dismissal for want of jurisdiction.</u>  Whether the complaint states a cause

of action on which relief could be granted is a question of law and just as issues of fact, it must be

2

decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood*,

327 U.S. 678, 683-84 (1946) (emphasis added).  In the Order denying the United States' motion to

dismiss the *Complaint for Damages* in the MRGO case, this Court recognized prevailing Fifth

Circuit jurisprudence and held that it should not dismiss Plaintiffs' claims in the context of a bare

Rule 12(b)(1) *Motion*:

> Therefore, we follow our general rule in holding that a jurisdictional
> attack intertwined with the merits of an FTCA claim should be treated
> like any other intertwined attack, *thereby making resolution of the
> jurisdictional issue on a 12(b)(1) motion improper*.

*Robinson v. United States*, C.A. No. 06-2268 (Feb. 2, 2007) (MRGO Order denying 12(b)(1) motion

to dismiss) (Exhibit 1).  That wisdom should guide the Court's adjudication of the instant claims and

lead it to deny the United States' *Motion to Dismiss*.

**ARGUMENT**

There exist at least three (3) reasons why the Court should deny the United States' *Motion*

*to Dismiss*.  At the outset, the *Motion* is predicated on the notion that the damages at issue were

related to a flood control project, something neither apparent from the current record nor from the

actual facts of the case.  Furthermore, even if the Corps' actions related to "flood control projects",

the Corps <u>cannot</u> show that its actions received proper Congressional authorization, and the actions

are therefore not shielded by §702c immunity.  Finally, the United States cannot claim immunity

from liability under the FTCA based on a "due care" exercise of any valid discretionary function.

The Court should therefore deny the United States' *Motion to Dismiss* in its entirety.

**I.      THE CORPS CANNOT CLAIM IMMUNITY UNDER §702C.**

3

Although the United States claims throughout its *Motion* that the Court must look to the statutory language of §702c of the Flood Control Act of 1928 to determine the scope of immunity afforded by that provision, the United States quixotically fails to cite the statute itself. To be exact, §702c states in relevant part that:

> No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War [Army] and the Chief of Engineers to institute proceedings on behalf of the United States United States to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

As a substantive matter, the immunity granted under this statute is <u>not</u> as broad as the United States suggests. Although *U.S. v. James*, 478 U.S. 597 (1986), attempted to apply the "broad" language of the statute to immunize virtually all flood-related projects from suit, courts interpreting *James* quickly recognized the absurdity of such an interpretation. *See, e.g., Fryman v. U.S.*, 901 F.2d 79, 81 (7th Cir. 1990)("*James* was so broadly written that it cannot be literally applied"). Recognizing the unworkable nature of the *James* standard[1], the Supreme Court in *Central Green v. U.S.*, 531 U.S. 425 (2001), narrowed the scope of §702c immunity to cover only those damages caused by "floods" or "flood waters" that flow through Congressionally-authorized projects that have flood control as their unique purpose. *See, Id.* at 436-437. This Court has already recognized the fact-intensive

---

[1]       See *Hiersche v. U.S.*, 503 U.S. 923 (1992)(Stevens J., dissenting from the denial of certiorari).

4

nature of this determination and the narrowing of attendant immunity occasioned by *Central Green*. *See,* Doc No. 6194 at p. 2 (Exhibit E.2). The Court must now determine whether the United States has overcome the heavy barrier erected against the grant of immunity under §702c.

Having failed to cite the governing <u>substantive</u> statute, the United States further fails to delineate the exact <u>procedural</u> means by which it may raise this issue, or the burden it must carry to demonstrate its *prima facie* entitlement to this immunity. The United States' *Motion to Dismiss* turns on the question of whether the water that damaged Plaintiffs' property was "flood water", the diversion of which was related to a "flood control project". *Compare,* Doc. No. 6380 at p. 4 with *Central Green*, 531 U.S. 425. Thus, at a minimum, the United States bears the initial burden of production to show by *prima facie* <u>factual</u> evidence that "flood water" related to a "flood control project" caused Plaintiffs' damages. *See, e.g., Virtual Cos., Inc. v. Repub. of S. Africa*, 300 F.3d 230, 241 (2nd Cir. 2002). To mount such a challenge would require the United States to "go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Svcs. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004). Despite this burden, the United States has not taken any such procedural steps, and it has utterly failed to establish the factual predicate necessary for the Court to determine whether immunity attaches under §702c.

Further, there is no doubt but that the question of whether damages resulted from "flood water" related to a "flood control project" raises issues of fact best resolved by summary judgment-type evidence. *Compare, e.g., Central Green*, 531 U.S. at 436-437; *Cantrell v. U.S.*, 89 F.3d 268, 272 (6th Cir. 1996); *Bailey v. U.S. Army Corps of Engineers*, 35 F.3d 1118 (7th Cir. 1994). Although the United States has not met its initial burden of producing competent evidence to establish the

necessary evidentiary facts sufficient to find immunity, Plaintiffs submit the Exhibits attached hereto as A1-F27 to demonstrate the factual predicate for finding <u>no</u> immunity in the present case. These exhibits underscore the inappropriateness of granting the United States' *Motion*.

Because the Corps in this case has relied solely on the allegations of Plaintiffs' *Complaint*, and has not introduced any additional facts to contravene those allegations, the Court must look solely to the allegations of the *Complaint* to determine the extent of its jurisdiction over the claims contained therein. *See, e.g., Price v. Socialist Peoples' Libyan Arab Jamihiriya*, 389 F.3d 192, 199 (D.C.Cir. 2004); *Folden v. U.S.*, 379 F.3d 1344, 1354 (Fed. Cir. 2004). Thus the sole question before this Court is whether the Corps enjoys immunity under §702c based solely on the allegations of fact set forth in the original and amending complaints filed by Plaintiffs. Clearly it does not.

A. **The Plain Language of §702c, the Legislative History Behind It and the Jurisprudence Interpreting It Do Not Support A Finding of Immunity.**

Only by embracing a now-debunked interpretation of §702c, ignoring the more modern interpretation of the statute's immunity, truncating the plain language of §702c, and refusing to reconcile the legislative history of the Flood Control Act, can the Corps cobble together a means by which this Court may grant it immunity herein. A reasoned look at the statute and its history eviscerates the United States' rationale and compels denial of its *Motion to Dismiss*.

1. **The plain language of §702c limits the extent to which the Corps enjoys immunity for flooding along the Mississippi River.**

Although the Corps focuses on that portion of §702c that immunizes it for "damages from or by flood waters at any place", 33 USCA §702c, that immunity can only be as broad as the Corps has interpreted it if one ignores the following limitation on that immunity:

6

> Provided, however, That if in carrying out the purposes of sections §702a, §702b to §702d, §702e to §702g, §702h, §702i, §702j, §702k, §702l, §702m, and §704 of this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

33 U.S.C.A. §702c

  The plain language of this statute mandates that the Corps provide indemnification for "lands in such stretch of the [Mississippi River that] are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river." *Id.* Furthermore, although the statute speaks in terms of condemnation proceedings—the acquisition of flowage rights or fee-simple ownership of damaged property—it clearly contemplates that the Corps will have liability beyond simple acquisition of property for damage caused by its levee construction. Reading the limiting provisions in this context demonstrates that Congress <u>never</u> intended to permit the Corps to flood the lands adjacent to the Mississippi River with impunity. Only by ignoring this ineluctable fact can the Corps craft the blanket immunity it so desperately seeks.

    **2.** <u>**The legislative history of §702c shows that it was never meant to apply to a case like the matter *sub judice*.**</u>

  As is always the case with statutory interpretation, the first place to look in defining an ambiguous statute is to the legislative history underlying the statute. Consequently, both a broad and a specific look at the legislative history underlying §702c is warranted, and it completely belies the

7

United States' request for open-ended immunity.  A close look at the legislative history of §702c demonstrates that it never intended to limit the recovery of damages occasioned by the fault of the Corps.  Nothing in the history of §702c attempts to limit the liability of the Corps for such injuries. Instead, the only limitations on liability were those directed to the cost of acquiring property for flood control purposes, a limitation not even relevant to the projects along the Mississippi River. Thus the Corps cannot use §702c to shield it from liability for its wrongful conduct.

The most specific debate prior to the adoption of §702c shows the intent of the framers that the Government would compensate landowners for damages caused by Corps negligence:

> This amendment is not proposed for the purpose of obligating the Government to make good all damages that may result because of the execution of this project... My friend the gentleman from New York [LaGuardia] made the statement that he was willing for the Government be committed to paying the damage that the Government might cause, and this amendment is to put the Government in the position where this can be done, so far as property along the main river is concerned." 70 Cong. Rec. 5284, 7023(1928)(statement by Rep. Cox), bates# MGA:00133. (Exhibit E.4).

This pellucid debate is a microcosm of the proceedings that led to the adoption of the FCA as a means to limit the U.S.'s acquisition costs while protecting landowners from the wrongful actions of the U.S.

Designed to prevent future disasters such as the Great Flood of 1927 in the Lower Mississippi Valley, The Flood Control Act of 1928 provided for a comprehensive program of flood control projects, including the building of dikes, dams, levees, and related works.  The Flood Control Act of 1928, *See,* Pub. L. No 391, 45 Stat. 534 (Exhibit A.2).  It constituted the largest and most expensive public works program undertaken by the United States Federal Government until that time, called "the greatest expenditure government has undertaken since the Great War" (Barry p.

8

405). Due to the broad scope of the proposed project, Congress naturally intended to mitigate some of the cost of the program by immunizing the federal government from liability in narrowly-defined instances. Yet that limitation centered largely on the extent to which the United States would be liable for the initial acquisition costs of the land necessary to build the flood controls envisioned by the Act. Only by reading far more into the legislative intent than is actually there can one divine any broader limitation on liability.

On March 24, 1928, Senator Wesley L. Jones (WA) introduced bill S. 3740, "for the control of floods on the Mississippi River from Head of Passes to Cape Girardeau, Missouri, and for other purposes." S.3740, 70th Cong. (1928)(reprinted at 70 Cong. Rec. at 5482 (Bates# MG&A:00006 (Exhibit B.2). The bill was referred to the Senate Committee on Commerce, of which Jones was a member. *Id.* The committee had been working on the bill already and quickly reported it back to the Senate without amendment. *Id.* The Senate held a general debate regarding the scope of the proposed bill, S. 3740, focused on a discussion of the tributaries of the River and local contributions to the proposed projects. *Id.* at 548 (Bates# MG&A:00007). It added only two minor amendments before the bill was passed unanimously and referred to the House of Representatives on March 28, 1928. *Id.* at 5491 (Bates# MG&A:00015). The bill declared that the Federal Government took full responsibility for the Mississippi River. S. 3740, 70th Cong. (as passed by Senate, March 24, 1928). At this point, notably, the immunity provision that would become §702c had not been added to the bill. Compare 33 U.S.C.A. §702c with *Id.*

After passage in the Senate, the bill reached the House of Representatives and was referred to the House Committee on Flood Control, who reported the bill back with amendments *Id.* at 5708 (Bates# MG&A:00016). To secure a compromise agreement, a proposal was submitted to the

9

committee that eliminated some of the worst provisions of the Jones bill. The amendments, it was believed, would meet objections voiced repeatedly by the President in an effort to stop any proposed Treasury raid. *Id.* at 6869 (Bates# MG&A:0107) (statements of Rep. Frear). The House debated the scope and cost of the bill, local rights of way, flowage rights and the requirements for local contributions. *Id.* That debate led to the provision that, except when authorized by the Secretary of War upon the recommendation of the Chief of Engineers, no funds appropriated by Congress for the execution of the project should be spent on works within a State until that State:

> (a) …provide[d] rights of way
>
> (b) …has consented to the maintenance of the levee…
>
> (c) … has agreed to hold and save the US free from all damage claims resulting from the construction of this project; and to maintain all flood-control works after their completion except controlling and regulating spillway structures. *Id.* at 6659 (Bates# MG&A: 00037) (statement of Rep. Frear) (Exhibit E.3).

Little discussion of the provision occurred; some legislators even thought the provision unnecessary given existing sovereign immunity. *Id.* at 7028 (Bates# MG&A:00137)(statement of Rep. Spearing). (Exhibit B.2).

What would ultimately become §702c replaced a generous provision in the original bill which would have required the federal government to pay "just compensation for all rights of way and damages, including expenses to railroads or states in changing their property." S.3740, 70th Cong. (1928)(reprinted at 70 Cong. Rec. at 5482 (Bates# MG&A00006)(Exhibit B.2). Both the President and Members of Congress criticized the plan as federal largess that would have given greater benefits to the railroad and lumber companies than the actual flood sufferers whom the Act intended to protect. *Id.* One congressman went so far as to suggest the provision must have

"originated in some railroad office," because it gave "the railroads in the Mississippi Valley an unfair and unjust advantage."' *Id.* at 6712 (Bates# MG&A:00041).

Section §702c was thereafter designed to counter these criticisms by immunizing the federal government from these types of damages that would unjustly benefit Railroads and large corporations and open up a "general raid" on the United States Treasury. Congress inserted "the latter part of the last paragraph of the section [the proviso] so as to clarify the meaning." *Id.* at 8119 (Bates# MG&A00186)(Exhibit B.2). Under no circumstances was this provision designed to provide the United States with blanket immunity for injuries sustained by ordinary landowners and residents adjacent to bodies of water swollen and overflowed by wrongful conduct of the Corps.

Indeed, the very language of the provision's sponsors showed its limited reach. The framers of the provision intended only to shield the United States from flood damages caused by uncontrollable Acts of God—it never intended to shield the United States or the Corps from liability for acts caused by it and its agencies. Senator Gregory of Kentucky, speaking in favor of adopting the proviso language as a limitation to the disclaimer of liability, stated that the destruction brought on his people came "not from an Act of God, but from a man made and government funded bottling up of the Mississippi River." *Id.* at 6708 (Bates# MG&A 00054). The Senators then refused to shield the Corps from liability for its own acts.

The drafters inserted clear language preventing the Federal Government from escaping responsibility for man-made floods:

> I am going to present amendments embodying everything the President asked, with the single exception of agreeing to one thing—and I will never propose an amendment or support any section of this bill which will permit the turning down on innocent people in these so-called flood ways of a torrent three times that of Niagra falls

11

without first acquiring the rights of way or the flowage rights; and there I stand, and that is the only difference between us to-day... I consider we have gone as far as we could go and I think any other settlement of the matter would be inhuman. That the Government shall be liable where it diverts the water from the main channel." *Id.* at 700 (Bates#:MG&A: 00111) (statement of Rep. Reid, Chairman of the House Committee on Flood Control)(Exhibit B.2).

On April 25, 1928, S.3740 passed the Senate by a vote of 254-91. This version of the bill contained the immunity provision which became §702c. The Senate and House agreed to form a conference committee to reconcile the differences in the bill. *House Reports; 70th C 1st Session: Control of Floods on the Mississippi River* (reprinted in 70 Cong Rec. 1928) (Bates# MG&A:00246) (Exhibit B.2). The Senate agreed to an immunity clause that would "(c) provide without cost to the US, all rights of way for levee foundations and levees..." Thus it was debate over apportionment of the project's costs that led to the adoption of §702c. The language employed by §702c was proposed on April 23, 1928, by Congressman Frank Reid, Chairman of the House Flood Control Committee. *See,* 70 Cong. Rec. 7022 (1928) (Exhibit ___).. Significantly, the immunity provision was not introduced until the very end of the debate. *Id.* With the addition of that immunity provision, which was aimed largely at reducing the Government's cost of acquisition, both chambers passed the bill and President Coolidge signed the bill on May 15, 1928. *Id.* at 8785 (Bates# MG&A00213).

The foregoing history demonstrates that the immunity provision expressed in the 1928 Act directed itself to acquisition cost and not to the Corps' general liability for damages caused by the building of levees. In other words, the question before Congress was not "*whether* government would compensate for private damages and expenses ... but *which* government would pay--federal

or state and local." *James v. U.S.,* 478 U.S. at 597, 598 n. 13 (1986).  Any attempt to read more into this legislative grant of immunity is to look for succor where none exists.

        3.    **Courts interpreting the reach of §702c have substantially limited the extent to which it immunizes Corps actions.**

      Apparently conceding its inability to find jurisprudential support for its immunity theory in current precedent, the Corps embraces the *James* theory of immunity that has been criticized since its inception and has been subsequently abrogated by more modern Supreme Court jurisprudence. The Corps' desire to cling to this outdated version of immunity demonstrates its inability to find any actual support for its theory.

      *United States v. James* was the first U. S. Supreme Court case to speak on the issue of immunity under §702c. *James, supra,* 478 U.S. 597).  In *James,* the Court stated that the purpose of §702c of the 1928 FCA was to insulate the Federal Government from any accountability for its actions as long as they relate in some way to a "flood control project." *Id.*  The Court focused solely on the one-phrase disclaimer of liability and found it "difficult to imagine broader language." *Id.* In addition, the Court held that, because the Act covered floodwaters at flood control projects, it was "clear from §702c's plain language that the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control." *Id.*  In a stinging dissent that would characterize future interpretations of *James,* Justice Stevens argued that the Court misread the statute in order to define "damages", further asserting that Congress did not intend to limit damages actions brought by individuals injured through the Corps' construction of levees and other projects. *Id.* at 614-16 (Stevens, J., dissenting).  Justice Steven's dissent further argued that the legislative history

of section §702c provided no support for the importance the majority attached to the immunity

provision—a provision not introduced until very late into the debates, over which little discussion

occurred, *Id.* at 598 (citing 69 Cong. Rec. 7022 (1928)), and which did not receive any significant

attention prior to passage of the Act. *Id.* at 602. This dissent portended things to come.

In light of the obvious confusion that arose from a literal interpretation of *James*, the

Supreme Court in *Central Green Co. v. U.S.*, 531 U.S. 425 (2001), limited the scope of liability in

terms that gave the concept greater texture. The Court held:

> the phrase "related to flood control" has generated conflicting opinions among the
> Courts of Appeals. In an attempt to make sense of what is admittedly confusing
> dicta, some courts have focused on whether the damage relates in some, often
> tenuous, way to a flood control project, rather than whether it relates to "floods or
> flood waters."[5] However, more than one court has pointed out that, if read literally,
> the sentence sweeps so broadly as to make little sense.[6] Moreover, the sentence was
> unquestionably dictum because it was not essential to our disposition of any of the
> issues contested in *James*.[7] It is therefore appropriate to resort to the text of the
> statute, as illuminated by our holding in *James*, rather than to that isolated
> comment, to determine.

*Id.* at 430-1.

The *Central Green* Court ultimately held that its review of the statute disclosed:

> [i]t is the text of §702c, as informed by our holding in *James*, rather than the broad
> dictum in that opinion, that governs the scope of the United States' immunity from
> liability for damage caused "by floods or flood waters." Accordingly, in
> determining whether §702c immunity attaches, courts should consider the character
> of the waters that cause the relevant damage rather than the relation between that
> damage and a flood control project.

*Id.* at 436.

Thus, in order for the United States to be immune from damages caused by water under its

control or supervision, "(1) the water must have a nexxus to a flood control project and (2) the water

must be "flood waters." *Id.* at 434. This holding narrows the immunity granted by §702c in such

14

a manner as to render any citation to *James* hopelessly obsolete.  That narrowing of liability should figure prominently in the Court's analysis of the current Motion.

In sum, the Corps seeks to mask the true language and context of §702c by omitting crucial language of the provision, fostering an incorrect interpretation of the statutory language, the legislative history of the Act, and prior case law.  These failings of the Corps' argument compel its rejection.

**B.**     **A Genuine Issue of Material Fact Exists as to Whether the Levee Breaches were Caused by Flooding Related to a Flood Control Project**.

As a preliminary matter, even if this Court agrees with the Corps that it enjoys immunity for flooding related to a flood control project, the Court must further determine as a matter of fact that the breach of the levees was in fact "flooding" caused by a "flood control project."  A substantial and genuine issue of material fact exists as to whether such was the case.

The timing of the innundation at issue is crucial.  If the levee breach along the canals that caused the innundation occurred <u>before</u> the storm surge, it was related to the dredging and other activities attendant to that canal, and there is no immunity under §702c. To hold to the contrary and grant immunity under these circumstances would extend the scope of immunity beyond that permitted by *Central Green.  Compare, Cantrell,* 89 F.3d at 273-274. No flood control project, no floodwater, no immunity.

In the instant matter, significant empirical and expert testimony raises a genuine issue of material fact as to whether the levee breaches occurred <u>before</u> or <u>after</u> the advent of the storm surge. Dr. Robert Bea, a renowned expert on the performance of engineering systems during catastrophic

15

events and a member of the Independent Levee Investigation Team (hereinafter "ILIT") team that

investigated the Canal breaches, summarized the series of failures leading to the breaches:

> During Hurricane Katrina, a large segment of the levee and floodwall lining the 17th Street canal in New Orleans failed catastrophically before the design water evaluations were realized (Fig 1). Eyewitness reports indicate that the failure initiated about 6:00 AM on August 29, 2005 (USACE IPET 2007).[11] Pumping Station 6 water level recordings (Fig. 2) corroborate the time of failure initiation and subsequent development of the failure until final breaching (USACE IPET 2007) These records indicate that the water level in the canal was approximately 7 feet at the time of initiation of the breach. At approximately 8 AM, there was another drop in the water level indicating further development of the breach.

> Prior to arrival of the storm surge, strong winds from the northwest had blown over large oak trees growing at the toe of the levee thereby opening paths for accelerated water seepage and pressure effects (Figs. 1 and 3).

> Water was first seen coming through the 'water stops' (vertical rubber joints) that seperated the concrete floodwall sections. Differential movements of the supporting soil levee were large enough to open these joints. About 9:00 AM an eyewitness reported that the water had reached the top of the levee on the west side and a "whirlpool" had developed on the east side at the south end of the developing breach.

> Due to the off-centerline dredged profile of the canal, the top of the levee on the east canal side was approximately 6 feet lower than on the west side. The west side would support vegetation while the east side was normally underwater (Fig. 4).

> At this point, a deep breach opened with large horizontal displacements between two adjacent sections of the floodwall indicating that there had been a failure of the sheet pile interlocks at the section. In the end, the levee, floodwall, and supporting sheet pile were displaced laterally toward nearby homes by more than 50 feet (Fig. 5 and 6).

Bea reinforces his conclusions with eyewitness testimony and photographic evidence

showing the breach occurring <u>prior to </u>the surge occasioned by Hurricane Katrina. This evidence

precludes a finding as a matter of law that the levee breaches and resultant innundation arose from

---

[11]    Interagency Performance Evaluation Task Force

floodwater related to a flood control project, as opposed to drainage water from a non-flood control project. This issue precludes the grant of the Corps' motion.

### C. The Corps Can Only Claim Immunity for Congressionally-authorized Flood Control Projects.

In 1965, the Congress authorized creation of a "barrier plan" for flood control in the New Orleans area. This plan was silent as to the protection to be erected along the outfall canals. The Corps unilaterally switched to the "high level plan" without subsequent Congressional authorization.

Despite the lack of Congressional authorization for these projects, the Corps now seeks Congrssional immunity for acts Congress never intended. The Corps can only claim immunity under §702c if the "flood control projects" at issue were specifically authorized by Congress. This the Corps cannot do with respect to the alleged "flood control projects" at issue in this case.

Immunity under §702c is itself a legislative creation, having no constitutional counterpart, but instead deriving from specific Congressional enactment. *See generally, Kennedy v. Tx. Utils.*, 179 F.3d 258, 261 (5th Cir. 1999); *Powers v. U.S.*, 996 F.2d 1121, 1122-23 (11th Cir. 1993)(defining §702c as "a statutory provision of sovereign immunity enacted by Congress in connection with the government's construction of flood control projects"); *E. Ritter & Co. v. Army Corps of Engineers*, 874 F.2d 1236, 1238 (8th Cir. 1989)(defining §702c immunity as "statutory"). Contrary to the United States' position that §702c creates blanket and absolute immunity for any project arguably related to flood control, and that it is to be read in the "broadest and most emphatic sense"[1], the contemporary reading of the scope of immunity is substantially narrower. As the Supreme Court recognized in *Central Green*, "in determining whether §702c immunity attaches, courts should

---

[1]   *See,* Doc. No. 6380 at p. 5.

17

consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project." *Central Green*, 531 US. at 437.   Thus *Central Green* requires the Court to identify "*the cause of the damage* rather than base a decision on the mere fact that a flood control project was involved." *See, Robinson v. U.S.*, 471 F.Supp.2d 684, 695 (E.D.La. 2007) (emphasis added).   Interpreting the scope of the United States' immunity using this criterion hews more closely to the Congressional intent motivating the creation of that immunity.

In its analysis of the United States' immunity for the actions taken by the Corps, the United States asks the Court to immunize it from <u>any</u> actions however peripherally related to a flood control project, whether the actions were authorized by an Act of Congress or undertaken by the Corps on its own initiative.   Yet this interpretation is premised on the absurd position that Congress would immunize actions taken in excess of its own authorization.   The contrary is true.   "An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *La. P.S.C. v. FCC*, 476 U.S. 355, 374 (1986).   Furthermore, simply because Congress may appropriate money for a particular project does not mean that it authorizes <u>any and all</u> derivations or permutations of that project the executing agency might employ.   *See, e.g., Atchison, Topeka & Santa Fe. R. Co. v. Callaway*, 382 F.Supp. 610, 619-620 (D.D.C. 1974).   By definition, a Congressional enactment of immunity cannot extend immunity to actions Congress did not expressly authorize.   Thus a government agency cannot establish the existence of Congressionally-enacted immunity for an action or project which was itself performed in excess of Congressionally-allocated authority.

18

This principle holds even more true in the context of §702c. In the 1946 Flood Control Act, Congress mandated that the Corps undertake no flood control project - - or any modification thereof- - without express authorization of Congress. "No project or any modification not authorized of a project for flood control on rivers and harbors shall be authorized unless a report for such project on modification has been previously submitted" by the Corps. *See* Exhibit 11 at pp. 1-2 (emphasis added). Congress only extended immunity under §702c to actions taken pursuant to the related enabling legislation. Where such actions are not taken pursuant to authorization, no immunity exists.

Certainly the United States cannot reasonably assert such broad immunity with respect to §702c in this case. Immunity under §702c requires the showing at a minimum that the project in question "is authorized by Congress for flood control purposes." *McCarthy v. U.S.*, 850 F.2d 558, 562 (9th Cir.1988) . *See also, Graham v. U.S.*, 18 F.Supp.2d 1137, 1140 (E.D.Wash. 1997)(same). This Court in its July 2, 2007 Order, denying the United States' request to certify the Court's prior *Motion to Dismiss* in *Robinson*, pointed out the absurdity that a contrary reading of *Central Green* would entail:

> Apparently, the United States hinges its argument as to certification on a very broad reading of *Central Green*, such that if flood waters cause damage and the United States is sued as a result of those flood waters, it is immune regardless of the cause. Taken to its logical extreme, the United States could dynamite a levee along the Mississippi and be immune. A ship owned by the United States could collide into a dam causing flooding, and it would be immune. The United States could break a water main causing flooding, and it could be immune.

*See,* Doc. No. 6194 at p. 3 (Exhibit 2).. The Court's wary view of any broad reading of §702c immunity tracks that of other courts refusing to give the Corps blanket immunity for actions which Congress did not or would not authorize. *See, Central Green*, 531 U.S. at 431 n. 5; *Fryman v. U.S.,*

901 F.2d 79, 81 (7ᵗʰ Citr. 1990)("If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree-trimmer's car should careen through some picnickers, these injuries would be 'associated with' flood control. They would occur within the boundaries of the project, and but for the effort to curtail flooding the injuries would not have happened. Yet they would have nothing to do with management of flood waters, and it is hard to conceive that they are 'damage from or by floods or flood waters' within the scope of §702c"); *Cox v. U.S.*, 827 F.Supp. 378, 381 (N.D.Va. 1992).  In other words, Congress has delineated certain means of flood control and has limited the Corps' discretion to deviate from those means.  Only where the United States can demonstrate that it acted within that discretion can it subsequently claim immunity for damages arising out of a particular flood control project.[2]  This the United States cannot do with respect to the actions at issue herein.

### D.    The Corps Did Not Have Authorization for the Actions It Took Relating to the Alleged "Flood Control Projects" at Issue Herein.

The Corps' own internal memorandum, generated at a time when it was not faced with this litigation and could thus give an objective view of the scope of its discretion, indicates that it must seek Congressional reauthorization when a project modification will:

---

[2]Ironically, while the Corps has continued to make its immunity argument *a priori*, it has never cited to the seminal cases concerning the Corps' discretion to alter or modify flood control projects previously authorized by Congress. A series of cases have held that–where the Congress sets guidelines for a particular flood control projects and permits the Corps to build the projects "substantially" as authorized, the Corps may modify the existing plans. *See, e.g., Allison v. Froehlke*, 470 F.2d 1123 (5ᵗʰ Cir. 1972).  Yet these cases provide little assistance to the United States even if raised. First, they were decided under the broader interpretation of §702c immunity extant prior to *Central Green*. Second, the cases are essentially nonsensical–if the Corps were permitted to build whatever type of flood control project it desired with Congressional funds, Congressional authorization for a particular project would be unnecessary, as Congress would simply write a check and give the Corps a goal as to its desired object, without ever delineating the means by which to achieve that goal. *But see, Callaway, supra*. Finally, the departure from the authorized plans in this case is so extreme as to constitute an entire departure from the authorization in a manner wholly inconsistent with the original intent of Congress in the enabling legislation.  For these reasons, the Court should grant these cases–and the theories they espouse–short shrift.

a.  Materially alter the function of the project, such as deletion or addition of a project purpose when not otherwise authorized by law,

b.  Materially change the scope of the authorized plan of improvement, and

c.  Change legal relationships, such as requirements of local cooperation.

*See,* Exhibit E13.

The switch from the barrier plan (BP) to the hihgh level plan (HLP) entailed variations in all three (3) of these categories.  Consequently, that switch required reauthorization, something the Corps never got.

The BP was designed to prevent flooding to the New Orleans Area by preventing storm surges from entering Lake Pontchartrain.  The HLP had the same objective but instead sought to achieve it by builder higher levees along the lakefront to account for increased storm surges that would enter Lake Pontchartrain with no barriers to stop them.  These two (2) plans differed in function, amounts spent, and legal relations between the Corps and the local authorities.  In a Q&A memorandum, the Corps concluded that "such a project modification to eliminate the barrier elements is considered to be a significant post authorization change" which "must be submitted to Congress for modification of the existing project authorization." *See,* Exhibit E14.  The Corps had an obligation to advise Congress of its radical departure from the authorized BP to the unauthorized HLP and obtain Congressional consent for the change.  This it did not do.

**1.      The Corps Had to Obtain Reauthorization for the Change from the BP to the HLP**

The Chief of Engineers of the Corps did not have the discretionary authority to switch from the BP to the HLP.  Colonel Rush, the Corps' Chief of Engineers, admitted to Congress that changes to the LPVHPP BP would require further authorization from Congress because the change in plans

deviated from the basic concept of hurricane protection in the Lake Pontchartrain area. In the Hearing Before the Subcommittee on Water Resources of the Committee on Public Works and Transportation in the House of Representatives on January 5, 1978, then-Congressman Breaux asked Colonel Rush, "…what kind of major changes can you make in this project under your current authorization?" (*See*, Exhibit E15). Colonel Rush responded to the Congressman's statement:

> Well, sir, if we were to deviate from the basic concept which we now have of the Chalmette plan, which I do not believe will change, but if we made a major change in the Lake Pontchartrain barrier plan, *that we would have to come back to Congress for a reauthorization.*
>
> *Id.* (emphasis supplied).

Congressman Breaux responded and asked, "starting over from day one?" *Id.* Colonel Rush answered, "Yes, sir. An alternative that would not be a barrier type of alternative." *Id.* The HLP was not a barrier type of alternative, and Rush stated before Congress that such an alternative required reauthorization from Congress.

Further evidence of the Chief's lack of discretionary authority surfaced in a FAQ report in 1976 titled "Questions by LMVD on Barrier Plan: Lake Pontchartrain and Vicinity Hurricane Protection Project, Corps" that FAQ asked "Do you consider that the Chief of Engineers has the authority to abandon the barrier plan and substitute a high level levee plan without reference to Congress?" *See*, Exhibit E16. The response to this question was simply "No." *Id.* Thus the Corps knew as early as 1976 that it could not replace the BP without Congressional authorization.

More doubt over the Chief's lack of discretionary authority surfaced in a memorandum sent on November 17, 1982 from the Assistant Secretary of the Army (Civil Works) -- William R. Gianelli -- to the Chief of Engineers. The Assistant Secretary posited that "I have serious

22

reservations about exercising the Chief's discretionary authority when a substantially different solution to the problem is proposed." *See,* Exhibit E17. In response to this letter, Lieutenant General J. K. Branton –the Corps of Engineers -- expressed his own uncertainty regarding the discretionary authority to materially change the Congressionally authorized LPVHPP.  He then requested the "guidance" from the Lower Mississippi Valley Division Engineer on the subject of his discretionary authority. *See,* Exhibit E15.  These letters demonstrate that the changes to the LPVHPP proposed in the switch from the BP to the HLP prompted uncertainty within the Corps itself regarding the Chief of Engineers discretionary authority.  Any such uncertainty should have prompted an attempt at Congressional authorization.  It did not.

### a)      Non-discretionary functional changes occurred.

The Chief of Engineers did not have discretionary authority to change from the BP to the HLP because the switch involved material alterations in the function of the project, including deletion and addition of project purposes not, otherwise authorized by law.  One of the project purposes of the LPVHPP was to exclude hurricane tidal surges from entering Lake Pontchartrain, as evidenced by the original Report of the District Engineer entitled *Hurricane Study Interim Survey Report Lake Pontchartrain, Louisiana and Vicinity*, submitted to Congress in House Document 231. The report reads in pertinent part:

> Hurricane damages result from surges entering Lake Pontchartrain from Lake Borgne through natural tidal passes at Rigolets and Chef Menteur Pass and through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal. The surges are intensified by local wind effects, and the combination of waves and surges causes overtopping of the protective works along the shores of the lake.

*See*, Exhibit E18 at p. 17.  The HLP deleted the project purpose of preventing surges from entering

Lake Pontchartrain. It therefore embodies a material alteration for which the Chief of Engineers should have obtained Congressional reauthorization.

### b) Non-discretionary changes in the scope of the project were made.

By the Corps' own admission in a report to Congress by the USACE dated August 31, 1976, the cost of providing protection to the outfall canals was estimated to be up to $60 million, a cost seen as an "additional major feature" which would therefore "have to be authorized by the Congress." *See*, Exhibit E19. Although in 1984 Lieutenant General Bratton opined that the modified construction plan (HLP) would not materially alter the scope of the authorized plan --since the HLP would supposedly cost less and be completed quicker -- Bratton failed to include in his memorandum the costs of providing protection for the outfall canals, a significant problem not yet solved, which would cost considerably more under the HLP than the BP. *See*, Exhibit E20. Furthermore, the change in scope from the BP to the HLP is demonstrated by the fact that the LPVHPP Reevaluation Study of July 1984 (Volume I) proposed to use $124 million for protection of the outfall canals by introducing pumps and gates at the ends of the canals, a far cry from sandbagging bridges.[1] *See*, Exhibit ____, Exhibit E21 at p. 63 and 64.

### c) Changes in legal relationships were required and those changes required Congressional approval.

Additionally, the Chief of Engineers did not have discretionary authority to change from the BP to the HLP because the switch involved changes in legal relationships between the Corps and the local authorities. The requirement to provide lands, easements, rights of way, and relocations represented a material alteration to the authorized plan because the HLP required more space to

---

[1] The cost for alternatives for protection along the lengths of the canals ( the protection eventually provided) was estimated to run between $200-$250 million.

24

accommodate higher levees than called for by the BP. In a 1976 FAQ titled "Questions by LMVD

on Barrier Plan: Lake Pontchartrain and Vicinity Hurricane Project, USACE," a discussion of rights-

of-way and relocation problems involved with switching from the BP to the HLP, stated:

> A high level plan for Greater New Orleans would require
> considerably more rights-of-way in St. Charles Parish and in Orleans
> Parish along the lakefront from Jefferson Parish line to Seabrook and
> from South Point to the GIWW. Commitment of lands in Orleans
> Parish will involve considerable expense in terms of first cost,
> severance where floodwall is required, and loss of property values
> behind higher levees and floodwalls. Levees from the IHNC to South
> Point will be constructed in the lake. Jefferson Parish levee would be
> topped with floodwall and will result in costs for severance and loss
> of property values behind the protection. Extensive relocations will
> be required, including major ramping at U. S. Highway 11, Highway
> 90, Interstate 10 and Causeway Blvd.
>
> A comprehensive high level plan would require commitments of vast
> amounts of R/W for levees on the north side of the lake as well as
> extensive relocations, including numerous roads, major highways and
> numerous pipelines. Additionally, many streams and rivers would
> have to be controlled with structures and this would involve
> considerable urban and rural drainage modifications.

*See,* Exhibit E16.

Furthermore, the Corps admitted aside from the changes in project scope that would result

from elimination of the barrier elements, there would be certain necessary changes in local

cooperation requirements, which include among other items, a required cash contribution equivalent

to the estimated capitalization value of operation and maintenance of the Rigolets navigation lock

and channel. *See,* Exhibit E14.

The new local responsibilities accompanying the change from the BP to the HLP embody

material alterations in the legal relationship between local authorities and the Corps. Therefore, a

switch from the BP to the HLP falls outside the discretionary authority of the Chief of Engineers.

25

2.      **The Chief of Engineers never reported the PAC from the BP to the HLP and he thus acted outside the scope of his discretionary authority.**

Even if the Chief of Engineers of the Corps had the necessary discretion to avoid a Congressional reauthorization of the switch from the BP to the HLP by means of a PAC, he never reported the PAC to Congress for approval and, thus, acted outside of his discretionary authority. Post Authorization Changes require submittal to both the Assistant Secretary of the Army (Civil Works) (ASA(CW)) and to Congress. *See,* Exhibit E23 and Exhibit E24 at p. 9-2. The Chief of Engineers sought the approval of the ASA(CW) and the Director of Civil Works of the Corps but never obtained a reply in support of the PAC from the ASA(CW) or approval from Congress. Therefore, the Post Authorization Change Notification Report of August 8, 1984 (*See,* Exhibit E25) did not authorize the Chief of Engineers to switch from the BP to the HLP.

The Chief of Engineers recognized the requirement to submit a PAC Notification Report to both the ASA(CW) and Congress in the draft of a memorandum for the ASA(CW). In that memo, the Chief opines, "…I intend upon signing the Record of Decision to forward the PAC Notification Report to the appropriate Congressional Committees. This will satisfy the need to fully inform Congress of the changes to the project prior to undertaking construction of any element of the high level plan." *See,* Exhibit E26. (emphasis supplied). The Chief of Engineers furnished the ASA(CW) with the PAC Notification Report as an attachment to a memorandum dated August 29, 1984. *See,* Exhibit 25. Major General John F. Wall, Director of Civil Works, shared his approval of the PAC Notification Report by signing the Record of Decision on February 7, 1985. *See* Exhibit E27. However, the PAC Notification Report never received any documented approval from the ASA(CW), nor does any record exist of the PAC being reported to the proper subcommittees of

26

Congress. By his own admission, the Chief of Engineers did not have authority to switch from the BP to the HLP under a PAC Notification Report unless he satisfied the "...need to fully inform Congress of the changes to the project prior to undertaking construction..." *See,* Exhibit E26. Absent this notification to Congress, the PAC Notification Report did not authorize the Chief of Engineers to switch from the BP to the HLP.

### 3.     The Corps did not build what it was told to build.

The Corps lacked authorization to construct the type of protection it implemented along the New Orleans outfall canals. As detailed below, the Corps disregarded not only <u>Congressional directives</u> but also <u>its own design specifications</u> with regard to the 17th St. Outfall Canal, the London Avenue Outfall Canal, and the Orleans Avenue Outfall Canal. Congress told the Corps on numerous occasions to build "*levees*," to which the Corps responded by building cheaper, smaller, and weaker structures or sometimes no structures at all. In addition, Congress authorized certain amounts of funds for construction of levees along the outfall canals, but the Corps spent far less than the amounts directed by Congress. Because the Corps deviated from Congressional directives and their own standards for protection of the outfall canals, the items built along the outfall canals constitute unauthorized projects to which the §702c immunity does not apply.

### a) .   The Corps failed to comply with Congress's definition of "parallel protection" which specifically required "raising of levees".

As a threshold matter, Plaintiffs suggest that this Honorable Court and all parties take notice

of the fast and loose use of the phrase "parallel protection." The Corps treats the phrase "parallel protection" synonymously with *any* protection built along the outfall canals. Congress, in fact, did not define the term until 1991. Congress first instructed the Corps to provide protection along the outfall canals in a Conference Committee Report on the Water Resources Development Act of 1990, which read in pertinent part:

> It was not necessary for the original barrier plan to address the problems associated with outfall canals that provide drainage of storm waters into Lake Pontchartrain from the City of New Orleans...
>
> ...Therefore, the conferees direct the Corps to treat the outfall canals as part of the overall hurricane protection project, and to favorably consider a plan that *raises the levees* along the entire lengths of the London Avenue and Orleans Avenue Canals to grades sufficient to confine a standard project hurricane with costs to be borne by both Federal and local assuring authorities.

*See,* Exhibit E28 (emphasis added). Although the United States only partially quoted the language of the Conference Committee Report in its *Memorandum of Law in Support if Its Motion to Dismiss Counts I-III and V-VII of the Superseding Master Complaint* ("Motion"), the sentence does not end at "the conferees direct the Corps to treat the outfall canals as part of the overall part of the overall hurricane project," but continues to read "and to favorably consider a plan that *raises the levees*..." *See,* R. D. 6380-3 at p. 8; Exhibit E29. In a letter to Colonel Gorski of the Corps dated March 18, 1991, Congressman William J. Jefferson referred to the type of protection mentioned in the Conference Committee Report as "300-year parallel hurricane protection along both the London Avenue and Orleans Avenue Canals." *See,* Exhibit E30. Senator John Breaux also referred to the protection mentioned in the Conference Committee Report as "parallel protection." *See,* Exhibit E31. Subsequently, in the Energy and Water Resources Development Appropriations Act

28

("Appropriations Act") of 1992, Congress defined "parallel hurricane protection" by authorizing and

directing the Secretary of the Army to:

> ...provide parallel hurricane protection along the entire lengths of the
> Orleans Avenue and London Avenue Outfall Canals <u>by raising levees</u>
> and improving flood protection works along and parallel to the entire
> lengths of the outfall canals and other pertinent work necessary to
> complete an entire parallel protection system...

*See,* Pub. L. 102-104, 105 Stat. 510, 514, attached as Exhibit E32a (emphasis added).

Further taking matters out of context, the Corps quotes the part of the Appropriations Act

directing the Corps to perform the "work necessary to complete an entire parallel protection system",

but fails to include the other directives listed in the same sentence. *Id.* Congress's definition of

"parallel protection" entailed (1) inclusion of two of the outfall canals: Orleans and London; (2)

protection along the entire lengths of the two canals; (3) raising levees; (4) improving flood

protection works; and (5) other pertinent work. Congress therefore specified its understanding of

"parallel protection" and instructed the Corps to implement it accordingly.

Synthesizing these misquotations of Congressional authority, decisions of this Court, and the

FCA to support its argument that the work performed on the outfall canals constituted a federally

authorized National Flood Control Project ("NFCP"), the Corps argues that "the court has already

*held* that [t]he London Avenue and 17th Street Outfall Canals are components of the National Flood

Control Program authorized by Congress and implemented by the Army Corps of Engineers." *See*

*Berthelot v. Boh Bros. Constr. Co.*, 2006 WL 1984661 at *2 (E.D. La. June 1, 2006) (R.D. 469),

attached as Exhibit E33. What the United States quoted was actually "the statutory and factual

background as attested by the OLD," not the holding of this Court that the London Avenue and 17[th]

Street Outfall Canals constituted components of the NFCP. *See, Id.* No such holding was necessary

29

to this Court's *Berthelot* decision. Consequently, the issue of whether the works built by the Corps constitute federally authorized aspects of an authorized flood control project has not been resolved by the Court, and presents a question of fact sufficient to warrant further investigation.

### *The London Avenue Outfall Canal:*

The Corps did not construct protection along the lengths of the London Avenue Outfall Canal according to the Congressional definition of "parallel protection." Although the Congressional definition of "parallel protection" specifically calls for raising levees, the Corps did not raise a single levee along the Outfall Canal. It instead constructed I-walls. The Corps had the Congressional directive and authority to raise levees, not construct I-walls. Had Congress wanted I-walls, Congress would have authorized and directed the Secretary of the Army to construct I-walls. It did not.

### *The Orleans Avenue Outfall Canal:*

Just as with the London Avenue Outfall Canal, the protection constructed along the Orleans Avenue Outfall Canal did not comply with the Congressional definition of "parallel protection." Although the Corps did raise levees along the Orleans Avenue Outfall Canal, it failed to raise levees along the "*entire length of the Orleans Avenue*" Outfall Canal. The Corps left a 200 foot gap at the end of the Canal, which allowed water to simply pass through the opening. *See,* Exhibit E34 at pp. 8-16, 17 and 8-62, 63, 64. By failing to construct *anything* along the south end of the Orleans Avenue Outfall Canal, the Corps's construction of protection along the canal does not comply with the Congressional definition of "parallel protection."

30

*The 17ᵗʰ Street Outfall Canal:*

The 17ᵗʰ Street Outfall Canal represents a special case because, unlike the London and Orleans Avenue Outfall Canals, <u>Congress never authorized the Corps to provide parallel protection or any type of protection along the lengths of the 17ᵗʰ Street Outfall Canal whatsoever</u>. However, even assuming the Corps had authorization to provide parallel protection along the lengths of the 17ᵗʰ Street Outfall Canal, the Corps did not provide protection in compliance with the Congressional definition of "parallel protection."

Instead of raising levees along the lengths of the 17ᵗʰ Street Outfall Canal, the Corps took a New Orleans Sewerage and Water Board ("S&WB") and Orleans Levee District ("OLD") dredging project and attempted to transform it to a flood control project by merely building a concrete monolith over the sheetpile that was required to be installed as a condition of the original dredging permit. The Corps failed to do anything remotely close to "raising of levees" required by Congress' definition of parallel protection. Consequently, it created something other than federally authorized parallel hurricane protection along the 17ᵗʰ Street Outfall Canal.

> **b)**   **<u>The Corps ignored Congressional directives by refusing to spend the amounts of money appropriated to it for protection along the outfall canals and spending far less than its own plans required for protection from a SPH.</u>**

Congress told the Corps to build levees and spend the money needed to do so. The Corps sacrificed the integrity of the levees by spending less than either necessary or authorized and then refusing to obtain Congressional approval for that reduced spending. Under no circumstances can it now shield this unauthorized parsimony by invoking Congressionally-created immunity.

Although the BP was cheaper than the HLP, and would have provided better protection for the surrounding region, the Corps decided to switch to the HLP without Congressional authorization.

31

The problem was that the alteration made the Corps short of funds to do the necessary tasks. The 1984 Re-evaluation Study performed by the Corps confirmed this - - it called for the expenditure of $124 million to protect the outfall canals in the New Orleans region. *See,* Exhibit E21 at p. 71. The Corps now faced a dilemma- - it could not return to Congress and ask for more money to implement a plan Congress never authorized or adopted. The <u>only</u> way the Corps could make ends meet was to cut costs - - and it cut costs by decreasing safety.

The Corps immediately began doing this cost-cutting by changing the amount of protection afforded by the levees. It initially began by recommending using protection along as opposed to on the front levees surrounding the Canals. This trick worked - - the cost of this alternate protection was projected at $9.1 million for the Orleans Avenue Outfall Canal, $15.1 million for the London Avenue Outfall Canal, and $20.5 million for the 17th Street Outfall Canal. *See,* Exhibit E35 at p. 59, Exhibit E36 at p. 62, and Exhibit E37 at p. 35. Thus the Corps completely ignored the Congressional mandate to build levees so as to reduce it costs from $124 million to $44.7 million. Of course, it completely destroyed any hope of true protection by adopting the resultant project, all in a manner <u>never</u> contemplated or authorized by Congress.

But that was still not enough for the Corps. Again, it fell short of money to find adequate levee protection. Thus the Corps began to push the use of "butterfly valve gate protection" along the canals. This presented the cheapest but least-protective plan possible. Use of this cheap-and-dirty plan was met with suspicion by the local authorities and thus required some coercion on the part of the Corps. In a letter to Mr. Steven O. Medo, Jr.,the President of the Board of Commissioners of the OLD, from Colonel Richard V. Gorski, District Engineer, U.S. Army, the Corps proposed to withhold funding for implementation of protection along the outfall canals in excess of the cost of

the frontage protection. The letter states that the Corps will only "cooperate with you in the construction of the parallel protection up to the Federal cost of the butterfly gated structures." *See,* Exhibit E38. The GDM for the Orleans Avenue Outfall Canal generated by the Corps states that "the Federal participation will be limited to 70 percent of the first cost for fronting protection." *See,* Exhibit E35 at p. 8. The Corps likewise refused to pay for protection along the London Outfall Canal in excess of 70 percent of the costs of the butterfly valve gated structures. *See,* Exhibit E39. In response to this ultimatum, Congressmen representing the area wrote to the District Chief of Engineering and explained that protection along the lengths of the London and Orleans Avenue Outfall Canals embodied the intent of Congress as expressed in the Conference Committee Report on the Water Resources Development Act of 1990. *See,* Exhibits E30 and E31. The Corps refused to agree with the Congressmen and maintained its position that the Corps would not pay anything greater than 70% of the cost of the butterfly valve gated structures. *See,* Exhibits E39 and E40. It took a Congressional directive in the Energy and Water Resources Development Appropriations Act of 1992 to force the Corps to agree to pay for protection along the London and Orleans Avenue Outfall Canals, and to bear 70% of the entire cost of the project. *See,* Pub. L. No. 102-04, 105 Stat. 510, 514 (1991), attached as Exhibit E32a.

That this was wholly inadequate to the objective of Congress is apparent in the experience the Orleans Levee District received when it attempted to build levees sufficient to meet the goals of the BP. In 1990, the OLD recognized the lack of protection afforded by the HLP, and it sought to construct its own levee system. The study it commissioned showed that to build the system to Corps standards would require an expenditure of $44 million for the London Avenue Canal alone:

> In April 1986, a general design memorandum was prepared for this flood protection (protection for a 300 year storm plus two feet of free

33

> board with the Corps' current geotechnical design standards) which
> indicated a cost of 44 million dollars.  At the time, the available
> budget for London Avenue Canal was considerably less than this
> amount. Therefore, the Board decided to upgrade the existing system
> for interim flood protection to a level within the budgetary limits.
> Also, with the Corps standards being too stringent, the Board decided
> to follow the ASCE's state of the art geotechnical criteria and
> standards for structural design.

*See,* Exhibit E41 at p. 1.  Of course, the Corps spent less than that amount on all three (3)

Outfall Canals and it thus shirked it Congressional mandate to provide <u>adequate</u> protection to the

levees.

Even with a Congressional directive, and funds appropriated for protection along the outfall

canals, the Corps spent far less than the amount directed by Congress as necessary for adequate

protection.  The Appropriations Acts of 1992 and 1993 appropriated $26.2 million for protection

along the lengths of the Orleans and London Avenue Outfall Canals. *See,* Pub. L. No. 102-377, 106

Stat. 1315, 1320 (1992), (Exhibit E32b).  In addition, the Energy and Water Resources Development

Appropriations Acts from 1994 to 1996 appropriated an additional total of $42.8 million for the

LPVHPP, not including Jefferson Parish, to which Congress appropriated money separately. *See,*

Pub. L. No. 1030126, 107 Stat. 1312, 1316 (1995) (Exhibit E32c); Pub. L. No. 103-216 (Exhibit

E32d); Pub. L. No. 104-46 (Exhibit E32e). The Corps spent $6.7 million on the London Avenue

Outfall Canal in 1993 in a contract with Boh Bros. Construction Co., Inc., $4.6 million in 1994 on

the London Avenue Outfall Canal in a contract with B&K Construction Co., Inc., and $2.9 million

on the Orleans Avenue Outfall Canal in a contract with Maharrey Houston Construction Co., Inc.

*See,* Exhibits E42, E43 and E44. These contracts represented a fraction of the amount of money

appropriated by Congress for protection along the these outfall canals.  Although Congress

appropriated no money for work on the 17th Street Outfall Canal, the GDM for the 17th Street Outfall

34

Canal stated that protection along the lengths of the canal would necessitate expenditures of $20.7 million. *See,* Exhibit E37 at p. 36. Instead, the Corps issued one contract regarding the 17th Street Outfall Canal -- in the amount of $2.6 million dollars -- for concrete capping of sheetpile by Pittman Construction Co., Inc. *See,* Exhibit E45. Despite <u>Congress' directive</u> and the <u>Corps' own standards</u> of how much such protection would cost, the Corps refused to spend the amount of money necessary to provide adequate hurricane protection along the lengths of the outfall canals.

The Corps disregarded Congressional directives and its own design memoranda, all of which provided for specific barrier protection along the Outfall Canals, necessitating the expenditure of specific amounts of funds to provide protection from a SPH. Because the Corps refused to obey Congress and its own standards, it lacked authorization to construct the type of protection it built along the outfall canals, rendering those aspects of the outfall canals' protection and beyond the scope of §702c immunity.

### III.   THE GOVERNMENT CANNOT CLAIM IMMUNITY FOR THE ISSUANCE OF DREDGING PERMITS TO THE SEWERAGE AND WATER BOARD.

#### A.   The History of the Dredging Permit Process Shows the Corps' Failure to Adhere to a Non-Discretionary Duty.

The history of the modern day 17th Street Canal mirrors that of the development of the city of New Orleans. Yet the 17th Street Canal's modern-day use as a drainage project is a recent development. The Canal was first dug in the early 1850's as a right-of-way for the Jefferson and Lake Pontchartrain Railroad. The right-of-way allowed the town of Carrollton to be connected with the shipping port of Bucktown.[2]

---

[2]      *See PSLLC Master Complaint* at ¶ 18.

In 1858 a secondary canal, situated alongside a projected street entitled "17th Street," was built to connect the original canal to the Mississippi River side of the Metairie Ridge. Upon completion of this spur canal, the entire project acquired the moniker "the 17th Street Canal.[3] The completed project assured the navigational and commercial purpose of the Canal, as it connected the Bucktown port–located where the northern end of the 17th Street Canal enters Lake Pontchartrain–with the rest of the City.[4] Boat navigation flourished throughout the 19th century with construction of a commercial wharf and a resort called "Lakeport." Steamboats also docked at the entrance of the New Basin Canal (also known as Pontchartrain Boulevard) and at the terminus of the Jefferson and Lake Pontchartrain Railroad. A fleet of around one hundred (100) shrimp boats docked there pursuant to a lease agreement with the New Orleans Sewerage and Water Board (defendant "SWB").[5]

The utilization of the Canal for drainage purposes was not considered until the end of the 19th Century when the defendant SWB took over the Canal's operations. Dredging was conducted by the SWB in 1897 and again in 1929. It was not until after the SWB's completion of the construction of Pumping Station No. 6 in 1913, however, that a large portion of New Orleans was drained through the 17th Street Canal.[6] The 17th Street Canal continued to be a Parish-owned, Parish-run city drainage facility throughout the better part of the 20th century, and this remained so despite the ravages of the great Mississippi River flood of 1927 and Hurricane Betsy in 1965.

The Canal itself is entirely located in what is now the Parish of Jefferson. Since it was dug, the 17th Street Canal has never become part of any federal flood control project, nor was it ever

---

[3]    See PSLLC Master Complaint at ¶ 19.
[4]    See PSLLC Master Complaint at ¶ 20, 23.
[5]    See PSLLC Master Complaint at ¶ 21-24.
[6]    See PSLLC Master Complaint at ¶ 24.

mentioned in connection with any federal flood control legislation. The east bank levee on the Orleans side of the 17th Street Canal was built by the Orleans Levee Board with no federal funds. The west bank levee on the Jefferson side of the 17th Street Canal was apparently constructed with federal funds in 1950.[7]

In July of 1974, defendant SWB initiated a project (hereinafter "Hydrologic Improvement Project") to further improve drainage through the Canal. The aim was to dredge 2.4 miles of the Canal-- from Pump Station No. 6 to Lake Pontchartrain-- to increase the flow characteristics of the Canal and the pump capacity of Pump Station No. 6.[8] Defendant SWB anticipated that the removal-- via dredging of approximately 85,000 cubic yards of bottom sediment and the resulting re-configuration of the cross section of the Canal--would yield the desired results.[9]

Given the 17th Street Canal's aforementioned history, and presumably its status as a navigable waterway, the SWB--pursuant to the River & Harbors Act, 33 U.S.C. §§403 et seq. (See Exhibit A.1, Doc #1)-- was required to seek a dredging permit from the Corps in order to proceed with the drainage project.[10]  In July of 1974, the SWB submitted an "Application For Permit to Discharge or Work in Navigable Waters and their Tributaries" to the Operations Division of the Corps.[11] The application, like all applications for the issuance of permits to dredge navigable waterways,fell within the purview of the Army Corps' Operating Division.[12] The Corps admits in its *Motion to Dismiss* that- in connection with its determination whether to permit the dredging - it was required to make certain that the work requested to be permitted was not a detriment to flood protection.[13]

---

[7]      *See* Exhibit ___.
[8]      *See PSLLC Master Complaint* at ¶ 25.
[9]      *See PSLLC Master Complaint*.
[10]     *See PSLLC Master Complaint* at ¶ 26.
[11]     *See* PSLLC *Master Complaint* at ¶ 27;  *See also* Doc # 2.
[12]     This differentiates these types of applications from those renewed by the Corps' Engineering Division, which is responsible for flood control. *See* PSLLC Master Complaint at ¶ 27.
[13]     *See,*   at   .

On August 8, 1974, the Louisiana Department of Public Works- whose approval to dredge was also required-advised the SWB that it would be necessary to furnish engineering information insuring that the excavation would not endanger the levees on both sides of the canal.[14] On May 23, 1977, the Corps returned the application with no action because the SWB had failed to furnish information requested by the Department of Public Works and other state agencies.[15]

On August 23, 1978, the local Corps District Office confirmed that "in order for the Sewerage and Water Board to dredge in the canal, they will have to apply to this office for a permit."[16] After being hired by SWB to formulate a plan for the design and implementation of the dredging project, the engineering firm Modjeski and Masters submitted a *second* dredging permit application on behalf of the SWB on August 23, 1979.[17] That application itself was then resubmitted on December 29, 1980, after environmental concerns arose over the disposal of the dredged material.[18]  It is clear that, long before the SWB resubmitted its application, the Corps knew the dangers associated with any proposed dredging.

On September 16, 1977, an internal Corps memorandum between branches of the District Office admitted that the soil studies available at the time would not allow for new dredging without serious comprising levee stability:

> We have completed a research of available soil and geologic
> information.  This data indicates the presence of a buried beach sand
> deposit that underlies the outfall canals.  The sand deposit approaches
> the bottom of each outfall canal, creating the potential for excessive
> and dangerous hydrostatic uplift pressures during high stages in the
> canals.  Additionally, there are reaches in each of the outfall canals
> that presently do not meet minimum stability requirements even

---

[14]   *See*, PSLLC Master Complaint at ¶ 28;  *See* also Doc #3.
[15]   *See*, Doc #4.
[16]   *See*, Doc #6.
[17]   *See*, PSLLC Master Complaint at ¶ 30.
[18]   *See*, PSLLC Master Complaint at ¶ 31; *See* also Doc #7.

during normal stages. Therefore, no matter which alternative selected for the GDM return levees are not part of federal hurricane protection, we anticipate some modification of the existing levees. This may be in the form of relief wells, sheet-pile cutoff, seepage and or stability beams, or any combination of these modifications. The extent of necessary modifications would depend on the water surface requirements as determined by Hydraulics Branch.

(Fig 5)

On January 28, 1981 Modjeski and Masters provided the Corps with a slope study of the 17th Street Canal levees, again confirming what the Corps already knew - - the dredging did not comply with the Corps' own safety standard:

> Of these six locations, the factors of safety for three fell below the required value of 1.30 as set by the US Army Corps of Engineers... More serious were two other locations Sta 554+00 on the Jefferson Parish side of the canal and Sta 604+00 on the Orleans Parish side of the canal, which yielded factors of safety of 0.75 and 0.87 respectively... These two specific locations yielded low factors of safety due to the existence of very soft clays. . . [19]

On February 6, 1981, Modjeski and Masters provided the Corps with a stability analysis of the existing sheet pile wall along the east side of the Canal north of Hammond Highway. This report also spoke to the instability of the wall, stating "portions of the wall are extremely unstable as they now stand. This instability, *even under normal water level situations* is due to . . . the soft to very soft clays which make up the soil stratum. . ."[20] (emphasis added).

On February 13, 1981, the Corps issued a "Public Notice" regarding the SWB's request to dredge. It advised that the grant of such a permit required a determination of whether the requested

---

[19]     *See, Doc #8.*
[20]     *See* PSLLC Master Complaint at ¶ 33. *See also* Doc #9.

dredging would have a detrimental effect on flood protection.[21]  On February 26, 1981, the Corps
issued a notice of public hearing on the SWB's dredging permit request.[22]

An internal memorandum, issued by the Corps on March 5, 1981, addressed the soil stability
findings of Modjeski and Masters.  It acknowledged what the Corps had known for years - - at
stations 554+00 and 604+00, factors of safety were substantially below the minimum 1.30 factor of
safety, requiring a re-design of these sections.[23]  Notably, the location of the levee failure is between
these very stations, illustrating one of the fundamental flaws in the evaluation of the permit -- by
taking this incomplete snapshot of the soil, the Corps failed to evaluate the inherent stability of the
levee as a whole.  That the failure occurred in the section between those stations evaluated -
specifically at Sta 560– further exemplifies the flaws in the Corps' testing protocol.

On March 31, 1981, at a public hearing held by the Corps regarding the proposed dredging,
the discussion turned to whether widening the existing levee by steepening the slopes along the
Canal (rather than dredging) - would provide a greater cross-section and greater pump capacity.  The
consulting engineer for Modjeski and Masters stated at the hearing that the levees "currently violate
the Corps of Engineers standards for levee stability... They violate that standard virtually along the
canal. Any attempt by us to dig more dirt away adjacent to those levees tends to worsen that stability
problem."[24]  At that same public hearing, concern was voiced over the effect of dredging on the
levees.  "And also be real careful on the studies on the dredging of the Canal, if it becomes a fact,
that the dredging does not infect the integrity of that levee..."[25]  The incredible irony here is that,
despite these bold warnings of the dangers inherent in more digging, the Permit, as modified by the

[21]     *See* Doc #10.
[22]     *See* Doc #11.
[23]     *See* PSLLC Master Complaint at ¶ 34. *See also* Doc #12.
[24]     *See,* PSLLC Master Complaint at ¶ 36; *citing Doc #13* at p. 54-55.
[25]     *See,* Doc #13 at p. 205.

Corps, and as reflected on the Corps' "as built" drawing of the dredging permit shows the removal of dirt to an elevation of 1.5 on the Orleans levee, where as the elevation (on the Jefferson side 2.5).[26] This means dirt was removed one foot lower on the Orleans side than on the Jefferson side, and that the water met the levee on the Orleans side.

On April 20, 1981, the Corps wrote Congresswoman Lindy Boggs, in response to her request for a quick response to the dredging permit. The Corps indicated the application to be a "controversial one" and indicated that the seriousness of the issues led to the lengthy approval process. Noted first in the Corps letter was the necessity of insuring that dredging would not undermine the integrity of the levees.[27]

On June 16, 1981, the Corps addressed the "new" preliminary plan to install sheet pile walls with concrete caps for the entire length of the dredging project, as described by the Phase II permit dated April 20, 1981.[28] In this response, the Corps once again acknowledged that a number of problems concerning stability seemed likely if the SWB plan were implemented.[29]

On July 13, 1981, a subsoil investigation was performed for Mojeski and Masters by Eustis Engineering.[30] In borings 62 and 64 - - taken from the area that ultimately failed during Hurricane Katrina--show organic matter, roots and soft clay at depths between 16.5 feet and 40 feet. This material increased the risk of seepage that would become more likely to occur with a change in the depth of the canal. *See* Declaration of Robert Bea. Seepage through this porous material undermined the strength of the levee and ultimately led to its breach. Id.. The Corps should have

---

[26]     *See,* Doc #15.
[27]     *See,* Doc #14.
[28]     *See,* Doc #14; *See also* PSLLC Master Complaint at ¶ 37.
[29]     *See,* PSLLC Master Complaint at ¶ 38.
[30]     *See,* Doc #17.

taken the data into account and not permitted the dredging without taking precautions necessary to counter this problem.

In 1982, additional analysis confirmed the porous nature of the soil. As indicated above, the Corps was already aware that sands and poor soils underlay the *entire* 2.4 miles of the 17th Street Canal, from Pumping Station No. 6 to Lake Pontchartrain. Despite this knowledge, the Corps ignored fundamental engineering principles - - as well as its own standards - - by testing only one section of one bank of the Canal. Thus, instead of taking a representative sample that would have given it objective results, the Corps risked the integrity of its findings by using an overly narrow range of data.[31] As a follow up, on February 12, 1982, an internal memorandum from the Corp's Engineering Division to the Corps' Operations Division suggested that a stability analysis be done for the land side of the Canal only. Accordingly, the incompleteness of the Corps' data was now assured.[32]

On August 23, 1982, Eustis Engineering provided a more comprehensive "additional subsoil investigation" report to Modjeski and Masters. On November 30, 1982, Modjeski and Masters relayed the report to the Corps.[33] This report shows a high probability of failure at the areas tested, and those areas showed a high likelihood of failure, and boldly states that, between stations 617+50 and 663+00, "computations indicate the possibility of a blow-out during extreme high water in the canal."[34] The Report further acknowledged that "measures must be taken to prevent a blow-out [including] installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the land side toe of the levee, and sealing the canal bottom."[35] Because the testing was

---

[31]     *See,* PSLLC Master Complaint at ¶ 39.
[32]     *See,* PSLLC Master Complaint; *See also* Doc #18.
[33]     *See,* Doc #19
[34]     *See, PSLLC Master Complaint* at ¶ 40; *See also* Doc #19 at p. 8.
[35]     *See, PSLLC Master Complaint*; *See* Doc #19.

42

limited to the limited areas tested, it is ridiculous that the "preventive-measures" presume the un-tested areas do not also have a high probability of failure.  Stated another way, these results are restricted to specific areas  of the Canal only and not  the Canal system as a whole; the test results cannot be used by the Corps to assume the remaining 2.4 miles of the Canal were stable.

On January 20, 1983 the Chief of the Corps' Engineering Division offered his opinion of the proposed permit to the Operations Division.  First, curiously, the opinion delineate  "the Corps has jurisdiction on the 17[th] Street Canal only to the extent the proposed construction affects the grade and integrity of the existing Federal levees on the west bank."[36] Second, despite all of its information about sand and bad soils underlying the entire 17th Street Canal, the memorandum does not question uplift pressure at any location other than the length between Sta 617+50 and 663+00. Finally, the report recognizes that sheet pile cutoff will not positively reduce uplift pressure, suggesting that installation of relief wells would be an appropriate way to provide the "necessary assurance against uplift" of the Canal wall's sheet piles.[37] This memo is plain evidence of the tunnel vision of the Corps that led it to ignore the systemic soil problems throughout the Canal.

On May 9, 1983, Modjeski and Masters submitted a new permit application on behalf of defendant SWB for the 17th Street Drainage Canal Improvement Project.[38]  This application superseded all previous applications, with the new project limits being from Pump Station No. 6 on the south to a point 370.0 feet north of the Bucktown Pedestrian Bridge.  Unlike the original plan, which had called for only 85,000 cubic yards, the new application envisioned 470,000 cubic

---

36    Does this mean Corps engineering ignored the Eastbank?
37    *See* PSLLC Master Complaint at ¶ 43; *See* also  Doc #20.
38    *See* Doc #21.

43

yards—in other words, removal of over five and half times more cubic yards of the canal bottom than previously contemplated.[39]

On July 27, 1983, Eustis Engineering submitted yet another revised soil stability report. It extended the area to be tested and contained "the results of floodwall analyses, slope stability analyses and other pertinent analyses based on revised high and low water elevations." The report not only reaffirmed the potential for a blow-out at the land side toe of the levee, it further extended the area of concern to the pumping station: "[P]recautions must be taken to prevent a blow-out during high water conditions between Stations 617+50 and the Pump Station." The slope stability analyses for stations 554+00 - 670+00 all fell below the 1.3 factor of safety. The uplift analysis for the entire length of the Canal fell well below the Factor of Safety of 1.3, the lowest being a factor of safety of 5.1 for the area of Sta 617+50 to Sta 663+00. Not surprisingly, encompasses the area where the Katrina breach occurred.[40] Dredging of a test section in the Canal was recommended in order to further study the hydrostatic uplift pressure.[41] [42]

Accordingly, from November 29 to December 16, 1983, a test section was dug just south of Interstate 10. Six piezometers were installed on the Jefferson Parish side of the Canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation.[43] No testing was done on the Orleans side. Test results were submitted to the Corps on January 17, 1984. The accompanying report by Eustis concluded that no relevant changes were monitored by

---

[39]    *See* PSLLC Master Complaint at ¶ 44.
[40]    *See* Doc #22.
[42]    *See* PSLLC Master Complaint at ¶ 45.
[43]    Most amazing is that the slope studies showed a safety factors below the 1.2 minimum accepted by the Corps!
[44]    *See* PSLLC Master Complaint at ¶ 46.
[45]    *See* PSLLC Master Complaint; *See* also Doc #23
[46]    *See* PSLLC Master Complaint at ¶ 47.

44

the piezometers when the test section was dug, such that "it is believed that the possibility of a blow-out during high water conditions in the Canal is probably slight."[45] Thus, by virtue of this one test, conducted on only one section and on one bank of a 2.4 mile canal, years of studies and evidence of a probability of a blow-out were dispelled. Less than five months after these results were submitted, to the Corps, the Corps granted the SWB's permit to dredge.

The gross negligence inherent in basing a decision on this test is further exacerbated because the piezometer study of the test section failed to account for the fact that seepage flow through the permeable soils of the Canal was already in progress at the time of the piezometer installation. Therefore, any conclusions as to stability and permeability of the Canal's walls were intrinsically unreliable.[46] More importantly, fundamental engineering standards do not allow testing of only one section, much less testing of only one side of the canal, to be used to determine the stability and permeability of both sides of the entire length of the Canal.

Despite the fact that the Corps had its own data regarding the existence of sands underlaying the entirety of the 17th Street Canal, despite its own recognition that seepage was a real and existing danger to flood protection, and despite its recognition of the need to either put sheet pile tips below the Canal bottom or provide relief wells, the Corps ultimately issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge . . ."[47] The Corps' "Statement of Findings", issued in conjunction with the June 13, 1984 permit, stated that factors considered in issuing the permit included, *inter alia*, "navigation," present and prospective; flood heights and flood plain use; and "other public interests."[48]

45

An extension of the permit was granted on February 20, 1987 and again on June 22, 1992.

The later extension permitted dredging until June 13, 1997.[44]  The work order for Phase II-A of the

permitted SWB dredging project, which included from Interstate 10 to Hammond Highway on the

Orleans side, was issued on July 4, 1990 and completed by Boh Brothers on January 10, 1992.[50]

### B.    The United States Lacks Immunity Under The Federal Tort Claims Act For Plaintiffs' Dredging Claims.

The United States argues that the Army Corps' alleged negligence in the design, construction,

maintenance, and operation of the 17th Street Canal is protected by exceptions to the FTCA's

sovereign immunity waiver. *See* 28 U.S.C. §§2671, *et seq.*  Yet the United States cannot claim that

its employees exercised "due care" in following the dictates of the legislation authorizing either the

issuance of a dredging permit or the building of I-Walls on the 17th Street Canal, as no such

authorizing legislation ever existed.  Furthermore, even if there were some latitude for the Army

Corps in issuing the subject dredging permits, the Corps' decisions were *not* the type of social,

political, and economic policy judgments insulated from liability under the FTCA.

With respect to the "due care" exception, the United States' argument is trumped by the well-

pled allegations that *no* such statutory authorization was ever made by Congress regarding dredging

of the 17th Street Canal, such that the exception does not apply.  As for the "discretionary function"

exception, the Corps-- as alleged in the *Complaint*-- was exercising professional engineering

judgment that is classically unprotected by the discretionary function exception.  Finally, disputed

issues of fact about the implementation of the Congressional mandate with regards to the LPVHPP,

---

[47]        *See,* PLSSC Master Complaint at ¶ 48; *See* also Doc #24
[48]        *See,* PSLLC Master Complaint at ¶ 49.
[49]        *See,* Doc #25; *See also* PSLLC Master Complaint at ¶ 53
[50]        *See,* Doc #26

and any eventual I-Wall construction on the canals, preclude resolution of these immunity questions on a motion to dismiss under Rule 12(b)(1).[51]

### 1.    The Discretionary Function Exception Does Not Apply.

"[T]o survive a motion to dismiss based on the discretionary function exception, a complaint 'must allege facts which would support a finding that the challenged actions are not the kind of conduct that could be said to have been grounded in considerations of public policy.'"  *See Baldassaro v. United States*, 64 F.3d 206, 209 (5th Cir. 1995), *cert. denied*, 517 U.S. 1207 (1996)(quoting *Gaubert*, 499 U.S. at 324-25).  Clearly the *Complaint* herein meets that test.

If a statute prescribes an agency's actions, and the prescribed course of conduct is *not* followed, the discretionary function exception does not apply.  As stated by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, at 322, 324 (1991), "[t]he exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice' . . . .  The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive...there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. . ." (citations omitted).  *See also, Berkovitz v. United States*, 486 U.S. 531, 536 (1986)("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.")  Thus, violation of a statutory mandate defeats the discretionary function exception since sovereign immunity does not bar suits based on an employee's failure to follow the

---

[51] Forty years ago, in *Graci v. United States* (Case Nos. 65-15962, 65-15976, 65-16091), the United States also filed a motion to dismiss asserting its immunity under the "due care" and "discretionary function" FTCA exceptions, Judge Hebert Christenberry refused to dismiss plaintiff's case, quoting *Smith v. United States*, 113 F.Supp. 131, 136 (D. Del. 1953): "At this stage of the proceedings..., I cannot rule out plaintiff's claims... because the allegations are fully as consistant with non-discretionary functions as they are with discretionary functions..."  *Id.*

prescribed course of conduct. *Kiska Const. Corp. v. Washington Metropolitan,* 321 F. 3d 1151, 1159 (D.C. Cir. 2003) (citations omitted). The Army Corps' violation of its non-discretionary duty in issuing the dredging permit substantially contributed to the failure of the 17th Street Canal. Therefore, the allegations made by Plaintiffs concerning this breach of the Corps' duty will withstand a *Motion to Dismiss.*

Count I of Plaintiffs' *Complaint* alleges that the Corps "negligently failed to follow federal regulations and its own engineering standards and procedures in regard to the issuance of a permit to dredge the 17th Street Canal;" "violated federal law to the extent the River and Harbors Act prohibits the granting of a dredging permit that is contrary to the public interest;" "had no discretion [under 33 C.F.R. §320.4] to permit the dredging activity in question since the approved activity constituted damage to the public interest . . . . . activity which undermined already-existing flood protection" and, "in fact [in issuing the permit, the Corps] disregarded overwhelming evidence to the effect that approval of the permit would dangerously compromise the 17th Street Canal's flood protection levee."[52]

As noted by the Fifth Circuit in *Buttrey v. U.S.*, 690 F.2d 1170 (5th Cir. 1982), "[b]efore issuing any dredge or fill permit, the Corps is required to conduct a 'public interest' review" which "considers virtually all aspects of a project," and such review "may not be 'piecemeal'-a few acres here, a small tract there." *Id.* at 1180. 33 C.F.R. §320.4 governed the Corps' issuance of the dredging permit at the time relevant to this action, and it states in pertinent part:[53]

§ 320.4 General policies for evaluating permit applications.

---

[52] *Complaint* at ¶¶ 198-205.

[53] The United States' motion quotes extensively from 33 C.F.R §320.41. However, it uses the current version of the Code. Because regulations in effect at the time of the permit's issuance dictate the standards by which the Corps' conduct must be judged, Plaintiffs have used the 1984 version (effective date of July 22, 1982) in response. Since that is when the decision to grant the permit occurred, that is the version the Corps must have used when deciding to approve the permit. *See Buttrey v. U.S.*, 573 F.Supp. 283 (E.D.La. Cir. 1982)("An agency is bound to apply the law in effect at the time of its decision.").

(a) Public interest review.

(a)(1) The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs and, in general, the needs and welfare of the people. No permit will be granted unless its issuance is found to be in the public interest.

33 C.F.R. §320.4(a)-(a)(1)(1984).[54]

Contrary to the United States' suggestions that 33 C.F.R. §320.4(a)(1) as it stood in 1984 allowed the Corps almost unbridled discretion in determining whether to issue a dredging permit, careful analysis of the regulation's language reveals that non-discretionary duties of the Corps abound. The regulation is replete with language couched in mandatory terms such as "will," "must,"

---

[54] (j) Other Federal, State, or local requirements

(j)(4) In the absence of overriding national factors of the public interest that may be revealed during the evaluation of the permit application, a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR Part 320-324, and the applicable statutes have followed and considered: e.g., the National Environmental Policy Act; the Fish and Wildlife Coordination Act; the Historical and Archeological Preservation Act; the National Historic Preservation Act; the Endangered Species Act; the Coastal Zone Management Act; the Marine Protection, Research and Sanctuaries Act of 1972, as amended; the Clean Water Act, the Archeological Resources Act, and the American Indian Religious Freedom Act. Similarly, a permit will generally be issued for Federal and federally-authorized activities; another Federal agency's determination to proceed is entitled to substantial consideration in the Corps' public interest review 33 C.F.R. §320.4(j),(j)(4)(1984).

49

"requires," "determined," and "should," with such terms being included in virtually every sentence. Specifically, 33 C.F.R. §320.4(a)(1) states that the decision whether to issue a permit "*will* be based on an evaluation of the probable impact including cumulative impacts of the proposed activity . . . on the public interest." Impact on the "public interest" itself "*requires* a careful weighing" of all relevant factors. Furthermore, the benefits of any proposed dredging "*must*" be balanced against "reasonably foreseeable detriments." Thus, under the terms of the Corps' regulations, the Corps was required to not only evaluate the proposed permit's impact on the public interest, but also to guard against any "reasonably foreseeable" detriments.

33 C.F.R. §320.4(a)(1) continues in its specific explication of the Corps' duty. It states that any permitting decisions-- while determined by the outcome of a balancing process-- "*should*" also reflect a national concern for protection and utilization of resources, such that "*all*" relevant factors "*must*" be considered. The factors then listed by the Regulation, as a non-exclusive list, include *inter alia*, the cumulative effects of the proposal on "flood hazards," "flood plain values," "land use," "navigation," "safety," and "the needs and welfare of the people." *Id.* Given the extensive warning the Corps had about the uncertainty of the outfall canals system, and given the Corps' mandate to consider *all* effects-- including cumulative effects-- of any action taken on the Canals, the Corps clearly failed in its non-discretionary duties to dredging. This action ignored completely the general needs and welfare of the people the Corps was charged to protect.

Finally, 33 C.F.R. §320.4(a)(1) ends, importantly, with the caveat that "[n]o permit will be granted unless its issuance is found to be in the public interest." Whenever there is evidence that minimum safety standards are *not* met, a permit is necessarily against the public interest, and issuance of one is not allowed. Plaintiffs can prove minimum safety standards were <u>never</u> met. As such, the Corps did not have the discretion to issue the permit to dredge the 17th Street Canal. Its

issuance of the permit endangered the public. Unprotected by the discretionary function exception,

lacking this discretion, the Corps cannot claim immunity under the discretionary function exception.

a)    **The Corps' lack of professional engineering competence is not protected by the FTCA.**

The discretionary function doctrine "has traditionally been narrowly construed by the courts."

*Collins v. United States*, 783 F. 2d 1225, 1231 (5th Cir. 1986). Originally, the Supreme Court tied

a discretionary function to the level within an administrative hierarchy at which a decision is made.

For example, in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), a tugboat operator sued the

United States, claiming that a shipping accident was caused by an out-of-commission lighthouse

negligently maintained by the United States Coast Guard. The Supreme Court concluded that "[t]he

question is one of liability for negligence at what this Court has characterized the 'operational level'

of governmental activity." *Id.* at 64.

Later, the Supreme Court shifted away from the "level of the decision-making" doctrine to

focus on the nature of the discretion exercised. *See Berkovitz v. United States*, 486 U.S. 531 (1988).

As the Supreme Court held in *Varig Airlines*, 467 U.S. 797 (1984), "it is the nature of the conduct,

*rather than the status of the actor*, that governs whether the discretionary function exemption applies

in a given case." *Id.* at 813 (emphasis added). In *Berkovitz*, *Varig*, and *Gaubert*, 499 U.S. 315, the

Supreme Court refined the methodology used to assess the "nature of the conduct," holding that only

governmental policy decisions based on economic, political, or social factors fall within the

discretionary function exemption. *See Gaubert*, 499 U.S. at 322-23.

Under any formulation of the discretionary function test, the allegations in the *Complaint*

negate any immunity. Plaintiffs seek recovery for the Corps' operational-level[55] execution of

---

[55] As stated in the Complaint, the *Operations* Division of the Army Corps is responsible for the issuance of permits to dredge navigable waterways. *See, Complaint* at ¶¶26-27.

Congressional directives that called upon the Corps to prudently exercise scientific and engineering judgments based on professional standards. Such judgments do not implicate social, political or economic issues, and they fall far outside the protected immunity sphere of the discretionary function exception.

The prevailing law is that "matters of scientific and professional judgment – *particularly judgments concerning safety* – are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. U.S.*, 400 F. 3d 1177, 1181 (9th Cir. 2005)(emphasis added). *See also, Fisher Bros. Sales, Inc. v. U.S.*; 46 F. 3d 279, 290 (3rd Cir. 1995) ("[j]udgment guided purely by scientific or other objective principles does not involve discretion for purposes of the discretionary function exception"); *Cope v. Scott*, 45 F. 3d 445, 452 (D.C. Cir. 1995) ("The 'engineering judgment' the government relies on is no more a matter of policy than were the 'objective scientific principles' that the [Supreme Court in *Berkovitz v. United States*, 486 U.S. 531 (1988)] distinguished from exempt exercises of policy judgment"); *Ayala v. U.S.*, 980 F. 2d 1342, 1349-1350 (10th Cir. 1992) ("We fail to see how the determination in this case can be labeled a policy decision. The choice was governed, as plaintiffs contend, by 'objective principles of electrical engineering"); *Moyer v. Martin Marietta Corp.*, 481 F. 2d 585, 598 (5th Cir. 1973) (finding no discretionary immunity for negligent design and construction decisions).

The Fifth Circuit has reached the same conclusion, holding the United States liable for damages caused by the negligent design or construction of a canal or waterway. In *Seaboard Coast Line Railroad Co. v. United States*, 473 F. 2d 714 (5th Cir. 1973), the plaintiff's train and railroad tracks were damaged in a derailment caused by flooding from a drainage ditch on a nearby military base. The District Court found that "the actions of the government *in designing the drainage system* were negligent" and that *"the floods resulting therefrom* constituted an actionable trespass and a

nuisance." 473 F. 2d at 715 (emphasis added). Echoing the Supreme    Court in *Indian Towing Co.*,[56] the Fifth Circuit affirmed the district court's decision:

> Once the government decided to build a drainage ditch, it was no longer exercising a discretionary policy-making function and it was required to perform *the operational function of building the drainage ditch* in a non-negligent manner.

*Id.* at 716 (emphasis added). *See also, Alabama Electric Cooperative, Inc. v. United States*, 769 F. 2d 1523, 1531 (11th Cir. 1985)( ["T]he Corps' engineers must be held to the same professional standards of reasonableness and due care that a private engineer faces when he plies his trade"); *O'Toole v. United States*, 295 F. 3d 1029, 1036 (9th Cir. 2002) ("We hold that an agency's decision to forego, for fiscal reasons, the routine maintenance of its property – maintenance that would be expected of any other landowner – is not the kind of policy decision that the discretionary function exception protects"); *United States v. Hunsucker,* 314 F. 2d 98, 105 (9th Cir. 1962) (United States is not immunized from liability for "its failure to take reasonable precautions to prevent [flood] damage to appellee's land" from a drainage ditch).

These cases support Plaintiffs' claims against the Corps for liability predicated on the negligent exercise of scientific and engineering judgment. Once the Corps was charged with

---

[56] The Supreme Court held in *Indian Towing* that the discretionary function exception does *not* apply to maintenance and operation of a federal facility:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . . and engendered reliance on the guidance afforded by the light, it was *obligated to use due care to make certain that the light was kept in good working order*; and, if the light did become extinguished, then the Coast Guard was *further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning*. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*Indian Towing,* 350 U.S. at 69 (emphasis added).

permitting dredging in the Canals, it was required to do so in a non-negligent manner, in accord with the public interest and minimum standards of safety. [57]

### b)   The Corps' cited case law is inapposite.

The Corps offers several cases in support of its argument that the discretionary function exception protects permitting decisions. *See,* Doc. No 6380-3 at p. 13.  However, these cases are distinguishable from the instant matter.

For instance, *Varig Airlines*, 474 U.S. 797 (1984), involved a government safety inspection program, wherein aircraft manufactured by private companies were "spot-checked" for their compliance with minimum safety standards before the issuance of a commercial aircraft license. In this "failure to inspect case", the Government argued that spot-checking of some planes but not others was a reasonable way to enforce safety standards. The Court agreed with the Government that its role in the inspection process was merely to police private actors engaged in commercial conduct to force compliance with minimum safety standards. *See Id.* at 815-16 ("When an agency determines the extent to which it will supervise safety procedures of private individuals, it is exercising discretionary regulatory authority. . .[the exception] plainly was intended to encompass the discretionary acts of the government acting in its role as regulator of the conduct of private individuals.") These facts stand in sharp contrast to the instant case. Unlike *Varig*, plaintiffs here are suing not over the *means* of the enforcement of minimum safety standards, but rather *whether any minimum safety standards were enforced at all*. Even if the Corps' decision to issue a permit is held to be discretionary, the Corps may not negligently issue a permit that allows dredging to be done in violation of safety standards.  Further, while the *means* of enforcing standards are

---

[57] "The Supreme Court has observed that Congress, in adopting the FTCA, sought to prevent the unfairness of allowing 'the public as a whole' to benefit 'from the services performed by Government employees,' while allocating 'the entire burden' of government employee negligence to the individual, 'leav[ing] him destitute or grievously harmed.'" *O'Toole v. U.S.*, 295 F.3d 1029 (9th Cir. 2002)(quoting *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957)).

discretionary, decisions as to *whether* to enforce them are *not*.  As outlined above, Plaintiffs have evidence that the Corps blatantly disregarded its own minimum standards of safety when it permitted dredging of the 17th Street Canal, making *Varig* distinguishable from this case.

Other cases cited by the United States are also inapposite. *Lindsay v. United States*, 778 F.2d 1143 (5th Cir. 1985), involves a suit over the denial of a patent. *United States v. Morrell*, 331 F.2d 498 (5th Cir. 1964), is a case where the Government was essentially sued for issuing a permit which allowed the trespass of cattle and related economic injury. Unlike the instant case, neither *Morrell* nor *Lindsay* involved the public safety, nor the welfare of thousands, nor any minimum safety standards.  It goes without saying that the Corps has an obligation to protect the lives of masses of people greater than that to protect the economic interests of a single individual's pocketbook.

Finally, in *Reed ex rel. Allen v. U.S. Dept. of Interior*, 231 F.3d 501 (9th Cir. 2000), a case dealing with permitting of an outdoor festival by the Bureau of Land Management, the Court held that the BLM was not negligent because "the permitting statute did not mandate any particular act which the government failed to perform." *Id.* at 507. However, the court also noted that in certain other cases the exception would fail– and the United States would be held liable for its negligence– where "allegations of isolated instances of negligence that were not policy-based" could be proven. *Id.* (referencing *Faber v. United States*, 56 F.3d 1192 (9th Cir. 1995) and *Routh v. United States*, 941 F.2d 853 (9th Cir. 1991)). The issuance of the permit to dredge the 17th Street Canal was a similar incident of negligence that was not policy based, as minimum safety standards were violated.[58]

---

[58] The United States cites *Boston Edison Co. v. Great Lakes Dredge & Dock Co.*, 423 F.2d 891, 896-7 (1st Cir. 1970) and *Lynch v. U.S. Dept. of Army Corps of Eng'rs*, 474 F.Supp. 545, 551 (D.Md.), *aff'd*, 601 F.2d 581 (4th Cir. 1979), for the proposition that other courts have held the granting of dredging permits in particular to be protected as discretionary functions. *Boston Edison Co.* dealt with liability of the United States for a government contractor who damaged plaintiffs' power cables when working under a Government permit. *Boston Edison Co.*, 423 F.2d at 891. *Lynch* involved the permitting process for building a dock or bulkhead and the court held "it was for the Corps to determine whether and when plaintiff was required to secure a permit for the dredging and filling work in question." *Lynch*, 474 F.Supp. at 551. In the instant case, it is undisputed by both sides that a permit was required in order to dredge.

The United States also cites to several other cases involving dredging permits and operations where

55

###### 2.      The Due Care Exception Does Not Apply.

According to the United States, "even if the discretionary function exception did not apply, Count I [legal fault in the dredging of the 17th Street Canal] would be subject to dismissal for failing to state a claim, because it is premised on violations of federal rather than state law." *Motion* at 14. The United States seemingly contends that Plaintiffs' *Complaint* is an *implied* attack on the regulations authorizing issuance of dredging permits on the 17th Street Canal. The United States argues that any issuance of permits is discretionary in nature, pursuant to 33 C.F.R. § 320.4(a)(1), and thus any attack on the nature and quality of their implementation is barred under the "due care" exception to the FTCA.   See 28 U.S.C. § 1346(b)(1).[59]   Because the challenged conduct is discretionary in nature, according to the United States, any issuance of a dredging permit is protected under the due care exception, even if that discretion was abused. *Motion* at 10, 14.

The United States' argument fails for several reasons.  First, nowhere do Plaintiffs question the validity of a federal statute or regulation; rather Plaintiffs complain only about the Corps' negligent implementation of relevant mandatory regulations. Second, the United States incorrectly assumes that the issuance of a permit to dredge the 17th Street Canal was completely discretionary in nature.  Third, under 28 U.S.C. § 1346(b)(1), the United States is liable for its negligent role in the dredging of the 17th Street Canal.

---

FTCA immunity was found to apply.  However, these cases are also distinguishable from Plaintiffs' case, as the  cases cited involve suits brought against the United States for its failure to warn of a certain danger or obstruction or to ensure safe passage. *See, e.g., Dunaway v. United States*, 136 F.Supp.2d 576 (E.D. La. 1999); *Johnson v. United States*, 2000 WL 1528078 (E.D.La. 2000); *Liner v. Draco Basic Materials, Co.*, 162 F.Supp.2d 499 (E.D.La. 2001);

[59] 28 USC § 2680, entitled "Exceptions to the Federal Tort Claims Act," states:

"The provisions of this chapter and section 1346(b) of this title shall not apply to-- (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"  28 USC § 2680(a)(emphasis added).

The "due care" exception to governmental liability under the FTCA arises from the first sentence of 28 U.S.C. § 2680(a), exempting the federal government from liability for any claim "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid. " As the United States recognizes, the exception exists to prevent a plaintiff from challenging the validity of a statute under the guise of a tort action. *See Gaubert*, 499 U.S. 315 at 337 (Scalia, J. dissenting) ("We have taken this to mean that regulations '[can]not be attacked by claimants under the Act'."); *Dalehite v. United States*, 346 U.S. 15, 42 (1953) ("The immunity of a decision as to labeling, in fact, is quite clearly shown by the fact that the ICC's regulations, for instance, could not be attacked by claimants under the Act by virtue of the first phrase of section 2680(a)"). Section 2680(a) presumes adherence to statutory mandates, and an agency's refusal to comply with a federal statute establishes a *prima facie* example of a lack of "due care" under the FTCA. *See, e.g., U.S. v. Second Nat'l Bank of N. Miami*, 502 F. 2d 535, 549 (1974) ("The words 'due care' point to the issue of whether a party's conduct complies with or violates a duty owed to another . . .") Here, Plaintiffs have alleged the Corps failed to comply with federal statutes and regulations, and they have provided this Court with further evidence of the Corps' non-compliance with statutory requirements. Plaintiffs therefore have alleged the Corps' lack of "due care."

Simply put, Plaintiffs' negligence claims are predicated on the Corps' incompetence and ignorance of statutory regulations during the permitting process for the dredging of the 17th Street Canal.[60] After issuance of the permit, the Corps further compounded its negligence by the unauthorized construction of I-Walls on top of an already compromised levee system, whose perilous situation was a direct result of the Corps' involvement several years earlier. Plaintiffs will present

---

[60]     *See, Complaint*, ¶¶196-205.

57

evidence that--but for the Corps' issuance of the dredging permit--the dredging would never had occurred, nor would the breaches that caused Plaintiffs' injuries. In *Buchanan v. U.S.*, 915 F. 2d 969, 970-71 (5th Cir. 1990), the Fifth Circuit noted that "[t]he first clause, exempting actions mandated by statute or regulation, *applies only if the actor has exercised due care.*" (emphasis added)). Because Plaintiffs have adequately alleged the Army Corps' negligence and lack of "due care" in fulfilling and/or ignoring what congressionally authorized minimum standards existed--all the while taking later unauthorized actions which exacerbated their previous negligence--the "due care" exception is inapplicable.

The United States ends its *Motion* with the argument that Count I must be dismissed "inasmuch as the Corps is vested with exclusive authority to permit dredging . . . there cannot be a private analog for the challenged conduct." *Motion* at 14. Pursuant to the Louisiana Coastal Wetlands Conservation and Restoration Act, La. R.S. 49:214.21, *et seq.* (1987 & Supp. 1991), the Corps is not the exclusive permitting authority in Louisiana. *See* La. R.S. 49:214.30. Furthermore, state judicial review of claims brought by those adversely affected by permitting decisions is allowed, not only under the Coastal Restoration Act, *See* La. R.S. 49:214.30(D), but also pursuant to the Louisiana Administrative Procedures Act, La. R.S. 49:64(A). *See generally*, La. R.S. 49:214.32-39; *see also U.S. v. Land, 62.50 Acres of Land More or Less, Situated in Jefferson Parish, State of La.*, 953 F.2d 886 (5th Cir. 1992); *Oakville Community Action Group v. Plaquemines Parish Council*, 942 So.2d 1152 (La.App. 4 Cir. 9/27/06); *Pardue v. Stephens*, 558 So.2d 1149 (La.App. 1 Cir.1989).

Finally, the Corps' argument that Plaintiffs' negligent dredging claims derive from federal and not state law is absurd. Plaintiffs allege that the Corps acted negligently—in violation of its own standards and express Congressional mandates—when it issued a permit for dredging the 17th Street

Canal. Article 2315 of the Louisiana Civil Code provides that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. Louisiana jurisprudence has expressly extended this statute to permit claims against government agencies and entities whose violations of their own duties and regulations cause damage to others. *See, e.g., Gregor v. Argenot Cent. Ins. Co.*, 851 So.2d 959, 967-968 (La. 2003)(failure by the Department of Health and Hospitals to adequately warn of the dangers of eating shellfish); *Fowler v. Roberts*, 556 So.2d 1, 18 (La. 1990)(issuance of a drivers license to an individual afflicted with multiple sclerosis); *Bozeman v. Reed*, 633 So.2d 944 (La.App. 1st Cir. 1994). This state law claim—and not any statute or provision of federal law—grounds Plaintiffs' claims. The Corps' argument to the contrary is unavailing.

Finally, the instant case is similar to that in *American Exchange Bank of Madison, Wis. v. United States*, 257 F.2d 938 (7th Cir. 1958), wherein the Court stated:

> Undoubtedly there was an exercise of discretion in deciding whether and where a post office building should be located in Madison, Wisconsin, but whether a handrail should be installed as a safety measure on wide stone steps involves action at the operational level and would seem to involve no more discretion than fixing a sidewalk on post office grounds that might be in need of repair.

*Id.* at 941. Even if there was an exercise of discretion in deciding whether to permit the dredging activity in the 17th Street Canal, whether to issue the permit in accordance with minimum safety standards involves no discretion whatsoever.

Notwithstanding the United States' attempts to recast the Plaintiffs' claims, the Corps is not immune from its negligent failure to comply with federal law or its defective exercise of engineering judgment. The Court should therefore reject the United States' immunity, due care, and discretionary function exception arguments.

IV.     **THE MR-GO CLAIMS HEREIN DO NOT VIOLATE CASE
        MANAGEMENT ORDER NO. 4.**

In a final attempt to avoid Plaintiffs' claims, the United States argues that Case Management Order

No. 4 precludes the bringing of MR-GO claims under this docket.  Again, that argument only works

if its underlying premise is taken out of context.

When the Court authored Case Management Order No. 4, it partitioned off those MR-GO claims

related to "the Upper and Lower Ninth Ward, New Orleans East and St. Bernard Parish." *Id.* at p.

3. Subsequent investigation has shown that flooding in portions of Orleans Parish <u>outside</u> the Ninth

Ward and New Orleans East derived from the construction and operation of the MR-GO Case

Management Order No. 4 does not place these claims in the MR-GO category, because the

geographic area of the damage falls outside that delineated in that category.  Therefore, the claims

must be brought herein, and should not be stricken.

## CONCLUSION

For the foregoing reasons, Plaintiffs move this Court to deny the *Motion to Dismiss* brought

by the United States.

Dated:   July 23, 2007

                        **Respectfully Submitted,**

                        **APPROVED PLAINTIFFS LIAISON COUNSEL**

                        s/ Joseph M. Bruno
                        JOSEPH M. BRUNO (La. Bar # 3604)
                        PLAINTIFFS LIAISON COUNSEL
                        The Law Offices of Joseph M. Bruno, APLC
                        855 Baronne Street
                        New Orleans, Louisiana 70113
                        Telephone: (504) 525-1335
                        Facsimile: (504) 561-6775
                        Email: jbruno@jbrunolaw.com

                        **LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

                        s/Gerald E. Meunier
                        GERALD E. MEUNIER (La. Bar #9471)
                        LEVEE PSLC LIAISON COUNSEL
                        Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
                        2800 Energy Centre
                        1100 Poydras Street
                        New Orleans, Louisiana 70163-2800
                        Phone:504/522-2304
                        Facsimile:504/528-9973
                        E-mail:gmeunier@gainsben.com

                        For

                        **LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

                        Gerald E. Meunier
                        Daniel E. Becnel, Jr.
                        Joseph M. Bruno
                        D. Blayne Honeycutt
                        Hugh P. Lambert
                        Darlene Jacobs
                        Walter Dumas

## CERTIFICATE OF SERVICE

I do hereby certify that on this 23rd day of July, 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.  I also certify that I have mailed the foregoing by United States Postal Services, First Class, to all non-CM/ECF participants.

s/ Joseph M. Bruno_____
JOSEPH M. BRUNO
