

**FIG 20: Factor of Safety (FS) for west breach site as function of water level (ILIT 2006).**

Three detailed forensic studies have been conducted to determine the engineering mechanics responsible for the failure of the east side of the SSC levee and floodwall. All of these studies arrived at the same general conclusions: the levee and floodwall failed prematurely at a water elevation of between 7 and 8 feet. The FPSs were originally designed to have total lateral loading factors of safety greater than unity for a water elevation of +14.5 feet.

The forensic studies indicate that the water filled gap cut-the-levee in half behavior was critical in this development. This behavior was not anticipated in the design analyses. The analyses performed by the USACE IPET team indicated a failure mode involving the deeper lascustrine clays. The ILIT team indicated a failure mode involving the shallower marsh intermixed zone that contained the very weak and sensitive organic silty clay layer that was missed in the IPET soil characterizations. In addition, the ILIT analyses included explicit analyses of the seepage – water pressure effects developed in the marsh – transition zones

that overlay the deeper lacustrine and beach deposits. Team Louisiana's analyses confirmed these findings.

One of the potentially important issues that was not addressed in detail by the three studies were the subterranean water flow and pressure effects associated with the underlying marsh and transition zone layers overlying the lacustrine clay and beach sand layers found at this site. The USACE IPET studies associated with the centrifuge model testing (Appendix 5 of IPET 2007 report) did specifically address such conditions. However, these studies were based on soil characterizations in which the tips of the sheet piling penetrated into the lacustrine clay layer effectively cutting off water flow and pressure effects.

In contrast, the ILIT studies were based on soil characterizations in which the tips of the sheet piling did not penetrate into the lacustrine clay layer, but rather penetrated into an overlying intermixing zone that could allow water migration and pressure effects. Water pressure and migration effects were specifically included in the ILIT analyses (Figs. 17,18,20).

This very important difference was based on the very detailed soil characterization field work, geologic studies, and historic mapping studies conducted during the ILIT study (e.g. Figs. 13 and 17, ILIT 2006). Observations made in the field during the ILIT soil borings performed in this area (Figs. 21, 22) showed that the buried marsh and transition zone sediments (swamp deposits) had very high horizontal water conductivity (permeability). The observations indicated that the horizontal conductivity was very much higher than the vertical conductivity due to the structure of the organic – marsh materials (Fig. 20).



**FIG. 21: Observed water transmission – hydraulic conductivity during soil borings performed at the SSC breach site (Rogers 2006).**



**FIG. 22: Horizontal water conductivity much higher than vertical conductivity due to structure of highly organic (peat, marsh) layers (Rogers 2006).**

These observations were corroborated with reports and photographs provided by home owners on the east side of the SSC (Fig. 23). The home owners reported that there were persistent wet spots that would not support normal vegetation (potentially due to the salinity of the brackish water from Lake Pontachatrain). Similar conditions would not be

26

expected on the west side due to the paved road, deeper sheet piling, and buttressed levee immediately adjacent to the toe of the west side levee.



**FIG. 23: Photographs of persistent wet spots in yards of homes adjacent to breach site prior to hurricane Katrina (IPET 2007).**

During the ILIT studies, it was not possible to perform in situ tests to determine the hydraulic conductivity characteristics of the buried marsh – transition layers. In the initial set of results, a horizontal hydraulic conductivity (permeability coefficient, K) of 0.0028 feet per day ($10^{-2}$ centimeters per second, cm/s) was used. A value 10 times less was used for the vertical permeability. These results were based on published results for intrinsic – insitu horizontal permeabilities for soils (Fig. 24) and on results from recent very high quality laboratory and field measurements performed on peat – marsh deposits similar to those found at the SSC (e.g. Fig. 25).

It is important to note that there are potentially very important differences between permeability coefficients determined from conventional laboratory tests and those that are actually present in the field.  There can be similarly important differences between improperly performed field tests and the actual in situ characteristics.

| $K$ (cm/s) | $10^2$ | $10^1$ | $10^0=1$ | $10^{-1}$ | $10^{-2}$ | $10^{-3}$ | $10^{-4}$ | $10^{-5}$ | $10^{-6}$ | $10^{-7}$ | $10^{-8}$ | $10^{-9}$ | $10^{-10}$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $K$ (ft/day) | $10^5$ | 10,000 | 1,000 | 100 | 10 | 1 | 0.1 | 0.01 | 0.001 | 0.0001 | $10^{-5}$ | $10^{-6}$ | $10^{-7}$ |
| Relative Permeability | Pervious | | | | | Semi-Pervious | | | | Impervious | | | |
| Aquifer | Good | | | | | Poor | | | | None | | | |
| Unconsolidated Sand & Gravel | Well Sorted Gravel | | Well Sorted Sand or Sand & Gravel | | | Very Fine Sand, Silt, Loess, Loam | | | | | | | |
| Unconsolidated Clay & Organic | | | | | | Peat | | Layered Clay | | Fat / Unweathered Clay | | | |
| Consolidated Rocks | Highly Fractured Rocks | | | | | Oil Reservoir Rocks | | Fresh Sandstone | | Fresh Limestone, Dolomite | | Fresh Granite | |

**Fig. 24: Ranges of intrinsic horizontal permeability values of natural materials (Bear, 1972).**

It is important to note that peat and layered clay (marsh deposits) have in situ horizontal permeabilities that are comparable with sands and silts. Recently the USACE furnished a summary report on this topic ("Inner Harbor Navigation Canal Seepage Analysis," June 26, 2007) stated: "*The permeability values for the marsh materials used by NSF-Berkeley in their seepage analyses* ($10^{-2}$ cm/sec) *were at least 1,000 times too high. Their values are higher than the permeability values for the sand layer at the London Avenue Canal determined from field pump tests…..There is no possible or plausible explanation for NSF-Berkeley's choice of permeability values for the marsh material.*" Hopefully, the information presented here will provide background and information to help reform USACE thinking regarding the

28

issues associated with the hydraulic conductivity of the swamp deposits that underlie the

majority of the greater New Orleans area.



**Fig. 25: Horizontal permeability values (Kh) and ratio of horizontal to vertical permeability values (Kh/Kv) (Beckwith, Baird, Heathwaite, 2002).**

Recently, this same issue developed in evaluations of levee vulnerability in the

Sacramento Delta area. This area has geologic depositional and geotechnical characteristics

that are very similar to those of the Mississippi River Delta area. In this very extensive study

or more than 200 failures of levees during flood stages it was concluded: "*The Vulnerability

team believes 80 percent of the past failures (levees) can be attributed to seepage-induced

failures. The team also believes that both through and under seepage-induced failures

occurred in equal numbers. The remaining 20% of past failures can be attributed to

overtopping*" (California Department of Water Resources, Levee Fragility / Levee

29

Vulnerability Report 2007). In their analytical studies of levee vulnerabilities horizontal permeabilities in the range of $10^{-3}$ to $10^{-4}$ cm/sec were used for the organic peat and marsh layers. This same recognition of the importance of through and under levee seepage on levee stability and reliability has been developed in the Netherlands where again geologic deposition and geotechnical conditions are very similar for many of their levees (S. Van Baars, "Peat Dike Failure in the Netherlands," European Water Management, 2004).

Concerns for under seepage of levees in the greater New Orleans historically have been focused on the underlying beach sand deposits. This concern surfaced several times during the deliberations that developed as a result of the SSC dredging permit applications. Initial considerations of the implications of the effects of the proposed dredging indicated factors of safety that were substantially less than unity in several locations along the SSC (Modjeski and Masters, January 28, 1981). Additional studies highlighted concerns for excess "*hydrostatic pressures…. and the potential for blow-outs during high water in the canal*" (Eustis Engineering Co., 23 August 1982). Considerations for under seepage led to suggested preventative measures including seepage cutoff (driving sheet piling to depths of 65 feet), employing relief wells (reduce and dissipate hydrostatic pressures), dry bottom seal for the canal (concrete liner, impervious blanket), and underwater seal (concrete and membrane liners) (Eustis Engineering Co., 23 August 1982).

In response to these concerns, a 'piezometer' test involving test section dredging to deepen the SSC was run on the Jefferson parish west side of the SSC (Modjeski and Masters, January 17, 1984). Based on these very limited test results, it was concluded that there would be no significant under seepage for the entire SSC. Current analyses of the test data indicate that it gave a 'false negative' (indicated no important water pressure effects when there

would be important water pressure effects at high water conditions through the additional exposure of the highly permeable soils). The test was unable to detect the seepage – pressure change effects associated with deepening the SSC because the seepage – saturation – pressuring of the soils already had taken and was taking place during the testing (ILIT 2006). Concerns for seepage was focused on the underlying sand layer, not on the highly permeable overlying marsh and intermixing zones. This conclusion has been validated by recent analyses performed as part of development of this Declaration.

　　　Based on all available information on the geologic and geotechnical characteristics of the SSC east side FPS, transient flow analyses were performed (Fig. 26).



**Fig. 26: Transient flow analyses model geometry**

　　　The water elevation versus time characteristics provided in the USACE IPET investigation (Fig. 3) was utilized in these analyses. These analyses incorporated a very wide range in horizontal permeabilities ($10^{-2}$ to $10^{-6}$ cm / sec) of the marsh – intermixing zone soils that connect the bottom of the SSC with the protected landside (Figs. 11, 26). The transient flow analyses indicated that even for the very lowest horizontal permeability, there was almost direct water pressure communication under and through the levee trough the marsh –

31

intermixing zone soils (Fig. 27). As the water level in the canal increased there were essentially immediate increases in the water pressures in the marsh –intermixing zone soils. The transient pore pressure analyses indicated that in excess of 95% of the steady-state pressures for a water level of +7 feet were generated by 6 AM on August 29, 2005.



**FIG. 27: Pore water pressure development along bottom of marsh deposit (horizontal permeability of 10-6 cm/s).**

Fig. 28 shows the variation of pore pressure along the bottom of the marsh – intermixing zone layers that underlie the east breach site for a SSC water level of +6 feet. The pore pressures along the bottom of the marsh – intermixing zone layers vary less than 5% when the in situ horizontal hydraulic conductivity (Kh) decreases from $10^{-2}$ to $10^{-6}$ cm / sec. The insensitivity of the pore pressures to the hydraulic conductivity is due to the saturated conditions of the layers – the layers are able to quickly communicate the pressures from the rising water in the SSC. There is virtually no obstacle in pressure development

underneath the levee toward the landside toe. The sheet piling were not driven deep enough to form an effective barrier to the seepage – water pressure development. Most important, the results indicate that the hydraulic pressures are sufficient at the toe of the levee dramatically exceed the overburden pressures from the soils and hence indicate a very high probability of levee toe 'blow-out'. It is clearly apparent for a very wide range in plausible in situ horizontal permeabilities that the marsh – intermixing zone water conductivity is a key player in the hydraulic behavior and stability of the east side SSC FPS.



**FIG. 28: Pore water pressures along bottom of marsh – transition zone layers for SSC water level elevation of + 6 feet**

A similar observation was developed during the IPET (2007) centrifuge studies: "As water levels in the canal rise, the pore water pressure in the clay layer also rise due to the

increase in total stress (the weight of the water in the canal) and not due to seepage" (*Appendix 5, IPET Centrifuge Model Test Report*, 2007).

Transient and steady-state pore pressure development analyses were also performed for the 'blown-over tree root-ball' at the toe of the levee condition (15 feet diameter, 5 foot thick modeled in 3 stages of development). To model this condition, elements were removed from the finite elements and new boundary conditions assigned to the appropriate nodes. The results for the entire range of permeabilities showed increasing hydraulic gradients as the hole got deeper and wider and as the storm surge increased in elevation. For a surge elevation of +6 feet, vertical hydraulic gradients larger than unity were found in the marsh deposit and in the underlying intermixing deposit in the vicinity of the toe of the levee and root-ball removal zone (Fig. 29). Such vertical hydraulic gradients would have led to additional softening and/or erosion of the marsh – intermixing zone soils leading to a 'blow-out' at this location. These analyses corroborated the observations made in the field during and after the failure concerning the high likelihood that the overblown trees played instrumental roles in triggering the failure and in defining the location of initiation of the failure of the east side SSC FPS. It is of more than passing interest to note that similar observations also were made at both locations of the north and south breaches on the London canal. ILIT analyses of the London south breach indicated that the overblown tree rootballs played important roles in development of the failure (ILIT 2006).



**FIG: 29: Tree removal simulation (final stage) vertical hydraulic gradients for surge at +6 feet**

The finite element analytical models show vertical hydraulic gradients that exceed unity (upward pressures exceed downward pressures) in the immediate vicinity of the toe of the protected side levee (Fig. 30). Interestingly, they are the highest for the in situ horizontal permeabilities for the marsh and intermixing zone in the range of $10^{-6}$ cm/s. The marsh and intermixing zone become an effective 'blanket' that acts to develop very high pore water pressure gradients leading to uplift  and vertical gradients that could cause uplift or blowout failures. The combination of the geometric, hydro-geologic, geotechnical and mechanical aspects of the SSC east side FPS combine to generate a very important weak zone that very likely led to the initiation of the failure that developed into the catastrophic SSC east side breach.

35



**FIG 30: Range of vertical hydraulic gradients along the bottom of the marsh - intermixing zone for permeabilities in range of 10-2 to 10-6 cm/s**

Concerns for stability effects on the SSC FPSs as a result of the proposed dredging have been pervasive during its recent history (1980s to 1990s). These concerns were focused in the low strength soils along the SSC, the likelihoods for important subterranean hydraulic effects (through and under seepage), and 'factors of safety' (FS) specified for the components (levee, sheet piling, floodwalls) that comprised the FPS (e.g. minimum FS for levee lateral stability in short-term Standard Project Hurricane loading conditions of 1.2 to 1.3).

Early considerations of the levee stability in the area of the east side breach indicated factors of safety which were less than unity (Modjeski and Masters, January 28, 1981). These concerns were clearly recognized by the USACE in their Combined Phase I Type General

36

Design Memorandum and Revised Environmental Impact Statement Plan of Study (USACE, September 1981): *"There is an unresolved issue with regards to the three main outfall canals in New Orleans which empty into Lake Pontchartrain along the reach known as the New Orleans Lakefront. Return levees flank these gravity drainage canals for a considerable distance inland from the lake, tying into lift pump stations at the head of the canals. Since the time of project authorization, it has been determined that the return levees are inadequate in terms of both grade and stability."*

Considerations of I-wall sheet pile – levee supported structures indicated potentially unacceptable deflections which indicated the necessity to use a much more expensive T-wall which would reduce the potential deflections (USACE letter to Modjeski and Masters September 7, 1983). Full-scale loading tests were run in the mid-1980s to demonstrate that the less expensive sheet pile supported I-walls could be designed to be acceptable (USACE *E-99 Sheet Pile Wall Field Load Test Report*, June 1988). Unfortunately, perhaps because of the focus on justifying the cost-savings associated with shorter sheet piles, much of the valuable information contained in this test was not recognized nor used by the design engineers. The critical 'tension side sheet pile – soil gapping' effects (dramatically increasing lateral water loadings and decreasing lateral soil – sheet pile resistance) was recognized by the USACE researchers yet was not incorporated into the USACE engineering guidelines being used to design all of the I-walls incorporated into the flood protection system for the greater New Orleans area (and for other parts of the U.S.) (Kardon, Bea, and Williamson 2006; Bea 2007; American Society of Civil Engineers 2007; Woolley and Shabman 2007).

Most egregious were oversimplified assumptions and analyses concerning mechanisms of seepage and subsurface erosion. Such mechanisms have been well known for decades.

37

Seepage beneath levees is discussed in depth in the USACE Engineer Manual EM 1110-2-1913, *Design and Construction of Levees*, Chapter 5 "Seepage Control." This chapter begins as follows: "*Without control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself. Under seepage problems are most acute where a pervious substratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of a levee.*" Inappropriate evaluation and analyses of the hydraulic and strength – deformation characteristics of the highly pervious organic marsh (swamp) layers underlying most of the greater New Orleans area has been a historic and pervasive 'blind spot'. Forensic engineering investigations subsequent to hurricane Katrina clearly have identified its potential effects at the SSC breach, the London Canal breaches, many of the important breaches along the Mississippi River Gulf Outlet protective structures, and at the two breaches at the Lower 9th Ward.

One of the most critical engineering involved in the USACE approval of the dredging permit regards inappropriate considerations of risks and reliability associated with flooding from hurricane surges. This factor most frequently surfaced in definition of the design 'demands' (represented by the Standard Project Hurricane, SPH, conditions and the associated guidelines to determine the loadings, forces, and associated effects) and in definition of the design 'capacities" (represented by the FPS factors of safety).   While selection of the SPH could be determined to be a 'policy decision', coupling that policy decision to the 'minimal' factors of safety and the associated demand and capacity determination guidelines resulted in probabilities of failure which were and are clearly

excessive. These probabilities of failure when coupled with the consequences associated with failure resulted in risks that were and are even more clearly excessive.

It has been contended in the report to the USACE titled *Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project* (D. Woolley and L. Shabman, 2007) that: *"At that time, formal engineering reliability evaluation methods were not highly developed by the engineering community outside of a few areas such as nuclear power plant safety. Nonetheless, the concept of engineering reliability would not have been unfamiliar to project engineers and designers, and the nascent state of formal evaluation methods at the time that the project decisions were made can not fully explain the absence in the project record of engineering reliability questions and considerations."*

This statement particularly struck the author because starting in the early 1960s he was working 'just down the street' from the New Orleans District of the USACE. The majority of the author's work and those of many of his company and industry engineering colleagues was focused on implementation of advanced risk and reliability technology to design, construction, operation, and maintenance of offshore platforms and pipelines (and some on-shore facilities associated with refineries). As early as the late 1960s, advanced methods were developed, verified with field data, published in journals and contained in industry engineering guidelines. In this time period, these guidelines were being applied by industry to determine both Gulf of Mexico hurricane design 'demand' conditions and associated forces and platform – pipeline 'capacity' characteristics. These guidelines included the associated design and requalification factors of safety for both elements and systems (assemblies of elements). This work has continued world-wide to the present time in a wide variety of different industries. Currently, Risk Assessment & Management (RAM)

technology is able to address the human, organizational, and institutional factors that have proven to be of critical importance in the quality and reliability of engineered systems (Bea 2000, 2006). During the past two decades, the RAM technology has been validated and applied in a wide variety of industries and government agencies (e.g. commercial and military aviation; oil, gas, and chemical production, transportation and refining; health and emergency care; law enforcement, firefighting, environmental protection). Starting principally in the 1990s, the USACE developed and implemented very significant parts of this technology in its dam safety program and the related water resource planning activities (e.g. *Guidelines for Risk and Uncertainty Analysis in Water Resource Planning, Vol. I and II*, USACE Institute for Water Resources, IWR Report 92-R-1 and IWR Report 92-R-2; Engineering and Design Risk-Based Analysis for Flood Damage Reduction Studies, USACE, EM 1110-2-1619, August 1996). The reliability and risk based developments were applied by the USACE to a wide variety of geotechnical engineering studies including evaluations of levees (e.g. Risk-Based Analysis in Geotechnical Engineering For Support of Planning Studies, USACE ETL 1110-2-556, May 1999). So, the proven technology in very closely associated engineering domains (e.g. Gulf of Mexico oil and gas, offshore and coastal engineering, USACE dam safety, water resources planning, flood damage reduction, and geotechnical engineering) did exist and could have been utilized by the USACE in helping reach more rational decisions regarding trade-offs, flood protection, and the interests of the public associated with permitting the dredging of the SSC.

If this existing technology were properly utilized, it would have become very apparent to the design engineers and the associated organizations and institutions that the combination of demand and capacity factors being utilized in development of the flood

protection system for the greater New Orleans area and the SSC FPS were developing flood

risks which were clearly excessive and unacceptable.   For example, given the currently

available information on the engineering guidelines and methods used for the SSC FPS and

the associated permitted dredging, application of this extensive and proven technology would

indicate annual probabilities of failure (breaching) that would be of the order of 1/50 to 1/100

per year (Fig. 31) (ASCE 2007, ILIT 2006).



**FIG 31: U.S. historic actuarial annual probabilities of failure and consequences associated with engineered systems (after Whitman 1984, Bea 1990, Christian 2004).**

Given that most public facilities in the U.S. are designed, constructed, operated, and

maintained for annual probabilities of failure (due to extreme environmental events) in the

range of 1/1,000 to 1/10,000 per year (and less) (*ASCE Standard Minimum Design Loads for*

*Buildings and Other Structures*, ANSI/ASCE 7-93, 7-95, and 7-05), it clear that the factors of safety (associated with the prescribed design conditions, forces, and capacities) used by the USACE in making both policy and design engineering decisions regarding flood protection systems and structures have been and are inadequate. The resulting probabilities of failure are clearly excessive. While today a FPS in the greater New Orleans area might be founded on a factor of safety of 1.3, the comparable factor of safety for an equivalent oil and production platform in the adjacent Gulf of Mexico would be in the range of 5 to 6 and more (for very important critical structures). It is important to note that these structures evacuated BEFORE hurricanes are expected to strike.

Shown in Fig. 32 are results from a reliability analysis to determine appropriate factors of safety (FS) for elements that comprise engineered systems (R. Bea, *Margins of Quality*, 2005). The FS has been based on the presumption that there are no significant 'biases' (conservative or unconservative) in the methods used to compute the element demands and capacities. The FS has been based on the presumption that the demands and capacities are lognormally distributed, the total uncertainties (annual) expressed as the variable σ (range 0.5 to 0.8), and the uncertainties in the demands are σ = 30%. Even for a probability of failure of 1/100 per year, the minimum FS is 1.5. As the probability of failure approaches the values used for both public and industrial facilities, the FS are in the range of in excess of 2 to 10. The uncertainties (natural or inherent and model or parametric) have very important effects on the required FS; greater uncertainties require greater FS.



**FIG. 32: Reliability based factors of safety as function of annual probability of failure and total uncertainties in demands and capacities (for constant uncertainty in annual maximum demands of σ=0.3).**

It is clear that engineers and decision makers alike have been utilizing factors of safety (and associated reliabilities) 'targets' that are far too low for the public flood protection facilities in the greater New Orleans area. When such systems are challenged with conditions associated with strong hurricanes like Katrina (Rita, Betsy, Camille) they should not be expected to 'survive'; they should be expected to 'fail.' And, that is what happened at the SSC FPS during hurricane Katrina.

In their review of the USACE IPET studies, the American Society of Civil Engineers reached the following conclusions (ASCE 2007): *"Unlike a major dam in the United States, the risks associated with New Orleans's hurricane protection system had never been quantified prior to hurricane Katrina. As a result, the residents of New Orleans could not have known the actual risks with which they were living. Risk quantification could have*

43

*raised awareness of planners and policy-makers so they understood that this system might have been massively under-designed relative to the standards for other critical life-safety infrastructure."* This observation concerning the risks (likelihoods and consequences associated with excessive flooding) associated with the New Orleans flood protection system indicates clear violations of the first minimal principle of civil law: *imposing risks on people if and only if it is reasonable to assume that they have consented to those risks.*

Review of the available background documentation (documentation which is still incomplete at this time) indicates that these concerns for engineering quality and reliability (and the associated public flood protection safety) were consistently 'mediated' with cost, schedule, political, and institutional considerations (D. Woolley and L. Shabman, *Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Projec*t, June 2007; *The New Orleans Hurricane Protection System: What Went Wrong and Why*, 2007; *Hurricane Katrina, A Nation Still Unprepared*, 2006; *Third Report of the National Academy of Engineering / National Research Council Committee on New Orleans Regional Hurricane Protection Project*; "Chapter 12 – Organized for Failure," *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*, July 31, 2006.). These mediations were combined with important flaws and defects in engineering and appropriate utilization of available technology. In the end, the history of mediations, compromises, decisions, and flaws and defects embedded by engineering resulted in important compromises to the quality and reliability of the SSC FPSs which became evident early the morning of 29 August 2005. The requirements to provide adequate public flood protection and not submit the public to risks that it was not reasonable to assume that they have acknowledged and consented to clearly were not satisfied. In issuing the

44

permit to dredge the SSC, the USACE guidelines of "*Public interest factors considered include, but are not limited to, …flood damage prevention, ….and the needs and welfare of the people*" (USACE Permit to Dredge, June 13, 1984) were not adequately addressed. The views of the USACE District Engineer in issuing this permit that "*The proposed dredging and canal improvements will help alleviate street flooding and minimize flood damages to residences and businesses in both Orleans and Jefferson parishes within the drainage areas of the canal totaling over 10,000 acres inhabited by over 200,000 people*" (USACE Permit to Dredge, June 13, 1984) were clearly not realized.  The lack of appropriate use of existing technology combined with 'mediating' decisions frequently focused on cost reductions and political considerations resulted in tradeoffs of the wrong things at the wrong times and places (Fig. 33). This observation was reinforced in the report by Woolley and Shabman (June 2007): "*However, the available project record does clearly show that cost considerations and policy interpretations, at both local and federal levels, played a significant role in these design decisions for the outfall canals. The same record also includes no evidence that anyone within the Corps had fully evaluated the possible joint effects of the two design decisions on the reliability protection network.*"



**FIG 33: Hurricane Protection Decision Chronology summary of findings (USACE 2006)**

**IV. CONCLUSION**

12.     I have been asked to address two key questions in this Declaration (letter to Professor Robert Bea from Mr. Joseph M. Bruno, July 16, 2007):

i. "Question 1: The original dredging permit for the 17[th] Street Canal was applied for in April 1981 (Permit originally made April 1974, USACE deemed to be abandoned. Second application August 1979; submitted December 1980 for dredging including sheet pile walls west / north of Hammond Highway; April 1981 permit for sheet pile walls along banks; May 1983 combined December 1980 and April 1981 evidenced by the General Design Memorandum No. 20); issued on June 13, 1984; and extended twice to February 20, 1987 and to June 22, 1992.[1] In your expert opinion was any factor in the dredging permit or dredging operation – including but not limited to, any change in the dredging profile from that contained in General Design Memorandum No. 20 – a factor contributing to the failure of the I-wall at the 17[th] Street Canal?"

ii. "Question 2: If you find that the dredging permit or operation contributed to the I-wall failure, do you have an opinion on whether the Corps violated either its own engineering standards or other more generally applicable engineering standards by either (a) issuing the permit or (b) permitting a modification of the permit?"

13.     It is my expert opinion that important contributors to the failure of the FPS adjacent to the east side of the SSC were developed by dredging performed for the OSWB and permitted and approved by the USACE. The dredging resulted in substantial reductions in the cross section and elevation of the east side levee of the SSNC compared with that of the west side levee thereby reducing the levee and floodwall capacities to resist flood waters.

---

[1] Amendment to question: *and extended to June 13, 1992 and June 13, 1997.*

Also, the dredging resulted in deepening the canal to elevations below the tips of the sheet piling thereby exacerbating under-levee and sheet piling seepage effects resulting in reductions in the levee and floodwall capacities to resist flood waters.

14.     It is my expert opinion that multiple factors associated with the dredging permit and dredging operations – including but not limited to, any changes in the dredging profile from that contained in General Design Memorandum No. 20 – were major contributing factors to the failure of the I-wall at the SSC. The permitted dredging resulted in decreases in the east side levee cross section that led to reductions in the capacity of the FPS. The permitted dredging resulted in decreases in the soil levee top elevation which led to early water intrusion into the tension gap that developed between the sheet piling and the supporting soils on the canal side. This development led to important and unanticipated increases in lateral water loadings and associated reductions in the soil levee capacity. Further, the permitted dredging resulted in increasing the hydraulic conductivity between the SSC and the protected side which led to further reductions in lateral capacity of the FPS.

15.     It is my expert opinion that the USACE violated its own engineering standards and other more generally applicable engineering standards by (a) issuing the permit and (b) permitting a modification of the permit. These violations primarily concerned multiple engineering decisions made and approved by the USACE that resulted in substantial reductions in the quality and reliability of the SSC FPS/s (*Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project*, Report to Institute For Water Resources of the U.S. Army Corp of Engineers, June 2007; *The New Orleans Hurricane Protection System: What Went Wrong and Why*, 2007; *Hurricane Katrina, A Nation Still Unprepared*, 2006; *Third Report of the National Academy of Engineering /*

*National Research Council Committee on New Orleans Regional Hurricane Protection Project*; "Chapter 12 – Organized for Failure," *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*, July 31, 2006.).

16.     During the course of development of this Declaration, it has become apparent that there are still many potentially important 'gaps' in the information, data and documentation which has been made available regarding the design, construction, operation, and maintenance of the SSC FPS and the associated dredging permit developments. It is clear that additional important factual details remain to be developed and corroborated before there is a complete and comprehensive understanding of the dredging permit factors that had important impacts on development of the breach failure on the east side and the non-breach incipient failure on the west side of the SSC. My analyses, evaluations, assessments and conclusions have been based on the background information and documentation cited in this Declaration. I reserve the right to modify my analyses, evaluations, assessments, and conclusions in the case that new or additional information becomes available in the future.

I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed on July 22, 2007, in Moraga, California.

_____

Robert Bea, Ph.D, PE