IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA DREDGING LIMITATION                    CIVIL ACTION
ACTIONS CONSOLIDATED LITIGATION
                                                     NO.  06-8676
PERTAINS TO:
ALL DREDGING LIMITATIONS ACTIONS                     SECTION "K" (2)

## CLAIMS

NOW INTO COURT, through undersigned counsel, come claimants, George D. Dotson,

Jr., Xavier RaSadd Lee, Timothy J. Wells, Jeannie H. Wells, Cynthia Olivia Moore, Travis I.

Phillips, and all the other claimants identified in the List of Claimants No. 1, which is attached

hereto and incorporated as if it were part of this pleading[1] (hereinafter the "Claimants"), and

assert claims against all petitioners,

a.   Great Lakes Dredge and Dock Company, as owner of the Dredges
     CALIFORNIA, MANHATTAN ISLAND, PADRE ISLAND and
     ALASKA, and as owner *pro hac vice* of the Dredge TEXAS;

b.   Mike Hooks, Inc., as owner of the Dredge Missouri H;

c.   T. L. James and Company, Inc., as owner of the Dredges Tom James and
     George D. Williams II a/k/a Geo D. Williams;

d.   Gulf Coast Trailing Company, a Louisiana partnership, and TLJIC,
     L.L.C., as owners of the Dredge OUACHITA;

e.   Manson Construction Company, as owner and operator of the Hopper
     Dredges Newport and Bayport;

f.   Luhr Bros., Inc., as owner of the Spud Barge L-1101, Spud Barge L-1103
     and  M/V Michael A, and as owner *pro hac vice* of the M/V Charlie B;

---

[1] The Court has issued an order allowing counsel to attach the Lists of Claimants in lieu of listing the Claimants in
this pleading, without the need to provide any additional information at this time.

      g.      King Fisher Marine Service, L.P., as owner of the Dredges Leonard M. Fisher and Everett Fisher;

      h.      Pine Bluff Sand and Gravel Company, as owner of the Dredge MARION; and

      i.      Weeks Marine, Inc., as owner of the Dredges B.E. Lindholm, George D. Williams, BT 208 and WEEKS 262.

(all petitioners are hereinafter collectively referred to as the "Limitation Petitioners" and all their vessels are hereinafter collectively referred to as the "Vessels"), for all the damages suffered by Claimants after Hurricane Katrina made landfall on August 29, 2005, when several levee systems failed as a result of environmental damage to protective wetlands caused by the Limitation Petitioners' maritime activities in the Mississippi River Gulf Outlet ("MRGO") from 1958 through August 29, 2005.  In support of their claims, Claimants aver:

1.

**Project History of MRGO**

The MRGO is a 76-mile man-made navigational channel connecting the Gulf of Mexico to the City of New Orleans.  Approved by the United States Congress under the Rivers and Harbor Act of 1956, construction by the U.S. Army Corps of Engineers ("the "Corps of Engineers"), an agency and instrumentality of the United States of America, began in 1958 and was completed in 1965 at an initial cost of approximately $92 million.  Authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet, the MRGO bisects the marshes of lower St. Bernard Parish and the shallow waters of Chandeleur Sound.

2.

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes.  Since the construction of the MRGO, several basic impacts on the region have become evident.  These include wetland loss caused by excavation and maintenance dredging of the channel, soil erosion and shifts in habitat type because of increased salinity.  The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh.  More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered.  Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, where the MRGO is perceived as a "superhighway for storm surge" because of the channel's susceptibility to inundation by tropical storms and hurricanes.

3.

**Prior Knowledge of Potential Harmful Effects**

Before excavation of the MRGO, state and federal resource agencies expressed concern about the project's apparent lack of ecological consideration.  Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat.  Local concerns mounted as the project's "ecological footprint" expanded and economic benefits failed to emerge.  Concerns expanded with a growing perception that the project had dramatically increased the region's vulnerability to hurricanes and tropical storms.  By the 1990's, the project was widely characterized as an environmental disaster, although adverse environmental impacts

from the MRGO were evident as early as the late 1960's.  In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.

4.

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters.  Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain.  This combined water storage and braking action lowers flood heights and reduces erosion.  The holding capacity of wetlands helps control floods.  Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

5.

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  The sides of the original channel were at a 25 degree angle. Because the soft soils on the sides of the original channel would not stand up at such a steep angle, and because of the maintenance dredging conducted by the Limitation Petitioners, the soil began to slide or "slough-off" into the bottom of the channel.  This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the surface.  This

"sloughing-off" of the soft sides along the channel banks only partially explains why the MRGO's banks have eroded from 650 feet wide to over 2,000 feet wide today.

6.

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug.  This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks.  The MRGO has thus created an environmental disaster.  Tidal flows, and the wave action, suction, and propeller backwash from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel.

7.

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks which settles in the bottom of the channel impedes the movement of ships.  In order to maintain the depth of the channel to allow ships to pass, the Corps of Engineers, using its own fleet of dredge vessels and through maritime dredging contracts with the Limitation Petitioners, continuously dredge soil from the bottom and slope of the channel.  The Corps of Engineers and the Limitation Petitioners use the Vessels to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico.  Some of the dredged soil is piled on spoil banks along the channel, but very little is used beneficially to restore the wetlands the channel has destroyed.  In fact, piling of dredged soil along spoil banks causes further damage to the wetlands behind the spoil banks.

8.

The Corps of Engineers does not mitigate or compensate for the damage it causes to the wetlands. Each year, the United States of America pays the Limitation Petitioners, pursuant to maritime dredging contracts, about $22 million to dredge the MRGO channel and dump the soil (originally from St. Bernard Parish's wetlands) into the Gulf of Mexico. Making matters worse, the Corps of Engineers and the Limitation Petitioners do advance maintenance dredging to the channel to a depth of 41 feet. With each dredging, the MRGO channel grows wider and wider.

9.

Until approximately 1978, the Corps of Engineers performed all or most of the dredging of the MRGO. After restrictions were imposed in 1993, the Corps of Engineers dredged the MRGO using primarily the Dredge Wheeler. The Dredge Wheeler is operated by the New Orleans District of the Corps of Engineers. It is the largest seagoing hopper dredge in the United States. The Wheeler is a "trailing suction" hopper dredge and operates much like a giant vacuum cleaner. It is uniquely designed with three large drag arms and an impressive pumping capacity. To dredge a channel, the drag arms are lowered over the side of the channel bottom. While the Wheeler travels forward at a speed of approximately 2 knots, the drag arms suck a water and sand mixture, known as slurry, from the channel bottom. The slurry passes through the drag heads and pipelines into the hopper. With all pumps and drag arms operating, the Wheeler fills its hopper with slurry in about 11 minutes; however, pumping continues to allow sediment to displace the water in the hopper and obtain a maximum load of as much as 7,872 cubic yards of sediment. On a good operating day, the Wheeler can remove 100,000 cubic yards of material, or about 7,000 dumptruck loads, from a project site. The dredged material is transported from the

channel being maintained to an authorized Dredge Material Containment Area, where it is deposited by opening 14 hopper doors on the Wheeler's bottom and allowing the material to fall to the ocean floor.  In 2005, the Wheeler spent twelve working days dredging the MRGO, from August 11, 2005 to August 27, 2005, and stopping only as Hurricane Katrina was about to make landfall.  It removed 503,603 cubic yards of dredge material during that trip alone.  The Limitation Petitioners own and/or operate and/or charter the Vessels, some of which have characteristics similar to those of the Dredge Wheeler.

10.

From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352,636,430 cubic yards of dredge material.  Many of those contracts were awarded to the Limitation Petitioners.

11.

In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the Limitation Petitioners and other dredging companies dredged the following amounts of dredge material from the MRGO under contracts with the Corps of Engineers:

| YEAR | DEFENDANT | QUANTITY CUBIC YARDS |
|---|---|---|
| 1993 | Bean Dredging Corp.<br>Bean Dredging Corp. | 5,700,000<br>11,900,000 |
| 1994 | Gulf Coast Trailing Co.<br>T.L. James & Co., Inc. | 2,000,000<br>6,000,000 |
| 1995 | Great Lakes Dredge & Dock Co.<br>T.L. James & Co., Inc. | 3,600,000<br>2,400,000 |
| 1996 | Stuyvesant Dredging Co. L.L.C.<br>Bean Horizon Corporation | 2,000,000<br>3,300,000 |

| | | |
|---|---|---:|
| | Bean Horizon Corporation | 1,800,000 |
| 1997 | Gulf Coast Trailing Co. | 2,000,000 |
| | Natco Limited Partnership | 2,000,000 |
| | T.L. James & Co., Inc. | 2,500,000 |
| 1998 | Bean Horizon Corporation | 1,300,000 |
| | Great Lakes Dredge & Dock Co. | 10,500,000 |
| 1999 | Weeks Marine, Inc. | 2,000,000 |
| | Weeks Marine, Inc. | 2,000,000 |
| | Bean Horizon & Stuyvesant (Joint Venture) | 2,000,000 |
| | Bean Horizon Corporation | 1,600,000 |
| | Bean Horizon Corporation | 1,400,000 |
| | Great Lakes Dredge & Dock Co. | 1,500,000 |
| | Great Lakes Dredge & Dock Co. | 1,500,000 |
| 2000 | NONE | NONE |
| 2001 | Great Lakes Dredge & Dock Co. | 3,000,000 |
| | Mike Hooks, Inc. | 4,300,000 |
| | Luhr Bros., Inc. | 1,700,000 |
| 2002 | Bean Stuyvesant, L.L.C. | 400,000 |
| | Bean Stuyvesant, L.L.C. | 2,000,000 |
| | Weeks Marine, Inc. | 2,700,000 |
| 2003 | Manson Construction Co. | 1,500,000 |
| | Manson Construction Co. | 2,000,000 |
| | Weeks Marine, Inc. | 8,800,000 |
| 2004 | Bean Stuyvesant, L.L.C. | 2,000,000 |
| | Great Lakes Dredge & Dock Co. | 2,000,000 |
| | Pine Bluff Sand & Gravel Co. | 1,900,000 |
| | King Fisher Marine Service, Inc. | 1,000,000 |
| 2005 | Great Lakes Dredge & Dock Co. | 4,700,000 |

12.

**Dredging the MRGO Constitutes a Threat to Public Safety**

Since 1965, operation and maintenance dredging of the MRGO channel by the Limitation Petitioners have caused the destruction of over 20,000 acres of Louisiana wetlands due to soil erosion, saltwater intrusion and channel dredging.  In their natural state, wetlands provide a natural barrier against tidal surge from storms and hurricanes.  When hurricanes pass over wetlands, friction is crated, which in turn reduces the storm's wind speeds.  Wetlands also absorb hurricane storm surges, softening and shrinking the wall of water that slams inland during a hurricane.  Wetlands loss caused by the MRGO now allows a greater volume of water from the Gulf of Mexico to move more quickly inland.  Wetlands loss from the MRGO now makes the residents of Orleans and St. Bernard Parishes more vulnerable to tidal surge from tropical storms and hurricanes.  The MRGO has increased the flooding risk to thousands of people, their homes and businesses.

13.

**Prior Similar Events**

In 1965, Hurricane Betsy created a tidal surge that moved up the MRGO channel and breached the levees in Orleans Parish, causing $2 billion in damages.  Today, the MRGO is a much greater threat to the safety of people living in Orleans and St. Bernard Parishes than it was in 1965 because the MRGO is more than 2000 feet wide, allowing it to carry a tidal surge several times greater than the destructive power of Hurricane Betsy.  In 1998, the tidal surge from Hurricane George caused enough erosion to shut down the MRGO for several months, and the channel was re-dredged by the Limitation Petitioners in order to re-open it to the very small

number of ships that use it for navigation.  Today the MRGO provides a superhighway for tidal surge caused by tropical storms and hurricanes.

14.

**MRGO's Role in Hurricane Katrina Disaster**

The Gulf Intracoastal Waterway ("GICW") from its junction with the MRGO and eastward to its outlet into Lake Borgne and Mississippi Sound, is a dredged small craft and barge channel approximately 400 feet in width, with a project depth of 12 feet.  West of the MRGO junction, the GICW becomes a ship channel and widens to 800 feet and 32-35 feet in depth to accept MRGO ship traffic.  The wider and deeper GICW intersects with the Industrial Canal causing a narrowing funnel shape into the Industrial Canal, which has a depth of approximately 30 feet but a width of approximately 400 feet, and is blocked at its south end by the Industrial Canal locks.  The Industrial Canal becomes progressively narrower and shallower as it proceeds toward New Orleans' Ninth Ward like a funnel.

15.

During Hurricane Katrina, levees along MRGO were breached in approximately 20 places along its length, directly flooding most of St. Bernard Parish and New Orleans East. Storm surge from MRGO also caused and contributed to three breaches of the levees along the Industrial Canal.  The levee failures were caused by overtopping, as the storm surge rose over tops of the levees and produced erosion that subsequently led to failures and breaches of the levees.  The breached levees are located in areas where wetlands had been destroyed.  In other areas where wetlands have not been so extensively damaged, the impact of Hurricane Katrina was not as severe and the levees were not damaged.

16.

Three months before Hurricane Katrina made land fall, Dr. Hassan Mashriqui, a storm surge expert at Louisiana State University's Hurricane Center, called MRGO a "critical and fundamental flaw" in the flood protection system that protects the New Orleans region because it could amplify storm surges 20 to 40 percent.  Following Hurricane Katrina, an engineering investigation and computer modeling has shown that MRGO intensified the initial surge by 20 percent, raised the height of the wall of water about three feet, and increased the velocity of the surge from 3 feet per second to 8 feet per second in the funnel.  This contributed to the scouring that undermined the levees and floodwalls along the MRGO and Industrial Canal.  "Without MRGO, the flooding would have been much less," Dr. Mashriqui said.  "The levees might have overtopped, but they wouldn't have been washed away."  The complete devastation of St. Bernard Parish and areas of Orleans Parish would not have occurred.

17.

**Role of the Limitation Petitioners**

The damages suffered by Claimants were caused by the fault and negligence of the Limitation Petitioners, which had privity and knowledge of the faulty and negligent operations and the unseaworthy conditions of the Vessels while dredging the MRGO.

18.

The events described above occurred as a result of the actual fault and with privity and knowledge of the Limitation Petitioners, thus rendering Limitation Petitioners liable *in personam* to Claimants for all damages, without the benefit of limitation of or exoneration from liability.

19.

Limitation Petitioners and the Vessels performed their dredging operations in the MRGO as independent contractors pursuant to contracts with the Corps of Engineers. Limitation Petitioners and the Vessels were not agents of the Corps of Engineers and did not perform their dredging operations under the direction and/or control of the Corps of Engineers. Because Limitation Petitioners and the Vessels were not agents of the Corps of Engineers, they may not invoke any defense under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). *See Bynum v. F.M.C. Corp.*, 770 F.2d 556 (5th Cir. 1985).

20.

To the extent that Limitation Petitioners and the Vessels seek to invoke the "government contractor defense" adopted in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Limitation Petitioners bear the burden of proof to establish such defense. *Bailey v. McDonald Douglas Corporation*, 989 F.2d 794 (5th Cir. 1993). Limitation Petitioners cannot allege the existence of any evidence to satisfy the three *Boyle* conditions required to establish this defense with respect to their dredging activities in the MRGO.

21.

The Corps of Engineers did not issue reasonably precise specifications to Limitation Petitioners and the Vessels, to follow while conducting their dredging work in the MRGO.

22.

If the Corps of Engineers issued reasonably precise specifications for the work conducted in the MRGO, then Limitation Petitioners and the Vessels failed to follow them.

23.

Limitation Petitioners and the Vessels failed to warn the Corps of Engineers of the dangers associated with their dredging operations in the MRGO not known to the Corps of Engineers.

24.

Limitation Petitioners and the Vessels are not entitled to invoke the benefit of any governmental immunity, because the government has no immunity for the damage caused to Claimants.  The dredging work does not fall within governmental discretionary immunity because it is regulated by dredging regulations enacted by the Corps of Engineers and the State of Louisiana.  The Corps of Engineers, Limitation Petitioners and the Vessels were required to follow those regulations.

25.

Limitation Petitioners and the Vessels failed to perform their dredging work with due care and are not entitled to assert any "due care" defense.

26.

Limitation Petitioners and the Vessels performed their dredging work in the MRGO negligently.

27.

The Vessels were unseaworthy because they were not the correct type needed for the work in which they were involved, or lacked the proper equipment to conduct dredging operations in the MRGO without causing damage to the surrounding wetlands.  Furthermore, the lack of proper control for the operations rendered the Vessels unseaworthy.

28.

Limitation Petitioners and the Vessels failed to follow requirements of 33CFR Parts 335-38, particularly 33 CFR 336.1(c)(4) and 33 CFR 320.4(b) and Executive Order No. 11990 made applicable thereby.

29.

Limitation Petitioners and the Vessels deviated from and/or failed to execute their dredging activities in the manner required by the Corps of Engineers, or by reasonably precise specifications issued by the Corps of Engineers (if they were issued) and/or by the Nationwide Permits, specific permits, or general authorizations for dredging issued by or obtained by the Corps of Engineers pursuant to 33 CFR 337.5 and 338.2, and all other regulations that Limitation Petitioners and the Vessels were required to follow.

30.

Limitation Petitioners and the Vessels failed to follow Louisiana State dredging requirements (made applicable by 33 CFR 337.2), including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code related to dredging activities.

31.

Limitation Petitioners and the Vessels have performed "advance maintenance" and "over-depth" dredging of the MRGO, going beyond its authorized project depth.  Limitation Petitioners and the Vessels have also performed "over-width" dredging, also for advance maintenance purposes. Limitation Petitioners and the Vessels also overcut the slope of the channel, based on the potential for undisturbed material to slough downward to the channel, and for other reasons, changing the designed slope of the channel's banks, thereby enlarging the design width of the

channel, causing wetlands along the banks of the channel to erode, and causing the width of the channel to increase.  These activities were conducted without authorization, approval or control of the Corps of Engineers, and were outside of any reasonably detailed specifications provided by the Corps of Engineers for the work.  These activities by Limitation Petitioners and the Vessels constitute negligence and violate regulations enacted to control dredging activities.

**Claimants' Damages**

32.

As a result of reckless and/or negligent conduct of the Limitation Petitioners, all Claimants have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

33.

Claimants are entitled to a judgment finding the Limitation Petitioners liable to them for all the damages suffered as a result of the Limitation Petitioners' negligence and awarding Claimants adequate compensation therefor in amounts determined by the trier of fact.

34.

Claimants request a trial by jury.

35.

Claimants reserve the right to raise additional allegations once discovery is conducted.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Claimants demand judgment against the Limitation Petitioners, jointly, severally and *in solido,* as follows:

a.      Economic and compensatory damages in amounts to be determined at trial;

b.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

c.      Attorney's fees and costs of litigation;

d.      Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate;

e.      A trial by jury as to all Defendants.

**Respectfully Submitted,**

PLAINTIFF'S LIAISON COUNSEL

/s/ Joseph M. Bruno_____
JOSEPH M. BRUNO (#3604)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 30th day of July, 2007, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of Louisiana using the CM/ECF system which will send notification of such filing to counsel for petitioners.

/s/ Joseph M. Bruno

-16-

## LIST OF CLAIMANTS NO.1

1.  Micheal J. D'Antonio
2.  Claude D'Antonio
3.  Concette Smith
4.  Patricia D. Marchand
5.  Anthony G. D'Antonio
6.  Jerome J Howard
7.  Gerald Meads
8.  Jeremy New
9.  Robin New
10. Alenia Ditimus
11. Demetria F. Robinson
12. Louis Robinsion
13. Beatrice B. Williams
14. Glynn Williams Sr.
15. Eric Smith Jr
16. Glynn  Williams Jr
17. Brain Joseph Williams
18. Trey Micheal Williams
19. Margie H. Brooks
20. Mark A. Brooks Sr.
21. Karen M. Brooks
22. Mark Brooks Jr
23. Marlon M. Brooks
24. Herman Wallace
25. Deborah Wallace
26. Alexander Gascon
27. Raquel Gascon
28. Cheri Gascon
29. Zachary Gascon
30. Inez Johnson
31. Anthony Motalbano Jr
32. Ashley Motalbano
33. Michelle Conerly
34. Carmicheal  James Goins Jr.
35. Raven Corrine Conerly
36. Corrine Conerly
37. Mellissa Conerly
38. Alphonse Bazile
39. Hilda Bazile

40. Alphonse Bazil Jr.
41. Paris Sylvester
42. Mariah Monroe
43. Sade Sylvester
44. Deshine Sylvester
45. Angela Bazile
46. Latoya Sylvester
47. Carl Sylvester
48. William D. Sturken
49. Canisha Sylvester
50. Hilda Sylvester
51. Patrica A. Lewis
52. Donald Jenkins Sr.
53. Elo D. Louis
54. Darrell L. Prosper
55. Javis Ray Miller
56. Wayne M. Guy
57. George C Jackson Jr
58. Journell Taylor
59. Olivia L. Bell
60. Raymond G. Young Sr.
61. Linda M. Young
62. Raymond Young Jr.
63. Stephanie Hamilton
64. Dave Richardson
65. Marie Norton Wheatley
66. Margaret Y. Bell
67. David A. Bell
68. Joshua E Bell
69. Claire L. Bell
70. Maxfield B. Bell
71. Shelia Benjamin
72. Shelia Benjamin
73. Melvinisha Benjamin
74. James T. White
75. Judy A. White
76. Wanda Davis
77. Ronaldo C Davis
78. Joseph A Virgadamo
79. Janet B. Virgadamo
80. Byron J. Virgadamo
81. Author Virgadamo
82. Virginia Virgadamo
83. Gina Virgadamo

84. Irene Virgadamo
85. Janice E. Lewis
86. Raneer Lewis
87. Robert Lewis
88. Cynthia R. McFarland
89. Hedi Mc Farland
90. Brynell McFarland
91. Brain A. McFarland
92. Rory U. McFarland
93. Makayla M. McFarland
94. Shelison M. Wilson
95. Victoria M. McFarland
96. Karisha A. Packnett
97. Brenda J. Packnett
98. Kourtney D. Crier
99. Felicia Jones Crier
100.        Kenneth L. Crier
101.        Betty Ann Hill
102.        Eugene Brazley
103.        Rolyntria E. Enclarde
104.        John A. Pennino
105.        Charles A. Richard
106.        Shirley Young
107.        Reva M Duplantier
108.        Katina Benjamin
109.        Darnell Benjamin
110.        Aaronisha Benjamin
111.        Donnell Benjamin
112.        Lillian Temple
113.        Joycelyn C. Yarls
114.        Sam Bland
115.        Geralinde L Bordelon
116.        Albertine Love
117.        Eyvory  Ringo Love
118.        Amber Love
119.        Edwin Baker Jr.
120.        Shamyra  B. Shallerhorn
121.        Matthias Love
122.        Ja'Shaun Ringo
123.        Charles Bolden Sr.
124.        Mark A. Bolden
125.        Shannell S. Bolden
126.        Charles Bolden Jr.
127.        Gail T Bolden

128.      Kimberly M Richardson
129.      Tyanta Stennis
130.      Tiyava N Jones
131.      Thomas Stennis
132.      Sandra D. Stennis
133.      Sariana D. Stennis
134.      Kirk I. Washington  Jr
135.      Kobie M. Washington
136.      Ellis A. West Jr.
137.      Henry Robinson Jr.
138.      Virginia S. Robinson
139.      De'Vante M. Robinson
140.      Gloria Taylor
141.      Genell Nelson
142.      Ronald Nelson
143.      Derick Paul Brown
144.      Zuri Nelson
145.      Natalie Mercadel
146.      Monique Massey
147.      Eunice H. Merritt
148.      Kathleen Ann Manske
149.      Mack H. Sims
150.      Paula A Merritt
151.      Gregory P. Perrault Sr.
152.      Tranell S. Perrault
153.      Gregory P. Perrault Jr.
154.      Jarrod Perrault
155.      Ashanti Douglas
156.      Raynell Banks
157.      Cordell S. Dobard
158.      Forstall W. Dobard
159.      William F. Dobard
160.      Nicholas A. Sceau
161.      Alearrana Barthelemy
162.      Helen Mayberry
163.      Joshua Mayberry
164.      Alana Neckles
165.      Cory K Young Sr.
166.      Martha J. Woods
167.      Karen Lewis
168.      Archie Lambert Jr.
169.      Melvina Lambert
170.      Melisha Robertson
171.      Alonzo James Monroe

172.        Amiliana A. Monroe
173.        Kenya N Lambert Monroe
174.        Ray C. Shavers
175.        Tonya Pierce
176.        Dean M. Meilleur
177.        Micheal M. Reeves
178.        Martha G. Reeves
179.        Kailan Age
180.        Kaisha Age
181.        Chaniel Age