## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES          CIVIL ACTION
      CONSOLIDATED LITIGATION

                                      NO. 05-4182

                                      SECTION "K" (2)

FILED IN:    05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324,
                05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152,
                06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066,
                06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159,
                06-5161, 06-5260, 06-5162, 06-5771, 06-5937, 07-0206,
                07-0621, 07-1073, 07-1271, 07-1285

PERTAINS TO: MRGO

---

## THE MRGO PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANT UNITED STATES' FIRST SET OF INTERROGATORIES

---

PURSUANT TO ¶ IV(B)(h) of Case Management and Scheduling Order No. 4 and Rule 33 of the Federal Rules of Civil Procedure, the MRGO PSLC, on behalf of the consolidated class action representatives, provides the following objections and responses to Defendant the United States of America's first set of interrogatories.

### PRELIMINARY STATEMENT

Responding Parties do not concede the relevancy, materiality, or admissibility of any information sought by any of the interrogatories or any response hereto.  Responding Parties' responses are made subject to and without waiver of any objections as to the relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the information referred to or of the responses given herein, or of the subject matter thereof, in any proceeding, including any arbitration of this action or any other subsequent proceeding.

1

Further, Responding Parties' responses have been made after a reasonable inquiry and are based solely on information presently known to them before they have had an opportunity to review any discovery responses or documents produced by Defendants in response to their discovery requests.  Accordingly, Responding Parties' responses are made without prejudice to Responding Parties' right to supplement, amend, or correct these responses or to argue other evidence during any proceeding related to the issues presented herein.

<u>**OBJECTIONS AND RESPONSE TO INTERROGATORIES**</u>

<u>INTERROGATORY NO. 1</u>

Explain in full narrative detail how the MRGO ought to have been designed, engineered, and constructed "to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm driven surge."  MRGO Master Complaint ¶ 23.

<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1</u>

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Responding Parties further object to this interrogatory on the grounds that it is vague, ambiguous, and overbroad as to time. Specifically, the phrase "full narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and ideas of Plaintiffs' counsel, and the opinions of Responding Parties' experts. Because of the breadth of the phrase, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Moreover, the question misstates the nature and substance of Plaintiff's complaint. Specifically, Responding Parties' contend the negligent design, engineering, or construction of the MR-GO originally created the "waterway's inherent and

known capability of serving as a funnel or conduit for rapidly -accelerated, storm-driven surge."

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that the MR-GO was designed, engineered and constructed in such a manner as to cause the following engineering and ecological consequences:

(1) The wetlands through which the MR-GO was constructed provided a pristine natural barrier to storm surge caused or generated by storms in the Gulf of Mexico, including, but not limited to, hurricanes. The United States Army Corps of Engineers were aware of the effects of these wetlands on storm surge during either or all of the following: (a) the reconnaissance or investigation of the feasibility of a "tidewater canal" between the Port of New Orleans and the Gulf of Mexico; (b) the compilation or preparation of House Doc. No. 245; (c) the design phase of the MR-GO project; or (d) construction of the MR-GO. Moreover, the USACE was aware that construction of the MR-GO through the wetlands would cause the death and destruction of substantial portions of these wetlands and that the death and destruction of these portions of the wetlands would cause Greater New Orleans to be increasingly vulnerable to the effects of hurricane storm surge, including, but not limited to, the flooding of greater New Orleans.

(2) The construction of the MR-GO, which extended into the Gulf of Mexico, created a direct conduit through which storm surge, including, but not limited to, storm surge generated by hurricanes, could traverse through the canal into the Gulf Intracoastal Waterway ("GIWW") and the combined GIWW/MR-GO (Reach 1), subjecting any flood control structures to increased stress and pressure.

(3) The intersection of the "land cut" portion of the MR-GO (Reach 2) with the GIWW produced a single point at which storm surge traveling along the GIWW and the MR-GO

would merge, thereby combining and focusing the two storm surge forces within the Reach 1 of the MR-GO (the combined MR-GO/GIWW), and causing increased stress and pressure on flood control structures along the GIWW, Reach 1 and the Inner Harbor Navigation Canal (IHCN or Industrial Canal).  In addition, the spoil bank retaining structures along the southern bank of the MR-GO and the flood control structures along the banks of the GIWW (east of the confluence of Reach 2 of the MR-GO and the GIWW) created a "funnel" which would further concentrate storm surge forces within Reach 1 of the MR-GO.

The MR-GO "ought to have been designed, engineered, and constructed" in such a way as to prevent the foregoing foreseeable conditions from having been created.  Since Defendants have yet to provide Plaintiffs with copies of relevant data and documents which they had agreed to provide pursuant to Case Management Order no. 4, the exact means by which these negative design, engineering or construction effects should have been avoided or mitigated remains to be determined.

INTERROGATORY NO. 2:

Please describe in full narrative detail every aspect of the "failure of the Corps to follow the MRGO 1951 Authorization Report." MRGO Master Complaint at 18.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds that it is vague, ambiguous, and overbroad as to time.  Specifically, the phrase "full narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and ideas of Plaintiffs' counsel, and the opinions of Responding Parties' experts.  Because of the

breadth of the phrase, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.  Responding Parties also object to this interrogatory on the grounds that the term "aspect" is vague, ambiguous, overbroad, and calls for information protected from disclosure by the attorney work product doctrine.  Specifically, the word "aspect," as used, can mean the legal thought process employed, and reasoning developed, by counsel for Responding Parties that is protected from disclosure by the attorney work product doctrine.  Similarly, the word "aspect, as used, can also mean expert opinions that need not be disclosed at this point in the litigation.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that the USACE, in House Doc. No. 245 and in testimony during hearings before the United States Congress, proposed the connection of the land-cut portion of the MR-GO, otherwise known as "Reach 2," to the Industrial Canal by way of a distinct canal or other waterway, separate from the GIWW.   In addition, the route for the MR-GO proposed by the USACE in House Doc. No. 245 terminated in Chandeleur Sound.  The United States Congress approved the MR-GO according to the proposed canal described in House Doc. No. 245, but the USACE constructed the MR-GO as follows.

Rather than connecting Reach 2 of the MR-GO to the Industrial Canal via a discrete canal, the USACE connected Reach 2 to the GIWW in the vicinity of the later constructed Parris Road Bridge.   Moreover, Reach 1 of the MR-GO between the juncture of the MR-GO and the GIWW was substantially deepened and widened and became a combined portion of the GIWW and the MR-GO.  The USACE also constructed the terminus of Reach 2 of the MR-GO through

Breton Sound, not Chandeleur Sound as set forth in House Doc. No. 245.

INTERROGATORY NO. 3:

If you contend that the construction of the MRGO along the route of the existing GIWW constituted an unauthorized deviation from the route approved by Congress, please set forth in full and complete narrative detail the basis for this contention.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Responding Parties further object to this interrogatory on the grounds that it is vague, ambiguous, and overbroad as to time. Specifically, the phrase "full narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and ideas of Plaintiffs' counsel, and the opinions of Responding Parties' experts. Because of the breadth of the phrase, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that the USACE, in House Doc. No. 245 and in testimony during hearings before the United States Congress, proposed the connection of the land-cut portion of the MR-GO, otherwise known as "Reach 2," to the Industrial Canal by way of a distinct canal or other waterway, separate from the GIWW.   In addition, the route for the MR-GO proposed by the USACE in House Doc. No. 245 terminated in Chandeleur Sound.  The United States Congress approved the MR-GO according to the proposed canal described in House Doc. No. 245, but the USACE constructed the MR-GO as follows.

Rather than connecting Reach 2 of the MR-GO to the Industrial Canal via a discrete canal, the USACE connected Reach 2 to the GIWW in the vicinity of the later constructed Parris Road Bridge.   Moreover, Reach 1 of the MR-GO between the juncture of the MR-GO and the GIWW was substantially deepened and widened and became a combined portion of the GIWW and the MR-GO.  The USACE also constructed the terminus of Reach 2 of the MR-GO through Breton Sound, not Chandeleur Sound as set forth in House Doc. No. 245.

INTERROGATORY NO. 4:

If you contend that the modification of the MRGO route below Bayou La Loutre (i.e. gulfward from the bayou) so that it passed through Breton Sound rather than Chandeleur Sound, caused the alleged damages, please set forth in full narrative detail the basis for this contention.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.4:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Responding Parties further object to this interrogatory on the grounds that it is vague, ambiguous, and overbroad as to time. Specifically, the phrase "full narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and ideas of Plaintiffs' counsel, and the opinions of Responding Parties' experts. Because of the breadth of the phrase, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state construction of the Reach 2 of the MR-GO in the direction of Bretton Sound was destructive to the Breton Sound estuary east of New Orleans.  (Team Louisiana

7

Report Vol. 7 at 227).  The spoil from the construction of the MR-GO to the Breton Sound estuary buried and destroyed approximately 18,000 of marshland that could (and would) have retarded storm surge from the Gulf of Mexico.  *Id*.  In addition, constructing Reach 2 of the MR-GO along the approved route to Chendeleur sound, instead of to Breton Sound, would have required the MR-GO to be constructed with a turn towards the north east.  This turn or bend would have reduced the speed or volume of storm surge entering the MR-GO from the Gulf of Mexico.  In effect, this bend would have acted as a brake on storm surge transiting up Reach 2 of the MR-GO towards Greater New Orleans, and by "straightening" the MR-GO towards Breton Sound, the USACE created a more direct route for storm surge delivery from the Gulf of Mexico.

In addition, creating a bend in the MR-GO would have reduced the speed of shipping transiting the MR-GO.  Since its construction, the banks of the MR-GO eroded and widened from the ship wakes scouring the banks of the canal.  (ILIT Final Report Vol. 10 at 10-19).  This erosion and widening of the canal accelerated the destruction of storm surge mitigating wetlands, and increased the volume of storm surge water that could traverse the MR-GO.  Reducing the speed of ship travel in the canal would have reduced the amount bank erosion caused by ship traffic.

INTERROGATORY NO. 5:

If you contend that the building of the MRGO as "a separate canal running parallel to the GIWW" would have diminished or prevented the alleged damages, please explain fully the basis for your contention, identifying any and all documents that you rely on and any and all persons on whose analysis or study you rely in so contending.

8

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Notwithstanding the forgoing, and without waiving any objection to this interrogatory,  the intersection of the "land cut" portion of the MR-GO (Reach 2) with the GIWW produced a single point at which storm surge traveling along the GIWW and the MR-GO would merge, thereby combining and focusing the two storm surge forces within the Reach 1 of the MR-GO (the combined MR-GO/GIWW), and causing increased stress and pressure on flood control structures along the GIWW, Reach 1 and the Inner Harbor Navigation Canal (IHCN or Industrial Canal).  In addition, the spoil bank retaining structures along the southern bank of the MR-GO and the flood control structures along the banks of the GIWW (east of the confluence of Reach 2 of the MR-GO and the GIWW) created a "funnel" which would further concentrate storm surge forces within Reach 1 of the MR-GO.

The construction of a separate canal connecting Reach 2 of the MR-GO with the IHNC would have avoided the merging of storm surge from the MR-GO and the GIWW into Reach 1 of the MR-GO (the combined MR-GO/GIWW).   In addition, separating the GIWW from the MR-GO would have increased the distance between flood control structures along the GIWW and the spoil bank retention dykes along the southern bank of the MR-GO.  This increase in the "gape" of the funnel would have reduced the speed, volume or water pressure within the funnel itself.  *See generally* Team Louisiana Report Vol. 7 at pp. 223-277.

The opinions expressed in the Team Louisiana Report were those of its authors Ivor Ll. Van Heerden, G. Paul Kemp, Hassan Mshriqui, Radhey Sharma, Billy Proschaska, Lou

Capozzoli, Art Theis, Ahmet Binselam, Kate Streva and Esra Boyd.  The identity and opinions of Responding Parties' experts shall be disclosed at the appropriate time in accordance with Case Management Order No. 4.

Finally, Responding Parties have been informed that two resent studies and papers – one conducted on behalf of the USACE by Bruce Ebersol and one conducted by Matthijs Kok of the Delft University of Technology in the Netherlands – have found that the storm surge within the IHNC would have been reduced by approximately 1 meter if the MR-GO had not existed.

INTERROGATORY NO. 6

For each negligent or wrongful act or omission that you contend caused or contributed to the failure or overtopping of a levee or floodwall adjacent to the INHC, the GIWW, the MRGO, the 40 Arpent Canal, or the Florida Walk Canal, please provide all of the information that is available, including, without limitation:

(a)  the date or inclusive dates of the act or omission

(b)  a complete narrative description of the act or omission

(c)  the identity of the person or persons who negligently acted or failed to act

(c)  what the person or persons ought to have done or refrained from doing in order to conform their behavior to the standard required by the law

(d)  how the act or omission caused or contributed to the failure or overtopping

(e)  the precise location or locations of the levees and floodwalls that failed or were overtopped as a result of the act or omission (identifying the location with sufficient precision to differentiate it from other locations and thereby allow an investigation)

(f)  the identity of any and all persons who have analyzed or studied or provided

information concerning the causal connection between the act or omission and the failure

(g)  the identity of any and all persons who knew or should have known prior to August 29, 2005, that the act or omission was negligent or wrongful

(h)  the pinpoint legal citation (or analogous identifying reference information) of any and all statutory or regulatory provisions and other mandatory and specific federal directives that the act or omission contravened.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds that it is compound.  Because of the breadth of the interrogatory, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties note that the question as phrased asks for "information that is available," some of the questions asked in this interrogatory cannot be answered at this time since Defendants have not produced all documents which they represented to Responding Parties would be made available pursuant to Case Management Order No.4.  Moreover, those documents that were produced and marked for scanning and release to Responding Parties have not be turned over to Responding Parties.  Accordingly, Responding Parties response to this interrogatory is not a final or exclusive explanation of the "negligent or wrongful act[s] or omission[s] that [Responding Parties] contend caused or contributed to the failure or overtopping of a levee or floodwall adjacent to the IHNC, the GIWW, the MRGO, the 40 Arpent Canal, or

11

the Florida Walk Canal … ."

(a)    Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(b)    To the best of Responding Parties knowledge, based on the information currently available, the following negligent acts by the USACE caused or contributed to the failure of either the levees, floodwalls or spoil bank retention dykes along either the IHNC, the GIWW, the MRGO, the 40 Arpent Canal, or the Florida Walk Canal:  (1) the USACE never constructed levees along extensive portions of Reach 2 of the MR-GO as required under the Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan; (2) certain of the levees constructed by the USACE – as set forth in the responses herein – were built with materials unsuitable for levees intended to protect urban populated areas; (3) certain floodwalls were constructed in soils which the USACE knew was no able to counteract the force of storm surge waters pressing against the flood walls; (4) certain flood walls were not placed deep enough within the earth to counteract the force of storm surge water pressing against the flood walls; (5) the tops of certain flood control structures were constructed below the heights specified in designs because of the use of NGVD29 rather than mean sea level figures for the Greater New Orleans area; and (6) certain flood control structures were designed based on faulty technical or engineering assumptions, including, but not limited to, the Standard Project Hurricane.

(c)    Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(d)    Responding Parties are not certain what laws Propounding Parties are referring to. In any event, the "persons or persons" should have taken actions to prevent against the

12

following conditions and circumstances:   (1) the USACE never constructed levees along

extensive portions of Reach 2 of the MR-GO as required under the Lake Pontchartrain and

Vicinity Hurricane Flood Protection Plan; (2) certain of the levees constructed by the USACE –

as set forth in the responses herein – were built with materials unsuitable for levees intended to

protect urban populated areas; (3) certain floodwalls were constructed in soils which the USACE

knew was no able to counteract the force of storm surge waters pressing against the flood walls;

(4) certain flood walls were not placed deep enough within the earth to counteract the force of

storm surge water pressing against the flood walls; (5) the tops of certain flood control structures

were constructed below the heights specified in designs because of the use of NGVD29 rather

than mean sea level figures for the Greater New Orleans area; and (6) certain flood control

structures were designed based on faulty technical or engineering assumptions, including, but not

limited to, the Standard Project Hurricane.  Nothing in this response should, however, be

construed as a an admission by Responding Parties that compliance with any statute, regulation,

ordinance, policy or practice equates with compliance with any applicable standard of care.

(e)       (1) the USACE never constructed levees along extensive portions of Reach 2 of

the MR-GO as required under the Lake Pontchartrain and Vicinity Hurricane Flood Protection

Plan which permitted storm surge water to inundate parts of  Greater New Orleans; (2) certain of

the levees constructed by the USACE – as set forth in the responses herein – were built with

materials unsuitable for levees intended to protect urban populated areas which caused such

levees to either be susceptible to underseepage or to disintegrate under the force of storm surge

waters; (3) certain floodwalls were constructed in soils which the USACE knew was no able to

counteract the force of storm surge waters pressing against the flood walls, causing such flood

walls to buckle or collapse, and allowing flood waters to inundate parts of Greater New Orleans; (4) certain flood walls were not placed deep enough within the earth to counteract the force of storm surge water pressing against the flood walls, causing such flood walls to buckle or collapse, and allowing flood waters to inundate parts of Greater New Orleans; (5) the tops of certain flood control structures were constructed below the heights specified in designs because of the use of NGVD29 rather than mean sea level figures for the Greater New Orleans area, and the lowered heights permitted flood waters to overtop these structures; and (6) certain flood control structures were designed based on faulty technical or engineering assumptions, including, but not limited to, the Standard Project Hurricane, which caused such structures to be designed or constructed in a weakened state.

   (f)  Responding Parties have not completed compiling this information.

   (g)  Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

   (h)  Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

   (i)  Responding Parties have not completed compiling this information.

<u>INTERROGATORY NO. 7</u>:

   For each occasion on which you contend dredging was negligently performed, please provide all of the available information, including without limitation:

   (a)  the date or dates (inclusive)

   (b)  the location, specifying the specific reach, including mile markers or other geospatial identification

14

(c)  the vessel or vessels, if any, involved in the dredging

the manner in which the dredging failed to conform to the applicable standard of care (*e.g.,* too

deep, too shallow, too narrow, too wide, too long, improper placement of spoils)

(d)  the identity of the person or persons who performed the dredging

(e)  the identity of the person or persons who supervised the dredging

(f)  the identity of the  all documents that evidence the dredging, including the contract or

contracts, if any, under which the dredging was performed

(g)  the acts and omissions of any and all employees of the Government upon which you

found your claim of negligence with respect to the dredging performed on this occasion

(h)  the effect of the dredging on wetlands and marsh

(i)  the specific effect of the dredging on each plaintiff who was affected by the dredging

(j)  the name and address of any and all persons who have studied or analyzed the effect

of the dredging on wetlands or marsh at any time or on storm surge during Hurricane Katrina

(k)  the surface area (in square feet, acres, square miles, or other standardized measure) of

wetlands and marsh lost as a result of the dredging

(l)  the extent of the increase (in centimeters, meters, or other standardized measure) in

storm surge elevation during Hurricane Katrina directly or indirectly resulting from the dredging

(m)  how you contend the dredging ought to have been performed, if at all

(n)  alternative measures, if any, that you contend ought to have been employed to

maintain the seaway at its authorized depth in lieu of dredging.

<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO 7</u>:

Responding Parties object to this interrogatory to the extent it seeks the premature

15

disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds that it is compound.  Because of the breadth of the interrogatory, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state dredging was negligently performed by the USACE or its contractors in that they allowed the MR-GO to fill with sediment and failed to dredge it to certain specified depths.  In addition, dredging in the vicinity of flood control structures was negligently performed in that soil closer to canal banks, such as the banks of the IHNC, was improperly dredged and removed such that the stability of the banks was compromised.  This loss of bank stability weakened the flood control structures erected along those banks and increased the likelihood that the structures would fail.

The specifics of these dredging operations – including the date of the dredging operations, the vessels involved in the dredging, the persons involved in the dredging, et c. – requested in this interrogatory are in the possession of the Propounding Parties.  Propounding Parties, however, have not provided Responding Parties with all of the relevant documentation pursuant to Case Management Order no. 4, and Responding Parties therefore cannot answer this interrogatory at this time.  Responding Parties shall supplement their response to this interrogatory upon receipt and review of these documents.

INTERROGATORY NO. 8:

Explain in full narrative detail how "proper dredging of the MR-GO would ameliorate the 'funneling effect' of the waterway" and "diminish the lethal threat to residents and businesses in Orleans and St. Bernard Parishes during hurricanes such as Katrina."  MRGO

Master Complaint ¶ 24.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds that it is vague, ambiguous, and overbroad as to time.  Specifically, the phrase "full narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and ideas of Plaintiffs' counsel, and the opinions of Responding Parties' experts.

Responding Parties state that they are informed and believe that proper dredging of the MR-GO would have increased the volume of water contained within the canal, which in turn would have decreased the speed with which storm surge from the Gulf of Mexico would have travelled up the MR-GO, and decreased water pressure levels.

INTERROGATORY NO. 9:

If you contend that any MRGO operational or maintenance activity other than dredging caused the alleged damages, please provide all of the available information about each such activity, including without limitation:

(a)  a full and complete detailed description of each such activity

(b)  the date or inclusive dates on which the activity occurred

(c)  the identity of the person or persons who performed the activity

(d)  the identity of the person or persons who supervised the activity

(e)  the identity of all documents that evidence the activity

(f)  the effects and consequences of the activity in causing the alleged damages

(g)  the pinpoint legal citation (or analogous identifying reference information) for each and every statutory or regulatory provision or other mandatory and specific federal directive that

17

was violated by the performance of the activity.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Responding Parties further object to this interrogatory on the grounds that it is compound. Because of the breadth of the interrogatory, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Accordingly, notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that documents relevant to their claims are in the possession of Propounding Parties, and Propounding Parties have yet to make such information available to Responding Parties.  Accordingly, Responding Parties shall supplement their response to this interrogatory once they have received and reviewed this data..

INTERROGATORY NO. 10:

For each "known defect[] in the levee system," MRGO Master Complaint ¶ 56, please provide all of the available information, including without limitation:

(a)  a full and complete description of the defect

(b)  the precise location of the defect (sufficiently precise to differentiate it from other defects and allow an investigation)

(c)  the date on which the defect came into existence

(d)  the acts and omissions of the person or persons who caused the defect to come into existence

(e)  the name, last known address, and employer of each person who caused the defect to come into existence

18

(f)  the name and last known address of every person who had knowledge of the defect prior to August 29, 2005

(g)  each and every effect of the defect in producing the alleged damages

(h)  the pinpoint legal citation (or analogous identifying reference information) of every statutory or regulatory provision or other mandatory and specific federal directive that was violated by the acts and omissions that caused the defect to come into existence.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds that it is compound. Because of the breadth of the interrogatory, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state the following:

(a-b) The USACE were aware of the following defects in the levee system:   (1) the USACE never constructed levees along portions of Reach 2 of the MR-GO as required under the Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan; (2) certain of the levees constructed by the USACE – as set forth in the responses herein – were built with materials unsuitable for levees intended to protect urban populated areas; (3) the tops of most levees were constructed below the heights specified in designs because of the use of NGVD29 rather than mean sea level figures for the Greater New Orleans area; and (4) most levees were designed based on faulty technical or engineering assumptions, including, but not limited to, the Standard Project Hurricane.

19

(c)     Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(d)     Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(e)     Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(f)     Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

(g)     (1) the USACE never constructed levees along portions of Reach 2 of the MR-GO as required under the Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan which permitted storm surge water to inundate parts of Greater New Orleans; (2) certain of the levees constructed by the USACE – as set forth in the responses herein – were built with materials unsuitable for levees intended to protect urban populated areas which caused such levees to either be susceptible to underseepage or to disintegrate under the force of storm surge waters; (3) the tops of certain levees were constructed below the heights specified in designs because of the use of NGVD29 rather than mean sea level figures for the Greater New Orleans area, and the lowered heights permitted flood waters to overtop these structures; and (4) certain levees were designed based on faulty technical or engineering assumptions, including, but not limited to, the Standard Project Hurricane, which caused such structures to be designed or constructed in a weakened state.

(h)     Information in the possession of Propounding Party and not yet released or provided to Responding Parties.

INTERROGATORY NO. 11:

Specify the permeability coefficient or coefficients that were used by Robert Bea and fully describe the basis for his use of them in determining that underseepage "contribut[ed] to the failure of the flood protection structure adjacent to the Lower 9th Ward." Bea Declaration ¶ 26.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Notwithstanding the foregoing and without waiving any objection to this interrogatory, Responding Parties state the permeability coefficients were $1 \times 10^{-1}$ to $1 \times 10^{-6}$ cm/sec. Dr. Bea's bases for use of these permeability coefficients were documentation on permeability tests in the lab and in the field on marsh and swamp soils. In addition, his observations in the field on the failure of levees constructed on or with swamp or marsh soils that involved through and underbase seepage. Further information on this topic can be found by Propounding Parties in the transcript of Dr. Bea's recent deposition and in a paper entitled *New Orleans & Hurricane Katrina: II – The Central Region and Lower Ninth Ward* written by R. B. Seed, R. G. Bea, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray, C Cheung, D. Cobos-Roa, L. Ehrensing, L. F. Harder, J. M. Pestana, M. F. Reimer, J. D. Rogers, R. Storesund, X. Vera-Grunauer, and J. E. Wartman (Katrina II), a copy of which is attached hereto as Exhibit A.


INTERROGATORY NO. 12:

Set forth in full and complete detail each of the "transient flow analyses" that have shown, in the opinion of Robert Bea, "that the rising storm surge in the IHNC was effectively transmitted to the inboard side levee toe area." Bea Declaration ¶ 14.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.12:

*See* Katrina II, attached hereto as Exhibit A.

INTERROGATORY NO. 13:

Describe fully in narrative detail the "[a]bundant evidence of flood side cracking and sinkhole formation on the protected side," Bea Declaration ¶ 14, that Robert Bea relied on in forming his opinion that underseepage "contribut[ed] to the failure of the flood protection structure adjacent to the Lower 9th Ward."

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties object to Propounding Party's request for an explanation "in full narrative detail" as being vague, ambiguous, and overbroad.  Because of the breadth of the phrase "in full narrative detail," Responding Parties further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that Dr. Bea's statement were based on his personal, visual observations on or about September 24, 2005.

INTERROGATORY NO. 14:

Inasmuch as Robert Bea concluded his declaration by opining that "the failure of the flood protection structure adjacent to the Lower 9th Ward *potentially* was caused by underseepage," does he have an opinion which he holds to a reasonable degree of professional certainty as to whether underseepage more probably than not caused the failure of the flood protection structure adjacent to the Lower 9th Ward and, if so, what is his opinion?

22

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:

Yes.  Underseepage was a primary (major) contributor to the breaches in the north and south lower ninth ward.  Further information responsive to this question can be found in an article entitled *Connecting the Lower 9thWard 'Dots'* written by Dr. Robert Bea (Connecting the Dots), a true and correct copy of which is attached hereto as Exhibit B.

INTERROGATORY NO. 15:

Set forth in full detail the scientific analyses and mathematical calculations which underlie your assertion that the enlargement of the GIWW by construction of the MRGO "exponentially enhanced the surge risk."

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Because of the breadth of the phrase "[s]et forth in full detail," Responding Parties further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties refer Propounding Parties to Chapter 7 of the Team Louisiana Report.

INTERROGATORY NO. 16:

Describe in complete and full narrative detail the basis for your assertion that the Corps "fail[ed] to ensure the use of proper materials in constructing the levees."

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony. Responding Parties object to Propounding Party's request for an explanation "in complete and full narrative detail" as being vague, ambiguous, and overbroad.

23

Because of the breadth of the phrase "in complete and full narrative detail," Responding Parties further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objections to this interrogatory, Responding Parties state that the USACE's design manual for construction of levees is document no. EM 1110-2-1913, entitled *Engineering and Design –Design and Construction of Levees* ("USACE Levee Manual). This document provides that "any soil is suitable for constructing levees, except very wet, fine-grained soils or highly organic soils." *See* Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems*, Vol. 10 (Final Report, July 31, 2006) (ILIT Final Report Vol. 10). Where the USACE used cohesive soils to construct a levee, the levees performed satisfactorily.   On the other hand, where the USACE used the types of soils warned against in the USACE Levee Manual, the levees or spoil retention dykes performed poorly.

These conclusions are reflected in the observations of the ILIT investigation team set forth in the following paragraphs:

*1.      ILIT Report Observations on Locations of Adequate Levee Performance*

  *A.      Eastern Perimeter of New Orleans East*

"In this vicinity, the flood protection system consists primarily of earthen levees that are protected by both low-lying swamplands and trees on both the outboard (water) side and the inboard (protected) side of the levee. . . . The overall condition of the levees in this area is excellent and no observable damage or erosion was encountered. . . . The excellent performance at this site was likely due to a number of factors, including . . . utilization of moderately to highly erosion-resistant embankment materials." ILIT Final Report Vol. 10 at 10-15.

### B.      Entergy Michoud Generating Plant

"In this vicinity, the flood protection system consists primarily of earthen levees. . . .
The overall condition of the levees in this area was good and no major damage was encountered.
. . .   The good performance of this embankment in the face of sustained moderate overtopping
was likely due to several factors including:  . . .  utilization of moderately to highly erosion
resistant embankment materials (clay) . . . ." ILIT Final Report Vol. 10 at 10-15 to 10-16.

### C.      GIWW/MRGO Southern Shoreline Levee

"In this vicinity, the flood protection system consists primarily of earthen levees with a
concrete floodwall beneath the bridge that connects the eastern and western levee segments. . . .
 The overall condition of the levees in this area was good and no major damage was encountered.
. . .  The good performance of the levee system at this location was likely due in large part to
the utilization of moderately to highly erosion-resistant embankment materials; these erosion
resistant (clayey) materials were also capable of absorbing impact loads from the barges,
allowing the barges to come to rest on the levee without breaching it."  ILIT Final Report Vol.
10 at 10-17 to 10-18.

### D.      St. Bernard Parish Interior Levee (Forty Arpent Levee)

"In this vicinity, the flood protection system was designed to be a secondary containment
system for potential overtopping-related flooding behind the MRGO frontage levees and to act
as a barrier against rainwater that is discharged into the swamp area. . . .  Although this levee
was significantly overtopped, it did not experience significant damage or erosion. . . .  The
clearly excellent erosion resistance of this secondary levee, despite significant overtopping, was
the result of use of cohesive, clayey soils as the levee fill material. The ability of these soils to
sustain significant overtopping without catastrophic erosion is an important lesson. . . .  The

25

performance factor that most significantly influenced the observed surprisingly good performance of the flood protection levee embankment at this site was the utilization of moderately to highly erosion-resistant embankment materials."  ILIT Final Report Vol. 10 at 10-21.

**2.      ILIT Report Observations on Locations of Inadequate Levee Performance**

**A.      Southeast Corner of New Orleans East**

"Location 4 is situated at the southeast corner of the New Orleans East polder. In this vicinity, the flood protection system consists primarily of earthen levees adjacent to the GIWW, fronting Lake Borgne.  . . .  [S]ignificant erosion and breaching occurred at this location, and this length of levee frontage was the single largest point of ingress for the floodwaters that eventually inundated the New Orleans East protected basin.  . . .  Performance factors of the levee system that impacted the unacceptable performance of the earthen levees along this frontage included  . . . the utilization of embankment fill soils of variable erosion resistance (and permeability) so that both wind-driven wave erosion and through-flow erosion, as well as overtopping (wave splashover) erosion are all likely to have been active at this location."  ILIT Final Report Vol. 10 at 10-15 to 10-16.

**B.      Bayou Bienvenue Control Structure**

Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"In this vicinity, the flood protection system consists primarily of earthen levees that connect, with a concrete control structure (with steel floodgates) across Bayou Bienvenue. . . . The southern side of the control structure did not perform well; massive erosion and scour produced a major breach at the contact between the concrete control structure and the adjacent earthen levee. The southern side of the control structure was built using mainly spoils from the excavation of the adjacent MRGO channel that are more erosion-susceptible than the clays on the northern side of the control structure." ILIT Final Report Vol. 10 at 10-20 to 10-21.

### C.       *Mississippi River Gulf Outlet*

Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"Location 8 is situated along the western edge of the MRGO, south of the Bayou Bienvenue Control structure and north of the Bayou Dupre Control structure. In this vicinity, the flood protection system consists primarily of earthen levees constructed from excavated materials from the MRGO channel.  . . .  The identified "spoil area" corresponds to the zone of poor levee performance.  . . .  A bank erosion study was performed by the USACE (1988) that identified the presence of highly erosion-susceptible soils within the MRGO alignment. . . . Performance factors of the levee system that impacted the performance of the flood protection components included the following: utilization of highly erosive embankment materials, lack of appropriate surface slope protection to minimize erosion of the flood side of the levee during the

27

storm-surge" ILIT Final Report Vol. 10 at 10-19 to 10-20.

### D.       Bayou Dupre Control Structure

Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"In this vicinity, the flood protection system consists primarily of earthen levees that connect via a concrete and steel flood access structure to a concrete control structure across Bayou Dupre. . . .  The area to the south of the control structure performed very well, while the northern side of the control structure did not perform well, with significant erosion and scour as a result of the overtopping. . . .  Performance factors that impacted the performance of the flood protection components at this location included the following: utilization of highly erosive embankment materials, lack of appropriate surface slope protection to minimize erosion of the flood side of the levee during the storm-surge" ILIT Final Report Vol. 10 at 10-20 to 10-21.

### 3.       ILIT Report Conclusions Concerning Levee Performance Factors

"As with the ILIT team's overall observations and studies of failures and successful performances throughout the New Orleans Flood Defense System, it is apparent that the use of highly erodeable soils such as cohesionless (sandy) soils represents a potentially unacceptably hazardous condition, and that the use of suitably compacted cohesive, clayey soils with relatively high intrinsic resistance to erosion can provide a measure of ductility and resilience to an otherwise brittle system (levees that can overtop for some number of hours, without

28

catastrophically eroding and breaching.)" ILIT Final Report Vol. 10 at 10-22.

**4.      *Team Louisiana's Similar Observations***

Team Louisiana made similar observations with respect to the alleged levees along the

MR-GO (Chalmette Extension).  Again, Responding Parties contend that that the USACE never

constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE

constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by

any member of the ILIT team to describe any putative flood control structure along any portion

of the MR-GO is not to be construed as an admission by Responding Parties that the USACE

ever constructed a flood control structure, of any kind including, but not limited to, levees, on or

along the MR-GO.

The authors of the Team Louisiana Report observed, with respect to the putative levees

along Reach 2 of the MR-GO, that they were constructed from unsuitable materials:

> Based on visual observations in the field, post Katrina, many miles
>
> of the Chalmette and New Orleans East Levees were constructed
>
> of shell-rich sands derived from excavation of the adjacent GIWW
>
> and MRGO channels, rather than the clay soils specified for levees
>
> protecting urban areas (EM 1110-2-1913, 1978 ed.).  This
>
> observation was also made by members of the ILIT team.

Team Louisiana Report Vol. 6 at 201.

INTERROGATORY NO. 17:

For each location where a levee or floodwall "collapsed or was otherwise compromised

or overtopped due to construction . . . with porous, erodible lightweight 'shell sand' fill, or other

inappropriate fill material not suitable for levee construction," MRGO Master Complaint ¶ 71,

please provide all of the available information, including without limitation:

(a)  the precise location (sufficiently precise to differentiate it from other locations and allow an investigation)

(b)  the location (city, state, street address, and room number or other identifying designation) of any and all soil samples (including borings) or other materials obtained from this location

(c)  the identity of the person or persons who have custody and control of the samples or other materials

(d)  a complete and full geotechnical description of the characteristics of the samples and other materials obtained

(e)  the identity of any and all persons who have tested or otherwise analyzed the samples and other materials obtained

(f)  the dates on which and locations at which testing or analysis of the samples and other materials was performed

(g)  the commonly accepted name or a complete description of the tests or other analysis, in sufficient detail to allow a qualified expert to replicate the tests or analyses

(h)  the conditions (*e.g.,* temperature and humidity) under which samples and materials have been maintained

(i)  a chronological listing of all persons who have had custody and control of the samples and materials, in sufficient detail to reveal an unbroken chain of custody from the date and time of sampling until the present

(j)  a description of each and every document that evidences the chain of custody of each soil sample or other material obtained

30

(k)  the name and address of the person or persons who documented the chain of custody for each soil sample or other material.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony as provided for in Case Management Order No. 4. Notwithstanding the foregoing, and without waiving any objections to this interrogatory, Responding Parties not the following levee failures due to the use of "porous, erodible lightweight 'shell sand' fill, or other inappropriate fill material not suitable for levee construction" observed by the authors of the ILIT and Team Louisiana Reports.

*1.*     ***ILIT Report Observations on Locations of Inadequate Levee Performance***

  *A.*     ***Southeast Corner of New Orleans East***

"Location 4 is situated at the southeast corner of the New Orleans East polder. In this vicinity, the flood protection system consists primarily of earthen levees adjacent to the GIWW, fronting Lake Borgne.  . . .  [S]ignificant erosion and breaching occurred at this location, and this length of levee frontage was the single largest point of ingress for the floodwaters that eventually inundated the New Orleans East protected basin.  . . .  Performance factors of the levee system that impacted the unacceptable performance of the earthen levees along this frontage included  . . . the utilization of embankment fill soils of variable erosion resistance (and permeability) so that both wind-driven wave erosion and through-flow erosion, as well as overtopping (wave splashover) erosion are all likely to have been active at this location."  ILIT Final Report Vol. 10 at 10-15 to 10-16.

  *B.*     ***Bayou Bienvenue Control Structure***

Responding Parties contend that that the USACE never constructed levees along

substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"In this vicinity, the flood protection system consists primarily of earthen levees that connect, with a concrete control structure (with steel floodgates) across Bayou Bienvenue.  . . . The southern side of the control structure did not perform well; massive erosion and scour produced a major breach at the contact between the concrete control structure and the adjacent earthen levee. The southern side of the control structure was built using mainly spoils from the excavation of the adjacent MRGO channel that are more erosion-susceptible than the clays on the northern side of the control structure." ILIT Final Report Vol. 10 at 10-20 to 10-21.

### C.      *Mississippi River Gulf Outlet*

Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"Location 8 is situated along the western edge of the MRGO, south of the Bayou Bienvenue Control structure and north of the Bayou Dupre Control structure. In this vicinity, the flood protection system consists primarily of earthen levees constructed from excavated materials from the MRGO channel.  . . .   The identified "spoil area" corresponds to the zone of

poor levee performance.  . . .  A bank erosion study was performed by the USACE (1988) that identified the presence of highly erosion-susceptible soils within the MRGO alignment.  . . . Performance factors of the levee system that impacted the performance of the flood protection components included the following: utilization of highly erosive embankment materials, lack of appropriate surface slope protection to minimize erosion of the flood side of the levee during the storm-surge" ILIT Final Report Vol. 10 at 10-19 to 10-20.

### D.        Bayou Dupre Control Structure

Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

"In this vicinity, the flood protection system consists primarily of earthen levees that connect via a concrete and steel flood access structure to a concrete control structure across Bayou Dupre.  . . .  The area to the south of the control structure performed very well, while the northern side of the control structure did not perform well, with significant erosion and scour as a result of the overtopping.  . . .  Performance factors that impacted the performance of the flood protection components at this location included the following: utilization of highly erosive embankment materials, lack of appropriate surface slope protection to minimize erosion of the flood side of the levee during the storm-surge" ILIT Final Report Vol. 10 at 10-20 to 10-21.

### 2.        ILIT Report Conclusions Concerning Levee Performance Factors

"As with the ILIT team's overall observations and studies of failures and successful performances throughout the New Orleans Flood Defense System, it is apparent that the use of highly erodeable soils such as cohesionless (sandy) soils represents a potentially unacceptably hazardous condition, and that the use of suitably compacted cohesive, clayey soils with relatively high intrinsic resistance to erosion can provide a measure of ductility and resilience to an otherwise brittle system (levees that can overtop for some number of hours, without catastrophically eroding and breaching.)" ILIT Final Report Vol. 10 at 10-22.

**3.      *Team Louisiana's Similar Observations***

Team Louisiana made similar observations with respect to the alleged levees along the MR-GO (Chalmette Extension).  Again, Responding Parties contend that that the USACE never constructed levees along substantial portions of Reach 2 of the MR-GO.  Instead, the USACE constructed spoil banks and spoil retention dykes.  Accordingly, any use of the term "levee" by any member of the ILIT team to describe any putative flood control structure along any portion of the MR-GO is not to be construed as an admission by Responding Parties that the USACE ever constructed a flood control structure, of any kind including, but not limited to, levees, on or along the MR-GO.

The authors of the Team Louisiana Report observed, with respect to the putative levees along Reach 2 of the MR-GO, that they were constructed from unsuitable materials:

> Based on visual observations in the field, post Katrina, many miles
> of the Chalmette and New Orleans East Levees were constructed
> of shell-rich sands derived from excavation of the adjacent GIWW
> and MRGO channels, rather than the clay soils specified for levees
> protecting urban areas (EM 1110-2-1913, 1978 ed.).  This

observation was also made by members of the ILIT team.

Team Louisiana Report Vol. 6 at 201.

INTERROGATORY NO. 18:

For each "design, engineering or construction criteri[on] for levees, flood walls, and/or spoil banks" that you contend was "violated," MRGO Master Complaint ¶ 74, please provide all of the available information, including without limitation:

(a)  the pinpoint legal citation (or analogous identifying reference information) for the criterion

(b)  the date or inclusive dates on which the criterion was violated

(c)  the identity of the person or persons who violated it

(d)  the act or omission that violated or caused a violation of the criterion

(e)  the results and consequences of the act or omission that violated the criterion

(f)  the identity of each and every person who knew or should have known that the act or omission that violated or resulted in a violation of the criterion.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony as provided for in Case Management Order No. 4. Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties note that the USACE used fine-grained soils or highly organic soils in the construction of levees intended to protect urban areas from flooding in contravention of their own USACE Levee Manual.

35

INTERROGATORY NO. 19:

For each act and omission that you contend failed to comply with state or federal "regulations affecting design, engineering, construction, maintenance and operations of levees, flood walls and spoil banks," MRGO Master Complaint ¶ 74, please provide all of the available information, including without limitation:

(a)  the date or inclusive dates on which the act or omission occurred

(b)  a complete description of the act or omission

(c)  the name, last known address, and employer of the person or persons who acted or failed to act

(d)  the effects and consequences of the act or omission

(e)  the name and last known address of every person with knowledge of the act or omission

(f)  the pinpoint legal citation (or analogous identifying reference information) for the regulations that were violated

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony as provided for in Case Management Order No. 4.  In addition, documents which would contain this information are in the possession of Propounding Parties. Propounding Parties, however, have not yet provided Responding Parties with copies of these documents as required under Case Management Order no. 4.  Accordingly, Responding Parties are unable to respond to this interrogatory.

INTERROGATORY NO. 20:

For each occasion on which the Corps failed to monitor and properly inspect the work of

the contractor, MRGO Master Complaint ¶¶ 47, 56, please provide all of the available

information, including without limitation:

(a)  the date or inclusive dates

(b) the precise location of the work (sufficiently precise to differentiate the work from

other work and allow an investigation of the allegation)

(c) a detailed narrative description of the work that was not monitored or properly

inspected;

(d) the identity of the persons who performed the work;

(e) the identity of the persons who supervised the work;

(f) the identity of the persons who failed to monitor and properly inspect the work

(g) a detailed narrative description of the consequences of the work in causing or

contributing to the alleged damages

(h) the identity of the persons who knew, prior to August 29, 2005, that the work was

negligently performed or substandard

(i) the identity of the persons who should have known, prior to August 29, 2005, that the

work was negligently performed or substandard

(j) a complete and detailed description of how the work would have been performed if it

had been monitored and properly inspected.

<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20</u>:

Responding Parties object to this interrogatory to the extent it seeks the premature

disclosure of expert testimony as provided for in Case Management Order No. 4.  In addition,

documents which would contain this information are in the possession of Propounding Parties.

Propounding Parties, however, have not yet provided Responding Parties with copies of these

documents as required under Case Management Order no. 4.  Accordingly, Responding Parties are unable to respond to this interrogatory.

INTERROGATORY NO. 21:

With respect to each "warning of impending disaster that would fall upon Greater New Orleans as a result of the negligent design, construction, operation and maintenance of the MR-GO and the failure of the Corps to timely do what it should have done to eliminate or at least ameliorate the impending inundation of Greater New Orleans," Master Complaint ¶ 33, please provide all of the available information, including without limitation:

(a)  the contents of the notice

(b)  the date of the notice

(c)  the identity of the person or persons who sent or gave the notice

(d)  the identity of the person or persons who received the notice

(e) a detailed narrative description of the acts and omissions of the recipient upon receipt of the notice

(f) a detailed narrative description of the actions that you contend the recipient ought to have performed upon receipt.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:

Information related to public meetings and written notices in which persons expressed concerns about the dangers posed by the MR-GO are in the possession of Propounding Parties. Propounding Parties, however, have not made such information available to Responding Parties as required under Case Management Order no.4.  Accordingly, Responding Parties can not respond to this interrogatory at this time, and they will supplement their response to this interrogatory after they have received and reviewed the relevant documents from Propounding

38

Parties.

INTERROGATORY NO. 22:

Set forth in complete and full detail the basis for your assertion that "the speeding impact of the surge jet entering from the east through the MRGO/GIWW ship channel" damaged levees and floodwalls along the IHNC.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:

As explained herein, the intersection of the "land cut" portion of the MR-GO (Reach 2) with the GIWW produced a single point at which storm surge traveling along the GIWW and the MR-GO would merge, thereby combining and focusing the two storm surge forces within the Reach 1 of the MR-GO (the combined MR-GO/GIWW), and causing increased stress and pressure on flood control structures along the GIWW, Reach 1 and the Inner Harbor Navigation Canal (IHCN or Industrial Canal).  In addition, the spoil bank retaining structures along the southern bank of the MR-GO and the flood control structures along the banks of the GIWW (east of the confluence of Reach 2 of the MR-GO and the GIWW) created a "funnel" which would further concentrate storm surge forces within Reach 1 of the MR-GO.

The combined forces generated by these two conditions struck and undermined levees and floodwalls along the IHNC as is evidenced by the fact that one of the earliest recorded failures of the Greater New Orleans flood protection system occurred along the IHNC before Katrina made landfall.  According to the Team Louisiana Report:

> The first sustained flooding of GNO residential areas occurred well
>
> before Katrina made landfall in Louisiana. Between 4:30 and 5:00
>
> am, water began to come through a gap on the west bank of the
>
> IHNC where the CSX Railroad crosses the northern arm of the

canal, adjacent, and parallel to, the Interstate 10 bridge . . . .

Here, sand bags had been laid across the tracks . . . . The metal

gate that should have sealed this opening had been damaged during

a train derailment, and had been removed for repair. This water

flowed into the Desire or Upper 9th Ward neighborhood when a

nearby water level recorder on the IHNC recorded the surge was 9

feet . . . . Temporary protection on the east side of the canal also

apparently blew out about this time initiating the first flooding of

the Orleans East Polder.  A larger breach developed south of the

railroad crossing, also on the west side of the IHNC, near the

Florida Avenue Bridge at the France Road terminal . . .  at about

the same time  . . . . This was the major breach that flooded the

eastern part of Orleans Metro south of the Metairie Ridge  . . . .

Team Louisiana Report Vol. 3 at 53.

INTERROGATORY NO. 23:

Describe in full narrative detail the basis for your assertion that "the Corps negligently

failed to consider any alteration of the project" after 1981.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23:

Responding Parties object to this interrogatory to the extent it seeks the premature

disclosure of expert testimony.  Responding Parties further object to this interrogatory on the

grounds that it is vague, ambiguous, and overbroad as to time.  Specifically, the phrase "full

narrative detail" is not limited to facts, but may also encompass the thoughts, impressions and

ideas of Plaintiffs' counsel, and the opinions of Responding Parties experts.  Because of the

breadth of the phrase, Responding Parties therefore further object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine.

Notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state documentation related to the decisions made by the USACE with respect to the initial construction, maintenance, operation, repair or upgrade of the MR-GO or the LPVHPP are in the possession of Propounding Parties.  Propounding Parties, however, have not made this information completely available to Responding Parties as required under Case Management Order no.4, and Responding Parties are therefore unable to respond to this interrogatory at this time.  Responding Parties shall supplement their response to this interrogatory once that they receive and review the relevant data.

INTERROGATORY NO. 26:

Describe fully and completely the basis for your assertion that the Corps knew or should have known in 1965 that the characteristic rate of subsidence in Greater New Orleans was "3 to 4 feet/century."

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 26:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony.  Responding Parties further object to this interrogatory on the grounds it is vague and ambiguous with respect to the phrase "[d]escribe fully and completely the basis for your assertion . . .  ."  As used, the phrase is not limited to simple facts, but includes expert and attorneys opinions, conclusions, observations, investigations, and analysis which are either protected from disclosure by the attorney-client privilege or work product doctrine, or which constitute a premature request for expert opinion.

41

Accordingly, notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties refer Propounding Parties to the Team Louisiana Report Vol. 5 at 115-137.

INTERROGATORY NO. 27:

With respect to each levee district that negligently failed to carry out its responsibility for the care and inspection of levees, please set forth in full narrative detail the acts and omissions that did not meet the applicable standard of care.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 27:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony pursuant to Case Management Order no. 4.  Responding Parties further object to this interrogatory on the grounds that it is vague and ambiguous in that Propounding Party does not specify whether the "levee districts" referred to as those levee districts formed under, or by, an act of the Louisiana Legislature, or under, or by, some other authority.

Responding Parties further object to this interrogatory on the grounds that it assumes facts not in evidence in that there has been no evidence produced establishing any negligence by any "levee district," regardless of the type or authority of such district, with respect to the care and inspection of levees.

The interrogatory is also vague and ambiguous with respect to the use of the phrase "care and inspection of levees".  Specifically, the term "levees" does not specify or differentiate between either (a) such flood protection structures which were constructed by State or local authorities, but transferred to federal ownership; (b) such flood protection structures which were constructed by State or local authorities, ownership retained by State or local authorities, but

42

responsibility for maintenance or repair assumed by, or transferred to, the USACE; (c) such

flood control structures constructed by the USACE, but using funds appropriated by Congress

for purposes other than flood control; (d) so-called "levees and floodwalls" that also serve non-

flood control purposes; (e) and such flood control structures which were wholly "designed,"

owned, in the exclusive custody of, maintained or repaired by entities other then the United

States or the USACE.

In addition, Propounding Party does not specify whether they are referring to any mound

of soil, or a flood control structure constructed in compliance with the USACE's standards,

guidelines, or policies governing the construction of levees intended to protect human life using

funds specifically appropriated by the United States Congress for the purpose of levee

construction.

With respect to the phrase "care and inspection," Propounding Party does not identify or

specify any criteria, guidelines, or other standards establishing the manner in which such

purported levees were to be cared for or inspected by such "levee districts."

Finally, Responding Parties object to this interrogatory on the grounds it is vague and

ambiguous with respect to the phrase "set forth in full narrative detail."  As used, the phrase is

not limited to simple facts, but includes expert and attorneys opinions, conclusions, observations,

investigations, and analysis which are either protected from disclosure by the attorney-client

privilege or work product doctrine, or which constitute a premature request for expert opinion.

Finally, documents which would contain this information are in the possession of

Propounding Parties.  Propounding Parties, however, have not yet provided Responding Parties

with copies of these documents as required under Case Management Order no. 4.  Accordingly,

Responding Parties are unable to respond to this interrogatory.

43

INTERROGATORY NO. 28:

If you contend that the United States is liable for failing to insure that a levee district fulfilled its responsibility for the care and inspection of a levee or other flood-control structure, please set forth in full narrative detail the basis for your contention.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 28:

Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony pursuant to Case Management Order no. 4.  Responding Parties further object to this interrogatory on the grounds that it is vague and ambiguous in that Propounding Party does not specify whether the "levee districts" referred to as those levee districts formed under, or by, an act of the Louisiana Legislature, or under, or by, some other authority.

Responding Parties further object to this interrogatory on the grounds that it assumes facts not in evidence in that there has been no evidence produced establishing any negligence by any "levee district," regardless of the type or authority of such district, with respect to the care and inspection of levees.

The interrogatory is also vague and ambiguous with respect to the use of the phrase "care and inspection of levees".  Specifically, the term "levees" does not specify or differentiate between either (a) such flood protection structures which were constructed by State or local authorities, but transferred to federal ownership; (b) such flood protection structures which were constructed by State or local authorities, ownership retained by State or local authorities, but responsibility for maintenance or repair assumed by, or transferred to, the USACE; (c) such flood control structures constructed by the USACE, but using funds appropriated by Congress for purposes other than flood control; (d) so-called "levees and floodwalls" that also serve non-

flood control purposes; (e) and such flood control structures which were wholly "designed," owned, in the exclusive custody of, maintained or repaired by entities other then the United States or the USACE.

In addition, Propounding Party does not specify whether they are referring to any mound of soil, or a flood control structure constructed in compliance with the USACE's standards, guidelines, or policies governing the construction of levees intended to protect human life using funds specifically appropriated by the United States Congress for the purpose of levee construction.

With respect to the phrase "care and inspection," Propounding Party does not identify or specify any criteria, guidelines, or other standards establishing the manner in which such purported levees were to be cared for or inspected by such "levee districts."

Finally, Responding Parties object to this interrogatory on the grounds it is vague and ambiguous with respect to the phrase "set forth in full narrative detail."  As used, the phrase is not limited to simple facts, but includes expert and attorneys opinions, conclusions, observations, investigations, and analysis which are either protected from disclosure by the attorney-client privilege or work product doctrine, or which constitute a premature request for expert opinion. Responding Parties object to this interrogatory to the extent it seeks the premature disclosure of expert testimony as provided for in Case Management Order No. 4.  In addition, documents which would contain this information are in the possession of Propounding Parties.  Propounding Parties, however, have not yet provided Responding Parties with copies of these documents as required under Case Management Order no. 4.  Accordingly, Responding Parties are unable to respond to this interrogatory.

INTERROGATORY NO. 29:

If you base your complaint, in whole or in part, on any violation by an employee of the United States of America of any federal or state statute, regulation, policy, or other similar law or directive, state your contention and the basis for the contention.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 29:

The identity of Defendants' employees who worked on either the MR-GO or the LPVHPP projects is in the possession of Propounding Parties.  Propounding Parties, however, have yet to provide Responding Parties with copies of all the relevant document in their possession as required under Case Management Order no. 4. According, Responding Parties cannot respond to this interrogatory at this time, and Responding Parties will supplement their response to this interrogatory once they have received and reviewed the relevant documents.

INTERROGATORY NO. 30:

Identify all documents that you contend support your allegations and contentions in this lawsuit.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 30:

Propounding Parties have yet to provide Responding Parties with copies of all the relevant document in their possession as required under Case Management Order no. 4. According, Responding Parties cannot respond to this interrogatory at this time, and Responding Parties will supplement their response to this interrogatory once they have received and reviewed the relevant documents.

Notwithstanding the foregoing, Responding Parties identify the following documents:

1. Louisiana Statute creating the Board of Commissioners of the Orleans Parish Levee District

2. Louisiana Statute creating the Board of Commissioners of the Lake Borgne Levee District

46

3.  Federal Regulations Regarding Maintenance of the MRGO

4.  Topographical maps depicting Class Area Pre- and Post-Katrina

5.  Documents substantiating each class representative's losses

6.  Post-Katrina Photographs of Class Representatives' Damaged Properties & Neighborhoods

7.  Maps Identifying Locations of Class Representatives' Damaged Properties

8.  Maps and Photographs Identifying All Navigable Waterways Surrounding the Class Area, Including Levees, Floodwalls, and/or Spoil banks, and all Canal Breaches

9.  Photographs and Other Depictions of New Orleans Metropolitan Area Illustrating the Depth of Inundation

10. Report of Robert Bea, Ph.D.

11. Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005 Report of Independent Levee Investigation Team Funded by the National Science Foundation

12. Report of the Committee on Homeland Security and Government Affairs - United States Senate, Washington D.C.

13. Final Report of the Subject By-Partisan Committee to Investigate the Preparation for the Response of Hurricane Katrina (A Failure of Initiative)

14. Team Louisiana Report - The Failure of the New Orleans Levee System during Hurricane Katrina

15. Model/Simulation of Water Transport From the Breaches

16. Public Records Verifying Class Demographics

17. Weather Bureau Data Regarding "Standard Project Hurricane" ("SPH"), Including Promulgations from 1959 and 1972

18. 1979 National Oceanic and Atmospheric Administration ("NOAA") Technical Report NWS 23

19. Engineering Regulation ER 1110-2-1453, issued in 1981 by the Office of the Chief of Engineers in Washington

20. The National Geodetic Vertical Datum of 1929 ("NGVD29").

21. Data from the levee project design authorized by Congress, known as the "Barrier Plan," included a series of levees along the lakefront, concrete floodwalls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook at the northern end of the IHNC.

22. December, 1977 court ruling enjoining the Corps from constructing the barrier complex and certain other parts of the Project, until a revised Environmental Impact Statement was prepared and accepted

23. The Flood Control Act of 1928

24. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000.

25. Information from the July of 1914 authorization by the Louisiana State Legislature to the City of New Orleans to locate and construct a deep water canal between the Mississippi River and Lake Pontchartrain. Construction of the Inner Harbor Navigations Canal ("IHNC"), which is also known as the Industrial Canal, commenced on June 6, 1918.

26. Information regarding the Gulf Intracoastal Waterway ("GIWW"), which is the navigation canal project completed between New Orleans and Corpus Christi, Texas by mid-1942 under the authority of the Corps.

27. Information regarding the construction and maintenance of the Mississippi River Gulf Outlet navigational canal ("MR-GO").

28. The Corps' report on Hurricane Betsy (USACE, 1965).

29. The Rivers and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945).

30. The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 662, as amended in 1946 and 1958, et seq.

31. The 1958 DOI report concluding that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study would be a prerequisite to predictions of the MR-GO's effects and establishment of mitigatory measures.

32. September 25, 1951 report by the Corps to Congress with recommendations for construction of the MR-GO ("MR-GO Authorization Report"), including the letter from the former Corps Chief of Engineers stating that the proposed MR-GO would be connected to the IHNC by its own *separate* canal running parallel to the GIWW and the report from the Corps' Board of Engineers recommending further studies into the MR-GO's impact on the Louisiana coast.

33. Executive Order 11990.

34. National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (c).

35. The Water Resources Development Act of 1990 (WRDA).

36. The Coastal Zone Management Act, 16 U.S.C. § 1452, *et. seq*.

37. The Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et. seq*.

38. Record of the Congressional hearings which authorized the construction of the MR-GO in 1956 (P.L.-455) and the record of the Corps' subsequent actions regarding the MR-GO.

39. "1984 Re-Evaluation Study" means the study conducted by the Army Corps, published in 1984, that examined the feasibility of providing hurricane protection by raising, elevating, and strengthening levees and floodwalls in Greater New Orleans, as referred to and described in Volume 1, pages 26-27 of the IPET Report.

40. Mississippi River Gulf Outlet Deep-Draft De-Authorization Interim Report to Congress, dated December 2006.

41. Status Report - Comprehensive Plan for Timely Modification of the Mississippi River Gulf Outlet, Lee Wilson and Associates, Inc., (July 31, 2000)

42. "Mister Go Must Go; a Guide for the Army Corps' Congressionally-Directed Closure of the Mississippi River Gulf Outlet," Dr. John Day, et al, (December 4, 2006)

43. Mississippi River-Gulf Outlet, St. Bernard Parish, La., Bank Erosion, Reconnaissance Report, United States Army Corps of Engineers (January 1994)

44. Notice of Study Findings, Louisiana Coastal Area, Louisiana, Shore and Barrier Island Erosion, Initial Evaluation Study, United States Army Corps of Engineers (July 1984)

45. An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet, Louisiana and an Outline of Proposed Fish and Wildlife Studies, Army Corps of Engineers (April 1958)

46. The Army Corps' report on the proposed Mississippi River-Gulf Outlet was submitted to the House Committee on Rivers and Harbors. *See* H. R. Doc. No. 71-46 (June 11, 1930)

47. September 18, 1951 hearings before the House Subcommittee on Rivers and Harbors of the House Committee on Public Works with respect to the Mississippi River Gulf outlet and the Mobile to New Orleans Intracoastal Waterway"

48. July 26, 1955 Report to the House of Representatives from the House Committee on Public Works on H. R. 6309

49. Act of March 29, 1956 to "Authorize Construction of the Mississippi River Gulf-Outlet," Pub. L. 84-455, 70 Stat. 65 (1956)

50. Public Works Appropriation Act of 1958, P. L. 85- 167, 71 Stat. 416 (August 26, 1957) (act authorizing Congressional funds for MRGO construction)

51. August 24, 1957 letter from United States Secretary of the Interior, Fred A. Seaton, to Army Secretary Wilber M. Bruckner about the proposed canal.

52. September 24, 1959 memorandum from F. C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C. outlining the recommendations re MRGO made to the Army Corps, and the Army Corps' response to these recommendations

53. 1959 draft correspondence from the Secretary of the Interior to the Secretary of the Army re invitation for bids on Reach 2 of the MR-GO issued on January 30, 1959, after the 1958 Amendments were enacted

54. May 4, 1959 correspondence to the Army Corps District Engineer from W. L. Towns, Acting Regional Director for the Fish and Wildlife Service re recommendations on MRGO construction

55. Letter from Cary W. Kerlin, Field Supervisor for the United States Fish and Wildlife Service in Lafayette, Louisiana to Jack A. Stephen, Director-Secretary of the St. Bernard Parish Planning Commission in response to a written request for information concerning the MR-GO's effects on "St. Bernard Parish's wetlands and water bodies."

56. 1976 Army Corps document entitled *Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana*

57. 1958 Army Corps soil report re construction of the MR-GO, entitled *Geological Investigation of the Mississippi River-Gulf Outlet*

58. Mississippi River-Gulf Outlet, Louisiana: Design Memorandum Nos. 1-A, 1-B, 1-C

59. Mississippi River Gulf Outlet Deep-Draft De-Authorization Interim Report to Congress, dated December 2006

60. US Army Corps of Engineers Soil and Bank Erosion Report from 1998.

61. "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System", Final Report of the Interagency Performance Evaluation Task Force, Interim Final Version as of 26 March 2007

62. "New Orleans Hurricane Protection Projects Data"

50

63. "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005", Final Report of the Independent Levee Investigation Team, July 31, 2006

**64.** "The Failure of the New Orleans Levee System during Hurricane Katrina", Final Report of Team Louisiana, February 12, 2007

65. "A FAILURE OF INITIATIVE," Final Report of the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, February, 15, 2006,

66. "Hurricane Katrina - A Nation Still Unprepared", Special Report of the Committee on Homeland Security and Governmental Affairs, United States Senate, 2006

67. "Cost, Schedule, And Performance Problems Of The Lake Pontchartrain And Vicinity, Hurricane Protection Project", Report to The Congress by the Comptroller General of the United States, August 31, 1976

68. "Hurricane Protection Plan for Lake Pontchartrain and Vicinity", Hearing before the Subcommittee on Water Resources of the Committee on Public Works and Transportation, House of Representatives, Ninety-Fifth Congress, Second Session, January 5, 1978.

69. "Improved Planning Needed By The Corps Of Engineers To Resolve Environmental, Technical, And Financial Issues On The Lake Pontchartrain Hurricane Protection Project", Report to the Secretary of the Army by the U.S. General Accounting Office, August 17, 1982

70. "Expert Views On Hurricane And Flood Protection And Water Resources Planning For A Rebuild Gulf Coast", Hearing before the Subcommittee on Water Resources And Environment of the Committee on Transportation and Infrastructure, House of Representatives, One Hundred Ninth Congress, October 20, 2005

71. "HURRICANE PROTECTION - Statutory and Regulatory Framework for Levee Maintenance and Emergency Response for the Lake Pontchartrain Project", Testimony before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, December 15, 2005

72. "Protecting New Orleans: From Hurricane Barriers to Floodwalls", Report for Congress by the Congressional Research Service, January 26, 2006,

73. Documents obtained through a Freedom of Information Act Request by the United States Army Corps of Engineers, New Orleans District;

74. "Energy and Water, and Related Agencies Appropriations for Fiscal Year 2007 – Department of Defense-Civil Department of the Army-Corps of Engineers-Civil," Hearing before the U.S. Senate, Subcommittee of the Committee on Appropriations, 5

April 2006.

75. The Rivers and Harbors Act of 1899 (33 U.S.C. § 403).

76. The Flood Control Act of 1946.

77. The Flood Control Act of 1965.

78. U.S. Army Corps of Engineer Manuals

79. U.S. Army Corps of Engineer Regulations

80. Publications of the Headquarters, United States Army Corps of Engineers,

81. Documents obtained through the Defendants Document Production in Civil Action 05-4182 *In Re: Katrina Canal Breaches Consolidated Litigation* (E.D. La).

82. "Decision Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project," June 2007, Douglas Woolley and Leonard Shabman.

INTERROGATORY NO. 31:

Identify all witnesses that you contend have information relevant to the allegations and contentions in this lawsuit.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 31:

## I.   Plaintiff Class Representatives

| Witness | Subject Matter |
|---------|----------------|
| Kenneth Paul Armstrong, Sr.<br>28 Park Place Dr., #601<br>Covington, LA 70433 | Fact testimony re personal experiences and losses;<br>Lower 9th Ward & St. Bernard Sub-Class Rep |
| Jeanine B. Armstrong<br>28 Park Place Dr., #601 Covington, LA 70433 | Fact testimony re personal experiences and losses;<br>Lower 9th Ward & St. Bernard Sub-Class Rep |
| Ethel Mae Coats<br>756 Louisiana Ave.<br>New Orleans, LA 70118 | Fact testimony re personal experiences and losses;<br>Lower 9th Ward & St. Bernard Sub-Class Rep |

| | |
|---|---|
| Henry Davis<br>7650 Morel Street<br>New Orleans, LA | Fact testimony re personal experiences and losses;<br>New Orleans East Sub-Class Rep |
| Glynn Wade<br>4719 Bundy Rd<br>New Orleans, LA | Fact testimony re personal experiences and losses;<br>New Orleans East Sub-Class Rep |

## II.      Army Corps Officials/Employees

| | |
|---|---|
| Lt. Gen. Carl A. Strock<br>US Army Corps of Engineers | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Richard Varuso,<br>US Army Corps of Engineers | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Al Naomi,<br>New Orleans District, U.S. Army Corps of Engineers New Orleans, LA 70160, (504) 862-2255 | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable |

| | |
|---|---|
| | to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Colonel Richard Wagenaar, New Orleans District, U.S. Army Corps of Engineers New Orleans, LA 70160, (504) 862-2255 | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Dan Hitchings, US Army Corps of Engineers | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Greg Breerwood, US Army Corps of Engineers | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the |

| | |
|---|---|
| | Greater New Orleans area before and after Hurricane Katrina. |
| Brigadier General Robert Crear, Mississippi Valley Division, Army Corps of Engineers, 1400 Walnut Street, Vicksburg, MS 39180, (601) 634-7110 | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |
| Major General Don T. Riley, United States Army Corps of Engineers, 441 G Street, NW, Washington, DC 20314, (202) 761-0008 | The Army Corps' design, construction, operation, maintenance, and history of the MR-GO; the causes of the catastrophic flooding of the Greater New Orleans area that occurred on or around August 29, 2005, including without limitation those causes of flooding attributable to the MR-GO;  the Army Corps' efforts to reconstruct the levees, spoil banks, floodwalls, or any alleged or putative flood control measure along the MR-GO and IHNC, in the Greater New Orleans area before and after Hurricane Katrina. |

III.     **Authors and/or contributors of the Interagency Performance Evaluation Task Force ("IPET") Report**

| Witness | Subject Matter |
|---|---|
| Dr. Lewis E. Link, Academy of Leadership, University of Maryland, College Park, MD 20742-7715 (301) 405-8574 | The creation and genesis of the IPET Report, including the various studies, analyses, and conclusions detailed in the IPET Report concerning the flooding of the Greater New Orleans area on or around August 29, 2005. |
| Dr. John Jaeger, Chief of the Engineering and Construction | Water management, flood protection, and environmental enhancement and restoration |

| | |
|---|---|
| Services Division of the Huntington (WV) District, U.S. Army Corps of Engineers, 502 Eighth Street, Huntington, WV 25701, (304) 399-5662. | projects, and the design, construction, review and evaluation of water resource and construction projects, including the MRGO, IHNC and the LPVHPP |
| Jeremy Stevenson, Cost Engineering Section of the Huntington (WV) District, U.S. Army Corps of Engineers, 502 Eighth Street, Huntington, WV 25701, (304) 399-5662 | Cost engineering and project management for large civil works projects like the MR-GO, including all phases of life cycle cost estimating, project scheduling and management as well as life cycle cost engineering of navigational locks, dams, floodwalls, levees, and nonstructural flood proofing. |
| Denise Martin, U.S. Army Engineer Research and Development Center, 441 G. Street, NW, Washington, DC 20314, (202) 761-1839 | The development of information sharing architectures involving key issues of information portability, modularity, scalability, and interoperability as well as requirements identification and analysis, development, enhancement, and implementation of Computer-Aided Drafting and Design (CADD), Geographic Information Systems (GIS), and relational database management as they apply to business, engineering, management and research and development projects, like the MRGO |
| Dr. Reed L. Mosher, U.S. Army Engineer Research and Development Center, 441 G. Street, NW, Washington, DC 20314, (202) 761-1839 | Dynamic response of structures to hydraulic loads from fluid flow. |
| James Garster, U.S. Army Engineer Research and Development Center, 441 G. Street, NW, Washington, DC 20314, (202) 761-1839 | Army Corps surveying and mapping support as well as implementation of NAVD88 datum and devising procedures to meet geodetic vertical requirements using the Global Positioning System. |
| David Zilkoski, National Oceanic & Atmospheric Administration, 14th Street & Constitution Avenue, NW, Room 6217, Washington, DC 20230, (202) 482-6090 | Shallow Water Positioning System, the incorporation of geodetic data and procedures to determine accurate elevation models, and the use of GPS, LIDAR and IFSAR to generate shoreline and other coastal information as well |

| | |
|---|---|
| | as coastal subsidence, surveying, and vertical datum issues. |
| Bruce Ebersole, Coastal and Hydraulics Laboratory, U.S. Army Engineering Research and Development Center Vicksburg, MS 39180, (601) 634-2011. | Coastal and estuarine hydrodynamic and sedimentation processes, field data acquisition, and hydrology/surface water/groundwater interactions as well as tidal circulation, storm surge, nearshore wave transformation, and beach/inlet processes with a focus on numerical model development and application. |
| Dr. Joannes Westerink, Department of Civil Engineering and Geological Sciences University of Notre Dame, Notre Dame, IN 46556, (219) 631-6475. | Advanced circulation model ("ADCIRC"), hurricane storm surge prediction, tidal hydrodynamics, modeling of circulation and transport in coastal areas and oceans, finite element methods, and computational fluid mechanics. |
| Dr. Robert Dean, Civil and Coastal Engineering, 365 Weil Hall PO Box 116580, Gainesville, FL 32611-6580, (352) 392-9537 | Beach and shoreline erosion problems, wave theories, tidal inlets and coastal structures. |
| Dr. Don Resio, U.S. Army Engineer Research and Development Center, 441 G. Street, NW, Washington, DC 20314, (202) 761-1839 | The Army Corps' MORPHOS project aimed at improving the predictive state of the art for winds, waves, currents, surges, and coastal evolution due to storms. |
| Dr. Michael Sharp, U.S. Army Engineer Research and Development Center, 441 G. Street, NW, Washington, DC 20314, (202) 761-1839 | Soil dynamics, engineering geophysics and centrifuge modeling. |
| Dr. Scott Steedman, Steedman & Associates, 25 Eldon Square, #1, Reading RGI 4DP UK, 44 (0) 118 958 7185 | Risks and disasters, forensic investigations, and urban engineering and research. |
| Dr. J. Michael Duncan, Civil and Environmental Engineering, 104 Patton Hall, Blacksburg, VA 24061 (540) 231-5103. | Slope stability, soil-structure interaction, design and analysis of foundations, strength and deformation properties of soils, finite element analyses of stresses and deformations in earth masses, and seepage through soil. |

| | |
|---|---|
| Robert Howard,<br>South Florida Water Management District,<br>P.O. Box 24680, West Palm Beach, FL 33416-4680, (561) 686-8800 | Operational control and monitoring of water control structures and water bodies for flood control, water supply and environmental enhancement. |
| Steve Fitzgerald,<br>Harris County Flood Control District, 9900 Northwest Freeway, Houston, TX 77092, (713) 684-4000 | The monitoring and evaluation of actual flood events. |
| Jeff Harris,<br>U.S. Army Engineers, Hydrology and Hydraulics Technology Division, 609 Second Street, Davis, CA 95616-4687, (530) 756-1104 | The development of hydraulic flood and surge models. |
| Dr. David A. Moser,<br>U.S. Army Corps, Institute for Water Resources, Casey Building, 7701 Telegraph Road, Alexandria, Virginia 22315703-428-6289 | Economic methods related to cost-benefit analysis and risk analysis methods for water resources including procedures for major rehabilitation and flood damage evaluation. |
| Jerry Foster, Foster Engineering Services,1381 Teaberry Ln, Severn, MD 21144, (410) 551-4211 | Structural engineering issues including risk and reliability analysis of civil works structures; design, evaluation and construction of dams, navigation and flood control structures; structural reliability of aging structures; computer analysis of civil works structures and the design of buildings. |
| Bruce C. Muller, Jr., Bureau of Reclamation, Dam Safety, P.O. Box 25007, Denver Federal Center, Denver, CO 80225-0007, (303) 445-3750 | Implementation of risk-based analysis methods for evaluating the safety of dams and other flood control structures. |
| Harley Winer, New Orleans District, U.S. Army Corps of Engineers New Orleans, LA 70160, (504) 862-2255. | The MR-GO's impact on hurricane-induced storm surge generated by Hurricane Katrina, ADCIRC modeling, tidal hydrodynamics, modeling of circulation and transport in coastal areas and oceans, finite element methods, and computational fluid mechanics. |

| | |
|---|---|
| Dr. Charles L. Bretschneider, P.O. Box 61264, Honolulu, HI 96839, phone number unknown | The effects of the MR-GO and levees, spoil banks, floodwalls, or any alleged or putative flood control measure on hurricane-generated storm surge, as well as analysis of hurricane winds and storm surge predictions. |
| Dr. J.I. Collins, current address and phone number unknown. | The effects of the MR-GO and levees, spoil banks, floodwalls, or any alleged or putative flood control measure on hurricane-generated storm surge, as well as analysis of hurricane winds and storm surge predictions. |
| Colonel William L. Conner III, Commander, U.S. Army Engineer District, P.O. Box 60267, New Orleans, LA 70160-0267, (504) 862-2204 | The MR-GO's impact on wetlands in Greater New Orleans as well as the impact that wetlands, or lack thereof, on hurricane-generated storm surge. |
| Dr. Richard A. Luettich, Marine Science and Environmental Sciences and Engineering at the University of North Carolina at Chapel Hill, 3431 Arendell Street, Morehead City, NC 28557 (252) 726-6841 | Tidal and storm surge circulation, numerical modeling techniques, and wind forced aquatic systems, specifically as they relate to the MR-GO. |

| Department, division, subsection, task force, or other subgroup of the Army Corps involved in the planning, design, construction, operation and maintenance of the MRGO | Person most knowledgeable concerning the planning, design, construction, operation and maintenance of the MRGO |
|---|---|
| **USACE, Mississippi Valley Division, New Orleans District** ||
| Executive Office | COL Richard P. Wagenaar, Commander |
| Engineering Division (ED) | Walter Baumy, Chief<br>John Bivona, Asst. Chief |
| ED - Structures Branch | Darryl Bonura, Chief |
| ED - Hydraulics and Hydrologic Branch | Nancy Powell, Chief |
| ED - Geotechnical Branch | Richard Pinner, Chief |
| ED - Design Services Branch | Julie LeBlanc, Chief |
| ED - Engineering Control Branch | Michelle Dupuy, Chief |
| ED - Civil Branch | John Bivona, Chief |
| Contracting Division (CT) | Jim Barr, Chief |
| CT - Projects East Branch | C. Nicholas, Chief |
| CT - Projects West Branch | C. Zammitt, Chief |
| CT - Policy Branch | D. Allen, Chief |
| Planning, Programs and Project Management Division (PM) | Edward Watford, Chief<br>Gary Hawkins, Asst. Chief |
| PM - Support Services Branch | Gary Hawkins, Chief |
| PM - Projects Branch | Falcolm Hull, Chief |
| PM - Protection and Restoration Office | Tom Podany, Chief |
| PM - Protection and Restoration Office, Regional Projects Branch | Brett Herr, Chief |

| | |
|---|---|
| PM - Protection and Restoration Office, Floodwalls Westbank Vicinity Branch | Al Naomi, Chief |
| PM - Protection and Restoration Office, Restoration Branch | Troy Constance, Chief |
| PM - Protection and Restoration Office, LaCPR Branch | Ed Russo, Program Manager |
| PM - Coastal Restoration Branch | T. Constance, Chief |
| PM - Programs Management Branch | Marcia Demma, Chief |
| PM - Economic and Social Analysis Branch | Richard Manguno, Chief |
| PM - Economic and Social Analysis Branch, General Water Resources Section | Kevin Lovetro, Chief |
| PM - Economic and Social Analysis Branch, Navigation Support Center | Juanita Russell, Chief |
| PM - Environmental Planning and Compliance Branch | Elizabeth Wiggins |
| PM - Environmental Planning and Compliance Branch, Environmental Analysis and Support Section | Richard Boe, Chief |
| PM - Environmental Planning and Compliance Branch, Natural and Cultural Resources Analysis Section | Joan Exnicios, Chief |
| PM - Environmental Planning and Compliance Branch, Ecological Planning and Restoration Section | Gib Owen, Chief |
| Construction Division (CD) | B. Terrell, Chief |
| CD - Contract Administration Branch, New Orleans Area Office | A. Hunter, Area Engineer |
| CD - Contract Administration Branch, Lafayette Area Office | Ted Eilts, Area Engineer |
| CD - Contract Administration Branch, West Bank Area Office | Tim Roth, Area Engineer |
| Operations Division (OD) | Chris Accardo, Chief Jerry Colletti, Asst. Chief |

| OD - Technical Support Branch | Fred Shilling, Chief |
|---|---|
| OD - Readiness Branch | Mike Lowe, Chief |
| OD - Physical Support Branch | Joaquin Mujica, Chief |
| OD - Regulatory Branch | Pete Serio, Chief<br>Ron Ventola, Asst. Chief |
| OD - Management Support Branch | Jimmy Gautreaux, Chief |
| OD - Mississippi River Baton Rouge to Gulf | Michelle Ulm, Operations Manager |
| OD - Completed Works | Amy Powell, Operations Manager |
| OD - Atchafalaya Basin | Beth Nord, Operations Manager |
| OD - Calcasieu River and Pass | Tracy Falk, Operations Manager |
| OD - Mississippi River Gulf Outlet | Michelle Daigle, Operations Manager |
| OD - Gulf Intracoastal Waterway | Victor Landry, Operations Manager<br>Michelle Ulm, Asst. Operations Manager |
| OD - Old River | Cary McNamara, Operations Manager |

Other departments, divisions, subsections, task forces, or other subgroups of the Army Corps of Engineers involved in the planning, design, construction, operation and maintenance of the MRGO include, but are not limited to, the following:

| Department, division, subsection, task force, or other subgroup of the Army Corps involved in the planning, design, construction, operation and maintenance of the MRGO | Person most knowledgeable concerning the planning, design, construction, operation and maintenance of the MRGO |
|---|---|
| **USACE, Mississippi Valley Division** | |
| Executive Office | BG Robert Crear, Division Commander |
| Programs Directorate | Michael B. Rogers, Director |
| Business Technical Division | James A. Waddle, Chief |
| Planning | Susan K. Smith, Chief |
| Operations | James R. Hannon, Jr., Chief<br>Steve Jones, Navigation Representative |

| MVN District Support Group | Rayford E. Wilbanks, Chief |
|---|---|
| **USACE Headquarters** | |
| Directorate of Civil Works (DCW) | MG Don Riley, Director |
| DCW- Mississippi Valley Division Regional Integration Team | Tom Waters, Civil Chief |
| DCW - Mississippi Valley Division Regional Integration Team | Zoltan Montvai, Civil Deputy Chief |

| Department, division, subsection, or other subgroup of the Army Corps of Engineers, New Orleans District, may have been involved in the planning, design, construction, operation and maintenance of the levees and other flood control projects built pursuant to the LPVHPP: | Persons most knowledgeable: |
|---|---|
| Project Management Division | Alfred Naomi<br>Stan Green<br>Elizabeth Wiggins<br>Terral Broussard<br>Dan Judlin<br>Gordon Hebert |
| Engineering Division: Policy Level Technical Issues | Walter Baumy<br>John Grieshaber<br>John Bivona<br>Gerald Satterlee<br>Eugene Tickner |
| Engineering Division: Waterways | Richard Broussard |
| Engineering Division: Geotechnical Issues | Richard Pinner<br>Richard Varuso<br>Bill Caver |
| Engineering Division: Hydrology & Hydraulics Issues | Nancy Powell<br>Vann Stutts<br>Cecil Soilieau |
| Engineering Division: Levees | El Pilie<br>Wayne Naquin<br>Louis Danflous<br>Russell Young |
| Engineering Division: Structures | Mark Gonski<br>Darryl Bonura<br>Tom Hassenboehler<br>Carl Guggenheimer<br>Dan Marsalone<br>Bob Guizerix |
| Operations Division: Policy Level Operations Issues | Chris Accardo<br>Fred Schilling<br>Greg Breerwood |

| Operations Division:  Maintenance Dredging | Michelle Daigle<br>Edmond Russo<br>Fred Schilling |
|---|---|
| Operations Division:  ICW | Jerry Colletti<br>Amy Powell |
| Operations Division:  Regulatory Functions | Roger Swindler<br>Ron Ventola |
| Construction Division:  Policy Level Construction Issues | Bruce Terrell<br>Don Hull |
| Construction Division:  Construction Management | Butch Marsalis<br>Ward Purdom<br>Chester Ashley |

## IV.   Individuals Identified by the United States in its Interrogatory Responses

| Chris Accardo,<br>Army Corps Chief of Operations Division | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
|---|---|
| Diane Allen,<br>Army Corps Supervisory Contract Specialist Chief, Policy Branch Contracting Division | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Jim Barr,<br>Army Corps Chief of Contracting Division | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure |

| | constructed pursuant to the LPVHPP. |
|---|---|
| John Bivona,<br>Army Corps Assistant Chief of Engineering Division | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Rick Broussard,<br>Army Corps Civil Engineer | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Michelle Daigle,<br>Army Corps Operations Manager | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Marcia Demma,<br>Army Corps Supervisory Program Manager, Chief of Programs Management Branch Planning, Programs and Project Management Division | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Mark Hubert,<br>Army Corps Hydraulics; | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, |

| | |
|---|---|
| | among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Reuben Mabry, Army Corps Engineering Division, Geotechnical Branch Chief | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Nancy Powell, Army Corps Chief of Hydraulics and Hydrologic Branch | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Edmund Russo, previous Army Corps Operations Manager | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Vann Stutts, Army Corps Hydraulic Design Section | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Glen Matsuyama, | Information concerning Defendant United |

| | |
|---|---|
| Army Corps General Engineering Branch Chief | States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Gerard S. Satterlee, Jr., former Army Corps Chief of Engineering | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |
| Frank Vojkovich, Geotech | Information concerning Defendant United States and Defendant United States Army Corps of Engineers responses to MRGO Common Liability Discovery concerning, among other things, the MRGO, IHNC, and the levees, spoil banks, floodwalls, or any alleged or putative flood control measure constructed pursuant to the LPVHPP. |

## V.    Others

| | |
|---|---|
| Douglas Woolley, Radford University | The findings and conclusions about the report entitled, "Decision-Making Chronology for the Lake Pontchartrain and Vicinity Hurricane Protection Project" (June 2007) |
| Leonard Shabman, Resources for the Future | The findings and conclusions about the report entitled, "Decision-Making Chronology for the Lake Pontchartrain and Vicinity Hurricane Protection Project" (June 2007) |
| URS Corporation Person Most Knowledgeable | The findings and conclusions about the report entitled, "The Direct Impact of the MRGO on Hurricane Storm Surge, Louisiana Department |

| | of Natural Resources" (2006) |
| --- | --- |
| Louisiana Department of Natural Resources Person Most Knowledgeable | The findings and conclusions about the report entitled, "The Direct Impact of the MRGO on Hurricane Storm Surge, Louisiana Department of Natural Resources" (2006) |
| As Yet Unnamed Defense 30(b)(6) Designees | The findings and conclusions about the report entitled, "Numerical Modeling of Storm Surge Effect of MR-GO Closure" (2003) |
| As Yet Unnamed Defense 30(b)(6) Designees | The findings and conclusions about the report entitled, "Louisiana Coastal Protection and Restoration. Preliminary Technical Report to the United States Congress" (2006). |
| As Yet Unnamed Defense 30(b)(6) Designees | General fact testimony |
| Any witness listed and/or called by any other party | General fact testimony |

INTERROGATORY NO. 32:

Identify any and all past or present employees, agents, or servants of the United States whom you interviewed, consulted, received information from, or have had any contact whatsoever relevant to these consolidated cases.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 32:

Responding Parties object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and attorney work product doctrine. Responding Parties further object to this interrogatory on the grounds that it is vague and ambiguous and overbroad. Specifically, the questions asks for the identity of parties with whom responding parties "had any contact whatsoever relevant to these consolidated cases." This

question, as phrased, would necessarily include Plaintiffs' counsel or consulted hired by Plaintiffs' counsel, as well as anyone with whom Plaintiffs had a casual conversation concerning this litigation and the facts and events underlying this lawsuit.

Accordingly, notwithstanding the foregoing, and without waiving any objection to this interrogatory, Responding Parties state that they are still investigating the Responding Parties' claims.

INTERROGATORY NO. 33:

If you contend that any factual issue(s) must be decided before the Court can finally rule on subject matter jurisdiction, state your contentions and the basis for the contentions.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 33:

Responding Parties object to this interrogatory on the grounds that it calls for a legal opinion or seeks information protected from discovery by the attorney-client privilege or the attorney work product doctrine.

INTERROGATORY NO. 34:

If you contend that jurisdiction rests in admiralty for all or any part of this lawsuit state with particularity your legal contention and the facts on which you base the contention.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 34:

Responding Parties object to this interrogatory on the grounds that it calls for a legal opinion or seeks information protected from discovery by the attorney-client privilege or the attorney work product doctrine.

INTERROGATORY NO. 35:

Identify all experts whom you intend to call at the trial of this matter and provide their opinions and conclusions, the bases for those opinions and conclusions, and all other expert

disclosures and reports, that are required by the Federal Rules of Civil Procedure.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 35:

Responding Parties object to this interrogatory to the extent that it calls for information protected from disclosure by the attorney-client privilege or the attorney work product doctrine. Responding Parties further object to this interrogatory to the extent it seeks the premature disclosure of expert witnesses and expert testimony before the September 17, 2007 deadline for Responding Parties' list of all expert witnesses who may be used at trial or in connection with motions concerning common liability issues; before the October 31, 2007 deadline to supplement Responding Parties' initial expert witness disclosures; and before the May 30, 2008 deadline for Responding Parties' expert reports. *See* CMO No. 4 at p. 36, ¶ (E)(1)-(3). Responding Parties will identify all experts whom they intend to call at the trial of this matter and provide their opinions and conclusions, the bases for those opinions and conclusions, and all other expert disclosures and reports, that are required by the Federal Rules of Civil Procedure pursuant to the deadlines mandated in CMO No. 4.

Respectfully Submitted,

MRGO PLAINTIFFS SUB-GROUP LITIGATION
COMMITTEE

_____
PIERCE O'DONNELL (*pro hac vice*)
MRGO PSLC Liaison Counsel
O'Donnell & Associates PC
550 South Hope Street, Suite 1000
Los Angeles, California 90071-2627
Telephone: (213) 347-0290
Facsimile: (213) 347-0299
Email: pod@oslaw.com

PLAINTIFFS' LIAISON COUNSEL

s/ Joseph M. Bruno
JOSEPH M. BRUNO
PLAINTIFFS LIAISON COUNSEL
LA Bar Roll Number: 3604
Law Office of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: **jbruno@jbrunolaw.com**


MRGO PLAINTIFFS SUB-GROUP LITIGATION
COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MRGO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: (337) 233-2796
Email: **jimr@wrightroy.com**


MRGO PLAINTIFFS SUB GROUP LITIGATION
72

COMMITTEE

s/ Jonathan Andry
LA. Bar Roll Number: 20081
The Andry Law Firm, LLC
610 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788
Clay Mitchell (Levin, Papantonio et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles, CA)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on July 30, 2007, I caused to be served the MRGO Plaintiffs' Supplemental Responses to Defendant United States' First Set of Interrogatories, upon Defendants' counsel, Robin D. Smith, Catherine Corlies, Traci Colquette, and Jim McConnon by email at robin.doyle.smith@usdoj.gov; catherine.corlies@usdoj.gov, traci.colquette@usdoj.gov, and jim.mcconnon@usdoj.gov ; and U.S. mail addressed to the United States Department of Justice, Torts Branch, Civil Division, P.O. Box 888, Benjamin Franklin Station, Washington, D.C. 20044.


_____
Pierce O'Donnell