Exhibit A

# NEW ORLEANS & HURRICANE KATRINA:
## II – THE CENTRAL REGION AND THE LOWER NINTH WARD

by

R. B. Seed, R. G. Bea, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
C. Cheung, D. Cobos-Roa, L. Ehrensing, L. F. Harder, J. M. Pestana, M. F. Riemer,
J. D. Rogers, R. Storesund, X. Vera-Grunauer, and J. E. Wartman

**ABSTRACT:** The failure of the New Orleans regional flood protection systems, and the resultant catastrophic flooding of much of New Orleans during Hurricane Katrina, represents the most costly failure of an engineered flood protection system in U.S. history. This paper presents an overview of the principal events that unfolded in the central portion of the New Orleans metropolitan region during this catastrophic hurricane, and addresses the levee failures and breaches that occurred along the east-west trending section of the shared GIWW/MRGO channel, and along the Inner Harbor Navigation Channel (IHNC), that led to additional admission of floodwaters to the New Orleans East protected basin and to the St. Bernard Parish and Lower Ninth Ward protected basin. The emphasis in this paper is on geotechnical lessons, and also broader lessons with regard to the design, implementation, operation and maintenance of major flood protection systems of this sort. This paper focuses principally on the middle stages of this disaster, with companion papers addressing the preceding and subsequent stages. Significant lessons learned here in the central region include: (1) the need for regional-scale flood protection systems to perform as systems, with the various disparate components meshing well together in a mutually complimentary manner, (2) the importance of considering all potential failure modes in the engineering design and evaluation of these complex systems, (3) the risks associated with policy decisions directed towards holding down initial system costs in exchange for accepting higher likelihoods of eventual potential failure, and (4) the problems inherent in the construction of major regional systems over extended periods of multiple decades. These are important lessons, as they are applicable to other regional flood protection systems in other areas of the United States, and throughout much of the world.

## Introduction

This paper is the second of a series of companion papers that, together, present the principal results of an investigation of the performance of the New Orleans regional flood protection systems during and after Hurricane Katrina, which struck the New Orleans region on August 29, 2005.   A more complete report on these studies by the Independent Levee Investigation Team (ILIT) can be found in Seed et al, 2006.  This paper addresses events that unfolded in the central part of the devastated region, producing levee failures and breaches along the GIWW/MRGO channel and the Inner Harbor Navigation Channel.

Figure 1 is a map showing the three main protected "polders" or levee-protected basins of the New Orleans metropolitan area.  New Orleans is situated mainly between Lake Pontchartrain to the north, and the Mississippi River.  "Lake" Borgne, which is actually a bay as it is directly connected to the Gulf of Mexico, occurs immediately to the east.  As shown in this figure, the three main protected basins are (1) the New Orleans East protected basin, (2) the St. Bernard and Lower Ninth Ward protected basin, and (3) the main ("downtown") Orleans East Bank metropolitan basin.

Figure 1 shows the locations of levee failures (breaches) that occurred in this region, and the locations of partial breaches and incipient failures.  The solid stars in this figure show the locations of levee breaches (and/or floodwall failures), and the open stars show the locations of partial breaches and/or significant levee distress (e.g. incipient failures that did not fully mobilize).  The X's in this figure show the locations of deliberate "notches" in the levees that were created after the storm had passed in order to facilitate outward drainage of floodwaters from within the flooded basins.

## Phase Three: Storm Surge and Failures in the Central Region

The catastrophic flooding produced by Hurricane Katrina unfolded progressively in four main stages as the storm advanced.  First, as Katrina approached the coast, the rising storm surge caused the Gulf waters to well up and overwhelm the levees protecting developments extending south from New Orleans along narrow, levee-protected strips of land along the edges of the lower reaches of the Mississippi River (an area known as Plaquemines Parish).

Next, the storm surge also raised up the waters of "Lake" Borgne, massively inflating this body of water on the east flank of the regional flood protection systems.  As the eye of the storm passed over the Lower Mississippi River reaches (Plaquemines Parish) and then continued

northwards, the counterclockwise rotation of the storm's winds next pushed the swollen waters of Lake Borgne (and wind-driven waves) forcefully westward against, and then through, the defenses of the east flank of the regional flood protection system, as illustrated schematically by the lighter set of (hollow) arrows in Figure 1. Multiple levee breaches, and massive erosion of levee embankments, produced multiple miles of openings along this eastern flank that quickly doomed both the New Orleans East and the St. Bernard/Lower Ninth Ward protected basins.

The swollen waters of Lake Borgne were also pushed westward, along the horizontal channel separating New Orleans East from St. Bernard Parish, as indicated by the larger arrows in Figure 1. This east-west trending channel is jointly the Gulf Intracoastal Waterway (GIWW) and the Mississippi River Gulf Outlet (MRGO), and this shared GIWW/MRGO channel forms a "T" intersection at its western end where it meets the north-south trending Inner Harbor Navigation Channel (IHNC). As a result, the waters of the IHNC were also swollen by waters pushed westward from Lake Borgne through these two channels and then into Lake Pontchartrain. This precipitated the third phase of the disaster, as numerous failures and breaches occurred along the banks of the GIWW/MRGO and IHNC channels. It is this third phase that is the focus of this paper.

Figure 2 shows a hydrograph of water elevations produced within the IHNC waterway as the storm surge was pushed westward from Lake Borgne through both the GIWW/MRGO and IHNC channels. As shown in this figure, the main peak of this storm surge was relatively short-lived, rising quickly over a period of several hours to a maximum elevation of approximately +14 ft (MSL) at approximately 8:30 a.m., and then subsiding relatively quickly thereafter. The hydrographs of Figure 2 were developed by the IPET investigation team, based on actual measurements of flood stage vs. time near the west bank crossing of the CSX rail line across the IHNC channel. Hydrograph calculations, based on regional-scale modeling by both the IPET team and by Team Louisiana, produced good agreement with these measured flood stages [IPET, 2007; Van Heerden, et al., 2006]. The "dip" in the rising hydrograph at one of the stations in Figure 2 was caused by a localized temporary drawdown due to the occurrence of a breach in that vicinity at approximately 5:00 a.m.

**Failures Along the GIWW/MRGO and IHNC Channels**

The surge through the GIWW/MRGO and IHNC channels produced numerous breaches and partial breaches along both of these waterways. Length constraints will not permit a full

examination of the approximately 23 full and partial failures that occurred in this region, so instead this paper will discuss key features of some of the most important "types" of failures, and will then present a more detailed examination of the two large failures that occurred at the west end of the Lower Ninth Ward.

**(a) Failures at "Transitions"**

A majority of the failures along these two waterways occurred at locations where two separate sections of the flood protection system, usually built at separate times as independent "projects", joined together.  Figure 3 shows a typical example; in this case a transition between a full height earthen levee embankment section that adjoins a half-height earthen embankment section topped by a sheetpile-supported concrete I-wall (floodwall).  Away from this transition (or connection), both the full height embankment section and the I-wall topped levee section performed well.  The failure (and breach) occurred as these two sections came together.

The elevation of the top of the I-wall shown in Figure 3 is approximately 1 foot higher than the top of the adjoining full-height earthen levee section.  This was found to be common throughout the New Orleans regional flood protection systems; adjoining sections, built at different times, often had different crest heights.  A pattern observed was that the sections with significant "structural components" (e.g. concrete floodwalls, concrete gate structures with steel floodgates, etc.) often tended to have slightly higher top elevations than adjoining earthen embankment sections; this represented a somewhat informal local policy of "structural superiority" wherein the structural sections were built a bit higher so that failures would occur instead at the adjacent earthen levee sections which would be less costly to repair.  It is suggested here that the cost of repair of the flood defenses themselves pales with regard to the costs of the losses incurred within the protected communities, and that a better policy would be to ensure that there is suitable compatibility between the crest elevations such that the chances of any failure are suitably minimized.

Similarly, the two adjoining and well-designed sections in Figure 3 are "connected" by a transition section that consists of a simple sheetpile wall section.  The height of the top of this wall is lower than either of the two adjoining levee or levee/floodwall sections, and overtopping thus occurred preferentially at this low spot.   This overtopping flow eroded (scoured) a trench behind the back side of the sheetpile wall, and the lateral force of the floodwaters then pushed back the inadequately laterally supported sheetpile wall and produced the failure shown.

This was a much-repeated theme in this central section of the overall region, and in other areas (e.g. Plaquemines Parish) as well.  Nineteen of the approximately twenty three full breaches and partially developed breaches along the GIWW/MRGO and IHNC waterways in this central region occurred at transitions between two disparate , adjoining perimeter flood defense sections.  There is clearly a need to recognize that these are flood protection systems, and that individual segments and components must combine seamlessly into an overall defense that has no localized points of weakness.  Similarly, there is a need to place additional emphasis on the engineering design and construction of such "transitions", as more than half of the approximately 53 breaches that occurred throughout the full region during this overall event occurred at such transitions.

**(b)  Failures at "Penetrations"**

One of the common reasons for "transitions" between differing types of adjoining flood protection system elements is "penetrations", locations where a utility, pipe, roadway, or rail line, etc. must pass through the protective perimeter.  This is often accomplished by means of gated concrete structures; reinforced concrete structure or floodwalls with openings for rolling steel floodgates that can be closed during storm surges.  These penetrations pose a special set of difficulties, as they typically represent locations where a collection of differing interests, and differing authorities, converge with overlapping responsibilities.

Five of the failures and breaches in this central region occurred at such penetrations. Two of the most galling failures were the east bank and west bank crossings of the IHNC waterway by the CSX rail line; these same two sites had also failed previously during Hurricane Betsy in 1965, and so represented a troubling failure to adequately learn from that previous disaster.

The west bank crossing of the CSX rail line represents an excellent example of the difficulties associated with penetrations.   Figure 4 shows the main breach at the site of the penetration of the CSX rail line across the crest of the levee on the west bank of the IHNC, immediately to the south of the Highway 10 bridge.   At the time of this photograph, the breach had been partially repaired, and the newly compacted fill in the immediate foreground is infilling part of the breach.

As shown in this photograph, this is a complex multiple penetration, with the Highway 10 bridge crossing over the federal levee system immediately to the north of the rail crossing (at the

left of the photo), the CSX rail crossing over the top of the earthen levee and then crossing over a steel drawbridge, and a road passing over the crest of the levees immediately adjacent to the rail line (at the right of the photo) to provide access to Port of New Orleans facilities on the outboard (water) side of the federal levees.   Accordingly, at least five agencies and bodies have mutually overlapping interests and jurisdictions at this site; the USACE, the local levee board, the State Highway Department, the CSX rail line, and the Port of New Orleans.   Our investigation team was unable to determine who, if anyone, was in overall charge at this location prior to Hurricane Katrina's arrival.

The main failure and breach at this site occurred as a result of adverse interaction between the rail line and the adjacent Port access roadway.   The low spot at this site with regard to passage of water was the base of the pervious gravel ballast beneath the rail lines.   Flow through this ballast appears to have eroded the soils beneath the adjacent Port roadway.   These soils consisted of poorly compacted, and highly erodeable, lightweight shell sands as evinced by the eroded detritus strewn back behind the breach.   The main (federal) levee section was comprised of better materials, but the USACE did not appear to have, or to exercise, control of the fill immediately beneath the roadway.

A second problem occurred just to the left of the photo of Figure 4, immediately to the left of the person in Figure 4, where the rail line passes through a concrete gatewall with a rolling steel floodgate.  This location is shown in Figure 5.  The steel floodgate had been damaged by a minor rail accident several months prior to Hurricane Katrina's arrival, and had been taken away for repairs.   Accordingly, an emergency levee crest section was erected across the opening in the gatewall using sandbags prior to Katrina's arrival.   This emergency sandbag crest section washed out during the storm, and the "dip" in the hydrograph of Figure 2 at approximately 5:00 a.m. may have been the result of this failure.  In hindsight, it is difficult to condone the removal of this steel floodgate, leaving the main (downtown) Orleans East Bank metropolitan basin exposed to hurricane flooding, just so that a rail line could continue to operate.

The lessons here are obvious.   Penetrations are challenging both because they require transitions between different system elements, and also because of overlapping interests and jurisdictions.   If regional flood protection systems are to function safely and reliably, someone must be in overall charge at such sites, and they must have sufficient authority as to impose successful overall engineering solutions on behalf of public safety and the greater common good.

**(c) Partially Developed Breaches**

A large number of partially developed breaches occurred along the IHNC waterway, especially on the east bank of the IHNC at the west end of the New Orleans East protected basin. It should be noted that these "partially developed" breaches each began to erode and scour, but then the scouring stopped before a major breach could be eroded through the defenses.   In our opinion, each of these partially developed breaches appeared to be capable of progressing to become a full breach, but they did not do so because the two protected basins (the New Orleans East, and the St. Bernard Parish/Lower Ninth Ward protected basins) were already infilling so rapidly with floodwaters from numerous additional breaches at other locations.   Thus, most of these "partially developed" breaches were of little actual consequence in this disastrous event, but each would potentially have been features of major significance if other, worse failures and breaches had not already occurred at other locations.

**The Lower Ninth Ward**

The two largest breaches that occurred in the central region occurred on the east bank of the IHNC, at the west end of the Lower Ninth Ward.   These were two of the larger breaches that occurred during the hurricane, and they warrant more detailed discussion.

**(a) The North Breach on the IHNC at the Lower Ninth Ward**

The first of these two breaches to occur was the North breach.   Based on timing established by "stopped clocks", this breach appears to have occurred at approximately 5:45 a.m., as floodwaters began to halt clocks in homes in the adjacent neighborhood shortly after that time.

Figure 5 shows an aerial view of this feature, with the interim outboard side repair embankment nearing completion on October 5, 2006.  This was a relatively narrower feature, less than 90 feet in width, and unlike the more massive second failure that occurred several hundred yards to the south (as discussed in the section that follows) there was no evidence of sustained overtopping adjacent to this feature (only minor overtopping and/or wave "splash-over" at two locations).

Figure 6(a) shows a cross-section through this breach site, as employed in both finite element analyses and limit equilibrium and finite difference analyses.   The embankment crest occurs at an elevation of approximately + 7.5 ft. (MSL), and the upper portion of the

embankment consists of moderately compacted clay fill. The lower embankment section is older, historic fill and consists of locally available paludal clays of relatively high plasticity (CH). These are underlain by a stratum of variable "marsh" deposits approximately 10 feet in thickness. These highly variable materials include peat deposits and variably interlayered mineral soils. This marsh stratum is, in turn, underlain by a relatively deep layer of soft, lacustrine clays of relatively high plasticity (CH). This figure also shows clearly the relatively extensive dredged sandy fill placed at the outboard side of the floodwall to create additional "land" for facilities on the outboard (water) side; these facilities had been abandoned and removed in the years prior to the hurricane.

The top of the concrete floodwall occurs at approximately Elev. + 12.7 ft. (MSL), and the steel sheetpile curtain supporting the concrete I-wall is tipped with its base extending to approximately Elev. - 8 ft. (MSL).

Figure 6(b) shows the finite element mesh used for transient flow seepage analyses at this site, and Figure 7 shows a close-up view of calculated seepage exit gradients (based on transient seepage analyses) as they would have existed at approximately 8:30 a.m. (with a canal water level of Elev. +14 feet, MSL) if this site had not breached and failed earlier in the morning. These transient flow analyses modeled the progressive rise in storm surge levels over the 24 hours preceding the failure.

Numerous analyses were performed, varying the key parameters. It will not be possible to discuss all of these within the length constraints of this paper. The most important parameter was the lateral coefficient of permeability of the "marsh" deposits. The analyses shown in Figure 7 were performed with a modeled coefficient of horizontal permeability of $k_{h,marsh} = 10^{-4}$ cm/sec. Exit gradients had become unsafe with regard to initiation of erosion and piping at an earlier stage of this analysis, with exiting toe gradients reaching values of greater than 0.8 as early as 5:00 a.m. In addition, the pore pressures beneath the inboard (landside) levee toe became potentially unsafe with regard to hydrostatic uplift (heave, or "blowout") at approximately the same point in time, so that hydraulic uplift (or "blowout") failure at the toe may have significantly exacerbated the piping erosion.

The "timing" of the resultant failure is difficult to ascertain with certainty based on analyses, as it is controlled primarily by the rate at which pore pressures were transmitted underneath the levee and floodwall, and these are in turn controlled by the permeabilities of the foundation soils. In addition, the rate at which piping erosion would progress to full failure is

also hard to predict.   These analyses strongly suggest, however, that the mechanism of failure was most likely the result of underseepage-induced erosion and piping, and this was likely exacerbated by hydraulic uplift or potential "blowout" inboard of the levee toe.   Close re-examination of the field evidence (see Figure 6) supports this; the observed failure has the narrow, tunnel-like character of a piping failure, and the failure appears to have initiated inboard of the levee toe.

This differs from the conclusions of the IPET study (IPET, 2006).   That study concluded that this north breach section failed as a result of semi-rotational stability failure, with the principal (curved) shear surface passing through the soft clays underlying the upper "marsh" deposits.  The IPET investigation did not consider potential underseepage in their initial studies, as it was judged that the foundation soils were insufficiently pervious as to transmit significant pore pressures to the inboard side during the relatively short-lived storm surge.

Figure 8 shows the IPET investigation's interpretation of the stratigraphy and shear strengths in the foundation soils beneath the inboard side levee toe at this location.  The solid symbols are shear strength test data, and the irregular line is IPET's interpreted undrained shear strengths from CPT testing using a cone tip factor of $N_k = 15$.     The IPET investigation concluded that the soils at this site were normally consolidated over their full depths, and the linear red lines in this figure are then the linearly increasing shear strength profiles (vs. depth) used in the IPET limit equilibrium stability analyses at this section.

Our investigation used somewhat more elaborate methods for interpretation of shear strength data, and these are explained in more detail in the companion paper by Seed et al., 2007-IV.  They are also explained in greater detail in the main ILIT investigation report (Seed et al., 2006).     For the soft clays at this site, making use of the pore pressure measurements from the piezocone data and the interpretive methods of Karlsrud et al., 1996, we re-interpreted the CPT-based undrained clay strengths using a site-specific and material-specific cone tip factor of $N_k = 12$, as shown by the irregular, fine blue line in Figure 8.     For the marsh deposits, following the same procedures, we used a site-specific and material-specific cone tip factor of $N_k = 15$.  The rest of the available strength data was also re-interpreted, and it was concluded that the site was not normally consolidated through its full depth (producing the linear trends of undrained shear strength vs. depth of the IPET interpretation), but that there were instead three clearly evidenced dessicated "crusts"; the result of three "stands" during the progressive accretion of these sediments and marsh deposits.  An example of the resulting re-interpreted profiles of undrained

shear strength vs. depth by our ILIT investigation (in this case directly beneath the inboard side levee embankment toe) is then shown in Figure 8 by the heavy dashed red lines.

Using this alternate, and somewhat higher strength profile, and similarly derived profiles beneath other sections with both higher and lower effective overburden stresses, limit equilibrium analyses were then performed for conditions corresponding to various storm surge heights using Spencer's Method. These analyses assumed undrained shearing of the soft clays underlying the marsh stratum, and the focus was on deep, semi-rotational failures passing through this unit. In all of these analyses, as with the IPET analyses, it was assumed that a "gap" opened between the outboard side of the sheetpile-supported I-wall and the levee embankment, and that water entered this gap and applied lateral pressure against both the sheetpiles and I-wall.

The most critical failure surface, based on our (ILIT) shear strength interpretation, for conditions corresponding to the surge height of approximately +10.5 ft, MSL (which was roughly the surge height that was present at the apparent time of failure) agreed fairly closely with the most critical failure surface found by the IPET studies. This was a relatively deep, semi-rotational failure surface with most of the shear failure occurring within the soft clays underlying the marsh layer. The minimum calculated factor of safety based on our investigation's (somewhat higher) strength interpretation, and for a canal water elevation of +10.5 ft. (MSL), was found to be FS = 1.38. But this actually significantly underestimates the overall factor of safety, as these are two-dimensional (plane strain) limit equilibrium analyses, and the narrow, tunnel-like geometry of the observed field failure (and the assumed undrained cohesive shear strength behavior) would cause a more appropriate fully three-dimensional assessment to result in an even higher overall factor of safety; likely on the order of at least 10% to 15% higher. Accordingly, it was concluded that best estimated factor of safety for fully three-dimensional conditions would have been on the order of FS ≈ 1.51 to 1.60. Based on this, it was concluded that the failure at this site cannot be explained by a deep, semi-rotational failure through the soft foundation clays.

The actual mechanism of failure at this site will likely be a subject for some continued debate, however, as the lateral permeabilities modelled in the marsh stratum for the transient seepage analyses illustrated in Figure 7 are somewhat higher than the more "typical" values of $k_h$ ≈ $10^{-5}$ to $10^{-6}$ cm/sec more commonly attributed to these types of peaty marsh deposits. Analyses performed with lower coefficients of permeability in the range of $10^{-5}$ and even $10^{-6}$

cm/sec also show low factors of safety with regard to the inception of piping at the inboard toe, but they do not well explain the occurrence of failure at this site as early as 5:45 a.m.

In the end, our conclusion that underseepage and piping (likely exacerbated by uplift or "blowout" at the inboard of the levee toe) was the principal cause of this failure is based on several factors as follow:

1.  The post-failure geometry is clearly characteristic of a deep, narrow, tunnel-like piping erosion failure initiated at the inboard side levee toe region and then progressing back beneath the levee embankment (see Figure 5).

2.  The next best alternate explanation, a deep semi-rotational stability failure through the soft foundation clays, is not supported by the geometry, stratigraphy, surge force and shear strength data available.

3.  Permeabilities of the types of "marsh" strata present are highly variable. As shown and discussed in the companion paper on regional geology by Rogers et al., 2007, this site is situated in a region traversed by southwest to northeast trending drainage features (diagonally crossing the north-south trending IHNC channel) that eventually converge less than half a mile northeast of this North Breach to form the historic headwaters of Bayou Sauvage. There is a clear geologic likelihood that one or more zones of variably high permeability would transect this IHNC levee frontage. If so, then such a zone of higher than average permeability might be expected to manifest itself as a failure and breach.

4.  There was a well-documented history of previous problems with seepage at this location, including a contractor's previous failure to successfully dewater a shallow excavation immediately adjacent to the breach location due to excessive underseepage flows through these marsh deposits (Seed et al., 2006).

5.  Toe boils were observed and documented by Team Louisiana immediately to the south of this breach site in the early weeks after the hurricane, providing clear evidence of sufficiently high lateral permeability through the (similar) foundation soils at that location as to produce at least limited toe boiling.

On balance, it was our investigation's conclusion that the most likely cause of failure at this North Breach was underseepage and piping, possibly exacerbated by hydraulic uplift (or "blowout") at the inboard levee toe region. The sheetpile curtain was designed at this site to support the concrete I-wall against lateral water forces by cantilever action, and the possibility of

underseepage-induced failure was not considered in detail due to assumption that the foundation soils were insufficiently pervious as to foment such a failure during the relatively transient loading of a hurricane-induced storm surge. This was a repeated pattern, as four of the largest and most damaging breaches and failures that occurred during Hurricane Katrina appear to have been the result of underseepage passing beneath relatively shallow sheetpile curtains that were designed and sized principally for the purpose of providing lateral (cantilever) support of the concrete floodwalls that they carried (Seed et al., 2006), apparently without sufficient consideration of potential underseepage risk.

To their credit, the USACE have now initiated a program to re-assess underseepage risk for the overall New Orleans regional flood protection systems as part of ongoing efforts to re-assess, re-build and upgrade these critical systems.

## (b) The South Breach on the IHNC at the Lower Ninth Ward

Several hundred yards to the south of the breach discussed in the previous section, a massive second breach occurred. Figure 9 shows an oblique aerial view of this South Breach, which was approximately 950 feet in length. A large barge was washed in through this very long feature, and is visible in this photo. The sheetpile wall is also clearly visible; the sheetpiles remained interlocked throughout the severe inflow and scour caused by the breach, and the sheetpile curtain (although stretched and extended to a length of approximately 1,300 feet as the flanges were stretched and straightened out) is still contiguous over its full length. The concrete floodwall atop the sheetpiles could not this level of extensile ductility, however, and so most of the concrete I-wall panels spalled off of the top of the sheetpile curtain during this failure.

As shown in Figure 9, the inboard side community was devastated by the heavy rush of water through this breach; the homes of the first several blocks have been stripped from their foundations and scattered across the community, mostly in pieces. At the time of this photograph (September 30, 2006), the initial interim closure embankment on the outboard side of the large breach had been largely completed.

The first question to answer was whether the barge caused the breach, or was drawn in through a breach that was already open. Figure 10 shows a close-up view of the top of the concrete floodwall at the south end of the breach. The concrete floodwall along the top of the sheetpile curtain across the rest of the width of this large breach was largely spalled off of the tops of the sheetpiles in extension as the sheetpiles were pulled by extensile/tensile forces. The

south end of the breach (Figure 10) was the only location where the concrete floodwall, and its rebar, were crushed by compressive impact. In addition, a large dent on the left side of the barge, near the bow, and a scrape on its base at that location, appeared to correlate well with the south end impact site shown in Figure 10. Finally, geo-forensic studies clearly show that this section would have been expected to fail without barge impact. It was concluded by this investigation that the barge was most likely drawn in through a breach that was already open.

Figure 11 shows a trench behind the concrete floodwall at the south end of the breach (the large barge can be seen in the background of this photo.) As canal waters overtopped the floodwall, they eroded this trench, reducing the lateral support for the floodwall and its supporting piles. The IPET investigation (IPET, 2006) concluded that this directly caused the failure, as the raised waters in the canal then pushed the under-braced wall laterally towards the inboard (protected) side.

Figure 12 shows a cross-section through the breach section. The top of the concrete floodwall at this location is at approximately Elev. +12.7 ft. (MSL). The clayey levee embankment sits atop primarily gray clays (CH) with occasional plastic silt strata, but there are two significant "marsh" deposits in the upper foundation as well. As shown in this figure, the sheetpile curtain supporting the concrete floodwall is very short, with its base at Elev. − 8 ft. (MSL), and fails to cut off flow through the second (main) marsh layer. As with the North Breach described previously, the "marsh" layer is a variably interbedded layer of organic silts, clays and peats. Lateral permeability of this ensemble is variable, and there is a well-established history of underseepage problems along this levee frontage (Seed et al., 2006; Van Heerden et al., 2006).

Transient flow analyses showed that the rising storm surge in the canal was likely able to be at least partially effectively transmitted to foundation soils beneath the inboard side levee toe. The storm surge rose slowly at first, raising water levels in the IHNC from approximately Elev. + 2 ft (MSL) to + 5 ft. (MSL) over a 22 hour period, and then the rate of water level rise increased as the eye of the storm approached more closely, raising water levels from Elev. +5 ft. to their full peak at approximately Elev. +14 feet (MSL) over an 11-hour period, and overtopping the concrete floodwall height by a bit more than a foot.

Figure 13(a) shows equipotential contours (contoured in 1 ft. increments of head) and seepage vectors for transient flow analyses of conditions as the canal water levels reached Elev. +14 feet (MSL). The equipotential contours shown in Figure 13(a) are those calculated based on

a lateral coefficient of permeability for the "marsh" stratum of $k_{h,marsh} = 10^{-4}$ cm/sec. This is only one of a number of permeability assumptions modeled and analyzed. Figure 13(b) shows pore pressures calculated at the top of the marsh stratum, directly beneath the inboard side levee toe (beneath Point D in Figure 13(a)) based on transient flow analyses using a range of different values of representative horizontal permeability for the marsh stratum. The fully developed "steady state" seepage pore pressure at this location would have been $u \approx 1,080$ lb/ft$^2$ if the maximum canal water level of Elev. $\approx +14$ ft. (MSL) had remained in place long enough as to establish steady state flow conditions. As shown in Figure 13(b), the fraction of the "steady state" pore pressure that actually accrues at this location is strongly affected by the lateral permeability of the marsh stratum. For values of $k_{h,marsh} = 10^{-4}$ cm/sec, $10^{-5}$ cm/sec, and $10^{-6}$ cm/sec, the fraction of the full steady state pore pressure achieved by transient flow at this location would have been on the order of 85%, 81% and 77% of the steady state pore pressures, respectively. This overstates the degree of pore pressure transmission due to the transient rise in canal water level, however, as the pore pressures shown in Figure 13(b) include the minor initial pore pressure present at this location prior to the storm surge. Subtracting out the initial pre-storm pore pressure, the fraction of the "steady state" pore pressure change (due to storm surge rise) transferred to the top of the marsh beneath Point D was on calculated to be on the order of 80%, 75% and 69% for values of $k_{h,marsh} = 10^{-4}$ cm/sec, $10^{-5}$ cm/sec, and $10^{-6}$ cm/sec, respectively. It should also be noted that the pore pressures shown in Figure 13(b) correspond to the "gapped" case, wherein it is assumed that a gap opens between the sheetpiles and the levee embankment soils on the waterside as the canal water reaches an elevation of approximately + 11 to + 12 feet (MSL), as such gapping was noted in finite element analyses performed to model the behavior of this section. The effect of this opening of a gap, in part, is to permit direct entry of high water pressures at the base of the sheetpile curtain during the later stages of the storm surge rise, and this also adds to the pore pressure rise beneath the inboard side of the levee embankment.

Exit gradients at the toe were calculated to be marginally unstable with respect to initiation of erosion and piping at this stage by approximately 8:30 a.m. for conditions corresponding to $k_{h,marsh} \approx 10^{-4}$ cm/sec or greater, and hydrostatic forces on the upper clay veneer (overlying the main "marsh" layer) at the toe region were also marginally stable with regard to potential hydrostatic uplift for those conditions.

It was, however, lateral translational instability that appears most likely to have won the race to failure at this site. Both limit equilibrium analyses (Spencer's Method, cross-checked against several others) and finite element analyses (PLAXIS) were performed, and the results were in excellent agreement. Figure 14 shows the limit equilibrium analysis for the most critical section, at a canal water elevation of +14 feet (MSL). The most critical failure surface was a semi-rotational failure along the top of the lower (main) marsh stratum, with soil strengths in this region reduced by the underseepage-induced pore pressure increases. The calculated Factor of Safety is FS = 0.94 , but this actually slightly overstates the overall factor of safety as conditions are also marginal with regard to hydraulic uplift in the "passive" resisting soil region just inboard of the levee toe. A second, slightly shallower mechanism, shearing along the top of the upper "marsh" stratum, has only a slightly higher calculated Factor of Safety (FS ≈ 1.02) and is also likely unstable at approximately this canal water level given the marginal uplift condition at the toe.

These limit equilibrium analyses include the presence of a "gap" that opened on the outboard side of the sheetpile curtain between the sheetpiles and the outboard section of the levee embankment. This effectively cut the levee embankment in half, and it also admitted water into this gap; significantly increasing the lateral water pressures against the sheetpiles/floodwall and the resisting inboard side of the embankment. Finite element analyses showed that this gap likely began to open at canal water levels of approximately +10 to +12 feet (MSL), and opened progressively (to increased depth) thereafter. The rapid scouring of a trench to a depth of approximately 4 to 6 feet behind the floodwall (after overtopping began, at a canal water Elev. ≈ +12.4 feet, MSL) was also modeled in these finite element analyses, but it was found to contribute little to the overall failure; the "gap" on the outboard side of the sheetpiles was already well advanced by that stage, and the sheetpiles/floodwall were still calculated to be laterally stable under the applied outboard side water forces if the erosion of the trench at the inboard toe had been the only mechanism of potential concern at this site. Lateral translational stability failure of the inboard side of the embankment itself was found to be necessary for overall failure of the sheetpiles and concrete floodwall for a scoured trench with a depth of less than about 8 feet.

The analyses shown in Figure 14 are based on $k_{h,marsh} = 10^{-4}$ cm/sec, and as noted previously, this is somewhat higher than the values of $k_{h,marsh} \approx 10^{-5}$ cm/sec to $10^{-6}$ cm/sec more typically ascribed to these types of deposits. For values of $k_{h,marsh} \leq 5 \times 10^{-5}$ cm/sec, the factor

of safety calculated by means of conventional limit equilibrium analyses is low, but is greater than 1.0 as the reduction in strength of the foundation soils beneath the inboard side of the levee is progressively less severe at lower permeabilities.

Figure 15 shows the results of finite element analyses, in this case conditions at a canal water elevation of +13.5 feet (MSL). Both the evolving outboard side "gap", and the eroded inboard side trench are present at this stage. As shown in this figure, two distinct failure mechanisms are approaching a failure state; an upper failure controlled by the relatively thin upper "marsh" stratum, and a deeper mechanism along the top of the (main) lower "marsh" stratum. An important nuance not captured in the more conventional limit equilibrium analyses is the "lever" action of the sheetpile curtain and I-wall, which results in additional lateral force against the upper portion of the levee embankment soils, causing the upper marsh failure mechanism to be more severe than the failure along the top of the lower marsh stratum. This cannot be captured in conventional limit equilibrium analyses, which model only overall lateral force acting against the sheetpile curtain and I-wall, and so miss this lever-like action that concentrates the forces more against the upper soils.

Figure 16 shows the calculated evolution of Factor of Safety as canal water levels rose. At a water level of approximately Elev. +10 to +12 feet, a water-filled "gap" began to open on the outboard side of the sheetpile curtain, and the analytical case began to transition from the "ungapped case" (blue diamonds) to the "water-filled gap" case (yellow circles.) Based on both conventional limit equilibrium analyses (coupled with transient flow seepage analyses), and finite element analyses (which internally incorporated the seepage/flow analyses), the best analytical estimate was that failure would occur at a canal water elevation of approximately +12.5 to +14.5 feet (MSL); in close agreement with the observed field performance at this section (which suggests that the failure occurred at a canal water level of approximately Elev. + 12.5 to + 14 feet, MSL).

There is one additional issue that cannot be analyzed at this section, and that is the partial transmission of water pressures through the joints in the sheetpile curtain. Ordinarily that is not a significant issue, as such transmission is slow, and the limited volume of seepage through the joints can dissipate rapidly after reaching the rear side (land side) of the sheetpiles. At this site, however, the upper marsh stratum pinches out, and so is "capped" by less pervious clays and is unable to rapidly dissipate any pore pressures due to flow through the sheetpile curtain. This type of flow through the sheetpile curtain is not amenable to analysis, but it would serve to

further increase the pore pressures within this upper marsh stratum. That, in turn, would further reduce strengths, and would lead to lower stability for the mechanism of semi-rotational shear failure along the top of the upper marsh stratum (as shown previously in Figure 15). It would also serve to further reduce the Factors of Safety shown in Figure 16, and/or it would provide for similarly low Factors of Safety when coupled with somewhat lower assumed values of $k_{h,marsh}$.

Finally, it is necessary to consider the alternate possibility that overtopping erosion, and resulting erosion of a trench adjacent to the inboard side of the concrete I-wall, directly served as the primary cause of the failure and breach at this site. Analyses showed that it would be necessary to erode such a trench to a depth of at least 8 feet in order to fully topple the I-wall (and its supporting sheetpile wall) laterally under the lateral water pressure loads imposed by a canal water elevation of +13.5 ft. (MSL). The erosive trenching observed immediately to the south of the breach site (Figure 11) was to a depth of typically between 2.5 to 4 feet along most of this reach, but deepened towards to edge of the breach itself with a maximum observed eroded trench depth of 4.5 feet at the edge of the last portion of intact levee adjacent to the breach itself. That leaves open the question as to the likely depth of erosive trenching at the location of the breach itself, as this section was catastrophically eroded after the failure and cannot be examined. Most conventional analyses accept that falling water can scour soils fairly rapidly to a depth roughly equal to the depth of fall (in this case the approximately 5 feet of wall height above the crest of the earthen levee embankment), but that scour is then progressively slower towards a maximum depth of on the order of 1.5 times the free fall drop height. This is not well established, and does not account for the effects of soil type and conditions on the rate(s) of erosion expected. This would allow some possibility for potential erosion to have reached a maximum depth of approximately 7.5 to 8 feet, or barely enough as to permit lateral instability of the I-wall under the maximum water pressures with the canal level at Elev. + 14 ft (MSL).

The embankment materials at the breach location were moderately compacted clays and silty clays, and had good intrinsic resistance to erosion. Accordingly, the likelihood that erosion rapidly proceeded to something near to the maximum achievable depth was low. Several miles of this frontage, with similar I-wall heights and similar levee embankment materials, remained largely intact after the hurricane except for eroded trenches in the earthen levee crests at the inboard sides of many of the I-walls. At no location was erosion to a depth of more than 4.5 feet observed. That does not mean, however, that erosion to a greater depth did not occur at the

breach location; as the occurrence of the failure and breach may have been an indication that the maximum depth of erosion occurred at that location.

Analyses of the potential effects of erosion to sufficient depth as to laterally topple the unbraced concrete floodwall are thus also of interest. Figure 17 shows finite element analyses performed for a situation in which overtopping has been assumed to result in erosion of a trench to a depth of 8.5 feet at the inboard side of the floodwall. The floodwall has been laterally displaced (pushed over) by water pressures associated with a canal water level of Elev. + 13.5 ft (MSL), and is now resting against the inboard side of the eroded trench. The configuration, as shown, is stable with a factor of safety of approximately 1.15 with regard to failure. The most critical failure mode (with this factor of safety) is illustrated by the two arrows superimposed on the figure; a cantilever failure requiring reverse slippage (with movement to the left in the figure) of the soils laterally supporting the base of the sheetpile curtain. Secondary modes of failure, with higher margins of safety, would include: (1) failure to the right of the upper portion of the levee embankment under the lateral "push" exerted by the upper portion of the I-wall and sheetpile curtain, and (2) a deeper seated, semi-rotational failure of the overall embankment and floodwall. This finite element analysis was performed with a very low coefficient of lateral permeability within the "marsh" strata, and so deliberately does not reflect major reductions in strength due to underseepage flows.

This does not mean that the conditions shown in Figure 17 (without significant underseepage) do not represent a potential failure mechanism, however. The large lateral displacement of the sheetpiles and I-wall would have resulted in differential movements, and resultant elongation of the sheetpile curtain and I-wall. As noted previously, the sheetpile curtain showed itself to be surprisingly capable of surviving such extensile stresses and deformations, but the concrete I-wall would have broken and spalled off the top, and this in turn would have led to uncontrolled erosion as floodwaters began to enter through the resulting breach in the I-wall. Thus, lateral I-wall instability produced by overtopping erosion represents a feasible candidate mechanism for the failure at this site.

In the end, it is our investigation's conclusion that a fully definitive determination cannot be made between the two competing potential failure mechanisms at this site: (1) overtopping, producing erosion of a trench on the rear face of the concrete I-wall, and resultant lateral instability of the I-wall, and (2) underseepage-induced reduction of strength in the foundation soils, and resultant lateral stability failure of the inboard half of the levee embankment pushed by

lateral water forces exerted against the sheetpile curtain and I-wall.   Opinions within our investigation team are divided, and both mechanisms appear to be feasible explanations.

Arguments for the overtopping-induced failure include the clear observation of such erosive scouring of trenches behind overtopped I-walls along this frontage, and the demonstrated feasibility (at least marginal feasibility) of sufficient erosion as to produce lateral wall movement and resultant breakage of the concrete I-wall.

The underseepage-induced failure hypothesis would require either higher than average lateral permeability of some of the marsh strata along this frontage, or through-passage of seepage-induced pore pressures through the joints in the sheetpile curtain into the upper marsh stratum (which is surrounded and "capped" by less pervious clays and thus has little ability to dissipate such pore pressures).

In the end, some of the most important evidence comes not from geotechnical analyses, which can support the feasibility of both mechanisms, but from the breach itself.   This was an enormously long breach (nearly 1,000 feet in length), and the evidence suggests that it occurred largely all at once, as a single cataclysmic event rather than as a progressively widening feature that had initiated at a smaller "point".    Witnesses described a roar, and then a massive rush of water, and the homes within the first several hundred feet of the breach, along its full width, were clearly subjected to massive lateral water forces (see Figure 9).

The overtopping failure hypothesis can be checked against other overtopping-induced failures that occurred during hurricane Katrina.   A long section of concrete I-wall was overtopped along the north bank of the east-west trending GIWW/MRGO channel, just to the east of the IHNC, and this produced lateral toppling failures of the I-wall along many hundreds of feet; but these were not catastrophic failures with massive and complete embankment erosion (to the point of complete disappearance of the eroded embankment) as was observed at the Ninth Ward's south breach.   Figure 18 shows two sections along this damaged I-wall frontage; the observed character of the damage is starkly different from the complete destruction of the I-wall and levee embankment noted at the Lower Ninth Ward breach site, and instead closely resembles the finite element analyses shown previously in Figure 15.   An additional I-wall failure due to overtopping occurred on the west bank of the IHNC, across the channel from the Lower Ninth Ward, and this is presented and discussed briefly in the companion paper by Seed et al. 2007. Here again, the I-wall failure due to overtopping produced a much more localized and non-cataclysmic failure.   So it appears that overtopping-induced lateral I-wall instability produced

failures of a different character than that observed at the Lower Ninth Ward's south breach. The occurrence of lateral translational embankment stability failure, on the other hand, would well explain the sudden and dramatic failure along a considerable frontage length, the resulting sudden lateral force of the unleashed floodwaters, and also the essentially complete erosion of the levee embankment due to subsequent scour.

Finally, it is noted that the lateral permeability of the marsh strata at this site are highly variable. Historic geologic mapping clearly shows the occurrence of northeast trending drainage features passing diagonally across this levee frontage from southwest to northeast, which eventually converge and form the headwaters of Bayou Sauvage just to the east of this failure site (see the companion paper on regional geology by Rogers et al., 2007). There was also a well-established history of underseepage issues along this frontage. Toe boils, clearly indicating the occurrence of at least sufficient underseepage as to produce the initiation of toe boil erosion at least at one location, were observed and documented by Team Louisiana along this frontage (Van Heerden et al., 2006). And an additional indication of the potential for a zone of pronounced underseepage at the breach location was provided after the hurricane had passed. Figure 19 shows a well-developed crevasse splay; an erosional feature produced by reverse underseepage as the last of the floodwaters drained back into the IHNC from the flooded Lower Ninth Ward beneath the newly completed emergency repair embankment section at the south breach. The gradients that produced this feature would have been very low, as the Lower Ninth Ward had already been largely unwatered by pumping, so this classic reverse crevasse splay is an indication of locally problematic soils (with regard to both lateral permeability and erosive potential) underlying the repair embankment at precisely the location of the original failure.

In the end, we have concluded that the preponderance of the evidence appears to favor underseepage as the principal cause of the failure and breach at this site, but that the alternate hypothesis of overtopping-induced failure is also plausible and cannot be fully discounted.


## Summary

The devastating damages produced by the flooding of New Orleans during Hurricane Katrina were an exceptionally costly disaster. It is now our responsibility to learn as much as we can from this, and to do all that is necessary to ensure that similar events are not repeated. To that end, we must ferret out and embrace important lessons, no matter how difficult.