# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES         CIVIL ACTION
CONSOLIDATED LITIGATION
                                      NO. 05-4182
                                        "K" (2)
PERTAINS TO:  MRGO                    JUDGE DUVAL

FILED IN:  05-4181, 05-4182,          MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


                Videotaped Deposition of

         KENNETH PAUL ARMSTRONG, JR.,

28 Park Place Drive, Apartment 601, Covington,

Louisiana  70433, taken in the offices of

Bruno & Bruno, 855 Baronne Street, New

Orleans, Louisiana 70113, on Monday, the 9th

day of July, 2007, beginning at 9:26 A.M.

Page 14

1    A.  No, it was actually pushed -- pushed
2  up into the property.
3    Q.  When you went in, what did you see
4  there in your house?
5    A.  I guess, you know, the best thing I
6  can describe it is that it looked like
7  somebody threw up.  What I mean, the house was
8  turned upside down.  There was nothing
9  salvageable.  Nothing.
10   Q.  During the storm did you go up on
11  any satellite sites or anything like that, try
12  to see your house, see where --
13   A.  We tried to.  We tried to.  We
14  wasn't able to get up, our property up on the
15  satellite at the time.
16   Q.  And so between the time you
17  evacuated and you went back, did you see your
18  property through any photographs or satellite
19  --
20   A.  No.
21   Q.  -- or anything?
22   A.  I wasn't able to.  You can get a
23  general area, but you couldn't actually get a
24  fix on your property.  It was -- Some people
25  did, but it was hard to pinpoint what house

Page 15

1  was yours.
2    Q.  Now, your Counsel produced to us a
3  DVD.
4    A.  Correct.
5    Q.  And can you tell us about that
6  generally, what the background of that is?
7    A.  It's basically someone who -- It's a
8  lot of guys from the fire department who
9  stayed, they were put in the shelter at the
10  Domino Sugar refinery, and that's where they
11  started out at.  At the beginning of the
12  video, I think in one -- one of them states
13  after some of the weather started and
14  everything that we are getting the back side
15  of the storm.  And then the water appeared.
16  That's what I saw.  And then you see them
17  going through all parts of the community in
18  their boat and trying to retrieve food and see
19  where people were and things like that.  And
20  then they made their way to one of the
21  firemen's home -- mother's home who lives
22  about seven houses from me.  That's how we
23  were able to get that video.
24   Q.  Do you know that lady?
25   A.  Yes.

Page 16

1    Q.  What's her name?
2    A.  Miss Helena and Ron Silver.
3    Q.  And have you watched that whole DVD?
4    A.  Pretty much, yeah.
5    Q.  And there's one part on there where
6  the fireman that's narrating it says "There's
7  Kenny Armstrong's house"?
8    A.  Correct.
9    Q.  Do you remember that part?
10   A.  Yes, I do.
11   Q.  Could you see your house there?
12   A.  Yes, I could.
13   Q.  And the water was up over the roof
14  line?
15   A.  Over the gutter cans at the time,
16  yes.  Maybe a few feet up above that.
17   Q.  And then does your house appear on
18  there at any other time?
19   A.  No.  No.  Just that one time on me.
20   Q.  There's some people at the end,
21  towards the end where there's a lady out in
22  the yard and then she goes in the house.  Do
23  you know those people?
24   A.  I'd have to see the video, because I
25  have seen a few videos, so I am not sure.  I

Page 17

1  would have to see the video to see.
2    Q.  Do you know those firemen?
3    A.  I know a few of them.
4    Q.  Do you know the fellow that was
5  narrating it?
6    A.  Yeah.  Byron Silver.
7    Q.  And then it's his mother that lives
8  --
9    A.  Correct.
10   Q.  -- a few houses from you?
11   A.  Correct.
12   Q.  Let's say we stand in your front
13  yard at 4016 Hamlet.
14   A.  Uh-huh (affirmatively).
15   Q.  Which way do you look to find her
16  place?
17   A.  I live in a cul-de-sac.  The street
18  comes straight at me.  If it turns, if I am
19  looking out my front door, his parents would
20  be to my left.
21   Q.  And they're up around the turn?
22   A.  Yeah, it's really one house.  The
23  street starts, I'm off to the side right there
24  and looking down the street.
25   Q.  When you came back, did you bring a

Page 18

1  video camera, a camera with you or anything?
2      A.  Yes. My wife took some pictures.
3      Q.  And did you give those to your
4  lawyers?
5      A.  Yes. If I am not mistaken, yes, we
6  did.
7      Q.  I may have them. I looked. I can't
8  tell what's what, you know, --
9      A.  Right.
10     Q.  -- because it's pretty trashed out.
11 But we'll look a little bit and see if those
12 are the ones. And let's just back up when you
13 bought that place; about 1985?
14     A.  Let's see. Katie was born there.
15 She's 21. So I'd say in that time frame.
16     Q.  And you and Jeannine have been
17 married a couple, three years by that time?
18     A.  Married in '82. Yeah.
19     Q.  And had you all owned a house
20 anywhere else?
21     A.  Oh, no. No. I was only 19 or 20
22 years old at the time.
23     Q.  And we have got some real estate
24 records, you know, they're publicly available,
25 and it looked like it was about a $73,000

Page 19

1  purchase price?
2      A.  That's what I thought, yeah.
3      Q.  And about 66,000 on the mortgage?
4      A.  When we bought it? I guess.
5      Q.  Okay. And you had had it for 20
6  years then when Katrina hit?
7      A.  Yes.
8      Q.  Was your mortgage pretty well paid
9  down?
10     A.  Yes.
11     Q.  Was it paid off?
12     A.  After the storm I paid it off.
13 $18,000.
14     Q.  So about the time the storm hit you
15 owed about 18,000?
16     A.  That's what my payoff was when I
17 paid it off.
18     Q.  Do you know what the elevation
19 relative to sea level is where your house is
20 at 4016 Hamlet?
21     A.  No, I don't.
22     Q.  Below sea level?
23     A.  I am making a guess here. I would
24 say.
25     MR. GILBERT ANDRY:

Page 20

1     Let me just tell you one thing.
2  Nobody in this room wants you to
3  guess. You either know or you don't
4  know.
5     THE WITNESS:
6     I don't know.
7  EXAMINATION BY MR. MARPLE:
8      Q.  And did you have flood insurance
9  from the beginning?
10     A.  Yes, I did.
11     Q.  And you had flood insurance then at
12 the time of Katrina?
13     A.  Correct.
14     Q.  Had you ever made any claims on that
15 flood policy prior to Katrina?
16     A.  It never flooded. It never did.
17     Q.  Did you ever get water up in the
18 street from rain when the pumps wouldn't pump
19 it out or anything like that?
20     A.  Sometimes, yes.
21     Q.  Did it ever come up in the yard?
22     A.  A few times.
23     Q.  Did it ever make it into the house?
24     A.  Never did.
25     Q.  Now, also Rita hit before you got

Page 21

1  back to look at your house; right?
2      A.  Correct.
3      Q.  Do you know what damage Rita did to
4  your house?
5      A.  No.
6      Q.  Did you have shingles off?
7      A.  Oh, yeah.
8      Q.  And do you know, was that wind
9  damage or flood damage? Do you have any
10 idea?
11     A.  No.
12     Q.  Did you make a claim under your
13 homeowner's policy for wind type damage?
14     A.  Yes, I did.
15     Q.  And was that Allstate?
16     A.  No.
17     Q.  Liberty?
18     A.  Yes.
19     Q.  Liberty Mutual?
20     A.  Yes.
21     Q.  And did they send anybody out to
22 look at the place?
23     A.  Sent somebody out twice.
24     Q.  Did they do a report?
25     A.  The first time they did it and we

Page 22

1  disagreed and they they sent somebody out in
2  July if I am not mistaken, the following
3  July.
4      Q.  That's July, '06?
5      A.  Correct.
6      Q.  So they came out earlier than July,
7  2006 and looked at it?
8      A.  Right.
9      Q.  Somebody made a report?
10     A.  Correct.
11     Q.  And then they said it was all flood
12 damage, I take it?
13     A.  Correct.
14     Q.  And you said, "No, we got some wind
15 damage"?
16     A.  Correct.
17     Q.  And then how did that get resolved?
18     A.  When the first report came, I think
19 they offered me strictly roof replacement and
20 then we disputed it. They came out in July
21 and they paid us I think 35,000 for some hard
22 deck, a few other things that were -- some
23 decking that they thought was cracks in it.
24 Also had a fireplace that was -- you could see
25 where there was a leak in there, too.

Page 23

1      Q.  Now, this report, maybe there's two,
2  I don't know, but however many there are on
3  the insurance coming out and looking, do you
4  have those?
5      A.  We could produce them, yes.
6      Q.  And then you had flood insurance
7  with Allstate?
8      A.  Yes.
9      Q.  I am just curious. Is there any
10 reason you had them with different companies?
11     A.  We had switched insurance companies
12 at the time, and at the time we were going to
13 go to Liberty Mutual to get it all on one, but
14 when we bought the house versus when our car
15 insurance expired, it was two different time
16 frames. So we were waiting to get the flood
17 insurance moved to one agent at the time.
18     Q.  And do you know -- Well, tell me
19 what your approximate premium was for your
20 flood insurance.
21         MR. GILBERT ANDRY:
22            If you know.
23         THE WITNESS:
24            I am not exactly sure. I can
25         give you an around about, but I am not

Page 24

1  exactly sure.
2  EXAMINATION BY MR. MARPLE:
3      Q.  Around about would be fine.
4      A.  I thought it was about $700.
5  Because some of this was paid for through the
6  mortgage.
7      Q.  And as a condition to your mortgage,
8  you had to carry homeowner's insurance and
9  flood insurance; correct?
10     A.  Correct.
11     Q.  Do you know what risk level you
12 were?
13     A.  No, I didn't.
14     Q.  Did you ever undertake to look at
15 that?
16     A.  What I will tell you is when we
17 bought the policy and -- I guess that was
18 about, you know -- that we ever needed,
19 however much we needed.
20     Q.  You understand that the premium you
21 pay for flood insurance is related in some way
22 to the degree of the flood risk where you
23 are?
24     A.  One more time?
25     Q.  Some people pay more for flood

Page 25

1  insurance than other people.
2      A.  Correct.
3      Q.  And the variable, at least one of
4  them is how likely is that property to flood.
5      A.  Right.
6      Q.  And some pay more, some pay less.
7      A.  Right.
8      Q.  It depends on I guess past flooding
9  and all of that.
10     A.  Correct.
11     Q.  Do you know how old your house is?
12 In other words, when it was built?
13     A.  I think in the '70s, the early
14 '70s.
15     Q.  And do you have wood cabinets in the
16 kitchen?
17     A.  Yes.
18     Q.  You didn't have any tin cabinets?
19     A.  Oh, no.
20     Q.  And --
21         MR. GILBERT ANDRY:
22            That would have been the Ninth
23         Ward, a little bit further up.
24 EXAMINATION BY MR. MARPLE:
25     Q.  I was trying figure out on my photos

Page 46

```
 1        That's -- I object to the form.
 2        I'm sure he had to worry about it.
 3        But it just wasn't his.
 4           THE WITNESS:
 5           Yeah.
 6   EXAMINATION BY MR. MARPLE:
 7      Q.  Financially, that -- and
 8   insurance-wise --
 9      A.  No, that was not mine.  That was
10   theirs.
11      Q.  That was the company's?
12      A.  Yeah.
13      Q.  And were your three personal
14   automobiles okay?
15      A.  We took them all with us.
16      Q.  Did you have a boat?
17      A.  Yes, I did.
18      Q.  Was it there at the property?
19      A.  Yes, it was.
20      Q.  Did you take it or leave it?
21      A.  No, I left it.
22      Q.  And what kind of boat was that?
23      A.  It was an 18 foot Scout with a 120
24   Evinrude.
25      Q.  And what happened to it?
```

Page 47

```
 1      A.  It floated about 10 or 12 houses
 2   down with the trailer, and the trailer on it
 3   and everything, it was -- Basically when I got
 4   it, it was stuck in a tree.  Pulled it out of
 5   a tree.
 6      Q.  Was it okay, though?
 7      A.  No.  No, I still got it, but, I
 8   mean, it's -- I moved it to a safer location
 9   and -- but it -- it -- I still got it.  I can
10   get you pictures of it if you want it.
11      Q.  Was there any insurance coverage on
12   it?
13      A.  No.  No.
14      Q.  Now, aside from insurance, have you
15   gotten any benefits paid to you through Road
16   Home or anything like that?
17      A.  No.  Not yet.
18      Q.  Have you applied for Road Home?
19      A.  Yes, we did.
20      Q.  When did you do that?
21      A.  I am not sure of the date.
22      Q.  Recently?
23      A.  No.  It's been a while.
24      Q.  Have you heard anything from them?
25      A.  A few times we talked.  We dispute
```

Page 48

```
 1   the value of our home.
 2      Q.  What are they saying?
 3      A.  140.
 4      Q.  And what are you saying?
 5      A.  160s.
 6      Q.  Now, if this went the way you wanted
 7   it to go, you could get maybe $150,000?
 8      A.  No.  They deduct any money -- Any
 9   monies you received for structure, they take
10   -- they take off.
11      Q.  So that would be the insurance?
12      A.  A minus.  A minus.  They would take
13   -- If I had -- My content on flood was 42 and
14   they would take that off, and any -- Most of
15   the Liberty Mutual money was structure.  So
16   they take that off.  So that would be 77,000,
17   78,000 deducted from Road Home.  Now, Road
18   Home is a different animal.  Some people are
19   getting a grant to rebuild.  We lose our
20   property.
21      Q.  And explain that to me, how that's
22   going to work for you the way you anticipate
23   it.
24      A.  Well, some people get a grant or
25   money for 150,000 or whatever they deem to fix
```

Page 49

```
 1   or repair their home.  We forfeit our property
 2   for the 77,000 or 76,000.
 3      Q.  And then you take that money and you
 4   go rebuild somewhere else?
 5           MR. GILBERT ANDRY:
 6           Objection to the form.  It
 7        assumes that he would rebuild.
 8           THE WITNESS:
 9           Right.
10   EXAMINATION BY MR. MARPLE:
11      Q.  What can you do with that money, if
12   you get it?
13      A.  Well, we'll see.  It depends on what
14   SBA, they take, if they take any, because we
15   have a loan in waiting until we make a
16   decision, and we are not sure if they take the
17   money and -- but we got an agreement right now
18   in principle -- just in waiting until we make
19   a decision of I think a 20 or 30 year loan.
20      Q.  But whatever this number is, and I
21   will just say 70,000 approximately that you
22   might get from the Road Home, somewhere in
23   that neighborhood?  Is that about it?  60?
24      A.  No, it's -- Yeah, it's 70-something
25   thousand, right at 70, I think a little bit
```

### Page 142

1  Q. Have you seen that one before?
2  A. So many things came across, I don't
3  -- I mean, it's possible.
4  Q. In terms of learning about today's
5  dep, did you just get a call from the lawyers
6  and they said be here on the 9th at 9:00
7  o'clock? Is that basically what happened?
8  A. No. We met -- We met with Jon Andry
9  once before.
10 Q. Once before today?
11 A. Correct.
12 Q. And you told us about that; you --
13 A. Yes.
14 Q. -- you passed one of the other
15 Plaintiffs coming in or out of the office;
16 correct?
17 A. Correct.
18 Q. If we look at Exhibit A, it's the
19 sort of separate document that's attached?
20 A. This (indicating).
21 Q. Yes. By the way, do you see on the
22 second page of 14, on the notice, it says that
23 we asked you to produce the documents set
24 forth on Exhibit A? Do you see that? You see
25 where it asks --

### Page 143

1  A. I see that, yeah.
2  Q. Now, the first question is, did you
3  bring any documents with you today when you
4  came in?
5  A. No, I have no documents.
6  Q. You have none with you? You might
7  have some at home; right?
8  A. Depending on what you're looking
9  for.
10 Q. Look at number 3. We talked about
11 that earlier. There's documents that relate
12 to insurance claims that you have. Right? On
13 Exhibit A, number 3?
14 A. Okay.
15 Q. Is that right? You do have some of
16 those or you or your wife do somewhere;
17 right?
18 A. Pertaining to her with her back and
19 stuff, yes, we do. I'm sure we have them.
20 Q. All right. But also insurance
21 claims that relate to what you filed with
22 Liberty and -- Liberty Mutual and Allstate,
23 you have got files on those you told me?
24 A. I'm sure we have documentation on
25 that.

### Page 144

1  Q. By the way, I wanted to ask you, do
2  you know, did you have any friends or
3  relatives that died as a result of Katrina?
4  A. I only -- Other people who passed
5  away, thinking back, I knew two of them.
6  Q. And where were they?
7  A. One was located on the street where
8  I grew up, which is Munster Boulevard, and one
9  was -- stayed at his home off of Paris Road on
10 LaPlace Street.
11 Q. And do you know how they died?
12 A. I'd be guessing. I think they
13 drowned.
14 Q. And out in St. Bernard Parish out
15 near where you lived there were some deaths;
16 right?
17 A. Correct.
18 Q. And the cause of those deaths varied
19 from drowning to electrocution to different
20 things; right?
21 A. That's what I heard, yes.
22 Q. Did your wife keep any kind of diary
23 or journal related to Katrina?
24 A. No.
25 Q. Or the kids?

### Page 145

1  A. She -- No. Not my kids. My wife, I
2  don't know what she has document-wise, other
3  than maybe taking notes to call back somebody
4  or something like that.
5  Q. But not a diary or daily log?
6  A. Not a diary or journal, no.
7     MR. MARPLE:
8        I believe that's all I have.
9     MR. GILBERT ANDRY:
10       And I want to say for the record
11    I appreciate you going right at it.
12    MR. MARPLE:
13       All right. Thank you. I
14   appreciate the courtesy that you have
15   shown us and that your witness has
16   shown us so far. Mr. Armstrong, thank
17   you.
18    THE WITNESS:
19       You're welcome.
20 EXAMINATION BY MR. WEINSTOCK:
21 Q. Andy Weinstock. I represent the
22 Lake Borgne Basin Levee District. I don't
23 believe I'll have that many questions for
24 you.
25    You had indicated that you made

Page 146

1  claims with Liberty Mutual and Allstate for
2  your homeowner's insurance and your flood
3  insurance. Is that right?
4      A. Correct.
5      Q. Did you ever make any kind of claim
6  in writing or send any letters to those
7  insurers?
8      A. I don't think we did for the flood,
9  but I think we had to do that for
10 homeowner's. Because we didn't agree with the
11 first document. We had to prove from a
12 contractor what was the damages and things
13 like that.
14     Q. Do you have that documentation
15 still?
16     A. I think we have some of it.
17     Q. And you would have naturally sent a
18 copy to Liberty Mutual?
19     A. Correct.
20     Q. Do you know if you sent a copy to
21 your agent?
22     A. Bill, I could -- Well, I think what
23 he told us is that we had to send everything
24 to the claims department. He might have gave
25 us the information on what we had to do. Or

Page 147

1  phone number to call.
2      Q. Who was your a little?
3      A. Bill Bubrig.
4      Q. Where is his office located?
5      A. Belle Chasse, Louisiana.
6      Q. Where in Belle Chasse?
7         MR. GILBERT ANDRY:
8         Belle Chasse Highway.
9         THE WITNESS:
10        It's on Belle Chasse Highway.
11 EXAMINATION BY MR. WEINSTOCK:
12     Q. So his office is fine; right?
13     A. Correct.
14     Q. He's still there basically?
15     A. Correct.
16     Q. Was he your agent for both the
17 homeowner's and the flood?
18     A. No.
19     Q. Who was your agent for the flood?
20     A. Trying to think of the guy's name.
21 It was Allstate. His name was -- I can't
22 think of it off the top of my head. It was a
23 guy -- My first insurance agent retired and
24 this guy picked up the work. So I am not
25 sure.

Page 148

1      Q. Is it your belief that you were
2  under-insured on your flood?
3      A. After the fact, yes.
4      Q. Do you hold your agent accountable
5  for that in any way?
6      A. I would hope that they would have
7  contacted me, you know, ahead of time, you
8  know. But the belief, my belief was that
9  50-something thousand dollars to replace -- I
10 never dreamed this would happen.
11     Q. You haven't filed any kind of claim
12 against your flood agent?
13     A. Correct.
14     Q. Do you intend to file such a claim
15 before August 29th, 2007?
16     A. I never intended TO.
17     Q. Do you know Bob Turner?
18     A. I heard the name before.
19     Q. How about Dan Caluda?
20     A. Yes.
21     Q. What, if anything, do you believe
22 the Lake Borgne Basin Levee District should
23 have done differently to prevent you from
24 having your loss and suing them?
25     A. I just don't know their specific

Page 149

1  duties, to answer that question, so -- or what
2  their responsibilities were.
3      Q. "I don't know" is a correct answer
4  to any question you don't know the answer to.
5      A. Okay.
6         MR. GILBERT ANDRY:
7         See, I told you.
8  EXAMINATION BY MR. WEINSTOCK:
9      Q. You applied for Road Home benefits?
10     A. Yes, I did.
11     Q. And was there -- there was an
12 application there as well?
13     A. Correct.
14     Q. And that's in writing?
15     A. Yes.
16     Q. A written application?
17     A. Yes.
18     Q. Do you have copies of that?
19     A. I'm sure we do.
20     Q. I know you answered this, but I did
21 not catch it. We had a hail storm, I don't
22 know, five, six, seven years ago? Yes.
23     A. Yes.
24        MR. GILBERT ANDRY:
25        Longer than that now.