# Exhibit 2

JEANNINE ARMSTRONG (MRGO)                                      7/9/2007

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182 "K"(2)

 PERTAINS TO:  MRGO                 JUDGE DUVAL

 FILED IN:  05-4181, 05-4182,       MAG. WILKINSON
 05-5237, 05-6073, 05-6314,
 05-6324, 05-6327, 05-6359,
 06-0225, 06-0886, 06-1885,
 06-2152, 06-2278, 06-2287,
 06-2824, 06-4024, 06-4065,
 06-4066, 06-4389, 06-4634,
 06-4931, 06-5032, 06-5155,
 06-5159, 06-5161, 06-5162,
 06-5260, 06-5771, 06-5786,
 06-5937, 07-0206, 07-0621,
 07-1073, 07-1271, 07-1285




Videotaped deposition of JEANNINE B. ARMSTRONG,
28 Park Place Drive, Apartment 601, Covington,
Louisiana  70433, taken in the offices of Bruno &
Bruno, 855 Baronne Street, New Orleans, Louisiana
70113, on Monday, the 9th day of July, 2007,
beginning at 9:21 a.m.



APPEARANCES:

      LAW OFFICES OF FRANK J. D'AMICO, JR.
      (BY:  RICHARD M. EXNICIOS)
      2nd Floor
      622 Baronne Street
      New Orleans, Louisiana  70113

          ATTORNEYS FOR THE PLAINTIFFS


JOHNS PENDLETON COURT REPORTERS                  800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG  (MRGO)                                7/9/2007

Page 18

1      Q.    Have -- has there ever been an
2   occasion where you prepared a list of all of
3   those items of your personal possessions that
4   were lost --
5      A.    Before the hurricane or after?
6      Q.    After the hurricane.
7      A.    Yes.
8      Q.    What occasion was that?  Why did you
9   prepare such a list?
10      A.    The insurance companies.
11      Q.    And do I understand that you filed a
12   claim for the loss of your personal possessions?
13      A.    Yes.
14      Q.    And did you also file an insurance
15   claim for the loss of your house?
16      A.    Yes.
17      Q.    Again, we'll come back to the
18   details of that.  I just want to understand
19   broadly the injuries here.
20         I guess, why don't you tell me now
21   what were those few items of personal property
22   that you were able to save?  We've identified
23   your car that you drove out on.
24      A.    Uh-huh.
25      Q.    You obviously had some clothes and

Page 19

1   luggage.
2      A.    Actually, the clothes was more
3   shorts and tank tops than anything, you know,
4   because we figured, you know, if it was a
5   hurricane and we were going to -- you know, we
6   figured we'd get street flooding water, water in
7   the house.  Mostly shorts and tank tops, because
8   you knew you'd have to get back in there and tear
9   everything out.  One pair of capri pants, not a
10   pair of jeans, not a collared shirt.  That's
11   about it.  We had one box -- a Rubbermaid box of
12   pictures, and that's about it.  Me and my husband
13   shared a suitcase.
14      Q.    Your three children were with you?
15      A.    Yes.  Well, my daughter was in Baton
16   Rouge because she's going to school up there, but
17   the other two were with us.
18      Q.    So, really, other than a small stack
19   of photographs --
20      A.    That's it.
21      Q.    -- everything?
22      A.    Yeah.
23      Q.    Turning to the third type of injury,
24   the mental distress, again, can you just tell me
25   a little bit about that at this point?

Page 20

1      A.    What you want to know?
2      Q.    I'm sure it's terrible.
3      A.    Yeah.  And it's not the house, and
4   it's not the possessions.  That's not it.  If you
5   think that's it, you don't have a clue.  It's
6   your community more than anything.
7      Q.    Tell me about that.
8      A.    It's your own -- where your children
9   went to school, where I went to school, where
10   Kenny went to school, everything.  My parents
11   lived across the street.  You know, we went to
12   church.  We were married at the church.  My
13   children were christened at that church.  Gone.
14      Q.    I apologize for having to go through
15   what's clearly painful testimony.  Obviously, I'm
16   from out of town, but the nation understands in
17   some small part the terrible tragedy that struck
18   this community, but, you know, for purposes of
19   the lawsuit, we do need to talk about the mental
20   distress --
21      A.    That's fine.
22      Q.    -- a little bit.
23         So, as I understand what you're
24   saying, to you, your mental distress is primarily
25   focused on, your words, loss of community and

Page 21

1   your immediate neighborhood.
2      A.    Uh-huh.
3      MR. EXNICIOS:
4         Just an objection.  I'm not
5      disagreeing with your
6      summarization, but you're saying
7      "your primary," and she didn't say
8      that.  She said "it's more than
9      just."  She didn't say her primary
10      emotional distress was -- she said
11      "it's more than just" -- a
12      mischaracterization of what she
13      said.
14      A.    The hospital where I worked is gone,
15   my job is gone.
16   EXAMINATION BY MR. DOAK:
17      Q.    Do you consider that set of examples
18   that you identified, your parents across the
19   street, the church that you were married in and
20   your children were baptized, the friends in your
21   neighborhood, your nearby job at the hospital, do
22   you consider that to be the primary basis of your
23   mental distress here?
24      A.    The schools.
25      Q.    The schools.

6 (Pages 18 to 21)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                 7/9/2007

Page 30

1  they thought there was a link between what was
2  started as the pneumonia and then moved to your
3  spine as a fungal inspection (sic); is that
4  correct?
5       A.   Infection, yes.
6       Q.   And that sounds like that was pretty
7  unhappy.  A month -- full month in the hospital?
8       A.   Yes.
9       Q.   And where was that, in Baton Rouge?
10      A.   At West Jeff.
11      Q.   I'm sorry?
12      A.   West Jefferson, on the west bank.
13      Q.   And two surgeries, again, you said?
14      A.   Yes.
15      Q.   Would you give me a little bit more
16 detail on those surgeries?
17      A.   The first surgery, it's called a
18 thoracotomy, where you cut from here all along
19 the side and up your back, where they had to go
20 in and remove two of the vertebrae that were
21 infected, clean everything out.  Then went back
22 the next week straight down my back and put two
23 rods in, bolts, like, through six or seven
24 vertebrae in my back, and then put a cage in,
25 which they call a cage, which actually is in that

Page 31

1  space where they took out the two vertebrae.
2       Q.   Have you ever discussed with any of
3  your physicians the possibility that this fungal
4  infection may have been caused by fungal
5  contamination at -- following the hurricane?
6       A.   Their biggest question was:  How
7  often were you down there?  You know, you were
8  down there cleaning your house out, you know.
9  It's odd.
10      Q.   What I'm trying to get at is whether
11 or not this is your personal theory as,
12 certainly, more informed than me, you're a nurse
13 and you've explained your relationship idea of
14 the fungus.  I'm trying to find out, though, is
15 this your theory or did some of your doctors also
16 agree with your theory, that the fungal infection
17 might have come from Hurricane Katrina and your
18 cleanup activities after it?
19      A.   I would say it was both.  You know,
20 when we went into the house, you know, there's
21 mold all over everything.  There's mold on the
22 studs.  There's mold on the rafters.  It was
23 everywhere.
24      Q.   How long were you in the house doing
25 the cleanup?

Page 32

1       A.   I'd say a few -- every time we went,
2  it was for a few hours.
3       Q.   Let's divert and talk about that for
4  a while.  You went -- your first time back was
5  the date in October, you said.
6       A.   (Nods head affirmatively.)
7       Q.   Summarize, please, the various trips
8  you made back to your house and what happened in
9  those trips, what you were doing.
10      A.   When we first went in, there was at
11 least -- at least two feet of mud and water still
12 in the house.  You know, when you would step
13 down, the mud and water would come over your
14 boots.  So, you were just trying to like -- like,
15 I forgot all my jewelry.  So, we tried to -- you
16 know, you got to find your dresser because the
17 ceiling had fallen.  So, there's no light -- you
18 got to realize, there's no light.  The windows
19 all -- it's hot as hell.  You know, in -- it
20 might be October, but it's hot.  You got long
21 sleeves on.  You have gloves on.  You're sweating
22 constantly.  You're trying to get in there.
23 You're trying to break apart stuff, trying to dig
24 through, trying to find, you know, just any piece
25 of trinket that you could find, you know, because

Page 33

1  it was a maze.  It was a maze as in -- because
2  nothing was where you left it.  Everything was
3  jumbled because everything had been floating
4  around and tossed around.  And you spend most of
5  your time digging because you didn't really know
6  what you were digging through.
7       Q.   How soon in the process did you and
8  your husband think that the house was probably
9  going to be a complete loss and would need to be
10 demolished?
11      A.   When we first saw it.
12      Q.   Immediately?
13      A.   Yes.
14      Q.   So, these follow-up trips after your
15 first return in October were aimed at trying to
16 find what precious items you could retrieve; is
17 that correct?
18      A.   Yes.  Yes.
19      Q.   Using your spinal infection
20 difficulties in July of '06, was the house on
21 Hamlet -- had it been demolished by that time, do
22 you recall?
23      A.   I don't think so.  I think it was
24 closer to November.
25      Q.   You think it was after that?

9 (Pages 30 to 33)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                         7/9/2007

Page 38

```
 1      he's talking about.
 2          THE WITNESS:
 3          Okay.
 4      A.  Yes.
 5  EXAMINATION BY MR. DOAK:
 6      Q.  Do you think that you saw Exhibits 1
 7  and 2 at the same time?  I thought you had said
 8  in preparing for this deposition you remembered
 9  at one time reviewing some documents that
10  Jonathan Andry had shown to you.
11      A.  Uh-huh.
12      Q.  And are these two of those
13  documents?
14      A.  I believe so, yes.
15      Q.  And do you have a basic recollection
16  of when that might have been?
17      A.  We received one on the 26th, when we
18  went to their office, June 26, and the other one
19  was the week before, I believe, when I had to
20  drop something off.
21      Q.  Okay.  And these were just being
22  furnished to you by way of information?
23      A.  Yes.  Yes.
24      Q.  Speak up.
25          Were you ever asked any questions by
```

Page 39

```
 1  your attorneys with respect to particular
 2  questions in these discovery requests?
 3      A.  What do you mean?
 4      Q.  For example, there were document
 5  requests that asked if you had any documents,
 6  notes, photographs, anything of that type about
 7  Hurricane Katrina.  Did your attorney ever sit
 8  down with you and go through a list of questions
 9  about either factual matters or about what
10  documents or photographs you might have had?
11      A.  Yes.  Yes.
12      Q.  And when was that?
13      A.  We spoke to him a few times.  You
14  know, we furnished pictures, a video.  I don't
15  know a timetable.
16      Q.  Did you or your husband any -- ever
17  produce -- strike that.  Let me start over.
18          Did you or your husband ever submit
19  any administrative claim forms to any government
20  entity other than this Form 95 that we talked
21  about earlier?
22      A.  Like what?  Like --
23      Q.  The Road Home Program.
24      A.  Yes.  Yes.
25      Q.  Did you participate in The Road Home
```

Page 40

```
 1  Program?
 2      A.  Yes.
 3      Q.  Do you remember participating in any
 4  other government-sponsored program?
 5      A.  Like FEMA?
 6      Q.  Yes.
 7      A.  Yes.
 8      Q.  And did you fill out a form for it?
 9      A.  Yes.
10      Q.  Did you keep copies of the claim
11  forms that you submitted to FEMA?
12      A.  I believe so.  The application --
13      Q.  Yes.
14      A.  -- in the very beginning?
15      Q.  Yes.
16      A.  Yes.
17      Q.  And did you keep a copy of the claim
18  form you submitted for The Road Home Program?
19      A.  If I don't have a -- whatever -- you
20  had to bring your stuff to them.  They fill it
21  out.  They put it on a disk for you.  We still
22  have that, yes.
23      Q.  Okay.  Do you have a copy of the
24  insurance claim that you submitted?
25      A.  I don't know if I have a copy of
```

Page 41

```
 1  that.
 2      Q.  Did you have any documents that
 3  reflect any eyewitness account --
 4      A.  Yes.
 5      Q.  -- of Hurricane Katrina?
 6      A.  Yes.
 7      Q.  What were those documents?
 8      A.  It was a video.
 9      Q.  Was this the one --
10      A.  A DVD.
11      Q.  -- done by the St. Bernard fireman?
12      A.  Uh-huh.
13      Q.  I was going to ask about that later.
14  Is that -- who was that gentleman?
15      A.  He was a neighbor of ours who grew
16  up on the street.  His parents still lived on the
17  street.
18      Q.  Do you recall his name?
19      A.  Ronald Silva.
20      Q.  Silver?
21      A.  Silva, S-I-L-V-A.
22      Q.  And he is a fireman where?
23      A.  St. Bernard Parish.
24      Q.  And what do you know about him
25  preparing this video?
```

11 (Pages 38 to 41)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

Page 46

```
 1  also, on Hamlet.
 2      A.   We lived in Buccaneer Villa North,
 3  which was the north side of Judge Perez,
 4  basically on the Forty Arpent Canal.
 5      Q.   Yes.  And on your side of Paris
 6  Road, I think, the Forty Arpent is called the
 7  Florida Walk.
 8      A.   I have no idea.
 9      Q.   There -- well, immediately to the
10  north of you, there's a levee --
11      A.   Yes.
12      Q.   -- that goes up, and then there's
13  water right on the other side of that.
14      A.   Yes.  Yes.
15      Q.   And how far was that levee from you?
16  Hundred, 200 yards?
17      A.   I have no idea.  Put it this way.
18  We were two houses off.
19      Q.   You could see it from your --
20      A.   Oh, yeah.  Oh, yeah.
21      Q.   Very near this levee?
22      A.   Yes.
23      Q.   Do you know if -- there was
24  overtopping of that levee, wasn't there, water
25  coming over the top of the levee and coming into
```

Page 47

```
 1  your neighborhood?
 2      A.   I'm assuming so.
 3      Q.   And I know that there is a backwash
 4  station very nearby.
 5      A.   What's that?  A pumping station?
 6      Q.   Pumping station.
 7      A.   Yes.
 8      Q.   How far away is that from your
 9  house?
10      A.   Maybe half a mile.
11      Q.   Okay.  My understanding, that there
12  were problems with that pumping station.
13      A.   Prior to the hurricane?
14      Q.   Were there prior to the hurricane?
15      A.   I don't know.  I -- I don't know.
16      Q.   So, you don't know if that pumping
17  station had failure in connection with Hurricane
18  Katrina or not?
19      A.   Oh, I have no idea.  When we left,
20  there was no -- it wasn't even raining.  There
21  was no water anywhere.
22      Q.   And in the 20 preceding years, had
23  you ever really had standing water in your
24  neighborhood from any of the prior storms?
25      A.   No.  No.  Like, when we came back
```

Page 48

```
 1  from Georges, there wasn't water in the street,
 2  no.
 3      Q.   How about as a girl, living at your
 4  parents' home in that same neighborhood, did you
 5  ever have problem with standing water just in
 6  rain and stuff, or was this neighborhood largely
 7  free of that problem?
 8      A.   I would say over the past -- our
 9  house had never flooded before the -- we have
10  never had water in my house.  Never.
11      Q.   Was there ever water on the streets
12  in any of these prior storms?
13      A.   No.
14      Q.   You said there wasn't water in the
15  house.
16      A.   No.
17      Q.   Not in the street, any --
18      A.   No.
19      Q.   Okay.  What, if anything, do you
20  know about the causes of this severe damage to
21  your house?  I mean, it was water.
22      A.   (Nods head affirmatively.)
23      Q.   But what do you know -- let me start
24  there.  What do you know about -- was that an act
25  of God?  Was that overtopping of the levee?  Was
```

Page 49

```
 1  there a breach -- I don't think near you -- was
 2  it this back pump?  What do you know about the
 3  cause for the water that actually made it to your
 4  property in such volume that it was all the way
 5  up to the roof of your house?
 6      A.   I know it wasn't that much rain.  I
 7  know that.  The only thing I know is what I saw
 8  on TV, the breach at the Industrial Canal in the
 9  Ninth Ward.  That was free-flowing south into St.
10  Bernard, and then I -- I wasn't there.  I don't
11  know if the water came over the top of the -- in
12  the back of the Forty Arpent.  I don't know.  I
13  never saw any, you know, actual coming over of
14  that.
15      Q.   But you're not south of the
16  Industrial Canal.  You're far east of there, and
17  north, aren't you?
18      A.   I'm down from the Industrial Canal.
19  You have to go through the Ninth Ward to get into
20  St. Bernard.
21      Q.   Right.  So, you think that water
22  from the Industrial Canal --
23      A.   Yes.
24      Q.   -- may have reached your
25  neighborhood.
```

13 (Pages 46 to 49)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 50

1    A.   Yes.
2    Q.   How much water do you think came
3  from there as opposed to the levee --
4    A.   I have no idea.
5    Q.   -- that was nearby?
6    A.   I have no idea.
7    Q.   Was there any sign of looting or
8  vandalism to your house?
9    A.   No.
10    Q.   I understand that the house next
11  door and many others, though, did survive.  They
12  were not demolished.
13    A.   Right.  That's a personal choice.
14    Q.   Explain that to me.
15    A.   You could board your house up -- as
16  long as you secured it, it could stay standing.
17  That's up to you if you want to have it torn down
18  or not.  The house next door to us is a
19  two-story, so --
20    Q.   Well, it may be up to you in some
21  circumstances.  I mean, there are some houses
22  that are standing because they didn't suffer as
23  much damage as your house, right?
24    A.   I guess.
25    MR. EXNICIOS:

Page 51

1        Objection.  If we can
2        clarify where.  I mean, some
3        houses in St. Bernard or some
4        houses in New Orleans?
5  EXAMINATION BY MR. DOAK:
6    Q.   There are some houses in St. Bernard
7  standing that did not have as much damage as your
8  house.
9    A.   I would say yes.
10    Q.   And there are houses in Chalmette
11  that didn't have as much damage as your house.
12    A.   I would say yes.
13    Q.   You took some of the worst of it for
14  either of those areas, Chalmette or all of St.
15  Bernard Parish, right?
16    A.   Yes.
17    Q.   Yours was worse than most.
18    A.   Yes.
19    Q.   Okay.  Was there any indication of
20  looting or vandalism?  Did I ask you that?
21    A.   Yeah.  Not -- not at our house.
22    Q.   Okay.  Were you -- did you have
23  friends or people that you had heard of in your
24  area, any area near you that had looting and
25  vandalism?

Page 52

1    A.   Not -- pretty much not in Buccaneer
2  Villa North.  There's nothing to vandalize.
3  There's nothing to loot.
4    Q.   How about in St. Bernard?
5    A.   I've heard of that.
6    Q.   Have you heard of it in New Orleans
7  East?
8    MR. EXNICIOS:
9        Objection.  You're asking if
10        she's heard of looting in other
11        areas.  What's the relevance of
12        this?
13    MR. DOAK:
14        You've stated your relevance
15        objection.
16  EXAMINATION BY MR. DOAK:
17    Q.   Have you heard of looting in New
18  Orleans East?
19    A.   I've seen it on the news.
20    Q.   Okay.  What about wind and rain
21  damage in your neighborhood?  As I understand it,
22  your house immediately next doors to yours had
23  wind and rain damage on the roof that was clearly
24  visible.  Do you remember seeing that?
25    A.   I have no idea what they had.

Page 53

1    Q.   Okay.  Are you aware of other houses
2  in your immediate neighborhood of a half mile
3  having wind and rain damage of some kind?  I'm
4  not saying predominantly, but that part of the
5  damage to their home was caused by wind and rain?
6    A.   I don't know.
7    Q.   So, you're not saying that it didn't
8  happen.  You just don't know?
9    A.   I don't know.
10    Q.   Okay.  I guess, according to the
11  video that you produced, you know that there
12  clearly were some houses in your immediate
13  neighborhood that blew up as a result of ruptured
14  natural gas lines.
15    A.   I -- I don't know.  I have no idea.
16    Q.   Did you see the video that was
17  produced?
18    A.   Yes.
19    Q.   I think there's a reference on there
20  to that.
21    A.   I don't think it's a house being
22  blown up.  I think it's bubbling in the water.
23    Q.   Did you have any roof damage?
24    A.   Yes.
25    Q.   And would you describe it, please?

14 (Pages 50 to 53)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)         7/9/2007

Page 70

1    A.   Yes.
2    Q.   Okay.  Have your money from the
3  insurance proceeds in a bank?
4    A.   Yes.
5    Q.   Waiting to decide.
6         Returning to this idea about what
7  are the circumstances surrounding each of your
8  types of loss, anything else come to your mind
9  about the circumstances surrounding the loss of
10 the house on Hamlet that we haven't covered?
11 We're going to talk about the claim forms and all
12 of that, but about the circumstances or the
13 causes?
14   A.   Not that I know of.  No.
15   Q.   Okay.  Did you pay to have the house
16 demolished?
17   A.   No.
18   Q.   You said you went down to the
19 courthouse.
20   A.   No.
21   Q.   This was just a local or
22 governmental program?
23   A.   I think -- I guess it's a
24 governmental thing.
25   Q.   They just said come and sign and

Page 71

1  that was it?
2    A.   Sign up for it.  Both of you had to
3  sign.  That was it.
4    Q.   Okay.  Personal property loss, I
5  guess, in terms of cause and circumstance, you're
6  going to tell me whatever happened to the house
7  happened to the personal property because it was
8  all together.
9    A.   Right.
10   Q.   Wherever the water came from,
11 everything that we talked about that you knew or
12 didn't know, or theory, whatever we said before,
13 is all true to your personal property loss,
14 right?
15   A.   Yes.
16   Q.   Do -- did you make a claim for that
17 personal property loss on your insurance?
18   A.   Content?
19   Q.   Yes.
20   A.   Yes.
21   Q.   And how much did you receive on your
22 insurance for the house?
23   A.   Flood?
24   Q.   The flood and the homeowner's
25 separated.

Page 72

1    A.   Structure and content, is that what
2  you're asking?  Structure and content for flood,
3  we had -- I believe it was 52,000.
4    Q.   Paid under your flood insurance?
5    A.   Yeah, minus deductibles.
6    Q.   Right.  And that was with Allstate?
7    A.   Yes.
8    Q.   And was the 52,000 limited by
9  coverage issues or that is simply the sum of all
10 of the dollar value losses that you could
11 remember to submit?
12   A.   No.  That was what our policy was
13 for.
14   Q.   Okay.
15   A.   We were severely underinsured.
16   Q.   Okay.  So, you got policy limits?
17   A.   No.  That's just what the price was,
18 if that's what you're asking.  That was the
19 dollar amount that we were insured for.
20   Q.   Yes.
21   A.   Yes.
22   Q.   That's what I meant.
23   A.   Yes.
24   Q.   Okay.  And what about on your
25 homeowner's policy, did you receive payment for

Page 73

1  the structure of the house on it?
2    A.   In homeowner's?
3    Q.   Yes.
4    A.   I'm not exactly sure how it was
5  broken down, if it was structure, content,
6  whatever, but I know we received -- I think it
7  was 32,000 from homeowner's.
8    Q.   Liberty Mutual, was that the name of
9  your homeowner's?
10   A.   Yes, homeowner's.
11   Q.   And you don't know what portion of
12 that was attributable to the house versus the
13 contents?
14   A.   Not in homeowner's, no.
15   Q.   Okay.  Do you have any documents
16 about the payments you've received either --
17 well, from Liberty Mutual?  Didn't they have to
18 send you a check and some kind of paperwork --
19   A.   Yes.  Yes.  Yes.
20   Q.   -- to reconcile your claim and what
21 they're paying and explain what they're doing and
22 why?
23   A.   Yes.  Yes.
24   Q.   Do you still have those documents?
25   A.   I'm sure we do.

19 (Pages 70 to 73)

21814518-488c-4610-8293-a5825110c6b6