# Exhibit 3

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,        MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


          Videotaped Deposition of

             HENRY EARL DAVIS,

7650 Morel Street, New Orleans, Louisiana

70128, taken in the offices of Bruno & Bruno,

855 Baronne Street, New Orleans, Louisiana

70113, on Wednesday, the 11th day of July,

2007, beginning at 10:34 A.M.

Page 38

1  Q. Okay. Anything else that comes to
2  mind just talking about the particular
3  injuries to the house or your personal
4  possessions that we haven't covered
5  generally?
6  A. That's about it. I don't know.
7  Q. Let's talk about the third type of
8  injury that you're alleging, your severe
9  mental distress. Tell me a little bit about
10 that.
11 A. Tell you a little bit about me first
12 and then I'll get to that.
13 Q. All right.
14 A. I've been taking care of me since I
15 was 18 years old. I never thought that I
16 would be homeless also. When I came back that
17 Monday, I realized I was really homeless. I
18 ended up staying with some people that didn't
19 want me there at their house. And that's
20 really stressful when somebody wants you out
21 of their house and you can't find anywhere to
22 go. That's super stressful. I endured that
23 part for about a month and a half before I
24 could find anything, and I found a dump. I
25 hurried up and moved into a dump. When you

Page 39

1  walk on the floor, it felt like you were going
2  to fall through, and I am in an upstairs
3  apartment. That was the best I could find at
4  that time. So that's what I mean by that.
5  Q. Okay. Let's start with the living
6  with people. This is when you first evacuated
7  New Orleans --
8  A. No.
9  Q. -- and went to Mississippi?
10 A. No. When I left Mississippi and
11 came to Baton Rouge due to my job, I was
12 living with my wife's cousin --
13 Q. Yes.
14 A. -- who already had seven or eight
15 other people living in his house, and it's a
16 small house. It was horrible, man.
17 Q. So this was when you first went to
18 Baton Rouge?
19 A. When I went to Baton Rouge.
20 Q. And that was about one and a half
21 months?
22 A. Before I could find an apartment.
23 Q. Okay. And at that time it was your
24 wife and your daughter, youngest daughter
25 living with you still?

Page 40

1  A. Yeah.
2  Q. All right.
3  A. Well, what happened, that's -- my
4  youngest daughter stayed in Mississippi when I
5  left, because I thought I was only going to be
6  gone three or four days. They had something
7  starting up in Baton Rouge for three or four
8  days, and that's what I told the gals, I was
9  going to be there for three or four days. But
10 after I got to Baton Rouge, they wanted to
11 start up the whole nine yards and I really
12 didn't have anywhere to go, but I needed my
13 job so I had to do what I had to do.
14 Q. So you had to stay with your wife's
15 cousin, and that was not a happy month and a
16 half?
17 A. No. No.
18 Q. Okay. And as a result of that month
19 and a half experience you suffered mental
20 distress?
21 A. Man, just being homeless is enough
22 to do that. But being with somebody else who
23 don't want you there, that was hard for me.
24 Q. Now, the second part that you
25 identified was that you finally found a place

Page 41

1  that you could move your family, --
2  A. Right.
3  Q. -- but it was a dump?
4  A. That was a dump.
5  Q. Tell me about that. That's still in
6  Baton Rouge?
7  A. It's still in Baton Rouge.
8  Q. Okay.
9  A. At the front door, it felt like the
10 floor was loose. When you step, it feel like
11 you about to go through. The rooms was real,
12 real tiny. You didn't have enough room really
13 to move around. And the floors was all uneven
14 all over the place. I think the rent was 400
15 a month or something like that. But it just
16 wasn't a very nice place to be in.
17 Q. So this was a small apartment that
18 was just a dump?
19 A. Yes, it just was a dump.
20 Q. How long did you live in this dump?
21 A. About two months. And then FEMA
22 gave me a trailer. It was another little
23 hardship, but I made the best of that.
24 Q. Okay. So the FEMA trailer was
25 somewhat of a hardship, but nothing compared

Page 42

1  to living with the relatives for a month and a
2  half?
3     A.  And the dump. It was better than
4  that.
5     Q.  And the dump. Okay.
6     A.  It just was real tiny. It was
7  small.
8     Q.  Okay. Was there any other aspect of
9  your mental distress between those three
10 items, living with your relatives, the dump,
11 and the FEMA trailer?
12    A.  That's about it.
13    Q.  Okay. And how long were you in the
14 FEMA trailer?
15    A.  I don't know exactly what month I
16 went into it.
17    Q.  Was that still in Baton Rouge?
18    A.  It was still in Baton Rouge.
19    Q.  Okay.
20    A.  It was still in Baton Rouge until
21 they got me a trailer here in New Orleans.
22 Well, I waited until I retired to come to the
23 one here in New Orleans to start to work on my
24 house. I just didn't work here in New Orleans
25 about maybe four -- four months. I came in

Page 43

1  August. September, October, November. About
2  three months. Because I moved in by
3  December.
4     Q.  Okay. Any other aspects to your
5  mental distress that you haven't told me
6  about?
7     A.  Not that I could think of right now.
8     Q.  Okay. Again, preview question, but
9  I want to get a list of the places that you
10 made claims for assistance. I believe that
11 you mentioned that you had home insurance.
12 Did you make a claim against the home
13 insurance?
14    A.  Uh-huh (affirmatively). What they
15 did is when I was in Baton Rouge, they gave me
16 $1,500. Like a living expense. I thought it
17 was.
18    Q.  Yes.
19    A.  In the end, they told me that they
20 gave me the $1,500 and that was an
21 overpayment. That's the worst thing I ever
22 heard of, you know.
23    Q.  Okay. We're going to go through
24 this again. But the flood insurance, though,
25 you did receive?

Page 44

1     A.  Yes.
2     Q.  And how much of a policy for flood
3  insurance did you have?
4     A.  They gave -- I don't -- I think they
5  gave me --
6     Q.  Do you know what your policy limit
7  was?
8     A.  I don't -- I don't remember right
9  now.
10    Q.  You know what I mean, the maximum
11 amount?
12    A.  I know. I think I got pretty much
13 the maximum amount, though.
14    Q.  Okay.
15    A.  I think I did.
16    Q.  And what about was that
17 approximately?
18    A.  Well, they gave me my -- they paid
19 me for my contents and they gave me -- I think
20 they gave me 33,000 for the contents, I
21 think.
22    Q.  Okay. And what did they pay you for
23 the house?
24    A.  I don't -- I don't know the exact
25 figure.

Page 45

1     Q.  Okay. And I know that you reached
2  an agreement with the Road Home Program.
3     A.  Yes.
4     Q.  And how much did they pay you?
5     A.  They gave me 52,000.
6     Q.  Okay. And were there any other
7  Federal, state, local, charities, anything,
8  any other programs that gave you --
9     A.  FEMA gave me 2,000 and then they
10 gave me -- I don't know if it was $2,200 or
11 $2,400. I don't remember the other one.
12 Somewhere in that field.
13    Q.  Okay.
14    A.  And LRA. That's -- That's -- I got
15 a loan from them on my house.
16    Q.  What's the name again?
17    A.  Ain't that -- I think it's LRA.
18    Q.  LRE?
19    A.  LRA.
20    Q.  A? And what was the loan amount?
21    A.  $10,000.
22    Q.  And that was for any purpose or to
23 use --
24    A.  For repairing stuff around -- You
25 know, I told you the homeowner's didn't give

Page 46

1  me anything. I had to get my shed and stuff
2  put back. So I used the money for that.
3      Q. Okay. I'm about to move on to
4  another area, but before I do, I want to
5  confirm that we have talked about all of your
6  injuries and damages and things. I just want
7  to make sure that you're not seeking any other
8  relief. You know, I have to get an exhaustive
9  list of everything you're claiming in the
10 lawsuit, all of which we're going to go
11 through again, but we're going to talk about
12 losing your house, number 1; number 2, losing
13 your personal possessions; and number 3, the
14 mental distress that you suffered as a result
15 of Hurricane Katrina. Are you seeking any
16 other relief in this lawsuit other than for
17 those three categories?
18     A. No.
19     Q. Okay. And I also want to confirm
20 with your Counsel.
21     MR. DOAK:
22         As we did in the prior
23     deposition, as you know, when the
24     deponent was noticed, attached to the
25     depo notice was Exhibit A with a list

Page 47

1      of document requests, and Defendants
2      agreed you didn't need to move for a
3      protective order on that. You
4      informed us that you were making the
5      same objections which are the current
6      subject of discovery motions that are
7      pending. But just to confirm with
8      you, based upon that agreement and
9      your current position, you're not
10     producing any documents in response to
11     that Exhibit A today, are you?
12     MR. EXNICIOS:
13         No, no documents are being
14     produced today. Some documents were
15     produced previously and then the rest
16     of it is all part of that argument I
17     think taking place on the 17th.
18     MR. DOAK:
19         Okay.
20 EXAMINATION BY MR. DOAK:
21     Q. Mr. Davis, on June 12th the
22 Plaintiff attorneys gave the Defendants some
23 responses to a written set of discovery that
24 we do in lawsuits. Does that ring any bells
25 with you?

Page 48

1      A. Not really.
2      Q. There was -- I don't know that it
3  should.
4      A. Okay.
5      Q. I am just asking.
6      A. Right.
7      Q. There are three names. There was a
8  set of what lawyers call requests for
9  admissions; there was a set of
10 interrogatories; and a set of document
11 requests, all pertaining to class
12 certification issues. Do you remember seeing
13 or being asked anything about those discovery
14 requests?
15     A. Not on the date you said, I don't
16 think.
17     Q. Well, do you remember being involved
18 in those discovery requests on any other
19 date? It would have been in the last couple
20 of months.
21     A. I would have to see what you're
22 talking about.
23     Q. That's what I am getting ready to do
24 next.
25     A. I don't know if I can answer.

Page 49

1      Q. Mr. Davis, I'm handing to you what's
2  been marked as Davis Exhibit 1. I ask that
3  you examine that. I'll tell you that those
4  are the Plaintiff's responses to the
5  Defendants' class certification discovery
6  requests.
7      A. I think I seen this one before.
8  Yeah. I think I seen this one.
9      Q. Did you see that after the answers
10 were prepared?
11     A. No. Is this the stuff that was sent
12 to me?
13     MR. EXNICIOS:
14         You can't ask me, unfortunately.
15     THE WITNESS:
16         I'm not sure. Looks familiar,
17     but I am not sure.
18 EXAMINATION BY MR. DOAK:
19     Q. You think it may look familiar?
20     A. Yeah.
21     Q. Do you think that you participated
22 in giving the answers, or was it sent to you
23 after it was already done just to keep you
24 abreast of what was going on in the lawsuit?
25     A. I don't think it was already done.

Page 50

1  I don't think it was. No. I don't think it
2  was already done. I think they sent me
3  something.
4  Q. Let me hand you another document
5  that's been marked as Davis Exhibit Number 2.
6  And I will tell you that is the set of
7  Plaintiff's responses to the common liability
8  issues in the case. I'd ask you the same
9  thing, to examine that document a little bit
10 so that we could discuss whether or not you
11 participated in its preparation.
12 A. I think when I got this, it wasn't
13 answered and I didn't understand a lot of the
14 questions. I did talk with somebody else on
15 this.
16 Q. Okay.
17 A. You know. I didn't understand. I
18 don't want to sign up on something I don't
19 understand.
20 Q. I understand.
21 A. So that's what may have happened
22 with this, --
23 Q. Okay.
24 A. -- you know.
25 Q. But you think that you did talk to

Page 51

1  one of your attorneys?
2  A. Yeah.
3  Q. I am not asking anything about what
4  you talked about, but you think that you may
5  have talked to one of your attorneys about
6  these discovery requests?
7  A. I think this is what led me to the
8  three things you asked me about at first,
9  other than a whole bunch of other stuff that I
10 saw.
11 Q. Okay.
12 A. I think this is what I was looking
13 at.
14 Q. Okay. Do you recall when that
15 meeting was?
16 A. No.
17 Q. Was it recent, a few weeks ago? You
18 were talking about being prepared for this
19 deposition?
20 A. No, I was talking with somebody on
21 the phone about this, I think.
22 Q. Okay.
23 A. But I don't know when it was.
24 Q. Okay.
25 A. I think whenever it was, it was

Page 52

1  shortly after I got it. I got it like on a
2  Friday and it may have been that Monday or
3  something else I talked to somebody else on
4  it. Because I didn't understand it. I didn't
5  want to say a whole bunch of stuff that don't
6  pertain to me.
7  Q. Okay. Let me ask you a few
8  questions about some documents. You indicated
9  that you have submitted claim forms at least
10 to the Road Home Program? Is that correct?
11 A. That's correct.
12 Q. And did you keep a copy of that
13 application form?
14 A. I may have. I don't know. I'm not
15 sure.
16 Q. And you also indicated that you made
17 an insurance claim, both against your
18 homeowner's policy and your flood insurance
19 policy; correct?
20 A. Correct.
21 Q. Did you keep a copy of your
22 insurance claim form?
23 A. Probably so at home.
24 Q. And did you keep a copy of your
25 flood insurance claim form?

Page 53

1  A. Yes, I'm sure.
2  Q. Did you prepare any kind of notes,
3  eyewitness account, either at the time you
4  evacuated your house or on the trips when you
5  were coming back to your house on Morel about
6  your experiences?
7  A. No.
8  Q. Do you have any documents or notes
9  that refer to the damages to your house on
10 Morel? Did you keep any paperwork?
11 A. I may have. I'm not sure.
12 Q. You had to pay somebody to do the
13 work; right?
14 A. Yes.
15 Q. And who were the companies that did
16 the work?
17 A. What, the gutting out work? The
18 work that I was just speaking of?
19 Q. Yes.
20 A. Just the gutting out or the coming
21 back up?
22 Q. Both.
23 A. I got some paperwork on the coming
24 back up. I used a guy, it was a contractor I
25 used, a Hispanic guy named Jose. I got some

### Page 54

```
 1   paperwork on that.
 2        Q.  And do you have any paperwork about
 3   your personal possessions that were lost?  You
 4   said you thought you might have prepared a
 5   list to one of the insurance companies in the
 6   claim.
 7        A.  I sent that to the insurance
 8   company.  I don't know if I got it still.  I
 9   may have.  I'm not sure.
10        Q.  Have you looked for it?
11        A.  No.
12        Q.  Okay.  Do you have any photographs,
13   videotapes, DVDs that refer to any of your
14   property damage?
15        A.  I had photos and I think I left them
16   at the place I told you where I got the
17   $10,000 out of.  It's not the Road Home.  It's
18   something else.  Some kind of loan.
19        Q.  But you would have something at home
20   that would probably refresh your memory
21   there?
22        A.  Maybe not.  I may have left it with
23   -- The pictures?  I might not have gotten the
24   pictures back.  Because they had to reclassify
25   me or something when I went to the City.  I
```

### Page 55

```
 1   had to go to City Hall and bring the pictures.
 2        Q.  Yes.
 3        A.  So I don't know if they still have
 4   them.
 5        Q.  Okay.  But what were you doing at
 6   City Hall that you left the pictures with
 7   somebody?  I am trying to find --
 8        A.  To get -- To get certified to get a
 9   permit to -- to come back up with my house.
10        Q.  A building permit?
11        A.  Yeah.
12        Q.  Okay.  And so --
13        A.  So I had to take pictures to them in
14   order to get started on the house.
15        Q.  Okay.
16        A.  And I think they kept them.
17        Q.  Did you make a copy of those
18   pictures for your lawyers?
19        A.  No.
20        Q.  Okay.
21        A.  I don't think I had a lawyer at that
22   time.
23        Q.  The various documents that we have
24   just talked about that you think you might
25   have at home, --
```

### Page 56

```
 1        A.  Uh-huh (affirmatively).
 2        Q.  -- have you ever been asked
 3   questions about those documents by your
 4   attorneys?
 5        A.  I was asked that about the pictures
 6   and I can't find them.
 7        Q.  Okay.  But what about the other
 8   documents, the claim forms for the insurance
 9   or the Road Home, all --
10        A.  No.
11        Q.  -- the other things we went through?
12        A.  No.
13        Q.  No, they did not ask you questions
14   --
15        A.  No.
16        Q.  -- for those documents?
17        A.  No.
18        Q.  Okay.  Now, Mr. Davis, I would like
19   to go back and talk about your three
20   categories of injuries in a little bit more
21   detail and talk about the real circumstances
22   and the details of each.  I like to give you a
23   road map.  I'm not trying to trick you.
24        A.  I thought that's what we just did.
25        Q.  No, I wanted to understand what your
```

### Page 57

```
 1   injuries were.  I want to talk now a little
 2   bit more about what are the circumstances and
 3   what you know about how those injuries
 4   occurred, beginning with your house on Morel
 5   being damaged.  What do you know about how
 6   that damage occurred?  You weren't present.
 7   You have already told me that.
 8        A.  No, not -- I already told you what I
 9   thought happened, you know, in that.  You
10   know, like the part on the roof, I believe
11   that water came in through there.  Now, --
12        Q.  Right.
13        A.  -- that's all I know about that.
14        Q.  Right.  No, I -- What you said on
15   the roof I understand.
16        A.  Okay.
17        Q.  What about the water that came into
18   your neighborhood; do you have any idea where
19   that water came from?
20        A.  No.  I believe it was the MRGO,
21   though.
22        Q.  Okay.
23        A.  That's where I believe it come from,
24   but I didn't see where it came from.
25        Q.  I didn't know if you know, were
```

Page 58

1  there any levees nearby that had overtopping
2  or breaches near your house?
3      A.  None near my house overtopped.  All
4  -- All of them are still the same, intact.
5      Q.  Okay.  We have talked about wind and
6  rain already.
7      A.  Uh-huh (affirmatively).  Okay.
8      Q.  When you came back, any sign of
9  looting or vandalism to your house?
10     A.  No.  I came back, all the furniture,
11 everything was in the same spot where it was
12 when I left it, but it just was wet, most of
13 it.
14     Q.  Okay.
15     A.  You could see where it had been
16 wet.  And mud on the floor where water came
17 in.
18     Q.  Right.  Mr. Davis, I am going to
19 hand you what's been marked Davis Exhibits 3,
20 4, and 5.  They are photographs, two per
21 page.  I just want you briefly to identify
22 it.  I guess the first page of pictures,
23 Exhibit 3, are two pictures of the outside of
24 your house?  Is that correct?
25     A.  That's correct.

Page 59

1      Q.  And this is a more recent photo
2  showing how it appears today now that you have
3  repaired the house?
4      A.  Uh-huh (affirmatively).
5      Q.  And the second picture would be
6  Exhibit 4, and it's two more photographs of
7  the front of your house --
8      A.  Uh-huh (affirmatively).
9      Q.  -- and your garage area?
10     A.  That's correct.
11     Q.  And the next exhibit, Exhibit 5,
12 shows your kitchen on the bottom and the --
13     A.  Kitchen on the top.
14     Q.  I'm sorry, on the top.  And on the
15 bottom, the air conditioner compressor on the
16 side of your house.
17     A.  That's correct.
18     Q.  And that's the air conditioner
19 compressor that you had before the storm;
20 right?
21     A.  That's correct.
22     Q.  And yet --
23     A.  Just recently had it changed,
24 though.
25     Q.  You did?  But this one --

Page 60

1      A.  Was there when they came out.
2      Q.  I'm sorry?
3      A.  That's the one that was there when
4  they came out, when they came out to take the
5  picture.
6      Q.  I'm sorry, I am not understanding.
7      A.  That's the one that was there when
8  they came to take the picture a few weeks
9  after the storm.
10     Q.  But it was working at the time,
11 wasn't it?
12     A.  It was working.
13     Q.  So it wasn't damaged too badly by
14 the storm, because it was working at the time
15 nearly two years after Katrina?
16     A.  Yeah.
17     Q.  Yes, you agree with my question?
18     A.  It was working.
19     Q.  Okay.  Now, from that it would
20 appear that there must not have been too much
21 standing water on that side of your house?
22     A.  Well, if you look at this picture
23 now, this air conditioner here is elevated as
24 opposed to a lot of them that's not.
25     Q.  You're right.  It's elevated.

Page 61

1      A.  Uh-huh (affirmatively).  So I don't
2  know how high the water would have to get to
3  move in.  But air conditioning on the side of
4  the house, rain goes through them all the
5  time, so you can't say it wasn't much standing
6  water.  Due to that running, you can't say
7  it.  I couldn't.  You might would, but I
8  wouldn't.
9      Q.  I understand that the elevation of
10 your house is maybe six to eight inches higher
11 than other houses on your street anyway.  Did
12 you know that?
13     A.  No, I didn't know that.
14     Q.  And you're pointing out in this
15 picture, Exhibit 5, that your air conditioning
16 compressor is sitting on a cement platform.
17     A.  Uh-huh (affirmatively).
18     Q.  And that serves to raise it up a
19 little bit.
20     A.  (Witness nods head affirmatively.)
21     Q.  And certainly there is room for a
22 few inches of water to be standing there
23 perhaps without damaging the air conditioner
24 compressor.  And I think that's what you're
25 saying.  Correct?

Page 62

1  A.  That's what I am saying.
2     MR. EXNICIOS:
3        He's already answered, but I
4     object to the form.  Your summary, I
5     lost your summary in there.
6  EXAMINATION BY MR. DOAK:
7  Q.  When your house was repaired, tell
8  me about how much they had to gut the
9  insides.  Did they take down the drywall?
10 A.  They took out four feet of drywall
11 in all of the rooms except my daughter's
12 room.  In my daughter's room I told you it
13 came in through the roof, so the whole thing
14 had to be gutted and replaced.
15 Q.  So that was much more severe damage?
16 A.  Right.
17 Q.  Obviously you had the roof collapse
18 and you also had water coming from above that
19 the other areas of the house didn't have that
20 problem.
21 A.  That's correct.
22 Q.  They had water from below, but not
23 on top.
24 A.  That's correct.
25 Q.  Okay.  And you have already conceded

Page 63

1  that that was the water that was coming down
2  this pipe, however that pipe was damaged up on
3  the top of your house?
4  A.  That's correct.
5  Q.  For the rest of your house, though,
6  you're saying that the sheet walls in all of
7  the various rooms, they just cut out, they cut
8  it out at four feet, replaced that, and still
9  used the existing two by four studs and redid
10 the house with that repair?
11 A.  Correct.
12 Q.  Okay.  And have you ever heard
13 anybody say that you probably only had a few
14 inches of water standing in your house?
15    MR. EXNICIOS:
16       Objection to the form.
17 EXAMINATION BY MR. DOAK:
18 Q.  Have you ever heard people say that
19 you had standing water in your house that was
20 not more than six inches?
21 A.  I ain't heard nobody say that.  I
22 heard my neighbor across the street say -- You
23 know, he was here.
24 Q.  Yes.
25 A.  He said he had about three feet of

Page 64

1  water in his house.
2  Q.  All right.
3  A.  I don't know how much I had in my
4  house really.
5  Q.  Okay.  Tell me about your other
6  neighbors.  What else happened in your -- to
7  your neighbors according to either your
8  observation when you came back and looked --
9  A.  Well, this particular neighbor had
10 to change everything, because I think they
11 tried to get up in their attic and they ended
12 up falling through and all of that kind of
13 stuff.  So then they ended up on the roof for
14 four days.
15 Q.  Oh, my.  So they made the mistake of
16 not evacuating.
17 A.  And I called them to get out of
18 there and they just didn't do it.
19 Q.  And what did he report about the
20 water in your neighborhood?
21 A.  He said that the storm had passed,
22 he was taking the boards down off of his
23 windows, and he heard the water rushing around
24 the corner, with ice chests and buckets
25 banging into stuff and he couldn't figure out

Page 65

1  where the water was coming from.  And in a few
2  minutes it was up on his truck and he ran and
3  he -- somebody else had left some kids with
4  him, and he pulls the thing down for the attic
5  and run up in the attic and those kids was
6  moving around and falling through the
7  sheetrock, and they had to go back outside,
8  get on a ladder, and go on the roof.  That's
9  what he said.
10 Q.  And they were stranded for four days
11 before they were rescued?
12 A.  Four days.  Helicopters flying right
13 by them, wouldn't stop.
14 Q.  I was told that when the inspectors
15 were out, they had observed a lot of roof
16 damage, wind and rain roof damage in your
17 neighborhood.
18 A.  Uh-huh (affirmatively).
19 Q.  Do you agree with that?
20 A.  Yes.
21 Q.  Do you know from your neighbors that
22 many of them submitted insurance claims
23 because they had damage not due to the
24 flooding of water, but due to wind and rain?
25 A.  Uh-huh (affirmatively).

17 (Pages 62 to 65)