## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES                    CIVIL ACTION
       CONSOLIDATED LITIGATION

NO.: 05-4182

SECTION "K" (2)

FILED IN:    05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
             05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
             06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
             06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
             06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
             06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
             07-0993, 07-1284, 07-1286, 07-1288, 07-1289.

PERTAINS TO: LEVEE

---

### PLAINTIFFS' CORRECTED RESTATED LEVEE MASTER CONSOLIDATED CLASS ACTION COMPLAINT

NOW INTO COURT, COMES THE LEVEE PLAINTIFFS' SUBGROUP LITIGATION COMMITTEE ("LEVEE PSLC"), pursuant to Case Management Order No. 4, for the purpose of filing this (Superseding) Corrected Restated Levee Master Consolidated Class Action Complaint:

### I.

### INTRODUCTION

1.    This action results from one of the most predictable and preventable catastrophes in

American history. On or about August 29, 2005, Hurricane Katrina ("Katrina") hit the Gulf Coast largely sparing Greater New Orleans, which fortunately lay in Katrina's rapidly deteriorating western eye-wall.  The result was that Katrina laid waste to virtually everything in its path along the Mississippi Gulf Coast; but in Orleans Parish, Katrina's winds did not register as a Category 3 on the Saffir-Simpson scale, instead barely reaching 100 miles per hour.  Nevertheless, through the fault and negligence of Defendants, Katrina's surge rushed from the Gulf of Mexico through the Mississippi River Gulf Outlet ("MR-GO") and converged with another storm surge rushing from Lake Borgne through the Gulf Intracoastal Waterway ("GIWW"). The combined surge was then funneled into the joint MR-GO/GIWW, otherwise known as Reach 1 of the MR-GO  inundating the heart of the City of New Orleans from the east by overwhelming levees/floodwalls and/or spoil banks that had been negligently designed, constructed, maintained, undermined, weakened, inspected and/or operated by the Defendants.  In addition, through the fault and negligence of Defendants, Katrina's surge rushed unhindered through the Rigolets and Chef Menteur Passes into Lake Pontchartrain to inundate the heart of the City of New Orleans from the north by breaching  levees/floodwalls and/or spoil banks that had been negligently designed, constructed, maintained, undermined, weakened and/or operated by the Defendants.

2.     This (Superseding) Restated Master Consolidated Class Action Complaint is an Administrative Master Complaint ("AMC") which incorporates all parties to the class action proceedings consolidated or cumulated before this Court, including those named in any and all subsequently filed class actions which are later transferred to this Court. This AMC does not merge the above referenced suits into a single cause nor does it alter the rights of any

party in any respect.  This AMC shall not be given the same effect as an ordinary Complaint, but shall only be considered as an administrative device to aid efficiency and judicial economy.  *See In re Propulsid Products Liability*, 208 F.R.D. 133 (E.D. La. 2002).

## II.

## JURISDICTION

3.      This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) (Defendant United States), and 28 U.S.C. § 2671, *et seq.* (Federal Tort Claims Act, "FTCA").

4.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), inasmuch as Plaintiffs' claims arise under the Constitution and/or laws of the United States, which statutory laws include, without limitation, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*, the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§ 403 *et seq.*

5.      The Court also has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. § 1332(d)(2), which vests original jurisdiction over the class claims asserted herein based upon the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711 *et seq.*

6.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1367 as to those claims asserted under state law because they are so related to claims within the federal jurisdiction of the Court that they form part of the same case or controversy within the meaning of Article III of the United States Constitution.

7.      The Court also has subject matter jurisdiction over those claims asserted  herein which arise under the Admiralty/Maritime Law of the United States, pursuant to 28 U.S.C. § 1333(1) and saving

to all Plaintiffs as suitors all legal and equitable remedies to which they otherwise are entitled.

8.    The Court also has subject matter jurisdiction as to the defendant Corps of Engineers pursuant to 46 U.S.C. §§ 741-752 (the Suits in Admiralty Act, "SAA"), and/or 46 U.S.C. §§ 781-790 (the Public Vessels Act, "PVA") as applicable, and/or 46 U.S.C. § 740 (the Admiralty Extension Act, "AEA")).

9.    All named Defendants have engaged in sufficient conduct within the jurisdiction of this Honorable Court, and/or have sufficient contacts with the jurisdiction of this Honorable Court related to the events complained of herein, to be subject to the Court's *in personam* jurisdiction.

### Administrative Claim Requirements

10.    All named Plaintiffs/Complainants have presented their administrative claims in writing to the Corps as provided under appropriate federal law and regulation and a period of at least six months has expired since the filing of their claims. Further, named Plaintiffs/Complainants, individually, and on behalf of all others, reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a consequence of the inaction and failure to act on the part of the Corps in failing to process and evaluate said claims.

### Futility Doctrine

11.    While the Named Plaintiffs and the proposed Class Representatives herein have timely filed their administrative claims for damages with the Corps and have allowed the requisite time to file suit against the Corps to elapse, Class Representatives, individually and on behalf of the Putative Class they seek to represent, expressly plead the futility doctrine on behalf of any member of the Putative Class herein who either did not timely file an administrative claim for monetary damages under any applicable law or regulation, or if they did file such

a claim and six months has not yet run from time of filing. All administrative exhaustion requirements imposed by 28 U.S.C. § 2675 (applicable to suits under the FTCA) and 46 U.S.C. § 30101 (applicable to suits under the AEA) have been waived by the "futility of exhaustion" doctrine because they can serve no purpose at all. Requiring all potential class members to present administrative claims to the Corps of Engineers prior to filing suit would serve no purpose at all because:

a.     The Corps of Engineers has made it clear through its actions and inactions that it does not intend to resolve any of these claims through its administrative claim process;

b.     While many months have passed since many potential class members filed administrative claims, the Corps of Engineers has taken no action to resolve them, signaling its decision to let the judicial process decide them;

c.     The regulations enacted by the Corps to handle the FTCA administrative claims, 28 CFR Sections 14.1- 14.11, do not provide a mechanism by which potential class members can conduct the necessary discovery needed to prove their cases, and such discovery can only be provided by this Court;

d.     Many potential class members will suffer irreparable harm if they are required to file administrative claims (which the Corps will not act upon) because they have no knowledge of the need to file them in order to protect their rights;

e.     No regulations have been enacted prescribing the manner in which claims brought under the AEA should be handled, leading to much confusion among potential class members; and

f.     It is impossible to comply with the requirements of 46 U.S.C. § 30101 because there

is no "agency owning or operating (all) vessel(s) causing the injury or damage."

12.    Additionally, as to the Corps' administrative claim requirements, Class Representatives, and the Class they seek to represent, challenge those requirements as a violation of the rights of Class Representatives and the Class under the United States Constitution, as amended. Enforcement of administrative filings will cause denial of access to the Courts and a denial of due process. Class Representatives and the Class further aver that the Corps is incapable of providing administrative relief in any reasonable time frame because of the massive, unprecedented, number of claims and the inherent inability of the Corps to properly staff and run any meaningful claims administration. Thus, the Corps' administrative procedure (and thus any future relief) is inadequate under the special circumstances following Hurricane Katrina. The requirement by the Corps that an administrative procedure be followed following Hurricane Katrina is an unreasonable governmental action that is not substantially justified. Unless Class Representatives and the class are able to proceed in Court immediately, Class Representatives are threatened or will be threatened with impending irreparable injury from the delay of the Corps' prescribed administrative procedure. Accordingly, Class Representatives and the Class expressly plead that individuals and entities harmed due to the negligence and fault of the Corps be relieved of the need to file administrative claims as a requirement precedent to suit against the Corps. Class Representatives and the Class further complain of the illegal and unconstitutional denial of equal access to justice through the Corps' administrative filing claim as predicate to suit. Class Representatives and the Class further expressly plead for attorney fees and costs to be awarded in addition to any other right to claim attorney fees and costs pursuant to the Equal Access to Justice Act passed by the United States Congress (5 U.S.C. § 504).

**III.**

**VENUE**

13.　Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants'

negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial

part of the events and omissions giving rise to this action occurred in the Eastern District of

Louisiana, and at the time of the damage the Class Representatives all resided in the Eastern

District of Louisiana, and the damage to the Class Representatives and the Class occurred

within the Eastern District of Louisiana.

**IV.**

**WAIVER OF SOVEREIGN IMMUNITY**

14.　The United States of America and the United States Army Corps of Engineers waived its

sovereign immunity in connection with the claims asserted in this suit by the enactment of

the FTCA, 28 U.S.C. § 2671, *et seq.*  While Class Representatives believe that all of the

Class' claims against the Corps are derived from the FTCA applying the tort and other laws

of the State of Louisiana, out of an abundance of caution, the Class Representatives

alternatively plead admiralty and maritime jurisdiction and causes of action under the AEA,

46 U.S.C. App. § 740, the SAA, 46 U.S.C. §§ 741-52, the PVA, 46 U.S.C. §§ 781-90 and/or

the Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*, the Coastal Zone Management

Act, 16 U.S.C. §§ 1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§ 403 *et seq.*

Furthermore, any immunity sought by the Defendant Corps pursuant to 33 U.S.C. §702c (the

Flood Control Act of 1928) is not available to the extent the provisions of this Act do not

apply, have not been complied with, and/or the liability of the Corps is not predicated on

flood control activity

## V.

## PARTIES

### Proposed Class Representatives

15.   Named Plaintiffs, MICHELLE HENNESSEY, LENNIECE MORRELL, KENNETH A.

POLITE, SR., MICHELE HARRISON, THURMAN R. KAISER, SR., ROSEMARY R.

KAISER, BETTY SONNIER STALBERT, EMANUEL ESTEVES, JR., STELLA

WASHINGTON, JOHN B. WILLIAMS, EMANUEL WILSON, ELOIS BELL, LEO

MITCHELL, TRENISE JACKSON, DWAYNE MALLET, LESLIE DORANTES, DONNA

AUGUSTINE, GLADYS LABEAUD, DAISY INNIS, BETTY JONES, JOSE' LOUIS

RODRIGUEZ, BEATRICE DREW, EDDIE KNIGHTEN, CALVIN LEVY, NICOLA

MCCATHEN and CHARLES MOSES, are all persons of the age of majority and citizens

of the United States who, at all times relevant hereto resided within the jurisdiction of this

Court, who, for themselves individually and on behalf of others similarly-situated, seek

damages resulting from the above-referenced catastrophe.  The definitions of the proposed

class and subclasses to which these named Plaintiffs belong and which they seek to

represent, are specified *infra* under the heading CLASS ACTION ALLEGATIONS.

### Defendants

16.   Named Defendants herein are:

a.      The UNITED STATES OF AMERICA, a sovereign government amenable to suit

for civil liability in accordance with the federal laws and regulations set forth

herein; and the UNITED STATES ARMY CORPS OF ENGINEERS, a division

of the United States Government under the direct jurisdiction of the Department

of the Army (both defendants collectively referred to hereafter as "CORPS");

b       The BOARD OF COMMISSIONERS OF THE ORLEANS PARISH LEVEE
        DISTRICT (hereafter "OLD"), a local government entity created by LSA-R.S.
        38:291, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana;

c       The SEWERAGE AND WATER BOARD OF NEW ORLEANS (hereafter
        "S&WB" or "SWB"), a political subdivision of the State of Louisiana created by La.
        R.S. 33:4071 *et seq*., amenable to suit, and domiciled in the Parish of Orleans, State
        of Louisiana;

d       The BOARD OF COMMISSIONERS OF THE EAST JEFFERSON LEVEE
        DISTRICT (hereafter "EJLD"), a political subdivision of the State of Louisiana
        created by LSA-R.S. 38:291, amenable to suit, and domiciled in the Parish of
        Jefferson;

e.      The BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS
        (hereafter "PORT OF NO", or "PORT"), a local government entity created by LSA-
        R.S. 34:21, amenable to suit, and domiciled in New Orleans, Louisiana;

f.      CSX TRANSPORTATION CORPORATION (hereafter "CSX CORP**.**"), a foreign
        corporation doing business in the Parish of Orleans, State of Louisiana;

g.      CSX TRANSPORTATION, INC**.** (hereafter "CSX INC."), a foreign corporation
        doing business in the Parish of Orleans, State of Louisiana;

h.      PUBLIC BELT RAILROAD COMMISSION FOR THE CITY OF NEW ORLEANS
        (hereafter "PUBLIC BELT"), an entity amenable to suit and domiciled in the Parish
        of Orleans, State of Louisiana; and

I.      ST. PAUL FIRE AND MARINE INSURANCE COMPANY (hereafter "ST.
        PAUL"), a foreign insurer authorized to do and doing business as an insurer in the

                                                                                        -9-

State of Louisiana, who at all times relevant herein had in full force and effect a

policy or policies of liability insurance, under the terms, provisions, and conditions

of which it assumed liability for the acts and/or negligence of its insured, OLD, and

further had in full force and effect a policy or policies of liability insurance, under

the terms, provisions, and conditions of which it assumed liability for the acts and/or

negligence of its insured, EJLD, and against whom Class Representatives assert their

claims under the Louisiana Direct Action Statute, La. R.S. 22:655.

j.      NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

(hereafter "NATIONAL UNION"), a foreign insurer authorized to do and doing

business as an insurer in the State of Louisiana, who at all times relevant herein had

in full force and effect a policy or policies of liability insurance, under the terms,

provisions, and conditions of which it assumed liability for the acts and/or

negligence of its insured, EJLD, and against whom Class Representatives assert their

claim under the Louisiana Direct Action Statute, La. R.S. 22:655

## VI.

## CLASS ACTION ALLEGATIONS

### Proposed Class

17.     This action is appropriate for determination through the Federal Class Action Procedure

(Fed. R. Civ. P. 23, *et seq*.) and the proposed Class Representatives herein seek to represent

the following proposed Greater New Orleans Class, and subclasses as outlined, *infra*.:

> All individuals and entities, both private and public and both natural
> and juridical, in "**GREATER NEW ORLEANS METRO**" (the
> geographic area bounded to the north by Lake Pontchartrain, to the
> south by the Mississippi River, to the east by the IHNC, and to the
> west by the 17th Street Canal running from Lake Pontchartrain south

to Metairie Road and then west on Metairie Road to Causeway Boulevard, and then south on Causeway Boulevard to the Mississippi River) who/which sustained damages as a result of the inundation in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

**Class Representatives are:**

I.      **MICHELLE HENNESSEY**.  At the time of the storm, Ms. Hennessey resided at 417-419 40th Street, New Orleans, Louisiana, 70124  Ms. Hennessey is 40 years old and employed as a dentist analyst, CCMSI. Ms. Hennessey owned the property, a duplex, in which she resided in half.  The duplex was approximately 1600 square feet per unit and was situated on a lot 50 feet x 110 feet.  The property had a new roof prior to the storm and an unattached shed, which washed away during the storm.  Ms. Hennessey now resides at 3808 N. Labarre Road in Metairie, Louisiana, 70002. Ms. Hennessey suffered damages as a result of the negligent acts of the defendants.

ii**.**    **LENNIECE MORRELL**.  At the time of the storm, Ms. Morrell resided at 114 Winthrop Place, New Orleans, Louisiana, 70119.  She is a 38 year old Louisiana Air National Guard Civil Service Technician.  The property was a single family dwelling that she owned.  The property was approximately 1310 square feet. Upon moving in, Ms. Morrell had all interior walls repainted, ceiling fans, air conditioning units, and some electrical work updated.  Ms. Morrell has returned home and resides at 114 Winthrop Place, New Orleans, Louisiana, 70119.  Ms. Morrell suffered damages as a result of the negligent acts of the defendants.

iii.    **KENNETH A. POLITE, SR.**  At the time of the storm, Mr. Polite resided at 5651

Cartier Avenue in New Orleans, Louisiana, 70122.  Mr. Polite is currently 49 years old and is employed by the New Orleans Police Department.  The property is a single family residence which he and his wife own.  Mr. Polite has now returned to his home and he and his wife are again residing at 5651 Cartier Avenue, New Orleans, Louisiana, 70122.  Mr. Polite suffered damages as a result of the negligent acts of the defendants.

iv.    **MICHELE HARRISON**.  At the time of the storm, Ms. Harrison owned and resided at 2418-A and 2418-B North Robertson Street in New Orleans, Louisiana 70117, and owned 2420 North Robertson Street and 5904-5906 Marigny Street, New Orleans, Louisiana. She is 45 years old and currently a student.  The property on North Robertson was a residential triplex, which she owned and resided in two of the units.  Ms. Harrison now resides at 3630 North Johnson Street in New Orleans, Louisiana 70117. Ms. Harrison suffered damages as a result of the negligent acts of the defendants.

v.    **THURMAN R. KAISER, SR.**  At the time of the storm Mr. Kaiser resided at 3801 North Turnbull Drive in Metairie, Louisiana, 70002.  Mr. Kaiser is 77 years old and presently retired.  He owns eighteen (18) rental properties in Orleans Parish, all but four (4) of those properties suffered flood damages as a result of the levee breaches. Mr. Kaiser's damaged property addresses are: 2506-2508 Acacia Street; 2541, 2541A, 2543, 2543A Acacia Street; 1619-1621 N. Broad Street; 3221-3223 Belfort Avenue; 6574-6576 Catina Street, 4029-4031 Clematis Street; 612-614 South Cortez Street; 4125-4127 D'Hemecourt Street; 4129-4131 D'Hemecourt Street; 1618-1620 Paul Morphy Street; 612 North Murat Street; 3223-3225 St. Philip Street; and 436-

438 Telemachus Street.  Mr. Kaiser has returned and is residing in his home at 3801

North Turnbull Drive, Metairie, Louisiana, 70002.  Mr. Kaiser suffered damages as

a result of the negligent acts of the defendants.

### Proposed Sub-Classes

18.   In addition to requesting certification of the foregoing, general class as defined, named

Plaintiffs request pursuant to the provisions of Rule 23(c)(4) that the above class be divided

into the following subclasses, each subclass to be treated as a class:

**a.     ZONE ONE SUBCLASS:**

> All individuals and entities, both private and public and both
> natural and juridical, in the geographic area bounded to the
> north by Lake Pontchartrain, to the south by Metairie Road
> and City Park Avenue, to the east by the Orleans Avenue
> Canal, and to the west by the 17th Street Canal, who/which
> sustained damages as a result of the inundation/flooding in
> this area which occurred during and immediately following
> the landfall of Hurricane Katrina on or about August 29,
> 2005, and who/which, as to the defendant Corps only, have,
> or by a date to be determined by the Court, will have fulfilled
> whatever administrative claim filing requirements this Court
> deems applicable in this matter.

**Zone One Sub-Class Representatives are:**

I.     **MICHELLE HENNESSEY**.  At the time of the storm, Ms. Hennessey resided at

417-419 40th Street, New Orleans, Louisiana, 70124   Ms. Hennessey is 40 years old

and employed as a dentist analyst, CCMSI. Ms. Hennessey owned the property, a

duplex, in which she resided in half.  The duplex was approximately 1600 square feet

per unit and was situated on a lot 50 feet x 110 feet.  The property had a new roof

prior to the storm and an unattached shed, which washed away during the storm.  Ms.

Hennessey now resides at 3808 N. Labarre Road in Metairie, Louisiana, 70002.  Ms.

Hennessey suffered damages as a result of the 17th Street Canal breach.

ii.    **THURMAN R. KAISER. SR. and ROSEMARY R. KAISER**.  At the time of the storm Mr. and Ms. Kaiser resided at 3801 North Turnbull Drive in Metairie, Louisiana, 70002.  Mr. and Ms. Kaiser are both 77 years old and presently retired. They own eighteen (18) rental properties in Orleans Parish, all but four (4) of those properties suffered flood damages as a result of the levee breaches, including their property at 6574-6576 Catina Street, New Orleans, Louisiana, 70122.  The Kaiser's other damaged property addresses are: 2506-2508 Acacia Street; 2541, 2541A, 2543, 2543A Acacia Street; 1619-1621 N. Broad Street; 3221-3223 Belfort Avenue; 4029-4031 Clematis Street; 612-614 South Cortez Street; 4125-4127 D'Hemecourt Street; 4129-4131 D'Hemecourt Street; 1618-1620 Paul Morphy Street; 612 North Murat Street; 3223-3225 St. Philip Street; and 436-438 Telemachus Street.  The Kaisers have returned and are residing in their home at 3801 North Turnbull Drive, Metairie, Louisiana, 70002.  The Kaisers suffered damage as a result of the 17th Street Canal breach and as a result of the various levee breaches and the negligent acts of the defendants.

b.    **ZONE TWO SUB-CLASS:**

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the west by the Orleans Avenue Canal, to the east by the London Avenue Canal, to the south from where the London Avenue Canal intersects with Gentilly Boulevard, along Gentilly Boulevard to the south-west to North Broad Street, where it intersects with Esplanade Avenue, and then running northwest along Esplanade Avenue to City Park Avenue where it meets Marconi Boulevard, then running north to the Orleans Canal, who/which sustained damages as a result of the

inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

**Zone Two Sub-Class Representatives are:**

I.    **BETTY SONNIER STALBERT.**  At the time of the storm, Ms. Stalbert resided at 3913 Virgil Blvd. in New Orleans, Louisiana, 70122.  She is 53 years old and works as an insolvency specialist with the Internal Revenue Service.  She owned her residence which was a single family home.  Ms. Stalbert has still not been able to return to her home and currently resides at 2225 College Drive, Apt. 104, Baton Rouge, Louisiana, 70808.  Ms. Stalbert suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

ii.   **EMANUEL ESTEVES, JR.**  At the time of the storm, Mr. Esteves owned and resided at 4543 Cartier Avenue in New Orleans, Louisiana, 70122, and owned property at 1559-1561 Senate Street, New Orleans, Louisiana, 70122.  He is 68 years old and a retired United States postman.  His home was a single family home of approximately 3,500 square feet on a lot of 40 feet x 100 feet.  Mr. Esteves had recently renovated his kitchen with new cabinets and counter tops and installed new hardwood floors in the study, dining, and living rooms prior to the storm.  Mr. Esteves now resides at 4656 Gaines Street, New Orleans, Louisiana, 70126.  Mr. Esteves suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

-15-

iii.   **STELLA WASHINGTON.**   At the time of the storm, Ms. Washington resided at 1478 Mithra Street, New Orleans, Louisiana, 70122.  She is 56 years old and employed as a casino dealer. Her property was a single family home that she owned consisting of approximately 2,500 square feet on a lot of 51.5 feet x 120 feet.  Ms. Washington is now back and residing in her home at 1478 Mithra Street, New Orleans, Louisiana, 70122.  Ms. Washington suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

iv.   **JOHN B. WILLIAMS.**   At the time of the storm, Mr. Williams owned and resided at 6 Charlotte Drive, New Orleans, Louisiana, 70122, and owned property at 1830-1832 Hope Street and 2640 Bruxells, New Orleans, Louisiana, 70119.  He is a retired and 82 years old.  His home was a single family dwelling of approximately 3,300 square feet and situated on a lot 60 feet x 130 feet.  Mr. Williams now resides at 1830 Hope Street, New Orleans, Louisiana, 70119.  Mr. Williams suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

v.   **EMANUEL WILSON.**   At the time of the storm, Mr. Wilson resided at 1512 Mandolin Street in New Orleans, Louisiana, 70122.  He is a 25 years old and while previously employed and the Ramada Hotel he is currently searching for new employment. The property was a single family home owned by his grandmother that he rented.  The property was approximately 1,600 square feet with an unattached 340 square foot garage.  Mr. Wilson is now back in his home at 1512 Mandolin Street, New Orleans, Louisiana, 70122.  Mr. Wilson suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

c.     **ZONE THREE SUB-CLASS:**

> All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the east by the IHNC, to the west by the London Avenue Canal, and to the south by Gentilly Boulevard/Gentilly Road, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

**Zone Three Sub-Class Representatives are:**

I..     **ELOIS BELL.**  At the time of the storm, Ms. Bell resided at 1866 Carnote Street, in New Orleans, Louisiana 70122.  She is a retired 65 year old.  The property was a single family home that she owned.  The property was approximately 2,500 square feet on a lot of 30 feet x 120 feet and had a new roof within the five years prior to the storm and had new floors installed in 2005.  Ms. Bell is 65 years old, retired and now resides at 750 Landwood Drive in Baton Rouge, Louisiana 70806.  Ms. Bell suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

ii.     **LEO MITCHELL**. At the time of the storm, Mr. Mitchell resided at 6203 Waldo Drive in New Orleans, Louisiana, 70122. He is a 40 year old commercial truck driver.  The property was a duplex of approximately 2,200 square feet which he rented one side. Mr. Mitchell now resides in a FEMA Trailer at 10821 Dreux

Avenue, New Orleans, Louisiana, 70127.  Mr. Mitchell suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

iii.  **TRENISE JACKSON.**  At the time of the storm, Ms. Jackson resided at 5010 Frankfort Street, New Orleans, Louisiana, 71026  She is a 37 year old student.  Her property was a single family home that she owned.  Ms. Jackson now resides at 1 Gibson Street, Apt. 172, Houston, Texas, 77060.  Ms. Jackson suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

iv.  **DWAYNE MALLET.**  At the time of the storm, Mr. Mallet resided at 1924 Wildair Drive, New Orleans, Louisiana, 70122.   He is 42 years old and employed as a purchasing director.  The property was a single family home that he owned, situated on a lot approximately 60 x 120 feet.  In 2005 prior to the storm, Mr. Mallet had new floors and carpet installed in his home.  Mr. Mallet now is now living in a FEMA trailer at 208 Maumas, New Orleans, Louisiana, 70131.  Mr. Mallet suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

v.  **LESLIE DORANTES**.  Prior to the storm, Ms. Dorantes resided at 3614 Virgil Boulevard, New Orleans, La., 70122.  The property was a residential apartment where she resided as a renter.  The property was approximately 2500 square feet.  Ms. Dorantes is 59 years old and works as an administrative assistant.  She now resides in Convent, Louisiana, 9216 Sugar Hill Street, Lot 127, Convent, Louisiana, 70723-2749   Ms. Dorantes suffered damages as a result of the London Avenue

Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

### d. ZONE FOUR SUB-CLASS:

All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Gentilly Boulevard/Gentilly Road to North Broad Street (Gentilly Ridge), to the south by the Mississippi River, to the east by the IHNC, and to the west by Esplanade Avenue, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

**Zone Four Sub-Class Representatives are:**

I..   **DONNA AUGUSTINE.**  At the time of the storm, Ms. Augustine resided at 2126 North Broad Street, New Orleans, Louisiana, 70119.   She is 57 years old and currently disabled.  The property was a single family dwelling of approximately 2,000 square feet, which she rented.  Ms. Augustine now resides at 2230 Sherwood Meadow Drive, Apartment A, Baton Rouge, Louisiana, 70816.  Ms. Augustine suffered damages as a result of inundation from the Inner Harbor Navigational Canal.

ii.   **GLADYS LABEAUD.**  At the time of the storm, Ms. LaBeaud resided at 1708-1710 Industry Street in New Orleans, Louisiana 70119.  She is 76 years old and presently retired.  The property, which she owned, was a duplex of approximately 2,500 square feet and situated on a lot of approximately 30 x 130 square feet.  Ms. LaBeaud now resides at 500 South Jefferson Davis Parkway, Apt. 1, New Orleans, Louisiana,

70119.  Ms. LaBeaud suffered damages as a result of inundation from the Inner Harbor Navigational Canal.

iii.    **DAISY INNIS.**  At the time of the storm, Ms. Innis resided at 4024 Stutz Street, New Orleans, Louisiana, 70126.  She is a retired and 64 years old. The property was a single family residence that she owned.  Ms. Innis has now returned to her home and is living at 4024 Stutz Street, New Orleans, 70126.  Ms. Innis suffered damages as a result of inundation from the Inner Harbor Navigational Canal.

iv.    **BETTY JONES**.  At the time of the storm, Ms. Jones resided at 2111 Clouet Street, New Orleans, Louisiana, 70117.  She is 69 years old and presently retired.   The property, which she owned, was a residential duplex of approximately 3,000 square feet and situated on a lot of approximately 30 x 81 square feet.  Ms. Jones has now returned home and is living in her home at 2111 Clouet Street, New Orleans, Louisiana, 70117.  Ms. Jones suffered damages as a result of inundation from the Inner Harbor Navigational Canal

v.    **JOSE LOUIS RODRIGUEZ.**  Jose Louis Rodriguez is representing the claim of his father, Jose Rodriquez, including the wrongful death claim.  Mr. Rodriguez was born in 1927 and at the time of the storm resided at 2923 Bruxelles Street, New Orleans, Louisiana, 70119, which he was renting.  Mr. Rodriguez drowned as a result of the floodwaters from the inundation from the Inner Harbor Navigational Canal. Jose Louis Rodriguez currently resides at 2223 Prentiss Street, New Orleans, Louisiana, 70122.

e    **ZONE FIVE SUB-CLASS:**

All individuals and entities, both private and public and both

natural and juridical, in the geographic area bounded to the north by Metairie Road/City Park Avenue, to the south by the Mississippi River, to the west by Causeway Boulevard, and to the east by Esplanade Avenue, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

Zone Five Sub-Class Representatives are:

I.   **BEATRICE DREW.**  At the time of the storm, Ms. Drew resided at 1227 South Galvez Street, New Orleans, Louisiana, 70125.   She is 58 years old and currently disabled. The property was a single family residence of approximately 1,500 square feet, which she rented. Ms. Drew now resides at 606 Egle Street in Morgan City, Louisiana, 70380.  Ms. Drew suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

ii.   **EDDIE KNIGHTEN.**  At the time of the storm, Mr. Knighten resided at 7726-7728 Edinburgh Street, New Orleans, Louisiana, 70125   He is 64 years old and employed as a truck driver.  The property was a duplex that he owned.  Mr. Knighten has now returned and is living in his property at 7726 Edinburgh Street, New Orleans, Louisiana, 70125.  Mr. Knighten suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

iii.   **CALVIN LEVY.**  At the time of the storm, Mr. Levy resided at 3205 College Court, New Orleans, Louisiana, 70125   He is 46 years old and employed as a taxi driver.

The property was a single family home that he owned.  Mr. Levy has returned and is living in his property at 3205 College Court, New Orleans, Louisiana, 70125.  Mr. Levy suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

iv.    **NICOLA McCATHEN.**  At the time of the storm, Ms. McCathen resided at 961 S. Telemachus Street, New Orleans, Louisiana, 70125.  She is 35 years old and employed as a financial coordinator.  The property was a single family residence of approximately 722 square feet in size, which she rented.  Ms. McCathen now resides at 1805 Berrymore Drive, Slidell, Louisiana, 70461.  Ms. McCathen suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

v.    **CHARLES MOSES.** At the time of the storm, Mr. Moses resided at 3717 General Perishing Street in New Orleans, Louisiana, 70125.  He is retired and 55 years old.  The property was a single family dwelling of approximately 3,000 square feet which Mr. Moses rented. Mr. Moses now resides at 8536 South Claiborne Avenue in New Orleans, Louisiana, 70118.  Mr. Moses suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

19.    The numerosity prerequisite of Fed.R.Civ.P. 23(a)(1) is satisfied because the proposed class and subclasses are so numerous that joinder of all members is impracticable.

20.    The commonality prerequisite of Fed.R.Civ.P. 23(a)(2) is satisfied because there are common questions of law and fact applicable to both the named Plaintiffs and putative class and subclass  members, including, but not limited to:

(a)    The cause or causes of the breaches and/or failures of the hurricane protection systems associated with the 17th Street Canal, the London Avenue Canal, and the Lake Pontchartrain and Vicinity Hurricane Project;

(b)    The legal duties of the defendants owed to the Plaintiffs and the class members;

c)    Each defendant's breach of said duties;

(d)    The causal relationship between any such breaches and the failures of the hurricane protection systems at issue; and

(e)    Whether the named defendants may assert certain affirmative defenses applicable to all named Plaintiffs and putative class members.

21.    The typicality requirement of Fed.R.Civ.P. 23(a) is satisfied because the claims of the class and sub-class representatives are typical of the claims of the putative class and sub-class members.

22.    The adequacy of representation prerequisite of Fed.R.Civ.P. 23(a) is satisfied because the Class and Sub-Class Representatives will fairly and adequately represent the interests of the proposed classes.  Each representative is represented by skilled counsel, experienced in the handling of mass tort cases and class action litigation.  These attorneys may be expected to handle this matter in an expeditious and economical manner, serving the interests of all class and sub-class members.  Moreover, the representatives will protect the interests of all class and sub-class members by remaining involved as necessary in the decision-making required on the part of claimants herein.

23.    The predominance prerequisite of Fed.R.Civ.P. 23(b)(3) is satisfied because the common questions or issues of law and fact  predominate over individualized issues of law and fact.

24.    The superiority prerequisite of Fed R.Civ.P. 23 (b)(3) is satisfied because the class

action procedure is the superior vehicle for the efficient handling and disposition of the issues and claims presented in this litigation.  In addition, superiority is satisfied because piecemeal litigation would be judicially inefficient, enormously expensive, greatly protracted,  time-consuming, and unduly burdensome for the litigants and the Court.

25.     Additionally, or in the alternative, Plaintiffs suggest that this matter should be certified as a class pursuant to Fed.R.Civ.P. 23(b)(2), inasmuch as certain defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.  The actions of the defendants have resulted in harm to the class as a whole which harm includes the breakdown of New Orleans social structure, the loss of cultural heritage, and the dramatically altered physical, economic, political, social and psychological character of the New Orleans area. Such harm is appropriately remedied by injunctive relief to the class as a whole because the harm is not suffered by any single individual, rather it is societal in nature and is suffered by the class as a whole, and can only be fairly and efficiently adjudicated as such.

## VII.

## COUNT ONE

**THE 17TH STREET CANAL DRAINAGE PROJECT ALLEGATIONS AGAINST THE DEFENDANTS CORPS, SWB, OLD, EJLD, NATIONAL UNION , AND ST. PAUL, APPLICABLE TO THE OVERALL CLASS, AND SUB-CLASS ZONES ONE, TWO, FOUR AND FIVE**.

### HISTORY OF THE 17TH STREET CANAL

26.     The canal known today as the "17th Street Canal" forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana.  Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall

Canal," the "Metairie Relief Canal," and the "Upperline Canal."

27.    The 17th Street Canal was dug in the early 1850's through swampy ground to provide a right-of-way.  It was located where the Jefferson and Lake Pontchartrain Railway was built.  The railway connected the town of Carrollton with a shipping port on Lake Pontchartrain in the area today known as "Bucktown."

28.    In 1858, a secondary canal was built, connecting the original canal to the river side of the Metairie Ridge.  This spur canal was situated alongside a projected street numbered "17th Street," and thus, became known as the "17th Street Canal."  The name eventually came to commonly refer to the original, larger canal to which this spur canal connected.

29.    The community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, began more than a hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain.  The earliest structures were wooden huts raised on stilts; and the canal provided transportation as well as a harbor for fishing boats.

30.    More substantial development in this area occurred during the mid-19th century, with construction of a commercial wharf and a resort called "Lakeport."  Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard), and at the terminus of the Jefferson and Lake Pontchartrain Railway (where Bucktown is today).

31.    At the end of the 19th century, the defendant S&WB took over the operation of the canal. In 1897 the canal was re-dredged, and in 1929 it was re-dredged again.  In 1913, the S&WB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans through the canal.

32.    Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats.  The fleet previously had a lease agreement with the defendant S&WB.

33.     In addition, to its use as a home for the shrimping fleet, the Louisiana Department of Wildlife & Fisheries permitted commercial fishing and crabbing activities along the entire length of the 17th Street Canal.

34.     The 17th Street Canal historically is, and at all times pertinent hereto has been, a Navigable Water of the United States within the meaning of 33 C.F.R. 329.5.

## THE DREDGING PERMIT APPLICATION

35.     On July 15, 1974, the S&WB initiated a project to improve drainage from the 17th Street Canal Drainage Basin.  Initially, this project called for the dredging of 2.4 miles of the 17th Street Canal from Pump Station No. 6 to Lake Pontchartrain.  The purpose of the dredging was to remove sediment from the canal bottom and re-shape the canal cross section to improve the canal's  flow characteristics, and to increase the pump capacity of Pump Station No. 6.  The removal of approximately 85,000 cubic yards of bottom sediment was anticipated.  That dredge material was then to be deposited along the banks of Breakwater Drive and an area of the then proposed Bucktown Dock Facility (West End Park).

36.     Dredging projects in navigable waters of the United States require a permit from the Department of the Army pursuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403).  Accordingly, on July 15, 1974, the S&WB filed an application for a "Permit To Discharge Or Work In Navigable Waters And Their Tributaries" with the Corps' New Orleans District.

37.     The Army Corps of Engineers is a Department of the United States Army.   It has seven divisions in the United States, one of them being the Lower Mississippi River Valley Division. Each division is divided into districts.  The New Orleans District is a district of the Lower Mississippi Valley Division and it is divided into six technical divisions.   The

-26-

technical divisions are: Real Estate, Contracting, Construction New Orleans/Lafayette, Engineering, Planning Program Project Management (PPPMD), and Operations. The Operations division is responsible for navigation and the issuance of permits. Issues regarding flood control come under the ambit of the Engineering division. Thus, the issuance of the permit to dredge was the primary responsibility of the Operations division rather than the Engineering division which is responsible for flood control.

38.   The permit approval process required the S&WB to obtain approval from, among others, the Louisiana Department of Public Works.

39.   In August of 1974, the Louisiana Department of Public Works, in response to the permit application, indicated that it could not complete a review of the permit because the applicant had no soil data substantiating the stability or integrity of the levees in question.

40.   On May 23, 1977, the Corps returned the application with no action because the S&WB failed to furnish information requested by, among others, the Louisiana Department of Public Works.

41.   In 1978, the S&WB retained the civil engineering firm, Modjeski & Masters, Inc. ("Modjeski"), to provide a plan for the design and implementation of the dredging project, and, on August 23, 1979, Modjeski submitted a second dredging permit application on behalf of the S&WB.

42.   The same application was resubmitted on December 29, 1980 after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

43.   On January 28, 1981, Modjeski, in response to inquiries about the impact of the dredging on existing levees, provided the Corps with its first memorandum addressing the stability of the

existing levees and sheet pile wall along the canal.  The memo indicated that on three of the

six test locations, the factors of safety fell below the required values set by the Corps. The

handwritten report stated:

> "These two locations yielded low factors of safety due to two
> basic causes, (1) the existence of very soft clays with minimal
> (illegible). . . ."

44.     On February 6, 1981, Modjeski provided the Corps with a stability analysis of the existing

sheet pile wall along the east side of the canal north of Hammond Highway. This report is

difficult to read, but states in pertinent part that:

> "This analysis indicates that portions of the wall are
> extremely unstable as they now stand. This instability, even
> under normal water level situations is due to several factors:
> a) the soft to very soft clays which make up the soil stratum.
> (Illegible). . . ."

45.     On March 5, 1981, the Corps' Engineering Division issued an internal memorandum

addressing the soil stability analyses provided by Modjeski. Item No. 4 of the memorandum

states:

> "The factors of safety at 554+00 and 604+00[1] are
> substantially below the minimum 1.30 factor of safety,
> therefore, the design sections should be redesigned."[2]

46.     On March 31, 1981, the Corps held a public hearing regarding the dredging permit

application. Discussion was had about whether raising the existing sheet pile wall instead

of dredging the bottom would provide a greater cross section and greater pump capacity.

Modjeski's consulting engineer voiced his concerns about widening the canals, stating that

---

[1]

These numbers reference points along the Orleans levee bank of the 17th Street Canal, the lower number
being closer to the lake, moving higher as one gets closer to the pump station.

[2]

The breach along the 17th Street Canal occurred at station 560+00.

the levees were already in violation of the Corps' engineering standards for levee stability and that attempts to dig away more dirt adjacent to the levees would worsen the stability problem.

47. On April 20, 1981, in response to the concerns that the dredging would negatively impact the existing levee, Modjeski submitted on behalf of the S&WB another application under the River and Harbor Act.  This application specified a preliminary plan to install sheet pile walls with concrete caps for the entire length of the project, then excavation of the canal. The sheet pile walls were to be of a sufficient height to meet flood protection criteria.

48. In reviewing the April 20, 1981 application referenced in the preceding paragraph, an internal Corps memorandum dated June 16, 1981 indicated that a number of levee and flood wall stability problems were likely if the S&WB plan were implemented.

49. In addition to their own efforts, Modjeski hired Eustis Engineering Company to assist with the subsoil investigation at the 17th Street Canal. On October 27, 1981, Eustis submitted its first report entitled "Subsoil Investigation—S&W Board of New Orleans—Metairie Relief Canal" Eustis reported that the natural ground surface consists primarily of extremely soft to medium soft organic clay, humus and wood that continue to elevations between 7 C.D. (Cairo Datum) and 3.5 C.D.

50. An internal memorandum from the Corps' Engineering Division to the Corps' Operations Division, dated February 12, 1982 noted the existence of a stability problem between station 625+00 and station 670+00 where excavation of the canal will directly tap the sands underlying the levee.  The memo suggested that a stability analysis be done for the landside of the canal incorporating effects of seepage to determine what corrective action is needed. In fact, sands underlay the entire 2.4 miles of the 17th Street canal from Pumping Station No.

6 to Lake Pontchartrain and as such the stability problem was not confined to any one section of the canal.

51.    On August 23, 1982, Eustis provided Modjeski with a more comprehensive subsoil investigation report. This report states in pertinent part:

> "Between Stations 617+50 and 663+00, computations indicate the possibility of a blow-out during extreme high water in the canal. Unless more definite information can be developed regarding the potential hydrostatic uplift pressure at the levee toe through this reach, measures should be taken to prevent a blow-out during extreme high water conditions."

The report then goes on to suggest "preventive measures":

> "Preventive measures include the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the landside toe of the levee, and sealing the canal bottom:
>
> "Seepage Cutoff. The most positive measure to minimize the possibility of a blow-out is the installation of a seepage cutoff, steel sheetpiling and/or a slurry wall should penetrate the sand stratum. Considering that the bottom of the sand stratum is at or near elevation -30 C.D. (Cairo Datum), a 65-ft long cutoff wall would be required."
>
> "Relief Wells.   Consideration should also be given to installation of pressure relief wells near the landside toe of the levee. To be effective, relief wells should penetrate close to the bottom of the sand, and, therefore, wells approximately 50 feet deep will be required. For planning purposes, it is estimated that a well spacing of 30 to 45 feet may be necessary."
>
> "Conclusions. Unless a test section can be dredged to develop more definitive information regarding the potential hydrostatic pressure at the landside levee toe, measures should be taken between Stations 617+00 and 663+00 to prevent a possible blowout indicated by theoretical analysis."

This report demonstrates that although the problem was well understood, the assumption that

it existed at only one section was grossly incorrect.

52.   On November 30, 1982, Modjeski furnished the Corps with copies of the Eustis soils report.

53.   On February 22, 1983, the Chief of the Corps' Engineering Division, Frederic M. Chatry, addressed a letter to Mr. G. Joseph Sullivan, the Superintendent of the S&WB. He stated the following in response to Modjeski's recommendations:

> "our problems with the solution selected by your consultant relate to our opinion that a sheet pile cutoff is, in fact, not impermeable, and is therefore not a dependable means of reducing uplift. It is not our policy to specify to applicants the measures to be used in meeting Corps criteria, but we do provide advice and suggestions about such measures. In this instance, we feel that the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift."

54.   On May 9, 1983, Modjeski submitted a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project, with the project limits being Pump Station No. 6 on the south, and 370.0 ft. north of the Bucktown Pedestrian Bridge. The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

55.   On July 27, 1983, Eustis submitted a revised soil stability report that confirmed the potential for a blow-out at the land side toe of the levee extending the area of concern from station 617 to the pumping station due to hydrostatic uplift pressure in the underlying stratum.  In this report Eustis recommended to dredge a test section in the canal to study the hydrostatic uplift pressure after the test section was dredged.  Once again, there was a failure to understand

that the problem existed on the entire length of the canal.

56.   From November 29, to December 16, 1983, a test section was dug just south of Interstate I-10. Six piezometers were installed on the Jefferson side of the canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis' report concerning the test was submitted to the Corps on January 17, 1984. The report concluded that no relevant changes were monitored by the piezometers when the test section was dug, and that it was, therefore, believed that the possibility of a blow-out during high water conditions in the canal was probably slight.

57.   The piezometer study of the test section failed to take into account that the seepage flow through the permeable soils was already in progress when the piezometers were installed and that therefore the conclusions as to stability and permeability were incorrect.

58.   On June 13, 1984, the Army Corps issued the Department Of The Army Permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge" This permit was issued in spite of the fact that the Corps' internal engineering procedure and good engineering practice mandated that a permit which would allow the canal bottom to be below the sheet pile tips be denied.

59.   The "Statement of Findings" issued with the permit states that factors considered in issuing the permit included, *inter alia*:

> "navigation, present and prospective; flood heights floodplain use; other public interests."

Clearly, the federal regulations requiring a determination that the permitted action not negatively impact flood protection was violated.

**PROJECT IMPLEMENTATION**

60.     The Project was ultimately divided into the following Phases:

Phase I:      from Pump Station No. 6 to Interstate 10
Phase II-A:   from Interstate 10 to Hammond Highway – Orleans Side
Phase II-B:   from Interstate 10 to Hammond Highway – Jefferson Side
Phase III:     from Hammond Highway to Lake Pontchartrain

61     The Work Order for Phase I was issued on December 5, 1983, and the job was

completed on June 1, 1984.

62.     Because the S&WB and the OLD could not yet effect an Agreement with the East

Jefferson Levee District regarding Phase II of the Project, an extension of the 1984 permit

was applied for on February 4, 1987, and granted by the Corps on February 20, 1987.  On

April 24, 1987 the Corps created a drawing showing a sheet pile design which located the

sheet pile tips 16 feet lower than the bottom of the canal.  While the Operations Division was

working on the S&WB permit, the Engineering Division was working on a flood wall design

that might incorporate the sheet piles that were permitted under the dredging project.

63.     In connection with the consideration of using the sheet piles as the base of a flood

wall, on December 23, 1987, the Corps' Mississippi River Commission in Vicksburg issued

a memorandum to the Commander of the Corps' New Orleans District relative to sheet pile

wall design criteria. This memorandum summarized the results of the Corps' "E-99 Sheet

Pile Wall Load Test Report".

64.     The "E-99 Sheet Pile Wall Load Test" was a full scale instrumented lateral load test

of a 200-foot long sheet pile wall conducted by the Corps in the Atchafalaya basin in 1985.

This location in the Atchafalaya basin was chosen because of the close correlation of its soil

conditions with those in the New Orleans area.  Test data from the sheet pile wall and

-33-

adjacent supporting soils indicated a gapping behavior (separation of the steel sheet piles from the soils) exactly like that which occurred during Hurricane Katrina. From the E-99 sheet pile test the Corps learned, among other things that there was potential soil separation from the sheet piles (allowing water to penetrate below the ground surface between the piles and the soils) and that the calculated safety factor was not reached. The Corps failed to take into consideration the fact that the fundamental purpose of sheet piles is to prevent water seepage. They incorrectly focused on whether the sheet piles could support a concrete wall.

65.     All of the information about bad soils and the potential for water seepage was completely ignored in connection with the design of the flood walls contemplated to be built on the previously permitted sheet pile wall.

66.     On August 31, 1988, Eustis provided another geo-technical report containing the results of revised cantilever floodwalls analyses and revised slope stability analyses for the proposed modifications along the Orleans side of the 17th Street Drainage Canal between Stations 553+70 and 670+00, the reach where the breach of the canal wall would later occur. The recommended tip depth of the sheet pile wall already permitted to be higher than the canal bottom was 12.8 feet, five feet higher than the canal bottom.

67.     On August 11, 1988, the S&WB issued the Work Order for Phase III of the Project, and the job was completed on December 6, 1989.

68.     On July 4, 1990, the work order for Phase II-A of the previously permitted S&WB dredging project, including the installation of sheet piles on the Orleans side of the canal was issued. The job was completed on January 10, 1992. The contractor for that part of the Project was Boh Bros. Construction Co., Inc.

69.     The dredging activity conducted in the 17th Street Canal pursuant to the S&WB

permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal.  These barges constituted vessels in navigation for the time period during which the dredging occurred.

## ALLEGATIONS OF FAULT AND/OR LIABILITY
## AGAINST THE UNITED STATES

70.     The United States, through Defendant Army Corps of Engineers, violated Federal law because the River and Harbors Act of 1899 (33 U.S.C. § 403) prohibits the Corps of Engineers from granting a dredging permit that is contrary to the public interest.

71.     Title 33 C.F.R § 320.4 establishes general policies for evaluation of permit applications. That policy requires that the benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. Among the factors required to be considered is the effect on flood control.  The Corps violated this policy by failing to consider the impact of the approval of the permit on flood control and/or if the Corps did consider the impact on flood control, it did so with reckless disregard of overwhelming evidence that the approval would, in fact, damage the flood protection levee.

72.     The Corps failed to exercise due care in its evaluation of the dredging permit as evidenced by its failure to employ its own engineering guidelines and general engineering guidelines in considering the impact of the application on the public interest, including flood protection.

73.     The Corps breached its duty by negligently issuing a permit which allowed changes to the canal bottom, resulting in subsurface soil destabilization of the levee.

74.     The Plaintiffs' and class members' damages were proximately caused by the

negligent acts and/or omissions as described herein.

75.     Each Plaintiff has complied with all conditions precedent to this action.

76.     Pursuant to the federal maritime and admiralty statutes, the Corps is liable or is responsible to Plaintiffs for money damages for its negligence in permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

77.     In addition or in the alternative, the United States is liable pursuant to the FTCA, for money damages for its negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

78.     The activities for which the Corps of Engineers issued a permit did not involve any activities as part of a federally authorized and funded flood control project.

79.     The United States is not immune from civil liability for its negligence under the Flood Control Act, as amended, 33 U.S.C. § 702©, because the actions of the Corps of Engineers in issuing the dredging permit were wholly unrelated to any federally authorized and funded  flood control project.

80.     The Corps' negligence was such that, if a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred–in this case–the State of Louisiana.

81.     The Corps had no discretion to permit the dredging and construction associated with the 17th Street Drainage Canal Improvement Project because the approved work damaged the public interest by undermining existing flood protection.

82.     The failure of the 17th Street Drainage Canal sheet pile retaining wall and the resulting inundation of the New Orleans Metropolitan Area was directly and proximately caused by the Corps' negligence and approval of the S&WB's proposed dredging of the 17th

Street Drainage Canal and its improvements.

83.    The permitting of the dredging and attendant construction of the 17th Street Drainage

Canal Improvement Project was a substantial contributing factor to the failure of the 17th

Street Drainage Canal sheet pile retaining wall, and the resulting inundation of the New

Orleans Metropolitan Area .

84.    The Corps knew, or reasonably should have known, that its acts and/or omissions

would proximately cause the damages suffered by the Plaintiffs and the Class.

### ALLEGATIONS OF FAULT AND/OR LIABILITY AGAINST
### S&WB, OLD, EJLD, ST. PAUL AND NATIONAL UNION

85.    In addition to the liability of the United States, Defendants S&WB, OLD, EJLD, and

S&WB,  had the legal responsibility and duty to the Plaintiffs and the Putative Class to

cause, allow, and/or conduct the aforesaid dredging activity in a manner that would not

compromise the safety of the canal's levee/flood wall system.  The Defendant St. Paul is

directly liable to these Plaintiffs as the liability insurer of Defendants OLD, and EJLD, and

Defendant National Union is directly liable to these Plaintiffs as the liability insurer of

Defendant EJLD.

**SEWERAGE AND WATER BOARD**

86.    The S&WB breached its legal responsibilities and duties to Plaintiffs in proposed

Subclasses One, Two, Four and Five by seeking the dredging permit for the 17th Street

Canal, and by failing to withdraw its application for the permit upon learning of the flood

protection dangers which might result from the requested dredging activity.

87.    The S&WB was negligent in the following non-exclusive particulars:

a.      in requesting and causing the 17th Street Canal to be dredged to a depth lower than

the sheet piles;

b.      in requesting and causing the canal to be dredged only on the Orleans Parish side;

c.      in requesting and causing the canal to be dredged too close to the flood wall on the Orleans Parish side;

d.      in requesting and causing the canal to be dredged in a manner that compromised the safety of the canals/levee flood walls;

e.      in refusing to agree to the implementation of the High Level plan utilizing flood gates and insisting on the adoption of the flawed, alternative "parallel plan" with respect to the 17th Street Canal; and

f.      in having received reports from residents of water underseeping the levee and onto adjacent residential property and then failing to take any action on said reports, including but not limited to actions to investigate the source or sources of the water, report the existence of the water on the adjacent properties to other authorities, and/or to take measures to remedy the cause of the under seepage.

**THE ORLEANS LEVEE DISTRICT**

88.    The Defendant, OLD, violated its legal responsibilities and duties to the Plaintiffs and the Putative Class in proposed Subclasses One, Two, Four and Five in the following non-exclusive particulars:

a.      by negligently allowing, and/or by negligently failing to challenge and prevent, the aforesaid dredging in the 17th Street Canal;

b.      in refusing to agree to the implementation of the High Level plan utilizing flood gates and insisting on the adoption of the flawed, alternative "parallel plan" with respect to the 17th Street Canal; and

-38-

c.    by negligently failing to conduct appropriate oversight, maintenance and inspection of the 17th Street Canal levee/flood wall system, thus allowing the safety flaws and discoverable dangers of the system to remain uncorrected and undisclosed to the public.

**THE EAST JEFFERSON LEVEE DISTRICT**

89.    The EJLD violated its legal responsibilities and duties to the Plaintiffs and the Putative Class in proposed Subclasses One, Two, Four and Five in the following non-exclusive particulars:

a.    by negligently allowing, and/or by negligently failing to challenge and prevent, the aforesaid dredging in the 17th Street Canal; and

b.    by negligently failing to conduct appropriate oversight, maintenance and inspection of the 17th Street Canal levee/flood wall system, thus allowing the safety flaws and discoverable dangers of the system to remain uncorrected and undisclosed to the public.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY**
**and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH**

90.    Plaintiffs in proposed Subclasses One, Two, Four and Five aver that Defendant, St. Paul, had in full force and effect a policy of liability insurance affording liability coverage to the Defendant OLD, and a policy of liability insurance affording liability coverage to the defendant EJLD, thereby affording Plaintiffs and the Putative Class the a cause of action against St. Paul pursuant to the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

91.    Plaintiffs in proposed Subclasses One, Two, Four and Five aver that Defendant, National

Union, had in full force and effect a policy of liability insurance affording liability coverage to the Defendant, EJLD, thereby affording Plaintiffs and the Putative Class the a cause of action against National Union pursuant to the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

## VIII.

## COUNT TWO

## THE LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY, HURRICANE PROTECTION PROJECT ALLEGATIONS AGAINST THE CORPS OF ENGINEERS, APPLICABLE TO THE ENTIRE CLASS

92.    Most of the levee and/or I-Wall structures that surround the New Orleans Metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain Project"). Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain. The Corps was responsible for project design and construction.

### Negligent and Inherently Dangerous Design Criteria and Violation of Congress' Mandate

**The Standard Project Hurricane**

93.    The overall design criterion of the Lake Pontchartrain Project mandated by Congress was to protect the area from "the most severe combination of meteorological conditions considered characteristic for the region." The Corps expected these conditions to occur once in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project Hurricane" ("SPH"). However, the Corps based its overall design specifications on the 1959

U.S. Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to protect from a 1-in-200 year to a 1-in-300 year hurricane.

94. By 1972, just as the construction of initial parts of the Lake Pontchartrain Project and floodwalls along the INHC were getting underway, the 1959 SPH was known by the Corps to be obsolete. By this time, the 1959 SPH specification of maximum sustained wind speeds of 107 mph had been increased by the National Weather Service to 129 mph. An increase of 20 percent in maximum winds results in up to a 40 percent increase of maximum surge elevation.

95. Again in 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the maximum sustained winds, this time to 140 mph, a category 4 hurricane (Technical Report NWS 23), which further exacerbated the Corps' design deficiencies.

96. In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation ER 1110-2-1453. The regulation provides direction for the development of SPH and Probable Maximum Hurricane wind fields along the Gulf and east coast of the United States. The regulation states specifically:

> 5. Requirements. ER 1110-2-1453 provides direction on the selection of the level of protection to be afforded by Corps flood damage prevention projects in urban areas. All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric Administration (NOAA) Technical Report NWS 23 for specifying meteorological criteria for SPH and PMH wind fields along the gulf and east coasts of the United States.

97. Notwithstanding these events as set forth in Paragraphs 98–101, and the history of the area to date, the Corps negligently failed to consider any alteration of the project to strengthen the protection

from flooding, and in failing to do so, negligently and/or intentionally violated Engineering Regulation ER 1110-2-1453.  In ignoring this order to revise all SPH-based analysis to reflect the new understanding of threat, the Corps elected to base its designs for the Lake Pontchartrain Project on the 1959 SPH.  Such negligence and/or intentional act in violation of law significantly increased the flooding risk to the Greater New Orleans Area from Hurricane storm surge.

**Negligent and Inherently Dangerous Design Criteria – the Elevation Datum**

98.     In addition to applying the outdated and incorrect SPH, the Corps elected to base the overall design specifications on outdated and incorrect elevation datum. The Corps applied the National Geodetic Vertical Datum of 1929 ("NGVD29"), even though they were aware of the fact that NGVD29 was no longer equal to–and interchangeable with–local mean sea level ("LMSL"). LMSL was the only relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. However, when the Corps adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and thus, the floodwalls crowns were constructed lower by this margin. This design flaw continued with the use by the Corps of the outdated NGVD29 adjustment for elevation control up to the time of Katrina.  As a result, no provision was made to account for the 3 to 4 feet per century subsidence rates characteristic of the Greater New Orleans metropolitan area even though this rate was known or should have been known by the Corps at the time of Congressional authorization of the Lake Pontchartrain Project.  Crown elevation deficiencies ranging up to 6 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees that otherwise would have been overtopped only briefly, if at all. Prolonged overtopping led to catastrophic breaches into the Greater New Orleans area.

**The Unauthorized Change from the Barrier Plan to the High-Level Plan**.

99.     The original and only project design authorized by Congress, known as the "Barrier Plan,"

included a series of levees along the lakefront, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook, Louisiana. These structures were intended to prevent storm surges from entering Lake Pontchartrain, thus protecting from overflowing the levees along the lakefront and other areas.

100. The Barrier Plan, estimated to be completed in 1978, was selected by the Corps and authorized by Congress over another alternative, known as the "High-Level Plan," which would have excluded the barriers and flood control gates at the Rigolets, Chef Menteur Pass, and Seabrook complexes, and instead employed higher levees and flood protection structures along the lakefront and other areas. The Barrier Plan was selected because the High-Level Plan was believed to have many serious drawbacks, including the following:

     a.    High-Level Levees would take years longer to construct because of subsidence problems;

     b.    High-Level Levees would be wider, thus requiring more rights of way, result in displacement of more residences, businesses, et cetera;

     c.    In some locations less efficient and less esthetically pleasing floodwalls would be required rather than levees;

     d.    With higher Lake levels, the interior drainage system would be severely hampered;

     e.    The High Level Plan would offer no protection to less densely populated areas such as the North Shore;

     f.    Lakefront Levees would have to be 6 to 9 feet higher than the present design grade; and

     g.    In studies leading to project authorization, the high level plan was determined to cost approximately 50 percent more than the Barrier Plan.

The final design memoranda for the Barrier Plan were completed in the late 1960s, and construction commenced thereafter.

101. During the 1970s, the control complexes at the Rigolets and Chef Menteur were

facing significant opposition from environmentalists.  This opposition culminated in a December 1977 court decision that enjoined the Corps from constructing the barrier complex and certain other parts of the Project, until a revised Environmental Impact Statement was prepared and accepted.

102.    The Corps was unable to produce a satisfactory Environmental Impact Statement for the Barrier Plan, and in 1984 the Corps finally abandoned the Barrier Plan and elected to implement the High-Level-Plan, despite the many serious flaws as outlined hereinabove.

103.    The Corps knew that Congressional Re-Authorization was required for a major change in the design of a public works project.

104.    The Corps implemented the change without obtaining the required Congressional Re-Authorization.

105.    Following the design change, the Corps took no action to adjust certain floodwalls to the new high-level design thus leaving their crests at a considerably lower design height than what was necessary under the High-Level Plan.

106.    Moreover, the Corps knew that the High Level Plan provided no protection against high lake surges entering the drainage canals.

107.    Nineteen years after Congress mandated the Corps to provide the Greater New Orleans Metro Area with protection from the "most severe combination of meteorological conditions," the Corps had now exposed the citizenry to the risk of catastrophic storm surges to inundate the city.

108.    By the mid 1980's, a dense network of single family residences abutted the drainage canals along their entire courses. The encroachment of these homes adjacent to the canal embankments circumvented any possibility of using conventional methods to heighten the levees, which is usually accomplished by adding compacted earth on the land-side of the levees. To achieve the Congressional mandated level of protection, the Corps would

therefore have had to displace hundreds of residences, which would have been extremely costly, time-consuming, and controversial.

109.   Therefore, the Corps proposed to provide protection from storm surge by placement of flood gates and new pump stations at the end of the drainage canals.

110.   The Corps had no funds available, and no Congressional authorization for the construction of flood gates and pump stations at the ends of the canals. In addition, the Defendants OLD and SWB objected to such a plan citing fears that the city could not be drained of rain waters when the gates were closed in the event of a storm.

111.   Therefore, the Corps opted to provide "parallel protection" by raising the height of the existing levees and sheet pile flood walls along each side of the canals. By 1991, the Corps, OLD, and SWB decided to proceed with this plan.

112.   Among the flood-wall options were "T-Walls" and "I-Walls." The Corps first considered the more expensive T-Walls which provide a higher level of stability and reliability, especially in soft soil conditions. However, in many locations along the canals there was insufficient space to install T-Walls.

113.   As a result, twenty-six years after Congress' mandate to the Corps to provide hurricane protection from a severe hurricane, the Corps opted to construct I-Wall systems in the soft to very soft soils, including the beach sands of the Pine Island trend, that are characteristic for the entire area of the drainage canals.

114.   Construction of the I-Walls along the 17th Street, Orleans Avenue, and London Avenue canals was completed by the end of 1990s.

115.   On or about August 29, 2005, floodwalls on the east side of the 17th Street Canal, on both sides of the London Avenue Canal, failed catastrophically due to the Corps' unauthorized,

negligent, grossly negligent, wanton and/or reckless, and unilateral decision to abandon the congressionally authorized Barrier Plan and opt instead for the unauthorized parallel protection utilizing an I-Wall design.

116.    The Corps knew or reasonably should have known that the Barrier Plan would have prevented large amounts of Katrina's surge from entering Lake Pontchartrain, reducing the surge level in Lake Pontchartrain by more than 3 feet, and thus preventing any floodwalls from failing along the 17th Street and London Avenue Canals.

117.    The Corps knew or reasonably should have known that the design and construction of I-walls with particularly short sheet pile depths was impracticable, unsafe, and subject to overflow and damage, putting Plaintiffs' safety and property at risk.

118.    More than forty years after authorization, the Lake Pontchartrain Project remains incomplete. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, and/or wantonly or recklessly postponed while the original project remained incomplete and continued to fall further behind schedule.  The Corps' design assumptions and policy negligently made in 1965 continue to diminish the Lake Pontchartrain Project today, and were a proximate cause of the innundation of the Greater New Orleans Area.

119.    None of the projects constructed as part of the High-Level Plan were ever authorized by Congress. Thus, the High Level Plan is not an Congressionally authorized federal flood control project, and, as such the Flood Control Act of 1928 and the immunity afforded by section 702c is inapplicable.

120.    Alternatively, if the Flood Control Act of 1928 is applicable, the immunity afforded by section 702c is not applicable because the Corps breached its affirmative duty to institute

proceedings to acquire either the absolute ownership of the lands adjacent to the canal which was subject to overflow and damage, or to acquire the floodage rights over such lands, as required by the Act.

**IX.**
**COUNT THREE**

**NEGLIGENT DESIGN AND CONSTRUCTION OF FLOODWALLS AT THE 17TH STREET CANAL  ALLEGED AGAINST THE CORPS, OLD, S&WB, NATIONAL UNION, AND ST. PAUL, AND APPLICABLE TO THE ENTIRE CLASS AND/OR SUB-CLASSES ONE, TWO, FOUR AND FIVE**

121.  Class representatives of Sub-Classes One, Two, Four and Five re-allege and re-aver each and every allegation of paragraphs 1–25, and each and every allegation set forth in Count I, as if copied herein in their entirety.

122.  In the 1990s, I-walls were constructed at the 17th Street Canal under the direction of the OLD and the SWB.   The design memorandum for these I-walls was provided by the Corps.

123.  The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is the proper design when walls higher than seven feet are required.

124.  The I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground.

125.  The "I-wall" design consists of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling.  Concrete is then poured to encapsulate the top of the piling and form the wall.  The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets which allow the monoliths to expand and contract.

126.  As stated herein, extensive analysis of the 17th Street Canal soils had been performed since the early 1980s by Modjeski, and Eustis.  The analysis utilized soil borings taken along the canal's levee.

127.  The borings revealed alternating layers of soft clay and black humus or peat, a soft, spongy soil comprised of decaying trees and other organic material, occurring from fifteen to twenty-one feet below sea level.  The layer of humus or peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from flood water.

128.  Despite the discovery of such soil composition, the flood walls of the 17th Street Canal levee were constructed with steel sheet piling driven to a depth that was seventeen (17) feet below sea level.  At such depths, the bottom of the sheet pilings terminated above or within the layers of weak soil.  Moreover, the sheet pilings' bottoms terminated at a depth higher than the deepest point of the canal bottom.

129.  Additionally, the soil adjacent to the 17th Street Canal levee had subsided significantly after construction of the levee and flood wall, thereby significantly reducing the amount of support that the land behind the levee provided against the pressure of flood waters.

130.  In 1993, Pittman was retained for the construction of the  monoliths atop the sheet pile wall along the 17th Street Canal.

131.  During the construction of the monoliths, Pittman reported to the Corps that it was encountering major problems in that the sheet pile walls with the monoliths installed on top were beginning to lean towards the canal side because the supporting soil foundation was of insufficient strength, rigidity and stability.

132.  Despite these concerns and problems, the construction of the I-walls was allowed to proceed,

and was completed prior to the events giving rise to this litigation.

133.  Soil studies performed in connection with this construction activity failed to account for the possible weakening of the soil in connection with the affect of subsidence of land alongside the levee, soft soils at the base of the levee, and/or soil that would be weakened if flood waters pushed through the subterranean levels under the levee and flood wall.

134.  In the course of conducting construction activity, Pittman built and placed concrete flood walls on top of sheet piling driven into unstable soil beneath the sheet piling.  The soil conditions were either discovered or discoverable at the time of this activity.

135.  Upon information and belief, reports of canal water in the yards of homes adjacent to the 17th Street Canal were made to the Defendant SWB prior to Hurricane Katrina.  The presence of canal water in adjacent yards is an indicator of under seepage due to the flawed design and construction of flood walls.

136.  The Defendants Corps, OLD, and SWB, had a duty to Plaintiffs to design and construct the I-walls at the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system.

137.  The Defendants, SWB and OLD, were negligent in their rejection of the "Barrier Plan," and insistence on the implementation of the flawed High Level parallel plan implemented for the 17th Street Canal.

138.  In addition, or in the alternative, Defendants OLD and EJLD had the care, custody and control, and the *garde* of the 17th Street Canal Levee and flood wall system at all times pertinent hereto, and accordingly are strictly liable in accordance with Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the levee and flood wall system which caused the damages of which Plaintiffs complain.

-49-

139.    On information and belief, the Defendant, SWB, received reports of canal water in the yards
        of homes adjacent to the 17th Street Canal, said water being an indicator of under seepage
        of water from the canal.  SWB was negligent in failing to properly respond to said reports.


## X.

## COUNT FOUR

**ALLEGATIONS OF NEGLIGENT DESIGN AND CONSTRUCTION OF
FLOODWALLS AT THE LONDON AVENUE CANAL AND THE ORLEANS AVENUE
CANAL AGAINST DEFENDANTS CORPS, OLD, SWB, AND ST. PAUL, AND
APPLICABLE TO ENTIRE CLASS AND SUB-CLASSES TWO, THREE, FOUR AND
FIVE**

140.    The London Avenue Canal was constructed in the first half of the 19th century, through an
        area that was mostly swampland, and later became part of the City of New Orleans.  The
        canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted
        small boat traffic from Lake Pontchartrain to a section of New Orleans, and provided for
        swamp drainage.

141.    A major project of upgrading the flood walls and bridges along the London Avenue Canal
        began in the early 1980's.  In connection with this upgrading project, Defendant, OLD,
        contracted several firms for engineering, design, and construction, namely: B&K
        Construction, James Construction, Gotech, C.R. Pittman, and Burk-Kleinpeter.

142.    The Defendant, Corps, previously proposed to provide protection from storm surge by
        placement of a flood gate at the hurricane levees where the London Avenue Canal entered
        Lake Pontchartrain.  Defendants, OLD and SWB, objected to this plan and instead favored
        building and raising the height of the parallel flood walls and levee structures along each
        side of the canal (the aforementioned Parallel Protection Plan).  By 1991, the Corps, OLD

and SWB had decided to proceed with this plan.

143.    The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design, consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the piling and form the wall.  The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops), intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

144.    The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend.  The sands are encountered about 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity of the northern breach  (stations 113 to 118).  The sand is covered with a veneer of peaty swamp deposits.

145.    Of primary importance in constructing an I-wall atop an earthen levee are the composition of the soil into which the sheet piles will be driven and upon which the I-wall will rest, and the depth of the sheet piles as dictated by the composition of the soil.

146.    Soil borings of the levee at the site of London Avenue Canal south breach  indicate the presence of sand at a depth of 10 to 15 feet below sea level.

147.    Soil borings of the levee at the site of London Avenue Canal north breach indicate conditions similar to those of the south breach site, with the layer of sand present at the north breach site at a depth of 12 feet below sea level, as well as a layer of peat, a highly porous material that shrinks when dry and expands when wet, and makes for highly unstable soil conditions.

148.    The sheet piles supporting the flood wall monoliths at the site of the London Avenue Canal

south breach were driven to a depth of 14 feet below sea level.  Thus, the bottom of the sheet piles terminated within a layer of sand.

149.   The flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

150.   The I-walls at both breach sites on the London Avenue Canal have concrete sections that rise to eleven (11) feet above ground surface.

151.   The Orleans Avenue Canal is a canal in Orleans Parish connected on its north end to Lake Pontchartrain and with the SWB's Pumping Station No. 7 on its south end.

152.   The floodwalls system along the Orleans Canal designed and constructed by the Corps ended abruptly 200 feet away from the pumping station.  The height of the area within the gap was 6 feet lower than the top of the floodwalls protection system.  As a result, there was no flood protection provided due to the 200 foot long gap that was 6 feet lower than the nearby floodwalls.  A smaller gap existed on the opposite side of the canal as well.

153.   Plaintiffs and class representatives of proposed Subclasses Two, Three, Four and Five refer to all preceding allegations of fact which relate to the design and construction of the London Avenue Canal levees and flood walls, and the Orleans Canal flood walls.  All allegations of fault incorporated therein are respectfully re-averred.

154.   The Defendants Corps, and OLD, had a duty to design and construct the levees and flood walls of the London Avenue Canal, and the Orleans Canal in a manner that would not compromise the safety of the canal's levee/flood wall system.

155.    The Defendants Corps, and OLD, breached their duty to design and construct the levees and flood walls of the London Avenue Canal, and the Orleans Canal in a manner that would not compromise the safety of the canal's levee/flood wall system.

156.    As a result of Defendants' Corps, and OLD's, breach of their duty, the floodwalls of the London Avenue Canal failed, and the floodwalls of the Orleans Canal were incomplete, causing Plaintiffs' and class members damages.

157.    In addition, or in the alternative, Defendant, OLD, had the care, custody and control, and the *garde* of the London Avenue Canal, and Orleans Canal levee and flood wall systems at all times relevant hereto, and accordingly is strictly liable in accordance with Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the levee and flood wall system which caused the damages of which Plaintiffs complain.

158.    Plaintiffs in proposed Subclasses Two, Three, Four and Five aver that Defendant, St. Paul, had in full force and effect a policy of liability insurance affording coverage to the Defendant OLD, and  with respect to the matters, risks and things for which this Defendant is liable herein, thereby affording Plaintiffs the right to proceed against this Defendant insurer under the provisions of the Louisiana Direct Action Statute  LSA-R.S. 22:655.

## XI.

## COUNT FIVE

## THE MR-GO ALLEGATIONS AGAINST CORPS AND APPLICABLE TO SUB-CLASS FOUR AND FIVE

### A.    THE COMMERCIAL NAVIGATION CANALS PERVADING GREATER NEW ORLEANS

#### The Gulf Intracoastal Waterway

159.    The Gulf Intracoastal Waterway ("GIWW") forms a protected shipping lane between Port

Isabel, Texas (the Mexican border) and Apalachee Bay, Florida. The GIWW was a navigation canal project completed between New Orleans and Corpus Christi, Texas by mid-1942. The GIWW was officially completed in June, 1949. In 1944, under the authority of the Corps, the GIWW was rerouted to pass through the southern part of the IHNC, creating the first shallow channel through the wetlands that would facilitate propagation of hurricane surge from Lake Borgne into the heart of New Orleans. This act of the Corps negligently created the first part of a "Hurricane Alley" right into the heart of New Orleans.

**The Mississippi River Gulf Outlet**

160.   The "Hurricane Highway" was enlarged in the 1960s by construction of the Mississippi River Gulf Outlet navigational canal ("MR-GO").   This enlargement   exponentially enhanced both the likelihood and risk of storm surge for Greater New Orleans.  The surge threat was first realized during Hurricane Betsy in September of 1965.  6,560 homes and 40 businesses were flooded with water up to seven feet deep.

161.   Since its inception over forty years ago, the MR-GO runs from the Gulf of Mexico alongside St. Bernard and into the GIWW in New Orleans.

162.   The Plaintiffs and class members' damages were sustained as a direct and proximate result of the Corps' breach of its duty to adequately design, construct, maintain, inspect and operate the MR-GO.  But for the fault and/or negligence of the Corps, the severe flooding of parts of the New Orleans Metro Area would not have occurred.

163.   The Federal Tort Claims Act (FTCA) places the United States in the same position as a private defendant and authorizes Plaintiffs to sue for damages arising from the Corps' negligence and fault in the design, construction, repair, and maintenance of the MR-GO. Such negligent acts and/or fault on the part of the Corps were a proximate  cause of the

-54-

innundation of the New Orleans Metropolitan area.

**The MR-GO's Faulty Design and Construction**.

164.    The Corps' negligence and/or fault in designing, engineering, inspecting and/or constructing MR-GO, included, without limitation:

    a.    failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish;

    b.    failing to "armor" levees on both banks of the MR-GO; and

    c.    failing to recognize that the construction of the MR-GO,  as well as subsequent salt water intrusion and accelerated erosion, would result in the devastation of the wetlands, forests, and land masses thus denuding and destroying a critical natural buffer against storm surge, and thereby further exacerbating the funnel effect created by the MR-GO's design.

**Negligent Operation and Maintenance of the MR-GO**

165.    The Corps is responsible for the operation and maintenance of the MR-GO. This on-going responsibility included dredging the bottom of the waterway to remove deposited soil and silt. The Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MR-GO would ameliorate the "funneling effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in the New Orleans Metropolitan area during hurricanes.  Notwithstanding that dredging is a critical safety requirement for the MR-GO, the Corps negligently failed to maintain the MR-GO and failed to properly dredge the canal. While the negligent design

of the MR-GO caused destruction of the surrounding wetlands, the Corps' ongoing negligent maintenance of the MR-GO, further exacerbated it. The loss of thousands of acres of marshlands due to the MR-GO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' and class members respective properties.

166.   The banks of the MR-GO and, especially the northeast shore juncture of the MR-GO and the GIWW are particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels.   The Corps was negligent in failing to provide bank stabilization measures, as well as in allowing the saltwater intrusion which degraded the wetlands adjacent to MR-GO.

## B.     REGULATORY VIOLATIONS OF THE CORPS

### Illegal Failure of Corps to Coordinate with the State of Louisiana

167.   The Corps designed, constructed, operated, and maintained the MR-GO according to faulty plans and specifications in violation of the Rivers and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945) ("MR-GO Planning Law") which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the Governor's designee), as an "affected state" in investigation and planning. Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ("DOI").   The Corps failed to coordinate with and involve the Governor and the DOI, and thus violated its duties and obligations established under the MR-GO Planning Law as well as the FWCA, *infra*.

**Violation of Fish and Wildlife Coordination Act of 1934, as Amended – Failure to Coordinate with Louisiana and Department of Interior and to Perform Required Study**

168.   The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 662, as amended in 1946

and 1958, also required coordination between any federal agency, proposing to "impound," "divert," or "control" a waterway or body of water, and the Fish and Wildlife Service. The MR-GO is such a waterway. The FWCA statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MR-GO project, including investigation, planning and construction. The Corps was also directed therein to incorporate any of the observations or concerns raised by these state and federal agencies into any plans and specifications for the design and construction of the MR-GO. The Corps failed in its duties under said laws. In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study, would be a prerequisite to predictions of the MR-GO's effects and establishment of mitigatory measures. 1958 Interior Report at 19. The report further concluded that "this project should be thoroughly investigated from the biological standpoint before construction through the marshes below Paris Road and the Sound is undertaken." 1958 Interior Report at 19-20. A four year regime of testing and study to assess the impact of the MR-GO was recommended. The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MR-GO without waiting for the completion of the essential four year study requested by the DOI. The Corps knew or should have known that construction of the MR-GO through the wetlands from the GIWW to the Gulf would devastate Louisiana and wetlands and result in the negligent, reckless, wanton, or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal surges.

**Failure of the Corps to Follow MR-GO 1951 Authorization Report**

169. On September 25, 1951, the Corps submitted a report to Congress with its recommendations for construction of the MR-GO ("MR-GO Authorization Report"). This report contained a

letter from the former Corps Chief of Engineers stating that the proposed MR-GO would be connected to the IHNC by its own *separate* canal running parallel to the GIWW. MR-GO Authorization Report at 5. However, as built, such a separate parallel canal was not built and, instead, the Corps unilaterally deviated from the MR-GO Authorization Report and did not dig a separate parallel canal to the IHNC. Rather the Corps connected the MR-GO into the existing GIWW and significantly deepened and widened the GIWW, thus increasing vessel traffic and producing significantly increased hydrologic consequences that were a proximate cause of the flooding of the New Orleans Metro Area.

**Failure of Corps to do studies recommended by its own Board of Engineers**

170.    The MR-GO Authorization Report further included a report from the Corps' Board of Engineers recommending further studies into the MR-GO's impact on the Louisiana coast and opined: "(t)he exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available." MR-GO Authorization Report at 14. No such studies were done and, thus, the Corps did not consider alternatives that would be less destructive to the lands and wetlands of Louisiana; such negligent, reckless, wanton or illegal acts or omissions were a proximate cause of the damages sustained by Class Representatives and the class they putatively represent.

**Other Regulatory Violations by Corps**

171.    The Corps further failed to follow requirements of 33 CFR §§ 335-38, particularly 33 CFR § 336.1(c)(4) and 33 CFR § 320.4(b) and Executive Order 11990. The Corps deviated from

and/or failed to execute their dredging activities (maintenance and operation of the MR-GO) in the manner required by the Corps pursuant to 33 CFR §§ 337.5 and 338.2. Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by 33 CFR § 337.2) including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities. In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance, and operation of the MR-GO, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 ©; the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§ 2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. § 1452, *et. seq*. and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et. seq*. Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil including, but not limited to, negligent and illegal placement of said spoil as spoil banks.

**Illegal And/or Negligent Failure of Corps to Follow Authorized Design, Route, and Alignment.**

172.   After hearings, Congress authorized the construction of the MR-GO in 1956 (P.L.-455) and the record thereof that the Corps unlawfully did not follow the Congressionally authorized design, route, or alignment, and it did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the  destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate what would prove to be disastrous hydrologic consequences to the New Orleans Metro Area.

**Failure of Corps to Heed Multiple Warnings of Impending Disaster.**

173.   After the hurricane of 1947 and Hurricane Betsy in 1965, the Corps knew or reasonably

should have known of the hazards posed by the MR-GO and the effects of its negligent design, construction, operation and maintenance. Additionally, the Corps knew or reasonably should have known of the high probability of future damages likely to result from the inundation of Greater New Orleans.  In recognition of the probability of future damage to the New Orleans Metropolitan area as a consequence of the MR-GO  project, the Corps illegally and/or negligently (or through gross negligence, wanton and/or reckless acts and/or omissions) failed to close the MR-GO, construct Control Structures, and/or constructed levees, floodwalls, and other structures in a defective, negligent, sub-standard fashion; such "Levee" allegations are detailed separately herein.

174.    Virtually from the inception of the planning and construction of the MR-GO, the Corps received numerous warnings of the eventual disaster that would occur as a result of the negligent design, construction, operation, and maintenance of the MR-GO, and the Corps' failure to take appropriate steps to prevent or reduce the impending inundation of the New Orleans Metro Area.  Such warnings were voiced by private citizens, scholars, scientists, engineers, journalists, municipal and Parish governments, and the State of Louisiana.  Such warnings repeatedly put the Corps on notice of massive destruction to marshes, wetlands and other land and forest areas -- all resulting from the negligent and/or faulty inspection, design, construction, operation, and maintenance of MR-GO.

175.    As a result of the negligence and/or fault of the Corps, during and/or immediately following Hurricane Katrina an accelerated/enhanced hurricane surge was propelled up the MR-GO and then through the MR-GO/GIWW in an even greater surge smashing into the I-Walls and/or levees along the MR-GO/GIWW causing massive inundation of to the Sub-Class Four and Five geography.

176.    As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Corps described herein, the Class Representatives and the Class sustained damages.

## XII.

### COUNT SIX

**ALLEGATIONS AGAINST CORPS, OLD, PORT OF NO, AND THE RAILROAD DEFENDANTS, AND APPLICABLE ENTIRE CLASS AND/OR SUB-CLASSES FOUR AND FIVE**

177.    All allegations of fault incorporated herein are respectfully re-averred.

178.    The Corps, OLD, St. Paul, CSX, PBR, and PNO had the legal responsibility and duty to the Plaintiffs and the Class to protect against the harm and damages alleged herein.

179.    The City of New Orleans is the sole owner of the New Orleans Public Belt Railroad Commission, a non-profit switching railroad which operates switches and terminal services for over 100 miles of track in New Orleans, Louisiana.

180.    On or about September 11, 2004, a New Orleans Public Belt Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30.

181.    On December 14, 2004, the defendant PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-30.  Despite PBR's making of said payment and the OLD's receipt of said payment, both PBR and OLD failed to assure the repairs were made.

182.    Upon information and belief, Defendant, CSX, designed and constructed a railroad crossing at or near the certain flood protection structures.  In so doing, CSX utilized highly erodible, lightweight, and/or porous materials including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than its surrounding flood protection structures.

-61-

183.  Upon information and belief, CSX, also failed to install a "sheet pile cutoff" or similar device to prevent or limit erosion of its structure.

184.  Upon information and belief, CSX, could have prevented the failure of its structure at minimal additional cost by installing concrete "splash pads" or other erosion protection devices at the base of the "I-walls."

185.  CSX failed to exercise due care in buildings its structure, and its failures directly and/or proximately caused and/or contributed to the breaches of certain levees or floodwalls.

186.  The PNO has the full and exclusive right, jurisdiction, power, and authority to govern the Port and is responsible for the maintenance of its wharves, terminals, marshaling yards, cranes, and all transportation infrastructure affecting the regulation of commerce.

## XIII.

## COUNT SEVEN
## NUISANCE

187.  Plaintiffs re-allege all previous allegations contained herein, and allege that, as the proprietor of the MR-GO, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to the 17th Street and London Avenue canals, and the MR-GO that has deprived, and threatens imminently to deprive, the Proposed Class from the enjoyment of their property in the event of a hurricane. Defendants have violated this state statutory duty by creating the hazardous conditions in the 17th Street and London Avenue canals, and the MR-GO.

188.  As the designer, builder, owner, and operator of the 17th Street, London Avenue, and MR-GO canals - as applicable, the Corps also had a federal common law duty to avoid creating a hazardous condition that harms, and threatens imminently to harm, the lives and property

of nearby residents in the event of a hurricane.  Defendants have violated this federal common law duty by allowing the 17th Street and London Avenue canals, and the MR-GO to become a lethal threat to human life, property, and the environment.

189.   Accordingly, the Class is entitled to recover damages sustained by them as a result of such nuisance.

## XIV.

## RES IPSA LOQUITUR

190.   Plaintiffs expressly plead the doctrine of *Res Ipsa Loquitur* against each and all of the Defendants, as may be appropriate under the circumstances and permitted by law.

## XV.

## DAMAGES

191.   In addition to damages as alleged throughout this Complaint, Plaintiffs on behalf of themselves and the Class and Subclasses, allege as a result of the Defendants' negligent, grossly negligent, reckless, wanton and or illegal inactions described throughout this Complaint damages as follows:

a..   **PROPERTY AND OTHER SPECIAL DAMAGES**:  As a direct and proximate result of the Defendants' negligence,  gross negligence, reckless, wanton and or illegal acts and/or failures to act, Plaintiffs, Class and Subclass Members have suffered property damages and other special damages including, but not limited to, the following: loss of property (real and personal), immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities and business interruption; evacuation expenses; loss of opportunity to avoid injury and damage through preventative measures, including but not limited

to relocation, raising of homes, and purchase of additional insurance, which actions would have been taken had knowledge of the insufficiency of the flood protection system been known, and other special damages to be proven at trial.

b. **PERSONAL INJURY AND OTHER GENERAL DAMAGES**: As a direct and proximate result of the Defendants' negligence, gross negligence, reckless, wanton and or illegal acts and/or failures to act, Plaintiffs, Class and Subclass Members have suffered personal injury and other general damages including, but not limited to, the following: wrongful death, survival damages, fear, fright and emotional distress, grief, mental anguish, inconvenience, pain and suffering, loss of the capacity to enjoy life; loss of consortium; and costs of suit.

c. **DAMAGES TO THE CLASS AS A WHOLE**. As a direct and proximate result of the Defendants' negligence, gross negligence, reckless, wanton and or illegal acts and/or failures to act, the Class as a whole has suffered a societal harm which includes the breakdown of New Orleans social structure, the loss of cultural heritage, and the dramatically altered physical, economic, political, social, and psychological character of the New Orleans area.

## XVI.

## PRAYER FOR RELIEF

**WHEREFORE**, Class Representatives individually and on behalf of the Class and Sub Classes they seek to represent pray that after due proceedings had that there be a judgment or judgments entered in plaintiffs favor and against the defendants:

a. Certifying the requested class and sub-classes;

b. Appointing undersigned counsel as Class Counsel;

-64-

c.      For economic and compensatory damages in amounts to be determined at trial;
together with interest thereon from the time of demand until paid, and for Attorneys'
fees and costs of litigation pursuant to the Federal Tort Claims Act, and/or the Equal
Access to Justice Act; and

d.      Such other relief to the Class Representatives and Class as is available under
Louisiana and/or Federal law; and

e.      Such other relief as the Court deems just and equitable.

**Respectfully Submitted,**

LAW OFFICES OF JOSEPH M. BRUNO

s/ Joseph M. Bruno
JOSEPH M. BRUNO
Plaintiff's Liaison Counsel
LA Bar Roll Number: 3604
DAVID S. SCALIA
LA Bar Roll Number 21369
L. SCOTT JOANEN
LA Bar Roll Number 21431
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

and

PLAINTIFFS LEVEE SUB-GROUP LIAISON COUNSEL

s/Gerald E. Meunier
GERALD E. MEUNIER
Levee PSLC Liaison Counsel
LA. Bar Roll Number: 9471
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone:504/522-2304

Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com

For
LEVEE PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this Motion upon all known counsel for all parties via the Court's CM/ECF system, or by placing same in the United States mail, properly addressed and with first class postage prepaid, or by facsimile, e-mail, or other electronic transmission this   3rd       day of August, 2007.

/s/   Joseph M. Bruno
**JOSEPH M. BRUNO**