# Exhibit 4

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION
CONSOLIDATED LITIGATION
                                     NO. 05-4182
                                        "K" (2)
PERTAINS TO: MRGO                    JUDGE DUVAL

FILED IN: 05-4181, 05-4182,          MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


            Videotaped Deposition of

                GLYNN WADE,

4719 Bundy Road, New Orleans, Louisiana 70127,

taken in the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on Tuesday, the 10th day of July, 2007,

beginning at 9:09 A.M.

Page 26

1  Gentilly.
2      Q. And then did they evacuate? Do you
3  know when they evacuated?
4      A. She finally told me she had
5  evacuated that Sunday evening with her
6  boyfriend.
7      Q. And your husband called you, was it
8  on Monday? Is that when you got the call from
9  him?
10     A. It was about Monday -- If I recall,
11 it was about Monday evening, Monday night.
12     Q. And what kind of telephone access
13 did you have and did he have? Was it on a
14 land line or a cell phone or what?
15     A. I had my cell phone and my husband
16 had his cell phone. My daughter had her cell
17 phone.
18     Q. And you were able to talk to your
19 husband on the cell phone?
20     A. Yes, sir.
21     Q. And then were you able to talk to
22 your daughter on her cell phone?
23     A. Yes, sir.
24     Q. And you obviously had electricity up
25 at LSU in Baton Rouge.

Page 27

1      A. Yes, sir.
2      Q. And the shelter where your husband
3  had gotten to had power, I guess, as well?
4      A. Yes, sir.
5      Q. And your daughter and granddaughter,
6  where did they go?
7      A. The only place she could get
8  reservations was in San Antonio, Texas, on I
9  think it's an Air Force base. She was still
10 in the Navy Reserve and they -- they took
11 her.
12     Q. And then when was it that you and
13 your husband were able to get back together in
14 person?
15     A. October 1st, 2005.
16     Q. And where was that?
17     A. I was still in Baton Rouge working
18 and he came down from Tallulah, Louisiana and
19 picked me up in the -- He had his truck. He
20 took his truck.
21     Q. And did you come back to New Orleans
22 then?
23     A. I came back to Destrehan,
24 Louisiana.
25     Q. And you stayed there for a few days

Page 28

1  or a while?
2      A. Destrehan?
3      Q. Yes.
4      A. I stayed there for -- Well, back
5  up. My administrator was trying to help us
6  State workers to get apartments. Because we
7  all had lost our homes. And I was blessed to
8  get a one room apartment -- one bedroom
9  apartment in Destrehan September of 2005 and I
10 immediately paid the rent and deposit. So,
11 therefore, when my husband picked me up
12 October 1st, 2005 in Baton Rouge, we had our
13 apartment waiting for us.
14     Q. And I have been to Destrehan and,
15 what, I am going to guess wrong if I try to
16 remember where it is, but it's out west on the
17 other side of the lake; right?
18     A. Destrehan is near LaPlace.
19 Destrehan -- First Baton Rouge, Hammond,
20 LaPlace, Destrehan.
21     Q. And you took up residence then in
22 that apartment for quite some time?
23     A. From October 1st, 2005 to March
24 17th, 2007.
25     Q. And when was it that you first came

Page 29

1  back to New Orleans and saw your house?
2      A. October 1st, 2005.
3      Q. All right. I'm sorry, I might have
4  missed it. You all drove all the way to New
5  Orleans?
6      A. From Baton Rouge.
7      Q. And --
8      A. We went to our apartment. My
9  husband could -- My husband had never seen
10 it. I was the one that found it with my
11 co-workers and administrator. So we went to
12 look at them for him to see the apartment and
13 then we had some -- a little cash money and
14 our landlord told us where we could go and get
15 a mattress and box spring, portable TV, a
16 little TV. And we went and bought -- We got a
17 bed frame. We set it up and before it got
18 dark October 1st, we went to look at our
19 house.
20     Q. And what did you see when you went
21 to your house? I mean, what condition was it
22 in?
23     A. Well, before we went in, some of the
24 -- a lot of the bricks had been knocked off
25 the front of our house. The picture window,

Page 30

1  of course, was broken into, but they had to do
2  that to -- whomever, to search for bodies. We
3  went through that window and the water had
4  receded or gone down, but we could tell before
5  we went in the house the water line of our
6  house. Now, I can't say for sure, but it
7  looked like it was about four feet of water or
8  more. So when we got inside of the house, we
9  looked around. All of the furniture was wet.
10 The floor was slippery, wet and slippery. I
11 don't know what that black slippery was, but
12 we had boots on and we had held each other's
13 hand, but it was slippery, black sludge. But
14 the furniture, my living room furniture was
15 turned upside down. And then the kitchen was
16 next to the living room. Our refrigerator was
17 turned upside down. It's amazing. I have
18 never seen anything like that.
19         Some of the furniture that was in
20 the master bedroom was in the kitchen. Some
21 of the kitchen stuff was in the master bedroom
22 and the other two bedrooms. But everything
23 was just turned upside down. Damp, moldy,
24 stinky. Some of the pictures on our walls
25 that were hanging a little low were ruined.

Page 31

1  There was nothing in the house salvageable
2  except my mother's and daddy's portrait, and I
3  -- it was full of mold and sludge and I said,
4  "Just leave it alone. Just -- I won't try to
5  take it." But my husband took them down and
6  wiped them. And that was salvageable.
7      Q.  What about things on top of the
8  counters? Had it reached the kitchen
9  countertops in the house?
10     A.  Yes, sir.
11     Q.  Now, did you do any -- Well, just
12 tell me what you did generally after that
13 time. Did you board anything up? Did you
14 leave it alone? I mean, what did you do?
15     A.  Well, that evening we left because
16 it was getting dark and there was a curfew,
17 especially in the East. So we really weren't
18 supposed to even be there, but we did October
19 1st. But a couple of days later my husband
20 came back and he boarded up the window, the
21 window of our living room, but we didn't
22 really have to worry about anything because
23 everything was ruined. So nobody could steal
24 anything because it was stinky, dirty,
25 ruined.

Page 32

1           And we talked to friends and
2  neighbors and they start telling us about
3  having the house gutted out and taking all of
4  the debris out of the house. So we hired some
5  people to first take the debris out of the
6  house and then we hired people to -- men to
7  gut out the entire house.
8      Q.  And was that -- had you contacted
9  your insurance agents at that point or made a
10 claim for flood on your homeowner's?
11     A.  Yes, sir, I did that when I was at
12 Baton Rouge.
13     Q.  And you had a flood policy on the
14 house?
15     A.  Yes, sir, I did.
16     Q.  And had you had that the entire time
17 you lived there?
18     A.  Yes, sir.
19     Q.  Was that part of the requirement on
20 the mortgage, that you have flood insurance?
21     A.  Yes.
22     Q.  And you also then had a regular
23 homeowner's policy as well; right?
24     A.  Yes, sir.
25     Q.  Did you make claims under both of

Page 33

1  those policies?
2      A.  Yes, I did.
3      Q.  Were both of those with Allstate?
4      A.  Yes, they were.
5      Q.  Did you get -- Well, I'll just ask
6  you what the history was of -- Let's start
7  with the one on the homeowner's policy. What
8  did you claim under the homeowner's policy?
9  And did you fill out some forms to do that?
10     A.  I filled out forms, but Allstate
11 stated for the homeowner's insurance that we
12 had very little wind damage and -- on our
13 roof. So, therefore, the deductible was far
14 more than what they claimed wind damage, so we
15 paid for the roof damage ourselves.
16     Q.  Did you ever -- Did you contest that
17 or go any further with Allstate?
18     A.  For wind damage?
19     Q.  Yes.
20     A.  No, sir. It didn't make sense.
21     Q.  So Allstate said there's some wind
22 damage there to the roof and shingles off and
23 tile maybe or something there?
24     A.  Uh-huh (affirmatively).
25     Q.  Is that right?

Page 46

1  straight A student, and all her trophies on
2  the floor ruined from the water.
3      Q.  And you say -- I think you might
4  have mentioned she also had roof or wind
5  damage to her house?
6      A.  Well, she had wind damage and what
7  have you, but the City found fit -- She
8  requested to have it demolished since it was
9  not repairable and, to be honest, when I went
10 October -- December of '06 to just check on
11 her house, because she had paid to get it
12 gutted, also she came down and had it gutted,
13 there was no more house.  It was just a slab.
14 So she's waiting for Road Home money to come
15 home and rebuild.
16     Q.  All right.  Now, you have a Road
17 Home -- You got Road Home money?
18     A.  Yes, sir, I did.
19     Q.  And when did you apply for that?
20     A.  I applied around -- Well, you know,
21 whenever they said to apply.  So maybe that
22 was maybe the beginning of 2006.  I can't
23 remember.
24     Q.  It was early on when the Road Home
25 Program came into effect and got rolling?

Page 47

1      A.  As soon as the -- it was in the news
2  and they gave the website and phone number,
3  what have you, I applied.
4      Q.  And I don't want to know anything
5  lawyers said or you said to your lawyers, but
6  were lawyers involved in that Road Home
7  application?
8      A.  No.  No, sir.  Uh-huh (negatively.)
9      Q.  And do you have a copy of that at
10 home somewhere?
11     A.  No.  Because I got my money.  And I
12 didn't see any need to keep all of that.  I
13 did get -- We did get our money on or about
14 maybe March or April of this year.
15     Q.  And how much Road Home money did you
16 get?
17     A.  22,000.
18     Q.  Now, in terms -- have you gotten any
19 other -- aside from amounts of money you may
20 have gotten initially right after Katrina,
21 have you gotten any other aid?  Like were you
22 getting rent assistance?
23     A.  No.  FEMA said I wasn't eligible.
24     Q.  You applied for rent assistance or
25 housing assistance and FEMA turned you down?

Page 48

1      A.  I paid -- I also applied for
2  assistance with my medication, because I'm on
3  about eight pills a day because of
4  hypertension, diabetes, high cholesterol.
5  Many other problems.  But I was denied.  FEMA
6  said that my husband and I were not eligible.
7          Red Cross, we could not get the
8  Red Cross at all on the phone.
9      Q.  And did you get food stamps?
10     A.  For about three months while we were
11 working in -- when I say "we", OPH workers, we
12 were working in Baton Rouge, some of the
13 co-workers drove us to Port Sulphur and I
14 think we got it from October, November,
15 December.  October, November, and December,
16 both of '05 if I recall.  And at that time it
17 didn't matter what your livelihood was.  The
18 fact that you were a Katrina victim.
19     Q.  And there came a time when you made
20 a claim against the Army Corps of Engineers.
21 You filled out a form?  Do you recall that?
22     A.  Yes, sir.
23     Q.  And were the lawyers involved in
24 helping you fill out that form?
25     A.  Nobody -- No attorneys.  I have done

Page 49

1  everything on my own.
2      Q.  And the form, we have got it, we can
3  look at it in a little bit, but parts of it
4  were printed up, printed up ahead of time and
5  had some stuff filled in on it about what
6  happened with the levees and so forth and then
7  you filled in some additional information.  Is
8  that -- Do you remember that?
9      A.  Yes.  To be honest, maybe after I
10 had applied with the lawsuit, the law firm
11 mailed that to me.
12     Q.  So you may have gotten it from the
13 law firm and then you filled out some more
14 information on it?
15     A.  Yeah.
16     Q.  All right.  What I was wondering is
17 if there were in part of the social work
18 worker network or otherwise had these forms to
19 fill out to make claims against the Army Corps
20 of Engineers.  Is that something that was part
21 of the social work network or anything?
22     A.  There's no social work network, but
23 those that got them from the firm told us
24 where to call and get one from.
25     Q.  And when you were telling us about

Page 70

1    A.  Well, what I wrote is here
2  (indicating).  I mean when I signed my name.
3    Q.  Right.  What we looked at on the
4  back, the "To whom it may concern".  But this
5  page that we're looking at that says "Claim
6  for damage, injury or death" in the upper
7  left-hand corner on that page, is there
8  anything that you think you typed in or wrote
9  on this page?
10   A.  Well, I didn't write anything in,
11 nor did I type anything in.
12   Q.  Now, the amount of the claim down
13 here says, in 12-A as you get towards the
14 bottom, "Property damage, $500,000".  Do you
15 see that?
16   A.  Yes, sir.
17   Q.  What's that consist of?
18   A.  When you say -- When you say
19 property damage?
20   Q.  Yes.  How did you arrive at the
21 $500,000?  When we talked today, we have got a
22 house that's worth $180,000 and whether or not
23 what counts in that, but it would seem to me
24 180,000 for the house would be the max.  You
25 salvaged some of it, so it would be less than

Page 71

1  that.  And then you have got the contents
2  would be the main property damage.  Right?
3    A.  Yes, sir.
4    Q.  All right.  And if you've got a
5  $180,000 house that was worth something when,
6  you know, when it was stripped down and
7  everything and you have got the contents, how
8  do you get to $500,000 in property damage?
9    A.  I am going to answer you honestly.
10 I figure if you ask for far more, I come in
11 the middle, half or less.
12   Q.  You have got less property damage.
13 You asked for more hoping that you would
14 compromise somewhere where you come out about
15 right?
16   A.  That is correct.
17   Q.  This was what some people might call
18 your opening position?
19   A.  I don't know what it's called, but I
20 know usually when you ask for one thing, you
21 get far less.
22   Q.  And so in reality the property
23 damage you have is far less than 500,000;
24 correct?
25   A.  It's less than 500,000, yes.

Page 72

1    Q.  Do you have a number that you've
2  calculated to know what your property damage
3  is for the contents of your house, the damage
4  to the structure, and your van?
5    A.  No, sir.
6    Q.  You have not calculated that?
7    A.  No, sir, I haven't.
8    Q.  Then the next slot there is 12-B,
9  says "Personal injury, $500,000".  What's that
10 consist of?  What injuries is that?
11   A.  Well, I wasn't sure about the
12 personal injury, what that -- what that
13 meant.  Because I didn't claim to be injured
14 by Katrina.  I was in Baton Rouge working.
15   Q.  And your husband wasn't injured
16 either by Hurricane Katrina, because he got
17 out ahead of time, too; right?
18   A.  That's correct.
19   Q.  The address up at the top there is
20 P. O. Box 1101, Destrehan.  Is that the P. O.
21 Box you had up there somewhere at the Post
22 Office near the apartment?
23   A.  Yes, sir.
24   Q.  And when it talks about the basis of
25 the claim there, which is near the top of the

Page 73

1  page there, number 8, do you see that?
2    A.  Yes.  What about it?
3    Q.  Is that your understanding of what
4  the basis of your claim is against the Army
5  Corps of Engineers?
6    A.  To be honest, I -- I am not sure.  I
7  left it up to Andry Law Firm to -- to indicate
8  that.
9    Q.  Do you have any understanding from
10 personal knowledge of where the water came
11 from that flooded your house?
12   A.  No, sir, I don't.
13   Q.  And have you undertaken to make any
14 investigation since Katrina to try to
15 determine where that water came from?
16   A.  No, sir.
17   Q.  Number 8 talks about, I am basically
18 -- the design and operation and construction
19 of the MRGO.  Do you see that?
20   A.  Yes, sir.
21   Q.  And what I take it from what you're
22 telling me is you're not sure about whether
23 any, or any of the details of the construction
24 of the MRGO or otherwise that might have led
25 to flooding of your house.  Right?

Page 74

1    A.  All I know is that my house was
2  flooded.  I am depending on the attorneys
3  that's representing us to give the facts.  I
4  have no idea about that stuff.
5    Q.  And whether it came from rainwater
6  or water that came over a levee or through a
7  levee or which levee or which body of water,
8  that's something you don't know about as you
9  sit here today?
10   A.  I don't know anything about it.
11   Q.  Let me show you what we have marked
12 as Exhibit 3.  I believe this is the one I
13 handed to Rich earlier, giving you another one
14 now.  And is that a four-page document?
15   A.  Is this exactly what you have?
16     MR. EXNICIOS:
17       Yes, ma'am.  That appears to be
18     the same one.
19 EXAMINATION BY MR. MARPLE:
20   Q.  Is Exhibit 3 a four-page document?
21   A.  Yes, sir, it is.
22   Q.  And the top two pages are a letter
23 dated January 25th, 2007 from the Army Corps
24 of Engineers to you.  Is that correct?
25   A.  Yes, sir.

Page 75

1    Q.  Do you remember receiving that
2  letter?
3    A.  No, I don't.
4    Q.  You think you might have gotten it
5  and you just don't remember it?
6    A.  Yes, I believe that happened.
7    Q.  All right.  It's addressed to you
8  properly and everything; right?
9    A.  Yes, sir.
10   Q.  And it's called, or the subject line
11 is an "Acknowledgment of receipt of
12 complaint".  Do you see that?
13   A.  Yes, sir.
14   Q.  Now, if we go over to the third and
15 fourth pages, and particularly the third page,
16 this is a claim for damage, injury or death.
17 That's the same or close to being the same
18 type of form as the one we just talked about,
19 which was Exhibit 2.  Right?
20   A.  Yes, sir.
21   Q.  And this one's dated January 12,
22 2007.  Correct?
23   A.  Correct.
24   Q.  If you'd look on that page where
25 it's a claim for damage, you look down at

Page 76

1  number 14 in the lower right-hand corner, do
2  you see it's dated there, correct?  I'll point
3  it to you.  Right there (indicating).  Do you
4  see that?
5    A.  Okay.
6    Q.  Is that your signature there to the
7  left of that in item 13-A?
8    A.  Yes, sir, it is.
9    Q.  And is the handwriting on this page
10 your handwriting or is there someone else's
11 handwriting besides yours on this one?
12   A.  It's my handwriting.
13   Q.  And this is one -- Well, I'll ask.
14 Is this one you filled out yourself or did you
15 get part of this form from somebody and add
16 the additional information that's in
17 handwriting?  Can you tell us what happened in
18 that respect?
19   A.  I can't remember where I got this
20 form.  Yes, everything that's in here, I wrote
21 it.
22   Q.  And do you have any explanation for
23 why you would have filed this second claim
24 when you had filed one approximately six
25 months earlier?

Page 77

1    A.  Let me make sure I understand you.
2  You're asking me why did I file this one
3  (indicating) when I had gotten this one
4  (indicating)?
5    Q.  Well, as I understand it, the one we
6  marked as Exhibit 2 was in July, 2006 and this
7  --
8    A.  Yes.
9    Q.  -- is in January of 2007.  So I am
10 really asking you if you can explain it either
11 way.  But I am asking you why would you file
12 the second one.
13   A.  Because when I got this one
14 (indicating), and if I -- it is from the --
15 the Corps -- the Corps of Engineers, when I
16 got it, I filled it out because I figured that
17 if I didn't fill it out they would say I was
18 not cooperating.  So anything I got as far as
19 a form -- Well, this is 95?  I filled it out.
20   Q.  All right.  And the first two pages
21 there, the letter from the Army Corps of
22 Engineers to you, the Department of Army, is
23 dated January 25th, 2007.  Right?
24   A.  Yes, sir.
25   Q.  And the form is dated January 12,

Page 82

1  Q. Now, in the next item down, in 10,
2  it's got "mental distress" with a couple of
3  little stars there. Do you see that?
4  A. Yes, sir.
5  Q. And that's your handwriting; right?
6  A. Yes, it is.
7  Q. And you have circled "Personal
8  injury" and it says "Personal injury and
9  mental distress", you have circled "mental
10 distress"?
11 A. That's what I circled.
12 Q. And you didn't have any personal
13 injury, but on this one you have got mental
14 distress. Correct?
15 A. Yes, sir.
16 Q. And this one mentions Mr. Wade,
17 Adolph Wade, Sr.; right?
18 A. Yes, sir.
19 Q. That's your husband?
20 A. Yes, it is.
21 Q. And you.
22 A. Yes, sir.
23 Q. And you are mentally distressed
24 because you had about five feet of water in
25 the home and the flood water knocked the

Page 83

1  bricks off the front of the home and the house
2  was severely damaged and "We lost everything
3  we owned in our home." Right?
4  A. Yes, sir.
5  Q. Can you describe for me the mental
6  distress that you have as a result of that?
7  A. Well, at the time I wrote this, I
8  did have mental distress. It's -- I'll have
9  mental distress until I die as a result of the
10 trauma we experienced. But each day gets
11 better. But to work for years, to try to
12 accomplish material goods, try to save a
13 little money in the bank, and to lose
14 everything you own can be mentally distressful
15 as well as physical, but somehow it just kept
16 me for a long time, but I did not go to a
17 psychiatrist. For about a year I didn't sleep
18 hardly at night except maybe one or two hours
19 thinking about all that I have lost and my
20 husband and I trying to figure out how would
21 we try to gain some of it back. Because we
22 will never, ever get what we lost. All of the
23 heirlooms, family heirlooms from my
24 grandparents and my parents, they're not
25 replaceable. They're not replaceable. What

Page 84

1  monies we had that we had put aside to live
2  off of for a rainy day, I don't think we'll
3  ever get that back, to be honest.
4  Q. Now, the heirlooms from your
5  grandparents, I take it that's something very
6  personal to you; right?
7  A. Very personal.
8  Q. And the value of that is not what
9  somebody -- to you is not what somebody might
10 have paid you for it. It's personal and
11 individual to you. Is that correct?
12 A. It certainly is.
13 Q. And to your neighbor, those
14 heirlooms might not have any value at all;
15 right?
16 A. Probably so.
17 Q. And vice versa. If they had some,
18 you might empathize with them about the loss,
19 but personally that wouldn't have value to you
20 if they lost some of their heirlooms; right?
21 A. That's right.
22 Q. Can you tell us what those -- some
23 of those heirlooms that you lost were?
24 A. China, our --
25 Q. I'm sorry. I apologize for

Page 85

1  interrupting, but China, did you salvage any
2  China?
3  A. No.
4  Q. Of yours or anybody's?
5  A. No.
6  Q. And is there a reason for that? I
7  mean, I am -- just from a lay person's
8  standpoint, if it weren't broken, I would have
9  thought you could have cleaned China up.
10 A. Everything that was in -- my China
11 was in the cabinets in the kitchen at the
12 bottom. It was all broken. Broken.
13 Q. Were you able to salvage even one
14 dish or saucer or cup or anything of that --
15 A. No, sir.
16 Q. -- China? And I am sorry I
17 interrupted you. What else?
18 A. Then I had a, what you call I guess
19 a place setting with knives and forks and what
20 have you that also belonged to my mom. Then I
21 had pots and pans that belonged to my
22 grandmother that were not salvageable. I had
23 linen, towels, pillow cases that had been in
24 the family for years. When I said family, my
25 grandmother when she passed away, my mother