# Exhibit 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NO. 05-4182 "K"(2) |
| PERTAINS TO: MRGO | JUDGE DUVAL |
| FILED IN: 05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152, 06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066, 06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159, 06-5161, 06-5162, 06-5260, 06-5771, 06-5786, 06-5937, 07-0206, 07-0621, 07-1073, 07-1271, 07-1285 | MAG. WILKINSON |

Videotaped deposition of ETHEL COATS, 756
Louisiana Avenue, New Orleans, Louisiana  70115,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Tuesday, the 17th day of July, 2007, beginning at
9:28 a.m.


APPEARANCES:

    ARTHUR W. LANDRY AND JEANNE ANDRY LANDRY
    (BY:  ARTHUR W. LANDRY)
    710 Carondelet Street
    New Orleans, Louisiana  70130

        ATTORNEYS FOR THE PLAINTIFFS

(504)525-1753     HUFFMAN & ROBINSON, INC.     (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 38

```
 1  back to see your house?
 2      A.  Because they wouldn't let us down
 3  there to see the house. They wouldn't let nobody
 4  down there. It was so -- they had houses all in
 5  the streets, and we just couldn't get to our home
 6  at that time. They wouldn't let us down there.
 7  It was too dangerous to go.
 8      Q.  And who was it that was keeping you
 9  out of the neighborhood?
10      A.  The National Guards.
11      Q.  Did you know of anyone else who
12  got -- any of your neighbors who got to go back
13  in sooner?
14      A.  No. No.
15      Q.  So, when you got back to your house
16  in May of 2006, do you recall being able to tell
17  how high the water got in the house?
18      A.  About -- my ceilings is nine feet.
19  So, it's about seven and a half.
20      Q.  So, nearly to the ceiling?
21      A.  Yes.
22      Q.  About seven and a half feet?
23      A.  Yeah.
24      Q.  How could you tell?
25      A.  They have a line where the water
```

Page 39

```
 1  settled at.
 2      Q.  And I assume everything in the house
 3  was ruined?
 4      A.  Yes.
 5      Q.  Was there anything that you were
 6  able to save?
 7      A.  No.
 8      Q.  Anything in the attic, that kind of
 9  thing?
10      A.  No.
11      Q.  Was there window damage?
12      A.  Yes.
13      Q.  Even though you'd boarded them up?
14      A.  Uh-huh.
15      Q.  What kind of window damage?
16      A.  The windows was, like -- some of
17  them was blowed out, some of them was taken out,
18  some of them stayed, some of them was just --
19  there wasn't no windows in some part of the
20  house.
21      Q.  So, some of the windows were blown
22  out even though you had them boarded up?
23      A.  Yeah.
24      Q.  Do you remember what side of the
25  house those windows were on?
```

Page 40

```
 1      A.  One, two, three in the back part of
 2  the house, where the -- where the two bedrooms --
 3  where my -- where my two bedrooms was and where
 4  my den was.
 5      Q.  Did you have any damage to the roof?
 6      A.  Uh-huh.
 7      Q.  What kind of damage did you have to
 8  the roof?
 9      A.  I had a chimney in the house. The
10  chimney was ruined. The chimney was ruined.
11  Some of my shingles came off the house. I forget
12  what you call these things, all of that was off
13  my house, what they puts down on the -- right on
14  the line of the house. I done forgot what you
15  call them.
16      Q.  What happened to the chimney?
17      A.  Well, the chimney blowed off.
18      Q.  The whole chimney was blown off of
19  your house?
20      A.  The top, where the roof at, that was
21  just off.
22      Q.  Wow. So, you must have had a lot of
23  wind damage at your house.
24      A.  I had some, not much, not that much,
25  because my roof is still on. It just was a
```

Page 41

```
 1  few -- I don't know the things that run down
 2  there, but it was just a -- because that's
 3  bricks, and they just came off, you know. It
 4  wasn't a lot of wind damage. It was just a few
 5  bricks came off my chimney.
 6      Q.  The thing that came off, was it
 7  orange -- were they orange clips?
 8      A.  Right. Yeah.
 9      Q.  Are those the hurricane clips or the
10  hurricane joints that people -- no, it's
11  something different?
12      A.  I think that's the closing where --
13  you know, where the line set where they closed
14  the -- I don't know what they.
15      Q.  Orange-red terra cotta ridge
16  markings?
17      A.  They was orange. They was orange.
18  Yeah.
19      Q.  Okay.
20      A.  That was all what happened to the
21  roof.
22      Q.  Okay. But -- well, the chimney --
23      A.  The chimney was bricks, and it had a
24  few bricks to fall with the -- you know, come
25  loose.
```

11 (Pages 38 to 41)

(504) 525-1753      HUFFMAN & ROBINSON, INC.      (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 50

```
 1  house.
 2       A.   Yes.
 3       Q.   But did you submit an insurance
 4  claim on your personal property to Alliance?
 5       A.   Yes.
 6       Q.   Was that on your homeowner's policy
 7  or your flood policy or both?
 8       A.   Both.
 9       Q.   As part of that process, did you
10  make a list of all of the -- your personal
11  property that may have been damaged?
12       A.   Yes.
13       Q.   Did you keep a copy of that?
14       A.   Yes.
15       Q.   Do you still have that -- that --
16  that list of property?
17       A.   Yes.
18       Q.   Where is that list located?
19       A.   At my home now.
20       Q.   At the Louisiana address?
21       A.   (Nods head affirmatively.)
22       Q.   Did you come up with an estimate of
23  how much all of your personal property that you
24  lost was worth?
25       A.   That's contents?
```

Page 51

```
 1       Q.   Yes.
 2       A.   Yes.
 3       Q.   What was that estimate?
 4       A.   It was about 56,000.
 5       Q.   Fifty-six thousand dollars?
 6       A.   Uh-huh.
 7       Q.   And that covered everything that you
 8  lost?
 9       A.   In the home.
10       Q.   Was that actually your estimate or
11  was that the insurance company's estimate?
12       A.   That was mine.
13       Q.   Your estimate?
14       A.   Yes.
15       Q.   Does that include just your property
16  or does it include, you know, the property of
17  your daughter and Nathan and everyone?
18       A.   Everyone.
19       Q.   Everyone who was living there at the
20  time?
21       A.   Yes.
22       Q.   Is there any other high-dollar item
23  or is there anything that you have thought of
24  since you came up with that estimate that --
25  where the estimate should have been higher, or
```

Page 52

```
 1  are you pretty comfortable with that number?
 2       A.   I think it should have been higher.
 3       Q.   How much higher do you think it
 4  should have been, looking back?
 5       A.   Looking back, I'd say a good --
 6  maybe another good hundred and something thousand
 7  dollars, because I had my grandkids' clothes, I
 8  had my grandkids' different things in there, my
 9  daughter's stuff, and I just put down my losses,
10  but I didn't put down their losses during that
11  time.
12       Q.   Oh, okay.  So the $56,000 was your
13  losses only?
14       A.   My loss.  Mines only.
15       Q.   Okay.  I misunderstood you earlier.
16  I thought you said that was for everyone.
17       A.   I did, but I -- yeah, but when you
18  asked me the question, if I go back now, yes, I
19  would have did it different.
20       Q.   Okay.  But $56,000 is --
21       A.   It wasn't enough.
22       Q.   -- is enough for your losses, just
23  you?
24       A.   Yes, just mines.
25       Q.   But if you included the losses for
```

Page 53

```
 1  everyone living there, it may have been higher?
 2       A.   Right.  Yeah.
 3       Q.   Okay.  Let's talk about the third
 4  type of injury, the severe mental distress.  Can
 5  you just describe that for me briefly?
 6       A.   The mental distress?
 7       Q.   Yes.
 8       A.   To walk in my home, to see
 9  everything destroyed, it took a heavy toll on me.
10  I had to go back to the hospital.  My heart -- my
11  hair fell out.  I just couldn't sleep at night.
12  It was something that I don't think I'll ever
13  forget.  It was -- I must have vomit about two
14  weeks.  Vomit.  Every time I think about it --
15  everything was destroyed in that home.
16       Q.   Was that after you'd actually come
17  in and seen the loss yourself, or was it before
18  then, just suspecting?
19       A.   Just to walk in my home to see
20  everything just gone.  Everything.  I couldn't
21  stop shaking.  I cry.  And it just was horrible.
22  Right now, I think about my home, I'm not in it,
23  and it upsets my stomach.
24       Q.   We'll talk about this a little bit
25  more later, but you mentioned that your -- your
```

14 (Pages 50 to 53)

(504) 525-1753    HUFFMAN & ROBINSON, INC.    (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 58

1  they give me nerve pills to calm me down.
2      Q.  I understand that you may have high
3  cholesterol, also; is that correct?
4      A.  That was before the storm.
5      Q.  Okay. So -- okay. So, you did have
6  some preexisting heart problems before the storm
7  and your surgery --
8      A.  Uh-huh.
9      Q.  -- but didn't have to take as much
10 medication until after?
11     A.  No. No. Right.
12     Q.  The high blood pressure came on
13 after the storm.
14     A.  Yes.
15     Q.  Before Hurricane Katrina, you had
16 never had any blood pressure problems --
17     A.  No.
18     Q.  -- is that correct?
19     A.  Right.
20     Q.  And then the nerve pills to help
21 calm you down --
22     A.  Right.
23     Q.  -- that was something that you
24 started taking after the storm?
25     A.  Yes.

Page 59

1      Q.  Had you ever taken any kind of nerve
2  pills or --
3      A.  No. No.
4      Q.  Okay. We're starting to talk over
5  each other a little bit again.
6      A.  I'm sorry.
7      Q.  It's okay. It's hard to remember
8  because in a normal conversation, it's natural to
9  talk back and forth like that. We just have to
10 remember she's taking down what we say.
11         Okay. This is just another preview,
12 overview question. We can get into more details
13 later. But I want to get a preliminary list of
14 any type of claims you made for assistance or
15 insurance claims, anything like that, to recover
16 for the storm, and I know you said earlier you
17 had your flood insurance with Alliance; is that
18 right?
19     A.  Yes.
20     Q.  And your homeowner's insurance also
21 with Alliance?
22     A.  Yes.
23     Q.  Did you have any other kind of
24 insurance?
25     A.  No.

Page 60

1      Q.  What about The Road Home Program,
2  did you make a claim for assistance under that?
3      A.  Yes.
4      Q.  How much did The Road Home Program
5  pay you -- or have you received money from The
6  Road Home Program yet?
7      A.  Well, they say 76,000.
8      Q.  They paid -- The Road Home Program
9  paid you $76,000?
10     A.  Yes.
11     Q.  And how much did your flood
12 insurance pay?
13     A.  One twenty-five.
14     Q.  A hundred twenty-five thousand?
15     A.  Yes.
16     Q.  Was that the policy limit, the
17 maximum amount you were insured for?
18     A.  Yes.
19     Q.  What about your homeowner's
20 insurance, how much did that pay?
21     A.  Thirty-three dollars.
22     Q.  It sounded like you said $33.
23     A.  Thirty-three dollars for -- let me
24 see -- one was 33 and one was 1,017 -- 1,700.
25 One check was for 33 and one check for was for

Page 61

1  17 -- 1,700.
2      Q.  Seventeen hundred?
3      A.  Uh-huh. One thousand, seven hundred
4  dollars.
5      Q.  Okay. So, they sent you one check
6  for only $33?
7      A.  Thirty-three dollars.
8      Q.  What was that check for $33 for?
9      A.  My fence.
10     Q.  Oh, the fence. But it probably cost
11 more than $33 to repair it, right?
12     A.  That's what they say. Yeah.
13 Thirty-three dollars. Yes.
14     Q.  Okay. And what was the 1,700 for?
15     A.  To fix the damage on the roof.
16     Q.  So, the maximum you got from your
17 homeowners was $17,033.
18     MR. LANDRY:
19         Object. Seventeen hundred.
20     MS. PAYNE:
21         My mistake. Thank you,
22 Counsel.
23     MR. LANDRY:
24         Sure.
25 EXAMINATION BY MS. PAYNE:

16 (Pages 58 to 61)

(504) 525-1753    HUFFMAN & ROBINSON, INC.    (800) 749-1753
ONE SHELL SQUARE, #250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 62

1  Q. One thousand, seven hundred
2  thirty-three dollars --
3  A. Yes, ma'am.
4  Q. -- was the maximum you got for your
5  homeowner's insurance?
6  A. Yes.
7  Q. Thank you. What about FEMA? Did
8  you get any assistance from FEMA?
9  A. No. All but the 2,500 they send you
10 when it first happened.
11 Q. Twenty-five hundred?
12 A. I think it was 2,500 they give
13 everybody.
14 Q. Did you apply for additional
15 assistance from FEMA?
16 A. I did, but they say I wasn't
17 available -- I wasn't eligible to get it.
18 Q. Did you get a FEMA trailer?
19 A. Yes.
20 Q. How did you go about getting the
21 trailer?
22 A. Well, I just called on the phone and
23 told them I needed -- you know, a trailer, and
24 they send a trailer out.
25 Q. How long -- or did you stay in the

Page 63

1  trailer?
2  A. One night.
3  Q. Has anyone else used the trailer?
4  A. No.
5  Q. What do you use the trailer for?
6  A. I had got the trailer to live in,
7  but the trailer -- by me having a nerve problem,
8  looked like the wall was closing up, the
9  trailer's too small. They have, like, rodents
10 running in and out. It's too small. You
11 can't -- the tub and -- I just couldn't take it.
12 Q. Have you tried to get someone to
13 take the trailer away?
14 A. Well, I had said I was going to call
15 to see about getting it moved.
16 Q. You have called?
17 A. I'm going to call to see about it.
18 Q. You are going to call.
19 A. Uh-huh.
20 Q. You but you haven't called yet?
21 A. Uh-uh.
22 Q. So, nobody's getting any use of the
23 trailer that you know of?
24 A. No.
25 Q. Were there any other programs where

Page 64

1  you got any type of assistance?
2  A. I think it was Red Cross.
3  Q. Red Cross?
4  A. Uh-huh.
5  Q. What kind of assistance did you get
6  from Red Cross?
7  A. It was $1,000.
8  Q. Did you have to apply for that or
9  was it automatic?
10 A. We had to apply for it.
11 Q. Were there any other programs where
12 you got any type of assistance?
13 A. No.
14 Q. Did you get any type of food stamps?
15 A. Right after the storm, we did.
16 Q. How long did you get food stamps?
17 A. About two months.
18 Q. Other than that, is there any other
19 type of assistance?
20 A. No.
21 Q. Okay. I'm about to move on to
22 another area, but just one more time, I want to
23 go through and make sure I have all of your
24 injuries and types of relief down.
25 A. Uh-huh.

Page 65

1  Q. The loss of your property, severe
2  mental distress, loss of your personal
3  possessions --
4  A. Okay.
5  Q. -- and the physical injury, the
6  heart and high blood pressure problems.
7  A. Right.
8  Q. Is there anything else I'm leaving
9  out?
10 A. No.
11 Q. Okay.
12 MS. PAYNE:
13     This might be a good time to
14 take a break.
15 THE WITNESS:
16     Good.
17 MS. PAYNE:
18     You'd like to do that?
19 THE WITNESS:
20     (Nods head affirmatively.)
21 MS. PAYNE:
22     Okay. Let's go off the
23 record.
24 THE VIDEOGRAPHER:
25     We're going off the record.

17 (Pages 62 to 65)

(504) 525-1753    HUFFMAN & ROBINSON, INC.    (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

Page 70

```
 1        Did he? That slip my mind?
 2   EXAMINATION BY MS. PAYNE:
 3        Q. You may not have. I'm just asking.
 4   Not that you remember?
 5        A. No, not that I remember.
 6        Q. Okay. Your answer might be the same
 7   on this, too, but I just want to go ahead and
 8   show this one to you. I'm handing you what's
 9   been marked as Coats Exhibit Number 3. This
10   document is called "Plaintiffs' Response to MRGO
11   Defendants' First Set of Joint Interrogatories,
12   Requests For Production of Documents and Requests
13   For Admissions to Plaintiffs Regarding Common
14   Liability Issues." Have you reviewed this
15   document before?
16           (Whereupon, Coats Exhibit
17           Number 3 was marked for
18           identification.)
19        A. No.
20   EXAMINATION BY MS. PAYNE:
21        Q. Do you have any familiarity with it?
22        A. No.
23        Q. Have you talked to your lawyers at
24   all about responses to the defendants' requests?
25        MR. LANDRY:
```

Page 71

```
 1           I'll just object to the
 2           form.
 3           You can answer it if you
 4           know or if you remember.
 5        THE WITNESS:
 6           Okay.
 7        A. No.
 8   EXAMINATION BY MS. PAYNE:
 9        Q. As far as you know, you haven't been
10   involved in responding to discovery at all --
11        A. No.
12        Q. -- is that right?
13        A. Right.
14        Q. So, The Road Home Program that we
15   were talking about before, did you keep a copy of
16   your application form to that?
17        A. Yes.
18        Q. Do you still have it, that copy?
19        A. Yes.
20        Q. And your insurance claims for your
21   homeowner's insurance, did you keep a copy of
22   that application?
23        A. Yes.
24        Q. Do you still have it?
25        A. Yes.
```

Page 72

```
 1        Q. And what about your flood insurance,
 2   did you --
 3        A. Yes.
 4        Q. Just a reminder -- you know.
 5           I'll ask it again so the record's
 6   clear.
 7           For your flood insurance policy, did
 8   you keep a copy of your application for that?
 9        A. Yes.
10        Q. But you didn't have any of the
11   pictures, am I right?
12        A. No.
13        Q. Because those were taken directly by
14   the insurance company?
15        A. Yes.
16        Q. Did you prepare any kind of notes or
17   summary or did you write down anything about your
18   experiences during Hurricane Katrina?
19        A. No.
20        Q. Your evacuation?
21        A. No.
22        Q. Did you make any notes about the
23   property when you returned in May of 2006?
24        A. No.
25        Q. Some of the work that you had done
```

Page 73

```
 1   on your property on Charbonnet Street, did you
 2   get any receipts for the work?
 3        MR. LANDRY:
 4           Object to the form. Are you
 5           referring to before or after the
 6           storm?
 7        MS. PAYNE:
 8           Thank you. I'll rephrase.
 9   EXAMINATION BY MS. PAYNE:
10        Q. Some of the work that you had done
11   to the property after Hurricane Katrina, like,
12   the people that you paid to clean it out, for
13   example, do you have any receipts from them or
14   invoices for those expenses?
15        A. No, I don't.
16        Q. Do you remember whether you paid
17   them by cash or by check?
18        A. Cash.
19        Q. Cash. Do you have any kind of
20   documents that would show what kind of work that
21   you had done after Hurricane Katrina?
22        A. I don't have any documents, but I
23   can get some.
24        Q. Just in your memory?
25        A. Uh-huh.
```

19 (Pages 70 to 73)

(504) 525-1753        HUFFMAN & ROBINSON, INC.        (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

Page 74

1    Q.  Other than the list of the
2  possessions that you had that you gave to the
3  insurance company of the things that were lost,
4  do you have any other kinds of lists about the
5  personal possessions that you lost?
6    A.  Yes.
7    Q.  What kind of lists do you have?
8    A.  I have the lists about my furniture,
9  my pictures, my clothes.  What else I have a list
10 of?  Everything that I had in that house.
11   Q.  When did you make the other lists?
12   A.  Right after I got in the home, when
13 I went to the home, to --
14   Q.  And, then, did you use those other
15 lists that you made to get your final list for
16 the insurance company?
17   A.  Yes.
18   Q.  Do you still have the early drafts
19 of the lists?
20   A.  I don't know.  I have to check to
21 see.  I don't really know.
22   Q.  You might still have those?
23   A.  Yeah.
24   Q.  The people who gutted your house,
25 did you pay them cash, you said?

Page 75

1    A.  Yes.
2    Q.  How much did you pay them?
3    A.  Three thousand, five hundred
4  dollars.
5    Q.  Do you have any photographs or
6  videotapes or DVDs of the property damage that
7  you still have?
8    A.  No.
9    Q.  Have your attorneys already asked
10 you about all these documents?
11   A.  Yes.
12   Q.  Have you provided any of the
13 these --
14   A.  No.
15   Q.  -- documents to your attorneys?
16   A.  I'm sorry.  No.
17   Q.  Do you have plans to provide any of
18 the documents to your attorneys?
19   A.  Yes.
20   Q.  They have asked you for them?
21   A.  Yes.
22   Q.  When are you planning to provide
23 these documents to your attorneys?
24   A.  When I probably get them all
25 together.  Take time to get them together and

Page 76

1  different things.
2    Q.  When did they ask you for these
3  documents?
4    A.  About two months ago, I think it
5  was.
6    Q.  About two months ago?
7    A.  Or three months ago.
8    Q.  About three months ago?
9    A.  Uh-huh.
10   Q.  Do you remember what documents
11 specifically they asked you for?
12   A.  My losses in the home, damage to the
13 home.
14   Q.  Anything else?
15   A.  No, I don't think so.
16   Q.  Okay.  So, now, Mrs. Coats, I want
17 to go back to the four main categories of
18 injuries that we talked about generally before
19 and just get into more of the detail about the
20 circumstances for each of those types of
21 injuries, starting with the damage to your home.
22   A.  Uh-huh.
23   Q.  I know you weren't present during
24 the storm, but do you have a view or
25 understanding of how your house was damaged?

Page 77

1    A.  Uh-huh.
2    Q.  Please explain that.
3    A.  My home was damaged by floodwaters
4  that came from MRGO.
5    Q.  Floodwaters that came from MRGO?
6    A.  Yes.
7    Q.  When you say floodwaters that came
8  from MRGO, what -- what do you mean by that?
9  Where do you mean they came from?
10   A.  Where it came from?  Came from St.
11 Bernard Parish.  They didn't have nothing to stop
12 the water from coming through to the Lower Ninth
13 Ward.
14   Q.  So, that would be the water then
15 came from the -- basically, the east, through St.
16 Bernard Parish, and then to the Lower Ninth Ward,
17 is your understanding?
18   A.  Yes.
19   Q.  Do you know of any other source of
20 water that came to -- that would have reached
21 your house?
22   A.  No.
23   Q.  Have you heard anything from other
24 people about other sources of the water?
25   A.  No.

20 (Pages 74 to 77)

(504) 525-1753      HUFFMAN & ROBINSON, INC.      (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

Page 78

1  Q. Your understanding that the water
2  came from -- through St. Bernard Parish to the
3  Lower Ninth Ward, what is that understanding
4  based on?
5  A. What the understanding is based on?
6  From my understanding -- okay. Let me see if I
7  understand the basis of my understanding. It
8  didn't come from the -- it couldn't have come
9  from nowhere else but that -- the -- from St.
10 Bernard Parish.
11 Q. Why do you see that?
12 A. Because the levee was all right.
13 There wasn't nothing wrong with the levee. The
14 levee was okay. I was right there by -- see --
15 St. Bernard Parish, then the Lower Ninth Ward.
16 And this water came through the Lower Ninth
17 Ward -- from MRGO to the Ninth Ward.
18 Q. When you say that levee was okay,
19 which levee are you referring to?
20 A. Six blocks from my home.
21 Q. The Industrial Canal levee --
22 A. Yes.
23 Q. -- along where you live was okay?
24 A. Right. Right.
25 Q. Are you aware of some breaches to

Page 79

1  the Industrial Canal levee and floodwall, though?
2  A. Was I -- no.
3  Q. You don't know of any breaches along
4  the Industrial Canal?
5  A. Uh-uh. Uh-uh. No.
6  Q. Had you heard about any overtopping
7  of water along the Industrial Canal?
8  A. No.
9  Q. So, as far as you've heard or as far
10 as you're aware, there was no water coming into
11 the Lower Ninth Ward from the Industrial Canal.
12 It was all coming from St. Bernard Parish.
13 That's your understanding?
14 A. Yes.
15 Q. Okay. Was there anything else that
16 caused damage to your house besides the flooding,
17 the water? I guess we talked earlier about
18 some -- some wind damage to your chimney and to
19 the fence, right?
20 A. Yes.
21 Q. Was there any other type of wind
22 damage?
23 A. No. No. None whatsoever. No.
24 Q. Do you know how much rain you got in
25 that area during the hurricane?

Page 80

1  A. Uh-uh.
2  Q. You didn't have any fire or problem
3  like that at your house, did you?
4  A. No.
5  Q. Do you know how much damage to your
6  house may have been caused by Hurricane Rita as
7  opposed to Hurricane Katrina?
8  A. The home was messed up before Rita
9  came in. Katrina was the one who did the damage
10 to my home.
11 Q. How do you know which damage was
12 from Katrina versus which damage was from
13 Hurricane Rita?
14 A. Because the damage was did before
15 Rita came along. I think Rita was two weeks
16 after Katrina. The Ninth Ward was flooded.
17 Everything was destroyed with Katrina. When Rita
18 came along, you know, it probably made it a
19 little bit worse, but it was Katrina, the first
20 one, who came through and destroyed my home.
21 Q. Okay. I think I understand what you
22 mean by that. Hurricane Katrina did a lot of
23 damage. Hurricane Rita may have made it worse --
24 A. Yeah.
25 Q. -- but you don't really know the

Page 81

1  exact amount; is that right?
2  A. Yeah. Right.
3  Q. When you came back, was there any
4  sign of looting or vandalism to your home?
5  A. No.
6  Q. Let's talk a little bit about your
7  neighborhood. I know that we talked about the
8  house that was right next door to you, the, I
9  guess, 1016 and 18 house.
10 A. Uh-huh.
11 Q. You said that house had a lot more
12 roof damage than yours. Was that right? Am I
13 remembering correctly?
14 A. That house was destroyed by water,
15 also. The roof was a little bit bad on that home
16 before Katrina. But that house was destroyed,
17 just like my house was, from Katrina.
18 Q. Right. Got lots of water.
19 A. Yes.
20 Q. I thought you said earlier that that
21 house got more roof damage than your house got.
22 Is that correct?
23 A. I can't remember saying it had wind
24 damage. Can you go back over that and remind me?
25 Q. It could have been my mistake. I

21 (Pages 78 to 81)

(504) 525-1753   HUFFMAN & ROBINSON, INC.   (800) 749-1753
ONE SHELL SQUARE, #250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb