**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | MAG. J. WILKINSON |
| | § | |
| FILED IN: | § | |
| 06-1885, 06-4634, 06-4931, 06-5042, | § | |
| 06-5159, 06-5163, 06-5771, 07-0206, | § | |
| 07-0647, 07-1284, 07-1286, 07-1288, | § | |
| 07-1289 | § | |
| | § | |
| PERTAINS TO:  LEVEE | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |


**UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO DISMISS AND TO STRIKE COUNTS IV**
**AND VIII OF THE LEVEE SUPERSEDING MASTER**
**CONSOLIDATED CLASS ACTION COMPLAINT**


"No liability of any kind shall attach to or rest upon the United States for any damage

from or by floods or flood waters at any place . . . ."  33 U.S.C. § 702c.  On this basis, the United

States has moved to dismiss the Levee Superseding Master Complaint, which seeks to impose

liability for "the flooding and inundation" allegedly caused by and resulting from alleged

"failures of, and deficiencies in, the hurricane protection system" that was intended to protect

New Orleans from hurricane-induced flooding.  Complaint ¶ 1.  The complaint also seeks to

1

impose liability for the permitting of dredging of the 17th Street Canal, *see id.* ¶¶ 196-202, even though such permitting is a discretionary function as to which the United States has not waived its sovereign immunity, *see* 28 U.S.C. § 2680(a).

In opposing dismissal, Plaintiffs make three main arguments: (1) the record does not demonstrate that the damages at issue were caused by flooding related to a flood control project; (2) even if the damages were caused by flooding related to a flood control project, the Corps of Engineers' activities with respect to that project were not properly authorized; and (3) the permitting of dredging is actionable because the permitting was done with a lack of due care.  Plt. Opp. at 3.  None of these arguments withstands scrutiny.

First, the complaint itself alleges that Plaintiffs' damages were caused by a flood that had a nexus to a flood control project.  *See, e.g.,* Complaint §§ 149, 151, 153.  In addition, the nexus between the East Bank flooding following Katrina and the failure of the canal levees is too well known to be the subject of a genuine factual dispute.  In all events, the scope of the United States' immunity under 33 U.S.C. § 702c does not turn on whether there is a nexus between a flood control project and damages; the United States is immune for any claim for damage "from or by flood waters at any place."

Second, Flood Control Act immunity applies to flood damages resulting from a flood control project even if the project or the Corps's activities with respect to it were not properly authorized.  In the event at issue here, moreover, the Corps's activities *were* properly authorized: Congress specifically directed the Army Corps of Engineers to perform the "work necessary to complete an entire parallel protection system" for the outfall canals.  Pub. L. No. 102-104, 105 Stat. 510, 514.  Congress was kept apprised of the flood control work along the outfall canals as it was proceeding, and Congress annually appropriated funds for its continuation.

Third, the permitting of dredging, even if negligently performed, is protected by both the Flood Control Act and the FTCA's discretionary function exception because the permitting occurred (1) in conjunction with a flood control project and (2) pursuant to statutes and regulations that vested the Corps with broad, policy-based discretion

For these reasons, all of the challenged conduct is protected from suit by 33 U.S.C. § 702c, and the challenged permitting is additionally and independently protected by 28 U.S.C. § 2680(a), the FTCA's discretionary function exception.  The United States' motion to dismiss Levee Superseding Master Complaint Counts I–III ,VI, and VII should therefore be granted.

The remaining Counts, IV and VII, should be stricken because they pertain to the Mississippi River-Gulf Outlet ("MRGO") and are redundant of claims set forth in the MRGO Superseding Master Class Action Complaint.  The only distinction, and the only argument adduced by Plaintiffs against striking them from the Levee complaint, is that the alleged damages asserted in the Levee complaint are said to have occurred in areas other than St. Bernard Parish and the Lower Ninth Ward.  *See* Plt. Opp. at 60.  But this distinction does not, without more, warrant the continued litigation of identical claims on separate tracks.  For reasons of litigative and judicial economy, the Court can and should amend its Case Management Orders to bring all MRGO claims, regardless of the geographical location of the alleged damages, under the MRGO umbrella.  Requiring that virtually identical claims be litigated on separate tracks creates gross litigative inefficiencies.  For these reasons, the motion to strike should be granted.

**ARGUMENT**

**I. The Superseding Master Complaint Provides a Sufficient Basis for Dismissal Inasmuch As It Alleges that Plaintiffs' Damages Were Caused by Flood Waters that a Flood Control Project Failed to Control.**

At the outset of their Opposition, Plaintiffs attempt to lower the bar that their Complaint must surmount in order to survive this motion to dismiss.  They contend that this motion "can be granted only if it appears certain that the plaintiff cannot prove *any set of facts*" that would entitle them to relief.  Opp. at 2 (citation omitted) (emphasis in original).  Recently, however, the Supreme Court made clear that the *Conley v. Gibson* "any set of facts" "rule is not 'the minimum standard of adequate pleading to govern a complaint's survival.'" *In re: Katrina Canal Breaches Lit.,* — F.3d —, 2007 WL 2200004, at *28 n.10, slip op. at 19 n.10 (5th Cir. Aug. 2, 2007) (quoting *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1969 (2007).  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.,* 2007 WL 2200004, at *10, slip op. at 19 (footnote, quotation marks, and citations omitted); *see also United States v. Gaubert,* 499 U.S. 315, 324-25 (1991) ("For a complaint to survive a motion to dismiss [predicated on 28 U.S.C. § 2680(a)] it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.").

The Opposition also mistakes the applicable law when it argues that "the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."  Opp. at 2 (quoting *Bell v. Hood,* 327 U.S. 678, 683-84 (1946); emphasis omitted).  Though true, this legal precept is wholly inapposite, because the jurisdictional defects in this case

do not arise from the nonexistence of a cause of action.  They arise instead because the United States has not waived its sovereign immunity to Plaintiffs' claims.  These jurisdictional defects are "separate and apart from the merits of the claims.  The sovereign immunity issue and the merits of the . . . claims are simply not intertwined, as the resolution of one does not depend on resolution of the other."  *Orff v. United States,* 358 F.3d 1137, 1150 (9th Cir. 2004), *aff'd,* 545 U.S. 596 (2005); *see also Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir. 1995) (applicability of Flood Control Act is not intertwined with merits of plaintiff's claim).

In any event, since Plaintiffs have pleaded the necessary facts pertinent to dismissal, there is no need to resolve any dispute concerning facts that may be relevant to both the merits and the jurisdictional issues.  *Compare Montez v. Dept. of Navy,* 392 F.3d 147, 151 (5th Cir. 2004) (disputed facts concerning scope of employment were dispositive of both subject matter jurisdiction and merits of an FTCA claim and therefore should not have been resolved under Rule 12(b)(1)), *with Morales v. Dept. of the Army,* 947 F.2d 766, 769 (5th Cir. 1991) (scope of employment was not subject to dispute in FTCA action because plaintiff alleged in complaint that employees had acted within scope of employment).

As set forth in the United States' opening brief and further demonstrated below, the Court need not reach the merits of the negligence claims asserted in the Superseding Master Complaint in order to determine that the relevant damages were caused by "flood waters" within the meaning of 33 U.S.C. § 702c.  Inasmuch as Plaintiffs have pleaded a nexus between the flooding that caused their damage and the failure of the hurricane-flood protection project, the facts supporting dismissal are not "inextricably intertwined" with the merits of these consolidated actions, and there is no reason to postpone dismissal pending factual development of the case.

**A.  Plaintiffs Erroneously Contend that the Flood Control Act, 33 U.S.C. § 702c, Provides Immunity Only for Property Acquisitions Along the Mississippi River and Does Not Provide Immunity for Damages Caused by Negligence.**

Inexplicably, Plaintiffs' primary argument in opposition is a construction of § 702c that was rejected by the Supreme Court more than two decades ago.  Under the Opposition's reading, the statute provides immunity only for diversions of the Mississippi River onto lands that were not "'overflowed or damaged'" prior to "'the construction of levees on the opposite banks of the river.'" *Id.* at 7 (quoting § 702c).  Relying extensively on legislative history, the Opposition argues that "the *only* limitations on liability were those directed to the cost of acquiring property for flood control purposes . . . ."  *Id.* at 8.  "The framers of the provision . . . never intended to shield the United States of the Corps from liability for acts caused by it and its agencies."  *Id.* at 11.  "[T]he immunity provision directed itself to acquisition cost and not to the Corps' general liability for damages caused by the building of levees."  *Id.* at 12.

However plausible such a construction of § 702c may have been prior to July 2, 1986,[1] it became completely untenable on that date, when the Supreme Court reversed the en banc decision of the Fifth Circuit that had adopted the very construction Plaintiffs now urge.  The Court of Appeals' decision in *James v. United States,* 760 F.2d 590 (5th Cir. 1985) (en banc), *rev'd,* 478 U.S. 597 (1986), was premised on the mistaken understanding that "[t]he key to the immunity clause of section 702c lies in the debates over the extent to which the United States should bear these costs," *i.e.,* the costs of "compensation for all rights of way and damages,

---

[1]Even prior to that date, the construction advocated by Plaintiffs was implausible.  *See James v. United States,* 478 U.S. 597, 603 n.4 (1986) ("All other Courts of Appeals that have interpreted § 702c—and, prior to this case, the Court of Appeals for the Fifth Circuit, see n. 2, *supra*—have held that § 702c grants immunity to the Federal Government from damages caused by floodwaters from a flood control project.").

*including expenses to railroads or others in changing their property.*"  *Id.* at 597 (emphasis in

original); *see also James,* 478 U.S. at 602-03 (Court of Appeals "determined that § 702c

contained 'latent ambiguities' that could be resolved only by reference to the legislative

history"); *cf.* Opp. at 7 ("the first place to look in defining an ambiguous statute is the legislative

history").  *But see James,* 478 U.S. at 604 ("given the plain terms of the statute, 'it requires some

ingenuity to create ambiguity'").

 Plaintiffs inexplicably adhere to this mistaken construction even though it was

specifically considered and rejected by the Supreme Court in *James.*[2]  Eschewing reliance on the

legislative history in view of "the plain terms of the statute," the *James* Court endorsed the

construction of § 702c set forth by Judge Thomas Gibbs Gee who, writing for himself and four

other dissenting judges, recognized "that the [majority's] holding was contrary to 'the statute's

plain words' and that 'both the language of § 702c and the legislative history are entirely

consistent with a purpose in the Congress . . . to state clearly that the federal treasury was to be

placed at risk no further than was required by the Constitution.'" 478 U.S. at 603 (citations and

brackets omitted).  Hewing to the hoary adage that judicial inquiry into legislative intent is

complete when the terms of a statute are unambiguous, the Court held that the plain language of

§ 702c "[o]n its face . . . covers the accidents here" because "[r]espondents' injuries occurred as a

result of the release of waters from reservoirs that had reached flood stage."  *Id.* at 604.  And in

any event, the Court "d[id] not find that the legislative history justifies departure from the plain

words of the statute.  Indeed, on balance we think the legislative history of the Flood Control Act

---

 [2]Plaintiffs erroneously attribute the Fifth Circuit's discredited reading of the legislative
history to the Supreme Court.  *See* Opp. at 12-13 (quoting *James,* 760 F.2d at 597 n.13 but
attributing the quote to the Supreme Court's opinion, which reversed the Fifth Circuit's
decision).

of 1928 *reinforces* the plain language of the immunity provision in § 702c."  *Id.* at 606 (emphasis in original).

Contrary to Plaintiffs' contention, the Supreme Court's *James* decision has not been "abrogated by more modern Supreme Court jurisprudence."  Opp. at 13.  Plaintiffs argue that *Central Green Co. v. United States,* 531 U.S. 425 (2001), "narrows the immunity granted by § 702c in such a manner as to render any citation to *James* hopelessly obsolete."  Opp. at 14-15 (quoting R.D. 6194, at 4-5).[3]  This is patently erroneous.  Far from rendering *James* "obsolete," *Central Green* buttressed it by calling attention to the vitality of the *James* holding, which "illuminate[s]" "the text of the statute."  *Central Green,* 531 U.S. at 431.  *James* shed light on the "sweeping" breadth of the statutory text by revealing that the terms "floods" and "flood waters" encompass not only "those waters that a federal project is unable to control" but also "waters that are released for flood control purposes when reservoired waters are at flood stage."  *Id.*  That holding had been overlooked by the lower courts, who were distracted by the dictum that Plaintiffs here confuse for the holding.  *See id.* at 430-31; Opp. at 13.  The *Central Green* Court ensured the continuing vitality of *James* by incorporating the *James* holding into the *Central Green* holding.  *See Central Green,* 531 U.S. at 437.  Accordingly, both cases fully apply to the cases at bar and to future cases seeking to impose liability on the United States for flood damage.[4]

_____

[3]Plaintiffs erroneously describe a conclusion drawn by this Court in one of the consolidated cases, *Robinson,* as the "holding" of the Supreme Court in Central Green.  This mistake is inconsequential.  Neither the Supreme Court nor this Court has "narrow[ed] the immunity granted by § 702c in such a manner as to render any citation to *James* hopelessly obsolete."

[4]Plaintiffs also erroneously argue that § 702c, "cover[s] only those damages caused by
(continued...)

**B.  It Is Well Established that the Alleged Damages Resulted from a Flood with a
Nexus to a Flood Control Project.**

Despite unambiguous allegations to the contrary in their complaint, Plaintiffs contend that

certain "evidence precludes a finding as a matter of law that the levee breaches and resultant

innundation arose from floodwater related to a flood control project, as opposed to drainage

water from a non-flood control project."  Opp. at 16-17.  They argue that "the question of

whether damage resulted from 'flood waters' related to a 'flood control project' raises issues of

fact best resolved by summary judgment-type evidence."  *Id.* at 5.  This contention cannot be

sustained in the context of these consolidated cases, in which Plaintiffs have expressly pleaded

that their actions are founded on damage caused by flood waters related to a flood control

project:  "This Complaint arises out of catastrophic failures of, and deficiencies in the hurricane

protection system surrounding the Parish of Orleans . . . .  These failures and deficiencies caused

and substantially contributed to the flooding and inundation of approximately 80% of the City of

New Orleans, causing extensive harm and loss of life."  Complaint ¶ 1.

The proposed class definitions also set forth the relevant nexus.  As proposed, the class

will consist of individuals and entities "who/which sustained damages as a result of the

inundation/flooding . . . which occurred during an immediately after the landfall of Hurricane

_____

[4](...continued)
'floods' or 'flood waters' that flow through Congressionally-authorized projects that have flood
control as their unique purpose."  Opp. at 4 (citing *Central Green ,* 531 U.S. at 236-37).  *Central
Green* refutes this contention, for the waters at issue there were waters that flowed through a
multi-purpose project.  *See id.* at 431-34; *cf. id.* at 434-36 (Madera Canal "is used primarily for
irrigation purposes," and excess water that flows through canal into Chowchilla River may
include flood water).  Also, the projects at issue in *United States v James,* 478 U.S. 597 (1986),
served more than a single purpose.  In recognition of this, the Fifth Circuit has expressly rejected
the argument advanced by Plaintiffs.  *See Kennedy v. Tex. Utils.,* 179 F.3d 258, 261 (5th Cir.
1999).

Katrina . . . ."  Complaint ¶ 151; *accord id.* ¶¶ 161, 168, 175, 182, 189.  The "cause or causes of the breaches and/or failures of the hurricane protections systems associated with the 17th Street Canal, the London Avenue Canal and the IHNC, the MRGO, and the Lake Pontchartrain and Vicinity Hurricane Project ["LPVHPP"]" are "common questions" of fact for purposes of class certification.  *Id.* ¶ 153; *accord id.* ¶¶ 162, 169, 176, 183, 190.  These actions clearly concern damages caused by flood waters having a nexus to a flood control project.[5]

It is common knowledge that the flooding of the East Bank resulted from the breaching of levees along the outfall canals and the Inner Harbor Navigation Canal.  These facts are so well known as to warrant judicial notice.  *See* Fed. R. Evid. 201 (b), (c).  There simply cannot be a *genuine* issue of material fact concerning the cause of Plaintiffs' alleged damages:

> In the midst of a hurricane, three canals running through the City of New Orleans overflowed their normal boundaries.  The flood-control measures, *i.e.,* levees, that man had put in place to prevent the canal's floodwaters from reaching the city failed.  The result was an enormous and devastating inundation of water into the city, damaging the plaintiffs' property.  This event was a "flood" within that term's generally prevailing meaning as used in common parlance . . . .

*In re: Katrina Canal Breaches Lit.,* — F.3d —, 2007 WL 2200004, at *25, slip op. at 47 (5th Cir. Aug. 2, 2007).

> When a body of water overflows its normal boundaries and inundates an area of land that is normally dry, the event is a flood.  This is precisely what occurred in New Orleans in the aftermath of Hurricane Katrina.  Three watercourses—the 17th Street, Industrial, and London Avenue Canals—overflowed their normal channels, and the levees built alongside the canals to hold back their floodwaters failed to do so.  As a result, an enormous volume of water inundated the city.  In common parlance, this event is known as a flood.

---

[5]Inasmuch as Plaintiffs are conclusively bound by their well-pleaded factual averments, they cannot now be heard to say that their damages did not result from flooding that occurred when LPVHPP levees were breached during Hurricane Katrina.  *Morales v. Dep't of the Army,* 947 F.2d 766, 769 (5th Cir.1991); *Davis v. A.G. Edwards & Son, Inc.,* 823 F.2d 105, 108 (5th Cir.1987); *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983).

*Id.,* — F.3d —, 2007 WL 2200004, at *18, slip op. at 34-35 (footnote omitted).

It is not merely the Complaint's recitation of these well and widely known facts that rebuts Plaintiffs' argument that this Court cannot dismiss these actions until it determines whether the breaching of the levees resulted in a flood having a nexus to a flood control project. *See* Opp. at 15.  Even if these facts had *not* been pled, their local prominence would demand judicial notice of them.

Plaintiffs futilely attempt to manufacture factual uncertainty by adducing "evidence" that the levees were breached as a result of Katrina's winds rather than her waves.  Plaintiffs erroneously assert that the relation of the flooding to the flood control project cannot be ascertained without a factual determination of "whether the levee breaches occurred *before* or *after* the advent of the storm surge."  *Id.*  They say "[t]he timing of the inundation at issue is crucial," because the timing reveals whether the breaches were caused by Katrina's winds rather than her surge.  *See id.* at 15-16.  Plaintiffs imply that the canals were filled with "drainage water" rather than flood water if the breaches occurred before the arrival of Katrina's storm surge.  *See id.* at 16-17.

Even if the "evidence" were sufficient to support a finding that the flood was caused by the toppling of trees along the levee or to support a finding that the canals were filled with "drainage water" when the breaches occurred, any dispute concerning these facts would be immaterial.[6]  It is not the cause of the failure of the levees that is relevant for purposes of § 702c.

---

[6]The proffered "evidence" would not support a finding that the 17th Street Canal levee was breached before the advent of the storm surge.  The purported statement of Robert Bea (for which no citation is provided) describes a series of events occurring between 6 a.m. and 9 a.m. on August 29, 2005.  None of the events that are described as occurring within this period is said to have occurred "*prior to* the surge occasioned by Hurricane Katrina."  Opp. at 16 (emphasis in (continued...)

Nor is it the character of the water in the canals before the levees gave way that is relevant. Instead, it is "the character of the waters that cause the relevant damage" that matters. *Central Green,* 531 U.S. at 437.  And as the Court of Appeals has found, an overflow from a body of water resulting in a widespread inundation of dry land is a flood, by any definition.  *In re: Katrina Canal Breaches Lit.,* — F.3d —, 2007 WL 2200004, at *15-*16, slip op. at 29-30. Indeed, with regard to the very event at issue, the Fifth Circuit has observed that "[w]hen the inundation results from the overflow of a body of water, whether natural or artificial, the event is a flood." *Id.*

Plaintiffs fail to face the fact that their alleged damages were caused by a flood regardless of the timing of the breaches or the cause of the breaches or the character of the water before it flooded New Orleans.  The only force that damaged Plaintiffs' properties was the flood. Regardless of the many factors that may have preceded, contributed to, or caused the flood, those factors "did not act, apart from [the] flood, to bring about [the alleged] damage." *In re: Katrina Canal Breaches Lit.,* — F.3d —, 2007 WL 2200004, at *26, slip op. at 50.  Whether the flood was caused by Katrina's winds or her waters has no bearing on the application of § 702c, because it is clear that regardless of which of these forces caused the flood "the only force that damaged the plaintiffs' properties was flood." *Id.*  Consequently, any dispute over the "timing of the inundation" is immaterial to an assessment of the United States' immunity under § 702c.

---

[6](...continued)
original).  The only event that is said to have occurred "[p]rior to arrival of the storm surge" is the toppling of "large oak trees" by "strong winds." *Id.*  Whether the trees fell between 6 a.m. and 9 a.m. or at some unspecified earlier time is not stated.  Nothing in the statement supports the Opposition's assertion that the levees were breached before the arrival of the storm surge.

As the Opposition expressly recognizes, the motion to dismiss is founded "solely on the allegations of Plaintiffs' *Complaint,*" and the United States "has not introduced any additional facts to contravene those allegations."  Opp. at 6 (emphasis in original).  Because this motion mounts a facial attack on the legal sufficiency of Plaintiffs' own averments, "the Court must look solely to the allegations of the *Complaint* to determine the extent of its jurisdiction over the claims therein."  *Id.* (emphasis in original; citations omitted).  Plaintiffs are undoubtedly correct in asserting that the question before this Court is whether the United States enjoys immunity under § 702c "based solely on" the Superseding Master Complaint's allegations of fact.  *Id.*  The Court need not engage in fact finding to resolve the motion to dismiss.[7]

In all events the extent of the involvement of flood control works here is irrelevant to the United States' immunity under § 702c.  Under the plain language of the statute, the United States is immune from damages caused by "floods or flood waters" without limitation.  There is and can be no dispute that Plaintiffs are alleging damages from "floods or flood waters."

**C.   Plaintiffs Erroneously Assert that § 702c Applies Only to Congressionally Authorized Flood Control Activities and that the Flood Control Measures Taken with Respect to the Outfall Canals Were Unauthorized.**

In a final, futile attempt at avoiding dismissal under the Flood Control Act, Plaintiffs argue that § 702c applies only to flood control activities authorized by Congress and that the

---

[7]Despite their acknowledgment that "the Court must look solely to the allegations of the *Complaint* to determine the extent of its jurisdiction," Plaintiffs have adduced numerous and lengthy exhibits in opposition to the pending motion.  These exhibits should be stricken.  Not only are they superfluous but Plaintiffs have failed to comply with Orders of this Court concerning their production.  *Compare* R.D. No. 6592 (Order directing plaintiffs to provide a "proper Rule 26(b)(5) [privilege] log") *with* R.D. No. 6685 (plaintiffs' assertion of blanket privilege over broad categories of unreviewed documents).  Plaintiffs' superfluous exhibits should be stricken if for no other reason than Plaintiffs' unwarrantable failure to produce them pursuant to Case Management Order No. 4 or to identify them on a proper privilege log.

provision therefore does not apply to the design and construction of parallel protection along the outfall canals, because the work performed was not in sufficient conformity to the congressional authorizations. This argument cannot be sustained.

1. **The Immunity Accorded by § 702c is not Limited by the Character of the Federal Project and Therefore Applies to Flood Damage Related to Unauthorized Flood Control Activities.**

Plaintiffs fail to adduce any legal authority for the proposition that Flood Control Act immunity does not apply to flood control activities that insufficiently conform to congressional authorizations. The cases they cite show only that § 702c applies "in connection with" flood control projects. Opp. at 17 (quoting *Kennedy v. Tex. Utils.,* 179 F.3d 258, 261 (5th Cir. 1999), and *Powers v. United States,* 996 F.2d 1121, 1122-23 (11th Cir. 1993)). And contrary to Plaintiffs' argument, there is case law applying § 702c to putatively unauthorized flood control activities. In *Pierce v. United States,* 650 F.2d 202 (9th Cir. 1981), it was alleged that certain flood control activities were beyond the purview of § 702c because they diverged from plans that had been incorporated by reference into the legislation that authorized the flood control project within which the activities took place. The plaintiffs asserted that "the damage to their property resulted, not from the Government's attempt at flood control, but rather from backwaters that resulted from the Government's impoundment of the flood waters." *Id.* at 204. They contended that the Corps of Engineers was not authorized to impound the flood waters, because the authorizing statute incorporated by reference a discharge schedule set forth in the House of Representatives document referenced in the authorizing statute. *Id.* According to their argument, the "decision to impound the waters, rather than release them in accordance with the recommended minimum discharge schedule" set forth in the report of the Chief of Engineers

"constituted unauthorized activity that was wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control."  *Id.*

Assuming without deciding that the authorizing legislation did incorporate the Chief's recommended discharge schedule and the Corps deviated from that schedule, the Court of Appeals concluded that the challenged conduct still lay within the ambit of § 702c.  *Id.* at 204-05 & n. 2.  "[T]he release or nonrelease of flood waters impounded in the dam was integrally related to a Congressional Act whose sole purpose was flood control. . . . Indeed, the Government's decision to deviate from the discharge schedule was for the purpose of enhancing its capacity to control flood waters.  Its actions were therefore integrally related to the flood control purpose of the statute authorizing the dam."  *Id.* at 205.  The court therefore held that § 702c immunized the United States against liability for its actions.  *Id.*

If Plaintiffs were correct in contending that § 702c applies only to floods resulting from authorized flood control projects, then the United States would "have immunity only for some, but not all, of its flood control projects."  *James,* 478 U.S. at 610 n.10.  Such a construction would be at odds with the "sweeping terms" employed by Congress to describe the immunity. *Id.* at 604.  But "the sweeping language of § 702c was no drafting inadvertence.  Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control."  *Id.* at 608 (citation omitted).  Plaintiffs' attempt to tie the scope of the immunity conferred by § 702c to the authorization of the project is contrary to the teaching of the Supreme Court in *Central Green,* which rejected any limitation based on "the character of the federal project."  531 U.S. at 434.  Thus, even if it *were* true that the challenged conduct was not properly authorized, there would be no warrant for concluding on that basis that the immunity accorded by § 702c does not apply.

**2. The Challenged Flood Control Activities Related to the Outfall Canals Were Authorized by Congress.**

The flood control activities related to the outfall canals did not lack congressional authorization. The Lake Pontchartrain and Vicinity Hurricane Protection Project was authorized "for hurricane-flood protection on Lake Pontchartrain." Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965). Plaintiffs' contrary conclusion depends upon Plaintiffs' conflation of the means or method of carrying out the project with the project itself. They erroneously posit that "Congress authorized creation of a 'barrier plan' for flood control in the New Orleans area." *Id.* at 17. Thus their actual argument is not that the flood control project was unauthorized but rather that "[t]he Chief of Engineers of the Corps did not have the discretionary authority to switch from the BP [Barrier Plan] to the HLP [High Level Plan]." Opp. at 21.

Within the framework of this argument, they set forth arguments concerning each of the three outfall canals. First, they contend that the construction of floodwalls along the London Avenue canal was unauthorized because "the Congressional definition of 'parallel protection' specifically called for raising levees. . . . The Corps had the Congressional directive and authority to raise levees, not construct I-walls." *Id.* at 30. Second, Plaintiffs contend that "the protection constructed along the Orleans Avenue Outfall Canal did not comply with the Congressional definition of 'parallel protection'" because, [a]lthough the Corps did raise levees along the Orleans Avenue Outfall Canal, it failed to raise levees along the 'entire length of the Orleans Avenue' Outfall Canal." *Id.* (emphasis omitted). Finally, Plaintiffs contend that "Congress never authorized the Corps to provide parallel protection or any type of protection along the lengths of the 17th Street Outfall Canal whatsoever." Opp. at 31 (emphasis omitted). These contentions lack merit.

16

The congressional authorization—both the broad authorization of the project as a whole and the specific authorization for the protection of the outfall canals—is far broader than Plaintiffs acknowledge.  As noted, the authorization was "for hurricane-flood protection on Lake Pontchartrain," and it gave the Corps broad discretion concerning the means by which to effectuate the statute's purpose:  "The project for hurricane-flood protection on Lake Pontchartrain, Louisiana, is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress . . . ."  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965).  Decades later, in 1991, when it became apparent that protection specifically for the outfall canals was necessary, Congress specifically directed the Secretary of the Army "to provide parallel hurricane protection works along the entire lengths of the Orleans Avenue and London Avenue Outfall Canals by raising levees and improving flood protection works along and parallel to the entire lengths of the outfall canals and other pertinent work necessary to complete an entire parallel protection system."  Pub. L. No. 102-104, 105 Stat. 510, 514 (1991).  The following year, Congress again appropriated funds and "directed the Secretary of the Army, acting through the Chief of Engineers, to incorporate parallel protection along the Orleans and London Avenue Outfall Canals into the authorized Lake Pontchartrain and Vicinity, Louisiana, Hurricane Protection project."  Pub. L. No. 102-377, 106 Stat. 1315, 1320 (1992).  These authorizations and appropriations gave legal force to a prior congressional committee directive to "treat the outfall canals as part of the overall hurricane protection project."  H.R. Rep. No. 101-966, at 67 (1990).

In their Opposition, Plaintiffs acknowledge that the Corps's discretion in prosecuting authorized projects is broad.  Indeed, they cite *Allison v. Froehlke,* 470 F.2d 1123 (5th Cir. 1972), for the proposition that "where the Congress sets guidelines for a [sic] particular flood

control projects and permits the Corps to build the projects 'substantially' as authorized, the Corps may modify the existing plans." *Id.* at 20 n.2. In *Allison,* the gist of the plaintiffs' allegations was that a post-authorization modification of a flood control project "constituted a redesign of the project purposes; that the changes in the redesign were 'substantial'; that the Corps 'did not submit a report by the Chief of Engineers to Congress which is prerequisite to obtaining Congressional authorization under 33 U.S.C. § 701b-8'; and that authorization of the project as presently proposed was never given by Congress." 470 F.2d at 1125. The case came to the Court of Appeals on the District Court's denial of the plaintiffs' motion for a permanent injunction. *See id.*

In affirming the district court, the Fifth Circuit in *Allison* found "[m]uch guidance" in a prior case—*United States v. 2,606.84 Acres of Land,* 309 F. Supp. 887 (N.D. Tex. 1969), *rev'd,* 432 F.2d 1286 (5th Cir. 1970)—in which "virtually the same arguments" had been advanced. *Id.* at 1126. In *2,206.85 Acres of Land,* the Court of Appeals reversed a decision that was founded on the very argument pressed by Plaintiffs here. The district court had concluded that a Corps of Engineers project was not authorized, because the project "as built differed significantly from the plans contained in" the House Document that was referenced in the authorizing legislation. *Id.* at 1292. As a result of the "deviations" from the plans that had been submitted to Congress, the district court concluded that the project "as built was not authorized by Congress." *Id.* The Fifth Circuit found that the source of the trial court's "misconception" lay "in the finality and binding effect which it gave" to the House Document. *Id.* The Court of Appeals observed that "[t]he plans in H.D. 403 could not . . . have been intended by Congress to be the final plans for the project" because the report of the Chief of Engineers and the "cover letter" indicated that the plans were subject to change. *Id.* The Court of Appeals noted that "[i]t has long been the custom

18

of Congress to approve projects of this nature on the basis of such preliminary plans and to

authorize the Chief of Engineers to made such modifications as later studies indicate are

necessary." The fact that the project dam "as actually built was approximately three miles away

from the site suggested in H.D. 403, was considerably larger, and was considerably more costly

did not deprive the Secretary of the Army of the authority to build the dam." *Id.* at 1293.

> It is undisputed that the Congressional authorization was for a flood control project on the Clear Fork of the Trinity River. This is what the Corps of Engineers built. The area served and the project purposes were not changed. The dam is on the Clear Fork and it takes no safari to locate the project when guided by its historiography. The consummated project was vicinal to the original preliminary plans for the Benbrook project. Mere changes in the plans and specifications of the Dam and Reservoir did not render arbitrary and capricious the discretion exercised by the Secretary of the Army and the Chief Engineer pursuant to H.D. 403. Nor did such changes render their actions without authority. In projects of this sort there is a built-in margin for error, leaving room for necessary changes. We hold therefore that the project as built was authorized by Congress in Public Law 14 even though it did not conform exactly to the plans contained in H.D. 403.

*Id.*

Applying *2,606.84 Acres of Land*, the Fifth Circuit in *Allison* stressed that "'[i]t has long

been the custom of Congress to approve projects of this nature on the basis of such preliminary

plans and to authorized the Chief of Engineers to make such modifications as later studies

indicate are necessary.'" 470 F.2d at 1126 (quoting *2,606.84 Acres of Land,* 432 F.2d at 1292).

The *Allison* panel also called attention to the court's conclusion in *2,606.84 Acres of Land* that

"'the Secretary of the Army and the Chief of Engineers were authorized to deviate from the plans

in H.D. 403.'" 470 F.2d at 1126-27 (citation omitted).

> "[T]he Congressional authorization was for a flood control project * * *. This is what the Corps of Engineers built. The area served and the project purposes were not changed. * * * Mere changes in the plans and specifications of the Dam and Reservoir did not . . . render their actions without authority. In projects of this sort there is a built-in margin for error, leaving room for necessary changes. We hold

> therefore that the project as built was authorized by Congress in Public Law 14 even though it did not conform exactly to the plans contained in H.D. 403."

*Id.* (quoting *2,606.84 Acres of Land,* 432 F.2d at 1293).

The teaching of *2,606.84 Acres of Land* was adverted to again in *Creppel v. U.S. Army Corps of Eng'rs,* 670 F.2d 564 (5th Cir. 1982):

> Even when a project's purpose is authorized by Congress, the executive officer charged with responsibility for the project may modify its purpose unless this action is so foreign to the original purpose as to be arbitrary or capricious. *United States v. 2,606.84 Acres of Land,* 432 F.2d 1286, 1290 (5th Cir. 1970) (condemnation proceedings). It imparts both stupidity and impracticality to Congress to conclude that the statute impliedly forbids any change in a project once approved, and thus prevents the agency official from providing for the unforeseen or the unforeseeable, from accommodating newly discovered facts, or from adjusting for changes in physical or legal conditions. Any change must, however, serve the original purpose of the project.

670 F.2d at 572-73 (footnote omitted); *see also Missouri v. Ashcroft,* 526 F. Supp. 660, 668 (W.D. Mo. 1980); *cf. United States v. Spoonbarger,* 308 U.S. 256, 268 (1939) (Inasmuch as Flood Control Act of 1928 "envisaged a vast program, the Act naturally left much to the discretion of its administrators and future decisions of Congress. Recognizing the value of experience in flood control, Congress and the sponsors of the Act did not intend to foreclose the possibility of changing the program's details as trial and error might demand."); H.R. Rep. No. 79-2165 (1946), at 4 ("[I]t has been the policy of the Flood Control Committee and the Congress to recognize that changing conditions often make plans obsolete, and to avoid undue rigidity they have given the Secretary of War and the Chief of Engineers the authority to modify plans as may be found necessary and desirable.").

The changes at issue in these consolidated cases were authorized in accordance with controlling legal authority. The changes "serve[d] the original purpose of the project," *Creppel,* 670 F.2d at 573, which was "hurricane-flood protection on Lake Pontchartrain, Louisiana," Pub.

L. No. 89-298, 79 Stat. 1073, 1077 (Oct. 27, 1965).  The authorizing legislation provided that the

project construction would proceed "substantially in accordance with the recommendations of the

Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress . . . ."  Pub. L.

No. 89-298, 79 Stat. 1073, 1077 (1965).  And the recommendation of the Chief of Engineers in

the referenced House Document acknowledged that the plan set forth therein was subject to

revision.  *See* H.R. Doc. No. 89-231, at 3 (Chief's recommendation was "[s]ubject to re-

examination of the levee alignment in the preconstruction planning stage").   Moreover, the

recommendation of the District Engineer, which the Chief endorsed, was based on a proposal

that the project proceed "generally in accordance with the plans of the District Engineer and with

such modifications as in the discretion of the Chief of Engineers may be advisable."  *Id.* at 11.

Thus, as in *2,606.84 Acres of Land,* it must be concluded that "[t]he plans in [the House

Document] could not have been intended by Congress to be the final plans for the project."  432

F.2d at 1292.  There is simply no warrant for concluding that the Corps was not authorized to

deviate from the plans set forth in H.R. Doc. No. 89-231 or that the Corps's eventual adoption of

the High Level Plan annulled Congress's authorization of the LPVHPP.

Confirmation that Congress continued to view the LPVHPP as an authorized project after

the Corps's adoption of the High Level Plan can be found in the congressional authorization of

parallel protection along the outfall canals.  In 1991 Congress appropriated funds for the

LPVHPP and directed the Secretary of the Army "to provide parallel hurricane protection works

along the entire lengths of the Orleans Avenue and London Avenue Outfall Canals by raising

levees and improving flood protection works along and parallel to the entire lengths of the outfall

canals and other pertinent work necessary to complete an entire parallel protection system."  Pub.

L. No. 102-104, 105 Stat. 510, 514 (1991).  In 1992 Congress again appropriated funds and

"directed the Secretary of the Army, acting through the Chief of Engineers, to incorporate parallel protection along the Orleans and London Avenue Outfall Canals into the authorized Lake Pontchartrain and Vicinity, Louisiana, Hurricane Protection project."  Pub. L. No. 102-377, 106 Stat. 1315, 1320 (1992).  Congress was properly informed that the project was proceeding pursuant to the High Level Plan instead of the Barrier Plan.  *See, e.g., Energy and Water Development Appropriations for 1994:  Hearings Before a Subcommittee of the Committee on Appropriations, Part 2,* 103d Cong. 108 (1993) (report of Gen. Eugene S. Witherspoon, Cmdr., Lower Miss. Valley Div., U.S. Army Corps of Eng'rs) ("Amended assurances for the High Level Plan were executed by the local sponsor . . . and accepted by the United States"); *Energy and Water Development Appropriations for 1995:  Hearings Before a Subcommittee of the Committee on Appropriations,* 103d Cong. 10 (1994) (report of Gen. Eugene S. Witherspoon, Cmdr., Lower Miss. Valley Div., U.S. Army Corps of Eng'rs) (apprising Congress that "work on the parallel protection on the London Avenue, Orleans Avenue, and 17th Street Outfall canals" is continuing); *cf.* Complaint ¶ 57 (parallel protection was part of High Level Plan), ¶ 120 (High Level Plan "employed higher levees and flood protection structures along the lakefront").  Plaintiffs' contention that the LPVHPP was no longer authorized after the High Level Plan was adopted or that Congress was not properly informed of the change in plans is wholly unfounded.

Because the prosecution of the High Level Plan was within the original authorization of the LPVHPP, Plaintiffs' general argument that the Corps lacked authorization to perform flood control work related to the outfall canals fails.  *See* Opp. at 27-31.  Inasmuch as these improvements were part of the High Level Plan, *see* Complaint ¶¶ 57, 120, this specific work was within the original project authorization, no less than any other work performed pursuant to

the High Level Plan.  Although Plaintiffs have attempted to bolster their argument by

formulating specific attacks on the work that occurred at each canal, those arguments also fail.

Plaintiffs contend that the work at the London Avenue canal was unauthorized because

"the Corps did not raise a single levee along the Outfall Canal.  It instead constructed I-walls.

The Corps had the Congressional directive and authority to raise levees, not construct I-walls."

Opp. at 30; *see also id.* at 27 ("Congress told the Corps on numerous occasions to build *'levees,'*

to which the Corps responded by building cheaper, smaller, and weaker structures or sometimes

no structures at all.").  The plausibility of Plaintiffs argument disappears when the light shed by

the authorizing statute is cast upon it.  The statute did *not* handcuff the Corps by directing that

parallel protection be provided by the exclusive means of "raising levees."  On the contrary, the

law explicitly allowed the Corps to provide protection "by raising levees *and* improving flood

protection works" and by performing "other pertinent work necessary to complete an entire

parallel protection system."  Pub. L. No. 102-104, 105 Stat. 510, 514 (1991) (emphasis added).

Because Congress allowed the Corps to provide parallel protection by a variety of methods and

means, there is absolutely no merit to Plaintiffs' assertion that the construction of I-walls along

the London Avenue canal was unauthorized.

Plaintiffs next contend that "the protection constructed along the Orleans Avenue Outfall

Canal did not comply with the Congressional definition of 'parallel protection'" because the

Corps "failed to raise levees along the '*entire length of the Orleans Avenue*' Outfall Canal."

Opp. at 30 (emphasis in original).  Although the complaint includes no specific allegations

concerning the Orleans Avenue canal, Plaintiffs nonetheless contend in their Opposition that the

Corps's failure to complete the authorized work prior to Katrina's landfall renders the United

States liable notwithstanding § 702c.  Plaintiffs' contention, however, lacks support in the

23

authorizing legislation, for the statute that authorized the project did not require that the work be completed by a specific date.  The progress of construction was contingent on many factors, including the appropriation of funds necessary to complete the project.  Plaintiffs' suggestion that the flood control project was incomplete when the flood occurred does not provide a basis for withholding the protection of § 702c from the work that had been performed.  There is absolutely no merit in Plaintiffs' contention that the Corps lacked congressional authorization for the work that *was* done with respect to the Orleans Avenue canal, namely, the raising of levees.  *See id.*

Plaintiffs final contention regarding the outfall canals is that "Congress never authorized the Corps to provide parallel protection or any type of protection along the lengths of the 17th Street Outfall Canal whatsoever."  Opp. at 31 (emphasis omitted).  But, on the contrary, it is clear that Congress did not intend for the 17th Street Canal to be left out of the LPVHPP.  In fact, Congress, through one of its committees, directed the Corps to "treat the outfall canals as part of the overall hurricane protection project."  H.R. Rep. No. 101-966, at 67 (1990).  The statute itself expressly authorized the Corps to perform the "work necessary to complete an entire parallel protection system." Pub. L. No. 102-104, 105 Stat. 510, 514 (1991).  The only reason why the London Avenue and Orleans Avenue canals were called out by name in the law and in the committee report is that the Corps had rebuffed requests that these canals be protected by this means.  The Corps favored the installation of butterfly gates at the mouths of these canals, as their construction would be less costly than parallel protection.  The Corps did not need to be directed to construct parallel protection along the 17th Street canal because the Corps was already proceeding with parallel protection plans for it.  These background facts are set forth in the House Conference Report on the Water Resources Development Act of 1990:

The Lake Pontchartrain and Vicinity, Louisiana, hurricane protection project provides hurricane protection to the metropolitan New Orleans area.  As originally authorized by Section 204 of Public Law 89-298, the recommended plan included the construction of a large barrier structure to prevent storm water surges from entering Lake Pontchartrain and flooding developed areas during hurricanes.  In 1977, as a result of environmental litigation, a plan for the construction of high level levees was substituted for the barrier plan.

It was not necessary for the original barrier plan to address the problem associated with outfall canals that provide drainage of storm waters into Lake Pontchartrain from the City of New Orleans.  These problems must not [sic] be resolved in completing the high level plan.  One option under consideration is the construction of structures which will close the outfall canals at London and Orleans Avenues during periods of hurricane conditions.  Local authorities have raised legitimate concerns that this would result in flooding within the City because water discharged from drainage pumps would not flow into Lake Pontchartrain when the structures are closed.

The conferees do not believe it was the intent of Congress in authorizing this project to compound flooding or drainage problems in the City of New Orleans. Therefore, the conferees direct the Corps to treat the outfall canals as part of the overall hurricane protection project, and to favorably consider a plan that raises the levees along the entire lengths of the London Avenue and Orleans Avenue Canals to grades sufficient to confine a standard project hurricane with costs to be borne by both Federal and local assuring authorities.

H.R. Rep. No. 101-966, at 67 (1990).

As the foregoing demonstrates, this Court did not err when it previously determined that

"[t]he London Avenue and 17th Street Outfall Canals are components of the National Flood

Control Program authorized by Congress and implemented by the Army Corps of Engineers."

*See Berthelot v. Boh Bros. Constr. Co.,* 2006 WL 1984661 at *2 (E.D. La. June 1, 2006) (R.D.

469).  Inasmuch as the challenged conduct was authorized for flood control purposes, Counts I-

III and V-VII of the Levee Superseding Master Class Action Complaint, which seek to impose

liability for damages caused by flooding related to a flood control project, should be dismissed.

25

## II. The FTCA's Discretionary Function Exception Bars Count I Because the Decision to Permit the Dredging of the 17th Street Canal Was the Sort of Decision that Properly Involves the Exercise of Policy-Based Discretion.

As set forth in the United States' moving papers, Count I of the Master Complaint should be dismissed not only because of the immunity provided by the Flood Control Act but also for the additional, independent reason that the challenged conduct, negligent permitting of the dredging of a canal, requires the exercise of policy-based discretionary judgment and is therefore beyond the purview of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671–2680, and the Admiralty Extension Act.  *See United States v. Gaubert,* 499 U.S. 315, 322 (1991).  Indeed, neither the Rivers and Harbors Act, 33 U.S.C § 403, nor the regulations found at 33 C.F.R. § 320.4, remove the Corps' permitting discretion by "specifically prescrib[ing] a course of action for an employee to follow."  *See Berkovitz v. United States,* 486 U.S. 531, 536 (1988).  To the contrary, the pertinent statute and regulations convey broad discretion to the Corps in deciding whether to grant dredging permits.  Plaintiffs' Opposition to the United States Motion to Dismiss offers only unsupported arguments and inapplicable case law, and does not demonstrate that the Corps' dredging permit decision is actionable under the FCA.

Plaintiffs' Opposition first argues that 33 C.F.R. § 320.4(a)(1) eliminates the Corps' discretion to grant dredging permits because it "is replete with language couched in mandatory terms such as 'will,' 'must,' 'requires,' determined,' and 'should.'"  Opp. at 49-50.  That language, however, at most directs the Corps only generally to "consider[]," "weigh[]," "evaluate," and "balance[]" the various broad categories referred to in the statute, *e.g.,* "cumulative impacts," "probable impacts," "expected" "benefits," and "foreseeable detriments." 33 C.F.R. § 320.4(a)(1).  The regulation does not "specifically prescribe a course of action," such as directing the Corps to grant or deny a permit under specified circumstances.  Rather, as stated

in the regulation itself, it provides only a "general balancing process," from which the Corps has wide discretion to ultimately determine whether or not to grant a particular dredging permit.

Observing that "33 C.F.R. § 320.4(a)(1) ends . . . with the caveat that '[T]o permit will be granted unless its issuance is found to be in the public interest,'" Plaintiffs contend that issuance of a permit is proscribed "[whenever there is evidence that minimum safety standards are *not* met" because in those circumstances "a permit is necessarily against the public interest." Opp. at 50. Contrary to Plaintiffs' contention, however, the general balancing process outlined in 33 C.F.R. § 320.4(a)(1) does not prohibit the issuance of a permit whenever there is evidence that minimum safety standards are not met. The regulation neither references nor specifies any minimum standards, and Plaintiffs do not cite an other source for this supposed requirement. The regulation thus does not cabin the Corps in this way or eliminate the Corps's discretion to evaluate evidence and issue a dredging permit despite evidence that minimum safety standards are not met. Indeed, the regulation requires only that the Corps "consider[]" and "balance[]" certain general factors listed in the statute and then deny applications for permits that the Corps, in its sole discretion, has determined not to be in the public interest. The regulation does not direct the outcome of the Corps's determination, nor does it require the Corps to find that any particular permit is not "in the public interest." *See Miller v. United States*, 710 F.2d 656, 663-64 (10th Cir.) (finding the discretionary function applicable to claims that the Department of Transportation failed to adequately supervise, inspect, design, build, repair and maintain a certain federal highway, because the statutory requirement that "the Secretary evaluate each project in light of the 'best overall public interest'" was not "specific [and] mandatory . . . [and] did involve policy and competing considerations to such an extent that they were within the discretionary function exception."); *see also Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1540 (10th Cir. 1992)

27

(finding statute that required "protection of human health and the environment" did not contain "specific, mandatory directives" for purposes of discretionary function exception).  Rather, the statute and the regulations bestow broad discretion to make that determination on a case-by-case basis, based on the Corps's evaluation of myriad, diverse factors of what constitutes "the public interest."

Plaintiffs next contend that issuance of the dredging permit is not protected by the discretionary function exception because the permitting involved "scientific and engineering judgments based on professional standards." Opp. at 52.  However, as the Court explained in *United States v. Gaubert,* 499 U.S. 315, 324-25 (1991), "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  Plaintiffs' argument that scientific and engineering judgments "do not implicate social, political or economic issues" and therefore "fall far outside the protected immunity sphere of the discretionary function exception" (Opp. at 51-52) is based on a false dichotomy of science-based judgments and policy-based judgments, as though no judgment could ever be based on both.  Its falsity is demonstrated by the very regulation that governs the issuance of dredging permits, for the regulation expressly requires consideration of "all those factors which become relevant in each particular case."  33 C.F.R. § 320.4(a)(1).  "All factors which may be relevant to the proposal must be considered," not just "safety."  *Id.*

Although some of the specific factors to be considered do implicate safety—*e.g.,* "flood hazards" and "navigation"—most of the specified factors invite, indeed, require an assessment of social, economic, and political policy—*e.g.,* "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, . . . floodplain

values, land use, . . . shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, . . . food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.* Very few of the factors to be considered are susceptible to scientific or engineering analysis, and even those that are can be analyzed in terms of broader policy considerations. Indeed, the fact that the decision is, in the final analysis, to be based on the anticipated impacts on the overall "public interest" suggests that collapsing the entire analysis into a scientific calculation or an engineering computation would be improper.

Given the obvious implications of the governing statute and regulations, Plaintiffs' citation to inapposite case authority cannot sustain their argument. Cases in which the challenged conduct was governed by specific standards are not even persuasive in view of the many amorphous factors that dominate the regulatory list that governs the Corps's exercise of discretion in issuing dredging permits. In *Whisnant v. United States,* 400 F.3d 1177 (9th Cir. 2005), for example, the discretionary function exception was held to be inapplicable because decisions concerning the clean up of obvious and known mold in a commissary were governed by "objective, scientific standards." *Id.* at 1183. Similarly, in *Cope v. Scott,* 45 F.3d 445 (D.C. Cir. 1995), the Court of Appeals concluded that routine decisions regarding where and what type of warning signs to post along a park road did not involve a consideration of public policies. *See id.* at 451. And in *Ayala v. United States,* 980 F.2d 1342 (10th Cir. 1992), the court found that a federal inspector's advice concerning the wiring of lights to certain mining equipment was not protected by the discretionary function exception because the advice was governed by "[a] mandatory MSHA regulation [that] required that the add-on lights be wired in [a particular] manner." *Id.* at 1349; *see also Moyer v. Martin Marietta Corp.,* 481 F.2d 585, 598 (5th Cir.

1973) (specific design of pilot's ejection seat was not protected by discretionary function exception); *Seaboard C.L. R.R. v. United States,* 473 F.2d 714, 716 (5th Cir. 1973) (design of drainage system was not protected by discretionary function exception).[8]

Plaintiffs' allegations against the Corps, on the other hand, involve neither a specific scientific calculation or design, nor the violation of a specific mandatory standard or requirement; rather, Plaintiffs allege that the Corps violated the "general balancing process" described in 33 C.F.R. § 320.4(a)(1), which contemplates consideration and balancing of numerous "social, political [and] economic issues," including, according to the statute, "conservation, economics, [] general environmental concerns, . . . cultural values, . . . energy needs, safety, food and fiber production . . . and, in general, the needs and welfare of the people."

Finally, Plaintiffs attempt to distinguish numerous cases cited in the United States' Motion to Dismiss, all of which support the position that the Corps' decisions to grant dredging permits are protected by the discretionary function exception.  To distinguish *United States v. Varig Airlines,* 467 U.S. 797 (1984), Plaintiffs assert that they "are suing not over the *means* of the enforcement of minimum safety standards, but rather *whether any minimum safety standards were enforced at all.*"  Opp. at 54 (emphasis in original).  They argue that "[e]ven if the Corps' decision to issue a permit is held to be discretionary, the Corps may not negligently issue a permit that allows dredging to be done in violation of safety standards."  *Id.*  But even if Plaintiffs could identify a safety standard that was violated (and they have not), not even the violation of such a standard would diminish the discretion afforded by the pertinent regulations.

_____

[8]Plaintiffs also cite *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 286-288, where the court dismissed the plaintiffs' FTCA claims, finding that "the FDA Commissioner's decisions to bar fruit from Chile and to remove it from the marketplace" was protected by the discretionary function exception.

Indeed, here, as in *Varig Airlines,* because the Corps's permitting "decisions require the agency

to . . . balanc[e] the objectives sought to be obtained against [other] practical considerations,"

those decisions are protected discretionary functions.  *Varig Airlines,* 467 U.S. at 820.

Plaintiffs also attempt to distinguish *Lindsay v. United States,* 778 F.2d 1143 (5th Cir.

1985), and *United States v. Morrell,* 331 F.2d 498 (5th Cir. 1964), by suggesting that neither case

"involved the public safety, nor the welfare of thousands, nor any minimum safety standards,"

and arguing "that the Corps has an obligation to protect the lives of masses of people greater than

that to protect the economic interests of a single individual's pocketbook."  Opp. at 55.  This

distinction is immaterial, however, inasmuch as a decision is neither more nor less discretionary

as a consequence of the magnitude or importance of the decision.  *See Varig Airlines,* 467 U.S. at

820.  Indeed, in *Varig Airlines* the Court found the discretionary function exception applicable to

decisions concerning aircraft safety procedures.  *See* 467 U.S. at 797.  Similarly the marking of

dangerous submerged shipwrecks has been held to be a protected discretionary function.  *See*

*Cranford v. United States,* 466 F.3d 955 (11th Cir. 2006).  Thus, like the decision to deny the

patent application in *Lindsay* and the decision to issue the grazing permit in *Morrell,* the Corps'

decision to grant the dredging permit constitutes "a discretionary function beyond purview of the

Tort Claims Act."  331 F.2d at 501 (citation omitted).

Finally, Plaintiffs attempt to distinguish *Reed ex rel. Allen v. U.S. Dept. of Interior,* 231

F.3d 501 (9th Cir. 2000), in which the discretionary function exception was held to be applicable

because, as is the case here, "the permitting statute did not mandate any particular act which the

government failed to perform."  *Id.* at 507.  Plaintiffs point out that, despite its application of the

exception to challenged discretionary acts, the Ninth Circuit observed that the exception would

not apply to "'isolated instances of negligence that were not policy-based.'"  Opp. at 55 (quoting

*Reed*).  This observation is, of course, unremarkable; it merely states the law.  Plaintiffs, however, baldly assert, without any support whatsoever, that "[t]he issuance of the permit the dredge the 17th Street Canal was a similar incident of negligence that was not policy based, as minimum safety standards were violated."  *Id.*  The challenged conduct of the Corps, its permitting of dredging, is not at all similar to acts that have no basis in policy.  Quite to the contrary, however, the Corps's dredging permit decisions are based on numerous policy considerations, many of which, as discussed above, are set forth in 33 C.F.R. §320.4(a)(1).  The challenged conduct in these consolidated cases is very much like the *Reed* decision to grant an outdoor festival permit*,* which the Ninth Circuit readily found to have been based on the federal agency's "balanc[ing of] competing public policy concerns, including concerns about public access, safety, resource allocation, and the environment."  231 F.3d at 505.  Inasmuch as Count I challenges a decision that was grounded in numerous considerations of public policy, it is not actionable under the FCA and must be dismissed for lack of subject matter jurisdiction.

### III. Counts IV and VIII Pertain Solely to MRGO and Should Therefore Be Stricken from the Levee Superseding Master Consolidated Class Action Complaint.

In their Opposition, Plaintiffs argue that Counts IV and VIII should not be stricken because Case Management Order No. 4 defines the MRGO category in such a way as to exclude MRGO claims by plaintiffs who reside on the East Bank.  *See* Opp. at 60.  Although it is true that the case management order defines the MRGO category by reference to "the Upper and Lower Ninth Ward, New Orleans East and St. Bernard Parish," CMO 4, at 3, Plaintiffs provide no reason why the United States should be compelled to litigate identical claims in separate tracks.  Plaintiffs' formalistic argument is inconsistent with the stated purpose of CMO 4, namely, to "maximize efficiencies."  *Id.* at 2-3.  Allowing the MRGO-related claims in Counts IV and VIII

to remain in the Levee Master Complaint would unnecessarily require the United States to duplicate efforts, litigating identical allegations on two tracks.

In contrast to its geographical definition of the MRGO category, the case management order contains no analogous geographical reference for the Levee category.  The Levee category is simply defined to include "plaintiffs . . . [who] allege that defendants are liable for water damage caused by the breaching of an I-wall on the 17th Street Canal, the breaching of I-walls on the London Avenue Canal, and the breaching of the levees on the Industrial Canal."  *Id.*  Thus, while the MRGO category is defined by both the cause of the plaintiffs' damage and the geographic location of that damage, the Levee category is defined only by the cause of the plaintiffs' damage.

The inclusion of the geographical reference in the definition of the MRGO category appears to be inadvertent, as the division is fundamentally based on the cause of the flood damage.  The geographical reference can and should be stricken to bring all plaintiffs alleging damages caused by the MRGO into a single category.  As acknowledged in Plaintiffs' Opposition, Counts IV and VIII of the Levee Master Complaint allege liability for flood damage caused by the MRGO, and the allegations in these counts mirror those in the MRGO Master Complaint.  *See* R.D. 3415 (MRGO Master Complaint) at ¶¶ 23, 26-30 (Count IV); ¶¶ 36-37 (Count VIII).  Allowing these allegations to remain in the Levee Master Complaints would result in a wasteful use of resources and by causing duplicative litigation would tend to eviscerate any benefit from the Court's creation of separate tracks.  For these reasons, the allegations in Counts IV and VII are more appropriately litigated in the MRGO Master Complaint and should be stricken from the Levee Master Complaint.

## CONCLUSION

For these reasons, the United States' motion to dismiss Counts I-III and V-VII of the

Levee Master Complaint and to strike Counts IV and VIII should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

/s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel, Torts Branch
KEITH LIDDLE
KARA K. MILLER
Trial Attorneys, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202)-616-4289
robin.doyle.smith@usdoj.gov
Attorneys for the United States

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2007, a true copy of the foregoing was served on all parties by ECF.


/s/ Robin D. Smith
ROBIN D. SMITH