UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISAINA

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 "K" (2) and (3) |
| ———————————————————— | * | |
| PERTAINS TO LEVEE: | * | JUDGE DUVAL |

| | |
|---|---|
| NO. 06-5116 (SIMS) | NO. 06-5134 (CHRISTOPHE) |
| NO. 06-5118 (RICHARD) | NO. 06-5137 (WILLIAMS) |
| NO. 06-5142 (AUGUSTINE) | NO. 06-5127 (DEPASS) |
| NO. 06-5132 (FERDINAND) | NO. 06-5128 (ADAMS) |
| NO. 06-5131 (BOURGEOIS) | NO. 06-5140 (PORTER) |

MEMORANDUM IN OPPOSITION TO UNITED STATES'
MOTION TO DISMISS UNDER 12(b)(1)

**NOW INTO COURT,** through undersigned counsel, come the Plaintiffs in Case No. 06-5116 (*Sims*), Case No. 06-5118 (*Richard*), Case No. 06-5142 (*Augustine*), Case No. 06-5132 (*Ferdinand*), Case No. 06-5131 (*Bourgeois*), Case No. 06-5134 (*Christophe*), Case No. 06-5137 (*Williams*), Case No. 06-5127 (*DePass*), Case No. 06-5128 (*Adams*), and Case No. 06-5140 (Porter), hereinafter collectively "Respondents", to file this Opposition to the Motion to Dismiss filed by the United States.  Doc.6646.

**Background**

Your Respondents are property owners and residents of the Greater New Orleans Area. They assert claims for redress for damage to property and for personal injuries particular to their geographic areas, and the floodwaters from particular waterways, and declaratory judgment against state entities under various Assurance Agreements, to-wit:

(1)  The Old Metairie residents (No. 06-5127, *DePass*) seek redress for damages from the 17th Street canal closure, the resulting flooding from the Metairie Ridge Relief Canal[1] south of Pumping Station Six, and from the Palmetto Canal and the Hoey Canal;

(2) The Lakeview, Carrollton and Hollygrove plaintiffs (No. 06-5116, *Sims*), the failure of the 17th Street drainage canal eastbank, the former (Lakeview) due to flooding north of Pumping Station Six, and Carrollton Hollygrove neighborhood residents from the flooding from the Metairie Relief Canal and from the Palmetto Canal;

 (3)  The Bywater and Mid City plaintiffs (No. 06-5132, *Ferdinand*) seeks redress from the failure of Gate I-W 30 part of the floodwall of the Industrial Canal westbank, which the United States acquired in 2002 incident to the New Lock project completed in June 2005[2], and the  failure and topping of the Industrial Canal west bank, and from New London Avenue Outfall Canal;

(4)  The Old Gentilly and Lake Terrace (No. 06-5131, *Bourgeois*), from the Industrial Canal and New London Canal;

(5)  New Gentilly (No. 06-5134, *Christophe*) from MRGO, Gulf Intracoastal Waterway (IWW) and Industrial Canal;

(6)  Kenilworth Subdivisions, Lakefront, Spring Lake, Lake Willow and Pines Village Subdivisions (No. 06-5137, *Williams*) from Lake Pontchartrain, MrGo and the Industrial Canal east bank;

---

[1] The Metairie Relief Canal is the extension of the 17th Street Canal south of Pumping Station (sic), and is sometimes referred to as the Monticello Canal.

[2] The lock links the eastbound Gulf Intracoastal Waterway (GIWW) to the Mississippi River, and thence to the westbound Gulf Intracoastal Waterway through the nearby Algiers and Harvey locks in the New Orleans area. See http://www.mvn.usace.army.mil/prj/ihnc/factsheet.asp

(7)  The Eastover Subdivision (No. 06-5118, *Richard*) from MRGO the Michaud Canal and IWW;

(8)  Lake Bullard, Lake Barrington, Lake Forest, Huntington Park, and Fairway Estates (No. 06-5142, *Augustine*) from MRGO, Michaud Canal  and IWW; .

(9)  Oak Island, Lake Carmel, Village de L'est, Little Woods and Michoud Subdivisions and environs' (No. 06-5128, *Adams*) MRGO, IWW and the Michoud Canal;

(10)  Lower 9th extended, including St. Bernard (No. 06-5140, *Porter*), Industrial Canal east bank, IWW and MRGO.

**Claims Asserted; other parties;**

Your Respondents seek a declaratory action as respect claims against the Orleans Levee District and the Port of New Orleans, the East Jefferson Levee District, and the Sewerage and Water Board[3], under various Acts of Assurance given by those local political subdivision in favor of the United States Army Corps of Engineers, as an inducement to cause the latter to undertake the federal navigation[4] works.  Federal Tort Claims Act ("FTCA") and Admiralty Extension Act claims[5] have been filed by Plaintiffs with the United States and or Corps, and many of those claims have matured sufficiently at this date, to enable certain of your

---

[3] Prior to suit, Respondents made demand under Acts of Assurance on each Levee District and Port Complaint (*Sims, et al*) paragraph 90, Complaint (*Richard, et al*) paragraph 75, Complaint (*DePass, et al*) paragraph 94, Complaint (*Adams*, et al) paragraph 74, Complaint (*Porter, et al*) paragraph 74; and Complaint (*Augustine, et al*) paragraph 74;

[4] As an example, declaratory judgment relief is sought against the Port of New Orleans with respect to particular Act of Assurances; see for instance *Sims* Complaint paragraph 49, April 15, 1957 MRGO flooding; *Sims* paragraph 51, February 3, 1969, Michoud Canal flooding, Cf. *Sims* paragraph 53, January 10, 1974, Michoud Canal; Declaratory Relief is also sought as against Orleans Levee District, East Jefferson Levee District and NOSWB under Act of Assurance particular to each.

[5] Case Management Order No. 4, [Doc. 3299, pps. 13-14, paragraph II (c).

Respondents to file Amended Complaints to assert damage claims against the United States[6].
Respondents contemplate that others will intervene in these cases when it their clams against the
United States become ripe.

Bywater & Mid City (*Ferdinand*) and Old Gentilly (*Bourgeois*) Plaintiffs also assert
damage claims against CSX, Burlington R.R and Public Belt R.R.  Kenilworth and Lakefront
Plaintiffs (*Williams*) also assert claims against Norfolk & Southern R.R. Unique to the claim of
residents in Old Metairie and Lakeview, Carrollton and Hollygrove communities, those residents
also assert design, construction and maintenance claims respecting deficiencies in the 17th Street
and Metairie Relief Canals against the East Jefferson Levee Board, and the Parish of Jefferson,
Orleans Levee District and Sewerage and Water Board.[7]

Your Respondents residing on the GNO east bank cite flooding from the drainage
"outfall" canals: the 17th Street Canal, the Metairie Relief Canal, and the Orleans and New
London outfall canals, particularly the portion of the outfall canals south of the pumping station[8]
and from other non-federal portion of the drainage canals, and the Hoey and Palmetto Canals.
See New Orleans Lakefront Outfall Canals, Plate 5, Reproduced as Appendix I., Exhibit A.
Complainants in New Orleans East cite flooding from the Michoud Canal, the IWW and the

---

[6] The Complaints were amended to assert damage claims against the United States when it was
seasonable to do so. Doc. 3708 (*DePass, et a.l*), Doc. 3710 (*Richard, et al*), Doc. 3712 (*Adams,
et al*), Doc. 3720 (*Porter, et al.*), Doc. 3716 (*Ferdinand, et al*), Doc 3733 (*Sims et al.*), Doc. 3719
(*Williams, et al.*),  Doc. 3714 (*Bourgeois, et al.*), Doc. 3723 (*Augustine, et al.*), Doc. 3725
(*Christophe, et al*).

[7] Initially the State of Louisiana Department of Transportation was named as a defendant but it
was later dismissed,  the court having dismissed DOT under Eleventh Amendment grounds in
*O'Dwyer*. Doc.

[8] The Outfall Canal pumping stations are owned by the Sewerage & Water Board, Pumping
Station Six is located in Jefferson Parish on property owned by the City of New Orleans for the
use and benefit of the Sewerage & Water Board in cooperation with the Parish of Jefferson.
*DePass* First Amendment to Complaint [Doc.    ] paras.

Industrial Canal, directly, and from MRGO.  All these waterways pre-existed the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project.[9]  In fact, the Lake Plan adopted in 1966 approved the Barrier Plan which contemplated the closure of the Lake's three tidal passes, at the Rigolets, the Chef and Seabrook (Inner Harbor Navigational Lake pass) "the latter said to be a feature of the MRGO Navigation Project".  See 1984 Lake Pontchartrain & Vicinity Reevaluation Plan[10]. p. 34. Exhibit B.  In 1966, "the return levees paralleling the canals to the pumping stations were considered adequate." *Id.* P. 39.  No work was commissioned on the return levees in the 1966, *i. e.,* Lake Plan.  The 1984 Reevaluation Study abandoned the Barrier Plan in favor of the High Level Plan, including portions of these return levees in the plan, calling for elevating their heights, and "installing auxiliary pumping stations . . . at the lake to provide pumping capability when the flood gates were closed."  Exhibit C.  These "at the Lake" pumping stations were never installed, however.  The portions of the outfall canals or return levees south of the pumping station were not considered in the Lake Plan, nor was the expenditure of federal funds for their improvement authorized or ever employed.  It is from the flooding from the return levees south of the pumping stations, entirely state "designed and operated", that the East bank residents in Old Metairie Carrollton Hollygrove seek redress in *DePass* and *Sims*.

The MRGO, the Michoud Canal, the Gulf Intercoastal Waterway, and the Industrial Canal were not part of the Mississippi River Levee System.[11]  The Gulf Intercoastal Waterway east of New Orleans (IWW) was authorized in 1942 and MRGO was authorized in 1951.  None

---

[9] PL 89-298, 27 Oct. 1965, House Doc. 231, 8th Cong. 1st Session.

[10] The Reevaluation Plan is included in the Rule of Evidence 201 Submission filed 12/20/06, [Doc. 2324-2 thru 2324-21].

[11] House Document 90. 70th Cong. 1st Ses. Submitted 8 December 1927 and adopted in the Flood Control Act of 1928.

of the three were authorized by or made part of the original Lake Plan in 1966 or the 1984

Reevaluation Plan.  They were all man-made and all pre-existed the Plan.  Pertinent to the claims

of the residents whose harm derives from waters from these sources, however, is that the Lake

Plan did not call for any change in "design or operation" of these existing waterways on which

*Central Green* made immunity depends.  The works contemplated by the Lake Plan were

designed and operated to lessen the risk from the creation, design, construction, operation and

maintenance of the Industrial Canal, the IWW and MRGO, highways of commerce, the risk of

which Hurricane Betsy exposed.  What was designed, first in the Barrier Plan and then in High

Level Plan, was never constructed. .

**Allocating flooding to immune and non-immune Sourses**

Given the multiple sources of flooding, Respondents cannot dismiss the possibility that

some of the water causing harm may be found to have the required nexus to a federal flood

control project and 702c immunity properly invoked, as the United States suggest.   In such event

it will be necessary to attribute harm to immune and non immune sources. That is a teaching of

*Central Green*.  There some of the water was from the San Joaquin River and some from the

Madera Canal and part of the Central Valley Flood Control Project the purpose of which was

flood control.  Yet, the court remanded for a determination of the extent of flooding from a non-

immune source.

**The United States' Motion**

The Government in the instant motion has moved to dismiss this complaint pursuant to

Fed. R. Civ. P. 12(b)(1) maintaining that the Court lacks jurisdiction over the subject matter

based on the Flood Control Act of 1928 ("FCA") and the exceptions found in the FTCA.  Section

3 of the FCA, 33 U.S.C. § 702c, (hereinafter "§ 702c") provides that "[n]o liability of any kind

shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  33 U. S. C. § 702c.  As such, the United States maintains it is immune because the waters which damaged plaintiffs were "flood waters", under the provisions of § 702c.  As an alternative position, the Government maintains it is immune because it is indisputable that the damages alleged were caused by floodwaters that federal works failed to control.

In addition, the United States maintains that the FTCA did not waive sovereign immunity for the defalcations alleged by plaintiffs.  Section 28 U.S.C. § 2680(a) provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure or exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* The Government maintains that the "due care" exception and the "discretionary function" exception found in § 2680(a) likewise require the dismissal of this suit.

**Respondents' Positions on the United States Motion**

The FTCA claims of the Old Metairie residents (*DePass*) are not barred by the '28 Act Section 702(c) immunity because their flood damages resulted from flooding from the Hoey and Metairie Relief Canals, after closure of the Pumping Station Six, due to continued pumping in the feeder canal stations, particularly Palmetto Canal's pumping station at Broad Street.[12]  Their flooding was exacerbated by waters from the Industrial Canal and due to the breach in the 17th Street Canal East Bank, and from Orleans and London Canal waters. The United States argues these waters were intended to be controlled by a Federal Flood Control Project, to wit:  the Lake

---

[12] The *DePass* Third Amendment to the Complaint alleged in pp. 10j " As a direct result of the failure of the west side of the 17th Street canal and the closure of Pumping Station Six caused thereby, the flood waters intended to be discharged through the 17th Street Canal via Pumping Station Six poured into the Hoey Basin damaging Plaintiffs' property";

Pontchartrain and Vicinity Plan.  Respondent *DePass and Sims et al* disagree.  The Metairie

Relief Canal and the Palmetto Canal were not part of the Lake Plan in any way, and thought the

17th Street Canal, Orleans Canal and London Canal were arguably included in the High Level

Plan, the these waters only exacerbated the damage to Old Metairie already occasioned by

Metairie Relief Canal flooding.  Their passage was arrested by Metairie Ridge[13], a natural barrier

which runs west to east from Metairie Road to U. S. Highway 90, and the waters became merged

with the City drainage system, impacting Hoey Basin and Carrollton Hollygrove properties via

Metairie Relief Canal and Hoey Canal long after their banks have been overcome.

The FTCA claims of the residents of Carrollton Uptown (*Sims*) are similarly outside the

bar of the '28 Flood Act.  Their claims, like the claims of Old Metairie residents (*DePass* et al)

arise from flooding of the Metairie Relief Canal and the Palmetto Canal, due to the closure of

Pumping Station Six, and the continued pumping in the feeder drainage canal stations,

particularly Broad Street.  As such the flood waters were not "waters that flow through a federal

facility designed and operated, at least in part, for flood control purposes", required for immunity

under *Central Green*. As to the Lakeview residents, those situated on the north side of the

Metairie Ridge who were first flooded by the breach in the 17th Street Canal and the failure to

complete the fronting protection for the London Avenue and Orleans Avenue Outflow Canals,

Respondents contend that the flood waters were not intended to be controlled by a Federal Flood

Control Project, because the Outfall Canals were not materially affected by Lake Pontchartrain

and Vicinity Plan ("Lake Plan "), (certainly not sufficient to be said to be "designed and

---

[13] Interagency Performance Evaluatiuon Task Force (IPET),  Volume III, Figure 8.2;  and
Independent Levee Investigation Team Report (Berkley Report), Figure 3.22,  Exhibits D and E.

operational . . . for flood control purposes")[14].  It can hardly be said that these outflow canals had

"morphed into a federal flood project".  It was not a federal flood project in the first place, and

even if it was, 702(c) immunity is not implicated because the project was never completed at all

and not completed as designed.[15]  The Corps' failure to complete construction of the fronting

protection at the New London and Orleans Canals and failure to complete the planned flood-

proofing of the London Avenue bridge at Robert E. Lee, preclude imposition of immunity with

respect to claimants seeking redress for damages for waters escaping at those locations.[16]

Eligible Bywater and Mid City residents (*Ferdinand*) assert Admiralty Extension Act

claims, as their claims arise at least in part from the work involved in the construction in

Industrial Canal New Lock Project completed in June 2005.  Bywater and Mid City

Respondentss barges and crane barges employed in construction were vessels, as was the New

Lock itself, *i. e*., "any contrivance used or capable of being used as a means of transportation on

water, . . ."  1 USC § 3[17].  In addition, the Bywater and Mid City residents assert Civil Code

Article 2317 and 2317.1 claims[18] due to the United States acquisition of the "banks" incident to

---

[14] *Robinson* Opinion, Doc. 2994, p. 17. .

[15] Lakeview, Carrollton Holygrove (*Sims*) and Old Metairie (*DePass*) residents have alleged that the Corps was aware that the bank was structurally suspect and that the work it commissioned Pittman Const. to perform had not been completed and was never accepted. Third Amendment (*DePass, et als*) pp. 10(c) to 10(i), Motion for Leave to file with Third Amendment is at Doc. ……………; Third Amendment *(Sims, et al)*,  pp. 9(c) to 9 (k)

[16] IPET, Section 3.2.1.5.2 and 8.3.1.  Exhibits F and G.

[17] "In determining the meaning of the revised statutes, or any act or resolution of Congress passes subsequent to February twenty fifth eighteen hundred and seventy one , . . .{t)he word vessel included every description of watercraft or other artificial contrivance used or capable of being used as a means of transportation on water. . ." 1 U.S.C. § 3 Source provision: 18 Stat., pt.1, p1.

[18] Respondents have asserted a state law claim under the Restatement of Torts 2nd , the fact that the Corps subsumed the duties of the Orleans Levee Board when *in extremis*. *Sims* Complaint,

the New Lock project[19].  The '28 Flood Act immunity does no apply for two added reasons: waiver of sovereign immunity in the Admiralty Extension Act extends to 28' Flood Act Immunity, and attributed to the New Lock project, the harm lacks the nexus to Federal Flood Project *Central Green* requires.  Alternatively, Bywater and Mid City residents (*Ferdinand*) assert FTLA claims.  Their flooding resulted from breaches of the west bank of the Industrial Canal, the MRGO surge, and from the London Avenue Canal.  The Flood Act Immunity does not bar FTLA claims arising from the work of the New Lock project[20] or the State law claims arising as a result of the ownership of the banks and waters acquired incident to the New Lock Project.  Finally, the '28 Act immunity extends to projects designed and operated, completed projects, and does not extend to flooding from the south end of those two Outfalls Canal due to the Corps' failure to complete the frontage protection as required by its agreement with the Sewerage & Water Board.[21]

The same can be said of the claims of Old Gentilly Residents (*Bourgeois*).  The Industrial Canal breaches directly caused their flooding.  Like the *Ferdinand* plaintiffs, these Plaintiffs invoke the Admiralty Extension Act sovereign immunity and assert claims under Civil Code

---

para. 88(2) (e). ["The Corps of Engineers is liable to Plaintiffs under the Restatement (Second) Torts § 324A, as interpreted in *Bujol v. Entergy Services, Inc. et al*., 03-0492, 502 (La.5/25/04), 922 So.2d 1113; rehearing granted 10/29/04."]

[19] The December 10, 2002, Act of Sale and Easement Agreement by which the United States acquired the property interest provided in part that "(t)he aforementioned real estate interest are being acquired by the United States of America for and in connection with the Industrial Canal New Lock Project. . ."  Exhibit H.  See also January 2, 2002, Act of Sale;

[20] The recommended plan is for a deep-draft lock, 110 feet wide by 1,200 feet long by 36 feet of draft. The current lock, placed in service in 1921, is too small to accommodate the existing traffic: 640 feet long, 75 feet wide and 31.5 feet deep. The average delay to navigation is 11 hours, but can be as much as 24 to 36 hours on many occasions. Id. fn. 2.

[21] Second Act of Assurance given by the Sewerage & Water Board to the Corp.

Article 2317 and 2517.1, claims due to the New Lock project[22], completed in April, 2005, and the United States' ownership of banks and waters incident to the New Lock Project, and its perpetual easement rights incident to that project.  These claims are outside the '28 Act immunity.  Alternatively, these Respondents assert FTCA claims against the United States and resist any effort to assert 28'Act immunity on the grounds that Flood Act Immunity did not extend to bar FTLA claims arising from the New Lock project or to State law claims arising as a result of the ownership of the banks and waters acquired incident, not to Lake Plan, but to the Lock Project.

The claims of the residents in the community to the east of the Industrial Canal, East Gentilly, (*Christophe*), Kenilworth, Lakefront (*Williams*), and Lower Ninth Ward (*Porter*) escape the immunity from the '28 Act because their claims sound in Admiralty or in *garde* for property the United States acquired incident to the Industrial Canal Lock Project.  Alternatively, the FTCA claims are not barred because that Flood Act Immunity did not extend to bar FTLA claims arising from the Lock project on the State law claims arising as a result of the ownership of the banks and waters acquired incident to the Lock Project.

In addition, the claims of East Gentilly residents (*Christophe*) and Lower Ninth Ward residents (*Porter*) derive in part from the Intercoastal Waterway.   The flooding of their properties is attributable to MRGO and this Court has already held "it would be legally inappropriate to use a Rule 12(b)(1) and dismiss this case at this junction on the Court's finding . . . of facts based on (this) record. . . " Opinion *Robinson*, Doc. 2994 p 17.

---

[22] The Industrial Canal Lock Replacement Project completed in 2005, was authorized by the River and Harbor Act of 1956 (PL 84-455) and the Water Resources Development Acts of 1986 (PL 99-662), which reauthorized the project and established cost-sharing requirements, and 1996 (PL 104-303), which authorized the Community Impact Mitigation Plan.

Eastover (*Richard*) and Lake Bullard (*Augustine)* and lower Ninth Ward and St. Bernard *(Porter)* Plaintiffs assert claims of flooding from MRGO.  As such, as to their claims, like those in *Robinson,* "it would be legally inappropriate to use a Rule 12(b)1) and dismiss this case at this junction."  Id.  p. 17 "The Court would be extremely precipitous if in deciding the underlying facts concerning the appropriations and in relationships between LPVP and MRGO now. It is certainly not clear that MRGO has morphed into a hybrid flood control project /navigation project ."  Id. p. 17.

Kenilworth and Lakefront (*Williams*) at least in part involve flooding from Lake Pontchartrain, as do Oak Island and Little Woods residents (*Adams*). They complain of incomplete sections of the levee behind the Lakefront Airport[23]  and in Little Woods. Incomplete section can hardly be said to be "designed and operated" as part of a federal flood project, even if Lake Plan is both said to be one and otherwise extended to these matters.

**Industrial Canal**

It is alleged[24] that the Board of Commissioners of the Port of New Orleans built the Inner Harbor Navigation Canal.  (Industrial Canal).  It was completed in 1921, before the Flood Control Act of 1928 was enacted, and for reasons wholly unrelated to it.  The lands were initially acquired by the Port of New Orleans from the City which received it as a result of a donation of the 80 acre tract from the Ursuline Nuns of the Parish of Orleans.  Called "The Industrial Canal", it is a navigable waterway dug out of the lands and is used by the maritime industry to move vessels and cargo from and to the Mississippi River Gulf Outlet to and from the Mississippi

---

[23] *Independent Levee Inspection Team Report,* P 2-9.  Exhibit I.

[24] See Second Amendment to Complaint in *Ferdinand* (Bywater and MidCity) pp14a to 14(m), *Williams* (Lakefront), *Porter* (Lower Ninth Ward,  *Bourgeois* (Old Gentilly) and *Christophe* (New Gentilly).

River and to and from the River to and from Lake Pontchartrain through the Seabrook Pass.

Portions of the Canal were transferred by the Port to the United States Army Corps of Engineers

by the Act of Sale and Easement/Servitude Agreement dated 10 December 2002, and Act of Sale

dated January 2, 2002, for the Industrial Canal, New Lock Project[25].  The December 10, 2002,

deed to the United States quitclaimed unto the United States all right title and interest which the

Port had "in the banks, shores, beds and waters opposite to and fronting on the land, including all

littoral and or riparian rights incident thereto and whatever rights the Port may have had in any

alleys, roads, streets, ways, strips, gores or railroad rights of way located in or abutting or

adjoining said land"[26].  The transfer to the United States were effected for purposes unrelated to

flood control works for the purposes of improving the Inner Harbor Navigational Canal, New

Lock Project, as aforesaid.  It is alleged that the real estate was purchased from the Port of New

Orleans for $16.8 million.  The final act of sale took place Dec. 19, 2002.  The works were

prosecuted by Washington Capital and others at the direction and instances of the United States

Army Corps of Engineers from crane and derrick barges operating from the waters in the

Industrial Canal owned by the Port of New Orleans and the United States and/or subject to

Perpetual Easement /Servitude Agreement in favor of the United States Army Corp of Engineers.

The work was completed in April, 2005. The New Lock transports vessels inclusive of their

cargo and as such is a vessel, which is defined to include "any contrivance used or capable of

being used as a means of transportation on water". 1 U.S.C. §3. That the New Lock transports

vessels is irrelevant. *Ayres v. United states*,  277 F3D 821 (6th Cir.; 2002) ;

<div align="center">

**SUMMARY OF THE ARGUMENT '28 ACT IMMUNITY**

</div>

---

[25] *Id*. fn. 19

[26] *Id.* fn. 19

Section 702 (c) Immunity does not attach to floodwaters emanating from state designed and operated drainage "outfall" canals, the 17th Outfall Street, New London Outfall Canal or Orleans Avenue Outfall Canal, proximately caused by the defective design and operation of federal portion of those canals, and it certainly does not even arguably apply to flooding from the Metairie Relief Canal, including state designed, constructed and operated.  Nor does immunity attach to flooding from the Michoud Canal, the MRGO, the Intercoastal Waterway or the Industrial Canal, as they were not "designed or operated . . . for flood control purposes."  By rejecting the more stringent "not wholly unrelated test" and testing immunity on the "character of the water that caused the relevant damage," Central Green excluded from §702(c) immunity harm (i) from floodwaters emanating from state canals, even harm proximately caused by the failure of the federal flood works, and (ii) for flood waters resulting from the failure of federal waterways not "designed and operated for flood control purposes".  That the state drainage works failed because of failure of federal "designed and operated" flood works, did not alter "the character of the waters."[27]  Nor did the subsequent inclusion of portions of MRGO, IWW and Industrial Canal in the Lake Pontchatrain and Vicinity Hurricane Protection Plan, indisputably, make "all waters" that flow through them "designed and operated, at least in part for federal flood control purposes".  *Graci v. United States*, 456 F2d (5 Cir.; 1971) instructs us otherwise.

Thus considered, and in view of the fact that the absolute immunity is an affirmative defense, not raised by the complaint and not suitable for disposition in FRCP 12(b)(1) Motion, the United States' Motion should be denied.

## LAW & ARGUMENT

---

[27] *Central Green v. United States,* 531 U.S. 425, 837 (2001)  itself defined the "character of the waters" as "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes".

Introduction

      This matter, if not this case, will turn on the Court's reading of the Supreme Court's opinion in *Central Green Co. v. United States,* 531 U. S. 425 (2001). There, the property owner sued for damages to a pistachio farm allegedly caused by subsurface flooding from the Madera Canal, a federally owned canal, one of the purposes of which is to direct flood waters from the San Joaquin River. Allegedly the defective design, construction and maintenance of the canal caused subsurface flooding and increased cost of operating the orchids, although a serious river flood in 1997 may have also damaged the farm.

      The case was before the Court because the Court's earlier opinion in *United States v. James*, 478 U. S. 597 (1986) had generated conflicting opinions among the Circuit Courts of Appeals that §702(c) immunity attached "to all waters carried through federal flood control projects for purposes of or *related to flood control*". (Emphasis added) *Id*. 429. The italicized phase was singled out by the Court as particularly troublesome. "(T)he narrow question presented" was said to be whether "§702(c) immunity attaches to *all waters* that flow through a federal facility that was designed and is operated, at least in  part for flood control purposes." (*Emphasis Added*)  *Id.* 427. The Ninth Circuit had concluded that immunity attached, citing the "not wholly unrelated" standard, commenting that there "would seem to be no set of facts where the government is not immune for damages arising from water that at one time passed through part of the Central Valley or other flood control project."  *Id.* 482. The Supreme Court granted certiorari, reversed and remanded.

      The conflicting opinion cited *Fryman v. United States,*901 F2d 79 (7th Cir. 1990)*, Boyd v. United States,* 881 F2d 895 (10 Cir., 1989), and *Hayes v. United States,* 585 F2d 701 (4 Cir., 1978), circuits "requiring a nexus between the flood control activities and the harm".  Id. 1008.

The Ninth Circuit singled these out particularly as circuits in which a different result would have been reached.  The Ninth Circuit, the Supreme Court noted, had held that "although the water in the Madera Canal was not held for purposes of flood control, because it was part of the Central Valley Project, it was "not wholly unrelated" to flood control, stressing the particular phase from its earlier opinion in *James*.  Id. 482.

The United States reads the *Central Green* opinion to say more.  It implies that "all waters" includes the waters from the state designed and operated drainage canals which poured over as a consequence of the closure of the Pumping Station No. 6, in the case of the 17th canal flooding, for instance.  It implies that the same can be said of the flooding from the non-federal portion of the New London and Orleans Avenue Canals.  It argues that in dispensing with the requirement that the waters be "related to flood control", the Supreme Court discarded with the requirement that the waters be carried through a federal flood control project as well.  It overlooks the fact that by remanding to "consider the character of the water that caused the relevant damage", the Supreme Court was requiring a finding of facts*, i.e.,* determination of the part of the whole of the damage which had occurred gradually by subsurface seepage and the damage attributable to the 1997 San Joaquin flood.  The United States persists, however, arguing that the "threshold prong," the relationship between the harm and the federal flood control facility, has been entirely abandoned.

Respectfully, Respondents disagree.  The ultimate holding in *Central* Green, that the harm must be attributed to the flood waters emanating from a federal project, the Court was announcing a rule required a nexus between the waters and the harm, *i.e*., "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes".  The "threshold prong" to use the phrase coined by *Williams v. United States,* 957 F2d, 742, 743 (10

Cir., 1978), that the waters pass through a federal flood control facility was not disturbed. Nor

was it disputed. The "Madera Canal was part of the Front Division of the Central Valley project

and flood control was one of the purposes of the project". *Id*. 428. The relationship between the

damage and the federal flood project was a given. The District Court judgment on the pleading

under the "not wholly unrelated test" was predicated on that concession. The Supreme Court

said as much in characterizing the split among circuits prompting its review of the decision in

*United States v. James*, *supra*. "All other Courts of Appeal that have interpreted §702(c) and

prior to this case, the Court of Appeal for the Fifth Circuit, see N. 2, *supr*a, has held the §702(c)

grants immunity cased by flood waters from a federal flood control project". *Id.* 429.

Furthermore, nexus between the damages and the federal flood control activity was

present in each of the decisions of the other circuits in conflict with the decision of the Ninth

Circuit. *Fryman v. United States,* 901 F2d 79 (7th Cir. 1990)*,* (the death of diver on Lake

Shelbyville in Illinois created between 1963 and 1970 as part of a flood-control project) and

*Boyd v. United States,* 881 F2d 895 (10 Cir., 1989) (a boat speeding through the Tenkiller Lake,

which was the jurisdiction of the United States Army Corps of Engineers-- struck and killed a

snorkeler); *Hayes v. United States,* 585 F2d 701 (4 Cir., 1978) (the damage to a farm, allegedly

caused by operation of the flood gates of the Kerr Scott Dam, a flood control facility.) Finally,

*Central Green* evidences no intention of abandoning the Court's declarative in *James* that "the

Act concerns flood control projects designed to carry floodwaters". 478 U. S at p. 604.

Finally, Justice Stevens, the author of the opinion in *Central Green,* had authored both

the denial of *certiorari* in *Hiersche v. United States,* 503 U. S. 923 (1992), and the dissenting

opinion in *James.* In *Hiersch*e, Justice Stevens called §702(c) an "acronyism", and "absolute

remnant . . . nothing more than an engine of injustice." He dissented to the holding in *James,*

that §702(c) immunity precluded claims for personal injuries, as well as property damages, in the course of which he offered this comment on the Mississippi Flood Control Act, tying damage to federal flood control project:  "There is a sentence stating that no liability of any kind shall attach upon the rest of the United States from any damage form or by flood waters at any place."  "The text of Section 3 read as a whole irresistibly implies that the sentence in question was intended merely to place a limit on potential liability of the United States from the direction to the Secretary of War and Chief of Engineers concerning the overflow damage to land".  478 U. S. at 617.  It is unlikely that Justice Stevens would have departed from his prior writings linking harm and federal flood control project without saying more.

*Central Green* evidences no intention to depart from the line of cases beginning with *Peterson v. United States,* 367 F2d 271 (9 Cir.; 1966), which had held that "the alleged act of negligence was wholly unrelated to the Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to such authorization."  At p. 275.  In *Peterson,* the damage occurred as a result of the engineers attached to Ladd Air Force Base dynamiting an ice jam.  The distinction drawn in *Peterson* was acknowledged by the Second Circuit in *Parks v. United States,* 370 F2d 92 (2 Cir.; 1966), and by the Ninth Circuit in *McClaskey v. United States,* 386 F2d 807 (9 Cir.; 1967).  ("It does not follow that the mere happening of the flood constitutes the formation from all damage claims flowing from it.")  *Cf. Valley Calle Co. v. United States*, "(allowing recovery against the United States for flood damages caused by negligent maintenance of streams and culverts as part of the construction of an oil field."  *Cf. Williams v. United States, supra* N. 7 (10 Cir., 1978).  Because the dam was not part of a flood control project, the government did not enjoy immunity under §702(c).

As an alternative, the United States cites the Lake Pontchartrain and Vicinity Project,

with the evident intent of endeavoring to offer the nexus between the harm and a federal flood control project, and thus satisfy the threshold prong.  In doing so, it ignores the fact that each of the flood producing waterways involved:  the Mississippi River Gulf Outlet, the Intracoastal Waterway, the Industrial Canal, the 17th Street Canal, the London Canal and the Orleans Canal, all existed, in substantially their present form, before being enveloped into the Lake Pontchartrain and Vicinity Plan.  In fact, the Fifth Circuit had already held that MRGO was not a federal flood control project for purpose of §702(c) and the United States not immune from suits on that account.  *Graci v. United States*, 456 F2d (5 Cir.; 1971).  In addition, until argued here, it has been generally accepted that damage from flood waters form overflow from drainage canals was redressable under the Federal Tort Claim Act.  *Seaboard Coast Line R. R. Co. v. United States,* 473 F2d 714 (5th Cir. 1973), and *United States v. Hunsucker,* 314 F2d 98 (9th Cir. 1962) (negligence in construction and design of drainage systems).

This case will turn on whether redress from damage from waters emanating from the MRGO, a navigation canal alleged to have been defectively designed, constructed and maintained by the United States Army Corps of Engineers, and the others, is precluded by its subsequent inclusion of the Lake Pontchartrain & Vicinity Flood project.  The same can be said of the failures at the Intercoastal Waterway and the Industrial Canal.  *Central Green* suggests that findings of fact are required to determine whether the inclusion was tantamount to a "design and operation at least in part of a federal flood control purposes".

Much of the London Avenue, Orleans Canal and 17th Street Canal flooding lacks the requisite nexus to a federal project, the threshold prong for §702(c) immunity.  These flood waters did not emanate from "federal facilities designed and operated . . . for flood control purposes".  Finally, the flood of the federal portions of those drainage canals may be due to

19

negligence issuance of dredging permits and the nexus between the harm and federal flood

project may be found wanting the outfall.  Did their subsequent inclusion in the Lake

Pontchartrain and Vicinity absolve the Corps?  Of course not, the outfall canals were not

"designed and operated" as flood control facility as a result of the Lake Plan.

> 1.  ABSOLUTE IMMUNITY IS AN AFFIRMATIVER DEFENSE, NOT APPARENT
> ON THE FACE OF THE COMPLAINT; FRCP 12(B)(6), DISMISSAL UNDER THE
> "MORE STRINGENT STANDARD" IS INAPPROPRIATE.

Where, as here, the defendant raises an affirmative defense *via* Rule 12(b) Motion, in this

case §702(c) immunity, the burden is even more stringent than the usual burden.  "The

availability of the defense as a matter of law, then, turns on whether the plaintiff could possibly

prove any set of facts that would undermine the objective reasonableness of defendants' actions.

In other words, the defense must be "based on facts appearing on the face of the complaint."

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir., 2004) (internal quotation marks omitted).  Also

*Brooks v. City or Winston Salem,* 85 F.3d 178, 181 (4th Cir; 1996) (observing that an affirmative

defense may also be raised in a pre-answer motion pursuant to Rule 12(b) of the Federal Rules

"when the face of the complaint clearly reveals [its] existence").  "The defense faces a

formidable hurdle when advanced on such a motion."  *Cohn v. New Paltz Cent. School Dist.,* 171

Fed.Appx. 877 (2d. Cir, 2006).

For examples of cases applying the more stringent rule to defense see *Nicholas* v. *Goord*,

430 F.3d 652, 658 n. 8 (2d. Cir., 2005) (stating that a Rule 12(c) motion for judgment on the

pleadings is "evaluated under the same standard as a Rule 12(b)(6) motion"). To prevail on a

motion for qualified immunity in this early stage of the proceedings, "[n]ot only must the facts

supporting the defense appear on the face of the complaint, but . . .  the motion may be granted

only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim that would entitle him to relief." *McKenna,* 386 F.3d at 436 (internal quotation marks and citation omitted).

*Brody v. Hankin* 145 Fed.Appx. 768 (3rd Cir., 2005.) (reversing a decision in granting a motion to dismiss under Rule 12(b)(6) grounds of *res judicata*, or claim preclusion. " Because *res judicata* is an affirmative defense, and the basis for dismissing this case on *res judicata* grounds was not apparent on the face of the complaint". At 770, 771.

*Terranova v. New York,* 144 Fed.Appx. 143 (2nd. Cir.; 2005.)" [W]e have permitted the defense to be successfully asserted in a Rule 12(b)(6) motion," *id.,* where " 'the complaint itself establishe[d] the circumstances required as a predicate to a finding of qualified immunity.' " *Green v. Maraio*, 722 F.2d 1013 , 1018(2nd Cir.,1983).

2.  A NEXUS BETWEEN THE HARM AND THE FEDERAL FLOOD CONTROL PROJECT, IS PREDICATE TO A FINDING OF IMMUNITY FROM FLOOD WATERS UNDER §702(C).

Section 702(c) grant of immunity extends to damages caused by flood waters from a flood control project.  See *Hayes v. United States, supra,* 4th Cir., *Fryman, supra.*  See*, e. g*., *Potis v. Folk Construction Co.,* 694 F2d 520, 522 (8 Cir., 1982) (purpose of 702(c) is to "assure the government of absolute immunity for flood control projects") and *Burleson v United States,* 627 F2d 119 (8th Cir., 1980) on which *Potis* relied ("there can be no serious question that the alleged negligent acts of the Army Corps of Engineers was in connection with the flood control project") at 121.  *Morci Corp. v. United States,* 681 F2d 645, 647-8 (9th Cir., 1982), ("(I)f the plaintiff's inquiry resulted from the operation of [a] flood control project for flood control purposes, governmental immunity is complete". *Cf. Purci v. United States*, 650 F2d 202 (9th Cir.; 1981).  *Calloway v. United States,* 568 F2d 684, 686-7, (10th Cir.; 1978) (rejecting arguments that §702(c) does not apply to flood damage resulting from the operation of a flood

control project in view of "broad and emphatic language of §702(c))"; *Parks v. United States,*

370 F2d 92, 93 (2ⁿᵈ Cir; 1966); *Graci v. United States,* 456 F2d (5 Cir., 1971).  *Florida East*

*Coast Railway Company v. Central and So. Florida Flood Central District,* 519 F2d, 1185 (5ᵗʰ

Cir., 1975).

      3.    *CENTRAL GREEN* EXTENDS IMMUNITY TO "FLOODWATERS CAUSED
BY THE GOVERNMENT'S NEGLIGENT DESIGN OF AN INTEGRAL PART OF A
FLOOD CONTROL PROJECT " AND NO FURTHER,  READ WITHOUT THE
THRESHOLD PRONG DEPARTS FROM THE STATUTE, AND IS NON
PERSUASIVE DICTA.

      The holding of *Central Green* is expressed in these two portions of the Court's

opinion:

> "(T)he narrow question presented" was said to be whether "§702(c) immunity
> attaches to all waters that flow through a federal facility that was designed and is
> operated, at least in  part for flood control purposes."
>
>      For present purposes, we merely hold that it was error to grant the
> Government's motion for judgment on the pleadings and that it is the text of §§
> 702c, as informed by our holding in *James* rather than the broad dictum in that
> opinion, that governs the scope of the United States' immunity from liability for
> damage caused "by floods or flood waters." Accordingly, in determining whether
> §§ 702c immunity attaches, courts should consider the character of the waters that
> cause the relevant damage rather than the relation between that damage and a
> flood control project.

      The United States is wrong when it suggests that the Court abandoned the requirement of

a nexus between the harm and the federal flood control facility.  In fact, the Court framed the

question, the very question presented, in terms of whether "all waters that flow through a federal

facility that was designed and operated at least in part for flood control purposes."  Further, the

Plaintiff conceded that Madera Canal was a federal flood control project, the opinion below was

predicated on that concession, and nexus was not at issue.  When the Court instructs one to

consider "the character of the waters that cause the relevant damage" it is requiring nexus

between the harm and the waters that were carried by on passed through the federal facility for flood control.

In addition, *Central Green* also instruct one "to resort to the text of the [702(c)] statute . . . rather than an isolated comment'" in its opinion, "to determine whether the water flowing through the Madera Canal that allegedly caused the damage . . . is covered by §§702(c)". It cites *Humphrey's Executor v. United States*, 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) for the proposition that its own "dicta 'may be followed if sufficiently persuasive' but (is) not binding." In *Humphrey's Executors*, Justice Sutherland, in announcing the rule quoted no less authority than Chief Justice Marshall, who delivering the opinion in the *Cohens* v. *Virginia*, 6 Wheat, 264, 399, 5 L.Ed. 257, had said:

> 'It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.'

And Justice Marshall added, that the general expressions in the case of *Marbury v. Madison* were to be understood with the limitations put upon them by *Cohens*.

> 4.(a) *GRACI v. UNITED STATES, SUPRA,* HELD MRGO TO BE A NAVIGATION CANAL, CLAIMS FOR DAMAGES FROM THE DEFECTIVE DESIGN, CONSTRUCTION AND MAINTENANCE OF WHICH WAS NOT PRECLUDED BY THE IMMUNITY PROVIDED IN 702(c).

The Fifth Circuit has held that floodwater damage caused by the negligence of the United States in constructing the MRGO "a navigation project that provided a short cut from the Gulf of Mexico to New Orleans" are not barred by §702(c). *Graci v. United States*, 456 F2d, 2022 (5th Cir.; 1971). In that case the hurricane-driven waters which overflowed the MRGO flooded

proportions in Orleans and St. Bernard Parishes.  The case had been assigned to Judge Herbert

Christenberry initially.  Judge Christenberry held the MRGO was not a flood control project and

that Section 3 of the Flood Control Act of 1928 did not apply.  The matter was reheard by Judge

Heebe, and the Motion was again denied.  *Graci v. United States,* 301 F. Supp. 947 (Ed. Dist. La.

1969).  Judge Heebe cited a comment of a House member "to the effect that in engaging in flood

control works, the government should not lay itself open to suits for flood damage."  *Id.* 23.

Citing early "nexus" cases, *National Manufacturing v. United States,* 210 F2d 263, *Stover

v. United States,* 332 F2d 204 (9th Cir., 1964), and *Graci v. United States,* 301 F. Supp. 947 (Ed.

Dist. La. 1969), the Fifth Circuit held:

> The question then becomes whether it is reasonable to
> suppose that in exchange for its entry into flood control
> projects the United States demanded complete immunity from
> liability for negligent and wrongful acts of its employees
> *unconnected with flood control projects.*  Judge Heebe
> answered that it would not be reasonable so to conclude.  301
> F. Supp. at 952.  Our analysis of another group of § 3 cases
> leads us to agree.
>
> (b)  THE INTERCOASTAL WATERWAY, THE INDUSTRIAL
> CANAL, THE MICHOUD CANAL WERE ALL
> NAVIGATIONAL CANALS OR WATERWAYS OF
> COMMERCE AND WERE NOT DESIGNED,
> CONSTRUCTED OR OPERATED PURSUANT TO
> MISSISSIPPI FLOOD CONTROL ACT OF 1928, AS
> AMENDED OR ANY OTHER FLOOD PROJECT.

The MRGO was neither "designed nor operated as a federal flood control project", to

paraphrase *Central Green*.  House Document No. 245, 82nd Cong. 1st. Sess., submitted 25 Sept.,

1951, the River and Harbor Act of 1951 unauthorized of the Mississippi River Gulf Outlet.  The

Gulf Intercoastal Waterway east of New Orleans was authorized in House Document No. 95,

76th Cong., 1st Session, submitted May 19, 1942.  The Lake Pontchartrain, Louisiana, and

Vicinity Hurricane Protection Project was authorized by Public Law 89-298, 27 Oct. 1965, House Doc. 231, 89th Congress 1st Session.

Work under the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project commenced construction in 1966. It did not result in the redesign of any of MRGO or IWW. It merely incorporated features previously constructed. As initially conceived and approved it consisted of two basic elements, barrier complexes at the three main tidal entrances to Lake Pontchartrain and levee floodwalls. The barrier complexes would have permitted closure of the Lake Pontchartrain tidal passes, keeping water levels low and reducing the required height of the floodwall and levees' heights.

Portions of MRGO were included in the Lake Pontchartrain and Vicinity Plan, *i. e.*, Seabrook Pass Barrier and Chalmette, but Seabrook was abandoned and the Chalmette inclusion was not a redesign to MRGO. The inclusion did not alter the fact that MRGO was designed and operated as a highway of commerce. The same can be said of the Michoud Canal, the Intercoastal Waterway and the Inner Harbor Navigational Canals. None of them were "designed or operated for flood control purposes". In fact, it was the risk they posed that prompted their inclusion.

   (c) THE ORLEANS, NEW LONDON AND 17TH STREET CANALS WERE
   DRAINAGE 'OUTFALL' CANALS, NOT DESIGNED, CONSTRUCTED OR
   MAINTAINED BY THE UNITED STATES CORP OF ENGINEERS,
   PURSUANT TO THE MISSISSIPPI FLOOD CONTROL ACT OF 1928, AS
   AMENDED, OR ANY OTHER FLOOD PROJECT.

New Orleans had three outfall canals to accommodate the discharge of water via pumping stations at the 17th Street, Orleans and New London Canals. These canals were designed and constructed by local interests with no federal involvement. The pumping stations - all state owned - set back from the Lakefront to better accomplish their purpose, the discharge of

water which might collect inside the GNO Basin.  At the time of the adoption of the Lake

Pontchartrain Plan, they were said to be adequate.  Whether the adequacy determination was

based on the assumption that the Barrier Plan had been adopted is unstated.  The Reevaluation

Study published in July 1984:  abandoned the Barrier Plan and authorized the High Level Plan,

the return levees would no longer be benefited by control of the level of lake waters afforded by

the Barrier Plan.  The outfall canals on the Lake side of the pumping station would be exposed to

elevated levels of the substitute High Level Plan.

Thus in sum Section 702(c) immunity does not preclude claims of residents and property

owners which derive from waters emanating from the non-federal portions of the outfall canals,

proximately caused by a breach in the federal portion.  Nor does it preclude actions for damages

wrought by waters emanating from the federal portion of the outfall canals, as they were not

"designed and operated" for federal control purposes.[28]   So to, the claims of residents and

property owners emanating from the Michoud Canal, the Gulf Intercoastal Waterway, the Inner

Harbor Navigational Canal, Industrial Canal and MRGO are not precluded as these waterways

were not "designed and operated" for federal flood control purposes.

*Central Green* held that whether immunity attaches depends on the "character of the

waters", which it defined as "all waters that flow through a federal facility designed and

operated, at least in part, for flood control purposes".  Under these facts, the immunity defense

cannot be sustained.

> (d) IT IS MISLEADING TO SAY THAT THE LAKE PLAN WAS
> ORIGINALLY AURTHORIZED BY THE FEDERAL FLOOD ACT OF 1965
> AND A MISSTATEMENT TO REFER TO THE LAKE PLAN AS A PART OF

---

[28] Indeed, Pittman Construction was commissioned by the Corps to prosecute the works on the east bank of the 17th Street Canal.  The work was never completed.  The job was not accepted and never turned over to the state interest.

THE BROADER FEDERAL CONTROL PROJECT, OR TO SUGGEST AND END TO THE INQUIRY.

To be immune under Section 702c, the damages must be caused by floodwaters carried by from a Federal Flood Control Project "designed and operated" as such[29], and the London Outfall Canal was neither designed nor operated as a federal flood control project.  The London Avenue Outfall Canal was designed and constructed by state interests entirely apart from the Federal Flood Control, and was operated as an outfall drainage canal.

Furthermore, though portions of the London Avenue Outfall Canal (north of the pumping station) were mentioned in the Lake Pontchartrain & Vicinity Hurricane Protection Project, that inclusion did not effect a redesign as a federal flood control work on which immunity as defined in *Central Green*, is predicated.  In fact, the F Project was contained in the letter of the Chief of Engineers "on a review of reports . . . authorized by the Rivers & Harbors . . ." Chief's Letter, Starkel Declaration, Exhibit G (Doc. 2951-12), and was adopted to mitigate the risk of exposure due to the construction of the MR-GO, a Highway of Commerce, made apparent

by Hurricane Betsy. *Cf. Graci v. United States*, 456 F2d (5 Cir.; 1971).  The belated inclusion of portions of the London Avenue Canal in the High Level Plan did not federalize the levees for flood control purposes.  No work was done.  The work later performed was commenced through the 1992 Energy & Water Development Appropriation Act, otherwise thus as designed by the Corps.

Finally, the flood waters which damaged your Respondents, though proximately caused by the failure of the London Avenue Canal, and the fault of the Corps, were not "of waters that

---

[29] *Central Green,* 531 U.S. 425, 837 (2001) itself defined the "character of the waters" as "all waters that flow through a federal facility designed and operated, at least in part, for flood control purposes".

27

flow through a federal facility designed and operated, at least in part, for flood control purposes" on which immunity depends under *Central Green*.

The closure of the London Avenue pumping station, as a result of the failure of the levees federalized by the Lake Pontchartrain & Vicinity Hurricane Protection Plan improvements in 1997, was a proximate cause of the flooding suffered by Old Gentilly (*Bourgeois*) Plaintiffs. The Berkley Final Report expressed the opinion thusly: "loss of drainage capabilities as a result of breach of the drainage canals [such as within the 17th Street Drainage Canal, and the London Avenue Canal . . .]," which it identifies among the "three other significant pump and drainage system based failures." July 31, 2006 Report pp. 10-31. Memorandum Excerpt, Exhibit N.

It is misleading to simply say that the Lake Plan Project was originally authorized in the Federal Flood Act of 1965 (*Id.* Starkel Declaration, para. 15) and to refer to the Lake Pontchartrain project as "flood protection control works." *Id*. Starkel Declaration, para 10) Though Title II of Public Law 89-289 "may be cited as the Flood Control Act of 1965"( Sect.222), Section 201 (a) defines the scope as authorizing the Corps "to construct, operate and maintain any water resource development project, involving, but not limited to , navigation, flood control and shore protection." Exhibit J, p. 1075. Furthermore, The Lake Pontchartrain project was not specified as a "flood control and improvement of the lower Mississippi River, adopted by the Act of May 15, 1928 (45 Stat 534) as amended or modified", rather the project was authorized in accordance with House Document 231, authorized by the Rivers & Harbor Act approved March 2, 1945.

It is a misstatement to refer to the Lake Plan project "a part of a broader federal flood control project." 1984 Reevaluation Plan.[30] *Id.* p.15. The Lake Plan adopted in 1966

---

[30] The Reevaluation Plan is included in the Rule of Evidence 201 Submission Id. at fn 26.

contemplated the closure of the Lake's three tidal passes at the Rigolets, the Chef and Seabrook

(Inner Harbor Navigational pass) "the latter said to be a feature of the MRGO Navigation

Project".  p. 34.  In 1966, "the return levees paralleling the canals to the pumping stations were

considered adequate." *Id.* p. 39.  No work was commissioned on the return levees in the 1966

Plan.  The 1984 Reevaluation Study which abandoned the Barrier Plan in favor of the High

Level Plan included portions of these return levees, calling for elevating their heights, and

"installing auxiliary pumping stations . . . at the lake to provide pumping capability when the

flood gates were closed."  The portions of the outfall canals or return levees inside the pumping

station were not incorporated in the Lake Plan, nor were the expenditure of federal funds for

their improvement authorized.

The 1992 Energy & Water Development Appropriation Act mandated construction of the

outfall levees.  The IPET Report, Exhibit K, describes it as follows:

> On February 7, 1985, the Director of Civil Works for the Corps of
> Engineers, after reviewing the reevaluation study and the final supplement to the
> environmental impact statement, approved the post-authorization change for the
> Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project, thereby
> formalizing the High Level Plan.  In turn, the New Orleans District commenced
> examining two alternative plans for providing "high level" standard project
> hurricane protection for the outfall canals—fronting protection in the form of
> gated structures at the canal entrances from the lake, and parallel protection in the
> form of floodwalls and flood proofing of bridges.  The plans and designs for the
> outfall canals called for gated control structures at or near the canal entrances to
> the lake, but the local sponsor, the Orleans Levee Board, indicated its preference
> for parallel protection.  *Congress settled the dispute through the 1992 Energy and
> Water Development Appropriations Act, which mandated construction of the
> parallel protection plan.*  Emphasis Added.  Final Draft, Performance Evaluation
> of the New Orleans and Southeast Louisiana Hurricane Protection System, June 1,
> 2006.

*Emphasis Added*

5.   UNDER *STEWART V. DUTRA CONSTRUCTION COMPANY*, 543 U.S. 481
(2007) THE DREDGES AND CRANE BARGES USED TO  CONSTRUCT
THE INDUSTRIAL CANAL'S  NEW LOCK IS A VESSEL AS DEFINED BY 1

U.S.C. 3, AS IS THE NEW LOCK ITSELF, UNDER *AYRES V. UNITED STATES*, 277 F3D 821 (6TH CIR.; 2002) ; CLAIMS FOR FLOODING FROM THE INDUSTRIAL CANAL SOUND IN ADMIRALTY

Without reaching to the question of Admiralty jurisdiction *per se*, this Court in *Reed* and *Anderson* dismissed the claims against the United States based on lack of subject matter jurisdiction because the plaintiffs there failed to file an Administrative Claims [Doc. 3365 and Doc. 5551]. In its opinion in *O'Dwyer*, 05-4181, *Berthelot,* 05-82, and others [Doc. 6175], however, this Court found the 17th Street Canal was not a navigable body of water, but "a drainage ditch" and dismissed allegation of maritime jurisdiction of claims relating to the 17th Street, the Orleans and the London Avenue Canals [Opinion in *O'Dwyer etal., Bertholot et al*. and others, Doc. 6175]. Whether admiralty jurisdiction extends to the Industrial Canal claims is an open issue. [31]. Respondent suggest admiralty jurisdiction is properly invoked.

In *Jerome B. Grubar, Inc. v. Great Lake Dredge and Dry Dock, Inc*., 513 U.S. 527 (1995) the Supreme Court held admiralty jurisdiction existed over claims concerning flooding of buildings in downtown Chicago; the flooding was alleged to have occurred as a result of work prosecuted by a crane barge driving piles in the riverbed above a tunnel. The *Grubart* Court applied the *Sisson* test, and stated that "A party seeking to invoke federal admiralty jurisdiction over a tort claim must satisfy conditions both of location and of connection with maritime activity." Id at 534. "To determine location" the tort must occur "on navigable water and whether on land was caused by a vessel on navigable

[31] The United States has moved to strike all admiralty act claims pled in the MRGO Master Consolidated Class Action Complaint [Doc. 3415] and the superseding Master Consolidated Class Action Complaint [Doc. 3420] [Doc. 5855].

water." *Id*. at  536-7.   The connection test turns on the potential disruptive effect on

maritime commerce and risk to shipping.

*Stewart, supra*, followed *Grubart* holding that a floating platform armed with a

clamshell bucket used to dredge a trench, to build the Ted Williams Tunnel extension to

the Boston turnpike, was a vessel, though powerless, moved "by manipulating anchors

and cables." *Id.* p. 484

In *Ayres, supra,* the administrator of the Estate of Hardin, brought suit against the

United States, alleging negligent operation of the Lock and Dam on the Kentucky River

by the United States Corps of Engineer. Hardin had died while swimming in the river

proximate to the Locks. The District Court dismissed the claim on the holding though the

Estate had filed an administrative claims under FTCA, his claim sounded in

Admiralty and he failed to bring suit within two years. 46 U.S.C. App. §.745. *Ayres*

Argued that no vessel was involved in Hardin's drowning." The Court was not

persuaded. The judgment dismissing the claim was affirmed. Rejecting a mechanical

application of the locality test, the Court said:

> "The locality prong of the test for admiralty jurisdiction has been satisfied. Not
> only was Hardin drowned in navigable water, but also *the instrumentality that
> Appellant suggests caused the drowning (Lock No. 2) was located in navigable
> waters*. "  Id. p. 827

*Emphasis Added*

6.   AS THIS COURT HELD IN *ROBINSON*, QUESTIONS OF FACT AS
TOWHETHER THE DECISIONS MADE WITH RESPECT TO VARIOUS
WATERWAYS AND LOCKS PRECLUDE RESOLUTION UNDER THE DUE CARE
AND DISCRETIONARY FUNCTION EXCEPTIONS;

The "due care" exception immunizes the Government from suit with respect to claims

based on the execution of a statute or regulation and requires "for its application that the actor

have exercised due care." *Id.* at 297, *Buchanan v. United States*, 915 F.2d 969 F.2d 969 (5th Cir. 1990). The "discretionary function exception" excepts "claims based on the performance of a discretionary function and ha no such requirement with respect to the exercise of due care."

First, a court must determine whether the action is "a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States,* 486 U. S. at 536. *Id.* citing *Dalehite v. United States,* 346 U. S. 15, 34 (1953). "If an employee violates a mandatory regulation 'there will be no shelter from liability because there is no room for choice." *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.,* 1998 WL 113935 (E. D. La. March 10, 1998) *citing United States v. Gaubert,* 499 U. S. 315, 324 (1991).

The second inquiry is whether that judgment or choice is based on considerations of public policy. As stated in *Berkovitz,* "The basis for discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines* [467 U. S.] at 814." *Berkovitz* 486 U. S. at 537. "The discretion function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id.*

In any event, "if the [Government's] policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful." *Berkovitz,* 486 U. S. at 546-7.

As to the second prong of the discretionary function exception, the salient issues to consider is whether the Government actor is (1) acting in contravention of its own regulations or standards or (2) exercising a policy choice.

The Court has held that it "cannot accept on the record before it that all actions done by the Corps wee based on policy determination". Indeed, this Court has held ". . . it is impossible to find on this record that all actions taken either were not in contravention of the relevant regulations and policies of the Army Corps and/or that all decisions made by the Army Corps were policy decisions. This issue is one which must be examined in discovery."

The Court in *Whisnant v. United States,* 400 F3d 1177 (9th; 2005) noted that the danger with the discretionary function exception is more pronounced where the government takes on the role of a private landowner. It noted:

> Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources. As we have noted before in the discretionary function exception context, "[b]udgetary constraints underlie virtually all governmental activity." Were we to view inadequate funding alone as sufficient to garner the proection of the discretionary function excepton, we would read the rule too narrowly and the excepton too broadly. Instead, in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly. *Id.* (quoting *ARA Leisure,* 831 F.2d at 196) (additional citations omitted) (emphasis added).

*Id.* at 1183-84. Thus, there are questions of fact as to whether the decisions made with respect to the maintenance of the MRGO were actually policy based.

## CONCLUSION

The United States' motion should be denied.

Respectfully submitted,

OF COUNSEL:                                              /s/ William C. Gambel

33

MILLING BENSON WOODWARD LLP

William C. Gambel (LA Bar No. 5900)
909 Poydras Street, Suite 2300
New Orleans, LA  70112-1010
Telephone:  (504) 569-7000
Telecopy:  (504) 569-7001
wgambel@millinglaw.com


John J. Cummings, III, (LA Bar No. 4652)
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA  70130
Telephone:  (504) 586-000
Telecopy:  (504) 586-8423
ccdlawfirm@aol.com


W363805

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by electronic notice in accordance with Local Rules to those counsel receiving electronic notice, and all others depositing same in the United States mail, postage prepaid and properly addressed, this 13th day of August, 2007.

/s/ William C. Gambel
William C. Gambel

W363805