# Investigation of the Performance of the New Orleans Flood Protection Systems

## in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**



EXHIBIT

I

tabbies®

    

Like St. Bernard Parish, the breaches at the west end of the Lower Ninth Ward occurred before the storm surge peaked (at about 8:30 a.m. in the IHNC channel), so the Lower Ninth Ward was flooded to a level well above mean sea level before the storm surge subsequently subsided. This neighborhood, which had ground surface elevations of generally between about -3 to -6 feet (MSL) was flooded to elevations of up to as much as 10 to 12 feet above sea level. The resulting carnage, in terms of both loss of life (as shown in Figure 2.12) and destruction of homes and businesses was considerable, as the flooding rose above the tops of many of the one-story homes in this densely packed neighborhood.

The protected area of New Orleans East, directly to the north of the St. Bernard Parish/Ninth Ward protected area, had been breached at its southeastern corner by the initial storm surge and lateral rush from Lake Borgne (as shown schematically in Figure 2.11) by about 6:00 to 7:00 a.m., though the resulting breaches were confined to several locations so that the inflowing waters began to make their way across the undeveloped swamplands of the eastern portion of this protected area and timing is thus difficult to pin down with exactitude. The storm surge then passed laterally along the GIWW/MRGO east-west channel and produced another finite breach on the north side of this channel and several additional distressed sections. This breach added to the sources of water beginning to flow into this protected area.

The surge that passed west along the GIWW/MRGO east-west channel then pushed north along the IHNC, and produced several additional breaches and distressed sections, of varying severity, along the IHNC frontage as shown in Figure 2.4. These, too, added to the flow into the protected area of New Orleans East.

The lateral storm surge that passed westward along the east-west trending GIWW/MRGO channel between New Orleans East and St. Bernard Parish also attacked the west side of the IHNC channel, at the eastern edge of the main Orleans East Bank (downtown New Orleans) protected area. This produced three additional breaches along this frontage, as shown in Figures 2.4 and 2.11. Floodwaters began to flow into the main New Orleans metropolitan (downtown) protected area through these breaches between approximately 7:00 to 8:30 a.m. Although three of these breaches were relatively significant, all three breaches along this frontage failed to scour to significant depths. As a result, all three either had "lips" with lowest elevations above mean sea level, or there were points along the path from the IHNC to the breach that were above mean sea level. Accordingly, although all three breaches allowed some flow of water into the main Orleans East Bank (downtown) protected area, they allowed only limited flow and this flow stopped as the storm surge subsequently subsided. It would be the subsequent breaches in the drainage canals, to the northwest (along the edge of Lake Pontchartrain) that would prove to be devastating for this main (downtown) protected area.

As the hurricane then passed northwards to the east of New Orleans, the counterclockwise direction of the storm winds also produced a well-predicted storm surge southwards towards the south shore of Lake Pontchartrain. The lake level rose, but mainly stayed below the crests of most of the lakefront levees. The lake rose approximately to the tops of the lakefront levees at a number of locations, especially along the shoreline of New Orleans East, and there was moderate overtopping (or at least storm wave splash-over) and some resulting erosion on the crests and inboard faces of some lakefront levee sections along the Lake frontage. Significant overtopping occurred over a long section of concrete floodwall near the west end of the New Orleans East protected area lakefront (behind the Old Lakefront Airport), where the floodwall appears to have

tion of a claim to renewal of copyright, $4; which fees shall include a certificate for each registration: *Provided,* That only one registration fee shall be required in the case of several volumes of the same book published and deposited at the same time: *And provided further,* That with respect to works of foreign origin, in lieu of payment of the copyright fee of $6 together with one copy of the work and application, the foreign author or proprietor may at any time within six months from the date of first publication abroad deposit in the Copyright Office an application for registration and two copies of the work which shall be accompanied by a catalog card in form and content satisfactory to the Register of Copyrights.

"For every additional certificate of registration, $2.

"For certifying a copy of an application for registration of copyright, and for all other certifications, $3.

"For recording every assignment, agreement, power of attorney or other paper not exceeding six pages, $5; for each additional page or less, 50 cents; for each title over one in the paper recorded, 50 cents additional.

"For recording a notice of use, or notice of intention to use, $3, for each notice of not more than five titles; and 50 cents for each additional title.

"For any requested search of Copyright Office records, works deposited, or other available material, or services rendered in connection therewith, $5, for each hour of time consumed."

Sec. 3.  This Act shall take effect thirty days after its enactment.

Approved October 27, 1965.

## PUBLIC WORKS—RIVERS AND HARBORS

### PUBLIC LAW 89–298;  79 STAT. 1073

[S. 2300]

An Act authorizing the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

### TITLE I—NORTHEASTERN UNITED STATES WATER SUPPLY

Sec. 101.   (a)  Congress hereby recognizes that assuring adequate supplies of water for the great metropolitan centers of the United States has become a problem of such magnitude that the welfare and prosperity of this country require the Federal Government to assist in the solution of water supply problems.   Therefore, the Secretary of the Army, acting through the Chief of Engineers, is authorized to cooperate with Federal, State, and local agencies in preparing plans in accordance with the Water Resources Planning Act (Public Law 89–80) to meet the long-range water needs of the northeastern United States.   This plan may provide for the construction, opera-

EXHIBIT
J

tion, and maintenance by the United States of (1) a system of major reservoirs to be located within those river basins of the Northeastern United States which drain into the Chesapeake Bay, those that drain into the Atlantic Ocean north of the Chesapeake Bay, those that drain into Lake Ontario, and those that drain into the Saint Lawrence River, (2) major conveyance facilities by which water may be exchanged between these river basins to the extent found desirable in the national interest, and (3) major purification facilities. Such plans shall provide for appropriate financial participation by the States, political subdivisions thereof, and other local interests.

(b) The Secretary of the Army, acting through the Chief of Engineers, shall construct, operate, and maintain those reservoirs, conveyance facilities, and purification facilities, which are recommended in the plan prepared in accordance with subsection (a) of this section, and which are specifically authorized by law enacted after the date of enactment of this Act.

(c) Each reservoir included in the plan authorized by this section shall be considered as a component of a comprehensive plan for the optimum development of the river basin in which it is situated, as well as a component of the plan established in accordance with this section.

### TITLE II—FLOOD CONTROL

Sec. 201. (a) The Secretary of the Army, acting through the Chief of Engineers, is authorized to construct, operate, and maintain any water resource development project, including single and multiple purpose projects involving, but not limited to, navigation, flood control, and shore protection, if the estimated Federal first cost of constructing such project is less than $10,000,000. No appropriation shall be made to construct, operate, or maintain any such project if such project has not been approved by resolutions adopted by the Committees on Public Works of the Senate and House of Representatives, respectively. For the purpose of securing consideration of such approval the Secretary shall transmit to Congress a report of such proposed project, including all relevant data and all costs.

(b) Any water resource development project authorized to be constructed by this section shall be subject to the same requirements of local cooperation as it would be if the estimated Federal first cost of such project were $10,000,000 or more.

Sec. 202. Section 3 of the Act approved June 22, 1936 (Public Law Numbered 738, Seventy-fourth Congress), as amended by section 2 of the Act approved June 28, 1938 (Public Law Numbered 761, Seventy-fifth Congress), shall apply to all works authorized in this title except that for any channel improvement or channel rectification project, provisions (a), (b), and (c) of section 3 of said Act of June 22, 1936, shall apply thereto, and except as otherwise provided by law, the authorization for any flood control project authorized by this Act requiring local cooperation shall expire five years from the date on which local interests are notified in writing by the Department of the Army of the requirements of local cooperation, unless



**US Army Corps
of Engineers®**

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume III – The Hurricane Protection System

1 June 2006



**FINAL DRAFT**
(Subject to Revision)

**EXHIBIT**

tabbies®

K

project components, with the exception of the barrier complexes at the Rigolets and Chef Menteur Pass.

In response to the court injunctions against the barrier complexes, the New Orleans District initiated an effort to pursue a fast-track study to recommend a path forward for the project. This effort culminated in a July 1984 reevaluation study of the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project. The reevaluation study examined the continued feasibility of the barrier plan and the feasibility of providing hurricane protection solely by the means of raising and strengthening levees and floodwalls, more common known as High Level plans. The study concluded that a High Level Plan represented the most feasible plan of protection for the study area from the Standard Project Hurricane—the most severe hurricane reasonable expected to occur from a combination of meteorological and hydrologic events characteristic of the area. The plan recommended improved hurricane protection levee systems in Orleans Parish, St. Bernard Parish, and the east bank of Jefferson Parish; repairing and rehabilitating the Mandeville Seawall in St. Tammany Parish; constructing a new levee on the east bank of St. Charles Parish north of US Highway 61; and raising and strengthening the levee along the Jefferson and St. Charles Parish boundary.

The reevaluation study, however, did not address lingering concerns on the treatment of the 17th Street, London Avenue, and Orleans Avenue outfall canals. Subsequent to the 1965 Flood Control Act, the New Orleans District determined that the levees flanking the outfall canals were inadequate in terms of grade and stability. The reevaluation study did set forth five potential solutions, ranging from higher and stronger levees to floodgates at the entrances to auxiliary pumping stations at the canal openings; but left the final determination for alternative selection to future design memorandums.

On February 7, 1985, the Director of Civil Works for the Corps of Engineers, after reviewing the reevaluation study and the final supplement to the environmental impact statement, approved the post-authorization change for the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project, thereby formalizing the High Level Plan. In turn, the New Orleans District commenced examining two alternative plans for providing "high level" standard project hurricane protection for the outfall canals—fronting protection in the form of gated structures at the canal entrances from the lake, and parallel protection in the form of floodwalls and flood proofing of bridges. The plans and designs for the outfall canals called for gated control structures at or near the canal entrances to the lake, but the local sponsor, the Orleans Levee Board, indicated its preference for parallel protection. Congress settled the dispute through the 1992 Energy and Water Development Appropriations Act, which mandated construction of the parallel protection plan.

### 3.2.1.3. Datum – Subsidence and Vertical Datum Problems in New Orleans, LA

Because of technological gains, the U.S. Army Corps of Engineers is able to more accurately track subsidence of projects – something that could not be done as reliably in the past. Based on a recent study, we can now estimate that the New Orleans area is subsiding at a rate of 6-17 mm/yr or 2-5½ feet per century. In the city itself, it's about 3 feet per century and as much as 10 feet per century in Venice, if recent trends continue.

This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.