UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE KATRINA DREDGING LIMITATION ACTIONS CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NUMBER:  05-4182 |
| PERTAINS TO: ALL ACTIONS | SECTION:  K |
| | MAGISTRATE:  2 |

## PETITION AND COMPLAINT IN INTERVENTION

Named plaintiff MELISSA PIERCE, together with all individuals and entities whose names appear on the attached Exhibit A, through undersigned counsel with respect represent that:

## I.  PARTIES

1.

Named plaintiffs are all majors and citizens of the State of Louisiana.

2.

Named plaintiffs include all individuals set forth and listed in the attached Exhibit A, which listing is incorporated herein as if set forth *in extenso*.

3.

Defendant herein is the United States of America.  The U.S. Army Corps of Engineers is an agency of the United States of America.  At all times material hereto all persons working at, working for, on behalf of, at the behest of the U.S. Army Corps of Engineers were agents, servants, and/or

–1–

employees of the U.S. Army Corps of Engineers, the United States of America, or some other agency thereof, and were at all times material hereto, acting within the course and scope of such employment.

## II.  JURISDICTION AND VENUE

5.

The Court has subject matter jurisdiction over certain claims asserted herein pursuant to the Admiralty/Maritime Law of the United States and the provisions of 28 U.S.C. §1333(1), saving to all plaintiffs as suitors the full range of legal and equitable remedies to which they are entitled.

6.

The Court has subject matter jurisdiction over certain claims asserted herein pursuant to the Admiralty Extension Act, 46 U.S.C. §30101, the Suits in Admiralty Act, 46 U.S.C. §30901, and the Public Vessels Act, 46 U.S.C. §31101.

7.

The injuries and damages complained of herein were inflicted and/or consummated on land, in part as the result of vessel activity on navigable water, and likewise in part as the result of traditional maritime activity (i.e., dredging) which had actual as well as potential impact on maritime commerce.

8.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1346(b)(1), the United States being a defendant.

–2–

9.

The Court has subject matter jurisdiction over certain claims asserted herein pursuant to 28 U.S.C. §§2671, *et seq*. (The Federal Tort Claims Act).

10.

The Court has subject matter jurisdiction over certain claims asserted herein pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction), inasmuch as certain claims arise under the United States Constitution and/or the laws of the United States, including, without limitation, the Federal Water Pollution & Control Act, 33 U.S.C. §§1251 *et seq.*, the Coastal Zone Management Act, 16 U.S.C. §§1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§403 *et seq*.

11.

In addition, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §1367 as to any and all claims asserted under Louisiana law, since these claims are so related to the claims within the federal jurisdiction of the Court that they form part of the same case or controversy within the meaning of Article III of the United States Constitution.

12.

Each named plaintiff has presented to the defendant's agency, the U.S. Army Corps of Engineers [hereafter "the Corps"] the written, administrative claim required under appropriate federal law and/or regulation, and a period of at least six months has expired since the filing of these claims.  The Corps has failed to resolve the claims.  The claims are deemed denied, and, accordingly, plaintiffs have complied with all jurisdictional prerequisites herein.  All plaintiffs, however, further reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a

consequence of the inaction and failure on the part of the Corps in regard to the processing and

evaluation of said claims.  Plaintiffs specifically invoke the "futility doctrine" as a basis for the

waiver and/or inapplicability of all administrative claim filing requirements in this matter.

13.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, inasmuch

as the defendant's negligent and wrongful action occurred in this district, a substantial part of the

events and omissions giving rise to this action occurred in this district, named plaintiffs resided in

this district at the time of the event giving rise to this litigation, and the damages suffered by all

named plaintiffs occurred within this district.

### III.  FACTUAL ALLEGATIONS

23.

On or about August 29, 2005, Hurricane Katrina (hereafter "Katrina") made landfall on the

Gulf Coast, largely sparing Greater New Orleans, which fortunately lay in the storm's rapidly-

deteriorating western eye-wall as it came ashore.

24.

In both Orleans and St. Bernard Parishes, Katrina's winds at the time of landfall did not

register as a "Category 3" storm on the Saffir-Simpson scale.  The hurricane winds at this time

barely reached the velocity of one hundred miles per hour (mph).

25.

Nonetheless, through the fault of the defendant, the storm surge associated with Katrina

inundated St. Bernard Parish and approximately 80% of the Greater New Orleans area, causing extensive loss of life, catastrophic property damage, and the displacement and continuing disruption of a major urban community.  The defendant's actions and inactions as set forth herein, effectively converted a less-than-Category 3 hurricane into one of the worst disasters in U.S. history.

### The Mississippi River Gulf Outlet, Gulf Intra-Costal Waterway and Industrial Canal

26.

Constructed over forty years ago, the Mississippi River Gulf Outlet [hereafter "MRGO"] is a navigational channel running between the Gulf of Mexico (to the east of St. Bernard Parish) and the Gulf Intra-Coastal Waterway [hereafter "GIWW"].  The MRGO connects through the GIWW with the Industrial Canal [hereafter "IHNC"] in New Orleans.

27.

Enlarged by construction in the 1960s, the MRGO for years has enhanced the risk of hurricane storm surge damage to the Greater New Orleans area.  This risk, in fact, was made manifest after Hurricane Betsy in September 1965, when both the east and west sides of the IHNC experienced levee failures and overtopping, due to the surge-potentiating and funneling effect of the MRGO.

28.

Construction of the IHNC as a deep water canal to connect the Mississippi River and Lake Pontchartrain began in June 1918.  Excavation work initiated with the construction of parallel dykes on either side of the canal, with excavated materials being used as a basis for protective levees.

29.

From the onset, contractors involved in the IHNC project were confronted with problems of slope and soil instability.  Nevertheless, the excavation of the canal was completed in 1919, and a lock structure was completed in January 1923, at which time the water level in the IHNC was controlled by the tides of Lake Pontchartrain.

30.

By the late 1990s, the Corps had undertaken a project site development and remedial action of the IHNC, East Bank Industrial Area [hereinafter "EBIA"] for the construction of a replacement for the existing lock on the IHNC.  The existing lock lacked the capacity for the full volume of ship traffic passing from the Mississippi River to the IHNC as required by the Port of New Orleans.  The new lock would require the construction of a bypass channel at the EBIA, located in the lower Ninth Ward of New Orleans, west of the flood wall and east of the IHNC, between Florida Avenue and Claiborne Avenue.  In order to construct this bypass channel, the Corps ordered the excavation of soils, subsurface obstructions, sheet piles and piles constituting IHNC wharfage.  Work on this project was continuing in 2000, with the remediation work having important effects on the soils relied upon to provide stability and protection for the flood protection structure.

31.

The GIWW was a navigational project completed in 1942.  It forms a protected shipping lane between Port Isabel, Texas and the Apalachee Bay, Florida.

32.

In 1944, under the authority of the defendant, the GIWW was re-routed to pass through the

southern part of the IHNC, creating the first shallow channel through the wetlands.  This decision by the Corps facilitated the propagation of storm surge from Lake Borgne into New Orleans.

## Lake Pontchartrain Project

33.

Most of the levee and/or I-wall structures that surround the New Orleans metropolitan area were constructed, at least in part, under the authority of the Lake Pontchartrain, Louisiana Vicinity Hurricane Protection Project [hereafter "Lake Pontchartrain Project"].   The defendant was responsible for the design and construction of this project.

34.

The overall design criterion for the Lake Pontchartrain Project as mandated by Congress, called for the protection of the New Orleans area from "the most severe combination" of weather conditions which would be considered "characteristic for the region."  It was anticipated that such conditions might occur once every two hundred to three hundred years.  The defendant deemed these conditions to be equivalent with the "Standard Project Hurricane" [hereafter "SPH"], but based its overall design specifications on a 1959 U.S. Weather Bureau one-in-100 year SPH.   This contradicted to the Congressional mandate to protect the New Orleans area in the event of the most severe hurricane which might be expected in a two to three hundred year period of time.

35.

By 1972, just as the construction of the initial parts of the Lake Pontchartrain Project and flood walls along the IHNC was in the early stages, the 1959 SPH was known by the defendant to be obsolete.  As of this time, the 1959 specification of maximum sustained wind speeds of 107 MPH

had been increased by the National Weather Service to 129 MPH.  An increase of twenty percent in maximum wind speed equates to a forty percent increase in maximum storm surge elevation.

36.

In 1979, the National Oceanic and Atmospheric Administration increased the maximum sustained winds for the SPH once again, this time to 140 MPH.  This recognition of the risk of a "Category 4" hurricane even further exacerbated the design deficiency of the defendant's Lake Pontchartrain Project.

37.

In 1981, the office of the Chief of Engineers in Washington, D.C. issued Engineering Regulation [ER] 110-2-1453.  Providing direction for the development of SPH criteria along the Gulf Coast, this regulation required that "[a]ll field operating activities having Civil Works responsibilities" be "required" to use specific and updated SPH meteorological criteria.  The defendants Corps nonetheless failed and refused to consider any alteration of the Lake Pontchartrain Project on this basis, opting instead to continue basing its designs for the Project on the 1959 SPH, and not on the updated and more current meteorological criteria.

38.

In regard to the Lake Pontchartrain Project, the defendant also referred to and utilized the National Geodetic Vertical Datum of 1929 ["NGVD29"], despite the fact that this datum no longer was equal to, or interchangeable with, true local mean sea level [LMSL] of the area meant to be protected by the Project.

39.

LMSL is the only relevant datum for superimposition of hurricane surge and wave height for a 1950's era oceanographic analysis. However, when the defendant adopted its design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 already was between 1.3 and 1.6 feet below the actual LMSL at different parts of the system to be protected, assuring that flood wall crowns based on NGVD29 would be constructed lower by this same margin.

40.

No provision was made to account for the three-to-four foot per century subsidence rates characteristic of the Greater New Orleans metropolitan area, even though this rate was known by the Corps at the time of the Congressional authorization of the Lake Pontchartrain Project. This meant that crown elevation deficiencies ranged up to six feet at the time Katrina struck, which in turn prolonged overtopping of a number of flood walls and levees that otherwise would have been overtopped only briefly, if at all, during Katrina's storm surge. This prolonged overtopping led to catastrophic breaches and water intrusion into the Greater New Orleans area.

**Unauthorized Change from Barrier Plan to High Level Plan**

41.

The original and only project design authorized by Congress in connection with the Lake Pontchartrain Project was known as the "Barrier Plan," which contemplated a series of levees along Lake Pontchartrain controlled structures including barriers and flood control gates at the Rigolets, the Chef Menteur Pass, and Seabrook at the northern end of the IHNC. These structures were intended to prevent storm surges from entering Lake Pontchartrain, as well as the IHNC through

MRGO's confluence with the GIWW, thus protecting citizens from the overtopping of levees along Lake Pontchartrain, the IHNC flood walls, and other areas.

42.

The Barrier Plan had been selected and authorized by Congress over an alternative design, known as the "High Level Plan." The latter would have excluded the barriers and flood control gates discussed above, and instead employed higher levees and flood protection structures along the lakefront and other areas. There were numerous and serious deficiencies and drawbacks known to be associated with the High Level Plan.

43.

The final design memoranda for the Barrier Plan were completed in the late 1960s, and construction commenced thereafter. However, during the 1970s, the control complexes at the Rigolets and at Chef Menteur drew opposition from environmentalists, culminating in a 1977 Court decision that prevented the Corps from constructing the barrier complex in certain other parts of the plan until and unless a revised Environmental Impact Statement was accepted.

44.

The defendant did not produce a satisfactory Environmental Impact Statement, and decided in 1984 to abandon the Barrier Plan and implement the High Level Plan, notwithstanding the latter's flaws and deficiencies.

45.

The Corps knew that Congressional re-authorization was required for such a major change in the design of the Lake Pontchartrain Project, but implemented the change to the High Level Plan

without seeking or obtaining the necessary re-authorization by Congress.

46.

By the mid-1980s, a dense network of single family residences abutted the various drainage canals in New Orleans, extending along their entire courses. The encroachment of these homes adjacent to canal embankments eliminated the possibility of using conventional methods to heighten canal levees, which usually is accomplished by adding compacted earth on the land-side of the levees. To achieve the Congressionally-mandated level of protection, the defendant, therefore, would have had to displace hundreds of residences, which would have been costly, time-consuming and controversial.

47.

The Corps accordingly proposed to provide protection from storm surge by placing flood gates and new pump stations at the end of these drainage canals. No funds, Congressionally-authorized or otherwise, were available for this purpose; and, in addition, local authorities objected to the installation of such flood gates or pumps for fear that the City could not be properly drained when the gates were closed in the event of a storm.

48.

The Corps, therefore, opted to provide "parallel protection," by raising the heights of the existing levels and sheet-pile flood walls along each side of the City's drainage canals in question.

## 17th Street Canal

### 49.

The 17th Street Canal was dug in the early 1850s through swampy ground to provide a right-of-way for a railway which connected the town of Carrollton with a shipping port on Lake Pontchartrain, in the area today known as "Bucktown."

### 50.

In 1958, a second canal was built, connecting the original canal to the river side of the Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th Street," and thus became known as the "17th Street Canal." The name eventually came to commonly refer to the original, large canal to which this spur canal connected.

### 51.

The community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, began more than a hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts; and the canal provided transportation as well as a harbor for fishing boats.

### 52.

More substantial development in this area occurred during the mid-19th century, with construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard), and at the terminus of the Jefferson and Lake Pontchartrain Railway (where Bucktown is today).

53.

Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats.  In addition, the Louisiana Department of Wildlife & Fisheries permitted commercial fishing and crabbing activities along the entire length of the 17th Street Canal.

54.

The 17th Street Canal historically is, and at all times pertinent hereto has been, a navigable waterway of the United States, within the meaning of 33 C.F.R. §329.5.  It was dredged and re-dredged during its historic use as such.

55.

On July 15, 1974, the Sewerage and Water Board of New Orleans ["S&WB"] initiated a project to improve drainage from the 17th Street Canal Drainage Basin.  Initially, this project called for the dredging of 2.4 miles of the 17th Street Canal from Pump Station No. 6 to Lake Pontchartrain.  The purpose of the dredging was to remove sediment from the canal bottom and reshape the canal cross-section both to improve flow characteristics and increase the pump capacity of Pump Station No. 6.  The removal of approximately 85,000 cubic yards of bottom sediment was anticipated. Dredge material was to be deposited along the banks of Breakwater Drive and an area of the then-proposed Bucktown Dock Facility (West End Park).

56.

Dredging projects in navigable waters of the United States require a permit from the Department of the Army pursuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403).  Accordingly, on July 15, 1974, the S&WB filed an application for a

"Permit to Discharge or Work in Navigable Waters and their Tributaries" with the Corps' New Orleans District.

57.

The Army Corps of Engineers, as a Department of the United States Army, has seven divisions in the United States, one of them being the Lower Mississippi River Valley Division. Each division is divided into districts. The New Orleans District is a district of the Lower Mississippi Valley Division and it is divided into six technical divisions. The technical divisions are: Real Estate, Contracting, Construction New Orleans/Lafayette, Engineering, Planning Program Project Management (PPPMD), and Operations. The Operations division is responsible for navigation and the issuance of permits. Issues regarding flood control come under the ambit of the Engineering division. Thus, the issuance of the permit to dredge was the primary responsibility of the Operations division rather than the Engineering division which is responsible for flood control.

58.

The permit approval process required the S&WB to obtain approval from, among others, the Louisiana Department of Public Works. In August of 1974, this Department indicated that it could not complete a review of the permit because the applicant had no soil data substantiating the stability or integrity of the levees in question. On May 23, 1977, the Corps returned the application with no action because the S&WB failed to furnish information requested by, among others, the Louisiana Department of Public Works.

59.

In 1978, the S&WB retained the civil engineering firm, Modjeski & Matters, Inc.

–14–

["Modjeski"], to provide a plan for the design and implementation of the dredging project, and, on August 23, 1979, Modjeski submitted a second dredging permit application on behalf of the S&WB.

60.

The same application was resubmitted on December 29, 1980 after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

61.

On January 28, 1981, Modjeski, in response to inquiries about the impact of the dredging on existing levees, provided the Corps with its first memorandum addressing the stability of the existing levees and sheet pile wall along the canal.  The memo indicated that on three of the six test locations, the factors of safety fell below the required values set by the Corps.

62.

On February 6, 1981, Modjeski provided the Corps with a stability analysis of the existing sheet pile wall along the east side of the canal north of Hammond Highway.  This report stated that portions of the canal's flood wall were "extremely unstable," due (among other things) to "very soft" supporting soil.

63.

On March 5, 1981, the Corps' Engineering Division issued an internal memorandum addressing the soil stability analyses provided by Modjeski.  Item No. 4 of the defendant's memorandum acknowledged that "factors of safety" were "substantially below the minimum...factor of safety" for such a flood wall.

64.

On March 31, 1981, the Corps held a public hearing regarding the dredging permit application.  Modjeski's consulting engineer voiced his concerns at this hearing about widening the 17th Street Canal, stating that its levees already were in violation of the Corps' engineering standards for levee stability and that attempts to dig away more dirt adjacent to the levees would only worsen the stability problem.

65.

On April 20, 1981, in response to the concerns that the dredging would negatively impact the existing levee, Modjeski submitted, on behalf of the S&WB, another dredging permit application under the Rivers and Harbors Act.  This application specified a preliminary plan to install sheet pile walls with concrete caps for the entire length of the project, preceding excavation of the canal.  The sheet pile walls were to be of a sufficient height to meet flood protection criteria.

66.

Following review of the above application, an internal Corps memorandum dated June 16, 1981 indicated that a number of levee and flood wall stability problems were likely if the S&WB plan were implemented.

67.

In addition to their own efforts, Modjeski hired Eustis Engineering Company ("Eustis") to assist with the subsoil investigation at the 17th Street Canal.  On October 27, 1981, Eustis submitted its first report, entitled "Subsoil Investigation—S&WB of New Orleans—Metairie Relief Canal."  Eustis reported therein that the natural ground surface of this canal's levee system consists primarily

of extremely soft to medium soft organic clay, humus and wood, all continuing to elevations between 7 C.D. (Cairo Datum) and 3.5 C.D.

68.

An internal memorandum from the Corps' Engineering Division to the Corps' Operations Division dated February 12, 1982, noted the existence of a stability problem between station 625+00 and station 670+00 where excavation of the canal will directly tap the sands underlying the levee. The memo suggested that a stability analysis be done for the landside of the canal incorporating effects of seepage to determine what corrective action is needed. In fact, sands underlay the entire 2.4 miles of the 17th Street Canal from Pumping Station No. 6 to Lake Pontchartrain, such that the stability problem here noted by the Corps itself was not confined to any one section of the canal.

69.

On May 9, 1983, Modjeski submitted a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project, with the project limits being Pump Station No. 6 on the south, and 370.0 north of the Bucktown Pedestrian Bridge. The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

70.

On July 27, 1983, Eutis submitted a revised soil stability report that confirmed the potential for a blow-out at the landside "toe" of the levee, extending the area of concern from station 617 to the pumping station due to hydrostatic uplift pressure in the underlying stratum.

71.

On June 13, 1984, the Army Corps nonetheless issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge." This permit was issued despite the fact that prior analysis, and the Corps' own internal engineering procedure and good engineering practices, revealed that such a permit would create the clear risk of flood wall failure.

72.

The "Statement of Findnigs" announced with the permit confirmed that factors considered in issuing the permit included, *inter alia*:

> "navigation, present and prospective; flood heights flood plain use; other public interests."

73.

An extension of the 1984 permit was applied for on February 4, 1987 and granted by the Corps on February 20, 1987. On April 24, 1987 the Corps created a drawing showing a sheet pile design which located the sheet pile tips 16 feet lower than the bottom of the canal. While the Operations Division was working on the S&WB permit, therefore, the Engineering Division was working on a flood wall design that would incorporate sheet piles being positioned to account for the dredging project.

74.

In connection with the consideration of using the sheet piles as the base of a flood wall, on

December 23, 1987, the Corps' Mississippi River Commission in Vicksburg issued a memorandum to the Commander of the Corps' New Orleans District relative to sheet pile wall design criteria. This memorandum summarized the results of the Corps' "E-99 Sheet Pile Wall Load Test Report."

75.

The "E-99 Sheet Pile Wall Load Test" was a full-scale instrumental lateral load test of a 200-foot long sheet pile wall conducted by the Corps in the Atchafalaya basin in 1985.  This location in the Atchafalaya basin was chosen because of the close correlation of its soil conditions with those in the New Orleans area.  Test data from the sheet pile wall and adjacent supporting soils indicated a gapping behavior (separation of the steel sheet piles from the soils) exactly like that which occurred during Hurricane Katrina.  From the E-99 sheet pile test the Corps learned, among other things, that there was potential soil separation from the sheet piles (allowing water to penetrate below the ground surface between the piles and the soils) and that the calculated safety factor was not reached.  The Corps failed to take into consideration the fact that the fundamental purpose of sheet piles is to prevent water seepage.  They incorrectly focused on whether the sheet piles could support a concrete wall.

76.

All of the information about bad soils and the potential for water seepage was completely ignored in connection with the design of the flood walls contemplated to be built on the previously permitted sheet pile wall.

77.

On August 31, 1988, Eustis provided another geo-technical report containing the results of

revised cantilever flood walls analyses and revised slope stability analyses for the proposed modifications along the Orleans side of the 17th Street Drainage Canal between Stations 553+70 and 670+00, the reach where the breach of the canal wall would later occur.  The recommended tip depth of the sheet pile wall (already permitted to be higher than the canal bottom) was 12.8 feet, a full five feet above the canal bottom.

78.

The dredging activity conducted in the 17th Street Canal pursuant to the S&WB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. These barges constituted vessels in navigation for the time period during which the dredging occurred.

79.

The flood walls constructed for the 17th Street Canal in connection with the foregoing, were "I-walls," based on a design memorandum for such walls provided by the Corps.  The alternative design was "T-walls," which would have provided far greater reliability and stability, especially in soft soil.

80.

The defendant's *Manual on Engineering, Design and Construction of Levees* dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is the proper design when walls higher than seven feet are required.

81.

The I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground.  The design consists of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling.  Concrete is then poured to encapsulate the top of the piling and form the wall.  The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets which allow the monoliths to expand and contract.

82.

As stated herein, extensive analysis of the 17th Street Canal soils had been performed since the early 1980s by Modjeski and Eustis.  The analysis utilized soil borings taken along the canal's levee.  The borings revealed alternating layers of soft clay and black humus or peat, a soft, spongy soil comprised of decaying trees and other organic material, occurring from fifteen to twenty-one feet below sea level.  The layer of humus or peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from flood water.

83.

Despite the discovery of such soil composition, the flood walls of the 17th Street Canal levee were constructed with steel sheet piling driven to a depth that was seventeen (17) feet below sea level.  At such depths, the bottom of the sheet pilings terminated above or within the layers of weak soil.  Moreover, the sheet pilings' bottoms terminated at a depth higher than the deepest point of the canal bottom, despite the above recommendations to the contrary.

84.

The soil adjacent to the 17th Street Canal levee had subsided significantly after construction of the levee and flood wall, thereby significantly reducing the amount of support that the land behind the levee provided against the pressure of flood waters.  Additionally, soil studies performed for the construction of the flood walls failed to account for the possible weakening of the soil associated with the subsidence of land alongside the levee, the soft soils at the base of the levee, and/or soil that would be weakened if flood waters pushed through the subterranean levels under the levee and flood wall.

85.

In 1993, Pittman Construction Co. was retained for the construction of the monoliths atop the sheet pile wall along the 17th Street Canal.  During the construction of the monoliths, Pittman reported to the Corps that it was encountering major problems in that the sheet pile walls with the monoliths installed on top were beginning to lean towards the canal side because the supporting soil foundation was of insufficient strength, rigidity and stability.

86.

Despite these concerns and problems, the construction of the I-walls was allowed to proceed, and was completed prior to the events giving rise to this litigation.  Pittman Construction was allowed and directed by the Corps to build and place concrete flood walls on top of sheet piling driven into unstable soil beneath the sheet piling.  The unsafe soil conditions were either discovered or discoverable by the defendant at the time of this activity.

87.

Upon information and belief, canal water was found in the yards of homes adjacent to the 17th Street Canal prior to Katrina. The pre-storm presence of canal water in adjacent yards was an indicator of canal water under-seepage due to the flawed design and construction of flood walls, a manifest risk which defendant continually failed to acknowledge or address.

**The London Canal and The Orleans Avenue Canal**

88.

The London Avenue Canal was constructed in the first half of the 19th century, through an area that was mostly swampland, and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans, and provided for swamp drainage.

89.

A major project of upgrading the flood walls and bridges along the London Avenue Canal began in the early 1980s.

90.

The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design, consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops), intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

91.

The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend.  The sands are encountered about 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity of the northern breach (stations 113 to 118).  The sand is covered with a veneer of peaty swamp deposits.

92.

Of primary importance in constructing an I-wall atop an earthen levee are the composition of the soil into which the sheet piles will be driven and upon which the I-wall will rest, and the depth of the sheet piles as dictated by the composition of the soil.

93.

Soil borings of the levee at the site of London Avenue Canal south breach indicate the presence of sand at a depth of 10 to 15 feet below sea level.

94.

Soil borings of the levee at the site of London Avenue Canal north breach indicate conditions similar to those of the south breach site, with the layer of sand present at the north breach side at a depth of 12 feet below sea level, as well as a layer of peat, a highly porous material that shrinks when dry and expands when wet, and makes for highly unstable soil conditions.

95.

The sheet piles supporting the flood wall monoliths at the site of the London Avenue Canal south breach were driven to a depth of 14 feet below sea level.  Thus, the bottom of the sheet piles terminated within a layer of sand.

96.

The flood walls along the London Avenue Canal are constructed with an "I-wall" design. The defendant's *Manual on Engineering, Design and Construction of Levees* dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

97.

The I-walls at both breach sites on the London Avenue Canal have concrete sections that rise to eleven (11) feet above ground surface.

98.

The Orleans Avenue Canal is a canal in Orleans Parish connected on its north end to Lake Pontchartrain and with the S&WB's Pumping Station No. 7 on its south end.

99.

The flood walls system along the Orleans Canal designed and constructed by the Corps ended abruptly 200 feet away from the pumping station.  The height of the area within the gap was 6 feet lower than the top of the floodwalls protection system.  As a result, there was no flood protection provided due to the 200 foot long gap that was 6 feet lower than the nearby flood walls. A small gap existed on the opposite side of the canal as well.

## IV.  ALLEGATIONS OF LEGAL FAULT

### Faulty Design and Construction of the MRGO

100.

Through the legal fault of the defendant, Katrina's storm surge came through the Gulf of Mexico and into and through the MRGO, converging with a storm surge originating from Lake Borgne to the east, coming through the GIWW, causing and creating a combined surge which then was funneled into the combined section of the MRGO and the GIWW (referred to as "Reach 1" of the MRGO).

101.

This inundated the City of New Orleans from the east by overwhelming levees and flood walls and spoil banks that had already been negligently designed, constructed, maintained, inspected, and/or operated by the defendant.

102.

Additionally, through the legal fault of the defendant, Katrina's surge rushed unhindered through the Rigolets and Chef Menteur passes into Lake Pontchartrain, there being no barriers of wetlands to prevent same because of the erosive effects of the MRGO.  This inundated the City of New Orleans from the north by breaching levees, flood walls and/or spoil banks which previously have been negligently designed, constructed, and maintained by defendant.

103.

The Corps' negligence and/or fault in designing, engineering, inspecting and/or constructing MRGO, included, without limitation:

a.      failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish;

b.      failing to "armor" levees on both banks of the MRGO; and

c.      failing to recognize that the construction of the MRGO, as well as subsequent salt water intrusion and accelerated erosion, would result in the devastation of the wetlands, forests, and land masses thus denuding and destroying a critical natural buffer against storm surge, and thereby further exacerbating the funnel effect created by the MRGO's design.

### Negligent Operation and Maintenance of the MRGO

104.

The Corps is responsible for the operation and maintenance of the MRGO. This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt. The Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MRGO would ameliorate the "funneling effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in the New Orleans Metropolitan area during hurricanes. Notwithstanding that dredging is a critical safety requirement for the MRGO, the Corps negligently failed to maintain the MRGO and failed to properly dredge the canal. While the negligent design of the MRGO caused destruction of the surrounding wetlands, the Corps' ongoing negligent maintenance of the MRGO, further exacerbated it. The loss of thousands

of acres of marshlands due to the MRGO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' and class members respective properties.

105.

Dredge vessel activity which did occur in the MRGO, conducted not only under the Corps' authority but at times with the federal government's dredge vessel THE WHEELER, also caused or contributed to the effects of the MRGO's negligent design, and such vessel activity therefore caused or contributed to the inundation of land following Katrina, inflicting on land the injuries and damages complained of herein.

106.

The banks of the MRGO and, especially the northeast shore juncture of the MRGO and the GIWW are particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels. The Corps was negligent in failing to provide bank stabilization measures, as well as in allowing the saltwater intrusion which degraded the wetlands adjacent to MRGO.

### Illegal Failure of Corps to Coordinate with the State of Louisiana

107.

The Corps designed, constructed, operated, and maintained the MRGO according to faulty plans and specifications in violation of the Rivers and Harbors Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945) ("MRGO Planning Law") which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the Governor's designee), as an "affected state" in investigation and planning. Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ("DOI"). The Corps failed to coordinate

with and involve the Governor and the DOI, and thus violated its duties and obligations established under the MRGO Planning Law as well as the FWCA, *infra*.

### Violation of Fish and Wildlife Coordination Act of 1934, as Amended - Failure to Coordinate with Louisiana Department of Interior and to Perform Required Study

108.

The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. §662, as amended in 1946 and 1958, also required coordination between any federal agency, proposing to "impound," "divert," or "control" a waterway or body of water, and the Fish and Wildlife Service.  The MRGO is such a waterway.  The FWCA statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MRGO project, including investigation, planning and construction.  The Corps was also directed therein to incorporate any of the observations or concerns raised by these state and federal agencies into any plans and specifications for the design and construction of the MRGO.  The Corps failed in its duties under said laws.  In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study, would be a prerequisite to predictions of the MRGO's effects and establishment of mitigatory measures.  A four year regime of testing and study to assess the impact of the MRGO was recommended.  The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MRGO without waiting for the completion of the essential four year study requred by the DOI.  The Corps knew or should have known that construction of the MRGO through the wetlands from the GIWW to the Gulf would devastate these wetlands and result in the negligent, reckless, wanton, or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal

surges.

### Failure of the Corps to Follow MRGO 1951 Authorization Report

109.

On September 25, 1951, the Corps submitted a report to Congress with its recommendations for construction of the MRGO ("MRGO Authorization Report"). This report contained a letter from the former Corps Chief of Engineers stating that the proposed MRGO would be connected to the IHNC by its own *separate* canal running parallel to the GIWW. However, as built, such a separate parallel canal was not built and, instead, the Corps unilaterally deviated from the MRGO Authorization Report and did not dig a separate parallel canal to the IHNC. Rather the Corps connected the MRGO into the existing GIWW and significantly increased hydrologic consequences that were a proximate cause of the flooding of the New Orleans Metro Area.

### Failure of Corps to do Studies Recommended by its own Board of Engineers

110.

The MRGO Authorization Report further included a report from the Corps' Board of Engineers recommending further studies into the MRGO's impact on the Louisiana coast and opined: "(t)he exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available." MRGO Authorization Report at 14. No

such studies were done and, thus, the Corps did not consider alternatives that would be less destructive to the lands and wetlands of Louisiana; such negligent, reckless, wanton or illegal acts or omissions were a proximate cause of the damages sustained by the Class Representatives and the class they putatively represent.

### Other Regulatory Violations by Corps

111.

The Corps further failed to follow requirements of 33 CFR §§337.5 and 338.2.  Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by 33 CFR §337.2) including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities.  In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance, and operation of the MRGO, including the National Environmental Policy Act (NEPA), 42 U.S.C. §4332(c); the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. §1452, *et seq.* and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et seq.*  Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil including, but not limited to, negligent and illegal placement of said spoil as spoil banks.

## Illegal and/or Negligent Failure of Corps to Follow
## Authorized Design, Route, and Alignment

112.

After hearings, Congress authorized the construction of the MRGO in 1956 (P.L.-455).  The Corps unlawfully did not follow the Congressionally authorized design, route, or alignment, and it did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate what would prove to be disastrous hydrologic consequences to the New Orleans Metro Area.

## Failure of Corps to Heed Multiple Warnings of Impending Disaster

113.

After the hurricane of 1947 and Hurricane Betsy in 1965, the Corps knew or reasonably should have known of the hazards posed by the MRGO and the effects of its negligent design, construction, operation and maintenance.  Additionally, the Corps knew or reasonably should have known of the high probability of future damages likely to result from the inundation of the Greater New Orleans.  In recognition of the probability of future damage to the New Orleans Metropolitan area as a consequence of the MRGO project, the Corps illegally and/or negligently (or though gross negligence, wanton and/or reckless acts and/or omissions) failed to close the MRGO, construct Control Structures, and/or constructed levees, floodwalls, and other structures in a defective, negligent, substandard fashion; such "levee" allegations are detailed separately herein.

114.

Virtually from the inception of the planning and construction of the MRGO, the Corps

received numerous warnings of the eventual disaster that would occur as a result of the negligent design, construction, operation, and maintenance of the MRGO, and the Corps' failure to take appropriate steps to prevent or reduce the impending inundation of the New Orleans Metro Area. Such warnings were voiced by private citizens, scholars, scientists, engineers, journalists, municipal and Parish governments, and the State of Louisiana.  Such warnings repeatedly put the Corps on notice of massive destruction to marshes, wetlands and other land and forest areas — all resulting from the negligent and/or faulty inspection, design, construction, operation, and maintenance of MRGO.

115.

Certain levees and flood walls along the GIWW, IHNC, and MRGO were damaged due to the potentiating effect of the storm surge which was improperly channeled and exacerbated by the MRGO.

116.

Additionally, the MRGO through salt water intrusion and other factors impaired and/or destroyed natural wetland and other barrier protection for the citizens of the Greater New Orleans area in the event of a hurricane and storm surge.  The defendant negligently failed to fulfill its obligation to design, construct, operate, maintain and properly repair the MRGO in such a way as to avoid having it posed as a threat to named plaintiffs in the event of a natural event such as Hurricane Katrina.

## Negligence in Regard to the IHNC

117.

The defendant contracted with Washington Group International, Inc. ["Washington Group"] to enlarge and deepen the locks of the IHNC, which included the removal of industrial sites along the Industrial Canal and the clearing of acreage to make way for the digging of a new canal to accommodate a new system of larger locks.

118.

This work, conducted under the authority and direction of the Corps, included the removal of salvage, debris and other materials from the IHNC and/or its banks.

119.

In the performance of this work, the integrity of the levee and/or flood walls along the eastern shore of the IHNC was undermined; and, in particular, there was under seepage-induced erosion and other damage to the levee and flood walls of the IHNC.

120.

Removal and disturbance of the surface soils overlying the permeable sub-soils (marsh layers) undermined the integrity of the levee and/or flood wall along the eastern shoreline of the IHNC that resulted in under seepage-induced erosion and other damage to the levee and/or flood wall, ultimately causing and/or contributing to its catastrophic failure of the EBIA flood walls during Hurricane Katrina.

121.

The defendant, among other things, negligently:

−34−

a.      allowed the work of Washington Group to proceed without appropriate correction against the risks entailed;

b.      failed to caution the Washington Group about the potential damage to the IHNC levee and/or flood wall system;

c.      failed to monitor and/or properly inspect the work of Washington Group;

d.      failed to adequately evaluate the potential damage to the levee and/or flood wall structure of the work being done by Washington Group;

e.      failed to correct damage caused by the actions of Washington Group, when such damage was known or reasonably discoverable by the Corps; and

f.      failed to discharge its duty to maintain the integrity of the levee and flood wall system of the IHNC throughout the work being done by Washington Group.

### Negligence in Regard to the Failures and Deficiencies of the Lake Pontchartrain Project

122.

As Katrina's storm surge increased in intensity, water levels within the MRGO, the GIWW, and the IHNC began to rise, and certain levees and flood walls collapsed or otherwise were compromised or overtopped.  This was due to construction by the Corps with porous, erodible fill material not suitable for levee construction, together with the use of inadequately-designed levee and flood wall elevations.

−35−

123.

Pursuant to the factual allegations set forth *supra*, the defendant negligently failed to implement updated criteria and utilize applicable data to assure the Congressionally-mandated protection against flooding contemplated by the Lake Pontchartrain Project.

124.

The Corps negligently failed to adhere to the direction provided by ER 1110-2-14543, by failing, among other things, to consider needed alterations to the Lake Pontchartrain Project to maintain the intended protection of citizens from flooding due to predictable weather and storm surge conditions.

125.

The defendant negligently ignored the direction to revise its SPH-based analysis to reflect a new understanding of the threat of storm surge in the area meant to be protected by the Lake Pontchartrain Project, electing instead to base its design for the Project on outdated data (the 1959 SPH). The Court negligently applied NGVD29 in its design criteria for the Lake Pontchartrain Project, despite its awareness that the reference no longer was equal to, or interchangeable with, local mean sea level (LMSL).

126.

These design flaws adopted by the defendant and continued as a reference at the time of Katrina, assured that various flood walls protecting the citizens who were meant to be protected by the Project, necessarily were lower than was safe and proper.

127.

The Corps was negligent in abandoning the Congressionally-authorized Barrier Plan for a High Level Plan, known to be deficient in many respects which caused or contributed to the flooding associated with Katrina.

128.

The flood walls, levees and other structures constituting the Lake Pontchartrain Project failed to protect named plaintiffs because of negligent design, construction, engineering, maintenance, and/or inspection by the defendant, and/or those acting on its behalf.

129.

More than forty years after authorization, the Lake Pontchartrain Project remains incomplete. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, and/or wantonly or recklessly postponed while the original project remained incomplete and continued to fall further behind schedule. The Corps' design assumptions and policy negligently made in 1965 continue to diminish the Lake Pontchartrain Project today, and were a proximate cause of the innundation of the Greater New Orleans area.

**Negligent Abandonment of the Barrier Plan**

130.

Flood walls on the east side of the 17th Street Canal as well as on both sides of the London Avenue Canal, failed catastrophically after Katrina made landfall due to the Corps' unauthorized, negligent, grossly negligent, wanton and/or reckless, and unilateral decision to abandon the

–37–

Congressionally-authorized Barrier Plan and opt instead for the unauthorized parallel protection utilizing an I-wall design.

131.

The Corps knew or reasonably should have known that the Barrier Plan would have prevented large amounts of Katrina's surge from entering Lake Pontchartrain, reducing the surge level in Lake Pontchartrain by more than 3 feet, and thus preventing any flood walls from failing along the 17th Street and London Avenue Canals.

132.

The Corps knew or reasonably should have known that the design and construction of I-walls with particularly short sheet pile depths was impracticable, unsafe, and subject to overflow and damage, putting plaintiffs' safety and property at risk.

133.

None of the projects constructed as part of the High Level Plan were ever authorized by Congress.  Thus, the High Level Plan is not a Congressionally-authorized federal flood control project, and, as such, the Flood Control Act of 1928 and the immunity afforded by Section 702c is inapplicable.

134.

Alternatively, if the Flood Control Act of 1928 is applicable, the immunity afforded by Section 702c is not, because the Corps breached its affirmative duty to institute proceedings to acquire either the absolute ownership of the lands adjacent to the canal which was subject to overflow and damage, or to acquire the floodage rights over such lands, all as required by the Act.

## Negligent Design of Flood Walls for the 17th Street and London Canals

135.

Pursuant to the factual allegations, *supra*, the defendant negligently adopted and implemented an I-wall instead of a T-wall design for both the 17th Street and London Avenue Canals.

136.

Pursuant to the factual allegations, *supra*, the defendant also negligently ignored soil analysis and testing data, and otherwise failed to consider soil-related issues, which exacerbated the safety risks of flood wall stability and under seepage in the 17th Street and London Avenue Canals.

## Negligent Allowance of 17th Street Canal Dredging

137.

Only the defendant had authority to issue a dredging permit for the 17th Street Canal, and the River and Harbors Act of 1899 (33 U.S.C. §403) prohibits the Corps from granting a dredging permit that is contrary to the public interest.

138.

Title 33 C.F.R. §320.4 establishes general policies for evaluation of permit applications. That policy requires that the benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.  Among the factors required to be considered is the effect on flood control.  The Corps violated this policy by failing to consider the impact of the approval of the dredging permit on flood control.  If the Corps claims it did consider

the impact on flood control, it did so with reckless disregard of overwhelming evidence that the permit approval would, in fact, jeopardize the flood protection structures of the 17th Street Canal.

139.

The Corps failed to exercise due care in its evaluation of the dredging permit as evidenced by its failure to employ its own engineering guidelines and general engineering guidelines in considering the impact of the application on the public interest, including flood protection.

140.

The Corps breached its duty by negligently issuing a permit which allowed changes to the canal bottom, resulting in subsurface soil destabilization of the levee.

141.

The failure of the 17th Street Drainage Canal sheet pile retaining wall and the resulting inundation of the New Orleans Metropolitan Area was directly and proximately caused by the Corps' negligence and approval of the S&WB's proposed dredging of the 17th Street Drainage Canal and its improvements.

142.

Dredge vessel activity in the 17th Street Canal conducted under the Corps' direction and/or authority, combined with the attendant construction of the 17th Street Drainage Canal Improvement Project, were factors substantially contributing to the failure of the 17th Street Drainage Canal sheet pile retaining wall and the resulting inundation of the New Orleans Metropolitan Area, which inflicted on land the injuries and damages complained of herein.

143.

Pursuant to the federal maritime and admiralty statutes, the Corps is liable or is responsible to plaintiffs for money damages for its negligence in permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

144.

In addition or in the alternative, the United States is liable pursuant to the FTCA, for money damages for its negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

145.

The activities for which the Corps of Engineers issued a permit did not involve any activities as part of a federally authorized and funded flood control project.

146.

The United States is not immune from civil liability for its negligence under the Flood Control Act, as amended, 33 U.S.C. §702(c), because the actions of the Corps of Engineers in issuing the dredging permit were wholly unrelated to any federally authorized and funded flood control project.

147.

The Corps had no discretion to permit the dredging and construction associated with the 17th Street Drainage Canal Improvement Project because the approved work damaged the public interest by undermining existing flood protection.

**Liability Under Article 2317, La. Civ. Code**

148.

The defendant had custody, control and/or *guarde* of one or more things posing unreasonable risks of harm to named plaintiffs, and specifically risks of which the defendant had notice and/or should have been aware, which things consisted of the MRGO, the GIWW, the IHNC, the 17th Street Canal, the London Avenue Canal and the Orleans Canal, thus imposing liability under Article 2317 of the Louisiana Civil Code with respect to the failures and harm resulting from the condition of these waterways.

**Liability Under Article 667, La. Civ. Code**

149.

The defendant, as the proprietor of the MRGO, had a duty under Louisiana Civil Code Article 667 to refrain from creating a nuisance with respect to property owners affected by the failures of the 17th Street, London Avenue, and Orleans Canal levee/flood wall systems.

150.

The defendant, as the designer, builder and owner of the 17th Street, London Avenue and Orleans Canals, also had a duty under federal common law to avoid creating a hazardous condition that harms, and threatens to harm, the lives and property of named plaintiffs in the event of a hurricane or a hurricane storm surge, based on the conditions associated with these canals.

151.

The Corps wrongly has deprived, and still threatens to deprive, the named plaintiffs of their property in the event of hurricanes and hurricane storm surges, by creating hazardous conditions

associated with the MRGO as well as the outfall canals referenced in this Complaint.

## V.  RES IPSA LOQUITUR AND NEGLIGENCE PER SE

### 152.

Named plaintiffs expressly plead and invoke the doctrine of *res ipsa loquitur* against the defendant, inasmuch as that doctrine may be found applicable by the Court.

### 153.

Plaintiffs are within the category of citizens meant to be protected against flooding by one or more regulatory and statutory provisions violated herein by the Corps.  Hence, the doctrine of negligence *per se* is expressly invoked by plaintiffs.

## VI.  DAMAGES AND PRAYER FOR RELIEF

### 154.

In one or more respects, but in any case as a direct and proximate result, of the legal fault of the defendant as set forth above, named plaintiffs and plaintiff class members similarly situated have suffered legal harm and sustained recoverable damages.

### 155.

The damages suffered by named plaintiffs and recoverable from the defendant based upon its legal fault, include the following:

    a.      the destruction or impairment of property (real and personal, movable and immovable), and the loss of use of same;

    b.      the diminution of property values;

    c.      the cost of repair and restoration of property;

d.      increased living expenses and other costs associated with evacuation and displacement; and

e.      the loss of income and/or diminished economic opportunity;

f.      the loss of societal services, community enjoyment and culture;

g.      personal injury, including, among other things, fear and fright, mental anguish and emotional distress; and

h.      wrongful death and survival damages in regard to the loss of life.

156.

Plaintiffs also seek injunctive relief as necessary to assure legally-warranted hurricane protection safety and/or to restore the pre-Katrina enjoyment of life in the community to which plaintiffs belong, which safety and quality of life both have been impaired, and remain threatened, due to defendant's fault.

WHEREFORE, named plaintiffs pray that, after due proceedings, there be a class certified in this matter, and that, in any event, there be a judgment and/or judgments entered in their favor and against the defendant for all compensatory damages found reasonable in the premises, all pre-and/or post-judgment interest provided by law, all costs and disbursements of these proceedings, and any and all injunctive, declaratory and/or equitable relief which the Court may deem fit.

Respectfully submitted,

GAUTHIER, HOUGHTALING
 & WILLIAMS, L.L.P.


  /s JAMES M. WILLIAMS
JOHN HOUGHTALING, BAR NO. 25099
JAMES M. WILLIAMS, BAR NO. 26141
ED DOWNING, BAR NO. 01339
TODD R. SLACK, BAR NO 24647
3500 N Hullen St.
Metairie, LA  70002
Telephone:     (504) 456-8600
Facsimile:     (504) 456-8624
ATTORNEYS FOR PLAINTIFFS