1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5
   COLLEEN BERTHELOT, ET AL      *    Docket 05-CV-4182-K(2)
6                                *    (cons. Katrina Canal)
   versus                        *
7                                *    New Orleans, Louisiana
   BOH BROS. CONSTRUCTION CO.,   *
8    LLC, et al                  *    August 25, 2006, 1:30 p.m.
   * * * * * * * * * * * * * * * *
9

10

11                     PROCEEDINGS BEFORE THE
                  HONORABLE STANWOOD R. DUVAL, JR.
12                 UNITED STATES DISTRICT JUDGE

13

   APPEARANCES:
14

15   For the Plaintiffs:          Bruno & Bruno
                                  BY:  JOSEPH M. BRUNO, ESQ.
16                                855 Baronne Street
                                  New Orleans, Louisiana 70113
17
     For the Plaintiffs:          Gainsburgh Benjamin David
18                                  Meunier & Warshauer
                                  BY:  GERALD E. MEUNIER, ESQ.
19                                1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163
20
     For the Plaintiffs:          Lambert & Nelson
21                                BY:  HUGH P. LAMBERT, ESQ.
                                  701 Magazine Street
22                                New Orleans, Louisiana 70130

23   For the Plaintiffs:          ASHTON R. O'DWYER JR., ESQ.
                                  One Canal Place, Suite 2670
24                                New Orleans, Louisiana  70130

25

 1   <u>APPEARANCES</u>:

 2
     For the Defendants:          Gardner & Kewley
 3                                BY:  THOMAS F. GARDNER, ESQ.
                                  1615 Metairie Road, Suite 200
 4                                Metairie, Louisiana 70005

 5   For the Defendants:          Deutsch Kerrigan & Stiles
                                  BY:  TERRENCE L. BRENNAN, ESQ.
 6                                     CHARLES F. SEEMANN JR.,  ESQ.
                                       VICTOR E. STILWELL JR., ESQ.
 7                                755 Magazine Street
                                  New Orleans, Louisiana 70130
 8
     For the Defendants:          Long Law Firm
 9                                BY:  ADRIAN G. NADEAU, ESQ.
                                  4041 Essen Lane, Suite 500
10                                Baton Rouge, Louisiana 70809

11   For the Defendants:          Simon Peragine Smith & Redfearn
                                  BY:  HERMAN C. HOFFMANN JR., ESQ.
12                                1100 Poydras Street, 30th Floor
                                  New Orleans, Louisiana 70163
13
     For the Defendants:          McCranie Sistrunk Anzelmo
14                                  Hardy Maxwell & McDaniel
                                  BY:  THOMAS P. ANZELMO, ESQ.
15                                3445 N. Causeway Blvd., Suite 800
                                  Metairie, Louisiana 70002
16
     For the Defendants:          GEORGE R. SIMNO III, ESQ.
17                                Sewerage & Water Board Legal Dept.
                                  625 St. Joseph Street, Room 201
18                                New Orleans, Louisiana 70165

19   Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room HB-406
20                                New Orleans, Louisiana 70130
                                  (504) 589-7778
21

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

1          **PROCEEDINGS**

2         **(August 25, 2006)**

3          **THE DEPUTY CLERK:**  All rise.

4              Court is in session.  Please be seated.

5          **THE COURT:**  Good afternoon.  In the <u>Berthelot</u>

6   umbrella, we have some motions.  As I understand it, for this

7   afternoon we are going to take up the contractors' motions, the

8   engineers' motions, and the motions of the Orleans Levee

9   District and the Sewerage and Water Board.  We'll take the

10  contractors first.

11         **MR. GARDNER:**  I'm Tom Gardner, Your Honor, counsel

12  for Eustis and representative of the engineers.  We had

13  understood that the engineers would be first in the slot.  If

14  that's not correct, I understand.

15         **MR. NELSON:**  Your Honor, I had understood that the

16  contractors were going to be first in the slot as of yesterday.

17  I don't have any problem with the engineers going first as long

18  as my friend Mr. Meunier can argue some legal issues because,

19  of course, I'm not real good at that.

20         **MR. MEUNIER:**  What we expected, Judge, was that in

21  the argument of the contractor case in general the position

22  would be laid out for plaintiffs which would really apply to

23  both contractor and engineer issues, so Mr. Lambert was

24  assuming I would cover those.

25         **THE COURT:**  Since it seems to me, even though they

1   are different statutes, the fundamental legal issues will be

2   coterminous and, if you have to leave, any nuances that relate

3   specifically to the contractors, then you can --

4           MR. MEUNIER:  I'll defer on those.

5           MR. GARDNER:  May we go first, Your Honor?

6           THE COURT:  Yes.

7           MR. SEEMANN:  Charles Seemann for, in this instance,

8   Burk-Kleinpeter, LLC, a small mouse amongst all these

9   elephants.

10          THE COURT:  Well, I have this one right here.  It

11  looks like you ought to win.

12          MR. SEEMANN:  You didn't mention that there was an

13  opposition filed, but --

14          THE COURT:  Not a robust one.  You're certainly on

15  the docket.

16          MR. SEEMANN:  Okay, your Honor.  Thank you.

17          THE COURT:  You're on the docket at the very end.

18  Mr. Seemann, did you plan to be here for the entire argument?

19          MR. SEEMANN:  If I have to, Your Honor, I will.

20          THE COURT:  I see what you're saying.  Why don't we

21  talk about this one first.  This is the motion brought by

22  Burk-Kleinpeter, LLC, and I think that the focus of your motion

23  is that you simply did no work at all on any of the --

24          MR. SEEMANN:  The only thing it has to do with it is

25  Burk-Kleinpeter, who are both shareholders and officers of BKI,

1   the engineer, happened to be members of the limited liability

2   company.  There's an affidavit that said we don't have an

3   engineering license, we didn't do engineering, we don't have

4   anything to do with this, and I think most of the --

5           **THE COURT:**  I saw that --

6           **MR. SEEMANN:**  Like eight of them have withdrawn,

7   Judge.  There are two or three left.  The response -- do you

8   want to do the opposition?

9           **MR. BRUNO:**  Well, no.  I just want to explain, Judge,

10  that, yes, we did -- "we" meaning in those cases that I filed,

11  that is, Joe Bruno.  We dismissed this entity and encouraged

12  others to do the same.  For reasons that I don't know, that

13  wasn't done.  In my role as liaison, I thought we better file

14  some opposition because there was none forthcoming.

15          **THE COURT:**  Right.

16          **MR. BRUNO:**  I think you should take this up first.

17  We have no oral argument on this issue.  I don't even know the

18  cases.  Do you have the cases in which --

19          **THE COURT:**  I have them.

20          **MR. SEEMANN:**  That can be sorted out later.  I don't

21  want to keep everybody busy.

22          **MR. BRUNO:**  Well, all I'm saying is there will be no

23  oral argument from plaintiffs.  I just don't know who to call

24  upon.

25          **THE COURT:**  To my knowledge, the ones that have not

 1  voluntarily withdrawn are:  05-5237; 05-6314; 05-6327; 06-2346;
 2  06-2228; 06-2287; and any others that I omitted.
 3          MR. SEEMANN:  If that is the extent of the
 4  opposition, Your Honor, then I will submit it on motion and
 5  affidavit.
 6          THE COURT:  I'm going to grant your motion for
 7  summary judgment and dismiss Burk-Kleinpeter, LLC as a
 8  defendant in all of the matters which have not already
 9  voluntarily withdrawn you.
10          MR. SEEMANN:  Thank you, Your Honor, and thank you
11  all.
12          THE COURT:  I doubt if I will have something that
13  easy.  Thank you very much.  All right, sir.
14          MR. GARDNER:  Good afternoon, Your Honor.  My name is
15  Thomas Gardner.  Along with Erin Dearie to my left, we
16  represent Eustis Engineering Company, Inc.  I'm also the
17  designated representative of the engineer group.  The other
18  lawyers who represent other parties who are in that group are:
19  Charles Seemann, who represents Burk-Kleinpeter, Inc.;
20  Victor Stilwell and Frank Barry, who represent Modjeski and
21  Masters; and Adrian Nadeau, who represents GOTECH, Inc.  We are
22  all here in the courtroom and we have allocated our time, and
23  we promise the Court not to take all 30 minutes.
24          Your Honor, the engineers jointly move for
25  summary judgment on the issue of preemption on two independent

1   grounds.  The first ground is an ultimate fact that is

2   irrefutable.  It is a public record, completely accessible to

3   everyone.  It is a certified document for which there are no

4   evidentiary issues.  It is a document that the engineers gave

5   to the plaintiffs 90 days ago, and there is no challenge as to

6   the admissibility of that document nor is there a challenge as

7   to the critical information on that document, which is the date

8   of the document.

9            We say there's only one ultimate fact in this

10  motion because, even though there are three projects, when you

11  examine the proof, you'll see that the Certificate of

12  Acceptance for the Industrial Canal project is September of

13  1992 and the Certificate of Acceptance for the 17th Street

14  Canal is April of 1995.  Under every theory that's been

15  advanced to this Court, more than 10 years has elapsed on those

16  two projects; therefore, Modjeski and Masters and Eustis, all

17  claims against those two engineers on the 17th Street Canal are

18  clearly preempted.  As to Eustis on the Industrial Canal, that

19  claim is also preempted.

20           So there's really only one fact before the Court

21  today and that involves the acceptance on the London Avenue

22  Canal project.  That acceptance is dated October 31, 1996,

23  Your Honor.  What we have done is attempt to compile the

24  graphic that's in the benchbook I previously handed to counsel

25  and provided to the Court.

1          **THE COURT:**  I have it in my bench memo.  We were able

2    to take some of the charts from your brief and place them in my

3    bench memo, so I have them in multiple places.

4          **MR. GARDNER:**  Apparently we tried to simplify this a

5    little bit more for the folks here today and we have put

6    together a very simple graphic.  On the left side of the time

7    line, which is the black line, is the beginning point of the

8    preemptive period.  As you travel five years down that black

9    line, you'll see that there is a vertical red bar.  That

10   signifies the preemptive decision of the Louisiana legislature

11   to cut off all claims against engineers five years after the

12   date of acceptance.  That's 9:5607.  It doesn't cut off every

13   claim the plaintiffs may have against every party, but it's

14   particularized as to engineers.  After that preemptive bell

15   tolls, no claims could ever been made against the engineers.

16          Now, we all know what happened last August.  We

17   all suffered damage from that Katrina fiasco, but under the

18   Louisiana precedent in the <u>Wall</u> case in particular and

19   <u>639 Julia Street</u>, property damage claims as well as personal

20   injury claims vest or accrue when there is cognizable damage.

21   The damage occurred when Katrina hit.  There's no question

22   about that.  So the application of 9:5607 is prospective

23   because those rights had never vested.  The 2003 enactment of

24   9:5607 comes two full years before Katrina hit, so these claims

25   unquestionably were imperfect when Katrina hit and they were

1  extinguished by the legislature no later than 2003.

2          THE COURT:  I think the argument is, one, that a

3  statute that involves preemption is by its nature remedial

4  unless otherwise specified by the legislature.  If it is

5  remedial, it is therefore retroactive.  That's my

6  understanding.

7          MR. GARDNER:  That's correct.

8          THE COURT:  Further, for the purposes of

9  extinguishing causes of action, if the cause of action had not

10 yet accrued, it is extinguished even though you may -- in other

11 words, it never occurred.

12         MR. GARDNER:  It never came into existence.  Right.

13         THE COURT:  The way the Louisiana law reads, that if

14 the injury had not occurred, since there is no *contra non*

15 *valentem*, that in essence the cause of action is abolished,

16 extinguished.

17         MR. GARDNER:  Extinguished as a matter of law.

18         THE COURT:  Then the only other issue is when did the

19 work occur and when were the acceptances or other triggers

20 under the statute.

21         MR. GARDNER:  Yes, sir.  The work occurred we have

22 proven with a certified document that was equally accessible to

23 both parties -- in fact, it was actually accessible and sought

24 by the plaintiffs months before the engineers were brought into

25 this fray.  The evidence attached to the engineers' reply

1   clearly shows that a FOIA request issued from the plaintiffs in

2   October of '95 -- where they took an expert with them to see

3   all the files of the Corps of Engineers.  That's where these

4   documents came from.  The plaintiffs had to jump, so there can

5   be no real serious claim that these documents were inaccessible

6   because the plaintiffs knew where to get the documents before

7   the engineers were brought into this fray.

8           **THE COURT:**  Now, there's some other things -- and I

9   don't want to disrupt you too much, but you'll get to these.

10  There are things mentioned in the brief and the reply brief,

11  and I understand I allowed an overly lengthy reply brief late.

12  I'll let you, if you want to, brief any issues that you need to

13  before I rule and discuss it.  I'm sure the plaintiffs will

14  talk about discovery, but there's some mention of your work

15  being done in remote areas.

16          **MR. GARDNER:**  Yes, sir.

17          **THE COURT:**  "Remote" is maybe -- I don't know what it

18  really means, but work being done within the preemptive period,

19  but not in the proximity of the failures.

20          **MR. GARDNER:**  Yes, sir.

21          **THE COURT:**  I don't see any allegations of fraud in

22  the complaint, but it's mentioned in the reply brief.

23          **MR. GARDNER:**  Right.

24          **THE COURT:**  I know you probably want to touch on

25  that.

1          **MR. GARDNER:**  Yes, sir.

2          **THE COURT:**  I don't write these laws, but I must

3     interpret them, and it seems to me you are correct based on

4     what I have looked at that -- and I'll be interested to hear

5     argument on the other side.  But insofar as the basic

6     preemptive statute, preemption is remedial, therefore,

7     retroactive.  Cause of actions are not being taken away because

8     they never accrued, therefore, there's no constitutional

9     implications.  It looks to me like, according to the literal

10    meaning, you could build a building and five years and one day

11    after the trigger, if it collapsed, you're scot-free unless

12    there's fraud.  Again, that has not, to my knowledge, been

13    alleged.  So I accept those principles.  We may get into other

14    issues about what do I do about the remote work.  I don't know.

15    You might tell me your position on that.

16         **MR. GARDNER:**  Yes, sir.

17         **THE COURT:**  Do we have any charts where that would be

18    in relation to the failures?

19         **MR. GARDNER:**  We do.  We have attached to the motion

20    papers --

21         **THE COURT:**  I did try to figure that out.  Do you

22    have any graphic that we could talk about?

23         **MR. GARDNER:**  Do I have a graphic with me today?

24    While the plaintiffs are making their argument, I can dig that

25    out of the papers and we can put it up there, Your Honor.

1    **THE COURT:**  Okay.  That would help me.

2    **MR. GARDNER:**  With the Court's consent, the

3    presentation may be a little out of sequence now, but I would

4    like to respond directly to some of the questions that you have

5    raised.

6    **THE COURT:**  I've gotten you out of sequence.  Go

7    ahead.

8    **MR. GARDNER:**  We have assigned a monicker to this

9    claim that other projects somehow influenced the preemptive

10   projects.  We call it "remoteness."  The first argument in

11   response to that attack on preemption is that subsequent

12   engagements on other tasks have no impact whatsoever on the

13   preemption date of a contract that's finished.  Those end dates

14   are fixed.  It really doesn't matter what happened on another

15   project because the levees that failed were preempted.  All

16   those claims were preempted.  We have the statute.  We have the

17   acceptances.  So those end dates are fixed and nothing can

18   change those.

19   More important than that, the plaintiffs have

20   retained we now know at least two -- if Mr. Bruno's comment

21   this morning about experts means additional experts, three.

22   They have had three experts on the team we know since October,

23   and they have yet to put at issue an affidavit that says the

24   end dates are wrong.  They have also failed to put at issue any

25   document that would suggest, after reviewing all these

1    documents, that the end dates are incorrect.  But the real

2    issue on this remoteness attack is that it's overreaching.

3              These notice pleadings that we got, if you read

4    them, they're framed as if they are state petitions.  If you

5    look at every complaint -- and, again, because we just got the

6    surreply, we don't have it all lined out.  But if you look at

7    the complaints and you look particularly at <u>Berthelot</u> paragraph

8    14, <u>Ezell</u> paragraph 14, <u>Finney</u> paragraph 14, <u>Kirsch</u> paragraph

9    14, LeBlanc paragraph VI(f), you will see that there is a very

10   clear distinction that the plaintiffs made in the pleadings.

11   It's a two-part negligence theory they have advanced in every

12   one of those pleadings and they are very clear how they make

13   it.

14             The first part is the floodwalls that failed

15   were improperly designed and constructed, so they have a claim

16   against the engineers and contractors.  Then the plaintiffs

17   very carefully separate the second clause or the second theory

18   from the first.  The plaintiffs go on to plead "and/or the

19   contractors" -- not the engineers, only the contractors -- "on

20   subsequent projects damaged the levee system."  So the

21   pleadings that are before the Court do not reach these

22   allegations that arise in these memorandums.  They were never

23   part of the pleadings.  That's why this preemption motion is

24   universal in nature.

25             If you look clearly at all of the allegations,

1   it's a single project that each plaintiff is seeking

2   compensation for.  It's something that was designed.  It was in

3   the past tense.  It's not influenced by anything else.  It's a

4   single project and it's preempted and there's nothing that can

5   bring it back.  Perhaps one of the most compelling reasons that

6   you ought to conclude that the only projects on the table are

7   those that were designed in the '90s and completed in the

8   '90s -- actually, some were designed even earlier than that --

9   is look at who the defendants are before the Court today.

10  There are only four engineers here.  Every one of those

11  engineers rendered services solely on areas that breached.

12              You don't see in the courtroom Mr. Pepper.  You

13  don't see Mr. Baudier from Design Engineers.  You don't see

14  Linfield, Hunter & Junius.  You don't see Meyer Engineers.  You

15  don't see Hartman Engineers.  Those engineers worked on all the

16  remote projects.  They rendered services on all the remote

17  projects.  There's a reason they are not here:  Because the

18  claim doesn't extend that far.  They are improperly attempting

19  to extend these pleadings to areas that are not --

20              **THE COURT:**  This is not a factual scenario, but I'm

21  going to ask you to tell me whether it's remote or not.  Work

22  done in the '90s, mid '90s, and completed on the 17th Street

23  Canal in the area of the failure, work done in the year 2003

24  300 yards from the last vestige of failed levee, is that

25  remote?

1     **MR. GARDNER:**  Yes.

2     **THE COURT:**  Why?

3     **MR. GARDNER:**  First of all, it's doubly remote, it's

4   temporally remote --

5     **THE COURT:**  Yes.

6     **MR. GARDNER:**  -- and it is physically remote.  It's

7   almost like we are bending light with Einstein's theory of

8   relativity.  Time and space are different.  It doesn't really

9   matter what happened remote from the project because that's not

10  what's before the Court in the pleadings.  If you want to take

11  a look at --

12    **THE COURT:**  There's no pleading saying that because

13  of the work done in 2003 it contributed to the levee failing in

14  2005.

15    **MR. GARDNER:**  Correct.

16    **THE COURT:**  There's no such pleading before us.

17    **MR. GARDNER:**  There's no pleading that says the

18  design of something subsequent to one of these preempted

19  projects somehow influenced the damage.  That's an omission in

20  the pleadings that is very clear.  We gave you the cites that

21  we found this morning and last night.

22    **THE COURT:**  Okay.

23    **MR. GARDNER:**  The remoteness issue is a red herring

24  of the highest order.  I would like to take a couple more

25  minutes with the Court to review just one other fact because

1    there are two grounds on which the engineers may be excused on

2    preemption.  The first one we talked about, and that's the

3    certified public record.

4              **THE COURT:**  Right.

5              **MR. GARDNER:**  The defense to that is remoteness,

6    which we have already talked about.  It's also Rule 56(f).  The

7    Rule 56(f) attack that the plaintiffs raise is somewhat

8    inconsistent -- is perhaps the best way to put it -- with the

9    facts that we know exist in the case.  Under Rule 56(f), the

10   plaintiffs have a two-part burden.  They have to show that the

11   information that they needed to obtain was unavailable and they

12   have to show what triable fact would be developed if they were

13   given the opportunity to enter into formal discovery.

14             The triable fact that's before Your Honor is a

15   certified public record prepared by a third party, so there's

16   no possible changing that.  No matter how much discovery you

17   can do, you can't change history.  So the plaintiffs would have

18   to lose on the triable issue component of 56(f).  If you take a

19   look at the inability -- and I would ask Your Honor to please

20   turn to the second exhibit in the benchbook which we have

21   styled "Access to Discovery."  This stark graphic represents

22   the opportunities that the plaintiffs admittedly had to develop

23   information in an effort to avoid preemption attack.

24             **THE COURT:**  We are talking about information now that

25   relates to the date of completion -- however it came about,

1   either the six months after or the acceptance, we are talking
2   about discovery in that regard?
3           MR. GARDNER:  We are talking about discovery on both
4   aspects of the engineers' preemption motion, but principally we
5   are talking about the ability of the plaintiffs to develop
6   facts that would undermine or somehow undercut the certified
7   acceptance and secondarily -- only secondarily -- the ability
8   of the plaintiffs to overcome the engineers' secondary attack,
9   which is that we have end dates for our services that are
10  unrefuted and unchallenged.  Those are sworn affidavits
11  submitted by all of our clients.
12          Your Honor, this is the best type of discovery.
13  This is not party-controlled documents.  There's no one who
14  would have any reason to do anything to hide these documents.
15  These are public records maintained by the Corps, public
16  records maintained by the Recorder of Mortgages, public records
17  maintained by the Orleans Levee District.  It's the same source
18  of documents the engineers used.
19          What's really interesting, if you look at the
20  time line when the plaintiffs responded to the engineers'
21  motion, they had 261 days to review these documents.  Now they
22  have had 311.  If you fast forward from the plaintiffs'
23  original FOIA complaint served in October of '05 to January,
24  let's take a look and see what the plaintiffs knew in January.
25  Your Honor, if you will flip to the next tab in your benchbook,

1    you'll see an e-mail dated January 25, 2006.  That's seven
2    months ago to the day.  What we are going to talk about in the
3    e-mail are the records that were available to the world not
4    just on January 25, but as Your Honor will see as early as
5    December 1, 2005.
6              Skipping down to the middle of the document,
7    you'll see some boldfaced entries, "Eustis Geotechnical
8    Reports."  In that paragraph, Eustis explained to the
9    plaintiffs how they could obtain Eustis' geotechnical reports,
10   how the plaintiffs could find design memorandums.  Directly to
11   respond to Your Honor's question about the acceptance
12   information, subparagraph B, "As-Builts," that is the folder
13   where all of the acceptance information that the plaintiffs
14   would need to look at is contained.  The contract documents are
15   Burk's and Modjeski's plans that were issued on these canals.
16             If you flip the page, Your Honor, the plaintiffs
17   complain that they were not able to use the IPEC web site to do
18   research because there was no search engine.  On the left side
19   of this graphic, the first red entry is "Lake Pontchartrain,
20   Louisiana and vicinity."  As you go down that column, if the
21   plaintiff wanted to look at the contracts, they would open that
22   second folder; design memorandums prepared by the Corps, the
23   third folder; hydrology.  The next one is plans and
24   specifications.  If you don't want to do that, you go to
25   as-builts, construction drawings, but more importantly, for

1    purposes of today, reports.  Twelve of Eustis' reports were
2    available to the plaintiffs on line at their desktop in January
3    and they knew it.
4              Flipping the page, you'll see that the next
5    graphic deals with Modjeski's plans for the 17th Street Canal,
6    which were available to the world on December 2, 2005.  Eustis
7    was a sub to Modjeski.  It's undisputed that Eustis' services
8    ended on September 12, '89, sixteen years before that.
9    Plaintiffs knew how to get this information.
10             The next tab in your benchbook deals directly
11   with the London Avenue Canal issue.  This is our alternative
12   argument, Your Honor, why discovery is not needed and it would
13   be a complete waste of time.  This argument involves Eustis,
14   BKI, and GOTECH.  You will recall we were talking about an
15   acceptance of the work performed by others of October 31, '96.
16   If you look in the table of contents, the first red entry is
17   lit up and that corresponds to the graphic title sheet for
18   BKI's plans for the London Avenue Canal.
19             This may take some doing.  I had trouble because
20   my bifocals don't always work too well.  If you look in the
21   lower right-hand corner of that graphic image, you'll see a
22   date on Burk's plans.  1994 is the issue date.  It's another
23   public document that confirms that these engineering services
24   in the design phase were certainly over before December 31,
25   1994.  Add 10 years and this claim is preempted doubly.

1              Your Honor, I promised my co-counsel I would be

2    brief.  I guess they are going to chastise me when I leave, but

3    I promised I would give them some time, too.  If you have any

4    questions before I sit down, I would be delighted to respond.

5              THE COURT:  I'm going to give you a chance to respond

6    after the plaintiffs speak because I'm sure we are going to

7    hear more about discovery and other things.

8              MR. GARDNER:  Yes, sir.

9              THE COURT:  I'll give you some time for response.

10             MR. GARDNER:  Thank you.  May we reserve our time for

11   rebuttal?

12             THE COURT:  Yes, you may.

13             MR. GARDNER:  Mr. Stilwell would like to address the

14   Court, Your Honor.

15             THE COURT:  All right.

16             MR. STILWELL:  Your Honor, Victor Stilwell

17   representing Modjeski and Masters, Inc.  I would like to go

18   back to your question about remoteness because Modjeski did

19   only flood control projects on the 17th Street Canal.  In the

20   disclosure that we made to the Court per Your Honor's order, we

21   disclosed seven projects.  The ineluctable fact is, Your Honor,

22   that all seven projects are preempted.  Two of the seven

23   projects were done on the east wall in the breach area.

24   They're preempted by more than 10 years.  So vis-à-vis Modjeski

25   there really is no remoteness issue; it's all preempted.  So I

1    don't take any more time, I will just simply say in closing

2    that we, in our motion papers, are asking for dismissal of all

3    claims against Modjeski on the 17th.  Your Honor, we also ask

4    that all claims against Modjeski for MRGO, London, Orleans, and

5    Gulf Intracoastal Waterway -- I think there's one out there --

6    should also be dismissed because we simply provided no flood

7    control services for those other canals.  Thank you,

8    Your Honor.

9              **THE COURT:**  Thank you, sir.

10             **MR. SEEMANN:**  Charlie Seemann, Your Honor, for

11   Burk-Kleinpeter very, very, very quickly.  You have the

12   preemption issue.  I'm on the very last one, so the issues on

13   London Avenue are well before.  You asked a rhetorical question

14   about what is remote.  One thing remote is, if you look at the

15   supplemental affidavit or supplemental declaration of Jackson

16   in the BKI supplemental reply to the omnibus opposition,

17   there's a map, Exhibit 2, that shows where all the other remote

18   BKI projects are.  Now, remote is when those projects are in

19   the 17th Street Canal and what we design and are claiming

20   preemption was in the London Avenue Canal.  Now, that's remote.

21             Now, the second point I want to make on that,

22   like Tom said, I know we have notice pleadings.  I'm

23   embarrassed to admit I didn't go back and carefully read the

24   petitions until after we replied to the surreply.  If you look

25   at it, there's no mention in there that anything but the

1  breached levees caused the problem.  There's no allegation that

2  any other projects anywhere else did it.  So there's no notice

3  to us, particularly not to BKI.  Again, Your Honor, that's

4  remote.  I'll leave it there.

5          **MR. NADEAU:**  Good afternoon, Your Honor.  Adrian

6  Nadeau for Dale Clary on behalf of GOTECH, Inc.  I just want to

7  point out a couple things very briefly.  GOTECH was a

8  sub-consultant to BKI on one project involving the London

9  Avenue Canal.  Those services were concluded in 1993, some 12

10  years before Hurricane Katrina and these lawsuits.  Plaintiffs'

11  remoteness argument has no bearing as to GOTECH because we

12  didn't perform any of the services on any other projects

13  anywhere on any of the canals.  The same goes for their

14  argument regarding 9:5607, which I think is clearly applicable

15  because these claims all arose after its enactment, almost two

16  years after its enactment, so it's clearly applicable.  But

17  regardless, the claims against GOTECH would be preempted

18  pursuant to a five, seven, or a ten-year period.  Thank you,

19  Your Honor.

20          **THE COURT:**  Thank you, sir.  Anybody else?

21  Mr. Meunier, you have your work cut out for you.

22          **MR. MEUNIER:**  I see that.  May it please the Court.

23  Jerry Meunier for plaintiffs.  Your Honor, I will try to

24  address some of the legal issues that are really inherent in

25  both the engineer motions and the contractor motions.  I'm

1    prepared to go more deeply into the specifics of the contractor

2    motions when it's my turn.  I appreciate my colleague,

3    Mr. Lambert, letting me have some time to lead off here.

4                    First of all, Judge, the defendant movants

5    really bear a twofold burden today.  They bear, under Rule 56,

6    a burden of demonstrating to this Court that there is no

7    material issue of fact to preclude a summary dismissal of all

8    of the plaintiffs' claims which have been filed against them as

9    a matter of law.  I submit that that is an especially

10   significant burden in a case where, as here, the Rule 56 motion

11   is brought before any discovery has been conducted.  Not a

12   single potential witness on any of these issues raised by these

13   motions has been deposed.

14                    The second burden which the defendants bear is

15   to establish beyond any factual dispute that all of the

16   requirements under the preemption statute that they rely on

17   have been satisfied and that none of the exceptions set forth

18   in the statute are in play.  Our position is that these burdens

19   have not been successfully carried by the defendants at this

20   early stage of the litigation.  To the extent that on its face

21   there is legally a preemption defense -- and we dispute that

22   there is -- then certainly some discovery should occur prior to

23   the dismissal based on preemption.

24                **THE COURT:**  You know, let me ask you about this.  We

25   have affidavits which are competent for summary judgment.  We

1  aren't saying this evidence isn't competent for summary

2  judgment purposes.  We have a plethora of information.  It

3  could be argued that it would be irresponsible of me to conduct

4  discovery when it's seemingly fruitless, that is, on when they

5  completed this.  I don't see any affidavits or anything from

6  the plaintiffs saying these things are wrong or they may be

7  wrong.  I understand what you're saying, you're in a vacuum,

8  but go ahead.

9       MR. MEUNIER:  Judge, I hear you.  I will leave to

10 Mr. Lambert to discuss the acceptance issues.  I'm prepared to

11 do that on the contractor motions, not the engineer motions.  I

12 do say, with respect to both sets of motions, the fraud

13 exception, which is a state-of-mind issue, is one which I think

14 suggests --

15      THE COURT:  It hasn't been pled.  Don't you think

16 there has to be a pleading of fraud?  They have to prove a

17 negative, "Oh, by the way, we didn't commit fraud"?  What is

18 fraud?  Tell me.  I'm sure you know more about this than I do.

19 Would fraud be, for instance, I'm supposed to use a certain

20 gauge of metal and I use a lesser gauge?  That would seem to be

21 one indicia of fraud.  In the context of the statute, what does

22 "fraud" mean?

23      MR. MEUNIER:  Let me go to that.  That was actually

24 going to be one of the latter points, but let's go to it now.

25 It's the definition of "fraud" in the Civil Code.

1          THE COURT:  I'm familiar with --

2          MR. MEUNIER:  Judge, I think we can stipulate that

3    both statutes -- without pulling up right now the specific

4    provision in the engineer statute -- make an expressed

5    exception for fraud.

6          THE COURT:  Absolutely.

7          MR. MEUNIER:  This is the definition.  It's a

8    misrepresentation or a suppression of the truth made with the

9    intention either to obtain an unjust advantage or cause a loss

10   or inconvenience.  It may result from silence or inaction.  So

11   the question becomes -- these are experts.  These are

12   engineers.  Their business is engineering.  They are at the

13   site.  They are at the scene.  There now does appear certainly

14   to be a colorable issue in this historic litigation that

15   perhaps arguably -- certainly more than perhaps arguably -- the

16   design at the time was unsafe, that the construction at the

17   time was unsafe, that the design and the construction of these

18   important flood protection properties put many citizens at

19   great risk.

20              If you have that situation where experts are out

21   there doing their thing -- and we now know looking back

22   historically that there were problems, or arguably there were

23   problems.  The questions becomes -- a familiar question in tort

24   cases such as this -- what did the defendants know and when did

25   they know it?

1          Now, we recognize our burden, and here is the

2     conundrum.  Here is the problem.  Fraud goes to state of mind.

3     Fraud goes to intent.  They can give me an affidavit from their

4     engineer saying, "I didn't know anything," but I have to depose

5     that man to know truly whether that's the case.  I acknowledge,

6     Judge, and we must acknowledge that there is a rule that must

7     be taken seriously that says plaintiffs have to plead with

8     particularity the circumstances of fraud.

9          **THE COURT:**  I think there are cases that say you can

10    do it on information and belief, but under 9(b) you have to

11    give some indicia of fraud at least that can be explored.

12         **MR. MEUNIER:**  The question, I guess, becomes:  How

13    particular can I get, as a plaintiff, consistent with my

14    Rule 11 obligation not to sign something that is purely

15    speculative, particularly as serious as a fraud allegation?  I

16    have no discovery opportunity to get into the state of mind.  I

17    can look at documents.  I can look at their disclosure.  I can

18    look at their affidavits.  This is a state-of-mind issue.  So I

19    can't take any depositions yet.  I can't discover the state of

20    mind yet.  I have a rule telling me you have got to be

21    particular about what it is that was in the state of mind that

22    led to this.  I have another rule telling me don't go there;

23    you may be in a sanctionable situation.  I mean, it's been

24    difficult for the plaintiffs.

25         Now, in the normal case you would have a

1   defendant in court.  You would have made various allegations of

2   negligence as well as other theories against that defendant.

3   You would hold back on the fraud allegation until you got

4   discovery.  You would then add it upon discovery, or you would

5   add it in advance and they would come in and challenge it and

6   maybe you've got to drop it, but they're still in court and you

7   come back with an amendment later.  The problem here is we are

8   up on the one-year anniversary of this catastrophe.

9               Now, I don't know what the impact will be if

10  this Court decides, well, you don't have discovery yet, but you

11  haven't pled it with particularity.  It's an exception to

12  preemption.  I'm saying the exception is not established, and

13  then later we get into discovery without the defendant in the

14  case and find out that, indeed, there was some state of mind

15  here, a knowledge of an issue of a risk.  What do we do?  So,

16  Judge --

17          **THE COURT:**  You would probably have a real problem,

18  to be fair to your concerns, of at the very least collateral

19  estoppel or res judicata.  Even though it wasn't at issue, it's

20  an interesting -- I understand your concerns.

21          **MR. MEUNIER:**  It wouldn't be such a problem unless

22  I'm forced to rely on it to keep them in the case, you see.  If

23  they are out of the case without my establishment of this

24  exception to preemption, then I've got a problem.  So,

25  Your Honor, when I talk about the importance of discovery as a

1    predicate -- again, pretermitting the acceptance question, the
2    remoteness question, which I'm not prepared to address -- I
3    think in both sets of motions there is that issue.
4                Now, if I may go to what I think is a pure legal
5    issue, which has to do with what we say is an attempt to
6    retroactively apply preemption statutes -- this is true in both
7    cases, both engineering and construction.  To retroactively
8    apply preemption statutes, which albeit remedial in nature,
9    divest a cause of action, a right of action that existed at the
10   time.
11        **THE COURT:**  I've read the cases and, unfortunately,
12   again, I don't make this law, but I have to interpret it.  It
13   appears that the cases hold -- and I'm sure you'll give me a
14   good parry -- that the cause of action doesn't vest until the
15   injury actually occurs and here, in this instance, when your
16   house is flooded or damaged or accidentally destroyed, whatever
17   the appropriate term is, and that cause of action occurred
18   August or September of 2005.
19        **MR. MEUNIER:**  If the Court will just bear with me and
20   keep an open mind because I have some slides to show you with
21   some cases.
22        **THE COURT:**  The cases would help.  Go ahead.
23        **MR. MEUNIER:**  Right now they are my only help.  First
24   of all, Judge, by definition only, we know that preemption
25   under Article 3458 extinguishes a right of action whereas

1  prescription bars the enforcement.  What I am focusing on today

2  is the existence of the cause of action, not the enforcement of

3  the cause of action.  That distinction at the very outset is

4  critically important to us.

5          THE COURT:  I agree.  If the cause of action actually

6  exists, it is arguable that the preemption does not extinguish

7  a cause of action that existed prior to the statute being

8  enacted.

9          MR. MEUNIER:  Right.

10          THE COURT:  I understand.

11          MR. MEUNIER:  So our concept is that if I can

12  demonstrate to the Court that the plaintiffs' cause of action

13  existed at the time of the delict, the wrongful conduct, albeit

14  not made manifest, mature, or enforceable until the time of

15  Katrina --

16          THE COURT:  Aren't you somehow cleverly trying to

17  obscure -- *contra non valentem* doesn't apply.  Are you arguing

18  a form of *contra non valentem*?

19          MR. MEUNIER:  I'm really not.  Let's look first at

20  the Lott case.  The steps here are rule, exception, exception

21  to exception.  What's the rule?  The rule is, under the Civil

22  Code, laws apply -- they don't have any retroactive operation,

23  and that's reiterated in the statute.  Statutes and laws are

24  not retroactive.  However, the exception is procedural or

25  remedial laws, they can go retroactively.  So we have a rule

1  against retroactivity.  We have an exception to that rule

2  dealing with remedial.  Then the important thing for us is the

3  exception to the exception, which is those remedial statutes

4  such as statutes of limitation, which normally would be

5  accorded under the exception retroactive application, do not

6  apply retroactively when?  When they disturb a person of a

7  preexisting right.

8          **THE COURT:**  Thus far I think we are in agreement that

9  is the state of the law.

10          **MR. MEUNIER:**  Now, let me talk a little bit more

11  about <u>Lott v. Haley</u> because it's an apt case.  This is a

12  Supreme Court decision that dealt with a '72 misdiagnosis, as

13  you know, and a subsequent manifestation of the problem.  It

14  does address the question that we are dealing with here.  What

15  does it say?  It says the cause of action vested -- in this

16  case back in '72 -- the date of the negligence that gives rise

17  to the injuries.  So <u>Lott</u> doesn't say the cause of action vests

18  when the plaintiff knew he had a problem.  <u>Lott</u> says the cause

19  of action vests when the doctor misdiagnosed and committed

20  negligence years before, long before.  Now, I don't think this

21  principle, Your Honor, is seriously at question when you read

22  cases even other than <u>Lott</u>.

23          **THE COURT:**  Weren't we talking about prescription,

24  though, there, where you do have *contra non valentem* and where

25  that would be relevant?

1          **MR. MEUNIER:**  Judge, this case is not based on *contra*
2    *non valentem*.  Look what it is.  It's based on that exception
3    to the exception.

4          **THE COURT:**  Isn't it a prescriptive case rather than
5    a preemptive?

6          **MR. MEUNIER:**  It is a prescriptive case.

7          **THE COURT:**  Prescription doesn't run until you knew
8    or should have known when the injury occurred, so isn't that an
9    apple and an orange?

10          **MR. MEUNIER:**  The Supreme Court in <u>Lott</u> could have
11   gone in that direction and could have said, "You know what?
12   Unlike preemption, we are dealing with prescription.  We have
13   *contra non*.  We have the discovery rule," but they don't do
14   that.  They say the reason they hold this way is because you
15   would be divesting the plaintiff of a vested right in its cause
16   of action in violation of the Constitution.  So what I'm saying
17   <u>Lott</u> does -- although you may suggest to me, "Well, they didn't
18   have to do it that way," but the way they did it in <u>Lott</u> was to
19   cite the exception to the exception.

20          Let's look as <u>Cole v. Celotex</u>.  This language is
21   a been inapposite because in <u>Cole</u> what the court was trying to
22   discern was when the plaintiff's action against the defendant
23   vested and also when there was a joint tort feasor action or an
24   action between and among joint tort feasors.

25          Again, it reiterates the <u>Lott</u> decision.  At the

 1   time of the delict, there is vested one cause of action and two

 2   rights of action.  The injured party has a right of action and

 3   cause of action against the tort feasors and the joint tort

 4   feasors have a right of action which is different.  So what I'm

 5   suggesting Cole does is reiterate the exception to the

 6   exception, that you have got a vested cause of action at the

 7   time of the delict, not the time of the harm.

 8              Now, this was an exposure to asbestos, and the

 9   analogy that will be clear in this is:  When the engineers or

10   contractors go do their work and even intentionally or

11   otherwise overlook a serious problem with the levees and put

12   thousands of citizens at risk, is that as injurious or even

13   more injurious than exposure to asbestos?  Now, there are no

14   symptoms yet.  There are no symptoms yet, but you know what?

15   If the plaintiffs had known what was going on, if the

16   plaintiffs had been aware that the levees were putting them at

17   risk back at the time of the delict, they could have done

18   something.

19              THE COURT:  Unquestionably, and that's one of the

20   insidious things, frankly, about preemptive statutes.  The

21   legal profession benefits from one, as well.  Again, I'm not in

22   the legislature, but there's some philosophical problems I

23   might have with the concept.  When the preemptive statute is

24   passed, if we apply this, wouldn't that in essence eviscerate

25   the purpose of making it -- of the legislature in its infinite

1   wisdom going ten to seven to five, eviscerate the legislative

2   will by making it preemptive?  It would then be prescriptive

3   because then the prescriptive period -- we would be applying a

4   prescriptive period only when I knew or should have known, and

5   the only time I could have known is when the doggone thing

6   broke, therefore, my statute of limitations is five years from

7   August 29.  I think that's what you would argue, "My preemptive

8   period would be August 29, 2005 until."  That's basically what

9   you're arguing.

10          **MR. MEUNIER:**  That's correct, Your Honor.  I am going

11  to acknowledge to you it may not be as easy for us as you may

12  be suggesting because there's one more case I want to look at,

13  but let me say it's not an evisceration when you enforce a

14  constitutional exception.  In other words, it's not saying,

15  "Gee, we are going to override sacred legislative intent here,"

16  because the basic constitutional rights of people override

17  everything.

18          **THE COURT:**  Unquestionably, you are correct.  If

19  there's a constitutional right that says this cause of action

20  vested at the time of the delict for the purpose of a

21  preemptive statute, then I would have to grapple with that,

22  you're right.

23          **MR. MEUNIER:**  Your Honor, I hope that these cases I'm

24  showing you, even though they deal with prescription not

25  preemption --

1          THE COURT:  You're showing that the concept of

2    vesting separate and apart from preemption -- the concept of

3    vesting is embedded in some of these Supreme Court cases,

4    meaning that maybe the vesting has taken place at the time of

5    the delict.

6          MR. MEUNIER:  I want to go a step further.  You say,

7    well, these are prescription not preemption cases, but you know

8    what?  I think I'm helped by the fact that we are dealing with

9    preemption.  Why?  Because, remember, preemption goes to the

10   existence of the cause of action.  Preemption asks the question

11   by nature "When did that cause of action exist because we are

12   going to extinguish it?"  Prescription bars it, but doesn't

13   extinguish it.  Preemption extinguishes it.  So I'm entitled to

14   ask the question of this Court:  When did my clients' cause of

15   action come into existence?  I can't be silenced on that

16   question when it comes to preemption.  Let's look at the <u>Austin</u>

17   case, which --

18          THE COURT:  The problem is "on cause of action for

19   property damage not arising until damages are incurred.  It is

20   only at that point in time the cause of action can be

21   considered vested."  That's in a lot of cases.

22          MR. MEUNIER:  Well, Your Honor, I'm showing some

23   others here, and I'm sticking with the Supreme Court.

24          THE COURT:  That's a good place to start.

25          MR. MEUNIER:  I'm showing you <u>Lott</u> because this is an

1  <u>Erie</u> decision.  I've shown you <u>Lott</u>.  I've shown you <u>Cole</u>.  I
2  think both those cases say what they say.  Now, here is <u>Austin</u>,
3  which is another asbestos case.  Candidly, this language is
4  more nuisanced and probably gives the defendants more
5  opportunity to argue against my position, but this is I think a
6  fair -- it's a sophisticated point, but it's a fair statement.
7          It says, look, the *sine qua non* for accrual is
8  damages.  That sounds pretty good for the defendants' position.
9  The damages came with Katrina.  It's although that, Louisiana
10 is going to be generous in the concept of damages.  Well,
11 that's interesting.  What is the concept of damages?  Then it
12 says, "While a mere invasion is insufficient to support a cause
13 of action, an invasion that brings about some degree of loss or
14 detriment and is capable of repair is the type that we are
15 talking about."  Then they go on to say that the court of
16 appeal here was myopic because it cannot be reasonably disputed
17 that the plaintiff suffered compensable injury, at some earlier
18 date the condition would have been more capable of repair.
19 Again, it's an exposure case, and I'm suggesting to you the
20 analogy between the exposure to a disease and an exposure to
21 bad levees.
22          Now, I admit that we have the burden of
23 convincing you that when the delictual action occurred the
24 plaintiffs at that moment suffered some degree of loss or
25 detriment.  Was it capable of repair, which is the other

1    requirement?  I think absolutely so.  As I said before, if we

2    had known, we could go out and get an injunctive order, get

3    this Court to say, "Build some good levees."  We don't know.  I

4    know that you think that walks me into *contra non valentem*, but

5    it's embedded in this idea:  Is it capable of repair?

6              So I think if you examine <u>Austin</u> and <u>Cole</u> and

7    <u>Lott</u>, our position is that the preemption statutes that are

8    being invoked here under the important constitutional

9    exceptions that we have talked about cannot be applied in a way

10   that divests these plaintiffs of causes of action which we say

11   existed at the time of the delict.

12             Your Honor, I will put up one more slide, which

13   is again pertinent to both sets of motions, and that's the way

14   you interpret preemption.  This is from -- it's hard to read

15   the case name, but it's a Louisiana Supreme Court decision of

16   '94.  I think this is incontrovertible that prescriptive and

17   preemptive statutes are to be strictly construed against

18   preemption and against prescription, and if there are two

19   possible ways to interpret these matters it should be to uphold

20   and preserve the right.  Thank you, Your Honor.

21        **THE COURT:**  Thank you very much, sir.  We are going

22   to now argue the remote, Mr. Lambert.

23        **MR. LAMBERT:**  Yes, Your Honor.

24        **THE COURT:**  Because they are so significant, in all

25   these decisions I make, I intend to get them to the court of

1    appeal as quickly as possible.  Then it's up to them.  I think
2    they all need to be either 1292, 54(b), so we can get closure
3    on it.

4              **MR. GARDNER:**  Thank you.

5              **THE COURT:**  Do we have a disk on this, Mr. Lambert?

6              **MR. LAMBERT:**  I'll provide you with one, Your Honor.

7              **THE COURT:**  So when we go over all this we can be
8    meticulous.  Of course, opposing counsel, too, I'm sure.

9              **MR. LAMBERT:**  Your Honor, Hugh Lambert on behalf of
10   the plaintiffs.  I'm going to hopefully address some issues
11   with regard to the summary judgment motion.  Since Eustis was
12   first, we'll go with Eustis first.  I might say that on Monday
13   our intent is to file some complaints that sort of clarify or
14   organize these issues in a much, I think, more logistically
15   competent manner.

16             What we have done, Your Honor, is developed what
17   we finally refer to as the "bowl theory."  What that means,
18   simply, is that, for example, with regard to the 17th Street
19   Canal, we intend to identify areas that were affected -- which,
20   of course, relate to our clients which were affected -- by
21   bowls.  In that way, we can address flooding issues as they
22   relate to specific failure modes.  Example:  We are looking
23   here at the 17th Street Canal, and the area right here is
24   obviously the portion of the canal -- those were taken in
25   December -- where the repair is under way.

1        **THE COURT:**  Yes.

2        **MR. LAMBERT:**  There's some features that are fairly

3    important in this series of photographs, but as it relates to

4    the bowl concept this particular failure will have to do with

5    these clients.  When we go further down the canal to the

6    Palmetto intersection, where there's overrunning of the top of

7    the levee system that had nothing to do with a specific

8    mechanical failure -- possibly an engineering failure, but not

9    a construction error -- we'll be able to relate that instance

10   to those defects and speak in a much more organized way.

11       **THE COURT:**  Precise and organized.  Got it.

12       **MR. LAMBERT:**  That's correct.  That leads to my first

13   general comment, which is it's too early for this.  It's too

14   early for those summary judgments.  It's too early for us, as

15   the plaintiff lawyers in this case, to have appropriately

16   organized the presentation we are trying to make today despite

17   the existence of IPEC.  If Your Honor ever has gone to that

18   site, which I invite you to do, it's clearly not as simple as

19   it's set forth in that benchbook.  You click on a particular

20   folder and you get thousands of -- it takes 10 minutes just to

21   load the index, and then when you try to get to the specifics

22   inside of a folder it's very, very difficult.

23            I would also like to say, with regard to that

24   particular portion of the presentation, that the October date,

25   insofar as the plaintiffs knowing, that had to do with Ashton

1   O'Dwyer's claim.

2           **THE COURT:**  I saw that the e-mails --

3           **MR. LAMBERT:**  With regard to those documents, I've

4   not seen them.  Maybe that's my fault, but to imply that

5   there's knowledge on behalf of the whole group as of a certain

6   date because of an attorney who is out in front of everybody,

7   given from the standpoint of time, isn't quite fair with regard

8   to the timing sequence of all this.

9           Anyway, we plan to organize these things,

10  Your Honor, on what I call the bowl concept in a much more

11  clearer manner, but there are certain things that need to be

12  thought of as just general principles.  One of them is,

13  obviously, the dredging of this canal.  This particular

14  photograph is interesting because it brings up an issue which I

15  can demonstrate with other photographs in just a minute.  Along

16  the right-hand side of that canal, which is of course the east

17  wall, there's no vegetation whatsoever.  Along the west wall or

18  the Jefferson Parish side, you can see that there is

19  vegetation.  This particular photograph might not be quite as

20  easy as the next, but you can see right along this 17th Street

21  Jefferson side a clear indication of vegetation.

22          The other thing that's obvious from this

23  photograph, Your Honor, is that there is a street which runs

24  all the way down the Jefferson side which gives access, from an

25  observation or inspection standpoint, to the whole levee from

1  the back side.  On the east side or the Orleans side, the
2  street is over here.  The houses are built right up against the
3  dry side of the wall or the land side of the levee structure
4  and that creates issues with regard to design, in the first
5  place, engineering design.  With regard to the maintenance of
6  this structure along here, which the engineering companies as
7  well as other entities like the Levee Board and so on had
8  obligations to fulfill, from an engineering standpoint it is
9  impossible for this area to have been monitored and maintained
10  over the years as the development of these houses and backyards
11  and swimming pools and trees and so on took place.
12                    There is another issue that I might touch on
13  right here.  In this access area there was, as there was in a
14  couple of other locations along the Orleans side or east side
15  of the 17th Street Canal, water in the lawns which was reported
16  at some point in time.  Now, this is from statements from
17  clients and so on that we know these things.  The point is that
18  the water was tested.  There was knowledge on the part of
19  somebody -- and I can't imagine that it wasn't discussed with
20  engineers, which is who you talked to these things about -- the
21  fact that that water came from the canal.  It was analyzed.  It
22  came from the canal.  It only got to where it got in these
23  backyards and in this area by going underneath this retaining
24  wall.
25                    If you know that, then you know that there's

1  something going on there that ultimately leads to the weakening

2  of a system.  In our way too long surreply brief, which was

3  rambling and not real well organized -- kind of like my

4  presentation -- but in it there's an affidavit of an engineer.

5  That engineer has had an opportunity to inspect these systems,

6  and he says in his affidavit that this is a system.  The system

7  is sort of like a person's anatomy.  He doesn't say it the way

8  I will, but I will just say it anyway.  The neck bone is

9  connected to the backbone is connected to the tailbone and so

10 on.  That's really the way this levee system works.

11          To say something is remote is really unfair if

12 you are not given the opportunity to discover whether or not

13 the dredging that took place admittedly along the east side of

14 this canal and not the west led to a condition which then led

15 to a failure which occurred here, but may have occurred in

16 another place as a result of some activity which was not

17 associated directly with the breach site.

18          We had the opportunity, Your Honor, two days ago

19 to take the first deposition of a representative of the Corps

20 of Engineers in another matter.  We don't have the transcript

21 of that deposition yet, but I'll represent to the Court what I

22 believe to be some of the facts that were disclosed in that

23 very first deposition.  That wasn't the first deposition in

24 this case.  That's what we want, some depositions in this case.

25 In that testimony, the Corps' representative drew a graph or a

1    sketch of a floodwall.  Here was the levee crown, and this was
2    the wave berm on the wet side, and this was the stability berm
3    on the dry side of the levee.  It's just sort of his depiction,
4    and this is my sketch and my notes of what he drew as an
5    exhibit.
6            What's interesting about this is that it is
7    strangely familiar to another stretch.  Now, this is a diagram
8    which was clipped to a little plastic fence at the site of the
9    17th Street Canal excavation of the sheet piles back in
10   December a day or two after the aerial photographs I just
11   showed you were taken.  In that depiction you can see that on
12   the canal side of the 17th Street Canal there is a wave berm
13   and then on the dry side, the protected side, there is this
14   slope of this structure.  Now, this is all engineering.  This
15   is all significant with regard to a failure mechanism.
16           Now, let's go back to the canal.  Water side.
17   Then this is the protected side.  The protected side, we have
18   got trees, swimming pools, houses, sheds, all kinds of stuff
19   going on back there, which has an effect on that.  We also have
20   an operation on this side, which included dredging at some
21   point in time.  The engineering companies that did this were
22   Eustis and Modjeski.  There was work done down in an area of
23   the canal down here, which is where the Sidmar's is right in
24   this area.  There's a footbridge.
25           THE COURT:  Mr. Lambert, let me make sure I'm getting

1  you right so we get on track here.  As I understand it -- and

2  correct me if I'm wrong -- these are events which --

3  pretermitting your argument on the preemptive period, this is

4  work done within the last five years?

5          MR. LAMBERT:  Yes, sir.  With regard to Eustis,

6  there's some on the Industrial Canal, 2002; on the London

7  Canal, 2002 work.  With regard to Modjeski, there's work that

8  was done as recent as -- and I think it's on the London --

9  2001.  There was some work --

10         THE COURT:  I'm talking about the dredging thing

11  you're talking about now.  When was that done and by whom?

12         MR. LAMBERT:  There was some work done by Eustis in

13  the inner harbor area, in this area right here, which had to do

14  with the -- wait.  I'm sorry.  No, that's in the Industrial

15  Canal.  Let me back up just one second.  Soil borings done in

16  December of '98 with regard to some environmental issues.

17  Dredging was done in the '90s, in the late '90s.

18         THE COURT:  Do we have right now a list that would

19  show the Court, at least what you know now, what was done

20  within the preemptive period, where it was done, who did it,

21  and any effect it may have on the alleged failure?

22         MR. LAMBERT:  We have the first two, but not the

23  last.  We have a list, and I plan to provide you with more

24  information with regard to what effect it may have, but I think

25  we need some discovery with regard to that.

1          **THE COURT:**  First I need to look at the list.

2          **MR. LAMBERT:**  Okay.  We can do that.  Let me just

3     take you on the ground level just for a second so I can make

4     sure this point is clear.  This is the Jefferson side or the

5     west side.  That is the building that's right at the Veterans

6     overpass right there.  This is the vegetation on the canal side

7     wave berm.  This is the Orleans side, which you can see has

8     water lapping right up against the cement eye wall because of,

9     we think, the dredging activities and the engineering in

10    connection with this canal's maintenance.  We believe that that

11    is probably what led to -- there's a clearer picture.  That's,

12    by the way, the breach side.

13         **THE COURT:**  Right.  I see it.

14         **MR. LAMBERT:**  You can see all the way along here

15    there's absolutely not one ounce of berm.  If you go, then,

16    back to the depiction by the Corps of Engineers as to what is

17    supposedly to have been there -- I'm sure they didn't draw this

18    themselves.  I'm sure this was prepared by someone.  This is

19    the eye wall and how it's supposed to attach.  That, again, is

20    the picture that's supposed to represent --

21         **THE COURT:**  To put this in context, the purpose of

22    this legal argument, when and where was this done and by whom?

23         **MR. LAMBERT:**  Well, these representations were made

24    in December.

25         **THE COURT:**  No, no.  I mean the dredging.

1    Representations aren't a cause of action.

2         **MR. LAMBERT:**  I'm with Mr. Meunier with regard to the

3    conduct.  In other words, the conduct was done in the late '90s

4    and there was also some work done by --

5         **THE COURT:**  But if I don't agree with Mr. Meunier, I

6    guess right now I'm wondering -- we were talking about remote.

7    What remote work was done in the preemptive period by whom?

8         **MR. LAMBERT:**  Well, I don't know what was done

9    exactly by, for example, whatever engineering company was

10   contacted by the Levee Board with regard the complaints about

11   water seeping under --

12        **THE COURT:**  I know you mentioned that.  That's not

13   pled in the complaint as we speak.

14        **MR. LAMBERT:**  I understand.  That's one of those

15   little fraud problems that we have that we don't have enough

16   particularity at this point in time to address.  The problem is

17   that I'm standing here trying to answer Your Honor's

18   questions -- and I would love to.  The problem is I don't have

19   the information that I need to do that and I cannot get it from

20   the IPEC report.  I need some deposition testimony in order to

21   find out where this berm went and who engineered this project

22   to the point where the water is up at this level on a calm day.

23   I just don't have that.

24        **THE COURT:**  Have they not provided -- "they" meaning

25   the engineers, let's say -- all of the times they have been in

 1    the area and where they have been?  You don't have that

 2    information?

 3           **MR. LAMBERT:**  I do, but I really don't believe it,

 4    the reason being, Your Honor, that one of the things we were

 5    told was that no work was done at all by a particular firm,

 6    BKI.  They claim that they have done absolutely no work and

 7    then later on in one of their --

 8           **THE COURT:**  I saw that in your reply memorandum.

 9           **MR. LAMBERT:**  One of their web sites, they come up

10    that they did do work.  I need to be able to discover these

11    things.  I think the things that we can say is that, based on

12    the representations, I can provide the Court with a list of

13    projects that clearly no one had any connection with.  For

14    example, GOTECH's representations to the Court are exactly

15    correct, as far as we can tell, they didn't do any work in the

16    past 12 years, they only worked as a subcontractor for BKI, and

17    they probably shouldn't be here.  We can also say the same

18    thing with regard to Burk-Kleinpeter regarding the Industrial

19    Canal and the MRGO.  In other words, there are certain areas we

20    can just eliminate.

21           **THE COURT:**  We have agreement on.

22           **MR. LAMBERT:**  That's correct.  On the other hand, it

23    would be, I think, way premature to ignore issues -- and I

24    could go on, but it's stuff that gets really redundant -- that

25    have to do with the fact that these engineering companies

1    sitting here in this courtroom, particularly Modjeski and

2    Eustis, are the companies that worked in connection with the

3    Corps of Engineers.  They know about requirements of how much

4    clay there's supposed to be and what the borings showed with

5    regard to what existed in these levees when they did their

6    work.  If they were silent in that regard, then clearly there

7    is a basis for an allegation of fraud.  That clearly wouldn't

8    be affected by this preemption argument.

9              In addition, if I knew enough about it, I would

10   discuss a little bit more clearly some language in 5607 which

11   was just enacted in 2003, on the same day twice, and doesn't

12   have any retroactive language in it that would lead the Court

13   to do anything but look at it as prospective.

14             **THE COURT:**  The problem is, unless otherwise stated,

15   it's unquestioned that the preemptive statute is remedial

16   according to the Louisiana courts.  Remedial is then an

17   exception to the exception, as Mr. Meunier pointed out.

18             **MR. LAMBERT:**  It doesn't say that in 5607.

19             **THE COURT:**  It doesn't have to say it.  By its very

20   nature, it's intrinsically remedial according to the court

21   cases.

22             **MR. LAMBERT:**  I'm in the wrong ballpark here, so let

23   me step back from that.  Let me just comment on some basic

24   argument.  If there's a rule that says you can make a mistake

25   and build a building, as you pointed out, or a levee and five

1    years later it can fall down and you did it poorly and there's

2    a bunch of people that are hurt as a result of it, they have no

3    opportunity to redress their grievances in any way.

4              **THE COURT:**  Nope.  I agree with you.

5              **MR. LAMBERT:**  Something is basically wrong with that

6    concept.

7              **THE COURT:**  Somebody should have told the legislature

8    that.

9              **MR. LAMBERT:**  Somebody should think about that.  The

10   real point here, Your Honor, is that it's clear from an

11   engineering standpoint and looking at dates and times that we

12   can provide the Court with a list of no-brainers in terms of we

13   will withdraw our claims --

14             **THE COURT:**  I understand now.

15             **MR. LAMBERT:**  -- because in this instance we can say

16   there's no evidence of any work done in connection with that,

17   and we are happy to do that.

18             **THE COURT:**  I appreciate that.

19             **MR. LAMBERT:**  Happy to do that.  Also, Your Honor, as

20   I pointed out in the very beginning, we would like the

21   opportunity to provide the Court with a much more organized

22   approach towards analyzing these engineering failures.  Then,

23   when we do that, we'll be in a position with very little

24   discovery and you can hone it down to a simple number, if that

25   is a comfortable way to do it; but we get a shot at discovering

1   the things that we need to complete our organizational attack

2   or, in a better sense, would be explanation for why these

3   failures occurred and then provide the Court with enough

4   information to make a determination from a factual standpoint

5   if there is a dispute and if there is a basis for allegations

6   of silence having created this problem because we really

7   believe that that's true.

8              In other words, one of the things I hopefully

9   pointed out is, as these levee systems developed, that the

10  engineering companies became aware of things that were

11  occurring in connection with their development.  That wealth of

12  knowledge is what I think needs to be considered when you look

13  at whether or not things have been covered up or not disclosed.

14             **THE COURT:**  All right, sir.

15             **MR. LAMBERT:**  I could go through the listing of what

16  particular work was done on what particular levee system by

17  what particular engineering company, but I have to tell you --

18             **THE COURT:**  No need to.

19             **MR. LAMBERT:**  -- at this juncture I would suggest in

20  writing would be a better way to do it.

21             **THE COURT:**  I think so.

22             **MR. LAMBERT:**  Thank you, Your Honor.  Your Honor,

23  there's one little point I forgot to mention and I would like

24  to just before I sit down, and that is during the deposition of

25  the Corps of Engineers one of the things that was very clear,

1   one little factual caveat, had to do with the content and the

2   geology of the soil and the fact that borings are done on a

3   regular basis and an analysis of these structures is ongoing.

4   We don't have any of that.  I think that that's particularly

5   pertinent with regard to these ongoing issues.  I don't know

6   that that's even codified as a project.  It's simply something

7   that's likely done by an engineering firm because those borings

8   and the soil conditions are something that has to be studied by

9   engineers.  Thank you.

10          **THE COURT:**  Thank you, sir.

11          **MR. STILWELL:**  Your Honor, Victor Stilwell again.  I

12  would like to give you a few answers you were asking

13  Mr. Lambert about, "Well, can you tell me when this dredging

14  was done?"  This kind of ties together some things that

15  Mr. Gardner was trying to help the Court with.  Your Honor

16  ordered us to do a disclosure of our involvement with flood

17  control projects, if you recall.

18          **THE COURT:**  Yes.

19          **MR. STILWELL:**  I know I personally, on behalf of

20  Modjeski and Masters, went overboard to tell them everything we

21  did on 17th Street Canal.  Whether it was a remote or it was at

22  the breach site, we told you everything.  Had they read that --

23  and Mr. Lambert is talking like "Well, we have got a wave berm

24  on the west side of the 17th Street Canal.  We have nothing on

25  the east side."  He seems to be in some state of confusion.

1    All they have got to do is read my disclosure.  Both sides of
2    the canal were dredged.  PCS did the work on the west side.
3    Another contractor did the work on the east side.  They're both
4    preempted.  The dates are set forth in my disclosure.  At this
5    point, 311 days after Armageddon, they should know this.  This
6    was in our disclosure in good faith.

7              Now, Mr. Lambert mentioned something about
8    Modjeski on the London Avenue Canal.  When Your Honor asked for
9    disclosures, you wanted to know who did what on levees,
10   floodwalls, flood protection.  All of the sudden I saw
11   something in a surreply, I believe, talking about he has got
12   Modjeski over on the London Avenue Canal.  We never did a flood
13   control job on the London Avenue Canal.  We did -- and Eustis
14   did the soil work for -- work for the Norfolk and Southern
15   Railroad on a railroad embankment that had nothing to do with
16   flood control or levees or floodwalls.  So I think they haven't
17   even read the disclosures that we have made.  We have tried to
18   lay out for this Court what we did.

19             **THE COURT:**  Do we have in the record -- and forgive
20   me if I don't remember if it is -- when the work was done on
21   the rail bed?

22             **MR. STILWELL:**  That was in 2001.  It was contained in
23   the Eustis supplemental affidavit, Your Honor.  There was a
24   one-page letter from Eustis, and I'm here to tell this Court
25   that we commissioned Eustis because the district engineer for

1   the railroad, sitting in Atlanta, had some trepidation.  They

2   were going to add some pumps to Pump Station 3.  That's

3   7,500 feet from the first break on the London Avenue Canal.

4   What they then were going to do is dewater that holding area

5   just north of the pump station.  There is a floodwall.  It has

6   a concrete bottom.

7               So this engineer was concerned that a few

8   hundred feet upstream where you have the trestle embankment

9   that somehow the dewatering was going to have a negative effect

10  on that, so they wrote to Modjeski.  We got Eustis on the job.

11  They did a quick report, which is in Tom's supplemental

12  affidavit.  It was not a flood control project, and that's the

13  long and the short of it.  All of the jobs on the 17th Street

14  Canal that we did are preempted.  So, again, there's no

15  remoteness issue as to Modjeski and Masters.  They are all

16  gone.

17              As respects some of the things that Mr. Meunier

18  was trying to argue, you know, the first point was burden.  As

19  Gardner has told the Court, we are dealing with irrefutable

20  evidence.  We went to the effort not only to get the recorded

21  acceptance out of the mortgage records for the completion date

22  out of the Corps, we got them certified.  We wanted no

23  question.  We wanted to go overboard.  That is irrefutable.

24  When we are talking about burden, we have met our burden.  They

25  haven't met their burden in opposing our motion for summary

 1   judgment.

 2              Particularly, I believe the name "Rosenberg"

 3   came up, who was the engineer that one of them referred to that

 4   had given the affidavit.  That affidavit did not meet the

 5   requisites of Rule 56(e), sir.  It did not state that he was

 6   competent to testify about the facts contained therein.  It had

 7   nothing about education, training, experience.  It did

 8   nothing -- nothing -- to refute our irrefutable evidence about

 9   the end dates that we choose to celebrate because our argument

10   is based on end dates, Your Honor.

11        **THE COURT:**  Is Modjeski and Masters sued in relation

12   to the London Street Canal?

13        **MR. STILWELL:**  Yes, Your Honor, in several.  They are

14   all over the lot.  We are in 14 of the cases.

15        **THE COURT:**  I knew the 17th, but also the London.  Is

16   there any allegation reference this rail work?

17        **MR. STILWELL:**  Negative.  The answer is:  No, sir.

18   No, no allegation.  I will represent to the Court, as I have

19   said I think twice now already, we did no flood control work on

20   MRGO, London, Orleans, Gulf Intracoastal Waterway.  Our flood

21   control work was on 17th.  It's all preempted.  It's all in my

22   disclosure.

23        **THE COURT:**  One other question just for the record,

24   because I need to lay all this out when it's written.  Was

25   there any failure near this work you did in 2001 in the

1  Industrial Canal?

2          **MR. STILWELL:**  No, sir.  There were two breaches --

3  and I think plaintiffs will correct me if I misstate something

4  to this Court.  There were two breaches on the London Avenue

5  Canal.  One was near Mirabeau and the other was near Robert E.

6  Lee.  The southmost breach on the London Avenue Canal was near

7  Mirabeau.  That, Judge, was about 7,500 feet from Pump

8  Station 3.

9          **THE COURT:**  That's what I thought you said.

10          **MR. STILWELL:**  Yes, sir.  Finally, just on my way

11  out, Mr. Meunier is a good lawyer, and I know he tried on the

12  preemption, but he wants to read out all the case law.

13  Your Honor made the remark we gave you five or six cases in our

14  memorandum about property damage and the cause of action

15  accruing upon discovery.  I think you agree with us.  I guess

16  that's it.  Thank you very much.

17          **THE COURT:**  Thank you, sir.

18          **MR. SEEMANN:**  I know this has been long, Judge.  I

19  will try to keep the rest of this short.  I'm a little

20  confused.  I gather there's going to be yet another complaint

21  filed Monday morning.  I understand there's a flood coming in.

22  Somebody told me there were a hundred new suits filed yesterday

23  in this Court alone.  Lord knows what was filed in CDC, but I

24  expect we'll all be busy through Halloween just with that, sir.

25          **THE COURT:**  It looks like you're right, sir.

1    **MR. SEEMANN:**  I'm not sure what that does in this
2    suit, the claims with BKI.  Are they in this suit or not on the
3    17th Street Canal?  If you read their opposition, they would
4    seem to be.  I would point out this quandary, Your Honor, and I
5    only say I'm glad I don't have to solve it right now or even to
6    suggest a resolution right now; it's just whether that
7    shouldn't have been pled as an amendment in this suit.  I don't
8    know the answer to that.

9    **THE COURT:**  Depending on how I rule on this, it may
10   spawn yet another host of motions involving res judicata,
11   collateral estoppel, et cetera.

12   **MR. SEEMANN:**  It will keep me active into retirement,
13   Judge.

14   **THE COURT:**  I'm thinking about passing this on at
15   that time, but go ahead.

16   **MR. SEEMANN:**  Your Honor, there was a representation
17   made that Burk-Kleinpeter said or stated or represented that it
18   had done no work on London Avenue, and nothing could be further
19   from the truth than that.  Burk-Kleinpeter came in and admitted
20   that it drew the plans and specifications.  They admitted their
21   part in the drawing of the plans and specifications on the east
22   side levee.  They described that GOTECH had done the west side
23   levee.  That was all clearly disclosed.

24   Where that came up, Your Honor, was in the
25   affidavit with respect to whether or not there was inspection.

1   What was represented in the affidavit was that on the

2   construction of the plans and specifications for the permanent

3   levees and floodwalls, they had done no inspection; the

4   importance of that being that if they had done inspection, the

5   end date would be the date of the completion of the whole

6   project, whereas the last day of services, which was in the

7   summer of '94, would control.

8           We also disclosed in the affidavit that we had

9   done the design memorandum and the plans and specifications for

10  the temporary levees and floodwalls that preceded the

11  permanent.  Now, these temporary structures were pulled out

12  when the permanent structures were built.  What I didn't think

13  to put in -- because it didn't seem important at the time --

14  was we had also done inspection on the construction of the

15  temporary floodwalls.

16          Now, the documents in the Jackson affidavit make

17  absolutely clear that Burk -- like every other engineer, like

18  most lawyers -- was hungry for work and actively sought the

19  inspection work on the permanent floodwalls, but there's a

20  letter in there attested as part of the BKI records that they

21  were told not only no, but emphatically no, and that Burk

22  didn't do it.  That's where the rub comes.  Up on the web site

23  it says they did inspection and the affidavit explained they

24  had done it on the temporary floodwalls.

25          **THE COURT:**  When would that have been done,

1    Mr. Seemann?

2            **MR. SEEMANN:**  Well, when?  It would have been done

3    long before the permanent floodwalls were even begun, way

4    before '94, that's correct.  Where that leaves us on London is

5    you have before you the document showing that London was

6    completed October of '95, certified by the Corps of Engineers,

7    no evidence to the contrary, although the issue of the

8    verification of that alone, despite the difficulty of the IPEC

9    site, could not have been that big a problem.  So that case

10   clearly is preempted, and all I can say is I'm glad for us that

11   Your Honor is on the bench and was not in the legislature

12   because were it the other way around we would probably have a

13   worse problem.

14           **THE COURT:**  Probably true.

15           **MR. SEEMANN:**  The fact of the matter is where that

16   leaves us, Judge, is Burk belongs out of London Avenue.

17           **THE COURT:**  You have me in the right place.

18           **MR. SEEMANN:**  So where we are on London Avenue is

19   that case is preempted.  They finished in 1994 and you know the

20   law.  I'm done with that.  I want to go now to 17th Street.  We

21   talked about that.  In the plaintiffs' presentation about 17th,

22   I was listening strained and I heard several times Eustis had

23   done things and Modjeski.  I didn't hear anything about

24   anything Burk did on the 17th Street that they think was wrong,

25   and it may be they will have to wait until the chapter comes

1   out Monday to find out.  The fact of the matter is it is going

2   to come up sooner rather than later.

3                    They did a flood control project and we

4   disclosed them because in the larger rubric I wanted to be

5   cautious, but they didn't do long lengths of floodwall, the

6   likes of which failed.  They did work not for the Corps of

7   Engineers or the Levee Board, but for the Sewerage and Water

8   Board because they had pump station design.  One of those pump

9   stations was the big pump station under the railroad track on

10  I-10 that always floods.  That had to go into the 17th Street

11  Canal and so they had a place there on the 17th Street Canal

12  where that plugged in.  They did that, and it had to tie into

13  the floodwalls.  I said, "Seemann, you better disclose that one

14  because it does relate to the floodwall," but it didn't fail

15  during Katrina, didn't fail after Katrina, and it's there now

16  happily prepared to pump water out of the I-10.

17                   Same-same on the other side for Jefferson

18  Parish.  They did an outlet for the Canal Street pump station,

19  which came in on the west side.  That didn't fail.  It wouldn't

20  have flooded Orleans, in any event, because it's on the other

21  side of the canal.  Finally, they did some improvements to

22  Pump Station 6, which is the monster pump station at the far

23  southern end of the canal, as far away as you can get from the

24  breach, and the involvement was similar.  It had to tie the

25  improvements in the pump station into the floodwall, but that's

1   it for that kind of improvement.

2                   All of those were south of I-10.  If you look at

3   the map that I put in the Jackson reply, it's very simple.

4   It's not any complicated map.  It's right out of an atlas.  You

5   can see that I-10 is about a mile south of the breach and these

6   are south of I-10 and they didn't breach.

7               **THE COURT:**  Okay.

8               **MR. SEEMANN:**  The last project is on the opposite

9   side of the canal, the Jefferson Parish side, and it was

10  nothing more than a sheet-pile wall to protect a historic

11  house.  It was outside.  It was north of the hurricane levee

12  system that ties together.  The Bruning House, which sat on

13  that point for many, many years, was in danger of sliding into

14  the lake.  Jefferson Parish wanted to drive a sheet-pile wall

15  around so it would not erode anymore.  It wasn't a big flood

16  protection deal.  It wasn't I-walls, T-walls, and it wasn't

17  destroyed in Katrina.  It's out there.  The Bruning House is

18  gone, but the sheet-pile wall is there.  That's all BKI did,

19  Your Honor.  I'm not sure what that does.  There's nothing in

20  an affidavit anywhere that ties us, certainly -- they took

21  Mr. Rosenberg, which has the most remarkable paragraph in legal

22  or scientific writing, I think.

23              **MR. GARDNER:**  I thought I would save the Court some

24  time, Your Honor.  Excuse me.  I'm Tom Gardner.  Just a few

25  remarks.  I know you have been on the bench a long time.

1          **THE COURT:**  Right, and we have two more motions.

2          **MR. GARDNER:**  Just really quick.  Eustis was a sub on

3     the flood control matters to either Modjeski or Burk, so

4     whatever happens to them will likely happen to us.  Secondly,

5     Mr. Lambert threw the gauntlet down.  I've got to pick it back

6     up.  He said I wasn't fair to the Court.  I wasn't intending to

7     be anything other than truthful and fair to the Court in

8     connection with the disclosure on how to use the IPEC site.  I

9     pointed out to the Court that that was an e-mail and it was

10    circulated to whoever was on that distribution list.  If any

11    other plaintiffs' attorneys had asked me, I would have told

12    them the same thing, how to do it, but it's not my obligation

13    to read their mind.  If they wanted to know how to do it, all

14    they had to do was ask.

15              Secondly, IPEC is not the only source that these

16    folks had available to them.  They knew about FOIA.  They knew

17    about IPEC.  They could have circulated public records requests

18    to any of the agencies and gotten these documents.  What really

19    is striking, when you step back and look at this, the

20    plaintiffs have not told you what they did.  They have not

21    said, "We tried to get something and we couldn't."  The record

22    is bare, and they have had almost a year to develop these

23    facts.  They are unable to do it and, in fact, they couldn't do

24    it because a date is a date.

25          **THE COURT:**  We are going to take a five-minute recess

1    and move to the contractor motions.

2              **MR. O'DWYER:**  Your Honor, excuse me.  May I state an

3    objection for the record, please, for court of appeals

4    purposes?

5              **THE COURT:**  Do it now, Mr. O'Dwyer.

6              **MR. O'DWYER:**  I'm sorry for upsetting the applecart

7    by doing this, but I do want to state this for the record for

8    purposes of the court of appeals.  Your Honor, I've been

9    criticized in some papers filed by the lawyers for the

10   contractors and engineers for having filed a memorandum

11   arguably "out of time."  The reason it was filed in that manner

12   was because I waited for the filing of the interim plaintiff

13   committee's surreply brief, which I had hoped was going to

14   include a legal argument, which is apparent to any admiralty

15   lawyer in the city, namely that admiralty and maritime law in

16   the uniformity of maritime law would be harmed irreparably if a

17   state preemptive statute were to govern what I maintain is an

18   admiralty and maritime case.  I brought that to the Court's

19   attention in a memo after the committee's memo failed to

20   address it.

21             Two other quick points, Your Honor, that I want

22   to state for the record that I'm objecting to.  There have been

23   a number of terrific books written about Katrina, the

24   construction of the levees, the nature of the failures,

25   et cetera.  I just want to read a quick little part about

1    Eustis and Modjeski and Masters from one of the better ones.

2              **MR. GARDNER:**  Objection, Your Honor.  This is

3    hearsay.  It's not in the record.

4              **THE COURT:**  I don't know what this is, but I'm taking

5    my recess.  You can stay here and put it on the record.

6              **MR. O'DWYER:**  I'll put it on the record, Your Honor.

7              (WHEREUPON, the Court exited the courtroom for the

8    recess.)

9              **MR. O'DWYER:**  This is John McQuaid and Mark

10   Schleifstein's book called *Path of Destruction*.  I just want to

11   read two brief paragraphs:

12              "The Corps and its contractors" -- they are

13   talking about Eustis now -- "had drawn up a subterranean map

14   using soil borings 350 feet apart, most at the center line of

15   the levee.  But in New Orleans, the soil varies yard by yard."

16              "The soil analysis technique Modjeski and

17   Masters used dated to the early 20th Century.  Other Corps

18   offices had abandoned this type of analysis in favor of more

19   up-to-date soil models, but the New Orleans district had

20   stubbornly stuck with what it knew."

21              Your Honor, for purposes of the court of

22   appeals, I respectfully submit that the failure of Eustis,

23   Modjeski and Masters, and other parties similarly situated to

24   bring to the attention of the innocent people of the city of

25   New Orleans that they were using improvident engineering or

1  construction techniques constitutes fraud under Louisiana Civil

2  Code Article I believe it's 1953.

3          Lastly, Your Honor, fraud can take many forms,

4  and one thing that the Court has alluded to today is the

5  argument that this is a legislative problem.  The Court must

6  apply the law.  I believe we are entitled to discover fraud by

7  the contractors and engineers and their relationship with

8  politicians, legislators, et cetera, for getting this

9  legislation passed in the first place.  I just want that on the

10  record for court of appeals purposes.  Thank you.

11      **MR. STILWELL:**  Modjeski and Masters objects to what

12  counsel just read into the record as hearsay.  Also, counsel

13  for Modjeski and Masters points out for the record that

14  Mr. O'Dwyer has never made any allegation of fraud in his

15  pleading.

16      (WHEREUPON, the court reporter exited the courtroom

17  for the recess.)

18      **THE DEPUTY CLERK:**  All rise.

19      **THE COURT:**  Please be seated.  Contractors.

20      **MR. BRENNAN:**  The same thing that they said.

21      **THE COURT:**  That's the best argument I've heard yet.

22      **MR. BRENNAN:**  I'm Terry Brennan and I represent

23  Boh Bros. Construction Co.  With me is Charles Colvin with the

24  Kingsmill Riess law firm.  Of course, Herman Hoffmann is here

25  on behalf of B&K Construction Company.  We have very little to

1  say, but I wanted to point out a few issues and factual

2  questions that maybe make our situation a little different than

3  what you have already heard from the engineers.

4         **THE COURT:**  Yes, sir.

5         **MR. BRENNAN:**  As you know from reading the pleadings,

6  Boh Bros. is named in I think 14 or 15 lawsuits, all of which

7  principally allege the same thing.  There were two projects

8  that are specifically identified in those pleadings.  One is a

9  project involving the 17th Street Canal, a project which you

10  have already heard some about, drawings and specifications

11  prepared by M&M (Modjeski and Masters).  Boh Bros. had a

12  contract and that contract was entered into in 1992 -- actually

13  1990, May of 1990, and the scope of that work, Your Honor, was

14  to drive the sheet piles, including the sheet piles where the

15  breach occurred on the 17th Street Canal, and there was also

16  some dredging that was part of that contract.  That contract

17  was completed.  The same acceptance that the engineers referred

18  to applies to that particular contract, therefore, we are still

19  dealing with a public record.  Obviously that document has

20  already been offered into the record of this Court.

21         **THE COURT:**  That was in 1992?

22         **MR. BRENNAN:**  That is correct.  There was a

23  Certificate of Substantial Completion that was recorded in the

24  mortgage records on August 24, 1992.  As of that date, that

25  project was completed.  Boh Bros. had no further work in

1   connection with that project.  I might note that another

2   contractor followed Boh Bros., one of the Pittman entities, and

3   actually was involved in installing the concrete floodwall on

4   top of those sheet pile.  Boh Bros. had nothing to do with that

5   contract.

6           The second contract that Boh Bros. was involved

7   with is on the Industrial Canal.  That contract was a fairly

8   straightforward and simple contract to do some test piles.

9   That contract, the work was commenced in December of 1999.  The

10  contract was actually signed in September of 1999.  The work

11  was completed in May of 2000.

12          There was some difficulty finding a document

13  that would establish the end date of that particular contract.

14  In our initial motion, we submitted an affidavit of a Boh

15  employee who testified in that affidavit that the completion of

16  Boh's work was concluded on May 25, 2000.  Subsequent to filing

17  that memorandum, we submitted a reply memorandum that included

18  a document from the Corps of Engineers, properly certified as

19  authentic, witnessed by two individuals, also notarized, signed

20  off by a Corps representative, that establishes the date of

21  completion as May 25.

22          So that there would be no question about whether

23  there was any document that was actually filed in a public

24  record, I had my fellow partner, Keith Bergeron, go down to the

25  mortgage records in Orleans Parish.  He has sworn out an

1    affidavit, which was properly notarized, that said there is no

2    document in the public record that was filed in connection with

3    that project.  The reason for that, of course, is that in the

4    statute there's a question.  There are start dates as to when

5    this period begins to run.  Obviously, if you have an

6    acceptance that is filed, then the start date is from the

7    acceptance, which would apply on the 17th Street Canal.  If you

8    do not have an acceptance that's filed within six months of

9    occupancy, then you go to the date of occupancy.  In this case,

10   through that authenticated certificate of the document from the

11   Corps, we are able to establish that the occupancy date,

12   completion date was May 25.  So from Boh Bros.' standpoint, we

13   think we have established the end dates for both of those

14   contracts and that they are not in dispute.  The plaintiffs

15   have raised the issue as to whether the project was occupied on

16   the Industrial Canal.  We believe that the authenticated

17   document takes care of that issue.

18            I'm almost prepared simply to talk in rebuttal

19   because of the nature of the previous discussion.  The

20   plaintiffs really raised four issues as to Boh Bros.  One was

21   the end date that we just talked about, which I think is no

22   longer an issue.  The second issue was fraud and the issue

23   about allegations of fraud.  I think you have already heard a

24   discussion and argument about that.  Our argument would be the

25   same thing.  As to Boh Bros., there was no allegation of fraud

1   set forth in any of these pleadings.  The third issue involved

2   the question of whether this statute is retroactive, which I'm

3   going to defer for a second.  The fourth issue was that the

4   cause of action here accrued within the fifth year and that the

5   statute provides a certain remedy.

6        **THE COURT:**  I saw your response on that and

7   apparently the counting works in your favor.  The fifth year

8   would be 2004.

9        **MR. BRENNAN:**  So it would commence May 25, 2004, and

10   expire on May 25, 2005, and therefore the preemption period is

11   expired.  So I don't believe that's in dispute either.  I think

12   that's just a clear reading of the statute, which brings us

13   back to retroactive application.

14            Again, you've heard a lot about that and you've

15   made some statements about it.  I just want to emphasize here

16   that really, when you look at it, we are not applying the

17   statute retroactively.  In other words, there's no retroactive

18   effect that takes place here by applying the statute the way

19   that we are asking the Court to apply it.  The cause of action

20   didn't accrue until after the effective date of the statute.

21   That is a prospective application of the statute.

22        **THE COURT:**  I understand what you are saying.  Simply

23   the only way it's retroactive is it would apply to work

24   performed prior to the enactment of the statute.

25        **MR. BRENNAN:**  Exactly.  So, for example, if we had a

1   building where damage manifested itself before the enactment of

2   this five-year period and it was within, let's say, a

3   seven-year period, that cause of action accrued before the

4   enactment that reduced the time period from seven to five --

5           **THE COURT:**  So it would be seven years.

6           **MR. BRENNAN:**  So it would be seven years.  They would

7   have whatever prescriptive period would apply to assert that

8   cause of action by filing a lawsuit.  In that case, you could

9   say that there's a retroactive effect as a result of that

10  existing accrued cause of action.  If we were to apply it in

11  such a way to take away that cause of action, that would be an

12  impermissible retroactive effect of that statute.

13          **THE COURT:**  I think we all agree on that, plaintiffs

14  and defendants and the Court.  Mr. Meunier argues -- you heard

15  his argument -- that he thinks that the cause of action vested

16  at the delict and, therefore, it couldn't be taken away from

17  him.  That's what he argued.

18          **MR. BRENNAN:**  That's what he argued.  If you go

19  through the cases -- and they have cited some cases and

20  presented some cases --

21          **THE COURT:**  I have gone through them, I promise.

22          **MR. BRENNAN:**  If you look at <u>Wall</u>, <u>Wall</u> is a

23  Supreme Court case -- I think a very well-reasoned case -- and

24  they go through this issue about retroactive effect, and they

25  explain the nature of the retroactive effect.  But in our case

1  we are talking about really a procedural statute here rather

2  than a substantive statute.  There may be some differences

3  between the application of one versus the other, but if you go

4  back to <u>Wall</u> and look at the analysis there, they're really

5  only two situations where you would have retroactive effect.

6  One of the cases actually discusses that retroactive effect,

7  and neither one of them apply here.  Neither one of those

8  instances apply here unless, of course, you would adopt the

9  plaintiffs' argument that there was a vested right, and then we

10  are infringing upon or suppressing that vested right.

11          **THE COURT:**  That is correct.

12          **MR. BRENNAN:**  Of course, we don't agree that there is

13  a vested right.  The case law clearly states the cause of

14  action doesn't vest here until the damage occurs on a tort

15  action of this nature.  So I think it's pretty straightforward

16  application of the law to conclude that here we are applying

17  the statute prospectively and by doing so it's preempted.  I

18  want to reserve the rest of my comments.  I know Mr. Hoffmann

19  may have a couple minutes on his contract.

20          **MR. HOFFMANN:**  Your Honor, Herman Hoffmann.  I

21  represent B&K Construction Company.  I'm tempted to say we

22  finished the London Avenue floodwalls on October 31, 1996, and

23  sit down.  I don't have too much more to say than that.  You

24  have heard all the arguments.  We adopt those same arguments as

25  to the effective application of 9:2772.  We think it applies to

1   us and the claims against us are preempted.

2               There's no dispute as to when we completed it.

3   We have submitted affidavits to that effect from both the Corps

4   and from our client.  The plaintiffs have not demonstrated

5   where they could go in conducting any discovery that would lead

6   them to the proposition that we were still doing this project

7   in August of 2000, in any event, four years after the

8   acceptance.  There's been no indication "Look, we need to go

9   look at this.  There's a possibility of that."  They, I think,

10  needed to do that.

11              On the fraud issue, there's been no pleading of

12  fraud against B&K Construction.  These projects have been

13  investigated by numerous so-called independent investigative

14  teams.  In fact, the plaintiffs' counsel have offered to

15  furnish you copies of their pages and pages of reports.  I dare

16  say if any of those teams and the Corps of Engineers or anyone

17  would have uncovered any hint of fraud, we would have heard a

18  lot about it from the plaintiffs.  Thank you.

19              **THE COURT:**  Thank you, sir.

20              **MR. MEUNIER:**  Your Honor, Jerry Meunier for

21  plaintiffs.  A cause of action can be defined legislatively to

22  vest on the occurrence of harm, and a prime example is wrongful

23  death.  The wrongful death cause of action only exists on the

24  event of a negligently caused death.  Before the event of harm,

25  in that case death, there is no wrongful death plaintiff

1   beneficiary.  So when we talk about <u>Burmaster</u> or we talk about

2   the <u>Wall</u> case, that's a critical distinction that in those

3   cases the court did say, yes, the vesting of the cause of

4   action is the death.  That's because a wrongful death cause of

5   action is defined to exist on death.

6              A very different situation exists with personal

7   injury claims.  We have tried to point out to the Court that if

8   you have the breach of a duty that causes some detriment not

9   manifest and it's capable of being repaired and time passes and

10  manifestation of harm occurs, we believe that the case law

11  indicates in Louisiana that the vesting of the cause of action

12  was at the time of the delict.

13             I want to mention one thing about the <u>Austin</u>

14  case because the Court has used the word "accrual," if we can

15  put up <u>Austin</u>.  I went through that slide except I didn't

16  mention this last part.  I think the defendants actually say --

17  they invite you to look at <u>Austin</u> and they say in footnote 5

18  the court gives you a definition there of what accrual is.  I

19  want you to look at that definition.

20             We haven't run the whole definition out.  This

21  is how it starts.  "'Accrual' has been defined to mean:  When a

22  duty is breached."  Then what you'll see, in that footnote is

23  "when a duty is breached," semicolon, and then there's about

24  eight other examples of accrual.  I suggest to the Court that

25  it's not a collective definition of "accrual."  It is a

 1   clause-by-clause definition of "accrual."  What it suggests is
 2   there are cases in which the cause of action accrues when the
 3   duty is breached, and specifically that is this case; where
 4   like an asbestos exposure, these plaintiffs were exposed to
 5   harm at the time of the delict, they could have repaired the
 6   harm had they known, and now years later a manifestation.
 7              Your Honor, let me put on the ELMO this time
 8   line of events.  Your Honor, in a nutshell, this is -- I'm
 9   tempted, in a very rough way, to give an at-a-glance look at
10   where we are with respect to the contractor motions, both
11   Boh Bros. and B&K.  You have the initial 10-year preemption
12   statute.  All of this is 9:2772.
13              THE COURT:  Right.
14              MR. MEUNIER:  It's back in '64.  It's changed to
15   seven years in '99.  As the Court knows, what's interesting
16   about the '99 statute is it says it shall be prospective only.
17              THE COURT:  Right.
18              MR. MEUNIER:  Then we go to the current five-year
19   statute passed in '93.  On the bottom of the line, I have tried
20   to indicate when the activities at issue took place:  Boh Bros.
21   worked on the 17th Street Canal in '92; B&K worked on the
22   London Avenue Canal in '96, '97; and Boh Bros. on the
23   Industrial Canal in '99 and 2000.
24              The question before the Court, I respectfully
25   suggest, is this:  Which of these preemption statutes is

1   available to be applied to do away with the plaintiffs' causes

2   of action?  The defendants are very clear.  They say, "Judge,

3   this is the one.  The five-year preemption statute is the one

4   that governs because that's the one that was in place at the

5   time of Katrina."  So obviously, if we were dealing with the

6   five-year preemption statute, we are going to go back and look

7   at the activities below the line and we are going to count five

8   years forward and we are going to see if counting five years

9   forward from these dates -- '92, '96, '97, '99 to 2000 -- makes

10  the claims timely.

11              What I'm submitting to the Court is that, as a

12  matter of law, this five-year preemption statute, albeit

13  remedial, albeit the kind of a statute that like prescription

14  is applied retroactively, cannot be retroactively applied if,

15  in doing so, it divests the plaintiff of causes of action.  We

16  get back to that same question, which I won't go into.

17              **THE COURT:**  We all agree with that.  I think the

18  defendants would even agree that, as a general principle of

19  law, that is true.

20              **MR. MEUNIER:**  That's the question, now.  But just to

21  finish, if the five-year preemption statute cannot be applied

22  retroactively for the reasons we have argued, then you have to

23  decide, okay, what about the seven-year?  Well, we know the

24  seven-year is prospective only, so the only thing the

25  seven-year can be applied to would be the '99, 2000 work of

1    Boh Bros., in which event counting seven years forward from

2    that work claims are timely.  If the seven-year preemption,

3    which is only in a prospective application, is not in play on

4    its face because of that stipulation in the statute, then we

5    fall back to the 10-year preemption statute.

6              **THE COURT:**  I understand your argument.

7              **MR. MEUNIER:**  That's the question, is which of these

8    three.  We are not saying preemption doesn't apply.

9              **THE COURT:**  So if the cause of action vested upon the

10   Boh Bros. work in 1992 --

11             **MR. MEUNIER:**  Right, 10 years has run since '92.  The

12   only issue, then, becomes do you have a trigger date issue, do

13   you have a fraud issue, because on its face this 10-year

14   statute preempts the cause of action.  It does not do so with

15   respect to the other one.

16             **THE COURT:**  Right.  I agree that your logic follows

17   if we accept the premise of when the cause of action vests or

18   becomes something that cannot be taken away.

19             **MR. MEUNIER:**  That's the legal issue.  Judge, let me

20   just quickly move to some fact issues in addition to the law

21   issues that we have talked about.  I believe there are some

22   fact issues requiring discovery as to the trigger date.  All of

23   these statutes, no matter which one we are talking about, they

24   have two trigger dates.  They are mutually exclusive trigger

25   dates.  Trigger date 1 is:  Is there a registration of a

1    Certificate of Acceptance of the work?  That's trigger date 1.
2    Mutually exclusive.  If no registration, trigger date 2:  When
3    did the owner reoccupy or repossess?  So I submit that the
4    defendants who moved for the protection of these statutes have
5    a burden to show there's no fact issue on trigger date.  I
6    submit that, with respect to Boh Bros., there is a fact issue
7    in the case of the Industrial Canal.  We have an affidavit from
8    Boh Bros. with their motion that tells us, "We finished the
9    work and we got our equipment off the job and we relinquished
10   the site to the Corps of Engineers in May of 2000."  That's the
11   Industrial Canal work.  The question is:  Did that trigger the
12   preemption statute?
13            Now, we know and Boh Bros. admits that there's
14   no acceptance of the Industrial Canal work that was ever
15   registered by the Corps of Engineers or anyone else.  So the
16   question then becomes, under trigger date 2, when did the Corps
17   of Engineers, if they are the owner -- I don't think they
18   are -- or the Orleans Levee District, which is the owner,
19   actually physically reoccupy, repossess, because that's the
20   trigger date.  With all the available resources of Boh Bros., I
21   still don't believe we have been given a clear answer to that
22   question, and I believe discovery is needed.
23            On the contrary, they tell the Court in their
24   brief, "Look, the plaintiffs can go dig through the documents
25   from the Corps and they can figure it out."  With all due

1   respect, it's not our burden.  The burden is on the movants

2   here -- as I said earlier, a twofold burden:  First, a summary

3   judgment burden, no fact issues; and, second, these strictly

4   interpreted trigger dates for preemption.  So I think we need

5   discovery as to the trigger date to the extent that becomes,

6   Judge, relevant in your legal analysis.

7              **THE COURT:**  Assuming I don't agree with your argument

8   on the vesting -- if I do, then except the 1992, all of it

9   would be, in fact, extant.  Your causes of action would be not

10  preempted.

11             **MR. MEUNIER:**  Correct.  On B&K, with respect to this

12  London Avenue Canal work, they tell us the main work was

13  completed and accepted October 31, 1996.  No Certificate of

14  Acceptance was registered.  They tell us there was some

15  so-called "closeout work" in January '97 and then they attach

16  an Exhibit D to their motion, which talks about an amendment to

17  the contract, and it reflects an actual closeout date effective

18  May of '97.

19             So, again, we don't have any registration of any

20  certificate and, therefore, we go to the trigger date of owner

21  reoccupancy and repossession, and we don't really know when

22  that was.  We don't really know when that was.  If the total

23  closeout of the project apparently was not until May of '97,

24  the question is:  Was the delict of this defendant embedded in

25  that closeout work?  If so, then even more clearly we are

1    within the 10-year preemptive period that we say is applicable.

2                    Your Honor, there are two exceptions that we

3    believe need to be focused on, getting past the issue of

4    vesting of cause of action, getting past the issue of trigger

5    date issues.  One exception we have talked about, that's fraud;

6    I won't go back into that.  The other exception is this very

7    interesting issue of the exception that's in the current

8    version of the statute, the five-year statute, and that's

9    during the fifth year.  I think, from your remarks when counsel

10   was up here, I probably have a tough row to hoe, but I'm going

11   to try to walk it anyway.

12            THE COURT:  I'm always, hopefully, open to being

13   enlightened.

14            MR. MEUNIER:  I'm not going to put the slide up again

15   about how you have to interpret these statutes strictly.  You

16   are doing away, in this case, with thousands and thousands of

17   claims in a historic catastrophe.  So I'm hoping that, in the

18   case of an ambiguity or in the case of a question, the tie goes

19   to the plaintiffs here.

20            THE COURT:  Okay.

21            MR. MEUNIER:  This tells us that if the injury occurs

22   during the fifth year after the date -- now, what is "during

23   the fifth year after the date"?  If "fifth year" here is fifth

24   calendar year, then we are -- if Katrina occurred in August of

25   2005, then this claim is asserted during the fifth calendar

1   year, which is 2005, that occurred after the 2000 completion.

2                    Now, we acknowledge there's a different way to

3   read it.  The different way to read it is the "during the fifth

4   year after" phrase sets up not calendar year counting, but

5   actually the counting of 365-day intervals, which can bridge

6   different calendar years.  That's another way to look at it.

7   You can start now with May of a given year and go to May of the

8   next year and so we bridge calendar years and that's how we

9   count the five.

10                   Well, there's two ways to do it, and I suggest

11  to the Court that unless this is totally out of bounds under

12  the strict construction of the statute, we submit the

13  legislature could have been more clear.  They weren't.

14  Plaintiffs can prevail because the fifth calendar year was 2005

15  and that's when the claims arose.

16          THE COURT:  How could they have been clearer, saying

17  "the fifth year (not calendar year)"?  "Calendar year" would be

18  clear, and not having an end could be also clear that we didn't

19  intend to say "calendar year."  So tell me how would that be

20  clearer, "the fifth year"?  You can say "commencing from the

21  date of the end of the work," I guess, the acceptance.

22          MR. MEUNIER:  The other ambiguity is not only during

23  the fifth year, how are we counting years, but it's after the

24  date.  Is it the first year, the first new year that comes

25  after the date, or are we going to be starting on the date in

1  the given year?  In any event, Judge, if we are correct in our

2  interpretation, then we are timely because of a final phrase

3  that says in no event -- you have to bring your claim, then,

4  within a year of the event, which was done here.

5            Just to conclude, Your Honor -- I know this has

6  been a long discussion and, you know, these are issues which

7  are purely legal in nature to some extent, which is the

8  applicability of retroactivity of preemption statutes.  That's

9  a law call, and I think they're properly raised in motion

10 practice at this stage of the case.

11           Again, I just want to close by saying that

12 especially in this case, especially when there's so much at

13 stake for the citizens and the parties and the Court, we should

14 air on the side of caution with respect to the appropriateness

15 of discovery.  If we have managed, in your mind, Judge, to

16 raise a question of fact today with respect to fraud, with

17 respect to any of these issues, trigger dates, et cetera, even

18 if you limited discovery to those issues pertinent to deciding

19 the preemption matter before you, then we would think that

20 limited discovery, at least, would be important as a predicate

21 to your taking the invited step here of at this point

22 extinguishing so many thousands of claims.

23           Frankly, we are confident that if you will

24 review, as you have reviewed the case law, read the statute

25 strictly, that causes of action vested at such a time as to

1   make retroactive application of the desired statute

2   inappropriate.  Thank you.

3           THE COURT:  Thank you, Mr. Meunier.  Can we wrap up

4   and get to the poor, long-suffering immunity parties?

5           MR. BRENNAN:  I will.  I just want a minute.  I just

6   wanted to emphasize again that we have an affidavit and

7   authentic certificate, and in the affidavit our affiant so

8   testifies that we have removed all equipment, completed the

9   work.  I don't know what else we can do to establish the end

10  date of the contract.  Everyone knows that there is no

11  acceptance filed in the record and, typically, there is not an

12  acceptance filed on federal projects.  There's no reason for it

13  from their standpoint.  With regard to the fifth year --

14          THE COURT:  What about the statute saying, as I

15  recall, if the trigger date is when the owner occupies -- do we

16  have anything that says -- because you leave, does that mean

17  the owner occupies?

18          MR. BRENNAN:  Well, our affidavit so states that,

19  okay, but there isn't anything else that we can find that would

20  establish anything other than we left the site, we completed

21  the work, and the Corps accepted the project.  Acceptance, if

22  an acceptance was formally filed, wouldn't have to establish

23  occupancy either.  So I think we have met the burden of proof

24  there, and I don't know what else is out there that would -- of

25  course, we would have tried to assert it if we could find it.

1       **THE COURT:**  For the purposes of the statute in your

2   case, would the owner be the Corps or the Levee District?

3       **MR. BRENNAN:**  I think the only way that statute could

4   be applied uniformly would be the party that you contract with.

5       **THE COURT:**  Which was the Corps; correct?

6       **MR. BRENNAN:**  That's correct.  I can't figure out

7   whether somebody else who might be a naked owner is occupying

8   the project or not, so I think that's consistent with the

9   intent of the statute.  I also might add that since counsel

10  continues to refer to the case of Austin v. Abney Mills and has

11  shown you excerpts, that when you go into the discussion on

12  page 1148, the very first sentence says, "Under Louisiana law,

13  for a negligence cause of action to accrue, three elements are

14  required:  Fault; causation; and damages."  You can't just

15  allege fault to establish accrual.  Here, you also have to be

16  able to establish damages and the damages clearly, in my

17  opinion, occurred at the time that these homes were flooded due

18  to the levee breaches.  Even under Austin and clearly Austin --

19      **THE COURT:**  I'm just thinking about this.

20  Mr. Meunier, I may give him a minute.  Then that might mean it

21  could work against you, if it accrues and you don't know about

22  it.  Then I guess we get into you should have known, so

23  perhaps --

24      **MR. BRENNAN:**  Please remember that Austin goes

25  through a lot of different scenarios there and that accrual

1    occurs differently --

2          **THE COURT:**  Frankly, right now, as I have indicated,

3    I think that's the law.  Certainly, I will look closely at

4    Mr. Meunier's argument, but I tend to agree with your argument.

5          **MR. BRENNAN:**  All right.  Thank you.

6          **MR. HOFFMANN:**  Very briefly, Your Honor.  Herbert

7    Hoffmann again.  I have a rough time envisioning the

8    effectiveness of a preemptive statute if a vested right occurs

9    at the moment of defective construction or negligent

10   construction.  Does that mean, for example, ludicrously, if

11   Hurricane Katrina occurred 50 years from now that the people

12   had the vested right the moment that floodwall was constructed,

13   and then so what is the effectiveness of the statute that tries

14   to put a time period on it?

15               Even if we use the May date that Jerry pointed

16   to in this amendment to the solicitation, just reading from the

17   amendment to the solicitation it says total contract price is

18   $4 million, et cetera, et cetera, all items in this contract

19   have been closed, and that's May 7, '97.  That document, what

20   it is is, basically, "We have settled up the account.

21   Everything is closed.  You have got all your money.  We don't

22   owe you any more," and it shuts it down and it cuts off claims,

23   et cetera, et cetera, et cetera.

24         **THE COURT:**  Why don't we take the last motion.  The

25   only thing I've done for you being last is, hopefully, you get

1   to have a good billing day without having to work as hard.  I

2   thank all of you for your arguments.  They were all very good.

3          **MR. ANZELMO:**  Tommy Anzelmo.  May it please the

4   Court, Your Honor.  Tommy Anzelmo, assisted by my partner,

5   Mr. Kyle Kirsch, as counsel for the Orleans Parish Levee

6   District.  Mr. George Simno and Mr. John Krentel are here as

7   counsel for the Sewerage and Water Board.  For the purposes of

8   this motion, which is the joint motion relative to immunity,

9   I'm going to be arguing the position on behalf of both of these

10  defendants.

11         Your Honor, the statute at issue is Revised

12  Statute 29:735.  The analysis, however, begins with Revised

13  Statute 29:722, which sets out the purpose of the Homeland

14  Security and Emergency Assistance and Disaster Act.  The

15  statute in this chapter sets out in clear and unambiguous terms

16  the expression of legislative will, which immunizes the Orleans

17  Levee District and the Sewerage and Water Board for the actions

18  taken by them in preparation for, mitigation of, and response

19  to disasters, specifically such disasters as hurricanes,

20  including Hurricane Katrina, and also immunizes these two

21  entities even from manmade disasters.  The entities appearing

22  for this motion are acknowledged political subdivisions of the

23  state and are not individuals or agents or employees of those

24  particular bodies.

25         Now, this particular specie of immunity was

1    originally enacted in 1950.  The law was amended in 1993 and

2    again in 2005.  The 1993 version is the applicable version for

3    us.  The immunity granted in 29:735 is different from that that

4    was proposed or granted by Revised Statute 9:2798.1.  We are

5    not claiming 2798.1 immunity in these motions.  To the extent

6    that the O'Dwyer opposition referenced that particular statute,

7    it should be disregarded because it's of no moment here.

8            THE COURT:  Yes, sir.

9            MR. ANZELMO:  The 29:735 immunity is unique in that

10   its function is to protect select public bodies from the broad

11   array of claims that follow disasters, including actions which

12   would have occurred years prior to the disaster.  In this

13   particular case, Your Honor has already written in prior

14   judgments where this is acknowledged to be a disaster.  The key

15   aspect of the purpose in the statute set out in Section 722, it

16   describes and it's pertinent to dispel allegations that only

17   contemporaneous actions by the public bodies are immune.

18           THE COURT:  That's the real argument, as I see it,

19   whether it applies to actions that have a nexus to the

20   emergency or actions that are attenuated in time from the

21   emergency.  That's the rub.  That's what you're getting to.

22           MR. ANZELMO:  Yes, Your Honor.  I typically do not

23   write out my arguments, but this argument is one that is

24   discrete and can be precisely made because it's what the

25   statute sets out for us, again, in clear and unambiguous terms.

 1   If Your Honor would, the court in an analysis takes Section

 2   722, and I'm going to read it because everything in here is

 3   pertinent about it.  It says:

 4                   Because of the existing possibility of the

 5   occurrence of emergencies and disasters of unprecedented size

 6   and destructiveness resulting from multiple things, but

 7   particularly flood and/or other natural or manmade causes, and

 8   in order to ensure that the preparations of this state will be

 9   adequate to deal with such emergencies or disasters --

10   preparation -- and in order to detect, prevent, prepare for,

11   investigate, respond to, or recover from these events and

12   generally to preserve the lives and property of this state.

13                   The genesis of the statute was originally in

14   1950.  This particular section was passed in 1993.  What it

15   does is it sets out what the state is desiring to do, and that

16   is to protect against things that are going to happen in the

17   future, things of unprecedented size, disasters of

18   unprecedented scope.  They weren't forecasting particularly

19   Hurricane Katrina and what was going to happen in 2005, but

20   what they did was they were explaining to the people of the

21   state that what we were going to do is set out protective

22   measures that were going to be available and the reason behind

23   them.

24                   The whole point of the purpose is to show how

25   this is not something that is to be viewed on a contemporary

1    basis.  Moving forward, the historical perspective confirms
2    that the act was designed to include flood control, drainage
3    structures within its purview.  The structures are long-term
4    construction projects that would necessarily be included in the
5    purpose and grant of immunity by the act.  To argue otherwise
6    necessarily has to exclude the phrase; it has to change the
7    legislation to read out "in order to ensure that preparations
8    will be adequate to deal with disasters and to prevent, prepare
9    for these events to preserve the lives and property of the
10   people of Louisiana."  You have to exclude that if you are
11   trying to say that it has to be something that is absolutely
12   contemporaneous, and the plaintiffs are suggesting that
13   rewrite.
14           The _Castille_ case that we have provided the
15   Court with in our memorandum of law is the most excellent
16   analysis for the Court to follow.  It is a pronouncement by a
17   court of appeal.  It's writs denied.  Your Honor, in its
18   determination of what your _Erie_ guess is going to be as to what
19   the Louisiana Supreme Court would determine the law of
20   Louisiana to be --
21           **THE COURT:**  These were cleanup efforts after
22   Hurricane Lili?
23           **MR. ANZELMO:**  Yes, sir.  It is clearly an after
24   statute, but what _Castille_ is going to instruct us in, when you
25   look at it carefully -- which I'm sure Your Honor has -- it's

1  going to tell us certain things.  First of all, it's very

2  instructive insofar as establishing that the public body itself

3  is going to be immune and that willful misconduct only applies

4  as depriving the immunity to individuals.

5          THE COURT:  I don't buy any willful misconduct

6  argument.  In other words, I know there's an exception, but I

7  don't regard this as a willful misconduct case.  I simply

8  don't.

9          MR. ANZELMO:  Thank you, Your Honor.  I will quickly

10  move past that.

11          THE COURT:  In other words, I agree with you on that.

12          MR. ANZELMO:  Yes, sir.  I understand.  The court, in

13  its discussion, talks about the statute and it says it governs

14  the state's response to an emergency whether natural or

15  manmade.  The reason I keep stressing "natural" and "manmade"

16  is while we believe that Hurricane Katrina obviously is a

17  natural disaster, the assertion -- because we have talked about

18  it before -- is that this is a manmade disaster because of --

19          THE COURT:  It applies either way.

20          MR. ANZELMO:  Either one.  Then the next thing we

21  move to is the court discussing about -- and although it is

22  within the willful misconduct section of its argument, they did

23  a comparison and contrasting of the Kansas statute and the

24  Oregon statute.  The key thing here is the court first wanted

25  to see -- although, it's again willful misconduct, they wanted

1    to see what those statutes were about because they set out in

2    one case what they felt was the majority rule, which was

3    Kansas, and then threw in the minority rule, which was Oregon.

4              The key thing about these two statutes, to set

5    it apart from 29:735, which is the strict immunity section of

6    the statute, this is what they say and this is what the Kansas

7    statute says:  "Whenever a proclamation is issued declaring a

8    state of disaster emergency".  It talks about the immunity.  It

9    says:  "As a result of any such activity performed during the

10   existence of such state of disaster emergency."  It's a very

11   discrete statute.  You are immunized.  First of all, they have

12   to declare an emergency, and then you're going to get immunity

13   only if it's activity performed during the existence of such

14   state of emergency disaster.

15             When you look at 735, it leaves all of that part

16   out.  It chooses not to implement or to follow that rule, but

17   what does it tell us?  It doesn't put any of this

18   contemporaneous type of language in the Kansas statute because

19   it begins and says, "Neither the state nor any political

20   subdivision thereof nor agencies, while complying with or

21   attempting to comply with this chapter or any rule promulgated

22   pursuant to the provisions of this chapter, shall be liable for

23   death or injury to the persons or damage to property as a

24   result of such activity."  There is no contemporaneousness

25   here.  It is the broadest possible statement of immunity.

1          When we look at the Oregon statute, which was

2    the minority rule even though it was minority relative to the

3    willful misconduct, what does it say?  Is says "during the

4    existence of an emergency," and it talks about the willful

5    misconduct.  It says "as a result of that activity."  So,

6    again, contemporaneous actions during the emergency itself,

7    which is the antithesis of what we have here, what Louisiana

8    has described, has set out as its immunity provision for itself

9    and for the public bodies.

10          What it has chosen to do is, in essence,

11    identical to what the United States of America has chosen to

12    do.  It says if we are going to get into this arena where we

13    are going to have the obligation to perform all of these

14    protective measures, whether it's in mitigation of, preparation

15    for, or response to things that occur before and after, you are

16    going to have the broadest possible immunity because of, in

17    essence, the size of the obligation that you're going to

18    undertake and the multifaceted things that you're going to have

19    to do.

20          The federal government, in its immunity

21    provision dealing with floodwaters says, "Look, in essence, if

22    we are going to undertake the obligation under the Flood

23    Control Act to protect everything, we are going to write in

24    immunity for things caused by flood."  When that obligation is

25    imposed upon the public body or imposed upon itself -- because,

1  in essence, that's what happens.  Because they are political

2  subdivisions and public bodies, there are statutory obligations

3  that are going to be imposed upon them, obligations that a

4  private contractor or private individuals may never in their

5  wildest dreams have wanted to undertake because of the exposure

6  that might be prevented if they have to levee off and protect

7  the entire city of New Orleans and then be responsible if

8  something happens in the course of that protection that would

9  make them liable for damages.

10            The state has insulated itself and political

11  subdivisions in this narrow field, because I'm not claiming

12  that the state has claimed sovereign immunity and it's

13  protected from everything.  It's protected in the narrowest and

14  discretest of fashions because it has to fall within the

15  provisions of the chapter and it has to meet the definitions of

16  what was described herein.

17            We next go the section of the law which is the

18  definitional section of what is a disaster, what constitutes

19  emergency preparedness.  Again, the law is clear and

20  unambiguous.  It does not impose a temporal element that

21  plaintiffs are attempting to impose upon this public body.  It

22  just says if you are doing these things in preparation for a

23  disaster and it constitutes emergency activities or

24  preparedness activities, then you are going to be immune from

25  that.

1        Now, this is not a great leap that I am taking
2   here nor would it be, I believe, a great leap for the court to
3   take, meaning the state courts to take, because it is the
4   identical analysis and rationale that the broader court has
5   already taken.  You have before you right now, Your Honor, the
6   report and recommendation of Magistrate Wilkinson in the
7   Armstead v. Nagin case.  We made this identical argument to
8   him.  In his ruling, document 74, filed July 26, 2006, he
9   confirms the analysis in exactly what he said.  I'm just going
10  to briefly, for the record, provide that.
11        "Plaintiff fails to state a claim against the
12  Levee District under state law.  The Louisiana Homeland
13  Security and Emergency Assistance and Disaster Act specifically
14  includes 'political subdivisions of the State' in its immunity
15  provision.  La. Rev. Stat. 29:724(D)(5).  The Levee District's
16  functions of building and maintaining levees for flood
17  protection are 'emergency preparedness activities' for which
18  the Levee District is immune from liability."
19        "The statute defines 'emergency preparedness' as
20  'the mitigation of, preparation for, response to, and the
21  recovery from emergencies or disasters.'  Certainly building
22  and maintaining levees for flood control is intended as
23  mitigation and preparation for a disaster and repairs of
24  breached levees after a hurricane qualify as responses to and
25  recovery from a disaster."

1          "'Disaster' means 'the result of natural or
2   manmade events which causes loss of life, injury, and property
3   damage, including but not limited to natural disasters such as
4   hurricane, et cetera, other weather-related events, and manmade
5   disasters.'  Thus, the Levee District is immune from liability
6   regardless whether the flooding following Hurricane Katrina
7   resulted from natural or manmade events or a combination
8   thereof," and he cites the Hontex v. City of Westwego decision.
9   "Plaintiffs have not alleged any facts to show that the Levee
10  District committed any willful misconduct that would exempt it
11  from the immunity granted by Section 29:735."

12          I couldn't have written it any better.  I
13  couldn't say it any better because what the court has done is
14  he took a statute that is clearly worded.  It's not ambiguous
15  on its face.  He applied it as written.  If he were a state
16  court, he would be a true civilian because he has taken the
17  most solemn expression of legislative will, a statute, clear
18  and unambiguous on its face, he applied it, and didn't apply it
19  in a manner -- because it's not ambiguous -- that would have
20  led to absurd results.  This is what the legislature intended,
21  has always intended, and has been consistent, although there's
22  been very little case law on the subject.  The case law was
23  consistent in its application of the grant of immunity both to
24  public bodies, whether it was a levee district or whether it
25  was a sewerage and water board, but it took it within the

1   contexts of the cases that were presented to it, and those

2   contexts were they were doing things right when it happened.

3         **THE COURT:**  Just a question that occurred to me.

4   It's late, so it may not be a very good question.  Would this

5   apply, in your mind, to acts performed by the Levee District or

6   the Sewerage and Water Board prior to the enactment of the act?

7   In other words, it is not a prescriptive statute so, therefore,

8   one could argue it would be prospective.  So if there are

9   acts -- and I don't know if there are any acts that are alleged

10  that were before 1993 reference the design and construction of

11  the levees.  I don't know.

12        **MR. ANZELMO:**  I can answer in two words.  You just

13  heard a great deal of discussion about when the cause of action

14  vests, when the damage --

15        **THE COURT:**  That was true enough, and here you don't

16  have a preemptive statute.  In other words, let's say I got

17  injured in August 2005 or September and it was the result of an

18  improper -- it's something that allegedly occurred prior to the

19  enactment of this statute.  What would be the effect?  I

20  haven't thought about it.  It's not in the briefs, not that you

21  should have put it in yours.

22        **MR. ANZELMO:**  We did think about it.  We thought

23  about it in preparation for the argument in case Your Honor --

24        **THE COURT:**  In case I woke up and asked a question.

25        **MR. ANZELMO:**  No.  It's because we woke up and, as

1    Your Honor suggested that you would be asking a lot of

2    questions, we were trying to think of what questions.  What's

3    the law in effect at the time that the damages were sustained?

4    Something could have occurred years and years ago, but when

5    does the claim arise and what's the law in effect at the time

6    that the claim arose?  Whether it's preemptive or prescriptive,

7    you get into this same issue of, first of all, we don't know

8    that anything happened.

9              THE COURT:  I certainly don't.

10             MR. ANZELMO:  Right.  It's not alleged that anything

11   happened way, way back.  In fact, most of the discussion that

12   we have heard is things that were being done and completed post

13   1993.  So the 1993 statute is clearly applicable.  Again, my

14   response was my response.  If something happened 50 years ago

15   that nobody knew about and you're damaged today, it's what is

16   the law in effect at the time.  We are not divesting anybody of

17   any substantive right because a substantive right didn't

18   accrue --

19             THE COURT:  Well, there are cases, though -- it gets

20   a little complicated.  I'm not even sure if I need to go there

21   if there's no allegation before 1993, if I agree with your

22   analysis.  It's something that occurred to me.  Well, let's

23   hear what Mr. Bruno has to say.

24             MR. ANZELMO:  Your Honor, just give me two seconds so

25   I can make sure that I am finished.

1      **THE COURT:**  Absolutely.

2      **MR. ANZELMO:**  There was some discussion in the

3   non-<u>O'Dwyer</u> brief relative to the inability or that there is no

4   pleading of willfulness, but it gets into this fraud and things

5   that might have occurred.  There's nothing before Your Honor.

6   There aren't any facts.  There are allegations, there are

7   conclusions that, for the purposes of this motion, need to be

8   disregarded.  No matter what the conclusory allegations that

9   can be made, the statute is clear on its face and should be

10  applied here, Your Honor, to grant the immunity to the Orleans

11  Levee District and to the New Orleans Sewerage and Water Board.

12  I'll be glad to answer any questions that might have been

13  provoked by --

14      **THE COURT:**  Are there allegations in the complaint --

15  I don't have it right with me and I'm trying to remember -- of

16  willful misconduct in the complaint that's before me?

17      **MR. ANZELMO:**  There are none except in <u>O'Dwyer</u>

18  because <u>O'Dwyer</u> does say "intentional," and that's the reason

19  why I had to bring up the point.

20      **THE COURT:**  Right.  I've looked at that, and your

21  statement is that it's conclusory without any factual

22  predicate.

23      **MR. ANZELMO:**  Yes, sir, but it's more than that, and

24  that's the part of Louisiana -- the statute itself, 735, as

25  well as the case law in the <u>Castille</u> case makes it very clear

1  that the willful misconduct can only apply to agents or

2  employees.  It's not the public body that was part of the exact

3  holding of the Castille case.  They went through it in specific

4  detail and compared the majority ruling, Kansas and Oregon, and

5  they said, "Oh, no," and they ruled positively that the public

6  body was not affected.  Because these motions are only brought

7  on behalf of the public bodies themselves and no member of the

8  public body --

9          THE COURT:  You mean if it wasn't the policy of the

10  public body itself?  Is that what you're saying?  I have

11  Castille right here.  Are you saying what is willful misconduct

12  on the part of the public body, when would that occur?  "The

13  act includes a provision immunizing state government entities

14  and their employees from liability for damages resulting from

15  the burdens of preparedness.  The provision voids anything for

16  individual employees who have engaged in willful misconduct."

17  That's your point.

18          MR. ANZELMO:  That's right.  That's right.

19          THE COURT:  We don't have any individual employees

20  named.

21          MR. ANZELMO:  I couldn't answer this part of the

22  question.  In the O'Dwyer lawsuit, there was a statement about

23  Mr. Huey, who was a former president.  He has not been served,

24  and we were trying to determine whether he had been dismissed

25  because of no effort to serve or to bring Mr. Huey in.  Insofar

1    as the Sewerage and Water Board is concerned, there's no
2    member --
3            **THE COURT:**  The only potential employee would be
4    Mr. Huey.
5            **MR. ANZELMO:**  Right.  Again, I don't recall there
6    being any acts of willful misconduct other than the broad
7    spectrum of misfeasance, malfeasance, any other feasance that
8    you could think of that we didn't do, but short of that there's
9    nothing.  Thank you, Your Honor.
10           **THE COURT:**  Thank you, sir.  Mr. Bruno.
11           **MR. BRUNO:**  Your Honor, it's been a long day.  I will
12   be as brief as I can.  This particular motion doesn't merit a
13   whole lot of attention in my humble opinion.  If you look at
14   the statute itself, it's pretty clear.  It says that "neither
15   the state" -- blah, blah, blah, blah, blah, blah -- "while
16   complying with or attempting to comply with this chapter," in
17   other words, the activities that the legislature decided to
18   grant immunity for are specifically understood and enumerated
19   by that chapter, which takes this case completely out of that
20   chapter.
21           Consider the allegations in this case.  The
22   Orleans Parish Levee Board is charged with the responsibility
23   of maintaining and inspecting levees.  They didn't build any of
24   these levees.  The most egregious example of their conduct was
25   when a CSX Railroad (sic) train crashed through one of the

1   gates, the CSX Railroad (sic) gave the Levee Board a check for

2   $400,000 to fix the gate.  The Levee Board didn't fix the gate.

3   Now, how on earth anybody can say that that's an act done in an

4   attempt to prepare for an emergency, the Good Lord only knows.

5               The other act of which we complained -- and you

6   have read about this yourself, I'm certain, in the newspaper,

7   and some explanation.  The Corps of Engineers builds levees.

8   They build a levee up to what's called the "project hurricane

9   height."  The project hurricane height is set by Congress.

10  Congress gives them enough money to build a levee to that

11  height.  When they build the levee, they go home.  The Levee

12  Board accepts the responsibility to inspect and maintain.  If

13  the Levee Board doesn't tell the Corps, "Hey, water is leaking

14  under the bottom," the Corps don't know, and the Corps can't go

15  get more money and make repairs.

16              What do these guys do?  Every year they get a

17  bus or a van and they have a luncheon somewhere, and one guy

18  gets to decide the best place to eat in the state.  They go up

19  and down the levees and then they go eat.  Now, once again, I

20  submit to you that's not exactly what anybody had in mind when

21  they passed this emergency preparedness statute.

22              Does it have to be contemporaneous?  It has to

23  be contemporaneous, either before or after.  Why?  The logic is

24  crystal clear.  When you have an emergency, people don't think

25  clearly.  They don't think straight.  You have to allow people

1   to make decisions on the fly, and when you make decisions on

2   the fly you have to give them immunity.  That's what the

3   statute was passed for.  It doesn't apply here.

4             I don't see how on earth it could remotely

5   affect the Sewerage and Water Board.  I didn't hear much,

6   didn't see anything that suggests that what the Sewerage and

7   Water Board was doing was an emergency preparedness activity.

8   The Sewerage and Water Board, like the Orleans Parish Levee

9   Board, has a specific mandate from the legislature that says:

10   You guys, you maintain levees.  You guys, you watch for the

11   drainage.  That's what they are legislatively mandated to do;

12   and if they don't do it, they are liable for their misconduct.

13        **MR. ANZELMO:**  It's to act in furtherance of the

14   chapter.  The chapter sets out the definitions as to what

15   "emergency preparedness" is.  They almost want to create a

16   disincentive by the way they read the statute relative to

17   contemporaneousness, that's all the immunity is; meaning that

18   when the hurricane first appears in the gulf we have to start

19   building levees, because if we built them before then it's not

20   in furtherance of the chapter.  It is not a sound argument.

21             The same thing for the Sewerage and Water Board.

22   Their mission is drainage.  You don't start digging the ditch

23   to drain the subdivisions when the storm enters the gulf.  The

24   immunization was designed to protect the public bodies because

25   of the long-term construction that they were to undertake, but

1    so too it protects them from the immediate responses which

2    occurred.  That's why it's called an emergency activity.  The

3    statute is clear and unambiguous.  On its face, it doesn't

4    suggest the temporal element that's there, it certainly doesn't

5    state the temporal element that they suggest, and it causes

6    their construction to read out large portions of the statute,

7    whether it be the purpose, whether it be the definition,

8    whether it be the actual immunity itself.

9              The willful misconduct aspect is extremely

10   pertinent when it comes to allegations that you got a check to

11   fix the floodgate and you didn't fix it.  When you look at

12   their pleadings -- and it's, in essence, the same pleading that

13   repeats itself over and over again.  It's in the <u>Berthelot</u>

14   case.  It's going to be the second amended petition,

15   paragraph 10, because they all in essence parrot the same

16   thing.  It says we "negligently failed to repair."

17             Because we are on "willful," this is the thing

18   I'm going to conclude on.  When you look at the Kansas statute

19   and you look at the Oregon statute compared to what we said, in

20   those two statutes they also said this is what you don't get

21   immunized for:  Willful misconduct; gross negligence; and bad

22   faith.  Both of those statutes -- that buzz means my time is up

23   has those elements in there.  So what did our legislature

24   intend?  It intended to immunize those public bodies from

25   anything.

1          **THE COURT:**  You have made both good arguments.  I

2    will now have to determine a scope at least at this level.

3    This is all going to be looked at by my dear colleagues.

4          **MR. BRUNO:**  Judge, very briefly.  I misspoke and just

5    to clarify --

6          **THE COURT:**  I'll give you the last word, just make it

7    short.

8          **MR. BRUNO:**  This is just to clarify.  It wasn't a CSX

9    Railroad train.  It was a Public Belt Railroad train.  In

10   deference to the lawyers for CSX, I wanted to correct the

11   record.  Forgive me.

12         **MR. SIMNO:**  Let me thank you for allowing Mr. Anzelmo

13   to argue the last motion on our behalf.  May it please the

14   Court.  George Simno on behalf of the Sewerage and Water Board

15   of New Orleans pursuant to the motion to dismiss under

16   Rule 12(b)(6), Your Honor.  We are seeking dismissal under

17   Rule 12(b)(6) on the singular legal premise that under any set

18   of hypothetical circumstances, either alleged or even

19   envisioned by our quite talented opponents, which allegations

20   to date only offer conclusory statements, must fall by virtue

21   of Rule 12(b)(6).

22              The issue before the Court is not a complicated

23   factual issue of what caused the levees or floodwalls to fail,

24   but rather the issue is who was in charge of the levees or

25   floodwalls when they failed or for any period of time leading

1    up to their failure.  In other words, legally speaking,

2    Your Honor, who -- and by that I mean what entity was charged

3    with the legal duty and responsibility for the design,

4    construction, and/or maintenance of the levees or floodwalls

5    bordering the outfall canals that failed during or following

6    Hurricane Katrina.  This responsibility, just admitted to by

7    Mr. Bruno on his client's behalf, falls squarely on the

8    shoulders of the Orleans Levee District and United States Army

9    Corps of Engineers.  It falls on the Levee District pursuant to

10   Louisiana Revised Statute 38:307(A).  The law is clear that the

11   Orleans Levee District is solely and exclusively responsible

12   for the levees and the outfall canals and not the Sewerage and

13   Water Board of New Orleans.

14             38:307(A), Your Honor, states in pertinent part

15   that the Board of Commissioners for the Orleans Levee District

16   "shall have full and exclusive right, jurisdiction, power, and

17   authority to locate, relocate, construct, maintain, extend and

18   improve levees, embankments, seawalls jetties, breakwaters,

19   water basins, and other works in relation to such projects."

20             The Orleans Levee District's responsibility

21   extends to the shores of the lake and along the canals

22   connected therewith.  The Orleans Levee District likewise,

23   Your Honor, has admitted unequivocally before the Court in the

24   Court-ordered disclosure that it was their duty to maintain the

25   levees bordering the 17th Street, London, and Industrial Canals

1    in compliance with the designs, plans, specifications, and

2    requirements issued by the United States Army Corps of

3    Engineers.

4            From a federal law perspective, Your Honor, the

5    simple and only reasonable and legally viable answer is that

6    the responsibility fell and falls today squarely on the

7    shoulder of the United States Army Corps of Engineers, working

8    in cooperation with the Orleans Levee District and other levee

9    districts, pursuant to Public Law 89-298, the Flood Control

10   Act.

11           The Orleans Levee District has likewise admitted

12   unequivocally, Your Honor, in their Court-ordered disclosure

13   that it was their duty to maintain the three levees bordering

14   the 17th Street, London, and Industrial Canals in compliance

15   with the design, specifications, and requirements of the

16   United States Army Corps of Engineers.

17           Given these statutes, Your Honor, mandating the

18   Orleans Levee District's exclusive obligation concerning levees

19   done in compliance with the design, specifications, and plan

20   requirements of the Corps of Engineers, there are simply no

21   factual circumstances whatsoever that any of the plaintiffs can

22   put forward that would shift legal responsibility to provide

23   for design, construction, or maintenance of the levees to the

24   Sewerage and Water Board of New Orleans.

25           Your Honor, in conclusion, the plaintiffs have

1   simply applied a broad brush stroke in painting their picture

2   before this Court by including the Sewerage and Water Board of

3   New Orleans as a defendant and a legal entity that they submit

4   is answerable in damages for the failure in the design,

5   construction, or maintenance of the levees and floodwalls at

6   issue.  Your Honor, for this reason, dismissal of the Sewerage

7   and Water Board is in order.

8           **THE COURT:**  Thank you, Mr. Simno.

9           **MR. BRUNO:**  Once again, I will be brief.  First of

10  all, this is a 12(b)(6) motion.  We have to accept the

11  pleadings as accurate and complete.  Judge, very, very quickly,

12  we have alleged that the Sewerage and Water Board had the guard

13  or control of the canal.  Like it or not, if you look at this

14  piece of paper, you will see that the Sewerage and Water Board

15  is the applicant for a permit -- and I will just as an aside

16  tell you under the River and Harbor Act, so let's not throw

17  away maritime law just yet in this canal -- for the purposes of

18  dredging the canal.  Judge, you will remember that one of the

19  extraordinary allegations --

20          **THE COURT:**  I know you need a permit to dredge a

21  canal.  That's a far cry from every maritime lawyer in the

22  city --

23          **MR. BRUNO:**  Judge, you will remember a serious

24  allegation in the case is that the dredging activity made the

25  bottom of the canal lower than the bottom of the sheet pile, so

1  the business of dredging is an extraordinarily important issue

2  in this case.  Now, whether they are the right party or not, I

3  don't know.  It's a 12(b)(6).  All I know is they are the

4  applicant.  They are the ones that made application for and

5  received a permit and, in fact, did dredge the canal.

6            I also know that the Sewerage and Water Board

7  had somehow the standing to tell the Corps of Engineers, "We

8  don't want to put a gate at the lake to prevent the waters from

9  entering the canal."  Now, once again -- and I've heard about a

10  lot about a lot of statutes and stuff and how that may be

11  somebody else, but there is at least right now, as we stand

12  here before you on a 12(b)(6), the notion that the Sewerage and

13  Water Board made those representations, and as a result of

14  those representations that gate was never built and the city

15  suffered the consequence.  I'll put it to you that because it's

16  a 12(b)(6) the motion should be denied.  It may well be in the

17  future that the facts will bear Mr. Simno out and he will

18  prevail on a summary judgment.  Today is not his day.  Thank

19  you, Judge.

20            **THE COURT:**  Again, thank you for your arguments.  As

21  I told everybody here, I'm going to try to get every ruling I

22  make as quickly as possible up to the court of appeals because

23  we all need closure on this, whatever it is.  I'm hoping that

24  my colleagues will act with some alacrity when it goes up.

25  However I rule, hopefully the Fifth Circuit will look at this

1    and get this stuff straight.

2          **MR. SIMNO:**  Judge, I'm happy to answer any questions

3    that you have.  Mr. Bruno brings up the issue of the permit.

4    The dredging permit for the 17th Street Canal issued by the

5    Army Corps of Engineers that was applied for in 1979, not

6    issued until sometime in 1984, is really not relevant to this

7    12(b)(6) motion.

8          If you look in the permit, the purpose of the

9    permit was to foster drainage for the city of New Orleans.  The

10   permit itself, it shows public notice that the dredged

11   materials removed from the bottom of the canal would be placed

12   and stacked on top of the levees adjacent to where the dredging

13   took place.  For the purpose of the 12(b)(6) motion,

14   Your Honor, dredging does not remove the legal responsibility

15   of the Orleans Levee District or the Corps of Engineers for

16   flood protection or protection of the levees.  Your Honor,

17   thank you.

18         Just in closing, since I guess you'll have the

19   final remarks, I used to say, when I said the rosary, "Oh, My

20   Jesus, forgive us our sins.  Save us from the fires of Hell."

21   After sitting here all afternoon, Hell might be a nicer place

22   to be than the coldness of this freezing courtroom.

23         **THE COURT:**  Well, I didn't make it cold enough.  We

24   are adjourned for the day.

25         **MR. BRUNO:**  Judge, let me thank you for today.  Also,

1    let me give you just a quick heads up.  You know Monday is the

2    day before the anniversary.  If I may just very briefly, there

3    will be filed a variety of new lawsuits.  We are going to file

4    these lawsuits based upon Mr. Lambert told you the bowl

5    concept, that is, where the bowls are, so that they are more

6    logical.  We will be joining all of these defendants.  I don't

7    want you to believe that that's a second bite at the apple;

8    however you rule, we'll abide by those rulings in these other

9    lawsuits.

10              The last point I want to make to you is that I

11   think -- and I don't want to frighten you by this, but we feel

12   like we may have to file a lawsuit for 3,000 or 4,000 people

13   solely for the purpose of interrupting prescription on their

14   homeowners' claims.  Our contemplation would be we would file

15   it and we would park it.  That's all.  I would hope it would

16   come here.  I know you have no control over that.

17              **THE COURT:**  I don't know where it would go.

18              **MR. BRUNO:**  I'm just heads up, that's all.  Thank you

19   all very much, appreciate your patience.

20              **THE DEPUTY CLERK:**  Everyone rise.

21              (WHEREUPON, the Court was in recess.)

22                               * * *

23

24

25

1                            **CERTIFICATE**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, do hereby certify that the foregoing is a true

5    and correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                              _____

11                              Toni Doyle Tusa, CCR, FCRR
                                Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25