United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2007

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

Charles R. Fulbruge III
Clerk

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   AUG 2 9 2007

LORETTA G. WHYTE
CLERK

No. 07-30119

D.C. Docket No.  2:06-CV-1674
2:06-CV-1673
2:06-CV-1672
2:06-CV-516
2:06-CV-169
2:05-CV-6323
2:05-CV-4182

IN RE:  KATRINA CANAL BREACHES LITIGATION

---

RICHARD VANDERBROOK; MARY JANE SILVA; JAMES CAPELLA;
MADELINE GRENIER, misidentified as Sophia Granier; JACK CAPELLA,
as the Executor of the Succession of Lilian Capella;
GREGORY JACKSON; PETER ASCANI, III; ROBERT G HARVEY, SR

Plaintiffs - Appellees-Cross-Appellants

v.

UNITRIN PREFERRED INSURANCE COMPANY; HANOVER INSURANCE COMPANY;
STANDARD FIRE INSURANCE COMPANY

Defendants - Appellants

STATE FARM FIRE AND CASUALTY COMPANY

Defendant - Cross-Appellee

---

KELLY A HUMPHREYS

Plaintiff - Appellee-Cross-Appellant

v.

ENCOMPASS INDEMNITY COMPANY

Defendant - Appellant-Cross-Appellee

---

XAVIER UNIVERSITY OF LOUISIANA

Plaintiff - Appellee

v.

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

___ Fee _____
___ Process _____
_X_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

                    Defendant - Appellant
------------------------------------------------------------
GLADYS CHEHARDY; DANIEL FONTANEZ; JACQUELYN FONTANEZ; LARRY
FORSTER; GLENDY FORSTER; ET AL

                Plaintiffs - Appellees-Cross-Appellants

     v.

ALLSTATE INDEMNITY COMPANY; ALLSTATE INSURANCE COMPANY;
AMERICAN INSURANCE COMPANY; AEGIS SECURITY INSURANCE COMPANY;
LAFAYETTE  INSURANCE  COMPANY;  LIBERTY  MUTUAL  FIRE  INSURANCE
COMPANY;
AAA  HOMEOWNERS  AUTO  CLUB  FAMILY  INSURANCE  COMPANY;  LOUISIANA
CITIZENS
PROPERTY   INSURANCE   CORPORATION;   LEXINGTON   INSURANCE   COMPANY;
ENCOMPASS
INSURANCE COMPANY OF AMERICA; GREAT NORTHERN INSURANCE COMPANY;
HANOVER INSURANCE COMPANY; STANDARD FIRE INSURANCE COMPANY

                Defendants - Appellants

STATE FARM FIRE AND CASUALTY COMPANY

                Defendant - Cross-Appellee


        Appeal from the United States District Court for the
            Eastern District of Louisiana, New Orleans.

Before KING, DeMOSS, and OWEN, Circuit Judges.


                    J U D G M E N T

    This cause was considered on the record on appeal and was
argued by counsel.

    It is ordered and adjudged that the judgment of the District
Court is affirmed in part and vacated in part, and the cause is
remanded  to  the  District  Court  for  further  proceedings  in
accordance with the opinion of this Court.

    IT IS FURTHER ORDERED that appellees pay to appellants the
costs on appeal to be taxed by the Clerk of this Court.


ISSUED AS MANDATE:       AUG 2 7 2007          **A True Copy**
                                                   **Attest**

                                      Clerk, U.S. Court of Appeals, Fifth Circuit

                                      By: _____
                                                        **Deputy**

                                      **New Orleans, Louisiana**   8/27/07

United States Court of Appeals
Fifth Circuit

F I L E D

August 2, 2007

Charles R. Fulbruge III
Clerk

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 07-30119

IN RE: KATRINA CANAL BREACHES LITIGATION

RICHARD VANDERBROOK; MARY JANE SILVA; JAMES CAPELLA; MADELINE GRENIER, misidentified as Sophia Granier; JACK CAPELLA, as the Executor of the Succession of Lilian Capella; GREGORY JACKSON; PETER ASCANI, III; ROBERT G HARVEY, SR

Plaintiffs - Appellees - Cross-Appellants

v.

UNITRIN PREFERRED INSURANCE COMPANY; HANOVER INSURANCE COMPANY; STANDARD FIRE INSURANCE COMPANY

Defendants - Appellants

STATE FARM FIRE AND CASUALTY COMPANY

Defendant - Cross-Appellee

KELLY A HUMPHREYS

Plaintiff - Appellee - Cross-Appellant

v.

ENCOMPASS INDEMNITY COMPANY

Defendant - Appellant - Cross-Appellee

XAVIER UNIVERSITY OF LOUISIANA

Plaintiff - Appellee

v.

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

Defendant - Appellant

———————

GLADYS CHEHARDY; DANIEL FONTANEZ; JACQUELYN FONTANEZ; LARRY FORSTER; GLENDY FORSTER; ET AL

Plaintiffs - Appellees - Cross-Appellants

v.

ALLSTATE INDEMNITY COMPANY; ALLSTATE INSURANCE COMPANY; AMERICAN INSURANCE COMPANY; AEGIS SECURITY INSURANCE COMPANY; LAFAYETTE INSURANCE COMPANY; LIBERTY MUTUAL FIRE INSURANCE COMPANY; AAA HOMEOWNERS AUTO CLUB FAMILY INSURANCE COMPANY; LOUISIANA CITIZENS PROPERTY INSURANCE CORPORATION; LEXINGTON INSURANCE COMPANY; ENCOMPASS INSURANCE COMPANY OF AMERICA; GREAT NORTHERN INSURANCE COMPANY; HANOVER INSURANCE COMPANY; STANDARD FIRE INSURANCE COMPANY

Defendants - Appellants

STATE FARM FIRE AND CASUALTY COMPANY

Defendant - Cross-Appellee

———————

Appeals from the United States District Court
for the Eastern District of Louisiana, New Orleans

———————

No. 07-30119

Before KING, DeMOSS, and OWEN, Circuit Judges.

KING, Circuit Judge:

On the morning of August 29, 2005, Hurricane Katrina struck along the coast of the Gulf of Mexico, devastating portions of Louisiana and Mississippi. In the City of New Orleans, some of the most significant damage occurred when levees along three major canals—the 17th Street Canal, the Industrial Canal, and the London Avenue Canal—ruptured, permitting water from the flooded canals to inundate the city. At one point in Katrina's aftermath, approximately eighty percent of the city was submerged in water.

Each plaintiff in this case is a policyholder with homeowners, renters, or commercial-property insurance whose property was damaged during the New Orleans flooding. Despite exclusions in their policies providing that damage caused by "flood" is not covered, the plaintiffs seek recovery of their losses from their insurers. Their primary contention is that the massive inundation of water into the city was the result of the negligent design, construction, and maintenance of the levees and that the policies' flood exclusions in this context are ambiguous because they do not clearly exclude coverage for an inundation of water induced by negligence. The plaintiffs maintain that because their policies are ambiguous, we must construe them in their favor to effect coverage for their losses.

We conclude, however, that even if the plaintiffs can prove that the levees were negligently designed, constructed, or maintained and that the breaches were due to this negligence, the flood exclusions in the plaintiffs' policies unambiguously preclude their recovery. Regardless of what caused the failure of the flood-control structures that were put in place to prevent such a catastrophe, their failure resulted in a widespread flood that damaged the plaintiffs' property. This event was excluded from coverage under the plaintiffs' insurance policies, and under Louisiana law, we are bound to enforce the unambiguous terms of their insurance contracts as written. Accordingly, we conclude that the plaintiffs are not entitled to recover under their policies.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

3

No. 07-30119

The cases in this appeal are a handful of the more than forty currently pending cases related to Hurricane Katrina that have been consolidated for pretrial purposes in the Eastern District of Louisiana. In several of the consolidated cases, property owners are suing their insurers to obtain recovery under homeowners, renters, and commercial-property policies for the damage their property sustained during the inundation of water into the city that accompanied the hurricane. This appeal involves four such cases: *Richard Vanderbrook et al. v. Unitrin Preferred Insurance Company et al.* ("the *Vanderbrook* action"), *Xavier University of Louisiana v. Travelers Property Casualty Company of America* ("the *Xavier* action"), *Gladys Chehardy et al. v. State Farm Fire & Casualty Company et al.* ("the *Chehardy* action"), and *Kelly A. Humphreys v. Encompass Indemnity Company* ("the *Humphreys* action").[1] The detailed factual and procedural background of each of these cases follows.

## A. The *Vanderbrook* Action

In the *Vanderbrook* action, eight individuals ("the *Vanderbrook* plaintiffs") filed a petition for damages in Louisiana state court against their insurers.[2] The *Vanderbrook* plaintiffs allege that "[s]ometime between 10:00 and 11:00 a.m. on August 29, 2005, before the full force of [Hurricane Katrina] reached the City of New Orleans, a small section of the concrete outfall canal wall known as the 17th Street Canal, suddenly broke, causing water to enter the streets of the [c]ity," resulting in damage to their insured property. They assert that the water damage "was not the result of flood, surface water, waves, [tidal] water, tsunami, seiche, overflow of a body of water, seepage under or over the outfall canal wall or spray from any of the above but was water intrusion, caused simply from a broken levee wall."

---

[1] The *Humphreys* action was initially consolidated with the remaining cases, but on Encompass Indemnity Company's motion, the district court severed it from the consolidated case.

[2] The *Vanderbrook* plaintiffs also sued the Board of Commissioners for the Orleans Levee District for the Parish of Orleans, but the claim against that defendant is not at issue in this appeal.

No. 07-30119

The *Vanderbrook* plaintiffs allege that their insurers have refused to adjust or pay for their losses, despite "a sudden break in the concrete wall of the levee outfall canal" not being described in any of their policies as an excluded loss. They assert that their insurance policies are contracts of adhesion and are "unduly and unreasonably complex," resulting in their lack of understanding of the policies' provisions. And they allege that the policies' exclusions are so "oppressive" to them and "unreasonably favorable" to the insurers that the exclusions are unconscionable and void. The *Vanderbrook* plaintiffs seek compensatory damages, additional damages for the insurers' arbitrary and capricious conduct, interest, expert fees, and attorney's fees.

Plaintiffs-appellees James Capella and Madeline Grenier were insured through defendant-appellant Hanover Insurance Company ("Hanover"), plaintiffs-appellees Peter Ascani III and Gregory Jackson were insured through defendant-appellant Standard Fire Insurance Company ("Standard Fire"), and plaintiff-appellee Richard Vanderbrook was insured through defendant-appellant Unitrin Preferred Insurance Company ("Unitrin"). The Hanover,[3] Standard Fire, and Unitrin policies provide coverage for risk of direct physical loss to structures on the property as well as for certain risks of loss to personal property, as long as the loss is not an excluded peril. The policies contain the following flood exclusion:

> We do not insure for loss caused directly or indirectly by any of
> the following. Such loss is excluded regardless of any other
> cause or event contributing concurrently or in any sequence to
> the loss.
>
> . . . .
>
> . . . Water Damage, meaning:
>
> > . . . Flood, surface water, waves, tidal water, overflow of
> > a body of water, or spray from any of these, whether or
> > not driven by wind . . . .

---

[3] At oral argument before the district court, a copy of Madeline Grenier's policy with Hanover that contains only the odd-numbered pages was inserted into the record. Because the copy of the policy in the record is incomplete, we cannot adequately review it. Consequently, we leave it to the district court on remand to obtain a copy of the entire policy and to interpret it consistently with this opinion.

5

No. 07-30119

Plaintiffs-cross-appellants Mary Jane Silva and Robert G. Harvey Sr. were insured through defendant-cross-appellee State Farm Fire and Casualty Company ("State Farm"). The State Farm policies insured against loss to the dwelling and for certain losses to personal property except as excluded by the policy.  The policies contained the following flood exclusion:

> We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events.  We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
>
> . . . .
>
> . . . Water Damage, meaning:
>
> > (1)     flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not . . . .

The *Vanderbrook* action was removed to federal court on the basis of diversity jurisdiction.  Hanover, Standard Fire, Unitrin, and State Farm filed Rule 12(c) motions for judgment on the pleadings, contending that the *Vanderbrook* plaintiffs' losses were excluded under their respective policies.  In a single eighty-five-page order issued on November 27, 2006, the district court addressed the availability of coverage under the policies at issue in all four cases in this appeal, first addressing the *Vanderbrook* action.  With respect to Hanover, Standard Fire, and Unitrin, the district court denied their motions and ruled that the plaintiffs' policies insured them against loss from water damage resulting from levee breaches where the breaches were induced by negligence.  The court determined that the policies' flood exclusions were ambiguous because the term "flood" was susceptible to two reasonable definitions: one that relates to floods resulting from natural causes only and one that relates to floods resulting from both natural causes and negligent or intentional acts.

6

The district court reached this conclusion based on several sources. First, the court discussed dictionary definitions of the term "flood" and opined that the definitions contemplated a natural event caused by rain or tide. Second, the court looked to cases interpreting "water damage" exclusions in the context of ruptured water mains, as well as "earth movement" exclusions, wherein courts have applied a distinction between naturally and non-naturally occurring events. Finally, the court considered but rejected cases that interpreted flood exclusions as extending to inundations of water caused by the rupture of a dam or dike.

Having concluded that the term "flood" as used in the exclusions was ambiguous, the district court construed the Hanover, Standard Fire, and Unitrin policies in the insureds' favor and concluded that the policies covered water damage caused by a ruptured levee where the rupture was due to the levee's inadequate design, construction, or maintenance. Because the plaintiffs alleged that the post-Katrina inundation of water into the City of New Orleans was caused by negligent design, construction, and maintenance of the levees alongside the city's canals, the court decided that if the plaintiffs could prove their allegations, they could prevail. Accordingly, the district court denied Hanover's, Standard Fire's, and Unitrin's motions.

With respect to State Farm's policies, however, the district court concluded that the flood exclusion's "lead-in" clause removed any ambiguity and clearly excluded coverage for all floods, whether natural or not. The "lead-in" language on which the district court relied provides in part: "We do not insure for such loss [i.e., loss resulting from flood] regardless of . . . the cause of the excluded event[] or . . . whether the event . . . arises from natural or external forces." The court granted State Farm's motions and dismissed the actions against it.

## B. The *Xavier* Action

Plaintiff-appellee Xavier University of Louisiana ("Xavier") filed suit against its insurer, defendant-appellant Travelers Property Casualty Company of America ("Travelers"), in federal court on the basis of diversity jurisdiction. In its complaint, Xavier alleged that

7

No. 07-30119

Hurricane Katrina caused in excess of $30 million in damage to insured structures on its campus. The complaint itself does not allege how the damage was caused—i.e., by water inundation from failed levees or otherwise. Xavier avers that it has filed a claim with Travelers and that despite lengthy communication, the insurer has failed to pay for the damage to Xavier's campus. Xavier brings claims for breach of contract and for violations of various provisions of Title 22 of the Louisiana Revised Statutes, seeking compensatory damages, attorney's fees, and statutory penalties.

Xavier's commercial policy with Travelers provided coverage for direct physical loss to buildings and personal property, subject to policy limitations and exclusions. The policy contained the following flood exclusion:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> . . . .
>
> . . . Water
>
>> . . . Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not . . . .

Xavier filed a motion for partial summary judgment, seeking a ruling that as a matter of law (1) the damage to Xavier's campus was "caused by ground water which came from the collapses of the 17th Street Canal and the London Avenue Canal levees as a result of man-made causes" and (2) such damage was covered under Xavier's policy with Travelers. The district court granted the motion in part and denied it in part. For the same reasons that the court denied Hanover's, Unitrin's, and Standard Fire's motions in the *Vanderbrook* action, the court granted partial summary judgment in Xavier's favor on the second issue, determining that water damage resulting from a failed levee due to negligence would be covered under the insurance policy. But the court denied Xavier's partial-summary-judgment motion on the question whether the damage to the campus was in fact caused by the collapses

No. 07-30119

of the levees, concluding that there were material questions of fact as to the cause of Xavier's water damage.

## C. The *Chehardy* Action

In the *Chehardy* action, a group of thirty individuals and one corporation ("the *Chehardy* plaintiffs")[4] allege that their real and personal property was damaged or destroyed by the inundation of water into the City of New Orleans that followed Hurricane Katrina. They bring a putative class action[5] against their insurers, asserting that their losses were covered by their respective insurance policies.

The defendants in the *Chehardy* action are thirteen insurance companies. Among them is a group of insurers hereinafter called "the ISO Defendants," so named because these insurers used policy forms provided by Insurance Services Office, Inc. The ISO Defendants are defendants-appellants Lafayette Insurance Company ("Lafayette"), Liberty Mutual Fire Insurance Company ("Liberty Mutual"), American Insurance Company ("American"), Auto Club Family Insurance Company ("Auto Club"), Standard Fire, Lexington Insurance Company ("Lexington"), Aegis Security Insurance Company ("Aegis"), and Hanover. The remaining *Chehardy* defendants are defendants-appellants Allstate Indemnity Company and Allstate Insurance Company (collectively, "Allstate"), Louisiana Citizens Property Insurance Corporation ("Louisiana Citizens"), Encompass Insurance Company of America

---

[4] The *Chehardy* plaintiffs comprise plaintiffs-appellees-cross-appellants Gladys Chehardy; Daniel and Jacquelyn Fontanez; Larry and Glendy Forster; Kenneth and Judy Maier; Randy and Lori Gervais; Andre and Marlin Mauberret; Debbie and Dave Strawn; Stephanie and Brad Boyd; New Orleans Flooring Supply, Inc.; Shawn and Angelina Burst; Patricia Brown; Marie Fatheree; Katrina Daniels; Lionel and Edna Jones; Karen Lewis; Shane Sylvester; Austra Zapata; Sabrina Perkins; Eldridge Pollard; Michael Peterson; Wendell Glation; and Mack Barham.

[5] The amended complaint defines the class of policyholders as

> all owners in the Parishes of Orleans, St. Bernard, and Jefferson, State of Louisiana, who own immovable property with improvements, principally houses or related residential structures, as well as personal property located there, which was destroyed or damaged by winds generated by Hurricane Katrina in excess of their respective policy deductibles and not reimbursed by their insurance companies, but excluding members of the judiciary, their administrative staff and any other personnel who may cause a member of the Louisiana bench to be unable to preside over this action.

("Encompass Insurance"), and Great Northern Insurance Company ("Great Northern"), as well as defendant-cross-appellee State Farm.

In their amended complaint, the *Chehardy* plaintiffs allege that after Hurricane Katrina made landfall on August 29, 2005, the New Orleans-area levee system was breached in at least eight places, causing water to be released into the city and adjoining parishes. According to the amended complaint, by 9:00 a.m. on August 29, approximately three hours after the hurricane's landfall, there was six to eight feet of water in the Lower Ninth Ward area of New Orleans, and approximately eighty percent of Orleans Parish ultimately became submerged. The plaintiffs aver their properties sustained damage as a result of these events.

The *Chehardy* plaintiffs also allege that "any damages attributable to the levee failures are the result of improper and/or negligent design, construction, [or] maintenance of the levees by various third parties and or third party negligence." The complaint refers to engineering reports concluding that "the vast amounts of the water that entered the City of New Orleans and the surrounding parishes came about as the result of levee failures caused by negligent design, negligent maintenance and/or inadequate materials and not by topping of the levees." The complaint also summarizes the testimony of the Chief of the Army Corps of Engineers that "the Corps neglected to consider the possibility that the levee walls atop the 17th Street Canal levee would lurch away from their footings under significant water pressure and eat away at the earthen barriers below" and that "[t]he levees simply failed to work the way they were supposed to work." Additionally, the complaint alleges that "the levee breach of the Industrial Canal to the Lower Ninth Ward side was caused by an inadequately moored barge that crashed into the levee wall, rupturing the levee and compromising its ability to hold water back."

The *Chehardy* plaintiffs assert in their complaint that each was insured under an all-risk insurance policy and that their losses are covered perils under their all-risk policies. They allege that they timely filed claims with their insurers but their insurers denied coverage and have refused to indemnify them. The *Chehardy* plaintiffs acknowledge that their policies contained flood exclusions, but they assert that these exclusions should not be read so

No. 07-30119

broadly as to disallow coverage for their damages because to do so "would contravene the very purpose of [all-risk] policies." They posit that the reasonable expectations of Louisiana policyholders would be that "flood" would "encompass[] overflowing of the Mississippi River, accumulation of water due to heavy rainfalls, or similar phenomena, but not the failing of" the levees "due to negligent conduct beyond [their] control." Additionally, they opine in their complaint that they should not be deprived of coverage where the insurers "have drafted vague, ambiguous and unclear limitations on coverage"; they allege that although other policies on the market clearly exclude harm caused by the failure of levees, theirs do not.

The *Chehardy* plaintiffs seek a declaratory judgment that the efficient proximate causes of their damage were windstorm, acts of negligence, and storm surge, all of which were covered perils; that "[t]he breaking or failure of boundaries of lakes, reservoirs, rivers, streams, or other bodies of water was a peril not specifically excluded by any of the . . . policies"; and that "[t]he damage caused by water entering the City of New Orleans . . . due to the breaches in the levees . . . neither falls within the regular definition of 'flood,' nor within any of the subject insurance policies' exclusions of 'flood.'" The *Chehardy* plaintiffs also bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and insurance bad faith under section 22:1220 of the Louisiana Revised Statutes. Additionally, the plaintiffs bring claims for breach of fiduciary duty against State Farm, Allstate, Liberty Mutual, and other insurers who sell their homeowners insurance policies directly to their customers.

The *Chehardy* plaintiffs did not include in their complaint the pertinent language from their insurance policies, nor did they attach the policies or identify which plaintiff was insured through which defendant. Instead, copies of the policies were attached to the defendants' motions seeking dismissal of the plaintiffs' claims.[6]

---

[6] In its order, the district court stated that it was unable to identify with certainty which *Chehardy* plaintiffs were insured through which defendants:

> The Court has attempted to ascertain this information for purposes of specificity with respect to its ensuing orders herein; however, there is some

No. 07-30119

The policies of American, Auto Club, Hanover, Lafayette, Lexington, Liberty Mutual, Standard Fire, and Louisiana Citizens are nearly identical in every respect relevant to this appeal. All of these policies provide coverage for risk of direct physical loss to structures on the property as long as the risk is not an excluded peril. They also provide coverage for direct physical loss to personal property but only if the loss is caused by an enumerated peril and not by an excluded peril. With respect to both structures and personal property, the policies contain a list of exclusions that are not insured against—among them, flood. The flood exclusions provide:

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . . .
>
> . . . Water Damage, meaning:
>
>> . . . Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind . . . .[7]

The Aegis policy is identical in all relevant respects to the above policies, with the exception of the lead-in clause before the flood exclusion. Aegis's policy contains an

---

confusion which prevents the Court from doing so. In addition to which, the information provided is not in the record. However, it has been represented to the Court by counsel that all insurers herein have provided at least one policy to one plaintiff, thus the Court will enter its orders with respect to the insurers and will not be able to identify the specific plaintiff who is [a]ffected by such order.

We examined the record on appeal and identified what appear to be insurance policies corresponding with each named *Chehardy* plaintiff except Wendell Glation and Andre and Marilyn Mauberret. With respect to those plaintiffs, we granted unopposed motions to supplement the record on appeal with copies of their policies. Nevertheless, we leave it to the district court on remand to identify with certainty which plaintiff was insured under which policy (or policies) for the purposes of orders to be entered subsequent to this appeal.

[7] The only variations in language between these policies are immaterial to this appeal. For example, American and Hanover substitute the words "loss or damage" for "loss," Hanover inserts "any" before "body of water," and Hanover names its exclusion "Water" rather than "Water Damage."

endorsement deleting the clause that excludes coverage "for loss caused directly or indirectly by" water damage "regardless of any other cause" and replacing it with the following: "We do not insure for loss caused by any of the following."   The effect is that Aegis's flood exclusion reads as follows:

> We do not insure for loss caused by any of the following.
>
> . . . .
>
> . . . Water Damage, meaning:
>
>> . . . Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind . . . .

The Great Northern policies provide coverage for risk of physical loss to the home and its contents except where provided otherwise or excluded by a policy exclusion.  The policies contain a "Surface water" exclusion, which provides:

> Surface water.  We do not cover any loss caused by:
>
> • flood, surface water, waves, tidal water, or water borne material from any of these;
>
> • overflow of water or water borne material from a body of water;
>
> . . .
>
> from any source, even if driven by wind.

The policies also define "caused by" as "any loss that is contributed to, made worse by, or in any way results from that peril."

The Allstate policies provide coverage for losses to the dwelling and other structures on the insured property except as limited or excluded in the policies, as well as coverage for losses to personal property caused by certain enumerated causes and subject to exclusions. The policies contain the following flood exclusion:

> We do not cover loss to [insured] property . . . consisting of or caused by:

13

No. 07-30119

> . . . Flood, including, but not limited to surface water, waves,
> tidal water or overflow of any body of water, or spray from any
> of these, whether or not driven by wind.

The State Farm policies in the *Chehardy* action are identical in every relevant respect to the State Farm policies in the *Vanderbrook* action.

Each of the defendants in the *Chehardy* action filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. (The ISO Defendants filed a consolidated motion to dismiss.) The district court addressed only the claims for breach of contract and the request for declaratory relief. With respect to all defendants except State Farm, the court denied the motions to dismiss for the same reasons it denied the motions for judgment on the pleadings in the *Vanderbrook* action. With respect to State Farm, however, the district court granted the motion to dismiss for the same reason it granted State Farm's motion in the *Vanderbrook* action. As to the extra-contractual claims (for breach of the implied covenant of good faith and fair dealing, insurance bad faith, and breach of fiduciary duty), the district court denied the motions to dismiss without prejudice to their being re-urged at a later time, after the resolution of this appeal.

## D. The *Humphreys* Action

In the *Humphreys* action, plaintiff-appellee-cross-appellant Kelly A. Humphreys filed suit against her insurer, defendant-appellant-cross-appellee Encompass Indemnity Company ("Encompass Indemnity"), in Louisiana state court.[8] Humphreys alleges that as Hurricane Katrina passed through New Orleans, the city "began pumping storm water runoff through various feeder canals into and through the 17th Street and London Avenue drainage canals into Lake Pontchartrain." "As a result of a 'sudden and accidental event' storm water drainage exerted pressure against the storm wall and levee" erected along the canals, "causing the levee and storm wall to collapse" and "result[ing] in storm waters being distributed over large portions of New Orleans." Humphreys alleges that the cause of the collapse was "inadequate maintenance" of the levee and storm wall on the part of the Orleans

---

[8] Humphreys amended her petition to add the Orleans Levee District as a defendant. Her claims against the Orleans Levee District are not at issue in this appeal.

14

No. 07-30119

Levee District. She avers that as a result of these events, her residence "was inundated with approximately 12 inches of storm water causing major damage to building and contents." She asserts that the efficient proximate cause of her loss was the levee and storm-wall collapse, not flood and surface water. Humphreys states that Encompass Indemnity has failed to pay for her losses, which she asserts were covered under her policy. She brings claims for breach of contract and breach of the duty of good faith and fair dealing, and she seeks compensatory damages, attorney's fees, and treble damages under various provisions of Title 22 of the Louisiana Revised Statutes.

Humphreys's homeowners policy with Encompass Indemnity covers direct physical loss to real property, as well as direct physical loss to personal property if caused by an enumerated peril. Both the real-property coverage and the personal-property coverage are subject to exclusions, including the following water-damage exclusion:

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> 1.    Real Property and Tangible Personal Property. We do not insure for loss:
>
>    a.    Caused by water damage, meaning:
>
>       (1)    Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

The policy also contains the following "Hurricane Deductible Endorsement":

> We will pay only that part of the total of the loss for all Property Coverages that exceeds the hurricane deductible stated on the Coverage Summary. The hurricane deductible shown on the Coverage Summary applies to all covered property for direct physical loss or damage caused directly or indirectly by a hurricane as defined below. Such deductible applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by a hurricane. In no event

15

No. 07-30119

> will the deductible applied for a hurricane loss be less than the property deductible shown on the Coverage Summary.
>
> Hurricane means wind, wind gust, hail, rain, tornado, cyclone or hurricane which results in direct physical loss or damage to property by a storm system that has been declared to be a hurricane by the National Weather Service. . . .
>
> . . . .
>
> All other provisions of this policy apply.

The *Humphreys* action was removed to federal court. On June 12, 2006, Humphreys and Encompass Indemnity settled and agreed to dismiss with prejudice (pursuant to Rule 41) the wind-damage portion of Humphreys's claims as well as the entirety of her bad-faith claim. The parties' stipulation of partial dismissal specified that the remaining claim was the "claim to seek recovery for flood/rising water damage" under the policy.

The next day, Humphreys moved for partial summary judgment, asking the district court to rule that her policy provided coverage for flood damage to her residence pursuant to the policy's hurricane-deductible endorsement. At oral argument before the district court, according to the district court's order, Humphreys's counsel also adopted the *Chehardy, Vanderbrook,* and *Xavier* plaintiffs' arguments concerning the ambiguity of the flood exclusion, and the district court therefore construed Humphreys's partial-summary-judgment motion as also extending to the issue of the flood exclusion's applicability.[9]

The district court granted in part and denied in part Humpreys's motion. The court concluded that the hurricane-deductible endorsement did not itself create or extend coverage and denied Humphreys's partial-summary-judgment motion on this issue. But for the same reasons that the court construed most of the policies in the *Vanderbrook, Xavier,* and *Chehardy* actions as providing coverage, the court concluded that Humphreys's alleged

---

[9] Encompass Indemnity disputes that Humphreys properly asserted the issue of the flood exclusion's applicability in her motion for partial summary judgment. Encompass Indemnity characterizes the district court's grant of partial summary judgment in Humphreys's favor on this issue as sua sponte and contends that it did not receive Rule 56(c)'s requisite notice. Because we conclude that even if Encompass Indemnity did have notice, the grant of partial summary judgment was nonetheless erroneous, we need not address whether Encompass Indemnity received the required notice.

damage was covered under her policy and granted partial summary judgment in her favor on this issue.

## E. Appeal

The district court certified that its orders involved a controlling question of law as to which there is a substantial ground for a difference of opinion and that appeal may materially advance the ultimate termination of the litigation. All appellants and cross-appellants timely sought leave from this court to appeal from the district court's interlocutory order pursuant to 28 U.S.C. § 1292(b), and we granted their requests.

All defendants except State Farm now appeal the district court's order concluding that the water damage resulting from the levee breaches was not excluded by their policies' flood exclusions. The *Chehardy* plaintiffs and the *Vanderbrook* plaintiffs cross appeal the district court's grant of State Farm's motions to dismiss. And Humphreys cross appeals the district court's denial of her motion for partial summary judgment on the issue whether her policy's hurricane-deductible endorsement provides coverage for her losses.

## II. STANDARD OF REVIEW

We review de novo the district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6). The "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).[10] "Factual allegations must be enough to raise a right to relief

---

[10] We have often stated that a claim should not be dismissed under Rule 12(b)(6) unless the plaintiff would not be entitled to relief under any set of facts or any possible theory he may prove consistent with the allegations in the complaint. *See, e.g., Martin K. Eby Constr.*, 369 F.3d at 467 (quoting *Jones*, 188 F.3d at 324). This standard derived from *Conley v. Gibson*, which stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). But recently in *Bell Atlantic*, the Supreme Court made clear that the *Conley* rule is not "the minimum standard of adequate pleading to govern a complaint's survival." 127 S. Ct. at 1968-69.

above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (quotation marks, citations, and footnote omitted).

Generally, in deciding a motion to dismiss for failure to state a claim, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." FED. R. CIV. P. 12(b). In this case, that would normally include the insurance contracts, since those documents were not attached to the complaints. But because the defendants attached the contracts to their motions to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000))).

We also review de novo the district court's decision on a Rule 12(c) motion for judgment on the pleadings. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citing *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)). The standard for deciding such a motion is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See id.* at 313 n.8; *see also* 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2004). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Great Plains Trust Co.*, 313 F.3d at 312 (citing *Hughes*, 278 F.3d at 420).

We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). "Summary judgment is proper when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury

No. 07-30119

could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

### A. Controlling Law

In diversity cases such as these, federal courts must apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 265 (5th Cir. 1997). In determining which state's substantive law controls, the court applies the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The parties agree that in these Louisiana actions involving the interpretation of insurance policies issued in Louisiana for property located in Louisiana, Louisiana's substantive law controls. *Cf. Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. *See id.* In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. *See id.* In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir. 2003)); *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169 (5th Cir. 1999). "Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana." *Prytania Park Hotel*, 179 F.3d at 169 (footnote omitted); *see also Am. Int'l Specialty Lines Ins. Co.*, 352 F.3d at 261 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them. *Am. Int'l Specialty Lines Ins. Co.*, 352 F.3d at 261.

Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the

No. 07-30119

Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045 (1987); *see also Cadwallader*, 848 So. 2d at 580; *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." LA. REV. STAT. ANN. § 22:654 (2004). Interpretation of an insurance contract generally involves a question of law. *Bonin v. Westport Ins. Corp.*, 930 So. 2d 906, 910 (La. 2006) (citing *Robinson v. Heard*, 809 So. 2d 943, 945 (La. 2002)); *see also La. Ins. Guar. Assoc.*, 630 So. 2d at 764.

"The words of a contract must be given their generally prevailing meaning." LA. CIV. CODE ANN. art. 2047 (1987); *see also Cadwallader*, 848 So. 2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046 (1987). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader*, 848 So. 2d at 580.

Where, however, an insurance policy includes ambiguous provisions, the "[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n*, 630 So. 2d at 763 (citing LA. CIV. CODE ANN. art. 2050 (1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")). "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." LA. CIV. CODE ANN. art. 2048 (1987). "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Id.* art. 2049 (1987).

No. 07-30119

Ambiguity may also be resolved through the use of the reasonable-expectations doctrine—i.e., "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *La. Ins. Guar. Ass'n*, 630 So. 2d at 764 (quoting *Breland v. Schilling*, 550 So. 2d 609, 610-11 (La. 1989)). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry.'" *Id.* (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990)). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE ANN. art. 2053 (1987).

"If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *La. Ins. Guar. Ass'n*, 630 So. 2d at 764. Article 2056 of the Louisiana Civil Code provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." LA. CIV. CODE ANN. art. 2056 (1987). "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Cadwallader*, 848 So. 2d at 580. "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Id.* The fact that a term is not defined in the policy itself does not alone make that term ambiguous. *Am. Deposit Ins. Co. v. Myles*, 783 So. 2d 1282, 1287 (La. 2001).

"An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an

21

No. 07-30119

absurd conclusion." *Cadwallader*, 848 So. 2d at 580. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Id.*

The policies in this case—which are homeowners, renters, and commercial-property policies—are all-risk policies. All-risk policies "create[] a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 504 (5th Cir. 2000) (applying Louisiana law) (citing *U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461 (5th Cir. 1982)). Insurers may, however, limit their liability under all-risk policies: "[A]bsent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume." *Carbon v. Allstate Ins. Co.*, 719 So. 2d 437, 440 (La. 1998) (citing *La. Ins. Guar. Assoc.*, 630 So. 2d at 763); *see also Bonin*, 930 So. 2d at 911. But "[e]xclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured." *Ledbetter v. Concord Gen. Corp.*, 665 So. 2d 1166, 1169 (La. 2006) (citing *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So. 2d 975, 976 (La. 1991)).

**B. Flood Exclusions**

The plaintiffs contend that their policies' flood exclusions do not unambiguously exclude coverage for losses caused by an inundation of water resulting from a breached levee where the breach occurred in part because the levee was negligently designed, constructed, or maintained. The plaintiffs urge us to conclude that the term "flood" is ambiguous in this context and that the policies must be construed in favor of coverage. By contrast, the insurers maintain that the policies unambiguously exclude coverage for the inundation of water resulting from the breached levees.

No. 07-30119

The Louisiana Supreme Court has not interpreted a flood exclusion in the context of breached levees. We must therefore make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with this case.[11]   *Am. Int'l Specialty Lines Ins. Co.*, 352 F.3d 254 at 260.

The plaintiffs first contend that because the term "flood" is not defined in the policies, it is ambiguous—indeed, the *Chehardy* plaintiffs say that the term's undefined status makes it per se ambiguous—requiring us to construe the term in favor of coverage. But the fact that a term used in an exclusion "is not defined in the policy itself . . . alone does not make the exclusion ambiguous; instead, [the court] will give the term its generally prevailing meaning." *Am. Deposit Ins. Co.*, 783 So. 2d at 1287 (citing LA. CIV. CODE art. 2047); *see also Hendricks v. Am. Employers Ins. Co.*, 176 So. 2d 827, 830 (La. Ct. App. 1965);[12] *accord*

---

[11] The motions of Xavier and the *Chehardy* plaintiffs to certify the questions raised in this appeal to the Louisiana Supreme Court pursuant to Rule XII of the Louisiana Supreme Court Rules are denied. Although we acknowledge that the Louisiana Supreme Court has not issued a definitive ruling on the interpretation of a flood exclusion in the context of the facts before us, this is not alone sufficient to warrant certification. *See Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997) (per curiam) ("Alone, the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification."). Because the rules of contract interpretation set forth in the Louisiana Civil Code provide us with an adequate basis to decide this appeal, we decline the certification requests. *Cf. Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559, 564 (5th Cir. 1992) (refusing to certify question where "decisional analysis is relatively straightforward").

[12] The *Chehardy* plaintiffs cite *Hendricks* for the proposition that if an insurance company fails to define a pertinent term of the policy or exclusionary provision, the court must adopt the meaning of that term most favorable to the policyholders. But *Hendricks* states: "Where . . . a particular word or phrase is not defined [in the insurance policy], the courts will endeavor by means of generally accepted legal techniques to ascertain the common and popular meaning of such word or phrase." 176 So. 2d at 830. Rather than immediately construe the undefined term in favor of the insured, the *Hendricks* court first looked to dictionary definitions and other cases to determine if the term was ambiguous. *See id.* at 830-31.

The *Chehardy* plaintiffs also cite *Arnette v. NPC Services, Inc.*, 808 So. 2d 798 (La. Ct. App. 2002). In that case the term being construed was "professional duty" in the context of a professional-liability exclusion. The *Arnette* court did state: "Further, because 'professional duty' is undefined in the First State policy, we conclude the professional liability exclusion is ambiguous and must be construed in favor of NUS and against First State." *Id.* at 803. But the term "professional duty," unlike "flood," lacks any generally prevailing meaning in common parlance, and it thus provided no clear indication of what coverage was being excluded. *Arnette* cannot stand for the proposition that even though a term has a generally accepted meaning outside the context of the policy, the policy's failure to define it nonetheless makes it ambiguous; otherwise *Arnette* would conflict with article 2047's command to give the words of a contract their generally prevailing meaning. *See* LA. CIV. CODE ANN. art. 2047.

23

No. 07-30119

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1270 (Cal. 1993) (rejecting rule that absence of definition makes term ambiguous even where term has generally accepted meaning and stating: "[A]ny rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable.  To avoid the ambiguity perceived . . . , an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity.").

The plaintiffs also maintain that because the insurers could have more explicitly excluded floods that are caused in part by negligence, their failure to do so in these policies makes the flood exclusions ambiguous.  Specifically, the *Chehardy* plaintiffs point to evidence that before Hurricane Katrina struck, the insurer defendants knew about the availability of policy forms that more explicitly excluded floods caused in part by man but that they elected not to amend their policies' language accordingly.  Xavier, which was insured through Travelers, also points to its policy's "earth movement" exclusion, which excludes earth movements "whether natural or man made"; Xavier asserts that Travelers thus knew how to clearly exclude man-made floods but did not do so.  Similarly, the district court compared the flood exclusions in most of the policies with those in the policies of State Farm and Hartford Insurance Company of the Midwest,[13] remarking that those insurers succeeded with little effort in clearly excluding water damage resulting from negligent acts and that the other insurers could have done so as well.

But the fact that an exclusion could have been worded more explicitly does not necessarily make it ambiguous.  *See La. Ins. Guar. Ass'n*, 630 So. 2d at 766 ("[T]hough . . . the Interstate policy could have more clearly delineated its payment obligation, 'that fact does not mandate the conclusion that the policy was legally ambiguous.'" (quoting *Garmany v.*

---

[13] Hartford Insurance Company of the Midwest ("Hartford") was a defendant in the *Vanderbrook* action.  The district court granted Hartford's motion to dismiss for failure to state a claim because its policy explicitly excluded coverage for loss caused by release of water held by a levee.  The *Vanderbrook* plaintiffs do not appeal this aspect of the district court's order, and Hartford is therefore not a party to this appeal.

No. 07-30119

*Mission Ins. Co.*, 785 F.2d 941, 945-46 (11th Cir. 1986)). Nor does the fact that other policies have more explicitly defined the scope of similar exclusions. As the Louisiana Supreme Court stated in *Cadwallader* when interpreting the term "relative":

> The appellate court further erred in reaching a conclusion that because some insurance policies specifically include foster children in their policy definition of "relative" or "family member," the term "relative" is somehow rendered ambiguous in the policy at issue. In making this assumption, the appellate court ignored the fundamental precept that it was required to interpret the term using its plain, ordinary and generally prevailing meaning as set forth in the policy at hand. . . . It is the particular insurance policy of the insured that establishes the limits of liability and it is well established that this contract of insurance is the law between the parties. When we find the contract of insurance is clear and unambiguous . . . we must enforce the policy as written.

848 So. 2d at 583. We therefore reject the plaintiffs' arguments that the flood exclusions in the policies before us are ambiguous in light of more specific language used in other policies.[14]

Furthermore, even where the scope of an exclusion is not readily apparent, we do not immediately construe that exclusion in favor of coverage. Instead, we first apply the general rules of contract construction set forth in the Civil Code. *La. Ins. Guar. Ass'n*, 630 So. 2d at 764. Under those rules, we give the words of a contract their "generally prevailing meaning." LA. CIV. CODE ANN. art 2047. Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning. *See Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 964 (La. 2003) ("Dictionaries are a valuable source for determining the 'common and approved usage' of words."); *Cadwallader*, 848 So. 2d at 581-83 (looking to dictionaries, treatises, and jurisprudence to interpret the term "relative"). When the words of a policy provision are clear and unambiguous in the context

---

[14] To the extent that the plaintiffs also argue that the language of the other policies may be used to resolve ambiguity (not simply to demonstrate that an ambiguity exists), we need not look to other policies because the flood exclusions in the policies before us are unambiguous in the context of these facts.

of the facts of the case and do not lead to an absurd result, we apply the provision as written without any further interpretation. *See Cloud v. Nat'l Auto. Ins. Co.*, 875 So. 2d 866, 870 (La. Ct. App. 2004); LA. CIV. CODE ANN. art. 2046.

To ascertain the generally prevailing meaning of the term "flood," we begin by considering dictionary definitions of the term. Each of the dictionaries we have accessed lists more than one definition of "flood," but the existence of more than one definition of a term does not itself make the term ambiguous. *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY Explanatory Notes at 17a n.12.4 (2002) (explaining that when a word has multiple definitions, the best definition "is the one that most aptly fits the context of an actual genuine utterance"). Likewise, when "a word has two meanings, one broad and one more restrictive included within the broader meaning, it does not follow that the narrower meaning was intended." *Comm. Union Ins. Co. v. Advance Coating Co.*, 351 So. 2d 1183, 1186 (La. 1977); *see also Falgout v. Walter Jester, Hampton Inc.*, 883 So. 2d 515, 520 (La. Ct. App. 2004).

The Oxford English Dictionary has two pertinent definitions of "flood": (1) "[a]n overflowing or irruption[15] of a great body of water over land not usually submerged; an inundation, a deluge" and (2) "[a] profuse and violent outpouring of water; a swollen stream, a torrent; a violent downpour of rain, threatening an inundation." 5 OXFORD ENGLISH DICTIONARY 1075-76 (2d ed. 1989). Webster's Dictionary defines "flood" as "a rising and overflowing of a body of water that covers land not usu[ally] under water . . . [;] an outpouring of considerable extent . . . [;] a great downpour." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 873 (2002). The sixth edition of Black's Law Dictionary defines "flood" as follows: "An inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be." BLACK'S LAW DICTIONARY 640 (6th ed. 1990). "Flood" itself is not defined in the current (eighth) edition of Black's Law Dictionary, but "floodwater" is defined as "[w]ater

---

[15] "Irruption" is "[t]he action of bursting or breaking in; a violent entry, inroad, incursion, or invasion, esp[ecially] of a hostile force or tribe." 8 OXFORD ENGLISH DICTIONARY 104 (2d ed. 1989).

No. 07-30119

that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel." BLACK'S LAW DICTIONARY 1622 (8th ed. 2004). The most straightforward definition comes from the American Heritage Dictionary: "An overflowing of water onto land that is normally dry." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 674 (4th ed. 2000). Finally, of particular interest is the discussion of "flood" in the Columbia Encyclopedia, which specifically includes in the definition the inundation of water resulting from the bursting of a levee:

> [I]nundation of land by the rise and overflow of a body of water. Floods occur most commonly when water from heavy rainfall, from melting ice and snow, or from a combination of these exceeds the carrying capacity of the river system, lake, or ocean into which it runs. . . .
>
> . . . Less predictable are *floods resulting from . . . the bursting of a natural or man-made dam or levee.*
>
> . . . .
>
> In the United States the Johnstown, Pa., flood of 1889, in which thousands of lives were lost, was caused by the breaking of an earth dam above the city.

COLUMBIA ENCYCLOPEDIA 1002 (6th ed. 2000) (emphasis added).

We also consider the definitions of "flood" in treatises. Appleman's Insurance Law and Practice defines "flood waters" as "those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the water flowing in the ordinary channel." 5 JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 3145 (1970). And Couch on Insurance defines "flood" as "the overflow of some body of water that inundates land not usually covered with water." STEVEN PLITT ET AL., COUCH ON INSURANCE § 153:54 (3d ed. 2006) [hereinafter COUCH]. Couch also states that the term "flood" is generally unambiguous. *Id.* § 153:49.

Additionally, we look to jurisprudence, both from Louisiana courts and from courts outside Louisiana. In *Riche v. State Farm Fire & Casualty Co.*, an intermediate Louisiana

27

No. 07-30119

court interpreted a policy's exclusion for "flood, surface water, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not." 356 So. 2d 101, 103 (La. Ct. App. 1978). The plaintiff in *Riche* was fishing in a boat on a lake when a windstorm caused the boat to sink, *id.* at 103, and he sought recovery under his homeowners insurance policy for the loss of his fishing gear, which was on the boat when it sank, *id.* at 102. The court held that the exclusion did not preclude the plaintiff's recovery, reasoning that the "exclusion, when read as a whole, contemplates only such damage caused by water which has risen over and covered areas not ordinarily covered by water" and does not extend to "damage caused by windstorm (or resulting waves) over a body of water, such as a lake or reservoir." *Id.* at 103-04. *Riche*, however, is of limited value in this case because its determination was simply that a water-damage exclusion applied only to losses that occurred on areas not normally covered by water (i.e., dry land) and not to a loss occurring on a body of water. *See id.* at 103-04; *see also* COUCH, *supra*, at § 153:54 (citing *Riche* for the proposition that "[b]ecause a flood is generally understood to mean the inundation of land, claims by insurers that the inundation of a boat on the water is an excluded flood are generally unsuccessful"). Unlike in *Riche*, the losses in this case occurred on land that is normally dry.

Where courts outside Louisiana have considered whether a flood exclusion similar to the ones here unambiguously precludes coverage for water damage resulting from the failure of a structure such as a dam or dike, they have uniformly declared that the inundation of water falls within the language of the exclusion. Russell G. Donaldson, Annotation, *What is "Flood" Within Exclusionary Clause of Property Damage Policy*, 78 A.L.R.4th 817 (1990 & Supp. 2007) (citing *Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678 (Colo. 1989); *Bartlett v. Cont'l Divide Ins. Co.*, 697 P.2d 412 (Colo Ct. App. 1984); and *E.B. Metal & Rubber Indus., Inc. v. Fed. Ins. Co.*, 84 A.D.2d 662 (N.Y. App. Div. 1981)).[16]

---

[16] The plaintiffs argue that *E.B. Metal*, which involved a broken dike, may be distinguished because the flood exclusion in that case included in the definition of "flood" the phrase "rising (including overflowing or *breaking of boundaries*) of lakes, reservoirs, rivers, streams, or other bodies of water." 84 A.D.2d at 662-63 (emphasis added). The plaintiffs assert that "breaking of boundaries" would include breaches of levees.

No. 07-30119

The most prominent such case is *Kane*, which arose in the context of the failure of the Lawn Lake Dam in Colorado. *See* 768 P.2d at 679. As a result of the dam failure, water swept into the Fall River and inundated the plaintiffs' insured property, causing extensive damage. *Id.* The plaintiffs argued that their all-risk policies provided coverage for the damage, even though the policies contained flood exclusions.[17] *Id.* at 680. The Colorado Supreme Court rejected this argument and construed the term "flood" as extending to the water damage resulting from the dam failure. The court relied in part on dictionary definitions and the definition of "flood" in Appleman's treatise and observed that "[t]he inundation of insureds' normally dry land falls squarely within these generally accepted definitions of the term 'flood.'" *Id.* at 681. Concluding that the term was unambiguous in

---

We agree that *E.B. Metal*'s rationale may not be fully applicable to this case on this basis. Nevertheless, the plaintiffs have not directed us to any authority contradicting the proposition that in the context of a broken dam, levee, or other similar structure, courts have reached a consensus that the term "flood" is unambiguous and that flood exclusions preclude recovery.

We also do not include in our analysis *TNT Speed & Sport Center, Inc. v. American States Insurance Co.*, 114 F.3d 731 (8th Cir. 1997), or *Pakmark Corp. v. Liberty Mutual Insurance Co.*, 943 S.W.2d 256 (Mo. Ct. App. 1997), because the parties in those cases did not dispute that a flood had occurred. Nor do we rely on *Florida East Coast Railway v. United States*, 519 F.2d 1184 (5th Cir. 1975), or other cases interpreting the phrase "floods or flood waters" in 33 U.S.C. § 702c, which grants the United States immunity for damage resulting from floods, because the scope of the government's immunity may be broader than the exclusions in the policies before us, which we must strictly construe. *See Ledbetter*, 665 So. 2d at 1169.

[17] The flood exclusions in *Kane* provided:

> The Company shall not be liable for loss:
>
> . . . .
>
> 12. caused by, resulting from, contributed to, or aggravated by any of the following:
>
> . . . .
>
> (b) flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not.

768 P.2d at 679-80 (omissions in original).

light of its generally accepted meaning and in the context of the facts of the case, the court declared that "there is no doubt that this large-scale inundation of water was a 'flood.'" *Id.*[18]

In *Wallis v. Country Mutual Insurance Co.*, an Illinois intermediate court stated that the "plain and ordinary meaning" of "flood" is "water that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel ending up in an area where it would not normally be expected." 723 N.E.2d 376, 383 (Ill. Ct. App. 2000). The court held that it was immaterial that a particular watercourse was originally man-made as long as it had a defined bed, visible banks, and a recurrent water flow. *See id.* Indeed, the court observed that a permanent watercourse with these characteristics is considered a natural watercourse. *See id.* at 382; *see also* BLACK'S LAW DICTIONARY 1623 (8th ed. 2004) ("If [a man-made] watercourse is of a permanent character and has been maintained for a sufficient length of time, it may be considered a natural watercourse . . . ."). Accordingly, the *Wallis*

---

[18] The district court attempted to distinguish *Kane* in three ways, none of which withstands scrutiny. First, the district court opined that *Kane* "applied the broadest possible definition" of the term "flood," whereas Louisiana law requires exclusions to be narrowly construed. It is not clear on what basis the district court believed *Kane* applied the broadest possible definition. The *Kane* court stated that it simply determined that in the context of the facts before it, the flood exclusion was unambiguous, and it applied the exclusion as written. This is entirely consistent with Louisiana law. *See Cadwallader*, 848 So. 2d at 580 ("If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written.").

Second, the district court erroneously inferred that the failure of the Lawn Lake Dam in *Kane* resulted from water overtopping the dam. The court opined that this factually distinguished *Kane* from the case before us, where the allegations are not that the levees were overtopped but that they collapsed when faced with conditions they should have withstood. The district court relied on the following statement in *Kane*: "Although leakage from a ruptured city water line does not fall within [Appleman's] definition [of 'flood'], the *rising and overflowing* of Fall River does. . . . [T]he Fall River clearly *overflowed* above the highest line of its ordinary flow." *Kane*, 768 P.2d at 682 (emphases added; brackets and quotation marks omitted). But *Kane* never stated nor implied that water overtopped the *dam*; instead, it stated that the *river*, which was downstream from the dam, overflowed its ordinary boundaries due to the large volume of water pouring in from the failed dam.

Third, the district court observed that it was unclear from *Kane* whether Colorado follows the doctrine of efficient proximate cause, pointing to the clause: "the 'efficient moving cause' rule, if it were to be adopted by this court." *Id.* at 685. Assuming without deciding that Louisiana does follow the efficient-proximate-cause doctrine, the doctrine has no impact on how a term within a policy exclusion should be construed. The doctrine comes into play only when both a covered loss and an excluded loss are identified. *See Pieper v. Commercial Underwriters Ins. Co.*, 69 Cal. Rptr. 2d 551, 557 (Cal. Ct. App. 1997). This distinction therefore is immaterial.

No. 07-30119

court held that water that had overflowed a man-made creek's banks and damaged the plaintiff's house was a flood within the plain and ordinary meaning of the term, *id.* at 383, and that the plaintiff's loss was excluded by his insurance policy's flood exclusion, *id.* at 384.

In light of these definitions, we conclude that the flood exclusions are unambiguous in the context of this case and that what occurred here fits squarely within the generally prevailing meaning of the term "flood." When a body of water overflows[19] its normal boundaries and inundates an area of land that is normally dry, the event is a flood. This is precisely what occurred in New Orleans in the aftermath of Hurricane Katrina. Three watercourses—the 17th Street, Industrial, and London Avenue Canals—overflowed their normal channels, and the levees built alongside the canals to hold back their floodwaters failed to do so. As a result, an enormous volume of water inundated the city. In common parlance, this event is known as a flood.

Additionally, a levee is a *flood*-control structure; its very purpose is to prevent the floodwaters of a watercourse from overflowing onto certain land areas, i.e., to prevent floods from becoming more widespread. *See* 50 Am. Jur. 2d *Levees and Flood Control* § 1 (2006) (defining "levee" as "an embankment constructed along the edge of a river to prevent flooding" and describing levees as one of three principal means of flood prevention and control); Webster's Third New International Dictionary 1300 (2002) (defining "levee" as "an embankment designed to prevent flooding"). By definition, whenever a levee ruptures and fails to hold back floodwaters, the result is a more widespread flood. That a levee's failure is due to its negligent design, construction, or maintenance does not change

---

[19] The district court noted the presence of the word "overflowing" in many of the dictionary definitions and explicitly equated "overflowing" with "overtopping" (even though the term "overtopping" was nowhere to be found in the definitions), referring to the definitions as "the 'overtopping' definitions." Since the levees' failures here are not alleged to have occurred due to water overtopping the levees, the court inferred that the breaches did not result in a flood. But the court's substitution of "overtopping" for "overflowing" was erroneous. "Overflow" means (1) "[t]o flow over; to overspread or cover with water or other liquid; to flood, inundate"; (2) "[t]o pass or spread over like a flood, so as to pervade, fill, cover, submerge, overwhelm, etc."; and (3) "[t]o flow over (the brim, banks, or sides)." 10 Oxford English Dictionary 1086. This is much broader than "overtop," which means "[t]o rise over or above the top of; to surpass in height, surmount, tower above, top." *Id.* at 1131.

31

No. 07-30119

the character of the water escaping through the levee's breach; the waters are still floodwaters, and the result is a flood.

The plaintiffs, however, attempt to inject ambiguity into the term "flood" by asserting that a reasonable interpretation of the term is that it refers only to inundations of water with "natural" causes, not those with a "non-natural" cause. The plaintiffs rely primarily on cases interpreting flood exclusions in the context of broken water mains. They also assert, applying two canons of construction, *noscitur a sociis* and *ejusdem generis*, that a flood includes only natural events because the other terms in the water-damage exclusions are natural phenomena. Additionally, they contend that a reasonable policyholder would expect that only naturally occurring floods would be excluded.

Before we address these contentions, we first question the notion that the flood in this case was non-natural. The plaintiffs focus on the alleged negligent design, construction, or maintenance of the levees as being the cause of the flood, and we accept as true (for the purpose of assessing the motions to dismiss) their allegation that the canals' floodwaters would not have reached their property had the negligence not occurred. This focus, however, ignores the sizeable natural component to the disaster: a catastrophic hurricane and the excess water associated with it. The non-natural component is simply that in certain areas, man's efforts to mitigate the effect of the natural disaster failed, with devastating consequences. But if man's failure to adequately prepare for a natural disaster could alone transform the disaster into a non-natural event outside the scope of a policy's exclusion, it is difficult to conceive how an insurer could ever exclude the resulting loss; any natural event could be recharacterized as non-natural either because man's preventative measures were inadequate or because man failed to take preventative measures at all.

Even if we accept the plaintiffs' characterization of the flood in this case as non-natural, we disagree that the term "flood" in this context is limited to natural events. The plaintiffs first maintain that dictionary definitions support their interpretation, but the dictionaries we have reviewed make no distinction between floods with natural causes and

32

those with non-natural causes.[20] Indeed, the Columbia Encyclopedia specifically states that a flood may result from the bursting of a levee. *See* COLUMBIA ENCYCLOPEDIA 1002. Similarly, Appleman's treatise states: "A 'flood,' contemplated by the exclusion, can result from either natural or artificial causes." 5 JOHN ALAN APPLEMAN & JEAN APPLEMAN, *supra*, at § 3145 (Supp. 2007) (citing *Kane*, 768 P.2d 678).

The plaintiffs next rely heavily on a line of cases, arising in the context of broken water mains, holding that the term "flood" in a policy's exclusion was ambiguous based on a distinction between natural and non-natural events. For example, in *Ferndale Development Co. v. Great American Insurance Company*, a Colorado intermediate court observed that "[s]everal cases have held that ['flood'] appl[ies] only in cases where 'natural' water sources are involved," and it concluded that the term was ambiguous and thus did not extend to water from a burst water main. 527 P.2d 939, 940 (Colo. Ct. App. 1974); *see also Ebbing v. State Farm Fire & Cas. Co.*, 1 S.W.3d 459 (Ark. Ct. App. 1999) (following *Ferndale* and concluding that "the term 'flood' is unambiguous but that its common usage applies to water occasioned from natural events rather than a burst water main"). Similarly, a New York intermediate court held that a flood exclusion did not apply in the context of a broken water main because the term "flood" "connotes an inundation; a deluge." *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48 (N.Y. App. Div. 1975). That court also opined that even if the term "flood" is to be read broadly so as to include any "great quantity" of water, the term should be construed in light of the other terms in the exclusion (surface water, waves, tidal water, tidal wave, etc.), which it stated "relate to natural phenomena." *Id.*; *see also Ender v. Nat'l Fire Ins. Co. of Hartford*, 169 A.D.2d 420, 421 (N.Y. App. Div. 1991) (following

---

[20] Xavier points to the mentioning of "Act of God" in the sixth edition of Black's Law Dictionary's definition of "flood" as authority for limiting floods to natural events. Since an "Act of God" is "[a]n act occasioned exclusively by forces of nature without the interference of any human agency," BLACK'S LAW DICTIONARY 33 (6th ed. 1990), Xavier posits that for an event to be a flood, it must be purely natural. But Black's Law Dictionary does not include "Act of God" in the definition of "flood" or indicate that they are entirely synonymous; it instead cross-references (i.e., it states, "*See also*") "Act of God" at the end of the definition. *See id.* at 640. This singular cross-reference is not sufficient to persuade us that the dictionary definitions of "flood" limit it to purely naturally occurring events. Furthermore, as we explained, the flood occurred here in the context of an enormous hurricane, and it thus had a significant natural component.

No. 07-30119

*Popkin* and concluding that flood exclusion did not bar recovery for damage resulting from water-main break because the exclusion "preclude[d] only recovery for damages arising from natural causes, not from artificial devices"); *cf. Mellon v. Hingham Mut. Fire Ins. Co.*, 472 N.E.2d 674, 675 (Mass. App. Ct. 1984) (concluding that exclusion for "water below the surface of the ground" did not exclude damage from drainage pipe's rupture because the "loss was caused by an accidental break rather than a natural occurrence" and, as a fortuity, was "the kind of risk an 'all risk' policy is designed to cover").[21]

Although we do not quibble with the results reached in the water-main cases, we do not believe that a distinction between natural and non-natural causes is applicable in this context. First, unlike a canal, a water main is not a body of water or watercourse. Many (although not all) dictionary definitions define "flood" as an overflow or inundation of a body of water or watercourse.[22] Likewise, Appleman's treatise observes that flood waters generally come from a "river, stream, or natural water course."[23] 5 JOHN ALAN APPLEMAN

---

[21] The plaintiffs also rely on cases interpreting "earth movement" exclusions in insurance policies. Such exclusions typically define "earth movement" as including earthquake, volcanic eruption, landslide, subsidence, mud flow, sink hole, erosion, sinking, shifting, and settling. *See, e.g., Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 8 (W. Va. 1998). "A small majority of jurisdictions hold that [such] exclusions do not apply to earth movements that are non-natural in origin or source." COUCH, *supra*, at § 153:65 (collecting cases); *see also id.* §§ 153:66-:67; *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086-89 (Fla. 2005); *Murray*, 509 S.E.2d at 4-5, 10; *Peach State Uniform Serv., Inc. v. Am. Ins. Co.*, 507 F.2d 996, 1000 (5th Cir. 1975) (applying Georgia law).

We do not question the holdings or the rationale of the earth-movement cases. But the usefulness of a distinction between natural and non-natural causes in one context does not necessarily mean that the distinction is warranted in an unrelated context. These two contexts are unrelated in part because the term "earth movement," unlike "flood," does not have a generally prevailing meaning in common parlance. And as we explain, a distinction between natural and non-natural causes in the context of a broken levee would be unworkable and would yield absurd results.

[22] The Oxford English Dictionary and Webster's Dictionary refer to "body of water." 5 OXFORD ENGLISH DICTIONARY 1075-76; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 873. Black's Law Dictionary refers to "watercourse." BLACK'S LAW DICTIONARY 1622 (8th ed. 2004). And the Columbia Encyclopedia refers to "river system, lake, or ocean." COLUMBIA ENCYCLOPEDIA 1002.

[23] A man-made watercourse may be considered natural if it is permanent and has been maintained for a sufficient length of time. BLACK'S LAW DICTIONARY 1623 (8th ed. 2004); *see also Wallis v. Country Mut. Ins. Co.*, 723 N.E.2d 376, 382 (Ill. Ct. App. 2000) (stating that a permanent watercourse with a defined bed, visible banks, and a recurrent water flow is considered natural, even if it was originally man-made).

No. 07-30119

& JEAN APPLEMAN, *supra*, at § 3145. So where a water-main break is involved, it is less clear that the flow of water is within the generally prevailing meaning of "flood." *See Kane*, 768 P.2d at 681 (reasoning that in the context of a ruptured water main, the term "flood" is ambiguous in part "because a water main is not so clearly a body of water" (quotation marks omitted)); *Wallis*, 723 N.E.2d at 383 (distinguishing between rupture of water main and overflow of watercourse, regardless of whether the watercourse was originally man-made or forged from nature). Couch on Insurance recognizes a distinction between water-main breaks and the overflow of a body of water and opines that the body-of-water delineation is more useful than the natural/non-natural distinction in determining whether an event is a flood:

> Some jurisdictions attempt to distinguish naturally occurring floods from inundations from artificial or man-made causes such as dams or water mains. Such distinctions lead to apparent inconsistencies. For example, an inundation from the failure of a dam is considered a flood, while water pouring from a broken water main is not a flood. Therefore, distinguishing events based on whether the inundation had a natural or artificial cause may be unhelpful, especially if the policy itself does not make such a distinction. Instead, the key to reconciling these cases lies in the common definition of a flood as an overflow from a body of water. Thus, when the inundation results from the overflow of a body of water, whether natural or artificial, the event is a flood. Conversely, if the inundation does not arise from the overflow of a body of water, as when a water main breaks, the event is not a flood.

COUCH, *supra*, at § 153:54 (footnotes omitted).[24]

Second, the amount of water generally released from a broken water main is not comparable to the massive inundation of water that occurred when the levees in New Orleans ruptured. *Cf. Kane*, 768 P.2d at 681 (distinguishing water-main cases on the basis that the

---

[24] Xavier's counsel contended at oral argument that the canals in this case were not bodies of water because they were man-made. We disagree; the canals in this case are plainly watercourses, regardless of their man-made genesis. And a flood may result from the overflow of a watercourse regardless of whether it was man-made. *See Wallis*, 723 N.E.2d at 383.

amount of water released from a broken water main is "less clearly an inundation or deluge" (quotation marks omitted)). A broken water main or other pipe would generally be expected to produce more localized water damage and lacks the same potential to inundate large swaths of land that a breached levee or a failed dam would have. Although the plaintiffs argue that the quantity of water involved should make no difference and that the key inquiry instead should be the cause of the water damage, inherent in the definition of "flood" is the concept of inundation or deluge, and it seems apparent that the greater the inundation involved in an event, the more clearly that event is a flood. *See Popkin*, 48 A.D.2d at 48 (concluding that flood exclusion does not encompass water-main break because the term "flood" "connotes an inundation; a deluge").

Third, and most important, unlike water mains, levees are flood-control structures, which by definition means that they interact with floodwaters. Because levees are man-made, one could point to man's influence nearly any time a levee fails. If a levee fails despite not being overtopped by the floodwaters, it is because the levee was not adequately designed, constructed, or maintained. If a levee fails due to the floodwaters overtopping it or loosening its footings, it is because the levee was not built high enough or the footings were not established strongly or deeply enough. Even where a levee does not fail, one could find a non-natural flood; where a properly designed and constructed levee causes floodwaters to be diverted downstream to another area of land, the resulting flood downstream occurs because the levee performs as designed. Any time a flooded watercourse encounters a man-made levee, a non-natural component is injected into the flood, but that does not cause the floodwaters to cease being floodwaters. *Cf. Smith v. Union Auto. Indem. Co.*, 752 N.E.2d 1261, 1267 (Ill. App. Ct. 2001) (concluding that surface water does not lose its characterization as surface water simply because it is touched or affected by man-made structures). The distinction between natural and non-natural causes in this context would therefore lead to absurd results and would essentially eviscerate flood exclusions whenever a levee is involved. Consequently, we decline to follow this approach in this case. *See* LA.

CIV. CODE ANN. art. 2049 (directing the court to interpret a term with a meaning that renders that term effective).

The plaintiffs additionally contend that the canons of construction known as *noscitur a sociis* and *ejusdem generis* support the proposition that the term "flood" is limited to purely natural events.[25] Although we have concluded that the distinction between natural and non-natural events in this context is unworkable and would lead to absurd results, we will nonetheless engage the plaintiffs' arguments about these canons.  Under the canon of *noscitur a sociis*, a term is interpreted by considering the meaning of the terms associated with it. *See United States v. Golding*, 332 F.3d 838, 844 (5th Cir. 2003) (per curiam); BLACK'S LAW DICTIONARY 1087 (8th ed. 2004) ("A canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it.").  Under the canon of *ejusdem generis*, "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 500 (5th Cir. 2004); *see also* BLACK'S LAW DICTIONARY 556 (8th ed. 2004). The plaintiffs assert that under these canons, the term "flood" includes only naturally occurring events because the other terms in the water-damage exclusions—e.g., "surface water," "waves," "tidal water," and "overflow of a body of water"—are events that occur naturally.

We disagree that the other terms in the exclusion necessarily refer to natural events. For example, a "surface water" exclusion has been held to bar coverage where the inadequate design of a drainage system caused water to accumulate rather than drain away, resulting in water damage. *See Front Row Theatre, Inc. v. Am. Mfr.'s Ins. Cos.*, 18 F.3d 1343, 1348 (6th Cir. 1994) (applying Ohio law).  And the term "waves" has been held to "encompass[] both

---

[25] In the context of interpreting earth-movement exclusions, some courts have applied these canons of construction to support a distinction between naturally and non-naturally occurring earth movements. *See* COUCH, *supra*, at § 153:66; *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 9 (W. Va. 1998).

those waves which are motivated by natural forces and those motivated by artificial forces"
such as passing motorboats. *See O'Meara v. Am. States Ins. Co.*, 268 N.E.2d 109, 111-12
(Ind. Ct. App. 1971). Since at least some of the terms immediately surrounding "flood" in
the water-damage exclusions also relate to both natural and non-natural events, the canon of
*noscitur a sociis* does not support the plaintiffs' proposed limitation of the term "flood." And
*ejusdem generis* is not at all applicable in interpreting "flood" in the exclusions before us.
This canon is used to interpret general terms (e.g., "and the like") following a list of specific
terms. *See First Am. Title Ins. Co.*, 368 F.3d at 500. But "flood" is not a general term; it is
one of the specific terms listed in the definition of "water damage." Moreover, if we were
to employ these canons to justify a distinction between natural and non-natural floods in the
context of the facts before us, we would be injecting ambiguity into an otherwise
unambiguous term. We decline to do so. *See Tourdot v. Rockford Health Plans, Inc.*, 439
F.3d 351, 354 (7th Cir. 2006) (stating that *ejusdem generis* applies only where a term is
ambiguous, that it may not be used "both to create and to resolve the ambiguity," and that it
"may not be used to defeat the obvious purpose or plain meaning of the text"); *Schenkel &
Shultz, Inc. v. Homestead Ins. Co.*, 119 F.3d 548, 551 (7th Cir. 1997) ("We cannot use the
doctrine [of *noscitur a sociis*] to create uncertainty in an otherwise unambiguous term . . . .").

The plaintiffs finally contend that the reasonable expectations of homeowners
insurance policyholders would be that damage resulting from man-made floods would be
covered. "[A]scertaining how a reasonable insurance policy purchaser would construe the
clause at the time the insurance contract was entered" is one way that ambiguity in an
exclusion clause may be resolved. *La. Ins. Guar. Ass'n*, 630 So. 2d at 764. But "Louisiana
law . . . precludes use of the reasonable expectations doctrine to recast policy language when
such language is clear and unambiguous." *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d
511, 522 (5th Cir. 2005). As we have explained, the flood exclusions in the policies are
unambiguous in the context of the specific facts of this case; thus, we need not resort to
ascertaining a reasonable policyholder's expectations. For the sake of thoroughness,
however, we will briefly address a few of the parties' arguments.

No. 07-30119

First, the plaintiffs assert that because their policies are all-risk policies, they have a heightened expectation of coverage and that a reasonable policyholder thus would not expect water damage resulting from third-party negligence to be excluded. Although a few courts have stated that insureds with all-risk policies have "heightened expectations" of coverage, *see, e.g., Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 14 (W. Va. 1998), we are not aware of any Louisiana court that has so held. And although all-risk policies do generally extend to all fortuitous losses, this is true only to the extent that the policy does not expressly exclude the loss from coverage. *See Alton Ochsner Med. Found.*, 219 F.3d at 504. Each policy in this case contains a specific provision expressly excluding damage caused by flood, and none of the exclusions indicates that whether a particular flood is excluded depends on whether its cause is purely natural. Given the generally prevailing use of the term "flood," we believe a reasonable policyholder would expect a massive inundation of water from a breached levee to be excluded, notwithstanding the all-risk nature of the policies.

Second, the plaintiffs assert that because many of the policies contained a "Hurricane Deductible Endorsement," reasonable policyholders would expect those policies to cover damage resulting from a hurricane. Many of the policies contained an endorsement materially similar to the following, from Humphreys's policy with Encompass Indemnity:

> We will pay only that part of the total of the loss for all Property Coverages that exceeds the hurricane deductible stated on the Coverage Summary. The hurricane deductible shown on the Coverage Summary applies to all covered property for direct physical loss or damage caused directly or indirectly by a hurricane as defined below. Such deductible applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by a hurricane. In no event will the deductible applied for a hurricane loss be less than the property deductible shown on the Coverage Summary.
>
> Hurricane means wind, wind gust, hail, rain, tornado, cyclone or hurricane which results in direct physical loss or damage to property by a storm system that has been declared to be a hurricane by the National Weather Service. . . .

No. 07-30119

. . . .

All other provisions of this policy apply.

The plaintiffs assert that in light of this language, a reasonable policyholder would have expected the water damage in this case to be covered.   Humphreys goes a step further and argues that the hurricane-deductible endorsement in her policy actually expands coverage to extend to any property damage caused by a hurricane.

But the plain language of the hurricane-deductible endorsements indicates that they do nothing more than alter the deductible for damage caused by a hurricane.  Nothing in the language of the endorsements purports to extend coverage for floods or to restrict flood exclusions; indeed they do not even include flood or water (other than rain) in the definition of "hurricane." Further, the endorsements state that all other provisions of the policies apply, indicating that the flood exclusions remain in effect. The hurricane-deductible endorsements therefore would not give a reasonable policyholder the impression that flood resulting from a breached levee would be covered.

Finally, several defendants[26] argue that in light of flood insurance available though the National Flood Insurance Program ("NFIP"), a reasonable policyholder would not expect homeowners policies to cover the flooding in this case.  The defendants assert that we may consider the NFIP in interpreting "flood" because custom and industry usage is relevant under article 2053 of the Civil Code.  They contend that the NFIP's existence over many years has made it clear to property owners that standard all-risk policies do not cover flood damage, regardless of whether the cause of the flood is natural or non-natural, and that property owners who want flood coverage must purchase it through the NFIP; a reasonable policyholder thus would not expect the inundation of water in this case to be covered under a standard homeowners, renters, or commercial-property insurance policy.

The plaintiffs, in contrast, urge us not to consider the NFIP, contending that it has no bearing on this appeal.  And to the extent the NFIP may be relevant, the plaintiffs argue that

---

[26] Specifically, Standard, Hanover, Great Northern, and the ISO Defendants make this argument.

a reasonable policyholder would expect the NFIP to provide coverage for naturally occurring floods but that floods induced by negligence would be covered under standard all-risk policies.

   We do not rely upon the NFIP to decide this appeal. Our decision is based instead upon our determination that the flood exclusions in the policies before us unambiguously preclude the plaintiffs' recovery. But to the extent that the NFIP's definition of "flood" is further evidence of the term's generally prevailing meaning, we note that it is consistent with our interpretation. Standard insurance policies issued under the NFIP define "flood" as follows:

> A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is [the policyholder's] property) from:
>
> a.   Overflow of inland or tidal waters,
>
> b.   Unusual and rapid accumulation or runoff of surface waters from any source,
>
> c.   Mudflow.

44 C.F.R. Pt. 61, App. A(1), App. A(2), App. A(3) (2006); *see also* Federal Emergency Management Agency, FloodSmart.gov: What is a Flood?, http://www.floodsmart.gov/floodsmart/pages/whatflood.jsp (last visited July 25, 2007). The NFIP makes no distinction between inundations of water caused by natural levee ruptures and those caused by man-made ruptures (even if such a distinction were workable). The canals' overflowing into the City of New Orleans due to the levee ruptures was certainly an overflow of inland waters as used in the NFIP's definition, and it may also have been an unusual and rapid runoff of surface waters.

   In sum, we conclude that the flood exclusions in the plaintiffs' policies are unambiguous in the context of the facts of this case. In the midst of a hurricane, three canals running through the City of New Orleans overflowed their normal boundaries. The flood-control measures, i.e., levees, that man had put in place to prevent the canal's floodwaters

from reaching the city failed. The result was an enormous and devastating inundation of water into the city, damaging the plaintiffs' property. This event was a "flood" within that term's generally prevailing meaning as used in common parlance, and our interpretation of the exclusions ends there. The flood is unambiguously excluded from coverage under the plaintiffs' all-risk policies, and the district court's conclusion to the contrary was erroneous.[27]

## C. Efficient Proximate Cause and Anti-Concurrent-Causation Clauses

Lastly we turn to the doctrine of efficient proximate cause. Under this doctrine, as it is applied in many jurisdictions, where a loss is caused by a combination of a covered risk and an excluded risk, the loss is covered if the covered risk was the efficient proximate cause of the loss.[28] *See, e.g., Chadwick v. Fire Ins. Exch.*, 21 Cal. Rptr. 2d 871, 873 (Cal. Ct. App. 1993); *Kish v. Ins. Co. of N. Am.*, 883 P.2d 308, 311 (Wash. 1994); *See generally* COUCH, *supra*, at §§ 101:43-:45, :53-:55. The efficient proximate cause of the loss is the dominant, fundamental cause or the cause that set the chain of events in motion. *See* COUCH, *supra*, at § 101:45.

Many of the insurance policies at issue in this appeal excluded "loss caused directly or indirectly by" flood "regardless of any other cause or event contributing concurrently or in any sequence to the loss." This language, which the district court referred to as an anti-concurrent-causation clause, has been recognized as demonstrating an insurer's intent to

---

[27] Because we reach this conclusion, we need not address the issue raised in the cross-appeals of the impact of the "lead-in" language in the State Farm policies.

[28] To our knowledge, the Louisiana Supreme Court has not addressed the applicability of the efficient-proximate-cause doctrine in the context of an all-risk policy. But it has concluded in the context of interpreting a windstorm insurance policy (which provided coverage only for loss caused by windstorm) that "if a windstorm is the dominant and efficient cause of the loss, the insured may recover notwithstanding that another cause or causes contributed to the damage suffered." *Lorio v. Aetna Ins. Co.*, 232 So. 2d 490, 493 (La. 1970); *see also Roach-Strayhan-Holland Post No. 20, Am. Legion Club, Inc. v. Continental Ins. Co. of N.Y.*, 112 So. 2d 680, 683 (La. 1959) ("[I]t is sufficient, in order to recover upon a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate or efficient cause of the loss or damage, notwithstanding other factors contributing thereto."). We express no opinion on the extent to which Louisiana follows the efficient-proximate-cause rule in the context of all-risk policies because we conclude that the rule is inapplicable to this case.

contract around the operation of the efficient-proximate-cause rule. *See, e.g., TNT Speed & Sport Center, Inc. v. Am. States Ins. Co.*, 114 F.3d 731, 732-33 (8th Cir. 1997).

The district court considered the anti-concurrent-causation clauses in this case and concluded that they are inapplicable here because there were not two separate causes of the plaintiffs' damage. The court remarked that this case does not present a combination of forces that caused damage and that it therefore is not analogous to cases where Hurricane Katrina may have damaged property through both wind and water. *Cf. Tuepker v. State Farm Fire & Cas. Co.*, 2006 U.S. Dist. LEXIS 34710 (S.D. Miss. May 24, 2006) (unpublished opinion) (Hurricane Katrina case involving alleged damage from wind, rain, and storm surge), *appeal docketed*, Nos. 06-61075 & 06-61076 (5th Cir.). Instead, the court stated that "in this case the 'cause' conflates to the flood," meaning that the alleged negligent design, construction, or maintenance of the levees and the resulting flood were not separate causes of the plaintiffs' losses. Consequently, the court concluded that the anti-concurrent-causation clauses needed not be addressed at that time but stated that they may need to be addressed at later stages in the litigation.

On appeal, several insurers rely in part on the language in their anti-concurrent-causation clauses to demonstrate that floods are excluded regardless of the cause. The *Chehardy* plaintiffs respond that "the District Court correctly determined that the anti-concurrent causation clauses were inapplicable," contending that the cause of their damage ("man-made inundation of water or inundation resulting from third-party negligent acts") was a covered peril.[29] Xavier responds that the district court "correctly noted that [the anti-concurrent-causation clause] is inapplicable because there is no separate or other cause of damage."

We agree with the district court's determination that we need not address whether insurers may contract around the efficient-proximate-cause rule under Louisiana law, nor need we address the operation of the efficient-proximate-cause rule itself in this case. The

---

[29] The *Vanderbrook* plaintiffs and Humphreys adopted the *Chehardy* plaintiffs' arguments.

No. 07-30119

efficient-proximate-cause doctrine applies only where two or more distinct actions, events, or forces combined to create the loss. *See Pieper v. Commercial Underwriters Ins. Co.*, 69 Cal. Rptr. 2d 551, 557 (Cal. Ct. App. 1997) ("For the efficient proximate cause theory to apply, . . . there must be two separate or distinct perils . . . ."); *Kish*, 883 P.2d at 311 ("The efficient proximate cause rule applies only where two or more independent forces operate to cause the loss."). But here, on these pleadings, there are not two independent causes of the plaintiffs' damages at play; the only force that damaged the plaintiffs' properties was flood. To the extent that negligent design, construction, or maintenance of the levees contributed to the plaintiffs' losses, it was only one factor in bringing about the flood; the peril of negligence did not act, apart from flood, to bring about damage to the insureds' properties. Consequently, as the plaintiffs argue and as the district court held, the efficient-proximate-cause doctrine is inapplicable. *See Chadwick*, 21 Cal. Rptr. 2d at 1117 ("When, however, the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application."); *see also Cornhusker Cas. Co. v. Farmers Mut. Ins. Co.*, 680 N.W.2d 595, 601-02 (Neb. 2004); *Kish*, 883 P.2d at 311.

Moreover, to the extent that the plaintiffs do attempt to recharacterize the cause of their losses by focusing on negligence as the cause rather than water damage, their argument fails. "An insured may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Kish*, 883 P.2d at 311; *Chadwick*, 21 Cal. Rptr. 2d at 874. "If every possible characterization of an action or event were counted an additional peril, the exclusions in all-risk insurance contracts would be largely meaningless." *Chadwick*, 21 Cal. Rptr. 2d at 874. Thus, in *Pieper v. Commercial Underwriters Insurance Company*, where a policy covered loss caused by arson but excluded loss caused by brush fire, a brush fire caused by arson was excluded. 69 Cal. Rptr. 2d at 557-58. The *Pieper* court determined that the cause of the brush fire was irrelevant; the plaintiffs' property was damaged by one cause alone, brush fire, and thus, the efficient-proximate-cause rule was inapplicable. *Id.* And in *Kish v. Insurance Company of North America*, where a

44

No. 07-30119

policy covered loss caused by rain but excluded loss caused by flood, the court held that the insured could not avoid the operation of the flood exclusion by merely recharacterizing the flood as rain. 883 P.2d at 311-13. The court held that there was one cause of the plaintiffs' loss—rain-induced flood—which was excluded, and concluded that the efficient-proximate-cause rule was inapplicable. *Id.* We similarly reject any attempt on the plaintiffs' part to avoid the exclusion of the flood exclusion by recharacterizing the flood as negligence; the sole cause of the losses for which they seek coverage in this litigation, flood, was excluded from coverage regardless of what factors contributed to its development.

In sum, we need not address the applicability of anti-concurrent-causation clauses or the efficient-proximate-cause rule because, as pleaded, there was not more than one separate cause of the plaintiffs' losses. As the district court recognized, there are other cases arising in the context of Hurricane Katrina where these issues may come into play, but this is not the case for their resolution.

## IV. CONCLUSION

With respect to the *Vanderbrook* action, the district court's grant of State Farm's motion for judgment on the pleadings is AFFIRMED. The denial of the motions for judgment on the pleadings filed by Hanover and Standard Fire is VACATED and REMANDED.

With respect to the *Xavier* action, the motion to certify questions to the Louisiana Supreme Court is DENIED. The district court's grant of partial summary judgment in favor of Xavier is VACATED and REMANDED.

With respect to the *Chehardy* action, the motion to certify questions to the Louisiana Supreme Court is DENIED. The district court's grant in part of State Farm's motion to dismiss is AFFIRMED. And the denial of the motions to dismiss filed by Lafayette, Liberty Mutual, American, Auto Club, Standard Fire, Lexington, Aegis, Hanover, Allstate, Louisiana Citizens, Encompass Insurance, and Great Northern pertaining to the claims for declaratory judgment and breach of contract is VACATED and REMANDED.

45

No. 07-30119

With respect to the *Humphreys* action, the district court's denial of Humphreys's partial-summary-judgment motion on the question of coverage under the policy's hurricane-deductible endorsement is AFFIRMED. The grant of partial summary judgment in Humphreys's favor on the question of the interpretation of the policy's flood exclusion is VACATED and REMANDED.

Motions DENIED; AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion. The appellees shall bear the cost of this appeal.

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

BILL OF COSTS

No. 07-30119

U.S. COURT OF APPEALS

**F I L E D**

AUG 1 6 2007

CHARLES R. FULBRUGE III
CLERK

In re Katrina Canal Breaches Litigation

Appellees

The Clerk is requested to tax the following costs against:

NOTE: The Bill of Costs is due in this office *within 14 days from the date of the opinion.* See FED. R. APP. P. & 5TH Cir. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5ᵗʰ Cir. R. 39 | REQUESTED | | | | ALLOWED (if different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | $ 450.00 | | | | 450.00 |
| Appendix or Record Excepts | | | | | | | | |
| Appellant's Brief | 9 | 75 | .25 | $ 168.75 | 9 | 75 | .25 | 168.75 |
| Appellee's Brief | 9 | 38 | .25 | $ 85.50 | 9 | 38 | .25 | 85.50 |
| Appellant's Reply Brief | 9 | | | | | | | |
| Other: Petition for Permission to Appeal | 6 | 32 | .25 | $ 48.00 | | | | |

Total:  $ 752.25

Costs are taxed in the amount of $ 704.25

Total:  $ 752.25

axe

U.S. COURT OF APPEALS
RECEIVED
AUG 1 6 2007
NEW ORLEANS, LA.