UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION
                                       NO.: 05-4182

                                       SECTION "K" (2)

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
            05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
            06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
            06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
            06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
            06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
            07-0993, 07-1284, 07-1286, 07-1288, 07-1289

PERTAINS TO: LEVEE

## POST HEARING MEMORDUM

**MAY IT PLEASE THE COURT:**

This *Post-Hearing Memorandum* is respectfully submitted on behalf of Consolidated Class Plaintiffs in the captioned matter.

### ARGUMENT

This Court poignantly and succinctly highlighted the essential issue permeating this case– is it the law that the King can do no wrong? The Corps in this case has all but conceded that its failure to build an appropriate levee system and to regulate the dredging of the 17th Street Canal

Page 1 of 14

contributed to the devastation caused to the people of New Orleans by Hurricane Katrina. Yet the Government argues that <u>precisely because</u> it contributed to that flooding it is absolutely immune from liability. One need not resort to Justice Stevens' characterization of such an argument as an "obsolete legislative remnant [that] is nothing more than an engine of injustice"[1] to demonstrate the fallacy behind this argument. Because Congress <u>never</u> authorized the Corps to construct the levee system as it ultimately did, no immunity attaches to the construction of that system under 33 U.S.C. §702c. Furthermore, because the Corps intentionally disregarded the criteria set forth in its enabling legislation and regulatory guidelines when it issued a permit for the dredging of the 17th Street Canal, it cannot use the discretionary function exception to the Federal Tort Claims Act to shield it from liability. The Corps' *Motion to Dismiss* should therefore be denied in its entirety.

## I. THE CORPS MUST HAVE AUTHORIZATION AND RE-AUTHORIZATION FOR MODIFICATIONS TO ITS FLOOD CONTROL PROJECTS.

At argument, the Court appropriately recognized that authorization of a flood control project is a necessary prerequisite to the grant of immunity for such a project under §702c. The Government argued vociferously that Congressional grants of immunity do not depend on authorization or re-authorization of any particular project. Yet that argument assumes that the tail wags the dog–that the Corps has control over its own spending and that Congress must adapt its legislative function to the will of the Corps. That is simply not the case.

---

[1] *Hiersche v. U.S.*, 112 S.Ct. 1304, 1305 (1992).

It is axiomatic that federal agencies like the Corps of Engineers are creatures of Congress and cannot exceed the scope of authority granted them by Congress. "First, an agency literally has no power to act. . . unless and until Congress confers power upon it." *La. Pub. Svc. Com'n. v. FCC*, 476 U.S. 355, 374 (1986). *See also, Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961)("the fact is that the Board is entirely a creature of Congress and the determinative question is not what the Board thinks it should do but what Congress has said it can do"); *Pittston Co. v. U.S.*, 368 F.3d 385, 408 (4th Cir. 2006). The Constitutionally-mandated separation of powers thus delineates that Congress–not the Corps or any other federal agency–creates the parameters within which it must operate. To the extent that an agency acts outside the scope of its Congressionally-defined discretion, its actions are *ultra vires*, and cannot fit within any Congressionally-created exemption from liability.2 The Corps is not a fourth branch of Government and, thus, cannot claim immunity where it lacks authorization for the project that caused the loss for which it seeks immunity.

Up until this litigation, the Corps was convinced that it did have to return to Congress whenever it modified or otherwise altered its plan for hurricane protection levees in the New Orleans area. On pages 20-23 of Plaintiffs' *Opposition Memorandum*, Plaintiffs synopsized the extensive Congressional testimony from Corps officials, the publications of the Corps and correspondence sent by members of the Corps indicating their belief that any modification to the original Barrier Plan would require Congressional re-authorization. This position of the Corps was well founded in application of their own regulations, namely ER 1105-2-10, Appendix A,

---

2   It is important to note that §702c does not confer immunity to the Corps but instead to the United States. To the extent that the Corps avails itself of this immunity, that availment can only occur by explicit delegation of Congress to the Corps. Therefore, Congress cannot *implicitly* or *negligently* transfer this immunity,

Post Authorization Change, issued February 5, 1982, and EP 1105-2-15, Changes to Uncompleted Authorized Projects, issued January 27, 1982.[3]

This longstanding interpretation of the scope of the Corps' discretion is entitled to deference. *See, Barnhart v. Walton*, 535 U.S. 212, 221-222 (2002); *U.S. v. Mead Corp.*, 533 U.S. 218, 230 (2000). That the Corps has now refuted that prior position requires the Court to grant little or no deference to its *post hoc* rationalization crafted for purposes of this litigation. *See, Nat'l. Fed'n. of Federal Employees, Local Union 1309 v. DOI*, 526 U.S. 86, 109-110 (1999); *Smiley v. CitiBank (S.D.), N.A.*, 517 U.S. 735, 741-742 (1996). This shifting of positions is fatal to any claim by the Corps that they did not need authorization before modifying the Barrier Plan and adopting the High Level Plan.[4]

Despite its clear and unambiguous obligation to obtain Congressional approval before shifting to the High Level Plan, the Corps failed utterly to obtain any such authorization. The Corps now claims that later appropriated funds for the "Parallel Protection Plan," which is part of the allover High Level Plan *healed* the lack of Congressional authorization of the High Level Plan.

---

and it would not immunize a project over which it lacked knowledge or approval.

[3] Plaintiffs have submitted the updated versions of these regulations as Exhibits E 24.1 (EP 1165-2-1, dated July 30, 1999) and E 24.2 (ER 1105-2-100, updated June 30, 2004) with their Opposition Memorandum.

[4] It further defeats any argument to the effect that *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972), vests the Corps with sufficient discretion so as to negate the need for re-authorization. *Allison* and progeny all turn on the specific language in Congressional authorizations to the effect that the Corps could deviate if need be from specific Congressional guidelines. The Corps in this instance has consistently maintained—until pressed with litigation—that it had no such blanket authorization but that it instead required re-authorization for modifications to existing flood control plans. In light of this longstanding interpretation of the specific legislation applicable herein, the Corps cannot hide behind *Allison* as a barrier to liability.

[5] Furthermore, as pointed out by Plaintiffs on page 19 of their brief, the 1946 Flood Control Act expressly delineated that the Corps had to return to Congress and obtain authorization before modifying any putative flood control project. Those same pages of the brief delineate the Corps' singular refusal to obtain this authorization prior to adopting the High Level Plan.

This argument must simply fail, because the Corps *did* nonetheless change the Congressionally envisioned level of protection implemented in the Barrier Plan. The Barrier Plan was supposed to protect the project area from a hurricane event that was deemed to have a reoccurrence of 1-in-300 years. However, in implementing the Parallel Plan, the Corps designed the system only for a level of protection of 1-in-100 years, thus again materially altering the scope of the Congressionally authorized plan.

Finally, the Corps asserts that the Congressional funding it obtained for this proposal equate to Congressional authorization of that proposal. This is wrong. Congressional authorization legislation is separate and distinct from Congressional appropriation legislation. The fact that money was appropriated to fund a specific objective does not mean that Congress authorized any specific means by which to achieve that objective. As recognized by the court in *Atchison, Topeka & Sanata Fe R. Co. v. Callaway*, 382 F.Supp. 610 (D.D.C. 1974):

> It is a general principle that Congress cannot and does not legislate through the appropriation process. This principle has been codified in Rule XXI of the Manual of the House of Representatives, which provides in pertinent part:
>
>> 2. No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless on continuation of appropriations for such public works or projects as are already in progress.
>
> Thus, an authorization bill would be necessary at the least for Congressional consent under Section 401. And, Locks and Dam 26 would not come under the exception since it is not a project already in progress. On this point, House Rule § 836 must also be considered:

> Previous enactment of items of appropriation unauthorized by law does not justify similar appropriations in subsequent bills unless if through appropriations previously made a function of the government has been established which would bring it into the category of continuation of works in progress.

*Id.* at 620. *See also, Rincon Band of Mission Indians v. Califano*, 464 F.Supp. 934, (C.D.Ca. 1979); *Nat'l. Audubon Society v. Andrus*, 442 F.Supp. 42 (D.D.C. 1977). Thus the fact that Congress appropriated money to the Corps does not in any way mean that it ratified any specific action taken by the Corps with respect to the switch from the Barrier Plan to the High Level Plan.[5]

The Corps had the obligation to obtain Congressional authorization before it adopted the High Level Plan. It refused to do so. Because it acted outside the scope of its Congressionally-defined discretion, it cannot rely on Congressionally-created immunity to avoid the consequences of its acts. The Court should therefore refuse to grant the Corps immunity under §702c.

## II. BECAUSE FLOOD WATER WAS NOT THE PROXIMATE CAUSE OF THE LEVEE BREACHES, THE RESULTANT DAMAGE IS NOT "FLOOD WATER" RELATED TO A "FLOOD CONTROL PROJECT" AS REQUIRED FOR §702C IMMUNITY.

Some discussion ensued at the hearing over the character of the water that caused the damage to the levees and ultimately caused the flooding within the New Orleans region. As Plaintiffs have previously demonstrated, it was drainage water from the outfall canals–not "flood water" from the Hurricane Katrina storm surge–that caused the initial breaches in the levee. It

was this drainage water that was the proximate cause of the resultant damage. Therefore, because the ensuing "flood water" came after and as a result of this initial breach, the Court cannot as a matter of law say that all water causing damage was "flood water."

Plaintiffs' substantive claim concerning the levee breaches derives from the Federal Tort Claims Act (hereafter "FTCA"). A plaintiff bringing a claim under the FTCA must apply the tort law applicable to the state in which the fault occurred. *See*, 28 U.S.C. §1346(b); *Chapa v. U.S.*, 2007 U.S.App. Lexis 19455 at *9 n. 2 (8th Cir.). The controlling state law herein is that of the State of Louisiana. Under Louisiana law, the proximate cause test is replaced by the duty-risk analysis, which asks–in determining whether to impose liability on a specific actor for a specific act–"how easily the risk of harm can be associated with the rule which was breached." *Roberts v. Benoit*, 605 So.2d 1032, 1055 (La. 1992). *See also, Hill v. Lundin Associates, Inc.*, 256 So.2d 620 (La. 1972). Furthermore, to the extent that the Court looks to see whether a particular act or omission was a cause-in-fact of the resultant injury, the Court must conduct the following analysis:

> Generally, the initial determination in the duty/risk analysis is cause-in-fact. *Boykin*, 707 So. 2d at 1230. Cause-in-fact usually is a "but for" inquiry, which tests whether the accident would or would not have happened but for the defendant's substandard conduct. *Id.* Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. *Id.* at n. 10, 707 So. 2d at 1230; *Jones v. Hawkins*, 98-1259, 98-1288, p. 7 (La. 3/19/99), 731 So. 2d 216, 220; *Rick v. State, Dept. of Transp. and Development*, 93 1776, 93-1784, p. 8 (La. 1/14/94), 630 So. 2d 1271, 1275; *Dixie Drive It Yourself System v. American Beverage Co.*, 242 La. 471, 137 So. 2d 298 (1962). To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm.

*Andry v. Murphy Oil U.S.A.*, No. 05-0126 (La.App. 4 Cir. 06/14/06); 935 So. 2d 239, 255. Applying this test to the immunity question shows that a--if not the--cause-in-fact of the damage in this case was the under seepage of water that ultimately undermined the strength of the levees, and the resultant break of the levees <u>before</u> the onset of the storm surge that flooded New Orleans. Furthermore, the faulty permitting of dredging that contributed to that under seepage was clearly an activity easily associated with the collapse of the levees. For these reasons, it was the drainage water <u>and not the flood water</u> that caused damage herein, and the Court cannot therefore conclude as a matter of law that flood water was the sole cause of Plaintiffs' damages.

At the outset, it is clear that the under seepage and the resultant breach of the levees was a cause-in-fact of the damages caused to Plaintiffs. While it is true that the water that ultimately came into Plaintiffs' homes and businesses was arguably flood water, that flood water would not have made landfall absent the breach in the levees. That initial breach was caused by the drainage water in the canals and not the flood water that subsequently made landfall in New Orleans. Therefore, one cause-in-fact of the damage was non-flood water undermining and ultimately breaching the levees, something for which the Corps has no immunity under §702c.

Furthermore, the acts of fault claimed by Plaintiffs are easily associated with the risks that ultimately befell Plaintiffs. Plaintiffs' claims are essentially two-fold–a) the Corps did not appropriately design and build the levees surrounding the outfall canals and b) the Corps improperly issued a permit for the Orleans Sewerage and Water Board to dredge the 17th Street Canal. As to the first claim, the levees were designed <u>both</u> to retain the drainage water usually within the canals <u>and</u> to protect against hurricane breaches. To the extent that the levees did not

accomplish the first goal, then they did not retain water <u>whose character is not flood related</u>, a breach of duty both easily associated with the resultant flooding and wholly separate and apart from a flood control project enjoying §702c immunity. To the extent that the Corps exacerbated this problem by permitting dredging of the 17th Street Canal, it breached its regulatory mandate to safeguard the integrity of the levees, again an activity easily associated with Plaintiffs' damages and wholly unrelated to a "flood control project" as envisioned by §702c. This lack of any nexus with a flood control project means that the initial breach of the levees occurring in the morning of August 29, 2005 was an activity the cause of which–the Corps' failures with respect to the levees around the outfall canals–is not shielded from liability.

### III. THE CORPS CANNOT USE THE DISCRETIONARY FUNCTION EXCEPTION TO AVOID LIABILITY FOR THE PERMITTING OF DREDGING IN THE 17TH STREET CANAL.

Also at argument, the Court indicated its inability to find precedent holding that licensure and permitting issues did not involve discretion on the part of the permitting agency. Yet clear and specific case law indicates that the fact that a claim rests on a permitting or licensure decision, without more, will not give rise to immunity under the discretionary function exception to the Federal Tort Claims Act. That same case law indicates that an agency disobeying specific mandates as to the licensure or permitting process cannot avail itself of immunity under the discretionary function exception. These twin principles should guide the Court's consideration of the case *sub judice*.

As a threshold matter, the Court should recognize the illogical bent the Corps' argument takes. The Corps argues that it had discretion to issue the dredging permit even though the issuance of that permit ultimately undermined the levee system surrounding the 17th Street Canal. Thus the Corps assumes that Congress and the regulations governing the Corps mandated the Corps to erect a hurricane protection system in the New Orleans Metropolitan Area <u>and then vested it with discretion to destroy the very protection system it created</u>. Any such argument must be washed away by the flood of its own flaws.

Instructive in this regard is *Berkovitz v. U.S.*, 486 U.S. 531 (1988). The Plaintiff in *Berkovitz* sued the FDA for improperly licensing an oral polio vaccine from which his son contracted a severe case of polio. *Id.* at 533. The Government alleged that the decision of whether to grant or reject a particular vaccine was a discretionary matter that involved policy-making decisions by the FDA. *Id.* at 533-534. The Court began its analysis by noting that, if the Plaintiff alleged that the agency failed to follow its own mandatory requirements in issuing the license, the discretionary function exception would not apply. *Id.* at 536 ("Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.") Furthermore, the Court found the question of whether the FDA could be immune from liability based on deficiencies in its licensure process to be one of fact, and it failed to rule out the possibility that a claimant could defeat the discretionary function exception based on deficiencies in the licensing process:

> If petitioners' claim is that the DBS made a determination that Orimune complied with regulatory standards, but that the determination was incorrect, the question of the applicability of the discretionary function exception requires a somewhat different analysis. In that event, the question turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception. Petitioners contend that the determination involves the application of objective scientific standards, see Brief for Petitioners 16-17, whereas the Government asserts that the determination incorporates considerable "policy judgment," Brief for United States 36. In making these assertions, the parties have framed the issue appropriately; application of the discretionary function exception to the claim that the determination of compliance was incorrect hinges on whether the agency officials making that determination permissibly exercise policy choice. The parties, however, have not addressed this question in detail, and they have given us no indication of the way in which the DBS interprets and applies the regulations setting forth the criteria for compliance. Given that these regulations are particularly abstruse, we hesitate to decide the question on the scanty record before us. We therefore leave it to the District Court to decide, if petitioners choose to press this claim, whether agency officials appropriately exercise policy judgment in determining that a vaccine product complies with the relevant safety standards.

*Id.* at 544-545. Therefore, without summary judgment-type evidence showing the process through which the FDA licensed the vaccine at issue, the Court could not determine as a matter of law whether or not the discretionary function exception applied.

*Berkovitz* is compelling both for articulating the standard necessary for establishing the discretionary function exception and the extent to which it defines the type of decisions subject to that exception. The case absolutely dispels the notion that "regulatory" decisions like licensing and permitting are automatically discretionary and therefore immune. *See, Id.* at 538 ("In restating and clarifying the scope of the discretionary function exception, we intend specifically to reject the Government's argument, pressed both in this Court and the Court of

Appeals, that the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies. That argument is rebutted first by the language of the exception, which protects "discretionary" functions, rather than "regulatory" functions.") *See also, Nat. Assoc. Of Home Bldrs.. v. Defenders of Wildlife*, 127 S.Ct. 2518, 2535-36 (2007); *Gooden v. U.S. B.I.A.*, 339 F.Supp.2d 1072, 1076-77 (D.N.D. 2004). Instead, under *Berkovitz* and progeny, even actions that relate to core regulatory functions like permitting will not be immune unless the regulatory function involved "such acts as are "discretionary" in nature. This coverage accords with Congress' purpose in enacting the exception: to prevent "judicial intervention in . . . the political, social, and economic judgments" of governmental -- including regulatory -- agencies." *Berkovitz*, 486 U.S. at 538-539. *Accord, O'Toole v. U.S.*, 295 F.3d 1029 (9th Cir. 2002); *Ayala v. U.S.*, 980 F.2d 1342 (10th Cir. 1992). It is therefore improper to follow a *gestalt* reaction that all decisions regarding permitting or licensing are automatically discretionary. In many instances–this case being one–they are not.

In this case, the regulatory guidelines for permitting do not admit of discretion. As previously discussed on pages 48-51 of Plaintiffs' *Opposition Memorandum*, the guidelines for permitting list <u>mandatory</u> criteria that are to be reviewed and the procedures to be utilized for making that determination. The mandatory phrasing of those guidelines brings this case parallel with *Berkovitz*–in both instances, the defendant federal agency failed to follow non-discretionary mandates and either licensed or permitted something it should not have approved. Under these circumstances, the agency "has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Its failure to do so makes it liable for the resultant damage caused by its lack of compliance with its own mandates.

## CONCLUSION

For the foregoing reasons, and for those expressed in their prior memorandum, Plaintiffs move this Court to deny the *Motion to Dismiss* brought in this matter by the United States.

**Respectfully Submitted,**

**APPROVED PLAINTIFFS LIAISON COUNSEL**

/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
The Law Offices of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

/s/Gerald E. Meunier
GERALD E. MEUNIER (La. Bar #9471)
LEVEE PSLC LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com

For

**LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

Gerald E. Meunier
Daniel E. Becnel, Jr.
Joseph M. Bruno
D. Blayne Honeycutt
Hugh P. Lambert
Darlene Jacobs
Walter Dumas

## CERTIFICATE OF SERVICE

I hereby certify that, on this 28th day of August, 2007, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to All Known Counsel of Record by operation of the Court's electronic filing system.

/s/ Joseph M. Bruno