UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * | CIVIL ACTION NO.: 05-4182 "K"(2) |
| | * | JUDGE DUVAL |
| PERTAINS TO: INSURANCE, *Xavier Univ. of La.*, No. 06-0516 | * * * * | MAGISTRATE JUDGE WILKINSON |

## AFFIDAVIT OF GEORGE CLAYPOOL

STATE OF ARIZONA

COUNTY OF MARICOPA

**BEFORE ME,** the undersigned Notary, duly commissioned and qualified in and for the aforesaid County and State, personally came and appeared

**George Claypool**

who being by me duly sworn, did depose and state as follows:

**1.**

I am an independent adjuster for Vericlaim, Inc., which was retained by Travelers Property Casualty Company of America ("Travelers") to assist with the investigation and

HART1-1420380-1_

evaluation of the commercial property insurance claim made by Xavier University of Louisiana ("Xavier") arising out of Hurricane Katrina.

2.

Attached as Exhibit A hereto is a certified copy of the commercial insurance policy issued by Travelers to Xavier, bearing Policy No. Y-630-528D9763-TIL-04, for the period September 1, 2004 to September 1, 2005 (the "Policy").

3.

In the course of my work on Xavier's claim, in or about late September of 2005, I met with Jim Landis of Landis Construction, the contractor retained by Xavier to repair the damage to its buildings. Landis agreed to maintain accurate records of the damages and, in particular, to specify the damage from wind and wind-driven rain, as opposed to flood (or rising water), and to record the repairs made by building, floor and room.

4.

On or about October 13, 2005, I met with Attorneys James Garner and Darnell Bludworth at Sher Garner's office to discuss the Xavier claim. I told Mr. Garner about my conversation with Landis and described the type of claim presentation that Landis had promised. Mr. Garner voiced no objection other than saying that the term "flood" should not be used in the Landis presentation. All agreed that Mr. Landis should accommodate this concern by using the term "rising water" instead of "flood." Attorneys Garner and Bludworth also promised electronic layouts of the buildings. I left that meeting believing that I would be able to rely upon Landis' detailed scope of work.

2

**5.**

On or about October 18, and November 14, 2005, Attorney Bludworth submitted to me Landis' requisitions nos. 1 and 2. On or about November 18, 2005, I asked for a meeting with Xavier and its team to discuss the claim. That meeting occurred on November 30, 2005.

**6.**

On November 30, 2005, a meeting was held at Landis' office to discuss the claim. During the meeting, I indicated that I still had not received the electronic layouts promised, or the scope of hurricane damage work claimed, or the claim separating "rising water" and wind damage. After some discussion, Mr. Claypool requested that Xavier at least break out the damages between first floor and upper floors. Although this was not to be the end of the analysis, it was suggested that this would be a helpful starting point to delineate the expenditures between excluded flood damages and covered wind damage. Attorney Bludworth agreed to provide that documentation.

**7.**

On December 2, 2005, Attorney Bludworth provided me with six binders of documents. The binders included: photo arrays of the hurricane damage, but largely without reference to location, thereby making it difficult, and, in some instances impossible, to determine where the damage depicted was located; prioritization of buildings to be repaired to enable the University to begin the second semester; miscellaneous construction contract information; and many

invoices. The invoices, however, did not specify work by location, either by building or floor, and were largely useless in formulating any analysis of the scope of the hurricane damage. Based on the invoices, it was impossible to determine which portions of the work performed on the Xavier campus pertained to damage that was caused by a covered cause of loss under the Policy. It was also impossible to determine from the invoices which portions of the work pertained to repairs of damaged property as opposed to improvements and betterments. Xavier failed to provide the documents detailing the scope of the work and the cause of the damage being repaired, as Landis had agreed to prepare in late September.

8.

After I explained the problems with the documents submitted on December 2, 2005, on or about December 8, 2005, Attorney Bludworth provided a purported breakout of the damages by category of work, by building and by first floor and upper floors. Attorney Bludworth claimed that this document was prepared based upon Jim Landis' personal knowledge of the damage. No backup has ever been submitted by Xavier detailing how these damage categorizations relate to the invoices supplied. Because the invoices were not labeled with any degree of specificity, I cannot, from the invoices, match the breakout with actual costs incurred at specific buildings and floors.

9.

I learned that at a meeting held on November 16, 2006, Landis' employee, Sarah Busch, disclosed, for the first time, that she had prepared a handwritten scope of the damage shortly after Hurricane Katrina. Although Landis had promised that he would provide me with this type of document as far back as September of 2005, this was the first time I learned that such a

4

document had actually been prepared and existed. If this scope document had been provided on a timely basis it would have enabled the adjustment process to proceed much more quickly.

**10.**

That the above and foregoing is true and correct to the best of his knowledge, information and belief.

_____
GEORGE CLAYPOOL

Sworn to and subscribed before me,
this 10 day of September, 2007.

_____
Notary Public



CLAUDIA BUELNA
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 12-28-2010

5