



# DEPARTMENT OF THE ARMY

### BEFORE THE CORPS OF ENGINEERS BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| APPEAL OF | ) | |
| | ) | |
| PITTMAN CONSTRUCTION CO., INC. | ) | ENG BCA No. 6198 |
| | ) | |
| CONTRACT NO. DACW29-93-C-0081 | ) | |

APPEARANCE FOR APPELLANT:   GERALD J. GALLINGHOUSE, ESQ.
NEW ORLEANS, LOUISIANA

APPEARANCES FOR RESPONDENT: FRANK CARR, ESQ.
CHIEF TRIAL ATTORNEY
WASHINGTON, D.C.

DENISE D. FREDERICK, ESQ.
ANTHONY C. OCCHIPINTI, ESQ.
ALAN D. SCHULZ, ESQ.
GOVERNMENT TRIAL ATTORNEYS
NEW ORLEANS, LOUISIANA

## OPINION BY ADMINISTRATIVE JUDGE PAGE

Pittman Construction Company, Inc. (Pittman, the Contractor, or Appellant), was awarded Contract No. DACW29-93-C-0081 by the U.S. Army Corps of Engineers, New Orleans District (the Government or Respondent) in the amount of $2,564,264. The contract was entitled "Lake Ponchartrain LA. & Vicinity, Hurricane Protection Project, High Level Plan, 17th St. Outfall Canal, Flood Protection Improvement Project, Capping of Floodwalls, East Side Improvements, Orleans Parish, LA." The work required Pittman to construct three types of floodwalls along the 17th Street Canal in New Orleans, Louisiana: Type I, Type II, and Type III. During construction of the Type I floodwall, the Contractor experienced problems with movement of the monoliths beyond the tolerance specified by the contract. It is Pittman's contention that the lack of structural integrity of the existing sheet pile around which the concrete was poured, and relative weakness of the soils, permitted the concrete to shift during construction, resulting in monoliths that were not in alignment as required by the contract. The Appellant subsequently filed a claim seeking additional compensation in the amount of $809,659 and a time extension of eighty days. Following the Contracting Officer's denial of its claim, Pittman filed this timely appeal.

On April 4, 1997, with the Board's approval, the parties entered into an agreement to resolve the appeal by means of Alternative Dispute Resolution (ADR), using the Board's nonappealable, Summary Binding Trial procedure. The parties filed position papers setting forth, in their respective

opinions,  the essential facts and issues of the matter.  A pretrial conference was conducted, providing the parties with what is essentially an "early neutral evaluation" in ADR parlance; this gave the parties a limited opportunity to present their positions and to address procedural aspects of the upcoming trial.  The Summary Binding Trial was held on April 21-22, 1997, in New Orleans. Each party provided a four-hour presentation of its case, and was permitted one hour for rebuttal testimony.  Both parties provided well-prepared position papers, and presentations at the ADR proceeding were very well done; this information, added to the thorough record previously submitted, provided the Presiding Judge with a sound basis for deciding the appeal.  Both parties filed final, summary position papers; counsel for both parties are to be commended for their professionalism in their handling of this appeal.  After a period of time occasioned by the serious illness of Appellant's counsel, the Presiding Judge issued an Order stating that this opinion would be rendered on February 17, 1998.

## FINDINGS OF FACT[1]

### Background

1.     The Government issued a solicitation for the subject contract on April 21, 1993; bids from seven contractors were received on June 9, 1993.  Pittman Construction Company, Inc. submitted its bid, 19.3% over the Government estimate, and was awarded the contract.  Notice to proceed was issued by the Government on July 30, 1993; Pittman commenced work on or about August 10, 1993. The original completion date was set for September 3, 1994 (400 calendar days following notice to proceed); time extensions of 44 calendar days were granted through April 30, 1994 and 36 calendar days from May 1, 1994 through September 30, 1994 for unusually severe weather.  (R.4, Tabs C-2, 3; Tab D).

2.     The contract required Pittman to construct three types of floodwalls along the 17th Street Canal in New Orleans, Louisiana.  Sheet piling was already in place, serving as a "skeletal" floodwall and providing a measure of temporary flood protection. The contract work consisted of mobilization and demobilization of plant, clearing, constructing a cofferdam, driving existing steel sheet piles to deeper penetration, and placing a reinforced concrete cap over that piling.  Type III floodwalls have "balanced" legs of equal length on both the landward and floodward sides of the wall.  Type II floodwalls have one leg slightly longer than the other on the floodside.  Type I floodwalls are "unbalanced," with the floodside  leg 3-4 feet longer than the one landside. (*See* Drawing 8 of 16, Contract Plans and Specifications).

3.     Pittman Construction Company, Inc., a small business concern, is an experienced general contractor with more than fifty years of experience in the New Orleans area.  As stated by Mr. A.E. Pittman, company president, this contract was regarded as requiring Pittman to perform construction, not provide design services.

---

[1] Citations to the record, where given, are for illustrations, and are not necessarily exhaustive.  The Findings of Fact and Decision are based upon the record as a whole.

4.     In late 1993, the Contractor began experiencing difficulty in construction of the Type I floodwalls, resulting in movement of the Type I concrete caps (monoliths) beyond specified tolerances and resulting in the Government's rejection of Pittman's work. (Appellant's Position Paper, ¶ 10).

5.     Pittman alleged that, in late November 1993, the Government furnished Pittman copies of some soil boring logs in response to the Contractor's request. Pittman avers that the Government represented at the time that these were complete records relating to the soil and other physical conditions at the project site. (Appellant's Position Paper, ¶ 11). The information was needed by Pittman to prepare its submittal for the cofferdam, as required by the contract. There was no evidence that Pittman ever requested any soils information or other physical data prior to submission of its bid.

6.     Pittman submitted its initial draft plan for the cofferdam in December 1993; this was later revised and then accepted by the Government. The actual cofferdam design was done by Mr. Ed Morphy, a consulting structural engineer; unfortunately, Mr. Morphy passed away not long thereafter. Pittman was thus deprived of the services of the well-regarded engineer who had been privy to, or had made, certain engineering assumptions in designing the cofferdam. The lack of Mr. Morphy's particular knowledge and expertise regarding the cofferdam may have contributed to the difficulties later experienced by Pittman, as it used the cofferdam in attempting to support the concrete formwork during construction.

7.     According to Appellant's Position Paper, Pittman repeatedly requested the Government to provide all soils investigation report and other essential information, by means of written correspondence, in meetings, and during jobsite discussions during the seven-month period from December 1, 1993 through August 30, 1994. Pittman stated that the Government was not forthcoming with the information requested, and that it ultimately resorted to a formal request pursuant to the Freedom of Information Act (FOIA) to obtain the necessary information. (Appellant's Position Paper, ¶ 12). In response, the Government asserted that it provided all information requested on a timely basis. It is the Government's position that Pittman did not request information other than soil borings until it made its FOIA request, at which time the material promptly was furnished. Mr. Ashley, the Government's Area Engineer for the project, testified it was his practice to advise contractors to file an FOIA request where, as here, the documents were not available within his office, and would require several other offices to research their files and compile the information.

8.     On February 8, 1994, the Government issued a Notice of Contract Deficiency regarding the placement of monoliths 18, 20, 22 and 24 as exceeding the allowable tolerances of section C3D-4.2 of the specifications. (R.4, Tab C-4). By letter dated February 16, 1994, the Contractor requested that the monoliths not be removed and claimed the appearance of the monoliths was good enough to permit them to remain in place.

9.      The contract plans for the Type I cap show reinforcing steel (rebar) placed around the
existing floodwall sheet pile and attached by tie wires, but not welded together or connected to the
steel piling by any rigid method or means. In detail, the rebar-to-sheet pile assembly consisted of
a ⅝ inch diameter (#5) rebar (one per sheet pile) passed through a nominal two-inch diameter
handling hole near the top of the sheet pile, and, two rebars per linear foot, each ¾ inch #6 in
diameter (see Drawing 8 of 16), passed through and rested upon a nominal 2" by 3" hole in the sheet
pile near the dry bottom on the protected side. Studs of ⅝ inch in diameter by eight inches long were
tack welded to the lower four feet of the sheet pile on the floodside only and on both sides above that
level, to bond concrete to the sheet pile. Vertical rebars (#6 per linear foot) and horizontal (#4) bars
were placed in a mat parallel to the form. Chairs (spacers) were attached to the vertical rebars with
tie wire. The forms were set up on each side, with the chairs used to hold the space between the
rebars and the form face. The rebar was not so rigidly tied to the sheet pile so as to move the top of
the forms; there was no structural connection (ability to transfer shear and movement) between the
existing sheet pile, the reinforcing steel and the formwork to have transferred any deflection of that
sheet pile to the top of the formwork, and further, to have pushed the formwork out of tolerance.
The steel reinforcement inside the forms lacked the necessary rigidity to transmit forces from the
sheet pile to the formwork.

10.     Pictures and a videotape of the construction operations depicted the formwork support
system. In selecting a method of support for the framework during construction of the Type I
unbalanced concrete caps, Pittman planned for, and first used, a mat on the ground with diagonal
braces for the wall alignment. While the Contractor regarded this as "normal procedure" for such
work, it was not successful. Pittman augmented this procedure and used the mat, plus a steel beam
for struts and diagonal braces, and began welding steel straps to the sheet piling to hold the bottom
of the forms after they separated during the initial pouring of the Type I caps. About mid-April
1994, Pittman began the use of "armor plating," which involved placement of a steel beam against
the cofferdam to brace the concrete forms. That cofferdam had been installed a number of feet
floodside to keep the floodwall base area dry while the existing floodwall sheet pile was being
capped (see Drawing 7 of 17). The cofferdam consisted of steel sheet piles which were from 8-16
feet in length, with an average penetration of only 6 feet; the cofferdam was not installed in a straight
line. To compensate for the unevenness of the cofferdam, Pittman filled in gaps between it and the
I-beam with 2" by 4" wooden shims at irregular spacings. The plans and specifications did not call
for the use of the cofferdam to brace the concrete support system. There was no evidence Pittman
chose the cofferdam as a brace based upon a prior technical analysis, or that it made calculations to
determine the adequacy of the support of the amount of load the cofferdam would have to withstand
as the concrete was poured.

11.     Pittman claimed that movement at the top of the existing sheet pile, when concrete was being
poured, resulted in movement of the whole formwork system toward the floodside. Critical to this
theory were assumptions that the stabilization slabs were "points of fixity," and that the concrete
remained a fluid during the entire pour. However, the stabilization slabs were not restrained, and,
considering the small deflections of the existing sheet pile, the concrete slabs would tend to move
as that sheet pile was loaded. The concrete would not remain a perfect fluid from bottom to top of
the Type I concrete cap. A small increase in the strength of the poured concrete would reduce the

4

lateral pressures it imposed on the sheet pile. The top of the formwork did move out of tolerance, due to the Appellant's failure adequately to design or construct the concrete formwork system, including lack of sufficient bracing. Pittman's reliance upon the cofferdam as the anchorage for the support of the formwork was a poor choice, as it was not strong enough to withstand the pressures Pittman should have anticipated would be exerted during construction. The sheet pile of the cofferdam deflected as the load of the concrete was exerted against it, and uneven support was given to the concrete formwork, resulting in the shifting of the concrete caps during construction. I find the movement of the monoliths to be attributable to the inadequate manner in which Pittman braced the formwork.

12.   On March 21, 1994, the Government issued Notice of Construction Deficiency No. 4 for concrete placement of monolith 4 out of the allowable tolerances of the contract. (R.4, Tab C-7). The Government's letter dated March 25, 1994 directed Pittman to submit a plan to correct the defective concrete monolith. (R.4, Tab C-8). By letter dated May 5, 1994, the Government requested the Contractor to submit a proposal for a credit for the monoliths which were placed out of the specified tolerances. (R.4, Tab C-9). By letter dated May 5, 1994, the Government requested that the Contractor submit a proposal for a credit to the Government for the Type I monoliths where were placed out of the specified tolerances. (R.4, Tab C-10).

13.   By letter dated June 7, 1994, the Government again requested Pittman to submit a credit proposal. (R.4, Tab C-11). The Contractor responded by letter dated June 15, 1994, and requested design calculations on rotation of sheet pile and all soil information used to design the project. (R.4, Tab C-12). Pittman submitted an FOIA request dated June 21, 1994, seeking sheet pile and soil information. (R.4, Tab C-13), and amplified its request by seeking additional information under FOIA by letter dated June 22, 1994 (R.4, Tab C-14). This request concerned soils along the wall that would have been obtained by taking borings. The Government responded to Pittman's FOIA request by letter dated June 22, 1994, advising that while the soil report was being provided, the Government did not have any design calculations on rotation of sheet pile with respect to actual construction conditions. (R.4, Tab C-15). By letter dated July 1, 1994, Pittman indicated that all soil data requested had been received by June 27, 1994, and requested another meeting to discuss the difficulties it had experienced. (R.4, Tab C-16).

14.   By letter dated July 5, 1994, the Government advised that if Pittman intended to assert the existence of a differing site condition, prompt notice should be given to the Government in accordance with the contract specifications, and all claims should be presented in a timely manner. The Government advised Pittman it must provide specific information regarding the nature of conditions different from those shown in the contract, so that the Government might conduct its investigation. (R.4, Tab C-17).

15.   Pittman submitted the Roussel Engineering, Inc. (Roussel) report dated July 5, 1994 by letter of the same date. (R.4, Tab C-18). The report, prepared by Dr. Herbert Roussel, contained extensive calculations detailing his analysis, and a letter summarizing his findings. Dr. Roussel concluded "[T]his soil is so weak and may have been further weakened by the additional driving of the sheet pile that increasing the penetration can not get the deflection within tolerance. After some period

5

of time the soil may regain strength that was lost from driving." Dr. Roussel also criticized the reasonableness of the specified tolerances, asserting it was not appropriate for the floodwall. He noted that driving the sheet pile weakened the soil, and that there had not been sufficient time for the soil to recover strength before concrete was placed. In addition to Dr. Roussel, Pittman also consulted with expert engineer George Stoll.

16.     The Government confirmed receipt of the Roussel report by letter dated July 7, 1994. The Government restated that a differing site conditions claim must identify what site conditions were encountered that were different from those shown in the contract. The letter also took exception to the facts as posited by Pittman in its letters. (R.4, Tab C-19).

17.     By letter  dated July 7, 1994, the Contractor referred to a summary sheet with detailed information regarding the "Sequence of Events Regarding Forming and Placement of Concrete for Monoliths." (R.4, Tab C-20). Pittman's letter also referenced the recent death of Mr. Ed Morphy, a consulting engineer retained by the Contractor to review the "serious concrete wall alignment problems" experienced during construction. Pittman stated that due to Mr. Morphy's death, and the fact that it had not received information from the Government until June 27, 1994, Pittman had been unable to provide a detailed engineering report until July 5, 1994.

18.     The Government responded by letter dated July 11, 1994 to a number of statements in Pittman's letters dated July 1, 5, and 7, 1994, indicating the Government's position that Pittman had erred in these letters. (R.4, Tab C-21). The letter stated that the Government was not aware of any request by Pittman for information beyond soil borings, especially soil reports and design calculations, until June 15, 1994. The Government also disputed Pittman's minutes of the jobsite meeting held on April 20, 1994, and stated that Mr. Duhon, the Government's project engineer, had told Pittman it must advise the Contracting Officer what condition in the field was different from that indicated in the contract so that any claim could be investigated.

19.     The Government, by letter dated July 15, 1994, accepted all Type I floodwalls placed to date, including the twelve monoliths which were placed out of tolerance. The letter advised that while Pittman continued to allege that movement of the permanent sheet pile caused additional effort to place the concrete cap within specified tolerances, it was the Government's contention that Pittman's concrete formwork system was inadequate to support the forms during placement. The letter advised that Pittman had not provided any data to support its position that the permanent sheet piling was moving, or that any such movement would adversely have affected the work had Pittman not chosen to tie its formwork to the sheet pile. (R.4, Tab C-22).

20.     By letter dated July 22, 1994, the Government restated some of the items that had been discussed at a July 12, 1994 meeting with Pittman. (R.4, Tab C-23). Specifically, the Government asserted again that any movement of the sheet pile would not have affected the Contractor's placement effort had it not chosen to tie the formwork to the sheet pile. The Government maintained that the adjustments being made during the concrete placement were necessitated by the inadequate Contractor-provided support system, as substantiated by recorded movements up to two inches in the support I-beam. As a result, the Government contended that Pittman's claim for additional

compensation had no merit. The letter also referenced Mr. Ashley's statement that Pittman would not be held responsible for movement of the completed cap resulting from the eccentric load conditions.

21.     By letter dated July 27, 1994, Pittman expressed disagreement with the Government's position, submitting a second report from Roussel which the Contractor claimed substantiated its position. (R.4, Tab C-24). The second report contained observations made by Dr. Roussel of sheet pile movement during concrete placement. It described in detail the manner in which Pittman braced the formwork, and discussed the formwork support system provided for monoliths 104, 108, and 110. It also referenced a device set up by Dr. Roussel to monitor sheet pile movement using a stylus attached to an arm that was designed to record a change in position of the sheet piling. Dr. Roussel also mentioned that data contained in the logs of the soil borings was necessary to determine the movement of the sheet pile. The report stated, "[I]t is my opinion that unless the soil data was made available during the bid process there would be no way to determine if the movement of the sheet pile would be a problem." [Emphasis added].  Dr. Roussel concluded by making several recommendations regarding the formwork support system to ameliorate the problem.

22.     Government witnesses Buddy Burns, Chester Ashley, and Dennis Duhon questioned the efficacy of Dr. Roussel's test, which was made during adverse weather conditions while a vibrator was being used during pouring the concrete. They felt that either the rain, or the vibration, or both invalidated the readings obtained.

23.     Pittman documented its account of the events since the first monolith was placed out of tolerance in a letter dated August 8, 1994. It alleged that "unforeseen and unanticipated difficulties almost doubled" the planned time and cost to install the monoliths within the specified tolerances. (R.4, Tab C-25). Pittman argued the Government had superior knowledge of actual site conditions and potential construction problems, and that the Government had impliedly warranted the conditions to be encountered in addition to the Government's project design.

24.     By letter dated August 19, 1994, the Government restated its position that Pittman was responsible for constructing the concrete caps within specified tolerances. Pittman was informed that, if it continued to disagree, it should request in writing a final decision by the Contracting Officer, and provided all information necessary to quantify, qualify, and certify the claim. (R.4, Tab C-26). Pittman, by letter dated August 25, 1994, expressed its concern that the Government had not explained the factual and/or legal basis for denying the claim, and advised Pittman would assert in writing a documented claim for payment of additional compensation and request an extension of contract performance time. (R.4, Tab C-27). The Government replied on September 2, 1994, stating its position concerning the merits of the claim had not changed. (R.4, Tab C-28).

25.     The Government informed the Contractor, by letter dated September 6, 1994, that it was behind in its work progress and that 10% of the amount of future progress payments would be withheld until satisfactory progress was achieved. (R.4, Tab C-29).

SEP-22-2005  11:46                                                                                       P.09/22

26.    By letter dated September 7, 1994, the Contractor indicated that it assumed the statements
of the Government's position in the August 19 and September 2, 1994 letters were not to be
considered as a final decision of the Contracting Officer. (R.4, Tab C-30). Pittman wrote again on
September 14, 1994, stating that it intended to submit in writing a claim for equitable monetary
adjustment and a contract time extension. (R.4, Tab C-31). The Government replied by letter dated
September 15, 1994, and stated that a Contracting Officer's Final Decision had not been issued
because one had not been requested. (R.4, Tab C-32).

27.    Pittman submitted its certified claim by letter dated November 7, 1994. The Contractor
sought an equitable adjustment, including (a) additional compensation of at least $809,659 for the
excess costs, expenses, fees, damages and losses sustained and (b) an extension of contract time of
at least 80 days for the suspensions, disruptions, and delays for which the Contractor claimed no
responsibility, occurring between January 12, 1994 through December 23, 1994. The letter asserted
that the status of the project as of September 30, 1994, was at least 77.2% complete according to
invoicing records, and at least 84% complete by October 31, 1994. The letter stated Pittman had
encountered serious problems in placement of the Type I reinforced concrete floodwall caps over
the Government's existing sheet piles, beginning in mid-January, 1994. Pittman stated it had
assumed in its bid it would be able to construct three monoliths each day, but that unexpected
difficulties prevented timely completion. (R.4, Tab C-33).

28.    Pittman sent the Government a second letter dated December 30, 1994, indicated to be a
"supplemental claim." That letter briefly reiterated the essence of the November 7 letter, and
contained specific cost information for the additional compensation sought. (R.4, Tab C-34).

29.    By letter dated January 3, 1995, the Government notified the Contractor that a Contracting
Officer's final decision would be issued on or before March 30, 1995. (R.4, Tab C-35). The
Contracting Officer's Final Decision was issued on March 27, 1995, denying Pittman's claim. The
decision found that Pittman had failed to allege with specificity or provide proof that a differing site
condition existed, and attributed the problems experienced by Pittman to the Contractor's inadequate
formwork support system. It concluded that because responsibility for adequacy for the support
system rested with the Contractor pursuant to the terms of the contract (see sections C3A-4. DESIGN
and C3A-6 INSTALLATION), the Government was not liable. (R.4, Tabs C and D).

30.    The Appellant repeatedly attributed the difficulties it encountered to "latent conditions [that]
resulted in unanticipated and eccentric movement and displacement of the Type I concrete caps
during installation, that were observed by the Corps' representatives as the concrete caps were being
installed." Appellant's Position Paper, ¶ 10. The Government  repeatedly requested that the
Contractor identify with specificity what these "latent conditions" were. During the ADR
proceedings, this "latent condition" was identified by Mr. A.E. Pittman as the movement of the
existing sheet pile which in turn caused the concrete formwork to shift, resulting in the cap being
beyond the acceptable tolerance limit of the completed floodwall.

31.    Pittman filed a notice of appeal with the Board dated April 12, 1995. By mutual agreement,
the parties requested the use of Alternate Dispute Resolution to resolve the matter. The Summary

Binding Trial was held in New Orleans on April 21-22, 1997. At the trial, the parties presented physical and documentary evidence, and the testimony of both fact and expert witnesses. Each party produced credible expert witnesses testifying in support of technical arguments made at the hearing.

32.     Prior to the solicitation, Government witness Philip Napolitano, chief of the structural foundations section, reviewed the plans and specifications used in this contract, primarily from a geotechnical standpoint. He had no concern over the design, or for the need to further address the unbalanced legs of the floodwall during construction. Mr. Napolitano remarked that it wouldn't have mattered if the existing sheet pile had been "tin foil," since it was not intended to contribute structural strength during construction of the floodwall. He believed the effects of any deflection of the sheet pile would be, at most, minuscule. He also did not feel that the soils would be sufficiently weakened by the driving of the sheet pile to have an adverse effect upon construction of the floodwall, particularly if sufficient time was allowed to lapse for the soil to regain strength. While Mr. Napolitano was involved in the review and approval of Pittman's submittals, he testified the cofferdam submittal did not alert the Government that Pittman intended to use the cofferdam to provide support to the concrete formwork during construction.

33.     Mr. Robert Chautin, project superintendent for the T.L. James Company, testified regarding his firm's successful construction of a similar, unbalanced floodwall at the nearby Orleans Avenue Canal project. That work took place the same time as this contract. Mr. Chautin acknowledged that some problems were initially encountered in providing adequate support to the concrete formwork when pouring the concrete caps, but that these were addressed within a short time without the need for extraordinary construction means, delay or expense. Any weakness in the soils occasioned by driving the sheet pile was eliminated by T.L. James' waiting another week to place concrete. T.L. James was able to meet a construction tolerance of  ¼" in 10 feet, demonstrating that the requirements placed on Pittman could be achieved.

34.     Mr. Dan Marsalone, chief of the Government's construction division during the contract, testified it was customary to require the contractor to design the bracing system for concrete formwork. This permitted the contractor maximum flexibility in determining its construction methods. Mr. Marsalone demonstrated that the rebar used in Pittman's concrete formwork system was free to rotate on the existing sheet piling, making it unable to cause the rotation of anything else, i.e., transfer movement through the rebar.

35.     Mr. Carl Guggenheimer, chief of the Government's flood control section, testified that unbalanced concrete caps were used for this project due to field conditions. These had been used previously elsewhere with success. It was his opinion that it would be important for a prospective contractor to take the unbalanced loading into account in designing its formwork, and in making its bid. Mr. Guggenheimer explained the difference between the design phase and the construction phase of the floodwall projects. The design phase, for which the Government was responsible, accounts for the hurricane loading condition, i.e., how the completed floodwall will act under "worst conditions." The construction phase was the Contractor's responsibility. However, while Pittman was not responsible for design of the Type I cap itself, it was responsible for design and installation of those items required by its own construction procedures, such as the cofferdam, formwork,

support, bracing, etc. Mr. Guggenheimer explained that because the existing sheet pile was designed to meet the worst case scenario (hurricane loading) with a minimum of deflection, that deflection still would be greater than any deflection of a properly braced sheet pile during placement of the concrete.

36.    Mr. Guggenheimer also clarified the purpose of the submittal review done by the Government. He testified that his office approved formwork shop drawings, after a cursory review to find obvious problems. A check was made of pouring rates and adequacy of the form, and a determination is made regarding any gross inadequacies of the Contractor's design. He testified that his office did not review and approve the adequacy of the formwork system, as that was Pittman's responsibility. As provided by the contract, approval of shop drawings does not relieve the Contractor from responsibility for errors or omissions in such drawings or from complying with requirements of the contract. (Exh. G-43, p.2).

37.    Dr. Lawrence Gilbert, a geotechnical expert relied upon by the Government, provided testimony regarding the Contractor's claim. One of the important, underlying differences of his opinion from Dr. Roussel's, was his belief that the problems arose from Pittman's failure to provide adequate bracing and concrete formwork support. Dr. Roussel had accepted the premise of Pittman that it was the Government that was responsible for design and installation of the formwork, and focused his criticism upon the weakness of the soils, the pressure exerted by the fluid concrete against the sheet pile, and the lack of structural strength of the sheet pile in accounting for the problems encountered. Dr. Gilbert's premise is consistent with my legal conclusion. Therefore, I have relied upon Dr. Gilbert's expert opinion and rejected the premise urged upon Dr. Roussel by Pittman.

*Relevant Provisions of the Contract*

38.    Contract Section C3A-FORMWORK FOR CONCRETE places responsibility upon the Contractor for the design and engineering, and construction of the concrete formwork as follows:

> C3A-4. DESIGN. The design and engineering of the formwork, as well as its construction, shall be the responsibility of the Contractor. The submittals shall include the member properties, allowable material stresses and form dimensions. The computations shall include the design of individual members for stress and deflection lead diagrams are also required. The formwork shall be designed for loads, lateral pressure and allowable stresses in accordance with Chapter 2 of ACI Standard 347R. Forms shall have sufficient strength to withstand the pressure resulting from placement and vibration of the concrete and shall have sufficient rigidity to maintain specified tolerances. For Class A or Class B finish, the design shall be made to limit deflection of facing material between studs as well as deflection of studs and walers to 0.0025 times the span. [Emphasis added].

> C3A-6. INSTALLATION. Forms shall be sealed to be mortar tight, properly aligned and adequately supported to produce concrete surfaces meeting the surface

requirements of Section C3D-4.3 and meeting the construction tolerances of C3D-4.2. . . .

                    *  *  *      *  *  *      *  *  *

39.    Contract Section C3D -  CAST-IN-PLACE STRUCTURAL CONCRETE covers the materials, techniques, and workmanship for placing cast-in-place structural concrete.  It provides in relevant part:

        C3D-4.2 <u>Construction Tolerances</u>.  Variation in alignment, grade, and dimensions of the structures from the established alignment, grade, and dimensions shown on the drawings shall be within the tolerance specified in the following tables:

                    Table 1.

            CONSTRUCTION TOLERANCES FOR
           REINFORCED CONCRETE STRUCTURES

(1) Variations from the plumb:     In any 10 feet of length. . . .   1/4 inch
a.  In the lines and surfaces        Maximum for entire length . . .  1 inch
    of columns, piers, and
    walls and in arrises

                *  *  *     *  *  *     *  *  *

40.    Potential bidders were advised of the availability of physical site data in paragraph H-6, later incorporated into the contract:

        H-6 <u>PHYSICAL DATA (FAR 52.236-4 - 1984 APR)</u>.  Data and information furnished or referred to below is for the Contractor's information.  The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.

        a.  The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys and borings.

        b. <u>Field notes, representative soil samples, field and laboratory test results, and other data on which this information is based are available at U.S. Army Engineer District, New Orleans, Corps of Engineers, Attn: CELMN-ED, Foot of Prytania Street, P.O. Box 60267, New Orleans, Louisiana 70160-0267, and access thereto may be had upon request.</u> [Emphasis added].

              *  *  *     *  *  *     *  *  *

41.    Contract clause I-72, Differing Site Conditions, requires in relevant part:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized at inhering in work of the character provided for in the contract.

   \* \* \*   \* \* \*   \* \* \*

42. Contract clause I-91, Inspection of Construction, requires in relevant part:

  (a) Definition.  "Work" includes, but is not limited to, materials, workmanship, and manufacture and fabrication of components.

   \* \* \*   \* \* \*   \* \* \*

  (c) Government inspections and tests are for the sole benefit of the Government and do not --

   \* \* \*   \* \* \*   \* \* \*

  (3) Constitute or imply acceptance;

   \* \* \*   \* \* \*   \* \* \*

## DECISION

### Jurisdiction

The Board has jurisdiction over this appeal pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§601-613 and by the terms of the contract itself. By agreement of the parties, this non-appealable decision is issued by the Presiding Judge, acting on behalf of the Board.

### Positions of the Parties

The Appellant alleges, among other arguments, that (1) the Government had superior knowledge regarding the construction site which it wrongfully withheld from the Contractor; (2) Pittman encountered soils that materially differed from those anticipated; (3) the Government failed timely to provide information to Pittman and did not cooperate when concerns were raised; and (4) the Government-furnished plans and specifications were defective.  As asserted through the testimony of Mr. A.E. Pittman, the alleged defect is that the floodwall could not be constructed within the tolerances required by the Government using the means contemplated by Pittman, due to the lack of strength of the existing sheet piling and soils. Pittman raised several legal theories, including a differing site condition, and the Government's assumption of responsibility by its approval of Pittman's submittals.  The Respondent counters that (1) the Contractor has failed timely to allege with specificity any differing site condition; (2) Pittman failed to request the physical data available for the site that was offered to all bidders, and such failure contributed to or was the cause of the problems encountered; (3) the plans and specifications were adequate and were not defective; (4) the Government did not fail to cooperate with the Contractor, merely because it regarded its claim as without merit; (5) the failure to achieve the required tolerances for the constructed floodwall was the result of inadequate concrete formwork and support, which was the responsibility of the

Contractor pursuant to the contract; (6) the rotation of the formwork resulted from the foreseeable unbalanced load of concrete and the Contractor's inadequate support of the forms; and (7) the Government's approval of Pittman's submittals did not warrant the success of Pittman's concrete formwork system. In summary, the Government asserts that because Pittman was responsible for determining the means, method, and sequence of project construction, and failed adequately to do so, there is no merit to the appeal.

### Discussion

Pittman has espoused several theories to support its contention that any problem causing the Type I floodwalls to be out of tolerance lies with the Government, each discussed separately below. These theories have been fully considered; they have been, however, rejected for the reasons articulated. I find that the Government successfully demonstrated that the Type I floodwall could be constructed using well-planned construction means and methods that were neither extraordinary nor unreasonably costly. Pittman failed to prove that the difficulties it encountered were attributable to anything other than its own failure adequately to design and install concrete formwork to support the construction of the Type I floodwalls. Pittman did not understand its contractual obligation to ensure that the concrete formwork and support system it provided would address the stresses imposed by the unbalanced legs of the Type I floodwall. Pittman did not prove that it reasonably anticipated the requirements of, or provided for, constructing the unbalanced monoliths and the unequal loads that were clearly delineated by the plans and specifications provided prior to bid. Pittman never established the reasonableness of its approach for bracing the formwork, or that any deflection of the existing sheet pile resulted in the forms being out of tolerance. The Contractor's inability to construct the monoliths in the manner it anticipated is not conclusive of Government fault. Pittman's position is further controverted by the success of another contractor contemporaneously performing similar work nearby that successfully braced the concrete forms, and achieved a stringent tolerance. Although Pittman asserted that the soil conditions were different from those it anticipated, it never established that it availed itself of or relied upon the Government's soils data in formulating its bid, or exactly how that actual conditions encountered "differed" from those reasonably anticipated. While Pittman also complained that the Government was both uncooperative and dilatory in providing certain essential soils information, I do not find that to be the case, or the cause of Pittman's problems. Having failed timely to request allegedly vital information made readily available prior to bid by the Government, Pittman cannot sustain its charge that the Government withheld superior knowledge.

### 1. Contract Interpretation

This appeal is primarily a matter of contract interpretation. The central issue to be determined here is, which party had the responsibility for designing and constructing the concrete formwork and support system? The Board interprets contract provisions according to their plain, ordinary meaning. Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 351 F.2d 972 (1965). These guidelines are followed in interpreting a contract:

When interpreting the language of a contract, a court [or board] must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless [citations omitted]. Otherwise stated, in ascertaining the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions" [citations omitted]. The language of a contract, moreover, must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the circumstances."

Benju Corporation, ASBCA Nos. 43648 et al., 97-2 BCA ¶ 29,274 at p. 145,654 quoting M.A. Mortenson Co. v. United States, 29 Fed. Cl. 82, 96 (1993).

I find that the contract unambiguously placed the burden upon Pittman, as the contractor, to design and provide a concrete formwork support system adequate to permit construction of the project floodwalls. Contract Section C3A-FORMWORK FOR CONCRETE clearly allocates that responsibility to Pittman as follows:

C3A-4. DESIGN. The design and engineering of the formwork, as well as its construction, shall be the responsibility of the Contractor. The submittals shall include the member properties, allowable material stresses and form dimensions. The computations shall include the design of individual members for stress and deflection lead diagrams are also required. The formwork shall be designed for loads, lateral pressure and allowable stresses in accordance with Chapter 2 of ACI Standard 347R. Forms shall have sufficient strength to withstand the pressure resulting from placement and vibration of the concrete and shall have sufficient rigidity to maintain specified tolerances. For Class A or Class B finish, the design shall be made to limit deflection of facing material between studs as well as deflection of studs and walers to 0.0025 times the span. [Emphasis added].

Although Pittman is largely correct in its repeated assertions that its responsibility under the contract was as builder, not designer, of the project, there was one area of design that was made the specific responsibility of Pittman: concrete formwork. This requirement is a standard industry practice, described in ACI 347 as referenced in the contract. (Exh. G-29, p.3; Exh. G-30). G&C Enterprises, Inc., DOT BCA No. 1736, 89-1 BCA ¶ 21,556. It was the inadequacy of the concrete formwork system, particularly the manner in which Pittman attempted to brace and support the effort, that caused the problems encountered resulting in the Type I monoliths being out of tolerance, and resulted in contract delay and additional expense.

*2. Alleged Differing Site Condition*

During contract administration, and as part of its continuing argument in the appeal, Pittman asserted it had encountered a differing site condition that caused the problems in constructing the Type I floodwalls. However, despite repeated requests by the Government, Pittman never clearly identified what that site condition was, or how it differed from that which should have been

reasonably anticipated. As discussed in <u>Gulf Coast Trailing Co.,</u> ENG BCA No. 6050, 96-1 BCA ¶ 28,217, Pittman must prove the following by a preponderance of the evidence to prevail on the basis of a differing site condition:

> (1) subsurface or latent conditions indicated in the contract differed materially from those actually encountered; (2) it acted as a reasonable contractor in interpreting the contract indications; (3) it reasonably relied on the contract indications when formulating its offer; (4) the conditions encountered were not reasonably foreseeable based on all the information available to it at the time of bidding; and (5) the materially differing conditions caused it injury because of the variation between the expected and encountered conditions. (citations omitted).

*Id.* at p. 140,874.

The key to proving a differing site condition claim lies in the Appellant's being able show how site conditions reasonably anticipated, based upon reliance upon the contract, differed from those conditions actually encountered. This requires an appellant to show *specific* contract representations that were at variance to *actual* subsurface or latent *site* conditions. A differing site condition is a well-defined legal argument that requires a contractor to show more than that it was unable to prosecute the work as planned. Pittman must prove that it took into account all salient information made available by the Government; how it reasonably relied upon that information in planning its construction means, methods and sequencing; that the Government's information was in error; and that the Government's error was the cause of the problems that resulted. <u>Steele Contractors, Inc.,</u> ENG BCA No. 6043, 95-2 BCA ¶ 27,653;  <u>GAI Consultants, Inc.,</u> ENG BCA No. 6030, 95-2 BCA ¶ 27,620.

Pittman has failed to prove any, much less all, of the above. Pittman has not asserted any "subsurface or latent" site condition differing from information made available at bid. Although Pittman alleges that the soils weakened more than anticipated after pile was driven, it did not prove what it should have reasonably anticipated, or that some extent of temporary soil liquefaction should not have been expected or accounted for in planning its construction methods. After problems were encountered, it complained for the first time of the lack of soils information; its expert, Dr. Roussel, rightly pointed out that soil data was necessary for planning and executing a construction job of this nature. The contract solicitation advised prospective bidders that physical data was available upon request. Pittman never asked for that data prior to bid, was thus unable to have considered it in formulating its construction approach or bid, and has not proved that such information was in error or was the root of the problem. Pittman's assertion that there was a differing site condition fails for want of proof. Mere allegations that are unsupported by proof cannot be sustained. <u>Cottrell Engineering Corp.,</u> ENG BCA No. 6064, 97-1 BCA ¶ 28,852 and <u>Indelsa, S.A.,</u> ENG BCA No. PCC-117, 95-2 BCA ¶27,633.

## 2. Alleged Defective Specifications

During the ADR proceedings, Mr. A.E. Pittman alluded to the unsuitability of the floodwall design for construction; it was not clear whether this was intended as a separate argument in support of the Appellant's position, or an explanation of the alleged differing site condition. The suggestion of a defective specification is worthy of consideration as a legal argument. The burden of proving a claim of defective specifications is on the appellant. <u>Trescon Corporation,</u> ENG BCA No. 5253, 88-3 BCA ¶ 21,163.

Admitting that the completed floodwall was adequate for the purpose ultimately intended, i.e., to provide protection from floodwaters, Mr. Pittman asserted that the sheet piling around which the concrete walls was poured was inadequate from a structural standpoint, and that the resulting deflection when the concrete was poured caused the concrete caps to be out of alignment. If it is Pittman's argument that the Government's plans and specifications contain a latent defect preventing the project from being successfully constructed, that argument fails for want of proof. To prevail on a claim of defective specifications, the Appellant must prove by a preponderance of the evidence that the contract specifications were defective; that it performed work in accordance with such specifications; and that it suffered damages as a direct and proximate result thereof. <u>Better Roads of Lake Placid, Inc.,</u> ASBCA No. 39,133, 93-2 BCA ¶ 25,580.

Pittman did not assert any specific contract provisions as defective. It did criticize the instability of the existing sheet pile around which the concrete was poured, and charged that the flimsiness of the sheet pile was such that it deflected when the concrete caps were poured, causing the formwork to shift, and resulting in the caps being out of tolerance. The Government produced credible evidence that any movement of the sheet pile did not adversely affect the formwork, or cause the caps to shift. Even if the sheet pile could have contributed to the problems encountered, Pittman did not establish that a reasonable contractor should not have taken the structural strength (or lack thereof) of the sheet pile into account when formulating its construction techniques for placing concrete, or that it was reasonable for Pittman to have expected the sheet pile to have contributed to formwork stability to the extent that it did.

Pittman introduced credible testimony of several expert witnesses who described the difficulty of constructing an unbalanced floodwall. Some of the possible techniques discussed were very expensive; the inclusion of such high costs might have put Pittman's bid at a competitive disadvantage. What Pittman failed to prove was that its contemplated approach was reasonable, or that it adequately took into account its responsibility for design and installation of the concrete formwork, including requisite bracing.

Pittman's argument that the unbalanced floodwall design was defective because it could not be reasonably constructed is undermined by the testimony of another contractor. Mr. Robert Chautin, project superintendent for the T.L. James Company, testified regarding his firm's successful construction of a similar, unbalanced floodwall at the nearby Orleans Avenue Canal project. That work took place at the same time of this contract. Mr. Chautin acknowledged that some problems were initially encountered, but that these were readily addressed within a short time without the need

for extraordinary construction means or cost. T.L. James was able to meet a construction tolerance of ¼" in 10 feet, as required of Pittman.

### 3. Commercial Impracticability

The legal argument of commercial impracticability is raised by Mr. Pittman's testimony that the floodwall design could not be readily constructed, and by testimony of Appellant's experts that certain construction techniques, although likely to be successful, would be inordinately expensive. To establish commercial impracticability, a contractor need not demonstrate literal impossibility; it must show only that the object of the contract could not be accomplished without commercially unacceptable costs and time input far beyond that contemplated in the contract. GAI Consultants, Inc., supra. Whether performance of specified work is commercially impracticable is initially a question of fact. Maxwell Dynamometer Co. v. United States, 181 Ct. Cl. 607, 386 F.2d 855 (1967). The Appellant must also prove that any failure to perform was not the result of its own inadequacy, but must relate to the commercial impracticability imposed by the work specified in the contract. Blount Bros. Corp. v. United States, 872 F.2d 1003 (Fed. Cir. 1989); Steele Contractors, Inc., supra.

Pittman has failed to establish any of these. While it was not controverted that Pittman's construction methods failed to achieve necessary tolerance, or that additional time and expense were required to complete the job, that is insufficient to establish a claim of commercial impracticability. It was incumbent upon Pittman to establish that it reasonably planned its construction techniques adequately to address the unequal loads occasioned by the Type I floodwall. Pittman could not do so. Pittman's underlying assumption that it had no design responsibility under the contract apparently led it erroneously to assume the Government somehow warranted Pittman's construction techniques. While the contract contained certain design specifications which made the Government responsible for the overall success of the floodwall to function as intended, there was an exception made for concrete formwork. Specification §C3A-4 and 6 placed the responsibility for successful design, engineering and construction of the concrete formwork squarely upon Pittman, including the duty to ensure the formwork was adequately braced so the concrete caps would meet the prescribed tolerances. A.A. Conte & Son, ENG BCA Nos. 6104, 6227, 96-2 BCA ¶ 28,581. Pittman's failure to achieve the rate it anticipated at bid was not of the Government's making. That performance of the contract may have been unprofitable for the Contractor does not alone equate to commercial impracticability. Boozer, Wharton & Ziegler, Inc., ASBCA No. 24529, 81-1 BCA ¶ 14,910 at p. 73,746. Pittman is solely responsible for its choice of formwork support, the difficulties experienced in construction, and increased costs of performance. Lionsgate Corp., ENG BCA Nos. 5391, 5409, 5446, 91-1 BCA ¶ 23,368 at p. 117,244.

### 4. Superior Knowledge

Pittman has alleged that the Government, as owner agency and engineer, had superior knowledge regarding the conditions at the construction site. Pittman suggests that the Government knew or should have known that:

[t]he existing sheet pile and the soils in which they were embedded were not of sufficient strength, rigidity, and stability (1) to withstand the pressure resulting from placement and vibration of the 257 unbalanced Type I concrete floodwall caps (monoliths), or (2) to maintain the strict construction tolerances specified in Section C3D-4.2 during and after installation, even though [Pittman's] formwork was designed, engineered, approved and installed in compliance with the Corps' contract documents and direction.

Appellant's Position Paper, p. 8.

To prevail, Pittman must demonstrate that (1) it undertook performance without knowledge vital to that performance; (2) the Government possessed such knowledge and knew that it was not shared by the contractor; and (3) that the contract either misled the contractor or did not put the contractor on notice to inquire. Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F.2d 774 (1963); Maitland Brothers Co., ENG BCA No. 5782, 94-1 BCA ¶ 26,473.

The two items for which Pittman alleges the Government unreasonably withheld its superior knowledge are soils conditions and the structural integrity of the existing sheet piling, which would be at the center of the floodwall when it was surrounded by the finished concrete caps. Both of these have been discussed sufficiently elsewhere in this opinion to conclude that Pittman has failed to prove the Government unreasonably withheld soils information, or that properties of the sheet pile were essential. Contract paragraph H-6 Physical Data alerted bidders that information, including field notes, representative soil samples, field and laboratory test results, and other data would be made available upon request to prospective bidders. Pittman never sought that information, until after it had encountered problems constructing the Type I floodwalls. Pittman cannot complain that the Government withheld essential information that it had in fact made freely available.

Pittman's assertion that the Government withheld essential information about the "strength, rigidity and stability" of the sheet pile also fails, but for a different reason. Pittman failed to prove that such detailed knowledge of the sheet pile was essential to the ability to perform in accordance with the contract, or that it was unreasonable for it to have taken loading during construction into account in designing the concrete formwork system. Had Pittman been able to prove that the contract made the Government responsible for the successful design and installation of concrete formwork, including bracing, it would have met at least a part of its burden of proof. It could not do so, for the contract was unequivocal in placing that responsibility upon the contractor. Pittman should have understood this from the outset, as it is presumed to have read the contract it signed and is bound by same. Schoeffel v. United States, 193 Ct. Cl. 923, 934-35 (1971). Part of this responsibility, as a well understood and accepted principle of engineering, is accounting for loads imposed during construction, especially the placement of concrete for the unbalanced Type I caps required here. While I am not unmindful that contractors often give priority to technical requirements in estimating bids of planning construction methods, this cannot be done to the exclusion of understanding the legal obligations it assumes under the contract. Pittman had only 48 days between issuance of the solicitation and submittal of its bid, which it asserted was a very short time for such a job. This short time allotted to a contractor to fully understand all required by the

contract, and plan and price its work, is a frequent and sometimes justified criticism of the government contracting process. Ultimately though, it becomes the bidder's decision to determine if the risks that can result from preparing a bid more quickly than it thinks reasonable are outweighed by its desire to obtain that work.

### 5. Duty to Cooperate

The Appellant has alleged that the Government failed in its duty to cooperate in administering the contract, thereby unreasonably delaying its progress and failing to approve work that did not meet the contract's strict tolerances. Pittman's specific allegations include that (a) the Government was "unreasonable, arbitrary and unfair" in requiring the contractor to adhere to the tolerances required by the contract; and (b) the Government's failure timely to provide all soils information requested during contract performance. The affirmative duty of the Government to cooperate with a contractor was discussed in Keno and Sons Constr. Co., ENG BCA No. 5837, 95-2 BCA ¶ 27,687, where it was determined that the Government failed to reasonably cooperate with the contractor in devising an acceptable performance method. In Keno, the Government rejected the contractor's efficient, permissible method of performance and did not disclose the underlying basis for rejection. Had that key information been made available to the contractor in advance, it would have known that there were additional factors that had to be addressed before a method of performance could be decided upon.

The logic of Pittman's assertion that the Government failed to cooperate by requiring adherence with the tolerances specified by the contract hinges upon a finding that the contract plans and specifications were defective, or that meeting the contract requirements was commercially impracticable. Both of these contentions have been fully considered and rejected, as is Pittman's assertion that the Government failed to cooperate on this point. In any event, it was uncontroverted that the Government permitted certain out-of-tolerance caps to remain without requiring replacement, and that the Government did not take a credit for the noncomplying work, evidencing cooperation on the part of the Government. I accept as reasonable the Government's argument that permitting the contractor to construct a floodwall that was out of true and appeared to undulate is not conducive to instilling public confidence in the efficacy of the much-needed and expensive floodwall. It was not appropriate to expect the Government to abdicate the requirement of a reasonably straight floodwall; the Government is entitled to compliance with the contract's plans and specifications. Granite Construction Co. v. United States, 962 F.2d 998 (Fed. Cir. 1992), cert. denied, 113 S.Ct. 965 (1993).

Pittman's other contention regarding the Government's alleged breach of duty to cooperate lies in the provision of information concerning soils at the site. Pittman began asking for that information after it experienced problems with Type I floodwalls. As it did not know exactly what the Government possessed, or exactly what it needed, it repeated and refined its request over a period of a few months. The Government provided information on hand within the office to whom the request was directed, but instructed Pittman to file a request pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552 (1994), which the Government answered.

After examining the record, I conclude the Government did not breach its duty to cooperate with the Contractor. While the Government did not respond to Pittman's initial request by providing all information it had within the possession of its collective offices, I am satisfied reasonable efforts were made to comply with the request as made. That the Government failed to provide all Pittman wanted or needed seems more to have been a matter of inadequate communication between the parties, and lack of ready availability of all information to the office within which the request was made. The Government's later instruction to Pittman to file a formal FOIA request was viewed by the contractor, itself proud of its long history of successful and harmonious government contracts, more as a bureaucratic hindrance than a genuinely helpful response. It is unfortunate that the instruction was perceived as an affront, rather than a vehicle intended to facilitate the release of information that would have to be obtained from a number of Government sources, including several not involved with administration of this contract.

### 6. The Government's Approval of Pittman's Submittals

Pittman's claim and subsequent arguments suggest that the Government, by its approval of the contractor's submittals, approved of the construction methods proposed and therefore must accept responsibility for resulting problems. I reject this contention, as it is contrary to specific requirements of this contract as well as legal precedent. The approval of the drawings does not shift the responsibility for formwork design and support from the Contractor to the Government. Brinderson Corporation, ASBCA No. 30938, 86-3 BCA ¶ 19,107. Neither does acceptance of the work relieve the Contractor of compliance with the contract provisions. G&C Enterprises, Inc., DOT BCA No. 1736, 89-1 BCA ¶ 21,556. As stated by this Board in Acmat Corporation, ENG BCA No. PCC-100, et. al., 95-2 BCA 27,742, at p. 138,312 (aff'd, Acmat Corporation v. Panama Canal Commission, 132 F.3d 51 (Fed. Cir.) (Table)):

> As a general rule, routine Government approval of contractor submittals . . . does not constitute a waiver of contract requirements. This is particularly true where, as here, there is no express indication in the submittal that the contractor was requesting a deviation, change or waiver. See, e.g., Community Science Technology Corp., ASBCA No. 20244, 77-1 BCA ¶ 12,352.

Pittman cannot place responsibility upon the Government for its poor choices in supporting the concrete formwork because the Government reviewed submittals pertaining to planned work. It is Pittman, not the Government, that was responsible for determining the means, methods, and sequencing of construction of the Type I floodwalls, and is accountable for difficulties encountered as a result of its failure adequately to brace the concrete during construction.

### Conclusion

Pittman has failed to meet its burden of proving, by a preponderance of the evidence, that it is entitled to relief in this appeal. I find Pittman has failed to establish that, had it timely requested the physical data information made available to it during the bidding process, it could not have avoided the difficulties experienced. The importance of this data in anticipating any potential

problems, a necessary step to properly designing and installing the formwork, is emphasized by Pittman's expert Dr. Roussel, who stated "[I]t is my opinion that unless the soil data was made available during the bid process there would be no way to determine if the movement of the sheet pile would be a problem." *See* Dr. Roussel's report, Tab C-18. The physical data *was* made available to Pittman, but was never requested at the appropriate time, prior to bid. Pittman's statement that it regarded itself only as a general contractor having no responsibility for the design of the project ignores a key contractual requirement placed upon the contractor: the design, engineering, and construction of the formwork and attendant support system. While not responsible for the overall design of the project, Pittman was responsible for this element. Having failed to prudently request or review the physical data made available when forming its bid, or to ensure that the method of bracing the concrete formwork was adequate, and having failed to prove how any deflection of the existing sheet pile could not have reasonably been accommodated by a proper formwork support system, or that the sheet piling contributed to the problems encountered, Pittman cannot recover the additional time and expense necessary to correct the problems of its own making. While Pittman attempts to place blame upon the structural integrity of the Government-furnished sheet pile, it has failed to establish that the relative strength of the sheet pile was a factor it could not or should not have compensated for by properly supported formwork. Pittman has failed to prove the Government breached its duty to cooperate; among other actions, the Government's acceptance of floodwalls that were out-of-tolerance, without insisting upon a credit, evidences its willingness to work with the contractor.

Each of the legal theories propounded by Pittman to support its contention that the additional costs should be borne by the Government (including differing site condition, defective specifications, superior knowledge, an alleged breach of the Government's duty to cooperate, and that the Government assumed responsibility for successful use of the cofferdam by approving certain submittals) carries with it an essential element of the burden of proof that Pittman has not met. This Appeal is DENIED in its entirety.

Date: February 17, 1998

REBA PAGE
Administrative Judge
Member, Corps of Engineers
Board of Contract Appeals