STATE OF LOUISIANA
FOURTH CIRCUIT COURT OF APPEAL

DOCKET NO. 2007-CA-0757

JOSEPH SHER,
Plaintiff-Appellee

VERSUS

LAFAYETTE INSURANCE COMPANY,
Defendants-Appellants

CIVIL APPEAL FROM THE JUDGMENT OF THE
CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
CASE NO. 06-9276, DIVISION "G", SECTION "11"
THE HONORABLE ROBIN GIARRUSSO, PRESIDING

APPELLEES' ORIGINAL BRIEF AND
BRIEF IN SUPPORT OF ANSWER TO APPEAL

JAMES M. GARNER, #19589,
DARNELL BLUDWORTH #18801
TIMOTHY B. FRANCIS, #14973
SHER GARNER CAHILL RICHTER
  KLEIN & HILBERT, L.L.C.
909 Poydras Street, Suite 2800
New Orleans, LA 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
jgarner@shergarner.com
COUNSEL FOR PLAINTIFF/APPELLEE
JOSEPH SHER



EXHIBIT
1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . xii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   I.   GENERAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   II.  FACTS AND BACKGROUND RELATED TO TRIAL AND
       VERDICTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   III. FACTS AND BACKGROUND RELATED TO "FLOOD
       EXCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

LAW AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   I.   STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      A.   Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      B.   Damages Award by Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      C.   Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 14

   II.  THE JURY FINDINGS WERE SUPPORTED BY THE
       EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      A.   The Jury Properly Found that Lafayette Violated the Bad Faith
          Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          1.  The Jury Correctly Found that Lafayette was Arbitrary and
              Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          2.  There was Evidence to Support the Jury's Finding of
              Failure to Initiate Loss Adjustment within 30 Days of
              Notice of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          3.  Whether "Flood" Claim Was Disputed in Good Faith Is
              Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          4.  Whether the Business Personal Property Claim was
              Disputed in Good Faith is Irrelevant . . . . . . . . . . . . . . 17
          5.  The Rents were not Disputed in Good Faith . . . . . . . . 17
          6.  The Building Damages were not Disputed in
              Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      B.   The Jury Verdict on Lost Rents was Supported by
          the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      C.   The Jury Award for Physical Damage is Supported by The
          Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          1.  Overhead and Profit was Appropriate . . . . . . . . . . . . . 19
          2.  The Award of Damages Related to "Water Hammer" is
              Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          3.  Mr. Carubba Testified to Structural Damage . . . . . . . . 20
          4.  The Jury Award Did Not Exceed Amounts Established by
              Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      D.   Lafayette is not Entitled to a Credit . . . . . . . . . . . . . . . . . . 21

III.   TRIAL COURT RULINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   A.   The Trial Court Properly Prohibited Lafayette from asserting
      Policy Exclusions/Limitations That Were Not Properly Pled  21
   B.   The Jury Properly Awarded Mr. Sher $31,577.00 in Contents 24
   C.   The Trial Court Properly Awarded Attorneys' Fees and Costs 26
      1.   Mr. Sher is Entitled to Recover Attorneys' Fees and Costs
         Pursuant to Louisiana Revised Statutes 22:658 and
         22:1220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         a.   The Jury's Finding That Lafayette Acted in Bad
            Faith Is Not Manifestly Erroneous . . . . . . . . . . 27
         b.   Lafayette Waived the Argument That the Old
            Version of §658 Applies by Submitting Joint Jury
            Instruction No. 34 . . . . . . . . . . . . . . . . . . . . . . . 27
         c.   The current version of 22:658 applies to
            the present case . . . . . . . . . . . . . . . . . . . . . . . . . 28
            i.   Assessing the Temporal Effect of Laws . 28
            ii.  Legislative History and Historical Notes
                Establish Legislature's Intent to Apply Act
                813 Retroactively . . . . . . . . . . . . . . . . . . 29
            iii. Petition for Damages Constituted a
                Proof of Loss . . . . . . . . . . . . . . . . . . . . . 31
            iv.  Section 658 Applies to Lafayette's Post-
                Lawsuit Conduct . . . . . . . . . . . . . . . . . . 33
      2.   Mr. Sher is also entitled to recover attorneys' fees and
         costs pursuant to Louisiana Civil Code article 1997 . . 35
      3.   The Amount of Attorneys' Fees is More Than Reasonable
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   D.   The Trial Court Properly Awarded Legal Interest on Penalties and
      Attorneys' Fees From the Date of Judicial Demand . . . . . . . 38
   E.   The Trial Court Properly Awarded Costs Pursuant to La. C.C.P.
      Article 970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   F.   No Offset for NFIP is Appropriate . . . . . . . . . . . . . . . . . . . . . 40
      1.   No Evidence of Payments from NFIP was Introduced or
         Proffered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      2.   NFIP is a Collateral Source that Should Not be Deducted
         from the Jury Award . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
         a.   The Collateral-Source Rule Applies to Breach-of-
            Contract Claims . . . . . . . . . . . . . . . . . . . . . . . . 41
         b.   The Collateral Source Rule Applies to
            Mr. Sher's Claims . . . . . . . . . . . . . . . . . . . . . . . 42
         c.   Lafayette is Not Entitled to a Collateral Source
            Credit or Offset . . . . . . . . . . . . . . . . . . . . . . . . . 43
            i.   Courts Have Prohibited Insurers From Using
                Offset Principles to Obtain a Windfall . . 44
            ii.  There is No Windfall for Mr. Sher . . . . . 44

IV.   THE DISTRICT COURT CORRECTLY GRANTED PARTIAL
   SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   A.   Principles of Insurance Policy Interpretation . . . . . . . . . . . . . 45
   B.   The Trial Court Properly Held That the Term "Flood"

           is Ambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C.    Lafayette's Argument that there are No Natural Floods
       is Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

D.    The Cases Cited by Lafayette Are Distinguishable . . . . . . . . 51

E.    Judge Duval's Decision that "Flood" Is Ambiguous is
       Persuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

F.    The Ensuing Loss Provision Renders the "Weather Conditions"
       and "Negligent Design, Construction or Maintenance" Limitation
       Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

G.    The District Court Properly Found that Lafayette Has the Burden
       of Proving Applicability of an Exclusion and Failed to do so 56

V.    ANSWER TO APPEAL: THE TRIAL COURT ERRED IN NOT
      INSTRUCTING THE JURY REGARDING GENERAL DAMAGES
      FOR MENTAL ANGUISH, INCONVENIENCE, AND EMOTIONAL
      DISTRESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

### LOUISIANA CASES

*Abate v. Healthcare Int'l, Inc.,*
    560 So. 2d 812, 814 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*Ardoin v. Hartford Accident & Indem. Co.,*
    360 So. 2d 1331, 1338 (La. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*Calogero v. Safeway Ins. Co. of La.,*
    No. 1999-1625, (La. 1/19/2000) 753 So.2d 170, 173 . . . . . . . . . . . . . . . 15
*Cochran v. Travelers Ins. Co.,*
    606 So. 2d 22, 24 (La. App. 5 Cir.,1992) . . . . . . . . . . . . . . . . . . . . . . . . 45
*Crabtree v. State Farm Insurance Co.,*
    632 So. 2d 736 (La. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
*Detraz v. Lee,*
    No. 2005-1263 (La. 2007); 950 So. 2d 557 . . . . . . . . . . . . . . . . . . . . . . 14
*Dixie Savings and Loan Association v. Pitre,*
    No. 99-154 (La. App. 5th Cir. 7/27/99); 751 So.  2d 911 . . . . . . . . . . . . . 22
*Doerr v. Mobil Oil Corp.,*
    00-0947 (La. 12/19/00), 774 So.2d 119, 124 . . . . . . . . . . . . . . . . . . . . . 46
*Gulf Wide Towing,*
    554 So. 2d at 1353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Historic Restoration, Inc. v. RSUI Indem. Co.,*
    955 So. 2d 200, 204 (La. App. 4th Cir. 3/21/2007) . . . . . . . . . . . . . . . . . 13
*Kansas City Southern,*
    846 So. 2d at 741 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
*King v. Phelps Dunbar, L.L.P.,*
    98-1805, (La. 6/4/99), 743 So.2d 181 . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*McDill v. Utica Mutual Insurance Co.*
    475 So. 2d 1085 (La. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
*Olivier v. LeJune,*
    No. 1995-0053 (2/28/1996), 668 So. 2d 347 . . . . . . . . . . . . . . . . . . . . . 14
*Pullen v. Employers' Liability Assur. Corp.,*
    89 So. 2d 373, 377 (La. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
*Reynolds v. Select Properties, Ltd.,*
    634 So. 2dd 1180, 1183 (La. 4/11/94), . . . . . . . . . . . . . . . . . . . . . . . . . 46
*Sevier v. United States Fidelity & Guaranty Co.,*
    497 So. 2d 1380, 1384 (La. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Smith v. Burton,*
    2004-2675 (La. App. 1st Cir. 12/22/05), 928 So. 2d 74 . . . . . . . . . . . . . 46
*Theriot v. Midland Risk Insurance Co.,*
    664 So.2d 547, 550, rev'd on other grounds, 694 So.2D 184 (La.1997) . . 35
*Walker v. Travelers Indem. Co.,*
    289 So. 2d 864, 871-872 (La. App. 1974) . . . . . . . . . . . . . . . . . . . . . . . 56

### FEDERAL AND NON-LOUISIANA CASES

*Airline Construction v. Hicks.*
    506 So. 2d 554 (La. App. 1 Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 37
*All Property & Casualty Carriers,*

937 So. 2d at 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*Alton Ochsner Medical Foundation v. Allendale Mu. Ins. Co.,*
   219 F.3d 501, 506 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
*Balehi Marine, Inc. v. Firemen's Fund Ins. Co.,*
   No. 1985-1409 (La. App. 1st Cir. 5/28/1986) 489 So. 2d 1360, 1363 . . . . 37
*Baton Rouge Oil & Chem. Workers Union v. Exxonmobil Corp.,*
   289 F.3d 373 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
*Bertalo's Restaurant Inc. v. Exchange Ins. Co.,*
   240 A.D. 2d 452, 453-54 (N.Y. A.D. 2 Dept., 1997) . . . . . . . . . . . . . . . 23
*Beutler England Chiropractic Clinic v. Mermentau Rice, Inc.*
   2005-942 (La. App..3 Cir. 5/31/2006), 931 So. 2d 553, 561 . . . . . . . . . . 31
*Boutte v. Nissan Motor Corp.,*
   94-1470, p. 12 (La. App. 3 Cir. 9/13/95), 663 So. 2d 154, 162 . . . . . . . 40
*Broussard v. State Farm Fire and Casualty Co.*
   2007 WL 1213942 at * 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
*Bryant v. New Orleans Public Service, Inc*
   406 So. 2d 767 (La. App. 4 Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 45
*Carrier v. Handelsman,*
   307 F.2d 525, 535 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Change, Inc. v. Westfield Insurance Co.,*
   542 S.E.2d 475 (W. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*Chargois v. Guillory,*
   97-439 (La. App. 3 Cir. 10/29/1997), 702 So. 2d 1068, 1069 . . . . . . . . . 35
*Cobb v. Gallet,*
   392 So. 2d 134, 135 (La. App. 1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . 37
*Cock-N-Bull Steak House, Inc. v. Generali Insurance Company,*
   466 S.E. 2d 727 (S.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*Daney v. Haynes,*
   630 So. 2d 949, 955 (La. App. 4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 38
*Depalma v. Westland Software House,*
   225 Cal.App.3d 1534, 1539 (Cal. 2 Dist. Ct. App. 1990) . . . . . . . . . . . . . 43
*Dombrowski v. New Orleans Saints,*
   2005-0762 (La. App. 1 Cir. 8/02/2006), 943 So. 2d 403 . . . . . . . . . . . . . 29
*E.B. Metal & Rubber Industry, Inc. v. Federal Insurance Co.*
   444 N.Y.S.2d 321 (N.Y. App. Div. 1981) . . . . . . . . . . . . . . . . . . . . . . . 51
*Ebbing v. State Farm Fire & Cas. Co.,*
   1 S.W.3d 459 (Ark. Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*Fayad v. Clarendon Nat'l Ins. Co.,*
   899 So. 2d 1082 (Fla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
*Fla. E. Coast Ry. Co. v. United States,*
   519 F.2d 1184 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
*Genusa v. Dominique,*
   1997-0047 (La. App. 1 Cir. 2/20/98), 708 So. 2d 784, 790 . . . . . . . . . . . 29
*Harris v. Fontenot ,*
   606 So. 2d 72, 74 (La.App. 3 Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 33
*Haynes v. Shumake,*
   582 So. 2d 959 (La.App. 2 Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Held v. Aubert,*
   845 So. 2d 625, 636 (La. App. 1 Cir. 5/9/03) . . . . . . . . . . . . . . . . . . . . . 40
*Hollier v. State Farm Mutual Auto. Co.,*

2001-0592 (La. App. 3 Cir. 10/31/01), 799 So.2d 793, 797 . . . . . . . . . . 17

*In re Katrina Canal Breaches Consol. Litig.,*
466 F. Supp. 2d 729 (E.D. La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 53

*In re: D.D.D.,*
No. 2006-2274 (La. App. 1 Cir. 5/4/2007); __ So. 2d __; 2007 WL 1300698,
*6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Industrial Risk Insurers v. New Orleans Public Service, Inc.*
735 F. Supp. 200 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*J. Ray McDermott & Co., Inc. v. Fidelity & Cas. Co. of New York,*
466 F.Supp. 353, 361 (D.C.La., 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Kane v. Royal Insurance Co.,*
768 P.2d 678 (Col. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*Kansas City Southern,*
846 So. 2d at 739 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indemnity Co.,*
857 F.2d 286, 287 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Layrisson v. H.S.S. Vending Distributors,*
1998 WL 355461, *2 (E.D. La. June 26, 1998) . . . . . . . . . . . . . . . . . . . 36

*LeBlanc v. Underwriters at Lloyds,*
402 So.2d 292, 299 (La. App. 3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . 17

*Lewis v. State Farm Ins. Co.,*
41,527 (La. App. 2 Cir. 12/27/06), 946 So. 2d 708, 728 . . . . . . . . . . . . . 56

*Louisiana, DODT v. Kansas City So. R.R.,*
2002-2349 (La. 5/2/2003), 846 So. 2d 734, 739 . . . . . . . . . . . . . . . . . . 41

*Madere v. Serpas,*
442 So. 2d 842, 844 (La. App. 4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 28

*Malbrough v. Wallace,*
594 So. 2d 428 (La. App. 1 Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Manuel v. Louisiana Sheriff's Risk Management Fund,*
93-2177 (La.App. 1 Cir. 11/18/1994), 647 So. 2d 363 . . . . . . . . . . . . . . 34

*McClendon v. Economy Fire & Cas. Ins. Co.,*
98-1537 (La. App. 3 Cir. 4/7/99); 732 So.2d 727, 731 . . . . . . . . . . . . . . 17

*Modisette v. Am. Integrity Ins. Co.,*
297 So. 2d 498 (La. App. 2 Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Murray v. State Farm Fire & Cas. Co.,*
509 S.E.2d 1 (W. Va. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49

*Newport Ltd v. Sears, Roebuck & Co.*
1995 WL 688799, *7-8 (E.D. La. Nov. 21, 1995) . . . . . . . . . . . . . . . . . . 36

*O'Brian v. Allstate Ins. Co.,*
420 So. 2d 1222, 1225 (La. App. 3d Cir. 1982) . . . . . . . . . . . . . . . . . . . 16

*Pakmark Corp. v. Liberty Mutual Insurance Co.,*
943 S.W.2d 256 (Mo Ct. App. 1997), . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Peach State Uniform Svc., Inc. v. Am. Ins. Co.,*
507 F.2d 996 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Peavey Co. v. M/V ANPA,*
971 F.2d 1168 (5 Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pendleton v. Smith,*
95-1805 (La. App. 4 Cir.,1996), 674 So. 2d 434, 437 . . . . . . . . . . . . . . . 23

*Popkin v. Security Mutual Insurance Co. of New York,*
367 N.Y.S.2d 492 (N.Y. App. Div. 1975) . . . . . . . . . . . . . . . . . . . . . . . 48

*Reed v. Ricard,*
 1997-2250 (La. App. 1 Cir. 11/18/98), 744 So. 2d 13, 19 . . . . . . . . . . . . 56
*Rye v. Terminix,*
 423 So. 2d 754 (La. App. 4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 37
*Sanderford v. Lombard*
 685 So. 2d 1162, 1167 (La. App. 4th Cir. 1996) . . . . . . . . . . . . . . . . . 38
*Sibley v. Insured, Lloyds,*
 442 So. 2d 627, 632 (La. App. 1st Cir. 1983) . . . . . . . . . . . . . . . . . . . 15, 16
*Smallpage v. Wagner & Wagner,*
 84 So. 2d 863, 866 (La. App. Orl. 1956) . . . . . . . . . . . . . . . . . . . . . . 36
*Solomon Dehydrating Co. v. Guyton,*
 294 F. 2d 439 (U.S. 8 Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Stout v. AMCO Ins. Co.,*
 645 N.W. 2d 108, 114 (Minn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
*Suhor v. Lagasse,*
 2000-1628, (La. App. 4 Cir. 9/13/2000); 770 So. 2d 422, 423 . . . . . . . . . 41
*Taylor v. Burton,*
 1993-1348 (La. App. 3 Cir. 3/6/98), 708 So.2d 531, 535-36 . . . . . . . . . . 57
*Texas Gas Transmission Corp. v. Sileau,*
 251 So. 2d 104, 107 (La.App. 3 Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . 33
*Thomas v. Desire Comm. Housing Corp.,*
 1998-2097 (La. App. 4 Cir 7/19/00), 773 So.2d 755, 763 . . . . . . . . . . . . 57
*TNT Speed & Sport Center, Inc. v. American States Insurance Co.,*
 114 F.3d 731 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
*Tomilson v. Allstate Indemnity Company*
 06-617 (E.D. La. 2/12/2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
*Urrate v. Argonaut Great Central Ins. Co.,*
 No. 2004-256 (La. App. 5th Cir. 8/31/2004) 881 So. 2d 787, 791 . . . . . . . 15
*Van Tassel,*
 207 N.W. 2d at 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
*Warner v. Liberty Mut. Fire Ins. Co.,*
 1988-2250, (la. App. 4 Cir. 6/14/89), 543 So. 2d 511, 515 . . . . . . . . . 16, 17
*Warner v. Liberty Mut. Fire Ins. Co.,*
 1988-2250, (La. App. 4 Cir. 4/13/1989), 543 So. 2d 511 . . . . . . . . . . . . 17
*Wilcox v. Gamble Guest Care Corp.,*
 40,650 (La. App. 2 Cir. 4/12/2006), 928 So. 2d 695, 698 . . . . . . . . . . . . 31
*Williams v. La. Indemn. Co.,*
 26,887 (La. App.2 Cir. 6/21/95), 658 So. 2d 739, 743 . . . . . . . . . . . . . . . 57
*Wooley v. State Farm Fire & Cas. Ins. Co.,*
 2005-1490 (La. App. 1 Cir. 2/10/2006), 928 So. 2d 618, 622 . . . . . . . . . . 30
*Young v. Ford Motor Co.,*
 595 So. 2d 1123, 1124 (La. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## LOUISIANA STATUTES

La. Civ. Code Ann. art. 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
La. Civ. Code Proc. art. 970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxxi, 11, 39
La. Civ. Code Proc. art. 1005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
La. Civ. Code Proc. art. 1920 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
La. Civ. Code Proc. art. 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 35, 37, 57

La. Civ. Code Proc. art. 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
La. R.S. §9:2798.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
La. Rev. Stat. Ann. §29:723(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
La. Rev. Stat. §22:1220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 12, 15, 27, 57
La. Rev. Stat. §22:658 . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 11, 15, 26, 27, 30, 32, 33
La. Rev. Stat. §23:1225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## FEDERAL STATUTES

33 U.S.C. §702(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## ACTS

Act 813 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 32, 35

## RESOLUTIONS

House Concurrent Resolution No. 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TREATISES

20 La. Civ. L. Treatise, Legis, Law & Proc. §7.10 . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF APPENDICES

APPENDIX A:    CASES FROM OTHER STATES CITED IN APPELLEES'
             ORIGINAL BRIEF

1.  *Bertalo's Restaurant Inc., v. Exchange Ins. Co.*
    240 A.D. 2d 452, 453-54 (N.Y. A.D. 2 Dept., 1997)

2.  *Broussard v. State Farm Fire and Casualty Co.*
    2007 WL 1438792 (S.D. Miss.)

3.  *Change Inc. V. Westfield Insurance Co.,*
    542 S.E.2d 475 (W.Va. 2000)

4.  *Cock-N-Bull*
    321 S.C. 1, 466 S.E. 2d 727

5.  *The Collateral Source Rule and Contract Damages,*
    71 CAL. L. REV. 56 (Jan. 1983)

6.  *DePalma v. Westland Software House,*
    225 Cal.App.3d 1534

7.  *E.B. Metal & Rubber Industry, Inc. V. Federal Insurance Co.,*
    444 N.Y.S.2d 321 (N.Y. App. Div. 1981)

8.  *Ebbing v. State Farm Fire & Casualty Co.,*
    1 S.W.2d 459 (Ark.Ct.App.1999)

9.  *Fayad v. Clarendon National Insurance Co.,*
    899 So.2d 1082 (Fla. 2005)

10. *Gypsum Carrier, Inc. V. Handelsman C.A.*
    307 F.2d 525 (Cal. 1962)

11. *Kane v. Royal Insurance Co.,*
    768 P.2d 678 (Colo. 1989)

12. *Mateer v. Reliance Ins. Co.,*
    247 Md. 643, 233 A.2d 797 (Md. 1967)

13. *Murray v. State Farm Fire and Casualty Co.,*
    509 S.E.2d 1 (W. Va. 1998)

14. *Pakmark Corp. V. Liberty Mutual Insurance Co.,*
    943 S.W.2d 256 (Mo.Ct.App. 1997)

15. *Popkin v. Security Mutual Insurance Co. of New York,*
    367 N.Y.S.2d 492 (N.Y. App. Div. 1975)

16. *Stout v. AMCO Inc. Co.,*
    645 N.W.2d 108 (Minn., 2002)

17. *Van Tassel v. Horace Mann Insurance Company,*
    296 Minn. 181, 207 N.W.2d 348 (Minn. 1973)

APPENDIX B:    HOUSE CONCURRENT RESOLUTION NO. 58

APPENDIX C:    *KATRINA CANAL BREACHES CONSOLIDATION LITIGATION,*
             466 F.SUPP 2d 729 (E.D.La. 2006) (p. 847)

APPENDIX D:    *HISTORIC RESTORATION, INC. V. RSUI INDEMNITY*
             *COMPANY AND ESSEX INSURANCE COMPANY,*
             NO. 06-4990, DIV. D-16-11, CIVIL DISTRICT COURT,
             PARISH OF ORLEANS, STATE OF LOUISIANA, JUDGMENT
             DATED DECEMBER 5, 2006

APPENDIX E:   UNITED  RESTAURANT  ENTITIES,  L.L.C. INSURANCE
              POLICY

## ASSIGNMENTS OF ERROR IN ANSWER

With respect to his Answer to the Appeal, Joseph Sher avers the following errors by the Trial Court:

1.  The trial court erred in failing to instruct the jury regarding general damages for mental anguish, inconvenience, and emotional distress caused by the bad faith of Lafayette.

2.  The Trial Court erred in refusing to allow Plaintiff to introduce evidence regarding Plaintiff's mental anguish, inconvenience, and emotional distress caused by Lafayette's bad-faith handling of Plaintiff's claim.

3.  The Trial Court erred in failing to include a line on the verdict form for damages for mental anguish, inconvenience, and emotional distress caused by the bad faith of Lafayette.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether the Jury correctly found that Lafayette failed to initiate loss adjustment within 30 days of notice, and was arbitrary and capricious in failing to adjust Mr. Sher's claims properly.

2.  Whether the Jury correctly determined the amount of lost rents.

3.  Whether the Jury correctly determined the amount of property damage.

4.  Whether the Trial Court properly granted Mr. Sher's Motion in Limine on policy exclusions and limitations that were neither plead nor preserved by way of a reservation of rights.

5.  Whether the Trial Court properly allowed the issue of whether Mr. Sher lost covered business personal property to go to the Jury.

6.  Whether the Trial Court properly awarded penalties, attorney's fees and costs.

7.  Whether the Trial Court properly awarded interest from the date of judicial demand.

8.  Whether the Trial Court properly awarded costs pursuant to Louisiana Code of Civil Procedure article 970.

9.  Whether Lafayette waived any right to claim an offset for NFIP proceeds by failing to either offer or proffer evidence of NFIP payments.

10. Whether the Trial Court properly found that NFIP proceeds were not a collateral source.

11. Whether the Trial Court properly granted Mr. Sher's motion for partial summary judgment holding that, as a matter of law, the term "flood" as used in the water damage exclusion contained in the "all risks" policy of insurance issued by Lafayette to Mr. Sher was ambiguous.

12. Whether the Trial Court properly held that the term "flood" as found in the

water damage exclusion contained in the "all risks" policy of insurance issued by Lafayette to Mr. Sher was limited only to naturally occurring events and did not exclude from coverage damages caused by man-made acts, errors, or omissions.

13. Whether the Trial Court properly held that Lafayette, which bears the burden of proving an exclusion from coverage in this case, failed to create an issue of material fact with respect to the cause or the source of Mr. Sher's ground water intrusion.

14. Whether the trial court erred in failing to instruct the jury regarding general damages for mental anguish, inconvenience, and emotional distress.

15. Whether the Trial Court erred in refusing to allow Mr. Sher to introduce evidence regarding his mental anguish, inconvenience, and emotional distress caused by Lafayette's bad-faith handling of his claim.

16. Whether the Trial Court erred in failing to include a line on the verdict form for damages for mental anguish, inconvenience, and emotional distress due to Lafayette's bad faith adjustment of Mr. Sher's claim.

**MAY IT PLEASE THE COURT:**

Plaintiff, Joseph Sher (hereinafter "Mr. Sher"), respectfully submits that the Judgments of the District Court should be affirmed with respect to the assignments of error of defendant, Lafayette Insurance Company (hereinafter "Lafayette") and should be reversed with respect to the assignments of error of Mr. Sher.

## INTRODUCTION

This case is not about dueling repair estimates or reasonable differences between an insurer and insured. It is not a case only about interpretation of policy provisions such as the "flood" exclusion. Rather, it is a case about an insurance company that accepted premiums from its insured (a retired tailor who is a Holocaust survivor and was 91 years old at the time of trial) for over 15 years, and then when Katrina struck, attempted to abdicate responsibility for the resulting damages claiming preexisting deterioration, despite the fact that when Lafayette inspected the property in 1994, 2001, 2002 and 2003 it found the property to be well maintained. The following are Lafayette's own descriptions of the property on which it accepted premiums for 15 years, which were in its underwriting file:

- 1994 Lafayette inspection
  - "building condition or upkeep poor?" **"no"**

- 2001 Lafayette inspection
  - "Structure is **sound and well maintained**"
  - "**No deficiencies** noted"
  - "Condition of building" **"good"**
  - "Any sign of past water leakage" "no"
  - "Any plumbing problems" "no"

- 2002 Lafayette inspection
  - "This appears to be a **very well maintained** risk"
  - "Lafayette has written since 1989, and has proved to be **profitable**"

- 2003 Lafayette inspection
  - "Risk is **well maintained**"

    •    "Tenants and owner take **pride in ownership**"[1]

Then, once a claim was made, Lafayette changed its mind and ignored its own
inspection reports and told Mr. Sher "the majority of the damages were **pre-existing**
and caused by a **lack of maintenance.**"[2]

    Simply put, Lafayette accepted premiums from Mr. Sher for over 15 years,
describing his property as "sound" and "well maintained," and then when Mr. Sher
called upon Lafayette to honor its end of the bargain, Lafayette chose to disavow its
own inspections which found the property to be well maintained. Lafayette deprived
Mr. Sher of the coverage for which he paid even though Lafayette knew that its
excuse of "lack of maintenance" was unfounded. This is the epitome of bad faith,
and the jury was well within its prerogative as a fact finder in awarding compensatory
damages and also in finding that Lafayette was arbitrary and capricious and in bad
faith breached the insurance contract and violated La.R.S. 22:658 and 22:1220.

## STATEMENT OF THE CASE

### I.    GENERAL BACKGROUND

    Lafayette issued Mr. Sher an "all risk" commercial lines insurance policy
identified as policy number 60111266 for the policy period June 15, 2005 to June 15,
2006 (the "Lafayette Policy")[3] which insures the Property located at 1410 Broadway
Street, New Orleans, Louisiana, 70118 (the "Property"). The Property is a fourplex
with a fifth apartment in the basement. Since purchasing the building in the mid-
1960s and up until Katrina, Mr. Sher resided in one apartment, and he rented the four
other apartments to tenants to help make ends meet.

    On August 29, 2005, Hurricane Katrina struck the New Orleans area, causing

---

[1] Pl. ex. P-108, pp. 294, 295,300, 302, 429.

[2] Pl. ex. P-28.

[3] Pl. ex. P-3.

substantial property damage to the Property. The ground floor (basement) of the Property was further damaged when the levees surrounding the City of New Orleans - which had been constructed to protect the city in the event of a hurricane - failed.

Because he had recently had a heart attack and angioplasty, Mr. Sher chose not to evacuate and instead stayed in his home during Katrina and witnessed firsthand the damage to the Property. After the storm, so that he could repair the Property and make it habitable for himself and his tenants, Mr. Sher made demand on Lafayette to fulfill its obligations under the Policy, but Lafayette refused to fully compensate Mr. Sher for his losses. As of date of trial (and the present date), Lafayette has tendered only $2,755.08,[4] despite the fact that the Property sustained major damages and the coverage limits are $463,000.00 for the Building. Rather than meeting its contractual obligations, Lafayette refused to properly and timely adjust Mr. Sher's claim.

Lafayette's recitation of the facts for the most part ignores the evidence introduced at trial and upon which the jury relied in reaching its verdicts. The relevant facts are recited below.

## II.   FACTS AND BACKGROUND RELATED TO TRIAL AND VERDICTS

The trial commenced on March 12, 2007 (with a delay for writ practice) and concluded on March 20, 2007. Prior to the commencement of trial, the Trial Court ruled upon a number of pending motions including motions in limine.[5] A five day jury trial was conducted in two phases, one concerning the amount due under the policy, and the second concerning whether Lafayette was responsible for extra-contractual damages under La. R.S. 22:658 and 22:1220.

Mr. Sher rode out Hurricane Katrina at the Property because he felt it was safer

---

[4] Lafayette claims it paid a higher amount by including amounts that it paid to itself for premium without Mr. Sher's permission.

[5] Tr. 3/13/07 pp. 15-16 (Vol. XV).

to stay than to evacuate given his recent heart attack and angioplasty procedure.[6] Mr. Sher testified that during Katrina, he was in his apartment and that the house was shaking and he saw windows bowed out and water seeping through the walls.[7] Mr. Sher testified that the walls appeared to be "crying."[8] Gayle Parmelee, a retired Loyola University ballet instructor who was a tenant in the building, testified that she rode out Katrina and that the building shook during the storm and she heard objects hitting the house.[9] Ms. Parmelee identified numerous photographs of damage to the interior of her apartment that occurred during Katrina.[10] An expert meteorologist testified that the Property experienced sustained winds of 97 miles an hour, which correlates to pressure of 21.7 pounds per square foot on the house, and wind gusts of 126 miles per hour, which correlates to pressure of 36.6 pounds per square foot.[11] Mr. Sher and the tenants who stayed were rescued by a good Samaritan four days after the storm and Mr. Sher did not return to his home until it was repaired months later.[12]

Mr. Sher's son, Leopold Sher, who helped his father with his insurance claim, testified that he gave notice of loss to Lafayette during the first two weeks of September, 2005.[13] The first time an adjuster inspected the property on behalf of Lafayette was November 1, 2005.[14] Leopold Sher gave quite detailed and extensive testimony on the damages caused to the Property by Katrina and the repair efforts.[15] Additionally Leopold Sher testified regarding the amount of lost rents.[16]

---

[6] Tr. 3/13/07 p. 57, ln. 28-p. 58, ln. 15; Tr. 3/14/07, p. 98, ln. 9-16 (Vol. XV).

[7] Tr. 3/14/07, p. 98, ln. 17 - p. 99, ln. 28 (Vol. XVI).

[8] Tr. 3/14/07, p. 99, lns. 8-12 (Vol. XVI).

[9] Tr. 3/14/07, p. 110, ln. 21 - p. 111, ln. 8 (Vol. XVI).

[10] Tr. 3/14/07, p. 113 ln. 24 - p. 117, ln. 12 (Vol. XVI).

[11] Tr. 3/14/07, p. 130, lns. 5 - 25 (Vol. XVI).

[12] Tr. 3/13/07, p. 59, lns. 22-23; 3/14/07, p. 112, lns. 3-24 (Vol. XV).

[13] Tr. 3/13/07, p. 114, lns. 6-11 (Vol. XV).

[14] Tr. 3/13/07, p. 115, lns. 17-19 (Vol. XV).

[15] Tr. 3/13/07, pp. 70 - 109, pp. 126 - 131 (Vol. XV).

[16] Tr. 3/13/07, pp. 110 - 113 (Vol. XV).

On November 29, 2005, Lafayette issued a check to Mr. Sher for $270.09, and sent it to the Property address (resulting in it not being received until 2006) despite knowing that Mr. Sher was not living at that address because it was damaged.[17]

In February of 2006, **Lafayette** hired Fred Vanderbrook, an engineer, to inspect the property, and Mr. Vanderbrook sent Lafayette a report on February 7, 2006 finding roof damage, windblown rain entering the apartments through damaged shingles, damaged flashing, and a missing turbine vent, damage to plumbing from water hammer as a result of reinstatement of water pressure after the storm, and specifically concluding that water leakage occurred as a result of damages to flashing and shingles.[18] Mr. Vanderbrook specifically testified that a letter dated July 19, 2006 (exhibit P-28), sent by Lafayette to Mr. Sher misrepresents Mr. Vanderbrook's conclusions in two particulars. Initially, that letter states that Mr. Vanderbrook inspected the property with a Lafayette field adjuster, but Mr. Vanderbrook testified that this was not accurate -- no adjuster from Lafayette inspected with him.[19] The second misrepresentation in exhibit P-28 is even more significant: the letter states "It is the conclusion of the PLC adjuster, engineer [Mr. Vanderbrook] and field adjuster that the majority of the damages were pre-existing and caused by a lack of maintenance." Mr. Vanderbrook flatly contradicted this statement when he testified at trial, stating that the house was neither poorly maintained nor neglected.[20]

On March 3, 2006, Lafayette sent Mr. Sher a second and last check, this one for $2,484.99.[21] Neither check sent by Lafayette was negotiated by Mr. Sher.[22]

Documentation providing proof of Mr. Sher's loss was sent to Lafayette

---

[17] Pl. ex. 122; Tr. 3/13/07, p. 117, ln. 29 - p. 18, ln. 21 (Vol. XV).
[18] Pl. ex. 20; Tr. 3/14/07, pp. 72-79 (Vol. XVI).
[19] Tr. 3/14/07 p. 81, lns. 25-31 (Vol. XVI).
[20] Tr. 3/14/07, p. 82, ln. 11 - p. 83, ln. 6 (Vol. XVI).
[21] Pl. ex. 23.
[22] Tr. 3/13/07, p. 125, lns. 25-26 (Vol. XV).

repeatedly asking that they properly adjust the loss, including the following:

| | |
|---|---|
| December 12, 2005 | L. Sher writes letter to agent expressing problems with adjustment including request for lost rents (Pl. ex. 17). |
| December 22, 2005 | Agent faxes Sher letter to Lafayette Insurance (Pl. ex. 18). |
| January 3, 2006 | Agent sends a follow up letter to Lafayette Insurance (Pl. ex. 19). |
| June 30, 2006 | L. Sher writes letter to Lafayette with estimates and copies of payments for repairs totaling $23,742.93 (Pl. ex. 24). |
| July 3, 2006 | L. Sher writes letter to Lafayette with additional receipts and checks for repairs totaling $198,553.88 (Pl. ex. 25). |
| July 14, 2006 | L. Sher emails Swank with Orleans Sheet Metal estimates (Pl. ex. 26). |
| July 16, 2006 | L. Sher emails Swank regarding concerns of possible mold (Pl. ex. 27). |
| July 25, 2006 - August 22, 2006 | L. Sher exchanged numerous emails with Swank regarding the lost rents on the apartments (Pl. ex. 8). |
| August 1, 2006 | L. Sher emails Swank attaching copies of apartment leases (Pl. ex. 31) |
| August 10, 2006 | L. Sher (L. Jones) email to Swank regarding discovery of mold in Apartment D (Pl. ex. 32). |
| August 15, 2006 | L. Sher emails Swank with duplicate copies of bills sent on July 3, 2006 (Pl. ex. 33) |
| August 28, 2006 | Lawsuit filed with invoices already produced attached as exhibits (ROA pp. 1-286) |

In addition to the testimony discussed above, the jury heard the following testimony:

Roy Carubba, who was tendered and accepted as an expert in civil engineering, structural engineering and as a contractor, testified at length regarding the effect of the storm winds on the building, the structural damage to the building that he found and the costs of repairing the same.[23]

Barry Scairono, who was tendered and accepted as an expert in architecture, water intrusion analysis, roofing, cost estimation, and construction administration also testified.[24] Mr. Scairono testified in great detail regarding roof damage and cracked stucco caused by Katrina that allowed water to enter the building and then

---

[23] Tr. 3/14/07, p. 150 lns. 20-24, pp. 156-180, pp. 198-202 (Vol. XVI).

[24] Tr. 3/15/07, p. 21, lns. 23-27, p. 24, lns. 7-8 (Vol. XVII).

migrate within the building, and identified dozens of photos depicting the damages.[25] Mr. Scairono also explained detailed repair estimates that he prepared of the costs to repair the damages caused by Katrina, which estimates were separated into an estimate for above the basement, and an estimate for the basement.[26]

The first "adjuster" that Lafayette sent to look at the damages, Robert Jones, was in fact a contractor by trade who only did adjusting work when a big hurricane came along.[27] Although Jones claimed most of the damage he saw was due to preexisting deterioration/maintenance needs, he admitted that **Lafayette never provided him the documents showing that Lafayette inspected the property four times before Katrina and found it to be well maintained.**[28] Similarly, Kenneth Jones, who prepared an estimate of Mr. Sher's damages for Lafayette without ever having seen the Property, admitted that he had never seen the Lafayette inspections showing the property was well maintained before Katrina.[29] Furthermore, while Lafayette's claim file notes reflect that Kenneth Jones told Lafayette that he spoke to Fred Vanderbrook and they agreed the property "was in bad need of maintenance before the storm," Kenneth Jones did not recall talking to Mr. Vanderbrook.[30] As noted above, Mr. Vanderbrook emphatically denied such a conversation.

In July of 2006 another Lafayette adjuster, Wes Swank, inspected the Property.[31] Swank, who first looked at the Property on July 12, 2006, admitted that despite the fact that he found damages, he never wrote the damages up into an estimate and sent it to Lafayette.[32] Mr. Swank saw water stains on the interior of the

---

[25] Tr. 3/15/07, pp. 24-78 (Vol. XVII).

[26] Tr. 3/15/07, pp. 79-104 (Vol. XVII).

[27] Tr. 3/15/07, p. 169, lns. 6-11 (Vol. XVII).

[28] Tr. 3/15/07, p. 182, ln. 1 - p. 184, ln. 14 (Vol. XVII).

[29] Tr. 3/19/07, p. 13, lns. 20-22; p. 32, lns. 3-27 (Vol. XVIII).

[30] Tr. 3/19/07, p. 29, ln. 21 - p. 31, ln. 3 (Vol. XVIII).

[31] Tr. 3/13/07, p. 144 ln. 28 - p. 145, ln. 10 (Vol. XV).

[32] Tr. 3/19/07, p. 96, lns. 1-8 (Vol. XVIII).

Property, including on ceilings, and also saw loose windows, but does not know whether those damages were caused by Katrina.[33]

Another engineer **retained by Lafayette**, Dr. Jerry Householder, who first saw the Property two(2) weeks before trial, **agreed that the building was well maintained.**[34] Dr. Householder agreed that the Property sustained damages as a result of Katrina, including: cracks in exterior stucco, loss of granules on the flat roof, loss of ridge caps, damaged shingles, and loss of a turbine vent on the roof.[35]   Dr. Householder testified that the roof damage allowed water to enter the building that resulted in interior damage including six(6) gallons of water through the missing turbine vent and that such water could travel anywhere once it was in the roof, that water could have entered the building through the cracks in the stucco, that water came down the interior walls of building, and that water came in through windows.[36]

Tom Miller, a supervisor for Lafayette, and the only direct employee of Lafayette to testify admitted that given the "round robin" system Lafayette had where no Lafayette employee was assigned to the claim, an insured could talk to a different person every time they called (which is in fact what happened here, as 15 different persons touched Mr. Sher's file).[37]  While Miller was the supervisor assigned to Mr. Sher's claim after January 16, 2006, no Lafayette employee was assigned to Mr. Sher's claim before that date.[38] Mr. Miller admitted that despite the fact that Mr. Sher has lost rents coverage, Lafayette never tendered a penny for lost rents, and never responded to the lost rent claim at all.[39] Once the claim was assigned to an outside

---

[33] Tr. 3/19/07, p. 100, lns. 14-27, p. 101, ln. 19 - p. 102, ln. 20 (Vol. XVIII).

[34] Tr. 3/19/07, p. 66, lns. 1-3, p. 65, lns. 29-32 (Vol. XVIII).

[35] Tr. 3/19/07, p. 66, ln. 24 - p. 67, ln. 7, p. 70., ln. 17 - p. 71, ln. 6, p. 73, lns. 19-25 (Vol. XVIII).

[36] Tr. 3/19/07, p. 67, lns. 19-26, p. 70, lns. 24-27, p. 74, ln. 18 - p. 75, ln. 10, p. 80, lns. 19-32, p. 81, lns. 21-25 (Vol. XVIII).

[37] Tr. 3/19/07, p. 113, lns.8-13 (Vol. XVIII).

[38] Tr. 3/19/07, p. 111, ln. 30, p. 112, ln. 30 (Vol. XVIII).

[39] Tr. 3/19/07, p. 113, lns. 14-21, p. 121, lns. 6-20 (Vol. XVIII).

adjuster, Lafayette left it up to the outside adjuster how to proceed; Mr. Miller thought assigning the file to the outside adjuster was "initiation of loss adjustment."[40]

**Mr. Miller did not see Lafayette's own inspection forms showing that the property was well maintained until after suit was filed.**[41] Despite admitting to seeing the inspection forms establishing that the property was well maintained after suit was filed, Mr. Miller and Lafayette did not thereafter honor their continuing obligation to adjust the claim. This act of bad faith was after August, 2006.

On March 20, 2007, the jury answered jury interrogatories regarding amounts owed under the policy as follows:

1.  Did Joseph Sher's property at 1410 Broadway Street in New Orleans, Louisiana sustain physical damage as a result of Hurricane Katrina?

    ✓_____          _____
    YES                            NO

    If the answer to Question No. 1 is "NO", Stop, Sign the form and inform the Court.

    If the answer to Question No. 1 is "YES", proceed to Question No. 2.

2.  What is the amount of money necessary to repair the damages to Joseph Sher's property caused by Hurricane Katrina, covered by the Lafayette policy?

    Damages above the basement:        $175,850.00

    Damages in the basement:             $144,300.00

3.  Did Joseph Sher sustain any loss of or damage to business personal property as a result of the damages caused to his property by Hurricane Katrina?

    ✓_____          _____
    YES                            NO

4.  If the answer to question No. 3 is yes, what is the amount of lost rents that Joseph Sher sustained?

---

[40] Tr. 3/19/07, p. 118, ln. 23 - p. 120, ln. 7 (Vol. XVIII).

[41] Tr. 3/19/07, p. 122, ln. 19 - p. 123, ln. 3 (Vol. XVIII).

$17,350.00

5.   Did Joseph Sher incur loss of or damage to business personal property as a result of the damages caused to his property by Hurricane Katrina?

✓
YES                                                    NO

6.   If your answer to Question No. 5 is yes, what is the amount of loss of or damage to business personal property Joseph Sher sustained?

$31,577.00

After this verdict, a second phase of the trial was conducted relative to extra-contractual damages. The parties were allowed to present additional evidence, and Lafayette was allowed to present evidence about its denial of aspects of the claim based upon certain policy defenses, including purported poor maintenance and the "flood exclusion."[42] After hearing all of Lafayette's reasons for not paying, including those that had been excluded from the first phase of trial, the jury answered interrogatories regarding amounts owed for extra contractual damages as follows:

1.   Did Lafayette initiate adjustment of Joseph Sher's losses within 30 days of notice of loss?

                                                        ✓
YES                                                    NO

2.   Did Lafayette fail to pay Joseph Sher any amounts owed within 30 days of receipt of satisfactory proof of loss?

✓
YES                                                    NO

3.   If you chose YES to Question No. 2, was the failure to pay the amount arbitrary, capricious or without probable cause?

✓
YES                                                    NO

4.   Did defendants fail to pay Mr. Sher within 60 days of receipt of satisfactory proof of loss?

✓
YES                                                    NO

5.   If you chose YES to Question No. 4, was the failure to pay the amount

---

[42] Tr. 3/20/07, p. 98, lns. 10-13 (Vol. XIX).

arbitrary, capricious or without probable cause?

✓
_____                    _____
YES                                    NO

6.    Did Lafayette misrepresent pertinent facts or insurance policy provisions?

✓
_____                    _____
YES                                    NO

7.    If your answer to Questions 1, 3, 5 or 6 was YES, did Joseph Sher sustain any
      damages as a result of the failure to pay?

✓
_____                    _____
YES                                    NO

8.    If your answer to Question No. 7 is YES, what is the amount of damages
      sustained?

      $184,538.50

Judge Giarrusso entered a Judgment on March 26, 2007. Also, after the trial,

Mr. Sher moved the Court to Award Attorneys' Fees and Costs. After reviewing the

briefs and hearing oral argument, Judge Giarrusso granted Mr. Sher's Motion and

awarded Mr. Sher $16,288.60 pursuant to Louisiana Code of Civil Procedure article

1920, $42,020.24 pursuant to Louisiana Code of Civil Procedure article 970, and

$258,728.00 in attorneys' fees pursuant to Louisiana Civil Code article 1997,

Louisiana Revised Statutes 22:658, and/or Louisiana Revised Statutes 22:1220,

specifically relying on **all** grounds cited by Mr. Sher.[43] These appeals followed.

## III.    FACTS AND BACKGROUND RELATED TO "FLOOD" EXCLUSION

In addition to the damages caused by the winds of Hurricane Katrina, Mr.

Sher's Property sustained extensive water damage as a result of the breach of the

levees and walls along the 17th Street Canal levees and/or the London Avenue Canal.

To protect against the fortuitous risk of loss or damage to his home and

property, Mr. Sher procured: an "all risk" insurance policy from Lafayette.[44] The

Lafayette Policy does not contain an express "flood" exclusion and does not define

_____
[43] ROA pp.3073 (Vol. XIII).
[44] Pl. ex. P-3.

the term "flood." In pertinent part, the Lafayette Policy states:

> 1.   We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>     . . .
> g.   Water
>
>> (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
>> (2) Mudslide or mudflow;
>> (3) Water that back up from a sewer or drain; or
>> (4) Water under the ground surface pressing on, or flowing or seeping through:
>>> (a) Foundations, walls, floors or paved surfaces;
>>> (b) Basements, whether paved or not; or
>>> (c) Doors, windows, or other openings.

Notably, the "water" exclusion  does not exclude coverage for damages resulting from man-made events.

In its answer, Lafayette alleged that coverage was excluded for damages caused by a "flood." On December 4, 2006, Mr. Sher filed a Motion for Partial Summary Judgment seeking a ruling that the damages for water inundation to his home and property were covered under the Lafayette Policy because (1) the sources of the water inundation at his home and property were the breaches of the levees along the 17th Street Canal and the London Avenue Canal; (2) those breaches and ensuing loss resulted from the inadequate planning, design, and construction of the levees; and (3) the term "flood" as defined in the Policy was ambiguous as a matter of law and did not exclude from coverage those damages resulting from man-made events.[45]

In support of the Motion, Mr. Sher submitted an Affidavit attesting that he remained in his home throughout Katrina and its aftermath, that he observed the weather associated with the hurricane, which began the evening of August 28, 2005 and ceased in the mid-afternoon of August 29, 2005, and he did not observe standing water in those buildings until the early morning of August 30, 2005, after the levees

---

[45] ROA pp. 1148-1325 (Vol. V).

had been breached.[46] The United States Army Corps of Engineers has conceded that the failure of the levee protection systems was caused by its inadequate design, planning, and construction.[47] Lafayette presented **no contrary factual evidence** in opposition to the Motion, despite the fact that Lafayette had the burden of proof on applicability of exclusions.

On February 2, 2007, the Trial Court heard oral argument on the motion and thereafter issued a Judgment granting Mr. Sher's motion.[48] The Judgment stated:

> IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is hereby GRANTED because the "flood" exclusion is ambiguous; therefore, the policy covers manmade events and Lafayette has not met its burden of proving that any of the damage was not caused by a man made event.[49]

## LAW AND ANALYSIS

### I.   STANDARDS OF REVIEW

#### A.   Findings of Fact

Findings of fact are reviewed for manifest error. As explained by this Court,

> Appellate courts review factual findings made by the trier of fact under the manifest error or clearly wrong standard. Thus, if two reasonable views exist, the trier of fact's decision cannot be wrong. To reverse, the appellate court must first find that a "reasonable factual basis does not exist" for the trier's findings and that the "finding is clearly wrong (manifestly erroneous).[50]

The jury's findings of fact cannot be reversed unless manifestly erroneous. When findings of fact are based on credibility determinations, the finding is given even greater deference:

> When factual findings are based on determinations regarding the credibility of

---

[46] See supplemental record.

[47] For a detailed recitation of the admissions of the Corps with respect to the levee and outflow canal failures, see the Memorandum in support of Mr. Sher's Motion for Summary Judgment and exhibits thereto contained in the record at ROA pp. 1148-1325, and supplemental record and see current IPET report at https://ipet.wes.army.mil/.

[48] ROA at 2015 (Vol. XV).

[49] Id.

[50] *Historic Restoration, Inc. v. RSUI Indem. Co.*, 955 So.2d 200, 204 (La. App. 4th Cir. 3/21/2007) (citations omitted).

witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact's findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.[51]

An appellate court cannot substitute its findings of fact for those of the trier of fact:

The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently.[52]

### B.   Damages Award by Jury

The proper standard of review for an award of damages is abuse of discretion:

Much discretion is left to the fact finder's reasonable assessment of damages. La. C.C. art. 1999. In reviewing a damage award, the appellate court "is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact."[53]

### C.   Motion for Summary Judgment

The Louisiana Supreme Court has held that a "motion for summary judgment which shows that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law shall be granted."[54] A genuine issue exists "if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue."[55]

## II.   THE JURY FINDINGS WERE SUPPORTED BY THE EVIDENCE

Lafayette challenges several factual findings by the Jury.

### A.   The Jury Properly Found that Lafayette Violated the Bad Faith Statutes

Whether an insurer's handling of a claim was arbitrary and capricious is a

---

[51] *In re: D.D.D.*, No. 2006-2274 (La. App. 1 Cir. 5/4/2007); __ So. 2d __; 2007 WL 1300698, *6.

[52] *Detraz v. Lee*, No. 2005-1263 (La. 2007); 950 So. 2d 557 (citations omitted).

[53] *Olivier v. LeJune*, No. 1995-0053 (2/28/1996), 668 So. 2d 347 (citations omitted).

[54] *King v. Phelps Dunbar, L.L.P.*, 98-105, p.3 (La. 6/4/99), 743 So. 2d 181, 185.

[55] *Id.*

factual finding which may not be disturbed unless manifestly erroneous.[56] The Jury was given detailed instructions on La. R.S. 22:658 and 22:1220.[57] A number of those instructions were jointly submitted by the parties.[58] Lafayette has not claimed on appeal that any of these instructions incorrectly stated the law, as such, the only issue is whether the jury's findings are manifestly erroneous. After hearing the evidence, the Jury found Lafayette failed to satisfy the statutes in almost every way possible. These findings are supported factual findings which must stand.

1. **The Jury Correctly Found that Lafayette was Arbitrary and Capricious**

Lafayette cites to this Court page after page of law on what conduct is arbitrary and capricious, but interestingly, **does not cite a single shred of evidence** that contradicts the jury's finding that it was arbitrary and capricious. Lafayette cites **no evidence** that establishes that it had a reasonable basis to deny Mr. Sher's claim. Certainly, sufficient evidence was presented that **Lafayette had no reasonable basis for the positions it took**. Lafayette's own underwriting file contains inspection reports that detail that the property was well-maintained before Katrina. For Lafayette to take the post Katrina position that the property was not well maintained as a basis to refuse to pay was the epitome of bad faith – such a position is at best bad faith for Lafayette and at worst a suppression of the truth.

Presumably, Lafayette is claiming that it had a reasonable basis to challenge causation, as that it cites law regarding causation disputes. However, as noted above, **every Lafayette witness agreed that Katrina caused damage to the Property.** There is no issue of causation. Further, there are portions of the claim that Lafayette

---

[56] *Calogero v. Safeway Ins. Co. of La.*, No 1999-1625, (La. 1/19/2000) 753 So.2d 170, 173; *Urrate v. Argonaut Great Central Ins. Co.*, No. 2004-256 (La. App 5th Cir. 8/31/2004) 881 So. 2d 787, 791; *Sibley v. Insured, Lloyds*, 442 So. 2d 627, 632 (La. App. 1st Cir.1983).

[57] Tr. 3/20/07, pp. 159-168 (Vol. XIX).

[58] ROA pp. 2204-2250 (Vol. X).

simply ignored. For example, Lafayette **has never, to this day, responded to the lost rent claim**. Similarly, while Wes Swank found damages that he believed were storm related, Lafayette **did not tender** any further payments after his inspection. Further, there are aspects of the jury award that are not contested on appeal. For example, Lafayette does not challenge that lost rents are due, only the quantum. Even though there are elements of the jury award that Lafayette has not contested on appeal, Lafayette has not tendered a single penny to Mr. Sher since the jury verdict. Not paying uncontested amounts with no basis for doing so is per se bad faith.

If part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim.[59] Consequently, when such a dispute arises, to avoid the imposition of penalties the insurer must unconditionally tender to the insured the undisputed portion of the insured's claim. That was not done here.

### 2.    There was Evidence to Support the Jury's Finding of Failure to Initiate Loss Adjustment within 30 Days of Notice of Loss

Leopold Sher testified that he gave Lafayette notice of loss during the first two weeks of September, 2005.[60] Lafayette did not contradict this testimony. The first time an adjuster inspected the property on behalf of Lafayette was November 1, 2005.[61] There is no evidence that Lafayette did anything to initiate loss adjustment before November 1, 2005. Mr. Miller of Lafayette testified that merely assigning the file to an outside adjuster was initiation of loss adjustment; a claim that is inconsistent with Louisiana law. In order to initiate loss adjustment, Lafayette must have taken a substantive and affirmative step to accumulate the facts necessary to evaluate the

---

[59] *Warner v. Liberty Mut. Fire Ins. Co.*, No. 1988-2250, (La. App. 4 Cir. 4/13/1989), 543 So. 2d 511; *Sibley v. Insured, Lloyds*, 442 So. 2d 627, 632 (La. App. 1st Cir.1983); *O'Brian v. Allstate Ins Co.*, 420 So. 2d 1222, 1225 (La. App. 3d Cir. 1982).

[60] Tr. 3/13/07, p. 114, lns. 6-11 (Vol. XV).

[61] Tr. 3/13/07, p. 115, lns. 17-19 (Vol. XV).

claim and simply opening a file does not satisfy this requirement. [62]

### 3.    Whether "Flood" Claim Was Disputed in Good Faith Is Irrelevant

Lafayette claims that its dispute of the "flood" portion of the claim was in good faith. That is a non-issue, as "if part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the <u>entire claim</u>."[63] Whether or not the dispute of the "flood" portion of the claim was in good faith is irrelevant because Lafayette failed to pay other parts of the claim that it should have paid.

> An insurer must take the risk of misinterpreting its policy provisions. If it errs in interpreting its own insurance contract, such error will not be considered as a reasonable ground for delaying the payment of benefits, and it will not relieve the insurer of the payment of penalties and attorney's fees.[64]

When presented with several scenarios and asked if they were covered, Mr. Miller testified that he would have to investigate, but he admitted never investigating whether the man made levee breaks were covered.[65] Thus, while a non-issue, the jury fairly concluded event the handling of the "flood" issue was in bad faith.

### 4.    Whether the Business Personal Property Claim was Disputed in Good Faith is Irrelevant

Whether the failure to pay for business personal property was in good faith is also irrelevant. Clearly, the failure to pay lost rents and failure to pay property damage observed by Mr. Swank was in patent bad faith.

### 5.    The Rents were not Disputed in Good Faith

Lafayette claims that it disputed the amount of rents owed in good faith. However, what this argument fails to discuss is the fact that Lafayette, through trial

---

[62] *Hollier v. State Farm Mutual Auto. Co*, 2001-0592 (La. App. 3 Cir. 10/31/01), 799 So.2d 793, 797; *McClendon v. Economy Fire & Cas. Ins. Co.*, 98-1537 (La. App. 3 Cir. 4/7/99); 732 So.2d 727, 731.

[63] *Warner v. Liberty Mut Fire Ins. Co* 1988-2250, (La. App. 4 Cir. 6/14/89), 543 So. 2d 511, 515 (emphasis added).

[64] *LeBlanc v. Underwriters at Lloyds*, 402 So.2d 292, 299 (La. App. 3d Cir. 1981).

[65] Tr. 3/20/2007, p. 129, ln. 11 - p. 130, ln. 32 (Vol. XIX) .

and in fact through today's date **has not paid a single penny in lost rents**. If Lafayette wanted to be in good faith, it should have tendered the undisputed amount, presumably the pre-Katrina level rents for the apartments on the upper floors that were damaged. Here, it tendered nothing, hence the argument that some rents were not owed must fail. Further, as discussed above, if any amount due was not paid in bad faith, the fact that some amounts were challenged in good faith is irrelevant.

      6.    **The Building Damages were not Disputed in Good Faith**

     Lafayette claims that it disputed the amount of the building damages in good faith. The facts shown at trial belie that claim. Lafayette's primary excuse at trial for why the damages that all of its adjusters and engineers acknowledged were present was a claim of failure to maintain. This claim was **obviously** in bad faith, as **Lafayette inspected the property multiple times before Katrina**, each time noting that the property was "well maintained" or some variation thereon.

     Lafayette misrepresents the amount claimed before trial, by claiming that Mr. Sher was only claiming a small amount pre-litigation. The documents introduced show that Mr. Sher claimed in excess of $200,000 before suit, and provided Lafayette with estimates and invoices supporting that claim amount.[66] Furthermore, the claim that Mr. Sher did not claim damage for the basement is not supported by the record. Leopold Sher specifically testified that he attempted to show the basement damage to Lafayette's first adjuster, Jones, but that he **refused to look at it**.[67] Under *Warner*, the inquiry is not whether Lafayette failed to pay *all* of the amounts claimed in bad faith, but whether Lafayette failed to pay *any* of the amounts claimed in bad faith. Here, the Jury properly answered that question "yes."

    B.    **The Jury Verdict on Lost Rents was Supported by the Evidence**

---

[66] Pl. ex. 25 and 26, sending invoices/estimates totaling $23,742.99 and $198,553.88, respectively.
[67] Tr. 3/20/2007, p. 112, lns. 10-12 (Vol. XIX).

The lost rent award was supported by the evidence submitted to the Jury. The Policy states that it pays for the "actual loss of business income you sustain." [68] Leopold Sher testified that the apartments could have been rented out at the rental rates awarded by the jury during the period of lost rents. In fact, Apartment C was rented out at the rate awarded by the Jury after it was repaired.

Lafayette attempts to lower the amount of lost rents by claiming that only the rents charged pre-Katrina are recoverable. That overlooks the facts that 1) Mr. Sher, because of the damage to the property, lost his pre-Katrina tenants who were renting month to month and were not bound by leases, and 2) Mr. Sher could have rented the apartments for the amount awarded if they had not been damaged by Katrina. The award does not result in a windfall, it only places Mr. Sher in the position he would have been in if his property would not have been damaged by Katrina.

C.   The Jury Award for Physical Damage is Supported by The Evidence

Lafayette next challenges the quantum of the jury award for physical damages. Once again, Lafayette, without basis, second guesses the jury. The jury heard detailed evidence of the actual amounts spent on repairs and the projected cost of additional repairs needed. Mr. Sher retained Mr.Scairono, an architect, to review all invoices and estimates and to prepare a comprehensive estimate including all repair costs necessary because of the storm. Mr. Scairono gave detailed testimony regarding his estimates (exhibits P-149 and P-150). [69] Mr. Scairono's testimony is uncontested in that Lafayette did not have any of its experts prepare a competing estimate.

1.   Overhead and Profit was Appropriate

Lafayette contends that Mr. Scairono included 45% overhead and profit. This contention is incorrect. The estimates both reflect 25% overhead and profit. [70]

---

[68] Pl. ex. P-3, p. 64.

[69] Tr. 3/15/07, p. 80, ln. 16 - p. 103, ln. 16 (Vol. XVII).

[70] Pl. ex. P-149, P-150.

Lafayette is apparently including the 20 % contingency that is a part of the Scairono estimates when it asserts that the overhead and profit total 45%. However, Mr. Scairono clearly explained that the contingency is separate and distinct from overhead and profit and that both are reasonable and customary.[71] As such, there was a sufficient factual basis for the Jury to award damages in accordance with Mr. Scairono's estimates.

### 2. The Award of Damages Related to "Water Hammer" is Appropriate

Lafayette challenges the damages caused when the water pressure, which was lost due to Katrina, was reinstated resulting in pipes bursting in the Property. Lafayette does not offer any analysis of why this is not covered.  The policy defines covered causes of losses "risk of direct physical loss."[72] Lafayette is precluded from arguing that any exclusion applies as it **never pled that this damage was not covered and did not issue any reservation of rights**.

### 3. Mr. Carubba Testified to Structural Damage

Lafayette argues that Mr. Carubba testified he had no supporting evidence of structural damage. That argument is incorrect and miscites the record. Particularly, Mr. Carubba, was asked "Do you have any supporting evidence for your opinion that there's underlying structural damage, **other than what you have told us so far?**"[73] Mr. Carruba answered "no," because he had already given detailed testimony concerning why he believed there was structural damage.[74] On redirect, Mr. Carubba reiterated that it is his testimony that the porch actually moved and that is structural damage.[75] Accordingly, the jury verdict is supported by the testimony.

---

[71] Tr. 3/15/07, p. 93, lns. 1-18, p. 94, lns. 3-15, p. 103, lns. 8-16 (Vol. XVII).

[72] Pl. ex. 3, p. 72.

[73] Tr. 3/14/07, p. 190, lns. 30-32 (Vol. XVI).

[74] Tr. 3/14/07, p. 156, ln. 11 - p. 159, ln. 30, p. 161, ln. 29 - p. 162, ln 25, p. 165, lns. 17-25, p. 174, lns. 19-25 (Vol. XVI).

[75] Tr. 3/14/07, p. 202, lns. 4-8 (Vol. XVI).

4. The Jury Award Did Not Exceed Amounts Established by Testimony

Lafayette argues that the Jury award exceeds the estimates of Mr. Scairono. With respect to the $50,000 differential which Lafayette complains of, on cross examination Mr. Carubba testified that in order to learn if there is hidden structural damage in addition to the structural damage included in his estimate, that it would be necessary to open up the walls to examine the structural members to determine if such damages exist.[76] Mr. Scairono testified that the cost of performing such work would be $50,000 to $80,000.[77] The Jury was asked to award $50,000 to $80,000 for this investigative work, and evidently chose to award the lower end of this range.[78]

D. Lafayette is not Entitled to a Credit

Lafayette argues that it is entitled to a credit for the amounts tendered to Mr. Sher. This argument is spurious in that it completely ignores the uncontested testimony that the checks sent to Mr. Sher were not cashed.[79]Lafayette is not entitled to a credit for checks tendered but not negotiated.

III. TRIAL COURT RULINGS

Lafayette challenges a number of rulings made by Judge Giarrusso during and after trial. These rulings were well founded and should be affirmed.

A. The Trial Court Properly Prohibited Lafayette from asserting Policy Exclusions/Limitations That Were Not Properly Pled

Lafayette failed to specifically plead any exclusion or policy limitation, other than the "Water" exclusion and credit for any payments made under the NFIP policy in its Answer. Other than one paragraph mentioning the Water exclusion and one paragraph mentioning the NFIP policy, Lafayette's Answer only generally alleges the terms of the policy. Paragraph 79 of Lafayette's Answer provides:

---

[76] Tr. 3/14/07, p. 194, lns. 6-24, p. 200, ln. 15 - p. 201, ln. 24 (Vol. XVI).

[77] Tr. 3/15/07, p. 93, ln. 19 - p. 94, ln. 2 (Vol. XVII).

[78] Tr. 3/20/07, p. 27, lne 11-19, p. 30, lns 3-11, p. 33, lns. 14-19 (Vol. XIX).

[79] Tr. 3/13/07, p. 125, lns. 12-29 (Vol. XV).

> Lafayette adopts the terms, conditions, coverages, exclusions and endorsements of its policy, as if copied herein *in extensio*, as a defense to petitioner's claims; Lafayette further pleads all defenses, exclusions, rights and remedies under the policy of insurance issued by Lafayette to petitioner.[80]

Because Lafayette failed to specifically plead any exclusions or limitations (other than the water exclusion), the Trial Court properly prohibited Lafayette from offering proof regarding any other limitation or exclusion.

Louisiana Code of Civil Procedure article 1005 provides: "The answer **shall** set forth affirmatively . . . and any other matter constituting an affirmative defense." In *Dixie Savings and Loan Association v. Pitre*,[81] the Court addressed this exact issue and held that no proof could be offered in connection with the proposed affirmative defense because the defendant failed to specifically plead the affirmative defense. There, a defendant generally pleaded that the "policy is its own best evidence and the provisions, exclusions, and limitations therein are pled herein as though copied in extensio."[82] The defendant attempted to amend its answer to specifically plead the affirmative defense at issue, but the trial court did not allow the amended answer. The Court refused to consider the defendant's purported affirmative defense:

> Louisiana Code of Civil Procedure article 1005 provides that all affirmative defenses shall be specifically pled in the answer. In the absence of such pleading, no proof can be offered in connection with that affirmative defense. Because [the defendant] raised no affirmative defenses relating to coverage afforded the Pitres under the policy, we will not consider the merits of this assignment.[83]

Because Lafayette did not specifically plead any policy exclusions or limitations, other than the "Water" exclusion and credit for NFIP payments, the Trial Court properly precluded Lafayette from offering evidence or testimony of policy exclusions or limitations not pled, pursuant to article 1005.

---

[80] ROA pp. 619-631 (Vol. III).

[81] No. 99-154 (La. App. 5th Cir. 7/27/99); 751 So. 2d 911,

[82] *Id.* at 924.

[83] *Id.*

This Honorable Court has specifically held that reliance on an insurance contract is considered an affirmative defense which must be specifically pleaded:

> [A] defendant's answer must set forth any matter constituting an affirmative defense. **Reliance upon an exclusion in an insurance contract is considered to be an affirmative defense, which must be specifically pleaded in defendant's answer. In the absence of such a pleading, no proof can be offered in connection with the exclusion.**[84]

In *Pendleton*, the defendant's answer did not contain any references to the exclusion sought to be applied by defendants. This Court held that where the pleadings fail to refer to the exclusion, the defendants were precluded from offering any proof regarding the exclusion:

> In the present case, defendant's answer does not contain any reference to the above-cited exclusion contained in the subject policy. Defendant did not raise this issue until the conclusion of the trial when he sought a directed verdict, which the trial court denied. Under these circumstances, **where the pleadings fail to include this defense, defendant is precluded from offering proof in connection with this exclusion.**[85]

Similarly, Lafayette failed to raise any exclusions or limitations, other than "water" and NFIP, in its Answer.

Likewise, Lafayette did not raise these exclusions or limitations in a reservation of rights, thereby waiving the right to raise them.[86] An insurer's duty to inform its policyholders of the intent to deny coverage has been discussed as follows:

> The policy holder argues that the carrier waived its affirmative defenses and should be estopped from relying on those defenses.
>
> **We reject the carrier's contention that a property damage insurance carrier has no duty to inform its policyholder at any time that it intends to deny coverage.** Although the date that the carrier makes a firm decision to reject the claim is not necessarily the date it issues a disclaimer, once a demand for payment has been made and a "firm decision to reject a claim" has been made, **the carrier is obligated to issue a disclaimer of coverage.**[87]

---

[84] *Pendleton v. Smith*, 95-1805 (La. App. 4 Cir.,1996), 674 So. 2d 434, 437 (citations omitted) (emphases added).

[85] *Id.* (emphasis added).

[86] *Peavey Co. v. M/V ANPA*, 971 F.2d 1168 (5 Cir. 1992)

[87] *Bertalo's Restaurant Inc. v. Exchange Ins. Co*, 240 A.D. 2d 452, 453-54 (N.Y. A.D. 2 Dept., 1997) (citations omitted) (emphasis added).

Accordingly, Lafayette waived these affirmative defenses and the Trial Court's holding was correct.

Even if Lafayette should have been allowed to present evidence and testimony of exclusions, the partial exclusion of this evidence was harmless error. Particularly, Lafayette was allowed to present evidence of policy defenses in the second phase of trial, and despite that evidence, the jury found Lafayette was arbitrary and capricious.

### B.   The Jury Properly Awarded Mr. Sher $31,577.00 in Contents

On Thursday, March 15, 2007, Lafayette orally moved for a directed verdict that Business Personal Property is not covered under its Policy. This is the first time Lafayette ever claimed that it did not cover such property -- it was never pled as an affirmative defense and never raised in a reservation of rights. For the reasons discussed above, Lafayette waived this affirmative defense by failing to timely raise it in a reservation of rights or in its answer.

Paragraph 56 of the original petition addressed the contents claim, stating:

> A declaratory judgment is necessary in that Joseph Sher contends that the damages to the Insured Premises **and its contents** were caused by Hurricane Katrina and the actions and/or errors of the Corps and that **the damages are covered under the Lafayette Policy**. Defendants contend, however, that the damages to the Insured Premises **and its contents** are not covered under the Policy . . . .[88]

Thus, Lafayette was aware of this claim since the inception of the lawsuit, **but failed to address it in any manner prior to moving for directed verdict.**

In support of its argument, Lafayette cited the Building and Personal Property Coverage Form, and the Declarations Page of the Policy. The Building and Personal Property Coverage Form provides, in pertinent part, that Lafayette will pay for damage to "Covered Property."[89]   Lafayette argues that the Declarations page provides limits of liability for "Building" and "Rental Value with Extra Expense" –

---

[88] ROA p. 14 (Vol. I).
[89] Pl. ex. P-3, p. 55.

and thus, the policy does not cover "Building Personal Property." However, this ignores the description of business personal property covered which states that the covered property "consist[s] of the following unless otherwise specified in the declarations."[90] The fact that the declarations page does not specifically set forth particular property should not be construed to eliminate this coverage.

Additionally, Lafayette also ignores the plain language of its own policy, in which the "Building" coverage is defined to include certain personal property. The declarations page contains a limit of liability of $463,000 for the "Building," which is defined to include many of the "contents" which Mr. Sher recovered. The Policy provides coverage for the following:

> 1. Covered Property: Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:
>
>     a. Building meaning the building or structure described in the Declarations, including:
>
>         1) Completed additions;
>         2) Permanently installed:
>             a) **Fixtures;**
>             b) **Machinery; and**
>             c) **Equipment;**
>         3) **Outdoor fixtures;**
>         4) **Personal property owned by you that is used to maintain or service the building or structure or its premises, including:**
>             a) **Fire extinguishing equipment;**
>             b) **Outdoor furniture;**
>             c) **Floor coverings; and**
>             d) **Appliances used for refrigeration, ventilation, cooking, dishwashing or laundering;** [91]

Accordingly, all fixtures, machinery and equipment, and all personal property used to maintain or service the building are covered under the "Building" coverage. The "Building" and "Business Personal Property" coverages are not mutually exclusive.

---

[90] *Id.*

[91] Pl. ex. P-3, p. 55.

In *Cock-N-Bull Steak House, Inc. v. Generali Insurance Company,*[92] the court examined a policy with the exact same language and determined that certain items fell within both categories: "A comparison of the categories "Building" and "Building Personal Property" reveals that they are not mutually exclusive. Certain fixtures, machinery, and equipment fall within the definitions of both." Similarly, in the present case, certain items fall within both descriptions, and as such, are covered by the building coverage provision. For example, items such as water heaters, stove, air conditioner, and locks are fixtures and as such are covered under the "Building" coverage, as defined by the Policy. Further, items such as washers and dryers, tools, lawn mower, refrigerator, freezer, light bulbs, lumber, concrete mix, vacuum cleaner, and space heater are also covered under the "Building" coverage as personal property used to maintain or serve the building. Thus, many of the personal property items are covered under the "Building" coverage.

## C.    The Trial Court Properly Awarded Attorneys' Fees and Costs

### 1.    Mr. Sher Is Entitled to Recover Attorneys' Fees and Costs Pursuant to Louisiana Revised Statues 22:658 and 22:1220

The jury found that Lafayette acted in bad faith. Given the abundant evidence demonstrating Lafayette's repeated actions of bad faith, such as Lafayette's incredible reliance throughout this entire litigation on its theory that the property was not well-maintained despite the fact that its own underwriting file demonstrated that the property was well maintained, and Lafayette's intentional misrepresentations regarding the opinions of its first expert, Mr. Fred Vanderbrook, the jury's findings in this regard are certainly not manifestly erroneous. Further, Lafayette waived any argument that the current version of §658 does not apply by submitting a joint jury charge which applied the current version of §658. Regardless, the current version of

---

[92] 466 S.E. 2d 727 (S.C. 1996).

§658 applies to the present case.

### a.   The Jury's Finding That Lafayette Acted in Bad Faith Is Not Manifestly Erroneous

La. R.S. 22:658(B)(1) provides that when an insurer violates the provisions of

the statute and the insurer's failure is arbitrary, capricious, or without probable cause,

the insurer **shall** be subject to penalties, including attorneys' fees:

> Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefore or failure to make a written offer to settle any property damage claim . . . within thirty days after receipt of satisfactory proof of loss of that claim . . . when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of **fifty percent** damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due **as well as reasonable attorney fees and costs**.[93]

The jury found Lafayette failed to initiate adjustment within 30 days of notice, failed

to pay within 30 days of receipt of proof of loss, and failed to pay within 60 days of

proof of loss.[94]  The jury also found that the failures to pay were arbitrary, capricious,

or without probable cause.[95]  These findings are not manifestly erroneous.

### b.   Lafayette Waived the Argument That the Old Version of §658 Applies by Submitting Joint Jury Instruction No. 34

Lafayette waived any argument that the former version of Louisiana Revised

Statute 22:658 applies because it signed Joint Jury Instruction No. 34, which recites

the current version of Louisiana Revised Statute 22:658(B)(1).[96]  No assignment of

error by Lafayette claims that the joint jury charge was erroneous. Pursuant to

Louisiana Code of Civil Procedure article 1793(C), Lafayette cannot argue that Joint

Jury Instruction No. 34 was given in error because Lafayette submitted the

---

[93] La. Rev. Stat. 22:658 (emphasis added).

[94] ROA p. 2663 (Vol. XI).

[95] Id.

[96] ROA pp. 2204-2250 (Vol. IX).

instruction: "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires, stating specifically the matter to which he objects and the grounds of his objection." Because Lafayette jointly submitted the instruction, it cannot now complain that it was given in error. As explained by this Court, when a party fails to timely object to a jury instruction, he waives the right to do so on appeal: "A review of the record reveals that appellant was given ample opportunity by the trial court to object to the jury charges, and he failed to do so, thus waiving his right to raise the objections on appeal."[97]

In *Solomon Dehydrating Co. v. Guyton*, the court addressed a similar issue and determined that a party cannot complain about an alleged error in a jury instruction when the error is contained in the instruction he submitted to the court.[98] In *Solomon*, the appellant argued that the court erred in instructing the jury, but the Court found that the appellant could not raise the argument for the first time on appeal and that "the appellant's own requested instruction is not out of line with the instruction given. 'A party cannot complain of an alleged error in instructions when the same error is found in its own instructions.'"[99] Here, Lafayette submitted Joint Jury Instruction No. 34, which applied the current version of 22:658. Accordingly, Lafayette waived its right to argue that the court erred in giving Joint Jury Instruction No. 34.

### c.   The current version of 22:658 applies to the present case

Further, the Trial Court did not err in using Joint Jury Instruction No. 34 because the current version of Louisiana Revised Statute 22:658 applies.

### i.   Assessing the Temporal Effect of Laws

Although generally, laws cannot apply retroactively, the Louisiana Supreme Court, has stated, "civilian theory . . . admits three exceptions" to this general rule:

---

[97] *Madere v Serpas*, 442 So. 2d 842, 844 (La. App. 4th Cir. 1983).

[98] 294 F. 2d 439 (U.S. 8 Cir. 1961).

[99] *Id.* at 445 (citations omitted).

laws that lessen penalties, laws that are merely interpretive of existing legislation, and those that the legislature has expressly or impliedly declared to be retroactive.[100]

Louisiana Civil Code article 6 and Louisiana Revised Statute § 1:2 set forth rules for deciding whether a law may be applied retroactively.  Courts construe the two statutes as "co-extensive."[101]  Courts read these statutes "together to determine whether a legislative enactment is to be applied retroactively or prospectively, the courts must ascertain whether in the enactment the legislature expressed its intent regarding retroactive or prospective application."[102]  If a court decides that the "legislature expressed its intent regarding retrospective or prospective application . . . [its] inquiry is at an end."[103]

        ii.    **Legislative History and Historical Notes Establish Legislature's Intent to Apply Act 813 Retroactively**

Courts may "consider . . . legislative history" when interpreting a statute.[104] Legislative history that directly relates to statutory construction typically "refers to utterances (and some events) that engage the attention of the legislature during the process, from conception to birth, of enacting the statute being interpreted."[105]

Courts consider legislative history when determining whether legislation applies retroactively.[106] *Dombrowski*, centered on a dispute over the applicability of a workers' compensation provision related to offsets.[107]  This provision, Louisiana Revised Statutes § 23:1225, was in effect at the time plaintiff signed his employment contract (in 1996), but had been legislatively repealed in 2004.  Plaintiff argued that

---

[100] *Ardoin v. Hartford Accident & Indem. Co.*, 360 So. 2d 1331, 1338 (La. 1978).

[101] *Genusa v. Dominique*, 1997-0047 (La. App. 1 Cir. 2/20/98), 708 So. 2d 784, 790.

[102] *Id.*

[103] *All Property & Casualty Carriers*, 937 So. 2d at 321.

[104] 20 La. Civ. L. Treatise, Legis. Law & Proc. § 7.10.

[105] *See id.*

[106] *Dombrowski v. New Orleans Saints* 2005-0762 (La. App. 1 Cir. 8/02/2006), 943 So. 2d 403.

[107] 2005-0762 (La. App. 1 Cir. 8/02/2006), 943 So. 2d 403.

the repeal should be applied retroactively, which would mean that Section 23:1225 would be treated as if it never existed.[108] The Court reasoned, however, that the **"legislative history indicates the contrary,** in that it reflects that the legislature considered and expressly rejected the thought of making the repeal of Section 1225(D) retroactive."[109]

*Industrial Risk Insurers v. New Orleans Public Service, Inc.,* arose out of a 1980 fire.[110] Plaintiff sued the New Orleans Fire Department, which moved to dismiss the claims, arguing it was immune from suit under La. R.S. § 9:2798.1, the 1985 statute that immunized government employees from their discretionary or policy-making acts.[111] The court agreed that "the legislature intended that [Section 9:2798.1] be applied retroactively."[112] As support for this statement, **the court cited the Minutes of Meetings in both the Louisiana House of Representatives and the Louisiana Senate.**[113] As such, it is appropriate for this Court to consider the Minutes of Meetings connected with the enactment of Act 813 when considering whether the legislature intended for this Act to apply retroactively.[114]

The "Historical and Statutory Notes" to La. R.S. 22:658 include House Concurrent Resolution No. 58, which blames insurance companies' dilatory conduct for "delays in the recovery process."[115] Along with legislative history, Louisiana

---

[108] *See id.* at 408.

[109] *Id.* (emphasis added).

[110] 735 F. Supp. 200 (1990).

[111] *See id.* at 201.

[112] *Id.* at 202.

[113] *See id.*

[114] *See also Abate v. Healthcare Int'l, Inc,* 560 So. 2d 812, 814 (La. 1990) (referring to legislative history to determine if legislative history evinced intent to overrule jurisprudence); *Wooley v State Farm Fire & Cas. Ins. Co.,* 2005-1490 (La. App. 1 Cir. 2/10/2006), 928 So. 2d 618, 622 (reviewing legislative history to decide if statute "should be given retroactive effect").

[115] *See* Appendix B.

courts examine "Historical and Statutory Notes" to determine legislative intent.[116] In *Beutler England Chiropractic Clinic v. Mermentau Rice, Inc.*, for example, the court reviewed the "Historical and Statutory Notes" to determine whether, for retroactivity purposes, a statute could be considered procedural or interpretive.[117]

Here, the "Historical and Statutory Notes" to Louisiana Revised Statute § 22:658 establish the legislature's concern that the failure of insurance companies to adjust claims timely stalled the recovery process. Senator Murray confirmed this belief when he noted, in support of his bill, that increasing the penalties available under Section 22:658 would **"encourage" insurers to timely resolve the claims of insureds who were already "deal[ing] with the costs associated with a disaster."**[118] The statements of Senator Murray, the bill's sponsor, have no meaning unless the Act is applied retroactively to insurers who arbitrarily and capriciously failed to pay claims timely in the aftermath of Hurricanes Katrina and Rita.

Further, the case relied upon by Lafayette, *Tomilson v. Allstate Indemnity Company*, is easily distinguishable. The effective date of the amendment to 22:658 was August 15, 2006. In *Tomilson*, the petition was filed on January 17, 2006, eight months prior the amendment. Here, Mr. Sher filed his Petition on August 28, 2006, after the effective date of the amendment. Further, there is no indication that the Act's legislative history, which unmistakably evidences the legislature's intent that it apply retroactively, was considered in *Tomilson*. Because the retroactivity of 22:658 was not considered in *Tomilson*, the ruling is not applicable here.

### iii.   Petition for Damages Constituted a Proof of Loss

Regardless, the dispute over whether Act 813 applies retroactively is, in this

---

[116] *See Wilcox v. Gamble Guest Care Corp.*, 40,650 (La. App. 2 Cir. 4/12/2006), 928 So. 2d 695, 698.

[117] 2005-942 (La. App. 3 Cir. 5/31/2006), 931 So. 2d 553, 561 (Peters, J., concurring).

[118] *See* Appendix B pp. 2-3 (emphasis added).

lawsuit, purely academic.  When Mr. Sher served his lawsuit on Lafayette on September 5, 2006, he supplied Lafayette with satisfactory proof of loss, thus triggering *the current version* of Louisiana Revised Statutes § 22:658.  Because Lafayette is liable for bad-faith penalties for its post-lawsuit conduct, it is irrelevant whether Act 813 applies to Lafayette's pre-lawsuit conduct.

§ 22:658(A)(4) declares that all insurers "shall make a written offer to settle any property damage claim . . . within thirty days after receipt of satisfactory proofs of loss."  The penalty provisions of Section 22:658 apply when an insurer fails to pay what it owes "within thirty days after receipt of *satisfactory proofs of loss.*"[119] Courts interpret the phrase "satisfactory proof of loss" very liberally.   As the Louisiana Supreme Court has stated, the "cases under section 658 have demonstrated that 'proof of loss' is <u>a flexible requirement to advise the insurer of the facts of the claim</u>."[120]  In other words, as long as the proof of loss "fully apprise[s] the insurer of the insured's claim," the "satisfactory proof of loss" requirement of Section 22:658 is met.[121]  In *Gulf Wide Towing*, for example, the court held that telexes sent by the owner of a sunken tugboat to the boat's insurers "established that notice of the sinking (proof of loss) was made."[122]  The insurer's subsequent failure to pay subjected it to penalties under Section 22:658.[123]

In *Haynes v. Shumake*, the court found that <u>a petition for damages could constitute a satisfactory proof of loss.</u>[124]  Plaintiff sought penalties under §658 from his uninsured motorist ("UM") insurer.  The UM insurer argued that it did not receive a satisfactory proof of loss triggering the time period by which it must decide whether

---

[119] *See* La. Rev. Stat. § 22:658(B)(1) (emphasis added).

[120] *Sevier v. United States Fidelity & Guaranty Co.*, 497 So. 2d 1380, 1384 (La. 1986).

[121] *Gulf Wide Towing*, 554 So. 2d at 1353.

[122] *Id.* at 1354 (emphasis added).

[123] *See id.*

[124] 582 So. 2d 959 (La.App. 2 Cir. 1991).

to pay the claim, until a pre-trial conference conclusively established that the tortfeasor was underinsured.[125] The Court of Appeal concluded that the *petition for damages itself* should have put the UM insurer on notice to investigate the plaintiff's claim.[126] Because of the petition filed against the UM insurer, the insurer "should have known of the underlying limits long before the pretrial conference so that the sixty day period should have begun running before the date of that conference."[127]

Here, Mr. Sher served the Petition on Lafayette on September 5, 2006.[128] This Petition advised Lafayette of the identity of the property and the type of damage sustained by the property and included voluminous loss support documents.[129] By serving this lawsuit, Mr. Sher put Lafayette on notice to investigate his claim and then pay what was owed under the policy. Mr. Sher, in short, "**apprised**" Lafayette of the underlying facts supporting his claim. Indeed, under Louisiana law, the very purpose of a Petition is to "**apprise** defendants of all the elements" of a plaintiff's claim.[130] The Petition met the requirement of a satisfactory proof of loss under §658. Since Mr. Sher served the Petition, Lafayette has not tendered a penny to Mr. Sher.

### iv. **Section 658 Applies to Lafayette's Post-Lawsuit Conduct**

Section 658 imposes a duty of good faith and fair dealing on an insurer. In *Harris v. Fontenot*, the court found that "nowhere in either statute is there an express distinction limiting the application to the pre-litigation conduct of the insurer."[131] The court reasoned that the "**requirements [of good faith and fair dealing] are no less**

---

[125] *See id.* at 962.

[126] *See id.*

[127] *Id.* In 1991, when *Haynes* was issued, Section 22:658 allowed insurers a longer time to respond to satisfactory proofs of claim (sixty days) instead of the "thirty days" provided to insurers in the current version of the statute.

[128] ROA p. 308 (Vol. II).

[129] ROA pp. 1-286 (Vol. I, II).

[130] *Texas Gas Transmission Corp. v Soileau*, 251 So. 2d 104, 107 (La.App. 3 Cir. 1971) (emphasis added).

[131] 606 So. 2d 72, 74 (La.App. 3 Cir. 1992) (emphasis added).

<u>important after litigation has begun.</u>"[132] The *Harris* court also noted that in *McDill v. Utica Mutual Insurance Co.*[133] the Louisiana Supreme Court imposed penalties on an insurer for post-litigation conduct. Because an insurer's duty of good faith and fair dealing "<u>continues throughout litigation,</u>" Lafayette is liable for bad faith penalties for failing to respond to the satisfactory proof of loss provided to it on September 5, 2006.[134] Also, a duty to pay the claim was triggered by the following post litigation knowledge of Lafayette:

> 1. Lafayette's supervisor, Mr. Miller admitted that he learned of the inspection forms showing the property was well maintained, yet still didn't pay Mr. Sher the amounts owed[135];
>
> 2. Dr. Householder found the house well maintained when he inspected the house and still Lafayette didn't fulfill its obligation in good faith[136]; and
>
> 3. At trial Mr. Vanderbrook gave the opinion the house was well maintained and that he had never told Lafayette otherwise, and still Lafayette didn't do the right thing and fulfill its contractual obligation in good faith.[137]

This post litigation knowledge obligated Lafayette to continue adjusting the claim.

Lafayette's claim that "Sher's cause of action arose well before the effective date of the amendment" is wrong.[138]  In  *Manuel v. Louisiana Sheriff's Risk Management Fund*, plaintiff alleged that he was entitled to penalties for an insurer's failure to fund a settlement after it had been reduced to writing.[139]  The court ruled that, even though the accident at issue occurred before an amendment to §1220, the failure to fund the settlement timely occurred after the amendment, hence the

---

[132] *Id.* (emphasis added).

[133] 475 So. 2d 1085 (La. 1985).

[134] *Theriot v. Midland Risk Insurance Co.*, 95-227 (La.App. 3 Cir. 11/2/1995), 664 So.2d 547, 550 (emphasis added).

[135] Tr. 3/19/07, p. 122, ln. 19 - p. 123, ln. 3 (Vol. XVIII).

[136] Tr. 3/19/07, p. 66, lns. 1-3, p. 65, lns. 29-32 (Vol. XVIII).

[137] Tr. 3/14/07, p. 81, lns. 25-31, p. 82 ln. 11 - p. 83. ln6 (Vol. XVI).

[138] Lafayette brief, p. 33.

[139] 93-2177 (La.App. 1 Cir. 11/18/1994), 647 So. 2d 363.

amendment applied to plaintiff's penalty claims against his insurer.[140]

Here, one aspect of the "complained-of conduct" is Lafayette's failure to make any payments after Mr. Sher supplied Lafayette with the Petition, a satisfactory proof of loss. Thus, a part of the "conduct or events" upon which Mr. Sher bases his penalty claims occurred **after August 15, 2006.** Accordingly, Act 813 applies to Lafayette's bad faith refusal to respond to Mr. Sher's satisfactory proof of loss.

Section 658 imposes a duty on insurers to "adjust claims fairly and promptly and to take reasonable steps to settle valid claims."[141] In one of the Mississippi Katrina cases, *Broussard v. State Farm Fire and Casualty Co.*, Judge Senter ruled that insurers had a **"continuing duty** to act reasonably and in good faith in investigating and paying legitimate claims under its polices."[142] Although Judge Senter rendered his decision under Mississippi law, Louisiana law is no different.

In *Theriot v. Midland Risk Ins. Co.*, the court held that the duties of good faith and fair dealing imposed on insurers by §658 "continue throughout the litigation."[143] Lafayette's duty to adjust claims fairly and promptly extended beyond August 15, 2006, and continues to this day, thus subjecting it to the increased penalties provisions set forth in Act 813. When Mr. Miller learned of the Lafayette inspections showing the property was well maintained, Lafayette should have paid the claim.

### 2.    Mr. Sher is also entitled to recover attorneys' fees and costs pursuant to Louisiana Civil Code article 1997

Louisiana Civil Code article 1997 provides that "an obligor [who acts] in bad faith is liable for all . . . damages, foreseeable or not, that are a direct consequence of his failure to perform."[144] Article 1997 supports the award of attorneys' fees in

---

[140] *Id.* at 370 (emphasis added).

[141] *Chargois v. Guillory*, 97-439 (La. App. 3 Cir. 10/29/1997), 702 So. 2d 1068, 1069.

[142] *Broussard*, 2007 WL 1213942 at * 3 (emphasis added).

[143] 664 So. 2d at 550, *rev'd on other grounds*, 694 So. 2d 184 (La. 1997).

[144] *See* LA. CIV. CODE art. 1997.

situations when an obligor has acted in bad faith.[145] The Court in *Newport Ltd v. Sears, Roebuck & Co.* recognized that the Louisiana Courts of Appeal for the First and Fourth Circuits have "recently recommitted themselves to their application of article 1997," affirming that attorneys' fees are awardable in instances of bad faith breach.[146] In *Newport*, Judge Duval discussed the history of article 1997 and whether it supports an award of attorneys' fees in instances of bad faith breach of contract, holding that when interpreting the two articles together, the only logical interpretation is that article 1997 is the Code's general provision on damages, awarding **all** damages, where article 1958 and its limited language is governed by article 1997:

> Also in 1984, the legislature enacted La. Civ. Code article 1958 which is the provision for damages in the case of rescission arising from fraud as a vice of consent.
>
> *   *   *
>
> *Recovery under [Article 1958] is governed by the general provisions on damages.* (emphasis added). Included as a cross-reference is article 1997. **From this, it appears that as article 1958, which allows attorneys fees is "governed" by the general provision of damages (art. 1997), then 1997 itself must contemplate attorneys' fees in the appropriate circumstances.**[147]

In *Smallpage v. Wagner & Wagner* awarded attorneys' fees as damages for a tailor's bad faith breach of contract.[148] Although *Smallpage* was decided prior to the enactment of article 1997, the court based its decision on the language of the former Louisiana Civil Code article 1934, which provided **nearly the exact same language as article 1997**, stating:

> When the execution of the contract has proceeded from fraud or **bad faith**, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but **also to such as are the**

---

[145] *See* LA. CIV. CODE art. 1997; *Smallpage v. Wagner & Wagner*, 84 So. 2d 863, 866 (La. App. Orl. 1956).

[146] 1995 WL 688799, *7-8 (E.D. La. Nov. 21, 1995) (citing *Airline Constr. Inc. v. Ted Hicks & Assoc., Inc.*, 506 So. 2d 554 (La. App. 1st Cir. 1987); *Rye v. Terminx*, 423 So. 2d 754 (La. App. 4th Cir. 1982)); *See also Layrisson v. H.S.S. Vending Distributors*, 1998 WL 355461, *2 (E.D. La. June 26, 1998) (holding that attorneys' fees are recoverable under article 1997).

[147] 1995 WL 688799 at *3-4.

[148] 84 So. 2d 863, 866 (La. App. Orleans 1956).

<u>immediate and direct consequence of the breach of that contract.</u>[149]

In *Smallpage*, the court held that a tailor's demand for an advance of $400 and representation that plaintiff's requested clothes were "in work," when in fact they were not, constituted "bad faith" such that attorneys' fees were recoverable under the language of article 1934.

In *Cobb v. Gallet*, the Court recognized that while generally, breach of contract does not give rise to an award of attorneys' fees unless expressed in the contract or by statute, an exception exists when there is evidence of bad faith on behalf of the contracting party against whom relief is sought.[150] The First Circuit again recognized this bad faith exception in the 1987 decision *Airline Construction v. Hicks*,[151] and this Court recognized the bad faith exception in the 1982 decision *Rye v. Terminex*.[152] Accordingly, Mr. Sher respectfully submits that he is also entitled to attorneys' fees and costs pursuant to Louisiana Civil Code article 1997.

3.   **The Amount of Attorneys' Fees is More Than Reasonable**

"The amount of attorney's fees is in the discretion of the trial judge."[153] Here, the simple fact of the matter is that Lafayette acted unreasonably in declining Mr. Sher's offer of judgment, and Mr. Sher's very reasonable settlement offer on the eve of trial. Lafayette forced Mr. Sher, a 91 year old Holocaust survivor, to undergo a lengthy and expensive jury trial, and Lafayette should not be allowed to rely on the amount of Mr. Sher's damages to reduce the amount of attorneys' fees and costs for which it is liable. To allow Lafayette to do so would reward it for acting unreasonably and encourage bad faith conduct. A strategy of continuing a war of

---

[149] *Id.*

[150] 392 So. 2d 134, 135 (La. App. 1st Cir. 1980).

[151] 506 So. 2d 554 (La. App. 1 Cir. 1987).

[152] 423 So. 2d 754 (La. App. 4 Cir. 1982).

[153] *Bolehi Marine, Inc. v. Fireman's Fund Ins. Co.*, No. 1985-1409 (La. App. 1st Cir. 5/28/1986) 489 So. 2d 1360, 1363.

attrition by an insurer in bad faith should not be encouraged or rewarded.

Lafayette incorrectly asserts that Mr. Sher seeks to recover in attorneys' fees over two-thirds of the jury's award of damages. In doing so, Lafayette ignores the fact that in addition to the $369,077.00 of general damages, the Judgment on Jury Verdict awards Mr. Sher $184,538.50 in penalties, as well as attorneys' fees and interest from the date of judicial demand until paid. Interest on a judgment of approximately $553,615.00 (which includes $369,077.00 of general damages and $184,538.50 in penalties) from the date of judicial demand, August 28, 2006, through April 25, 2007, is $31,859.41. Thus, the total judgment is at least $585,474.41. Mr. Sher's attorneys' fees of $258,728.00 are less than half of the amount of the judgment. Lafayette relies on *Malbrough v. Wallace*, 594 So. 2d 428 (La. App. 1 Cir. 1991) in support of its argument that attorneys' fees of 1/3 of the judgment is more appropriate. In *Malbrough*, however, plaintiff's counsel testified that he charged a 1/3 contingency fee. Here, counsel charged hourly. Thus, *Malbrough* is easily distinguishable. Moreover, here, counsel wrote off $54,832.50 in attorneys' fees, approximately 21.2% of the total bill for attorneys' fees. Accordingly, Mr. Sher's attorneys' fees are more than reasonable.

### D.    The Trial Court Properly Awarded Legal Interest on Penalties and Attorneys' Fees From the Date of Judicial Demand

Lafayette's argument that interest is calculated from the date of Judgment is incorrectly premised upon the theory that this action is delictual, not contractual. Clearly, the amounts owed under the policy are subject to Louisiana Civil Code article 2000, and interest runs from the date the amounts were owed. With respect to penalties, at the very least, interest on the penalties is due from date of judicial demand. *See Sanderford v. Lombard*, 685 So. 2d 1162, 1167 (La. App. 4th Cir. 1996); *Daney v. Haynes*, 630 So. 2d 949, 955 (La. App. 4th Cir. 1993).

E.   The Trial Court Properly Awarded Costs Pursuant to La. C.C.P.
     Article 970

Without any explanation whatsoever, Lafayette simply alleges that the Trial

Court erred in awarding costs pursuant to Louisiana Code of Civil Procedure article

970. Article 970 provides:

> If the final judgment obtained . . . against the defendant-offeree
> is at least twenty-five percent greater than the amount of the offer of
> judgment made by the plaintiff-offeror, the offeree must pay the
> offeror's costs, exclusive of attorney fees, incurred after the offer was
> made, as fixed by the court.[154]

Mr. Sher made an offer of judgment to Lafayette Insurance Company on February 9,

2007, in the amount of **$225,000.00** The final judgment obtained by Mr. Sher is at

least **$553,615.50**[155] (not including attorneys' fees, costs, and interest, which were

specifically included in the offer of judgment).  Pursuant to article 970(E), all

amounts expressly included in the offer of judgement are taken into consideration

when comparing the offer of judgment and the final judgment:

> For purposes of comparing the amount of money offered in the offer of
> judgment to the final judgment, which judgment shall take into account
> any additur or remittitur, the final judgment obtained shall not include
> any amounts attributable to costs, interest, or attorney fees, or to any
> other amount which may be awarded pursuant to statute or rule, **unless
> such amount was expressly included in the offer.**[156]

Mr. Sher's Offer of Judgment expressly included "costs, interest, attorney fees, and

any other amount which may be awarded Plaintiff against Lafayette in this matter."[157]

The final judgment greatly exceeds Mr. Sher's Offer of Judgment of $225,000.00. Mr.

Sher is entitled to all costs incurred after the Offer of Judgment.

The purpose of article 970 is to compensate the offeror who was forced to incur

trial litigation costs that could have been avoided had the offeree acted reasonably:

---

[154] LA. CODE CIV. PROC. art. 970(C).

[155] ROA p. 2688 (Vol XI).

[156] LA. CODE CIV. PROC. art. 970(E) (emphasis added).

[157] ROA p. 2966 (Vol. XII).

> Article 970 is punitive in nature and its function is to compensate the rejected offeror who is forced to incur greater trial litigation costs that could have been avoided if the offeree had not acted unreasonably in rejecting the offer.[158]

The Jury Verdicts of March 20, 2007 greatly exceed Mr. Sher's Offer of Judgment. As such, Lafayette should be taxed with all costs associated with Mr. Sher's trial preparation from February 10, 2007 to date.

The costs allowed by Article 970 include all litigation costs expended in preparation for trial:

> We note that Article 970 does not define "offeror's costs." However, if the legislature had intended to assess only court costs against an offeree who acts unreasonably in rejecting an offer thereby causing the offeror to incur greater trial litigations costs, Article 970 would have provided as such. In our opinion, "offeror's costs," as it is used in Article 970, refers to the costs of litigation, which includes court costs.[159]

Mr. Sher incurred substantial expenses in preparing exhibits for trial, including copies of numerous photographs and documentary evidence. Exhibit costs fall within the category of costs that are taxable against the party cast in judgment.[160] Mr. Sher has incurred approximately **$42,020.24** in litigation costs from February 10, 2007 through the date of the hearing on the Motion for Award of Attorneys' Fees and Costs.

### F.   No Offset for NFIP is Appropriate

Lafayette is not entitled to a credit for any insurance proceeds received pursuant to an NFIP policy for several reasons.

### 1.   No Evidence of Payments from NFIP was Introduced or Proffered

Judge Giarrusso did not refuse to allow the introduction of evidence of amounts paid by the NFIP carrier at trial. Rather, she ruled that such evidence would

---

[158] *Held v. Aubert*, 845 So. 2d 625, 636 (La. App. 1 Cir. 5/9/03).

[159] *Id.* at 638.

[160] *See Boutte v. Nisson Motor Corp.*, 94-1470, p. 12 (La. App. 3 Cir. 9/13/95), 663 So. 2d 154, 162 (holding that the "trial judge has great discretion in awarding costs (including expert witness fees, deposition costs, *exhibit costs*, and related expenses)").

be considered by her, not the jury.[161] **Lafayette simply failed to introduce any evidence of any amounts received by Mr. Sher from his NFIP carrier**. Not even Lafayette's proffer included evidence of NFIP payments. Simply put, Lafayette neither offered nor proffered any evidence of the amount of NFIP payments. Accordingly, this issue is not properly before the court.

### 2. NFIP is a Collateral Source that Should Not be Deducted from the Jury Award

The collateral source rule is a common law concept that has become "well-established" in Louisiana.[162] The effect of the collateral-source rule is as follows:

> [A] tortfeasor generally is not entitled to a credit for a payments made to the plaintiff through collateral sources independent of the wrongdoer's procuration or contribution. Generally, payments to a tort victim from a collateral source do not reduce the victim's recovery against the tortfeasor. Thus, the collateral source rule applies to situations where the victim receives compensation for his damages from a source independent of the tortfeasor.[163]

Among the several "public policy" reasons for the collateral-source rule, the "reason most often stated . . . is that the defendant should not gain an advantage from outside benefits provided to the plaintiff independently of any act of the defendant." Under this rule, payments received from an independent source "**are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer.**"[164]

#### a. The Collateral-Source Rule Applies to Breach-of-Contract Claims

The Louisiana Supreme Court has rejected the suggestion that the collateral-source rule narrowly applies to tort suits only. In *Kansas City Southern*, the Court stated that it was "**mere happenstance** that the collateral source rule has been applied chiefly in the context of a conventional [Article 2315] tort."[165] The Court further held

---

[161] Tr. 3/13/07 p. 12, lns. 9-22.

[162] *Louisiana, DODT v. Kansas City So. R.R.*, 2002-2349 (La. 5/2/2003), 846 So. 2d 734, 739 (hereinafter, "*Kansas City Southern*").

[163] *Suhor v Lagasse*, 2000-1628, (La.App. 4 Cir. 9/13/2000); 770 So. 2d 422, 423.

[164] *Kansas City Southern* 846 So. 2d at 739 (emphasis added).

[165] *Louisiana, DOTD*, 846 So. 2d at 741 (emphasis added).

that the collateral-source rule had been applied in "a range of situations where the collateral source is provided to the plaintiff by a **government agency** or even a gratuitous source."[166] Once the Court ruled that the collateral-source rule *could* apply to the DOTD's claim against the defendants, it held that the rule *should* apply to prevent any offset of the amounts paid to the DOTD by the FHWA.[167] The Court reasoned that, even if its decision resulted in a "windfall" for the DOTD, it was preferable to "**allowing the liability of the potential wrongdoer under the LEQA to be reduced by the 90 percent federal share.**"[168] As between the victim and the wrongdoer, any windfall should go to the victim. The Court held that any judgment against defendants "should not be reduced by the ninety percent of the federal share of the remediation funded by the FHWA."[169]

### b. The Collateral Source Rule Applies to Mr. Sher's Claims

This Court should follow *Kansas City Southern* and find that Mr. Sher's recovery should not be reduced by any payments made pursuant to the NFIP. Although the typical application of the collateral-source rule occurs in tort suits, the Louisiana Supreme Court recognizes that this fact is "mere happenstance."[170]

Lafayette breached the Policy by failing to pay for levee-related damages. As the breaching party, Lafayette is the wrongdoer. Mr. Sher submits that application of the collateral-source rule will ensure that the wrongdoer will not benefit from Mr. Sher's receipt of funds from an independent source, the federal government, for which Mr. Sher paid separate premiums.

---

[166] *Id.* at 740 (emphasis added). The Louisiana Supreme Court observed that, considering the origin of the collateral-source doctrine, decisions from other states on the collateral source rule were "persuasive." *Id.* at 742.

[167] *Id.* at 744.

[168] *Id.* (emphasis added).

[169] *Id.* at 745.

[170] *Kansas City Southern*, 846 So. 2d at 741.

There are three sides to every collateral-source issue: (1) the injured party, (2) the injurer, and (3) a source independent of the injurer who has paid the injured party.[171] If, under the application of the collateral-source rule, the injurer pays what he owes without offsetting the amount paid by the independent source, then Mr. Sher may receive "double recovery."[172] Forty-five years ago, the United States Ninth Circuit Court of Appeals addressed criticisms that the collateral-source rule overcompensates plaintiffs:

> [t]he question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall that already exists. **As between the injured person and the tortfeasor, the former's claim is the better.** This may permit a double recovery, but it does not impose a double burden. **The tortfeasor bears only a single burden for his wrong.**[173]

To the extent that the Judgment permits Mr. Sher to receive funds from Lafayette and the NFIP for the same loss, such a result is preferable to Lafayette keeping Mr. Sher's premiums without paying for what is owed under the Policy.

### c.    Lafayette is Not Entitled to a Collateral Source Credit or Offset

If this Court finds that the collateral-source rule is inapplicable, this Court should still find that Lafayette is not thereby entitled to a credit or offset:

> A court's decision not to grant a defendant collateral source credit does not rely on the same legal basis as the decision to apply the collateral source rule. [Even though] the collateral source rule has never [in California] been extended to breach of contract . . . not granting the [defendant] collateral source credit is well within the judge's discretion. In California, there is no statutory or common law precedent in a breach of contract action to give defendants collateral source credit for income tax benefits which plaintiffs may have received.[174]

Similarly, Louisiana has no precedent allowing for the type of credit sought by Lafayette, which was arbitrary and capricious in its adjustment of the claim.

---

[171] *See* John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 CAL. L. REV. 56 (Jan. 1983).

[172] As argued below, Mr. Sher disputes whether he will receive a "windfall" if its motion is granted.

[173] *Carrier v. Handelsman*, 307 F.2d 525, 535 (9th Cir. 1962).

[174] *Depalma v. Westland Software House*, 225 Cal.App.3d 1534, 1539 (Cal. 2 Dist. Ct. App. 1990).

i.   **Courts Have Prohibited Insurers From Using**
     **Offset Principles to Obtain a Windfall**

Lafayette argues unless it is permitted to offset amounts received from NFIP,

Mr.Sher will receive a "windfall." If this Court accepts Lafayette's arguments,

Lafayette will have collected premiums from Mr. Sher and then avoided the

obligation to pay for covered losses and thereby itself receive a "windfall."

In this zero-sum scenario, some party will benefit from a unique scenario

whereby a catastrophic failure by the Army Corps of Engineers entitles Mr. Sher to

recover under the NFIP **and** Lafayette policies. The Minnesota Supreme Court aptly

framed the question, and answer, as follows:

> if the question must be resolved on the basis of who gets a windfall, **it seems**
> **more than just that the insured who has paid a premium should get all he**
> **paid for** rather than that the insurer should escape liability for that for which
> it collected a premium.[175]

It is more just that Mr. Sher, who suffered due to the fault of others, should be paid

for all losses covered under the policy for which he paid premiums to Lafayette over

the years.[176] Anything less would result in a windfall to Lafayette.

Here, where Mr. Sher paid premiums in exchange for Lafayette's commitment

to pay for covered losses, Lafayette will receive a windfall "at the expense" of Mr.

Sher if it is allowed to use offset to reduce its coverage obligations to Mr. Sher.

ii.   **There Is No Windfall for Mr. Sher**

Louisiana courts recognize that, particularly in the insurance context, the

collateral-source rule does not bestow a "windfall" on plaintiffs. In *Bozeman v.*

*State*, the Supreme Court observed that this Court's Judgment in *Bryant v. New*

*Orleans Public Service, Inc.*[177] provides a "lucid discussion of the policy reasons

---

[175] *Van Tassel,* 207 N.W.2d at 352 (emphasis added).

[176] *See id.; see also Stout v. AMCO Ins. Co.,* 645 N.W.2d 108, 114 (Minn. 2002) (prohibiting auto insurer from using payments made to plaintiff under state Medicaid system to reduce amounts owed to insured for medical benefits).

[177] 406 So. 2d 767 (La. App. 4 Cir. 1981).

supporting the collateral source rule."[178]  In *Bryant*, this Court analyzed and refuted

the argument that application of the collateral-source rule results in a windfall for

plaintiff, reasoning that there is no "windfall" or "double dip" in collateral-source

cases because the "injured party's patrimony was diminished to the extent that he was

forced to recover against outside sources,"[179] reasoning:

> In the case of insurance purchased by the plaintiff or by deductions made form
> the plaintiff's paycheck, the plaintiff has paid premiums which are a
> diminution of his patrimony as that cash would have otherwise been available
> to him.  By going against his own insurance policy, <u>he is diminishing the</u>
> <u>benefits of that policy which would otherwise be available, he has suffered</u>
> <u>a diminution of the patrimony by premium payments and his rates will</u>
> <u>rise providing a third area of loss.</u>[180]

If Mr. Sher recovers from both Lafayette and the NFIP, he is not receiving a windfall

because he has already diminished his patrimony by paying premiums for NFIP

coverage. The benefits to be derived from those premiums have also been diminished.

## IV.  THE  DISTRICT  COURT  CORRECTLY  GRANTED  PARTIAL SUMMARY JUDGMENT

### A.    Principles of Insurance Policy Interpretation

The Lafayette Policy is an "all risks" policy, which creates a special type of

coverage extending to every conceivable loss or damage, unless clearly, specifically

and expressly excluded therein.[181]

In *Crabtree v. State Farm Insurance Co.*,[182] the Louisiana Supreme Court set

forth the following general principles guiding interpretation of an insurance policy:

> An insurance policy is a contract between the parties and should be construed
> using the general rules of interpretation of contracts set forth in the Civil Code.
> If the words of the policy are clear and explicit and lead to no absurd
> consequences, no further interpretation may be made in search of the parties'
> intent and the agreement must be enforced as written.  An insurance policy

---

[178] 2003-1016 (La. 7/2/2004), 879 So. 2d 692, 699.

[179] *Bryan*, 406 So. 2d at 768.

[180] *Id.* (emphasis added).

[181] *See, e.g. Cochran v. Travelers Ins. Co.*, 606 So. 2d 22, 24 (La. App. 5 Cir.,1992); *J. Ray McDermott & Co , Inc. v. Fidelity & Cas. Co. of New York*, 466 F.Supp. 353, 361 (D.C.La., 1979).

[182] 632 So. 2d 736 (La. 1994).

should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. The policy should be construed as a whole and one portion thereof should not be construed separately at the expense of disregarding another. If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of the insured.[183]

Exclusions from coverage are to be afforded a narrow construction, and, "a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied."[184]

Pursuant to article 2056 of the Louisiana Civil Code, "[i]n case of doubt that cannot otherwise be resolved, a provision in a contract must be interpreted against the party who furnished its text."[185] Thus, to the extent this Court has any doubt as to whether Lafayette failed to clearly and explicitly exclude "flood" from man-made acts in its policy, it should affirm. In policy construction, "the specific controls the general."[186] That is, the meaning of general terms will be restricted by other specific or more descriptive terms on the same subject.[187] These principles are reflected in the contractual interpretation doctrines of *ejusdem generis*[188] and *noscitur a sociis*.[189] The burden of proving a coverage exclusion rests on Lafayette.[190]

### B.   The Trial Court Properly Held That the Term "Flood" Is Ambiguous

---

[183] *Id.* at 741 (internal citations omitted).

[184] *See Reynolds v. Select Properties, Ltd.*, 634 So. 2d 1180, 1183 (La. 1994).

[185] LA. CIV. CODE ANN. art. 2056.

[186] *Smith v. Burton*, 2004-2675 (La. App. 1ˢᵗ Cir. 12/22/05), 928 So. 2d 74, 79.

[187] *Baton Rouge Oil and Chemical Workers Union v. Exxonmobil Corp.*, 289 F.3d 373, 377 (5ᵗʰ Cir. 2002).

[188] "In the construction of laws, wills, and other instruments, . . . where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 517 (6ᵗʰ ed. 1990).

[189] "It is known from its associates. The meaning of a word is or may be known from accompanying words. . . . [T]he meaning of questionable or doubtful words may be ascertained by reference to the meaning of other words or phrases associated with it." Black's Law Dictionary, *supra*, at 1060.

[190] *See Doerr v. Mobil Oil Corp.*, 00-0947 (La. 12/19/00), 774 So. 2d 119, 124 ("On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy.").

The Lafayette Policy does not define the term "flood." Thus, this Court must determine its meaning. In doing so, this Court must construe the water damage exclusion narrowly. As the Louisiana Supreme Court has observed, "once coverage has been extended, . . . it should be withdrawn only when exclusion is established with certainty."[191] To the best of Mr. Sher's knowledge, every Louisiana court to consider this issue has held that the purported "flood" exclusion is ambiguous and excludes from coverage only those damages caused by naturally occurring events.[192]

In *Doerr v. Mobil Oil Corp.*,[193] the Louisiana Supreme Court determined whether a "total pollution" exclusion in a liability policy was applicable to damages resulting from the release of hydrocarbons into a parish water system. The exclusion applied to the "discharge, dispersal, seepage, migration, release or escape of pollutants at any time."[194] The Court concluded that, if applied literally, absurd results would be achieved.[195] For example, it would cover "anything from the release of chlorine gases by a conglomerate chemical plant to the release of carbon monoxide from a small business owner's delivery truck" and even a slip and fall in a puddle of spilled gasoline at a gas station would not be covered.[196] The Court held that the policy was ambiguous and interpreted narrowly to effect, not deny, coverage.[197]

Other jurisdictions have echoed similar concerns. In *Murray v. State Farm Fire and Casualty Co.*,[198] the Court recognized that an earth movement exclusion was

---

[191] *Pullen v. Employers' Liability Assur. Corp.*, 89 So. 2d 373, 377 (La. 1956).

[192] *See In re Katrina Canal Breaches Consol. Litig.*, 466 F. Supp. 2d 729 (E.D. La. 2006) attached hereto as Appendix C; *Historic Restoration. Inc. v. RSUI Indemnity Company and Essex Insurance Company*, No. 06-4990, Div. D-16-11, Civil District Court, Parish of Orleans, State of Louisiana, Judgement dated December 5, 2006 Order & Reasons attached hereto as Appendix D); *White III, L.L.C. v. Travelers Property & Cas. Co.*, No. 06-9607, Div. G-11, Civil District Court, Parish of Orleans, State of Louisiana, ruling in open court on July 20, 2007, Judgment pending.

[193] 00-0947 (La. 12/19/00), 774 So. 2d 119.

[194] *Id.* at 122.

[195] *Id.* at 124-25.

[196] *Id.* at 124.

[197] *Id* at 124-25.

[198] 509 S.E.2d 1 (W.Va. 1998).

ambiguous because the term did not reference its source. The court noted:

> On the one hand, the exclusions cited in the defendants' policies could bar coverage for solely natural events such as earthquakes, volcanic eruptions, and sinkholes. On the other hand, the same exclusions refer to events which could be man-made, such as subsidence or earth movement caused by equipment or a broken water line. Or, as alleged in this case, earth movement could be caused by both man and nature over a period of time, such as landslides, mudflows, or the earth sinking, shifting, or settling. *Because the policy language is reasonably susceptible to different meanings, we believe that the earth movement exclusions in the insurance policies at issue are ambiguous, and must have a more limited meaning than that assigned to it by the defendants.*[199]

The term "flood" in the Lafayette Policy should likewise be limited. There are two potential interpretations of the word. It either applies to natural events or both natural and man-made events. Consistent with long-standing principles of insurance policy interpretation, the term should be given its most narrow meaning, and the term "flood" should apply only to naturally occurring events.

Various courts have found that water escaping from a broken water main does not constitute a "flood" for the purposes of a water damage exclusion.[200] These broken water main cases and Mr. Sher's losses share a similar factual basis. In both instances, the insured sustained water inundation when man-made structures designed to contain the flow of water – water mains and the levees and walls along the 17th Street and London Avenue drainage canals – failed.

Lafayette cannot contest that several courts have limited the meaning of the term "flood" only to naturally-occurring events. Just like the water mains and pipes in these cases, the levees and canal walls in the present case failed. The greater scope of damages from the levee failures does not alleviate the insurer of its obligations under an "all risks" policy.

---

[199] *Id.* at 9 (emphasis added).

[200] *Change, Inc. v. Westfield Insurance Co.*, 542 S.E.2d 475 (W. Va. 2000); *Ebbing v. State Farm Fire & Casualty Co.*, 1 S.W.3d 459 (Ark. Ct. App. 1999); *Popkin v. Security Mutual Insurance Co. of New York*, 367 N.Y.S.2d 492 (N.Y. App. Div. 1975). Interestingly, in at least one case an insurer took a position consistent with these cases by claiming a broken water main was not a "flood." *Matcer v. Reliance Ins. Co.*, 233 A.2d 797 (Ma. Ct. App. 1967).

There are also various court decisions holding that a so-called "earth movement" exclusion was ambiguous and applicable only to natural earth movement, i.e., earthquakes. In *Peach State Uniform Service, Inc. v. American Insurance Co.*,[201] heavy rains washed away uncompacted fill dirt under the foundation of its building and when the dirt washed away, the building collapsed. The insurer denied coverage, in part, on the basis of a provision that excluded coverage for damage resulting from "'[e]arthquake, volcanic eruption, landslide or other earth movement.'" Plaintiff contended that the exclusion was inapplicable because it did not apply to earth movement caused by external sources. The district court disagreed, and entered judgment in favor of the insurer. The Fifth Circuit reversed, noting:

> There is no clear manifestation here of an intent not to limit the general term other earth movement in this policy to events of the same nature as earthquakes, volcanoes, and landslides. . . . *[W]e read other earth movement as referring only to phenomena related to forces operating within the earth itself, and not to the merely superficial effects of external forces, such as erosion by run-off rainwater.*[202]

Other courts have similarly limited the earth movement exclusion.[203] The courts' rationales in these cases are all applicable to the present case. In those cases, as in the present case, the insurers' policies contained a term susceptible of more than one meaning, and that term was followed by more specific, naturally caused events. In such situations, the broad term must be afforded a limited construction consistent with the other terms in the exclusion. The term "flood" is susceptible to multiple meanings, and should be narrowly construed.

Had Lafayette wished to draft an exclusion specifically deliniating that it applied to both natural and man made causes, it could have done so. For example, another insurer issued (prior to Katrina) a policy with a more specific water exclusion

---

[201] 507 F.2d 996 (5th Cir. 1975).

[202] *Id.* at 999-1000 (emphasis added).

[203] *Murray v. State Farm Fire & Casualty Co*, 509 S.E.2d 1 (W. Va. 1998); *Fuyad v. Clarendon National Insurance Co.*,899 So. 2d 1082 (Fla. 2005)

to another New Orleans entity, United Restaurant Entities, L.L.C. ("United Restaurant").[204] Unlike the policy issued to Mr. Sher, the United Restaurant policy provides that coverage is excluded for damages caused by:

> 1. Flood, surface water, waves, tides, tidal waves, overflow of any body of water, of their spray, all whether driven by wind or not;
>
> . . .
>
> **all whether naturally occurring or due to man made or other artificial causes.**[205]

The United Restaurant water exclusion demonstrates that Lafayette could have used a more detailed "flood" exclusion in Mr. Sher's policy, had it chosen to do so.

### C.    Lafayette's Argument that there are No Natural Floods is Incorrect

Lafayette contends that Mr. Sher's interpretation of "flood" will render the other terms in the exclusion superfluous, because "there can hardly be such a thing as a 'flood' which occurs solely because of natural causes." This argument defies logic. Natural "floods" happen all of the time. A large inundation of rainwater, particularly in the City of New Orleans, that produces standing water is the very common definition of a natural "flood." Where normal drainage of the streets does not occur, a natural "flood" is produced. The greatest example of "flood" due to a large inundation dates back to Noah in the book of Genesis:

> (6) Now Noah was six hundred years old when the flood of water came upon the earth. (7) Then Noah and his sons and his wife and his sons' wives with him entered the ark because of the water of the flood. (10) It came about that after the seven days, that the water of the flood came upon the earth. (11) In the six hundredth year of Noah's life, in the second month, on the seventeenth day of the month, on the same day all the fountains of the great deep burst open, and the floodgates of the sky were opened. (12) The rain fell upon the earth for forty days and forth nights. ... (17) The flood continued upon the earth for forty days.[206]

Similarly, dictionaries define "flood" in natural terms. Merriam-Webster's Online

---

[204] *See* United Restaurant Travelers Policy, attached hereto as Appendix E.

[205] *See id.* at p. 23 of 39 (emphasis added).

[206] *Genesis* 7:6-7, 10-12, 17.

Dictionary defines "flood" as "(A) A rising and overflowing or a body of water especially onto normally dry land; (B)A flood described in the Bible as covering the earth in the time of Noah."[207] Websters' Third New International Dictionary of the English Language, which defined "flood," in part, as a "rising and overflowing of a body of water that covers land not usu[ally] under water."[208] Finally, Black's Law Dictionary defines "flood" as:

> Inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be. *See also* Act of God.[209]

### D.   The Cases Cited by Lafayette Are Distinguishable

Lafayette refers the Court to several cases it claims show that the term "flood" is not ambiguous. None of these cases even discusses whether "flood" applies only to naturally occurring actions, as opposed to man-made actions. In *TNT Speed & Sport Center, Inc. v. American States Insurance Co.*,[210] the issue was whether an anti-concurrent cause clause applied to limit coverage where a vandal stole a sandbag protecting the plaintiff's property against rising river water. The court held only that the anti-concurrent cause clause precluded coverage because it eliminated the efficient proximate cause doctrine. The court never discussed the meaning of the term "flood" in the context of the water damage exclusion.[211]

Lafayette also relies on *E.B. Metal & Rubber Industry, Inc. v. Federal Insurance Co.*[212] The *E.B. Metal* court held the damages were excluded because the policy language specifically excluded the breaking of boundaries of bodies of water.

---

[207] http://www.merriam-webster.com/dictionary/flood.

[208] WEBSTER'S THIRD NEW INT'L DICTIONARY 873 (1993).

[209] BLACK'S LAW DICTIONARY at 640 (6th Ed. 1990)(emphasis added). Act of God" is defined as "[a]n act occasioned exclusively by forces of nature <u>without the interference of human agency.</u>" (emphasis added).

[210] 114 F.3d 731 (8th Cir. 1997).

[211] Similarly, the only issue in *Pakmark Corp. v. Liberty Mutual Insurance Co.*, 943 S.W.2d 256 (Mo Ct. App. 1997), was the application of the anti-concurrent cause clause, not the meaning of the term "flood."

[212] 444 N.Y.S.2d 321 (N.Y. App. Div. 1981).

In contrast, the term "flood" as used in the Lafayette Policy is undefined and susceptible of more than one reasonable interpretation.

Lafayette also relies on *Kane v. Royal Insurance Co.*[213]  In *Kane*, the Lawn Lake Dam failed, and the resulting flow of water damaged the plaintiffs' properties who sought coverage under their property policies.  Defendant denied coverage on the basis of a purported "flood" exclusion.  Plaintiffs contended that there was a distinction between naturally and artificially caused floods, and that their loss was caused by an artificial "flood."  The court refused to recognize this distinction and, most importantly, noted that the lake had overflowed "*above the highest line of [its] ordinary flow.*"[214]  In other words, the cause of the water inundation appeared to be natural in cause.  It is undisputed that the ground water inundating Mr. Sher's home came from the failure of levees along the 17th Street and London Avenue Canals, not from the "overflow" of a body of water.  Thus, *Kane* is distinguishable on its facts.

The court's decision in *Kane* is further distinguishable because it cites a Colorado statute it contended did not limit the term "flood" to a natural act.[215]  As set forth below, Louisiana law, defines "flood" in reference to other *natural* acts as distinguished from man-made acts.[216]  Thus, *Kane* is not consistent with Louisiana law.  The *Kane* court also erred in concluding that the breakage of the dam was different from the breakage of a water main.  As the dissent in *Kane* aptly noted, in the broken water main case, "the inundation was caused by the breakage of an artificially created containment of water. . . . [T]he inundation from the failure of the

---

[213] 768 P.2d 678 (Col. 1989).

[214] *Id.* at 682 (emphasis added).

[215] *Id* at 681 n.2.

[216] *See* La. Rev. Stat. Ann. § 29:723(1)("Disaster means the result of a natural or man-made event which causes loss of life, injury, and property damage, including but not limited to natural disasters such as hurricane, tornado, storm, flood, high winds, and other weather related events, forest and marsh fires, and man-made disasters, including but not limited to nuclear power plant incidents, hazardous materials incidents, oil spills, explosion, civil disturbances, public calamity, acts of terrorism, hostile military action, and other events related thereto").

dam in the present case can fairly be characterized in a like manner."[217]

Finally, *Kane* improperly relied on the definition of "flood" in 33 U.S.C. § 702(c).[218] This same statute was discussed by the United States Fifth Circuit Court of Appeals in *Florida East Coast Railway Co. v. United States*,[219] and cited by Lafayette. The *Florida* Court was interpreting the term "flood" in the context of the federal government's sovereign immunity, which was granted "in '*the broadest and most emphatic language.*'"[220] Immunity is favored; exclusions from coverage are not.

Lafayette offers no reason that this Court should not consider the cause of the "flood" in determining whether there is coverage for Mr. Sher's damages. The breaking of a water main – a man-made act – is not excluded by the water exclusion. Where a structure designed to control the flow of water fails, and damage results, that loss is covered under an "all risks" insurance policy as it is not explicitly excluded.

This Court's inquiry should be whether a "flood" as that term is used in the Policy applies to water released when an artificially created containment of water (i.e., levees and floodwalls) fails due to an error in design, construction, or maintenance. The term "flood" is susceptible to multiple meanings and is ambiguous.

### E.   Judge Duval's Decision that "Flood" Is Ambiguous is Persuasive

The decision of the Judge Stanwood Duval in *In re Katrina Canal Breaches Consolidation Litigation*,[221] is persuasive authority for affirming the Trial Court. In *In re Katrina*, Judge Duval, considering a purported "flood" exclusion similar to that found in the present case, held that the term flood was ambiguous because it was susceptible to more than one reasonable interpretation.[222] Judge Duval surveyed cases

---

[217] *Kane*, 768 P.2d at 686 (Lohr, J., dissenting).

[218] *See id.* at 683.

[219] 519 F.2d 1184 (5th Cir. 1975)

[220] *Id.* at 1192 (emphasis added).

[221] 466 F. Supp. 2d 729 (E.D. La. 2006).

[222] *Id.* at 748.

concerning broken water mains and earth movement exclusions and held that "because the policies are all-risk, and because 'flood' has numerous definitions, it reasonably could be limited to natural occurrences."[223] Similarly, the term "flood" in the Lafayette Policy is susceptible to multiple meanings.

### F.    The Ensuing Loss Provision Renders the "Weather Conditions" and "Negligent Design, Construction or Maintenance" Limitations Inapplicable

Lafayette relies on the "Weather Conditions" and "Negligent Design, Construction or Maintenance" Limitations to support its argument for reversal, but it has waived this argument as these portions of the policies were not pled (see, *supra*) and conveniently ignores the effects of the "ensuing loss" provision at the inception of these policy limitations:

> We will not pay for loss or damages caused by or resulting from any of the following. **But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.**
>
>> a. Weather conditions.  But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. Above to produce the loss or damage.
>> . . .
>> c. Faulty, inadequate or defective: (1) Planning, zoning development, surveying, siting; (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; (3) Materials used in repair, construction, renovation or remodeling; or (4) Maintenance; of part or all of any property on or off the described premises.

(Emphasis added). The water damage to Mr. Sher's home was caused by a covered cause of loss – water damage not excluded under the purported "flood" exclusion. Thus, the ensuing loss provision cited above makes Mr. Sher's damages covered.

Nothing in the ensuing-loss provision indicates that a separate and distinct act is required for coverage to apply.  In making this argument, Lafayette ignores contrary case law contrary.  In *Lake Charles Harbor & Terminal Dist. v. Imperial*

---

[223] *Id.* at 757.

*Cas. & Indemnity Co.*,[224] the court applied an ensuing loss provision according to Louisiana law. In *Lake Charles*, the insurance policy excluded losses caused by "mechanical breakdown," but it also contained an ensuing loss provision allowing coverage if "an insured peril ensues, and then only for the actual loss or damage caused by such ensuing peril."[225] When a cable broke on plaintiff's ship loader, a part of the loader crashed into the interior of the loader and caused extensive damage to the loader.[226] The court held that the crash and resultant damages were an "ensuing peril" that was covered under the policy.[227] The exclusion was "not designed to insulate an insurance company from liability for major or 'catastrophic' losses."[228]

The covered damage must be different in kind, not simply in degree.[229] The court in *Alton Ochsner* explained that the distinction could be understood by determining whether the loss was caused by an event "extraneous" to the construction process bringing about the loss; the court noted that "[a]ll-risk insurance policies generally are viewed as 'limiting recovery to those losses in which the cause is 'external to the structure insured,' as opposed to an 'internal' or 'inherent' defect in the item of property which is damaged."[230] Mr. Sher's damages were not caused by some internal or intrinsic defect but by an external cause – the breach of the levees. The water damage in this case ensued from the levee breaches. There is a covered cause of loss in this case. The ensuing loss provision applies and provides coverage.

Further, the terms of the "weather conditions" limitation render it inapplicable. Simply put, the weather conditions exclusion applies only if weather conditions contribute with an excluded cause of loss. As previously discussed, Mr. Sher's water

---

[224] 857 F.2d 286, 287 (5th Cir. 1988).

[225] *Id.* at 287. Judge Rubin described this exclusion as "self-contradictory gibberish." *Id.*

[226] *Id.*

[227] *Id.* at 289.

[228] *Id.* at 287.

[229] See *Alton Ochsner Medical Foundation v. Allendale Mu. Ins. Co.*, 219 F.3d 501, 506 (5th Cir. 2000).

[230] *Id.* at 507 (quoting Couch on Insurance 3d, § 148:59 at 148-104 (1998)).

damage was not caused by an excluded cause of loss.

### G.   The District Court Properly Found that Lafayette Has the Burden of Proving Applicability of an Exclusion and Failed to do so

Lafayette, not Mr. Sher, has the burden of proving the application of a policy exclusion. Mr. Sher's burden of proof under the Lafayette "all risks" policy is to "show only that a loss has occurred. Upon plaintiff's making such a prima facie showing, the burden shifts to the defendant-insurer to prove that the loss arose from a cause which is excepted from the policy or for which it is not liable."[231]

Mr. Sher submitted an Affidavit to establish that any water inundating his home did not come from any storm surge, overtopped levee, or rainwater that failed to drain properly. Lafayette did not contest these affidavits. It is Lafayette, not Mr. Sher, that must establish that the water inundation results from an excluded cause of loss. Lafayette did not do so and, thus, failed to raise an issue of material fact.

### V.   ANSWER TO APPEAL: THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY REGARDING GENERAL DAMAGES FOR MENTAL ANGUISH, INCONVENIENCE, AND EMOTIONAL DISTRESS

The trial court, over Mr. Sher's timely objection, did not instruct the jury regarding general damages for mental anguish, inconvenience, and emotional distress. Specifically, Mr. Sher requested that the jury be instructed as follows:

#### Plaintiff's Proposed Jury Charge Regarding General Damages

A finding that an insurance company breached the duty owed to its insured of good faith and fair dealing, pursuant to Louisiana Revised Statutes 22:1220, entitles the insured to recover penalties against the insurer for "any damages sustained as a result of the breach." Such damages may include general damages for mental anguish and emotional distress associated with the pursuit of the insurance claim, as well as aggravation and inconvenience.

LA. REV. STAT. ANN. §22:1220.
*Lewis v. State Farm Ins. Co.*, 41,527 (La. App. 2 Cir. 12/27/06), 946 So. 2d 708, 728.
*Reed v. Ricard*, 1997-2250 (La. App. 1 Cir. 11/18/98), 744 So. 2d 13,

---

[231] *Walker v. Travelers Indem. Co.* 289 So.2d 864, 871 -872 (La. App. 1974).

19.
*Williams v. La. Indemn. Co.*, 26,887 (La. App. 2 Cir. 6/21/95), 658 So.
2d 739, 743.

### Plaintiff's Proposed Jury Charge Regarding Mental Anguish

The finding that an insurance company violated Louisiana Civil Code Article
1997 by engaging in a bad faith breach of contract supports an award of
damages for inconvenience, anguish and the like resulting from the actions of
the defendant.

LA. CIV. CODE ART 1997.
*Modisette v. Am. Integrity Ins. Co.*, 297 So. 2d 498 (La. App. 2 Cir.
1974).

### Plaintiff's Proposed Jury Charge Regarding Mental Anguish

Damages for nonpecuniary losses such as emotional distress and mental
anguish are also available under Louisiana Civil Code Article 1998, which
allows recovery of such damages where the contract is intended to gratify a
nonpecuniary interest.

The nonpecuniary interest need only be a "significant" object or cause of the
contract, as opposed to the primary or exclusive object of the contract for such
damages to be recoverable.    Damages for nonpecuniary losses can be
recovered where the contract is intended to gratify both pecuniary and
nonpecuniary interests.  Contracts pertaining to a plaintiff's residence can
satisfy such an objective.

LA. CIV. CODE ART 1998.
*Young v. Ford Motor Co.*, 595 So. 2d 1123, 1124 (La. 1992).
*Thomas v. Desire Comm. Housing Corp.*, 1998-2097 (La. App. 4 Cir.
7/19/00), 773 So. 2d 755, 763.
*Taylor v. Burton*, 1993-1348 (La. App. 3 Cir. 3/6/98), 708 So.2d 531,
535-36.

Mr. Sher timely objected to the jury charges to the extent the charges did not address

mental anguish, inconvenience, and emotional distress[232] and that the jury verdict

form did not contain a line item for mental anguish, inconvenience, emotional

distress, and general damages that would accompany the proposed jury instructions.[233]

Mr. Sher proffered testimony in support of the claim for mental anguish,

inconvenience, and emotional distress.[234]

---

[232] Tr. 3/20/2007, pp. 169-71 (Vol. XIX).
[233] Tr. 3/20/2007, p. 172 (Vol. XIX).
[234] Tr. 3/20/2007, pp. 176-178 (Vol. XIX).

Mr. Sher requests that this Court modify the Judgment to include damages for his mental anguish, inconvenience, and emotional distress caused by Lafayette. Mr. Sher respectfully requests that this Court award him $500,000.00 in general damages.

## CONCLUSION

For the foregoing reasons, Mr. Sher respectfully requests that this Honorable Court affirm the Judgments below, except to the extent that mental anguish damages were not allowed.

Respectfully submitted,

JAMES M. GARNER, #19589,
DARNELL BLUDWORTH #18801
TIMOTHY B. FRANCIS, #14973
SHER GARNER CAHILL RICHTER
  KLEIN & HILBERT, L.L.C.
909 Poydras Street, Suite 2800
New Orleans, LA 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
COUNSEL FOR PLAINTIFF/APPELLEE
JOSEPH SHER

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on the following counsel of record by electronic mail and by depositing same in the United States Mail, properly addressed and postage prepaid, this 31 day of July, 2007:

Howard B. Kaplan
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
Metairie, LA 70055-5490

JAMES M. GARNER