**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN THE MATTER OF THE | * | CIVIL ACTION |
| COMPLAINT OF INGRAM BARGE | * | |
| COMPANY, AS OWNER OF THE | * | NO. 05-4419 |
| ING4727, PETITIONING FOR | * | |
| EXONERATION FROM OR | * | SECTION "C" (2) |
| LIMITATION OF LIABILITY | * | JUDGE BERRIGAN |
| | | MAG. JUDGE WILKINSON |

\*   \*   \*   \*   \*   \*   \*   \*

THIS DOCUMENT RELATES TO:  CASE NOS. 05-4237, 05-5531, 05-5724; 06-5054; 06-5342; 06-6299; 06-7516

## UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

     Third-party defendant, the United States of America, has moved pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(h)(3) to dismiss the third-party complaints filed against

it by Lafarge North America Inc. ("LNA").[1]

---

[1] LNA filed third-party complaints in connection with its answers in *Boutte* (05-5531), *Mumford* (05-5724), *Hubert* (06-5054), *Lagarde* (06-5342), *Perry* (06-6299), and *Benoit* (06-7516).  *See* Rec. Docs. 202 (*Boutte* and *Mumford*); 332 (*Hubert*); 333 (*Lagarde*); 391 (*Perry*); and 597 (*Benoit*).  LNA has amended its third-party complaints in *Boutte*, *Mumford*, *Hubert*, *Lagarde*, and *Perry* in its First Amended Third-party Complaint filed on March 29, 2007.  *See* Rec. Doc. 590.  In *Parfait* (05-4237), LNA filed a cross-claim and supplemental and amended cross-claim against the United States.  *See* Rec. Doc. 35 in 05-4237; Rec. Doc. 204 in 05-4419. The United States has been dismissed as a defendant in *Parfait*, *see* Rec. Doc. 161, and a cross-claim cannot be sustained against an entity that is no longer a party to the suit.  Because LNA

(continued...)

LNA has been named as a defendant in seven civil actions in this consolidated litigation. In each of those actions, plaintiffs seek damages from LNA for losses sustained as a result of the failure of the levee and flood wall system along the Inner Harbor Navigation Canal ("IHNC" or "Industrial Canal") and consequent flooding of the Lower Ninth Ward area of New Orleans caused by Hurricane Katrina in 2005. LNA, in turn, has filed a third-party complaint against the United States seeking contribution and indemnity for any liability that LNA may incur in these actions. LNA's third-party complaint alleges two theories against the United States, one based in tort, pursuant to the Suits in Admiralty Act ("SAA"), Public Vessels Act ("PVA"), or Federal Tort Claims Act ("FTCA"), and a second pursuant to the Fifth Amendment takings clause of the United States Constitution and the Little Tucker Act.

This Court lacks subject matter jurisdiction over these third-party claims against the United States. There has been no waiver of the United States' sovereign immunity for the tort claim under any theory by which it is asserted. The Flood Control Act of 1928, 33 U.S.C.

---

[1](...continued)
also filed its First Amended Third-Party Complaint, Rec. Doc. 590, in *Parfait*, the United States assumes that LNA seeks to convert its cross-claim into a third-party claim and treats it as such for purposes of this motion to dismiss. LNA's first amended third-party complaint, Rec. Doc. 590, also is identical to its third-party complaint in *Benoit*, Rec. Doc. 597. Therefore, the United States' motion to dismiss and memorandum of law in support address the identical third-party allegations made in Rec. Docs. 590 and 597, which encompass all of the claims LNA has brought against the United States in the actions consolidated with Civil Action 05-4419. For simplicity throughout this memorandum, the United States' citations to the third-party complaint refer to Rec. Doc. 590. The United States previously moved on other grounds to dismiss the claims asserted against it by LNA in *Boutte*, *Mumford*, and *Parfait*. Rec. Doc. 285. This Court denied the United States' motion as to LNA's third-party claims in *Boutte* and *Mumford* on March 14, 2007, and granted LNA leave to amend its third-party complaints in those actions. Rec. Doc. 587. The United States brings this motion to dismiss the amended third-party complaint pursuant to Rule 12(h)(3), which directs that an action shall be dismissed "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter." Fed. R. Civ. P. 12(h)(3).

2

§ 702c, provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  LNA's claim seeks to hold the United States liable for "damage from or by floods or flood waters" within the plain meaning of those terms.  Therefore, this Court lacks subject matter jurisdiction over the tort claim asserted against the United States, and it should be dismissed.

This Court also lacks subject matter jurisdiction over LNA's Little Tucker Act claim because it is not founded on the Constitution and instead sounds in tort.  In any event, even as amended, LNA's third-party claim for indemnity necessarily seeks more than $10,000 from the United States.  Accordingly, it exceeds the jurisdictional limit under the Little Tucker Act.  *See* 28 U.S.C. § 1346(a)(2).

## STANDARD OF REVIEW

The burden to establish subject matter jurisdiction rests on the party asserting it. *Kokkonen v. Guardian Life Ins. Co of Am.*, 511 U.S. 375, 377 (1994); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).  The United States is immune from suit "'save as it consents to be sued,'" and the terms of the United States' consent to suit "'define [a] court's jurisdiction to entertain the suit.'"  *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  At the outset of a case in which the United States has been sued, therefore, a court must first decide whether the United States' immunity has been waived.  *FDIC v. Meyer*, 510 U.S. 471, 745 (1994).

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rules 12(h)(3) and 12(b)(1) may be based on the sufficiency of the facts alleged in the pleadings alone.  *Cedars-Sinai*, 11 F.3d at 1583; *McWaters v. FEMA*, 436 F. Supp. 2d 802, 811 (E.D. La. 2006); *Hassan v.*

3

*La. Dep't Transp. & Dev.*, 923 F. Supp. 890, 892 (W.D. La. 1996). In such a facial challenge to the pleadings, the factual allegations are taken as true and considered in the light most favorable to the pleader. *Id.* Additionally, a party is bound by the factual admissions that are made in its complaint: "factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983). *See also Morales v. Dep't of the Army*, 947 F.2d 766, 769 (5th Cir. 1991) ("[Plaintiff] may not now argue contrary to the factual allegations of his complaint."); *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987) ("Facts that are admitted in the pleadings 'are no longer at issue.'").

Here, assuming the facts alleged by LNA in its third-party complaint to be true, LNA has not met its burden to establish subject matter jurisdiction over the third-party claims against the United States.

## FACTUAL BACKGROUND

As this Court has observed, "[t]his action arises from injuries to persons and property sustained as a result of the flooding of the Inner Harbor Navigation Canal ('Industrial Canal'), the Mississippi River Gulf Outlet ('MRGO'), and the Gulf Intracoastal Waterway ('GIWW') that occurred in New Orleans in the wake of Hurricane Katrina." Order & Reasons 3/14/2007, Rec. Doc. 587 at 1. The Industrial Canal, or IHNC, is a navigation channel connecting the Mississippi River and Lake Pontchartrain. Rec. Doc. 590 ¶ VIII. LNA alleges that the IHNC is "surrounded and contained by a system of levees, retaining walls (including I-walls), and related structures, all of which were designed, constructed, and maintained by the United States through its agency, the [Army Corps of Engineers]." *Id.* ¶ XXII. The MRGO is a "navigation channel, approximately

4

76 miles long," which extends from the Gulf of Mexico to the IHNC, providing a route to the New Orleans Inner Harbor.  *Id.* ¶ X.  The GIWW "is a shallow-draft canal running generally in an east-west direction from Carrabelle, Florida to Brownsville, Texas."  *Id.* ¶ IX.  "[N]ear the junction of the MR-GO, it becomes a ship channel and its project depth and width increase respectively to 36 feet by 500 feet to the turning basin at the junction of the MR-GO and IHNC." *Id.*  LNA alleges that "[t]he [United States Army Corps of Engineers] is responsible for project design, administration, construction, and maintenance of the MR-GO, the GI[W]W, and certain parts of the IHNC, as well as their respective levee and retaining wall (including I-wall) systems."  *Id.* ¶ XXVIII.  The levees, retaining walls, I-walls, and "related structures," referenced throughout LNA's third-party complaint, and specifically the section of the IHNC flood wall that is the focus of the plaintiffs' complaints against LNA, were part of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP") authorized by the Flood Control Act of 1965. Pub. L. No. 89-298, 79 Stat. 1073, 1077 (Oct. 27, 1965).[2]

Hurricane Katrina made landfall in Louisiana on August 29, 2005.  Rec. Doc. 590 ¶ XI. The hurricane had generated a "massive surge."  *Id.* ¶ XIII.  That massive storm surge

---

[2] The Flood Control Act of 1965 provided that: "The project for hurricane-flood protection on Lake Pontchartrain, Louisiana, is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-Ninth Congress . . . ."  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (Oct. 27, 1965).  House Document 89-231 describes the authorized hurricane protection works to include "construction of a concrete-capped sheet-pile wall along the levee west of the Inner Harbor Canal in New Orleans; . . . construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal between the Gulf Intracoastal Waterway and the New Orleans Airport; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the Gulf Intracoastal Waterway . . . . The improvements are designed to provide protection from hurricane flood levels and wave runup . . . ."  H.R. Doc. 89-231, Rep. of the Bd. of Eng'rs for Rivers and Harbors at 9.

5

overwhelmed the hurricane protection system that was in place in and around New Orleans. *See id.* ¶¶ XIII, XIV, XXIII, XXV. As LNA describes, "the storm surge overtopped the levees and retaining walls in numerous places along the MR-GO, GI[W]W, and IHNC." *Id.* ¶ XXV. "The surge cascaded over the tops of the levees and retaining walls/I-walls on the IHNC in particular and scoured out a deep trench on the landward side of the walls into soil that lacked any concrete or other armoring to protect it from erosion by the cascading water, which in turn undermined the retaining walls/I-walls themselves. . . . Those structures were soon overcome, resulting in catastrophic inundation of Orleans and St. Bernard Parishes . . . ." *Id.*

The plaintiffs in the seven civil actions against LNA consolidated herein were residents or owners of property located in the Lower Ninth Ward area of New Orleans at the time Hurricane Katrina struck. *See*, *e.g.*, *Mumford* Compl., Rec. Doc. 1 in 05-5724, ¶ III ("The nominal plaintiff, and the class she seeks to represent, are: owners, renters, or occupiers, of residences, and the contents thereof, and owners of automobiles, trucks, or boats, on the East side of the Industrial Canal in the Ninth Ward of the City of New Orleans, and St. Bernard Parish, whose property was destroyed, or damaged, by flooding following Hurricane Katrina on Monday, August 29, 2005."). The plaintiffs "claim to have suffered property loss and/or damage, personal injury and death, emotional distress, and other damages as a result of the failure and breach of the IHNC levees, retaining walls (including I-walls), and related structures." Rec. Doc. 590 ¶ XXIX. Plaintiffs "have alleged that LNA (among others) is liable for those damages," *id.*, based on LNA's actions with respect to mooring the barge ING 4727 at LNA's facility on the IHNC. Plaintiffs' allege that LNA negligently moored the barge causing it to break loose during the hurricane, and that the barge drifted into the IHNC flood wall, causing the breach and the flooding that damaged the

6

plaintiffs' property.  *See, e.g., Mumford* Compl. ¶ VII (the barge "crashed through the East side flood wall of the Industrial Canal . . . causing a huge amount of water from Lake Pontchartrain and the Industrial Canal to flow into the Ninth ward of Orleans Parish and St. Bernard Parish causing catastrophic damage . . . .").

It is undisputed that the cause of the plaintiffs' alleged damages was the flooding that occurred as a result of Hurricane Katrina and, specifically, as a result of the failure of the flood wall along the IHNC.  LNA's third-party complaint contradicts the plaintiffs' allegations regarding the cause of the breach in the IHNC flood wall, however.  LNA alleges that it was not the barge that caused the flood wall to breach, but that "the barge ING 4727 broke free from her moorings and was drawn through one of four pre-existing breaches in the levee/retaining wall/I-wall structures of the IHNC."  Rec. Doc. 590 ¶ XV.  LNA's theory of causation, as it is alleged in the third-party complaint, is that the breaches and overtopping of "the levees and retaining walls in numerous places along the MR-GO, GI[W]W, and IHNC," *id.* ¶ XXV, including the breach of the IHNC through which the barge allegedly drifted, were caused by the United States' "negligence, errors, acts, and/or omissions in the design, construction, and maintenance of the MR-GO, GI[W]W, IHNC, and their respective levee and retaining wall systems," *id.* ¶ XXX.

Although the cause of the breach is disputed, both the plaintiffs and LNA allege that Hurricane Katrina's storm surge flooded the waterways in the New Orleans area, that the flood wall along the east side of the IHNC was breached, and that the breach resulted in flooding of the Ninth Ward area where the plaintiffs resided or owned property.  The plaintiffs' suits against LNA, and therefore LNA's third-party actions against the United States, arise out of this flooding.  These undisputed facts, as alleged by the plaintiffs and by LNA as third-party plaintiff,

and accepted as true for purposes of this motion, preclude any liability on the part of the United States.

**ARGUMENT**

**I.    LNA's Tort Claim Should be Dismissed for Lack of Subject Matter Jurisdiction.**

**A.    LNA's Third-Party Tort Claim is Barred by the Plain Language of the Flood Control Act, 33 U.S.C. § 702c.**

LNA's third-party complaint is ripe for dismissal based on the pleading alone because the third-party complaint reveals that it is an action for "damage from or by . . . flood waters." 33 U.S.C. § 702c. The Flood Control Act of 1928 ("FCA") provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. This provision "outlines immunity in sweeping terms . . . . It is difficult to imagine broader language." *United States v. James*, 478 U.S. 597, 604 (1986) (footnote omitted). As the plain language of the FCA makes clear, the United States is absolutely immune where the damage at issue was caused by water that is considered to be "floods or flood waters." *Central Green Co. v. United States*, 531 U.S. 425, 437 (2001). Here, it is undisputed that plaintiffs' alleged damages were from "floods or flood waters," and, therefore, LNA's third-party complaint is barred by the clear text of the FCA.

This plain language reading is reinforced by the Supreme Court's interpretation of the FCA in *James* and *Central Green*. The Supreme Court first construed section 702c in *James*, reviewing an *en banc* decision of the Fifth Circuit in which the lower court had held that the United States could be liable for injuries caused by waters being discharged from flood control reservoirs. *See James v. United States*, 740 F.2d 365, 367 (5th Cir. 1984) (panel opinion),

8

*overruled*, 760 F.2d 590, 604 (5th Cir. 1985) (en banc), *rev'd*, 478 U.S. at 599-600.  In reaching

its decision, the Court of Appeals had concluded that application of section 702c hinged not on

the character of the waters that caused the plaintiffs' injuries, but on the nature of the conduct

that caused them.  760 F.2d at 603.  Finding nothing in either the statutory text or the legislative

history that would "justif[y] departure from the plain words of the statute," the Supreme Court

reversed.  478 U.S. at 606.  "On its face," the language of the FCA covered the accidents in

*James* because the "injuries occurred as a result of the release of waters from reservoirs that had

reached *flood stage*."  *Id.* at 604 (emphasis added).

        In reaching its decision, the Supreme Court began with the principle that "[t]he starting

point in statutory interpretation is 'the language [of the statute] itself,'" and the assumption "'that

the legislative purpose is expressed by the ordinary meaning of the words used.'"  *Id.* (alteration

in original; citations omitted).  Looking at the text of the statute, the Court found no uncertainty

in the terms "flood" and "flood waters" and their application to the facts before it, stating, "the

waters here clearly fall within the ambit of the statute."  *Id.* at 605.  The Court also analyzed the

legislative history of the FCA, noting that "[i]n the absence of a 'clearly expressed legislative

intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as

conclusive.'"  *Id.* at 606 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447

U.S. 102, 108 (1980)).  Finding that "the legislative history of the Flood Control Act of 1928

*reinforces* the plain language of the immunity provision in § 702c," the Court concluded that

"Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the

Government from 'any' liability associated with flood control."  *Id.* at 606, 608 (emphasis in

original).  To this end, Congress employed "'the broadest and most emphatic language'" to

describe the Government's immunity.  *Id.* (quoting *Nat'l Mfg. Co. v. United States*, 210 F.2d 263, 270 (8th Cir. 1954)).

Despite the clarity of the *James* Court's holding that the plain language of the statute determines the scope of the government's immunity, 478 U.S. at 612, certain language in the Court's opinion gave rise to conflicting constructions by the Courts of Appeals.  Based on the *James* Court's language that the statutory phrase "floods or flood waters" "appl[ies] to all waters contained in or carried through a federal flood control project for purposes of or related to flood control," 478 U.S. at 597, the Courts of Appeals struggled to define the extent to which flood waters must be connected to a flood control project in order for immunity to attach.[3]  The Fifth Circuit, too, struggled to find the limits of section 702c immunity.[4]

---

[3] *See, e.g., Cantrell v. U.S. Dept. of Army Corps of Eng'rs*, 89 F.3d 268, 273-74 (6th Cir. 1996) ("[T]he proper standard . . . is whether the plaintiff can recover without holding the government liable for a privileged activity – *i.e.*, an activity (or a physical phenomenon caused by an activity) somehow necessary in the government's battle to control floods.")*; Bailey v. United States*, 35 F.3d 1118, 1122 (7th Cir. 1994) (requiring a causal nexus between injury and flood control activities:  section 702c immunity protects only flood control activities that increase risk of harm to plaintiff); *Williams v. United States*, 957 F.2d 742, 744-45 (10th Cir. 1992) (focusing on nature of project and "nexus between the operation of that project and the . . . injury").

[4] *See Kennedy v. Texas Utils.*, 179 F.3d 258, 263 (5th Cir. 1999) (declining to apply section 702c because "the only relation to 'flood waters' is that Kennedy would not have gone to the park but for the existence of the lake, and that her injury occurred on a patch of land that is within the flood stage pool;" the "alleged nexus with flood waters . . . is too attenuated to hold that Kennedy suffered 'damage from or by' such waters under § 702c"); *Boudreau v. United States*, 53 F.3d 81, 84, 86 (5th Cir. 1995) (finding a "sufficient association" between challenged conduct and flood control where the "injury resulted from a boating accident on flood control waters involving the Government's patrol of those waters"); *Mocklin v. Orleans Levee District*, 877 F.2d 427, 429-30 (5th Cir. 1989) (holding that section 702c provided immunity for drowning in a floatation channel because channel was used to reinforce flood-control levees and could therefore "properly . . . be said to contain water related to flood control").

In *Central Green Co. v. United States*, 531 U.S. 425 (2001), the Supreme Court took responsibility for the confusion evident in the Courts of Appeals' constructions of section 702c. The Court acknowledged that "the phrase 'related to flood control'" in *James* had "generated conflicting opinions among the Courts of Appeals" and clarified that the phrase was, in fact, dictum. 531 U.S. at 430-31. The Court made it clear that *James* had not conferred the status of "flood waters" upon waters whose only relationship to floods and flood control was that they happened to be contained in or carried through a flood control project; rather, *James* held that "the phrase 'floods or flood waters,'" encompasses both "those waters that a federal project is unable to control," and "waters that are released for flood control purposes when reservoired waters are at flood stage." *Id.* at 431. The Court emphasized in *Central Green* that "the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release." *Id.* at 434. To require that "flood control is among the purposes served by the project" would "unnecessarily dilute[] the language of the statute." *Id.* Based on the text of section 702c, the significant nexus or association that is relevant to whether immunity attaches is the causal relationship between water – specifically, "floods or flood waters" – and the plaintiffs' damages. *Id.* at 437.[5] Thus, *Central Green* instructs that it is not the *project* from which water flows that is key for determining the government's immunity under the FCA, but the character of the *water* itself. *See Central Green*,

---

[5] The factual record before the Supreme Court in *Central Green* did not establish whether the water in question was at flood stage when it caused the plaintiffs' damages. *Id.* at 436-37. The Court therefore remanded the case so that the "character of the waters that cause the relevant damage" could be determined. *Id.* at 437.

531 U.S. at 434 ("The text of the statute does not include the words 'flood control project.' Rather, it states that immunity attaches to 'any damage from or by floods or flood waters . . . .'") (quoting 33 U.S.C. § 702c).

Accordingly, *Central Green* and *James* reinforce that the plain language of the FCA is controlling, and the United States is absolutely immune from "any damage from or by floods or flood waters" regardless of any connection to a flood control project. And here, it is clear that the plaintiffs' alleged damages are from "flood waters." As noted, it is undisputed that the damages alleged by the plaintiffs were caused by *flooding* and that the flooding resulted from Hurricane Katrina's "massive surge," which "overtopped the levees and retaining walls in numerous places along the MR-GO, GI[W]W, and IHNC." Rec. Doc. 590, ¶¶ XIII, XXV. *See also Central Green*, 531 U.S. at 436 (noting that the determination that damages are caused by "flood waters" within the meaning of the statute is "relatively easy" when the damages are caused by "a single, discrete incident"). Because the third-party complaint makes plain that the relevant damage was caused by water at flood stage, LNA's allegations bring its tort claim squarely within the immunity conferred by the unambiguous language of the FCA.

> **B.    Even if Flood Control Act Immunity Applies More Narrowly to Flood Waters that a Flood Control Project Failed to Contain, LNA's Third-Party Tort Claim is Barred.**

For purposes of this motion, it is undisputed that the "failure and breach of the IHNC levees, retaining walls (including I-walls), and related structures" was the immediate cause of the flooding that inundated the plaintiffs' properties. Rec. Doc. 590 ¶ XXIX. This fact is alleged by LNA as well as by each plaintiff's complaint. *See id*. Nonetheless, LNA attempts to avoid the immunity conferred by section 702c by trying to focus its theory of liability on acts or omissions

12

of the United States that purportedly occurred in relation to the MRGO, IHNC, and GIWW waterways themselves as opposed to the federal flood control projects that line the waterways. Citing to the district court decisions in *Graci v. United States*, 301 F. Supp. 947, 949 (E.D. La. 1969) and 435 F. Supp. 189, 192 (E.D. La. 1977), LNA alleges: "the MR-GO, GI[W]W, and IHNC are navigation channels, rather than flood control projects.  This Third-Party Complaint is therefore not barred by any immunity provisions in the Flood Control Act of 1928."  Rec. Doc. 590 ¶ XXVII.  LNA's reliance on the *Graci* decisions is misplaced.

In *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971), the Fifth Circuit reviewed whether FCA immunity applied to allegations that the United States was responsible for the flooding caused by Hurricane Betsy in 1965, allegedly as a result of the United States' negligent construction of the MRGO.  The Fifth Circuit held that, "when, as here, the plaintiffs alleged that they have suffered floodwater damage as a result of the negligence of the United States *unconnected with any flood control project*, § 3 of the Flood Control Act of 1928 [33 U.S.C. § 702c] does not bar an action against the United States . . . ."  *Graci*, 456 F.2d at 27 (emphasis added).  *Graci*, however, antedated both *James* and *Central Green*, the only two Supreme Court cases to have construed 33 U.S.C. § 702c.  As explained, in clarifying the opinion in *James*, the *Central Green* Court took pains to point out that "[t]he text of the statute does not include the words 'flood control project.'"  *Central Green*, 531 U.S. at 434.  The *Central Green* opinion concludes with the instruction: "in determining whether § 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project."  *Id.* at 437.  The Supreme Court's authoritative construction of section 702c, in *James* and especially *Central Green*, shows that *Graci* is

13

inapplicable to this case, which arises out of "flood waters" within the plain meaning of the FCA. *See Central Green*, 531 U.S. at 431 ("It is . . . the text of the statute . . . [that] determine[s] whether the water . . . that allegedly caused the damage . . . is covered by 702c."), *id.* at 434 ("The text of the statute . . . states that immunity attaches to 'any damage from or by floods or flood waters . . . .'"), *id.* at 431 (even "narrowly confined," "the phrase 'floods or flood waters'" denotes "those waters that a federal project is unable to control").

Moreover, the flood that led to the *Graci* cases antedated construction of the federal flood protection system whose failure resulted in the flooding and damages alleged by the plaintiffs and LNA here.  LNA alleges that actions related to the waterways – specifically, dredging of the MRGO and the configuration of the waterways – caused erosion and a loss of wetlands, which diminished the "natural protective barrier that absorbed surges caused by tropical storms and hurricanes."  Rec. Doc. 590 ¶ XVIII.  Although LNA alleges that this "created a hazardous condition that resulted in catastrophic damage to these areas without regard to the performance of any flood control project," Rec. Doc. 590 ¶ XXI (second),[6] it is not the "hazardous condition" alone that is alleged to have caused the plaintiffs' damages.  To the contrary, LNA alleges that "[a]s a direct and inevitable result of the arrangement, configuration, and condition of the man-made navigation channels[,] . . . the storm surge overtopped the levees and retaining walls in numerous places along the MR-GO, GI[W]W, and IHNC. . . . Those structures were soon overcome, resulting in catastrophic inundation of Orleans and St. Bernard Parishes that would not have occurred but for the existence, design, and deteriorated and eroded condition of the MR-

---

[6] Rec. Doc. 590 includes two paragraphs numbered "XXI."  Therefore, when citing these paragraphs, the United States cites either "XXI (first)" or "XXI (second)."

GO *and the inadequacies of the levee and retaining wall systems* and related structures along the

GI[W]W and IHNC."  Rec. Doc. 590 ¶ XXV (emphasis added).  *See also* ¶ XXIII ("The IHNC

levees, retaining walls . . . and related structures . . . were designed and built to a height that was

based on the wrong elevation datum and that failed to account for the effect of subsidence . . .

resulting in crown elevation deficiencies that caused *prolonged overtopping that would not have*

*occurred but for this failure*."); ¶ XXX ("LNA avers that plaintiffs' damages, if any, are the

result of the [] USCOE's negligence, errors, acts, and/or omissions in the design, construction,

and maintenance of the MR-GO, GI[W]W, IHNC, *and their respective levee and retaining wall*

*systems*, some or all of which caused or contributed to the multiple levee and retaining wall

failures and resulted, in turn, in the injuries and damages (if any) complained of by the plaintiffs

in these cases.") (emphasis added).

Thus, although the putative negligence for which recovery is sought is the "negligence or

fault in the design, engineering, inspection, construction and/or maintenance of the MR-GO,"

Rec. Doc. 590 ¶ XXI (first), a navigation channel, the gravamen of the allegations is that the

levees should have been built better, given the existence of the MRGO.  Indeed, LNA

specifically so alleges:

> The USCOE's negligence or fault in the design, engineering, inspection,
> construction and/or maintenance of the MR-GO included, . . . (1) failing to take
> account of the waterway's inherent and known capability for serving as a funnel
> or conduit for rapidly accelerated, storm-driven surges which would magnify the
> storm surge's force against levees, floodwalls, and spoilbanks in New Orleans and
> St. Bernard Parish; (2) failing to account for the devastation (through construction
> itself as well as subsequent salt water intrusion and accelerated erosion) of the
> wetlands, forests, and land masses thus denuding and destroying a critical natural
> buffer against storm surge, thereby further exacerbating the funnel effect created
> by the MR-GO's design; (3) failing to account for, or remedy, the effects of
> subsidence on the levees and retaining walls; and (4) failing to armor the landward

side of the levee against erosion and scouring . . . .

Rec. Doc. 590 ¶ XXI (first).  As the failures cited by LNA illustrate, the third-party claim

challenges the design of the levees and flood walls and their adequacy to protect the plaintiffs

from flood damages.

LNA's third-party complaint makes clear that LNA is alleging damages from "floods or

flood waters."  The fact that the surge overtopped the existing flood control "levees, retaining

walls (including I-walls), and related structures" to inundate the plaintiffs' neighborhoods

necessarily means that the storm surge was *flood water* within the meaning of the FCA when it

caused the plaintiffs' damages.  *See* Rec. Doc. 161, Order and Reasons 5/25/2006, at 11 ("A

levee is a structure fixed to the land whose fundamental purpose is to protect the landbased

community from *flood waters*.") (emphasis added).  In contrast to the facts alleged by LNA, the

*Graci* holding depended on the factual premise that the MRGO was "totally unrelated to . . . the

national flood control program."  *Graci*, 301 F. Supp. at 956.  This factual premise was based on

the situation that existed in September of 1965 when Hurricane Betsy landed.  Within days after

Betsy struck, however, Congress authorized the Lake Pontchartrain and Vicinity Hurricane

Protection Plan ("LPVHPP").  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965).  The legislative

history reveals that Congress was aware both that the MRGO had affected the hydrology of the

area and that the new flood control plan took the potential hydrological effect of the MRGO into

account.  House and Senate committees observed that the proposed project would entail

"construction of a new levee along the Gulf Outlet Channel [*i.e.*, the MRGO] . . . to prevent entry

of lake surges into the developed areas."  H.R. Rep. 89-973 at 77 (1965); S. Rep. 89-464 at 121

(1965).

16

The relationship between the MRGO and the national flood control program is underscored in the reports on which Congress relied when it authorized the LPVHPP. The report of the Army's Chief of Engineers explained in detail that the contemplated levees were intended to guard against any potential hydrological impact from the MRGO.[7] The flood walls built alongside the IHNC are part of the hurricane protection system authorized by the Flood Control Act of 1965, Pub. L. No. 89-298, and it is undisputed that the breach of these flood walls is central to the claim asserted here, Rec. Doc. 590 ¶ XXIX. The non-existence of the LPVHPP during Hurricane Betsy factually distinguishes *Graci* from the present litigation, and a claim based on the "eroded condition of the MRGO," Rec. Doc. 590, ¶ XXI (second), can no longer be considered "unconnected with flood control projects," as it was in *Graci*. This litigation is further distinguished from *Graci* by the specific allegation that the failure of the IHNC levee and flood wall caused the plaintiffs' damages. *See* Rec. Doc. 590 ¶ XXIX.

In *Central Green*, the Supreme Court reiterated its holding in *James*, stating that "the phrase 'floods or flood waters' is not narrowly confined to those waters that a federal project is

---

[7] The Chief's Report and its attachments discussed the potential problem of "[h]urricane damages result[ing] from surges entering Lake Pontchartrain from Lake Borgne . . . through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal." H.R. Doc. 89-231, Rep. of the District Eng'r at 17. The Report described a comprehensive system of levees "[f]or protection from hurricane flood levels," including "construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the gulf Intracoastal Waterway." *Id.*, Rep. of the Bd. of Eng'rs for Rivers and Harbors at 9. The Report further noted that "[t]he Chalmette area can be afforded adequate protection against hurricane flooding by construction of a new levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet and the improvement of existing protective structures along the Inner Harbor Navigation Canal . . . ." *Id.*, Rep. of the District Eng'r at 81. The Flood Control Act of 1965 authorized the LPVHPP to be constructed "substantially in accordance with the recommendations of the Chief of Engineers" as presented in the report at H.R. Doc. 89-231. Pub. L. No. 89-298. *See also* n.3, *supra*.

unable to control." 531 U.S. at 431. Therefore, it is clear that, at a *minimum*, "the phrase 'floods or flood waters'" must encompass "those waters that a federal project is unable to control." *Id.* There is no dispute that the waters that caused the plaintiffs' damages here were those that a federal project – specifically, the IHNC levees and flood walls – could not control. Whether the IHNC flood wall failed because a loose barge crashed into it, as the plaintiffs allege, or as a result of the height and strength of the storm surge, as LNA alleges, there is no dispute that the plaintiffs' damages were caused by flood waters that rushed through the breach of the IHNC flood wall. And whether the height and strength of the surge was magnified by the configuration or condition of the area's waterways, Rec. Doc. 590 ¶ XXV, a funnel effect, *id.* ¶ XXIV, the structural support or design of the levees, *id.* ¶¶ XXI (first), XXIII, the condition of wetlands in the area, *id.* ¶ XXI (second), or any other reason, is immaterial. The IHNC flood wall was "designed to provide protection from hurricane flood levels." H.R. Doc. 89-231, Rep. of the Bd. of Eng'rs for Rivers and Harbors at 9. There is no doubt that the IHNC flood wall was unable to control Hurricane Katrina's flood. Therefore, even if the words of the FCA are "confined to those waters that a federal project is unable to control," *Central Green*, 531 U.S. at 431, LNA's third-party complaint must be dismissed. For the same reason, dismissal also would be necessary even if it were to be assumed that section 702c applies only if the relevant damages are "connected" to a "flood control project." *Graci*, 456 F.2d at 27. LNA's allegations establish that the damages at issue in these consolidated cases are "related to flood control." *See* Rec. Doc. 590 ¶¶ XIV, XV, XXI-XXIII, XXV, XXVI, XXVIII, XXIX, XXX.

Under any analysis, the FCA immunizes the United States from any liability suffered by the plaintiffs as a result of the flooding following Hurricane Katrina. The United States is

immune from liability "for any damage from or by floods or flood waters at any place," 33

U.S.C. § 702c, and this immunity bars LNA's third-party indemnity claim against the United

States.

        **C.**        **The Decision in *Robinson v. United States* is not Controlling Here.**

In *Robinson v. United States*, Civil Action No. 06-2268, consolidated with Civil Action

No. 05-4182, *In re Katrina Canal Breaches Consolidated Litigation*, before Section K of this

Court, Judge Duval denied the United States' motion to dismiss pursuant to section 702c,

concluding that the FCA's applicability to the allegations in that case could not be decided on a

Rule 12(b)(1) motion because the issue depended on a factual determination as to whether the

alleged negligence was related to a flood control project such that immunity attached to the flood

waters at issue. *Robinson* Order & Reasons 2/2/2007, Rec. Doc. 2994 in Civil Action No. 05-

4182. In *Robinson*, the plaintiffs dispute the very existence of levees along the MRGO.

Accordingly, Judge Duval found that "there [was] intense disagreement as to the scope of the

'levees' that were created in the dredging of the MRGO." *Robinson* Order at 15-16. Judge

Duval therefore concluded that the Court could not determine from the allegations in the

plaintiffs' complaint whether their damages were caused by "flood waters" within the meaning of

the FCA; that determination would instead require discovery to resolve factual disputes regarding

"the scope of the 'levees'" and whether they were "actual flood control projects," as well as the

"relationship between the MRGO and the [LPVHPP]," *id.* at 15-16, which "authorized the flood

control projects designed to protect th[e] area from flooding," *id.* at 7.

Even accepting Judge Duval's characterization of the law and the record in *Robinson*, his

conclusion could not apply here, where no factual disputes regarding the existence of a flood

control project can be argued.  It is plain from the facts alleged in LNA's third-party complaint

that the plaintiffs and LNA seek "damages as a result of the failure and breach of the IHNC

levees, retaining walls (including I-walls), and related structures."  Rec. Doc. 590 ¶ XXIX.  *See*

*generally supra* pp. 6-8.  Thus, the existence of flood control structures along the IHNC and their

failure here are conclusively established facts.  *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d

105, 108 (5th Cir. 1987) (noting that a party is bound by the factual admissions in its pleadings:

"Facts that are admitted in the pleadings 'are no longer at issue.'"); *White*, *v. ARCO/Polymers,*

*Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) ("factual assertions in pleadings . . . are considered to

be judicial admissions conclusively binding on the party who made them.").

    As this Court has observed, "a plain reading of LNA's complaint . . . indicates that it

considers both the 'eroded condition of the MRGO *and the inadequacies of the levee and*

*retaining wall systems* and related structures along the GIWW and IHNC' potentially responsible

for the 'catastrophic inundation of Orleans and St. Bernard Parishes.'"  Rec. Doc. 587 at 9

(quoting Rec. Doc. 202 at 7) (emphasis added).  While "LNA does not indicate the degree to

which it considers each factor ultimately responsible for plaintiffs' damages," Rec. Doc. 587 at 9,

there is no reading of LNA's third-party complaint or the plaintiffs' complaints against LNA

under which it can be said that the waters at issue were not "flood waters" within the plain

meaning of the FCA, let alone "unconnected with any flood control project," *Graci*, 456 F.2d at

27.  *See* Rec. Doc. 587 at 10 (describing LNA's allegations as "primarily concerned . . . with the

degree to which dredging impacts or undermines the[] land-based structures").  Even if LNA's

third-party complaint is interpreted to allege that the existence and condition of the MRGO was

the sole cause of the levee failures, the fact remains that the *plaintiffs' damages* were

undisputedly caused by the failure of a flood control structure when water was at flood stage.

The plain language of the FCA immunizes the United States from "any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  *Central Green*, *James*, and even *Graci*, make clear that this language encompasses the flood waters that flowed through the breach in the IHNC levee and flood wall.[8]

## II.   This Court Lacks Subject Matter Jurisdiction Over LNA's Third-Party Little Tucker Act Claim for Indemnity or Contribution.

In its third-party complaint, LNA asserts a second cause of action against the United States for "Indemnity for Fifth Amendment Takings, 28 U.S.C. § 1346(a)(2)."  Rec. Doc. 590, ¶¶ XXXII-XXXV; Rec. Doc. 597, ¶¶ XXXII-XXXV.  Despite LNA's amendment of its third-party complaint in response to the Court's Order & Reasons issued on March 14, 2007, Rec. Doc. 587, LNA has not alleged a takings claim within this Court's subject matter jurisdiction.  The Little Tucker Act, pursuant to which LNA brings its takings claim, provides: "The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: . . . (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon the Constitution, . . . in cases not sounding in tort . . . ."  28 U.S.C. § 1346(a)(2).  To establish jurisdiction in this Court, therefore, LNA must allege a compensable claim (1) founded on the Constitution; (2) not based in tort; and (3) within the $10,000

---

[8] Even if this Court concludes that this case is identical to *Robinson*, the Court is not bound by Judge Duval's decision that the issue of the United States' immunity pursuant to the Flood Control Act cannot be decided without factual development.  District court opinions of one judge are not binding on other district judges.  *See Dispute Resolution, Inc. v. Judicial Council of the State of California*, ___ F.3d ___, 2007 WL 1544589 at *3 (9th Cir. May 30, 2007) ("[A] district court opinion does not have binding precedential effect."); *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 423 at n.10 (6th Cir. 2006) ("a district court opinion [] is not binding precedent on any court").

21

jurisdictional limit.  None of these requirements are met here.

A.      **LNA's Third-Party Claim for Indemnity or Contribution is not itself Founded on the Constitution.**

Even assuming arguendo that plaintiffs themselves could state a claim under the Fifth Amendment for a taking of their property, LNA's third-party claim for indemnity or contribution is not itself founded on the Constitution.  Indeed, LNA's third-party complaint alleges only that the *plaintiffs* may have a claim based on the Constitution and contains no allegation that its own indemnity or contribution claim is founded upon any right conferred by the Constitution:  "The United States' actions and/or inactions . . . entitl[e] the owner of each such damaged property to 'just compensation' under the Fifth Amendment to the United States Constitution. . . . LNA asserts an *independent* indemnity and/or contribution claim under 28 U.S.C. § 1346(a)(2) against the United States, which is liable for the taking of each plaintiff's property."  Rec. Doc. 590 ¶¶ XXXII-XXXIII (emphasis added).

The elements of a claim for compensation pursuant to the Fifth Amendment for "a taking by inverse condemnation through flooding" require a plaintiff to "prove that [it] owned a property right at the time of the taking . . . and that flooding has been intermittent, frequent and inevitably recurring because of authorized actions by defendant."  *Hendricks v. United States*, 14 Cl. Ct. 143, 149 (Cl. Ct. 1987) (citations omitted).  Ownership of property is an essential element of a Fifth Amendment takings claim, and it also is a necessary element to establish standing. *Maniere v. United States*, 31 Fed. Cl. 410, 420 (Fed. Cl. 1994) ("Pursuant to a taking claim under the Fifth Amendment, a plaintiff must initially show standing, including proof of personal injury, that is, the requisite interest in the property at issue and the deprivation thereof by the United

States.").  LNA has not alleged an ownership interest in any property for which damages are

sought.  Rather, LNA's third-party complaint alleges that "[t]he United States' actions . . .

effectively destroyed *the plaintiffs' property* . . . entitling *the owner* of each such damaged

property to 'just compensation' . . . ."  Rec. Doc. 590 ¶ XXXII (emphasis added).

LNA lacks standing to bring an action alleging that the United States violated the

Constitutional rights of the plaintiffs.  "The person entitled to compensation for a taking of

property by the Government is the owner of the property at the time of the taking."  *Lacey v.*

*United States*, 595 F.2d 614, 619 (Ct. Cl. 1979).  *See also Cavin v. United States*, 956 F.2d 1131

(Fed. Cir. 1992) (citing *United States v. Dow*, 357 U.S. 17, 20-21 (1958)) ("Without undisputed

ownership of the [] property at the time of the takings, the [plaintiffs] cannot maintain a suit

alleging that the Government took their property without just compensation."); *Murray v. United*

*States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[O]nly one possessing an ownership interest in

the real property at the time of the taking is entitled to receive the required compensation.").  The

Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights

and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"

*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499

(1975)).  Because LNA's cause of action is not founded upon its own legal interest, LNA lacks

standing to bring the takings claim it asserts.  Bringing the claim by way of a third-party

complaint does not remedy the defect.  *See Index Fund, Inc. v. Hagopian*, 417 F. Supp. 738, 745

(S.D.N.Y. 1976) ("Rule 14 cannot be utilized to circumvent the requirement of standing.").

Indeed, because LNA alleges that the *owners of the damaged property*, *i.e.*, the original

plaintiffs, are entitled to compensation pursuant to the Fifth Amendment, not that LNA is so

entitled, LNA's claim is not even a proper third-party claim pursuant to Rule 14(a). Rule 14(a) allows the assertion of a third-party claim against "a person not a party to the action who is or may be liable *to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff*." Fed. R. Civ. P. 14(a) (emphasis added). *See also Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 368 n.1 (1978) ("Under Rule 14(a), a third-party defendant may not be impleaded merely because he may be liable to the *plaintiff*."); *Millard v. Mun. Sewer Auth. of Twp. of Lower Makefield*, 442 F.2d 539, 541 (3d Cir. 1971) ("It is no longer possible, as it was prior to the 1948 amendment to this rule, to implead a third party claimed to be solely liable to the plaintiff."). As LNA's third-party complaint expressly acknowledges, it would be the *plaintiffs*, if anyone, who would be entitled to any compensation due pursuant to a Fifth Amendment claim. Rec. Doc. 590, ¶ XXXII. A "third-party complaint must allege that the third-party defendant is liable to the *defendant* and not that the third party is liable to the plaintiff." *Index Fund*, 417 F. Supp. at 744 (emphasis added). LNA's attempt to bring an indemnity cause of action based on the allegation that owners of the damaged property at issue may be entitled to compensation pursuant to the Fifth Amendment is not a permitted use of Rule 14(a) impleader. Where a "third-party complaint seeks to implead [third-party defendants] on the ground that they injured the plaintiff in the main action," it is a "fatal defect in the complaint [that] cannot be camouflaged by its prayer for indemnity and contribution." *Index Fund*, 417 F. Supp. at 745-46. *See also Uptagrafft v. United States*, 315 F.2d 200, 202 (4th Cir. 1963) ("It is not enough that the third-party defendant may be liable to the plaintiff. Rule 14 does not establish a right of reimbursement, indemnity or contribution.").

Additionally, LNA's assertion of a Fifth Amendment takings claim is an independent cause of action that does not derive from the plaintiffs' allegations of negligence against LNA. Rule 14(a) does not permit "'[a]n entirely separate and independent claim [to] be maintained against a third party . . . even though it does rise out of the same general set of facts as the main claim.'" *Southeast Mortgage Co. v. Mullins*, 514 F.2d 747, 749 (5th Cir. 1975) (quoting *United States v. Joe Grasso & Son, Inc.*, 380 F.2d 749, 751 (5th Cir. 1967)). *See also United States v. Olavarrieta*, 812 F.2d 640, 643 (11th Cir. 1987). "[I]t is clear that impleader under Rule 14 requires that the liability of the third party be dependent upon the outcome of the main claim." *Southeast Mortgage*, 514 F.2d at 749. LNA's claim against the United States seeks indemnity for any liability that the plaintiffs may obtain against LNA, but the plaintiffs' claims against LNA sound in tort, and any claim based on the Fifth Amendment would not depend on the success of the plaintiffs' tort claims. Therefore, even if the elements of a Fifth Amendment claim were properly alleged, the claim would not be permitted by Rule 14(a). *Id.* ("The suggestion that a separate and independent claim can be made the proper subject of a third party complaint because, but for the violation of duty alleged the main claim would not have matured, has been rejected by this and other courts.").

LNA's third-party claim alleges that the United States took the plaintiffs' property. At best, the Fifth Amendment would give the plaintiffs a right to compensation. Because LNA fails to allege a proper Fifth Amendment takings claim that it has standing to assert, its third-party claim for indemnity or contribution does not come within this Court's jurisdiction pursuant to the Little Tucker Act.

**B.     LNA's Third-Party Claim for Indemnity or Contribution Sounds in Tort.**

This Court also lacks subject matter jurisdiction over LNA's second cause of action because "[t]he Tucker Act permits suits only 'in cases not sounding in tort.'"  *Ware v. United States*, 626 F.2d 1278, 1285 n.6 (5th Cir. 1980) (quoting 28 U.S.C. §§ 1346(a)(2), 1491).  *See also Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355-56 (Fed. Cir. 2003) (distinguishing torts and takings); *Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976) (same).  As the basis of its takings cause of action, LNA alleges that the United States' actions "effectively destroyed the plaintiffs' property resulting in a permanent taking and/or inevitably recurring inundation which is equivalent to a permanent taking."  Rec. Doc. 590, ¶ XXXII.  For the specific actions of the United States that allegedly resulted in a permanent taking, however, LNA refers to the "actions and/or inactions[] described in paragraphs I to XXXI."  *Id.*  Paragraphs I to XXXI encompass LNA's allegations of the United States' negligence, which form the basis of LNA's tort claim.  No additional facts specific to a takings claim are alleged.

The elements of a takings claim based on flooding are "well established."  *Hendricks*, 14 Cl. Ct. at 149.  "The cases disclose the rule that the permanent, intermittent flooding which amounts to a taking must be frequent, . . . and productive of substantial damage."  *Barnes*, 538 F.2d at870.  Where flooding is not "intermittent, frequent, and inevitably recurring," there is no taking.  *Cooper v. United States*, 37 Fed. Cl. 28, 36 (Fed. Cl. 1996).  *See also Singleton v. United States*, 6 Cl. Ct. 156, 162 (Cl. Ct. 1984) ("It is well established that the critical element of an inverse condemnation taking in a flooding case is that of inevitable recurring floods.").  Equally well established is the rule that a single incident of flooding cannot give rise to a takings claim:

"It is settled that a single flood does not, . . . nor indeed one, two or three floods by themselves do not . . . constitute a taking by inverse condemnation." *Singleton*, 6 Cl. Ct. at 162-63 (citing *B Amusement Co. v. United States*, 148 Ct. Cl. 337, 341-42, 180 F. Supp. 386, 389 (1960); *National By-Products, Inc. v. United States*, 186 Ct. Cl. 546, 576, 405 F.2d 1256, 1273 (1969)). *See also Fromme v. United States*, 412 F.2d 1192, 1198 (Ct. Cl. 1969) ("[O]ne flooding . . . or two floodings . . . cannot be regarded as a taking of a permanent interest in the affected land."); *Stover v. United States*, 332 F.2d 204, 206 (9th Cir. 1964) ("An isolated injury is not considered a taking.").

Where flooding is not alleged to occur with the frequency necessary to establish a taking, the claim is, at most, one in tort. *Baird v. United States*, 5 Cl. Ct. 324, 328 (Cl. Ct. 1984) ("Damages from government-induced flooding that cannot be deemed permanent merely give rise to a claim in tort."); *Barnes*, 538 F.2d at 870 ("Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort."). The plaintiffs' allegations against LNA and LNA's allegations against the United States involve only a single flood – that caused by Hurricane Katrina's storm surge in August 2005. "A one-time occurrence . . . could only be compensable through an action in tort." *Baird*, 5 Cl. Ct. at 329. *See also id.* at 330 ("[P]laintiffs in the present case have established no more than damage due to 'a random event induced more by a natural phenomenon than by Government interference' [for which] there can be no taking, even if there is permanent damage to property partially attributable to Government activity."); *Harris v. United States*, 205 F.2d 765, 767 (10th Cir. 1953) ("Generally it is held that a single destructive act without a deliberate intent to assert or acquire a proprietary interest or dominion is tortious . . . .").

Additionally, LNA does not allege any facts specific to its second cause of action for taking, but instead merely incorporates by reference its allegations of negligence that form the basis of its tort claim.  The "incorporation of a tort theory or recovery in [the] complaint recognizes the fact that [the] charges . . . are tort oriented." *Singleton*, 6 Cl. Ct. at 165.  Here, not only does LNA incorporate a tort theory, but its takings theory is premised on the tort allegations. All but four of the thirty-five paragraphs in LNA's amended third-party complaint describe the basis for LNA's assertion of a tort claim against the United States.  No additional facts are alleged in the remaining four paragraphs.  LNA's allegations of the United States' negligence establish that the nature of the third-party claims, including the takings claim, is in tort and that there is no factual basis to support a claim pursuant to the Fifth Amendment.  *See Hassan v. La. Dep't Transp. & Dev.*, 923 F. Supp. 890, 894 (W.D. La. 1996) ("[T]he substance of a claim and not the complainant's characterization of it controls whether the claim falls within § 1346(a) or § 1346(b).").  Because LNA's claim of "permanent taking and/or inevitably recurring inundation" is grounded in negligence and is based on a single occurrence, the claim falls outside this Court's subject matter jurisdiction under 28 U.S.C. § 1346(a)(2), which specifically excludes actions sounding in tort.

## C.    LNA's Attempt to Plead Around the Little Tucker Act's $10,000 Jurisdictional Limit is Unavailing.

LNA amended the allegations in its third-party complaint to seek indemnity of "no more than $10,000 for each plaintiff (including each plaintiff class member if the Court certifies a class over LNA's objection)."  Rec. Doc. 590, ¶ XXXIV.  Because each action in which LNA brings a claim for indemnity against the United States involves multiple plaintiffs, with some styled as

class actions, and the plaintiffs in each case against LNA invoke federal diversity jurisdiction

pursuant to 28 U.S.C. § 1332, such that each plaintiff necessarily seeks more than $75,000 in

damages, and because LNA's indemnity claim is based on the same set of facts for each plaintiff,

LNA does not bring its claim within the jurisdictional limitation of 28 U.S.C. § 1346(a)(2) by its

amended allegations.

Multiple claims under 28 U.S.C. § 1346(a)(2) may sometimes be combined in one action

within the district court's jurisdiction even where the aggregate amount claimed exceeds

$10,000, but this is permitted only where the claims are distinct and each individual claim is

itself within the $10,000 jurisdictional limit.  For example, the district court in *Glover v. Johns-*

*Manville Corp.*, 662 F.2d 225, 231 (4th Cir. 1981), had jurisdiction over indemnity claims

brought by 14 manufacturers in a single action against the United States because each claim was

based on an "independent contractual relationship with the United States," and each

manufacturer submitted an affidavit to show that it sought damages less than $10,000.  Likewise,

in *United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 701-02 (6th Cir. 1955), the

district court had jurisdiction over a complaint asserting 74 claims pursuant to section 1346(a)(2),

in the aggregate seeking more than $10,000, where each individual claim was for less than

$10,000 and was based on a distinct contract and unique facts.  "[T]he 74 bills of lading

constituted the 74 contracts between the carriers and the shipper.  Since these 74 claims arise out

of diverse and separate acts and agreements and totally different evidence is necessary to support

them, plaintiff has not split a single cause of action as contended by defendant, but has joined

several causes."  *Id.* at 702.  *See also Fitzgerald v. Staats*, 429 F. Supp. 933, 934-35 (D.D.C.

1977) (jurisdiction under Tucker Act, 28 U.S.C. § 1346, existed over two claims for less than

$10,000 each but in aggregate greater than $10,000 *because claims were distinct*).

Here, LNA does not allege a distinct claim for each plaintiff. LNA brings a single indemnity action against the United States for "the maximum amount that may be recovered under 28 U.S.C. § 1346(a)(2) for any liability that LNA may incur herein . . . ." Rec. Doc. 590 ¶ XXXV. The plaintiffs allege jurisdiction pursuant to 28 U.S.C. § 1332 and necessarily seek more than $75,000 in damages from LNA. It is plain that if the plaintiffs themselves filed takings claims against the United States, there would be no jurisdiction in the district court under 28 U.S.C. § 1346(a)(2). By seeking "$10,000 per plaintiff," LNA attempts to carve its indemnity claim into multiple actions and thereby come within the jurisdiction conferred by 28 U.S.C. § 1346(a)(2). There is no authority to support this artificial division of an indemnity claim. Indeed, district courts have rejected similar attempts to manufacture jurisdiction under section 1346(a)(2).

In *United States v. Lindberg Corp.*, 686 F. Supp. 701 (E.D. Wis. 1987), *aff'd* 882 F.2d 1158 (7th Cir. 1989), the United States sued to recover 265 gears in the possession of Lindberg, a subcontractor who was owed money by an insolvent government contractor. Lindberg filed a counterclaim against the United States pursuant to the Fifth Amendment, arguing that recovery of the gears would be an unlawful taking and seeking compensation of $10,000 per gear. *Id.* at 705. Finding that "[s]plitting the counter-claim into 265 parts does not change the factual or legal issues relating to each part," the district court held that it lacked jurisdiction under 28 U.S.C. § 1346(a)(2) because "recovery on each gear would rise and fall on the same facts and legal arguments," and, "[i]n essence then, the claim is for 265 times $10,000." *Id.*; 882 F.2d at 1164 ("The appellant's breaking down the total amount [of the counterclaim] to a less-than-$10,000

amount-per-gear is untenable."). *See also, State of Washington v. Udall*, 417 F.2d 1310, 1320-21 (9th Cir. 1969) (affirming district court's determination that "the State impermissibly split its claim for damages under the Tucker Act, 28 U.S.C. § 1346(a)(2), in an attempt to limit the amount in controversy to less than $10,000," and rejecting the State's argument that "a controversy involving separate parcels of real property creates inherently separate causes of action."); *Eccles v. United States*, 396 F. Supp. 792, 795 (D.N.D. 1975) ("Plaintiffs have but one action under several counts, which cannot be divided as to tracts or time to vest the Court with jurisdiction.").

LNA's third-party complaint does not allege separate causes of action for each plaintiff, and LNA cannot artificially split its indemnity claim against the United States by plaintiff in an attempt to limit the amount in controversy. There are multiple plaintiffs in each action, and the plaintiffs' claims against LNA all involve the same factual and legal issues and arise from the same, single flooding event. Likewise, LNA's third-party complaint is identical in each action and is based on identical facts and allegations of negligence. LNA has not pleaded any facts that are particularized by plaintiff. Rather, all of LNA's allegations are common to each plaintiff, which shows that LNA does not assert distinct claims that can be considered separately for the purpose of assessing the amount in controversy for its indemnity claim. *See Louisville & Nashville R.R.*, 221 F.2d at 701 (multiple claims within the district court's jurisdiction because "each claim is founded upon a different contract. . . . The evidence, therefore, does not . . . apply equally to all of the separate claims[;] . . . if only the facts common to each individual claim were pleaded, no case would be stated.").

Because LNA does not allege distinct individual claims that alone would satisfy the jurisdictional requirements of 28 U.S.C. § 1346(a)(2), the cause of action seeking indemnity pursuant to the takings clause of the Fifth Amendment remains outside the district court's subject matter jurisdiction and cannot be maintained.

## **CONCLUSION**

For the reasons stated herein, the third-party claims against the United States should be dismissed.

Dated: June 22, 2007                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        C. FREDERICK BECKNER, III
                                        Deputy Assistant Attorney General

                                        PHYLLIS J. PYLES
                                        Director, Torts Branch

                                        JAMES G. TOUHEY, JR.
                                        Assistant Director, Torts Branch

                                        /s/ Kara K. Miller
                                        _____
                                        KARA K. MILLER
                                        Trial Attorney, Torts Branch, Civil Division
                                        PETER MYER
                                        Trial Attorney, Torts Branch, Civil Division
                                        U.S. Department of Justice
                                        Benjamin Franklin Station, P.O. Box 888
                                        Washington, D.C.  20044
                                        (202) 616-4448/(202) 616-5200 (Fax)
                                        Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I, Kara K. Miller, hereby certify that on June 22, 2007, I served a true copy of Defendant United States of America's Motion to Dismiss Lafarge North America Inc.'s Third-party Complaints, Memorandum of Law in Support, and Notice of Hearing upon all counsel of record by ECF or first class mail.


/s/ Kara K. Miller
Kara K. Miller