# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE | * CIVIL ACTION |
| COMPLAINT OF INGRAM BARGE | * |
| COMPANY, AS OWNER OF THE | * NO. 05-4419, C/W 05-4237, C/W 05-5531, |
| ING 4727, PETITIONING FOR | * C/W 05-5724, C/W 06-3313, C/W 06-5342, |
| EXONERATION FROM OR | * C/W 06-5054, C/W 06-6299, C/W 06-7516 |
| LIMITATION OF LIABILITY | * |
| | * SECTION "C" (2) |
| | * |
| | * JUDGE HELEN G. BERRIGAN |
| | * MAG. JUDGE JOSEPH C. WILKINSON, JR. |

***THIS PLEADING APPLIES TO CASE NOS. NO. 05--4237, 05-5531, 05-5724, 06-5054, 06-5342, 06-6299.***

## OPPOSITION OF LAFARGE NORTH AMERICA INC.
## TO THE UNITED STATES' SECOND MOTION TO DISMISS

On March 14, 2007, this Court denied the government's motion to dismiss the third-party complaint filed by Lafarge North America Inc. ("LNA"), except for requiring LNA to explicitly state the dollar limit of its Little Tucker Act claims. LNA made that amendment, and the government filed its answer. Now, however, the government has filed a second motion to dismiss, asserting that the Court lacks subject matter jurisdiction on the basis of arguments that the government failed to raise in its original motion to dismiss.

1

Those arguments provide no basis for dismissing LNA's complaint.  LNA's first cause of action, for which jurisdiction lies under the Federal Tort Claims Act ("FTCA"), alleges that the government's negligent design, construction, and dredging of navigation channels caused plaintiffs' alleged injuries.  The government advances two arguments as to why § 3 of the Flood Control Act ("FCA") divests the Court of its jurisdiction over that claim.  Judge Duval has rejected both of these arguments in the *Katrina* litigation, and they should be rejected here as well.

The government's threshold argument is that § 3 immunizes it from liability for flood-related damage even absent any connection to a flood control project.  The Fifth Circuit rejected that exact argument in *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971), and the government is wrong when it argues that *Graci* was implicitly overruled by *United States v. James*, 478 U.S. 597 (1986), or by *Central Green v. United States*, 531 U.S. 425 (2001).  Those cases are fully consistent with, and indeed support, the decision in *Graci*.

The government's fallback FCA theory is that the flooding here was connected to a flood control project because the government had added levees to the waterways after the decision in *Graci*.  This argument fails for three reasons.  First, *Graci* holds that immunity turns on whether the government's negligent act was connected to a flood control project, and thus § 3 does not apply to LNA's allegations based on the government's negligence in designing, building, and dredging the navigation channels.  Second, § 3 only applies to flood control projects designed to contain natural flooding, not to measures to remedy the government's own prior negligence, and thus § 3 also does not apply to the government's additional negligence in its design and construction of the "levees" at issue here.  Finally, and in any event, there is a factual dispute as to whether a flood control project had been implemented at each of the many locations from which flooding occurred.

LNA's second cause of action is asserted under the Little Tucker Act, which creates jurisdiction over any claim against the government "founded … upon the Constitution." The government argues first that LNA is trying to assert the plaintiffs' taking claims and lacks standing to do so. To the contrary, LNA asserts <u>its own claim</u> for indemnity or contribution founded on the Constitution – a claim that LNA surely has standing to assert and that falls within the plain terms of the Act's jurisdictional grant. LNA also alternatively asserts the plaintiffs' takings claim <u>under a subrogation theory</u>, and it is settled that subrogees have standing to assert claims against the government. To the extent that the government disputes the existence of a constitutional claim for indemnity or contribution, or of subrogation rights in these circumstances, that dispute goes to the merits, not to subject matter jurisdiction, and thus is not properly before the Court on this second motion to dismiss.

The government next argues that LNA has not pled enough details as to why government's actions have effectuated a taking of plaintiffs' property, but that argument does not go to jurisdiction. LNA's complaint, in any event, alleges that those actions have resulted in "inevitably recurring" flooding – which the government admits is the test for a taking – and even explains why that is so. It thus amply satisfies the notice pleading requirement of Rule 8(a).

Finally, the government says that LNA's claims exceed the Little Tucker Act's $10,000 limit because LNA's claims against the government arising from each plaintiff's claim against LNA should be aggregated for this purpose. LNA's complaint, however, expressly asserts an "independent" claim against the government arising from "each" plaintiff's claim against LNA. The applicable caselaw, moreover, holds that the joinder of claims into a single lawsuit does not result in their aggregation for this purpose. The government's motion to dismiss LNA's Little Tucker Act claims should therefore be denied as well.

## BACKGROUND

1.      As the Court is well aware, a number of plaintiffs have filed individual or putative class actions lawsuits against LNA and certain other defendants, claiming that a barge broke free from its moorings at LNA's terminal during Hurricane Katrina and allegedly caused one of the wall breaches on the east side of the Inner Harbor Navigation Canal ("IHNC").

2.      LNA, in turn, filed a third-party complaint against the United States government in those cases, alleging that if LNA is held liable to the plaintiffs, then LNA is entitled to indemnity or contribution from the government for some or all of those amounts.  Rec. Doc. 202. In general, LNA alleges that it was the government's actions in the design, construction, maintenance, and dredging of the Mississippi River-Gulf Outlet Canal ("MR-GO") and the IHNC that resulted in the widespread flooding from those waterways that caused plaintiffs' claimed damages.  LNA alleges that the government's actions constituted a tort and that jurisdiction over LNA's claim exists under the FTCA, 28 U.S.C. § 1346(b)(1), and/or the Public Vessels Act, 46 U.S.C. App. §§ 781 et seq.  LNA also alleges that the government's actions constituted a Fifth Amendment taking and that jurisdiction over LNA's resulting claim against the government exists under the Little Tucker Act, 28 U.S.C. § 1346(a)(2).

3.      On October 6, 2006, the government filed a motion to dismiss LNA's complaint, arguing that LNA has failed to state a valid claim for indemnity or contribution and has failed to allege a claim within the jurisdictional limit of the Little Tucker Act.  Rec. Doc. 272.

4.      On March 14, 2007, this Court denied the government's motion to dismiss.  Rec. Doc. 587.  The Court first rejected the government's argument that the FTCA's administrative exhaustion requirement applies to LNA's third-party claim.  Next, the Court rejected the argument that LNA has no claim for indemnity or contribution, holding that both that maritime law

and Louisiana law at least potentially give LNA such a cause of action.  Finally, the Court held that LNA had not properly stated a claim under the Little Tucker Act solely because LNA had not expressly stated the amount it is claiming, and allowed an amendment to add that allegation.

5.      On March 29 and April 10, 2007, LNA filed amended third-party complaints. Rec. Docs. 590, 597.  The amended complaints explicitly state that LNA's claims under the Little Tucker Act are for no more than $10,000 per plaintiff.

6.      The government filed its answer to LNA's complaints on April 24, 2007.  Rec. Doc. 607.

7.      On June 22, 2007, the government filed a second motion to dismiss.  Rec. Doc. 685.  The motion is expressly brought only pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3), which are limited to arguments that the Court lacks subject matter jurisdiction.

## ARGUMENT

As this Court wrote in its order denying the government's first motion to dismiss, "[b]ecause the motion to dismiss pursuant to 12(b)(1) challenges the Court's subject matter jurisdiction based on the sufficiency of the pleadings' allegations, the court will also construe those allegations as true and consider them in the light most favorable to the complainant for the purposes of the 12(b)(1) motion."  Rec. Doc. 587 at 3.  When applying that standard, dismissal under Rule 12(b)(1) is improper "unless it appears certain that the plaintiffs cannot prove any set of facts in support of their claim which would entitle them to relief."  *Saraw Partnership v. United States*, 67 F.3d 567, 569 (5th Cir. 1995) (citation omitted).

## I.      SECTION 3 OF THE FLOOD CONTROL ACT DOES NOT DIVEST THE COURT OF ITS JURISDICTION OVER LNA'S FTCA CLAIMS

The United States advances two theories as to why Flood Control Act immunity requires the dismissal of LNA's claims under the FTCA.[1]  As Judge Duval recently ruled when faced with identical arguments in the *Katrina* litigation, neither contention entitles the government to dismissal.

### A.      FCA Immunity Does Not Apply Where the Government's Negligent Conduct Was Unconnected to a Flood Control Project

The government's first argument (at 12) is that "the United States is absolutely immune from 'any damage from or by floods or flood waters' regardless of any connection to a flood control project."  This argument relies on one part of one sentence in § 3 of the FCA, which states that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place ...."  33 U.S.C. § 702c.  The Fifth Circuit rejected that argument in *Graci*, and *Graci* remains binding authority in this Court.

#### 1.      The Fifth Circuit in *Graci* Rejected Precisely the Same Argument that the United States Again Advances Here

In *Graci v. United States*, 301 F. Supp. 947 (E.D. La. 1969), landowners whose properties were flooded when waters overflowed the MR-GO during Hurricane Betsy sued the government, alleging that it had negligently designed and constructed the MR-GO.  *Id*. at 949.  The government moved to dismiss based on § 3 of the FCA.  As Judge Heebe explained, although "[t]he government admits that the Outlet is a 'navigation aid' and not a flood control project," it nonetheless claimed that immunity applied because plaintiffs' damages had been caused by floodwaters.  *Id*.  Judge Heebe rejected that argument, holding that "Section 3 does represent a

---

[1]  The government does not argue that the FCA would entitle it to dismissal of LNA's claims under the Little Tucker Act.  In any event, it is settled that the FCA does not apply to claims under the Tucker Act (see *California v. United States*, 271 F.3d 1377 (Fed. Cir. 2001), nor could it provide immunity from a constitutional claim.

reasonable public policy determination to secure the government from liability for floodwater damage connected with flood control projects; but we hold that it should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects …." *Id*. at 951.

On appeal, the government argued – using terms essentially identical to its motion here – that "§ 3 of the Flood Control Act … affords an absolute immunity from liability for floodwater damage regardless [of] whether the negligence alleged was in connection with a flood project or a navigation aid project."  456 F.2d at 23.  The Fifth Circuit expressly rejected the government's argument and affirmed.  The court noted that "[t]he thrust of the [Act] was flood control, and it was in that context that § 3 was enacted."  *Id*.  Based on this context and a review of cases arising under the Act, the court held that "[t]he purpose of § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs."  *Id*. at 25.  In particular, "immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the areas of nationwide flood control programs."  *Id*. at 26 (citation omitted).  Given that history and purpose, the Fifth Circuit said:

> The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees <u>unconnected with flood control projects</u>.  Judge Heebe answered that it would not be reasonable to so conclude.  Our analysis … leads us to agree.

*Id*. (emphasis in original, citation omitted).  Based on this reasoning, the Fifth Circuit held that "when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States unconnected with any flood control project, § 3 of the [FCA] does not bar an action against the United States under the Federal Tort Claims Act."  *Id*. at 27.

In sum, the Fifth Circuit in *Graci* rejected – in the same factual context – the same argument that the government advances again here:  that § 3 immunizes the government from damages caused by flooding regardless of any connection to a flood control project.

### 2. The Legal Rule Set Forth in *Graci* Is Firmly Grounded and Has Been Adopted by Other Courts As Well

The Fifth Circuit is not the only court to conclude that § 3 immunity only applies to flooding caused by government negligence in connection with a flood control project.  In *Peterson v. United States*, 367 F.2d 271 (9th Cir. 1966), the plaintiffs brought suit against the United States under the FTCA for property damages suffered when the government dynamited an ice-jam that was blocking the Chena River, which caused a flood of ice and water downstream.  The Ninth Circuit held that "Section 702(c) must be viewed in proper context" and was intended to keep the government free from liability for damages arising from its flood control program.  *Id.* at 275-76.  Because "the decision to dynamite the ice-jam" – the act of alleged negligence – "was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization," § 3 immunity did not apply. *Id.* at 275.  See also *Valley Cattle Co. v. United States*, 258 F. Supp. 12 (D. Haw. 1966) (no immunity for flooding caused by government blockage then clearing of drainage stream); *Schell v. National Flood Insurers Ass'n*, 520 F. Supp. 150 (D. Colo. 1981) (no immunity for flooding unconnected to flood control project); *Downs v. United States*, 2007 U.S. Dist. LEXIS 19023 (S.D. Fla. Mar. 20, 2007) (no immunity for injury caused by ocean waters, which do not involve flood control project).

The interpretation of § 3 adopted in *Graci* and these other cases is firmly grounded in the rules of statutory construction.  First, it is well established that in order to ascertain the meaning of a statute, a court cannot review isolated words, but must rather "look to the particular statutory

language at issue, as well as the language and design of the statute as a whole." *United States v. Elrawy*, 448 F.3d 309, 315 (5th Cir. 2006) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 US 281, 291 (1988)).  "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. United States Postal Serv.*, 546 US 481, 486 (2006).  As such, courts have often held that the application of what appear to be unlimited statutory phrases must be confined to the specific context of the statute in which they appear.[2]

*Graci* thus properly rejected the government's argument – repeated here – that one phrase in § 3 should be construed without regard to its statutory context.  And, as *Graci* held, that context makes it clear that immunity only applies to actions taken <u>in connection with flood control projects</u>, both (1) because "[t]he thrust of the [Act] was flood control, and it was in that context that § 3 was enacted," and (2) because "[t]he purpose of § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs."  456 F.2d at 25-26.  Moreover, the phrase in § 3 about the government's immunity is (1) immediately preceded by a sentence specifying conditions needed for funds to be spent on flood control projects and (2) immediately followed by a proviso that again is specifically concerned with flood control

---

[2]  In *Shell Oil Company v. Iowa Department of Revenue*, 488 U.S. 19 (1988), for example, the Outer Continental Shelf Lands Act contained a sentence stating that "[s]tate taxation laws shall not apply to the outer Continental Shelf."  *Id.* at 24 (quoting 43 U.S.C. § 1333(a)(2)(A)).  Despite this apparently unqualified language, the Court held that the statute did not prohibit states from including income earned from outer continental shelf goods because "the meaning of words depends on their context" and "[w]e believe that [the statute], read in its entirety, supports a narrower interpretation."  *Id.* at 25.  Similarly, in *Dolan*, *supra*, the statute contained a sentence that unqualifiedly barred claims against the government for the "negligent transmission of letters or postal matters."  546 U.S. at 486 (quoting 28 U.S.C. § 2680(b)).  The Supreme Court held that although "[i]f considered in isolation, the phrase 'negligent transmission' could embrace a wide range of negligent acts committed by the Post Service[,] ... [t]he definition of words in isolation ... is not necessarily controlling in statutory construction."  *Id.*  The Court further held that "both context and precedent require a narrower reading, so that 'negligent transmission' does not go beyond negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address."  *Id.*

projects.  33 U.S.C. 702c.  In short, the rules of statutory construction, which require reading the FCA as a whole, amply support the Fifth Circuit's rejection of the government's argument.

As both Judge Heebe (301 F. Supp. at 953 n.8) and the Fifth Circuit (456 F.2d at 25) held in *Graci*, the Act's legislative history further supports this interpretation.  In transmitting the Chief Engineer's flood control proposal to Congress, President Coolidge opined that "States and other local authorities should … assume all pecuniary responsibility for damages <u>which may result from the execution of the project</u>."  S. Rep. No. 448, 70th Cong., 1st Sess. 11 (1928) (emphasis added).  The report from the Chief of Engineers, which estimated the cost of the project to be nearly $300 million dollars, emphasized that that amount did not include the costs of "damages, if any, <u>resulting from the execution of the plan</u>."  *Id*. at 18 (emphasis added).  Congress thus wanted to cabin the potential costs of flood control projects,[3] and § 3 was enacted in order to limit <u>those</u> costs.  The legislative history, therefore, supports the conclusion in *Graci* that "the purpose of § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs."  456 F.2d at 25.

### 3.    *Graci* **Was Not Implicitly Overruled by Either** *James* **or** *Central Green*

The government's memorandum grudgingly acknowledges (at 13) that the Fifth Circuit in *Graci* rejected the very argument that it is making to this Court.  The government, though, says that "*Graci* … antedated both *James* and *Central Green*," apparently implying that *Graci* has been overruled.  It is firmly settled, however, that prior Fifth Circuit decisions are binding

---

[3] For example, Senator King from Utah stated, "when we are confronted with a proposition where the maximum and the minimum costs are so widely variant, as already indicated, we are anxious to know what we are about to commit the Government to, and we are trying to ascertain just what the plan now is and what it possibly might culminate in, and if it should cost a billion dollars ultimately just what the plan would be that would call for such an enormous expenditure."  H. R. Rep. No. 1100, 70th Cong., 1st Sess., 18 (1928) (quoting the Senate floor debate).

authority "in the absence of an <u>on-point</u> en banc or Supreme Court <u>holding</u>." *United States v. Pineiro*, 377 F.3d 464, 468 (5th Cir. 2004) (emphasis added), *vacated on other grounds*, 531 U.S. 1101 (2005).  More specifically, a prior Fifth Circuit decision can be disregarded only if "such overruling is <u>unequivocally directed</u> by controlling Supreme Court precedent." *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001) (emphasis added, citation omitted).  As we now discuss, *Graci* surely remains binding authority under these standards.

The *James* decision is fully consistent with, and indeed reinforces, the decision in *Graci*. As the Supreme Court wrote, the question presented in *James* was whether § 3 applies to "personal injury caused by the Federal Government's negligent failure to warn of the dangers from the release of floodwaters <u>from federal flood control projects</u>."  478 U.S. at 489 (emphasis added).  The Supreme Court answered that question in the affirmative.  *Id*. at 492-93.  The Court's opinion, moreover, reinforced the point that actions taken in connection with flood control projects are the touchstone for immunity, just as the Fifth Circuit had held in *Graci*.  In particular, *James* stated that "[t]he Act concerns flood control projects designed to carry floodwaters" (478 U.S. at 494), and it approvingly cited numerous lower court decisions holding that § 3 "grants immunity to the Federal Government from damages caused by floodwaters <u>from a flood control project</u>" (*id*. at 492 n.4, emphasis added).  Indeed, the government's own brief to the Supreme Court in *James* expressly emphasized that "every appellate court to address the question [in the past 30 years] had construed Section [3] as conferring complete immunity upon the United States for all damage caused by the release of flood waters <u>from a federal flood control project</u>." Declaration of Richard M. Wyner ("Wyner Declaration") Exh. E at 6-7, 16 (emphasis added).

Moreover, the Supreme Court's opinion in *James* expressly recounted the Fifth Circuit's holding in *Graci* – that § 3 "conferred immunity only for floods or floodwaters connected with a

flood control project," not for "damages caused by … floodwaters … unconnected with flood control projects" – without any hint of disagreement with that holding.  478 U.S. at 491 n.2.  Furthermore, in response to the plaintiffs' argument that the government's negligent conduct was unconnected to flood control, the Court did not hold that such an argument was irrelevant – as would be the case under the United States' theory here – but instead held that the allegedly negligent conduct in question (failing to warn of the release of flood waters) was in fact "part of the 'management' of a flood control project."  *Id*. at 496.  In sum, by holding that FCA immunity applies to negligent conduct that results in "the release of floodwaters <u>from federal flood control projects</u>" (*id*. at 489, emphasis added), *James* reinforced, rather than overruled, *Graci*.

The *Central Green* decision in no way overruled *Graci* either.  To the contrary, after a number of courts misinterpreted dicta in *James* as broadening the scope of § 3 immunity, *Central Green* <u>narrowed</u> the scope of § 3 immunity back to the *James* standard just discussed – *i.e.*, "the release of floodwaters from federal flood control projects."  Specifically, a number of courts had construed a sentence in the *James* opinion as suggesting that FCA immunity applied to <u>all</u> waters released from a flood control project, not just floodwaters released from such a project.  As the Supreme Court said in *Central Green*, the relevant passage from *James* stated:

> Nor do the terms "flood" and "flood waters" create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry flood-waters.  *It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control*, as well as to waters that such projects cannot control.

*Central Green*, 531 U.S. at 429-30 (emphasis in original), quoting *James*, 478 U.S. at 605.

The *Central Green* Court acknowledged that this particular sentence in *James*, which "was unquestionably dictum," "sweeps so broadly as to make little sense."  531 U.S. at 431.

And the Court resolved the misunderstanding by refocusing on the "holding in *James*" (*id*. at 431, 437), under which – as noted above – immunity applies only to "the release of floodwaters from federal flood control projects," not to all waters contained in such a project.  In doing so, the Court emphasized that § 3 does not apply to all waters in a flood control project, but only to "floods or flood waters"; that "to characterize every drop of water that flows through that immense [flood control] project as 'flood water' simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute"; and hence that there can be no immunity for damages not caused by "floods or flood waters."  *Id*. at 434, 437. Therefore, by instructing courts to look at whether the damage was done by flood waters, rather than simply looking at whether the waters were somehow connected to a flood control project, the Court was narrowing the scope of § 3 immunity by making connection to a flood control project only one part, rather than all, of what the government had to show to establish immunity.

*Central Green* thus did not address, much less overrule, the holding in *Graci*.  *Central Green* expressly answered a "narrow question" (*id*. at 426) as to the scope of § 3 where there *is* a flood control project, and thus did not even purport to address its scope in a case <u>unconnected</u> to such a project – the issue decided in *Graci*.  As then-District Judge Edith Brown Clement has written, a district court is "not warranted in concluding" that a Supreme Court case that addresses a "narrow" question has "implicitly overruled" Fifth Circuit precedent not directly covered by that question.  *Succession of Wardlaw v. Whitney Nat'l Bank*, 1994 U.S. Dist. LEXIS 15215, *17-18 (E.D. La. Oct. 17, 1994).  Moreover, as both Judge Duval and the Ninth Circuit have recognized, the import of *Central Green* was to narrow § 3, not to expand it exponentially.  See *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182 "K" (2), Rec. Doc. 6194, at 4 (July 2, 2007) (*Central Green* "narrowed the immunity granted by § 702c"); *Sanko S.S. Co., Ltd. v.*

*United States*, 272 F.3d 1231, 1232 (9th Cir. 2001) (reversing and remanding dismissal of complaint under § 3 because *Central Green* "established a more restrictive test for determining sovereign immunity").  Indeed, the effect of *Central Green* was a return to the holding in *James* – a holding that, as explained above, is fully consistent with the decision in *Graci*.

In the *Katrina* litigation, Judge Duval recently held that *Central Green* did not eliminate the *Graci* requirement of a connection to a flood control project.  Specifically, he ruled that "[t]he holding in *Central Green* is:  In order for the United States to be immune from damages caused by water under its control or supervision (1) the water must have a nexus to a flood control project and (2) the water must be 'flood waters.'"  *In re Katrina*, Rec. Doc. 6194 at 4-5.  For all of the reasons just discussed, that decision is manifestly correct.

### 4.   The Government's Unbounded Interpretation of § 3 Would Produce Absurd Results

The government's view that § 3 of the Flood Control Act immunizes it from all liability for flooding regardless of any connection to a flood control project would lead to nonsensical results.  Suppose, for example, that the government constructed a negligently-designed water tower in the middle of a desert to promote commerce in a nearby federal park.  One day the tower fails and floods nearby properties.  Under the government's interpretation of § 3, it would be immune from liability for that flooding – even though the flooding had nothing to do with any flood control project.  There is no basis to believe that Congress intended the immunity provision in the Flood Control Act to apply to such a situation.

Judge Duval recognized the overreaching nature of the government's position in his decisions denying the government's motion to dismiss and denying its motion for certification of that order.  In the latter, he wrote that "[t]aken to its logical extreme, the United States could dynamite a levee along the Mississippi and be immune.  A ship owned by the United States could

14

collide into a dam causing flooding, and it would be immune.  The United States could break a water main causing flooding, and it would be immune.  In essence, this is how broadly the United States reads *Central Green*."  *In re Katrina*, Rec. Doc. 6194 at 3; see also *In re Katrina*, Rec. Doc. 2994 at 15.[4]

\* \* \* \* \*

In sum, the Fifth Circuit has previously rejected the United States' assertion that it enjoys immunity under § 3 of the FCA regardless of whether its negligent conduct was connected to a flood control project.  That binding decision has not been implicitly overruled by later authority, while the government's view would produce absurd and unjust results.  The motion to dismiss on this ground should therefore be denied.

**B.     Applying *Graci*, the Government is Not Immune Because LNA's Claim is Based on Negligent Conduct Unconnected to a Flood Control Project**

The government argues that even under *Graci*, § 3 applies here because its addition of levees to the MR-GO and IHNC after the decision in *Graci* means that the flooding here was connected to a flood control project.  This argument fails for three separate reasons.

1.     As a matter of law, *Graci* made clear that the existence of § 3 immunity depends on whether <u>the government's act of negligence</u> was connected to a flood control project.  Specifically, the Fifth Circuit held that "when, as here the plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States unconnected with any flood control project, § 3 … does not bar an action against the United States …."  456 F.2d at 27.  Likewise, in *Peterson*, the Ninth Circuit held that § 3 immunity did not apply because "[t]he decision to dynamite the ice jam" – the act of alleged negligence – "was wholly unrelated to any

---

[4]  The government acknowledged at oral argument before Judge Duval that this is its position.  See Transcript of 10/27/06 Hearing at 29.

Act of Congress authorizing expenditure of federal funds for flood control, or any act undertaken pursuant to any such authorization." 367 F.2d at 275. This focus on the government's allegedly negligent conduct necessarily follows from the basic purpose of § 3 which, as explained above, was to prevent the government from being held liable for the actions it took in carrying out flood control projects. See pages 7 and 10 *supra*.

Applying that proper focus here, LNA's claim against the government falls outside the scope of § 3 because LNA alleges acts of government negligence that are unconnected to any flood control project. This is unquestionably true, since LNA alleges the same acts of negligence that *Graci* held to be outside the scope of § 3 – the design, construction, and maintenance of the MR-GO in a manner that funneled storm waters to the heart of New Orleans. These allegations, moreover, are not based on any conduct relating to the later-constructed levees. Specifically, ¶ XXI of LNA's complaint (Rec. Doc. 597) alleges that:

> When or shortly after Hurricane Katrina made landfall in Louis-
> iana, the banks of the MR-GO were overwhelmed in approxi-
> mately twenty places along the canal's length, directly flooding
> most of St. Bernard Parish, as well as a substantial part of Orleans
> Parish, including New Orleans East and the lower Ninth Ward.
> The existence and eroded condition of the MR-GO intensified
> Katrina's initial storm surge, raised the height of the wall of water,
> and increased the velocity of the surge that battered, breached, and
> destroyed the banks of the MR-GO. Thus the MR-GO "storm
> surge funnel," as exacerbated by the loss of coastal wetlands, cre-
> ated a hazardous condition that resulted in catastrophic damage to
> these areas without regard to the performance of any flood control
> project. These facts and conditions, without more, suffice to ren-
> der the United States liable.

Likewise, ¶ XVIII of the complaint further alleges that:

> The annual maintenance dredging of the MR-GO by dredges
> owned and operated by and/or under contract to the United States
> government through its agency, the USCOE, has caused and/or
> contributed to coastal erosion, the loss of wetlands, and destruction
> of cypress swamps in Southeast Louisiana. Before the MR-GO was
> built, and to a diminishing degree thereafter, those wetlands and

> cypress swamps formed a natural protective barrier that absorbed
> surges caused by tropical storms and hurricanes. This periodic
> dredging has allowed the waters of the Gulf of Mexico to wash
> away and erode the northeast (or left descending) bank of the
> MRGO, thus allowing saltwater intrusion. The dredging has also
> gradually opened the MR-GO's northeast bank to the sea, particu-
> larly in the area of Lake Borgne, which is an arm of the sea.

See also ¶ XXIV (alleging, again without reference to any levees, that that GICW was construct-

ed with a "funnel-shaped configuration" that "was bound to and did heighten and intensify the

storm surge from the north and east into the IHNC").

LNA's complaint also expressly alleges (at ¶¶ X and XXVII) that the MR-GO, IHNC,

and GICW were constructed as navigation channels, not flood control projects.  Indeed, the gov-

ernment admitted this fact in *Graci* (see page 6 *supra*) and has done so again in the *Katrina*

litigation, where it wrote, referring to itself and the plaintiffs:  "The parties agree that the MRGO

was <u>not</u> a flood control project and was <u>not</u> absorbed into the LPVHPP [the hurricane protection

project].  The parties agree that the MRGO did <u>not</u> have a flood control purpose or function.  The

parties agree that no levees were constructed <u>as part of the MRGO project</u>."  *In re Katrina*, Rec.

Doc. 5853-3 at 4 (emphasis in original).

The government's assertion that levees were added to the MR-GO and the IHNC thus

fails to establish immunity because, under *Graci*, the proper focus is on the government's alleg-

edly negligent conduct, and Paragraphs XVIII, XXI, and XXIV of LNA's complaint allege negli-

gent conduct unconnected to any flood control project.

*Graci's* holding that § 3 turns on whether the act of negligence was done in connection

with a flood control project means that § 3 does not eliminate the government's liability for prior

negligent conduct that was unrelated to a flood control project simply because the government

has added on a flood control element.  Let's return to our example, from page 14 above, of the

negligently-designed water tower in the desert that failed and flooded nearby properties.  As

17

*Graci* shows, § 3 immunity did not apply to that flood.  Suppose, after the flood, the government failed to close or fix the defectively designed tower, but instead built a sand wall (which it christened a "flood control project") between the tower and the nearby properties.  Then the tower sprung another huge leak, the new wall failed to hold back the water, and the properties again flooded.  *Graci* instructs that, because the focus is on the allegedly negligent act – the design of the water tower, not the later building of the wall – § 3 immunity would not apply to that second flood either.  That result is compelled by the purpose of § 3, which was to prevent the government from taking on new liability when it carries out flood control projects, not to eliminate the government's liability for prior conduct that had nothing to do with such a project.

In sum, LNA's complaint alleges negligence unconnected to any flood control project, and the government's purported subsequent addition of a flood control project does not retroactively immunize the government from the continuing effects of that negligence.

2.      Not only does the purported addition of the levees to the MR-GO and the IHNC not immunize the government from any continuing effects of its prior negligence in the design and maintenance of those navigation channels, but § 3 also does not immunize the government for its <u>additional</u> negligence in its construction of those supposed levees.   The reason is that the addition of any such levees to the MR-GO and the IHNC was not the kind of flood control activity that § 3 was intended to immunize.   As explained above, § 3 was enacted to prevent the government <u>from taking on new liability</u> as a result of actions taken to prevent <u>natural</u> flooding for which the government bore no responsibility.  See pages 7 and 9-10 *supra*.  For example, the original Flood Control Act of 1928 addressed natural flooding of the Mississippi River.  By contrast, as set forth above, the MR-GO and the IHNC were man-made navigation channels that, due to the government's negligence in their construction, produced flooding where none had

previously occurred. See pages 6 and 17 *supra*. Accordingly, when the government added levees to the MR-GO and the IHNC, it was not magnanimously coming to the rescue of people affected by natural flooding, but instead was trying to limit the effects of its own prior negligence. That simply is not the kind of activity that § 3 was meant to shield.[5]

Thus, not only is the government's motion to dismiss meritless to the extent that LNA alleges negligence in connection with construction and maintenance of the MR-GO, IHNC, and GICW (*e.g*, Complaint ¶¶ XVIII, XXI, XXIV), it similarly fails to the extent that LNA also alleges additional negligence in connection with construction of levees that were supposed to address the government's own prior mistakes (*e.g.*, Complaint ¶ XXIII).[6]

3.    The government's motion also fails because there is a factual dispute over the extent to which there had been flood control measures at the places from which flooding occurred. The government mistakenly assumes that LNA's claims for indemnity and contribution all arise from the southern breach of the IHNC wall. *E.g.*, U.S. Mem. at 2, 18. To the contrary, LNA's complaint alleges that the plaintiffs suing LNA were injured as a result of flooding from numerous locations along the MR-GO, the GICW, and the IHNC and that the government is liable for the flooding at all of those locations. *E.g.*, Complaint ¶ XXI ("the banks of the MR-GO were overwhelmed in approximately twenty places"), ¶ XXV (flooding from "numerous places along the MR-GO, GICW, and IHNC").

---

[5]  This conclusion is confirmed by the fact that, in *Graci*, the Fifth Circuit expressly stated that the plaintiffs' claims included that "the Government's negligence consisted of constructing the outlet … without taking the appropriate steps to build retaining levees to protect the residential areas of the surrounding country from flooding due to hurricane driven waters." 456 F.2d at 22. *Graci* thus recognized that § 3 immunity only applies to the negligent construction of levees as part of a flood control project, not to their negligent construction (or omission) as part of the creation of a navigation channel.

[6]  Even if § 3 did bar LNA from asserting claims against the government for its negligence in constructing the levees, that of course would at most justify dismissing those particular allegations from the complaint. It would not entitle the government to dismissal of LNA's claims that are based on the government's negligence in the construction and maintenance of the navigation channels in the first instance.

Given that LNA's claims against the United States involve numerous locations along the MR-GO, IHNC, and GICW, the government's assertion that it is entitled to dismissal because it built flood control structures fails because there is a factual dispute as to which, if any, of those many locations had been the site of a flood control project. Indeed, Judge Duval specifically held that there is a "substantial factual dispute over the existence of flood control levees along Reach 2 of the MRGO." *In re Katrina*, Rec. Doc. 6194 at 5. For example, a 1988 Corps of Engineers report referred to "[t]he unleveed banks of the MR-GO."[7] Moreover, a Government Accountability Office report from November 2005 found that, when Hurricane Katrina struck, the LPVHPP project was only "60-90 percent complete in different areas with an estimated completion date for the whole project of 2015."[8]

There are also factual questions as to whether some of the purported "levees" were simply the spoils of dredging operations, not structures built as part of a flood control project. The recent Team Louisiana report, for example, refers to a levee along the south bank of the MR-GO as having been "constructed primarily of hydraulic fill obtained from the MRGO channel, much of which was sand, silt and shell."[9] Likewise, a 2006 National Science Foundation report found that levees along the MR-GO "were, in the end, constructed using large volumes of spoil material excavated during the dredging of the adjacent MRGO shipping channel, and they contained unusually large quantities of highly erodeable sandy soils."[10] The gov-

---

[7]  *Mississippi River Gulf Outlet, St. Bernard Parish, Louisiana: Reconnaissance Report on Channel Bank Erosion*, U.S. Army Corps of Engineers, February 1988, at 30 (Wyner Declaration Exh. A).

[8]  *Army Corps of Engineers:  History of the Lake Pontchartrain and Vicinity Hurricane Protection Project*, U.S. General Accountability Office, November 9, 2005, at Highlights (Wyner Declaration Exh. B).

[9]  *The Failure of the New Orleans Levee System during Hurricane Katrina*, Team Louisiana, December 18, 2006, at 134 (Wyner Declaration Exh. C).

[10]  *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*, National Science Foundation, July 31, 2006, at 2-7 (Wyner Declaration Exh. D).

ernment, moreover, does not even try to show that flood control levees had been constructed at each of the many places from which flooding occurred.

For all of these reasons, the government's argument that it is entitled to dismissal under *Graci*, like its argument that *Graci* is no longer good law, is wholly without merit.

## II.   THE COURT HAS JURISDICTION OVER LNA'S CLAIMS UNDER THE LITTLE TUCKER ACT

Two principles sharply limit the issues concerning LNA's Little Tucker Act claims that are properly addressed in the context of the present motion.  First, only the issue of subject matter jurisdiction is before the Court.  This is so for three reasons.  To begin with, this is the government's <u>second</u> motion to dismiss LNA's claim under the Little Tucker Act.  See pages 4-5 *supra*.  Under Federal Rules of Civil Procedure 12(g) and 12(h), which limit serial motions to dismiss, the government may not raise grounds other than subject matter jurisdiction in this motion.  See 5C Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1392; *Albany Ins Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir. 1993).  Moreover, the government's motion is made pursuant to Rules 12(b)(1) and 12(h)(3), which are limited to subject matter jurisdiction.  Finally, Rule 12(b) states that provides that any other motion to dismiss "shall be made before pleading," and here the government has already filed its answer.  Thus, only the issue of subject matter jurisdiction is before the Court.

Second, recent Fifth Circuit precedent makes clear that a court cannot grant a motion to dismiss for lack of subject matter jurisdiction where jurisdiction depends on the existence of a cause of action or is otherwise intertwined with the merits of the case.  In *Montez v. Dep't of the Navy*, 392 F.3d 147 (5th Cir. 2004), the plaintiffs sued the government under the FTCA, alleging that the driver of a vehicle that caused a fatal accident was acting within the scope of his employment at the time of the collision.  The district court dismissed for lack of subject matter juris-

diction, holding that the FTCA did not apply because the driver had not been acting within the scope of his employment.  The Fifth Circuit reversed, holding that "where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court …. is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case under either Rule 12(b)(6) or Rule 56." *Id.* at 150 (citation omitted).  The court explained that "no purpose is served by arguing the merits in the context of federal jurisdiction.  Judicial economy is best promoted when the existence of a federal right is directly reached ….  This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim …." *Id*. (citation omitted).

In short, the only issue to be decided is whether this Court has subject matter jurisdiction under the Little Tucker Act, which can be disavowed only if doing so does not require the Court to consider whether LNA has a valid cause of action against the government.

### A.      LNA Has Standing to Assert its Little Tucker Act Claims

The Little Tucker Act grants jurisdiction over any "claim against the United States … founded … upon the Constitution."  28 U.S.C. § 1346(a)(2).  As we now show, LNA's complaint asserts claims against the United States that are "founded … upon the Constitution" and for which LNA has standing.  The government's contrary arguments merely dispute the merits of those claims; as such, those arguments do not defeat the existence of jurisdiction and are not ripe for resolution in the context of the pending jurisdictional motion.

### 1.      LNA Has Standing to Assert Its Claim for Indemnification or Contribution Founded Upon the Constitution

The Fifth Amendment to the Constitution provides that, in addition to certain other prohibitions, "nor shall private property be taken for public use, without just compensation."  The

government acknowledges that this Takings Clause creates a constitutional claim for just compensation in favor of a party whose property is directly taken by the government.  LNA's position is that the Takings Clause also creates a constitutional claim for indemnity or contribution in favor of any other party who is required to pay that just compensation on the government's behalf.  And, in ¶ XXXII of the Complaint, LNA asserts that constitutional claim for indemnity or contribution against the government.

Thus properly characterized, LNA's claim falls squarely within the Little Tucker Act.  Simply put, it is a "claim against the United States … founded … upon the Constitution."  Nor is there any doubt that LNA has standing to assert that claim, since LNA obviously is the party who has standing to assert a claim for indemnity or contribution.

Accordingly, all that the government can argue is that the Constitution does not create a claim for indemnity or contribution where a third party is forced to pay the just compensation for a government taking.  But that is precisely the kind of merits argument that (1) *Montez* forbids the Court from entertaining in the guise of a Rule 12(b)(1) motion and (2) the United States was required to bring in its first motion to dismiss, if it wanted to move for dismissal on that ground.  As quoted above, the Fifth Circuit held in *Montez* that "where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court …. is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case under either Rule 12(b)(6) or Rule 56."  Because the government is really asserting a "challenge to the existence of a federal cause of action" for indemnity or contribution under the Takings Clause of the Constitution, the proper

course of action here "is to find that jurisdiction exists" and to address the merits of that question in due course (*e.g.*, in connection with a later motion under Rule 56).[11]

LNA will, in due course, fully demonstrate that the Constitution does create such a claim. For example, LNA will show that if it is forced to pay the plaintiffs for the value of their properties that have been taken by the government's actions, then unless LNA is allowed to assert a claim for indemnity or contribution, the government will have accomplished precisely what the Takings Clause prohibits it from doing – namely, taking private property for public use without paying just compensation. LNA also will show that the economic reality is that if LNA is forced to pay the plaintiffs for the value of their properties taken by the government, then LNA (rather than the plaintiffs) will be the entity whose property (*i.e.*, money) will have been taken. Under either analysis, the Constitution affords LNA a claim to redress the taking of its property. See, *e.g.*, *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 179 (1871) (the Takings Clause is a "limitation on the power of the Federal government" because of a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified"); *Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("One of the principal purposes of the Takings Clause is to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

LNA's right to indemnity under the Takings Clause is akin to the right that parties have to bring illegal exaction claims against the United States. A claim for an illegal exaction allows one to sue for a sum "improperly exacted or retained" in violation of the Constitution, a statute,

---

[11]   Similarly, under the analogous statutory provision giving federal courts jurisdiction over claims "arising under the Constitution, laws, or treaties of the United States" (28 U.S.C. § 1331), the Fifth Circuit has made clear that "[t]he question of whether the district court had subject matter jurisdiction pursuant … is not whether [the plaintiff] had a valid cause of action against the [defendant] under federal common law ... [but] [r]ather ... whether the determination of the existence vel non of that cause of action is a question 'arising under ... the laws ... of the United States.'" *Cooperative Ben. Adm'rs, Inc. v. Ogden*, 367 F.3d 323, 329 (5th Cir 2004).

or a regulation.  See, *e.g.*, *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007, 1008 (Ct. Cl. 1967) (illegal exaction claims are claims "in which the Government has the citizen's money in its pocket").  In *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1573 (Fed. Cir. 1996), for example, the plaintiff airlines had standing to seek remuneration for amounts they paid to house passengers seeking political asylum in the United States, an obligation that the airlines argued had to be paid by the government under a statute.  The Federal Circuit held that because the statute obligated the United States to pay these costs, the expenses had been extracted illegally from the airlines, entitling them to seek remuneration from the government to recover those expenses.  The same principle applies here.  If LNA is forced to pay the plaintiffs the "just compensation" that the government would be obligated to pay them under the Takings Clause, then LNA is entitled to recover those amounts from the government under that Clause.

## 2.  LNA Also Has Standing To Assert the Plaintiffs' Takings Claims Acquired by Way of Subrogation

This Court also has jurisdiction over LNA's Little Tucker Act claim to recovery from the government, for any funds that LNA is required to pay the plaintiffs, based on the law of subrogation.  The government acknowledges (at 24) that the plaintiffs could assert takings claims against the government.  If LNA rather than the government is required to pay the plaintiffs for their alleged losses, LNA will take over the plaintiffs' takings claims against the government by virtue of subrogation.  And there is no question that, assuming LNA takes over and (as subrogee) asserts the plaintiffs' takings claims against the government, each such claim will be "founded … upon the Constitution" within the terms of the Little Tucker Act.  Accordingly, subrogation provides another basis for this Court's jurisdiction under that Act.

The government nevertheless argues (at 23) that a takings claim can be brought only by the person who owned the property at the time of the taking.  The law is otherwise.  Although the

Anti-Assignment Act bars the <u>voluntary</u> assignment of takings or other claims against the government (see *Dow v. United States*, 357 U.S. 17 (1958)), it is well settled that that Act does not apply to claims that are transferred <u>by operation of law</u>, including by way of subrogation.  See *United States v. Aetna Cas. & Surety Co.*, 338 U.S. 366, 373-76 (1949) (Anti-Assignment Act does not bar FTCA claim by subrogee against United States).[12]  Thus, claims against the government, including takings claims, can be asserted by subrogees.  See, *e.g.*, *Monarch Ins. Co. of Ohio v. District of Columbia*, 353 F. Supp. 1249, 1252-52 (D.D.C. 1973) (dismissing due process claim as redundant because subrogee had taking claim against government).  Similarly, waivers of sovereign immunity apply just as much to a claim by a subrogee as they do to the original claimant.  See *Ins. Co. of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) (Tucker Act waiver of immunity applies to claim asserted via subrogation).

To the extent that the government denies that LNA has a right of subrogation against the government if it is forced to pay the plaintiffs for their alleged damages, that disagreement, once again, goes to the merits and cannot be decided in the context of a motion that is limited to subject matter jurisdiction.  LNA will, in due course, fully demonstrate the merits of its claim.  For example, LNA will show that both Louisiana law and maritime law provide for subrogation by operation of law.  La. Civ. Code art. 1829 provides that "[s]ubrogation takes place by operation of law … [i]n favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment."  See also, *e.g.*, *Dumas v. Angus Chemical Co.*, 31,969 (La. App. 2 Cir. 8/20/99), 742 So. 2d 655, 667.  Subrogation by operation of law likewise exists under maritime law.  See, *e.g.*, *Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d

---

[12]  The cases cited by the government simply apply the *Dow* rule that voluntary transfers are barred by the Anti-Assignment Act, and hence those cases are inapposite here.  See, *e.g.*, *Cavin v. United States*, 956 F.2d 1131 (Fed Cir. 1992); *Maniere v. United States*, 31 Cl. Ct. 143 (1987); *Lacey v. United States*, 595 F.2d 614 (Ct. Cl. 1979).

659, 669 (5th Cir. 1985), citing *Compania Anonima Venezolana de Nav. v. A.J. Perez Export Co.,* 303 F.2d 692 (5th Cir. 1962).  Accordingly, if LNA is compelled to pay plaintiffs for the value of their allegedly destroyed properties, LNA will be subrogated to, and entitled to recover on, those plaintiffs' taking claims against the government.

For all of these reasons, the government's motion to dismiss for lack of standing should be denied, with the merits of LNA's claims to be addressed at an appropriate future time.[13]

### B.      LNA's Taking Claims Do Not "Sound in Tort"

The government acknowledges (at 26) that, under well-settled caselaw, government conduct that results in "inevitably recurring" flooding constitutes a taking under the Fifth Amendment.  The government also concedes (*id.*) that LNA's complaint explicitly alleges (at ¶ XXXII) that the government's actions have resulted in "inevitably recurring inundation."  Notwithstanding these concessions, the government asserts that LNA's claim "sounds in tort," rather as takings, because the complaint does not also set forth additional facts stating why the flooding that occurred during Hurricane Katrina will inevitably recur.

This argument fails for three separate reasons.  *First*, this argument does not go to the Court's subject matter jurisdiction, which is the only issue before the Court.  See page 21 *supra*.

---

[13]  As this explanation shows, the government's argument (at 24-25) that Rule 14 does not permit LNA to assert its Little Tucker Act claims fails for two reasons.  First, Rule 14 arguments do not go to the Court's subject matter jurisdiction and thus cannot support the government's motion.  Second, the government's Rule 14 argument depends on its mischaracterization of LNA as simply asserting the plaintiffs' taking claims on the plaintiffs' behalf.  As shown in the text, LNA in fact advances claims as to which the government is liable to LNA depending on the outcome of the plaintiffs' claims against LNA – *i.e.*, claims for indemnity or contribution and claims for takings that LNA acquires by way of subrogation.

LNA also has the right to assert its claims now, at the same time as the plaintiffs' claims against LNA are proceeding.  See, *e.g.*, *Travelers Ins. Co. v. Busy Elec. Co.*, 294 F.2d 139, 144-45 (5th Cir. 1961) (indemnification action permitted to be tried alongside primary claim).  Indeed, in denying the government's first motion to dismiss, this Court already held a failure to resolve the third-party claims simultaneously with the first-party action would "potentially deny complete relief to all parties" and "would also result in a significant waste of judicial resources."  Rec. Doc. 587 at 11.

To the contrary, the government's argument merely asks whether LNA has pled sufficient facts to state a valid claim for relief.

*Second*, the Federal Rules do not require LNA's complaint to set forth the additional, detailed facts that the government says are missing.  Federal Rule of Civil Procedure 8(a) says that a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Indeed, it is axiomatic that a complaint need only give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).[14]  The complaint gives ample notice that LNA's claim is for takings based on "inevitably recurring" flooding:

> The United States' actions and/or inactions, described in paragraphs I - XXXI above, effectively destroyed the plaintiffs' property resulting in a permanent taking and/or <u>inevitably recurring inundation</u>, which is equivalent to a permanent taking ….

Rec. Doc. 597 at ¶ XXXII (emphasis added).  These allegations are more than sufficient under the notice pleading standard of Rule 8(a).

*Finally*, and in any event, LNA's complaint in fact does set forth additional facts explaining why the government's actions have resulted in "inevitably recurring" flooding.  As set forth above, the complaint describes how the government (1) designed the MR-GO in such a way that it has an "inherent capability for serving as a funnel or conduit for rapidly-accelerated, storm-driven surges" (¶¶ XX-XXI), (2) undertook extensive dredging that further opened the MR-GO to the sea and that destroyed wetlands that served as a natural barrier that absorbed storm surges (¶ XVIII), and (3) designed the GICW to have a "funnel shape" that "was bound to

---

[14]  See also *EPCO Carbon Dioxide Prods, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006) ("A claimant does not have to set out in detail the facts on which the claim for relief is based …."'" (citation omitted); *Laird v. Deep Marine Technology*, 2004 U.S. Dist. LEXIS 20754 (E.D. La. Oct. 18, 2004) (Berrigan, J.) ("Plaintiffs need only give defendants fair notice of the basis or grounds of their claims and a 'general indication of the type of litigation involved.  The discovery process fills in the details.") (citation omitted).

… heighten and intensify the storm surge from the north and east into the IHNC" (¶ XXIV).  The complaint further alleges that flooding is the "direct and inevitable result of the arrangement, configuration, and condition of the man-made navigation channels described in the preceding paragraphs" (¶ XXV).  In short, the complaint amply alleges that the government's actions have created a system that makes recurrent flooding of the properties inevitable.  In addition to all this, the government is well aware, and the Court can take judicial notice (*e.g.*, from the *Graci* case), that the MR-GO flooded during Hurricane Betsy.  It therefore cannot plausibly be argued that, under principles of notice pleading, the extensive allegations in LNA's complaint do not suffice to state a claim for a taking under the applicable "inevitably recurring" standard.

As a last point, the cases on which the government relies are inapposite.  Some of them simply hold that conduct that causes flooding that will not necessarily recur constitutes a tort rather than a taking.  See Gov't Mem. at 26-28.  As just shown, however, LNA's complaint alleges that the government's actions have resulted in "inevitably recurring" flooding, which – as the government admits (at 26) – rises to the level of a taking, not merely a tort.[15]  The other cases that the government cites are even less apt, involving cases where the plaintiff did not expressly allege a taking under the Fifth Amendment.  See *Ware v. United States*, 626 F.2d 1278, 1284-85 (5th Cir. 1980).  By contrast, LNA's complaint (¶¶ XXXII-XXXV) expressly alleges "Fifth Amendment Takings" by the government here.

---

[15]  The government implies (at 27) that there is some "frequency necessary to establish a taking," but none of its quotations support that requirement.  To the contrary, as the government's own citations (at 26-27) show, the test is whether the flooding will inevitably recur – which is precisely what LNA alleges here.

In sum, LNA's complaint properly alleges a taking claim, rather than a mere tort claim, because it alleges with ample sufficiency that the government's conduct has resulted in inevitably recurring flooding.  The motion to dismiss on this ground is therefore meritless.[16]

**C.    Under the Little Tucker Act, LNA Can Assert a Claim Against the Government for $10,000 for Each Plaintiff**

The government's final argument (at 28-32) is that LNA's claims exceed the $10,000 limitation under the Little Tucker Act because LNA does not assert separate indemnity claims for each plaintiff, but instead asserts a single indemnity claim with an aggregate value in excess of $10,000.  This argument is mistaken both as to the nature of LNA's claims and as to the applicable law.

First, LNA's complaint unmistakably alleges a <u>separate</u> indemnity claim of no more than $10,000 for <u>each</u> plaintiff.  Specifically, ¶ XXXIII alleges:

> For <u>each plaintiff</u> asserting a claim against LNA (including <u>each class member</u> if the Court certifies a class over LNA's objection, LNA asserts an <u>independent</u> indemnity and/or contribution claim under 28 U.S.C. § 1346(a)(2) against the United States, which is liable for the taking of <u>each</u> plaintiff's property.

(Emphasis added.)  LNA's complaint, thus, plainly alleges an "independent" indemnity and/or contribution claim against the government for "each" separate plaintiff who asserts a claim against LNA.[17]

---

[16]  Even if LNA's tort claim under the FTCA was inconsistent with its takings claim – which is not the case – the rules expressly permit a party to plead alternative theories for relief.  Federal Rule of Civil Procedure 8(e)(2) allows a party to "set forth two or more statements of a claim or defense alternately …. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."  Thus, LNA has the right to assert in its complaint that the government's actions constitute a tort subject to the jurisdiction under the FTCA and a taking subject to jurisdiction under the Little Tucker Act.  See, *e.g.*, *Modern, Inc. v. Florida*, 2006 U.S. Dist. LEXIS 40558, *18 (M.D. Fla. June 16, 2006) (denying motion to dismiss tort and takings claims because "[a]t this stage of the proceedings, … the Plaintiffs may continue to assert alternative theories.").

[17]  It is settled that a party, such as LNA here, may limit a claim to $10,000 in order to assert jurisdiction under the Little Tucker Act.  See *Lichtenfels v. Orr*, 604 F. Supp. 271, 274 (S.D. Ohio 1984), *aff'd*, 878 F.2d 1444 (6th Cir. 1989); *Smith v. Orr*, 855 F.2d 1544, 1552 (Fed. Cir. 1988); *In re All Asbestos Cases*,

Moreover, the government cites no case in support of its proposition that the claims of a class of plaintiffs directly suing the government, or the claims of a defendant seeking indemnity from the government for each of those class member's claims, should be aggregated for purposes of the $10,000 limitation in § 1346(a)(2).  In fact, the law is just to the contrary.

Where plaintiffs assert their claims against the government through a class action, such claims are not aggregated for purposes of the Little Tucker Act.  See *March v. United States*, 506 F.2d 1306, 1309 n.1 (D.C. Cir. 1974) (jurisdiction does not depend on an aggregate amount of claims from all class members, but on amounts claimed individually by those members); *Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981) (same).  Furthermore, courts have repeatedly held that the use of joinder devices, such as Rule 23, does not result in the aggregation of separate claims for purposes of § 1346(a)(2).[18]

Given that claims by class members against the United States are not aggregated for purposes of § 1346(a)(2), a defendant's claims for indemnity or contribution against the United States for claims by class members are not aggregated either.  To the contrary, LNA's claim for indemnity or contribution arises with respect to each plaintiff or class member who asserts a claim against LNA, and since the plaintiffs' claims are separate for purposes of § 1346(a)(2), so too are LNA's claims for indemnity or contribution for each of those claims.  See, *e.g.*, *In re All Asbestos Cases*, 603 F. Supp. 599, 602 n.14 (D. Haw. 1984) (in case seeking indemnity against government for claims by over 100 consolidated plaintiffs, noting defendants properly sought

---

603 F. Supp. 599, 602 n.14 (D. Haw. 1984).  The government does not, and could not, deny that LNA has unambiguously done so.  See Complaint ¶ XXXIV.

[18] See *United States v. Louisville & N. R. Co.*, 221 F.2d 698 (6th Cir. 1955) (holding that joinder of multiple Little Tucker Act claims is desirable when each claim could have been brought in a separate suit); *Jones Motor Co. v. Teledyne, Inc.*, 690 F. Supp. 310 (D. Del. 1988) (although claims totaled $62,000, each, if tried separately was worth less than $10,000 and the court's interest in judicial economy permitted them to be joined); *Schowalter v. United States Army*, 2000 U.S. Dist. LEXIS 21905 (N.D. Ga. Aug. 9, 2000) (same).

indemnity because "[t]he prayers in all third-party complaints … expressly limit the damages sought under the Tucker Act claims to $10,000 per plaintiff"); *Alaska Airlines v. Austin*, 801 F. Supp. 760, 762 (D.D.C. 1992) (upholding jurisdiction under Little Tucker Act where plaintiffs sought recovery of no more than $10,000 for each of the thousands of tickets on which overcharges occurred, even though "plaintiffs are seeking the return of approximately $100 million"), *rev'd on other grounds*, 8 F.3d 791 (Fed. Cir. 1993).[19]

### CONCLUSION

The government's motion to dismiss for lack of subject matter jurisdiction should be denied.[20]

Respectfully submitted,

/s/ *Derek A. Walker*

_____

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
Ivan M. Rodriguez (#22574)
Parker Harrison (#27538)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075

---

[19] Not only does LNA have an independent claim against the government arising from each plaintiff's claim against LNA, but it is clear that the plaintiffs' choice to proceed either in multi-plaintiff or class actions against LNA should not prejudice LNA's ability to bring individual claims for each plaintiff under the Little Tucker Act.  If every plaintiff sued LNA in a separate action, there is no question that LNA could assert one indemnity claim pursuant to the Little Tucker Act against the United States in each of those separate actions.  Here, plaintiffs seek to use Rule 23 and other joinder rules to proceed against LNA in multi-plaintiff cases.  Assuming *arguendo* that the rules allow the plaintiffs to do so, that *procedural* choice by the plaintiffs cannot impair LNA's *substantive* rights against the government.  See Rules Enabling Act, 28 U.S.C. § 2072 (the Federal "[R]ules rules shall not … modify any substantive right").  Courts have thus encouraged the consolidation of individual claims under the Little Tucker Act as it would "save time" and would "in no way affects, extends, or limits the jurisdiction of the District Court."  *Louisville & N.R. Co.*, *supra*, 211 F.2d at 702-03.

[20] If the Court finds any defect in LNA's complaint, LNA respectfully requests leave to amend its complaint.  Particularly at this stage of the case, the government would not be prejudiced by any such action.

Fisher@chaffe.com
Walker@chaffe.com
Harrison@chaffe.com

John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4240

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA 70130
Telephone:  (504) 598-2715

***Attorneys for Lafarge North America Inc.***

33

## **<u>Certificate of Service</u>**

I do hereby certify that I have on this 25th day of July, 2007 served a copy of the fore-going pleading on counsel for all parties to this proceeding, by electronic notification.

/s/ *Richard M. Wyner*

_____

Richard M. Wyner