**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | * | |
| | * | CIVIL ACTION |
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | NO. 05-4182 |
| | * | |
| | * | SECTION "K" (2) |
| | * | |
| PERTAINS TO: | * | JUDGE DUVAL |
| | * | |
| MRGO | * | MAGISTRATE WILKINSON |
| LEVEE | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**EXCLUDE THE REPORT AND TESTIMONY OF**
**PLAINTIFFS' PUTATIVE EXPERT JOHN A. KILPATRICK**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.     The Fifth Circuit Requires This Court To Fulfill Its Daubert Gatekeeping Functions At This Early But Critical Stage Of The Proceedings. ........................ 3

II.    Federal Rule of Evidence 702 Requires A Rigorous Analysis of Expert Reports ........................................................................................................... 6

III.   Ipse Dixit Does Not Satisfy the Intellectual Rigor Required By Federal Rule of Evidence 702 .............................................................................................. 7

IV.   Kilpatrick's Conjectures Are Not Based Upon Sufficient Facts Or Data To Satisfy Rule 702(1) ....................................................................................... 10

      A.      A Promise To Investigate – Even If Made Over A Dozen Times – Cannot Satisfy Rule 702(1).................................................................. 10

      B.      The Promise To Analyze Data Empirically – Even If Made Two Dozen Times – Cannot Satisfy Rule 702(1).................................... 12

V.     Kilpatrick's Off The Cuff Ruminations Are Not The Product Of Reliable Principles And Methods And Fail Rule 702(2) .................................................. 14

      A.      Kilpatrick's Model – To Be Determined At A Later Date – Cannot Be Tested Or Subjected To Peer Review ....................................................... 14

      B.      Kilpatrick's Hypothetical Model Will Apparently Rely On Unscientific and Unreliable Methods ....................................................... 15

           1.      The Road Home Program And The Insurance Companies Have Abandoned Mass Valuation Techniques in Favor of Individual Appraisals .................................................................................. 16

           2.      Survey Methods Such As Contingent Valuation Are Inherently Flawed and Produce Unreliable Results ..................................... 17

VI.   Kilpatrick's Mere Promise To Create A Model Reveals That He Has Not Applied Scientific Principles and Methods Reliably To The Facts Of This Case As Rule 702(3) Demands ........................................................................ 20

CONCLUSION................................................................................................. 22

# TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005)......................................... 3, 4, 5, 6

*Bell v. Ascendant Solutions, Inc.*, No. Civ. A. 301-CV-0166-N, 2004 WL 1490009, at *4
   (N.D. Tex. July 1, 2004) ...................................................................................................... 4

*Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996) ...................................................... 3

*Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir. 1996) .................................................................... 9

*Coffey v. Dowley Manufacturing, Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002) .......... 15, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, *509* U.S. 579 (1993)................................. *passim*

*General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) .......................................................... 14

*In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*")... 5, 6

*In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 1999)....................... 5

*Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 160 (S.D. Tex. 2003) ............................. 12

*Kumho Tire Co.  v. Carmichael*, 526 U.S. 137 (1999) ........................................................... *passim*

*Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) ................................... 13, 22

*Minasian v. Standard Chartered Bank PLC*, 109 F.3d 1212 (7th Cir. 1997)........................ 21, 22

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 271 (5th Cir. 1998) .......................................... 7

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996)........... 9

*Turner v. Murphy Oil*, No. Civ. A. 05-4206, 2006 WL 91364, *3-4 (E.D. La. Jan. 12, 2006)...... 5

*U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)........................................................................... 9

*Unger v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. (La.) 2005) ........................................... 3, 4, 5, 6

### DOCKETED CASES

*Perrine v. DuPont*, No. 04-C-296 (Harrison Cnty, W.V.)........................................................... 18

**TABLE OF AUTHORITIES CONT'D**

**Page**

**OTHER AUTHORITIES**

Hon. David Hittner, Hon. William W. Schwarzer, Hon. A. Wallace Tashima, and James M.
  Wagstaffe, *Practice Guide: Federal Civil Procedure Before Trial, 5th Circuit Edition*, ch.
  10.575 (Thompson West 2007) ............................................................................................ 4, 5

**RULES**

Fed. R. Civ. P. 23 ............................................................................................... 1, 3, 4, 5

Fed. R. Civ. P. 26 ...................................................................................................... 8, 9

Fed. R. Civ. P. 37 ........................................................................................................ 9

Fed. R. Evid. 702 ................................................................................................. *passim*

Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments ........................................ 9

**INDEX OF EXHIBITS**

Exhibit 1      Levee and MRGO Plaintiffs' Consolidated Brief in Support of Motions for Class
               Certification

Exhibit 2      Affidavit of John A. Kilpatrick, Re: Hurricane Katrina Litigation, July 30, 2007

Exhibit 3      Deposition of John A. Kilpatrick, August 13-14, 2007

Exhibit 4      John A. Kilpatrick & Sofia Dermisi, *The Aftermath of Katrina: Recommendations
               for Real Estate Research*, 15 Journal of Real Estate Literature 213 (forthcoming
               Nov. 7, 2007)

Exhibit 5      Coleman Warner, *Road Home Rethinks Appraisals*, The Times-Picayune, Dec. 21,
               2006.

Exhibit 6      Louisiana Recovery Authority, *Proposed Action Plan for the Use of Disaster
               Recovery Funds Allocated by P.L. 109-234*, May 16, 2007, *available at*
               http://www.doa.louisiana.gov/cdbg/dr/plans/ActionPlan_2_06-11-30.pdf (last
               visited Sept. 25, 2007).

Exhibit 7      *The Road Home, Protocols for Estimating Replacement Housing Costs v12*, May
               15, 2007 *available at*
               http://road2la.org/Docs/TRH_Deliverable_00035_Protocols_for_Estimating_Repl
               acement_Housing_Costs_v12_%205-15-07.pdf (last visited Sept. 25, 2007)

Exhibit 8      *Katrina Recovery Program Burned By AVMs: 'Road Home' Will Use Appraisals
               Instead*, Jan. 4, 2007, *available at* www.alamode.com/News/07/070104.aspx (last
               visited Sept. 25, 2007).

Exhibit 9      *Governor Blanco Announces Road Home Changes: Home Appraisal Process To
               Be Streamlined, More Accurate*, State of Louisiana, Office of the Governor Press
               Release, Dec. 20, 2006, *available at*
               http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=2438
               (last visited Sept. 25, 2007).

Exhibit 10     Insurance Information Institute, *Hurricane Katrina Insurance FAQs*, *available at*
               http://www.iii.org/media/hottopics/additional/katrina_faqs/?printerfriendly=yes
               (last visited Sept. 25, 2007).

Exhibit 11     *Katrina's Force Changes Insurance Adjusters' Tactics*, *available at*
               http://www.bankrate.com/brm/news/insurance/20050913a1.asp (last visited Sept.
               25, 2007)

Exhibit 12     Bill Mundy and David McLean, *Using the Contingent Value Approach for Natural
               Resource and Environmental Damage Applications*, The Appraisal Journal, July
               1998, at 290.

Exhibit 13     Albert R. Wilson, *Contingent Valuation: Not An Appropriate Valuation Tool*, The
               Appraisal Journal, Summer 2006, at 53

Exhibit 14      Richard J. Roddewig and James D. Frey, *Testing the Reliability of Contingent Valuation in the Real Estate Marketplace*, The Appraisal Journal, Winter 2006, at 267.

Defendants Washington Group International, Inc., Orleans Levee District, Lake Borgne Basin Levee District, and the United States (collectively, "Defendants") respectfully submit this memorandum in support of their Motion to Exclude the Report and Testimony of Plaintiffs' Expert John Kilpatrick, who asserts that he will create a real estate valuation model based on data he has not yet identified or collected.  The mere promise of such a model does not constitute admissible evidence upon which this Court may rely for purposes of evaluating Plaintiffs' Motion for Class Certification.

## INTRODUCTION

Plaintiffs have identified four experts to assist the Court in its evaluation of their Motion for Class Certification, including John Kilpatrick ("Kilpatrick"), a professional real estate appraiser who holds a Ph.D. in Real Estate Finance.  Plaintiffs argue that Kilpatrick's opinion will provide evidence that will assist Plaintiffs in fulfilling their obligation to prove that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" under Federal Rule 23(b)(3).  Plaintiffs claim that Kilpatrick's opinion – which promises but does not deliver a model or methodology – will establish that Plaintiffs' claims are suitable for class treatment because the diminution of real property values may be ascertained on a class-wide basis.  Levee and MRGO Plaintiffs' Consolidated Brief in Support of Motions for Class Certification (hereinafter "Mot. for Class Cert.") at 15-16 (attached as Exh. 1).

In his report (the "Report," attached as Exh. 2), Kilpatrick detailed his real estate appraisal qualifications, generally described mass appraisal methodologies, and identified "common factors" purporting to favor a mass appraisal methodology in this case.  He further asserted that a model he will create at some undefined point in the future will measure the actual

effects of flooding – *without* differentiating among the many and disparate causes of those effects – and the prospective effects of an intangible "stigma" arising from the possibility of future flooding.  But the Report did not disclose anything tangible about the promised model.  It did not describe any specific methodology to create or run the model, or identify any specific data for it to analyze.

In his deposition, Kilpatrick asserted that the mere description of a mass appraisal model should be sufficient to demonstrate *his ability* to analyze property values on a class-wide basis. *See* Kilpatrick Dep. at 35:16-18, Aug. 13-14, 2007 (attached as Exh. 3).  Kilpatrick indicated that he would use any "tools and techniques" he deemed "systematic and statistically valid," although he did not provide *any* details about how he will create — or apply — a model that will (1) purportedly control a multitude of property characteristics; (2) address divergent impacts of Hurricane Katrina (to which Plaintiffs refer as if it were a singular occurrence, rather than a confluence of events) and (3) ultimately deliver tidy figures relating to the alleged diminution of real property values.  Exh. 3 at 226:25-229:1; Kilpatrick Report ¶ 20.

Kilpatrick's assurances aside, he has done no work to demonstrate that he will actually be able to account for the complexities involved in this case, including multiple class areas and subclasses; hundreds of thousands of residential, commercial and institutional properties varying in their construction, elevation, and condition; socioeconomically and geographically diverse neighborhoods; different degrees of flooding in different neighborhoods and even from house to house; damage from not just flooding, but from wind, rain, fire, theft, and vandalism, which occurred in different sequences in different locations; highly individualized repair costs; and inherently individualized property values.  Neither he – nor anyone else – has ever developed a model based on so many variables.  His speculative promise to do so cannot assist this Court's

evaluation of Plaintiffs' argument that questions of law or fact common to class members predominate over questions affecting only individual members.

## ARGUMENT

The admissibility of expert testimony, opinion or otherwise, is governed by Rule 702 of the Federal Rules of Evidence, as it is written and as the Supreme Court has applied it in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny. This Court must rigorously analyze whether Kilpatrick's hypothetical opinions constitute admissible evidence that Plaintiffs may properly use to attempt to satisfy the requirements of Federal Rule of Civil Procedure 23.

**I.      The Fifth Circuit Requires This Court To Fulfill Its Daubert Gatekeeping Functions At This Early But Critical Stage Of The Proceedings.**

Where expert testimony is offered to support a motion for class certification, the Fifth Circuit Court of Appeals has observed that it

> makes sense to consider the admissibility of the testimony of an expert proffered to establish one of the Rule 23 elements in the context of a motion to strike *prior* to considering class certification. In order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable.

*Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. (La.) 2005) (emphasis added). Where, as here, expert testimony is offered as the only evidence supporting a particular Rule 23 requirement for class certification, the need for a preliminary but rigorous analysis of an expert's opinion is particularly acute. *Id.* at 321 (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996)); *see also Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005).

In *Bell,* a securities case, the district court concluded that an expert's report (which purported to address market efficiency, an important "preliminary certification issue" in the

securities context) was unreliable and purposefully designed to support its own conclusion. *Bell v. Ascendant Solutions, Inc.*, No. Civ. A. 301-CV-0166-N, 2004 WL 1490009, at *4 (N.D. Tex. July 1, 2004). Without the expert's report, the district court found that plaintiffs could not satisfy the predominance requirement of Rule 23(b)(3), and denied the motion for class certification. *Id*. On appeal, plaintiffs argued that they were only required to plead market efficiency at the class certification stage, and that the district court's exclusion of their expert improperly reached the merits of the case. *Bell,* 422 F.3d at 311.

The Fifth Circuit explicitly rejected the notion that a district court must accept a plaintiff's allegations and arguments concerning class certification without further inquiry. *Id*. at 311-14. Rather, the Court of Appeals held, a district court has a duty arising from the text of rule 23(b)(3) to find – and not just assume – facts favoring class certification. *Id*. at 312. So holding, the *Bell* court affirmed its prior statement in *Unger* that "a careful certification inquiry is required and findings must be made based on adequate *admissible* evidence to justify class certification." *Id*. at 312-13 (emphasis added) (quoting *Unger*, 401 F.3d at 319). The Fifth Circuit found no error with the district court "going beyond the pleadings" to conduct a *Daubert* examination of the expert testimony offered by plaintiffs, nor with the exclusion of the expert upon the district court's finding that his testimony was unreliable. *Id*. at 311-14.

Although *Unger* and *Bell* addressed securities-specific issues, the Court of Appeals' analysis is wholly applicable here. The Fifth Circuit's Federal Practice Manual, co-authored by Judge Hittner, notes that a court:

> may consider expert opinions in making its certification
> determination. In doing so, however, the court should rely on the
> admissibility standards for expert evidence as construed by the
> Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc*.,
> 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526
> U.S. 137 (1999).

Hon. David Hittner, Hon. William W. Schwarzer, Hon. A. Wallace Tashima, and James M.

Wagstaffe, *Practice Guide: Federal Civil Procedure Before Trial, 5th Circuit Edition*, ch.

10.575 (Thompson West 2007).

      To be sure, Plaintiffs here will argue that the Court should disregard *Unger, Bell*, and the

*Practice Guide* in favor of the same "*Daubert*-lite" standard that their counsel urged upon Judge

Fallon in the *Murphy Oil* litigation.  In that case, defendants moved to exclude the plaintiffs'

experts (including Kilpatrick) prior to the class certification hearing.  Plaintiffs' counsel argued

that Judge Fallon should rely not on *Bell,* but on *In re Visa Check/MasterMoney Antitrust*

*Litigation*, 280 F.3d 124 (2d Cir. 1999), a case in which the Second Circuit affirmed a district

court's decision to defer difficult questions concerning the admissibility of an expert's testimony.

Judge Fallon agreed, and concluded that "so long as the expert's opinion is relevant to one of the

six elements needed for class certification, that opinion should be admissible, provided it

survives a limited *Daubert* review."  *Turner v. Murphy Oil*, No. Civ. A. 05-4206, 2006 WL

91364, *3-4 (E.D. La. Jan. 12, 2006).

      Since that decision, the Second Circuit has revisited and renounced *Visa Check*.  In *In re*

*Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*"), the

Second Circuit expressly "disavow[ed] the suggestion in *Visa Check* that an expert's testimony

may establish a component of a Rule 23 requirement simply by being not fatally flawed."  *Id*. at

42.  The Court of Appeals concluded that it should adopt the "predominant view of other

circuits" that Rule 23 requires a rigorous analysis of all evidence purporting to support a class

certification motion, and that a district judge must "assess all the relevant evidence admitted at

the class certification stage and determine whether each Rule 23 requirement has been met, just

as the judge would resolve a dispute about any other threshold prerequisite for continuing a

lawsuit." *Id.* at 42.  According to this standard – consistent with that articulated in *Unger* and *Bell* – a district court judge should not accept a plaintiff's proffered expert simply because his analysis is "not fatally flawed."

## II.     Federal Rule of Evidence 702 Requires A Rigorous Analysis of Expert Reports

Rule 702 of the Federal Rules of Evidence provides in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1)     the testimony is based upon sufficient facts or data,
>
> (2)     the testimony is the product of reliable principles     and methods, and
>
> (3)     the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 must be interpreted and applied in light of the Supreme Court's decisions in *Daubert*, 509 U.S. 579, and *Kumho Tire,* 526 U.S. 137.  Under *Daubert*, the trial court is tasked with acting as a "gatekeeper" to determine whether the proffered testimony is relevant to and reliable for performing the task at the court's hand. *Daubert*, 509 U.S. at 589-91.

The requirement that testimony be "reliable" stems from Rule 702's dictate that expert testimony be based on some manner of "scientific, technical or other specialized knowledge." *Id*.  The Court set forth four guidelines to aid a district court in the determination of whether evidence is "reliable":  (1) whether the conclusion can be and has been tested and validated; (2) whether the opinion has been peer reviewed; (3) whether standards exist to control the methodology and to identify and mitigate the known or potential rate of error; (4) whether the methodology is consistent with generally accepted methods for assessing relevant scientific

-6-

evidence.  *Id*. at 593-94.  The party seeking to admit expert testimony bears the burden of proving reliability by a preponderance of the evidence.  *Moore v. Ashland Chemical, Inc*., 151 F.3d 269, 271 (5th Cir. 1998) (en banc).  The court should not focus upon the expert's conclusions but upon his or her methodology.  *Id*.

In *Kumho*, the Supreme Court explained that the trial court's gatekeeping responsibilities apply not only to scientific testimony, but also to testimony based on "technical" or "other specialized" knowledge.  *Kumho*, 526 U.S. at 141.  The Court explained that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Id*.  Further, the Court emphasized that a trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id*. at 152.  Thus, "where [the expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Id*. at 149.  Defendants respectfully submit that Kilpatrick's report and testimony fail this fundamental hurdle to admissibility, and should be excluded from the Court's consideration of Plaintiffs' Motion for Class Certification.

## III.  *Ipse Dixit* Does Not Satisfy the Intellectual Rigor Required By Federal Rule of Evidence 702

Kilpatrick has appeared in numerous class actions for the purpose of testifying that contamination from industrial sites has diminished or may diminish real property values located near those sites.  *See* Exh. 3 at 70:4-73:10; 81:1-91:22.  In this case, Plaintiffs have proffered Kilpatrick to opine that diminution of property values as a result of the events occasioned by Hurricane Katrina can be ascertained with mass appraisal methodology on a class-wide basis,

-7-

supposedly rendering this case suitable for class action treatment.  Mot. for Class Cert. at 15-16.

Plaintiffs are effectively – and impermissibly – asking this Court to bless Kilpatrick's simple

*promise* to develop a model that will magically calculate any actual or stigma-based diminution

in property value for hundreds of thousands of proposed class members who lived in different

neighborhoods and who suffered different degrees of flooding and damage from many and

various sources other than any alleged negligence by the Defendants (including, among others,

wind, rain, and falling debris).

      According to Kilpatrick, "individuals who owned property within [the two subclasses to

the east of the Industrial Canal in the MRGO case and the five subclasses to the West of the

Industrial Canal in the Levee case] sustained a damage to the value of their property."  Kilpatrick

Report ¶ 6.  Further, Kilpatrick believes that the "amount of the damage can be determined on a

'subclass by subclass' basis expressed as a percentage loss of pre-Katrina property value."

Kilpatrick Report ¶ 6.  Kilpatrick does not explain how this is so.  Notwithstanding the Court's

explicit order that expert testimony about purely legal matters would not be allowed,[1] the rest of

the Report purports to instruct the Court about the appropriate contours of a class action

implicating real estate valuation issues.  Kilpatrick's report provides no details about the model

he promises to construct, and it fails to identify or analyze any piece of data that he will use to

support that elusive model.

      As a preliminary matter, Federal Rule of Civil Procedure 26(a)(2) governs the content of

expert reports and provides that "[t]he report shall contain a complete statement of all opinions to

be expressed and the basis and reasons therefore; [and] the data or other information considered

by the witness in forming the opinion…"  The Fifth Circuit requires an expert's report to be

---

[1] *See* Case Management and Scheduling Order No. 4, March 2, 2007, at 17.

"detailed and complete" in order to "avoid the disclosure of sketchy and vague expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co*., 73 F.3d 546, 571 (5th Cir. 1996).[2]  As a sanction for failing to comply with Rule 26 requirements for expert reports, the Court may prohibit the use of the subject testimony.  *See* Fed. R. Civ. P. 37(c)(1).

Moreover, Kilpatrick's *ipse dixit* attitude flies in the face of Rule 702 and a multitude of cases applying it, including *Daubert*, *Kumho,* and their progeny.  Rule 702 requires a trial court to do more than "tak[e] the expert's word for it," Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments, and an expert's testimony should be excluded where it is based on subjective beliefs and unreliable guesswork.  *See U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong."); *Cavallo v. Star Enter*., 100 F.3d 1150, 1159 (4th Cir. 1996) (excluding expert testimony where opinions were "based largely on hypothesis and speculation), *cert. denied*, 522 U.S. 1044 (1998).

This Court must require more of Kilpatrick than a reiteration of academic theory, proclamation of superficial conclusions, and haughty declaration that he can reduce an unprecedented and factually difficult computation to a "trivially simple" exercise.  *See, e.g.,* Exh. 3 at 183:2-184:6; 434:25-435:21; 465:3-17.  Kilpatrick's hypothetical opinions must be excluded for failing to articulate the methodology he intends to apply and disclose the facts and data required by the Federal Rules.

---

[2] In addition, this Court expressly instructed the parties that "[a]ll reports of expert witnesses who may testify at class certification hearings must comply fully with the requirements of Fed. R. Civ. P. 26(a)(2)(B)."  *See* Case Management and Scheduling Order No. 4, March 2, 2007, at 17.

IV.    **Kilpatrick's Conjectures Are Not Based Upon Sufficient Facts Or Data To Satisfy Rule 702(1)**

A.    **A Promise To Investigate – Even If Made Over A Dozen Times – Cannot Satisfy Rule 702(1)**

During his deposition, Defendants attempted to ascertain the methodology Kilpatrick would use to prove his assertion that diminution of real property values may be determined on a class-wide basis.  But Kilpatrick refused to disclose any information about what he assures the Court he will be able to do at some point in the future.  He did not provide definitive answers to most of Defendants' questions, and asserted instead "[t]hat's something we'll investigate" or "[w]e will determine that empirically."[3]  Indeed, Kilpatrick repeated those two statements *over thirty times* at his deposition.  But Defendants' questions need to be resolved *before* the Court can credit and admit Kilpatrick's hypotheses, which were apparently developed in just 10 to 25 hours (a remarkable fact given that this is one of the largest and most complex putative class actions in history).  *See* Exh. 3 at 116:17-117:6.

Kilpatrick testified that he understands that Plaintiffs propose to define the class to include a "series of subclasses that have to do with, um – areas that flooded from, um – either water from the MRGO canal or water from the Lake Pontchartrain.  In general, it's made up of subclasses defined by the topography of areas east and west of the canal."  *See* Exh. 3 at 145:14-145:23.  But Kilpatrick:

- *Does not know* the scope of work for this project.  *See* Exh. 3 at 351:6-11.

- *Does not know* what model he will use to conduct his analysis, *see* Exh. 3 at 33:14-22, or whether his proposed model will deal with anything other than diminished real estate values.  *See* Exh. 3 at 175:24-176:10.

---

[3] *See, e.g.,* Exh. 3 at 33:14-34:3; 112:5-14; 114:11-115:5; 144:3-8; 144:24-145:9; 146:5-9; 151:2-152:7; 158:23-159:11; 165:22-166:6; 177:4-178:13; 179:8-23; 180:3-12; 182:19-24; 183:2-185:25; 186:11-188:6; 201:9-202:16; 206:9-206:21; 208:9-19; 208:23-209:7; 210:21-211:9; 242:22-244:2; 245:11-20; 247:6-9; 380:3-9; 386:3-10; 454:21-455:8; 478:10-17; 486:14-489:6; 494:19-495:12.

- *Does not know* how many neighborhoods are in the city of New Orleans, *see* Exh. 3 at 151:2-7, or how neighborhoods are distinguished from one another.  *See* Exh. 3 at 151:8-17.

- *Does not know* how many neighborhoods are in the classes, *see* Exh. 3 at  144:3-8, or how the neighborhoods correlate to the subclass boundaries.  *See* Exh. 3 at 165:22-166:6.

- *Does not know* whether all of the properties within each subclass flooded, *see* Exh. 3 at 179:8-23, or how he will account for a situation where one house suffered substantial flooding and the house next door to it or within a block of it suffered very little to no flooding.  *See* Exh. 3 at 484:22-488:19.

- *Does not know* whether elevation variations exist among different neighborhoods in New Orleans, *see* Exh. 3 at 185:10-25, or whether there are differences in topography between different subclasses.  *See* Exh. 3 at 145:24-146:2; 146:5-9.

- *Does not know* how he will segment real estate markets in his analysis, *see* Exh. 3 at 201:9-20, or how many control groups he will need to identify.  *See* Exh. 3 at 201:9-20; 208:9-212:14.

- *Does not know and has not examined* the class representatives' properties or data about their properties.  *See* Exh. 3 at 114:11-114:23.

- *Does not know* how many mixed-use properties are in the class, *see* Exh. 3 at 144:24-145:9, or how many mixed use neighborhoods exist in St. Bernard Parish.  *See* Exh. 3 at 380:3-10.

- *Does not know* whether the market is in equilibrium yet, *see* Exh. 3 at 247:6-9, or how many sales occurred in the class areas in 2006 and 2007.  *See* Exh. 3 at 386:3-10.

Kilpatrick has promised to provide a model only at the "merits" phase of the case.  *See*

Exh. 3 at 33:14-22.  But Rule 702 requires him to deliver on that promise now.

Kilpatrick's ruminations, masquerading as "expert opinions," cannot be tested adequately

because he has refused to reveal any methodology or factual bases for his testimony.  *See*

*Daubert*, 509 U.S. at 592 n.10.

It would require an enormous and wholly unprecedented leap of faith for *any* court to

accept Kilpatrick's unsupported word that he will build a magical model to deal with the myriad

of variables involved in evaluating and valuing these properties and the varying damages they suffered from different events (including wind, rain, falling trees and debris, flooding from overtopping, flooding from breaches, and looting, among others) that unfolded before and after Hurricane Katrina.  The complexity of this case does not excuse compliance with Rule 702, and a speculative promise to provide a model later cannot satisfy the Court's *Daubert* inquiry now. *See, e.g., Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 160 (S.D. Tex. 2003) (rejecting Plaintiffs' promise that factual disputes can be resolved by deciding on a formula for calculating damages because "courts have been 'hesitant to rely on a formulaic nostrum given the consequences if it fails to meet expectations.'").

**B.     The Promise To Analyze Data Empirically – Even If Made Two Dozen Times – Cannot Satisfy Rule 702(1)**

Kilpatrick testified he is going to "study the actual data in the marketplace on a statistically valid and reliable basis," *see* Exh. 3 at 369:15-19, but he admitted that he had not begun to collect any market data, or identified the time period he will use to frame his analysis. *See* Exh. 3 at 351:6-20; 180:17-182:16.[4]  The only "data" Kilpatrick reviewed prior to writing his report and appearing for deposition included a National Geographic article; some unspecified "data" from the Brookings Institute; more unidentified "data" from the White House post-Katrina study,[5] and yet more undescribed "data" from the article he and Sofia Dermisi gathered for an article in the Journal of Real Estate Literature entitled *The Aftermath of Katrina: Recommendations for Real Estate Research* (attached as Exh. 4).  *See* Exh. 3 at 146:12-147:12.

_____

[4] Kilpatrick testified that he conducted some studies about the number of housing units in St. Bernard Parish for the *Murphy Oil* case, but he has not begun collecting market data for this case.  *See* Exh. 3 at 347:8-21; 351:6-20.

[5] Frances Fragos Townsend, *The Federal Response to Hurricane Katrina: Lessons Learned* (Feb. 23, 2006) *available at* http://www.whitehouse.gov/reports/katrina-lessons-learned.pdf (last visited Sept. 24, 2007).

Though he has not done so yet, Kilpatrick promised to study market data concerning actual property sales after August 29, 2005.  *See* Exh. 3 at 370:21-371:1.  But Kilpatrick admitted that he is unsure about the existence or usability of data concerning post-Katrina property sales.  *See* Exh. 3 at 366:14-367:3.  "In many areas, particularly those with the greatest physical damage," Kilpatrick testified, "real estate markets were and continue to be totally disrupted, and market data for valuation is simply non-existent.  Thus, even retrospective appraisals, with a pre-Katrina valuation, will be problematic."  *See* Exh. 4 at 218; *see also* Kilpatrick Report ¶ 15.

Despite these challenges, Kilpatrick claims – without explanation – that any data deficiency is "solvable in the context of a large-scale mass-appraisal project."  Kilpatrick Report ¶ 36.  He did not elaborate on *how* it is solvable; instead, Kilpatrick asserted that "in a case of a large scale mass appraisal problem – or project, excuse me, we'll have access to lots of databases and we'll be able to, in a statistically efficient manner, compare and at times merge these databases into one efficient and reliable database."  *See* Exh. 3 at 251:8-14.  Kilpatrick failed to identify the databases he had in mind or how he proposed to use them, depriving this Court and the Defendants of valuable information by which to assess the Report's reliability.

Kilpatrick's failure to analyze any market data before preparing his report or appearing for deposition is, by itself, sufficient grounds for this Court to exclude his "expert opinion."  As the Seventh Circuit recently observed, "[t]alking off the cuff – deploying neither data nor analysis – is not an acceptable methodology."  *Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000) (noting also that "experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data").  The Court cannot presume that Kilpatrick will find sufficiently accurate and reliable data to put into a model he has

only hypothesized. There is "simply too great an analytical gap between the data and the opinion proffered," *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997), and Kilpatrick's report and testimony should be excluded from the Court's consideration of Plaintiffs' Motion for Class Certification.

**V.      Kilpatrick's Off The Cuff Ruminations Are Not The Product Of Reliable Principles And Methods And Fail Rule 702(2)**

      **A.      Kilpatrick's Model – To Be Determined At A Later Date – Cannot Be Tested Or Subjected To Peer Review**

Kilpatrick admitted in his deposition that his firm's previous litigation models were not peer reviewed. *See* Exh. 3 at 29:8-23. He explained that "we don't pave any new ground in a litigation report, we basically make sure that we're simply applying models which have already been peer reviewed." *See* Exh. 3 at 32:1-4. Even if that proposition were true – which it is not, as discussed more fully below – Kilpatrick has not proposed a model against which to test this assertion. Kilpatrick testified that he will conduct a "mass appraisal in general," but he has not "suggested any particular hedonic formula" because "[t]hat will have to be empirically determined as part of the … merits phase" of the case. *See* Exh. 3 at 33:14-22. He said he would use any "tools and techniques" he deems to be "systematic and statistically valid methods," *see* Exh. 3 at 226:25-229:1, but refused to say what those would be, apparently because he has not decided what they might be. *See* Exh. 3 at 33:14-22.

No one has ever attempted to create the multifaceted model Kilpatrick apparently contemplates here. It appears that Kilpatrick is operating under the assumption that his command of academic literature in the field of real estate appraisal and his familiarity with *tested* mass valuation models will relieve him of the obligation to articulate the model he intends to first

construct and then apply to the facts of this case.  His notion of a model has not been (and indeed, could not have been) subjected to peer review.

Simply stated, the Court cannot be comforted that the promised model will exemplify the "intellectual rigor" of an expert – *other than Kilpatrick himself* – in the relevant field.  *See Daubert*, 509 U.S. at 593-94 ("a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of act will be whether it can be (and has been) tested."); *see also Kumho*, 526 U.S. at 152, 157 (holding that a district court is not required to admit opinion evidence based on the expert's proclamation of the accuracy of his own method); *Coffey v. Dowley Manufacturing, Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002) (finding that "although [the expert]'s pedigree is impressive, the Rule 702 and *Daubert* analysis demands that Court not simply take [the expert]'s bare assertions as gospel"), *aff'd* No. 02-5454, 2003 WL 23156640 (6th Cir. 2003).  Kilpatrick's own unsubstantiated assertion that he can and will create such a model cannot be substituted for critical peer analysis that will expose any weaknesses in his methodology or the principles underlying his conclusions.  *See id.* at 975 ("an individual is not an expert in the abstract; expertise can only be judged within the context of a given case").

### B. Kilpatrick's Hypothetical Model Will Apparently Rely On Unscientific and Unreliable Methods

Kilpatrick's report references automated valuation, hedonic, and regression models – all modeling techniques with at least some academic acceptance when appropriately executed for appropriate purposes – but Kilpatrick has refused to provide any detail as to how he will use any one or a combination of those methods to calculate alleged damages in this case.  Kilpatrick Report ¶¶ 19, 21, 26, 29, 34.  This is a critical shortcoming, since there has already been considerable controversy surrounding the application of mass valuation methods to properties in

New Orleans.  *See* Coleman Warner, *Road Home Rethinks Appraisals*, The Times-Picayune, Dec. 21, 2006 (attached as Exh. 5).  In addition, although Kilpatrick's report does not refer at all to survey methods, Kilpatrick admitted at his deposition that he was "almost certainly" going to use survey research, referring to questionable techniques such as "contingent valuation" and "conjoint analysis."  *See* Exh. 3 at 225:6-12; 228:9-12; 229:21-230:6; 226:7-228:8.

> 1.     **The Road Home Program And The Insurance Companies Have Abandoned Mass Valuation Techniques in Favor of Individual Appraisals**

The Louisiana Recovery Authority's "Road Home Program" initially contemplated a hedonic mass appraisal model to determine property values prior to August 29, 2005.[6]  After resolving just 100 claims, the Road Home Program abandoned a mass appraisal model in favor of individualized appraisals, admitting that there were "serious problems" with the hedonic model, *see* Exh. 5, for a city with "neighborhoods as diverse as the greater New Orleans area."[7] *See Katrina Recovery Program Burned By AVMs: 'Road Home' Will Use Appraisals Instead*, Jan. 4, 2007, *available at* www.alamode.com/News/07/070104.aspx (last visited Sept. 25, 2007) (attached as Exh. 8).  Private and federal insurers, too, abandoned mass appraisal techniques and decided to conduct individualized assessment of properties, but for a different purpose:  they needed to distinguish wind and rain damage from flood damage.  *See* Insurance Information

---

[6] *See* Louisiana Recovery Authority, *Proposed Action Plan for the Use of Disaster Recovery Funds Allocated by P.L. 109-234*, May 16, 2007, *available at* http://www.doa.louisiana.gov/cdbg/dr/plans/ActionPlan_2_06-11-30.pdf (last visited Sept. 25, 2007) (attached as Exh. 6); *see also The Road Home, Protocols for Estimating Replacement Housing Costs v12*, May 15, 2007 *available at* http://road2la.org/Docs/TRH_Deliverable_00035_Protocols_for_Estimating_Replacement_Housing_Costs_v12_%205-15-07.pdf (last visited Sept. 25, 2007) (attached as Exh. 7).

[7] Senator Ann Dupleiss agreed that changing from a mass appraisal technique to an individualized appraisal "make[s] sense when you consider how diverse the New Orleans housing market is."  *See Governor Blanco Announces Road Home Changes: Home Appraisal Process To Be Streamlined, More Accurate*, State of Louisiana, Office of the Governor Press Release, Dec. 20, 2006, *available at* http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=2438 (last visited Sept. 25, 2007) (attached as Exh. 9).

Institute, *Hurricane Katrina Insurance FAQs*, *available at*

http://www.iii.org/media/hottopics/additional/katrina_faqs/?printerfriendly=yes (last visited

Sept. 25, 2007) (noting that insurers will distinguish between wind and flood damage by

evaluating claims on a case by case basis) (attached as Exh. 10); *see also Katrina's Force*

*Changes Insurance Adjusters' Tactics*, *available at*

http://www.bankrate.com/brm/news/insurance/20050913a1.asp (last visited Sept. 25, 2007)

(attached as Exh. 11).

　　　　Notwithstanding the experience of the Road Home Program and the insurance

companies, Kilpatrick claims he will be able to create and apply a mass appraisal model that will

successfully account for diverse neighborhoods, distinguish wind and rain damage from flood

damage, and control for a host of other Katrina-related factors.  This is a remarkable assertion

given that previous attempts to apply a hedonic model for only *one* purpose failed.

　　　　**2.　　Survey Methods Such As Contingent Valuation Are Inherently
　　　　　　　　Flawed and Produce Unreliable Results**

　　　　The survey techniques Kilpatrick is apparently contemplating and has used in other cases

have been subject to extensive criticism from his closest peers to broader circles of academic

thought.  For example, Kilpatrick's former boss (and Kilpatrick's current employee) Bill Mundy

published an article analyzing valuation surveys in which survey participants were asked what

monetary values they would place on hypothetical properties affected by hypothetical

contamination of some sort.  *See* Bill Mundy and David McLean, *Using the Contingent Value*

*Approach for Natural Resource and Environmental Damage Applications*, The Appraisal

Journal, July 1998, at 291-93 (attached as Exh. 12).  The Mundy article cataloged the various and

inherent flaws in the hypothetical nature of such surveys.

For example, Mundy noted that any stigma survey would involve "**extremely hypothetical**" questions, asking people who respond to use "monopoly money."  *See id.* at 293 (emphasis in original).  "[E]xpressed willingness to pay [to avoid a contamination problem] is higher in a hypothetical situation than [when] willingness to pay meant an immediate cash payment. . . . . [As a result,] the hypothetical . . . often results in 'overestimation.'"  *Id.* Moreover, Mundy observed, survey methods could not control for a respondent's pre-existing bias about a contamination source, or the tendency for randomly-selected people to overstate a diminution in property values.[8]  *See* Exh. 3 at 290:19-293:18; 295:4-297:15; *see also* Exh. 12 at 293-94.

Mundy was hardly alone in his criticism of stigma survey techniques.  In *Testing the Reliability of Contingent Valuation in the Real Estate Marketplace*, The Appraisal Journal, Winter 2006 (attached as Exh. 13), Richard Roddewig and James Frey concluded that "contingent valuation was neither an accurate nor reliable indicator of market prices or trends in the market situations in which it was applied."  *See* Exh. 13 at 268.  At best, they found that contingent valuation studies result in hypothetical value estimates disconnected from actual prices.  *Id.* at 268, 280.[9]

---

[8] In *Perrine v. DuPont*, No. 04-C-296 (Harrison Cnty, W.V.), Kilpatrick's team designed and implemented an automatic dialing survey to call more than 7,000 prescreened property owners.  Approximately 800 people answered the phone.  Only half of them would talk to the employees conducting the survey, and then only after Kilpatrick offered them money to stay on the line.  Kilpatrick did not screen the persons to determine if they were even remotely considering buying a house, and included persons (and counted their response in arriving at his conclusions) who affirmatively stated they had no intention whatsoever of ever buying any property, as well as those who did not have the financial qualifications to purchase the hypothetical $100,000 home involved in the survey. He did not exclude the results of people who said they had Alzheimer's, strokes, or people who could not understand the hypothetical scenario.  Finally, he conducted the survey during the daytime, skewing the demographics toward women and persons over age 55.  *See* Exh. 3 at 389:21-395:24.

[9] It should also be noted that the world's leading treatises on real estate valuation – also published by the Appraisal Institute – do not mention, let alone endorse or support, survey techniques for ascertaining property value diminution on a class-wide basis.  *See Appraisal of Real Estate* 12th Ed. published by The Appraisal Institute. Kilpatrick Report ¶ 2; *see* Exh. 3 at 346:23-347:7; *see also* Mark R. Linne, M. Steven Kane and George Dell, *A*

Similarly, in *Contingent Valuation: Not An Appropriate Valuation Tool*, The Appraisal Journal, Summer 2006 (attached as Exh. 14), Albert Wilson described the "fatal flaw" of all hypothetical surveys:  the inability to ascertain or control a respondent's perspective and inherent filter for the very questions asked.  *See* Exh. 14 at 60.  According to Wilson, hypothetical questions cannot substitute for careful examination of actual sales information.  *Id.* at 59-60.

Kilpatrick could not rebut any one of these criticisms during his deposition.  Instead, Kilpatrick lobbed grenades at the intellectual integrity of the authors, commenting that "even a blind pig finds a truffle now and then."  *See* Exh. 3 at 443:6-9.  Moreover, in response to Roddewig's critique, Kilpatrick launched into a four-page, nonsensical diatribe about the difference between appraisal and colloquial definitions of the terms "assumption" and "hypothetical."  Among a long list of other objections to Roddewig, Kilpatrick asserted that:

> If you read appraisal standards, you will see very clearly that
> hypothetical condition is something that's known not to be true,
> whereas an assumption is something believed to be true.  And so
> an assumption is in fact 180-degree opposite of a hypothetical.
> Mr. Roddewig, who has been hired in the Spelter case, has
> attempted to turn that on its ear and disingenuously convince the
> Court in West Virginia that hypothetical means assumption,
> assumption means hypothetical, up means down, down means up,
> green is red, red is green.  These, um – despite the fact that Mr.
> Roddewig is a compelling story teller, that doesn't mean that the
> word assumption here on Page 24 of appendix K means exactly the
> opposite of what it actually means.  It means what it means,
> counselor.

Exh. 3 at 401:2-20.  Finally, lamenting the Appraisal Journal's publishing standards (and notwithstanding the fact that Kilpatrick continues to publish in the journal himself), Kilpatrick complained that "the Appraisal Journal . . . seems now to be shifting towards just being a mouth piece for folks like Wilson who can't – don't know how to write an

---

*Guide to Appraisal Valuation Modeling* (Appraisal Institute 2000) (discussed at Exh. 3 at 218:11-220:11; 372:11-24).

article."  *See* Exh. 3 at 439:17-440:4.  Kilpatrick's contempt for anyone challenging his views strongly suggests that his is not the testimony of a scientist confident in his own ability to opine about objective and readily observable phenomena.

According to *Daubert,* scrutiny from the scientific community will "increase the likelihood that substantive flaws in methodology will be detected."  509 U.S. at 593-94.  Leading appraisal authorities have identified several critical flaws in the survey methods Kilpatrick has employed in other cases and is apparently contemplating here.  These methods – speculative as they are in Kilpatrick's report and testimony – fail Rule 702(2), and they should be excluded from further consideration.

**VI.    Kilpatrick's Mere Promise To Create A Model Reveals That He Has Not Applied Scientific Principles and Methods Reliably To The Facts Of This Case As Rule 702(3) Demands**

In his report, Kilpatrick states that "the issue for us as appraisers…will be measuring the effects of flooding on property values."  Kilpatrick Report ¶ 14.  To measure flood-related effects of "Hurricane Katrina," Kilpatrick promises to create one or more price models that will represent prices "in the case of residential properties within a contiguous or near contiguous area of a particular community."  Kilpatrick Report ¶ 26.  Kilpatrick contends that these aspirational price models and notional calculations will reveal the market or "stigma" effect of risk and damage perceptions.  Kilpatrick Report ¶ 17.

Kilpatrick has done no work to demonstrate that he will actually be able to address the complexities of this case, which includes multiple class areas and subclasses; hundreds of thousands of residential, commercial and institutional properties varying in their construction, elevation, and condition; socioeconomically and geographically diverse neighborhoods; different degrees of flooding in different neighborhoods and even from house to house; damage from not

just flooding, but from wind, rain, fire, theft, and vandalism occurring in different sequences in different locations; highly individualized repair costs; and inherently individualized property values.  Neither he – nor anyone else – has ever developed a model based on so many variables.

Indeed, the largest number of properties for which Kilpatrick has ever designed a complete damages model – and the only damages model he has ever developed for a class action – involved some 2,300 contiguous properties in West Virginia that were contaminated by lead, arsenic, zinc and cadmium from a single nearby lead smelter.  *See* Exh. 3 at 83:23-84:9; 196:14-17; 282:11-17.  Kilpatrick conceded that it took many months to develop and complete a model at a cost somewhere "north of a half million dollars."  *See* Exh. 3 at 196:14-21.  The causation of the contamination was not an issue, and its single source obviated many of the problems in this case, where multiple forces – flooding, wind, rain, fire, theft, and vandalism, among others – may have caused a class member damage.

Despite the fact that he has never created such a model before, has only spent 10-25 hours on this case, has not yet begun formulating the model, and has no idea what the budget for this massive project will be,  Kilpatrick promises he will be able to deliver precise calculations at the end of the day.  *See* Exh. 3 at 116:17-117:6; 173:11-174:9; 183:2-184:6; 196:2-197:3; 371:2-18; 434:25-435:21; 465:3-466:2.  Once he has created a model that accounts for every known factor, Kilpatrick contends that it will be "trivially simple" to allocate causes of property value losses between actual and stigma losses; to determine a fixed percentage for property value losses; and to apply it across the class.  *See* Exh. 3 at 434:25-435:21.

The Court simply cannot rely upon Kilpatrick's self-aggrandizing assertion that he will be able to create a model in the absence of any evidence supporting that statement.  *See Minasian v. Standard Chartered Bank PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (warning that "judges

[should] not be deceived by the assertions of experts who offer credentials rather than analysis" and rejecting expert affidavit that was "full of vigorous assertion … carefully tailored to support plaintiffs' position but devoid of analysis"); *Lang*, 217 F.3d at 924 (when an expert does not explain how the methodology works, what data he used as inputs, or what outputs were obtained, his report requires "[r]eaders [to] take everything on faith, and that alone would be good reason to exclude [the expert's] conclusion"); *Coffey*, 187 F. Supp. 2d at 979 (concluding that "[the expert]'s knowledge, skill and expertise do not overcome the inherent deficiencies and complex factual and legal circumstances involved in this case").

## CONCLUSION

This Court does not have the "discretion to abandon [its] gatekeeping function." *Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring).  In this case, that gatekeeping function requires the Court to exclude the report and testimony of an expert who has only provided this Court with a restatement of academic theory and made an unsupported and conclusory claim that he will construct an extraordinary mathematical model to analyze some unspecified data, magically "interpret" the results, determine that real property values diminished by a specific and allocable amount, and apply that factor across the classes in this litigation.

Nothing in the Federal Rules of Evidence permits a trial judge to admit expert testimony that is connected to the underlying facts only by the *ipse dixit* of the expert.  That is all Kilpatrick has offered here, and the Court must exclude his testimony and report from further consideration of Plaintiffs' Motion for Class Certification.

Dated:  September 26, 2007                         Respectfully submitted,


                                        /s/William D. Treeby
                                        William D. Treeby, 12901
                                        Carmelite M. Bertaut, 3054
                                        Heather S. Lonian, 29956
                                            Of
                                        Stone Pigman Walther Wittmann L.L.C.
                                        546 Carondelet Street
                                        New Orleans, Louisiana  70130
                                        Telephone:  (504) 581-3200
                                        Facsimile:   (504) 581-3361

                                        Attorneys for Washington Group
                                        International, Inc.

                                        Of counsel

                                        Adrian Wager-Zito
                                        Julie McEvoy
                                        Julia L. Cronin
                                        Jones Day
                                        51 Louisiana Avenue, N.W.
                                        Washington, D.C. 20001-2113
                                        Telephone:  (202) 879-4645
                                        Facsimile:  (202) 626-1700

                                        Jerome R. Doak
                                        Jones Day
                                        2727 N. Harwood Street
                                        Dallas, Texas  75201
                                        Telephone:  (214) 220-3939
                                        Facsimile:  (214) 969-5100

_/s/Thomas P. Anzelmo_
Thomas P. Anzelmo, 2533
Mark E. Hanna, 19336
Kyle P. Kirsch, 26363
Andre J. Lagarde, 28649
      Of
McCranie, Sistrunk, Anzelmo, Hardy,
   Maxwell & McDaniel
3445 N. Causeway Boulevard, Suite 800
Metairie, Louisiana  70002
Telephone:  (504) 831-0946
Facsimile:  (504) 831-2492
And
James L. Pate, 10333
Ben L. Mayeux, 19042
      Of
Laborde & Neuner
One Petroleum Center, Suite 200
1001 West Pinhook Road, Suite 200
Post Office Drawer 52828
Lafayette, Louisiana  70505-2828
Telephone:  (337) 237-7000

Attorneys for the Orleans Levee District

_/s/Robin D. Smith_
Robin D. Smith
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
Telephone:  (202) 616-4289
Facsimile:   (202) 616-5200

Attorneys for United States

_/s/ Gary M. Zwain_
Lawrence J. Duplass, 5199
Gary M. Zwain, 13809
Andrew D. Weinstock, 18495
      Of
Duplass, Zwain, Bourgeois, Morton, Pfister &
Weinstock
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Facsimile: (504) 837-3119

Attorneys for Board of Commissioners for the
Lake Borgne Basin Levee District

**CERTIFICATE**

I hereby certify that a copy of the above and foregoing Memorandum of Law in Support of Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A. Kilpatrick has been served upon Joseph Bruno, Plaintiffs' Liaison Counsel, this 26th day of September, 2007.

*/s/ William D. Treeby*
 William D. Treeby
