# **EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES                    CIVIL ACTION
CONSOLIDATED LITIGATION

NO: 05-4182

SECTION "K" (2)

### PERTAINS TO: ALL LEVEE AND MR-GO CASES

---

### AFFIDAVIT OF JOHN A. KILPATRICK, PH.D., MRICS
### RE: HURRICANE KATRINA LITIGATION

**BEFORE ME,** the undersigned authority personally came and appeared:

### JOHN A. KILPATRICK, PH.D., MRICS

who after being duly sworn by me, did depose and say that:

1. I am Dr. John A. Kilpatrick. I hold a Ph.D. degree in Real Estate Finance, and am a state-certified (general) real estate appraiser in Louisiana and many other states. I am the President of Greenfield Advisors, formerly Mundy Associates, LLC, a real estate appraisal and consulting firm headquartered in Seattle, Washington. For more than two decades, our firm has been a leading authority on difficult real estate appraisal problems, specializing in particular in the valuation of contaminated sites. We are unusual, if not unique in the high level of educational and professional qualifications of our staff, including several PhDs, the rigor of our quantitative techniques and our published articles in both academic and professional journals on appraisal techniques.

2. I am the author or editor of four books on real estate, most recently Subdivision Development (1998), published by the Realtors Land Institute of the National Association of Realtors. I am presently a consultant on environmentally impaired property to many organizations. At the invitation of the Japan Real Estate Institute, I co-authored the authoritative guide on the appraisal of environmentally impaired properties for appraisers in that nation, published in the October, 2003, issue of the Journal of the Japan Real Estate Institute. I am a member of the Publications Review Board of the U.S. Appraisal Institute, which publishes The Appraisal of Real Estate, currently in its 12th edition, and which is universally regarded as the leading authoritative guide on the subject in the world today. In 2004, I am became one of a handful of appraisers in the

United States designated as a nationally certified appraisal standards instructor by the Appraisal Standards Board in Washington, D.C. Also, in 2004, I was honored by my peers in the industry by being nominated for a seat on the Appraisal Qualifications Board and by being named a Member of the Faculty of Valuation of the British Royal Institution of Chartered Surveyors. I have been professionally engaged in real estate finance, appraisal, development, and teaching for the past twenty-five years. I have been accepted as an expert witness in various state and federal courts throughout the U.S. on matters relating to real estate valuation, contaminated or otherwise impaired property values, construction defects, and statistical analysis. A more complete and current set of my Professional Qualifications is attached to this affidavit, along with a listing of my trial testimony for the past four years.

3.  I am the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research", a peer-reviewed article written at the invitation of the Journal of Real Estate Literature (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in New Orleans following the 2005 Hurricane. The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas. A copy of that article is attached to this affidavit.

4.  Since Hurricane Katrina, I have made extensive examinations of the New Orleans market. Our firm was engaged by attorneys representing property owners in the Murphy Oil Spill matter, and we are presently engaged in a number of projects in various parts of Louisiana. Since the conclusion of the Murphy Oil Spill matter, we have continued to gather data about the New Orleans market and I continue to conduct personal inspections of neighborhoods affected by the flooding.

5.  I have been asked to opine on behalf of the plaintiffs in the above referenced case on the question of whether or not, from a real estate analysis and appraisal perspective, the matters at hand in this case can be best analyzed as a class action. While my main focus will be on the elements of appraisal methodology that argue for class treatment of valuation issues in cases of this nature, it may be useful to begin with a brief summary of general principles related to class certification and a non-technical summary of relevant appraisal issues in relation to those principles.

6.  I understand that the Plaintiffs have filed two separate class actions. The first proposes two subclasses to the east of the Industrial Canal. The second proposes five subclasses to the west of the Industrial Canal. I believe that individuals who owned property within each of these subclasses sustained a damage to the value of their property. I further

believe that the amount of the damage can be determined on a "subclass by subclass" basis expressed as a percentage loss of pre-Katrina property value.

### Summary of Findings

7. With respect to cases involving damages to real estate property values, use and enjoyment, we can paraphrase the salient issues regarding class treatment as follows:

   - Is the number of affected properties large enough to result in efficiencies for the courts and the parties in treating the plaintiffs as a class, the so called numerosity criterion?

   - Do appraisal standards and best practices of the valuation profession indicate that the real estate value issues litigated are best analyzed on a class-wide basis or on an individual property basis, that is, for the issues litigated with respect to property values, do the common factors between properties affected outweigh the differing factors?

   - A related question is whether the class can be unambiguously defined, that is, can the class of properties damaged by the issues at hand in this case be distinguished from unaffected properties?

   - Can plaintiffs be found who are representative of the class and adequately represented so as to protect the interests of the class, should the issue be resolved through a class action?

   - Is there sufficient reason to believe, given previous experience, available data, salient literature, expert analysis, and preliminary examination of evidence in the case, that the common issues affecting property values constitute factors whose effects can be measured in such a way as to result in a reasonable and fair estimate of damages and just apportionment of damages among the members of the class? Does class treatment and use of mass appraisal methods allow for a scientifically valid assessment of damages consistent with the requirements of Daubert? Further, will technical aspects of valuation or appraisal methods make class treatment a better way to estimate and apportion damages in comparison to individual valuations of each property? Would individual valuations that did not treat the affected properties as a class be more likely to result in arbitrary variations in damage assessments? Therefore, in addition to increasing costs and adding delays through individual treatment of cases, would the likely result of

individual litigation of damages on a property by property basis be less consistent and less fair apportionment of damages? Most of the following affidavit comprises a summary of real estate appraisal literature and methodology to establish the feasibility and superiority of class treatment of the valuation issues.

8. In my opinion, answers to all of the above questions strongly favor class certification in this case. In particular, estimates of damages would almost certainly be more fair and reflective of actual damages if the appraisal problem is approached through mass appraisal approaches rather than via individual valuations where damage estimates would be more capricious and difficult to assess in a fair and consistent manner. For a fair and consistent apportionment of damages, the same class wide valuation issues and comparisons would have to be revisited for each property. Every property's value must be related to the common factors, flooding and its effect on the class. To ensure a fair allocation of damages, individual treatment of each property would for each individual case require the same broader analysis of effects of common factors on the class of affected properties, requiring the appraiser(s) to revisit the same issues again and again with similar appraisal issues in each case.

9. The list of common factors in this case is among the most clear and compelling we have observed in our broad and long term experience with such cases. The list of common factors includes, but is not limited to:

   - Hurricane Katrina—this storm affected all of the properties in the proposed class, a common cause or initiating factor that undeniably had common effects on many properties.

   - Floodwaters—similar flooding occurred throughout the proposed class. Further, the extent of the flooding is easily ascertainable.

   - Economic effects—The regional economy and real estate markets in particular suffered common effects due to the storm and flooding. These effects impact on all properties in the proposed class.

   - Stigma and perception of risk—The real estate markets are affected by a common factor of increased perception of risks, including potential risk of future flooding that continues to depress prices[1].

   - Higher insurance premiums and other changes affecting property owners ability to purchase and finance homes—Properties throughout the class (and beyond)

---

[1] USA Today July 25, 2007 p. 1-2b "New Orleans home sellers high and dry"

> are affected by common factors such as higher insurance premiums. Since insurance coverage is required by lenders, these premiums affect purchasers ability to afford home purchases throughout the affected class.

This extensive, albeit incomplete, list of common factors affecting the entire class of properties and in ways that lead to large effects on property values throughout the class argue very strongly for class treatment. In our professional experience, we have seldom if ever seen a stronger and clearer set of common factors affecting a class of real properties. This matter, with the common factors of Hurricane Katrina and flooding of entire low lying sectors of the city and surrounding areas, and the identifiable responsibility for the flooding, strikes us as a strong candidate to become literally a textbook example of common issues of fact cited by future authors in real estate appraisal.

10. From an appraisal standpoint, the argument for class treatment exactly parallels the argument from a legal standpoint—a class treatment will save costs, expedite resolution and reduce demands on the court's time and resources. With respect to appraisals, there are not only great efficiencies in treating the plaintiffs as a class, but also advantages in terms of consistency, fairness and justice in allocation of the damage estimates among properties to be gained by examining the pattern of price effects across the class through mass appraisal methods.

11. **Numerosity.** Preliminary indications, and our own research into the post-Katrina market in New Orleans, demonstrate that tens of thousands of individual properties have been similarly affected by the flooding. There can be no reasonable doubt that so many properties are involved that individual treatment of these cases would be not only expensive and time consuming, but practically impossible. As with the common factors, the numerosity of the properties affected is at the upper end of our experience. Class treatment has frequently been chosen by the courts in cases with far fewer properties affected than in the present instance.

12. When we combine this evidence with the common-sense notion that wide-spread economic impacts are reflected in property values, it is reasonable to examine the merits of a case for property damages and the similarity of damages across properties. The common factor of flooding argues for class treatment. This view is reinforced by publications in the academic and professional literatures that have indeed documented this. Regrettably, these issues are not new. Widespread impacts to property values have been documented in similar disaster situations, both man-made and otherwise, in other parts of the U.S.

13. Moreover, analysis of real estate markets has found indirect, secondary, and even tertiary value damage to property due to stigma from nearby affected properties. In this case, therefore, it will be far more efficient for Plaintiffs, Defendants and the Courts to handle these cases as a class action. Where there are numerous cases with common issues, class actions benefit all parties and particularly the court system through the savings of time and cost of hearing a case once rather than repeating the same issues of law and fact thousands of times.

14. **Common factors.** This question goes to the heart of the class certification question from a real estate valuation perspective. Do the systematic impacts of the flooding predominate over the individual property aspects from a valuation perspective? The issue for us as appraisers, when the case comes to the merits phase, will be measuring the effects of flooding on property values. Undoubtedly, there are both similarities and differences in the affected properties, although all have the common factor of values that may be reduced because of flooding. It would be far more difficult to assess damages to property values if they were appraised individually on a property by property basis, rather than in the context of price variations across the affected area and in comparison to comparable unaffected properties nearby. Individual property valuations would be more subject to variations arising from both data and appraisal methods. Consistency of treatment across this large class of properties argues for valuing damages as a single mass appraisal exercise carefully designed to detect the value impact of the flooding and consequent damages.

15. The reduction in transactions in the market since Katrina makes it problematic to approach valuations strictly on a case by case basis. Individual property valuation methods typically rely on small samples of comparable sales (e.g. 3 in the case of the widely used Uniform Residential Appraisal Report, URAR, Fannie Mae Form 1004). Estimates from small samples are subject to random statistical variation. A mass appraisal method that looks at the broader geographical pattern and incorporates spatial analysis techniques will result in more stable, accurate, unbiased and scientifically-valid estimates of value impacts due to flooding. Moreover, these estimates will be more consistent and fair in revealing an overall pattern of price effects and apportioning damages among members of the class.

16. At issue is whether the common flooding factor can be evaluated in the context of other varying property features. A mass appraisal model can do that more validly than individual property appraisals, because more data on both the price effects of the common factor (flooding) and other common and varying property characteristics can be

incorporated into the estimates. In a single case, random variation can obscure or mask the effects of the factor being studied. Considering the cases as a class, the pattern of price effects will be more reliably revealed. Mass appraisal is better suited to sorting out the "signal" from the "noise" while accounting for the effects of other property characteristics. These methods will be further discussed in more detail below.

17. An additional "common factor" in this case would be "the local market" and in particular a degree of "stigma" in market perceptions of the affected properties. Buyers and sellers will have common perceptions, to a degree, of the flooding issue and its effects on property supply and demand in the area. Real estate markets are segmented, of course, by property types and by neighborhoods and properties are heterogeneous in many of their characteristics. However, it is likely that any buyer of property in the affected area would or should have some awareness of the issues of this case. The physical facts of flooding, one common factor, are mediated through common market perceptions into a change in demand and prices. The market perceptions and price effects are additional common factors consequent to the common factor of area wide flooding. "Stigma," that is, the effect on market values of perceptions of risk and damage, has been well documented as a common factor in the peer reviewed real estate literature. (Mundy, 1992, Kilpatrick & Kummerow, 2006)

18. **Unambiguous identification of the class.** Modeling experts engaged in this case are able to identify the properties affected by the flooding. Our research thus far indicates that the extent of the flooding has been well documented. Additionally, Greenfield has extensive experience and in-house technology to work with two- and three-dimensional spatial models. Indeed, mass appraisal models are uniquely suited to integrate geographic information systems (GIS) models into the valuation process. In short, the use of geographic modeling will allow for unambiguous identification of the affected properties when approached on a mass basis.

19. Generally accepted economic theory of consumer demand understands demand (and hence prices paid) for complex goods such as real estate, to be related to the characteristics of the good. (Lancaster, 1966, Rosen, 1974) Prices can therefore be represented and explained through "hedonic" models in the form: *Price = Sum of value of property characteristics*. Thus, for example, size of a house has an influence on price, larger houses tend to sell for higher prices. Hedonic models of house prices often include characteristics such as house size, age of the structure, location variables, house features such as garages, and so on, that consumers consider in their pricing decisions. Hundreds of academic and professional journal papers have been published

reporting statistically significant estimates of the price effects of a wide variety of hedonic characteristics. Not all property characteristics affect prices positively. Negative characteristics, such as age or physical deterioration, show negative price effects in hedonic model estimates and the size of these price effects can be estimated by statistical analysis of sales price/property characteristics data. These mass appraisal techniques can provide scientifically valid and unbiased estimates of the property value damages due to flooding by comparison of prices in flooded and non-flooded areas, while controlling for the effects on prices of other factors.

20. Unambiguous identification of the class of properties in a market affected by a particular phenomenon can be achieved by a) Identifying the geographical location of properties, b) Associating the extent of the event with these geographical locations, c) Estimating the hedonic price effects due to the varying degrees of flooding and proximity to flooded areas, and d) Incorporating economic variables into a class-wide equation. These effects can also be measured by the same methods in areas not affected by the flooding, and thus unaffected areas can be used as controls for model testing.

21. Hedonic variables in an appropriate pricing model essentially account for the price effects of other variables, allowing us to identify effects of the flooding and compute statistically valid estimates of the price impact of various degrees of flooding, proximity to flooded areas, and other economic variables (systematic decline in the market) based on market evidence or other empirically valid data. The class, defined as "properties within an affected area," can be unambiguously defined by the price/flooding relationship as revealed by empirical estimates of a pricing model. Identifying all such properties within such an area, of course, can be unambiguously done using well defined and accepted geographic information system (GIS) tools.

22. Additionally, the impact of the flooding has been felt throughout the market as a result of well-documented macroeconomic factors (e.g. – loss of base employment, loss of infrastructure, disruption of the supply/demand, etc.). Mass appraisal models are superior to individual appraisal models in this respect, and allow for the inclusion of such macroeconomic factors, particularly when those have changed over time or been disrupted by an exogenous event. Further, a mass appraisal model allows for consideration of the impact of these economic factors in a wide-spread area, even when properties may have suffered indirect, secondary, or tertiary effects from the flooding.

23. **Fair and consistent estimates of the allocation of damages among class members.** Our firm has a unique and longstanding record as analysts who model value effects of various complex situations on individual properties within classes of affected properties.

Our staff includes several PhD's with extensive price modeling experience and we have been pioneers in developing new methods for more fairly and accurately assessing damages to property values in such cases. We have in many cases produced results deemed by courts to be fair, equitable and the best that can reasonably be achieved to reflect a standard of justice between the parties within the limits of human knowledge and abilities. We aim to approach "best practice" or state of the art methods for estimating fair and reasonable damages and apportioning damages among affected parties. If better methods can be discovered or developed given the facts and data of this case, we will adopt them. Our methodology reflects continuous improvement as we adapt progress in appraisal methods from the academic and professional literatures and incorporate our own experience into improving data and pricing models.

## Literature review and comments

24. The extant peer-reviewed appraisal literature is almost unanimous on the issue that mass-appraisal techniques are preferable when similarly characterizable phenomenon impact a statistically large number of individual properties. The governing paradigm for real estate valuation in Louisiana and other states is the Uniform Standards of Professional Appraisal Practice (USPAP), which we have consistently cited in our work on cases such as this one. Kilpatrick, Throupe, Mundy, and Spiess (2005)[2] summarize these methodologies as they are used in the appraisal of affected property and as they are applicable under USPAP. Kilpatrick (2004, 2005)[3,4] specifically applies the use of these techniques in class-action matters.

25. As I will demonstrate in the remainder of this Affidavit, the class action model is not only the best way to manage the estimation of losses in this case, the overwhelming weight of prevailing valuation methodology and the Uniform Standards of Professional Appraisal Practice make it difficult, if not impossible, to consider this valuation problem *without* resorting, at least *de facto*, to a mass-appraisal model. As I will demonstrate in this model, the prevailing thought among academic researchers is that large-scale valuation issues can be best described using large-scale statistical models, and in fact, from a real estate analysis perspective, only those models meet the criteria outlined in *Daubert*[5].

[2] Kilpatrick, John A., Ron Throupe, Bill Mundy, and Will Spiess, "Valuation of Impaired Property", Chapter 6 in Simons, Robert, ed., When Bad Things Happen to Good Property (Washington, DC: Environmental Law Center, 2005 forthcoming)
[3] Kilpatrick, John A., "Real Estate Issues in Class Certification", Class Action Litigation Report, October 8, 2004
[4] Kilpatrick, John A., "Appraising Real Estate in Complex Environmental Class Actions: An Expert's View", Toxic Law Reporter, January 13, 2005.
[5] For an authoritative view of the real estate analysis perspective on appropriate methods under Daubert, see McLean, Dave, Bill Mundy, and John A. Kilpatrick, "Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc.", Real Estate Issues, Fall, 1999

The Uniform Standards of Professional Appraisal Practice have long recognized this, and the provisions therein are fully applicable to a class action model. Quoting from the USPAP Standard Rule 6-1 (a), "Comment: Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results."

26. As implied by the "systematic approach and uniform application of appraisal methods" USPAP standards comment quoted above, a key test of "common factors" from the appraiser's point of view is whether it is appropriate to use a common pricing model across a class of properties. This is the key to uniform assessment of price impacts in the affected areas. Price modeling begins by determining a market or submarket where the pricing factors would be uniform enough so that, to a reasonable degree of accuracy, buyers' thinking with respect to price is "captured" or well represented by the variables in the model. This requirement is certainly met in the case of residential properties within a contiguous or near contiguous area of a particular community. Literally hundreds of papers in the academic literature have represented prices in an area by a common model according to this logic consistent with class treatment. Again, this expresses the close relationship between existence of a class of properties and mass appraisal methods. We believe a common model, or small number of models reflecting sub-classes of properties, will suffice to determine flood damages, stigma, and other effects on property prices in this case and that this will be the best possible way to determine damages in a consistent fashion across the class and/or subclass.

27. Appraisal methods hinge on the appraisal principle of _substitution_, which holds that the value of an individual parcel of property is a function of the cost of finding another property with comparable utility, and on the basic economic theory that prices are revealed by arms length transactions in markets. Fundamentally, values of unsold properties are inferred from transactions involving similar assets where a realized price reveals how forces of supply and demand are crystallized in buyer behavior. Under this principle, idiosyncratic, individual characteristics of a given property have value _only to the extent those characteristics provide utility and relative to the values of other properties_. In short, even an individual property appraisal, most often performed for financing purposes, requires that the appraiser consider the values of neighboring and comparable properties and subordinate the individual property value to those values which are common and prevailing in the salient market.

28. Because variation is possible in prices, possible prices that might be realized for a particular property are best thought of as a random variable or probability distribution of

possible prices. This means that individual sales may vary from the most probable price. This in turn implies that it is best to examine a number of sales to determine average prices through the statistical law of large numbers in order to gain understanding of the possible price distribution. This fact argues for the superiority of methods that examine larger data sets within a defined class of properties to extract the most relevant pricing factors and sales evidence. (Kummerow, 2002)[6]

29. The "law of large numbers" is a basic statistical principle stating that variation in results decreases and hence accuracy of estimates improves as sample size increases. This occurs because with large samples, the effects of positive and negative random variations tend to cancel out resulting in an unbiased estimate. In the case of complex goods, such as houses or other real estate assets, economic theorists have shown that the prices buyers are willing to pay can be thought of as the sum of what they are willing to pay for particular property characteristics. (Lancaster, 1968, Rosen, 1974)[7][8]. These are called "hedonic characteristics" or variables, from a Greek word meaning "pertaining to pleasure or to hedonism" or "relating to like or dislike." A hedonic pricing model, representing the buyer's willingness to pay for a property, can be written as: $P_s = \Sigma b_x$, where $P_s$ is the price the buyer will pay, and the right hand side of the equation is the sum of the price per unit (a multiplier or coefficient, b, representing the price per unit of each characteristic) times a set of hedonic characteristics (x's). Econometricians use a statistical method called regression model estimation to find the best fitting coefficients (b's) to multiply by the amounts of each characteristic in order to derive a price estimate. The coefficients are estimated from the data by minimizing the total of squared errors in the prediction of price from the hedonic variables. It is important to point out that this is a relatively objective method involving mathematical algorithms. Thus, given the same data and model, every econometrician will estimate the same coefficients. In comparison to conventional appraisal methods based on ad hoc "judgment and experience" for estimating price impacts of property coefficients, this statistical estimation technique offers far more reliability and objectivity. This consistency is an extremely desirable property of a valuation method whose purpose is to assess damages fairly across a large sample of property values.

30. Note that while other hedonic characteristics (such as house size, number of rooms, etc.) may vary between houses, the flooding or water damages and stigma variables

[6] Kummerow, Max, "A Statistical Definition of Value", The Appraisal Journal, October, 2002, 407-416.
[7] Lancaster, K.J.A., "A New Approach to Consumer Theory", Journal of Political Economy 1966, 132-57.
[8] Rosen, S., "Hedonic Prices and Implicit Markets: Price Differentiation in Pure Competition", Journal of Political Economy, 1974, 34-35.

appear in all of the affected properties pricing equations. This is another way of restating the point that a class action approach is appropriate because of the common factors affecting all of the properties. Professor Kelly Pace of Louisiana State University, a specialist in spatial statistical methods, has noted the courts' acceptance of hedonic pricing models in complex litigation such as this[9].

31. The task in the present case is to evaluate the effect of common hedonic variables — the negative effects of flooding, stigma and other common economic effects — on the entire set of properties in the class. The price estimation mass appraisal model will include the common flooding variable in the case of all affected properties. Although comparison between affected and unaffected properties could be made on a case by case, single property basis, a superior methodology and logic for this valuation problem considers a set of properties where the effects of individual variation in transactions prices can be "averaged away" by "the law of large numbers." Then the effects of the common factors can be estimated more reliably by the mass appraisal, pricing model approach.

32. In the next section, I will present examples of Mass Appraisal Techniques, governed under USPAP Standard 6. However, it is important to note that the individual property appraisals performed under Standards 1 and 2 of USPAP require that the appraiser gather comparable data on surrounding properties. **Hence, if the appraiser was to perform individual appraisals on a large number of neighboring properties, each individual appraisal would be extraordinarily inefficient since the same data would be gathered and re-analyzed repeatedly under a set of rules which were never designed for this type of problem.**

---

[9] http://www.finance.lsu.edu/academics/finance/re/newpage11.htm , retrieved 7/20/06

## Authoritative Support for Mass Appraisal

33. Outside of the class action problem, appraisers are frequently called upon to value large numbers of properties where the common, systematic factor or factors exceed the individual or idiosyncratic element or elements. Two of the most common examples are *ad valorum* taxation and highway right-of-way condemnation. The latter is of particular interest to real estate appraisers when faced with the environmentally impaired property question, since some of the earliest writings about appraisal of such properties appeared in the eminent domain literature[10]. County tax assessors, treasurers, auditors, or other public officials filling similar roles throughout the United States are required to continuously maintain data bases of real estate values throughout their jurisdictions. As discussed in the foregoing section, individual affected property appraisals conducted under USPAP Standards 1 and 2, following the sales comparison approach typically performed for individual property mortgage financing, would be unnecessarily inefficient, time consuming, and duplicative. Fortunately, USPAP provides for Mass Appraisals under Standard 6. Given that every property in the United States is currently valued by a local tax assessor or other official, and given that most states have laws requiring reappraisal for assessment purposes on regular, periodic, often annual, basis, it goes almost without saying that the frequency and volume of Rule 6 mass appraisals in the United States are at least one or two orders of magnitude more common than are Rules 1 and 2 individual appraisals.

34. The mass appraisal rule allows the appraiser to develop an Automated Valuation Model which provides for the more important and significant common factors plus variation on a per-property basis for other hedonic factors. For example, all of the homes in a given neighborhood will have a fairly common valuation function – say, a base-line "dollars per square foot" value. Above and beyond this, there will be a small variation for homes certain amenities, such as larger-than-average lots, corner lots, larger garages, or other amenities. The appraiser uses statistically valid and unbiased data to determine the valuation model in a given neighborhood and then applies that model to all of the properties in question. Similar models are developed and used for non-residential properties, again with common factors predominating.

35. Note that it is not important for there to be a statistically significant number of properties or transactions of a given type within the class area itself, only that the valuation model

---

[10] For example, see Johnson, J.L., "Public Concerns and Issues: Siting Hazardous Waste Facilities," Right-of-Way, February, 1990, 8-14; and Pestinger, J., and R. Gambill, "Home Values Stabilized after Landfill Gas Scare," Right-of-Way, December, 1990, 4-6.

for that area can be developed using a significantly large sampling of comparable properties. Hence, unimpaired data developed outside the class area (e.g. – a control area with comparable characteristics) allows validation of a useful pricing model. Price modeling can occur even where the properties within the class area are not homogeneous. For ad valorum tax purposes the county tax assessor is almost always faced with the problem of heterogeneous property types. As long as each of the property types can be categorized and a valuation model developed and described, then Rule 6 is the preferred method for valuing a large number of properties together under USPAP.

36. Greenfield Advisors has examined available data on sales in the affected area and nearby. We recognize that there are problems associated with data in the New Orleans market due to damage from Hurricane Katrina. Much of the records base depended upon by appraisers was destroyed and has not yet been restored. However, this data problem is solvable in the context of a large-scale mass appraisal project, and our research in the recent Murphy Oil Spill litigation as well as our subsequent ongoing studies of the New Orleans market have demonstrated the feasibility of tackling a large-scale problem in this market with the tools and techniques of mass appraisal.

37. Colwell, Cannady and Wu (1983) showed that in the traditional sales comparison approach with only a few comparable sales analyzed, appraisers choices of weighting of certain comparables or adjustments is largely a subjective choice rather than an objective one[11]. Vandell (1991) pointed out that where appraisers use "ad hoc" techniques to estimate price differences due to hedonic variables, "bias can enter."[12] Traditional "one property at a time" appraisal methods based mainly on "judgment and experience" have difficulty rising to the standard of empirical verification demanded by Daubert.

38. Lipscomb and Gray's (1990) work illustrates the commonly recognized problem that Standard 1 appraisals and Standard 2 reports are heavily influenced by appraisers experience and subjective judgment, rather than empirical data, when developing adjustments in the sales comparison approach[13]. It is the sales comparison approach which is typically given the most reliance in individual residential property appraisals under USPAP Standard 1.

---

[11] Colwell, P. F., R.E. Cannaday, and C. Wu, "The Analytical Foundations of Adjustment-Grid Methods, Journal of the American Real Estate and Urban Economics Association, 1983, 11-29.

[12] Vandell, Kerry D., "Optimal Comparable Selection and Weighting", Journal of the American Real Estate and Urban Economics Association, 19(2), 1991, 213-231.

[13] Lipscomb, J.B, and J.B. Gray, "An Empirical Investigation of Four Market-Derived Adjustment Methods, Journal of Real Estate Research, 1990, 53-66. Lipscomb and Grey's findings are also discussed in Lentz, G.H. and K. Wang, "Residential Appraisal and the Lending Process: A Survey of Issues", Journal of Real Estate Research, 1998, 11-40.

39. Kershaw & Rossini (1999) assemble evidence reviewing the accuracy of conventional real estate appraisals[14]. In summary, conventional appraisal techniques result in rather large errors. Crosby and Murdoch data on commercial property appraisals revealed that about 1/3 of the appraisals (three different data sets were examined) were "off" by more than 10% in comparison to sale prices.

40. Consistent with USPAP Rule 6, academics find that multivariate statistical methods, such as the hedonic pricing model, overcome the shortcomings in "one at a time" appraisals. Hedonic models have been widely used in the valuation field for at least two decades. Bruce and Sundell (1977) show that such models were used as early as 1924 for appraising rural land and in 1935 for appraising forest land in New Hampshire[15]. Lentz and Wang (1998) stated that "Most appraisal textbooks advocate this method as an essential tool for mass appraisal.[16]" Advances made in since the 1990's improve these statistical properties. Today, a substantial and growing number of home loans are made with values derived from mass appraisal models[17]. Progress has been rapid in recent years in spatial modeling and this has further improved the accuracy of mass valuation methods.

41. The application of such models to the appraisal process in cases such this one has strong foundations in the peer-reviewed economics and real estate literature. The early development of theory and methods includes studies by Tiebout (1956)[18], Lancaster (1966)[19], Muth (1966)[20], Oates (1969)[21], and Rosen (1974)[22]. More advanced development work has been presented by Randolph (1988) who reviewed the statistical properties of residuals, Durbin (1988)[23] who examined spatial autocorrelation; Halvorsen and Palmquist (1981)[24], Durbin and Sung (1990)[25], and Burgess and Harmon (1991)[26]

---

[14] Kershaw, Paul, and Peter Rossini, "Using Neural Networks to Estimate Constant Quality House Price Indices", University of South Australia working paper, 1999

[15] Bruce, R.W., and P.J. Sundell, "Multiple Regression Analysis: History and Applications in the Appraisal Profession", Real Estate Appraisal and Analyst, 1977, 37-44.

[16] Lentz and Wang, op. cit.

[17] For example, reportedly over 50% of home loans made in Oregon in 2002 used an automated valuation model.

[18] Tiebout, C.M., "A Pure Theory of Local Expenditure", Journal of Political Economy, 1956, 416-24.

[19] Lancaster, op. cit.

[20] Muth, R.F., "Household Production and Consumer Demand Functions", Econometrica, 1966, 699-08.

[21] Oates, W.E., "The Effects of property Taxes and local Public Spending on Property Values: An Empirical Study of Tax Capitalization and the Tiebout Hypothesis," Journal of Political Economy, 1969, 957-71.

[22] Rosen, op. cit.

[23] Durbin, R.A., "Estimation of Regression Coefficients in the Presence of Spatially Autocorrelated Error Terms", Review of Economics and Statistics 1988, 466-474.

[24] Halverson, R., and R. Palmquist, "Choice of Functional Form for Hedonic Price Equations", Journal of Urban Economics, 1981, 37-49.

[25] Durbin, R.A., and C. Sung, "Specifications of Hedonic Regressions: Non-nested Tests on Measures of Neighborhood Quality", Journal of Urban Economics 1990, 97-110.

[26] Burgess, J.F., and O.R. Harmon, "Specification Tests in Hedonic Models", Journal of Real Estate Finance and Economics, 1991, 375-93.

discussing functional form of the valuation model; and Gau and Kohlhepp (1978)[27] who examined colinearity among the variables in the valuation model used in a mass appraisal.

42. Both Butler (1980)[28] and Bajic (1985)[29] discuss the market homogeneity issues. Mark (1983)[30] looks at the time-stability of the coefficients in a mass appraisal model. Parsons (1990)[31] and Smith and Huang (1994)[32] examine market conditions within a mass appraisal model. Atkinson and Crocker (1987)[33] investigate the optimum number of variables in a model.

43. Flower and Ragas (1994) examine property values in St. Bernard Parish, Louisiana, using mass-appraisal-type models to determine the stigma impact on residential property values of nearby oil refineries. Their models, which incorporate proximity to the refineries, explain between 69.3% and 77.6% of the variation in house prices in the affected neighborhood. Further, their models support a proximity-distance variable relating price effects to the distance from the sources of contamination.[34] We anticipate in this case developing a three dimensional spatial pricing model relating not only location to price effects but also elevation, that is the depth of water that occurred following the flooding. The fact that "water seeks its own level" has created a means of ascertaining water depths and hence a data relevant to ascertaining the common factor of water damage throughout the proposed class.

44. A rather important trend currently underway in real estate finance provides practical "real world" market evidence demonstrating the accuracy and cost effectiveness of mass appraisal methods. In the past decade or so, so called AVM (automated valuation methods) have made considerable inroads in the real estate finance markets as support in loan underwriting. Many major real estate lenders are using AVMs as support for their lending decisions, without any requirements for conventional appraisals in the case of refinancings and home equity lending transactions. Lenders may also classify loans and

[27] Gau, G.W., and D.B. Kohlhepp, "Multicollinearity and Reduced-Form Price Equations for Residential Markets: AN Evaluation of Alternative Estimation Methods", Journal of the American Real Estate and Urban Economics Association, 1978, 50-69.
[28] Butler, R.V., "Cross-Sectional Variation in the Hedonic Relationship for Urban Housing Markets, Journal of Regional Science, 1980, 439-54.
[29] Bajic, V., "Housing Market Segmentation and Demand for Housing Attributes: Some Empirical Findings", Journal of the American Real Estate and Urban Economics Association, 1985, 58-75.
[30] Mark, J.H., "An Empirical Examination of the Stability of Price Equations over Time", Journal of the American Real Estate and Urban Economics Association, 1983, 397-415.
[31] Parsons, G.R., "Hedonic Prices and Public goods: An Argument for Weighting Locational Attributes in Hedonic Regressions by Lot Size", Journal of Urban Economics, 1990, 308-21.
[32] Smith, V.K., and J. Huang, "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models," Journal of Political Economy, 1994, 209-227.
[33] Atkinson, S.E., and T.D. Crocker, "A Bayesan Approach to Assessing the robustness of Hedonic Property," Journal of Applied Econometrics, 1987, 27-45.
[34] Flower and Ragas, 1994, op, cit.

rely on AVM appraisals for low loan to value loans or simple tract homes where AVMs give satisfactory results. They may still delegate appraisals of unique properties whose features may not be well represented in AVM pricing models to conventional appraisals.

45. Moreover, AVMs have come to be routinely used by lenders in both the primary and secondary mortgage markets as a check method to detect fraud, incompetence or bias in conventional appraisals. As real estate databases and AVM techniques improve, it seems likely that mass appraisal methods will come to be standard operating procedure as support for most residential lending decisions. This major change in underwriting methods provides strong evidence that lenders believe AVM accuracy is sufficiently good so that they can improve their risk/return results by relying on mass appraisal methods as their primary means for documenting property values. Our firm is currently completing an evaluation study of an AVM product used by lenders as support for commercial property lending decisions. So even in the case of commercial properties, AVM methods are becoming more accepted and accurate.

46. As a result of these developments, on the order of more than a dozen AVM valuation products are now available for purchase from private firms by lenders. These important developments prove that those who rely on appraisals as part of their fiduciary responsibilities in real estate lending businesses have chosen in many cases to rely on AVMs in preference to conventional appraisals. This is market evidence of the growing competitiveness and accuracy of mass appraisal methods.

47. In short, both market decisions by real estate lenders and the academic, peer-reviewed provide support for a Standard 6 Mass Appraisal. These conclusions are well developed, empirically demonstrated and robust and supported by the trend of markets to choose mass appraisal methods over conventional methods. It is clear that this is the preferred model, when dealing with a class treatment of a large number of contiguous properties. It allows for efficient development of unimpaired values, it leverages off of existing public-sector developed and publicly available data, and it provides a more statistically well-defined set of methods, consistent with *Daubert*, for characterization of property values. The statistically based, objective methods move appraisal practice towards a more scientific approach based on objective inference from empirical data as *Daubert* requires.

48. In summary, large-scale mass appraisal techniques are well established in the valuation literature. These methods and techniques are incorporated in the Uniform Standards, specifically in Rule 6, and are employed regularly by practicing appraisers throughout the United States in a variety of day-to-day situations, such ad valorem taxation. It is

probably reasonable to say that more properties are appraised using mass appraisal techniques each year than by Rule 1 and Rule 2 techniques. With specific respect to the impacts of the damages, the use of Rule 1 and Rule 2 techniques has been called into question in the appraisal literature, and are not widely used in the peer-reviewed academic literature specifically because of these shortcomings.

49. Attachments: Professional Qualifications, recent trial testimony, and Journal of Real Estate Literature article.

JOHN A. KILPATRICK, PH.D., MRICS

Sworn to and subscribed
Before me, this 30th day of July, 2007.

Lisa Mc Sherry, notary



(seal)

# The Aftermath of Katrina:
# Recommendations for Real Estate Research

John A. Kilpatrick* and Sofia Dermisi**

## Abstract

*This paper provides an overview of government and independent research conducted in the wake of Hurricane Katrina in an effort to highlight additional areas in need of study. In addition to the overview of natural disasters and their impact on the United States, the aftermath of the San Francisco earthquake and the actions taken by the government, the local and private sector is also highlighted as providing some lessons learned but maybe forgotten in the wake of Hurricane Katrina.*

The literature is replete with studies on the impacts of natural disasters on real estate markets. Baen and Dermisi (2006) reviewed many of these in their study of federal policies and programs. Montz and Tobin (1998) examine property market disequibrium following a flood event. Brookshire, Thayer, Tschirhart, and Schulze (1985) and Bernknopf, Brookshire, and Thayer (1990) examined the real estate market implications of natural disaster risks, and Murdoch, Singh, and Thayer (1993) discussed the real estate impacts of the actualization of such a risk following California's Loma Prieta Earthquake. Geotechnical risks also motivated Sanders (1996) and Kinnard and Dickey (1995).

In many perspectives, including economic, the Hurricane Katrina disaster in 2005 is thought to be the worst natural disaster to hit the United States in modern times. The Insurance Information Institute estimates the property coverage alone for Katrina topped $38.1 billion, although as of this writing that was not finalized. Current thinking puts the total damage estimate, insured and uninsured, at between $200 billion and $300 billion. To put this in perspective, the next most severe natural disaster, Hurricane Andrew, generated $15.5 billion in insurance claims in 1992. The combined 9/11 attacks totaled $18.8 billion in insurance claims in 2001 dollars and an estimated $67.3 billion in total costs.[1] The Great San Francisco Earthquake and Fire of 1906 caused an estimated $500 million in property damages at the time, of which $235 million was insured.

The purpose of this paper is twofold. First, the government's reevaluation strategies, the non-governmental agencies and researchers' suggestions for redevelopment of New Orleans, and the lessons learned from the San Francisco Earthquake and Fire are discussed. Second, and perhaps more importantly for the real estate research community, this paper hopes to offer suggestions for future research.

*Greenfield Advisors LLC, Seattle, WA 98109 or john@greenfieldadvisors.com.
**Roosevelt University, Chicago, IL 60605 or sdermisi@roosevelt.edu.

214    Journal of Real Estate Literature

## Hurricane Background and the Generation of Katrina

Hoyos, Agudelo, Webster, and Curry (2006) opined that global warming will lead to a significant increase in both the frequency and intensity of Category 4 and 5 hurricanes. If this is indeed true, and coupled with the estimate that roughly 60% of the population in the United States lives in coastal areas, then a significant revisit of public policies with respect to building, financing, and insuring properties in these areas may be in order. The areas for future research include, but are not limited to, policies for building on flood plain land, federal flood protection programs (levees, dams, and channelization), and public expenses for rebuilding in sensitive areas.

### *Hurricanes and the U.S. Mainland*

According to the National Oceanic and Atmospheric Administration (NOAA), hurricanes are rated on the Saffir-Simpson scale in Categories 1–5 (Exhibit 1). The official Atlantic hurricane season lasts from June 1 to November 30, with peak activity usually found between mid-August and mid-October. Typically, ten tropical storms develop annually in the Gulf of Mexico, the Caribbean, or the Atlantic, and six of these become hurricanes. The U.S. mainland is usually hit by about five hurricanes during a three-year span, of which two will be major hurricanes (Category 3, 4, or 5). Exhibit 2 identifies the worst hurricanes in U.S. history from 1900 through 2005 in terms of deaths and damages and how they measure in comparison to other natural disasters. From the seventeen worst natural disasters in the U.S., included in Exhibit 3, 82% are hurricanes. This indicates the need for additional research and examination of urbanization policies in high-risk areas. As Exhibit 3 suggests, there is significant fluctuation in the number of hurricanes on a decade basis but there is a clear and continuing increase in the damage sustained by the various areas impacted by a hurricane. Not all U.S. coastal states have suffered the direct impact of hurricanes. Florida, Texas, North Carolina, and Louisiana are the states most likely to be hit (Exhibit 4).[2]

### *The Hurricane Season of 2005 and Katrina Chronology*

On May 16, 2005, NOAA and the National Weather Service (NWS) released the 2005 Atlantic Hurricane Outlook.[3] NOAA estimated a 70% chance of an above-average

**Exhibit 1**
**Saffir-Simpson Hurricane Scale**

| Category | Wind Velocity (mph) |
| --- | --- |
| Tropical Storm | 39–73 |
| 1 | 74–85 |
| 2 | 96–110 |
| 3 | 111–130 |
| 4 | 131–155 |
| 5 | > 155 |

**Exhibit 2**
**U.S. Natural Disasters that Caused the Most Death and Damage to Property**
**in Each Decade, 1900–2005, with 2004 Major Hurricanes Added Damage in**
**Third Quarter 2005 Dollars**



The source is White House (2006).

**Exhibit 3**
**Number and Cost Distribution of Hurricanes: 1851–2004**



The source is NOAA.

216    Journal of Real Estate Literature

**Exhibit 4**
**Hurricane Direct Hits on the Mainland U.S. Coastline and for Individual
States: 1851–2004**



The source is NOAA.

hurricane season and predicted twelve to fifteen tropical storms, with seven to nine
becoming hurricanes, and three to five of those being major storms. June and July
confirmed NOAA's prediction, with a record seven Atlantic tropical storms and two
hurricanes. One of these, Dennis, prompted mandatory evacuations in the lower
Florida Keys and major disaster declarations in Alabama, Florida, and Mississippi.
Louisiana's Governor Blanco declared a State of Emergency, and although the brunt
of the storm hit Cuba, the U.S. did sustain an estimated \$2 billion in damage.[4] On
August 2, 2005, NOAA released the Updated 2005 Atlantic Hurricane Outlook that
projected an additional eleven to fourteen tropical storms in the remainder of the
season, with seven to nine of those potentially turning into hurricanes.[5]

Hurricane Katrina initiated in the Bahamas on August 23 and was initially named
Tropical Depression Twelve in the first of sixty-one advisories to be issued over the
next seven days by the National Hurricane Center (NHC). On August 24, the
depression strengthened and was named Tropical Storm Katrina, the eleventh named
storm of the season, and on August 25 it became a Category 1 hurricane. The NWS
and the NHC forecasted that Katrina would make landfall in Florida and enter the
Gulf of New Mexico and head toward the Alabama–Florida panhandle. On August
26, Katrina weakened to a Tropical Storm as it passed over Florida, but was shortly
re-upgraded to a hurricane. That afternoon, the NHC upgraded the hurricane to a
Category 2 and released a forecast track projecting an August 29 landfall east of New
Orleans. This forecast projected that Katrina would be a Category 4 or 5 by the time
it reached this second landfall. On August 27, Katrina strengthened to a Category 3
storm, and the NHC predicted it would become a Category 4 before landfall. Also,
during the day, the storm nearly doubled in size. On August 28, Katrina strengthened
from a Category 4 to a 5 over a six-hour period but on August 29, Katrina made
landfall in Plaquemines Parish, Louisiana as a Category 3 hurricane (Exhibit 5).

**Exhibit 5**
**Hurricane Katrina Track**



The source is Bryan Woods, http://thestormtrack.com/archives/2005/12/hurricane_katri_1.html.

## Katrina Urban Environmental Impacts

### *Katrina Events—Aftermath and Government Strategy Reevaluation*

Hurricane Katrina generated a massive storm surge as it hit the coastline, estimated as high as twenty-seven feet in some places and reaching six to twelve miles inland. As far east as Mobile Bay, Alabama, the storm surge was over eleven feet.[6] The storm surge, rain, and wind overwhelmed the New Orleans pumping stations and caused multiple breaches within the 350-mile levee system. About 228,000 housing units were flooded (45% of the area total), including 120,000 owner-occupied units (39%), and 108,000 rental units (56%). Minorities made up 58% of the flooded neighborhoods in the metropolitan area, and 80% of the neighborhoods within New Orleans itself. Thirty-eight of the area's forty-nine "extreme poverty" neighborhoods were flooded (The Brookings Institution, 2005).

### *Aftermath Strategy Re-evaluation*

*Urban Land Institute Study.* Soon after Hurricane Katrina, the Urban Land Institute (ULI) assembled an advisory panel working with the New Orleans government leadership to develop an agenda for redevelopment. Their initial findings, published

in early 2006, focused on five key areas: government effectiveness, economic development and culture, city and urban planning, infrastructure, and housing. All five of these areas pose various types of challenges for both redevelopment efforts and repopulation. Although, as ULI stated, their suggestions were an initial step in redeveloping New Orleans, there is need for additional and more in-depth research on such proposals as the ULI. For example, under the government effectiveness area, ULI calls for the "basic rights"[7] of current and future citizens of New Orleans for fair compensation for a property that cannot be rebuilt. This poses a particularly intriguing problem. After Hurricane Katrina, real estate appraisers in the area found that widespread loss of normally dependable public databases and other research sources were destroyed or otherwise rendered undependable.

In many areas, particularly those with the greatest physical damage, real estate markets were and continue to be totally disrupted, and market data for valuation is simply non-existent. Thus, even retrospective appraisals, with a pre-Katrina valuation, will be problematic. The city and urban planning recommendations are particularly ripe for real estate researchers, especially for those in urban planning because of the recommended zoning redevelopment agenda.[8] Other ideas also proposed by ULI, such as the formation of a conduit called the Crescent City Rebuilding Corporation, need to be further studied for their potential effectiveness and timely acquisition and disposition of land and funds. The coordination between this conduit and the New Orleans Housing Partnership, a proposed vehicle fostering low- to moderate-income housing, will be crucial in the balanced redevelopment of the city inclusive of all levels of income.

*Katrina Effects on Other Cities.* Hurricane Katrina resulted in an immediate displacement of about 1.3 million people; an estimated 723,000 of these relocated over 100 miles from their homes (Baen and Dermisi, 2006). While Baen and Dermisi suggest that the dispersion of urban poor among various areas around the country will allow them to be easily absorbed into other communities, this suggests at least a marginal change in poverty housing and other real estate resources devoted to low-to-moderate income families in those communities absorbing the larger numbers of urban poor. Many communities face the paradox of increasing numbers of displaced urban poor coupled with a heightened demand for real estate at all levels, thus bidding up marginal prices of available properties.[9] A 2006 report entitled "The State of Real Estate" highlights that housing demand in Baton Rouge and other unaffected areas has increased significantly, and many of these new residents are buyers rather than just temporary renters. Further anecdotal evidence suggests that there has been a commensurate crowding-out effect in many of these areas, as lower-valued property, often previously rental in nature, is being purchased at prices unaffordable by the current residents. Jones Lang LaSalle (JLL),[10] on the other hand, highlights that surrounding major cities, such as Atlanta, Dallas, and Memphis, would enjoy positive commercial real estate benefits as businesses relocated out of the New Orleans area concurring with earlier research conducted by the National Association of Realtors.[11] Notably, however, the JLL study suggests that the more important post-Katrina question is the impact on energy prices, particularly as the region struggles to bring back on-line the huge industrial infrastructure needed to support the refining capacity.

However, they also note that the U.S. economy as a whole is in a better position than it was in 2001 (after 9/11) to absorb the economic shocks to the real estate industry and other markets.

*Tenant Evictions and Speculation.* Another trend becoming more evident especially in the historic neighborhoods of New Orleans is the increase in the tenant eviction rate. These evictions are often on short notice so that landlords may sell residences to speculators. Fletcher and Efriti (2005) identified this trend by interviewing both speculators and brokers in New Orleans. They suggest that there is wide-spread speculation in the area.

*Insurance Issues.* The insurance industry is reevaluating their policies and procedures in the wake of Hurricane Katrina and some changes are already visible. For example, certain insurance companies are not insuring owners from natural disasters (e.g., hurricane, flood, or earthquake) in certain areas (e.g., Florida, Long Island) because of the significant risk identified by a combination of scientific predictions and more sophisticated insurance modeling. Indeed, current risk-sharing structures may prove inadequate for future disasters. Some suggest simply not rebuilding in hurricane-prone areas, while others propose insurance structures similar to the way California handles earthquake risks. Considering that insurance companies usually base their scenario developments on worst cases and the increasing number of scientists who believe that global worming will further intensify weather-related phenomena spurring more disasters in the years to come, further research is needed in disaster preparedness and prevention in densely populated urban areas.

*Financing Issues.* Looming on the horizon are significant and severe financing problems of sufficient magnitude to have real impacts on underwriting agencies. According to news reports, mortgage delinquencies in Katrina-affected areas have skyrocketed, with nearly 12% of all mortgages over 90 days overdue just four months after Katrina. Not surprisingly, FHA and sub-prime mortgages are fairing much worse, reporting 21% and 24% delinquency rates, respectively, according to the Mortgage Bankers Association. As of yet, the foreclosure rate is still low because lenders are taking a wait-and-see attitude. However, eventually this will need to be revised. Further, it is likely that these delinquency rates vary widely across neighborhoods, with highly affected areas suffering the worst. As a result, large swaths of New Orleans neighborhoods may face foreclosures in the near future, opening the door to the same sort of "ghost town" effect seen in parts of Houston during the oil crisis of the early 1980s. In response, the HUD Office of Housing urged lenders to provide forbearance to FHA borrowers displaced by the storm and unable to make regular monthly payments. HUD took the lead in providing the first 90-day foreclosure relief for FHA borrowers in presidential-declared Major Disaster Areas affected by Hurricanes Katrina, Rita, and Wilma. On November 22, 2005, HUD extended foreclosure moratoriums in those counties declared eligible for individual assistance as a result of Hurricanes Katrina and Rita for an additional 90 days to February 28, 2006. Recognizing that many FHA-insured families needed more time to recover, HUD extended FHA's foreclosure moratorium yet again on February 27, 2006. On December 1, 2005, HUD announced an additional homeownership retention initiative to help homeowners with FHA-insured mortgages who are unable to maintain their

payment obligations due to hurricane-related property damage, curtailment of income, or increased living expenses. The FHA will advance mortgage payments for up to 12 months for eligible borrowers who are committed to continued occupancy of their homes as a principal residence and are expected to have the financial capacity to repair storm damage and resume making full mortgage payments within a 12-month period.

*Environmental Issues.* Other studies, including the ULI report and the DHS report, note the very real potential for damage to the environment. South Louisiana contains an almost unique combination of highly sensitive ecosystem and a significant percentage of the oil and chemical refinery capacity for North America. In the aftermath of Hurricane Katrina, there were numerous oil and chemical spills, including a 1.05 million gallon crude oil spill from a refinery in St. Bernard's Parish, located to the east of New Orleans. Public policy researchers will find post-Katrina to be a rare laboratory, both for governmental decision-making and for market solutions. Empiricists will also be busy, particularly studying valuation impacts of contamination.

*Native-American Issues.* The Chitimacha Tribe of Chareton, Louisiana and the Tunica-Biloxi Tribe of Marksville, Louisiana, provided housing for displaced tribal families evacuated from New Orleans and coastal Mississippi. HUD provided up to \$2.4 million for emergency tribal assistance, up to \$425,000 per tribe on a first-come-first-served basis. As of this writing, little is known of the nature of tribal displacement, the future of housing for these tribal families, or the adequacy of tribal federal assistance.

*Suggestions for the Federal Government.* The extensive overtopping and several breaches in critical places resulted in catastrophic failure for certain areas of the levee system. In addition to the levee breaches, the miscommunication[12] among federal, state, and local agencies along with the devastated effects of Hurricane Katrina prompted DHS to look at the critical challenges faced by the federal government before, during, and after devastating natural disasters. The White House report (2006) written by DHS identified seventeen critical challenges before and during Hurricane Katrina (Exhibit 6).

Within these seventeen challenges in Exhibit 6, the DHS outlined 125 specific recommendations for federal action in the wake of Hurricane Katrina. The five recommendations under "Mass Care and Housing" (numbered 68–72 in DHS's overall listing) have specific implications for the real estate research community:

68. The American Red Cross (ARC) and DHS should retain the mass care and sheltering responsibilities during disasters.
69. Designate Housing and Urban Development (HUD) as the lead federal agency for the provision of temporary housing.
70. Assist states and municipalities in developing mass relocation plans for each major metropolitan area and inventories of existing shelters and shelter sites.

### Exhibit 6
### Hurricane Katrina Critical Challenges

| | Critical Challenges |
|---|---|
| 1 | National Preparedness |
| 2 | Integrated Use of Military Capabilities |
| 3 | Communications |
| 4 | Logistics and Evacuation |
| 5 | Search and Rescue |
| 6 | Public Safety and Security |
| 7 | Public Health and Medical Support |
| 8 | Human Services |
| 9 | Mass Care and Housing |
| 10 | Public Communications |
| 11 | Critical Infrastructure and Impact Assessment |
| 12 | Environmental Hazards and Debris Removal |
| 13 | Foreign Assistance |
| 14 | Non-Governmental Aid |
| 15 | Training, Exercises, and Lessons Learned |
| 16 | Homeland Security Professional Development and Education |
| 17 | Citizen and Community Preparedness |

Note: The source is White House (2006).

71. DHS should develop a system to maintain awareness of the movement of shelter and temporary housing residents.
72. DHS should review and revise the federal regulations under the Stafford Act to emphasize "location-independent" housing assistance.

While all of these have potential research implications for the real estate community, numbers 69 and 72 merit particular examination. Referring to the first of these, anecdotal and news reports after Hurricane Katrina indicated that FEMA attempts at providing temporary housing ("FEMA Trailers") were widely considered to be a failure.[13] DHS recognizes in their report that HUD has extensive experience providing housing resources and an extensive network of regional offices and state and local housing agencies. Therefore, DHS recommends that HUD devote resources to developing competencies in this area.

In the second case, recommendation 72, current regulations allow payment of rental subsidies but not routine payments of security deposits or utility fees. Additionally, regulations do not authorize payment for repairs to existing and available housing units, effectively precluding the use of housing that may need only minor repairs—often at less expense—in order to be occupied. As a result, many people are pushed

into less desirable and often more expensive manufactured housing (the famous "FEMA Trailers") while more efficient solutions are left vacant.

Finally, all of these recommendations suggest a refreshing level of "outside of the box" thinking at DHS in response to Hurricane Katrina. Researchers could take advantage of this window of opportunity to take a fresh look at other options to deal with housing and other infrastructure needs after future disasters.

Baen and Dermisi (2006) provided an overview of the past and present federal policies encouraging urban growth in areas with high risk of recurring natural disasters and highlighted the need for federal policy reform in these areas. Specific recommendations were offered for seven areas of government agencies with direct or indirect influence on urban growth: Federal Flood Insurance Programs and FEMA, FHA-VA-SBA and Federal Bank Loans, General Services Administration, the Justice Department, U.S. Department of Transportation, U.S. Department of Health and Human Services, and the Department of Defense. Some of the recommendations include updating of federal flood maps, cancellation of flood insurance offerings in areas the private insurance industry has not priced the flood risk, and removal of GSA and prison facilities from high-risk areas.

## Impact of the San Francisco Earthquake and Lessons Learned

The impact of Hurricane Katrina may be unique to modern experience, but its scope and scale are not unique. Various cities around the world have faced both manmade and natural disasters [e.g., London (the great fire of 1666) and Lisbon (the great earthquake of 1755)]. Chicago and Atlanta suffered devastating fires in 1871 and 1917, respectively. While San Francisco experienced both a destructive earthquake and a firestorm in 1906, the city experienced a period of extensive growth in the aftermath. Grossi and Muir-Wood (2006) draw comparisons between Hurricane Katrina and the San Francisco Earthquake in a centennial review of the earlier disaster and the implications for risk management.[14] Though separated by half a continent and a century, and with widely different resource sets and topography, these two very different natural disasters have many things in common. For one, both were actually two separate disasters: in the case of Katrina, a hurricane and subsequent flooding; in San Francisco, an earthquake and a resultant fire.[15] In both cases, the consequential disaster did more damage than the initial peril by a factor of three to four. San Francisco was the largest American city west of the Mississippi River with the fastest growing economy in the country. Damage in 1906 dollars was approximately \$500 million, of which \$235 million was insured loss (this translates to a \$10 billion loss in 2006 values using the CPI inflator). The city population was about 450,000 at the time, and recent studies have indicated that about 3,000 people died as a result of the disaster.[16] Fires continued for three days, eventually destroying 2,830 acres and 28,000 properties. Two weeks later, there were fewer than 200,000 people living in the city. Immediately after the San Francisco disaster, the city took steps to facilitate rebuilding. Characteristic is the formation of the Relief Committee the afternoon of the quake, which focused on the rebuilding process through fire prevention. New, stringent fire codes were put in place; and by 1909, 25,000 new buildings had been constructed to

meet the new stringent requirements. By 1910, the rateable value of the city's properties (60% of market value) was $492 million, only $10 shy of the 1905 value. Within a year, 60 miles of streets and 200 miles of street railways were cleared of earthquake and fire debris. About $75 million was spent on rebuilding in the first year, and by April, 1907, the population was back up to an estimated 435,000. Recovery was considered to be complete by 1911, when the city beat out, ironically, New Orleans for the right to host the 1915 World's Fair.

### Parallels and Lessons Learned from the San Francisco Experience

Hindsight focused on the San Francisco re-build provides a number of lessons for real estate research post-Hurricane Katrina. For example:

1. The decision to focus on fire prevention rather than earthquake-proofing new structures may have been the only possible course of action, given the technology of 1906, but it continued to haunt the city many years after. For example, the 1915 World's Fair was held on a site containing 635 acres of landfill rubble from the disaster, and this area was subsequently developed to be 76 city blocks of what is now the Marina District. As Grossi and Muir-Wood (2006) note, "one disaster has the tendency to lay the foundations for the next." The poor soil conditions in this area led to liquefaction, structural damage, and subsequent fires in 1989 during and subsequent to the Loma Prieta Earthquake. Only later did building codes begin adopting seismic guidelines, such as those proffered by the American Technology Council in 1992.

2. Rents in surrounding towns surged out of control in the aftermath of the San Francisco earthquake, with Oakland reporting immediate rent increases of as much as 500%. However, this demand surge set in motion a supply response, and by April, 1907, there were an estimated 50,000 workers engaged in rebuilding at a daily wage rate of $4—reportedly the highest construction laborer pay rate in the world. By 1909, masons were being paid $12 per day. Demand for lumber and other building materials stimulated an economic boom for surrounding cities.

3. Delays in repairs led to further damage, particularly from several rainstorms that occurred during the month after the quake. Researchers have never been able to separate the actual quake and fire damage cost estimates from those resulting from such subsequent and consequential damage.

4. Both homeowners and insurance companies lost records and other paperwork, but were faced with a 60-day rule for submitting claims. Even at the time, it was recognized that many claims were exaggerated, albeit innocently, in the haste to file. About 90% of San Francisco homeowners held fire insurance policies, a much higher proportion than today.[17] Total fire insurance premiums for San Francisco were $2.6 million on $350 million of coverage limits. This coverage was shared by 80 domestic and 50 foreign insurance companies. The total surplus-in-excess for domestic insurers was $100 million, with an additional $49 million in paid-in-

capital. Foreign insurers had a surplus of about \$150 million. Most policies had a "fallen building" clause, which denied coverage if a building collapsed (i.e., due to earthquake) prior to a fire. Many insurers attempted to deny claims on this basis, but strong political pressure was brought to bear to pay. Insurers met in New York City in May, 1906, to coordinate strategy.[18] The outcome of this meeting was an agreement to pay a fire claim unless it could be determined that the building was totally destroyed as a result of the earthquake prior to being consumed by fire. Not surprisingly, of the first 2,000 claims submitted, none noted earthquake damage preceding the fire. Not all insurers agreed to this, and some insurance companies used their full-limit-settlement practices as a powerful marketing ploy. Eventually about 100,000 claims were settled, a settlement rate of about 80%. Of the \$235 million paid, about \$100 million came from British insurers.

5. Immediately after the disaster, urban planners came forward with important suggestions for improving the city and providing more of comprehensive master plan. Many of these were outlined in an article in the *San Francisco Chronicle*[19] one month after the quake.

## Conclusion

The principle goal of this paper was to outline potential areas of real estate research implied by Hurricane Katrina. It is already apparent that there will not be any "quick fix" solutions to the devastation and economic disruption faced by the citizens of southern Louisiana. As government leaders, financial intermediaries, engineers, and others seek to implement solutions in the near- and long-term, it is critical that the research community support them with fundamental theoretical models and empirical analysis, both to estimate the efficacy solutions put in place in the near-term but also to provide lessons learned for other cities, from a real estate perspective, as those other cities prepare for other natural disasters that will certainly be faced in coming years.

In addition, real estate researchers, particularly those engaged in government and applied research, are faced with a host of potential research areas, including, but certainly not limited to, the following areas.

- **Mortgage Lending Experience and Strategies**: How does a disaster of this magnitude impact mortgage failure and/or prepayment rates? Were lender and government responses after Katrina adequate? What are the best-practices learned from this experience?
- **Urban Planning:** While many disaster-prone locales (e.g., earthquake prone areas of California) have rigid comprehensive plans; many others, such as New Orleans, have no such plans. What sort of public policy issues are implied for these non-planned or non-regulated areas? What are the implications for mortgage lending and other financing issues of non-planning? What defines sustainability in these non-planned regions?

■ **Real Estate Valuation**: When markets are thrown into complete disequilibrium, how do appraisers and others accomplish their work? What sort of wholesale pricing and value shifts are experienced by real estate in the area? What are the implications for lenders, insurers, and others?

## Endnotes

1. New York City attacks, only.

2. Much of this chronology is adopted from the U.S. Department of Homeland Security's report to the president, February, 2006.

3. National Oceanic and Atmospheric Survey, May 16, 2005.

4. NOAA Satellite and Information Service, http://lwf.ncdc.noaa.gov/oa/reports/billionz.html.

5. NOAA, August 2, 2005.

6. www.srh.noaa.gov/mobile/0805katrina/.

7. Basic rights:

   1. Restore public utility service and levees so that all residents can return to the city;

   2. Immediate and equitable redevelopment;

   3. Efficient and effective government;

   4. Integrity and transparency in government;

   5. Stronger, empowered neighborhoods; and

   6. Fair compensation for property on which owners cannot rebuild.

8. The ULI recommends a zoned redevelopment agenda, taking into account traditional land-use patterns including historic district designation, topography, proximity to open space, current building conditions and occupancy patterns, storm sewer capacity, and other factors.

   **Zone A** includes those areas most severely affected by Hurricane Katrina, by environmental contamination, by high repair costs, and other recovery constraints. It is anticipated that block-by-block and even parcel-by-parcel analysis will be required, and great care must be taken to work with the residents to determine appropriate patterns of reinvestment. In many cases, parcel or even block reconfiguration may be needed.

   **Zone B** properties have borne a more varied impact. Some parcels will require either repair or urban infill redevelopment, while other neighborhoods will require larger scale redevelopment. However, these areas will likely not require broad conversion of entire blocks. The appropriate strategy in this zone will probably be focused on rehabilitation of existing land uses.

   **Zone C** was the least affected by Hurricane Katrina, and will require mostly a parcel-by-parcel analysis. Much of the damage in Zone C resulted from consequential actions, such as abandonment. Many usable but unoccupied structures remain in Zone C, which could potentially be adapted for temporary housing while Zones C and B are being rehabilitated.

9. Personal interviews by author with residents of Baton Rouge, Alexandria, and New Orleans, Louisiana, Autumn, 2005 and Spring, 2006.

10. International Facilities Management Association report, www.ifma.org/daily_articles/2005/sept/09_14.cfm.

11. National Association of Realtors press release, "Hurricane Katrina Impact Mixed for Economy and Housing," September 13, 2005.

12. Characteristic example of the miscommunication is that at 8:12 AM CDT, the NWS received a report of a levee breach along the Industrial Canal at Tennessee Street and issued a flash flood warning. However, as late as 6:00 PM EDT in Washington, D.C., DHS and White House authorities were receiving reports from the Homeland Security Operations Center that the levees had not been breached.

13. A Failure of Initiative, The Final Report of the Select Bipartisan Committee to Investigate the reparation for and Response to Hurricane Katrina, February 16, 2006, http:// katrina.house.gov.

14. Much of this section is taken from the Grossi and Muir-Wood review and a timeline prepared by Gladys Hansen, Curator of the Virtual Museum of San Francisco.

15. Hurricane Katrina was also accompanied by other issues, including environmental contamination and levy failure, which are discussed elsewhere in this study.

16. Grossi and Muir-Wood (2006) note that casualties probably stayed low as a result of the time of day. Most residents were home, and most residences were wood-frame structures, which were less susceptible to life-threatening collapse.

17. Recent disastrous fires, such as the Baltimore fire of 1904, led to a popular wave of fire insurance policies.

18. Notably, U.S. anti-trust laws were not nearly as significant in 1906.

19. ■ W.W. Goodrich, an engineer from Portland, Oregon and a former professor at the University of California, had made an extensive geological survey of the area and recommended seismic-proofing techniques for new or reconstructed buildings. George Stratton of Johns Hopkins University also stressed the need for both fireproofing and earthquake-proofing, and recommended wide-open spaces as protection and for firebreaks.

   ■ Callaghan Byrne, described by the *Chronicle* as a local "capitalist," recommended specific grade changes in certain streets and the purchase of land for a park around City Hall. He also suggested a committee of architects, representing property owners, who would agree on a more harmonious style of building fronts and elevations. I.W. Goldman also suggested re-grading, particularly Telegraph Hill.

   ■ One anonymous writer suggested double-decker streets, with one deck reserved for freight and the other for pedestrians and streetcars. City plumbing and gas mains could be under the sidewalk of the lower deck, exposed for easy repairs.

   ■ W.R. Schott suggested two parks that would divide the city into three districts (manufacturing, wholesale/retail, and residential) and also provide firebreaks.

## References

Baen, J.S. and S.V. Dermisi. Urban Functionality and Extreme Natural Disasters: The New Orleans-Katrina Case for New Federal Policies and Programs for High Risk Areas. Unpublished working paper. Presented at the 2006 ARES meetings.

Bernknopf, R., D. Brookshire, and M. Thayer. Earthquake and Volcano Alerts: An Economic Evaluation of Risk Changes. *Journal of Environmental Economics and Management*, 1990, 18, 35–49.

Brookshire, D., M. Thayer, J. Tschirhart, and W. Schulze. A Test of the Expected Utility Model: Evidence from Earthquake Risks. *Journal of Political Economy*, 1985, 93, 369–89.

Fletcher, J. and E. Efriti. Real Estate Speculators Seek Opportunity. The *Wall Street Journal* online edition, September 20, 2005.

Grossi, P. and R. Muir-Wood. San Francisco Earthquake and Fire: Perspectives on a Modern Super Cat. Newark, CA: Risk Management Solutions, 2006.

Guidelines for the Seismic Rehabilitation of Buildings. ATC-33. American Technology Council, 1992.

Hansen, G. Chronology of the Great Earthquake, and the 1906–1907 Graft Investigations. The Virtual Museum of the City of San Francisco, www.sfmuseum.org.

Hoyos, C.D., P.A. Agudelo, P.J. Webster, and J.A. Curry. Deconvolution of the Factors Contributing to the Increase in Global Hurricane Intensity. *Science*, 2006, 312, 94–7.

Kinnard, W.N. and S.A. Dickey. A Primer on Proximity Impact Research. *Real Estate Issues*, 1995, April, 23–29.

Montz, B.E. and G.A. Tobin. The Spatial and Temporal Variability of Residential Real Estate Values in Response to Flooding. *Disasters: The Journal of Disaster Studies and Management*, 1988, 12–4, 345–55.

Murdoch, J., H. Singh, and M. Thayer. The Impact of Natural Hazard on Housing Values: The Loma Prieta Earthquake. *Journal of the American Real Estate and Urban Economics Association*, 1993, 122, 89–114.

Sanders, M. Post-Repair Diminution in Value from Geotechnical Problems. *The Appraisal Journal*, 1996, January, 59–66.

Texas A&M Real Estate Center. *The State of Real Estate*, January, 2006.

The Brookings Institution. *New Orleans After the Storm: Lessons from the Past, a Plan for the Future.* October 2005.

Urban Land Institute. *New Orleans, Louisiana, A Strategy for Rebuilding.* Washington, DC, 2005.

White House. The Federal Response to Hurricane Katrina–Lessons Learned. Washington D.C., February 2006.

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 06-1102 | Peterson, et. Al. v. D.R. Horton | Contaminated Property | Circuit Court for Montgomery County, MD | Law Offices of Peter Angelos; Baltimore, MD | Ogletree, Deakins, Nash, Smoak, and Stewart; Greenfield, SC | Plaintiff | | X | 26-8778-V |
| 06-1002 | Duffin v. Exelon | Contaminated Property | USDC, ND of Illinois, Eastern Division | Cohen, Milstein, Hausfeld, Toll, Washington, DC; Williams Cuker, Berezofsky, Philadelphia, PA | Jenner & Block, Chicago, Il; Harkins Cunningham, Washington, DC; | Plaintiff | | X | 06 CV 1382 |
| 04-1201 | Thomas, et. Al. v. A. Wilbert & Sons and Dow Chemical, et. Al. | Contaminated Property; Underground Rent | 18th Judicial District Court, Parish of Iberville, State of Louisiana | Robert Smokie and Adele Owens, Baton Rouge, LA; Patrick Pendley, Plaquemine, LA | Barry Marionneaux, Plaquamine, LA; John Michael Parker, Baton Rouge, LA | Adele Owens | | X | No. 55,127 |
| 04-0115 | Turnbull v. MTA | Contaminated Property | Supreme Court of NY, Kings County | Dunewood Truglia | Staff attorneys, NYC Metropolitan Transit Authority | Dunewood Truglia | X | | 26485/99 |
| 06-0407 | Koch v. Hicks | Contaminated Property & Class Certification | USDC, Southern District of New York | Law Offices of Peter Angelos, Baltimore, MD | Staff attorneys, Exxon-Mobile Corporation | Law Offices of Peter Angelos | | X | 05-cv-05745-SAS |
| 05-0801 | Neodesha v. Amoco/BP | Contaminated Property & Class Certification | Wilson County, State of Kansas | Edgar Law Firm, Kansas City, MO | E. Wayne Taff, Sherman, Taff, & Bangart, Kansas City, MO; Evan Westerfield, Evan Westerfield, Sidley Austin, Chicago, IL | Edgar Law Firm | | X | |
| 05-0801 | Perrine, et. al., v. DuPont | Contaminated Property & Class Certification | Circuit Court of Harrison Cnty, West Virginia | Farrast Taylor, Cochran, Cherry, Givens, & Smith, Dothan, AL; Steve Medina, Levin Papantonio, Pensacola, FL | Allen Guthrie, McHugh, & Thomas, PLLC, Charleston, WV; Wildman, Harrold, Allen, & Dixon, Chicago, IL; | Farrast Taylor & Steve Medina | X | X | 04-C-296 |
| 05-1201 | Turner, et. al., v. Murphy Oil USA, Inc. | Contaminated Property & Class Certification | U.S. District Court, E. Dist. Of Louisiana | Daniel Becnel, New Orleans, LA | Friiol, Partridge, Kohnke, & Clements, New Orleans, LA | Daniel Becnel | | X | 05-4114 |



Greenfield Advisors

Economic, Market and Valuation Analysis

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 04-1006 | In the matter of Wold | Appraisal Standards matter | Alaska Board of R.E. Appraisers | Robert C. Auth, Asst. Attorney General, State of Alaska | Clay Keene, Keene & Currall; Ketchikan, AK | Clay Keene | X | | 3300-98-006, 330-02 004 |
| 04-1003 | Thornell v. Cooper Farms | CAFO | Court of Common Pleas, Paulding County, Ohio | Joel R. Campbell, Britt, Campbell; Nagel & Sproat, LLP, Columbus, Ohio | Wesley Newhouse; Lane Alton, & Horst, Columbus, Ohio | Britt, Campbell, Nagel, & Sproat | | X | CI-03-155 |
| 01-0606 | Incredible Motels, Inc., et. al., v. Connecticut Resources Recovery Authority, et. al. | Landfill & Impaired Property | Superior Court at New Britain (Connecticut) | Walter Twachtman and John Grasso; Boscarino, Grasso & Twachtman, Hartford, CT | Kenneth G. Williams; Gordon, Muir, and Foley, Hartford, CT | Boscarino, Grasso, & Twachtman | | X | X03CV01051437 |
| 05-0401 | Washington DOT v. Happy Valley | Eminent Domain | Superior Court of Washington for King County | Mark Lyon, Deputy Attorney General for the State of Washington | Scott Smith and Richard Ross; Riddell Williams, Seattle, WA | Riddell Williams | | X | |
| 02-1201 | Celebrity Cruises Inc. and Fantasia Cruising, Inc., v. Essef Corp., Pac-Fab Inc, and Structural Europe N.V. | Business Value | U.S. District Court, New York, NY | Gregory O'Neill, James Hazen, and Mark Jaffe; Hill Betts, Nash, New York, NY | Renee Plessner & Kenneth Lang; Mound Cotton Wollan & Greengrass, Garden City, NY | Hill Betts Nash | | X | 98 Civ 3135 (JCF) |
| 05-0102 | Koszewski-Jones, Et. al., v. Delphi Corporation | Contaminated Property | Circuit Court for the County of Kent, Michigan | Carole Bos and Bradley Glazier; Bos & Glazier, PLC, Grand Rapids, Mich. | John A. Ferroli; Dykema Gossett, Grand Rapids, Mich. | Bos & Glazier | | X | 04-09808-CE |
| 05-0303 & 05-0304 | Norbut v. Jaeger, et. al. | Geotechnical | Superior Court of Washington for Kitsap County | Eric Johnson, Bainbridge Island, WA; David Bierman, Alexander & Bierman, Seattle, WA | Sally Leighton, Burgess Fitzer, PS, Tacoma, WA; David Bricklin, Bricklin Newman Dold, LLP, Seattle, WA. | Burgess Fitzer and Bricklin, Newman, Dold | X | X | 02-2-02636-4 |
| 04-1202 | Central Puget Sound Regional Transit Authority, dba Sound Transit, v. Carver G. Wilcox, et. al. | Eminent Domain | Superior Court of Washington for King County | Janis White and Larry Smith, Graham & Dunn, PC, Seattle, WA | Catherine Clark, Williams Clark PSC, Kenmore, WA | Williams Clark | | X | 04-2-06106-7 SEA |



Greenfield Advisors

Economic, Market and Valuation Analysis

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 02-1109 | Henry, et. al., v. St. Croix Alumina, LLC, Alcoa, Incl, and Glencore, Ltd | Class Action Contaminated Property | District Court of Virgin Islands, Division of St. Croix | Baron & Budd, Dallas, TX | Lebouaf Lamb, Pittsburgh, PA;, Bernard C. Pattie, Christainsted, VI; Fowler White, Jacksonville, FL; Tairo Tekcsky; Los Angeles, CA | Baron & Budd | | X | 1999/0036 |
| 05-0105 | Kauri Investments Ltd. V. General Insurance Company of America | Contract Dispute | Superior Court of Washington, County of King | Short Cressman & Burgess, PA, Seattle, WA | Byrnes & Keller, Seattle, WA | Short Cressman & Burgess | X | X | 03-2-40223-1 SEA |
| 04-0803 | Kleinberg, et. al., v. Sto, et. al. and Governors Lane Condomunium Association v. Sto, et. al. | Class Certification, Construction Defects | Superior Court of New Jersey, Monmouth County | Berger & Montegue, Philadelphia, PA | Edwards & Angell, LLP, Short Hills, NJ | Berger & Montegue | | X | MON-911-01 |
| 03-0601 | Carter, et. Al. v. Ballard, et. Al | Contaminated property | District Court of Nueces County, TX | Hilliard & Munoz, LLP, Corpus, Christi, TX | Hayes & Boob, LLP, Houston, TX; Harris & Greenwell, LLP, Corpus Christi, TX; Hartline, Dacus, Barger, Dreyer, & Kern, LLP, Corpus Christi, TX; David Sibley, Attorney at Law, Corpus Christi, TX; Fred Dreiling, Attorney at Law, Corpus Christi, TX; Hill & Villarreal, Corpus Christi, TX; Thompson & Knight LLP, Houston, TX. | Hilliard & Munoz | X | X | 03-720-F |
| 04-0901 | Carrara II Condominium Owners Assn. V. Carrara, LLC, et. Al., | Construction Defects | Superior Court of Washington for King County | Goff & DeWall, LLP, Seattle, WA | Tousley, Brain, Stephens, LLC, Seattle, WA; | Goff & DeWall, LLP, Seattle, WA | | X | 03-2-17510-4SEA |
| 03-0202 | Palmisano, et. Al., v. Olin Corporation and Standard Fusee Corporation | Contaminated property | U.S. District Court, Northern District of California | Rapazzini & Graham, San Francisco, CA; Duane Morris, San Francisco, CA | Husch & Eppenberger LLC, St. Louis, MO; Sedgwick, Deter, Moran, & Arnold, San Fransisco, CA; Creech, Liebow, & Kraus, San Jose, CA | Rapazzini & Graham; Duane Morris | X | X | 5:03-CV-01607-RMW |



Greenfield Advisors

Economic, Market and Valuation Analysis

as of August, 2007

TRIAL TESTIMONY, JOHN A. KILPATRICK, Ph.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 04-0703 | Amberly Farms Condominium Owners Association v. J. Scott Homes, Inc., et. Al. | Construction Defects | Superior Court of Washington for King County | Golf & DeWalt, LLP, Seattle, WA | Krilich, LaPorte, West, & Lockner, PS, Tacoma, WA | Golf & DeWalt | | X | 02-2-13001-7 |
| 00-0501 | Guillory v. Union Pacific | Contaminated property & class certification | 14th Judicial District Court, Parish of Calcasieu, State of Louisiana | Sanders, Crockett, & Chism; and Lundy & Davis; Lake Charles, LA | Bergstedt & Mount; Stockwell, Sievert, Viccellio, Clements, & Shaddock; Fraser, Morris, & Wheeler, Lake Charles, LA | Sanders, Crockett & Chism; and Lundy & Davis | X | X | 98-5405 |
| 04-0114 | Henry v. Dow | Class Certification; Contaminated Property | Circuit Court of Saginaw County, Michigan | Stueve Helder Siegel LLP and Spencer, Fane, Britt & Brown, LLP (Kansas City, MO); Trogan & Trogan, PC (Saginaw, MI) | Dickinson Wright PLLC (Detroit, MI); Braun Kendrick Finkbeiner PLC (Saginaw, MI); Beveridge & Diamond PC (Washington, DC); Kirkland & Ellis LLP (Chicago, IL) | Stueve Helder Siegel | | X | 03-047775-NZ |
| 03-0303A | Martinelli v. Dan Paulson Construction, Inc. | Construction Defects | American Arbitration Association, Seattle, WA | Law offices of Robert Gould, Seattle, WA | Greg Jones, Fallon & McKinley, Seattle, WA | Robert Gould | X | X | 75 110 00402 02 VMD |
| 02-1108 | Holdgrafer , et. al. v. Unocal, et. al. | Contaminated Property (Petroleum) | Superior Court of California, San Luis Obispo County | Steve Crandall, Law Offices of Steve Crandall, San Luis Obispo, CA | James Buttery, Andre Morris & Buttery, Santa Maria, CA | Steve Crandall | X | X | CV 10262 |
| 02-0909 | Exit 7 Inc. v. Gemini Construction of Washington, Inc., et. al. | Contaminated Property | Superior Court for the State of Washington in King County. | Kim Johannessen, Johannessen & Associates, Seattle, WA | Keith Moxon, Buck & Gordon, Seattle, WA | Kim Johannessen | X | | 01-2-27639-5 KNT |
| 03-0303 | Martinelli v. Olson Sundberg, et. al. | Construction Defects | Superior Court for the State of Washington in King County. | Law offices of Robert Gould, Seattle, WA | Lane, Powell, Spears, Lubersky, Seattle, WA | Robert Gould | | X | 02-2-05927-1 SEA |
| 03-0301 | In re: W.R. Grace & Co. et. al. | Bankruptcy | U.S. Bankruptcy Court for the Dist. Of Delaware | Lukins & Annis PA (Spokane, WA) and Richardson, Patrick, Westbrook, & Brickman (Charleston, SC | Reed Smith, Pittsburgh, PA | Lukins & Annis PA and Richardson, Patrick, Westbrook, & Brickman | | X | 01-01139 (JKF) |

Greenfield Advisors

Economic, Market
and Valuation Analysts

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 03-0110 | RMB Properties LLC v. Roy Street Development, Inc. | Contract Dispute | Superior Court for the State of Washington for King County | Dennis McGlothin, Barokas, Martin, Tomlinson, Seattle, WA | Vincent Lombardi, Short, Cressman, & Burgess, Seattle, WA | Dennis McGlothin | | X | 02-2-16285-9 |
| 01-0507 | SAD LLC v. Phillips | Contaminated Property (Chemicals) | Superior Court for the State of Washington for King County | David Ashbaugh, Stanislaw Ashbaugh, Seattle, Washington | Randall Thomsen, Danielson Harrigan & Tollefson, Seattle, WA | David Ashbaugh | | X | |
| 02-1107 | Patrick Cooley, et. al, v. Pilchuck Contractors, Inc. | Contaminated Property (Sewerage) | Superior Court for the State of Washington for King County | Ross, Williamson, Loitz, Seattle, WA | Biggs & Young, Seattle, WA | Ross, Williamson, Loitz | X | X | 01-2-28029-5 |
| 02-1106 | Albuquerque Commons v. City of Albuquerque | Eminent Domain | Federal District Court, Albuquerque, NM | Timothy Flynn-Obrien, Bryan & Flynn O'Brien, Albuquerque, NM | Jack Campbell, Campbell & Wells, Albuquerque, NM, & Mark Hirsch, Albuquerque City Attorney | Campbell & Wells | | X | CV-95-06031 |
| 02-1103 | In the Matter of Cingular Wireless | Cell Tower Permit | Snohomish County Hearing Examiner, Everett, WA | Mike Myhre, pro se | Gary Huff, Kar Tuttle Campbell, Seattle, WA | Mike Myhre | X | | N/A |
| 02-0605 | Juanita Griesemer v. Pete Appleton, et. al. | Private Takings | Superior Court for the State of Washington for Pierce County | Sinnitt & Sinnitt, Tacoma, WA | Bullivant Houser Bailey, Seattle, WA | Bullivant Houser Bailey | X | | 01-2-10352-6 |
| 02-0202 | Kurtis R. and Pamela Mayer v. Sto Industries, Inc. | Construction Defects | Superior Court for the State of Washington for Pierce County | J.B. Meade, Gordon Thomas Honeywell, Tacoma, WA | Kenneth Hobbs & Lisa Marchesse, Stafford Frey Cooper, Seattle, WA | J.B. Meade | X | X | 95-2-04168-5 |
| 01-1105 | In the Matter of Lanza | Divorce | Superior Court for the State of Washington for King County | William Kinzel, Kinzel Allen Skone & Searing, Bellevue, WA | Lori Guzzo and Susan Goplen, Betts Patterson Mines, Seattle, WA | Lori Guzzo and Susan Goplen | | X | 01-03-04027-1 SEA |
| 01-1103 | Renaissance Customs, Inc., v. Toni-Junnell Herbert, et. al. | Construction Defects' | Circuit Court for Montgomery County, Maryland | John J. McKenna, Jr., Rockville, MD | Patricia Johnson, Washington, DC | Patricia Johnson | | X | 209478V |



Greenfield
Advisors

*Economic, Market
and Valuation Analysts*

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 01-0502 | BRE/River Shores LLC v. GeoEngineers, Inc., et. al. | Contract Dispute & Contaminated Property | Superior Court of the State of Washington, in and for Pierce County | Valerie Ann Lee, Lee & Associates, Seattle, WA | Guy Bowman, Betts Patterson, Minos, Seattle, WA | Guy Bowman | | X | 00-2-06215-5 |
| 01-0305 | Naness v. Benaroya | Contract Dispute | Binding Arbitration | Deborah Phillips, Perkins Coie, Seattle, WA | Henry Jameson, Jameson, Babbitt, Stiles, & Lombard, Seattle, WA | Henry Jameson | X | X | |
| 01-0304 | Sundquist v. Strom | Contract Dispute | Superior Court of the State of Washington, in and for Snohomish County | Rich Hill, Phillips McCullough, Seattle, WA | Ross Radley, Seattle, WA | Rich Hill | X | | 00-2-07879-9 |
| 01-0207 | Sundance at Klahanie Condominium Owners Association v. Village Homes Ltd., et. al. | Construction Defects | Superior Court of the State of Washington, in and for King County | Anthony Rafel, Williams PS, Seattle, WA | Mark O'Donnell and Gregory Ursich, Preg, O'Donnell, & Gillett, Seattle, WA | Anthony Rafel | | X | 99-2-09506-5 |
| 01-0206 | Sierra at Klahanie Condominium Owners Association v. Sierra, Inc., and Murray Franklyn, Inc. | Construction Defects | Superior Court of the State of Washington, in and for King County | Anthony Rafel, Williams PS, Seattle, WA | Mark O'Donnell and Gregory Ursich, Preg, O'Donnell, & Gillett, Seattle, WA | Anthony Rafel | | X | 99-2-13892-9 |
| 01-0202 | Park Avenue Condominium Homeowners Association v. Buchan Homes | Construction Defects | Superior Court of the State of Washington, in and for King County | Dean Eric Martin, Barker and Martin, Seattle, WA | Stephen M. Todd, Todd and Wakefield, Seattle, WA | Dean Eric Martin | | X | 99-2-20934-6 |
| 00-1204 | Bush, et. al. v. Charoen Pokphand | Contaminated Property (CAFOs) | Superior Court, State of Alabama | Adam Jones, Beasley, Allen, Crow, Methvin, Portis, & Miles, Montgomery, AL | Floyd Gilliland, Nix, Holtsford, Gilliland, Lyons, & Higgins, Montgomery, AL | Adam Jones | | X | |
| 00-1104 | Peter Ciani and Deborah Ciani v. Agra Earth and Environmental | Geotechnical | U.S. District Court, Western District at Seattle | Evan Inslee, Inslee, Best, Doezie, & Ryder, Seattle, WA | Terence Scanlan, Skellenger Bender, Seattle, WA | T. Scanlan | | X | C99-1269Z |



Greenfield
Advisors

*Economic, Market
and Valuation Analysts*

TRIAL TESTIMONY, JOHN A. KILPATRICK, PH.D., GREENFIELD ADVISORS LLC

| Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINER FOR M&A | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 00-0503 | Lawrence C. Mendoza, et. Al. v. Toll Brothers, Inc., et. Al. | Construction Defects | Circuit Court for Fairfax County, Virginia | Peter Grenier and Marc Pasekoff, Bode and Beckman, Washington, DC | Michael McManus, Drinker, Biddle, & Heath, Washington, DC | Marc Pasekoff | | X | 184846 |
| 00-0207 | Andrews, Et. al. v. Kerr McGee, et. al. | Contaminated Property (Creosote) | U.S. District Court, N. Dist. Of Mississippi | Hunter Lundy, Lundy and Davis, Lake Charles, LA | J. Gordon Flowers, Gholson Hicks & Nichols, Columbus, MS | Hunter Lundy | | X | 1:00CV158-D-A |
| 00-0101 | Keaton's Landing v. Metco Homes | Condominium Construction Defects | Superior Court for the State of Washington for Snohomish County | Stellman Keehnel, Foster Pepper Shefelman, Seattle, WA | John Evans, Williams Kastner & Gibbs, Seattle, WA | Stellman Keehnel | | X | 98-2-04491-6 |
| 99-806 | Florida Dept. of Transportation v. Phil Smith Toyota | Condemnation | Florida Condemnation Court | Florida DOT attorneys | Allan Rubin, Shutts & Bowen, Ft. Lauderdale, FL | Allan Rubin | X | | 86110-2510 |
| 99-305 | Alice Andahl and Victor and Nancy Chynoweth v. Rick Mezich and Mary Mezich and the City of Edmonds | Geotechnical | Superior Court for the State of Washington for the County of Snohomish | Marc McPherson & Michael Wampold, Hillis Clark Martin & Peterson, Seattle, WA | John Wiegenstein, Heller & Wiegenstein; Steven J. Jager & Christopher Clemenson, Lee Smart Cook Martin & Patterson, Everelty, WA | John Weigenstein | X | X | 98-2-00489-2 |
| 99-303 | City of Vancouver v. Clark County Board of Equalization and Kerry and Ted Gilbert | Inverse Condemnation | WA State Board of Equalization | Brent Boger, City Attorney, City of Vancouver | A. W. Mackie, Owens Davies Mackie, Olympia, WA | A. W. Mackie | X | X | No. 98-72 through 98-75 |
| 99-0206 | Future Shop v. Blume | Contract Dispute | Binding Arbitration | Spencer Hall, Hall Zanzig Widell, Seattle, WA | Henry Jameson, Jameson, Babbitt, Stites, & Lombard, Seattle, WA | Spencer Hall | X | | |
| 98-1204 | Martuscelli v. Lund | Contaminated Property (Chemicals) | Superior Court of the State of Washington in and for the County of Walla Walla | James Dodge, Foreman and Arch, Wenatchee, WA | | James Dodge | | X | 97-2-00694-6 |

Greenfield Advisors

Economic, Market and Valuation Analysts

SUITE 650, 2601 4TH AVENUE
SEATTLE, WASHINGTON 98109
PHONE 206-623-2935   FAX 206-623-2985
HTTP://WWW.GREENFIELDADVISORS.COM



Economic, Market
and Valuation Analysts

## JOHN A. KILPATRICK, Ph.D. MRICS
## PROFESSIONAL QUALIFICATIONS

John Kilpatrick is the President and Managing Member of Greenfield Advisors, formerly Mundy Associates, and has over 25 years experience in real estate and business development, statistical and financial analysis, consulting, teaching, and corporate finance, including:

- The Shumaker Company (1978-1981 and 1984-1987) Controller of a large-scale residential subdivision development, homebuilding, and brokerage company.

- Dean Witter Reynolds (now Dean Witter Morgan Stanley, 1981-1984), Account Executive and S.C. Municipal Bond Coordinator

- Kilpatrick and Associates Realty (1987-1990) Broker-in-Charge, and Vice President of Sand Creek Development Company

- University of South Carolina: Lecturer in Real Estate (1992-1998), Researcher in the Center for Applied Real Estate (1997-1998), Administrator of the South Carolina Supercomputer Network (1994-1996), Project Coordinator of the Washington, DC, based Academic Coalition for Intelligent Manufacturing Systems (1994-1995), Assistant to the Senior Vice President for Research (1990-1994).

- Kilpatrick Research Group (1994-1998) Principal, conducting economic, financial, and market analyses for governments and private firms in the Southeast.

- Greenfield Advisors LLC (1998-Present) President and Managing Member

He has published extensively, including *Financing Development and Construction in the 90's* and *Understanding Home Construction*, both published by the National Assn. of Homebuilders, and *Subdivision Development*, published by the National Assn. of Realtors. His recent invited presentations include members of the U.S. Senate (on advanced manufacturing R&D), the American Real Estate Society, the annual Applied Geography Conference of the American Assn. of Geographers, Southeastern Builders Conference, American Real Estate and Urban Economics Assn., National Trust for Historic Preservation, National Assn. of Homebuilders annual Executive Officers Conference, and the Georgia Trust for Historic Preservation. He served on the *Housing 2000 Task Force* for the S.C. Housing Finance and Development Authority. He is presently the editor of *Greenfield Report*, a semi-monthly internet-based newsletter covering current economic, financial, and legal topics, and is a peer-reviewer for the journal *Real Estate Economics*. In 2003, his industry peers in Western Washington honored him by naming him Editor of the semi-annual Central Puget Sound Real Estate Research Report.

His consulting and academic research activities included work for and funded by the National Science Foundation, the US Dept's of Energy, Interior, Defense, and Commerce, Oak Ridge National Lab, Southeastern Universities Research Association, Oak Ridge Associated Universities, SC Budget and Control Board, SC Department of Archives and History, SC Downtown Development Association, SC Housing Finance and Development Authority, and many city and county governments and private corporations. His work in real estate has recently been featured in *The Wall Street Journal*, the *Boston Globe*, *The New York Times*, and other national publications. Among his recent professional honors, in 1999-2000, Kilpatrick served on the Working Group of the Data Consortium, formed and financed by major national real estate organizations to set the agenda for information in that industry in the 21st Century. In 2000, the State of South Carolina and the U.S. Department of the Interior published a monograph honoring his research in real estate values. In 2002, following the terrorist attacks on the World Trade Center, Kilpatrick was named as a consulting expert for Bloomberg Network News on real estate issues. In 2003, he was named a Professional Member of the International Code Council, which oversees the development of building codes in the United States, and became a Fellow of the American Real Estate Society. In 2004, Dr. Kilpatrick was elected to be a Member of the Faculty on Valuation of the Royal Institution of Chartered Surveyors (MRICS). Also, in 2004, Dr. Kilpatrick was designated by the Appraisal Qualifications Board in Washington, DC, as a Nationally Certified Instructor for the Uniform Standards of Professional Appraisal Practice. Dr. Kilpatrick is featured in the 2006 and later editions of *Who's Who in America*.

John Kilpatrick has been qualified as an expert witness on real estate, economics, finance, construction matters, and statistical research in various state and federal courts throughout the United States.

*John A. Kilpatrick, Ph.D., MRICS*

## EDUCATION

Bachelor of Science in Business Administration (Accounting)
University of South Carolina

Master of Business Administration
University of South Carolina

Doctor of Philosophy, Finance (Real Estate)
University of South Carolina
Dissertation: *Agency Costs and the Determinants of the Capital Structure of REITs*

## HONORS AND AWARDS

Visiting Scholar in Real Estate, Zicklin School of Business, Baruch College, New York (2007-)
*Who's Who in American Business and Finance (2007-)*
*Who's Who in America* (2006-)
Editorial Board, *Brownfield News* (2005-2006)
Principal Member, Real Estate Counseling Group of America (2004-)
    Education Chairman (2005-)
Nationally Certified Instructor, Uniform Standards of Professional Appraisal Practice, designated by the
    Appraisal Qualifications Board, Washington, DC (2004-)
Member, Royal Institution of Chartered Surveyors, Faculty of Valuation (2004-)
Fellow, American Real Estate Society (2003-)
Professional Member, International Code Council (2003-)
American Real Estate and Urban Economics Association 1994 Doctoral Seminar Honoree (1993)
Omicron Delta Epsilon Economics Honor Society (1993)
Graduate Scholar, The Appraisal Institute (1992-1993)
Arthur Warner Scholar, The S.C. Association of Realtors (1991-1992)
National University Scholar, Commercial Investment Real Estate Council of the National Association of
    Realtors (1990-1991)
*Who's Who in the South and Southwest* (1984 - 1991 editions)
*Who's Who Among Students in American Universities and Colleges* (1976 edition)
Omicron Delta Kappa Leadership Honor Society (1975)

## RECENT PUBLICATIONS AND WORKING PAPERS

*Central Puget Sound Real Estate Research Report* (Editor), published semi-annually by the Central
    Puget Sound Real Estate Research Committee, Inc., 2003-

"Foreign Direct Real Estate Investment in the U.S. – Opportunities and Cautions", presented at the
    annual meetings of the Asian Real Estate Society, Macao, China, July, 2007

"Economic Feasibility – the Challenge for Eminent Domain Appraisers under *Lucas*", working paper in
    progress

"Real Estate Investments of the Rich and Famous", *Journal of Wealth Management,* Spring, 2007

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT PUBLICATIONS (continued)

"When is a Taking 'Fair'?, a Repeat Sales Analysis", presented at the American Real Estate Society annual meetings, April, 2007; presented at the Eminent Domain Institute annual meeting, April, 2007

"Valuing Multiple Contemporaneous Events: The Case of the Murphy Oil Spill", presented to the American Real Estate Society annual meetings, April, 2007

"Real Estate and the Nash Equilibrium", working paper in progress

"Valuation of Brownfield Properties", Chapter 29 in *Brownfield Law and Practice*, LexisNexis Matthew Bender Publications, 2007.

"Valuation of Impaired Property" with Ron Throupe, Bill Mundy, and Will Spiess, Chapter 6 in *When Bad Things Happen to Good Property*, Robert Simon, ed., (Washington, DC: National Environmental Law Center, 2006)

"Highlights from 'Valuation of Brownfield Properties'", American Bar Association's *Section on Environmental Transactions and Brownfields Newsletter*, November, 2006

"The Aftermath of Katrina – Recommendations for Real Estate Research", with Sofia Dermisi, *Journal of Real Estate Literature*, 15-2, Spring, 2007

"Non-Parametric Methods and the Appraisal Process", working paper in progress.

"Stigma Revisited Again", working paper in progress with, Max Kummerow, presented at the American Real Estate Society annual meetings, Key West, Fl, April, 2006

"The Impact of Transit Corridors on Residential Property Values", with Ron Throupe, John Carruthers, and Andy Krause, *Journal of Real Estate Research*, Spring, 2007

"Application of Repeat Sales Analysis to Determine the Impact of a Contamination Event", Jo*urnal of Housing Research.* Fall, 2006

'Redevelopment Brings Developers, Conservationists Together", with Nina Marshtein, *Charleston (SC) Business Journal*, March 2, 2006

"5 mega-trends for Puget Sound Real Estate", *Daily Journal of Commerce* (Seattle, WA), October 6, 2005

"Brownfields Let Texans Do Well While Doing Good," with David I. Mayes, *Dallas Business Journal*, 28 October 2005

"Find Creative New Ways to Develop Land in Tampa Bay", with Mark Tumlin, *Tampa Bay Business Journal,* July 25, 2005

"Creative New Ways to Find Land to Develop", with Brad Anderer, *Arizona Journal of Business and Real Estate*, April 15, 2005

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT PUBLICATIONS (continued)

"Multiple Regression Models and Diminishing Marginal Returns in Land Values", with John I. Carruthers, working paper in progress.  Presented at the American Real Estate Society annual meetings, April, 2005

"Geotechnical Problems and Property Values:  Market Evidence from the Pacific Northwest", working paper in progress

"Agency Costs and REIT Debt Announcements", with Ronald C. Rogers, working paper in progress (presented at the American Real Estate Society meetings in 2004)

"Appraising Real Estate in Complex Environmental Class Actions:  An Expert's View", *Toxic Law Reporter*, January 13, 2005

"Where Will Our Children Live?  Adaptive Re-Use of Brownfields", with Joseph Kesling, *Puget Sound Business Journal*, December, 2004

"Real Estate Issues in Class Certification", *Class Action Litigation Report,* October 8, 2004

"Terrorism Impacts on the Value of Major Downtown Office Buildings", Mundy Associates LLC working paper series.

"Agency Costs and REIT IPO's", working paper in progress, with Ronald. C. Rogers, presented at the American Real Estate and Urban Economics Association meetings in January, 2004.

"Agency Costs and REIT Mergers", working paper in progress

"Windfall Lien Guidance", *Newsletter of the Environmental Transactions and Brownfields Committee*, American Bar Association Section on Energy, Natural Resources, and the Environment, January, 2004.

"Looking Backward and Forward:  Economic Restructuring and United States Real Estate Markets," *Real Estate Issues*, Fall, 2003, with John Carruthers, Bill Mundy, and Ron Throupe.

"Appraisal of Contaminated Real Estate in the United States", prepared by invitation of and for publication in the *Journal of the Japan Real Estate Institute*, October, 2003 (with Bill Mundy)

"Construction Defects and Stigma", *Mealey's Construction Defects*, July, 2003

"*Daubert* Raises Its Ugly Head Again", *In-House Counsel Committee Newsletter*, American Bar Association, February, 2003

"Concentrated Animal Feeding Operations and Proximate Property Values" *Appraisal Journal,* July, 2001

"The Future of Real Estate Information", *Real Estate Issues,* Spring, 2001

"Valuation Implications of EIFS", *Mealey's Construction Defects,* January, 2001

"Factors Influencing CBD Land Prices", *Real Estate Issues*, Fall, 2000, co-authored with Bill Mundy

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT PUBLICATIONS (continued)

"Lead Contamination Impact on Property Values Significant," *Real Estate Environmental Liability News*, March, 2000.

*The Economic Impact of Historic Designation* (monograph reviewing research done over several years, published by the S.C. Department of Archives and History, January, 2000)

"Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc.", *Real Estate Issues*, Fall, 1999, co-authored with Bill Mundy and Dave McLean

"Valuing Brownfields," *Valuation Insights and Perspectives*, February 1999, co-authored with Bill Mundy and Dave McLean.

"Performance of Exterior Insulation Finish Systems," co-authored with Douglas C. Brown and Ronald C. Rogers, *Appraisal Journal* January 1999

*The Economic Impact of Local Preservation Ordinances on Small Towns in South Carolina* (1998) research monograph funded by the South Carolina Downtown Development Association and the U.S. Department of the Interior - National Park Service

*House Price Impacts of School District Choice* (1998), research monograph funded by the South Carolina Center for Applied Real Estate Education and Research, with Frank J. Hefner.

*CAREER News* (semi-annual publication of the USC Center for Applied Real Estate Education and Research), John A. Kilpatrick, editor, 1997-1998

"Appraisal of Contaminated Properties," *CAREER News*, August, 1998.

"Real Estate Law Means Major Changes," *Business and Economic Review*, April-June, 1998.

"Economic Value Added for Real Estate," *CAREER News*, February, 1998.

*Subdivision Development* (Chicago: Realtors Land Institute of the National Association of Realtors, 1998), John A. Kilpatrick, editor.

"Historic Designation and House Prices," *CAREER News*, August, 1997.

The Five Critical C's of Credit," *Florida Home Builder Monthly*, May, 1997.

"Managing the Shrinking Margins," *Florida Homebuilder*, April, 1997.

*The Impact of Historic District Designation in Beaufort, South Carolina* (1997) research monograph funded by the Historic Beaufort Foundation, the S.C. Dept. of Archives and History, and the U.S. Department of the Interior - National Park Service

*The Economic Impact of Local Preservation Ordinances in Greenville, South Carolina* (1997) research monograph funded by the Historic Greenville Foundation, the City of Greenville, South Carolina, the S.C. Dept. of Archives and History, and the U.S. Department of the Interior - National Park Service.

*Analysis of the Columbia Owens Downtown Airport Commercial Corridor* (1996) research monograph funded by the South Columbia Development Corp. and the City of Columbia.

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT PUBLICATIONS (continued)

"Impact of Historic District Designation on House Prices in Columbia, South Carolina," (1995) research monograph prepared for the S.C. Dept. of Archives & History.

*Understanding Home Construction*, (Washington, DC: Homebuilder Press, 1993). ***Honorable Mention, 1993 Washington, DC, EdPress Association Awards*** and ***Top Honors, 1994, Society for Technical Communications Awards.***

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," (1992) *Papers and Proceedings of Applied Geography Conferences* Volume 15, J. Frazier, B. Epstein, and F. Schoolmaster, editors.

"Development and Construction Financing: Where Do We Go From Here?" *Maryland Builder*, Baltimore, Md., February, 1992.

*Sample Letters and Memos*, (Washington, DC: Homebuilder Press, 1992).

*Financing Development and Construction in the Nineties*, (Washington, DC: Homebuilder Press, 1991).

## RECENT INVITED TALKS

*In addition to the invited talks listed below, John Kilpatrick is a frequent guest speaker at civic clubs and events throughout the U.S.*

"Investing in Real Estate", Integrated Wealth Management Conference, sponsored by Institutional Investor magazine, schedule for September 12, 2007

"Dollars and Sense of Real Estate Investments", Chair of Continuing Education Program, Seattle, Washington, June, 2007. Presentations: "What's Working and What's Not" and "The Future of Real Estate Financing"

"Land Valuation", session chair, Asian Real Estate Society Annual Meetings, Macao, China, July, 2007

"Foreign Real Estate Investment in the U.S.: Pitfalls and Opportunities", Asian Real Estate Society annual meetings, Macao, China, July, 2007

"When is a Taking Fair?", Eminent Domain Institute, Las Vegas, April, 2007

"Real Estate Investments of the Rich and Famous", American Real Estate Society annual meetings, San Francisco, April, 2007

"Consistency and Bias in Eminent Domain Appraisals", American Real Estate Society annual meetings, San Francisco, April, 2007

"Real Estate Investments of the Rich and Famous", American Real Estate Society annual meetings, San Francisco, April, 2007

"Scope of Work Updates to the 2006 Uniform Standards of Professional Appraisal Practice, presented to the Real Estate Counseling Group of America, Philadelphia, PA, October, 2006

"Valuation of Contaminated Property in the United States", seminar presented to the faculty and students of the University of Endhoven, the Netherlands, June, 2006

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT INVITED TALKS (continued)

"Stigma Revisited Again", working paper in progress with, Max Kummerow, presented at the American Real Estate Society annual meetings, Key West, Fl, April, 2006

"Application of a Repeat Sales Methodology to Evaluate Property Value Damages from Contamination", presented at the American Real Estate Society annual meetings, Key West, Fl, April, 2006, acceped for publication in the *Journal of Housing Research*.

"The Impact of Transit Corridors on Residential Property Values", with Ron Throupe, John Carruthers, and Andy Krause, presented at the American Real Estate Society annual meetings, Key West, Fl, April, 2006, accepted for publication in the *Journal of Real Estate Research*

"Real Estate Investing", Seattle Society of Chartered Financial Analysts, December 14, 2005

"Valuation", Session Chair for the American Real Estate Society meetings, Santa Fe, NM, April, 2005

"History of Valuation" Panelist for the American Real Estate Society meetings, Santa Fe, NM, April, 2005

"Regression Analysis and Diminishing Marginal Returns -- An Appraisal Case Study" by (with John Carruthers), accepted for presentation at the 2005 Annual Meeting of the American Real Estate Society, Santa Fe, NM, April, 2005

"The USPAP Scope of Work Proposal", presented to the Real Estate Counseling Group of America, Savannah, Georgia, March, 2005

"Valuation of Brownfields", presentation to officials of the City of Greensboro, NC, January, 2005

"Trophy Property", presentation at the annual meetings of the American Society of Auctioneers, Madison, Wisconsin, July, 2004

"Environmental Valuation Issues", Session Chair for the American Real Estate Society meetings, Captiva Island, Florida, April, 2004.

"Agency Costs and REIT Debt Announcements", presented at the American Real Estate Society meetings, Captiva Island, Florida, April, 2004.

"The Future of Real Estate", presented at the invitation of the Real Estate Counseling Group of America, Half Moon Bay, California, March, 2004.

"Property Tax Appraisal", presented at a seminar in Tacoma, Washington, February, 2004

"Agency Costs and REIT IPOs", presented at the invitation of the American Real Estate and Urban Economics Association, San Diego, California, January, 2004

"Updates on the EPA's New Windfall Lien Provisions" presented at the invitation of the U.S. EPA at the Brownfields Conference, Portland, Oregon, October 29, 2003.

"Updates on the EPA's New Windfall Lien Provisions" presented in a nationwide teleconference sponsored by the American Bar Association's Section on Energy, Environment, and Natural Resources, August 20, 2003.

## RECENT INVITED TALKS (continued)

"Can a Tribal Utility Pay for Itself", presented at the Tribal Utilities Conference, Seattle, Washington, June 9 & 10, 2003

"Financing Residential Development", Master Builders Association of Olympia, April, 2003

"Agency Costs and REIT Mergers", American Real Estate Society annual meetings, Monterrey, California, April, 2003

"Economics of Brownfield Redevelopment", presented at the Advanced Brownfields Redevelopment Workshop, Anchorage, Alaska, January 27, 2003

"Appraisal of Contaminated Property," International Association of Assessing Officials, West Puget Sound Chapter, Olympia, WA, April 26, 2002.

"Market Value(s)", presented to the Seattle Chapter of the Appraisal Institute, Seattle, Washington, November, 2001

"Loss Profits and Damages from an Economist's Point of View" presented at the Washington State CPA's Association Litigation Services Seminar, May 4, 2001

"Appraisal of EIFS Residences" presented at a Symposium on emerging litigation areas sponsored by Mealy Publications, Marina del Mar, CA, November, 2000.

"The Puget Sound Economy", guest speaker for KIRO-TV (Seattle CBS affiliate) at client breakfast, September 21, 2000.

"Public Interest Value", presented at the conference Valuation 2000, jointly sponsored by the Appraisal Institute, the American Society of Appraisers, and the American Farm Managers and Rural Appraisers, Las Vegas, NV, July 6-7, 2000

"An Economic Model of Downtown Seattle Land Prices", presented to the Pacific Northwest Regional Economic Conference, Western Washington U., April, 2000

"Deposing the Real Estate Expert Witness", presented to participants in the Trial Advocacy classes, U. of Washington School of Law, March, 2000.

"Economic Impact of Real Estate Development" presented to the Seattle Economists Club, December, 1999.

"Appraisal of Contaminated Property," presented to the International Association of Assessing Officials, Evergreen Chapter, Woodenville, WA, November 1999.

"Appraisal of EIFS Residences," presented at a Symposium on EIFS sponsored by U.S. Inspect, Washington, DC, June, 1999.

"House Price Implications of School District Choice" presented at the American Real Estate and Urban Economics Association, New York City, January 1999.

"Economic Impact Studies for Homebuilding" presented to the National Assn. of Homebuilders annual Governmental Affairs, St. Louis, Missouri, November 7, 1998.

"Economic Assessment of Historic Properties" presented to the 52nd annual Preservation Conference, National Trust for Historic Preservation, Savannah, Georgia, Oct. 23, 1998.

*John A. Kilpatrick, Ph.D., MRICS*

## RECENT INVITED TALKS (continued)

"Current Topics in Financial Management for Homebuilders and Developers," presented to the South Eastern Builders Conference, Orlando, Florida, August 17, 1998.

"Valuation of Contaminated Property," presented to the Quarterly Meeting of the South Carolina Appraisal Institute, Columbia, South Carolina, July 23, 1998.

Panel discussion on Land Use, Regulation, and House Prices, presented at the American Real Estate and Urban Economics Association Mid-Year Meeting, held at the National Association of Homebuilders, Washington, DC, May 26, 1998.

"Accounting and Financial Management for Homebuilders," presented to the Southeastern Builders Conference, Orlando, Florida, July, 1997

"Impact of Historic District Designation in Beaufort, South Carolina," presented to the American Real Estate Society, Sarasota, Florida, April, 1997

"The Value of History to Real Estate" presented to the Lovable Communities Conference sponsored by the South Carolina Downtown Development Association, Charleston, South Carolina, October, 1996

"Valuation of Historic Residences" presented to Appraisal Institute members, Savannah, Georgia, May, 1996

"House Price Implications of Historic District Designation" presented to the American Real Estate Society, Lake Tahoe, CA, March 29, 1996

"Economics of Historic Districts" presented to the Georgia Trust for Historic Preservation, Atlanta, GA, February 16, 1996

"Accounting and Financial Management for Homebuilders," presented to the South Eastern Builders Conference, Orlando, Florida, July, 1995

Panel chair, "Appraisal of Historic Properties," presented at "Historic Preservation for Realtors," sponsored by the S. C. Department of Archives and History, Columbia, S.C. January 13, 1995

Presentation on Advanced Manufacturing Capabilities made to members of the U.S. Senate, Washington, DC, July, 1993.

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," presented at the Applied Geography Conference, Denton, TX, October 20, 1992.

## TEACHING

From 1992-1998, John Kilpatrick taught real estate and corporate finance in the Moore School of Business at the University of South Carolina. Courses developed and taught included:

- Principles of Real Estate (FINA 366 - certified as a pre-licensing course by the S.C. Real Estate Commission)
- Real Estate Market Analysis (FINA 367 - certified as a pre-licensing course by the S.C. Real Estate Commission)
- Principles of Finance (FINA 363 - required of all undergraduate business majors)
- Commercial and Central Banking (ECON 301)

John Kilpatrick's students won many of USC's top undergraduate Business scholarships, and his courses were consistently oversubscribed months in advance. Additionally, John Kilpatrick was a featured speaker for the Daniel Management Center of the University of South Carolina, teaching Executive Education courses on Real Estate (1995-96) and Corporate Budgeting (1997-98). He was the first person in South Carolina certified by the Real Estate Commission to teach continuing education courses via statewide closed circuit broadcast. As a Lecturer in Finance, Kilpatrick has taught Appraisal or Real Estate Continuing Education in South Carolina (1995 - 1998), Georgia (1996), Florida (1995-1998), and Washington (1999-pres), and has recently taught appraisal continuing education for the Seattle chapter of the Appraisal Institute, Bellevue College, and various chapters of the International Association of Assessing Officials. Dr. Kilpatrick is a frequent lecturer on Real Estate Appraisal Standards and Methods, and in 2004 was appointed by the Appraisal Standards Board (Washington, DC) as a Nationally Certified instructor of the Uniform Standards of Professional Appraisal Practice, and occasionally teaches the pre-licensing course for Bellevue College, Bellevue, Washington. Also, in 2004, he was nominated for a seat on the Appraisal Qualifications Board. Dr. Kilpatrick currently serves on the Advisory Board for the Finance Department at Washington State University and as a Visiting Scholar in Real Estate at the Zichlin School of Business, Baruch College, New York City, NY.

### PROFESSIONAL ASSOCIATIONS

John Kilpatrick is an active member of various academic and professional organizations, including the Royal Institution of Chartered Surveyors (Member, Faculty of Valuation), the Appraisal Institute (Associate Member), the American Bar Association (Associate Member), the American Real Estate Society (Fellow), the American Real Estate and Urban Economics Association, the Financial Management Association, the American Finance Association, the American Statistical Association, the Econometric Society, the International Right of Way Association, the International Association of Assessing Officials, the International Code Council (Professional Member) and the Washington State Bar Association (Associate Member). Dr. Kilpatrick serves on the Publications Review Board of the Appraisal Institute and as a reviewer for the journal *Real Estate Economics*, published by the American Real Estate and Urban Economics Association.

*John A. Kilpatrick, Ph.D., MRICS*

## CURRENT APPRAISAL LICENSING (Certified General)

John A. Kilpatrick is a Certified General appraiser in numerous states and the U.S. Virgin Islands, plus holds temporary practice permits as needed. He is an approved Right-of-Way Appraiser for the Washington Department of Transportation and various other jurisdictions. Dr. Kilpatrick is designated by the Appraisal Qualifications Board (Washington, DC) as a Nationally Certified Instructor of the Uniform Standards of Professional Appraisal Practice.