# **EXHIBIT 3**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO         MAG. WILKINSON


(V O L U M E   I)


        Deposition of JOHN A. KILPATRICK,

PH.D., MRICS, given in both the levees and MRGO

cases, at the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on August 13th, 2007.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

---

**Page 2**

1  APPEARANCES:
2  REPRESENTING ORLEANS LEVEE DISTRICT:
3     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
4     MAXWELL & MCDANIEL
5     (BY:  THOMAS ANZELMO, ESQUIRE)
6     3445 N. Causeway Boulevard, Suite 800
7     Metairie, Louisiana 70002
8     504-831-0946
9
10  REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11     JONES DAY.
12     (BY:  WILLIAM E. MARPLE, ESQUIRE)
13     (BY:  JEROME R. DOAK, ESQUIRE)
14     2727 North Harwood Street
15     Dallas, Texas 75201
16     214-220-3939
17
18  REPRESENTING THE PARISH OF JEFFERSON:
19     BURGLASS & TANKERSLEY
20     (BY:  MONICA M. WALDRON-BURGLASS,
21     ESQUIRE)
22     5213 Airline Drive
23     Metairie, Louisiana 70001
24     504-836-2220
25

---

**Page 3**

1  REPRESENTING THE PLAINTIFFS:
2     GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
3     WARSHAUER, L.L.C.
4     (BY:  GERALD E. MEUNIER, ESQUIRE)
5     2800 Energy Centre
6     1100 Poydras Street
7     New Orleans, Louisiana 70163-2800
8     504-522-2304
9     - and -
10
11     LAW OFFICE OF DANIEL E. BECNEL, JR.
12     (BY:  DANIEL E. BECNEL, JR., ESQUIRE)
13     425 W. Airline Highway, Suite B
14     LaPlace, Louisiana 70068
15     985-651-6101
16     - and -
17
18     LAW OFFICE OF RONALD G. PENTON
19     (BY:  RONALD G. PENTON, ESQUIRE)
20     209 Hoppen Place
21     Bogalusa, Louisiana 70427
22     985-732-5651
23     - and -
24
25

---

**Page 4**

1     RANIER, GAYLE & ELLIOTT, L.L.C.
2     (BY:  DREW RANIER, ESQUIRE)
3     (BY:  ANDREW P. HILL, ESQUIRE)
4     1419 Ryan Street
5     Lake Charles, Louisiana 70601
6     337-494-7171
7
8  REPRESENTING BOARD OF COMMISSIONERS FOR THE
9  EAST JEFFERSON LEVEE DISTRICT:
10     DUPLASS, ZWAIN, BOURGEOIS, MORTON,
11     PFISTER & WEINSTOCK
12     (BY:  JOSEPH E. BEARDEN, III, ESQUIRE)
13     Three Lakeway Center, 29th Floor
14     3838 N. Causeway Boulevard
15     Metairie, Louisiana 70002
16     504-832-3700
17
18  REPRESENTING SEWERAGE & WATER BOARD OF NEW
19  ORLEANS:
20     CHRISTOVICH & KEARNEY, L.L.P.
21     (BY:  WARREN J. GARDNER, JR., ESQUIRE)
22     (BY:  H. CARTER MARSHALL, ESQUIRE)
23     601 Poydras Street, Suite 2300
24     New Orleans, Louisiana 70130
25     504-561-5700

---

**Page 5**

1  REPRESENTING EAST JEFFERSON LEVEE DISTRICT AND
2  LAKE BORGNE LEVEE DISTRICT:
3     DUPLASS, ZWAIN, BOURGEOIS, MORTON,
4     PFISTER & WEINSTOCK
5     (BY:  GARY M. ZWAIN, ESQUIRE)
6     Three Lakeway Center, 29th Floor
7     3838 N. Causeway Boulevard
8     Metairie, Louisiana 70002
9     504-832-3700
10
11  ALSO PRESENT:
12     RICHARD RODDEWIG
13     KERRY VANDELL
14     GREG RIGAMER
15
16  ATTENDING VIA INTERNET:
17     MARGARET LYLE
18     JAMES ROY
19     KIRK AURANDT
20     DREW RANIER
21
22  VIDEOGRAPHER:
23     TODD MEAUX (DEPO-VUE)
24
25

---

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 6

1    E X A M I N A T I O N   I N D E X
2
3    EXAMINATION BY:                  PAGE
4
5    MR. ZWAIN   ...........................   8
6    E X H I B I T   I N D E X
7
8    EXHIBIT NO.              PAGE
9    Exhibit Kilpatrick 1 ....................   11
10   Exhibit Kilpatrick 2 ....................   11
11   Exhibit Kilpatrick 3 ....................   63
12   Exhibit Kilpatrick 4 ....................  121
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1         S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Federal Rules of Civil Procedure, in accordance
7    with law, pursuant to notice;
8         That all formalities, save reading
9    and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11        That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18             * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.

Page 8

1         JOHN A. KILPATRICK, PH.D., MRICS
2    2601 Fourth Avenue, Suite 650, Seattle,
3    Washington 98121, a witness named in the above
4    stipulation, having been first duly sworn, was
5    examined and testified on his oath as follows:
6    EXAMINATION BY MR. ZWAIN:
7         Q.  Dr. Kilpatrick, my name is Gary Zwain.
8    I represent East Jefferson Levee District and
9    the Lake Borgne Levee District.
10        How are you?
11        A.  I'm fine.  Thank you.
12        Q.  Good.  I appreciate your coming to New
13   Orleans and agreeing to submit yourself to this
14   deposition.  You've given depositions before,
15   because I know, I've read them, so you know
16   what the ground rules are.
17        A.  Yes.
18        Q.  All right.  If I ask you a question
19   that you don't understand, ask me the rephrase
20   or repeat and I'll be happy to do that;
21   otherwise, if you answer the question I'm going
22   to have to assume that you've understood it.
23        Fair enough?
24        A.  Fair enough.
25        Q.  All right.  Also, you've written a

Page 9

1    report in this case, or in these cases, I
2    should say, that deals with both MRGO and
3    levee, the MRGO case and the levee case all in
4    one report.
5         Am I understanding that correctly?
6         A.  Yes.
7         Q.  All right.  So can we have an
8    agreement that if I ask you a question, unless
9    I refer specifically to the levee case or to
10   the MRGO case that the question will pertain to
11   both cases?
12        A.  That's fine.
13        Q.  And if you answer the question without
14   making specific reference to the MRGO case or
15   to the levee case, your answer will be deemed
16   to pertain to both cases.  Fair enough?
17        A.  Yes.
18        Q.  Would you state your full name for the
19   record, please.
20        A.  John Aaron Kilpatrick.
21        Q.  And your address?
22        A.  My business address or home address?
23        Q.  Your business address.
24        A.  Care of Greenfield Advisors, L.L.C.
25   Suite 650, 2601 Fourth Avenue, Seattle

JOHN KILPATRICK (LEVEE VOL I)                                      8/13/2007

Page 10

1  Washington 98121.
2    Q.  These depositions are being noticed in
3  connection with the MRGO case and with what's
4  called the levee case, and I'd like to know --
5  I'm going to show you copies of each and ask if
6  you have seen them before.  (Tendering.)
7    A.  I've seen one or the other.  I think
8  I've seen the Notice of Videotape Deposition.
9  I don't recall seeing the Renotice of Videotape
10  Deposition.
11    Q.  All right.  In looking at the Renotice
12  of Deposition for the MRGO case and for the
13  levee case, I realize that you looked through
14  it quickly, did you notice any substantial
15  differences between the renotice and the
16  original notice?
17    A.  I didn't read that carefully.
18    Q.  I think the renotice, the difference
19  between the re notice and the original notice
20  was with respect to changing the date from
21  July 13th to August 13th.  It was a typo, I
22  think, from the original notice.  Other than
23  that, the notices are the same.
24    MR.MEUNIER:
25      Including the exhibits.

Page 11

1    MR. ZWAIN:
2      Including the Exhibit A, yes.
3      And I'm going to mark for
4  identification the Renotice of
5  Videotape Deposition for the levee
6  case as Exhibit Kilpatrick 1, and for
7  the MRGO case as Exhibit 2.
8    MR. BECNEL:
9      You're going to ask that those
10  be attached to the depo.
11    MR. ZWAIN:
12      Yes, sir.
13    (Exhibit Kilpatrick 1 was marked for
14  identification and is attached hereto.)
15    (Exhibit Kilpatrick 2 was marked for
16  identification and is attached hereto.)
17  EXAMINATION BY MR. ZWAIN:
18    Q.  Now, if you would, Dr. Kilpatrick,
19  would you turn to Exhibit A on either of the
20  notices you care to.
21      Have you been presented with that
22  exhibit prior to today?
23    A.  Yes.
24    Q.  When was the first time you saw it?
25    A.  I believe Thursday afternoon.

Page 12

1    Q.  And how did you get it?
2    A.  I believe it was either faxed or
3  E-mailed.  I'm pretty sure faxed to us.
4    Q.  Thursday afternoon, August 9th?
5    A.  I believe that's correct.
6    Q.  And were you asked to make a search of
7  the materials at your disposal, in your
8  possession or under your control to determine
9  whether or not any of those materials were
10  responsive to any of the items requested in
11  Exhibit A?
12    A.  Yes.
13    Q.  Did you make such a search?
14    A.  Yes.
15    Q.  Have you produced certain documents
16  responsive to Exhibit A, specifically Items 1
17  through 18?
18    A.  Yes.
19    Q.  And have you brought them here with
20  you today?
21    A.  Yes.  Except for these items which I
22  had already provided prior to this along with
23  my original affidavit.
24    Q.  All right.  We're going to go through
25  these items one by one.  And what I'd like you

Page 13

1  to do is, if you could designate what items you
2  provided both prior and today that are
3  responsive to each one of those.  Can we do
4  that?
5    A.  Yes.
6    Q.  All right.  What if any materials have
7  you provided in response to Exhibit A, number
8  1, which is a request for any and all materials
9  considered or relied upon by the deponent in
10  connection with this litigation?
11    A.  Well, shortly after delivery of the
12  deposition -- excuse me, shortly after delivery
13  of the affidavit, we sent to counsel of CD
14  containing all of the footnoted material on my
15  original affidavit, with the exception of one
16  paper.  I think there was a citation to an
17  article by I believe it was Bruce and Sundell
18  which, as it turns out, we did not have in our
19  possession, and so we had to get that, and it
20  was subsequently Fed Ex'd the very next day.
21  So all of those footnoted materials relied upon
22  in preparation of the affidavit were delivered
23  at least a week ago.
24    Q.  All right.  The article you Fed Ex'd
25  was Fed Ex'd to whom?

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                  8/13/2007

Page 14

1    A.  Precisely whom, I'm not sure.  I think
2  it went to the Lambert & Nelson law firm.
3    Q.  And it was Fed Ex'd on Friday for
4  delivery on Saturday?
5    A.  No, this would have been much earlier
6  than that.  I would say a week or so ago.
7    Q.  All right.  Any other materials that
8  you've produced responsive to Request Number 1?
9    A.  No.  Request Number 1 referenced those
10  things considered or relied upon -- well, you
11  say with respect to the litigation, but I was
12  responsive to everything that I used in
13  preparation of my affidavit.
14    Q.  Okay.  With respect to Request
15  Number 2, the request is any and all data,
16  models, analyses, results, damage estimates
17  and/or reports produced by the deponent in the
18  Murphy Oil litigation.
19        Do you know what we mean by the Murphy
20  Oil litigation?
21    A.  I do.  And we again received this
22  exhibit on Thursday afternoon.  Much of our
23  material, that is to say everything which is
24  preprinted in Murphy Oil, has been locked away
25  in storage and wasn't accessible to us by

Page 15

1  Friday.  We contract with Iron Mountain to
2  store all of our hard data; nonetheless,
3  everything which was electronically on file,
4  which would have included databases and the
5  like, I asked the staff to print out everything
6  that they could print out in a day, and
7  everything that was in the form of electronic
8  database was burned to a CD, and that CD along
9  with that paperwork was brought with me today.
10    Q.  All right.  So that CD is in your box
11  of materials that you produced today?
12    A.  That's correct.
13    Q.  All right.  Now, was all your
14  electronic data printed?
15    A.  No.  For example, we had a server disk
16  full of databases.  I started examining those
17  on Friday, pulled each one of them, and this
18  was a database of properties, mass appraisal
19  type data from St. Bernard Parish which I noted
20  was over twenty-eight thousand records long; in
21  other words, I had mass appraisal data of
22  twenty-eight thousand properties in St. Bernard
23  Parish.  Being that I didn't want to kill too
24  many trees in the process of being responsive,
25  I simply asked the staff to burn that and all

Page 16

1  other similar databases to a CD.  And by the
2  way, I did check.  Had I printed that database
3  out on 8-1/2 x 11 paper, it was going to take
4  twenty-three hundred sheets of paper.
5    Q.  So when we look on this CD, what
6  categories of information are we going to find?
7    A.  Well, you'll find addresses, parcel
8  numbers, location information such that all of
9  these properties could be located very easily
10  in a 3 dimensional spatial coordinate set.
11  You'll find property characteristics, I believe
12  you'll find lot size, house size, number of
13  bedrooms, number of bathrooms, age, condition,
14  those kinds of things, the sorts of things with
15  which one would construct a robust, valid and
16  statistically reliable mass appraisal model.  I
17  can't recall all of the records, but as I
18  recall there were better than 25 to 30 records
19  for each -- excuse me, better than 25 or 30
20  fields for each record in the database.
21    Q.  Twenty-five or thirty fields for each
22  particular property?
23    A.  That's correct.
24    Q.  All right.  If that is the sum and
25  substance of what's on that CD?

Page 17

1    A.  No.  That was just one of the
2  databases that I opened in that particular
3  electronic folder.  I noted that were there,
4  oh, I don't know, eight, ten, twelve databases
5  in that particular folder.  I didn't bother to
6  open the rest of them.  Once I saw what was in
7  that one representative database I recognized
8  that we were not going to merely kill trees but
9  in fact whole swaths of forests in order to
10  print all that off.
11    Q.  So what electronic data relating to
12  Request Number 2, the Murphy Oil litigation
13  materials, do we not as yet have from you?
14    A.  Well, I don't know what you don't
15  have; in other words, we've provided on a CD
16  everything which was on our computer server.
17  But insofar as anything which is on storage in
18  Iron Mountain, I haven't had the opportunity to
19  examine that.
20    Q.  All right.  When do you expect that
21  you'll receive that?
22    A.  I will put in requests as soon as I
23  get back to my office.
24    Q.  All right.  And what are the sorts of
25  things or the sorts of information or materials

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 18

1  that you believe are stored at Iron Mountain
2  which are responsive to Request Number 2?
3     A.  Well, there would be information
4  regarding the survey research which was done.
5  We were in the midst of extensive survey
6  research in that particular case.  In fact, we
7  were at the tail end of the first phase of the
8  survey research when Murphy Oil settled.  So as
9  best I recall, there's a substantial amount of
10 information pertaining to that in Iron
11 Mountain.  Precisely what, I don't know.
12    Q.  All right.  Did you ever complete a
13 damage report in Murphy Oil?
14    A.  No.
15    Q.  Did you complete a draft of a damage
16 report in Murphy Oil?
17    A.  No.
18    Q.  How far did you get?
19    A.  We were at the end of the first phase
20 of survey research.  We were completing the
21 data gathering for the unimpaired valuation
22 analysis.  We were pretty much -- let's call it
23 75 percent of the way through the data
24 gathering process.
25    Q.  What materials, if any, have you

Page 19

1  produced in response to Request Number 3 on
2  Exhibit A which calls for production of any and
3  all information and data in the deponent 's
4  possession or control and which pertain to the
5  Greater New Orleans tax assessments for both
6  Orleans and St. Bernard Parish assessors,
7  including but not limited to assessment data,
8  models, AVMs, or other analysis and/or
9  documents regarding assessment methodologies.
10    A.  Well, as I mentioned, we've got a
11 substantial amount of data for St. Bernard
12 Parish, which we've already gathered.  That's
13 in database form, and which is contained in a
14 CD in the box I brought today.  There are some
15 other I'll call it miscellaneous tax assessment
16 related data including but not limited to a --
17 I think there is an article or a monograph on
18 tax assessment processes in the state of
19 Louisiana which is published by one of the tax
20 assessors not in one of the Greater New Orleans
21 parishes but in another parish over in western
22 Louisiana.  Um -- but we don't have specific
23 models of AVMs used by Greater New Orleans
24 parish tax assessors in our possession at this
25 time.

Page 20

1     Q.  And when you say Greater New Orleans,
2  you're including both Orleans and St. Bernard
3  Parish in the scope of that definition?
4     A.  That's correct.
5     Q.  So the response to my question
6  regarding the materials you produced for
7  Number 3 is that to the extent that that is
8  responded to in the electronic data that you
9  produced regarding Murphy Oil, then the
10 St. Bernard Parish stuff is there but you don't
11 have anything specific to Orleans Parish; is
12 that --
13    A.  That's correct.
14    Q.  All right.  You have not acquired any
15 information or data that pertains to New
16 Orleans tax assessments or assessment
17 methodologies or data with respect to Orleans
18 Parish since your retention in this lawsuit?
19    A.  Nothing specific.  There's some
20 general information which regards Orleans
21 Parish.  I can't recall specifically what it
22 is.  But to the extent that we have anything in
23 general about Orleans Parish or any of the
24 other surrounding parishes that would be in our
25 possession and which was deliverable at the

Page 21

1  time of my gathering of information on Friday,
2  then certainly that's in the box.
3     Q.  All right.  So all of the information
4  regarding I'll call it assessor data responsive
5  to Request Number 3 in Exhibit A that you have
6  for Orleans Parish is in the box that you
7  delivered to us here today.
8     A.  I'm going to reserve anything which is
9  in Iron Mountain which may have Orleans Parish
10 tax assessment data.  If in fact we have that
11 sort of information, then it has not been
12 delivered but I will certainly endeavor to
13 deliver that in a timely fashion.
14    Q.  All right.  With respect to Request
15 Number 4, the request is calling for production
16 of any and all data and/or other materials in
17 the deponent 's possession or control and which
18 pertain to the Greater New Orleans property
19 values for both Orleans and St. Bernard
20 Parishes, including but not limited to
21 information obtained from MLS and other
22 sources.
23    A.  Well, there is a good bit of that for
24 St. Bernard Parish in the box.  We had quite a
25 bit of hard copy material about St. Bernard

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 22

1   Parish left over from Murphy as part of our
2   data gathering process there, and that's in the
3   box.
4       Q.  What about Orleans?
5       A.  Don't know if there is anything for
6   Orleans or not.  There may be, but I'm not
7   sure.
8       Q.  Do you have anything for Orleans?
9       A.  If I do, it's in Iron Mountain.
10      Q.  All right.  With respect to Request
11  Number 5, any and all materials in the
12  deponent 's possession or control regarding the
13  class representatives' properties, including
14  but not limited to any and all data, documents
15  and/or photographs pertaining to tax
16  assessments, market value at any point in time,
17  condition, transactions, occupancy,
18  depreciation and/or repairs, what if anything
19  do you have responsive to that request?
20      A.  Anything that was in our possession in
21  our office would be in the box or in the Murphy
22  Oil files which, as I said, will be delivered
23  to you as quickly as I can.
24      Q.  Okay.  So what's in the box and what's
25  not?

Page 23

1       A.  Well, in the box is basically
2   electronic stuff that was on file in our
3   office.  In Iron Mountain would be paper stuff
4   that wasn't in possession in our office.
5       Q.  All right.  So am I understanding you
6   correctly to say that if by some coincidence
7   the materials that you gathered from Murphy Oil
8   pertain to some of the class representatives in
9   this case then you have information responsive
10  regarding class representatives, if it doesn't
11  then you don't?
12      A.  That's a good way of phrasing it, yes,
13  counselor.
14      Q.  You have no specific subfiles that you
15  went to or groupings of documents that pertain
16  to each -- or to any individual designated
17  class representative in either of the levee
18  lawsuit or the MRGO lawsuit?
19      A.  No.
20      Q.  You have none of their tax
21  assessments, you have no photographs, you have
22  no -- nothing that depicts the condition or
23  configuration of their properties?
24      A.  No, not at this juncture.  I'm sure
25  when we go forward with respect to data

Page 24

1   gathering, we'll get all of that in a timely
2   fashion, but not at this point.
3       Q.  Request Number 6 regards any and all
4   photographs in the deponent 's possession
5   regarding the Greater New Orleans areas,
6   including both Orleans and St. Bernard
7   parishes.  Do you have that?
8       A.  I asked my staff to make sure that any
9   photograph we had of the area was included on
10  the CD.  If we have other photographs which are
11  included in Iron Mountain, we'll deliver that
12  in a timely fashion.
13      Q.  All right.  And what member of your
14  staff did you direct that request to?
15      A.  Well, I asked our director of
16  administration Ms. McSherry to take that role
17  on herself.  Her -- my assistant Ms. Rix was
18  helping her with that.  We had two or three
19  other junior staff who aided them.  So I guess
20  there were probably five or six people total
21  who were at one time or another working on this
22  project on Friday.
23      Q.  All right.  And have you received a
24  report this morning as to what the status of
25  their progress is at this point?

Page 25

1       A.  No.  You know, it's 6:30 in the
2   morning -- it's 7:30 in the morning over there.
3   They're still getting their first Starbucks.
4       Q.  Do you know if they worked on it over
5   the weekend?
6       A.  No, I'm pretty sure they didn't.
7       Q.  So they worked on it Friday,
8   basically.
9       A.  That's correct.
10      Q.  Request Number 7 regards any and all
11  reports that the deponent has ever presented
12  concerning properties in the Greater New
13  Orleans area including both Orleans and
14  St. Bernard Parishes.
15      A.  Well, the only report that I've
16  presented would have been my affidavit in
17  support or class certification in Murphy Oil,
18  and that's included in the box.
19      Q.  Have you done any property appraisals
20  in the Greater New Orleans area?
21      A.  No.
22      Q.  Ever?
23      A.  No, not -- I mean, narrowly defining
24  Greater New Orleans, no.  In other parts of
25  Louisiana, sure.  But not here in New Orleans,

7 (Pages 22 to 25)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 26

1  no.
2      Q.  How do you define Greater New Orleans?
3      A.  Those parishes which surround New
4  Orleans and touch Orleans Parish.  You know,
5  St. Bernard, Jefferson, Plaquemines -- I can't
6  remember all of them offhand.
7      Q.  All right.  Item Number 8 calls for
8  production of the most recent six reports that
9  the deponent has prepared regarding evaluation
10  of real estate involved in class action
11  litigation.  Did you produce those?
12     A.  No.
13     Q.  Why not?
14     A.  Time.  Simply ran out of time.  We'll
15  produce those when I get back to the office.
16     Q.  All right.  To the best of your
17  knowledge, what do you believe those reports
18  would include?  What cases?
19     A.  Well, you'll have two different
20  things.  First, if they've been class action
21  cases, it would have been some affidavit and/or
22  testimony in support of class certification.
23     Q.  Right.  And I'm asking you to the best
24  of your ability can you identify those cases
25  that you believe would fall within the six most

Page 27

1  recent class action reports you've written?
2      A.  Okay.  Well, um -- trying to look back
3  on it, and again, I'm going off of memory here,
4  we have the Murphy Oil case, which class was
5  certified.  We have, um -- a case versus Dupont
6  in, um -- near Baton Rouge, Myrtle Grove area
7  down near the town of Plaquemine.  I can't
8  remember if that's been certified or not.  But
9  that's pending.  We have --
10         MR. BECNEL:
11             That's called the Myrtle Grove
12         case.
13         THE WITNESS:
14             Yeah.
15     A.  We have a case in Lake Charles,
16  Louisiana, which was certified a couple of
17  years ago.  And I think that settled.  I never
18  testified in the merits phase.
19  EXAMINATION BY MR. ZWAIN:
20     Q.  Was that the Guillory case?
21     A.  Guillory v. Union Pacific, yes.
22         We have a class action in Kansas,
23  which is the BP Amoco, we have a class action
24  in Michigan, Henry v. Dow which is in Saginaw,
25  Michigan.

Page 28

1          I'm thinking.  It's been a while.
2  I'll have to go back and look.  I can remember
3  those offhand.
4      Q.  Okay.  Who retained you -- what law
5  firm retained you in the Myrtle Grove case?
6      A.  Um -- Law Office of Patrick Pendley.
7  P-E-N-D-L-E-Y.
8      Q.  What about the Lake Charles Guillory
9  case?
10     A.  That would have been Lundy & Davis.
11  L-U-N-D-Y and Davis.
12     Q.  Have you done any work -- well, I take
13  it some of lawyers in this room retained you in
14  the Murphy Oil case.
15     A.  Yes.
16     Q.  Other than the Murphy Oil case, have
17  you done any work for any of the lawyers in
18  this room before?
19     A.  Not that I can recall.
20     Q.  Have you done any work for any of the
21  lawyers on the plaintiffs' side of these cases
22  before, other than Murphy Oil?
23     A.  Not that I can recall.
24         MR. BECNEL:
25             Counsel, he hasn't done any work

Page 29

1         for us in the Coffeeville, Kansas oil
2         tank that just floated.  We retained
3         him, but the work hasn't begun yet.
4         It only happened a few weeks ago.
5         MR. ZWAIN:
6             Thank you.
7  EXAMINATION BY MR. ZWAIN:
8      Q.  Request Number 9 asks for production
9  of any and all models that the deponent has
10  prepared to capture the stigma effect of any
11  real estate.
12     A.  Well, as you may or may not be aware,
13  our firm and I personally, as well as other
14  members of our firm, have written and published
15  extensively on that.  To the extent it's been
16  included in some of the other material, we've
17  delivered it here.  We've also included a lot
18  of stigma models which are not in the form of
19  peer review published material in reports that
20  we've prepared in various matters both
21  litigation and non litigation.  We do a lot of
22  stuff other than litigation that involves
23  stigma.
24         That having been said, we feel that
25  our published work has captured the essence of

JOHNS PENDLETON COURT REPORTERS              800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                        8/13/2007

Page 30

1  our views on stigma, and I believe that a
2  cross-section of that has been delivered here.
3  But as part of our further responsiveness in
4  this case, we'll try to wipe the plate clean
5  with respect to anything that's been published
6  by our firm. It's a fairly large volume of
7  material, and we'll have that delivered with
8  respect to -- or along with the other material.
9      Q. Well, when you say that you're going
10 to produced published material, does that
11 include models or reports that you've written
12 regarding the stigma effect in litigation?
13     A. Well, we don't separate stigma in
14 litigation versus non litigation. I mean, we
15 have written, published, lectured, extensively
16 on stigma in academic and practitioner
17 materials, in non litigation consulting cases,
18 um -- Brownfield Redevelopment, for example.
19 We have opined with respect to stigma in a
20 variety of circumstances.
21     As I am perhaps not clear in my
22 previous answer, we believe that our views on
23 stigma are well captured in the published
24 material, both things published in the peer
25 reviewed academic literature as well as things

Page 31

1  published in the more practitioner literature.
2  And we'll certainly endeavor to make sure all
3  of those stigma models are included in the
4  material that we deliver to you later on.
5      Q. Are there stigma models that you have
6  written that have not been published?
7      A. I'll have to go back and look. I
8  certainly can't recall one, but it's worth
9  taking a look at it.
10     Q. Are there stigma models that you've
11 written that have been written for purposes of
12 litigation?
13     A. I don't think anything we've done has
14 been done for the purpose of litigation.
15     Q. Have there been stigma models that
16 you've written that have been used in
17 litigation?
18     A. Well, yes. Now that's true.
19     Q. And not published elsewhere.
20     A. I can't recall if there is anything
21 that's been used in litigation that hasn't been
22 published elsewhere. I will say this: We do,
23 I think, a very robust job of ensuring that any
24 stigma model proffered by us in a litigation
25 matter is exceptionally well supported in the

Page 32

1  literature. In other words, we don't pave any
2  new ground in a litigation report, we basically
3  make sure that we're simply applying models
4  which have already been peer reviewed. Now,
5  many if not most of those come from authorship
6  of members of my firm. There may be stigma
7  models which we have applied in litigation
8  which come from the pen of people who are not
9  employed by me. I'm willing to leave that door
10 open. So we'll take a look at all of that and
11 make sure that a representative cross-section
12 of stigma models which have been published
13 somewhere are included in what we deliver you,
14 to the extent they haven't already been
15 delivered to you by what we've sent at this
16 point.
17     Q. Well, how many models do you think you
18 have written, whether published or not? You or
19 your firm.?
20         MR. MEUNIER:
21             To capture the stigma effect?
22         MR. ZWAIN:
23             Yes, sir.
24     A. Over a dozen.
25 EXAMINATION BY MR. ZWAIN:

Page 33

1      Q. Well, what's the burden in producing
2  all of them for us?
3      A. No burden at all. I will be glad to.
4      Q. All right. Request Number 10 calls
5  for production of any and all documents
6  pertaining to the model that the deponent
7  proposes that the Court adopt in the instant
8  litigation.
9      A. Well, I think I was fully responsive
10 to that in the CD that was sent following my
11 affidavit, with the exception of the Bruce and
12 Sundell article, which I mentioned had to be
13 faxed the next day.
14     Q. Are you proposing a specific model for
15 the Court to adopt in this litigation?
16     A. Yes.
17     Q. What model is that?
18     A. Well, mass appraisal in general. I'm
19 not suggesting any particular hedonic formula.
20 That will have to be empirically determined as
21 part of the what you attorneys might call the
22 merits phase of this. But with respect to
23 certification of class, it's clear and indeed I
24 think overwhelmingly compelling that some sort
25 of large scale mass appraisal model is not only

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 34

1  recommended but imperative in order to
2  intellectually get one's arms around the
3  magnitude of this -- of these cases.
4      Q.  So if I'm understanding you correctly,
5  you think that a mass appraisal model can be
6  constructed for purposes of this case, but you
7  haven't gone about to do it yet.  Is that
8  right?
9      A.  I'm not sure if I heard every word of
10 that question.  Did you say I think a mass
11 appraisal model?  Was that --
12     MR. ZWAIN:
13        Could you read the question back.
14        (Whereupon the previous question was
15 read back.)
16     A.  Yeah.  I have a little trouble with
17 that word think.  You know, if I take one of
18 these coffee cups here and hold it out over the
19 floor and let go of it, the certainty with
20 which I know that it's going to fall to the
21 floor transcends the word think.  So I don't
22 have an opinion that that coffee cup is going
23 to fall out of my hand and hit the floor, I
24 have a high degree of certainty that unless a
25 small animal runs along and catches it before

Page 35

1  it touches the floor it's going to hit the
2  floor.
3        Now, I have a certainty that some kind
4  of mass appraisal model is the only way you're
5  going to get at the truth here.  That's not
6  something I think, it's not an opinion I hold,
7  that's just, to be frank, a reality that I've
8  attempted to summarize as best I could in my
9  affidavit.
10     Q.  Well, regardless of what you think or
11 of what you're certain about, you have not gone
12 about the business of constructing such a model
13 for purposes of this case and recommending it
14 to the court.
15     A.  No, we haven't constructed a specific
16 empirical model, but I think the generalities
17 of a mass appraisal model are well described in
18 the affidavit that I've put forth.
19     Q.  So the affidavit you've written for
20 the purposes of those cases is the only
21 document that you are producing in response to
22 the request for documents pertaining to the
23 model that you propose to recommend to the
24 Court for adoption in this particular
25 litigation, is that right?

Page 36

1      MR. MEUNIER:
2        Did you say his affidavit?
3      MR. ZWAIN:
4        Yes.
5      MR. MEUNIER:
6        Didn't he just talk about the CD
7  of reliance material?  I think that
8  was his earlier answer.
9      A.  Well, I think I have already testified
10 that I sent, with the exception of the Bruce
11 and Sundell article, a CD which contained a
12 host of material which more fully flesh out and
13 support the use of a mass appraisal model.
14 EXAMINATION BY MR. ZWAIN:
15     Q.  All right.  So your affidavit and that
16 reliance material that your affidavit relies
17 upon are the only documents that you have
18 responsive to Item No. 10, correct?
19     A.  Well, I understand we may have put two
20 definitions on the word only.  I don't want to
21 minimize what I've done by saying that's the
22 only thing I've done.  I think captured in that
23 is a pretty good course on how you do these
24 sorts of things.
25     Q.  What other documents, if any, do you

Page 37

1  have that are responsive to Number 10?
2      A.  Well, nothing else is needed.
3      Q.  Do you have any other documents that
4  are responsive to Number 10, yes or no?
5      A.  No.
6      Q.  Thank you.
7        Request Number 11 calls for production
8  of any and all documents relating to instances
9  in which the deponent's model or models have
10 been accepted by the Court -- by any Court.
11 I'm sorry.
12        Do you have such documents?
13     A.  Not yet.
14     Q.  All right.  When do you expect to get
15 them?
16     A.  When I deliver more material to you.
17 Probably in a week or two.
18     Q.  All right.  And what's the material
19 that you're going to deliver responsive to
20 Number 11 going to include?
21     A.  Well, it will certainly include copies
22 of all of the affidavits and citations where
23 the Court has accepted a mass appraisal model
24 as being useful.  In my material which I've
25 sent you to date, including in there is a list

JOHNS PENDLETON COURT REPORTERS            800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 38

1  of deposition and/or trial testimony, and we've
2  noted on that list, um -- which of those
3  pertained to class certification.  At least I
4  believe we have.  The Court has accepted my
5  model of mass appraisal in every single one of
6  those instances.  It's never been rejected.
7  So -- and by the way --
8      Q.  So you can give us those documents.
9      A.  Oh, yeah.  And by the way, I want to
10 make sure when I use the word my, this isn't
11 something John Kilpatrick dreamed up.  It's
12 simply John Kilpatrick 's testimony with
13 respect to the realities of how you do these
14 cases.
15     Q.  Okay.  So we should expect to get
16 whatever you have that is responsive to Request
17 Number 11 in a week, that being next Monday?
18     A.  Well, over and above those things
19 which haven't been sent yet.  And we're
20 certainly going to endeavor to get that out by
21 a week from today.  But this is a fairly broad
22 collection of materials.  We're very busy
23 people.  I'm not saying we're too busy to
24 respond this, I'm saying that you've asking for
25 a lot of history from us and we've produced

Page 39

1  libraries of documentation in just the last few
2  years.  In fact, when I first read through
3  these eighteen points, I was talking with one
4  of the attorneys on the plaintiffs' side on the
5  phone and I said, I'm not dabbling in hyperbole
6  by saying that it will indeed take me a
7  tractor-trailer truck to bring all this stuff
8  from Seattle, if in fact we could print it that
9  fast.
10     So indeed we're going to deliver, that
11 is to say, make photostatic copies, make CDs,
12 transmit to you in some appropriate form, as
13 much of this material as we can as quickly as
14 we can.  We are going to put a team to work on
15 that and there will be nothing else in their
16 way.  But to the extent I can deliver this to
17 you on Monday a week hence, um -- I'm not sure
18 about that.
19         MR. MEUNIER:
20         Can we get some clarification on
21     the scope of 11?  When you say any and
22     all documents related to instances in
23     which his model has been accepted, the
24     witness has indicated searching for
25     affidavits and citations to those

Page 40

1  Court decisions.
2          MR. ZWAIN:
3          Uh-huh.
4          MR. MEUNIER:
5          That will be sufficient to
6      respond to the, quote, any and all
7      documents related to the question?
8          MR. ZWAIN:
9          Well, I would think that
10     documents might pertain to databases
11     and other data that he's got relative
12     to those models that were accepted by
13     other Courts, if he has them.  I don't
14     know whether he has them or not.
15     But --
16         MR. MEUNIER:
17         Well, we may have to interpose an
18     objection if you're looking for all
19     the reliance material, including
20     databases, that support every
21     affidavit in which his model has been
22     accept by a Court.  I think he's
23     offering to assemble the affidavits
24     and give you reference to the Court
25     decisions.  If in addition you want

Page 41

1  all of the underlying data that went
2  into the construction of the model or
3  form support for the affidavit, we may
4  have to talk about that.
5          MR. ZWAIN:
6          I'll be happy to talk.
7          MR. MEUNIER:
8          So I want to reserve the right to
9      object to going beyond the -- what
10     he's offered to produce, which is the,
11     as I understand, the affidavits and
12     the citations to the Court decisions.
13     And then if you think you need more at
14     that point, we can take that up with
15     the Court.
16         MR. BECNEL:
17         And Gary, you have to come to
18     grips with the cost -- you know, when
19     you talk about a trailer truckload of
20     documents, you're looking at something
21     maybe half the size of this room.  But
22     that's a substantial amount of effort
23     that would go into that, related to a
24     number of cases that have been long
25     settled, and, you know, providing

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 42

1     you're going to compensate him for all
2     of that cost relating to all of this
3     irrelevant stuff, you know, I think
4     you have to -- we'd have to put that
5     on the table right now.
6        MR. ZWAIN:
7            It's on the table.
8        MR. MEUNIER:
9            All right.  In a week or so we'll
10    get the affidavits and the citations,
11    and all I'm saying is we'll have to,
12    at that point, sort out what in
13    addition the defendants think they
14    need and whether there's a practical
15    limit on what the witness can do or
16    should be asked to do.
17       MR. ZWAIN:
18           We'll do that.  Thanks.
19    EXAMINATION BY MR. ZWAIN:
20       Q.  Request Number 12, Mr. Kilpatrick,
21    calls for production of any and all documents
22    regarding the deponent's model or models being
23    put into effect anywhere in the world in the
24    last ten years.
25       MR. MEUNIER:

Page 43

1            We do object for the record to
2        the scope and breadth and vagueness of
3        that request.
4            But subject to that objection,
5        Dr. Kilpatrick, why don't you respond.
6        A.  Well, I could only drive one tractor
7    trailer truck at a time.  That will require a
8    second one at least, and maybe a train.
9            And again, I'm not trying to dabble in
10   hyperbole here.  Our firm has been so widely
11   cited that it boggles the mind.  Case in point:
12   One member of our firm wrote an article called,
13   um -- oh, I can't remember the name of the
14   article now, it's something like Stigma in
15   Value, or the Valuation of Property Impacted by
16   Environmental Contamination, wrote it in 1992.
17   Um -- in the Spring 2007 edition of the
18   Appraisal Journal, that article was listed as
19   one of the nine most important thought pieces
20   in the history of the appraisal profession.
21   EXAMINATION BY MR. ZWAIN:
22       Q.  That's great, but what documents are
23   you going to produce responsive to Number 12?
24   Any?
25       A.  I'm trying to get to that, counselor.

Page 44

1        Q.  Good.
2        A.  I mean, we can give a cross-section of
3    peer reviewed, published literature which is
4    consistent with mass appraisal models, stigma
5    and damages, real estate impaired by events
6    such as this, and certainly provide an
7    overwhelming body of support for the reality of
8    a mass appraisal model.
9        Q.  I understand that.  But this request
10   calls for models being put into effect anywhere
11   in the world.
12       A.  And I'm getting to that, counselor.
13       Q.  Okay.
14       A.  You've asked for any and all
15   documents.  We're talking -- if we just limit
16   that to peer reviewed, published literature,
17   we're talking about -- there's utterly no way
18   that will happen within a week or two.
19       Q.  Is there a model of yours presently
20   being put into effect anywhere in the world?
21       A.  Well, all counties in the United
22   States, every single one of them, and that's
23   over three thousand, use a mass appraisal model
24   for ad valorem taxation purposes.  Now, if we
25   were to read that sentence just in its literal

Page 45

1    term, that means that I need to produce for you
2    the ad valorem taxation model used in every
3    single county in the United States.  At an
4    hourly rate, we would be more than happy to
5    survey that, but it's going to take more than
6    two weeks.
7        MR. MEUNIER:
8            I don't think that's what the
9        defendants have in mind.
10   EXAMINATION BY MR. ZWAIN:
11       Q.  So us your position that the -- either
12   a substantial number or perhaps the great
13   majority of ad valorem tax assessment
14   methodologies are yours that other people are
15   borrowing?
16       A.  No, that's not mine at all.  There are
17   two things wrong with that question.  Number
18   one, I'm not suggesting that most or the vast
19   majority, I'm saying all of them.  But number
20   two, they're not mine.  My model isn't
21   something that I dreamed up that all the tax
22   assessors of this country use.  The arrow
23   points in exactly the opposite direction.  All
24   I'm proffering is the reality of a mass
25   appraisal model which is so widely used in the

JOHN KILPATRICK (LEVEE VOL I)                                        8/13/2007

---

Page 46

1    United States as to be the only model which is
2    acceptable for getting one's arms around this
3    kind of a problem. So indeed if you're asking
4    about the model that I want to put into effect,
5    I'm simply putting into effect a universally
6    accepted model here in the United States. If
7    you want every instance of where that's put
8    into effect, um -- you have now designed my
9    retirement plan.
10   Q.  All right. Request Number 13 calls
11   for any and all materials in the deponent 's
12   possession or control and which discuss the
13   property claims made by the Murphy Oil
14   litigation class plaintiffs and/or the property
15   claims made by MRGO and levee plaintiffs
16   classes.
17        What materials, if any, do you have
18   responsive to Number 13?
19   A.  Well, that's certainly duplicative of
20   prior points here. Everything that we have
21   with respect to Murphy Oil and/or the claims
22   being made here have either already been
23   produced to you or will be produced as soon as
24   we get those files out from Iron Mountain.
25   Q.  Request Number 14 calls for production

---

Page 47

1    of any and all documents relating to all
2    instances in which the deponent has ever been
3    appointed by the Court to facilitate or effect
4    calculation of damages in any class action.
5    A.  Well, I'd like some further
6    clarification of the question, because clearly
7    the Court has used our model for stigma damages
8    or class action damages in many cases. And by
9    the way, that's a separate matter from just the
10   class action mass appraisal model. That's
11   something that would come after we have done
12   what you attorneys might call merits work in
13   these matters. We can certainly provide to you
14   representations of citations where the Court
15   has accepted our damage calculation, that's not
16   a problem.
17       MR. MEUNIER:
18           Dr. Kilpatrick, excuse me. The
19       request here is instances where you
20       have been appointed by a Court, which
21       is a different thing than just being
22       retained by one of the parties. As I
23       appreciate it, this is limited to
24       those instances, if any, where a court
25       has actually appointed you as a Court

---

Page 48

1        appointed expert.
2          Is that correct?
3    MR. ZWAIN:
4          That's what it looks like.
5    MR. MEUNIER:
6          So that's a limited scope, I
7    believe.
8    A.  As long as we're limiting it to that
9    scope, there aren't any such instances.
10   EXAMINATION BY MR. ZWAIN:
11   Q.  Have you ever been appointed by a
12   Court to facilitate or effect the calculation
13   of damages in any class action?
14   A.  Not that I recall.
15   Q.  How many damage reports have you
16   written with respect to any class action,
17   whether appointed by the Court or hired by an
18   attorney?
19   A.  Several. I can't recall an exact
20   number offhand.
21   Q.  Name a few.
22   A.  Oh, um -- well, there's certainly the
23   Myrtle Grove litigation, there is the BP Amoco
24   litigation in Kansas -- well, those two come
25   off the top of my head. I can't recall any

---

Page 49

1    others offhand.
2    Q.  Were you in a case called Perine or
3    Perine?
4    A.  P-E-R-I-N-E? Yes. That's in West
5    Virginia. I forgot about that one.
6    Q.  Have you written a damage report in
7    that case?
8    A.  Sure did. Forgot all about it.
9    Q.  Any other damage reports besides
10   Myrtle Grove, Amoco and Perine?
11   A.  There might be. I couldn't remember
12   Perine and I just got deposed on that a few
13   weeks ago, so I'm sure there are others that I
14   can't remember.
15   Q.  Would you mind producing the damage
16   reports you wrote in Myrtle Grove and the
17   damage report you wrote in the Amoco case for
18   us, please?
19   A.  Well, I wouldn't mind, but those are
20   specific to clients, um -- and those cases are
21   currently on going, and so I've got a
22   confidentiality matter to deal with with
23   respect to appraisal standards. Now, if the
24   clients don't mind, I'll certainly be glad to
25   ask them.

---

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 50

1    Q.  Well, have those reports been
2  exchanged with the other side in the case?
3    A.  I don't know.  I'll have to look.
4    Q.  When was the report in Myrtle Grove
5  written?
6    A.  Earlier this year.
7    Q.  2007?
8    A.  I think so.
9    Q.  And what about Amoco?
10   A.  Either -- I think '06.  I think it was
11  late '06.
12   Q.  And both those reports were written in
13  order to meet certain expert report deadlines?
14   A.  Yes.
15   Q.  So you would expect that those reports
16  would have been exchanged with the opposing
17  side?
18   A.  Well, one would expect, but I'm not an
19  expert on court procedures.
20   Q.  Have you given depositions regarding
21  your damage reports in either of those cases?
22   A.  Yes.
23   Q.  So you would expect that the side that
24  deposed you has your damage report.
25   A.  One would expect so.

Page 51

1    Q.  Do you recall if in fact they did?
2    A.  I would think so but, um -- again, I
3  hadn't thought about it in a while.
4    Q.  All right.
5    MR. ZWAIN:
6       We would request copies of those
7    reports.
8    MR. MEUNIER:
9       Well, I'm a little confused
10   because pursuant to Request Number 8,
11   we already talked about the six most
12   recent reports, and in fact he gave
13   examples that he's talking about
14   again.  Are we revisiting, under
15   another subpart, the request for most
16   recent six reports or are you going
17   past the -- further than the most
18   recent six?
19   MR. ZWAIN:
20      There are reports that he writes
21   for class certification, there are
22   reports that he writes to assess
23   damages once the class certification
24   issue is resolved one way or another.
25   So I just want to make sure that my

Page 52

1  request encompasses both.
2    MR. MEUNIER:
3       All right.  So pursuant to
4    Number 8, we're going to produce the
5    most recent six reports he's prepared
6    for class action litigation.  Now,
7    which -- what beyond that is the
8    subject of --
9    MR. ZWAIN:
10      I would like production of all
11   the damage reports he's written, where
12   he's actually gone ahead, done a mass
13   appraisal, calculated damages for the
14   group of people he's calculating it
15   for.  I know that he's written one in
16   the Perine case, we've discussed, he's
17   now told me he's written one in Myrtle
18   Grove and in Amoco and there may be
19   others, so I would like to see those.
20   MR. MEUNIER:
21      So you want all damage reports
22   whether related to a class action or
23   not going back forever.  Is that what
24   we -- I mean, in 8 you limit --
25   MR. ZWAIN:

Page 53

1       If he's got six, I'll take six.
2    MR. MEUNIER:
3       Well, that was Number 8.  We've
4    agreed to furnish the most recent six
5    reports in class action.  Now we're
6    talking about something broader.  I
7    still don't know where the broader
8    request fits in the Court appointment
9    item we were just talking about.  But
10   I just want to be clear what it is you
11   want, Gary.
12   MR. ZWAIN:
13      I'd like the last six class
14   certification reports, which is
15   basically a report akin to like the
16   one he's written in this case --
17   MR. MEUNIER:
18      Right.
19   MR. ZWAIN:
20      -- and I'd like the last six
21   damage reports, if there are in fact
22   six, I don't know that there are, he's
23   identified three, all of which have
24   been written relatively recently.
25   MR. MEUNIER:

JOHNS PENDLETON COURT REPORTERS                        800  562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 54

1        All right.  Are you clear,
2   Dr. Kilpatrick, on the question?
3   THE WITNESS:
4        Well, I'm not clear, because we
5   do non class action matters, as well,
6   and we do non litigation matters, as
7   well.  So we happened to cite three
8   large class action litigations that
9   I've done in the last year, but we
10  have Brownfield valuation matters,
11  um -- indeed one of them is in the box
12  here.  We've got, um -- non class
13  action property damage reports which
14  we've done in cases.  So I could think
15  of three different kinds of property
16  value diminution cases in which we've
17  been involved.  Number one are models
18  of large scale damages in which some
19  sort of mass appraisal is necessary.
20  We've got property specific cases
21  where we're only dealing with one
22  property.
23  EXAMINATION BY MR. ZWAIN:
24      Q.  I want models that reach conclusions
25  about damage figures in class actions.  That's

Page 55

1   what I want.
2       A.  Only class actions.
3       Q.  Yes, sir.
4       A.  Thank you.
5       Q.  Okay.  Can you do that?
6       A.  That I can do.
7       Q.  Okay.  All right.  I think we left off
8   at Number 14.  We'll now go to Number 15, which
9   calls for production of any and all documents
10  reflecting the peer review of any model of
11  property damage that the deponent has created
12  or proposed.
13      A.  Well, there are two issues there.  I
14  can, number one, provide you with copies of
15  peer reviewed publications.  There are
16  documents relating to peer review which we
17  usually don't retain.  So I just want to make
18  sure we understand that.  That is to say, when
19  you publish in a peer reviewed journal, like
20  the Journal of Real Estate Research or
21  something like that, you get comments from peer
22  reviewers.  Once you incorporate those comments
23  you tend to throw them in the trash can.
24      Q.  All you can produce for me is that
25  which you have.

Page 56

1       A.  Thank you.  I will do that.
2       Q.  Have any of the property damage models
3   that you have created for class action purposes
4   been subject to peer review process or a review
5   process as all?
6       A.  Well, yes.
7       Q.  Describe the process.
8       A.  Oh, um -- well, recently we had a
9   model -- actually, it wasn't a class action, it
10  was just a large, um -- model that I developed
11  for determining the impact of a transit
12  corridor on property values.  It wasn't related
13  to class action litigation.
14      Q.  My question is focused on reports that
15  you've done for class action litigation.  Have
16  any of those been peer reviewed or reviewed by
17  a process that you would describe as resembling
18  peer review?
19      A.  Well, counselor, it hits me as two
20  different things.  I mean, we produce models
21  for peer reviewed publications and other
22  scholars in the field produce models for peer
23  reviewed publications.  And then in litigation,
24  all we do is adopt those previously peer
25  reviewed models.  So every single model that I

Page 57

1   have ever used in class action related matters
2   has been subject to some prior peer review.
3   But that's -- you're getting the cart before
4   the horse.  We didn't do the model in
5   litigation and then get it peer reviewed as
6   part of the litigation.  It was peer reviewed
7   as part of the peer review process, and then we
8   adopted it for litigation purposes.  So in
9   order to be responsive to that question, I've
10  got to go back to peer reviewed academic
11  publications, which by the way I have already
12  delivered a substantial number of those, indeed
13  everything which was supportive of the
14  affidavit that I submitted has already been set
15  forth to you.  Now we're talking about class
16  action damages models.  And certainly we can do
17  that, but that's going to take a little time
18  because we're talking about a vast number of
19  peer reviewed journal articles which capture
20  all of the nuances of mass appraisal models.
21  And those models are the ones we of course
22  adopt in their peer reviewed form to use in
23  litigation circumstances.
24      Q.  All right.  Request Number 16 regards
25  any and all documents regarding any work that

15 (Pages 54 to 57)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 58

1  the deponent has contracted to perform or has
2  performed for any governmental agency, whether
3  federal, state or local. Do you have any such
4  documents?
5      A. Well, I submitted a copy of my report
6  that I did for the General Services
7  Administration, that's in the box here. I'm
8  going to have to go back and look and reflect
9  on whether we've done anything else. I'm
10  simply going to have to go back through our
11  files and see what else I may have done for
12  other government agencies. We do work for
13  government agencies, from time to time, but we
14  don't segregate those out and keep a list. So
15  I'm going to have to go back through a pretty
16  huge array of clients we've worked for in the
17  past and see if any of them are government
18  agencies.
19      Q. Have you done any work for any
20  governmental agency within the State of
21  Louisiana?
22      A. I'm going to have to go back and look.
23      Q. None comes to mind?
24      A. None comes to mind.
25      Q. All right. Number 17 regards any and

Page 59

1  all documents reflecting the deponent 's travel
2  to New Orleans for the purposes of this
3  litigation, including but not limited to any
4  and all invoices, travel records, journals,
5  memoranda, photographs, concerning such visits.
6      A. Well, the only thing that's
7  reflective -- it's a two-part question. Number
8  one, I've only made one trip specific to this
9  litigation, and it's the trip that I'm in the
10  middle of right now. So naturally, that will
11  be included in our next round of invoices that
12  come out, and I'll be more than happy the ask
13  our clients to send you copies of those
14  invoices.
15      Now, I've made, I'm guessing, fifteen
16  trips to New Orleans since Katrina. And the
17  affidavit in question is based on all of those
18  fifteen trips. I've made extensive trips with
19  respect to Murphy Oil, I've made extensive
20  personal visits on my own nickel to observe
21  property characteristics in this area.
22      MR. MEUNIER:
23          Doctor, we're only talking about
24          this litigation. So we're talking
25          about your current visit only.

Page 60

1      THE WITNESS:
2          Okay. As long as that's what
3      we're talking about.
4      MR. MEUNIER:
5          Correct?
6      THE WITNESS:
7          I just want to make sure that we
8      understand --
9      MR. ZWAIN:
10          If he wants to tell me, he can
11      tell me.
12      A. My impressions, my understanding of
13  New Orleans are based on a whole host of
14  investigations I've made of this market. I
15  just don't want to imply for the record that
16  everything I know about New Orleans is based on
17  this one and only trip.
18  EXAMINATION BY MR. ZWAIN:
19      Q. But the one and only trip that you've
20  made for this litigation is the trip that
21  brings you here today.
22      A. That's correct.
23      Q. Okay. And then the last request for
24  documents, Number 18, regards any and all
25  invoices prepared and/or submitted by the

Page 61

1  deponent regarding work performed by the
2  deponent in connection with this litigation.
3      A. I haven't done any yet. Just got
4  started. We bill monthly and I don't think
5  we've produced any invoices yet.
6      Q. Okay. Going back for a moment to
7  Number 17, the travel that you have experienced
8  in New Orleans for purposes of this litigation,
9  if I broaden the question to ask whether there
10  are members of your firm who have traveled to
11  New Orleans for purposes of this litigation,
12  would your answer be any different?
13      A. No.
14      Q. Okay. So as far as Greenfield and
15  associates is concerned, your trip here today
16  is the first and only trip made to New Orleans
17  for purposes of this litigation.
18      A. Well, it's Greenfield Advisors.
19      Q. Sorry.
20      A. But yes, that's correct.
21      Q. All right.
22      MR. BECNEL:
23          Gary, we did send his firm a
24          retainer of ten thousand dollars, but
25          we haven't had a billing against it

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 62

1    yet.
2       MR. ZWAIN:
3       Great.
4       MR. BECNEL:
5       Okay.
6       MR. ZWAIN:
7       Thank you.
8    (Off the record.)
9       MR. BECNEL:
10      On behalf of the plaintiffs, and
11   I would assume on behalf of the
12   defendants at all future depositions,
13   if we have anyone in the room who is
14   not an attorney and has not identified
15   themselves, then we need to put onto
16   the record also present and have those
17   people identify themselves and on
18   whose side they are in the room for.
19      MR. RIGAMER:
20      I am Greg Rigamer, and I am an
21   expert witness retained by Tom
22   Anzelmo.
23      MR. VANDELL:
24      I am Kerry Vandell.  I'm an
25   expert retained by Jones, Day.

Page 63

1       MR. RODDEWIG:
2       I'm Richard Roddewig.  I'm a
3    consulting expert retained by the
4    defendants in the levee case.
5    EXAMINATION BY MR. ZWAIN:
6       Q.  All right.  Dr. Kilpatrick, I have
7    handed you what I've marked as Kilpatrick
8    Exhibit Number 3, which purports to be your
9    affidavit prepared for this case, the article
10   you wrote entitled "The Aftermath of Katrina,"
11   that was attached to your affidavit, and also
12   your Listing of Trial Testimony by John A.
13   Kilpatrick, Greenfield Advisors, followed
14   finally by your curriculum vitae.
15      Is that what you have before you?
16      (Exhibit Kilpatrick 3 was marked for
17   identification and is attached hereto.)
18      A.  I do.
19   EXAMINATION BY MR. ZWAIN:
20      Q.  All right.  Let's turn first, if we
21   could to your curriculum vitae.  If you would
22   look quickly through it and tell us whether in
23   fact it is current I would be appreciative.
24      A.  It appears to be up to date.
25      Q.  All right.  How do you describe your

Page 64

1    area of expertise?
2       A.  Real estate finance.
3       Q.  Do you hold a law degree?
4       A.  No.
5       Q.  Have you ever been to law school?
6       A.  No.
7       Q.  Do you profess any expertise regarding
8    the legal requirements for a class
9    certification under the Federal Rules of Civil
10   Procedure?
11      A.  Only to the extent that those have
12   economic and real estate valuation
13   implications.
14      Q.  In terms of the legal requirements, I
15   take it you would defer to the lawyers in this
16   case and the judge in this case to know those
17   better than you.
18      A.  Yes.
19      Q.  Are you a demographer?
20      A.  Only to the extent one becomes
21   reasonably competent with demographics in the
22   course of doing large scale real estate
23   analyses.
24      Q.  Do you have any formal training in
25   demography?

Page 65

1       A.  Geography, specifically economic
2    geography, which includes a substantial
3    component in demographics.
4       Q.  And where did you obtain that specific
5    training?
6       A.  Academically at the University of
7    South Carolina, and then as a matter of ongoing
8    work I've participated in work with the, um --
9    American Association of Geographers, in fact,
10   presented a paper at one of the applied
11   geography conferences.  So to the extent, um --
12   one develops expertise in that area, I've done
13   it, but I wouldn't told myself out to be a
14   demographer, per se.
15      Q.  So you know something about demography
16   but you're not an expert in that field.  Is
17   that fair to say?
18      A.  Well, not really fair to say.  It's
19   important that one has a certain degree of
20   expertise in population and economic
21   demographics in order to be able to do the
22   thing I do.  I mean, I've done a whole lot of
23   studies which have had substantial demographic
24   components.  I've done input/output models, for
25   example, which have economic demographic and

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 66

1   population demographic components. So it's not
2   my principal field of endeavor. There are
3   other people who do it more than I do, but I've
4   certainly done enough of it to be able to hire
5   myself out for consulting work in those kinds
6   of studies.
7       Q. All right. Does Greenfield Advisors
8   retain or employ any demographers by trade?
9       A. We retain and employ economists and
10  survey researchers who have extensive training
11  in demographics, particularly with respect to
12  sampling and surveying of demographics.
13      Q. Okay. Do you hold yourself out as a
14  sociology expert?
15      A. Only to the extent that there's a
16  sociological components to real estate, real
17  estate values. I certainly wouldn't profess to
18  be able to teach sociology in university, but
19  have garnered sufficient training to be able
20  the utilize sociology, particularly with
21  respect to the statistics of sociology, in the
22  work I do.
23      Q. All right. So to the extent that you
24  have expertise in demography, to the extent
25  that you have expertise in sociology, would I

Page 67

1   be correct in understanding you to mean that to
2   the extent those disciplines apply to real
3   estate and finance of real estate that's the
4   way you use them.
5       A. That's correct.
6       Q. What about urban planning, do you have
7   any expertise in urban planning?
8       A. Again, to the extent it's necessary to
9   understand how urban planning impacts real
10  estate finance, real estate valuation, I've
11  delivered lectures at the -- in the urban
12  planning program at the University of
13  Washington and have, um -- spoken at urban
14  planning meetings. I can't remember them
15  offhand, I know I've done it. Um -- so indeed
16  I've more than a passing familiarity with
17  urban planning.
18      Q. And what about anthropology?
19      A. No. Not too good with anthropology.
20      Q. History?
21      A. Yeah. Actually started out as a
22  history major in college and switched. I
23  certainly wouldn't profess to be an historian,
24  but I'm more than an amateur at history,
25  history research, those kinds of things.

Page 68

1       Q. Prior to Katrina -- you told us that
2   post-Katrina you've been down here about
3   fifteen times. Before Katrina, how frequently,
4   if ever, had you traveled to New Orleans?
5       A. A few times. I frankly can't remember
6   how many times prior to Katrina. I'd say the
7   most recent time prior to Katrina was about
8   2002 or something like that. Um -- and I know
9   I had been here off and on since the early
10  1980s.
11      Q. Can you give me an estimate as to how
12  many times you've been in New Orleans prior to
13  Katrina?
14      A. Less than a half dozen.
15      Q. Less than a half a dozen?
16      A. Yes.
17      Q. And what was purpose for those trips,
18  generally speaking?
19      A. Usually just personal visits. I can't
20  think of any business related trips I made.
21      Q. Prior to Katrina, had you performed
22  any studies relative to New Orleans, New
23  Orleans real estate, New Orleans refinance?
24      A. I can't recall.
25      Q. Okay.

Page 69

1       MR. BECNEL:
2          Gary, I assume when you say New
3          Orleans you mean the metropolitan
4          area. Or are you just saying New
5          Orleans?
6   EXAMINATION BY MR. ZWAIN:
7       Q. I'm going to ask you the same question
8   with regard to the St. Bernard area. Any
9   specific visits or -- well, let's say visits to
10  St. Bernard prior to Katrina?
11      A. Not that I can recall.
12      Q. Any particular studies,
13  investigations, review of data that you made
14  with regard to St. Bernard real estate or real
15  estate finance issues in St. Bernard prior to
16  Katrina?
17      A. No.
18      Q. How much of the work you do is for
19  purposes of litigation?
20      A. I don't know if I have ever broken
21  that out. Um -- I mean, me personally, a big
22  chunk of the work I do is just running the
23  firm. Um -- then in the twenty or so hours a
24  week that I get to spend doing billable hours
25  stuff, probably half of it is litigation, half

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 70

1  of it is non litigation.  So I guess overall,
2  probably 25 percent of my active business time
3  is associated with litigation.
4      Q.   And how much of your litigation work
5  involves class actions?
6      A.   Oh, currently, probably 5 or
7  10 percent.
8      Q.   The rest involves actions either by
9  individuals or by groups of individuals who are
10 not trying to achieve class certification?
11     A.   Right.  It waxes and wanes.  I mean,
12 if we have a big class action going on, then it
13 may occupy a substantial portion of my time.
14 Of late, our big class action cases have all
15 been quiet, so my attention has been focused --
16 if you had asked me that question a month ago,
17 I would have said zero.
18     Q.   How many class actions are you
19 currently involved in as an expert?
20     A.   Four or five.
21     Q.   Which ones besides this one?
22     A.   Oh, the, um -- Saginaw, Michigan case,
23 I think there's a case in Maryland, um -- I
24 think there's -- the, um -- Perine case that we
25 talked about a little earlier which is in West

Page 71

1  Virginia.  There's another case in West
2  Virginia that's just starting to raise its
3  head, totally separate from Perine, just a
4  different case in West Virginia.  Um -- there
5  is a case in Kansas that's -- we haven't been
6  doing anything on for several months, but it's
7  slated to go to trial starting in September so
8  I'll be pretty busy on that.  Um -- I'm sure
9  there are others, but I can't recall offhand.
10     Q.   What's the name of the case in
11 Maryland, do you remember?
12     A.   No, I can't remember as I sit here
13 today.
14     Q.   Who is the law firm that you're
15 working for?
16     A.   Peter Angelos law firm.  Law Office of
17 Peter Angelos.
18     Q.   What's the name of the other case in
19 West Virginia that's not Perine?
20     A.   I can't remember the citation.  It
21 involves Monsanto.
22     Q.   Who is the lawyer you're working for?
23     A.   Um -- they're a consortium of law
24 firms, the local counsel in the West Virginia
25 is the Caldwell Law Practice.  C-A-L-D-W-E-L-L.

Page 72

1  I think they're in Charleston, West Virginia.
2  I'd have to go back and look.
3      Q.   And what about the case in Kansas, is
4  that different from the Amoco case?
5      A.   No.  That is the Amoco case.  And
6  again, I'm not talking about the Coffeeville
7  case which is the one that I've been retained
8  on but not -- have not worked on yet.  There's
9  a separate one in southeastern Kansas which is
10 the Amoco case.
11     Q.   Are all of the cases that you
12 currently have pending and that are class
13 actions, do they all involve your retention on
14 behalf of the plaintiffs?
15     A.   Currently, I think all of our cases
16 are plaintiff.  We do a fair amount of defense
17 work, but I don't think any of them are pending
18 right now, with the exception -- I'll take that
19 back.  We are involved in a case which we're
20 engaged by Kirkpatrick, Lockhart in their
21 defense of Burlington Northern Santa Fe.
22     Q.   Is that a class action?
23     A.   I can't recall if it is or isn't.
24 It's a large scale case.  It involves a lot of
25 property owners, but I don't know if they have

Page 73

1  applied for class certification or not.  I
2  don't think they did, come to think of it.
3      Q.   And what is the name of the lawyer
4  you're working with?
5      A.   Um -- Craig Trueblood.  He's what used
6  to be Preston, Gates & Ellis that just got
7  acquired by Kirkpatrick Lockhart.
8      Q.   Have you done a report in that case?
9      A.   Several.
10     Q.   What are you being asked to do; what
11 opinions are you being asked to give?
12     A.   Oh.  They've got a contaminated town,
13 they know they contaminated it, they're sorry
14 about that and they want to know how deep the
15 bottom of the well is; they want to know how
16 much damages are.  And so they knew we were
17 going to give them a straight answer and so
18 they hired us.
19          Actually, we've done quite a few cases
20 for Burlington Northern.  They tend to fess up
21 when they make a mistake, so we've done cases
22 for them in Haver, Montana, Livingston,
23 Montana, um -- a couple of other places I can't
24 recall.  Different law firms.  I guess we've --
25 somehow or another every time Burlington

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 74

1   Northern gets engaged in the case they tell
2   whatever lawyer's working for them to go hire
3   us.  So we've worked for probably half a dozen
4   law firms.
5       Q.  So if I'm understanding you correctly,
6   and maybe I'm not, those cases involve
7   situations where Burlington Northern has an
8   environmental problem and they want to settle
9   it and they consult you with respect to
10  settlement allocation issues?
11      A.  They consult with us with respect to
12  how badly the property is damaged, how much the
13  environmental contamination has impacted the
14  property values.
15      Q.  In any of the cases in which you've
16  been retained by Burlington Northern, have you
17  used contingent valuation methodologies to
18  write your reports?
19      A.  Oh, of course.  We use that all the
20  time.  It's popular and highly accepted
21  appraisal methodology written about in a whole
22  variety of publications, including the
23  Appraisal Journal, and accepted by, um -- an
24  extensive group of appraisers who work both on
25  plaintiff and defense cases.  So it would be

Page 75

1   inappropriate of us not to consider contingent
2   valuation in a case, particularly involving
3   environmental damages, environmental
4   contamination.
5       Q.  Have you worked with Mr. Trueblood in
6   all of the Burlington Northern cases?
7       A.  No, just a handful of them.  We worked
8   for, as I mentioned, probably five or six other
9   law firms.  He just happens to be the one we're
10  currently working with.  There are other
11  active -- there are other cases under which
12  we're currently working, but they're not
13  active.  It is just that the one with
14  Mr. Trueblood happens to be currently active.
15      Q.  And you don't know the name of that
16  case?
17      A.  No.
18      Q.  And it's pending where?  I'm sorry.
19      A.  As we said, we have cases pending in
20  Montana and Washington.  The one with
21  Mr. Trueblood is pending in Washington.
22      Q.  Would the reports, any of the reports
23  that you've written for Burlington Northern be
24  included within the reports -- the damage
25  reports we've asked you to produce earlier this

Page 76

1   morning?
2       A.  I hadn't thought about it.  We were
3   talking this morning about class actions, and
4   I'm not -- again, the Burlington Northern cases
5   have not been class actions.  The plaintiffs
6   have not pursued class certification in those
7   cases.
8       Q.  About how many plaintiffs or
9   properties are involved in each of those cases?
10      A.  Um -- a lot.  For instance, in either
11  Haver or Livingston, there was a neighborhood
12  which had quite a few residences in it in which
13  Burlington Northern declared the residences to
14  be 100 percent diminished in value and just
15  bought them all.  We didn't get a chance to
16  appraise those.  They just said, look, we'll
17  just go ahead and buy them up and pay
18  unimpaired market value for them, because we
19  know they're fully contaminated by the plume of
20  oil which is underneath the houses.  So I can't
21  recall just how many houses were in that
22  neighborhood.  At least a dozen or so.
23      Q.  All right.  In those cases where
24  you've done contingent valuation appraisals for
25  Burlington Northern, how many properties were

Page 77

1   in one of those, best as you can recall?
2       A.  Well, we got one in Skykomish,
3   Washington, that's the town in which the
4   Kirkpatrick Lockhart case is involved.  And I
5   guess 100 properties, both residential and
6   commercial.  I've lost track of how many.
7       Q.  That's the one in Washington, correct?
8       A.  Right.
9       Q.  What about the one in Montana?
10      A.  No.  Not the one Montana, just the one
11  in Washington.  I think we have -- I believe
12  we've used contingent valuation in some of the
13  Montana ones, as well, but I can't speak to
14  that as I sit here.  I would think we would.
15  It would certainly be something we would
16  consider given the fact that these were
17  environmentally impaired properties and the
18  findings of contingent valuation are so widely
19  used in those kind of cases.
20      Q.  All right.  Well, let me see if I
21  understand.  How many cases have you worked on
22  for the Burlington Northern?
23      A.  A lot.  I don't have a number.  In
24  other words, we've worked in several different
25  cities, there have been multiple projects in

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 78

1  all of these cities involving as many as six
2  different law firms.
3      Q.  And are all of these projects in
4  litigation, or were they in litigation?
5      A.  Some were, some weren't.  In Montana,
6  all of them were in litigation.  In Skykomish,
7  Washington, I don't know if any of them had
8  actually filed or if Burlington Northern was
9  just trying to preempt filing by going ahead
10 and settling the cases.  I'm not sure if
11 anything was filed or not.
12     The issue in the state of Washington
13 was responsive to a state department of ecology
14 action against them.  So to the extent that
15 that had a litigious background to it, of
16 course they were in litigation.  But I don't
17 recall if any of the individual property owners
18 had filed tort actions.
19     Q.  How many property in the Montana case?
20     A.  Again, I've lost track.  We have got
21 at least two different cities.  I recall
22 working in Haver and Livingston.  We worked on
23 at least a half dozen properties in those two
24 towns, if not more.  And as I said, there were
25 also residential properties in those towns that

Page 79

1  we didn't do any specific work on, just sort of
2  general advisement.
3      Q.  So you're telling me that in each case
4  in Montana, there were about a half dozen
5  properties in each of those cases?
6      A.  No, probably total in Montana, about a
7  half a dozen.
8      Q.  Half a dozen properties.
9      A.  Right.
10     Q.  Did you perform contingent valuation
11 with respect to any of those properties?
12     A.  Well, I'm -- as I sit here today, I
13 would say we probably used the result of our
14 contingent valuation surveys to aid us in
15 formulating value opinions.  I say probably
16 because I can't say that with certainty as I
17 sit here.
18     Q.  All right.
19     A.  I haven't read those reports in, oh,
20 gosh, two or three years.
21     Q.  Besides the two Montana cases and the
22 Washington case, what other Burlington Northern
23 cases have you used contingent valuation?
24     A.  I think those are all the cases we
25 worked for, for Burlington Northern.

Page 80

1      Q.  All right.  Those three cases.
2      A.  Right.
3      Q.  Are there any other cases in which --
4  where you've worked for defendants?
5      A.  Oh, I'm sure there are, I just can't
6  recall them offhand.
7      Q.  What percentage of your work is
8  defense as opposed to plaintiff?
9      A.  Well, on a total hourly basis, um --
10 it varies from time to time.  I mean, when
11 we've got one of these big defense-related
12 cases, it might be eating up all of my
13 litigation time.  Presently, for example, we're
14 in a big bankruptcy case in, um -- in Texas in
15 which we're using, again, contingent valuation.
16     Q.  On how many pending cases do you have
17 currently, and of those which you have pending
18 currently how many are for defense and how many
19 are for plaintiff, can you estimate?
20     A.  Oh, no.  Not really.  I'll say
21 probably a total of fifty or so projects with
22 our firm right now, of which probably half of
23 them are litigious, and I'm guessing a third
24 defendant, two thirds plaintiff.  But that's a
25 pretty wild guess.

Page 81

1      Q.  Let's turn, if we may, to your list of
2  trial testimony attached to your report.  And
3  can you go through this document and tell us
4  which cases are class actions?
5      A.  Well, let's see here.  Um -- starting
6  on the very first page of it, and the third one
7  down which is 04-1201, Thomas v. A. Wilbert &
8  Sons and Dow Chemical, that's a class action.
9      Q.  All right.
10     A.  Um -- then we have 04-0115, Turnbull
11 v. MTA.  I can't recall if that's a class
12 action or not.  It involved multiple property
13 owners, but I'm not sure if that was certified
14 as a class or not.  I didn't get involved in
15 the early stages, but only came in to testify
16 as to the damages.
17     Q.  All right.  How many properties
18 involved in Turnbull?
19     A.  A couple dozen.
20     Q.  How many properties involved in
21 Thomas?
22     A.  Don't know.  We measured it on an
23 acreage basis.  It's quite a few thousand
24 acres.  I'm not quite sure how many discreet
25 property owners, because we valued it as an

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 82

1  underground rents case.
2      Q.  I noticed that one of the lawyers you
3  were working for is Pat Pendley.  Is this the
4  Myrtle Grove case you referred to before?
5      A.  That's correct.  And then we go down,
6  06-0407, Koch V. Hicks, that's the Peter
7  Angelos case.
8      Q.  Is that a class action?
9      A.  Yes.  Then 05-0801, Neodesha v.
10 Amoco/BP --
11     Q.  Is that the Amoco case in Kansas that
12 you were referring to before?
13     A.  That's correct.
14     Q.  In the Koch v. Hicks case, did you --
15 at what stage did you get involved, at the
16 class certification stage or the damage stage
17 or both?
18     A.  I think at class certification stage.
19     Q.  Was it class certified?
20     A.  I think so.  I'd have to go back and
21 check.  I'm not sure.
22     Q.  You wrote a report in support of class
23 certification in that case?
24     A.  Yes.
25     Q.  Did you do a damage report?

Page 83

1      A.  No.  Not yet.
2      Q.  I'm sorry.  You were talking about the
3  Amoco case in Kansas?
4      A.  Well, the Amoco case in Kansas would
5  be the next one.  It's certified, I believe,
6  and it goes to trial, um -- in September.  And
7  so we've, um -- already written a damage
8  report.
9      Q.  How many properties involved in the
10 Kansas cases?
11     A.  A whole town.  I don't remember how
12 many discreet property.  We simply developed a
13 model but didn't extent that model to the
14 actual number of property.
15     Q.  Can you give me an estimate to the
16 number of properties involved in that case?
17     A.  Hundreds.
18     Q.  What about Koch v. Hicks, how many
19 properties?
20     A.  Hundreds.
21     Q.  All right.  That's when next class
22 certification case?
23     A.  05-0801, Perine, et al, v. Dupont, and
24 that's a class action that involved a lot of
25 properties.  Um -- it depends on how you define

Page 84

1  property in that case.  We had over seven
2  thousand discreet tax assessor parcels, but we
3  went through and found that oftentimes multiple
4  parcels would have common ownership so we ended
5  up finding 2300 and some change individual
6  properties.
7      Q.  And that's a case in which you wrote a
8  damage report; correct?
9      A.  That's correct.
10     Q.  Turner versus Murphy Oil, the next
11 one, is that the Murphy Oil case that we talked
12 about earlier?
13     A.  Yes.
14     Q.  And you wrote a report in support of
15 class certification in that case, right?
16     A.  That's correct.
17     Q.  You did not do a damage report?
18     A.  That's correct.
19     Q.  Keep going.
20     A.  On the second page, you go about the
21 third from the bottom, 05-0102, Koszewski Jones
22 et al versus Delphi Corporation, I think that
23 got started as a class action and eventually
24 settled before class got certified.  In other
25 words, Delphi made a settlement offer before

Page 85

1  the class was even certified.
2      Q.  What was your role in the case?
3      A.  Advising the, um -- plaintiff's
4  counsel.
5      Q.  Did you write a report?
6      A.  Yes.
7      Q.  Regarding what, class certification or
8  damages or both?
9      A.  I think it went straight to the heart
10 of damages.  We didn't even -- I don't believe
11 we even paused at class certification but went
12 straight to what the most probable damages were
13 and Delphi wrote a check.
14     Q.  So you made a damage calculation.
15     A.  Right.  Well, I say Delphi.  Delphi is
16 in bankruptcy.  General Motors actually ended
17 up writing the check.
18     Q.  Any other class actions?
19     A.  I'm looking down.
20     Q.  How many properties, by the way, in
21 the Koszewski Jones matter?
22     A.  I'm going to say a hundred, plus or
23 minus.
24        Going through to the third page, we've
25 got Henry, et al versus St. Croix Alumina, and

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 86

1    that's a class action.
2        Q.  Was the class certified?
3        A.  I believe so.  It's been two or three
4    years since I've done anything on that case.
5    It's sort of winding its way through motions
6    which are outside of the scope of what I do, so
7    I frankly can't recall if that class was
8    certified or not.  I think it was.
9        Q.  You worked for the plaintiffs in the
10   case?
11       A.  Yes.
12       Q.  What was your role?
13       A.  Um -- pretty much the same as this
14   one.
15       Q.  Writing a report in favor of class
16   certification?
17       A.  And, um -- determination of damages.
18   We also --
19       Q.  Did you do two separate reports, one
20   for class cert and one for damages?
21       A.  I think so.  I do know that we also
22   were proffered as economic experts to make some
23   estimates of personal property damages.  And we
24   incorporated the personal property damages into
25   the real property appraisal report.

Page 87

1        Q.  Personal property including what, in
2    your mind?
3        A.  Oh, furniture, clothing, appliances,
4    those sorts of things.
5        Q.  All right.  How many properties were
6    involved?
7        A.  On the order of hundreds.  I can't
8    recall how many.
9        Q.  So you did a damage report and a class
10   cert report.
11       A.  I think we did two.  I'm not sure if
12   we -- one or two.  I know the damages was all
13   combined into one, but I can't recall if the
14   class issues were a separate report or not.
15       Q.  Any other class actions on this page?
16       A.  Um -- yeah.  04-0803, Kleinberg v.
17   Sto, I submitted an affidavit in support of
18   class certification.
19       Q.  For the plaintiffs?
20       A.  Yes.
21       Q.  I guess if it's in support of class
22   certificate it would be for the plaintiffs.
23           Did you do a damage report?
24       A.  No.
25       Q.  How many properties were involved?

Page 88

1        A.  Don't know.  Never determined that.
2        Q.  Any other class certificate cases --
3    class action cases on this page?
4        A.  Not on this page, no.
5        Q.  What about the next page?
6        A.  Next page we have, um -- the second
7    one down 00-0501, Guillory v. Union Pacific --
8        Q.  That's Lake Charles case we talked
9    about earlier?
10       A.  That's correct.
11       Q.  And you did both the class cert report
12   and the damage report?
13       A.  No, just class cert.
14       Q.  What kind of case was that?
15       A.  Contaminated property.
16       Q.  Contaminated by what?
17       A.  An overturned tanker truckload of,
18   um -- herbicide, I think.  It's been a while.
19       Q.  How many properties were involved?
20       A.  Never determined.
21       Q.  Okay.  It was never determined, or you
22   knew and have now since forgotten?
23       A.  No.  No.  Never determined.  We
24   simply -- I testified as to the appropriateness
25   of using a mass appraisal model for a

Page 89

1    geographically defined area.  In other words,
2    the modeling people were going to come in and
3    determine how large the affected area would be,
4    and my job was to simply opine that if you have
5    a large area like that, the appropriate way to
6    get at the property valuation in an efficient
7    manner is to use a mass appraisal model.  And
8    based on that, the class was of course
9    certified.  And I think they went on to settle
10   it.  But we never did any damages work beyond
11   testifying to the appropriateness of the model.
12       Q.  All right.  Any other class
13   certification cases on this page?
14       A.  Yes.  04-0114, Henry v. Dow.
15       Q.  We talked about that previously.
16       A.  Yeah.
17       Q.  Is that the one you wrote a damage
18   report in?
19       A.  No.  I haven't written a damage report
20   there.  That's been -- we've written a report
21   not dissimilar to the affidavit that I've
22   written in this case, and the Court has
23   certified the class and it's presently on
24   appeal.  The certification is on appeal.
25       Q.  And how many properties are involved

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 90

1  in that case?
2      A.  I don't know.  Roughly twelve to
3  fifteen hundred.  But we haven't gotten to the
4  actual empirics or quantification of the model
5  yet.  No need to get into that sort of
6  quantification at the class certification
7  stage.  It's just important that we testify
8  that mass appraisal is the only way you'd do
9  this sort of thing.  So, um -- that was the
10 basis on which the lower Court certified the
11 class.
12     Q.  Okay.  Any other class actions on this
13 page?
14     A.  Um -- I'm looking.  No.
15     Q.  What about the next page?
16     A.  No.
17     Q.  Next page.
18     A.  No.
19     Q.  Next page, which is the last page.
20     A.  No.
21     Q.  This trial testimony lift encompasses
22 what period of time?
23     A.  Oh, at least the last four years.  I
24 think some of these are a little older than
25 that.

Page 91

1      Q.  So for at least the last four years we
2  have all of the class actions in which you
3  worked, which I understand to be to the Thomas
4  case, the Koch case, the Neodesha case, the
5  Perine case, the Koszewski Jones case, the
6  Henry case, the Kleinberg case, the Guillory
7  case, the Henry versus Dow case, and that's it.
8          MR. MEUNIER:
9              You failed to mention Turner.
10 EXAMINATION BY MR. ZWAIN:
11     Q.  Oh, and the Turner case.  I'm sorry.
12     A.  And you also missed Turnbull v. MTA,
13 which I didn't opine with respect to class
14 certificate, but later on with respect to
15 damages.
16     Q.  Okay.  Those are all the class actions
17 that you've been involved in within the last
18 four years or so.
19     A.  To the best of my recollection, yes.
20     Q.  All right.  And in all those cases you
21 were retained by the plaintiffs?
22     A.  I believe so, yes.
23     Q.  In all of those cases you felt that
24 class certification was appropriate?
25     A.  Oh, I -- you know, I don't get

Page 92

1  feelings about these things.  I mean, I try to
2  keep my feelings out of it.
3      Q.  In all of those cases you concluded
4  that class certification was the recommended
5  course of treatment?
6      A.  I wouldn't use the word recommended
7  either, I'd use only --
8      Q.  Okay.
9      A.  It's kind of like a broken leg,
10 really.  You don't recommend setting the bone,
11 that's just the thing you do.
12     Q.  Have you ever been retained in
13 connection with a class action case involving
14 property damage to multiple contiguous
15 properties that you felt was not suitable for
16 class certification?
17     A.  No.
18     Q.  Has anyone, a lawyer, come to you to
19 discuss your possible retention in a case
20 involving class certification issues regarding
21 multiple contiguous damaged properties and you
22 told them you just didn't feel the class
23 certification method was appropriate?
24     A.  You know, I may have done that.  I
25 can't recall.  Almost always it's going to be a

Page 93

1  situation where the case is very small, you
2  know, something like that.  But as I sit here
3  today I can't recall one of those
4  circumstances.
5          I'm keeping the door open because we
6  turn down a lot of projects.  We probably say
7  no to more projects than we say yes to.  And so
8  I don't want to leave myself open to having
9  committed an error here by saying that it's
10 never happened and then you find some guy who
11 said he called me up and we had a conversation
12 and I dissuaded him from doing so.
13     Q.  But you don't ever remember such a
14 conversation.
15     A.  No.  And certainly not on a case
16 that's even a fraction of the size of this one.
17     Q.  Besides this case and the Murphy Oil
18 case, the case that you have that involves the
19 most amount of properties is the Perine case?
20     A.  I think so.  Um -- that seems to be
21 about right.  Um -- yeah.  I think I was having
22 a conversation with Woody Hansen, the past
23 president of the Appraisal Institute over lunch
24 one day, and he said, you guys do all these big
25 cases, don't you?

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 94

1        And I said, yeah, we do.
2        Um -- so I think that's the biggest
3   one, but we're doing some other fairly big
4   ones.  You know, Neodesha is pretty big.
5   Saginaw is pretty big.
6        Q.  Are there any cases that -- class
7   action cases that you are currently involved in
8   that did not appear on this list because you
9   were retained after the list was prepared?
10       A.  Yeah.  We have got a couple of cases
11  that we haven't -- this list only lists things
12  in which I've been deposed or testified.  We've
13  got another case in Maryland, in a different
14  county in Maryland, it's not the Koch v. Hicks
15  case which is in Baltimore county, but it's a
16  case in, um -- in a different county, and I
17  can't remember which one it is, in which we're
18  currently retained and actually have begun work
19  but I've not been deposed and I don't know that
20  I've written an affidavit yet.
21       Q.  What's the name of the case?
22       A.  I cannot recall.  It's just in the
23  town of Jacksonville, Maryland.
24       Q.  What lawyer are you working for?
25       A.  Again, Peter Angelos.

Page 95

1        Q.  How many properties?
2        A.  I haven't figured that out yet.
3        Q.  Do you have any ballpark estimate?
4        A.  A couple hundred.
5        Q.  Any other cases that don't appear on
6   this document?  Class actions?
7        A.  Maybe.  I don't want to say no, but I
8   can't recall any as I sit here.
9        Q.  All right.  Do you hold the MAI
10  designation from the Appraisal Institute?
11       A.  No.
12       Q.  What association, if any, do you have
13  with the Appraisal Institute?
14       A.  Well, I'm an associate member, I'm on
15  the publications review panel, um -- I use them
16  as a source of continuing education credits
17  from time to time.  Um -- I've sat on a couple
18  of committees with them but I can't remember
19  what they are, and I don't have time to do much
20  of that anymore.
21       Q.  What do you have to do to be an
22  associate member of the Appraisal Institute?
23       A.  I think your dues check has to clear
24  the bank.  I'm being a little facetious because
25  I believe historically they had two categories

Page 96

1   of -- they had three categories of members.
2   They had what are called designated members who
3   are people who had gone through kind of a
4   practitioner education process and been --
5   received one of several designations.  MAI, as
6   you just cited, is one of them.  Those are
7   called designated members.
8        Then anybody who's a state certified
9   appraiser who hasn't pursued that route is
10  called an associate member.
11       Um -- and then anyone who's not a
12  state certified appraiser but nonetheless wants
13  to be a member of the Appraisal Institute is
14  called an affiliate member.  But that's a
15  distinction that gets lost on a lot of people.
16       Q.  Have you ever taken any of the
17  necessary courses for certification as an MAI?
18       A.  Yes, all of them.
19       Q.  Have you ever completed a
20  demonstration appraisal report for review and
21  approval?
22       A.  I'm the only person in history to be
23  allowed to do a research project in lieu of a
24  demonstration report.  And in fact, my research
25  project is now being used as the demonstration

Page 97

1   research project for anybody else who wants to
2   find out how to take that route.
3        Q.  Have you ever taken the MAI exam?
4        A.  Yes.
5        Q.  Pass it?
6        A.  Yes.
7        Q.  When did you pass it?
8        A.  A couple of years ago.
9        Q.  So I thought in answer to my previous
10  question that you did not hold an MAI
11  designation for the Appraisal Institute.
12       You do, in fact, hold such a
13  designation?
14       A.  No, not yet.  You have to -- there is
15  one final requirement.  You have to go through
16  an experience log.  It's a fairly time
17  consuming process where you have to go through
18  and list all the experience -- all the
19  appraisal reports you've done over time and
20  submit copies of them and go through an
21  experience review process.  That's the only
22  thing I haven't done for the MAI designation.
23  And I'm also working on a commercial pilot 's
24  license, and to be frank with you, that's just
25  emotionally more important to me right now than

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 98

1   the MAI designation.
2       Q.  How many appraisals have you done?
3       A.  In my life?
4       Q.  Yes, sir.
5       A.  I've lost track.  Hundreds, if not way
6   more than hundreds.
7       Q.  So what do you physically have to do
8   in order to complete your application for MAI
9   designation?
10      A.  Well, now you're starting to sound
11  like my commercial pilot instructor.  You know,
12  why don't you just sit down and do it, John.
13  It's just going to take a couple of weeks of
14  your time, and if you just do it you'll be a
15  commercial pilot.  But no, I haven't gotten
16  around to doing it yet.
17      Q.  Okay.  Just tell me what you have to
18  do.
19      A.  I got to sit down and do all that
20  stuff, compile the log and send it in and go to
21  some meetings and have some phone conferences,
22  and I just haven't been able to carve out a
23  couple of weeks of my time in the last two
24  years to do that.  It's just not
25  professionally, um -- if I were a journeyman

Page 99

1   appraiser, you know, had a bachelor's degree
2   and I was a state certified appraiser and
3   wanted the figure out a way to charge my
4   clients a little bit more money, I'd carve out
5   a couple of weeks and do this thing.  But,
6   um -- you know, given what I do for a living,
7   it's not -- it's not a thing that holds very
8   much promise.  I certainly am not going to be
9   able to raise my billing rates any more by
10  getting it, so.
11      Q.  Do you have a permanent Louisiana
12  appraisal license?
13      A.  I think so.  I know I've got at least
14  a temporary practice permit, but my suspicion,
15  given the number of projects we do in this
16  state, is that I've got a permanent one.
17      Q.  So as you sit here today, you're not
18  sure?
19      A.  No.  It's one or the other.
20      Q.  Did you get that license in connection
21  with or at around the time that you were first
22  retained as an expert witness in one of your
23  Louisiana cases?
24      A.  Yeah.  Four or five years ago.
25      Q.  And that would have been the case

Page 100

1   through Mr. Pendley?
2       A.  No.  No.  No.  No.  No.  I've done
3   earlier cases prior to ever meeting
4   Mr. Pendley.
5       Q.  What other cases in Louisiana have you
6   done?
7       A.  I think the first project I ever
8   worked on here was the Guillory versus Union
9   Pacific project.
10      Q.  All right.  Any other cases besides
11  that case and the one for Mr. Pendley noted in
12  your trial testimony lift which I believe was
13  the Thomas case?
14      A.  Oh.  I've done other projects, I
15  just -- they haven't gotten -- they aren't -- I
16  haven't been deposed or testified in them.
17      Q.  What other projects?
18      A.  I've done one, um -- in Baton Rouge
19  regarding valuation of a neighborhood generally
20  called Devil's Swamp, which is a finger of land
21  surrounded on about three sides by the
22  Mississippi to the northwest of Baton Rouge and
23  to the west of the Baton Rouge Canal.  I've
24  done --
25      Q.  Is that litigation you're working on?

Page 101

1       A.  Well, it's for settlement.  It could
2   potentially go into litigation, but it's
3   probably not.
4       Q.  Who are you working for?
5       A.  Again, Pat Pendley.  There's some
6   other lawyers involved in that, but he retained
7   me.
8       Q.  And what has he asked you to do?
9       A.  Oh, figure out what the land is worth
10  in the as is -- as if unimpaired condition.
11      Q.  And that figure, whatever figure you
12  arrive at, is going to be the basis for some
13  settlement negotiations?
14      A.  That's correct.
15      Q.  What other Louisiana projects do you
16  have?
17      A.  We have got the CITGO oil spill matter
18  in Lake Charles.  CITGO spilled a couple
19  million gallons of slop oil, as it's called,
20  into, um -- the Calcasieu estuary and into the
21  Calcasieu Ship Canal.  And I'm mostly involved
22  in determining the unimpaired value of a track
23  of development land which fronts on the, um --
24  fronts on the ship canal.
25      Q.  And what lawyers are you working for

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 102

1  in that matter?
2      A.  Again, Pat Pendley.
3      Q.  Is it in litigation?
4      A.  Probably will be, but I don't know.  I
5  think at this point they're just -- they just
6  want to know what it's worth.
7      Q.  Any other Louisiana projects?
8      A.  You know, I think there are but I
9  can't recall any.
10     Q.  Are those Katrina cases, the MRGO
11 case, the levee case, the Murphy Oil case, the
12 first cases that you've had in the New Orleans
13 area?  Or the first projects you've worked on
14 in the New Orleans area?
15     A.  Our firm has worked on other projects
16 in the New Orleans area in the past.  These are
17 the first ones I've personally worked on, yes.
18     Q.  What New Orleans projects has your
19 firm been involved in?
20     A.  I can't raw, I just know we have.
21     Q.  What kind of projects?
22     A.  Usually, straightforward valuation
23 projects.
24     Q.  Okay.  And what were you valuing?
25     A.  Again, I can't recall.  And by the way

Page 103

1  I want to be careful using the word
2  straightforward because nobody ever hires us on
3  a straightforward anything.  If it's not
4  complicated, our phone doesn't ring.  But
5  generally, I think in the past we had worked on
6  a couple of non litigation valuation cases down
7  here.
8      Q.  Do you remember for whom?
9      A.  No, I don't.  I wasn't personally
10 involved in that.  It's a big firm, and so I
11 just happen to know that we've done some
12 Louisiana work.
13     Q.  Do you remember who at your firm was
14 involved?
15     A.  No.
16     Q.  Do you remember what type of property
17 was that you were evaluating?
18     A.  No.  Like I say, there were one or
19 more cases and -- I happen to be aware that my
20 firm has done this work in the past down here.
21     Q.  So when you say cases, I'm inferring
22 from that that there was some litigation
23 involved.
24     A.  No.  I wouldn't infer that.  We use
25 the word cases a little bit sloppily.  We

Page 104

1  didn't mean to imply that there's litigation.
2  Oft-times we get engaged in matters which could
3  potentially be litigious but thanks to our work
4  our clients are able to avoid.  So we've
5  come to use the word case simply because quite
6  frequently whenever our phone rings it's
7  because there's a matter which might have some
8  legal overtones.
9      Q.  Do you remember who it was at your
10 firm that had this involvement in matters
11 within the New Orleans area?
12     A.  No.  I really don't.
13     Q.  Do you have any matters pending in the
14 New Orleans area at present besides Murphy Oil
15 and the MRGO and the levee case?
16     A.  No.
17     Q.  Have you ever been involved in any
18 cases other than these cases that involve flood
19 damage?
20     A.  I think so, but as I sit here today
21 I'm having trouble recalling that.  It seems
22 that we have, but I just can't recall what they
23 were.
24     Q.  Okay.  Have you been involved in any
25 cases that have involved only flood damage?

Page 105

1      A.  Again, it seems like we have, but I
2  can't recall that offhand.  I'd have to go back
3  and look.
4      Q.  If you remember as we continue to have
5  this conversation, would let me know, please?
6      A.  Oh, I'll be glad to.
7          MR. BECNEL:
8              Coffeeville is flood over by the
9          forty mile area of Kansas and
10         Oklahoma.
11         MR. ZWAIN:
12             There you go.
13         MR. BECNEL:
14             But he hasn't done any work on it
15         yet.  He doesn't know that.
16 EXAMINATION BY MR. ZWAIN:
17     Q.  All right.  Besides Coffeeville, you
18 can't remember any flood damage cases.
19     A.  There is also the Saginaw, Michigan
20 case, which is not purely flood, it's a
21 contaminant carried by flood.  In that case,
22 it's, um -- properties which have been
23 contaminated by flood borne contaminants.  And
24 of course Murphy Oil was -- had a flood
25 component to it.  But as I sit here I can't

27 (Pages 102 to 105)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 106

1  recall any.
2      Q.  Have you ever testified in a case -- I
3  take it that you haven't -- in opposition to
4  class certification?
5      A.  No.
6      Q.  Have you ever been involved in any
7  cases of any kind, class action or otherwise,
8  that involve damage due to hurricane?
9      A.  Um -- you mean as an expert?
10     Q.  Yes, sir.
11     A.  I'm going to pause on that one.  I may
12 have, but I can't recall offhand.
13     Q.  The damage source from the -- in the
14 Virgin Islands case was what exactly?
15     A.  You're right, it was a hurricane that
16 carried -- Hurricane Georges that carried
17 by-product of an aluminum smelter into homes in
18 the surrounding neighborhood.
19     Q.  And that was from a single source?
20     A.  Yes.
21     Q.  What was the source?
22     A.  An 11-story high pile of red dust that
23 had been piled up on the property of the
24 aluminum smelter.
25     Q.  Was it water damage also involved in

Page 107

1  that case?
2      A.  No.
3      Q.  How big was the class area?
4      A.  Multiple neighborhoods.  It's a model
5  defined class area because when you look at the
6  topography you can see that there is a varying
7  terrain around this smelter, and there are
8  homes that exist in shallows and swales in the
9  surrounding area, and so that topography and
10 the modeling thereof tended to define the
11 affected class area.
12     Q.  And when you talk about modeling,
13 you're talking about air modeling or some such
14 thing done by somebody else?
15     A.  Well, somebody else did modeling, but
16 it wasn't air modeling, it's a topographical
17 model.  In other words, you can draw a model of
18 this, and it's actually pretty simple modeling.
19 We didn't do it.  But it becomes very obvious
20 where the properties would be defined, and in
21 fact we went out and did some survey work to
22 confirm the accuracy of the models that were
23 drawn.
24     Q.  All right.  So what area did that
25 class area encompass, to the best of your

Page 108

1  recollection?
2      A.  Quite a few square miles, but I can't
3  define it.
4      Q.  And how many property, approximately,
5  contained within that class area?
6      A.  Hundreds.
7      Q.  Were there any wind damage claims?
8      A.  No, we were just involved in the red
9  dust side of it.
10     Q.  Was there wind damage sustained by
11 some of the homes that had sustained red dust
12 damage?
13     A.  No, no.  Not really.
14     Q.  Okay.
15     A.  Um --
16     Q.  And if my recollection is correct, you
17 wrote a report in support of class
18 certification in this case?
19     A.  I can't remember if we wrote one
20 report or two.  I note we wrote a damages
21 report.  But as I testified earlier here this
22 morning, I can't recall if we wrote anything
23 separate with respect to certified class.
24     Q.  And that damages report concerned
25 itself only with damages caused by the

Page 109

1  inflection of red dust upon the properties
2  involved?
3      A.  That's correct.
4      Q.  There were no issues of water damage
5  or wind damage that complicated that particular
6  case.
7      A.  No.  We were able to hone in on the
8  narrow focus of the issue at hand.
9      Q.  Okay.  What did you do to prepare for
10 this deposition?
11     A.  Well, um -- reread my affidavit.  I
12 reread, um -- some of the supportive material
13 that had gone into the, um -- deposition.  Of
14 course then on Thursday I got your, um --
15 affidavit -- excuse me, your Notice of
16 Videotape Deposition with the attached Appendix
17 A which caused me to give a great deal of
18 thought about how to be as responsive as
19 possible in the shortest period of time, and so
20 I had meetings with a couple of my senior staff
21 and, um -- directed them to do whatever was
22 possible to be supportive in the narrow time
23 frame involved.  I also took another look at a
24 couple of the footnoted documents from the,
25 um -- article that I wrote for -- or cowrote

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 110

1  for the Journal of Real Estate Literature, I
2  specifically directed my attention to, um --
3  two items, which are the third and second from
4  the bottom in the list, in the bibliography on
5  Page 227 of that.  The Brookings Institute,
6  "New Orleans After the Storm, Lessons from the
7  Past, Plan for the Future," published October,
8  2005, and the Urban Land Institute, "New
9  Orleans, Louisiana, A Strategy for Rebuilding,"
10 Washington, D.C., 2005.  So I took another
11 glance at those two articles just to refresh my
12 memory on some of the supportive material that
13 Professor Dermisi and I have put into this
14 article.
15      I read the National Geographic
16 article, the current article about New Orleans,
17 which I've included a copy of that National
18 Geographic issue in the box which I brought
19 with me here today.
20      Um -- that's about it.
21     Q.  All right.  You said you read your
22 affidavit, notice of deposition, the article
23 that you attached to your affidavit, the
24 National Geographic article, and you said
25 something else about documents supportive of

Page 111

1  this deposition.  So I'm not sure what you
2  meant.
3     A.  Sure, I asked my staff to, um --
4  devote whatever people we had available to
5  be -- to, um -- print out as much as we could
6  to be responsive to Appendix A to your notice.
7  And I also reviewed two articles which appear
8  on Page 227 of the Kilpatrick Dermisi article,
9  and those were the Brookings Institute article
10 and the Urban Land Institute publication.  I
11 reviewed those and put them in a box, and then
12 reviewed the National Geographic article and
13 put it in the box.
14     Q.  Since your report was prepared, you
15 have not felt the need to change it or alter
16 your opinions and conclusions stated in this
17 report?
18     A.  No.
19     Q.  Have you ever had an occasion to read
20 either the Complaint and Amended Complaint
21 filed in the levee case and the complaint filed
22 in the MRGO case?
23     A.  Yeah.  I think I did.  They don't
24 stand out in my mind.  I was focusing my
25 attention more on real estate issues and not so

Page 112

1  much on legal issues.
2     Q.  Okay.  So you may have read it, you
3  may not, you just don't remember?
4     A.  That's correct.
5     Q.  All right.  Have you ever read any of
6  the depositions of any of the plaintiffs that
7  we've taken in these cases?
8     A.  No.
9     Q.  Have you read any summaries of those
10 depositions?
11     A.  No.  I obviously will want to read
12 those when we get to the actual empirical
13 portion of this case.  But at present, that
14 wasn't part of formulation of my opinion.
15     Q.  Have you met any of the class
16 representatives in this case?
17     A.  Know, I may have.  I don't know.
18     Q.  Do you remember speaking to any of
19 them?
20     A.  No.  I mean, I've met lots and lots of
21 people here, so I don't know if any of them
22 happen to be included in the class reps.  I
23 don't want to be disinclusive of that, but I
24 haven't purposefully met with anyone in my role
25 as an expert in the case and their role as a

Page 113

1  class rep in the case.
2     Q.  Have you reviewed any of the
3  plaintiffs' written discovery responses in this
4  case?
5     A.  No.  But again, I certainly will when
6  we get to the appropriate part of the analysis.
7     Q.  Have you reviewed the Motion for Class
8  Certification in the levee case?
9     A.  I think so.  I don't recall if I have
10 or haven't.
11     Q.  Have you reviewed the Amended Motion
12 for Class Certification in the levee case?
13     A.  Again, I can't recall if I have or
14 haven't.
15     Q.  Have you reviewed the Motion for Class
16 Certificate in the MRGO case?
17     A.  Again, I can't recall.
18     Q.  Have you reviewed the Amended Motion
19 of Class Certification in the MRGO case?
20     A.  No.
21     Q.  And have you looked at any photographs
22 or diagrams or any other descriptions or
23 depictions of any of the class representatives'
24 properties in these cases?
25     A.  Not specific the formulating my

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 114

1  opinion here today.  I mean, I've looked at at
2  least one map, one modeling map.  Of course,
3  I've looked at hundreds of maps of the area and
4  I can't tell you how many flood maps.
5      Q.  I'm interested to know if you've
6  looked at any properties owned by the class
7  plaintiffs.  Class representatives.
8      A.  Right.  And with respect specific to
9  this case, no.  Specific to my preparation thus
10  far in this case, I have not yet.
11      Q.  Okay.  Have you sent anyone down from
12  Greenfield to look at any of the class
13  representatives' properties in these cases?
14      A.  Not yet.  But I have every intention
15  of doing that at the appropriate time.
16      Q.  Have you looked at any assessor data
17  with respect to any of the class
18  representatives' property in these cases?
19      A.  No, not yet.
20      Q.  Have you looked at any bank appraisal
21  for mortgages with respect to any of the class
22  representatives' properties in these cases?
23      A.  No, not yet.
24      Q.  All of these things you intend to do
25  at some point in the future?

Page 115

1      A.  Um -- yes, as we move forward in the,
2  um -- the empirical analysis phase, all of this
3  will be considered in its appropriate light as
4  we gather data and formulate the quantitative
5  component of the model and put that in place.
6      Q.  Are you charging by the hour in this
7  case?
8      A.  Yes.
9      Q.  What is your hourly rate?
10      A.  Currently, six hundred.
11      Q.  How many others at Greenfield are
12  engaged in this particular project?  And when I
13  say this particular project, I'm talking about
14  the MRGO and the levee case.
15      A.  Um -- until Thursday afternoon, none.
16  As of Thursday afternoon, about five.
17      Q.  And the sort of people who are engaged
18  in this case at Greenfield are the people that
19  you talked about who are trying to respond to
20  the request for documents we made in Exhibit A?
21      A.  That's correct.
22      Q.  And so how do you charge their time,
23  if at all?
24      A.  By the hour.
25      Q.  At what rate?

Page 116

1      A.  It ranges from fifty to a hundred
2  dollars an hour.
3      Q.  Were you the sole crafter of this
4  report, this Exhibit 3?
5      A.  Yes.
6      Q.  No one helped you?
7      A.  I believe Dr. Kummerow, Max Kummerow,
8  read through it for me, and I probably had
9  Ms. McSherry read through it for typos and
10  those sorts of things.
11          Dr. Kummerow is one of our analysts at
12  Greenfield, a former professor, and he has
13  written extensively.  In fact, I've cited him
14  in a couple of places here.  So, um -- I asked
15  him to read these things before I send them
16  out.
17      Q.  Besides traveling here and preparing
18  or your deposition and preparing and drafting
19  your affidavit, have you done any other work in
20  this case?
21      A.  Not that I can recall.
22      Q.  About how long did it take you to
23  draft your affidavit?
24      A.  Um -- you know, I'll have to go back
25  and look at the billing records.  It was -- it

Page 117

1  wasn't a trivial amount of time, but it didn't
2  take a month.  So obviously somewhere between
3  an hour and a month.  Now that sounds stupid,
4  but frankly, as I sit here today I can't tell
5  you whether that took me ten hours or twenty
6  hours or twenty-five hours.  I don't know.
7      Q.  Would it be somewhere in that range?
8      A.  Yeah.  That sounds about right.
9      Q.  All right.  Is your compensation for
10  your hourly rate, I guess for the time spent
11  drafting the report, the same as your rate for
12  traveling to and testifying in this deposition?
13      A.  Right.
14      Q.  Is your rate any different for
15  testifying at a certification hearing or in a
16  trial?
17      A.  No.  Not yet.  If the room gets any
18  hotter, I'm going to raise it, though.
19          (Off the record.)
20  EXAMINATION BY MR. ZWAIN:
21      Q.  All right.  So can you tell me when
22  you were first contacted about this case, being
23  MRGO and levee?
24      A.  You know, first contacted about it, I
25  don't know.  It may have been a while ago.

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 118

1  Um -- first formally contacted, it's been
2  pretty recently.  But I don't remember the
3  exact date.
4      Q.  What do you remember about your first
5  contact?
6      A.  Um -- not much.  Just that we received
7  a phone call.  I think it was Mr. Becnel, I'm
8  not positive about that, who called me and
9  said, um -- you know, we've got this thing
10 we're going to do and we need you to help us do
11 it.
12     Q.  Uh-huh.
13     A.  And I said sure.
14     Q.  And that was about how many weeks,
15 months ago?
16     A.  I can't remember.
17     Q.  All right.  What part of the year?
18     A.  I assume it was summer.  It wasn't
19 that long ago.  I'd have to go back and check
20 on my billing records.  But it wasn't eons ago.
21     Q.  So we're speaking at some point in the
22 spring or summer of 2007?
23     A.  I think so.  But again, I just
24 can't -- I really can't tell you.  It would be
25 reflected in my correspondence, which would

Page 119

1  have been sent to you, you know, in response
2  the discovery.
3      Q.  Sent to me?
4      A.  Well, sent to them for them to send to
5  you.
6      Q.  Okay.
7      A.  I always respond to the discovery via
8  my client.
9          MR. MEUNIER:
10             You mean the reliance material?
11     A.  It should have been sent with the
12 reliance material.  If not, then that was an
13 inadvertent omission and we'll correct that.
14         MR. BECNEL:
15             Gary, just for the record, he
16         knew that most of us in the Murphy Oil
17         were also involved, or some of us, in
18         MRGO and levee.  That was always in
19         the back of his mind but he had no
20         assignment.
21 EXAMINATION BY MR. ZWAIN:
22     Q.  When were you actually retained for
23 purposes of these cases?
24     A.  Again, that would be in our
25 contractual material.

Page 120

1      Q.  Which you thought you gave us but I
2  don't think you did.
3      A.  I thought I did, but if I didn't we'll
4  correct that error in a hurry.
5      Q.  Okay.  Well, give me your best
6  recollection as to when you believe you were
7  formally retained for purposes of these cases?
8      A.  I want to say early summer.  Late
9  spring, early summer.  It may not have been
10 that long ago.
11     Q.  And what were you retained to do?
12     A.  Um -- I can't recall the exact
13 phrasing of our assignment.  I usually in our
14 contractual documents put a sentence or two, it
15 tends to be fairly open-ended, provide
16 litigation support in the flooding cases.  So
17 I'll have to go back and look and see exactly
18 how that was phrased.  It wouldn't have been,
19 um -- a terrifically narrowly defined scope of
20 work.  Let me put it that way.
21     Q.  Well, I'm going to show you what I'm
22 marking as Exhibit Kilpatrick Number 4.  And I
23 will represent to you that this is a copy of
24 Levee Plaintiffs Final Witness List for Class
25 Certification dated July 20th of 2007.  And

Page 121

1  I'll direct your attention to Witness
2  Number 30, which is you, and the description of
3  your area of testimony listed next to your
4  name, which says, Dr. Kilpatrick 's testimony
5  will address the diminution of value of the New
6  Orleans real estate market resultant of the
7  August/September 2005 Metropolitan New Orleans
8  inundation and that such diminution can be
9  quantified on a class wide basis.  (Tendering.)
10            Would you read that, please, and tell
11 me whether that's a fair appreciation of what
12 the scope of your opinions in these cases will
13 be?
14            (Exhibit Kilpatrick 4 was marked for
15 identification and is attached hereto.)
16     A.  Yeah.  I think that's very nice
17 wording.
18 EXAMINATION BY MR. ZWAIN:
19     Q.  Okay.
20     A.  I like that.
21     Q.  All right.  So is the scope of the
22 opinions contained in that description that
23 which your report, your affidavit in this case
24 is directed to?
25     A.  It is supportive and consistent with

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 122

1  that, yes.
2      Q.  All right.  Does this affidavit
3  contain all of the opinions and conclusions
4  which factual observations that you have made
5  with respect to this case?
6      MR. MEUNIER:
7          Relative to class certification.
8      MR. ZWAIN:
9          Yes.
10     A.  Relevant to class certification, yes.
11 EXAMINATION BY MR. ZWAIN:
12     Q.  Now, tell me, besides writing this
13 report, which took you between ten and
14 twenty-five hours, and discussing your
15 retention with Mr. Becnel -- I assume it was
16 Mr. Becnel who sent you the retention letter.
17 Is that right?
18     A.  I believe so.
19     Q.  -- what else, if anything, have you
20 done in connection with this case?
21     A.  Well, we've had conversations on the
22 phone with the attorneys, we've talked about
23 issues like, you know, who the class reps were,
24 you know, things like commonality and
25 representation and those sorts of things.  I've

Page 123

1  talked in general about, um -- the common
2  factors issues, about modeling and how we would
3  adapt and adopt the models drawn and use them
4  in our valuation empirics, just pretty general
5  conversations about how the case would
6  progress.
7      Q.  Well, have you had any conversations
8  regarding this case with any people other than
9  the attorneys who represent the plaintiffs?
10     A.  My staff and my wife.
11     Q.  Anyone else?
12     A.  I can't think of any, no.
13     Q.  Have you had any conversations
14 regarding this case or these cases with any of
15 the plaintiffs' experts or consultants?
16     A.  No.
17     Q.  Have you reviewed any of the other
18 expert reports tendered on behalf of the
19 plaintiffs in these cases?
20     A.  No.
21     Q.  Estimate for me the amount of time
22 that you have spent in conversation with the
23 lawyers who represent the plaintiffs in these
24 cases, for purposes of discussing these cases.
25     A.  A couple of hours.

Page 124

1      Q.  Have you generated any work product
2  other than your affidavit, for purposes of
3  these cases?
4      A.  No.
5      Q.  What documents, if any, have the
6  plaintiffs' attorneys provided you in this
7  case?
8      A.  I'd have to go back and look.  You
9  know, obviously the things we've talked about
10 earlier today.  I think they've sent us some of
11 the filings in the case, um -- but not much.
12     Q.  Okay.  By some of the filings in the
13 case, you mean the complaints?
14     A.  I think they've sent a copy of the
15 complaint.
16     Q.  You don't recall whether you've looked
17 at those are not?
18     A.  I can't recall as I sit here today.
19     Q.  What other documents might they have
20 sent you?
21     A.  Not much.
22     Q.  Anything else besides the complaint?
23     A.  Not much I can think of.  I mean,
24 honestly, as I sit here today, it's not -- you
25 know, and don't take this the wrong way, but

Page 125

1  I'm not hung up on the legal side of this, I'm
2  hung up on the evaluation side of it.  And so
3  we had conversations on the phone about what
4  this case was all about, and, um -- I came to
5  an understanding in oral conversations with the
6  client about what it was that this case hinged
7  on, and my affidavit is, um -- is based on and
8  relies on those oral conversations with the
9  clients.
10     Q.  Those oral conversations with the
11 client, by client you mean the plaintiffs'
12 attorneys?
13     A.  That's correct.
14     Q.  Do you intend to write any other
15 reports or affidavits prior to class
16 certification hearings that were scheduled in
17 this case to begin in November?
18     A.  Um -- I haven't been asked to, um --
19 and I'm not sure what will come out of
20 conversations that I have with the clients.
21 But as I sit here today, I haven't made any
22 plans in that regard.
23     MR. BECNEL:
24         Counsel, to put you on notice,
25         that after our experts are deposed and

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 126

1       yours are deposed we will probably ask
2    him to comment.
3       MR. ZWAIN:
4          What does that men?
5       MR. BECNEL:
6          Just what I said.
7       MR. ZWAIN:
8          Comment to you?
9       MR. BECNEL:
10         Comment in terms of a
11      countervailing affidavit in case it's
12      needed.  Don't know that yet.
13   EXAMINATION BY MR. ZWAIN:
14      Q.  Well, do you need to do any work other
15   than what you've done already to prepare for a
16   class certification hearing?
17      A.  What was that last word you said?
18      Q.  Class certification hearing.
19      A.  Hearing.  Um --
20      MR. MEUNIER:
21         Let me just interpose an
22      objection.  The answer to that may be
23      imbedded in some legal strategy and
24      analysis to which he's not privy at
25      this time.  You can ask him

Page 127

1       independent of what we may feel he
2       needs to do.
3    EXAMINATION BY MR. ZWAIN:
4       Q.  From what you know today, is there any
5    other preparation, or any documents you need to
6    look at, any people you need to talk to,
7    anything else that you need to review, in order
8    to be properly prepared to state opinions at a
9    class certification hearing?
10      A.  No.  If the courtroom is cooler, we
11   can go in there this afternoon.  But in my
12   professional experience, other things may come
13   up.  But as I sit here today, I could certainly
14   offer testimony right now consistent with other
15   testimony that I've offered in the past.
16      Q.  All right.
17      (Lunch break.)
18      MR. MEUNIER:
19         Is there any counsel or non
20      counsel here what has not yet made an
21      appearance on the record?
22      MR. GARDNER:
23         I may not have.  Warren Gardner
24      for the Sewerage & Water Board.
25   EXAMINATION BY MR. ZWAIN:

Page 128

1       Q.  Dr. Kilpatrick, I want to now focus
2    your attention on your affidavit, and I have
3    some questions about some of the things that
4    you've written here.  And so let's started to
5    go through that.  First I would like you to
6    turn your attention to Paragraph 4.  You stated
7    in the first sentence of that paragraph that
8    since Hurricane Katrina I have made extensive
9    examinations of the New Orleans market.
10   There's a few questions I need to ask you about
11   take sentence.
12         We spoke a little while ago this
13   morning, I think, about some of the trips that
14   you have made to New Orleans since Katrina.  I
15   think you said that for the purposes of this
16   lawsuit, this appearance at the deposition
17   today, is your first trip to New Orleans
18   related to these particular cases, that you had
19   made some other trips since Katrina related to
20   the Murphy Oil case and that you had made some
21   other trips, as well, not related to either
22   case.
23         Did I understand you correctly?
24      A.  Yes.
25      Q.  How many trips have you made to the

Page 129

1    New Orleans area, approximately, related to
2    Murphy Oil?
3       A.  Oh, I'm guessing somewhere between
4    five and ten.  I can't recall exactly.
5       Q.  All right.  And so the remainder would
6    have been trips that you made here for purposes
7    other than Murphy Oil or these cases?
8       A.  That's correct.
9       Q.  And so we're estimating somewhere
10   between five and ten for those purposes,
11   depending upon how many Murphy Oil trips you
12   made?
13      A.  That's correct.
14      Q.  Now, what were the purposes of your
15   visits for Murphy Oil?  What did you do in
16   terms of any data gathering or site
17   investigations or gathering of information that
18   might be related to this case or that you might
19   use in connection with this case?
20      A.  Well, of course we had initial visits,
21   and that included a site visit to the affected
22   area in Murphy Oil.  I made a couple of
23   appearances in federal court.  I was, um --
24   deposed -- I can't remember if I was deposed
25   here or wherever, but I made just several

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 130

1  general purpose data gathering trips which
2  included focus groups that we conducted as part
3  of our initial survey research.
4      Q.  Was this for Murphy Oil?
5      A.  Yes.
6      Q.  Okay.
7      A.  So I guess that's a petty good summary
8  of what I did.
9      Q.  How were the survey groups composed in
10 Murphy Oil?
11     A.  We did either seven or eight focus
12 groups.  I think it was eight, two each in --
13 and I believe, I'm talking off the top of my
14 head now -- two each in Wilmington, North
15 Carolina, Corpus Christi, Texas, St. Charles,
16 Missouri, I think, and here.
17     Q.  When you say here, what specific area
18 in the New Orleans area are you talking about?
19     A.  We actually did two here in New
20 Orleans.  Both of them were done in the City of
21 New Orleans.  In fact, I think both of them
22 were conducted at the, um -- at the Sheraton
23 Hotel on Canal Street.
24     Q.  And the people were from New Orleans?
25     A.  Were from Greater New Orleans.  I

Page 131

1  think some were from Orleans Parish and some
2  were from St. Bernard Parish.
3      Q.  Do you know what parts of Orleans and
4  what parts of St. Bernard?
5      A.  The ones from St. Bernard were
6  specifically -- and I'm talking off the top of
7  my head, I don't have the protocols in front of
8  me.  But I believe one of the focus groups was
9  to be made up of people who had been impacted
10 by the Murphy Oil spill and one of the focus
11 groups was to be made up of people who had been
12 affected by flooding but not the Murphy Oil
13 spill.
14     Q.  Okay.  Are the questionnaires that you
15 would have posed to the focus groups, I'm
16 assuming you did, contained in the materials
17 that you produced here today?
18     A.  They should be.  If not, I have staff
19 working to copy the paper files, and as we
20 discussed earlier today, whatever hasn't been
21 disclosed to you today with respect to Murphy
22 certainly will be disclosed as quickly as
23 possible.
24     MR. BECNEL:
25         Counsel, I'm going to ask for a

Page 132

1  Protective Order, only because we have
2  settled with Murphy for the class wide
3  boundaries.  We have not settled and
4  we're under an obligation to continue
5  for people that are in immediate
6  proximity, which -- whose cases will
7  be litigated down the road or
8  hopefully settled.  And I would ask
9  that -- I don't have any objection to
10 you guys looking at any of it, but
11 that it doesn't go beyond you and to
12 the defense counsel at this point.
13 MR. ZWAIN:
14     What about our experts?
15 MR. BECNEL:
16     As long as they're not experts
17 for Murphy in defending that other
18 litigation.
19 MR. ZWAIN:
20     I think we can work something
21 out.
22 MR. BECNEL:
23     Okay.
24 MR. MEUNIER:
25     Make sure the material comes to

Page 133

1  you.
2  MR. BECNEL:
3      Yeah.
4  EXAMINATION BY MR. ZWAIN:
5      Q.  Besides those focus groups, making
6  court appearances, attending depositions, what
7  else have you done in your trips to New Orleans
8  post-Katrina?
9      A.  You're speaking about the Murphy
10 related things or other trips?
11     Q.  Well, you said in your first sentence
12 in Paragraph 4, you made extensive examinations
13 of the New Orleans market.
14         What does extensive examinations mean?
15     A.  Well, number one, I've made just a lot
16 of, um -- personal familiarization with, um --
17 New Orleans geographically.  I've driven around
18 the street, familiarized myself with the
19 neighborhoods.  I, um -- rented a plane here
20 and flew myself around the area and observed
21 the lakefront area from 2000 feet up.
22 Essentially drove the whole south side of Lake
23 Pontchartrain in a Cessna 177.
24     Q.  How long did that take?
25     A.  Well, I was in the plane for most of

JOHNS PENDLETON COURT REPORTERS              800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 134

1  the day.  I did other things that day besides
2  just drive along -- just fly along Lake
3  Pontchartrain.  I guess I was flying there
4  for -- it's no more than about a fifteen,
5  twenty minute flight.  Well, I did it twice, so
6  about an hour 's worth of flying along Lake
7  Pontchartrain.
8      Q.  All right.  What else in terms of
9  extensive examinations of the New Orleans
10  market have you done besides fly over the city?
11     A.  Well, um -- I don't want to get, I
12  guess, too personal here, but we have adopted a
13  church here, St. Paul's Episcopal Church in the
14  Lakeview neighborhood, and so we attended
15  church with them a couple of times, met with
16  the rector there extensive, got to know him
17  personally.
18     Q.  Who is that?
19     A.  Reverend Wil Hood.  He's the newly
20  appointed rector at St. Paul 's and a friend of
21  mine.
22     Q.  Okay.  What else -- what other
23  extensive examinations of the New Orleans
24  market have you done besides fly over the city
25  and associate yourself with this church?

Page 135

1          MR. BECNEL:
2              Let me enter a further objection
3          in order to tell you this, that he has
4          met on numerous occasions with a
5          plethora of other experts that I'm
6          asking him not to go into those other
7          experts.  They're not, per se, experts
8          in the real estate market, but they
9          have reported things in testing and
10         what they found and things of that
11         type.
12         MR. ZWAIN:
13             Well, I think I'm entitled to go
14         into just that.
15         MR. BECNEL:
16             Have at it.  And I'll ask that
17         this part of the record be sealed
18         outside of your experts and, um -- and
19         the lawyers.
20  EXAMINATION BY MR. ZWAIN:
21     Q.  What I want to know is what other
22  things have you done that you would include
23  within the term extensive examinations of the
24  New Orleans market.
25     A.  Well, as we were just discussing, I,

Page 136

1  um -- have met with other I'll call them
2  physical science experts who have a familiarity
3  with specifically the Murphy Oil case.
4      Q.  Who?
5      A.  Can't remember the names offhand.
6      Q.  What did they tell you?
7      A.  Oh, we basically talked about the
8  extent and the finger printing of oil coming
9  out of Murphy.  Um -- these were mainly folks
10 who are involved in finding out whose oil is
11 what.  And so they were explaining to me what
12 they had done with respect to Murphy.
13     Q.  Have you met with any of the
14 plaintiffs' experts or other consultants or
15 experts not for the plaintiffs with regard to
16 your extensive examinations of the New Orleans
17 market?
18     A.  Over and above the Murphy work, no.
19 But I had meetings with various experts with
20 respect to Murphy.
21     Q.  Okay.
22     A.  And, um -- we met with a couple of,
23 um -- appraisers here.
24     Q.  Who?
25     A.  Oh, Mr. Oubre.

Page 137

1      Q.  What's his first name?
2      A.  You know, I totally forgot his first
3  name.
4      Q.  Where's his office?
5      A.  Baton Rouge.
6      Q.  Why did you meet with him?
7      A.  Well, I had lunch with him a couple of
8  months ago to just ask him questions about the
9  New Orleans market.  I've decided to open a
10 permanent office down here.
11     Q.  Where?
12     A.  In a town home that I bought at the
13 intersection of Canal Boulevard and Robert E.
14 Lee in the Lakeview neighborhood.  And so I
15 wanted to get Mr. Oubre's personal assessment
16 of the market, really more inclined to the
17 potential of he and I working together on some
18 projects.  But it was, um -- mostly a friendly
19 lunch, and we ended up spending most of the
20 time talking about how to grill oysters.  And
21 I'm not trying to be facetious, we just didn't
22 talk about real estate that much.
23     Q.  How long was your lunch with
24 Mr. Oubre?
25     A.  About forty-five minutes to an hour.

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 138

```
 1      Q.  Have you had any other contact with
 2  Mr. Oubre about this case?
 3      A.  I've had no contact with Mr. Oubre
 4  about this case.
 5      Q.  Have you retained Mr. Oubre for any
 6  appraisal purposes or any other reasons, to
 7  helped you out in terms of preparing your
 8  report or opinions relative to this case?
 9      A.  No.
10      Q.  Who if anyone else have you talked
11  with regarding your extensive examinations of
12  the New Orleans market?
13      A.  Well, I've had meetings with Gulf
14  Coast Bank.  That was primarily relative to
15  financing the townhouse.  But in the process of
16  meeting with Gulf Coast Bank I had, again,
17  conversations about the market for contractors,
18  what it was like after Katrina as opposed to
19  before Katrina.
20      Q.  Who did you talk to?
21      A.  One of their senior lending officers.
22      Q.  Who was that?
23      A.  Name escapes me right now.
24      Q.  How long did you talk to him?
25      A.  Oh.  Multiple times over a period of,
```

Page 139

```
 1  um -- a month or so.
 2      Q.  Did you take notes regarding any of
 3  your conversations?
 4      A.  Um -- no, not really.
 5      Q.  Did you tape the conversations?
 6      A.  No.
 7      Q.  There's no record of those
 8  conversations.
 9      A.  No.
10      Q.  There's no record of any conversation
11  you had with Mr. Oubre?
12      A.  No.
13      Q.  Who else did you talk to regarding
14  your extensive examinations of the New Orleans
15  market?
16      A.  Oh, real estate agents at Latter &
17  Blum.  That's L-A-T-T-E-R --
18      Q.  Who?
19      A.  B-L-U-M.  A Mr., um -- Lester Sack.
20  S-A-C-K.  And I met with him about, um -- oh,
21  four or five times.  He is, um -- the -- he
22  actually owned the townhouse that we bought,
23  but he was also the agent for the townhouse.
24      Q.  Okay.  And any record of your
25  conversations with Mr. Sack?
```

Page 140

```
 1      A.  No, nothing, um --
 2      Q.  What's the sum total of time you spent
 3  with him, would you estimate?
 4      A.  A few hours.
 5      Q.  Okay.  Anybody else?
 6      A.  Well, a number of contractors,
 7  electrician, a general contractor, um -- people
 8  at Lowe's, cabinet makers, people who sell
 9  ceramic tile, folks who sell appliances, um --
10  let's see here, the head of the homeowner's
11  association in the condo complex.
12      Q.  Condo complex in which you bought your
13  townhouse?
14      A.  Right.
15      Q.  All right.
16      A.  The people at the lakefront airport,
17  and specifically the folks in the fixed base
18  operator office there.
19      Q.  Have you taken notes of any of these
20  conversations?
21      A.  No.
22      Q.  Made any record of them whatsoever?
23      A.  No.  And of course, um -- the people I
24  rented the airplane from, had a nice
25  conversation with them.
```

Page 141

```
 1          Oh, I'm trying to be all-inclusive
 2  here.  Um -- again, having visited here so many
 3  times, I tend to talk to a lot of people.
 4      Q.  Right.  I just want to know about your
 5  extensive examinations of the New Orleans
 6  market.  Is that what these conversations all
 7  entail?
 8      A.  Yes.
 9      Q.  Okay.
10      A.  I talked to a professor at a junior
11  college over in St. Bernard Parish.  His name
12  escapes me right now.  We've corresponded a
13  couple of times about his impressions of New
14  Orleans before and after Katrina.  Um --
15      Q.  Has anyone else from Greenfield made
16  extensive examinations of the New Orleans
17  market for purposes of these lawsuits?
18      A.  Well, none have done anything with
19  respect to this lawsuit.  I mean, this has all
20  been general purpose data gather, all conducted
21  after the conclusion of our Murphy work and
22  before the, um -- beginning of our, um --
23  flooding work.  And all conducted for just
24  general information, general familiarity with
25  the New Orleans market.  And, um -- part of it
```

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

1  is to gain a familiarity with -- that we needed
2  to gather prior to making the decision to open
3  an office, but part of it also is just general
4  purpose information.
5        I was writing an article for the
6  Journal of Real Estate Literature, of course
7  that's attached here. I wanted to get general
8  impressions about the marketplace as part of
9  the research I was doing for that article. So
10 it's all, um -- basically research on my
11 nickel, not on my client 's, to get better
12 familiar with how the market dynamics were
13 working pre and post-Katrina.
14    Q. So as a result of your extensive
15 examinations do you feel that you have a
16 fairly -- or do you feel you have an adequate
17 understanding of the New Orleans market that
18 would allow you to advocate your opinions at
19 the class certificate hearing scheduled in
20 November?
21    A. Yes.
22    Q. You don't have to do any more
23 extensive examination for purposes of that
24 hearing?
25    A. I'm not going to suggest that I won't,

1  but --
2        MR. MEUNIER:
3           Again, subject to my earlier
4        objection reservation that counsel
5        developing legal strategy may invite
6        him to do more. But subject to that
7        qualification he can answer for
8        himself.
9     A. I'm not going to suggest that I won't,
10 but I don't at this juncture have to.
11 EXAMINATION BY MR. ZWAIN:
12    Q. How many neighborhoods are there in
13 the class as defined in the levee case?
14    A. I don't know.
15    Q. How many markets?
16    A. Well, the word market has a bit of a,
17 um -- lay connotation to it. As a --
18    Q. Well, you used the term New Orleans
19 market at Paragraph 4 of your affidavit. What
20 did you mean by that?
21    A. I'm thinking of New Orleans broadly as
22 being a real estate market. Admittedly, a
23 person who might buy a house in one
24 neighborhood might not be a potential buyer of
25 a house in another neighborhood, but broadly

1  defined New Orleans can certainly be considered
2  one comprehensive market.
3     Q. How many neighborhoods are there in
4  the class defined by the levee complaint?
5     A. At this point, I don't know. That's
6  something that we would certainly empirically
7  determine when we begin doing our quantitative
8  what you guys might call merits analysis.
9     Q. What is the topography of any of those
10 neighborhoods?
11    A. Well, without a map in front of me,
12 I'm going to make a general characterization.
13 Compared to other parts of the country, one
14 might consider most of New Orleans to be flat.
15 But in fact there's a rolling topography such
16 that, for example, in Lakeview you might have a
17 change in elevation of as much as ten or twelve
18 feet in a span of just a short distance. So
19 compared to, say, my own home neighborhood of
20 the Cascade Mountains, it's pretty flat.
21 Compared to a wheat field in Iowa -- or a corn
22 field in Iowa, it's fairly rolling in some
23 places.
24    Q. Have you familiarized yourself yet
25 with the mix of residential uses or commercial

1  uses, or governmental uses, industrial uses
2  that affect any particular area or neighborhood
3  within the class defined by the levee
4  complaint?
5     A. Not specifically to the various
6  neighborhoods within the class definition.
7  Clearly, that's the sort of work that we would
8  do at the empirical investigation phase of our
9  analysis.
10    Q. Would your answer to my question be
11 the same if I were to pose it with reference to
12 the MRGO complaint?
13    A. That's correct.
14    Q. What is your understanding of how the
15 class is defined, or the proposed class is
16 defined by the levee complaint?
17    A. Broadly speaking, it's defined by a
18 series of subclasses that have to do with,
19 um -- areas that flooded from, um -- either
20 water from the MRGO canal or water from the
21 Lake Pontchartrain. In general, it's made up
22 of subclasses defined by the topography of
23 areas east and west of the canal.
24    Q. What's the difference in topography of
25 areas east and west of the canal?

Page 146

1    A.  Well, at this point I can't comment on
2  that, but we will certainly.
3    Q.  You don't know?
4    A.  That's correct.
5    Q.  What's the difference in topography
6  between any of the subclasses identified in the
7  levee complaint?
8    A.  That's part of what we're going to
9  examine in our empiric investigation.
10    Q.  Don't know that?
11    A.  Don't know.
12    Q.  You say in the third sentence of
13  Paragraph 4 that since the Murphy Oil spill
14  matter concluded, quote, we have continued to
15  gather data about the New Orleans market, and I
16  continue to conduct personal inspections of
17  neighborhoods affected by the flooding.
18        Did I read that correctly?
19    A.  Yes.
20    Q.  What data have you gathered?
21    A.  I think that sentence probably ought
22  to focus on the personal inspections and less
23  on the data.  We've actually not gathered an
24  extensive amount of data.  There is in the file
25  box, for example, a, um -- copy of the National

Page 147

1  Geographic which has a great article about New
2  Orleans in the current edition.
3    Q.  Do you regard that as data?
4    A.  Yes.  We've got material from the
5  Urban Land Institute, we've got data from the
6  Brookings Institute, we've got data from the
7  Whitehouse post-Katrina study, we've got a
8  great deal of data that I and, um -- Professor
9  Dermisi gathered for the article that just came
10  out in the Journal of Real Estate Literature.
11  So all of that is what I'm referring to when I
12  talk about data.
13    Q.  Regarding the Urban Land Institute,
14  you cite something from them in your article.
15  If you could turn to Page 225 of that article,
16  which is attached to your report, I want to ask
17  you something about that.
18    A.  I'm at 225, yes.
19    Q.  Look at Footnote 8.
20    A.  Yes.
21    Q.  It says, under -- you see where it
22  says Zone A?
23    A.  Yes.
24    Q.  And then if you look at the second
25  sentence, it reads:  It is anticipated that

Page 148

1  block-by-block and even parcel-by-parcel
2  analysis will be required, and great care must
3  be taken to get the residents to determine
4  appropriate patterns of reinvestment.  In many
5  cases, partial and even block reconfigurations
6  may be needed.
7        What does that sentence mean to you?
8    A.  Well, first, there is nothing in that
9  sentence that's inconsistent with a mass
10  appraisal model I want to stress that.
11    Q.  I just asked what it meant to you.
12    A.  I understand, and I'm trying to tell
13  you, counsel.
14    Q.  Okay.
15    A.  Um -- number two, the -- ULI 's
16  analysis does not preclude the notion of
17  gathering consistent data throughout the
18  market, but it does recognize the fact that the
19  data within whatever database is put together
20  is going to have to have a certain level of
21  specificity.
22    Q.  I just asked what the sentence meant
23  to you.
24    A.  I understand.  Counselor, I'm trying
25  to answer that.

Page 149

1    Q.  Okay.  Go ahead.
2    A.  Thank you.  That sentence then means,
3  to me, that in the conduct of a mass appraisal
4  model our databases will include information
5  specific to individual parcels and properties.
6  So within the context of the work I do, and
7  within the context of my reading of the ULI 's
8  recommendations, I find great support for
9  creation of a large scale, comprehensive
10  database such as we would propose to do in this
11  case.
12    Q.  So you agree with the sentence I just
13  read?
14    A.  Every bit of it, yes.
15    Q.  You said that the use of the term
16  market was a layman 's term.  What did you mean
17  by that?
18    A.  Well, I want to make sure that I'm not
19  imbuing any economic meaning, or shall I say
20  meaning within the jargon of economics, to the
21  word market.  I'm tending to use the word
22  market in a broader context.  Market does have
23  some meanings within the field of economics
24  which are somewhat different from the way most
25  people take it.  When I'm using the word market

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 150

1  in here, I'm referring as one might generally
2  refer to New Orleans as one big market.
3      Q.  But it's not, is it?
4      A.  Um -- in some contentions, it is.  So
5  I don't know that I would agree with what you
6  just said.
7      Q.  In what context is it not?
8      A.  Well, if someone says, you know, I
9  just got a job teaching at Tulane, I need to go
10 buy a house in New Orleans, so as they begin
11 thinking about moving here, they initially, and
12 correctly, think of New Orleans as one big
13 market made up of varying neighborhoods.
14     Q.  What's the definition that you would
15 use as a professional appraiser or refinance
16 expert, of neighborhood?
17     A.  Well, a neighborhood, within a market,
18 has certain, um -- cohesive factors, which mean
19 that one house in that neighborhood has very
20 much the same valuation components, in a
21 hedonic sense, as any other house in that
22 neighborhood.
23     Q.  All right.  I take it there are
24 multiple neighborhoods within the City of New
25 Orleans and within the Parish of St. Bernard.

Page 151

1      A.  That's correct.
2      Q.  How many neighborhoods are there
3  within the City of New Orleans?
4      A.  As I sit here today, I'm not prepared
5  to answer that question.  That's something that
6  we would empirically determine as part of our
7  investigation.
8      Q.  How are any of those neighborhoods
9  distinguished from one another?
10     A.  Well, it's an empirical
11 distinguishing, that is to say, um -- one would
12 not from a real estate valuation perspective
13 distinguish one neighborhood from another
14 neighborhood until one had examined the pricing
15 in these neighborhoods and --
16     Q.  And you have not done that?
17     A.  Not yet.
18     Q.  So you don't have any idea as we sit
19 here today how many neighborhoods you might
20 ultimately determine there to be in the New
21 Orleans market.
22     A.  Well, that's a little pejorative,
23 counselor.  I mean, I know that we're talking
24 about a finite and measurable number of
25 neighborhoods.  I recognize that we're not

Page 152

1  talking about thousands of neighborhoods.  We
2  may not even be talking about hundreds of
3  neighborhoods.  But certainly within the New
4  Orleans market and within the affected area
5  we're talking about more than a few.  So it's
6  not as if I have no idea, it's that it's a
7  matter that we would empirically investigate.
8      Q.  What is your idea?
9      A.  That we have more than a few but
10 probably less than a hundred.
11     Q.  Can you estimate for me, or what's
12 your appreciation of the number of
13 neighborhoods that exist in Subclass 1 of the
14 levee complaint?
15     A.  I don't have that information yet.
16     Q.  Subclass 2?
17     A.  Same answer.
18     Q.  Subclass 3?
19     A.  Same answer.
20     Q.  Subclass 4.
21     A.  Same answer.
22     Q.  Subclass 5?
23     A.  Same answer.
24     Q.  Subclass 1 of the MRGO complaint.
25     A.  Same answer.

Page 153

1      Q.  Subclass 2?
2      A.  Same answer.
3      Q.  Subclass 3?
4      A.  Same answer.
5      Q.  Subclass 4?
6      A.  Same answer.
7      Q.  You say in the sentence I've just
8  quoted from that you continue to conduct
9  personal inspections of neighborhoods affected
10 by the flooding.
11         Did I read that correctly?
12     A.  Yes.
13     Q.  What neighborhoods have you inspected
14 personally?
15     A.  Well, for example, Wednesday we'll go
16 back over the Lakeview neighborhood --
17 singular.  I suspect we will also traverse some
18 other neighborhoods.  My wife and I have talked
19 about going up in some other parts of town.
20     Q.  Okay.  But that's what you're going to
21 do, right?
22     A.  Right.
23     Q.  What have you done?
24     A.  Now since then, I was, um -- well,
25 again, Lakeview, we've gone all along the

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 154

1  lakefront area.  We have gone over into the
2  Ninth Ward.  We've gone back over into St.
3  Bernard Parish.
4      Q.  Okay.
5      A.  We've gone over into Gretna and that
6  area.
7      Q.  Did you take any notes relative to
8  those inspections?
9      A.  No.
10      Q.  Did you take any photographs relative
11  to those inspections?
12      A.  I can't recall.  If I have, then
13  they've been delivered to you in discovery.
14      Q.  So you don't know whether you have or
15  you haven't.
16      A.  That's right.
17      Q.  If they're not in this box, then you
18  didn't.
19      A.  If they're not in that box, then
20  either I didn't or someone slipped up and
21  didn't send them to you.
22      Q.  Do you have a specific recollection of
23  taking photos on any of your inspections of
24  neighborhoods affected by flooding?
25      A.  No.

Page 155

1      Q.  Why did you inspect Gretna?
2      A.  I was interested in what was there.  I
3  hadn't had the opportunity to go there in the
4  Murphy Oil matter, and I wanted to spend couple
5  of hours driving around there, go look at,
6  um -- some of the neighborhoods over there,
7  drive up and down the roads.
8      Q.  Why Gretna?
9      A.  I just picked it.
10      Q.  For what reason?
11      A.  No particular reason.  It was just
12  there.  I decided --
13      Q.  How does it relate to this case?
14      A.  Um -- at this point I'm not prepared
15  to answer that.
16      Q.  How does it relate to Murphy Oil?
17      A.  No way at all.
18      Q.  Okay.  Did you take any videos of any
19  of your inspections?
20      A.  No.
21      Q.  Was anyone with you besides your wife
22  when you went on such inspection of any
23  neighborhood impacted by the flooding?
24      A.  No.
25      Q.  So is there any record at all of any

Page 156

1  of these inspections?
2      A.  No.
3      Q.  Did you see anyone or encounter any
4  person when doing one of these inspections that
5  we could confirm that the inspection was
6  actually made and what it looked like?
7      A.  I'm not sure I understand the
8  question, counselor.
9      Q.  If I were to try to confirm by some
10  objective source whether in fact you actually
11  went on an inspection of any particular
12  neighborhood in the City of New Orleans or the
13  outlying area, who would I be able to confirm
14  that with?
15      A.  You can call my wife.  She will be
16  glad to tell you.
17      Q.  Who else?
18      A.  Well, in terms of the Lakeview
19  neighborhood, you can certainly call any of the
20  people that I just talked with.  I mentioned,
21  um -- Gulf Coast Bank, I mentioned Mr. Sack
22  from --
23      Q.  And the gentleman's name with Gulf
24  Coast Bank is?
25      A.  I can't recall offhand.

Page 157

1      Q.  Okay.  Anybody else?
2      A.  Mr. Sack from Latter & Blum.
3      Q.  Anybody else?
4      A.  Um --
5      Q.  Which Latter & Blum office is Mr. Sack
6  at?
7      A.  I don't know.
8      Q.  Okay.  Anybody else?
9      A.  I don't have those, um -- I don't have
10  that information with me.
11      Q.  Okay.  Now, again turning to that same
12  phrase in the last sentence of Paragraph 4, you
13  talk about neighborhoods affected by the
14  flooding.  What does affected by the flooding
15  mean?
16      A.  Well, it could mean two things.
17      Q.  What do you mean?
18      A.  Well, I'll rephrase.  I mean two
19  things.
20      Q.  Okay.
21      A.  Number one, properties actually
22  flooded themselves, that is to say properties
23  which received flooding, um -- following
24  Hurricane Katrina.
25      Q.  Okay.

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 158

1     A.   Number two, there are other properties
2  which are affected in a secondary way.  Now,
3  that's really not within the scope of this
4  case, but in a market, um -- which has been hit
5  by widespread, um -- disruption such as the New
6  Orleans market has been hit, we have extensive,
7  um -- secondary and tertiary effects.  You have
8  a disruption of the economy, you have a
9  disruption of culture, which of course in a
10 market like this is a direct, um -- influencer
11 of real estate values.  So there's almost an
12 iterative process whereby properties were
13 flooded but then the market in which those
14 properties would normally be sold in an
15 unimpaired condition has also been disrupted as
16 a result of the same forces.  So there's both
17 direct physical flooding as well as an
18 iterative, indirect, secondary and tertiary
19 effect resulting from things like the loss of,
20 um -- of public services, the loss of culture,
21 the loss of jobs, the loss of economic
22 multipliers, those kinds of things.
23    Q.   All right.  And it's these economic
24 losses, economic disruption that you are trying
25 to calculate in terms of its effect on

Page 159

1  individual pieces of real estate; is that
2  right?
3     A.   Well, there are two things with that
4  sentence.  First, we're not trying to get -- I
5  mean, we certainly will do that as part of the
6  empirical investigation, and second, we would
7  do that -- and the proper way to do that is on
8  a large scale, statistically relevant empirical
9  basis, and then apply those determinations to a
10 database, if you will, of individual
11 properties.
12    Q.   Okay.  Let's turn to Paragraph 5 of
13 your report.  It says that, in the first
14 sentence, I have been asked to opine on behalf
15 of the plaintiffs in the above-referenced case
16 on the question of whether or not from a real
17 estate analysis and appraisal perspective the
18 matters at hand in this case can best be
19 analyzed as a class action.
20      His that a correct statement of what
21 your understanding is regarding your role in
22 this case?
23    A.   Yes.  Thus far.
24    Q.   Okay.  And then turning to
25 Paragraph 6, it seems like you answered the

Page 160

1  question posed in Paragraph 5 when you say, I
2  believe that individuals who owned property
3  within each of these subclasses sustained a
4  damage to the value of their property.  I
5  further believe that the amount of the damage
6  can be determined on a subclass-by-subclass
7  basis, expressed as a percentage of loss of
8  pre-Katrina property value.
9       Is that a fair statement of the
10 essence of your opinions?
11    A.   Yes.
12    Q.   Now, you say in Paragraph 6 that you
13 have an understanding that the plaintiffs have
14 filed two separate class actions.  Correct?
15    A.   Correct.
16    Q.   One would be the MRGO class action,
17 one would be the levee class action.  True?
18    A.   True.
19    Q.   Now, you say the first, I guess, that
20 meaning MRGO, proposes two subclasses?
21    A.   Um -- I'm not sure if they're divided
22 up exactly that way.  I know there are a total
23 of seven subclasses.  I can't remember exactly
24 how many are in MRGO and how many are in the
25 other one.

Page 161

1     Q.   Well, let me ask you this:  In either
2  case, whether it be MRGO or levee, do you have
3  an understanding as to the geographic
4  boundaries or the general contours of any
5  subclass?
6     A.   No, not at present, other than the --
7  my broad understanding of the geography of this
8  marketplace and my broad understanding of the
9  extent of flooding resulting from the MRGO
10 canal and, um -- the levee breach after
11 Katrina.  In other words, I am not intimately
12 familiar with the modeling work that is being
13 done and will continue to be done, I assume, by
14 various experts engaged in this case.  However,
15 I have a general understanding of the extent of
16 the flooding and recognize the fact that once
17 my merits work gets underway we will be able to
18 incorporate the actual data from the models
19 into the work I -- we're doing.
20    Q.   Do you know whether your general
21 understanding of the flooding is consistent or
22 inconsistent with the opinions rendered by the
23 flood and modeling expert retained by the
24 plaintiffs?
25    A.   Um -- I'm, um -- somewhat assuming

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                           8/13/2007

Page 162

1  that they're not inconsistent with one another.
2  They --
3      Q.  I'm sorry.
4      A.  The lines may not match up perfectly,
5  but --
6      Q.  I'm sorry.  Go ahead.
7      A.  -- but my understanding of the extent
8  of the flooding and my extent of the modeling
9  work, particularly having conversed with the
10 attorneys about this, is sufficient for me to
11 believe that the modeling work will be
12 congruent with the opinions I've expressed in
13 my report.
14     Q.  Have you seen the modeler 's report?
15     A.  No.
16     Q.  What have the attorneys told you about
17 what the model will show?
18     A.  They haven't -- they have given me a
19 broad stroke understanding of where the water
20 came from and what the underlying concepts of
21 these subclasses are.
22     Q.  Where did the water --
23         MR. MEUNIER:
24             I don't want you to share any
25         underlying concepts you shared with

Page 163

1          counsel.
2          MR. ZWAIN:
3              I don't want underlying concepts
4          either, but I want facts.
5          MR. MEUNIER:
6              I just want to make sure we don't
7          step into privileged discussions.
8          MR. ZWAIN:
9              I don't know what underlying
10         concept is, I just want facts.
11 EXAMINATION BY MR. ZWAIN:
12     Q.  Where did the water come from?
13     A.  Let's talk about MRGO first.  Well,
14 first things first.  This is not a
15 representation of what the clients have told
16 me, but a representation of my own, um --
17 understanding of the flooding, which predates
18 my in engagement in this case.
19     Q.  When you say clients, you're talking
20 about the lawyers who hired you?
21     A.  That's correct.  Whenever I use the
22 word client I'm always referring to the
23 attorneys who engaged me.
24     Q.  Regardless of what source is, what's
25 your understanding -- let's talk about MRGO

Page 164

1  first -- of where the water came from?
2      A.  That the water came up the MRGO canal
3  following Hurricane Katrina.
4      Q.  Where was there a breach or
5  overtopping of water relative to Subclass 1?
6      A.  I don't know.
7      Q.  What about relative to Subclass 2?
8      A.  I don't know.
9      Q.  How many breaches or overtoppings were
10 there on the MRGO?
11     A.  Offhand, I don't know.
12     Q.  How many breaches -- is MRGO the only
13 source of water for the MRGO class?
14     A.  I'm sure I've read that, and not from,
15 um -- work I've done with the attorneys, but
16 just general information that I've read, but as
17 I sit here today I can't recall that.
18     Q.  Okay.  What is the source of water for
19 the levee case?
20     A.  And again, this is my own personal,
21 um -- data gathering prior to my engagement in
22 the case and not representative of any
23 information that's been provided to me by my
24 clients, but my understanding is it came from
25 Lake Pontchartrain.

Page 165

1      Q.  Okay.  How did it get into the levee
2  case class area?
3      A.  Oh, a series of floodings and
4  breaches.
5      Q.  How did the floodings and breaches
6  occur?
7      A.  Again, I've read that, but as I sit
8  here today, it's not germane to what I've
9  written and as a result I don't have it fresh
10 in my mind.
11     Q.  Where did the water come from
12 regarding Subclass 1 in the levee case?
13     A.  Again, I don't know.
14     Q.  Subclass 2?
15     A.  As I sit here today, I don't know.
16     Q.  Subclass 3?
17     A.  Same answer.
18     Q.  4?
19     A.  Same answer.
20     Q.  5?
21     A.  Same answer.
22     Q.  How, if at all, do the neighborhoods
23 in New Orleans correlate with the subclass
24 boundaries as defined by the plaintiffs?
25     A.  That's a matter I'll have to

42 (Pages 162 to 165)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 166

1  empirically investigate in the merits phase of
2  the work I've done.  I will do.  Excuse me.
3      Q.  Do you know if the subclass boundaries
4  correlate at all with the neighborhood areas in
5  New Orleans?
6      A.  I haven't investigated that yet.
7      Q.  So you don't know.
8      A.  And it may very well be that they
9  don't, precisely, simply because flooding may
10 or may not have followed, um -- neighborhood
11 boundaries.  When we get to the edge of an
12 economically defined neighborhood, floodwaters
13 don't often stop or start.  So indeed it would
14 not be inconsistent with my expectations to
15 find that part of a neighborhood flooded and
16 part of it didn't flood.  Now that's not at
17 all, um -- undermining the notion that this is
18 the way you study these things; indeed, this is
19 supportive of the notion that a large scale,
20 statistically valid mass model is the only way
21 you study these kind of things.  But
22 nonetheless, um -- I don't, as I sit here
23 today, have a -- have I done any sort of
24 precise measurement of the flooding boundaries
25 versus the neighborhood boundaries.

Page 167

1      Q.  Have you done any measurement?
2      A.  No.
3      Q.  If I'm understanding you correctly,
4  I'm gathering that you would almost expect that
5  the neighborhood boundaries for the
6  neighborhoods in New Orleans would not
7  correlate with the class boundaries drawn by
8  the plaintiffs' complaint --
9      A.  No, I didn't say that at all.
10     Q.  -- in the levee case.
11     A.  All I really said was that it wouldn't
12 surprise me and it wouldn't be inconsistent
13 with my expectations if in fact the flooding
14 didn't in all cases follow neighborhood
15 boundaries.  However, there are also cases
16 where flooding or other kinds of events such as
17 this do follow neighborhood boundaries.  We
18 talked this morning, for example, about the St.
19 Croix, Virgin Islands case where the, um -- red
20 dust followed neighborhood boundaries quite
21 precisely because neighborhood boundaries
22 coincided with topographical boundaries.  So
23 indeed if any of the neighborhoods in the
24 affected area are consistent with topographical
25 features, then it wouldn't be surprising for

Page 168

1  the flooding extent to be coincidental with the
2  neighborhood extent.
3      Q.  Do you expect that you will be in a
4  position to offer opinions at the class
5  certification hearing in November as to whether
6  or not the subclass boundaries as defined
7  either in MRGO or in levee correlate or
8  correspond to neighborhood boundaries?
9      A.  I don't have an opinion one way or the
10 other about that right now.  I may or may not
11 be asked to opine with respect to that.
12     Q.  What additional work would you have to
13 do in order to figure that out?
14     A.  I haven't determined that scope of
15 work yet.
16     Q.  But you would need to do some
17 additional work?
18     A.  Yes.
19     Q.  Okay.  Now, you say in the last
20 sentence of Paragraph 6 that you believe the
21 amount of damage can be determined on a
22 subclass-by-subclass basis.
23         What does that mean?
24     A.  Well, for example, we just finished a,
25 um -- case in Spelter, West Virginia in which

Page 169

1  the area was divided into multiple subclasses,
2  and so it was helpful for us to be able to
3  total up the damages by totalling up the
4  aggregate value on an unimpaired basis of all
5  the properties in each geographically defined
6  subclass, the aggregate value on an impaired
7  basis of all those properties, and the
8  difference between A and B of course equals the
9  damages.  So totaling things up on a
10 subclass-by-subclass basis makes for a useful
11 and handy mnemonic for the work we do.  There
12 are any one of a number of ways that we could
13 total this up, but that happens to be one of
14 them and we can do it that way.
15     Q.  Well, if you don't know whether or not
16 neighborhood boundaries correlate or correspond
17 with subclass boundaries, how are you going to
18 determine damages on a subclass-by-subclass
19 basis?
20     A.  Well, remember, as I testified this
21 morning, once we get to the merits phase we
22 will have a database with every single property
23 that's been affected by this flood.  Using a
24 mass appraisal model does not obviate a
25 property-by-property value.  It simply provides

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 170

1  a statistically valid, extraordinarily
2  efficient and rigorously peer reviewed
3  methodology in which one can accomplish this
4  thing without spending millions of dollars in
5  unneeded costs and years of time.  So if you
6  want to know all of the damage to properties in
7  a particular subclass, if you want to know all
8  of the damage to properties in a particular
9  neighborhood which were flooded as opposed to
10 the properties in that neighborhood that
11 weren't flooded, if you want to know Sam and
12 Susan Jones' house and how much it was damaged
13 by the flood, we'll be able to pull that out of
14 the database.  In fact, using a valid, sortable
15 database, I can give you a total of how many --
16 how much dollar damage was done to all the
17 houses with fireplaces.  I can give you a
18 damage figure for all the houses that are one
19 story as opposed to all of the houses that are
20 two story.  So that using this kind of model
21 that I'm proposing here provides a set of
22 exceptionally powerful tools not only for the
23 plaintiff attorneys but as well as for the
24 defense attorneys and certainly provides a
25 level of efficiency for the Court that just

---

Page 171

1  doesn't -- isn't available any other way.
2      Q.  You say that the amount of damages,
3  the amount of damage can be determined on a
4  subclass-by-subclass basis expressed as a
5  percentage of loss of pre-Katrina property
6  value.  Right?
7      A.  Correct.
8      Q.  Am I understanding that correctly to
9  mean that you will be in a position to
10 calculate each individual 's percentage of loss
11 on a subclass-by-subclass basis?
12     A.  Or on a type of property by type of
13 property basis, or on -- if you want to know
14 the percentage loss for John and Susan Jones'
15 house, we can do it that way, too.
16     Q.  Okay.  Also, if I'm understanding you
17 correctly, what you will not be able to
18 determine, and what you're expressing no
19 opinions about, is the amount of damage
20 expressed in the necessary repair costs in
21 order to repair damage caused by flooding.
22     A.  At this juncture, um -- it's not my
23 anticipation to do that.  At this juncture, my
24 anticipation is to develop a comprehensive loss
25 in value model, that is to say, what is the

---

Page 172

1  diminution in value which would encompass both
2  the anticipated repair costs as well as any
3  stigma damage which might be associated with
4  other economic losses in the marketplace.  So,
5  as is well captured in the literature,
6  immediately after Katrina a loss in market
7  value of an individual property, or a whole
8  collection of properties, would be the sum of
9  that anticipated repair cost plus the stigma
10 damages dealt to the property.
11     Q.  Well, are you going to be able to
12 delineate what repair costs might be
13 attributable to wind and rain as opposed to
14 flood?
15     A.  Well, with can certainly delineate
16 what loss in value might be attributable to
17 flood as opposed to other factors.  And indeed,
18 we have got some very powerful tools, such as
19 survey research, which have proven to be
20 consistently useful and acceptable not only for
21 determining the total amount of market value
22 lost to a given property but also to be able to
23 delineate, on a statistically valid and
24 reliable basis, how much loss is attributable
25 to one component as opposed to how much loss is

---

Page 173

1  attributable to another component.
2      In the Murphy Oil case, that's
3  precisely what we were in the process of doing
4  when the case finally settled.
5      Q.  Are you going to be able to attribute
6  or allocate value lost to a particular source
7  of damage, in other words, waters coming from a
8  particular place as opposed to another place?
9      A.  I'm not sure I understand that
10 question.
11     Q.  Are you going to be able to attribute,
12 on any particular property, that amount of
13 damage attributable to water coming from the
14 17th Street Canal as opposed to the London
15 Avenue Canal, for instance?
16     A.  Oh, I see.  Well, that's an intriguing
17 research question.  As I sit here today, it
18 seems like something that would certainly be
19 doable.  We've been thinking about flooding in
20 the aggregate, that is to say if you have a
21 particular house and it's been flood damaged,
22 what's its loss in market value.  But if the
23 modelers tell us that there is an apportionment
24 issue, that this damage ought to be apportioned
25 between 60 percent that water and 40 percent

---

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 174

1    this other water, then that becomes almost a
2    trivially simple exercise.  And if in fact the
3    modelers can draw a geographic model over water
4    and express that through GIS shape files or
5    other statistical, um -- expressions or other
6    mathematical expressions, it becomes almost
7    trivially simple to incorporate that into our
8    valuation model.
9        Q.  And what if they can't?
10       A.  In other words, what if it's unknown
11   as to how much water on Sam and Susan Jones'
12   house came from this source as opposed to this
13   other source?
14       Q.  What if the plaintiffs' modelers can't
15   make an attribution with respect to how much
16   damage was allocated -- allocable from one
17   source of water as opposed to another source of
18   water?
19       A.  Well, then in my somewhat lay opinion,
20   that becomes a matter for the Courts to decide.
21   We, as valuation experts, can certainly tell
22   the Court what the aggregate amount of
23   diminution of value to Sam and Susan Jones'
24   house is and then leave it up to the Court to
25   decide how much of that damage to allocate to

Page 175

1    one defendant as opposed to how much to
2    allocate to another defendant.  My lay
3    understanding is the Courts do that all the
4    time.
5        Q.  Okay.  Who are the defendants or
6    potential parties at fault with respect to the
7    17th Street Canal?
8        A.  Oh.  I don't know.
9        Q.  London Avenue Canal?
10       A.  You know, I haven't got myself, um --
11   bogged down in that, because who might be at
12   fault here is not part of -- you know, my job
13   is not to lay fault on people, my job is just
14   to measure.
15       Q.  Industrial Canal?
16       A.  I don't know.
17       Q.  Do you have an understanding as to
18   where the water from any of the canals went?
19       A.  You know, I think I read that, but I
20   can't recall offhand.  And when say read it,
21   not in the material provided to me by my
22   clients, but in general reading and studying
23   I've done about New Orleans.
24       Q.  Does your model deal with, or does
25   your -- model.  Does your projected model deal

Page 176

1    with business interruption loss?
2        A.  Well, we haven't gotten to the
3    specifics of that yet.
4        Q.  Does your business model deal with
5    anything other than diminished real estate
6    values?
7        A.  We haven't gotten specific to that
8    yet.  We certainly can.  I mean, that's
9    something that's, um -- easily modelable and
10   doable.
11       Q.  Well, but you were asked -- I think we
12   just discussed a moment ago that you were asked
13   to determine from a real estate analysis and
14   appraisal perspective whether this case can
15   best be analyzed by a class action.  Right?
16       A.  Right.
17       Q.  That's what you're doing in this case,
18   right?
19       A.  Right.
20       Q.  You're not undertaking to do anything
21   else, so far as we know, correct?
22       A.  Correct.
23       Q.  Turning to Paragraph 7, the fourth
24   subparagraph, can plaintiffs be found who are
25   representative of the class and adequately

Page 177

1    represented so as to protect the interests of
2    the class?  Do you see that?
3        A.  I do.
4        Q.  Have you made any determinations as to
5    whether or not the proposed class
6    representatives are representative of the class
7    and adequately represent the class?
8        A.  I haven't made any determination.
9    I've had conversations with the clients about
10   this issue from an appraisal perspective and
11   how, um -- in our work in cases like this it's
12   often useful for us as appraisers to have class
13   representatives who are within the -- any
14   statistical sample we take.  But, um -- other
15   than that, I haven't made any particular
16   empirical determination.
17       Q.  Do you know whether these class
18   representatives are within any statistical
19   sample that you might take?
20       A.  I haven't made that determination.
21   That's something that we will make a
22   determination of when we get to the empirics
23   component of this.
24       Q.  So you won't have that determination
25   made by November.

45 (Pages 174 to 177)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 178

1    A.  I didn't say that.
2    Q.  Well, I'm asking you.
3    A.  We may be asked to do that, but we
4  haven't done it yet.
5    Q.  So in answer to my question are
6  these -- do you think these class
7  representatives adequately represent and
8  protect the interests of the class, your answer
9  is you don't know?
10    A.  I haven't made any sort of empirical
11  determination about it.  I know that sounds
12  like a fancy way of saying I don't know, but
13  it's a little different.
14    Q.  That's what it sounds like.
15    A.  It's a little bit different.
16    MR. BECNEL:
17      Counsel, remember, you're not
18  entitled to merits discovery right
19  now.  This is certification only.
20    MR. ZWAIN:
21      That's why I'm asking about the
22  class representatives.
23    MR. BECNEL:
24      No.  Merits.  Three fourths of
25  what you're been asking for the last

Page 179

1      hour is merits.
2  EXAMINATION BY MR. ZWAIN:
3    Q.  Do you know whether all of the
4  properties located within any class boundary --
5  subclass boundary flooded?
6    A.  Perhaps I didn't understand that
7  question.  Could you repeat it, please?
8    Q.  Do you know whether all of the
9  properties located in each subclass boundary,
10  either from MRGO or levee, flooded?
11    A.  Not yet.  That's something I'll
12  empirically determine as part of the merits
13  investigation.
14    Q.  Do you know the percentages of those
15  houses or those properties that flooded as
16  opposed to those that did not?
17    A.  Again, that's something that I'll
18  determine as part of the merits investigation.
19    Q.  Do you know the percentage of
20  properties that flooded due to rainwater as
21  opposed to those that flooded due to canal
22  breaches?
23    A.  Same answer.
24    Q.  Do you know the percentage of those
25  that flooded due to rainwater or canal breaches

Page 180

1  or overtopping?
2    A.  Same story.  Same answer.
3    Q.  To the extent that there are
4  properties within any class boundaries that did
5  not flood, would you expect those properties'
6  values to be diminished or increased?
7    A.  That would be a matter for empirical
8  investigation.
9    Q.  You don't know.
10    A.  Well, I'm going to stick with that
11  would be a matter for our empirical
12  investigation.
13    Q.  That investigation won't take place
14  until after the class certification hearing is
15  complete?
16    A.  Properly so, that's correct.
17    Q.  The model that you propose to suggest
18  to the Court as a basis in part to support
19  class certification, what will your valuation
20  date be?
21    A.  Well, there are two answers to that
22  question.  From a practical matter, we're going
23  to have a conversation with our clients to make
24  that determination.  Um -- my recommendation,
25  however, will be that the unimpaired values of

Page 181

1  properties be valued immediately before
2  Katrina, and the impaired values of the
3  properties will be effective immediately after
4  Katrina.  But there are occasions when the
5  Courts have asked us to use other dates more
6  arbitrarily set.
7    Q.  So for pre-Katrina values, you're
8  going to use values effective August 28th 2005?
9    A.  I believe that's the date, yes.
10    Q.  For post-Katrina value, you're going
11  to use values August 30th, 2005?
12    A.  Right.  Assuming the, um -- our
13  clients and the Court, um -- concur with that
14  recommendation.
15    Q.  And why are you going to select as the
16  valuation date for a post-Katrina value
17  August 30th, 2005?
18    A.  Well, you want to pick a date
19  immediately after Katrina.
20    Q.  Why?
21    A.  In other words -- well, if you have an
22  event which occurred, and we want to, um --
23  pick up an impact of that event, it's a little
24  bit, um -- silly, in fact -- I mean, we could
25  pick any arbitrary date and say what's the

46 (Pages 178 to 181)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 182

1    impact to these houses pre and post that date,
2    but to follow the somewhat stylized, um --
3    methodology of appraisal standards, we want to
4    have an effective date as if unimpaired before
5    and another date as is impaired after.
6    However, sometimes Courts might ask us, well,
7    why don't you pick the opening date of trial?
8    And so if the opening date of trial is July
9    1st, 2008, we might value these properties as
10   if they had never been hit by Katrina as of
11   July 1st, 2008, and then we could also value
12   these properties as is, considering the impact
13   of the flood, as of July 1st, 2008. So that's
14   a perfectly doable exercise in an appraisal
15   context. So in short, I could do it either
16   way.
17       Q.  I don't think I understand what you
18   just said, but we'll move on.
19           How would you expect -- or would you
20   expect values to have changed from August 30th,
21   2005 through today?
22       A.  I don't have an anticipation one way
23   or the other. I think that's something that
24   we'll empirically determine.
25       Q.  After the class certification hearing.

Page 183

1        A.  Properly so, yes.
2        Q.  In Paragraph 9, subpart --
3    subparagraph -- the second one, Floodwaters,
4    you say, the extent of the flooding is easily
5    ascertainable.
6            What do you mean by extent of the
7    flooding?
8        A.  Well, even in the absence of modeling
9    performed by another experts engaged by our
10   client, we have at our disposal extensive,
11   um -- aerial photography, for example, which
12   show the extent of the flooding throughout the
13   New Orleans market, and our own GIS department
14   at Greenfield could digitize those photographs
15   as we do in other cases on a regular basis and
16   be able to measure the extent of flooding.
17   We've got topographical information about,
18   um -- the New Orleans market, and so it would
19   be trivially simple to be able to take the
20   furthest extent of the flooding and back from
21   that into the depths of flooding for each and
22   every parcel of property within this market.
23   So, um -- indeed, this has been one of the most
24   rigorously researched markets in the country
25   with respect to that over the last couple of

Page 184

1    years, and we have extraordinary empirical
2    tools at our disposal which didn't exist even a
3    few years ago in order to be able to ascertain
4    facts about real estate, um -- matters. So
5    indeed, it's not only easily ascertainable,
6    it's almost trivially ascertainable.
7        Q.  Well, how are you going to assess the
8    depths of flooding in any particular area,
9    let's say, in any particular subclass?
10       A.  Well, first, I'm going to rely on
11   modelers engaged by the, um -- clients.
12       Q.  What information do you expect to get
13   from them relative to depth of flooding?
14       A.  Well, it should be, as I just pointed
15   out, a relatively simple matter for them to be
16   able to model the depth of flooding at any
17   area.
18       Q.  The depth measured from what point?
19       A.  Well, we can measure depth from the
20   datum of the surface and extent of the
21   flooding; in other words, we have
22   extraordinarily detailed topo maps of the
23   affected area, and so it becomes real easy,
24   once you know where the zero mark is, that is
25   to say the furthest extent of the flooding, to

Page 185

1    back into a depth measurement at every other
2    point in the affected area.
3            And by the way, counselor, I'm sort of
4    off my area here because we're going to rely on
5    expert modelers to do this for us. But as a
6    real estate analyst, this is my understanding
7    of how to do it, and it's important that I
8    understand how it's done so that I can rely on
9    the work that others will do.
10       Q.  As a real estate appraiser or expert,
11   do you have an appreciation for the elevation
12   variance among structures in New Orleans,
13   neighborhood to neighborhood?
14       A.  Well, sure. As I've gone through the
15   marketplace since Katrina, I have been able to
16   observe, you know, structures through out the
17   neighborhoods and how some neighborhoods
18   have -- certain neighborhoods have homes of
19   certain heights and other neighborhoods have
20   homes of certain heights. This is naturally
21   something that we'll more carefully ascertain
22   as part of the, um -- empirical portion of our
23   analysis. But at this juncture I do understand
24   that this is something that we'll need to
25   study.

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 186

1      (Brief recess.)
2    EXAMINATION BY MR. ZWAIN:
3      Q.  Turning to the next page, the last
4    section of Section 9 of your report, you open
5    the last paragraph with the sentence this
6    extensive albeit incomplete list of factors
7    affecting the entire class of properties and in
8    ways that lead to large effects on property
9    values throughout the class argue very strongly
10   for class treatment.
11        What other factors, besides those that
12   you've listed in Paragraph 9, which I
13   understand to be Hurricane Katrina, floodwater,
14   economics effects, stigma, perception of risk,
15   higher insurance premiums -- what other common
16   factors do you believe are present?
17     A.  Well, you have, um -- the general
18   economic factors for the marketplace, which is,
19   um -- includes but certainly not limited to the
20   loss of jobs, the loss of an economy, the loss
21   of the economic drivers, and to a certain
22   extent a large scale, um -- reduction in the
23   housing stock in the marketplace is an economic
24   factor that feeds on itself.  Let me give you
25   an example.  Assume you have a marketplace of

Page 187

1    100,000 holes, the loss of one or two or even a
2    hundred homes might not have a significant
3    detrimental impact on the market.  But a loss
4    of fifty thousand residences for a period of
5    time necessitating these people move away is
6    going to have a huge and measurable impact on
7    the values of the remaining homes and the
8    values of the homes once restored.  And so
9    you've got these kinds of macroeconomic factors
10   which are certainly going to be common to every
11   one of the properties described in this class
12   action.
13        You've got what I call the loss of
14   culture.  And that's a very important point
15   here in New Orleans.  It's important in other
16   areas, as well.  We know that there are
17   significant problems with respect to, um -- the
18   reason for being for New Orleans that no longer
19   exists, the music, culture, the arts, those
20   kinds of things.  People want to move to New
21   Orleans to be close to those kinds of things.
22   Those things have been impacted in a
23   systematic, common way by the events of this
24   case and are, therefore, common impacts in the
25   valuation equation throughout the New Orleans

Page 188

1    market.
2        Now, those are just two that come to
3    mind right now.  I'm sure that there are going
4    to be others that we will empirically determine
5    as we get into the merits phase of our
6    investigation.
7      Q.  Why did you move to New Orleans?
8      A.  Well, I've got a lot of business down
9    here.  I mean, remember, I deal in damaged real
10   estate.  And I think -- I'm not trying to be
11   silly here, but this is sort of the global
12   epicenter for damaged real estate right now.
13   So it's not just this Katrina project, but we
14   have other projects throughout the other Gulf
15   Coast states, we knew we were going to locate a
16   southeastern office even before Katrina, but
17   after Katrina this became the logical place to
18   do it.  Had Katrina not occurred, we probably
19   would have gone to Atlanta or someplace like
20   that, but -- you know, A, we wanted to locate
21   something common to the various cases we're
22   doing and, B, we wanted to give something back
23   in a little way.
24     Q.  Why did you choose to move to the
25   Lakeview area as opposed to Mandeville or

Page 189

1    uptown New Orleans or the French Quarter or a
2    place that wasn't affected by flooding?
3      A.  Well, a couple of reasons.  First, as
4    I testified earlier today, I now have a
5    relationship with St. Paul 's church in that
6    neighborhood.  And so this townhouse is just a
7    few blocks from that church.  B, I'm a pilot,
8    and this is relatively close to the lakefront
9    airport, so it will be easy to get in and out
10   of there.  C, I'm -- I also involved in water
11   sports, boating, those kinds of things, and
12   it's not far from the marina, if that ever gets
13   going again.  So, you know, from a personal
14   perspective, it was a great place to invest in
15   real estate.  From a business perspective, it
16   was a good investment; I could get it pretty
17   cheap because, let's face it, after Katrina
18   real estate here is pretty cheap.
19     Q.  How much did you buy it for?
20     A.  A hundred and fifty thousand.
21     Q.  Had it been flooded?
22     A.  Yes.
23     Q.  To who extent?
24     A.  The ground floor, when I bought it,
25   was stripped back to stud walls.  There's some,

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                           8/13/2007

Page 190

1  um -- damage to the front door and to some of
2  the downstairs window frames, although
3  interestingly enough I don't think there is any
4  broken glass downstairs.  The downstairs
5  sustained about eight feet of floodwater.  When
6  you go to the second and third floors, not only
7  did they sustain very little flood damage, but
8  in fact in the bedrooms on the second floor
9  there were still clothes hanging in the closet,
10 bed linens on the beds, there was still a towel
11 hanging in one of the bathrooms absolutely
12 undisturbed by anything.
13     Q.  When did you buy it?
14     A.  I think we closed, um -- in April or
15 May.
16     Q.  Of 2007?
17     A.  Yes.
18     Q.  What's the address?
19     A.  650 Robert E. Lee Boulevard.
20     Q.  And is it in a named condominium
21 development?
22     A.  There's -- I would n't call it a large
23 development.  There's a homeowner's association
24 made up of I think twelve more or less
25 identical three-story -- two and three-story

Page 191

1  townhomes.
2     Q.  Okay.  Are all the townhouses
3  occupied?
4     A.  Most are.  I think one or two of them
5  are still undergoing renovation.
6     Q.  Have renovations been completed on
7  your townhouse?
8     A.  No.
9     Q.  Have you hired a contractor?
10     A.  We have hired a few subcontractors.
11 We are -- we've got all the permitting
12 underway, got the power pole set in, um -- but
13 we -- and we've gotten mold inspections and
14 those kinds of things done.  But as of yet,
15 we've done very little in the way of the
16 construction work.  We're going to kick that
17 off actually, hopefully, Wednesday morning if
18 this deposition ends by then.  We'll go over
19 there and have a meeting with various subs.
20     Q.  Do you know what price the prior owner
21 paid?
22     A.  No.  They bought it way back in the
23 1990s.  Townhomes in this complex were selling
24 in the range of three ninety to four fifty
25 prior to Katrina.

Page 192

1     Q.  How many square feet?
2     A.  I want to say 2400, but I could be
3  wrong there.  I'd have to go back and check.
4     Q.  Is there a yard?
5     A.  Um -- there's a fee simple ownership
6  of a, um -- a swath of dirt, I'll put it that
7  way.  There's a common front area that is
8  legally deeded to this townhome but in fact is
9  shared commonly as a big front yard by all of
10 the townhomes.
11     Q.  Do you have a garage?
12     A.  Yes.
13     Q.  Do you have a pool?
14     A.  No.
15     Q.  Are the people who live there people
16 who owned those properties prior to Katrina, by
17 and large?
18     A.  Some are.  Some have bought in
19 afterward.  But I think most of them -- of the
20 twelve, I believe most of them are prior
21 Katrina owners.
22     Q.  What's your estimate as to how much
23 needs to be spent in order to restore the
24 property?
25     A.  Somewhere between sixty and ninety

Page 193

1  thousand.  I'm having a little appliance debate
2  with Mrs. Kilpatrick.
3     Q.  And will that restore it to its
4  pre-Katrina state or will that include some
5  upgrades?
6     A.  That will include some upgrades.
7     Q.  Have you done any calculations as to
8  how much would be necessarily to restore it to
9  its pre-Katrina state?
10     A.  No, it would be less than that.  Um --
11 probably the low end of that sixty to ninety
12 range.  You know, there were some
13 long-in-the-tooth appliances, some less than
14 adequate, um -- cabinetry.  There was some
15 functional disutility with respect to a couple
16 of closets that were designed poorly, so we're
17 having some downstairs walls ripped out and
18 redone to somewhat more functional utility.
19 We're having upgraded electronics put in,
20 security system, a camera so that I can, you
21 know, punch up on the Internet in Seattle and
22 take a look at the yard if I want to, those
23 kinds of things that certainly weren't
24 available to buyers of fifteen years ago.
25 Upgraded appliances, granite countertop, slate

49 (Pages 190 to 193)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 194

1  floor, those sorts of things.  That's what
2  carries you up to about ninety thousand on the
3  rehab.
4      Q.  Was the purchase of this property
5  financed by Gulf Coast Bank?
6      A.  Yes.
7      Q.  Was there an appraisal done in
8  connection with that purchase?
9      A.  Yes.
10     Q.  Who did the appraisal?
11     A.  I can't remember.
12     Q.  But it was an individual appraisal?
13     A.  Yes.
14     Q.  Do you know whether all the damage to
15  your townhouse was flood damage or was there
16  some wind and rain damage?
17     A.  Um -- there was a minimal amount of
18  wind damage.  Um -- we went ahead and had the
19  place reroofed anyway, even though it -- the
20  house was about fifteen years old.  The roof
21  was about fifteen years old, and so I went
22  ahead and had it reroofed.  It was the first
23  thing I did after I bought it, at a cost of I
24  think $2,300.  So I don't know how much of that
25  was wind damage and how much of it was just old

Page 195

1  age of the roof, but I went ahead and had that
2  done anyway.
3      Q.  Was there ever a blue roof on the
4  roof?
5      A.  There wasn't when I bought it.
6      Q.  Okay.  Do you know the names of the
7  people you purchased from?
8      A.  Yes.  As I testified this morning, it
9  was Mr. and Mrs. Lester Sack.  S-A-C-K.
10     Q.  And where is Mr. Sack today?
11     A.  He lives in the warehouse district
12  here in New Orleans.
13     Q.  Did he buy a new condominium after he
14  sold his townhouse?
15     A.  I don't know what his living
16  arrangements are now other than he lives in the
17  warehouse district.
18     Q.  You made mention previously to cost
19  savings that you felt would result from use of
20  mass appraisal techniques as opposed to
21  individual appraisals and the time that might
22  be saved by doing mass appraisal as opposed to
23  individual appraisals.
24         Did I understand you correctly about
25  that?

Page 196

1      A.  Yes.
2      Q.  If you were retained to do a mass
3  appraisal, damage model report, whatever you
4  call it, what do you think it would cost in
5  terms of fees and expenses?
6      A.  Well, I don't have a good estimate of
7  that.  These kinds of cases range anywhere from
8  a hundred thousand to a million dollars in
9  terms of the appraisal expense.  A lot of that
10  depends on, um -- a number of factors that I
11  haven't ascertained at this point.  We have
12  done cases like this for in the range of a
13  hundred thousand.
14     Q.  Well, the largest case I think you've
15  had in terms of numbers of properties was that
16  case up in West Virginia.  Is that right?
17     A.  That's correct.
18     Q.  How much did that cost?
19     A.  I don't know.  I would estimate that
20  our budget to date is somewhere north of a half
21  a million.
22     Q.  In the West Virginia case.
23     A.  That's correct.
24     Q.  You would expect that preparation of a
25  damage report and model would be greater in

Page 197

1  this case than it would be in that case?
2      A.  I have no estimate of that one way or
3  the other.  The -- you know, what I do know is
4  that any way you stack it up, it's going to be
5  at least an order of magnitude cheaper than
6  doing individual appraisals on these
7  properties.
8      Q.  Well, what's the cost of doing
9  individual appraisals on the property?
10     A.  Well, let's do the math.  We've got a
11  hundred and fifty thousand houses, let's say,
12  at three hundred bucks a throw, just for the
13  appraisers.  That assumes we can hire enough
14  appraisers.  That's forty-five million dollars.
15  Now, if you're going to run this project,
16  you're going to have a supervisory process to
17  sort of aggregate and supervise all these
18  people.  It's going to take you another, oh,
19  less say at least another 25 to 50 percent of
20  that, so let's just say that the cost alone is
21  somewhere in the sixty million range.
22     Q.  Uh-huh.
23     A.  I'm probably being conservative.  I
24  don't know if you can do these properties for
25  three hundred bucks a throw, but if you can

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                           8/13/2007

Page 198

1  that's the number.  Now, let's start talking
2  about time.  A hundred and fifty thousand
3  properties, let's say an appraiser can do --
4  and this is going to be tough, but let's say he
5  could do five a week.  Okay?  Now I'm going to
6  try to do the math in my head.  That's thirty
7  thousand man weeks, or -- and I mean people
8  weeks, because we have female appraisers, as
9  well.  Excuse me.  Thirty thousand person
10  weeks, fifty work weeks in a year, assuming we
11  give them a little bit of a vacation, is six
12  hundred person years.  If we hire, let's say,
13  every appraiser in the state of Louisiana, we
14  could probably do the job in two to three
15  years.  However, mortgage lending, eminent
16  domain and taxation in the state would freeze
17  for a period of two to three years as we sucked
18  up every available appraiser in the state.
19      So in terms of an expense, it's
20  horrendous.  In terms of an organizational
21  undertaking, yes, I would like to have the job.
22  And in terms of the disruption to the appraisal
23  community in the state of Louisiana, it's
24  utterly unprecedented.
25      Q.  You seem readily able to run a quick

Page 199

1  calculation as to how much it would take to do
2  individual approvals.  I'm just curious as to
3  why that same calculation can't be done to run
4  a mass appraisal, something you're so
5  intimately familiar with.
6      A.  Well, I said that it was going to cost
7  somewhere between a hundred thousand and a
8  million.  Given -- given the various, um --
9  components of a mass appraisal model, there are
10  a number of different ways we could stack it
11  up, and until we get into the empirics of it,
12  um --
13      Q.  You just don't know.
14      A.  I just don't know.  But it is pretty
15  obvious that it's at least an order and a half
16  of magnitude cheaper than trying to do it by an
17  individual appraisal process.
18      Q.  What does an order and a half
19  magnitude cheaper mean?
20      A.  It's got more than a zero difference
21  in the price.  I mean, we go from a million at
22  the upper end of my scale to sixty million
23  doing it the other way.
24      Q.  In paragraph 11, you talk about
25  numerosity.  And again, you mention in the

Page 200

1  first sentence, our own research into the
2  post-Katrina market in New Orleans.
3      Q.  What research into the post-Katrina
4  market in New Orleans have you done?
5      A.  Well, all of that, um -- research that
6  I detailed with respect to the five or ten
7  trips that I've made to, um -- New Orleans
8  since the end of Murphy Oil, not to mention all
9  the research that we did with respect to Murphy
10  Oil.
11      Q.  Well, I think you were talking before
12  about extensive investigation which you
13  mentioned in -- or extensive examinations which
14  you wrote about in Paragraph 4, and now in
15  Paragraph 11 we're talking about your own
16  research.  So is there a distinction between
17  the two?
18      A.  Not really.
19      Q.  Okay.  You say that your own research
20  demonstrates that tens of thousands of
21  individual properties have been similarly
22  affected by the flooding.  What does similarly
23  affected mean?
24      A.  Well, they've been flooded.  I mean --
25      Q.  By what?

Page 201

1      A.  Excuse me -- by water.
2      Q.  Coming from where?
3      A.  From various sources.
4      Q.  You say in Paragraph 17, in the second
5  sentence, that real estate markets are
6  segmented, of course, by property types and by
7  neighborhoods, and properties are heterogeneous
8  in many of their characteristics.
9      Have you made any attempts to segment
10  the real estate markets in the levee case or
11  the MRGO case?
12      A.  No.  And here we're using markets
13  somewhat more analogously to neighborhoods.  I
14  don't want to get away from the notion that New
15  Orleans is one big market and that within that
16  big market you have multiple neighborhoods.  So
17  I don't want anything I've said there to be
18  construed otherwise.  Certainly, as I testified
19  earlier, a rigorous investigation into this
20  would be part of the empirical analysis.
21      Q.  You say in the first sentence of
22  Paragraph 17, an additional common factor in
23  this case would be the local market and in
24  particular a degree of stigma in market
25  perceptions of the affected properties.

Page 202

1  Correct?
2      A.  Correct.
3      Q.  Is the stigma the same in each
4  segmented market?
5      A.  We don't know that.  The fact that you
6  would have stigma and an underlying necessary
7  and sufficient conditions for stigma are common
8  not only throughout New Orleans but wherever
9  stigma is an applicable term.  Nonetheless, the
10  fact that stigma can be measured by a common
11  model throughout the marketplace is well
12  established in the literature, and the
13  measuring of that stigma, even as it might vary
14  across the marketplace or across neighborhoods
15  or even from property to property, would be an
16  empirical exercise.
17      Q.  What is the stigma suffered by
18  property owners in the MRGO case?
19      A.  Well, in general terms, it's
20  diminution in value, over and above, um --
21  merely the cost of repair.
22      Q.  What's the stigma?
23      A.  But -- well, that's what it is.
24      Q.  No, not what's the amount of the
25  stigma, what's the stigma?

Page 203

1      A.  Well, I just -- I mean, I just said,
2  stigma is a term that we real estate appraisers
3  give to that diminution in value of property
4  over and above the cost of restoration.
5      Q.  All right.  Stigma is a function of
6  perception, right?
7      A.  Well, among other things.  It's a
8  function of risk.  All property values are a
9  function of perception.  Indeed if you don't
10  perceive that a property has value, then it
11  doesn't have any value.  So everything in life
12  that has value is a matter of perception, and
13  everything in live that is a diminution in
14  value is because of perception.  Stigma is
15  merely one of those things.
16      Q.  Okay.  What is the stigma associated
17  with any individual piece of property in the
18  MRGO case?
19      A.  Well, I'm giving you an empirical
20  definition of it.  And I'm an empiricist.  So
21  we're going to go out and measure that.  But
22  I'm not trying to define stigma as a causality
23  factor.  The causality factor here is flooding.
24  Stigma is the explanation that we place on the
25  diminution of value of the property over and

Page 204

1  above anticipated cost of repair.
2      Q.  So you're trying to assess a stigma
3  value related to flooding.
4      A.  Not really.  We're trying to assess
5  the diminution in value on these properties
6  after the flooding, as a result of the
7  flooding, and stigma is the label we give a
8  portion of that diminution in value.  But it's
9  not the cause of the diminution in value, it's
10  the empirical definition of that diminution in
11  value.
12      Q.  Well, is there a stigma associated
13  with the fact that New Orleans is in an area
14  that is prone to be affected by hurricanes?
15      A.  Well, that's an issue which may or may
16  not be captured in prices prior to Katrina.
17  And in fact, there's some studies that have
18  been done, particularly with respect to
19  earthquakes in California, that ask the
20  question does the market already discount the
21  likelihood of an earthquake prior to the
22  earthquake actually happening?  And in fact, it
23  looks like markets are pretty good at pricing
24  the anticipation of what we might call normal
25  events, that is to say, anticipatable events.

Page 205

1      So in fact, we know that New Orleans
2  has been hit by storms of varying magnitudes
3  throughout it's life, but the likelihood of
4  another one of those storms is generally
5  captured in real estate prices already.  And as
6  a result of that, these anticipatable events
7  would be discounted in the pre-Katrina pricing
8  model.
9      Q.  How familiar are you with New
10  Orleans 's history of being affected by
11  tropical storms and hurricanes?
12      A.  I did little bit of research in that
13  with respect to the paper that I wrote for the
14  Journal of Real Estate Literature.  I recognize
15  the fact that throughout it's history New
16  Orleans and all of the cities on the Gulf Coast
17  have been storm prone.
18      Q.  Are you familiar, specifically, with
19  New Orleans history with respect to the effect
20  hurricanes and other tropical storm systems
21  have had on it over the years?
22      A.  What I'm saying is I've read about it,
23  and I can't recount it to you verbatim as I sit
24  here today.
25      Q.  Well, what do you know about it?

52 (Pages 202 to 205)

Page 206

1     A.  Well, New Orleans gets hit by storms
2  on occasion.
3     Q.  When was the last one?
4     A.  Offhand, I can't tell you.
5     Q.  Okay.  How many in the 20th century?
6     A.  Oh, I can't tell you that offhand.
7     Q.  How often has New Orleans flooded?
8     A.  That I can't tell you either.
9     Q.  What areas of town have flooded prior
10 to Katrina?
11    A.  Well, that's part of what I need to
12 study with respect to the, um -- empirical
13 component of this case.  But our focus of study
14 is going to be specific to the Katrina
15 flooding.  And in fact, it's going to be
16 empirically determinable just how much
17 diminution in value has occurred with respect
18 to Katrina as opposed to all of that flooding
19 that may have happened in the past and the
20 discounted notion of normal flooding occurring
21 in the future.
22    Q.  What's normal flooding?
23    A.  Well, you have anticipatable events.
24 I just mentioned the earthquake study out of
25 California.  Markets are pretty good at

Page 207

1  anticipating the fact that they're going to
2  have some problems.  New Orleans has,
3  throughout its history, had storms that have
4  come through, and so property values here
5  discounted normal events.  Katrina and the
6  follow-up flooding is not a normal event and
7  not discounted in real estate prices;
8  therefore, our study will be able to isolate
9  specifically what impact this Katrina-related
10 flooding has had on property values as opposed
11 to any of the other flooding that's happened in
12 the past several centuries.
13    Q.  You say in Paragraph 20, in your last
14 sentence, these effects can also be measured by
15 the same methods in areas not affected by
16 flooding and, thus, unaffected areas can be
17 used as controls for model testing.
18       What do you mean by that?
19    A.  Well, if we want to test a hedonic
20 model -- and all real estate appraisals,
21 whether you're talking about individual
22 appraisals or mass appraisals, are, at the end
23 of the day, some form of hedonic model.  If you
24 want to test that hedonic model, you can take a
25 control areas that's unaffected by the flooding

Page 208

1  and apply that hedonic model to it and get an
2  output which let's you fine tune the model.
3  The term of art in real estate appraisal is
4  called calibrating the model.  That language is
5  contained in the Uniform Standards of
6  Professional Appraisal Practice Standards Rule
7  6.  So we can use a control area to calibrate
8  whatever model is utilized empirically here.
9     Q.  What control area or control --
10 what area would you want to use as your control
11 for model testing for, let's say, Subclass 1 in
12 the levee case?
13    A.  Well, we haven't determined that.
14 That's a part of the empirical investigation to
15 go in and make a determination as to which
16 control areas.  And I would almost certainly
17 say plural areas would provide us with a good
18 model testings and model calibration areas for
19 the various neighborhoods in these subclasses.
20    Q.  You haven't even started to think
21 about that?
22    A.  Yeah, I've started thinking about it.
23    Q.  Well, have you identified any
24 potential areas of interest?
25    A.  No.  Not yet.  When we get to the

Page 209

1  empirics, that's something that we'll want to
2  do some testing.  But those will be empirically
3  determined class areas.  We won't try to ex
4  ante make a determination, we'll want to do
5  some appropriate empirics and make sure that
6  we've, um -- developed an appropriate set of
7  control areas.
8     Q.  So I guess would I be correct in
9  assuming that you haven't considered any areas
10 for model testing with respect to any of the
11 subclasses in either the levee case or the MRGO
12 case?
13    A.  Well, we haven't begun the empirics to
14 determine those.  That doesn't mean we haven't
15 started considering it.
16    Q.  Well, what areas have you considered?
17    A.  Well, we would consider any area that
18 hasn't flooded. we consider any area --
19    Q.  Give me an example.
20    A.  Well, we might even go to the other
21 side of the lake --
22    Q.  Where?
23    A.  -- and work over there.  I mean, I've
24 thought about going out to Metairie.  I've
25 thought about, um -- going, um -- further out.

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 210

1  But we've just thought about these areas that
2  we're going to want to empirically test.  And
3  unquestionably that's an appropriate and
4  important part of the empirical testing, but I
5  think we would be getting the cart way before
6  the horse if we try to arbitrarily establish or
7  even begin to identify some potential control
8  areas today without doing the appropriate level
9  of testing.
10     Q.  But what would you be testing for?
11     A.  Well, we would be testing in a
12  pre-Katrina control area for pricing models
13  that resemble what we would have seen prior to
14  Hurricane Katrina.
15     Q.  Seen where?
16     A.  In the affected area versus the
17  unaffected area.
18     Q.  The affected area being entire
19  Subclass 1, for instance, in the levee case?
20     A.  Well, neighborhoods within Subclass 1.
21     Q.  And you don't know how many
22  neighborhoods there are.
23     A.  Well, I think we determined earlier
24  today that that's an empirical determination.
25     Q.  So you'd have to get a test group for

Page 211

1  each and every neighborhood identified in each
2  and every subclass in the levee case and in the
3  MRGO case?
4     A.  Well, I'm certain that within our
5  empirical investigation we will delineate, A,
6  neighborhoods, B, neighborhood characteristics,
7  and C, pricing factors within those
8  neighborhoods affected by those neighborhood
9  characteristics.
10     Q.  Well, let me just -- let's say there's
11  a hundred neighborhoods in Subclasses 1 through
12  5 in New Orleans.  Does that mean you'd have to
13  get a hundred different control groups to
14  correspond with each of those neighborhoods?
15     A.  No.
16     Q.  What does it mean?
17     A.  It means that to the extent those
18  hundred neighborhoods have differences, we will
19  went to identify a sufficient number of control
20  areas in order to be able to accommodate those
21  hundred neighborhoods.  Now you might have a
22  hundred neighborhoods but a lot of them are
23  alike.  You might have twenty kinds of
24  neighborhood characteristics, that is to say
25  twenty sets of characteristics which define a

Page 212

1  neighborhood.  So in fact, many neighborhoods
2  might be alike, they just are different
3  neighborhoods.  And so with that, we might at
4  most need twenty control areas.  Although
5  oftentimes we find that even though two
6  neighborhoods have different pricing
7  characteristics we can capture those in one
8  control area.  So, in fact, the number of
9  control areas might be much smaller than the
10  number of neighborhoods.  You'll never need --
11  or I don't want to say never, but you hardly
12  ever need a number of control areas greater
13  than the number of neighborhoods.  But all in
14  all --
15     Q.  You might need as many control groups
16  as there are neighborhoods, and you might need
17  less, but you're still going to need multiple
18  control groups.
19     A.  Well, sure, but it's an empirically
20  manageable task.  In other words, within the
21  context of a statistically robust pricing
22  model, it's a pretty easy thing to manage.
23  It's certainly a heck of a lot easier to manage
24  this than it would be to manage a hundred and
25  fifty thousand individual appraisals.

Page 213

1     By the way, each of those hundred and
2  fifty thousand individual appraisals would have
3  to draw data from an unaffected area, and so
4  would have to go find identically the same
5  number of control areas that we'll have to find
6  in this mass appraisal model.  So I want to
7  make sure I'm making clear that the use of
8  control areas is not something that's
9  necessitated only by the model we're talking
10  about.  Even if we were to do the hundred and
11  fifty thousand individual appraisals at a cost
12  of sixty million dollars that your line of
13  questioning suggests, we would still need to go
14  find control areas from which to draw
15  comparable data.
16     Q.  What control area did the appraiser
17  who appraised your townhouse use?
18     A.  I think he used unflooded houses, or
19  excuse me, post-repair or unflooded houses in
20  the Lakeview neighborhood.
21     Q.  Was he right to do that?
22     A.  I'm not going to suggest he was wrong.
23  I mean, he managed to do an appraisal which
24  satisfied the bank and the bank reviewers.
25     Q.  Did it satisfy you?

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 214

1    A.  Well, yes.  I didn't have a problem
2  with it.  Um -- but the numbers on his
3  appraisal certainly wouldn't disagree very much
4  with the, um -- kind of numbers we would expect
5  to find in a mass appraisal.
6    Q.  In fact, you felt his appraisal was an
7  accurate estimation of the value of your
8  property?
9    A.  Yes.  And indeed, um -- if you want to
10  do that again for 60 million, three years and
11  five hundred appraisers, we can probably do all
12  of those.  I'm not suggesting that an
13  individual appraisal is not inaccurate.  I'm
14  simply suggesting, A, a mass appraisal, that is
15  to say doing all these at the same time, is a
16  far, far superior way, certainly from an
17  efficiency perspective.  B, there's no way I'm
18  going to be able to do a statistical
19  characterization of his appraisal, it just
20  seemed right to me and it seemed right to the
21  bank.  But with respect to a mass appraisal,
22  we're certainly going to be able to
23  statistically characterize that in a way that's
24  consistent with the needs of the Court, and C,
25  if I had a whole bunch of appraisers do a whole

Page 215

1  bunch of things -- appraisals, individual
2  appraisals like were done for my townhouse, I'm
3  going to have a big management problem managing
4  the inherent inconsistencies among the five or
5  six hundred appraisers doing the work.  By
6  doing one big mass appraisal, we get over those
7  inconsistencies.
8    Q.  Is your firm or are you the only firm
9  or person qualified to do a mass appraisal in
10  this case?
11    A.  When you say are we the only persons
12  qualified to do it, you mean here in the United
13  States?
14    Q.  All right.  Let's start with the
15  United States.
16    A.  Well, good point.  I would say nearly
17  any real estate academic would be familiar with
18  hedonic models and large scale valuation
19  models.  If you open nearly any rigorous real
20  estate, um -- journal published by the academic
21  organizations, you will find real estate
22  studies done using hedonic pricing models.
23  They're exceptionally common.  I notice you
24  have Dr. Vandell here with you advising you.
25  I've cited several of his papers.  They're in

Page 216

1  the cardboard box I brought with me today where
2  he's used these types of models for valuation
3  purposes.  So the fact is, you could find a lot
4  of academics to do a study like this and indeed
5  do these studies all the time.
6    Our firm happens to be set up with the
7  research analysts and the computer tools and
8  such to do it on a practical basis.  So I'm
9  sure there are other people qualified here in
10  the United States, but I don't know if all
11  those other people have, um -- the necessary
12  tools and staff in order to be able to do this
13  thing.
14    Q.  Is Dr. Vandell qualified to do it, in
15  your view?
16    A.  I certainly hope so.  His curriculum
17  vitae would suggest he's familiar with this
18  stuff.
19    Q.  What about Mr. Roddewig?
20    A.  Well, you know, I've read a lot of
21  Mr. Roddewig 's work.  He doesn't believe in
22  these things, and so --
23    Q.  Is he qualified?
24    A.  Well, you know, it's like asking if an
25  atheist is qualified to be a priest.  Probably

Page 217

1  not.  You got to start out by being a believer
2  before you can put on the collar and the robe.
3    Q.  I guess it's fair to say that all
4  these persons who are qualified to conduct a
5  mass appraisal might not necessarily agree with
6  you that a mass appraisal is an appropriate
7  thing to do relative to these cases.  Is that a
8  fair statement?
9    A.  You know, good people can have
10  disagreements.  I -- we have academic
11  organizations that get together and present
12  papers and critique those papers, and sometimes
13  those presentations can get -- sometimes they
14  can be very friendly, but sometimes they can be
15  rather contentious.  People can disagree with
16  how one of these gets done and whether or not
17  it ought to be done, um -- but the fact of the
18  matter is, A, I haven't heard a good substitute
19  for it, B, you might be able to nip around the
20  edges and say, well, you shouldn't do it this
21  way, you ought to do it take way, but at the
22  end of the day you get around to the same
23  probably, you're going to have to do it.  And,
24  um -- so I think that certainly you could find
25  somebody who's going to criticize this.  I

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 218

1  don't doubt that at all.
2     Q.  Someone who's just as qualified as
3  you, with the same degrees, the same
4  background, the same training.
5     A.  I don't disagree that somebody as
6  qualified as me might criticize this, but I
7  would offer up the rejoinder that someone as
8  qualified as me who would criticize this way of
9  doing it might also be challenged to offer up
10 an effective and efficient substitute.
11    Q.  You said much earlier today that you
12 were a member of the publications review board
13 of the U.S. Appraisal Institute.
14       Did I hear you correctly?
15    A.  Yeah.  I want to make sure that I call
16 it the right thing, though.  I don't know if
17 it's still called a board or a panel or a
18 committee.
19    Q.  But whatever it is, you're a member of
20 it.
21    A.  Whatever it is, I've been a member of
22 it for four or five years and every now and
23 then they send me a publication to review.
24    Q.  Okay.  That U.S. Appraisal Institute
25 publishes the Appraisal Journal?

Page 219

1     A.  Yes.
2     Q.  So what does the publication review
3  board or whatever you call it do?
4     A.  Oh.  The Appraisal Institute also
5  publishes some books from time to time.
6     Q.  Not the Appraisal Institute.  What
7  does the publications review board that you're
8  on do?
9     A.  Right.  I'm trying to answer that
10 question, counselor.
11       Would let me answer the question?
12    Q.  I'm sorry.  I will.
13    A.  Thank you.  The Appraisal Institute
14 publishes books from time to time, and the
15 publications review board or panel or
16 committee, whatever it's called, is made up of
17 people who are called on to review those books
18 prior to publication.
19    Q.  Who else is on it besides you?
20    A.  I don't even know.  I had -- it
21 occasionally has meetings.  The last one I went
22 to was in either 2000 or 2001.  And, um -- I
23 haven't been to a meeting in six or seven
24 years.
25    Q.  Who's the chairman?

Page 220

1     A.  I have no idea.  Like I say, they send
2  me a book every now and then, I review it.
3     Q.  What was the last book they sent you?
4     A.  Um -- it was about a year ago.  It was
5  a book on, um -- statistics.
6     Q.  What was -- who wrote it?
7     A.  I can't remember the authors now.  I
8  mean, it was, um -- I mean, I review a lot of
9  stuff.  I don't commit all of them to memory.
10 But it was a book on statistics that was
11 written, and I reviewed it and made some
12 recommendations, and it ended up getting
13 published.
14    Q.  Who appointed you to this board?
15    A.  Oh, whoever was president of the
16 institute seven or eight years ago, nine years
17 ago, I guess.  And I've been summarily
18 reappointed every year.
19    Q.  Have you ever published in the
20 Appraisal Journal?
21    A.  Yes.
22    Q.  What?
23    A.  Articles.  I don't recall the names of
24 them.
25    Q.  How many articles?

Page 221

1     A.  I'm guessing four or five.  Something
2  like that.
3     Q.  You don't remember the name of any
4  one?
5     A.  Yeah.  Um -- I remember --
6     Q.  Maybe it's on your CV.
7     A.  Yeah.  Could be.  Thank you for
8  suggesting that.  Looking -- starting currently
9  and working our way backwards, um -- most
10 recent one I published was Concentrated Animal
11 Feeding Operations and --
12    Q.  Where do you see that?
13    A.  Excuse me?
14    Q.  Where are you looking?
15    A.  I'm on my CV.  I'm in the heading
16 titled Recent Publications, and I'm on the
17 third page of recent publications, near the
18 bottom.
19    Q.  Okay.
20    A.  It's the fourth item from the bottom.
21 It's called Concentrated Animal Feeding
22 Operations and Proximate Property Values,
23 published in July, 2001.
24    Q.  Okay.  Any others?
25    A.  Yeah.  Um -- I'm looking.  I've got

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 222

1   Performance of Exterior Insulation Finish
2   Systems, coauthored with Douglas C. Brown and
3   Ronald C. Rogers that appeared in January,
4   1999.  Boy, I think there was everybody.
5        I am looking, but I don't see one
6   more.  So apparently -- and I'll reserve the
7   right to add to this if something has been left
8   off.  Apparently it's just those two.
9        Q.  Do either of those deal with mass
10  appraisal techniques?
11       A.  Um -- no, not really.
12       Q.  Have you ever forwarded any letters to
13  the editor at the Appraisal Journal?
14       A.  Yeah.  I think I have, and I can't
15  remember what about.
16       Q.  Were they published?
17       A.  Yeah.  I think so.  I just can't
18  remember what they were about.
19       Q.  Did you -- sorry.  Go ahead.
20       A.  I apologize.  I recall having sent a
21  letter to the editor of the journal about
22  something that was published, but it was quite
23  a few years ago.
24       Q.  Was it in response to Mr. Wilson 's
25  article?

Page 223

1        A.  No, that one wasn't published.  The
2   one that was published was in response to, I
3   think, an article that had been written by the
4   late William Kenard and Bill Mundy.  It would
5   have been written about 2002 or so.  I think I
6   wrote about that.
7        There was also an article I want to
8   say coauthored with -- or a paper -- a letter,
9   excuse me, coauthored sometime in the last few
10  years, maybe with Grant Austin out of -- he's
11  an appraiser out of Fort Lauderdale.  He and I
12  had done some stuff together.  Um -- I don't
13  keep track of letters to the editor.  So no.
14       Q.  What is contingent valuation?
15       A.  It's one of several survey research
16  methods that have come into acceptance in the
17  appraisal field.  It comes from other fields,
18  but it's been adapted for use by appraisers.
19  There are a few people who criticize it.  I
20  mean, Mr. Roddewig here at the table is
21  probably the leading critic of it.  Um -- but,
22  um -- generally, there probably are more
23  proponents than critics.
24       Q.  What is it?
25       A.  Um -- well --

Page 224

1        Q.  How does it work?
2        A.  -- it's a real estate appraisal
3   technique.  It's a survey, research based
4   statistical technique where you elicit from a
5   statistically valid pool of respondents their,
6   um -- opinions and attitudes toward, um -- some
7   contingency, which may be a property
8   impairment, for example, but you -- it was
9   historically used to value other kinds of
10  contingencies.
11       You use contingent valuation to value,
12  um -- positive amenities.  For instance, home
13  builders who are trying to offer a new
14  subdivision and have a home with some new
15  features in it that aren't offered in this
16  marketplace could use contingent valuation to
17  find out how much a market participant is going
18  to be willing to pay for this exiting new
19  product that the builder is trying to offer.
20       Similarly, quite a few researchers
21  have used contingent valuation in what's called
22  natural resource damage cases.  A lot of that
23  is written about in journals like Land
24  Economics and things like that.
25       Within the appraisal profession, there

Page 225

1   are a lot of appraisers who use contingent
2   valuation.  Outside of the appraisal profession
3   there are a lot of people in urban planning and
4   such who use contingent valuation for their
5   work.
6        Q.  I've seen reference in your report to
7   automated valuation models, hedonic models,
8   regression models.  I didn't see any reference
9   to contingent valuation.
10       Did I miss something?
11       A.  No, I don't think I had anything in
12  there about contingent valuation.
13       Q.  Are you intending to recommend
14  contingent valuation techniques with respect to
15  any model that you might construct for either
16  the MRGO or the levee cases?
17       A.  Well, I intend to recommend some
18  survey research.  I think survey research will
19  be exceptionally valuable in this case to get
20  at the truth of the matter.  That having been
21  said, specifically which survey research
22  methodology we might employ might in fact be an
23  empirically determined matter.
24       Q.  Well, what's the difference between
25  survey research and contingent valuation?

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 226

1    A.  Well, contingent valuation is just one
2  of a whole host of survey research tools and
3  techniques.  It's a fairly large bag full of
4  tools.  Which one we pull out and use is
5  something that we'll develop when we develop
6  the scope of work of the merits phase.
7    Q.  All right.  So are you or are you not
8  going to recommend the use of contingent
9  valuation on either the MRGO model you want to
10 build or the levee model you want to build?
11   A.  Well, counselor, I may not have been
12 clear about that.
13   Q.  And it may be me.  I'm just dense.
14   A.  No, that's okay.  Let me try to be
15 clearer.
16      Every appraiser, even in an
17 individual, single property appraisal, uses
18 some kind of survey research.  When the
19 appraiser appraised the townhouse that I
20 bought, he used some kind of survey research in
21 order to ascertain what comparable data was
22 selling for and what market participants were
23 viewing in the marketplace.  So every time
24 every appraiser does every appraisal, there is
25 a little bit of survey work into it.  There are

Page 227

1  several different what I'll call systematic and
2  statistically valid methods which come into
3  play when we're looking at a large number of
4  properties; in other words, when we've got a
5  scope of work sufficient to be able to gather a
6  lot of data, we can start utilizing some
7  methodology that has some statistical validity
8  to it.  Contingent valuation is one of those
9  which, as I say, is highly regarded outside of
10 the appraisal profession by people who value
11 real estate.  It's also regarded within the
12 appraisal profession by quite a few appraisers,
13 although there are some appraisers who don't
14 like it.  They tend to be atheists on that
15 subject.
16      There's also conjoint analysis.
17 There's perceived diminution.  These three
18 together are some of the statistically valid
19 survey research techniques.  I think certainly
20 in a case here where you had a market that just
21 froze after the flooding and properties didn't
22 transact, and the market is still in what we
23 might gently call disarray, a statistically
24 valid survey research technique like this would
25 be extraordinarily valuable.  That doesn't mean

Page 228

1  we can't do it without it, that just means it's
2  a tool that we would want to bring into play
3  and would highly recommend that.
4      And so whether we use conjoint or
5  perceived diminution or contingent valuation or
6  something else will be a matter that we'll
7  decide when we put together the scope of work
8  of our merits phase.
9    Q.  Did you use any of those survey
10 research approach titles or terminologies in
11 your report?
12   A.  No.
13   Q.  Why not?
14   A.  Well, whether you choose to use those
15 or some other tools and techniques, the kernel
16 of this problem is explaining to the Court
17 whether a large, statistically valid and
18 reliable appraisal model is preferred over a
19 set of individual happenstance appraisals done
20 by four or five hundred individual appraisers
21 over a period of three years at a cost of tens
22 of millions of dollars.  The individual
23 methodologies from which the appraiser might
24 choose to employ for the mass appraisal model
25 are irrespective of the superiority of the mass

Page 229

1  appraisal model.
2      In other words, um -- it's like
3  getting sick and deciding whether to go to the
4  doctor or not go to the doctor.  If you're sick
5  and you're sick enough that, you know, you're
6  in decline, you need to go to the physician and
7  get yourself taken care of.  I mean, that's the
8  superior course of action.  You know, trying to
9  treat yourself with some aspirin and chicken
10 soup is probably not going to solve your
11 problem.  So that's what we've got here.  You
12 know, we've got a big problem, it needs to be
13 solved in a statistically valid, efficient way.
14 We don't know exactly what diagnosis the
15 physician is going to give us, and we don't
16 know exactly what treatment the physician might
17 apply, but we know that going to the physician
18 is a much, much superior course of action to
19 just staying home and getting worse and worse.
20 Those are our choices here.
21   Q.  So you may or may not use some form of
22 survey research in connection with constructing
23 your model either in the MRGO case or the levee
24 case, you haven't made that determination yet.
25   A.  Well, we're almost certainly going to

58 (Pages 226 to 229)

Page 230

1  use at least minimal survey research. As I
2  say, every appraiser in every appraisal uses at
3  least some simplistic survey research. Exactly
4  how much survey research or what kind of survey
5  research we use is a matter for determination
6  at a later date.
7      Q.  What will that depend on?
8      A.  Well, we haven't even begun talking
9  about the scope of work with our clients, and I
10 think we want to have a more detailed
11 conversation with them about how much scope is
12 needed to get where we've got to go here.
13     Q.  Well, do you have any ideas or
14 recommendations that you're thinking of making?
15     A.  Well, I can think of several ways to
16 pursue this thing. I mean, you could pursue
17 these damages based on a survey research model,
18 you could pursue it in a lot of non appraisal
19 models. I mean, I've done when are called
20 input output models which construct valuation
21 component based on pure economic factors, loss
22 of jobs, loss of market rents, loss of the
23 economy, what's been the aggregate impact on
24 the economy of the area? But if we're strictly
25 talking about a property value diminution case,

Page 231

1  then as I said, I'm certainly going to make
2  that recommendation.
3      Q.  Regardless of what technique you use,
4  whether it be an hedonic modeling or regression
5  analysis or contingent valuation or -- let's
6  see, the automated, um -- something or other.
7  Um -- what's that model going to tell us at the
8  end of the day?
9      A.  It's going to tell us two things:
10 Number one, on a property-by-property basis,
11 within the confines of a statistically valid
12 database, it's going to tell us what these
13 properties were worth prior to this flooding.
14 And again, that's going to be on a
15 property-by-property basis which will be
16 sortable either by subclass areas or in any one
17 of a number of different ways. If we want to
18 know how much all the houses with two and a
19 half baths in this affected area were worth,
20 we'll be able to tell you that. If you want to
21 know how much all the two-story houses were
22 worth, we'll be able to tell you that. So on a
23 property-by-property basis, we'll be able to
24 tell you in a statistically reliable and valid
25 manner how much all these properties were

Page 232

1  worth. That's point number one.
2      Point number two:  We will be able to
3  tell you what the impaired, that is to say,
4  post-flooding value of these properties was
5  immediately after Katrina, and that's of course
6  after extracting for exogenous effects. For
7  example, you talking about wind damage. We
8  can, if called upon by our clients, use
9  appropriate kind of tools and techniques to
10 actually separate out the market, um --
11 valuation component of one damage versus
12 another damage.
13     And then finally, if in fact their
14 modelers are able to tell us the boundaries of
15 water, they say, well, over in this area it was
16 all this water, over in that area it was all
17 that, and over here we have a computer model
18 that tells us it's 60/40 or 75/25 this water
19 versus that water, we can actually total up
20 what these damages are based on whose water
21 came on the property.
22     And so a robust, valid, large scale,
23 statistically reliable computer model that
24 we'll be able to develop using tried and true
25 valuation techniques within the scope of

Page 233

1  appraisal standards will give you all of this
2  information at the end of the day.
3      Q.  So let me see if I understand. At the
4  end of the day, I'm going to know, for a
5  particular piece of property, Mr. Smith 's
6  piece of property in Subclass 1 of the levee
7  case, what the value of his home, let's say,
8  was on the day before Katrina struck, and what
9  the diminished value of his home would have
10 been on the day after Katrina left; is that
11 right?
12     A.  That's right. And not only would we
13 be able to do that, but we'll be able to do it
14 probably two years quicker and 90 or 95 percent
15 cheaper then the alternative method being
16 proffered.
17     Q.  Will I be able to know what the amount
18 of repair costs we sustained as a result of
19 Katrina?
20     A.  That will simply be a component of the
21 diminution of value. The market value will be
22 the standard that we will be seeking here. And
23 so market value is the difference in the
24 value before Katrina versus the value after
25 Katrina, and that diminution in value will

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

---

Page 234

1  capture both the repair costs as well as any
2  other loss in value suffered by --
3     Q.  How will it do that?
4     A.  Well, it's a diminution in market
5  value.  In other words, we're looking at what
6  the market value of the house was pre-Katrina
7  versus the market value of the house
8  post-Katrina.  And so that difference between
9  the two will definitionally include both any
10  anticipated repair costs immediately after
11  Katrina plus any other what we're calling
12  stigma damages -- what we're labeling as stigma
13  damages which would impact this property value.
14     Q.  How are you going to factor in what
15  somebody has paid to repair his or her house,
16  in terms of your model?
17     A.  Well, that's a cumbersome way to do
18  it, and I'm not going to -- you know, I'm not
19  really sitting here debating that issue, per
20  se, because I'm a real estate appraiser and not
21  a construction manager.  I mean, you might have
22  construction managers that are going to look at
23  these things very differently.  But as a real
24  estate appraiser I'm focused on market value
25  issues.  So market value should include the

---

Page 235

1  perceived -- the market perceptions of repair
2  costs plus that other stigma issue that we're
3  talking about.  So it's certainly not necessary
4  to get at the heart of market value for us to
5  go out and count every 2x4 and every box of
6  nails and every sheet of plywood bought in the
7  marketplace.  I mean, that would be an
8  extraordinarily cumbersome, expensive, time
9  consuming and probably not even valid way of
10  getting at the truth here.
11     Q.  Well, do you understand that people
12  have claims out there for the costs that
13  they've incurred to repair their homes as a
14  result of whatever damage occurred through
15  Katrina?
16     A.  I understand that.  And here's a way
17  of getting at the heart of that, which is, you
18  know -- and we talked about the townhouse that
19  I have acquired and am going to fix up.  If I
20  chose to bring it back to pre-Katrina state, it
21  would probably cost me about $60,000.  I'm
22  actually going to put about ninety thousand
23  dollars into it.  Now, I don't have a dog in
24  this fight because I didn't own that house
25  prior to Katrina, but the point of it is, if I

---

Page 236

1  did, would my basis in diminution value be
2  60,000 or 90,000?  Well, it's neither.  It's
3  the market value issue.  It doesn't have
4  anything to do with whether I get top of the
5  line kitchen cabinets and imported appliances
6  and slate floors, or whether I go back to the
7  same old carpet and off-the-rack Lowe's
8  counters that were there before Katrina.  It
9  doesn't have anything to do with that.
10     It has everything to do with the
11  market value issue.  That's what we as
12  appraisers are going to measure.  And in so
13  doing, by the way, we're able to come up with a
14  measure of value which is consistent all the
15  way across the market; in other words, a person
16  on one side of the canal gets treated the same
17  way a person on the other side of the canal
18  gets treated.  They're going to be treated in a
19  manner which is consistent all the way across
20  the board.
21     (Brief recess.)
22  EXAMINATION BY MR. ZWAIN:
23     Q.  I'm curious as to why you apparently
24  believe that the most accurate date to measure
25  a class member 's property damage is the day

---

Page 237

1  after Katrina occurred and not, for instance,
2  on the date this case goes to trial.
3     Could you explain?
4     A.  Well, I think the -- if the issue at
5  hand is determining the impact of flooding on
6  this property, then we would want to pick a
7  date as close as possible to the actual
8  flooding itself.  But if as a matter of Court
9  requirement we're to value at the opening
10  day of trial or the filing of the lawsuit or
11  what have you, we as appraisers can deal with
12  that and deal with it all the time.
13     Q.  All right.  What would the -- let's
14  assume class member Smith owns a $100,000 home
15  that's valued on the day before Katrina and
16  suffers flooding that requires him to pay what
17  ultimately would be something in the
18  neighborhood of $50,000 to repair it.  On the
19  day after Katrina he obviously would not have
20  paid those costs, but by the time of trial
21  let's assume that he has and that his house has
22  been restored and rebuilt.
23     What if any differences in the
24  appraisal of Mr. Smith 's property would we
25  expect to see if the date of damage was

---

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 238

1  measured on the date of trial as opposed to
2  August 30th, 2005?
3      A.  Well, it becomes certainly a lot
4  simpler to measure it as of the date after
5  Katrina, because as I mentioned, we're not
6  getting hung up on an accounting measure here,
7  that is to say I'm not tying to figure out what
8  Mr. Smith paid for his 2x4 or the plywood or
9  what his neighbor across the street paid for
10  his 2x4 and plywood, and maybe Mr. Smith had to
11  hire a contractor but the neighbor across the
12  street put in some sweat equity because he
13  couldn't find a contractor, so Smith had to pay
14  thirty thousand dollars to get something done
15  where the neighbor across the street only paid
16  fifteen thousand dollars but the neighbor
17  across the street had to work on his own every
18  weekend for a year.  You get a whole lot of
19  these kind of nuances in the case.
20      Market value is a much more clean and
21  efficient way of doing it.  It's certainly much
22  more statistically valid if done in a mass
23  appraisal setting.  And also, and this is very
24  important to stress, this diminution in market
25  value will capture both the anticipated fair

Page 239

1  market value of the repair costs plus any
2  additional stigma that might be suffered by
3  these property owners.
4      Q.  Okay.  But all I want -- I don't know
5  that that answers my question.
6      What would be expected the difference
7  in appraised value to be if the damage were
8  measured on the date of the trial, presumably
9  sometime in 2008, 2009, I don't know, 2010, as
10  opposed to day after Katrina?
11      A.  I don't have any expectations going
12  into this.  I mean, I'm trying to approach this
13  entirely as objectively as I can.  And so
14  whether that property would have gone up down
15  or sideways in value is not something that I
16  have any priors about.
17      Q.  It's not something that you have any
18  priors about -- prior conceptions?
19      A.  Opinions, conceptions, biases.  I
20  mean, I don't come into this with any sort of
21  bias about this.  I think that by focusing --
22  and it's my opinion, and obviously if the Court
23  wants to institute a separate date, that's
24  fine, but I still think, A, you get at the
25  heart of the matter by looking at real estate

Page 240

1  market value and, B, you get at the heart of
2  real estate market value by looking at the date
3  of the actual event occurred.
4      And by the way, this market value that
5  I keep going at, this is the standard for all
6  kinds of takings in the state of Louisiana, any
7  other kind of property value diminution case in
8  the state of Louisiana.  If this was a road
9  widening and I was going to expand one of these
10  streets from two lanes to four so I had to take
11  a portion of everybody's front yard and I was
12  going to knock down some of their houses, the
13  Court wouldn't care that you spent fifty
14  thousand for your house and your neighbor spent
15  a hundred thousand for his, the Court is going
16  to require that appraisers measure the
17  diminution in market value associated with that
18  taking.  This is identically the same kind of
19  problem.  The flooding precipitated a taking on
20  these properties -- and I'm not trying to get
21  bogged down in takings law or what have you,
22  I'm just saying that as an appraiser, if
23  requested to analyze this sort of problem, my
24  standard for analyzing it would be the
25  diminution in market value.  It's no different

Page 241

1  here.
2      Q.  Well, takings are measured by how
3  much -- a taking measures how much a
4  property 's market value was worth at the time
5  of the taking, correct?
6      A.  Well, it depends.  I mean, for
7  example, we might have an eminent domain action
8  in which the property is going to be taken as
9  of a specific date.  Now, if the property owner
10  decides to protest and wants to, um -- go to
11  trial on this thing, the date of value is still
12  going to be, as you put it, the date of the
13  taking, the date on which he's going to lose
14  ownership or control of the property, not the
15  date of trial.  And so in many jurisdictions,
16  the taker is allowed to go ahead and acquire
17  the property as of a given date, and then we'll
18  sort out the valuation issues later on when the
19  judge gets some room on his schedule.
20      And so, in fact, that is a perfect
21  analogy to the flooding situation where the
22  flood precipitated a take, we'll go ahead and
23  measure the take as of the date the take
24  occurred, not as of the date we finally got
25  around the adjudicating the value of the take.

JOHN KILPATRICK (LEVEE VOL I)                               8/13/2007

Page 242

1    Q.  Well, how do you handle some people
2  who didn't flood and who had a spike in values
3  to their homes that occurred shortly after
4  Katrina there were properties in New Orleans
5  that didn't flood and were selling at a
6  premium?
7    A.  Well, first thing first.  My
8  understanding is this case involves flooded
9  property, so that particular property would not
10  be part of the impaired data set.
11    Q.  Uh-huh.
12    A.  So that particular case has no
13  relevance here.  Second, if in fact you have
14  that kind of property value spiking, and to the
15  extent that was anticipated by the market as of
16  the day after Katrina, then that will be
17  captured in the market value estimation.  But
18  remember, that anticipatory factor is -- is
19  predicated upon this house not being flooded,
20  and all the properties in this case are
21  properties that were flooded.
22    Q.  Are you familiar with the tax
23  assessment system in New Orleans?
24    A.  In a cursory manner.  I'm going to
25  become more familiar with it because, a, I just

Page 243

1  got a tax assessment notice in the mail the
2  other day and, B, as part of the empirical
3  analysis in this case we're going to
4  investigate how properties were assessed.  But
5  the actual tax assessments themselves and the
6  manner in which that was conducted is
7  irrelevant to our investigation, because while
8  we're going to be using mass appraisal
9  standards, which are the standards set forth
10  for tax assessors, we're not relying on those
11  tax assessments, per se, for our value.  We're
12  going to, in fact, replicate all of that
13  through the use of an efficient mass appraisal
14  model.
15    Q.  So are you or are you not going to use
16  tax assessment data in order to determine
17  pre-Katrina value?
18    A.  We will investigate that data, it's
19  clear that we're going to want to get some
20  property descriptions, so we're going to take a
21  look at that data and see how accurate it is.
22  I'm not obviating the use of any particular
23  database in mind.  We -- when we were looking
24  at St. Bernard Parish, we found that there was
25  robust data available, but that the tax

Page 244

1  assessment dollar figures themselves were
2  probably not going to be reliable.
3    Q.  What do you understand that the tax
4  assessment system in New Orleans and St.
5  Bernard to be?
6    A.  Well, they all are based on some form
7  of mass appraisal model.  But we also
8  understand that the actual practice of tax
9  assessment in the parishes in Louisiana is --
10  let's be kind and say it purportedly varies in
11  quality from place to place.  And so if we're
12  trying to do a mass appraisal model that spans
13  more than one of these tax assessing districts,
14  then we are certainly going to want to redo
15  that ourselves.
16    Q.  And how are you going to redo it?
17    A.  Well, you use underlying data, that is
18  to say property descriptions, and then go get
19  market data from control areas in order to
20  value the properties themselves.  In other
21  words, we use actual transactional data --
22    Q.  From someplace else.
23    A.  -- from someplace that didn't flood.
24      And, you know, one of the interesting
25  things is, if we set the date as pre-Katrina,

Page 245

1  then property transactions in the very
2  neighborhoods themselves become pre-Katrina
3  control areas.  In short, it becomes highly
4  efficient to use the neighborhoods themselves
5  as control areas by simply reverting to
6  pre-Katrina transactions.  In other words, we
7  go before Katrina, we measure transactions in
8  the very neighborhoods that we're determining,
9  and that gives us the transactional price basis
10  for fleshing out our hedonic model.
11    Q.  Why wouldn't you use the same kind of
12  data in a post-Katrina valuation?
13    A.  Because post-Katrina, these markets
14  slammed shut.  Now, we'll examine transactional
15  prices post-Katrina, but that's going to be in
16  just one or several methodologies that we would
17  propose to use.  But yes, indeed we're going to
18  investigate post-Katrina transactions
19  recognizing the fact that post-Katrina these
20  flooded markets were highly at disequilibrium.
21    Q.  If you're using the after Katrina as
22  your post-Katrina value date, how are you going
23  evaluate post-Katrina transactions?
24    A.  Well, we'll do that, we're going to
25  look at -- we're going to propose to look at

JOHNS PENDLETON COURT REPORTERS                800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 246

1  survey research, we can look to the extent that
2  there are other markets that have been impacted
3  by similar cataclysmic events, we can take a
4  look at --
5      Q.  But I don't understand how you're
6  going to factor in post-Katrina transactions if
7  you're using the value date as the day after
8  Katrina hit, when presumably there would be no
9  such transaction.
10     A.  Well, the day after, there won't be,
11 but there's certainly going to be transactions
12 within a short period of time afterward.  Now,
13 the question is to what extent are those
14 transactions valid measures of true equilibrium
15 value in this marketplace?
16     Q.  Why wouldn't they be?
17     A.  Well, we're going to have to take a
18 look.  You have a disequilibrium that goes on
19 after a cataclysmic event like this where you
20 have some folks who simply have to sell, they
21 got to take whatever price they can get, you
22 have other people who hold their houses off the
23 market because they have what's called a
24 reservation price phenomenon, that is to say
25 they can't sell because they owe a mortgage and

Page 247

1  they can't take fifty thousand dollars for the
2  house because they owe the bank a hundred.  So
3  the market tends to freeze up, and those
4  transactions which do occur tend not be
5  representative of equilibrium pricing.
6      Q.  Well, how long would you expect the
7  market to take to hit equilibrium?
8      A.  That's a matter for empirical
9  investigation.
10     Q.  You don't know?
11     A.  Don't know.  But it's certainly
12 ascertainable as to whether or not the market
13 is back to equilibrium yet.
14     Q.  Your investigation may show that the
15 market has hit equilibrium at the point we are
16 now?
17     A.  It may very well.
18     Q.  If I'm understanding your report
19 correctly, the various mass appraisal
20 techniques that you cite are applicable to
21 assessment of residential values.  Is that
22 correct?
23     A.  Well, let's don't limit it to
24 residential, but yes.  Although mass appraisal
25 is used for all kind of property, including

Page 248

1  commercial, industrial, farmland, you name it.
2  If you go into any of the three thousand or
3  more counties which are taxing jurisdictions in
4  America, you will find that all manner of
5  property is appraised using mass appraisal
6  techniques.
7      Q.  Well, there was some mention in your
8  report that mass appraisal techniques, as
9  applied to commercial properties, are becoming
10 more accepted.  I don't have a particular page
11 or paragraph to cite to you.  It's in there.
12     Do you remember what I'm talking
13 about?
14     A.  I seem to remember making that sort of
15 reference, counselor.  If you will refer me to
16 the precise cite I'll be more than happy to
17 explain what I meant in the context in which I
18 said it.
19     Q.  All right.  I'll do that.
20     Here is it, Paragraph 45.
21     A.  45?
22     Q.  Yes.
23     A.  Thank you.
24     Q.  You say -- your last sentence says, so
25 even in the case of commercial properties, AVM

Page 249

1  methods are becoming more accepted and
2  accurate.
3      Did I read that correctly?
4      A.  You did.
5      Q.  Are AVM methods universally accepted
6  to appraise commercial properties?
7      A.  Well, no.  I mean, I've just pointed
8  out you've got Mr. Roddewig here as a
9  consultant and he's an atheist on the subject.
10 The so there are people that don't believe in
11 these things.  But if you read the sentence
12 immediately before that, it reads, our firm is
13 currently completing an evaluation study of an
14 AVM product used by lenders as support for
15 commercial property lending decisions.  So the
16 use of AVMs is universally recognized by tax
17 assessors for all of their tax assessment
18 appraisal decisions.  And what those two
19 sentences taken together mean is that the use
20 of AVMs for commercial lending decisions is
21 rapidly catching on in the United States.
22     Q.  But not as accepted as they would be
23 for use in appraising residential values.
24     A.  Well, for lending purposes, um -- we
25 started using AVMs a lot earlier.  And so you

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 250

1  see a lot more AVM based lending decisions in
2  residential not because it's more or less
3  accepted but simply because the available,
4  um -- tools and techniques which are all
5  computer and statistical based predate the ones
6  for commercial.  So it's not as if one is more
7  accepted than the other, it is just that we've
8  been doing one more frequently than the other,
9  or longer than the other, shall I say.
10     Q.  Look at Paragraph 36 of your report.
11 Now, the second and third sentence, we
12 recognize that there are problems associated
13 with data in the New Orleans market due to
14 damage from Hurricane Katrina.  Much of the
15 records base depended upon by appraisers was
16 destroyed and has not been yet been restored.
17     What are you referring to?
18    A.  Well, for example, in St. Bernard
19 Parish, when we first went in there after the
20 Murphy Oil spill, we found that there was a
21 problem getting tax assessment data.  We
22 eventually were able to work around that
23 problem and find sources of data.  But there
24 were some data records problems immediately
25 after Katrina.  Fortunately, enough, we're

Page 251

1  sitting here a couple of years afterward and a
2  lot of these databases are in the process of
3  being restored.
4     Q.  All right.  So is there a records
5  based destruction problem with reference to the
6  levee case?
7     A.  Well, we recognize that that may be a
8  problem.  Fortunately enough, in the case of a
9  large scale mass appraisal problem -- or
10 project, excuse me, we'll have access to lots
11 of databases and we'll be able to, in a
12 statistically efficient manner, compare and at
13 times merge these databases into one efficient
14 and reliable database.
15    Q.  I just want to know what your
16 understanding is as to what records in New
17 Orleans were destroyed.
18    A.  My understanding is that some records
19 were destroyed as a result of flooding.  I
20 can't, as I sit here today, tell you precisely
21 which of those were destroyed other than the
22 St. Bernard Parish tax assessment data that I
23 referred to earlier.
24    Q.  Do you know if any New Orleans records
25 were destroyed?

Page 252

1     A.  Um -- again, I can't cite which ones
2  other than my understanding that some were.
3     Q.  And what's that understanding based
4  on?
5     A.  Um -- offhand, I can't give you a
6  citation for that understanding.
7     Q.  In Paragraph 3, among others, you cite
8  Dr. Vandell 's 1991 article.  And for what
9  point are you citing that?
10    A.  Well, just to show the superiority of
11 a statistically valid mass appraisal model over
12 and above ad hoc type adjustments made by
13 appraisers in individual property appraisals.
14 Professor Vandell 's paper, albeit about
15 sixteen years old, provided a nice quote there,
16 quote, bias can enter, unquote, which describes
17 I think very succinctly one of the clear and
18 compelling problems with using individual
19 property appraisals in cases like this.
20    Q.  Paragraph 43, you cite the Flower &
21 Ragas report?
22    A.  Yes.
23    Q.  That model, it's my understanding, was
24 used to assist in allocation of settlement
25 funds that were reached in the Murphy Oil case.

Page 253

1  Is that right?
2     A.  No.  The study that Flower & Ragas did
3  was published thirteen years ago.  Now, um --
4  later on that was applied, but that study that
5  I'm citing here was the one that predated
6  Murphy Oil.
7     Q.  All right.  I think I've run out of
8  questions for today.
9        MR. MEUNIER:
10          Okay.
11          (Recessed for the day.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JOHNS PENDLETON COURT REPORTERS          800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 254

1      WITNESS' CERTIFICATE
2
3          I, JOHN A. KILPATRICK, Ph.D., do
4    hereby certify that the foregoing testimony was
5    given by me, and that the transcription of said
6    testimony, with corrections and/or changes, if
7    any, is true and correct as given by me on the
8    aforementioned date.
9
10   _____    _____
11   DATE SIGNED        JOHN A. KILPATRICK, Ph.D.
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN: August 13th, 2007

Page 255

1      REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3    Certified Court Reporter in and for the State
4    of Louisiana, do hereby certify that the
5    aforementioned witness, after having been first
6    duly sworn by me to testify to the truth, did
7    testify as hereinabove set forth;
8          That said deposition was taken by me
9    in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13         I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 256

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO         MAG. WILKINSON


                (V O L U M E   II)


        Deposition of JOHN A. KILPATRICK,

PH.D., MRICS, given in both the levees and MRGO

cases, at the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on August 14th, 2007.








REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 257

1   APPEARANCES:
2   REPRESENTING ORLEANS LEVEE DISTRICT:
3       MCCRANIE, SISTRUNK, ANZELMO, HARDY,
4       MAXWELL & MCDANIEL
5       (BY:  THOMAS ANZELMO, ESQUIRE)
6       3445 N. Causeway Boulevard, Suite 800
7       Metairie, Louisiana 70002
8       504-831-0946
9
10  REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11      JONES DAY.
12      (BY:  WILLIAM E. MARPLE, ESQUIRE)
13      (BY:  ERIN FARNS, ESQUIRE)
14      2727 North Harwood Street
15      Dallas, Texas 75201
16      214-220-3939
17
18  REPRESENTING THE PARISH OF JEFFERSON:
19      BURGLASS & TANKERSLEY
20      (BY:  MONICA M. WALDRON-BURGLASS,
21      ESQUIRE)
22      5213 Airline Drive
23      Metairie, Louisiana 70001
24      504-836-2220
25

Page 258

1   REPRESENTING THE PLAINTIFFS:
2       GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
3       WARSHAUER, L.L.C.
4       (BY:  GERALD E. MEUNIER, ESQUIRE)
5       2800 Energy Centre
6       1100 Poydras Street
7       New Orleans, Louisiana 70163-2800
8       504-522-2304
9       - and -
10
11      LAW OFFICE OF DANIEL E. BECNEL, JR.
12      (BY:  DANIEL E. BECNEL, JR., ESQUIRE)
13      425 W. Airline Highway, Suite B
14      LaPlace, Louisiana 70068
15      985-651-6101
16      - and -
17
18      RANIER, GAYLE & ELLIOTT, L.L.C.
19      (BY:  DREW RANIER, ESQUIRE)
20      1419 Ryan Street
21      Lake Charles, Louisiana 70601
22      337-494-7171
23
24
25

Page 259

1   REPRESENTING BOARD OF COMMISSIONERS FOR THE
2   EAST JEFFERSON LEVEE DISTRICT:
3       DUPLASS, ZWAIN, BOURGEOIS, MORTON,
4       PFISTER & WEINSTOCK
5       (BY:  JOSEPH E. BEARDEN, III, ESQUIRE)
6       Three Lakeway Center, 29th Floor
7       3838 N. Causeway Boulevard
8       Metairie, Louisiana 70002
9       504-832-3700
10
11  REPRESENTING EAST JEFFERSON LEVEE DISTRICT AND
12  LAKE BORGNE LEVEE DISTRICT:
13      DUPLASS, ZWAIN, BOURGEOIS, MORTON,
14      PFISTER & WEINSTOCK
15      (BY:  GARY M. ZWAIN, ESQUIRE)
16      Three Lakeway Center, 29th Floor
17      3838 N. Causeway Boulevard
18      Metairie, Louisiana 70002
19      504-832-3700
20
21
22
23
24
25

Page 260

1   REPRESENTING SEWERAGE & WATER BOARD OF NEW
2   ORLEANS:
3       CHRISTOVICH & KEARNEY, L.L.P.
4       (BY:  ELIZABETH S. CORDES, ESQUIRE)
5       601 Poydras Street, Suite 2300
6       New Orleans, Louisiana 70130
7       504-561-5700
8
9   ALSO PRESENT:
10      RICHARD RODDEWIG
11      KERRY VANDELL
12      GREG RIGAMER
13
14  ATTENDING VIA INTERNET:
15      MARGARET LYLE
16      TRACI COLQUETTE
17      KIRK AURANDT
18      DREW RANIER
19
20  VIDEOGRAPHER:
21      TODD MEAUX (DEPO-VUE)
22
23
24
25

2 (Pages 257 to 260)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 261

1     E X A M I N A T I O N   I N D E X
2
3   EXAMINATION BY:                    PAGE
4   MR. MARPLE  ........................... 264
5   MR. ZWAIN  ............................ 457
6         E X H I B I T   I N D E X
7
8   EXHIBIT NO.                       PAGE
9   Kilpatrick Exhibit 5 .................... 267
10  Kilpatrick Exhibit 6 ................... 268
11  Kilpatrick Exhibit 7 ................... 287
12  Kilpatrick Exhibit 8 ................... 290
13  Kilpatrick Exhibit 9 ................... 314
14  Kilpatrick Exhibit 10 .................. 316
15  Kilpatrick Exhibit 11 .................. 323
16  Kilpatrick Exhibit 12 .................. 342
17  Kilpatrick Exhibit 13 .................. 376
18  Kilpatrick Exhibit 14 .................. 387
19  Kilpatrick Exhibit 15 .................. 425
20  Kilpatrick Exhibit 16 .................. 429
21  Kilpatrick Exhibit 17 .................. 437
22  Kilpatrick Exhibit 18 .................. 438
23  Kilpatrick Exhibit 21 .................. 443
24  Kilpatrick Exhibit 19 .................. 454
25  Kilpatrick Exhibit 20 .................. 454

Page 262

1         S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Federal Rules of Civil Procedure, in accordance
7   with law, pursuant to notice;
8         That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11        That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18              * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

Page 263

1         JOHN A. KILPATRICK, PH.D., MRICS
2   2601 Fourth Avenue, Suite 650, Seattle,
3   Washington 98121, a witness named in the above
4   stipulation, having been first duly sworn, was
5   examined and testified on his oath as follows:
6   EXAMINATION BY MR. MARPLE:
7        Q.  Mr. Kilpatrick, you've produced some
8   documents in a box to us yesterday.  I believe
9   there was a CD in there, as well.  One of the
10  documents in there appeared to be a retention
11  agreement that we returned to your counsel in
12  case they wanted to assert a privilege or some
13  objection to producing that even though it was
14  already produced to us by you.
15        MR. MARPLE:
16            And I want to inquire on the
17        record if counsel is asserting any
18        kind of privilege.
19        MR. MEUNIER:
20            We do.  On behalf of the
21        plaintiffs in both the levee and MRGO
22        cases, notwithstanding the inadvertent
23        inclusion of this in the material
24        furnished by the witness, we do assert
25        a privilege as to the document.

Page 264

1   EXAMINATION BY MR. MARPLE:
2        Q.  Let me ask you some questions about
3   it, then, without -- well, let me ask some
4   questions.
5        Do you recognize that document?
6        A.  Yes.
7        Q.  And without telling us what's in it,
8   what is it?
9        A.  It's a retention agreement regarding
10  this case.
11        Q.  And who is it to and who is it from?
12        A.  Well, I understand that it comes from
13  the attorneys representing the -- specific to
14  the levee breach, and it, um -- is to
15  Greenfield Advisors, the firm I head up in
16  Seattle.
17        Q.  And is that in fact the retention
18  agreement between you and the levee group
19  plaintiffs?
20        A.  Correct.
21        Q.  Does that refresh your memory as to
22  when you became formally engaged by the
23  plaintiff's counsel in this case?
24        MR. BECNEL:
25            Let me enter an objection,

3 (Pages 261 to 264)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 265

1        counsel, only because this is one that
2        Mr. Bruno apparently prepared, not the
3        one in which I retained him.
4   EXAMINATION BY MR. MARPLE:
5        Q.  Let me ask you, does that refresh your
6   recollection as to when Mr. Bruno engaged you?
7        A.  Well, that -- limited to that, yes.
8   That's correct.
9        Q.  And what date was that?
10       A.  Well, that would have been May 9th.
11       Q.  All right.  Now, with respect to other
12  counsel that may have engaged you, was that
13  before or after this time?
14       A.  I think that was after Mr. Becnel and
15  I had conversed.
16       Q.  Having seen the document we're talking
17  about today, does it refresh your recollection
18  as to when that was with Mr. Becnel?
19       A.  No, all I can say is that Mr. Becnel
20  had retained me to consult on his case, or
21  cases in this regard, sometime before then.
22       Q.  Also, just for the record, you
23  produced to us what appeared to be some drafts
24  of your expert report.  Is that your
25  understanding, that there were drafts of your

Page 266

1   expert report in that box?
2        A.  I now find out that to be the case,
3   yes.
4        Q.  Okay.  And we returned those to
5   counsel for the plaintiffs this morning.
6        MR. MARPLE:
7            And let me ask counsel if you're
8        asserting any objection or privilege.
9        MR. MEUNIER:
10           We do assert a privilege as to
11       the draft work, yes.
12       MR. RANIER:
13           That is correct.  The CMO says
14       draft reports are not discoverable.
15  EXAMINATION BY MR. MARPLE:
16       Q.  Let me show you what we've marked as
17  Exhibit 5.  And we're picking up sequentially
18  from where we left off yesterday with respect
19  to numbering documents so that we don't repeat
20  exhibits.
21           Do you recognize that document?
22           (Kilpatrick Exhibit 5 was marked for
23  identification and is attached hereto.)
24       A.  I do.
25  EXAMINATION BY MR. MARPLE:

Page 267

1        Q.  And is that a document that you
2   produced to us in the box yesterday?
3        A.  It is.
4        Q.  And you referred to that as having an
5   article about New Orleans in it, correct?
6        A.  Correct.
7        Q.  And I believe you said you relied on
8   that article in some way in formulating your
9   views or opinions in this case.  Is that
10  correct?
11       A.  Well, that's correct.
12       Q.  I show you what I've marked as
13  Exhibit 6.
14           You recognize that document?
15           (Kilpatrick Exhibit 6 was marked for
16  identification and is attached hereto.)
17       A.  I do.
18  EXAMINATION BY MR. MARPLE:
19       Q.  And is that a report that you produced
20  in what I call the Spelter smelter case in West
21  Virginia?
22       A.  Well, at appears to be a good copy of
23  one of the five reports that I produced in that
24  case.
25       Q.  It's dated March 31, 2007?

Page 268

1        A.  Yes.
2        Q.  Is that the last report you have
3   produced in that case?
4        A.  No, I don't believe so.
5        Q.  You have a later report.
6        A.  That's correct.
7        Q.  And what's the later report?
8        A.  Well, it was a, um -- response to
9   some rebuttal work that was done by
10  Mr. Roddewig and a Mr. Jay Goldman who is a
11  local appraiser in that part of West Virginia.
12       Q.  Well, what was the number of pages,
13  approximately, of that response?
14       A.  Oh, somewhere in the fifteen to
15  twenty-five range.
16       Q.  Was it in typed form as opposed to
17  having been printed up by a commercial printer
18  or by some nice color printer?
19       A.  Well, it was produced on identically
20  the same printer in our office.  We do all of
21  this in-house.  So we have these facilities in
22  Greenfield.  So it was produced on identically
23  the same printer that produced this.
24       Q.  All right.  When was it,
25  approximately?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 269

1    A.  Oh, you know, I want to say June or
2  July of this year.  I may be off by a month or
3  so there.
4    Q.  Now, what we've marked as Exhibit 6
5  contains your opinion as to the diminished
6  value of the properties in the vicinity of the
7  Spelter smelter, is that correct?
8    A.  That's correct.
9    Q.  And it explained how you went about
10  finding all that and what your actual
11  conclusion was as to the diminished value
12  correct?
13    A.  That's correct.
14    Q.  One of the things you used in the
15  Spelter smelter case was a contingent value
16  survey, correct?
17    A.  Correct.
18    Q.  And some of the results of that were
19  produced as an appendix to what we've marked as
20  Exhibit 6, correct?
21    A.  Yes.
22    Q.  I want to ask you a little more about
23  testimony yesterday on the diminished value
24  that you're going to attempt to model in the
25  levee case and the MRGO case.  I believe you've

Page 270

1  said that's going to be a percentage of
2  pre-Katrina market value.  Right?
3    A.  Well, it would be my anticipation that
4  that's the way we would express it, yes.
5    Q.  And what I was not quite clear about
6  is what factors are going to be in that
7  percentage?
8    A.  Well, it's not a built-up percentage,
9  per se; in other words, it's not 10 percent for
10  this, plus 20 percent for that, plus 30 percent
11  for this other thing.  But we have a, um-- a
12  very interesting situation here which is
13  somewhat different from the Spelter situation.
14  Um -- in the Spelter situation, we had a market
15  in which knowledge and understanding of the
16  contamination problem was not widespread and
17  incorporated into the pricing phenomenon.  In
18  other words, if you just go into Spelter and
19  attempt to measure property prices at the
20  present time, you're going to get disingenuous
21  results simply because not everybody knows
22  about the contamination, not everyone
23  appreciates the extent or the danger of the
24  contamination.
25        Here in New Orleans, the fact and

Page 271

1  reality of the flooding is not something that's
2  been hidden under a rock.  The people who were
3  property owners at the time of the flood kind
4  of knew about the flood.  And I'm not trying to
5  be silly there, but it certainly wasn't
6  something that we could say was hidden from
7  people.
8        In addition, potential market
9  participants, that is to say anybody who might
10  want to buy into this market, people who might
11  move here in the normal course of a well
12  functioning market equilibrium, certainly at
13  this juncture would have no reason to not be
14  aware of Katrina.  It's one of the most
15  publicized events in the history of the world.
16  As a result of that, we have a post-Katrina
17  market in which we're going to be able to
18  observe pricing phenomenon that are going to
19  tell us something.  Now, they won't tell us
20  everything, because we do know that, um --
21  houses that didn't flood, or properties that
22  weren't damaged in New Orleans, had some
23  spikes, um -- and so in fact, if you go outside
24  of the flood zone, you are indeed going to find
25  a disequilibrium.  But I think we're going to

Page 272

1  have a pricing phenomenon here that's going to
2  tell us a whole lot.  And so, um -- that's one
3  of the ways in which our analysis of the
4  diminution in value is going to, here in New
5  Orleans, and specifically in the flooded areas,
6  is going to differ from the analysis we did in
7  Spelter.
8    Q.  Okay.  What I was trying to get at is
9  what the components you think will make up this
10  percentage, stigma or perceived risk of
11  flooding is one.
12    A.  Well --
13    Q.  Is that right?
14    A.  One would, um -- surmise that the
15  market pricing phenomenon here in New Orleans
16  is capturing that stigma.  In other words,
17  there is a diminution in value, a diminution in
18  market value, and a great deal of that is going
19  to be reflected in the transactional market.
20  I'm not suggesting all of it, but certainly a
21  great deal of it is going to be reflected in
22  the transactional market post-Katrina.  So as
23  we go into the flooded area post-Katrina and
24  start measuring, um -- the transactional
25  market, to a certain extent we're going to pick

5 (Pages 269 to 272)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                           8/14/2007

Page 273

1  up transaction prices, pricing differentials
2  that are going to include both the anticipated
3  cost of repair plus the stigma. And so I'm
4  not -- we're not going to go in and try to
5  impute stigma, we are instead going to be able
6  to go and to a certain extent directly measure
7  stigma by the diminution in property prices
8  which will help us formulate an opinion of the
9  diminution in market value.
10    Q. Um -- so you plan to look at actual
11  post-Katrina sales of property in New Orleans
12  and in St. Bernard and in the class areas to
13  determine diminished value, if any, is that
14  correct?
15    A. Well, that would be my recommendation
16  to the clients. Now, as of this juncture,
17  um -- I have recommendations rather than plans.
18  But we would certainly recommend that a
19  starting point for our analysis is going to be
20  a widespread, um -- examination of the property
21  pricing phenomenon immediately after Katrina
22  and, in fact, all the way to today.
23    Q. You told us yesterday you were going
24  to do it -- your recommendation was to do it
25  immediately post-Katrina. Now you're saying

Page 274

1  you're going to look at it all the way up until
2  whenever you get your report done; is that
3  right?
4    A. No, that's not what I said.
5      MR. MEUNIER:
6        Objection to the form.
7    A. Our proposed valuation date would be
8  immediately after Katrina. Um -- we can, of
9  course, oblige whatever arbitrary date might be
10  established by the Court. But nonetheless, in
11  order to formulate an opinion of value
12  immediately after Katrina, we would be remiss
13  in not capturing any data which might be
14  available to us during the period from Katrina
15  right up until the day we, um -- put wet ink on
16  a paper.
17    Q. And let's take your hypothetical
18  hundred thousand dollar piece of property that
19  includes a structure, a home, and the real
20  property pre-Katrina. You've used that
21  example, I believe, here before. Right? And
22  let's say today, and this is a property touched
23  by water in some way, it's worth a hundred and
24  fifty thousand dollars.
25      Does it have a diminished value?

Page 275

1    A. Well, let me give if an actual
2  example. I mean, that's a hypothetical, but I
3  think reality is probably more explanatory than
4  hypothetical. Yesterday we talked about a
5  townhouse that I bought in order to create an
6  office here in, um -- New Orleans. In the
7  small, um -- enclave of townhouses where I
8  bought this, pre-Katrina these townhouses had
9  been selling in the high three hundred, low
10  four hundred range. So let's take the middle
11  of that and go four hundred. The particular
12  townhouse that I acquired had damage to the
13  first floor as a result of flooding, no damage
14  to the second, and de minimis damage to the
15  roof. I was able to acquire that townhouse,
16  um -- roughly, almost two years after Katrina,
17  at a price of about a hundred and fifty
18  thousand dollars. I'm not sure of the exact
19  number.
20      If prices in New Orleans had been
21  going up at pre-Katrina rates, and I'm just
22  going to pick an almost arbitrary percentage of
23  5 percent a year, it may have been a little
24  less than that, it may have been a lil little
25  more, but let's say that, that four hundred

Page 276

1  thousand dollar townhouse should have been
2  worth about four hundred and forty, four
3  hundred and fifty thousand dollars. So I
4  picked it up for a hundred and fifty thousand
5  dollars, or a diminution in value of roughly
6  two-thirds of its otherwise unimpaired value.
7  Now, that diminution in value was a sum of the
8  anticipated repair cost, which as I testified
9  yesterday would be somewhere between sixty and
10  ninety thousand dollars, and the stigma damage,
11  that is to say the loss in value from it being
12  in a neighborhood which was subjected to the
13  flooding that is at the heart of this case. So
14  there, we've got one example of absolute actual
15  diminution in value of a property in the flood
16  area that withstood about an 8-foot floodwater
17  into the ground floor, um -- and is repairable
18  and has a, um -- an anticipated repair cost.
19  Um -- that's the sort of market data that we
20  want to gather on a class-wide basis and
21  present to the Court as a part of our opinion.
22    Q. So am I to understand you are not
23  going to recommended that there be a contingent
24  value survey done to determine stigma or
25  diminished value in these two cases?

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 277

1    A.  I wouldn't say to determine.  I think
2  it will be extraordinarily valuable to help
3  explain it.  It becomes useful for us to be
4  able to explain to the Court why we have this
5  pricing phenomenon, and we may or may not use
6  contingent valuation, we may or may not
7  recommend conjoint analysis.  As I sit here
8  today, frankly my recommendation would be
9  conjoint analysis as opposed to contingent
10  valuation.  We may or may not use perceived
11  diminution.  We certainly will use some kind of
12  survey research, because as I testified
13  yesterday, every appraiser uses some kind of
14  survey research in even the most simple
15  appraisal in order to gather some data.  So
16  some sort of survey research would be done.
17  But -- and my recommendation to the client will
18  be that it be either conjoint analysis or
19  contingent valuation, but it won't be necessary
20  for determining stigma.
21        You know, in this particular case, it
22  seems that stigma is probably captured in the
23  market at least in large part already.  It will
24  be extraordinarily useful in explaining this
25  quantification to the Court.

Page 278

1    Q.  How did you go about determining the
2  value of that townhouse you bought pre-Katrina;
3  how do you know that it was whatever you said
4  it was?
5    A.  Well, I think there are three things
6  going on.  Number one, I've been messing around
7  with real estate for over twenty-five years
8  now, and while -- and have been here in
9  Louisiana since several years pre-Katrina.  So
10  I have sort of a good feel for, um -- real
11  estate and what it's valued.  I don't suggest
12  that I do litigation support based on a good
13  feel, but you kind of know what something is
14  worth.  And particularly I know what something
15  is worth to me.  Um --
16    Q.  I understand -- can I just -- did you
17  undertake to find appraisals of that property
18  or comps from pre-Katrina to determine what the
19  market value was before Katrina?
20    A.  Well, as I was going on, there were
21  three things, second, I did travel around the
22  neighborhood and look at other properties that
23  were for sale, um -- and, um -- look at the
24  prices of, um -- quite a few properties that
25  were for sale in the Lakeview neighborhood,

Page 279

1  and, um -- without doing any formal
2  calculations, more or less rank ordered this
3  particular townhouse among the many properties
4  that I took a look at.  And then number three,
5  um -- it happened to be priced at, as I say,
6  about a hundred and fifty thousand dollars, and
7  I figured, well, I could probably talk him
8  down a little bit, I might be able to negotiate
9  down about five or ten thousand dollars, but
10  frankly I didn't think it was worth the effort.
11  Um -- I just, um -- to me, given the use that I
12  had for the property, and given my need to open
13  an office down here sometime in the coming
14  year, I felt like a hundred and fifty thousand,
15  or thereabouts, was a fair price, so I went
16  ahead and did it.
17    Q.  And so if I understand from what you
18  told me of the three things you did, one of
19  them was not to do a regressive study of what
20  that market was with that condo or the other
21  ones you looked at prior to Katrina.  Is that
22  correct?
23    A.  Um -- no, I don't think that's fair at
24  all.  Um -- I certainly didn't do a formal
25  regression analysis.  But as has been shown in

Page 280

1  the literature, even a informal sales
2  comparison approach is a generalized form of a
3  regression analysis.  Um -- George Lentz and Ko
4  Wang, in an article in the Journal of Real
5  Estate Research, in I think 1997, um -- doing a
6  survey of mortgage lending appraisals, showed
7  that the, um -- the sales comparison approach
8  is a -- simply a generalized lease squares
9  model.  So even though I might not have pulled
10  out my laptop and, um -- booted it up, put in a
11  whole bunch of data from the marketplace, I was
12  in fact performing a, um -- an ad hoc, um --
13  somewhat heuristic regression of prices and
14  values in the surrounding neighborhood in order
15  to arrive at a, um -- an opinion of value that
16  a hundred and fifty thousand was not an unfair
17  price.
18    Q.  So in any event, what you did was
19  typical of what a lot or most buyers do when
20  they're going to buy property, they look at a
21  lot of different factors, right?
22    A.  Well, we're --
23    Q.  And the market ultimately determines
24  price.
25    A.  Yeah.  I think ultimately the market

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 281

1  determines price. The market doesn't always
2  determine value. We know that markets can be
3  at disequilibrium. The Spelter case a prime
4  example of a market where knowledge and, um --
5  prudent buyer behavior was not inculcated in
6  that market.
7         Now, I realize that this is not a
8  trial about the Spelter case, I get the
9  privilege of doing that a little later this
10 year. But the fact is you often have markets
11 which cannot be described as equilibrium
12 markets because the necessary and sufficient
13 conditions set forth in the salient definition
14 of value are not met. And in this particular
15 case, for example, one definition of value is
16 called market value. That's a definition
17 promulgated by federal lending institutions.
18 State of Louisiana has a couple of other
19 definitions of value which are statutorily
20 established.
21        But in West Virginia, the definition
22 of market value includes the, um -- assumption
23 that buyers and sellers are knowledgeable about
24 the matters at hand. Our, um -- studies of the
25 affected market showed that that knowledge

Page 282

1  component was lacking in transaction prices in
2  the affected area and, therefore, market price
3  in the affected area were not reflective of
4  market values.
5         Here in New Orleans, particularly in
6  the flooded area, it's clear and I think highly
7  compelling that we're going to find some
8  truth -- maybe not all the truth, but certainly
9  a lot of the truth, in the market prices in the
10 affected flooded area.
11     Q.  And in the Spelter smelter case, there
12 was a smelter that had -- and I don't remember
13 if it was lead or zinc or arsenic or all of the
14 above that had spread onto the surrounding
15 properties through the air or otherwise.
16 Right?
17     A.  That plus cadmium, yes.
18     Q.  And when you're saying disequilibrium,
19 you're talking about you don't think all the
20 people around there knew that, and until
21 they've had full knowledge of that and that was
22 publicized and everybody knew, the market had
23 disequilibrium, correct?
24     A.  Well, I want to make a careful
25 delineation of the word knowledge versus the

Page 283

1  phrase full knowledge that you used in your
2  question. The definition of market value that
3  I cited a minute ago, the one promulgated for
4  federal lending purposes, simply uses the word
5  knowledge. Now, my colleague Bill Mundy at my
6  firm who's written extensively on this topic
7  has himself used the phrase full knowledge with
8  respect to this disequilibrium phenomenon. I'm
9  not sure that I split hairs as finely as my
10 colleague Dr. Mundy. We do measure whether
11 there's knowledge in the marketplace or not.
12 Um-- I think that distinction between knowledge
13 and full knowledge, um -- might be a red
14 herring. And certainly here in the New Orleans
15 case, um -- one cannot doubt that a substantial
16 number, certainly the majority of market
17 participants, would have at least knowledge, if
18 not full knowledge, of the flooding phenomenon.
19     Q.  Whereas, there was some lesser
20 knowledge at some state in the Spelter smelter
21 case; right?
22     A.  Oh, sure. I mean, there are
23 diminution in value situations even when you
24 don't have any knowledge at all. And I'll give
25 you case in point.

Page 284

1         MR. MARPLE:
2             I just want to object to
3         everything after the first sentence as
4         being nonresponsive and move to strike
5         it.
6         MR. MEUNIER:
7             Well, he's entitled to explain
8         his answers, counsel. So.
9         MR. MARPLE:
10            Yeah, and I'm entitled to object.
11        MR. MEUNIER:
12            Your objection is noted. But I'm
13        sure the witness is aware of his right
14        the explain his answers.
15     A.  As I was about to say, um -- not long
16 ago, um -- I was, um -- studying a case that I
17 didn't testify in, it was the Rocky Flats case
18 in Colorado in which there was an air
19 dispersion of plutonium out of the Rocky Flats
20 nuclear arsenal. Hardly anyone knew about that
21 in the affected area, and yet using survey
22 research, the, um -- testifying expert was able
23 to make a determination of a diminished
24 property value in the surrounding area which
25 was compelling to the Court and jury.

8 (Pages 281 to 284)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                        8/14/2007

Page 285

1      MR. MARPLE:
2         Object to the last part of the
3      answer as being nonresponsive.
4   EXAMINATION BY MR. MARPLE:
5      Q.  You mentioned surveys, earlier, in
6   terms of they're done with respect to, for
7   instance, a Fannie Mae 1004 form appraisal,
8   right?
9      A.  Yes.
10      Q.  And those are comps of three
11   comparable properties that are on that form
12   that you look at, correct?
13      A.  Well, not just that.  For example --
14      Q.  Could you answer that question?
15      A.  Well, I'm trying to, counsel.
16      Q.  I think it can be fairly answered yes
17   or no.
18      A.  I don't think so.
19      MR. MEUNIER:
20         Not necessarily.
21   EXAMINATION BY MR. MARPLE:
22      Q.  Okay.  Let me rephrase it.
23         On Form 1004 of Fannie Mae, one of the
24   things you look at are three comparable
25   properties in the neighborhood, correct?

Page 286

1      A.  Well, that would be one of the things
2   you look at, correct.
3      MR. MEUNIER:
4         Yes.
5   EXAMINATION BY MR. MARPLE:
6      Q.  Thank you.  Let me show you what I've
7   marked as Exhibit 7, which is the
8   Times-Picayune from yesterday morning.
9         Did you see that?
10      (Kilpatrick Exhibit 7 was marked for
11   identification and is attached hereto.)
12      A.  Um -- yes, I saw the front page.  I
13   didn't read it in any, um -- great detail.
14   EXAMINATION BY MR. MARPLE:
15      Q.  Read the headline on the upper
16   left-hand side banner over there.
17      A.  Thomas scrape seen as another black
18   eye.
19      Q.  All right.  Now, when you're
20   determining stigma damages in some way here,
21   will you have to take into account things like
22   a city councilman who's corrupt and pleads
23   guilty as perhaps having some effect on
24   property values in New Orleans?
25      MR. BECNEL:

Page 287

1         Let me enter on objection.  That
2      occurred five years ago, counsel.  And
3      so you're trying to make it into a
4      question today?
5   EXAMINATION BY MR. MARPLE:
6      Q.  You can answer.
7      A.  Well, as I have already testified a
8   couple of times here this morning, counselor,
9   my, um -- analysis of stigma will begin with
10   analysis of actual market pricing phenomenon
11   within the flooded area.  Now, we're going to,
12   um -- work to, um -- explain that with some
13   survey research, that is to say survey people
14   about flooding versus other kinds of
15   phenomenon.  Um -- the question, of course,
16   will be to what extent can we separate out
17   flooding from other phenomenon in the
18   marketplace.  This may be one of a whole host
19   of other phenomenon in the marketplace that
20   affect prices, but, as I testified yesterday, a
21   lot of things that happen in New Orleans, for
22   example the frequency of hurricanes and other
23   storms, is already captured in pre-Katrina
24   pricing.
25         So going back to the case of the

Page 288

1   townhouse, that three hundred to four hundred
2   thousand dollar pricing that would have
3   occurred pre-Katrina already inculcated the
4   likelihood of Mr. Thomas' corruption, the
5   likelihood of windstorms of New Orleans, the
6   likelihood of hurricanes.  What it didn't
7   inculcate was the one phenomenon that we'll be
8   measuring, which is the floodwater that came
9   into the ground floor.  So the market pricing
10   phenomenon allows us to begin the process of
11   measuring that.  The survey research will allow
12   us to be able to separate out the extraneous
13   factors from the one factor of flooding.
14      Q.  And that will be in a contingent value
15   survey where you construct questions of
16   hypothetical situations and ask about all these
17   variables that you have in mind or that could
18   be in play there, right?
19      A.  No, that's wrong.
20      MR. MEUNIER:
21         Objection to form.
22      A.  That's wrong on two different counts.
23   Number one, we might not use contingent
24   valuation, we might use some, um -- other form
25   of formalized, statistically based survey

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                      8/14/2007

Page 289

1   research such as contingent -- such as conjoint
2   measurement. We might use informal surveys, as
3   have been done, and as have in fact been
4   accepted by the Federal Courts. Um -- second,
5   there won't be anything hypothetical in any of
6   the surveys we do. This is all quite real.
7   Um -- the flooding was not a hypothetical
8   event. I have photographs of it here courtesy
9   of National Geographic in Exhibit 5. I have a
10  study of that in my own published, um -- paper
11  in the Journal of Real Estate Literature which
12  I've attached to my affidavit here.
13      So, you know, counselor, I think it's
14  a misdirection to suggest -- and a disingenuous
15  misdirection, at that, to suggest that we're
16  going to create hypothetical scenarios in
17  whatever kind of survey we do. Absolutely
18  nothing hypothetical about it.
19      Q.  All right. Look at Exhibit 8. You
20  recognize that article, correct?
21      (Kilpatrick Exhibit 8 was marked for
22  identification and is attached hereto.)
23      A.  That's an article from, um -- nine
24  years ago published by the, um -- Appraisal
25  Journal and authored by the late Dave McLean

Page 290

1   and Dr. Bill Mundy.
2   EXAMINATION BY MR. MARPLE:
3       Q.  And tell us what your relationship is
4   to Dr. Bill Mundy.
5       A.  He's an employee of mine.
6       Q.  And at that time he was your boss,
7   right?
8       A.  No. At that time I was at the
9   University of South Carolina and I had never
10  met Dr. Mundy.
11      Q.  All right. If you'd turn over to
12  Page 293 -- well, let me ask, do you consider
13  this article a reliable authority in the field
14  of using contingent value approach for natural
15  resource and environmental damage applications?
16      A.  Not only do I, but a substantial
17  number of appraisers around the United States
18  consider to be a highly authoritative article.
19      Q.  All right. Now, look at the criticism
20  on Page 293. Do you see those?
21      A.  Yes.
22      Q.  And one of them is called Monopoly
23  Money. And you understand that what he's
24  talking about there is that the reported
25  willingness to pay -- or protect natural

Page 291

1   resources is significantly greater than actual
2   willingness to pay. Do you see that?
3       A.  I see that.
4       Q.  And that's what he said is one of the
5   criticism, right?
6       A.  Well, he's reporting these
7   criticisms --
8       Q.  I think that can be fairly answered
9   yes or no.
10      MR. BECNEL:
11          Counsel, please, quit
12      interrupting. If you make an
13      objection, you make it on the record
14      and you use the Federal Rules of
15      Procedure to make your objection and
16      the Federal Rules of Evidence.
17      MR. MARPLE:
18          I object to his answer as being
19      nonresponsive.
20      MR. BECNEL:
21          Answer the question.
22      A.  Well, I see the criticism that
23  Dr. Mundy and the late Mr. McLean are
24  reporting, but it's important to understand the
25  context within which they're reporting these.

Page 292

1   Dr. Mundy and Mr. McLean have written -- or had
2   written extensively on this topic and are
3   reporting the issues which appraisers using
4   survey research need to take care to, um --
5   correct for when doing a properly constructed
6   survey.
7       These two gentlemen, um -- were and
8   are authorities on the subject of how to
9   properly do this, and in fact their own
10  criticisms of this kind of work have now been
11  incorporated in the proper procedures for doing
12  it. But number two, I think I have already
13  testified here this morning that any use of
14  survey research is not, um -- our fundamental
15  way of determining, um -- either real money or
16  monopoly money diminution in value in this
17  case. Our use of survey research will be
18  focused on helping explain to the Court why the
19  pricing phenomenon in the affected area is what
20  it is.
21      MR. MARPLE:
22          I object to everything after the
23      first sentence in that answer as being
24      nonresponsive and move to strike it.
25  EXAMINATION BY MR. MARPLE:

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 293

1    Q.  Dr. Mundy writes, in the next
2  sentence, it has been found that express
3  willingness to pay is higher in a hypothetical
4  situation than when willingness to pay meant an
5  immediate cash payment.
6      You see that?
7    A.  Yes.
8    Q.  He says, since there is no real
9  downside, i.e., paying the money, the
10  hypothetical willingness to pay often results
11  in overestimation.
12      He stated that as a criticism of the
13  contingent value survey method, correct?
14    A.  Well, he did, but I don't see what
15  that has to do with what I'm doing here,
16  because I have no intention of using, as I sit
17  here today, a willingness to pay contingent
18  value survey.
19      Counselor, I understand you're
20  deposing me on the Spelter, West Virginia case.
21  And while I appreciate and I'm sure the
22  attorneys for the defense in the Spelter case
23  appreciate this line of questioning, it really
24  doesn't have anything to do with what I'm
25  proposing to do here in New Orleans.  And so I

Page 294

1  know that, um -- your advisor Mr. Roddewig is
2  the opposing expert in Spelter, and I
3  understand that he'd like to take one more shot
4  at me before we get into the courtroom in a
5  couple of months, but this ain't that case.
6      MR. MARPLE:
7        I move to strike the last six
8      sentences of your answer as totally
9      irrelevant to what I asked him.  And
10      you can keep doing this, but we'll
11      just keep hanging in here.
12      MR. BECNEL:
13        You're going to take all day
14      long, but if you keep this attitude up
15      in this deposition, we're going to see
16      the Magistrate real quick.  Okay?
17  EXAMINATION BY MR. MARPLE:
18    Q.  Now --
19      MR. BECNEL:
20        Maybe they do that in Texas and
21      other places you come from, but not
22      how we conduct -- we had a very civil
23      deposition yesterday with a very fine
24      defense lawyer.  And we don't have to
25      have all this confrontation.

Page 295

1      MR. MARPLE:
2        I object to your speech.
3  EXAMINATION BY MR. MARPLE:
4    Q.  Now, you have cited this Mundy article
5  in your reliance materials, right?
6    A.  Yes.
7    Q.  You produced it as something you
8  relied on.
9    A.  I did.
10    Q.  All right.  Now, one to other
11  things -- criticism that he cites, in the next
12  subsection, is the extreme hypothetical nature
13  of the questions.
14      You see that?
15    A.  Yes.
16    Q.  And that's one of the criticisms that
17  Mr. Mundy noted that have been made of
18  contingent value surveys, right?
19    A.  Well, it's not a criticism, it is an
20  explanation of what appraisers who do those
21  kinds of surveys in those kind of cases need to
22  be careful of.  But as I have already
23  testified, A, there's nothing hypothetical
24  about flooding, and B, we're not proposing to
25  use contingent valuation as our sole source of

Page 296

1  measuring the amount of damages to those
2  properties.  As a result, Dr. Mundy and the
3  late Mr. McLean 's work here is extraordinarily
4  helpful in cases where it's applicable, but
5  it's just not applicable right now.
6    Q.  You haven't ruled in using the
7  contingent value survey, and you haven't ruled
8  it out; is that a fair statement?
9    A.  Um -- that's a fair statement.
10    Q.  The next one is imbedding, and it says
11  that contingent valuation produces results
12  inconsistent with assumptions of rational
13  thought.  And that's one of the criticisms that
14  he noted, correct?
15    A.  That's one of the criticisms that
16  he's, um -- helping appraisers understand how
17  to deal with; in other words, Dr. Mundy, who's
18  a great proponent of using contingent
19  valuation, is not attempting to discount the
20  use of it by these criticisms, but he's
21  offering up areas in which appraisers need to
22  be careful when using it.  And so, yes, it's a
23  criticism if indeed we were planning to use CV
24  to explain the -- or to determine the dollar
25  amount of stigma or the percentage stigma here,

11 (Pages 293 to 296)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 297

1   this would be an useful criticism for us to
2   incorporate in our work.  Um -- that having
3   been said, um -- it's not applicable to what
4   I'm proposing to do here.
5       Q.  And he gives the example that comes
6   out of contingent value surveying where they
7   found that some people valued two hundred
8   thousand oily ducks, from contamination, I
9   assume, the same as two thousand oily ducks.
10  Correct?
11      A.  Well, I understand the question,
12  counselor, but given the fact that I haven't
13  been asked to value any oily ducks in this
14  case, I'm not sure if I understand what it
15  means to me here.
16      Q.  And by the way, in the Spelter smelter
17  case, you were dealing with contamination.
18      A.  We didn't have any oily ducks there
19  either.
20      Q.  But you had contamination.
21      A.  That's correct.
22      Q.  And in the Murphy Oil case, you had
23  contamination of from oil.
24      A.  We had oil but no ducks.
25      Q.  All right.  And in this case, meaning

Page 298

1   the MRGO and levee cases, there's no
2   contamination for which you're going to try to
3   determine a diminished value, is that correct?
4       A.  At this juncture, I haven't been asked
5   about contamination, I've been asked about
6   impairment from the flood, that's correct.
7       Q.  And the impairment from the flood I'm
8   a little curious about, and maybe your own
9   experience with buying the townhouse could shed
10  some light on it.
11          Did you have a fear of future flooding
12  when you bought that townhouse?
13      A.  Well, I'm always hesitant to use the
14  word fear.  Not that I'm a fearless sort of
15  guy, but I have an excellent insurance company
16  to help me allay those fears.  And so by buying
17  what I consider to be a, um -- a rock solid
18  insurance policy, I expect, and I have every
19  reason to expect that, um -- if the, um --
20  townhouse again floods as a result of, um --
21  let's say a breach in the levee, I will be,
22  um -- sipping a cup of coffee and watching it
23  from three thousand miles away.
24      Q.  And that's the same kind of
25  determination some other buyers, or probably

Page 299

1   most buyers, in the Greater New Orleans area
2   are going to make now, tomorrow, next month, a
3   year from now, when they buy a home.?
4       MR. BECNEL:
5          Objection.
6       MR. MEUNIER:
7          Objection to form.  Calls for
8       speculation.
9       A.  Well, A, it is speculative, and that
10  indeed would be hypothetical, and we're not
11  trying to measure anything hypothetical here.
12  But B, everybody with what I would consider to
13  be an ironclad insurance policy, I still paid a
14  two-thirds diminished price for this townhouse.
15  See, even with the advantages that I have of
16  being able to afford and acquire excellent
17  insurance, I'm still not willing to pay full
18  pre-Katrina market value for this townhouse
19  that I bought.
20      Q.  In other words, if it had been three
21  hundred thousand dollars, you wouldn't have
22  bought it.
23      A.  That's correct.
24      Q.  Have you seen the Home Depot out there
25  on Veterans Highway?

Page 300

1       A.  Seen it, been to it, spent about an
2   hour there.
3       Q.  And I think you mentioned the Lowe's,
4   it's also out there on Veterans highway.
5   Right?
6       A.  I believe so, yes.
7       Q.  And you mentioned yesterday that you
8   had had some contact or talked to some people
9   at Lowe's.  I was assuming that's the one you
10  were talking about.
11      A.  Yes.
12      Q.  Pretty robust business at both places?
13      A.  I asked them about that.  In fact, I
14  sat down with one of the managers while I was
15  there and asked them if they were getting more
16  business since Katrina than they got before
17  Katrina.  And they said, no, they had a
18  significant diminution in business post-Katrina
19  than they had pre-Katrina.  I was actually
20  surprised, because I went in there on a
21  Saturday back in I think April, and, um -- it
22  seemed to be quit crowded.  So I had the same
23  sort of, um -- innocent reaction that your
24  question implies, which is, wow, post-Katrina
25  these people are selling a lot of stuff.  So I

12 (Pages 297 to 300)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 301

1  sat down and asked one of the managers, I said,
2  did you work here pre-Katrina?
3        Yes.  She said she did.
4        And I said, now, did you have more
5  business pre-Katrina or less business?
6        She said, no, this is a significant
7  diminution in business from what we had
8  pre-Katrina, it would have been much busier
9  prior to Hurricane Katrina.
10    Q.  What was her name?
11    A.  I can't remember.
12    Q.  How old was she?
13    A.  Um -- I'd say in her thirties.
14    Q.  And what color hair did she have?
15    A.  Blonde.  That sort of thing I
16  remember.
17    Q.  And she was the manager of that Home
18  Depot?
19    A.  No, she was one of the managers.
20    Q.  She was managing an aisle way or two
21  of tools or something?
22    A.  A department.
23    Q.  And you understand that she knew what
24  the financials were for that whole store for a
25  period of months?

Page 302

1     A.  Oh, I'll bet you got to go way up the
2  beltway, um -- in the, um -- hierarchy of Home
3  Depot to know that.  But, um -- I found, in my,
4  um -- work that often people on the street can
5  give you pretty good indications of things
6  that, um -- the accountants three thousand
7  miles away can't give you.  So I believe that,
8  um -- her reaction, by itself, would not be,
9  um -- an indication of the change in the
10  economy in the Greater New Orleans area, but if
11  her reaction is indicative of, um -- a
12  collection of reactions, then I think we might
13  have something there.
14    Q.  And let me ask you, if there are
15  businesses, Home Depot, or sheetrockers or
16  people that demolish homes or painters or
17  contractors whose business, like yours, has
18  improved because of Katrina, will they owe the
19  defendants money at the end of the day?
20    A.  Well, that's an interesting question.
21  And first, I hesitate to say that my business
22  has improved.  My business has gone up, um --
23  but, you know, I deal in people who have -- in
24  situations where people have awful things
25  happen to them; people have contaminated homes,

Page 303

1  where people have flooded homes, people have
2  disasters hit them.  And so I'm hesitant to use
3  the word improved to describe that.  Um -- so
4  the question is, do I owe your clients some
5  money because I have increased business here in
6  the state of Louisiana?  We had a lot of
7  business here in the state of Louisiana before
8  Katrina.  I'm just sorry to say that the good
9  citizens of this city need my help because they
10  got hit by this disaster.
11    Q.  And, but businesses whose business has
12  improved -- and you'll agree that there are
13  those kinds of businesses in New Orleans whose
14  business has improved since Katrina, right?
15    A.  Um -- I'm going to be hesitant to say
16  yes to that.  I mean, there are certain
17  businesses here in New Orleans who potentially
18  are doing, um -- better, but I haven't measured
19  any of those.  I haven't attempted to ascertain
20  any of those.
21        Hypothetically?  That might be right,
22  but again, I don't deal in hypotheticals here.
23  We're trying to deal in reality.
24    Q.  And let's say -- and this percentage
25  that you could come up with for diminished

Page 304

1  value as we sit here today, that's hypothetical
2  because it hasn't happened yet, right?
3     A.  No.  No.  I'm not going to come up
4  with a hypothetical value here.  I think we've
5  got reality that we could measure in the
6  marketplace in the affected flooded areas.  So
7  I'm -- I really take offense at the use of the
8  word hypothetical.  Um -- I've answered this
9  several times, counselor.  I'm not measuring
10  hypothetical values in this flooded area.
11  We're going in there to measure reality in the
12  flooded area.
13    Q.  And with respect to businesses that
14  have improved, they wouldn't be entitled to a
15  diminished value; is that correct?
16        MR. MEUNIER:
17            Well, wait.  Hold on.  Are you
18        asking a legal question, now?  Because
19        if you are calling on the witness to
20        expound on a legal right or duty or
21        breach of a duty or right to
22        compensation, then I think the
23        question is improper.
24        MR. MARPLE:
25            Objection to the speaking

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 305

1      objection.
2  EXAMINATION BY MR. MARPLE:
3      Q.  You can answer.
4      A.  Well, again, I don't have an opinion
5  about that one way or the other.  I, um -- I'm
6  a real estate appraiser, not a lawyer.
7      Q.  The hypothetical situation we've been
8  talking about a time or two, is a property
9  that's a residence that's worth a hundred
10  thousand dollars pre-Katrina.  Can we assume
11  that for just a moment?
12      A.  We can assume a hundred thousand
13  dollar, um -- let's call it a typical
14  residence, sure.
15      Q.  Okay.  And let's say that that owner
16  spends seventy-five thousand dollars to restore
17  that house to its pre-Katrina state, neither
18  improving it or not as good, but to the same
19  state that it was in pre-Katrina.  Will you
20  accept that?
21      A.  As a, um -- as a hypothetical,
22  strictly for purposes of answering your
23  question, but having no relationship whatsoever
24  to the analysis I'm intending to do here, of
25  course.

Page 306

1      Q.  All right.  And let's say your -- at
2  the end of the day, your percentage of
3  diminished value post-Katrina is 50 percent.
4      A.  Well, um -- again, for purposes purely
5  of illustrating a, um -- a question which has
6  no bearing on the analysis we're going to do,
7  sure.
8      Q.  All right.  And so that house's
9  post-Katrina value is fifty thousand dollars --
10  or it's been impaired fifty thousand dollars is
11  a better way to put it, under our hypothetical.
12  Correct?
13      A.  Correct.
14      Q.  And the owner has seventy-five
15  thousand dollars in cost to get it back to its
16  pre-Katrina state, correct?
17      A.  Correct.
18      Q.  And so as I understand what -- under
19  your proposed model, that owner is just going
20  to have to eat that twenty-five thousand
21  dollars that they spent in cost beyond the
22  diminished value.  Is that right?
23      A.  No.  No.  Again, you've crossed the
24  line back over into -- and I don't want to call
25  it my model, but it's certainly the universally

Page 307

1  accepted model for constructing a hedonic
2  pricing evaluation of a large scale area.  It's
3  not the John Kilpatrick model, it's the mass
4  appraisal model.  But that model would, um --
5  pick up the, um -- change in market value,
6  um -- and, um -- generally speaking, as a
7  generality, that change in market value would
8  include the sum of the anticipated repair
9  costs, plus the additional stigma over and
10  above that which diminishes market value.  So
11  if you've got a pre-Katrina house of a hundred
12  thousand dollars pre-Katrina value, and it's
13  anticipated that it's going to cost
14  seventy-five thousand in order to restore that
15  damaged house back up to its original
16  condition, then we would, um -- anticipate
17  finding a market value of that house far below
18  twenty-five thousand dollars.
19          Now, that's our anticipation, but
20  we'll let the market speak for itself.  And,
21  um -- in the few instances of data that I've
22  gathered thus far have told me that the market
23  will probably price that pretty well.
24      Q.  Even though yesterday you gave us the
25  example of the person that put sweat equity in

Page 308

1  and may have gotten repairs done for fifteen
2  thousand and the other person spent thirty
3  thousand, even though the cost of repair varied
4  from property to property --
5      A.  Right.
6      Q.  -- you can take that into account and
7  compensate the class members on a mass
8  appraisal basis without them having to come in
9  with receipts and prove up their actual cost of
10  restoration, right?
11      A.  Generally speaking, we would
12  anticipate, and certainly there's a lot of
13  literature out there to support this, that the
14  diminution of market value will capture both
15  the anticipated repairs costs as well as the,
16  um -- additional diminution in value associated
17  with stigma.
18          Case in point:  Some people put in
19  some sweat equity and had to put in some sweat
20  equity because they either didn't have the cash
21  to, um -- pay or they didn't have a job and
22  they had some spare time, or they, um -- simply
23  couldn't find anybody to do repairs.  Um -- you
24  can have wildly differential actual
25  out-of-pocket costs of repair that might vary

14 (Pages 305 to 308)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 309

1  because of people's personal circumstance.
2  Fortunately enough, we have a very simple and
3  easy to apply mechanism, which is a diminution
4  in market value, that captures both of those,
5  the anticipated cost of repair plus the
6  additional stigma over and above that.
7      Q.  And just so I understand, you won't be
8  looking at any individual plaintiff's actual
9  receipts or what they actually spent to restore
10 the property to get where you were just talking
11 about, is that correct?
12     MR. BECNEL:
13        Objection, repetitious.  It was
14        covered yesterday.
15     A.  As our core, um -- measurement, we
16 will be looking at the market pricing
17 phenomenon.  In the same way that we will look
18 at some sort of survey research, some sort of
19 formalized, such as conjoint measurement, it's
20 highly likely that we will survey some market
21 participants, some random sample of those, to,
22 um -- get an understanding of, um -- of their
23 own specific, um -- experiences in order to
24 flesh out and explain to the Court why market
25 value is a valid measure of the diminution in

Page 310

1  value.  So, um -- in answer to your question,
2  we will look at some situations, we will survey
3  some people to get their, um -- actual
4  experiences, but that won't be the core
5  valuation model that we will use.
6  EXAMINATION BY MR. MARPLE:
7      Q.  If we go back to Mr. Mundy and
8  McLean 's article, which is 8, on 294, one of
9  the criticisms he notes in his little bold
10 subheading there is Funny Money.  You see that?
11     A.  Yes.
12     Q.  And as I understand what he's talking
13 about is -- well, maybe you can tell me what
14 he's talking about here.
15        What's this criticism all about with
16 funny money?
17     A.  Well, again, um -- he's doing, um --
18 two things here.  Number one, he's describing a
19 hypothetical situation and, of course, as I
20 have already testified, that hypothetical
21 situation bearings no, um -- has no bearing on,
22 um -- this flooding case because we're going to
23 be dealing with realities.  Number 2, Dr. Mundy
24 and Mr. McLean are offering up an example of a
25 factor which appraisers need to control for.

Page 311

1  And, um -- these -- and all of these factors
2  have now been taken into account in other,
3  um -- supportive material subsequent to this
4  1998 article which helps appraisers explain or
5  understand, um -- how to do, um -- these kinds
6  of surveys.
7      MR. BECNEL:
8        Counsel, if you're going to keep
9        using exhibits, I think the rule is
10       that you're supposed to provide us a
11       copy of them.
12     MR. MARPLE:
13       We've got you one.
14     MR. BECNEL:
15       Well, then let's have them.  I
16       haven't gotten one.
17     MR. MARPLE:
18       You haven't asked for one.
19     MR. BECNEL:
20       No, no, but that's the rule.
21 It's not the rule for me to have to --
22     MR. MARPLE:
23       You've got it.
24     MR. MEUNIER:
25       Can I have a copy of the Mundy

Page 312

1  article?
2      MR. BECNEL:
3        I want every one of them.  I want
4  the newspaper, I want the National
5  Geographic, I want every one of them.
6      MR. MARPLE:
7        Sorry, I don't have one of the
8  National Geographic.
9      MR. BECNEL:
10       Then you better get it or
11 withdraw it.
12     MR. MEUNIER:
13       Whatever new exhibits you're
14 bringing in today we'd like.  As you
15 hand the witness one, why don't you
16 hand us one.
17     MR. MARPLE:
18       Sure.  Are y'all satisfied on
19 that?  I gave you one.
20     MR. MEUNIER:
21       One will do for our side.  One
22 total.
23 EXAMINATION BY MR. MARPLE:
24     Q.  You recognize what we've marked as
25 Exhibit 9, correct?

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 313

1       (Kilpatrick Exhibit 9 was marked for
2   identification and is attached hereto.)
3       A.  Yes, I do.
4   EXAMINATION BY MR. MARPLE:
5       Q.  And you've cited this in your reliance
6   materials, or at least talked about it?
7       A.  I don't think I either cited it or
8   talked about it.
9       Q.  But you know what it is, it's a panel
10  that came up with some -- well, it's a report
11  on contingent valuation by some panel of
12  scholars --
13      MR. BECNEL:
14          Counsel, we're going to have to
15      read it since it wasn't relied on, and
16      you're asking him to now comment on
17      some apparently statutes --
18      MR. MARPLE:
19          I object to the comments.
20      MR. BECNEL:
21          I don't care what you object to.
22      MR. MARPLE:
23          He knows what it is.
24      MR. BECNEL:
25          That's fine.  But that isn't the

Page 314

1       way it works here.  He's going to read
2       it, we're going to read it, and then
3       we're going to continue.
4   EXAMINATION BY MR. MARPLE:
5       Q.  I've got a question pending.  You know
6   what it is, and it's a report of a panel of
7   the -- looked at contingent valuations several
8   years ago in the context of the federal statute
9   that dealt with oil spills and setting up
10  trusts to recover money for damage to property,
11  right?
12      A.  Well, it's ancient history.  It was
13  written fourteen years ago.  There's been a lot
14  of water under the bridge since then.  I, um --
15  I no longer use it as reliance material because
16  it's been superseded, particularly in the
17  Federal Courts by the, um -- standards for
18  survey research published by, um -- Dr. Sherry
19  Sheldon-Diamond of the University of Chicago
20  Law School which has been adopted for use in
21  the -- as a supplement to the Federal Rules of
22  Evidence.  So while this is an interesting
23  piece of history, um -- it's just not something
24  that I use as reliance material for this case.
25  Frankly, it's been a long time since I've read

Page 315

1   it and I've forgotten everything it says.
2       Q.  And let me show you what I've marked
3   as Exhibit 10.  And I'm not sure I've got
4   another copy of that, but we'll let your
5   lawyers look at it.
6       (Kilpatrick Exhibit 10 was marked for
7   identification and is attached hereto.)
8       MR. BECNEL:
9          No.  We're not going to use it
10      until you get us a copy.
11  EXAMINATION BY MR. MARPLE:
12      Q.  Can you tell me what Exhibit 10 is?
13      MR. BECNEL:
14          No.  You're not going to use it
15      until you get me a copy, counsel.
16      MR. MARPLE:
17          Are you instructing --
18      MR. BECNEL:
19          I am instructing him that way,
20      yes, sir.  Because you're not
21      following the protocol.  The protocol
22      says you shall tender to opposing
23      counseling a copy of any exhibit at
24      the same time you confront the witness
25      with it.  Now, if you have an extra

Page 316

1       one, we'll be glad to use it.  But
2       he's not going to look at it with us
3       not looking at.
4       MR. MARPLE:
5          He just told us he used it--
6       MR. BECNEL:
7          I'm not worried what he told you.
8       I told what you the rule is.
9   EXAMINATION BY MR. MARPLE:
10      Q.  Did you produce a copy of this to us
11  in your box or in your reliance materials?
12      A.  No, it's not reliance material for
13  this case thus far.
14      MR. MARPLE:
15          Let's take a little break.
16      (Brief recess.)
17  EXAMINATION BY MR. MARPLE:
18      Q.  Mr. Kilpatrick, let me show you what
19  we've marked as Exhibit 10 and I ask you if you
20  recognize that as the article that you were
21  referring to in your previous testimony.
22      MR. BECNEL:
23          Let me enter an objection,
24      counsel.  I noticed you have
25      reproduced Moore's Federal Practice.

16  (Pages 313 to 316)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 317

1    There's a copyright on this, and
2    unless you have a waiver of the
3    copyright or you have purchased the
4    copyright, that's improper and it's
5    subject to the copyright infringement.
6    So I'm just pointing it out to you
7    before you do it.
8          MR. MARPLE:
9          Counsel, I don't want to debate
10   fair use with you.
11         MR. BECNEL:
12         Okay.  That's fine.  Long as you
13   know you're violating the law.
14         MR. MEUNIER:
15         If the question is whether this
16   is the article he had previously cited
17   in --
18         MR. MARPLE:
19         His testimony immediately before
20   the break.
21         MR. MEUNIER:
22         That's right.  Before the break.
23   A.  It appears to be that.
24   EXAMINATION BY MR. MARPLE:
25   Q.  Now, I think you told us that you

Page 318

1    could do a sampling or survey of repair cost as
2    part of what you might do in this case.  Is
3    that right?
4    A.  I think I said that I would propose
5    doing that as a supplement to explain the
6    validity of market value observations.
7    Q.  And have you put together any protocol
8    to do that in this case?
9    A.  No.  But I could assure you whatever
10   protocols we put together will follow proper
11   form and substance, um -- as is expressed in
12   best practices in the appraisal profession.
13   Q.  Now, as part of any model that you've
14   done to establish diminished value, have you
15   done such a such a survey of repair costs?
16   A.  Yes.
17   Q.  And in which case?
18   A.  Oh, I can't recall.  Um -- I, um -- I
19   mean I know I've done one, but it's been a long
20   time since we've done that sort of thing.
21   Um -- I'd have to go back and reflect on that.
22   Q.  Approximately how long ago was it?
23   A.  It's quite a few years ago.  I did a
24   good bit of work on what are called
25   construction defects.  I'm a what's called a

Page 319

1    professional member of the International Code
2    Council, which is the group that writes the
3    building codes here in the United States.  And,
4    um -- I have, as a result of that, written some
5    articles about, um -- the valuation implication
6    of various kinds of construction defects.  As a
7    part of the research for those articles, as
8    well as a few cases that I testified on, um --
9    I did some surveys of construction costs, and
10   of course I've kept abreast of construction
11   costs, um -- as a result of my work as an
12   appraiser.  Um -- and as a result of my work
13   with the International Code Council.  So
14   exactly when those were, four, five, six years
15   ago are probably the most recent that I've done
16   something like that.
17   Q.  And have you done modeling work in
18   connection with a class action to sample or
19   survey or evaluate repair costs?
20   A.  Um -- we did a study, um -- a very
21   informal survey, the sort of informal survey
22   that appraisers do all the time, in St. Croix,
23   Virgin Islands about these kinds of issues,
24   um -- and appended that to our property value
25   report.  I think I testified about that

Page 320

1    yesterday.
2    Q.  And just let me ask you, was that one
3    of the reports you said you could find and
4    would produce to us sometime here in the near
5    future?
6    A.  If we submitted an affidavit about
7    class certification in that case, then that is
8    one, yes.
9    Q.  And would it have these appended to
10   it, what you just mentioned?
11   A.  Well, the damage report in that case
12   would.  Now, my understanding from yesterday
13   was that what I'll be asked to submit is any
14   affidavit that we have, um -- submitted in
15   support of class certification.  What I'm
16   hearing you say now is something different,
17   which is the actual merits report, which is
18   different from what I thought I understood that
19   I was agreeing to yesterday.
20   Q.  And how long ago did you do that, what
21   you're now referring to as the damage report or
22   merit report in the Virgin Islands case?
23   A.  It's been a couple of years.  I want
24   to say more than two years ago.
25   Q.  You do have it, correct?

17 (Pages 317 to 320)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 321

1      A.  Yes.
2      Q.  I would ask that that be produced
3   whether that was encompassed within --
4      MR. ZWAIN:
5         I thought that I had asked for
6   damage reports and class cert reports.
7      MR. BECNEL:
8         No, you asked for class cert
9   reports.  You didn't ask for damage
10  reports.
11     MR. ZWAIN:
12        Check the transcript.  My
13  recollection is otherwise.
14     MR. BECNEL:
15        You're not entitled to damage
16  reports at this point.  This is on
17  class cert.  It's limited to class
18  cert.  It's not limited to merits
19  discovery.  That's a different day at
20  a different time.
21     MR. ZWAIN:
22        I think I'm entitled to reports
23  he's written.
24     MR. BECNEL:
25        File your motion with the

Page 322

1         Magistrate, and we object.  Only as to
2         damages related to merits.  Set it for
3         hearing.
4   EXAMINATION BY MR. MARPLE:
5      Q.  Let me show you what I've marked as
6   Exhibit 11.
7         You've seen Exhibit 11 before,
8   correct?  The article?
9         (Kilpatrick Exhibit 11 was marked for
10  identification and is attached hereto.)
11     A.  Yes.
12  EXAMINATION BY MR. MARPLE:
13     Q.  I can't recall, did you cite it in
14  your reliance materials or produce it to us in
15  the box yesterday?
16     A.  No.  No, I did not.
17     Q.  And it was published in the Appraisal
18  Journal, correct?
19     A.  Correct.
20     Q.  And that's the -- one of the
21  publications for which you sit on a panel or
22  board of review, with respect the publications,
23  correct?
24     A.  No.  I did not say that.
25     Q.  I understand that you reviewed

Page 323

1   articles occasionally that they sent you
2   probably in a double blind situation that were
3   proposed to be published in the Appraisal
4   Journal.
5      A.  No, that's a misunderstanding.
6      Q.  All right.  I'm sorry.  Have you
7   ever -- you've never reviewed any articles that
8   were submitted for publication in the Appraisal
9   Journal prior to publication?
10     A.  Not as part of a formal review
11  process.  I've had authors who are writing
12  articles for the journal send them to me and
13  ask me my opinion of them, but that's not a
14  part of any sort of blind review process for
15  the journal itself.
16     Q.  All right.  And yesterday, just to
17  clear up, you said you had reviewed something
18  that was going to be published by the Appraisal
19  Institute.  And what the context of that?
20     A.  It was a book.  I've reviewed several
21  books for them.  But I think yesterday my
22  answer was specific to one book.
23     Q.  All right.  And if you turn to
24  Page 271, the authors are undertaking to test
25  the reliability of contingent valuation with

Page 324

1   respect to certain sites for which they have
2   reported data of one kind or another, including
3   one in North Tacoma, Washington, right?
4      A.  That's correct.  Well, that's not
5   exactly what they do.  The authors pick and
6   choose a handful of studies that support their
7   findings.  One of them they happened to pick
8   out was North Tacoma, and they failed to cite a
9   follow-up peer reviewed study that came out in
10  an economics journal which finds that the North
11  Tacoma work done by Dr. Mundy, which is what
12  they're talking about here, turned out to be
13  right on the money.  Um -- it was a follow-up
14  study of the accuracy of that that went into,
15  um -- an Urban Economics Journal.  I don't have
16  that citation off the top of my head, but I
17  did, um -- have the opportunity to critique
18  Mr. Roddewig 's work -- he's the coauthor of
19  this article -- with response to the Spelter
20  case, and I pointed out in my critique that
21  Mr. Roddewig has cherry picked a handful of
22  examples which support his contention about CV.
23  He's been disingenuous about the North Tacoma
24  study, and even though he cites in his
25  footnotes several peer reviewed articles which

18 (Pages 321 to 324)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 325

1    are highly complimentary of CV, and I'll refer
2    you, for example, to Footnotes 19, 20, 21 and
3    22, he fails to discuss the findings of the
4    articles referenced in those footnotes because
5    if he did that he would find that they're
6    totally counter to the contentions in his
7    article.  And so all that's on the record in
8    the Spelter case already.
9        Q.   And did you undertake to review the
10   data that the authors of Exhibit 11 looked at
11   in reaching their conclusions on the North
12   Tacoma site?
13       A.   Yes.  And I've looked at that data and
14   I also looked at the study that was
15   subsequently published in one of the Urban
16   Economics Journals, and found that the work
17   here was -- Mr. Roddewig and Mr. Frey have done
18   is -- let's be kind and call it disingenuous
19   with respect to the Tacoma study.
20       Q.   And who was the author of this article
21   in the urban institute journal or whatever that
22   was that you've been referring to?
23       A.   You know, I can't remember his name.
24   It was brought to my attention by Dr. John
25   Caruthers who's a senior researcher at HUD in

Page 326

1    Washington.  Used the be our director of
2    research.  That's how I know him.  But
3    Dr. Caruthers brought this countervailing
4    article which is in the academic press to my
5    attention as the counterpoint to the Roddewig
6    piece.
7        Q.   And do you know when that was
8    published?
9        A.   The, um --
10       Q.   The follow-up that you've referred to
11   here to Exhibit 11.
12       A.   Well, it wasn't a follow-up.  It was,
13   um -- the, um -- countervailing piece in the
14   Urban Economics Press was published sometime in
15   the 2003, 2006 period.  I can't remember
16   precisely when.  Um -- but it wasn't published
17   to be a counterpoint to Roddewig, it was simply
18   published to be a more rigorous reflection on
19   the work that Mundy did and to show that the
20   Mundy and McLean study in Tacoma was indeed on
21   the mark.
22       Q.   And I'm sure the article will speak
23   for itself, but is your understanding that
24   it -- this article in Urban Economics looked at
25   the same data that the authors of Exhibit 11

Page 327

1    looked at?
2        A.   No, and again, I don't have it in
3    front of me, and I'd have to dig it out, but my
4    recollection is that the study in one of the
5    Urban Economics or Regional Sciences journals
6    did a much more detailed study of house price
7    trends in North Tacoma to follow up on actual
8    pricing phenomenon and did a much more rigorous
9    examination than the page and a half
10   Mr. Roddewig devotes to, as I earlier
11   characterized it, cherry picking in order to
12   support his thesis.
13       Q.   And then if we look over on Page 277,
14   another one of the sites he looked at was
15   Columbus, Mississippi, right?
16       A.   Right.
17       Q.   And that was another Mundy contingent
18   value valuation approach that had been used,
19   correct?
20       A.   Right.  And I don't think anybody in
21   the industry is blind to the fact Mr. Roddewig
22   likes to critique Dr. Mundy, but, you know,
23   um -- everybody needs a hobby, I guess.
24       Q.   Now, do you understand what's reported
25   in this article as to there was a 73 percent

Page 328

1    loss in value, that that was Mr. Mundy 's
2    finding?  Do you agree with that?
3        A.   Well, Dr. Mundy did an extensive
4    study.  And again, I didn't commit the Crystal
5    Springs study to memory before coming in here,
6    but as best I can recall, he did a, um -- an
7    extensive study in Mississippi.  But, um --
8    this was not a class action, so they picked a
9    couple of houses in order to use as exemplar
10   cases based on a large scale study of I'm going
11   to say twelve hundred or so properties in the
12   Crystal Springs area that were affected by the
13   contamination.  As it happened, this house
14   turned out to sell for a price that was, um --
15   not representative of the outcome of the
16   Mundy-McLean study.  It's one of those things
17   that happens when you pick only one house.
18            And so does that one example of one
19   house sold in one town in Mississippi undermine
20   all of contingent valuation?  Well,
21   Mr. Roddewig would hold forth that it does.  I
22   would suggest that given the huge body of
23   literature out there that Mr. Roddewig did not
24   include in his article which shows support for
25   contingent valuation and shows, um --

19 (Pages 325 to 328)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                           8/14/2007

Page 329

1  consistent, um -- validity of CV results, um --
2  that, um -- the weight of opinion in the
3  valuation literature is certainly on the other
4  side of the lever here.
5      Q.  I think you've testified in an earlier
6  case, I believe the Andrews case -- you
7  remember giving deposition in that case?
8      A.  Andrews.
9      Q.  Major Andrews?  That ring a bell?
10     A.  Um -- may have.  Where was it?
11     Q.  Kerr-McGee in Northern District of
12 Mississippi.  Does that ring a Bell?
13     A.  Oh, yes.  It was quite a few years
14 ago.
15     Q.  Right.  2001.
16     A.  Yeah.
17     Q.  When did you move -- but at any rate,
18 you talked about when you moved from South
19 Carolina to Seattle and bought a house out
20 there, right?
21     A.  Yes.
22     Q.  And when was it that you moved to the
23 Seattle area?
24     A.  September, 1998.
25     Q.  And you did a number of things to --

Page 330

1  you investigated a number of things before you
2  bought that house, about the area and about
3  that particular neighborhood and everything, is
4  that right?
5      A.  My wife did.
6      Q.  You didn't do anything?
7      A.  No, the house we bought, I had never
8  seen it until I drove up in front of it the
9  weekend of September 7th, 1998.
10     Q.  All right.  I believe you testified in
11 the Andrews case that you looked at the LP
12 siding issue out in that area.  Is that
13 correct?
14     A.  Right.
15     Q.  That's something you did?  Or did she
16 do that?
17     A.  I did.  I, um -- I found out as part
18 of the disclosure made to me by the, um --
19 property -- by the sellers that there was an LP
20 siding issue.  And I recognized that we were
21 buying the house at a substantial discount
22 from, um -- otherwise unimpaired values in that
23 neighborhood, and we were booking, um --
24 probably about a fifty thousand dollar profit
25 in the house the day we moved in.  And so given

Page 331

1  the extent of the LP siding, if in fact called
2  upon to replace it my estimate was that it
3  would cost seven to ten thousand dollars to
4  replace the siding if indeed it failed.  And
5  so, um -- it was was, um -- my belief at the time
6  that the purchase price of the house more than
7  accommodated the stigma loss associated with
8  the LP siding.
9      Q.  And let me just understanding.  You
10 investigated the LP siding problem before it
11 was -- you had put a contract on this house, or
12 what?
13     A.  No, at the time of putting the
14 contract on the house.
15     Q.  And so you didn't investigate that
16 prior to writing the contract?
17     A.  It was part of the disclosure, um --
18 in the listing agreement, and so I guess it
19 would be safer to say that I investigated it
20 prior to signing the contract, yes.
21     Q.  Do you know that there were lawsuits
22 and class actions about this LP siding around
23 the country?  Were you aware of that?  Did you
24 learn about that?
25     A.  Yes.

Page 332

1      Q.  And there were some here in this area,
2  in Louisiana, are you aware of that?
3      A.  Not specifically.  I know that there
4  were various lawsuits around the country, but
5  whether they were here or not, um -- no never
6  mind.
7      Q.  And if one of the properties owned by
8  the class members in either of the two classes
9  here and subclasses had an LP siding issue,
10 that would be a factor in that house's or
11 property's value post-Katrina, right?
12     A.  Well, not exactly.  It would be a
13 factor pre-Katrina.  If in fact the LP siding
14 issues predated Katrina, and certainly I
15 think -- it's my belief that the LP siding
16 litigation predated Katrina, then to the extent
17 that information is known to market
18 participants it would already be captured in
19 the pricing phenomenon prior to Katrina and it
20 would be captured in the pricing phenomenon
21 after Katrina.  In other words, it would be a
22 constant variable, just like the number of
23 bathrooms.  If the number of bathrooms in the
24 house didn't change pre and post-Katrina, then
25 that would be a constant that would exist in

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                  8/14/2007

Page 333

1  both pricing models.
2      Q.  And that's assuming that the owner was
3  aware of it and that there had been some
4  transaction prior to Katrina which incorporated
5  the knowledge of the problems with LP siding,
6  right?
7      A.  Well, the interesting part is it
8  doesn't really matter.  If there was no
9  knowledge prior to Katrina, then it
10 takes a fairly substantial leap of faith to
11 suggest there would be some change in knowledge
12 about it post-Katrina.  Because the same
13 disclosure obligations would apply both pre and
14 post-Katrina with respect to LP siding.  If
15 there were no disclosure obligations pre
16 Katrina, there would be no obligations post.
17 Same is true with if there were disclosure
18 obligations pre-Katrina, those disclosure
19 obligations would still -- would transcend the
20 flooding event.
21     Q.  Yeah.  But you understand there could
22 be a home that had LP siding on it pre-Katrina
23 in which the owner didn't know that there was a
24 problem with the siding and may have purchased
25 it with the problem pre-Katrina, not knowing

Page 334

1  about this problem with the LP siding.
2      A.  Right.  And then that lack of
3  knowledge would transcend Katrina.  In other
4  words, it would be a very simple transcending
5  event and it wouldn't have any differential
6  valuation impact pre and post-Katrina.
7          In short, counselor, this is not an LP
8  siding case.  If there is indeed LP siding in
9  any of these properties, then that LP siding
10 phenomenon transcended the flooding.
11     Q.  And so it's not -- LP siding problems
12 that exist now in any of the Katrina properties
13 is not something you're going to take into
14 account or deal with in any modeling, is that
15 right?
16     A.  Well, we'll certainly control for
17 that, but I don't think anybody has installed
18 any brand new LP siding on any homes in this
19 area since Katrina.  And so any and all LP
20 siding phenomenon would have preexisted
21 Katrina.  It in fact is a fairly trivial
22 situation.  It's just like any other potential
23 defect which existed pre-Katrina would also
24 exist post-Katrina.  The only thing we're
25 controlling for here is the flooding in

Page 335

1  Katrina.
2      Q.  Now, back to when you were buying your
3  house out there in Seattle.  You contacted
4  brokers and talked to them informally about the
5  market, is that right?
6      A.  My wife did.
7      Q.  You didn't do that?
8      A.  No.  My wife is an extraordinarily
9  well trained researcher, used to head up a
10 research lab at the University of South
11 Carolina, was a senior executive at the largest
12 hospital in South Carolina, I had more than
13 enough faith that she was going to do much more
14 rigorous job of this than any other buyer that
15 who ever brought a house in that market.
16     Q.  And so you relied on what she did?
17     A.  Yeah.  Oh, yes.
18     Q.  And you contacted -- you looked at ads
19 somewhere.
20     A.  Well, I assume she did.  She built a
21 library of information about the suburbs of
22 Seattle T-L prior to making these decisions,
23 and I mean an actual library of information.
24 It was a rigorously researched event.  And then
25 she called me up one day and said, I just

Page 336

1  bought a house in this neighborhood called
2  Glenwood.
3      Q.  So between the two of you, buying this
4  house you accumulated this library of
5  information with respect to all aspects of the
6  neighborhood and the property, right?
7      A.  Well, I think my contribution was
8  buying the three-ring binders.
9      Q.  And either she or you talked to people
10 in the neighborhood, right?
11     A.  She did.
12     Q.  And interviewed school personnel,
13 right?
14     A.  She relied heavily on the Internet.
15 We spent about a week in Seattle prior to the
16 decision to move there, and I spent all of my
17 time at what was then called Mundy Associates,
18 interviewing staff.  She spent her time doing
19 those sorts of things.  So again, I relied very
20 heavily on my wife's good judgment and decision
21 making in this.
22     Q.  You even hired a real estate agent who
23 you had said earned his commission by gathering
24 data, interviewing people and providing you
25 with those results rather than negotiating the

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 337

1  price.
2    A.  Right.
3      MR. BECNEL:
4        Counsel, you're reading from a
5      transcript without offering a copy of
6      it to us.
7      MR. MARPLE:
8        I'm looking at my own notes here.
9      MR. BECNEL:
10       No, sir, you're not looking at
11     your own notes, you're looking at a
12     transcript.
13     MR. MARPLE:
14       There's the transcript.
15     MR. BECNEL:
16       But you're quoting from a
17     transcript.
18     MR. MARPLE:
19       No, I'm not.
20     MR. BECNEL:
21       You're not?  Wait.  You just said
22     you're not?
23     MR. MARPLE:
24       Do you have an objection?
25     MR. BECNEL:

Page 338

1        Yes I have an objection.  It's
2      unprofessional to use a transcript and
3      not to tender a copy to us.  Okay?
4      MR. MARPLE:
5        I object to your speech.
6  EXAMINATION BY MR. MARPLE:
7    Q.  You mapped out all 92 Episcopalian
8  churches in western Washington, right?
9    A.  My wife did.
10   Q.  And it's because she's an Episcopalian
11 minister, right?
12   A.  She was the, um -- that's not exactly
13 the term of art, but that's a good way of
14 describing it.
15   Q.  And so it was important, I take it, to
16 be within a proximity acceptable to you and to
17 her of these Episcopal churches just like you
18 did here with respect to the townhouse that you
19 purchased in this area, right?
20   A.  Yes.  But I assure you, counselor,
21 that my personal religious beliefs enter in no
22 way, shape or form to my analysis of property
23 values in and about the, um -- New Orleans
24 market.  I'm not going to value houses close to
25 an Episcopal church any differently than I'll

Page 339

1  value houses to a Lutheran church or a Catholic
2  church or a synagogue or what have you.
3    Q.  But it was a highly individualized
4  factor for you and your wife, right?
5    A.  It was, but in the end of the day we
6  ended up buying a house that's a pretty good
7  distance from any Episcopal church because we
8  got a good deal on it.
9    Q.  But a Catholic boys school basketball
10 coach might value that neighborhood
11 differently, right?
12   A.  I have not inquired into the purchase
13 decisions of any Catholic boys school coaches.
14   Q.  But that's an kind of thing that
15 enters into people's decision of where they
16 want to live, is it near a school, is it near
17 where they work, those sort or things, right?
18     MR. BECNEL:
19       Objection.  Compound.
20   A.  That's true.  And I will say this:  To
21 the extent that those amenities in the flooded
22 areas were destroyed by the flood, they will
23 indeed have an impact post-Katrina on the
24 values of homes.  So if, for example, in the
25 Lakeview neighborhood public services like

Page 340

1  schools, churches, shopping centers, police
2  stations, things like that, got destroyed by
3  the flood, then naturally that's going to be
4  captured in home values after Katrina.  I mean,
5  that's part and parcel of the stigma losses
6  suffered by these properties, is because those
7  services which are important in the valuation
8  equation have now been removed as a result of
9  the very same flood which has damaged the
10 properties.
11   Q.  And to the extent they may have been
12 restored and are better in one area than
13 another, that could have a positive effect on
14 property values, right?
15   A.  And the good news is we'll be able to
16 pick all that up in the pricing phenomenon.  So
17 if there's a cross-sectional differential in
18 the degree to which public services are being
19 restored, then, um -- we're going to be able to
20 pick that up.  Anecdotally, I might say, the
21 Lakeview neighborhood is getting a restoration
22 that's pretty good.  I mean, we've got right
23 around the corner from us restoration of
24 shopping, churches, schools, these kind of
25 things, and yet we were still able to buy this

                                    22 (Pages 337 to 340)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 341

1  house a couple of months ago at a two-thirds
2  discount from the approximate otherwise
3  unimpaired value.  So I think mere restoration
4  of services has not totally alleviated the
5  potential for stigma damages.  Nonetheless, our
6  model will pick that up.
7     Q.  Have you conducted an individual
8  appraisal of residential property in the last
9  four years using a Fannie Mae Form 1004?
10    A.  Yeah.
11    Q.  And when did you do that?
12    A.  I can't remember.  I know I've done
13 quite a few in the last four years.  I just
14 can't remember exactly when or where.  I would
15 guess it been a couple of dozen.
16    Q.  And were those for lenders?
17    A.  Um -- I doubt it very strongly.  Um --
18 I would say these were probably either for
19 investment or litigation purposes.
20    Q.  Let me show you what we've marked as
21 Kilpatrick Deposition Exhibit 12.  Do you
22 recognize that as a Fannie Mae Form 1004?
23     (Kilpatrick Exhibit 12 was marked for
24 identification and is attached hereto.)
25    A.  I do.  I have the software in my

Page 342

1  office to print these out.  It's like a canned
2  software package, and there are different
3  providers who, um -- have a contract with
4  Fannie Mae and Freddie Mac to be able to print
5  this form out.  We use a firm called "a la
6  mode" software in our office, and I can get a
7  key and fill in all these blanks and do it
8  right from my laptop in my office.
9     Q.  And so am I to understand you can, if
10 you want to, you, meaning Mr. Kilpatrick, can
11 fill out a lot of the information that is asked
12 for, or for which there are blanks to fill in,
13 from your desk?
14    A.  Well, um -- after appropriate field
15 research, you can.  I mean, um -- the starting
16 point for filling this form out is to go out in
17 the field and do field research.  On an
18 individual property-by-property basis, it
19 eventually gets pretty expensive if we're going
20 to do a whole bunch of them.  That's why this
21 is an appropriate form to use if you just want
22 to appraise one house.  But if you want to
23 appraise a hundred and fifty thousand houses,
24 or even a hundred or a couple of hundred or a
25 thousand, a mass appraisal model consistent

Page 343

1  with Appraisal Standards Rule 6 is the accepted
2  and appropriate method for doing that.
3     Q.  The Universal Residential Appraisal
4  Report, Fannie Mae Form 1004, is the maybe even
5  required but certainly the accepted individual
6  appraisal report form that's used by most
7  lenders when they're doing individual
8  appraisals of residential property, correct?
9     A.  On an individual basis.  But including
10 the addendum, this report here is fifteen pages
11 long.  No, if I was going to produce this
12 fifteen-page report on a hundred and fifty
13 thousand properties, that would be a document
14 two million two hundred and fifty thousand
15 pages long.  It would certainly be much more
16 efficient for the Court if I were to do this in
17 a computerized database and a simple mass
18 appraisal report summarizing all of that rather
19 than burdening the Court with reading two
20 million two hundred and fifty thousand pages of
21 individual appraisal reports.
22    Q.  With respect to any work you're doing,
23 I take it you're not going to do any modeling
24 or anything for any health problems that any of
25 the class members or putative class members may

Page 344

1  have, right?
2     A.  No, that's not my field.
3     Q.  And that would include you're not
4  going to do any modeling or work on mental
5  distress or emotional distress that any class
6  member may have.  Is that right?
7     A.  No.
8        MR. MEUNIER:
9           Counsel, just for the record, you
10       meant to associate with the appraisal
11       report those two attachments, the
12       frequently asked questions and the --
13      MR. MARPLE:
14          Oh, sure.
15 EXAMINATION BY MR. MARPLE:
16    Q.  You understand, and I think you may
17 have referenced, Mr. Kilpatrick, that there's
18 some explanatory materials attached to that
19 that came from the Fannie Mae website.  Is that
20 right?
21    A.  That's correct.  What's missing from
22 here are, um -- forms for photographs of the
23 property, sketches of the property.  If in fact
24 this was required by a lender, I wouldn't send
25 the lender these frequently asked questions,

23  (Pages 341 to 344)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 345

1  but I would send the lender various addenda and
2  appendices which would include the text of,
3  um -- any, um -- limiting conditions or
4  assumptions or hypothetical conditions, plus
5  photographs and maps of the property itself as
6  well as the comparables.  So when I said that
7  this document would go up to about fifteen
8  pages, that's the typical length of a Fannie
9  Mae or Freddie Mac Uniform Residential
10  Appraisal Report submitted, um -- for, um --
11  Fannie Mae underwriting.
12      Q.  And you told us you've done several of
13  these in the last four years, and I apologize
14  if you already answered, but were they done in
15  connection with litigation reports?
16      A.  Probably.  They may have also been
17  done for investment purposes.  Or I think in
18  one case we had a, um -- we do a fair amount of
19  investment consultation, things like that.  And
20  I think we were aiding a, um -- an estate in,
21  um -- disposing of a single-family residence
22  that had a value in the eight to ten million
23  dollar range.  So we started out by doing an
24  appraisal, and I think we used a URAR form for
25  that, and then we followed up with a

Page 346

1  consultation project on the estate disposition.
2  In short, we do those for a lot of things.  I
3  cannot recall a circumstances in which we did
4  one for financing purposes.
5      Q.  You're familiar with the Appraisal of
6  Real Estate 12th Edition, correct?
7      A.  Yes.
8      Q.  And you cite it in your report as
9  being an authoritative and reliable source on
10  the appraisal of real estate, correct?
11      A.  I mean, to the extent -- to the
12  extent -- it is what it is.  I mean, it's,
13  um -- it's exceptionally valuable and used as a
14  textbook for appraisal courses.  But let's
15  don't lose site of the fact that it is what it
16  is.
17      Q.  Can I have a copy of your report?  I
18  think it might be Exhibit 4.
19      A.  Which report?
20      Q.  Deposition Exhibit 3 or 4.
21      A.  There we go.  Here's Deposition
22  Exhibit 3.
23      Q.  In your report, you say that the
24  Appraisal of Real Estate 12th -- and that's the
25  back I have here, right?

Page 347

1      A.  Yes.
2      Q.  -- is universally regarded as the
3  leading authoritative guide on the subject in
4  the world today.
5          Meaning the appraisal of real estate,
6  right?
7      A.  Yes.
8      Q.  Have you done work to determine the
9  number of housing units in New Orleans East, or
10  the New Orleans East subclass of MRGO?
11      A.  No, not yet.
12      Q.  Or in St. Bernard Parish?
13      A.  No, not yet.  Well, let my take that
14  back.  We did some studies about St. Bernard
15  Parish with respect to the Murphy Oil case.  I
16  don't have that number memorized, but as I
17  recall yesterday I cited a database of
18  twenty-eight thousand plus properties which we
19  had gathered in St. Bernard Parish.  So I think
20  that is indicative of the research we've done
21  thus far in St. Bernard Parish.
22      Q.  And do you know if that's the totality
23  of the properties, or is that something less
24  than the whole, the twenty-eight thousand?
25      A.  As I sit here today, I can't tell you.

Page 348

1      Q.  And did that include businesses?
2      A.  Again, I can't tell you.
3      Q.  And I assume then you don't know if it
4  included professional offices, retail stores,
5  shopping centers, or any other aspect or type
6  of property.  Right?
7      A.  Well, we do know from our studies in
8  St. Bernard Parish that there are some
9  properties that have mixed uses.  In other
10  words, you might have somebody who owns a home
11  and runs a chiropractor 's office in the ground
12  floor, or has a, um -- automobile repair shop
13  in the backyard.  These are not uncommon mixed
14  uses in some lightly zoned residential
15  neighborhoods.
16      Q.  And with respect to those people who
17  may be a chiropractor or a car repair guy that
18  may have claims for damages from lost business,
19  are you going to model that and opine to the
20  Court as to what those damages are for business
21  losses?
22      A.  We have not been asked to do --
23          MR. MEUNIER:
24              Objection, just on the basis that
25          it's repetitive and was already asked

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 349

1      and answered yesterday.
2      A.   Our report is going to be focused on
3   market value of real estate.  And by the way,
4   when I say market value, I want to be sure to
5   note that there are varying definitions of
6   value, and I think I have already cited here
7   today that one commonly defined standard of
8   value is called market value.  It's promulgated
9   by federal lending organizations, and in fact
10  the text of that is contained in this Fannie
11  Mae report which is Exhibit 12.  State of
12  Louisiana promulgates two other, um --
13  definitions of fair market value, one
14  statutorily and one administratively.  We'll
15  include all of these definitions in our report
16  and, um -- reconcile them for purposes of
17  establishing a basis of value.
18     Q.   And so have you done that yet,
19  reconciled those definitions?
20     A.   I have done them in other cases here
21  in Louisiana.  Um -- I recently wrote, in a
22  particular case, in a different piece of
23  property, in a different part of Louisiana,
24  that -- I reconciled the language of those
25  three and showed, um -- how they were, um --

Page 350

1   for purposes of that analysis, consistent with
2   one another.
3      Q.   And what is your definition of market
4   value once you've done all that?
5      A.   Well, we don't attempt to formulate an
6   ad hoc opinion of market value or an ad hoc
7   definition, we simply cite all of them and
8   discuss the differences among them, and, um --
9   for purposes of their relevance with respect to
10  the analysis we're doing.
11     Q.   Well, I understand, but at the end of
12  the day in this case, in the merits end of it
13  as you call it, when you actually get a damage
14  report, are you going to have to have -- at
15  that point will have defined market value?
16     A.   I will have defined our basis for
17  value.  And it may very well be -- include the,
18  um -- market value definition proffered by
19  federal organizations for federal lending, but
20  it also -- we will provide and cite the
21  statutorily provided definitions of value here
22  in the state of Louisiana.  We don't want to
23  leave anything out.
24     Q.   And so you may get different numbers
25  depending on the definition you use.

Page 351

1      A.   No, I don't think so.  In the case --
2   other case that I just wrote a report on, which
3   has not been submitted anywhere yet, it's still
4   in process, so to speak, um -- we found that
5   for purposes of our analysis there was no,
6   um -- difference.  Now, um -- the definition of
7   value, that is to say establishing the basis
8   for value, in the, um -- appraisal analysis, is
9   part of what's called the scope of work
10  decision which is done right up front in what
11  you attorneys would call the merits analysis.
12  When we get to the actual, um -- boots on the
13  ground portion of this case, one of the very
14  first things we will do is reconcile those
15  definitions, and they will provide guidance for
16  gathering data.  As a result of that, we won't
17  come up with different values based on
18  different definitions of value, we will
19  reconcile all of that prior to the data
20  gathering portion of our analysis.
21     Q.   And if I understood you correctly,
22  you've done that in this other case in
23  Louisiana, and so do you contemplate that you
24  could come up with a different definition in
25  this case?

Page 352

1      A.   I don't contemplate that.  I suspect
2   as we sit here today, that, um -- the same
3   finding that I had in that other case, which is
4   that the other definitions, plural, of value
5   established by law and regulation in the state
6   of Louisiana will be internally consistent with
7   the language of the definition of market value
8   used in federal lending.  But, hey, you just
9   pointed out the Appraisal of Real Estate 12th
10  Edition, and if you turn to Page 24, you'll
11  find an essay -- I think it's Page 24 -- you'll
12  find an essay which, um -- outlines I believe
13  it's 15 definitions of value which can be used
14  by appraisers in different circumstances.  And
15  in fact they go on to provide language in,
16  um -- in that discussion to show that various
17  definitions of value are applicable in various
18  circumstances.
19          So we're not wedded to anything in
20  particular, but as good appraisers we will
21  determine the standard of value right up front,
22  we will provide that, we will provide a
23  citation to it, and we'll explain what that
24  means in the context of the analysis we're
25  doing.

25  (Pages 349 to 352)

Page 353

1    Q.  Have you studied the knowledge of
2  flood risk in New Orleans East or St. Bernard
3  Parish or the Lower 9th Ward population prior
4  to Katrina?
5    A.  By studied, I'm not sure exactly what
6  you mean.  We did a series of focus groups -- I
7  talked about this yesterday.  We did a series
8  of, um -- eight focus groups with respect to
9  the Murphy Oil litigation.  We did two each in
10  I think it was Corpus Christi, Wilmington, St.
11  Charles, Missouri, and here in Louisiana, here
12  in New Orleans.  Our two focus groups here in
13  New Orleans, if I recall correctly, one was
14  made up of St. Bernard Parish residents who did
15  not get an oil, um -- contamination, and then
16  St. Bernard Parish residents who did get an oil
17  contamination.  And our objective in these
18  focus groups was to make a determination of the
19  perceptions of risk of a variety of
20  circumstances, flooding being one of them, and
21  to be able to create a separating equilibrium
22  between the flood damage and the subsequent oil
23  damage.  And so I would suggest to you that
24  from an appraisal perspective, that's probably
25  the most extensive study of this kind of

Page 354

1  phenomenon ever done by a real estate
2  appraiser.
3        Is there more to be done?  Sure.  Am I
4  going to do more?  That's certainly going to be
5  my recommendation to the client.
6    Q.  And you produced those focus group
7  results to us in the box yesterday, right?
8    A.  Or on the CDs which are in the box,
9  yes.
10    Q.  And whatever that is that's in there
11  of those focus group results is the most
12  extensive study that's ever been done in the
13  real estate world.
14    A.  Appraisal community.  I would -- I
15  would hold forth that I don't know of one more
16  extensive.  If indeed someone has done a more
17  extensive study of perceptions sessions of risk
18  of flooding in an appraisal context, I would
19  appreciate it if you would send me a copy of
20  that.
21    Q.  Do you know of any others that have
22  been done?
23    A.  I don't know anybody who's done a
24  fraction of what we've done in this case.
25    Q.  I understand.  But just with respect

Page 355

1  to focus groups and flooding and perception of
2  flooding, similar to the one you produced to
3  us, do you know anybody else that's ever done
4  another one of those focus group studies?
5    A.  I don't know if it was focus group
6  studies or not.  FEMA, of course, does
7  extensive studies of, um -- flood risks
8  throughout the United States.  And real estate
9  appraisers are, as a matter of course, familiar
10  with, um -- FEMA flood maps.  Many appraisers
11  have copies of the FEMA flood maps in their
12  offices, they use them as part of real estate
13  appraisal practice.  I've been using FEMA flood
14  maps for over two decades.  So that's probably
15  the largest repository of flood risk
16  information that is used by real estate
17  appraisers.  There may be other studies, and as
18  I say, I would appreciate it, um -- if people
19  bring those to my attention.
20    Q.  All right.  And I'm talking about
21  focus group studies, not FEMA studies, where
22  they actually go out and map elevations and
23  whatever they do to come up with these flood
24  risk areas and ratings.  I am talking about
25  focus groups where some real estate appraiser

Page 356

1  or somebody in the real estate business trying
2  to make an appraisal did something similar to
3  what you did in the Murphy Oil case with those
4  focus groups.
5        Are you aware of anybody else having
6  ever having done that before?
7    A.  No, I'm not.  And just to make matters
8  complete, I also want to point out that the
9  results of those, um -- studies were, um --
10  incorporated into a presentation that was
11  accepted for presentation at the 2007 American
12  Real Estate Society meetings in San Francisco.
13  So not only did we do those focus group
14  studies, but I also made a presentation about
15  those studies before colleagues in the field.
16    Q.  And that means what, the fact that you
17  made a presentation about it?
18    A.  Well, just adds to what we have done
19  in this matter.  And it adds to the fact that I
20  didn't just do this back in Murphy Oil and drop
21  it.  We are continuing to study the results of
22  those focus groups and, in fact, giving very
23  serious consideration to eventually producing a
24  journal article for submission and peer review.
25    Q.  Now, my original question was had you

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 357

1  done any studies of the knowledge of flood risk
2  by the public in New Orleans East or St.
3  Bernard or the Lower 9th Ward prior to Katrina?
4      A.  Um -- well, the focus groups helped us
5  with that.  In fact, that was part of the
6  questioning in the focus groups, was to elicit
7  from people their anticipation of flood risks
8  as buyers in this market, or for that matter
9  buyers in other hurricane or flood prone
10  communities such as Wilmington, Corpus Christi
11  and St. Charles, Missouri.  We chose those
12  communities for focus groups specifically
13  because people who have bought homes in those
14  communities are aware of the risks -- and I'll
15  call them the normal and anticipated risks, of,
16  um -- of flooding and/or hurricanes.
17      Q.  All right.  And those focus groups
18  were done after Katrina, right?
19      A.  That's correct.
20      Q.  And did those focus groups which we
21  have here ask questions or determine any
22  knowledge of risk by anybody of these
23  participants of flood risk prior to Katrina?
24      A.  That's exactly what we were asking.
25      Q.  All right.  And then did you ask them,

Page 358

1  okay, now what do you know about it now?
2      A.  Yes.
3      Q.  Is any work you're doing going to
4  include renters?
5      A.  To the extent that rental values
6  impact the market value of homes, we're
7  certainly going to survey rental rates before
8  and after Katrina.  And that may include an
9  actual survey of renters, but it will certainly
10  include a survey of landlords, property
11  managers, brokers, and other market
12  participants to inquire about rental rates
13  before Katrina and rental rates after Katrina.
14      Q.  As it would affect value of the homes,
15  correct?
16      A.  Correct.
17      Q.  Not as determining a percentage or any
18  amount of damage that a renter gets.
19      A.  That's correct.
20      Q.  Okay.  And would a renter have the
21  same amount of intangible stigma, injury, or
22  whatever that is, as a homeowner?
23      A.  Renters are going to have a couple of
24  different layers of damage, but that's not part
25  of this case.  That's not part of what we're

Page 359

1  measuring.  Our focus is on market value of
2  homes themselves.  And so, um -- the varying
3  stigma levels suffered by renters is outside
4  the scope of what I've contemplated or what I'm
5  opining to here.
6      Q.  And are you proposing that there is a
7  model for which you can construct the damage to
8  rental property, property that is owned for
9  rental purposes, whether it be a home or a
10  duplex or an apartment complex?
11      A.  If it's, um -- a residence which is a
12  part of this, um -- study, um -- and it has the
13  potential to be rented and rental rates in that
14  neighborhood can be ascertained, then certainly
15  for the sake of completeness we'll include that
16  as part of our analysis.
17      Q.  And what about an apartment complex,
18  let's say a 100-unit apartment complex, are you
19  going to opine on the diminished value or
20  perhaps increased value of an apartment
21  complex?
22      A.  Well, I haven't, um -- determined yet
23  from my clients whether non residential
24  property is going to be part of the case, but
25  certainly if non residential property, that

Page 360

1  is -- and when I say non residential property,
2  I include apartment complexes because it's
3  income producing, exclusively income producing.
4  So if you have apartments, office buildings,
5  shopping centers, industrial property, vacant
6  land, um -- whatever, even public buildings
7  within a flooded area, all of that is easily
8  ascertainable because all of those have pre and
9  post-Katrina determinable market values.  And
10  so we could, in the same kind of model, model
11  pre and post-Katrina market values of every
12  square inch of the flooded area irrespective of
13  its pre or post-Katrina use.
14      And by the way, that will also take
15  into account properties which have a change in
16  use pre and post-Katrina.
17      Q.  And you could do a refinery?
18      A.  Well, I could, sure.
19      Q.  I mean, is that within the scope of
20  this, the Murphy Oil Refinery; are you going to
21  come up with a diminished value for Murphy Oil
22  Refinery?
23      A.  I have not yet asked whether the
24  actual Murphy Oil Refinery is included in the
25  property list to be appraised.  If it is, we'll

27 (Pages 357 to 360)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 361

1  do it.  If it's not, we won't.
2      Q.  Do you know approximately the number
3  of square miles in St. Bernard Parish?
4      A.  No.  It's probably in my files.  Um --
5  but I don't know that off the top of my head.
6      Q.  And do you know what percentage of
7  whatever the area of St. Bernard Parish is is
8  water versus land?
9      A.  No.  And again, that's probably in my
10  files, but I don't have that offhand.
11      Q.  All right.  Do you know the land area
12  of Orleans Parish?
13      A.  No.  Not off the top of my head, but
14  again, that may be in my files.  It's less
15  probable than St. Bernard.
16      Q.  And do you know how many miles of
17  levees there are in St. Bernard Parish and
18  Orleans Parish?
19      A.  Offhand, no.  But again, that may very
20  well be in my files.
21      Q.  Do you have an approximation?  Is it
22  more than a hundred miles of levees?
23      A.  No, I don't have an approximation.
24  Again, I've flown over much of it, I know it to
25  be quite a few miles, but I didn't, um -- I

Page 362

1  didn't stop to do a calculation of, um -- how
2  many miles per hour I was flying and how many
3  minutes it took me to fly over the levee.
4      Q.  Would the state of repair or
5  improvement of levees in a given area of
6  Orleans Parish or St. Bernard Parish be a
7  factor in the post-Katrina value of individual
8  properties?
9      A.  Well, that's something that we'll
10  elicit with some surveys which I would
11  recommend doing.  And I want to point out that
12  we don't measure dollar or percentage figure
13  with the survey and then put that into the
14  equation.  Or don't need to do that.  We
15  certainly can do it and we did it in the
16  Spelter case which you cited earlier.  But,
17  um -- our use of surveys of people will help us
18  explain why we're observing this, um --
19  phenomenon of a diminution in property value.
20  And if in fact people's reluctance to buy in
21  those flood prone areas now, post-Katrina, is a
22  result of fear or risk associated with their
23  understanding of the maintenance level of the
24  levees, then that will come out.  But we're not
25  going into this presupposing that to be the

Page 363

1  truth.
2      Q.  But that would be something that you
3  would consider in determining -- under your
4  model in arriving at a value post-Katrina of
5  properties, right?
6      A.  Well, no.  That's something that
7  market participants would consider.  And so if
8  in fact market participants are considering
9  that to be a factor in their purchase
10  decisions, and particularly if that
11  consideration is manifested in the prices
12  people are paying for properties, then that's
13  going to come out in the values that we observe
14  in the marketplace -- or excuse me, the prices
15  we observe in the marketplace and the value
16  opinions we determine from those prices.  So
17  that's not something John Kilpatrick is going
18  to make any, um-- presuppositions about, that
19  is a factor which may or may not be captured in
20  people's pricing decisions, and we of course
21  will test for that.
22      Q.  Did you investigate the state of levee
23  repair up there around that townhouse that you
24  bought before you purchased it?
25      A.  Not specifically.  My wife and I drove

Page 364

1  by it and observed it.  Um -- there are some
2  places where I saw people working on the levee
3  and there are some places where I saw just bare
4  metal sticking out of the ground.  But I
5  didn't, um -- make any, um -- intense, um --
6  calculations about that because I recognized
7  the fact that I was paying a price for the
8  property which already incorporated some risk
9  of subsequent levee failure.
10      Q.  Did you have any discussions or
11  thought or do any work scratching around on a
12  piece of paper what the potential for increased
13  value was of that townhouse?
14      A.  Well, I think that's pretty obvious,
15  that if in fact values ever get restored back
16  to their pre-Katrina levels I stand to, um --
17  make a few dollars on the townhouse.  On the
18  other hand, if it takes ten or fifteen years,
19  for example, for these prices to get back to
20  where they were pre-Katrina, well, on a time
21  adjusted basis I'm not going to make any money
22  on that townhouse at all.  So there is an
23  investment risk associated with that.  And but,
24  um -- that sword cuts both ways.
25      Q.  And that's the kind of things that an

28  (Pages 361 to 364)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 365

1   individual buyer takes into consideration when
2   they buy any piece of residential property,
3   right?
4       A.  Of course.  And that's something that
5   we're going to be able to measure, just like
6   any other appraiser measures those things, by
7   looking at market prices, by doing surveys of
8   market participants, by examining other factors
9   in the market, and concluding an opinion of
10  value.  Either way you cut it, counselor, there
11  are two ways of doing this thing.  You can
12  either do a property-by-property appraisal, and
13  if you do a property-by-property appraisal you
14  incorporate all that stuff.  Or you do mass
15  appraisal, in which case you incorporate all
16  that stuff.  Both alternatives, either
17  property-by-property or a mass appraisal,
18  incorporate identically the same information.
19  The only different between the two is that mass
20  appraisal is so very much more efficient and so
21  very much more statistically reliable and so
22  very much more characterizable in terms of
23  means and standard deviations, as opposed to
24  the extraordinarily expensive mechanism of
25  doing individual house-by-house appraisals.

Page 366

1       Q.  I'm confused.  Maybe you can help me
2   out a little bit.  I thought you had told us
3   that you were going to recommend that you do
4   the fair market value post-Katrina on
5   August 30th, 2005, the day after the hurricane
6   was here.
7       A.  The day after the flood.  I want to
8   make sure that I differentiate between the
9   hurricane and the flood.  Our -- obviously,
10  we've linked the two of them and we've used the
11  word Katrina in a rather sloppy fashion, but
12  the focus of our attention is going to be pre
13  and post the flood.
14      Q.  All right.  And then you've told us
15  the market was in disequilibrium at that point,
16  so you couldn't use sales as a measure because
17  it was frozen up and there wasn't anything
18  going on as of that time, post-Katrina.  Right?
19      A.  Well, immediately after Katrina, you
20  know, for a short period of time, there were no
21  sales.  Now, we do know that there are sales
22  which have manifested since Katrina in the
23  flooded areas.  To the extent we're able to
24  develop an opinion of value using those, we'll
25  use them.  We're certainly going to gather all

Page 367

1   of the data about sales post-Katrina that we
2   possibly can and analyze all of that data to
3   find out what truth lies in there.
4       Q.  And if somebody's pre-Katrina value of
5   their property and structure was $100,000, and
6   let's say three months ago they sold it for
7   $200,000, and they had $25,000 in restoration
8   costs, do they get money for diminished value
9   at the end of the day?
10      A.  Well, if we try to do this on a
11  property-by-property basis, you would get,
12  potentially, those aberrations, because indeed
13  you're going to find that in any large number
14  of cases you're going to have people who, um --
15  whose transactions stands out.
16          And let me give you an example that's
17  outside of the realm of property value, but
18  something you might understand.  Let's talk
19  about cigarette smoking for minute.  I think
20  it's kind of universally recognized that
21  cigarette smoking is dangerous for people.  I
22  used the smoke a long time ago, I finally got
23  convinced that it was danger and quit.  That
24  having been said, some people smoke cigarettes
25  and don't die.  You smoke cigarettes, you

Page 368

1   appear to be alive.
2       Q.  Thank you.
3       A.  You're quite welcome.  Take it as a
4   compliment.
5          Now, having said that, does that
6   diminish the likelihood that cigarettes are
7   going to kill people?  No, it doesn't at all.
8          So the fact is, if you go into a very
9   large study group, you're going to find people
10  who have individual experiences which are
11  called outliers.  And we have outliers in real
12  estate.  You have a property that ought to be
13  worth a hundred thousand dollars, that somebody
14  picks up for zero.  You have a property that
15  ought to be worth a hundred thousand dollars
16  that somebody comes along and pays two hundred
17  for.  Now, these outliers would tend to skew
18  the reality of the situation if we were trying
19  to do property-by-property appraisals.  But by
20  taking in the account all of this data at the
21  same time, all hundred and fifty thousand
22  properties, and creating a statistically valid
23  and reliable data set with respect to all of
24  this, we're able to account for the outliers,
25  explain what they are, and then report the

JOHN A. KILPATRICK (VOL II)                        8/14/2007

Page 369

1  measure of central tendency.
2        Now, indeed counselor, if in fact the
3  truth is that $100,000 houses pre-Katrina are
4  selling for $200,000 today, then your clients
5  win.  And this is the only way to get at the
6  truth of that.
7        Q.  Or if we had actual sales data and
8  showed that we can get at it that way, too.
9        A.  Well, that's exactly what I propose to
10 do, counselor.  And in fact, whichever side is
11 right in this case, whether the plaintiffs are
12 right or the defense is right, all I'm
13 proposing to do is to follow the tried and true
14 methodology on a large scale, statistically
15 valid basis to get at the truth.  And so the
16 only thing I'm proposing to do here is study
17 the actual data in the marketplace on a
18 statistically valid and reliable basis in order
19 to get at the truth.  And if the truth falls
20 down on the plaintiffs' side, so be it.  If the
21 truth falls down on the defense side, so be it.
22 But any objection to the analysis I'm proposing
23 is an objection to a statistically valid method
24 of getting at the truth.
25       Q.  Is the market now in equilibrium?

Page 370

1        A.  Don't know.  But that's something that
2  can only be tested in a large scale,
3  statistically valid analytical process.
4        Q.  And it could be or could not be,
5  correct?
6        A.  Well, it could or could not be, but,
7  you know, if I was going to try to perform an
8  individual appraisal, the likes of which you
9  were suggesting with the Fannie Mae form a
10 minute ago, then I'd still have to do a large
11 scale test of this market in order to determine
12 whether sales in the marketplace were
13 equilibrium sales or not.  So in fact even if I
14 wanted to use this one Fannie Mae appraisal
15 form which is Exhibit 12 in order to perform a
16 single appraisal in that marketplace, for it to
17 be in any way, shape or form valid I'd have to
18 start out with some sort of large scale test in
19 order to determine if the comps in the
20 neighborhood were indeed valid comps.
21       Q.  All right.  Market data of actual
22 sales is going to be one of the primary forms
23 of data or sources of data post-Katrina that
24 you're going to use, right?
25       A.  Both pre and post-Katrina.  But yes,

Page 371

1  that's correct.
2        Q.  All right.  But then in addition,
3  you've mentioned different kinds of surveys for
4  different issues to screen for or to provide
5  information to you, right?
6        A.  Consistent with best practices in the
7  appraisal profession, we, um -- would
8  recommended to our clients that we can use
9  survey research in order to help explain the
10 phenomenon that we're observing in the
11 marketplace.
12       Q.  And have you developed any protocol or
13 budget that -- for how many of these surveys
14 that you would conduct?
15       A.  No.  We haven't developed that yet,
16 but certainly as part of the scope of work
17 process in the merits phase we will develop
18 those protocols.
19       Q.  There are sales of residential
20 properties that have taken place in New
21 Orleans, quite a few, now, in 2007 and
22 particularly second half of 2006, correct?
23       A.  Yes.  I think we have already
24 discussed the fact that I bought one of them.
25       Q.  Yeah.  And typically each of those

Page 372

1  residences, if they were sold to -- from one
2  private owner to the other, would have had --
3  the lender would have done an appraisal,
4  something similar to the Form 1004 we have
5  talked about earlier, right?
6        A.  Um -- one would think so.  I have not
7  examined all those transactions, but if in fact
8  the property has been financed with a federally
9  regulated mortgage, then that would be the
10 protocol.
11       Q.  Let me ask you if you're familiar with
12 a book called A Guide to Appraisal Valuation
13 Modeling published by the Appraisal Institute.
14       A.  The name sounds familiar.  Who's the
15 author of it?
16       Q.  The authors are Mark L. Linne and
17 Stephen Cane and George Dell.
18       A.  Yes, I'm familiar with it.  I reviewed
19 it.
20       Q.  You did?
21       A.  Yes.  I was the reviewer on that book.
22       Q.  Is this the one, or one of the ones
23 you told us you did review earlier?
24       A.  It is.
25       Q.  All right.

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 373

1    A.  A couple of years ago.
2    Q.  I'm only laughing because you looked
3  at it like you hadn't seen it before, and you
4  kind of surprised me with your answer when you
5  said you had.
6        Do you know, are the words contingent
7  valuation or contingent valuation surveys
8  mentioned in this guide?
9    A.  I can't recall.  Um -- I can't recall
10  whether they mentioned that at all in there.
11    Q.  What about in the Appraisal of Real
12  Estate 12th Edition, do you know, are
13  contingent valuation surveys or the contingent
14  valuation appraisal method, whatever you want
15  to call it, is that mentioned at all in that
16  book?
17    A.  I don't know if the exact words are.
18  The survey research methodologies are discussed
19  briefly in there, and the appraisers are
20  recommended to rely on the salient peer
21  reviewed work in the, um -- journal articles
22  and academic press that's out there.  So yeah,
23  there's like a page or a half a page or
24  something like that on survey research in there
25  somewhere.  But it essentially directs the

Page 374

1  reader to, um -- rely on the, um -- tried and
2  true methods, as we will do here.
3    Q.  I'll tell you what, over the lunch
4  hour I'll look for that and see if I can find
5  it.  If I can't, do you think you would be able
6  to find where that was in that book?
7    A.  I wouldn't make any representations
8  pro or con.  That book has quite a few hundred
9  pages in it.  I've read it back and forth a few
10  times, but I can't recall exactly which page
11  everything is on.  I gave you a citation this
12  morning from Page 24, but that's because I've
13  given a speech on that topic.  I don't know
14  that I've given a speech on the Appraisal of
15  Real Estate 12th Edition 's reference to survey
16  research.
17    Q.  Are the Uniform Standards of
18  Professional Practice a reliable authority in
19  the field of real estate appraisal?
20    A.  Yes.  Indeed I think I've disclosed in
21  my vita that I'm one of the handful of
22  appraisers who's been authorized to teach that
23  by the Appraisal Standards Board and the
24  Appraisal Qualifications Board.  I just taught
25  an appraisal standards course at a college in,

Page 375

1  um -- Washington two weeks ago.  And I just
2  renewed my instructor's qualifications, um --
3  earlier this year.
4    Q.  Let me show you what we've marked as
5  Exhibit 13 and ask if you can tell me if that
6  is a copy of the Uniform Standards of
7  Professional Practice Rules 1, 2 and 6, and
8  then some advisory opinions and other, um --
9  well, I guess mostly advisory opinions that go
10  with these standards?
11        (Kilpatrick Exhibit 13 was marked for
12  identification and is attached hereto.)
13    A.  Well, it is, um -- it appears to be
14  the text of it.  It's missing the line numbers.
15  It's clear that you've downloaded this from the
16  Internet, and it appears that you downloaded it
17  from the appraisalfoundation.org which is the
18  parent organization of the Appraisal Standards
19  Board that that publishes this.
20        That having been said, I also note
21  that these are discontinuous downloadings; in
22  other words, it will go Page 1 through 3, 1
23  through 5, et cetera.  So without a thorough
24  review to see if these are, um -- complete, and
25  in the absence of the line numbers which are an

Page 376

1  integral component to USPAP, I'm at least
2  willing to say that this appears to be a good
3  text of the 2006 edition of the appraisal
4  standards.
5  EXAMINATION BY MR. MARPLE:
6    Q.  And is the 2006 edition the latest
7  version of these?
8    A.  Yes.
9    Q.  Let me ask you -- the question is
10  going to be whether each of the following --
11  I'm going to list off some things, I'll do it
12  one at a time, however -- are factors in the
13  market value of a residence -- property.  And
14  there may be a second follow-up question, which
15  is later, about what you might do with that,
16  but my question is just to establish whether
17  it's a factor that comes into play in the value
18  of real estate.
19    A.  My understanding is you're asking if
20  it's a factor which influences the market
21  value?
22    Q.  Yes.
23    A.  All right.
24    Q.  And not how or to what extent or
25  whether it's one of the big once or little

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 377

1  ones.  We can come back to that, and maybe
2  we'll stop and do that, but I'm letting you
3  know where I was going with this.
4       The location.
5     A.  It may be.
6     Q.  The neighborhood name.
7     A.  It may be.
8     Q.  Real estate taxes.
9     A.  They may be.
10    Q.  Whether it's owned in fee simple or
11  some other ownership.
12    A.  Um -- that probably would be.
13    Q.  The asking price.
14    A.  Probably not.
15    Q.  Conditions in the contract for sale.
16    A.  Probably not.
17    Q.  For instance, subject to below market
18  financing.
19    A.  No.  In fact, that's a condition of
20  sale which appraisers are supposed to adjust
21  away in determining value.
22    Q.  Would that be a factor that a buyer or
23  seller might consider in an individual
24  transaction?
25    A.  Yeah.

Page 378

1     Q.  Financing?  Chinese financing,
2  whatever you want to call it.
3     A.  Well --
4     Q.  Maybe that wasn't a good question.
5     A.  Well, without respect to any
6  particular type of financing, the, um -- the
7  nature of the financing, pro or con, may
8  influence the price pro or con.  It doesn't
9  influence the underlying value.  So in an
10  individual appraisal, the appraiser has to take
11  that into account in determining value.  In a
12  mass appraisal, the appraiser has to take it
13  into account but usually does so by making some
14  examination of whether or not those factors on
15  a mass appraisal basis are normally
16  distributed, that is to say you've got as many
17  plus signs as you have minus signs.  If in fact
18  it's determined that the factors are not
19  normally distributed, then you have to make
20  some accounting for that.
21       Um -- so, um -- it's something you
22  consider in the valuation process for sure, but
23  it doesn't -- the availability of exceptional
24  financing, good or bad, does not, per se,
25  influence value, unless that's a long-term

Page 379

1  systematic reality.
2     Q.  Does the perceived or actual growth
3  potential of a neighborhood affect market
4  value?
5     A.  Generally, yes.
6     Q.  It could be rapid, stable or slow.
7     A.  Could be.
8     Q.  Or something else.
9     A.  Or something else.
10    Q.  And whether property values are
11  increasing, stable or declining is a factor in
12  determining market value, right?
13    A.  Could be.
14    Q.  Zoning?
15    A.  Could be.
16    Q.  I mean, you mentioned earlier it could
17  be mixed use zoning which would allow
18  residences and some sort of businesses being
19  run out of homes, or other uses mixed in with
20  residential, right?
21    A.  Could be.
22    Q.  And not always, but more often than
23  not mixed use would have an adverse effect on
24  residential property value, right?
25    A.  Not necessarily.  That's -- I see

Page 380

1  increasing trends toward higher value property
2  in mixed use neighborhoods.
3     Q.  And do you know how many mixed use
4  neighborhoods there are in St. Bernard Parish?
5     A.  No, but that's something that we'll
6  investigate in the empirical, that is to say
7  the merits phase of our analysis.  Naturally,
8  it would -- it's included in the model that we
9  plan to develop, we just haven't done that yet.
10    Q.  And same would be true, then, I take
11  it, in New Orleans East or the Lower 9th Ward?
12    A.  Of course, that's something we
13  recommended to our clients that we incorporate
14  as part of our analytical process.
15    Q.  And the neighborhoods that have mixed
16  use may well have a different end result in
17  diminished value, if that's the result, than
18  one next door that's not mixed use, right?
19    A.  We identified yesterday -- I had
20  discussed under oath that we would do a, um --
21  an analysis on a neighborhood-by-neighborhood
22  basis.  That's part of the model that I'm
23  proposing to the Court here.
24    Q.  Now, there is also grandfathered uses
25  in individual properties, right?

                              32  (Pages 377 to 380)

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 381

1    A.  Um -- could be.  That's something that
2  may very well have an impact on value.
3    Q.  For instance, it could have -- let's
4  say you can have horses on the property, that
5  you couldn't have -- that was a grandfathered
6  use.
7    A.  Sure.  And if there are any horses on
8  any of the properties in the flooded area we'll
9  take that into account in our model.
10   Q.  And that could cut both ways, right?
11 It could increase the value of the ones -- of
12 the property that has the horse use and
13 decrease it for the one right next door, right?
14   A.  My general observation of properties
15 which have horses on them is that they tend to
16 be higher value.  But that's a generality, and
17 we will certainly take that into account in the
18 model which we're proposing to the Court that
19 we test in these affected areas.
20   Q.  Do you know how many grandfathered
21 uses are in the class areas?
22   A.  Not yet, but it's important no note
23 that our model will account for those and will
24 take those into consideration in the model; in
25 other words, we'll know that at the end of the

Page 382

1  day.  And in fact, um -- this sort of large
2  scale holistic approach that we are proposing
3  is the only way of getting at the truth of
4  that.  So all of these factors that you've
5  listed today are factors that we intend to
6  examine and test in a large model.
7    Q.  Well, you could get at it by looking
8  at the property and determining exactly what's
9  going on with that particular property, right?
10   A.  Well, you could, but why would you?  I
11 mean, that's that just creates a burden for the
12 Court and a burden for the appraisers that, as
13 I have already testified, would be -- would
14 cost millions dollars and take huge numbers of
15 people years in order to, um -- facilitate.
16 When you've got tools and techniques that are
17 provided for one appraisal methodology and are
18 consistent with appraisal standards, which
19 allow us to get at the truth of this matter in
20 a much more straightforward, streamlined and
21 statistically reliable and valid fashion, then
22 for goodness sakes why would be burden the
23 Court with, um -- a process which would be more
24 happenstance, more reliable, take more time,
25 cost more money and require the Judge to read

Page 383

1  over two million pages of, um -- of affidavit.
2    Q.  By the way, have you ever investigated
3  or looked at or researched the due process
4  rights of defendants when people sue them for
5  damages to have some feel for what those due
6  process rights are under the 7th Amendment?
7    A.  Counselor, those are legal
8  determinations.  I'm a real estate appraiser,
9  and I'm here to propose a model to the court
10 which from a real estate appraisal perspective
11 is efficient, statistically reliable and gets
12 at the truth in a quick and affordable fashion.
13 And so while I can understand and appreciate
14 that there are due process rights provided for
15 under the Constitution and the law -- and by
16 the way, I personally appreciate living in a
17 society where I have those due process
18 rights -- to get an explanation of those I
19 would engage the services of an attorney not a
20 real estate appraiser.
21   Q.  Now, with May have touched upon this,
22 but a refinery in the neighborhood would affect
23 the value of residential property, right?
24   A.  Well, we know that pre-Katrina, that
25 is to say pre-flooding, there was a study

Page 384

1  published by a Dr. Ragas back in 1994 which
2  studied precisely that impact.  So we know what
3  the pre-Katrina diminution in value is, and of
4  course in a mass appraisal model that will
5  already be incorporated in the pricing model
6  which we will study pre-flooding.
7        MR. MARPLE:
8            All right.  I think we need to
9        take a break because they tell me
10       we're about out of tape here.
11           (Brief recess.)
12 EXAMINATION BY MR. MARPLE:
13   Q.  Would easements on a property affect
14 its value?
15   A.  Both before and after Katrina an
16 easement might have an impact on value in a
17 consistent matter.
18   Q.  The easements could change after
19 Katrina, right?
20   A.  And that's why we would want to pick
21 valuation dates as close as possible to one
22 other to control for that.  In fact, if you had
23 picked valuation dates immediately before and
24 immediately after, I think you'd obviate that
25 problem.

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 385

1    Q.  With respect to the interiors of the
2  homes, if they had been redone or restored,
3  would that be a variable that would affect
4  market value after Katrina?
5    A.  Well, only to the extent that it also
6  impacted value before Katrina.  By Katrina, I'm
7  of course referring to the flood.  In other
8  words, if you had a house that had been
9  renovated and restored in some fashion
10  immediately prior to Katrina, then that would
11  influence its unimpaired value, but it also may
12  have some influence on its impaired value,
13  except to the extent that flooding may have
14  damaged the renovations done.
15         And let me give you an example.  The
16  townhouse that we just acquired, um -- if, for
17  example, the downstairs of that townhouse,
18  um -- had been, um -- substantially renovated
19  prior to Katrina and all those renovations
20  destroyed, well, then, that's going to have an
21  impact on value.
22         But again, the only way to get at the
23  truth of that matter is to do some sort of
24  large scale appraisal of all hundred and fifty
25  thousand of those houses.  That's the only

Page 386

1  thing I'm proposing to do is appraise these
2  very things that you're talking about.
3    Q.  If I asked you this, I apologize, but
4  do you know how many sales occurred in the
5  class areas in 2006 and 2007?
6    A.  No, that's a matter that -- whether we
7  appraise these things with individual
8  appraisers or with a mass appraisal, we're
9  still going to have to ascertain that as part
10  of the merits investigation here.
11    Q.  Let me show you what we've marked as
12  Exhibit 14.  And is that the damage report you
13  did in the Spelter smelter case?
14       (Kilpatrick Exhibit 14 was marked for
15  identification and is attached hereto.)
16    A.  Well, I wouldn't characterize it this
17  way.  This is the data from survey research
18  done under my direction by Dr. Mulhern dated
19  September, 2002, so this material is right at
20  five years old.  Dr. Mulhern, um -- is no
21  longer in my employ, so he will not be helping
22  me with the New Orleans case, and as a result,
23  um -- this has no bearing on the work that I'm
24  doing here.
25  EXAMINATION BY MR. MARPLE:

Page 387

1    Q.  And is there something wrong with the
2  work in survey work that Dr. Mulhern did?
3    A.  Nothing wrong with the survey work he
4  did, but he doesn't do it anymore.  He's
5  retiring.  So I'm not going to use him in the
6  New Orleans case, and as a result
7  Dr. Mulhern 's work is of no interest to me
8  here in New Orleans.
9    Q.  Are you planning to engage someone
10  like Dr. Mulhern that can construct a survey
11  for you?
12    A.  If indeed we, at the merits phase,
13  decide that it's appropriate to use a
14  formalized survey research instrument such as
15  conjoint measurement, then it's altogether
16  likely that I will want to engage, um --
17  appropriate scholars to help me do that.  But
18  we haven't engaged those sort of folks yet.  We
19  have got a couple of people on our payroll
20  already who have written and published on
21  survey research, and we may or may not have to
22  add anybody else.
23    Q.  Who are they?
24    A.  Well, of course Dr. Mundy is on our
25  payroll, um -- and he's written extensively.

Page 388

1  Um -- Dr. Kimberly Winson-Giedemon is on our
2  payroll.  She's a full-time professor but
3  part-time engaged by us.  She's published quite
4  a few articles recently, including in the
5  Appraisal Journal, on the applicability and
6  effectiveness of survey research.  We may get
7  her to do this.  Um -- but we may go to some
8  other outside consultant, almost certainly an
9  academic with extensive experience in survey
10  research, to assist us in this matter.  But it
11  won't be Dr. Mulhern.
12    Q.  Now, I believe you said this was done
13  several years ago.  But it was attached to the
14  damage report that's dated March 31, 2007 of
15  this year, is that correct?
16    A.  Yeah.  I made a mistake.  I was
17  reading one of the earlier dates in there.
18  Some of the material dates to 2002, but the
19  effective date of the research itself is
20  actually February 27, 2007.
21    Q.  So it's recent.
22    A.  Well, yeah.  About six months ago.
23    Q.  And you had something to do with the
24  construction of this survey that was used,
25  right?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 389

1     A.  Well, counselor, I did, but I got to
2  ask the question -- I have already been deposed
3  in the Spelter case a couple of times, and I'm
4  being deposed again next week in the Spelter
5  case, being redeposed.  I note that you have
6  the opposing expert in the Spelter case here in
7  the room with you, and on behalf of my clients
8  in that other case I have to ask you are you
9  simply prepping me for my deposition next week?
10  Because I have already testified this has
11  absolutely nothing to do with the research that
12  I've done thus far or I am proposing to do here
13  in New Orleans.
14     Q.  And the question was did you have
15  anything to do with the construction of this?
16     MR. MEUNIER:
17        Well, wait.  Let's go off the
18     record for a second.
19        (Off the record.)
20  EXAMINATION BY MR. MARPLE:
21     Q.  If you turn to Page 9 of Appendix J,
22  Mr. Kilpatrick, do you see the non response
23  paragraph there?
24     A.  Counselor, I do, but again, I did not
25  submit this document as, um -- in response to

Page 390

1  discovery here, it's not a reliance document in
2  this case, nor going forward will this be a
3  reliance document since I've already indicated
4  to you I cannot envision using Dr. Mulhern's
5  assistance going forward.  So whatever is said
6  in this report from Dr. Mulhern to me with
7  respect to this other case has no bearing
8  whatsoever on, um -- what we propose to do
9  going forward here in the New Orleans case.
10     MR. MEUNIER:
11        Let's get the question.  What's
12     the question?
13  EXAMINATION BY MR. MARPLE:
14     Q.  You say a cash incentive was offered
15  to increase the likelihood of participation; is
16  that correct?
17     A.  Um -- correct.
18     Q.  And what was that cash incentive?
19     A.  It was de minimis.  I'm guessing on
20  the order of twenty dollars, something like
21  that.
22     Q.  And did you offer that at the outset
23  of the interview to everyone?
24     A.  Yes.
25     Q.  And did you in fact pay people that

Page 391

1  said they wanted it?
2     A.  Are you asking me did we cheat them
3  and not do what we said we were going to do?
4     Q.  No.  I just want to know if you then
5  went ahead and paid these people.
6     A.  I promise you that whatever we told
7  people we were going to pay them we honestly
8  paid them.
9     Q.  And the final response number that you
10  had was three hundred and ninety-five, right?
11     A.  That sounds right.  It's been a while
12  since I've checked that number.
13     Q.  Look at Page 12.
14     A.  Yes.  Three hundred and ninety-five.
15     Q.  And you used an automatic -- or the
16  people that did this for you did an automatic
17  dialing -- computerized assisted dialing
18  program to call about over seven thousand
19  people that they dialed up, right?
20     A.  Right.
21     Q.  And you prescreened or tried to
22  determine that you were getting some people
23  that were homeowners; that was one thing,
24  right?
25     A.  Correct.

Page 392

1     Q.  You didn't screen for whether or not
2  people might be interested in buying a
3  residence anywhere, right?
4     A.  Our goal wasn't to find people who
5  were specifically interest in buying a
6  residence, our goal was to find people who were
7  typical homeowners or home buyers.  In other
8  words, the fact that they might be interested
9  in buying a residence today is inconsequential
10  to the study.  In fact, there's no reason to
11  believe that that would be of consequence
12  either in this study or any other study which
13  we might undertake.
14     Q.  And so you didn't screen for people
15  that might be interested at that time in buying
16  a residence.
17     A.  No.  Because it would have been
18  improper to do so.
19     Q.  Now you, as I understand it, made
20  contact with approximately eight hundred people
21  that when you called you got somebody that
22  answered?
23     A.  I can't recall the exact number.
24     Q.  And it would be fair to say that a
25  good number of the people told you they didn't

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                           8/14/2007

Page 393

1  went to participate.
2     A.  Yeah.
3     Q.  And that's what you do when people,
4  marketers or surveyors call you personally at
5  home, or anyplace, you say I don't want to talk
6  to you.
7     A.  It depends.  Sometimes I do.
8     Q.  Sometimes you don't.
9     A.  Sometimes I don't.
10    Q.  You also screened -- I take that back.
11 You determined the income level at the
12 household, right?
13    A.  Yes.
14    Q.  And if you look at Page 7 of Appendix
15 K, you see that you've determined the
16 percentage of the population that fell in the
17 various age categories, right?
18    A.  Yes.
19    Q.  And then on the right-hand side you
20 calibrated -- or determined the percentage of
21 the people that responded to the survey by the
22 same age brackets, right?
23    A.  Right.
24    Q.  And you have more than 50 percent of
25 the people that responded to the survey were 55

Page 394

1  and older, right?
2     A.  Correct.
3     Q.  And yet they were only 36.4 percent of
4  the population, right?
5     A.  Right.  And, you know, that difference
6  does not appear to provide a level of
7  atypicality which discounts the validity of the
8  survey.
9     Q.  And what can you cite to me that would
10 tell you that?
11    A.  Well, counselor, I would ask the
12 obvious.  What would you cite that would
13 suggest that there's some atypicality there?
14    Q.  Well, would you think maybe common
15 sense might tell you that people 55 and older
16 living in a rural or semi-rural area, some of
17 whom according to your survey lived there for
18 more than 35 years, might not be interested in
19 buying a residence?
20    A.  Well, counselor, first thing first.
21 As I pointed out with respect to this survey,
22 we specifically were not trying to screen for
23 people who were currently interested in buying
24 a residence.  Second, in New Orleans, and in
25 the affected neighborhoods of New Orleans, I

Page 395

1  don't believe there are any rural areas that
2  we're going to be studying.  And so this
3  question which goes to the heart of what sort
4  of motivations might differ 35 year olds from
5  55 year olds in rural West Virginia is
6  certainly germane to the deposition questions
7  that I might hear next week from
8  Mr. Roddewig 's clients, but it's not at all
9  germane to the work I intend to do for my
10 clients here in New Orleans.
11    Q.  All right.  And so if you do a survey
12 here in New Orleans related to a class, the
13 disparity between the percent of that age group
14 and the population and the actual percentage
15 that you get back in a survey is not going to
16 matter to you.
17    A.  I didn't say it's not going to matter.
18 But that small amount of difference, let's say
19 relative 14 percentage points or 15 percentage
20 points difference doesn't, um -- cast this
21 survey into doubt.
22    Q.  You also determined from the survey
23 respondents the household income, right?
24    A.  That's correct.
25    Q.  And your hypothetical property in this

Page 396

1  survey was a $100,000 property, am I correct?
2     A.  That's correct.  But I want to make a
3  point.  You're using the word hypothetical
4  again.  And here in the flooding case we're
5  dealing with real situations.  So, um -- the
6  word hypothetical does not at all apply to any
7  answer I might give with respect to the New
8  Orleans flooding situation.
9     Q.  All right.  But this survey did deal
10 with the hypothetical 100 percent, right?
11    A.  Counsel, I thought you were going to
12 ask me about questions that had to do with New
13 Orleans.
14       MR. MEUNIER:
15          I thought we were going to link
16       the methodology between the two, and I
17       haven't heard any questions along
18       those lines.
19 EXAMINATION BY MR. MARPLE:
20    Q.  The survey you did in the West
21 Virginia case dealt entirely with a
22 hypothetical situation, right?
23    A.  Counselor, again, if you want to ask
24 me about New Orleans questions, I would be more
25 than happy to answer those.  But right now, as

JOHNS PENDLETON COURT REPORTERS                800 562-1285

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 397

```
 1   I say, all you're really doing is prepping
 2   Mr. Roddewig 's client for their deposition
 3   next week.
 4      Q.  And I'm to understand that --
 5         MR. BECNEL:
 6             Don't answer any further
 7         questions dealing with that subject.
 8   EXAMINATION BY MR. MARPLE:
 9      Q.  All right.  You screened --
10         MR. BECNEL:
11             Based upon ethical considerations
12         of not notifying opposing counsel in
13         that case of the types of questions
14         that you're asking.  I've given you a
15         choice of calling the Magistrate Judge
16         and laying this out to him, you've
17         declined, therefore I'm going to
18         instruct him not to answer this
19         question based upon an ethical
20         consideration.
21         MR. MARPLE:
22             All right.  The CMO governs the
23         conduct of depositions and when it's
24         appropriate to instruct a witness not
25         to answer and when it's not.  So I
```

Page 398

```
 1         don't believe this objection falls
 2         within that.
 3         MR. BECNEL:
 4             Then call the Magistrate.
 5         MR. MARPLE:
 6             And the obligation would be upon
 7         you to call the Magistrate Judge for a
 8         Protective Order.  What I believe the
 9         CMO provides is we can go forward with
10         the deposition and we're correct on
11         this we'll have to bring
12         Mr. Kilpatrick back -- or you will,
13         probably, and pay, if we're -- well, I
14         won't say what the Court might rule.
15         MR. BECNEL:
16             Let's call the Magistrate right
17         now, then.  Let's go off the record
18         and call the Magistrate Judge.
19         (Off the record.)
20         (Whereupon the previous question was
21   read back.)
22      A.  No, it didn't deal with a hypothetical
23   question, no.
24   EXAMINATION BY MR. MARPLE:
25      Q.  The part that you consider not
```

Page 399

```
 1   hypothetical were the facts that you recited as
 2   to what the situation was at the smelter; is
 3   that correct?
 4      A.  No, no.  The hypothetical in Spelter,
 5   that's Mr. Roddewig 's term.  He's tried to
 6   turn this around in this rebuttal opinion to,
 7   um -- cast doubt on the reality of the
 8   contamination in Spelter, West Virginia.
 9   Spelter is in fact contaminated.  That's been
10   established by physical science experts.
11         Now, what we've done is used a
12   contingent valuation survey in order to measure
13   the impact of contamination on people's
14   opinions about property values.  Mr. Roddewig
15   would like to suggest that that's a
16   hypothetical value when in fact careful reading
17   of appraisal standards would show you that what
18   we're measuring is the as is or actual value.
19   The hypothetical in Spelter would be the value
20   of the properties if they weren't contaminated.
21         When we as appraisers talk about
22   hypothetical conditions, we are testing and
23   surveying for what these properties would be
24   worth if they weren't and had never been
25   contaminated.  Now, in New Orleans, we don't
```

Page 400

```
 1   have to do that, we're not going to deal with
 2   any hypotheticals because we have an event, the
 3   flooding, we can measure actual property values
 4   before the event, then we can measure actual
 5   property values after the event.  There's no
 6   need the create any sort of hypothetical in
 7   either of those cases.  But the only thing we
 8   would have done hypothetical in Spelter, West
 9   Virginia would have been the hypothetical
10   values of these properties as if they were
11   never contaminated.  And that's not what the
12   survey is about.
13      Q.  All right.  Look at Page 24 of
14   Appendix K, that Contingent Valuation, Willing
15   to Accept at the top.
16      A.  Yes.
17      Q.  And this is one of the questions that
18   was asked in the survey, right?
19      A.  Yes.
20      Q.  And it says, please assume --
21      A.  I see that.
22      Q.  -- your home was located in the area
23   subject to the conditions I have described.
24      A.  Yes.
25      Q.  That's a hypothetical situation, isn't
```

                                    37 (Pages 397 to 400)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 401

1  it not?
2      A.  Of course not.  If you read appraisal
3  standards, you will see very clearly that a
4  hypothetical condition is something that's
5  known not to be true, whereas an assumption is
6  something believed to be true.  And so an
7  assumption is in fact a 180-degree opposite of
8  a hypothetical.
9      Mr. Roddewig, who has been hired in
10 the Spelter case, has attempted to turn that on
11 its ear and disingenuously convince the Court
12 in West Virginia that hypothetical means
13 assumption, assumption means hypothetical, up
14 means down, down means up, green is red, red is
15 green.  These, um -- despite the fact that
16 Mr. Roddewig is a compelling storyteller, that
17 doesn't mean that the word assumption here on
18 Page 24 of Appendix K means exactly the
19 opposite of what it actually means.  It means
20 what it means, counselor.
21     Q.  The word assume in common
22 understanding would mean -- as used in this
23 sentence, means that this is not a real set of
24 facts with a real buyer and seller, but you're
25 asking someone to assume a situation, correct?

Page 402

1      A.  Well, counselor, if you look at
2  Exhibit 13, which you handed me, and if you'll
3  flip in to, let's see, let's call it about the
4  ninth page of this, you'll see a set of
5  definitions.  And it's labeled in the upper
6  right-hand corner Page 2 of 4.  And under the
7  word assumption, it says, that which is taken
8  to be true.  And if you look on the very next
9  page, you'll see, under hypothetical condition,
10 it says, that which is contrary to what exists
11 but is supposed for the purpose of analysis.
12     In other words, an assumption is
13 something which is believed or taken to be
14 true, whereas a hypothetical condition is that
15 which is contrary to what exists; in other
16 words, that which is false.  My guess is,
17 counselor, that you have been ill advised on
18 that question.
19     Q.  So which -- this first sentence, which
20 is it, is it an assumption or is it a
21 hypothetical?
22     A.  Well, counselor, what does it say?
23 Read the language to me.  What does it say
24 right there?
25     Q.  Please assume your home --

Page 403

1      A.  Assume.  Counselor, it says assume.
2  Which it is true.  We're dealing with truth
3  here.  Counselor, we're dealing with something
4  which exists.  We're not dealing with a
5  hypothetical, we're not dealing with a fiction.
6  In the case of the Spelter matter, we're
7  dealing with something which is taken to be
8  true, which is that the properties are
9  contaminated.
10     Now, that's the Spelter case.  That's
11 not the New Orleans case.  New Orleans case
12 we're also dealing with things which are true.
13 The flood is not a hypothetical.  It's not an
14 act of fiction.  I didn't read about it in a
15 story book somewhere.
16     And I don't mean to be, um --
17 elaborating here, counselor, but we were
18 talking about legal ethics a moment ago, and I
19 fear that you're causing me by this line of
20 questioning to drive a truck through appraisal
21 ethics which respect to my clients in Spelter.
22     Q.  The next sentence is, what if you and
23 other affected homeowners were offered
24 compensation for the soil and home dust
25 contamination that was on your property?

Page 404

1  That's asking, again, something that has not
2  occurred, it's not a fact, it's asking about
3  some assumption or hypothetical using those
4  terms in layman's terms, not in real estate
5  appraisal terms.
6      A.  See, I'm obligated to use them in real
7  estate appraisal terms.  I understand as an
8  attorney you're not obligated to do so.  But
9  Mr. Roddewig and I are both appraisers.  I'm
10 certified in this state, I don't know whether
11 he is or not.  But the fact of the matter is,
12 if I'm going to use the word assumption, I have
13 to use it the way appraisers mean it, which
14 is that everything in this paragraph is dealing
15 with a contamination problem, not a flooding
16 problem, by the way, but a contamination
17 problem, which is a true.  And so you in your
18 question said assumption or hypothetical
19 condition.  Those are two polar opposite
20 things.  So I'll talk about assumption because
21 that's what we're dealing with in the Spelter
22 survey, but there's no hypotheticals here in
23 the Spelter survey, nor are there any
24 hypotheticals here in, um -- New Orleans.
25     Q.  And did you explain these definitions

                                    38  (Pages 401 to 404)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 405

1  of hypothetical or assumption -- since you used
2  the word assume, were those explained to the
3  people you called up so they'd know that you
4  were using it in a real estate appraiser
5  context rather than the ordinary usage of the
6  word?
7      A.  Well, no, why would we?  But, you see,
8  we're not dealing with a hypothetical, nor do
9  we use that term hypothetical in this
10  paragraph.  In other words, I don't need to go
11  explain something to people just to confuse
12  them with terminology that's not utilized here.
13  All we're asking them to do is to assume that
14  the home is located -- in other words, we're
15  talking about real live situations.
16      Just like the flood.  When I, um -- do
17  this appraisal work, if in fact we choose to
18  use some kind of survey, I don't have to ask
19  people let's talk about a hypothetical flood.
20  There were no hypothetical floods.  We can talk
21  about the real live flood.
22      Q.  And you then ask them how much they
23  thought they ought to take for the diminution
24  in value if this fact situation that you
25  described on Page 21 of Exhibit K were

Page 406

1  applicable to their place, right?
2      A.  That's correct.  That's a fair and
3  reasonable way to elicit people's market
4  reactions to a real live situation.  Um -- one
5  could use this in any one of a number of
6  situations.  We happened to use it in a
7  contaminated property situation.  But again,
8  counselor, it's highly disingenuous to accuse
9  me of using a hypothetical situation when as we
10  clearly state, um -- that's a falsehood.  I'm
11  using the word assume here, which means
12  something that's true, and in this case we're
13  dealing with a flood which, um -- my
14  understanding is was a real live flood.
15      Q.  If you look at Page --
16      MR. BECNEL:
17          Excuse me, counsel.  I called
18      Judge Wilkinson 's office and Judge
19      Duval 's office and was informed that
20      the Judge Duval -- Wilkinson is indeed
21      out of town.  I was told to fax to
22      Judge Duval the issues and they would
23      be presented.  I dictated that to my
24      secretary and have sent it to the
25      judge, basically saying that issues

Page 407

1  have arisen dealing with the West
2  Virginia case, substantive issues,
3  that we feel uncomfortable going
4  forward -- we have no objection to
5  methodology, we feel uncomfortable
6  going forward where merits are being
7  discussed because it may involve an
8  ethical issue dealing with the
9  plaintiff lawyer in that case and
10  we're asking for a ruling on how to
11  handle the situation.  I will send you
12  a copy of the fax as soon as -- I'll
13  give you a copy of the fax as soon as
14  it's prepared by my secretary and sent
15  to the Judge and I'll give you a copy.
16      MR. ANZELMO:
17          Can I ask a question for the
18      record?  Was defense liaison counsel
19      on the phone when you were talking to
20      the Court?
21      MR. BECNEL:
22          No, y'all chose to stay in here.
23      I asked you to come out and none of
24      you chose to come.
25      MR. MARPLE:

Page 408

1          Nobody asked me to come.
2      MR. BECNEL:
3          No, I said I was calling the
4      Judge.  And I said I was going there
5      to call the judge, and y'all said,
6      well, we're going to just keep going.
7      MR. MEUNIER:
8          How many more questions do you
9      have on the report, counsel?
10      MR. MARPLE:
11          About as many as I've asked,
12      probably.
13      MR. MEUNIER:
14          So you're about halfway through.
15      MR. MARPLE:
16          I may be further along than that.
17      MR. MEUNIER:
18          And you're going to continue not
19      to link methodology, you're going to
20      continue to ask specific substantive
21      questions about his findings in this
22      report?
23      MR. MARPLE:
24          I'm asking about this methodology
25      in this report.

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                           8/14/2007

Page 409

```
 1      MR. BECNEL:
 2         I'm instructing you not to answer
 3   any further question.  It's presented
 4   to the Court now.
 5         And counsel, it's on your nickel.
 6      MR. MEUNIER:
 7         If the question you asked by
 8   reference to this is a question about
 9   what he intends to do in the Katrina
10   case, I think we can get through this.
11   If the questioning continues to be
12   confined to the facts and arguably
13   unique circumstances of this case on
14   the merits, that's when we get into
15   trouble.  So I'm hoping that you'll
16   agree with me to shape your questions
17   so that we get through it without
18   objection, but if you choose not to do
19   that, that's your decision and we'll
20   just have to go by the earlier
21   proposal which is that you proffer and
22   we'll get the Judge later to tell us
23   whether or not the witness has an
24   obligation to respond to the questions
25   as asked.  So just proffer the
```

Page 410

```
 1   remaining questions, unless you're
 2   going to do a methodology oriented to
 3   this case.
 4      MR. MARPLE:
 5         I mean, I'm on the record, so I
 6   will state for the record that he's
 7   told us that he might use a contingent
 8   valuation study in this case -- in the
 9   Katrina cases.
10      MR. MEUNIER:
11         Right.
12      MR. MARPLE:
13         This is, as far as I know, the
14   most recent and it may be the only
15   one, I think he's referenced a couple
16   of others, that he's done, certainly
17   the most recent one.  There certainly
18   appear to us to be issues about that,
19   whether that's a good methodology, and
20   that's what I'm exploring.  And it
21   would be incumbent, if this is what
22   he's done in the past, if he's going
23   to do something different then I
24   suppose he can tell us that.
25      MR. MEUNIER:
```

Page 411

```
 1         I know, counsel, but what you're
 2   declining to do, for example, is say,
 3   Dr. Kilpatrick, do you intend in this
 4   case to ask a question similar or like
 5   this one where you were asking
 6   assumption?
 7      MR. MARPLE:
 8         That's incorrect, sir.
 9      MR. MEUNIER:
10         But it's the whole key here.
11   Instead of directing him to testify
12   about what he's going to do in
13   Katrina, you're eliciting testimony
14   that's confined to a case that is not
15   before the Court and that in fact is
16   actively being litigated with
17   depositions pending.  That's the
18   question.  I hope we have made
19   ourselves clear as to what our concern
20   is.
21      MR. MARPLE:
22         I think we have a different view
23   of the world, and I don't want to
24   needlessly clutter the record by
25   asking a series of questions and
```

Page 412

```
 1   having y'all instruct.  I may ask one
 2   so that the record is clear as to what
 3   you've instructed about, and I ask
 4   that -- well, let me ask it and we'll
 5   see where you guys go.
 6      MR. BECNEL:
 7         We've already been directed to
 8   what to do.
 9      MR. MARPLE:
10         We don't ask anything else is
11   your understanding.
12      MR. BECNEL:
13         No, no, no.  If you think -- you
14   have at least nine people here,
15   experts, lawyers, paralegals,
16   whatever.  I would suggest that if you
17   think I have mischaracterized what the
18   question was, for somebody to go do
19   the same thing, go to your phone,
20   direct your position by fax to the
21   judge, and then it's solved.
22      MR. MARPLE:
23         Let's get your fax and we'll see
24   then.  Let me go to a different area.
25   I'm not sure what the state of what
```

JOHN A. KILPATRICK (VOL II)                            8/14/2007

Page 413

1    the Judge may order is.
2    MR. BECNEL:
3        He didn't order anything.  I
4    didn't even talk to him.  I talked to
5    a secretary who says, this is what I
6    want you to do:  Put it in writing to
7    the Judge in a fax and advise your
8    opposing counsel.
9        That's what I've done.
10   MR. MEUNIER:
11       Let's move to another area.
12   MR. MARPLE:
13       I want to just get the record
14   clear.  I'm going to ask a question
15   and y'all do what you want.
16   EXAMINATION BY MR. MARPLE:
17   Q.  I'm directing your attention to
18   Page 28 of Exhibit K.
19       Do you see the question at the top of
20   the Page F1?
21   A.  Counsel, I've been asked by my clients
22   to defer answering these questions until later.
23   Q.  And so you're refusing to answer --
24   MR. BECNEL:
25       No, he said he's deferring,

Page 414

1    counsel.  It was very clear.  It's the
2    English word defer.  If you want a
3    dictionary to determine what that
4    means, I'll get you one.
5    MR. MARPLE:
6        All right.  I think the record is
7    clear that whatever I ask about
8    Exhibit Appendix K is not going to be
9    answered by your witness at the
10   current time.
11       Is that correct?
12   MR. BECNEL:
13       Up until we get a ruling from the
14   Court, unless you ask about
15   methodology.  We have no objection to
16   methodology questions.  We have
17   objection --
18   MR. MARPLE:
19       Let me try this one.
20   EXAMINATION BY MR. MARPLE:
21   Q.  I want to ask you about your
22   methodology in Question F1 on Page 28.  I'm
23   directing your attention there.
24   A.  Counselor, I've put away the Spelter
25   report.  My understanding of my direction from

Page 415

1    my clients --
2    MR. BECNEL:
3        You can go ahead and do that if
4    he can get it right.
5    THE WITNESS:
6        All right.
7    EXAMINATION BY MR. MARPLE:
8    Q.  I'm asking about the methodology in
9    framing Question F1.  And in doing that, you
10   came up with a question that asked, first, if
11   you were in the market to purchase residential
12   property -- correct?
13   A.  Correct.
14   Q.  And then the next was, would you
15   consider purchasing residential property in the
16   community we are discussing under the present
17   conditions?  Right?
18   A.  Right.  Well, that's all one sentence,
19   so I don't want the fact that you've broken
20   that one sentence, which is one question, up
21   into two parts to imply that there are two
22   different things going on here.  We're asking
23   one continuous question of the people: If you
24   were in the market to buy a house would you
25   consider buying a house in this neighborhood?

Page 416

1    Q.  And let me ask you about the
2    methodology on Page 39 on post coding.  And
3    this runs through I think several questions.
4    And I'm just trying the figure out what is
5    represented here.  There's a column on the left
6    that's the response number.  I assume that's
7    the abbreviation or respondent number.  You see
8    on the left hand column there?
9    A.  Yes.
10   Q.  When I see that Number 82, is that
11   Respondent Number 28?
12   A.  That's correct.
13   Q.  It's not 82 people said what's over
14   here on the right-hand side.
15   A.  That's correct.
16   Q.  Now, is there a way to know how many
17   people made these responses that are over on
18   the right-hand column?
19   A.  Yes.
20   Q.  And how do you determine that?
21   A.  You count the number of lines in this
22   table.
23   Q.  In other words, in B1B, I don't know,
24   there's maybe twenty lines there in that box?
25   A.  I haven't counted them.

41 (Pages 413 to 416)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 417

1    Q.  But I mean that's the number.
2    A.  If indeed the number is twenty.  And I
3  haven't count the number of lines --
4    Q.  Yeah.
5    A.  -- then indeed there would be twenty
6  didn't people who have responded with verbatim
7  responses.
8    Q.  And this verbatim response was the
9  best the person doing survey could take down
10  what they said using some codes and stuff that
11  you developed to maybe summarize some of these,
12  or are these actually verbatim as best you
13  could get them?
14    A.  As the heading says, verbatim
15  response.
16    Q.  And that's as best you could get what
17  they actually said.
18    A.  Well, anything we do in life is as
19  best we can get, but we instruct our
20  interviewers to what take whatever time is
21  needed to write that down as accurately as
22  possible.
23    Q.  In your methodology, you didn't screen
24  for people that had lived in a home for, say,
25  more than -- the home where they were living

Page 418

1  for more than ten years, right?
2    A.  I don't recall if we did or didn't.
3    Q.  Would that be something you'd be
4  interested in?
5    A.  Not really.
6    Q.  I think that's all I have on that.
7  So --
8        MR. MEUNIER:
9           Well, good.
10       MR. MARPLE:
11           I'll leave it up to you all, but
12       if the Judge --
13       MR. MEUNIER:
14           Those questions were not
15       objectionable.
16       MR. BECNEL:
17           So I'll tell the Judge to kill
18       it.
19  EXAMINATION BY MR. MARPLE:
20    Q.  Can I ask you if you agree with a
21  couple of statements?
22    A.  What if I said no?
23    Q.  I'm going to ask you if you agree with
24  a couple of statements.
25    A.  Oh, okay.  All right.

Page 419

1    Q.  Is it your understanding that the
2  plaintiffs' in this case focus, or one of their
3  focuses is on the alleged negligent design,
4  construction or maintenance of the levees as
5  being a cause of flooding?
6    A.  I don't have any opinion one way or
7  the other.  I'm hired here as a real estate
8  appraiser.  The cause of this flood is a legal
9  issue that's outside of the purview of my
10  analysis.
11    Q.  Are you familiar with the Road Home
12  program here in the Greater New Orleans area, I
13  guess the whole gulf coast area in Louisiana?
14    A.  Casually.
15    Q.  Have you made any investigation into
16  what they're doing to determine how much they
17  pay an individual homeowner in terms of coming
18  out to the home and looking at it or anything
19  like that?
20    A.  Only casually.
21    Q.  And what's your casual understanding?
22    A.  That it's been a highly contentious
23  problem.
24    Q.  In terms of homeowners wanting more
25  money than what they're offering them, that

Page 420

1  sort of thing?
2    A.  Um -- you know, all I know is what I
3  read in the newspaper, and the reports I've
4  read is that they -- well, let me give you a
5  for instance.  I cited, both yesterday and
6  today, that it might cost sixty million dollars
7  to do individual appraisals of these homes.  I
8  read in the newspaper some time ago that Road
9  Home had attempted to hire an outside
10  contractor from California to do the sort of
11  appraisals we're talking about and had spent,
12  um -- and please don't -- you know, I know I'm
13  under oath on this now, but I'm not exactly
14  sure of number, but my understanding is they
15  had spent several times that much money on
16  appraisal services and got absolutely nowhere
17  with it.  So it may very well be that my sixty
18  plus million dollar estimate of how much it
19  will cost to do individual appraisals may in
20  fact not even have the right number of zeros in
21  it.
22    Q.  And do you understand the order of
23  magnitude of how much money the Road Home
24  Program is going to pay out eventually?
25       MR. BECNEL:

Page 421

1         Let me enter an objection,
2    counsel. Where? Because there's
3    different programs in Mississippi and
4    Louisiana.
5    MR. MARPLE:
6         Good objection.
7    MR. BECNEL:
8         And Rita and Katrina.
9    MR. MARPLE:
10        I accept that one.
11   EXAMINATION BY MR. MARPLE:
12        Q.  In the Greater New Orleans area, do
13   you have any idea of the magnitude of
14   money that's been allocated or that may be paid
15   out in the Road Home program?
16        A.  No.
17        Q.  Lots of it.  Billions.
18        A.  I don't have that number in mind.  I
19   really don't.
20        Q.  Do you know what the maximum amount is
21   you can get under the Road Home program as an
22   individual homeowner?
23        A.  No, I don't.
24        Q.  You wouldn't have any reason to
25   disagree if it's a hundred and fifty thousand

Page 422

1    dollars; right?
2         A.  I have no reason to agree or disagree.
3         Q.  If you're doing a contingent value
4    survey like the one that was done in the West
5    Virginia case, in guidelines of people that are
6    expert in this do they state a preference for
7    whether you do it by telephone or in person?
8         A.  I'm not sure.  Um -- and when I say
9    that, there's a lot of -- there are a lot of
10   peer reviewed, published studies which have
11   been done by telephone.  The Appraisal Journal
12   is replete with contingent value surveys that
13   have been done by telephone.  And indeed in
14   Mr. Roddewig 's article that you brought up a
15   little earlier, he's got citations to four
16   different contingent value studies which he
17   doesn't analyze in this article, but he
18   nonetheless footnotes them, which were
19   telephone based contingent valuation studies.
20        On the other hand, um -- I understand
21   that in some neighborhoods there's a lot of
22   argument for doing face-to-face studies.  Um --
23   that in fact, um -- if you have neighborhoods
24   where telephone, um -- usage is not ubiquitous,
25   or at the other end of the socioeconomic

Page 423

1    spectrum where unlisted phone numbers are
2    ubiquitous, then it may be helpful to do
3    face-to-face studies.
4         Q.  Let me ask, since yesterday have you
5    undertaken to formulate any additional opinions
6    than what were in your report and what you
7    talked about yesterday and today so far?
8         A.  I can't say any additional opinions.
9    Um -- I've had very minor anecdotal additional
10   support for my opinions, but not additional,
11   no.
12        Q.  If this has been asked, I apologize,
13   but do you know what the homestead exemption is
14   in Louisiana?
15        A.  Hasn't been asked, and no, I don't
16   know what it is.  I'm aware that there is one.
17   I just don't have it memorized.
18        Q.  And you're not a hydrologist, right?
19        A.  No.
20        Q.  Not an engineer?
21        A.  No.
22        Q.  Let me ask you about the MAI.  The MAI
23   designation that we talked about yesterday that
24   you've got to do some -- a little bit more work
25   to get is the way I understand your testimony

Page 424

1    by submitting some reports or something that
2    you've already done and you haven't pulled
3    together.  I mean, that's the gist of what
4    understood you to say.
5         A.  Yeah.  I got to take a couple of weeks
6    and pull together some reports, go to some
7    meetings.  When I say a couple of weeks, it's
8    not like a continuous couple of weeks, I have
9    to take a day here and a few days there, and I
10   just haven't put together the time to do it.
11        Q.  And I'm handing you Exhibit 15
12   which -- you recognize what that is?
13        (Kilpatrick Exhibit 15 was marked for
14   identification and is attached hereto.)
15        A.  Yes.  It's a listing of the -- of
16   three designations currently held by what are
17   called designated members of the appraisal
18   institute.
19   EXAMINATION BY MR. MARPLE:
20        Q.  And it lists some things you have to
21   do to get an MAI designation, right?
22        A.  Yes.
23        Q.  And would you tell us which of these
24   you've done?  It's the first -- I mean, maybe
25   there's others, but it says receive a passing

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 425

1  grade on eleven examinations that reflect 380
2  hours of classroom instruction.  Have you
3  completed that?
4      A.  Nailed every one of them.
5      Q.  All right.  And then you got to
6  receive a passing grade on a 4-module, 2-day,
7  comprehensive examination.
8      A.  It was a very relaxing couple of days.
9      Q.  You already know all this stuff,
10  right?
11     A.  I teach this stuff.
12     Q.  And then you've got to do a
13  demonstration report.  Is that the one you
14  haven't done yet?
15     A.  No.  There is an option to do what's
16  called a research report, it's got to be a
17  comprehensive real estate research project, in
18  lieu of a demonstration report.  You have to
19  submit a proposal as if you were responding to
20  a request for proposals from an agency, it's
21  got to go before a committee, got to be
22  approved, and then you have to actually do it.
23  I did a demonstration report on the valuation
24  of real estate investment trusts.  And it was
25  not only accepted, it's the only -- I'm the

Page 426

1  only candidate for an MAI who's ever been able
2  to do that, and my demonstration report -- my
3  research project is being used, I'm told, as
4  the example for how to do one of those by
5  anybody who makes that request.
6      Q.  And is that what you're going to
7  submit there?
8      A.  No, I have already done that  I did
9  that I guess a year or two ago.
10     Q.  All right.  What's left?  I'm not
11  clear what's left for you to do.
12     A.  There's something called an experience
13  log.  You have to justify that you have -- if
14  you'll notice, under this little MAI triangle
15  about two-thirds of the way down the page, it
16  says experience:  Receive credit for 4500 hours
17  of experience, all of which must meet strict
18  criteria.  Well, I've got to fill out a log,
19  and you've got to submit a certain number of
20  reports that you've done on, um -- properties,
21  and then this has to go before a board, and you
22  have to go to a meeting and have a big all-day
23  session about this thing.  And I frankly -- in
24  fact, I've one of my assistants the other day,
25  I said, you know, we need to pull this MAI log

Page 427

1  thing together and get around to it.  She told
2  me, John, it's going to take you two or three
3  days to do that.  And I said, well, ask me
4  again -- remind me when I have two or three
5  spare days.  And I might get to it after I
6  retire.
7      Q.  With respect to any of the proposed
8  class members or the named plaintiffs in MRGO
9  or levee group cases, do you know which of them
10  had flooding prior to Katrina?
11     A.  No, I don't.
12     Q.  Is that something you're going to need
13  to take into consideration when you do any
14  modeling in this case?
15     A.  Well, I think for all of the
16  properties, not just the representative cases,
17  but all 150,000, and I'm using that number
18  loosely, for all of these we're going to want
19  to see how that's reflected in pre-flooding,
20  unimpaired market values.  And so that's
21  something that of course not just for the named
22  plaintiffs but for everybody in this class
23  we'll want to take into account, and hopefully
24  that will be picked up in our unimpaired
25  valuation.

Page 428

1      Q.  And so you're going to have to find
2  data somewhere on what the flooding was in
3  particular neighborhoods pre-Katrina, whether
4  it was from just a heavy rainfall, right?
5      A.  No, that's the brilliance of using
6  market value appraisal methodologies such as
7  we're proposing here, that's going to be
8  reflected in the market value of these homes.
9  And so if we've got homes that have been
10  subjected to flooding before Katrina as a
11  result of other kinds of circumstances, then
12  that's going to be picked up in the pre-Katrina
13  values.
14     Q.  Let me show you what's marked as
15  Exhibit 16.  And I'm sure you'll recognize that
16  as also being attached to your expert report in
17  this case.  Right?
18        (Kilpatrick Exhibit 16 was marked for
19  identification and is attached hereto.)
20     A.  Right.
21  EXAMINATION BY MR. MARPLE:
22     Q.  And that is an article that you wrote
23  somewhat recently, after Katrina, right?
24     A.  Correct.
25     Q.  And one of the things you discuss is,

44 (Pages 425 to 428)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                      8/14/2007

Page 429

1    and I believe you say words to the effect
2    that -- well, let's look at Page 232 where
3    you're talking about the impact of the San
4    Francisco earthquake and lesson learned.
5        A.  My copy does not have a Page 232.
6        Q.  I'm sorry.  222.
7        A.  Thank you.
8            MR. MEUNIER:
9                And for the record, this is
10           already attached as part of his CV.
11           MR. MARPLE:
12               Right.
13   EXAMINATION BY MR. MARPLE:
14       Q.  And you say, the impact of Hurricane
15   Katrina may be unique to modern experience.
16           You haven't changed that view, I
17   guess, have you?
18       A.  No.
19       Q.  But its scope and scale are not
20   unique.
21       A.  Well, the scope and scale of the
22   disaster are not unique, but we have to go back
23   to the San Francisco earthquake and resultant
24   fire of 101 years ago in order to get something
25   that parallels this.

Page 430

1        Q.  And in your view, the San Francisco
2    earthquake and aftermath and what happened in
3    the market are the closest parallel that you
4    could find to what happened to New Orleans as a
5    result of Katrina, is that correct?
6        A.  Notwithstanding there were, um --
7    significant differences in the after action,
8    behavior of responsible parties, and as a
9    result San Francisco came out of the earthquake
10   much quicker than New Orleans is coming out of
11   its flood.  But notwithstanding those
12   differences, it certainly has a some parallels.
13       Q.  And the response to Katrina that you
14   just talked about that was different than the
15   San Francisco earthquake, you're not talking
16   about the response by any of the defendants in
17   this action that had something to do, according
18   to allegations in the complaint, with the
19   design or maintenance or construction of the
20   levees or their breaches, right?  That's not
21   what you're talking about.
22       A.  To the best of my knowledge, there
23   weren't any levees breaches or flooding in San
24   Francisco.  And I don't mean to be silly there,
25   but obviously that's a different wrinkle here.

Page 431

1        Q.  And I'm asking about, you mentioned
2    the response to Katrina was different than the
3    response to the San Francisco earthquake in the
4    aftermath.  Correct?
5        A.  Correct.
6        Q.  And I'm asking, are you talking about
7    the response of the federal government with
8    FEMA and the response of the local responders
9    and local leaders, that sort of thing; is that
10   what you're referencing?
11       A.  I'm particularly noting the response
12   of the insurance companies after San Francisco,
13   which was much different than what you've seen
14   here.
15       Q.  And I'm paraphrasing and generalizing,
16   but in the San Francisco earthquake situation
17   they paid up, basically.
18       A.  Yes.
19       Q.  All right.  And that insurance money
20   infusion had a positive effect on the real
21   estate market in San Francisco, correct?
22       A.  Well, it had a positive effect on
23   everyone.  I mean, the insurance companies were
24   seen to be good for their word, and as a result
25   of that they could be trusted thereafter.  The

Page 432

1    city became one of the vibrant economic and
2    financial capitals of the world.  To the best
3    of my knowledge some of those insurance
4    companies have chosen to headquarter there.  So
5    as a result, it was a win-win situation by
6    stepping up to the plate and, um -- getting
7    things fixed in a timely fashion in San
8    Francisco.
9        Q.  And within five years they had -- San
10   Francisco had mostly or nearly fully recovered,
11   is that right?
12       A.  Yes.  But only because, again, they
13   had, um -- the infusion of capital necessary to
14   rebuild from the damage.
15       Q.  And that came largely from insurance
16   money, right?
17       A.  A big chunk of it.  I can't -- I don't
18   want to -- I can't recall the exact numbers
19   offhand, but certainly there was a large
20   infusion from that.
21       Q.  And whatever the insurance companies
22   have done in response to Katrina in the Greater
23   New Orleans area, we also have the Road Home
24   program that's infusing money into the market,
25   right?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 433

1     A.  Well, again, I think I testified
2   already that I have not done a, um -- thorough
3   investigation of that.  I only know what I read
4   about in the newspaper.  And I recognize the
5   fact that adjudicating Road Home from an
6   appraisal perspective turned out to be
7   horrendously expensive and probably could have
8   been done considerably cheaper if they had
9   opted to use a mass appraisal model.
10    Q.  And you don't know whether the Road
11  Home program considered using the mass
12  appraisal approach and decided against it or
13  what their reasons were for doing it the way
14  that they're doing it, right?
15    A.  Well, you know, I don't want to blow
16  my own horn here, but I think we testified
17  yesterday that my firm is one of the few in the
18  country that's really set up to do one of these
19  in this kind of circumstance, and I know they
20  didn't call me.
21    Q.  Are you familiar with Morris Knutsen?
22    A.  Name's familiar, but I don't know how
23  I know that name.
24    Q.  Or Washington Group International?  Do
25  you know what their role would be, if any, in

Page 434

1   this litigation?
2     A.  No.
3     Q.  You haven't done any work for them, I
4   take it.
5     A.  No.
6     Q.  To the extent that some sort of
7   diminished value of cultural heritage or
8   anything like that is involved in this case,
9   you're not the person that's going to opine on
10  what those factors are or what goes into that,
11  you would only quantify something somebody else
12  did?
13    A.  Well, the quantification is manifested
14  in market values.  The decline in cultural
15  heritage, public services, loss of schools,
16  churches, utilities, services, all those kind
17  of things, are things which contribute to the
18  diminution in market value.  So indeed it gets
19  the cart before the horse to try to talk about
20  cultural services and then use that to opine
21  with respect to property value diminution.  We
22  will observe property value diminution but then
23  use those kind of factors to explain the things
24  that we're seeing.
25    Q.  And I think you've testified there

Page 435

1   could be a lot of different factors that would
2   go into that diminished value.
3     A.  And by isolating the time period
4   immediately surrounding the flood, we'll be
5   able to control for changes in those another
6   factors exogenous to the problem.
7     Q.  And you haven't developed a protocol
8   for how you would allocate these various
9   factors, whether it's loss of cultural heritage
10  or fear -- perceived fear of future flooding,
11  or anything like that, to determine how you
12  would allocate within whatever the diminished
13  value, if any, is, is that right?
14    A.  At the present, we haven't, although
15  it doesn't seem to be a terribly complicated
16  problem.  Certainly this is one of the benefits
17  of using survey research, it becomes almost
18  trivially simple to, in a statistically valid
19  and comprehensive manner, determine from among
20  various reasons how much one would allocate to
21  A versus B versus C.
22        (Brief recess.)
23  EXAMINATION BY MR. MARPLE:
24    Q.  Mr. Kilpatrick, have you ever seen
25  what we've marked as Exhibit 17 before?

Page 436

1         (Kilpatrick Exhibit 17 was marked for
2   identification and is attached hereto.)
3     A.  Yeah.  I did.
4   EXAMINATION BY MR. MARPLE:
5     Q.  And Mr. Wilson, here, the author, has
6   criticisms of mass appraisal method, right?
7     A.  That's correct.
8     MR. BECNEL:
9         Counsel, once again this is a
10  copyrighted document.
11    MR. MARPLE:
12        Will you advise him as to fair
13  use?
14    MR. BECNEL:
15        I don't think you can do that.
16    MR. MARPLE:
17        You know, he produced a bunch of
18  this stuff.
19    MR. BECNEL:
20        Yeah, but he isn't a lawyer.
21    MR. MARPLE:
22        Oh, it a different rule for
23  lawyers?
24    MR. BECNEL:
25        Yeah.

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 437

1  EXAMINATION BY MR. MARPLE:
2      Q.  Let me show you what I've marked as
3  Exhibit 18.
4          Are you familiar with that article?
5          (Kilpatrick Exhibit 18 was marked for
6  identification and is attached hereto.)
7      A.  I am.
8  EXAMINATION BY MR. MARPLE:
9      Q.  That's another article by Mr. Wilson,
10 and it was published in the Appraisal Journal,
11 right?
12     A.  Yes.
13     Q.  And those Appraisal Journal articles
14 get reviewed by an editorial panel, an academic
15 panel and I think one other panel.  Isn't that
16 correct?
17     A.  Well, they do and they don't.  In
18 other words, um -- the, um -- we know that the
19 Appraisal Journal does send these out for
20 review, but in the case of an academic journal
21 like the Journal of Real Estate Research or
22 Real Estate Economics, something like that, if
23 a reviewer has criticism about an article, then
24 the author of the article is obligated to
25 address those criticisms either by amending the

Page 438

1  article or addressing the criticism in writing
2  in some way, and the editor of the journal will
3  not publish the article until those criticisms
4  are addressed.  I notice you've got Professor
5  Vandell here, I believe he's edited from
6  journals in his life, he could probably attest
7  to that.
8          In this particular case, Mr. Wilson,
9  who is no expert on contingent valuation, to
10 the best of my knowledge he's never done one
11 and he's not taken any course work in it,
12 submitted this article to the Appraisal Journal
13 on contingent valuation.  It was then sent out
14 for review to a Dr. Robert Simons.  Now,
15 Dr. Simons is the author of many studies on
16 contingent valuation.  He has done them, he's
17 familiar with them, he's written articles about
18 them which have been published in many
19 journals, including Appraisal Journal, and he's
20 a professor of real estate at Cleveland State
21 University.  So Dr. Simons' expertise in the
22 field is, um -- certainly beyond reproach, and
23 the Appraisal Journal indeed acknowledged his
24 expertise not only by publishing his articles
25 but by sending him the Wilson article for

Page 439

1  review.
2          Dr. Simons reviewed the Wilson article
3  and found it to be woefully bad, found it to be
4  deficient in many ways.  For example, many of
5  the footnotes are quite old, he fails to use
6  current articles, he tries to dredge up things
7  like the old NOAA report that we talked about
8  earlier today, but fails to cite the more
9  recent and comprehensive improvements that have
10 been done.  And so Mr. Wilson criticizes CV in
11 a woefully inaccurate way.  So Dr. Simons sent
12 his review to the editor of the Appraisal
13 Journal with the flat statement that this
14 article was not deserving of being published
15 and was not to be published without substantial
16 rewrites.
17         For reasons that neither Dr. Simons
18 nor anybody else who's an expert in the field
19 can understand, the Appraisal Journal opted to
20 print Mr. Wilson 's letter -- Mr. Wilson 's
21 article verbatim without these changes.
22 Needless to say, quite a few scholars in the
23 field are livid about that because, um --
24 apparently the Appraisal Journal, which was a
25 fine journal back when people like Dan Swango

Page 440

1  and David Lenhoff were editors, nonetheless
2  seems now to be shifting toward being just a
3  mouthpiece for folks like Wilson who can't --
4  don't know how to write an article.
5      Q.  And this Dr. Simons, did he put
6  something in writing and did it get published
7  in the Appraisal Journal on what his critique
8  was?
9      A.  He did.  Dr. Simons -- in fact, after
10 this article hit, Dr. Simons called me and we
11 had a conversation about it, um -- and he wrote
12 a letter to the editor to the journal in his
13 position as the reviewer who had been appointed
14 by that journal and, um -- basically said he
15 was astonished -- or at least he told me on the
16 phone that he was astonished that they would go
17 ahead and publish this thing without
18 considering the opinions of the very reviewer
19 whom they'd appointed.
20         So indeed, I don't know what the
21 journal was up to.  I communicated back and
22 forth with the editor about this, as well, and
23 he and I frankly were at loggerheads at the end
24 of our correspondence.  The point being,
25 Mr. Wilson, who has written these two pieces,

47 (Pages 437 to 440)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 441

1 has no training, no expertise, um -- no, um --
2 scholarly basis for what he does. He's never
3 done this kind of work, his opinions are
4 unfounded and unsupported, and when subjected
5 had to any kind of criticism, um -- he, um --
6 he wilts in the face of that.
7     Q.   And do you know where I can find
8 Dr. Simons' criticism or review of this?
9     A.   Well, his review was sent to the
10 editor of the Appraisal Journal. He has since
11 transmitted to me verbally what his review was.
12    Q.   No, but I'm talking about that written
13 one.
14    A.   In a subsequent issue of the Appraisal
15 Journal, one or two issues later, I think --
16 and please -- I'll go back and check -- I think
17 they published his letter to the editor about
18 Wilson 's piece. Um -- and it was a fairly,
19 excuse my language, damning letter about the
20 woeful inadequacy of the review process in the
21 Wilson piece as well as the shortcomings of
22 Wilson 's so-called research.
23    Q.   Let me show you what we've marked as
24 Exhibit 21. I'll fill in the missing ones
25 there in a minute.

Page 442

1         I guess you disagree with the first
2 statement in that exhibit where the Appraisal
3 Institute says the Appraisal Journal retains
4 it's preeminence in real estate appraisal while
5 keeping abreast of the latest issues of
6 importance and interest to appraisers?
7         (Kilpatrick Exhibit 21 was marked for
8 identification and is attached hereto.)
9     A.   I sure would have agreed to that a
10 couple of years ago. I mean, I cited Dr. Dan
11 Swango and David Lenhoff. I'm the Education
12 Chairman of the Real Estate Counseling Group of
13 America. Dr. Swango used to be one of our
14 members before he kind of went into
15 semi-retirement. Dave Lenhoff is still a
16 member of our group. They were fine, fine
17 editors of this journal, and it had a, um -- I
18 think a very good, um -- editorial policy back
19 in those days.
20         Today, um -- I don't know what the
21 heck they're up to. I mean, this language is
22 fine, but what you do with the language is the
23 problem.
24 EXAMINATION BY MR. MARPLE:
25    Q.   And can you give us a cutoff date from

Page 443

1 your standpoint of when you could consider
2 Appraisal Journal articles acceptable and okay
3 and contributing something to the field of
4 appraisal if that's the topic of the article
5 and when you would stop that?
6     A.   Well, I'm not going to suggest that
7 there aren't still some good articles in there.
8 Um -- you know, even a blind pig finds a
9 truffle every now and then. I'm not even going
10 to suggest that most of articles aren't fine.
11 There's some good stuff in there. But as long
12 as they allow junk like this to get published,
13 even if in the face of the reviewer himself
14 telling them that it can't be published or
15 shouldn't be published without substantial
16 rewrite, then I think the Appraisal Journal has
17 got a real problem.
18    Q.   And did you opine in writing to the
19 Appraisal Journal of these views of how you
20 think the journal has declined and how this was
21 junk that Mr. Wilson came up with in this
22 article?
23    A.   Oh, I sent a nasty letter directly to
24 the editor personally at his office, and cc'd
25 it to every member of the board of the

Page 444

1 Appraisal Institute and every member of the
2 editorial board of the Appraisal Journal. I
3 was -- I was livid not so much about Wilson 's
4 piece.
5         I mean, Wilson is who he is. You
6 know, I don't really concern myself too much
7 with Wilson. By I do concern myself with a
8 journal that is supposed to be reliable
9 publishing something even after the reviewer
10 himself told them that it needed work. I mean
11 that, to me, flies in the face of editorial
12 competence, and I think my letter said so. I
13 can't remember exactly what I said because that
14 was, you know, some time ago. but I was pretty
15 scathing. You'd probably guess I'd know all
16 the words to use in that regard.
17    Q.   Did your letter get published?
18    A.   No. I didn't expect it to be. I
19 mean, my letter wasn't so much to the substance
20 of Wilson 's article, my letter was a personal
21 diatribe against the editor himself sent to
22 him.
23    Q.   And who is that?
24    A.   I can't even remember the man's name
25 now.

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 445

1    Q.  Is he still the editor?
2    A.  Yeah.  I think so.  You know, he will
3  be around for a couple of years and then
4  they'll find someone new.
5    Q.  This manuscript, according to the
6  guidelines, of Mr. Wilson 's article would have
7  been submitted to members of the editorial
8  board, right?
9    A.  Right.
10   Q.  In addition to Dr. Simons.
11   A.  Well, Dr. Simons is on the editorial
12  board.
13   Q.  But others reviewed it, too, right?
14   A.  Well, at least a couple of others were
15  supposed to have reviewed it.  And, you know,
16  how it got through I don't know.  But it's --
17  it's garbage.  Let's face it.
18   Q.  And then it was also reviewed by a
19  review panel.
20   A.  No, I don't think it goes -- I think
21  you get a couple of reviewers who review it,
22  but I don't believe there is any additional
23  review panel beyond that.
24   Q.  Well, if you look at Exhibit 21, it
25  says each manuscript is considered in a

Page 446

1  double-blind review.  You see that?
2    A.  Yes.
3    Q.  And what that means is the reviewer
4  doesn't know who it came from.
5    A.  No, not before the fact, but certainly
6  after the fact.
7    Q.  But while they're reviewing it and
8  formulating whatever they think about it, they
9  don't know who it's from.
10   A.  That's right.
11   Q.  And then it says it's reviewed by
12  members of the editorial board, right?
13   A.  Right.
14   Q.  The review panel.  Right?
15   A.  Right.
16   Q.  The academic review panel.  Right?
17   A.  No, it's not -- it doesn't go through
18  all of them.  It's simply reviewed by one or
19  more reviewers who come from those groups.  So
20  it doesn't go through multiple layers of
21  review.
22   Q.  Multiple people that are picked from
23  each of those groups.
24   A.  Well, again, I don't know how many are
25  picked.  Um -- one would think two or three.  I

Page 447

1  mean, most of your better journals will go with
2  two or three reviewers.  I don't know, frankly,
3  how many reviewers this one would have been
4  sent to.
5    Q.  And then it says, and by outside
6  specialists when appropriate.
7      Do you know if that happened with
8  respect to Mr. Wilson 's article?
9    A.  No, I have no idea.  It would be hard
10  to imagine that an outside specialist who is
11  familiar with contingent valuation would
12  approve of this article.  I mean, it's so full
13  of holes.
14   Q.  And has anybody with Greenfield
15  Advisors published in the Appraisal Journal in
16  the last two years?
17   A.  I can't remember if it was the last
18  two or three.  We, in fact, have an -- have a
19  Swango Award winner.  If you'll read in the
20  second paragraph here, the Appraisal Journal
21  awards the Armstrong/Kahn Award for the best
22  article published and also presents the Swango
23  Award -- that's named after Dan Swango who used
24  to be in the real estate counseling group with
25  me -- for the best article published on

Page 448

1  residential, general or technology related
2  subject.  Dr. Kummerow who's on our staff has
3  published, um -- has received the Swango Award
4  sometime in the last couple of years.
5  Dr. Throupe --
6    Q.  And he kept it.  He didn't say,
7  because of Wilson 's article and they published
8  that trash I'm not going to take the Swango
9  Award, right?
10   A.  No, nobody turns these things down.
11     Let's see here.  Ron Throupe of our
12  staff had a cover article a couple of years
13  ago.  Dr. Mundy had a covered article a couple
14  of years ago.  So we've had two cover articles
15  in the past I think three or four years, plus
16  the article honoring Dr. Mundy that was in the
17  January issue this year, plus the Swango Award
18  from sometime in the last couple of years.
19     So, yes, Greenfield has been pretty
20  active.  I would say, there are only a handful
21  of appraisals firms in the world who have been
22  more active in the Appraisal Journal than we
23  have in the past few years.
24   Q.  And that was during the time that
25  whomever is the editor, or the editorial board

49 (Pages 445 to 448)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 449

1  that is there now or was there when Mr. Wilson
2  published this article, was there running your
3  stuff through the same group of people, right?
4      A.  Yeah.  I mean, sometimes -- I'm not
5  suggesting every article in there is not good.
6  Um -- we certainly produced some excellent
7  articles.  Um -- but I think the strength of a
8  chain is it's weakest link, and I was critical
9  of the Appraisal Journal for publishing the
10  Wilson article.  It's very difficult to hold
11  our standards up when you allow something like
12  through the mix, particularly when the reviewer
13  himself tells you not to publish it.
14      Q.  And the fact that he disagrees with
15  your approach, that doesn't have anything to do
16  with your view of Wilson article, I take it.
17      A.  Well, not particularly.  As I said, I
18  was less concerned about the substance of his
19  article and more concerned about the way the
20  journal discounted their own reviewer.
21      I will say this:  The problem with the
22  Wilson article, which of course Dr. Simons
23  pointed out quite correctly in his review is
24  that his citations are so old and so
25  incomplete, and his bias comes through so

Page 450

1  strongly by his failure to cite anything which
2  is more mainstream in the literature.  Um -- as
3  a result of all of that, um -- it, um -- it's
4  just not a publishable piece.
5      Q.  And on Page 54, the very first article
6  he cites is Bill Mundy and David McLean Using
7  Contingent Value Approach for Natural
8  Resources, which is one we marked earlier,
9  right?
10      A.  Oh, yeah.  I mean, he cites McLean and
11  Mundy in the process of damning them.  If you
12  look at Exhibit 17, he cites me.  But he
13  doesn't cite me to say anything nice about me.
14      Q.  And by the way, you produced an
15  article written by you as part of your reliance
16  materials that was in that same volume in the
17  same reporter as Exhibit 17, right?
18      A.  I'm not sure if it was the same volume
19  or not.  His is in Volume 20.  I think mine may
20  have been in Volume 19, but I can't recall
21  correctly.
22      Q.  And at any rate, in that article that
23  you did produce, it says right at the top, a
24  rebuttal appears following this one.  And this
25  indeed is the rebuttal.  You have your view and

Page 451

1  his view, right?
2      A.  Well, that's the case, yes.
3      Q.  And when you wrote yours, did you know
4  that was going to be the case?
5      A.  No.
6      Q.  You didn't know that they were going
7  to take Wilson and have him offer a rebuttal or
8  another view to what you wrote?
9      A.  No, I didn't.
10      Q.  And you didn't see that headline
11  informing the reader that that was going to
12  happen before that got published?
13      A.  No.  Um -- I don't recall if I saw
14  that or not.  Not like it matters to me.
15      Q.  You wanted to get your view out there,
16  and he's going to have his out there for
17  whatever it's worth, I suspect is your view,
18  right?
19      A.  Well, you know, that's the case.  I
20  mean, I think what Wilson does stands on, um --
21  it's own, and what I do stands on my own.
22  Um -- I think if you look at the level of
23  citations in my article, the quality of the
24  citations, the support for what I wrote, you'll
25  find that I've, um -- managed to provide an

Page 452

1  extraordinary level of academic and scholarly
2  support for, um -- what I put forth in mine.
3      Mr. Wilson, on the other hand, has
4  very few citations, he goes to the very old
5  NOAA panel on contingent valuation because he
6  wants to make a mass appraisal article about
7  contingent valuation.  Well, mass appraisal
8  article is not about contingent valuation.
9  He's mixing his metaphors.  He cites himself,
10  he cites a handful of other people.  His
11  authoritative support in his article is
12  woefully inadequate, particularly, if we want
13  to say it, compared to mine.  So I think all
14  that pretty much stands on its own strength.
15      Q.  And you cite yourself in your own
16  publications, don't you?
17      A.  I do.
18      Q.  And you cited yourself in the reliance
19  materials, and you've cited yourself in your
20  deposition testimony, right?
21      A.  I do, and I don't make any bones about
22  it.  But I also cite many, many other scholars
23  in the field, and so the weight of scholarly
24  citations between Mr. Wilson and myself, um --
25  certainly is a lopsided comparison.

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                           8/14/2007

Page 453

1    Q.  Let me show you what we have marked as
2  Exhibit 19.
3      Have you seen that article?
4      (Kilpatrick Exhibit 19 was marked for
5  identification and is attached hereto.)
6    A.  Um -- I don't think so.
7  EXAMINATION BY MR. MARPLE:
8    Q.  All right.  And so you, um -- one of
9  the things that's being reported here is that a
10 person came back to their home after Katrina
11 and it was unscathed.  And I'm asking if that
12 rings a bell or you know, have read that
13 newspaper account before.
14   A.  I don't recall reading that in the
15 newspaper.
16   Q.  All right.  And you've certainly, I
17 take it, if you've looked through that, don't
18 have any reason to dispute what's being
19 reported there factually.  Right?
20   A.  No.
21   Q.  I show you what we've marked as
22 Exhibit 20.
23      Have you seen that article before?
24      (Kilpatrick Exhibit 20 was marked for
25 identification and is attached hereto.)

Page 454

1    A.  No.
2  EXAMINATION BY MR. MARPLE:
3    Q.  And let me ask you something.  You've
4  produced an article to us out of the
5  Times-Picayune in the box or in your reliance
6  material, I think it was in the box.  Do you
7  remember that?
8      MR. BECNEL:
9         No.
10   A.  I may have, yes.  I can't recall.
11      MR. BECNEL:
12        I think it was USA Today.
13      MR. MARPLE:
14        You may be right.
15 EXAMINATION BY MR. MARPLE:
16   Q.  It was a newspaper article that talked
17 about the New Orleans real estate market, and
18 it was about June or July 27th, but within the
19 last month or two, right?
20   A.  May very well have, yes.
21   Q.  All right.  And have you undertaken to
22 do a newspaper search in the Times-Picayune or
23 USA Today to determine what's being said,
24 publicly, about the recovery of the real estate
25 market or the state of the real estate market

Page 455

1  in New Orleans?
2    A.  No.  We will, of course, when we get
3  to the merits portion of our analysis.
4  Naturally, that would be consistent with the
5  model we're proposing to use in here to provide
6  explanatory information for the empirical
7  observations that we'll measure in the
8  marketplace.
9      MR. BECNEL:
10        Counsel, let me enter an
11        objection.  I think Mr. Wade Ragas has
12        stated in the article that the repairs
13        plunged by 42 percent -- or the prices
14        plunged by 42 percent.  And he's an
15        expert for one of the defendants in
16        here.  After having talked to some of
17        the plaintiffs in here, I think he's
18        conflicted out.  But I'm quite
19        concerned about that.
20 EXAMINATION BY MR. MARPLE:
21   Q.  By the way, you cited Mr. Ragas'
22 article, one of his articles, it's the one
23 about the St. Bernard Parish --
24      MR. BECNEL:
25        14 years ago.

Page 456

1  EXAMINATION BY MR. MARPLE:
2    Q.  -- done back in 1991 or whatever it
3  was, right?
4    A.  Yes.
5    Q.  I believe that's all I have.
6  EXAMINATION BY MR. ZWAIN:
7    Q.  Okay.  Dr. Kilpatrick, I'm going to
8  try not to repeat what we have already done.
9  If I do, it's an oversight so I apologize I in
10 advance.
11      MR. BECNEL:
12        We'll stop you.
13      MR. ZWAIN:
14        Thank you.
15 EXAMINATION BY MR. ZWAIN:
16   Q.  Have you been told that class
17 certification will not be sought to prove what
18 damages floodwaters caused to a particular home
19 or property?
20   A.  Um -- I haven't had those
21 conversations with my clients.
22   Q.  All right.  If that were true, what I
23 just said, how would it impact, if at all, your
24 understanding of what your role in this case is
25 about?

JOHNS PENDLETON COURT REPORTERS              800 562-1285

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 457

1    A.  Well, I'm not sure I understand that
2  question, then.
3    Q.  Okay.  Do you have an understanding
4  that the model you are to recommend or advocate
5  for use by the Court is to include an appraisal
6  of individual pieces of real estate owned by
7  individual class members?
8    A.  Well, I understand that, um -- but
9  there's a little bit of a subtle nuance here.
10  I'm not recommending a model to the Court, per
11  se, I'm trying to explain to the court what the
12  appropriate model is.
13    Q.  I understand.
14    A.  It may seem like a subtle difference
15  to you, it's a real difference to me, but that
16  model will of course include an appraisal
17  opinion of value on each and every residence in
18  the affected area -- each and every property in
19  the affected area.  I think we're sticking to
20  residences here, so we'll -- I'll limit that
21  answer to residences.
22    MR. MEUNIER:
23       Perhaps just to clarify, real
24       property diminution, as an element of
25       recovery, is the subject of the Rule

Page 458

1       23 certification request by the
2       plaintiffs.  So I don't want your
3       question to be misunderstood by the
4       witness.
5  EXAMINATION BY MR. ZWAIN:
6    Q.  Well, if I'm understanding what your
7  basic bottom line opinion is going to reflect,
8  and I'm looking at, if you have your report in
9  front of you, Exhibit 3, Paragraph 6, last
10  sentence, I believe that the amount of the
11  damage can be determined on a
12  subclass-by-subclass basis expressed as a
13  percentage loss of pre-Katrina property value.
14       Did I read that correctly?
15    A.  You did.
16    Q.  So if I understand what you're going
17  to do is you are going to seek to appraise each
18  individual class member 's property value loss
19  comparing the post-Katrina value to the
20  pre-Katrina value and state a percentage of
21  what that loss is.
22    A.  Well, it will come out as a dollar
23  figure and as a percentage.  And so I might
24  have Sam and Susan Jones' house at a particular
25  address and I might -- this model, the mass

Page 459

1  appraisal model, which has proven so useful in
2  so many other situations, would determine and
3  allow me the opine that Mr. and Mrs. Jones'
4  house would have been worth a hundred thousand
5  dollars before Katrina, that it's been
6  diminished in value 50 percent, and so
7  immediately after Katrina it has a diminished
8  value of fifty thousand dollars.
9    Q.  Okay.  And that percentage or that
10  dollar figure that will you state for the Jones
11  residence will contain within it the amount of
12  diminution attributable to stigma?  True?
13    A.  As one of its components, yes.
14    Q.  And the amount of diminution
15  attributable to necessary repair costs?
16    A.  Um -- as one of the components, yes.
17    Q.  And the amount of diminution
18  attributable to economic or social disruption.
19    A.  Well, that's part and parcel of
20  stigma.  In other words, the social disruption
21  stigmatizes homes within affected neighborhoods
22  because it diminishes services, culture, the
23  neighborhood, all of those external assets
24  which make up the value of homes.
25    Q.  Okay.  So when you use economic or

Page 460

1  social disruption in your report, that's
2  synonymous with stigma.
3    A.  It's part of stigma.  It's not
4  synonymous with stigma but it's contributory to
5  stigma.
6    Q.  All right.
7    A.  And by the way, I want to be very
8  clear.  We're not going to go exogenously
9  measure stigma and then imply it in the model.
10  The model itself will measure diminution in
11  value, part of which is anticipated repair cost
12  and part of which is the other diminution in
13  value which we're labeling stigma.  Stigma is
14  just a label that we put on that diminution in
15  value which is over and above the anticipated
16  repair cost.
17    Q.  Just so I'm clear, what components
18  comprise stigma in your mind?
19    A.  Well, I don't want to try to offer an
20  all inclusive list here.
21    Q.  Do the best you can.
22    A.  Well, I would suggest to you that
23  stigma will include but certain not be limited
24  to, um -- risk of a recurrence of, um -- the,
25  um -- post-Katrina flood, it will include a

52  (Pages 457 to 460)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 461

1  loss of community services such as schools and
2  shopping and other kinds of services, it will
3  capture all of those changes in the value of
4  the neighborhood, um -- from pre Katrina to
5  post-Katrina which have been stimulated by the
6  flood, and it will include any other factors
7  which have influenced the values of these
8  properties as a result of the flooding.
9      Q.  All right.  So those components
10  comprise stigma.  And we've talked about repair
11  costs or anticipated repairs cost as making up
12  the percentage figure which will represent
13  diminution of value of a particular class
14  members 's home.
15      Is that all that goes into that
16  percentage?
17      A.  Well, no, I don't want to make that an
18  all-inclusive list.
19      Q.  Then --
20      A.  That's just what hits me on the top of
21  my head right now.
22      Q.  Well, I'm trying to be as
23  all-inclusive as we can possible be right now
24  because I want to come to an understanding as
25  to what that percentage means.

Page 462

1      A.  Well, counsel, I've been focused very
2  narrowly on defining the model for the Court,
3  which is of course that it's a pre-Katrina
4  value model versus post-Katrina value model.
5  And I've attempted to explain to you that
6  within that model there's going to be
7  anticipated costs of repair of these
8  properties, plus an additional component, an
9  additional diminution in value which we're
10  labeling stigma.  Now, the question you're
11  positing to me is what things make up, why --
12  other than repair costs, why else would
13  properties be diminished in value?  Um -- which
14  is a matter for great study.  And indeed, as
15  part of the, um -- merits phase of this, that's
16  arts of what we're going to study.  Now, we
17  just spent a lot of time today talking about
18  contingent valuation.  One of the reasons I'm
19  going to survey people is to ask them the
20  question, why is this true, why is this
21  diminution in value occurring; in other words,
22  what is it that's causing these properties to
23  be diminished in value?  In short, counselor,
24  as I sit here today I can think of some
25  reasons, but I really want to ask the good

Page 463

1  people of New Orleans what those reasons are.
2  And that will be part of the merits phase of my
3  investigation.
4      Q.  So as we sit here today, other than
5  those categories that might comprise stigma
6  that you specifically mentioned, you cannot
7  give us or don't feel comfortable giving us at
8  this time an estimate of the number of
9  variables or varieties of influences that might
10  make up stigma damage.
11      A.  Well, just to the contrary,
12  counselor -- and first, it's not that I don't
13  feel comfortable about something.  As you'd
14  probably guess, I'm pretty comfortable
15  answering as many questions as I can as long as
16  they don't run into that gray area of ethical
17  problems.  The issue, however, is that in our
18  empirical investigation of the whys and
19  wherefores of the New Orleans market, we want
20  to let the market speak for itself.  And in
21  fact, part of our merits investigation will be
22  an exploration of why those things are true.
23  So I'm not going to try and presuppose any
24  motivations on the part of market participants
25  here in New Orleans.  Indeed, I think that a

Page 464

1  rigorous analysis of this case would require
2  that we go out and let the citizens of New
3  Orleans and prospective buyers in New Orleans
4  tell us what those reasons are.  And what's
5  what I'm going to investigate.  I'm not going o
6  put a cap on the number of reasons, I'm not
7  going to put a cap on what those reasons are,
8  and I'm not going to try to suggest any reasons
9  ex ante to this study.
10      Q.  Now, despite the likelihood -- and we
11  used the Smith property as our mythical -- the
12  Smith property as our example.  The likelihood
13  that Mr. and Mrs. Smith 's repair invoices,
14  estimates, what they paid for repair costs,
15  will not be reviewed by you or your team,
16  you're going to make an assessment as to what
17  their anticipated repair costs are anyway, is
18  that right?
19      A.  No, we're going to make an appraisal
20  of what their diminution in market value is.
21  And appraisal principles would tell us that
22  people won't pay more for a house than is
23  dictated by its anticipated cost of repair and
24  its stigma and these other factors --
25      Q.  Okay.  I guess what I'm trying to find

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 465

1  out --
2      A.  -- so it's almost a tautology.
3      Q.  What I'm trying to find out is, how
4  are you going to figure out anticipated cost of
5  repair if you're not going to do an inspection
6  or appraisal or an assessment of a particular
7  home 's repair needs?  That's what I'm trying
8  to find out.
9      A.  Well, our focus is on diminution in
10  property value, however, if indeed we want
11  to -- we are asked to parse, for each one of
12  these properties, the difference between
13  anticipated repair costs and anticipated
14  stigma, we could certainly do some sampling and
15  develop a statistical model of that.  That's
16  not what I'm proposing to do here, but it would
17  certainly be trivially easy to accomplish.
18      Q.  Well, then, I'm confused, because I
19  thought you said a minute ago that your
20  percentage, um -- is going to have two
21  components, the stigma component and the
22  anticipated repair cost component.
23          Did I miss something in the
24  translation there?
25      A.  No.  You didn't miss a bit.  It's

Page 466

1  going to have both, but the raw model, the
2  appraisal won't parse between the two.
3      Q.  Explain.
4      A.  Well, um -- let me give an example of
5  somebody who overeats and drinks beer too much
6  and as a result becomes overweight.  Um -- we
7  know he's overweight, and we can measure
8  precisely how overweight he is, but we can't
9  know how much over that overweight came from
10  eating too much, and we don't know how much of
11  that overweight came from drinking too much
12  beer.  But we know it came from the two of
13  them.
14          The precise answer here is that if we
15  measure the diminution of value of each of
16  these properties, then we can tell you that
17  it's the sum of their repair costs plus their,
18  um -- stigma.  Now, precisely how much of it is
19  repair costs and how much of it is stigma is
20  not a dividing line that we are proposing to
21  cut, um --
22      Q.  I see.  Okay.  Okay.  So let's take
23  Mr. and Mrs. Smith 's home.  And let's lay over
24  that not only the anticipated repair cost and
25  the stigma damage, but let's talk about the

Page 467

1  possibility that Mr. and Mrs. Smith's home --
2  some of that damage is attributable to wind and
3  rain, some of it is attributable to water that
4  comes from overtops rather than breached
5  levees, and some of it is attributable to
6  looting or loss of electrical power or a
7  variety of other things.
8          How is your model going to account for
9  these things that, for instance, are not within
10  the control or not the legal fault of the East
11  Jefferson Levee District who is the client I
12  happen to represent in one of these cases?
13      A.  Well, I understand.  And --
14          MR. MEUNIER:
15              I want to make an objection.
16          This is repetitive.  We covered it
17          yesterday.  And to some extent the
18          answer calls for a legal analysis. .
19              Subject to those objections,
20          Mr. Kilpatrick, you can answer.
21      A.  And you know, I offered up an example
22  of the townhouse that I'm, um -- in the process
23  of converting into an office, which in the
24  greater scheme of things required a new roof and
25  it had some holes in the roof and needed to be

Page 468

1  patched, and I wrote a check with, for me, is a
2  relatively trivial amount of twenty-three
3  hundred dollars and had a brand new roof put
4  on.  In the greater scheme of things, that cost
5  was, um -- I don't want to suggest that
6  twenty-three hundred dollars is
7  inconsequential, but it was certainly minor
8  compared to the roughly two hundred and
9  sixty-seven thousand dollar diminution in value
10  two hundred and fifty thousand dollar
11  diminution in value of the property as a whole.
12  The roof repair cost was roughly 1 percent of
13  the whole diminution in value.  Now, that's
14  just one anecdotal example.
15          But as a real estate appraiser, I know
16  that the measure of economic damages is a
17  diminution in value of the property.  And if
18  you have two houses side by side and have the
19  same diminution in value but one property
20  owner, let's say he's a real estate appraiser
21  from Seattle who has a little extra money and
22  doesn't feel like wielding a hammer -- and
23  certainly it's not economically advisable for
24  me to wield a hammer -- then that property
25  owner is just going to write a check to

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 469

1  contractors, and it may take him ninety or a
2  hundred thousand dollars get his house cleaned
3  up. On the other hand, you got a property
4  owner next door who has identically the same
5  sort of townhouse, identically the same sort of
6  damage, but he's retired and has a little time
7  on his hands, and money is a little tighter for
8  him so he's going to do his own hammer and
9  nails, and lay his own tile and carpet and put
10 in his own appliances. He manages to do
11 identically the same repairs for thirty or
12 forty thousand dollars. Now, counselor, if I
13 go out to measure repair costs as a standard of
14 damage, the appraiser who bought the townhouse
15 from Seattle is going to get a hundred thousand
16 dollars, and the poor retired guy who was tight
17 on a nickel is only going to get thirty or
18 forty thousand dollars. The true measure of
19 damage to both of these people is the
20 diminution in value of their property. And how
21 they choose to use that money, whether one of
22 them wants to pay a contractor or the other one
23 wants to earn some sweat equity, is up to the
24 two of them.
25     Q. So you're going to state a figure as

Page 470

1  far as anticipated repair costs that is
2  essentially an average of the amount that each
3  home sustained.
4      A. No. We're not going to --
5          MR. MEUNIER:
6              Objection to form. That's not
7          his testimony at all.
8      A. I'm not going to do anything like
9  that.
10 EXAMINATION BY MR. ZWAIN:
11     Q. What are you going to do?
12     A. Well, we're going to measure
13 diminution in value of each and every property
14 in the marketplace using a mass appraisal
15 model.
16     Q. And how are you going to account for
17 the specific repair costs in each individual
18 home?
19         MR. MEUNIER:
20             Objection, asked and answered.
21 EXAMINATION BY MR. ZWAIN:
22     Q. That's what I'm trying to figure out.
23     A. Don't need to do that.
24         MR. MEUNIER:
25             Asked and answered multiple

Page 471

1          times.
2              Go ahead.
3      A. Don't need to do that.
4  EXAMINATION BY MR. ZWAIN:
5      Q. Why not?
6      A. Because the diminution in value is
7  going to include that as well as any stigma
8  loss.
9      Q. How?
10     A. Because it does. It's a tautology in
11 the real estate appraisal model.
12     Q. Explain it to me.
13     A. And it's a very simple formula,
14 counsel. Diminution in value of the property
15 equals the anticipated repair cost plus the
16 stigma damage, period.
17     Q. And how do you plug into that equation
18 anticipated repair cost?
19     A. You don't. You just -- you measure
20 the diminution in value and know that it
21 includes the anticipated repair cost plus
22 stigma. You don't break it out between the
23 two.
24     Q. Okay. But if someone is paid the
25 amount that you estimate in terms of diminution

Page 472

1  of value, that amount should be sufficient to
2  repay -- or pay that person's repair costs to
3  repair his or her home?
4      A. Anticipated repair costs plus their
5  loss of value attributable to stigma, that's
6  correct.
7      Q. Okay. Now, do you have any
8  familiarity with any individual neighborhood to
9  determine how similar or dissimilar neighboring
10 homes may be in terms of their construction,
11 their elevations, how many stories they have
12 and so on?
13     A. Well, I'm more familiar with some
14 neighborhoods like Lakeview than I am with
15 other neighborhoods. Um -- of course we did an
16 intensive study in the St. Bernard Parish area.
17 That having been said, um -- even if I did not
18 have that sort of familiarity, even if this was
19 my very first trip to New Orleans today, I'd
20 still be proposing identically the same model,
21 and I would be telling you that those
22 neighborhood characteristics would be developed
23 as part of the merits phase of our analysis.
24     Q. How long does stigma take to go away?
25     A. That's a matter for some debate. In

55 (Pages 469 to 472)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 473

1   Dr. Mundy 's article "Stigma and Value" in the
2   1992 Appraisal Journal, he presupposed that
3   stigma would be ameliorated rather quickly
4   after remediation of the problem.  However,
5   subsequent empirical studies have determined
6   that stigma is in fact much longer lived than
7   we thought it previously might be.  For
8   example, I just cited Dr. Winson-Giedemon's
9   work, she's a consultant to our firm nowadays,
10  and her doctoral dissertation studied the
11  persistence of stigma in residential properties
12  in affected neighborhoods in Chicago.  She
13  found that stigma to be quite persistent and
14  quite long lived.  So indeed while there's some
15  theory that stigma ought to ameliorate rather
16  quickly, there's no, um -- empirical evidence
17  about that.
18          Peter Caldwell, former chair professor
19  of real estate at University of Illinois
20  Urbana-Champaign published an article in one of
21  the top journals, I can't remember which one,
22  in which he studies the persistence of stigma
23  in trichlorethylene contaminated neighborhoods
24  in Scottsdale, Arizona, and finds that the
25  stigma effects are relatively long lived.

Page 474

1       Q.  Well, is it fair to say that the
2   further away from the event you get, assuming
3   some remediation of it, that stigma diminishes
4   over time?
5       A.  Well, that's the theory.  But, you
6   know, there is an irony -- a paradox to that
7   theory.  For that theory to be true, for stigma
8   to ameliorate, that means that previously
9   stigmatized properties have to increase in
10  value at a more rapid rate than non previously
11  stigmatized properties.  So, in fact, if
12  stigmatized properties which have been
13  remediated continue to increase in value at the
14  very same rate as non stigmatized properties,
15  um -- in that same market, then stigma will, in
16  fact, be permanent.  So the paradox of the
17  amelioration of stigma is that you've got to
18  find a situation in which those properties have
19  a more rapid improvement in value than other
20  properties in the same market.
21      Q.  Were there stigmas that affected the
22  areas defined by the levee class and the MRGO
23  class prior to the occurrence of Katrina?
24      A.  Well, we're isolating stigma with
25  respect to the flooding.  In other words, there

Page 475

1   may have been other factors, other negative
2   externalities, which is how they're referred to
3   in the appraisal jargon, which impacted the
4   values of these properties.  But by taking a
5   value immediately before and immediately after
6   the flooding, we're controlling for all of
7   those.
8       Q.  Okay.  What were the stigmas that
9   preexisted Katrina?
10      A.  Well, we don't know, but it doesn't
11  really matter because we're going to be looking
12  at property values immediately before stigma --
13  before the flooding, excuse me.  So whatever
14  those negative externalities might have been,
15  they're going to be controlled for by using
16  this sort of event study.
17      Q.  In Paragraph 9 of your report, in the
18  subparagraph labeled economic effect -- you see
19  that?
20      A.  Yes.
21      Q.  -- you talk about the regional economy
22  and real estate markets.  When you refer to or
23  use the term regional economy, what are you
24  meaning?
25      A.  Well, I'm defining it in a broader

Page 476

1   way.  Um -- you of course have a New Orleans
2   Metropolitan area which is, um -- the sort of
3   statistical metropolitan area defined by urban
4   economists and others, and it's a handy way for
5   the government to collect local economic data.
6   Um -- I'm tending to use a nonspecific
7   definition here to encompass all of those
8   things that one might consider about the New
9   Orleans market.
10      Q.  Does it include or refer to employment
11  within the region?
12      A.  Right.
13      Q.  Does it refer to population within the
14  region?
15      A.  Yes.
16      Q.  Does it refer to the number of real
17  estate transactions within the region?
18      A.  Yes.
19      Q.  Does it refer to regions that fall
20  outside the class definitions as proposed by
21  the plaintiffs in either the levee case or the
22  MRGO case?
23      A.  Yes.
24      Q.  To what extent?
25      A.  Well, the whole of the New Orleans

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 477

1  region has certainly suffered to varying
2  degrees from the flooding event, but those have
3  been differential in different parts of the
4  market.  For example, yesterday evening my wife
5  and I were looking at home prices on
6  St. Charles Street.  If you go down in the 4000
7  and 5000 blocks of St. Charles Street, you get
8  some very nice homes with some very nice home
9  prices.  That neighborhood doesn't seem to be
10 too negatively affected.  On the other hand,
11 you go out where we just bought a townhouse in
12 Lakeview, and those property prices seem to be
13 quiet severely affected.  Now, all of these
14 properties share in the same New Orleans
15 market, they're all part of the City of New
16 Orleans, they all have the same kind of public
17 services and such and so forth, but these
18 impacts will be felt differentially in
19 neighborhoods that were flooded versus
20 neighborhoods that weren't flooded.  So we have
21 to take all of that into account in a more
22 holistic sense.
23    Q.  Okay.  Referring to the economic
24 effects that you mentioned in Paragraph 9, are
25 you assuming that those effects are permanent

Page 478

1  or transitory?
2     A.  Not assuming anything about them.
3     Q.  Well, in your opinion, are they
4  permanent or transitory?
5     A.  At this juncture, I don't have an
6  opinion about that, but I certainly will be
7  prepared to develop some opinions about that in
8  the merits phase of the model that we're
9  proposing the Court to adopt.
10    Q.  What effect, if any, do or will fully
11 repaired levees by an estimated date of 2010
12 have with regard to stigma damage?
13    A.  I think that's a matter that we need
14 to investigate, and I suspect that some sort
15 of, um -- survey research as I've been
16 rigorously asked about here today will help us
17 reveal the truth of that matter.
18    Q.  All right.  So if I'm understanding
19 you correctly, issues such as whether or not
20 certain economic effects are permanent or
21 transitory or whether an effect by repaired
22 levees, what effect that might have, your model
23 incorporates a certain amount of speculation
24 into the future as to what conditions will
25 affect the properties that you're being asked

Page 479

1  to model a value for, is that correct?
2     A.  Well, I'm hesitant --
3        MR. MEUNIER:
4           Objection to the form of the
5        question.
6     A.  I'm hesitant to accept the word
7  speculative in there.  All property values are
8  anticipatory in nature.  The market value of
9  any property, whether it's residential or
10 income producing to farmland, what have you, is
11 the present value of the future benefits which
12 one anticipates receiving.  In the case of
13 income producing property, it's the present
14 value of future rents discounted at an
15 appropriate discount rate.  In the case of
16 residential property, it's the imputed value of
17 all of the subjective enjoyment and utility one
18 will receive into the future, discounted by a
19 rational market to the present.  So as long as
20 rational expectations hold and markets are
21 reasonably efficient, then people will
22 understand what is known or knowable or at
23 least believed or believable about the future
24 and will discount that to a certain extent to
25 formulate opinions of value.

Page 480

1        So indeed all value is a present value
2  of anticipated future benefits, and some
3  changes in the status of the levees some years
4  down the road will be one of those anticipated
5  future benefits.
6  EXAMINATION BY MR. ZWAIN:
7     Q.  Will it be necessary in the
8  construction of your model to make predictions
9  or speculations about the fluctuation of
10 insurance rates over the next decade or so?
11    A.  No, none whatsoever.  Because as I
12 said, if we live in a world with rational
13 expectations and some reasonable degree of
14 efficiency, those anticipations will already be
15 discounted in market values.
16    Q.  Well, how will market values be
17 affected if insurance rates decline?
18    A.  Um -- if we indeed were able to hold
19 all other things equal, then market values
20 would marginally increase if insurance rates
21 marginally decrease.  But that's if we're able
22 to hold everything else equal.  Indeed we know
23 that nothing happens in a vacuum, and in fact
24 declining insurance rates can in fact happen
25 coincidental with other factors.  So an

57 (Pages 477 to 480)

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 481

1  anticipated decline in insurance rates would be
2  something that market participants would
3  measure alongside of other anticipated changes.
4       The good news is that an appraisal
5  model such as we're proposing here will capture
6  all of that because, again, as long as markets
7  are acting with rational expectations and
8  there's a reasonable efficiency about the
9  knowledge of those anticipated future insurance
10 changes, then the market will have already
11 discounted those.
12    Q.  What effect will your model have to
13 account for future rises or declines in
14 interest rates?
15    A.  Well, to the extent future rises or
16 declines in interest rates are already captured
17 in market values, then we don't have make any
18 assumptions about those, market value has
19 already captured the market's expectation of
20 future rises and declines in interest rates.
21    Q.  Have you done any research or
22 published any works in connection with
23 assessing real estate values in places like
24 Homestead, Florida, or Charleston, South
25 Carolina, or other areas that have been damaged

Page 482

1  due to hurricanes such as Hurricanes Hugo and
2  Andrew?
3     A.  I may have with respect to Charleston.
4  I have to go back and look.  Um --
5     Q.  Have you published?
6     A.  I can't recall.  Um -- I may have been
7  cited in some newspaper articles, you know,
8  just interviewed by the newspaper, something
9  like that.  And I usually don't keep track of
10 those things because, I mean, there are a lot
11 of them.
12    Q.  Have you read any in connection with
13 preparing for this case?
14    A.  No.  No.  Not really.  I mean, I lived
15 through Hurricane Hugo down in Charleston, and
16 in fact I got up in the middle of the night and
17 watched the eye pass over my house.  So I'm
18 quite familiar with, um --
19    Q.  You're drawn to hurricane prone areas
20 of the country, are you?
21    A.  No, I lived there.  I'm very familiar
22 with that.  And, um -- so we're very familiar
23 with the lead up and the reaction and the
24 aftermath to Hugo and everything that happened
25 there.

Page 483

1       With respect to Homestead, I visited
2  Homestead shortly after the hurricanes down
3  there, and in fact visited Key West shortly
4  after they had some hurricanes in the last year
5  or year before last, I can't remember.  I,
6  um --
7     Q.  All I want to know is if you reviewed
8  any literature that deals with property values
9  in places like Homestead and Charleston
10 subsequent to their having been hit by
11 hurricanes, such as --
12    A.  Right, and what I'm saying is I've
13 done personal investigations of those.  And
14 there was a de minimis hiccup in Charleston,
15 and property values continued to move upward at
16 an unabated pace, the rate at which they had
17 moved upward prior to Hurricane Hugo.
18       Key West has had some fluctuations in
19 property values before and after the hurricanes
20 hit there a couple of years ago, but I haven't
21 done any intense study of Key West.
22    Q.  All right.  But there's literature out
23 there that would shed some light on all that.
24    A.  That's right.  That's correct.
25    Q.  All right.  Yesterday I asked you

Page 484

1  whether or not you had had an opportunity to
2  read any other expert reports that the
3  plaintiffs group have had generated in this
4  case.  And you said you had not.  I'm just
5  wondering if you took the opportunity last
6  night or this morning to do that.
7     A.  No.
8     Q.  Okay.  How differently, if at all,
9  would you treat two contiguous properties, one
10 that experienced, say, five feet of flooding
11 and the other that experienced, say, two
12 inches?
13    A.  Well, that would mean that one of them
14 sits up on a cliff and the other one sits down
15 in a gully.
16    Q.  Is that what that would mean to you?
17    A.  Yeah.  I don't know if there are very
18 many cliffs and gullies in the affected area.
19 But indeed to the extent the modeling provides
20 us with that kind of differential, that will
21 have to be taken into account.
22    Q.  So you don't think you're going to see
23 that phenomenon very often in either the levee
24 case or the MRGO case where one house suffers
25 substantial flooding and the house right next

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 485

1  door to it or within a block of it suffers very
2  little to no flooding?
3      A.  Well, your earlier question was
4  contiguous.  So now you're talking about a
5  block away.  You may very well have that sort
6  of differential a block away.  That's possible.
7  Contiguous I'd find a little bit unlikely.
8  Nonetheless, the model -- any appraisal model,
9  whether we do a mass appraisal or individual
10 appraisals, we're going to take that into
11 account.
12     Q.  How are you going to take it into
13 account?
14     A.  Well, we're going to let the data
15 speak for itself.  It's a diminution in value
16 case.  So we'll value the two houses -- the
17 only difference here is whether we value them
18 all at the same time or we hire every appraiser
19 in the region and spend three years trying to
20 appraise them one at a time and generate two
21 million pages worth of paper.  I mean, we're
22 going to take this into account in either
23 model.
24     Q.  Just tell me how the model takes in
25 into account.  That's all I want to know.

Page 486

1      A.  Well, we're going to measure market
2  values.  We'll have a market value before and
3  the market value after, and the data will speak
4  for itself.  But in the merits phase, either in
5  the two million page model or maybe the hundred
6  page model, we're going to go out and measure
7  the differential market values between the
8  house that was severely flooded versus the
9  house in your first question that's next door
10 that only had two inches of flooding.  We'll
11 have to measure that.  The data will speak for
12 itself and the model will take that into
13 account.
14     Q.  How is the model going to do that?
15 Walk me through it.
16     A.  Well, at this juncture we know what
17 the model is going to look like.  We're going
18 to have to go gather the data to see what
19 market value data in these markets tell us
20 about the value of one house versus the value
21 of another house.  In other words, you're
22 asking me to tell you just what, for example,
23 the sales adjustment grid on a house I haven't
24 appraised yet is going to look like.  I don't
25 know what the adjustments are going to be.  I

Page 487

1  don't know what the exact factors are going to
2  be.  I'm not sure exactly how much stigma this
3  house might be because it sits up on a hill in
4  a neighborhood that was otherwise flooded,
5  versus a house that sits down in a gully in a
6  neighborhood that was otherwise above water --
7  or above the water level.  So indeed, this is
8  something we're going to empirically
9  investigate in the merits phase.  It doesn't
10 have anything to do with which model we choose.
11     Q.  You haven't seen houses in
12 neighborhoods in New Orleans where on one lot
13 the house sits on a slab virtually flush with
14 the ground, and right next door to it is a
15 house raised three or four feet off the ground?
16 You've not seen that?
17     A.  As I sit here thinking about it, sure
18 we've seen that.  And counselor, we're going to
19 appraise that.  It's going to be included in
20 the appraisal.  And exactly what appraisal
21 adjustments we're going to use, as I sit here
22 today, not only would I not know but no
23 appraiser would know that.  We're going to have
24 to go out and investigate in the field the
25 market values and report that to you in an

Page 488

1  appraisal report.  But at this juncture, I
2  haven't done the merits investigation yet.  At
3  this juncture, what I'm testifying to is that
4  these factors, whatever they tend to be, will
5  be more easily ascertainable, more efficiently
6  measured, and more statistically validly
7  reportable in a mass appraisal model than they
8  would be in a grossly inefficient individual
9  house appraisal.  But we're going to measure
10 identically the same thing.  We just haven't
11 measured it yet.
12     Q.  Well, I'd still like you to tell me
13 how you're going to measure for that.  And if
14 you can't tell me, I guess you should tell me
15 you can't tell me.
16     A.  Well, I can tell you, but not today.
17     Q.  When?
18     A.  Well, once we have done our merits
19 investigation.
20     Q.  How long is that going to take?
21     A.  Well, a whole lot less time than it
22 would take if we were trying to do one
23 appraisal at a time.
24     Q.  But I didn't ask you that.
25         How long is it going to take?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 489

1    A.  Well, after the certification of this
2  case, and once we have begun our merits
3  investigation, um -- certainly a matter of
4  months.  Not a matter of three years or more
5  the way individual appraisals would take.  But
6  it certainly will take a matter of months.
7    Q.  How many months?
8    A.  I can't tell you at this juncture.
9  More than three, probably less than twelve.
10    Q.  Okay.  How many people are you going
11  to have working on it?
12    A.  I haven't tasked that out yet, because
13  working with my client, in a manner properly
14  prescribed by appraisal standards, we will
15  develop a scope of work that's sufficient for
16  the intended use of this appraisal in this
17  case.
18    Q.  How many people with your background
19  will be asked to work on it with you?
20    A.  Well, we have got, oh, I guess about
21  eight people with Ph.D.'s on our payroll either
22  under contract or as full-time employees.  I
23  suspect, as I sit here today, um -- we may have
24  as many as four people with Ph.D.s working on
25  the project.

Page 490

1    Q.  And what are their hourly rates?
2    A.  They vary from three hundred and fifty
3  dollars -- excuse me, I think I've got one at
4  two seventy-five, up to my own six hundred.
5    Q.  All right.  And for purposes of
6  preparing this model, will you be working on
7  anything else during the time it takes to
8  prepare this model?
9    A.  Yes.  You talking about me personally
10  or my firm?
11    Q.  Both.
12    A.  Well, the firm, as I indicated
13  yesterday under questioning, has at any point
14  in time thirty to fifty projects going on.
15    Q.  Right.  You told us you're very busy.
16  So I'm just wondering how much time you have to
17  devote to this project?
18    A.  Well, I will certainly personally
19  devote a substantial amount of time.
20    Q.  How much time?
21    A.  I at this juncture can't tell you, but
22  I think it's fair to say more than, um -- 10
23  percent of my time.  But certainly less than
24  100 percent of my time.
25    Q.  What about your colleges?

Page 491

1    A.  I may very well task a couple of the
2  Ph.D.s to work on it a quarter to half time,
3  and more than likely several master degreed
4  people to work on it, probably one of them
5  full-time.
6    Q.  How many master's degreed people?
7    A.  On my payroll?
8    Q.  How many will you assign to this
9  matter?
10    A.  I haven't decided that yet.
11    Q.  Approximately?
12    A.  Well, in total, um -- including
13  contract employees, it wouldn't surprise me if
14  we have four or five people.  Now, they won't
15  all work full time.  We would probably have one
16  Master degreed person or Ph.D.'d person, I
17  hadn't figured that out yet, working as a
18  project coordinator full time on the project
19  for the duration of the project.  Then we
20  would --
21    Q.  At what hourly rate?
22    A.  They vary anywhere from a hundred to a
23  hundred and seventy-five an hour.
24    Q.  Okay.  Will any other types of people
25  be working on this project besides Greenfield

Page 492

1  people?
2    A.  Well, we have other research analysts,
3  many of whom have bachelor's degrees.  In fact,
4  I think nearly all of them have bachelor's
5  degrees.
6    Q.  And how many of them will be working
7  on this project?
8    A.  Probably one or two full-time, and
9  then we'll put some part-time people on it from
10  time to time as we need them.
11    Q.  And at what rates?
12    A.  They vary in hourly rate from fifty to
13  a hundred dollars an hour.
14    Q.  And will they be working full time on
15  this project or part-time?
16    A.  Probably one or two people working
17  full time and we'll put other people on the
18  project on an as-needed basis.
19    Q.  Anybody else?
20    A.  Um --
21    Q.  At Greenfield.
22    A.  At Greenfield?  Um -- to the extent we
23  need to hire temporary people, and they may
24  usually be billed out at rates of fifty or
25  sixty bucks an hour.  Particularly when we

60 (Pages 489 to 492)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 493

1    start doing -- if we do any survey research,
2    um -- we may need to hire some, um -- contract
3    people, and usually, like I say, we bill them
4    out fifty or sixty dollars an hour.
5        Q.  Will you contract out any of that
6    work?  Any of work associated with building the
7    model?
8        A.  Well, in the past, we have used, um --
9    contracted people.  We use a company called
10   Northwest Research in the focus group issues
11   in, um -- Murphy Oil.  I can't remember exactly
12   what we paid them, but it was on an order of
13   sixty thousand dollars, something like that.
14       Q.  Okay.  And that was to do how many
15   interviews?
16       A.  That was to do series of eight focus
17   groups in four cities over a period of several
18   weeks.
19       Q.  Do you expect the number of focus
20   groups in these two cases will be more than
21   that?
22       A.  I don't know if we're going to do
23   focus groups or not.
24       Q.  But if you did?
25       A.  If we did, I don't know.  Quite

Page 494

1    frankly, the focus groups were contributory to
2    an anticipated contingent valuation survey, but
3    as I say, I hadn't made up my mind if we're
4    going to do contingent valuation or something
5    else.
6        Q.  Okay, now would you have to acquire
7    any new software or hardware in order to build
8    this model?
9        A.  Well, we're always acquiring new
10   hardware and software.  I don't know that we
11   would have to acquire any new hardware or
12   software in order to build this model, per se,
13   but that doesn't mean that we might not.  We're
14   always buying new stuff.
15       Q.  To what extent does hedonic modeling
16   require there to be a market in equilibrium?
17       A.  It, um -- anticipates a market in
18   equilibrium.
19       Q.  Would you say that the New Orleans
20   market was in equilibrium on the day after
21   Katrina passed?
22       A.  Um -- no.  And I think I testified
23   yesterday I didn't believe it was.
24       Q.  You're not even sure it is today.
25       A.  Not sure, but that's certainly

Page 495

1    something we're going to test.  We do believe
2    that the market was in equilibrium prior to
3    Katrina, and so we're able to come up with a
4    hedonic model at least of the unimpaired
5    values.  And we will measure the valuation
6    model after Katrina by examining prices in the
7    market and seeing what we've got here.  We
8    haven't -- in other words, we haven't
9    investigated the equilibrium circumstance
10   post-Katrina yet, but that's certainly going to
11   be something that we're going to investigate as
12   part of our merits phase.
13       Q.  From an appraisal standpoint, the term
14   market equilibrium has a specific meaning?
15       A.  Um -- you know, appraisers hardly ever
16   use that phrase.  It has more of a meaning in
17   economics, and I can't exactly cite you the
18   textbook definition of it offhand.
19       Q.  Give me your understanding as to what
20   its definition is.
21       A.  Oh, markets which are clearing at
22   values above reservation prices.
23       Q.  Markets that are clearing at prices
24   that are above reservation prices?
25       A.  Yes.

Page 496

1        Q.  What does that mean?
2        A.  Well, markets that are clearing means
3    that sellers have a reasonable anticipation of
4    finding buyers.  And reservation prices are
5    prices above which properties have to transact
6    or sellers are obligated to hold them off the
7    market because they can't deliver clear title.
8        Q.  Okay.  So in layman's terms, it means
9    an environment where there are willing buyers
10   and willing sellers and no artificial
11   impediments to their getting together and doing
12   deals.
13       A.  Right.  The reservation prices is
14   something of an artificial impediment because
15   there's a price below which the market can't
16   clear.  So if the supply and demand curves --
17   and I'm using a very simplistic Econ 101 type
18   analogy -- if the supply and demand curves have
19   shifted such that the market clearing price is
20   below the reservation price, then the market
21   can't clear because the transaction can't
22   occur, so the market is at disequilibrium.
23       Q.  To what extent would a market reaching
24   equilibrium tell you that whatever stigma that
25   might have been previously associated with that

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 497

1   market is diminishing?
2       A.  Well, we're not going to investigate
3   that, because we're going to take the market at
4   equilibrium prior to Katrina hitting.  So in
5   other words, the market is what it is prior to
6   Katrina.  Um -- and we will probably do some
7   tests to see -- to confirm the fact that that
8   market was an equilibrium market prior to
9   Katrina, but that's certainly something that we
10  would accept as a predicated for what we're
11  doing, and in fact there's no evidence to the
12  contrary.
13      Q.  If you find that the market is not in
14  equilibrium, does that mean you can't do
15  hedonic modeling?
16      A.  Well, if we were to find that, but
17  that's certainly an extraordinary
18  circumstances.  Because we do know that there
19  were -- there was an active market for property
20  in New Orleans and in these affected
21  neighborhoods prior to the flooding and there
22  were quite a few transactions.
23      Q.  No, but I'm talking about
24  post-Katrina.
25      A.  No.

Page 498

1       Q.  If you find that the market has not
2   returned to market equilibrium post-Katrina,
3   will that mean that you cannot apply or use a
4   hedonic modeling form?
5       A.  No.
6       Q.  Why not?
7       A.  Well, we'll still have the hedonic
8   form of pre-Katrina prices, but let's remember
9   something.  Every sales adjustment grid
10  appraisal is a hedonic model.  So even if all I
11  did was go out and use the Fannie Mae form that
12  we talked about earlier today and tried to
13  appraise a hundred and fifty thousand homes one
14  at a time, I'm going to be using a hedonic
15  model, I'm just going to be using it very, very
16  slowly, and at an extraordinary cost, and at a
17  high degree of inefficiency without any
18  statistical reliability.
19      Q.  So it's your opinion that as long as
20  the pre-Katrina market was in equilibrium it
21  doesn't matter whether the post-Katrina market
22  is in equilibrium or not.
23      A.  That's right.  And by the way, I want
24  to be clear that I'm not trying to express my
25  opinion here.  We're going -- whether we do it

Page 499

1   with mass appraisal or you go out and hire five
2   hundred appraisers to do it over three years
3   for sixty million dollars plus at individual
4   appraisals, you're going to be doing some kind
5   of economic model.  Now, if in fact we find
6   that there are equilibrium problems, we're
7   going to have to account for those, we're going
8   the have to deal with them.  But one way, shape
9   or form you're going to have some kind of
10  hedonic explanation for the values of homes.
11      Q.  Now, what makes you think that it's
12  going the require a hundred and fifty thousand
13  individual appraisals?
14      A.  Well, if you don't use a mass
15  appraisal, then how would you get at the values
16  of these homes?
17      Q.  What makes you think a hundred and
18  fifty thousand people are interested in filing
19  claims?
20      A.  Well, however many have filed a claim,
21  if it's a hundred thousand or a hundred and
22  twenty thousand or two hundred thousand, if
23  you've got a hundred thousand properties, I
24  estimated this morning --
25      MR. BECNEL:

Page 500

1           There are three hundred thousand
2           counsel.  What are you talking about?
3           That's the government 's estimate now,
4           three hundred thousand.
5   EXAMINATION BY MR. ZWAIN:
6       Q.  What makes you think any specific
7   number of people are interested in filing
8   claims in this lawsuit?
9       A.  Well, my conversations with my clients
10  have caused me to understand that the number is
11  much greater than a hundred thousand, and
12  potentially greater than a hundred and fifty
13  thousand.
14      Q.  Who have been affected.  Who have been
15  flooded.
16      A.  Understood, yes.
17      Q.  But that's a different number than
18  those who might ultimately file claims in this
19  lawsuit, correct?
20      A.  I think that's a legal issue that I'm
21  going to let lawyers sort out.
22      MR. BECNEL:
23          Counsel, three hundred plus
24          thousand people have filed Form 95s.
25          That evidences an interest in them

62 (Pages 497 to 500)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

---

Page 501

1    pursue this case.  In fact, this
2    week --
3    MR. ZWAIN:
4        I hear you, Danny.  I hear you.
5    MR. BECNEL:
6        -- I will file -- for the record,
7    I will file seventy thousand lawsuits
8    this week or next week.  And I'm
9    putting your clients on notice for
10   policy limits once.
11   MR. ZWAIN:
12       I'm a levee district.  I --
13   MR. BECNEL:
14       I know you are.  Whatever
15   policies there are.  Whatever policies
16   you are, I'm putting you on notice for
17   policy limits.  Failing that, take
18   your chances.
19   MR. ZWAIN:
20       Okay.  Well, don't be surprised
21   if I didn't write you back.
22   MR. BECNEL:
23       Well, that's why I got it on the
24   record for you.
25   THE WITNESS:

---

Page 502

1        And counselor, may I amend what
2    my earlier testimony of $60 million
3    was predicated on the notion of a
4    hundred and fifty thousand properties.
5    If we have three hundred thousand
6    properties, the math would suggest
7    that we're talking about over a
8    hundred million dollars in appraisal
9    costs and over four and a half million
10   pages of appraisal reports to deliver
11   to the Judge.
12   EXAMINATION BY MR. ZWAIN:
13   Q.  Okay.  How are you going to test the
14   accuracy of your model?
15   A.  Sampling.
16   Q.  Describe it.
17   A.  We'll go out and sample actual prices.
18   In fact, if we indeed determine that the market
19   is at equilibrium, then the testing will be a
20   tautology.  But in fact we can pretest the
21   model by going into unaffected areas, and that
22   is the say control areas.  And indeed the model
23   itself will use pre-Katrina prices in the
24   affected areas of the control area, so we'll
25   have almost a perfect test case for this ahead

---

Page 503

1    of time.
2    Q.  So you're just going to take a
3    sampling of actual real estate transactions in
4    various areas of town and compare those samples
5    to your data as a whole?
6    A.  That's right.  Counselor, this is a
7    textbook case of how to use this kind of
8    situation.  I could not have dreamed up a
9    better circumstance for using a large scale
10   hedonic mass appraisal model.  There's utterly
11   no other way I'd consider doing this.  And
12   frankly, when it's all over with I'm going to
13   write I book about it.
14   Q.  Me, too.
15   MR. ZWAIN:
16       All right.  I'm done.  Thank you
17   very much.
18   MR. BECNEL:
19       That's it?  Thank you.
20
21
22
23
24
25

---

Page 504

1        WITNESS' CERTIFICATE
2
3        I, JOHN A. KILPATRICK, Ph.D., do
4    hereby certify that the foregoing testimony was
5    given by me, and that the transcription of said
6    testimony, with corrections and/or changes, if
7    any, is true and correct as given by me on the
8    aforementioned date.
9
10   _____    _____
11   DATE SIGNED       JOHN A. KILPATRICK, Ph.D.
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN: August 14th, 2007

---

63 (Pages 501 to 504)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                          8/14/2007

```
                                          Page 505
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8          That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13          I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```

37e1fdda-6ee6-45f3-b5e7-ec48c590d114