# **<u>EXHIBIT 6</u>**

**Disaster Recovery Initiative**
**U.S. Department of Housing and Urban Development (HUD)**
*Public Law 109-234*
*The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery*

# Louisiana Office of Community Development, Division of Administration

## Louisiana Recovery Authority

# *Proposed* Action Plan for the Use of Disaster Recovery Funds Allocated by P.L. 109-234

**November 30th, 2006**





**Kathleen Babineaux Blanco**
**Governor**

**Mitch Landrieu**
**Lieutenant Governor**

**Jerry Luke LeBlanc**
**Commissioner of Administration**

**Dr. Norman Francis**
**Chairman, LRA Board**



**Office of Community Development**
**1201 North Third Street, Suite 7-270**
**P.O. Box 94095**
**Baton Rouge, LA 70804-9095**
**http://www.LouisianaRebuilds.info**
**http://www.doa.louisiana.gov/cdbg/cdbg.htm**



Louisiana Proposed Action Plan

11/30/2006

# OVERVIEW

The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery [P.L. 109-234] allocated $4.2 billion to Louisiana to fund programs for recovery from the disaster inflicted by Hurricane's Katrina and Rita.  This funding was a supplement to $6.21 billion awarded previously for the same purpose.

The proposed Action Plan was developed by the Office of Community Development, Disaster Recovery Unit in the Division of Administration, the agency charged with administration of Community Development Block Grant funds allocated to the state. The Louisiana Recovery Authority (LRA), the agency charged with the policy and planning for Louisiana's disaster recovery efforts, has developed and recommended the programs described in this proposed Action Plan and recommended on November 6th 2006 that this proposed Action Plan be published for public comment.

In the Action Plan for the first supplemental appropriation of disaster recovery funds, the state allocated funds into three categories.  This proposed Action Plan is an extension of the goals of the earlier Action Plan's goals.  The disaster recovery CDBG funds are directed by the state to be used for Housing, Infrastructure, and Economic Development.  This Action Plan allocates the $4.2 billion in supplemental funding granted to Louisiana to fully fund the state's recovery housing programs, collectively titled the *Road Home* Housing Programs, which are designed to allow displaced Louisiana citizens to return to their homes. In this regard $3,608,800,000 of this funding is for housing programs with the balance of $41,200,000 for administration. Currently unallocated funds associated with this proposed Action Plan are $550,000,000.  All unallocated funds are expected to be used in the Infrastructure category as well as some additional administrative costs.

For the purposes of disaster recovery CDBG plans, Louisiana has followed and will continue to follow a thorough process for public review and comment involving citizen participation and public input.  For allocations of these funds, the state provides for citizen participation and public comment, public presentation and review through the Louisiana Recovery Authority Board's public meetings, executive approval by the Governor, and approval by the State Legislature.

Louisiana Proposed Action Plan

11/30/2006

# TABLE OF CONTENTS

**Overview** …………………..…………………………………………..……………………..1
**1. Introduction** ………………………………………………………………………3
**2. Assistance to Homeowners Program** …………………………………….........10
**3. Workforce and Affordable Rental Housing Programs** ………………………..21
**4. Louisiana's Use of Disaster Funding for Infrastructure**……………………29

**Appendix 1**……………………………………………………………………….45

Louisiana Proposed Action Plan

11/30/2006

# 1. Introduction - Impact of Hurricanes Katrina and Rita on the State of Louisiana

Hurricane's Katrina and Rita legacy to coastal Louisiana was an unprecedented wake of death, destruction and devastation.  Taken together, 1,465 people lost their lives, more than 200,000 homes and 18,000 businesses were destroyed and billions of dollars in property was impacted.

Hurricane Katrina hit Louisiana on August 29, 2005, and Rita slammed into the state on September 24, 2005.  They were the second and third Category 5 hurricanes of the 2005 hurricane season.   Hurricane Katrina will most likely be categorized as the third deadliest and the costliest storm in U. S. history.  While Hurricane Rita exacted a lower death toll it was the second most powerful hurricane of the 2005 season and the fourth most intense ever to cross the Atlantic Basin. Together these storms wrought catastrophic destruction on the Louisiana coast, exacting an enormous toll on the material, financial and emotional resources of thousands of Louisianans.

While the impact was wide-spread and indiscriminate of income and social status, the impact of the hurricanes on the poor was particularly devastating, especially in Orleans Parish where the U.S. Census in 2000 reports only a 46.5% homeownership rate (compared to 67.9% in the State), a median household income of $27,133 (compared to $32,566 in the State), and a poverty rate of 27.9% (compared to a state rate of 19.6%). In contrast, while Calcasieu, Cameron, Plaquemines and St. Bernard Parishes sustained major damage, they had higher homeownership rates (ranging between 71% and 85%), higher median incomes (ranging between $34,000 and $38,000) and lower poverty rates (12% to 18%).

The concentration and number or persons in extreme poverty neighborhoods exacerbated the negative impact on the poor, principally in New Orleans.  According to the Brookings Institution (October 2005), one out of every four neighborhoods in the city of New Orleans was classified as an "extreme-poverty" neighborhood, with at least 40% of its residents living below the federal poverty threshold.  These 47 neighborhoods were home to nearly 100,000 residents and had an average household income which lagged the City's by over $17,000.   The Congressional Research Service (CRS) calculates that the poverty rate in the flooded and damaged areas in the State of Louisiana was 21.4%, confirming the widespread sentiment that high poverty neighborhoods were disproportionately flooded (CRS, November 4, 2005).

The social impacts were also greater for those most vulnerable before the storms. These individuals were less connected to the workforce, had educational disadvantages, were elderly or disabled, or were children.  Nearly 90,000 persons aged 65 and older were likely displaced by the storms, many of whom lived alone and had at least one disability.  Displaced aged persons also were poor (an estimated 15%) and one quarter lacked vehicles.   The child poverty rate in the areas affected by the hurricanes was over 30% (CRS, November 4, 2005).  The fragility of the most affected

Louisiana Proposed Action Plan

11/30/2006

populations places a greater burden on the federal, state and local resources available for recovery efforts. The poor standing of the impacted population before the hurricanes severely stretches Louisiana's state and local resources, making the need for federal assistance even more critical.

The current and projected financial impact on Louisiana from Hurricanes Katrina and Rita has reached into the tens of billions of dollars, according to estimates from a number of groups, think tanks and government agencies. Preliminary estimates in late 2005 from the Louisiana Recovery Authority (LRA) – the Governor's State-wide coordinating body for all recovery efforts – projected that the 2005 hurricanes had an impact of $75 - $100 billion on property and infrastructure and $15 - $20 billion in temporary relief services. In a separate report, the Federal Emergency Management Agency (FEMA) estimated an $18 - $25 billion impact on property and infrastructure. As for the impact on the State's economy, the Louisiana Legislative Fiscal Office has projected the possibility of a $40 - $60 billion impact on the economy and a $4 - $8 billion in lost revenues.

Even before the hurricanes, the State was in a precarious situation, with many unmet needs in the areas of infrastructure, education, economic investment, health care and social services. The impact of the storms on the executive budget and on state revenues makes it even more difficult to deal with the critical needs caused by the hurricanes without substantial assistance from the federal government.

According to FEMA, the total number of individuals applying for FEMA assistance related to Hurricanes Katrina and Rita was 1.89 million as of January 10, 2006. These applicants have received individual assistance such as clothing, food, and temporary housing as described below.

**One Year After**

Coastal Louisiana struggles one year the hurricanes.

The population of Orleans Parish which was 455,000 in June 2005 had fallen to less than 200,000 in September 2006, according to population study by organized by the LRA and Department of Health and Hospitals, and overseen by the federal Census Bureau and Centers for Disease Control and Prevention. Plaquemines Parish has lost an estimated 25% of its population while St. Bernard decreased from 65,000 to 19,000 residents, a loss of greater than 70%. By comparison, St. Tammany parish north of Lake Pontchartrain and out of the direct path of the storms, gained 15,000 people. East Baton Rouge Parish had an influx of nearly 34,000 people. In mid- November 2006, 66,000 FEMA trailers remained occupied statewide, and 5,848 individuals remained on the FEMA waiting list for temporary housing. Louisiana citizens were displaced all over the state and country with over 90,000 in Texas and significant numbers in Mississippi, Georgia and Florida. In total, approximately 296,000 Louisiana residents were living outside of the state as of November 2006.

Louisiana Proposed Action Plan

11/30/2006

Job losses peaked at round 220,000 in October 2005.  Currently there are 27% fewer people employed on the New Orleans MSA in October 2006 when compared to August 2005.  Since October 2005, the New Orleans MSA has regained about 50,000 jobs, of which about 7,000 are reported as working in the Construction sector. In respect to the impact on businesses by the hurricanes, 62,000 of the estimated 81,000 affected businesses have reopened since the hurricanes hit, representing an estimated gap of 25% that have not reopened.  The gross state product declined nearly $7.4 billion dollars in the one year period of June 2005 to 2006.

42% of the public schools and 21% of the child care centers in New Orleans have reopened, and only four of ten New Orleans pre-storm hospitals have reopened.  Fifty (50) water systems statewide were storm damaged to the point that they have been deactivated or closed.  Sixteen (16) of those that are still inactive have plans to return to service at some point in time. The rest have or will be consolidated into other systems or abandoned due to lack of need.

In New Orleans only 65% of the electric and 50% of the gas pre-storm customers were using these services. Bus ridership was at 49% of the pre-storm level and 59% of the daily air line seats in and out of the Louis Armstrong Airport were being filled.  The famed New Orleans streets cars, known worldwide, are still only partly operational.

As of mid-November, over 80,000 persons have applied with the *Road Home* Homeowner Assistance program.  Affordable housing in New Orleans is virtually non-existent with over 35% of the City's rental units either destroyed or severely damaged by Katrina.  Four of the City's largest public housing complex's are scheduled to be demolished, rather than being rebuilt or replaced, furthering hampering New Orleans residents ability to return.

Debris left in the wake of the storm amounts to staggering quantities: 22 million tons [or enough to fill the Superdome more than 13 times]; 350,000 flooded or abandoned vehicles; 60,000 damaged vessels; nearly 1.5 million units of white goods [refrigerators/freezers, washers/dryers, stoves, AC units, etc.]

Estimates are available for the City of New Orleans regarding the impact of Hurricane Katrina on housing occupied by low to moderate income residents which are defined as those below 80% of the average median income (AMI).  Those estimates produced by the Greater New Orleans Community Development Center show that 65% of the owner occupied units that are damaged or destroyed belonged to low to moderate income families.  Low to moderate income families rented 89% of the rental units that were damaged or destroyed.  An estimated total of 119,770 owner occupied and rental units serving the low to moderate income population, or 88.7%, were damaged or destroyed.

Not only did the hurricanes greatly affect the availability of housing, it also affected the capacity of the non-profit infrastructure as well as the private home building industry to address the needs arising from this crisis.  Prior to the storms of 2005, the non-profit

5

Louisiana Proposed Action Plan

11/30/2006

sector accounted for 5.6% of the State's total workforce, a substantial force on the State's economy.   A large percent of those jobs fell within the State's metropolitan statistical areas, and 55% of all non-profit jobs are in the health care industry.  The fact that 70% of these jobs were located in the parishes most devastated by the hurricanes call into question the state's capacity to offer critical services related not only to housing, but also to the areas of health care, social services, education and nearly more.

The Louisiana Recovery Authority provides ongoing updates on the progress of the recovery related to Hurricanes Rita and Katrina.  Updated information similar to these facts above can be found online at www.LRA.Louisiana.gov.

**Proposed of P.L. 109-234 Funds**

Louisiana plans on using the $4.2 billion appropriated by Congress under PL 109-234 in conjunction with the programs and goals associated with the first supplemental appropriation for disaster recovery funds.   The funds in this second disaster appropriation of CDBG dollars will be used to fully fund the state's recovery programs for Housing, for both owner-occupants and rental units, and for Infrastructure Programs.  Much of the unallocated funds in this proposed Action Plan will be allocated to Infrastructure Programs.   The *Road Home* Housing Program includes: assistance to owner occupants to compensate them for their hurricane loss; a small rental property repair program designed to serve small properties and target assistance to small owners; for supportive housing for special needs population; and for another rental program involving the low income housing tax credits.   Funds are allocated in the following manner:

| | |
|---|---|
| Assistance to Owner Occupants | $2,496,150,000 |
| Low Income Housing Tax Credits/ | |
|     Piggyback Program | 593,970,000 |
| Supportive Housing | 25,980,000 |
| Small Rental Property Repair Program | 492,700,000 |
| State Administration | 41,200,000 |
| Unallocated | 550,000,000 |
| **TOTAL** | **$4,200,000,000** |

In keeping with the Statute and language in HUD's notice FR-5089-N-01 from October 30, 2006, this Action Plan clearly demonstrates that the State of Louisiana "has identified dedicated resources sufficient to meet the key disaster recovery needs for repair, rehabilitation, and reconstruction of affordable rental housing stock, including public housing, in the most impacted areas of the State."  The State is keenly aware of the need to support affordable rental housing in the wake of the damage caused by Katrina and Rita.  In fact, the State's response far exceeds the requirements of PL 109-234.   Not only does this plan devote approximately $1.113B of its $4.2B second allocation to rental housing needs, the State's overall plan, including both the first

6

Louisiana Proposed Action Plan

11/30/2006

allocation and the second allocation, commits over $1.5B of assistance for the repair and rehabilitation of affordable rental housing.  The state has also leveraged its disaster CDBG resources with Gulf Opportunity Zone Low Income Housing Tax Credits, which will contribute roughly $1.7 billion in tax credit development equity that has similarly been directed to target the most hurricane impacted parishes of South Louisiana.  The combined benefit to repair and rehabilitation of affordable housing stock is over $3.2 billion.

The State has also taken special steps to ensure that its rental programs deliver affordable housing and that they are targeted to those areas of the State that suffered the most damage to their rental housing stocks from the Storms.  Furthermore, the State's plan ensures that a significant portion of its affordable housing resources are directed to restore Public Housing units and other Federally assisted units.

Specifically, the State has reviewed the available FEMA data regarding rental units damaged by the Storms and has used this information to develop its rental housing initiatives.  First, as noted, a significant portion of the rental housing units lost were occupied by low income households, including extremely low income households.  In response to this need and in keeping with the CDBG program rules, the State has set up its rental housing programs to ensure that the funds are generally used to create rental units that are affordable and available to households earning less than 80% of area median income.  As outlined below, the only exception is the "market rate" component of the mixed income projects assisted through the CDBG LIHTC Piggyback Program (see further explanation below).  Though even in these cases, the majority of units in the development will be initially affordable to households earning less than 80% of Area Median Income.

In addition, in recognition of the losses suffered by extremely low income households, the Piggyback program is designed to ensure that a significant portion of the low income tax credit units created are set aside as "deep affordability" units for households earning less than 40% of area median income, including people with special needs to be served through a Permanent Supportive Housing component.  These households would not otherwise be assisted through the Tax Credit Program, which generally assists households at or near 50% or 60% of Area Median Income.

Both the Small Rental Property Repair Program and the CDBG-LIHTC Piggyback program are also strictly targeted geographically as well.  Specifically, all of the Piggyback assistance will be directed to the 8 Parishes that received the majority of the damage to their rental housing stock.  These Parishes received approximately 98 percent of the damages to rental units.  Within this target area, the LIHTC Qualified Allocation Plan contains language designed to ensure that a proportionate amount of the assistance is directed to each of the 8 Parishes.  The Small Rental Property Repair Program is also strictly targeted to the most damaged areas.  The vast majority of funds (98 percent) are strictly reserved for the 8 most heavily damaged Parishes targeted by the Piggyback Program. A much smaller amount (less than 2 percent) is being set aside for 5 Parishes that received damages to rental housing, but were not affected as

7

Louisiana Proposed Action Plan

11/30/2006

severely as the top 8 Parishes.  Each Parish will receive its proportionate amount of the assistance – i.e. the percentage of funding will be related to the percentage of damage suffered.

Finally, the Piggyback Program will devote a significant percentage of its assistance to spur the redevelopment of Public Housing and other Federally assisted projects.  First, more than $20M of LIHTC tax credits or approximately $200M in tax credit equity will be expressly directed to projects that propose to redevelop damaged Public Housing developments.  In addition, these projects are also eligible to receive up to $27M each in Piggyback CDBG funds by virtue of their qualifying as mixed income developments. This provision was designed to ensure that more than a 1000 units of Public Housing will be revitalized through the set aside alone.  The LIHTC Qualified Allocation Plan and CDBG Piggyback program were also designed to offer other Public Housing developments an excellent opportunity to receive Tax Credit assistance and CDBG funding on a competitive basis.  Consequently, two other large Public Housing developments appear to be in line to receive assistance.  All told, it is anticipated that approximately 1900 units of Public Housing will be funded in the City of New Orleans as mixed income developments under the Piggyback program.  It appears that this total will bring about the reconstruction of more than half of the units that received severe or major damage from the storm and were subsequently taken out of service.  In comparison, the State's overall rental housing program is expected to address approximately 40% of the total number of rental units that received severe or major damage from the Storms.

Also, the Piggyback Program made special provisions to address the needs of other Federally assisted projects through its Special Priority Projects Pool.  HUD assisted family housing and elderly housing developments were both considered to meet the definition of Special Priority Project, and a minimum of $10M in tax credit – or roughly $100M in tax credit generated equity – was targeted to HUD assisted Elderly Housing Projects.  In addition to the Piggyback supported units, the LIHTC program has awarded other tax credits to Public Housing projects to repair and rebuild affordable housing units, which received allocations under the 2006 GO Zone LIHTC application process.

For the above reasons, the State is confident that it demonstrated full compliance with the Statutory provisions and anticipates that HUD will provide the State with the necessary approval so that it may expedite its program for repairing and rehabilitating the damaged affordable rental housing that are targeted by the rental housing programs of the Second allocation.

Below is a detailed description of the programs that make up this Action Plan.

## 1.1 Goals of *The Road Home* Housing Programs

*The Road Home* Housing Programs have several goals. They will:

8

Louisiana Proposed Action Plan
11/30/2006

- Provide compensation to homeowners for damages to their homes related to Hurricane Katrina and Hurricane Rita;
- Help restore pre-storm value to homeowners who want to return to Louisiana;
- Provide affordable rental housing opportunities for displaced residents; and
- Provide housing for the return of critical workforce.

*The Road Home* Housing Programs will achieve their goals by ensuring, among other things, that:

- Neighborhoods are rebuilt pursuant to locally driven plans that emphasize safety and reduce risks in rebuilding;
- Homes are rebuilt in ways that ensure safer and smarter construction and meet the State's codes and the latest available flood elevation guidance from FEMA
- Neighborhoods are rebuilt in a manner that promotes mixed income communities; and
- Households with special needs such as the elderly and those with disabilities are provided housing opportunities

## 1.2 Basis for Recommendations

*The Road Home* Housing Programs have been designed based on the best available information on housing needs, housing costs, potential public funding and the ability of the programs to leverage private resources. This Action Plan describes *The Road Home* Housing Programs to be supported with Community Development Block Grant funds appropriated under PL 109-234.

The CDBG funds directed to workforce and affordable rental housing will supplement an estimated $1.7 billion in private equity investments derived from Low Income Housing Tax Credits allotted to Louisiana through the federal Gulf Opportunity Zone legislation. In addition, the State will supplement assistance to owner-occupants with an estimated $1.17 billion in housing-related Hazard Mitigation Grant Program funds.

The damage from Hurricanes Katrina and Rita disproportionately impacted families with low to moderate incomes. HUD therefore requires that at least fifty percent of the supplemental CDBG funds allocated to Louisiana for recovery be invested in programs that directly support those families.  Accordingly a substantial majority of funds will go to low- and moderate-income families.

If federal agencies require changes to the proposed Action Plan or program costs exceed projections and available funding, Louisiana will be required to modify this proposed Action Plan.

9

Louisiana Proposed Action Plan

11/30/2006

# 2.  Assistance to Homeowners[1]

## 2.1 Overview of the Homeowner Assistance Program

In the aftermath of Hurricanes Katrina and Rita, an estimated 123,000 owner-occupied homes were destroyed or suffered major damage, according to FEMA. In response to this unprecedented disaster, Louisiana will use $8,080,000,000 of the supplemental CDBG funds and an additional $1.17 billion of funds from the FEMA Hazard Mitigation Grant program for *The Road Home* programs.

The overarching purpose of *The Road Home* is to rebuild Louisiana's impacted communities. Devastated communities will be blighted by abandoned homes, clouded land titles, and disinvestments if a large portion of the financial assistance is not provided to homeowners as compensation for their losses and as incentives for homeowners to remain in the affected areas. Therefore, the most comprehensive financial and technical assistance packages will be made available to those pre-Katrina and Rita homeowners who make the effort and take the risks to move back to play a part in rebuilding Louisiana. The homeowner assistance activities consist of the following:

- Funds provided to homeowners as (i) compensation grants for hurricane damage to their home, without limitations with respect to income, and additional compensation in the form of affordable compensation loans for eligible homeowners (i.e., those whose household income are less than are equal to 80% of median income for the affected area); or (ii) payment for the acquisition of their homes by the State ("Buyout/Relocate" or "Sale" Programs). Homeowners can elect how to receive their assistance (i.e., as compensation for losses if they elect to retain their home or as payment for the sale of their homes to the State). After certain deductions, the homeowner has complete discretion as to the use of compensation grant funds received, as allowable by State and Federal law, as they work through their personal disaster recovery situation.

- The state will require that a homeowner who elects to keep his/her home allows covenants be placed on it. The covenants ensure that the homeowner is returning to the neighborhood and helping to rebuild the community by requiring owner occupancy for three years. The covenants also help ensure that homes are better able to withstand storms by requiring that the home to be occupied meets Uniform Construction Code or local codes if amended, is elevated if required to do so to meet the FEMA's latest flood elevation guidance, and that the home is insured against hazards. The covenants do not require program funds to be used to meet these conditions.

---

[1] For the purpose of this Action Plan homeowner and owner occupant are used interchangeably.

Louisiana Proposed Action Plan

11/30/2006

- To ensure that the *Road Home*'s goals are achieved and the covenants satisfied, the State has worked with lenders to gain their consent to subordinate their mortgage liens to the covenants. A homeowner should expect that the first mortgage lender, in exchange for the subordination of the mortgage lien, will ask that payments received by the homeowner be deposited in a disbursement account for the benefit of the borrower. The homeowner and the first mortgage lender will be able to jointly manage the funds in the account.

- A homeowner without a mortgage who elects not to sell a home to the State will also sign the covenants to ensure that the program requirements are met. Payments may be made to such homeowners by the State in full or in installments to ensure compliance with the covenants.

- A homeowner may elect to use funds received to reinvest in the State and relocate to another home within the State. Alternatively, an owner may choose to no longer remain a homeowner within the State by either moving outside of the State or remaining in the State and becoming a renter.  The payment provided will be less than the payment available if the owner elects to remain and reinvest in the State.

- An elderly homeowner (persons 65 or older as of December 31, 2005) will not be penalized for electing to no longer remain a homeowner within the State.

## 2.2 Eligibility for Homeowner Assistance

To be eligible for the Homeowner Assistance Program:

- The homeowner must be able to prove that he or she owned and occupied the property as a primary residence at the time of the Katrina/Rita disasters, prior to August 29, 2005;

- The owner must have registered for FEMA Individual Assistance and FEMA must have categorized the home as having been "destroyed" or having suffered "major" damage. In certain cases, owners may not have been able to register with FEMA or an owner may have registered with FEMA but the FEMA records do not reflect their registration. These homeowners may still be eligible for assistance if the damage to their home meets the FEMA damage classification as destroyed or suffering major damage as a result of the storm and verified by the State through alternative means.

- The home must be in a single-unit or double-unit structure to apply to the Homeowner Assistance Program for compensation.  An owner-occupant of a double-unit structure may apply to the Homeowner Assistance Program.  The full double-unit structure will serve as the basis for calculation of assistance up to the program cap of $150,000. .

- An owner- occupant of a three- or four-unit structure is also eligible for homeowner assistance.  However, they must submit their application through the

11

Louisiana Proposed Action Plan

11/30/2006

> Small Rental Repair Program. The homeowner's compensation will be a pro-rated amount of the total structure with compensation available up to $150,000 for the owner occupant. Note: If the owner chooses, they may also submit an application for additional assistance to repair the property's rental units through the Small Rental Property Repair Program

Applicants must meet all of the above requirements to receive assistance. Homeowners that believe they have suffered major or severe damage, but did not qualify for FEMA assistance will be able to appeal their eligibility for *The Road Home*. Homeowners who believe they will be eligible for the program are encouraged to apply with *The Road Home* program at www.road2la.org or by calling 1-888-ROAD-2-LA.

During the process of reviewing applications to *The Road Home*, the LRA in collaboration with OCD will make available information about the preferences of homeowners to retain their homes or relocate so the choices can inform local planning officials. In areas where a high proportion of homeowners are choosing not to remain in an area, state or local authorities may limit the use of assistance only to purchase of properties.

## 2.3 Requirements for Receiving *Road Home* Homeowner Assistance

To accomplish the State's goal to resurrect damaged communities, the State proposes to encourage investment in Louisiana. The homeowner will be required to demonstrate his or her commitment to the State by signing legally binding agreements and covenants to ensure that the *Road* Home Housing Program goals are met. The program agreements and commitments include, but are not limited to, assurances that:

- o An occupied home meets the legal requirements under the State Uniform Construction Code,[2] complies with local zoning codes, and if located in a special flood hazard zone, complies with the latest available FEMA guidance for base flood elevations, unless exceptions are granted by the LRA based on reasonable alternatives where safety is not minimized;[3]
- o If staying in the state, a home will remain an owner-occupied primary residence for at least three years after final receipt of funds from *Road Home* ( the original owner can sell to a buyer who assumes this responsibility);
- o If staying in the state and the homeowner also receives an affordable compensation loan, the owner must retain the home as the primary residence for five years after final receipt of funds from *Road Home* (the owner does not have option of buyer assuming this responsibility).;

---

[2] A number of communities have not yet adopted or implemented the State Uniform Construction Code. Pursuant to the State's commitment to rebuild safer and stronger communities, homeowner assistance provided by *The Road Home* will be contingent upon local enforcement of and individual compliance with all legal requirements under the code.
[3] Federal and state law may require homes in historic districts to meet additional standards.

Louisiana Proposed Action Plan

11/30/2006

- o A home will be covered by a residential hazard insurance for three years if receiving only the compensation grant and five years if receiving the additional affordable compensation loan;
- o A home must remain covered by flood insurance if the home was previously flooded and located in a special hazard flood zone;
- o Claims for unpaid and outstanding insurance payments and other reimbursements that may duplicate program benefits will be subrogated back to the *Road Home*.

Homeowners making application to the program must be willing to:

- o Sign a release so that information required to approve the application can be verified by *Road Home;*
- o Agree to verification of their ownership status, the amount of disaster related damage to the home, and its pre-storm value;
- o Swear to the accuracy and completeness of all information provided to the Program under penalty of law.

While homeowners are not required by the *Road Home* to clear their properties prior to a sale to the program, they are encouraged to contact their local government to obtain clearance assistance from the Army Corp of Engineers. Similarly, homeowners whose homes were flood damaged and who carried flood insurance are urged to contact their insurance agent to obtain information about eligibility for clearance through the Increased Cost of Compliance (ICC) benefits available under their insurance policy.

Homeowners that fail to meet all of the program's requirements may not receive benefits or may be required to repay all or some compensation received back to the *Road Home* program.

## 2.4 Amounts and Forms of Homeowner Assistance

### 2.4.1 Maximum Assistance

The maximum financial assistance from all Program resources for owner occupants is up to $150,000.  The proposed ceiling assumes that estimates of likely demand for assistance derived from HUD, FEMA and SBA data are accurate.

Though it is the intent of the program that homeowners have sufficient resources to get back in to a home, not every homeowner is necessarily entitled to the maximum amount of financial assistance. In many cases the *Road Home* will not provide 100% of the resources the homeowner needs to recover from the losses suffered as result of Hurricane Rita or Hurricane Katrina. This is true for many reasons, such as the fact that assistance is capped at $150,000, labor and material costs in Louisiana are very high, and assistance is reduced by any hazard insurance, flood insurance, FEMA benefits

Louisiana Proposed Action Plan

11/30/2006

and other compensation payments received by the homeowner for the losses due to Hurricane Katrina and Hurricane Rita.[4]

Note that *Road Home* is not an annually funded entitlement program and cannot go over budget. If costs exceed budgeted projections, grant assistance to homeowners may have to be reduced and the Program may be required to pro-rate remaining benefits for homeowners who have not received funds from the program.

## 2.4.2 Financial Assistance for Homeowners - Overview
The Program will provide compensation for three types of homeowners:
- Homeowners that want to stay in their homes (referred to as "Option 1: Stay")
- Homeowners that want to sell the home they occupied as of the date of the storms to the state, but remain homeowners in Louisiana (referred to as "Option 2: Relocate")
- Homeowners that want to sell the home they occupied as of the date of the storms to the state, and either move out of the state or remain in the state but as a renter (referred to as "Option 3: Sell").

Compensation is provided in exchange for acceptance of legal agreements described in Section 2.3. Homeowners that want to stay in their home or relocate will be eligible for compensation calculated in three tiers:
- compensation grant to cover <u>uninsured, uncompensated</u> damages by the homeowner as a result of Hurricane Katrina or Hurricane Rita.
- mitigation allowances; and[5]
- additional affordable compensation loan of up to $50,000 for homeowners with income at or below 80% of area median income which will be forgiven over a period of 5 years.

The calculation of compensation payments takes into account the cost of replacement housing, whether or not the home was more than 51% damaged, the value of a home before the storm, and other payments received by the homeowner as compensation for losses. The compensation grant for homeowners who did not carry hazard insurance and homeowners who were living in the flood zone and did not carry flood insurance will be reduced by thirty percent.

## 2.4.3. Factors Used to Calculate Benefits

### *Estimated Cost of Damage* or *Estimated Cost to Replace Home*
It is the State's Policy that participants in the *Road Home* Homeowner Assistance Program deserve a fair and independent estimate of the cost of damages from the

---

[4] The reduction of *Road Home* benefits by the amount of compensation received from other sources is a requirement imposed by federal funders to eliminate duplication of benefits.
[5] Mitigation grants are generally available to pay for costs of elevation in order to meet Advisory Base Flood Elevations and for post repair mitigation measures.   Funding of up to $30,000 is available for the elevation allowance (additional funds may be available with affordable loan) and up to $7,500 is available to complete other mitigation measures.

Louisiana Proposed Action Plan

11/30/2006

storms regardless of the cause of the damage. Therefore, the *Road Home* program staff will provide evaluations that identify the costs of damage to the home or the estimated cost to replace the home. The *Road Home* Program reserves the right to use damage estimates prepared by others such as FEMA, the Small Business Administration, and insurance companies where those estimates are deemed reliable.

- If the home is less than 51% damaged, the *Estimated Cost of Damage* will be used in determining homeowner compensation.
- If the home is more than 51% damaged, the *Estimated Cost to Replace the home* will be used in determining the homeowner compensation.
- A determination of the percentage damage will be calculated using the following calculation:

[Estimated Cost of Damage (divided by) Estimated Cost to Replace] * 100 = % Damage

### *Pre-Storm Value*
To accurately calculate compensation, the *Road Home* Program must base assistance on a fair and equitable pre-storm value of the home.  The pre-storm value is based on one of four methods:
- A third party appraisal conducted before the storm but after January 1, 2000;
- An Automatic Valuation Method (AVM);
- A Broker's Opinion of Value (BOV); or
- In absence of any of the above, a third party appraisal conducted by the *Road Home.*

### *Duplication of Benefits*
Pursuant to federal statute and HUD requirement for the CDBG program, homeowner assistance may not duplicate any benefits from any source, received by the homeowner as a result of damages incurred during Hurricanes Katrina and Rita. Therefore, compensation from other sources such as FEMA and insurance payments for damages must be deducted from *Road Home* compensation.  Legal fees associated with obtaining insurance benefits will not be deducted as duplication of benefits.  The homeowner must be able to adequately document these costs.

### 2.4.4 Option 1: Homeowner Staying in Home

**Figure 1** provides a summary of the basic calculations that the *Road Home* program will use to determine compensation benefits. **Appendix 1** provides examples of how hypothetical households might be assisted.

Louisiana Proposed Action Plan

11/30/2006

---

**Figure 1 – COMPENSATION GRANT FOR OPTION 1: STAY**

Equals the following up to $150,000

Pre-storm value* *(Minus)* other Compensation [FEMA , Insurance, other funds] (Minus) 30% Penalty for failure to have insurance if applicable

*NOTE: If the Estimated Cost of Damage or Estimated Cost to Replace Home is less than the Pre-storm value, the Estimated Cost of Damage/Estimated Cost to Replace Home will be used instead of PSV in the calculation.*

---

### 2.4.5  Option 2: Relocate

A homeowner who elects to stay in Louisiana as an owner, but not in the same home will be able to sell their property to the State. **Figure 2** provides a summary of the basic calculations that the *Road Home* program will use to determine compensation benefits. Depending on the percentage damage to the home, the State will compensate the homeowner based on the home's pre-storm value or the Estimated Cost of Damage. **Appendix 1** provides examples of how hypothetical households might be assisted.

---

**Figure 2 – COMPENSATION GRANT FOR OPTION 2: RELOCATE**

**If home is less than 51% damaged**
Equals the following up to $150,000

Pre-storm value* *(Minus)* other Compensation [FEMA , Insurance, other funds] (Minus) 30% Penalty for failure to have insurance if applicable

*NOTE: If the Estimated Cost of Damage is less than the Pre-storm value, the Estimated Cost of Damage will be used instead of PSV for the calculation*

**If home is equal to or greater than 51% damaged**
Equals the following up to $150,000

Pre-storm Value (Minus) other Compensation [FEMA, Insurance, other funds] (Minus) 30% Penalty for failure to have insurance if applicable

---

### 2.4.6  Option 3: Sell

Homeowners may elect to forego homeownership in the State.  They may choose to sell their property to the State and relocate outside of Louisiana or remain in the State but choose not to purchase a home.  Depending on the percentage damage to the home, the State will compensate the homeowner based on 60% of the home's pre-storm value

Louisiana Proposed Action Plan

11/30/2006

or the Estimated Cost of Damage.  For elderly households, calculations for compensation will be based on **100%** Pre-storm Value and will follow the calculations in Figure 2 above.  F**igure 3** provides a summary of the basic calculations that the *Road Home* program will use to determine compensation benefits.  **Appendix 1** provides examples of how hypothetical households might be assisted.

---

### Figure 3 – COMPENSATION GRANT FOR OPTION 3:SELL

**If home is less than 51% damaged,**
Equals the following up to $150,000

60% of Pre-storm Value* (Minus) other Compensation [FEMA, Insurance, other funds] (Minus) 30% Penalty for failure to have insurance if applicable

*\*NOTE: If the Estimated Cost of Damage is less than 60% of the Pre-storm value, the Estimated Cost of Damage will be used instead of  PSV for the calculation*

**If home is equal to or greater than 51% damaged,**
Equals the following up to $150,000
60% of Pre-storm Value (Minus) other Compensation [FEMA, Insurance, other funds] (Minus) 30% Penalty for failure to have insurance if applicable

---

## 2.5 Redevelopment of Purchased Property

The publicly chartered nonprofit *Road Home* Corporation will take title to properties purchased by the *Road Home* Homeowner Assistance Program. Properties purchased by the program and held by the *Road Home* Corporation will be redeveloped and returned to commerce or preserved as green space, in a manner which is consistent with local land use plans and direction. Pursuant to a primary goal of the Homeowner Assistance Program, purchased land will not be left to blight and disrepair.

The *Road Home* Corporation will work with local and parish governments to decide on the disposition of purchased properties. Working with local and parish governments, The *Road Home* Corporation may among other things:

o *Develop* properties by packaging the properties for redevelopment, offering them for redevelopment through competitive bids, and overseeing the redevelopment of the property consistent with local and regional plans that have been approved by the LRA and in adherence to the policy guidelines for rebuilding, recovery, and land use management set forth by the LRA. Any proceeds derived through the sale of these properties would be program income and would be used to fund eligible CDBG activities.

17

Louisiana Proposed Action Plan

11/30/2006

o *Transferring* properties from the state to a local redevelopment agency upon approval by the LRA of redevelopment plans that takes into account local land use guidelines. The local agency would package the properties, offer them up for redevelopment through competitive bids, and oversee the redevelopment of the property.  Any proceeds derived through the sale of these properties would be considered as program income and will be used for eligible CDBG activities.

o *Maintaining* properties as permanent green space as a result of a decision by local authorities by transferring the properties to an appropriate local land management agency which will operate and maintain them.

The LRA has endorsed the findings and recommendations of the American Institute of Architects and the American Planning Association planning conference held on behalf of the LRA in November 2005.  Consistent with those recommendations, for properties that are acquired by the *Road Home* Homeowner Assistance Program or other land assembled by the State for redevelopment, the State will insure that 25% of the properties are used for affordable housing according to HUD guidelines for the HOME program.

Whether properties are managed by a state agency or local redevelopment authority, the properties acquired by the *Road Home* Program or other land assembly programs must retain affordability requirements to be defined by the *Road Home* Corporation after their transfer.  The State will monitor the property to assure the requirements are met and maintained.

The LRA recognizes the potential for a significant return on investment in property redevelopment, a scenario demonstrated with research in a recent report of the Gerson Lehrman Group.  The LRA is committed to reinvesting these proceeds in the comprehensive community redevelopment activities already supported by supplemental CDBG funds allocated through state programs, including *the Road Home*.  The priorities of recycled funds shall include housing restoration, affordable housing for homeowners and renters, infrastructure enhancements, and economic development activities designed to help recreate strong communities which are closely tied to transit, jobs, and public services.

## 2.6 Treatment of Homeowners with Special Circumstances

Assignability: After the launch of *The Road Home*, the State will prepare policies that allow a homeowner to sell his or her home on the open market and to assign rights to Program assistance to the new buyer. Assigned grants will require the new buyer to meet  the same requirements the original homeowner would have been required to meet to qualify and receive assistance under the Program.

Death or Infirmity of Eligible Owner: Some homeowners have died since the time of the storms. In such event, an heir who has been placed into legal possession of the

Louisiana Proposed Action Plan

11/30/2006

property under applicable law will be eligible for homeowner assistance in place of the deceased owner.  If a homeowner is incapacitated due to illness or other infirmity, any person legally authorized to act on behalf of such a person,  such as is provided by a power of attorney, is eligible to apply for assistance on behalf of the homeowner.

If a homeowner who has received assistance from *The Road Home* dies after receiving assistance and signing the required legally binding agreements to ensure compliance with the Program requirements, the agreements will continue to apply to the property.

Owner-Occupants Who Have Already Sold Their Principal Residence: Some homeowners may have chosen to sell their homes prior to launch of the *Road Home* Homeowner Assistance Program on August 29, 2006. It is the goal of *The Road Home* to ensure that damaged properties qualifying under the Homeowner Assistance Program do not remain blighted and undeveloped. If the development goals of the Program are met for the damaged property, and a homeowner can demonstrate that he or she remains in a loss situation after selling the damaged property to another party, such homeowner may receive assistance under the Program to compensate for remaining losses in accordance with the Program requirements.

Owners Who Have Received Other Assistance: Policies will be set for discounting compensation amounts for any grants or below-market interest rate loans from government agencies that may have been received by an owner for these purposes. Pursuant to federal statute, assistance from *The Road Home* must be used to repay any loans from the Small Business Administration (SBA) that a homeowner has received in compensation for the same losses.

Owners of Mobile Homes: Owners of a site built home, manufactured home or mobile homes may also be eligible for assistance regardless of whether they own the land on which the damaged home was located, to be determined by criteria developed in order to ensure ownership and immobilization of the structure.

Appeals: Any homeowner has the right to appeal decisions made by the *Road Home* program including eligibility decisions and calculation amounts used to determine funding assistance awards.  To appeal, call 1-800-Road2LA (1-800-762-3252).

## 2.7 Accounts for Receipt of Funds

The state will employ a closing agent to disburse compensation to homeowners who elect to stay in their storm damaged home. The closing agent will ensure that legal agreements are signed and covenants recorded.  Compensation payments may be paid to the homeowner by either (1) payment to a two-party joint account controlled by the homeowner and his or her first mortgage lender, when a first mortgage lender is involved; or (2) on a periodic basis as evidence of compliance with Program requirements is provided to the State by the homeowner or others, where a first mortgage lender is not involved.   The Program administrator or its designated agent will

Louisiana Proposed Action Plan

11/30/2006

coordinate the execution of documents by the homeowner as necessary or required by the Program to receive the payments, and to ensure that the Program requirements are met.

If the homeowner elects to sell his or her property to the State, the funds may be paid to a closing agent (i.e., such as a title insurance company or a licensed Louisiana attorney acting as title agent or closing agent for the transaction), who will disburse the funds under separate instruction from the State and in accordance with a closing statement or other disbursement statement approved by the State, to ensure that existing mortgage and other liens are paid and satisfied at or after closing with respect to the property purchased by the State, and to ensure that Program requirements are satisfied with respect to such homeowner.

## 2.8 Homeowner Assistance Centers – Process for Receiving Assistance

*The Road Home's* Call Center is available to assist anyone with questions regarding *The Road Home* program, including general questions about the program as well as specific questions on the application process.

Homeowners interested in participating in *The Road Home* program must complete an application online, submit a hard copy to a housing assistance center, or complete an application over the phone by calling 1-888-Road 2 LA (1-888-762-3252).  To apply online, visit www.road2LA.org. TTY callers use 711 relay or 800.846.5277.

Once an application has been received, *The Road Home* team will review the application. The homeowner will then receive a letter in the mail with detailed instructions on how to call to schedule an appointment.

Appointments held at *The Road Home's* Housing Assistance Centers will help homeowners navigate through a maze of obstacles such as negotiating insurance settlements, dealing with mortgage issues, understanding the implications of new flood maps, and dealing with building contractors as they rebuild. An owner will have to make decisions on whether to stay in their homes, buyout and relocate in Louisiana, or to sell their home and move out of State. While some homeowners can overcome these barriers themselves, many homeowners will need expert, trustworthy advisors, in addition to receiving financial assistance.

*The Road Home* program's Housing Assistance Centers are designed to respond to these needs. These Centers serve as the places where eligible homeowners with scheduled appointments can speak one-on-one with trained housing advisors who will guide homeowners through the process and help them make informed decisions about their options. During a homeowner's initial appointment, housing advisors will collect records about ownership, flood and homeowners' insurance, and recovery estimates. This information and any other personal information will be stored at a secured data center and will be protected for privacy.

20

Louisiana Proposed Action Plan

11/30/2006

Advisors will provide information that helps a homeowner:

- Evaluate his or her personal disaster recovery situation;
- Deal with mortgage and refinancing issues;
- Select professional services providers such as home inspectors, architects, surveyors (for replacement homes) to design and prepare for repairing or replacing homes;
- Make informed decisions about selection of repair contractors, homebuilders and manufactured housing companies; and
- Obtain advice about fair housing and protections against housing discrimination.

The Housing Assistance Centers will help mitigate the potential for misunderstanding and abuse by providing standardized, structured, and guided relationships between homeowners and service providers.  In addition, *The Road Home* program will provide a Professional Rebuild Registry that connects homeowners with professional service providers and building contractors.

# 3. Workforce and Affordable Rental Housing Programs

Approximately 82,000 rental housing units received major or severe damage in Hurricanes Katrina and Rita.  Replacement of the damaged or destroyed rental housing in the hurricane ravaged areas is vital to the return of a strong workforce, and is a lynchpin of Louisiana's economic recovery.  All sectors of the economy have reported a workforce shortage due to a lack of affordable housing.  Rental housing stock is also imperative to support the return of the high proportion of residents that were renters prior to the storms, particularly in New Orleans, as well as the return of homeowners transitioning into repaired and rebuilt homes over the coming months.

With funds appropriated from Public Law 109-234, the second allocation to Louisiana, $1,112,650,000 will be used for affordable rental housing programs, the vast majority of which will directly benefit households earning less than 80% of the Area Median Income.  It is noted that this exceeds, by a substantial amount the required 19.33%, or $811,907,984 required by HUD regulations as published on 10/30/2006.  Moreover, the State is also committing a sizeable portion of its first disaster allocation to rental housing programs.  All told, approximately $1.54B of disaster CDBG funds will be devoted to affordable rental housing programs. These CDBG funds are also leveraging the federal allocation of Gulf Opportunity Zone Low Income Housing Tax Credits, which are expected to generate an additional $1.7 billion in tax credit development equity.  The combined net result is an estimated $3.2 billion for affordable rental housing recovery efforts.

21

Louisiana Proposed Action Plan

11/30/2006

*The Road Home* Workforce and Affordable Rental Housing Programs have four broad goals:

- To ensure that the workforce needed to accommodate full economic recovery has access to affordable rental housing;
- To provide affordable rental housing to low income households who could not otherwise afford to return to their communities;
- To ensure that affordable rental housing is provided in the context of high-quality, sustainable, mixed-income communities; and
- To ensure that a portion of affordable rental units will host supportive services for families with special needs or high risks following their extended displacement.

To achieve these goals, the programs described below will serve a range of households, including some "deeply affordable" units targeted to households earning between 20% and 40% of the Area Median Income, as well as a range of units for other low income households, including working families earning less than 60% of Area Median Income, and moderate income units targeted for households earning up to 80% of the area median income.  Low income units created in conjunction with the Tax Credit program will remain affordable for at least 20 years.

These programs are also designed to ensure that a significant portion of these affordable units are created within mixed income settings.   Mixed-income communities will be created by fostering market rate rental units in properties that also serve a range of low income households or by supporting single family homes in the same development with a range of affordable and deeply affordable rental units, for renters 20% to 60% of the area median income.

### Summary of Intended Rental Units to be Built or Restored and Program Dollars

| Program | P.L. 109-148 | P.L. 109-234 | Total |
|---|---|---|---|
| LIHTC/CDBG Piggyback | - | $593,970,000 | $593,970,000 |
| | - | 18,000 units | 18,000 units |
| Supportive Housing Services | $46,750,000 | $25,980,000 | $72,730,000 |
| | 0 units built; 2,000 served | 0 units built; 1,000 served | 0 units built; 3,000 served |
| Small Rental Properties | $376,300,000 | $492,700,000 | $869,000,000 |
| | 8,000 units | 10,000 units | 18,000 units |
| TOTAL | $423,050,000 | $1,112,650,000 | $1,535,700,000 |
| | 8,000 units | 28,000 units | 36,000 units |

As shown above, the rental programs funded through the Second Allocation will create an estimated 28,000 units, in a broad mixture of mixed income developments, small rental properties, and other tax credit projects.  The Workforce and Affordable Rental

Louisiana Proposed Action Plan

11/30/2006

Programs target these funds to those parishes with the most damaged or destroyed rental housing have adequate resources to replace significant numbers of affordable rental units.  The State proposes these rental programs as a means to focus on the housing needs of low to moderate income people in the most heavily damaged areas. According to the National Low Income Housing Coalition Research Note #05-02:

"Forty-seven percent of the housing units in the entire Katrina affected area [of the Gulf Coast] were rental units. In New Orleans, 55% were rental units. Fully 20% of the rental units lost in New Orleans were affordable to extremely low income households, i.e. households earning 30% of AMI or less, amounting to 16,000 units. This percentage was 16%, 22,000 units, for all Katrina affected areas. Thus, 73% of all the rental units affordable to extremely low income households in the Katrina affected areas were in New Orleans and likely destroyed."

## 3.1 Low-Income Housing Tax Credit (LIHTC) "Piggyback" Program

The LIHTC-CDBG program (referred to as the "Piggyback" program in the Louisiana Recovery Administration Action Plan) supports affordability for especially low-income Louisianans in properties receiving Low Income Housing Tax Credits (LIHTC), which are allocated by the Louisiana Housing Finance Agency (LHFA).  Furthermore, GO Zone LIHTC benefits are also being targeted to those parishes which suffered the most damaged or destroyed rental properties as described for the Workforce and Affordable Rental Housing programs above.

Through the Piggyback program, the State is seeking to promote the following types of rental housing units:

**Workforce Housing Units.** Including *market-rate units*, units initially affordable to households with incomes below 80% of AMI and *units affordable to (and restricted to occupancy by) households with incomes below 60% of AMI*.

**Additional Affordability Units.** OCD and LRA seek to facilitate development of units affordable to (and restricted to occupancy by) households with incomes at or below 20% of area median income ("AMI"), hereinafter referred to as "20% AMI Units;" 30% of AMI, hereinafter referred to as "30% AMI Units;" 40% of AMI, hereinafter referred to as "40% AMI Units."

**Permanent Supportive Housing ("PSH").** OCD and LRA also seek to facilitate the development of permanent supportive housing for a variety of households including extremely low income people (30% of AMI and below) with serious and long term disabilities, and/or who are homeless and/or who are most at-risk of homelessness. OCD and LRA will pursue two PSH strategies:

The primary strategy is a PSH Set-Aside Program, under which all properties that receive 2007-2008 GO Zone Credits will agree to make at least 5% of total units available to PSH clients, who will be supported by appropriate services (provided

Louisiana Proposed Action Plan
11/30/2006

through local agencies using CDBG funds).

An additional strategy is development of PSH properties (in which at least 15% of units are designated for PSH clients). PSH clients will be supported by appropriate services (provided through local agencies and the property's sponsor using CDBG funds).  Permanent supportive housing is an "evidenced-based" best practice housing model which provides affordable rental housing units in a non-institutional setting linked with flexible community-based supportive services. It is anticipated that a significant number of PSH units will be created in PSH developments due to the priority granted through LHFA's QAP and the availability of additional Piggyback funding.  In addition, it is certain that a large number of PSH units will be created within Mixed Income, Additional Affordability LIHTC, and non-CDBG GO Zone developments, through the required set-aside of at least 5 percent of total units.

In addition, as noted above, the Piggyback Program in accordance with the second supplemental appropriation (PL 109-234) - places a special emphasis on the rehabilitation of damaged Public Housing developments and other HUD assisted housing developments affected by Hurricanes Katrina and Rita.  This program will also address the special housing challenges faced by people with disabilities by ensuring that all buildings comply with Section 504.  Also, as noted earlier, all LIHTC developments within the 2007 and 2008 GO Zone LIHTC rounds have been required to set aside at least 5 percent of their units as Permanent Supportive Housing for people with special needs.

Financing Tools
To support these goals, OCD will make available the following types of financial assistance:

**Louisiana Project Based Rental Assistance** –operating support funding will be available for units affordable to households with incomes below 40% of AMI.

**Louisiana Mixed Income Flexible Subsidy** –financial support for Mixed Income developments.

**Louisiana Additional Affordability Gap Financing** -- gap financing for Additional Affordability LIHTC developments, potentially including projects financed through tax exempt bonds and LIHTCs.

**Louisiana Permanent Supportive Housing Gap Financing** -- gap financing for Permanent Supportive Housing developments.

**Louisiana Supportive Services Grants –** funding for the cost of supportive services for occupants of PSH units.

Allocations of Piggyback Program dollars among these financing options will be determined based upon the responses to the QAP.  These responses, in turn, will be shaped by development costs, and anticipated operating costs for rental projects.

In order to ensure that units created through the Piggyback program are readily available to returning households, the State will require that developers promote their

Louisiana Proposed Action Plan

11/30/2006

available units through the Rental Housing Registry, available online at
www.LAHousingSearch.org.


**Additional Information**

Additional information on the Piggyback Program can be found in the draft program
design document posted on the Office of Community Development's website at
www.state.la.us/cdbg/DRactionplans.htm.


## 3.2 Services Funding for Supportive Housing

Louisiana will use CDBG funds or other available financial resources to fund supportive
services for approximately 3,000 units of Permanent Supportive Housing.   The
principal mechanism to develop this housing is the Piggyback program and each unit of
Permanent Supportive Housing that is produced through this program will receive a full
allocation of supportive service funding.   Other HUD programs such as the McKinney
Vento Act, Project Based Section 8 Vouchers, Section 811, and Section 202 program
funds may supplement supportive efforts.

The supportive housing units will serve individuals and families with special needs, most
importantly, renter households who are returning to Louisiana after having endured,
very often, traumatic relocations from shelter to shelter, to hotels, and to other
temporary living arrangements in other cities. Supportive housing units are also needed
for returning families and individuals who are disabled, frail elderly, or have other
special needs.

The state will be providing $25,980,000 in Supportive Service funding through the
Second Funding award.

This program component and use of CDBG funds for supportive services is proposed
with the recognition that the number of supportive housing units that can be developed
in Louisiana over the next few years will be severely limited by the scarcity of public and
private funding for the necessary resident services.


## 3.3 Small Rental Property Repair Program

Before the disaster, a large portion of low income and other working families lived in
small rental properties - single-family homes, "doubles" and small, multi-family
buildings that were owned and operated by small-scale owners.  A sizeable number
of these properties were underinsured or uninsured and no longer available for
occupancy. The State has developed the Small Rental Property Repair Program in
order to provide financial assistance for the repair and/or reconstruction of these

Louisiana Proposed Action Plan

11/30/2006

small-scale rental housing units.[6]

The primary purposes of this financing program is to enable small-scale rental properties to return to the market while limiting the amount of debt (and therefore debt service) required for the properties so that the owners will be able to charge affordable rents. This Action Plan Amendment clarifies and updates the program description that was previously published as part of the Road Home Action Amendment #1.

The Small Rental Property Repair Program will, on a competitive basis, provide financing to qualified owners who agree to offer apartments at affordable rents to be occupied by lower income households. Subsidies will be provided on a sliding scale, with the minimum subsidy provided for units made available at affordable market rents (rents affordable to households with incomes at or below 80% of median) and maximum amount of subsidy going to units affordable to families with incomes at or below 50% of AMI. In addition to funding incentives for providing affordable units in small rental properties, the program will, where practical, make funds available to improve building design and make properties less susceptible to damage from natural events.

Each application will be scrutinized by underwriters in light of selection criteria to be developed by the State and based on the proposed project costs. The State reserves the right to negotiate with applicants to seek the best possible outcomes for each project while preserving valuable incentive funds.

In exchange for accepting financial incentives, property owners will be required to accept limitations on rents (with inflation clauses) and incomes of renters for a period ranging between 3 and 20 years, to assure that the assisted housing remains affordable and is occupied by families with incomes corresponding to several tiers of affordable rents. The amount of CDBG financing available will range from $10,000 to $100,000 per unit (with the highest awards available only where special circumstances warrant this level of assistance). In general, higher per unit amounts will be available to property owners who agree to offer lower rents to reflect the lower amount of rental income these properties will receive and their more limited ability to retire debt service.   The assistance will be offered as deferred payment loans at 0% interest, due only upon resale of the property or failure to comply with the agreed-upon restrictions on rents and household incomes.

Unlike the *Road Home* Homeowner Assistance Program, funds for the Small Rental Property Repair Program will be insufficient to provide every eligible property owner with enough money to repair or replace their rental properties. Funding for loans will be based on factors including, but not limited to, the following:

---

[6] The number of units assisted will depend on the average amount of subsidy per unit.  In general, the more affordable the rents, the higher the subsidy per unit, and the fewer total units that will be funded.

Louisiana Proposed Action Plan

11/30/2006

- Properties demonstrating capacity to obtain matching market-rate financing, if necessary, to carry out the repairs and;
- Properties that are most cost-effective to repair or replace, and located in areas that have adequate infrastructure and redevelopment activities occurring.
- Priority will be given to Louisiana based small-scale owners where rental revenue constituted a substantial portion of household income and/or assets so long as these investor-owners meet the threshold requirements for capacity necessary to repair or replace, and then manage their units.
- A first preference will be given to providing loans to returning owner-occupants of three and four unit properties who are seeking to repair their rental units that were damaged by the storms.  Note:  These owners will also be able to receive a pro-rated homeowner's compensation award based on the owner's residence.

Eligible properties include:

- Small Rental Properties
- Small Owner Occupied Properties with one or more rental units

The program will assist one to four unit buildings.  Multiple small properties under the same ownership (whether they are scattered or contiguous) may be rehabilitated as a single, larger project if practical.

The State is committed to promoting homeownership opportunities for low and moderate income households.  The LRA and the OCD are working with the Louisiana Housing Finance Agency (LHFA) and other partner agencies to promote the use of funding from the HOME program and other available sources to foster first time homeownership initiatives.  In addition, the Small Rental Property Repair Program application process will be structured in such a way as to accommodate the participation of potential homebuyers (including existing tenants) who are receiving homebuyer assistance through other programs.  Also, in order to assist additional homebuyers, the State may develop its own pilot program(s) to provide incentives, not only for repairing damaged rental properties, but converting them to owner-occupied housing.  For example, a Lease-Purchase Pilot Program would allow a owner to sell a repaired one-family or two-family rental property to a low- or moderate-income homeowner, rather than rent the home.  A Homebuyer Assistance Pilot program would allow low- and moderate-income households to purchase un-repaired one-family and two-family former rental properties and carry the home through the repair process. Creating first-time homebuyers would be a priority, but the pilot program may also serve buyers who have previously owned homes. Homeowners who are exercising the "sell" or "relocate" option under the Road Home Homeownership Program are not eligible to receive additional financial assistance from the State through these pilot programs.  Pilot programs will be expanded if successful using funding from the budget for the Small Rental Assistance Program

Louisiana Proposed Action Plan

11/30/2006

as well as other sources that may become available.

Participants in the pilot programs as well as owner-occupants of small rental properties may have access to expert financial and construction advisors to assist them with refinancing and reconstruction, or if they so desire, to sell their properties to developers using other programs designed to provide affordable housing.

In keeping with program guidelines for the Community Development Block Grant program, Small Rental Property Repair Program funds may be used to support reconstruction, where it is rendered a more feasible alternative to rehabilitation by virtue of the damage to the existing property and the need to make the finished structure less susceptible to hurricane damage and other acts of nature.

Small Rental Property Repair Program funds will be distributed geographically (by Parish) in direct proportion to the number of rental units damaged by Hurricanes Katrina and Rita, based on FEMA Rental Units with "Major" or "Severe" Damages. Applications for assistance will first be sorted by Parish and then scored.  Funding reservations will be issued, by Parish, to each project that meets the minimum threshold score, up to the number of projects that can be funded within the Parish's dollar allocation.  If there are unallocated funds remaining in a Parish's allocation pool after all of the projects that meet minimum score have been funded in a single round, these funds may be "forward allocated" for qualifying projects in other eligible Parishes.  However, these funds will be "charged against" the receiving Parish's total allocation and so will not reduce the overall amount that is available to the Parish that experienced a shortage of applications.

11/30/2006

# 4. INFRASTRUCTURE

*In the following narrative, the State of Louisiana describes how it's Action Plans gives priority to infrastructure development and rehabilitation and describes the activities that will be undertaken.*

Louisiana has suffered severe infrastructure losses.  There is an enormous gap to fill to bring back basic infrastructure at the state and local level in order to provide the necessary public services.  In order to help meet some of the identified unmet needs, $1,187,500,000 will be programmed into infrastructure activities at the state and local level.  Appendix 2 in Louisiana's First Action Plan provides detail on the extend of post-hurricane infrastructure needs.

*Local Government Emergency Infrastructure*

| | |
|---|---|
| Eligible Activity | 105(a)(2) and (9) Public Facilities |
| National Objective | Low to moderate income, elimination of blight, urgent need |
| Activity Amount | $95 million |

Of the $1,187,500,000, an initial allocation of $95,000,000 will be programmed into the Local Government Emergency Infrastructure Program.  This program will provide local governments with the required FEMA match for emergency infrastructure projects.  The method of distribution will be on a first come, first serve basis.  As public assistance projects are approved by FEMA, the State will allocate funding for the local match for these projects if the following guidelines are met:

1. That the funding to be provided is for cases of emergency need (to be determined by the State);
2. That the funding to be provided will be match for projects eligible for FEMA Public Assistance;
3. That the funding be provided to parishes which have adopted the latest available base flood elevations of the FEMA Flood Recovery Guidance;
4. That the funding be provided to parishes or communities which have adopted, implemented or are in the process of implementing the new statewide building code standards adopted in the 2005 1st Extraordinary Session of the Louisiana Legislature;
5. That the funding be provided to communities for projects recommended through a broad community planning process; and
6. That the projects receiving funding follow the best design for delivery of services in light of the population shifts and changed circumstances of many Louisiana communities.

Louisiana Proposed Action Plan

11/30/2006

Each project funded will meet one of three national objectives.  Until applications are received and service areas and beneficiaries are known, the specific national objective cannot be determined.

This activity is considered a low risk activity.  Monitoring will be performed in accordance with the attached monitoring plan.  (Appendix 6)

*State Building Infrastructure Program*

| | |
|---|---|
| Eligible Activity | 105(a)(2) and (9) Public Facilities |
| National Objective | Low to moderate income, elimination of blight, urgent need |
| Activity Amount | $142,500,000 |

Approximately 1,500 state buildings were damaged by Hurricanes Katrina and Rita. Damage estimates for both buildings and contents are approximately $1.8 billion. Insurance will cover approximately $300 million of that loss leaving $1.5 billion not covered by insurance.  FEMA funds under the Stafford Act provisions and presidential declarations will cover 90% of those uninsured losses, which leaves a gap of $150 million at a time when the State's tax base has been severely impacted.  $142.5 million of the CDBG funds will be utilized to provide the FEMA match for those facilities.

It is impossible to repair all 1,528 damaged facilities at the same time.  There are not enough designers and contractors to repair all $1.8 billion in damages immediately. Because of this, the State developed a process to determine the priorities and timing of bringing state buildings back up to par.  A decision tree was developed and from that a plan for the restoration of state facilities.  In order to begin this process we had to first develop a data base, or list, of all damaged facilities, and estimates of cost for the repair of those damages.  Understand that these are initial estimates, and actual costs of repairs may vary depending on the bid climate as well as hidden, unforeseen and unanticipated damages that will be revealed after repairs are begun.

After developing the list of damaged facilities, a system was developed to set priorities. The staff of Facility Planning and Control (FP&C) in the DOA developed a decision tree that was approved by the Joint Legislative Committee on the Budget.  The decision tree was based on FP&C's understanding of the facilities, agencies and programs housed in those impacted buildings.  The following is a summary of the decision making process and application of the decision tree:

The first thing considered was the degree to which those buildings are of great significance to and are symbols of our state, or are recognized cultural or historical artifacts.  It was felt that the repair of those facilities would be important to send a message to the world and our citizens that Louisiana is coming back.  So this was the first

Louisiana Proposed Action Plan

11/30/2006

question asked and answered.  Those facilities fitting these criteria became Priority 1 projects.

The second type facility considered was those facilities that house basic and necessary functions of state government.  (Statutorily mandated function, public safety, health protection services, education and incarceration)  The following questions were asked: "What is the business of government?"  "Why does government exist?"  These facilities fell into Priority 2 if they did not flood or Priority 3 if they did flood.  It was considered important to determine whether or not we should restore those facilities that were at risk of flooding again before we restore those that were not.  Those facilities that are not in a special flood hazard zone were placed in the higher Priority 2 category while those at risk of flooding were placed at a lower Priority 2 category.  A question asking whether this facility houses a program essential of state government was answered.  If the answer was no, it stayed on the left of the decision tree.  If the answer was yes, it went to the right and ultimately ended up in either Priority 2 or Priority 3.

The next level of the decision tree was based on the question, "Does the facility promote economic development?"   (Those facilities that encourage industry to relocate or encourage tourism.)  If the answer was no the facility stayed on the left of the decision tree.  If the answer was yes the facility/building went to the right and ultimately ended up in Priority 4 if it was not in the Special Flood Hazard Zone and Priority 5 if it was in the Special Flood Hazard Zone.

The next level of decision making related to self generated funded facilities.  The question was asked, "Does the facility have historic significance?"  (Over 45 years old, site of an historic event, significant and/or unique architectural style or educational in nature.)  If the answer was no, then the facility stayed on the left of the decision tree.  If the answer was yes, the facility/building went to the right and ultimately ended up in Priority 8 if it was not in the Special Flood Hazard Zone and Priority 9 if it was in the Special Flood Hazard Zone.

The next level of decision making related to historically significant facilities.  The question was asked, "Does the facility generate revenues that fully support it?"  (Collects fees for other forms of self generated revenues.)  If the answer was no, then the facility stayed on the left of the decision tree.  If the answer was yes, the facility/building went to the right and ultimately ended up Priority 6 if it was not in the Special Flood Hazard Zone and Priority 7 if it was in the Special Flood Hazard Zone.

The first stage of the process yielded a prioritization of all facilities at the program level. It was then necessary to further apply the priorities on a building by building basis asking the questions for each building at the site level.  The following questions were asked of us and the user agencies or management boards of the institutions, "Does that building house a function that is essential to the mission of the institution, program or activity?"

Louisiana Proposed Action Plan

11/30/2006

The importance of each building as it relates to the mission of the agency, program or activity was then discussed. Also the potential for consolidation, alternate locations for programs and activities if restorations were delayed, was discussed in all the groups. This information enabled a better refinement of the priority list.

The priority list was then submitted in priority order to the Joint Legislative Committee on the Budget and subsequently approved by that committee. See Appendix 7 for the priority listing and Appendix 8 for further explanation of the decision tree.

Each project funded will meet one of three national objectives. Until applications are received and service areas and beneficiaries are known, the specific objective cannot be determined.

The State has developed comprehensive procedures to ensure compliance with HUD's CDBG program regulations for each funded project. The State will verify each project's ranking on the pre-determined priority list and ensure that the project meets one of the three national objectives. The State will also ensure that each project is eligible to receive the aforementioned FEMA funds. The State will verify that each project has been environmentally cleared by FEMA prior to any construction activity.

The State will review the procurement process utilized in the hiring of an architect and/or engineer for each project and will verify and document that the person/firm hired is not listed on the federal Excluded Parties List. The State will also ensure that the professional services contract will include all required supplemental clauses and conditions.

The State will review the project's bid package and ensure inclusion of all required supplemental clauses and conditions, Federal Labor Standards Provisions, current wage decision(s), etc. The State will attend the pre-bid conference and the bid opening as necessary. The State will obtain a copy of the bid tabulation and verify and document the eligibility of the contractor selected via the federal Excluded Parties List system. The State will attend the pre-construction conference to ensure that all required Equal Opportunity forms and certifications are signed by the prime contractor and all sub-contractors as well as to provide these contractors with a list of eligible workers obtained from the State's Department of Labor. This list will help the contractor in meeting the Section 3 hiring goals requirement. At this conference, the State will also explain the Labor Standards requirements of weekly payrolls and daily inspections reports.

The State will review submitted payrolls, new and existing employee forms, payroll deduction authorization forms, etc., as well as conduct employee interviews and make site visits to the project when necessary. During the review of the payrolls, the State will ensure that all Davis-Bacon and Contract Work Hours and Safety Standards Act (CWHSSA) requirements are being met and will ensure payment of restitution where

Louisiana Proposed Action Plan

11/30/2006

needed.  The State will also review and process Request For Payment (RFP) forms and supporting documentation, and will review change orders for reasonableness of cost and consistency with the project's scope of work.

The State will prepare a Final Wage Compliance Report, accept clear liens, make final payments and issue Acceptance of Work Certificates.


## Local Government Emergency Infrastructure

The State has altered the Local Government Emergency Activity which was described above.  Of the $1,187,500,000 set aside for infrastructure activities, $95 million was initially set aside for the Local Government Emergency Infrastructure activity.  Because of consultations with local governments and comments received from the local governments, the State requests that an additional $500 million be allocated to this activity.

In addition to the match for eligible FEMA Public Assistance (PA) grants, the State would like to expand the use of these funds to include providing the non-federal match for FEMA Hazard Mitigation Grant Program (HMGP) funds.

The State would also like to expand the program to pay for repairs that are ineligible under the FEMA PA grant program, including but not limited to uninsured and underinsured damages, insurance deductibles and improvements for code compliance, if they are determined to be critical to continued delivery and or protection of vital public services by state and local government entities in accordance with criteria established by the LRA.  These criteria shall take into account the areas where the hurricane damages were most severe.

Expenditures from the program for match of FEMA's PA programs must meet the following guidelines:

1. Funding is provided as a match for projects eligible for FEMA Public Assistance;
2. For requests for match of FEMA's PA program, projects must have been assigned a FEMA field project number by the project officer on or before August 29, 2006;
3. That the funding to be provided is for cases of critical needs.  (To be determined by the State);
   4.      That the funding be provided to parishes which have adopted the latest available base flood elevations of the FEMA Flood Recovery Guidance unless exceptions are granted by the LRA based on reasonable alternatives where safety is not minimized;

Louisiana Proposed Action Plan

11/30/2006

5.     That the funding be provided to parishes or communities which have adopted, implemented or are in the process of implementing the new statewide building code standards adopted in the 2005 1st Extraordinary Session of the Louisiana Legislature;

6.     That the funding be provided to communities for projects recommended through a broad community planning process; and

7.That the projects receiving funding follow the best design for delivery of services in light of the population shifts and changed circumstances of many Louisiana communities.

8.     That a project demonstrate that it is the most efficient and cost effective way to rebuild the infrastructure, or that the applicant has considered alternate methods of rebuilding to achieve the greatest efficiency of the infrastructure to serve the local as well as regional needs of the community as a result of the Public Assistance repairs or reconstruction;  and

9.     That each infrastructure project considers and/or proposes a mitigation plan to minimize damage in the event of future floods or hurricanes.

Expenditures from the program for projects that are ineligible for FEMA PA grants must meet the following guidelines:

1.  Projects demonstrate that they are not eligible for PA or any other source of funds;
2.  Projects have a substantial return on investment (ROI);
3.  That the funding to be provided is for cases of critical needs based on their meeting criteria developed by the LRA for the use of these limited funds;
4.  That the funding be provided to parishes which have adopted the latest available base flood elevations of the FEMA Flood Recovery Guidance, unless exceptions are granted by the LRA based on reasonable alternatives where safety is not minimized;
5.  That the funding be provided to parishes or communities which have adopted, implemented or are in the process of implementing the new statewide building code standards adopted in the 2005 1st Extraordinary Session of the Louisiana Legislature;
6.  That the funding be provided to communities for projects recommended through a broad community planning process; and
7.  That the projects receiving funding follow the best design for delivery of services in light of the population shifts and changed circumstances of many Louisiana communities;
8.  That a project demonstrate that it is the most efficient and cost effective way to rebuild the infrastructure, or that the applicant has considered alternate methods of rebuilding to achieve the greatest efficiency of the infrastructure to serve the local as well as regional needs of the community as a result of the Public Assistance repairs or reconstruction;  and

Louisiana Proposed Action Plan

11/30/2006

   9. That each infrastructure project considers and/or proposes a mitigation plan to minimize damage in the event of future floods or hurricanes.

A Ranking Team will be created for evaluation of proposed FEMA ineligible projects based on criteria established by the LRA. The Ranking Team will be comprised of representatives from the Governor's Office, the LRA, the Office of Community Development, and legislative representation appointed by the Speaker of the House and President of the Senate. This team will rank all the applications received and recommend projects for funding.

Of the $595 million now allocated to this activity, $200 million will be set aside for Primary and Secondary Education Infrastructure. Working with the LRA, the Department of Education will develop needs-based criteria to prioritize the allocation of the funds to the school districts. These funds will flow to the affected school districts through the Office of Community Development. Schools that are repaired or rebuilt shall demonstrate they have taken into account specific educational and repair goals to build back better facilities. In addition, rebuilding plans will address local community planning priorities, including opportunities for shared use of school facilities with other public agencies, such as libraries.

As stated in the initial action plan, each project funded will meet one of the three national objectives. Until applications are received and service areas and beneficiaries are known, the specific national objective cannot be determined.

This activity is considered to be a low risk activity. Monitoring will be performed by the Office of Community Development staff in accordance with the Infrastructure Monitoring Plan.

## Description of Physical Damage to Utility Infrastructure

 The storms caused unprecedented damage to electric and gas system infrastructure in the State of Louisiana, and especially in New Orleans. The extent of the damage to utility infrastructure there was substantially worse due to the flooding caused by the failure of the federal levee system. The damage to the infrastructure of Entergy New Orleans, Inc. (ENO), the regulated public utility responsible under City charter for providing both electricity and natural gas service in the City of New Orleans, was extensive.

Damage to the electricity infrastructure included:

- All electricity transmission lines were knocked out of service; 78 transmission towers were significantly damaged;

Louisiana Proposed Action Plan

11/30/2006

- All 22 electrical substations were knocked out of service.  Twelve of the 22 substations were flooded and sustained moderate to heavy flood damage; and
- The electricity distribution facilities received extensive damage from the storm and flooding:  approximately 2,300 spans of conductor, covering 95 miles (or 76% of the total of 125 line-miles), over 1,700 poles and over 3,100 cross-arms required replacement.

Damage to the natural gas infrastructure included:

- 12 of 13 operational city gates (i.e. connections from high pressure natural gas transmission pipelines to lower pressure city distribution lines) experienced damage;
- Approximately four million gallons of salt water entered the natural gas distribution system, flooding approximately 60 percent of the system and causing catastrophic damage to:  approximately 257 miles of cast iron pipe; 277 miles of low-pressure steel and 310 miles of high-pressure steel were subject to saltwater infiltration; and over 1,400 miles (out of approximately 2,500 miles) of gas service lines were subject to saltwater infiltration; and
- More than 80% of natural gas meters and regulators were destroyed.

Entergy New Orleans (ENO) estimated that approximately 10 percent of the total amount of damage to the electricity and natural gas infrastructure was caused by the storms, with about 90 percent due to the subsequent flooding caused by the failure of the federal levee system intended to protect New Orleans.

**Status of Utility Infrastructure Restoration Efforts**:  Entergy New Orleans (ENO) mounted an aggressive program to restore electricity and natural gas service.  ENO employed in excess of 1,800 personnel from other utility companies to expedite the restoration program.  Electricity service to critical loads was restored by mid-October 2005, following the removal of the flood waters.  Service to all occupied areas of the City was restored by the end of 2005.  However, the level of system redundancy has not yet been returned to pre-Katrina levels, and the flooding may reduce the operational life of certain equipment such as network protectors and transformers.  Natural gas service has been restored except for several areas, including Lake Catherine and small areas with the 9th Ward and Lakeview.  However, service outages occur due to residual amounts of water in the gas distribution system.  In addition, the natural gas distribution system suffered significant corrosion, requiring early replacement of 844 miles of flooded gas mains, beginning in 2007.  Additional monitoring and higher levels of preventative maintenance also will be required for the gas mains pending rebuilding.

**Cost for Infrastructure Restoration and Rebuilding**:  ENO estimates the total cost for restoration of infrastructure, rebuilding of the natural gas system, and at $842 million, of

Louisiana Proposed Action Plan

11/30/2006

which $250 million may be reimbursed through insurance, leaving a net total cost of $592 million. The LRA retained Navigant Consulting, Inc. to perform a preliminary review of these estimates. The Navigant analysis identified $638 million of the $842 million as related to the restoration of infrastructure and rebuilding of the natural gas distribution system. **After the offset for approximately $250 million in insurance proceeds, the net unmet need for restoration and rebuilding of infrastructure is $388 million.** The breakdown of the cost estimates is shown below.

| New Orleans Electricity and Natural Gas Infrastructure Restoration, Rebuilding and Related Costs [*] | |
|---|---|
| | $ Millions |
| Electricity Infrastructure Restoration | 160.9 |
| Natural Gas Infrastructure Restoration | 121.8 |
| Natural Gas Rebuilding (beginning 2007) | 355.0 |
| Total Restoration and Rebuilding | 637.7 |
| Less: Estimated Insurance Reimbursement | (250.0) |
| **Net Total** | **387.7** |

**Availability of CDBG Assistance**: P.L. 109-148 provided $11.5 billion to the states of Mississippi, Louisiana, Alabama, Florida and Texas through the U.S. Department of Housing and Urban Development's Community Development Block Grant (CDBG) Program. Louisiana received $6.2 billion of those funds. Congress allocated an additional $4.2 billion of CDBG funds for Louisiana in P.L. 109-234.

These monies have been designated for "disaster relief, long-term recovery and restoration of infrastructure in the most impacted and distressed areas related to the consequences of hurricanes in the Gulf of Mexico in 2005." The legislation also gave the authority to the Governor to designate an entity or entities to administer the state's allocation of funds. Moreover, the legislation grants the Secretary broad waiver authority for the application of this additional CDBG funding, so that the necessary recovery assistance can be facilitated.

As the target of investment of this supplemental CDBG assistance, Governor Kathleen Babineaux Blanco has prioritized housing development, infrastructure rehabilitation, and economic development. The CDBG funds are available to the State subject to HUD approval of action plans which describe how the funds will be used. The Louisiana Recovery Authority (LRA) has been charged by the Governor and Louisiana Legislature with statutory responsibility for developing policy and action plans for CDBG funds.

---

[*] Source: Navigant Consulting, Inc. Presentation to Louisiana Recovery Authority, October 12, 2006, based upon estimates provided by Entergy New Orleans, Inc.

Louisiana Proposed Action Plan

11/30/2006

The Louisiana Office of Community Development (OCD), the agency that runs the State's annual CDBG Program, will administer the supplemental CDBG recovery program.

To promote sound short- and long-term recovery planning at the state and local levels, the LRA has created task forces that research and report on the redevelopment needs in Louisiana's most affected parishes.

**Recommended allocation of CDBG Funding to Utility Infrastructure Restoration and Rebuilding:** On October 12, 2006 the LRA Board approved a Resolution allocating $200 million of CDBG funds for costs that have been incurred by ENO, and will continue to be incurred in restoring electricity and natural gas service to the residents of New Orleans, in order to mitigate extraordinary levels of rate increases that would otherwise be passed on to New Orleans gas and electric utility ratepayers. The $200 million approved by the LRA Board is part of the $1.1875 billion set aside for state and local infrastructure in the first Action Plan. This Action Plan Amendment establishes the criteria for the Ratepayer Mitigation Action Plan. In addition, the State pledged to work with the Congressional delegation, City Council and local governments, business interests, and others to seek additional federal funds to cover future gas system repair costs which are largely due to salt water intrusion that resulted from the failure of the federal government's levee system.

**Ratepayer Mitigation**

Repopulation of New Orleans and associated recovery is necessary for Louisiana, the Gulf Coast region and the nation as a whole:

- Pre-Katrina, New Orleans metropolitan statistical area (MSA) comprised over 1/3 of Louisiana's population:

- New Orleans is a strategic port for the U.S. and associated international commerce;

- New Orleans and the South Louisiana region are key to U.S. energy security needs, providing servicing to offshore oil and natural gas production, petroleum refining and petroleum product and natural gas distribution systems that supply the major consuming regions of the country.

As a direct result of Hurricane Katrina and the subsequent flooding that persisted for weeks, ENO and other Louisiana utility providers sustained damage to their infrastructure that is unprecedented in the utility industry. Significant portions of the electric and gas infrastructure were either damaged or destroyed by the storm and flooding. This

Louisiana Proposed Action Plan

11/30/2006

destruction resulted in extensive disruptions in service to business and residential communities throughout Louisiana.

The restoration and rebuilding of electricity and natural gas infrastructure is a necessary next step for the recovery of New Orleans. Electric service has become an essential ingredient of the American way of life. A home is not complete without a dependable source of electricity to support the family homestead. Americans spend $200 plus billion dollars annually on electricity.
Returning businesses and residents have a primary need for reliable and affordable utility service.

The cost of electric and gas service is a major ownership operation cost that appears in each family's housing budget. For returning residents seeking to return to New Orleans, utility costs are a primary cost of home ownership, together with housing payments (mortgages or rents) and property taxes. Business and housing recovery efforts need to take into account the cost of utility service. The contribution of utility service to economic development and the vitality of the housing efforts was analyzed in detail in several studies that were provided to the LRA by ENO.[7]

As required by Louisiana law, the prudently incurred costs to deliver emergency and temporary services and to rebuild damaged infrastructure for permanent services, not covered by insurance providers, after being approved by the New Orleans City Council, will be passed on to the ratepayers. Utility costs for New Orleans residents will rise substantially if assistance is not allocated to mitigate utility restoration and rebuild costs.

To defray passing the majority of the costs of preparing for and performing utility repairs and restoration related to Hurricane Katrina on to its citizens who have already suffered significant loss, the State seeks to mitigate those costs and the ultimate charge to ratepayers.

The objective of the Ratepayer Mitigation Plan is to protect business and residential customers from bearing the entire cost of the utility infrastructure restoration and rebuilding. $200 million in funds will be allocated through this program and will offset the cost of restoration, reconstruction and rebuilding of an eligible applicant's damaged electric and gas utility systems, and to offset such other fixed costs as may be the responsibility of ratepayers.

---

[7] Three economic analyses conducted for ENO support this conclusion. Mr. Gregory Rigamer issued a report entitled "Housing Needs and Recovery Perspectives in the Post-Katrina and Rita Era." Mr . Rigamer is a management consultant and expert in urban planning who is Chief Executive Officer of GCR and Associates. Dr. James A. Richardson, an Alumni Professor of Economics at Louisiana State University, reached a similar conclusion in his "Economic Analysis of Electricity and Natural Gas and the New Orleans Economy. The final report was written by Dr. Timothy P. Ryan, who is an economist and chancellor of the University of New Orleans.

Louisiana Proposed Action Plan

11/30/2006

The analysis prepared for the LRA by Navigant Consulting, Inc. confirmed that the net (after insurance) costs of electricity and natural gas infrastructure restoration and rebuilding, if not mitigated through the application of CDBG funds, will be recovered through rates and added to customer bills. **Navigant estimated that the application of $200,000,000 of CDBG funds will avoid an annually recurring increase of $23,943,500 in revenue requirements recoverable through rates.** These costs represent the first year cost, which would be depreciated over a period of time based on the average life of the equipment (an estimated average life might be approximately 20 years).

**Program Eligibility and Eligible Activity**

Eligibility to receive CDBG assistance under this Action Plan is limited to regulated electric and natural gas utility companies certificated by the New Orleans City Council and with service territory in the City of New Orleans that incurred costs resulting from Hurricane Katrina. Entergy New Orleans (ENO) is the sole entity that meets the eligibility criteria.

This proposed CBDG activity is an specifically provided for as an eligible activity under 24 CFR 570.201 (l), which states:

"(l) Privately owned utilities. CDBG funds may be used to acquire, construct, reconstruct, rehabilitate, or install the distribution lines and facilities of privately owned utilities, including the placing underground of new or existing distribution facilities and lines."

Additional waivers may be necessary for other costs related to the restoration of this privately owned utility as are detailed below.

**Eligible Costs**

CDBG funds may only be used to reimburse the cost of restoration, reconstruction and rebuilding of an eligible applicant's damaged electric and gas utility systems, and only to the extent that such costs would otherwise be recovered through rates charged to customers. Subject to certain waivers being approved by HUD, the eligible costs for reimbursement include costs for:

(1) Emergency and temporary response and permanent restoration of electricity distribution systems, substations, transmission lines, and generation facilities that are located within and serve the residents of the City of New Orleans;

(2) Emergency and temporary response, permanent restoration, replacement and rebuilding of natural gas distribution systems located within and serving the residents of the City of New Orleans;

40

Louisiana Proposed Action Plan

11/30/2006

(3) Emergency and temporary relocation expenses due to the flooding of the City;

(4) Emergency communications, logistics and administrative expenses;

(5) Repair and restoration of damaged support facilities; and

(6) Replacement of materials and equipment inventories used in response and restoration efforts;

A more detailed list of the general categories of eligible restoration and replacement costs, prepared by ENO, is shown in the accompanying table.

**General Categories of Eligible Restoration and Rebuilding Costs \***

**Electricity System**
- Distribution overhead lines
- Distribution underground lines
- Substations and voltage conversion equipment
- Transmission lines
- Generation Facilities
- Meter repairs & replacements
- Interim system configuring
- Debris/vegetation removal
- Inventory replenishment
- Control equipment

**Natural Gas System**
- System condition assessment
- Partial system shutdown
- Dewatering
- City gate repairs & replacements
- Valve, meter & regulator replacement
- Pressure conversion equipment repairs
- Inventory replenishment
- Special equipment/tool replacement

**Other or Common Cost Categories**
- Temporary office space to replace inundated locations
- Temporary staff relocation

41

Louisiana Proposed Action Plan

11/30/2006

- Logistics during emergency
- Communications
- Temporary staging areas
- Facilities cleanup
- Security
- Administration building repairs
- Customer care center repairs
- Maintenance Facilities

\* Many of these categories may be subject to waivers from HUD in order to be CDBG eligible.

Eligible costs are subject to the following limitations:

- All eligible costs must be directly related to damages caused by Hurricane Katrina, and were incurred on or after August 28, 2005;

- Costs are eligible only to the extent that they were incurred to repair, restore, reconstruct, rebuild, and replace facilities and inventories to approximately the same condition or levels that existed before the onset of Hurricane Katrina.

- Eligible costs can include either reimbursement for previously incurred costs for emergency and temporary response and restoration; or reimbursement for future rebuilding costs, subject to true-up once costs are incurred and paid.

- The reimbursement covered under any applicable insurance policy shall be primary to any consideration for receipt of funding through this Partial Action Plan.  As such, coverage under all applicable insurance policies shall pay first, or be subrogated back to the State, in the event that coverage was in place.  Any uncompensated eligible costs that remain after receipt of all applicable insurance recoveries shall be eligible for payment under this Action Plan.

**Funding Limitations**

Once the level of eligible costs has been established, the award of CDBG funding under this proposed Action Plan Amendment shall be subject to the following additional limitations:

42

Louisiana Proposed Action Plan
11/30/2006

- Eligible costs shall not be reimbursed for more than 90% of their eligible costs.

- Total CDBG funding under this Plan shall not exceed the lesser of 90% of eligible costs or $200 million.

**Additional Conditions**

The October 12, 2006 LRA Resolution established 6 conditions for the award of the CDBG funds, as requested by the City Council of New Orleans. These conditions are incorporated as additional conditions in this proposed Action Plan Amendment, and include:

1. CDBG funds may only be used to offset the cost of restoration, reconstruction and rebuilding of ENO's damaged electric and gas utility systems, and to offset such other unrecovered fixed costs as may be the responsibility of ratepayers. (This condition is addressed in Section 4 of this Action Plan).

2. CDBG funds should be used to mitigate and/or eliminate possible rate increases to New Orleans ratepayers. (This condition is discussed further in Section 2 of this Action Plan).

3. No CDBG funds may be used to profit ENO's parent, Entergy Corporation.

4. ENO must agree that all restoration, reconstruction, and rebuilding costs claimed for CDBG funding must be certified as reasonable and necessary through an independent process approved by the Louisiana Recovery Authority.

5. ENO must not claim in any forum capital assets paid for with CDBG funds as additions to the rate base for ratemaking purposes or for the valuation of ENO's assets in connection with the city's perpetual option to purchase set forth in the applicable 1922 Ordinances, as amended.

6. Any CDBG funds awarded to ENO should be exempt from existing or future liens held by any of the applicant's bondholders and, except to the extent necessary to reimburse audited expenditures for restoration, reconstruction, and rebuilding, the Entergy Corporation debtor-in-possession loan to ENO.

**Review and Approval of Eligible Costs**

The New Orleans City Council is the government entity that analyzes and approves all ENO requests for recovery of costs in rates charged to customers within the New Orleans

43

Louisiana Proposed Action Plan

11/30/2006

jurisdiction.  Restoration and rebuilding costs for which a utility provider is seeking rate payer mitigation must be submitted to the New Orleans City Council who will follow their normal processes and methodologies for analyzing, auditing and validating these costs to determine eligibility under the Ratepayer Mitigation program.

ENO allows the Council and its Advisors access to the financial books and records of the company as needed, in order to verify and validate costs for incorporation into rates. ENO must extend access to state and federal officials in accordance with administration of the CDBG funds for this program.

ENO also must disclose all related insurance coverage and the status of pending and settled insurance claims.  The New Orleans City Council, after analyzing, auditing and validating the pertinent records will provide notice to OCD that certifies the total of uncompensated costs eligible for ratepayer mitigation.  Based on this information, OCD will determine the amount of ratepayer mitigation within the limitations described in Sections 5 and 6 of this proposed Action Plan Amendment.


**Monitoring**

The State has a monitoring plan for the regular and disaster recovery CDBG programs under the state Office of Community Development.  Particular attention will be paid to ensuring that the use of funds are disaster related and that funding allocated will not duplicate other benefits.

The State will ensure through its application process, monitoring of recipients, and oversight by the Office of Community Development, that recipients are not receiving duplication of benefits.  The State, drawing upon it's the resources of the OCD and LRA and under its guidance, will coordinate with FEMA, Small Business Administration (SBA), and Corps of Engineers, insurance companies, and other entities during the application process to ensure there is no duplication of benefits.  Recipients will be required to provide the appropriate information to the State.

Louisiana Proposed Action Plan

11/30/2006

# APPENDIX 1

## SAMPLE BENEFIT CALCULATIONS

**Example 1**

A couple owns a home with a pre-storm value of $100,000. Their home was severely damaged and the *Road Home* evaluation determined that the percent damage was equal to or greater than 51%.  The *Road Home* determined that the estimated cost to replace their home is $140,000. The home is in a flood plain and the local municipality determined the home was 60% damaged and therefore requires elevation to meet the Advisory Base Flood Elevations (ABFEs). They received $30,000 from their insurance company and $10,000 in FEMA Assistance. Their mortgage runs for another 8 years and the monthly payments are modest. What are their options under the *Road Home* housing plan?

**Homeowner Summary**

| | | |
|---|---|---|
| Pre-storm Value: | | $100,000 |
| Estimated Cost to Replace Home: | | $140,000 |
| Prior Compensation | | |
| Insurance: | $30,000 | |
| FEMA Assistance: | $10,000 | |
| | $40,000 | |

Estimated elevation cost based on *Road Home* evaluation:      $60,000
NFIP Increased Cost of Compliance (ICC) Funding to elevate:      $30,000

**What if the couple wants to stay in their house?**
**Option 1:  Stay**

| | |
|---|---|
| Uncompensated replacement costs:  ($140,000-$40,000) | = $100,000 |
| Uncompensated loss: ($100,000-$40,000) | = $60,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $60,000** |
| | |
| Uncompensated elevation cost ($60,000-$30,000) | = $30,000 |
| **Elevation allowance is above up to $30,000 cap** | **= $30,000** |
| | |
| **TOTAL ASSISTANCE** | **= $90,000** |

**What if the couple wants to sell their home and buy another in the State?**
**Option 2:  Relocate**

| | |
|---|---|
| Uncompensated loss: ($100,000-$40,000) | = $60,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $60,000** |
| | |
| Allowance to elevate to meet ABFE ($30,000 cap) | = Not required (new home not in ABFE) |
| | |
| **TOTAL ASSISTANCE** | **= $60,000** |

The full $60,000 may not go directly to the couple since they will have to pay off the mortgage and any other liens on their home at the time of settlement. They may be eligible for additional mitigation assistance if their new home requires elevation or individual mitigation measures.

Louisiana Proposed Action Plan

11/30/2006

**What if the couple wants to sell their home and move outside of Louisiana?**
**Option 3:  Sell**

| | |
|---|---|
| 60% of Pre-Storm Value: ($100,000 X .60) | = $60,000 |
| Minus Other Compensation | = $40,000 |
| Uncompensated loss: ($60,000-$40,000) | = $20,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $20,000** |
| | |
| **TOTAL ASSISTANCE** | **= $20,000** |

**What if the couple is in their seventies and chooses Option 3: Sell?**
**Option 3: Sell**

Since the couple was 65 years of age or older as of December 31, 2005, the couple is exempt from the penalty associated with **Option 3: Sell.**

| | |
|---|---|
| Uncompensated loss: ($100,000-$40,000) | = $60,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $60,000** |
| | |
| **TOTAL ASSISTANCE** | **= $60,000** |

**What if the couple did not carry hazard or flood insurance?**
**Option 1:  Stay**

| | |
|---|---|
| Compensation grant without penalty | = $60,000 |
| Minus 30% insurance penalty | = ($18,000) |
| **Compensation grant** | **= $42,000** |
| | |
| **Elevation allowance to meet ABFE** | **= $30,000** |
| | |
| **TOTAL ASSISTANCE** | **= $72,000** |

**Option 2:  Relocate**

| | |
|---|---|
| Compensation grant without penalty | = $60,000 |
| Minus 30% insurance penalty | = ($18,000) |
| **Compensation grant** | **= $42,000** |
| | |
| Allowance to elevate to meet ABFE ($30,000 cap) | = Not required (new home not in ABFE) |
| | |
| **TOTAL ASSISTANCE** | **= $42,000** |

**Option 3:  Sell**

| | |
|---|---|
| Compensation grant without penalty | = $20,000 |
| Minus 30% insurance penalty | = ($6,000) |
| **Compensation grant** | **= $14,000** |
| | |
| **TOTAL ASSISTANCE** | **= $14,000** |

**What if the couple was insured and their household income is at or below 80% Area Median Income (AMI)?**

Louisiana Proposed Action Plan

*11/30/2006*

**Option 1:  Stay**
    Uncompensated replacement costs:  ($140,000-$40,000)   = $100,000
    Uncompensated loss: ($100,000-$40,000)   = $60,000
    **Compensation grant is lesser of above up to $150,000  = $60,000**

    Uncompensated elevation cost ($60,000-$30,000)   =$30,000
    **Elevation allowance is above up to $30,000 cap   = $30,000**

    Estimated Cost to Replace Home   = $140,000
    Minus Compensation Grant   = ($60,000)
    Minus Other Compensation   = ($40,000)
    **Affordable Compensation Loan up to $50,000 cap   = $40,000**

    **TOTAL ASSISTANCE   = $130,000**

**Option 2:  Relocate**
    Uncompensated loss: ($100,000-$40,000)   = $60,000
    **Compensation grant is lesser of above up to $150,000  = $60,000**

    Allowance to elevate to meet ABFE ($30,000 cap)   = Not required (new home
                                                         not in ABFE)

    Estimated Cost to Replace Home   = $140,000
    Minus Compensation Grant   = ($60,000)
    Minus Other Compensation   = ($40,000)
    **Affordable Compensation Loan (up to $50,000 cap)   = $40,000**

    **TOTAL ASSISTANCE   = $100,000**

**Option 3:  Sell**
    60% of Pre-Storm Value: ($100,000 X .60)   = $60,000
    Minus Other Compensation   = $40,000
    Uncompensated loss: ($60,000-$40,000)   = $20,000
    **Compensation grant is lesser of above up to $150,000  = $20,000**

    **TOTAL ASSISTANCE   = $20,000**

**Example 2**
A family bought their home 15 years ago.  The home has appreciated in value and the family has upgraded their insurance policy over the years though not enough to pay for all the replacement costs from the damages that were incurred.  The *Road Home* evaluation determined that the estimated cost to replace the home is $110,000 and the estimated cost of damage is $40,000.  Based on the following calculation, the *Road Home* determined that the percent damage was less than 51%:

$$($40,000/$110,000) *100 = 36\% \text{ damage}$$

The pre-storm value is $100,000. The family's insurance policy paid for $20,000 in repair costs. The home is not in an area that requires elevation to meet ABFEs.

47

Louisiana Proposed Action Plan

11/30/2006

**Homeowner Summary**
Pre-storm Value:                                                    $100,000
Estimated Cost of Damage:                                 $40,000
Estimated Cost to Replace Home:                       $110,000


Prior Compensation
     Insurance:                                                $20,000
     FEMA Assistance                                $\underline{\$\qquad 0}$
                                   $20,000

Allowance to elevate home to meet ABFEs:          = $0 (home not in ABFE)

**What if the family wants to stay in their house?**
**Option 1:  Stay**
     Uncompensated damage costs:  ($40,000-$20,000)     = $20,000
     Uncompensated loss: ($100,000-$20,000)                   = $80,000
     **Compensation grant is lesser of above up to $150,000  = $20,000**

      Allowance to elevate to meet ABFE ($30,000 cap)      = Not eligible (home not in
                                                                          ABFE)


     **TOTAL ASSISTANCE**                                             **= $20,000**


**What if the family wants to sell their home and buy another in the State?**
**Option 2:  Relocate**
     Uncompensated damage costs:  ($40,000-$20,000)     = $20,000
     Uncompensated loss: ($100,000-$20,000)                   = $80,000
     **Compensation grant is lesser of above up to $150,000  = $20,000**

      Allowance to elevate to meet ABFE ($30,000 cap)      = Not required (new home
                                                                          not in ABFE)


     **TOTAL ASSISTANCE**                                             **= $20,000**

Couple 2 will not necessarily receive the full $20,000 since they will have to pay off the mortgage and any other liens on their home at the time of settlement. They may be eligible for additional mitigation assistance if their new home requires elevation.

**What if the family wants to sell their home and move outside of Louisiana?**
**Option 3:  Sell**
     Uncompensated damage costs:  ($40,000-$20,000)     = $20,000
     60% of Pre-Storm Value: ($100,000 X .60)                  = $60,000
     Minus Other Compensation                                         = ($20,000)
     Uncompensated loss: ($60,000-$20,000)                     = $40,000
     **Compensation grant is lesser of above up to $150,000  = $20,000**

     **TOTAL ASSISTANCE**                                             **= $20,000**

**What if a member of the family is elderly and the family chooses Option 3: Sell?**
**Option 3: Sell**

Louisiana Proposed Action Plan

11/30/2006

Since one of the owner-occupants was 65 years of age or older as of December 31, 2005, the family is exempt from the penalty associated with **Option 3: Sell.**

| | |
|---|---|
| Uncompensated damage costs:  ($40,000-$20,000) | = $20,000 |
| Uncompensated loss: ($100,000-$20,000) | = $80,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $20,000** |
| | |
| **TOTAL ASSISTANCE** | **= $20,000** |

**What if the family did not carry hazard insurance?**
**Option 1:  Stay**

| | |
|---|---|
| Compensation grant without penalty | = $20,000 |
| Minus 30% insurance penalty | = ($6,000) |
| **Compensation grant** | **= $14,000** |
| | |
| **TOTAL ASSISTANCE** | **= $14,000** |

**Option 2:  Relocate**

| | |
|---|---|
| Compensation grant without penalty | = $20,000 |
| Minus 30% insurance penalty | = ($6,000) |
| **Compensation grant** | **= $14,000** |
| | |
| **TOTAL ASSISTANCE** | **= $14,000** |

**Option 3:  Sell**

| | |
|---|---|
| Compensation grant without penalty | = $20,000 |
| Minus 30% insurance penalty | = ($6,000) |
| **Compensation grant** | **= $14,000** |
| | |
| **TOTAL ASSISTANCE** | **= $14,000** |

**What if the family is insured and their household income is at or below 80% Area Median Income (AMI)?**

**Option 1:  Stay**

| | |
|---|---|
| Uncompensated damage costs:  ($40,000-$20,000) | = $20,000 |
| Uncompensated loss: ($100,000-$20,000) | = $80,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $20,000** |
| | |
| Allowance to elevate to meet ABFE ($30,000 cap) | = Not eligible |
| | |
| Estimated Cost of Damage | = $40,000 |
| Minus Compensation Grant | = ($20,000) |
| Minus Other Compensation | = ($20,000) |
| **Affordable Compensation Loan (up to $50,000 cap)** | **= $0** |
| | |
| **TOTAL ASSISTANCE** | **= $20,000** |

**Option 2:  Relocate**

| | |
|---|---|
| Uncompensated damage costs ($40,000-$20,000) | = $20,000 |

49

Louisiana Proposed Action Plan

11/30/2006

| | |
|---|---|
| Uncompensated loss: ($100,000-$20,000) | = $80,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $20,000** |
| | |
| Allowance to elevate to meet ABFE ($30,000 cap) | = Not required (new home not in ABFE) |
| | |
| Estimated Cost to Replace Home* | = $110,000 |
| Minus Compensation Grant | = ($20,000) |
| Minus Other Compensation | = ($20,000) |
| **Affordable Compensation Loan (up to $50,000 cap)** | **= $50,000** |
| | |
| **TOTAL ASSISTANCE** | **= $70,000** |

*Note: The Affordable Compensation Loan calculation for homeowners choosing Option 2: Relocate is based on the Estimated Cost to Replace Home.

**Option 3:  Sell**

| | |
|---|---|
| Uncompensated damage costs: ($40,000-$20,000) | = $20,000 |
| 60% of Pre-Storm Value: ($100,000 X .60) | = $60,000 |
| Minus Other Compensation | = ($20,000) |
| Uncompensated loss: ($60,000-$20,000) | = $40,000 |
| **Compensation grant is lesser of above up to $150,000** | **= $20,000** |
| | |
| **TOTAL ASSISTANCE** | **= $20,000** |