UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br><br>NUMBER: 05-4182<br><br>SECTION: "K" (2) |

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073, 05-6314, 05-6324,
05-6327, 05-6359, 06-0020, 06-1885, 06-0225, 06-0886, 06-11208, 06-2278,
06-2287, 06-2346, 06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471, 06-5771, 06-5786,
06-5937, 06-7682, 07-0206, 07-0647, 07-0993, 07-1284, 07-1286, 07-1288,
07-1289, 07-1349

PERTAINS TO:  LEVEE

---

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE REPORT AND TESTIMONY
OF PLAINTIFFS' PUTATIVE EXPERT JOHN A. KILPATRICK**

**MAY IT PLEASE THE COURT:**

Over 300,000 citizens in the class area proposed by the Levee and MRGO plaintiffs now have filed Form 95 claims against the United States/Army Corps of Engineers for damages suffered in the catastrophic flooding which followed Hurricane Katrina.  Almost 100,000 of these claimants are named plaintiffs in an action now filed against the Corps.  *See Frederick Bradley, et al v. The United States of America*, USDC No. 07-5174.  Even accounting for both purely personal injury claims and for filings by multiple residents of the same household, these filings indicate that well over 100,000 properties within the proposed class areas are alleged to have sustained damage due to the flooding.  Indeed one of defendant's own experts, Michael Truax,

has reported his research of census data showing that at the time of Katrina there were more than 66,000 residential properties in the MRGO class area alone. *See* excerpt (p. 8) from 8/28/07 Report by Michael Truax [Attachment I].

There essentially are two methods for assessing or quantifying the flood damage involving these properties: individual appraisals, literally conducted on a property-by-property basis; or mass appraisal, a recognized method designed to valuate property or property loss <u>without</u> the necessity of conducting individualized property appraisals. Plaintiffs here propose to conduct, through a well-qualified expert, a mass appraisal of flood-damaged properties in the class areas which will determine the percentage diminution in post-Katrina property values attributable to the flood following Hurricane Katrina. The expert to be utilized in this regard is Dr. John Kilpatrick.

The superiority of a mass appraisal versus individualized appraisal method under Rule 23(b)(3) is virtually self-evident. Not even defendant's real estate experts are in a position to estimate the time and costs involved in individually appraising over 100,000 properties to assess flood damage associated with the storm. Based upon what time estimates have been given for average individual appraisals, however, it is clear that the task of performing such appraisals for these many properties will take many years and cost millions of dollars.

In moving to strike the testimony of Dr. Kilpatrick for class certification purposes, defendants suggest that no mass appraisal methodology can be considered reliable if applied herein. Their argument, however, proceeds on the basis of fundamental misstatements of both the record and governing legal principles.

Defendants first fail to acknowledge that the mass appraisal approach to the class- wide

determination of diminution of property value associated with an environmentally catastrophe, is a path previously tread in this Court (as well as in other federal district court jurisprudence).  In the case of *Turner v. Murphy Oil, USA, Inc.*, No. 05-4206 (E.D. La. Jan. 9, 2005), a case which involved the discharge of approximately one million gallons of oil into the St. Bernard Parish community following Hurricane Katrina, Dr. Kilpatrick was retained as a plaintiffs' expert, and was allowed to testify, regarding the mass appraisal valuation of property damage.  In so doing, he employed large-scale real estate valuation models, including mass appraisal models, to opine as to the post-spill diminution of property value resulting from the stigma of oil contamination.

Defendant Murphy Oil likewise filed a Motion in *Turner* to exclude Kilpatrick's expert testimony at the certification hearing, arguing that:  (1) his opinion failed to take into account any potential diminution in property value due to Hurricane Katrina, including the failure to consider whether the mass appraisal techniques utilized in his opinion were valid in a post-disaster market; (2) his opinion lacked foundation in that it assumed no geographical boundaries; and (3) his opinion lacked foundation because Dr. Kilpatrick had performed no research regarding comparable sales, pending sales, historical sales, or market trends in St. Bernard Parish.  In rejecting all of these arguments, Judge Eldon Fallon reasoned as follows:

> Dr. Kilpatrick's expertise is clear from his curriculum vitae.  He has extensive experience and education in real estate appraisal, in particular in appraisal of environmentally-impacted sites.  Dr. Kilpatrick bases his opinion upon mass appraisal techniques, which are governed by Rule 6 of the Uniform Standards of Professional Appraisal Practice (USPAP).  The USPAP are the governing rules of real estate appraisal in Louisiana.  In his report, Dr. Kipatrick cites a number of studies that support his view that mass appraisal techniques are more reliable than appraisals on a house-by-house basis.  He further cites to studies that support his view that mass appraisal is a useful form of valuation for environmentally-

>damaged properties, and that these properties suffer diminution in value on a group basis because of the negative perceptions of potential buyers.
>
>While Dr. Kilpatrick's expert report often speaks in generalities, <u>the Court finds that his failure to perform extensive research in St. Bernard Parish does not render his opinion on the issues related to class certification inadmissible. Dr. Kilpatrick is qualified and is using generally-accepted methodology. . . . Defendant's argument that Dr. Kilpatrick's testimony should be excluded really concerns what weight the Court should afford his opinion. This is an issue that can be addressed during cross-examination or summation</u>.

See 1/11/06 Order and Reasons on Motions in *Limine*, *Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.* at p. 9 [emphasis added]. The same reasoning applies with equal force in the matter at hand.

Moreover, other federal jurisprudence has allowed the class-wide diminution of property value due to an environmental catastrophe, to be presented and resolved by jury in a common issues trial on the merits. In the case of *Cook, et al v. Rockwell International Corporation, et al*, a plaintiff class sought damages from the operators of a nuclear weapons plant near Denver, Colorado, based upon alleged contamination due to plutonium released from the plant. *See* 2006 WL 3533049 (D. Colo. 2006). The case proceeded to trial on the merits, at which the jury was asked to determine on a percentage loss basis, the diminution of property value in defined areas which could be related to plutonium contamination. *See Cook* Verdict Form, dated 2/13/06 [Attachment II].

Such property value diminution is precisely the issue which plaintiffs propose to have the Court handle on a class-wide basis herein; and the expert testimony of Dr. Kilpatrick would be specifically addressed to the merits resolution of this common question of damages.

In any event, the issue at hand is expert witness admissibility for a class certification proceeding, not trial on the merits; and defendants' motion proceeds on the legally incorrect notion that the *Daubert* analysis in each of these two scenarios is identical. To the contrary, both in the Fifth Circuit and elsewhere, it logically has been the position of the Courts that a full-fledged borrowed analysis by the trial judge as "gatekeeper" is not needed in determining whether an expert is allowed to testify for the benefit of the trial judge in a class certification determination under Rule 23.

The *Daubert* inquiry was designed to shield the fact-finder from unreliable evidence at "trial." As Judge Eldon Fallon recently noted, case law supports the proposition that "a full review of expert testimony under the *Daubert* standard is not suitable to class certification proceedings." *See* 1/11/06 Order and Reasons, *Turner v. Murphy Oil USA, Inc.*, Civ. No. 05-4206, at pp. 3-4 [citing *In re Visa Check/Master Money Antitrust Litigation*, 280 F.3d 124, 135 (2d Cir. 2001); *Blades v. Monsanto Co.*, 400 F.3d 562, 569-70 (8th Cir. 2005); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 648 n.35 (S.D. Ala. 2005); Anderson v. Boeing Co. 222 F.R.D. 521, 526-27 (N.D. Okla. 2004); *In re Polypropylene Carpet Antitrust Litigation*, 996 F.Supp. 18, 26 (N.D. Ga. 1997)]. Rather, during class certification:

> a district court may not weigh conflicting expert evidence or engage in a statistical dueling of experts. The question for the district court at the class certification stage is whether the plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.

*Id*. at 4 [quoting *In re Visa Check/Master Money Antitrust Litigation*, 280 F.3d 124, 135 (2d Cir. 2001)]. Judge Fallon agreed that, "as long as the expert's opinion is relevant to one of the six

elements needed for class certification, that opinion should be admissible, provided it survives a limited *Daubert* review." *Id*. at 6.

Under this approach, a district judge will limit review of the proffered expert testimony's reliability and relevance, to the requirements of class certification under Rule 23.  The court specifically would decline to consider whether the proffered testimony would "pass muster" on issues such as causation at the time of trial on the merits, reserving a full *Daubert* examination for a later, more appropriate time.  See 1/11/06 Order and Reasons in *Turner, supra*, at p. 6.  Accordingly, Dr. Kilpatrick's opinion in *Murphy Oil* was reviewed "to ensure that it contained no flaws that would render it inadmissible as a matter of law," and the expert's methodology was examined to determine whether it showed "some hallmarks of reliability, whether through peer review or use of generally accepted standards of methods." *Id*.  In addition, the court noted that to survive scrutiny, the proffered expert must be qualified and the opinion "must have probative value for the issues of class certification. *Id*. (citing *In re Polypropylene Carpet Antitrust Litigation*, 996 F.Supp. 18, 26 (N.D. Ga. 1997).

Contrary to Defendant's assertion, the Fifth Circuit has not directly addressed whether a *Daubert* analysis should or should not be conducted by the district court in the context of class certification.  *See Turner v. Murphy, supra*, pp. 4-5.  As noted by Judge Fallon in *Turner, supra*, this circuit has yet to "weigh in" on the issue.  *See* 1/11/06 Order and Reasons in *Turner*, at p. 4.

Moreover, other than the *Turner* opinion in this District, the only other decision on point within this jurisdiction hails from the Northern District of Texas decision in *Bell v. Ascendant Solutions, Inc*., No. 301-CV-0166-N, 2004 WL1490009 at p. 2 (N.D. Tex. Jul. 1, 2004).  There,

the district court opined that a *Daubert* review was necessary in order for it to perform a meaningful determination of the class certification issues presented. *Id.* The Fifth Circuit affirmed the district court's denial of class certification, finding that it had acted properly in "applying 'rigorous, through preliminary, standards of proof" to the class certification question. *See Bell v. Ascendant Solutions, In*c. 422 F.3d 307, 313 (5th Cir. 2005) (quoting *Unger v. Amedisys, Inc.*, 401 F.3d 316, 322 (5th Cir. 2005)). However, the appellate court decision does not even reference *Daubert*, and likewise does not address what standard of *Daubert* review, if any, should apply to a class certification hearing. Judge Fallon in *Turner v. Murphy* noted this fact, and on this basis applied the same limited *Daubert* review which he had applied previously in *In re Propulsid Prod. Liab. Litig.*, MDL No. 1355, Minute Entry of August 23, 2001, Rec. Doc. No. 274. *See* 1/11/06 Order and Reasons in *Turner*, at p. 6. Notably, the Fifth Circuit affirmed Judge Fallon's certification decision without opinion or comment.

Defendants also misconstrue, or misstate, the law of the Second Circuit Court of Appeals. The cited case of *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ["In Re Ipo"] did not address what *Daubert* standard, if any, applies in the class certification context. In fact, neither Federal Rule of Evidence 702 nor *Daubert* is cited at any point in the opinion. Instead, the narrowly-framed issues before the appellate court were: (1) "whether a definitive ruling must be made that each Rule 23 requirement has been met or whether only some showing of a requirement suffices;" (2) "*whether all of the evidence at the class certification stage is to be assessed or whether a class plaintiff's evidence, if not fatally flawed, suffices*;" and (3) "whether the standards for determination of a Rule 23 requirements are lessened when a Rule

23 requirement overlaps with an aspect of the merits of the proposed class action." *Id*. at 26 (emphasis added).

The Second Circuit's ruling in *In Re Ipo* stands for propositions which are not particularly novel in our Circuit's jurisprudence: (1) a district judge may not certify a class without making a ruling that each Rule 23 requirement is met, the lesser standard of "some showing" for satisfying each requirement being insufficient; (2) all class certification evidence must be assessed as with any other threshold issue; and (3) a Rule 23 requirement might overlap with an issue on the merits, but this does not obviate the need to make a ruling as to whether the requirement is met, even though this overlap might limit the scope of the court's inquiry at the class certification stage. *See* 471 F.3d at 27.

*In Re Ipo* was a securities case, in which defendants argued that the plaintiffs' expert report did not establish loss causation. The lower district court concluded that weighing the competing expert reports was inappropriate at the class certification stage. See 471 F.3d at 31. In reversing the district court's class certification decision, the appellate court noted that the Supreme Court's prohibition against merits consideration at a class hearing as stated in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L.Ed.2d 732 (1974), "has sometimes been taken out of context and applied in cases where a merits inquiry either concerns a Rule 23 requirement or overlaps with such a requirement." *Id*. at 34. But without conducting any *Daubert* analysis whatsoever, the Second Circuit panel simply concluded that its prior standard that putative class plaintiffs make "some showing" with regard to the Rule 23 requirements was inadequate, and that a "definitive assessment" of Rule 23 factors should be required. *Id*. at 41.

"A district judge must receive enough evidence, by affidavits, documents or testimony, to be satisfied that each Rule 23 requirement has been met." *Id*.

Under the approach taken in the Second Circuit, this Court therefore would be expected to separately consider each Rule 23 requirement and to resolve any factual dispute concerning one of those requirements. This exercise would call for plaintiff to present something more than meeting a "fatally flawed" standard of proof, but it would <u>not</u> — as defendants suggest — necessitate the kind of *Daubert* analysis ordinarily reserved for trial on the merits. The holding of the Court in *In Re Ipo* was clear:

> [W]e. . .disavow the suggestion in *Visa Check* that an expert's testimony *may establish a component of a Rule 23 requirement simply by being not fatally flawed*. A district judge is to assess *all of the relevant evidence* admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about *any other threshold prerequisite for continuing a lawsuit*."

*Id*. at 42 [emphasis added].

The question in the case at hand is the same as that presented in the *Murphy Oil* case: should Dr. Kilpatrick be allowed to testify for class certification purposes, based upon a limited *Daubert* review appropriate to a proceeding addressed to case management, not merits. The expert opinions at issue are proffered for the purpose of assisting the court in determining whether the procedural requirements for class certification are met. The merits of neither liability nor damages is at issue at this preliminary, procedural stage. The articulation of a general mass appraisal methodology (as discussed *infra*) suffices for purposes of the present inquiry.

Defendant-movants represent to the Court that "[Dr.] Kilpatrick's report and testimony...promise — but do not deliver — data and a method by which to ascertain various

forms of property damage on a class-wide basis." *See* Defendant's Motion to Exclude, at p. 1. They further assert that Dr. Kilpatrick "provides no details about the model he promises to construct, and...fails to identify or analyze any piece of data that he will use to support that elusive model." *See* Memorandum in Support of Defendant Motion to Exclude, at p. 8.

These are mischaracterizations and/or misinterpretations of the expert testimony and report of Dr. John Kilpatrick, and amount to mere arguments by counsel which are at odds with the record, as reflected both in the expert's written report and in his deposition testimony. Dr. Kilpatrick in fact <u>has</u> described the mass appraisal model and techniques he proposes to use, and <u>has</u> referred to the type of data that which he intends to gather for model input. On the other hand, Dr. Kilpatrick has refused to accept the repeated invitations of defendants' counsel to specify empirical findings and predict what the data will reveal and what the model, once applied to the data, will produce in results. If the gist of defendant's concern or frustration about the expert witness is this lack of applied specificity, it is respectfully submitted that the present motion at best is premature (and should await discovery on the merits when Dr. Kilpatrick presents the results of his mass appraisal model), or at worst is an argument without foundation in law or in fact.

As noted, Dr. Kilpatrick served as class plaintiffs' expert in the *Murphy Oil* litigation, and, in that regard, he has disclosed that he already possesses data relevant to the class area in this litigation, and in particular to St. Bernard Parish, which is the largest subclass of the MRGO class area. A computer disk of reliance material produced by Dr. Kilpatrick at his deposition specifically was represented as including this data from the *Murphy Oil* case, and Dr. Kilpatrick even specified the precise property and housing data it contained. *See* Excerpt from 8/13/07

Deposition of Dr. Kilpatrick [Attachment III], at p. 16.  He made clear that this data would be used to construct a "robust, valid and statistically reliable mass appraisal model."  *See id.* at 36.

Dr. Kilpatrick further testified in deposition that at a merits trial he will have constructed a larger database to include all properties in the class area, enabling discernment of property damages on a sub-class (or even neighborhood) basis, and by specific type of home (one story, two story, etc.).  *See* Attachment III at 170.  He stated that he intends to analyze all post-Katrina transactional sales data for the class area.  *See* Excerpt of 8/14/07 Deposition of Dr. Kilpatrick [Attachment III], at pp. 366-67.  Moreover, his affidavit report declares that he has done "extensive examination" of the New Orleans market, has both gathered data through the *Murphy Oil* litigation and continues to do so, and has inspected neighborhoods affected by flooding.  *See* 7/30/2007 Affidavit Report of Dr. John Kilpatrick [Attachment IV] at ¶4.  In fact, defendants attach as Exhibit 4 to their own motion, an article co-authored by Dr. Kilpatrick and published in the "Journal of Real Estate Literature."  This article is based on this expert's specific research into the flood effects of Katrina on the real estate market of this community.

Dr. Kilpatrick also has identified the type of mass appraisal model or Automated Valuation Model (AVM) he intends to use in this case.  He has indicated that he already possessed a number of "stigma models" from his firm's work in the past, done for both litigation and non-litigation purposes, and that he does not "create" any such models purely for litigation purposes.  He will apply to the case at hand a statistical model which already have been peer-reviewed.  *See* Attachment III  at pp. 29 & 32.

Dr. Kilpatrick proposes a mass appraisal "loss in value model."  *See* Attachment III at pp. 33, 171-72.  It will focus on loss attributable to the post-Katrina flood, as opposed to other

factors, the amount of such loss being determined on a location basis and expressed as a percentage diminution of pre-Katrina property value. *See id.* at pp. 160 & 172. He recommends as a reference point the valuation of properties just before Katrina, and the value diminishment of same immediately following Katrina. *See id.* at 180-81.

Dr. Kilpatrick has testified that his proposed model will reveal two things: (1) pre-Katrina values, "sortable" in different ways (by house type, etc.); and (2) impaired values after Katrina due to flooding. *See* Attachment III at pp. 231-33. This diminution in value investigated by the model will capture both repair costs and "stigma" as merged components of damages. *See id.* at pp. 238-39. The model will account for repair cost as a component of loss because this will be captured by the stigma associated with the flood. The diminution percentage loss, in other words, will include both repair and stigma components without separating the two, based upon its comparison of pre-Katrina and post-Katrina property values. *See* Attachment III at pp. 460, 462 and 471. The model will measure and quantify the difference in market values in properties affected by the flooding. *See* Attachment III at pp. 486-87.

Dr. Kilpatrick intends to test the class area housing market for "equilibrium" in order to conduct this market analysis, and will address any continuing or post-Katrina disequilibrium in the market if and as this problem arises. *See id.* at pp. 496-99. He also proposes to test the accuracy of the mass appraisal model by sampling actual prices in real property transactions. *See id.* at pp. 502-03.

In his written report, Dr. Kilpatrick identified certain "common factors" which will be addressed as variables in the mass appraisal model, including the flood, the stigma of risk perception, the economic impact of the flood in the real estate market, post-Katrina higher

insurance premiums, etc.  *See* Attachment IV at ¶9.

Dr. Kilpatrick also has provided ample authority for mass appraisal/AVM, both in industry standards and in published and peer-reviewed literature.  *See* Attachment IV at ¶¶25, 33-48.

In articulating and justifying the mass appraisal model he proposes, Dr. Kilpatrick has posed the central question

> whether a large, statistically valid and reliable appraisal model is preferred over a set of individual happenstance appraisals done by 400 or 500 individual appraisers over a period of three years at a cost of tens of millions of dollars.

*See* Attachment III at p. 229.  He has stated that his mass appraisal model can produce results at 5% to 10% of that cost, and in less than two years, perhaps even less than a year.  *See* Attachment III at pp. 229, 230-33; Attachment III at p. 489.  There is, for example, little if any disagreement between the plaintiff and the defendant experts in this case concerning the variables to be considered in any market analysis of property damage due to flooding.  However, it is Dr. Kilpatrick's view that any such variables will be more efficiently measured and will be reportable in a more statistically valid way, through mass appraisal as opposed to individual appraisals.  *See* Attachment III at p. 488.  *See also* Attachment IV at ¶¶8, 10 & 16.  In fact, the peer-reviewed literature in the real estate field is "almost unanimous" to the effect that mass appraisal techniques are preferable in discerning value impact on a statistically large number of properties.  *See id.* at ¶24.

Dr. Kilpatrick also has been specific in testifying that his mass appraisal model will be a "hedonic model," *i.e.*, one designed to determine the value diminution impact of a negative

externality, in this case, the intrusion of rising water in each of the class and subclass areas. In this regard, he notes that virtually all real estate appraisals use some form of hedonic model, and then test this approach by referring to a "control area" unaffected by the negative externality. Reference to a control area (in this case, an area unaffected by flooding), serves to "calibrate" the model, pursuant to standards specified by the Uniform Standards of Professional Appraisal Practice [USPAP]. *See* Attachment III at pp. 207-209. Individual appraisals likewise search for "comparable" transactions, which Dr. Kilpatrick suggests is tantamount to reference to a "control" area or property. *See id.* at 213.[1]

The purpose of the hedonic model, as specified by Dr. Kilpatrick, is to isolate the post-Katrina flood experience in the class area as a stigma, or a negative externality. *See* Attachment III at pp. 474-75. Stigma, by definition, is recognized in the real estate industry as a common factor affecting the market value of properties; and it has been documented as such in peer-reviewed literature. *See* Attachment IV at ¶17.

Hedonic models are mass appraisal techniques which are well-established, as providing valid estimates of property value diminution due to flooding (in this case), by comparing values

---

[1]In this portion of Dr. Kilpatrick's deposition, there is an apt illustration of the issue raised by the instant motion. Not content with a discussion of methodology, defendants' counsel asked Dr. Kilpatrick to specify the control area (area unaffected by Katrina flooding) which he would propose to use in his model in this case. Dr. Kilpatrick declined to do so, simply saying that he would undertake to determine which area to use as part of his empirical investigation in the case. He did offer that the area could be, for example, the Northshore or Metairie. *See* Attachment III at pp. 207-209.
   This lack of specificity is more about detail than it is about methodology. If the defendants at some point wish to challenge the validity of the selection of a control area, in other words, they will have ample opportunity prior to a trial on the merits. For present purposes, the methodology of selecting a control area has been specified, and it is an accepted and well-established technique which will underlie the conclusions reached by the expert.

and prices in flooded and non-flooded areas. The model is designed to account for the price effects due to flooding, as opposed to other variables. *See* Attachment IV at ¶¶19 & 21. Dr. Kilpatrick has made it clear that in this case, through the mass appraisal technique of a hedonic model, flooding will be identified as the negative externality or factor to be assessed in terms of market value impact. *See id.* at ¶31.

What defendant-movants fail to disclose is that their own opposing expert, Michael Truax, previously has conducted his own analyses of property value discrimination due to "detrimental conditions," ranging from environmental contamination to proximity to a refinery. He has done so using a sales comparison methodology, whereby he looks at individual sales transactions and makes comparisons between affected and non-affected areas and properties. This is a painstaking and slow process, and virtually impossible to accomplish on an efficient and consistent basis with over 100,000 properties at issue. But in one of his expert reports in this case, Mr. Truax has acknowledged that there are other methodologies for isolating and assessing the property value impact of a detrimental condition, including a "market data analysis." *See* Excerpt from 9/10/07 Report of Michael Truax, et al [Attachment V] at p. 146. A market data analysis which studies the effects of detrimental conditions on property values, is a methodology clearly comparable to a hedonic/mass appraisal model to valuate the negative impact of stigma on property values. Any such methodology used by Mr. Truax would not be challengeable at this stage of the proceedings because he might not disclose the precise properties, market data, or comparables he would use in applying the methodology. The methodology of the model is subject to *Daubert* assessment without regard to potential application of the model in the merits phase.

The search for comparable market data is embedded in both the mass and individual appraisal approaches to evaluating the post-Katrina impact of the flood on property values. Both the mass appraisal/AVM and individualized appraisal techniques refer to comparable data and seek to discern differential value. Neither <u>methodology</u> is flawed. The question at hand is which methodology will be more efficient and reliable, as applied, to make the needed determination in the case of 100,000 or more properties. It is neither necessary nor appropriate in this regard to challenge a well-established and recognized methodology, on the ground that the specific empirical data serving as input for the model is not yet known, nor the results obtained until the model is applied to the data that has been gathered.

As Dr. Kilpatrick has stated in resisting the invitation of opposing counsel to be more specific empirically, or more predictive of analysis outcome, the data must be allowed to first be gathered, and then "speak for itself." *See* Attachment III at p. 463.

Finally, Dr. Kilpatrick has indicated that his model will rely upon survey research to investigate the impact of the flood event on property value, including the effect of the promised repair of flood control structures and levees in the future. *See* Attachment III at p. 478. One of the benefits of such survey research is to isolate a factor (here, flooding) in a statistically valid and comprehensive manner. *See id.* at 435. Dr. Kilpatrick has pointed out that <u>all</u> real estate appraisers use survey research to some extent, whenever comparable transactions are used as a reference in the appraisal. The survey technique to be used in this case will include any one of several recognized and well-established survey techniques, such as "contingent evaluation," "conjoint analysis," or "perceived diminution." *See* Attachment III at pp. 226-27.

**CONCLUSION**

Dr. John Kilpatrick, plaintiffs' expert to address the class-wide, flood-related diminution of property value in the proposed class areas, is both well-qualified and widely-published on the methodology of mass appraisal. He has been recognized as a mass appraisal expert, specifically for class certification purposes, by another judge of this Court, in the Katrina-related case of Murphy Oil, where the same alleged diminution of post-Katrina property value was the issue to be addressed.

Defendants are legally incorrect to suggest that anything more than a "*Daubert*-lite" analysis is required for class certification purposes, just as they are factually incorrect to suggest that Dr. Kilpatrick has failed to articulate his proposed methodology, and/or to identify the type of data he will utilize for model input. The specific, empirical details of Dr. Kilpatrick's mass appraisal model is an application, not a methodology, question, and one more properly addressed in the discovery and trial "merits phase" of this litigation.

Finally, the use of accepted and peer-reviewed mass appraisal techniques will be vastly superior to any conceivable property damage determination on a house-by-house, individual appraisal basis. Not even defendants' experts can estimate the time and cost of this approach, with at least 100,000 properties at issue. It would be difficult to imagine a more suitable use of the Rule 23 class action device, than mass appraisal methodology to investigate the post-Katrina diminution of property value attributable to rising water intrusion in the class and subclass areas.

**Respectfully Submitted,**

**APPROVED PLAINTIFFS LIAISON COUNSEL**

/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
The Law Offices of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

/s/Gerald E. Meunier
GERALD E. MEUNIER (La. Bar #9471)
LEVEE PSLC LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com

For

**LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

Gerald E. Meunier
Daniel E. Becnel, Jr.
Joseph M. Bruno
D. Blayne Honeycutt
Hugh P. Lambert
Darlene Jacobs
Walter Dumas

**CERTIFICATE OF SERVICE**

     I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 2nd day of October , 2007.

                                                /s/ Gerald E. Meunier
                                                Gerald E. Meunier