Page 14

1   A. Precisely whom, I'm not sure. I think
2 it went to the Lambert & Nelson law firm.
3   Q. And it was Fed Ex'd on Friday for
4 delivery on Saturday?
5   A. No, this would have been much earlier
6 than that. I would say a week or so ago.
7   Q. All right. Any other materials that
8 you've produced responsive to Request Number 1?
9   A. No. Request Number 1 referenced those
10 things considered or relied upon -- well, you
11 say with respect to the litigation, but I was
12 responsive to everything that I used in
13 preparation of my affidavit.
14   Q. Okay. With respect to Request
15 Number 2, the request is any and all data,
16 models, analyses, results, damage estimates
17 and/or reports produced by the deponent in the
18 Murphy Oil litigation.
19       Do you know what we mean by the Murphy
20 Oil litigation?
21   A. I do. And we again received this
22 exhibit on Thursday afternoon. Much of our
23 material, that is to say everything which is
24 preprinted in Murphy Oil, has been locked away
25 in storage and wasn't accessible to us by

Page 15

1 Friday. We contract with Iron Mountain to
2 store all of our hard data; nonetheless,
3 everything which was electronically on file,
4 which would have included databases and the
5 like, I asked the staff to print out everything
6 that they could print out in a day, and
7 everything that was in the form of electronic
8 database was burned to a CD, and that CD along
9 with that paperwork was brought with me today.
10   Q. All right. So that CD is in your box
11 of materials that you produced today?
12   A. That's correct.
13   Q. All right. Now, was all your
14 electronic data printed?
15   A. No. For example, we had a server disk
16 full of databases. I started examining those
17 on Friday, pulled each one of them, and this
18 was a database of properties, mass appraisal
19 type data from St. Bernard Parish which I noted
20 was over twenty-eight thousand records long; in
21 other words, I had mass appraisal data of
22 twenty-eight thousand properties in St. Bernard
23 Parish. Being that I didn't want to kill too
24 many trees in the process of being responsive,
25 I simply asked the staff to burn that and all

Page 16

1 other similar databases to a CD. And by the
2 way, I did check. Had I printed that database
3 out on 8-1/2 x 11 paper, it was going to take
4 twenty-three hundred sheets of paper.
5   Q. So when we look on this CD, what
6 categories of information are we going to find?
7   A. Well, you'll find addresses, parcel
8 numbers, location information such that all of
9 these properties could be located very easily
10 in a 3 dimensional spatial coordinate set.
11 You'll find property characteristics, I believe
12 you'll find lot size, house size, number of
13 bedrooms, number of bathrooms, age, condition,
14 those kinds of things, the sorts of things with
15 which one would construct a robust, valid and
16 statistically reliable mass appraisal model. I
17 can't recall all of the records, but as I
18 recall there were better than 25 to 30 records
19 for each -- excuse me, better than 25 or 30
20 fields for each record in the database.
21   Q. Twenty-five or thirty fields for each
22 particular property?
23   A. That's correct.
24   Q. All right. If that is the sum and
25 substance of what's on that CD?

Page 17

1   A. No. That was just one of the
2 databases that I opened in that particular
3 electronic folder. I noted that were there,
4 oh, I don't know, eight, ten, twelve databases
5 in that particular folder. I didn't bother to
6 open the rest of them. Once I saw what was in
7 that one representative database I recognized
8 that we were not going to merely kill trees but
9 in fact whole swaths of forests in order to
10 print all that off.
11   Q. So what electronic data relating to
12 Request Number 2, the Murphy Oil litigation
13 materials, do we not as yet have from you?
14   A. Well, I don't know what you don't
15 have; in other words, we've provided on a CD
16 everything which was on our computer server.
17 But insofar as anything which is on storage in
18 Iron Mountain, I haven't had the opportunity to
19 examine that.
20   Q. All right. When do you expect that
21 you'll receive that?
22   A. I will put in requests as soon as I
23 get back to my office.
24   Q. All right. And what are the sorts of
25 things or the sorts of information or materials

Page 26

1  no.
2      Q.  How do you define Greater New Orleans?
3      A.  Those parishes which surround New
4  Orleans and touch Orleans Parish.  You know,
5  St. Bernard, Jefferson, Plaquemines -- I can't
6  remember all of them offhand.
7      Q.  All right.  Item Number 8 calls for
8  production of the most recent six reports that
9  the deponent has prepared regarding evaluation
10 of real estate involved in class action
11 litigation.  Did you produce those?
12     A.  No.
13     Q.  Why not?
14     A.  Time.  Simply ran out of time.  We'll
15 produce those when I get back to the office.
16     Q.  All right.  To the best of your
17 knowledge, what do you believe those reports
18 would include?  What cases?
19     A.  Well, you'll have two different
20 things.  First, if they've been class action
21 cases, it would have been some affidavit and/or
22 testimony in support of class certification.
23     Q.  Right.  And I'm asking you to the best
24 of your ability can you identify those cases
25 that you believe would fall within the six most

Page 27

1  recent class action reports you've written?
2      A.  Okay.  Well, um -- trying to look back
3  on it, and again, I'm going off of memory here,
4  we have the Murphy Oil case, which class was
5  certified.  We have, um -- a case versus Dupont
6  in, um -- near Baton Rouge, Myrtle Grove area
7  down near the town of Plaquemine.  I can't
8  remember if that's been certified or not.  But
9  that's pending.  We have --
10         MR. BECNEL:
11             That's called the Myrtle Grove
12     case.
13         THE WITNESS:
14             Yeah.
15     A.  We have a case in Lake Charles,
16 Louisiana, which was certified a couple of
17 years ago.  And I think that settled.  I never
18 testified in the merits phase.
19 EXAMINATION BY MR. ZWAIN:
20     Q.  Was that the Guillory case?
21     A.  Guillory v. Union Pacific, yes.
22         We have a class action in Kansas,
23 which is the BP Amoco, we have a class action
24 in Michigan, Henry v. Dow which is in Saginaw,
25 Michigan.

Page 28

1      I'm thinking.  It's been a while.
2  I'll have to go back and look.  I can remember
3  those offhand.
4      Q.  Okay.  Who retained you -- what law
5  firm retained you in the Myrtle Grove case?
6      A.  Um -- Law Office of Patrick Pendley.
7  P-E-N-D-L-E-Y.
8      Q.  What about the Lake Charles Guillory
9  case?
10     A.  That would have been Lundy & Davis.
11 L-U-N-D-Y and Davis.
12     Q.  Have you done any work -- well, I take
13 it some of lawyers in this room retained you in
14 the Murphy Oil case.
15     A.  Yes.
16     Q.  Other than the Murphy Oil case, have
17 you done any work for any of the lawyers in
18 this room before?
19     A.  Not that I can recall.
20     Q.  Have you done any work for any of the
21 lawyers on the plaintiffs' side of these cases
22 before, other than Murphy Oil?
23     A.  Not that I can recall.
24         MR. BECNEL:
25             Counsel, he hasn't done any work

Page 29

1  for us in the Coffeeville, Kansas oil
2  tank that just floated.  We retained
3  him, but the work hasn't begun yet.
4  It only happened a few weeks ago.
5         MR. ZWAIN:
6             Thank you.
7  EXAMINATION BY MR. ZWAIN:
8      Q.  Request Number 9 asks for production
9  of any and all models that the deponent has
10 prepared to capture the stigma effect of any
11 real estate.
12     A.  Well, as you may or may not be aware,
13 our firm and I personally, as well as other
14 members of our firm, have written and published
15 extensively on that.  To the extent it's been
16 included in some of the other material, we've
17 delivered it here.  We've also included a lot
18 of stigma models which are not in the form of
19 peer review published material in reports that
20 we've prepared in various matters both
21 litigation and non litigation.  We do a lot of
22 stuff other than litigation that involves
23 stigma.
24         That having been said, we feel that
25 our published work has captured the essence of

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 30

1  our views on stigma, and I believe that a
2  cross-section of that has been delivered here.
3  But as part of our further responsiveness in
4  this case, we'll try to wipe the plate clean
5  with respect to anything that's been published
6  by our firm. It's a fairly large volume of
7  material, and we'll have that delivered with
8  respect to -- or along with the other material.
9      Q. Well, when you say that you're going
10 to produced published material, does that
11 include models or reports that you've written
12 regarding the stigma effect in litigation?
13     A. Well, we don't separate stigma in
14 litigation versus non litigation. I mean, we
15 have written, published, lectured, extensively
16 on stigma in academic and practitioner
17 materials, in non litigation consulting cases,
18 um -- Brownfield Redevelopment, for example.
19 We have opined with respect to stigma in a
20 variety of circumstances.
21     As I was perhaps not clear in my
22 previous answer, we believe that our views on
23 stigma are well captured in the published
24 material, both things published in the peer
25 reviewed academic literature as well as things

Page 31

1  published in the more practitioner literature.
2  And we'll certainly endeavor to make sure all
3  of those stigma models are included in the
4  material that we deliver to you later on.
5      Q. Are there stigma models that you have
6  written that have not been published?
7      A. I'll have to go back and look. I
8  certainly can't recall one, but it's worth
9  taking a look at.
10     Q. Are there stigma models that you've
11 written that have been written for purposes of
12 litigation?
13     A. I don't think anything we've done has
14 been done for the purpose of litigation.
15     Q. Have there been stigma models that
16 you've written that have been used in
17 litigation?
18     A. Well, yes. Now that's true.
19     Q. And not published elsewhere.
20     A. I can't recall if there is anything
21 that's been used in litigation that hasn't been
22 published elsewhere. I will say this: We do,
23 I think, a very robust job of ensuring that any
24 stigma model proffered by us in a litigation
25 matter is exceptionally well supported in the

Page 32

1  literature. In other words, we don't pave any
2  new ground in a litigation report, we basically
3  make sure that we're simply applying models
4  which have already been peer reviewed. Now,
5  many if not most of those come from authorship
6  of members of my firm. There may be stigma
7  models which we have applied in litigation
8  which come from the pen of people who are not
9  employed by me. I'm willing to leave that door
10 open. So we'll take a look at all of that and
11 make sure that a representative cross-section
12 of stigma models which have been published
13 somewhere are included in what we deliver you,
14 to the extent they haven't already been
15 delivered to you by what we've sent at this
16 point.
17     Q. Well, how many models do you think you
18 have written, whether published or not? You or
19 your firm.?
20     MR. MEUNIER:
21         To capture the stigma effect?
22     MR. ZWAIN:
23         Yes, sir.
24     A. Over a dozen.
25 EXAMINATION BY MR. ZWAIN:

Page 33

1      Q. Well, what's the burden in producing
2  all of them for us?
3      A. No burden at all. I will be glad to.
4      Q. All right. Request Number 10 calls
5  for production of any and all documents
6  pertaining to the model that the deponent
7  proposes that the Court adopt in the instant
8  litigation.
9      A. Well, I think I was fully responsive
10 to that in the CD that was sent following my
11 affidavit, with the exception of the Bruce and
12 Sundell article, which I mentioned had to be
13 faxed the next day.
14     Q. Are you proposing a specific model for
15 the Court to adopt in this litigation?
16     A. Yes.
17     Q. What model is that?
18     A. Well, mass appraisal in general. I'm
19 not suggesting any particular hedonic formula.
20 That will have to be empirically determined as
21 part of the what you attorneys might call the
22 merits phase of this. But with respect to
23 certification of class, it's clear and indeed I
24 think overwhelmingly compelling that some sort
25 of large scale mass appraisal model is not only

9 (Pages 30 to 33)

JOHN KILPATRICK (LEVEE VOL I)                                                                 8/13/2007

Page 158

1    A.  Number two, there are other properties
2    which are affected in a secondary way.  Now,
3    that's really not within the scope of this
4    case, but in a market, um -- which has been hit
5    by widespread, um -- disruption such as the New
6    Orleans market has been hit, we have extensive,
7    um -- secondary and tertiary effects.  You have
8    a disruption of the economy, you have a
9    disruption of culture, which of course in a
10   market like this is a direct, um -- influencer
11   of real estate values.  So there's almost an
12   iterative process whereby properties were
13   flooded but then the market in which those
14   properties would normally be sold in an
15   unimpaired condition has also been disrupted as
16   a result of the same forces.  So there's both
17   direct physical flooding as well as an
18   iterative, indirect, secondary and tertiary
19   effect resulting from things like the loss of,
20   um -- of public services, the loss of culture,
21   the loss of jobs, the loss of economic
22   multipliers, those kinds of things.
23   Q.  All right.  And it's these economic
24   losses, economic disruption that you are trying
25   to calculate in terms of its effect on

Page 159

1    individual pieces of real estate; is that
2    right?
3    A.  Well, there are two things with that
4    sentence.  First, we're not trying to get -- I
5    mean, we certainly will do that as part of the
6    empirical investigation, and second, we would
7    do that -- and the proper way to do that is on
8    a large scale, statistically relevant empirical
9    basis, and then apply those determinations to a
10   database, if you will, of individual
11   properties.
12   Q.  Okay.  Let's turn to Paragraph 5 of
13   your report.  It says that, in the first
14   sentence, I have been asked to opine on behalf
15   of the plaintiffs in the above-referenced case
16   on the question of whether or not from a real
17   estate analysis and appraisal perspective the
18   matters at hand in this case can best be
19   analyzed as a class action.
20         His that a correct statement of what
21   your understanding is regarding your role in
22   this case?
23   A.  Yes.  Thus far.
24   Q.  Okay.  And then turning to
25   Paragraph 6, it seems like you answered the

Page 160

1    question posed in Paragraph 5 when you say, I
2    believe that individuals who owned property
3    within each of these subclasses sustained a
4    damage to the value of their property.  I
5    further believe that the amount of the damage
6    can be determined on a subclass-by-subclass
7    basis, expressed as a percentage of loss of
8    pre-Katrina property value.
9          Is that a fair statement of the
10   essence of your opinions?
11   A.  Yes.
12   Q.  Now, you say in Paragraph 6 that you
13   have an understanding that the plaintiffs have
14   filed two separate class actions.  Correct?
15   A.  Correct.
16   Q.  One would be the MRGO class action,
17   one would be the levee class action.  True?
18   A.  True.
19   Q.  Now, you say the first, I guess, that
20   meaning MRGO, proposes two subclasses?
21   A.  Um -- I'm not sure if they're divided
22   up exactly that way.  I know there are a total
23   of seven subclasses.  I can't remember exactly
24   how many are in MRGO and how many are in the
25   other one.

Page 161

1    Q.  Well, let me ask you this:  In either
2    case, whether it be MRGO or levee, do you have
3    an understanding as to the geographic
4    boundaries or the general contours of any
5    subclass?
6    A.  No, not at present, other than the --
7    my broad understanding of the geography of this
8    marketplace and my broad understanding of the
9    extent of flooding resulting from the MRGO
10   canal and, um -- the levee breach after
11   Katrina.  In other words, I am not intimately
12   familiar with the modeling work that is being
13   done and will continue to be done, I assume, by
14   various experts engaged in this case.  However,
15   I have a general understanding of the extent of
16   the flooding and recognize the fact that once
17   my merits work gets underway we will be able to
18   incorporate the actual data from the models
19   into the work I -- we're doing.
20   Q.  Do you know whether your general
21   understanding of the flooding is consistent or
22   inconsistent with the opinions rendered by the
23   flood and modeling expert retained by the
24   plaintiffs?
25   A.  Um -- I'm, um -- somewhat assuming

JOHN KILPATRICK (LEVEE VOL I)                                              8/13/2007

Page 170

1   a statistically valid, extraordinarily
2   efficient and rigorously peer reviewed
3   methodology in which one can accomplish this
4   thing without spending millions of dollars in
5   unneeded costs and years of time. So if you
6   want to know all of the damage to properties in
7   a particular subclass, if you want to know all
8   of the damage to properties in a particular
9   neighborhood which were flooded as opposed to
10  the properties in that neighborhood that
11  weren't flooded, if you want to know Sam and
12  Susan Jones' house and how much it was damaged
13  by the flood, we'll be able to pull that out of
14  the database. In fact, using a valid, sortable
15  database, I can give you a total of how many --
16  how much dollar damage was done to all the
17  houses with fireplaces. I can give you a
18  damage figure for all the houses that are one
19  story as opposed to all of the houses that are
20  two story. So that using this kind of model
21  that I'm proposing here provides a set of
22  exceptionally powerful tools not only for the
23  plaintiff attorneys but as well as for the
24  defense attorneys and certainly provides a
25  level of efficiency for the Court that just

Page 171

1   doesn't -- isn't available any other way.
2       Q. You say that the amount of damages,
3   the amount of damage can be determined on a
4   subclass-by-subclass basis expressed as a
5   percentage of loss of pre-Katrina property
6   value. Right?
7       A. Correct.
8       Q. Am I understanding that correctly to
9   mean that you will be in a position to
10  calculate each individual's percentage of loss
11  on a subclass-by-subclass basis?
12      A. Or on a type of property by type of
13  property basis, or on -- if you want to know
14  the percentage loss for John and Susan Jones'
15  house, we can do it that way, too.
16      Q. Okay. Also, if I'm understanding you
17  correctly, what you will not be able to
18  determine, and what you're expressing no
19  opinions about, is the amount of damage
20  expressed in the necessary repair costs in
21  order to repair damage caused by flooding.
22      A. At this juncture, um -- it's not my
23  anticipation to do that. At this juncture, my
24  anticipation is to develop a comprehensive loss
25  in value model, that is to say, what is the

Page 172

1   diminution in value which would encompass both
2   the anticipated repair costs as well as any
3   stigma damage which might be associated with
4   other economic losses in the marketplace. So,
5   as is well captured in the literature,
6   immediately after Katrina a loss in market
7   value of an individual property, or a whole
8   collection of properties, would be the sum of
9   that anticipated repair cost plus the stigma
10  damages dealt to the property.
11      Q. Well, are you going to be able to
12  delineate what repair costs might be
13  attributable to wind and rain as opposed to
14  flood?
15      A. Well, with can certainly delineate
16  what loss in value might be attributable to
17  flood as opposed to other factors. And indeed,
18  we have got some very powerful tools, such as
19  survey research, which have proven to be
20  consistently useful and acceptable not only for
21  determining the total amount of market value
22  lost to a given property but also to be able to
23  delineate, on a statistically valid and
24  reliable basis, how much loss is attributable
25  to one component as opposed to how much loss is

Page 173

1   attributable to another component.
2           In the Murphy Oil case, that's
3   precisely what we were in the process of doing
4   when the case finally settled.
5       Q. Are you going to be able to attribute
6   or allocate value lost to a particular source
7   of damage, in other words, waters coming from a
8   particular place as opposed to another place?
9       A. I'm not sure I understand that
10  question.
11      Q. Are you going to be able to attribute,
12  on any particular property, that amount of
13  damage attributable to water coming from the
14  17th Street Canal as opposed to the London
15  Avenue Canal, for instance?
16      A. Oh, I see. Well, that's an intriguing
17  research question. As I sit here today, it
18  seems like something that would certainly be
19  doable. We've been thinking about flooding in
20  the aggregate, that is to say if you have a
21  particular house and it's been flood damaged,
22  what's it's loss in market value. But if the
23  modelers tell us that there is an apportionment
24  issue, that this damage ought to be apportioned
25  between 60 percent that water and 40 percent

Page 178

1  A. I didn't say that.
2  Q. Well, I'm asking you.
3  A. We may be asked to do that, but we
4  haven't done it yet.
5  Q. So in answer to my question are
6  these -- do you think these class
7  representatives adequately represent and
8  protect the interests of the class, your answer
9  is you don't know?
10  A. I haven't made any sort of empirical
11  determination about it. I know that sounds
12  like a fancy way of saying I don't know, but
13  it's a little different.
14  Q. That's what it sounds like.
15  A. It's a little bit different.
16  MR. BECNEL:
17     Counsel, remember, you're not
18  entitled to merits discovery right
19  now. This is certification only.
20  MR. ZWAIN:
21     That's why I'm asking about the
22  class representatives.
23  MR. BECNEL:
24     No. Merits. Three fourths of
25  what you're been asking for the last

Page 179

1  hour is merits.
2  EXAMINATION BY MR. ZWAIN:
3  Q. Do you know whether all of the
4  properties located within any class boundary --
5  subclass boundary flooded?
6  A. Perhaps I didn't understand that
7  question. Could you repeat it, please?
8  Q. Do you know whether all of the
9  properties located in each subclass boundary,
10  either from MRGO or levee, flooded?
11  A. Not yet. That's something I'll
12  empirically determine as part of the merits
13  investigation.
14  Q. Do you know the percentages of those
15  houses or those properties that flooded as
16  opposed to those that did not?
17  A. Again, that's something that I'll
18  determine as part of the merits investigation.
19  Q. Do you know the percentage of
20  properties that flooded due to rainwater as
21  opposed to those that flooded due to canal
22  breaches?
23  A. Same answer.
24  Q. Do you know the percentage of those
25  that flooded due to rainwater or canal breaches

Page 180

1  or overtopping?
2  A. Same story. Same answer.
3  Q. To the extent that there are
4  properties within any class boundaries that did
5  not flood, would you expect those properties'
6  values to be diminished or increased?
7  A. That would be a matter for empirical
8  investigation.
9  Q. You don't know.
10  A. Well, I'm going to stick with that
11  would be a matter for our empirical
12  investigation.
13  Q. That investigation won't take place
14  until after the class certification hearing is
15  complete?
16  A. Properly so, that's correct.
17  Q. The model that you propose to suggest
18  to the Court as a basis in part to support
19  class certification, what will your valuation
20  date be?
21  A. Well, there are two answers to that
22  question. From a practical matter, we're going
23  to have a conversation with our clients to make
24  that determination. Um -- my recommendation,
25  however, will be that the unimpaired values of

Page 181

1  properties be valued immediately before
2  Katrina, and the impaired values of the
3  properties will be effective immediately after
4  Katrina. But there are occasions when the
5  Courts have asked us to use other dates more
6  arbitrarily set.
7  Q. So for pre-Katrina values, you're
8  going to use values effective August 28th 2005?
9  A. I believe that's the date, yes.
10  Q. For post-Katrina value, you're going
11  to use values August 30th, 2005?
12  A. Right. Assuming the, um -- our
13  clients and the Court, um -- concur with that
14  recommendation.
15  Q. And why are you going to select as the
16  valuation date for a post-Katrina value
17  August 30th, 2005?
18  A. Well, you want to pick a date
19  immediately after Katrina.
20  Q. Why?
21  A. In other words -- well, if you have an
22  event which occurred, and we want to, um --
23  pick up an impact of that event, it's a little
24  bit, um -- silly, in fact -- I mean, we could
25  pick any arbitrary date and say what's the

Page 206

1   A.   Well, New Orleans gets hit by storms
2   on occasion.
3   Q.   When was the last one?
4   A.   Offhand, I can't tell you.
5   Q.   Okay.  How many in the 20th century?
6   A.   Oh, I can't tell you that offhand.
7   Q.   How often has New Orleans flooded?
8   A.   That I can't tell you either.
9   Q.   What areas of town have flooded prior
10  to Katrina?
11  A.   Well, that's part of what I need to
12  study with respect to the, um -- empirical
13  component of this case.  But our focus of study
14  is going to be specific to the Katrina
15  flooding.  And in fact, it's going to be
16  empirically determinable just how much
17  diminution in value has occurred with respect
18  to Katrina as opposed to all of that flooding
19  that may have happened in the past and the
20  discounted notion of normal flooding occurring
21  in the future.
22  Q.   What's normal flooding?
23  A.   Well, you have anticipatable events.
24  I just mentioned the earthquake study out of
25  California.  Markets are pretty good at

Page 207

1   anticipating the fact that they're going to
2   have some problems.  New Orleans has,
3   throughout its history, had storms that have
4   come through, and so property values here
5   discounted normal events.  Katrina and the
6   follow-up flooding is not a normal event and
7   not discounted in real estate prices;
8   therefore, our study will be able to isolate
9   specifically what impact this Katrina-related
10  flooding has had on property values as opposed
11  to any of the other flooding that's happened in
12  the past several centuries.
13  Q.   You say in Paragraph 20, in your last
14  sentence, these effects can also be measured by
15  the same methods in areas not affected by
16  flooding and, thus, unaffected areas can be
17  used as controls for model testing.
18       What do you mean by that?
19  A.   Well, if we want to test a hedonic
20  model -- and all real estate appraisals,
21  whether you're talking about individual
22  appraisals or mass appraisals, are, at the end
23  of the day, some form of hedonic model.  If you
24  want to test that hedonic model, you can take a
25  control areas that's unaffected by the flooding

Page 208

1   and apply that hedonic model to it and get an
2   output which let's you fine tune the model.
3   The term of art in real estate appraisal is
4   called calibrating the model.  That language is
5   contained in the Uniform Standards of
6   Professional Appraisal Practice Standards Rule
7   6.  So we can use a control area to calibrate
8   whatever model is utilized empirically here.
9   Q.   Well, what control area or control --
10  what area would you want to use as your control
11  for model testing for, let's say, Subclass 1 in
12  the levee case?
13  A.   Well, we haven't determined that.
14  That's a part of the empirical investigation to
15  go in and make a determination as to which
16  control areas.  And I would almost certainly
17  say plural areas would provide us with a good
18  model testings or model calibration areas for
19  the various neighborhoods in these subclasses.
20  Q.   You haven't even started to think
21  about that?
22  A.   Yeah, I've started thinking about it.
23  Q.   Well, have you identified any
24  potential areas of interest?
25  A.   No.  Not yet.  When we get to the

Page 209

1   empirics, that's something that we'll want to
2   do some testing.  But those will be empirically
3   determined class areas.  We won't try to ex
4   ante make a determination, we'll want to do
5   some appropriate empirics and make sure that
6   we've, um -- developed an appropriate set of
7   control areas.
8   Q.   So I guess would I be correct in
9   assuming that you haven't considered any areas
10  for model testing with respect to any of the
11  subclasses in either the levee case or the MRGO
12  case?
13  A.   Well, we haven't begun the empirics to
14  determine those.  That doesn't mean we haven't
15  started considering it.
16  Q.   Well, what areas have you considered?
17  A.   Well, we would consider any area that
18  hasn't flooded.  we consider any area --
19  Q.   Give me an example.
20  A.   Well, we might even go to the other
21  side of the lake --
22  Q.   Where?
23  A.   -- and work over there.  I mean, I've
24  thought about going out to Metairie.  I've
25  thought about, um -- going, um -- further out.

Page 210

1  But we've just thought about these areas that
2  we're going to want to empirically test. And
3  unquestionably that's an appropriate and
4  important part of the empirical testing, but I
5  think we would be getting the cart way before
6  the horse if we try to arbitrarily establish or
7  even begin to identify some potential control
8  areas today without doing the appropriate level
9  of testing.
10      Q.  But what would you be testing for?
11      A.  Well, we would be testing in a
12  pre-Katrina control area for pricing models
13  that resemble what we would have seen prior to
14  Hurricane Katrina.
15      Q.  Seen where?
16      A.  In the affected area versus the
17  unaffected area.
18      Q.  The affected area being entire
19  Subclass 1, for instance, in the levee case?
20      A.  Well, neighborhoods within Subclass 1.
21      Q.  And you don't know how many
22  neighborhoods there are.
23      A.  Well, I think we determined earlier
24  today that that's an empirical determination.
25      Q.  So you'd have to get a test group for

Page 211

1  each and every neighborhood identified in each
2  and every subclass in the levee case and in the
3  MRGO case?
4      A.  Well, I'm certain that within our
5  empirical investigation we will delineate, A,
6  neighborhoods, B, neighborhood characteristics,
7  and C, pricing factors within those
8  neighborhoods affected by those neighborhood
9  characteristics.
10      Q.  Well, let me just -- let's say there's
11  a hundred neighborhoods in Subclasses 1 through
12  5 in New Orleans. Does that mean you'd have to
13  get a hundred different control groups to
14  correspond with each of those neighborhoods?
15      A.  No.
16      Q.  What does it mean?
17      A.  It means that to the extent those
18  hundred neighborhoods have differences, we will
19  went to identify a sufficient number of control
20  areas in order to be able to accommodate those
21  hundred neighborhoods. Now you might have a
22  hundred neighborhoods but a lot of them are
23  alike. You might have twenty kinds of
24  neighborhood characteristics, that is to say
25  twenty sets of characteristics which define a

Page 212

1  neighborhood. So in fact, many neighborhoods
2  might be alike, they just are different
3  neighborhoods. And so with that, we might at
4  most need twenty control areas. Although
5  oftentimes we find that even though two
6  neighborhoods have different pricing
7  characteristics we can capture those in one
8  control area. So, in fact, the number of
9  control areas might be much smaller than the
10  number of neighborhoods. You'll never need --
11  or I don't want to say never, but you hardly
12  ever need a number of control areas greater
13  than the number of neighborhoods. But all in
14  all --
15      Q.  You might need as many control groups
16  as there are neighborhoods, and you might need
17  less, but you're still going to need multiple
18  control groups.
19      A.  Well, sure, but it's an empirically
20  manageable task. In other words, within the
21  context of a statistically robust pricing
22  model, it's a pretty easy thing to manage.
23  It's certainly a heck of a lot easier to manage
24  this than it would be to manage a hundred and
25  fifty thousand individual appraisals.

Page 213

1           By the way, each of those hundred and
2  fifty thousand individual appraisals would have
3  to draw data from an unaffected area, and so
4  would have to go find identically the same
5  number of control areas that we'll have to find
6  in this mass appraisal model. So I want to
7  make sure I'm making clear that the use of
8  control areas is not something that's
9  necessitated only by the model we're talking
10  about. Even if we were to do the hundred and
11  fifty thousand individual appraisals at a cost
12  of sixty million dollars that your line of
13  questioning suggests, we would still need to go
14  find control areas from which to draw
15  comparable data.
16      Q.  What control area did the appraiser
17  who appraised your townhouse use?
18      A.  I think he used unflooded houses, or
19  excuse me, post-repair or unflooded houses in
20  the Lakeview neighborhood.
21      Q.  Was he right to do that?
22      A.  I'm not going to suggest he was wrong.
23  I mean, he managed to do an appraisal which
24  satisfied the bank and the bank reviewers.
25      Q.  Did it satisfy you?

JOHN KILPATRICK (LEVEE VOL I)                                           8/13/2007

Page 226

1    A.  Well, contingent valuation is just one
2    of a whole host of survey research tools and
3    techniques.  It's a fairly large bag full of
4    tools.  Which one we pull out and use is
5    something that we'll develop when we develop
6    the scope of work of the merits phase.
7        Q.  All right.  So are you or are you not
8    going to recommend the use of contingent
9    valuation on either the MRGO model you want to
10   build or the levee model you want to build?
11       A.  Well, counselor, I may not have been
12   clear about that.
13       Q.  And it may be me.  I'm just dense.
14       A.  No, that's okay.  Let me try to be
15   clearer.
16           Every appraiser, even in an
17   individual, single property appraisal, uses
18   some kind of survey research.  When the
19   appraiser appraised the townhouse that I
20   bought, he used some kind of survey research in
21   order to ascertain what comparable data was
22   selling for and what market participants were
23   viewing in the marketplace.  So every time
24   every appraiser does every appraisal, there is
25   a little bit of survey work into it.  There are

Page 227

1    several different what I'll call systematic and
2    statistically valid methods which come into
3    play when we're looking at a large number of
4    properties; in other words, when we've got a
5    scope of work sufficient to be able to gather a
6    lot of data, we can start utilizing some
7    methodology that has some statistical validity
8    to it.  Contingent valuation is one of those
9    which, as I say, is highly regarded outside of
10   the appraisal profession by people who value
11   real estate.  It's also regarded within the
12   appraisal profession by quite a few appraisers,
13   although there are some appraisers who don't
14   like it.  They tend to be atheists on that
15   subject.
16           There's also conjoint analysis.
17   There's perceived diminution.  These three
18   together are some of the statistically valid
19   survey research techniques.  I think certainly
20   in a case here where you had a market that just
21   froze after the flooding and properties didn't
22   transact, and the market is still in what we
23   might gently call disarray, a statistically
24   valid survey research technique like this would
25   be extraordinarily valuable.  That doesn't mean

Page 228

1    we can't do it without it, that just means it's
2    a tool that we would want to bring into play
3    and would highly recommend that.
4            And so whether we use conjoint or
5    perceived diminution or contingent valuation or
6    something else will be a matter that we'll
7    decide when we put together the scope of work
8    of our merits phase.
9        Q.  Did you use any of those survey
10   research approach titles or terminologies in
11   your report?
12       A.  No.
13       Q.  Why not?
14       A.  Well, whether you choose to use those
15   or some other tools and techniques, the kernel
16   of this problem is explaining to the Court
17   whether a large, statistically valid and
18   reliable appraisal model is preferred over a
19   set of individual happenstance appraisals done
20   by four or five hundred individual appraisers
21   over a period of three years at a cost of tens
22   of millions of dollars.  The individual
23   methodologies from which the appraiser might
24   choose to employ for the mass appraisal model
25   are irrespective of the superiority of the mass

Page 229

1    appraisal model.
2            In other words, um -- it's like
3    getting sick and deciding whether to go to the
4    doctor or not go to the doctor.  If you're sick
5    and you're sick enough that, you know, you're
6    in decline, you need to go to the physician and
7    get yourself taken care of.  I mean, that's the
8    superior course of action.  You know, trying to
9    treat yourself with some aspirin and chicken
10   soup is probably not going to solve your
11   problem.  So that's what we've got here.  You
12   know, we've got a big problem, it needs to be
13   solved in a statistically valid, efficient way.
14   We don't know exactly what diagnosis the
15   physician is going to give us, and we don't
16   know exactly what treatment the physician might
17   apply, but we know that going to the physician
18   is a much, much superior course of action to
19   just staying home and getting worse and worse.
20   Those are our choices here.
21       Q.  So you may or may not use some form of
22   survey research in connection with constructing
23   your model either in the MRGO case or the levee
24   case, you haven't made that determination yet.
25       A.  Well, we're almost certainly going to

58 (Pages 226 to 229)

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

### Page 230

1  use at least minimal survey research. As I
2  say, every appraiser in every appraisal uses at
3  least some simplistic survey research. Exactly
4  how much survey research or what kind of survey
5  research we use is a matter for determination
6  at a later date.
7     Q. What will that depend on?
8     A. Well, we haven't even begun talking
9  about the scope of work with our clients, and I
10 think we want to have a more detailed
11 conversation with them about how much scope is
12 needed to get where we've got to go here.
13    Q. Well, do you have any ideas or
14 recommendations that you're thinking of making?
15    A. Well, I can think of several ways to
16 pursue this thing. I mean, you could pursue
17 these damages based on a survey research model,
18 you could pursue it in a lot of non appraisal
19 models. I mean, I've done when are called
20 input output models which construct valuation
21 component based on pure economic factors, loss
22 of jobs, loss of market rents, loss of the
23 economy, what's been the aggregate impact on
24 the economy of the area? But if we're strictly
25 talking about a property value diminution case,

### Page 231

1  then as I said, I'm certainly going to make
2  that recommendation.
3     Q. Regardless of what technique you use,
4  whether it be an hedonic modeling or regression
5  analysis or contingent valuation or -- let's
6  see, the automated, um -- something or other.
7  Um -- what's that model going to tell us at the
8  end of the day?
9     A. It's going to tell us two things:
10 Number one, on a property-by-property basis,
11 within the confines of a statistically valid
12 database, it's going to tell us what these
13 properties were worth prior to this flooding.
14 And again, that's going to be on a
15 property-by-property basis which will be
16 sortable either by subclass areas or in any one
17 of a number of different ways. If we want to
18 know how much all the houses with two and a
19 half baths in this affected area were worth,
20 we'll be able to tell you that. If you want to
21 know how much all the two-story houses were
22 worth, we'll be able to tell you that. So on a
23 property-by-property basis, we'll be able to
24 tell you in a statistically reliable and valid
25 manner how much all these properties were

### Page 232

1  worth. That's point number one.
2     Point number two: We will be able to
3  tell you what the impaired, that is to say,
4  post-flooding value of these properties was
5  immediately after Katrina, and that's of course
6  after extracting for exogenous effects. For
7  example, you talking about wind damage. We
8  can, if called upon by our clients, use
9  appropriate kind of tools and techniques to
10 actually separate out the market, um --
11 valuation component of one damage versus
12 another damage.
13    And then finally, if in fact their
14 modelers are able to tell us the boundaries of
15 water, they say, well, over in this area it was
16 all this water, over in that area it was all
17 that, and over here we have a computer model
18 that tells us it's 60/40 or 75/25 this water
19 versus that water, we can actually total up
20 what these damages are based on whose water
21 came on the property.
22    And so a robust, valid, large scale,
23 statistically reliable computer model that
24 we'll be able to develop using tried and true
25 valuation techniques within the scope of

### Page 233

1  appraisal standards will give you all of this
2  information at the end of the day.
3     Q. So let me see if I understand. At the
4  end of the day, I'm going to know, for a
5  particular piece of property, Mr. Smith 's
6  piece of property in Subclass 1 of the levee
7  case, what the value of his home, let's say,
8  was on the day before Katrina struck, and what
9  the diminished value of his home would have
10 been on the day after Katrina left; is that
11 right?
12    A. That's right. And not only would we
13 be able to do that, but we'll be able to do it
14 probably two years quicker and 90 or 95 percent
15 cheaper then the alternative method being
16 proffered.
17    Q. Will I be able to know what the amount
18 of repair costs we sustained as a result of
19 Katrina?
20    A. That will simply be a component of the
21 diminution of value. The market value will be
22 the standard that we will be seeking here. And
23 so the market value is the difference in the
24 value before Katrina versus the value after
25 Katrina, and that diminution in value will

JOHN KILPATRICK (LEVEE VOL I)                                          8/13/2007

Page 238

1  measured on the date of trial as opposed to
2  August 30th, 2005?
3      A.  Well, it becomes certainly a lot
4  simpler to measure it as of the date after
5  Katrina, because as I mentioned, we're not
6  getting hung up on an accounting measure here,
7  that is to say I'm not tying to figure out what
8  Mr. Smith paid for his 2x4 or the plywood or
9  what his neighbor across the street paid for
10 his 2x4 and plywood, and maybe Mr. Smith had to
11 hire a contractor but the neighbor across the
12 street put in some sweat equity because he
13 couldn't find a contractor, so Smith had to pay
14 thirty thousand dollars to get something done
15 where the neighbor across the street only paid
16 fifteen thousand dollars but the neighbor
17 across the street had to work on his own every
18 weekend for a year.  You get a whole lot of
19 these kind of nuances in the case.
20     Market value is a much more clean and
21 efficient way of doing it.  It's certainly much
22 more statistically valid if done in a mass
23 appraisal setting.  And also, and this is very
24 important to stress, this diminution in market
25 value will capture both the anticipated fair

Page 239

1  market value of the repair costs plus any
2  additional stigma that might be suffered by
3  these property owners.
4      Q.  Okay.  But all I want -- I don't know
5  that that answers my question.
6      What would be expected the difference
7  in appraised value to be if the damage were
8  measured on the date of the trial, presumably
9  sometime in 2008, 2009, I don't know, 2010, as
10 opposed to day after Katrina?
11     A.  I don't have any expectations going
12 into this.  I mean, I'm trying to approach this
13 entirely as objectively as I can.  And so
14 whether that property would have gone up down
15 or sideways in value is not something that I
16 have any priors about.
17     Q.  It's not something that you have any
18 priors about -- prior conceptions?
19     A.  Opinions, conceptions, biases.  I
20 mean, I don't come into this with any sort of
21 bias about this.  I think that by focusing --
22 and it's my opinion, and obviously if the Court
23 wants to institute a separate date, that's
24 fine, but I still think, A, you get at the
25 heart of the matter by looking at real estate

Page 240

1  market value and, B, you get at the heart of
2  real estate market value by looking at the date
3  of the actual event occurred.
4      And by the way, this market value that
5  I keep going at, this is the standard for all
6  kinds of takings in the state of Louisiana, any
7  other kind of property value diminution case in
8  the state of Louisiana.  If this was a road
9  widening and I was going to expand one of these
10 streets from two lanes to four so I had to take
11 a portion of everybody's front yard and I was
12 going to knock down some of their houses, the
13 Court wouldn't care that you spent fifty
14 thousand for your house and your neighbor spent
15 a hundred thousand for his, the Court is going
16 to require that appraisers measure the
17 diminution in market value associated with that
18 taking.  This is identically the same kind of
19 problem.  The flooding precipitated a taking on
20 these properties -- and I'm not trying to get
21 bogged down in takings law or what have you,
22 I'm just saying that as an appraiser, if
23 requested to analyze this sort of problem, my
24 standard for analyzing it would be the
25 diminution in market value.  It's no different

Page 241

1  here.
2      Q.  Well, takings are measured by how
3  much -- a taking measures how much a
4  property's market value was worth at the time
5  of the taking, correct?
6      A.  Well, it depends.  I mean, for
7  example, we might have an eminent domain action
8  in which the property is going to be taken as
9  of a specific date.  Now, if the property owner
10 decides to protest and wants to, um -- go to
11 trial on this thing, the date of value is still
12 going to be, as you put it, the date of the
13 taking, the date on which he's going to lose
14 ownership or control of the property, not the
15 date of trial.  And so in many jurisdictions,
16 the taker is allowed to go ahead and acquire
17 the property as of a given date, and then we'll
18 sort out the valuation issues later on when the
19 judge gets some room on his schedule.
20     And so, in fact, that is a perfect
21 analogy to the flooding situation where the
22 flood precipitated a take, we'll go ahead and
23 measure the take as of the date the take
24 occurred, not as of the date we finally got
25 around the adjudicating the value of the take.

Page 365

1  individual buyer takes into consideration when
2  they buy any piece of residential property,
3  right?
4      A.  Of course.  And that's something that
5  we're going to be able to measure, just like
6  any other appraiser measures those things, by
7  looking at market prices, by doing surveys of
8  market participants, by examining other factors
9  in the market, and concluding an opinion of
10 value.  Either way you cut it, counselor, there
11 are two ways of doing this thing.  You can
12 either do a property-by-property appraisal, and
13 if you do a property-by-property appraisal you
14 incorporate all that stuff.  Or you do mass
15 appraisal, in which case you incorporate all
16 that stuff.  Both alternatives, either
17 property-by-property or a mass appraisal,
18 incorporate identically the same information.
19 The only different between the two is that mass
20 appraisal is so very much more efficient and so
21 very much more statistically reliable and so
22 very much more characterizable in terms of
23 means and standard deviations, as opposed to
24 the extraordinarily expensive mechanism of
25 doing individual house-by-house appraisals.

Page 366

1      Q.  I'm confused.  Maybe you can help me
2  out a little bit.  I thought you had told us
3  that you were going to recommend that you do
4  the fair market value post-Katrina on
5  August 30th, 2005, the day after the hurricane
6  was here.
7      A.  The day after the flood.  I want to
8  make sure that I differentiate between the
9  hurricane and the flood.  Our -- obviously,
10 we've linked the two of them and we've used the
11 word Katrina in a rather sloppy fashion, but
12 the focus of our attention is going to be pre
13 and post the flood.
14     Q.  All right.  And then you've told us
15 the market was in disequilibrium at that point,
16 so you couldn't use sales as a measure because
17 it was frozen up and there wasn't anything
18 going on as of that time, post-Katrina.  Right?
19     A.  Well, immediately after Katrina, you
20 know, for a short period of time, there were no
21 sales.  Now, we do know that there are sales
22 which have manifested since Katrina in the
23 flooded areas.  To the extent we're able to
24 develop an opinion of value using those, we'll
25 use them.  We're certainly going to gather all

Page 367

1  of the data about sales post-Katrina that we
2  possibly can and analyze all of that data to
3  find out what truth lies in there.
4      Q.  And if somebody's pre-Katrina value of
5  their property and structure was $100,000, and
6  let's say three months ago they sold it for
7  $200,000, and they had $25,000 in restoration
8  costs, do they get money for diminished value
9  at the end of the day?
10     A.  Well, if we try to do this on a
11 property-by-property basis, you would get,
12 potentially, those aberrations, because indeed
13 you're going to find that in any large number
14 of cases you're going to have people who, um --
15 whose transactions stands out.
16         And let me give you an example that's
17 outside of the realm of property value, but
18 something you might understand.  Let's talk
19 about cigarette smoking for minute.  I think
20 it's kind of universally recognized that
21 cigarette smoking is dangerous for people.  I
22 used the smoke a long time ago, I finally got
23 convinced that it was danger and quit.  That
24 having been said, some people smoke cigarettes
25 and don't die.  You smoke cigarettes, you

Page 368

1  appear to be alive.
2      Q.  Thank you.
3      A.  You're quite welcome.  Take it as a
4  compliment.
5          Now, having said that, does that
6  diminish the likelihood that cigarettes are
7  going to kill people?  No, it doesn't at all.
8          So the fact is, if you go into a very
9  large study group, you're going to find people
10 who have individual experiences which are
11 called outliers.  And we have outliers in real
12 estate.  You have a property that ought to be
13 worth a hundred thousand dollars, that somebody
14 picks up for zero.  You have a property that
15 ought to be worth a hundred thousand dollars
16 that somebody comes along and pays two hundred
17 for.  Now, these outliers would tend to skew
18 the reality of the situation if we were trying
19 to do property-by-property appraisals.  But by
20 taking in the account all of this data at the
21 same time, all hundred and fifty thousand
22 properties, and creating a statistically valid
23 and reliable data set with respect to all of
24 this, we're able to account for the outliers,
25 explain what they are, and then report the

Page 433

1    A. Well, again, I think I testified
2  already that I have not done a, um -- thorough
3  investigation of that. I only know what I read
4  about in the newspaper. And I recognize the
5  fact that adjudicating Road Home from an
6  appraisal perspective turned out to be
7  horrendously expensive and probably could have
8  been done considerably cheaper if they had
9  opted to use a mass appraisal model.
10    Q. And you don't know whether the Road
11  Home program considered using the mass
12  appraisal approach and decided against it or
13  what their reasons were for doing it the way
14  that they're doing it, right?
15    A. Well, you know, I don't want to blow
16  my own horn here, but I think we testified
17  yesterday that my firm is one of the few in the
18  country that's really set up to do one of these
19  in this kind of circumstance, and I know they
20  didn't call me.
21    Q. Are you familiar with Morris Knutsen?
22    A. Name's familiar, but I don't know how
23  I know that name.
24    Q. Or Washington Group International? Do
25  you know what their role would be, if any, in

Page 434

1  this litigation?
2    A. No.
3    Q. You haven't done any work for them, I
4  take it.
5    A. No.
6    Q. To the extent that some sort of
7  diminished value of cultural heritage or
8  anything like that is involved in this case,
9  you're not the person that's going to opine on
10  what those factors are or what goes into that,
11  you would only quantify something somebody else
12  did?
13    A. Well, the quantification is manifested
14  in market values. The decline in cultural
15  heritage, public services, loss of schools,
16  churches, utilities, services, all those kind
17  of things, are things which contribute to the
18  diminution in market value. So indeed it gets
19  the cart before the horse to try to talk about
20  cultural services and then use that to opine
21  with respect to property value diminution. We
22  will observe property value diminution but then
23  use those kind of factors to explain the things
24  that we're seeing.
25    Q. And I think you've testified there

Page 435

1  could be a lot of different factors that would
2  go into that diminished value.
3    A. And by isolating the time period
4  immediately surrounding the flood, we'll be
5  able to control for changes in those another
6  factors exogenous to the problem.
7    Q. And you haven't developed a protocol
8  for how you would allocate these various
9  factors, whether it's loss of cultural heritage
10  or fear -- perceived fear of future flooding,
11  or anything like that, to determine how you
12  would allocate within whatever the diminished
13  value, if any, is, is that right?
14    A. At the present, we haven't, although
15  it doesn't seem to be a terribly complicated
16  problem. Certainly this is one of the benefits
17  of using survey research, it becomes almost
18  trivially simple to, in a statistically valid
19  and comprehensive manner, determine from among
20  various reasons how much one would allocate to
21  A versus B versus C.
22    (Brief recess.)
23  EXAMINATION BY MR. MARPLE:
24    Q. Mr. Kilpatrick, have you ever seen
25  what we've marked as Exhibit 17 before?

Page 436

1    (Kilpatrick Exhibit 17 was marked for
2  identification and is attached hereto.)
3    A. Yeah. I did.
4  EXAMINATION BY MR. MARPLE:
5    Q. And Mr. Wilson, here, the author, has
6  criticisms of mass appraisal method, right?
7    A. That's correct.
8  MR. BECNEL:
9    Counsel, once again this is a
10  copyrighted document.
11  MR. MARPLE:
12    Will you advise him as to fair
13  use?
14  MR. BECNEL:
15    I don't think you can do that.
16  MR. MARPLE:
17    You know, he produced a bunch of
18  this stuff.
19  MR. BECNEL:
20    Yeah, but he isn't a lawyer.
21  MR. MARPLE:
22    Oh, it a different rule for
23  lawyers?
24  MR. BECNEL:
25    Yeah.

Page 457

1  A. Well, I'm not sure I understand that
2  question, then.
3  Q. Okay. Do you have an understanding
4  that the model you are to recommend or advocate
5  for use by the Court is to include an appraisal
6  of individual pieces of real estate owned by
7  individual class members?
8  A. Well, I understand that, um -- but
9  there's a little bit of a subtle nuance here.
10 I'm not recommending a model to the Court, per
11 se, I'm trying to explain to the court what the
12 appropriate model is.
13 Q. I understand.
14 A. It may seem like a subtle difference
15 to you, it's a real difference to me, but that
16 model will of course include an appraisal
17 opinion of value on each and every residence in
18 the affected area -- each and every property in
19 the affected area. I think we're sticking to
20 residences here, so we'll -- I'll limit that
21 answer to residences.
22     MR. MEUNIER:
23         Perhaps just to clarify, real
24     property diminution, as an element of
25     recovery, is the subject of the Rule

Page 458

1     23 certification request by the
2     plaintiffs. So I don't want your
3     question to be misunderstood by the
4     witness.
5  EXAMINATION BY MR. ZWAIN:
6  Q. Well, if I'm understanding what your
7  basic bottom line opinion is going to reflect,
8  and I'm looking at, if you have your report in
9  front of you, Exhibit 3, Paragraph 6, last
10 sentence, I believe that the amount of the
11 damage can be determined on a
12 subclass-by-subclass basis expressed as a
13 percentage loss of pre-Katrina property value.
14 Did I read that correctly?
15 A. You did.
16 Q. So if I understand what you're going
17 to do is you are going to seek to appraise each
18 individual class member 's property value loss
19 comparing the post-Katrina value to the
20 pre-Katrina value and state a percentage of
21 what that loss is.
22 A. Well, it will come out as a dollar
23 figure and as a percentage. And so I might
24 have Sam and Susan Jones' house at a particular
25 address and I might -- this model, the mass

Page 459

1  appraisal model, which has proven so useful in
2  so many other situations, would determine and
3  allow me the opine that Mr. and Mrs. Jones'
4  house would have been worth a hundred thousand
5  dollars before Katrina, that it's been
6  diminished in value 50 percent, and so
7  immediately after Katrina it has a diminished
8  value of fifty thousand dollars.
9  Q. Okay. And that percentage or that
10 dollar figure that will you state for the Jones
11 residence will contain within it the amount of
12 diminution attributable to stigma? True?
13 A. As one of its components, yes.
14 Q. And the amount of diminution
15 attributable to necessary repair costs?
16 A. Um -- as one of the components, yes.
17 Q. And the amount of diminution
18 attributable to economic or social disruption.
19 A. Well, that's part and parcel of
20 stigma. In other words, the social disruption
21 stigmatizes homes within affected neighborhoods
22 because it diminishes services, culture, the
23 neighborhood, all of those external assets
24 which make up the value of homes.
25 Q. Okay. So when you use economic or

Page 460

1  social disruption in your report, that's
2  synonymous with stigma.
3  A. It's part of stigma. It's not
4  synonymous with stigma but it's contributory to
5  stigma.
6  Q. All right.
7  A. And by the way, I want to be very
8  clear. We're not going to go exogenously
9  measure stigma and then imply it in the model.
10 The model itself will measure diminution in
11 value, part of which is anticipated repair cost
12 and part of which is the other diminution in
13 value which we're labeling stigma. Stigma is
14 just a label that we put on that diminution in
15 value which is over and above the anticipated
16 repair cost.
17 Q. Just so I'm clear, what components
18 comprise stigma in your mind?
19 A. Well, I don't want to try to offer an
20 all inclusive list here.
21 Q. Do the best you can.
22 A. Well, I would suggest to you that
23 stigma will include but certain not be limited
24 to, um -- risk of a recurrence of, um -- the,
25 um -- post-Katrina flood, it will include a