Page 461

1  loss of community services such as schools and
2  shopping and other kinds of services, it will
3  capture all of those changes in the value of
4  the neighborhood, um -- from pre Katrina to
5  post-Katrina which have been stimulated by the
6  flood, and it will include any other factors
7  which have influenced the values of these
8  properties as a result of the flooding.
9       Q.  All right.  So those components
10 comprise stigma.  And we've talked about repair
11 costs or anticipated repairs cost as making up
12 the percentage figure which will represent
13 diminution of value of a particular class
14 members 's home.
15      Is that all that goes into that
16 percentage?
17      A.  Well, no, I don't want to make that an
18 all-inclusive list.
19      Q.  Then --
20      A.  That's just what hits me on the top of
21 my head right now.
22      Q.  Well, I'm trying to be as
23 all-inclusive as we can possible be right now
24 because I want to come to an understanding as
25 to what that percentage means.

Page 462

1       A.  Well, counsel, I've been focused very
2  narrowly on defining the model for the Court,
3  which is of course that it's a pre-Katrina
4  value model versus post-Katrina value model.
5  And I've attempted to explain to you that
6  within that model there's going to be
7  anticipated costs of repair of these
8  properties, plus an additional component, an
9  additional diminution in value which we're
10 labeling stigma.  Now, the question you're
11 positing to me is what things make up, why --
12 other than repair costs, why else would
13 properties be diminished in value?  Um -- which
14 is a matter for great study.  And indeed, as
15 part of the, um -- merits phase of this, that's
16 arts of what we're going to study.  Now, we
17 just spent a lot of time today talking about
18 contingent valuation.  One of the reasons I'm
19 going to survey people is to ask them the
20 question, why is this true, why is this
21 diminution in value occurring; in other words,
22 what is it that's causing these properties to
23 be diminished in value?  In short, counselor,
24 as I sit here today I can think of some
25 reasons, but I really want to ask the good

Page 463

1  people of New Orleans what those reasons are.
2  And that will be part of the merits phase of my
3  investigation.
4       Q.  So as we sit here today, other than
5  those categories that might comprise stigma
6  that you specifically mentioned, you cannot
7  give us or don't feel comfortable giving us at
8  this time an estimate of the number of
9  variables or varieties of influences that might
10 make up stigma damage.
11      A.  Well, just to the contrary,
12 counselor -- and first, it's not that I don't
13 feel comfortable about something.  As you'd
14 probably guess, I'm pretty comfortable
15 answering as many questions as I can as long as
16 they don't run into that gray area of ethical
17 problems.  The issue, however, is that in our
18 empirical investigation of the whys and
19 wherefores of the New Orleans market, we want
20 to let the market speak for itself.  And in
21 fact, part of our merits investigation will be
22 an exploration of why those things are true.
23 So I'm not going to try and presuppose any
24 motivations on the part of market participants
25 here in New Orleans.  Indeed, I think that a

Page 464

1  rigorous analysis of this case would require
2  that we go out and let the citizens of New
3  Orleans and prospective buyers in New Orleans
4  tell us what those reasons are.  And what's
5  what I'm going to investigate.  I'm not going o
6  put a cap on the number of reasons, I'm not
7  going to put a cap on what those reasons are,
8  and I'm not going to try to suggest any reasons
9  ex ante to this study.
10      Q.  Now, despite the likelihood -- and we
11 used the Smith property as our mythical -- the
12 Smith property as our example.  The likelihood
13 that Mr. and Mrs. Smith 's repair invoices,
14 estimates, what they paid for repair costs,
15 will not be reviewed by you or your team,
16 you're going to make an assessment as to what
17 their anticipated repair costs are anyway, is
18 that right?
19      A.  No, we're going to make an appraisal
20 of what their diminution in market value is.
21 And appraisal principles would tell us that
22 people won't pay more for a house than is
23 dictated by its anticipated cost of repair and
24 its stigma and these other factors --
25      Q.  Okay.  I guess what I'm trying to find

Page 469

1  contractors, and it may take him ninety or a
2  hundred thousand dollars get his house cleaned
3  up. On the other hand, you got a property
4  owner next door who has identically the same
5  sort of townhouse, identically the same sort of
6  damage, but he's retired and has a little time
7  on his hands, and money is a little tighter for
8  him so he's going to do his own hammer and
9  nails, and lay his own tile and carpet and put
10 in his own appliances. He manages to do
11 identically the same repairs for thirty or
12 forty thousand dollars. Now, counselor, if I
13 go out to measure repair costs as a standard of
14 damage, the appraiser who bought the townhouse
15 from Seattle is going to get a hundred thousand
16 dollars, and the poor retired guy who was tight
17 on a nickel is only going to get thirty or
18 forty thousand dollars. The true measure of
19 damage to both of these people is the
20 diminution in value of their property. And how
21 they choose to use that money, whether one of
22 them wants to pay a contractor or the other one
23 wants to earn some sweat equity, is up to the
24 two of them.
25    Q.  So you're going to state a figure as

Page 470

1  far as anticipated repair costs that is
2  essentially an average of the amount that each
3  home sustained.
4      A.  No. We're not going to --
5      MR. MEUNIER:
6          Objection to form. That's not
7      his testimony at all.
8      A.  I'm not going to do anything like
9  that.
10 EXAMINATION BY MR. ZWAIN:
11     Q.  What are you going to do?
12     A.  Well, we're going to measure
13 diminution in value of each and every property
14 in the marketplace using a mass appraisal
15 model.
16     Q.  And how are you going to account for
17 the specific repair costs in each individual
18 home?
19     MR. MEUNIER:
20         Objection, asked and answered.
21 EXAMINATION BY MR. ZWAIN:
22     Q.  That's what I'm trying to figure out.
23     A.  Don't need to do that.
24     MR. MEUNIER:
25         Asked and answered multiple

Page 471

1  times.
2      Go ahead.
3      A.  Don't need to do that.
4  EXAMINATION BY MR. ZWAIN:
5      Q.  Why not?
6      A.  Because the diminution in value is
7  going to include that as well as any stigma
8  loss.
9      Q.  How?
10     A.  Because it does. It's a tautology in
11 the real estate appraisal model.
12     Q.  Explain it to me.
13     A.  And it's a very simple formula,
14 counsel. Diminution in value of the property
15 equals the anticipated repair cost plus the
16 stigma damage, period.
17     Q.  And how do you plug into that equation
18 anticipated repair cost?
19     A.  You don't. You just -- you measure
20 the diminution in value and know that it
21 includes the anticipated repair cost plus
22 stigma. You don't break it out between the
23 two.
24     Q.  Okay. But if someone is paid the
25 amount that you estimate in terms of diminution

Page 472

1  of value, that amount should be sufficient to
2  repay -- or pay that person's repair costs to
3  repair his or her home?
4      A.  Anticipated repair costs plus their
5  loss of value attributable to stigma, that's
6  correct.
7      Q.  Okay. Now, do you have any
8  familiarity with any individual neighborhood to
9  determine how similar or dissimilar neighboring
10 homes may be in terms of their construction,
11 their elevations, how many stories they have
12 and so on?
13     A.  Well, I'm more familiar with some
14 neighborhoods like Lakeview than I am with
15 other neighborhoods. Um -- of course we did an
16 intensive study in the St. Bernard Parish area.
17 That having been said, um -- even if I did not
18 have that sort of familiarity, even if this was
19 my very first trip to New Orleans today, I'd
20 still be proposing identically the same model,
21 and I would be telling you that those
22 neighborhood characteristics would be developed
23 as part of the merits phase of our analysis.
24     Q.  How long does stigma take to go away?
25     A.  That's a matter for some debate. In

Page 473

1  Dr. Mundy's article "Stigma and Value" in the
2  1992 Appraisal Journal, he presupposed that
3  stigma would be ameliorated rather quickly
4  after remediation of the problem. However,
5  subsequent empirical studies have determined
6  that stigma is in fact much longer lived than
7  we thought it previously might be. For
8  example, I just cited Dr. Winson-Giedemon's
9  work, she's a consultant to our firm nowadays,
10 and her doctoral dissertation studied the
11 persistence of stigma in residential properties
12 in affected neighborhoods in Chicago. She
13 found that stigma to be quite persistent and
14 quite long lived. So indeed while there's some
15 theory that stigma ought to ameliorate rather
16 quickly, there's no, um -- empirical evidence
17 about that.
18         Peter Caldwell, former chair professor
19 of real estate at University of Illinois
20 Urbana-Champaign published an article in one of
21 the top journals, I can't remember which one,
22 in which he studies the persistence of stigma
23 in trichlorethylene contaminated neighborhoods
24 in Scottsdale, Arizona, and finds that the
25 stigma effects are relatively long lived.

Page 474

1     Q. Well, is it fair to say that the
2  further away from the event you get, assuming
3  some remediation of it, that stigma diminishes
4  over time?
5     A. Well, that's the theory. But, you
6  know, there is an irony -- a paradox to that
7  theory. For that theory to be true, for stigma
8  to ameliorate, that means that previously
9  stigmatized properties have to increase in
10 value at a more rapid rate than non previously
11 stigmatized properties. So, in fact, if
12 stigmatized properties which have been
13 remediated continue to increase in value at the
14 very same rate as non stigmatized properties,
15 um -- in that same market, then stigma will, in
16 fact, be permanent. So the paradox of the
17 amelioration of stigma is that you've got to
18 find a situation in which those properties have
19 a more rapid improvement in value than other
20 properties in the same market.
21    Q. Were there stigmas that affected the
22 areas defined by the levee class and the MRGO
23 class prior to the occurrence of Katrina?
24    A. Well, we're isolating stigma with
25 respect to the flooding. In other words, there

Page 475

1  may have been other factors, other negative
2  externalities, which is how they're referred to
3  in the appraisal jargon, which impacted the
4  values of these properties. But by taking a
5  value immediately before and immediately after
6  the flooding, we're controlling for all of
7  those.
8     Q. Okay. What were the stigmas that
9  preexisted Katrina?
10    A. Well, we don't know, but it doesn't
11 really matter because we're going to be looking
12 at property values immediately before stigma --
13 before the flooding, excuse me. So whatever
14 those negative externalities might have been,
15 they're going to be controlled for by using
16 this sort of event study.
17    Q. In Paragraph 9 of your report, in the
18 subparagraph labeled economic effect -- you see
19 that?
20    A. Yes.
21    Q. -- you talk about the regional economy
22 and real estate markets. When you refer to or
23 use the term regional economy, what are you
24 meaning?
25    A. Well, I'm defining it in a broader

Page 476

1  way. Um -- you of course have a New Orleans
2  Metropolitan area which is, um -- the sort of
3  statistical metropolitan area defined by urban
4  economists and others, and it's a handy way for
5  the government to collect local economic data.
6  Um -- I'm tending to use a nonspecific
7  definition here to encompass all of those
8  things that one might consider about the New
9  Orleans market.
10    Q. Does it include or refer to employment
11 within the region?
12    A. Right.
13    Q. Does it refer to population within the
14 region?
15    A. Yes.
16    Q. Does it refer to the number of real
17 estate transactions within the region?
18    A. Yes.
19    Q. Does it refer to regions that fall
20 outside the class definitions as proposed by
21 the plaintiffs in either the levee case or the
22 MRGO case?
23    A. Yes.
24    Q. To what extent?
25    A. Well, the whole of the New Orleans

Page 477

1  region has certainly suffered to varying
2  degrees from the flooding event, but those have
3  been differential in different parts of the
4  market. For example, yesterday evening my wife
5  and I were looking at home prices on
6  St. Charles Street. If you go down in the 4000
7  and 5000 blocks of St. Charles Street, you get
8  some very nice homes with some very nice home
9  prices. That neighborhood doesn't seem to be
10 too negatively affected. On the other hand,
11 you go out where we just bought a townhouse in
12 Lakeview, and those property prices seem to be
13 quiet severely affected. Now, all of these
14 properties share in the same New Orleans
15 market, they're all part of the City of New
16 Orleans, they all have the same kind of public
17 services and such and so forth, but these
18 impacts will be felt differentially in
19 neighborhoods that were flooded versus
20 neighborhoods that weren't flooded. So we have
21 to take all of that into account in a more
22 holistic sense.
23    Q. Okay. Referring to the economic
24 effects that you mentioned in Paragraph 9, are
25 you assuming that those effects are permanent

Page 478

1  or transitory?
2     A. Not assuming anything about them.
3     Q. Well, in your opinion, are they
4  permanent or transitory?
5     A. At this juncture, I don't have an
6  opinion about that, but I certainly will be
7  prepared to develop some opinions about that in
8  the merits phase of the model that we're
9  proposing the Court to adopt.
10    Q. What effect, if any, do or will fully
11 repaired levees by an estimated date of 2010
12 have with regard to stigma damage?
13    A. I think that's a matter that we need
14 to investigate, and I suspect that some sort
15 of, um -- survey research as I've been
16 rigorously asked about here today will help us
17 reveal the truth of that matter.
18    Q. All right. So if I'm understanding
19 you correctly, issues such as whether or not
20 certain economic effects are permanent or
21 transitory or whether an effect by repaired
22 levees, what effect that might have, your model
23 incorporates a certain amount of speculation
24 into the future as to what conditions will
25 affect the properties that you're being asked

Page 479

1  to model a value for, is that correct?
2     A. Well, I'm hesitant --
3        MR. MEUNIER:
4           Objection to the form of the
5        question.
6     A. I'm hesitant to accept the word
7  speculative in there. All property values are
8  anticipatory in nature. The market value of
9  any property, whether it's residential or
10 income producing to farmland, what have you, is
11 the present value of the future benefits which
12 one anticipates receiving. In the case of
13 income producing property, it's the present
14 value of future rents discounted at an
15 appropriate discount rate. In the case of
16 residential property, it's the imputed value of
17 all of the subjective enjoyment and utility one
18 will receive into the future, discounted by a
19 rational market to the present. So as long as
20 rational expectations hold and markets are
21 reasonably efficient, then people will
22 understand what is known or knowable or at
23 least believed or believable about the future
24 and will discount that to a certain extent to
25 formulate opinions of value.

Page 480

1        So indeed all value is a present value
2  of anticipated future benefits, and some
3  changes in the status of the levees some years
4  down the road will be one of those anticipated
5  future benefits.
6  EXAMINATION BY MR. ZWAIN:
7     Q. Will it be necessary in the
8  construction of your model to make predictions
9  or speculations about the fluctuation of
10 insurance rates over the next decade or so?
11    A. No, none whatsoever. Because as I
12 said, if we live in a world with rational
13 expectations and some reasonable degree of
14 efficiency, those anticipations will already be
15 discounted in market values.
16    Q. Well, how will market values be
17 affected if insurance rates decline?
18    A. Um -- if we indeed were able to hold
19 all other things equal, then market values
20 would marginally increase if insurance rates
21 marginally decrease. But that's if we're able
22 to hold everything else equal. Indeed we know
23 that nothing happens in a vacuum, and in fact
24 declining insurance rates can in fact happen
25 coincidental with other factors. So an

Page 485

1  door to it or within a block of it suffers very
2  little to no flooding?
3      A.  Well, your earlier question was
4  contiguous.  So now you're talking about a
5  block away.  You may very well have that sort
6  of differential a block away.  That's possible.
7  Contiguous I'd find a little bit unlikely.
8  Nonetheless, the model -- any appraisal model,
9  whether we do a mass appraisal or individual
10 appraisals, we're going to take that into
11 account.
12     Q.  How are you going to take it into
13 account?
14     A.  Well, we're going to let the data
15 speak for itself.  It's a diminution in value
16 case.  So we'll value the two houses -- the
17 only difference here is whether we value them
18 all at the same time or we hire every appraiser
19 in the region and spend three years trying to
20 appraise them one at a time and generate two
21 million pages worth of paper.  I mean, we're
22 going to take this into account in either
23 model.
24     Q.  Just tell me how the model takes in
25 into account.  That's all I want to know.

Page 486

1      A.  Well, we're going to measure market
2  values.  We'll have a market value before and
3  the market value after, and the data will speak
4  for itself.  But in the merits phase, either in
5  the two million page model or maybe the hundred
6  page model, we're going to go out and measure
7  the differential market values between the
8  house that was severely flooded versus the
9  house in your first question that's next door
10 that only had two inches of flooding.  We'll
11 have to measure that.  The data will speak for
12 itself and the model will take that into
13 account.
14     Q.  How is the model going to do that?
15 Walk me through it.
16     A.  Well, at this juncture we know what
17 the model is going to look like.  We're going
18 to have to go gather the data to see what
19 market value data in these markets tell us
20 about the value of one house versus the value
21 of another house.  In other words, you're
22 asking me to tell you just what, for example,
23 the sales adjustment grid on a house I haven't
24 appraised yet is going to look like.  I don't
25 know what the adjustments are going to be.  I

Page 487

1  don't know what the exact factors are going to
2  be.  I'm not sure exactly how much stigma this
3  house might be because it sits up on a hill in
4  a neighborhood that was otherwise flooded,
5  versus a house that sits down in a gully in a
6  neighborhood that was otherwise above water --
7  or above the water level.  So indeed, this is
8  something we're going to empirically
9  investigate in the merits phase.  It doesn't
10 have anything to do with which model we choose.
11     Q.  You haven't seen houses in
12 neighborhoods in New Orleans where on one lot
13 the house sits on a slab virtually flush with
14 the ground, and right next door to it is a
15 house raised three or four feet off the ground?
16 You've not seen that?
17     A.  As I sit here thinking about it, sure
18 we've seen that.  And counselor, we're going to
19 appraise that.  It's going to be included in
20 the appraisal.  And exactly what appraisal
21 adjustments we're going to use, as I sit here
22 today, not only would I not know but no
23 appraiser would know that.  We're going to have
24 to go out and investigate in the field the
25 market values and report that to you in an

Page 488

1  appraisal report.  But at this juncture, I
2  haven't done the merits investigation yet.  At
3  this juncture, what I'm testifying to is that
4  these factors, whatever they tend to be, will
5  be more easily ascertainable, more efficiently
6  measured, and more statistically validly
7  reportable in a mass appraisal model than they
8  would be in a grossly inefficient individual
9  house appraisal.  But we're going to measure
10 identically the same thing.  We just haven't
11 measured it yet.
12     Q.  Well, I'd still like you to tell me
13 how you're going to measure for that.  And if
14 you can't tell me, I guess you should tell me
15 you can't tell me.
16     A.  Well, I can tell you, but not today.
17     Q.  When?
18     A.  Well, once we have done our merits
19 investigation.
20     Q.  How long is that going to take?
21     A.  Well, a whole lot less time than it
22 would take if we were trying to do one
23 appraisal at a time.
24     Q.  But I didn't ask you that.
25         How long is it going to take?

Page 489

1  A. Well, after the certification of this
2  case, and once we have begun our merits
3  investigation, um -- certainly a matter of
4  months. Not a matter of three years or more
5  the way individual appraisals would take. But
6  it certainly will take a matter of months.
7  Q. How many months?
8  A. I can't tell you at this juncture.
9  More than three, probably less than twelve.
10 Q. Okay. How many people are you going
11 to have working on it?
12 A. I haven't tasked that out yet, because
13 working with my client, in a manner properly
14 prescribed by appraisal standards, we will
15 develop a scope of work that's sufficient for
16 the intended use of this appraisal in this
17 case.
18 Q. How many people with your background
19 will be asked to work on it with you?
20 A. Well, we have got, oh, I guess about
21 eight people with Ph.D.'s on our payroll either
22 under contract or as full-time employees. I
23 suspect, as I sit here today, um -- we may have
24 as many as four people with Ph.D.s working on
25 the project.

Page 490

1  Q. And what are their hourly rates?
2  A. They vary from three hundred and fifty
3  dollars -- excuse me, I think I've got one at
4  two seventy-five, up to my own six hundred.
5  Q. All right. And for purposes of
6  preparing this model, will you be working on
7  anything else during the time it takes to
8  prepare this model?
9  A. Yes. You talking about me personally
10 or my firm?
11 Q. Both.
12 A. Well, the firm, as I indicated
13 yesterday under questioning, has at any point
14 in time thirty to fifty projects going on.
15 Q. Right. You told us you're very busy.
16 So I'm just wondering how much time you have to
17 devote to this project?
18 A. Well, I will certainly personally
19 devote a substantial amount of time.
20 Q. How much time?
21 A. I at this juncture can't tell you, but
22 I think it's fair to say more than, um -- 10
23 percent of my time. But certainly less than
24 100 percent of my time.
25 Q. What about your colleges?

Page 491

1  A. I may very well task a couple of the
2  Ph.D.s to work on it a quarter to half time,
3  and more than likely several master degreed
4  people to work on it, probably one of them
5  full-time.
6  Q. How many master's degreed people?
7  A. On my payroll?
8  Q. How many will you assign to this
9  matter?
10 A. I haven't decided that yet.
11 Q. Approximately?
12 A. Well, in total, um -- including
13 contract employees, it wouldn't surprise me if
14 we have four or five people. Now, they won't
15 all work full time. We would probably have one
16 Master degreed person or Ph.D.'d person, I
17 hadn't figured that out yet, working as a
18 project coordinator full time on the project
19 for the duration of the project. Then we
20 would --
21 Q. At what hourly rate?
22 A. They vary anywhere from a hundred to a
23 hundred and seventy-five an hour.
24 Q. Okay. Will any other types of people
25 be working on this project besides Greenfield

Page 492

1  people?
2  A. Well, we have other research analysts,
3  many of whom have bachelor's degrees. In fact,
4  I think nearly all of them have bachelor's
5  degrees.
6  Q. And how many of them will be working
7  on this project?
8  A. Probably one or two full-time, and
9  then we'll put some part-time people on it from
10 time to time as we need them.
11 Q. And at what rates?
12 A. They vary in hourly rate from fifty to
13 a hundred dollars an hour.
14 Q. And will they be working full time on
15 this project or part-time?
16 A. Probably one or two people working
17 full time and we'll put other people on the
18 project on an as-needed basis.
19 Q. Anybody else?
20 A. Um --
21 Q. At Greenfield.
22 A. At Greenfield? Um -- to the extent we
23 need to hire temporary people, and they may
24 usually be billed out at rates of fifty or
25 sixty bucks an hour. Particularly when we

Page 493

1 start doing -- if we do any survey research,
2 um -- we may need to hire some, um -- contract
3 people, and usually, like I say, we bill them
4 out fifty or sixty dollars an hour.
5    Q. Will you contract out any of that
6 work? Any of work associated with building the
7 model?
8    A. Well, in the past, we have used, um --
9 contracted people. We use a company called
10 Northwest Research in the focus group issues
11 in, um -- Murphy Oil. I can't remember exactly
12 what we paid them, but it was on an order of
13 sixty thousand dollars, something like that.
14    Q. Okay. And that was to do how many
15 interviews?
16    A. That was to do series of eight focus
17 groups in four cities over a period of several
18 weeks.
19    Q. Do you expect the number of focus
20 groups in these two cases will be more than
21 that?
22    A. I don't know if we're going to do
23 focus groups or not.
24    Q. But if you did?
25    A. If we did, I don't know. Quite

Page 494

1 frankly, the focus groups were contributory to
2 an anticipated contingent valuation survey, but
3 as I say, I hadn't made up my mind if we're
4 going to do contingent valuation or something
5 else.
6    Q. Okay, now would you have to acquire
7 any new software or hardware in order to build
8 this model?
9    A. Well, we're always acquiring new
10 hardware and software. I don't know that we
11 would have to acquire any new hardware or
12 software in order to build this model, per se,
13 but that doesn't mean that we might not. We're
14 always buying new stuff.
15    Q. To what extent does hedonic modeling
16 require there to be a market in equilibrium?
17    A. It, um -- anticipates a market in
18 equilibrium.
19    Q. Would you say that the New Orleans
20 market was in equilibrium on the day after
21 Katrina passed?
22    A. Um -- no. And I think I testified
23 yesterday I didn't believe it was.
24    Q. You're not even sure it is today.
25    A. Not sure, but that's certainly

Page 495

1 something we're going to test. We do believe
2 that the market was in equilibrium prior to
3 Katrina, and so we're able to come up with a
4 hedonic model at least of the unimpaired
5 values. And we will measure the valuation
6 model after Katrina by examining prices in the
7 market and seeing what we've got here. We
8 haven't -- in other words, we haven't
9 investigated the equilibrium circumstance
10 post-Katrina yet, but that's certainly going to
11 be something that we're going to investigate as
12 part of our merits phase.
13    Q. From an appraisal standpoint, the term
14 market equilibrium has a specific meaning?
15    A. Um -- you know, appraisers hardly ever
16 use that phrase. It has more of a meaning in
17 economics, and I can't exactly cite you the
18 textbook definition of it offhand.
19    Q. Give me your understanding as to what
20 its definition is.
21    A. Oh, markets which are clearing at
22 values above reservation prices.
23    Q. Markets that are clearing at prices
24 that are above reservation prices?
25    A. Yes.

Page 496

1    Q. What does that mean?
2    A. Well, markets that are clearing means
3 that sellers have a reasonable anticipation of
4 finding buyers. And reservation prices are
5 prices above which properties have to transact
6 or sellers are obligated to hold them off the
7 market because they can't deliver clear title.
8    Q. Okay. So in layman's terms, it means
9 an environment where there are willing buyers
10 and willing sellers and no artificial
11 impediments to their getting together and doing
12 deals.
13    A. Right. The reservation prices is
14 something of an artificial impediment because
15 there's a price below which the market can't
16 clear. So if the supply and demand curves --
17 and I'm using a very simplistic Econ 101 type
18 analogy -- if the supply and demand curves have
19 shifted such that the market clearing price is
20 below the reservation price, then the market
21 can't clear because the transaction can't
22 occur, so the market is at disequilibrium.
23    Q. To what extent would a market reaching
24 equilibrium tell you that whatever stigma that
25 might have been previously associated with that

Page 497

1  market is diminishing?
2     A.  Well, we're not going to investigate
3  that, because we're going to take the market at
4  equilibrium prior to Katrina hitting. So in
5  other words, the market is what it is prior to
6  Katrina. Um -- and we will probably do some
7  tests to see -- to confirm the fact that that
8  market was an equilibrium market prior to
9  Katrina, but that's certainly something that we
10 would accept as a predicated for what we're
11 doing, and in fact there's no evidence to the
12 contrary.
13    Q.  If you find that the market is not in
14 equilibrium, does that mean you can't do
15 hedonic modeling?
16    A.  Well, if we were to find that, but
17 that's certainly an extraordinary
18 circumstances. Because we do know that there
19 were -- there was an active market for property
20 in New Orleans and in these affected
21 neighborhoods prior to the flooding and there
22 were quite a few transactions.
23    Q.  No, but I'm talking about
24 post-Katrina.
25    A.  No.

Page 498

1     Q.  If you find that the market has not
2  returned to market equilibrium post-Katrina,
3  will that mean that you cannot apply or use a
4  hedonic modeling form?
5     A.  No.
6     Q.  Why not?
7     A.  Well, we'll still have the hedonic
8  form of pre-Katrina prices, but let's remember
9  something. Every sales adjustment grid
10 appraisal is a hedonic model. So even if all I
11 did was go out and use the Fannie Mae form that
12 we talked about earlier today and tried to
13 appraise a hundred and fifty thousand homes one
14 at a time, I'm going to be using a hedonic
15 model, I'm just going to be using it very, very
16 slowly, and at an extraordinary cost, and at a
17 high degree of inefficiency without any
18 statistical reliability.
19    Q.  So it's your opinion that as long as
20 the pre-Katrina market was in equilibrium it
21 doesn't matter whether the post-Katrina market
22 is in equilibrium or not.
23    A.  That's right. And by the way, I want
24 to be clear that I'm not trying to express my
25 opinion here. We're going -- whether we do it

Page 499

1  with mass appraisal or you go out and hire five
2  hundred appraisers to do it over three years
3  for sixty million dollars plus at individual
4  appraisals, you're going to be doing some kind
5  of economic model. Now, if in fact we find
6  that there are equilibrium problems, we're
7  going to have to account for those, we're going
8  the have to deal with them. But one way, shape
9  or form you're going to have some kind of
10 hedonic explanation for the values of homes.
11    Q.  Now, what makes you think that it's
12 going the require a hundred and fifty thousand
13 individual appraisals?
14    A.  Well, if you don't use a mass
15 appraisal, then how would you get at the values
16 of these homes?
17    Q.  What makes you think a hundred and
18 fifty thousand people are interested in filing
19 claims?
20    A.  Well, however many have filed a claim,
21 if it's a hundred thousand or a hundred and
22 twenty thousand or two hundred thousand, if
23 you've got a hundred thousand properties, I
24 estimated this morning --
25    MR. BECNEL:

Page 500

1          There are three hundred thousand
2          counsel. What are you talking about?
3          That's the government's estimate now,
4          three hundred thousand.
5  EXAMINATION BY MR. ZWAIN:
6     Q.  What makes you think any specific
7  number of people are interested in filing
8  claims in this lawsuit?
9     A.  Well, my conversations with my clients
10 have caused me to understand that the number is
11 much greater than a hundred thousand, and
12 potentially greater than a hundred and fifty
13 thousand.
14    Q.  Who have been affected. Who have been
15 flooded.
16    A.  Understood, yes.
17    Q.  But that's a different number than
18 those who might ultimately file claims in this
19 lawsuit, correct?
20    A.  I think that's a legal issue that I'm
21 going to let lawyers sort out.
22    MR. BECNEL:
23         Counsel, three hundred plus
24         thousand people have filed Form 95s.
25         That evidences an interest in them

Page 501

```
 1    pursue this case.  In fact, this
 2    week --
 3  MR. ZWAIN:
 4        I hear you, Danny.  I hear you.
 5  MR. BECNEL:
 6        -- I will file -- for the record,
 7    I will file seventy thousand lawsuits
 8    this week or next week.  And I'm
 9    putting your clients on notice for
10    policy limits now.
11  MR. ZWAIN:
12        I'm a levee district.  I --
13  MR. BECNEL:
14        I know you are.  Whatever
15    policies there are.  Whatever policies
16    you are, I'm putting you on notice for
17    policy limits.  Failing that, take
18    your chances.
19  MR. ZWAIN:
20        Okay.  Well, don't be surprised
21    if I didn't write you back.
22  MR. BECNEL:
23        Well, that's why I got it on the
24    record for you.
25  THE WITNESS:
```

Page 502

```
 1        And counselor, may I amend what
 2    my earlier testimony of $60 million
 3    was predicated on the notion of a
 4    hundred and fifty thousand properties.
 5    If we have three hundred thousand
 6    properties, the math would suggest
 7    that we're talking about over a
 8    hundred million dollars in appraisal
 9    costs and over four and a half million
10    pages of appraisal reports to deliver
11    to the Judge.
12  EXAMINATION BY MR. ZWAIN:
13     Q.  Okay.  How are you going to test the
14  accuracy of your model?
15     A.  Sampling.
16     Q.  Describe it.
17     A.  We'll go out and sample actual prices.
18  In fact, if we indeed determine that the market
19  is at equilibrium, then the testing will be a
20  tautology.  But in fact we can pretest the
21  model by going into unaffected areas, and that
22  is the say control areas.  And indeed the model
23  itself will use pre-Katrina prices in the
24  affected areas of the control area, so we'll
25  have almost a perfect test case for this ahead
```

Page 503

```
 1  of time.
 2     Q.  So you're just going to take a
 3  sampling of actual real estate transactions in
 4  various areas of town and compare those samples
 5  to your data as a whole?
 6     A.  That's right.  Counselor, this is a
 7  textbook case of how to use this kind of
 8  situation.  I could not have dreamed up a
 9  better circumstance for using a large scale
10  hedonic mass appraisal model.  There's utterly
11  no other way I'd consider doing this.  And
12  frankly, when it's all over with I'm going to
13  write I book about it.
14     Q.  Me, too.
15  MR. ZWAIN:
16        All right.  I'm done.  Thank you
17    very much.
18  MR. BECNEL:
19        That's it?  Thank you.
```

Page 504

WITNESS' CERTIFICATE

I, JOHN A. KILPATRICK, Ph.D., do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_____     _____
DATE SIGNED     JOHN A. KILPATRICK, Ph.D.

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  August 14th, 2007

63 (Pages 501 to 504)

JOHNS PENDLETON COURT REPORTERS   800 562-1285