UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br><br>NO. 05-4182<br><br>SECTION "K" (2) |

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286, 07-1288, 07-1289

**PERTAINS TO: LEVEE AND MRGO**

---

**MEMORANDUM SUPPORTING
PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE
<u>CLASS CERTIFICATION-RELATED TESTIMONY OF MICHAEL W. TRUAX</u>**

**MAY IT PLEASE THE COURT:**

**I.   Introduction.**

   The Levee and MRGO Plaintiffs seek an Order *in limine* excluding the class

certification-related expert testimony of Michael W. Truax ("Truax") because his testimony is

Page -1-

not admissible under Rule 702 of the Federal Rules of Evidence and the dictates of <u>Daubert v. Merrell Dow Pharmacauticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167 (1999).

Truax, at page 81 (lines 19-20) of his September 26-27, 2007 deposition,[1] when asked "in what field are you being tendered in this case," tentatively told us: "I think in the field of real estate valuation and consultation." Thus, the pertinent questions are whether he has actually offered any mass appraisal expert real estate valuation opinions, and if so, are they admissible. As Plaintiffs will show, because Truax has no experience with AVM's, has no mass appraisal experience, but voices only a "position" regarding Plaintiffs' mass appraisal expert opinions, he must be excluded from offering testimony at the class certification hearing.

## II.     F.R.E. 702 and <u>Daubert</u>.

F.R.E. 104 (a) provides that the Court is to decide on the admissibility of the evidence and the qualifications of a person to be a witness. Subsequently, F.R.E. 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact and an issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied these principles and methods to the facts of the case.

Rule 702 provides guidance to the Court in determining whether the proffered expert testimony is sufficiently *reliable*. Rule 702 states, in relevant part, that expert testimony may be considered reliable if:

---

[1] For the Court's convenience, the two-volume Truax deposition is attached as Exhibits "A" and "B."

      (1)       "the testimony is based on sufficient facts or data;"

      (2)       the expert's technique or methodology in reaching the conclusion is considered reliable; and

      (3)       the expert has applied the methodology reliably to the facts of the case.

In order for the testimony to be admissible, all three components of Rule 702's reliability analysis must be met. Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir.2002) ("The reliability analysis applies to all aspects of the expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion.") (*quoting* In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir.1994)).

      In Daubert, 509 U.S. at 593-95, 113 S.Ct. 2786, the Supreme Court identified a non-exclusive list of factors for a district court to consider in determining reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *"[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."* Kumho Tire, 526 U.S. at 153, 119 S.Ct. 1167.

### III. Burden of proof.

      As explained in Perkins v. Origin Medsystems, Inc., 299 F.Supp.2d 45 (D. Conn. 2004), the proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence, *see* Daubert, 509 U.S. at 592 n. 10, 113 S.Ct. 2786, that the testimony is competent, relevant, *and reliable*. Koppell v. New York State Board of Elections, 97 F.Supp.2d 477, 479 (S.D.N.Y.2000); Union Bank of Switzerland v. Deutsche Financial Services Corp., 2000 WL

178278 at 8 (S.D.N.Y.2000) (internal citations omitted) (*citing* Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). If the expert is deemed competent (otherwise referred to as "qualified"), an issue which Plaintiffs dispute in this case, this Court must then determine, pursuant to its "gatekeeping" function, whether the proffered expert testimony is "relevant" and "reliable." *See* Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 (noting that trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony").

The person seeking to admit the expert testimony bears the burden of proving reliability by a preponderance of the evidence. Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir.1998) (en banc).  *As* the Supreme Court recognized in General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), although an expert may extrapolate his opinions from existing data,

> "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

*Id.* at 146, 118 S.Ct. 512.

**IV.     Relevance.**

Evidence is relevant if the testimony *"ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."* Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 264 (2d Cir.2002) (alteration in original) (*citing* Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir.2001) (*quoting* Fed.R.Evid. 401)); Daubert, 509 U.S. at 591, 113 S.Ct. 2786 (*"Expert testimony which does not relate to any issue in the case is not relevant and, ergo,*

*non-helpful .... Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."*). If the evidence is relevant, the trial court must then determine *"whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered"* by the trier of fact. Amorgianos, 303 F.3d at 265 (*quoting* Daubert, 509 U.S. at 597, 113 S.Ct. 2786).[2]

## V.     Reliability.

In Vargas v. Lee, 317 F.3d 498, 500-501 (5th Cir. 2003), *citing* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Fifth Circuit held that *before* expert testimony can be admitted under Federal Rule of Evidence 702, the district court must conduct a preliminary inquiry to ensure that the testimony is both relevant <u>and</u> reliable.  *See also* Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir.2002) ( *"[E]xpert testimony is admissible only if it is both relevant and reliable."*) and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (Before an expert is allowed to testify the trial court must assess the *reliability* of the methodology used by the proposed expert.).  The objective of this gatekeeping requirement *"is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."* Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167.

## VI.    Reasonable application of methodology to the facts.

---

[2]In Daubert, the Supreme Court rejected the traditional Frye rule (which had required that a scientific theory be generally accepted by the scientific community to be admissible, *see* Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923)), concluding that adherence to Frye's "rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules [of Evidence]." Daubert, 509 U.S. at 588, 113 S.Ct. 2786 (citations omitted).

If the court finds the methodology reliable, the court must then determine *if the methodology was reasonably applied to the facts of the case*. Amorgianos, 137 F.Supp.2d at 162. An expert's testimony must be held inadmissible if *"there is simply too great an analytical gap between the data and the opinion proffered,"* such that the opinion is *"connected to the existing data only by the ipse dixit of the expert."* Amorgianos, 303 F.3d at 266 (*quoting* General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)); *see also* Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1441 (S.D.N.Y.1997) (*"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."*) (internal citations omitted) (*quoting* Boucher v. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir.1996)).  Here, we have a terrific "analytical gap" because Truax isn't even attempting to address mass flood-caused property devaluation.

## VII.     Additional factors.

Additional factors are also relevant: (1) whether the expert is proposing to testify about a matter growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinions expressly for the purpose of testifying (*see* Daubert, 43 F.3d 1311 (9th Cir. 1995)); (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (*see* General Electric, 526 U.S. at 152-158, 119 S.Ct. At 1176-78); (3) whether the expert has adequately accounted for obvious alternative explanations (*see* Claar v. Burlington, 29 F.3d 499 (9th Cir, 1994)); (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting (*see* Sheehan v. Daily Racing Form, Inc., 104 F.3d 940 (7th Cir. 1997); Kumho, 119

S.Ct. at 1176); and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give (*see* Kumho, 119 S.Ct. At 1175).

**VIII.   What "opinion," if any, does Truax offer?**

To cut to the chase, why is Mr. Truax's testimony offered, and exactly what is it?  The answers to these two threshold questions are found in his September 26-27, 2007 deposition.  At page 117 (lines 15-22), the first question was answered when Truax stated that: *"His* [Dr. Kilpatrick's] *approach to determine that -- would be to use a mass appraisal technique, um -- likely the contingent valuation methodology, as well, to estimate some measure of damage associated with, I assume, the particular events for which the defendants are liable or may be liable."* [3]  At page 343 (lines 7-13), the second question was answered when Truax simply made a subjective, conclusory viewpoint that cannot reasonably be assessed for reliability:

> Q.     But you do know that whatever he [Dr. Kilpatrick] proposes ain't right.
>
> A.     No, I think -- my position is that AVM and AVM type models will not effectively work in our submarket because of the variety, lack of homogeneity, et cetera, that exists in this particular submarket.

There it is, Truax's "opinion" isn't even an expert opinion, and it also doesn't attempt to refute scientifically any of Dr. Kilpatrick's opinions.  Truax says it plainly, he isn't challenging Dr. Kilpatrick opinions as not being "right."   Moreover, Truax isn't even presenting an expert theory, he's offering a "position" (*i.e.*, viewpoint) is that AVM's "will not effectively work in our submarket."   As Plaintiffs will show, Truax admits he has absolutely no qualifications to

---

[3] As the Court is aware, Dr. Kilpatrick has offered the expert opinion that an "automated valuation model" ("AVM") can be used to determine the impact of flooding on class area properties.

offer this position. As such, his non-scientific viewpoint must be excluded.

Truax isn't attempting to offer *any* testimony, much less testimony that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In fact, at page 85 (lines 15-19) Truax candidly admits he isn't offering any opinions about property devaluation due to flooding:

> Q. You have not been asked to do anything in regard to the analysis of potential property value impact due to the flood event?
>
> A. No. As to particular value impact, no.
>
> Q. Well, is that the only seminar you've ever attended at which automated valuation models was the primary topic?
>
> A. To the best of my knowledge, yes.

**IX.    Truax has no experience in either AVM's or mass appraisal.**

Regretfully, Truax repeatedly testified that he has no meaningful experience whatsoever in using AVM's to value properties, and he isn't qualified to offer any opinions about whether AVM's can be used to model widespread disasters affecting properties. On page 102 (lines 78-21), Truax details his unfamiliarity with AVM's specifically and with mass appraisal generally, testifying:

> Q. Have you ever -- I know you never published on AVMs. Have you ever used an AVM?
>
> A. No.
>
> Q. And you've never given a professional presentation of an AVM.
>
> A. No.
>
> Q. What formal training do you have in mass appraisal?

    A.    None.

    Q.    And you've never published or given a paper on mass appraisal either.

    A.    That's correct.

    Q.    And you've never participated in a mass appraisal.

    A.    Correct.

More of the same is found at deposition page 105 (lines 1-17) where Truax again admits he has no expertise in either mass appraisal or AVM's:

    Q.    Do you know whether mass appraisal techniques are being used with increasing frequency in the real estate industry?

    A.    Again, you're asking me a very specific question, do I have data regarding that that I am personally aware of. No, I do not.

    Q.    In fact, Mr. Truax, since you have little or no formal training on the subject, you've never published on the subject, would it be fair to say that you do not have specialized expertise regarding AVMs or mass appraisal?

    A.    Well, I would ask you to define for me what you mean by specialized expertise.

    Q.    Do you hold yourself out as an expert on AVMs or mass appraisal?

    A.    No.

On deposition page 106 (line 20) through page 108 (line 2), Truax further conceded his utter lack of mass appraisal experience with regard to twelve cases where he's been deposed or has given trial testimony:

    Q.    Did any of these cases -- did your testimony in any of these cases involve the question of the applicability or appropriateness of mass appraisal?

    A.    No.

    Q.    Did your testimony in any of these cases involve the question of the applicability or appropriateness of automated valuation models?

  A. No.

  Q. Did your testimony in any of these cases involve the appropriateness or applicability of hedonic price modeling?

  A. No.

  Q. Contingent valuation?

  A. No.

  Q. Conjoint analysis?

  A. By implication, as I discussed earlier with the conjoint analysis, that concept is in most any appraisal process, so the answer to that probably would be yes, conceptually. But in terms of the direct addressing of a conjoint analysis, no.

  Q. All right. So let me make sure I'm right about the last response. Although conjoint analysis, you say, is embedded in all of the appraisal work you do, I'm correct that none of these occasions on which you've testified as an expert in the last four years has called on you to address whether or not conjoint analysis is proper, properly applied or appropriate in the case at issue.

  A. Essentially, you're correct.

And, at deposition page 137 (lines 7-25) a recapitulation of Truax's total lack of mass appraisal and AVM education, training, qualifications and experience:

  Q. And you say that although you told me -- I believe you've admitted that you've never published or presented on the question of mass appraisal or AVMs. Correct?

  A. I've told you that I've not published on those topics, that's correct.

  Q. And you've never been tendered or testified as an expert to address the appropriateness or applicability of mass appraisals or AVMs in a class action case, have you?

  A. Correct.

  Q. And you don't have any formal training on the subject of mass appraisals or AVM that you can think of other than the one-hour seminar on AVMs that you went to

>   ten years ago, correct?
>
> A. Again, it was a one-day seminar.
>
> Q. I'm sorry. One day.

X. **Truax hasn't read critical pleadings, so he doesn't understand Plaintiffs' cases.**

Truax hasn't read the motion to certify or the Plaintiffs' proposed trial plans, and said so at page 116 (line 16) through page 117 (line 1):

>   Q. So if you have not listed the plaintiffs' motion to certify, is it fair to say that that's not one of the court documents you've reviewed?
>
>   A. I think it's fair to say that certainly if I did, I didn't recall or I didn't list it.
>
>   Q. Okay. And you have also not reviewed the plaintiffs' proposed trial plan in the levee and MRGO cases, have you?
>
>   A. It's not listed, and I don't recall.

XI. **Truax didn't write all of his report, the "Roddewig folks" helped.**

When he was questioned about who wrote his "report," Truax admitted he'd simply appropriated someone else's work. Plaintiffs believe Truax did this because he has no experience whatsoever in AVM's and needed the "cover" provided by someone else. At deposition page 132 (lines 7-17), Truax explained how when he signs something, "it's mine":

>   Q. What portions of this report that you alone signed September the 10th, 2007, was coauthored by Mr. Roddewig or someone at Clarion?
>
>   A. Well, when I say -- understand, once I signed the report it's mine, no matter who penned the words or turned the typewriter on.

It gets worse, Truax couldn't even identify which portions of his "report" that he wrote himself. At deposition page 133 (line 13) through page 14 (line 10), Truax attempts to sidestep this serious problem:

> Q. Which of these conclusion statements were coauthored or authored by Mr. Roddewig or someone else at Clarion?
>
> A. Well, as I tell you, given the process in terms of how we prepared the entirety of this document, it was a -- you know, a compilation of views from the entire appraisal team, if you will. Now, exactly who penned the precise words that you see, I'm not sure I could even tell you at this point other than these are the combined thoughts of the appraisal team, which again is a very routine method of producing reports in our business.
>
> Q. You're telling me that when you write and sign expert reports in legal cases it's routine for you to have others coauthoring the report with you even though they're not named in a report or sign the report? That's a routine practice for you?
>
> A. Absolutely, in the sense that I may not have penned the words, but by the time I have edited it, reviewed it and accepted it as my own and sign it, it's my own.

At deposition page 135 (lines 4-7), Truax was asked *if* he had needed other persons' help with his "report," and he testified:

> Q. So you needed Roddewig and his team to join you as authors of this report because of time and because of their expertise?
>
> A. In part, yes.

Next, at deposition page 136 (line 18) through page 137 (line 5),Truax explained precisely why he needed "ghostwriters" to help with his report:

> Q. No, sir. My question was, what expertise did Roddewig and his group at Clarion bring to this effort that you did not possess of your own accord?
>
> A. Well, they certainly had experience in dealing with, um -- class action certification
> cases. Um -- that was probably the biggest single one.
>
> Q. How about expertise in the field of mass appraisal, did they bring that to the task?
>
> A. They certainly had a broader background in those issues than I did.

**XII.   Apples and oranges.**

At deposition page 172 (line 21) through page 173 (line 24), Truax explains why he thinks the class representatives aren't representative of their neighbors, and that AVM's won't work[4]:

> Q. All right. Now, your third statement -- third opinion is that the individual representatives are not representative of other residential properties including properties within the same neighborhood. Correct?
>
> A. Correct.
>
> Q. Is that true in every one of the 42 cases?
>
> A. Oh, there would be variations, I think, in terms of, one, what you defined as their neighborhood, and some of the neighborhoods would be better represented than others by this grouping. So, no, it wouldn't be a uniform answer to that.[5]
>
> Q. Your fourth conclusion that mass appraisal techniques like AVM's cannot fairly and effectively efficiently measure real property damages, again I think you've told me already you're not aware of any cases where AVM's in fact have been used to perform mass appraisal in class litigation. Correct?
>
> A. I'm not, and particularly I'm not locally.
>
> Q. And your statement to this effect is driven, I take it, by the variability of property characteristics within the class area?
>
> A. That's the primary cause, I believe, of lack of applicability in our local market.

---

[4] Curiously, at Truax deposition page 281 (lines 7-16), Truax made the following contrary admission:

> Q. You don't, again, deny that the AVM, on a mass appraisal approach to a hundred thousand properties, is superior in reducing time and costs associated with the appraisal process, do you?
>
> A. No, I think if you're married to that system and believe that it will produce credible results, no, I suspect it would certainly be more efficient and cost efficient as well.

[5] From this remark, Plaintiffs infer that Truax concedes that *some* class representatives indeed do represent their neighbors.

Truax's entire position is that the variability of property characteristics within the class area (*e.g.*, slab versus pier construction, brick versus wood construction, one versus two stories, single family versus multiple family, residential versus commercial, etc.) make mass appraisal inappropriate and, hence, no one plaintiff can represent any other plaintiff.[6]  This argument about how to best value a property – damaged or otherwise- focuses on the ancient practice of identifying the recent sale price of a comparable structure.  To Truax, it makes no difference that 77% of the properties he studied in the Catina area of Subclass One are residential, or 85% in the Belfort area of Subclass Two, or 92% in the Gaines area of Subclass Three, or 80% in the Stutz area of Subclass Four, or 50% in the Edinburgh area of Subclass Five.[7]  It similarly made no difference that 71% of the properties in the Catina area experienced more than four feet of flooding, or that all but one property in the Edinburgh area flooded, or that in Gaines *every* property flooded.[8]

Truax rejects use of AVM's, yet he acknowledges that they can be reliable.  At deposition page 291 (line 14) through page 292 (line 7), Truax concedes:

> Q. Right. And in the industry, this confirms, doesn't it, that there are actual model validation products and practices that one can access in order to develop a reliable AVM, correct?
>
> A. Oh, absolutely. You have to validate the model. And as I've told you, there are applications for them that are probably very fine.
>
> Q. And the application of one of those products, those model validation products, would be aimed at making the results of the AVM more reliable, correct?

---

[6] At deposition page 162 (lines 13-19), Truax admits he has no legal education or training, and does not hold himself out as an expert on the Louisiana law of fault or causation.

[7] Truax deposition at page 231 (line 17) through page 232 (line 5).

[8] Truax deposition at page 235 (lines 5-23).

      A.       That would be the purpose.

      Q.       And of course you're not familiar, as you sit here, with any of the available model valuation practices or products, are you?

      A.       Oh, I think I've told you I'm not an AVM expert. That's correct.

Near the end of his deposition, Truax's explains that he has no idea how long it would take (or how much money it would cost) to appraise the 66,000 residential property units in the MRGO area (there are, of course, an enormous number of additional residential housing units in the separate Levee area).[9] So, there must be some reason why he adopts the position that AVM's won't work in the class and subclass areas.

This reason is revealed in the final pages of Truax's deposition, where he tells us why he believes that class representation won't work. However, this reasoning has nothing to do with class certification or whether the class representatives claims are common to and typical of the class. Truax is entirely focused on the real estate concept of what is a "comparable," and not on the legal concept of what is a "representative. Indeed, to Truax, someone cannot be representative unless he is "comparable" in a strict appraisal sense. In other words, two adjoining two-story residential units on the same street aren't comparable if one is brick and the other is wooden.

The crucial explanation begins at Truax's deposition page 401 (line 12) and concludes on page 404 (line 2). There, Truax finally reveals why his ideas about comparables and Fed.R.Civ.P. 23's legal standard for the adequacy of class representation are apples and oranges, and shows why this Court should exclude his testimony:

---

[9] Truax deposition at page 368 (lines 16-22).

Q. Well, do you know what Rule 23 means when it says a class representative has to be an adequate representative? Do you know what that means?

A. From a legal perspective, no.

Q. So when you use the word representative in your report, you are not referring, intentionally, at least, to that meaning, are you?

A. No, I think I told you yesterday that representative, to me, would be -- could be likened to the word comparable.

Q. Comparable. Okay. So you're using it in an appraisal sense, meaning that it's got to have sufficient characteristics in common with other properties for me to be able to compare value, or utilize the values as a comparison. Is that what you mean by representative?

A. Yes.

Q. So by that definition, no residential property could ever be representative of a commercial property, could it?

A. Typically not done that way, that's correct.

Q. And a one-story property could never be representative of a two-story property.

A. Again, typically an appraiser would work very hard to compare two stores to a two-story property if that's what his subject was.

Q. An old property could never really be representative of a new property.

A. Any host of variations like that, that's correct.

Q. So you take all the characteristics that you look at for comparables -- and I think we actually looked -- you have some bullet point listings of things that you consider.

A. Correct.

Q. You take that list, and your idea of representative would be to group the properties according to those characteristics, correct?

A. Yes. As best you can. Obviously, you rarely if ever find three identical -- or four or five or however many that are identical to your subject property, but that is the

Page -16-

> goal, is to -- when you search for comparables, is to find those that are most similar to your subject.
>
> Q.  And again, this discussion about the class representative properties not being representative, and we're using the words differently, but, um -- you reference Exhibit C which are the pictures that we looked at, your photographs.
>
> A.  Correct.
>
> Q.  And the relevance here is that in the Charbonnet study area, you found a church, you found a Kentucky Fried Chicken, a school, as well as homes, and your view is that none of the homes could be considered representative of the whole area because you've got a church and you've got commercial establishments, et 1 cetera. That's your opinion.
>
> A.  Correct.

## XIII. Conclusion.

Mr. Truax does not have the qualifications to offer mass appraisal opinions himself, particularly if such opinions are founded upon AVM models. Not having the qualifications to offer such opinions himself, he is not qualified to criticize persons like Dr. Kilpatrick who *are* well-qualified to offer AVM-based mass appraisal opinions.[10]

Mr. Truax admits that he's just advancing a position, not expert opinions. Because he offers only a personal subjective viewpoint rather than a scientifically validated opinion, his testimony should be excluded because it isn't an expert opinion.

Lastly Mr. Truax's position that virtually no class representative's flood damage claim is "representative" of another class member's flood claim because they are not comparable has no

---

[10] F.R.E. 702 provides that *if* scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact and an issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion. Ultimately, is any "expert" really required to show the Court that when 80% of the structures in New Orleans flooded – some for several weeks – that immersion in flood waters damaged and devalued those structures?

bearing whatsoever on Fed.R.Civ.P. 23's requirements for class certification.  In Mr. Truax's mind, only a two-story, brick, raised on piers, single family, pool in the back yard, gated community, recent construction, slate-roofed, modern electric home with a two-car garage is comparable to another.  Any deviation renders the two properties non-comparable.

What the Levee and MRGO Defendants attempt is to take Mr. Truax's appraiser's "precise comparable property only" philosophy into the realm of the absurd.  While using Mr. Truax's exacting comparable standard may be very is useful in calculating the precise selling price of a Bucktown bungalow, using that standard to determine the adequacy or typicality of a class representative is far beyond the requirements of Fed.R.Civ.P. 23.  Because Mr. Truax's own explanation of what is "comparable" (*i.e.*, representative) is clearly self-limited to the real estate world, the Court should exclude Mr. Truax's testimony on this additional ground.

        RESPECTFULLY SUBMITTED:

        LEVEE LITIGATION GROUP

        BY:   s/Joseph M. Bruno
        Joseph M. Bruno (#3604)
        The Law Office of Joseph M. Bruno
        855 Baronne Street
        New Orleans, Louisiana 70113
        Telephone: (504) 525-1335
        Facsimile:(504) 581-1493
        E-Mail:jbruno@brunobrunolaw.com
        Plaintiffs' Liaison Counsel

        -and-

GERALD E. MEUNIER (La. Bar #9471)
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Phone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com
Levee PSLC Liaison Counsel
