1

EXHIBIT A

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4  IN RE: KATRINA CANAL BREACHES    CIVIL ACTION

5  CONSOLIDATED LITIGATION          NO. 05-4182 K2

6                    JUDGE DUVAL

7  PERTAINS TO LEVEE AND MRGO       MAG. WILKINSON

8

9         (V O L U M E  I)

10

11        Deposition of MICHAEL W. TRUAX, MAI,

12  given in both the levees and MRGO cases, at the

13  offices of Stone, Pigman, Walther, Wittmann,

14  LLC, 546 Carondelet Street, New Orleans,

15  Louisiana 70130-3588, on September 26th, 2007.

16

17

18

19

20

21

22

23  REPORTED BY:

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

2

1  APPEARANCES:

2  REPRESENTING ORLEANS LEVEE DISTRICT:

3      MCCRANIE, SISTRUNK, ANZELMO, HARDY,

4      MAXWELL & MCDANIEL

5      (BY:  THOMAS ANZELMO, ESQUIRE)

6      3445 N. Causeway Boulevard, Suite 800

7      Metairie, Louisiana 70002

8      504-831-0946

9

10  REPRESENTING WASHINGTON GROUP INTERNATIONAL:

11     JONES DAY

12     (BY:  WILLIAM E. MARPLE, ESQUIRE)

13     2727 North Harwood Street

14     Dallas, Texas 75201

15     214-220-3939

16     - and -

17

18     STONE PIGMAN WALTHER WITTMANN, L.L.C.

19     (BY:  WILLIAM D. TREEBY, ESQUIRE)

20     (BY:  CARMELITE M. BERTAUT, ESQUIRE)

21     546 Carondelet Street

22     New Orleans, Louisiana 70130

23     504-581-3200

24

3

1  REPRESENTING THE PLAINTIFFS:

2      GAINSBURGH, BENJAMIN, DAVID, MEUNIER &

3      WARSHAUER, L.L.C.

4      (BY:  GERALD E. MEUNIER, ESQUIRE)

5      2800 Energy Centre

6      1100 Poydras Street

7      New Orleans, Louisiana 70163-2800

8      504-522-2304

9      - and -

10

11      BRUNO & BRUNO

12      (BY:  JOSEPH M. BRUNO, ESQUIRE)

13      855 Baronne Street

14      New Orleans, Louisiana 70113

15      504-525-1335

16      - and -

17

18      LAW OFFICE OF FRANK J. D'AMICO, JR.

19      (BY:  RICHARD M. EXNICIOS, ESQUIRE)

20      622 Baronne Street

21      New Orleans, Louisiana 70113

22      504-525-9561

23

24

4

1  REPRESENTING THE PARISH OF JEFFERSON:

2      BURGLASS & TANKERSLEY

3      (BY:  MONICA M. WALDRON-BURGLASS,

4      ESQUIRE)

5      5213 Airline Drive

6      Metairie, Louisiana 70001

7      504-836-2220

8

9  REPRESENTING BOARD OF COMMISSIONERS FOR THE

10  EAST JEFFERSON LEVEE DISTRICT:

11      FRILOT, PARTRIDGE, L.C.

12      (BY:  JOSEPH E. BEARDEN, III, ESQUIRE)

13      3600 Energy Centre

14      1100 Poydras Street

15      New Orleans, Louisiana 70163-3600

16      504-599-8000

17

18  REPRESENTING NEW ORLEANS SEWERAGE & WARTER

19  BOARD:

20      CHRISTOVICH & KEARNEY, L.L.P.

21      (BY:  ELIZABETH S. CORDES, ESQUIRE)

22      601 Poydras Street, Suite 2300

23      New Orleans, Louisiana 70130

24      504-561-5700

5

1  REPRESENTING EAST JEFFERSON LEVEE DISTRICT AND

2  LAKE BORGNE LEVEE DISTRICT:

3      DUPLASS, ZWAIN, BOURGEOIS, MORTON,

4      PFISTER & WEINSTOCK

5      (BY:  GARY M. ZWAIN, ESQUIRE)

6      Three Lakeway Center, 29th Floor

7      3838 N. Causeway Boulevard

8      Metairie, Louisiana 70002

9      504-832-3700

10

11  ALSO PRESENT:

12      JOHN A. KILPATRICK, Ph.D

13

14  ATTENDING VIA INTERNET:

15      DENNIS REICH

16      KIRK AURANDT

17

18  VIDEOGRAPHER:

19      GILLEY DELORIMIER (DEPO-VUE)

20

21

22

23

24

6

1    E X A M I N A T I O N   I N D E X

2

3  EXAMINATION BY:                    PAGE

4

5  MR. MEUNIER  ...........................   10

6      E X H I B I T   I N D E X

7

8  EXHIBIT NO.                    PAGE

9  Exhibits 1, 2, 3 ........................   103

10  Exhibit 4   ...........................   114

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

1       S T I P U L A T I O N

2          IT IS STIPULATED AND AGREED by and

3   among counsel for the parties hereto that the

4   deposition of the aforementioned witness may be

5   taken for all purposes permitted within the

6   Federal Rules of Civil Procedure, in accordance

7   with law, pursuant to notice;

8          That all formalities, save reading

9   and signing of the original transcript by the

10  deponent, are hereby specifically waived;

11         That all objections, save those as to

12  the form of the question and the responsiveness

13  of the answer, are reserved until such time as

14  this deposition, or any part thereof, is used

15  or sought to be used in evidence.

16

17

18         *  *  *

19

20

21

22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23  Certified Court Reporter in and for the State

24  of Louisiana, officiated in administering the

**truax0926.txt**                        **Page 7**

8

1          MICHAEL W. TRUAX, MAI

2  3045 Ridgelake Drive, Suite 100, Metairie,

3  Louisiana 70002, a witness named in the above

4  stipulation, having been first duly sworn, was

5  examined and testified on his oath as follows:

6      MR. MARPLE:

7          Let me add one. I think it's

8      usual, but an objection by one

9      defendant will be on behalf of all

10       unless otherwise indicated.

11     MR. MEUNIER:

12         Jerry Meunier appearing for the

13     levee and MRGO plaintiffs.

14     MR. BRUNO:

15         Joseph Bruno, plaintiffs' liaison

16     counsel.

17     EXNICIOS:

18         Richard Exnicios, MRGO litigation

19     group.

20     MS. WALDRON:

21         Monica Waldron, Jefferson Parish.

22     MS. CORDES:

23         Elizabeth Cordes, Sewerage &

24     Water Board in the levee case.

9

```
 1        Joseph Bearden, East Jefferson

 2     Levee District and Lake Borgne Levee

 3     District.

 4     MR. ANZELMO:

 5        Tommy Anzelmo on behalf of the

 6     Orleans Levee District.

 7     MR. MARPLE:

 8        Bill Marple for Washington Group

 9     International.  I just may note

10     Mr. Kilpatrick, plaintiffs' expert, is

11      present today.

12     MR. ZWAIN:

13        And my name is Gary Zwain and I

14      represent the East Jefferson Levee

15      District in the levee case and the

16      Lake Borgne Basin Levee District in

17      the MRGO case.

18     MR. MEUNIER:

19        We have some time rules for these

20      depositions, and Mr. Truax is being

21      offered as an expert in both levee and

22      MRGO.  We propose to ask background

23      questions once and once only and

24      consider whatever time spent on that
```

10

1      MR. ZWAIN:

2          Fair enough.

3  EXAMINATION BY MR. MEUNIER:

4    Q.   Would you state your name and address,

5  please, sir?

6    A.   Michael William Truax, 5925 Cleveland

7  Place, Metairie, Louisiana.

8    Q.   Mr. Truax, with your Notice of

9  Deposition, there was an attached Exhibit A

10  which called for the production of certain

11  documents.

12      Do you have that in front of you?

13    A.   Yes, I do.

14    Q.   I'd like to go through this list with

15  you and verify that the material has been

16  produced.  Item 1 is all data, correspondence,

17  et cetera, in connection with the work that you

18  performed in the Katrina litigation.

19      Has that been produced?

20    A.   I note that that excites including

21  E-mail.  I've not produced E-mail

22  correspondence, based upon instruction of

23  counsel.

24    Q.   All right.  Well, we'll talk about

11

1       All of the other categories listed in

2   Item 1 of Exhibit A have been produced?

3     A.  It's here.

4     Q.  Here indicating this folder that

5   counsel has given me?  And this is our copy, I

6   understand.

7       MR. ZWAIN:

8           Yes.  That folder and the two

9         disks.

10      MR. MEUNIER:

11          And the two disks.

12    A.  Now, when I say -- that is the

13   information relating to the levee case.

14   EXAMINATION BY MR. MEUNIER:

15    Q.  All right.  Do you have a similar

16   production for the MRGO?

17    A.  I previously submitted that to the

18   Stone, Pigman attorneys, and I was under the

19   assumption that that was provided to you.

20      MR. MARPLE:

21          I believe you got that a week

22        ago, whatever we had, and then maybe

23        some invoices yesterday.

24      MR. MEUNIER:

12

1      mean, I don't think -- but we'll check

2      on that.

3         MR. BRUNO:

4            We'll check on it.

5   EXAMINATION BY MR. MEUNIER:

6      Q.  All right.  So you have a separate

7   group of material that's responsive to MRGO,

8   and this that you've produced here is only

9   levee.

10     A.  That's correct.

11        MR. BRUNO:

12           Was something like this produced?

13   EXAMINATION BY MR. MEUNIER:

14     Q.  Let me ask about the E-mail for a

15   moment.  Do I understand that on the advice of

16   counsel you are not furnishing us with any

17   E-mail that you have sent to any party in this

18   case?

19     A.  I've not furnished any E-mails.

20     Q.  And that would include not just

21   E-mails to counsel but E-mails to other

22   individuals, other experts, laypeople, et

23   cetera?

24        MR. ZWAIN:

13

1      E-mails between he and counsel and

2      E-mails between he and the people he

3      consulted with at Clarion because we

4      felt that was protected by the -- by

5      our agreement and also by the case

6      management order.

7      MR. MEUNIER:

8        All right.  What in the agreement

9      or case management order prevents

10     disclosure of E-mail from one expert

11     to another expert?

12     MR. ZWAIN:

13       I don't have the case management.

14     Order in front of me, but if you could

15     provide me with a copy I could

16     probably show you.

17     MR. BRUNO:

18       Our agreement is limited to

19     E-mails between counsel and the

20     expert.  That's what we agreed.  But

21     we'll talk --

22     MR. ZWAIN:

23       I don't even know if there are

24     such E-mails.  But --

14

1          Let me verify that with the

2          witness.

3    EXAMINATION BY MR. MEUNIER:

4    Q.  I think you've indicated, am I

5    correct, that there are E-mails not only

6    between you and the attorneys, but also E-mails

7    between you and other non attorney individuals,

8    correct?

9    A.  Well, no I didn't indicate that, but

10   there are E-mail communications between myself

11   and Clarion people.

12   Q.  When you say the Clarion people, you

13   mean Mr. Roddewig and others?

14   A.  Mr. Roddewig and associates of his.

15   Q.  All right.  The E-mails between you

16   and the Clarion group have reflected your

17   opinions and analysis in this case?

18   A.  I would say the majority of those

19   E-mails were communications regarding practical

20   concerns in working together on this case.

21   Certainly there would be likely some opinions

22   in them.

23   Q.  All right.  In addition to reflecting

24   opinions, do these E-mails between you and the

15

1  which you are relying to form your opinions in

2  this case?

3     A.  Well, when you say referred to,

4  certainly we discussed issues that were

5  important to the case, I think, and had some

6  communications regarding, you know, topics

7  associated with those.  I can't tell you

8  definitively whether there's a lot of media

9  information in those E-mails or not.

10    Q.  Well, can you give me some idea of how

11  many E-mails there are, total, between you and

12  non attorneys including the Clarion group?

13    A.  Well, anything I told you would be a

14  guess.

15    Q.  Can you tell me over what period of

16  time that category of E-mails have been

17  transmitted?

18    A.  Oh, the majority would certainly have

19  been in August.

20    Q.  August of '07?

21    A.  Yes.

22    Q.  But not all in August of '07, just the

23  majority?

24    A.  Again, I'm not looking at the records,

**truax0926.txt**                          **Page 15**

16

1    Q.   You have not erased these E-mails,

2  have you?

3    A.   Oh, I'm sure some that were very

4  mundane, that had to do with travel plans and

5  hotel reservations and the like, they probably

6  have been erased.

7    Q.   Well, were they printed out at any

8  time for counsel 's review or any other

9  purpose?

10    A.   No.  The E-mails were never printed

11  for counsel's review.

12    Q.   Were they printed for any purpose?

13    A.   Well, certainly if I had a hotel

14  reservation with a confirmation number in the

15  E-mail I might have printed that to carry with

16  me as I went to the hotel.  But it would have

17  been a mixed bag in terms of the ones that were

18  printed and the ones that were not.

19    Q.   But they're all still retrievable, are

20  they not?

21    A.   Possibly by someone other than me, for

22  those that are deleted.

23    Q.   Now, the E-mails between you and

24  counsel, can you give me an idea of how many of

17

1    A.  No.

2    Q.  Or the period of time over which

3  they've been transmitted?

4    A.  There were probably E-mails, you know,

5  starting at the beginning of my engagement with

6  regard to this assignment.  Again, most of them

7  probably of a practical nature.

8    Q.  Do any of the E-mails between you and

9  counsel reflect the opinions or conclusions

10  that you have reached in this case?

11    A.  I don't believe so.  But again, I

12  would have to review the records.

13    Q.  Do any of the E-mails from counsel to

14  you provide information on which you are

15  relying in whole or in part in this case?

16    A.  And again, you're asking from counsel?

17    Q.  Yes, sir.

18    A.  Again, I don't know until I would

19  review the substance of all of the E-mails.

20      MR. MEUNIER:

21        Well, we'd like to call for the

22        production of the E-mails, and if not,

23        at the very least a privileged log

24        that identifies the E-mails so that we

18

1      intelligent way with the Court.  And

2      we'd like to hold the deposition of

3      Mr. Truax open until that issue is

4      resolved.

5      MR. ZWAIN:

6          I don't have a problem providing

7      you with the E-mails and providing you

8      with a privileged log or even

9      producing those over which perhaps no

10      privilege is asserted.  I do have a

11      problem with leaving the deposition

12      open.

13      MR. MARPLE:

14          And let me state that to the

15      extent that they fall within the draft

16      provision of the CMO we would object

17      on that basis to any production.

18      MR. MEUNIER:

19          So I understand we will be

20      furnished with either the E-mails or a

21      privileged log reflecting each and

22      every one of the E-mails as to which a

23      privilege is asserted, at least by

24      some descriptive reference that makes

19

1       Court, and that the E-mails covered by

2       that agreement include not only

3       E-mails between the witness and

4       counsel but also E-mails between him

5       and other individuals, including the

6       Clarion group.  Is that agreed?

7       MR. MARPLE:

8           We'll review that on behalf of

9       MRGO, your request.  Certainly we'll

10      consider it.  I think it may also

11      be -- then that would be a request we

12      would make with respect to all of the

13      defendants' experts, as well.  Excuse

14      me, plaintiffs' experts.

15  EXAMINATION BY MR. MEUNIER:

16    Q.   Item Number 2 asks you for all billing

17  information, invoices, et cetera, relative to

18  this case.  Have you produced that, Mr. Truax?

19    A.   I did not bring that today, but that's

20  easily obtained.  I thought I had already

21  furnished that to counsel and they had provided

22  it to you.

23      MR. MARPLE:

24          I believe you were furnished it

20

1    it.  But those were sent to Mr. Bruno

2    yesterday.

3    MR. ZWAIN:

4        I did see that MRGO were

5    transmitted electronically.  We can do

6    the same for levee.

7    MR. MEUNIER:

8        If you have that with you, I

9    would appreciate it, counsel.  So the

10    MRGO bills were transmitted yesterday

11    electronically to Joe Bruno?

12    MR. MARPLE:

13        Yes.  And perhaps others.

14    MR. MEUNIER:

15        And the levee bills will be

16    furnished when?

17    MR. ZWAIN:

18        Um -- if this deposition goes

19    into tomorrow, you can have them by

20        then.

21  EXAMINATION BY MR. MEUNIER:

22    Q.  I gather from this discourse that your

23  billing is being kept separate between the MRGO

24  and levee cases, Mr. Truax?

**truax0926.txt**                    **Page 20**

21

1    Q.   The third item asks for the production

2  of all documents, including electronic, that

3  have been reviewed or received or considered by

4  you in this matter.

5    A.   What you have before you are my field

6  notes and other information taken during

7  essentially inspections of the plaintiffs'

8  properties that were offered for inspection.  I

9  certainly have received and seen the expert

10  reports, the other expert reports in this case,

11  which I did not bring with me today assuming

12  that certainly you had all of those documents,

13  as well.

14    Q.   You were also asked to furnish today a

15  copy of your current curriculum vitae,

16  including a list of all publications you have

17  authored or contributed to authoring.  And we

18  do see that you attached to your September 10,

19  2007 levee report, as Exhibit A, a list of your

20  qualifications, and you've attached, similarly,

21  to your August 28, '07 MRGO report, as Exhibit

22  A, that CV.

23        Is that CV current in all respects?

24    A.   Yes.

22

1  in either case reference publications, as

2  requested.  Do I take it from that that you

3  have not either authored or contributed to

4  authoring any professional publications?

5     A.  Correct.

6     Q.  So you've never written on any subject

7  in your field in a peer reviewed publication.

8     A.  Correct.

9     Q.  Have you ever presented a paper on any

10  subject in your field to a group of your peers

11  at some professional gathering or meeting?

12     A.  Not a paper that was submitted in

13  writing, no.  I have participated in a

14  convention, if you will, as the assessing

15  officers and an attorney group had a joint

16  session down here in New Orleans, and I

17  participated in a mock trial.

18     Q.  Is that the only time you've

19  participated in making any kind of a

20  presentation in your field?

21     A.  Oh, I think through the years I may

22  have been on one or two question and answer

23  type panels.  But I can't recall particularly

24  the dates and the locations.

23

1  officer/attorney meeting and mock trial.  When

2  was that?

3      A.   It was held in New Orleans, um -- some

4  years ago.

5      Q.   How long ago is some years ago?

6      A.   I would say more than five, less than

7  ten.  And as I stated, it was a mock trial.

8      Q.   A mock trial for which litigation?

9      A.   Um -- no particular litigation.  It

10  was a presentation of how experts might testify

11  in a trial setting.

12      Q.   Who was the audience?

13      A.   It appeared to be a mix of assessors

14  and attorneys.

15      Q.   Who was the sponsor of the event?

16      A.   Um -- if you said the acronym, I would

17  recognize it.  But it was -- it's the --

18      Q.   LADC?

19      A.   No.  No, I want to say it was the --

20  it was sponsored primarily by the assessing

21  officers group, but there's a particular group

22  that also has a legal connection, and it was

23  that group.  I probably have it -- have some

24  record of it certainly in my files somewhere.

24

1  through counsel?

2    A.  I believe so.

3    Q.  And so you gave a mock testimony as an

4  expert?

5    A.  I was a participant.  Exactly.

6    Q.  And so you were put on the witness

7  stand, so to speak, and examined and

8  cross-examined.

9    A.  Correct.

10    Q.  And was that mock testimony

11  transcribed?

12    A.  I don't believe so.

13    Q.  Did you write any reports as an

14  expert, as a mock expert for the purpose of the

15  exercise?

16    A.  No.

17    Q.  Did your mock testimony deal with the

18  subject of mass appraisal in any way?

19    A.  No.

20    Q.  What did it deal with?

21    A.  I believe we kept it quite simple, and

22  the property being appraised, if you will, was

23  a house.

24    Q.  So you gave mock testimony on how you

25

1  property?

2    A.  How I'd appraised it and, I guess, the

3  issues around the valuation of the house.

4    Q.  Did the issue deal with flood versus

5  wind and water damage?

6    A.  No.

7    Q.  Did it deal with flood damage in any

8  way?

9    A.  No.

10    Q.   The two question and answer panels you

11  think you remember being on, although you don't

12  remember when, did either one of those events

13  deal with the subject of mass appraisal?

14    A.  I don't believe so.

15    Q.  Did either deal with the appraisal of

16  flood damage to property?

17    A.  I do not believe so.

18    Q.  Item 5 calls for the production of the

19  entirety of your file with respect to the

20  Katrina case, to the extent that's not already

21  addressed in the preceding.  Now, you've given

22  us the disks and the folder of material

23  referring to Item 1, save for E-mails, and I

24  understand we're going to get some billing

26

1  you've reviewed and relied on, and of course

2  your CV.

3        Other than those things, is there

4  anything else that constitutes your file in the

5  Katrina case, including both MRGO and levee?

6    A.  I did not reproduce maps that I had

7  used to run from property to property as we

8  were moving through the inspection process,

9  um -- certainly have the 12th Edition of The

10  Appraisal of Real Estate that was conceivably

11  part of that file.  I did not produce that, as

12  well.  But yes, substantially, you have all of

13  the records that I have.

14        MR. BRUNO:

15            By did way, we can't find any of

16            the production.  Bill said he's going

17            to send us a copy, which is no

18            problem.  And we got the bills

19            yesterday.  I think.  That's what I'm

20            confused about.  Are the bills for

21            both MRGO and levee or is there a

22            differential?

23        MR. ZWAIN:

24            Just MRGO.

27

1        Yeah.  These were sent yesterday.

2        There's another copy of them.

3        (Tendering.)

4        MR. ZWAIN:

5           I will get you the levee bills.

6        I'm going to try for sometime today,

7        but at the latest tomorrow.

8     A.   There is one thing I might add that I

9  didn't produce.  You know, the articles and the

10  like that are sourced that are out there in the

11  public domain.

12  EXAMINATION BY MR. MEUNIER:

13     Q.   So there are some articles that you

14  have reviewed and relied on that are in the

15  public domain that you have not produced?

16     A.   Correct.

17     Q.   Are those articles all referenced in

18  your various reports?

19     A.   Yes.

20     Q.   Item Number 6 calls for a list of all

21  cases in which you have testified.  And this

22  was modified to refer to the last four years,

23  not five years as stated in the exhibit.  You

24  have attached, and we're going to talk about

28

1  last four years, you've made that an attachment

2  to your reports.

3     A.  Correct.

4     Q.  And that list is complete and up to

5  date at this point.

6     A.  Yes.  For the four years.

7     Q.  All right.  And 7 talks about the same

8  thing with respect to trials.

9        Number 8 references all materials

10  relied upon.  And again, we're referred to this

11  material that you have produced, the CDs and

12  the material in this folder.  In addition,

13  you've listed reliance documents associated

14  with your report.

15     A.  Correct.

16     Q.  And that would be a complete

17  identification of all that you have referred

18  to.

19     A.  Correct.

20     Q.  Item Number 9 asks for the most recent

21  six reports that you have prepared as an expert

22  in class action litigation.  Do you have a

23  response to that request?

24     A.  I have not been involved in a class

29

1    Q.  Well, the request is for reports that

2  you have prepared in class action litigation,

3  not limiting it to the question of class

4  certification.  Do you understand?  So it would

5  be any kind of a report issued in any class

6  action for any purpose.

7        Is it your testimony that before this

8  case you have never rendered a written report

9  as an expert in any class action for any

10  purpose?

11    A.  Well, when you say any purpose, could

12  I have certainly done an appraisal of a

13  property for someone who was potentially

14  involved in a class action dispute or some

15  sort?  That's possible.  But sitting here

16  today, I can't tell you that I have specific

17  recollection where that was a, I guess, an

18  important issue to me.  But that's not -- it's

19  not inconceivable that I've done an appraisal

20  at the request of someone who was involved in a

21  class action litigation of some sort, but I was

22  not necessarily involved in that particular,

23  um -- the particulars of the class fight.

24  Someone may have just asked me to appraise a

30

1  wasn't necessarily aware of that.

2       But as I said, sitting here today I

3  don't recollect any property that -- where I

4  was aware that it was involved in a class suit.

5    Q.  All right.  So you've never knowingly

6  rendered an expert report in a class action

7  before this case.

8    A.  Correct.

9    Q.  Number 10 asks that you furnish all

10  documents pertaining to any model that you

11  propose to do.  Would it be safe to say that

12  you don't intend to produce any modeling in

13  this case?

14    A.  Correct.

15    Q.  Number 11 likewise refers to models

16  and would be non applicable.  And the same

17  with -- well, let me ask you about Number 11

18  and 12 together.  Those refer to models that

19  you may have produced in prior cases, as well

20  as models that may have been put into effect

21  even outside of the litigation.

22       Can you think of anything that fits

23  that description in your case?

24    A.  No.

31

1  And for pagination purposes I'm going to refer

2  to Exhibit A attached to your September 10,

3  2007 levee report.  And it begins at Page 21.

4       Do you have that?

5  A.  I do.

6  Q.  You have a BS in engineering; correct?

7  A.  Correct.

8  Q.  During your undergraduate career, did

9  you take any courses in statistics?

10  A.  Yes.

11  Q.  How many?

12  A.  I believe one.

13  Q.  Did you take any course in

14  multiregression analysis?

15  A.  I believe in certainly some of the

16  engineering courses we -- there was some

17  minimal discussion of regression type analysis

18  in analyzing certain strength of materials and

19  the like type issues in the engineering field.

20  Q.  Now, on graduating, you worked for

21  about twenty-six years for Max Derbes, Inc. as

22  a realtor, appraiser and developer, correct?

23  A.  Correct.

24  Q.  What were your professional

32

1 categories of activity, realtor, appraiser and

2 developer?

3    A.  It was principally doing appraisal and

4 consulting work.  I did do some limited

5 development myself, and held a broker 's

6 license and through the years accounted as a

7 broker/agent in several transactions.

8    Q.  Principally, though, you worked as a

9 real estate appraiser?

10    A.  Yes.

11    Q.  Then you became a partner with the

12 Derbes company in 2002, correct?

13    A.  That is correct.

14    Q.  And formed your own company then in

15 March of 2005.

16    A.  Correct.

17    Q.  How, if at all, has your professional

18 activity changed since forming your own company

19 in March of '05?

20    A.  It is substantially the same.

21    Q.  So most of your professional time is

22 spent as a real estate appraiser?

23    A.  Correct.

24    Q.  When did you become certified in

33

1    A.  I don't recall the year, but it was --

2  once the certification law was passed it was

3  very shortly thereafter.

4    Q.  Can you give me some general idea when

5  it was?

6    A.  I really don't remember when they

7  passed the law.  Obviously those of us -- I was

8  already an MAI at the time, or had that

9  designation.  The transition was fairly simple,

10  I had to sit and take the comprehensive exam

11  and submit the experience requirement -- the

12  hours of experience that they required.  But I

13  don't remember the exact date that they passed

14  the certification law in Louisiana.

15    Q.  And when you say -- when you reference

16  MAI with the Appraisal Institute, what does MAI

17  stand for?

18    A.  It stands for Member of the Appraisal

19  Institute.

20    Q.  And when did you become a member?

21    A.  I believe '84.

22    Q.  How did you come to be a certified

23  general appraiser for the State of Michigan?

24    A.  We were involved -- our firm was

**truax0926.txt**                    **Page 33**

34

1  the state of Michigan, so I became certified in

2  that state to assist in those appraisals.

3     Q.   When was that?

4     A.   Oh, I believe I first became certified

5  there three or four years ago, and have

6  maintained it through the current date.

7     Q.   Well, what is involved in maintaining

8  your MAI status?

9     A.   We're required to take a certain

10  amount of education on a site specific basis.

11  I believe it's 100 hours every five years,

12  including certainly USPAP or standards course,

13  and they're fairly flexible beyond that in

14  terms of course materials you can take.

15     Q.   And what is involved in maintaining

16  your certification as a Louisiana real estate

17  appraiser?

18     A.   Well, they operate on a two-year

19  cycle, and require I believe it's thirty or

20  sixty hours, I forget which, every two years.

21  And there's certainly some crossover in terms

22  of the hours that can be used for the institute

23  as well as the state.

24     Q.   Have you been an MAI without

35

1    A.  Yes.

2    Q.  And have you been -- has your

3  certification in Louisiana been without

4  interruption since you received it?

5    A.  Yes.

6    Q.  In your CV, this is at Page 22, you

7  list -- you have a listing under approved fee

8  appraiser for, and then you list different

9  entities.  What is meant by approved fee

10  appraiser?

11    A.  Most of the entities cited on that

12  list are financial institutions, and generally

13  they'll have an approval process that they

14  require before they will engage you to do work

15  for them.  So in these cases I went through

16  that process and was certainly approved by the

17  gate keeper at those institutions to do work

18  for them.

19    Q.  So in each of these cases listed under

20  approved fee appraiser, you initiated or sought

21  approval from the entity and followed whatever

22  procedures that entity had to be approved?

23    A.  Essentially, yes.  I mean, we don't

24  always initiate the inquiry.  Many times the

36

1  expertise in a field they have interest in or

2  have a property where that expertise is

3  required, and will then ask us to submit the

4  necessary paperwork to become approved so that

5  we can work for them.

6    Q.   And I notice that Jefferson Parish is

7  one of the entities that has -- that is listed

8  here.

9    A.   Yes.

10   Q.   But not Orleans Parish.

11   A.   I'm not sure Orleans Parish has the

12  same process.  We have worked for Orleans

13  Parish, or departments of Orleans Parish.

14   Q.   So are you saying Jefferson Parish has

15  a process for the approval of fee appraisers,

16  but you don't believe that Orleans does?

17   A.   I remember the -- you know, the

18  necessity for, quote, being approved by

19  Jefferson Parish.  As I say, I've done jobs for

20  Orleans Parish and I don't remember any process

21  that required anything of me to become

22  approved.

23   Q.   At Page 22 on the bottom and

24  continuing to the top of Page 23, you list

**truax0926.txt**                    **Page 36**

37

1  have worked for, correct?

2     A.   That's a partial list, yes.

3     Q.   Have you ever been retained by

4  individual citizens in a class action or mass

5  tort case?

6     A.   Well, I think I alluded to earlier

7  that over my thirty years, possibly an

8  appraisal I did for someone or a given property

9  may have been for a client who was involved in

10  some class action case, but I'm not aware, and

11  I have no specific recollection where that was

12  the particular use of my appraisal.

13     Q.   What was done for the City of New

14  Orleans, which is one of the clients listed

15  here?

16     A.   The majority of the work I've done for

17  them had to do with the sale of surplus

18  property or the relocation of streets.

19  Sometimes they'll do some exchanges with

20  property owners when they want to relocate a

21  street.  Generally, that type of work.

22     Q.   Nothing dealing with flooding or flood

23  damage?

24     A.   No.

38

1    A.  No.

2    Q.  What have you done for the U.S. Army

3  Corps of Engineers, which is also listed here?

4    A.  Our firm has done quite a bit of work

5  for them through the years.  We were involved

6  where the Strategic Petroleum Reserve program

7  way back in the eighties when they formulated

8  that program.  We appraised the storage

9  facilities -- the oil storage facilities that

10  they ultimately used, and many of the pipeline

11  corridors that were associated with serving

12  those facilities.  A gentleman in my office --

13  I was not heavily involved in that -- worked

14  with in the Atchafalaya basin extensively

15  regarding flowage easements when they were

16  changing their -- how much water was going to

17  flow down the Atchafalaya.

18        We are now doing and have done levee

19  right-of-way acquisition work associated with

20  the expansion of the levee protection system

21  post-Katrina.

22    Q.  Is that it; is that all the work

23  you've done for the Corps that you can recall?

24    A.  I think that covers most of it.

39

1 pipeline corridor work that you did, were you

2 called on to discern the impact of those

3 facilities or corridors on property values?

4     A.  We were appraising the individual

5 properties that were being acquired to

6 implement those programs.

7     Q.  How many properties?

8     A.  Oh, if you include the pipeline

9 corridors, it was probably hundreds.

10    Q.  Can you be more specific than

11 hundreds?

12    A.  No.

13    Q.  And your work was to evaluate hundreds

14 of properties in connection with those

15 properties being taken by the government for

16 purposes of those projects?

17    A.  Correct.  Some were taken in fee,

18 others it was an easement or a servitude.

19    Q.  Did you prepare or issue or render any

20 written reports reflecting your appraisals?  Or

21 your appraisal activity?

22    A.  Oh, yes.  There were written reports

23 submitted probably with regard to almost all of

24 those properties.

40

1    A.   Correct.

2    Q.   Where was this located; where were

3  these properties located?

4    A.   Well, there were a number of

5  locations.  Um -- one of the oil storage

6  facilities was in Bryan Mound, Texas, one in

7  Weeks Island.

8    Q.   Where is Weeks Island?

9    A.   Weeks Island is down in the Avery

10  Island area.

11    Q.   Is that in Louisiana?

12    A.   Yes.  They were all -- there was one

13  in Hackberry, West Hackberry.  There were I

14  think five primary storage facilities, all on

15  salt domes.  And generally, they leased caverns

16  in the salt formation and used that as the

17  reservoir to store the oil.  And they're still

18  in use today.

19    Q.   And you performed individual

20  appraisals on each of the properties involved?

21    A.   Our firm appraised, yes, each of the

22  takings, if you will, or the properties that

23  were proposed for taking related to the caverns

24  themselves, and as I said, we did a lot of the

41

1  that whole program function.

2    Q.  In performing your appraisal analysis,

3  did you refer to comparable properties?

4    A.  Yes.

5    Q.  Tell me how you did that.  What

6  process did you use?

7    A.  We followed a very traditional

8  process.  We researched and analyzed the most

9  relevant comparables that we could find to

10  compare on a particular and individual basis to

11  each of the properties.

12    Q.  And so your work involved both

13  reference to transactional documents and field

14  work.

15    A.  Yes.

16    Q.  And do you have still a record of how

17  much time you spent in this exercise?

18    A.  Um -- I would not have a record of

19  that today, no.

20    Q.  Do you have any estimate of the amount

21  of time you spent on the project?

22    A.  Oh, goodness.  Um -- this was in the

23  eighties, so it was quite a while ago, but this

24  was a very substantial project that was

42

1   Q.   How many years?

2   A.   Probably two or three is my

3 recollection.

4   Q.   And how many individuals besides you

5 were involved in the appraisal work?

6   A.   Probably another four or five.

7   Q.   And what were the total charges paid

8 by the government for your services?

9   A.   I wouldn't be able to give you a

10 definitive number sitting here today.

11   Q.   Could you give me an educated range or

12 estimate?

13   A.   I would say over the course of the

14 entirety of that, probably in the -- including

15 appraisal updates and other associated

16 endeavors, probably a million bucks would be a

17 guesstimate.

18   Q.   Now, I know you told me you can't

19 remember how many properties, you think it was,

20 quote, hundreds.  It would be safe to say we're

21 talking about less than three hundred, correct?

22   A.   Not necessarily correct.  As I said,

23 it's hundreds.  I can't tell you whether it was

24 three or five, sitting here today.

43

1    A.   Again, I don't know without reviewing

2  the records.

3    Q.   All right.  Is it safe to say it was

4  less than a thousand?

5    A.   If you want my recollection, probably.

6    Q.   Okay.  And it took two to three years

7  with you plus four or five people, and the

8  charge was in the neighborhood of a million

9  bucks?

10    A.   Yes.  Now, the majority of the fee was

11  probably linked to the five primary salt

12  caverns, which were a handful of properties.

13  But they were very complex appraisal problems

14  associated with them, and we certainly relied

15  on consultants and the like at that point, as

16  well.

17    Q.   Were the properties in that project

18  that you were appraising residential as well as

19  commercial?

20    A.   There were probably some residential,

21  but the five principal sites, the salt caverns

22  themselves or the salt dome properties

23  generally were not residential.  And the

24  pipeline corridors generally went through rural

44

1  were, certainly, some home sites that were

2  impacted, as well.

3      Q.   So there were home sites, there was

4  some undeveloped land that you appraised, and

5  there was also, in my understanding, commercial

6  structures?

7      A.   Well, certainly I believe the Weeks

8  Island facility and one of the others were

9  literally on active salt mining facilities.

10    Q.   Okay.

11    A.   So those were of an industrial

12  character more than commercial.

13    Q.   Okay.  Tell me about the flowage

14  easement project with the Corps of Engineers.

15  What was the location of that project?

16    A.   It was in the Atchafalaya River basin.

17    Q.   And when was this conducted?

18    A.   Again, probably starting in the

19  eighties and progressed into the nineties.

20  Because of the timing -- certainly it had to do

21  with the timing of their requests.

22    Q.   And again, this was a takings case; in

23  other words, the government was acquiring

24  through eminent domain certain private property

45

1  the Atchafalaya?

2    A.  They were acquiring a limited interest

3  in certain properties in -- that were within

4  the levee system of the lower Atchafalaya

5  basin.

6    Q.  And so your job or your firm's job was

7  to evaluate the market worth of the property in

8  question.

9    A.  Correct.

10    Q.  How many pieces of property, or how

11  many individually owned units of property were

12  involved?

13    A.  Again, it was a substantial number,

14  probably several hundred.

15    Q.  Can we again assume it was less than a

16  thousand?

17    A.  I'm pretty confident it was, yes.

18    Q.  And you performed individual

19  appraisals.

20    A.  Correct.

21    Q.  And how many others besides you were

22  involved?

23    A.  I was only peripherally involved in

24  that, but there were probably two people that

46

1    Q.   Two primary and then you were

2  peripheral?

3    A.   Yes.

4    Q.   How long did that project take?

5    A.   Um -- again, based upon the sequence

6  of requests from the Corps, probably it ran for

7  several years, but certainly not -- we weren't

8  involved in it every day for several years.

9    Q.   What were the total charges by your

10  firm for that service?

11    A.   My recollection is that it was a per

12  parcel kind of fee of somewhere near maybe

13  seven hundred and fifty dollars per parcel.  So

14  you can do the math if -- you know, if it was a

15  couple of hundred property then it would be

16  that fee times two hundred or thereabouts.

17    Q.   And you referred to comparables,

18  related transactions of comparable property in

19  that analysis?

20    A.   Yes.

21    Q.   So the work involved both record

22  research and field work.

23    A.   Correct.

24    Q.   And then I think you named as the

47

1  right-of-way work in connection with the levee

2  expansion post-Katrina.

3      A.   Correct.

4      Q.   What territory or geography were you

5  involved with?

6      A.   Primarily, our firm has primarily been

7  involved in St. Bernard and Plaquemines Parish.

8  We have one small ongoing project in Orleans,

9  as well.

10     Q.   And when did this project begin?

11     A.   Probably sometime near the beginning

12 of '06.  I don't have the exact date, but

13 certainly it was post-Katrina, and once the

14 Corps had organized themselves to the point of

15 knowing what they needed to do and how to

16 proceed and, um -- they began to realize they

17 needed to take some additional property to

18 expand the bases of levees and do what they

19 needed to do to protect the area from flooding.

20     Q.   These are levees along outfall canals?

21     A.   No.

22     Q.   Where are the levees?

23     A.   The majority of the work was done

24 along the MRGO in St. Bernard Parish, and then

48

1 Mississippi River.

2   Q.  So levees along the river and MRGO are

3 where this expansion is involved.  Where the

4 expansion is involved is near or adjacent to

5 levees in MRGO and Mississippi River?

6   A.  Yes.  And we also did some property

7 that they were acquiring to use to obtain

8 borrowing materials to build those levees.

9   Q.  The project began in '06 and it

10 continues to this day?

11   A.  Yes.

12   Q.  Do you have an estimate of the charges

13 to date?

14   A.  Probably several hundred thousand

15 dollars.

16   Q.  Several?

17   A.  Yes.

18   Q.  Do you have a budget or an estimate on

19 the total cost for completion?

20   A.  Well, that's a moving target, because

21 it depends on what they request of us.  So I

22 really don't have a target, per se.

23   Q.  And how many individual units or

24 parcels of property have you appraised thus

49

1    A.  Probably between a hundred and fifty

2  and two hundred.

3    Q.  Do you have any idea of how many total

4  properties will be involved in this project?

5    A.  Not really.  Because again it depends

6  on their needs, and that's a fluid sort of

7  thing.  So, no, I can't tell you.

8    Q.  And you said this is right-of-way

9  acquisition.  So again the exercise is that of

10  eminent domain authority and the government

11  will pay these property owners for the taking

12  of their property in connection with the

13  expansion of the levees?

14    A.  Yes.  Some are fee taking, some are

15  servitudes.

16    Q.  All right.  And in -- you're doing

17  this on a property by property appraisal basis.

18    A.  Correct.

19    Q.  Are you referring again to comparable

20  transactions in that analysis?

21    A.  Yes.

22    Q.  How many people are involved in the

23  project at your firm both for the research

24  aspect and for the field work itself?

50

1    Q.  Two besides you or --

2    A.  Including me.

3    Q.  Including you.  All right.  Who is the

4 other besides you?

5    A.  Michael Truax, Jr.

6    Q.  That's your son.

7    A.  Correct.

8    Q.  Okay.  You list in your CV, and this

9 is at Page 23, you give a partial list of

10 attorney clients, correct?

11    A.  Correct.

12    Q.  One of whom is Frank D'Amico.

13    A.  Correct.

14    Q.  What work did you do for Mr. D'Amico?

15    A.  I believe he had a case in I believe

16 it was Kenner where there was some sloughing of

17 canal banks and there was an issue with regard

18 to whether the property owners could -- what

19 value might be lost as a consequence of the

20 sloughing of these canal banks which was

21 resulting in some cases where their fences were

22 falling into the canal itself.

23    Q.  That was litigation?

24    A.  I think it was potential litigation.

**truax0926.txt**                              **Page 50**

51

1   Q.   Never went to trial?

2   A.   Unh-unh.

3   Q.   And you didn't issue any written

4 reports in that case?

5   A.   Yes, I think we issued a report to

6 Frank D'Amico.

7   Q.   And how many -- was your report one

8 that set forth the appraised value of the

9 properties that were being affected by the

10 sloughing banks?

11   A.   Again, you know, the particular

12 details I can't tell you I remember sitting

13 here today, but I think we did attempt to

14 estimate what value impact there might be.

15   Q.   All right.  When you say estimate the

16 value of the impact, let me make sure I

17 understand what the case is about.

18       Were you asked to discern in that case

19 the diminished value of residential properties

20 given the fact that there was this sloughing of

21 the adjacent canal bank?

22   A.   Well, again, sitting here today I

23 can't tell you that I recall perfectly all of

24 the particulars of the assignment, because it

52

1  certainly I think the issue for which we were

2  contacted, what was the value impact, if you

3  will, associated with the problem?

4     Q.   So, what I'm trying to make sure I

5  understand, though, Mr. Truax, is it's not a

6  takings case where you were trying to come up

7  with a market value of the property and then

8  call on the government entity to pay for that,

9  it was, rather, a claim by the owners that

10  their land had been diminished in value because

11  of the phenomenon of the sloughing bank.

12     A.   Right.  I believe he represented the

13  property owners, yes.

14     Q.   And the case did not end up in formal

15  litigation as far as you know.

16     A.   I'm trying to recall, I might have

17  been deposed in the case, but I can tell you

18  definitively I don't think it went to trial.

19     Q.   Was there an opposing expert, someone

20  who took odds with your analysis?

21     A.   There usually is, but I can't tell you

22  that I recall.

23     Q.   And how many -- I may have asked you

24  this.  How many properties were involved?

53

1  the number, but it was certainly more than one.

2     Q.   Okay.  It was not a class action;

3  you've already told me you don't think --

4     A.   I don't believe so.  Now here's an

5  instance where, you know, exactly what

6  Mr. D'Amico was doing I can't tell you I

7  specifically recall.

8     Q.   And which canal was it?  You told me

9  in Kenner.

10    A.   I believe it's in Kenner.

11    Q.   Does the canal have a name?  Do you

12  remember the name?

13    A.   I'm sure it has a name, but I can't

14  tell you that I know it today.

15    Q.   Was it a drainage canal?

16    A.   Yes, it was a drainage canal.

17    Q.   And was it a canal owned by the City

18  of Kenner?

19    A.   Oh, I can't tell you I recall whether

20  it was them or a drainage district or what

21  entity might have owned it.

22    Q.   How did you discern the price or value

23  impact associated with the sloughing of the

24  canal bank?

54

1  recall the particulars of the analysis process,

2  but I know we reviewed sales data, and I made

3  some effort to do that through the market.

4     Q.   What do you mean through the market?

5     A.   We looked at market evidence as best

6  we could to determine if there was a

7  discernible value difference been those

8  properties, I believe, on the canal versus

9  those off the canal.

10    Q.   Well, did you have reference to actual

11 sales transactions involving the properties

12 that were subject to the sloughing impact?

13    A.   Yes.

14    Q.   So some of those properties were being

15 sold at the time the sloughing was taking

16 place?

17    A.   Um -- they were certainly being sold

18 in a reasonable period of time.  I remember we

19 had transactions of properties on that canal

20 where the problem was apparent.

21    Q.   And so your analysis consisted of

22 comparing sales transactions of properties

23 affected by the sloughing with sales

24 transactions of comparable property in a

55

1    A.  Well, as I told you, I can't tell you

2  sitting here today all the particulars of the

3  analysis.  I'm telling you what I generally

4  recollect.  But clearly, we did look at sales

5  evidence.

6    Q.  All right.  Do you have a name for the

7  technique or the methodology that you used for

8  your analysis?

9    A.  In that case, we would have called it

10  the sales comparison approach, I suspect.

11    Q.  You used no survey techniques in that

12  case.

13    A.  No, not that I recall.

14    Q.  No hedonic model?

15    A.  No.

16    Q.  What work have you done for attorney

17  Gerald Wasserman?

18    A.  The ones that come to mind most

19  recently have to do with establishing a rent

20  for several commercial use properties that were

21  subject to a lease renewal, and the lease

22  renewal rental rate was to be established by an

23  appraisal process.

24    Q.  So it was the appraisal of an

56

1  involved?

2   A.  Yes.

3   Q.   You list projects, major projects you

4  call them, on Pages 23 and 24 of your CV.  Do

5  you see that?

6   A.  Yes.

7   Q.   One of which was a project associated

8  with the Shell Norco explosion, correct?

9   A.  Yes.

10   Q.   Who retained you in the Shell Norco

11  case?

12   A.  It was the law firm that was certainly

13  representing Shell.  I want to say it was Adams

14  and Reese.

15   Q.  Adams and Reese?

16   A.  Yeah.

17   Q.  And what were you retained to do?

18   A.  We were retained to study -- basically

19  do a sales study, track activity and value

20  levels demonstrated primarily in St. Charles

21  and St. John Parish with -- over time, to

22  determine if was there any long-term impacts.

23  That was -- ultimately, it proved to be just a

24  study.  But the focus was trying to see what

57

1  explosion which I think occurred in '88.

2      MR. MEUNIER:

3          We've got someone here that knows

4          something about the case.

5      MR. BRUNO:

6          How can I forget?  They won't let

7          me forget.

8  EXAMINATION BY MR. MEUNIER:

9      Q.   You were aware that was a class

10  action.

11      A.   Yes.  Well, I'm certainly aware

12  ultimately there was a class determined, you

13  know, but we weren't directly -- like I said,

14  ours was purely a study.  It was a research

15  study.

16      Q.   Right.  Did you issue any reports as

17  an expert in that case?

18      A.   I will tell you we likely had

19  certainly some written transmission of

20  something along the way, but I don't recall a

21  comprehensive report submission other than we

22  had data folders, I recall that, and listings

23  of certain of the sales transactions and the

24  sales prices and the like in the communities we

58

1  finding, I don't recall whether it was

2  settled -- it ultimately was settled, and I

3  just don't recall whether we took it beyond

4  that stage at any point in our involvement.

5     Q.  Do you still have a file containing

6  whatever it is you wrote in that case?

7     A.  Probably not.

8     Q.  Not on computer.

9     A.  No.  No, it was a paper process,

10  unfortunately, in the majority back then, or we

11  had a Wang computer system, which finally blew

12  up.  And so whatever was on it is certainly

13  gone.

14     Q.  Did you give testimony under oath in

15  that case, either in trial or at a hearing or

16  deposition?

17     A.  No.  Not that I recall.

18     Q.  How many properties were the subject

19  of your sales study?

20     A.  Well, we were looking at a very broad

21  area in terms of sales activity.  So if you say

22  the subject, it was a majority of the developed

23  portions of St. Charles Parish, certainly

24  downriver of the Norco facility, and of the St.

59

1  core of the LaPlace area at the time but we

2  certainly looked at developments in St. John

3  the Baptist Parish, as well.

4     Q.  Do you have an estimate of the total

5  number of properties involved in your study?

6     A.  No.

7     Q.  Safe to say, though, that it included

8  thousands of properties, both residential and

9  commercial?

10     A.  I think that's fair.

11     Q.  In two different parishes, St. Charles

12  and St. John.

13     A.  Correct.

14     Q.  And your mission for the defendant

15  Shell was to discern the stigma effect, if any,

16  on property values which might be associated

17  with the plant explosion.

18        MR. ZWAIN:

19           Object to the form of the

20           question.

21     A.  Not exactly.  Our mission was to

22  collect and collate the data, and then

23  ultimately we would have looked at, certainly,

24  what the results were.  And I know we did.  We

60

1  from the data itself.

2  EXAMINATION BY MR. MEUNIER:

3     Q.  Well, your mission was to collect the

4  data and look at the data for what purpose?

5     A.  To determine whether there was a, you

6  know, a trend, a discernible value trend,

7  because clearly the arguments were being made,

8  yes, that values I think had declined

9  substantially and were going to -- I assume

10  someone was claiming were going to stay in a

11  depressed state.

12     Q.  So are you troubled by my use of the

13  word stigma, if I ask you whether or not your

14  mission in that case was to address the

15  question of whether any stigma effect could be

16  discerned in property values related to the

17  explosion?

18     A.  No, I'm not troubled by your use of

19  the word.  For me, you know, stigma has to be

20  linked to some factor.  Stigma, as most people

21  use it, that would be considered in any

22  appraisal.  So it's a -- you know, whatever

23  factors there are, of the many hundreds, you

24  know, it's no different than any of the other

61

1    Q.  But in that case, the factor at issue

2  that might have some relationship to property

3  values was a chemical or refinery explosion,

4  correct?  That was the factor?

5    A.  Well, certainly the factor that

6  warranted the study for Shell was that, yes.

7    Q.  Right.  Okay.  Now, tell us what

8  technique or techniques or methodology you

9  adopted in order to undertake this study.

10    A.  We followed fairly traditional

11  appraisal methods.  We researched sales

12  activities, went and researched the data

13  regarding those sales, and then tracked them

14  over a period of time.  I don't recall the

15  period of time.

16    Q.  Now, you were referring again to sales

17  transactions for both residential and

18  commercial properties, in the two parishes?

19    A.  I don't recall much of a focus on

20  commercial, because certainly probably in

21  number there were considerably less.  But we

22  certainly were -- the majority of the sales

23  data points were residential.

24    Q.  And were you referring to sales

62

1  predated the refinery event?

2    A.  I don't have a specific recollection

3  of the time period that we studied sales, but

4  we likely would have looked at something before

5  the explosion.

6    Q.  And then you obviously looked at sales

7  transactions after the event.

8    A.  Yes.

9    Q.  You also looked at sales transactions

10  for properties you considered comparable that

11  were outside of the area being studied; am I

12  correct?

13    A.  I don't know that in moving along with

14  that process that we ever got to a point of

15  looking at any control area.  We may have, I

16  just don't recollect it today.

17    Q.  Well, tell me, as precisely as you

18  can, how you were going to come up with a

19  conclusion about whether there was or was not a

20  stigma effect from the event by the comparison

21  of sales transactions.

22    A.  Well, I think I've told you that my

23  recollection is we never did that.  We were

24  never tasked to do that.  We were tasked to do

63

1  got to the point of doing anything other than

2  reporting what the data presented to us.

3     Q.   Well, maybe I misunderstood you

4  before.  You knew that Shell 's interest was in

5  determining whether or not there was a provable

6  stigma effect from the refinery event, agreed?

7        MR. ZWAIN:

8           Object to form of the question.

9     A.   Well, I can't tell you that I know

10 definitively that that was Shell 's interest.

11 What I'm telling you is that my recollection is

12 that what we were tasked to do and what we did

13 was study the raw data.  I don't recall us

14 going beyond studying, say, sales as they moved

15 over the time line from the explosion forward,

16 and I do remember I believe looking from year

17 to year saying -- and noting what change in the

18 data we saw.  But we never, to my knowledge,

19 or, you know, I don't recollect us ever

20 making -- coming to a conclusion with regard to

21 any stigma or any kind of impact, damage

22 estimate, whatever you want to call it.  I

23 don't think we ever did that.

24    Q.   You were never asked to do that.

64

1  that.  And I believe that's what I told you

2  earlier.  We did a sales study is what we did.

3       MR. ZWAIN:

4            When it's convenient to break,

5       can we do so?

6       MR. MEUNIER:

7            Yeah, let's take a break.

8       (Off the record.)

9  EXAMINATION BY MR. MEUNIER:

10    Q.  I don't know if I asked you, or if you

11  can recall what your total charges were for the

12  sales study work you did in the Shell Norco

13  case.

14    A.  I do not recall.

15    Q.  Now, one of the other projects that

16  you list as a major project in your CV involved

17  the Thompson-Hayworth plant in New Orleans,

18  correct?

19    A.  Correct.

20    Q.  And you say you did a market study of

21  real estate value impact associated with

22  environmental contamination.  Correct?

23    A.  Correct.

24    Q.  Was that a study of the stigma, or

65

1 associated with contamination?

2     A.   Again, much as with the Norco case,

3 the Shell case, as it evolved, it turned out to

4 be just a sales study and a little bit of

5 investigative work as to who was living at what

6 property at the time.  But again, it ultimately

7 was settled before it went beyond that.

8     Q.   Yes, sir, but as in Shell, was your

9 work undertaken as part of a prospective

10 investigation of the potential stigma effect

11 associated with that?

12       MR. ZWAIN:

13          Object to the form of the

14          question.

15     A.   I don't recall, today, whether that

16 task was specifically cited.  But -- because I

17 do remember in the initial stages of that

18 assignment was to really identify, through

19 whatever records we had, property owners and

20 residents of the properties in the immediate

21 area.  And then I believe it did evolve into

22 where we did start to look into sales

23 transactions in the area, but I do not believe

24 it ever got beyond that phase.  Now, would

66

1  getting to something else?  Probably so.

2     Q.  In both Norco and the -- in the Shell

3  Norco project and in the Thompson-Hayworth

4  plant project, Mr. Truax, you participated in

5  studies of real estate or property value

6  impacts associated with, in the case of Shell

7  Norco, an explosion, in the case of

8  Thompson-Hayworth, environmental contamination;

9  is that not true?

10    A.  If your definition of impacts is we

11  studied data that theoretically would have

12  reflected whatever impacts there were

13  associated with the explosion in one instance

14  and the property contamination issues in the

15  other, then yes.  But did we articulate any

16  specific difference in values?  I don't believe

17  we did in either case.

18    Q.  Well, what you're saying is that in

19  terms of outcome in neither case did you ever

20  arrive at a conclusion one way or the other

21  whether such an impact had occurred, correct?

22    A.  I think what we said is, we let the

23  data speak for itself, and whatever impacts

24  there were theoretically would have been

**truax0926.txt**                    **Page 66**

67

1    Q.   Right.  So as an expert, you never

2  arrived at a conclusion one way or the other

3  whether there had or had not been a property

4  value impact in those cases, true?

5    A.   I think what we concluded was that the

6  data was to speak for itself, and whatever the

7  trend was, say, in the Norco case the trend

8  was.

9    Q.   Well, did you or did you not interpret

10  data in either of those cases?

11    A.   I think we reported data.  I'm not

12  sure we interpreted it.  We looked at the data,

13  and mathematically if values went up 10 percent

14  or down 10 percent, they -- it was what it was.

15    Q.   So using the language that you have

16  used in your CV, in both cases you were part of

17  a study of property value or real estate value

18  impact associated with, your words, in the case

19  of Shell an explosion, in the case of

20  Thompson-Hayworth environmental contamination,

21  but you're telling us that in both cases even

22  though that was the nature of the study all you

23  did was gather data and let the data speak for

24  itself.  Is that your testimony?

**truax0926.txt**                                    **Page 67**

68

1  they were settled, yes.

2    Q.  So you never took them to the next

3  step of interpreting to answer the question

4  whether there was or was not impact, is that

5  what you're saying?

6    A.  I think I'm telling you that the data

7  itself, whatever impacts there were, would be

8  reflected in that data.

9    Q.  But you never took the interpretive

10  step of telling anyone what the data reflected

11  as to impact; is that your testimony?

12    A.  I'm telling you we were never asked --

13  we never got to the point in the assignment

14  where that was requested of us.

15    Q.  But the answer to the question whether

16  there was or was not impact was embedded in the

17  data for someone to interpret, if not you,

18  true?

19    A.  I think that's true.

20    Q.  Do you profess to have expertise on

21  interpreting property impact data in order to

22  answer the question whether there has or has

23  not been an impact associated with an event

24  such as an explosion?

**truax0926.txt**                          **Page 68**

69

1  interpret data and reflect impact from any of a

2  host of factors every day.  That's what we do.

3      Q.  And had you gone to the extent of, in

4  these cases Shell Norco and Thompson-Hayworth,

5  of expressing the opinion whether there was or

6  was not a property value impact associated with

7  an event, in both cases you're telling us the

8  methodology you used was a sales -- a

9  transactional sales record comparison.  Is that

10  true?

11     A.  It was a study of comparable sales

12  that had transacted, yes.

13     Q.  And your methodology, then, is to

14  compare sales of properties that arguably,

15  according to plaintiffs, were impacted with

16  sales of properties that could not have been

17  impacted, is that the methodology?

18     A.  Ask that one more time.

19     Q.  I'm asking about your methodology.

20     A.  I understand.

21     Q.  Had you gone the full measure of

22  interpreting and expressing an opinion, the

23  methodology upon which you would have relied

24  would have been a comparison of sales data; you

70

1    A.  Correct.

2    Q.  And the sales data comparison

3  methodology would have called for a comparison

4  of sales of properties in an area that the

5  plaintiffs claimed impact with sales

6  transactions in an area that would not have

7  been associated with an impact.  Is that true?

8    A.  If we were asked to do that.  We may

9  have been asked to do something quite different

10  than that.

11    Q.  No, sir.  I'm -- I'm trying to get

12  away from the question of where you ended in

13  those cases, and I'm asking a broader question

14  about your methodology.

15      Had you completed and gone all the way

16  with the interpretation.  You understand?

17    A.  I do understand.

18    MR. ZWAIN:

19      I think he answered your

20      question.

21    MR. BRUNO:

22      No, he didn't.

23  EXAMINATION BY MR. MEUNIER:

24    Q.  You've already told me, and I don't to

71

1  data comparison methodology.  Correct?

2    A.  Correct.

3    Q.  All right.  What I'm simply trying to

4  ask as a follow-up, so I can understand, is

5  does that methodology entail -- well, why don't

6  you tell me.  Under that methodology, what

7  different categories of sales are compared to

8  complete the methodology and arrive at your

9  interpretive conclusion?

10    A.  Well, again, I'll go back to what

11  you're asking me to do, as a client.  If the

12  client asks me, in either case, what is the

13  value of this particular property on this date,

14  then I would have certainly looked for

15  comparable sales that relate to that particular

16  property on that particular date and given them

17  that answer based upon that market information.

18  If the client asked me what is the value of

19  that property, in the case of, say, Norco, one

20  year after the explosion, as compared to what

21  it would have been one year prior to the

22  explosion, I would have analyzed sales that

23  related to the value issues for those two

24  property as of those given dates.

72

1  Possibly, possibly not.  But that's exactly

2  what I would do.

3     Q.   Now, in the report that you cosigned

4  with Mr. Roddewig, at Page 9 -- do you have

5  that report with you?

6     A.   Yes.

7     Q.   At Page 9 of that report, and in

8  setting forth your qualifications, you list

9  eight notable projects in which you have had

10  experience analyzing detrimental conditions as

11  they impact property values and markets,

12  correct?

13    A.   Correct.

14    Q.   And you do list Shell Norco, several

15  times in this list, correct?

16    A.   Well, there were several different

17  studies that we did around the Shell Norco

18  plant, so yes.

19    Q.   So are the three references to Shell

20  Norco in this list associated with the project

21  listing of Shell Norco in your CV attached to

22  your levee report?

23    A.   The first one on the list on Page 9 is

24  the same as the reference in the CV.

73

1    A.   The other two were for other -- you

2  know, they did not relate to the cracker

3  explosion.

4    Q.   All right.  Let's talk about them.

5  You studied residential property values near

6  the fence line of Shell Norco.  That's the

7  fourth listing of your --

8    A.   Correct.

9    Q.   Was the aim of that analysis to

10  discern whether there had been an impact on

11  those property values due to proximity to the

12  refinery?

13    A.   The primary focus of that study was to

14  give them an estimate of values for a

15  structured buyout type program.  It was

16  voluntary, certainly, but they wanted an

17  estimate or some sense of the values for the

18  properties near and along the fence line as

19  they proceeded, I guess, to budget or do

20  something else with regard to buying those

21  properties, which I think they've been ding for

22  years, buying properties that became available

23  along their fence line.

24    Q.   Yes, sir, but you list the project as

74

1  determining the impact of detrimental

2  conditions on property values, correct?

3     A.   Well, clearly there was -- one of the

4  things we did was look at an attempt to focus

5  on sales in doing that, which were subject to

6  the same influence, that is, they were very

7  proximate to the Shell Norco facility, which

8  is, by most people's estimation, not considered

9  an amenity for a residential location.

10     Q.   And then the final listing here is the

11  Shell Norco project where you undertook to

12  determine the potential impact on property

13  value due to noise from the refinery, correct?

14     A.   Right.

15     Q.   And in other cases you undertook, for

16  example, to determine property value impact

17  from highway noise, correct?

18     A.   Correct.

19     Q.   Property value impact from PCB

20  contamination, correct?

21     A.   Correct.

22     Q.   Property value impact associated with

23  contamination due to hazardous materials for

24  commercial properties in New Orleans, correct?

75

1    Q.   You've studied the property value

2  impact associated with leaks from a pipeline in

3  St. James Parish, haven't you?

4    A.   Right.

5    Q.   And you've studied the impact on

6  property values caused by mold contamination in

7  New Orleans.

8    A.   Correct.

9    Q.   Now, the Thompson-Hayworth project

10  which you list as a major one for your levee

11  report CV, is that identified in the listing on

12  Page 9 of your detrimental condition

13  experience?

14    A.   No, it wasn't listed there.

15    Q.   Why not?

16    A.   Probably an omission.  No particular

17  reason.

18    Q.   All right.  Well, can you think of any

19  other omissions of cases you haven't told us

20  about besides these where you have undertaken

21  part of an analysis aimed at discerning the

22  property value impact from an event such as

23  contamination or explosion?

24    A.   No.

**truax0926.txt**                                    **Page 75**

76

1 an analysis of the possible impact on property

2 values associated with a flood event?

3    A.   Not that I recall.

4    Q.   And in all of these cases, your

5 reported wide experience in discerning possible

6 impact on property value associated with an

7 event, a negative event or a detrimental

8 condition, has your methodology always been a

9 sales transaction comparison?

10    A.   Yes.

11    Q.   You've told me you took a course in

12 statistics in college.  That's the only

13 training you've had in statistics?

14    A.   Well, I suspect in some of the

15 Appraisal Institute courses I've taken there

16 was probably cursory discussion of it.  And I

17 believe one of my seminars that I took was an

18 ABM seminar.

19    Q.   For purposes of the sales comparison

20 methodology that you've used in your

21 detrimental condition work, what can you tell

22 me constitutes a sufficient statistical sample

23 from which to draw conclusions about price

24 impact?

77

1  of specific number?  I can't tell you that I

2  would have a number for you.

3      Q.   Well, is the number that you need for

4  statistical purposes dependent on the number of

5  total properties in the study?

6      A.   It certainly probably is statistically

7  relevant, yes.

8      Q.   So, for example, if I have a hundred

9  properties that allegedly were affected by a

10  detrimental condition or an event such as an

11  explosion or a flood or any negative event, and

12  you have a hundred properties and you want to

13  ask the question whether there was or was not a

14  stigma or price effect from the event, what

15  would you regard for those hundred properties

16  to be the minimum number of properties that

17  you'd have to include in your sales comparison

18  methodology?

19      A.   Well, I'm not sure there's an answer

20  to that question, given the parameters only

21  that you've given me.  If, say, you had

22  tremendous variety in the whole hundred

23  properties, a statistical analysis may not be

24  appropriate at all.  Or whatever grouping you

78

1  know, I'm not a big proponent of statistical

2  applications for individual property appraisals

3  because I find it to be, in my experience,

4  particularly in local markets, very unreliable

5  in terms of a broad brush approach to an

6  individual property valuation.

7    Q.  Yeah.  So maybe I didn't ask my

8  question clearly enough.  I'm asking about your

9  methodology, your sales comparison methodology.

10      Whenever you undertake to discern the

11  price impact on -- the property value impact of

12  a detrimental condition, under your methodology

13  of comparing the sales transactions, can you

14  tell us what you regard to be a sufficient

15  number of transactions studied in order to draw

16  conclusions applicable to the property being

17  studied?

18    A.  I think I've told you that in almost

19  all these cases we studied the data broadly and

20  let the data speak for itself, and that we

21  never went to the final step, if you will, of

22  coming to value conclusions.  If you're asking

23  me how would I approach assessing the impact of

24  a particular property, we would go back to the

79

1  comparables, three, four, to be -- merely a

2  handful if they were very good comparables and

3  were directly related, or in my opinion were

4  very good indicators of value for the subject

5  property, and analyze it in that context.  We

6  would do it on an individual property basis.

7      Q.   So you'd ask the question whether

8  there was or was not a value impact a hundred

9  times for a hundred properties, right?

10     A.   To get an articulate, credible answer,

11  yes.

12     Q.   You'd ask that same question a

13  thousand times for a thousand properties.

14     A.   Yes.

15     Q.   You'd ask it thirty thousand times for

16  thirty thousand properties.

17     A.   Yes.

18     Q.   Same question.

19     A.   Same question.

20     Q.   You'd just keep asking the same

21  question on a per property basis.  That's your

22  approach?

23     A.   That's correct.

24     Q.   And how many comparables you'd have to

80

1 every property would depend upon the unique

2 characteristics of that property?

3     A.   Yes, and the characteristics of your

4 comparable data pool.

5     Q.   Now, you've listed all the occasions

6 on which you've given testimony in deposition

7 or in Court as an expert.  Have you ever been

8 subject to a Daubert challenge?

9     A.   No.

10     Q.   Do you know what I mean by a Daubert

11 challenge?

12     A.   Yes.

13     Q.   In what fields have you been tendered

14 as an expert in these various cases?

15     A.   Certainly in the field of real estate

16 valuation and consultation.

17     Q.   In what field are you being tendered

18 in this case?

19     A.   I think in the field of real estate

20 valuation and consultation.

21     Q.   And what does that field entail?

22     A.   Well, it entails certainly evaluating

23 real estate markets, potentially looking at

24 values, but also more broadly looking and

81

1 real estate values and affect markets.

2    Q.  Including potential negative effects

3 on value due to an event such as a flood.

4    A.  I think as it would relate to a value

5 issue, any factor that would affect value.

6    Q.  What percentage of your professional

7 time is spent serving as an expert in legal

8 cases?

9    A.  Oh, I would say less than 20 percent,

10 but, you know, that's a horseback estimate from

11 me.

12    Q.  And on those occasions when you serve

13 as an expert, what percentage of the time are

14 you hired by a defendant which has been sued in

15 a case?

16    A.  I don't know that I could give you a

17 good reasonable answer on that one.  I would

18 say more often than not my perception would be

19 that it's on the defendant's side.  But not

20 always.

21    Q.  What is your average annual income

22 from your work as a legal expert?

23    A.  Particularly as a legal expert?  I

24 wouldn't have a number on that, as well.

82

1  income is associated with your legal work as an

2  expert?

3     A.  Again, if we link the 20 percent I've

4  given you as the amount of time I spent in that

5  effort, possibly 20 percent.

6     Q.  And your hourly rate is $250 an hour

7  for consulting and analysis, and $375 an hour

8  for testimony?

9     A.  Correct.

10    Q.  And we have received this document

11  relative to the MRGO case.  (Tendering.)

12        Can you verify that that is your total

13  bill for services to date as an expert in the

14  MRGO case?

15    A.  I believe that is correct.  We've

16  submitted three invoices in both of these cases

17  to this point.

18        MR. ZWAIN:

19            And I just E-mailed you the three

20            invoices he submitted in the levee

21            case, Joe.  You should be getting that

22            within seconds.

23  EXAMINATION BY MR. MEUNIER:

24    Q.  So the total amount that you

83

1  case is $23,250?

2      A.  I didn't total those, nor exclude

3  anything that wasn't related to me.  I don't

4  remember if there was anyone else on those

5  invoices.  It's approximately thirty-two

6  thousand or so, for me personally.

7      Q.  Thirty-two thousand to date in MRGO.

8      A.  I think that's correct.

9      Q.  And the invoice that we're receiving

10  now for the billing in levees is about sixteen

11  thousand?  Does that --

12      A.  Again, you know, the numbers will

13  speak for themselves.

14      Q.  Well, do you think you spent twice as

15  much work in MRGO as in levee?

16      MR. ZWAIN:

17          There are three invoices there.

18          One was sixteen thousand.

19      MR. BRUNO:

20          One for eighteen, one for

21          seventeen and one for sixteen.

22  EXAMINATION BY MR. MEUNIER:

23      Q.  Does it sound right to you that

24  there's been billing to date in levee of about

84

1    A.   Again, if that's what the numbers say.

2  I'm not going to dispute it.  Yeah.

3    Q.   And then $32,000 to date in MRGO.

4    A.   Correct.  Apparently.

5    Q.   And were you hired in both cases

6  simultaneously?

7    A.   Not simultaneously, but I think it was

8  close in time.

9    Q.   Okay.  In which case were you first

10  hired?

11    A.   I think I was hired in levee first,

12  but again the dates are shown on the invoices

13  as to when the first billing occurred, so.

14    Q.   So when were you retained in levee?

15    A.   I'm not looking at a levee invoice,

16  so.

17        MR. ZWAIN:

18          (Indicating.)

19    A.   Yeah.  I had my first meeting with

20  Gary Zwain and others in March of '07, and my

21  first billing for MRGO was around June.  So

22  levee would have been first.

23  EXAMINATION BY MR. MEUNIER:

24    Q.   So you had been retained for a little

85

1    A.   Approximately.

2    Q.   And your billing to date is about

3  $83,000 for that period of time?  $32,000 in

4  MRGO and $51,000 in levee?  Does that sound

5  right?

6    A.   Again, trusting that you're doing the

7  math correctly.

8    Q.   And what are you asked to do in these

9  cases?

10    A.   Well, I certainly have been asked to

11  go out and inspect all of the named plaintiffs'

12  properties, which was fairly time consuming,

13  um -- and then prepare the reports that you

14  have.

15    Q.   You have not been asked to do anything

16  in regard to the analysis of potential property

17  value impact due to the flood event?

18    A.   No.  As to particular value impact,

19  no.

20    Q.   And you told me before about the cases

21  in which you undertook to collect sales data

22  which would have been a basis for some

23  interpretation, although you may not have

24  always arrived at the interpretation?

**truax0926.txt**                        **Page 85**

86

1   Q.  Have you even undertaken, in this

2   case, to collect sales data aimed at some later

3   discernment of a price impact due to flood?

4   A.  In levee, we looked at sales

5   transaction data in the study areas that are in

6   this report, and I believe that's contained in

7   a schedule within the report.

8   Q.  Is that it?  Is that the extent of

9   what you've done in that regard?

10   A.  Yeah.  I think we have made statements

11   about some transactional volume as indicated,

12   say, through the MLS system, but in terms of

13   actually looking at sales transactions and

14   collecting individual sale transactions, yeah,

15   the only place we have done that, to my

16   knowledge, is in the study areas.

17   Q.  How many total properties, residential

18   and commercial, are in the class areas of the

19   MRGO and levee cases that have been proposed?

20   A.  Thousands.

21   Q.  Can you be more specific?

22   A.  Um -- no, not particularly.

23   Q.  Well, I believe in your MRGO report,

24   which I think we'll end up talking about

87

1  residential properties in the MRGO subclass

2  areas.  Do you not recall what?

3      A.   Yeah.  I recall certainly -- if you

4  want to direct me to the page, I'll look at it

5  for you.

6      Q.   Okay.  Well, let's assume that in that

7  report you've got a total of about 66,000

8  residential properties in the MRGO class area,

9  if you want to find that.

10     A.   Yeah.  For efficiency, if you know

11  exactly where it is why don't you point me in

12  that direction.

13     Q.   Page 8 of your report, using 2000

14  census data, 34,000 residential properties in

15  New Orleans East, 7,000 in the Lower Ninth

16  Ward, 25,000 in St. Bernard, that's a total of

17  66,000, correct?

18     A.   If you have added correctly, correct.

19     Q.   And that's based on seven year old

20  census data.

21     A.   Correct.

22     Q.   And can we assume that there are more

23  than 66,000 -- or were more than 66,000

24  residential properties in New Orleans East,

88

1    A.  I think we can assume that.

2    Q.  All right.  So did that help you

3 arrive at any estimate of the total residential

4 properties, adding MRGO and the levee proposed

5 class areas?

6    A.  It would likely be somewhat north of

7 70,000.

8    Q.  It would be over 100,000, wouldn't it?

9    A.  I'm sorry.  You added --

10   Q.  Total, levee and MRGO.

11   A.  Oh.  Yeah, yeah, yeah.  Levee and

12 MRGO, yeah.

13   Q.  Easily over 100,000.

14   A.  Yes.  Yes.

15   Q.  Now, if you are charged in this case

16 with the task of analyzing whether or not there

17 has been any price impact or property value

18 impact for these properties that can be

19 associated with the flood in these communities

20 after Katrina, would your methodology, as it

21 has been heretofore, be a sales comparison

22 methodology?

23   A.  Yes.

24   Q.  And you would go property by property

**truax0926.txt**                                    **Page 88**

89

1  fit that particular property.

2    A.   Correct.

3    Q.   And you would ask the question a

4  hundred thousand times or more, was there or

5  was there not a property value impact?  Same

6  question.  Right?

7    A.   Same question.  Likely different

8  parameters to be considered, but same basic

9  question, yes.

10    Q.   The question is common to every single

11  property, isn't it?  The question.

12      MR. MARPLE:

13        Object to the form.

14    A.   Potentially, yes.

15  EXAMINATION BY MR. MEUNIER:

16    Q.   Well, is the question different,

17  whether or not there was a property value

18  impact?  Does it change; does the question

19  change?

20    A.   No, but the answer may be -- will be

21  likely no in some cases, yes in others.

22    Q.   All right.  So you're going the take

23  the same common question and you're going to

24  ask it over a hundred thousand times, is that

90

1    A.   Yes.

2    Q.   All right.  Now, how long is this

3  going to take?

4    A.   If you ask me to individually do it,

5  it would take a while.

6    Q.   Ten years?

7    A.   Well, realistically, no.  I mean, I

8  think we have a sense of that from what Road

9  Home is doing.  They've accomplished -- I

10  believe I last saw, you know, over -- or

11  planned to have 96,000 of these properties

12  settled, if you will, by year end, or something

13  like that.  And they have resorted to

14  individual property by property analysis to

15  facilitate the implementation of their program.

16    Q.   Well, they did a mass appraisal for

17  the first wave of properties.

18    A.   And it didn't work.

19    Q.   The people who were the subject of

20  those mass appraisals haven't given their money

21  back, have they?

22    A.   Oh, I suspect a lot of them have filed

23  appeals, but I'm not certain of that.

24    Q.   Okay.  Now, you're not telling us that

91

1  out to discern the property value impact

2  associated with the flood, are you?

3     A.   I think the Road Home program has

4  implemented a specific property appraisal

5  process to utilize in their methodology as they

6  are implementing it to cut checks to people.

7  Pre-storm values certainly were the biggest

8  single issue that they've had to deal with on

9  the appraisal side.

10    Q.   Are you telling us that Road Home has

11  sought to discern whether or not there has been

12  a property value diminution that can be

13  associated with the flood that followed

14  Katrina?  Is that your testimony?

15    A.   At the heart of the Road Home program

16  is to -- an attempt to make people whole, at

17  some level, from the damages that they

18  incurred, as you probably well know,

19  incorporating a series of considerations

20  including insurance, grants, pre-storm values.

21  And the appraisal process, as I understand the

22  Road Home Program, has to do with establishing

23  appropriate pre-storm property values in the

24  majority.

92

1   question when I ask weather it is the object of

2   the Road Home program, in your understanding of

3   that program, to discern whether or not there

4   has been a property value impact that can be

5   associated with the flood after Katrina?  Is

6   that the object of the program?

7      A.   Well, I possibly heard your prior

8   question a little differently.  But you have

9   asked me about damages.  Now, if we focus

10  entirely on property value impact --

11     Q.   Yes, sir.

12     A.   -- in some sense, certainly, their

13  impact -- the whole goal of the program is to,

14  um -- provide people money relating to their

15  impacts, their individual impacts.  Now, part

16  of that process, as I said, involves

17  establishing pre-storm property value, looking

18  at what grants they received, looking at, um --

19  what insurance proceeds they received.  That's

20  all a part of the process, as I understand it,

21  that goes into their assessment of impact to

22  the individual people and for these properties.

23     Q.   So you think the Road Home Program and

24  methodology are valid indicators of how you

93

1 were given to you, of discerning the property

2 value impact of flood in the levee and MRGO

3 class areas.

4    A.   I think the Road Home Program

5 experience would suggest that individual

6 property appraisals, if needed, can be

7 accomplished for a tremendous number of

8 properties in a reasonable period of time.

9    Q.   Right.  And you'd have to go about

10 more than that, wouldn't you?  You'd have to do

11 your sales comparison methodology, and get into

12 comparables per property, as you discussed,

13 correct?

14    A.   Yes, and I believe that's exactly what

15 they're doing.

16    Q.   Well, but -- all right.  So how many

17 properties has Road Home disposed of now that

18 we're what, at two years and a month after

19 Katrina; what's their number of properties

20 accomplished, if you will?

21    A.   Oh, I can't tell you I know the

22 numbers definitively, but remember, don't -- in

23 terms of your time periods, remember, their

24 process was different for probably over a year

**truax0926.txt**                    **Page 93**

94

1  didn't work.  So they then implemented the more

2  detailed analysis that's being conducted now by

3  the appraisal community, and they're doing

4  individual pre-storm property valuations.

5     Q.   So the detailed, house-by-house

6  appraisal is actually going faster for them

7  than the mass appraisal was?  Is that what

8  you're saying?

9     A.   No, I didn't say that.

10    Q.   So when did Road Home begin its

11  appraisal work?

12    A.   Oh, I don't remember the exact date,

13  but clearly there's some articles, I know, that

14  I think are cited in some of these reports,

15  that had some dates about the -- that were

16  issued -- you know, Times Picayune articles

17  that talked about the problems and the new

18  process they were going to implement.

19    Q.   And how many properties have they

20  finished?

21    A.   I don't know the answer to that.

22    Q.   What percentage of the total have they

23  finished?

24    A.   I don't know that.

95

1 efficiency, this program?

2    A.   In its entirety?  No.

3    Q.   Okay.  So you don't know how many

4 years it would take you or a team with you to

5 accomplish the task of discerning property

6 value impact for over a hundred thousand

7 properties, you can't give me any estimate of

8 how long that will take, right?  Using your

9 methodology -- sales comparison methodology.

10    A.   No, I couldn't give you an estimate.

11    Q.   Okay.  Can you give me an estimate of

12 how much it would cost to conduct that analysis

13 in that way for all the properties involved in

14 this litigation?

15    A.   No.

16    Q.   Is it fair to say it would cost

17 millions of dollars?

18    A.   I think that's fair.

19    Q.   And is it fair to say it would take

20 years to finish?

21    A.   Probably years.

22    Q.   Now, let me go back to your CV in the

23 levee report, Page 21.  You list seminars which

24 you've attended, correct?

96

1   Q.   And in 1997, it looks like you

2   attended a seminar on the automated valuation

3   models.  True?

4   A.   True.

5   Q.   Define automation valuation model for

6   me, please.

7   A.   Well, an automated valuation model, as

8   I think typically discussed in the appraisal

9   community, you know, it's an appraisal tool, if

10  you will, a regression analysis, usually

11  computer driven, where you input certain

12  parameters that you would judge to be relevant,

13  and those would be, you know, independent

14  variables, and the whole goal is to get an

15  output or the dependent variable based upon the

16  inputs.

17  Q.   Is it a methodology used in mass

18  appraisal?

19  A.   Again, yes.  I mean, it's a tool that

20  is used in mass appraisal circumstances, yes.

21  Q.   Is it a tool which can be associated

22  with hedonic price modeling?

23  A.   Yes.

24  Q.   Contingent valuation?

97

1  typically, I think, employ an AVM.  Or possibly

2  some element of it could, but I don't believe

3  so.

4     Q.   All right.  Now you defined an

5  automatic valuation model.  Define hedonic

6  price model.

7     A.   Well, an hedonic price model is

8  essentially, again, a modeling method where, my

9  understanding of it is it's a regression

10  analysis type of system that would be employed,

11  again, as a tool, to give you some output that

12  you might find useful.

13    Q.   Is it a model used to discern property

14  value impact associated with a detrimental

15  condition?

16    A.   When you say is it --

17    Q.   Yes.  Is it?  Is it used for that

18  purpose?

19    A.   It could be.

20    Q.   Define contingent valuation.

21    A.   Well, contingent valuation basically

22  is a -- basically a survey method where -- I

23  think generally used for, based upon all the

24  literature and everything I have read, where

98

1  that you're studying is actively traded, so you

2  conduct surveys and, um -- from the surveys

3  make some projections.

4     Q.  Is it a tool that is used in

5  connection with discerning the property value

6  impact of detrimental conditions?

7     A.  Well, when you say when and is, I'm

8  sure someone has used it.  I believe someone

9  that is here today has used it, as I

10  understand.  But is it widely used and accepted

11  in the appraisal community?  To my knowledge,

12  no.

13     Q.  What is conjoint analysis?

14     A.  Well, conjoint analysis, I believe, is

15  basically the concept that, you know, an item

16  is the sum of the appeal of all of its

17  component parts and characteristics, and that

18  those elements can be segregated and, I guess,

19  analyzed independently at some level, though

20  certainly they interact one to another, but

21  that there's this interaction but yet distinct

22  component to all of those items -- I mean to a

23  given item of study.

24     Q.  Is that a tool which has been used in

99

1  impact of detrimental conditions?

2     A.  Well, again, when you say has been

3  used, I believe someone has certainly probably

4  used it.  But again I don't believe it's

5  been -- well, the concept is used, I guess, in

6  appraisal methodology generally.  When we go in

7  and adjust for a various -- let's say a

8  characteristic of a property, we are saying

9  that characteristic is certainly discernible

10  and has some value associated with it.  So in

11  that sense we're giving credibility to the

12  concept of conjoint analysis.

13     Q.  When you say we, you mean real estate

14  appraisers?

15     A.  Yes.

16     Q.  Now, have you attended any automated

17  valuation models seminars since 1997?

18     A.  That was -- where that was the primary

19  topic, no, I don't believe so.

20     Q.  Well, is that the only seminar you've

21  ever attended at which automated valuation

22  models was the primary topic?

23     A.  To the best of my knowledge, yes.

24     Q.  In 1998, you attended a seminar called

100

1    A.   Yes.

2    Q.   What is a DCF model?

3    A.   Discounted cash flow.

4    Q.   By the way, how long did the automated

5  valuation model seminar in 1997 last?

6    A.   Most of those seminars are one-day

7  seminars.

8    Q.   Okay.  Who sponsored that AVM seminar?

9    A.   It was likely the Appraisal Institute.

10    Q.   Where was it held?

11    A.   Don't know.  Or, rather, don't recall.

12    Q.   And in 1999 you attended a seminar

13  called "Attacking and Defending an Appraisal in

14  Litigation."  Was that a seminar about how to

15  conduct yourself as an expert in cases like

16  this?

17    A.   That would certainly be one

18  interpretation of that.

19    Q.   Was there any discussion about

20  automated valuation models or mass appraisal

21  techniques in that seminar?

22    A.   I don't recall.

23    Q.   You at and the he had a seminar called

24  appraisal trends in the year 2006, correct?

101

1    Q.   What do you recall learning at that

2  seminar?

3    A.   I can't tell you I have a specific

4  recollection of that seminar, sitting here

5  today.

6    Q.   You don't know what appraisal trends

7  were discussed at that seminar last year?

8    A.   No.

9    Q.   Were automated valuation models

10  discussed?

11    A.   I think I've told you I don't have a

12  specific recollection of that particular

13  seminar, period.

14    Q.   Okay.  Do I understand correctly,

15  Mr. Truax, that you have never received any

16  formal classroom training regarding automated

17  valuation models outside of that one-hour

18  seminar ten years ago?

19    A.   Well, I think in terms of -- first, I

20  believe I said it was probably a one-day

21  seminar.

22    Q.   I'm sorry.  One day.

23    A.   Some of the Appraisal Institute

24  offerings may have touched upon AVMs.  And

102

1  that deals with mass appraisal use and

2  application in our industry.  So it would have

3  been touched on there.  But in terms of it

4  being, as I've said, a primary topic, I think

5  that's correct, that that would have been the

6  only one.

7     Q.   Have you ever -- I know you never

8  published on AVMs.  Have you ever used an AVM?

9     A.   No.

10    Q.   And you've never given a professional

11  presentation of an AVM.

12    A.   No.

13    Q.   What formal training do you have in

14  mass appraisal?

15    A.   None.

16    Q.   And you've never published or given a

17  paper on mass appraisal either.

18    A.   That's correct.

19    Q.   And you've never participated in a

20  mass appraisal.

21    A.   Correct.

22    Q.   Let me attach as Truax 1 the Exhibit A

23  Qualifications of Michael Truax which are part

24  of the witness' September 10, 2007 letter

103

1  report the witness cosigned with Mr. Roddewig,

2  which we've referred to; as Truax 3, the

3  invoice to date in the MRGO case -- invoices to

4  date; and as Truax 4 the invoices to date in

5  the levee cases, which I assume we'll be able

6  to print out before we finish today.

7        (Exhibits 1, 2, 3 were marked for

8  identification and are attached hereto.)

9  EXAMINATION BY MR. MEUNIER:

10    Q.  Mr. Truax, would you dispute the

11  general assertion that AVMs are being used with

12  increasing frequency in the real estate

13  industry?

14    A.  Well, when you say increasing

15  frequency, I assume you mean over time are we

16  seeing those types of applications more broadly

17  used.  Or are there more of those today than

18  there were ten years ago.

19        Is that your question?

20    Q.  No, that's your question.  But if you

21  want to answer it that way, I'll go from there.

22    A.  No, go ahead and ask me a question.

23    Q.  No.  Answer your question first and

24  we'll go on from there.

104

1          Which question would you like him

2      to answer?

3 EXAMINATION BY MR. MEUNIER:

4    Q.  The question you just posed.  You were

5 saying they've been used more in the last ten

6 years?  Is that your question?

7    A.  I'm saying that's your question to me.

8      MR. ZWAIN:

9          He's asking for you to clarify

10        your question because he doesn't

11        understand it.  So would you --

12      MR. MEUNIER:

13          I'll ask it again.

14      MR. ZWAIN:

15          Good idea.

16 EXAMINATION BY MR. MEUNIER:

17    Q.  Would you dispute the general

18 assertion that AVMs are being used with

19 increasing frequency in the real estate

20 industry?

21    A.  I can't tell you that I definitively

22 know whether they're being used in a numerical

23 way more frequently today than they were, say,

24 a year ago or two years ago.  I can't answer

105

1    Q.  Do you know whether mass appraisal

2  techniques are being used with increasing

3  frequency in the real estate industry?

4    A.  Again, you're asking me a very

5  specific question, do I have data regarding

6  that that I am personally aware of.  No, I do

7  not.

8    Q.  In fact, Mr. Truax, since you have

9  little or no formal training on the subject,

10  you've never published on the subject, would it

11  be fair to say that you do not have specialized

12  expertise regarding AVMs or mass appraisal?

13    A.  Well, I would ask you to define for me

14  what you mean by specialized expertise.

15    Q.  Do you hold yourself out as an expert

16  on AVMs or mass appraisal?

17    A.  No.

18    Q.  Now, you have listed in Exhibit B

19  attached to your September 10, 2007 levee

20  report the testimony that you have given in the

21  last four years, correct?  Do you have that?

22  I'm sorry.  It's Page 26 of the report that you

23  cosigned with Mr. Roddewig.

24    A.  You say 26?

106

1  it's Exhibit B --

2     A.   Got it.

3     Q.   Yeah.  Okay.

4        MR. ZWAIN:

5           To clarify the record, it's

6        Exhibit B to Mr. Truax 's affidavit.

7        Correct?  That he signed himself.

8     A.   Correct.

9  EXAMINATION BY MR. MEUNIER:

10    Q.   Right.  I have a little trouble with

11  the word affidavit for reasons we'll talk about

12  later, but it's a signed report -- a signed

13  document of September 10, and it's Exhibit B.

14  And it's Page 26.

15          And there are twelve -- I think it's

16  twelve -- cases given here where you've given

17  deposition and/or trial testimony as an expert

18  in the last four years, correct?

19    A.   Correct.

20    Q.   Did any of these cases -- did your

21  testimony in any of these cases involve the

22  question of the applicability or

23  appropriateness of mass appraisal?

24    A.   No.

107

1  cases involve the question of the applicability

2  or appropriateness of automated valuation

3  models?

4      A.   No.

5      Q.   Did your testimony in any of these

6  cases involve the appropriateness or

7  applicability of hedonic price modeling?

8      A.   No.

9      Q.   Contingent valuation?

10     A.   No.

11     Q.   Conjoint analysis?

12     A.   By implication, as I discussed earlier

13  with the conjoint analysis, that concept is in

14  most any appraisal process, so the answer to

15  that probably would be yes, conceptually.  But

16  in terms of the direct addressing of a conjoint

17  analysis, no.

18     Q.   All right.  So let me make sure I'm

19  right about the last response.  Although

20  conjoint analysis, you say, is embedded in all

21  of the appraisal work you do, I'm correct that

22  none of these occasions on which you've

23  testified as an expert in the last four years

24  has called on you to address whether or not

108

1  or appropriate in the case at issue.

2    A.  Essentially, you're correct.

3    Q.  Okay.  In any of these twelve cases,

4  Mr. Truax, did your expert testimony involve

5  the question whether there was a property value

6  impact associated with a detrimental condition

7  or event?

8    A.  Yes.

9    Q.  Which ones?

10    A.   The first, the Hawthorne Land Company

11  versus Texas Brine Company.

12    Q.  Any others?

13    A.   The Folmar & Associates versus Select

14  Cleaners, Inc.

15    Q.  Any others?

16    A.  No.

17    Q.  All right.  So in the two cases where

18  you testified on that subject, did you express

19  an opinion as to whether or not there had or

20  had not been a discernible price or property

21  value impact associated with a detrimental

22  condition?

23    A.  Yes.

24    Q.  All right.  In both cases you did?

109

1  the Folmar & Associates versus Select

2  Cleaners --

3    Q.  Yes, sir.

4    A.  -- our firm did the research as to

5  sales activity in our local market, that being

6  Orleans, Jefferson Parish, for properties that

7  had previously had some environmental issues,

8  and studied that -- those sales and other sales

9  evidence to suggest whether there had been a

10  value impact associated with it, and so we did

11  do that, yes.

12    Q.  Now, who hired you in that case?

13  Which side?

14    A.  It was a dispute between an adjoining

15  property owner and the property owner that

16  owned the property, and so I would have been

17  representing the property owner where the -- in

18  that case I think it was perc contamination.  I

19  would have represented that property owner

20  through their attorneys in representing them.

21    Q.  So you were retained on behalf of

22  Select Cleaners or Folmar & Associates?

23    A.  Unfortunately, I'm not good about the

24  names.  But the -- there was actually a

110

1  site of a former cleaners.  And I don't think

2  Select Cleaners was still standing at the time,

3  but some insurance company was, so I would have

4  been hired by the insurance company.

5      Q.  So what was your opinion about the

6  property value impact of environmental

7  contamination?

8      A.  In that particular case, um -- the

9  data pretty will proved that in that instance

10  once the property had received a no further

11  action letter that there would have been

12  literally no impact.

13     Q.  No further action letter being

14  reference to what, LDEQ?

15     A.  Correct.  That they would have

16  basically given it a closure order and said

17  that they weren't requiring you to do anything

18  else in terms of remediation or cleanup.

19     Q.  So the property was fully remediated,

20  according to the environmental authority, and

21  based on that you concluded as an expert that

22  there was no ongoing depressive effect on the

23  property value due to the prior contamination.

24     A.  That's correct.  And we proved that by

111

1  market that had had similar circumstances.  And

2  we looked at their values that were obtained in

3  transactions to prove that.

4    Q.  How many other properties did you

5  reference?

6    A.  I think probably five.  Four or five.

7    Q.  And how long did that analysis for

8  that property take?

9    A.  Oh, I can't tell you definitively, but

10  I mean this was done in a relatively short

11  period of time over a normal work period.

12    Q.  I don't know what you mean by normal

13  work period.

14    A.  Well, we quote -- typically,

15  appraisers are quoting -- commercial

16  appraisers, anyway, thirty to ninety days to

17  complete assignments, and it would have been

18  that sort of window.  And I certainly would not

19  have been working on only that assignment over

20  that period of time, but it would not have

21  involved months and months of primarily

22  research to come to the -- to gather the data

23  and come to the conclusion.

24    Q.  Well, give me an estimate of the

112

1 complete the analysis start to finish. For

2 that one property.

3   A.   Again, I can't tell you definitively

4 sitting here today that I know -- can give you

5 a reasonable answer for that. But I'm telling

6 you it was -- it would have been -- it was --

7 it was days or weeks, not months. Which is not

8 unusual for a commercial property. And this

9 was a commercial property.

10   Q.   And the other case where you addressed

11 this issue of detrimental condition impact on

12 value was the Hawthorne case.

13   A.   Correct.

14   Q.   All right. Tell me about that case.

15 What was issue and who were you retained by?

16   A.   There was a brine pipeline that

17 extended across some property, in I think it

18 was St. Charles Parish, and the pipeline leaked

19 and the brine was released into a certain area,

20 and so the task was to determine whether

21 that -- the property had been damaged as a

22 result of that leak.

23   Q.   Well, was the task to determine

24 whether post remediation of the leak there was

113

1  property value?

2    A.  I think that was one part of it.  It

3  was to determine what impact that leak had --

4  might have had on property value.

5    Q.  And your opinion was there was no

6  impact on the property value, correct?

7    A.  In that particular case, beyond the

8  initial incident, that's right.

9    Q.  And you were hired I guess by Texas

10  Brine Company.

11    A.  Their counsel.

12    Q.  And you did sales comparisons.

13    A.  Yes.

14    Q.  How many different --

15    A.  Comparable sales.

16    Q.  How many different sales do you recall

17  looking at in that case?

18    A.  Oh, we probably looked at eight or ten

19  sales in that case.

20    Q.  And do you think you accomplished that

21  analysis in a matter of weeks?

22    A.  Yes.  I would say so.

23    Q.  Now, in neither the Hawthorne nor the

24  Folmar case was there a continuing -- was there

114

1  am I correct?

2    A.  Well, certainly in the Hawthorne was

3  there -- the pipeline remained in place, the

4  pipeline remained in operation, and it just so

5  happens I think subsequently they had some

6  additional leaks.  So was that risk the same?

7  Yes.

8    Q.  So they had subsequent leaks in the

9  pipeline case.

10    A.  I think that is the case.

11    Q.  Let me attach as Truax 4 the list of

12  the testimony that we've been referring to.

13      (Exhibit 4 was marked for

14  identification and is attached hereto.)

15  EXAMINATION BY MR. MEUNIER:

16    Q.  I'd like to refer now, to Truax, to

17  your September 10, 2007 report in the levee

18  case.  Now you have identified in Exhibit C,

19  Pages 27 through 33, all of the documents that

20  you relied on for writing that report, am I

21  correct?

22    A.  Correct.

23    Q.  So you have not reviewed the

24  plaintiffs' motion to certify a class in either

115

1    A.  I'm sorry.  Ask that again.

2    Q.  You have not reviewed the plaintiffs'

3  motion to certify a class in the levee or MRGO

4  litigation, correct?

5    A.  Well, I suspect I have, yes.

6    Q.  Where is that listed in the court

7  papers that you have listed here?

8    A.  Well, it may be -- my thinking was

9  that it was part of the complaint.  But you're

10  telling me that's a separate document.

11    Q.  Yeah.  I want you to assume for the

12  purpose of my question there's a separate

13  pleading entitled Motion to Certify, a formal

14  request to the Court to certify.  It's not the

15  complaint.  It's not listed here, and do I

16  assume correctly you haven't reviewed it?

17    A.  Well, I'm not going to sit here and

18  tell you that we might not have missed a

19  document in terms of the list of court papers.

20  There were a lot of them.

21    Q.  I'm not accusing you of anything, I'm

22  just -- I'm trying to establish the fact --

23    A.  I understand.  If you showed it to me,

24  I might recall having read it or not.

**truax0926.txt**                                    **Page 115**

116

1    A.  Now, did I rely upon it in some way?

2    Q.  Yeah.

3    A.  I don't know.  I suspect if I was

4  provided -- if it was provided to me, I might

5  have read it.  I think that's what you asked

6  me.

7    Q.  No.  No.  That's not what I asked you.

8  You undertake to list on Page 28 all of the

9  court papers that you reviewed in connection

10  with this case, right?

11    A.  I think that's correct.

12    Q.  And you did that in a serious, good

13  faith effort to be complete so you could tell

14  us today this is what I looked at, right?

15    A.  That was the attempt.

16    Q.  So if you have not listed the

17  plaintiffs' motion to certify, is it fair to

18  say that that's not one of the court documents

19  you've reviewed?

20    A.  I think it's fair to say that

21  certainly if I did, I didn't recall or I didn't

22  list it.

23    Q.  Okay.  And you have also not reviewed

24  the plaintiffs' proposed trial plan in the

117

1    A.   It's not listed, and I don't recall.

2    Q.   Now, you do understand, don't you,

3  that the plaintiffs are only seeking to recover

4  for a flood, that is, rising water intrusion

5  damages, as opposed to wind and rain related

6  damages?  You understand that?

7    A.   That is my understanding.

8    Q.   And you have reviewed Dr. Kilpatrick's

9  expert report and deposition?

10   A.   Yes.

11    Q.   What do you understand to be

12 Dr. Kilpatrick's proposed approach to the class

13 wide assessment of property damage due to

14 flooding in this case?

15   A.   His approach to determine that --

16   Q.   Yes, sir.

17   A.   -- would be to use a mass appraisal

18 technique, um -- likely the contingent

19 valuation methodology, as well, to estimate

20 some measure of damage associated with, I

21 assume, the particular events for which the

22 defendants are liable or may be liable.

23   Q.   Will his approach entail reference to

24 records -- sales records, sales transactional

118

1    A.   Well, I can't tell you, sitting here

2  today, that I would be able to definitively

3  tell you what his approach, you know,

4  particularly would involve.

5    Q.   Do you know -- you don't know the

6  answer to that question?

7    A.   No, I think I'm telling you, if you're

8  going to ask me about the particulars of

9  Dr. Kilpatrick 's approach, I'm not sure in my

10  general recollection of the document that it

11  was very particular in any respect.

12    Q.   So do you know whether his approach

13  will entail reference to transactional data; do

14  you know one way or the other if it will?

15    A.   We'll, given what I read, no, I can't

16  tell you that it was definitively on precisely

17  what he would do.

18    Q.   So let me ask it this way:  Do you

19  assume for purposes of your position and your

20  opinion in this case that Dr. Kilpatrick's

21  approach will not entail reference to sales

22  transactional data?  Is that your assumption?

23    A.   I don't know that I'm assuming

24  anything about what Dr. Kilpatrick would do in

119

1  I think clearly he was going to use a mass

2  appraisal technique.  Now, how he particularly

3  implements that mass appraisal technique, I

4  can't tell you.

5      Q.   Can mass appraisal techniques be used

6  in conjunction with reference to actual sales

7  data, actual transactional information?  Can

8  that be done?

9      A.   Yes.

10     Q.   Can a mass appraisal technique use

11  actual sample appraisals in the field?

12     A.   Can that be done?

13     Q.   Yes.

14     A.   Yes.

15     Q.   You've reviewed the expert report of

16  Kerry Vandell?

17     A.   Yes.

18     Q.   Are you relying on any of the opinions

19  and conclusions of Mr. Vandell in your

20  analysis?

21     A.   I know I read an article by him, and I

22  certainly read his report.  But did I rely on

23  any of the -- say the primary research that

24  they did or whatever his group did?  No, I

120

1   Q.  Now, you have listed certain academic

2  papers, starting at the bottom of Page 28 and

3  then continuing to Page 31 of this list of

4  documents reviewed, correct?

5   A.  Correct.

6   Q.  Is it your testimony, Mr. Truax, that

7  you have read each of these academic papers?

8   A.  It is my testimony that if I missed

9  one, um -- it would be a limited number.  And

10  yes, I have read the vast majority of these.

11   Q.  On Page 29 you reference in article by

12  George Dell called The Myth and The Reality --

13  "AVMs, The Myth and The Reality, The Problem

14  and The Solution," correct?

15   A.  I see that, correct.

16   Q.  What is the problem and what is the

17  solution, according to that article?

18   A.  Oh, I can't tell you today I would

19  recall specifically that particular article.

20   Q.  What is the myth and what is the

21  reality, according to that article?

22   A.  According to Mr. Dell?

23   Q.  Yeah.

24   A.  As I told you, you know, I can't tell

121

1  particulars of that specific article.

2    Q.   You list an article further down on

3  Page 29 by Richard Roddewig who cosigned the

4  report with you in this case.

5    A.   Correct.

6    Q.   And this is an article titled "Valuing

7  Contaminated Properties, et cetera," right?

8    A.   Yes.

9    Q.   So this article addresses the

10  methodology for discerning the price effect or

11  property value impact of environmental

12  contamination?

13    A.   Well, clearly that was a -- as I'm

14  remembering that one, it was a history, if you

15  will, of how contaminated properties have been

16  treated in the appraisal world.

17    Q.   Okay.  Now, you've set forth your own

18  methodology, which is a sales comparison

19  methodology, when you go about trying to

20  discern property value impact of a detrimental

21  condition or environmental event, correct?

22  We've talked about that.

23    A.   Yes.  And I think I've told you that,

24  yeah, in my opinion, that sales comparison

122

1  comparable sales, all of that, in my, um --

2  history and in my experience is the most

3  relevant approach.

4      Q.   Okay.  Does this article by

5  Mr. Roddewig endorse that approach?

6      A.   Well, again, you'd have to show me the

7  context in which maybe you're asking this

8  question as to the specifics of that, but, you

9  know, I don't know if that particular article

10  endorses that approach.

11      Q.   Does the article reference other

12  possible approaches to that question?

13      A.   Oh, I think that article -- yeah.  It

14  was a broad brush look at what has been

15  written, I believe, and, as I said, what the

16  history of the experience has been with how you

17  can approach those problems.

18      Q.   Has mass appraisal been used as a

19  methodology to address that question?

20      A.   Well, again, when you ask a question

21  like has it been, I'm sure in the world it has

22  been used, yes.

23      Q.   At the top of Page 30 you list -- you

24  cite an article by Bill Mundy and David McLean

123

1  correct?

2    A.  Yes.

3    Q.  Does that article endorse the

4  technique of contingent value?

5    A.  I think it does.

6    Q.  Does it endorse it as a means to

7  discern the price effect of environmental

8  damage on property following the event?

9    A.  I believe it does.

10      (Lunch break.)

11  EXAMINATION BY MR. MEUNIER:

12    Q.  Mr. Truax, I'm still referring to your

13  list of academic papers which is starting at

14  Page 28 and continuing in the exhibit

15  attachment to your September 10, '07 report.

16      You cite the article of Lamond, et al,

17  entitled "Does the Price Impact of Flooding

18  Fade Away."  Do you see that?

19    A.  Yes.

20    Q.  What did this article suggest in

21  response to that question?

22    A.  Again, I can't tell you I have

23  specific recollection.  Could you -- if you'd

24  show me the article I might have a better

124

1    Q.  No, sir, I don't have it with me.  But

2  you listed it as an article you've read, and --

3    A.  Correct.

4    Q.   -- I thought you might remember at

5  least --

6      MR. ZWAIN:

7        Do you remember all the articles

8      you've read?

9  EXAMINATION BY MR. MEUNIER:

10   Q.  Well, the basic answer to that

11  question posed in the title.  But you didn't

12  remember?

13   A.  Well, I can't remember what was

14  specifically provided in that particular

15  article.

16   Q.  You've listed, again on Page 30,

17  several articles by Moore and Jang, and Wilson

18  and Yellen, and Waller, all on -- all having

19  automated valuation models or AVM in the title.

20  I'm going to assume, based on your prior

21  answers, that you're not able today to tell me

22  what you recall about reading any of those

23  articles, what you recall from the articles

24  themselves.  Is that true?

125

1   particularity about one article for me to tell

2   you definitively that I have total recall of

3   that particular article sitting here today, no.

4   But if you want to show me the article, it may

5   refresh my memory with a little more

6   specificity as to what it said.

7       Q.   In the article by Bennie Waller called

8   "The Impact of AVMs on the Appraisal Industry,"

9   do you recall whether Mr. Waller in the article

10   characterized the impact of AVMs on the

11   appraisal industry as either negative or

12   positive, or some variation?

13       A.   Again, I can't tell you that I

14   remember that specific article as to what

15   Mr. Waller particularly said.  I think if you

16   look at the literature generally, you will see

17   that there are both positive and negative

18   aspects to the application of AVMs in the

19   appraisal business.

20       Q.   Well, have AVMs been bad for the

21   individual appraisal business?

22       A.   You're asking me for my personal

23   opinion?

24       Q.   Yes.

**truax0926.txt**                                **Page 125**

126

1  bad in and of themselves, no.

2    Q.  Turning to Page 31, the second-to-last

3  academic article listed that you say you've

4  read is one by Smith, et al, entitled "Can

5  Markets Value Air Quality," et cetera.

6    A.  Uh-huh.

7    Q.  Do you remember what the article 's

8  answer to that question was?

9    A.  Not particularly.

10    Q.  Do you believe markets can value air

11  quality?

12    A.  I believe markets will -- they'll

13  determine what has value and what doesn't, and

14  you will extract that from, you know, what

15  people actually do.

16    Q.  Right.  So in other words, polluted

17  air in a neighborhood in L.A. could influence

18  the value of that real estate market.

19    A.  Sure.  It would be a factor among

20  others that a reasonable buyer would probably

21  consider.

22    Q.  And the final article that you list

23  here by Flower & Company is entitled "The

24  Effects of Refineries on Neighborhood Property

127

1       Do you believe that refineries can

2  have effects on neighborhood property values?

3     A.  Well, I do remember that one a little

4  more thoroughly than most, because that's a

5  local --

6     Q.  Yeah.  Wade Ragas is a coauthor and

7  he's at UNO?

8     A.  He was at UNO.

9     Q.  Okay.

10     A.  And Patrick Flower is -- I believe at

11  the time was probably a graduate student

12  writing his Master's thesis or some such thing.

13  But again, I would tell you that a refinery or

14  any type of industrial property, let's say,

15  near residential property can have an impact on

16  how the market perceives that particular

17  property, and they would certainly consider it

18  in making a determination as to what they would

19  want to, say, buy a property for that's

20  immediately adjacent or near something like

21  that.  A facility like that.

22     Q.  Can the technique of hedonic price

23  modeling be used to discern the property value

24  effect of proximity to a refinery?

**truax0926.txt**                              **Page 127**

128

1  applied in a manner that would isolate

2  exclusively that impact.

3    Q.  All right.  So could it be -- when you

4  answered that way, meaning do you think that

5  the technique could be used to isolate a group

6  of related characteristics including that as

7  opposed to just isolating one?

8    A.  Well, I believe that if you create

9  your model and, let's say it's driven by ten

10  independent variables that you believe are

11  relevant, and you construct it in such a way

12  that your result -- well, the result is going

13  to essentially give you impact for anything

14  that wasn't considered in the ten.  Now,

15  whether it is just the impact associated with,

16  say, being next to a refinery or if it's that

17  plus ten other things, that's the problem.

18  That's one of the problems with AVMs.

19    Q.  Well, forgetting about AVMs for a

20  minute, I know we talked already about your

21  work in the area of discerning property value

22  impact of disamenities I think they're called,

23  and I understand what you just said about

24  having a group of characteristics in a model,

129

1  technique is available that you think is a

2  reliable one, discern the property value impact

3  of a single factor such as a catastrophic event

4  such as a proximity to a source of

5  contamination, whatever the single factor is?

6     A.  I think certainly in theory we would

7  tell you it should be doable.  In the real

8  world application, however, it's very, very

9  difficult to suggest that you can isolate one

10  single element apart from all others and create

11  that exact -- the value impact associated with

12  that precise property condition or

13  characteristic.

14     Q.  And yet you've been retained a number

15  of times to inquire into that very thing,

16  haven't you?

17     A.  Yes.

18     Q.  The next page, Page 32, at the end of

19  your listing of news and articles that you've

20  reviewed, has reference to an article by Tobin.

21  It's the third-to-last item listed --

22     A.  Yes.

23     Q.  -- called "The Impacts of a Second

24  Catastrophic Flood on Property Values in Linda

130

1    Do you remember the content of that

2 article?

3    A.  Not particularly.  Again, if you want

4 to show me the article it may refresh my

5 memory.

6    Q.  So without looking at the article, you

7 don't know what those authors reported about

8 the impact of a second catastrophic flood on

9 property values?

10    A.  Well, as I say, you know, I've read a

11 lot of articles, as is demonstrated by the

12 list, and I don't want to confuse one with the

13 others.  So if -- as I say, if you want to show

14 me the article, it might bring some clarity to

15 my thinking.  But short of that, no, I'm not

16 telling you I have a specific recollection of

17 that particular article.

18    Q.  How about the next one listed by

19 Stephen Yeo called "Effects of Disclosure of

20 Flood-Liability on Residential Property

21 Values," do you recall what that article had to

22 say?

23    A.  Again, you're going to get the same

24 response from me for most of these.

131

1  them without looking at it?

2  A.  Well, no.  That, again, looking at

3  that many articles, I don't want to confuse one

4  with the other.  And there is overlap,

5  certainly, one to the other, in some of the

6  concepts presented and even the particular

7  cases discussed.  So I don't want to say

8  something that is not consistent with the

9  question you're asking, and which is very

10  particular as to the -- you know, the article

11  you're citing.

12  Q.  Let's look at your expert report of

13  September the 10th, which is the 19-page report

14  that you wrote for the levee case.

15      Do you have that?

16  A.  Yes.

17  Q.  Now, you entitle this Affidavit of

18  Michael Truax.

19  A.  Correct.

20  Q.  But this document is neither witnessed

21  nor notarized, is it?

22  A.  That is correct.

23  Q.  So you were not under oath when you

24  wrote this report, were you?

132

1    Q.   No one put you under oath.

2    A.   No.

3    Q.   Okay.  Are you the sole author of this

4  article -- of this report?

5    A.   Oh, this article was -- I mean this

6  affidavit, rather, was written by myself as

7  well as -- portions of it were certainly

8  coauthored with the Roddewig folks -- I mean

9  Roddewig's firm, the Clarion people, and was

10  edited, you know, several times.

11    Q.   What portions of this report that you

12  alone signed September the 10th, 2007, was

13  coauthored by Mr. Roddewig or someone at

14  Clarion?

15    A.   Well, when I say -- understand, once I

16  signed the report it's mine, no matter who

17  penned the words or turned the typewriter on.

18  Q.   Right.

19    A.   And that's true of not only the

20  affidavit but the Exhibit D, as well, that is

21  jointly signed.

22    Q.   Yes, I understand that when you sign

23  you feel like you adopted everything in it.

24  That's fair.  But my question is a different

133

1  and maybe why don't we narrow that down, and

2  let's look at the conclusions that you set

3  forth in Paragraphs 4 and 5, A through G.

4       You see those conclusions?

5   A.  Correct.

6     MR. ZWAIN:

7        You mean Pages 4 and 5?

8

9     MR. MEUNIER:

10        Pages 4 and 5, Paragraph 9, A

11      through G.

12  EXAMINATION BY MR. MEUNIER:

13   Q.  Which of these conclusion statements

14  were coauthored or authored by Mr. Roddewig or

15  someone else at Clarion?

16   A.  Well, as I tell you, given the process

17  in terms of how we prepared the entirety of

18  this document, it was a -- you know, a

19  compilation of views from the entire appraisal

20  team, if you will.  Now, exactly who penned the

21  precise words that you see, I'm not sure I

22  could even tell you at this point other than

23  these are the combined thoughts of the

24  appraisal team, which again is a very routine

134

1    Q.   You're telling me that when you write

2  and sign expert reports in legal cases it's

3  routine for you to have others coauthoring the

4  report with you even though they're not named

5  in a report or sign the report?  That's a

6  routine practice for you?

7     A.   Absolutely, in the sense that I may

8  not have penned the words, but by the time I

9  have edited it, reviewed it and accepted it as

10  my own and sign it, it's my own.  And that's --

11  as I said, in almost every appraisal office I

12  have ever seen, um -- there are sometimes --

13  you might have one MAI who has two or three

14  people working independently with him in terms

15  of producing what ends up being substantially

16  the final product that that appraiser and that

17  appraiser alone signs.

18    Q.   Why is it you did not or could not

19  have written this by yourself?

20    A.   I could have.

21    Q.   But why didn't you?

22    A.   For several reasons.  One,

23  Mr. Roddewig and the Clarion team brought

24  valuable expertise to bear.  There were

**truax0926.txt**                          **Page 134**

135

1  resources that were useful in terms of bringing

2  that group into the picture, um -- so it was a

3  combination of reasons as to why.

4     Q.  So you needed Roddewig and his team to

5  join you as authors of this report because of

6  time and because of their expertise?

7     A.  In part, yes.

8     Q.  Okay.  What expertise did Roddewig and

9  his group bring to the writing of this report

10  that you did not possess on your own?

11     A.  Well, when you say the writing of the

12  report, I'm talking about the entire effort, in

13  terms of producing the studies, et cetera, that

14  are effectively a part of this report.  No --

15  are the words written, as I said, accepted

16  completely by me?  Yes, they are.  But did I

17  write every word?  No, I didn't.

18     Q.  No, sir.  My question was, what

19  expertise did Roddewig and his group at Clarion

20  bring to this effort that you did not possess

21  of your own accord?

22     A.  Well, they certainly had experience in

23  dealing with, um -- class action certification

24  cases.  Um -- that was probably the biggest

136

1    Q.  How about expertise in the field of

2  mass appraisal, did they bring that to the

3  task?

4    A.  They certainly had a broader

5  background in those issues than I did.

6    Q.  How about expertise on AVMs, did they

7  bring that to the task?

8    A.  Well, when you say expertise, exactly

9  what do you mean expertise?

10   Q.  You and I have been using the word

11  before now, so I didn't know we had a problem

12  with it.

13   A.  No, I'm just asking.

14   Q.  Special knowledge, um -- training,

15  education, background, experience, all those

16  things.

17   A.  I think given the history that I'm

18  aware of in terms of cases they've been

19  involved with, certainly they have done more

20  research than I had at that particular time as

21  to that particular appraisal tool.

22   Q.  Okay.  So the first conclusion which

23  is that damages cannot accurately or equitably

24  be determined on a class-wide basis, is that an

137

1  this effort by Mr. Roddewig and Clarion?

2      A.   No.

3      Q.   So you believe that you have the

4  background and training to express that opinion

5  independent of Mr. Roddewig?

6      A.   Yes.

7      Q.   And you say that although you told

8  me -- I believe you've admitted that you've

9  never published or presented on the question of

10  mass appraisal or AVMs.  Correct?

11      A.  I've told you that I've not published

12  on those topics, that's correct.

13      Q.   And you've never been tendered or

14  testified as an expert to address the

15  appropriateness or applicability of mass

16  appraisals or AVMs in a class action case, have

17  you?

18      A.  Correct.

19      Q.   And you don't have any formal training

20  on the subject of mass appraisals or AVM that

21  you can think of other than the one-hour

22  seminar on AVMs that you went to ten years ago,

23  correct?

24      A.   Again, it was a one-day seminar.

138

1   A.   And, no, I wouldn't agree with you on

2   that.  Certainly in appraisal literature and in

3   readings and the like I'm aware of the

4   application -- potential application for AVMs.

5   And I'm here to tell you, in the local market I

6   see no reasonable way to apply an AVM,

7   certainly in the New Orleans market, because of

8   the tremendous variety and variability of all

9   the properties involved such that you could I

10  think realistically expect to get credible,

11  reasonable results from one.  That's my

12  opinion.

13       And I'm not aware of anyone here

14  particularly street appraisers -- in fact, I

15  can tell you I'm definitively not aware of any

16  street appraisers that have applied any type of

17  AVM in doing appraisal work here in the New

18  Orleans area.

19   Q.   All right.  So you formed the first

20  conclusion without any -- without being

21  informed by any of the expertise of the

22  Roddewig group or Clarion, correct?

23   A.   Had I never met Mr. Roddewig, that

24  would have been my opinion, that's correct.

139

1  probably confirmed some of the notions that I

2  would have come to and did come to

3  independently, that that methodology, that

4  appraisal tool, isn't very relevant in the New

5  Orleans market.

6     Q.   All right.  How about the conclusion

7  that's set forth as Letter D on Page 5, that

8  mass appraisal techniques such as AVMs are

9  prone to high rates of error and cannot fairly,

10  efficiently and accurately measure real

11  property damages, et cetera?  Is that a

12  conclusion and an opinion that you have formed

13  without reliance on or input from Mr. Roddewig

14  and his colleges at Clarion?

15     A.   No.  That would have been my

16  independent experience in terms of the very

17  limited application that I'm aware of, of even

18  rudimentary AVMs under the local market.

19     Q.   All right.  Well, you told me that

20  you've never participated in any mass

21  appraisal, and you've never utilized an AVM.

22        Is that true?

23     A.   That is correct.

24     Q.   Okay.  So tell me now what experience

140

1  techniques such as AVMs are prone -- let's take

2  the first part -- to high rates of error?

3        What's your experiential basis for

4  that statement?

5    A.  Well, the only local entity that I'm

6  aware of that uses AVMs in a very basic way,

7  rudimentary way, not real complex, is Jefferson

8  Parish.  Their assessment department.  And as a

9  matter of course in doing an appraisal in our

10  community, as in most, the appraisers always

11  check assessed values as part of the reporting

12  process.  And my experience with assessed

13  values as compared to transaction prices and/or

14  appraised prices that myself and others have

15  included relative to the assessed values, is

16  that the assessed values, even coming from

17  their application certainly of an AVM process,

18  are generally not compatible.  It's rare that

19  we find an assessed value that's, say, within

20  10 percent of the appraised value.

21    Q.  All right.  What do you consider to be

22  a, quote, high rate of error?

23    A.  Oh, I think in the residential market,

24  if you're missing by, you know -- I'll expand

141

1  pretty high rate of error.  And the errors I'm

2  talking about that we see routinely are very

3  often much higher than that.

4      Q.   You're talking again about Jefferson

5  Parish assessor values of homes?

6      A.   As compared to either the transaction

7  price and/or, say, the appraised value that an

8  appraiser has come up with for that property.

9      Q.   Right.  So you're talking about

10  instances where mass appraisal or AVM has been

11  used by assessors for the purpose of property

12  tax determination.

13      A.   Yes.  Because locally, that certainly,

14  as I said, is one of the few places that we've

15  seen AVMs even attempted.  If not the only.

16      Q.   And so based upon a greater than

17  15 percent rate of error comparing the assessor

18  for tax purposes values with market values in

19  Jefferson Parish, it's based upon that that you

20  draw the conclusion that mass appraisal

21  techniques such as AVMs are prone to a high

22  rate of error to assess to measure property

23  damages in this litigation.

24        MR. ANZELMO:

**truax0926.txt**                    **Page 141**

142

1 EXAMINATION BY MR. MEUNIER:

2   Q.  Is that correct?

3    A.  Well, I think, as you read it, based

4 upon my experience in the New Orleans

5 marketplace, and based upon my knowledge of the

6 New Orleans marketplace, the only place I'm

7 aware AVMs have been applied in any even

8 rudimentary sense have been on the assessment

9 side.  So based upon that experience, I do find

10 that locally, in this marketplace, yeah, the

11 AVMs that have been attempted have produced

12 high rates of error.

13   Q.  Again, the AVM experience that you're

14 referring to, Mr. Truax, has to do with

15 assessment of property values for the purpose

16 of determining a property tax, correct?

17    A.  It purports to present the fair market

18 value of the property.

19   Q.  For the purpose of a property tax.

20    A.  Correct.  It's for that purpose.

21   Q.  Now, do you have any other

22 experience-based or experience-related

23 foundation, other than what you've talked

24 about, or for the statement of your conclusion

**truax0926.txt**                    **Page 142**

143

1   A.  Well, clearly the -- I think we've

2   mentioned this earlier:  Clearly the

3   application of an AVM with regard -- the

4   attempt to apply an AVM with regard to the Road

5   Home calculation, the Road Home Program

6   calculations proved disastrous.  We've talked

7   about that.  That's another attempt to apply an

8   AVM in a local market that did not work, and

9   produced, obviously, high rates of error.

10   Q.  What do you mean by high rates of

11   error in the Road Home Program?

12   A.  Well, I can't tell you I know

13   statistically what the particular results were,

14   but the fact that, you know, the majority of

15   the people apparently had serious problems with

16   the numbers that were being generated by that

17   system.  And it was significant enough that

18   obviously they scrapped it.  Now, what

19   percentage -- you know, what percentage the

20   dispute was about, I don't know that, and I

21   don't know that I have ever seen that written.

22   Q.  So you can't say that the rate of

23   error in Road Home is greater than 15 percent?

24   A.  On an overall basis?  No, I can't say

144

1    Q.   Okay.  Anything else that forms the

2   basis for your Conclusion Number 4, in your

3   experience?

4    A.   Well, again, you know, it's couched in

5   terms of the New Orleans marketplace.  Those

6   are the only -- those are the only applications

7   that I've seen attempted.

8    Q.   Jefferson Parish assessors and Road

9   Home.

10    A.   Well, and Orleans -- the Orleans

11   Parish reassessment process that was recently

12   all over the news, I think there was an

13   attempt, again it was a rudimentary one, to

14   apply some AVM type methodology to the

15   reassessments, and I think you've probably

16   read, as I have, that that had a few issues

17   with it, as well.

18    Q.   Well, the fact that people are unhappy

19   doesn't necessary mean that the numbers are

20   wrong, correct?

21    A.   Well, I guess that's true.

22    Q.   All right.  So what's the rate of

23   error on the reassessment in New Orleans?

24    A.   Well, I can tell you the particular

145

1  of my partners, his house went from being

2  woefully under-assessed to extremely

3  exorbitantly assessed.  Neither number was

4  correct.

5        I'm aware of at least three or four

6  other cases, particular cases, where I know

7  definitively that the numbers were

8  extraordinarily high in the AVM application as

9  that particular assessment was applied.

10   Q.  Have you now told me all of your

11  experience-related support for the fourth

12  conclusion of your report?

13   A.  I believe those are the only instances

14  where I know AVMs have been attempted to be

15  applied, with which I'm familiar, and they were

16  generally unsuccessful.

17   Q.  Your fifth conclusion about the lack

18  of a uniform, consistent method to measure the

19  impairment of property caused by Katrina, is

20  that a conclusion that you reach based on your

21  own expertise or has the Roddewig group

22  supported or contributed to that opinion?

23   A.  Well, I mean, I think, you know, their

24  thoughts were certainly considered in all of

146

1 But is that conclusion, um -- to me somewhat

2 self-evident in our marketplace?  Absolutely.

3 With or without Mr. Roddewig and his group, I

4 would have came to that same conclusion.

5    Q.  Uh-huh.  So let me just make sure I

6 understand.  Roddewig and the Clarion group

7 coauthored this report because of issues

8 dealing with time and their expertise, correct?

9    A.  They brought talents to the team.

10 Again, Mr. Meunier, very usual in our world.

11    Q.  I understand.

12    A.  And so yes, it was a benefit to have

13 that group involved in this process.

14    Q.  But you're not able to tell me of any

15 instances -- and again, I've been looking at

16 your list of conclusions just as a summary of

17 your report.

18    A.  Right.

19    Q.  You're not able to give me any

20 instances in this list of conclusions where the

21 expertise of Roddewig and Clarion was even a

22 primary basis for the conclusion; is that true?

23    A.  No, I don't believe that's true.

24 Well, when you say primary -- as I've said, it

147

1 inputs from the Clarion folks that were useful,

2 there were some that weren't. But the result,

3 the conclusions are mine. Once I sign, they're

4 mine. Whether the words were first penned by

5 someone else and then edited by me or first

6 written by me and edited by someone else

7 matters not to me.

8    Q.  Yes, sir. But it matters to me to

9 distinguish between the conclusions you drew on

10 your own and those that you adopted. So I

11 understand that when you signed off on it, it's

12 all yours.

13    A.  Right.

14    Q.  I'm trying to figure out where and how

15 you adopted opinions and conclusions that were

16 brought into the analysis from Roddewig and his

17 group based on their expertise.

18        MR. ZWAIN:

19            And I object to the form of that

20            question. I don't think he said he

21            adopted anything. I think he said it

22            was a collaborative effort they worked

23            together upon, and that the opinions

24            reached are his and those of the

148

1       Subject to the objection, you can

2     answer.

3   A.  I don't recall the question.

4 EXAMINATION BY MR. MEUNIER:

5   Q.  You're not able, as you sit here, to

6 tell me those instances in which the expertise

7 that was the justification for the involvement

8 of Roddewig and Clarion resulted in a

9 conclusion or an opinion that you then accepted

10 as your own, are you?

11    A.  All I can really tell you in response

12 to that is what I have already told you, which

13 is that this was a collaborative effort.  Did

14 they bring thoughts to the table that I may not

15 have initially perceived?  Possibly.  But at

16 the end of the day it became a team effort and

17 the results are presented in the report.  And,

18 you know, I don't know how many ways we can say

19 it, but once I sign it it's mine.

20   Q.  Now, at Page 3, Paragraph 4, you say

21 that you have appraised approximately 400

22 properties since Katrina.  400 properties in

23 the Greater New Orleans area since Katrina.

24   A.  Correct.

**truax0926.txt**                          **Page 148**

149

1    A.  Oh, a host of purposes.  Um --

2    Q.  For what purposes?

3    A.  Mortgage lending purposes, um --

4  expropriation purposes, succession purposes,

5  litigation purposes, the normal variety of work

6  that we typically do.

7    Q.  Did you use any standard appraisal

8  forms?

9    A.  I don't believe so.

10   Q.  You never used the Uniform Residential

11  Appraisal Report that's furnished by Fannie

12  Mae?

13   A.  We rarely use that, so I don't believe

14  so.

15   Q.  Well, you're telling me that in the

16  process of appraising the four hundred

17  properties you did not use any standardized

18  forms?

19   A.  Oh, we use certain templates that

20  certainly we have --

21   Q.  That your --

22   A.  -- in our office.

23   Q.  That your firm has developed?

24   A.  Yes.  But not the Fannie Mae form.

150

1  that your office uses?

2     A.   No.  We have multiple templates that

3  we will -- as I think everyone, probably in

4  your business as well, you don't recreate the

5  wheel every time.  So we have standard form

6  formats that we use, but it's not a form in the

7  sense of a Fannie Mae Residential Appraisal

8  Form, no.  It's not that.  It's a narrative

9  document.

10    Q.   How long is it?

11    A.   Oh, it depends on the task.  But I

12  mean, we have reports we write that are four

13  hundred pages and we have reports that we write

14  that are ten.

15    Q.   All right.  But this template that you

16  use sets forth certain basic items or

17  components of an appraisal that you're going to

18  expect to use in every case?

19    A.   No, no, no.  And maybe I'm leading you

20  astray there.  The template is not a fixed,

21  fill-in-the-blanks form, it is merely a

22  structure, and we then customizes within the

23  subheadings of that structure what the output

24  is relative to the task at hand and the

151

1    Q.  If you were to undertake an

2  individualized appraisal of the thousands of

3  properties subject to the claims in this case,

4  would you use a standardized form?

5    A.  Oh, we'd certainly create probably a

6  template that would work in the context of the

7  particular property being appraised.  It

8  wouldn't be the same for all of them.

9    Q.  So you'd use different forms for

10  different properties.

11    A.  Sure.  Well, it would also depend on

12  what was asked in terms of the results

13  presentation.  We have some options as to how

14  we can report a finding, and so that would

15  depend on what was asked for of us, as well.

16    Q.  In the four hundred or so appraisals

17  that you've done in the New Orleans area since

18  Katrina, just explain for me the basic steps

19  that you'd have followed to conduct these

20  appraisals.

21    A.  Well, with minor exception, it would

22  be the standard process.  We would go out,

23  certainly identify and inspect the property, do

24  whatever research was necessary to determine

152

1  also then certainly, when we're doing a sales

2  comparison approach, go research the market and

3  discern what comparable sales are available for

4  comparisons, and then apply those.  You know,

5  and also if it's an income producing property,

6  go research the rental market.  In other words,

7  gather all appropriate market information that

8  myth bear on the valuation of the property and

9  apply those approaches, either cost or income

10  or sales comparison, or all three, as is

11  relevant to the valuation task at hand.

12     Q.  Tell me what's involved in applying

13  all the gathered information to the valuation

14  task at hand.  How do you go about doing that?

15     A.  Well, you go to the data sources that

16  are available to you.  Let's say if we're

17  talking, say, about a house, you would go into

18  that neighborhood and certainly research the

19  comparables that have occurred recently and see

20  which of those comparables was most like your

21  subject and use those to, through a comparative

22  process, to develop an opinion of value.  If it

23  was a new house, you might do a cost approach.

24  Um -- in the single family market, you rarely

153

1    Q.   The four hundred property appraisals

2  that you've done since Katrina I assume are

3  variable in terms of the time you it took you

4  to complete the appraisal.

5    A.   Yes.

6    Q.   Give me a range from least to longest

7  in amount of time spent for these four hundred

8  properties you've appraised.

9    A.   Well, it probably ranges from a half a

10  day to sixty days.

11    Q.   Per property.

12    A.   Well, again, it depends on the

13  complexity, the workload -- remember, when I

14  give you these parameters, when I tell you it's

15  going to be sixty days to do an appraisal, I'm

16  not generally telling you -- that might be the

17  time frame in which I worked on that job, but

18  that wouldn't be the only job I was working on.

19  So when I quote a client thirty to sixty days,

20  that's -- it will take me that long to get him

21  his report, but I might produce twenty

22  appraisals in that window of time.

23    Q.   All right.  Well, can you give me the

24  average amount of time you spend to conduct an

154

1  you've done since Katrina?

2     A.  I don't know that there is an average

3  that would be meaningful.  And I've never

4  calculated it, so, no, I couldn't tell you what

5  that would be.

6     Q.  Well, when you said a half a day to

7  sixty days, that's to complete the appraisal.

8     A.  Yeah.

9     Q.  Can you give me the range from the

10  least to most amount of time that you would

11  spend in completing the appraisals?  Actual

12  time spent.

13     A.  Well, I mean, you ask a question

14  that's got a lot of other parameters to it.  As

15  I said, we can provide our finding verbally to

16  you.  We're allowed to do that, as long as we

17  have a file that supports what I tell you.  So

18  if you ask me to give you a value estimate in a

19  property, and I had happened -- and this

20  happens -- to have appraised the property

21  across the street, it may have taken me an

22  hour.

23     Q.  All right.  I want to talk about the

24  four hundred that you did.  You have experience

155

1  Katrina in the New Orleans area.  That's what

2  I'm talking about, okay?

3      A.   Right.

4      Q.   Now, you have no way -- you can't

5  estimate for me the average amount of time that

6  you have taken to conduct a single property

7  appraisal in that group of four hundred

8  properties you've done since Katrina, is that

9  your testimony?

10     A.   I'm telling you, yeah, our work is

11  diverse enough that I can't tell you an average

12  amount of time per appraisal.  Um -- no, I

13  mean, I guess if we wanted to take how many

14  hours I think I worked since Hurricane Katrina

15  and divide it by four hundred, possibly that

16  gives you a number, but I don't know what that

17  would be relevant to.

18     Q.   How about the amount you've charged

19  for these appraisals on an average basis; can

20  you give me any information about that?

21     A.   Not sitting here today that would be

22  useful.  That would be an absolute guess on my

23  part for the four hundred appraisals.

24     Q.   So you can't even state a range, that

156

1  amount; you can't even do that?

2      MR. ANZELMO:

3          Objection to form.

4  A.  Oh, yeah.  I can give you, you know, a

5  likely range for the type of work we do.

6  EXAMINATION BY MR. MEUNIER:

7  Q.  These four hundred, that's what I'm

8  talking about.

9  A.  Well, these four hundred constitutes

10  the volume of work that I've done.

11  Q.  Right.

12  A.  So I mean, the fees could range from

13  five hundred dollars or three hundred dollars

14  up to twenty-five thousand on a fixed fee

15  basis.

16  Q.  I gather the twenty-five thousand

17  range would deal with commercial appraisals?

18  A.  Yes.

19  Q.  And the minimum charge for an

20  appraisal of a residential would be three to

21  five hundred dollars?

22  A.  Yes.  In our shop, that's correct.

23  Q.  And you have records of all of those

24  appraisals?

157

1    Q.  Yes.

2    A.  Yes.

3    Q.  Are they all in the levee or MRGO

4  class areas?

5    A.  No.

6    Q.  Are any in the MRGO or levee class

7  area?

8    A.  Oh, sure.  Yes.

9    Q.  How many of the four hundred?

10    A.  Oh.  I don't know.  I don't know that

11  today.

12    Q.  When you say the Greater New Orleans

13  area, do I assume they're either in Orleans or

14  Jefferson?  Or do they also include St.

15  Bernard?

16    A.  No, it would include St. Bernard

17  probably, and include St. Tammany.  You know,

18  Greater New Orleans would be the seven parish

19  area.

20    Q.  Have any of those appraisals been

21  aimed at discerning damage due to Katrina?

22    A.  They were aimed certainly at, given

23  that they were post-Katrina, post-Katrina

24  values.  Now, whether they were used in that

158

1  base, a pre-Katrina value base to measure that

2  against, I don't know.

3      Q.   You also say that you've inspected

4  more than one hundred homes -- or that you

5  inspected more than one hundred homes

6  immediately after Katrina.

7      A.   Yes.

8      Q.   Why did you do that?

9      A.   Well, in the post-Katrina environment,

10  most of our clients were missing in action, and

11  so in an effort to stay busy and produce some

12  income we certainly had the talents to cross

13  over into the insurance adjuster world, which

14  is what most of us did for a time.

15      Q.   So what did those inspections consist

16  of?

17      A.   They were basically going out to

18  inspect properties that were damaged from wind

19  and fallen trees and the like.  They were the

20  non flood damaged properties that were subject

21  to an insurance claim.

22      Q.   Non flood damaged?

23      A.   Well, they might have been flood

24  damaged, but we weren't interested -- we were

159

1 liability of the people we were looking for, we

2 were working for insurance -- we were doing

3 insurance adjustments for wind, rain, that sort

4 of damage.

5    Q.   So the damage that you focused on in

6 those inspections was only damage above the

7 floodwater line of that particular property?

8    A.   That would generally be true, yes.

9    Q.   Anything below that line you would

10 consider flood damage and you were not

11 addressing that, correct?

12    A.   No.  Typically, there was another

13 adjuster that came out that dealt with the

14 flood issues.  There was some coordination.

15    Q.   So your understanding when you did the

16 inspections that you're talking about was that

17 any damage existing below the waterline, or the

18 flood line, was not going to be covered by the

19 insurer for whom you were doing these

20 inspections?

21    MR. ANZELMO:

22        Objection to form.

23    MR. ZWAIN:

24        We adopt that.

**truax0926.txt**                           **Page 159**

160

1   Q.  Is that your understanding --

2   A.  Would you mind repeating that?

3   Q.  You've told us that when you went out

4   and you got into the insurance adjusting

5   business for a while, you went out and you

6   inspected over a hundred homes.

7       MR. ZWAIN:

8           Are we switching class actions

9       now?

10   EXAMINATION BY MR. MEUNIER:

11   Q.  No.  You were looking only at damage

12   from Katrina above the flood line is what you

13   told me.

14   A.  Well, that may not be precisely

15   correct.  On a practical level that's pretty

16   close, but it would have been any damage that

17   was caused by the insured liability, which

18   would be for wind, rain, fallen trees, those

19   sorts of damage claims.

20   Q.  And you focused your attention on

21   damage above the flood line.

22   A.  That would have been the focus,

23   correct.

24   Q.  Now, what did you -- did you use

**truax0926.txt**                    **Page 160**

161

1    A.   Yeah.  They have a canned program, if

2  you.

3    Q.   Who is that?

4    A.   We didn't use standard forms,

5  necessarily, on inspections, but in terms of

6  the damage that we saw, then it was inputted

7  into a canned program that the insurance

8  adjusters use.

9    Q.   And what was the charge per

10  inspection?

11    A.   Remarkably, in that world it's a

12  percentage of the claim amount.

13    Q.   A percentage of the what?  I'm sorry.

14    A.   Of what ultimately becomes the claim

15  amount.

16    Q.   And what was the average time you

17  spent inspecting a property, if you can tell

18  me?

19    A.   Oh, well, that varied, as well.  I

20  mean, if we were at a very large house with

21  lots of damage and where a lot of detail was

22  required, you could take more than a day.  But

23  I'd say the average, the typical where you had

24  some limited -- where you had roof damage and

162

1  probably a couple of hours.

2      Q.   Now, in neither these inspections nor

3  in the appraisals of post-Katrina value for the

4  four hundred or so properties, in neither case

5  were you undertaking to discern the property

6  value impact of the flood event, is that true?

7  As a diminution of property value.

8      A.   Correct.  Well, in truth and fact, we

9  weren't really attempting to discern property

10  value impact, period, even for the items we

11  were looking at.  We were discerning repair

12  cost is what we were doing.

13     Q.   Right.  Now, Mr. Truax, you don't have

14  any legal training or education, do you?

15     A.   No.

16     Q.   You don't hold yourself out as an

17  expert on the Louisiana law of fault or

18  causation?

19     A.   I do not.

20     Q.   Refer to Page 8 -- I'm sorry.  4.

21  Page 4, Paragraph 8.  Final sentence of that

22  paragraph.

23          It is apparent to me that Hurricane

24  Katrina caused damage in a variety of ways,

163

1  any conduct of one of more defendant.

2        What is the basis in your expertise

3  for making that statement?

4      A.   Well, if you go to the first sentence

5  of that Paragraph 8, it says based upon my

6  reading of the First Supplemental and Amending

7  Levee Master Consolidated Class Action

8  Complaint filed by plaintiffs as well as my

9  conversations with attorneys for defendants.

10  So clearly I had a sense from counsel as to

11  what these defendants may be liable for.

12     Q.   A sense from counsel for the

13  defendants?

14     A.   Yes.

15     Q.   So the defendants have told you that

16  there are only a few damages suffered in

17  Katrina which could in any way relate to their

18  conduct?

19        MR. ANZELMO:

20          Object to form.

21     A.   Well, I was certainly aware that this

22  was about the flood event, as I think we all

23  are.  And I was certainly aware based upon my

24  own experience that many properties in our area

164

1  falling trees, looting, so I was -- nothing I

2  had read suggested that those -- that type of

3  property damage was at issue.

4  EXAMINATION BY MR. MEUNIER:

5    Q.  Right.  Well, which what you call few

6  damages that could relate to the conduct of one

7  or more defendant?

8    A.  Well, the few being the flood events

9  from the various water sources.

10   Q.  And we've already established that you

11  agree that the plaintiffs are only seeking

12  recovery in this case for damages relating to

13  the flooding.

14       MR. ZWAIN:

15          Objection to the form of the

16          question.  You're asking for a legal

17          conclusion.

18   A.  Well, the flood being water caused by

19  levee overtopping or breaching, I assume, and

20  not rain.

21  EXAMINATION BY MR. MEUNIER:

22   Q.  Now, we're back at the conclusions

23  again.  I want to review these in a different

24  way.  You start at Page 4.  And your first

165

1  determined on a class-wide basis.

2          Is it your testimony that you're not

3  aware of any class action litigation in which

4  property damage had been -- property damages

5  had been determined on a class-wide basis?

6  A.  No.

7  Q.  Have you researched that subject?

8  A.  Not particularly, in the sense that I

9  am, as I think I've told you, very confident

10  that a class-wide system is not going to work

11  and be even remotely applicable in this

12  submarket, that is Metropolitan New Orleans.

13  Q.  And you state here that it is the

14  variations between properties that make it

15  necessary to consider damages on a

16  property-by-property rather than a class-wide

17  basis, correct?

18  A.  That is what I state.

19  Q.  Therefore, you do not believe that

20  variations between properties can be controlled

21  for in any model approach to appraisal on a

22  class-wide basis, is that your testimony?

23  A.  I do not believe in this submarket

24  that a model could be constructed, at least

1  of, and the amount, and the number of variables

2  that would have to be addressed, to

3  realistically apply such a system here that it

4  could be implemented and produce reasonable and

5  credible results.

6     Q.   Your second opinion deals with 42

7  properties that are the class representatives'

8  properties, correct?

9     A.   Correct.

10    Q.   And you state that these properties --

11  that none of these properties is representative

12  of the other properties within the subclass

13  area?

14    A.   No, I didn't say none of these

15  properties were representative of any

16  properties in the subclass.  I didn't say that.

17    Q.   You say the 42 --

18    A.   I said they're not truly

19  representative of the tens of thousands of

20  other properties located within each of the

21  subclasses.

22    Q.   All right.  The 42 properties that

23  you're referring to are all of the proposed

24  class rep properties in the MRGO and the levee

167

1      MR. MARPLE:

2          I'm going to object to misstating

3      that.

4      MR. MEUNIER:

5          I'm sorry.  This is the levee

6      report.

7  EXAMINATION BY MR. MEUNIER:

8   Q.  So the 42 properties you're talking

9  about here are all of the proposed class and

10  subclass reps in levee?

11   A.   Yes.

12      MR. ZWAIN:

13          Who aren't renters.

14   A.  That's correct.

15      MR. ZWAIN:

16          All of the properties of the

17      subclass representatives who own

18      property.

19  EXAMINATION BY MR. MEUNIER:

20   Q.  Who are owners of the property.  Okay.

21      And are you saying that none of those

22  42 properties is representative of the other

23  properties in that area?

24   A.  No.

168

1  me go to your language.  The 42 properties are

2  not truly representative of the tens of

3  thousands of other properties located within

4  each of the subclasses.

5      Tell me what that means.

6    A.  Well, if you read the next sentence, I

7  believe it answers the question for you.  It

8  says, almost all of the class representative

9  properties are residential, yet the class and

10  subclass definitions encompass substantial

11  numbers of commercial, industrial,

12  institutional, governmental, vacant and other

13  types of properties.

14    Q.  All right.  That's the reason they're

15  not representative, right?

16    A.  They do not -- they're not

17  representative of the entire spectrum of

18  properties that exist in the subclass areas,

19  that's correct.

20    Q.  All right.  So you're saying they're

21  representative of residential properties, but

22  they're not representative of non residential

23  properties?

24      MR. ZWAIN:

169

1      question.

2      A.  They're representative, certainly, of

3  the properties that are of like type and of

4  such similarity that they would compare

5  reasonably to.  No, so I'm not saying they

6  wouldn't represent any of the properties in the

7  subclass areas.  I'm saying they represent one

8  segment only.

9      Q.  And what segment is that?

10     A.  That's the residential segment, and

11  it's generally either the one or the two-family

12  category.

13     Q.  So the 42 owner properties, class rep

14  owned properties you feel are representative of

15  other residential properties in those areas,

16  but are not representative of non residential

17  properties, is that what you're saying?

18     A.  No, I'm also saying -- I'll take it

19  beyond that.  I'm saying they're representative

20  of -- they're not representative of even all

21  the residential properties, in that there are

22  different types, styles, classes, that are not

23  included in the named plaintiffs group.

24     Q.  Now, what is your definition of

170

1    A.   For my purposes, it would mean that

2   they would be a reasonable comparable, if you

3   will, to the properties that they're going to

4   be compared to.

5    Q.   So if you were doing the traditional

6   appraisal analysis of looking at comparables,

7   that's the population of what you call

8   representative of the properties that are

9   useful.

10    A.   That would be one way to think of it

11   in terms of that.  Would I consider these --

12   let's say I had a property you asked me to

13   evaluate.  Would I consider some of these

14   properties sufficiently comparable that I would

15   use them as such in an appraisal?  That would

16   be one test.

17    Q.   Well, have you sought to determine the

18   extent to which each property is representative

19   of other residential properties?

20    A.   Well, clearly I think we've stated

21   that in the report -- I believe we do some

22   statistics, yeah -- that it -- in terms of the

23   types of properties that we see in the various

24   neighborhoods by classification, single family

171

1   industrial, et cetera.  We have the acres and I

2   believe we have the percentages from the census

3   that were in those categories.  So clearly, as

4   I said, these -- no, certainly some of these 42

5   would be representative of some segment of

6   those subclasses.  But even within a given

7   property type, single-family, let's say, there

8   are probably -- in fact, I know, it's not

9   probably -- there are single-family homes that

10  are of a character and a style and a type, a

11  scale that would not be truly represented by

12  these particular representatives.

13     Q.  Well, so, in your view, to have a

14  representative property -- to have a

15  representative property, one would have to

16  have, for example, a commercial property

17  representing commercial, an institutional

18  representing institution, et cetera?

19     A.  I would think so.

20     Q.  Because your definition has to do with

21  a comparable value analysis that you perform as

22  an appraiser; that's what you're thinking of,

23  right?

24     A.  Well, even beyond a value analysis, in

172

1  things, that's the only way you can truly make

2  a comparison that makes any sense.

3      Q.   All right.  In the class -- do you

4  know why these particular claimants are given

5  the title of class representative?  Do you know

6  what that legal term refers to?

7      A.   No, but I'm suspecting I'm going to

8  hear it.

9      Q.   So you don't know the criteria by

10 which they've been designated as

11 representatives by plaintiffs' counsel.

12     A.   No.

13     Q.   You don't know what the Rule 23

14 definition of typicality or adequacy of

15 representation is.

16     A.   No.

17     Q.   And you don't even know that those are

18 the rules that informed the selection of these

19 people as class reps; you're not aware of that.

20     A.   Am I aware of those legal rules?  No.

21     Q.   All right.  Now, your third

22 statement -- third opinion is that the

23 individual representatives are not

24 representative of other residential properties

173

1  neighborhood.  Correct?

2    A.  Correct.

3    Q.  Is that true in every one of the 42

4  cases?

5    A.  Oh, there would be variations, I

6  think, in terms of, one, what you defined as

7  their neighborhood, and some of the

8  neighborhoods would be better represented than

9  others by this grouping.  So, no, it wouldn't

10  be a uniform answer to that.

11    Q.  Your fourth conclusion that mass

12  appraisal techniques like AVMs cannot fairly

13  and effectively efficiently measure real

14  property damages, again I think you've told me

15  already you're not aware of any cases where

16  AVMs in fact have been used to perform mass

17  appraisal in class litigation.  Correct?

18    A.  I'm not, and particularly I'm not

19  locally.

20    Q.  And your statement to this effect is

21  driven, I take it, by the variability of

22  property characteristics within the class area?

23    A.  That's the primary cause, I believe,

24  of lack of applicability in our local market.

**truax0926.txt**                    **Page 173**

174

1  types -- I'm sorry.  Your fifth conclusion is

2  that the wide array in the types and sources of

3  damages caused by Katrina preclude a uniform

4  common method to measure impairment to real

5  property.  Correct?

6    A.  Yes.  That was speaking to the

7  particular damage issue in this case, which is

8  the flooding associated with the levee breaches

9  and overtoppings.

10   Q.  So your testimony is that you can only

11  discern flood damage to a property on a

12  property-by-property basis.

13      MR. ZWAIN:

14          Object to the form of the

15          question.

16    A.  I think to get reasonable, credible,

17  accurate results, I think that is the case,

18  yes.

19  EXAMINATION BY MR. MEUNIER:

20   Q.  Now, do you understand that

21  Dr. Kilpatrick proposes to use a mass appraisal

22  technique to actually evaluate the physical

23  flood damage done to a given piece of property

24  and that's your belief?

175

1  than saying that certainly he's going to use

2  mass appraisal techniques, possibly an AVM, the

3  particulars of what he's going to do I can't

4  tell you I could give that from my reading.

5      Q.   Yeah.  But my question is whether you

6  are assuming, in making this statement, that

7  Dr. Kilpatrick will use a mass appraisal

8  technique for the purpose of evaluating the

9  physical flood damage done to a specific piece

10  of property.  Is that your assumption?

11      A.   No, I don't believe that was

12  necessarily my assumption making that

13  statement.  What I think that I'm trying to

14  tell you is that the mass appraisal techniques,

15  the AVM modeling, et cetera, I do not believe

16  will work even to produce a value estimate for

17  the whole of properties, if you will, before

18  you even address the issue of the particular

19  damage associated with the flood event versus

20  the wind event and all of the various causes

21  that led to property damage.

22      Q.   And you take the position that the

23  diminution -- the possible diminution of

24  property value associated with the flood event

176

1 class-wide basis; is that true?

2 A. I'm sorry.

3 Q. The property diminution --

4 A. Right.

5 Q. -- associated with flooding, in your

6 view, cannot be approached on a class-wide

7 basis.

8 A. I know of no method that would produce

9 accurate and credible results on an individual

10 property basis employing methods like that.

11 Q. So if we get back to the question of

12 determining whether or not there was a property

13 value diminution that can be associated with

14 the flood, your approach, you say the only way

15 to do that is on a property-by-property basis,

16 correct?

17 A. Yeah. Yes.

18 Q. You're going to go one property at a

19 time, and you're going to ask the question in

20 each case, the same question, was there or was

21 there not a diminution in value associated with

22 flooding.

23 MR. ZWAIN:

24 Objection, asked and answered.

177

1        True.

2        MR. ZWAIN:

3            Is this a good time to break?

4        MR. MEUNIER:

5            Sure.

6        (Off the record.)

7    EXAMINATION BY MR. MEUNIER:

8        Q.   In the Paragraph F on Page 5, your

9    sixth opinion states that the types of mass

10   appraisal techniques advocated by

11   Dr. Kilpatrick are prone to high rates, et

12   cetera, et cetera -- high rates of error, et

13   cetera.  What are the types of mass appraisal

14   techniques that you understand being advocated

15   advocate by Dr. Kilpatrick?

16       A.   Certainly I believe that some

17   automated valuation model effort would be --

18   that's what I take from what he has written,

19   would be employed to accomplish the mass

20   appraisal.

21       Q.   All right.  So are you saying that all

22   AVMs are prone to high rates of error?

23       A.   No, there are likely applications for

24   AVMs that would probably work reasonably well.

178

1  the New Orleans marketplace is not one of them.

2  We have far too much variety and lack of

3  homogeneity to accomplish that.

4      Q.   So you're saying for the New Orleans

5  community, any and all uses of AVMs would be

6  prone to high rates of error.

7      A.   Well, when you say any and all, I

8  mean, certainly for some use possibly an AVM

9  may produce some result that someone might find

10  useful for some reason.  All I'm saying is for

11  the reasons that I think, or I believe are at

12  issue herein, I don't believe an AVM will work.

13     Q.   Give me an example of a use for which

14  an AVM might work in the New Orleans market.

15     A.   Oh, I guess if you were reviewing,

16  say, a portfolio of residential loans that were

17  maybe based in the New Orleans market, you may

18  be able to use it in some way as a test of some

19  reasonableness, but I don't believe that you

20  could produce reliable and accurate individual

21  property valuations through use of an AVM.

22     Q.   You then state that the inaccuracy of

23  mass appraisal techniques has been recognized

24  by the Appraisal Institute.

179

1    Q.   Now, is the specific authority for

2  that statement what you later set forth in

3  Paragraphs 33 and 35 at Pages 17 and 18 of your

4  report?

5    A.   You said 33 and 35?

6    Q.   Paragraphs 33 and 35 on Pages 17 and

7  18.  The paragraphs where you quote the

8  appraisal institute on AVMs.  My question is,

9  are those the references that you present in

10  support of this statement in Paragraph F on

11  Page 5?

12    A.   I think 33 and 35 are instances of

13  that, but I think if you read what limited

14  presentations there are in the 12th Edition of

15  the Appraisal of Real Estate, I believe some

16  language in USPAP, as I remember, there are

17  some cautions about the, um -- application of

18  AVMs when you don't have homogeneous -- a

19  homogeneous type area and properties that have

20  reasonably similar characteristics and the

21  like.  It cautions you as to the reliability of

22  the output.

23    Q.   Is it your assumption and belief,

24  Mr. Truax, that Dr. Kilpatrick proposes to use

180

1  tax assessors use the mass appraisal technique?

2     A.  Well, as I think I've told you now

3  several times, in reading Dr. Kilpatrick's

4  report I can't tell you definitively that I

5  understand, in a detailed way, how he would

6  precisely apply it.

7     Q.  All right.  Paragraph G on Page 5 is

8  your seventh conclusion in which you say some

9  of the types of mass appraisal techniques

10  advocated by Dr. Kilpatrick are not generally

11  accepted.  And you give examples of contingent

12  valuation and conjoint analysis.  Correct?

13    A.  Yes.

14    Q.  Are those the only types of mass

15  appraisal techniques advocated by

16  Dr. Kilpatrick which you believe are not

17  generally accepted by the national or local

18  communities of real estate appraisers?

19    A.  Well, as I say -- you keep asking me

20  about the types advocated by Dr. Kilpatrick.  I

21  only keep telling you that I don't see enough

22  specificity in what he's written to tell you --

23  tell me precisely what types he's advocating.

24  Clearly those types, the contingent valuation

181

1   accepted, and I'm not aware of anyone having

2   used that locally to evaluate property or

3   property interests.

4      Q.   All right.  Can you tell me the

5   authority for the statement that contingent

6   valuation is not a generally accepted

7   technique?

8      A.   Yes.  I mean, I've read -- certainly

9   I've read that in several of the articles that

10  I've reviewed.  And we have done enough

11  national profile work.  I can tell you from my

12  own personal experience I have not seen it

13  employed in thirty odd years of appraising

14  properties in any significant way at all.

15     Q.   And can you tell me the authority for

16  the statement that conjoint analysis is not a

17  generally accepted technique?

18     A.   Well, I've told you, embedded in the

19  appraisal process at some level is some measure

20  of conjoint analysis.  Because when we make

21  adjustments for different factors, we are

22  implicitly saying we can isolate that factor.

23  But in terms of it, I guess, from the bottom up

24  being used to say we can layer every single

182

1  condition, every property impact and ascribe a

2  particular value to each and every one of

3  those, and then that total somehow also

4  magically totals to what the total property

5  value would be, um -- I don't think that's

6  realistic on the ground where you really have

7  to apply these systems.

8      Q.   In Paragraph 12, Page 6, you discuss

9  the variability of property type in the

10  proposed levee class area, correct?

11     A.   I'm sorry.  Page 6, Paragraph 12.

12     Q.   Page 6.

13     A.   Okay.  Yes.

14     Q.   And you reference the City of New

15  Orleans land use plan of April, 1999.

16     A.   Right.

17     Q.   Do you have reference or do you rely

18  upon any data more current than April of 1999?

19     A.   Obviously not in that presentation.

20  That is a citation, so that is the source we

21  relied upon in that instance.

22     Q.   And according to this 1999 data, is it

23  true that more than 50 percent of the total

24  acreage within the proposed class area is

183

1  purposes?

2    A.  No.

3    Q.  That's not true?

4    A.  That's not true, unless I did the math

5  wrong.

6    Q.  If you add the acres for single and

7  multifamily residential, do you get

8  14,345 acres?

9    A.  Okay.  I rounded a little too quickly.

10  I rounded at the thousand level.  Sorry.

11  Approximately 50 percent.

12    Q.  Well, total acreage is 28,160.  It's

13  slightly more than 50 percent, isn't it?

14    A.  Very slightly.  Yes.

15    Q.  And if you take out the acreage for

16  parks, open space, unclassified roadways,

17  miscellaneous other, the last two entries --

18    A.  Uh-huh.

19    Q.   -- and subtracted that 5,842 acreage

20  from the total --

21    A.  All right.

22    Q.   -- and got 22,318 total acres, the

23  residential would be about 64 percent, true?

24    A.  Well, I'm trusting you on the math.

**truax0926.txt**                    **Page 183**

184

1  you just described I assume you're correct.

2    Q.   Page 7, Paragraph 13, you discuss the

3  fact that you have researched and determined

4  that there are more than 6900 real estate

5  transactions since Katrina in the proposed

6  levee class area.  Correct?

7    A.   Correct.

8    Q.   Now, we reference the fact earlier

9  that at Page 8 of your MRGO report you total

10  the residential properties in the MRGO class

11  area and there were about 66,000 total

12  residential properties according to your

13  report.  You remember that?

14    A.   Correct.

15    Q.   Do you know the total number of

16  properties, residential, commercial, et cetera,

17  in the levee area?

18    A.   No.

19    Q.   So you don't know what percentage of

20  the total the 6900 transactions affect?

21    A.   Well, no, I would have to know the

22  total.  And the 6900 transactions, you know, is

23  a minimum.

24    Q.   When you say more than 6900, what's

185

1   A.  Oh.  I don't know the exact total.

2  But that's -- there were 6900 transactions that

3  were discernible within the MLS system,

4  multilist system, and there were many

5  transactions that occur outside of the

6  multilist system.

7   Q.  Now, did you compare the sales prices

8  in those 6900 transactions post-Katrina with

9  the pre-Katrina values of those properties?

10   A.  No.

11   Q.  That would be possible to do so?  It

12  would be possible to do that?

13   A.  Well, you asked, I believe, did I

14  compare the sale prices of those 6900

15  transactions, those sale prices, to the

16  pre-Katrina property sales prices, or values?

17   Q.  Uh-huh.

18   A.  Well, sure it would be possible.

19  You'd have to appraise the property

20  pre-Katrina.  Those that have sold.

21   Q.  Do you have a breakdown of how many in

22  the 6900 transactions were residential

23  transactions?

24   A.  I don't recall that number.  It was

186

1   Q.  Have we reached market equilibrium,

2  Mr. Truax, in the levee class area?

3   A.  I would ask you to define what you

4  mean by market equilibrium.

5   Q.  Have you ever heard that phrase used

6  before in the real estate business?

7   A.  Yes.

8   Q.  What's your definition?

9   A.  My definition would be balance in

10  supply and demand.

11   Q.  Have we achieved that state in the

12  levee class area?

13   A.  That's difficult to answer on a couple

14  of levels.  One, market equilibrium certainly

15  on a -- well, what might be argued to be market

16  equilibrium is likely a little bit different

17  post-Katrina than what our notion classically

18  would have been for it.  Um -- and in certain

19  segments of the levee, um -- class area,

20  potentially.  But, and I think as it's

21  classically used, um -- would there probably be

22  more properties available for sale than buyers?

23  Probably.  But I can't tell you I've studied

24  that precisely.

187

1  whether market equilibrium as you define it has

2  yet been achieved in the levee class area.

3     A.  That's right.  I think it would be

4  hard for anyone to answer that precisely.

5     Q.  And if it has not been achieved, you

6  certainly don't have any opinion as to when it

7  might be achieved in the future.

8     A.  No.

9     Q.  Would reference to the 6900 real

10  estate transactions be useful as indicators in

11  inquiring whether there has been a post-Katrina

12  diminution of property value associated with

13  the flood event?

14     A.  Well, it certainly suggests there is

15  transactional volume of some magnitude.  Now,

16  what that implies relative to value, I can't

17  tell you that.

18     Q.  Well, do you acknowledge the

19  possibility that there could be useful

20  indicator information from these transactions

21  in inquiring into the potential diminution of

22  value?

23     A.  Well, yes, because I certainly

24  would -- I think I've told you, I would

188

1  property.  So certainly sales are -- would be

2  useful to me.

3     Q.   In fact, that's your method --

4     A.   That's correct.

5     Q.   -- for discerning the property value

6  diminution associated with an event, right?

7     A.   Well, associated with establishing the

8  value of a property, or implicitly considering

9  whatever factors are affecting value.  I think

10  that's what I said.

11     Q.   Well, what is the relevance of citing

12  the occurrence of 6900 real estate

13  transactions?

14     A.   Well, I think it points to the notion

15  that certainly there are transactions

16  occurring, and there's transaction volume, so

17  there is -- whether the market is at

18  equilibrium or not, I can't tell you, but there

19  are transactions occurring, there are people

20  buying and selling, and that data could be

21  used, I think, to accurately, credibly attempt

22  to establish a value base post-Katrina.

23     Q.   Could you see the usefulness of this

24  information from these transactions coming into

189

1  technique?

2    A.  Well, any AVM is going to have to be

3  tested, and certainly that would give you the

4  ability to do that.

5    Q.  Now, you then, in the next section of

6  your report, talk about sold and unsold

7  properties, right?

8    A.  Yes.

9    Q.  As to sold properties, your question

10  in Paragraph 14C is relevant, is it not, to

11  discerning whether or not a diminution of

12  property value in fact has occurred associated

13  with the flood event?

14    A.  Yes and no, in the sense that if there

15  was a structural change in, say, commission

16  structure post-Katrina as compared to what was

17  the norm previously, then arguably you could

18  say that that was certainly associated with

19  Katrina events.  Now, which Katrina events I

20  can't tell you.  It would not necessarily only

21  be related to the flood.

22    Q.  Yes, sir, but if I were to undertake

23  to investigate whether there has been a

24  diminution in property value associated with

190

1  class area, this question you pose, 14C, would

2  be relevant to that investigation for the sold

3  properties, correct?

4     A.   Well, yes, because it certainly would

5  bear on what the net proceeds say to a property

6  owner.  If the commission structure was

7  3 percent before Katrina and now it's

8  10 percent, certainly the net proceeds to that

9  property owner would be changed.

10     Q.   And in the same investigation of

11  whether there's been a diminution, a

12  post-Katrina diminution in value that can be

13  associated with the flood event, the question

14  for the unsold properties would be whether the

15  prospective sale of that property would be less

16  than if you had sold it Katrina never having

17  occurred, right?  That would be the question

18  for the unsold properties?

19     A.   Yeah.  Again, is there a structural

20  change that produces the net proceeds?  But

21  again, I would say you're mixing Katrina event

22  and flood event, and the Katrina event is -- I

23  believe, you know, involves things other than

24  just the flood.

191

1  I've asked you to assume today and I'll ask you

2  to again assume tomorrow, that the plaintiffs

3  in this case are only seeking to recover

4  damages for the flood, the rising water?

5    A.  Oh, I understand that fully.

6    Q.  And that likewise, the plaintiffs

7  would only be investigating the question

8  whether a diminution in property value can be

9  associated with the flood, whether it can or

10  not, would be the relevant question, you

11  understand.

12        MR. ZWAIN:

13            I object to the form of that

14            question because it, number one, asks

15            for a legal conclusion, I think, and

16            number two, it misstates what I

17            understand the class is seeking,

18            realizing that I may not understand it

19            as perfectly as you guys.

20  EXAMINATION BY MR. MEUNIER:

21    Q.  Let me just draw attention to your own

22  report, and maybe we can get closure on this.

23        For unsold properties, properties that

24  remain unsold since Katrina, if we were to

192

1  has been diminished value that can be

2  associated with the flood rising water

3  intrusion event, if that were the -- if that

4  were the question, is that related to what you

5  asked in Paragraph 15B on Page 8, which is how

6  will the current market values of individual

7  properties change in the future as the market

8  continues to recover from Katrina?

9        MR. ZWAIN:

10            And I will again object to the

11            form of the question.

12    A.   15B relates to the notion that values

13  change over time.  One of the principle, one of

14  the preeminent principles in the real estate

15  market is the principle of change.  It rarely

16  stays static.  So there will be change, because

17  your values are as of a point in time, a

18  specific point in time.  And that statement

19  recognizes that over time a value structure may

20  be changing and that may impact what someone's

21  impact may truly be.

22  EXAMINATION BY MR. MEUNIER:

23    Q.  How is that question relevant to the

24  assessment of property damages?

**truax0926.txt**                          **Page 192**

193

1  selling your property, you repaired it, it's

2  back on line, you had sufficient insurance

3  proceeds, et cetera, and it was worth a hundred

4  thousand before the storm and it's worth a

5  hundred and ten after.  Then other than some

6  damage issues relating to having to stay in a

7  hotel for a while, et cetera, in terms of the

8  property value damage what is your measure of

9  damage?

10    Q.  Because without Katrina it's worth

11  three hundred thousand.

12    A.  Well, that's your hypothet, but I'm

13  just saying, argue -- isolate on -- well,

14  maybe -- you're pointing out there is not a

15  simple answer to that, because there are so

16  many variables that have to be considered in

17  terms of assessing how some individual property

18  is impacted by the storm and all the events

19  associated with it.

20    Q.  In Paragraph 16 and 17, Pages 8 and 9

21  in your report, you state that more than half

22  of the 188,000 -- in Paragraph 16, you state

23  the more than half of the 188,251 occupied

24  homes in New Orleans were occupied by tenants,

194

1    A.  Correct.

2    Q.  Do you refer or can you refer to any

3  data on that subject more current than the

4  census taken seven years ago?

5    A.  Well, again, that's the source we

6  cited there and that was the base for those

7  numbers.

8    Q.  I'm being invited to go back on

9  something, which I think we probably should do

10  briefly.  I was exploring with you the analysis

11  of the flood-related value diminution effect,

12  if any, on unsold properties post-Katrina and

13  how one would go about, in other words,

14  deciding whether or not such a diminution in

15  value has occurred that can be associated with

16  the flood.

17      Are you aware that there already has

18  been a publicly reported analysis of the

19  diminution in the value of damaged -- homes

20  damaged by the Katrina comparing pre and

21  post-Katrina values on a square foot basis?

22    A.  Oh, I'm sure there have been a variety

23  of studies done that were -- you know, speak to

24  that kind of issue.

195

1  been reported in The Times-Picayune issue of

2  January 7, 2006 that the sales price of

3  unrepaired homes has plummeted to about

4  42 percent of pre-Katrina levels?  Were you

5  aware of that?

6      A.   Am I aware that someone reported that

7  to The Times-Picayune?  I can't tell you I was

8  particularly aware, but I'm not surprised.

9      Q.   All right.  Let me show you the

10  Times-Picayune report I'm talking about.  It's

11  dated Sunday, January 7th, 2006.  (Tendering.)

12      MR. ZWAIN:

13          For the record, there had to be a

14      map where a little square at top

15      left-hand corner.  Is this the entire

16      article?

17      MR. MEUNIER:

18          I'm sorry, Gary.  I missed the

19      question.

20      MR. ZWAIN:

21          Is this the entire article?

22      MR. MEUNIER:

23          This is all I have with me.  But

24      if you're interested in exploring this

196

1     that.

2     MR. ZWAIN:

3        Well, I would simply ask that if

4     you want to have Mr. Truax review and

5     comment on an article to figure out

6     what it's possible significance is,

7     that it's only fair that you provide

8     him with the complete article --

9     MR. MEUNIER:

10       Well, I won't ask him --

11    MR. ZWAIN:

12       -- as opposed to some extracted

13    paragraph.

14    MR. MEUNIER:

15       Fair enough.  I'm not going to

16    ask him to answer detailed questions

17    about it.

18  EXAMINATION BY MR. MEUNIER:

19    Q.  Just identify at least for the record

20  what appears to be the source of the

21  information, Mr. Truax, and if you're able to

22  discern the small print with me.  At the bottom

23  left-hand corner where it says sources, you see

24  that?

197

1   Q.  Read for us the sources for the

2  information given in this -- on this map.

3      A.  Yeah.  It cites the New Orleans

4  Metropolitan Association of Realtors and Real

5  Property Associates, Inc.

6      Q.  Are you familiar with either one of

7  those --

8      A.  Well, I'm familiar with the New

9  Orleans Metropolitan Association of Realtors.

10  I'm not familiar with Real Property Associates,

11  Inc.  I was going to say I'm not familiar with

12  the name.

13     Q.  Are you a member of the New Orleans

14  Metropolitan Association of Realtors?

15     A.  Yes.

16     Q.  You are?

17     A.  Yes.

18     Q.  Were you, before today, aware of that

19  group being cited as a source for the

20  information reported on this -- in this

21  newspaper?

22     A.  Oh, I'm fairly certain -- I get and

23  pretty meticulously read the newspaper every

24  day, so I'm sure I saw this.

**truax0926.txt**                    **Page 197**

198

1        Let the record reflect also that

2        this article apparently refers to a

3        study with regard to the properties in

4        Jefferson Parish, Orleans Parish, and

5        Plaquemines Parish, St. Bernard

6        Parish, also appears to represent, at

7        least the map, areas of the west bank,

8        and clearly areas outside the scope of

9        what this litigation is concerned

10       with.

11       MR. MEUNIER:

12            Yeah.  And I'll be happy to limit

13       my attention to the class and subclass

14       areas.

15 EXAMINATION BY MR. MEUNIER:

16   Q.  And just looking at the class and

17 subclass areas, Mr. Truax, do you see that

18 according to this article there has been a

19 diminution in post-Katrina values on a square

20 foot basis for damaged properties?

21       MR. ZWAIN:

22            You're referencing the date of

23       the article, I take it.

24       MR. MEUNIER:

199

1     MR. ZWAIN:

2        You're referencing as of the date

3     of the article?

4   A.  And they are, um -- I haven't done the

5   math, but I assume -- I mean, obviously for the

6   damaged properties there was no base

7   pre-Katrina.  You only had damaged properties

8   post-Katrina.

9   EXAMINATION BY MR. MEUNIER:

10    Q.  Well, if you look again at that source

11  box on the bottom left-hand corner --

12    A.  Yes.

13    Q.   -- it says ZIP codes with five or more

14  sales only.  Pre-Katrina figures are closed

15  sales from January through August of '05, and

16  the post-Katrina figures are October of '05

17  through December '06.

18    A.  That's fine.  But I'm saying, you

19  obviously could not have --

20    MR. ZWAIN:

21        December '05.

22    MR. MEUNIER:

23        Sorry?

24    MR. ZWAIN:

**truax0926.txt**                              **Page 199**

200

1        January 7th, '06?

2    A.   My only point to you was, you

3  obviously only have damaged properties

4  pre-Katrina.  You didn't have Katrina damage

5  pre-Katrina.  So what is the base for the value

6  reduction for the damaged properties on a

7  percentage basis?  It's not comparing damaged

8  properties to damaged properties.  You've

9  changed the base.

10  EXAMINATION BY MR. MEUNIER:

11    Q.   So as I understand it, this is the

12  first you've ever been made aware of this

13  study, correct?

14    A.   No, I've told you I get and read the

15  newspaper every day.  I'm sure I saw it.

16    Q.   Right.

17    A.   But there have been a lot of these

18  that I've noted in the paper over the last

19  several years.

20    Q.   Did you discount the validity of what

21  you see reported on this sheet?

22    A.   Oh, I'm sure it represents what they

23  say it represents, but how valid it is in, say,

24  my world -- would I use this as an appraiser?

201

1  understand the source of the information that

2  they used, how reliable it was.  I mean,

3  they're taking whole ZIP codes, and if a ZIP

4  code had five sales in it they have produced a

5  result.  Well, you know, I don't purport to be

6  a statistician, obviously, but you could have

7  one sale at a million dollars in one of these

8  Zip codes and every other sale sold for a

9  hundred thousand, and you're going to get a

10  result that's kind of skewed by the one sale.

11  So, it is what it is, but until I understood

12  the database which created these numbers I

13  couldn't tell you whether this is, you know,

14  approximately accurate, highly accurate, or

15  woefully inaccurate.  So I don't know.

16      Q.  And you did research and you said that

17  there were more than 6900 sales transactions as

18  of September '07?

19      A.  Correct.

20      Q.  And that was -- was that residential

21  properties in the levee class area?

22      A.  That was transactions that cycled

23  through the multilist service.  It was not all

24  transactions.  So that's a minimum.  Because we

202

1  outside of the MLS system.

2     Q.  Right.  Sales by owner and that kind

3  of thing.

4     A.  Well, just ones they never listed.

5  Sales by owners or other means.

6     Q.  But you didn't, in terms of what was

7  the basis for this January '06 report, you

8  didn't discern when you looked at it how many

9  transactions had occurred prior to December of

10  '05.

11     A.  I don't -- well, for what period?

12     Q.  From Katrina to December of '05.

13     A.  Um -- no, I don't think we cut that

14  little slice out of it.

15     Q.  Okay.  Why don't we mark this as what

16  is it, Truax Number 5?

17        MR. ZWAIN:

18           With the understanding that

19        you're going to provide the complete

20        article sometime tomorrow?

21        EXNICIOS:

22           I've got it.  We've just got to

23        have it copied.

24        MR. ZWAIN:

203

1    opportunity to look at the complete

2    article.

3    MR. EXNICIOS:

4        It's also available online.

5    MR. ZWAIN:

6        He may have something different

7    to say about the article at some point

8    later.

9    MR. BRUNO:

10       If he wants to have it, we'll

11   give him one.

12   MR. ZWAIN:

13       Thank you.

14   MR. BRUNO:

15       It makes no sense to attach it

16   because there's been no reference to

17   it in the deposition.

18   MR. MEUNIER:

19       I didn't say attach it.

20   MR. BRUNO:

21       I thought you said attach it.

22   MR. ZWAIN:

23       I said I have no problem

24   attaching this with the

204

1    MR. BRUNO:

2         Even though it's available on

3    nola.com.  I'm telling you.  You

4    inquired.  It's publicly available.

5    Go get it.

6    MR. ZWAIN:

7         Well, then, give me back all my

8    exhibits.

9    MR. BRUNO:

10        You didn't give me anything that

11        was publicly available.  That's the

12        point.

13 EXAMINATION BY MR. MEUNIER:

14    Q.  Mr. Truax, Pages 10 and 11 of your

15 report, Paragraphs 19, 20, 22, you discuss the

16 variability in post-Katrina rents and business

17 income from both individual and commercial

18 properties in the class area, right?

19    A.  Well, I talk about, yeah, particularly

20 the rents that would have been derived from

21 residential and commercial type properties.

22    Q.  And your point here, the relevance of

23 this is that you believe that rents have

24 increased since Katrina.  Is that your --

205

1   Q.  And what is the relevance of that?

2   A.  Well, that the -- that consideration

3 has to be accounted for in assessing value

4 impact.  There could -- you know, many

5 properties in the levee class area probably had

6 an increase in value, they weren't damaged at

7 all, in fact they had a value enhancement as a

8 consequence of all the events associated with

9 Hurricane Katrina.

10   Q.  Okay.  Now, the mass appraisal

11 technique being proposed in this case would not

12 be utilized to quantify business income or

13 rental income loss.  You understand that?

14   A.  If that's -- you're telling me that

15 that's what I guess Dr. Kilpatrick proposes,

16 that he's not going to use it for that, I

17 believe you.

18   Q.  But what I'm trying to understand, I

19 think I understand, is that the reason you're

20 mentioning the high rents is that if we were to

21 analyze this diminution in value possibility

22 post-Katrina, you're saying we would have to

23 take into account the fact that post-Katrina

24 income producing properties are earning more

206

1    A.   Well, understand for an income

2  producing piece of real estate, it's value is

3  directly linked in many ways to the income it

4  produces.

5    Q.   Right.

6    A.   So if the net operating income from

7  your property has increased by as much as

8  39 percent, then you're going to have a

9  commensurate increase in property value.  So

10  the property value will, in fact, be increased.

11    Q.   But the comparison, again --

12    A.   It may not be 1:1, but there will

13  be -- it impacts it.

14    Q.   But the comparison, again, would be

15  between that property post-Katrina being valued

16  as it is with Katrina having happened and the

17  potential value of that same property had

18  Katrina never happened; isn't that the relevant

19  comparison for the diminution of value

20  analysis?

21    A.   I believe generally so, yes.

22    Q.   Page 11, Paragraph 23, you discuss the

23  case of an individual who's spent more to

24  repair his property, for example, because of

**truax0926.txt**                    **Page 206**

207

1 more than the difference between the pre and

2 the post-Katrina value.  That's the scenario

3 you've discussed, right?

4    A.  (Nods affirmatively.)

5    Q.  In other words, I've had to spend more

6 to fix my property than whatever diminution in

7 value there may be in the property.

8    A.  Well, and that you can recover.  I

9 mean, it's not uncommon for historic type

10 properties, because of the obligations that

11 come with, you know, being located in an

12 historic district and mandates that they place

13 upon you.

14    Q.  So how would you propose to calculate

15 the loss of that individual?

16    A.  Well, I think that's the very point,

17 that you have to look at that individually and

18 understand his circumstances.  If the historic

19 group comes into the one and says, your

20 obligation is to, um -- the only thing we're

21 going to demand of you is that you fix the old

22 shutters that now have a few slats that are

23 broken, whereas the next guy, the obligation

24 for whatever reason is to -- the damage was

208

1  restore it to make it look like it looked in

2  1800 when that wasn't the case before, well

3  then that's a different issue.

4      Q.   Well, why is it relevant to the

5  inquiry of whether there's been a diminution in

6  property value?

7      A.   Well, if that obligation attaches to

8  the property, which it would, then it affects

9  how a buyer or whomever would see the value of

10  that property.

11     Q.   So you're saying the cost of repair or

12  restoration would be a factor to input in

13  addressing the post-Katrina value of the

14  property.

15     A.   That's correct.  In other words, that

16  and any other factor that would -- that a

17  prudent buyer would consider before he acquired

18  that property.

19     Q.   All right.  Do you have any idea of

20  what percentage of the total properties at

21  issue in the levee case would be instances

22  where more has been spent to repair or restore

23  the property than the value of the property?

24     A.   No.  I wouldn't have a percentage for

209

1    Q.  Paragraph 24, Page 11, you state that

2  generally accepted standards of professional

3  appraisal practice in the peer reviewed

4  literature recognize that the effect of the

5  detrimental conditions such as that caused by

6  hurricane will change over time and when impact

7  occurs is typically temporary rather than

8  permanent.  Right?

9       MR. ZWAIN:

10           Sorry.  What paragraph are you

11      on?

12      MR. MEUNIER:

13           Paragraph 24, Page 11.

14      MR. ZWAIN:

15           All right.

16  EXAMINATION BY MR. MEUNIER:

17    Q.  Now, do you interpret the stigma or

18  detrimental condition claim associated with

19  flooding that's being asserted here on

20  plaintiffs' behalf, do you interpret that as

21  referring, among other things, to the risk of

22  recurrent flooding following a hurricane?

23    A.  I'm struggling with how that relates

24  to what you read me.

**truax0926.txt**                    **Page 209**

210

1  setup question.  You know how in volleyball

2  they do the soft pass and then the spike?

3      MR. ZWAIN:

4          You're just setting yourself up.

5  EXAMINATION BY MR. MEUNIER:

6   Q.  I'm asking you -- it's a general

7  question.  But when we approach this question

8  of stigma, I call it stigma, the -- what might

9  be a diminution in value due to the flooding

10  that had occurred in that storm, do you

11  understand that that concept tries to get at

12  how people evaluate the risk of there being

13  another flood?  You understand?

14   A.  I do.

15   Q.  In other words, the property arguably

16  is worthless because it's in an area that

17  flooded once and now it may happen again so who

18  wants to buy here?  That's the general idea.

19  You understand?

20   A.  I do.

21   Q.  Do you agree that if we are trying to

22  get at that market appreciation of risk here,

23  we are talking here, in this case, not just

24  about the risk of another big hurricane,

211

1  importantly, if not more importantly, the risk

2  of another levee failure, the risk of another

3  floodwall failure, the risk of another flood

4  control project failure.  You understand that,

5  that that's part of the risk that's being

6  presented in the marketplace, right?

7     A.  I understand what you've said, yes.

8     Q.  Well, that was all the predicate.  Now

9  I want to get back to the question.

10       Tell me how in the standards and

11  published literature that you're citing here,

12  how any of those discussions have handled the

13  risk of a recurrent man made levee failure in

14  reaching the opinion that, you know, the Stigma

15  effect goes away, it's temporary?

16    A.  Well, clearly I think the literature

17  generally notes that many of these

18  conditions -- and there was one article, I

19  believe it was by Bell, that studied some

20  various flood effects over time, and values

21  recovered in a number of instances over time.

22  And it's a natural -- it's a very logical

23  consequence with the passage of time.  We have

24  a perfect example here in our own area with

212

1 certainly had dramatically reduced values for a

2 time post those storms, but certainly forty

3 years later they were a distant memory for most

4 and certainly it had not retarded the progress

5 of, you know, development in St. Bernard Parish

6 and east New Orleans and areas that were

7 dramatically impacted, say, by Hurricane Betsy

8 in 1965. So I think that certainly on a go

9 levels, that the effect is generally diminished

10 over time.

11        Now, was there still a MRGO, was there

12 still levees that probably were aren't as high

13 as maybe in hindsight they should have been?

14 Yes. But that didn't manifest itself over a

15 long period of time into permanently reduced

16 value levels. So I think that's the notion

17 being expressed there that -- and that is

18 generally what the literature says, it is a

19 moving target.

20        You ask me when -- at what time do you

21 want a value estimate, and you'll get an

22 answer. But move me out two years or back two

23 years, you're may get a different answer. If

24 you move up or down that time line.

213

1  case may be waiting 20 years for the stigma

2  effect to go away?

3      MR. ZWAIN:

4          Object to the form of the

5      question.

6    A.  Well, you and I and no one else can

7  accurately and precisely predict that because

8  it's a market phenomenon that we don't control.

9  EXAMINATION BY MR. MEUNIER:

10   Q.  You're not comparing the public or

11  market appreciation of risk post-Katrina with

12  the public or market appreciation of risk after

13  Hurricane Betsy, are you?  Are you making a

14  comparison there?

15   A.  They were similar events in certainly

16  the same area.  Now, was the public perception

17  at that time identical to the public

18  perceptions today?  No.  Probably not.  No

19  question of that.

20   Q.  Have you personally reviewed and

21  analyzed the standards and published literature

22  that you refer to in Paragraph 24?

23   A.  I've certainly reviewed a number of

24  articles, as I've told you, that spoke to that

214

1  they generally indicate.

2    Q.  Are the standards, quote, unquote,

3  that you're talking about, those promulgated by

4  the Appraisal Institute's analysis of

5  detrimental conditions?

6    A.  Well, I think, you know, the

7  institute 's um -- documents that I have seen

8  certainly tell you that a detrimental condition

9  like any other condition needs to be

10  considered, but they generally tell you that

11  there are certain cautions, if you will, about

12  what can happen over time.  That's my

13  recollection.

14    Q.  Well, let me refer you to the report

15  that you cosigned with Mr. Roddewig, and

16  specifically on Page 22 --

17      MR. ZWAIN:

18        Talking about Exhibit D?

19      MR. MEUNIER:

20        Yes.

21    A.  Okay.  I'm there.

22  EXAMINATION BY MR. MEUNIER:

23    Q.  -- reference is made here to something

24  called the detrimental condition life cycle.

215

1    Q.   Correct?  And this is based upon a

2   publication by the Appraisal -- is it the

3   Appraisal Institute?

4    A.   Yes.

5    Q.   In 1999.  Right?

6    A.   Correct.

7    Q.   Has this publication and the standards

8   associated with it ever been updated in the

9   last eight years?

10    A.   Oh, I can't tell you that I would be

11  able to definitively tell you yes or no.

12    Q.   Do you know of any more current

13  standard reference or reference for standards

14  than this 1999 publication by the Appraisal

15  Institute?

16    A.   Um -- sitting here today, no, I can't

17  tell you I would know that.

18    Q.   According to this model, every

19  property affected by a hurricane or a flood

20  goes through four stages, initial impact,

21  assessment, repair, and ongoing.  Correct?

22    A.   Right.

23    Q.   And different questions arise in each

24  stage in reference to so-called stigma, right?

216

1    Q.   Does each property eventually progress

2  to the fourth stage?

3    A.   Well, I think theoretically, yes.  In

4  reality, every property in every circumstance?

5  Possibly not.

6    Q.   So in the individualized approach that

7  you would propose here, again to inquire

8  whether there has been a diminution in value in

9  post-Katrina property associated with the

10  flood, how would you go about determining which

11  of the four stages apply to a particular

12  property?

13    A.   Well, some of this would relate to the

14  task I was given.  If the task is to measure

15  the difference between, say, pre-Katrina value

16  and post-Katrina value, that would be done

17  directly through the examination of market

18  evidence.  It really wouldn't matter -- if

19  there's sales activity, it really wouldn't

20  matter what stage I, as an appraiser, thought

21  that, say, that neighborhood or that property

22  was in, because if I had transactional evidence

23  available to me to say at this point in time

24  that property is worth X dollars based upon

217

1  I fail to see where identification of the stage

2  matters.

3     Q.  Well, so what's the relevance of

4  talking about it in your report?

5     A.  This is a -- if you will, it explains

6  the process that typically any neighborhood or

7  even a larger area such as we have here where a

8  substantial part of the metro area was

9  impacted.  These are the broad stages that the

10  areas, the neighborhoods generally will go

11  through.  This is pretty classic.  But you

12  asked me how would I evaluate a particular

13  property.  Well, the particular property I

14  think I told you how I would do that.

15     Q.  So you wouldn't reference this 1999

16  appraisal standard on detrimental condition

17  life cycle in your analysis.

18        MR. ZWAIN:

19            Of an individual property?

20        MR. MEUNIER:

21            For any purpose.

22     A.  Well, no, for an individual property I

23  would certainly be telling you -- say, if you

24  were reading my report, I would be telling you

218

1  neighborhood was, as it relates to the

2  valuation of the property.  Remember, all of

3  those factors, the risk, the perception of

4  recovery, all of those things, they're

5  assimilated by a buyer, and he processes those

6  in some fashion to determine what he's

7  ultimately going to pay for a property.  But

8  when -- you know, I don't know that it would be

9  particularly important to be precise on what

10  stage the -- say, the neighborhood recovery was

11  at at the given time.

12     Q.   And then you and Mr. Roddewig go

13  through the actual listing of different

14  questions that would apply to each stage,

15  right?

16     A.   Yes.  But again, all this has an eye

17  towards determining how a market participant --

18  what questions would they be asking before they

19  decided to buy?

20     Q.   All right.  Where in these questions

21  is there any inquiry into the effect of

22  residing in an area that supposedly was

23  protected by a flood control system which

24  failed to protect after Katrina?

**truax0926.txt**                               **Page 218**

219

1    Q.   You want me to ask it again?

2    A.   Yeah.  Please.

3    Q.   Where in any of these listed questions

4  is there an inquiry into the effect of residing

5  in an area that supposedly was protected by a

6  flood control system which is known to have

7  failed to protect after Katrina?  Tell me where

8  that inquiry appears in any of these questions

9  that are listed for the four stages.

10    A.   Well, I think -- you know, that's --

11  the risk of, say, a hurricane, the risk of

12  flooding, if you believe that the levee system

13  is inadequate, that's kind of overriding all of

14  the particular questions that you would ask in

15  a given, say, neighborhood.  So it almost begs

16  the question -- I mean, it is a fact of life

17  here in New Orleans if you lived here you were

18  protected by levees.  If the levees files,

19  might you get wet?  You assimilate whatever

20  risk you see associated with that.  But if you

21  choose to come to New Orleans, you live with

22  that fact.

23        (Brief recess.)

24  EXAMINATION BY MR. MEUNIER:

220

1 also talked about peer reviewed literature that

2 addresses detrimental condition and suggests

3 that it's something that changes and is

4 typically temporary not permanent.  Let me ask

5 you, Mr. Truax, if the literature you're

6 referring to is that which is cited in the

7 report that you and Mr. Roddewig cosigned

8 starting at Page 25 and concluding at the top

9 of Page 27.

10    A.  Sorry.  I'm struggling with the page

11 numbers.  25 is my --

12    Q.  Yes, sir.  25 of the --

13       MR. ZWAIN:

14          Study.

15 EXAMINATION BY MR. MEUNIER:

16    Q.  -- the document that you and

17 Mr. Roddewig signed.

18    A.  Sorry.  Some of these that are cited

19 there?

20    Q.  No.  My question is -- I want to be

21 sure I understand.  In your report, Page 11,

22 Paragraph 24, when you refer to published peer

23 reviewed literature on the typically temporary

24 effects of detrimental conditions, are you

221

1  specificity at Pages 25 and 26 of the study

2  that you and Mr. Roddewig signed?

3     A.  Well, those citations speak for

4  themselves, but there were other articles that

5  were in the source materials that also spoke to

6  value change over time from flooding events.

7     Q.  Well, let me, without taking the time

8  to go back to that list -- maybe we'll do that

9  tomorrow if we've got nothing better to do, but

10  looking at the ones that are actually cited

11  here, tell me whether any of the instances that

12  are discussed in these articles involved not

13  just a natural flood event but a flood control

14  or a levee system failure associated with a

15  flood event.

16     A.  I would have to look at the

17  particulars rather than just the little

18  quotations there that are excepted here to tell

19  you definitively if that's the case.  I'm

20  reasonably certain that there weren't control

21  structures of the nature that we had.

22     Q.  Were not.

23     A.  I think that's correct.

24     Q.  Okay.  Yeah, the fact is that these

222

1  discuss the effect of hurricane flood events,

2  they're discussing events in which the natural

3  storm inflicted damage, not event in which

4  there was a failure of a flood control system

5  without which there would not have been a

6  catastrophic flood, am I correct?

7     A.  I think generally that's true.  I

8  just -- I thought I was recollecting one where

9  there was a dam structure that failed, and that

10  would have been a man made structure, but

11  general I agree with you.

12     Q.  And did any of these instances

13  discussed in the literature cited involve

14  flooding that covered 80 percent of the land

15  area of the metropolitan area with population

16  comparable in size to the levee and MRGO class

17  area?

18     A.  I certainly hope not, and I don't

19  believe so.

20     Q.  In fact, you would agree with me,

21  wouldn't you, that the flood event in this

22  case, in terms of its impact and the scope of

23  its -- of the damage is not comparable to any

24  flood event in the history of this country?

223

1  was fairly unprecedented.  Well, I take that

2  back now.  If you go back to the -- I guess it

3  was the mid nineties when the Mississippi River

4  Valley -- effectively, you know, about a third

5  of the United States ended up underwater, when

6  we had that massive Mississippi River flooding,

7  that was probably of a geographic scale

8  certainly to dwarf this, in terms of the areas

9  that ultimately were covered with water.  But

10  in terms of the population base that was

11  impacted and dislodged, I can't tell you if

12  that would be -- when you looked at all of the

13  states that were impacted, whether that would

14  be comparable in scale.  But that's the only

15  one that comes to mind that arguably would be

16  of a magnitude that could be compared to our

17  problem here.

18    Q.  Mr. Truax, can you rule out, as an

19  expert, the possibility that the stigma effect

20  associated with this event as it pertains to

21  property values will be permanent?

22    A.  Well, certainly the market determines

23  that, ultimately.

24    Q.  Right.

224

1  know that.

2    Q.   Right.

3    A.   So the market will determine that.

4  All I can tell you is that historically there

5  is a change, as you move down the time line

6  with -- generally speaking, usually the values

7  will recover.

8    Q.   You can't rule out that it may take

9  ten years or more for the effects, if any, of

10  the property value diminution to disappear,

11  correct?

12    A.   No.  It may be ten, but it could be

13  two.  There's a lot of factors that could

14  impact it that we don't control.  So, or can

15  predict.  So there is no way to definitively

16  know that.

17    Q.   In fact, when you get into this

18  discussion about -- that you and Mr. Roddewig

19  initiated here of, you know, typically the

20  stigma effects are temporary and not permanent,

21  the truth is that in the professional view of

22  things there is no consensus on how long it

23  takes a flooded property to recover its

24  pre-flood value.  True?

225

1 different.  Every situation will be different.

2 So when you say census, I think there is a

3 general consensus in the literature I've read

4 that you typically see recovery in most areas

5 impacted by these detrimental influences.  But

6 I don't disagree with you that can you

7 categorically say that in all cases you get it

8 and you get it at a certain pace?  No.  But,

9 you know, it may not -- we may reasonably say

10 it's going to be ten years, and circumstances

11 may change and it may be one or two.

12   Q.  Right.  And as you say, market will

13 determine that.

14   A.  Market determines that.

15   Q.  And in fact the market will take into

16 account the duration of the supposed stigma,

17 won't it?  Won't that be one of the things

18 reflected in the market appreciation of the

19 risk, how long that risks will exist?

20   A.  Absolutely.  The market will determine

21 that.

22   Q.  So again, you'll agree there's really

23 no consensus on how long it would take a

24 flooded property to recover its pre-flood

226

1  is there?

2     A.  Well, with the caveat that -- as I've

3  said, there is consensus, I think, in the peer

4  reviewed literature that typically, in somewhat

5  of a normalized circumstance, if you will,

6  there is recovery.  Now, we have now both said

7  it several times; the base of it, the magnitude

8  of it, is determined by a host of factors that

9  we probably cannot readily predict.

10    Q.  It's true, isn't it, in the case of

11  the California flooding that was discussed in

12  Footnote 27 -- on Page 26, rather, of your

13  report.  You see the first bullet point --

14    A.  Yes.

15    Q.  -- at the top of Page 26?

16    A.  Yes.

17    Q.  It's true that in that case, the

18  flooding of those two California towns, that

19  houses took more than ten years, more than ten

20  years to recover in the neighborhoods with the

21  greatest flood damage?  Isn't that true?

22    A.  I think that's right.

23    Q.  Now, going back to your report,

24  Page 11, Paragraph 25, you cite the wide

**Page 226**

227

1  of housing types, conditions, et cetera,

2  correct?

3     A.  Yes.

4     Q.  And do you think that's a problem with

5  the use of AVMs by tax assessors, that's what

6  makes them not good indicators of market value

7  of that variability?

8     A.  That's certainly a big issue, yes.

9     Q.  Is it your position that there's no

10  way to control for variables using the AVM

11  technique?

12     A.  Well, clearly the AVM technique allows

13  for multiple inputs, so you can guide it at

14  some level.  But I'm here to tell you based on

15  my experience with the local market that the

16  variety is far too extensive and the number of

17  variables that you have to address far too

18  great to reliably produce, I believe, a model

19  that will produce accurate and credible

20  results.

21     Q.  Let's refer to your table on Page 13

22  in which you set forth an analysis of the

23  variations and the variables within the five

24  proposed subclass areas.

228

1  subclass Number 2, you studied a total of 130

2  properties, correct?

3     A.   Correct.

4     Q.   How many total properties are in the

5  Belfort area?

6     A.   In the Belfort study area, we looked

7  at 130.

8     Q.   No.  How many total properties are in

9  subclass 2?

10     A.   Oh.  I'm sorry.  Um -- I don't recall

11  that number.

12     Q.   So you can't tell me then whether 130

13  represents a statistically significant or

14  sufficient sample of the properties in that

15  subclass?

16     A.   Well, in terms of it being a

17  significantly -- I mean a statistically

18  significant number, no.  It likely isn't.  That

19  wasn't the point of the study.

20         The point of the study was to say even

21  in such a small area as one with only 130

22  properties, here was the variety that was

23  demonstrated.

24     Q.   Right.  But you want to suggest that

229

1  of 130 to a much larger group not even knowing

2  how big that larger group is, correct?

3     A.  I'm telling you that, again, based

4  upon my experience and my understanding of the

5  variety in these neighborhoods, that no, could

6  you extrapolate 1:1 and say that based upon

7  this study we will find 62 percent

8  single-family residential throughout that

9  broader subclass area, the subclass area 2?

10  No, I'm not telling you that.  I'm telling you,

11  this study is what it is.  It demonstrates what

12  you see even in an area as small as nine

13  blocks.

14     Q.  And I suppose we'll get the same

15  answer with respect to Catina, which is

16  Subclass 1, Edinburgh which is Subclass 5,

17  Gaines which is Subclass 3, and Stutz which is

18  Subclass 4, the total properties studied, 170

19  in Catina, 138 in the Edinburgh, 90 in Gaines,

20  82 in Stutz, are not being presented by you as

21  a statistically significant or sufficient

22  samples of the total properties in each of

23  those sub chance areas, correct?

24     A.  No, I would agree with you that

230

1 relative to the wholes of those subclasses.

2    Q.  How long did it take you to study each

3 of these five subclass areas?

4    A.  Well, in terms of the entire process,

5 as we were implementing it for use in this

6 report, probably -- now this is a horseback

7 estimate, but I'm going to give you man days,

8 if you will --

9    Q.  Okay.

10    A.   -- maybe five man days.

11    Q.  And can you tell me what professional

12 charges were associated with that work in that

13 estimate of your charges?

14    A.  I'm doing some math in my head.  Maybe

15 fifteen, twenty thousand dollars.

16    Q.  Is that just for you or did that

17 include the work of others?

18    A.  No, that would include others.  No,

19 I'm sorry.  I did that math wrong.  I

20 apologize.

21        No, it would be less than ten

22 thousand.

23    Q.  Are you multiplying 40 hours times --

24    A.  40 hours times, um -- $200.

**truax0926.txt**                          **Page 230**

231

1    A.  Yeah.

2    Q.  I thought your rate was $275.

3    A.  Well, we weren't using, the other

4  people that were helping weren't at the same

5  rate.

6    Q.  So you were charging $275, and others

7  were charging less, so you just took an average

8  of $200.

9    A.  Well, yeah.  You asked me how I got

10  take number, that's how.

11    Q.  Now, am I correct looking at the

12  property use portion of the table that the

13  total of 85 percent of the properties you

14  studied in the Belfort area of Subclass 2 are

15  residential?

16    A.  Yes.

17    Q.  And in the Catina area of Subclass 1,

18  76 percent?

19    A.  Yes.

20    Q.  77 percent, rather, were residential?

21    A.  Yes.

22    Q.  And in the Edinburgh area of Subclass

23  5, 50 percent were residential?

24    A.  Yes.

232

1 92 percent were residential?

2   A.  Yes.

3   Q.  And in the Stutz area of Subclass 4,

4 80 percent were residential?

5   A.  Yes.

6   Q.  And the percentages of commercial

7 properties in all 5 areas ranged from a low of

8 0 percent to a high of 3 percent.

9   A.  Correct.

10   Q.  Now, in the next two profiles

11 sections, the elevation and the depth of

12 flooding sections, you have entries for

13 demo/vacant land, right?

14   A.  Yes.

15   Q.  What does demo refer to?

16   A.  Well, remember, these were

17 observations made from the street.  So we

18 couldn't always tell if there had been a

19 demolition accomplished or if it had been a

20 vacant site previously.  So based upon the

21 observations from street right-of-way, it was

22 either demoed or vacant, but there was not a

23 building or a residence or a structure on the

24 site when we observed it.

233

1  in the demo/vacant land category include

2  demolished properties?

3    A.  Yes.  In other words, if we pulled up

4  to the lot and there was no residence on it,

5  one of two things could have been; it could

6  have been vacant before the storm, or they

7  could have demolished something that had been

8  there.

9    Q.  Is it reasonable to infer if a home

10  was demolished -- if a home was demolished

11  after Katrina it is reasonable to infer it

12  sustained some flood damage?

13    A.  No, I don't think you would

14  categorically say that had caused the demo.

15    Q.  You don't think that's a reasonable

16  inference?

17    A.  It is an inference, but the property

18  could have been destroyed by wind or a tree

19  could have fallen on it and cut it in half.  So

20  there are other reasons that a property

21  possibly required demolition.

22    Q.  And in Paragraph 30, Pages 14 and 15,

23  you cite the Catina area of Subclass 1 as

24  illustrative of variability in the elevation of

234

1    A.  I'm sorry.  Direct me again to where

2  you are?

3    Q.  Paragraph 30, Pages 14 and 15.

4    A.  Okay.  Yes.

5    Q.  But do I understand from the table

6  that 77 percent of the homes in the Catina area

7  ranged from an elevation of below 1 foot to

8  4 feet or more?

9       MR. ZWAIN:

10          Are you going back to the table

11       on the previous page?

12       MR. MEUNIER:

13          The table on Page 13.

14    A.  I'm sorry.  Ask me that question again

15  there.

16  EXAMINATION BY MR. MEUNIER:

17    Q.  Well, 77 percent of the homes that

18  were standing ranged in elevation from below

19  one foot to 4 feet or more, correct?  Excluding

20  the 23 percent of the demolished homes and

21  vacant land.

22    A.  You say you excluded those from your

23  calculation?

24    Q.  In other words, all the homes you

235

1  ranging from less than a foot to four feet or

2  more, correct?

3    A.  Yes.

4    Q.  Okay.  And the depth of the flooding

5  figures given for Catina indicate that

6  71 percent of the land experienced flooding of

7  4.1 feet or more, right?

8    A.  Excluding the demo and vacant, yes.

9    Q.  So in Catina, despite what you cite as

10 an elevation variability, it appears that

11 virtually all of the properties in the Catina

12 study area flooded; in fact, the table

13 indicates there was only no flooding in one

14 property, 1 percent of the study.

15    A.  I would say that's true in Catina,

16 yes.

17    Q.  It's also true in Edinburgh, by the

18 way, that every property but 1 experienced

19 flooding.

20    A.  That's probably correct, yes.

21    Q.  And in fact, in Gaines, every single

22 property experienced flooding.  Subclass area

23 3.

24    A.  Yes.

236

1  habitable floor flooding?

2     A.   We knew the ground elevation, I

3  believe from the IPET study, and -- no, IPET

4  gave us the depths of flood from ground.  We

5  knew the NAVD 88 datum, there was an

6  adjustment, GCR did that, to get to what sea

7  level was, and we observed, from the street,

8  what -- the approximate elevation, so it's an

9  approximation, of the first habitable floor

10  area was, from ground.  So if you were on a

11  pier house, low pier, we said it was two feet

12  above ground, if it was, you know, a slab

13  house, we said that was a foot or less.

14     Q.   So you agree that the depth of

15  flooding is ascertainable with some degree of

16  certainty within all five subclass areas?

17     A.   Yes.

18     Q.   How did you determine the no flooding

19  category which is given under depth of

20  habitable floor flooding?

21     A.   Again, we did the math.  We took the

22  IPET depths of flooding in that particular

23  neighborhood and subtracted that from -- or

24  subtracted, rather, the elevation of the living

237

1  have been in the first habitable living area

2  level.  In other words, if you had three feet

3  of flooding from ground in the neighborhood,

4  your house was raised two feet -- your first

5  floor living area was raised two feet, you had

6  one foot inside.

7     Q.   All right.  You feel that's a reliable

8  methodology?

9     A.   I'm sorry.

10    Q.   Did you feel that's a reliable

11  methodology?

12    A.   Well, it's reliable for what it is.

13  Certainly it is an estimate from -- an eyeball

14  estimate in terms of the elevation from ground

15  to the living area of floor.  But I think it's

16  reasonably close, yes.

17    Q.   According to this table, approximately

18  20 percent of the total properties studied

19  experienced no flooding.  True?

20    A.   Where are you speaking from?

21    Q.   I'm counting 122 properties in all,

22  five areas.

23    A.   That had no flooding.

24    Q.   In the no flooding, and I'm counting

238

1  610.  So 122 no flooding cases out of 610 is

2  20 percent.

3     A.   That's approximately correct.

4     Q.   Now, do you feel that that's a fair

5  representation for the entire class area;

6  20 percent?

7     A.   I wouldn't have any idea as to whether

8  you could extract that -- extend that over the

9  whole class area.

10    Q.   And the property repaired profile on

11  the table at the bottom, am I correct that

12  among the cases you studied, about 43 percent

13  were repaired and reoccupied?  Totalling up,

14  265 repaired and reoccupied out of a total of

15  609?

16    A.   Again I'm trusting your math, but if

17  these are the numbers they are the numbers.

18    Q.   Do you think that is a figure,

19  43 percent repaired and reoccupied, that can be

20  extrapolated to the class?

21    A.   No.  I don't think you could readily

22  extrapolate these percentages across the class

23  boundaries.

24    Q.   Now, we have talked a little bit about

239

1  discuss the fact that the class property, or

2  the properties owned by the class

3  representatives are not, in your view,

4  representative.  Correct?

5      A.  They're not representative of all of

6  the properties certainly within the class

7  area -- proposed class area.

8      Q.  Paragraph 29, at Page 14, for example,

9  you state that the class rep for this Edinburgh

10  study group within Subclass 5 is a multifamily

11  unit owner and yet there are only 38 percent of

12  those multifamily units in the study area, is

13  that right?

14      A.  Correct.

15      Q.  Then you note in Footnote 14 -- I'm

16  sorry, 4, that the property today is a

17  single-family unit.

18      A.  Well, it is a two-family dwelling in

19  style and construction, but the owner is

20  currently utilizing it as a single unit.

21      Q.  In order to have what you consider to

22  be representative properties identified,

23  Mr. Truax, would you have to have one property

24  from each of the property use, elevation, depth

240

1  order to be representative?

2    A.  I'm sorry.  I'm going to have to ask

3  you to ask that again.

4    Q.  What would it take to produce

5  representative properties in the subclass areas

6  you've looked at here; how would you go about

7  doing that?

8    A.  Well, I think I've told you, because

9  of the diversity and the lack of homogeneity in

10  most of our neighborhoods, it would be very

11  difficult to have a group of properties that

12  you say are truly representative of all of the

13  properties in these subclass areas.  I'm not

14  sure you could do it with a reasonable number

15  of, um -- of samples.

16    Q.  Let me refer you now to Page 17,

17  Paragraph 33.  Is it your testimony that the

18  Appraisal Institute guide rejects AVM as a

19  technique in appraising large numbers of

20  properties?

21    A.  I think the Appraisal Institute tells

22  appraisers that an AVM is a tool to be used,

23  potentially, if it's relevant, in certain

24  assignments.  The output of an AVM is not

241

1  Institute, it is nearly merely a tool, just as

2  we have other tools in our tool bag.  So -- and

3  they caution, I believe, appraisers to be

4  careful of that.

5      Q.   Yes, but you agree with me, don't you,

6  that the Appraisal Institute does not reject

7  AVMs as a tool or technique which can be used

8  in pricing large numbers of properties.

9      A.   Well, as you pose that question, I

10  think the Appraisal Institute tells you it is

11  not an appraisal.  So I to be clear on that.

12  It is merely a tool that may give you guidance,

13  it may help you in selection of data, but it is

14  one tool.  Certainly before you would, quote,

15  unquote, appraise a property and give a point

16  value, let's say, for a single-family home.

17      Q.   So it's one tool that can be used in

18  doing that, but not reliable as a sole or

19  primary tool?

20      A.   Yes.  It is not an appraisal, it does

21  not replace the appraiser in terms of assigning

22  a value to a particular property.

23      Q.   You quote the institute, bottom of

24  Page 17, to the effect that mass appraisal

**truax0926.txt**                                    **Page 241**

242

1  correct?

2      A.   That was the arena in which we most

3  often saw it used.

4      Q.   How long ago did these methods

5  originate with county assessors?

6      A.   Oh, some semblance of mass appraisal

7  techniques have probably been utilized almost

8  forever, in terms of the need for assessors,

9  particularly pre computers, to, um -- use a

10  methodology that let them evaluate, for their

11  purposes and their purposes only, large numbers

12  of properties.

13      Q.   And in how many counties in this

14  county are mass appraisal methods used by

15  assessors?

16      A.   Oh, I couldn't give you a number.  But

17  I'm sure it's substantial.

18      Q.   At the top of Page 18, you add

19  emphasis to the statement assessor models,

20  therefore, focus on equity rather than

21  individual market valuation veracity.  Correct?

22      A.   Correct.

23      Q.   So the purpose in focus of AVMs as

24  used by assessors is an equitable distribution

243

1    A.  That is correct.

2    Q.  Is it your impression that

3  Dr. Kilpatrick proposes to use this tool, this

4  technique, in the same way that assessors use

5  it to distribute the tax burden?

6    A.  Well, I think I've now told you

7  several times, you know, I can't tell you

8  definitively how Dr. Kilpatrick will use it

9  based upon his report as I have read it.  There

10  is not enough detail there for me to know that.

11    Q.  Paragraph 34, you say that the

12  inaccuracy of mass appraisal techniques is

13  specifically recognized by USPAP Standard 6,

14  correct?

15    A.  Correct.

16    Q.  And then you follow with the quote

17  that it is implicit in mass appraisal that even

18  when properly specified and calibrated mass

19  appraisal models are used, some individual

20  value estimates will not meet standards of

21  reasonableness, consistence and accuracy,

22  correct?

23    A.  Correct.

24    Q.  Do you think it's significant that the

244

1  some?

2    A.  Is it significant?

3    Q.  To you.

4    A.  I think the statement stands for --

5  stands on its own.

6    Q.  Do you think if it were possible to

7  state that most or many individual value

8  estimates will not meet standards that the

9  USPAP standard would have so specified?

10    A.  Well, I think if you -- that statement

11  in context, if you look at other published

12  portions of Institute documents, you'll see

13  that, you know, they tell you that certainly

14  having uniformity of property type and basic

15  characteristics is critical to the output from

16  mass modeling technique being reliable and

17  really useful.  And what I've told you is that

18  in our submarket we don't have that

19  circumstance at all.  We have a tremendous

20  amount of variety, variety not only from

21  neighborhood to neighborhood but block to

22  block, and even in lot to lot in many

23  neighborhoods.  So the backdrop, if you will,

24  that let's an AVM work efficiently, or even

245

1  norms, don't exist here, in my opinion.

2    Q.  Isn't it true, Mr. Truax, that the two

3  federal government sponsored enterprises

4  Freddie Mac and Fannie Mae both use AVMs in the

5  mortgage evaluation process?

6    A.  Yes, I think I told you earlier, when

7  evaluating loan portfolios those types of

8  models are utilized as a check on the packages.

9  I'm not aware that they use them for individual

10  property valuation.

11    Q.  Isn't it also true that despite your

12  quote in Paragraph 35 from a 2004 Appraisers

13  News Online that AVMs are rarely accepted by

14  mortgage investors, the truth is that today, in

15  2007, AVMs are playing an increasing role in

16  the mortgage lending industry?  True?

17    A.  I think -- are they used in certain

18  segments of the mortgage industry?  Yes.

19    Q.  No, sir.  They're playing, today, in

20  2007, an increasing role in the mortgage

21  lending industry.  True?

22    A.  Well, increasing relative to what?

23    Q.  Increasing relative to before.

24    A.  Before when?

246

1  the role of AVMs increasing in the mortgage

2  lending industry?

3     A.   I don't know that I can answer that.

4     Q.   Would you be surprised to read that

5  statement in peer reviewed literature?

6     A.   No.

7     Q.   In fact, it's true that many lenders

8  are using AVMs as their primary appraisal tool

9  for certain kind of loans, including

10  refinancings and equity loans.  You agree?

11     A.   Certain lenders will use that when

12  there's a low loan to value circumstance and

13  they perceive their risk to be fairly minimal.

14     Q.   No, sir.  Many lenders are using AVMs

15  as their primary appraisal tool for certain

16  kinds of loans; do you agree?

17     A.   Well, I think the key point you make

18  is for certain kind of loans, in certain

19  circumstances.  I would agree, based upon my

20  knowledge, for a narrow market segment, yes.

21     Q.   Do you deny that both contingent

22  valuation and conjoint analysis are methods

23  which a great majority of economists view as

24  acceptable and useful in measuring non market

247

1      MR. ANZELMO:

2          Objection to form.

3    A.  I'm not sure what that statement

4  means.

5      MR. ZWAIN:

6          Also he's not an economist.  So

7          you're asking him something outside of

8          his expertise.

9  EXAMINATION BY MR. MEUNIER:

10    Q.  So if you don't know what that means,

11  you I assume you wouldn't be surprised to read

12  that in the published literature either.

13    A.  Read the statement again when you say

14  non market values.

15    Q.  Contingent valuation and conjoint

16  analysis are methods which a great majority of

17  economists view as acceptable and useful in

18  measuring non market values.

19    A.  I'm aware that those methods are used

20  to -- for valuing certain commodities, if you

21  will, that don't typically trade, or there's no

22  active market for them.  Um -- but I'm not sure

23  that statement you've read me says that.

24    Q.  Well, in fact, you say in your report

248

1  contingent valuation and conjoint analysis are

2  widely recognized limited to situations in

3  which natural resources or other goods having

4  no economic market need to be measured in

5  economic terms.

6      A.  I'm glad I said that, because that's

7  what I was attempting to just tell you.

8      Q.  Give me an example of what you mean by

9  that.

10     A.  Well, if there's -- I've seen it

11  argued that if there is an amenity, let's say,

12  that -- a, say, limited number of properties

13  have access to this amenity, and those

14  properties never trade, or they haven't traded

15  in any reasonable fashion such that you could

16  do an analysis to isolate the value of that

17  particular amenity, then if you were asked to

18  say, well, what's that worth, it becomes a

19  difficult task if there is no market evidence

20  to study.  And at that point, you have to -- or

21  you're left with having to go to alternate

22  methods to try to evaluate that.

23     Q.  How about the valuation of a

24  disamenity; same answer?

**truax0926.txt**                                    **Page 248**

249

1          Object to form.

2     A.  Yeah.  Basically.

3  EXAMINATION BY MR. MEUNIER:

4     Q.  Now, you've talked already about what

5  you consider to be the high rate of error

6  associated with some of these appraisal

7  techniques, including contingent valuation and

8  conjoint analysis.

9          Do you deny, Mr. Truax, that the

10  uncertainty which is inherent in certain

11  methods such as these has been studied and has

12  been established to a degree allowing for

13  reliable results?  Do you deny that?

14    A.  Yeah.  I'm -- I don't agree with that.

15    Q.  And so you would be surprised to read

16  that in the published literature, too.

17    A.  Oh, I wouldn't be surprised to read

18  that in the published literature, but I don't

19  agree with that.

20        MR. MEUNIER:

21          Okay.  I believe we're at a

22          stopping point, and we'll resume

23          tomorrow at 9:30.

24

**truax0926.txt**                              **Page 249**

250

1       WITNESS' CERTIFICATE

2

3       I, MICHAEL W. TRUAX, MAI, do hereby

4  certify that the foregoing testimony was given

5  by me, and that the transcription of said

6  testimony, with corrections and/or changes, if

7  any, is true and correct as given by me on the

8  aforementioned date.

9

10 _____    _____

11 DATE SIGNED     MICHAEL W. TRUAX, MAI

12

13 _____ Signed with corrections as noted.

14

15 _____ Signed with no corrections noted.

16

17

18

19

20

21

22

23

24

**truax0926.txt**              **Page 250**

251

1       REPORTER'S CERTIFICATE

2       I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,

3  Certified Court Reporter in and for the State

4  of Louisiana, do hereby certify that the

5  aforementioned witness, after having been first

6  duly sworn by me to testify to the truth, did

7  testify as hereinabove set forth;

8       That said deposition was taken by me

9  in computer shorthand and thereafter

10  transcribed under my supervision, and is a true

11  and correct transcription to the best of my

12  ability and understanding.

13       I further certify that I am not of

14  counsel, nor related to counsel or the parties

15  hereto, and am in no way interested in the

16  result of said cause.

17

18

19

20

21

22

23  _____

24      JOSEPH A. FAIRBANKS, JR., CCR, RPR