252

EXHIBIT B

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4  IN RE: KATRINA CANAL BREACHES    CIVIL ACTION

5  CONSOLIDATED LITIGATION          NO. 05-4182 K2

6                    JUDGE DUVAL

7  PERTAINS TO LEVEE AND MRGO        MAG. WILKINSON

8

9        (V O L U M E  II)

10

11        Deposition of MICHAEL W. TRUAX, MAI,

12  given in both the levees and MRGO cases, at the

13  offices of Stone, Pigman, Walther, Wittmann,

14  LLC, 546 Carondelet Street, New Orleans,

15  Louisiana 70130-3588, on September 27th, 2007.

16

17

18

19

20

21

22

23  REPORTED BY:

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

**truaxvol20927.txt**                    **Page 252**

253

1  APPEARANCES:

2  REPRESENTING ORLEANS LEVEE DISTRICT:

3      MCCRANIE, SISTRUNK, ANZELMO, HARDY,

4      MAXWELL & MCDANIEL

5      (BY:  THOMAS ANZELMO, ESQUIRE)

6      3445 N. Causeway Boulevard, Suite 800

7      Metairie, Louisiana 70002

8      504-831-0946

9

10  REPRESENTING WASHINGTON GROUP INTERNATIONAL:

11      JONES DAY

12      (BY:  WILLIAM E. MARPLE, ESQUIRE)

13      2727 North Harwood Street

14      Dallas, Texas 75201

15      214-220-3939

16      - and -

17

18      STONE PIGMAN WALTHER WITTMANN, L.L.C.

19      (BY:  CARMELITE M. BERTAUT, ESQUIRE)

20      546 Carondelet Street

21      New Orleans, Louisiana 70130

22      504-581-3200

23

24

254

1  REPRESENTING THE PLAINTIFFS:

2      GAINSBURGH, BENJAMIN, DAVID, MEUNIER &

3      WARSHAUER, L.L.C.

4      (BY:  GERALD E. MEUNIER, ESQUIRE)

5      2800 Energy Centre

6      1100 Poydras Street

7      New Orleans, Louisiana 70163-2800

8      504-522-2304

9      - and -

10

11      BRUNO & BRUNO

12      (BY:  JOSEPH M. BRUNO, ESQUIRE)

13      855 Baronne Street

14      New Orleans, Louisiana 70113

15      504-525-1335

16      - and -

17

18      LAW OFFICE OF FRANK J. D'AMICO, JR.

19      (BY:  RICHARD M. EXNICIOS, ESQUIRE)

20      622 Baronne Street

21      New Orleans, Louisiana 70113

22      504-525-9561

23      - and -

24

255

1    ANDRY LAW FIRM

2    (BY:  JONATHAN B. ANDRY, ESQUIRE)

3    610 Baronne Street

4    New Orleans, Louisiana 70113

5    504-586-8899

6    - AND -

7

8    FAYARD & HONEYCUTT

9    (BY:  D. BLAYNE HONEYCUTT, ESQUIRE)

10    519 Florida Avenue SW

11    Denham Springs, Louisiana 70726

12    225-664-0304

13

14  REPRESENTING BOARD OF COMMISSIONERS FOR THE

15  EAST JEFFERSON LEVEE DISTRICT:

16    FRILOT, PARTRIDGE, L.C.

17    (BY:  JOSEPH E. BEARDEN, III, ESQUIRE)

18    3600 Energy Centre

19    1100 Poydras Street

20    New Orleans, Louisiana 70163-3600

21    504-599-8000

22

23

24

256

1  REPRESENTING THE PARISH OF JEFFERSON:

2      BURGLASS & TANKERSLEY

3      (BY:  MONICA M. WALDRON-BURGLASS,

4      ESQUIRE)

5      5213 Airline Drive

6      Metairie, Louisiana 70001

7      504-836-2220

8

9  REPRESENTING NEW ORLEANS SEWERAGE & WARTER

10     BOARD:

11     CHRISTOVICH & KEARNEY, L.L.P.

12     (BY:  ELIZABETH S. CORDES, ESQUIRE)

13     601 Poydras Street, Suite 2300

14     New Orleans, Louisiana 70130

15     504-561-5700

16

17  REPRESENTING EAST JEFFERSON LEVEE DISTRICT AND

18  LAKE BORGNE LEVEE DISTRICT:

19     DUPLASS, ZWAIN, BOURGEOIS, MORTON,

20     PFISTER & WEINSTOCK

21     (BY:  GARY M. ZWAIN, ESQUIRE)

22     Three Lakeway Center, 29th Floor

23     3838 N. Causeway Boulevard

24     Metairie, Louisiana 70002

**truaxvol20927.txt**                              **Page 256**

257

1  ALSO PRESENT:

2        JOHN A. KILPATRICK, Ph.D

3

4  ATTENDING VIA INTERNET:

5        KIRK AURANDT

6

7  VIDEOGRAPHER:

8        GILLEY DELORIMIER (DEPO-VUE)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

258

1    E X A M I N A T I O N   I N D E X

2

3 EXAMINATION BY:                    PAGE

4

5 MR. MEUNIER ............................ 261

6        E X H I B I T   I N D E X

7

8 EXHIBIT NO.                 PAGE

9 Exhibit 6   ............................ 267

10 Exhibit 7   ............................ 277

11 Exhibit 8   ............................ 281

12 Exhibit 9   ............................ 289

13 Exhibit 10  ............................ 303

14 Exhibit 11  ............................ 366

15 Exhibit 12  ............................ 375

16 Exhibit 13  ............................ 394

17

18

19

20

21

22

23

24

259

1      S T I P U L A T I O N

2           IT IS STIPULATED AND AGREED by and

3   among counsel for the parties hereto that the

4   deposition of the aforementioned witness may be

5   taken for all purposes permitted within the

6   Federal Rules of Civil Procedure, in accordance

7   with law, pursuant to notice;

8           That all formalities, save reading

9   and signing of the original transcript by the

10  deponent, are hereby specifically waived;

11          That all objections, save those as to

12  the form of the question and the responsiveness

13  of the answer, are reserved until such time as

14  this deposition, or any part thereof, is used

15  or sought to be used in evidence.

16

17

18          * * *

19

20

21

22          JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23  Certified Court Reporter in and for the State

24  of Louisiana, officiated in administering the

**truaxvol20927.txt**                    **Page 259**

260

1      MR. BRUNO:

2          Why don't we make appearances on

3      the record.

4      MR. MEUNIER:

5          Jerry Meunier for the levee and

6      MRGO plaintiffs.

7      MR. BRUNO:

8          Joseph Bruno, plaintiff liaison

9      counsel.

10     MR. ANDRY:

11         Jonathan Andry, MRGO plaintiffs

12     steering committee.

13     EXNICIOS:

14         Richard Exnicios, MRGO

15     plaintiffs.

16     MR. HONEYCUTT:

17         Blayne Honeycutt, levee and MRGO.

18     MS. WALDRON:

19         Monica Waldron, Jefferson Parish.

20     MS. CORDES:

21         Elizabeth Cordes, Sewerage &

22     Water Board, New Orleans levee case.

23     MS. BEARDEN:

24         Joseph Bearden, East Jefferson

261

1    District.

2    MS. BERTAUT:

3        Carmelite Bertaut, Washington

4    Group International.

5    MR. ANZELMO:

6        Tommy Anzelmo representing the

7    Orleans Levee District.

8    MR. MARPLE:

9        Bill Marple representing

10   Washington Group International.  And I

11   note that plaintiffs' expert

12   Mr. Kilpatrick is also present today.

13   MR. ZWAIN:

14        And I'm Gary Zwain.  I represent

15   East Jefferson Levee District in the

16   levee case and Lake Borgne Basin Levee

17   District in the MRGO case.

18        MICHAEL W. TRUAX, MAI

19   3045 Ridgelake Drive, Suite 100, Metairie,

20   Louisiana 70002, a witness named in the above

21   stipulation, having been previously sworn, was

22   reminded of his oath and was examined and

23   testified on his oath as follows:

24   EXAMINATION BY MR. MEUNIER:

262

1    A.   God morning.

2    Q.   Mr. Truax, we were speaking yesterday

3  about the extent to which AVMs are used in the

4  mortgage industry, mortgage lending business.

5  And I was wondering if you were aware of a

6  survey that was conducted in 2005 by the

7  consulting group Benchmark Consulting

8  International.

9    A.   I don't have any specific recollection

10  of that survey, no.

11    Q.   What is the Mortgage Bankers

12  Association of America?

13    A.   I can't tell you that I'm intimately

14  familiar with the group.  I expect that it is a

15  group of mortgage lenders that subscribe to or

16  as a group do certain things, but that's all I

17  would note definitively.

18    Q.   All right.  Let me show you, and I

19  want to just ask you a couple of questions

20  about what's said in it, an article that

21  appeared in the September 2006 issue of

22  Mortgage Banking which is a publication of the

23  Mortgage Bankers Association of America.

24  (Tendering.)  And the article is entitled

263

1        Do you see the statement in the second

2   sentence of the first paragraph to the effect

3   that AVMs are becoming increasingly important

4   to the mortgage industry?  You see that

5   statement?

6        A.  I see that statement.

7        Q.  Now, you don't deny or dispute the

8   truth of that statement, do you, that AVMs are

9   becoming increasingly important to the mortgage

10  industry?

11       A.  Well, important is, you know, a

12  judgment call, I think, so it's hard for me to

13  say that I, you know, agree with it, disagree

14  with it, dispute it.  The statement speaks for

15  itself.

16       Q.  Well, you don't dispute that AVMs are

17  used with increasing frequency in the mortgage

18  industry, do you?

19        MR. MARPLE:

20             Objection, asked and answered.

21  EXAMINATION BY MR. MEUNIER:

22       Q.  I believe you did admit that

23  yesterday, they're used with increasing

24  frequency?

**truaxvol20927.txt**                    **Page 263**

264

1          Same objection.

2     MR. ZWAIN:

3          Objection.  I don't think that's

4     what he said at all.

5     A.  I was going to say what I think I --

6  how I responded was, increased from when was --

7  you know, you're asking me if it's increased.

8  Well, I have to have a starting point, and we

9  never got around to that.  That's my

10  recollection of yesterday's conversation.

11  EXAMINATION BY MR. MEUNIER:

12     Q.  Let me ask it this way:  If you were

13  plotting it on a chart as a line, would you

14  dispute the fact that the line reflecting

15  frequency of use is going up, is rising?  Would

16  you dispute that?

17     A.  Well, certainly if you asked me that,

18  say, over a ten-year window, no, I would not

19  dispute that.

20     Q.  All right.  And in fact, what I wanted

21  to call attention to, if you look down on the

22  bottom left-hand side, the last full paragraph

23  of this article references a 2005 study that

24  was released -- that was performed by Benchmark

265

1  reference to that?

2    A.   I'm sorry.  Where were you?

3    Q.   Bottom left-hand side of the first

4  page of the article, last full paragraph on the

5  left-hand side.  According to?

6    A.   Okay.  I'm with you.

7    Q.   And do you see the report here that

8  according to the 2005 study the percentage of

9  valuations, obviously speaking about property

10  valuations, which were performed using AVMs

11  increased from 50 percent in 2003 to 66 percent

12  in 2005?  Do you have any basis on which to

13  dispute that increase?

14    A.   Well, as I say, I think the article

15  speaks for itself, it says what it says.  I

16  have -- I'm not attempting to dispute what this

17  author wrote.

18    Q.   And we see at the end of that same

19  paragraph the statement that as much as

20  50 percent of all originations, meaning

21  purchase, home equities, refinancings, involve

22  the use of valuation models as instruments in

23  the underwriting process.

24        Do you have any basis for disputing

266

1     A.   Again, the article speaks for itself.

2     Q.   And of course, on the right-hand side,

3  about five lines below that black box, you'll

4  see the statement that Fannie Mae and Freddie

5  Mac continue to legitimize the use of AVMs by

6  waiving independent valuation requirements by

7  use of their own internal AVMs.

8          You don't dispute that, do you?

9     A.   Same response, Mr. Meunier; the

10  article speaks for itself.

11     Q.   Now, referring there to the AVM

12  models, were you aware that the Freddie Mac

13  website discusses the Home Value Explorer, or

14  HVE, as Freddie Mac 's own automated valuation

15  model?  Have you ever been aware of that

16  before?

17     A.   No, I'm not familiar with that.

18     Q.   Well, it is true that AVMs are models

19  that can be customized to a particular use?

20          MR. ZWAIN:

21              Counsel, are you going to attach

22          this to the deposition as an exhibit?

23          MR. MEUNIER:

24              Yes.  I'll attach that article --

267

1      6.

2      (Exhibit 6 was marked for

3  identification and is attached hereto.)

4  EXAMINATION BY MR. MEUNIER:

5      Q.  Can AVMs be customized for a

6  particular use?

7      A.  Yes.

8      Q.  In other words, this isn't a one size

9  fits all, some structure that's rigid; an AVM

10  is a model with different component that you

11  can adjust and change or vary according to your

12  particular use of the AVM, correct?

13      A.  That is correct.

14      Q.  And in fact, let me hand you a

15  printout from the Freddie Mac website, and it's

16  a two-paged printout.  You see the reference,

17  bottom left-hand side, to Home Value

18  Explorer --

19      A.  Yes.

20      Q.  -- which is reported here to be a

21  model that generates a property estimate within

22  seconds?

23      Do you have any doubt that it can do

24  that?

268

1  a computer application can do that.

2    Q.   And you see that it's reported here

3  that HVE, this particular model used by Freddie

4  Mac, encompasses several models rolled into one

5  single product?  Correct?

6    A.   Again, I'll tell you the article

7  you've given me speaks for itself.

8    Q.   Let me -- but you've already

9  acknowledged, you've never utilized an AVM,

10  developed a model, customized one, or really

11  had any experience in the application of an

12  AVM.  Am I correct?

13    A.   That's correct.  I believe I've told

14  you that I don't dispute that AVMs have

15  applications that might be reliable.  I'm just

16  telling you that in the local market I would

17  tell you that the variability, the unique

18  character of our neighborhoods make -- I

19  believe, AVM output would not be useful in this

20  particular submarket.  I'm not disputing that

21  AVMs, for some uses and in some applications,

22  wouldn't be fine.

23    Q.   Okay.  So you think what calls into

24  question the utility of an AVM is the

269

1  properties?

2      A.   That's one of the factors, yes.

3      Q.   Would you consider that the main

4  factor that calls the use of the AVM into

5  question for the present case?

6      A.   Well, particularly if you're speaking

7  of just the valuation side of it, not

8  necessarily the damage articulation, yes, that

9  would probably be the biggest single factor.

10     Q.   Of course, we have already talked

11  about the fact they're used by virtually every

12  tax assessing authority in the country,

13  correct?

14         MR. MARPLE:

15            Objection.

16     A.   No, I would say I don't agree with

17  that.

18  EXAMINATION BY MR. MEUNIER:

19     Q.   Certainly a clear majority.

20     A.   Not the majority in our metro area.

21     Q.   Not the majority -- AVMs are not used

22  by the majority of tax assessing authorities in

23  Louisiana?

24     A.   Basically in -- until 2008, of the

270

1  that any of them effectively used AVMs prior to

2  the 2008 reassessment.  They didn't even have

3  the computer capability to do it.

4    Q.  Well, I thought you spent a lot of

5  time yesterday talking about the failure of the

6  tax assessor system as proof that mass

7  appraisal is not an accurate indicator of

8  market value.

9    A.  Oh, they used mass appraisal.  What

10  they do is, they use mass appraisal techniques,

11  but they don't use automated valuation models

12  to do that.

13    Q.  What mass appraisal techniques do they

14  use?

15    A.  Well, mass appraisal is when you're

16  appraising a large number of properties and

17  you're using some common factors across a broad

18  range of properties that you're evaluating.  It

19  doesn't mean that you have to use an automated

20  valuation model to do that.  Those assessors

21  are doing mass appraisals, that is, they're

22  appraising all the properties in their

23  district.

24    Q.  Uh-huh.

**truaxvol20927.txt**                                **Page 270**

271

1  have the computer capability to implement any

2  sort of automated valuation model until very

3  recently.  On the Orleans Parish side.

4    Q.  Okay.  Well, tell me, if you can, in a

5  little bit more detail, how mass appraisals are

6  accomplished.  And I assume you're talking

7  about appraisals of properties without there

8  being an individual property by property

9  appraisal.  Correct?

10    A.  Well, certainly the hope would be that

11  every property in the assessor 's taxing

12  district is appraised individually, if you

13  will, taking into account all of its particular

14  characteristics.  I think the reality in

15  Orleans has been that that was not generally

16  accomplished.

17    Q.  Right.  So tell me how you understand

18  the mass appraisal methodology to have occurred

19  in Orleans --

20    A.  Well --

21    Q.  -- historically.

22    A.  Well, I think historically what we

23  know is, even the state tax commission couldn't

24  determine what process was being implemented by

272

1  articles I've read cited that I think the Third

2  District assessor, they actually interviewed

3  him and went down and looked at this records

4  and couldn't find a process, period, that was

5  used for him to do his mass appraisal.  So I

6  can't tell you what some of them were doing.

7     Q.  Well, how do you know it was a mass

8  appraisal?

9     A.  Because he was appraising thirty

10  thousand odd properties, or whatever the number

11  is.  So it was a mass appraisal effort on his

12  part, and he was in fact, you know, providing a

13  value basis for all of these properties without

14  individually looking at them.

15     Q.  Right.

16     A.  But without implementing any kind of

17  structured process like an AVM.

18     Q.  All right.  Would it have been better

19  for the use of an AVM in that situation?

20     A.  Realistically, in his particular

21  situation?  I think probably most anything

22  would have been better.

23     Q.  Okay.  Including an AVM.

24     A.  Probably.

**truaxvol20927.txt**                    **Page 272**

273

1  no dispute that AVMs have been appropriately

2  used for certain purposes, correct?

3     A.   I think there are applications where

4  they would be appropriate.

5     Q.   Your problem with applying the AVM

6  model, some customized version of an AVM to

7  this case for the discernment of, for example,

8  the detrimental condition diminution of value

9  issue, is that there's too much heterogeneity

10  in the property population to make the model

11  accurate for that purpose?

12     A.   Well, you took the AVM now beyond just

13  valuing property.  You said to establish the

14  impact of the detrimental condition, which is I

15  guess at some level a damage issue.  Well,

16  there are two problems.  You have to base lack

17  of homogeneity of the properties themselves,

18  and then secondarily you have the varied

19  impacts because of the different

20  characteristics of all of these properties,

21  where they're located, the elevation of the

22  land, elevation of the flooding, et cetera,

23  that also now becomes a factor, and again

24  introduces another host of variables that I

274

1  have so many variables to try to model that I

2  think any result would be innately unreliable.

3      Q.   Let's stick with the first point.

4  You're right, let's not combined those ideas.

5  The first point being a valuation process using

6  an AVM.

7          Is your concern with a mass appraisal

8  approach in this case to achieve that valuation

9  outcome with the use of an AVM, is your concern

10  the heterogeneity of the property?

11     A.   Well, I think in the local market

12  that's the primary one.

13     Q.   Okay.

14     A.   But there are others.  And the other I

15  think large one in this case would be a lack of

16  good data input to apply your model, even if

17  you've got it structured.  Let's say you're

18  driving it by dollars per square foot of living

19  area.  Well, to my knowledge, most of Orleans

20  Parish, they don't know how big any of the

21  residences are.  That's not a part of the

22  database.

23     Q.   They being the tax assessors?

24     A.   Yes.

**truaxvol20927.txt**                    **Page 274**

275

1  is available, to your knowledge?

2      A.  Oh, for those properties that, say,

3  have sold in the last ten years or so, for that

4  period, that were listed through the MLS

5  system, you would probably have the ability to

6  retrieve information from that.  But then what

7  you wouldn't know is did someone make an

8  addition after they bought that house, was it

9  altered, was there a demolition.  So there

10  would be things that would have to be altered

11  even to that database.  But I'm not aware of

12  any current, accurate database that would give

13  you probably all the necessary base physical

14  information that you would need on a

15  property-by-property basis for that to have

16  reasonable output.

17      Q.  You'd go about building that database

18  one house at a time.

19      A.  I know of no other way to accurately

20  and reliably gain that data.

21      Q.  You wouldn't refer to any existing

22  sources of data, you'd go out in the field and

23  gather the data?

24      A.  No, I think I would go to whatever

276

1 certainly if there was a means to get

2 information on properties that you considered

3 reliable, you would certainly avail yourself of

4 that.  But I'm not aware of one that would give

5 you any significant number of the properties,

6 again from a reliable source.

7    Q.   Since heterogeneity is your primary

8 concern for the use of an AVM for the

9 valuation, for the determination of market

10 value in a mass appraisal basis, do I assume

11 that you're not aware of instances where AVMs

12 have been used with a heterogeneous property

13 base -- with a subject property base that was

14 heterogeneous?

15    A.   Well, again, every property database

16 is going to have some variety, you know.  I

17 think New Orleans -- the New Orleans area is

18 relatively unique in terms of the tremendous

19 variety we have.  Those of us that live here

20 know, you know, you have the mansion next to

21 the shack.  You will have tremendous change

22 block by block in terms of the market appeal

23 and parameters that drive value in our

24 marketplace.  It's just a function of our

277

1    Q.   What is your feeling about the

2  heterogeneity of the property base to which

3  Freddie Mac and Fannie Mae subject AVMs?

4    A.   Well, sitting here, I can't tell you

5  what base they're applying them to, and how

6  they use them.

7    Q.   Is New York City a heterogeneous

8  property population?

9    A.   In a global way, I would say so.

10   Q.   Let me refer you now to a printout

11  from the Fannie Mae website that discusses

12  AVMs, and I want to ask you a question about

13  this.

14       Before I forget, let me give an

15  Exhibit Number Truax 7, if I haven't done so

16  already, to the printout from the Freddie Mac

17  website.

18       (Exhibit 7 was marked for

19  identification and is attached hereto.)

20  EXAMINATION BY MR. MEUNIER:

21   Q.   What I'm showing you now, Mr. Truax,

22  is from a Fannie Mae website and discussing

23  AVMs.  It begins with the statement the

24  strengths of AVMs relative to traditional real

278

1  consistency and objectivity.

2       Do you disagree with that statement?

3       MR. MARPLE:

4            Let me object to the foundation

5       for representation in the first part

6       of your question that this was taken

7       from Fannie Mae.

8       MR. MEUNIER:

9            All right.  Subject to that

10       objection we'll proceed.

11  EXAMINATION BY MR. MEUNIER:

12  Q.  I'm going to ask you to assume it was.

13  We'll be able to prove that at the appropriate

14  time.

15  A.  Again, I will tell you -- you know,

16  the statement speaks for itself, but I will

17  tell you, particularly relative to the

18  consistency and objectivity components of that,

19  I think what they're telling you is it will be

20  internally consistent.  That is true.  Because

21  you will have built your box and your

22  parameters will be your parameters, and it will

23  be internally consistent.  And given the logic

24  of your program, it will be objective with

279

1     I wouldn't want you to -- I don't

2  believe this is intended to say that it is

3  necessarily better or worse than, say, a value

4  or analysis that an appraiser who went out to a

5  property and looked at all the parameters

6  himself would -- his conclusion would be any

7  less objective than, say, the AVM output.

8    Q.  All right.  So your concern has to do

9  with the accuracy or reliability of the market

10  valuation, correct?

11    A.  That's one of my concerns, certainly.

12    Q.  Uh-huh.  But the fact that AVMs

13  certainly in a mass appraisal approach to a

14  hundred thousand properties, you don't dispute

15  for a moment that it would be superior in terms

16  of speed, reduced cost, consistency and

17  objectivity as compared to a traditional

18  house-by-house appropriate; you don't dispute

19  that, do you?

20    A.  Well, again, I think -- I think I have

21  responded to that in terms of what I believe

22  the consistency, objectivity comments relate

23  to.  I mean, one of the other articles you gave

24  me -- you know, you had me read a certain

280

1  it says, a --

2     Q.  Wait.  For the record, we're going

3  back to which article?

4     A.  "Evaluating AVMs" by Brenda White.  I

5  believe it was the first one you handed me.

6     Q.  Oh.  Today?

7     A.  Yes.  And further down in that

8  article, it reads, as sophisticated as AVMs are

9  today, relying on them in the appraisal process

10  can present risks.  AVMs accuracy tends to

11  suffer in areas where local housing is highly

12  heterogeneous or where there is lack of

13  sufficient long-term data.

14        So that's the very --

15     Q.  Which are the two concerns that you

16  have expressed; heterogeneity and lack of --

17     A.  Absolutely.  And so the very article

18  you were citing to me has the same concerns I

19  do.

20     Q.  Well, I think we're succeeding in

21  identifying the strengths and weaknesses of

22  them.

23     A.  Well, I believe so.

24     Q.  Okay.  Now, let me go back to the

281

1  second sentence here is, as follows:  This is

2  not to suggest that conscientious, skilled

3  appraisers lack consistency and objectivity;

4  however, an AVM can significantly reduce the

5  time it takes to obtain an estimate, reduce the

6  costs associated, et cetera.

7       You don't, again, deny that the AVM,

8  on a mass appraisal approach to a hundred

9  thousand properties, is superior in reducing

10 time and costs associated with the appraisal

11 process, do you?

12    A.  No, I think if you're married to that

13 system and believe that it will produce

14 credible results, no, I suspect it would

15 certainly be more efficient and cost efficient

16 as well.

17    Q.  Right.  Let me attach as Truax 8 the

18 Fannie Mae website printout.  Uh-huh.

19       (Exhibit 8 was marked for

20 identification and is attached hereto.)

21 EXAMINATION BY MR. MEUNIER:

22    Q.  Now, we have spoken already about the

23 Appraisal Institute.  I'm not sure we've

24 identified or defined, in your deposition,

**truaxvol20927.txt**                    **Page 281**

282

1  organization.

2        What is the Appraisal Institute?

3    A.   It's a professional organization

4  that's been around for I think, oh, a hundred

5  or so years, a long time, that offers

6  professional education and certifies and

7  designates, if you will, appraisers as being

8  qualified professionals.  They offer the MAI

9  designation that I hold, among others.

10    Q.   And it's a credible organization,

11  correct?

12    A.   Yes.

13    Q.   Have you looked at the AIs discussion

14  of a publication by Linne and others called

15  "Guide to Appraisal Valuation Modeling?"

16    A.   I believe I have.

17    Q.   And let me again represent to you that

18  this is the printout yesterday from the AI

19  website.  And it's a discussion by the

20  Institute about that guide, correct?

21    A.   Well, I haven't read the entirety of

22  this in five seconds, but that appears to be

23  what it is.

24        MR. ZWAIN:

283

1       then.

2       A.   Yeah.  I mean, what you've handed to

3   me is essentially the lead in that I guess very

4   briefly summarizes what that guide contains and

5   what it purports to present.

6   EXAMINATION BY MR. MEUNIER:

7       Q.   Well, and this invitation to look at

8   the guide suggests, doesn't it, that there is

9   an interplay that's available between the, you

10  know, statistical theories of the modeling and

11  traditional appraisal standard, it's not either

12  or, it's both and; correct?

13      MR. ZWAIN:

14          You're saying that that's what

15      this says?

16      MR. MEUNIER:

17          Yes.

18  EXAMINATION BY MR. MEUNIER:

19      Q.   That's what it says the guide invites,

20  is, the highlighting of that, if you look at

21  the middle of that paragraph, "Throughout the

22  text the authors highlight the interplay of

23  evolving statistical theory, traditional

24  appraisal standard and practices and simple

284

1  essential reading for any appraiser who has

2  stubbornly resisted the encroachment of the

3  numbers crunchers."

4      MR. ZWAIN:

5         This is an advertisement.

6      MR. MEUNIER:

7         Well, it's the Appraisal

8      Institute 's review of the guide.

9      MR. ZWAIN:

10         It's an advertisement.  It's not

11      a review.  You're misrepresenting what

12      it is.  It's on a website that you can

13      add to your shopping cart and buy it.

14      It's no different than Amazon .com for

15      appraisers.

16      MR. MEUNIER:

17         And I'm sure the Appraisal

18      Institute would freely allow this to

19      be said on its website if it condemned

20         the guide as invalid.

21  EXAMINATION BY MR. MEUNIER:

22    Q.  What I'm asking, have you read this

23  guide?

24    A.  I've seen the guide, but no, I can't

285

1   Q.  So you've heard about it.

2   A.  Yes.

3   Q.  My question really, Mr. Truax -- and I

4  know you're at a disadvantage never having had

5  practical experience with mass appraisal or

6  AVMs.  But do you understand that AVMs are not

7  juxtaposed as an alternative to traditional

8  pricing methods and practices but, rather, as

9  models which allow the interplay between

10  statistical tools and traditional appraisal

11  methods?  Do you understand that?

12       MR. MARPLE:

13           I object to the first sentence in

14           that question.

15   A.  Mr. Meunier, I well understand that

16  AVMs are a tool.  And the Institute is very

17  clear as to how they see AVMs.  It is a tool in

18  our bag as appraisers that we should be aware

19  of and certainly utilize, possibly, if it's

20  appropriate.

21  EXAMINATION BY MR. MEUNIER:

22   Q.  Uh-huh.

23   A.  What I've now told you, I think

24  numerous times, is I don't believe an AVM

**truaxvol20927.txt**                                    **Page 285**

286

1  produce reliable, credible results.  At the end

2  of the day, for the Appraisal Institute,

3  everything is about producing reliable,

4  credible, professional results.

5     Q.  Yeah.  I understand.  But my question

6  is a little different.

7       If your concern about there not being

8  reliable, credible results has to do with the

9  uninvolvement of traditional appraisal

10  practices or appraisals in the field, do you

11  understand that AVMs actually can and do

12  utilize the services of appraisers in the

13  field?

14       MR. MARPLE:

15         Object to the form of the

16         question.

17     A.  What I would tell you is I'm certainly

18  aware that there are many ways to structure an

19  AVM.  There are many ways to test an AVM.  What

20  I'm telling you is, based upon my understanding

21  of what the capabilities are, and my

22  understanding of the parameters that we have to

23  deal with in the class area -- or potential

24  class area here, that I do not believe at the

287

1  of AVM the -- what I would ultimately have to

2  do would be essentially identical in

3  character -- to produce credible results would

4  be essentially identical in character to going

5  out and individually looking at every property

6  and looking at every characteristic that I

7  would do in a normal appraisal process.  I do

8  not believe at the end of the day you would get

9  any real benefit from the AVM that you could

10  feel very comfortable about in terms of the

11  output unless you did the rigorous property

12  inspection and look on an individual property

13  basis.

14     Q.   So any kind of devised or designed

15  shortcut or streamlining effort that obviates a

16  house-by-house traditional appraisal of a

17  hundred thousand or more properties, in your

18  view, sacrifices essential reliability.

19     A.   Oh, no.  I'm not saying that in any

20  case anywhere.  What I'm telling you is, based

21  upon my understanding of the data that's

22  available in our submarket, the variety that is

23  demonstrated in our submarket, that I do not

24  believe there are going to be many efficiencies

288

1  accurate and credible results on a

2  property-by-property basis.

3     Q.  Right.  So --

4     A.  I'm not telling you that an AVM could

5  not be tried.  What I'm telling you is, given

6  my day-to-day understanding of the marketplace,

7  that I do not believe that at the end, when

8  you've finished, that if you wanted accurate,

9  credible results, that you would have gained

10  any real efficiencies.

11     Q.  Right.  So in this case, your position

12  and your opinion is that there is no kind of

13  AVM shortcut or streamlining that could

14  possibly be implemented, even in conjunction

15  with traditional appraisal practice, because as

16  soon as you introduced any kind of AVM

17  streamlining mechanism, you have lost

18  reliability and accuracy?

19        MR. MARPLE:

20           Objection, asked and answered.

21  EXAMINATION BY MR. MEUNIER:

22     Q.  Is that your position?

23     A.  No, I think -- look, again, as a tool,

24  it could be used as a tool.

289

1  this case.

2      A.   In this case.

3      Q.   Okay.

4      A.   You know, you could potentially use it

5  as a tool.  But to put a tremendous amount of

6  reliance on it in terms of the individual

7  property valuations that appear to be necessary

8  in this case, I do not believe that the results

9  would be credible if you relied exclusively on

10  the AVM output.

11      Q.   Okay.  I'm going to mark as Truax

12  Number 9 the printout from the website.

13          (Exhibit 9 was marked for

14  identification and is attached hereto.)

15  EXAMINATION BY MR. MEUNIER:

16      Q.   I think counsel directed you to

17  another sentence in that article.  Maybe you'd

18  like to bring it to our attention.

19      MR. MEUNIER:

20          Thank you, Mr. Zwain.

21      MR. ZWAIN:

22          Thank you.

23      MR. MEUNIER:

24          Mr. Zwain is the next witness

290

1    chance to --

2    MR. ZWAIN:

3         Don't you think it fair to give

4    him an opportunity to read the

5    article?

6    MR. MEUNIER:

7         I want to hear everything he's

8    got to say about it now.

9  EXAMINATION BY MR. MEUNIER:

10    Q.   Has counsel referred you to another

11  sentence that you'd like to discuss?

12    A.   Well, in the same article that I had

13  gone back to --

14    Q.   This is Truax No. 6.

15    A.   Evaluating AVMs, yeah, there's a

16  section that talks about the validation

17  process.

18    Q.   Where are you, Page 1?

19    A.   Well, it's Page 18 on the article you

20  gave me, left-hand side, about the middle,

21  under the heading a key control as model

22  validation.  It says, AVMs should be subjected

23  to thorough model validation procedures that

24  are becoming standard for other types of

291

1  off-the-shelf AVMs available for mortgage

2  lenders, each processing its own strengths and

3  weaknesses.  Model validation is especially

4  important for these models given the lack of

5  tailoring to a given lender 's particular

6  product mix and geographic distribution among

7  other factors.

8     Q.  All right.  So what's important to you

9  about that?

10     A.  Well, it certainly says that you

11  certainly have to validate and test your model

12  in the market and for the purpose for which you

13  are using it.

14     Q.  Right.  And in the industry, this

15  confirms, doesn't it, that there are actual

16  model validation products and practices that

17  one can access in order to develop a reliable

18  AVM, correct?

19     A.  Oh, absolutely.  You have to validate

20  the model.  And as I've told you, there are

21  applications for them that are probably very

22  fine.

23     Q.  And the application of one of those

24  products, those model validation products,

292

1  more reliable, correct?

2    A.   That would be the purpose.

3    Q.   And of course you're not familiar, as

4  you sit here, with any of the available model

5  valuation practices or products, are you?

6    A.   Oh, I think I've told you I'm not an

7  AVM expert.  That's correct.

8    Q.   Okay.  Now, have you communicated with

9  Kerry Vandell, one of the other defendant

10  experts, about this case?

11    A.   I have met Kerry Vandell and been at a

12  conference, a meeting, if you will, with him.

13    Q.   A conference or a meeting with the

14  defendant lawyers?

15    A.   Um -- yes.

16    Q.   Who else was present at that meeting?

17    A.   Two gentlemen that were working with

18  Mr. Vandell, and I don't remember all of the

19  lawyers.

20    Q.   When did this meeting take place?

21    A.   Sometime in the last prior two months.

22  I don't remember the exact date.

23    Q.   And you consider Mr. Vandell credible.

24    A.   Based upon what I've read of him, and

293

1    Q.   Now, you have told us, I believe, that

2  in your own experience with detrimental

3  condition factor evaluation, as it impacts or

4  potentially impacts property value, you've

5  always used the sales comparison approach.

6    A.   Correct.

7    Q.   That's been your methodology that

8  you've used in every case.

9    A.   Correct.

10    Q.   Have you read Mr. Vandell 's article

11  entitled "Optimal Comparable Selection and

12  Weighing in Real Property Valuation" published

13  in the AREUEA Journal, 1991?

14    A.   I have read several articles by

15  Mr. Vandell.  That one I'm not certain of.  If

16  you show it to me, it may refresh my memory.

17    Q.   All right.  (Tendering.)

18        Looking at the article now, are you

19  familiar with it?  Have you read it?

20    A.   Well, again, you're asking me to very

21  quickly make that judgment, and I'd have to

22  certainly read a little more.

23    Q.   Well, let me just -- I'm just going to

24  ask you about the first page, so why don't you

294

1  paragraphs of the introduction.

2      MR. ZWAIN:

3          Well, counsel, if you're going to

4      ask him about an article, I think it's

5      fair to give him an opportunity to

6      read the entire article if he does n't

7      recall having read it before.  I

8      certainly don't know if he does or

9      does.  But if you want to pick and

10     choose particular sentences out of an

11     article that he's never read and take

12     them out of context and not allow him

13     the opportunity to put them in some

14     kind of context, then I don't think

15     that's a fair method of questioning.

16     MR. MEUNIER:

17         If the only way we could ever

18     question a witness, particularly an

19     expert, about a particular section of

20     a document was to interrupt the

21     deposition and allow the witness to

22     read the entirety of the document,

23     then the deposition and discovery

24     practice would devolve into something

295

1     of a hundred thousand homes.  So with

2     all due respect, Gary --

3     MR. ZWAIN:

4         Well, you're showing the witness

5     something he's never seen before, and

6     if you would ask him questions about

7     what it means then I don't think

8     you're right.

9     MR. MEUNIER:

10        But you haven't heard my

11     question.  And it may be a sentence

12     that he can readily agree or disagree

13     with, or, as you may be inviting him

14     to say, he may say I can't answer

15     until I read the whole article.  But

16     we'll wait and see.

17     MR. ZWAIN:

18        Fair enough.

19 EXAMINATION BY MR. MEUNIER:

20     Q.  Have you read the first couple of

21 paragraphs of the introduction?

22     A.  Yes, I have.

23     Q.  Okay.  Now, first of all, I want to

24 make sure I understand that the sales

296

1 to in the couple of paragraphs that begin the

2 article is the methodology that you have used

3 when you've gone about trying to determine

4 whether there's been a property diminution

5 value impact from a detrimental condition or

6 environmental event.  Is that true?

7    A.   Yes.  We have used a market analysis,

8 a sales comparison approach, if you will, to

9 study sales in the marketplace in determining

10 the impact from those sales.

11    Q.   Now, if in this case, Mr. Truax, you

12 were asked to use a methodology to investigate

13 whether the flood event associated with Katrina

14 in a given area did or didn't have a value

15 diminution effect on property values, if that

16 were your task, do I understand that you would

17 utilize the same sales comparison methodology

18 that you've utilized in other cases?

19    MR. MARPLE:

20       Let me object as asked and

21       answered more than one time.

22    A.   The only part of that I would dispute

23 is the same.  You said the same.  It would be

24 the same in that it would be a market analysis

297

1  whatever level of study was necessary to -- and

2  it would probably not be the same in all

3  cases -- to again produce accurate, credible

4  results.

5  EXAMINATION BY MR. MEUNIER:

6    Q.  Okay.

7    A.  But I would go to the marketplace and

8  I would look to sales evidence to do that.

9    Q.  Right.  So in other words, so I'm

10  clear about the methodology, the methodology --

11  the sales comparison methodology that you would

12  use would be, for example, an alternative to

13  the hedonic price modeling methodology to make

14  that investigation, is that true?

15    A.  I'm sorry.  Say that again.

16    Q.  The sales comparison methodology that

17  you would use to make that investigation would

18  be used as an alternative to the hedonic price

19  modeling methodology to make that

20  investigation; is that true?

21    A.  That's likely so.

22    Q.  Okay.  Do you see that Mr. Vandell, in

23  the introduction portion of the article, makes

24  the statement that the sales comparison

298

1 especially for relatively homogeneous

2 properties such as single-family homes, et

3 cetera?

4       MR. MARPLE:

5           Object to the form.

6 EXAMINATION BY MR. MEUNIER:

7   Q.  You see that statement?

8   A.  Yes.

9   Q.  Do you agree with him?

10   A.   Well, it's a matter of degree.

11 Especially for homogeneous property, that

12 certainly makes the task easier.  But I would

13 tell you, the sales comparison approach is used

14 in markets where you do not have homogeneous

15 property types, as well.  But is it easier to

16 apply when you have great homogeneity?  Yes.

17   Q.   All right.  And then the bullet points

18 that Mr. Vandell lists there when he says the

19 technique, being the sales technique, consists

20 of, and he lists those things, the bullet

21 points, we don't need to read them, but do you

22 agree with him -- let me ask it this way:  Are

23 those the components of the technique that you

24 use when you use the sales comparison approach?

299

1    Q.   And what follows -- the conclusion of

2   that same paragraph, what follows the bullet

3   points is Mr. Vandell 's statement that the

4   analyst, at each step in the process, must make

5   decisions about data selection and use that are

6   consistent with the intent of obtaining the

7   best estimate of value.  Do you agree with

8   that?

9    A.   I think that's true.

10    Q.   So in each and every step along the

11   way, the analyst is making that data selection

12   and use of data decision, correct?

13    A.   That is correct.  Again, with an yes

14   always towards producing the best result.

15    Q.   And then the final sentence I want to

16   ask about is the conclusion of that same

17   paragraph where Vandell says, in fact, however,

18   such decision frameworks -- meaning that

19   decision we just talked about you make in every

20   step of the process -- such decision frameworks

21   are typically linked only informally, if at

22   all, to such a best, quote, unquote,

23   methodology, and often allow discretion on the

24   part of the analyst thus permitting bias to

**truaxvol20927.txt**                      **Page 299**

300

1        My question is, do you agree with

2   Vandell that bias enters through the necessity

3   of the analyst having to engage in that data

4   selection and use decision making at every step

5   of the process?

6       A.   No, I would not agree with that maybe

7   in some ways.  Certainly the bias is to the

8   best available evidence being employed to

9   ultimately be processed.  That would be the

10  bias that a professional would employ.  It

11  would not be my sense of what I like,

12  particularly, it would be bias to choosing the

13  data set that was most relevant to

14  accomplishing the task at hand.

15      Q.   Right.  And just to focus on that just

16  one more moment with more specificity, when you

17  would do this sales comparison approach here

18  for the purpose of investigating the diminution

19  in value issue we talked about, you would

20  actually take a given piece of property and you

21  would decide how many comparable should be

22  looked at for that piece of property, and then,

23  in that way, by comparison with these

24  comparable transactions, arrive at some

**truaxvol20927.txt**                    **Page 300**

301

1    A.   In the normal circumstance, that is

2   generally the process.

3    Q.   So one of the decisions you'd have to

4   make each and every time is how many

5   comparables and which comparables.

6    A.   That is generally the process, yes.

7    Q.   And you'd make that decision time and

8   time and time and time again in approaching

9   this large number of homes and properties for

10  the investigation, correct?

11   A.   That is correct.  Now, we all know,

12  though, that certainly -- let's say we go to a

13  block where you have -- that block happens to

14  have ten homes that are extremely similar.  You

15  will likely use the same data set for all of

16  those ten homes.  You may not adjust all of the

17  comparables quite the same way because there

18  may be different characteristics one home to

19  another that require some different

20  adjustments, but -- so there would be overlap

21  and certainly some efficiency in small groups

22  of properties.

23   Q.   All right.  Let me, if I could have a

24  clean copy of that article back, Mr. Truax and

302

1  you as an exhibit.

2        Did you want to continue discussion of

3  the article?

4    A.   Well, I would only tell you if you go

5  to the conclusions portion, um -- in the

6  Conclusions and Implications section, which is

7  on Page 235, I believe, of the article, he

8  said, "However, whether this comparable

9  selection and weighting scheme performs better

10  than some alternative scheme is an empirical

11  question that can only be tested against the

12  data."

13        So the point being, again, no matter

14  what you implement, you have to test it, and it

15  has to prove to be reliable.

16    Q.   Uh-huh.  Okay.

17    A.   Which I think is a point we've seen in

18  all of these articles.

19    Q.   Right.  Any methodology you set about

20  using, in other words, you have to have some

21  kind of test run to see that it fits the case

22  at hand.

23    A.   That's the point, the case at hand.

24    Q.   Right.

303

1  doesn't apply for the test at hand, or for the

2  task at hand, then you probably wouldn't rely

3  on it.  And that's my very point, that in this

4  submarket I don't believe that that sort of

5  methodology is going to produce -- it will

6  produce a result.  It's just will it be a

7  reliable, credible result for the purposes that

8  I think are at issue in this case?  And I don't

9  think so.

10    Q.  Let me mark the copy of the Vandell

11  article we've been talking about as Truax

12  Number 10.

13       (Exhibit 10 was marked for

14  identification and is attached hereto.)

15  EXAMINATION BY MR. MEUNIER:

16    Q.  Now, let me refer you to Exhibit D to

17  your September 10, 2007 report in the levee

18  case.

19       Exhibit D is a 244-page report,

20  correct?

21    A.  I think that's approximately correct,

22  yes.  Yes, it is.

23    Q.  And it's dated September 10, 2007,

24  which is the same date as your report to which

304

1    A.  (Nods affirmatively.)

2    Q.  Correct?

3    A.  I believe that's correct.

4    Q.  And I think we've established

5  yesterday that you prepared this report in

6  collaboration with Mr. Roddewig and his

7  colleges at Clarion & Associates in Chicago,

8  Illinois?

9    A.  Correct.

10    Q.   You said that, correct me if I'm

11  wrong, some of the language in this Exhibit D

12  document would have originated with Roddewig,

13  some would have originated with you.  I assume

14  some would have originated with others at

15  Clarion.

16    A.  That's correct.

17    Q.  Okay.  Since this is an Exhibit D, let

18  me, if you don't mind, refer to the report to

19  which it is attached as your main report.

20  That's the report you signed on September 10,

21  2007.

22    A.  (Gesturing.)

23    Q.  Tell me which of these, your main

24  report of September 10 or this exhibit the

**truaxvol20927.txt**                    **Page 304**

305

1    A.   Oh, I think they were both prepared

2   along similar parallel tracks in terms of time.

3   I can't tell you definitively which page was

4   written when.  But the output was certainly

5   both right at the point of delivery, or very

6   near it.

7    Q.   So you were working on both

8   simultaneously?

9    A.   More or less, yes.

10   Q.   Whose idea was it to have you sign two

11   separate expressions of opinion in this case,

12   one the main report of September 10, 2007, and

13   the other this Exhibit D attachment?

14   A.   Whose idea was it?

15   Q.   Yes.

16   A.   I don't recall whose idea it was, but

17   it was clear that, you know, I had been

18   designated as the testifying witness, but that

19   Roddewig certainly and his group had

20   contributed significantly to the preparation of

21   Exhibit D, and so it was I think prudent to

22   have us both sign Exhibit D.

23   Q.   Well, what was your understanding of

24   the reason for Exhibit D as an attachment to

306

1    A.  Exhibit D certainly fleshed out, if

2  you will, and supported the opinions I was

3  rendering.

4    Q.  All right.  So the main report set

5  forth all your conclusions and opinions in the

6  case; correct?

7    A.  Correct.

8    Q.  And Exhibit D was meant to be a

9  support for those opinions, in which support

10  you and Roddewig joined?

11    A.  No.  Roddewig 's group certainly,

12  um -- substantially participated in the

13  research that was -- that undergirted my

14  opinions.  So as I said, I felt it reasonable

15  and appropriate for him to sign Exhibit D, as

16  well.

17    Q.  And why?

18    A.  Exhibit D, as most exhibits, supports

19  the primary report.

20    Q.  Why didn't he sign the main report if

21  he supported that one, as well?

22    A.  Well, he probably could have.  I don't

23  think he would disagree with anything that's in

24  the main report.

307

1  report and Exhibit D to be joint work products,

2  you and Roddewig and others?

3    A.  No -- well, I mean, certainly, as I

4  said, I consider this a single report.  Exhibit

5  D supports the main report, as you termed the

6  main report.  So this, the entirety of it,

7  constitutes my report.

8    Q.  So you've testified that all of the

9  conclusions set forth in Exhibit D are your

10  own.

11    A.  Once I sign it, they're my own.

12    Q.  But Roddewig signed, as well.  So can

13  I assume that the conclusions are his, too?

14    A.  I would assume he would agree with all

15  of those conclusions, as well.

16    Q.  Therefore, all the conclusions in both

17  your main report and in Exhibit D are opinions

18  jointly arrived at by you and Roddewig?

19    A.  Certainly we both agreed to the

20  conclusions, because neither of us would have

21  signed it if we didn't.

22    Q.  All right.  Are the portions of either

23  the main report or the Exhibit D that deal with

24  the critique of the mass appraisal approach

308

1    A.  I would say given his experience in --

2  with AVM, and having been in other class

3  certification hearings that dealt with that

4  issue, I would say certainly that his

5  background was more extensive than mine with

6  regard to those issue, so yes.

7    Q.  Now, I just want to verify that the

8  conclusions that are set forth on Page 151 of

9  Exhibit D, those seven paragraphs, not only

10  correspond to but they're actually almost

11  verbatim restatements of the seven conclusions

12  set forth in Paragraphs 9A through 9G in your

13  September 10 main report.  Correct?

14    A.  That is correct.

15    Q.  Well, since the conclusions in each

16  report are almost verbatim identical, why

17  couldn't they have been set forth in one

18  report?

19    A.  They probably could have.  And as I

20  tell you, I consider this one report.

21    Q.  When you say this, you're talking

22  about your main report, and then all the

23  attachments including Exhibit D.

24    A.  Well, you're making a distinction.  As

309

1  one report.  This addenda report, if you will,

2  is a supporting element of a single finding, if

3  you will.

4      Q.  Well, I understand.  It's my first

5  experience with an expert who writes a report

6  and then another report that he attaches to his

7  other report, so forgive me if this is new to

8  me.

9          Have you done this before?

10     A.  In this particular form?  Probably

11  not.  But I -- you know, a report comes to mind

12  where we had, you know, as many as ten

13  signatories on it, and not everyone was

14  responsible for -- all of the ten signatories,

15  not everyone was responsible for the entirety

16  of the pieces and parts.  But, yeah, so in that

17  context I've done it, yes.

18     Q.  At Page 38 of your -- of Exhibit D,

19  you identify the properties that you studied in

20  each of the five proposed subclass areas,

21  correct?

22     A.  I'm sorry.  Let me get to 38.

23     Q.  Page 38.

24     A.  Yes.

310

1  properties and study areas that are discussed

2  in your main report; in fact, this chart on

3  Page 38 is identical to the one on Page 12 of

4  your main report, is that correct?

5     A.  Yes.

6     Q.  And you don't really have any

7  particular reason why we're duplicating the

8  exact same chart and the exact same property

9  identification in both documents as opposed to

10  doing it one time?

11    A.  No particular reason.  This is just

12  the way we put together this particular

13  submission.

14    Q.  The truth is, Mr. Truax, you needed

15  Roddewig 's signature on something discussing

16  the criticism of Dr. Kilpatrick 's mass

17  appraisal because you were not qualified to do

18  so, isn't that true?

19     MR. MARPLE:

20        Objection to the form.

21    A.  Well, you're asking me if I'm

22  qualified to criticize or have an opinion

23  regarding what I believe I can take from what

24  Mr. Kilpatrick has presented to us.  No, I

311

1  will, as to my opinions.  My opinions are what

2  they are, and I think you have them in this

3  document.

4      Q.   So there was really no necessity of

5  having Roddewig in support of your opinions for

6  you to express your conclusions in this case?

7      A.   Roddewig and Clarion brought resources

8  to the table that were beneficial, and I

9  availed myself of those resources.

10     Q.   Now, in what follows Page 38 is a more

11  detailed analysis of these class -- these study

12  area properties, but your conclusions set forth

13  in Exhibit D are essentially the same as those

14  set forth in your main report, namely these

15  properties you say are not representative of

16  other properties in the area, correct?

17     A.   Correct.  And you will find the same

18  conclusions in the MRGO report, which was

19  written before I had any significant

20  involvement with Clarion at all.

21     Q.   Now, Page 40 of the Exhibit D lists

22  data that you and Roddewig and others, I guess,

23  looked at, right?  Page 40?

24     A.   Yes.

312

1  reference to Road Home Program recordings.

2      Tell me exactly what that references.

3    A.  That references the, um -- recorded

4  agreements, Road Home agreements that were

5  found in the study area, that were found in the

6  conveyance office of Orleans Parish.

7    Q.  And what information -- substantive

8  information from those agreements was used in

9  the analysis?

10    A.  It was just a notation that Road Home

11  agreements had been, um -- signed for -- with

12  regard to those particular properties.

13    Q.  And why was that considered relevant,

14  if at all?

15    A.  Well, I think it was an indicator of

16  recovery, if you will, that people were

17  availing themselves of those resources,

18  presumably to invest -- reinvest in those

19  properties and, therefore, those properties

20  would be redeveloped and improved or damage

21  repaired.

22    Q.  So the agreement was just used as an

23  indication of the fact that the person what,

24  had received Road Home --

**truaxvol20927.txt**                    **Page 312**

313

1    Q.   -- benefits?

2    A.   Yes.  Had gone to a closing, had

3   signed the agreement with the Road Home

4   organization.

5    Q.   And you researched the specific

6   properties in each study area to see if there

7   was a Road Home agreement?

8    A.   Yes.

9    Q.   In how many cases was there a Road

10  Home agreement?

11    A.   We can go to the back of the report,

12  and you will have a schedule.

13    Q.   Give me a page.

14    A.   We can go to Page 244, the very last

15  one.

16    Q.   You're going to have to help me with

17  the small print on this page.

18    A.   I believe the small print merely shows

19  the address.  But if you look at the color

20  scheme, in this particular study area there

21  were one, two, three, four, five, six, seven

22  recorded Road Home agreements.  And that was

23  for the Stutz area.  And there will be a page

24  like that for each of the study areas.

**truaxvol20927.txt**                    **Page 313**

314

1  as data that you looked, at under real estate

2  transaction data, pre-storm and post-storm real

3  estate transactions, correct?

4    A.  Correct.

5    Q.  And what was the significance of that

6  data in this study?

7    A.  I believe that basically demonstrates

8  that there was sales activity, transactional

9  volume, if you will, both in the pre-storm

10  circumstance and post-storm for which -- you

11  know, that could be used as a basis for

12  possibly drawing value conclusions both

13  pre-storm and post-storm if necessary.

14    Q.  And where is that data reflected in

15  the report?

16    A.  Again, there's -- if you go to

17  Page 241 -- well, no, I'm sorry, 242 and 243,

18  on Page 243 you see pre-Katrina sales, and that

19  period studied was from 2000 to 2005, and on

20  that particular page there were nine

21  transactions.

22    Q.  Page 242?

23    A.  Yes.  And then 243 shows post-Katrina

24  sales.  There were two in that study area

315

1   Q.   All right.  So for every study area,

2   you profiled that same thing?

3   A.   Yes.

4   Q.   Now, on Page 40, at the bottom of that

5   page in the final paragraph, you talk about

6   data collected by way of field observations,

7   correct?

8   A.   Correct.

9   Q.   And it's stated here that the study

10  results in that regard involved the exercise of

11  judgment in some cases.  Can you give me an

12  example of what you mean by that?

13  A.   Well, we observed these properties in

14  the study areas from public right-of-way, the

15  street, essentially.  And we made such

16  judgments as what the elevation of the first

17  floor living areas, say, was above ground

18  elevation.  That was an eyeball estimate from

19  the street.  So it was a judgment of sorts.  We

20  also had to make judgments, necessarily, as to

21  whether, say, a property was reoccupied or not.

22  We looked at such things as whether the

23  electric meter was in place, whether there

24  appeared to be cars in the driveway, curtains

316

1  judgment in that, as well.  So that's the kind

2  of judgments we were making, because we were

3  only able to obviously observe these properties

4  from the street.

5      Q.   On one occasion.

6      A.   Oh, no.  We saw them on more than one

7  occasion, possibly.  But visiting them more

8  than once probably wouldn't have dramatically

9  changed -- you would have made the same

10  judgments at each visit.

11      Q.   All right.  So you made judgments as

12  to the elevation of the property because you

13  were seeing it from a distance, from the

14  street?

15      A.   Correct.

16      Q.   You made judgments about whether the

17  property was reoccupied based on what it seemed

18  to look like or be --

19      A.   What would be reasonable based upon

20  what you could observe.

21      Q.   What other exercises in judgment were

22  made?

23      A.   The repair estimate.  Whether it was

24  being repaired or not was a judgment, as well.

**truaxvol20927.txt**                                   **Page 316**

317

1 underway?  Did you see evidence that some

2 historical repair activities had been

3 conducted?

4    Q.   Yeah.  Because repair activities could

5 have occurred the day after you left.

6    A.   Oh, absolutely.  No, I mean we could

7 only observe what we could observe when we

8 visited the properties.

9    Q.   Right.  What other exercises in

10 judgment?

11    A.   The use was generally pretty clear,

12 but not always.  So you would make some

13 judgments about that.

14    Q.   Use being what, whether it was --

15    A.   Single-family, two-family,

16 three-family --

17    Q.   Uh-huh.

18    A.   -- um -- institutional.  As I say,

19 there was probably less subjectivity in that

20 judgment because it was more readily observed

21 from the street.  But again, there was some

22 judgment in that.

23    Q.   Any other judgments?

24    A.   I think those were the primary.

318

1  D, that some of the information in the study

2  area analysis was provided in hurricane damaged

3  assessment reports from Nelson Architectural

4  Engineers, Inc.

5      Who is that?

6    A.  Nelson was a -- he's, I believe, a

7  forensic engineer.  They came in and looked at

8  the physical structures on all of the named

9  plaintiffs' properties.

10     MR. ZWAIN:

11         You have his report.

12     MR. MEUNIER:

13         That was my next question.

14         Is he being deposed?

15     MR. ZWAIN:

16         He was deposed the other day.  By

17     Mr. Bruno.

18     MR. MEUNIER:

19         Oh.  Well, then I know it was

20     done well.

21  EXAMINATION BY MR. MEUNIER:

22    Q.  Let me refer you to the neighborhood

23  observations set forth in the Plaintiff

24  Property Summary sheet starting at Page 87.

319

1  profile sheet.

2       And under neighborhood observations --

3   A.  Yes.

4   Q.   -- I notice that there's a bullet

5  point for long-term recovery prospects.

6   A.  Where are you, particularly?

7   Q.  The final bullet point under the

8  neighborhood observations, Page 88.

9   A.  Okay.  Yes.

10   Q.  And that statement, neighborhood 's

11  long-term recovery prospect is considered good,

12  that's certainly an exercise in judgment, isn't

13  it?

14   A.  That's an exercise in judgment, sure.

15   Q.  And I notice that you either use the

16  word good or reasonable or limited, depending

17  on the property.

18   A.  Well, that's the neighborhood

19  observation, so it would depend on the

20  neighborhood and what was observed in that

21  neighborhood.

22   Q.  Sometimes you'd say the prospects were

23  good, sometimes you'd say the prospects were

24  reasonable, and sometimes you'd say the

320

1    A.  Correct.

2    Q.  Any other grades besides those three?

3    A.  I think those were the three.

4    Q.  All right.  And tell me your

5  definitions of that grading system, good,

6  reasonable and limited.

7    A.  Good, I believe, is intended to

8  suggest that reasonable-minded people with an

9  understanding of our local markets would likely

10  conclude that long term, that this

11  neighborhood, which is that one, the one we've

12  discussed happens to be Lakeview, will --

13  there's a likelihood that you will have

14  recovery.  That judgment was made based upon

15  certainly historical perspective about the

16  pre-Katrina circumstances of Lakeview and

17  generally attitudes that I believe exist

18  regarding that neighborhood even post-Katrina.

19    Q.  You were the grader on this?

20    A.  I was the grader.

21    Q.  Okay.  And when you say a good

22  prospect for long-term recovery, what do you

23  mean by long-term; what's the end date?  What's

24  the date on which a good outcome is finally

321

1    A.  Well, I think the window is probably a

2  five to ten-year window.

3    Q.  All right.  So what you're saying is

4  that within -- in five to ten years from now,

5  what you're saying in those cases is that

6  there's a good prospect that that neighborhood

7  will be recovered.

8    A.  Recovered, reconstituted and become

9  hopefully much of what it was pre-Katrina, if

10  not better.

11    Q.  All right.  My next question was, when

12  you say recovered, you mean pre-Katrina status?

13    A.  Well, certainly we all know it's not

14  going to be -- non of the neighborhoods are

15  going to be exactly identical to what they

16  were.  But certainly I believe that this

17  particular neighborhood, Lakeview, will likely

18  recover to be, again, a very popular and

19  appealing area for people to live.  And will be

20  redeveloped.

21    Q.  Yes, but not the same as it was before

22  Katrina.

23    A.  No, I don't think same is in the cards

24  for most of our neighborhoods.

**truaxvol20927.txt**                    **Page 321**

322

1   A.  That's reasonable to say.

2   Q.  All right.  Now, define -- and we'll

3 finish with the definitions -- reasonable and

4 limited.  Tell me what the grading criteria for

5 those --

6   A.  Reasonable, to me, was an attempt to

7 say the jury is still out a bit in terms of the

8 direction that those neighborhoods are going.

9 It remains to be seen.  But it's not -- it

10 won't be, um -- unlikely that they recover and

11 become viable neighborhoods again.

12   Q.  Okay.

13   A.  Limited means the prospects are less

14 than 50 percent, let's saw, in my view.  Now,

15 these are my judgments.  That's all we can make

16 is a judgment about that.

17   Q.  Sure.  Uh-huh.

18   A.  But in those neighborhoods, I see it

19 as less probable -- not impossible, but less

20 probable that you're going to see a return to,

21 you know, maybe the status that you had

22 pre-Katrina.

23   Q.  And before we take a break let me just

24 make sure I understand.  What is the relevance

323

1  and say this neighborhood has got a good,

2  limited or reasonable prospect of good

3  long-term recovery?

4      A.   Well, part of any, you know, certainly

5  appraisal process is descriptive.  And this is

6  intended to describe, if you will, present

7  information about the named plaintiffs'

8  properties.  Clearly demonstrates that

9  neighborhood to neighborhood, there are

10  differences.

11      Q.   In your approach, the individualized

12  appraisal approach to investigating damages,

13  particularly diminution of property value

14  damages in this case, would you be relying on

15  these judgments as to whether a given

16  neighborhood has a long-term recovery prospect

17  that's either good, reasonable or limited?

18      A.   Well, I think absolutely, because that

19  is the very point, that without you

20  individualizing the analysis and the study, you

21  cannot globally, across the spectrum, determine

22  that everyone has the same prospects for

23  recovery.

24      Q.   Could you be wrong about your

324

1    A.  I think any future projection, and

2  that's what we're talking about here, is

3  subject to -- to, um -- error.  But, you know,

4  reasonable -- you go with what appears to be

5  reasonable based upon all the evidence that's

6  available to you at the time.

7    Q.  Could a reasonable, equally competent,

8  qualified appraiser come to a different grade

9  than you for the long-term recovery prospects

10  of a neighborhood?

11    A.   Theoretically, no.  If you presented

12  exactly the same facts to both, the theory

13  would be that, no.  But reality?  Yes.

14    Q.  All right.  If you took a hundred

15  appraisers and they ran through these same

16  neighborhoods --

17    A.  Oh, yeah, you're not going to get a

18  hundred same opinions.

19    Q.   -- you're not going to get the same

20  good, reasonable or limited, are you?

21    A.  No.

22      (Off the record.)

23  EXAMINATION BY MR. MEUNIER:

24    Q.  Mr. Truax, at Page 132 of the Exhibit

**truaxvol20927.txt**                    **Page 324**

325

1  assessment/sales ratio studies.  You see that?

2   A.  Where are you?  132?

3   Q.  Page 132, first full paragraph.

4      MR. ZWAIN:

5        Starting with virtually every

6      state?

7  EXAMINATION BY MR. MEUNIER:

8   Q.  Starting with virtually every state.

9  Second sentence, typically this involves.  You

10  see the quotes?

11   A.  Yes.

12   Q.  What is an assessment sales ratio

13  study?

14   A.  Well, I think they looked at the

15  assessed values relative to the sales and

16  determined what ratio exists between the

17  relative accuracy of the sale and the assessed

18  value.

19   Q.  And is it your testimony that this

20  practice of engaging in an assessment sales

21  ratio study takes place in virtually every

22  state?

23   A.  Well, certainly I can't speak with,

24  you know, specific knowledge about every state,

326

1  an oversight group, like in Louisiana you have

2  the state tax commission, so that they'll look

3  at the assessment data that is submitted from

4  local jurisdictions.

5     Q.  In how many states are assessment

6  sales ratio studies performed?

7     A.  I wouldn't know.

8     Q.  So you wouldn't be able to tell us

9  what percentage of the total states that have

10  mass appraisal techniques for tax assessment

11  purposes and what percentage of those states

12  this practice is engaged in?

13    A.  No.  I can't tell you that I have ever

14  particularly investigated those questions in

15  all fifty states.

16    Q.  Same page, 132, there then follows a

17  discussion about something called the

18  coefficient of inter-area dispersion, or COD.

19  You see that?

20    A.  Yes.

21    Q.  And that is represented here as being

22  the most widely used way to determine the

23  accuracy of mass appraisal techniques used by

24  assessors, right?

327

1  read that in some literature.

2    Q.  You've read what?

3    A.  That the COD is the most commonly used

4  measure of dispersion that is looked at.

5    Q.  All right.  Well, I notice there's no

6  citation of authority for the statement here.

7  If you've read that article, can you tell me

8  which article it was and in which publication?

9    A.  Well, I believe it's particularly

10  stated in the back of the 12th Edition of the

11  Appraisal of Real Estate, which is the textbook

12  published by the Appraisal Institute.

13    Q.  12th Edition Appraisal of Real Estate

14  by the Appraisal Institute --

15    A.  Yes.

16    Q.  -- states that the most widely used

17  way to determine mass appraisal is --

18    A.  Yes.  I believe that's where I've read

19  it, yes.

20    Q.  When did this COD method first become

21  utilized?

22    A.  Well, I can't tell you that I would

23  know when it was first utilized in some

24  jurisdiction, and I don't know if it's utilized

328

1    Q.  When did you first become aware of

2  this COD method?

3    A.  Well, I'm not, as you may realize, a

4  big proponent of statistical type analyses.  So

5  I read it in literature.  I'm not versed in the

6  particular on-the-ground application by the

7  state tax commission or any other oversight

8  authority.

9    Q.  All right.  But my question is, when

10  did you first become aware that there was such

11  a thing as COD?  Or coefficient of inter-area

12  dispersion?

13    A.  Well, to give you a specific time, I

14  don't know.  But conceivably when I took my

15  statistics course at Tulane University in the

16  seventies, possibly, if it was a common term

17  used at that time.

18    Q.  You say if it was.  You're not saying

19  it was.

20    A.  No, I'm telling you I would not have a

21  specific recollection of it.

22    Q.  You didn't become aware of this

23  method, this supposed method, checking mass

24  appraisal technique until this case, isn't that

329

1    A.  Oh, in terms of my being

2  refamiliarized, if you will, with the term,

3  yes, it would have been associated with this

4  case.

5    Q.  And you don't know even if this method

6  has been used with respect to any properties in

7  the class area, correct?

8    A.  Correct.

9    Q.  The second-to-last paragraph on Page

10  32 references U.S. census data.  You see that?

11    A.  Yes.

12    Q.  And it references 1367 local assessing

13  units, is that correct?

14    A.  That is what is printed, yes.

15    Q.  And there's reference made to this

16  study of these units having occurred in the

17  1980s, is that true?

18    A.  Yes.

19    Q.  Have you looked at the support

20  documentation for this statement that the

21  census bureau studied 1367 local assessing

22  units in the 1980s?

23    A.  Well, have I looked at the census

24  data, yes.  But whether I looked at that

330

1  statistic is taken from, I can't tell you that.

2    Q.  You say you looked at census data from

3  the 1980s?

4    A.  I've looked at census data for many

5  years.

6    Q.  Right.  But you can't tell me where

7  the support for this statement comes from, can

8  you?

9    A.  No.

10    Q.  And you have no idea whether the 1367

11  local assessing units mentioned here even

12  involve an assessing unit in Louisiana, can

13  you?

14    A.  That's correct.

15    Q.  There's a statement in the

16  third-to-last paragraph, first sentence, that

17  says mass appraisal techniques used by tax

18  assessors are so inaccurate that a COD between

19  15 and 20 is often considered a mark of good

20  assessing and acceptable assessing uniformity,

21  correct?

22    A.  Correct.

23    Q.  And the cite for that in Footnote 48

24  is a 1988 article in the Illinois Business

331

1  assessment in Illinois, correct?

2    A.  Yes.

3    Q.  Do you know of any support for the

4  statement made that is -- associated with that

5  footnote, is there any support that you know of

6  for the statement other than the 1988 article

7  that focused on tax assessment uniformity in

8  Illinois?

9    A.  Well, that is clearly the footnoted --

10  that article is referenced in the footnote as

11  attached to take statement.  So, no, that is

12  the source.

13    Q.  So as an expert having signed this

14  report, you can offer no other support or

15  authority for the statement that mass appraisal

16  techniques used by tax assessors is so

17  inaccurate that a COD between 15 and 20 is

18  considered good.  You can't give us any other

19  support for that statement other than what's in

20  Footnote 48?

21    A.  Well, I certainly remember reading

22  that the COD of 15 to 20 was often considered

23  good in assessment arenas.  I just don't

24  remember, sitting here today, whether it was

**truaxvol20927.txt**                          **Page 331**

332

1  it was another one.  But I definitely have seen

2  literature that made that statement.  But it

3  could very well have been this very article

4  that's cited.

5      Q.   Now, Page 133 through 135, there's a

6  discussion about a 2003 Times-Picayune

7  investigation and a Louisiana Legislative Audit

8  report of that same year criticizing how

9  property tax assessments were conducted in New

10  Orleans and other parishes, correct?

11      A.   Correct.

12      Q.   Did either The Times-Picayune or the

13  Legislative Auditors, Mr. Truax, ever conclude

14  that it was inappropriate to use the mass

15  appraisal technique for tax assessment

16  purposes?

17      A.   My recollection of the articles, I

18  would tell you no, their focus was that the

19  assessment practices being followed in Orleans

20  Parish had some serious issues.

21      Q.   In fact, what they criticized were the

22  lack of adequate or sufficient data, not the

23  use of the mass appraisal technique, true?

24      A.   Well, you know, you had a host of

333

1  data was certainly one of them.  I don't know

2  that they commented at all, positively or

3  negatively, regard application of a particular

4  mass appraisal technique.

5     Q.   Certainly you'd agree that neither The

6  Times-Picayune nor the auditors ever suggested

7  that it would be better or more workable to

8  have an assessment system based on individual

9  property-by-property appraisal; that was

10  certainly never suggested, was it?

11    A.   I don't know that that was or wasn't

12  suggested.  As I said, I think the focus of the

13  article, as I recollect it, was upon the

14  serious problems in how the process was being

15  implemented in Orleans Parish by the assessors

16  that were there at the time.

17    Q.   Let me ask it this way:  Has anyone in

18  your field ever suggested, in any county or

19  parish, that mass appraisal techniques be

20  abandoned entirely in favor of individualized

21  property appraisals as a basis for tax

22  assessment?

23    A.   Well, you've used two words, you've

24  said anyone in my field, anywhere.

334

1   A.   Now, there's no way I can know that.

2   Q.   No.  I should say that you know of.

3   That's obviously the qualification.

4   A.   Thank you.

5   Q.   You can only know what you know.  So

6   tell me if you know of anyone in your field

7   who's ever made that suggestion.

8   A.   Even my limited world, there are a

9   few.  I need to think of them.  I can't tell

10  you that I'm -- sitting here today recall a

11  specific discussion with anyone in my field

12  really about the topic.

13  Q.   Now, on Page 135 and 136, there's a

14  discussion in Exhibit D about the number of

15  appeals of tax assessments that are taken,

16  correct?

17  A.   Yes.

18  Q.   And you state with Mr. Roddewig that

19  that is an indication that mass appraisal

20  technique is inaccurate.  Correct?

21  A.   That was an indicator, yes.

22  Q.   So if people challenged the amount of

23  property tax they're asked to pay, your

24  conclusion is that the appraisal for tax

335

1    A.  No, I don't believe that's what we

2  were particularly saying.  I believe -- as I've

3  told you, I believe Orleans Parish for the

4  first time in '08 had the ability to implement

5  some rudimentary automated valuation model type

6  approach to projecting the reassessments.  And

7  historically, prior to this change in system,

8  the gentlemen I talked to said they would have

9  a relatively limited number of appeals that at

10  least moved to the parish council level, and

11  usually it was 60 or 80.

12       With the system that was implemented

13  by the assessors in '08, you ended up with 5200

14  appeals.  So it was -- there was a dramatic

15  shift -- dramatic change in the number of

16  appeals that were filed.  And it was

17  indicative, I believe, that whatever system

18  they implemented wasn't proving to be very

19  workable.

20       Now, we all know that some of it was

21  certainly a knee jerk reaction to a dramatic

22  change in the numbers, but I think I told you

23  yesterday I am personally aware of several

24  instances where the numbers that came from

336

1  opinion as an appraiser who is familiar with

2  the values in these given areas, they were

3  dramatically overassessed.

4     Q.   But that's not a condemnation of mass

5  appraisal as a technique, it's a challenge to

6  how the technique has been applied, correct?

7     A.   That is correct.  And it points, I

8  think, also to the notion that in our

9  particular submarket, as I've now told you many

10  times, it is difficult to implement a system

11  that is going to take into account all of the

12  varieties and vagaries of the types of

13  properties that we have.

14     Q.   And have you ever known a person in a

15  real estate transaction to complain about an

16  appraisal done in a traditional individualized

17  appraisal method?

18     A.   I'm sorry.  You have to restate that

19  one.

20     Q.   Have you ever known a person in a real

21  estate transaction to complain about the

22  outcome of an individualized appraisal?

23     A.   Yes.

24     Q.   Does that criticism condemn the

337

1    A.  No.  That criticism is of the result.

2  And sometimes the result can be fine in terms

3  of its veracity but subjectively for that

4  particular party they weren't happy.

5    Q.  Right.  So appeals don't condemn the

6  technique at all, do they?

7    A.  Oh, they can.

8    Q.  But not necessarily.

9    A.  Not necessarily.

10   Q.   Page 137 of your -- of Exhibit D, you

11  quote the IAAO standard for the valuation of

12  properties impacted by environmental

13  contamination, correct?

14   A.  Yes.

15   Q.  And the standard that you quote

16  acknowledges that some contamination, and they

17  give the example of air pollution, may be

18  universal throughout a jurisdiction, correct?

19   A.  That is what it states.  Yes.

20   Q.  The standard certainly would not

21  preclude the use of a mass appraisal technique

22  in those cases where there has been a universal

23  contamination, would it?

24   A.  I'm sorry.  Could you ask that again?

338

1  use of a mass appraisal approach in cases where

2  the contamination has been, quote, universal,

3  would it?

4    A.  Well, that standard I don't think

5  speaks to including or precluding any

6  methodology.  And it follows, you know, in all

7  other cases contamination should be viewed as a

8  special circumstance particular to a property.

9    Q.  Exactly.  So you agree with me --

10    A.  So it does --

11    Q.  Right.

12    A.  I'm saying the standard doesn't

13  include or preclude any methodology.

14    Q.  So you certainly don't think that the

15  standard requires a property-by-property rather

16  than mass appraisal approach in all cases of

17  contamination, do you?

18    A.  Mr. Meunier, I think I've told you,

19  the standard says what it says.  Whether it's

20  implied that it includes or precludes a

21  valuation methodology I don't think is a part

22  of that standard.  That's not what I read.

23    Q.  Correct.  So go to the opening

24  sentence of this section of your report

339

1   A.   Uh-huh.

2   Q.   And it says, the IAAO recognizes that

3  the valuation of properties impacted by

4  environmental contamination impairment requires

5  property-to-property rather than mass appraisal

6  techniques.

7       That is simply not true, is it?

8   A.   Well, I think what it's saying, what

9  we were attempting to tell you, was that, you

10  know, you will have some commonality, let's

11  say, with regard to, in their statement, the

12  air pollution circumstance, that will cover a

13  broad area.  But it follows in saying, in all

14  other cases the contamination must be viewed as

15  it exists if it impacts one property or if it

16  impacts two, that is the consideration.

17   Q.   The bottom of Page 138, there's a

18  discussion about the use of AVMs principally in

19  the secondary mortgage market.

20       You see that discussion beginning at

21  the bottom of Page 138?

22   A.   Yes.

23   Q.   And you state that that's the

24  principal realm where AVMs are used regularly,

340

1  against two things, the relatively low loan to

2  value ratios, and large number of properties in

3  the portfolios, correct?

4      A.   Yes.

5      Q.   So in the mortgage -- in the secondary

6  mortgage business, you're saying you tolerate

7  use of AVMs because the problem with inaccuracy

8  is offset by these things, the low loan to

9  value ratio and the large number of properties.

10     A.   Well, particularly my research, as to

11  particularly in the local markets, the use of

12  AVMs, is consistent with this statement, and

13  the AVMs were generally used as a second tier

14  test, if you will, of, say, the value of a

15  particular loan portfolio.  And so it's used in

16  that manner.  So it is used for those purposes,

17  and I think we have talked about that

18  yesterday.

19     Q.   Yes.  And the only thing I want to

20  specify here is, when you say large number of

21  properties in the portfolio --

22     A.   Yes.

23     Q.    -- as an offsetting factor or as a

24  justification for the use of AVMs, what do you

341

1    A.  Well, I mean, it will certainly -- I

2  think a lot of these loan packages will include

3  certainly hundreds of mortgage properties, so

4  it's in the hundreds, I think, in many, many

5  cases.

6    Q.  Page 140, at the top of the page,

7  first paragraph appearing after the indented

8  paragraph, in quotes, is As a result, AVMs are

9  almost never utilized to value non residential

10  properties, and then you say, and even for

11  single-family homes have been recognized as,

12  quote, reliable without human interaction for

13  only 30 to 35 percent of the market.

14      What is meant -- what do you

15  understand without human interaction to mean?

16    A.  Well, an automated valuation model can

17  be constructed such that there's literally a

18  black box and you have your base data inputs

19  and out comes your result without any tweaking

20  or, um -- maybe testing that might lead you to

21  make some alterations to the conclusion.

22    Q.  So this refers to instances where you

23  would use the model without trying to customize

24  it or fit it to the data or the properties at

342

1    A.  I think that's generally correct.

2    Q.  That's certainly not what

3  Dr. Kilpatrick proposes to do here, correct?

4    A.  Well, I think I've told you several

5  times I don't know what Dr. Kilpatrick proposes

6  to do here because it's not in his report.

7    Q.  But you do know that whatever he

8  proposes ain't right.

9    A.  No, I think -- my position is that AVM

10  AVMs and AVM type models will not effectively

11  work in our submarket because of the variety,

12  lack of homogeneity, et cetera, that exists in

13  this particular submarket.

14    Q.  Now, you then, starting on Page 40,

15  have a discussion about the Road Home.  And we

16  talked a bit about this yesterday, the fact

17  that the Road Home switched from an AVM mass

18  appraisal technique to an individualized

19  approach?

20    A.  Correct.

21    Q.  Is that your understanding?

22    A.  Correct.

23    Q.  The Road Home, before it discontinued

24  the use of the AVMs, was producing thousands of

**truaxvol20927.txt**                    **Page 342**

343

1  estate databases in which there was no

2  qualified pre-Katrina appraisal, true?

3     A.  I can't tell you that I specifically

4  know their output numbers, but I won't dispute

5  that it was -- it was large numbers.

6     Q.  And the perceived problem with that

7  approach was that it didn't take into account

8  square footage of a home, um -- and peg values

9  that fit the neighborhood; is that generally

10  the criticism?

11     A.  Well, I think the base criticism was

12  that the results were not correct.  I do not

13  know how their AVM was constructed, so I don't

14  know what their parameters were, and I don't

15  know -- so I don't know what those variables

16  were.

17     Q.  Do you know that Road Home was also

18  using broker price opinion, or BPO, as part of

19  its methodology for the appraisals?

20     A.  For some functions, yes.

21     Q.  And you're not aware that

22  Dr. Kilpatrick 's proposal here -- I know you

23  say you say you don't know what it is, but you

24  are challenging, so I have to assume you have

344

1  includes the use of BPO.

2      MR. ZWAIN:

3          Object to the form of the

4          question, that it implies that there

5          was a specific proposal by

6          Dr. Kilpatrick that's on the table

7          when there was not.

8  EXAMINATION BY MR. MEUNIER:

9    Q.  There's something to which he can

10  object, so that's the something I'm talking

11  about.  If there was nothing, then he wouldn't

12  be objecting.  So whatever it is that you

13  perceive to be involved in the approach that

14  Dr. Kilpatrick has that you have problems with,

15  do you perceive that to include the use of a

16  broker price opinion?

17    A.  I can only give you the same answer

18  I've given you multiple times here, that I do

19  not know what his process or approach is in

20  sufficient detail to answer that question.

21    Q.  You're aware, aren't you, that when

22  the Road Home program announced the change in

23  methodology many homeowners were happy with the

24  home values already used in their award

345

1  changed?  You're aware of that?

2      A.   Um -- I'm not surprised at that.  I

3  was not particularly aware of that.  I assumed

4  that all of -- certainly the properties that

5  have closed, those people were going to

6  generally, um -- live with whatever value

7  circumstances had been presented to them

8  previously.

9      Q.   Do you know, Mr. Truax, that it is

10  expected that by the end of this year Road Home

11  appraisals of pre-Katrina values of residential

12  properties will have been accomplished for much

13  if not all of the MRGO class area?

14      A.   I know what is -- that they're

15  attempting to complete the majority of the

16  appraisal work by year end.

17      Q.   Assuming that comes to pass, would it

18  be possible for a mass appraisal technique or

19  use of an AVM to incorporate the database of

20  those pre-Katrina appraisals in the class area?

21      A.   Whether someone will have access to

22  those records, I do not know.  And certainly we

23  both know not all of the properties in the

24  class area will have applied for Road Home

346

1  is, but certainly it's not all of them.

2    Q.  Well, my question was whether you

3  believe or agree it will be possible for a mass

4  appraisal technique or an automated valuation

5  model to utilize that database.  Would it be

6  possible?

7    A.  Well, possible, um -- conceivably, if

8  that becomes part of the public record or is

9  accessible by someone.  But I don't know that

10  that is or is not the case.

11    Q.  Would access to that database in a

12  mass appraisal technique or AVM facilitate the

13  accuracy or reliability of the mass appraisal

14  technique?

15    A.  Well, what you would get in that

16  database, conceivably, would be certainly

17  better information about the particular

18  properties that were being appraised for the

19  Road Home program, so you would then have a

20  better data starting point to value those

21  properties.  Now, how you then articulate the

22  particular characteristics of those properties

23  and how it is affected by a host of issues that

24  are being, you know, discussed certainly in

347

1    Q.   At the top of Page 42, in the

2  discussion of large scale hedonic modeling, the

3  first full paragraph at the top of Page 42 --

4  I'm sorry.  142.  Forgive me, Page 142.  You

5  see the paragraph "even if?"

6    A.   Yes.

7    Q.   You make the statement that for

8  purposes of the large scale hedonic modeling

9  that might occur under Dr. Kilpatrick 's

10  approach, the number of sales within each

11  submarket might not be sufficient to support

12  the use of the model.

13    A.   Correct.

14    Q.   Now, you told me yesterday that you

15  had done some research and determined that

16  there were at least 6900 sales transactions in

17  the levee class area alone since Katrina.

18    A.   Correct.

19    Q.   And when you say at least, obviously

20  there may be more than 6900?

21    A.   Oh, I think there are.

22    Q.   And there probably are, correct?

23    A.   Correct.

24    Q.   And then what would be your feeling

348

1  have occurred within the MRGO class area since

2  Katrina?

3     A.  I wouldn't want to hazard a guess.  I

4  would suggest it's probably less than that.

5     Q.  Just because there's less turnover in

6  places like St. Bernard?

7     A.  Exactly.

8     Q.  Well, I guess my question here is,

9  when you expressed the concern in the report

10  about having a large enough number of sales to

11  support a hedonic modeling approach, do you

12  believe that that number that you've discerned

13  in the levee area, levee class area, is

14  sufficient to support such an approach?  And if

15  not, tell me what the number would have to be.

16     A.  Well, I think the key word in this

17  statement that we have read from the report is

18  the submarket word.  I would not necessarily

19  hold that certainly the subclasses as proposed

20  herein constitute neighborhoods.  And because

21  of the nature of the New Orleans development

22  pattern and its unique characteristics, we have

23  little enclaves of very different character

24  type development interspersed throughout even

349

1  the point is that if you are going to have

2  relevant data to utilize in some sort of mass

3  appraisal technique like an AVM, it needs to be

4  sufficient in number to gain a reasonable

5  estimate of what, say, the average sale price

6  may be.

7    Q.  Well --

8    A.  But point being that, again, this goes

9  to the variety issue and the variability issue.

10    Q.  Well, can we agree, then, that you

11  don't know whether there would be a sufficient

12  number of sales to support the use of hedonic

13  modeling in the levee area based upon the 6900

14  plus transactions because we would have to know

15  how many of those transactions fell into the

16  discernible submarkets being studied?

17    A.  Certainly in part, yes.

18    Q.  But certainly with that many sales

19  transactions having occurred, you would

20  acknowledge the possibility that there may be

21  sufficient sales data within certain submarkets

22  to support hedonic modeling.

23    A.  Oh.  I think I've cited that several

24  times, that there are certainly limited

350

1  saying, on an overall basis, I do not believe

2  that it would be workable on a broad scale in

3  the proposed subclass areas.

4     Q.   Now, Page 144, you set forth a

5  discussion about the problem with hedonic

6  models being the inability to truly isolate the

7  dependent variable, the factor that's being

8  studied.

9     A.   Correct.

10    Q.   For example, if you were trying to

11 study the effect of the flood, you're saying

12 that hedonic model is challenged because how do

13 you ever really truly isolate that and not know

14 that the outcome has been shaped by variables

15 that weren't even considered?  Fair?

16    A.   Fair.  And then on top of that, you

17 have the issue of flood being what?  Flood is

18 water.  Well, we had rainwater, as well.  So.

19    Q.   We're going to take care of that

20 problem.  That's going to be a legal issue that

21 you will have determined for you by the time

22 you appear.

23       MR. ZWAIN:

24          How gracious of you.

351

1        I think that's a fair statement.

2        We'll have to work that out.

3        MR. MARPLE:

4            Yeah.  Let me just object to that

5        statement.

6        MR. MEUNIER:

7            There are some who don't want to

8        work it out, but I think we're going

9        to try hard to work it out.

10   EXAMINATION BY MR. MEUNIER:

11     Q.  So we're talking here about the

12   omitted variable problem, right?

13     A.  Essentially, correct.

14     Q.  And you're aware, aren't you, that

15   hedonic models have been in use for many years.

16     A.  Yes.

17     Q.  You're familiar, no doubt, with the

18   1974 article by Rosen that generally supports

19   hedonic models as the best available method to

20   estimate price effects of property

21   characteristics?

22     A.  I believe I looked at that article,

23   but, you know, I don't dispute what you said.

24     Q.  Isn't it true, Mr. Truax, that all

352

1  models it's not necessary to include and

2  measure all characteristics of interest in

3  order for the model outcome to be accurate,

4  it's necessary, instead, that there be a

5  sufficient number of variables considered to

6  explain the price variation.

7      Would you agree with that?

8   A.  Well, I think -- I certainly agree

9  that there is a number of variables that -- it

10  would never be all.  That's probably correct.

11  But the number that might be necessary to

12  particularly isolate, or attempt the isolate,

13  as best you can, a single, say, value impact,

14  or associated with a single component, if you

15  will, of the pie, can vary tremendously

16  neighborhood to neighborhood.

17   Q.  Do you know what is meant by a

18  geographically weighted regression scheme?

19   A.  I can't tell you I'm entirely familiar

20  with it.

21   Q.  So you don't know whether it's true or

22  not that the variability in hedonic models in

23  terms of the variability of property

24  characteristics is routinely addressed in

**truaxvol20927.txt**                          **Page 352**

353

1 regression scales.  You don't know that to be

2 true?

3    A.  No, I think I've told you I've not

4 studied these particular applications in any

5 depth.  I mean, clearly you can weight results

6 by neighborhood or by geography, and I assume

7 that's what they're referencing.

8    Q.  Now, Page 146 of Exhibit D, you set

9 forth five, quote, professionally recognized

10 techniques, close quotes, for determining the

11 impact of a detrimental condition, right?

12    A.  Yes.

13    Q.  The first of these is called the

14 paired sales analysis?

15    A.  Yes.

16    Q.  Which compares sales affected by a DC,

17 or detrimental condition, with similar sales

18 not affect by a DC.

19    A.  Right.

20    Q.  And that's your methodology?

21    A.  That is the methodology that I believe

22 is the most appropriate and the most relevant

23 to producing a credible result.

24    Q.  But all of these listed are

**truaxvol20927.txt**                    **Page 353**

354

1   A.  Yes.

2   Q.  The fourth one, market data analysis,

3  studies the effects of DCs on other properties,

4  correct?

5   A.  Yes.

6   Q.  And it says that a study designed to

7  cross reference remediation and stigma costs

8  and losses illustrates the wide range of

9  effects of DCs and provides market data on

10  conditions of sales comparables.

11      Obviously you agree with that

12  statement because you made it in your report;

13  correct?

14   A.  Correct.

15   Q.  So this is an equally valid,

16  recognized approach to the investigation of the

17  impact of a detrimental condition in a market

18  data analysis?

19   A.  Yes.

20   Q.  You've already told us, of course,

21  that you've never published on mass appraisals

22  or AVMs or hedonic modeling, um -- and that you

23  don't really consider yourself or hold yourself

24  out as an expert on those things, but in this

355

1  articles, correct?

2    A.  Correct.

3    Q.  Including, on Page 147, Footnote 103,

4  an article written by the same person who

5  prepared this report with you.

6    A.  Correct.

7    Q.  And it's Richard Roddewig.

8    A.  Correct.

9    Q.  So you're relying on Roddewig to

10  support opinions and conclusions in this case.

11    A.  Well, I think when we cite all of

12  these articles, remember, the articles in and

13  of themselves are the presentations and

14  opinions of the author, obviously, but the

15  point is that they're peer reviewed.  So

16  it's -- and I'm recollecting Dr. Kilpatrick 's

17  report, I believe most of his citations were of

18  his own articles.  So I -- you know, I think

19  the point of the citation and whatever weight

20  you give the article is the fact that at least

21  certainly at some level it was peer reviewed.

22    Q.  But you're relying on Roddewig, aren't

23  you, for the proposition stated here that

24  Kilpatrick 's survey techniques have been

**truaxvol20927.txt**                    **Page 355**

356

1  relying on Roddewig for that, aren't you?

2     A.   I'm relying on -- if that's the

3  article I'm recollecting --

4     Q.   Footnote 103, Page 147.

5     A.   Yes.  I believe it is.  I believe in

6  that article they actually went back and

7  reviewed, after the fact, the actual property

8  value diminution as represented by actual sales

9  activity in an area where I believe

10  Dr. Kilpatrick had projected certain value

11  losses, and then they looked at the actual

12  transaction data and discovered that the

13  prediction was not -- did not become the

14  reality.

15    Q.   They being Roddewig and his group?

16    A.   That study, yes.

17    Q.   Same group that cowrote these reports?

18    A.   The same group that was a part of this

19  appraisal team.

20       MR. MEUNIER:

21          Let's go off the record.

22          (Lunch break)

23  EXAMINATION BY MR. MEUNIER:

24    Q.   I'm ready to talk about your MRGO

357

1  2007 in the MRGO case; is that correct?

2      A.   That is correct.

3      Q.   Are you the sole author of this

4  report?

5      A.   Yes.

6      Q.   Did anyone contribute any language to

7  it besides you?

8      A.   Oh, there may have been some editing

9  by someone in my office, and than I know

10  certainly counsel saw it, but substantially,

11  and I mean very substantially, these are my

12  words.

13     Q.   Okay.  Who else in your office

14  contributed language to it?

15     A.   My, um -- well, it wasn't substantive

16  language, it would have been editing and

17  wordsmithing type things.  That was all that

18  was done to anything in this report, by any

19  party.

20     Q.   So if someone in your office and then

21  the attorneys took part in editing the report?

22     A.   Editing in the sense of wordsmithing

23  and correcting syntax errors, punctuation, et

24  cetera, but nothing in substance.

**truaxvol20927.txt**                          **Page 357**

358

1 took part in that process?

2   A.  I believe my son read a part of it.

3   Q.  Michael, Jr.

4   A.  Junior.

5   Q.  Michael Truax, Jr.  Now, you indicate

6 at Page 1 of the report that you are -- that

7 the client is Washington Group International

8 and MRGO defendants.  Correct?

9   A.  Correct.

10   Q.  Who are the MRGO defendants?

11   A.  Oh, I don't know who the rest of the

12 group is.

13   Q.  All right.  Have you, in connection

14 with --

15   A.  I mean, I know some of them, but --

16 you know.  The levee district, et cetera.

17   Q.  And in the MRGO case?

18   A.  I believe so, yes.

19   Q.  Okay.  So who are the MRGO defendants

20 who you consider to be your clients other than

21 Washington Group International?

22   A.  As I say, I don't have a list before

23 me, you know.

24   Q.  But there are a list of them that

359

1    A.  There are multiple.

2    Q.  Multiple.

3    A.  Yeah.  As I remember.

4    Q.  Is the Corps of Engineers a client of

5  yours now?

6    A.  I believe they were -- I believe that,

7  you know, the United States, um -- (Nods

8  affirmatively.)

9    Q.  Uh-huh.  Now, on Page 2 of the report

10  you set forth four conclusions; correct?

11    A.  Correct.

12    Q.  And these are all of the conclusions

13  that you were offering in the MRGO case?

14    A.  Correct.

15    Q.  And you agree with me that we have

16  already discussed, in connection with your

17  deposition as a levee expert -- levee case

18  expert, many of these same issues.  But I would

19  like to be more specific and avoid having to go

20  back over the same ground with you, so let's go

21  one at a time.

22        Opinion 1, which is the individual and

23  detailed property analysis and valuation

24  necessary to produce accurate, credible value

360

1  proposed class.  Now, all the questions that

2  I've asked and all the responses to those

3  questions that you've given pertinent to the

4  need for individual property analysis, and that

5  are not dependent on particular geography would

6  all be the same in connection with this

7  conclusion for MRGO, correct?

8    A.  Correct.

9    Q.  What about Number 2, the use of mass

10  appraisal techniques will not produce accurate

11  results; can we agree that the questions and

12  answers we have already been through in

13  connection with your service as a levee case

14  expert would simply be repeated in connection

15  with that conclusion?

16    A.  We can agree.

17    Q.  Okay.  Same for Number 3, that local

18  tax assessment data and values cannot reliably

19  be utilized?

20    A.  Yes.

21    Q.  And the same for Number 4, that --

22  well, Number 4 is unique to MRGO.  There you're

23  talking about the properties of the named

24  plaintiffs in MRGO only, correct?

361

1  the representative nature of the group in

2  levees, as well.

3    Q.   Okay.  Now, Page 8, we've already had

4  some reference to this, but I want to make sure

5  about where we stand on your estimates here.

6  You, on Page 8, in giving a class description,

7  state that you've looked at 2000 census data,

8  and you determined that in New Orleans East, at

9  that time there were approximately 34,000

10  households, correct?

11    A.   Correct.

12    Q.   That's residential property units.  Is

13  that what's meant by household there?

14    A.   Yes.

15    Q.   And then in the Lower Ninth Ward,

16  according to the 2000 census data, there were

17  7000 residential property units.

18    A.   Correct.

19    Q.   And according to the census in 2000

20  for St. Bernard Parish, there were

21  approximately 25,000 residential property

22  units.

23    A.   Correct.

24    Q.   Now, can we agree that as of August,

362

1  likely were greater?

2    A.  Yes.

3    Q.  In every case -- in all three cases?

4    A.  Yes, that they were likely higher.

5    Q.  Is there a more current source for

6  determining the total number of residential

7  properties in those three areas?

8    A.  Well, the census data is -- there are

9  these interim findings, if you will, since they

10  only do the definitive studies every ten years,

11  that are created using some pretty extensive

12  extrapolation.  So that's, I'm sure, published,

13  but it's an extrapolation from a very limited

14  sampling.

15    Q.  All right.  Have you looked at that?

16    A.  I've seen it through the years, but we

17  tend to recognize them for what they are.  It's

18  an extrapolation.  But as you said earlier, I

19  would agree with the concept, certainly, that

20  those numbers were higher than was reflected in

21  the 2000 study as of '05.

22    Q.  And this total of 66,000 residential

23  property units, if you add those numbers for

24  New Orleans East, Lower Ninth and St. Bernard,

363

1  commercial properties?

2   A.  I think that's correct.

3   Q.  Any idea how many commercial

4  properties we're talking about?

5   A.  No, I wouldn't have a number for you.

6   Q.  Is there any source or reference that

7  you know of to discern those totals?

8   A.  In these neighborhoods, not

9  particularly.

10   Q.  Same with institutional and government

11  properties, that would be in addition -- those

12  numbers would be in addition to the 66,000?

13   A.  I would think so, yes.

14   Q.  If I understand your sales comparison

15  approach which you would recommend to discern

16  the negative effect of any of the flood on the

17  property values, you would literally, um --

18  analyze each and every one of these more than

19  66,000 properties, correct?

20   A.  I would analyze properties on an

21  individual basis taking into consideration

22  their particular characteristics, yes.

23   Q.  And you would look at the factors, in

24  each case, that are listed on Page 9 of your

**truaxvol20927.txt**                           **Page 363**

364

1    A.   Among others, but yes.

2    Q.   So there would be additional factors

3  that you'd look at?

4    A.   Yes.

5    Q.   Even beyond those listed on Page 9.

6    A.   Yes.

7    Q.   As I asked you yesterday if you were

8  familiar with the Freddie Mac or Fannie Mae

9  appraisal form -- Residential Appraisal Report

10  form.

11    A.   Right.

12    Q.   And I believe you told me that your

13  office actually uses its own template or form

14  for conducting appraisals?

15    A.   What I told you was that we have

16  multiple templates that we use as an outline,

17  if you will, and then we'll, um -- customize

18  them as needed for the particular property

19  being appraised.

20    Q.   All right.  Let me show you the

21  Uniform Residential Appraisal Report form for

22  Freddie Mac and Fannie Mae which actually was

23  produced by defense counsel and made an

24  attachment as Exhibit 12 to the Deposition of

365

1       Are you familiar with that form?

2    A.  Yes.

3    Q.  In conducting your appraisals of the

4  more than 66,000 residential property units for

5  your sales comparison method, would you utilize

6  a form similar to that one?

7    A.  Well, certainly I believe some

8  template would be established, this one or

9  something similar to it, to facilitate the

10  efficient appraisal of a large number of

11  properties.

12    Q.  Let me mark, then, as --

13    A.  My only point is it need not be this

14  precise form.

15    Q.  But it would be similar.

16    A.  It would be a form -- again, if you

17  were tasked to appraise a large number of

18  properties, you would create some efficiencies

19  via a template of some sort that would be

20  utilized to facilitate, you know, that type of

21  endeavor.

22    Q.  But at a minimum you'd be looking at

23  the factors listed on Page 9 of your report.

24    A.  Yes.

366

1  Appraisal Report form.

2       (Exhibit 11 was marked for

3  identification and is attached hereto.)

4  EXAMINATION BY MR. MEUNIER:

5    Q.  Let me refer you now, Mr. Truax, to

6  the Fannie Mae website, I guess, guidance sheet

7  that accompanies this form, and it was also a

8  part of Kilpatrick Number 12 as an attachment,

9  and ask you if you've ever seen or reviewed

10  that guide sheet or that information sheet

11  before.  (Tendering.)

12    A.  I can't tell you I've reviewed this

13  recently.  Probably seen it through years or,

14  or something similar to it.

15    Q.  Okay.  And this Fannie Mae guide for

16  the execution of the form states that the

17  appraiser must, at a minimum, do four things,

18  and I'd like to ask you if you agree that all

19  four of these things must be done at a minimum

20  to conduct an appraisal in connection with the

21  use of this form.  (Indicating.)

22       Number 1:  Perform a complete visual

23  inspection of the interior and exterior areas

24  of the subject property.

367

1    A.   Not entirely.  There are various types

2   of appraisals that can be requested of an

3   appraiser.  If a complete appraisal, let's say,

4   is requested for mortgage lending purposes,

5   then that is absolutely correct.  But an

6   appraiser can be tasked to do an appraisal of a

7   property based upon exterior inspection only.

8   Obviously, there's a list of assumptions that

9   go with that finding, but it's not necessary in

10  all cases that a complete interior inspection

11  be accomplished to produce something that is

12  then called an appraised value.

13    Q.   Well, if you were using the sales

14  comparison methodology that you use to

15  investigate the detrimental condition factor,

16  in this case, again investigating whether

17  there's been property diminution post-Katrina

18  due to --

19    A.   Yes.

20    Q.   -- the flood, would you, for purposes

21  of that methodology, follow this minimum step

22  Number 1 on the Fannie Mae website?

23    A.   Yes, for that purpose I believe you

24  would.

368

1  inspection of the interior and exterior areas

2  of each and every one of more than 66,000

3  residential properties in the MRGO class area.

4     A.  In order to produce, yeah, accurate

5  and credible results, yes.

6     Q.  How long do you think that would take?

7     A.  I do not know.

8     Q.  How much do you think that would cost?

9     A.  I do not know.

10    Q.   The second minimum step, according to

11  Fannie Mae, is inspect the neighborhood.

12        Is that something that you would do in

13  connection with your sales comparison

14  methodology?

15    A.   Yes.

16    Q.  In this case.  How long do you think

17  it would take you to inspect the neighborhood

18  of more than 66,000 residential property units

19  in the MRGO class area?

20    A.  I do not know.

21    Q.  How much do you think that would cost?

22    A.  I do not know.

23    Q.  Number 3:  According to Fannie Mae, a

24  minimum step is inspect each of the comparable

369

1        Is that a step that you would follow?

2    A.  Yes.

3    Q.  So obviously the number of sales would

4  vary from street to street, correct?

5    A.  Well, the number of comparables --

6  yeah, that are relevant could vary property to

7  property.

8    Q.  Well, let me ask you, how would you go

9  about deciding what were the comparable sales

10  to look at on a given Street?

11    A.  You'd essentially follow the same path

12  you would in a normal appraisal, which means

13  that you would research the relevant areas that

14  you thought were particularly comparable to the

15  property being appraised and discover whatever

16  pool of data that existed that was reasonably

17  current, you'd, from that grouping, then select

18  those sales that you thought were particularly

19  comparable, and analyze those leading to a

20  value conclusion.

21    Q.  I guess you're going to tell me you

22  don't know how much that would cost or how long

23  that would take.  Am I correct?

24    A.  For 66,000?  You're correct.

370

1  would take, on average, to do it one time, one

2  residential property, conduct the needed

3  research of comparable sales for that property

4  from the nearby properties?

5     A.  Well, I can tell you, you know,

6  residential appraisal shops will generally

7  produce -- you know, an appraiser -- a good

8  experienced residential appraiser will produce,

9  oh, probably two to three a day, if the

10  business volume was sufficient to warrant them

11  running at that pace.

12     Q.  And am I correct that because you

13  regard this property mix, even the residential

14  property mix in MRGO class area, as

15  heterogeneous -- correct?

16     A.  Correct.

17     Q.  -- that would make the task of

18  researching and discerning comparable sales

19  more challenging than if it were a homogeneous

20  property?

21     A.  Correct.

22     Q.  Because now you got to look for truly

23  comparable properties, and to some extent

24  they're all different, you say.

371

1  type of neighborhood is more difficult.

2     Q.  The fourth minimum step, according to

3  Fannie Mae, is to research, verify and analyze

4  data from reliable public and/or private

5  sources.

6        Now, do you know what kind of data

7  Fannie Mae refers to there for purposes of an

8  appraisal?

9     A.  I think they're referring to

10 comparable data.

11    Q.  We're talking about sales data again?

12    A.  Yes.

13    Q.  Any other data?  Are we talking about

14 tax assessment data or --

15    A.  If a particular client, say, requires

16 that the tax assessment data be inputted on the

17 form, and some do, then certainly you would

18 research that.

19    Q.  And I guess you'd research the Road

20 Home appraisal data, as well, for either the

21 subject property or a perceived comparable.

22    A.  No, you wouldn't -- well, you wouldn't

23 particularly be focused upon that if your task

24 was to provide a market value estimate for the

372

1 information regarding other properties that had

2 actually sold in the marketplace.

3    Q.   Okay.  Because the Road Home would

4 give you the pre-Katrina value -- appraisal

5 value?

6    A.   Well, you wouldn't -- you likely would

7 aren't have access to the Road -- remember, the

8 what the Road Home database might have is an

9 individual property appraisal.  It would not

10 necessarily be a sale of that property that

11 would be useful in appraising that

12 particular -- your subject property.

13    Q.   It would be a pre-Katrina appraisal

14 wouldn't it?  Isn't that what the Road Home --

15    A.   That's correct.

16    Q.   Yeah.

17    A.   But that's what it would be.  It would

18 be a pre-Katrina appraisal of a given property.

19    Q.   Right.  Well, under your methodology,

20 if you're trying to discern the detrimental

21 condition of the flood, do you or do you not

22 look for that Road Home pre-Katrina appraisal

23 data at some step in the process?

24    A.   Are you assuming we are appraising a

**truaxvol20927.txt**                              **Page 372**

373

1  system?  Is that your assumption?

2   Q.  Yeah.  Assuming there's some data from

3  Road Home for the property, would you be

4  interested in it for purposes of this

5  methodology?

6   A.  Oh, yeah.  Certainly, appraisers are

7  great collectors of information, so any

8  information that would assist them in

9  accomplishing their task would be of use.

10   Q.  And then the final fifth minimum step

11  identified by Fannie Mae is to report the

12  analysis of opinions and conclusions in this

13  appraisal report, again referring in this case

14  to that form report we've looked at.

15       But when you use this exact report,

16  every appraisal needs to end up, doesn't it, in

17  some sort of a written form where you state

18  your conclusions?

19   A.  Technically, it doesn't have to.  I

20  can give you a verbal report.  But in the

21  arenas you've been talking to me about --

22   Q.  Right.

23   A.  -- all those findings were usually

24  transmitted in some written form.

374

1  litigation, if you were carrying out this task,

2  you would certainly reduce your conclusions --

3  your appraisal conclusions to written form --

4    A.  I believe so.

5    Q.  -- in each case.

6    A.  I believe so.

7    Q.  Okay.  I notice that the Fannie Mae

8  structure guide also then states or sets forth

9  what it calls required exhibits.  (Tendering.)

10      You see that?

11    A.  Yes.

12    Q.  Are all of those required exhibits

13  things that you would seek to obtain and attach

14  to the individual property appraisal for

15  purposes of your sales comparison methodology?

16    A.  I think these exhibits are certainly

17  typical of appraisal reports submitted to

18  Fannie Mae or Freddie Mac, but are they a

19  requirement in all cases for all appraisals?

20  No.  The key for an appraiser is to produce a

21  product that certainly is accurate, credible,

22  reliable and certainly suitable for the purpose

23  to which he was hired at some level.  That's

24  not to say that the value conclusion has to be

375

1  report was to be used, it has to be

2  appropriate.

3    Q.   And the exhibits that are required,

4  according to Fannie Mae, are street map, an

5  exterior building sketch, descriptive photos,

6  and any other data that's been looked at and

7  deemed relevant, correct?

8    A.   Correct.

9    Q.   All right.  Let me mark as Truax 12

10  the Fannie Mae Form 10004 guide.

11         (Exhibit 12 was marked for

12  identification and is attached hereto.)

13  EXAMINATION BY MR. MEUNIER:

14    Q.   Page 11 of your MRGO report, at the

15  bottom, you say the individual circumstances of

16  a property must be fully known, analyzed and

17  considered both on a macro and micro level.

18  And I know you have parenthetical explanations

19  of what macro and micro mean.

20         I want to make sure I understand.

21  When you say you're going to look at the

22  individual circumstances of the property on a

23  macro level, are you referring to comparable

24  properties in the neighborhood or in a larger

**truaxvol20927.txt**                    **Page 375**

376

1    A.  In any appraisal, you should consider

2  any and all factors that bear on its valuation.

3  So it's not a fixed list, if you will.

4  Anything that you believe would impact the

5  value and that a potential buyer in the

6  marketplace would consider, then you as the

7  appraiser need to consider that.

8    Q.  Right.

9    A.  So as you say in the parenthetical

10  here regarding the macro issues would be the

11  neighborhoods.  Certainly neighborhood in the

12  context of an individual appraisal would

13  primarily relate to the competitive

14  neighborhood market area.  For example, if you

15  were in Lakeview, you probably would primarily

16  research Lakeview.

17    Q.  Uh-huh.

18    A.  The micro has to do with the

19  particular -- the more particular circumstances

20  that bear on your subject property, like is

21  there a junk yard on the property next door or

22  across the street, and would that impact a

23  buyer's thinking?  So -- but conceptually, you

24  would consider and analyze anything that you

377

1  property.

2     Q.  Would your macro level reference for

3  purposes of the MRGO subclass areas, St.

4  Bernard, Lower Ninth, New Orleans East, ever

5  extend beyond those areas?

6     A.  Well, as I said, I think we talked

7  about this yesterday, um -- let's say in one of

8  those areas if there is the fact that it is in

9  New Orleans, it is in an area protected by

10  levees, that influence certainly is overriding

11  to all of the properties in the area, and so

12  that's embedded in the sales we will use,

13  hopefully, because they will come from a

14  neighborhood that's in the same area.  So that

15  influence is inherently considered by virtue of

16  your comparable selection.  You might not have

17  to articulate it in your form or in whatever

18  form you use for an adjustment because it's

19  embedded in the comparables already.

20     Q.  Let me refer you to page 12 of your

21  MRGO report which begins a discussion about the

22  diversity of properties in the MRGO class area.

23          Do I understand that in order to

24  demonstrate the diversity of property types in

**truaxvol20927.txt**                    **Page 377**

378

1  that diversity as extending through all three

2  subclasses, right?

3    A.  There is diversity in all three

4  subclasses.

5    Q.  So in order to demonstrate that, you

6  conducted a study of one specific area,

7  correct?

8    A.  Correct.

9    Q.  And that's the, shall we call it the

10  Charbonnet area?

11    A.  Correct.

12    Q.  How did you come to select the

13  Charbonnet area as a suitable area that

14  illustrates diversity throughout the entire

15  MRGO class area?

16    A.  Well, we only had -- given the

17  criteria that I had accepted that I was going

18  to employ, which was that we would center

19  whatever study we did around one of the named

20  plaintiffs, we only had four to choose from in

21  that particular case, and the Charbonnet

22  property is certainly in the proposed class

23  area, and it has -- it clearly demonstrates

24  considerable diversity in the immediate area.

379

1  diversity demonstrated in the Charbonnet area

2  is a diversity which exists throughout the

3  entire MRGO class area, is that true?

4     A.   No, I don't think I'm telling you that

5  the diversity, particularly, say, the

6  percentages of various property types within

7  that small study area, that I'm contending that

8  that is to be extrapolated to the whole of the

9  class area.  That's not the intent at all.  The

10  intent was to say, if you study in this case

11  just an area as small as nine blocks, you get a

12  tremendous amount of diversity, even in a

13  subset that is that small.

14     Q.   Well, do you believe that if you then

15  moved over into a different subclass area,

16  different neighborhood, and looked at a

17  different nine blocks, you're going to find the

18  same degree of diversity?

19     A.   Oh, no.  That would vary.  You would

20  find some nine block areas that had probably

21  even greater diversity.  You'd find some nine

22  block areas that had a limited amount of

23  diversity.

24     Q.   Okay.

**truaxvol20927.txt**                           **Page 379**

380

1   Q.  All right.

2   A.  Absolutely.

3   Q.  So you're not seeking to extrapolate

4  to the entire class area any opinions about the

5  degree or extent of diversity from the study of

6  this one nine block area, are you?

7   A.  Not in a particular way.  But I'm here

8  to tell you, having been an appraiser here for

9  thirty odd years, I'm confident that there is

10  tremendous diversity over the full extent of

11  the class area.

12   Q.  Now, listing of percentages starting

13  at the bottom of Page 12 and then continuing to

14  the top of Page 13 of your report indicate that

15  in the Charbonnet study area 73 percent of the

16  property units were residential.  True?

17   A.  Well, more particularly, 33 percent

18  were single-family and 40 percent were

19  multifamily.  That can be, you know, anything

20  above a two-family or more.  But these are

21  residential classifications, that is correct.

22   Q.  73 percent were residential, true?

23   A.  A mix of single and multifamily, yes.

24   Q.  And 80 percent were vacant.  Is that

381

1    A.  Well, 80 percent of those properties

2  were unoccupied, yes.

3    Q.  So for the most part, the Charbonnet

4  study area was a vacant residential

5  neighborhood.

6    A.  Obviously -- yeah.  The majority of

7  the people in that particular area had not come

8  back and repaired and reoccupied their homes.

9    Q.  And according to Page 13, 86 percent

10  of the structures, or is this just residential,

11  are one-story?

12    A.  That would be structures.

13    Q.  That's all structures.

14    A.  Right.

15    Q.  86 percent of all structures, of all

16  types, were one-story?

17    A.  Correct.

18    Q.  Now, when you say one story, you mean

19  slab foundation?

20    A.  One level of living area.

21    Q.  One level of living I area.  I see.

22  You're not here referring to elevation.

23    A.  No.

24    Q.  So 86 percent of the properties were

382

1    A.  Correct.

2    Q.  And then I guess it's in the next

3  category where you talk about something about

4  elevation.  You say, 72 percent were raised

5  above slab level, correct?

6    A.  Yes.  They were raised, typical New

7  Orleans style, older style home, raised on

8  piers.  Concrete block or brick piers.

9    Q.  So again, for the most part of the

10  Charbonnet study you're talking about one-story

11  raised structures.

12    A.  In the majority.

13       (Brief interruption.)

14  EXAMINATION BY MR. MEUNIER:

15    Q.  Still on Page 13 of your report,

16  Mr. Truax, you make a statement that there was

17  evidence of wind damage in 89 percent of the

18  structures in the Charbonnet study area?

19    A.  Yes.

20    Q.  How, how did you -- first of all, let

21  me ask you, do you profess to have expertise in

22  discerning different types of property damage,

23  that is, wind versus other types, for example?

24    A.  I think I would profess to have

**truaxvol20927.txt**                              **Page 382**

383

1  if not thousands of properties in my thirty

2  years of appraisal experience where we were

3  certainly looking for damage and that type of,

4  um -- structural characteristic as it would

5  relate to an appraisal.  So am I familiar with

6  seeing properties that have wind damage of

7  sorts?  Yes.

8     Q.  All right.  But notwithstanding your

9  experience in seeing that, you don't have the

10  training or specialized background, for example

11  possessed by adjusters who go out and, as a

12  profession, make distinctions between different

13  types of damages; you don't have that kind of

14  background, do you?

15     A.  Well, I believe when we were talking

16  about my background I told you after Hurricane

17  Katrina I actually worked as an adjuster for a

18  time.  So I did precisely that.

19     Q.  And how long did you do that?

20     A.  Oh, I probably did that for three

21  months.

22     Q.  Have you ever testified as an expert

23  in adjusting insurance claims?

24     A.  No.

**truaxvol20927.txt**                    **Page 383**

384

1  expert in adjusting insurance claims?

2      A.   We wrote reports on every one of the

3  properties we adjusted.

4      Q.   I mean in litigation.

5      A.   No.

6      Q.   Have you ever written an expert report

7  for litigation purposes as an adjuster?

8      A.   No.

9      Q.   Well, do you hold yourself out as an

10  expert in legal proceedings in the field of

11  insurance adjusting?

12         MR. MARPLE:

13             Let me object to the form of the

14             question.

15      A.   No.

16  EXAMINATION BY MR. MEUNIER:

17      Q.   So the 89 -- I want to understand how

18  you arrived at this 89 percent figure for

19  evidence of wind damage.  Tell me what you mean

20  by wind damage.

21      A.   Those observations were made from

22  public right of way, so from the street, and in

23  this particular case the majority of the

24  evidence was roof related.  If we observed that

385

1  on the roof were missing, the stacks and

2  turrets were removed, there was a blue tarp on

3  the roof, those were things that we were pretty

4  confident suggest there was evidence of wind

5  damage.  And wind damage, you asked me to

6  define it.  Wind damage, to me, is damage that

7  I suspect was caused by wind.

8      Q.   Right.  But specifically, you're

9  talking about roof damage?

10     A.   That was the primary evidence of that.

11  Now, at times you'd also see where there was

12  lap siding that might have been blown off, say,

13  a second floor portion of a building, or there

14  were windows that were, um -- blown -- broken

15  and open, say, on second floor levels.  Again,

16  we would have taken that as some evidence of

17  wind damage, probably.

18     Q.   Well, 86 percent of the homes were one

19  level properties.  86 percent of the structures

20  were one level, correct?

21     A.   Yes.

22     Q.   So when you saw a broken window in a

23  one level structure, you noted that as wind

24  damage?

386

1  have been enough on a one-story structure.  I

2  was just saying the primary -- the principal

3  area that was looked at closely was the roof.

4      Q.   Roof.  Okay.  Because you and I know

5  that broken windows can occur from anything

6  from a rock to any number of other things.

7      A.   Certainly.

8      Q.   And you're looking at properties two

9  years after an event --

10     A.   That's correct.

11     Q.   -- correct?

12     A.   Correct.

13     Q.   Were you trying to state the opinion

14  here, Mr. Truax, that 89 percent of the

15  properties in the Charbonnet area had wind

16  damage from Hurricane Katrina two years ago?

17     A.   I believe that the evidence of wind

18  damage that I saw was in the majority, yes,

19  associated with Hurricane Katrina.  Can I be

20  certain of that?  No.

21     Q.   You can't rule out intervening causes

22  for damage to a roof in the last two years, can

23  you?

24     A.   No.

387

1  house had evidence of wind damage now, two

2  years after Katrina, it must be due to Katrina;

3  that was your assumption?

4      A.   The inherent assumption was that the

5  damage we saw as we drove through that

6  neighborhood was in the majority caused by

7  Hurricane Katrina, yes.

8      Q.   Did the water level of the flooding in

9  the Charbonnet area reach the level of these

10  roofs?

11     A.   No.

12     Q.   What was the depth of the flooding in

13  the Charbonnet study area?

14     A.   I don't recall the depths of the

15  flooding exactly, but it wasn't at roof level.

16  I believe it was about, probably -- in the

17  subject property itself, I believe the -- it

18  was near the window line.

19     Q.   Did any of the residents in the

20  Charbonnet study area have to exit through

21  roofs by breaking out through a roof?

22     A.   Oh, I wouldn't know that.

23     Q.   If that happened and you saw evidence

24  of a hole in the roof, you'd call that wind

388

1    A.  It might have been characterized as

2  that.

3    Q.  Now, you've got a reference in your

4  report to Exhibit C which are photographs of

5  the Charbonnet area, correct?

6    A.  Correct.

7    Q.  And you represent that these

8  photographs depict the wind damage?

9    A.  No, they depict essentially the

10  variety of properties that were -- an example

11  of the variety of the properties that were

12  observed in that nine block study area.

13    Q.  You didn't take photographs of wind

14  damage.

15    A.  Well, if you look at the second

16  photograph on I guess the first page, the

17  photograph probably doesn't show it real

18  well --

19    Q.  It says 5625 Burgundy?

20    A.  Yes.  You can see some evidence of

21  some shingles missing there on the front of

22  that house.

23    Q.  All right.  So let me make sure I

24  understand.  5625 burgundy, with the shadowed

389

1  missing shingles.  Do you interpret that as

2  wind damage due to Hurricane Katrina two years

3  ago?

4    A.  Yes, probably.

5    Q.  All right.

6    A.  And if you go to the second page, the

7  5613 and 15 Burgundy Street --

8    Q.  Yes.

9    A.  -- that still has the remnants of the

10  blue tarp hanging off the roof.  And the blue

11  tarp program, I guess as you know, was

12  implemented by the Corps of Engineers after the

13  hurricane.

14    Q.  Well, when was that blue tarp put on

15  5613-15?

16    A.  Well, I don't know when, but it

17  certainly was subsequent to Hurricane Katrina.

18    Q.  Anytime subsequent?

19    A.  Um -- no, it wouldn't be -- you could

20  narrow the time parameters only in the sense --

21  I mean in the sense that that program began on

22  a certain date and ended on a certain date, and

23  it's not ongoing now, to my knowledge, so.

24    Q.  All right.  Well, what other wind

390

1  to Exhibit C?

2     A.   There's none that are apparent.

3     Q.   Well, to get to this 89 percent

4  figure, I assume you did some mathematical

5  calculation, took a total and divided it by

6  another number.  True?

7     A.   Yes.

8     Q.   Tell me what your numbers were to

9  reach 89 percent.

10    A.   Well, we looked -- the study area

11  included 102 properties.

12    Q.   Okay.

13    A.   So 89 percent of 102 I guess would be

14  on the order of 90.

15    Q.   90 homes in the Charbonnet area with

16  evidence of wind damage that you say was

17  primarily based on damage to roof.

18    A.   Yes.  Now, I would tell you, as well,

19  it included those that had a new roof.

20    Q.   So in the 89 percent total, how many

21  properties did you put in that column because

22  they had a new roof?

23    A.   I couldn't tell you that subset of the

24  group.

**truaxvol20927.txt**                              **Page 390**

391

1    A.  No, I wouldn't say it was the

2  majority, based upon my recollection.  But

3  there were a number of properties, certainly,

4  with new roofs in that area.

5    Q.  And so if it had a new roof -- you

6  assumed that if it had a new roof two years

7  after Katrina, you assumed it must have had

8  wind damage from Katrina to the roof during

9  Hurricane Katrina.

10    A.  Correct.

11    Q.  Now, made no effort to assess the

12  damage -- actual property damage associated

13  with wind events from Katrina in these area,

14  did you?  Quantify it.

15    A.  No.

16    Q.  You never went in the homes.

17    A.  No.  Other than the named plaintiffs.

18    Q.  There are, though, trained, skilled

19  adjusters, people with special training, who

20  can go into a home, and they can differentiate

21  between flood and wind damage, true?

22    A.  I believe that is the goal in many

23  cases.

24    Q.  You don't do that for a living, but

392

1  correct?

2     A.   I don't do that for a living, but as I

3  told you earlier I did do that post-Katrina for

4  a short period of time.

5     Q.   All right.  And even in that

6  three-month experience you had as an adjuster,

7  even without formal training, you were able to

8  tell the difference, weren't you, between flood

9  and wind damage?

10     A.   Yes.  I believe I was able to, yes.

11     Q.   Right.  Let me refer to the

12  worksheets, I guess for lack of a better word,

13  that we've been given as part of your reliance

14  materials.

15     A.   Yes.

16     Q.   And do I take it this is your

17  handwriting; am I correct this is your

18  handwriting on the sheet?

19     A.   If I could see it.

20     Q.   (Tendering.)  I have another copy.

21     A.   Yes.

22     Q.   And actually, under the column on this

23  document called evidence of wind damage, you

24  wrote yes, and then in some cases but not all

393

1  roof next to yes, correct?

2    A.  Correct.

3    Q.  In other cases you just wrote yes for

4  evidence of wind damage.

5    A.  Yes.

6    Q.  Now, do I assume correctly that when

7  you wrote just yes there was some evidence of

8  wind damage other than roof?

9    A.  No.

10    Q.  So if you saw a new roof or missing

11  shingles and you concluded that must be wind

12  damage from Katrina, you would write yes under

13  wind damage without noting roof in some cases?

14    A.  Probably in some cases, yes.

15    Q.  Why did you write roof in some cases

16  and simply yes in other cases?

17    A.  Some of it may be as mundane as we

18  were going down the street a little faster at

19  one point in time than another, I was writing

20  something else and didn't come back to fill

21  that in.  I mean, I don't think there was a --

22  there wasn't a, um -- absolute particular

23  effort in all cases to articulate what damage I

24  necessarily saw.

394

1   A.   It was a drive by process.

2   Q.   You didn't stop the vehicle?

3   A.   No.  And if you note, you see a little

4 more articulation on the first page?  And then

5 as you move to the other pages -- when what we

6 saw was fairly routine, I believe you saw many

7 more just yeses.

8   Q.   The car sped up toward the end?

9   A.   No, I'm just telling you once we

10 looked at enough damaged roofs I didn't

11 articulate that it was all roof related in

12 every case.

13   Q.   Now, at Page 14 of your report -- and

14 let me attach as Truax 13 the work sheet that

15 we've looked at for the Charbonnet study area.

16      (Exhibit 13 was marked for

17 identification and is attached hereto.)

18 EXAMINATION BY MR. MEUNIER:

19   Q.   Page 14 of your report you state, at

20 the bottom, based on your experience and

21 knowledge regarding assessment practices in

22 Orleans and St. Bernard Parishes, I would not

23 consider it reasonable to rely on that data,

24 evaluation.

395

1  you have regarding assessment practices in St.

2  Bernard Parish.

3     A.   As I think I told you before, in doing

4  an appraisal, most of our appraisal work

5  includes properties in St. Bernard Parish, one

6  of the requirements of most of our clients is

7  that we research the assessed values of the

8  properties.  And so we would interact with the

9  tax assessment personnel of St. Bernard Parish

10  for that purpose, and obviously then have a

11  comparison of what the assessed value was

12  relative to either the conclusion that we were

13  coming to, and if the property was selling,

14  what it was selling for.  So much as we found

15  in Orleans Parish, the assessed values were

16  rarely compatible with the appraised values or

17  the sale prices.

18     Q.   And what technique is used in

19  St. Bernard, or has been used historically in

20  St. Bernard Parish for assessment valuation?

21     A.   I don't know.  I'm not as familiar

22  with their process, if you will, in

23  St. Bernard Parish.  I can only tell you the

24  results of their process were generally not

396

1  that we saw.  And it was clearly a political

2  process at some level.

3     Q.   What do you mean by that?

4     A.   Well, I can tell you that if you knew

5  the assessor and there was, um -- you could go

6  in and maybe get a favorable result.  And I can

7  tell you that from experience because I lived

8  in St. Bernard.

9     Q.   But do I gather from your testimony

10  that as critical of the outcome as you may be,

11  you do not know what methodology has been used

12  historically, or even currently, in St.

13  Bernard, by the tax assessors to evaluate

14  properties?

15     A.   No, I do not know particularly their

16  process.

17     Q.   Now, let me refer you to Page 15 of

18  your report where you begin a discussion of the

19  properties of the class representatives.

20         And there were four properties that

21  you considered, correct?

22     A.   Correct.

23     Q.   And you state that these four

24  properties were inspected by you on June 18 and

**truaxvol20927.txt**                        **Page 396**

397

1    A.  Correct.

2    Q.  How long did you take for each

3  inspection?

4    A.  Well, there was certainly some

5  variations in the property types.  Probably

6  spent an hour and a half or so at Charbonnet,

7  maybe an hour.

8       Hamlet Street was a slab, the

9  structure was gone, so I spent less time

10  certainly at Hamlet Street.

11       Bundy and Morel, I'd say both an hour

12  to an hour and a half.

13    Q.  An hour and a half each?

14    A.  An hour to an hour and a half on each,

15  yes.

16    Q.  And what were your normal -- what

17  would your normal charges for that be?

18    A.  I think residential appraisals are

19  typically in the two hundred and fifty to three

20  hundred and fifty dollar range.  And I tell you

21  this, the time spent at each was probably

22  certainly a little longer than would have been

23  spent in a normal process.

24    Q.  Well, you say an hour to an hour and a

398

1 a normal process would be?

2    A.   Probably an on site inspection is

3 accomplished in probably somewhere between

4 thirty minutes and an hour tops --

5    Q.   Uh-huh.

6    A.   -- for a normal house.

7    Q.   Now, in the case of Ms. Coates at

8 1020-22 Charbonnet, you found this to be a

9 single-family residence, correct?

10    A.   Correct.

11    Q.   Which would put it within the

12 73 percent residential category for the

13 Charbonnet area, right?

14    A.   Um -- well, within the 33 percent

15 single-family category.

16    Q.   All right.  And within the 73 percent

17 residential category.

18    A.   If you want to combine the two.

19    Q.   And it was a raised, on piers,

20 structure, which puts it in the 72 percent

21 category for that area, correct?

22    A.   Correct.

23    Q.   So why is it you say the Charbonnet --

24 I mean the Coates home is not representative of

399

1    A.  I think what I've said is that the

2  Coates home, the Hamlet Street property, the

3  Bundy Street and Morel Street properties are

4  not representative of a large segment of the

5  broader class areas.  They're all single-family

6  homes.  There are obviously other property

7  types within the class area.  That's what I

8  said.

9    Q.  So Ms. Coates' home, since 73 percent

10  of the homes are residential in that study

11  area, and 72 percent are raised like her house,

12  you're not saying her home is atypical of her

13  neighborhood, are you?

14    A.  No, I'm not contending these

15  properties wouldn't be representative of some

16  of the properties in the subclass area.  They

17  certainly would be, of some.

18    Q.  Okay.  Well, that's what I wanted to

19  make sure about.  You're not saying that the

20  class area is so diverse that it's impossible

21  to come up with a representative set of

22  properties; you're not saying that, are you?

23    A.  No.  I mean, I believe that there

24  could be some representative class.  The

400

1   this broad area, and the, say the Coates home

2   is a raised -- actually, a converted double

3   that is now used as a single-family residence.

4   That property, say, would not be particularly

5   representative of, say, all of the residential

6   in the subclass area.  There are different

7   styles, different characteristics that would

8   not make that, let's say, a comparable, if you

9   will, if I was appraising many, many other

10   properties in that same subclass area.  Even

11   single-family properties.

12      Q.  All right.  So you could assemble a

13   sample group of properties that as a group

14   would be representative of these class and

15   subclass areas, you just need more properties

16   to do that, more than four.

17      A.  Clearly, four isn't representative.

18   And at some level, that's what an appraisal

19   does.  An appraisal selects representative

20   properties for their particular property that

21   are precisely or as best we can determine the

22   properties that are representative of the

23   property you're approving.

24      Q.  And let me just make sure you

401

1  yesterday, the words representative and typical

2  have specialized meaning in class action cases,

3  and I want to make sure when you say

4  representative here you are not referring to

5  the use of that word as it's used for class

6  certification purposes.  Correct?

7      MR. MARPLE:

8          Let me object to the form of the

9          question as calling for a legal

10          conclusion.

11  EXAMINATION BY MR. MEUNIER:

12      Q.  Well, do you know what Rule 23 means

13  when it says a class representative has to be

14  an adequate representative?  Do you know what

15  that means?

16      A.  From a legal perspective, no.

17      Q.  So when you use the word

18  representative in your report, you are not

19  referring, intentionally, at least, to that

20  meaning, are you?

21      A.  No, I think I told you yesterday that

22  representative, to me, would be -- could be

23  likened to the word comparable.

24      Q.  Comparable.  Okay.  So you're using it

**truaxvol20927.txt**                                    **Page 401**

402

1  have sufficient characteristics in common with

2  other properties for me to be able to compare

3  value, or utilize the values as a comparison.

4      Is that what you mean by

5  representative?

6  A.  Yes.

7  Q.  So by that definition, no residential

8  property could ever be representative of a

9  commercial property, could it?

10  A.  Typically not done that way, that's

11  correct.

12  Q.  And a one-story property could never

13  be representative of a two-story property.

14  A.  Again, typically an appraiser would

15  work very hard to compare two stores to a

16  two-story property if that's what his subject

17  was.

18  Q.  An old property could never really be

19  representative of a new property.

20  A.  Any host of variations like that,

21  that's correct.

22  Q.  So you take all the characteristics

23  that you look at for comparables -- and I think

24  we actually looked -- you have some bullet

**truaxvol20927.txt**                    **Page 402**

403

1   A.  Correct.

2   Q.  You take that list, and your idea of

3  representative would be to group the properties

4  according to those characteristics, correct?

5   A.  Yes.  As best you can.  Obviously, you

6  rarely if ever find three identical -- or four

7  or five or however many that are identical to

8  your subject property, but that is the goal, is

9  to -- when you search for comparables, is to

10  find those that are most similar to your

11  subject.

12   Q.  And again, this discussion about the

13  class representative properties not being

14  representative, and we're using the words

15  differently, but, um -- you reference Exhibit C

16  which are the pictures that we looked at, your

17  photographs.

18   A.  Correct.

19   Q.  And the relevance here is that in the

20  Charbonnet study area, you found a church, you

21  found a Kentucky Fried Chicken, a school, as

22  well as homes, and your view is that none of

23  the homes could be considered representative of

24  the whole area because you've got a church and

404

1  cetera.  That's your opinion.

2     A.   Correct.

3         (Off the record.)

4         MR. MEUNIER:

5            For the record, the plaintiffs in

6         levee and MRGO have no further

7         questions of the witness.  That

8         concludes the deposition.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

405

1      WITNESS' CERTIFICATE

2

3      I, MICHAEL W. TRUAX, MAI, do hereby

4  certify that the foregoing testimony was given

5  by me, and that the transcription of said

6  testimony, with corrections and/or changes, if

7  any, is true and correct as given by me on the

8  aforementioned date.

9

10  _____    _____

11  DATE SIGNED      MICHAEL W. TRUAX, MAI

12

13  _____ Signed with corrections as noted.

14

15  _____ Signed with no corrections noted.

16

17

18

19

20

21

22

23

24

**truaxvol20927.txt**         **Page 405**

406

1         REPORTER'S CERTIFICATE

2         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,

3   Certified Court Reporter in and for the State

4   of Louisiana, do hereby certify that the

5   aforementioned witness, after having been first

6   duly sworn by me to testify to the truth, did

7   testify as hereinabove set forth;

8         That said deposition was taken by me

9   in computer shorthand and thereafter

10  transcribed under my supervision, and is a true

11  and correct transcription to the best of my

12  ability and understanding.

13        I further certify that I am not of

14  counsel, nor related to counsel or the parties

15  hereto, and am in no way interested in the

16  result of said cause.

17

18

19

20

21

22

23  _____

24       JOSEPH A. FAIRBANKS, JR., CCR, RPR

**truaxvol20927.txt**                    **Page 406**