UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FRANKIN D. BEAHM, A Law Corporation and FRANKLIN D. BEAHM, individually | CIVIL ACTION |
| | NUMBER:        07-4510 |
| VERSUS | |
| | SECTION:       "K" |
| THE UNITED STATES OF AMERICA, THROUGH THE ARMY CORPS OF ENGINEERS | MAGISTRATE:  (2) |

## AMENDED COMPLAINT

Named plaintiff, Franklin D. Beahm, A Law Corporation, and Franklin D. Beahm individually, through undersigned counsel with respect represents that:

## I. PARTIES

1.

Franklin D. Beahm, A Law Corporation, and plaintiff in this matter, is a law corporation organized under the laws of the State of Louisiana. Franklin D. Beahm, also a plaintiff in this matter, is a major and citizen of the State of Louisiana.

2.

Defendant herein is the United States Army Corps of Engineers (hereafter "Corps"), a division of the United States government under the direct jurisdiction of the Department of the Army.

3.

## II.  JURISDICTION AND VENUE

3.

The Court has subject matter jurisdiction over the claims asserted herein pursuant to the Admiralty/Maritime Law of the United States and the provisions of 28 U.S.C. §1333(1), saving to plaintiff as suitor the full range of legal and equitable remedies to which it is entitled.

4.

The Court has subject matter jurisdiction pursuant to 46 U.S.C. §§741-752 (The Suits in Admiralty Act), and/or 46 U.S.C. §§781-790 (The Public Vessels Act), as applicable, and/or 46 U.S.C. §740 (The Admiralty Extension Act).

5.

Some or all of the fault alleged herein arises out of traditional maritime activity, including vessel activity, on or involving navigable water, and having an actual and/or potential impact on maritime commerce.

6.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1346(b)(1), the United States being a defendant.

7.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§2671, *et seq*. (The Federal Tort Claims Act).

8.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction), inasmuch as certain claims arise under the United States Constitution and/or the laws of the United States, including, without limitation, the Federal Water Pollution & Control Act, 33 U.S.C. §§1251 *et seq.*, the Coastal Zone Management Act, 16 U.S.C. §§1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§403 *et seq.*

9.

In addition, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §1367 as to any and all claims asserted under Louisiana law, since these claims are so related to the claims within the federal jurisdiction of the Court that they form part of the same case or controversy within the meaning of Article III of the United States Constitution.

10.

Plaintiffs have presented to the defendant Corps the written, administrative claim required under appropriate federal law and/or regulation.  Plaintiffs, however, reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a consequence of the inaction and failure on the part of the Corps in regard to the processing and evaluation of said claims. Plaintiffs specifically invoke the "futility doctrine" as a basis for the waiver and/or inapplicability of all administrative claim filing requirements in this matter.

11.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, inasmuch as the defendant's negligent and wrongful action occurred in this district, a substantial part of the

-3-

events and omissions giving rise to this action occurred in this district, named plaintiffs have resided in this district at the time of the event giving rise to this litigation, and the damages suffered by named plaintiff occurred within this district.

## III.  FACTUAL ALLEGATIONS

12.

On or about August 29, 2005, Hurricane Katrina (hereafter "Katrina") made landfall on the Gulf Coast, largely sparing Greater New Orleans, which fortunately lay in the storm's rapidly-deteriorating western eye-wall as it came ashore.

13.

In both Orleans and St. Bernard Parishes, Katrina's winds at the time of landfall did not register as a "Category 3" storm on the Saffir-Simpson scale.  The hurricane winds at this time barely reached the velocity of one hundred miles per hour (mph).

14.

Nonetheless, through the fault of the defendant Corps, the storm surge associated with Katrina inundated approximately 80% of the Greater New Orleans area, causing extensive loss of life, catastrophic property damage, and the displacement and continuing disruption of a major urban community.  The defendant's actions and inactions as set forth herein, effectively converted a less-than-Category 3 hurricane into one of the worst disasters in U.S. history.

## The Mississippi River Gulf Outlet

15.

Constructed over forty years ago, the Mississippi River Gulf Outlet [hereafter "MRGO"] is

-4-

a navigational channel running between the Gulf of Mexico (to the east of St. Bernard Parish) and

the Gulf Intra-Coastal Waterway [hereafter "GIWW"].   The MRGO connects through the GIWW

with the Industrial Canal [hereafter "IHNC"] in New Orleans.

16.

Enlarged by construction in the 1960s, the MRGO for years has enhanced the risk of

hurricane storm surge damage to the Greater New Orleans area.   This risk, in fact, was made

manifest after Hurricane Betsy in September 1965, when both the east and west sides of the IHNC

experienced levee failures and overtopping, due to the surge-potentiating and funneling effect of the

MRGO.

17.

Construction of the IHNC as a deep water canal to connect the Mississippi River and Lake

Pontchartrain began in June 1918.   Excavation work initiated with the construction of parallel dykes

on either side of the canal, with excavated materials being used as a basis for protective levees.

18.

From the onset, contractors involved in the IHNC project were confronted with problems of

slope and soil instability.   Nevertheless, the excavation of the canal was completed in 1919, and a

lock structure was completed in January 1923, at which time the water level in the IHNC was

controlled by the tides of Lake Pontchartrain.

19.

The GIWW was a navigational project completed in 1942.   It forms a protected shipping lane

between Port Isabel, Texas and the Apalachee Bay, Florida.

-5-

20.

In 1944, under the authority of the defendant Corps, the GIWW was re-routed to pass through the southern part of the IHNC, creating the first shallow channel through the wetlands. This decision by the Corps facilitated the propagation of storm surge from Lake Borgne into New Orleans.

## Lake Pontchartrain Project

21.

Most of the levee and/or I-wall structures that surround the New Orleans metropolitan area were constructed, at least in part, under the authority of the Lake Pontchartrain, Louisiana Vicinity Hurricane Protection Project [hereafter "Lake Pontchartrain Project"]. The defendant Corps was responsible for the design and construction of this project.

22.

The overall design criterion for the Lake Pontchartrain Project as mandated by Congress, called for the protection of the New Orleans area from "the most severe combination" of weather conditions which would be considered "characteristic for the region." It was anticipated that such conditions might occur once every two hundred to three hundred years. The defendant deemed these conditions to be equivalent with the "Standard Project Hurricane" [hereafter "SPH"], but based its overall design specifications on a 1959 U.S. Weather Bureau one-in-100 year SPH. This contradicted to the Congressional mandate to protect the New Orleans area in the event of the most severe hurricane which might be expected in a two to three hundred year period of time.

23.

By 1972, just as the construction of the initial parts of the Lake Pontchartrain Project and flood walls along the IHNC was in the early stages, the 1959 SPH was known by the defendant to be obsolete. As of this time, the 1959 specification of maximum sustained wind speeds of 107 MPH had been increased by the National Weather Service to 129 MPH. An increase of twenty percent in maximum wind speed equates to a forty percent increase in maximum storm surge elevation.

24.

In 1979, the National Oceanic and Atmospheric Administration increased the maximum sustained winds for the SPH once again, this time to 140 MPH. This recognition of the risk of a "Category 4" hurricane even further exacerbated the design deficiency of the defendant's Lake Pontchartrain Project.

25.

In 1981, the office of the Chief of Engineers in Washington, D.C. issued Engineering Regulation [ER] 110-2-1453. Providing direction for the development of SPH criteria along the Gulf Coast, this regulation required that "[a]ll field operating activities having Civil Works responsibilities" be "required" to use specific and updated SPH meteorological criteria. The defendants Corps nonetheless failed and refused to consider any alteration of the Lake Pontchartrain Project on this basis, opting instead to continue basing its designs for the Project on the 1959 SPH, and not on the updated and more current meteorological criteria.

-7-

26.

In regard to the Lake Pontchartrain Project, the defendant Corps also referred to and utilized the National Geodetic Vertical Datum of 1929 ["NGVD29"], despite the fact that this datum no longer was equal to, or interchangeable with, true local mean sea level [LMSL] of the area meant to be protected by the Project.

27.

LMSL is the only relevant datum for superimposition of hurricane surge and wave height for a 1950's era oceanographic analysis. However, when the defendant adopted its design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 already was between 1.3 and 1.6 feet below the actual LMSL at different parts of the system to be protected, assuring that flood wall crowns based on NGVD29 would be constructed lower by this same margin.

28.

No provision was made to account for the three-to-four foot per century subsidence rates characteristic of the Greater New Orleans metropolitan area, even though this rate was known by the Corps at the time of the Congressional authorization of the Lake Pontchartrain Project. This meant that crown elevation deficiencies ranged up to six feet at the time Katrina struck, which in turn prolonged overtopping of a number of flood walls and levees that otherwise would have been overtopped only briefly, if at all, during Katrina's storm surge. This prolonged overtopping led to catastrophic breaches and water intrusion into the Greater New Orleans area.

-8-

**Unauthorized Change from Barrier Plan to High Level Plan**

29.

The original and only project design authorized by Congress in connection with the Lake Pontchartrain Project was known as the "Barrier Plan," which contemplated a series of levees along Lake Pontchartrain controlled structures including barriers and flood control gates at the Rigolets, the Chef Menteur Pass, and Seabrook at the northern end of the IHNC.  These structures were intended to prevent storm surges from entering Lake Pontchartrain, as well as the IHNC through MRGO's confluence with the GIWW, thus protecting citizens from the overtopping of levees along Lake Pontchartrain, the IHNC flood walls, and other areas.

30.

The Barrier Plan had been selected and authorized by Congress over an alternative design, known as the "High Level Plan."  The latter would have excluded the barriers and flood control gates discussed above, and instead employed higher levees and flood protection structures along the lakefront and other areas.  There were numerous and serious deficiencies and drawbacks known to be associated with the High Level Plan.

31.

The final design memoranda for the Barrier Plan were completed in the late 1960s, and construction commenced thereafter.  However, during the 1970s, the control complexes at the Rigolets and at Chef Menteur drew opposition from environmentalists, culminating in a 1977 Court decision that prevented the Corps from constructing the barrier complex in certain other parts of the plan until and unless a revised Environmental Impact Statement was accepted.

-9-

32.

The defendant did not produce a satisfactory Environmental Impact Statement, and decided in 1984 to abandon the Barrier Plan and implement the High Level Plan, notwithstanding the latter's flaws and deficiencies.

33.

The Corps knew that Congressional re-authorization was required for such a major change in the design of the Lake Pontchartrain Project, but implemented the change to the High Level Plan without seeking or obtaining the necessary re-authorization by Congress.

34.

By the mid-1980s, a dense network of single family residences abutted the various drainage canals in New Orleans, extending along their entire courses.  The encroachment of these homes adjacent to canal embankments, eliminated the possibility of using conventional methods to heighten canal levees, which usually is accomplished by adding compacted earth on the land-side of the levees. To achieve the Congressionally-mandated level of protection, the defendant therefore would have had to displace hundreds of residences, which would have been costly, time-consuming and controversial.

35.

The Corps accordingly proposed to provide protection from storm surge by placing flood gates and new pump stations at the end of these drainage canals.  No funds, Congressionally-

-10-

authorized or otherwise, were available for this purpose; and, in addition, local authorities objected to the installation of such flood gates or pumps for fear that the City could not be properly drained when the gates were closed in the event of a storm.

36.

The Corps therefore opted to provide "parallel protection," by raising the heights of the existing levels and sheet-pile flood walls along each side of the City's drainage canals in question.

**17th Street Canal**

37.

The 17th Street Canal was dug in the early 1850s through swampy ground to provide a right-of-way for a railway which connected the town of Carrollton with a shipping port on Lake Pontchartrain, in the area today known as "Bucktown."

38.

In 1958 a second canal was built, connecting the original canal to the river side of the Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th Street," and thus became known as the "17th Street Canal." The name eventually came to commonly refer to the original, large canal to which this spur canal connected.

39.

The community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, began more than a hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts; and the canal provided transportation as well as a harbor for fishing boats.

-11-

40.

More substantial development in this area occurred during the mid-19th century, with construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard), and at the terminus of the Jefferson and Lake Pontchartrain Railway (where Bucktown is today).

41.

Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats. In addition, the Louisiana Department of Wildlife & Fisheries permitted commercial fishing and crabbing activities along the entire length of the 17th Street Canal.

42.

The 17th Street Canal historically is, and at all times pertinent hereto has been, a navigable waterway of the United States, within the meaning of 33 C.F.R. §329.5. It was dredged and re-dredged during its historic use as such.

43.

On July 15, 1974, the Sewerage and Water Board of New Orleans ["S&WB"] initiated a project to improve drainage from the 17th Street Canal Drainage Basin. Initially, this project called for the dredging of 2.4 miles of the 17th Street Canal from Pump Station No. 6 to Lake Pontchartrain. The purpose of the dredging was to remove sediment from the canal bottom and reshape the canal cross-section both to improve flow characteristics and increase the pump capacity of Pump Station

No. 6.  The removal of approximately 85,000 cubic yards of bottom sediment was anticipated. Dredge material was to be deposited along the banks of Breakwater Drive and an area of the then-proposed Bucktown Dock Facility (West End Park).

44.

Dredging projects in navigable waters of the United States require a permit from the Department of the Army pursuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403).  Accordingly, on July 15, 1974, the S&WB filed an application for a "Permit to Discharge or Work in Navigable Waters and their Tributaries" with the Corps' New Orleans District.

45.

The Army Corps of Engineers, as a Department of the United States Army, has seven divisions in the United States, one of them being the Lower Mississippi River Valley Division. Each division is divided into districts.  The New Orleans District is a district of the Lower Mississippi Valley Division and it is divided into six technical divisions.  The technical divisions are: Real Estate, Contracting, Construction New Orleans/Lafayette, Engineering, Planning Program Project Management (PPPMD), and Operations.  The Operations division is responsible for navigation and the issuance of permits.  Issues regarding flood control come under the ambit of the Engineering division.  Thus, the issuance of the permit to dredge was the primary responsibility of the Operations division rather than the Engineering division which is responsible for flood control.

-13-

46.

The permit approval process required the S&WB to obtain approval from, among others, the Louisiana Department of Public Works. In August of 1974, this Department indicated that it could not complete a review of the permit because the applicant had no soil data substantiating the stability or integrity of the levees in question. On May 23, 1977, the Corps returned the application with no action because the S&WB failed to furnish information requested by, among others, the Louisiana Department of Public Works.

47.

In 1978, the S&WB retained the civil engineering firm, Modjeski & Matters, Inc. ["Modjeski"], to provide a plan for the design an implementation of the dredging project, and, on August 23, 1979, Modjeski submitted a second dredging permit application on behalf of the S&WB.

48.

The same application was resubmitted on December 29, 1980 after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

49.

On January 28, 1981, Modjeski, in response to inquiries about the impact of the dredging on existing levees, provided the Corps with its first memorandum addressing the stability of the existing levees and sheet pile wall along the canal. The memo indicated that on three of the six test locations, the factors of safety fell below the required values set by the Corps.

-14-

50.

On February 6, 1981, Modjeski provided the Corps with a stability analysis of the existing sheet pile wall along the east side of the canal north of Hammond Highway.  This report stated that portions of the canal's flood wall were "extremely unstable," due (among other things) to "very soft" supporting soil.

51.

On March 5, 1981, the Corps' Engineering Division issued an internal memorandum addressing the soil stability analyses provided by Modjeski.  Item No. 4 of the defendant's memorandum acknowledged that "factors of safety" were "substantially below the minimum...factor of safety" for such a flood wall.

52.

On March 31, 1981, the Corps held a public hearing regarding the dredging permit application.  Modjeski's consulting engineer voiced his concerns at this hearing about widening the 17th Street Canal, stating that its levees already were in violation of the Corps' engineering standards for levee stability and that attempts to dig away more dirt adjacent to the levees would only worsen the stability problem.

53.

On April 20, 1981, in response to the concerns that the dredging would negatively impact the existing levee, Modjeski submitted on behalf of the S&WB another dredging permit application

-15-

under the Rivers and Harbors Act.  This application specified a preliminary plan to install sheet pile

walls with concrete caps for the entire length of the project, preceding excavation of the canal.  The

sheet pile walls were to be of a sufficient height to meet flood protection criteria.

54.

Following review of the above application, an internal Corps memorandum dated June 16,

1981 indicated that a number of levee and flood wall stability problems were likely if the S&WB

plan were implemented.

55.

In addition to their own efforts, Modjeski hired Eustis Engineering Company ("Eustis") to

assist with the subsoil investigation at the 17th Street Canal.  On October 27, 1981, Eustis submitted

its first report, entitled "Subsoil Investigation—S&WB of New Orleans—Metairie Relief Canal."

Eustis reported therein that the natural ground surface of this canal's levee system consists primarily

of extremely soft to medium soft organic clay, humus and wood, all continuing to elevations between

7 C.D. (Cairo Datum) and 3.5 C.D.

56.

An internal memorandum from the Corps' Engineering Division to the Corps' Operations

Division dated February 12, 1982, noted the existence of a stability problem between station 625+00

and station 670+00 where excavation of the canal will directly tap the sands underlying the levee.

The memo suggested that a stability analysis be done for the landside of the canal incorporating

-16-

effects of seepage to determine what corrective action is needed.  In fact, sands underlay the entire 2.4 miles of the 17th Street Canal from Pumping Station No. 6 to Lake Pontchartrain, such that the stability problem here noted by the Corps itself was not confined to any one section of the canal.

57.

On May 9, 1983, Modjeski submitted a new permit application for the 17th Street Drainage Canal Improvement Project.  This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project, with the project limits being Pump Station No. 6 on the south, and 370.0 north of the Bucktown Pedestrian Bridge.  The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

58.

On July 27, 1983, Eutis submitted a revised soil stability report that confirmed the potential for a blow-out at the landside "toe" of the levee, extending the area of concern from station 617 to the pumping station due to hydrostatic uplift pressure in the underlying stratum.

59.

On June 13, 1984, the Army Corps nonetheless issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge."  This permit was issued in spite of the fact that prior analysis, and the Corps' own internal engineering procedure and good engineering practices, mandated that a permit allowing the canal bottom to be below the sheet pile tips, created a clear risk of flood wall failure.

-17-

60.

The "Statement of Findnigs" announced with the permit confirmed that factors considered

in issuing the permit included, *inter alia*:

> "navigation, present and prospective; flood heights flood plain use;
> other public interests."

61.

An extension of the 1984 permit was applied for on February 4, 1987 and granted by the

Corps on February 20, 1987.  On April 24, 1987 the Corps created a drawing showing a sheet pile

design which located the sheet pile tips 16 feet lower than the bottom of the canal.  While the

Operations Division was working on the S&WB permit, therefore, the Engineering Division was

working on a flood wall design that would incorporate sheet piles being positioned to account for

the dredging project.

62.

In connection with the consideration of using the sheet piles as the base of a flood wall, on

December 23, 1987, the Corps' Mississippi River Commission in Vicksburg issued a memorandum

to the Commander of the Corps' New Orleans District relative to sheet pile wall design criteria.  This

memorandum summarized the results of the Corps' "E-99 Sheet Pile Wall Load Test Report."

63.

The "E-99 Sheet Pilc Wall Load Test" was a full-scale instrumental lateral load test of a 200-

foot long sheet pile wall conducted by the Corps in the Atchafalaya basin in 1985.  This location in

the Atchafalaya basin was chosen because of the close correlation of its soil conditions with those

-18-

in the New Orleans area. Test data from the sheet pile wall and adjacent supporting soils indicated a gapping behavior (separation of the steel sheet piles from the soils) exactly like that which occurred during Hurricane Katrina. From the E-99 sheet pile test the Corps learned, among other things, that there was potential soil separation from the sheet piles (allowing water to penetrate below the ground surface between the piles and the soils) and that the calculated safety factor was not reached. The Corps failed to take into consideration the fact that the fundamental purpose of sheet piles is to prevent water seepage. They incorrectly focused on whether the sheet piles could support a concrete wall.

64.

All of the information about bad soils and the potential for water seepage was completely ignored in connection with the design of the flood walls contemplated to be built on the previously permitted sheet pile wall.

65.

On August 31, 1988, Eustis provided another geo-technical report containing the results of revised cantilever flood walls analyses and revised slope stability analyses for the proposed modifications along the Orleans side of the 17th Street Drainage Canal between Stations 553+70 and 670+00, the reach where the breach of the canal wall would later occur. The recommended tip depth of the sheet pile wall (already permitted to be higher than the canal bottom) was 12.8 feet, a full five feet above the canal bottom.

-19-

66.

The dredging activity conducted in the 17th Street Canal pursuant to the S&WB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. These barges constituted vessels in navigation for the time period during which the dredging occurred.

67.

The flood walls constructed for the 17th Street Canal in connection with the foregoing, were "I-walls," based on a design memorandum for such walls provided by the Corps.  The alternative design was "T-walls," which would have provided far greater reliability and stability, especially in soft soil.

68.

The defendant's *Manual on Engineering, Design and Construction of Levees* dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is the proper design when walls higher than seven feet are required.

69.

The I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground.  The design consists of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling.  Concrete is then poured to encapsulate the top of the piling and form the wall.  The wall is composed of individual concrete slab

-20-

sections (monoliths) that are linked together by rubbery gaskets which allow the monoliths to expand and contract.

70.

As stated herein, extensive analysis of the 17th Street Canal soils had been performed since the early 1980s by Modjeski and Eustis.  The analysis utilized soil borings taken along the canal's levee.  The borings revealed alternating layers of soft clay and black humus or peat, a soft, spongy soil comprised of decaying trees and other organic material, occurring from fifteen to twenty-one feet below sea level.  The layer or humus or peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from flood water.

71.

Despite the discovery of such soil composition, the flood walls of the 17th Street Canal levee were constructed with steel sheet piling driven to a depth that was seventeen (17) feet below sea level.  At such depths, the bottom of the sheet pilings terminated above or within the layers of weak soil.  Moreover, the sheet pilings' bottoms terminated at a depth higher than the deepest point of the canal bottom, despite the above recommendations to the contrary.

72.

The soil adjacent to the 17th Street Canal levee had subsided significantly after construction of the levee and flood wall, thereby significantly reducing the amount of support that the land behind the levee provided against the pressure of flood waters.  Additionally, soil studies performed for the construction of the flood walls failed to account for the possible weakening of the soil associated

-21-

with the subsidence of land alongside the levee, the soft soils at the base of the levee, and/or soil that would be weakened if flood waters pushed through the subterranean levels under the levee and flood wall.

73.

In 1993, Pittman Construction Co. was retained for the construction of the monoliths atop the sheet pile wall along the 17th Street Canal. During the construction of the monoliths, Pittman reported to the Corps that it was encountering major problems in that the sheet pile walls with the monoliths installed on top were beginning to lean towards the canal side because the supporting soil foundation was of insufficient strength, rigidity and stability.

74.

Despite these concerns and problems, the construction of the I-walls was allowed to proceed, and was completed prior to the events giving rise to this litigation. Pittman Construction was allowed and directed by the Corps to build and place concrete flood walls on top of sheet piling driven into unstable soil beneath the sheet piling. The unsafe soil conditions were either discovered or discoverable by the defendant Corps at the time of this activity.

75.

Upon information and belief, canal water was found in the yards of homes adjacent to the 17th Street Canal prior to Katrina. The pre-storm presence of canal water in adjacent yards was an indicator of canal water under-seepage due to the flawed design and construction of flood walls, a manifest risk which defendant continually failed to acknowledge or address.

-22-