## The London Canal and The Orleans Avenue Canal

76.

The London Avenue Canal was constructed in the first half of the 19th century, through an area that was mostly swampland, and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.* it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans, and provided for swamp drainage.

77.

A major project of upgrading the flood walls and bridges along the London Avenue Canal began in the early 1980s.

78.

The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design, consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops), intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

79.

The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend. The sands are encountered about 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity of the northern breach (stations 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

-23-

80.

Of primary importance in constructing an I-wall atop an earthen levee are the composition of the soil into which the sheet piles will be driven and upon which the I-wall will rest, and the depth of the sheet piles as dictated by the composition of the soil.

81.

Soil borings of the levee at the site of London Avenue Canal south breach indicate the presence of sand at a depth of 10 to 15 feet below sea level.

82.

Soil borings of the levee at the site of London Avenue Canal north breach indicate conditions similar to those of the south breach site, with the layer of sand present at the north breach side at a depth of 12 feet below sea level, as well as a layer of peat, a highly porous material that shrinks when dry and expands when wet, and makes for highly unstable soil conditions.

83.

The sheet piles supporting the flood wall monoliths at the site of the London Avenue Canal south breach were driven to a depth of 14 feet below sea level.  Thus, the bottom of the sheet piles terminated within a layer of sand.

84.

The flood walls along the London Avenue Canal are constructed with an "I-wall" design. The defendant's *Manual on Engineering, Design and Construction of Levees* dated April 30, 2000

-24-

states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

85.

The I-walls at both breach sites on the London Avenue Canal have concrete sections that rise to eleven (11) feet above ground surface.

86.

The Orleans Avenue Canal is a canal in Orleans Parish connected on its north end to Lake Pontchartrain and with the S&WB's Pumping Station No. 7 on its south end.

87.

The flood walls system along the Orleans Canal designed and constructed by the Corps ended abruptly 200 feet away from the pumping station. The height of the area within the gap was 6 feet lower than the top of the floodwalls protection system. As a result, there was no flood protection provided due to the 200 foot long gap that was 6 feet lower than the nearby flood walls. A small gap existed on the opposite side of the canal as well.

## IV.  ALLEGATIONS OF LEGAL FAULT

### Faulty Design and Construction of the MRGO

88.

Through the legal fault of the defendant, Katrina's storm surge came through the Gulf of Mexico and into and through the MRGO, converging with a storm surge originating from Lake Borgne to the east, coming through the GIWW, causing and creating a combined surge which then

-25-

was funneled into the combined section of the MRGO and the GIWW (referred to as "Reach 1" of the MRGO).

89.

This inundated the City of New Orleans from the east by overwhelming levees and flood walls and spoil banks that had already been negligently designed, constructed, maintained, inspected, and/or operated by the defendant.

90.

Additionally, through the legal fault of the defendant, Katrina's surge rushed unhindered through the Rigolets and Chef Menteur passes into Lake Pontchartrain, there being no barriers of wetlands to prevent same because of the erosive effects of the MRGO. This inundated the City of New Orleans from the north by breaching levees, flood walls and/or spoil banks which previously have been negligently designed, constructed, and maintained by defendant.

91.

The Corps' negligence and/or fault in designing, engineering, inspecting and/or constructing MRGO, included, without limitation:

    a.    failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish;

    b.    failing to "armor" levees on both banks of the MRGO; and

    c.    failing to recognize that the construction of the MRGO, as well as subsequent salt

-26-

water intrusion and accelerated erosion, would result in the devastation of the wetlands, forests, and land masses thus denuding and destroying a critical natural buffer against storm surge, and thereby further exacerbating the funnel effect created by the MRGO's design.

## Negligent Operation and Maintenance of the MRGO

92.

The Corps is responsible for the operation and maintenance of the MRGO. This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt. The Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MRGO would ameliorate the "funneling effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in the New Orleans Metropolitan area during hurricanes. Notwithstanding that dredging is a critical safety requirement for the MRGO, the Corps negligently failed to maintain the MRGO and failed to properly dredge the canal. While the negligent design of the MRGO caused destruction of the surrounding wetlands, the Corps' ongoing negligent maintenance of the MRGO, further exacerbated it. The loss of thousands of acres of marshlands due to the MRGO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' and class members respective properties.

93.

The banks of the MRGO and, especially the northeast shore juncture of the MRGO and the GIWW are particularly susceptible to erosion induced by saltwater intrusion and the force of waves

-27-

from passing vessels.  The Corps was negligent in filing to provide bank stabilization measures, as well as in allowing the saltwater intrusion which degraded the wetlands adjacent to MRGO.

## Illegal Failure of Corps to Coordinate with the State of Louisiana

94.

The Corps designed, constructed, operated, and maintained the MRGO according to faulty plans and specifications in violation of the Rivers and Harbors Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945) ("MRGO Planning Law") which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the Governor's designee), as an "affected state" in investigation and planning.  Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ("DOI").  The Corps failed to coordinate with and involve the Governor and the DOI, and thus violated its duties and obligations established under the MRGO Planning Law as well as the FWCA, *infra*.

## Violation of Fish and Wildlife Coordination Act of 1934, as Amended - Failure to Coordinate with Louisiana Department of Interior and to Perform Required Study

95.

The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. §662, as amended in 1946 and 1958, also required coordination between any federal agency, proposing to "impound," "divert," or "control" a waterway or body of water, and the Fish and Wildlife Service.  The MRGO is such a waterway.  The FWCA statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MRGO project, including investigation, planning and construction.  The Corps was also directed therein to incorporate any of the observations or concerns

-28-

raised by these state and federal agencies into any plans and specifications for the design and construction of the MRGO.  The Corps failed in its duties under said laws.  In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study, would be a prerequisite to predictions of the MRGO's effects and establishment of mitigatory measures.  1958 Interior Report at 19-20.  A four year regime of testing and study to assess the impact of the MRGO was recommended.  The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MRGO without waiting for the completion of the essential four year study requred by the DOI.  The Corps knew or should have known that construction of the MRGO through the wetlands from the GIWW to the Gulf would devastate Louisiana and wetlands and result in the negligent, reckless, wanton, or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal surges.

### Failure of the Corps to Follow MRGO 1951 Authorization Report

96.

On September 25, 1951, the Corps submitted a report to Congress with its recommendations for construction of the MRGO ("MRGO Authorization Report").  This report contained a letter from the former Corps Chief of Engineers stating that the proposed MRGO would be connected to the IHNC by its own *separate* canal running parallel to the GIWW.  MRGO Authorization Report at 5.  However, as built, such a separate parallel canal was not built and, instead, the Corps unilaterally deviated from the MRGO Authorization Report and did not dig a separate parallel canal to the

-29-

IHNC. Rather the Corps connected the MRGO into the existing GIWW and significantly increased hydrologic consequences that were a proximate cause of the flooding of the New Orleans Metro Area.

### Failure of Corps to do Studies Recommended by its own Board of Engineers

97.

The MRGO Authorization Report further included a report from the Corps' Board of Engineers recommending further studies into the MRGO's impact on the Louisiana coast and opined: "(t)he exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board.  Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available."  MRGO Authorization Report at 14.  No such studies were done and, thus, the Corps did not consider alternatives that would be less destructive to the lands and wetlands of Louisiana; such negligent, reckless, wanton or illegal acts or omissions were a proximate cause of the damages sustained by the Class Representatives and the class they putatively represent.

### Other Regulatory Violations by Corps

98.

The Corps further failed to follow requirements of 33 CFR §§337.5 and 338.2.  Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by 33 CFR §337.2) including those contained in Chapter 7, Sections 701 and 707 of the Louisiana

-30-

Administrative Code relating to dredging activities. In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance, and operation of the MRGO, including the National Environmental Policy Act (NEPA), 42 U.S.C. §4332(c); the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. §1452, *et seq.* and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et seq.* Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil including, but not limited to, negligent and illegal placement of said spoil as spoil banks.

### Illegal and/or Negligent Failure of Corps to Follow
### Authorized Design, Route, and Alignment

99.

After hearings, Congress authorized the construction of the MRGO in 1956 (P.L.-455) and the record thereof that the Corps unlawfully did not follow the Congressionally authorized design, route, or alignment, and it did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate what would prove to be disastrous hydrologic consequences to the New Orleans Metro Area.

**Failure of Corps to Heed Multiple Warnings of Impending Disaster**

100.

After the hurricane of 1947 and Hurricane Betsy in 1965, the Corps knew or reasonably should have known of the hazards posed by the MRGO and the effects of its negligent design, construction, operation and maintenance.  Additionally, the Corps knew or reasonably should have known of the high probability of future damages likely to result from the inundation of the Greater New Orleans.  In recognition of the probability of future damage to the New Orleans Metropolitan area as a consequence of the MRGO project, the Corps illegally and/or negligently (or though gross negligence, wanton and/or reckless acts and/or omissions) failed to close the MRGO, construct Control Structures, and/or constructed levees, floodwalls, and other structures in a defective, negligent, substandard fashion; such "levee" allegations are detailed separately herein.

101.

Virtually from the inception of the planning and construction of the MRGO, the Corps received numerous warnings of the eventual disaster that would occur as a result of the negligent design, construction, operation, and maintenance of the MRGO, and the Corps' failure to take appropriate steps to prevent or reduce the impending inundation of the New Orleans Metro Area.  Such warnings were voiced by private citizens, scholars, scientists, engineers, journalists, municipal and Parish governments, and the State of Louisiana.  Such warnings repeatedly put the Corps on notice of massive destruction to marshes, wetlands and other land and forest areas — all resulting from the negligent and/or faulty inspection, design, construction, operation, and maintenance of MRGO.

-32-

102.

Certain levees and flood walls along the GIWW, IHNC, and MRGO were damaged due to the potentiating effect of the storm surge which was improperly channeled and exacerbated by the MRGO.

103.

Additionally, the MRGO through salt water intrusion and other factors impaired and/or destroyed natural wetland and other barrier protection for the citizens of the Greater New Orleans area in the event of a hurricane and storm surge.  The defendant Corps negligently failed to fulfill its obligation to design, construct, operate, maintain and properly repair the MRGO in such a way as to avoid having it posed as a threat to named plaintiffs in the event of a natural event such as Hurricane Katrina.

### Negligence in Regard to the IHNC

104.

The defendant contracted with Washington Group International, Inc. ["Washington Group"] to enlarge and deepen the locks of the IHNC, which included the removal of industrial sites along the Industrial Canal and the clearing of acreage to make way for the digging of a new canal to accommodate a new system of larger locks.

105.

This work, conducted under the authority and direction of the Corps, included the removal of salvage, debris and other materials from the IHNC and/or its banks.

-33-

106.

In the performance of this work, the integrity of the levee and/or flood walls along the eastern shore of the IHNC was undermined; and, in particular, there was under seepage-induced erosion and other damage to the levee and flood walls of the IHNC.

107.

The defendant Corps, consisted among other things, negligently:

a.     allowed the work of Washington Group to proceed without appropriate correction against the risks entailed;

b.     failed to caution the Washington Group about the potential damage to the IHNC levee and/or flood wall system;

c.     failed to monitor and/or properly inspect the work of Washington Group;

d.     failed to adequately evaluate the potential damage to the levee and/or flood wall structure of the work being done by Washington Group;

e.     failed to correct damage caused by the actions of Washington Group, when such damage was known or recently discoverable by the Corps; and

f.     failed to discharge its duty to maintain the integrity of the levee and flood wall system of the IHNC throughout the work being done by Washington Group.

## Negligence in Regard to the Failures and Deficiencies
## of the Lake Pontchartrain Project

108.

As Katrina's storm surge increased in intensity, water levels within the MRGO, the GIWW, and the IHNC began to rise, and certain levees and flood walls collapsed or otherwise were compromised or overtopped.  This was due to construction by the Corps with porous, erodible fill material not suitable for levee construction, together with the use of inadequately-designed levee and flood wall elevations.

109.

Pursuant to the factual allegations set forth *supra*, the defendant negligently failed to implement updated criteria and utilize applicable data to assure the Congressionally-mandated protection against flooding contemplated by the Lake Pontchartrain Project.

110.

The Corps negligently failed to adhere to the direction provided by ER 1110-2-14543, by failing, among other things, to consider needed alterations to the Lake Pontchartrain Project to maintain the intended protection of citizens from flooding due to predictable weather and storm surge conditions.

111.

The defendant negligently ignored the direction to revise its SPH-based analysis to reflect a new understanding of the threat of storm surge in the area meant to be protected by the Lake Pontchartrain Project, electing instead to base its design for the Project on outdated data (the 1959

-35-

SPH).  The Court negligently applied NGVD29 in its design criteria for the Lake Pontchartrain Project, despite its awareness that the reference no longer was equal to, or interchangeable with, local mean sea level (LMSL).

112.

These design flaws adopted by the defendant and continued as a reference at the time of Katrina, assured that various flood walls protecting the citizens who were meant to be protected by the Project, necessarily were lower than was safe and proper.

113.

The Corps was negligent in abandoning the Congressionally-authorized Barrier Plan for a High Level Plan, known to be deficient in many respects which caused or contributed to the flooding associated with Katrina.

114.

The flood walls, levees and other structures constituting the Lake Pontchartrain Project failed to protect named plaintiffs because of negligent design, construction, engineering, maintenance, and/or inspection by the defendant Corps, and/or those acting on its behalf.

115.

More than forty years after authorization, the Lake Pontchartrain Project remains incomplete. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, and/or wantonly or recklessly postponed while the original project remained incomplete and continued to fall further behind schedule.  The Corps' design assumptions and policy negligently made in 1965 continue to

-36-

diminish the Lake Pontchartrain Project today, and were a proximate cause of the innundation of the Greater New Orleans area.

## Negligent Abandonment of the Barrier Plan

116.

Flood walls on the east side of the 17th Street Canal, on both sides of the London Avenue Canal, failed catastrophically after Katrina made landfall due to the Corps' unauthorized, negligent, grossly negligent, wanton and/or reckless, and unilateral decision to abandon the Congressionally-authorized Barrier Plan and opt instead for the unauthorized parallel protection utilizing an I-wall design.

117.

The Corps knew or reasonably should have known that the Barrier Plan would have prevented large amounts of Katrina's surge from entering Lake Pontchartrain, reducing the surge level in Lake Pontchartrain by more than 3 feet, and thus preventing any flood walls from failing along the 17th Street and London Avenue Canals.

118.

The Corps knew or reasonably should have known that the design and construction of I-walls with particularly short sheet pile depths was impracticable, unsafe, and subject to overflow and damage, putting plaintiffs' safety and property at risk.

119.

None of the projects constructed as part of the High Level Plan were ever authorized by Congress. Thus, the High Level Plan is not a Congressionally-authorized federal flood control

-37-

project, and, as such, the Flood Control Act of 1928 and the immunity afforded by Section 702c is inapplicable.

120.

Alternatively, if the Flood Control Act of 1928 is applicable, the immunity afforded by Section 702c is not, because the Corps breached its affirmative duty to institute proceedings to acquire either the absolute ownership of the lands adjacent to the canal which was subject to overflow and damage, or to acquire the floodage rights over such lands, all as required by the Act.

## Negligent Design of Flood Walls for the 17th Street and London Canals

121.

Pursuant to the factual allegations, *supra*, the defendant Corps negligently adopted and implemented an I-wall instead of a T-wall design for both the 17th Street and London Avenue Canals.

122.

Pursuant to the factual allegations, *supra*, the defendant also negligently ignored soil analysis and testing data, and otherwise failed to consider soil-related issues, which exacerbated the safety risks of flood wall stability and under seepage in the 17th Street and London Avenue Canals.

## Negligent Allowance of 17th Street Canal Dredging

123.

Only the defendant had authority to issue a dredging permit for the 17th Street Canal, and the River and Harbors Act of 1899 (33 U.S.C. §403) prohibits the Corps from granting a dredging permit that is contrary to the public interest.

-38-

124.

Title 33 C.F.R. §320.4 establishes general policies for evaluation of permit applications. That policy requires that the benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. Among the factors required to be considered is the effect on flood control. The Corps violated this policy by failing to consider the impact of the approval of the dredging permit on flood control. If the Corps claims it did consider the impact on flood control, it did so with reckless disregard of overwhelming evidence that the permit approval would, in fact, jeopardize the flood protection structures of the 17th Street Canal.

125.

The Corps failed to exercise due care in its evaluation of the dredging permit as evidenced by its failure to employ its own engineering guidelines and general engineering guidelines in considering the impact of the application on the public interest, including flood protection.

126.

The Corps breached its duty by negligently issuing a permit which allowed changes to the canal bottom, resulting in subsurface soil destabilization of the levee.

127.

The failure of the 17th Street Drainage Canal sheet pile retaining wall and the resulting inundation of the New Orleans Metropolitan Area was directly and proximately caused by the Corps' negligence and approval of the S&WB's proposed dredging of the 17th Street Drainage Canal and its improvements.

-39-

128.

The permitting of the dredging and attendant construction of the 17th Street Drainage Canal Improvement Project was a substantial contributing factor to the failure of the 17th Street Drainage Canal sheet pile retaining wall, and the resulting inundation of the New Orleans Metropolitan Area.

129.

Pursuant to the federal maritime and admiralty statutes, the Corps is liable or is responsible to plaintiffs for money damages for its negligence in permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

130.

In addition or in the alternative, the United States is liable pursuant to the FTCA, for money damages for its negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

131.

The activities for which the Corps of Engineers issued a permit did not involve any activities as part of a federally authorized and funded flood control project.

132.

The United States is not immune from civil liability for its negligence under the Flood Control Act, as amended, 33 U.S.C. §702(c), because the actions of the Corps of Engineers in issuing the dredging permit were wholly unrelated to any federally authorized and funded flood control project.

-40-

133.

The Corps had no discretion to permit the dredging and construction associated with the 17th Street Drainage Canal Improvement Project because the approved work damaged the public interest by undermining existing flood protection.

**<u>Liability Under Article 2317, La. Civ. Code</u>**

134.

The defendant Corps had custody, control and/or *guarde* of one or more things posing unreasonable risks of harm to named plaintiffs, and specifically risks of which the defendant had notice and/or should have been aware, which things consisted of the MRGO, the GIWW, the IHNC, the 17th Street Canal, the London Avenue Canal and the Orleans Canal, thus imposing liability under Article 2317 of the Louisiana Civil Code with respect to the failures and harm resulting from the condition of these waterways.

**<u>Liability Under Article 667, La. Civ. Code</u>**

135.

The defendant, as the proprietor of the MRGO, had a duty under Louisiana Civil Code Article 667 to refrain from creating a nuisance with respect to property owners affected by the failures of the 17th Street, London Avenue, and Orleans Canal levee/flood wall systems.

136.

The defendant, as the designer, builder and owner of the 17th Street, London Avenue and Orleans Canals, also had a duty under federal common law avoid creating a hazardous condition that

-41-

harms, and threatens to harm, the lives and property of named plaintiffs in the event of a hurricane or a hurricane storm surge, based on the conditions associated with these canals.

137.

The Corps wrongly has deprived, and still threatens to deprive, the named plaintiff of its property in the event of hurricanes and hurricane storm surges, by creating hazardous conditions associated with the MRGO as well as the outfall canals referenced in this Complaint.

## V.  RES IPSA LOQUITUR AND NEGLIGENCE PER SE

138.

Named plaintiff expressly plead and invoke the doctrine of *res ipsa loquitur* against the defendant Corps, inasmuch as that doctrine may be found applicable by the Court.

139.

Plaintiff is within the category of citizens meant to be protected against flooding by one or more regulatory and statutory provisions violated herein by the Corps.  Hence, the doctrine of negligence *per se* is expressly invoked by plaintiff.

## VI.  DAMAGES AND PRAYER FOR RELIEF

140.

In one or more respects, but in any case as a direct and proximate result, of the legal fault of the defendant as set forth above, plaintiffs have suffered legal harm and sustained recoverable damages.

-42-

141.

The damages suffered by plaintiffs, recoverable from the defendant Corps based upon its legal fault, include the following:

a.  the destruction or impairment of property (real and personal, movable and immovable), and the loss of use of same;

b.  the diminution of property values;

c.  the cost of repair and restoration of property;

d.  increased living expenses and other costs associated with the evacuation and displacement; and

e.  the loss of income and/or diminished economic opportunity.

Plaintiffs contend damages are in excess of $1,000,000.00 for the interruption of business, a thriving law practice.

142.

Plaintiffs also seek injunctive relief as necessary to assure legally-warranted hurricane protection safety and/or to restore the pre-Katrina enjoyment of life in the community to which plaintiffs belong, which safety and quality of life both have been impaired, and remain threatened, due to defendant's fault.

**WHEREFORE**, plaintiffs pray that, after due proceedings, there be a judgment and/or judgments entered in their favor and against the defendant Corps, for all compensatory damages

-43-

found reasonable in the premises, for all costs and disbursements of these proceedings, and for any

and all injunctive, declaratory and/or equitable relief which the Court may deem fit.

Respectfully Submitted,

**BEAHM & GREEN**

Franklin D. Beahm (LBA  No. 2874)
Marcus A. Green (LBA No. 28921)
A. Rebecca Wilmore (LBA No. 29244)
145 Robert E. Lee Boulevard, Suite 408
New Orleans, LA 70124-2552
Telephone: (504) 288-2000
Facsimile: (504) 288-2099

**PLEASE SERVE**:
The U.S. Corp. Of Engineers
P.O. Box 60267 **[7400 Leake Ave.]**
New Orleans, LA 70160-0267 **[70118]**

-44-