# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO.: 05-4182

SECTION "K" (2)

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1185,
06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286, 07-1288, 07-1289

PERTAINS TO: LEVEE

## JOINT MEMORANDUM IN OPPOSITION
## TO AMENDED MOTION FOR CLASS CERTIFICATION

The Levee defendants[1], Orleans Levee District ("OLD"), Sewerage & Water Board of

New Orleans ("S&WB"), East Jefferson Levee District ("EJLD"), and Board of Commissioners

of the Port of New Orleans ("PNO"), submit this Joint Memorandum in Opposition to the

Plaintiffs' Amended Motion for Class Certification.

---

[1]   The United States Army Corps of Engineers is submitting a separate brief.

INDEX

I.   EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Plaintiffs' Damages Were Not Caused By a Single Event . . . . . . . . . . . . . . . . . 1

    B.   Plaintiffs' Trial Plan Violates the 7th Amendment . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Individual Causation and Damages Issues Predominate . . . . . . . . . . . . . . . . . . . 3

    D.   Class Action Proceeding is not Superior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E.   Named Plaintiffs are not "Typical" or "Adequate" . . . . . . . . . . . . . . . . . . . . . . . 4

II.  OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   The Class Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   The Storm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.   The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. ARGUMENT - CLASS ACTION PROCEEDINGS ARE INAPPROPRIATE . . . . . . . 20

    A.   Not a "Single Event" Mass Tort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.   Multiple Flood Water Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.   Multiple Potentially Responsible Entities . . . . . . . . . . . . . . . . . . . . . . . . 23

        3.   Multiple Theories of Recovery and Defenses . . . . . . . . . . . . . . . . . . . . . 23

        4.   Multiple Combinations of Flood Waters by Source . . . . . . . . . . . . . . . . 24

    B.   Impermissible Phasing of Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.   The Trial Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            a.   "General Causation" of the Breaches Does Not Prove
                Causation of Injury to any Class Member . . . . . . . . . . . . . . . . . 28

            b.   The Models Do Not Predict Property Damage . . . . . . . . . . . . . 29

i

2. Unconstitutional Trial Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C. Individualized Issues Predominate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

 1. "Common Liability Issues" Are Not Common . . . . . . . . . . . . . . . . . . . . 35

  a. Plaintiffs' "Common Issues" . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   i. Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   ii. Flooding Dynamics . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   iii. Diminution of Property Values . . . . . . . . . . . . . . . . . . . . 38

 2. Issues Requiring Individualized Proof Predominate . . . . . . . . . . . . . . . 41

D. Class Action Proceeding Is Not Superior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

 1. Individualized Issues and Reevaluation of Fault . . . . . . . . . . . . . . . . . . . 42

 2. Other Superiority Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  a. Class Member Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  b. Other Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

  c. Concentration of Litigation in Forum . . . . . . . . . . . . . . . . . . . . 44

  d. Manageability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

E. Rule 23(a)  Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 1. 23(a)(1) - Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 2. 23(a)(2) - Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 3. 23(a)(3) - Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  a. Not "Representative" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  b. No Incentive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    4.    23(a)(4) - Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        a.    Not Knowledgeable or Directing the Litigation  . . . . . . . . . . . . 48

        b.    Will Not Represent Interests of Absentees  . . . . . . . . . . . . . . . . 49

        c.    Antagonism  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

F.    Class Members not "Clearly Ascertainable" . . . . . . . . . . . . . . . . . . . . . . . . 51

IV.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

V.    APPENDIX

    A.    Hurricane Katrina Flooding Cases filed against OLD

    B.    Hurricane Katrina Flooding Cases filed against EJLD

    C.    Hurricane Katrina Flooding Cases filed against S&WB

TABLE OF AUTHORITIES

FEDERAL CASES

*In Re: Abbott Laboratories*,
  51 F.3d 524 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Allapattah Services, Inc. v. Exxon Corp.*,
  188 F.R.D. 667 (S.D. Fla. Aug. 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 26, 41, 42, 43

*Amchem Products. Inc. v. Windsor*,
  521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48, 49

*Bradley v. Nationwide Mutual Ins. Co.*,
  2006 WL 2594548 (S.D. Miss. Sept. 6, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Castano v. American Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) . . . . . . . . . . . . . . . . . 2, 3, 4, 21, 26, 33, 34, 35, 43, 44

*Cimino v. Raymark Indus., Inc.*,
  151 F.3d 297 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Comer v. Nationwide Mut. Ins. Co.*,
  2006 WL 1066645 (S.D. Miss. Feb. 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Debremaecker v. Short*,
  433 F.2d 733 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Fisher v. Ciba Specialty Chemicals Corp.*,
  238 F.R.D. 273 (S.D. Ala. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 41

*In Re: Ford Motor Company Vehicle Paint Litigation*,
  182 F.R.D. 214 (E.D. La. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Guice v. State Farm Fire & Cas. Co.*,
  2007 WL 912120 (S.D. Miss. March 22, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

iv

*Horton v. Goose Creek Independent School Dist.,*
      690 F.2d 470 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In Re: Initial Public Offerings Securities Litigation,*
      471 F.3d 24 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Jenkins v. Raymark Industries, Inc.,*
      782 F.2d 468, 472 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Labauve v. Olin Corp.,*
      231 F.R.D. 623 (S.D. Ala. Nov. 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lewis v. Timco, Inc.,*
      716 F.2d 1425 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 29, 37, 38

*Lifemark Hospitals, Inc. v. Jones, Walker,*
      1999 WL 33579254 (E.D. La. June 4, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lightbourn v. County of El Paso,*
      118 F.3d 421 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In Re: Matter of American Commercial Lines, L.L.C.,*
      2002 WL 1066743 (E.D. La. May 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37

*Mullen v. Treasure Chest Casino,*
      186 F.3d 620 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Neely v. Ethicon,*
      2001 WL 1090204 (E.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37

*In Re: Propulsid Products Liability Litigation,*
      208 F.R.D. 133 (E.D. La. June 4, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In Matter of Rhone Poulenc Rorer, Inc.,*
      51 F.3d 1293 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rohr v. Metropolitan Ins. & Cas. Co.,*
      2007 WL 163037  (E.D. La. Jan. 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rutherford v. City of Cleveland,*
      137 F.3d 905 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 51

*Sprague v. General Motors Corp.*,
 133 F.3d 388 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 32, 35, 45

*Steering Committee v. Exxon Mobil Corp.*,
 461 F.2d 598 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 26, 34, 41, 46

*Stirman v. Exxon Exploration*,
 280 F.3d 554 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Turner v. Murphy Oil USA, Inc.*,
 234 F.R.D. 597 (E.D. La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 38, 40

*Unger v. Amedisys, Inc.*,
 401 F.3d 316 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 48

*In Re: Visa Check/Master Money Antitrust Litig.*,
 280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In Re: Vioxx Products Liability Litigation*,
 239 F.R.D. 450 (E.D. La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 46

*Watson v. Shell Oil*,
 979 F.2d 1014 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

## STATE CASES

*Dabog v. Deris*,
 625 So.2d 492 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## STATUTES

28 USCA 2402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 USCA 2675(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

La. Civ. Code Arts. 2323 and 2324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26, 40

Rule 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rule 23(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

vi

Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 21, 26, 34, 35, 52

Rule 23(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

## I.      EXECUTIVE SUMMARY

Class certification is inappropriate because:

### A.      Plaintiffs' Damages Were Not Caused By a Single Event

The plaintiffs' conclusory statement that the litigation arises out of "a single catastrophic event culminating from a single course of conduct"[2] is wrong.

The "event" is not Hurricane Katrina.  Rather, the "events" are the eight separate and unrelated levee breaches and overtoppings that combined to contribute, at various degrees at different locations, to the flooding of the area.  Each breach or overtopping commenced at different times, lasted for different durations, and contributed different volumes of flood waters to the area.  No single breach or over-topping site contributed flood waters to all of the sub-class areas.  Each site was constructed by different entities, over a period of decades, and under the jurisdiction of different governmental entities or combinations of entities.  The plaintiffs' theories of recovery against these entities differ from site to site, and so too do the defenses raised by the entities.  Finally, both sides' experts agree, the relative contributions that each breach or over-topping site added to the flooding of a given location differ from location to location within the class and sub-class areas.

Because "one set of operative facts would not establish liability" this action is inappropriate for certification as a "single event" mass tort.  *Steering Committee v. Exxon Mobil Corp.*, 461 F.2d 598, 602-604 (5th Cir. 2006).  "In these circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried."

---

[2]        Levee and MRGO Plaintiffs' Consolidated Brief in Support of Motions for Class Certification ("Plaintiff Brief"), Doc. No. 7489, p. 15.

*Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996).

###### B.      Plaintiffs' Trial Plan Violates the 7th Amendment

The plaintiffs present a trial plan whereby "fault for the breaches," which they characterize as "general causation," will be determined at the Phase One trial.[3]  "Specific causation" will be left for subsequent Phase Two damages trials, but with the Phase One fault for the breaches verdict being given *res judicata* effect.[4]

The plaintiffs contend their flood modelers can show the flooding depth and percentage contributions by flood water source for any location in the area thereby establishing "general causation."  However, proof of where the water went does not prove that it did any damage when it got there.  Acknowledging this, the plaintiffs admit that "no one could resolve on a classwide basis the question of what damage water intrusion caused to a given structure. . ."[5]  However, the determination of fault unrelated to injury is not actionable, and is irrelevant to a determination of a defendant's liability to a plaintiff.  *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1431 (5th Cir. 1983).  Because the Phase One jury will not have determined the liability of any defendant for any plaintiff's damages, the Phase Two jury would be required to reexamine the defendants' actions to determine the issues of specific causation, comparative fault, and fault of third parties for every class member.

---

[3]      The Federal Tort Claims act prohibits a jury against the Corps.  28 USCA 2402.  Therefore, all issues with respect to the Corps will be tried by the Court.

[4]      Class Representatives' Proposed Levee and MRGO Trial Plan ("Trial Plan"), Doc. 7578-2; Plaintiff Brief, p. 25.

[5]      Plaintiff Brief, p. 23.

Such phased proceedings run afoul of the defendants' Due Process rights protected by the 7th Amendment.  "Severing a defendant's conduct from comparative negligence results in the type of risk that our court forbade . . ."  *Castano*, 84 F.3d at  750-751.

### C.    Individual Causation and Damages Issues Predominate

Save for a single component of property damages, diminution of value for homeowners, the plaintiffs concede that every other element of damages for each class member will require individualized proof.[6]  No model or formulaic calculation is offered for any of the other elements.  The diminution damages formula would not even apply to the majority of the class members because most of the pre-hurricane population were renters.

Moreover, causation will require individual proof for every plaintiff.  The flood models predict flood depth at a location, but they do not determine whether damages were caused by flooding at the location.  This determination requires site-by-site inspection and appraisal.  Individual inspections are required to differentiate damages caused by flooding due to levee breaches from flooding due, for example, to torrential rains or rain through a blown-off roof.

Mental anguish and emotional distress damages necessarily require individualized proof. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 416-417 (5th Cir. 1998).  Moreover, causation of intangible damages may be due to the comparative fault of the plaintiff in, for example, failing to heed the mandatory evacuation orders.  Additionally, comparison of the fault of third parties would be necessary in a case where the plaintiff claims emotional distress due in part to an assault while in an evacuation shelter.

---

[6]        Plaintiff Brief, pp. 23-24.

Where, as here, ". . . individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class." *Steering Committee*, 461 F.3d at 602.   To satisfy the predominance requirement of Rule 23(b)(3), the plaintiffs' causes of action must be considered "as a whole." *Castano*, 84 F.3d at 745 n. 21.  When viewed as a whole, individualized issues swamp any issues common to all class members.

### D.      Class Action Proceeding is not Superior

Because individualized issues of causation, comparative fault, and damages are not common, this action "would degenerate in practice into multiple lawsuits separately tried."  As a result, superiority is lacking.  *Allison*, 151 F.3d at 419.  Further, Phase Two juries will be required to reexamine the fault of the defendants.  In that situation, "[t]he risk of such reevaluation is so great that the treatment can hardly be said to be superior to individual adjudication." *Castano*, 84 F.3d at 751.  Finally, the deluge of Hurricane Katrina flood lawsuits filed in federal and state court jurisdictions and the plaintiffs' suggestion that flooding damages exceed $100 billion, show that these are not "negative value" claims and reflect the determination of the class members to litigate their claims regardless of whether this action is certified or not.

### E.      Named Plaintiffs are not "Typical" or "Adequate"

Because this action requires individualized proof of causation, injury, and comparative fault, there is no typicality.  *In Re: Vioxx Products Liability Litigation*, 239 F.R.D. 450, 459-460 (E.D. La. 2006).   Moreover, the claims by the named plaintiffs are not representative of the

claims of the proposed class members.  None of the proposed class representatives is a business, corporation, or public entity.  In fact, some expressly refute their representative status for these categories of absentees.  Because flood damages sustained by these entities are a significant, but wholly unrepresented, component of the class as defined, these named plaintiffs are not typical. The plaintiffs do not even contend that the trials of the named plaintiffs would apply to any absentee class member.

Nor are these named plaintiffs adequate.  They are entirely unknowledgeable regarding the progression of this litigation.  None assisted with the drafting of the complaints, attended any hearings, located or interviewed any witnesses, consulted with any experts, or provided any evidence to their counsel (except for evidence relevant only to their particular claims).  Counsel, not the class representatives, are directing the litigation.  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

Special vigilance is required when determining adequacy because absent class members are conclusively bound by the judgment in any class action brought on their behalf.  *Berger*, 257 F.3d at 479.  Included in the class definition are "public entities."  Although none of the proposed class representatives is a public entity, several of the defendants they have sued are. Thus there is a real conflict between the proposed class representatives and some of the absentees they seek to represent.  "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."  *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

## II.    OVERVIEW

A.    The Class Area

The proposed Levee class area consists of all of Orleans Parish west of the Inner Harbor Navigation Canal ("IHNC") and north of the Mississippi River along with a portion of Jefferson Parish on the east bank.

The Levee class area is not a simple "bowl," or single drainage basin as characterized by the plaintiffs.[7]  Instead, it is topographically, hydrologically, and demographically complex.[8]

The topography is dominated by the natural Mississippi River and Lake Pontchartrain embankments and the Metairie, Esplanade, and Gentilly ridges which separate the area into drainage basins.  Railroad embankments, streets, highways, and other manmade structures act as impediments to water flow and further separate the area into more drainage basins and sub-basins.  Adding more complexity to the hydrology of the area is the interconnected network of storm sewers and drainage canals which route water to a series of pumps designed to remove water from the area.  Pumps are necessary because a significant part of the area is below sea level and does not drain naturally.  The IPET Team determined that there are 20 hydrologically significant drainage basins in the proposed class area.

The figure below depicts the IPET 20 drainage basins and significant components of the drainage system.

---

[7]    Delft report, pp. 1-2.

[8]    In an effort to avoid burdening the Court with reams of duplicative documents, the Levee defendants do not attach copies of deposition transcripts which are anticipated will be introduced at the Class Certification hearing.  Nevertheless, citations to reports, studies, and deposition testimony is provided where warranted for the Court's later reference.



Figure 1.

More recently, the Corps identified 37 sub-basins within the proposed class area. The figure below depicts those sub-basins.



Figure 2.

Bounded by Lake Pontchartrain and the Mississippi River, the area has been prone to flooding by hurricane storm surges. In response to repeated floodings in the past, governmental entities built levees, flood walls, gates, and other structures to protect the area from high water events. This flood protection system is not a monolithic structure. It developed over decades and the components of the system were constructed, enlarged, or improved at different times, by different entities, to different elevations, by different engineers and contractors, using varied construction materials.

At the time of the storm, different components of the flood protection system were under the jurisdiction of multiple governmental entities with sometimes overlapping responsibilities. The plaintiffs allege that the Corps was responsible for the design and oversight of the entirety of the system, that the OLD and EJLD had inspection, operation, and maintenance duties for the components of the system within their respective Parishes, that the S&WB had jurisdiction over the pump stations and drainage canals within the area, and that the PNO was responsible for the "transportation infrastructure" at the port.[9]

From a demographic standpoint, the proposed class area is a veritable checkerboard of real estate usage, architectural types, and property values. There are over fifty identifiable neighborhoods within the area and almost all portray a mix of commercial, public, and residential use, population density, affluence, sources of income, and types of employment.[10] In many neighborhoods antebellum buildings are situated within walking distance from or even

---

[9]     See, the Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint, Doc. No. 7571, ("Restated Complaint"), Counts One through Six, in which the plaintiffs allege which components of the protection system are within the jurisdiction of each of the various defendants.

[10]     Dr. James Richardson, Louisiana State University Professor of Economics, studied the class area and will testify regarding the diversity of the area from an economics perspective.

side-by-side with dilapidated homes and ultra-modern architectural structures - "proud mansions standing close by blighted shotguns and cottages."[11]  Within the same neighborhoods and even in the same block, buildings have different ground elevations, varied finished floor elevations, divergent architectural styles, and different construction types.  The ages of the structures and maintenance conditions also vary widely.[12]

All of these factors combine to create a complex topographical, hydrologic, and demographic scenario.

###### B.     The Storm

The plaintiffs allege that their injuries arise from "a single catastrophic event," flooding following the failure of the "hurricane protection system."[13]  However, the hurricane impacted the area in many different ways, not just through levee breach flooding.

The initial effects were felt before the hurricane made landfall and prior to any flooding when the governing authorities issued voluntary followed by mandatory evacuation orders.  Most obeyed the mandatory evacuation orders, but many did not.

Some of the named plaintiffs ignored the mandatory evacuation orders.  Beatrice Drew was aware of the mandatory order to leave the city, but decided not to comply.  Drew was rescued from her daughter's home by boat and eventually transported to the Interstate 610 overpass where she remained for two days until taken by bus to the Astrodome.  During her evacuation, she cut her leg.  Drew believes the wound became infected from contact with

---

[11]     N.O. Times Picayune, April 4 and 5, 2004.

[12]     Michael Truax, defendants' expert appraiser, and Dr. Erik Nelson, defendants' expert professional engineer, will testify regarding the diversity of the area from engineering and appraisal standpoints.

[13]     Plaintiff Brief, pp. 2 and 15.

contaminated flood waters.  Drew is seeking to recover for her personal injury, medical

expenses, and emotional distress from this ordeal.[14]  Lenniece Morrell did not evacuate.  She

claims emotional distress because she experienced a "complete breakdown" while stranded on

the Interstate 610 overpass for three or four days.[15]  Emanuel Wilson admits that much of the

emotional stress he experienced was a direct result of his failure to accompany his family

members when they evacuated.[16]

    For many of those who did comply with the evacuation orders, the trek in and of itself

was a harrowing and traumatic experience.  Before any flooding due to levee breach or over-

topping had occurred, one of the named plaintiffs, Nicola McCathen, evacuated with her family

and sheltered in a mobile home in Mississippi, which lay in the track of the storm.  During the

night, the intensity of the storm and hurricane force winds forced the family to again evacuate

and seek shelter in a more secure structure.  McCathen described this as the "scariest"

experience of her life.  She seeks damages for emotional distress.[17]  Additionally, the over-

crowded shelters for the evacuees presented their own dangers.  While in a Lake Charles shelter

shortly after evacuating, Trenise Jackson's son was forced to hide in a restroom stall to avoid

being sexually assaulted.[18]  For those who did not evacuate and those who were injured during

the evacuation, flooding from levee breaches may not be a cause, or the sole cause, of their

---

[14]     Drew depo.,  pp.110, 121, 123,127-131.

[15]     Morrell depo., pp. 69-70, 98-106.

[16]     Wilson depo., pp. 48-50, 73-75.

[17]     McCathen depo., pp. 58-59, 78-79.

[18]     Jackson depo., pp 88-90.

injuries.

The next storm effects felt by the area were the hurricane force winds and torrential rains which arrived before the failures of the flood protection system.  The winds downed trees, knocked out power, and blew roofs from buildings across the area.  Some class members experienced losses from these events independent of any subsequent flooding.  Included in Calvin Levy's itemization of damaged personal property is loss of refrigerated food,[19] which due to the preceding power outage would have occurred regardless of subsequent flooding.

Many of the named plaintiffs experienced wind and wind-blown debris damage to their homes.  A neighbor's tree was blown over and damaged Elois Bell's roof and an out-building.[20] Wind damage to the roof allowed rain into Lenniece Morrell's kitchen, study, and bedroom.[21] Flying debris blew out a window and punched holes in Trenise Jackson's roof, allowing rain directly into her house.[22]  Wind-blown rain through holes in the roof of Emanuel Wilson's two-story house was the cause of the upstairs damage.[23]  That pre-flood damage caused by wind and flying debris was wide-spread across the area is further evidenced by the multitude of "blue roofs" seen all around the City.

As Hurricane Katrina passed, rainfall, which in some areas was recorded in excess of 20 inches, overwhelmed drainage systems and resulted in localized flooding of homes and

---

[19]     Levy depo., p. 29.

[20]     Bell depo., pp. 47-50.

[21]     Morrell depo., p. 71.

[22]     Jackson depo., pp. 173-179.

[23]     Wilson depo., p. 84.

businesses.  This flooding commenced prior to the breach or over-topping of any levee.

After the brunt of the hurricane winds and rain subsided, multiple levee and flood wall breaches and over-toppings added more water to the area.  The first was a small breach in the IHNC west bank at Gate W-30 very early on the morning of August 29th.  Shortly thereafter, the storm surge overwhelmed the IHNC west bank resulting in massive over-topping and two more breaches in the IHNC levee and flood wall.  This massive over-topping event lasted for several hours before any of the outfall canal breaches occurred.  The Lake Pontchartrain surge arrived mid-morning.  The London Canal flood walls, west and east, were the first to fail followed shortly thereafter by the breach of the 17th Street Canal.

The Figure 3 below depicts the over-topping and breach locations.



Later, at the height of the Lake Pontchartrain surge, there was overtopping of the Orleans Canal levees. During the course of the day as the flood waters rose, most of the pump stations flooded and the pumps were shut down.

After the storm, lawlessness in the form of looting and vandalism was widespread. Daisy Innis lost approximately $10 to $15 thousand to looters.[24] Looters stole doors and copper piping from one of Rosemary and Thurman Kaiser's properties.[25] Kenneth Polite was shot at seven times while performing his duties as a New Orleans police officer.[26] These intentional torts caused or contributed to the losses and injuries claimed by the class members.

As is evident, not all damages claimed by the class members in this action were caused by the "failure of the hurricane protection system." Other causes, either independently or in contribution with the flooding of the area, played roles in the causation of a given plaintiff's particularized damages. Therefore, the damages asserted in this action did not arise from a "single catastrophic event."

     **C.**    **The Complaint**

In the wake of the hurricane, dozens of class actions and hundreds of individual or mass actions were filed seeking recovery for damages caused by the flooding of the area. Cases in the federal system were eventually consolidated and from that mass, two suits emerged - the Levee and MRGO class actions.

---

[24]    Innis depo., 162-167.

[25]    R. Kaiser depo., p. 70.

[26]    Polite depo., p. 143

In the Levee action, the plaintiffs seek Rule 23(b)(3)[27] certification of a class defined as:

All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the south by the Mississippi River, to the east by the IHNC, and to the west by the 17th Street Canal running from Lake Pontchartrain south to Metairie Road and then west on Metairie Road to Causeway Boulevard to the Mississippi River, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only, have - or, by a date to be determined by the Court, will have - fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.[28]

The plaintiffs sub-divide the class area into five sub-classes, which they contend correspond to the topography of the class area.[29]

The proposed sub-class areas are depicted below.

---

[27]      Although the Restated Complaint asserts Rule 23(b)(2) - injunctive relief - as an alternate basis for class certification, the plaintiffs did not address this ground in the Plaintiff Brief, and it has apparently been abandoned.  Regardless, even if asserted, Rule 23(b)(2) certification is unavailing because the predominant, in fact the only, relief sought by the plaintiffs in the Restated Complaint is monetary damages.  See, *In Re: Propulsid Products Liability Litigation*, 208 F.R.D. 133 (E.D. La. June 4, 2002).

[28]      Plaintiff Brief, p. 6.

[29]      Plaintiff Brief, p. 5.



Figure 4.

Twenty-four named plaintiffs are identified as "representative" of the absent class members' claims.  The plaintiffs in each sub-class sued different groups of defendants under different theories of recovery depending upon which breach or over-topping site allegedly contributed waters to the sub-class.  The named defendants, the sub-classes, and the sites for which each defendant is alleged responsible are:

Page -17-

-       United State of America/Army Corps of Engineers - all sub-classes - all breaches and over-toppings;

-       Orleans Levee District and its insurer - St. Paul Fire and Marine Ins. Co. - subclasses 1, 2, 3, 4, and 5 - 17th Street and London Avenue Canal breaches, Orleans Canal over-topping, and IHNC Gate W-30 breach;[30]

-       Sewerage & Water Board of New Orleans - sub-classes 1, 2, and 5 - 17th Street Canal breach;

-       East Jefferson Levee District and its insurers - St. Paul Fire and Marine Ins. Co. and National Union Fire Insurance Company of Pittsburgh - sub-classes 1, 2, and 5 - 17th Street Canal Breach;

-       Port of New Orleans - sub-classes 4 and 5 - IHNC Gate W-30 breach;

---

[30]     Plaintiff Brief, Ex. B, pp. 4, 5, 7, 9, and 11.  The plaintiffs argue that defendants allegedly responsible for the flooding from the 17th Street Canal breach should be included as defendants for sub-class area 4. However, this allegation was not part of the Superseding Master Consolidated Class Action Complaint, Doc. No. 3420 ("Master Complaint").  The plaintiffs attempted to add sub-class 4 to the allegations with respect to Count One of the First Supplemental and Amending Levee Master Consolidated Complaint, Doc. No. 6941, but leave to amend was denied.  See, Order, Doc. #6939 August 8, 2007.  Consequently, with respect to waters from the 17th Street Canal, the OLD, S&WB, and EJLD are not defendants for the claims by sub-class 4 members.  The OLD was, however, sued in the Master Complaint with respect to the breach of Gate W-30 on the IHNC west bank.

        Count Four of the Restated Complaint asserts allegations against the OLD and S&WB with respect to the Orleans Canal which allegations were not included in the Master Complaint.  Consistent with the Court's order relating to adding sub-class 4 to Count One, the OLD and S&WB are filing Motions to Strike these allegations.  Although S&WB is referenced in the title of Count 4, Count 4 contains no statement alleging a duty or negligence with respect to the S&WB.  Because there are no allegations against S&WB in Count 4, there are no claims asserted against S&WB related to the London Avenue and Orleans Canals, and therefore, no claims asserted against S&WB by the members of sub-classes 3 and 4.

        Although CSX, Public Belt Railroad and Port of New Orleans are identified as defendants for sub-class area 3 in the Plaintiff Brief, Ex. B, p 8, in the Restated Complaint, Count 6, they are included in only sub-classes 4 and 5.  Note also that proceedings against the Public Belt Railroad and the CSX entities are stayed.  CMO 4, Doc. No. 3299, p. 23.

-        CSX Transportation Corp./CSX Transportation, Inc. - sub-classes 4 and 5 - IHNC west bank breach; and

-        Public Belt Railroad Commissioners for the City of New Orleans - sub-classes 4 and 5 - IHNC Gate W-30 breach.

Many of the engineering and contracting companies involved in the construction of the flood protection system were named as defendants in the Superseding Master Consolidated Class Action Complaint, but have since been dismissed based upon peremption motions.[31]  These engineers and contractors have been associated by the plaintiffs with different breach and over-topping sites for flood waters that impacted different sub-classes.[32]

Although not apparent from the plaintiffs' brief, the damages sought in this action are not limited to property damages.  Instead, the damages alleged in this case are, "loss of real property, loss of personal property, loss of income, costs of relocation, loss of business opportunities, business interruption, evacuation expenses, medical expenses, loss of opportunity to avoid injury and damage through preventive measures, relocating, raising homes, or by purchasing insurance, wrongful death, survival damages, fear, fright, emotional distress, grief, mental anguish,

---

[31]        La. Civ. Code Arts. 2323 and 2324 provide that a tortfeasor shall not be liable for more than his degree of fault, and that the fault of all persons causing or contributing to the injury ". . . shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, [or] immunity by statute . . ."  The fault of persons dismissed due to peremption shall also be determined.  *Lifemark Hospitals, Inc. v. Jones, Walker*, 1999 WL 33579254 (E.D. La. June 4, 1999).  Thus the fault of the contractors and engineers will be determined. So too will the fault of an absent party, such as the Department of Transportation and Development.  Though not amenable to the jurisdiction of the Court, the defendants will also be entitled to introduce evidence of the DOTD's role in causing or contributing to the damages asserted by the class.

[32]        The plaintiffs have alleged that the contractors and engineers were negligent in the design or construction of the flood control structures and are associated with particular sites and sub-classes as follows: Pittman Construction, Modjeski & Masters, Eustis Engineering, Boh Bros., and Gulf Group - 17th Street Canal dredging and flood wall failure - sub-classes 1, 2, 3, and 5; Burk-Kleinpeter, Gotech, B&K Construction, James Construction, Pittman Construction - London Avenue Canal flood wall failures - sub-classes 2, 3, and 5.  See, Plaintiff Brief, Ex. B, pp. 4, 5, 7, 9, and 11; Ex. E, pp. 6, 9, 10, 13, 17 and 18; Restated Complaint, paras. 41, 49, 68, and 141.

inconvenience, pain and suffering, loss of capacity to enjoy life, loss of consortium, societal harm in the breakdown in social structure, loss of cultural heritage, and altered physical, economic, political character, social, and psychological character of the New Orleans area.[33]

## III.    ARGUMENT - CLASS ACTION PROCEEDINGS ARE INAPPROPRIATE

The impact of Hurricane Katrina and the flooding in its aftermath resulted in massive litigation with undoubtably more at stake in the outcome than most involved will ever see again in their lifetimes.  The plaintiffs suggest damages in the New Orleans area alone exceed $100 billion.[34]  The sheer size of the litigation is daunting and all parties are sympathetic to the class members' understandable desire to resolve their claims quickly and move on with their lives and the rebuilding of New Orleans.

Every defendant shares these goals.  After all, most defendants are based in the New Orleans area and their owners, officers, and employees are among the proposed class members.  Nevertheless, the class action is only a procedural device and cannot be used to "abridge, enlarge or modify any substantive right."[35]  This is particularly true with respect to proof of causation of injury and individual damages.[36]  Despite the exigencies presented by this disaster and the ever-growing litigation, the procedural vehicles available to manage this litigation are constrained by Constitutional limitations and the Federal Rules of Civil Procedure.  Even for the most worthy of

---

[33]    Restated Complaint, para. 191.

[34]    Plaintiff Brief, p. 5.

[35]    *Amchem Products. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[36]    *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 313-314, 320-321 (5th Cir. 1998).

causes and with the best of intentions, these restraints may not be abandoned for the sake of expediency.[37]

The plaintiffs carry the burden of proving every requirement for class certification.[38] When evaluating the propriety of class certification, the Court must conduct a "rigorous analysis" to determine whether the action, "as a whole," meets the Rule 23 requirements.[39]  In conducting this analysis, the Court should look beyond the pleadings "to understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues."[40]

### A.      Not a "Single Event" Mass Tort

While mass torts are sometimes appropriate for class certification,[41] this is only true when the damages are caused by "single" events.[42]  Although the plaintiffs characterize the litigation as arising from: "a single catastrophic event culminating from a single course of conduct," and that "[e]ach class member's claims arise from a common set of operative facts,"[43]

---

[37]      *Cimino*, 151 F.3d at 320-321; *citing*, *Amchem Prods. Inc.*, 521 U.S. at 598.

[38]      *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

[39]      *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 and 745 n.21 (5th Cir. 1996).

[40]      *Castano*, 84 F.3d at 744.

[41]      But see, the Advisory Committee Notes to Rule 23(b)(3) which caution: "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages, but of liability and defenses of liability, would be present, affecting the individuals in different ways.  In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple law-suits separately tried."

[42]      *Castano*, 84 F.3d at 747; ("As modern mass tort litigation has evolved, courts have been willing to certify simple single disaster mass torts, but have been hesitant to certify more complex mass torts.") (citations omitted).

[43]      Plaintiff Brief, pp. 10 and 15.

this characterization is the "sufficiently abstract level of generalization" which the court cautioned should be avoided in *Sprague v. General Motors Corp.*[44]  This mischaracterization is also premised on that single event being Hurricane Katrina.  However, Hurricane Katrina "alone cannot serve as a common transaction or occurrence because the effects of the hurricane were unevenly felt, leaving each property owner in a unique situation based on the prior condition of the property owner's home, . . . and the immediate effects of the hurricane in that particular geographic area."[45]

In support of their single mass accident arguments, the plaintiffs rely extensively on *Watson v. Shell Oil*.[46]  Unlike this action, *Watson* was a single event accident - an explosion at a refinery.  After the Fifth Circuit granted rehearing *en banc*, which had the effect of vacating the decision, the case settled.[47]  Consequently, *Watson* is of no precedential value.  Inapplicable too are the other mass tort decisions upon which the plaintiffs ground their arguments, *Mullen v. Treasure Chest Casino*[48] and *Turner v. Murphy Oil USA, Inc.*.[49]  In *Mullen*, relying in part on *Watson*, the court certified a class consisting of casino boat employees who all asserted respiratory ailments from a single cause - the vessel's defective ventilation system.  In *Turner*,

---

[44]    133 F.3d 388, 397 (6th Cir. 1998).  As noted in two recent Hurricane Katrina decisions, the storm was a common cause only in a "superficial sense" because "[t]he storm was vastly different in its effect depending on the specific geographic location of each particular home.  *Rohr v. Metropolitan Ins. & Cas. Co.*, 2007 WL 163037, p.3  (E.D. La. Jan. 17, 2007); *Bradley v. Nationwide Mutual Ins. Co.*, 2006 WL 2594548, p. 1 (S.D. Miss. Sept. 6, 2006).

[45]    *Rohr*, 2007 WL 163037 at p.3.

[46]    979 F.2d 1014 (5th Cir. 1992).

[47]    *In Re: Abbott Laboratories*, 51 F.3d 524, 527-528 n. 7 (5th Cir. 1995).

[48]    186 F.3d 620 (5th Cir. 1999).

[49]    234 F.R.D. 597, 605 (E.D. La. 2006).

the single incident was an oil tank leak.[50]  In contrast to *Watson*, *Mullen*, and *Turner*, here there were multiple levee breaches and over-toppings that contributed to the flooding at different times and in varied combinations from location to location within the class and sub-class areas.

### 1. Multiple Flood Water Sources

The multiple flood water sources, including the torrential rainfall, began and ended at different times, occurred at disparate locations, and added different volumes of flood water to the area.  Moreover, waters from the various sources, including rainfall, mixed in a multitude of combinations that vary from location to location to location.

### 2. Multiple Potentially Responsible Entities

For each of the multiple flood water source sites there are different combinations of entities alleged to be at fault.  The plaintiffs have alleged that various entities, both defendants and former defendants, are associated with specific breach and over-topping sites.  Except for the Corps, no defendant or other potentially responsible entity is alleged to be responsible for every flood water source.  In turn, no single flood water source is alleged to have contributed to the flooding at every proposed sub-basin.  This diversity results in different combinations of potentially responsible entities for every sub-basin.

### 3. Multiple Theories of Recovery and Defenses

The theories of recovery alleged against the defendants and the defenses available to those defendants vary depending upon the breach or over-topping site, the theory of recovery alleged, and the sub-class in question.

---

[50]    In *Turner* the court distinguished the case from those involving complex, multi-source causation inquiries.  *Turner*, 234 F.R.D. at 604 n.4.

For example, the class members in sub-class 4 allege that the OLD was at fault in failing to timely repair Gate W-30 on the IHNC west bank.  The OLD asserts the discretionary/decision-making immunity to that theory of recovery.  In contrast, class members in sub-class 1 assert multiple theories of recovery against the OLD including: failure to object to the dredging of the 17th Street Canal; negligent opposition to the "Barrier Plan;" negligent design and construction of the flood wall structures along the 17th Street Canal; and strict liability.  With respect to the alleged failures to object to the dredging and opposition to the Barrier Plan, the OLD asserts the discretionary/decision-making immunity.  With respect to negligent design and construction and strict liability, the OLD asserts the federal contractor defense.  Finally, the OLD asserts the emergency preparedness immunity and that it "shares" the Corps' immunity from flooding as to all theories of recovery.

The plaintiffs' claims against the Corps are not identical.  All class members broadly allege negligence in the design and construction of the New Orleans area flood protection system.  However, only those class members in areas impacted by waters from the 17th Street Canal breach could assert claims with respect to the negligent granting of the dredging permit.  In turn, only those affected by the surge from the IHNC could assert claims against the Corps for alleged negligent design and construction of that structure.

### 4.      Multiple Combinations of Flood Waters by Source

The experts for both sides agree that mixtures of waters from the different breach and over-topping sites vary within the class area, and even within the proposed sub-class areas.

The plaintiffs' hydrologist, Professor J. K. Vrijling with Delft University, modeled eight separate locations across the Levee class area.  For each of these locations, even those within the

same sub-class area, the relative contributions to flooding from the different flood water sources varied.[51]  For example, the Delft team modeled two locations situated in proposed sub-class area 1.  According to Delft, the first location had 10 feet of flood water above ground level - 1 foot from rain, 6 inches from the over-toppings of the Orleans Canal and the IHNC, 6 inches from London Avenue Canal breach, and the remainder from the breach of the 17th Street Canal.  At the other location in sub-class 1, all 6 inches of flooding was attributed to the breach of the 17th Street Canal.[52]

The Levee defendants' hydrologist, Dr. Paul Kuhlmeier, performed a hydraulic and hydrologic evaluation of the class area to determine whether the flooding at the named plaintiffs' houses was representative of the flooding experienced by other class members across the class or sub-class areas.  Consistent with the Delft team conclusions, Dr. Kuhlmeier determined and opines that flood levels and relative contributions to that flooding from the different breach and over-topping sites were different for each named plaintiff's house.

Thus, the experts agree - flooding at any named plaintiff's house is not representative of the flooding experienced by other class members.  Therefore, particularized evaluation and proof of the causation of the flooding will be required for every location.

In sum, the damages sought by the plaintiffs did not arise from a "simple single" event.  Instead, the multiple sources of flood waters, multiple potential actors, varying theories of recovery, varying defenses, and the obvious fact (tacitly admitted by the plaintiffs through their

---

[51]        Vrijling depo. I, p. 145.  (Q: At maximum water level, maximum floodwater level, for each of the eight locations modeled in the New Orleans Metro polder, the relative contributions from the different floodwater sources your team considered vary, do they not?  A: Yes.  Depending on where you are.  Q: Which is entirely expected from you as a hydrologist and engineer, correct?  A: Yeah.).

[52]        Vrijling depo. I, pp. 133-136 (Delft location 1) and 144 (Delft location 8).

structure of the sub-classes) that every flood water source affected the class area at different locations at different times and in differing combinations, establish that the Levee action is inappropriate for class certification as a single mass disaster.  Because of the complex causation inquiries necessary, "one set of operative facts would not establish liability" and the plaintiffs' claims for damages must "focus almost entirely on facts and issues specific to individuals rather than the class as a whole . . .," this action cannot be certified.[53]

Sub-dividing the overarching class area into five sub-classes is no cure.  There is no hydrological relevance to the geographical boundaries of the proposed sub-classes because they do not correspond to the drainage basins both sides' experts found were present in the area.[54] Further, as shown, the experts agree that the relative contributions to the flooding from the different water sources differ from location to location - even within the same sub-class area. Because determining the sources and relative contributions to the flooding at any location within a sub-class will still require individualized proof, the division of the Levee action into 5 sub-classes does not solve the problem.[55]

### B.    Impermissible Phasing of Trials

The issues the plaintiffs seek to certify and the proposed trial plan require subsequent

---

[53]    *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 303 (S.D. Ala. 2006) ("where after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."); and *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996) ("In these circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.").

[54]    The Delft team determined that there were  more than five hydrologically significant drainage basins in the area.  Vrijling depo., p. 88.  Note that the Corps recently identified 37 significant basins.

[55]    *Sprague v. General Motors, Corp.*, 133 F.3d 388, 399 (Subclasses are not a substitute for compliance with Rule 23.)

juries to reexamine fault in violation of the 7th Amendment to the United States Constitution.

### 1. Trial Plan

Admitting that damages require individualized evaluation and proof,[56] the plaintiffs propose to carve out a few discrete issues - which they characterize as "common liability" issues - for a Phase One "Common Liability" class trial.  Thereafter, the plaintiffs suggest the Court should order mediation in an effort to drive settlements with any defendants found at fault.  If this effort at settlement fails, the plaintiffs turn to scheduling multiple successive Phase Two Damages trials for groups of trial plaintiffs where individual causation and damages issues will be decided.[57]  The plan does not speak to the number of Phase Two trials necessary and the expected duration of the Phase Two trial process.

The proposed Phase One Common Liability class trial issues have been described variously in the plaintiffs' pleadings and briefs, but distill to the following:

(1)     fault - which parties and allocations of fault for the levee breaches and
                overtoppings;

(2)     flooding dynamics for the five sub-basins - from where and to where did the flood
                waters from the various sources go and in what combinations; and

(3)     diminution of property value damages - which the plaintiffs suggest could provide
                a methodology for determining one component of property damages.[58]

---

[56]     Plaintiff Brief, p. 12.

[57]     Trial Plan, p. 3.

[58]     Trial Plan, p.2; Plaintiff Brief, p. 11 and Exhibit "E"; Restated Complaint, para. 20.

As justification for this trial plan, the plaintiffs contend that determining the fault of a defendant or combination of defendants for a breach or overtopping site, and then determining where waters from that site went and how those waters combined with waters from other sites, establishes "general causation" of property damages for each sub-class area.[59] The plaintiffs do not even suggest how proof of general causation would be applicable to any damage component besides structural property damage.

Confusing flood "depths" with "liability," the plaintiffs assure the Court that their flood model can predict the above-ground flood depths and flood water sources for "any given x-y coordinate," and thus "[l]iability for each of the flood water sources will have been determined as a matter of law via the class action."[60]  Moreover, save for the issues of individualized causation and damages, the plaintiffs assure the Court that the Phase One trial will do it all, "once and for all."  They promise "although no one could resolve on a class wide basis the question of what damage water intrusion caused to a given structure, we can answer every question up to that point for every class member."[61]

It's not that easy.

### a.    "General Causation" of the Breaches Does Not Prove Causation of Injury to any Class Member

At the outset, the term "Common Liability Issues" is a misnomer.  Under Louisiana law, there is no "liability" on the part of a defendant absent a confluence of all three elements of a tort

---

[59]    Plaintiff Brief, p. 24.

[60]    Plaintiff Brief, pp. 23-24.

[61]    Plaintiff Brief, pp. 12 and 23.

- "fault, causation, and damages."[62]   Thus, the determination of fault in a vacuum does nothing

to advance the litigation because a defendants' "[f]ault that did not cause injury is not

relevant."[63]  This is not a case where the class members seek to recover for **breaching** of the

levees; instead, the class members seek money damages for **injuries** caused by the defendants.

Establishing "general causation" for breaches is without legal significance, because even with a

finding of "liability for the breaches,"[64] each class member would remain obligated to prove that

their specific damages were caused by the fault of each defendant.[65]  Here, the Phase One "fault"

inquiry proposed by the plaintiffs does nothing more than "cross the threshold" of the requisite

elements of proof necessary to prove the liability of any defendant to any class member.[66]

### b.        The Models Do Not Predict Property Damage

The plaintiffs' flood model predicts flood depths at various locations from various

---

[62]      *Dabog v. Deris*, 625 So.2d 492, 493 (La. 1993).

[63]      *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1431 (5th Cir. 1983); *In re: Matter of American Commercial Lines, L.L.C.*, 2002 WL 1066743, p.15 (E.D. La. May 28, 2002) ("any fault on the part of a defendant is immaterial if an individual class member is unable to prove that the defendant's conduct caused the injury in fact . . .") (citing, *Neely v. Ethicon*, 2001 WL 1090204, p.11 (E.D. Tex. 2001)).

[64]      "Liability of [the defendants] for the floodwall breaches" is identified as one of the plaintiffs' common liability issues.  See, Plaintiff Brief, Ex. E - Common Issues of Law and Fact for the class and sub-classes.

[65]      *In Re: Ford Motor Company Vehicle Paint Litigation*, 182 F.R.D. 214, 220 (E.D. La. 1998) (proof of "general causation" would not satisfy each class members' obligation to prove that their individual damages were caused by the fault of the defendant).  Compare *Allapattah Services, Inc. v. Exxon Corp.*, 188 F.R.D. 667 (S.D. Fla. Aug. 10, 1999) upon which the plaintiffs rely, where the court found that bifurcation of the liability issue - breach of contract - was proper because determination of that issue established the defendant's liability to all plaintiffs.  See, *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003).

[66]      See, *In Re: American Commercial Lines, LLC*, 2002 WL 1066743, p.15 (E.D. La. May 28, 2002) (in which the court denied class certification on the issue of fault, concluding that "[a] finding of fault on the part of one or both of the class action defendants can only be likened to crossing a threshold, or perhaps sticking the proverbial foot in the door.  Thereafter, it is a virtual certainty that the proposed class action will degenerate into a series of liability jury trials addressing the predominate issues (i.e., proof as to the requisite findings under Louisiana law as to individual class members including proximate causation, injury-in-fact, and damages)").

sources (i.e., "where the water came from," "where did it go," "how deep did it get").  Proving where the water went, however, does not complete the chain of causation by establishing what injuries, if any, the water caused when it got there.

The Delft model does not, nor can it, predict damages.[67]  Nor can the Delft model show how much water got into any particular house.[68]  Similarly, Dr. Kuhlmeier's model does not predict damages.  Dr. Kuhlmeier's model gets the water to an area, but stops short of providing information as to how much flood water, if any, got into any buildings within that area.  This question requires individual site inspections including determinations of ground and finished floor elevations.  The figure below reflects the variations in ground and potential flood depths for a six block area.[69]

---

[67]     Vrijling depo. I, pp. 58 to 59

[68]     This is because the model: (1) is only sensitive to a 50 meter by 50 meter grid square (which in New Orleans' neighborhoods could include multiple structures within a single grid); (2) averages ground elevations for each grid square (which fails to take into account the differing ground elevations for each structure within the grid); and (3) does not account for different structure construction types (which means that the model cannot predict flood levels for slab on grade as compared to elevated slab or pier and beam structures).  Vrijling depo. I, pp. 81, 82, 99.

[69]     This location corresponds to the house owned by former proposed class representative Laurie Coniglio.



Figure 5.

Defendants' experts conducted individual site inspections at the named plaintiffs' residences.  Dr. Erik Nelson, a professional engineer retained by the defendants, and his team inspected each of the named plaintiffs' residences and noted multiple causes of structural damage, including wind, wind-driven rain, flooding, vandalism, and pre-existing structural damage.  Even for flood damages, they observed that the degree of damage varied depending upon the depth and duration of flooding at the site, the finished floor elevation of the structure, the depth of flooding above the finished floor elevation, and other factors.  Dr. Nelson observed that the effects of flooding at each residence inspected were different.  He opines that individual site inspections are required to determine the extent of  flood damage for any particular building.

In sum, the flood models cannot predict damage or the extent of damage caused by flooding.  Individual property inspections are required to make this determination.

The plaintiffs freely admit, that the Phase One trial cannot resolve "on a classwide basis the question of what damage water intrusion caused to a given structure."[70]  Because the mere determination of fault without a concurrent determination of causation of injury is "not relevant," the plaintiffs' proposed Phase One trial will not determine an issue "the resolution of which will advance the litigation."[71]

---

[70]    Plaintiff Brief, p. 23.

[71]    *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (". . . at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation.").

## 2.     Unconstitutional Trial Plan

The plaintiffs' trial plan violates the 7th Amendment.  As proposed, the Phase One jury would determine the fault and allocations of fault for the flooding of each the sub-class area, but leave for later Phase Two trials the questions of individual causation and particular damages for individual class members.[72]  The plaintiffs also propose that the Phase One findings of fault and fault allocations have *res judicata* effect for the subsequent Phase Two trials.[73]  Because the subsequent Phase Two juries would be required to reexamine the fault of the defendants when deciding individualized causation and comparative fault issues, the plaintiffs' Phase One "Common Liability Issues" trial plan fails when scrutinized in the light of the 7th Amendment.

The 7th Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues.  *Castano v. American Tobacco Co.*[74]  In *Castano*, just as in this action, the plaintiffs proposed a phased trial scheme in which the issue of "core liability" (here, "fault for the breaches") was separated from the issues of individual causation and damages.  After observing that the action was "permeated with individual issues, such as proximate causation, comparative negligence, . . . and compensatory damages," the Court found that: "[a]t a bare minimum, a second jury will rehear evidence of the defendant's conduct" and that such a scheme amounts to reexamination of fault in violation of

---

[72]     Trial Plan, pp.2 and 3; Plaintiff Brief, pp. 12, 23 and 24.

[73]     Plaintiff Brief, p. 25.

[74]     *Castano*, 84 F.3d at 750 and 751.

the 7th Amendment.[75]  The same is true here, proximate causation, comparative fault, and compensatory damages are not addressed in the plaintiffs' Phase One trial plan.  Thus, it is impossible to separate the claims as proposed by the plaintiffs within Constitutional limitations.

### C.    Individualized Issues Predominate

In contrast to the "commonality" requirement of Rule 23 (a), the "predominance" requirement of Rule 23(b)(3) is "far more demanding because it tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[76]

To justify class certification, the plaintiffs have combed the pleadings and cherry-picked the few issues they believe may be "common" and base the certification request on those issues alone.[77]  However, class certification has been specifically rejected under like circumstances.

Rule 23(b)(3) requires the Court to evaluate all of the claims asserted and from that evaluation determine whether all claims, taken together "as a whole," meet the predominance requirement.[78]  Moreover, the plaintiffs' attempt to rest on Rule 23(c)(4) issue certification is misplaced.[79]

---

[75]    *Castano,* 84 F.3d at 751; ("Severing a defendant's conduct from comparative negligence results in the type of risk our court forbade . . ."); See also, *In Matter of Rhone Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995) (The Court is required " 'to carve at the joint' in such a way so that the same issue is not reexamined by different juries.").

[76]    *Steering Committee*, 461 F.2d at 601-602.

[77]    This effort is illustrated in the plaintiffs' attempt to minimize the individualized nature of their property damage claims: "Though Defendants will offer red herrings based upon the unique combination of forces that damaged each Class Representative's property - **an issue Plaintiffs do not even seek to certify** . . ."  Plaintiff Brief, pp. 11, 12, (emphasis added).

[78]    *Castano*, 84 F.3d at 745 n.21.

[79]    Plaintiff Brief, p. 19.

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).
>
> . . .
>
> Reading Rule 23 (c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of Rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.[80]

When the action is considered "as a whole" common issues do not predominate.

### 1.    "Common Liability Issues" Are Not Common

Common questions must "advance the litigation," generalized commonality is insufficient.[81]

### a.    Plaintiffs' "Common Issues"

The plaintiffs have proposed various iterations of the "common issues" to be heard during the Phase One "common liability" trial.[82]  One of the proposed common issues is whether the defendants, or any of them, are immune from the claims asserted in this action.[83]  The immunities raised by the defendants do not, however, apply to all class members' claims in the same fashion.  As previously noted, the defendants assert different immunities for different theories of recovery that are material depending upon which breach or over-topping site is in question.

---

[80]    *Castano*, 84 F.3d at 745 n.21.

[81]    *Sprague v. General Motors Corporation*, 133 F.3d 388, 397 (6th Cir. 1998) ("It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation.")

[82]    Trial Plan, p.2; Plaintiff Brief, p. 11 and Exhibit "E"; Restated Complaint, para. 20; Amended Motion for Class Certification, Doc. #6940, p. 13.

[83]    Plaintiff Brief, p. 11; Trial Plan, p.2.

The plaintiffs also suggest that general background issues such as the historical development of the flood protection system surrounding New Orleans, the area topography, and meteorological data regarding the track, wind, and rain from Hurricane Katrina are common questions.[84]  With respect to the historical development of the flood protection system, if the plaintiffs are referring to what was built, when and where, it is likely that the questions are not in dispute and could be resolved through stipulations.  If, on the other hand, the plaintiffs are referring to duties and breach of duties with respect to the historical development of the protection system, that issue would then be intertwined with the fault inquiry and, as previously discussed, would violate the 7th Amendment.

Finally, the meteorology of the storm and topography of the area are also questions for which there should be little dispute, if any, and could also be resolved through stipulations.[85]  In short, the data is not in dispute - only how the data is used is contested.  These issues, though superficially common, are not significant class issues resolution of which would advance the litigation.

All of the remaining suggested Phase One common issues are subsumed in three broad categories: (1) fault - the duties, breach of duty, and allocations among the potentially responsible persons; (2) dynamics of the flooding - "where the water came from," "where the

---

[84]     Plaintiff Brief, p. 11; Trial Plan, p.2.

[85]     Contrary to Dr. Kuhlmeier's model, which allocates rainfall across the area in accordance with the NEXRAD precipitation data, the Delft team assumed that rainfall amounts were uniform for each sub-class. Nevertheless, both teams of experts used the same data.  (Delft report, p.7).  The same is true of the topographical data used in performing their evaluations.

water went," "how high the water got,"and "how long did it stay there"[86]; and (3) diminution of property value - the "appropriate methodology" for assessing this property damage component.

### i.     Fault

The determination of fault without causation and damages is a meaningless exercise.[87] That the plaintiffs confuse the preliminary causation inquiry of "fault for the breaches" with the ultimate liability issue of "fault for causation of injury" is illustrated in the listing of common issues in which the plaintiffs suggest that one such issue is: "[w]hose acts and omissions proximately caused the failures of the floodwalls . . .."[88]  However, because causation of damages for each class member will require individualized proofs,[89] "fault for the breaches" is not a relevant common issue.

### ii.     Flooding Dynamics

Nor is answering a part of the flood damage causation question appropriate for issue certification.  Proof of where the water came from, where it went, when it got there, and how long it stayed does not establish any element of any class member's claim.

Neither flood model predicts flood damage.  The Delft team modeled the flood water

---

[86]      Amended Motion for Class certification, Doc. #6940, p. 13.

[87]      *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1431 (5th Cir. 1983); *In re: Matter of American Commercial Lines, L.L.C.*, 2002 WL 1066743, p.15 (E.D. La. May 28, 2002) ("any fault on the part of a defendant is immaterial if an individual class member is unable to prove that the defendant's conduct caused the injury in fact . . .") (citing, *Neely v. Ethicon*, 2001 WL 1090204, p.11 (E.D. Tex. 2001)).

[88]      Plaintiff Brief, p. 11

[89]      Plaintiff Brief, p. 23; Plaintiffs Responses to Class Certification Requests for Admissions, Nos. 9 and 10 ("individualized proofs will be necessary in the trial of a given class member's individual damages.")

levels and relative contributions to the flooding from the various sources.[90]   The model does not

predict the high water levels (or any water level) within any structure, nor does it allocate flood

damage among the various sources, including flooding caused by rain.   In short, proving where

the water went does not prove that it did any damage when it got there.   Absent proof that flood

water caused injury, and that this injury was due to the fault of a defendant, the proposed flood

dynamics common question is "not relevant,"[91] nor an issue that would advance the litigation.[92]

### iii.        Diminution of Property Values

The plaintiffs argue that determining the "appropriate methodology for assessing

diminution in property value," is a common issue for the Phase One trial.[93]   The plaintiffs'

expert, Dr. John Kilpatrick, claims he can create a mass appraisal model to determine diminution

of property value, expressed as percentage, applicable to the entire class, or sub-classes without

conducting individual appraisals of each residence.[94]

Michael Truax, defendants' licensed certified professional real estate appraiser,

determined the area consists of a high density of mixed usage neighborhoods.   In his opinion,

damages cannot be accurately evaluated without analysis of individual properties.

---

[90]        Vrijling depo. I, pp. 58-59.

[91]        *Lewis*, 716 F.2d at 1431.

[92]        Compare, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) (an action against a single defendant where the damages arose from a single accident - an oil tank spill - and where the the court concluded that "where the oil went" was a common issue).

[93]        Trial Plan, p. 2.

[94]        Kilpatrick depo., pp. 170-171, 238-239.

Dr. James Richardson, the defendants' expert economist, will establish that due to the checkerboard demographics and home values in the New Orleans area, mass appraisal techniques are neither designed for nor capable of assessing real property diminution loss with any degree of accuracy or reliability. This is not just his opinion or a guess. The Louisiana Road Home program tried mass appraisal to determine pre-Hurricane Katrina real estate values for grant purposes. That effort failed due to seriously high error rates. Consequently, the mass model was scrapped in favor of individualized appraisals.

Determining the "appropriate methodology" for diminution damages is not a common issue for the Phase One jury.

First, the model is relevant only to diminution damages experienced by homeowners.[95] It does not apply to the entire class, or even to the majority of the class members because most are renters.

Next, the model will address only diminution of property damages. Even if it performs entirely as promised, the model does not purport to evaluate any other property damage or economic loss. Moreover, even for diminution damages, the model cannot predict or differentiate between damage caused by flooding due to breaches, flooding due to rain, or damages caused by wind, flying debris, or other factors.

Finally, and regardless of whether Kilpatrick can or cannot develop such a model, deciding the "appropriate methodology" for an expert is not a "common issue" for the jury to decide at the Phase One trial. Rather, "appropriate methodology" relates to whether a class can

---

[95]        Kilpatrick depo., pp. 358-359, 457- 461.

be certified at all.  If the plaintiffs claim that diminished property values are capable of class-wide determination, they are required to propose a specific model for consideration at the class certification hearing.  Absent a proposed model or other formulaic calculation, a class should not be certified.

That Kilpatrick's testimony was admitted by the Court in *Turner v. Murphy Oil USA, Inc.*,[96] is of no moment.  In *Turner*, the action arose from a single event (an oil spill), and the same damages were experienced by all class members (oil contamination).  In contrast, this action involves multiple breach and over-topping sites and damages caused by many factors other than flooding from the breaches.  In *Turner* there was no need for Kilpatrick's model to differentiate between the causes of damage.  Here there is.

Further, relying upon the Second Circuit's decision in *In Re: Visa Check/Master Money Antitrust Litig.*,[97] the Court in *Turner* concluded that only a limited *Daubert* review was warranted.  However, the Second Circuit subsequently disavowed this notion in *In Re: Initial Public Offerings Securities Litigation*.[98]  Consequently, Kilpatrick's testimony was admitted in *Turner* without being subjected to the rigorous analysis required by *Daubert* and Rule 23.  The mere promise that a formulaic methodology will compute diminution damages for all class members without a showing of record evidence, the underlying input data, or an analysis of the quantification of any plaintiff's damages is unpersuasive and "so flawed as to be inadmissible as

---

[96]     2006 WL 91364 (Jan 12, 2006).

[97]     280 F.3d 124 (2d Cir. 2001).

[98]     471 F.3d 24, 42 (2d Cir. 2006). ("we also disavow the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed.")

a matter of law."[99]

## 2.      Issues Requiring Individualized Proof Predominate

Except for diminution damages to real property, the plaintiffs suggest no other

mathematical or formulaic method for determining the compensation for any type of damage

claimed by the class members.  The plaintiffs admit that "individualized proofs will be necessary

in the trial of a given class member's individual damages."[100]  Where, as here, "individual

damages cannot be determined by reference to a mathematical or formulaic calculation, the

damages issue may predominate over any common issues shared by the class."[101]

In addition to compensatory damages, the following factual issues, items of special

damages, and legal determinations must be made for each individual class member's claim:

- the location of the class member at the time of the flooding due to rain and at the time of the flooding due to breaches;
- whether the class member complied with evacuation orders;
- the ground and finished floor elevations for each structure;
- the flood water depth in each structure;
- the pre-hurricane value of the structure;

---

[99]      See, *Fisher*, 238 F.R.D. at 308 n.77; and *Labauve v. Olin Corp.*, 231 F.R.D. 632, 676-678 n.99 (S.D. Ala. Nov. 10, 2005) ("[R]osy, conclusory prognostications of a 'common, formulaic methodology' obscure numerous conceptual and practical obstacles almost certain to negate straightforward use of an across-the-board formula.").

[100]      Plaintiff Brief, p. 12; Plaintiffs Response to Class Certification Requests for Admissions, Nos. 9 and 10; See also, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 416-417 (5th Cir. 1998) (compensatory damages for emotional and other forms of intangible injury require specific individualized proof.)

[101]      *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).  A finding of a lack of predominance would be consistent with the decisions of other courts considering class certification of Hurricane Katrina claims involving many fewer damages issues than exist in this action.  See, *Comer v. Nationwide Mut. Ins. Co.*, 2006 WL 1066645, p.2 (S.D. Miss. Feb. 23, 2006 (common issues did not predominate because "the nature and extent of the property damage the owners sustain . . . will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage."); See also, *Guice v. State Farm Fire & Cas. Co.*, 2007 WL 912120, p. 4 (S.D. Miss. March 22, 2007) (denying Katrina insurance class action because causation and damages would require individualized proof.)

-     the damage to the structure from wind, flying debris, flooding by rain, flooding by breach waters, overtopping, vandalism, power loss, or pre-existing conditions;[102]
-     the cause of and itemization of special damages (evacuation, medical, relocation expenses, and the like);
-     the cause of damage and itemization of lost personal property;
-     the class members' efforts to recover salvable items and mitigate damages;
-     the cause and amount of economic losses;[103]
-     the class members' efforts to mitigate economic losses;
-     the cause of any physical or mental injury claimed by the class members;
-     whether third parties contributed to the cause of any injury or loss sustained;
-     the allocation of fault among defendants, third parties, and each class member for each item of damages claimed;
-     whether each class member has exhausted administrative remedies under the FTCA - 28 USCA 2675(a); and
-     whether any defendant is entitled to setoff due to a class members' receipt of insurance or Road Home proceeds or other relief.

It is self-evident, issues requiring individualized proof predominate.

### D.     Class Action Proceeding Is Not Superior

#### 1.     Individualized Issues and Reevaluation of Fault

Because individualized issues of causation and damages predominate over issues common to the class as a whole, superiority is lacking. Such "an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried."[104]

Additionally, Phase Two trial juries will be required to reexamine the fault of the defendants. In that situation, "[t]he risk of such reevaluation is so great that class treatment can hardly be said

---

[102]    Dr. Erik Nelson, the defendants' expert professional engineer, will establish that individual site inspections are required to evaluate and differentiate flooding damages to a structure from damages due to other causes or conditions.

[103]    Dr. Richardson, the defendants' expert economist, will demonstrate that the economic losses claimed by the named plaintiffs vary, and will opine that individualized evaluation of each class members' economic damages, including lost wages, business interruption and the like, will required individualized evaluation.

[104]    *Allison*, 151 F.3d at 419.

to be superior to individual adjudication."[105]

### 2. Other Superiority Factors

Other pertinent factors also weigh against a finding of superiority.[106]

### a. Class Member Interest

That denial of certification would not deprive class members of a judicial remedy is evidenced by the number of individual claims filed and the dollar amounts claimed. Although the plaintiffs suggest that the transaction costs of the litigation in effect establishes the existence of "negative value claims," and that these costs would "scare off" both lawyers and litigants,[107] the reality of the legal landscape of the Hurricane Katrina litigation proves that the contrary is true.

Over 250 Hurricane Katrina class, mass joinder, and individual flood suits have been filed against the OLD in both state and federal courts. 70 have been filed against the EJLD, and over 200 have been filed against the S&WB.[108] Approximately 300 lawsuits have been filed against the United States. Additionally, in excess of 300,000 Hurricane Katrina SF-95 forms have been submitted to and processed by the United States.[109] The SF-95s submitted by the named plaintiffs alone claim over $5.6 million in property damage, and $204.7 million in

---

[105]        *Castano*, 84 F.3d at 751.

[106]        *Allison*, 151 F.3d at 419. Those factors include the interests of the members in individually controlling the litigation, the extent of litigation already commenced, the desirability of concentrating the litigation in the forum, and difficulties in managing the action as a class.

[107]        Plaintiff Brief, p. 25.

[108]        See attached listing of Hurricane Katrina flood suits filed against the OLD, EJLD, and S&WB. Exs. A, B, and C.

[109]        See, Order on Motion, p. 2, July 6, 2007; Doc. No. 6299.

personal injury damages.[110]  The plaintiffs estimate that damages in the New Orleans area exceed $100 billion.[111]  In the face of this reality, the suggestion that class action proceeding is the only way to achieve redress for the victims of Hurricane Katrina rings false.

**b.      Other Litigation**

The very existence of the wide-spread Hurricane Katrina litigation against these defendants, reflects the determination of individual class members to seek redress, whether through this proposed class action or otherwise.

**c.      Concentration of Litigation in Forum**

The existence of significant litigation in the state jurisdictions, which in many cases include claims against defendants who are not amenable to the jurisdiction of the federal courts, reflects that there is no particular benefit to concentrating the litigation in this forum.

**d.      Manageability**

The plaintiffs have not demonstrated that proceeding by class action would be any more manageable than proceeding by mass joinder.  Because the defendants' fault will necessarily be considered in both the class and individual trials, "[t]he net result may be a waste, not a savings, in judicial resources."[112]

---

[110]      Jose' Rodriquez alone claims $200 million in personal injury and wrongful death.

[111]      Plaintiff Brief, p. 5.

[112]      *Castano*, 84 F.3d at 749.

### E.      Rule 23(a)  Requirements

#### 1.        23(a)(1) - Numerosity

The Levee defendants do not contest this element.[113]

#### 2.        23(a)(2) - Commonality

As previously discussed, the plaintiffs' proposed common issues for the Phase One trial are not common nor will their resolution significantly advance the litigation.[114]

#### 3.        23(a)(3) - Typicality

The twenty-four[115] proposed class representatives are not typical of the class they seek to represent.

##### a.        Not "Representative"

Findings in a trial of the claims of the named plaintiffs would not apply to any absent class member, or even to other class members of the same proposed sub-classes.  To establish typicality the plaintiffs must prove that the claims of the named plaintiffs have the same essential characteristics as those of the absent class members, because "as goes the claim of the named plaintiff, so go the claims of the class."[116]

As previously discussed, the flood models do not obviate the need for particularized proof of causation of property damage to the named plaintiffs' houses.  Moreover, each named

---

[113]      As will be addressed by separate brief, the Corps contests numerosity.

[114]      *Sprague v. General Motors Corporation*, 133 F.3d 388, 397 (6th Cir. 1998).

[115]      Although listed on their final Class Certification Witness list, the plaintiffs have withdrawn Eddie Knighten and Leslie Dorantes as proposed class representatives.

[116]      *Stirman v. Exxon Exploration*, 280 F.3d 554, 562 (5th Cir. 2002); *Sprague*, 133 F.3d at 399.

plaintiff makes claims for different personal injuries, lost personal property, and special damages including lost wages, medical expenses, and evacuation expenses. The claims for intangible damages like mental anguish, inconvenience, emotional distress, and the like necessarily implicate "the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide remedy."[117]   No two class representatives' claims are the same in this respect. Individualized defenses including comparative fault, fault of third parties, and failure to mitigate damages will have to be considered on a plaintiff-by-plaintiff and injury-by-injury basis.

Flood insurance and Louisiana Road Home monies received by some, but not all, of the named plaintiffs add complexity by injecting subrogation issues into the mix. Stella Washington, Trenise Jackson, and Elois Bell received Road Home monies.[118]   Among the named plaintiffs receiving payments from their flood carriers are John Williams, Kenneth Polite, and Bette Jones.[119]   The payors of these monies and proceeds may have legal or conventional subrogation rights against the Levee defendants, which will require evaluation on a case-by-case basis.

Where, as here, the action requires individualized proof of causation, injury, and comparative fault, there is no typicality.[120]

---

[117]     *Steering Committee*, 461 F.3d at 602.

[118]     Washington depo., p. 136; Jackson depo., pp. 183-184; Bell depo., p. 67.

[119]     Williams depo., pp 199-120; Polite depo., p. 61; Jones depo., p. 77.

[120]     *In re: Vioxx Products Liability Litigation*, 239 F.R.D. 450, 459-460 (E.D. La. 2006).

### b.     No Incentive

Although, the class definition purports to include "public entities" within the proposed class, no named plaintiff is such an entity.  Several public entities that fall within the proposed class definition are, however, defendants in this action.  This circumstance weighs heavily against a finding of typicality because the proposed class representatives have no incentive to pursue the claims of these absent class members.[121]

The named plaintiffs also have no incentive to pursue the claims of absentee "private entities" though such entities are included in the class definition.  Absent are any proposed class representatives for gas stations, grocery stores, construction companies, medical clinics or many of the other hundreds of businesses that were flooded and which may have sustained business interruption, loss of business opportunity, and loss of market damages.[122]  There is no proposed class representative for tourists or business travelers caught in the City at the time of the storm, nor any representative for emergency workers or good samaritans who came to assist with rescue efforts, but who were persons "in" the City and included in the class definition.

The defendants recognize that the burden of establishing typicality is not very demanding.[123]  However, in this action the plaintiffs have not even attempted to assemble a fair cross section of the class members they purport to represent.  While the bar for typicality is low, it should not be this low.

---

[121]     *Stirman.,* 280 F.3d at 563 n.7.

[122]     Only one named plaintiff, John Williams, claims any business interruption loss, and that was for his wife's beauty shop.  Williams depo., pp. 57-61.

[123]     *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).

### 4.        23(a)(4) - Adequacy

Class representatives must be "willing" and "able" to "take an active role in and control the litigation and to protect the interests of the absentees."[124]  Class representatives, not their counsel, must direct the litigation and be sufficiently informed so as to manage the litigation.[125] The representatives need to know more than just that they were "involved" in the flooding.[126]

### a.        Not Knowledgeable or Directing the Litigation

The proposed class representatives are not knowledgeable of the facts, parties, and claims at issue in this action.  None of the class representatives participated in the drafting of the Class Action Complaints or selection of defendants.  Trenise Jackson and Rosemary Kaiser thought the Corps was the only defendant.[127]  Emanuel Esteves had no idea why the S&WB and Levee Districts were defendants.[128]  Donna Augustine, Calvin Levy, and Betty Jones had no idea why any defendant other than the Corps had been sued.[129]  Jose Rodriguez and Beatrice Drew did not know the names of any defendant.[130]  Most have never even seen the complaints and those that have were only provided a copy of the complaint in preparation for their depositions.

Other than being shown the complaints, none has reviewed any motions, briefs or other

---

[124]        *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

[125]        *Unger v. Amedisys, Inc.,* 401 F.3d 316, 321 (5th Cir. 2005).

[126]        *Berger*, 257 F.3d at 484; ("plaintiffs do need to know more than that they were 'involved in a bad business deal.'").

[127]        R. Kaiser depo., p. 85; Jackson depo., p. 218.

[128]        Esteves depo., p. 128.

[129]        Augustine depo., pp. 148-149; Levy depo., p. 193; Jones depo., p. 120.

[130]        Rodriguez depo., pp. 165-166; Drew depo., p. 225.

pleadings.  None has attended any of the hearings in this case.  Other than the Corps, most did not even know who all the defendants are, and those who did could not state why those defendants were sued other than in the most general sense.  None knew which defendants had been dismissed.

None of the named plaintiffs completed the SF-95s on his or her own.  All testified that Section 8 of the SF-95s, which states the claimant's basis for his claim, was preprinted at the time they received the forms from their attorneys.  Michelle Hennessy contradicted the claim in her SF-95 form stating that her damages were caused by pump failure, not, as her counsel had written, due to the failures of levees.[131]  Only one, Dwayne Mallett, had any concept of the geographic class area for which he is a named representative.   They have not interviewed any witnesses, provided any evidence to their counsel (beyond evidence of their own particularized damages), or met with any experts.

The proposed class representatives are not directing this litigation.  Instead, as is obvious, the action is being directed by counsel.

### b.     Will Not Represent Interests of Absentees

 Because absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be "especially vigilant" to ensure that the due process rights of all class members are safeguarded through adequate representation at all times.[132]

---

[131]     Hennessey depo., pp. 51 and 140.

[132]     *Berger*, 257 F.3d at 479.

That not all absentee class members will be adequately represented by the proposed class representatives is demonstrated by the absence of any representative for corporate or public entities or the hundreds of business and commercial ventures included in the class definition.

That the named plaintiffs will not, and have no intention to represent all absentees is expressed in their testimony.  Donna Augustine is not representing property owners, public corporations, private corporations, or anyone with business interruption claims.[133]  Similarly, Calvin Levy does not intend to prosecute claims on behalf of public or private corporations.[134]  Finally, Charles Moses says he is not representing businesses because "they have a means to represent themself."[135]  What these named plaintiffs fail to realize is that they have petitioned this Court to recognize them as representatives of the very businesses and entities they expressly plan to ignore in pursuing their claims.  It is obvious, many absent class members will not be adequately represented by these named plaintiffs.

### c.    Antagonism

Representatives are "inadequate" if they have "interests antagonistic to the unnamed members."[136]  In situations where there exists "a realistic possibility of antagonism" among class members, denial of certification is warranted.[137]  Here, there are actual conflicts of interests between the named plaintiffs and the absentees they propose to represent.

---

[133]     Augustine depo., pp. 147, 151-152.

[134]     Levy depo., pp. 195-196.

[135]     Moses depo., p. 123.

[136]     *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

[137]     *Horton v. Goose Creek Independent School Dist.,* 690 F.2d 470, 486 (5th Cir. 1982).

The named plaintiffs purport to represent "public entities" in the New Orleans area. However, the plaintiffs are suing some of the public entities, OLD, S&WB, EJLD, and PNO, they propose to represent.  This presents more than a theoretical or possible antagonism. Rather, actual conflicts of interest are plain.  "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."[138]

### F.    Class Members not "Clearly Ascertainable"

The class as proposed does not satisfy the requirement that it be "adequately defined and clearly ascertainable."[139]  Though the plaintiffs seek to represent persons "in" the area, they do not provide any insight as to the scope of this term.  Does the class include visitors and business travelers who were stuck in the City for a few days or emergency response teams, national guard troops, or volunteers who traveled to the area after the storm to restore order or assist with rescue efforts?  The proposed definition is unclear in this respect and the plaintiffs' response to the defendants' discovery sheds little light on the question.[140]  Regardless, there are no named plaintiffs who represent persons transiently in the area.

The Levee defendants adopt, by reference, the Corps' arguments with respect to administrative claim filing requirements.

---

[138]      *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

[139]      *Debremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).

[140]      When asked in discovery to clarify the intent of the definition, the plaintiffs initially objected then, following a motion to compel, responded: "[p]laintiffs intend the term "in" to include, without limitation, any person or entity who or which sustained injury or damage on August 29, 2005 and the days following thereafter as a result of the inundation by water in the geographical boundaries of each sub-class."

**IV.     CONCLUSION**

Considering the action "as a whole," the lack of predominance is plain.  To determine

causation, damages, and comparative fault, individualized proofs are required for each class

member.  The plaintiffs do not even contend that the findings of causation and damages for any

proposed class representative would be representative of the claims for any other class member.

Instead, the plaintiffs invite the Court to ignore the 7th Amendment problems and the

demanding predominance requirement of Rule 23(b)(3), and certify the class anyway because

class treatment, they profess, is the "only hope"[141] for the class members.  The plaintiffs are

wrong.  Certification should be denied.

                                    Respectfully submitted,


                                    s/Ben L. Mayeaux
                                    LABORDE & NEUNER
                                    Ben L. Mayeaux - #19042
                                    James L. Pate - # 10333
                                    Gregory A. Koury - #26364
                                    One Petroleum Center, Suite 200
                                    1001 West Pinhook Road
                                    Lafayette, Louisiana 70503
                                    TELEPHONE:        (337) 237-7000
                                    FACSIMILE:        (337) 233-9450

                                    and

---

[141]     Plaintiff Brief, p. 26.

McCRANIE, SISTRUNK, ANZELMO, HARDY,
MAXWELL & McDANIEL
Thomas P. Anzelmo, T.A. - #2533
Mark E. Hanna - #19336
Kyle P. Kirsch - #26363
Andre J. Lagarde - #28649
3445 N. Causeway Boulevard, Ste. 800
Metairie, Louisiana 70002
TELEPHONE:        (504) 831-0946
FACSIMILE:        (504) 831-2492
Attorneys for the ORLEANS LEVEE DISTRICT

and

CHRISTOVICH & KEARNEY, LLP
Mr. Charles M. Lanier, Jr. #18299
Mr. J. Warren Gardner, Jr. #5928
Ms. Elizabeth Cordes #1786
Pan American Life Center
601 Poydras Street, Suite 2300
New Orleans, LA 70130-6078
TELEPHONE:        (504) 593-4272
FACSIMILE:        (504) 561-5743
Attorneys for the SEWERAGE & WATER
BOARD OF NEW ORLEANS

and

DAIGLE FISSE & KESSENICH, PLC
J. Frederick Kessenich #7354
Jonathon H. Sandoz #23928
Michael W. McMahon #23987
Jon A. Van Steenis #27122
Kirk N. Aurandt #25336
P.O. Box 3530
Covington, LA 70434-5350
TELEPHONE:        (985) 871-0800
FACSIMILE:        (985) 871-0899
Attorneys for the BOARD OF COMMISSIONERS
OF THE PORT OF NEW ORLEANS

and

Page -53-

DUPLASS, ZWAIN, BOURGEOIS, MORTON,
PFISTER & WEINSTOCK
Lawrence J. Duplass #5199
Gary M. Zwain #13809
Andrew D. Weinstock #18495
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
TELEPHONE:          (504) 832-3700
FACSIMILE:          (504) 837-3119
Attorneys for the EAST JEFFERSON LEVEE
DISTRICT

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of October, 2007, a copy of the above and foregoing **Joint Memorandum in Opposition to Amended Motion for Class Certification** was filed electronically with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to All Known Counsel of Record by operation of the Court's electronic filing system.

s/Ben L. Mayeaux
COUNSEL