**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO. 05-4182 "K" (2)

JUDGE DUVAL
MAG. WILKINSON

PERTAINS TO: MRGO

FILED IN      05-4181, 05-4182, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885, 06-2152,
06-2278, 06-2287, 06-2824, 06-4024,
06-4065, 06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155, 06-5159,
06-5161, 06-5162, 06-5260, 06-5771,
06-5786, 06-5937, 06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285, 07-5067

**MRGO DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

October 9, 2007

## TABLE OF CONTENTS

**Page**

I.      Introduction ...................................................................................................... 1

II.     Factual Record Relevant To The Class-Certification Issue ..................................... 4

        A.      Overview Of The Hurricane Protection System
                And Hurricane Katrina ............................................................................ 4

        B.      Plaintiffs' Claims And Their Proposed Class ........................................... 14

        C.      Named Plaintiffs ................................................................................... 16

                1.      Jeannine and Kenneth Armstrong ................................................. 16

                2.      Ethel Mae Coats ......................................................................... 20

                3.      Glynn Wade ................................................................................ 24

                4.      Henry Davis ................................................................................ 27

        D.      Defendants' Experts .............................................................................. 31

                1.      Lee Wooten, P.E. ......................................................................... 31

                2.      Dr. Robert A. Dalrymple ............................................................. 32

                3.      James Danner, P.E. ..................................................................... 32

                4.      Dr. Kerry Vandell ....................................................................... 33

                5.      Michael W. Truax, MAI ............................................................... 34

        E.      Plaintiffs' Proposed Flood Model ........................................................... 34

        F.      Plaintiffs' Proposed Damages Model ...................................................... 40

III.    Argument And Authority ...................................................................................... 47

        A.      Overview .............................................................................................. 47

        B.      Plaintiffs' Proposed Class Fails To Satisfy The Commonality,
                Typicality, And Adequacy Requirements Of Rule 23(a) ........................... 49

                1.      Commonality ............................................................................... 50

                2.      Typicality ................................................................................... 51

                3.      Adequacy Of Representation ........................................................ 56

        C.      Plaintiffs' Proposed Class Fails To Satisfy The Predominance
                And Superiority Requirements Of Rule 23(b)(3) ...................................... 59

                1.      Common Questions Of Law And Fact Do Not Predominate
                        Over Questions Affecting Only Individual Members ...................... 60

i

# TABLE OF CONTENTS
### (continued)

Page

      a.    Plaintiffs' Claims, And The Defenses To Those Claims, Are Plagued With Issues That Would Inevitably Require Individualized Proof From Each Class Member At Trial ......................................................... 60

            (1)   This Case Is Not A "Single Catastrophic Event" Owing To A "Single Course Of Conduct" .............. 64

            (2)   Plaintiffs' Proposed Flood Model Was Primarily Intended To Estimate The Depths Of Floodwater Reaching Locations In The Class Area, And Cannot Replace The Need For Individualized Proof That A Particular Defendant's Conduct Injured A Particular Plaintiff .................................................................. 67

            (3)   Plaintiffs Have Not Proposed, Let Alone Developed, A Mass-Appraisal Model For Valuing The Myriad of Damages Sought By Plaintiffs ....................................................................... 73

      b.    Plaintiffs' Requested Certification Of Certain Issues Under Rule 23(c)(4) Cannot Ease Plaintiffs' Burden To Show Predominance ....................................................... 79

2.   Plaintiffs Cannot Demonstrate That Their Proposed Class Action Is The Superior Method Of Adjudicating The Claims Asserted Here, Or That A Class Action Involving So Many Individual Issues Would Be Manageable ......................................... 80

      a.    Plaintiffs' Proposed Two-Phase Trial Plan ......................... 80

            (1)   The So-Called "Common Issues" Phase Of Plaintiffs' Proposed Trial Plan Would Not Establish Liability On A Classwide Basis Because Causation And Comparative Fault Require Individualized Assessments ....................... 84

            (2)   Plaintiffs' Trial Plan Could Not Be Implemented Without Violating The Seventh Amendment And Would Not Create Efficiency Gains ........................................................................ 89

## TABLE OF CONTENTS
(continued)

**Page**

b.    The Individual Issues Necessarily Presented By The Claims Of Each Proposed Class Member Render The Proposed Class Trial Unmanageable ................................... 92

c.    The Claims Of The Class Are Not Negative-Value Claims, And Each Individual Class Member Has A Significant Interest In Controlling The Adjudication Of His Or Her Claim ........................................................... 94

IV.    Conclusion ......................................................................................... 95

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Abbott Labs.*,
    51 F.3d 524 (5th Cir. 1995) ..................................................................... 64

*In re Air Crash Disaster Near New Orleans*,
    764 F.2d 1084 (5th Cir. 1985) ................................................................ 56

*Alabama v. Blue Bird Body Co.*,
    573 F.2d 309 (5th Cir. 1978) ............................................................. 1, 49

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .......................................... 1, 48, 49, 50, 57, 58, 94

*Barasich v. Columbia Gulf Transmission Co.*,
    467 F. Supp. 2d 676 (E.D. La. 2006) ............................................... 85, 88

*Basco v. Wal-Mart Stores, Inc.*,
    216 F. Supp. 2d 592 (E.D. La. 2002) ...................................................... 88

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ................................................................. 75

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ................................................................. 57

*Bradley v. Nationwide Mut. Ins. Co.*,
    No. 1:06CV528-LTS-RHW,
    2006 WL 2594548 (S.D. Miss. Sept. 6, 2006) .................................... 4, 63

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) .......................... 1, 47, 48, 64, 79, 80, 82, 89,
    90, 91, 92, 93, 94, 95

*Cimino v. Raymark Indus., Inc.*,
    151 F.3d 297 (5th Cir. 1998) ........................................................... 87, 88

*Cole v. Gen. Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ................................................................. 48

*Comer v. Nationwide Mut. Ins. Co.*,
  No. 1:05 CV 436 LTD RHW,
  2006 WL 1066645 (S.D. Miss. Feb. 23, 2006) ................................................. 4, 62

*Corley v. Entergy Corp.*,
  220 F.R.D. 478 (E.D. Tex. 2004) ......................................................... 94

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 (1993) ........................................................... 40

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ........................................................... 80

*In re Fibreboard*,
  893 F.2d 706 (5th Cir. 1990) ........................................................... 49, 87

*In re Ford Motor Co. Vehicle Paint Litig.*,
  182 F.R.D. 214 (E.D. La. 1988) ........................................................... 51

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ........................................................... 47, 48

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996),
  *aff'd as Amchem*, 521 U.S. 591 (1997) ............................................... 1, 2

*Guice v. State Farm Fire & Cas. Co.*,
  No. 1:06CV001 LTS-RHW,
  2007 WL 912120 (S.D. Miss. March 22, 2007) ........................................... 4, 62, 71

*Hilton v. Atlas Roofing Corp. of Miss.*,
  No. 05-4204,
  2006 WL 3524295 (E.D. La. Dec. 5, 2006) ........................................................... 57

*Jenkins v. Raymark Indus., Inc.*,
  782 F.2d 468 (5th Cir. 1986) ........................................................... 93

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................... 40

*Lewis v. Timco, Inc.*,
  716 F.2d 1425 (5th Cir. 1983) ........................................................... 86

*Martin v. Home Depot U.S.A., Inc.*,
    225 F.R.D. 198 (W.D. Tex. 2004) ........................................................................ 58

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*,
    170 F.R.D. 417 (E.D. La. 1997) ................................................................... 90, 91

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) ....................................................................... 66, 67

*Neely v. Ethicon, Inc.*,
    No. 1:00-CV-00569, 1:01-CV-37, 1:01-CV-38,
    2001 WL 1090204 (E.D. Tex. Aug. 15, 2001) ............................................... 90

*Norwood v. Raytheon Co.*,
    237 F.R.D. 581 (W.D. Tex. 2006) ........................................................ 91, 92, 94

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ................................................................................... 1, 49

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ...................................................................................... 94

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ......................................................................... 90

*Robinson v. Tex. Auto. Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ......................................................................... 80

*Rohr v. Metro. Ins. & Cas. Co.*,
    No. 06-10511,
    2007 WL 163037 (E.D. La. Jan. 17, 2007) ...................................... 4, 54, 63, 64, 85

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000) ...................................................................... 63

*Salvant v. Murphy Oil USA, Inc.*,
    No. 06-8700,
    2007 WL 2344912 (E.D. La. Aug. 13, 2007) .................................................. 63

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) .................................................................... 50, 51

*Steering Comm. v. Exxon Mobil*,
    461 F.3d 598 (5th Cir. 2006) ..........................................4, 47, 62, 63, 65, 66, 84, 92

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ................................................................. 58

*Turner v. Murphy Oil USA, Inc.*,
    234 F.R.D. 597 (E.D. La. 2006) ............................................................ 66

*Unger v. Amedisys, Inc.*,
    401 F.3d 316 (5th Cir. 2005) ................................................................. 47

*In re Vioxx Prods. Liab. Litig.*,
    239 F.R.D. 450 (E.D. La. 2006) ......................................................... 52, 63

*Wagner v. Cent. La. Elec. Co.*,
    102 F.R.D. 196 (E.D. La. 1984) ............................................................ 50

*Watson v. Shell Oil Co.*,
    979 F.2d 1014 (5th Cir. 1992) ............................................................... 64

## STATE CASES

*Bonin v. Ferrellgas, Inc.*,
    877 So. 2d 89 (La. 2004) ...................................................................... 60

*Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*,
    828 So. 2d 530 (La. 2002) ..................................................................... 86

*Jones v. Peyton Place, Inc.*,
    675 So. 2d 754 (La. Ct. App. 1996) ....................................................... 60

*LeRay v. Bartholomew*,
    871 So. 2d 492 (La. Ct. App. 2004) ....................................................... 86

*Perkins v. Entergy Corp.*,
    782 So. 2d 606 (La. 2001) ..................................................................... 60

*Roman Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co.*,
    618 So. 2d 874 (La. 1993) .....................................................................77

## STATUTES

28 U.S.C. § 2402 ......................................................................................................... 81

La. Civ. Code Ann. art. 2323(A) (1997) ...................................................................... 82

La. Civ. Code Ann. art. 2324(B) (1997)................................................................. 55, 86

## I.    Introduction

The Supreme Court and Fifth Circuit have repeatedly held that the class-action procedural device may not be used to alter or dilute the requirements of substantive law.[1] Hence, an element of proof like causation or an affirmative defense like comparative fault may not be compromised — even in the face of exigent circumstances.[2]

Notwithstanding these clear legal mandates, however, exigencies do arise and courts are sometimes asked to adopt shortcuts.  Such requests are tempting when there has been a national disaster or crisis, and devastated individuals claim they can obtain relief only if the court certifies a class action.  The proposed "sprawling class" may include hundreds of thousands of individuals — many of whom have suffered devastating losses.[3]  Invariably, the defendants are accused of egregious fault.  Sometimes the crisis should have been addressed by legislation, but the national government has failed to act.[4] Consequently, a "class action" is touted as the only "efficient" way to proceed; otherwise, the courts would be overwhelmed with individual lawsuits.

One court faced with such a case observed:

> Every decade presents a few great cases that force the judicial
> system to choose between forging a solution to a major social

---

[1] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13, 629 (1997); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750-51 (5th Cir. 1996); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978).

[2] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 864 (1999).

[3] *Amchem*, 521 U.S. at 622.

[4] *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618, 634 (3d Cir. 1996), *aff'd as Amchem*, 521 U.S. 591 (1997).

problem on the one hand, and preserving its institutional values on the other.[5]

The dilemma is real and the temptation is great.

This is such a case.  Hurricane Katrina was one of the worst natural disasters in American history.  The hurricane-force wind and rain — as well as flooding from dozens of failures throughout the Hurricane Protection System — damaged homes and businesses, destroyed personal property, and caused injuries and deaths.

The proposed MRGO class includes more than 200,000 individuals and entities, each having an individual story and a unique mix of damages.  Some homes and businesses were damaged by wind and rain, others by flying debris, many by floodwater that entered Greater New Orleans due to the overtopping or breaching of floodwalls and levees at dozens of different sites, and still others by a combination of these forces. Nonetheless — unless the requirements of substantive law are ignored — this case cannot be certified and tried on a class-action basis.

The causal chain — negligent conduct, that was the factual and legal cause, resulting in injury-in-fact — will be complex for each separate injury allegedly incurred by each individual plaintiff.  All of the named plaintiffs submitted homeowner's insurance claims stating that some portion of their property damage was caused by wind and rain.[6]  Indeed, named plaintiff Henry Davis admitted that the worst damage to his

---

[5] *Georgine*, 83 F.3d at 617, *aff'd as Amchem*, 521 U.S. 591 (1997).

[6] (*See* J. Armstrong Dep., App. Tab 4 at 69; K. Armstrong Dep., App. Tab 5 at 21; Coats Dep., App. Tab 6 at 71; Wade Dep., App. Tab 7 at 32-33; Davis Dep., App. Tab 8 at 52.)

house was caused by wind damage and water intrusion through the roof.  He also incurred some flood damage.  But he noted that a church only three blocks away sustained no flood damage.[7]  Named plaintiff Kenneth Armstrong's house had wind, rain, and flood damage, whereas his in-laws' house — located only a few doors away — was crushed by a falling tree.[8]  Named plaintiff Jeannine Armstrong is also asserting a personal-injury claim for an infection that she attributes to mold in her home after Katrina, which resulted in a hospital bill of $282,000.[9]  Indeed, no named plaintiff could present "representative proofs" that would decide the claims of absent class members.  As named plaintiff Davis admitted, no one person can represent everybody:

> That's why *I don't understand why they just have one person represent everybody*, because nobody, no one person can do it exactly what happened to everybody out there.  It's no way.[10]

Recognizing that each person will need to submit his own individual proofs of causation and injury, numerous courts with Hurricane Katrina cases have denied class

---

(continued…)

Defendants are concurrently filing an Appendix that will contain materials cited in this memorandum. Cites to the Appendix will be in the following form:  [Description of Document], App. Tab [Appendix Tab Number] at [Page Number].

[7] (Davis Dep., App. Tab 8 at 22-23, 44, 62, 114-15.)

[8] (K. Armstrong Dep., App. Tab 5 at 21-22, 30, 36, 128.)

[9] (J. Armstrong Dep., App. Tab 4 at 77-78.)

[10] (Davis Dep., App. Tab 8 at 132-33 (emphasis added).)

certification or joinder of claims.[11]  In words that are equally applicable to this case, the

Fifth Circuit recently found another mass-tort case not appropriate for class certification:

> [I]n addition to the personal injury claims, separate types of
> proof would be necessary for the property damage,
> devaluation, and business loss claims . . . .  [E]ach plaintiff's
> claims will be highly individualized with respect to proximate
> causation . . . .
>
> * * *
>
> It is clear from the record that the damage claims in this case
> are not subject to any sort of formulaic calculation.[12]

The Court should also deny class certification here.

## II.     Factual Record Relevant To The Class-Certification Issue

### A.     Overview Of The Hurricane Protection System
### And Hurricane Katrina

Hurricane Katrina was a terrible natural disaster.  This storm of the century easily

exceeded the "standard project hurricane" model that was used for planning purposes in

the design and construction of the Hurricane Protection System.[13]  Hurricane Katrina

caused enormous damage to the Greater New Orleans area — death, personal injury,

mental distress, and property damage, both real and personal.  The Insurance Information

---

[11] *See Rohr v. Metro. Ins. & Cas. Co.*, No. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan. 17, 2007)
(Feldman, J.); *Comer v. Nationwide Mut. Ins. Co.*, No. 1:05 CV 436 LTD RHW, 2006 WL 1066645, at
*2 (S.D. Miss. Feb. 23, 2006); *Bradley v. Nationwide Mut. Ins. Co.*, No. 1:06CV528-LTS-RHW, 2006
WL 2594548, at *1 (S.D. Miss. Sept. 6, 2006); *Guice v. State Farm Fire & Cas. Co.*, No. 1:06CV001
LTS-RHW, 2007 WL 912120, at *1 (S.D. Miss. Mar. 22, 2007).

[12] *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (citation omitted).

[13] American Society of Civil Engineers, *The New Orleans Hurricane Protection System:  What Went
Wrong and Why* (2007), App. Tab 25 at 65-66 ("ASCE Report"); *see also* Interagency Performance
Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane
Protection System, Final Report*, App. Tab 22 at III-2 ("IPET Report").

Institute estimates the insured economic damages in Louisiana from the hurricane at more than $25 billion.[14]  Some relief programs have already allocated over $10 billion in grant money,[15] and insurance companies have paid an estimated $10.8 billion in homeowner's claims for wind and rain damage in Louisiana.[16]  Even without any levee breaches, Hurricane Katrina's rainfall and levee overtopping would have caused the worst property loss ever experienced by New Orleanians.  (*See* ASCE Report at 39.)

Much of Greater New Orleans lies below sea level and is bounded by large bodies of water, including the Mississippi River, Lake Borgne, and Lake Pontchartrain.  Over time, a system of canals and waterways was built, connecting the river, Lake Pontchartrain, Lake Borgne, and the Gulf of Mexico.  (Wooten Report, App. Tab 15 at 7.)  In 1968, construction of the Mississippi River Gulf Outlet ("MRGO") was completed, expanding the Gulf Intracoastal Waterway ("GIWW") and creating a deep-water navigational channel to the Gulf of Mexico.  *See* U.S. Army Corps of Engineers,

---

[14] Robert P. Hartwig, Louisiana Insurance Market Overview: Toward Viable Insurance Markets in the Post-Katrina & Rita Era, App. Tab 31 at 24, Insurance Information Institute (May 2, 2007), http://www.iii.org/media/industry/outlooks/louisiana/.

[15] *See* Laura Maggi, So far, Road Home's money trail doesn't lead to the flood victims (Nov. 5, 2006), http://www.nola.com/news/t-p/frontpage/index.ssf?/base/news-7/116271231871780.xml&coll=1&thispage=1, App. Tab 32.

[16] *See* Hartwig, *supra* note 14, at 26.  Insurance companies also paid $13 billion for commercial property claims and $1.4 billion for automobile claims in Louisiana.  *Id.*  The average Louisiana homeowner had an insurance claim for $15,647 from the hurricane, and the average Louisiana business had a commercial property claim for $150,000 from the hurricane.  *Id.* at 29.

In addition, affidavits from some of the major insurance companies offering homeowner's policies (covering wind, rain, and other damage, but not losses from flooding) identify the number of non-flood claims in the New Orleans area submitted for damage due to wind, rain, fire, vandalism, and/or theft, and the total amounts paid on such claims.  (*See* Affs. of insurance companies, App. Tab 44 (filed under seal).)  All of this evidences extensive and significant injury to property from causes other than flooding.

*Mississippi River Gulf Outlet Deep-Draft De-Authorization Interim Report to Congress*
(Dec. 2006), App. Tab 28 at ii.

 Also over a period of many years, a 350 mile-long network of complex hurricane and flood-control structures has been constructed.  (Wooten Report at 7.)  The earliest flood-control levees date from the 1700s.  (*Id*.)  Since 1946, Congress has authorized many hurricane-protection projects in the area.  (*Id*.)  As a result of changing evaluations of flood threats, subsidence, urban development, Congressional funding, and other reasons, many of these hurricane and flood-control structures have been rebuilt over the decades.  (*Id*.)  These structures — including levees and floodwalls of varying materials, design, and construction — run throughout the region.  (*Id*.; Dalrymple Report, App. Tab 16 at 5-6.)  An extensive interior drainage system has also been constructed, consisting of overland flow, storm sewers, roadside ditches, collector ditches, canals, and nearly 100 pumping stations, some dating from the early 1900s.  (ASCE Report at 22-23.)  These structures are designed to operate together to gather runoff and pump it into nearby waterways and bodies of water.  (*Id*. at 22.)  The number of entities that have designed, constructed, repaired, inspected, maintained, or otherwise contributed to the various, extensive, evolving network of hurricane and flood-control structures over their long history is likely great.  (Wooten Report at 7.)

 Networks of levees and floodwalls surround each of plaintiffs' proposed subclasses.  New Orleans East, for example, is bounded to the northwest by the New Orleans Lakefront Levee, the Citrus Lakefront Levee, and the New Orleans East Lakefront Levee; to the northeast by the New Orleans East Levee; to the east and south

6

by the New Orleans East Back Levee (along the GIWW); and to the south and west by

the Citrus Back Levee and Inner Harbor Navigational Canal ("IHNC") Levee.

(Dalrymple Report at 5-6.)  These include earthen levees along Lake Pontchartrain,

floodwall-embedded levees along the IHNC, and a variety of earthen levees, sheetpile

floodwalls, and concrete floodwalls along the GIWW.  (*Id.* at 6.)  Further, the levee

elevations vary — even when side-by-side.  (*Id.*)

The Lower Ninth Ward and St. Bernard Parish region is bounded to the west by

the I-walls of the IHNC; to the north by earthen levees along the GIWW; to the east by an

earthen levee along the MRGO; and to the south by a levee that connects the MRGO

levees to those on the Mississippi River.  (*Id.*)  The 40 Arpent Canal Levee, in the interior

of St. Bernard, divides the region between a populated area to the southwest and an

unpopulated wetlands area to the northeast.  (*Id.*)  Additionally, the Violet Canal, which

connects the town of Violet to the MRGO, is flanked by levees in the populated areas.

(*Id.*)  The levees in this region are likewise of a variety of construction types and

elevations.  (*Id.*)

On the morning of August 29, 2005, Hurricane Katrina struck Southeast Louisiana.

For hours, hurricane-force winds, heavy rainfall, and storm surge bombarded Greater

New Orleans.  Wind speeds varied with time and location but included maximum

sustained winds of between 86-92 miles per hour, with peak gusts in New Orleans East

and the Lower Ninth Ward reaching 130 miles per hour.  (*Id*. at 3-4.)  A FEMA model

suggests that 40-80 percent of structures in New Orleans would have sustained at least

moderate damage from wind alone.  (*Id*. at 4.)  Further, the hurricane dumped ten to

twelve inches of rain across the area.  (*Id.* at 5.)  Rainwater caused an average of one foot of flooding throughout the city, although actual rainwater flood depths varied greatly from place to place, as rainwater flowed to and ponded in the lowest points of elevation, including, for example, the northwestern section of the Lower Ninth Ward.  (*Id.*)

Although Hurricane Katrina was a category 3 hurricane when it made landfall, its storm surge — created when Katrina was a category 5 storm in the Gulf of Mexico — had the strength and height of an even stronger storm.  (*See, e.g.*, Wooten Report at 16, 18, 19.)  This storm surge overwhelmed the Hurricane Protection System.  At least 45 sources of water entered the proposed MRGO class area — at least 24 in the Lower Ninth Ward/St. Bernard region and at least 21 in New Orleans East — including rainfall; drainage system failures; pump-station backflows; storm-surge overtopping of at least 22 levees, floodwalls, and control structures; and breaching and overtopping of at least 17 other structures.  (*Id.* at 10-12.)[17]

The following map shows the plaintiffs' proposed class and subclass areas, the surrounding levees and floodwalls, and the locations of breaches and overtopping, as well as the locations of the named plaintiffs' properties:

---

[17] While each of the identified water sources can be linked to Hurricane Katrina, and each had the potential to cause damage to some properties or individuals within particular areas of New Orleans East or the Lower Ninth Ward and St. Bernard Parish, no single source of water caused all damage in either of plaintiffs' proposed subclass regions.  (Wooten Report at 7.)  Nor did any single source of water cause all of the damages within a basin, or damage every property.  (*Id.*)  Indeed, the degree, if any, to which a source could be linked to flooding or damages at a given place varied greatly depending upon the location. (*Id.*)



Water Sources
Lake Pontchartrain
Lakefront Airport
Chef Menteur Highway
Intracoastal Waterway
Michoud Canal
Lake Borgne
Mississippi River Gulf Outlet (MRGO)
Paris Road
IHNC
Mississippi River
Elevation In Feet
-5 Below
-2 to -4 Below
-2 to 4
4 Above
8 Above
12 Above
16 Above
Named Plaintiffs
A Henry Davis 7650 Morel Street
B Glynn Wade 4719 Bundy Rd
C Ethel Mae Coats 1020-22 Charbonnet
D Kenneth Armstrong, Jeannine B. Armstrong 4016 Hamlet Place
New Orleans East
Levee Breaches*
1 Airport Flood Wall/Gate
2 CSX Railroad Floodgate
3 New Orleans East Back Levee
4 Pump Station OP15 Flood Wall
5 Air Products Site Flood Wall
6 Citrus Back Levee
7 IHNC Levee/Flood Gates
Levee Overtopping
8 New Orleans Lakefront Airport Flood Wall
9 Citrus Lakefront Levee
10 New Orleans East Lakefront Levee
11 New Orleans East Levee
12 New Orleans East Back Levee
13 Michoud Canal Flood Walls
14 Citrus Back Levee, East of Paris Road
15 Citrus Back Levee, West of Paris Road
16 IHNC Levee
17 Interior Levees
Lower Ninth / St. Bernard
Levee Breaches*
18 IHNC North Breach
19 IHNC South Breach
20 IHNC/GIWW Levee Gates
21 Paris Road Gate Structure
22 MRGO East Embankment Levee
23 Bayou Bienvenue Control Structure
24 Bayou Dupre Control Structure
25 MRGO to Caernarvon Levee
Levee Overtopping
26 IHNC Levee
27 GIWW Levee
28 MRGO to Caernarvon Levee
29 Mississippi River Levee
30 Florida Avenue Back Levee
31 Florida Walk Canal Back Levee
32 Forty Arpent Canal Back Levee
33 Violet Canal Levees
*Almost all breach sites also had overtopping.
Levee Breach
Overtopped Levee

As explained by Lee Wooten, P.E., defendants' expert on levees and floodwalls, the reasons for breaching and/or overtopping of the levees and walls varied according to the individual sites.  (*See, e.g.*, *id*. at 7.)  Many of the problems may have been the result of using a design storm and water levels that were lower than the actual water levels generated by Hurricane Katrina.  (*Id*. at 16.)  Some of the problems could have resulted from building different parts of the levees and walls to different specifications because the Hurricane Protection System was built over decades using different design standards and multiple construction contactors.  (*Id*. at 8.)  Ongoing and significant subsidence of all structures, including levees and floodwalls, and datum benchmark difficulties increased the challenges faced by designers and caused extensive sections of the Hurricane Protection System to be lower than designers intended.  (*Id*. at 8, 12.)  In many locations, levees and walls were overtopped or breached because of subsidence.  (*See, e.g.*, *id*. at 16.)  Still other varying factors combined to cause levee and floodwall damage and breaching during the storm.  For example, protective structures and supporting soil eroded at some sites as the storm surge and/or waves overtopped levees and floodwalls.  (*See, e.g.*, *id*. at 31.)  The crests and/or back sides of many levees exhibited scour breaches, caused by overtopping erosion.  (*See, e.g.*, *id*. at 31.)  Transitions from earthen levees to floodwalls — typically occurring at gate structures for a transportation corridor — created higher, plunging flows and turbulent floodwaters that often caused greater erosion than what occurred at similar levee locations without transition features.  (*See, e.g.*, *id*. at 38-39.)  And individual floodwall sheetpiles may have settled in some locations as supporting soils became saturated with water.  (*See, e.g.*, *id*. at 32.)  In

addition, some pump stations may have contributed to flooding by possibly acting as conduits through which water entered inhabited areas.  (*Id*. at 28-30.)

A major uncertainty associated with Hurricane Katrina is the timing and evolution of the various breaches of levees and floodwalls within the Hurricane Protection System. (Dalrymple Report at 2.)  In fact, several groups of highly trained engineers and scientists — the IPET,[18] ILIT,[19] Team Louisiana,[20] and ASCE External Review Panel[21] — investigated the numerous failures throughout the Hurricane Protection System and have reached conflicting assessments regarding both the timing of and the reasons for the various failures.

For example, for the north breach along the east bank of the Industrial Canal (IHNC) bordering the Lower Ninth Ward, many different possible causes or contributing factors have been identified, and the major reports disagree by as much as three hours on the timing of the breaches.  (*See* Wooten Report at 43-44.)  The IPET Report suggests high water pressures against the I-wall caused the wall to give way.  Specifically, IPET suggests a gap formed between the I-wall sheeting and the levee, which allowed a higher water pressure to act over the full height of the I-wall, causing a failure of the wall and

---

[18] Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report* ("IPET Report"), App. Tab 22.

[19] Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005, Final Report* ("ILIT Report," or sometimes known as the "Berkeley Report"), App. Tab 23.

[20] Team Louisiana, *Final Report:  The Failure of the New Orleans Levee System during Hurricane Katrina* ("Team Louisiana Report"), App. Tab 24.

[21] American Society of Civil Engineers, *The New Orleans Hurricane Protection System:  What Went Wrong and Why* (2007) ("ASCE Report"), App. Tab 25.

supporting levee section at about 5:00 a.m.  (*Id.* at 43.)  The ILIT Report, however, estimates the levee failure occurred later, between 7:30 and 7:45 a.m., and attributes the failure to water seepage in the marshy soil deposits under the levee.  (*Id.*)  ILIT proposes that high seepage water pressures in the underlying marsh deposits caused levee instability in three possible ways — piping or erosion of foundation soils by the seepage; hydraulic uplift of soils at the toe of the levee; and translational instability of the levee due to foundation soil shear strengths weakened by high seepage pressures — each of which ILIT suggests could have led to the failure.  (*Id.*)  Robert Bea, Ph.D., P.E., a member of the ILIT team, maintains in a separate declaration prepared for plaintiffs in this case that construction projects on the canal side of the floodwall contributed to seepage.  (*Id.*)[22]  The Team Louisiana Report proposes that both failure mechanisms identified by IPET and ILIT were contributing factors and that the breach occurred between 7:00 a.m. and 8:00 a.m.  (*Id.* at 43-44.)  Francisco Silva-Tulla, Sc.D., P.E., found evidence of improper welding along the I-wall sheetpile sections in the breached area that may have contributed to the breach.  (*Id.* at 44.)[23]

Additionally, there is eyewitness evidence that a large barge moored in the IHNC may have struck the I-wall along the IHNC, possibly causing or contributing to either the

---

[22] A recent amendment to Volume V of the IPET Report, however, released on August 27, 2007 (albeit with a "June 2007" date on the cover page), directly challenges ILIT's notion that underseepage played a significant role in the northern IHNC breach.  *See* IPET Report at V-126-27 ("IPET has found no justification for [ILIT's] assumptions [for permeability] and no physical evidence of seepage being a systemic performance issue at this site.").

[23] After serving as a member of a levee assessment team that investigated the performance of the levees immediately following Hurricane Katrina, Dr. Silva-Tulla was retained by WGII as an expert.

north or south breaches.  (*Id.* at 46; *see also* Huerkamp Dep., App. Tab. 27 at 96.)  The allegation that the barge actually caused or contributed to the breaches along the IHNC is the subject of several independent lawsuits that have been consolidated as the "Barge" cases.  (Barge Consolidation Order (Sept. 18, 2007) (Docket No. 7723).)  Specifically, these cases allege that failing to moor or remove the barge before the hurricane caused the IHNC breaches.  (*See, e.g.*, *Parfait v. United States of America, et al.,* Class Action Complaint at 8 (07-3500) (Docket No. 1).)

Although IPET concluded that at least two-thirds of Hurricane Katrina's estimated flood damage in the Greater New Orleans area would have occurred even if the levees had not breached, breaching of the levees is an obvious source of some of Katrina's floodwaters.  (Dalrymple Report at 3.)  However, the nature and causes of damage to any particular property in the proposed class area depends on a variety of factors, including the location of the property and the timing and sequence of events.  (*Id.*)  Some structures could have been damaged by one agent, such as wind blowing the roof off the structure, while other structures could have been damaged by a sequence of different agents, such as wind, followed by rainfall into the wind-damaged structure, then flooding from one or more sources at different times.  (*Id.* at 3-4.)  For each structure, depending on its location within the city, a different type and sequence of damage would have occurred.  (*Id*. at 3.)

On September 24, 2005, less than a month after Katrina and before any of the named plaintiffs had returned to their homes to determine what damage had been done,[24]

---

[24] (*See* J. Armstrong Dep. at 13; Coats Dep. at 34; Wade Dep. at 28-29; Davis Dep. at 20-22.)

Hurricane Rita made landfall, causing flooding in some of the same areas of New Orleans.[25]

### B.   Plaintiffs' Claims And Their Proposed Class

In plaintiffs' Master Consolidated Class Action Complaint ("Complaint") (Docket No. 3415),[26] the five MRGO named plaintiffs allege negligence and strict-liability claims against all defendants.  (Compl. ¶¶ 75-79.)  The Complaint also asserts claims under the Federal Tort Claims Act and state and federal nuisance law against the United States Army Corps of Engineers ("Corps").  (*Id.* ¶¶ 36-38.)  The MRGO plaintiffs specifically identified 16 categories of damages they are seeking on behalf of the proposed class:

- Property and Other Special Damages (¶ 80(a))

  - loss of real property;
  - loss of personal property;
  - diminution of property value;
  - loss of income;
  - costs of relocation;
  - loss of business opportunities and business interruption;
  - evacuation expenses;

- Personal Injury and Other General Damages (¶ 80(b))

  - personal injury;
  - wrongful death;
  - survival damages;
  - fear, fright and emotional distress; grief; mental anguish;
  - inconvenience;

---

[25] *See* FEMA, Hurricane Rita Flood Recovery Maps, http://www.fema.gov/hazard/flood/recoverydata/rita/rita_la_about.shtm (last visited Oct. 6, 2007), App. Tab 30.  (*See also* Pls.' Supplemental & Restated Resp. to Disc., App. Tab 26 at 10 (admitting "one or more proposed class members' property was damaged, in part, because of Hurricane Rita passing near New Orleans on or about September 24, 2005").)

[26] At least one defendant has filed a motion to dismiss or in the alternative stay another class action filed with an overlapping proposed class.  (*See, e.g.*, Mem. in Support of WGII's Mot. to Dismiss or Alternatively to Stay *Parfait Family v. United States*, No. 07-3500, Docket No. 8224, filed Oct. 5, 2007.)

- pain and suffering;
- loss of the capacity to enjoy life;
- loss of consortium; and
- costs of suit.

Plaintiffs seek to certify these damage claims on behalf of the following class under Rule 23(b)(3):

> All individuals and entities (both private and public, both natural and juridical) in "Greater New Orleans" (defined as that area east of the IHNC/Industrial Canal . . .) who/which sustained damages as a result of inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and as to the Defendant Corps only, have, or by a date to be determined by the Court will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

(*Id.* ¶ 12; Levee & MRGO Pls.' Consol. Br. In Supp. Of Mots. For Class Certification ("Pls.' Br.") at 6 (Docket No. 7489).)  Additionally, plaintiffs propose two sub-classes: (1) the New Orleans East sub-class; and (2) the Lower Ninth Ward and St. Bernard sub-class.  (Compl. ¶ 13; Pls.' Br. at Ex. C.)[27]

According to defendants' property appraisal expert, Michael W. Truax, New Orleans East encompasses approximately 50,000 acres, with a 2000 Census population of approximately 96,000 people.  (Truax Report, App. Tab 18 at 9.)  The Lower Ninth Ward contains approximately 1,400 acres, with a 2000 Census population of approximately 20,000 people.  (*Id.*)  St. Bernard Parish contains approximately 300,000 acres (land areas

---

[27] Although plaintiffs' Complaint and Class Motion indicated they would seek class certification under both Rule 23(b)(1) and (b)(3), plaintiffs' class brief has sought certification only under Rule 23(b)(3). (*Compare* Compl. ¶ 19, *and* Am. Mot. for Class Certification at 1-3, *with* Pls.' Br. at 7, 14-25.)

only), with a 2000 Census population of approximately 67,000 people.  (*Id.*)

Consequently, the proposed MRGO class includes more than 350,000 acres and 200,000

class members, including both "individuals and entities (both private and public . . .)."

(Pls.' Br. at 6.)  The proposed class and subclass areas, and accompanying statistical

information, are shown on the map at Appendix Tab 1.

### C.   Named Plaintiffs

#### 1.   Jeannine and Kenneth Armstrong

Jeannine and Kenneth Armstrong seek to represent the proposed subclass for the

Lower Ninth Ward and St. Bernard Parish.  (Compl. ¶¶ 6, 13.)  In 1985, the Armstrongs

purchased for $73,000 their residence located at 4016 Hamlet Place in Chalmette, located

"two houses off" of the 40 Arpent Canal Levee and a half-mile from a pumping station.

(K. Armstrong Dep., App. Tab 5 at 17-19; J. Armstrong Dep., App. Tab 4 at 9-10, 45-46.)

It is a 1,870 square-foot four-bedroom, two-bathroom, single-story home, (K. Armstrong

Dep. at 27; J. Armstrong Dep. at 45), with a brick-veneer wood-frame structure, on a

concrete-slab foundation (Danner Report on 4016 Hamlet, App. Tab 19C at 3).  The lot is

approximately 2½ feet below sea level, and the house itself was about 2 feet below sea

level.  (Elevation Certification for 4016 Hamlet, App. Tab 19C at 1.)

The day before the storm, the Armstrongs and two of their children evacuated to

Baton Rouge.  (J. Armstrong Dep. at 9-10; K. Armstrong Dep. at 11-13, 44-45.)  The

Armstrongs "figured [they would] get street flooding" with Katrina and would have to

"tear everything out" of their house.  (J. Armstrong Dep. at 18-19.)  When the

Armstrongs first returned to their house in mid-October 2005, it had been damaged by

wind, rain, and flooding.  (*Id.* at 13; K. Armstrong Dep. at 22, 36, 148.)  Shingles and

vents were missing from the roof, and the ceiling had collapsed.  (J. Armstrong Dep. at

32, 53-54.)  Mr. Armstrong said the Louisiana Recovery Authority estimated the cost to

repair their house as more than $200,000.  (K. Armstrong Dep. at 31-32.)  Because the

Armstrongs concluded that the structure was a complete loss, they chose to demolish it in

late 2006.  (J. Armstrong Dep. at 13-14, 16, 50-51, 67-68.)

At their depositions, Mr. and Ms. Armstrong both admitted that houses in St. Bernard Parish sustained

significantly different levels of damage, and that such damage was the result of diverse

causes, including wind and rain.  (J. Armstrong Dep. at 50-51, 64; K. Armstrong Dep. at

35-36.)  Indeed, Ms. Armstrong's parents' house, located on the same block, was crushed

by a falling tree.  (K. Armstrong Dep. at 128-29.)  Many of the Armstrongs' neighbors

"didn't suffer as much damage as [the Armstrong] house," and those homes have not

been torn down.  (J. Armstrong Dep. at 50-51.)  Ms. Armstrong also heard of looting in

the St. Bernard area.  (*Id.* at 51-52.)

At their depositions, Mr. and Ms. Armstrong testified that they seek relief in this

lawsuit for their real and personal-property damage, mental distress, and

Ms. Armstrong's personal injury.  (*Id.* at 35-36; K. Armstrong Dep. at 69.)  They

estimate their home was worth between $160,000 and $175,000.  (J. Armstrong Dep. at

62.)  They submitted a claim on their homeowner's insurance for property damages

caused by wind and rain, and they were paid approximately $32,000 to $35,000.  (*Id.* at

72-73 (testifying to $32,000); K. Armstrong Dep. at 22 (testifying to $35,000).)  They

also were paid approximately $52,000 to $56,000, minus any deductibles, on their flood-

insurance policy.  (J. Armstrong Dep. at 71-73 (testifying to $52,000 minus deductibles); K. Armstrong Dep. at 21, 72-73 (testifying to $42,000 for the structure and $14,000 for contents).)  Because the Road Home program estimated the pre-Katrina value of their home as $140,000, the Armstrongs were offered $69,000 from the Road Home, but they are disputing the pre-storm value of their home.  (J. Armstrong Dep. at 125-27.)

The Armstrongs testified that they lost nearly all their household belongings. (J. Armstrong Dep. at 17; K. Armstrong Dep. at 54-55.)  The Armstrongs said it would be impossible to value their personal property because many items had sentimental value. (J. Armstrong Dep. at 76-77; K. Armstrong Dep. at 91-93.)  The Armstrongs also seek $5,000 to $6,000 for damage to a boat and trailer.  (J. Armstrong Dep. at 17; K. Armstrong Dep. at 46-47, 75-76.)

The Armstrongs both seek damages for mental distress.  (J. Armstrong Dep. at 35-36; K. Armstrong Dep. at 69.)  Ms. Armstrong has experienced periodic crying, anger, stress, and a reduced appetite that she attributes to the loss of her community and neighborhood.  (J. Armstrong Dep. at 19-22, 84-86.)  She grew up, married, and chose to raise her children in the close-knit community surrounding their Hamlet Place residence. (*Id.* at 23-24.)  Consequently, she agreed that her mental-distress claim is "a very significant component of this lawsuit."  (*Id.* at 86.)  Nonetheless, she agrees that mental distress is a highly subjective medical condition, and that a person who moved to St. Bernard Parish from New York, for example, and resided there for only six months before he lost his rented apartment in the storm, would have had an entirely different emotional experience from someone like her.  (*Id.* at 87, 90.)  Consequently, she admitted

that she cannot represent the experiences of other proposed class members: "I just know what I feel."  (*Id.* at 86-87.)  Although Ms. Armstrong is a nurse, she admitted she has not seen a doctor for her mental distress.  (*Id.* at 83-84.)

Mr. Armstrong also attributes his mental distress to loss of his community. (K. Armstrong Dep. at 69-72, 76-78.)  But Mr. Armstrong feels his wife "took it a lot harder," because he was able to "get away from" the loss by going back to work.  (*Id.* at 70, 78-79.)  He has not seen a doctor or taken medication for his mental distress.  (*Id.*)

Finally, Ms. Armstrong is asserting a substantial personal-injury claim for an infection that she attributes to a fungus contracted when cleaning out her house after Katrina.  (J. Armstrong Dep. at 27-28, 35-36.)  The infection required two surgeries to remove infected vertebrae and to place rods and bolts in other vertebrae.  (*Id.* at 29-31.) She incurred $282,000 in expenses for her hospitalization, not including doctors' fees, anesthesia, and medication.  (*Id.* at 78-79.)  She is still recovering from her surgery and has not yet returned to work.  (*Id.* at 27-28, 81, 138.)  Ms. Armstrong also has been diagnosed with a brain tumor that she does not attribute to Hurricane Katrina.  (*Id.* at 27.)

Mr. Armstrong and Ms. Armstrong each submitted separate Form 95s to the government.  (K. Armstrong Form 95, App. Tab 35 (filed under seal); J. Armstrong Form 95, App. Tab 34 (filed under seal).)  They asserted a combined total claim of $1,000,000 for property damage to their Hamlet Place residence.  Whereas Ms. Armstrong testified that the $500,000 property-damage claim on her Form 95 is the sum of her real-property damage ($170,000) and personal-property damage ($330,000), Mr. Armstrong testified that he cannot substantiate the additional $500,000 property-damage claim asserted on his

Form 95 — "it was just something we . . . put together." (J. Armstrong Dep. at 107-14; K. Armstrong Dep. at 87, 90-91.) Likewise, Mr. Armstrong and Ms. Armstrong each submitted separate $500,000 claims for personal injury, again totaling $1,000,000. (J. Armstrong Dep. at 113-14; K. Armstrong Dep. at 93-94.)[28] Yet, Mr. Armstrong testified that his claim covers his wife's mental distress as well, since his $500,000 figure was the sum of distress claims valued at $100,000 each for his three children, Ms. Armstrong, and himself. (K. Armstrong Dep. at 93-94.) Mr. Armstrong based these claims on his belief that "[his] kids suffered, too," by having to attend a new school in Baton Rouge for the rest of the year. (*Id.* at 88-89.)

Mr. Armstrong testified that he represents all people in St. Bernard Parish, although he concedes that he probably cannot represent those who remained in New Orleans during the storm and passed away as a result. (K. Armstrong Dep. at 151-52.)

### 2.    Ethel Mae Coats

Ethel Mae Coats seeks to represent the proposed subclass for the Lower Ninth Ward and St. Bernard Parish. (Compl. ¶¶ 6, 13.) She owns a house in the Lower Ninth Ward at 1020-1022 Charbonnet Street, where she resided with her fiancé, her adult daughter Lintoi Franklin, and Ms. Franklin's three children. (Coats Dep., App. Tab 6 at 9-11, 13-17, 167.) Ms. Coats purchased the home with her late husband Mr. Jimmy Coats for $16,000 in 1994. (*Id.* at 9, 89-90.) The single-story wood-framed structure was built in the early 1900s on a raised concrete pier foundation and was originally a duplex.

---

[28] Ms. Armstrong's Form 95, filed before her infection had been diagnosed, did not reference her personal-injury claim. (J. Armstrong Dep. at 112-13.)

(Danner Report on 1020-1022 Charbonnet St., App. Tab 19D at 2; Truax Report, App. Tab 18 at 15.)  There were two later additions to the house, each of which was of lower-quality construction than the original structure.  (Danner Report on 1020-1022 Charbonnet St. at 3.)  The lot elevation is about 1 foot above sea level, and the original structure is about 3½ feet above sea level.  (Elevation Certificate of 1020-1022 Charbonnet Street, App. Tab 19D at 1.)  Ms. Coats testified that she converted the home from a duplex to a single-family home and made a number of repairs and renovations before Katrina, including, in the late 1990s, replacing the roof with a new fiber-cement hard-shingle roof with terra-cotta ridge caps.  (Danner Report on 1020-1022 Charbonnet St. at 2-3; Coats Dep. at 10, 93-94, 113-20.)

Two days before Katrina's landfall, Ms. Coats boarded up windows, moved property indoors, elevated furniture on cinder blocks, and turned off the water and lights in her house.  (*Id.* at 27-28, 66-67.)  She and her family evacuated in Ms. Franklin's SUV to Hammond, Louisiana.  (*Id.* at 28-30.)  They returned in May 2006 to find their residence damaged by wind and floodwater.  (*Id.* at 34-35; Danner Report on 1020-1022 Charbonnet St. at 2, 4.)  Water marks indicate water depth of about 2 feet above the floor of the original residence and about 3 feet above the floor of the second addition.  (Denson Engineers Flood Elevation Report for 1020-1022 Charbonnet Street, App. Tab 19D at 1.)  There was no storm-related damage to the structure of the house, although most of the terra cotta ridge caps and the top courses of the bricks of the chimney were "blow[n] off."  (Danner Report on 1020-1022 Charbonnet St. at 3-4; Coats Dep. at 40-42.)  Some nearby

homes and commercial buildings, however, exhibited significant wind damage.  (Danner

Report on 1020-1022 Charbonnet St. at 3; Coats Dep. at 42-43.)

Ms. Coats testified that she seeks recovery in this lawsuit for real and personal-

property damage, mental distress, and personal injury.  (*Id.* at 44-45, 56.)  She estimates

the pre-Katrina value of her home as between $100,000 and $200,000, although she has

not had the home appraised since 1994, when she bought it for $16,000.  (*Id.* at 90, 95-96,

108-09.)  She does not know the post-Katrina value of her home, but she believes

damaged homes in the area sell for $30,000 to $40,000.  (*Id.* at 97-98.)  Ms. Coats says

that contractors have estimated it would cost between $35,000 and $170,000 to repair her

house.  (*Id.* at 103, 120-21.)  Ms. Coats believes, however, it would cost over $200,000 to

repair the home the way she wants.  (*Id.*)  She made a claim for wind damage on her

homeowner's policy and was paid $1,733.  (*Id.* at 60-61.)  Her flood insurer paid her the

$125,000 policy limit.  (*Id.* at 60.)  Ms. Coats also received $76,000 from the Road Home

program.  (*Id.*)  She spent approximately $3,500 to have the house gutted and plans to

restore the house, but she has not yet begun to do so.  (*Id.* at 43-44, 74-75, 100, 102.)  She

is currently living in the Uptown area of New Orleans.  (*Id.* at 13.)

Ms. Coats testified that almost all of her personal property, which she values at

$56,000, was destroyed.  (*Id.* at 49-51.)  She lost things of particular significance to her,

including Mr. Coats's military uniform, a flag, and awards and pictures of her husband

and late parents.  (*Id.* at 133-35.)

Ms. Coats is asserting a claim for mental distress due to the loss of her home and

possessions.  (*Id.* at 133.)  The destruction of her home "took a heavy toll on" her and

caused periodic vomiting, nausea, hair loss, shaking, and crying.  (*Id.* at 53.)  She has not seen a counselor for her distress, but she began taking "nerve pills" about four months after she first saw her house post-Katrina in May 2006.  (*Id.* at 57-59, 131, 133.)

Finally, Ms. Coats claims personal-injury damages for health problems, including high blood pressure and heart problems she believes developed after she first visited her property post-Katrina.  (*Id.* at 54-58, 124-27.)  She sees a doctor for quarterly checkups and is currently undergoing medical tests related to her illnesses.  (*Id.* at 125, 127-28.)

Ms. Coats submitted a Form 95 alleging "complete loss of the structure and contents" of her property and "severe emotional distress and mental anguish due to the loss of [her] property."  (*Id.* at 146, 150-53; Coats Form 95, App. Tab 36 (filed under seal).)  She claimed $500,000 in property damage, which she maintains is an accurate total of the loss of her personal property ($56,000) and the damage to her home.  (Coats Dep. at 153-56.)  She seeks an additional $500,000 for personal injury.  (*Id.* at 156-57.)  She could not explain the amount of the personal-injury claim but suggested it represents medical expenses, mental distress, and loss of real property.  (*Id*. at 156-57.)

At her deposition, Ms. Coats said she represents the people "in the neighborhood," which she defined as "the whole Lower Ninth Ward," but not the people in St. Bernard Parish.  (*Id.* at 161.)  She admitted she knows "nothing about [the] specifics" of other peoples' damages or injuries, and she explained that "[e]verybody['s] loss is not the same."  (*Id.* at 162-65.)  Ms. Coats anticipates difficulties in representing people who were renting their residences, who experienced varying levels of flooding, who lost loved ones, or who experienced serious personal injuries.  (*Id.* at 163-65.)

### 3. Glynn Wade

Ms. Glynn Wade is a social worker who seeks to represent the proposed subclass for New Orleans East. (Compl. ¶¶ 6, 13; Wade Dep., App. Tab 7 at 61-62.) In about 1994, she and her husband purchased their residence at 4719 Bundy Road — a single-story wood-frame house with exterior brick-veneer and wood siding built on a concrete slab foundation. (Wade Dep. at 12-13; Danner Report on 4719 Bundy Rd., App. Tab 19B at 3.) The lot sits about 6 feet *below* sea level, and the structure is a little higher than that. (Elevation Certificate for 4719 Bundy Road, App. Tab 19B at 1.) The Wades made a number of pre-Katrina renovations, including a roof replacement — not long before Katrina — with asphalt composition shingles and terra cotta ridge caps. (Danner Report on 4719 Bundy Rd. at 3; Wade Dep. at 13-14, 34-35.) Ms. Wade estimates that her home was worth approximately $180,000 before the storm. (Wade Dep. at 38-39.)

Two days before Katrina made landfall, Ms. Wade evacuated to Baton Rouge. (*Id.* at 18-20.) When the Wades returned to their property on October 1, 2005, they found damage caused by a combination of wind and flooding. (*Id.* at 28-31, 33; Danner Report on 4719 Bundy Rd. at 4.) Numerous bricks were "knocked off the front" of the house, and the "water line of [the] house . . . looked like it was about four feet of water or more." (Wade Dep. at 29-30.) Ms. Wade received money to repair her home in January or February of 2006, and the home was completely restored by May 2006. (*Id.* at 58.)

Ms. Wade seeks to recover damages in this lawsuit for her home, loss of personal property, and severe mental distress. (*Id.* at 53, 82-84.) Ms. Wade estimates that the cost of repairing her home was approximately $100,000. (*Id.* at 40.) The Wades received the

$84,900 flood policy limit for damage to their home's structure.  (*Id.* at 37.)  They used a portion of these proceeds to pay off the existing $48,000 mortgage, and the Wades now own the home outright.  (*Id.* at 40-41, 60.)  The Wades also filed a claim with their homeowner's insurance for wind damage to their roof, but the insurer determined that the amount of wind damage was less than their deductible.  (*Id.* at 33-34.)  The Wades received an additional $22,000 from the Road Home program.  (*Id.* at 47.)  They were dissatisfied with that amount, but did not appeal.  (*Id.* at 47, 128-30.)  Ms. Wade knows that the Road Home award is compensation from the government for some of the damage she incurred.  (*Id.* at 128-30.)

Ms. Wade and her family claim a total loss of their personal property.  (*Id.* at 53.)  She received $38,000 for her home's contents under her flood insurance policy.  (*Id.* at 37-38.)  Ms. Wade also received reimbursement for the loss of a van left parked at their home during the storm.  (*Id.* at 54-56.)

Ms. Wade attributes her mental distress to the loss of family heirlooms, including the family Bible, a mink coat, china, linens, vases, and pictures of her family.  (*Id.* at 82-86, 143.)  She agreed the value of these heirlooms "is not what somebody might have paid [her] for it.  It's personal and individual to [her]."  (*Id.* at 84.)  Accordingly, no one else could accurately describe the value she places on these items.  (*Id.* at 84-86.)  She did not seek professional treatment for her mental distress, but she feels some of her job training as a social worker served as a substitute.  (*Id.* at 132-33.)

Ms. Wade submitted multiple Form 95s asserting claims for damages against the Corps.  (*Id.* at 66-70, 74-77; Wade 7/10/06 Form 95, App. Tab 37 (filed under seal);

Wade 1/12/07 Form 95, App. Tab 38 (filed under seal).)  In the first Form 95, submitted

in July 2006, Ms. Wade claimed $500,000 of property damage and $500,000 of personal-

injury damage.[29]  (Wade 7/10/06 Form 95; Wade Dep. at 70-72.)  She admits her

property-damage claim on the Form 95 greatly exceeds the damage she sustained.  (*Id.* at

70-72; Wade 7/10/06 Form 95.)  She testified that she "ask[ed] for far more" on her

Form 95 so she would receive something "in the middle, half or less."  (Wade Dep. at 70-

72.)  She could not explain the basis for her personal-injury claim.  (*Id.* at 72.)  In a

second Form 95, prepared in part by Ms. Wade and in part by an unknown party and

submitted in January 2007, she claimed $252,501 of real-property damage and $50,000

of personal-property damage — an estimate of the "cost of things" that does not include

the sentimental, individualized loss of her family heirlooms.  (*Id.* at 79, 82, 86-88; Wade

1/12/07 Form 95.)  She made no claim for personal injury in this later Form 95, but did

add a claim for mental distress.  (Wade Dep. at 80-82; Wade 1/12/07 Form 95.)  She also

added a claim for "loss of opportunity to purchase a sufficient amount of flood

insurance" — a claim she could not explain because she feels she is adequately insured.

(Wade Dep. at 80-82.)  She likewise could not explain the statement that her injury

resulted from the fraud and/or concealment of the Corps.  (*Id.* at 80-81.)  Nor could she

explain the variations between her two Form 95s.  (*Id.* at 90-91.)

---

[29] A separate Form 95 was submitted on Mr. Wade's behalf at this time.  (*Id.* at 88.)

When questioned about who is responsible for her damages, she simply stated: "I blame no one." (*Id.* at 138-39). She believes that an Act of God caused her damages. (*Id.* at 138-39.)

### 4. Henry Davis

Henry Earl Davis seeks to represent the proposed New Orleans East subclass. (Compl. ¶¶ 6, 13.) He is a retired streetcar operator and instructor. (Davis Dep., App. Tab 8 at 15-16.) He owns the home at 7650 Morel Street, where he resided with his wife and then 16-year-old daughter before Katrina. (*Id.* at 14-15.) The house is located approximately one-half mile south of the Lake Pontchartrain Levee in New Orleans East. (*Id.* at 19.) In 1986, Mr. Davis paid $68,500 for the home — a single-story, three-bedroom, two-bathroom, wood-frame structure with brick veneer exterior, situated on a concrete slab foundation. (*Id.* at 26-27, 88; Danner Report on 7650 Morel St., App. Tab 19A, Vol. VII at 3.) The lot is about 3½ feet below sea level, and the structure is about 3 feet below sea level. (Elevation Certificate for 7650 Morel Street, App. Tab 19A at 1.)

The Davis family evacuated to Mississippi in their truck the Saturday before Katrina's landfall, partly because Mrs. Davis, who "was in" Hurricane Betsy in 1965, was afraid of hurricanes. (Davis Dep. at 16-17, 20, 32-33.) Mr. Davis returned months later to find his house damaged by wind, rain, and flooding. (*Id.* at 21-23, 29-30.) According to Mr. Davis, the damage was most extensive in his daughter's room, where there was wind damage and rainwater intrusion through the roof. (*Id*. at 22-23.) A plastic boot on a vent pipe that penetrated the roof above the room had split, allowing water to pour through the roof. (*Id.*) The rainwater in turn caused the ceiling in that

room to collapse.  (*Id*.)  The house had other wind damage, including missing roof shingles and separations between roof rafters and the hip ridge.  (*Id.*; Danner Report on 7650 Morel St. at 4-5.)  Wind blew down the fence that surrounded the property and destroyed a tin shed in the yard.  (Davis Dep. at 34-37.)

Upon his return to the home, Mr. Davis found wet floors and moldy walls.  (*Id.* at 22.)  On average, the houses in his neighborhood had water marks of approximately 1½ feet.[30]  (Denson Engineers Flood Elevation Report for 7650 Morel Street, App. Tab 19A at 1.)  Mr. Davis's neighbor, however, told him that the neighbor's house had about 3 feet of water.  (Davis Dep. at 63-64.)

Mr. Davis testified that there were markedly different flood levels throughout New Orleans East.  (*Id*. at 86, 109-12.)  Indeed, Mr. Davis testified that a nearby home and a church, only three blocks from his house, sustained no flood damage at all, although wind severely damaged the church roof.  (*Id.* at 87-88, 114-16.)[31]  Residences in his neighborhood experienced varying degrees of damage, with some homes exhibiting significant wind-related roof damage.  (*Id.* at 65-66, 78-79; Danner Report on 7650 Morel St. at 4.)  Mr. Davis identified a picture of his neighborhood that showed some houses covered with blue tarps (Davis Dep. at 82-83 & Ex. 8), and he agreed that FEMA installed the blue tarps to protect houses that presumably had roof damage from wind,

---

[30] After the storm, his outside air-conditioning compressor, which is slightly elevated off the ground, continued to work.  (Davis Dep. at 58-62; Danner Report on 7650 Morel St. at 2.)

[31] *See also* Leslie Williams, *Katrina left many in eastern N.O. unscathed,* The Times-Picayune, May 7, 2007 (describing experience of New Orleans East residents in the 8000 block of Lafourche Street who "didn't have floodwater anywhere in the house"), App. Tab 33.

rain, or debris (*id.*).  Mr. Davis also testified that looting was rampant in his area.  (*Id.* at 85-86.)  He lost expensive tools from his shed that he knew "were too heavy for the water to move."  (*Id.* at 101.)

Mr. Davis is seeking relief in this lawsuit for real and personal-property damage, and severe mental distress.  (*Id.* at 25-26.)  He estimates that his house had a pre-Katrina value of $110,000.  (*Id.* at 76-77.)  He had all of the drywall removed from his daughter's room and four feet of drywall removed from the rest of the house.  (*Id.* at 62.)  He repaired the house with new floors, new cabinets, new appliances, new doors, new bathroom cabinets, a new drain pipe, and new roof shingles.  (*Id.* at 69-75.)  He does not know the cost of these repairs.  (*Id.* at 76.)  Once his house was restored, he and his family moved back in December of 2006.  (*Id.* at 23-24.)  The Davis family received the policy limit of their flood insurance for damage to his house, but Mr. Davis does not recall the amount.  (*Id.* at 44-45.)  He also received $52,000 from the Road Home program, and a $10,000 loan from the Louisiana Recovery Authority.  (*Id.* at 45.)  Mr. Davis filed a claim under his homeowner's insurance policy for wind and rain damage.  (*Id.* at 43.)  Although the insurer denied coverage, Mr. Davis has retained an attorney to dispute this denial.  (*Id.* at 96-97.)

Mr. Davis asserts that all of his personal property was ruined.  (*Id.* at 28-32.)  During his first post-Katrina visit to his property, which lasted about 20 minutes, he concluded that nothing was salvageable and decided to hire someone to remove all contents.  (*Id.*)  He received his $33,000 flood insurance policy limit for loss of personal property.  (*Id.* at 44.)  A car left at the house was a complete loss, for which his insurer

paid $2,000.  (*Id.* at 33, 94-95.)  Although the Davis's boat survived the storm unscathed, Mr. Davis believes the boat caused damage to the patio when it drifted during the storm. (*Id.* at 33-34.)

Mr. Davis is also seeking damages for mental distress based on his poor living conditions after the hurricane.  (*Id.* at 38-43.)  He recalls feeling distressed upon seeing his damaged home and realizing he was "homeless."  (*Id.* at 38-39.)  After Katrina, he and his family lived with relatives in Mississippi for more than a month.  (*Id.* at 39-40.) He was stressed by feelings that his relatives did not want them there.  (*Id.*)  He then lived for two months in an apartment in Baton Rouge that he characterized as a "dump."  (*Id.* at 38-41.)  Later, he moved to a FEMA trailer for approximately three months, which he stated "was another little hardship."  (*Id.* at 40-43.)  He has not sought help from a mental-health professional or taken medication for his mental distress.  (*Id.* at 103-04.)

Mr. Davis submitted a Form 95 seeking recovery for the "complete loss" of his house, although Mr. Davis agreed that "significant loss" would have been a more accurate claim.  (*Id.* at 119-22; Davis Form 95, App. Tab 39 (filed under seal).)  While his Form 95 claims $500,000 for property damage, he admitted that his total real-property claim could not be more than $160,000 and that the fair market value of personal possessions lost in the storm was $50,000.  (Davis Dep. at 119-24; Davis Form 95.)

Mr. Davis agreed that "some people in [his] very immediate area may have had significant roof damage and others did not," that some people "may have had a lot of things stolen," and some people may have had "a tree fall over on their house."  (Davis

Dep. at 131-32.)  Consequently, Mr. Davis rejected the idea that any one person could

represent an entire subclass:

> That's why I don't understand why they just have one person
> represent everybody, because nobody, no one person can do it
> exactly what happened to everybody out there.  It's no way.

<div align="center">* * *</div>

> I can tell you what happened at my house.  I can't tell you
> what happened three blocks over.

<div align="center">* * *</div>

> *I thought maybe I would just give you what happened to mine
> and y'all figure out what happened with everybody else.*

(*Id.* at 131-33 (emphasis added).)

### D.      Defendants' Experts

#### 1.      Lee Wooten, P.E.

Lee Wooten is a Professional Engineer specializing in geotechnical engineering.

(Wooten Report, App. Tab 15 at 3.)  He received his Master's degree from M.I.T. in 1980,

and he was the American Society of Civil Engineers Geo-Institute's representative on the

Levee Assessment Team following Hurricane Katrina.  (*Id*. at 3-4.)  His expert report

identifies 45 separate sources of water that led to flooding in the MRGO class area.  (*Id*.

at 6.)  Each source could have resulted from combinations of complex factors that would

have to be considered to determine what role, if any, a particular potentially responsible

person may have had with respect to that source of water.  (*Id*.)  That inquiry would

include design, construction, and maintenance issues that require a source-by-source

analysis.  (*Id*. at 8.)

### 2.     Dr. Robert A. Dalrymple

Robert Dalrymple, Ph.D., is a  Professor of Civil Engineering at Johns Hopkins

University.  (Dalrymple Report, App. Tab 16 at 1.)  He is an expert in the field of

hurricane effects, including storm surge and associated flooding.  (*Id*. at 2.)  He has

published more than 100 papers on water waves, coastal processes, and nearshore water

circulation.  (*Id*. at 1.)  Dr. Dalrymple explains that damage to plaintiffs' properties was

caused by a variety of factors, including wind, rain, and flooding from breaches and

overtopping of floodwalls and levees.  (*Id*. at 2.)  His report explains that the Delft model

proposed by plaintiffs is of limited accuracy because of the many unknown variables in

the model's input data that were estimated, assumed, or omitted.  (*Id*. at 2.)  The Delft

model "does not and cannot show the actual nature or sequence of property damage,"

because not all possible causes of damages were included in the model, and there were

significant uncertainties in the input data.  (*Id*.)

### 3.     James Danner, P.E.

James Danner is a Professional Engineer in New Orleans with more than

thirty years experience in civil engineering, including forensic investigations of structure

failures, moisture intrusion, and wind damage.  (Danner Report, App. Tab 19 at 3.)  Since

Hurricane Katrina, he has inspected and evaluated more than 500 structures in the New

Orleans area on behalf of homeowners, business owners, and insurance companies.  (*Id.*

at 4.)  His opinion is that determining the causes and extent of damage to each individual

property in the class areas requires individual forensic inspection, analysis, and

evaluation, including consideration of evidence of damage from wind, rain, flying debris,

fire and vandalism, topography of the site and surrounding area, elevation of the structure, and the actual level of water, if any, that entered the structure.  (*Id.* at 2.)  The causes and extent of damage vary significantly from property to property.  (*Id.* at 3.)

### 4.    Dr. Kerry Vandell

Kerry Vandell is a professor of finance and Director of the Center for Real Estate at the University of California – Irvine.  (Vandell Report, App. Tab 17 ¶ 1.)  An expert in real estate economics and valuation, he holds a Ph.D. from M.I.T. and is a past president of the American Real Estate and Urban Economics Association.  (*Id*. ¶¶ 1-2.)  While at M.I.T., Dr. Vandell was the Charles Abrams Fellow at the Joint Center for Urban Studies. (*Id*. ¶ 1.)  He has published more than 40 articles in peer-reviewed real estate, finance, and other scholarly journals.  (*Id.* at Appendix A, 4-9.)  He explains that properties in the MRGO class areas are particularly diverse in their types of construction, their conditions, and their varying uses, including residential, commercial, and industrial.  (*Id*. ¶ 14.)  Thus, an individualized examination of each particular property is necessary to assess the damage to each property.  (*Id.* ¶¶ 15-16.)  Any approach to determining property damages must be able to differentiate between damages caused by negligence of a particular defendant and those damages caused by other factors, such as wind, rain, and flying debris.  (*Id.* ¶ 8.)  But as explained below in Sections II.F and III.C.1.a.3, plaintiffs' expert, Dr. Kilpatrick, has not constructed or even proposed any model that could isolate or quantify the effects of Hurricane Katrina on a particular property or determine which of those effects were caused by the negligence of any defendant.  (*Id.* ¶ 34.)  Furthermore, the variability of New Orleans real estate makes the area unsuited for the use of statistical

mass-appraisal models such as Dr. Kilpatrick proposes.  (*Id*. ¶ 30.)  Moreover, although

plaintiffs' expert Dr. Kilpatrick suggests the use of problematic survey valuation methods

such as contingent valuation and conjoint analysis, Dr. Vandell explains that the results

of these methods are not based on market transactions, and are susceptible to bias due to

the survey methodology, such as the ordering of survey questions.  (*Id*. ¶ 37.)

### 5.   Michael W. Truax, MAI

Michael W. Truax is a Louisiana Certified General Real Estate Appraiser and

holds the designation of MAI from the Appraisal Institute.  (Truax Report, App. Tab 18

at 5.)  He has appraised many properties in the New Orleans area, including

approximately 400 properties since Hurricane Katrina.  (*Id.*)  His opinion is that

individual and detailed property analysis and evaluation are necessary to produce

accurate valuation and damage estimates for properties in the proposed class.  (*Id*. at 9.)

The impact, if any, of flooding on the value of any one property is affected by many

factors, including the property's precise location, the condition of the property, its base

elevation, the elevation of the structure, the extent of repair, and the amenities of the

neighborhood and surrounding areas.  (*Id.* at 13.)  The use of mass-appraisal techniques

to assess value and determine damages will not produce accurate results because there are

unique variables among properties in the New Orleans real estate market.  (*Id.* at 9, 13.)

### E.   Plaintiffs' Proposed Flood Model

Plaintiffs' counsel retained a group affiliated with the Delft University of

Technology in Holland to create flood simulations of New Orleans and to issue a report

describing those flood simulations.  (Pls.' Br. at 22; *see also* Report of M. Kok, et al.,

*Polder Flood Simulations for Greater New Orleans* (July 30, 2007) ("Delft Report"),

App. Tab 9.)  According to plaintiffs' expert Professor Vrijling, who reviewed the report,

the most important purpose of the model was to show the ultimate depth of the

floodwaters following Hurricane Katrina:

> Q.  And I assume that this defined purpose is the reason you
> told us yesterday that of all of the objectives of this model,
> *the most important was to reach this final depth of water?*
>
> A.  Yeah.
>
> Q.  Correct?
>
> A.  Yeah, yeah.

(Vrijling Dep., App. Tab. 11, Vol. II at 52-53 (emphasis added).)

In order to create their flood simulations, the Delft group relied on information

about Hurricane Katrina supplied by experts retained by plaintiffs' counsel.  (Delft

Report at 4-5.)  Then, the Delft group input some of the information into a software

package called the Sobek-1D2D model.  (*Id.* at 1.)  In modeling both the New Orleans

East and St. Bernard proposed subclass areas, they used the "Rural" version of this

software package.  (Vrijling Dep., Vol. II at 56-57.)

The Delft Report acknowledges that the "output quality" of their model is

dependent on the quality of the input data, as well as the "accuracy of the base grid," (i.e.,

the underlying numerical grid for computations, 50- by 50-meters, which means nothing

can be resolved at a finer scale).  (Delft Report at i; Dalrymple Report, App. Tab 16 at 7-

8.)  For some matters, however, the input data was uncertain because there was

conflicting information, and the Delft group simply chose one source and disregarded the other:

> Q: "And this is an example of, and I think we talked about it before, there are times that modelers have two different pieces of empirical evidence and they have to choose — if they are in conflict you have to choose one and disregard the other."
>
> A: "Yeah. You are right. Yeah."

(Vrijling Dep., Vol. II at 120.) One example was the Delft group's decision to use the time of a levee breach that was estimated by the Team Louisiana Report (7:00-8:00 a.m.), instead of using the different time for that breach as estimated in the IPET Report (about 5:00 a.m.). (Dalrymple Report at 9; *see also* Wooten Report, App. Tab 15 at 43.) Knowing the correct time for any levee breach, however, is critically important to predicting the "time that those flood waters arrived at a particular location." (Dalrymple Report at 9.)

In addition, much of the input data used by the Delft team was based on assumptions or guesses. For example, Professor Kemp of LSU, who provided input on water levels (or "hydrographs") outside each of the polders, explained that the water levels were not actual empirical measurements, but rather estimates created by another model. (Kemp Dep., App. Tab 12 at 126 (stating that his "hydrographs are an amalgam of things, my best guess at what the water — when it got where and how high").) Indeed, the Delft Report concludes, "there will always be some uncertainty . . . given the chaos during a strong hurricane passage, driving rain and wind and the vagaries of the human memory." (Delft Report at 15.) Professor Vrijling also testified that plaintiffs' model

included other assumptions creating the potential for error in plaintiffs' simulations, such as not taking into account overtopping of levees and floodwalls by waves, even though he admitted that wave overtopping could be important at particular locations.  (Vrijling Dep., Vol. II at 86, 134-35.)

Professor Vrijling also admitted that the Sobek software was designed to accept various "fields" of input data that the Delft team did not use.  Specifically, the software had preexisting fields for four types of information that the Delft group simply did not input at all:  (1) wind; (2) underseepage; (3) flooding from sewers, ditches, and small waterways; and (4) backflow from pumping stations.  (*Id.*, Vol. II at 141-42, Vol. I at 102.)  In addition, although the Delft group considered two pumping stations in its simulations for the New Orleans Metro bowl in the Levee case (*id.*, Vol. I at 72-73), it ignored pumping stations in its simulations for the two proposed subclass areas in the MRGO Group (*id.*, Vol. II at 128).  When asked why some of these additional input data were not used, Professor Vrijling suggested that there were so many "other uncertainties" about the Delft model results, that any improvement in accuracy that could be achieved by including this omitted data would not be particularly helpful, likening the modeling effort to a "fog of war":

> Because, as I said earlier, you're operating in a fog of uncertainty, a fog of war they say, but it is not a war, and you can try to model everything in 5 by 5 meter grids and especially all the parts, but it doesn't give a better picture overall.  So strictly speaking, mathematically speaking it could be more accurate, *but there are so many other things you don't know that it doesn't help you really*.

* * *

37

> And in this case, there are so many things that are not clear,
> [that] including some things that might be very clear, [such as]
> the exact location of sewers[,] will be hidden in the end result
> and *all the other uncertainties*. . . .

(*Id*., Vol. I at 93-95 (emphases added).)

Considering all of the foregoing problems with the Delft model, it is not surprising that some of the water-depth estimates generated by the Delft model are inconsistent with other evidence about water depths throughout the class area.  For example, named plaintiff Wade's property is located near "location 1" on the Delft Report's Figure 4.5 on page 33, and the Delft model indicates (at Figure 4.6) that the maximum water level at "location 1" was approximately 13 feet.  (*See* Delft Report at 33-34.)  But the testimony of Ms. Wade and the measurements taken at her house during inspection by defendants' expert show that the water level at her house was nowhere near 13 feet, despite what the Delft model indicates.  As Ms. Wade testified, there had been "about four feet of water or more."  (Wade Dep., App. Tab 7 at 28-30.)  James Danner's professional engineering report agreed that the water marks found on the Wade property indicated a "static water depth would have been 4.14 feet or about 49½ inches above the floor of the residence." (Danner Report on 4719 Bundy Rd., App. Tab 19B at 2.)

Finally, the Delft model simply does not do what plaintiffs' counsel claims.  As defendants' expert Dr. Robert A. Dalrymple, Professor of Civil Engineering at Johns Hopkins University, concluded, plaintiffs' model "does not and cannot show the actual nature or sequence of property damage during Hurricane Katrina as not all possible causes of damage are included in the model and there were significant uncertainties in the

input data." (Dalrymple Report at 11.)  Professor Vrijling did not disagree.  In fact,

Professor Vrijling admitted at his deposition that plaintiffs' model is much more limited

than plaintiffs' counsel suggests:

1.   **It has never been used before to reconstruct a past flood**:

Q:  "Has the model ever been used to attempt to recreate a
flood event after there had been a levee breach or overtopping
before this occasion?

A:  "I — I don't think so." (Vrijling Dep., Vol. I at 55);

2.   **It cannot predict the type of damage at a particular property or the
cause of such damage:**

Q:  "You are not suggesting, are you, that this model can
directly predict property damage of an individual house or
building?"

A:  "No.  We never said that." (*id.*, Vol. II at 90);

3.   **It does not show how the flood sources correlate with flood damage at
any particular site in the Greater New Orleans area:**

Q:  ". . . The report does not attempt to correlate flood sources
with flood damage, does it?"

* * *

A:  "It correlates — we did not study damage.  We studied
flood levels, so this last step we did not make. . . ." (*id.*, Vol. I
at 58-59); and

4.   **It does not address the cause of any levee breach or overtopping:**

Q:  "Okay.  And you agree that the model does not address
the cause of any levee breach or overtopping failure?"

A:  "No. . . ." (*id.*, Vol. II at 148).

### F.  Plaintiffs' Proposed Damages Model

Plaintiffs do not propose to prove real-property damages in a traditional manner with individual proof.  Instead, they propose to develop — apparently during the proposed Phase One Trial[32] — a mass-appraisal model to determine diminution in property value across the class area.  Dr. John Kilpatrick, Ph.D., MRICS is a professional witness and the president of a real estate appraisal and consulting firm located in Seattle, Washington.  (Kilpatrick Report, App. Tab 10, ¶ 1, (and attached chart of experience).) He was retained by plaintiffs in the MRGO and Levee litigation to create such a damage model.  (*Id.* ¶¶ 5-8.)  Significantly, however, Dr. Kilpatrick has not yet created any model, nor does he intend to do so before the Court decides whether or not to certify a class. (Kilpatrick Dep., App. Tab 14 at 33-35.)  He has merely offered conclusory testimony that he can create such a model.[33]

Dr. Kilpatrick has only limited knowledge of the variability of the proposed class or sub-classes about which he says he can construct a mass-appraisal model.  For example, Dr. Kilpatrick:

- had never done any property appraisals in the Greater New Orleans area (*id.* at 25-26);

---

[32] (*See* Pls.' Trial Plan at 2 (identifying as a common issue:  "What is the appropriate methodology for assessing diminution in property value within the subject class or subclass area?").)

[33] Defendants have filed a motion to exclude the report and testimony of Dr. John Kilpatrick.  (Docket No. 7992, filed Sept. 26, 2007.)  Dr. Kilpatrick's report does not identify any sources of data or any particular methodology to ascertain the various forms of property damage on a classwide basis.  As Dr. Kilpatrick has not created the model he asserts will identify property damage on a classwide basis and merely offers conclusory opinions, his testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), and their progeny.

- had not reviewed any photographs or diagrams of the class representatives' properties (*id.* at 113-14);

- did not know the difference in topography between areas east and west of the Industrial Canal (*id.* at 145-46);

- did not know the extent to which St. Bernard Parish includes businesses, professional offices, retail stores, shopping centers, or any other type of property (*id.* at 348);

- did not know how many mixed-use neighborhoods were in St. Bernard Parish, New Orleans East, or the Lower Ninth Ward (*id.* at 380);

- did not know whether all of the properties located in each subclass boundary flooded (*id.* at 179);

- had not reviewed newspaper articles to determine what was being said publicly about the recovery or state of the real estate market in New Orleans (*id.* at 454-55); and

- did not know how many neighborhoods were within the City of New Orleans (*id*. at 150-51), or any of the subclasses (*id.* at 152-53), nor had he determined how he would distinguish one neighborhood from another (*id.* at 151).

Dr. Kilpatrick has taken no steps to collect data[34] (*id.* at 25-26, 150-53, 179, 351, 454-55), to develop a protocol for analyzing data (*id.* at 35, 172-73, 226-28), or to decide which of various methodologies he might use to construct a model (*id.*). Indeed, he spent only about 10 or so hours writing his report in this case. (*Id*. at 116-17.) Although Dr. Kilpatrick believes that the flood-model experts will provide information as to the apportionment of damages with regard to different sources of water (*id.* at 173-74), at the time of his deposition, he had not spoken with plaintiffs' experts who are creating the

---

[34] Although Dr. Kilpatrick conducted some studies about the number of housing units in St. Bernard Parish for the *Turner v. Murphy Oil* case, he has not begun collecting market data for this case. (Kilpatrick Dep. at 347, 351.)

flood model (*id.* at 123), nor had he reviewed their reports (*id.* at 162).  He suggested that he may use consumer "survey research" to differentiate between damages due to wind and rain and damages from flooding, but has made no determination in this regard.  (*Id.* at 172-73.)  Dr. Kilpatrick testified that his proposed model "anticipates a market in equilibrium," but admitted that the market was not in equilibrium on the day after Katrina passed, and he did not know whether the market was even in equilibrium now.  (*Id.* at 494-95.)  Additionally, Dr. Kilpatrick does not know what date that he would use to determine post-Katrina values, whether the day after the storm (August 30, 2005) (*id.* at 181), or the future date when he creates a model (*id.* at 273-74).  Dr. Kilpatrick also acknowledges that testing his proposed model would require sampling actual real estate transactions in "unaffected areas, and that is to say control areas" (*id.* at 502), but he has not yet identified any potential areas of interest for the purpose (*id.* at 208-09).  He admits that determining an appropriate control area will require empirical testing which he has not yet done.  (*Id.* at 209-10.)

Dr. Kilpatrick asserts that his yet-to-be-developed model will be able to determine, on a subclass-by-subclass basis, the amount of property damages expressed as a percentage of loss of pre-Katrina property value.  (*Id.* at 171.)  He admits, however, that he is not proposing a model that will delineate between the amount of repair costs and the amount of any stigma damages.  (*Id.* at 465-66.)  Dr. Kilpatrick does not plan to review receipts for the actual cost to repair individual plaintiffs' properties.  (*Id*. at 309-10.)  Rather, he expects to "survey some people to get their, um — actual experiences, but that won't be the core valuation model that we will use."  (*Id.* at 309-10.)

Defendants' expert, Dr. Vandell, explained that a mass appraisal, such as the one described in theory by Dr. Kilpatrick, cannot be used to determine the actual damages sustained by the proposed class members in this action.  (Vandell Report, App. Tab 17 ¶¶ 30, 61-62.)  This is because "any approach to determining damages in this case will need to differentiate between those damages caused by the alleged negligent breach of duty by a defendant . . . and the Other-Non-Recoverable damages caused by Acts of God or otherwise associated with Hurricane Katrina . . . ."  (*Id*. ¶ 8.)  Dr. Kilpatrick's proposed mass-appraisal approach cannot do this.  (*Id.* ¶ 35.)

As Dr. Vandell explains, because Hurricane Katrina was a composite event comprised of severe winds, heavy rains, high tides, water surges, floating debris, falling trees, flooding from overtopping of levees or floodwalls and/or from levee breaches, other flooding, and subsequent events (e.g., standing water, mold, looting), the amount and type of damages at a particular class member's location will depend on what forces hit that particular property in what sequence, as well as the pre-existing situation and condition of the property such as its state of repair and elevation.  (*Id*. ¶¶ 20, 27.)  As Dr. Vandell also explains, real estate properties in the New Orleans area are particularly diverse.  (*Id.* ¶ 14.)  In addition to varying types, construction, and condition of residences, there is a "striking variety of properties."  (*Id.* ¶ 24.)  "You could just think of a neighborhood with a retail tattoo parlor on the corner, a two or three story multi-family property next to it with a garage underneath, a home next door that may be on a raised site or on piers and had a roof leak, and another one next to that that was on a slab, but it was in good condition, and you can see how these different effects of the flood — the

43

storm event . . . could have a very much different effect on each one of those properties even though they're immediately on the same block."  (Vandell Dep., App. Tab 20 at 195-96.)  Consequently, Dr. Vandell believes that the only way to differentiate between the different types and causes of damages is by individual consideration of each particular property.  (Vandell Report ¶ 31.)

Michael Truax, MAI, is a real estate appraiser with a thirty-plus year career in New Orleans.  He has appraised more than 400 properties in the Greater New Orleans area since Hurricane Katrina.  He also notes the diversity of properties that makes the area unsuited for a mass-appraisal model.  (Truax Report, App. Tab 18 at 13.)  In light of "the rich diversity of property types/construction/circumstances and the need to capture the individual characteristics of a particular property to properly determine value and/or damages, mass appraisal techniques could not reliably be employed."  (*Id.* at 13.) Mr. Truax surveyed 102 properties in the nine square blocks that adjoin 1020-1022 Charbonnet Street, the home of named plaintiff Coats.  (*Id*. at 12.)  In that area alone, there is a mix of 5 different property types: Single Family Residences (33%), Multi-Family (40%), Commercial/Industrial (16%), Institutional (i.e., churches, schools, etc., as defined in the Truax Report) (7%), and Vacant Land (4%).  (*Id.* at 12-13.)  The construction, structural elevation, and style vary significantly.  For example, photographs of just a few properties in this area show a single family house on a raised foundation, a single family house with brick veneer on a concrete slab foundation, commercial and mixed-use properties of varying ages and types of construction, and even industrial and institutional properties.

## PHOTOGRAPHS OF VARIED PROPERTIES IN AREA
## SURROUNDING COATS RESIDENCE[*]



**Single Family Residence on Concrete Slab**



**Two-Story Commercial/Mixed-Use Property on Concrete Slab**



**Institutional Property (St. David's Church)**



**Commercial Property**



**Institutional Use (School)**



**Single Family Residence on Raised Foundation**

---

[*] (Truax Report, Ex. C.)

This diversity of property means that a mass-appraisal model, such as Dr. Kilpatrick suggests, simply could not be constructed in a statistically sound way. Either the model would have to include so many variables that it would not yield statistically valid results, or it would have to omit important variables, introducing "omitted variable bias," that would render it unreliable.  (Vandell Report ¶ 39; Vandell Dep. at 225-27.)  Indeed, the Road Home program attempted to implement a mass-appraisal approach in New Orleans, but encountered such serious problems that the mass approach was abandoned in favor of individual appraisals.  (Vandell Report ¶ 47.) Mortgage lenders such as Fannie Mae likewise recognize that mass appraisals are of limited utility.  (*Id*. at ¶ 43.)[35]

Dr. Vandell also offers specific criticisms of the contingent-valuation and conjoint-analysis survey methods suggested by Dr. Kilpatrick.  (*Id*. ¶ 37.)  These methods, which rely on consumer surveys to determine the willingness to pay for specific housing characteristics, are not based on market transactions (*id*.), are susceptible to bias due to the survey methodology, (such as the ordering of the questions) (*id*.), and yield problematic results that do not provide adequate empirical estimates of damages (Vandell Dep. at 207-08).

In addition to its other failings, Dr. Kilpatrick's approach is limited to residential real property.  It does not address the claimed damages of proposed class members who

---

[35]  Such Automated Valuation Models (AVMs) using mass appraisal are limited because they: (1) are dependent upon the accuracy, comprehensiveness, and timeliness of the data they use; (2) cannot be used to determine the physical condition and relative marketability of a property; and (3) can never fully incorporate the breadth of knowledge and judgment of a skilled appraiser.  (Vandell Report ¶ 43.)

are business owners or renters.  Nor does it address personal injury, mental-distress claims, or many of the other 16 categories of damages pled in the Complaint.  (Docket. No. 3415, ¶ 80.)  Dr. Kilpatrick admitted that renters' losses are "outside the scope of what I've contemplated," and that he has not been asked to measure business losses. (Kilpatrick Dep. at 348, 358-59.)  He further admitted that he does not know "whether non residential property is going to be a part of the case" (*id.* at 359-60), and that he has not "gotten to the specifics of" whether or how he will determine business interruption loss (*id.* at 175-76).  In fact, as Dr. Vandell explained, a mass-appraisal approach such as that advocated by Dr. Kilpatrick provides no guidance "for commercial properties which have experienced a loss of income."  (Vandell Report ¶ 35.)  Nor does it "consider rental property owners or tenants located in the class area, because they are not owners of the properties [Dr. Kilpatrick] is valuing."  (*Id*. ¶ 41.)

### III.    Argument And Authority

#### A.    Overview

The burden is on plaintiffs to demonstrate that their proposed class action satisfies all of the requirements for class certification under Rule 23(a) and (b)(3).  *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005); *Castano v. Am. Tobacco Co*., 84 F.3d 734, 740 (5th Cir. 1996).  Before certifying a class, a district court must conduct a "rigorous analysis" of whether a proposed class action meets all of those Rule 23 requirements.  *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006); *Castano*, 84 F.3d at 740; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  This is not a pretend or perfunctory analysis, but a *rigorous* analysis that focuses on whether

the case, if certified as a class action, could actually be tried based on the supposedly "representative" proofs of the named plaintiffs. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *see also Gen. Tel. Co.*, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.").

In order to conduct the "rigorous analysis" required by Rule 23, the Court must consider "how a trial on the merits would be conducted." *Castano*, 84 F.3d at 740. In other words, the Court must understand what types of evidence would be necessary at trial to adjudicate the claims asserted by the proposed class members, including the elements of proof for liability (for negligence, duty, breach, causation, and injury-in-fact), affirmative-defense issues (here, for example, Act of God and comparative fault), and damages. *Id.* at 744. The Court must consider all of the issues necessary to fully adjudicate plaintiffs' claims, not just the issues plaintiffs propose as the "common" ones. *Id.* at 744-45. Then, the Court must also decide whether the case could actually be tried on a classwide basis, based on "representative" proofs offered by the named plaintiffs, or instead would require individualized proofs. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723-24 (5th Cir. 2007). When the named plaintiffs have asserted claims that present significant issues that must be decided based on each plaintiff's individual facts, then class certification is not permitted under Rule 23(b)(3). *See, e.g.*, *Castano*, 84 F.3d at 744-45.

Moreover, both the United States Supreme Court and the Fifth Circuit have made clear that courts may not authorize class treatment as a shortcut that jeopardizes due process rights of litigants, even when there is a judicial crisis and large numbers of

lawsuits strain the resources of the courts.  *Amchem*, 521 U.S. at 598, 613; *In re Fibreboard Corp.*, 893 F.2d 706, 710-11 (5th Cir. 1990).  In *Amchem*, the Supreme Court was focused on the massive amount of asbestos-related litigation in the federal courts but nonetheless affirmed the Third Circuit's decision to vacate certification of a nationwide settlement class, holding that "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'"  521 U.S. at 598, 613; *accord Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978).

### B. Plaintiffs' Proposed Class Fails To Satisfy The Commonality, Typicality, And Adequacy Requirements Of Rule 23(a)

To satisfy the requirements of Rule 23(a), the named plaintiffs must establish that: (1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Plaintiffs have not met their burden of proving the commonality, typicality, or adequacy requirements of Rule 23(a).

Defendants, except for the United States,[36] presume that the proposed class definition, as written, would include enough people to satisfy numerosity.  However, the proposed class that plaintiffs seek to represent is neither adequately defined nor clearly

---

[36] The United States, however, contests numerosity, as explained in its separate brief.

ascertainable because the proposed definition is ambiguous and improperly incorporates a causation determination.  *See Wagner v. Cent. La. Elec. Co.*, 102 F.R.D. 196, 197 (E.D. La. 1984) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)).[37]

### 1.      Commonality

Even assuming that some common questions might exist in this case, the Rule 23(a) commonality requirement is subsumed within and superseded by the "far more demanding" predominance requirement in Rule 23(b)(3), which is discussed below in section III.C.  *Amchem*, 521 U.S. at 624.

Moreover, a common question for Rule 23 purposes must be one whose determination will advance the litigation.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("[A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation.").  Many of plaintiffs' suggested "common questions," however, are not really common in any meaningful way.  For example, the first question that the named plaintiffs suggest as "common" is "the class and sub-class members' causes of action against the Defendants."  (Pls.' Br. at Ex. F.)

---

[37] The proposed class definition is ambiguous because it does not specify whether it includes individuals and entities that were residents in, owned property in, and/or were physically present in the area on August 29, 2005.  (*See* Pls.' Br. at 6.)  Nor does the proposed definition define "inundation/flooding" (i.e., what amount of water and from what source?).  (*See id*.)  Finally, is the proposed class limited to those who/which sustained property damage and/or personal injury?  Or does the proposed class also include those whose property was not touched by floodwaters, but who/which nonetheless incurred economic losses due to the "inundation/flooding"?

The class definition also improperly incorporates a causation determination, because it defines the class as individuals and entities that "sustained damages *as a result* of inundation/flooding."  (*See id*. (emphasis added).)

But raised to this level of abstraction, the question glosses over central underlying elements of proof such as causation, comparative fault, and Act of God defenses, all of which must be individually determined based on the specific injuries incurred by a proposed class member at his or her location.  Thus, these are not really common questions at all.  *See, e.g.*, *Sprague*, 133 F.3d at 397.  Similarly, do-we-win questions, such as "[t]he inability of the Defendants to establish any factual or legal defense to the class and sub-class members' claims" (Pls.' Br. at Ex. F), are not truly common because they are so abstract.

### 2.    Typicality

Plaintiffs have failed to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A "claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 218 (E.D. La. 1988) (citation omitted).  "One of the purposes of the typicality requirement is to ensure that the representative's interest is 'aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.'"  *Id.* (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  In other words, "as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague*, 133 F.3d at 399.  As a result, there is no typicality when a "named plaintiff who proved his own claim *would not necessarily have proved anybody else's claim.*"  *Id.* (emphasis added).  Although typicality does not require that claims of

51

the named plaintiffs be identical to those of the class, "individual issues such as injury, causation, . . . and comparative fault" render the named plaintiffs' claims "not typical of the class." *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 460 (E.D. La. 2006).

Plaintiffs argue that typicality is satisfied in this case for two reasons.  First, plaintiffs say that the named plaintiffs and the proposed class members all "seek the same legal relief," and second, plaintiffs assert that the claims of the named plaintiffs and the proposed class members all "arise from a single set of operative facts" and from "the same event or practice or course of conduct."  (Pls.' Br. at 12-13 (internal citation omitted).)  But neither argument can survive scrutiny.

*First*, since the named plaintiffs and 200,000 proposed class members (individuals and entities) have not all suffered the same injuries, they do not all seek the same legal relief.  The Complaint includes 16 categories of damages sought on behalf of the proposed class, including loss of real property; loss of personal property; loss of income; loss of business opportunities and business interruption; evacuation expenses; personal injury; wrongful death; mental anguish; inconvenience; and loss of consortium.  (Compl. ¶ 80.)  Many categories of relief are not sought, however, by any of the named plaintiffs. For example, although the MRGO class area includes many commercial properties (*see* Vandell Report, App. Tab 17 ¶ 14; Truax Report, App. Tab 18 at 17), none of the MRGO named plaintiffs is a business or corporate entity, and none seeks relief for loss of

business opportunities and business interruption.[38]  Nor do the named plaintiffs include any institutional or public entities, even though the proposed class includes such entities and the churches, schools, and other facilities they own.

The Complaint also seeks to recover damages for wrongful death, but none of the named plaintiffs asserts such a claim; all of them evacuated safely with their families before Katrina made landfall.  Only two of the named plaintiffs consider their physical injuries to be a significant aspect of the relief they are seeking (*see* Coats Dep., App. Tab 6 at 53-58 (testifying that she has high blood pressure and is taking additional heart medication and "nerve" pills since Hurricane Katrina); J. Armstrong Dep., App. Tab 4 at 27-32 (testifying that she developed fungal pneumonia and a subsequent fungal infection, that resulted in two spinal surgeries, which she attributes to the mold in her home after Hurricane Katrina)), while the other named plaintiffs do not seek to recover for physical injuries at all.  And Ms. Armstrong's claim for a rare fungal pneumonia and her spinal surgeries would not be typical of the claims of other class members with different types of alleged personal injuries, such as the unnamed class member who was caught in water and broke out in sores (*see* Bates No. KLC0012386, App. Tab 42 (filed under seal)).

---

[38] Form 95s submitted to the government by absent proposed class members (which were produced by the United States pursuant to Court order (Docket No. 6053 at 16), and designated as "Confidential Information"), show, for example, that a large industrial business seeks almost $300 million for destruction of real and personal property, and more than $500 million for loss of production and loss of business income (*see* Bates No. NRL 035-0485, App. Tab 40 (filed under seal)); a restaurant owner who leased his property in St. Bernard Parish seeks approximately $2 million for damages to the leasehold, equipment, machinery, and inventory (*see* Bates No. MD 544-1415, App. Tab 41 (filed under seal)); and a large retailer in St. Bernard Parish seeks $79 million for damage to its building and its contents (*see* Bates No. NRL 216-1197, App. Tab 43 (filed under seal)).  The claims of the named plaintiffs are not typical of these absent proposed class members.

Further, all of the named plaintiffs seek to recover for damage to their residences, since they all owned their houses. But a large portion of the proposed class members would be renters — approximately 46 percent of the Lower Ninth Ward and Holy Cross area was rental property in 2000. (Vandell Report at Ex. 2.) Members of the proposed class who rented their residences would not be seeking damages to any real property. Rather, their interests would be focused on the loss of their personal property and any physical injuries they might have. These fundamental differences among the named plaintiffs and the proposed class members in the type of relief sought means that plaintiffs' claims fail the typicality requirement.

*Second*, plaintiffs' claims are not typical because they do not involve a "single event," do not arise from a single set of operative facts, and do not involve the same course of conduct. Hurricane Katrina was a composite event, bringing wind, rain, flooding, and other forces to bear in different ways at different times, in different locations. *See, e.g.*, *Rohr v. Metro. Ins. & Cas. Co.*, No. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan 17, 2007) (Katrina "alone cannot serve as a common transaction or occurrence because the effects of the hurricane were unevenly felt, leaving each property owner in a unique situation based on the prior condition of the property owner's home . . . and the immediate effects of the hurricane in that particular geographic area."). A particular plaintiff's property may have sustained damage from one or more forces — wind, rain, flooding, or looting — acting at the same time or in sequence. For example, named plaintiff Davis sustained wind damage and rainwater intrusion through his roof (Davis Dep. at 22-23), but also had flood damage (*id*. at 22), and lost expensive tools

from looting in the area (*id*. at 101).  And flood damage sustained by a particular plaintiff could have been caused by varying responsible parties or Acts of God that resulted in varying sources of water reaching the plaintiff's property in a particular sequence.  For example, the sources of water affecting Ms. Coats' property in the Lower Ninth Ward, and their sequence, are not the same sources and sequence reaching the Armstrongs' house in Chalmette, which was less than a block south of the 40 Arpent Canal Levee, much less an unnamed class member located in the extreme southeast reaches of St. Bernard Parish near the Mississippi River and the MRGO.

Similarly, plaintiffs' claims against defendants cannot be typical because each of the defendants is not alleged to be responsible for flooding in all of the parts of the Hurricane Protection System.  For example, there are no allegations against defendants WGII or Board of Commissioners of the Orleans Parish Levee District ("OLD") regarding the levee along the MRGO.  Similarly, there are no allegations against defendant Board of Commissioners of the Lake Borgne Basin Levee District ("LBBLD") with regard to breaches along the east side of the IHNC.  Moreover, the Hurricane Protection System was constructed and maintained piecemeal, over decades, with numerous different parties involved, including entities that are not defendants but that would be included in a comparative-fault determination.  *See* La. Civ. Code Ann. art. 2324(B) (1997).  Thus, the persons at fault for the unique combination of levee breaches and other forces that may have caused one plaintiff's particular damages would not be the same person(s) at fault, in the same percentage, for another plaintiff's set of losses sustained elsewhere within the 350,000-acre proposed class area.

*Finally*, to the extent defendants can assert defenses that are unique to certain named plaintiffs, typicality may not be satisfied.  For example, defendants may be able to assert a unique defense against the Armstrongs based on the premature destruction of their home.  While living in an apartment, the Armstrongs voluntarily demolished their house before providing defendants an opportunity to inspect their property, leading to the potential defense of spoliation of evidence.  (J. Armstrong Dep. at 9, 13, 67-68.)  Many plaintiffs will not be able to meet the strong causation or psychic trauma requirements to recover mental distress based on property damage alone.  "Due to the highly subjective nature of mental anguish claims," Louisiana courts require a "strong showing of causation" and proof that the plaintiff suffered actual psychic trauma, as opposed to the "usual worry over the consequences of property damage."  *See, e.g.*, *In re Air Crash Disaster Near New Orleans*, 764 F.2d 1084, 1087-88 (5th Cir. 1985) (reversing mental-anguish award because plaintiff had not demonstrated that the destruction of his home — due to airplane crash that spilled jet fuel on the home — contributed in some degree to his post-traumatic stress disorder).  Many plaintiffs received Road Home money that may be an offset against their damage claims against the government or others.  And some business properties within the class area — like gas stations that reopened after Katrina (*see* Truax Report at 11) — may have increased in value, not decreased in value, after the storm.

### 3.     Adequacy Of Representation

Plaintiffs have also failed to establish Rule 23(a)(4)'s requirement that the named plaintiffs "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  [A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Amchem*, 521 U.S. at 625 (internal citations and quotation marks omitted); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001).

As explained above in the typicality section, the named plaintiffs do not suffer from the same injury  — each alleges distinct injuries that differ in kind and cause — which is indicative of the conflicts of interest among the proposed class members. Indeed, the conflicts of interest in this case are overwhelming, due to the different kinds of proof necessary for each claim and the number of different categories of damages being sought:

- Renters will not have any interest in recovering real-property diminution, which may be the focus of many homeowners.

- Homeowners will have no interest in asserting claims on behalf of business owners for loss of business opportunity or business interruption.

- Persons with a serious personal-injury claim — such as Ms. Armstrong's fungal infection and resulting medical bills of $282,000, valued at more than her residence (*see* J. Armstrong Dep. at 78) — will want to emphasize those claims over others. [39]

---

[39] The law is overwhelming that class certification is not possible for the physical injury, wrongful death, and mental-distress claims alleged in the Complaint (*see* Section III.C.1.a below), but plaintiffs have not abandoned such claims, presumably because splitting their causes of action would create further problems with adequacy of representation.  If plaintiffs did not assert all of their claims, but abandoned some claims in an attempt to gain certification, they would subject the unasserted claims to *res judicata*.  Thus, numerous courts have found that "claim splitting" renders a named plaintiff an inadequate representative. *See, e.g.*, *Hilton v. Atlas Roofing Corp. of Miss.*, No. 05-4204, 2006 WL 3524295, at *4 (E.D. La. Dec. 5

- Long-time residents and homeowners may want to emphasize mental-distress claims for loss of community, over claims that a business owner or a transient renter would choose.

- Persons who weathered the storm may place a different importance on their mental-distress claims from those who evacuated before Katrina and returned weeks or months later.

- Persons who filed timely Form 95s have no personal interest in whether or not the Court excuses other class members' failures to file Form 95s.

- Some proposed class members may have experienced relatively minor damage to real property from wind and rain, whereas other proposed class members may have experienced a combination of wind, rain, and flooding, leaving the house a "total loss," in the view of its owners, like the Armstrongs (J. Armstrong Dep. at 13-14, 50-51, 67-68).

Thus, each named plaintiff, as well as each proposed class member, will have a distinct interest in emphasizing particular claims in order to get those proofs before the court. *See, e.g.*, *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002) (holding district court erred in failing to consider the named plaintiff's adequacy in case where named plaintiff could have an "incentive to litigate" her more valuable claim over the other claims); *Amchem*, 521 U.S. at 626 (acknowledging the "disparity between the currently injured and exposure-only categories of plaintiffs").

---

(continued…)

2006) ("[T]his issue-splitting [of monetary and injunctive relief claims] may endanger the claims of other class members . . . and bring[s] into question the adequacy of plaintiff as a class representative. . . . [P]laintiff may have created a conflict between her interests and those of the putative class members."); *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004) ("Courts have repeatedly held the failure to seek full recovery by splitting out personal injury and property damage claims creates a significant conflict of interest destroying adequacy of representation."). Nevertheless, the conflicts that remain are too great for named plaintiffs to be adequate representatives.

Finally, the incorrect and conflicting information submitted by many of the named plaintiffs in their Form 95s calls into question their adequacy as class representatives.[40] Consequently, the Court should find that plaintiffs have failed to establish adequacy of representation due to the conflicts of interest among class members.

### C. Plaintiffs' Proposed Class Fails To Satisfy The Predominance And Superiority Requirements Of Rule 23(b)(3)

In addition to the prerequisites of Rule 23(a), plaintiffs must prove the two requirements of Rule 23(b)(3):  (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs have failed to make either showing.

---

[40] For example, Mr. Davis sought $500,000 for property damage, although he admitted during his deposition that his personal-property loss was $50,000 and his real-property loss was not more than $160,000.  (Davis Form 95, App. Tab 39 (filed under seal); Davis Dep. at 123-24)  Ms. Wade filed conflicting Form 95s, although she admitted that in her first Form 95, the amount she claimed for property damage greatly exceeded the damages she sustained, and she could not explain the basis of her personal-injury claim (Wade Dep. at 66-72; Wade 7/10/06 Form 95, App. Tab 37 (filed under seal)); Ms. Wade prepared her second Form 95 with an unknown party, made different real-property and personal-property claims, omitted a claim for personal injury, added a claim for mental distress, added a claim for loss of opportunity to purchase sufficient flood insurance, which she could not explain because she feels adequately insured, and added a statement that her injury resulted from the fraud and/or concealment of the Corps, which she could not explain, other than stating that it must have been added by someone else (Wade Dep. at 74-82; Wade 1/12/07 Form 95, App. Tab 38 (filed under seal)); Ms. Wade also could not explain the variations between her Form 95s (Wade Dep. at 90-92).

      1.      **Common Questions Of Law And Fact Do Not Predominate Over Questions Affecting Only Individual Members**

          a.      **Plaintiffs' Claims, And The Defenses To Those Claims, Are Plagued With Issues That Would Inevitably Require Individualized Proof From Each Class Member At Trial**

Plaintiffs assert claims of negligence and strict liability against all defendants. Under Louisiana law, liability in negligence and strict-liability cases is determined under the duty/risk analysis, which requires proof of five elements. *Bonin v. Ferrellgas, Inc.*, 877 So. 2d 89, 94 (La. 2004). The five elements are (1) proof that the defendant had a duty to conform his conduct to a specific standard; (2) proof that the defendant's conduct failed to conform to the appropriate standard; (3) proof that the defendant's substandard conduct was the cause-in-fact of the plaintiff's injuries; (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) proof of actual damages. *See id.*; *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001); *Jones v. Peyton Place, Inc.*, 675 So. 2d 754, 762 (La. Ct. App. 1996). The proposed class-action nature of this lawsuit does not alter the requirement that each plaintiff prove every element of his claims.

Here, plaintiffs do not satisfy the predominance requirement because their negligence and strict-liability claims, and the defenses to those claims, are plagued with an overwhelming number of issues that would inevitably require individualized proof from each class member at trial, including:

    (1)    whether any particular plaintiff incurred injury(ies)-in-fact and, if so, which of the 16 categories of injuries the particular plaintiff sustained; (each proposed class member may have incurred multiple injuries, such as cost to

repair real property, loss of personal property, physical injuries, mental distress, and/or loss of business income);

(2)    whether any defendant's conduct was a cause-in-fact of an injury to any particular plaintiff; (when a plaintiff has multiple injuries, different persons may have been the cause of different injuries);

(3)    whether any defendant's conduct was a legal cause of injury to a particular plaintiff;

(4)    the determination of other forces, or persons other than any defendant, that may have caused a particular injury to a particular plaintiff; (if the injury is to personal property, for example, other potential causes could be wind, rain, and/or looting);

(5)    whether and the extent to which any particular plaintiff's injuries were caused by an Act of God, such as Katrina-related damage from wind, rain, and falling debris — injuries for which no defendant would be liable;

(6)    the allocation of fault among all entities — including one or more defendants, the forces of nature, plaintiffs, and non-parties — that caused a particular plaintiff's injuries at a particular location;

(7)    the actual amounts of each item of damages for any plaintiff, including amounts spent to repair real property, the value of real property before and after Katrina, personal-property losses, medical and other personal-injury expenses, mental distress, and other intangible damages;

(8)    medical causation of personal injuries (e.g., whether Ms. Armstrong's fungal infection was caused by mold in her house post-Katrina and if so, whether any defendant is liable in negligence for that infection);

(9)    the degree and extent of mental distress, symptoms, treatment, and whether those facts are legally sufficient to support a claim for mental distress (was medication or a visit to mental health professional required?);

(10)    whether any particular plaintiff has exhausted all administrative and other prerequisites for recovery (such as filing Form 95s to proceed against the government);

(11)    whether and the extent to which any particular plaintiff assumed the risk of or contributed to some or all injuries sustained; and

(12)    what amount and type of damages, if any, any particular plaintiff is entitled to recover, including whether the plaintiff has failed to mitigate his

damages and whether any defendant is entitled to offsets, and in what amounts, for particular monies received by the plaintiff from, for example, the Road Home program.

Answering the foregoing questions for one named plaintiff, based on his or her own circumstances and individualized damages, would not answer the questions for any other proposed class member.  Given the myriad of individual issues related to each of plaintiffs' claims, "one set of operative facts would not establish liability . . . ." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).  Any attempted trial of this case on a class-action basis would inevitably devolve into "a series of individual mini-trials" on particularized proofs for each plaintiff, "which the predominance requirement is intended to prevent."  *Id.*

Indeed, courts have consistently recognized the need for individual proof of causation of property damage in class-certification and joinder decisions involving Hurricane Katrina, recognizing that the proof of what caused damage to any particular property will be unique:

- In *Comer v. Nationwide Mutual Insurance Co.*, the court held that "[e]ach property owner in Mississippi who had real and personal property damaged in Hurricane Katrina is uniquely situated.  No two property owners will have experienced the same losses.  The nature and extent of the property damage the owners sustain . . . will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage. . . . [E]ach individual claim will require particular evidence to establish the cause of and the extent of the loss."  No. 1:05 CV 436 LTD RHW, 2006 WL 1066645, at *2 (S.D. Miss. Feb. 23, 2006).

- A year later, in *Guice v. State Farm Fire & Casualty Co.*, the court held that "important lessons" learned from individual trials relating to hurricane damage confirmed that "there are as many differences between the 'slab cases' as there are similarities in terms of the evidence available to

ascertain the cause of the destruction and damage to these properties" because the forces exerted by Hurricane Katrina varied substantially from one location to another and the forces exerted against a particular building varied substantially depending on the building's location.  No. 1:06CV001 LTS-RHW, 2007 WL 912120, at *1 (S.D. Miss. Mar. 22, 2007).

- In *Rohr v. Metropolitan Insurance & Casualty Co.*, Judge Feldman recognized that Hurricane Katrina left "each property owner in a unique situation based on the prior condition of the property owner's home . . . and the immediate effects of the hurricane in that particular geographic area." No. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan. 17, 2007).

- In *Bradley v. Nationwide Mutual Insurance Co.*, the court recognized that "the storm was vastly different in its effect depending on the specific geographic location of each particular home," such that Hurricane Katrina did not constitute the same "transaction or occurrence."  No. 1:06CV528-LTS-RHW, 2006 WL 2594548, at *1 (S.D. Miss. Sept. 6, 2006).

Courts also have consistently recognized that the need for individualized proof of personal injury and mental distress makes those claims inappropriate for class certification as well.  *See Steering Comm.*, 461 F.3d at 602 (personal-injury claims not suitable for class treatment because "each plaintiff's claims [would] be highly individualized"); *id.* (emotional-distress claims not appropriate for class treatment because they "necessarily implicate[] the subjective differences of each plaintiff's circumstances; they are an individual, not classwide, remedy") (citation omitted);[41] *see also Salvant v. Murphy Oil USA, Inc.*, No. 06-8700, 2007 WL 2344912, at *2 (E.D. La. Aug. 13, 2007) (denying class certification of claims for personal and emotional injuries).

---

[41] Other courts agree.  *See, e.g., In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 461-62 (E.D. La. 2006) (denying class certification of emotional-injury claims); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1239 (11th Cir. 2000) (reversing class certification of section 1981 claims seeking emotional and psychological-distress damages).

(1)     This Case Is Not A "Single Catastrophic Event"
Owing To A "Single Course Of Conduct"

In an attempt to portray their claims as being amenable to class treatment, plaintiffs ignore well-known facts to mischaracterize the case as a "single catastrophic event culminating from a single course of conduct."  (Pls.' Br. at 15.)  Plaintiffs advance this theme by repeated references to a meteorological event — Hurricane Katrina — as being the actor, thereby implicitly suggesting that the causation inquiry would be the same for each proposed class member.  But such an approach has already been rejected in other Hurricane Katrina cases.  *See, e.g.*, *Rohr*, 2007 WL 163037, at *3 (finding Hurricane Katrina "alone cannot serve as a common transaction or occurrence" and "each plaintiff will need to prove . . . the cause of the damage (which may vary according to the location of the property), and the extent of the damage").

Plaintiffs make this "single event" argument with heavy reliance on *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), which has no precedential value in the Fifth Circuit.[42]  The *Watson* plaintiffs proposed to represent a class of more than 18,000 plaintiffs who sustained injuries or damages, all as a result of a single refinery explosion that was allegedly due to a single negligent act.  *Id.* at 1016-17 nn.3-4, 1022.

Unlike *Watson*, this case involves a myriad of contributing factors and causes for each injury alleged by any particular plaintiff, including Acts of God like wind, rain, and

---

[42] *Watson* was settled after the Fifth Circuit granted a rehearing en banc.  Under Fifth Circuit rules, the effect of granting the rehearing was to vacate the opinion cited by the plaintiffs.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 n.12 (5th Cir. 1996) (reversing certification order that relied on *Watson*); *see also In re Abbott Labs.*, 51 F.3d 524, 528 n.7 (5th Cir. 1995) (noting that the decision in *Watson* has been vacated).

storm surge, and at least 45 different sources of water entering the proposed MRGO class area, such as rain, overtopping of various levees and floodwalls, various breaches of levees and floodwalls, and pump station backflow.  (Wooten Report, App. Tab 15 at 10-12, 16; Dalrymple Report, App. Tab 16 at 3-7.)  Moreover, unlike *Watson*, each of the possible contributing factors and causes in the proposed class suit potentially implicate the responsibility of a multitude of parties, including defendants, plaintiffs, and non-parties (e.g., designers or construction companies), such that a complex comparative-fault determination must be made for each proposed class member's particular injury(ies). (Wooten Report at 7.)  As such, plaintiffs in this case face drastically different and intensely individualized causation and fault determinations that the *Watson* plaintiffs did not.  Moreover, because these different factors and causes had different sequences and effects, each plaintiff must link any injury to its particular cause or causes.  For example, part of Henry Davis's home — his daughter's room — was destroyed by wind and rain, but other parts of the house had flood damage that may or may not be the fault of one or more defendants.  (Davis Dep. at 22-23.)  Ms. Armstrong's house had major flood damage and minor wind damage, while her mother's house, on the same block, sustained most of its damage from a falling tree.  (K. Armstrong Dep. at 35-37, 128-29.)

Indeed, the Fifth Circuit has distinguished the propriety of certifying mass-tort cases on the ground that an event involving complex causation cannot be treated like a simple, single event.  In *Steering Committee*, the Fifth Circuit affirmed denial of class certification of claims for punitive and compensatory damages, including personal injury, property damage, business loss, and emotional distress, arising from exposure to smoke

from a chemical plant fire.  461 F.3d at 605.[43]  Despite plaintiffs' argument in *Steering Committee* that the negligence or strict liability of the defendant for causing the fire could be determined on a classwide basis, the Fifth Circuit did not find Rule 23(b)(3) certification appropriate because the argument did "no more than prove that some common issues exist[ed] across the class.  The predominance inquiry, however, is more rigorous than the commonality requirement, [and] the evidence presented . . . regarding the complexity" of the causation and damages issues not common to the class indicated that such issues would predominate over the liability issues.  *Id*. at 603.[44]

The other case upon which plaintiffs rely, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999), (*see* Pls.' Br. at 15), is similarly inapplicable.  *Mullen* was, again, a very small class of some 100 to 150 former floating casino employees seeking to recover for occupational respiratory illnesses caused by the casino's defective ventilation system.  *Id*. at 630.  Moreover, the Fifth Circuit understood that causation was a unique

---

[43] The Fifth Circuit distinguished *Steering Committee* from another case where causation *could* be adjudicated on a classwide basis:

> In this case, although the alleged cause of the injuries is also a single accident—a refinery fire—the causal mechanism for plaintiff's injuries—alleged exposure or fear of exposure to toxic substances—is not so straightforward.  While it is certainly true that the cause of the fire itself is an issue common to the class, each individual plaintiff must meet his or her own burden of medical causation, which in turn will depend on any number of the factors . . . .

*Steering Comm.*, 461 F.3d at 603 (emphasis added) (discussing *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494 (E.D. Pa. 1998)).

[44] Judge Fallon's decision to certify a small class of plaintiffs asserting claims against a single oil refinery is fundamentally different from this case.  *See Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 n.4 (E.D. La. 2006).  The *Turner* class involved a small class (approximately 1800 properties) in a small geographical area asserting claims against only (1) *one* defendant allegedly responsible for (2) *one* oil leak (3) from *one* source.  *Id*.

issue that would require individualized proofs from each class member in second-phase individual trials, but that did not present difficulties because of the small size of the class. *Id.* at 626-27.[45]

> (2)    Plaintiffs' Proposed Flood Model Was Primarily Intended To Estimate The Depths Of Floodwater Reaching Locations In The Class Area, And Cannot Replace The Need For Individualized Proof That A Particular Defendant's Conduct Injured A Particular Plaintiff

Plaintiffs suggest that their proposed flood simulation model will allow important causation issues in this lawsuit to be decided on a classwide basis. Specifically, plaintiffs assert that their model will establish "all pertinent aspects of the flooding" (Pls.' Br. at 22), including "how much water was present at maximum depth; where that water came from; the relative contribution of the various sources; and the timing of its arrival and departure" (*id.* at 23). Plaintiffs further assert that the Delft model can establish all of these factors for any given address in the proposed class area with just a simple X,Y coordinate. (*Id.* at 23.) But this claim is refuted by the Delft Report and Professor Vrijling's candid admissions during his deposition, which demonstrate the flood model cannot and does not establish this information for each proposed class member, and it cannot replace the need for individualized proof of causation.

---

[45] Even with the very small class, Judge Garza dissented in *Mullen*, arguing that a class action was not superior to individual trials. *Mullen*, 186 F.3d at 630. Judge Garza urged that the "divers[e] allegations" of the named plaintiffs — one blamed smoke, another blamed germs, and yet another blamed cold temperatures for their respiratory illnesses — would lead to problems proving classwide causation and could lead to violations of the Seventh Amendment. *Id.* at 632 (stating that the plaintiffs' trial plan required proof of negligence in the first phase, but proof of proximate cause in the second phase, which might require both juries to consider overlapping issues about whether the defendant's ventilation system unreasonably failed to protect the plaintiffs from harm).

As an initial matter, Professor Vrijling admitted that the results of his model are only as good as the input data.  (Vrijling Dep., App. Tab 11, Vol. I at 61; *see also* Delft Report, App. Tab 9 at i.)  Professor Vrijling also admitted that the accuracy of the model results was necessarily limited by the following factors:

1.   *Much of the model's input data had to be estimated or assumed, including*:

— the ten water levels (hydrographs) in various waterways were created by using yet another model, with its own assumptions, as opposed to empirical measurements (Vrijling Dep., Vol. I at 51);[46]

— rainfall across each polder was assumed to be uniform, even though Professor Vrijling admitted this assumption "does not comport with reality" (*id.*, Vol. I at 110);

— the precise time when particular breaches occurred at particular floodwalls or levees is unknown, so the Delft team had to just "choose" the times (*id.*, Vol. II at 119-20);[47]

— the way various breaches developed over time (i.e., whether a floodwall slowly leaned and failed gradually, or whether it collapsed catastrophically) is also unknown (*id.*, Vol. I at 49-50; *see also* Dalrymple Report, App. Tab 16 at 7); and

---

[46] In estimating the volume and height of water going through the canals and other waterways throughout Hurricane Katrina, the Delft model's input hydrographs "assumed" there were no breaches — even when that assumption was contrary to well-known fact.  (Dalrymple Report at 9; *see also* Kemp Dep., App. Tab 12 at 91.)

[47] The Delft team's choice of input data regarding the northern breach of the IHNC is a good example. The ILIT and Team Louisiana reports suggest this breach occurred around 7:30 a.m. (Team Louisiana Report, App. Tab 24 at 54; ILIT Report, App. Tab 23 at 6-6), while the IPET Report sets the time considerably earlier, perhaps starting at 4:30 a.m. (IPET Report, App. Tab 22, Vol. IV at 192-94).  The Delft team simply chose the later time, noting that "IPET has another opinion about the north breach and states that this breach started earlier, but both ILIT and Team Louisiana contradict this conclusion." (Delft Report at 38.)  When questioned about such conflicts in the multiple investigative reports used by the Delft team, Professor Vrijling was forced to admit that "ultimately the modeler just has to . . . choose one over another . . . ."  (Vrijling Dep., Vol. II. at 117.)  The very significant consequences of this type of choice, however, are emphasized by Professor Vrijling's own characterization of how the timing of the breaches affects the model:  "if you wouldn't know the time of the breach, then the entire figure shifts." (*Id.*, Vol. I. at 60-62.)

&mdash; the sill height (i.e., the average depth of the breach) was determined by picking a few elevations along the base of the breach and taking the "average" of those points (Morris Dep., App. Tab 13 at 58-59).

2. *Certain input data were completely omitted from the model, even though, as Professor Vrijling admitted, they "might be important with respect to damage at a particular location"* (Vrijling Dep., Vol. II. at 140-41):

&mdash; overtopping of levees and floodwalls by waves, which could have been an "important" factor in causing damage to nearby properties (*id.*, Vol. II. at 134);

&mdash; the effect of wind passing over water, which could have made the overtopping "more serious than we anticipated in our model" (*id.*, Vol. I at 101-02; Vol. II at 141);

&mdash; sewers, drains, and small waterways, which could have channeled water in a particular direction and caused damage (*id.*, Vol. I. at 92);

&mdash; underseepage, which could have been important at a particular location (*id.* at 102); and

&mdash; backflow from pumps, which could have caused severe damage in particular locations (*id.* at 102-03).

The Delft team's decision not to input the foregoing data is especially questionable because the Sobek-1D2D model that they used had pre-existing computer fields where these specific data could have been entered. (*Id.*, Vol. II at 141-42.)

3. *The model has a certain "averaging effect," at best showing the average of what may have happened over a 50- by 50-meter area, but not at a particular address*:

&mdash; The Sobek model's numerical computations were done at a 50- by 50-meter resolution (Delft Report at 7); therefore, nothing can be said about smaller scales.

Thus, plaintiffs' model cannot eliminate the need for real-world evidence of the maximum depth of floodwater at any given location, or of the timing of the arrival and departure of floodwaters. Indeed, the model's purported output of the maximum flood

depth at any given location has been contradicted by named-plaintiff discovery in this case.  The Delft Report contained graphical depictions of water levels present at different locations in Greater New Orleans during Hurricane Katrina.  (*See, e.g.*, *id.* at 15, 31, 42.)  As confirmed by Professor Vrijling, Figure 4.6 of the Delft Report indicates that the maximum flood level at Location 1 (as seen on Figure 4.5) was 13 feet.  (*Id.* at 33-34; Vrijling Dep., Vol. II. at 160-62.)  This location is just slightly north of 4719 Bundy Road, the home of named plaintiff Glynn Wade.  But the testimony of Ms. Wade and Mr. Danner, who inspected the property, contradict the model's prediction by several feet.  The water line in Ms. Wade's home indicated that there had not been 13 feet, but, as Ms. Wade testified, "about four feet of water or more."  (Wade Dep. at 29-30.)  Mr. Danner's report also stated that the water marks found on the Wade property indicated that the "static water depth would have been 4.14 feet or about 49½ inches above the floor of the residence."  (Danner Report on 4719 Bundy Rd., App. Tab 19B at 2.)

Not surprisingly, Professor Vrijling admitted that such disparities between real-world evidence and the model's predictions would be "of concern."  (Vrijling Dep., Vol. II at 82.)  And the named plaintiffs' depositions contain specific evidence about the damage that occurred at their respective homes, (*see, e.g.*, Wade Dep. at 29-31; Coats Dep. at 38-43; Davis Dep. at 59-62; J. Armstrong Dep. at 16), as do the inspection reports prepared by the defendants' forensic engineer who determined the depth of flooding at each property, based on water marks at these specific properties or at nearby homes (*see*, *e.g*., Danner Report on 4719 Bundy Rd. at 2).  Consequently, even if the Court allowed plaintiffs' flood simulation model to be admitted at trial, defendants would have a due

process right to present individualized rebuttal evidence to prove plaintiffs' model predictions to be inaccurate for a particular class member based on all of the available evidence. *Guice*, 2007 WL 912120, at *2 (The defendant "has a right to offer any evidence it wishes to support its view of the relevant facts, and this right is part of the most fundamental requirements of due process, in my view.").

In addition, the Delft model is *not* designed to show the relative contribution of each source of floodwater — despite plaintiffs' claim that it does. For example, with regard to the proposed St. Bernard subclass, the Delft Report does not distinguish between water from the north breach of the IHNC and the south breach of the IHNC. (*See* Delft Report at 43 (describing scenario "without breaches at IHNC," simply grouping the north and south breaches together).) Yet, as demonstrated by Mr. Wooten, the north breach and south breach most likely occurred for different reasons, at different times, with different parties potentially responsible. (*Compare* Wooten Report, App. Tab 15 at 43-44 (describing the possible causes of the north breach of the IHNC) *with id.* at 45-47 (describing the possible causes of the south breach of the IHNC).) A house in the Lower Ninth Ward that was already severely flooded or collapsed due to one breach (and one set of parties potentially at fault), would have incurred little, if any, additional damage from another breach (and a different set of parties potentially at fault) occurring hours later. Moreover, the Delft model only considered the "main causes" of flooding (Delft Report at 1), but did not attempt to assess the contribution of other causes, which the Delft team thought were less significant (*see, e.g.*, Vrijling Dep., Vol. I at 67-68). But these other causes, and the potentially responsible parties associated with them, cannot

simply be ignored for the sake of efficiency.  It may be of no importance to the Delft team that a particular low-lying property had significant rainwater runoff flooding before any levee breached, but it is important to the law:  no defendant can be cast in liability for a plaintiff's damages that it did not cause.

Finally, even if the Delft model predictions could be accepted as fact, able to finally determine at each class member's location "how much water was present at maximum depth; where that water came from; the relative contribution of the various sources; and the timing of its arrival and departure" (Pls.' Br. at 23) — which they cannot — the model does not determine causation of property damage at any particular location (Vrijling Dep., Vol. II at 90).  Indeed, plaintiffs' class brief admits that "no one could resolve on a class-wide basis the question of what damage water intrusion caused to a given structure."  (Pls.' Br. at 23.)

The model does not show whether, like Ms. Armstrong's parents' house (located on the same street as her home), a house was crushed by a falling tree.  (K. Armstrong Dep. at 128-29.)  The model does not show whether, as in Mr. Davis's case, a fixture that penetrated the roof above the room had split, allowing rainwater to pour through the roof, and causing the ceiling in that room to collapse.  (Davis Dep. at 22-23.)  The model does not show whether, as in the well-known example of Commander's Palace (located in the proposed Levee group class area), the structure's roof was completely blown off and the interior soaked by rain.  *See Commander's Palace Returns to New Orleans*, USA Today, Sept. 30, 2006, *available at* http://www.usatoday.com/news/nation/2006-09-30-commanders-returns_x.htm ("Commander's Palace . . . has been closed since Katrina's

wind and rain tore off sections of its roof and swamped its interior."), App. Tab 29.  The

model does not show whether copper piping and fixtures that survived the flood were

stolen by looters.  (*See* K. Armstrong Dep. at 102-03.)  The model does not even show

how high the water got in any particular house, since some sites were on slabs and some

were on raised foundations.  (*Compare* Danner Report on 1020-1022 Charbonnet St.,

App. Tab 19D at 2 (stating that the Coats' house had a raised masonary pier foundation)

*with* Danner Report on 4016 Hamlet, App. Tab 19C at 3 (stating that the Armstrongs'

house had a concrete slab foundation).)  And, obviously, the model does nothing to prove

what caused any of the other 16 types of injuries alleged by plaintiffs in the Complaint.  It

cannot begin to address whether Ms. Armstrong's fungal infection came from mold in her

house or had some other medical or environmental cause.  (*See* J. Armstrong Dep. at 27-

29.)

> ### (3)   Plaintiffs Have Not Proposed, Let Alone Developed, A Mass-Appraisal Model For Valuing The Myriad of Damages Sought By Plaintiffs

In an attempt to escape the legal requirement of proving actual individual damages

linked to the conduct of a particular defendant, plaintiffs intend to rely on the testimony

of Dr. John Kilpatrick, who claims that diminution of real-property values can be

determined on a classwide basis through a mass-appraisal model.  (Pls.' Brief at 15-16.)

He proposes to arrive at an amount of damage from Hurricane Katrina on a classwide

basis "expressed as a percentage loss of pre-Katrina property value."  (Kilpatrick Report,

App. Tab 10 ¶¶ 6, 9, 36.)  This percentage would constitute the entirety of recoverable

damages for injury to plaintiffs' real property and would encompass all damages from all

causes.  Thus, Dr. Kilpatrick's damage proposal is inadequate from the outset, because it

(supposedly) yields a diminution-in-value figure that would include losses due to wind,

rain, looting, and other causes, which are not alleged to be the fault of any defendant.

As a threshold matter, Dr. Kilpatrick has not set forth anything beyond conclusory

descriptions of what his mass-appraisal model theoretically might do.  And neither his

report nor his deposition explain how he will actually accomplish whatever it is that he

proposes to do.  (*See id.* ¶¶ 5, 19, 21, 25-32, 34; *see also* Kilpatrick Dep., App. Tab 14 at

33-35, 175-76, 179-80.)  Neither Dr. Kilpatrick nor anyone else has ever developed or

implemented a mass-appraisal model to determine damages encompassing large

segments of a major metropolitan area, covering hundreds of square miles, involving tens

of thousands of diverse properties, and seeking billions of dollars of damages on behalf

of more than 200,000 proposed class members.  Most significantly, Dr. Kilpatrick has not

developed the necessary protocols for his proposed model, does not know the scope of

work for the project, does not know what empirical model he will use, and does not know

how much this daunting undertaking will cost.  (Kilpatrick Dep. at 33-35, 195-99, 317-18,

350-51, 371, 434-35, 487-89.)  Nor does he know the sources of data he will use to

construct his model.  (*Id.* at 370-71.)  Thus, plaintiffs have not provided the Court with

any basis to evaluate their proposed mass-appraisal model to determine whether it is

reliable for any purpose, let alone as a basis to abandon the necessity of individual proofs.

Moreover, mass-appraisal methods are inappropriate for the New Orleans area,

because of the great variability in real estate here.  (Vandell Report, App. Tab 17 at ¶¶

39-45; Truax Dep., App. Tab 21 at 137-38.)  And even if Dr. Kilpatrick's model could be

constructed, it would purport to determine only one sliver of the various types of damage claimed by plaintiffs — diminution in value to residential properties, expressed as a percentage of pre-Katrina value.  (Kilpatrick Dep. at 457-61.)  It would not, however, distinguish between diminished value caused by a negligent act of a defendant (*e.g.*, flooding from water from a particular breach) and damage caused by wind and rain, for which no defendant is liable.  Hurricane Katrina was a composite event comprised of severe winds, heavy rains, high tides, water surges, floating debris, falling trees, flooding from overtopping of levees or floodwalls and/or from levee breaches, other flooding, and subsequent events (e.g., standing water, mold, looting).  (Vandell Report ¶ 20.)  The amount and type of damages at a particular class member's location that can be attributed to a particular defendant's alleged conduct will depend on which of these events impacted that plaintiff's property and in what sequence, as well as the condition of the property, the elevation of the land, the elevation of the structure above the ground, and other factors.  (*Id*. ¶¶ 20, 23, 25-27.)  No model could ever differentiate among all of these complex causal events, and plaintiffs' yet-to-be-determined model does not even purport to do so.[48]

Moreover, plaintiffs' proposed model would not address a whole panoply of plaintiffs' alleged damages.  Significantly, the Complaint and the named plaintiffs seek damages for personal injury and mental distress.  (*See* Compl. ¶ 80(b).)  Indeed, the five

---

[48] *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("[W]here the issue of damages 'does not lend itself to . . . mechanical calculation, but requires separate mini-trial[s] of an overwhelmingly large number of individual claims,' the need to calculate individual damages will defeat predominance.") (citation omitted).

named plaintiffs have each claimed $500,000 for various personal injuries and mental distress — a total of $2.5 million for just the five named plaintiffs.[49]  Dr. Kilpatrick admits that his proposed model would not purport to address these significant, but individualized, claims for personal-injury damages.  (Kilpatrick Dep. at 344.)

And, despite the fact that the proposed class includes renters — who comprised about 40 percent of the Lower Ninth Ward, for example, (Vandell Report ¶ 24, Ex. 2), Dr. Kilpatrick specifically excluded the damages claims of all renters:  "Renters are going to have a couple of different layers of damage, but that's not part of this case. *That's not part of what we're measuring*" (Kilpatrick Dep. at 358-59 (emphasis added)).  Thus, the damages of thousands of proposed class members would have to be determined *in their entirety* in individual trials.

Moreover, even though plaintiffs seek "loss of income" and "loss of business opportunities and business interruption" (Compl. ¶ 80(a)), plaintiffs' counsel admits that the proposed model would not determine damages for these losses, including loss of income from rental property:  "the mass appraisal technique being proposed in this case would not be utilized to quantify business income or rental income loss" (Truax Dep. at 205 (statement of plaintiffs' counsel)).  Plaintiffs also seek damages for loss of "personal" and "movable" property such as boats, automobiles, furniture, appliances, and other household items.  (Compl. ¶ 80(a).)  Plaintiffs' proposed model, however, does not purport to address these damages either.  (*See* Kilpatrick Dep. at 459-62.)  Nor does the

---

[49] (*See* K. Armstrong Form 95, App. Tab 35; J. Armstrong Form 95, App. Tab 34; Wade 7/10/06 Form 95, App. Tab 37; Davis Form 95, App. Tab 39; Coats Form 95, App. Tab 36 (all filed under seal).)

proposed model purport to value "costs of relocation," "evacuation expenses," or "other special damages" that some of the named plaintiffs may seek.  (Compl. ¶ 80(a).)

Finally, plaintiffs' proposed model would not determine the amount of actual repair costs incurred by class members.  Instead, it would provide an arbitrary amount of recoverable repair costs as some unknown part of the percentage figure for diminished value that Dr. Kilpatrick purports to be able to determine:

> Q. "And how are you going to account for the specific repair costs in each individual home?"
>
> A. "Don't need to do that."
>
>                 * * *
>
> Q. "And how do you plug into that equation anticipated repair cost?"
>
> A. "You don't.  You just — you measure the diminution in value and know that it includes the anticipated repair cost plus stigma.  You don't break it out between the two."

(Kilpatrick Dep. at 470-71.)  Thus, although named plaintiffs Coats and the Armstrongs stated that it would cost more to repair their houses than the houses were worth pre-Katrina (Coats Dep. at 105-07; *but see id*. at 108-09; K. Armstrong Dep. at 31-32; J. Armstrong Dep. at 62), Dr. Kilpatrick would cap their damages at a modeled amount *less* than their claimed repair costs (Kilpatrick Dep. at 468-71).[50]

---

[50] The Louisiana Supreme Court, however, has allowed a plaintiff who can show a special personal reason for restoring the property to its original condition to recover costs that exceed diminution-in-value damages.  *See Roman Catholic Church of Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So. 2d 874, 879-80 (La. 1993) (finding that the plaintiff, the Roman Catholic Church, should be awarded the full cost of restoration of an apartment complex owned by the Church because the Church's interest in the property was not purely financial, but to provide housing for its low-income parishioners, and because repairs to the complex, restoring it to its original condition, were already complete).  Plaintiffs have

In summary, under plaintiffs' proposed model, the vast majority of class members' damages claims would not be resolved, including:

- Claims for personal injury, such as Ms. Armstrong's injury due to a rare fungal infection and Ms. Coats' high blood pressure and heart problems;

- Claims for mental distress, such as Ms. Coats' claim for insomnia, hair loss, and vomiting;

- Claims of renters;

- Actual repair costs;

- Losses of personal and household possessions, including ones with sentimental or individualized value, such as military uniforms, photos of deceased loved ones, and family Bibles;

- Losses of boats, cars, trailers, tool sheds, lawn mowers, and other personal property;

- Evacuation and relocation expenses;

- Losses to commercial properties;

- Loss of income; and

- Business interruption losses.

Plaintiffs have not proposed a reliable, established, and accepted alternative to individualized valuation. In any event, in light of the vast number of damages issues that plaintiffs' model would not address, let alone purport to resolve, the purported efficiency

---

(continued…)

admitted that at least one proposed class member "seek[s] to recover repair, remediation, or restoration costs that exceed the fair market value of their properties before Hurricane Katrina." (Pls.' Supplemental & Restated Resp. to Disc., App. Tab 26 at 7.) This presents another individual inquiry that Dr. Kilpatrick's model could never resolve, since it depends on the unique facts and circumstances of a particular plaintiff's own case and on a showing that he has sufficient "personal reasons" to justify a damage award covering uneconomical repairs.

and savings of time and money in the overall resolution of this massive case are
nonexistent.

   **b.**  **Plaintiffs' Requested Certification Of Certain Issues
Under Rule 23(c)(4) Cannot Ease Plaintiffs' Burden To
Show Predominance**

  Plaintiffs propose that if the Court decides against using Dr. Kilpatrick's mass-
appraisal approach to determine plaintiffs' damages, the Court should nonetheless certify
a class action and proceed with a trial of plaintiffs' so-called "common" issues, saving
individual issues — like causation and damages — for later trials because, as plaintiffs
have admitted in prior filings with the Court, such issues cannot be certified for class
treatment.  (*See, e.g.*, Pls.' Opp'n to Mot. to Compel, Docket No. 6404 at 3
("Certification will not be sought to prove what *damages* did the water *cause* to a
particular home or person; those are matters of individualized proof outside the purview
of Fed. R. Civ. P. 23.") (emphasis added).)

  As explained below, plaintiffs here are essentially proposing the same type of
"core liability" trial that the district court attempted and the Fifth Circuit later rejected in
*Castano*.  In *Castano*, the district court certified various "Phase 1" issues of "core
liability" — such as issues relating to defendants' "conduct" and "liability" — for a
common-issues jury trial, but the court refused to decide on a classwide basis "issues of
injury-in-fact, proximate cause, reliance, affirmative defenses, and compensatory
damages" due to the individual issues involved.  84 F.3d at 738, 740.  The Fifth Circuit,
however, rejected this trial plan and reversed the district court's decision, because Fifth
Circuit precedent requires courts to consider the *entire cause of action as a whole*, not

just common issues, in analyzing whether Rule 23(b)(3)'s predominance requirement is satisfied.  *Id.* at 745 n.21; *see also* Pls.' Br. at 19 (acknowledging this requirement of *Castano*).  The Fifth Circuit also held that the class had to be decertified because it failed Rule 23(b)(3)'s superiority requirement.  *Castano*, 84 F.3d at 746-51.  For the reasons discussed in the next section, plaintiffs here also fail the superiority requirement.

> **2.     Plaintiffs Cannot Demonstrate That Their Proposed Class Action Is The Superior Method Of Adjudicating The Claims Asserted Here, Or That A Class Action Involving So Many Individual Issues Would Be Manageable**

Plaintiffs fail to show that a class action is a superior method of adjudicating the claims of the class.  The superiority requirement obliges the Court to assure itself that a case can be managed and tried in a manner consistent with due process, *see Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 425-26 (5th Cir. 2004), and to consider the "whole range of practical problems that may render the class action format inappropriate" for the case, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Here, plaintiffs' trial plan does not cure the need for individualized liability determinations, cannot be implemented without violating the Seventh Amendment, and would be neither efficient nor manageable.  Further, the many individual issues that would arise in each plaintiff's suit, and the incentive and interest of each class member in litigating his or her claims individually, counsel against a finding of superiority.

> **a.     Plaintiffs' Proposed Two-Phase Trial Plan**

Plaintiffs propose that this Court proceed under a two-phase trial plan.  (*See* Class Representatives' Proposed Levee & MRGO Trial Plan (Docket No. 7578) ("Pls.' Trial

Plan").)  The proposed Phase One Trial would include the named plaintiffs and the

defendants, and would address purported "common issues," such as:

- where and when the floodwaters went, and in what proportions, according to the Delft model (*see id.* at 2; *see also, e.g.*, Pls.' Br. at 2, 23);

- what plaintiffs call "liability" questions, such as "liability" for a breach;[51]

- an "apportionment of fault" — although it is unclear from plaintiffs' papers whether this would be apportionment of fault for the levee breaches,[52] for inundation of the entire class and sub-class areas,[53] or for inundation of each of the properties in the proposed class,[54] according to plaintiffs' unsubstantiated claims for what the Delft model can do; and

- mass-appraisal damages for diminution in real property, according to Dr. Kilpatrick's to-be-created model (Pls.' Trial Plan at 2; *see also, e.g.*, Pls.' Br. at 3, 16).

But the so-called "liability" determinations proposed for plaintiffs' Phase One

omit a crucial element of a negligence claim, because the jury would not be asked to find

*whether or not a defendant's conduct was the cause-in-fact of a plaintiff's claimed*

*injury*.[55]  No member of the proposed class here claims *levee breach* as his injury.  Rather,

---

[51] (*See, e.g.*, Pls.' Br., Ex. F, suggesting as "common questions" at 1 ("Liability of OLD, Lake Borgne, and St. Paul for the failure of the entire New Orleans levee system."); *id.* at 3 ("Liability of the Corps for creating a hazardous condition in respect of the MRGO."); *id.* at 4 ("Liability of [WGII] for the eastern floodwall breaches along the IHNC.").)

[52] (*See* Pls.' Trial Plan at 3 (explaining that whether one or more defendants were "at fault for each breach or failure" and "apportioning fault [for the breach or failure]" would be determined in Phase One).)

[53] (*See id.* at 2 ("To what extent did breaching, overtopping, and the like contributed [sic] to inundation in the class and sub-class areas, and whose fault, individually or concurrently, caused the inundation?").)

[54] (*See id.* at 2 ("If more than one party is at fault for inundation of a given property (or classwide damages due to inundation), what legal apportionment of fault is appropriate among those found liable . . . ?").)

[55] The Federal Tort Claims Act prohibits the use of a jury in cases against the United States, *see* 28 U.S.C. § 2402, and therefore all issues with respect to defendant the United States will have to be tried by the Court.  The defendants other than the United States, however, have a right to trial by jury and have made

a proposed class member's alleged injuries are damage to his own house, personal property, or place of business; his personal injuries, if any; his particular mental distress; and/or his business losses, which depend on his unique circumstances.

Plaintiffs' proposed Phase One Trial also would not apportion "fault" correctly: the law requires that fault be assessed for causing the plaintiff's injury, not for causing a levee breach or inundating an entire class area.[56]  Because plaintiffs' proposed Phase One Trial would not determine cause-in-fact of injury or final apportionment of fault for any particular plaintiff, it could never resolve "fault" or "liability" on a common basis, as promised by plaintiffs.

Following their proposed Phase One, plaintiffs request a mediation period.  (Pls.' Trial Plan at 3.)[57]  In Phase Two of their trial plan, plaintiffs propose a series of "successive trials," in which some unspecified number of selected plaintiffs/class members and any remaining defendants would participate.  (*Id.*)  These Phase Two Trials would attempt to adjudicate three individual issues identified by plaintiffs:

---

(continued…)

a jury demand.  (*See, e.g.*, Affirmative Defenses & Answer of Def. WGII to Pls.' MR-GO Master Consol. Class Action Compl., As Am., Docket No. 3614, at 26.)

[56] Louisiana's comparative-fault statute provides that "*where a person suffers injury, death, or loss*, the degree or percentage of fault of all *persons causing or contributing to the injury, death, or loss* shall be determined. . . ." La. Civ. Code Ann. art. 2323(A) (1997) (emphasis added).

[57] The suggestion in plaintiffs' proposed trial plan for court-ordered mediation — after the Phase One trial and before the many successive Phase Two trials — is no substitute for satisfying all of the Rule 23 requirements.  If plaintiffs are asking the Court to certify a class to allow them to try abstract issues of defendants' conduct as a prelude to mediation, *Castano* rejects the use of the class-action device to exert settlement pressure.  84 F.3d at 746.  Noting that certification of mass torts "creates insurmountable pressure on defendants to settle, whereas individual trials would not," *Castano* calls such settlements "judicial blackmail."  *Id.*

- "What damages were sustained by each selected Plaintiff as a result of the waters that inundated each Plaintiff's property?" (*id*. at 3);

- "What contributions did various sources of inundation (for which allocations of fault and a percentage real property value diminution already will have been determined) contribute to the overall damage or destruction of each Plaintiff's property in light of various unrelated property-specific damages?" (*id*.); and

- "What amount of compensatory damages, if any, is owed to each of the selected trial Plaintiffs?" (*id*. at 4).

But these individualized Phase Two trials — for 200,000 persons and entities — still would *not* ask the jury to determine whether a particular defendant's conduct was the cause-in-fact *of a plaintiff's injury(ies)*, nor would they ask the jury to apportion fault for causing these injuries.  The proposed Phase Two Trials also would *not* address causation for any class member's personal-injury or mental-distress claims, nor for business losses.

While it is not clear whether plaintiffs' proposed Phase Two Trials would all be held before this Court, or whether plaintiffs propose that a single jury — or many juries — sit to hear the "Phase Two" questions for all proposed class members, it is clear that plaintiffs propose a series of trials, each consisting of a group of selected plaintiffs. Presumably, after the first group of selected plaintiffs had their Phase Two Trial, plaintiffs intend to continue with additional Phase Two Trials until plaintiffs' proposed Phase Two issues have been decided for all 200,000 proposed class members.

Plaintiffs do not say how the jury's findings in their Phase One and Phase Two trials could be used to enter judgment in favor of any plaintiff against any defendant(s).

(1)     The So-Called "Common Issues" Phase Of Plaintiffs' Proposed Trial Plan Would Not Establish Liability On A Classwide Basis Because Causation And Comparative Fault Require Individualized Assessments

Plaintiffs' trial plan is based on counsel's promises that the Delft model can determine, once and for all, on a classwide basis, "[w]hat source(s)—for example, specific breaches, overtopping, or rainfall—inundated the subject properties, at what time, in what proportions by source, to what ultimate depth, and for how long?" (Pls.' Trial Plan at 2.) But as demonstrated above at pages 67 through 73, the Delft model cannot replace the need for individualized evidence on these issues.

Moreover, plaintiffs' trial plan is based on the additional, fundamentally erroneous premise that negligence liability can be determined without the jury's ever deciding who or what caused a particular plaintiff's injuries, in what percentages of fault. But this is not a construction-malpractice claim, where the plaintiff would seek to recover damages for the loss of a levee that breached. The injury for which a proposed class member seeks to recover damages occurred not at the levee, but at the plaintiff's address, where wind, rain, and floodwaters from overtopping — or from one or more levee breaches for which one or more defendants is alleged to be at fault — caused damage in a particular way and sequence that was unique to that property. In short, causation at the floodwall does not equal causation at a particular house.[58] This is because proof of what may have "caused"

---

[58] And causation at the floodwall would certainly never prove medical causation for Ms. Armstrong's fungal infection, or for any other proposed class member's alleged personal injuries. *See Steering Comm.*, 461 F.3d at 603 ("[E]ach individual plaintiff must meet his or her own burden of medical causation. . . .").

a particular breach in a floodwall is not the same proof of *causation* required under Louisiana negligence law to show that any particular injury to a particular plaintiff was *caused by* the wrongful conduct of a particular defendant.

In order for a plaintiff to establish the element of cause-in-fact under Louisiana tort law, he or she must demonstrate a specific causal link between a particular defendant's conduct and the plaintiff's own injury.  Courts have consistently rejected causation theories imposing liability in the absence of evidence linking a particular defendant's conduct to a particular plaintiff's injury.  *See, e.g.*, *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 678, 694-95 (E.D. La. 2006) (Vance, J.) (in proposed Hurricane Katrina class action, rejecting a causation theory that all of the defendants' activities led to destruction of wetlands, thereby weakening a protective barrier against hurricanes and allegedly causing all of the plaintiffs' damages, because "plaintiffs cannot impose liability on a defendant absent a showing of individual causation," and because allowing a plaintiff to collect damages "without demonstrating any individual connection between any single [defendant] and the plaintiff's harm" would "subvert the notion of causation that underlies the system of tort liability in Louisiana").  As Judge Feldman held in another Hurricane Katrina case brought by homeowners in St. Bernard Parish, each plaintiff must prove "the cause of the damage (which may vary according to the location of the property), and the extent of the damage." *Rohr v. Metro. Ins. & Cas. Co.*, No. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan. 17, 2007).  The critical element of causation cannot be trivialized as merely relating to "amount of damage."  (Pls.' Br. at 21.)

85

Nor can "fault" be determined at the floodwall.  It must be determined at the house, so that the fault of the defendants and others who may have caused a plaintiff's injuries can be assessed.  Under Louisiana principles of comparative fault, a fact-finder must compare and assess the fault of every person responsible *for a plaintiff's injuries*.  Indeed, the Louisiana Supreme Court has held that "[La. Civ. Code Ann. art. 2323] clearly requires that the fault of every person responsible *for a plaintiff's injuries* be compared, whether or not they are parties, regardless of the legal theory of liability asserted against each person."  *Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*, 828 So. 2d 530, 537 (La. 2002) (emphasis added).[59]  And "[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault *and the extent of the causal relation between the conduct and the damages claimed*. . . .  [T]he relationship between the fault/negligent conduct *and the harm to the plaintiff* are considerations in determining the relative fault of the parties."  *LeRay v. Bartholomew*, 871 So. 2d 492, 506 (La. Ct. App. 2004) (emphasis added) (quoting *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985)); *see also Dumas*, 828 So. 2d at 538 ("Louisiana's policy is that each tortfeasor pays only for that portion of the damage he has caused and the tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of that other person.")[60]

---

[59] "A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss."  La. Civ. Code Ann. art. 2324(B) (1997).

[60] *Cf. Lewis v. Timco, Inc.*, 716 F.2d 1425, 1431 (5th Cir. 1983) (applying federal maritime law and explaining that "when the jury 'compares fault' the focus is upon causation.  It is inevitable that a

In *Cimino*, the Fifth Circuit rejected a trial plan for Texas asbestos plaintiffs that — like the one proposed here — failed to determine causation on an individual basis. *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 303, 321 (5th Cir. 1998).  The Fifth Circuit held that trial plan to be fatally deficient, because it did not "include a litigated determination, consistent with the Seventh Amendment, of . . . whether, as to each individual plaintiff, [the defendant's] product was a cause of his complained-of condition and, if so, the damages that plaintiff suffered as a result."  *Id.* at 314, 321.  As the Fifth Circuit had explained in an earlier asbestos case, class-action procedures cannot be used to undermine substantive causation principles that require "proof that a particular defendant's asbestos 'really' caused a particular plaintiff's disease . . . ."  *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990).  Proof "that *in most cases* the defendant's asbestos *would have been* the cause" was insufficient to establish causation in *Fibreboard*, *id.* at 712 (emphasis in original), where the Fifth Circuit rejected a trial based on "statistical estimates" because it would "lift[] the description of the claims to a level of generality that tears them from their . . . moorings to actual causation and discrete injury."  *Id*.

Even though the *Fibreboard* plaintiffs argued that trying causation as to groups was "the only realistic way of trying these cases," *id*., the Fifth Circuit recognized in *Fibreboard* and again in *Cimino* that "causation of plaintiff's injury . . . and plaintiffs'

---

(continued…)

comparison of the conduct of plaintiffs and defendants ultimately be in terms of causation.  'Fault' that did not cause injury is not relevant.").

resultant damages must be determined as to 'individuals, not groups.'"  *Cimino*, 151 F.3d at 313 (quoting *Fibreboard*, 893 F.2d at 711).  Accordingly, because the *Cimino* trial plan — like the one proposed here — lacked any provision for the jury to determine causation based on a plaintiff's individual facts, the Fifth Circuit reversed and remanded judgments that had been entered in individual damage phases.  *Id.* at 314, 321.

While *Cimino* acknowledged "the asbestos crises" faced by district courts at the end of the twentieth century, the Fifth Circuit nonetheless held that "deviation from these settled principles [is not] authorized because these are asbestos cases whose vast numbers swamp the courts."  *Id.* at 313; *see also id.* at 321 (noting that the Supreme Court in *Amchem* "refused to stretch the law to fill the gap resulting from congressional inaction" on asbestos); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 604 (E.D. La. 2002) (Duval, J.) (holding that an attempt to adjudicate Louisiana contract claims more efficiently could not deprive defendants "of their right to have a jury determine liability and damages as to each plaintiff"); *Barasich*, 467 F. Supp. 2d at 694 (granting motion to dismiss, holding "[t]he plaintiffs number in the hundreds of thousands . . . .  The defendants' conduct took place in different areas of south Louisiana at different times over the course of several decades.  Plaintiffs' theory is apparently some form of group liability.  Plaintiffs apparently believe that suing defendants as a class can overcome[] this defect.  But plaintiffs cannot impose liability on a defendant absent a showing of individual causation.  The Fifth Circuit has repeatedly rejected theories of group liability or market share liability.").

Because Louisiana law requires individual proof that a defendant's wrongful actions caused a plaintiff's particular injuries, Phase One of plaintiffs' "common issues" trial — which is designed to find causation and fault against a defendant without reference to a plaintiff's injury — cannot resolve "legal liability" in this case.  Nor would plaintiffs' proposed Phase Two Trials — time-consuming though they would be — ever supply the findings necessary to enter a tort judgment on any class member's claim. Because plaintiffs' proposed trial plan skips ahead to damage trials in Phase Two, without ever making the required individual determinations of causation or fault for proposed class member's injuries, it could never be superior to individual adjudication.

> (2)  Plaintiffs' Trial Plan Could Not Be Implemented Without Violating The Seventh Amendment And Would Not Create Efficiency Gains

Plaintiffs' trial plan is also deficient because it would either require the Phase One jurors to continue to serve for decades in Phase Two Trials, or else it would call upon successive Phase Two juries to reexamine the Phase One jury's determinations in violation of the Seventh Amendment.  This is because the plaintiffs' proposed trial plan places highly interrelated causation questions in both Phase One and Phase Two.

"The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues."  *Castano*, 84 F.3d at 750 (citing U.S. Const. amend. VII ("[N]o fact tried by jury, shall be otherwise re-examined in any Court of the United States . . . .")).  The Fifth Circuit "has cautioned that separation of issues is not the usual course that should be followed, and that the issue to be tried must be so distinct and separable from the others that a trial of it alone may be

had without injustice.  This limitation . . . is a recognition of the fact that inherent in the

Seventh Amendment guarantee of a trial by jury is the general right of a litigant to have

only one jury pass on a common issue of fact." *Id.* (quoting *Alabama v. Blue Bird Body*

*Co.*, 573 F.2d 309, 318 (5th Cir. 1978)).  This rule "is dictated for the very practical

reason that if separate juries are allowed to pass on issues involving overlapping legal and

factual questions the verdicts rendered by each jury could be inconsistent." *Id.* at 750-51;

*see also In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995) (a district

court must "carve at the joint" so that the same issue is not re-examined by different

juries).  The Fifth Circuit and its district courts have consistently refused to allow class

actions that invite such Seventh Amendment violations.[61]

In order to make its Phase Two determinations, the second jury would have to

reevaluate the sources of inundation already examined by the Phase One jury and

therefore could make determinations of causation facts inconsistent with the first jury's

findings.  For example, in Phase One, plaintiffs propose that a jury resolve the question of

what sources "inundated" the subject properties, at what time, and in what proportions

"by source."  (Pls.' Trial Plan at 2.)  In Phase Two, another jury would be asked to

resolve the substantially similar question of what contributions various sources of

inundation made to the damage to "each Plaintiff's" property.  (*Id.* at 3.)  But such

reconsideration of issues by the Phase Two juries of the Phase One jury's findings is

---

[61] *See, e.g.*, *Castano*, 84 F.3d at 750; *Neely v. Ethicon, Inc.*, Nos. 1:00-CV-00569, 1:01-CV-37, 1:01-CV-38, 2001 WL 1090204, at *13-14 (E.D. Tex. Aug. 15, 2001); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 426 (E.D. La. 1997).

impermissible under the Seventh Amendment.  This risk of reevaluation of the same causation facts by successive juries — and the potential for resulting inconsistencies — is so great that class treatment cannot be superior to individual adjudication here.  *See, e.g.*, *Castano*, 84 F.3d at 751 (class action was not the superior method of adjudicating the plaintiffs' claims because, in order to make the class manageable, the court would be forced to bifurcate a defendant's conduct from comparative negligence in violation of the Seventh Amendment); *see also In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 426 (E.D. La. 1997) (holding that a class action bifurcating a defendant's conduct from comparative negligence was not superior to individual adjudication, because the second jury could reconsider the decided factual question of a defendant's negligence in violation of the Seventh Amendment).

Furthermore, plaintiffs' contention that class adjudication will create efficiency gains is incorrect.  Plaintiffs "have not demonstrated that issues presented at the proposed class phase would not be presented again during the individual phase, resulting in further inefficiencies."  *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 605 (W.D. Tex. 2006).  In fact, the trial plan that plaintiffs propose would require overlapping issues to be "considered in both the class and individual phases of trial, [resulting] in a 'waste, not a savings, in judicial resources.'"  *Id*. (quoting *Castano*, 84 F.3d at 749).  This waste of judicial resources would only be exacerbated because plaintiffs' trial plan would never answer the central and critical causation question — *did this defendant's conduct cause this plaintiff's injury?*

        **b.**      **The Individual Issues Necessarily Presented By The Claims Of Each Proposed Class Member Render The Proposed Class Trial Unmanageable**

The sheer number and overwhelming predominance of individual issues in this case render the proposed class action an inferior method of adjudicating the claims of the class.  As the Fifth Circuit recognized in *Castano*, "[t]he greater the number of individual issues, the less likely superiority can be established."  84 F.3d at 745 n.19; *see also Steering Comm.*, 461 F.3d at 604-05 (finding predominance of individual issues of causation, injury, and damages relating to plaintiffs' claims for compensatory and punitive damages arising from chemical plant fire detracted from the superiority of the class action); *Norwood*, 237 F.R.D. at 592-93, 604-05 (finding that "numerous individual issues that would require adjudication," including specific causation, detracted from the manageability of the proposed class action).[62]  As in *Steering Committee*, this case is replete with individual issues of causation, injury, and damages.  *See supra* at pages 60 to 63.  Proper adjudication of many of the issues plaintiffs propose as "common" in reality necessitates the presentation of individualized evidence.  *See supra at* pages 84 to 89. (demonstrating the individualized proof necessary for determination of plaintiffs' purported common issues).  Plaintiffs' proposed trial plan thus does not cure the major

---

[62] This relationship particularly holds true in mass-tort cases, because of "the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways.  In these circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried."  *Castano*, 84 F.3d at 745 n.19 (quoting 23(b)(3) advisory committee's note).

manageability problem presented by the quantity and complexity of individual determinations necessary to resolve each proposed plaintiff's claim.

As the Fifth Circuit explained in *Castano*, with so many individual issues, the "net result" of certifying a class "may be a waste, not a savings, in judicial resources." 84 F.3d at 749. While the Hurricane Katrina insurance cases that have been brought to trial already demonstrate how complex and individual the inquiry into the causes of each plaintiff's property damage — wind/rain versus flooding — will be, no individual cases tried to verdict have dealt with the further complexity of a causation theory involving the alleged conduct of multiple defendants, resulting in levee breaches and/or other failures in the Hurricane Protection System, leading to the release of water from many sources, some of which may or may not have caused a particular plaintiff's property damage, personal injury, or mental distress. Without an established track record for a mass-tort theory, there is a "higher than normal risk that the class action may not be superior to individual adjudication."[63]  *Id.* at 747.

---

[63] For this reason, the plaintiffs' reliance on *Jenkins v. Raymark*, 782 F.2d 468, 472 (5th Cir. 1986), is misplaced here, just as it was in *Castano*. As *Castano* explained, certification of the state of the art defense was warranted in *Jenkins* by previous experience with individual trials. *Castano*, 84 F.3d at 749. But, like *Castano*, this case — with its 200,000 plaintiffs, multiple defendants, conduct spanning a century of the development of the Hurricane Protection System, dozens of levee breaches and other sources of water, as well as wind, rain, and looting causing damages to property and personal injuries during Hurricane Katrina — is far more complex than the 893 asbestos cases in *Jenkins. See Castano*, 84 F.3d at 744.

c. **The Claims Of The Class Are Not Negative-Value Claims, And Each Individual Class Member Has A Significant Interest In Controlling The Adjudication Of His Or Her Claim**

Plaintiffs assert that their claims are "'negative value' suits that demand certification." (Pls.' Br. at 25.)  In support of this assertion, plaintiffs cite *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985), which involved "claims averaging about $100 per plaintiff."  But the claims asserted in this case are for substantial damages. Here, each named plaintiff seeks hundreds of thousands of dollars of damages for loss of real and personal property, for mental distress, and, in some cases, for physical injury. Four named plaintiffs each submitted Form 95s claiming $1,000,000 – $500,000 for property damage and $500,000 for personal injury.[64]  Such a claim is simply not a negative-value claim.  *See, e.g.*, *Corley v. Entergy Corp.*, 220 F.R.D. 478, 489 (E.D. Tex. 2004) (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998); *Castano*, 84 F.3d at 748 ("If potential damages recoverable by class members are substantial, the lawsuit does not qualify as a negative value suit.").

And, where plaintiffs seek large awards, the members of the proposed class "have a significant interest in individually controlling the prosecution of separate actions," also defeating superiority of a class action.  *Norwood*, 237 F.R.D. at 604 (quoting *Georgine*, 83 F.3d at 633); *see also Amchem*, 521 U.S. at 616 ("The interest in individual control can be high where the stake of each member bulks large and his will and ability to take

---

[64] (K. Armstrong Form 95, App. Tab 35; J. Armstrong Form 95, App. Tab 34; Wade 7/10/06 Form 95, App. Tab 37; Davis Form 95, App. Tab 39; Coats Form 95, App. Tab 36 (all filed under seal).)

care of himself are strong[.]" (citations and brackets omitted)).  The proliferation of individual lawsuits on the Court's docket demonstrates this interest in individual control and prosecution of these actions.

Nor, contrary to plaintiffs' assertion, is there any lack of financial incentive for independent litigation.  The sheer number of suits and Form 95s filed by proposed class members before consolidation of this action confirms that individuals in the proposed class do have adequate incentive to bring solo actions.  Plaintiffs' further suggestion, that the significant damage recovery sought for each plaintiff would not outweigh the cost of "excavating the mountain of legal and factual information necessary" to bring the claim in an individual suit (Pls.' Br. at 24), has already been rejected in *Castano*.  Here, as in *Castano*, the proposed class "is represented by a consortium of well-financed plaintiffs' lawyers who . . . can develop . . . expertise and specialized knowledge[.] . . . Courts can also overcome the defendant's alleged advantages through coordination or consolidation of cases for discovery and other pretrial matters."  84 F.3d at 747 n.25.  Plaintiffs have not established superiority here.

## IV.    Conclusion

For all of the foregoing reasons, defendants respectfully request that this Court deny class certification.

Dated:  October 9, 2007                         Respectfully submitted,


*/s/Thomas P. Anzelmo*                          */s/William D. Treeby*
Thomas P. Anzelmo, 2533                         William D. Treeby, 12901
Mark E. Hanna, 19336                            Carmelite M. Bertaut, 3054
Kyle P. Kirsch, 26363                           Heather S. Lonian, 29956
Andre J. Lagarde, 28649                              Of
     Of                                         Stone Pigman Walther Wittmann L.L.C.
McCranie, Sistrunk, Anzelmo, Hardy,             546 Carondelet Street
  Maxwell & McDaniel                            New Orleans, Louisiana  70130
3445 N. Causeway Boulevard, Suite 800           Telephone:  (504) 581-3200
Metairie, Louisiana  70002                      Facsimile:  (504) 581-3361
Telephone:  (504) 831-0946
Facsimile:  (504) 831-2492                       Attorneys for Washington Group
And                                             International, Inc.
James L. Pate, 10333
Ben L. Mayeux, 19042                            Of counsel
     Of
Laborde & Neuner                                Adrian Wager-Zito
One Petroleum Center, Suite 200                 Julie McEvoy
1001 West Pinhook Road, Suite 200               Jones Day
Post Office Drawer 52828                        51 Louisiana Avenue, N.W.
Lafayette, Louisiana  70505-2828                Washington, D.C.  20001-2113
Telephone:  (337) 237-7000                      Telephone:  (202) 879-4645
                                                Facsimile:  (202) 626-1700

Attorneys for the Orleans Levee District
                                                Jerome R. Doak
                                                Margaret I. Lyle
                                                Amy Payne
                                                Jones Day
                                                2727 N. Harwood Street
                                                Dallas, Texas  75201
                                                Telephone:  (214) 220-3939
                                                Facsimile:  (214) 969-5100

/s/ Gary M. Zwain
Lawrence J. Duplass, 5199
Gary M. Zwain, 13809
Andrew D. Weinstock, 18495
  Of
Duplass, Zwain, Bourgeois, Morton,
Pfister & Weinstock
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana  70002
Telephone:  (504) 832-3700
Facsimile:  (504) 837-3119

Attorneys for Board of Commissioners for
the Lake Borgne Basin Levee District

## CERTIFICATE

I hereby certify that a copy of the above and foregoing MRGO Defendants' Joint

Memorandum in Opposition to Plaintiffs' Motion for Class Certification has been served

upon Joseph Bruno, Plaintiffs' Liaison Counsel, this 9th day of October, 2007.

*/s/ William D. Treeby*
William D. Treeby

DLI-6145681

97