# App. Tab 4

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182 "K"(2)

PERTAINS TO:  MRGO                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,        MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285




Videotaped deposition of JEANNINE B. ARMSTRONG,
28 Park Place Drive, Apartment 601, Covington,
Louisiana  70433, taken in the offices of Bruno &
Bruno, 855 Baronne Street, New Orleans, Louisiana
70113, on Monday, the 9th day of July, 2007,
beginning at 9:21 a.m.



APPEARANCES:

        LAW OFFICES OF FRANK J. D'AMICO, JR.
        (BY:  RICHARD M. EXNICIOS)
        2nd Floor
        622 Baronne Street
        New Orleans, Louisiana  70113

            ATTORNEYS FOR THE PLAINTIFFS

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                        7/9/2007

---

**Page 2**

```
1   APPEARANCES CONTINUED:
2     LABORDE & NEUNER
        (BY: GREGORY A. KOURY)
3     Suite 200
        One Petroleum Center
4     1001 West Pinhook Road
        Lafayette, Louisiana 70503
5
          ATTORNEYS FOR THE BOARD OF
6         COMMISSIONERS FOR THE
          ORLEANS LEVEE DISTRICT
7
8     DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
        & WEINSTOCK
9     (BY: JOSEPH E. BEARDEN, III)
        Suite 2900
10    3838 North Causeway Boulevard
        Metairie, Louisiana 70002
11
          ATTORNEYS FOR THE BOARD OF
12        COMMISSIONERS FOR THE LAKE BORGNE
          BASIN LEVEE DISTRICT
13
14    STONE PIGMAN WALTHER WITTMANN
        (BY: CARMELITE M. BERTAUT)
15    546 Carondelet Street
        New Orleans, Louisiana 70130-3588
16
17        AND
18    JONES DAY
        (BY: JEROME R. DOAK)
19    2727 North Harwood Street
        Dallas, Texas 75201-1515
20
          ATTORNEYS FOR WASHINGTON GROUP
21        INTERNATIONAL, INC.
22
23
24
25
```

---

**Page 3**

```
1   APPEARANCES CONTINUED:
2   VIDEOTAPED BY:
3     TODD MEAUX
        Depo-Vue, Inc.
4     Suite 205
        3200 Ridgelake Drive
5     Metairie, Louisiana 70002
        (504) 828-8856 or (888) 337-6883
6
7
    REPORTED BY:
8
      CAROL VALLETTE SLATER
9     Certified Court Reporter
        Registered Professional Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                 I N D E X
2
3   EXAMINATION BY:                          PAGE
4   MR. DOAK                                   5
5   MR. BEARDEN                              131
6
7
8   EXHIBITS:
9   Jeannine Armstrong Exhibit Number 1       37
      Document entitled "Plaintiffs'
10      Response to MRGO Defendants' First
        Set of Joint Class-Certification
11      Requests for Admission,
        Interrogatories, and Requests for
12      Production of Documents"
13  Jeannine Armstrong Exhibit Number 2       37
      Document entitled "Plaintiffs'
14      Response to MRGO Defendants' First
        Set of Joint Interrogatories,
15      Requests for Production of
        Documents and Requests for
16      Admissions to Plaintiffs Regarding
        Common Liability Issues"
17
    Jeannine Armstrong Exhibit Number 3      104
18      July 1, 2006, Department of the
        Army Corps of Engineers letter and
19      Standard Form 95
20  Jeannine Armstrong Exhibit Number 4      134
      Photocopied driver's license
21      (Not provided for attachment to
        transcript)
22
    Jeannine Armstrong Exhibit Number 5      134
23      Handwritten Social Security number
24
25
```

---

**Page 5**

```
1         THE VIDEOGRAPHER:
2             This is the videotaped
3   deposition of Jeannine Armstrong,
4   being held at 855 Baronne Street,
5   New Orleans, Louisiana, on July
6   9th, 2007. We're on the record at
7   9:21 a.m. My name is Todd Meaux.
8   I'm a Certified Legal Video
9   Specialist. The court reporter is
10  Carol Slater.
11            Would you please swear the
12  witness?
13            JEANNINE B. ARMSTRONG,
14  after being first duly sworn in the cause,
15  testified as follows:
16  EXAMINATION BY MR. DOAK:
17       Q.  Mrs. Armstrong, my name's Jerry Doak
18  again. We met as you came in.
19            For the record, would you please
20  state your name?
21       A.  Jeannine Armstrong.
22       Q.  How would you like for me to address
23  you, Miss Armstrong?
24       A.  Jeannine's fine.
25       Q.  I'll stay with last name. Mrs. or
```

---

JEANNINE ARMSTRONG  (MRGO)                                    7/9/2007

---

Page 6

1   Miss?
2       A.   Whatever's fine.
3       Q.   Okay.  Have you ever been deposed
4   before?
5       A.   No.
6       Q.   I will only explain a couple of
7   things.  I'm sure your counsel has reviewed them.
8   I will ask you questions.  You answer the
9   question.  Please allow me time to finish my
10  question, and if you have any questions that you
11  don't understand, just speak up and let me know
12  and I'll try to rephrase the question so you do.
13      A.   Okay.
14      Q.   Also, whenever you're ready to take
15  a break, just let us know, or your counsel, and
16  we'll take a break.
17           Let me begin by asking you:  What
18  did you do to prepare for this deposition?
19      A.   I read over the documents that we
20  were given by Jon Andry.  We had meetings with
21  the attorneys.
22      Q.   What were the documents that you
23  were given by Jon Andry?
24      A.   It was -- I don't know the name of
25  it -- that -- that -- interrogatories.

Page 7

1       Q.   Yes.
2       A.   That.  I really don't know the
3   formal names of them.
4       Q.   Some discovery responses.  Uh-huh.
5       A.   (Nods head affirmatively.)
6       Q.   And when was that?
7       A.   About three weeks ago.  Two, three
8   weeks ago.
9       Q.   And have you reviewed any other
10  documents in preparation for this meeting that
11  you can recall?
12      A.   No.
13      Q.   And you've had some meetings with
14  your counsel.
15      A.   Yes.
16      Q.   Have you had any meetings with
17  anyone other than your counsel?
18      A.   No.
19      Q.   Have you ever been involved in a
20  lawsuit before?
21      A.   No.
22      Q.   Never been a witness?
23      A.   No.
24      Q.   Never been a party to a lawsuit?
25      A.   No.

Page 8

1       Q.   Never been in a class action?
2       A.   No.
3       Q.   Never been sued?
4       A.   No.
5       Q.   Have you ever filed for bankruptcy?
6       A.   No.
7       Q.   Have you ever been involved in any
8   kind of criminal proceeding?
9       A.   No.
10      Q.   A little just background information
11  on you.  Where were you born?
12      A.   I was born in New Orleans.
13      Q.   Have you lived here all your life?
14      A.   Yes.
15      Q.   And you're currently married to
16  Kenneth Armstrong?
17      A.   Yes.
18      Q.   And when were you married to him,
19  what year?
20      A.   1983 -- 1982.
21      Q.   And had you been married before
22  then?
23      A.   No.
24      Q.   And you are still married today?
25      A.   Yes.

Page 9

1       Q.   What was your maiden name?
2       A.   Broggi, B-R-O-G-G-I.
3       Q.   And do you have children?
4       A.   Yes.
5       Q.   And their names and ages?
6       A.   I have a son, Kenneth, who's 23; a
7   daughter Katie, who's 21; and a daughter Reneé,
8   who's 16.
9       Q.   And were any of those children
10  living with you before -- shortly before
11  Hurricane Katrina?
12      A.   They all were living with us.
13      Q.   Were any other people residing in
14  your house besides you and your husband and your
15  three children?
16      A.   No.
17      Q.   And what is your current address?
18      A.   28 Park Place Drive, Apartment 601,
19  in Covington.
20      Q.   And how long have you been at that
21  address?
22      A.   Last June, we moved in.
23      Q.   I believe I recall seeing that you
24  all evacuated before the storm.
25      A.   Yes.

---

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG  (MRGO)                          7/9/2007

---

**Page 10**

1    Q.   Just very briefly -- we'll come back
2  to the details -- but about what time did you
3  leave and what time did you come back to the
4  area?
5    A.   We left at about 4:00 a.m. on
6  Sunday.
7    Q.   And what day was Sunday?  Was that
8  the day of the storm?
9    A.   That was the day before the storm.
10   Q.   Before.  And where did you go?
11   A.   To Baton Rouge.
12   Q.   And how long were you in Baton
13 Rouge?
14   A.   How long?
15   Q.   Yes.
16   A.   Until June of last year.
17   Q.   And as soon as you returned to the
18 New Orleans area, then you began living in this
19 apartment in Covington, where you still reside.
20   A.   That's where -- yes.
21   Q.   And prior to Hurricane Katrina, you
22 lived at what address?
23   A.   4016 Hamlet Place.
24   Q.   And you had been there since 1985?
25   A.   Yes.

**Page 11**

1    Q.   And would you describe your
2  educational background, please?
3    A.   I'm a registered nurse, graduated
4  from LSU Nursing School.
5    Q.   In what year?
6    A.   1994.
7    Q.   And would you describe your
8  employment history briefly, please?
9    A.   When I first got out of school, I
10 worked at Charity, Labor and Delivery.  Then, in
11 November of '94, I went to Chalmette Medical
12 Center, worked in the operating room for nine
13 years there.  Then, from the operating room, I
14 transferred to another department, Special
15 Procedures, and worked there till Friday before
16 the hurricane.
17   Q.   How far is that Chalmette hospital
18 from your Hamlet house?
19   A.   Less than a mile.
20   Q.   Can you briefly describe the
21 occasions where there were hurricanes before
22 Hurricane Katrina while you all were living in
23 the Hamlet house, what your experience was with
24 them.
25   A.   We only really evacuated maybe twice

**Page 12**

1  before.  The last time was for Hurricane Georges.
2    Q.   Do you recall what year that was?
3    A.   No.
4    Q.   What was the level of damage, if
5  any, to your house on Hamlet?
6    A.   Nothing.  Not even water in the
7  street.
8    Q.   And what about the second
9  evacuation?
10   A.   Second evacuation was for Katrina.
11   Q.   We will spend the rest of the day,
12 hopefully not all day, but the rest of the time
13 that we're here talking about the details, but I
14 really don't have a lot of background on you yet.
15 Could you just give me a introductory, brief
16 overview of your experience before, during and
17 after Hurricane Katrina?
18   A.   We were planning on leaving at --
19 early Sunday morning.  Get up in the morning, see
20 exactly where the hurricane was, what it was
21 doing.  Some friends of ours called about 2:00 in
22 the morning, you know, saying it was a
23 hurricane -- it was a Class 5, we got to get out
24 of here.  You know, so, we woke up and, you know,
25 started getting our stuff together and woke up --

**Page 13**

1  my oldest one and my youngest one were home.  My
2  other daughter goes to school in Baton Rouge.
3  She was in Baton Rouge -- and packed up our stuff
4  and left.
5    Q.   What was the reason you chose Baton
6  Rouge?
7    A.   My sister lives in Baton Rouge and
8  she works for a hotel and we had rooms reserved
9  there.
10   Q.   And when did you first return to New
11 Orleans after the hurricane and see your house?
12   A.   October 13th.
13   Q.   And how long were you in town for
14 that visit?
15   A.   Just a day.
16   Q.   And I take it at some point you had
17 the house bulldozed and --
18   A.   Demolished, yeah.
19   Q.   -- taken away, demolished?
20   A.   (Nods head affirmatively.)
21   Q.   When was that, approximately?
22   A.   I don't know the date.
23   Q.   Would it have been towards the end
24 of 2005, or later --
25   A.   Oh, no, later.

JOHNS PENDLETON COURT REPORTERS                 800 562-1285

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

**Page 14**

1    Q.   -- toward the end of 2006?
2    A.   In '06.  Maybe even -- I would say
3  the end of '06, I think.
4    Q.   And during that time, you were
5  continuously living in Baton Rouge?
6    A.   Yes.
7    Q.   You just came down for a day?
8    A.   Yes.
9    Q.   That was probably about as soon as
10  you could get back into the area.
11    A.   That was, yes.
12    Q.   Do you know what a Form 95 is?
13    A.   Not exactly.
14    Q.   The Form 95 is the government form
15  that your attorneys had to submit to Department
16  of Justice to make a claim against the Corps of
17  Engineer and the government.  Are you familiar
18  with that, that your attorney submitted such a
19  claim form for you?
20    A.   Yes.  Yes.
21    Q.   And submitted another claim form for
22  your husband?
23    A.   Yes.
24    Q.   Did you review that form?
25    A.   Yes.

**Page 15**

1    Q.   Before it was submitted?
2    A.   Yes.
3    Q.   As I understand from looking at that
4  form -- and we'll look at it in more detail --
5  right now, I just want to understand the injuries
6  or damages that you're alleging in this lawsuit,
7  and as I understand it from your Form 95 form,
8  you are claiming three types of damages:  First,
9  the loss of your house on Hamlet; second, your
10  personal property, we lawyers call it your
11  personal possession, everything other than your
12  house --
13    A.   Uh-huh.
14    Q.   -- and Number 3, mental distress as
15  a result of the storm.  Is that correct?
16    A.   Yes.
17    Q.   And are those the only three types
18  of damages that you're seeking in this lawsuit?
19    A.   I believe so.
20    Q.   Again, in a little while, I intend
21  to go back and discuss in some detail the
22  circumstances of each of these losses, but right
23  now, I just want to try to understand a little
24  bit better the precise injury for each of those
25  three to kind of define the injury, and then

**Page 16**

1  we'll come back and talk about it later for
2  detail.
3        Beginning with the real property,
4  your house on Hamlet, as I understand, was a
5  complete loss.
6    A.   Yes.
7    Q.   And you had it commercially
8  destroyed, bulldozed --
9    A.   Yes.
10    Q.   -- however they do that kind of
11  thing; is that correct?
12    A.   Yes.
13    Q.   So, that was a total loss.
14    A.   Yes.
15    Q.   And then, second, was all of your
16  personal possessions that, I guess, were in the
17  house.  Is it everything you owned other than
18  what you were able to pack up with you when you
19  evacuated?
20    A.   Yes.
21    Q.   All of your house possessions,
22  obviously, minus whatever you were able to fit in
23  the car to go to Baton Rouge?
24    A.   Right.
25    Q.   Did you own other car -- did you

**Page 17**

1  drive your car to Baton Rouge?
2    A.   Yes.
3    Q.   Did you have another car besides the
4  one you drove out of town?
5    A.   No.
6    Q.   Did you have a boat?
7    A.   Yes.
8    Q.   Was it lost?
9    A.   Yes.
10    Q.   Was it also a total loss?
11    A.   Yes.
12    Q.   So, pretty much wiped out?
13    A.   Yep.
14    Q.   The house wiped out, everything to
15  your name wiped out --
16    A.   (Nods head affirmatively.)
17    Q.   -- except the automobile, the shirt
18  on your back and, I assume, later, when we get
19  into details, you may have taken a few change of
20  clothes and maybe some photographs and --
21    A.   Exactly.
22    Q.   -- all that, correct?
23    A.   Yes.
24    Q.   Bad time.
25    A.   Yeah.

JEANNINE ARMSTRONG (MRGO)                              7/9/2007

Page 18

1    Q.   Have -- has there ever been an
2  occasion where you prepared a list of all of
3  those items of your personal possessions that
4  were lost --
5    A.   Before the hurricane or after?
6    Q.   After the hurricane.
7    A.   Yes.
8    Q.   What occasion was that?  Why did you
9  prepare such a list?
10   A.   The insurance companies.
11   Q.   And do I understand that you filed a
12 claim for the loss of your personal possessions?
13   A.   Yes.
14   Q.   And did you also file an insurance
15 claim for the loss of your house?
16   A.   Yes.
17   Q.   Again, we'll come back to the
18 details of that.  I just want to understand
19 broadly the injuries here.
20        I guess, why don't you tell me now
21 what were those few items of personal property
22 that you were able to save?  We've identified
23 your car that you drove out on.
24   A.   Uh-huh.
25   Q.   You obviously had some clothes and

Page 19

1  luggage.
2    A.   Actually, the clothes was more
3  shorts and tank tops than anything, you know,
4  because we figured, you know, if it was a
5  hurricane and we were going to -- you know, we
6  figured we'd get street flooding water, water in
7  the house.  Mostly shorts and tank tops, because
8  you knew you'd have to get back in there and tear
9  everything out.  One pair of capri pants, not a
10 pair of jeans, not a collared shirt.  That's
11 about it.  We had one box -- a Rubbermaid box of
12 pictures, and that's about it.  Me and my husband
13 shared a suitcase.
14   Q.   Your three children were with you?
15   A.   Yes.  Well, my daughter was in Baton
16 Rouge because she's going to school up there, but
17 the other two were with us.
18   Q.   So, really, other than a small stack
19 of photographs --
20   A.   That's it.
21   Q.   -- everything?
22   A.   Yeah.
23   Q.   Turning to the third type of injury,
24 the mental distress, again, can you just tell me
25 a little bit about that at this point?

Page 20

1    A.   What you want to know?
2    Q.   I'm sure it's terrible.
3    A.   Yeah.  And it's not the house, and
4  it's not the possessions.  That's not it.  If you
5  think that's it, you don't have a clue.  It's
6  your community more than anything.
7    Q.   Tell me about that.
8    A.   It's your own -- where your children
9  went to school, where I went to school, where
10 Kenny went to school, everything.  My parents
11 lived across the street.  You know, we went to
12 church.  We were married at the church.  My
13 children were christened at that church.  Gone.
14   Q.   I apologize for having to go through
15 what's clearly painful testimony.  Obviously, I'm
16 from out of town, but the nation understands in
17 some small part the terrible tragedy that struck
18 this community, but, you know, for purposes of
19 the lawsuit, we do need to talk about the mental
20 distress --
21   A.   That's fine.
22   Q.   -- a little bit.
23        So, as I understand what you're
24 saying, to you, your mental distress is primarily
25 focused on, your words, loss of community and

Page 21

1  your immediate neighborhood.
2    A.   Uh-huh.
3    MR. EXNICIOS:
4        Just an objection.  I'm not
5  disagreeing with your
6  summarization, but you're saying
7  "your primary," and she didn't say
8  that.  She said "it's more than
9  just."  She didn't say her primary
10 emotional distress was -- she said
11 "it's more than just" -- a
12 mischaracterization of what she
13 said.
14   A.   The hospital where I worked is gone,
15 my job is gone.
16 EXAMINATION BY MR. DOAK:
17   Q.   Do you consider that set of examples
18 that you identified, your parents across the
19 street, the church that you were married in and
20 your children were baptized, the friends in your
21 neighborhood, your nearby job at the hospital, do
22 you consider that to be the primary basis of your
23 mental distress here?
24   A.   The schools.
25   Q.   The schools.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                              7/9/2007

Page 22

1    A.   You know, had to pull your
2  children -- you know, put them in schools.  They
3  don't know anybody.
4    Q.   Right.  Right.  I'm not trying to
5  quibble.  I wasn't trying to restate your
6  testimony.  I just thought that since you told me
7  those things, I thought that you were saying that
8  it wasn't the house, it wasn't the possession,
9  but, rather, this list of neighborhood, community
10  issues that you articulated for me that was the
11  primary basis for your mental distress, and I
12  just wanted to find out if I understood that
13  correctly or incorrectly.
14    A.   That's correct.
15    Q.   Did I understand it correctly?
16    A.   Yes.
17    Q.   How long did your parents live
18  across the street?
19    A.   We moved there when I was in fifth
20  grade.
21    Q.   So, this wasn't only your home for,
22  really, your entire marriage --
23    A.   Right.
24    Q.   -- you raised your children there,
25  you were in the house from the early years all

Page 23

1  the way to the present.
2    A.   (Nods head affirmatively.)
3    Q.   There was all of that, but on top of
4  that, this neighborhood to you, goes all the way
5  back to being a five-year-old?
6    A.   Right.
7    Q.   I assume this was a strong reason
8  that you bought the house in 1985.
9    A.   Exactly.
10    Q.   And that pattern of community
11  involvement, that had begun in your youth,
12  continued as an adult as you went through the
13  stages of adulthood, of getting married and kids
14  being christened and having a job and working at
15  a nearby hospital and your children in those
16  schools, if not the same schools that you went
17  to, at least the same school system, I assume?
18    A.   Right.  Yes.
19    Q.   And all of those relationships that
20  your parents had had when you were a child, now
21  you were continuing those relationships.  Very,
22  very close --
23    A.   Yes.
24    Q.   -- relationships to you.
25    A.   Yes.

Page 24

1    Q.   Very important to you.
2    A.   Yes.
3    Q.   You did a very good job of giving us
4  more than a half dozen examples.  I'm just
5  wondering, as we've talked here for a couple of
6  moments, are there any other examples of why your
7  community, neighborhood were so important to you
8  and has caused you this mental distress beyond
9  the kind of examples you gave me?
10    A.   That's where you grew up.  That's
11  where you knew everybody.  You know, you could go
12  in -- you know, to a grocery store, to the -- to
13  the bank -- you know, working at the hospital,
14  just people in the community, you knew this one
15  or you knew that one, you know, was related to
16  this one.  It was a very, very close-knit
17  community that you don't have anymore.
18    Q.   Everything interrelated.
19    A.   Uh-huh.
20    Q.   The hospital, the neighbors --
21    A.   Right.
22    Q.   -- the schools, parents, children?
23    A.   Yep.
24    Q.   Again, we will talk about
25  circumstances some more, but have you sought any

Page 25

1  professional medical assistance with respect to
2  this mental distress?
3    A.   No.
4    Q.   No healthcare provider of any kind?
5    A.   Not for mental stress, no.
6    Q.   Okay.  And how about did you require
7  any medications for the mental distress?
8    A.   No.
9    Q.   Can you put a -- in time on the
10  mental distress?  Was this something that peaked
11  and has subsided over the past two years --
12    A.   Oh, no.
13    Q.   -- or it's still very much alive
14  with you today, it would seem, by looking at you
15  and hearing you.
16    A.   (Nods head affirmatively.)
17    Q.   Please, if you can --
18    A.   That's okay.
19    Q.   -- give a verbal answer for the
20  reporter.
21    A.   Well, we live in an apartment.  You
22  know, I never lived in an apartment when I first
23  got married.  You know, last week, we were
24  married 25 years.  I'm in an apartment.
25    Q.   So, you celebrated your 25th

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 26

1  anniversary --
2      A.   (Nods head affirmatively.)
3      Q.   -- in an apartment, something you
4  haven't lived in for a long time --
5      A.   Uh-huh.  Right.
6      Q.   -- instead of in the home where you
7  should have been?
8      A.   Exactly.  It would have been paid
9  for, too.
10     Q.   I think I'm ready to move to another
11 area, but I want to make sure that I understand
12 correctly that you're not seeking any relief in
13 this lawsuit for things other than these three
14 types of categories that we've talked about:
15 First, the loss of your house; second, the loss
16 of all of your personal possessions; and, third,
17 for this extreme mental distress that you
18 described as a result of losing everything,
19 including these neighborhood relationships; is
20 that correct?
21     A.   I did have other health issues, if
22 that's what you're referring to.
23     Q.   I have seen a couple of diseases
24 listed.  I don't know if the other health issues
25 are related to the lawsuit or not, but that's why

Page 27

1  I'm asking the question, to find out what this
2  group of defendants is being alleged to have been
3  partially responsible for.  I mean, that's one of
4  my jobs today.
5      A.   Right.
6      Q.   So, that's why I'm trying to -- so,
7  yes, ma'am, if there is something more beyond
8  mental distress in the area of loss that you
9  attribute -- for which you are seeking relief in
10 this lawsuit, yes, please tell me about that.
11     A.   Yes.
12     Q.   Okay.  And what are -- what are
13 those other things?
14     A.   I'm sure you know.  In November of
15 '05, I was diagnosed with brain tumor.  And that
16 would have been there no matter what.  That was
17 there before the hurricane.  Then, in June of
18 '06, I came down with pneumonia -- with
19 pneumonia, and was sick into July of last year
20 and developed a backache, and in August, went to
21 seek help for the backache.  Make a long story
22 short, wind up being an infection in my spine,
23 which was actually a fungal infection, and was
24 hospitalized for a month, had to have two
25 surgeries, removed two vertebrae out of my back,

Page 28

1  have rods and a cage in my back and was on
2  antibiotics for three months after I was out of
3  the hospital, had to have a blood test every week
4  and --
5      Q.   And how does that relate to the
6  lawsuit?  Do you attribute those things last
7  summer, the pneumonia and then the backache
8  developing into the back --
9      A.   The pneumonia was a fungal
10 pneumonia, which is rare.  You don't just get a
11 fungal pneumonia.  It's airborne.  We were down
12 at the house cleaning it out, gutting, all that
13 kind of stuff.  You know, doctors say it's from
14 the soil, from -- airborne from the soil.  Was it
15 from that?
16     Q.   So, you don't know, but you're
17 suspicious.  As a nurse, you're telling me that
18 this is rare?
19     A.   You don't see that.
20     Q.   To the limits of I only know briefly
21 what kind of areas you may have worked in as a
22 nurse, but when you say "rare," what kind of
23 percentage --
24     A.   Usually, you see a bacterial
25 pneumonia, viral pneumonia.  You very rarely see

Page 29

1  a fungal pneumonia.
2      Q.   Would fungal pneumonias be less than
3  5 percent of the whole?
4      A.   I don't know -- I don't know
5  percentages.
6      Q.   But in your experience, it's --
7      A.   You don't see it every day.
8      Q.   -- unusual.
9      A.   Yes.
10     Q.   Okay.  And because of that and
11 because of your cleanup activities at the site
12 and all of the stay-behind stuff, I guess,
13 following a hurricane, in your mind, you're
14 suspect that that might have been the cause of
15 that fungal pneumonia?
16     A.   Yes.  Yes.
17     Q.   Similarly, the back infection, I
18 think you said that that was also a fungal
19 inspection (sic)?
20     A.   Yes.  Yes.  They think it actually
21 was a pneumonia that went into the bone.
22     Q.   And your doctors have told you that.
23     A.   Yes.
24     Q.   That that was a, in their mind,
25 wherever the fungus came from in the first place,

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

---

Page 30

1  they thought there was a link between what was
2  started as the pneumonia and then moved to your
3  spine as a fungal inspection (sic); is that
4  correct?
5       A.   Infection, yes.
6       Q.   And that sounds like that was pretty
7  unhappy. A month -- full month in the hospital?
8       A.   Yes.
9       Q.   And where was that, in Baton Rouge?
10      A.   At West Jeff.
11      Q.   I'm sorry?
12      A.   West Jefferson, on the west bank.
13      Q.   And two surgeries, again, you said?
14      A.   Yes.
15      Q.   Would you give me a little bit more
16  detail on those surgeries?
17      A.   The first surgery, it's called a
18  thoracotomy, where you cut from here all along
19  the side and up your back, where they had to go
20  in and remove two of the vertebrae that were
21  infected, clean everything out. Then went back
22  the next week straight down my back and put two
23  rods in, bolts, like, through six or seven
24  vertebrae in my back, and then put a cage in,
25  which they call a cage, which actually is in that

Page 31

1  space where they took out the two vertebrae.
2       Q.   Have you ever discussed with any of
3  your physicians the possibility that this fungal
4  infection may have been caused by fungal
5  contamination at -- following the hurricane?
6       A.   Their biggest question was: How
7  often were you down there? You know, you were
8  down there cleaning your house out, you know.
9  It's odd.
10      Q.   What I'm trying to get at is whether
11  or not this is your personal theory as,
12  certainly, more informed than me, you're a nurse
13  and you've explained your relationship idea of
14  the fungus. I'm trying to find out, though, is
15  this your theory or did some of your doctors also
16  agree with your theory, that the fungal infection
17  might have come from Hurricane Katrina and your
18  cleanup activities after it?
19      A.   I would say it was both. You know,
20  when we went into the house, you know, there's
21  mold all over everything. There's mold on the
22  studs. There's mold on the rafters. It was
23  everywhere.
24      Q.   How long were you in the house doing
25  the cleanup?

Page 32

1       A.   I'd say a few -- every time we went,
2  it was for a few hours.
3       Q.   Let's divert and talk about that for
4  a while. You went -- your first time back was
5  the date in October, you said.
6       A.   (Nods head affirmatively.)
7       Q.   Summarize, please, the various trips
8  you made back to your house and what happened in
9  those trips, what you were doing.
10      A.   When we first went in, there was at
11  least -- at least two feet of mud and water still
12  in the house. You know, when you would step
13  down, the mud and water would come over your
14  boots. So, you were just trying to like -- like,
15  I forgot all my jewelry. So, we tried to -- you
16  know, you got to find your dresser because the
17  ceiling had fallen. So, there's no light -- you
18  got to realize, there's no light. The windows
19  all -- it's hot as hell. You know, in -- it
20  might be October, but it's hot. You got long
21  sleeves on. You have gloves on. You're sweating
22  constantly. You're trying to get in there.
23  You're trying to break apart stuff, trying to dig
24  through, trying to find, you know, just any piece
25  of trinket that you could find, you know, because

Page 33

1  it was a maze. It was a maze as in -- because
2  nothing was where you left it. Everything was
3  jumbled because everything had been floating
4  around and tossed around. And you spend most of
5  your time digging because you didn't really know
6  what you were digging through.
7       Q.   How soon in the process did you and
8  your husband think that the house was probably
9  going to be a complete loss and would need to be
10  demolished?
11      A.   When we first saw it.
12      Q.   Immediately?
13      A.   Yes.
14      Q.   So, these follow-up trips after your
15  first return in October were aimed at trying to
16  find what precious items you could retrieve; is
17  that correct?
18      A.   Yes. Yes.
19      Q.   Using your spinal infection
20  difficulties in July of '06, was the house on
21  Hamlet -- had it been demolished by that time, do
22  you recall?
23      A.   I don't think so. I think it was
24  closer to November.
25      Q.   You think it was after that?

9 (Pages 30 to 33)

21814518-488c-4610-8293-a5825110c6b6

Page 34

1    A.   I think so.
2    Q.   Let's go back to -- you said that
3  you'd been diagnosed with a brain tumor, and that
4  diagnosis was in November of '05?
5    A.   '05.
6    Q.   And you indicated that you had been
7  told or believed that the tumor had to have been
8  in existence before Hurricane Katrina.
9    A.   Yes.
10   Q.   Tell me about that.
11   A.   It's a slow-growing tumor, the type
12  that it is. It's not a fast-growing tumor.
13   Q.   And is there a connection in your
14  mind to that tumor being worsened in some way as
15  a result of your terrible experience with
16  Hurricane Katrina?
17   A.   The tumor?
18   Q.   Yes.
19   A.   No.
20   Q.   Okay. So, you're not seeking relief
21  in this lawsuit for anything having to do with
22  the brain tumor.
23   A.   The tumor was there.
24   Q.   Is it correct then that you're not
25  seeking anything in this lawsuit for the brain

Page 35

1  tumor? Is that a correct statement?
2    A.   Do I think the brain tumor had
3  anything -- was a result of the hurricane or --
4  no. No.
5    Q.   Okay.
6    A.   The tumor was there.
7    Q.   Okay. But, as I understand it, you
8  are seeking relief in this lawsuit for the fungal
9  pneumonia and the fungal spinal infection --
10   A.   Yes.
11   Q.   -- because of your theory of where
12  that fungus infection came from; is that correct?
13   A.   Yes.
14   Q.   Now, let me go back to the question
15  again because I need to confirm --
16   A.   That's okay.
17   Q.   -- that we understand all of the
18  injuries, damages, any other loss that you
19  believe that you're asserting in this lawsuit. I
20  want to make sure that I have a complete list of
21  those before we move on. We now have, I'll call
22  it, four types of injury, the real property, your
23  house on Hamlet, that's Number 1; Number 2 is
24  your personal possessions; Number 3 is your
25  severe mental distress; and Number 4 is personal

Page 36

1  injury in two forms, first, the fungal pneumonia,
2  and then, second, the fungal infection in your
3  spine. Is that a complete list now?
4    A.   Yes.
5    Q.   And there's nothing else for which
6  you're seeking relief in this lawsuit; is that
7  correct?
8    A.   Yes.
9    Q.   On June 12, your attorneys provided
10  responses to some class certification discovery
11  that the defendants had given them, and that
12  discovery is some words that you're probably not
13  accustomed to, but there were requests for
14  admissions, interrogatories and document
15  requests, those three kinds, and plaintiffs'
16  counsel gave us responses to that class
17  certification discovery on June 12, and I was
18  wondering if you recalled seeing that. Based
19  upon what you mentioned and what you did to
20  prepare for the deposition, this may have been
21  what you were referring to. So, I hand to you
22  what's been marked as Jeannine Armstrong Exhibit
23  1 and ask for you to examine that document.
24       MR. EXNICIOS:
25            You got a copy of it?

Page 37

1       MR. DOAK:
2            I don't.
3            (Whereupon, Jeannine
4       Armstrong Exhibit Number 1 was
5       marked for identification.)
6  EXAMINATION BY MR. DOAK:
7    Q.   I'm not going to quiz you on the
8  details. I'm just trying to find out if, you
9  believe, this was a document that you've seen
10  before?
11   A.   Believe so, yes. I believe so.
12   Q.   And, similarly, I hand to you what's
13  been marked Jeannine Armstrong Exhibit Number 2.
14  This is a similar set of your plaintiffs' counsel
15  responses to what were called common liability
16  issue discovery that were served back to the
17  defendants on June 14. I ask that you examine
18  that document, again, briefly, to determine
19  whether or not you think you have seen that
20  before.
21            (Whereupon, Jeannine
22       Armstrong Exhibit Number 2 was
23       marked for identification.)
24       MR. EXNICIOS:
25            This one. This is the one

JEANNINE ARMSTRONG  (MRGO)                              7/9/2007

Page 38

1    he's talking about.
2    THE WITNESS:
3        Okay.
4    A.   Yes.
5    EXAMINATION BY MR. DOAK:
6    Q.   Do you think that you saw Exhibits 1
7    and 2 at the same time? I thought you had said
8    in preparing for this deposition you remembered
9    at one time reviewing some documents that
10   Jonathan Andry had shown to you.
11   A.   Uh-huh.
12   Q.   And are these two of those
13   documents?
14   A.   I believe so, yes.
15   Q.   And do you have a basic recollection
16   of when that might have been?
17   A.   We received one on the 26th, when we
18   went to their office, June 26, and the other one
19   was the week before, I believe, when I had to
20   drop something off.
21   Q.   Okay. And these were just being
22   furnished to you by way of information?
23   A.   Yes. Yes.
24   Q.   Speak up.
25       Were you ever asked any questions by

Page 39

1    your attorneys with respect to particular
2    questions in these discovery requests?
3    A.   What do you mean?
4    Q.   For example, there were document
5    requests that asked if you had any documents,
6    notes, photographs, anything of that type about
7    Hurricane Katrina. Did your attorney ever sit
8    down with you and go through a list of questions
9    about either factual matters or about what
10   documents or photographs you might have had?
11   A.   Yes. Yes.
12   Q.   And when was that?
13   A.   We spoke to him a few times. You
14   know, we furnished pictures, a video. I don't
15   know a timetable.
16   Q.   Did you or your husband any -- ever
17   produce -- strike that. Let me start over.
18       Did you or your husband ever submit
19   any administrative claim forms to any government
20   entity other than this Form 95 that we talked
21   about earlier?
22   A.   Like what? Like --
23   Q.   The Road Home Program.
24   A.   Yes. Yes.
25   Q.   Did you participate in The Road Home

Page 40

1    Program?
2    A.   Yes.
3    Q.   Do you remember participating in any
4    other government-sponsored program?
5    A.   Like FEMA?
6    Q.   Yes.
7    A.   Yes.
8    Q.   And did you fill out a form for it?
9    A.   Yes.
10   Q.   Did you keep copies of the claim
11   forms that you submitted to FEMA?
12   A.   I believe so. The application --
13   Q.   Yes.
14   A.   -- in the very beginning?
15   Q.   Yes.
16   A.   Yes.
17   Q.   And did you keep a copy of the claim
18   form you submitted for The Road Home Program?
19   A.   If I don't have a -- whatever -- you
20   had to bring your stuff to them. They fill it
21   out. They put it on a disk for you. We still
22   have that, yes.
23   Q.   Okay. Do you have a copy of the
24   insurance claim that you submitted?
25   A.   I don't know if I have a copy of

Page 41

1    that.
2    Q.   Did you have any documents that
3    reflect any eyewitness account --
4    A.   Yes.
5    Q.   -- of Hurricane Katrina?
6    A.   Yes.
7    Q.   What were those documents?
8    A.   It was a video.
9    Q.   Was this the one --
10   A.   A DVD.
11   Q.   -- done by the St. Bernard fireman?
12   A.   Uh-huh.
13   Q.   I was going to ask about that later.
14   Is that -- who was that gentleman?
15   A.   He was a neighbor of ours who grew
16   up on the street. His parents still lived on the
17   street.
18   Q.   Do you recall his name?
19   A.   Ronald Silva.
20   Q.   Silver?
21   A.   Silva, S-I-L-V-A.
22   Q.   And he is a fireman where?
23   A.   St. Bernard Parish.
24   Q.   And what do you know about him
25   preparing this video?

                              11 (Pages 38 to 41)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 42

1    A.   I know he was at the sugar refinery
2  and they were at the sugar refinery and videoed
3  there and, then, after the storm, when they could
4  actually get out in boats, they actually went out
5  into the neighborhoods.
6    Q.   I have heard of the video.  I
7  haven't personally looked at it, but I'm told
8  that somebody who is speaking on the video is
9  reported to say something like there's Kenny
10 Armstrong's house.  So, that would be a reference
11 to your house on Hamlet?
12   A.   Yes.
13   Q.   And it, apparently, depicts very
14 severe devastation.
15   A.   Uh-huh.
16   Q.   Do you have any other eyewitness
17 account kind of documents?
18   A.   Actual -- of the hurricane actually
19 passing?
20   Q.   Yes.
21   A.   Not that I know of.
22   Q.   Did you prepare any statements or
23 documents pertaining to any of these four
24 categories of damages or injuries?  Like your
25 house, other than the insurance claim you

Page 43

1  submitted -- and we're going to talk about that
2  later -- but are there any other lists or
3  documents where maybe you listed things about the
4  house?
5       MR. EXNICIOS:
6         Yeah --
7    A.   I don't understand.
8       MR. EXNICIOS:
9         I don't understand the
10        question either.
11 EXAMINATION BY MR. DOAK:
12   Q.   Did you have any -- besides this one
13 videotape that was produced, did you have any
14 other photographs, DVD, videotapes or things like
15 that pertaining to anything surrounding Hurricane
16 Katrina?  I thought you referred earlier to some
17 photographs.
18   A.   I had photographs pre-hurricane.  We
19 had photographs when we went back into the house.
20 Not during the hurricane, because we weren't
21 there, but after the hurricane, when we could get
22 back to take photos of the house.
23   Q.   So, you have before-and-after photos
24 of the house on Hamlet?
25   A.   Yes.  Yes.

Page 44

1    Q.   And you told your attorneys that?
2    A.   Yes.
3    Q.   I assume that you must have many
4  documents about your two personal injuries, the
5  pneumonia and then the spine infection and the
6  resulting surgeries.
7    A.   I have documents?
8    Q.   Didn't you receive bills for all of
9  that?
10   A.   Oh, yeah.  Oh, yeah.
11   Q.   And perhaps correspondence with
12 medical providers and diagnostic materials?
13   A.   I don't know about diagnostic
14 materials, but I have plenty bills.
15   Q.   Okay.  Have you ever made any
16 statement or prepared notes, logs, journals,
17 diaries about your experience?
18   A.   No.
19   Q.   I want to change topics now and talk
20 more about the detailed circumstances for each of
21 the four types of injuries you're alleging in the
22 case and go through in more detail what happened
23 and your impression of things.  Beginning with
24 the damage to your house on Hamlet, you've
25 obviously testified that you weren't present, but

Page 45

1  do you have a view or understanding of how your
2  house was damaged?
3    A.   Yes.
4    Q.   Okay.  Would you please tell me
5  about that.
6    A.   From the photos I seen, I know the
7  water was almost over the roof.  It seems like
8  that's the --
9    Q.   Describe your house for us.
10   A.   It was a four-bedroom house, two
11 bath, garage, backyard.
12   Q.   One story?
13   A.   One story.
14   Q.   And the water was to the roofline?
15   A.   Yes.
16      MR. EXNICIOS:
17        Just for clarification, the
18        roofline, above the gutters, below
19        the gutters?
20      THE WITNESS:
21        Over the gutters.
22 EXAMINATION BY MR. DOAK:
23   Q.   Okay.  Pretty bad.
24   A.   Yeah.
25   Q.   Describe the location of your house,

                                    12 (Pages 42 to 45)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 46

1   also, on Hamlet.
2        A.   We lived in Buccaneer Villa North,
3   which was the north side of Judge Perez,
4   basically on the Forty Arpent Canal.
5        Q.   Yes.  And on your side of Paris
6   Road, I think, the Forty Arpent is called the
7   Florida Walk.
8        A.   I have no idea.
9        Q.   There -- well, immediately to the
10  north of you, there's a levee --
11       A.   Yes.
12       Q.   -- that goes up, and then there's
13  water right on the other side of that.
14       A.   Yes.  Yes.
15       Q.   And how far was that levee from you?
16  Hundred, 200 yards?
17       A.   I have no idea.  Put it this way.
18  We were two houses off.
19       Q.   You could see it from your --
20       A.   Oh, yeah.  Oh, yeah.
21       Q.   Very near this levee?
22       A.   Yes.
23       Q.   Do you know if -- there was
24  overtopping of that levee, wasn't there, water
25  coming over the top of the levee and coming into

Page 47

1   your neighborhood?
2        A.   I'm assuming so.
3        Q.   And I know that there is a backwash
4   station very nearby.
5        A.   What's that?  A pumping station?
6        Q.   Pumping station.
7        A.   Yes.
8        Q.   How far away is that from your
9   house?
10       A.   Maybe half a mile.
11       Q.   Okay.  My understanding, that there
12  were problems with that pumping station.
13       A.   Prior to the hurricane?
14       Q.   Were there prior to the hurricane?
15       A.   I don't know.  I -- I don't know.
16       Q.   So, you don't know if that pumping
17  station had failure in connection with Hurricane
18  Katrina or not?
19       A.   Oh, I have no idea.  When we left,
20  there was no -- it wasn't even raining.  There
21  was no water anywhere.
22       Q.   And in the 20 preceding years, had
23  you ever really had standing water in your
24  neighborhood from any of the prior storms?
25       A.   No.  No.  Like, when we came back

Page 48

1   from Georges, there wasn't water in the street,
2   no.
3        Q.   How about as a girl, living at your
4   parents' home in that same neighborhood, did you
5   ever have problem with standing water just in
6   rain and stuff, or was this neighborhood largely
7   free of that problem?
8        A.   I would say over the past -- our
9   house had never flooded before the -- we have
10  never had water in my house.  Never.
11       Q.   Was there ever water on the streets
12  in any of these prior storms?
13       A.   No.
14       Q.   You said there wasn't water in the
15  house.
16       A.   No.
17       Q.   Not in the street, any --
18       A.   No.
19       Q.   Okay.  What, if anything, do you
20  know about the causes of this severe damage to
21  your house?  I mean, it was water.
22       A.   (Nods head affirmatively.)
23       Q.   But what do you know -- let me start
24  there.  What do you know about -- was that an act
25  of God?  Was that overtopping of the levee?  Was

Page 49

1   there a breach -- I don't think near you -- was
2   it this back pump?  What do you know about the
3   cause for the water that actually made it to your
4   property in such volume that it was all the way
5   up to the roof of your house?
6        A.   I know it wasn't that much rain.  I
7   know that.  The only thing I know is what I saw
8   on TV, the breach at the Industrial Canal in the
9   Ninth Ward.  That was free-flowing south into St.
10  Bernard, and then I -- I wasn't there.  I don't
11  know if the water came over the top of the -- in
12  the back of the Forty Arpent.  I don't know.  I
13  never saw any, you know, actual coming over of
14  that.
15       Q.   But you're not south of the
16  Industrial Canal.  You're far east of there, and
17  north, aren't you?
18       A.   I'm down from the Industrial Canal.
19  You have to go through the Ninth Ward to get into
20  St. Bernard.
21       Q.   Right.  So, you think that water
22  from the Industrial Canal --
23       A.   Yes.
24       Q.   -- may have reached your
25  neighborhood.

13 (Pages 46 to 49)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 50

1      A.   Yes.
2      Q.   How much water do you think came
3  from there as opposed to the levee --
4      A.   I have no idea.
5      Q.   -- that was nearby?
6      A.   I have no idea.
7      Q.   Was there any sign of looting or
8  vandalism to your house?
9      A.   No.
10     Q.   I understand that the house next
11 door and many others, though, did survive.  They
12 were not demolished.
13     A.   Right.  That's a personal choice.
14     Q.   Explain that to me.
15     A.   You could board your house up -- as
16 long as you secured it, it could stay standing.
17 That's up to you if you want to have it torn down
18 or not.  The house next door to us is a
19 two-story, so --
20     Q.   Well, it may be up to you in some
21 circumstances.  I mean, there are some houses
22 that are standing because they didn't suffer as
23 much damage as your house, right?
24     A.   I guess.
25     MR. EXNICIOS:

Page 51

1          Objection.  If we can
2      clarify where.  I mean, some
3      houses in St. Bernard or some
4      houses in New Orleans?
5  EXAMINATION BY MR. DOAK:
6      Q.   There are some houses in St. Bernard
7  standing that did not have as much damage as your
8  house.
9      A.   I would say yes.
10     Q.   And there are houses in Chalmette
11 that didn't have as much damage as your house.
12     A.   I would say yes.
13     Q.   You took some of the worst of it for
14 either of those areas, Chalmette or all of St.
15 Bernard Parish, right?
16     A.   Yes.
17     Q.   Yours was worse than most.
18     A.   Yes.
19     Q.   Okay.  Was there any indication of
20 looting or vandalism?  Did I ask you that?
21     A.   Yeah.  Not -- not at our house.
22     Q.   Okay.  Were you -- did you have
23 friends or people that you had heard of in your
24 area, any area near you that had looting and
25 vandalism?

Page 52

1      A.   Not -- pretty much not in Buccaneer
2  Villa North.  There's nothing to vandalize.
3  There's nothing to loot.
4      Q.   How about in St. Bernard?
5      A.   I've heard of that.
6      Q.   Have you heard of it in New Orleans
7  East?
8      MR. EXNICIOS:
9          Objection.  You're asking if
10     she's heard of looting in other
11     areas.  What's the relevance of
12     this?
13     MR. DOAK:
14         You've stated your relevance
15     objection.
16 EXAMINATION BY MR. DOAK:
17     Q.   Have you heard of looting in New
18 Orleans East?
19     A.   I've seen it on the news.
20     Q.   Okay.  What about wind and rain
21 damage in your neighborhood?  As I understand it,
22 your house immediately next doors to yours had
23 wind and rain damage on the roof that was clearly
24 visible.  Do you remember seeing that?
25     A.   I have no idea what they had.

Page 53

1      Q.   Okay.  Are you aware of other houses
2  in your immediate neighborhood of a half mile
3  having wind and rain damage of some kind?  I'm
4  not saying predominantly, but that part of the
5  damage to their home was caused by wind and rain?
6      A.   I don't know.
7      Q.   So, you're not saying that it didn't
8  happen.  You just don't know?
9      A.   I don't know.
10     Q.   Okay.  I guess, according to the
11 video that you produced, you know that there
12 clearly were some houses in your immediate
13 neighborhood that blew up as a result of ruptured
14 natural gas lines.
15     A.   I -- I don't know.  I have no idea.
16     Q.   Did you see the video that was
17 produced?
18     A.   Yes.
19     Q.   I think there's a reference on there
20 to that.
21     A.   I don't think it's a house being
22 blown up.  I think it's bubbling in the water.
23     Q.   Did you have any roof damage?
24     A.   Yes.
25     Q.   And would you describe it, please?

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 54

1      A.   We had shingles off.  We had those
2  silver things that sit on your roof that twirl
3  around --
4      Q.   Yes.
5      A.   -- that was off.
6      Q.   Yes.  I take it from your Form 95
7  that you definitely believe that the MRGO had a
8  role in causing the flooding of your house.
9      A.   Yes.
10     Q.   Minor role, major role?  How would
11 you --
12     A.   Major role.
13     Q.   And explain that for me, please.
14     A.   I'm not an engineer or anything like
15 that.  I know the water came in and pushed
16 through, which feeds into all of the others,
17 which feeds into the Industrial Canal, which --
18 overtopping and the breaches and everything.
19     Q.   And you do have this lake -- I don't
20 know what it's called --
21     A.   Pontchartrain.
22     Q.   -- but that big pond of water.  No.
23     A.   Lake Borne?
24     Q.   No.  I mean right on the other side
25 of the levee that you can see from your yard,

Page 55

1  there's a levee and there's water.
2      A.   That's the swamp.  I don't know what
3  that's called.
4      Q.   There's a swamp.
5      A.   Yeah.
6      Q.   I mean standing water.  There's a
7  large water body there under normal
8  circumstances.
9      A.   Yes.  Yes.
10     Q.   And marshland and then the MRGO over
11 there.
12     A.   Yes.
13     Q.   And, I take it, you ascribe to the
14 theory that the MRGO channels water coming into
15 those vicinities and that caused a storm surge
16 that would have, could have caused overtopping
17 and breaches that would affect your neighborhood.
18     A.   Yes.
19     Q.   Do you have any specific knowledge
20 of the overtopping of the St. Bernard back levee
21 along the Florida Walk Canal near your house?
22     A.   I don't know.
23     Q.   Do you have any specific knowledge
24 of overtopping of the St. Bernard back levee
25 along the Forty Arpent Canal, on the other side

Page 56

1  of Paris Road?
2      A.   Yes.
3      Q.   And what is your knowledge of that,
4  that there was severe overtopping there?
5      A.   Yes.
6      Q.   And that water is how far away?
7  Mile or two?
8      A.   To -- yes, to the other side of
9  Paris Road.
10     Q.   Do you believe that that water made
11 it to your doorstep?
12     A.   Yes.
13     Q.   And you said, I think, that you
14 don't know anything about the pump station
15 backflow nearby.
16     A.   No.
17     Q.   Okay.  Do you know -- back up --
18 lifelong resident of New Orleans, right?
19     A.   Yes.
20     Q.   Heard about hurricanes since you
21 were a little girl.
22     A.   Yes.
23     Q.   Understand that there is an
24 elaborate hurricane protection system of levees
25 and walls and --

Page 57

1      A.   Yes.
2      Q.   -- you name it, all constructed over
3  50 plus years.
4      A.   Yes.
5      Q.   Big, long system, right?
6      A.   Yes.
7      Q.   And you understand from watching the
8  news that with Hurricane Katrina, dozens of
9  different points along that system failed all
10 around and through town, correct?
11     A.   Yes.
12     Q.   Overtopping, breaches.  It wasn't
13 just one or two places.
14     A.   Yes.
15     Q.   You can go all the way around -- and
16 have you had drawn for you the geographical
17 region that's called the MRGO Group Region, all
18 of New Orleans East on top and St. Bernard and
19 the Lower Ninth on the bottom, going over to the
20 Industrial Canal on the west?  Does that make
21 sense in your mind?
22     A.   Yes.  That makes sense.  Yes.
23     Q.   And all the way around that area,
24 there are levees and walls, right?
25     A.   Yes.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 58

1    Q.   And through the middle of that area
2  is the Intracoastal Waterway.
3    A.   Yes.
4    Q.   And there are levees, walls even
5  near your house and a lot of other people.
6    A.   (Nods head affirmatively.)
7    Q.   Would it surprise you to find that
8  the defendants' experts, looking at the three big
9  reports, Team Louisiana, IPET -- and I forgot the
10 name of the other one -- I think, have already
11 identified, like, 45 sites of overtopping and
12 breaches.  Does that sound in the ballpark, with
13 your knowledge from the news?
14   MR. EXNICIOS:
15       Can I -- are we asking if
16     that matches what she's heard on
17     the news or does that match her
18     personal experience?
19 EXAMINATION BY MR. DOAK:
20   Q.   I'm asking if that matches your
21 personal experience, your knowledge.
22   A.   I don't know a number, but I know
23 there was many.
24   Q.   Okay.  So, I'll accept "many."  So,
25 there were lots.

Page 59

1    A.   (Nods head affirmatively.)
2    Q.   My point is: Not all of those
3  sources of water made it to your house at Hamlet,
4  did they?
5    A.   No.
6    Q.   It was some of them, not all of
7  them.
8    A.   Yes.
9    Q.   Do you have any knowledge of which
10 of those sources of water reached your house on
11 Hamlet?
12   A.   I have a good idea.
13   Q.   I'm going to ask you two questions.
14   A.   Okay.
15   Q.   The first is do you have any
16 knowledge, and the second one is do you have a
17 theory.  Do you have any knowledge?
18   A.   Knowledge as in I've seen photos.
19 I've seen, you know, breaches on the news.  You
20 saw all of that during that time.
21   Q.   Yes.
22   A.   And then do I have an idea?  Yes.
23   Q.   Okay.  And what's your idea of the
24 sources of water that reached your house on
25 Hamlet?

Page 60

1    A.   From the backside, which would be
2  from the MRGO, to the Industrial -- to the -- the
3  water under Paris Road -- the Intracoastal.
4    Q.   Yes.
5    A.   There.  From that side there.  And
6  from the breach in the Ninth Ward.
7    Q.   And the Intracoastal Waterway is
8  above you -- north of your house?
9    A.   Yes.  Yes.
10   Q.   Running east to west?
11   A.   Yes.
12   Q.   And the Intracoastal Canal is west
13 of your house, running north to south.
14   A.   Is that the Industrial Canal?
15   Q.   Or the industrial --
16   A.   Yes.
17   Q.   -- wherever the Industrial Canal is.
18   A.   Yes.
19   Q.   Okay.  You think water from those
20 two general locations were the ones that reached
21 your house?
22   A.   Yes.
23   Q.   And water overtopping and breaches
24 at other locations did not reach your house; is
25 that correct?

Page 61

1    A.   I would say yes.
2    Q.   Okay.  Such as Lake Pontchartrain.
3  Lake Pontchartrain water didn't get down to you,
4  did it?
5    A.   No.
6    Q.   Okay.  What amount of money are you
7  seeking in this lawsuit to compensate you for the
8  loss of your house?
9    A.   A dollar value?  Just on my home?
10   Q.   Just for the home, yes, ma'am.
11   A.   I don't know.  I don't know.
12   Q.   Could you give me an approximate
13 range?
14   A.   Do you want me to account for
15 everything that was lost in it?
16   Q.   I'm going to ask you the same
17 question for all four of your types of damages.
18 I'm not trying to trick you in any way.  You
19 know, this is what we need to do today.  I'll ask
20 you first what you think the fair market value of
21 your house was.  Then, I'm going to ask you,
22 second, the same question for all of your
23 personal possessions and then, Number 3, your
24 mental distress and, Number 4, your personal
25 injury, both the pneumonia and the spinal

16  (Pages 58 to 61)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

Page 62

1  infection and all of the surgery and treatment in
2  conjunction with those two personal injuries,
3  just to try to have a, you know, quantifiable
4  number that we can work with to understand the
5  basis of your claims. Does that help you --
6      A.   Okay.
7      Q.   So, beginning with your house, what
8  do you think was the fair market value of your
9  house at the time it was destroyed on August 29,
10 2005?
11     A.   I would say between 160 -- 160, 175.
12     Q.   Okay. And what's the basis for that
13 estimate?
14     A.   What other houses sold in the
15 neighborhood for.
16     Q.   Okay. Had you had any formal
17 appraisal done on your house at any time
18 recently?
19     A.   No.
20     Q.   Had you had any informal appraisal,
21 kind of a write-up like a Realtor will give you?
22     A.   No.
23     Q.   But this is your neighborhood of 40
24 years and --
25     A.   Exactly, and the house across the

Page 63

1  street sold a few months before the hurricane. I
2  know what that sold for, and it was smaller than
3  ours.
4      Q.   Right. Okay.
5           What can you tell me about the
6  degree of damage to other homes in your
7  neighborhood?
8      A.   We all suffered the same loss. You
9  know, in our neighborhood, Buccaneer Villa,
10 everybody suffered the same -- the water was over
11 everyone's gutters, the whole subdivision.
12     Q.   And how large is that subdivision?
13     A.   From our house to Judge Perez is a
14 mile. Now, wide, I don't know how wide it was.
15     Q.   Judge Perez would be the street to
16 the south?
17     A.   Yes.
18     Q.   Okay. Does your neighborhood go to
19 the east, to Paris?
20     A.   No, not to Paris Road.
21     Q.   Something before Paris.
22     A.   To another canal, whatever the other
23 canal is called.
24     Q.   Yes. I know what you mean.
25     A.   And then it goes to -- on the other

Page 64

1  side of Jean Lafitte, which was the main street
2  into the subdivision.
3      Q.   I'm sorry. I just didn't hear you.
4      A.   The main street into the subdivision
5  was Jean Lafitte.
6      Q.   Yes.
7      A.   And then there was two or three
8  streets on that side, and that was the whole
9  subdivision.
10     Q.   Okay. And you believe that most of
11 the houses in that subdivision, as you have just
12 described it, were all totalled --
13     A.   Yes.
14     Q.   -- as a result of the storm?
15     A.   Yes.
16     Q.   Okay. Certainly, though, not all of
17 the houses in St. Bernard Parish were anywhere
18 close to being totalled, though, were they?
19     A.   Some houses got more water than
20 others, yes.
21     Q.   Well, I mean, weren't there
22 significant differences?
23     A.   Yes.
24     Q.   Did you see that article in the
25 Times-Picayune about the couple who came back and

Page 65

1  were surprised to find that they hadn't had any
2  damage at all?
3      A.   I never saw that article.
4      Q.   It was in New Orleans East.
5      A.   Uh-huh.
6      Q.   How would you describe the condition
7  of your property before the storm?
8      A.   It was in excellent condition.
9      Q.   It was obviously a slab house,
10 right?
11     A.   Yes.
12     Q.   When did you last have a roof put
13 on?
14     A.   In the '90s.
15     Q.   What is your description of your
16 house? You started to do this a little bit
17 earlier, but -- you said it was in excellent
18 condition.
19     A.   It was a single story. It had two
20 double doors on the front, two French doors and a
21 garage on the front. Columns. A big, huge,
22 giant oak tree on the front lawn. Four bedrooms,
23 two baths, a garage. Kitchen, dining room. That
24 was it.
25     Q.   What caused you to replace the roof

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 66

1  in the 1990s?
2      A.   Age.
3      Q.   Just --
4      A.   (Nods head affirmatively.)
5      Q.   Were you receiving any financial
6  housing assistance from the government or
7  anyplace -- anybody else on August 29, 2005?
8      A.   No.
9      Q.   And the title, I take it, is in your
10 name and your husband's name?
11     A.   Title for the house?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And what was the purchase price in
15 1985?
16     A.   Seventy-three something, 74.
17     Q.   And how did you know the house was
18 worth that much when you bought it in 1985?
19     A.   By what other houses sold for in the
20 neighborhood.
21     Q.   Did you have a formal appraisal done
22 in conjunction with buying your house?
23     A.   I didn't have it done.  It was done.
24 It was presented to us.  I didn't pay for that.
25     Q.   But it was part of a transaction?

Page 67

1      A.   Yes.  Yes.
2      Q.   Had to be, right?
3      A.   Yes.
4      Q.   Oh, yeah.  How old was it when you
5  bought it?
6      A.   I think it was seven years old.  I
7  believe.  I'm not sure exactly.
8      Q.   So, built sometime in the '70s?
9      A.   Yes.  Yes.
10     Q.   Tell me the -- when you say you have
11 before-and-after pictures of the house that you
12 took and have preserved --
13     A.   Uh-huh.
14     Q.   -- I haven't seen those yet --
15     A.   Yes.
16     Q.   -- but you have them.  Describe the
17 process by which you had the house bulldozed.
18     A.   It was an option.  You could have it
19 bulldozed or you had to maintain your property,
20 as in put in windows to secure it, put in, like,
21 doors or just construction doors to secure it,
22 and it didn't seem it was worth doing that, you
23 know, putting expense into that to secure the
24 house.  So, we opted to have it bulldozed, which
25 you went to the -- the courthouse, parish

Page 68

1  courthouse, and you filled out and signed a
2  paper, and that's how you had it demolished.
3      Q.   I'm going to come back on the
4  details, but I assume that by the time you did
5  that, you probably had resolved your insurance
6  claim and your --
7      A.   I believe so.
8      Q.   And your regular home insurance was
9  Liberty Mutual?
10     A.   Yes.
11     Q.   And Allstate for the flood
12 insurance?
13     A.   Yes.
14     Q.   Do you think you had resolved both
15 of those claims by the time you bulldozed the
16 house?
17     A.   I think so.
18     Q.   And where were you in the process of
19 making a claim for The Road Home Program?  Was it
20 also completed by that time?
21     A.   The Road Home process still isn't
22 complete.
23     Q.   Okay.  But the --
24     A.   We had filed a application with The
25 Road Home.

Page 69

1      Q.   Filed the application.  Okay.  But
2  you had completed the two insurance claims, the
3  regular homeowner's insurance and the flood
4  insurance claim?
5      A.   I believe so, yes.
6      Q.   Okay.  You would think so before you
7  bulldozed the house, right?
8      A.   I mean, dates, I'm not -- right.
9      Q.   And what are your current plans, if
10 any, for rebuilding or resituating?
11     A.   We don't have a plan.  We are in an
12 apartment because my husband and I cannot agree
13 on location, where we want to be.  I have -- my
14 youngest one's still in high school.  She has two
15 more years of high school.  She's in school on
16 the north shore.  So, I'd like to get her out of
17 school first before we make a decision on exactly
18 where to go.  He has to make the commute every
19 day, which is pretty rough.
20     Q.   So, you're taking what I call a
21 time-out.
22     A.   Yes.
23     Q.   I've been there, done that.
24     A.   Yes.
25     Q.   Trying to figure out what to do.

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 70

1    A.    Yes.
2    Q.    Okay.  Have your money from the
3  insurance proceeds in a bank?
4    A.    Yes.
5    Q.    Waiting to decide.
6          Returning to this idea about what
7  are the circumstances surrounding each of your
8  types of loss, anything else come to your mind
9  about the circumstances surrounding the loss of
10  the house on Hamlet that we haven't covered?
11  We're going to talk about the claim forms and all
12  of that, but about the circumstances or the
13  causes?
14    A.    Not that I know of.  No.
15    Q.    Okay.  Did you pay to have the house
16  demolished?
17    A.    No.
18    Q.    You said you went down to the
19  courthouse.
20    A.    No.
21    Q.    This was just a local or
22  governmental program?
23    A.    I think -- I guess it's a
24  governmental thing.
25    Q.    They just said come and sign and

Page 71

1  that was it?
2    A.    Sign up for it.  Both of you had to
3  sign.  That was it.
4    Q.    Okay.  Personal property loss, I
5  guess, in terms of cause and circumstance, you're
6  going to tell me whatever happened to the house
7  happened to the personal property because it was
8  all together.
9    A.    Right.
10    Q.    Wherever the water came from,
11  everything that we talked about that you knew or
12  didn't know, or theory, whatever we said before,
13  is all true to your personal property loss,
14  right?
15    A.    Yes.
16    Q.    Do -- did you make a claim for that
17  personal property loss on your insurance?
18    A.    Content?
19    Q.    Yes.
20    A.    Yes.
21    Q.    And how much did you receive on your
22  insurance for the house?
23    A.    Flood?
24    Q.    The flood and the homeowner's
25  separated.

Page 72

1    A.    Structure and content, is that what
2  you're asking?  Structure and content for flood,
3  we had -- I believe it was 52,000.
4    Q.    Paid under your flood insurance?
5    A.    Yeah, minus deductibles.
6    Q.    Right.  And that was with Allstate?
7    A.    Yes.
8    Q.    And was the 52,000 limited by
9  coverage issues or that is simply the sum of all
10  of the dollar value losses that you could
11  remember to submit?
12    A.    No.  That was what our policy was
13  for.
14    Q.    Okay.
15    A.    We were severely underinsured.
16    Q.    Okay.  So, you got policy limits?
17    A.    No.  That's just what the price was,
18  if that's what you're asking.  That was the
19  dollar amount that we were insured for.
20    Q.    Yes.
21    A.    Yes.
22    Q.    That's what I meant.
23    A.    Yes.
24    Q.    Okay.  And what about on your
25  homeowner's policy, did you receive payment for

Page 73

1  the structure of the house on it?
2    A.    In homeowner's?
3    Q.    Yes.
4    A.    I'm not exactly sure how it was
5  broken down, if it was structure, content,
6  whatever, but I know we received -- I think it
7  was 32,000 from homeowner's.
8    Q.    Liberty Mutual, was that the name of
9  your homeowner's?
10    A.    Yes, homeowner's.
11    Q.    And you don't know what portion of
12  that was attributable to the house versus the
13  contents?
14    A.    Not in homeowner's, no.
15    Q.    Okay.  Do you have any documents
16  about the payments you've received either --
17  well, from Liberty Mutual?  Didn't they have to
18  send you a check and some kind of paperwork --
19    A.    Yes.  Yes.  Yes.
20    Q.    -- to reconcile your claim and what
21  they're paying and explain what they're doing and
22  why?
23    A.    Yes.  Yes.
24    Q.    Do you still have those documents?
25    A.    I'm sure we do.

JEANNINE ARMSTRONG (MRGO)                                   7/9/2007

Page 74

1   Q.  Who is your Liberty Mutual agent?
2   A.  His name is Bill Bubrig.
3   Q.  Spell it, please.
4   A.  B-U-B-R-I-G.
5   Q.  And where is his office?
6   A.  He's on the west bank.
7   Q.  And what's the name of his insurance
8   agency?
9   A.  I'm not sure.
10  MR. DOAK:
11      Well, I'm being passed notes
12  that we've got five minutes left
13  on the tape and it's quarter of
14  11:00.  So, that's probably a good
15  hint that people are ready for a
16  break.  Would that be convenient
17  for you?
18  THE WITNESS:
19      Yes.
20  MR. DOAK:
21      Okay.  Take a break.  Thank
22  you.
23  THE VIDEOGRAPHER:
24      We're going off the record
25  at 10:45.  This is the end of Tape

Page 75

1   1.
2       (Whereupon, a discussion was
3   held off the record.)
4   THE VIDEOGRAPHER:
5       We're back on the record at
6   10:59.  This is the beginning of
7   Tape 2.
8   EXAMINATION BY MR. DOAK:
9   Q.  When you previously estimated that
10  the fair market value of your house was
11  approximately 160 to $175,000 on the date of the
12  storm, are you referring just to the structure or
13  the structure and the land?
14  A.  The structure and the land.
15  Q.  The whole thing?
16  A.  The -- what you would buy at an act
17  of sale.  Exactly.
18  Q.  Okay.  Do you know any of the
19  details about the Liberty Mutual claim and why
20  you didn't receive more than 32,000?  Do you know
21  how much the house was insured for?
22  A.  I had -- total, I don't know exactly
23  how it breaks down, but I think it was, like,
24  150/300, but I don't exactly know exactly what
25  that entails.

Page 76

1   Q.  Okay.  Do you know why you didn't
2   recover more insurance proceeds than 32,000 for
3   the house and contents from Liberty Mutual?
4   A.  They claimed it was flood.
5   Q.  And the reason you didn't recover
6   more than $52,000 on the flood insurance was that
7   was simply the maximum amount of insurance that
8   you had for flood.
9   A.  Yes.  Yes.
10  Q.  How much insurance could you have
11  had for flood?
12  A.  I believe the max is 250.
13  Q.  What -- moving to this second
14  category of personal possessions, what do you
15  believe is the fair market value for all of the
16  possessions that were lost, personal possessions,
17  not the house, you know, but what's the dollar
18  value of that claim for personal possessions that
19  you're asserting in this lawsuit?
20  A.  I don't know if you can put a fair
21  market value on all your -- everything you've
22  lost, you know.  I -- I have no idea.  I have no
23  idea.  From your children's christening gowns --
24  how can you put a value on that?
25  Q.  You can't.  You can't.  There's no

Page 77

1   way you can put a dollar value on those
2   sentimental --
3   A.  No.
4   Q.  -- priceless things.  The law,
5   however, would put a fair market value on things
6   simply as material things.  Could you give us an
7   estimate of what you believe that total aggregate
8   value of the material things was?  I'm sure it'll
9   be a range, an approximate.  I'm just trying to
10  get a rough idea of what you think all of those
11  possessions were worth as material things,
12  segregating out the sentimental value they had.
13  A.  A million dollars.  I have no idea.
14  Q.  Let's talk about the -- I'm going to
15  skip to your fourth category, the personal
16  injury.  Do -- could you estimate the dollar
17  value you are seeking for your out-of-pocket
18  expenses for all of the medical problems you had
19  with the fungus, pneumonia, and then the fungal
20  spine infection?
21  A.  What I've paid out of pocket or an
22  estimate -- or what I think?
23  Q.  An estimate of all of those bills.
24  I'm not talking about what insurance paid or you
25  paid.

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 78

1    A.   Oh.
2    Q.   I'm talking about what were the
3  total of all of your medical treatment bills,
4  regardless of who paid them?
5    A.   The hospital bill alone was 282,000.
6  That was the hospital bill.  That's just the
7  hospital.  That's not the doctors, anesthesia,
8  the medicine, everything else that went along
9  with that.  That was just the month-long hospital
10  stay.
11    Q.   And all of that was in one hospital,
12  though?
13    A.   I stayed in one hospital, yes.
14    Q.   And what hospital was that?
15    A.   West Jefferson.
16    Q.   I'm sorry.  Okay.  Keep going.  You
17  were saying that's just their bill.
18    A.   That's just their bill.
19    Q.   Right.  How about the various
20  physicians?
21    A.   There was the neuro doctor.  There
22  was the doctor who did the spinal surgery.  There
23  was an infection -- infectious disease doctor.
24  There was a pulmonary doctor.
25    Q.   All specialists.

Page 79

1    A.   Yes.  And then there was a
2  gastrointestinal doctor.  So, it's five doctors.
3    Q.   Give me your best estimate.  I don't
4  know if we're talking $50,000 or another
5  $200,000.
6    A.   Oh, and there was general
7  surgeons -- when they did the first -- they had
8  to bring in general surgeons to get in and move
9  everything around to be able to get to the spine.
10  So, that was another set in there.  I have no
11  idea how much that was.  They had doctors that
12  did biopsies, you know, that -- bone biopsies.
13    Q.   All of them sent you separate bills
14  on top of the hospital?
15    A.   Oh, yeah.  Yeah.
16  MR. EXNICIOS:
17       Can we move on?  I mean, she
18       says she has no idea.
19    A.   I really -- I have no idea how much
20  all of that is.  We're still paying and insurance
21  is still paying and -- it's an ongoing process.
22  EXAMINATION BY MR. DOAK:
23    Q.   Would you try, to the best of your
24  memory, to provide us with a list of the medical
25  professionals that you have seen beginning with

Page 80

1  your pneumonia?
2    A.   There was Dr. Crosby -- you want
3  names?
4    Q.   Yes, please.  Names and specialties.
5    A.   Dr. Robert Crosby, he's a pulmonary.
6  Dr. Frank Culicchia, he's neuro.  Dr. John Steck,
7  he is a neuro -- neuro backs.  There was Dr.
8  Werkman, he's infectious disease.  There was
9  Dr. -- his name is Dr. Thomas.  I don't know his
10  first name.  He was the -- one of the general
11  surgeons.  There was Dr. Kahn, who was the GI
12  doctor, gastrointestinal doctor.  There was a
13  group of pulmonary doctors, but I don't remember
14  their names.
15    Q.   And this was generally all in the
16  summer of 2006?
17    A.   Yes.
18    Q.   And what date did you get out of the
19  hospital?
20    A.   October 6th.
21    Q.   And describe, please, your recovery
22  after October 6.
23    A.   I came home on October 6th.  Because
24  of the infection and the medicine that I was on,
25  I had to have blood tests twice a week because of

Page 81

1  the effect on your liver.  So, we went to a lab
2  on the north shore to get that done every week,
3  and the results were sent to the infectious
4  disease doctor.  I had to see the back surgeon,
5  Dr. Steck, maybe, like, in November and then
6  December, I seen him again.  I seen him in March.
7    Q.   So, you had a regular series of
8  ongoing follow-up --
9    A.   Yes.
10    Q.   -- visits with some of those doctors
11  through the end of 2006, and some of them even
12  into 2007?
13    A.   Yes.  Yes.
14    Q.   How has that experience affected
15  your daily routine now?  Are you recovered now?
16    A.   I'm doing a lot better than I was.
17    Q.   Sure.
18    A.   Trying to build my strength up to go
19  back to work.  The work I did was pretty
20  physical, moving patients, pulling patients.
21    Q.   How long were you out of work?
22    A.   I haven't worked since the
23  hurricane.
24    Q.   Now, are you -- that's not on our
25  list of four.  You're not seeking relief for

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 82

1 being out of work as part of this lawsuit?
2     A.   As in loss of wages?
3     Q.   Yes. I'm asking you. I'm not
4 trying to put things on your work, I'm not trying
5 to trick you, but I want to be real clear --
6     A.   Well, the hospital I used to work
7 at's not there any longer.
8     Q.   All right.
9     A.   So, you know, that doesn't exist
10 anymore.
11     Q.   I'm just asking you a question: Are
12 you seeking any type of relief in this lawsuit
13 because you've been out of work?
14     A.   I don't know how to answer that.
15     Q.   Okay. Not clear to you that you are
16 seeking relief for that.
17     MR. EXNICIOS:
18        It's been asked and
19        answered.
20 EXAMINATION BY MR. DOAK:
21     Q.   Other than those follow-on visits
22 that you described through 2006, came into 2007,
23 have there been any additional surgeries or
24 procedures as a result of the pneumonia or
25 infected spine?

Page 83

1     A.   I have x-ray -- like, when I go to
2 the doctor, they x-ray me, if that's what you
3 meant.
4     Q.   Are you still on medications?
5     A.   No.
6     Q.   Let's switch now to the detailed
7 circumstances surrounding the mental distress
8 that we discussed some earlier. Why didn't you
9 ever seek professional assistance, go to
10 psychiatrists, a counselor, someone
11 someone to help you? Did you not feel that it
12 would be worthwhile?
13     A.   Everybody's going through the same
14 thing.
15     Q.   Well, perhaps, though, not everybody
16 has submitted a Form 95 saying that they were
17 making a claim for $500,000 on mental distress.
18 I understand it's hard to value mental distress,
19 but that's also a lot of money.
20     A.   Right.
21     Q.   So, I'm trying to see why you, as a
22 registered nurse, would not have gone and sought
23 professional medical care to assist with mental
24 distress, is my question to you.
25     A.   I go to enough medical doctors now,

Page 84

1 you know, constantly, you know, still. I
2 don't -- I don't like to go to the doctor.
3 Basically, nurses are the worst patients.
4     Q.   You didn't believe that they could
5 do anything for you that you couldn't do for
6 yourself?
7     A.   I think you have to deal with it.
8 Everybody has to deal with it. And everybody's
9 dealing with it the best way they can. I don't
10 think somebody telling me, you know, you've lost
11 everything, you've got to get over it -- I know
12 that.
13     Q.   Did you have any friends or family
14 who were seriously injured, bodily injury, died
15 or serious bodily injury as a result of Hurricane
16 Katrina?
17     A.   No.
18     Q.   Have you ever, before this mental
19 distress arising from Hurricane Katrina, had any
20 mental health issues?
21     A.   No.
22     Q.   Have you ever sought medical
23 treatment by a psychologist or psychiatrist?
24     A.   No.
25     Q.   How does your mental distress

Page 85

1 manifest itself?
2     A.   Crying, angry.
3     Q.   How frequently would you say you
4 cry?
5     A.   I don't know.
6     Q.   Still sometimes?
7     A.   Yes.
8     Q.   Do you cry most days?
9     A.   No.
10     Q.   Were you crying most days in 2005?
11     A.   Yes.
12     Q.   Were you crying most days in 2006?
13     A.   Yes.
14     Q.   Are there any other physical
15 manifestations to you besides crying? Are you
16 sleeping okay or the same as you did before
17 Hurricane Katrina?
18     A.   Sleeping okay. Usually, don't eat
19 very much.
20     Q.   You feel that's been a change
21 associated with this?
22     A.   Yeah.
23     Q.   Are there other things like that
24 that you think are a change associated with your
25 mental distress?

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 86

1    A.   l feel l have a very short fuse.
2    Q.   General greater feeling of stress?
3    A.   Yes.
4    Q.   Constantly?
5    A.   Yes.
6    Q.   Given your earlier testimony this
7  morning about how important your particular
8  neighborhood was to you, it was really the only
9  neighborhood you had ever known?
10   A.   Yes.
11   Q.   Coupled with the complete loss of
12  your house and personal possessions, I assume,
13  but want to confirm with you, that your claim for
14  severe mental distress is a very significant
15  component of this lawsuit to you.
16   A.   Yes.
17   Q.   You feel quite strongly about it.
18   A.   Yes.
19   Q.   Because you feel that you have
20  suffered quite badly.
21   A.   Yes.
22   Q.   You understand, everybody wouldn't
23  be in that situation. In many respects, you've
24  had it worse than a lot of people.
25   A.   I'm --

Page 87

1  MR. EXNICIOS:
2       Objection. A lot of people
3  in the United States, of course
4  not. But in the greater New
5  Orleans area, St. Bernard --
6  EXAMINATION BY MR. DOAK:
7    Q.   You understand in the MRGO
8  geographical region of New Orleans East and St.
9  Bernard Parish that not everyone is going to have
10  experienced mental distress as severe as yours.
11  Not everyone has the same affinity for their home
12  and neighborhood as you do.
13   A.   I don't know what everybody -- I
14  just know what I feel.
15   Q.   Right. And you don't know that
16  those feelings transfer to anyone else, do you?
17  A person who had moved here from New York and
18  resided in St. Bernard Parish for six months and
19  lost their rented apartment would not normally be
20  expected to suffer the same kind of mental
21  distress that you have suffered for the reasons
22  you stated; would you agree with me?
23   A.   Yes. Yes.
24   Q.   Don't you know many people in the
25  New Orleans community who have gone through the

Page 88

1  storm and you observed some have great mental
2  distress, some seemingly have none, and probably
3  a lot are in the middle? Has that been your
4  experience?
5    A.   Yes.
6    Q.   I assume, as a registered nurse, you
7  know from professional work that patients in all
8  kinds of circumstances are going to have
9  different subjective mental reactions to physical
10  and mental adversities, right?
11   A.   Yes.
12   Q.   That's --
13  MR. EXNICIOS:
14       Objection to the questions.
15  You're giving her your theory or
16  opinion on what the general belief
17  is --
18  MR. DOAK:
19       Do you have an objection,
20  Counsel?
21  MR. EXNICIOS:
22       I have objection to the form
23  of the questions. You make it so
24  the question stays within the
25  scope of what we're going for so

Page 89

1  that's a question, not your
2  testimony, and "don't you agree."
3  MR. DOAK:
4       I would appreciate it if
5  you'd simply say "objection,
6  form." The CMO, as you know, the
7  magistrate judge made a very
8  specific reaffirmation about the
9  scope of objections. You know,
10  what you just said could be
11  considered as guiding her in the
12  answers. We don't want that.
13  You're entitled to make the
14  objection. You're not entitled
15  to --
16  MR. EXNICIOS:
17       Please keep your questions
18  to conform to the CMO.
19  MR. DOAK:
20       All you have to do is say
21  "form" and you will have reserved
22  your objection.
23  MR. EXNICIOS:
24       Thank you. I will follow
25  the guidelines if you agree to do

23  (Pages 86 to 89)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 90

1    the same. So, please keep your
2    questions to conforming to the
3    CMO.
4    EXAMINATION BY MR. DOAK:
5        Q.   In your view as a registered nurse,
6    you've observed different people have different
7    mental reactions to things, don't they?
8        A.   Yes.
9        Q.   Mental distress is, as a matter of
10   medicine, a highly subjective medical condition,
11   isn't it?
12       A.   It can be physical.
13       Q.   Yes. But both the mental side and
14   the physical side are highly subjective to the
15   individual patient, aren't they?
16       A.   Yes.
17       Q.   Okay. And one last time, because
18   we've talked about all these things, probably the
19   last time today I'm going to ask the question,
20   but I want to confirm before leaving the
21   circumstance and causation questions that there
22   aren't any other categories of damages, relief of
23   any kind that you're seeking. You lost your
24   house entirely, you lost your personal
25   possessions entirely, you have severe mental

Page 91

1    distress and you've had these injuries, pneumonia
2    and spine and all of the problems that came with
3    it as a result of this fungus infection. Is
4    there any other relief than those items, anything
5    in addition to those items that you're seeking
6    relief for in this lawsuit?
7        A.   Not that I know of.
8        Q.   Okay. Who do you blame for those
9    four categories of damages? Who do you think's
10   responsible?
11       A.   Who do I think is responsible?
12       Q.   Uh-huh.
13       A.   People who were supposed to be
14   maintaining the levee system that we were
15   supposedly protected by.
16       Q.   Do you have any more specific detail
17   than that?
18       A.   I guess that would be the Corps of
19   Engineers.
20       Q.   Corps of Engineers. And other than,
21   you just said, maintaining the levee system and
22   you referred earlier to the consequences of the
23   MRGO channel, any other reason you attribute
24   responsibility to the Army Corps of Engineer?
25   You may not know any of these. I just -- part of

Page 92

1    my job is to ask to see.
2        A.   I don't know. I don't know.
3        Q.   Okay. That's a fair answer.
4            What portion of all of this do you
5    attribute to an act of God that wasn't
6    anybody's --
7        A.   I attribute the hurricane as an act
8    of God, and what happened because of the
9    hurricane, I don't necessarily consider that an
10   act of God, no.
11       Q.   Okay. You consider any of the
12   consequences that happened from the hurricane as
13   unavoidable, just that they were bound to happen
14   given the severity and intensity of this
15   hurricane?
16       A.   I'm not exactly sure.
17       Q.   Okay. Do you think that the local
18   levee boards were responsible?
19       A.   I don't know what their
20   responsibility is in maintaining -- I don't know.
21       Q.   Okay. Do you think that FEMA was
22   responsible for any of your alleged injuries?
23       A.   FEMA?
24       Q.   Uh-huh.
25       A.   No.

Page 93

1        Q.   What about the City of New Orleans,
2    do you think that the City of New Orleans is
3    responsible in part for some of your injuries?
4        A.   I don't know.
5        Q.   Might they be? Are they involved in
6    the levee protection system?
7        A.   Are they? I don't know.
8        Q.   Okay. State of Louisiana, do you
9    have any sense of blame there?
10       A.   I don't know.
11       Q.   My client, Washington Group
12   International, do you have any knowledge of
13   anything that you think that Washington Group did
14   that caused your harm?
15       A.   I don't know.
16       Q.   Do you ascribe to the theory that --
17   you know, there are articles about this -- some
18   people in New Orleans apparently think that some
19   of the breaches were set by bombs that were
20   deliberately set?
21       A.   Do I believe that?
22       Q.   Yes, ma'am.
23       A.   No.
24       Q.   When did you first start thinking
25   about filing a lawsuit as a result of your

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 94

1  losses?
2      A.   I guess when we started hearing
3  that, you know, some of the breaches could have
4  been from negligence or not maintaining.
5      Q.   I am going to ask some questions
6  about you and your attorneys.  I'll warn you, so
7  that your own lawyer won't have to, I'm not going
8  to ask questions to invade on the attorney-client
9  privilege.  So, I'm going to try to be careful of
10  where I'm going around the edges of that.  If I
11  make a mistake, I'm sure your counsel will, but
12  I'll just alert you that I'm going to ask some
13  questions in that area that I don't think are
14  privileged.
15          Did you know any of plaintiffs'
16  counsel before Hurricane Katrina?
17      A.   Yes.
18      Q.   I'm sorry?
19      A.   Yes.
20      Q.   Which ones?
21      A.   I know Gibby -- Gibby Andry and Jon
22  Andry.
23      Q.   Okay.  And they're brothers?
24      A.   Yes.
25      Q.   Okay.  Go back to the time when you

Page 95

1  were beginning to think of maybe you would want
2  to be involved in a lawsuit as you began to read
3  and learn about possible negligence and things
4  like that.  What became the precipitating event,
5  if you will, that then took you into a lawyer's
6  office?  Did you pick up the phone and call a
7  lawyer, or did a lawyer post an advertisement or
8  something that you responded to?  What was that
9  first contact?
10      A.   It wasn't advertisement.  We had
11  heard from other people that, you know, there was
12  a movement to, you know, I guess, pursue
13  negligence or -- you know, in the breaches, in
14  the overtopping, in the flooding, in the MRGO and
15  all of that.
16      Q.   Okay.  And as a result of hearing
17  from people that some people in the community
18  were talking more and more --
19      A.   Yes.
20      Q.   -- movement, your word --
21      A.   Yes.  And my husband called Gibby.
22      Q.   Okay.  And then as a result of that
23  telephone call, you went and saw the one or both
24  of the Andry brothers --
25      A.   Yes.

Page 96

1      Q.   -- and developed an attorney-client
2  relationship with respect to this litigation.
3      A.   Yes.
4      Q.   Okay.  How was it that you knew
5  Gibby before?
6      A.   We all lived in Chalmette.
7      Q.   So, you knew him from long, long
8  ago?
9      A.   From a kid.
10      Q.   You said earlier that you obviously
11  knew a lot of people in your particular
12  subdivision, but I'm sure that you know a wider
13  assortment of people in St. Bernard Parish, New
14  Orleans East, Lower Ninth, this whole vicinity.
15  Go through with me in your memory people in that
16  geographical area and tell me about their
17  different experiences.  Did you know some other
18  people who had a complete loss of their house and
19  possession like you?
20      A.   Yes.
21      Q.   Do you know people who got off
22  fairly light, maybe just had a few inches of
23  water in their house?
24      A.   I don't know anybody who had a few
25  inches.

Page 97

1      Q.   What's the lightest that -- of
2  someone you've ever heard of?
3      A.   Four to five feet.
4      Q.   Okay.  And how far away was that
5  from your house?
6      A.   Five miles.
7      Q.   For people that you don't know,
8  aren't you aware that there are people in New
9  Orleans East and St. Bernard Parish who, in fact,
10  had no damage to their house or just a few inches
11  of water?  Don't you know that those people
12  exist, or not?
13      A.   I don't know that those people
14  exist.
15      Q.   Okay.  Do you know people who have
16  suffered severe personal injury as a result of
17  the storm?
18      A.   Yes.
19      Q.   And what were some of their severe
20  personal injuries?
21      A.   A friend of ours' neighbor, not in
22  our neighborhood, in Meraux, a lady -- she
23  drowned.  A lady I worked with, her sister's
24  husband drowned in his attic.
25      Q.   So, two different people drowned?

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 98

1    A.   Yes.
2    Q.   Two deaths.
3    A.   Yes.
4    Q.   Okay. How about serious personal
5  injury who lived?
6    A.   I can't recall anyone right now.
7    Q.   Did the people in your immediate
8  subdivision largely evacuate?
9    A.   Yes.
10   Q.   What happened to the hospital,
11  Chalmette hospital, nearby?
12   A.   What -- during the storm or after?
13   Q.   During and after the storm. I mean,
14  was it demolished?
15   A.   Yeah. The whole first floor was
16  underwater.
17   Q.   Uh-huh.
18   A.   They had to move patients,
19  everything up to the second floor. Basically,
20  pulled mattresses out, slept on the roof because
21  it was so hot inside. And the building was
22  condemned. It's torn down. It's not there
23  anymore.
24   Q.   What happened to your parents'
25  house?

Page 99

1    A.   It was destroyed. It's been
2  demolished.
3    Q.   But this home-destruction policy in
4  your area was something that a homeowner could
5  have done for free?
6    A.   Yes.
7    Q.   And, really, avoid paying a big
8  expense if you had to do it yourself?
9    A.   Yes.
10   Q.   But you couldn't do that without
11  your insurance company signing on, I assume, or
12  at least you wouldn't want to until you had your
13  claim resolved, or not?
14   A.   I don't know. I don't know. We
15  never okayed it with them, if that's what you're
16  asking, before we had it done.
17   Q.   What do you know about -- do you
18  know of other people in St. Bernard Parish and
19  New Orleans East who went through the storm but
20  who did not incur any personal injury?
21   A.   No.
22   Q.   No? Everybody you know was injured?
23   A.   Everybody -- mentally, yes,
24  absolutely.
25   Q.   Okay. So, everybody is --

Page 100

1    A.   Is suffering.
2    Q.   -- suffering mental distress --
3    A.   Absolutely.
4    Q.   -- of some variety, some more than
5  others?
6    A.   Yes.
7    Q.   I'm talking about personal injury as
8  opposed to mental distress. Do you know people
9  who, although they may have mental distress,
10  weren't injured in their body otherwise?
11   A.   Yes.
12   Q.   And you already said you know some
13  who are injured seriously, some who died, and
14  some who weren't injured at all?
15   A.   Yes.
16   Q.   Do you know some people in the
17  broader area who did not evacuate? You said
18  everybody in your immediate area did evacuate,
19  you thought.
20   A.   Right.
21   Q.   But, certainly, some people in New
22  Orleans East and St. Bernard did not evacuate,
23  correct?
24   A.   Right. Yes. Yes.
25   Q.   And did you know some of them?

Page 101

1    A.   Yes.
2    Q.   And what were their experiences?
3    A.   A friend of ours evacuated to
4  Chalmette High School. My father had to stay in
5  the city. He worked at Xavier University. He
6  was there the entire time and got stuck there.
7    Q.   What happened to the firemen who
8  took the video?
9    A.   They were at the sugar refinery,
10  which is in Arabi, close to the river. They
11  stayed the entire time, till weeks and weeks
12  after.
13   Q.   What happened to their house?
14   A.   Oh, it was destroyed.
15   Q.   Do you know that many of your
16  neighbors, like you, submitted insurance claims
17  on their homeowner's insurance both for the house
18  itself and for their personal possessions and
19  were paid money on those claims?
20   A.   I would assume they made a claim.
21  If they were paid, I have no idea.
22   Q.   You just don't know?
23   A.   I don't know.
24   Q.   Okay. You don't read in the
25  newspaper -- I mean, don't you have general

26 (Pages 98 to 101)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 102

1  understanding that lots of people have submitted
2  claims and homeowner's have -- insurance
3  companies have paid billions of dollars --
4       A.   I don't know about homeowner's
5  paying billions.
6       Q.   Okay.
7       A.   They -- they -- they haven't paid
8  much.
9       Q.   And why is that?  Because they want
10 to claim everything was due to flooding.
11      A.   Yes.
12      Q.   And homeowners want to claim
13 everything's due to wind and rain in order to
14 maximize the insurance?
15      MR. EXNICIOS:
16           Objection as to form.
17           Go ahead and answer as best
18      you can.  I don't understand the
19      question.
20      A.   Flood -- flood agencies saying it's
21 wind and water, homeowners -- they're just
22 splitting hairs.
23 EXAMINATION BY MR. DOAK:
24      Q.   Do you, by chance, happen to know a
25 Mr. James Bates who lives in Chalmette --

Page 103

1       A.   No.
2       Q.   -- at 3429 Karen Drive.  Do you know
3  approximately where that is?
4       A.   I know that area.  I don't know that
5  person.
6       Q.   Couple of miles from you?
7       A.   Yeah.
8       Q.   They, apparently, were paid for wind
9  and rain damage on their house.  I just wondered,
10 since it was in Chalmette, if you happened to
11 know those persons?
12      A.   I don't know those people.
13      Q.   Okay.  Let's talk about the Form 95
14 that Mr. Andry submitted to the government for
15 you --
16      A.   Okay.
17      Q.   -- in some detail.  You said that
18 you had seen that form.  I didn't know if you saw
19 it before it was submitted or after it was
20 submitted.  You know, did you go to his office
21 and talk to him and he said, I'm ready to submit
22 this, is this all correct, and he showed it to
23 you like that and you said, yes, and then he sent
24 it in, or did you just delegate it to him and
25 said, you're my lawyer, I have the form, will you

Page 104

1  authorize him to submit it, just say you take
2  care of it, he took care of it and then sent you
3  an informational copy or gave it to you the next
4  time he saw you after it was done?
5       A.   I believe we filled that out.
6       Q.   You believe you filled that out?
7       A.   I believe so.
8       Q.   Okay.  Describe that.  You filled it
9  out at home?
10      A.   Yes.
11      Q.   In handwriting?
12      A.   Yes, I believe.
13      Q.   And maybe gave it to him then?
14      A.   I believe so, if it's what I'm
15 thinking of.
16      Q.   Let me show one to you.  I know I
17 had one for you.
18      MR. EXNICIOS:
19           It may be here.
20      MR. DOAK:
21           You want to put a sticker on
22      that?
23           (Whereupon, Jeannine
24      Armstrong Exhibit Number 3 was
25      marked for identification.)

Page 105

1  EXAMINATION BY MR. DOAK:
2       Q.   Ms. Armstrong, I hand you what's
3  been marked Jeannine Armstrong Exhibit Number 3
4  and ask that you examine that document.
5       MR. EXNICIOS:
6           She's really going to
7      examine it.
8           Is that for me or you need
9      this back?
10      MR. DOAK:
11           That's for you.
12 EXAMINATION BY MR. DOAK:
13      Q.   Can you confirm that this is the
14 Form 95 that Mr. Landry (sic) submitted on your
15 behalf to the government?  Near his signature,
16 the date is June 23, 2006?
17      MS. BERTAUT:
18           It's Andry.
19      MR. EXNICIOS:
20           Just for clarification, it's
21      Andry.
22      MR. DOAK:
23           Andry?
24      MR. EXNICIOS:
25           Yeah, Andry.  Landry is

27 (Pages 102 to 105)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

---

Page 106

1    actually his brother-in-law.
2    MS. BERTAUT:
3        That's right.
4    MR. EXNICIOS:
5        Yeah.
6    THE WITNESS:
7        What was the question? I'm
8    sorry. What was the question?
9    EXAMINATION BY MR. DOAK:
10       Q.   I was just asking if you now
11   recognize this as the claim form that Mr. Landry
12   submitted to the government on your behalf?
13       A.   Yes.
14   MR. EXNICIOS:
15       Andry.
16   MS. BERTAUT:
17       Jonathan Andry.
18   MR. DOAK:
19       I have a special talent with
20   words sometimes. When I say
21   "Landry," I mean "Andry."
22   MR. EXNICIOS:
23       The problem is there's
24   another lawyer on the case who is
25   Landry.

---

Page 107

1    MR. DOAK:
2        I wish I could claim that
3    was my problem, but it's nothing
4    so benign.
5    EXAMINATION BY MR. DOAK:
6        Q.   So, this is the Form 95 that your
7    lawyer submitted to the government for you; is
8    that correct?
9        A.   Yes.
10       Q.   And it's dated June 23 of 2006?
11       A.   Yes.
12       Q.   Look at the top of the second page.
13   In Box Number 8, there's a place to state the
14   basis of the claim. It states to state in detail
15   the known facts and circumstances attending the
16   damage, injury or death. I'll give you a moment
17   to read the couple of sentences that are typed in
18   there.
19       A.   Okay.
20       Q.   Now, your recollection a moment ago
21   was that you thought you had completed one of
22   these forms at home in handwriting and then given
23   that to your attorney.
24       A.   Uh-huh.
25       Q.   But this isn't the language that you

---

Page 108

1    wrote, is it?
2        A.   No.
3        Q.   Okay. Do you know what became of
4    the language that you wrote?
5        A.   I don't know.
6        Q.   Do you recall what kind of words you
7    used to answer this question? What -- what did
8    you say when you wrote it out in hand what was
9    the basis of the claim?
10       A.   I don't remember exactly what we
11   wrote. I know it was basically that our house
12   flooded and we were saying that it -- you know,
13   it was from -- from the MRGO, from the breaches
14   in the levee, from the not properly maintaining,
15   not properly taking care of.
16       Q.   From your earlier testimony today, I
17   would have thought that you would have also
18   mentioned the Industrial Canal.
19       A.   Exactly.
20       Q.   And what else do you recall that you
21   might have written when you completed this form
22   in handwriting?
23       A.   What else?
24       Q.   Do you recall any other details of
25   what else you might have said when you completed

---

Page 109

1    this Item 8 of the form in handwriting?
2    MR. EXNICIOS:
3        Can I object just for
4    clarification, make sure we're not
5    going to communications between
6    her and Jon or Gibby. Strictly on
7    what she may have put in that box,
8    correct?
9    MR. DOAK:
10       Yes.
11   EXAMINATION BY MR. DOAK:
12       Q.   I'm going to start over a little
13   bit.
14       A.   Okay.
15       Q.   When you said "we had prepared
16   this," I assumed that you were referring to that
17   your husband and you worked together to prepare a
18   blank Form 95.
19       A.   Yes. Yes.
20       Q.   And you worked together to write in
21   by hand what you thought would be the content for
22   the various boxes on this preprinted form.
23       A.   Yes.
24       Q.   And when you were done with that,
25   you mailed it or delivered it to one of your

---

28  (Pages 106 to 109)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

---

Page 110

1    attorneys; is that correct?
2        A.   Yes.
3        Q.   Okay.  So, I just want to talk about
4    what happened at home when you and your husband
5    were at the table filling out one of these forms.
6    Do you recall any more detail about what you all
7    wrote in this Box 8?  You already told me some
8    things about from MRGO, which is included here,
9    but you also mentioned the breaches in the
10   levees, that they were not maintained right, that
11   your description would have included a reference
12   to the Industrial Canal.
13       A.   Yes.
14       Q.   I'm wondering if your handwritten
15   version would have contained any other detail
16   that you can remember today.
17       A.   Not that I remember.
18       Q.   Okay.  Let's move down to in Box 9,
19   you see Property Damage and in the second half of
20   that, it says:  Briefly describe, and there's a
21   sentence that reads:  The damage was a complete
22   loss of structure and contents located at -- is
23   this the language that you recall writing?
24       A.   Yes.
25       Q.   Okay.  And is this language

Page 111

1    accurate?
2        A.   Yes, 4016 Hamlet.  Yes.
3        Q.   And this comports with your
4    testimony today.
5        A.   Yes.
6        Q.   Complete loss of the structure and
7    the contents in your house.
8        A.   Yes.
9        Q.   Okay.  And then in Item Number 10,
10   you are asked to identify personal injury and to
11   state the nature and extent of any injury which
12   you are claiming, and I'll give you a minute to
13   read the typed in description.
14       A.   Okay.
15       Q.   This is not the description you
16   wrote at home with your husband, is it?
17       A.   Loss of property, all possessions,
18   yes.  Mental distress, yes.
19       Q.   But in Box Number 10, when you're
20   asked to state the nature and extent of each
21   injury, not property damage, now, the losses
22   above there, I understand, the loss of the
23   structure and the contents, that's right, but for
24   your injury, is this language what you wrote in
25   handwriting -- is this the only thing you

Page 112

1    identified in the form to your lawyer?
2        MR. EXNICIOS:
3            Objection.  That's
4        privileged.  You're talking about
5        what she identified between her
6        and her lawyer.
7        MR. DOAK:
8            No, the underlying fact, in
9        fact, is not privileged.
10       MR. EXNICIOS:
11           Rephrase your question.
12   EXAMINATION BY MR. DOAK:
13       Q.   How does this typed version of Item
14   10 compare to that language that you and your
15   husband wrote at home in handwriting?
16       A.   Negligence as in the Corps of
17   Engineers, is that what you're referring to?
18       Q.   Yes.
19       A.   Yes.  Yes.  Do we feel it's a
20   negligence?
21       Q.   Uh-huh.
22       A.   Yes.  Absolutely.  Yes.
23       Q.   And I take it that your pneumonia
24   and back injury were not listed because they had
25   not yet developed on this date.

Page 113

1        A.   I was being treated for the
2    pneumonia at that time.
3        Q.   Okay.
4        A.   I was diagnosed during June.
5        Q.   On the handwritten form of this form
6    that you prepared at home, would you have listed
7    that pneumonia at that time?
8        A.   No.  I didn't know I was in
9    pneumonia at that time.
10       Q.   Okay.  And is that why you didn't
11   list it, that you didn't correlate it to
12   Hurricane Katrina?
13       A.   Right.  Right.
14       Q.   Okay.  When you prepared this at
15   home, directing your attention on further down to
16   Box 12a, there is a box for property damage, and
17   12b for personal injury, now, I will refer you --
18   the way this form, up in 9 above, property
19   damage, they're combining your house, contents
20   and your possessions, all of that together.
21       A.   Okay.
22       Q.   So, that's what 12a is for in
23   property damage.  On this typed form, it says
24   $500,000.  Do you know what dollar number you and
25   your husband wrote in the form that you did in

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                              7/9/2007

Page 114

1    handwriting?
2        A.   I would believe it was that.
3        Q.   So, you believe your house was 160,
4    $170,000 and your possessions were $330,000?
5        A.   Yeah.  You take a count of
6    everything in your house, it adds up quickly.
7        Q.   Okay.
8        A.   From any -- from a spoon to a shirt
9    to your furniture to your appliance -- it adds
10   up.
11       Q.   So, you think the 500,000 number is
12   one you provided?
13       A.   Yes.
14       Q.   And the personal injury, do you
15   believe $500,000 is the number that you provided
16   for your emotional distress --
17       A.   Yes.
18       Q.   -- claim?  Okay.  So, you basically
19   agree with the form as submitted except for
20   Paragraph 8, the basis of the claim.  You had
21   described more broadly in your handwritten
22   version than the description in this typed
23   version.
24       A.   I would say yes.
25       Q.   And your husband was doing this at

Page 115

1    the same time.
2        A.   Yes.
3        Q.   Do you know that your lawyer
4    submitted a identical form on behalf of your
5    husband?
6        A.   Yes.
7        Q.   Okay.  Did your -- has your husband
8    also suffered emotional distress?
9        A.   Yes.
10       Q.   Do you believe that it is as severe
11   as your emotional distress?
12       A.   Yes.  He just handles it
13   differently.
14       Q.   I'm sorry?
15       A.   He handles it differently than I do.
16       Q.   Did he also grow up in this
17   neighborhood?
18       A.   Yes.
19       Q.   So, the stories are pretty much the
20   same?
21       A.   Yes.
22       Q.   Okay.  Did you all intend to submit
23   two claims for $500,000 each for property damage?
24   That would mean that your house and contents,
25   you're claiming $1 million for?  Was that your

Page 116

1    intention, or was it 500,000?
2        A.   I'm not sure.
3        Q.   Well, as you sit here today, are you
4    seeking in this lawsuit for your house and your
5    personal possessions $500,000 or $1 million?
6        A.   I guess together, as a family --
7        Q.   Yes.
8        A.   -- the million.
9        Q.   Okay.  And your personal injury
10   claim was 500,000.  We couldn't ever determine
11   what the other doctors were, but if you have
12   500,000 here plus your hospital bill of 280,
13   we're up to 780,000.  So, it sounds like your
14   total injury claim now is approximately a million
15   dollars --
16       A.   Yes.
17       Q.   -- subject to looking at all of
18   those bills which we have requested in
19   discovery --
20       A.   Yes.
21       Q.   -- but would that be a fair estimate
22   as we sit here today?
23       A.   I'd say yes.
24       MR. DOAK:
25           I think that is a good place

Page 117

1    to end that subject and take our
2    lunch break.
3    THE VIDEOGRAPHER:
4        We're going off the record
5    at 12:01.
6        (Whereupon, a discussion was
7    held off the record.)
8    THE VIDEOGRAPHER:
9        We're back on the record at
10   1:23.  This is beginning of Tape
11   3.
12   MR. DOAK:
13       I have one housekeeping
14   matter to take up with Counsel,
15   just that I had forgotten to do
16   this morning, and that is in our
17   Notice of Deposition, we attached
18   as Exhibit A a document request
19   which was largely redundant of the
20   document request that we had
21   propounded as separate document
22   request and which is currently the
23   subject of a Motion to Compel.
24   Defendants' counsel agreed that
25   plaintiffs did not need to file a

30 (Pages 114 to 117)

JEANNINE ARMSTRONG   (MRGO)                                      7/9/2007

Page 118

1   Motion For Protective Order in
2   advance of this deposition and
3   both sides would simply await the
4   Court's ruling on the Motion to
5   Compel which has been filed and is
6   scheduled for hearing, I guess,
7   next week. So, I just wanted to
8   ask Mr. --
9       MR. EXNICIOS:
10          Exnicios.
11      MR. DOAK:
12          -- Exnicios to confirm that
13  the plaintiffs will not be
14  producing any documents in
15  response to this document request
16  today, but withholding that until
17  we resolve the matter with the
18  judge next week at the motion to
19  compel.
20      MR. EXNICIOS:
21          That is correct. The
22  parties have agreed to not produce
23  documents today in light of the
24  pending arguments in front of the
25  judge and the magistrate.

Page 119

1   EXAMINATION BY MR. DOAK:
2       Q.   Okay. Continuing on, we were
3   talking about various kinds of claims that you
4   may have submitted for money or assistance of any
5   kind, and we, I think, had finished the Form 95
6   that was submitted to the government.
7       Next, I wanted to turn to the
8   homeowner's insurance and the flood insurance. I
9   think we've largely covered this earlier in our
10  discussion. The homeowner's, you said you
11  submitted to Liberty Mutual, and I believe that
12  you gave me the name of your agent.
13      A.   Yes.
14      Q.   And do you know what documents, if
15  any, you might have in your possession with
16  respect to either the submission of this claim or
17  the results of that claim?
18      A.   I know we have, like, the -- the --
19  the check stub, the bottom part of the check that
20  we received.
21      Q.   Yes.
22      A.   I believe we have some papers from
23  Liberty Mutual that when the guy came in and did
24  the adjustment -- the adjuster -- it's like a
25  description of the house and it's like a diagram

Page 120

1   of, you know, this was a hole, that was a hole,
2   stuff like that.
3       Q.   I really don't think I have anything
4   else on that insurance claim form.
5       Similar question with respect to the
6   flood insurance claim against Allstate. Who was
7   your Allstate agent to whom you submitted the
8   claim?
9       A.   His name is Jim Turlington.
10      Q.   And where does he work?
11      A.   I believe he's also on the west
12  bank.
13      Q.   Do you know the name of his company?
14      A.   I don't.
15      Q.   And do you know what documents, if
16  any, you all have at home in your possession
17  about the process -- submission of that claim or
18  the processing of that claim or the amount of
19  proceeds paid?
20      A.   I believe the amount -- I know we
21  were insured for 52, minus deductibles. That's
22  what we received.
23      Q.   Do you know, though, what documents
24  you might have about that at home?
25      A.   Like?

Page 121

1       Q.   Either the claim form itself or --
2       A.   We did it over the telephone.
3       Q.   Okay.
4       A.   Strictly over the telephone.
5       Q.   Okay.
6       A.   They called up and basically wanted
7   a description of what was in your home, what you
8   had in your home, type of flooring, type of
9   lighting, just down -- you know -- and that was
10  it, and then they called up and said okay.
11      Q.   But this was all covered because
12  most of your damage was flood damage.
13      A.   Yes.
14      Q.   So, this was easy.
15      A.   Fifty-two thousand was absolutely
16  easy.
17      Q.   Did you make any claims in
18  connection with the Murphy Oil spill?
19      A.   No.
20      Q.   I know that we still have to talk
21  about The Road Home Program, but besides that,
22  we've got the Form 95, the homeowner's insurance,
23  the flood insurance, The Road Home Program. Are
24  there any other sources of help for Hurricane
25  Katrina that you all contacted, made claims for?

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

Page 122

1   Red Cross, state government, federal government,
2   city program, anything at all?
3       A.   We contacted Red Cross -- we were
4   still in a hotel -- so, soon after the storm.
5   And you had to call and tell them how many people
6   lived in your home and their Social Security
7   number, their ages and that, and I think they
8   sent -- I know it was $1,500 that we got from Red
9   Cross, and it was so much per head, like that.
10      Q.   And that was merely a payment for
11  temporary living expenses?
12      A.   Exactly, yes.
13      Q.   Okay.  Any other forms of assistance
14  that you --
15      A.   We received housing assistance from
16  FEMA.
17      Q.   Yes.
18      A.   Rental assistance.
19      Q.   Tell me about that.
20      A.   We received rental assistance until
21  June of last year, and that was it.
22      Q.   What was the amount of that per
23  month?
24      A.   I think it was, like -- we received,
25  like, $2,200 for a three-month period.

Page 123

1       Q.   Okay.  Any other programs besides
2   Road Home that you applied for?
3       A.   No.
4       Q.   Okay.  Tell me about The Road Home
5   Program.
6       A.   Road Home Program is supposed to
7   be -- I would guess -- this is only my
8   interpretation of it -- a gap to fill in of what
9   you had in insurance, what your home was worth,
10  and then if there was a gap in between that.
11  They give you a prestorm estimate of your home to
12  repair your home, back to get it up in order, and
13  then they -- prestorm value, estimated cost to
14  repair, and you have an option -- minus -- the
15  maximum you can receive from Road Home is
16  150,000.  Okay.  So, they come up with all these
17  figures, minus what you receive from insurance,
18  minus if you received any FEMA money, and if that
19  comes within that gap, you would be awarded X
20  amount of dollars.  And when you're awarded that
21  money, you're basically signing over your home to
22  the state.  You're basically selling your house
23  to them for that amount.
24      Q.   And what was the claims process for
25  that?  You said this morning that you had filled

Page 124

1   out some papers.
2       A.   You filled out an application
3   online.  Then, you received a postcard in the
4   mail.  You had to go meet with them.  Basically,
5   met with them, brought all your paperwork with
6   you, your W-2 forms, your insurance policies, all
7   of that kind of stuff.  Then, months later, you
8   were called back to go over anything else, if
9   there was any holes in it.  Then you received --
10  it's called the Golden Letter.  It's a letter on
11  yellow paper, and they come up -- that's where it
12  has all of the figures of what they say your
13  house was worth, repairing your home, if you want
14  to elevate your home and all that kind of stuff.
15      Q.   And when did you -- you said that
16  process for you began with going online to
17  complete the form.  Approximately when would that
18  have been?
19      A.   I would say early 2006.
20      Q.   And approximately when did you have
21  this meeting?
22      A.   It was in November of '06.
23      Q.   And by the end of that meeting with
24  The Road Home people, had you reconciled any
25  omissions or questions they had?

Page 125

1       A.   No.  The only thing at that meeting
2   was basically you were giving them your
3   information, and then it goes away, and then they
4   communicate with you through the mail.
5   Basically, all you're doing is giving your
6   information at that meeting.  There's no discuss
7   of figures or anything like that until you get
8   that letter in the mail.
9       Q.   I thought that the information was
10  provided on a homeowner application that you
11  committed online.
12      A.   You do, but you have to physically
13  bring it with you.  They made copies.  They put
14  it onto a DVD for you.
15      Q.   Okay.  I see.  So, you just print
16  the form out from online and then you print it
17  out and bring the supporting documentation, and
18  that's the first time you actually turned the
19  package over to them?
20      A.   Yes.
21      Q.   So, that submission, if you will, of
22  your Road Home application and supporting papers
23  wasn't done until November of '06?
24      A.   Yes.
25      Q.   And you have heard nothing since

JEANNINE ARMSTRONG (MRGO)                    7/9/2007

Page 126

1  then?
2      A.  No.  We received a letter in the
3  mail in January.
4      Q.  Oh, okay.  Which said?
5      A.  Which said they had a value of our
6  home, they had a estimated cost to repair, they
7  had an amount that they would pay if you wanted
8  to raise your home and they had an award amount
9  that they called it that you would -- which was
10 the gap.
11     Q.  Okay.  And what was your award
12 amount?
13     A.  Sixty-nine thousand.
14     Q.  And that would be the option that
15 you all would be taking, correct?
16     A.  As of now, no.  We are what they
17 call resolution, which means we're disputing the
18 prestorm value of our home.  We think it's below
19 the market value.  So, we've been in resolution
20 since January.
21     Q.  And what did they identify as the
22 value of your home on August 29, 2005?
23     A.  They said 140,000.
24     Q.  And in this resolution program,
25 you're maintaining that the value is what?

Page 127

1      A.  One sixty to 175.
2      Q.  And do you have any forecast of
3  timing?  You've been in this resolution process
4  since January.
5      A.  (Nods head affirmatively.)  And I
6  called last week and they said you're in
7  resolution.  That's it.
8      Q.  So, nobody knows.
9      A.  No.  No.
10     Q.  Did you offer any additional
11 justification for your 160 to $175,000 proposed
12 value?
13     A.  For what other homes sold in the
14 neighborhood for.
15     Q.  And was there documentation for
16 that?
17     A.  At the courthouse, there is.
18     Q.  Was any presented to Road Home?
19     A.  They don't go by that.  They go by
20 what they say their adjusters found your home was
21 worth.
22     Q.  And how do their adjusters work?
23     A.  I have no idea.
24     Q.  Do they come out individually?
25     A.  I'm assuming so.  I have no idea.

Page 128

1  Because they said that houses on the main
2  boulevard into our subdivision, which is, you
3  know, a boulevard with the neutral ground in the
4  middle, houses on that sold for 80,000, and
5  there's no way -- before the hurricane.  No way.
6      Q.  Did you keep a copy of the
7  application form that you printed off the
8  internet and then turned in at this meeting in
9  November?  Did you keep a copy of that for your
10 files?
11     A.  I'm sure we do.
12     Q.  And as I understand it, that Road
13 Home Program is limited in scope to just houses,
14 not other -- not personal property, not injuries.
15 It's just a program to recover the so-called gap
16 on people who lost their home.  Is that -- do I
17 have that understanding --
18     A.  I believe so, yes.
19     Q.  What is your understanding of your
20 role as a class representative in this case?
21     A.  My understanding is that I'm just
22 like everybody else in the parish.  I lost
23 everything, like everybody else.  You know, a
24 person who was born there, raised there, grew up
25 there, went to school there, worked there.  Just

Page 129

1  a regular --
2      Q.  Do you know anything about the
3  duties of a named plaintiff class representative?
4      A.  Yes.
5      Q.  And what are those duties?
6      A.  Well, I think you need to give a
7  fair, legitimate testimony of what you lost and
8  everything like that.
9      Q.  Have you been told by anyone that by
10 participating in this case as a named
11 representative you would receive any kind of
12 money or thing of value other than what you would
13 receive in satisfaction of your claim?
14     A.  That I would receive additional
15 or --
16     Q.  Yes.
17     A.  No.
18     Q.  Do you know what subclass you're
19 representing?
20     A.  What do you mean by "subclass"?
21     Q.  The class as proposed, and sometimes
22 there is a single class and sometimes the single
23 class is broken up into subclasses.  Do you know
24 any of the details of that?  You may not.
25     A.  I don't know that.

33 (Pages 126 to 129)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 130

1    Q.   Do you know anything about
2  individuals who were named plaintiffs in earlier
3  filed proposed class actions --
4    A.   No.
5    Q.   -- but who no longer are named
6  plaintiffs?
7    A.   No.
8    Q.   Do you know any of the other named
9  plaintiffs in this class action?
10   A.   My husband.
11   Q.   Yeah.  Besides him.
12   A.   No.
13   Q.   Okay.  What is your understanding of
14 what group of people you're representing in this
15 case?
16   A.   St. Bernard area.
17   Q.   And what?  Who went through the
18 hurricane?  Who had any damage?  Who had a total
19 loss?  What?
20   A.   I think it was anybody who suffered
21 damage.
22   Q.   Any kind of damage.  Property
23 damage, personal injury --
24   A.   Yes.
25   Q.   Mental distress --

Page 131

1    A.   Yes.
2    Q.   -- lost profits?
3    A.   Yes.
4  MR. DOAK:
5       You want to either take a
6  five-minute break in place or we
7  can take a formal break and let me
8  confer with my colleagues for a
9  few minutes.
10 MR. EXNICIOS:
11      Why don't we take about five
12 minutes.  I can go to the
13 bathroom.
14 THE VIDEOGRAPHER:
15      We're going off the record
16 at 1:42.
17      (Whereupon, a discussion was
18 held off the record.)
19 THE VIDEOGRAPHER:
20      We're back on the record at
21 1:55.
22 MR. DOAK:
23      I am done with my
24 questioning.
25 EXAMINATION BY MR. BEARDEN:

Page 132

1    Q.   My name's Jay Bearden.  I represent
2  the Lake Borgne Levee District.  I'm just going
3  to have a few quick questions for you.  I hope to
4  get finished with this real fast.
5       Some of this information, you may
6  have already provided to your lawyers.  I just
7  want it to have it on the record so we have a
8  clean transcript.
9       What's your date of birth?
10   A.   November 8th, 1962.
11   Q.   You have a driver's license?
12   A.   Yes.
13   Q.   Can we get a copy of your driver's
14 license and attach it as an exhibit to the
15 deposition?  I think we're on 4, I believe.  You
16 have your driver's license with you?
17   A.   No.
18   Q.   No, you don't.
19   A.   I don't.  I didn't put my wallet in
20 my purse.
21 MR. BEARDEN:
22      All right.  I'm going to
23 specifically ask your lawyer.  I
24 know it's already been produced in
25 discovery.  I just wanted it to

Page 133

1  attach to the deposition.
2  MR. EXNICIOS:
3       We can send it.  Not a
4  problem.
5  EXAMINATION BY MR. BEARDEN:
6    Q.   Your Social Security number?
7    A.   438 -- no --
8  MR. EXNICIOS:
9       Can we pause for a second?
10 How secure is all this
11 transmission and so forth?
12 MR. BEARDEN:
13      I'm not online at all.  I
14 don't know.
15 MS. BERTAUT:
16      I don't think I'm online.
17 MR. EXNICIOS:
18      It's just Social Security
19 numbers are --
20 MR. BEARDEN:
21      I don't know whether they're
22 streaming or not.  I have no idea.
23 MR. EXNICIOS:
24      That's what I'm asking.
25 THE VIDEOGRAPHER:

34  (Pages 130 to 133)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

Page 134

1       It is streaming online.
2    MR. EXNICIOS:
3           Is it secure? Can we write
4    it down and slide it to you? I
5    know it sounds ridiculous, but in
6    this day and age --
7    MR. BEARDEN:
8           Will you write your Social
9    Security number down and we'll
10   attach it as an exhibit to the
11   deposition. The driver's license
12   we're going to make, in
13   abstention, 4, I think; the Social
14   Security number with the piece of
15   paper on it will be 5.
16          (Whereupon, Jeannine
17   Armstrong Exhibit Number 4 and
18   Jeannine Armstrong Exhibit Number
19   5 were marked for identification.)
20   EXAMINATION BY MR. BEARDEN:
21   Q.   Do you have any criminal history?
22   A.   No.
23   Q.   Never been arrested?
24   A.   No.
25   MR. EXNICIOS:

Page 135

1       I should have objected to
2    that, but I think she answered
3    already.
4    EXAMINATION BY MR. BEARDEN:
5    Q.   Arrested in the last five or ten
6    years.
7    A.   Never.
8    Q.   You were never in the military, were
9    you?
10   A.   No.
11   Q.   Was your husband in the military?
12   A.   No.
13   Q.   You ever been treated for drug
14   abuse?
15   A.   No.
16   Q.   Alcohol abuse?
17   A.   No.
18   Q.   You ever had a history of
19   depression?
20   A.   No.
21   Q.   Other than what you've already
22   talked about here today?
23   A.   No.
24   Q.   Prior to Katrina?
25   A.   No.

Page 136

1    Q.   Apologize for the delay. I'm just
2    running through some of my notes here. These are
3    going to be sort of off-the-wall questions
4    because most of the stuff, everything was covered
5    very well before.
6           Did you keep any kind of diary or
7    journal in any way relating to Hurricane Katrina?
8    A.   No.
9    Q.   Do you have any receipts or other
10   documents to evidence expenses associated with
11   your evacuation and relocation because of
12   Hurricane Katrina?
13   A.   I have receipt from the hotel we
14   stayed in. I have rental receipts where we
15   stayed in Baton Rouge and then from where we're
16   staying in Covington.
17   Q.   Do you have any sort of spreadsheet
18   or itemization of all of the expenses that you
19   had because of your evacuation?
20   A.   No.
21   Q.   Have you provided those receipts to
22   your attorneys --
23   A.   No.
24   Q.   -- from your hotel?
25   A.   No.

Page 137

1    Q.   How much were you making as a nurse
2    before Hurricane Katrina?
3    A.   Hourly?
4    Q.   Yeah. Is that how you were paid,
5    hourly?
6    A.   We were paid hourly, and in my
7    department, we took call. So, you had call
8    during the week, you had call on weekends. I
9    think it was, like, 26 an hour.
10   Q.   Did you have benefits?
11   A.   Yes.
12   Q.   Okay. What were they?
13   A.   I had medical benefits. I had
14   disability benefits.
15   Q.   Did you have a 401(k)?
16   A.   Yes.
17   Q.   I don't know if this was asked to
18   you before; if it was, I apologize. Do you have
19   any plans to return to work?
20   A.   Yes.
21   Q.   Have you started looking for a job?
22   A.   Not yet.
23   Q.   Okay. You said you're an RN. What
24   was your specialty? What unit did you work in?
25   A.   At the time of the hurricane, I

35 (Pages 134 to 137)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

---

Page 138

1 worked in Special Procedures.
2      Q.   Which is what?
3      A.   Which we did endoscopy and special
4 procedures, as in lung biopsies, liver biopsies,
5 bronchoscopies, colonoscopies, gastro, into the
6 stomach.
7      Q.   When do you plan on -- or do you
8 have a date by which you plan on starting to look
9 for a job again?
10     A.   I go back to the doctor in
11 September, and I hope then.
12     Q.   For -- which doctor is that?
13     A.   That's Dr. Steck, who did the
14 surgery on my back.
15     Q.   On your back. Is that the reason
16 why you're out of work right now, is because of
17 the back surgery?
18     A.   Yeah. Physically, I just --
19     Q.   That's what I'm asking.
20     A.   Yes.
21     Q.   So, if Dr. Steck releases you to
22 return to work, you plan on going back?
23     A.   Yes.
24     Q.   Have you and your husband filed
25 income tax returns?

Page 139

1      A.   Yes.
2      Q.   Every year?
3      A.   Yeah.
4      Q.   So, for 2000 through 2006?
5      A.   Yes.
6      Q.   Okay. Did y'all own any type of
7 business?
8      A.   No.
9      Q.   No home businesses or anything like
10 that?
11     A.   Nope.
12     Q.   Did you prepare your own tax returns
13 or did you have them done by a -- a --
14     A.   Someone prepared them.
15     Q.   Do you know who?
16     A.   For what years?
17     Q.   Say, 2000 through 2006.
18     A.   2006 was Steve Kissee, and then
19 Frank Aurderer (phonetic) did them, but I'm not
20 sure which year -- he did them first and then
21 Steve Kissee's done the past few years.
22     Q.   Are those both CPAs?
23     A.   Steve Kissee is.
24     Q.   Are they local?
25     A.   Yes.

Page 140

1      Q.   Where are they?
2      A.   In Metairie.
3      Q.   Do they have a name of a business or
4 is that just a name of the CPA that you know of?
5      A.   I think it's Cheramie & Kissee or
6 Kissee & Cheramie.
7      Q.   Did you have a mortgage on your
8 house?
9      A.   Yes.
10     Q.   Has that mortgage been paid off?
11     A.   Yes.
12     Q.   You paid that with the proceeds of
13 your insurance?
14     A.   Yes.
15     Q.   How much was your mortgage for?
16 When you paid it off, what was the payoff value
17 of your mortgage?
18     A.   Eighteen thousand.
19     Q.   How much more do you hope to get out
20 of LRA, or The Road Home?
21     A.   How much more? I haven't gotten a
22 penny from them.
23     Q.   You said there's a dispute, I think,
24 between your resolution --
25     A.   Right. Right.

Page 141

1      Q.   -- between what they've offered you
2 and what you think you're entitled to. How much
3 more do you think you're entitled to?
4      A.   I'd hope to get the fair market
5 value for my house, which would be -- they
6 offered us 140 -- say 160. Twenty thousand.
7      Q.   So, you think -- you're in
8 resolution for another $20,000 from LRA?
9      A.   Yes.
10     Q.   Did you have any kind of SBA loan?
11     A.   Do we now?
12     Q.   Did you have an SBA loan?
13     A.   No, not before. No.
14     Q.   Before what?
15     A.   Not before the hurricane.
16     Q.   That's a bad question on my part.
17          Do you -- at any point in time
18 subsequent to Hurricane Katrina, have you applied
19 for and/or received an SBA loan?
20     A.   Prior to Katrina, no.
21     Q.   Post-Katrina.
22     A.   Yes.
23     Q.   How much was your SBA loan for?
24     A.   We don't have an SBA loan yet.
25     Q.   You've applied for?

                                    36 (Pages 138 to 141)

21814518-488c-4610-8293-a5825110c6b6

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

## Page 142

1    A.   We've applied.
2    Q.   Okay.  How much have you requested?
3    A.   You don't request.
4    Q.   Okay.  Fill me in.  I'm ignorant in
5  terms of how this works.  You have to educate me.
6    A.   Basically, you have to find a home
7  that you want, and then you apply for that
8  amount.  And the maximum amount, from what I
9  understood it, for an SBA loan is 250 -- 250,000.
10   Q.   Is that what you're hoping to get,
11 250,000?
12   A.   It depends on how expensive a house
13 I buy.
14   Q.   Okay.  Is that what you're hoping to
15 use the money for, is to buy a house?
16   A.   Yes.
17   Q.   Have you been contacted or contacted
18 anyone regarding television interviews or
19 newspaper interviews or other media outlets
20 regarding Hurricane Katrina?
21   A.   No.
22   Q.   Have you given any interviews at all
23 to the media about your experiences with
24 Hurricane Katrina?
25   A.   No.

## Page 143

1    Q.   Did you file a lawsuit for Hurricane
2  Katrina about -- related to your homeowner's
3  insurance?  The payment that you received from
4  your homeowner's insurance, did you file any kind
5  of lawsuit suing them?
6    A.   No.
7    Q.   No.  Other than the lawsuit that
8  we're here today to talk about, have you been
9  involved in any other litigation?
10   A.   No.
11   Q.   At all in the past?
12   A.   No.
13 MR. BEARDEN:
14      That's all the questions I
15 have.  Thank you.
16 THE VIDEOGRAPHER:
17      This concludes this
18 videotaped deposition.  We're
19 going off the record at 2:07.
20      (Whereupon, the testimony of
21 the witness was concluded.)
22
23
24
25

## Page 144

1            WITNESS' CERTIFICATE
2
3
4
5      I, JEANNINE B. ARMSTRONG, read or
6  have had the foregoing testimony read to me and
7  hereby certify that it is a true and correct
8  transcription of my testimony, with the exception
9  of any attached corrections or changes.
10
11
12
13
14
15      (Witness' Signature)
16
17
18
19
20
21
22
23
24
25

## Page 145

1            REPORTER'S CERTIFICATE
2
3
4      I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that JEANNINE B. ARMSTRONG, after having
9  been duly sworn by me upon authority of R.S.
10 37:2554, did testify as hereinbefore set forth in
11 the foregoing pages; that this testimony was
12 reported by me in the stenotype reporting method,
13 was prepared and transcribed by me or under my
14 personal direction and supervision, and is a true
15 and correct transcript to the best of my ability
16 and understanding; that I am not related to
17 counsel or the parties herein, nor am I otherwise
18 interested in the outcome of this matter.
19
20
21      CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22       REGISTERED PROFESSIONAL REPORTER
23
24
25

21814518-488c-4610-8293-a5825110c6b6