# App. Tab 5

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION
                                          NO. 05-4182
                                            "K" (2)
PERTAINS TO:  MRGO                       JUDGE DUVAL

FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


          Videotaped Deposition of

       KENNETH PAUL ARMSTRONG, JR.,

28 Park Place Drive, Apartment 601, Covington,

Louisiana  70433, taken in the offices of

Bruno & Bruno, 855 Baronne Street, New

Orleans, Louisiana 70113, on Monday, the 9th

day of July, 2007, beginning at 9:26 A.M.

b1110e9c-4042-450f-b4d8-0b2ee0c11266

---

Page 2

```
 1   APPEARANCES:
 2
 3      ANDRY LAW FIRM
           (BY:  GILBERT V. ANDRY, IV, ESQ.)
 4      2nd Floor
        622 Baronne Street
 5      New Orleans, Louisiana  70113
           ATTORNEYS FOR THE PLAINTIFFS
 6
 7      LABORDE & NEUNER
           (BY:  GREGORY A. KOURY)
 8      Suite 200
        One Petroleum Center
 9      1001 West Pinhook Road
        Lafayette, Louisiana  70503
10         ATTORNEYS FOR THE BOARD OF
           COMMISSIONERS FOR THE
11         ORLEANS LEVEE DISTRICT
           (NOT PRESENT)
12
13      DUPLASS, ZWAIN, BOURGEOIS, MORTON,
        PFISTER & WEINSTOCK
14         (BY:  ANDREW D. WEINSTOCK, ESQ.)
        Suite 2900
15      3838 North Causeway Boulevard
        Metairie, Louisiana  70002
16         ATTORNEYS FOR THE BOARD OF
           COMMISSIONERS FOR THE LAKE BORGNE
17         BASIN LEVEE DISTRICT
18
19      STONE PIGMAN WALTHER WITTMANN
           (BY:  JAMES C. GULOTTA, JR., ESQ.)
        546 Carondelet Street
20      New Orleans, Louisiana  70130-3588
21         AND
22      JONES DAY
           (BY:  WILLIAM E. MARPLE, ESQ.)
23      2727 North Harwood Street
        Dallas, Texas  75201-1515
24         ATTORNEYS FOR WASHINGTON GROUP
           INTERNATIONAL, INC.
25
```

Page 3

```
 1
       APPEARANCES CONTINUED:
 2
 3
 4   VIDEOTAPED BY:
 5      Gilly Delorimier
        Depo-Vue, Inc.
 6
 7
 8   REPORTED BY:
        ROGER D. JOHNS, RMR, CRR, RDR, CSR
 9      Certified Court Reporter
        State of Louisiana
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2
 3
 4                      PAGE
 5   Armstrong Exhibit 1...................... 67
 6   Exhibit 2................................ 87
 7   Exhibit 2................................ 96
 8   Exhibit 3................................ 98
 9   Exhibit 4................................ 98
10   Exhibit 5............................... 119
11   Exhibit 6............................... 124
12   Exhibit 7............................... 124
13   8....................................... 124
14   Exhibit 10.............................. 131
15   Exhibit 9............................... 132
16   Exhibit 11.............................. 139
17   Exhibit 12.............................. 139
18   Armstrong 13............................ 140
19   Exhibit 14.............................. 141
20
21
22
23   EXAMINATION BY MR. MARPLE:................. 6
24   EXAMINATION BY MR. WEINSTOCK:............ 145
25   EXAMINATION BY MR. MARPLE:............... 159
```

Page 5

```
 1              VIDEO OPERATOR:
 2         This is the videotaped deposition
 3   of Kenneth Armstrong.  This deposition
 4   is being held today at 855 Baronne
 5   Street in New Orleans, Louisiana, on
 6   July the 9th, 2007.  The time is
 7   approximately 9:26 A.M.
 8         Would the Court Reporter please
 9   now swear in the witness.
10         KENNETH PAUL ARMSTRONG, JR.,
11   28 Park Place Drive, Apartment 601, Covington,
12   Louisiana 70443, after having been duly sworn
13   by the Court Reporter, did testify as follows:
14         MR. MARPLE:
15         And for the record, Counsel here,
16   let's now announce for the Court
17   Reporter, I am Bill Marple for
18   defendant Washington Group
19   International, Inc.
20         MR. GULOTTA:
21         Jay Gulotta, Stone, Pigman; also
22   for Washington Group International,
23   Inc.
24         MR. WEINSTOCK:
25         Andy Weinstock, Duplass, Zwain;
```

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

---

Page 6

1       for Lake Borgne Basin Levee District.
2           MR. GILBERT ANDRY:
3               And Gilbert Andry, IV for the
4       Plaintiffs.
5       EXAMINATION BY MR. MARPLE:
6           Q.   Have you ever had your deposition
7       taken before?
8           A.   No.
9           Q.   If you need a break at any time, you
10      just let me know or your lawyer know and we'll
11      try to accommodate those.
12          A.   Okay.
13          Q.   Sometimes you just have to take a
14      little break, --
15          A.   Right.
16          Q.   -- a restroom break or whatever.
17      Just let us know.
18              Now, another thing, this is being
19      taken down by the Court Reporter over here and
20      he's going to take down what I ask and your
21      answers.  So if you'll let me finish my
22      question before you answer, and I will try to
23      let you finish your answer before I ask
24      another question, then we'll get a clear
25      question and answer.

---

Page 7

1           A.   Okay.
2           Q.   We'll try not to over-talk each
3       over.
4           A.   All right.
5           Q.   I think you told us you have not
6       been deposed before?
7           A.   Correct.
8           Q.   Have you ever been involved in a
9       lawsuit where you sued somebody or somebody
10      sued you?
11          A.   Not me.  My son was sued when he was
12      on my insurance.
13          Q.   Okay.  Can you give us your date of
14      birth?
15          A.   2/21/63.
16          Q.   And where were you born?
17          A.   In New Orleans.
18          Q.   What part?
19          A.   Shoot.  I think it was Mercy
20      Hospital, which is in I guess the outside of
21      central city.
22          Q.   And what part of New Orleans did you
23      grow up in?
24          A.   I didn't grow up in New Orleans.  I
25      grew up in St. Bernard Parish.

---

Page 8

1           Q.   All right.
2           A.   Chalmette.
3           Q.   Okay.  Did you go to school down
4       there?
5           A.   Yes, I did.
6           Q.   What high school did you go to?
7           A.   Chalmette High School.
8           Q.   What year did you graduate?
9           A.   '81.
10          Q.   When did you meet your wife
11      Jeannine?
12          A.   Probably '78, '79.
13          Q.   Did she go to the same high school?
14          A.   No.  She went to an all-girls
15      school.
16          Q.   Catholic school?
17          A.   No, public high school.
18          Q.   What was -- What's it called?
19          A.   Andrew Jackson.
20          Q.   And then did you go to any kind of
21      vocational school or college after high
22      school?
23          A.   No.
24          Q.   Did you go to work?
25          A.   Yes.

---

Page 9

1           Q.   What did you do?
2           A.   I first started out as a helper on a
3       truck for Anheiser-Busch.
4           Q.   And when you say a helper, I take it
5       you were loading and unloading cases of beer
6       at retailers?
7           A.   Correct.
8           Q.   And when did you and Jeannine get
9       married?
10          A.   '82.
11          Q.   And I understand she's a Registered
12      Nurse?
13          A.   Correct.
14          Q.   And when did she finish up her
15      schooling?
16          A.   I am guessing here.  Maybe 12 years,
17      13 years ago.
18          Q.   Before she was a Registered Nurse,
19      what did she do?
20          A.   She worked for doctors' offices and
21      things like that, if my memory serves me
22      right.
23          Q.   And have you been in the beer
24      business the whole time since you started
25      working?

---

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

**Page 10**

1    A.  Correct.
2    Q.  Where are you employed now?
3    A.  Yes, that same place.  Southern
4  Eagle.  Anheiser-Busch sold out to an
5  individual which is named Southern Eagle now.
6    Q.  But basically it's the same --
7    A.  Correct.
8    Q.  -- outfit?
9    A.  The same responsibilities, the same
10  thing.
11    Q.  And just let me remind you, you are
12  anticipating my questions just a hair --
13    A.  Okay.
14    Q.  -- and answering before I finish.
15    A.  Okay.
16    Q.  And I apologize for doing that.
17    A.  No, no, that's fine.  Okay.
18    Q.  And where is Southern Eagle located?
19    A.  Metairie, Louisiana.
20    Q.  And do you work out of an office
21  there?
22    A.  Yes, I do.
23    Q.  And pre-Katrina, the same place?
24    A.  Yes.
25    Q.  You live in Covington now; right?

**Page 11**

1    A.  Correct.
2    Q.  In an apartment?
3    A.  Yes.
4    Q.  Anybody besides Jeannine live there
5  with you?
6    A.  My youngest daughter.
7    Q.  Okay.  What's her anme?
8    A.  Renee.
9    Q.  How old is Renee?
10    A.  16.
11    Q.  Let's get the other kids.  I might
12  have missed those.  How many children do you
13  have?
14    A.  I have Kenny, who's 23; Katie, who's
15  20.  She has an apartment in Baton Rouge, but
16  she also stays with us in the summertime and
17  on weekends at times.
18    Q.  And then Renee is 16?
19    A.  Correct.
20    Q.  Can you just tell us generally what
21  your Hurricane Katrina experience was, where
22  you were before, during, and after?
23    A.  We evacuated on Sunday morning about
24  3:00 A.M. before the storm hit.  We evacuated
25  to Baton Rouge, Louisiana at the Lod Cook

**Page 12**

1  Conference Center, which is a hotel on LSU's
2  campus, and we actually stayed there until --
3  I am not exactly sure, a month, month and a
4  half.
5    Q.  And how long -- Well, let's ask you
6  -- let's just say the storm hit New Orleans
7  about 6:00 A.M., I mean, is that fair enough,
8  on the 29th?  Just roughly.
9    A.  I guess, yeah.
10    Q.  And how long before that did you
11  evacuate?
12    A.  If it hit 6:00 A.M. on Monday
13  morning?
14    Q.  Correct.
15    A.  Maybe 27 to 30 hours.
16    Q.  And who was living with you at the
17  time that evacuated with you?
18    A.  My whole family.  Me and my three
19  children.
20    Q.  Was Kenny living with you at that
21  time?
22    A.  Yes, he was.
23    Q.  And Katie?
24    A.  Yes.  Well, she was actually living
25  still, you know, -- but she was actually up in

**Page 13**

1  Baton Rouge starting school.  They had just
2  started at LSU.
3    Q.  And since you were in Baton Rouge, I
4  take it you didn't see anything with your own
5  eyes about what the storm did to your house or
6  otherwise in New Orleans?
7    A.  Not at the time of the storm, no.
8    Q.  Then when did you first return to
9  your home at 4016 Hamlet?
10    A.  It would probably have been, I am
11  going to say -- This is almost two years, so I
12  am speculating.  It was probably after Rita
13  hit.  Because they wouldn't allow us back in
14  down there after Rita.
15    Q.  Sometime the end of September,
16  beginning of October, in that range?
17    A.  I would say in that.  Like I said, I
18  am not exactly sure of the date, but it took a
19  while because we live -- where we lived, it
20  took a while to get the streets cleaned for us
21  to be able to get in there.
22    Q.  Mud in the street?
23    A.  Oh, yeah.
24    Q.  When you went back, was there still
25  mud in the street then?

4  (Pages 10 to 13)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                          7/9/2007

Page 14

1    A.  No, it was actually pushed -- pushed
2  up into the property.
3    Q.  When you went in, what did you see
4  there in your house?
5    A.  I guess, you know, the best thing I
6  can describe it is that it looked like
7  somebody threw up.  What I mean, the house was
8  turned upside down.  There was nothing
9  salvageable.  Nothing.
10    Q.  During the storm did you go up on
11  any satellite sites or anything like that, try
12  to see your house, see where --
13    A.  We tried to.  We tried to.  We
14  wasn't able to get up, our property up on the
15  satellite at the time.
16    Q.  And so between the time you
17  evacuated and you went back, did you see your
18  property through any photographs or satellite
19  --
20    A.  No.
21    Q.  -- or anything?
22    A.  I wasn't able to.  You can get a
23  general area, but you couldn't actually get a
24  fix on your property.  It was -- Some people
25  did, but it was hard to pinpoint what house

Page 15

1  was yours.
2    Q.  Now, your Counsel produced to us a
3  DVD.
4    A.  Correct.
5    Q.  And can you tell us about that
6  generally, what the background of that is?
7    A.  It's basically someone who -- It's a
8  lot of guys from the fire department who
9  stayed, they were put in the shelter at the
10  Domino Sugar refinery, and that's where they
11  started out at.  At the beginning of the
12  video, I think in one -- one of them states
13  after some of the weather started and
14  everything that we are getting the back side
15  of the storm.  And then the water appeared.
16  That's what I saw.  And then you see them
17  going through all parts of the community in
18  their boat and trying to retrieve food and see
19  where people were and things like that.  And
20  then they made their way to one of the
21  firemen's home -- mother's home who lives
22  about seven houses from me.  That's how we
23  were able to get that video.
24    Q.  Do you know that lady?
25    A.  Yes.

Page 16

1    Q.  What's her name?
2    A.  Miss Helena and Ron Silver.
3    Q.  And have you watched that whole DVD?
4    A.  Pretty much, yeah.
5    Q.  And there's one part on there where
6  the fireman that's narrating it says "There's
7  Kenny Armstrong's house"?
8    A.  Correct.
9    Q.  Do you remember that part?
10    A.  Yes, I do.
11    Q.  Could you see your house there?
12    A.  Yes, I could.
13    Q.  And the water was up over the roof
14  line?
15    A.  Over the gutter cans at the time,
16  yes.  Maybe a few feet up above that.
17    Q.  And then does your house appear on
18  there at any other time?
19    A.  No.  No.  Just that one time on me.
20    Q.  There's some people at the end,
21  towards the end where there's a lady out in
22  the yard and then she goes in the house.  Do
23  you know those people?
24    A.  I'd have to see the video, because I
25  have seen a few videos, so I am not sure.  I

Page 17

1  would have to see the video to see.
2    Q.  Do you know those firemen?
3    A.  I know a few of them.
4    Q.  Do you know the fellow that was
5  narrating it?
6    A.  Yeah.  Byron Silver.
7    Q.  And then it's his mother that lives
8  --
9    A.  Correct.
10    Q.  -- a few houses from you?
11    A.  Correct.
12    Q.  Let's say we stand in your front
13  yard at 4016 Hamlet.
14    A.  Uh-huh (affirmatively).
15    Q.  Which way do you look to find her
16  place?
17    A.  I live in a cul-de-sac.  The street
18  comes straight at me.  If it turns, if I am
19  looking out my front door, his parents would
20  be to my left.
21    Q.  And they're up around the turn?
22    A.  Yeah, it's really one house.  The
23  street starts, I'm off to the side right there
24  and looking down the street.
25    Q.  When you came back, did you bring a

KENNETH ARMSTRONG (MRGO)                    7/9/2007

**Page 18**

1  video camera, a camera with you or anything?
2      A.  Yes.  My wife took some pictures.
3      Q.  And did you give those to your
4  lawyers?
5      A.  Yes.  If I am not mistaken, yes, we
6  did.
7      Q.  I may have them.  I looked.  I can't
8  tell what's what, you know, --
9      A.  Right.
10      Q.  -- because it's pretty trashed out.
11  But we'll look a little bit and see if those
12  are the ones.  And let's just back up when you
13  bought that place; about 1985?
14      A.  Let's see.  Katie was born there.
15  She's 21.  So I'd say in that time frame.
16      Q.  And you and Jeannine have been
17  married a couple, three years by that time?
18      A.  Married in '82.  Yeah.
19      Q.  And had you all owned a house
20  anywhere else?
21      A.  Oh, no.  No.  I was only 19 or 20
22  years old at the time.
23      Q.  And we have got some real estate
24  records, you know, they're publicly available,
25  and it looked like it was about a $73,000

**Page 19**

1  purchase price?
2      A.  That's what I thought, yeah.
3      Q.  And about 66,000 on the mortgage?
4      A.  When we bought it?  I guess.
5      Q.  Okay.  And you had had it for 20
6  years then when Katrina hit?
7      A.  Yes.
8      Q.  Was your mortgage pretty well paid
9  down?
10      A.  Yes.
11      Q.  Was it paid off?
12      A.  After the storm I paid it off.
13  $18,000.
14      Q.  So about the time the storm hit you
15  owed about 18,000?
16      A.  That's what my payoff was when I
17  paid it off.
18      Q.  Do you know what the elevation
19  relative to sea level is where your house is
20  at 4016 Hamlet?
21      A.  No, I don't.
22      Q.  Below sea level?
23      A.  I am making a guess here.  I would
24  say.
25      MR. GILBERT ANDRY:

**Page 20**

1      Let me just tell you one thing.
2  Nobody in this room wants you to
3  guess.  You either know or you don't
4  know.
5      THE WITNESS:
6      I don't know.
7  EXAMINATION BY MR. MARPLE:
8      Q.  And did you have flood insurance
9  from the beginning?
10      A.  Yes, I did.
11      Q.  And you had flood insurance then at
12  the time of Katrina?
13      A.  Correct.
14      Q.  Had you ever made any claims on that
15  flood policy prior to Katrina?
16      A.  It never flooded.  It never did.
17      Q.  Did you ever get water up in the
18  street from rain when the pumps wouldn't pump
19  it out or anything like that?
20      A.  Sometimes, yes.
21      Q.  Did it ever come up in the yard?
22      A.  A few times.
23      Q.  Did it ever make it into the house?
24      A.  Never did.
25      Q.  Now, also Rita hit before you got

**Page 21**

1  back to look at your house; right?
2      A.  Correct.
3      Q.  Do you know what damage Rita did to
4  your house?
5      A.  No.
6      Q.  Did you have shingles off?
7      A.  Oh, yeah.
8      Q.  And do you know, was that wind
9  damage or flood damage?  Do you have any
10  idea?
11      A.  No.
12      Q.  Did you make a claim under your
13  homeowner's policy for wind type damage?
14      A.  Yes, I did.
15      Q.  And was that Allstate?
16      A.  No.
17      Q.  Liberty?
18      A.  Yes.
19      Q.  Liberty Mutual?
20      A.  Yes.
21      Q.  And did they send anybody out to
22  look at the place?
23      A.  Sent somebody out twice.
24      Q.  Did they do a report?
25      A.  The first time they did it and we

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 22

1  disagreed and they they sent somebody out in
2  July if I am not mistaken, the following
3  July.
4      Q.  That's July, '06?
5      A.  Correct.
6      Q.  So they came out earlier than July,
7  2006 and looked at it?
8      A.  Right.
9      Q.  Somebody made a report?
10     A.  Correct.
11     Q.  And then they said it was all flood
12  damage, I take it?
13     A.  Correct.
14     Q.  And you said, "No, we got some wind
15  damage"?
16     A.  Correct.
17     Q.  And then how did that get resolved?
18     A.  When the first report came, I think
19  they offered me strictly roof replacement and
20  then we disputed it.  They came out in July
21  and they paid us I think 35,000 for some hard
22  deck, a few other things that were -- some
23  decking that they thought was cracks in it.
24  Also had a fireplace that was -- you could see
25  where there was a leak in there, too.

Page 23

1      Q.  Now, this report, maybe there's two,
2  I don't know, but however many there are on
3  the insurance coming out and looking, do you
4  have those?
5      A.  We could produce them, yes.
6      Q.  And then you had flood insurance
7  with Allstate?
8      A.  Yes.
9      Q.  I am just curious.  Is there any
10  reason you had them with different companies?
11     A.  We had switched insurance companies
12  at the time, and at the time we were going to
13  go to Liberty Mutual to get it all on one, but
14  when we bought the house versus when our car
15  insurance expired, it was two different time
16  frames.  So we were waiting to get the flood
17  insurance moved to one agent at the time.
18     Q.  And do you know -- Well, tell me
19  what your approximate premium was for your
20  flood insurance.
21     MR. GILBERT ANDRY:
22        If you know.
23     THE WITNESS:
24        I am not exactly sure.  I can
25     give you an around about, but I am not

Page 24

1  exactly sure.
2  EXAMINATION BY MR. MARPLE:
3      Q.  Around about would be fine.
4      A.  I thought it was about $700.
5  Because some of this was paid for through the
6  mortgage.
7      Q.  And as a condition to your mortgage,
8  you had to carry homeowner's insurance and
9  flood insurance; correct?
10     A.  Correct.
11     Q.  Do you know what risk level you
12  were?
13     A.  No, I didn't.
14     Q.  Did you ever undertake to look at
15  that?
16     A.  What I will tell you is when we
17  bought the policy and -- I guess that was
18  about, you know -- that we ever needed,
19  however much we needed.
20     Q.  You understand that the premium you
21  pay for flood insurance is related in some way
22  to the degree of the flood risk where you
23  are?
24     A.  One more time?
25     Q.  Some people pay more for flood

Page 25

1  insurance than other people.
2      A.  Correct.
3      Q.  And the variable, at least one of
4  them is how likely is that property to flood.
5      A.  Right.
6      Q.  And some pay more, some pay less.
7      A.  Right.
8      Q.  It depends on I guess past flooding
9  and all of that.
10     A.  Correct.
11     Q.  Do you know how old your house is?
12  In other words, when it was built?
13     A.  I think in the '70s, the early
14  '70s.
15     Q.  And do you have wood cabinets in the
16  kitchen?
17     A.  Yes.
18     Q.  You didn't have any tin cabinets?
19     A.  Oh, no.
20     Q.  And --
21     MR. GILBERT ANDRY:
22        That would have been the Ninth
23     Ward, a little bit further up.
24  EXAMINATION BY MR. MARPLE:
25     Q.  I was trying figure out on my photos

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 26

1  which ones were which and I knew it wasn't
2  yours.  But I was trying to determine what
3  photos were what.
4      MR. GILBERT ANDRY:
5          My dad grew up with tin cabinets.
6      MR. MARPLE:
7          Those are '50s.  I had them, too,
8      when I was a kid.
9  EXAMINATION BY MR. MARPLE:
10     Q.  All right.  And about when did you
11 get your check from Liberty Mutual for your
12 wind damage?
13     A.  About August.  Somewhere in August.
14 It was a couple of weeks after the agent came
15 out.
16     Q.  Of 2006?
17     A.  Yeah, it was either late July or
18 early August.
19     Q.  And was that the first check you
20 got?
21     A.  No.  We had received the flood
22 insurance check.
23     Q.  And you made a claim for that,
24 obviously?
25     A.  Oh, yeah.

Page 27

1      Q.  Did you fill out a form?
2      A.  I am not sure.  My wife probably --
3  I think we had to call in and, you know,
4  something like that.  I am not sure.
5      Q.  Did they send anybody out?
6      A.  I don't think flood insurance did.
7      Q.  They wrote you a check?
8      A.  Right.
9      Q.  And what was the amount of your
10 flood insurance?
11     A.  Total was 5- --- 52,000.
12     Q.  And then did you get something on
13 the contents?
14     A.  It was the total, 52,000.
15     Q.  What was your house appraised at or
16 about what was it worth at the time of
17 Katrina?
18     A.  We hadn't had an appraisal, but my
19 neighbor, at 1,600 square foot, sold for 147
20 about four months before the storm.
21     Q.  And was that house sort of
22 comparable to yours?
23     A.  Mine's about 1,870.
24     Q.  And somewhere around 140,000,
25 150,000?  Is that what you think yours was

Page 28

1  worth?
2      A.  Hoping more, but I would say yeah.
3      Q.  And if I am doing the math --
4      MR. GILBERT ANDRY:
5          If you just break down the square
6      footage, I think that's how they sold
7      it in St. Bernard before the storm.
8      Pretty much anywhere in New Orleans,
9      if you break down the square footage,
10     you'll be able to see what he would
11     have at least asked for his if he were
12     to sell it.
13     THE WITNESS:
14         If I was asking, I would ask
15     probably 165 range.
16 EXAMINATION BY MR. MARPLE:
17     Q.  Okay.  That's good.  So far I have
18 only added up, I think, and I might have done
19 the math wrong, $87,000 in insurance you got.
20     A.  Right.
21     Q.  And can you explain why you didn't
22 get more than that?  Do you know why?
23     A.  Well, flood was all we had, was
24 52,000, so we got the max.  And wind damage
25 from Liberty Mutual was all -- that's what we

Page 29

1  agreed the damage was.  They pretty much said
2  it was all water, you know.  So --
3      Q.  Did you hire anybody on your side
4  when you were having this dispute with Liberty
5  Mutual to look at your house and make a report
6  and tell them what it was?
7      A.  Yes, I hired an appraiser to come
8  out and give us an appraised value on what it
9  would cost to fix.
10     Q.  And what was that number?
11     A.  I am not sure.
12     Q.  Do you have that report somewhere?
13     A.  If I am not mistaken, we probably
14 have it.
15     Q.  And what about some engineer type to
16 come out and look at the fireplace and
17 different things and say, "Water is coming
18 down here"?  Did you have somebody on your
19 side of this dispute to look at that?
20     A.  No, we didn't.
21     Q.  That was what you observed and what
22 you thought and what you told them?
23     A.  Correct.
24     Q.  Do you have any current disputes
25 going with any insurers that you're aware of?

KENNETH ARMSTRONG (MRGO)                          7/9/2007

---

Page 30

1    A. No. No.
2    Q. And you took part of that insurance
3 money and paid off the mortgage?
4    A. Correct.
5    Q. All right. And then at some point
6 you made a decision --
7    A. There's one thing. I haven't filed
8 anything yet. Could be with Liberty Mutual.
9    Q. You may sue them to get some more
10 money?
11    A. I am not sure yet.
12    Q. You think they owe you more; right?
13    A. Well, I am not sure.
14    Q. Well, put it this way. You think
15 that there was more damage done by this wind
16 and rain than what they paid you for?
17    A. Well, I think the dispute is going
18 to be the content -- attic content.
19    Q. When you got paid by Liberty, did
20 they break that out content?
21    A. No, there was no content at all.
22    Q. And you think they ought to be
23 liable for some of the contents that were
24 damaged in there?
25    A. Some portion up in the attic.

---

Page 31

1    Q. I might have asked you this a little
2 bit. Maybe you can tell me a little bit more
3 about it. Did you have shingles off?
4    A. Yes, we did.
5    Q. How many or what percentage?
6    A. I think y'all have pictures. It's a
7 decent amount.
8    Q. Were there parts of the roof that
9 were totally exposed where you could see the
10 under-roof there?
11    A. No.
12    Q. Did you ever have a blue tarp up?
13    A. No.
14    Q. Now, you made a decision at some
15 point to demolish that house.
16    A. Correct.
17    Q. And how did you come to make that
18 decision?
19    A. Well, the estimated value to fix or
20 replace the home they said was in the 200 and
21 something thousand range. I think it was
22 274.
23    Q. Who said that?
24    A. That was something I got from LRA,
25 estimated value to rebuild or repair was 200

---

Page 32

1 something thousand.
2    Q. And do you know why it was so high?
3    A. I guess due to the storm, the prices
4 to get people to do work and the materials to
5 build a house was going up in price, I would
6 imagine.
7    Q. Were they going to have to take that
8 slab out and do something different?
9    A. I guess it depends on what I decided
10 to do there.
11    Q. Were you going to have to raise the
12 house up?
13    A. That seems to be the regulations
14 now.
15    Q. Do you have paperwork where you have
16 got something from LRA that says, gives you
17 this $274,000 figure?
18    A. Yes.
19    Q. And when did -- approximately when
20 was it that you got that number from LRA?
21    A. A few months ago.
22    Q. Sometime in 2007?
23    A. I would say yes.
24    Q. When did you take the house down?
25    A. I am not sure what date.

---

Page 33

1    Q. But it was in 2007?
2    A. If I am not mistaken, it was.
3    Q. Do you have paperwork with the
4 contractor that took it down --
5    A. No.
6    Q. -- that would tell that?
7    A. No.
8    Q. How did you get it taken down?
9    A. We called -- We contacted the Parish
10 -- You had to sign paperwork at the Parish
11 government to get your house torn down.
12    Q. You had to go to St. Bernard Parish?
13    A. Correct.
14    Q. And you go in some office and get
15 some permit or fill something out, or what?
16    A. You had to go in and fill out some
17 paperwork agreeing to it.
18    Q. And then that was the end of it?
19 They -- Somebody else got it taken down and
20 you weren't part of what was going on out
21 there?
22    A. Correct.
23    Q. Did you have to pay anything?
24    A. No. Not -- I didn't personally have
25 to come out of pocket. I don't know if my

---

9 (Pages 30 to 33)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

## Page 34

1  insurance company's -- something like that was
2  done. I don't know if it was the Federal
3  government. I'm not sure.
4      Q.  Before you took it down, were you in
5  contact with the lawyers in this case about
6  that decision?
7      A.  No.
8      Q.  Have you been back out there since
9  it's been taken down?
10     A.  Oh, yeah. I'm out there every other
11  day.
12     Q.  You were there every other day?
13     A.  No, I go out there every other day.
14  I work out there.
15     Q.  And what do you do out there?
16  Deliver beer?
17     A.  No, I'm the supervisor over the
18  grocery stores.
19     Q.  And so grocery stores buy beer and
20  you go out there and make sure they're happy
21  and everything is going all right and getting
22  what they want?
23     A.  Something like that.
24     Q.  What's your title?
25     A.  District sales manager.

## Page 35

1      MR. GILBERT ANDRY:
2         If you want to know his real
3  title, it's the Bud Man.
4  EXAMINATION BY MR. MARPLE:
5      Q.  And the Bud Man's interested in
6  getting shelf space and signs and pricing and
7  all of that, I take it?
8      A.  Compliance with company policy
9  mostly. Salesman's mostly out there for the
10  other things that you mentioned.
11     Q.  And you don't have a reason,
12  specific reason to go to Hamlet Place? You
13  just swing around there and see how the
14  neighborhood is doing, I take it?
15     A.  Correct.
16     Q.  And post-Katrina there were at least
17  some blue tarps out in that neighborhood;
18  right?
19     A.  I'm sure there was. I don't
20  remember specifically, but I'm sure there
21  was. My neighbor I think had one.
22     Q.  And if you go around New Orleans,
23  greater New Orleans, at least post-Katrina
24  when you could get back in, late '05, early
25  2006, you would see those blue tarps all over

## Page 36

1  the place in some neighborhoods; correct?
2      A.  Oh, correct. Yes, there was.
3      Q.  And tell us what those blue tarps
4  were and where they came from and what they
5  did.
6      A.  It was a program I think set up by
7  FEMA, which a lot of people tried to protect
8  their homes from any further water damage
9  coming through the roof.
10     Q.  Well, what you had in Katrina is you
11  had some wind damage from the storm?
12     A.  Yes.
13     Q.  And shingles were off of various
14  roofs and things?
15     A.  Correct.
16     Q.  And then rain got in through leaks
17  in the roof and damaged some things like it
18  did at your place?
19     A.  I would imagine, yes.
20     Q.  And then, of course, you had
21  flooding in some -- a lot of places.
22     A.  Yes.
23     Q.  There were some places, however,
24  that didn't flood very much or almost not at
25  all; right?

## Page 37

1      A.  Correct. Not in my area, though.
2      Q.  You were living out there next to
3  this big levee; right?
4      A.  A few hundred yards away.
5      Q.  And what's the name of that levee?
6      A.  I am not sure.
7      Q.  Florida Wall? Did somebody call it
8  that?
9      A.  They call it the Florida Canal or 40
10  Arpent Canal.
11     Q.  All the time you lived out there,
12  did water ever come up over that other than
13  Katrina?
14     A.  I don't -- Not since I have been
15  there, no.
16     Q.  And that area on the other side of
17  that levee or canal is what?
18     A.  More of a marsh, broken marsh with
19  canals and fishing things and stuff like that.
20     Q.  And water high enough up that you
21  could take a boat out on it at least in
22  places, right?
23     MR. GILBERT ANDRY:
24        Objection to the form.
25     THE WITNESS:

10 (Pages 34 to 37)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285
b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 38

```
1        Yeah, it's --
2     MR. GILBERT ANDRY:
3        What do you mean "in places"?  Do
4     you mean like from the back of his
5     house all the way to the Mississippi
6     coast were there canals back there?
7     MR. MARPLE:
8        I don't know what you mean by
9     that.
10 EXAMINATION BY MR. MARPLE:
11    Q.  He's got a pretty good objection
12 there.  I'll try to be a little more
13 specific.  On the immediate side, on the other
14 side of that levee, was it water or marshy?
15    A.  Marshy.
16    Q.  And then as you went out further,
17 were there places that were actually like
18 water?
19    A.  I mean, you can't really see it
20 unless you come around over there.  It was
21 bayous that you can, you know -- I mean, one
22 of them -- There's a pumping station right
23 there.  And that pumping station went out into
24 -- that was the most visible thing.
25    Q.  And that pumping station pumped
```

Page 39

```
1  surface water over the levee or through it
2  into that marshy area when it rained?
3     A.  Correct.
4     Q.  Did that pump ever go out?
5     A.  Not to my knowledge.
6     Q.  Never had a problem where the pump
7  didn't work and the water just starts backing
8  up on you in the streets?
9     A.  Not to my knowledge.
10    Q.  Did you ever go to any meetings,
11 public meetings or anything about what the
12 Levee Boards or anybody else ought to be doing
13 with levees in your neighborhood?
14    MR. GILBERT ANDRY:
15       Objection to the form.  When you
16    say "Levee Boards", do you mean
17    cutting grass?
18 EXAMINATION BY MR. MARPLE:
19    Q.  I am talking about in terms of
20 structures, whether they're high enough, wide
21 enough, sufficient enough to stop water.
22    MR. GILBERT ANDRY:
23       Well, that would be the Corps
24    then.  So I object to the form of your
25    question.
```

Page 40

```
1  EXAMINATION BY MR. MARPLE:
2     Q.  All right.  I am leaving the Corps
3  out of this.  I am talking about just anybody,
4  whether -- whoever was having a meeting about
5  levees, to talk about them.  Did you ever go
6  to any of those kinds of meetings?
7     A.  No, I did not.
8     Q.  Did it concern you that you were
9  living that close to that marsh area and what
10 might happen during a hurricane?
11    A.  No.  Not at all.
12    Q.  It never occurred to you at any time
13 you lived there --
14    A.  No.
15    Q.  -- pre-Katrina?
16    A.  No.
17    Q.  You never then, I take it, did any
18 investigation of looking into the adequacy of
19 that levee or any other levee in case of a
20 hurricane?
21    A.  No.  No, I did not.
22    Q.  Since Katrina have you done any of
23 that?
24    A.  No.
25    Q.  Have you looked at any of the
```

Page 41

```
1  various reports from the Army Corps of
2  Engineers or anybody like that on what
3  happened to the levees?
4     A.  No.  I could -- There's so much in
5  the papers now, looking at stuff, you -- it's,
6  you know, that much (indicating).  So -- And
7  you can only hear what you heard on the news
8  and things like that.  So that's my
9  knowledge.  I might have had some paperwork on
10 it or something, but I never read -- what I
11 saw in the paper, it's so long, I never -- I
12 never got in detail with it.
13    Q.  Do you have any belief about where
14 the water came from that got up over the
15 gutters around your house?
16    MR. GILBERT ANDRY:
17       Objection to the form.  "Belief".
18 EXAMINATION BY MR. MARPLE:
19    Q.  You can go ahead and answer, but let
20 me just -- I'll try to ask a little different
21 question.  Do you have any information that
22 you have learned about of where the water came
23 from that got up over the gutters in your
24 house?
25    A.  I have a belief.
```

11 (Pages 38 to 41)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                      7/9/2007

Page 42

1    Q.  What's that?
2    A.  When we were in the Lod Cook
3  Conference Center and -- on TV, the
4  helicopters flew over the Industrial Canal.
5  They really didn't venture too much into St.
6  Bernard, so we couldn't see.  But that
7  morning, Monday morning, I am not exactly sure
8  of the time, the structure, levee, whatever
9  it's called there, was -- had fallen over.
10  You could see that plain as day on the TV
11  camera.
12    Q.  And in terms of whether water came
13  over the levee near your house or somewhere
14  else out there further south, east, you don't
15  know?
16    A.  Correct.
17    Q.  I'm going to back up to that DVD for
18  just a second.  How did you get ahold of that
19  from I believe it was Mr. Silver?
20    A.  Just a friend we saw after the
21  storm, you know, and he told me he videoed
22  back by the house and I asked him if I can get
23  a copy.
24    Q.  When you made claims with either
25  Liberty Mutual or Allstate, did you submit any

Page 43

1  photos along with any -- either of those
2  claims?
3    A.  Well, no, both of them came out.
4  They both came -- other than -- other than
5  Allstate.  I don't know if they sent anybody
6  out there or not.  We talked to them on the
7  phone, they basically said they were going to
8  send us our whole check.
9    Q.  So Allstate, you got the full value
10  of the policy?
11    A.  Correct.
12    Q.  So you don't have any current
13  dispute with Allstate?
14    A.  Correct.
15    Q.  I guess maybe I don't know exactly
16  how flood insurance works.
17    MR. GILBERT ANDRY:
18       You keep on referring to it as
19       Allstate's.  It's actually the Federal
20       government.  Allstate is just a third
21       party claims administrator.  So it's
22       not Allstate's money.
23    MR. MARPLE:
24       I understand.
25  EXAMINATION BY MR. MARPLE:

Page 44

1    Q.  And we'll just -- Just to clear that
2  up, it's a Federal program, it gets sold or
3  brokered by various insurance companies?
4    MR. GILBERT ANDRY:
5       Administered.  Administered.
6  EXAMINATION BY MR. MARPLE:
7    Q.  Administered, right?
8    A.  Correct.
9    Q.  And do you have any idea why you
10  only got $52,000 worth of flood insurance?
11    A.  Well, when we bought the house, the
12  original policy I had when I bought the house
13  was 52,000.
14    Q.  Could you have upped the amount of
15  coverage over the years?  Do you know?
16    A.  Oh, I'm sure -- Oh, I guess anybody
17  can up their coverage.
18    Q.  Now, when you evacuated the house,
19  did you do anything to the house itself to try
20  to hurricane-proof it or anything like that?
21    A.  Yeah, we put up some -- boarded up
22  the back door.  We have French doors.  Well,
23  we boarded that up.  We boarded up some of the
24  front and back windows due to where the house
25  was.  We -- You know, in between, it's eight

Page 45

1  feet in between the houses.  We didn't board
2  up the side windows, but we boarded up all the
3  back and front and we picked up as much stuff
4  as -- you know, we put stuff up on top of
5  counters and on top of tables and things like
6  that.  We didn't anticipate, you know -- We
7  have never flooded before, so we didn't
8  anticipate this.
9    Q.  And how many vehicles did you have
10  at that time?
11    A.  We had three personal.  I had a
12  company vehicle.
13    Q.  There were four total?
14    A.  Correct.
15    Q.  And did you take all four of them?
16    A.  Took the three personal vehicles.
17  Left the company car at Wal-Mart.
18    Q.  And do you know what happened to it?
19    A.  Yeah.  Flooded out.
20    Q.  It was totaled?
21    A.  Oh, yeah.
22    Q.  But that wasn't anything you had to
23  worry about?  That was the company's deal;
24  right?
25    MR. GILBERT ANDRY:

12  (Pages 42 to 45)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                          7/9/2007

---

Page 46

1        That's -- I object to the form.
2     I'm sure he had to worry about it.
3     But it just wasn't his.
4        THE WITNESS:
5           Yeah.
6     EXAMINATION BY MR. MARPLE:
7        Q.   Financially, that -- and
8     insurance-wise --
9        A.   No, that was not mine.  That was
10    theirs.
11       Q.   That was the company's?
12       A.   Yeah.
13       Q.   And were your three personal
14    automobiles okay?
15       A.   We took them all with us.
16       Q.   Did you have a boat?
17       A.   Yes, I did.
18       Q.   Was it there at the property?
19       A.   Yes, it was.
20       Q.   Did you take it or leave it?
21       A.   No, I left it.
22       Q.   And what kind of boat was that?
23       A.   It was an 18 foot Scout with a 120
24    Evinrude.
25       Q.   And what happened to it?

Page 47

1        A.   It floated about 10 or 12 houses
2     down with the trailer, and the trailer on it
3     and everything, it was -- Basically when I got
4     it, it was stuck in a tree.  Pulled it out of
5     a tree.
6        Q.   Was it okay, though?
7        A.   No.  No, I still got it, but, I
8     mean, it's -- I moved it to a safer location
9     and -- but it -- it -- I still got it.  I can
10    get you pictures of it if you want it.
11       Q.   Was there any insurance coverage on
12    it?
13       A.   No.  No.
14       Q.   Now, aside from insurance, have you
15    gotten any benefits paid to you through Road
16    Home or anything like that?
17       A.   No.  Not yet.
18       Q.   Have you applied for Road Home?
19       A.   Yes, we did.
20       Q.   When did you do that?
21       A.   I am not sure of the date.
22       Q.   Recently?
23       A.   No.  It's been a while.
24       Q.   Have you heard anything from them?
25       A.   A few times we talked.  We dispute

Page 48

1     the value of our home.
2        Q.   What are they saying?
3        A.   140.
4        Q.   And what are you saying?
5        A.   160s.
6        Q.   Now, if this went the way you wanted
7     it to go, you could get maybe $150,000?
8        A.   No.  They deduct any money -- Any
9     monies you received for structure, they take
10    -- they take off.
11       Q.   So that would be the insurance?
12       A.   A minus.  A minus.  They would take
13    -- If I had -- My content on flood was 42 and
14    they would take that off, and any -- Most of
15    the Liberty Mutual money was structure.  So
16    they take that off.  So that would be 77,000,
17    78,000 deducted from Road Home.  Now, Road
18    Home is a different animal.  Some people are
19    getting a grant to rebuild.  We lose our
20    property.
21       Q.   And explain that to me, how that's
22    going to work for you the way you anticipate
23    it.
24       A.   Well, some people get a grant or
25    money for 150,000 or whatever they deem to fix

Page 49

1     or repair their home.  We forfeit our property
2     for the 77,000 or 76,000.
3        Q.   And then you take that money and you
4     go rebuild somewhere else?
5        MR. GILBERT ANDRY:
6           Objection to the form.  It
7     assumes that he would rebuild.
8        THE WITNESS:
9           Right.
10    EXAMINATION BY MR. MARPLE:
11       Q.   What can you do with that money, if
12    you get it?
13       A.   Well, we'll see.  It depends on what
14    SBA, they take, if they take any, because we
15    have a loan in waiting until we make a
16    decision, and we are not sure if they take the
17    money and -- but we got an agreement right now
18    in principle -- just in waiting until we make
19    a decision of I think a 20 or 30 year loan.
20       Q.   But whatever this number is, and I
21    will just say 70,000 approximately that you
22    might get from the Road Home, somewhere in
23    that neighborhood?  Is that about it?  60?
24       A.   No, it's -- Yeah, it's 70-something
25    thousand, right at 70, I think a little bit

---

13 (Pages 46 to 49)

JOHNS PENDLETON COURT REPORTERS          800 562-1285

KENNETH ARMSTRONG (MRGO)                    7/9/2007

Page 50

1   less, they're offering us.
2       Q.  And you can use that to build a new
3   home?
4       A.  Supposed to.  Yeah.
5       Q.  And that's what you are at least
6   contemplating now; right?
7       A.  Correct.
8       Q.  And where are you contemplating
9   building?
10      A.  We're not sure.  We in a family
11  dispute over that.
12      Q.  And tell me what the various choices
13  are.
14      A.  Either back in St. Bernard, with
15  Metairie, Louisiana, Belle Chasse, Louisiana,
16  or Covington where we're at now.
17      Q.  And I think Belle Chasse is across
18  the lake, isn't it?
19      A.  Across the river.  It's on the west
20  bank.
21      Q.  All right.  And then is your
22  daughter Renee going to school up there in
23  Covington?
24      A.  Yeah.  Her school is demolished from
25  the storm, so it moved to Covington,

Page 51

1   Louisiana.
2       Q.  The one she was going to moved
3   across the lake?
4       A.  Archibishop Hannon High School is
5   relocated to Covington.
6       Q.  And is she involved in school
7   activities up there?
8       A.  Uh-huh (affirmatively).
9       Q.  Cheerleader?
10      A.  Cheerleader.  Student council.
11  Takes after her mama.
12      Q.  Did they build a new building or
13  move into a building?
14      A.  They anticipate starting a new
15  building.  They in trailers right now.
16      Q.  And then you had a daughter up at
17  LSU, I take it?
18      A.  Correct.
19      Q.  And she is still at LSU?
20      A.  Yes.
21      Q.  Probably getting close to finishing?
22      A.  Her fourth year.
23      Q.  Is that necessarily close to
24  finishing these days?
25      A.  No, she's trying to get in nursing

Page 52

1   school.
2       Q.  All right.  And then your son, is he
3   out of school?
4       A.  Yes.
5       Q.  What's he do?
6       A.  He's an air conditioning
7   technician.
8       Q.  Now, Covington's not St. Bernard
9   Parish obviously.
10      A.  No.
11      Q.  It does have some virtues, though;
12  right?
13      A.  If you live -- If you live and work
14  over there -- I mean, if you work over there,
15  you do.
16      Q.  Some disadvantage is you have to
17  cross over that Causeway 25 miles to get back
18  over here to work; right?
19      A.  Correct.
20      Q.  And things roll along there unless
21  there's fog or an accident?
22      A.  An accident this morning.
23      Q.  All right.  Is your wife working
24  over on that side?
25      A.  No.  Not at this time.

Page 53

1       Q.  Is she working at all?
2       A.  Not at all.
3       Q.  Now, I understand she has some
4   medical problems based on some information
5   that your Counsel has provided to us.
6       A.  Correct.
7       Q.  Can you tell us about those?
8       A.  November she was diagnosed with
9   brain -- 2005, she was diagnosed with brain
10  tumor.  Non-cancerous.  But it was at the base
11  of her brain stem, somewhere up in there.
12  Lost her hearing.  And they have a new
13  procedure that they have, cyberknife, that was
14  at West Jefferson Hospital that they performed
15  on her in January a few times after that.
16      Q.  So how is she doing right now?
17      A.  She's doing okay.
18      Q.  And was it -- You say it was
19  surgery?
20      A.  No.  No.  Cyberknife is a form of
21  radiation that's given in low doses -- low
22  doses from each -- every different angle
23  possible.  Not like gamma radiation, which is
24  a high dose, one stream of radiation.
25      Q.  And do you think this brain tumor is

14  (Pages 50 to 53)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 54

1  connected to Katrina in any way?
2     A.  No.  No, she -- They told her she
3  had that for probably for a while.
4     Q.  And then I understand, I don't know
5  the technical name, but she had a bone
6  infection or something like that?
7     A.  She had a fungus settled in her --
8  Again, I am not sure -- the vertebrae in her
9  spine, and an airborne fungus they told us
10 that's generated through soil she got.  I am
11 not sure of the date, but it was hurting her
12 maybe in July of '06.  Was it '06?  Yeah, July
13 of '06.
14    Q.  This was after the storm?
15    A.  Correct.
16    Q.  And is that related to Katrina?
17    A.  Airborne fungus in the soil.  You
18 know, when you back in your house.  You know,
19 we had, geez, I don't know, three foot of mud
20 in our yard you had to go through to get into
21 the house.  And then once you got in your
22 house, we had at least a foot, foot and a
23 little bit of mud in our house.
24    Q.  And she spent some time inside the
25 house?

Page 55

1     A.  Well, you know, tried to salvage
2  something, and just come to a realization that
3  you couldn't salvage anything.  There were
4  some keepsakes, you know, that were hanging in
5  a closet that didn't collapse in the mud.
6  Maybe two closets that didn't collapse, and
7  one being some of the kids' christening and
8  stuff like that, gowns that were still up that
9  she was able to salvage.  Our wedding ring,
10 her diamond ring, had to rush out of there to
11 evacuate, that was one of the things she
12 forgot.  So she went digging around, because
13 everything had collapsed down on the ground,
14 the beds fell, the ceiling was on top of it,
15 so just trying to get in a general area and
16 she wound up finding the box with her rings
17 and all of that in it.  So I guess we went
18 back to the house several times.
19    Q.  Did she find her rings?
20    A.  Yes.
21    Q.  And then she went to a doctor, I
22 take it, for this infection?
23    A.  Well, she went and we had gone on
24 vacation to Florida and thought from sitting
25 in one of the beach chairs, her back was

Page 56

1  hurting her, just discomfort, so being a nurse
2  she went to one of the doctors that she knew
3  relocated to the North Shore from St. Bernard
4  and they were treating it more as a muscle.
5  They thought it was more of a muscle problem.
6  And so after a couple of weeks, it didn't go
7  away, they ordered an MRI which found a mass
8  on her spine.  So --
9     Q.  And do you know if any doctor told
10 her that this was related to being in that
11 house or anything?
12    A.  No.  No, nobody told her.  Like I
13 say, they said it was an airborne fungus that
14 you catch from soil and everything else.  And
15 I don't remember the last time she was playing
16 in the mud other than the house.
17    Q.  Do you know anybody else that has
18 that particular problem post-Katrina?
19    A.  If I am not mistaken, somebody had
20 mentioned it in -- one of the doctors that
21 there was a case going on, the same thing at
22 Ochsner.
23    Q.  And had your wife ever heard of this
24 condition before?
25    A.  No.  Not to my knowledge.

Page 57

1     Q.  And tell me, at the time of Katrina
2  was she working as an RN?
3     A.  Yes.
4     Q.  Whereabouts?
5     A.  She was working for Chalmette
6  Hospital, which I think is owned by Uni- --
7  Universal.  I think it's UHS, I think it's
8  called, and she was a nurse -- she worked in
9  Special Procedures, which is I think more
10 gastro.  She was working at the time, the
11 hospital was about half a mile from our house,
12 and the hospital now is leveled now.  It's
13 knocked down.
14    Q.  Has she thought about going back to
15 work?
16    A.  Well, she's trying to go back right
17 now, but physically after the surgery they
18 removed the two disks in her -- vertebrae in
19 her back and put titanium, like a cage over
20 that spot with two rods running through her
21 back.  So my wife's only about 110 pounds, so
22 physically, you know -- you know, they require
23 some lifting and things like that, so she
24 don't feel like right now that she is
25 physically strong enough to go back.  But she

15 (Pages 54 to 57)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 58

1  anticipates trying to get back at the
2  beginning of the summer.
3      Q.  And you may have answered this, but
4  did she work as an RN anywhere after Katrina?
5      A.  No, not at all.
6      Q.  I take it if she wanted to work over
7  around Covington somewhere she'd probably find
8  a job over there?
9      A.  Nursing, yes, probably so.
10     Q.  Do you recall that you filed a form
11 or a claim with the United States government
12 related to the Army Corps of Engineers?
13     A.  We filled out a few documents.  I am
14 not exactly sure what they were or if they
15 sent it to me or you got ahold of it and you
16 filled it out.
17     Q.  Let me just ask, and I don't want to
18 know anything that was said, I just want to
19 know the time frame.  When was it that you
20 contacted the lawyers that are representing
21 you in this lawsuit?
22     A.  I am -- They might have the date.
23 I'm not sure of the date.  I'm not exactly
24 sure.
25     Q.  Can you give me -- It was after

Page 59

1  Katrina obviously?
2      A.  Obviously.
3      Q.  Was it in 2005, between Katrina and
4  the end of the year?
5      A.  I'd be guessing if I told you.
6      MR. GILBERT ANDRY:
7        Let me -- I object to the form
8      only to this extent.  That we have
9      known each other for a very long time
10     and we spoke after the storm almost
11     immediately to make sure that we each
12     other were alive.  So I don't know, if
13     you could just be a little more
14     particular, you might get what you're
15     looking for.
16     MR. MARPLE:
17       All right.
18 EXAMINATION BY MR. MARPLE:
19     Q.  I'll just ask you, again, I don't
20 want to know what was said, but have you known
21 some of the lawyers that are representing you
22 in this case for a while?
23     A.  Probably since I'm ten to twelve
24 years old.
25     Q.  And who did you know?

Page 60

1      A.  Gibby and his brother John.
2      Q.  Did you go to school with them?
3      A.  No, I did not.
4      Q.  How is it you knew them?
5      A.  We lived in the same community and
6  we met each other at the playground.
7      Q.  And played ball and stuff?
8      A.  Yes, we did.
9      Q.  And you stayed in contact throughout
10 the years?
11     A.  On and off through the years.
12     Q.  And then when the storm struck, you
13 had occasion to talk to Gibby about what was
14 going on with post-Katrina?
15     A.  Well, me and Gibbs was together July
16 the 28th and 29th right before the storm on a
17 fishing trip, so we were always in contact.
18 Played golf together a little bit and all.  So
19 -- But after the storm, we -- I had seen John
20 one day and while I was back -- When we were
21 able to get back to work, one of the stores
22 had opened up and me and John had a
23 conversation.
24     Q.  And John or Gibby, were they
25 involved in any of your insurance disputes?

Page 61

1      A.  I didn't need nobody.  I didn't need
2  a lawyer.
3      Q.  And are they handling anything else
4  for you besides this litigation that we're
5  here today in?
6      A.  No.
7      Q.  Is Gibby any good at golf?
8      A.  At the time he was a little better
9  than me.
10     MR. WEINSTOCK:
11       But he told you he was a lot
12     better; right?
13     THE WITNESS:
14       I'm a good listener.
15 EXAMINATION BY MR. MARPLE:
16     Q.  And back pre-Katrina where did you
17 play golf?  Public courses?
18     A.  Oh, yeah.  Yeah.  Yeah.  My
19 brother's brother-in-law owned a golf course,
20 too.  So we played there a little bit.  Or he
21 leased a golf course from the Parish.
22     Q.  You still play some?
23     A.  Probably four times since the storm,
24 five times since the storm.
25     Q.  Over on the North Shore somewhere?

16  (Pages 58 to 61)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG   (MRGO)                                    7/9/2007

---

Page 62

1    A.  Twice over here and maybe three to
2  four times on the North Shore.
3    Q.  Now, do you have any personal
4  injuries yourself, and let's include
5  everything we can think of for a second,
6  emotional distress, mental distress, any
7  diseases or anything you --
8      MR. GILBERT ANDRY:
9        Let me suggest before you finish
10     your question, that way, one, it's not
11     on the table officially; we have been
12     going about an hour now.  Let's take a
13     five minute --
14     MR. MARPLE:
15        A break?
16     MR. GILBERT ANDRY:
17        Yes, take a break and let him
18     stretch or whatever.
19     VIDEO OPERATOR:
20        We're now off the record at
21     10:22.
22     (Recess.)
23     VIDEO OPERATOR:
24        Returning to the record.  It's
25     10:41.  This is the start of tape 2.

---

Page 63

1  EXAMINATION BY MR. MARPLE:
2    Q.  Do you know of any neighborhood that
3  got more water than yours did in terms of
4  height?
5    A.  I don't know the -- I don't know all
6  the heights, you know.  Carolyn Park,
7  Buccaneer where I live, all down, seemed like
8  ours, the -- Let's see.  That would be east of
9  Paris Road, along that Florida Avenue had more
10  water than -- than what my brother did in
11  Lexington, which is west -- which is west of
12  Paris Road.
13    Q.  Did you get any oil or anything from
14  the Murphy Oil plant?
15    A.  No, we did not.
16    Q.  Were there other contaminants that
17  you identified that you made some claim
18  against anybody for for depositing onto your
19  yard or anything like that?
20    A.  No.  No, we didn't.
21    Q.  Where did your brother live?
22    A.  He lived in Lexington Place.
23    Q.  And that was west of you?
24    A.  We --
25     MR. GILBERT ANDRY:

---

Page 64

1        Call it "down the road".
2      THE WITNESS:
3        I'm sorry.  I am west of Paris
4      Road.  He's east of Paris Road.  So
5      west of Paris Road, seemed like it had
6      more water than east of Paris Road;
7      along Florida Avenue where my brother
8      lived.
9  EXAMINATION BY MR. MARPLE:
10    Q.  Were there some areas out there
11  along Judge Perez or some of those roads that
12  run out through St. Bernard where they didn't
13  get as much water up into the buildings?
14     MR. GILBERT ANDRY:
15        Objection to the form.
16  EXAMINATION BY MR. MARPLE:
17    Q.  If you know.
18    A.  Man, I got friends of mine who
19  lived, you know, along that, you know, the --
20  the whole parish, you know.  Some of them, you
21  know, 10 foot of water, some 12 foot of
22  water.  You had to be closer to St. Bernard
23  Highway and the Mississippi River to get less
24  water.
25    Q.  And that's, common sense would tell

---

Page 65

1  you, because it's at a higher elevation?
2    A.  Right.
3    Q.  The closer you get to the river, the
4  higher the elevation?
5    A.  But some people did have, you know,
6  eight foot of water closer to St. Bernard
7  Highway also.
8    Q.  And some had a lot less than that?
9    A.  Correct.
10    Q.  Over the years there has been stuff
11  in the newspaper about the --
12     MR. GILBERT ANDRY:
13        Let me just object to the form
14      when you say "a lot less".  That kind
15      of strikes me a little bit.  Four
16      feet, five feet.  I just object to the
17      quantification.
18     MR. MARPLE:
19        All right.  Well, we'll try to
20      quantify that a little more.
21  EXAMINATION BY MR. MARPLE:
22    Q.  Some had less than ten feet?
23    A.  Correct.
24    Q.  Less than eight feet?
25    A.  Yes.

---

KENNETH ARMSTRONG (MRGO)                    7/9/2007

Page 66

1    Q.  Some had even less than four feet --
2        MR. GILBERT ANDRY:
3        Objection to the form.
4    EXAMINATION BY MR. MARPLE:
5    Q.  -- in height up into the house?
6    A.  I don't know.  I mean, I can only go
7    -- Some people -- I think there was only
8    three houses maybe that didn't flood, or three
9    houses that didn't get water.  And that's all
10   speculation.
11   Q.  All right.
12   A.  Hearsay.
13   Q.  And that's because you didn't do an
14   investigation into how high water got into
15   anybody else's house; right?
16   A.  Correct.
17   Q.  Or where the water may have come
18   from?
19   A.  Like I say, only what I saw on TV.
20   Q.  Right.  But you didn't do any
21   investigation of your own?
22   A.  No.
23   Q.  Or have any engineers --
24   A.  No.
25   Q.  -- that gave you a report or

Page 67

1    anything like that?
2    A.  No.  No, sir.
3    Q.  Let me hand you what we have marked
4    as Armstrong Exhibit 1, and I am going to
5    represent to you that this was produced to us
6    by your lawyers providing some information
7    about the Plaintiffs in the lawsuit, including
8    yourself.
9    A.  Okay.
10   Q.  And it lists your occupation as
11   sales supervisor, Southern Eagle.  That's
12   basically correct; right?
13   A.  Right.
14   Q.  Then it says "Current medical
15   condition, no issues".  Is that correct?
16   A.  Nothing physical, no.
17   Q.  And pre-Katrina did you have any
18   physical --
19   A.  No.
20   Q.  -- issues?
21   A.  No.
22   Q.  And then since then have you had any
23   physical issues?
24   A.  No, I would just clarify it as, you
25   know, this is -- it gets emotional at

Page 68

1    sometimes, frustrating.  You live there every
2    day.  You been living this -- this didn't
3    happen two years ago, it seems like it
4    happened yesterday.
5    Q.  And it affects you one way and
6    somebody else another way; is that right?
7    A.  I would agree.
8    Q.  And let me just make sure I have got
9    this.  You have no physical issues for which
10   you're seeing a doctor or have seen a doctor
11   since Katrina?
12       MR. GILBERT ANDRY:
13       Objection to the form.  Asked and
14       answered.
15       You can answer.
16       THE WITNESS:
17       No, no, nothing where -- You
18       know, nothing where I would go see the
19       doctor.
20   EXAMINATION BY MR. MARPLE:
21   Q.  When I say physical, I am talking
22   about a disease of some kind --
23   A.  No.
24   Q.  -- or broken bone --
25   A.  No.

Page 69

1    Q.  -- or where there's some physical
2    impact to you in some way.
3    A.  Not physically, no, I would say no.
4    Mentally maybe, you know.
5    Q.  And we talked about Mrs. Armstrong,
6    the brain tumor and osteomyelitis, I think;
7    right?
8    A.  I think that's what they call it.
9    Q.  Tell us -- Well, let's go back
10   pre-Katrina.  Did you have any mental distress
11   or emotional distress type issues before
12   Katrina?
13   A.  No.
14   Q.  You never have been on
15   antidepressants or anything?
16   A.  No.
17   Q.  Had you ever been to a doctor or a
18   shrink for any of that stuff?
19   A.  No.
20   Q.  Now, post-Katrina you described that
21   you have some emotional upset at least or
22   something along those lines?
23   A.  Right.  I would say that's it.
24   Q.  And can you describe for us what
25   that is?

KENNETH ARMSTRONG (MRGO)                                      7/9/2007

Page 70

1      A.  Well, I don't know about -- It's --
2   It's one of them things you dwell on.  You
3   know, it's not knowing what your next home is
4   going to be, the decision, are you going to
5   make the right decision.  I mean, there's a
6   lot of that.  There's -- You know, it's
7   frustrating to be on top of the world, you
8   know, to be knocked down within a few hours,
9   you know.
10     Q.  Have you been on any kind of
11  medication for any --
12     A.  No.
13     Q.  -- emotional problem?
14     A.  No.
15     Q.  Have you been to a doctor?
16     A.  No.  No.
17     Q.  When did you first go back to work
18  after Katrina?
19     A.  They called back a small percentage
20  of us maybe, oh, let's see, I would probably
21  say -- and this -- we hit on this -- maybe a
22  little bit into September, early September we
23  went back.  It's like three or four, five
24  weeks afterwards.
25     Q.  And in the meantime were you getting

Page 71

1   paid?
2      A.  We got paid our sal- -- Well, we got
3   paid our salary, yes.
4      Q.  And has your salary gone up or down
5   since Katrina?
6      A.  Went up slightly due to the fact
7   that we were doing other -- I was delivering
8   product after the storm, so I went up slightly
9   after that.  Now I'm back to normal salary.
10     Q.  Is your compensation salary and some
11  bonus?
12     A.  Salary and incentive based.
13     Q.  And since Katrina have you stayed on
14  track with your salary and your incentives?
15     A.  My salary has gone up a little bit,
16  you know, in the course of normal inflation
17  and things like that and performance.
18     Q.  And from the emotional side of it,
19  you have been able to perform your
20  responsibilities at work despite the upset you
21  have over the storm?  Is that right?
22     A.  Yeah, I mean, it's something you got
23  to put aside, you know.  You got to go to
24  work.  I got three kids at home; my wife, you
25  know, can't physically work at this time; so

Page 72

1   it's something you got to put aside and keep
2   on going, you know.  It's knowing what you had
3   and what you lost.
4      Q.  I wanted to go back a little bit,
5   and we may have exhausted this, but I just
6   wanted to be sure.  You were thinking your
7   house, if you would have put it on the market,
8   if you wanted to sell it pre-Katrina for about
9   165,000?
10     A.  Yeah.
11     Q.  And we talked about what you have
12  gotten from insurance and what the difference
13  of that is.  And then what about the
14  belongings?  Did we get a number?
15     A.  Only content you talking about?
16     Q.  Yes.
17     A.  The only content money I got was
18  about 14,000.
19     Q.  And that was part of what you got
20  from the wind and rain?
21     A.  No.
22     Q.  Flood?
23     A.  Correct.
24     Q.  And have you done any listing of the
25  belongings, made a list of what you had and

Page 73

1   valued it for the insurance company or anybody
2   else?
3      A.  We, well, like I say, come back
4   again, that wasn't necessary, because they
5   gave us our -- I mean, everybody's got more
6   than $14,000 in contents in their house so
7   they just, like I say, wrote us out our total
8   policy, 42,000 for structure and 14 for
9   content.
10     Q.  That's on the flood?
11     A.  Correct.
12     Q.  All right.  What I am trying to get
13  at is, what haven't you gotten compensated for
14  by somebody, through insurance or whatever,
15  for the belongings?  How much do you think
16  your belongings were worth?
17         MR. GILBERT ANDRY:
18            This is the question.  Did y'all
19         quantify and itemize and quantify what
20         you lost in contents?
21         THE WITNESS:
22            Well, we -- we had a list, there
23         was a list put out for something with
24         some tax deal that my wife did.  I
25         don't know if we ever received

19 (Pages 70 to 73)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                7/9/2007

Page 74

1   anything with that.  I am not sure,
2   you know.  But, you know, you asking
3   --
4       MR. GILBERT ANDRY:
5       Do you remember those numbers?
6   Like --
7       THE WITNESS:
8       Total?
9       MR. GILBERT ANDRY:
10      What the total was, yes.
11      THE WITNESS:
12      No, I don't.
13      MR. GILBERT ANDRY:
14      We'll get that for you.  And if
15   you don't have it, we'll get it for
16   you.
17      THE WITNESS:
18      What I will --
19      MR. GILBERT ANDRY:
20      And what I will try -- Do you
21   know where it is?
22      THE WITNESS:
23      Well, I would have to ask my
24   wife.  Like I say, she wasn't working
25   so she did a lot of these things.

Page 75

1       MR. GILBERT ANDRY:
2       At the next break we'll try to
3   get that for you.  You should have
4   that and I apologize for you not
5   having that.
6       MR. MARPLE:
7       Thanks.
8       MR. GILBERT ANDRY:
9       No problem.
10  EXAMINATION BY MR. MARPLE:
11      Q.  And then did we get a number on the
12  boat, as to how much it was worth then and
13  now?
14      A.  I paid, when I bought the boat in
15  '9- -- It was a '96 boat, '98, something like
16  that.  I paid $14,000 for it used.
17      Q.  And what's it worth now?
18      A.  Now?  Or before the storm?
19      Q.  Well, before the storm.  Let's take
20  -- That's a good one.
21      A.  I don't know.  5,000 or 6,000.  I
22  don't know.  I'd be guessing.
23      Q.  5,000 or 6,000 now or before the
24  storm?
25      A.  Oh, before the storm 5,000 or 6,000

Page 76

1   I would have asked to get rid of it.  There
2   was nothing wrong with it.  I fished every day
3   that I had a chance.
4       Q.  So are you seeking in this lawsuit
5   some money for the boat?
6       A.  I don't know if specifically we put
7   that down.
8       Q.  And is that what you want out of
9   this lawsuit, is money for --
10      MR. GILBERT ANDRY:
11      Let me just object to the form.
12      Before you ask that, just so you don't
13      lose your train, just trying to help
14      you so we can move it along, you
15      didn't ever get an answer to the after
16      Katrina value I don't think.
17  EXAMINATION BY MR. MARPLE:
18      Q.  What's the after Katrina value of
19  the boat?
20      A.  I don't think anybody would buy it.
21      Q.  It was worth about five grand before
22  and virtually nothing now?
23      A.  Five to six.  I would have to check
24  the book to see, but about 5,000 to 6,000.
25      Q.  And so far we have talked about some

Page 77

1   things, we have got some contents or personal
2   belongings, some damage to the house, maybe
3   the boat, too, and that's what you're seeking
4   in this lawsuit; I mean, among some other
5   things.  You want money for the injury to that
6   property?
7       A.  I would like my life back, but I
8   don't think that's going to happen.  We didn't
9   just lose our home.  We lost our community.
10  We lost everything that we had.  I mean, just
11  like I say, not physically -- I mean, not just
12  your house.  I lost where my wife worked,
13  where my kids went at the school, where you
14  first kissed your girlfriend.  You lost all of
15  that.
16      Q.  And have you put a number on that?
17      A.  No.  I could go back in time, I'd
18  rather it like it was.  Just that everything
19  now is just so much more expensive than it was
20  before, you know.
21      Q.  And when you say "everything", what
22  kind of things are you talking about?
23      A.  If I was to replace my home, look at
24  what it would cost me to replace what I had.
25  I mean, I don't know how much content.  You

20 (Pages 74 to 77)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 78

1  could put that on paper, but then you don't
2  remember everything what -- What you build up
3  in a lifetime in your home is, you know,
4  astronomical in cost.
5      Q.  And did you ever go through
6  pre-Katrina and take photographs of everything
7  in the house that was in there?
8      A.  Through birthday parties or through
9  things that we took pictures for the kids or
10 things like that, did I do that specifically?
11 Yeah.  But where is all of that at?  It's
12 under water.
13     Q.  Now, does your wife have emotional
14 distress injuries as well?
15     A.  I would -- It's more frustrating
16 with her.  You know, it's like anything.  I
17 was -- My savior was actually trying to get
18 ready to go back to work so, you know, for
19 that ten hours a day you never had to focus on
20 any -- you were able to get away from it.
21 Like I say, she hasn't been able to work so
22 she's had to deal with this a lot more than
23 me.  It's been more frustrating for her.  And
24 more frustrating for her because she was
25 cooped up in an apartment.  And before that we

Page 79

1  lived with my sister-in-law.  She had to deal
2  with insurance companies more than I had to.
3  So she dealt with a lot more than me.  She
4  took it a lot harder than I did.
5      Q.  And has she seen a doctor or anybody
6  for any of those types of problems?
7      A.  No, I don't think so.  No.  It's
8  just hard to explain that you're not -- you're
9  not -- It's not something that, you know,
10 where -- It's just something you accept
11 happened and you try to get by, you know.
12 Like I say, it's something you live every day.
13     Q.  And her mental distress or emotional
14 distress is more serious than yours, you
15 think?
16     A.  Like I say, we were able to get
17 through -- You know, we were able to get
18 through this -- I guess let me put it we were
19 able to get through this with my family
20 living, nobody died, nobody nothing, but now
21 she's dealing with her parents.  Now her daddy
22 -- her daddy -- her daddy lived four or five
23 houses from us; they took it a lot harder.  My
24 wife is off work.  Her two sisters work, so
25 she's dealing with that more -- Like I say,

Page 80

1  it's the whole family.  You know, we were a
2  couple of miles from each other.  Now they're
3  everywhere, you know.
4      Q.  And where do her parents live now?
5      A.  They live probably, maybe seven,
6  eight miles from us.
7      Q.  Over on the North Shore, too?
8      A.  North Shore.
9      Q.  And let's -- I am not sure we
10 identified them.  Let's identify the people
11 that lived down there in St. Bernard or the
12 general neighborhood that were relatives of
13 yours pre-Katrina.
14     A.  Okay.
15     Q.  Can you tell me who those were?
16     A.  The John Bruggi, B R U G G I,
17 Jocelyn Bruggi, and Joy Bruggi.  That was my
18 -- The first two were my mother-in-law and
19 father-in-law.  The second, sister-in-law.  My
20 mother lived maybe three-quarters of a mile,
21 Frances Armstrong.  My brother lived about
22 three and a half miles from me.  He's Brian
23 Armstrong.  Wife is Celeste Armstrong.
24 Daughter, Ashley Armstrong.  Christy
25 Armstrong.  And has a daughter Callie

Page 81

1  Bordelon.  My other grandmother lived maybe
2  three miles from me, Claire Armstrong.  The --
3  My grandmother lived with my daddy's sister,
4  which was Frances Cochran, and my uncle's name
5  is Walter Cochran, and has a daughter Shawn
6  and a younger son named Walter.  My Aunt Rose,
7  my daddy's other sister, lived about a mile
8  from me.  Rose Mistretta.  I am not sure of
9  the spelling.  Her and my -- lived with my
10 cousin Rhonda Mistretta.  My first cousin, Sue
11 Mistretta, lived in close proximity to my
12 grandmother, which was maybe three miles.  Was
13 Mike and Sue -- Sue was my -- I can't remember
14 my cousin's first name -- I mean last name at
15 the time.
16     Let's see who else lived out
17 there.  Shoo.  I had a brother-in-law -- my
18 daddy's brother, Robert Armstrong, lived out
19 there.  He lived in an apartment close to the
20 house.  Let's see.
21     That's it as far as my family that
22 I know of that lived out there.
23     I'm sorry, I had a cousin that
24 lived -- my first -- Geez.  Lived right about
25 two minutes from my house.  My cousin Pam.

21 (Pages 78 to 81)

KENNETH ARMSTRONG (MRGO)                           7/9/2007

Page 82

1    Q.  And have any of those -- do any of
2    them live out there now?
3    A.  The only ones who live out there now
4    is my grandmother Claire and Aunt Frances and
5    my cousin -- I mean my Uncle Robby lives I
6    think in a FEMA trailer still.  And my --
7    Let's see.  I think that's it.  That's the
8    only ones that live out there now.
9    Q.  And your grandmother and great aunt
10   or whoever, I might get them a little confused
11   here, Claire and Frances --
12   A.  That's Claire's daughter, Frances.
13   Q.  Okay.  And where are they living?
14   A.  They live -- Actually, they live
15   closer to Murphy Oil.  If you know -- If you
16   familiar with that.
17   Q.  Yes.  Are they --
18   MR. GILBERT ANDRY:
19       We call that "down the road" --
20   THE WITNESS:
21       Yeah.
22   MR. GILBERT ANDRY:
23       -- from where he is.
24   EXAMINATION BY MR. MARPLE:
25   Q.  Down the road, are they living in a

Page 83

1    house?
2    A.  They back in their house.
3    Q.  How did -- How much water did they
4    get, about?
5    A.  I am not sure.  I am not sure.  They
6    on the -- the -- They further -- They not as
7    far as away from the levee as I am, but they
8    are further -- they on -- I guess that would
9    be the north side of Judge Perez.
10   MR. GILBERT ANDRY:
11       North side is 40 Arpent.
12   THE WITNESS:
13       Yeah.  Yeah.  I live right on the
14   40 Arpent.  They live probably 25, 30
15   houses off.
16   MR. GILBERT ANDRY:
17       We call that "the back".
18   THE WITNESS:
19       The back.
20   EXAMINATION BY MR. MARPLE:
21   Q.  Okay.  They were able to rebuild
22   their house or redo it, right?
23   A.  Yes.
24   Q.  Do you know what they had to do?
25   Did they strip it down to all the sheetrock

Page 84

1    out?  Do you know?
2    A.  I am guessing.  I would say they had
3    to take everything out.
4    Q.  And then some of the rest of the
5    family members you talked about, how many --
6    which ones are over in Covington or over on
7    the North Shore somewhere not too far from
8    you?
9    A.  The North Shore, my mother, she
10   lives in Ponchatoula, which is maybe 30, 35
11   minutes away.  My -- My brother Brian and his
12   wife live in Mandeville, and my in-laws.
13   That's it.
14   Q.  And then the others, and I am not
15   sure how many that leaves, we could look, but
16   where are the rest of them that don't live on
17   the North Shore and the ones you have told us
18   about that were able to get back into their
19   house, where are the rest of them?
20   A.  My Aunt Rose, I am not sure where
21   she's at.  She's with her daughter.  They live
22   on the other side of the lake.  I think they
23   live toward Ponchatoula.  Not as far as --
24   They live past Mandeville somewhere.  My --
25   Let's see who else I got on there.  Pam, my

Page 85

1    cousin Pam, the one that lived right around
2    the corner from me, she lives in Tennessee.
3    My mother, like I say, Ponchatoula.  My
4    in-laws are ten miles away, whatever it is.
5    Whoever else I left out.
6    Q.  Your lawyer here has done a little
7    sketch for us.
8    MR. GILBERT ANDRY:
9        Just so you'll have the local
10   lingo so you'll understand, because
11   that's the way everybody else refers
12   to it.
13   MR. MARPLE:
14       Right.  And I don't know all the
15   local lingo even though I lived here
16   for about three years.
17   EXAMINATION BY MR. MARPLE:
18   Q.  If we look at this pie plate that he
19   has done, can you point just generally where
20   your house at 4016 Hamlet was?
21   MR. GILBERT ANDRY:
22       It would be up the road from
23   there.
24   THE WITNESS:
25       It would be over here somewhere

22  (Pages 82 to 85)

KENNETH ARMSTRONG (MRGO)                                        7/9/2007

Page 86

1      (indicating).
2   EXAMINATION BY MR. MARPLE:
3      Q.  In the top right-hand, I'm going to
4   put a little X right there.  And then I
5   believe it was your grandmother that's back in
6   her house or --
7      A.  Correct.
8      Q.  And put a little X where she is.
9      A.  This would be Murphy Oil I guess
10  (indicating).
11     Q.  Okay.
12     A.  She would be right up in here.
13  There's Judge -- Well, --
14     MR. GILBERT ANDRY:
15        I did it from my mama and daddy's
16     house, basically, looking back.
17  EXAMINATION BY MR. MARPLE:
18     Q.  And did you go to her house after
19  Katrina to look at --
20     A.  Only in the front.  I passed there
21  and nobody was home.
22     Q.  Did you go inside?
23     A.  Oh, nobody was home.
24     Q.  And now what's the house now that
25  it's been redone?  Have you been in it?

Page 87

1      A.  No.
2      Q.  Let me show you what we have marked
3   as Exhibit 2.  I'll ask you to look through
4   that and tell me if you recognize any of the
5   paper there.
6      MR. GILBERT ANDRY:
7         And just for the record, Exhibit
8      Number 2 consists of a letter from the
9      Department of Army Corp of Engineers
10     dated July 1st, 2006 as well as I
11     believe the Form 95 that's attached to
12     it.  Is that fair, Counsel?
13     MR. MARPLE:
14        Yes.  And an authorization on the
15     back page.
16     MR. GILBERT ANDRY:
17        Correct.
18  EXAMINATION BY MR. MARPLE:
19     Q.  You go ahead and look at it there.
20  Do you understand that it appears on your
21  behalf that your lawyers filed a claim against
22  the United States Army Corps of Engineers?
23     A.  Yes.
24     Q.  And did you provide any information
25  in connection with this claim to your lawyers?

Page 88

1      A.  If I am not mistaken, my wife filled
2   out some forms.  The video.
3      Q.  Now, if you see the basis of the
4   claim there in the middle of the page, it
5   looks like it's a number 8 on the second
6   page.  Do you see that?  The basis of claim?
7      A.  All right.
8      Q.  Is that correct in terms of the
9   basis for your claim against the Army Corps of
10  Engineers?
11     A.  Yes.
12     Q.  And then down below there, look at
13  number 10 and it asks for the nature and
14  extent of each injury and it says "I have been
15  injured to the extent that I have experienced
16  severe emotional distress and mental anguish
17  due to the loss of my property and almost all
18  of my possessions."  Is that correct?
19     A.  I would say.
20     Q.  And then Renee Armstrong is
21  mentioned as a minor child there.
22     A.  Uh-huh (affirmatively).
23     Q.  Do you see that?  Do you know why
24  she's mentioned here on this?
25     A.  My kids suffered, too.  We're not

Page 89

1   the only ones that suffered.  They also
2   suffered, too.  You know, they just didn't put
3   -- You know, we didn't just move over the
4   lake and say we're moving, you know.
5      Q.  And --
6      A.  I mean, you ever get taken out of
7   high school?  Just on one day you're in high
8   school and the next day you're not.  That's
9   something, you know.  To have to go to a new
10  school up in Baton Rouge for, you know, for
11  the rest of that year, you know?  I mean -- I
12  mean, what kid wouldn't be affected by it?
13     Q.  And so what I am getting at is you
14  are making a claim here on her behalf as well
15  as yours for this severe emotional and mental
16  distress?
17     A.  Correct.
18     Q.  Now, I guess technically she didn't
19  lose the house.  That would have been you and
20  your wife that would have done that; right?
21     A.  Correct.  She lost -- She had a
22  room.  She had her own stuff in there, too,
23  you know.
24     Q.  She had possessions that she lost.
25     A.  Correct.

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 90

1    Q.  And I take it they were unique to
2  her in terms of what they meant to her?
3    A.  I would agree.
4    Q.  Does she, Renee, have any physical
5  type injuries, a disease or broken bones or
6  anything like that?
7    A.  No.
8    Q.  Has she been to a doctor?
9    A.  No.
10    Q.  And not taking any medication for
11  any kind of mental distress?
12    A.  No.
13    Q.  And how about the other two kids; do
14  you know, are they on any antidepressants or
15  anything like that?
16    A.  No, none of them.
17    Q.  Or under a doctor or some medical
18  provider's care for mental distress or
19  emotional distress?
20    A.  No.
21    Q.  Now, you look down there on that
22  form at 12-A, as you move down towards the
23  bottom, you see the figure for property
24  damage, 500,000?
25    A.  Uh-huh (affirmatively).

Page 91

1    Q.  And that's a "yes", I take it?
2    A.  Yes.  Yes.
3    Q.  Do you know where that number came
4  from?
5    A.  I guess it was just something we
6  maybe put together.
7    Q.  All right.  And as you sit here
8  today, you can't come up with $500,000 in
9  property damage; correct?
10    A.  No, I wouldn't think.
11    Q.  We talked about the numbers for the
12  house and the boat and the belongings --
13    A.  Right.
14    Q.  -- where we have got at least
15  ballpark figures and it doesn't come up to
16  500,000; correct?
17    A.  It depends on what you have to do to
18  replace what you got.  I wouldn't know until
19  we have to go out and replace what we had.  I
20  don't know if it meets $500,000.
21    Q.  And to replace what you had in terms
22  of those belongings, that's going to be an
23  individual situation with you and your wife
24  and kids to add all of that up and look at it
25  and see what it was; right?

Page 92

1    A.  Well, --
2    MR. GILBERT ANDRY:
3      Objection to the form.
4      But you can answer.
5    THE WITNESS:
6      I don't know.  There's a lot of
7  things, you know, that you -- you
8  can't replace.  I can't -- I guess
9  pictures of my daddy, who is deceased;
10  there's, you know, our wedding album.
11  You can't replace that.  I mean, what
12  value is that?  My wife's diamond
13  ring, even though she found it, it's
14  pitted, it's ruined.  There's other
15  things.  I don't know.  Pictures of
16  your kids.  You know, I don't think
17  anybody in here would want to lose any
18  of that.  You know, how do you put a
19  value on that?
20  EXAMINATION BY MR. MARPLE:
21    Q.  And what you're saying is that it's
22  an individualized value to you; correct?
23    MR. GILBERT ANDRY:
24      Objection to the form.
25  EXAMINATION BY MR. MARPLE:

Page 93

1    Q.  Is that right?
2    A.  I would say yes.  On top of other
3  things.
4    Q.  Then on personal injury, the next
5  one, 12-B, is 500,000 --
6    A.  Right.
7    Q.  -- dollars?  Do you see that?
8    A.  Yes.
9    Q.  And do you know where that came from
10  or what that consists of?
11    A.  No, I think we maybe just -- there
12  was five of us in the house, so every one of
13  us, you know, even though you don't see a
14  doctor, you know, you -- Like I told you, my
15  family lives this every day, not just -- The
16  whole community does.  So I think that was a
17  value.  Some people put more, some people put
18  less.  I don't -- You know, like say, I have
19  -- I have never been in this situation to
20  have to answer these type of questions or put
21  down what was a personal injury.
22    Q.  And the 500,000 includes Renee and
23  you; right?
24    A.  And my -- my wife.
25    Q.  Your wife and the other two kids?

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 94

1    A. Correct.
2    Q. And that would be $100,000 apiece?
3    A. I would say. Yes.
4    Q. There's a letter -- Let me back up
5 just a second. This is dated June 23rd,
6 2006. Is that correct? If you look at it?
7    A. Okay.
8    Q. Is that right?
9    A. Yes.
10    Q. Is that your signature there on
11 13-A?
12    A. That is mine.
13    Q. It is?
14    A. Yes.
15    Q. And then on the last page. Oh, I'm
16 sorry. We may have been looking at a
17 different page. That's your signature on the
18 very last page; right?
19    A. Right.
20    Q. Let's look back on the form itself
21 at the bottom there where it's dated, under
22 number 14, June 23rd, 2006. Do you see it on
23 the bottom here?
24    A. Uh-huh (affirmatively).
25    Q. Do you see that? I am only asking

Page 95

1 for a "yes" or "no" out loud for the Court
2 Reporter.
3    A. Right.
4    Q. Now, the signature over there, 13-A,
5 that's not yours, is it?
6    A. No.
7    Q. Do you know whose it is?
8    A. I can't make it out at this time.
9    Q. But by then you were working with
10 the Andry Law Firm?
11        MR. GILBERT ANDRY:
12        I object to the form. But you
13    can --
14 EXAMINATION BY MR. MARPLE:
15    Q. You were represented by the Andry
16 Law Firm at that time; is that correct?
17    A. That paper says it, yes.
18    Q. And as a matter of fact, on the last
19 page it says October 28, 2005.
20    A. Right.
21    Q. So by then you were represented by
22 the Andry Law Firm in a claim against the
23 United States Army Corps of Engineers and
24 other parties; right?
25    A. Right. I would say yes.

Page 96

1    Q. Do you remember signing this?
2    A. I'm sure I did. It was two years.
3 18 months, whatever it is, 19 months.
4        MR. MARPLE:
5        And if we haven't identified
6    that, I think we identified that as
7    deposition Exhibit 2. Is that right?
8        MR. GILBERT ANDRY:
9        2 in globo, and I tried to
10    identify with particularity, I think
11    you and I both did, the documents that
12    made up Exhibit 2.
13 EXAMINATION BY MR. MARPLE:
14    Q. We put a little sticker on that page
15 that says Exhibit 2. Right?
16    A. Exhibit 2, yes.
17    Q. Look at Exhibit 1 there for a
18 second. Do you know any of the other people
19 on there besides your wife Jeannine?
20    A. I met Miss -- That's not her. I
21 think it's Glynn -- Glenda Wade. I met her
22 maybe a week ago.
23    Q. All right. And without telling me
24 anything anybody said, did you and some of the
25 other Plaintiffs in this lawsuit get together

Page 97

1 with the lawyers in some way?
2    A. Well, we were leaving and she was
3 coming in.
4    Q. And so in meeting -- in connection
5 with meeting with your lawyers, you passed and
6 made her acquaintance?
7    A. No, we was actually sitting down and
8 I guess we -- me and my wife, my wife was
9 coming from treatment for her brain tumor and
10 we actually had run late getting there and I
11 think she was scheduled to come in after we
12 were finished, but we were actually late
13 getting to the thing so we ran over a little
14 bit and she actually came in a little early.
15    Q. And that was in connection with the
16 lawsuit as opposed to just out on the street
17 somewhere?
18    A. Correct.
19    Q. And did you know Ms. Wade before
20 that?
21    A. No.
22    Q. And are there other persons that are
23 involved in this lawsuit as Plaintiffs besides
24 those? And I can show you a list in a minute,
25 but I just wondered. Do you know anybody else

25 (Pages 94 to 97)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 98

1  that's involved in the lawsuit?
2      A.  Of these people here?
3      Q.  Right.
4      A.  No, I know none of them.
5      Q.  I'm going to show you a little
6  longer list and we'll mark it maybe if you
7  know somebody.  Well, we'll mark it.  I'll
8  show you what we have marked as Exhibit 3,
9  which is a three-page document.  And again,
10 I'll represent that this is some information
11 provided by your lawyers to us.  These are
12 some other people involved in an aspect of
13 this litigation.  I just wondered if you could
14 look through that and tell us whether you know
15 any of those people.
16     A.  No, I do not.
17     Q.  All right.
18     A.  Not by name.
19     Q.  Let me show you what we have marked
20 as Exhibit 4, and that's a four-page
21 document.  Is that correct?
22     A.  Yes.
23     Q.  All right.  And this is a claim, if
24 you look at the top, against the -- submitted
25 to the United States Army Corps of Engineers

Page 99

1  on behalf of Jeannine B. Armstrong.
2      A.  Okay.
3      Q.  Right?
4      A.  Yes.
5      Q.  And if you look at the information
6  there -- Well, I'll just ask.  That's not your
7  wife's signature down there at the bottom of
8  the first page; correct?
9      A.  Don't look like it.
10     Q.  Do you know whose it is?
11     A.  No, I do not.
12     Q.  If you look on the third page,
13 there's a form similar to the one that was on
14 yours that's got her name printed and then
15 signed above; right?
16     A.  Right.
17     Q.  Is that her signature?
18     A.  That looks like hers.
19     Q.  And did you provide any information
20 to anyone in connection with your wife
21 submitting this form to the Army Corps of
22 Engineers?
23     A.  What's that one more time?
24     Q.  Did you provide any of the
25 information to anyone that you know of in

Page 100

1  connection with the submission of this form to
2  the Army Corps of Engineers?
3      A.  Me and my wife filled out some
4  papers.  You know, we signed it, I'm sure we
5  did this.  We signed these papers.
6      Q.  Let's just try to get it clear.  You
7  don't remember what you might have done, or
8  you think your wife did it?
9      A.  My wife might have did it and I
10 might have signed it, you know.  I have been
11 giving her my whole life so I trust her, you
12 know, what we needed to fill out.
13     Q.  And do you remember during that time
14 frame, which would have been -- Well, let's
15 say in October of 2005, October 28th when she
16 signed this, and you signed one just like it,
17 --
18     A.  Okay.
19     Q.  -- did you go into the lawyer's
20 office to do that?
21     A.  My wife might have brought some
22 papers home to me.  She might have went
23 because I know she visited maybe in St.
24 Bernard one time.  And I don't know if this
25 was the document she got.  I am not sure.  I

Page 101

1  don't know if we called and maybe they mailed
2  it to us.  I am not sure.
3      Q.  Now, with respect to your job, we
4  touched on this, but is there any loss of
5  income that you have from your job as a result
6  of Katrina?
7      A.  No.
8      Q.  Did you have any side businesses or
9  anything like that that you were involved in?
10     A.  Me and my brother used to cut grass
11 before the storm.
12     Q.  Before Katrina?
13     A.  Yes.
14     Q.  Did you have the lawnmowers or did
15 he have them or both of you have them or what?
16     A.  Just depends on where we were that
17 day, where we finished up.  Because we lived
18 -- It depends on where we had to go to the
19 next time we went out.
20     Q.  How close did your brother --
21     MR. GILBERT ANDRY:
22         So the answer is both of you had
23     them?
24     THE WITNESS:
25         Correct.

JOHNS PENDLETON COURT REPORTERS            800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 102

1  EXAMINATION BY MR. MARPLE:
2     Q.  How close did your brother live to
3  you?
4     A.  Four miles.
5     Q.  Give me his name again?
6     A.  Brian Armstrong.
7     Q.  And when I say pre-Katrina, were you
8  doing this at the time of Katrina, that is, in
9  the weeks right before that, or was that
10  something a little further back?
11    A.  Correct.  We were in a phase-out
12  mode when Katrina hit.
13    Q.  Getting to be too darn hot and too
14  much darn work?
15    A.  Yeah.
16    Q.  Pardon?
17    A.  You're right.
18    Q.  Now, do you know, did you have any
19  looting or vandalism at your house?
20    A.  Like I say, there wasn't -- You
21  know, we were single stories.  I don't think
22  there was anything worth taking that I know
23  of.
24    Q.  How about people in that -- some of
25  your relatives that you told us about or

Page 103

1  friends you knew that lived in that Buccaneer
2  Villa; did they have looting?
3     A.  I had a neighbor who had a two story
4  house next door, I don't know, I'm not sure
5  about the water they had, but one time I was
6  back there and I seen somebody coming out of
7  the house, but I don't know who they were or,
8  you know -- I really didn't pay a whole lot of
9  attention to it because I just don't think
10  there was anything worth taking.  My brother
11  in Lexington Place, though, his house was --
12  copper was taken out, things like that.  His
13  upstairs at his home was -- a little bit of
14  the carpet on the second floor got wet, but
15  somebody actually looted his house.
16    Q.  Were there any houses there in your
17  immediate neighborhood that you saw that got
18  blown up because of the gas, natural gas lines
19  or gas explosions?
20    A.  I didn't see any.
21    Q.  Now, if I asked this before, I
22  apologize, but do you know whether there were
23  any breaches of the levee that was right a few
24  hundred yards away from your house?
25    A.  Like I say, I never seen -- The only

Page 104

1     -- The closest one to my home was the
2  Intracoastal that I heard of.  I mean that I
3  actually saw.  You know, they said there was
4  some lower -- below the --
5     MR. GILBERT ANDRY:
6        This is what he is actually
7     getting at.  Is that what you saw on
8     the news?
9        THE WITNESS:
10           That was on the news that I
11     actually saw on Monday, on the news.
12  EXAMINATION BY MR. MARPLE:
13    Q.  That was some aerial shot from a
14  helicopter or airplane and they were showing
15  the shot?
16    A.  Correct.
17    Q.  Now, over that -- what I am really
18  getting at is closer to your house, do you
19  know if there was a breach of that levee that
20  we called the 40 Arpent or the canal --
21  Florida Canal or whatever that big levee is
22  that's a few hundred yards from your house?
23     MR. GILBERT ANDRY:
24        And I object to the form, "big".
25     I don't know what that means.

Page 105

1  EXAMINATION BY MR. MARPLE:
2     Q.  Probably a bad question.  Let's try
3  it a little differently.  There's a big levee
4  near your house that we talked about before.
5     MR. GILBERT ANDRY:
6        Objection to form still.  You
7     have to quantify "big" for me.
8  EXAMINATION BY MR. MARPLE:
9     Q.  There's a levee near your house a
10  few hundred yards.  We talked about it
11  earlier.  Right?
12    A.  Right.
13    Q.  With respect to that levee, did it
14  breach anywhere that let water in that came up
15  around your house?
16    A.  To my knowledge, no.
17    Q.  Did it overflow?
18    A.  To my knowledge, no.
19    Q.  And when you say to your knowledge,
20  I think you told us earlier you're not sure
21  one way or the other; right?
22    A.  To my knowledge, no.  You know, if I
23  can answer that, though, I'm going to tell you
24  about the breach, because the metal -- It's
25  got metal girder on top of the levee and it's

27 (Pages 102 to 105)

KENNETH ARMSTRONG  (MRGO)                                    7/9/2007

Page 106

1  all still there.  So if there was a breach, it
2  would have -- you know, you would see evidence
3  of it from my house.
4      Q.  And there's a pumping station not
5  too far from your house; right?
6      A.  Correct.
7      Q.  And gates there at that pumping
8  station around the levee?  Am I wrong or
9  right?
10      A.  Not just -- Riding by and turning
11  and coming to my subdivision, well, the
12  pumping station is up with the levee.  It's up
13  on -- you know, up high like the levee.
14      Q.  Do you know -- I am just going to
15  ask you some -- was your house anchored on
16  that slab?  Do you know?
17      A.  Oh, yes.
18      Q.  And did you look at any --
19      A.  When you mean "anchored", you mean
20  was it nailed down to the concrete and studs
21  bolted down?
22      Q.  Bolted down.
23      A.  I'm not sure because I wasn't there
24  when they tore the house down.  So -- But as
25  far as was it nailed into the concrete or

Page 107

1  something?  I would imagine they had to do
2  that.
3      Q.  It was fastened to the concrete
4  slab, but what it was fastened with you don't
5  know?
6      A.  Correct.
7      Q.  Do you know if you had hurricane
8  joints up on the roof?
9      A.  I got pictures we could see.  I am
10  not sure.
11      Q.  And what was your roof made out of?
12  Tin, shingle, tile?
13      A.  Shingles.
14      Q.  And how long had it been on that
15  house?
16      A.  Trying to remember, because I had
17  just -- When I went with Liberty Mutual I had
18  to show a receipt.  I don't know, seven years,
19  six years, eight years.  Seven.  Something
20  like that.
21      Q.  Was that the only time you replaced
22  it after you bought it?
23      A.  No, that was the second time.
24      Q.  And so --
25      A.  I replaced it maybe a few years

Page 108

1  after we were there, four or five years after
2  we were there, six years, something like that,
3  and then that was the second time.
4      Q.  All right.  And when you had it
5  replaced the second time, which just ballpark
6  was five or six or seven years before
7  Katrina?
8      A.  I'd say yeah.  I'd say anywhere from
9  six to eight years.
10      Q.  And at that time was it replaced
11  because it was worn out or had you had some
12  hail damage or what?
13      A.  You know, that's probably a good --
14  It was -- We had a hail storm come through and
15  we had filed a claim and they paid us and we
16  replaced the roof.  I am not exactly sure of
17  the year that was.
18      Q.  And at the time just before Katrina,
19  was that roof okay?
20      A.  Yeah.  It was acceptable for the
21  insurance company.
22      Q.  Was it leaking in any way?
23      A.  No.
24      Q.  Before Katrina what were your
25  approximate taxes, real estate taxes that you

Page 109

1  were paying?
2      A.  For the house?
3      Q.  Yes.
4      A.  To be honest with you, we were -- I
5  was tax-exempt until -- I think we paid
6  300, $300 to $400.
7      Q.  A year for some period of time
8  before Katrina?
9      A.  Correct.  It was $300 or $400.
10      Q.  And before that you were exempt
11  because you had a homestead exemption?
12      A.  At the time of the period of 75 -- I
13  think it was $75,000.
14      Q.  And then since Katrina your taxes
15  are zero, real estate taxes?
16      A.  Correct.  Well, no.  No, no.  No,
17  no.  Because I got to pay taxes on the
18  property because there is no house there.
19  Houses were deemed --
20      MR. GILBERT ANDRY:
21          Exempt.
22      THE WITNESS:
23          Exempt.  But now I got to pay
24  taxes.  There's no house, I got to pay
25  taxes on property.

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

---

Page 110

1    EXAMINATION BY MR. MARPLE:
2        Q.  How much are you paying?
3        A.  My first -- My note is going to be
4    -- I mean my -- I think it's in October I got
5    to pay 250 or 350.  I am not sure what it is.
6        Q.  $250 or $350 --
7        A.  Right.
8        Q.  -- per year just on that slab
9    sitting there?
10       A.  Correct.
11       Q.  What's the value of that slab right
12   now?
13       A.  Oh, I am not sure.
14       Q.  I mean the lot.
15       A.  I mean, who would pay for it?
16       Q.  Not too much?
17       A.  Right.
18       Q.  And do you know of anybody that's
19   sold one out in that area?
20       A.  The property?
21       Q.  Yes.
22       A.  No.  Other than with a home on it of
23   some sort.
24       Q.  Now, I think you mentioned at some
25   point there was some tax benefit you got on

---

Page 111

1    your Federal income tax because of the
2    disaster loss and so forth?  Is that --
3        A.  It was -- There was a tax on the --
4    The sales tax, there was something.  I don't
5    know if my wife ever -- but there was -- there
6    was some type of tax -- tax break on the
7    losses.
8        Q.  Then have you gotten money -- Well,
9    let's back up.  Did you get any FEMA money
10   right after Katrina?
11       A.  They gave us some type of rental
12   assistance right after.
13       Q.  How long did that last?
14       A.  It stopped for me last June maybe.
15       Q.  In June of 2006?
16       A.  Right.
17       Q.  So seven, eight, nine months,
18   whatever it was?
19       A.  Correct.  Something like that.
20       Q.  How much was it?
21       A.  I think they gave you maybe 800 a
22   month.  Whatever the -- I think up to a
23   certain point because the rent had jumped up
24   so much, they basically either paid if it was
25   under that or subsidized, you know, $800, 824,

---

Page 112

1    something, something like that.
2        Q.  And how much is the rent over there
3    at that apartment in Covington?
4        A.  About 1,050, 1,075, 1,080, something
5    like that.
6        Q.  Any other FEMA relocation money or
7    anything like that you can think of?
8        A.  No.  No, they said we made too much
9    money.
10       Q.  All right.  And have I -- We're
11   talking about the Road Home that you have
12   applied for.  Are there others?
13       A.  That's it.
14       Q.  Do you have any grandchildren?
15       A.  No.  Thank goodness, no.
16       MR. GILBERT ANDRY:
17           You should say not yet.
18       THE WITNESS:
19           Well, not one yet.
20   EXAMINATION BY MR. MARPLE:
21       Q.  Did you get any kind of unemployment
22   benefits or anything like that at any time?
23       A.  No.
24       Q.  What about your wife?
25       A.  No.  Wait up on that.  I'm -- My

---

Page 113

1    wife might have gotten unemployment.  She
2    might have got it.
3        Q.  Do you know if she is getting it
4    now?
5        A.  No.  She hasn't -- She -- No.
6        Q.  I may have asked this, but over the
7    years did you follow at all what was going on
8    with various levees around New Orleans and
9    their progress in terms of whether they were
10   being updated or dredged or widened or
11   heightened or anything like that?
12       A.  Did I follow it?
13       Q.  Did you follow that, the progress of
14   any of that?
15       A.  No.  No, I didn't.
16       Q.  What entities or persons were
17   responsible for the water that came up around
18   your house?
19       A.  I am not sure.  I would -- You know,
20   I don't know who -- I don't actually know who
21   maintains the levees, the structures.  I don't
22   actually know who all the people are who built
23   them.  I can only guess, you know.
24       Q.  And do you include an act of God as
25   part of what happened to your house?

---

29 (Pages 110 to 113)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 114

1    MR. GILBERT ANDRY:
2        I object to the form.
3    THE WITNESS:
4        What I would think is if you look
5    at, based on my opinion only, if those
6    levees were just topped versus breaks
7    in them, we might not be sitting here
8    today. I don't think you would have
9    nowhere near the water we had.
10   EXAMINATION BY MR. MARPLE:
11       Q. Have you done any investigation or
12   learned anything about had levees not
13   breached, what amount of water would have come
14   over from over the tops of the levees or come
15   from rain and how high that water would have
16   gotten?
17       A. No. I just had a conversation with
18   a friend of mine who -- I'm not sure who he
19   works for. He works for the Parish, but I
20   think they do some work for the Corps of
21   Engineers.
22       Q. And what did he say?
23       A. He just don't think the damage would
24   have been nowhere near -- Some parts of the
25   Parish, and that's just his opinion, that he

Page 115

1    don't think they would even have gotten
2    water.
3        Q. Do you have any explanation in your
4    mind of why, for instance, the French Quarter
5    got no water, virtually no water?
6        A. The only thing I would think is the
7    structure, that the Industrial Canal is built
8    on our side, not on their side. Maybe the
9    structure at the lakefront, the 17th Street
10   Canal might have been too far away to get to
11   them. That's strictly a guess.
12       Q. You were too young I guess to
13   remember Hurricane Betsy?
14       A. Correct.
15       Q. Have you heard any stories from your
16   relatives about Betsy and what got flooded in
17   Lower Ninth Ward or St. Bernard?
18       A. I just seen a picture of the Judge
19   Sieber Bridge, which is in the Lower Ninth
20   Ward, when my grandmother lived in the middle
21   of Chalmette had no water. Where I lived at
22   the time in Violet had no water.
23       Q. Do you have any knowledge from
24   reading or studying about what was happening
25   to the wetlands down the road and out St.

Page 116

1    Bernard over the years?
2        A. I mean, I saw the erosion. I fished
3    and hunted down there for years. They started
4    putting the freshwater diversions in, and some
5    sides it helped. It helped on the -- I would
6    say the -- If you going down the road, it
7    helped on the right side of the marsh, but the
8    MRGO, closer to the MRGO, it was still
9    deteriorating out towards Lake Borgne.
10       Q. And describe for me what you saw in
11   terms of it deteriorating. What did you see?
12       A. Well, just land that used to be
13   there is not there any more. This is
14   ongoing. The -- You know, if I am not
15   mistaken, when I was a kid, the buoys that
16   marked the channel for the ships in-going and
17   out-going was actually on land. And now they
18   out in the water, you know, in some places 50
19   yards and stuff like that. I stopped fishing
20   that area.
21       Q. You left 27 hours I think you told
22   us roughly before the storm; did I get that
23   about right?
24       A. Correct.
25       Q. Tell me about what the decision

Page 117

1    process was to evacuate.
2        A. Well, the storm come up on us, you
3    know, all of a sudden. We didn't know nothing
4    about the storm until Friday about 6:00,
5    because the storm, we saw that the storm was
6    supposed to hit Florida. So we actually -- I
7    just picked up some shrimp from down in
8    Plaquemines Parish, brought them home. So we
9    have a place to evacuate to. So that's why we
10   didn't want to get caught up in all the
11   contraflow and all of that. So we had the
12   boiled shrimp. I mean had the shrimp. I
13   didn't want to put them in the freezer, so a
14   good friend of mine who lives out there is a
15   riverboat pilot, in Pilottown, we had a place
16   to stay, we had a place to go. So we stayed
17   Saturday, boiled the shrimp by the hot tub and
18   the swimming pool by his house, and I was
19   leaving the next morning. My boat was
20   supposed to go by his house because he was
21   staying. He lives in almost a three story
22   home, so he was going to stay. Well, we were
23   leaving anyway in the morning. We were going
24   to take Airline Highway the back road. We
25   never had to get caught up in the contraflow.

30 (Pages 114 to 117)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 118

1  And say about 2:00 in the morning he called
2  and for whatever reason he thinks he's a
3  better weatherman than most people and he
4  think he gets better data because he's a
5  pilot. Anyway, he said, "You better head out
6  of there." So he needed a place to stay. So
7  anyway, he got me and my wife out of bed and
8  we left, we took Airline Highway, and it was a
9  little traffic, but no stop and go like on --
10  That was why -- But we were leaving anyway
11  that morning to go to my sister-in-law's house
12  in Baton Rouge.
13      Q.  And how far out can you go on
14  Airline Highway?
15      A.  How far out?
16      Q.  Can you go all the way to Baton
17  Rouge on Airline Highway?
18      A.  Oh, yeah.  You can go all the way to
19  Houma if I am not mistaken.
20      VIDEO OPERATOR:
21          Off the record.  It is 11:43.
22      (Recess.)
23      VIDEO OPERATOR:
24          Returning to the record.  It's
25      11:48.

Page 119

1  EXAMINATION BY MR. MARPLE:
2      Q.  Let me hand you what we have marked
3  as Exhibit 5 and I'll represent to you that
4  that's the property tax inquiry that you get
5  online.
6      A.  Okay.
7      Q.  And I want to ask if this is
8  consistent with your understanding of the
9  assessment of the slab at 4016 Hamlet as that
10  lot in Chalmette.  It says "$4,128 total
11  assessment".  Is that consistent with what you
12  think the assessment is?
13      A.  Is that what they saying the
14  property is worth now?
15      Q.  I think so.  But I am just asking.
16      A.  I am not familiar with this
17  document.
18      Q.  All right.  Then it says the "Total
19  taxable" and it says zero, and I just wondered
20  if --
21      A.  No.  Well, what happened was, when I
22  went in there to talk to them about -- because
23  the time of when the storm hit, I didn't want
24  to pay -- to make sure -- I wanted to check on
25  taxes on my house.  I didn't want them to sell

Page 120

1  my destroyed house on the block, so I went and
2  talked to them and they said, "No, sir, you
3  are tax-exempt." I said, "Okay." I said,
4  "They tore my house down." She said. "Oh,
5  wait.  They tore your house down?" I said,
6  "Yes, it was damamged." She said, "Since
7  there's no house, it's not exempt." That's
8  what they told me.
9      Q.  As I think you had told us sometime
10  in maybe -- it was sometime in 2007 when they
11  actually took the house down?  You're not
12  sure?
13      A.  I would say yes, early 2000.
14      Q.  2007?
15      A.  '7.  That's my guess.
16      Q.  And before that you didn't have to
17  pay any taxes because you had a homestead
18  exemption?
19      A.  No, we had just started paying taxes
20  on the property back then.  I don't know if it
21  was two to three years we started paying
22  taxes.
23      Q.  But once they took it down, then
24  this homestead exemption or something goes
25  away, at least that's your understanding, so

Page 121

1  you have got to pay some tax on that lot?
2      A.  Correct.
3      Q.  I am not going to mark these to
4  start with.  I just want to ask you if this is
5  your house (indicating).
6      A.  That's the back of it.
7      Q.  Pre-Katrina?
8      A.  Pre-Katrina.
9      Q.  And there's a trampoline out there
10  for the kids, I guess?
11      A.  Yes.
12      Q.  And I am not sure, it looks like a
13  bucket of tar sitting there.  Were you doing
14  the driveway or the roof, or do you know?
15      A.  No, that's just a bucket.
16      Q.  Just a bucket.  And then is this,
17  the next one I am showing you, also your
18  house?
19      A.  Yes.
20      Q.  Pre-Katrina?
21      A.  Yes.
22      Q.  And was that garage finished out a
23  little bit in some way?
24      A.  You mean as far as another bedroom
25  or something?

JOHNS PENDLETON COURT REPORTERS

800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 122

1    Q.  Yes.
2    A.  No.
3    Q.  Did it have -- It was used as a
4  garage or storage area as opposed to a room?
5    A.  Storage and laundromat.
6    Q.  And then post-Katrina, let me show
7  you one, is that what the lot looks like more
8  or less today?
9    A.  The one to the left, yes.
10   Q.  The slab sitting there?
11   A.  That's my slab yes.
12   Q.  And then there's this big two story
13 house next door; right?
14   A.  Right.
15   Q.  Who lived there?
16   A.  Carl Gaines.  He's a computer genius
17 for the Parish.
18   Q.  And was he the one you were telling
19 me that you saw somebody come out of there, it
20 was a two story house and you didn't know if
21 there was anything in there worth anything or
22 not?
23   A.  Correct.  I didn't know what his
24 business was there.  He was parked in front
25 and, like I say, I pulled up in front of my

Page 123

1  house and that was it.
2    Q.  Looked suspicious to you, though?
3    A.  You saw a lot of different people
4  back in those area.  I don't know if it could
5  have been an adjustor.  Could have been -- I'm
6  not sure, you know.
7    Q.  Do you know anything about where he
8  stands on any claims for wind or rain damage
9  with his insurer?  Have you talked to him
10 about it?
11   A.  I just talking to him, he actually
12 did okay with the wind and rain.
13   Q.  And if you look at that picture, you
14 see that roof --
15   A.  Right.
16   Q.  -- is kind of torn up.
17   A.  Correct.
18   Q.  Because it's two story so he's --
19 he's got a different set of circumstances than
20 yours because of it being a two story house.
21   A.  Correct.
22   Q.  Why don't we mark that one as --
23     MR. GILBERT ANDRY:
24       6.
25 EXAMINATION BY MR. MARPLE:

Page 124

1    Q.  -- Exhibit 6.  And the house we have
2  just been talking about, your neighbor there,
3  is shown in Exhibit 6.  Is that right?
4    A.  Correct.
5      MR. GILBERT ANDRY:
6        I'll tell you what.  Just so the
7        record is complete, why don't we
8        attach it and refer to the two
9        photographs of his house as 7 and 8.
10     MR. MARPLE:
11       We'll do that.
12 EXAMINATION BY MR. MARPLE:
13   Q.  I believe the first one we talked
14 about was Exhibit 7.  Is that right?
15   A.  Correct.
16   Q.  And that's your house pre-Katrina?
17   A.  Correct.
18   Q.  And then 8 shows two photos of it
19 also pre-Katrina; right?
20   A.  Correct.
21   Q.  Do you know when, about when 7 and 8
22 were taken?  I mean, what year about?
23   A.  I was thinking for insurance
24 purposes, but I don't think it is.  Because of
25 the -- that trampoline.  Most insurance

Page 125

1  companies don't want to see a trampoline in
2  the yard.
3    Q.  So if you were trying to get
4  something insured, you wouldn't have included
5  that trampoline in the photo; right?
6    A.  Correct.
7    Q.  Do you know why they were taken?
8  There's people in them, so it looks like to me
9  you were taking them for some purpose to do
10 something with, or some business reason not
11 with respect to insurance or something like
12 that.
13   A.  I am not sure.  I would be lying if
14 I told you.
15   Q.  And these are ones you found after
16 Katrina.  Is that correct?
17   A.  Well, what we did, we had a bunch of
18 our photos from maybe George in a plastic --
19 We had all our pictures still in there from
20 the previous evacuation.  So we were able to
21 take a tub of pictures and throw them into the
22 truck, into the Suburban to take.
23   Q.  And so these are --
24   A.  These are actually ones we found in
25 the tub of pictures.

32 (Pages 122 to 125)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 126

1    Q.  That tub of pictures is something
2   you took with you --
3    A.  Correct.
4    Q.  -- when you went to Baton Rouge?
5    A.  Correct.
6    Q.  And you said that was the second
7   evacuation.  When was the other one?
8    A.  I don't know, Hurricane George, what
9   was it -- I don't know when it was.
10    Q.  Hurricane George?
11    A.  I think, if I am not mistaken, that
12   was the last time I evacuated.
13    Q.  And did you sustain any damage
14   during that storm?
15    A.  No.
16    Q.  And were there other times you
17   evacuated besides George?
18    A.  Maybe one other time.
19    Q.  And when was that?  Before or after
20   George?
21    A.  I am not sure.  I would have to see
22   the hurricanes to see which ones I evacuated
23   from.
24    Q.  And am I correct -- Well, let me ask
25   it.  Any other time you have evacuated did you

Page 127

1   come back to any damage?
2    A.  No.  Just from the oak tree, I
3   mean.  I saw it, that's a hell of a clean-up.
4   For the yard.  For leaves.  You know,
5   branches, stuff like that that fell.
6    Q.  Wind damage?
7    A.  No wind damage.
8    Q.  And you had a great big old tree in
9   the front yard; right?
10    A.  Yes, I did.
11    Q.  What happened to it?
12    A.  It's still there.  It's still there.
13    Q.  It's still there?
14    A.  Well, no.  After the storm, I mean.
15   You should have pictures of it.  I thought you
16   had pictures of it.  Actually, the branch that
17   breaks off that comes away from the house that
18   comes -- You can't see it in this picture.
19   Here a little bit here it comes out, it fell.
20    Q.  A part of the tree fell?
21    A.  Correct.
22    Q.  Did it fall onto the house?
23    A.  No.  That's what I am saying.  The
24   branch that came away from the house fell.  I
25   was hoping it fell on the house.

Page 128

1    Q.  If it had fallen on the house that
2   would have helped you with the homeowner's
3   insurance, because you'd have had a wind
4   damage falling into the house or something.
5   Is that why you would like it to have fallen
6   into the house?
7    A.  I guess.
8    Q.  I mean, it would help you on your
9   homeowner's; right?
10    A.  Well, it would have took away the
11   wind versus water.
12    Q.  And there were some trees that fell
13   into houses where people then did get to
14   collect on the homeowner's wind, rain policy;
15   right?
16    A.  My in-laws, which lived -- If you
17   came out of my house and looked to your left,
18   we lived -- the two story is a cul-de-sac.
19   Where the cul-de-sac is, my in-laws lived
20   right there and they had a pine tree fall on
21   their house, and they denied it.
22    Q.  They had a pine tree fall on the
23   house?
24    A.  Yeah.
25    Q.  And they then -- that was wind

Page 129

1   damage, right?
2    A.  Right.
3    Q.  Some of these didn't even hit
4   Louisiana or they were in the vicinity, but I
5   will just ask them.  Camille, you were too
6   young.  You didn't evacuate; right?
7    A.  My family, we -- we went into a
8   school.  The Palmer School.
9    Q.  And then did your family's house
10   have any damage that you remember?
11    A.  No.
12    Q.  Andrew?
13    A.  I don't think so.
14    Q.  Betsy, you were too young to
15   remember; right?
16    A.  Yes.
17       MR. GILBERT ANDRY:
18       I remember -- I remember Betsy so
19    you have got to remember Betsy.
20       THE WITNESS:
21       Two years old.
22       MR. GILBERT ANDRY:
23       I know.  I remember one day.
24       THE WITNESS:
25       That's why you're a lawyer and

33 (Pages 126 to 129)

KENNETH ARMSTRONG (MRGO)                    7/9/2007

Page 130

1     I'm a beer man.
2     EXAMINATION BY MR. MARPLE:
3        Q.  Let me show you a Google map here.
4     The arrow there is kind of sitting right on
5     top of Hamlet as it goes around the turn.
6     Right?
7        A.  Right.
8        Q.  And the in-law you were talking
9     about lived, if you look at this map, it would
10    have been right around the corner on the one
11    that runs the same direction as Benjamin and
12    Hermitage Drive, right?
13       A.  No, what it is, you don't see Hamlet
14    actually bent -- Hamlet starts right here
15    (indicating).
16       Q.  Right.
17       A.  I lived last -- I lived the last
18    house before the cul-de-sac starts.  There's
19    one, two, three houses and my in-laws are the
20    first house after the cul-de-sac.  So it's
21    actually three houses away.
22       Q.  All right.  Three houses away from
23    you.
24       A.  Correct.
25       Q.  From what you were talking about

Page 131

1     where the pine tree fell.
2        A.  Right.
3        Q.  That's good.  You have a commercial
4     driver's license?
5        A.  Yes, I do.
6        Q.  And is there a reason you have
7     that?  Driving beer trucks?
8        A.  It's a requirement for everybody at
9     the company.  If you physically can go on a
10    truck, it's a requirement for the company.
11       Q.  Let me show you --
12       MR. MARPLE:
13          Which one are we ready for?
14       MR. GULOTTA:
15          9.
16       MR. GILBERT ANDRY:
17          9.
18       MR. WEINSTOCK:
19          I'm sorry, are you going to mark
20       that map you were showing him?
21       MR. MARPLE:
22          We'll mark it as 10.
23    EXAMINATION BY MR. MARPLE:
24       Q.  What we have marked as Exhibit 10 is
25    that little Google map that didn't help us

Page 132

1     much, right?
2           Let me show you what I have marked
3     as Exhibit 9.  And that is some big document
4     that's entitled "Plaintiff's response to MRGO
5     Defendants' First Set of Joint Class
6     Certification Requests For Admissions,
7     Interrogatories and Requests For Production of
8     Documents."  Correct?
9        A.  Yeah, I guess so.
10       Q.  Have you ever seen that document
11    before?
12       A.  I think we have seen it.  I think
13    it's something we had.
14       MR. GILBERT ANDRY:
15          We don't want you to think.  Have
16       you ever seen it?
17       THE WITNESS:
18          Well, I saw a big document like
19       this.
20       MR. GILBERT ANDRY:
21          But you don't know if that was it
22       or not?
23       THE WITNESS:
24          Correct.
25       MR. GILBERT ANDRY:

Page 133

1           Okay.
2     EXAMINATION BY MR. MARPLE:
3        Q.  Look over on page 21.  You see that
4     where it says Interrogatory number 15?
5        A.  Uh-huh (affirmatively).
6        Q.  Yes?
7        A.  Yes.
8        Q.  Can you look at that question and
9     tell me, not what you did provide, but if you
10    provided any information to your lawyers along
11    the lines to answer that question.
12       A.  The only thing we provided was my
13    wife, any kind of substantiated information.
14       Q.  And that includes the medical
15    records?
16       A.  Well, for her back maybe.  But
17    nothing for -- That's about it.
18       Q.  She's got the back problem and then
19    she's got the brain tumor problem; right?
20    Those are two kind of separate issues; right?
21       A.  Correct.
22       Q.  Did you provide information in terms
23    of medical records on those to the lawyers, do
24    you think?
25       A.  Yes, we did.

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 134

1    Q.  And you don't have any; right?
2    A.  Not with me.
3    Q.  No, you don't have any related to
4  yourself?
5    A.  No physical.
6    Q.  Do you have any medical records of
7  --
8    A.  No.
9    Q.  There's none for any of your three
10 kids, either; right?
11   A.  No.
12   Q.  Is that right?
13   A.  Correct.
14   Q.  Now, in terms of photographs of your
15 house, we looked at the before pictures;
16 right?
17   A.  Right.
18   Q.  Are there any after photographs?
19   A.  Yeah, you should have some.
20      (Mrs. Armstrong enters conference
21 room.)
22   Q.  I don't want to mark these yet
23 because I'm not sure they're your house.  I
24 don't think they are.  Are these your house?
25   A.  Yes.

Page 135

1    Q.  It is?  Do you know what room we're
2  looking at there?
3      MR. GILBERT ANDRY:
4      Unless it's more than one.
5      THE WITNESS:
6      It is.
7  EXAMINATION BY MR. MARPLE:
8    Q.  Well, what rooms?
9    A.  This top is my garage, laundromat.
10 And this right here is a picture of my
11 refrigerator, my countertop gone, looking into
12 the kitchen.
13   Q.  I'm going to show you another one.
14 Is that one of your house, too?
15   A.  Yes.
16   Q.  And what room is that?
17   A.  That's the kitchen.  And the living
18 room is on top, too.
19   Q.  It looks like tin cabinets there,
20 but maybe that is not correct.
21   A.  No, that's not tin.
22   Q.  Okay.
23      VIDEO OPERATOR:
24      Excuse me, Counsel.  I have to go
25 off the record to change tapes.

Page 136

1      MR. MARPLE:
2      Okay.
3      VIDEO OPERATOR:
4      Off the record. It's 12:07.
5      (Recess.)
6      VIDEO OPERATOR:
7      Returning to the record.  It is
8  1:29.
9  EXAMINATION BY MR. MARPLE:
10   Q.  We talked earlier about the
11 categories of damages that you were seeking
12 for emotional or mental distress; right?
13   A.  Yes.
14   Q.  And damage to your home, the
15 structure; correct?
16   A.  Yes.
17   Q.  And belongings in the house; right?
18   A.  Yes.
19   Q.  And then that included the boat out
20 there.
21   A.  Yeah.
22   Q.  Now, are there any other categories
23 or types of things that you're seeking damage
24 for beyond what we have already talked about
25 today?

Page 137

1    A.  No, not that I can think of.
2    Q.  We look back at Exhibit 9 and let's
3  go into -- Look back at about page 30. Let's
4  back up a little bit.  Beginning on page 27,
5  there's some requests for production of
6  documents.  If we look at number 5 on page 28,
7  request for production number 5 on 28, do you
8  see that?
9    A.  Okay.
10   Q.  Documents that relate to any
11 eyewitness account of Hurricane Katrina.  Do
12 you have any of those type of documents?
13   A.  The eyewitness document?  No.
14   Q.  That relate to an eyewitness account
15 where --
16   A.  No.
17   Q.  We talked about number 8,
18 photographs, digital video disks, and I
19 believe you said you produced photographs and
20 that video to your lawyers, they we looked at
21 some of those photos today.  Right?
22   A.  Correct.
23   Q.  Do you know of any other set of
24 photos or anything that has anything to do
25 with your Katrina loss or your house or

35 (Pages 134 to 137)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                7/9/2007

---

Page 138

1  anything like that?
2     A.  None that I have, other than the
3  video and the pictures I produced.
4     Q.  Okay.  Did you keep any kind of
5  diary or record of what you were doing during
6  Katrina or immediately thereafter?
7     A.  No, I didn't.
8     Q.  Do you have a Katrina file at home
9  that's got insurance and everything else in
10 it?
11    A.  Yes, we have some -- some papers and
12 some documentation.
13    Q.  And we talked about some of those
14 insurance papers, the Road Home stuff, maybe
15 things back and forth with your lawyers in
16 this case.  Any other categories of documents
17 related --
18    A.  Not at all.
19    Q.  And if you don't mind, let me just
20 finish my question --
21    A.  Okay.
22    Q.  -- before you answer.  I again
23 apologize for that.  Have you looked at any of
24 the reports, something called the IPET report,
25 the Team Louisiana Report, Independent Levee

---

Page 139

1  Investigation Team Report or any of these
2  types of documents that looked at what
3  happened as a result of Katrina and whether
4  the levees were designed correctly or
5  overtopped or breached or whatever?
6     A.  No, I didn't.
7     Q.  Let me show you what we have marked
8  as Exhibit 11, which is another set of
9  responses to discovery in this case, and tell
10 me if you think you have ever seen Exhibit
11 11.
12    A.  It looks a lot like the other one
13 you showed me earlier.
14    Q.  I grant you it does on the front
15 page.
16    A.  This could be the first one I saw.
17 You know what I am saying?  I don't know.
18    Q.  Okay.  So you don't know if you have
19 seen that one or not?
20    A.  Right.  It looks a lot like
21 something I have saw, so it looks a lot like
22 the first one.
23    Q.  I'll show you what we have marked as
24 Exhibit 12, and that's something that's called
25 a Consolidated Class Action Complaint.

---

Page 140

1  Correct?
2     A.  Yes.
3     Q.  Have you ever seen that document
4  before?
5     A.  Like I say, it looks a lot like the
6  first two you gave me.
7     Q.  Right.  And you weren't -- You're
8  not the filter in the Armstrong household.  If
9  any of these came across -- Let me phrase that
10 differently.  You don't know if any of these
11 came across in front of you before they were
12 filed or not.  Is that right?
13    A.  They might have.  Like I say, I
14 remember seeing, you know, some of these
15 documents, it could have been one, it could
16 have been three, --
17    Q.  Right.
18    A.  -- at different times.  Not sure.
19    Q.  All right.  I show you another one
20 we'll mark as Armstrong 13 that's called
21 Plaintiff's Motion For Class Certification.
22 Have you ever seen that one?
23    A.  Like I say, I am not sure.
24    Q.  Look on page 5 of the last document
25 I showed you.  You see where it mentions

---

Page 141

1  Kenneth Paul Armstrong, Sr. and Jeannine B.
2  Armstrong --
3     A.  Okay.
4     Q.  -- at the top?  And can you look at
5  that paragraph and tell me if the information
6  in it is correct or you have anything to add
7  or change to what's set forth there?  Is it
8  correct?
9     A.  I'd say yes, it is.
10       MR. WEINSTOCK:
11          Can I see Exhibit 13?
12       THE WITNESS:
13          I don't know who the lady is on
14       the bottom there unless that's a lady
15       I met in New Orleans East.
16 EXAMINATION BY MR. MARPLE:
17    Q.  The information that's set forth
18 about you --
19    A.  Pretty accurate, yes.
20    Q.  Let me show you what we have marked
21 as Exhibit 14.  It's actually two pieces
22 there, but it's all one doc.  And that's a
23 notice of deposition, notice of videotaped
24 deposition to you for today.
25    A.  Okay.

---

36 (Pages 138 to 141)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 142

1    Q. Have you seen that one before?
2    A. So many things came across, I don't
3  -- I mean, it's possible.
4    Q. In terms of learning about today's
5  dep, did you just get a call from the lawyers
6  and they said be here on the 9th at 9:00
7  o'clock? Is that basically what happened?
8    A. No. We met -- We met with Jon Andry
9  once before.
10   Q. Once before today?
11   A. Correct.
12   Q. And you told us about that; you --
13   A. Yes.
14   Q. -- you passed one of the other
15  Plaintiffs coming in or out of the office;
16  correct?
17   A. Correct.
18   Q. If we look at Exhibit A, it's the
19  sort of separate document that's attached?
20   A. This (indicating).
21   Q. Yes. By the way, do you see on the
22  second page of 14, on the notice, it says that
23  we asked you to produce the documents set
24  forth on Exhibit A? Do you see that? You see
25  where it asks --

Page 143

1    A. I see that, yeah.
2    Q. Now, the first question is, did you
3  bring any documents with you today when you
4  came in?
5    A. No, I have no documents.
6    Q. You have none with you? You might
7  have some at home; right?
8    A. Depending on what you're looking
9  for.
10   Q. Look at number 3. We talked about
11  that earlier. There's documents that relate
12  to insurance claims that you have. Right? On
13  Exhibit A, number 3?
14   A. Okay.
15   Q. Is that right? You do have some of
16  those you or your wife do somewhere;
17  right?
18   A. Pertaining to her with her back and
19  stuff, yes, we do. I'm sure we have them.
20   Q. All right. But also insurance
21  claims that relate to what you filed with
22  Liberty and -- Liberty Mutual and Allstate,
23  you have got files on those you told me?
24   A. I'm sure we have documentation on
25  that.

Page 144

1    Q. By the way, I wanted to ask you, do
2  you know, did you have any friends or
3  relatives that died as a result of Katrina?
4    A. I only -- Other people who passed
5  away, thinking back, I knew two of them.
6    Q. And where were they?
7    A. One was located on the street where
8  I grew up, which is Munster Boulevard, and one
9  was -- stayed at his home off of Paris Road on
10  LaPlace Street.
11   Q. And do you know how they died?
12   A. I'd be guessing. I think they
13  drowned.
14   Q. And out in St. Bernard Parish out
15  near where you lived there were some deaths;
16  right?
17   A. Correct.
18   Q. And the cause of those deaths varied
19  from drowning to electrocution to different
20  things; right?
21   A. That's what I heard, yes.
22   Q. Did your wife keep any kind of diary
23  or journal related to Katrina?
24   A. No.
25   Q. Or the kids?

Page 145

1    A. She -- No. Not my kids. My wife, I
2  don't know what she has document-wise, other
3  than maybe taking notes to call back somebody
4  or something like that.
5    Q. But not a diary or daily log?
6    A. Not a diary or journal, no.
7    MR. MARPLE:
8       I believe that's all I have.
9    MR. GILBERT ANDRY:
10      And I want to say for the record
11  I appreciate you going right at it.
12   MR. MARPLE:
13      All right. Thank you. I
14  appreciate the courtesy that you have
15  shown us and that your witness has
16  shown us so far. Mr. Armstrong, thank
17  you.
18   THE WITNESS:
19      You're welcome.
20 EXAMINATION BY MR. WEINSTOCK:
21   Q. Andy Weinstock. I represent the
22  Lake Borgne Basin Levee District. I don't
23  believe I'll have that many questions for
24  you.
25      You had indicated that you made

37 (Pages 142 to 145)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                7/9/2007

Page 146

1  claims with Liberty Mutual and Allstate for
2  your homeowner's insurance and your flood
3  insurance. Is that right?
4      A. Correct.
5      Q. Did you ever make any kind of claim
6  in writing or send any letters to those
7  insurers?
8      A. I don't think we did for the flood,
9  but I think we had to do that for
10  homeowner's. Because we didn't agree with the
11  first document. We had to prove from a
12  contractor what was the damages and things
13  like that.
14      Q. Do you have that documentation
15  still?
16      A. I think we have some of it.
17      Q. And you would have naturally sent a
18  copy to Liberty Mutual?
19      A. Correct.
20      Q. Do you know if you sent a copy to
21  your agent?
22      A. Bill, I could -- Well, I think what
23  he told us is that we had to send everything
24  to the claims department. He might have gave
25  us the information on what we had to do. Or

Page 147

1  phone number to call.
2      Q. Who was your a little?
3      A. Bill Bubrig.
4      Q. Where is his office located?
5      A. Belle Chasse, Louisiana.
6      Q. Where in Belle Chasse?
7          MR. GILBERT ANDRY:
8              Belle Chasse Highway.
9          THE WITNESS:
10             It's on Belle Chasse Highway.
11  EXAMINATION BY MR. WEINSTOCK:
12      Q. So his office is fine; right?
13      A. Correct.
14      Q. He's still there basically?
15      A. Correct.
16      Q. Was he your agent for both the
17  homeowner's and the flood?
18      A. No.
19      Q. Who was your agent for the flood?
20      A. Trying to think of the guy's name.
21  It was Allstate. His name was -- I can't
22  think of it off the top of my head. It was a
23  guy -- My first insurance agent retired and
24  this guy picked up the work. So I am not
25  sure.

Page 148

1      Q. Is it your belief that you were
2  under-insured on your flood?
3      A. After the fact, yes.
4      Q. Do you hold your agent accountable
5  for that in any way?
6      A. I would hope that they would have
7  contacted me, you know, ahead of time, you
8  know. But the belief, my belief was that
9  50-something thousand dollars to replace -- I
10  never dreamed this would happen.
11      Q. You haven't filed any kind of claim
12  against your flood agent?
13      A. Correct.
14      Q. Do you intend to file such a claim
15  before August 29th, 2007?
16      A. I never intended TO.
17      Q. Do you know Bob Turner?
18      A. I heard the name before.
19      Q. How about Dan Caluda?
20      A. Yes.
21      Q. What, if anything, do you believe
22  the Lake Borgne Basin Levee District should
23  have done differently to prevent you from
24  having your loss and suing them?
25      A. I just don't know their specific

Page 149

1  duties, to answer that question, so -- or what
2  their responsibilities were.
3      Q. "I don't know" is a correct answer
4  to any question you don't know the answer to.
5      A. Okay.
6          MR. GILBERT ANDRY:
7              See, I told you.
8  EXAMINATION BY MR. WEINSTOCK:
9      Q. You applied for Road Home benefits?
10      A. Yes, I did.
11      Q. And was there -- there was an
12  application there as well?
13      A. Correct.
14      Q. And that's in writing?
15      A. Yes.
16      Q. A written application?
17      A. Yes.
18      Q. Do you have copies of that?
19      A. I'm sure we do.
20      Q. I know you answered this, but I did
21  not catch it. We had a hail storm, I don't
22  know, five, six, seven years ago? Yes.
23      A. Yes.
24          MR. GILBERT ANDRY:
25              Longer than that now.

38 (Pages 146 to 149)

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 150

1      THE WITNESS:
2        It's been -- I am not exactly
3    sure of the time, but I think that's
4    when Travelers and all pulled out of
5    the state.
6    EXAMINATION BY MR. WEINSTOCK:
7        Q.  But did you replace your roof as a
8    result of that?
9        A.  Yes, we did.
10       Q.  That's what I believe you said
11   earlier.
12          You understand that you're a class
13   plaintiff, not just a plaintiff in your own
14   right.  Is that correct?
15       A.  Correct.
16       Q.  Do you know what class of people you
17   represent?
18       A.  Can you clarify?
19       Q.  Do you know who you're here for
20   other than yourself and your family?
21       A.  Well, I would -- I would think
22   everybody, a good portion of the people who
23   live in my community.  We all look the same as
24   far as the depth of water, ten to whatever,
25   for the most part.  We all in the same boat.

Page 151

1    We all lost our -- everything we had.  We all
2    lost our community.  You know, we all
3    scattered everywhere.  We probably never get
4    back what we had.  So I am one of I think
5    there's 70,000 people in St. Bernard Parish.
6    You know, IF it's not me, it could be anybody
7    else who's in that predicament.
8        Q.  You told us a few minutes ago you
9    knew of some people who drowned?
10       A.  Correct.
11       Q.  Those people chose not to evacuate,
12   to your knowledge?
13       A.  Correct.
14       Q.  You did evacuate?
15       A.  Correct.
16       Q.  Are you here representing the people
17   who lost their life as a result of drowning --
18       MR. GILBERT ANDRY:
19          Objection.
20   EXAMINATION BY MR. WEINSTOCK:
21       Q.  -- because they did not choose to
22   evacuate?
23       MR. GILBERT ANDRY:
24          Objection to the form of the
25       question.

Page 152

1        You can answer
2    EXAMINATION BY MR. WEINSTOCK:
3        Q.  You can answer.
4        A.  I think that -- I would say no.
5        Q.  Do you understand that there are
6    certain obligations that come with being a
7    class representative?
8        A.  Yes.
9        Q.  Do you understand one of those
10   obligationss is to provide notice to the other
11   class members?
12       A.  Yes.
13       Q.  And you just told me that maybe up
14   to 70,000 people in St. Bernard.  Were you
15   also aware that your class contains not only
16   St. Bernard, but the Lower Ninth Ward?
17       A.  Correct.
18       Q.  As a class representative you might
19   have to provide notice to those 70 plus
20   thousand people.  Is that your understanding?
21       MR. GILBERT ANDRY:
22          That's why he has a lawyer.
23       That's why he has a team of lawyers
24       from all over the country with more
25       than enough resources to do that.  So

Page 153

1        I think that's beyond the pale.  I
2        object to the form.
3    EXAMINATION BY MR. WEINSTOCK:
4        Q.  Do you understand that you may have
5    that obligation to provide notice to those
6    70,000 people?
7        A.  No, I do not.
8        Q.  Do you understand that unless you
9    have an agreement with somebody else to pay
10   for it, you might have to pay for that
11   notice?
12       A.  No, I did not.
13       Q.  Do you understand there's case law
14   that says you might be personally responsible
15   for up to $250,000 to provide notice to the
16   other class members?
17       A.  No, I did not.
18       Q.  Are you prepared to do that?
19       A.  I don't want to, but if I had to, I
20   guess I could.
21       Q.  You would take out a loan to get
22   $250,000?
23       A.  No.
24       Q.  Do you understand that there may be
25   a limited amount of resources to settle or

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 154

1  resolve all the claims of the people that have
2  filed them in the class action?
3        MR. GILBERT ANDRY:
4        Objection to the form. Are these
5  legal questions that you're asking
6  him? You're asking him what his
7  understanding of the law is?
8        MR. WEINSTOCK:
9        I'm absolutely am asking him what
10  he understands and what he's prepared
11  to do as a class representative in
12  this case. And yes, there are
13  probably some legal implications to
14  those questions.
15        MR. GILBERT ANDRY:
16        I object to the form to the
17  extent that you're asking him if he, a
18  layman, knows what the law is.
19  EXAMINATION BY MR. WEINSTOCK:
20   Q.  Do you understand there may be a
21  limited amount of money to settle or resolve
22  all of these claims?
23        MR. GILBERT ANDRY:
24        And I object to the form. I
25  don't know that that's the case. Do

Page 155

1  you have -- form and foundation.
2  Because you have given no predicate to
3  indicate that that is the case. So
4  form and foundation.
5  EXAMINATION BY MR. WEINSTOCK:
6   Q.  Nevertheless, you can answer.
7   A.  I don't know.
8   Q.  Just assume for me one minute that
9  there is $100 to settle all the cases. Do you
10  understand that you represent not only the
11  people who have chosen to file suit like you
12  did, but those who have not chosen to file
13  suit?
14   A.  (Witness nods head affirmatively.)
15   Q.  Yes?
16   A.  I didn't understand that.
17   Q.  And that, therefore, that, whatever
18  I said, that hundred dollars is going to be
19  split up now not just amongst the people who
20  have chosen to file suit, but by all the
21  people you represent?
22        MR. GILBERT ANDRY:
23        I object to the form to the
24  extent that I am sure that you have
25  more than $100 in your pocket. So I

Page 156

1        object to the form that I think that
2        that's no foundation and any other
3        number of things.
4  EXAMINATION BY MR. WEINSTOCK:
5   Q.  Let'S just say it differently.
6  Let's say there's $1 million to settle these
7  claims and that, and I don't know the number,
8  150 people have filed a lawsuit. On that
9  math, you're a businessman, $1 million
10  potentially divided by 150 people. But you
11  now potentially represent 70,000 people. Do
12  you understand the number gets smaller by
13  dividing it by 70,000 instead of 150?
14   A.  Right.
15   Q.  And are you prepared as one of the
16  150 who have filed suit to take less by
17  representing the 70,000?
18   A.  Well, I think that's the way it's
19  going to have to go anyway no matter what we
20  do, so I'd say yes.
21   Q.  One of the parties you have sued is
22  the Orleans Levee District. And I don't
23  believe Mr. Andry, but I believe some of your
24  other Counsel has filed suit against the
25  Orleans Levee District in East Jefferson Levee

Page 157

1  litigation. Were you aware of that?
2   A.  They showed me some documentation
3  and it might have been on there.
4   Q.  Is it a problem for you that some of
5  these other lawyers, not Mr. Andry or his
6  firm, but some of these other lawyers are
7  representing a whole different group of people
8  and they're suing somebody you're suing as
9  well, splitting the pot even further?
10   A.  I knew there was another lawsuit out
11  there. I wasn't exactly sure who they were
12  suing and stuff.
13   Q.  Does that concern you at all?
14   A.  I never gave it much thought, to be
15  honest.
16   Q.  Previously you had said in your LRA
17  award, your Road Home award that they offered
18  you I think somewhere around $70,000. And
19  what was to happen with the property?
20   A.  Well, we basically selling our
21  property. We selling to the LRA.
22   Q.  So if you would rebuild, it would
23  not be on your existing site?
24   A.  Correct.
25   Q.  Unless you somehow repurchased that

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG   (MRGO)                                    7/9/2007

---

**Page 158**

1  from LRA?
2      A.  If I did go through with the selling
3  to the LRA, correct.  The property is still
4  mine at this time.
5      Q.  You had a family dispute as to
6  whether or not to go through with the LRA; is
7  that right?
8      A.  No, a dispute on where to move next.
9      Q.  When do you have to decide whether
10  you're going to sell your property to the LRA
11  or not?
12      A.  We meet with them in a couple of
13  weeks again.  Dispute is not the -- to sell.
14  The dispute is where we want to live.
15  Permanent residence.
16      Q.  So you have made a family decision
17  to sell the property to the LRA?
18      A.  Correct.
19      Q.  You would like more than they are
20  currently offering you?
21      A.  Correct.
22      Q.  Is there an appeal process you're
23  going through?
24      A.  There will be.
25          MR. WEINSTOCK:

---

**Page 159**

1          I believe that's all the
2      questions I have.
3  EXAMINATION BY MR. MARPLE:
4      Q.  I just wanted to ask a few more.  Do
5  you know or have you heard of an entity called
6  Washington Group International, Inc.?
7      A.  Yes, I do.
8      Q.  And how have you heard of that
9  entity?
10      A.  When I talked to my lawyer.
11      Q.  And do you know how they fit into
12  this lawsuit in any way?
13      A.  Well, when I asked -- when we talked
14  about that, they -- they would be representing
15  -- the lawyers would be representing that
16  company.
17      Q.  And do you know what Washington
18  Group International, Inc. did that led to harm
19  to your property or to your mental distress or
20  to your belongings?
21      A.  I thought they did some work along
22  the Industrial Canal.
23      Q.  Do you know what they did along
24  there?
25      A.  Not specifically, no, I don't.

---

**Page 160**

1      Q.  And is it fair to say that you
2  yourself did not have any information prior to
3  bringing suit and really don't have any
4  factual information yourself about what
5  Washington Group International, Inc. did wrong
6  specifically?
7      A.  Not at that time, no.
8      Q.  So you agree with me that you don't
9  have that information; right?
10      A.  You said at the time, though;
11  right?
12      Q.  Before you filed suit you didn't
13  have any information?
14      A.  No, I don't know who they -- if they
15  worked on the levees or what, I don't know who
16  built the levees years ago, no.
17      Q.  Sitting here today, you told me you
18  thought they did some work on the Industrial
19  Canal, but do you know anything more as to
20  what they may have done?
21      A.  I thought they did, if I am not
22  mistaken, they did some work on the section
23  over there by the Industrial Canal.
24      Q.  Do you know what it is they did down
25  there that caused them to fall over?

---

**Page 161**

1      A.  Not really.  No, I don't.
2      Q.  With your insurance company, either
3  Liberty Mutual or Allstate, do you know if you
4  signed any papers that said they get to sue
5  somebody instead of you?  In other words, they
6  asked you to sign over your rights to go
7  against somebody else since they were paying
8  you?
9      A.  I don't recall that.
10      Q.  Do you know -- That would be in the
11  file probably that you have on insurance,
12  right, if you did?
13      A.  If I signed something to let the
14  insurance company sue somebody else is what
15  you're asking me?
16      Q.  Yes.
17      A.  No, I don't recall that.
18      Q.  But if you signed it, you would have
19  kept a copy of it probably; right?
20      A.  Probably so.
21      Q.  So that would be in your insurance
22  file at home?
23      A.  Correct.
24      Q.  You understand the concept generally
25  of subrogation?  When an insurance company

---

JOHNS PENDLETON COURT REPORTERS          800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266

KENNETH ARMSTRONG (MRGO)                    7/9/2007

Page 162

1  pays you, that sometimes they want you to sign
2  and say, "Well, somebody did some harm to you,
3  you have got to sign that right over to us" so
4  they may have a chance of getting some of
5  their money back somehow?
6      A.  If that was the case, I don't recall
7  my agent, you know, asking me to do anything
8  like that.
9      Q.  Do you all go to church now across
10  the lake?
11      A.  My wife does.
12      Q.  Did the church move over there, too?
13      A.  No.
14      Q.  A different parish church?
15      A.  (Witness nods head affirmatively.)
16      MR. MARPLE:
17          I believe that's it.
18      MR. WEINSTOCK:
19          No more for me.
20      MR. GILBERT ANDRY:
21          None for me.
22      VIDEO OPERATOR:
23          This concludes the deposition.
24      It is 1:58.  We're now off the
25  record.

Page 163

1          *   *   *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 164

1
2      WITNESS'S CERTIFICATE
3
4      I, KENNETH PAUL ARMSTRONG, JR., read
5  or have had the preceding testimony read to
6  me, and hereby certify that it is a true and
7  correct transcription of my testimony, with
8  the exception of any attached corrections or
9  changes.
10
11
12  _____
        (Witness' Signature)
13  _____
    DATE SIGNED
14
15  DEPONENT PLEASE INITIAL ONE:
16
    _____ Read with no corrections
17
18  _____ Read and correction sheet attached
19
20
    DATE TAKEN:  July 9, 2007
21
22
23
24
25

Page 165

1
2
3      REPORTER'S CERTIFICATE
4
5      I, ROGER D. JOHNS, RMR, RDR, CRR,
6  Certified Court Reporter, do hereby certify
7  that the above-named witness, after having
8  been first duly sworn by me to testify to the
9  truth, did testify as hereinabove set forth;
10  that the testimony was reported by me in
11  shorthand and transcribed under my personal
12  direction and supervision, and is a true and
13  correct transcript, to the best of my ability
14  and understanding; that I am not of counsel,
15  not related to counsel or the parties hereto,
16  and not in any way interested in the outcome
17  of this matter.
18
19
20
21          ROGER D. JOHNS
22      CERTIFIED COURT REPORTER
23          STATE OF LOUISIANA
24
25

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

b1110e9c-4042-450f-b4d8-0b2ee0c11266