# App. Tab 6

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION
                                        NO. 05-4182 "K"(2)

  PERTAINS TO:  MRGO                     JUDGE DUVAL

  FILED IN:  05-4181, 05-4182,          MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285




Videotaped deposition of ETHEL COATS, 756
Louisiana Avenue, New Orleans, Louisiana  70115,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Tuesday, the 17th day of July, 2007, beginning at
9:28 a.m.



APPEARANCES:

        ARTHUR W. LANDRY AND JEANNE ANDRY LANDRY
        (BY:  ARTHUR W. LANDRY)
        710 Carondelet Street
        New Orleans, Louisiana  70130

             ATTORNEYS FOR THE PLAINTIFFS

## Page 2

```
 1  APPEARANCES CONTINUED
 2     DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
          & WEINSTOCK
 3     (BY  NICOLE M. BOYER)
       Suite 2900
 4     3838 North Causeway Boulevard
       Metairie, Louisiana 70002
 5
       ATTORNEYS FOR THE BOARD OF
 6     COMMISSIONERS FOR THE LAKE BORGNE
       BASIN LEVEE DISTRICT
 7
       STONE PIGMAN WALTHER WITTMANN
 8     (BY  CARMELITE M. BERTAUT)
       546 Carondelet Street
 9     New Orleans, Louisiana 70130-3588
10        AND
11     JONES DAY
       (BY:  AMY PAYNE)
12     2727 North Harwood Street
       Dallas, Texas 75201-1515
13
       ATTORNEYS FOR WASHINGTON GROUP
14     INTERNATIONAL, INC.
15  ALSO PRESENT:
16     EMMA I. DiANNA
       STONE PIGMAN WALTHER WITTMANN
17     546 Carondelet Street
       New Orleans, Louisiana 70130-3588
18
19  VIDEOTAPED BY:
20     GILLEY DeLORIMIER, C.L.V.S.
       Depo-Vue, Inc.
21     Suite 205
       3200 Ridgelake Drive
22     Metairie, Louisiana 70002
       (504) 828-8856 or (888) 337-6883
23
    REPORTED BY:
24
       CAROL VALLETTE SLATER
25     Certified Court Reporter
       Registered Professional Reporter
```

## Page 3

```
 1           I N D E X
 2  EXAMINATION BY:        PAGE
 3  MS. PAYNE              5
 4
 5  EXHIBITS:
 6  Coats Exhibit Number 1    68
       Document entitled "Notice of
 7     Videotaped Deposition"
 8  Coats Exhibit Number 2    69
       Document entitled "Plaintiffs'
 9     Response to MRGO Defendants' First
       Set of Joint Class Certification
10     Requests For Admission,
       Interrogatories and Requests For
11     Production of Documents"
12  Coats Exhibit Number 3    70
       Document entitled "Plaintiffs'
13     Response to MRGO Defendants' First
       Set of Joint Interrogatories,
14     Requests For Production of
       Documents and Requests For
15     Admissions to Plaintiffs Regarding
       CommonLiability Issues"
16
    Coats Exhibit Number 4    84
17     Aerial photograph
18  Coats Exhibit Number 5    85
       Aerial photograph
19
    Coats Exhibit Number 6    99
20     Photographs
21  Coats Exhibit Number 7    99
       Photographs
22
    Coats Exhibit Number 8    101
23     Photograph
24  Coats Exhibit Number 9    146
       June 9, 2006, Corps of Engineers
25     letter and Form 95
```

## Page 4

```
 1        S T I P U L A T I O N
 2        IT IS STIPULATED AND AGREED by and
 3  between counsel for the parties hereto that the
 4  deposition of the aforementioned witness is
 5  hereby being taken under the Federal Rules of
 6  Civil Procedure, for all purposes, in accordance
 7  with law;
 8        That the formalities of reading and
 9  signing are specifically not waived;
10        That the formalities of sealing,
11  certification and filing are specifically waived;
12        That all objections, save those as
13  to the form of the question and the responsiveness
14  of the answer, are hereby reserved until such
15  time as this deposition, or any part thereof, may
16  be used or sought to be used in evidence.
17
18            *   *   *   *
19
20        CAROL VALLETTE SLATER, Certified
21  Court Reporter, Registered Professional Reporter,
22  in and for the Parish of Orleans, State of
23  Louisiana, officiated in administering the oath
24  to the witness.
25
```

## Page 5

```
 1  THE VIDEOGRAPHER:
 2        This is the videotaped
 3  deposition of Ethel Coats.  This
 4  deposition is being held today at
 5  855 Baronne Street, in New
 6  Orleans, Louisiana, on July 17th,
 7  2007.  The time is 9:28 a.m.
 8  Would the court reporter please
 9  now swear in the witness.
10  ETHEL COATS,
11  after being first duly sworn in the cause,
12  testified as follows:
13  EXAMINATION BY MS. PAYNE:
14     Q.  Good morning, Mrs. Coats.
15     A.  Morning.
16     Q.  My name is Amy Payne.  We met
17  earlier off the record.  I represent defendant
18  Washington Group and I'm going to take your
19  deposition today.
20     A.  Uh-huh.
21     Q.  How are you?
22     A.  Fine.  Fine.
23     Q.  Will you please state and spell your
24  name for the record?
25     A.  My name is Ethel Coats, and
```

2 (Pages 2 to 5)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 6

1  spelling, E-T-H-E-L, Coats, C-O-A-T-S.
2       Q.  Is this your first time being
3  deposed?
4       A.  Yes.
5       Q.  And I'm sure your counsel ran down
6  with you the basics on depositions, but I'm just
7  going to remind you of a couple of things.  One
8  is that when I ask you a question, even if you
9  know what I'm about to say, if you let me finish
10 the question before you give your answer, that
11 will help the court reporter take it down.  And
12 I'll try to do the same.  I'll wait until you
13 finish your answer before I ask another question.
14 Just makes it easier.
15      A.  Yes.
16      Q.  And if at any time you don't
17 understand one of my questions, just let me know
18 and I'll try to clarify it.  Okay?
19      A.  Yes.
20      Q.  If you need a break at any time,
21 just let me know, and we'll take a break at your
22 convenience.
23      A.  Yes.
24      Q.  Mrs. Coats, what did you do to
25 prepare for the deposition today?

Page 7

1       A.  Got a good night rest.
2       Q.  Anything else?
3       A.  Talked to God.
4       Q.  Did you meet with any of your
5  attorneys?
6       A.  This morning.  (Nods head
7  affirmatively.)
8       Q.  This morning?
9       A.  (Nods head affirmatively.)
10      Q.  Just when you were walking over for
11 the deposition?
12      A.  (Nods head affirmatively.)  A few
13 minutes before that.
14      Q.  Did you meet with anyone other than
15 your attorneys?
16      A.  No.
17      Q.  Did you review any documents in
18 preparation for the deposition?
19      A.  No.
20      Q.  Is there anything else that you may
21 have done to prepare?
22      A.  No.
23      Q.  Have you been involved in any other
24 lawsuits?
25      A.  No.

Page 8

1       Q.  Ever involved in any kind of
2  criminal proceeding?
3       A.  No.
4       Q.  Have you ever filed for bankruptcy?
5       A.  No.
6       Q.  Let's just talk a little bit about
7  your background.  Where were you born?
8       A.  In St. Joseph, Louisiana.
9  MS. BERTAUT:
10      Miss Coats, I wonder if you
11      could speak up.  I'm having
12      difficulty hearing you.
13 THE WITNESS:
14      Okay.
15      A.  St. Joseph, Louisiana.
16 EXAMINATION BY MS. PAYNE:
17      Q.  And where is that?
18      A.  That's right out of -- right out
19 of -- St. Joseph is right out of Mississippi.
20      Q.  When did you first come to New
21 Orleans?
22      A.  When I was two years old.
23      Q.  Have you lived in New Orleans since
24 then?
25      A.  Yes.

Page 9

1       Q.  You never lived anywhere else
2  besides New Orleans since you were two?
3       A.  No.  No.
4       Q.  Are you currently married?
5       A.  My husband's deceased.
6       Q.  Is that Jimmy Coats?
7       A.  Yes.
8       Q.  He passed away in 1999; is that
9  right?
10      A.  Yes.
11      Q.  Mrs. Coats, what is your maiden
12 name?
13      A.  Nelson.
14      Q.  And before you married Mr. Coats,
15 had you been married before then?
16      A.  Larry Franklin.
17      Q.  Anyone else?
18      A.  No.
19      Q.  Do you have any children?
20      A.  Three.
21      Q.  What are their names?
22      A.  Lintoi Franklin.  L-I-N-T-O-I.
23 Franklin.
24      Q.  And who else?
25      A.  Latrice Franklin.

3 (Pages 6 to 9)

Page 10

```
 1      Q.  Will you spell that as well?
 2      A.  L-A-T-R-I-C-E Franklin.  Larry
 3  Franklin.
 4      Q.  And what years were they born?
 5      A.  Oh, my God.  One was born in '72,
 6  one's born in '74 and one's born in '76.
 7      Q.  In that order that you gave them to
 8  me?
 9      A.  Uh-huh.
10      Q.  So, they're all in their 30s.  Were
11  any of them living with you before Hurricane
12  Katrina?
13      A.  My daughter was living next door to
14  me.
15      Q.  Latrice was?
16      A.  No.  Lintoi.
17      Q.  Oh, Lintoi.  Is Lintoi still living
18  with you?
19      A.  No, ma'am.  No, ma'am.  No.
20      Q.  And when you say "next door," was
21  she in -- I understand you were in a duplex --
22      A.  The house was a double till I turned
23  it into be a one, single home.
24      Q.  And, so, was Lintoi in 1022, or was
25  she next door in one of the other houses?
```

Page 11

```
 1      A.  She was in 1022.
 2      Q.  Okay.  Was she paying you rent?
 3      A.  No.
 4      Q.  Do you currently have anyone else
 5  living with you?
 6      A.  No.
 7      Q.  Do you have any grandchildren?
 8      A.  I have nine.
 9      Q.  Where does Lintoi live now?
10      A.  Lintoi live in New Orleans East.
11      Q.  And where does Latrice live right
12  now?
13      A.  Latrice live in Hammond.
14      Q.  You'll have to forgive me.  I'm from
15  out of town.  Where is Hammond?
16      A.  Hammond is right there -- it's in --
17  it's in New Orleans, Louisiana.  It's in
18  Louisiana.
19      Q.  What part of New Orleans?
20      THE WITNESS:
21          Do you know where it at?
22  EXAMINATION BY MS. PAYNE:
23      Q.  Is it in New Orleans East or is it
24  in St. Bernard or is it on the other side of the
25  city?
```

Page 12

```
 1      A.  It's right out from Baton Rouge,
 2  right before you get to Baton Rouge.
 3      Q.  Oh, okay.  And where does Larry live
 4  now?
 5      A.  Well, Larry live in St. Rose.
 6      Q.  And where is --
 7      A.  Right out of Metairie.
 8      Q.  Can you spell that for me, the
 9  name --
10      A.  What?
11      Q.  Where he lives, where Larry lives?
12      A.  St. Rose?  I think it's R-O-S-S --
13  rose -- how do you -- rose.  Yeah -- S-T first, I
14  think.
15      THE WITNESS:
16          Am I right?  S-T and then
17  St. Rose?
18      MR. LANDRY:
19          I'm not supposed to be
20  helping you answer the questions.
21      THE WITNESS:
22          Oh, okay.
23      MS. PAYNE:
24          Oh, I've got it.  St. Rose.
25  Okay.
```

Page 13

```
 1      MR. LANDRY:
 2          St. Rose.
 3      MS. PAYNE:
 4          Thank you very much.
 5      MR. LANDRY:
 6          It's up the river, as they
 7  say.
 8  EXAMINATION BY MS. PAYNE:
 9      Q.  Now, the -- what is your current
10  address?
11      A.  756 Louisiana Avenue.
12      Q.  And that's in the uptown area,
13  right?
14      A.  Yes.
15      Q.  And before that, you lived at --
16      A.  1020 Charbonnet Street, in New
17  Orleans.
18      Q.  And then where did you live before
19  that?
20      A.  Metairie -- out in Kenner.
21      Q.  What was that address?
22      A.  9001 Fourth Street.  That was my
23  mother's new home.
24      Q.  And when did you move to the
25  Charbonnet Street address?
```

4  (Pages 10 to 13)

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139
b203d5cf-cf83-4456-a851-043c004e06cb

Page 14

1    A.   When I was 31 years old.
2    Q.   Would that have been -- what year
3  would that have been?  Let's see here.  I may
4  have it in my notes.  1994, does that sound about
5  right?
6    A.   (Nods head affirmatively.)
7    Q.   So, whenever you moved into the
8  house in 1994, was that with your husband, Jimmy
9  Coats?
10   A.   Yes.
11   Q.   And who all was living with you at
12 that time?
13   A.   Just my husband and I.
14   Q.   And when did Lintoi move in with
15 you?
16   A.   When she was about 21.
17   Q.   So, she must have moved in with you
18 shortly after you moved into the house?
19   A.   Uh-huh.
20   Q.   And then at the time of Hurricane
21 Katrina, who else was living there with you
22 besides Lintoi?
23   A.   Nathan Morgan.
24   Q.   Can you spell his last name?
25   A.   M-O-R-G-A-N.

Page 15

1    Q.   Was this the man who was present
2  during the inspection of the property that took
3  place in mid-June --
4    A.   Yes.
5    Q.   -- I think.  But you said you don't
6  still live with Nathan?
7    A.   Yes, Nathan and I still live
8  together.
9    Q.   Oh, you do?
10   A.   Uh-huh.
11   Q.   So, only Nathan Morgan and Lintoi
12 were the only people living there?
13   A.   That's all.
14   Q.   Does Lintoi have children?
15   A.   Lintoi have three kids.
16   Q.   Where do they live?
17   A.   With her, at New Orleans East.
18   Q.   But they weren't living with you at
19 the time of Hurricane Katrina?
20   A.   Yes.
21   Q.   Oh, they were.  Okay.
22   A.   Uh-huh.
23   Q.   So, Nathan Morgan was living with
24 you?
25   A.   Yes.

Page 16

1    Q.   And Lintoi?
2    A.   Lintoi Franklin.
3    Q.   And her three children?
4    A.   Yes.
5    Q.   What are their names?
6    A.   One name Lindsay Franklin.
7  MS. BERTAUT:
8       I'm sorry.  I can't
9  understand you.
10 THE WITNESS:
11      Lindsay.
12 MS. BERTAUT:
13      Clancy?
14 THE WITNESS:
15      Lindsay.
16 EXAMINATION BY MS. PAYNE:
17   Q.   Lindsay?
18   A.   Yes.
19 MR. LANDRY:
20      Lindsay, I think.
21 EXAMINATION BY MS. PAYNE:
22   Q.   And who else?
23   A.   Crystal Lin, L-I-N.
24   Q.   And who is the third child?
25   A.   Ronald Alexis.

Page 17

1    Q.   Ronald Alexis?
2    A.   Uh-huh.
3    Q.   And how old is Lindsay?
4    A.   Lindsay's 12.
5    Q.   Right now, she's 12?
6    A.   Uh-huh.
7    Q.   And how old is Crystal right now?
8    A.   Nine.
9    Q.   And how old is Ronald --
10   A.   Four.
11   Q.   Sorry.
12   A.   Four.
13   Q.   Ronald's four?
14   A.   Uh-huh.
15   Q.   Okay.  So, at the time of Hurricane
16 Katrina, the people who were living with you were
17 Nathan Morgan, Lintoi Franklin, Lindsay Franklin,
18 Crystal Lin, Ronald Alexis?
19   A.   Yes.
20   Q.   And -- anyone else living there?
21   A.   No.
22   Q.   Does Nathan have any children?
23   A.   No.
24   Q.   Mrs. Coats, what is your educational
25 background?

5  (Pages 14 to 17)

b203d5cf-cf83-4456-a851-043c004e06cb

1  A.  Eleventh grade.
2  Q.  And where did you go to high school?
3  A.  Bunche Village.  Bunche Village.
4  Q.  Will you describe your employment
5  history briefly?
6  A.  I was working for the school board;
7  I was a monitor.  Sitting work with the old
8  people.
9  Q.  When did you work for the school
10 board?
11 A.  I think I was, like, about 30 --
12 about 30 years old, I started working for them.
13 Q.  What school board?
14 A.  Adams Junior High School.
15 Q.  Is that in Jefferson Parish?
16 A.  Yes.
17 Q.  And how long did you work for the
18 school board at that junior --
19 A.  About five years.
20 Q.  And what did you do for the school
21 board?
22 A.  Monitor the hallways, make sure the
23 kids stayed in the classroom.  They had a
24 problem, bring them to the office.
25 Q.  And did you do anything during the

1  summer?
2  A.  No.
3  Q.  Is that where your -- some of your
4  children went to school at that time?
5  A.  No.
6  Q.  Were you living on Charbonnet Street
7  when you worked there?
8  A.  (Nods head affirmatively.)  No.
9  Q.  That was before you moved to
10 Charbonnet Street, right?
11 A.  Yeah.  Right.
12 Q.  I'm sorry.  Just so I can keep my
13 time frame straight, how old are you now?
14 A.  Fifty-six.
15 Q.  Okay.  And then, besides the work
16 that you did as a monitor at the junior high
17 school, you said sitting work with older people?
18 A.  Uh-huh.
19 Q.  Describe that to me.
20 A.  Well, I would go in their homes, sit
21 with them, till -- maybe about three or four
22 hours, just sit there with them, make sure they
23 had their water, make sure they could go to the
24 bathroom, something like that.
25 Q.  Who were you employed by at that

1  time?
2  A.  I just did it on my own, self-
3  employed.
4  Q.  Oh, so did you charge for this, or
5  was this volunteer work?
6  A.  It was -- I would charge for it.
7  Q.  And they just paid you directly, the
8  people that you worked for?
9  A.  Right.  Right.
10 Q.  And about what time did you do this
11 work?
12 A.  What do you mean, what time?
13 Q.  What years?  How old were you?  How
14 long ago has it been?
15 A.  That was about -- ooh, I'd say -- my
16 baby -- Lintoi was 31 years old -- that was
17 30-some-odd years ago.
18 Q.  Which jobs did you have first, the
19 monitor --
20 A.  School.  School.
21 Q.  -- at the junior high school?  And
22 then you did the sitting work later?
23 A.  Uh-huh.
24 Q.  Have you had any jobs since then?
25 A.  No.

1  Q.  Have you looked for work since then?
2  A.  No.
3  Q.  Do you have any kind of business on
4  the side?
5  A.  No.
6  Q.  Mrs. Coats, can you describe for me
7  your experience with past hurricanes besides
8  Hurricane Katrina?
9  A.  I was in Betsy.
10 Q.  Hurricane Betsy?
11 A.  Uh-huh.
12 Q.  Where were you living at the time of
13 Hurricane Betsy?
14 A.  On Fourth Street, in Metairie -- in
15 Kenner, I mean.
16 Q.  Kenner.  And that was about 1965,
17 correct?
18 A.  Yes.
19 Q.  Did you have any damage during
20 Hurricane Betsy to your home?
21 A.  My mother and father, I was living
22 with them.  No.
23 Q.  Where exactly is Kenner located?
24 A.  Right out of New Orleans.  Right out
25 of Metairie.

Page 22

1    Q.   Which direction from New Orleans?
2  It's near the airport, right?
3    A.   Uh-huh.
4    Q.   Did you know anyone who had serious
5  damage from Hurricane Betsy?
6    A.   A lot of the neighbors had damage.
7    Q.   What kind of damage?
8    A.   Well, they had more wind damage and
9  they had roofs off and windows blowed out, and
10  some of them homes was destroyed, but we was one
11  of the lucky ones.  Our house stood the storm
12  pretty good.  We had damage, but it wasn't like
13  the neighbors' houses.
14    Q.   What kind of damage did your
15  parents' house have?
16    A.   Well, they had some -- the roof,
17  some of her siding came off her home, tore down
18  our fence, stuff like that.
19    Q.   You didn't have any flooding?
20    A.   Uh-uh.
21    Q.   And the neighbors that you've
22  described with wind damage and the roofs blown
23  off and that sort of thing in Hurricane Betsy,
24  are those your neighbors in Kenner?
25    A.   They all deceased now.  They was my

Page 23

1  neighbors.
2    Q.   Right.  At the time?
3    A.   Right.
4    Q.   Your neighbors in Kenner at the
5  time?
6    A.   Right.
7    Q.   Did any of your neighbors there have
8  flooding?
9    A.   No.
10    Q.   The Lower Ninth Ward got hit pretty
11  hard during Betsy, though, right?
12    A.   Yes.
13    Q.   Did you know anyone in that area who
14  sustained --
15    A.   No.  No.
16    Q.   You just heard stories about it on
17  the news?
18    A.   Right.
19    Q.   Did you actually get to see any of
20  the aftermath of Betsy in the Lower Ninth Ward,
21  the area where you live now, where you lived
22  before Hurricane Katrina?
23    A.   No.
24    Q.   Did you know anyone who was hurt
25  during Hurricane Betsy?

Page 24

1    A.   No.
2    Q.   Did you and your parents evacuate
3  during Hurricane Betsy?
4    A.   We went to a shelter at the school,
5  Washington Elementary.
6    Q.   And was the school there in Kenner?
7    A.   Yes.
8    Q.   How long did you have to stay at the
9  shelter?
10    A.   Overnight.
11    Q.   Any other hurricanes besides
12  Hurricane Betsy?
13    A.   No.
14    Q.   Were you around for Hurricane Ivan
15  in 2004?
16    A.   I don't remember Ivan.
17    Q.   What about Hurricane Georges in
18  1998?
19    A.   Uh-huh.
20    Q.   Do you remember that hurricane?
21    A.   Yes.
22    Q.   You would have been living at the
23  Charbonnet Street address, right?
24    A.   Uh-huh.
25    Q.   Do you remember anything about that

Page 25

1  hurricane?
2    A.   It wasn't any damage to none of our
3  neighbors or anything like that, so, no.  I
4  don't -- I remember it, but it wasn't any damage
5  to my neighborhood, so --
6    Q.   What do you remember about the
7  hurricane specifically?
8    A.   Just, I think it was wind damage and
9  plenty people had their homes, you know, like,
10  knocked down -- some damage to their homes and
11  stuff like that.  That's probably all I remember
12  about it.
13    Q.   Do you remember whether you stayed
14  there at your home during that hurricane?
15    A.   Yes.  Uh-huh.
16    Q.   And, so, did you have any flooding
17  from that hurricane?
18    A.   No, I didn't.  No.
19    Q.   Did you have any wind damage to your
20  home?
21    A.   No.  No.
22    Q.   There was no damage to your home at
23  all from that?
24    A.   No.
25    Q.   But you knew people who did have

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 26

1  damage?
2    A.  Yes.
3    Q.  Who did you know that had damage
4  from --
5    A.  Just different people that was on
6  the news and around, you know.  I didn't know --
7  there wasn't anybody, like, kin to me or close
8  friends or anything like that, no.  I didn't know
9  nobody.
10    Q.  What kind of damage did you hear
11  about on the news?
12    A.  Like, some roofs, maybe, got blown
13  off and stuff, you know, that I can remember.
14    Q.  When Hurricane Georges came, did you
15  do anything to prepare your house for the storm?
16    A.  We boarded up our windows and
17  different stuff like that.
18    Q.  Anything that you did besides board
19  up the windows?
20    A.  Picked up all the furniture --
21  different -- barbecue grills and different things
22  like that that we had around.
23    Q.  Just bring those inside?
24    A.  Yeah.
25    Q.  Any other hurricanes that you

Page 27

1  remember?
2    A.  No.
3    Q.  When did you first hear about
4  Hurricane Katrina moving in the direction of New
5  Orleans?
6    A.  About four days before it hit.
7    Q.  And you were living at the
8  Charbonnet Street address at that time?
9    A.  Yes.  Yes.
10    Q.  At what point did you decide you
11  should evacuate for Hurricane Katrina?
12    A.  When they say it was coming direct
13  hit to New Orleans.
14    Q.  Do you remember when that was, how
15  far in advance?
16    A.  I think it was about two days
17  before.
18    Q.  So, describe for me what you just --
19  how -- the process that you went through getting
20  your house ready for Hurricane Katrina.
21    A.  Well, I boarded up everything, I
22  picked up all the stuff -- I picked up everything
23  out of the yard.  We placed it in the home.  We
24  turned all the water off to the house.  We turned
25  the lights off to the home.  We put some

Page 28

1  furniture and tried to elevate it up off the
2  floors and -- yeah.
3    Q.  What stuff did you try to elevate
4  off the floor?
5    A.  Some of my furniture.  Like, my
6  living room set, I went out and got some cinder
7  blocks and I tried to -- because I never had a
8  idea that the water would get that high in the
9  house.  So, we put it up on cinder blocks and
10  stuff like that.
11    Q.  And what else did you do to prepare?
12    A.  That's about -- took some clothes
13  and -- that's about it.
14    Q.  And did you have a car at the time?
15    A.  No.
16    Q.  How did you evacuate?
17    A.  With my daughter.
18    Q.  Did your daughter have a car at the
19  time?
20    A.  Yes.
21    Q.  Did Nathan have an automobile at the
22  time?
23    A.  No.
24    Q.  So, out of the people that you were
25  living with, Lintoi was the only one with the

Page 29

1  car?
2    A.  Uh-huh.
3    Q.  What kind of a car did she have?
4    A.  I think it was a -- like a little
5  Ford Expedition -- little Ford something, it was.
6  I done forgot what it was.
7    Q.  So, it was a SUV?
8    A.  Yeah, I think.
9    Q.  Where did you evacuate to?
10    A.  Hammond, Louisiana.
11    Q.  Why did you choose Hammond?
12    A.  That's where my sister lived.
13    Q.  So, you stayed with your sister?
14    A.  Uh-huh.
15    Q.  Did Nathan and Lintoi --
16    A.  Yes.
17    Q.  -- and the kids all go --
18    A.  Yes.
19    Q.  -- with you?
20  MR. LANDRY:
21    Be sure to wait till she's
22  finished asking the question.
23  THE WITNESS:
24    Oh.
25  EXAMINATION BY MS. PAYNE:

8  (Pages 26 to 29)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 30

1     Q.   We're making it hard here on Miss
2  Slater to take everything down.
3     A.   Oh.
4     Q.   So, did the six of you all go to
5  Hammond in the Expedition?
6     A.   Yes.
7     Q.   And what all were you able to take
8  with you?
9     A.   About two or three days of clothes,
10  and that was it.
11     Q.   Were you able to take any of -- you
12  know, your family photographs or --
13     A.   No.
14     Q.   Just the -- just the clothes and --
15     A.   Yes.
16     Q.   How long had Lintoi been living with
17  you at the time of Hurricane Katrina?
18     A.   About three years.
19     Q.   And all of that time, was she living
20  with you rent-free?
21     A.   Uh-huh.
22     Q.   What did you do with the other part
23  of the house before she moved in?
24     A.   What did I do with it?
25     Q.   Were you using the entire -- both

Page 31

1  sides of the Charbonnet Street address, or was
2  somebody else living there?
3     A.   No.  I just had it -- I was going to
4  do some renovating to it, and when she moved in,
5  we stopped.  She moved out, I finished taking my
6  house, and I renovated it, put it into one big
7  single home.
8     Q.   I'm not sure I'm exactly clear on
9  the timing there.  Had you already started
10  renovating it before Lintoi moved in?
11     A.   Uh-huh.
12     Q.   About what year -- if you moved in
13  in 1994, how long after you moved in did you
14  start renovating it?
15     A.   Oh, that was -- it was just before
16  Katrina, about a year before Katrina, I started
17  renovating the home.
18     Q.   So, you started renovating it after
19  Lintoi had moved in?
20     A.   Right.
21     Q.   Okay.  Who lived in the 1022 side
22  before Lintoi moved in?
23     A.   Nobody.
24     Q.   It was empty?
25     A.   It was empty.

Page 32

1     Q.   What did you use that side for?
2     A.   It just was empty till I got money
3  to redo it.
4     Q.   Okay.  So, you were staying with
5  your sister in Hammond, Louisiana?
6     A.   Yes.
7     Q.   How long did you stay there?
8     A.   Three months.
9     Q.   When was the first time that you
10  tried to go back to New Orleans after Hurricane
11  Katrina?
12     A.   About three weeks after.
13     Q.   So, probably sometime in late
14  September?
15     A.   Uh-huh.
16     Q.   And that first time that you tried
17  to go back, were you able to get to your house?
18     A.   No.
19     Q.   What happened?
20     A.   The house was still flooded.
21     Q.   The area was flooded?
22     A.   Right.
23     Q.   You couldn't get close?
24     A.   Yes.
25     Q.   How far did you get?

Page 33

1     A.   Right by the St. Claude bridge.
2     Q.   And then you had to turn back?
3     A.   Right.  Yes.  Yes.
4     Q.   When did you next try to go to see
5  your house?
6     A.   About -- maybe about four weeks
7  later.
8     Q.   Is that four weeks after the
9  Hurricane Katrina, or four weeks after your
10  first --
11     A.   After the first time.
12     Q.   So, that would have been in mid-
13  October, probably?
14     A.   Yes.
15     Q.   Were you able to get to the house at
16  that time?
17     A.   No.
18     Q.   Why not?
19     A.   It was still flooded with -- and
20  they really wasn't allowing anybody down there.
21     Q.   The third time you tried, were you
22  able to get to the house?
23     A.   No.
24     Q.   No?  When was the next time you
25  tried?

9  (Pages 30 to 33)

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 34

1    A.   About another month after that.
2    Q.   Mid-November?
3    A.   Uh-huh.
4    Q.   And in mid-November, you still
5  couldn't get to the house?
6    A.   No.
7    Q.   Why couldn't you get to the house
8  then?
9    A.   Because it flooded the second time.
10   Q.   Is that flooding from Hurricane
11 Rita?
12   A.   It's -- flooded -- yes.  Rita.
13 Yeah, Rita.
14   Q.   When was the fourth time that you
15 tried to make it back to the house?
16   A.   Well, I gave it up, and I didn't go
17 back anymore till around -- maybe around, I
18 think, in May, I think.  I'm not sure.
19   Q.   So, May of the next year was the
20 first time that you personally made it back to
21 the house?
22   A.   Uh-huh.  Uh-huh.
23   Q.   What did you see when you went back
24 in mid-May?
25   A.   A disaster.  Everything was

Page 35

1  destroyed.
2    Q.   What did the house look like when
3  you walked up?
4    A.   Everything was just ramshack.
5    Q.   Was -- had other people been in at
6  that point to the house?
7    A.   No.
8    Q.   Did -- did anyone, like, Nathan, go
9  back sooner than you did?
10   A.   He couldn't -- no.
11   Q.   So, the -- who was with you when you
12 went back in mid-May of 2006?
13   A.   My daughter and I and I think it was
14 my brother.
15   Q.   Your daughter and your brother, and
16 that was it?
17   A.   Uh-huh.
18   Q.   Why didn't Nathan go with you?
19   A.   Nathan was working that day.
20   Q.   Does your brother live in Hammond as
21 well?
22   A.   Yes.
23   Q.   You said earlier that you stayed in
24 Hammond for about three months with your sister.
25   A.   Yes.

Page 36

1    Q.   So, had you already -- were you
2  still with your sister at the time you finally
3  made it back to your house on Charbonnet Street,
4  or had you moved?
5    A.   Yes.  No.  Still at my sister's
6  house.
7    Q.   So -- what was that?
8    A.   I was still at my sister's house.
9    Q.   So, were you at your sister's house
10 longer than three months then?
11   A.   Well, I came down here and I stayed
12 about two weeks with my -- one of my other
13 sisters, and then I went back to Hammond.
14   Q.   Okay.  Just so I'm clear on the
15 chronology, Hurricane Katrina was at the very end
16 of August, 2005.
17   A.   Uh-huh.
18   Q.   And you went from there to
19 Hammond --
20   A.   Uh-huh.
21   Q.   -- to stay with your sister?
22   A.   Uh-huh.  Yes.
23   Q.   And how long did you stay at your
24 sister's house before you moved?
25   A.   I'd say a good five months.

Page 37

1    Q.   So, probably in February was when
2  you moved the next time?
3    A.   Yes.
4    Q.   And where did you move in February
5  of 2006?
6    A.   756 Louisiana Avenue.
7    Q.   That's where you're living now?
8    A.   Yes.
9    Q.   And, so, you'd been living where you
10 currently live now for about two or three months
11 before you finally made it to your house in the
12 Lower Ninth Ward?
13   A.   Yes.
14   Q.   How come you didn't make it back
15 sooner?
16   A.   Well, they wasn't letting anyone
17 down in the Ninth Ward because the Ninth Ward
18 stayed flooded for so long.
19   Q.   How long did the Ninth Ward stay
20 flooded that you know of?
21   A.   Maybe about -- maybe about -- I'd
22 say about six weeks, if I'm not mistaken.  About
23 six weeks.
24   Q.   So, why did you wait so many months
25 after the flooding had gone away before you went

b203d5cf-cf83-4456-a851-043c004e06cb

Page 38

1   back to see your house?
2       A.   Because they wouldn't let us down
3   there to see the house.  They wouldn't let nobody
4   down there.  It was so -- they had houses all in
5   the streets, and we just couldn't get to our home
6   at that time.  They wouldn't let us down there.
7   It was too dangerous to go.
8       Q.   And who was it that was keeping you
9   out of the neighborhood?
10      A.   The National Guards.
11      Q.   Did you know of anyone else who
12  got -- any of your neighbors who got to go back
13  in sooner?
14      A.   No.  No.
15      Q.   So, when you got back to your house
16  in May of 2006, do you recall being able to tell
17  how high the water got in the house?
18      A.   About -- my ceilings is nine feet.
19  So, it's about seven and a half.
20      Q.   So, nearly to the ceiling?
21      A.   Yes.
22      Q.   About seven and a half feet?
23      A.   Yeah.
24      Q.   How could you tell?
25      A.   They have a line where the water

Page 39

1   settled at.
2       Q.   And I assume everything in the house
3   was ruined?
4       A.   Yes.
5       Q.   Was there anything that you were
6   able to save?
7       A.   No.
8       Q.   Anything in the attic, that kind of
9   thing?
10      A.   No.
11      Q.   Was there window damage?
12      A.   Yes.
13      Q.   Even though you'd boarded them up?
14      A.   Uh-huh.
15      Q.   What kind of window damage?
16      A.   The windows was, like -- some of
17  them was blowed out, some of them was taken out,
18  some of them stayed, some of them was just --
19  there wasn't no windows in some part of the
20  house.
21      Q.   So, some of the windows were blown
22  out even though you had them boarded up?
23      A.   Yeah.
24      Q.   Do you remember what side of the
25  house those windows were on?

Page 40

1       A.   One, two, three in the back part of
2   the house, where the -- where the two bedrooms --
3   where my -- where my two bedrooms was and where
4   my den was.
5       Q.   Did you have any damage to the roof?
6       A.   Uh-huh.
7       Q.   What kind of damage did you have to
8   the roof?
9       A.   I had a chimney in the house.  The
10  chimney was ruined.  The chimney was ruined.
11  Some of my shingles came off the house.  I forget
12  what you call these things, all of that was off
13  my house, what they puts down on the -- right on
14  the line of the house.  I done forgot what you
15  call them.
16      Q.   What happened to the chimney?
17      A.   Well, the chimney blowed off.
18      Q.   The whole chimney was blown off of
19  your house?
20      A.   The top, where the roof at, that was
21  just off.
22      Q.   Wow.  So, you must have had a lot of
23  wind damage at your house.
24      A.   I had some, not much, not that much,
25  because my roof is still on.  It just was a

Page 41

1   few -- I don't know the things that run down
2   there, but it was just a -- because that's
3   bricks, and they just came off, you know.  It
4   wasn't a lot of wind damage.  It was just a few
5   bricks came off my chimney.
6       Q.   The thing that came off, was it
7   orange -- were they orange clips?
8       A.   Right.  Yeah.
9       Q.   Are those the hurricane clips or the
10  hurricane joints that people -- no, it's
11  something different?
12      A.   I think that's the closing where --
13  you know, where the line set where they closed
14  the -- I don't know what they.
15      Q.   Orange-red terra cotta ridge
16  markings?
17      A.   They was orange.  They was orange.
18  Yeah.
19      Q.   Okay.
20      A.   That was all what happened to the
21  roof.
22      Q.   Okay.  But -- well, the chimney --
23      A.   The chimney was bricks, and it had a
24  few bricks to fall with the -- you know, come
25  loose.

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 42

1    Q.   Okay.  So, a few of the bricks came
2 loose on the chimney, and that caused the whole
3 chimney to fall?
4    A.   Not the whole chimney.  Just about
5 ten bricks.
6    Q.   Oh, just part of the chimney?
7    A.   Yeah.
8    Q.   Okay.  Okay.  Did you have trees on
9 your property?
10   A.   No.
11   Q.   No?
12   A.   I had two trees.  Just one or two
13 trees.
14   Q.   One or two trees?
15   A.   Yeah.
16   Q.   Was there any damage to the trees?
17   A.   No.
18   Q.   Any damage to any of the trees in
19 your neighborhood?
20   A.   Yeah.  They had some damage to the
21 neighborhood trees.
22   Q.   Was there any debris around your
23 house?
24   A.   Plenty debris.  A whole lot.
25   Q.   What kind of -- I mean, what kind of

Page 43

1 things did you find?  Any big items?
2    A.   They had, like, the neighbors left
3 their cars.  The cars was all over.  They had
4 boats from some of the neighbors' house.  They
5 had --
6    Q.   The water had just picked that stuff
7 up --
8    A.   Picked all kind of stuff up and just
9 set it in different places from different -- I
10 don't know where it come from.  Just different
11 places where it came from.  But we had a -- it
12 was just a disaster -- it was horrible.  It was
13 just like -- it was just like all kind of
14 different things.
15   Q.   At what point did you actually get
16 to start cleaning up your house and cleaning up
17 that area?
18   A.   What month I came back in?  May?  It
19 was about two weeks after that we got a chance to
20 go in and start gutting it, taking out all the
21 stuff and getting rid of it.
22   Q.   Did you personally do that work, or
23 did you hire someone to do it?
24   A.   Hired.
25   Q.   Who did you hire to do that for you?

Page 44

1    A.   A crew that Andry's had.  A crew
2 that Brooke Andry's had to clean -- to gut the
3 house and clean it.
4    Q.   Brooke Andry's?
5    A.   Uh-huh.
6    Q.   Who was Brooke Andry's?
7    A.   That's -- she's a lawyer and she do
8 real estate.  She do's -- renovations on homes.
9    Q.   Okay.
10   A.   Troy's sister.  Yeah.
11   Q.   Mrs. Coats, do you know what a Form
12 95 is?
13   A.   No.
14   Q.   Do you remember signing a written
15 authorization to have your lawyer file a claim
16 with the United States Army Corps of Engineers?
17   A.   Yes.
18   Q.   That form is called a Form 95.
19   A.   Okay.
20   Q.   So, you know your attorney filed a
21 Form 95 on your behalf?
22   A.   Yes.
23   Q.   I just want to start by getting an
24 understanding of the injuries and, you know, the
25 relief that you're seeking in this lawsuit.  And

Page 45

1 the basic information I have right now in front
2 of me is your Form 95, and from looking at that,
3 it seems that there are three main types of
4 relief that you're seeking, and I just want to go
5 through them quickly with you and make sure I
6 understand what they are.  The first looks like
7 it's, you know, the damage to your home, to your
8 property.
9    A.   Yes.
10   Q.   The second, damage to your personal
11 possessions, your personal property that was in
12 your home.  And the third, severe mental
13 distress.
14   A.   Uh-huh.
15   Q.   Am I right, those are the three
16 types?
17   A.   Yes.  Yes.
18   Q.   Those are the three types of damages
19 you're seeking in the lawsuit?
20   A.   Yes.
21   Q.   Is there anything in addition to
22 those three?
23   A.   No.  No, ma'am.
24   Q.   And, again, I want to go through
25 each of those types and the circumstances of

b203d5cf-cf83-4456-a851-043c004e06cb

Page 46

1  those damages in more detail later, but just
2  before we get into the details, I want to make
3  sure I have the basic understanding of the types.
4  Beginning with your house at -- on Charbonnet
5  Street, can you just describe the location of
6  that house in the Lower Ninth Ward just for the
7  record, geographically where it's located?
8      A.  It's located right off of St. Claude
9  Avenue, across the Industrial Canal.
10     Q.  About how far from the Industrial
11 Canal is it?
12     A.  About six blocks.
13     Q.  And that was a one-level house --
14     A.  Uh-huh.
15     Q.  -- correct?
16     A.  Yes.
17     Q.  About how many square feet was the
18 house or is the house?
19     A.  I really don't know how many.  I
20 can't remember that right now.
21     Q.  Do you have any pictures of the
22 house before the -- of Hurricane Katrina?
23     A.  No.
24     Q.  You don't have pictures of the
25 house before Hurricane Katrina?

Page 47

1      A.  No.
2      Q.  When you were going in and looking
3  at the house, did you take any pictures or did
4  anyone take any pictures at that time of the
5  damage?
6      A.  Yes.
7      Q.  Do you have those pictures?
8      A.  Not right now.  My insurance company
9  has them, but I don't know -- can't get them
10 right now.
11     Q.  You sent them in to your insurance
12 company?
13     A.  Uh-huh.
14     Q.  Is that Alliance?
15     A.  Uh-huh.  Yes.
16     Q.  And did you keep copies of the
17 pictures that you sent in?
18     A.  No, I didn't.
19     Q.  Do you have the original negatives?
20     A.  No.
21     Q.  Were they taken with a digital
22 camera or a regular camera?
23     A.  A regular camera.
24     Q.  What happened to the negatives?
25     A.  I really don't know, because I

Page 48

1  didn't take the pictures.  My insurance company
2  take the -- the man who came out, he took the
3  pictures.  I didn't take the pictures.
4      Q.  Oh, okay.  So, the insurance company
5  took the pictures.  Did you or did Nathan, your
6  daughter, anyone that you were with take any
7  photos?
8      A.  No, we didn't take any.
9      Q.  And just so I'm correct, you didn't
10 have any pictures of the house before the storm?
11     A.  No, I don't have any of those.  No.
12     Q.  Mrs. Coats, do you own any other
13 property besides the house on Charbonnet Street?
14     A.  No.
15     Q.  Do you know who owns the duplex next
16 door, the 16 -- 1016 and 18?
17     A.  Yes.
18     Q.  Who owns that?
19     A.  Alberta Greff (phonetic).
20     Q.  Can you spell that for us?
21     A.  I don't -- I don't really know how
22 she spell that last name.
23     Q.  Okay.  And how long has Alberta
24 Greff lived there?
25     A.  Since I been living there.

Page 49

1      Q.  She was there when you moved in?
2      A.  No.  She was renting it out then,
3  during that time.  I think that was rental -- it
4  was rental property.
5      Q.  I understand that place next door to
6  you got pretty heavy wind damage.
7      A.  Right.
8      Q.  Do you know who owns the property --
9  another door down from Alberta Greff's property,
10 the 1012 and 14?
11     A.  Arcenio -- they sold that house, and
12 I really don't know -- Arcenio, I think that's
13 his name.
14     Q.  Arcenio.  Do you know a last name?
15     A.  No.
16     Q.  Let's move on to your second kind of
17 injury that we talked about, the damage to your
18 personal property.
19     A.  Uh-huh.
20     Q.  And it sounds like, from what you
21 said earlier, everything that you left in the
22 house was completely destroyed and --
23     A.  Everything.
24     Q.  All you had was a few days' worth of
25 clothes that you took with you to your sister's

13  (Pages 46 to 49)

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 50

1  house.
2     A.   Yes.
3     Q.   But did you submit an insurance
4  claim on your personal property to Alliance?
5     A.   Yes.
6     Q.   Was that on your homeowner's policy
7  or your flood policy or both?
8     A.   Both.
9     Q.   As part of that process, did you
10 make a list of all of the -- your personal
11 property that may have been damaged?
12    A.   Yes.
13    Q.   Did you keep a copy of that?
14    A.   Yes.
15    Q.   Do you still have that -- that --
16 that list of property?
17    A.   Yes.
18    Q.   Where is that list located?
19    A.   At my home now.
20    Q.   At the Louisiana address?
21    A.   (Nods head affirmatively.)
22    Q.   Did you come up with an estimate of
23 how much all of your personal property that you
24 lost was worth?
25    A.   That's contents?

Page 51

1     Q.   Yes.
2     A.   Yes.
3     Q.   What was that estimate?
4     A.   It was about 56,000.
5     Q.   Fifty-six thousand dollars?
6     A.   Uh-huh.
7     Q.   And that covered everything that you
8  lost?
9     A.   In the home.
10    Q.   Was that actually your estimate or
11 was that the insurance company's estimate?
12    A.   That was mine.
13    Q.   Your estimate?
14    A.   Yes.
15    Q.   Does that include just your property
16 or does it include, you know, the property of
17 your daughter and Nathan and everyone?
18    A.   Everyone.
19    Q.   Everyone who was living there at the
20 time?
21    A.   Yes.
22    Q.   Is there any other high-dollar item
23 or is there anything that you have thought of
24 since you came up with that estimate that --
25 where the estimate should have been higher, or

Page 52

1  are you pretty comfortable with that number?
2     A.   I think it should have been higher.
3     Q.   How much higher do you think it
4  should have been, looking back?
5     A.   Looking back, I'd say a good --
6  maybe another good hundred and something thousand
7  dollars, because I had my grandkids' clothes, I
8  had my grandkids' different things in there, my
9  daughter's stuff, and I just put down my losses,
10 but I didn't put down their losses during that
11 time.
12    Q.   Oh, okay.  So the $56,000 was your
13 losses only?
14    A.   My loss.  Mines only.
15    Q.   Okay.  I misunderstood you earlier.
16 I thought you said that was for everyone.
17    A.   I did, but I -- yeah, but when you
18 asked me the question, if I go back now, yes, I
19 would have did it different.
20    Q.   Okay.  But $56,000 is --
21    A.   It wasn't enough.
22    Q.   -- is enough for your losses, just
23 you?
24    A.   Yes, just mines.
25    Q.   But if you included the losses for

Page 53

1  everyone living there, it may have been higher?
2     A.   Right.  Yeah.
3     Q.   Okay.  Let's talk about the third
4  type of injury, the severe mental distress.  Can
5  you just describe that for me briefly?
6     A.   The mental distress?
7     Q.   Yes.
8     A.   To walk in my home, to see
9  everything destroyed, it took a heavy toll on me.
10 I had to go back to the hospital.  My heart -- my
11 hair fell out.  I just couldn't sleep at night.
12 It was something that I don't think I'll ever
13 forget.  It was -- I must have vomit about two
14 weeks.  Vomit.  Every time I think about it --
15 everything was destroyed in that home.
16    Q.   Was that after you'd actually come
17 in and seen the loss yourself, or was it before
18 then, just suspecting?
19    A.   Just to walk in my home to see
20 everything just gone.  Everything.  I couldn't
21 stop shaking.  I cry.  And it just was horrible.
22 Right now, I think about my home, I'm not in it,
23 and it upsets my stomach.
24    Q.   We'll talk about this a little bit
25 more later, but you mentioned that your -- your

14  (Pages 50 to 53)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 54

```
 1   heart. Has -- have you had any type of other
 2   physical problems related to the hurricane?
 3       A.   Pressure.
 4       Q.   High blood pressure?
 5       A.   Yes.
 6       Q.   Is that something that you had
 7   before the hurricane, or is that something that
 8   you have as a result of it?
 9       A.   The results of it.
10       Q.   So, before Hurricane Katrina, you
11   didn't have high blood pressure?
12       A.   Uh-uh. No.
13       Q.   You didn't take any high blood
14   pressure medicine before the hurricane?
15       A.   No. No.
16       Q.   Did you have any heart disease
17   problems before the hurricane?
18       A.   Uh-huh.
19       Q.   What kind of problems with heart
20   disease did you have before the hurricane?
21       A.   I just had to have open-heart
22   surgery.
23       Q.   And about when was that?
24       A.   I think it was about maybe about six
25   months before the hurricane.
```

Page 55

```
 1       Q.   So, the surgery was a success?
 2       A.   Yes.
 3       Q.   And were you taking medications for
 4   that, for your heart disease?
 5       A.   Aspirins.
 6       Q.   Any other medications?
 7       A.   Now, I'm taking Atenolols, Captopril
 8   for my pressure.
 9       Q.   What was the first medication?
10       A.   Atenolol.
11       Q.   Do you know how that's spelled?
12       A.   No. Okay.
13       Q.   The medicine -- the first one that
14   you mentioned, the medicine for your heart, when
15   did you start taking that?
16       A.   They gave me that prescription,
17   like, about -- I'd say about a week -- two weeks
18   after I saw my home, for my pressure and
19   different things, for my heart, pressure, they
20   had to give me medicine, but right after the
21   storm -- before the storm, I wasn't taking
22   nothing but aspirin. But after the storm, they
23   had to put me on all kind of medication.
24       Q.   So, is that another type of injury
25   that you would say you got as a result of
```

Page 56

```
 1   Hurricane Katrina?
 2       A.   Yeah, because I was doing fine till
 3   after this. I was doing fine.
 4       Q.   So, for you, it was probably more
 5   like four types of injury then?
 6       A.   Uh-huh.
 7       Q.   It was the loss of your property --
 8   your house?
 9       A.   Uh-huh. My house.
10       Q.   Your personal property?
11       A.   Yes.
12       Q.   The severe mental distress?
13       A.   Yes.
14       Q.   And then the heart and blood
15   pressure issues?
16       A.   Yes.
17       Q.   Is there any other type of injury
18   that you had?
19       A.   No.
20       Q.   Any other type of relief that you're
21   seeking besides those four things?
22       A.   Uh-uh.
23   MR. LANDRY:
24       Object to form.
25   THE WITNESS:
```

Page 57

```
 1       Huh?
 2   MR. LANDRY:
 3       Go ahead.
 4       A.   No.
 5   EXAMINATION BY MS. PAYNE:
 6       Q.   Okay. What about -- I understand
 7   from a list of health issues that I got from your
 8   plaintiffs -- the plaintiffs' attorneys --
 9       A.   I will take that back. I'm on nerve
10   pills. I would take nerve pills. They're going
11   to give me nerve pills.
12       Q.   You're currently taking nerve pills?
13       A.   Uh-huh.
14       Q.   What kind of nerve pills?
15       A.   I really don't know the name right
16   now, but I have nerve pills, also. I'm sorry
17   about that.
18       Q.   That's okay. Do you take them every
19   day?
20       A.   Yes.
21       Q.   And what exactly are you taking them
22   for? What are they supposed to do for you?
23       A.   Calm my nerves down because I get
24   so -- I can't just -- if I think about what
25   happened, I just go to crying, I can't stop. And
```

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

1   they give me nerve pills to calm me down.
2        Q.   I understand that you may have high
3   cholesterol, also; is that correct?
4        A.   That was before the storm.
5        Q.   Okay.  So -- okay.  So, you did have
6   some preexisting heart problems before the storm
7   and your surgery --
8        A.   Uh-huh.
9        Q.   -- but didn't have to take as much
10  medication until after?
11       A.   No.  No.  Right.
12       Q.   The high blood pressure came on
13  after the storm.
14       A.   Yes.
15       Q.   Before Hurricane Katrina, you had
16  never had any blood pressure problems --
17       A.   No.
18       Q.   -- is that correct?
19       A.   Right.
20       Q.   And then the nerve pills to help
21  calm you down --
22       A.   Right.
23       Q.   -- that was something that you
24  started taking after the storm?
25       A.   Yes.

1        Q.   Had you ever taken any kind of nerve
2   pills or --
3        A.   No.  No.
4        Q.   Okay.  We're starting to talk over
5   each other a little bit again.
6        A.   I'm sorry.
7        Q.   It's okay.  It's hard to remember
8   because in a normal conversation, it's natural to
9   talk back and forth like that.  We just have to
10  remember she's taking down what we say.
11            Okay.  This is just another preview,
12  overview question.  We can get into more details
13  later.  But I want to get a preliminary list of
14  any type of claims you made for assistance or
15  insurance claims, anything like that, to recover
16  for the storm, and I know you said earlier you
17  had your flood insurance with Alliance; is that
18  right?
19       A.   Yes.
20       Q.   And your homeowner's insurance also
21  with Alliance?
22       A.   Yes.
23       Q.   Did you have any other kind of
24  insurance?
25       A.   No.

1        Q.   What about The Road Home Program,
2   did you make a claim for assistance under that?
3        A.   Yes.
4        Q.   How much did The Road Home Program
5   pay you -- or have you received money from The
6   Road Home Program yet?
7        A.   Well, they say 76,000.
8        Q.   They paid -- The Road Home Program
9   paid you $76,000?
10       A.   Yes.
11       Q.   And how much did your flood
12  insurance pay?
13       A.   One twenty-five.
14       Q.   A hundred twenty-five thousand?
15       A.   Yes.
16       Q.   Was that the policy limit, the
17  maximum amount you were insured for?
18       A.   Yes.
19       Q.   What about your homeowner's
20  insurance, how much did that pay?
21       A.   Thirty-three dollars.
22       Q.   It sounded like you said $33.
23       A.   Thirty-three dollars for -- let me
24  see -- one was 33 and one was 1,017 -- 1,700.
25  One check was for 33 and one check for was for

1   17 -- 1,700.
2        Q.   Seventeen hundred?
3        A.   Uh-huh.  One thousand, seven hundred
4   dollars.
5        Q.   Okay.  So, they sent you one check
6   for only $33?
7        A.   Thirty-three dollars.
8        Q.   What was that check for $33 for?
9        A.   My fence.
10       Q.   Oh, the fence.  But it probably cost
11  more than $33 to repair it, right?
12       A.   That's what they say.  Yeah.
13  Thirty-three dollars.  Yes.
14       Q.   Okay.  And what was the 1,700 for?
15       A.   To fix the damage on the roof.
16       Q.   So, the maximum you got from your
17  homeowners was $17,033.
18       MR. LANDRY:
19            Object.  Seventeen hundred.
20       MS. PAYNE:
21            My mistake.  Thank you,
22       Counsel.
23       MR. LANDRY:
24            Sure.
25  EXAMINATION BY MS. PAYNE:

b203d5cf-cf83-4456-a851-043c004e06cb

Page 62

1    Q.   One thousand, seven hundred
2  thirty-three dollars --
3    A.   Yes, ma'am.
4    Q.   -- was the maximum you got for your
5  homeowner's insurance?
6    A.   Yes.
7    Q.   Thank you.  What about FEMA?  Did
8  you get any assistance from FEMA?
9    A.   No.  All but the 2,500 they send you
10 when it first happened.
11   Q.   Twenty-five hundred?
12   A.   I think it was 2,500 they give
13 everybody.
14   Q.   Did you apply for additional
15 assistance from FEMA?
16   A.   I did, but they say I wasn't
17 available -- I wasn't eligible to get it.
18   Q.   Did you get a FEMA trailer?
19   A.   Yes.
20   Q.   How did you go about getting the
21 trailer?
22   A.   Well, I just called on the phone and
23 told them I needed -- you know, a trailer, and
24 they send a trailer out.
25   Q.   How long -- or did you stay in the

Page 63

1  trailer?
2    A.   One night.
3    Q.   Has anyone else used the trailer?
4    A.   No.
5    Q.   What do you use the trailer for?
6    A.   I had got the trailer to live in,
7  but the trailer -- by me having a nerve problem,
8  looked like the wall was closing up, the
9  trailer's too small.  They have, like, rodents
10 running in and out.  It's too small.  You
11 can't -- the tub and -- I just couldn't take it.
12   Q.   Have you tried to get someone to
13 take the trailer away?
14   A.   Well, I had said I was going to call
15 to see about getting it moved.
16   Q.   You have called?
17   A.   I'm going to call to see about it.
18   Q.   You are going to call.
19   A.   Uh-huh.
20   Q.   You but you haven't called yet?
21   A.   Uh-uh.
22   Q.   So, nobody's getting any use of the
23 trailer that you know of?
24   A.   No.
25   Q.   Were there any other programs where

Page 64

1  you got any type of assistance?
2    A.   I think it was Red Cross.
3    Q.   Red Cross?
4    A.   Uh-huh.
5    Q.   What kind of assistance did you get
6  from Red Cross?
7    A.   It was $1,000.
8    Q.   Did you have to apply for that or
9  was it automatic?
10   A.   We had to apply for it.
11   Q.   Were there any other programs where
12 you got any type of assistance?
13   A.   No.
14   Q.   Did you get any type of food stamps?
15   A.   Right after the storm, we did.
16   Q.   How long did you get food stamps?
17   A.   About two months.
18   Q.   Other than that, is there any other
19 type of assistance?
20   A.   No.
21   Q.   Okay.  I'm about to move on to
22 another area, but just one more time, I want to
23 go through and make sure I have all of your
24 injuries and types of relief down.
25   A.   Uh-huh.

Page 65

1    Q.   The loss of your property, severe
2  mental distress, loss of your personal
3  possessions --
4    A.   Okay.
5    Q.   -- and the physical injury, the
6  heart and high blood pressure problems.
7    A.   Right.
8    Q.   Is there anything else I'm leaving
9  out?
10   A.   No.
11   Q.   Okay.
12 MS. PAYNE:
13      This might be a good time to
14 take a break.
15 THE WITNESS:
16      Good.
17 MS. PAYNE:
18      You'd like to do that?
19 THE WITNESS:
20      (Nods head affirmatively.)
21 MS. PAYNE:
22      Okay.  Let's go off the
23 record.
24 THE VIDEOGRAPHER:
25      We're going off the record.

17  (Pages 62 to 65)

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

1    It's 10:33. This is the
2  conclusion of Tape 1.
3       (Whereupon, a discussion was
4  held off the record.)
5    THE VIDEOGRAPHER:
6       Returning to the record. It
7  is 10:44. This is the start of
8  Tape 2.
9  EXAMINATION BY MS. PAYNE:
10    Q.   Okay. Mrs. Coats, while we were on
11 the break, I have a couple of things we talked
12 about earlier I just want to follow up real
13 quickly.
14    A.   Uh-huh.
15    Q.   When you were describing some of the
16 preparations that you took whenever you heard
17 about Hurricane Katrina coming, you mentioned
18 putting some of your furniture up on cinder
19 blocks.
20    A.   Uh-huh.
21    Q.   Had you ever had to do that before?
22    A.   No.
23    Q.   How did you think of doing that with
24 the cinder blocks?
25    A.   Because I had just bought my living

1  room set and I thought of something to try to
2  save it, and it didn't.
3    Q.   Have you ever had any flooding in
4  the house before?
5    A.   No.
6    Q.   And then, just to clarify, the
7  house -- or the part of the duplex that was next
8  door, the 1022 part, did you ever rent that out
9  when you were living there?
10    A.   No. No.
11    Q.   You never rented it out?
12    A.   No.
13 MS. PAYNE:
14       Okay. I'm marking as Coats
15    Exhibit Number 1 the Notice of
16    Videotape Deposition for today.
17    This is just the deposition notice
18    that your attorneys got about us
19    doing the deposition today and
20    where it would be. It has an
21    Exhibit A at the end with a list
22    of documents that we had
23    requested. I just wanted to
24    clarify on the record with your
25    counsel that we made a prior

1    agreement, I guess, like we did in
2    the other depositions, that you
3    would not actually be producing
4    those today because of the
5    outstanding -- we have an
6    outstanding -- defendants have an
7    outstanding motion to compel and
8    you have an objection to that and
9    that this will get worked out at
10    the hearing? Is that correct?
11       (Whereupon, Coats Exhibit
12    Number 1 was marked for
13    identification.)
14 MR. LANDRY:
15       That's correct.
16 MS. PAYNE:
17       And you're not producing any
18    documents today at the deposition?
19 MR. LANDRY:
20       That's correct.
21 EXAMINATION BY MS. PAYNE:
22    Q.   Okay. So, Mrs. Coats, I'm just
23 going to ask you a few questions about some
24 documents now.
25       Okay. I'm handing you what's been

1  marked as Coats Exhibit Number 2. This is
2  "Plaintiffs' Response to MRGO Defendants' First
3  Set of Joint Class Certification Requests For
4  Admission, Interrogatories and Requests For
5  Production of Documents." Have you seen this
6  before?
7       (Whereupon, Coats Exhibit
8    Number 2 was marked for
9    identification.)
10    A.   No.
11 EXAMINATION BY MS. PAYNE:
12    Q.   No. You've never had a chance to
13 look over it?
14    A.   No.
15    Q.   Did your lawyers talk to you at
16 all -- and I'm not asking anything specific that
17 they said to you, but did they talk to you about
18 the discovery requests from defendants or
19 answering the requests?
20    A.   Explain that again.
21    Q.   Did your lawyers ever talk to you
22 about the defendants' discovery requests, like
23 asking for things like documents? Did they ever
24 talk to you about the defendants' requests?
25 THE WITNESS:

18 (Pages 66 to 69)

Page 70

1      Did he?  That slip my mind?
2  EXAMINATION BY MS. PAYNE:
3      Q.   You may not have.  I'm just asking.
4  Not that you remember?
5      A.   No, not that I remember.
6      Q.   Okay.  Your answer might be the same
7  on this, too, but I just want to go ahead and
8  show this one to you.  I'm handing you what's
9  been marked as Coats Exhibit Number 3.  This
10 document is called "Plaintiffs' Response to MRGO
11 Defendants' First Set of Joint Interrogatories,
12 Requests For Production of Documents and Requests
13 For Admissions to Plaintiffs Regarding Common
14 Liability Issues."  Have you reviewed this
15 document before?
16          (Whereupon, Coats Exhibit
17      Number 3 was marked for
18      identification.)
19     A.   No.
20 EXAMINATION BY MS. PAYNE:
21     Q.   Do you have any familiarity with it?
22     A.   No.
23     Q.   Have you talked to your lawyers at
24 all about responses to the defendants' requests?
25     MR. LANDRY:

Page 71

1          I'll just object to the
2      form.
3          You can answer it if you
4      know or if you remember.
5      THE WITNESS:
6          Okay.
7      A.   No.
8  EXAMINATION BY MS. PAYNE:
9      Q.   As far as you know, you haven't been
10 involved in responding to discovery at all --
11     A.   No.
12     Q.   -- is that right?
13     A.   Right.
14     Q.   So, The Road Home Program that we
15 were talking about before, did you keep a copy of
16 your application form to that?
17     A.   Yes.
18     Q.   Do you still have it, that copy?
19     A.   Yes.
20     Q.   And your insurance claims for your
21 homeowner's insurance, did you keep a copy of
22 that application?
23     A.   Yes.
24     Q.   Do you still have it?
25     A.   Yes.

Page 72

1      Q.   And what about your flood insurance,
2  did you --
3      A.   Yes.
4      Q.   Just a reminder -- you know.
5          I'll ask it again so the record's
6  clear.
7          For your flood insurance policy, did
8  you keep a copy of your application for that?
9      A.   Yes.
10     Q.   But you didn't have any of the
11 pictures, am I right?
12     A.   No.
13     Q.   Because those were taken directly by
14 the insurance company?
15     A.   Yes.
16     Q.   Did you prepare any kind of notes or
17 summary or did you write down anything about your
18 experiences during Hurricane Katrina?
19     A.   No.
20     Q.   Your evacuation?
21     A.   No.
22     Q.   Did you make any notes about the
23 property when you returned in May of 2006?
24     A.   No.
25     Q.   Some of the work that you had done

Page 73

1  on your property on Charbonnet Street, did you
2  get any receipts for the work?
3      MR. LANDRY:
4          Object to the form.  Are you
5      referring to before or after the
6      storm?
7      MS. PAYNE:
8          Thank you.  I'll rephrase.
9  EXAMINATION BY MS. PAYNE:
10     Q.   Some of the work that you had done
11 to the property after Hurricane Katrina, like,
12 the people that you paid to clean it out, for
13 example, do you have any receipts from them or
14 invoices for those expenses?
15     A.   No, I don't.
16     Q.   Do you remember whether you paid
17 them by cash or by check?
18     A.   Cash.
19     Q.   Cash.  Do you have any kind of
20 documents that would show what kind of work that
21 you had done after Hurricane Katrina?
22     A.   I don't have any documents, but I
23 can get some.
24     Q.   Just in your memory?
25     A.   Uh-huh.

b203d5cf-cf83-4456-a851-043c004e06cb

1    Q.   Other than the list of the
2  possessions that you had that you gave to the
3  insurance company of the things that were lost,
4  do you have any other kinds of lists about the
5  personal possessions that you lost?
6    A.   Yes.
7    Q.   What kind of lists do you have?
8    A.   I have the lists about my furniture,
9  my pictures, my clothes.  What else I have a list
10 of?  Everything that I had in that house.
11   Q.   When did you make the other lists?
12   A.   Right after I got in the home, when
13 I went to the home, to --
14   Q.   And, then, did you use those other
15 lists that you made to get your final list for
16 the insurance company?
17   A.   Yes.
18   Q.   Do you still have the early drafts
19 of the lists?
20   A.   I don't know.  I have to check to
21 see.  I don't really know.
22   Q.   You might still have those?
23   A.   Yeah.
24   Q.   The people who gutted your house,
25 did you pay them cash, you said?

1    A.   Yes.
2    Q.   How much did you pay them?
3    A.   Three thousand, five hundred
4  dollars.
5    Q.   Do you have any photographs or
6  videotapes or DVDs of the property damage that
7  you still have?
8    A.   No.
9    Q.   Have your attorneys already asked
10 you about all these documents?
11   A.   Yes.
12   Q.   Have you provided any of the
13 these --
14   A.   No.
15   Q.   -- documents to your attorneys?
16   A.   I'm sorry.  No.
17   Q.   Do you have plans to provide any of
18 the documents to your attorneys?
19   A.   Yes.
20   Q.   They have asked you for them?
21   A.   Yes.
22   Q.   When are you planning to provide
23 these documents to your attorneys?
24   A.   When I probably get them all
25 together.  Take time to get them together and

1  different things.
2    Q.   When did they ask you for these
3  documents?
4    A.   About two months ago, I think it
5  was.
6    Q.   About two months ago?
7    A.   Or three months ago.
8    Q.   About three months ago?
9    A.   Uh-huh.
10   Q.   Do you remember what documents
11 specifically they asked you for?
12   A.   My losses in the home, damage to the
13 home.
14   Q.   Anything else?
15   A.   No, I don't think so.
16   Q.   Okay.  So, now, Mrs. Coats, I want
17 to go back to the four main categories of
18 injuries that we talked about generally before
19 and just get into more of the detail about the
20 circumstances for each of those types of
21 injuries, starting with the damage to your home.
22   A.   Uh-huh.
23   Q.   I know you weren't present during
24 the storm, but do you have a view or
25 understanding of how your house was damaged?

1    A.   Uh-huh.
2    Q.   Please explain that.
3    A.   My home was damaged by floodwaters
4  that came from MRGO.
5    Q.   Floodwaters that came from MRGO?
6    A.   Yes.
7    Q.   When you say floodwaters that came
8  from MRGO, what -- what do you mean by that?
9  Where do you mean they came from?
10   A.   Where it came from?  Came from St.
11 Bernard Parish.  They didn't have nothing to stop
12 the water from coming through to the Lower Ninth
13 Ward.
14   Q.   So, that would be the water then
15 came from the -- basically, the east, through St.
16 Bernard Parish, and then to the Lower Ninth Ward,
17 is your understanding?
18   A.   Yes.
19   Q.   Do you know of any other source of
20 water that came to -- that would have reached
21 your house?
22   A.   No.
23   Q.   Have you heard anything from other
24 people about other sources of the water?
25   A.   No.

20  (Pages 74 to 77)

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139
b203d5cf-cf83-4456-a851-043c004e06cb

Page 78

1     Q.   Your understanding that the water
2  came from -- through St. Bernard Parish to the
3  Lower Ninth Ward, what is that understanding
4  based on?
5     A.   What the understanding is based on?
6  From my understanding -- okay. Let me see if I
7  understand the basis of my understanding. It
8  didn't come from the -- it couldn't have come
9  from nowhere else but that -- the -- from St.
10 Bernard Parish.
11    Q.   Why do you see that?
12    A.   Because the levee was all right.
13 There wasn't nothing wrong with the levee. The
14 levee was okay. I was right there by -- see --
15 St. Bernard Parish, then the Lower Ninth Ward.
16 And this water came through the Lower Ninth
17 Ward -- from MRGO to the Ninth Ward.
18    Q.   When you say that levee was okay,
19 which levee are you referring to?
20    A.   Six blocks from my home.
21    Q.   The Industrial Canal levee --
22    A.   Yes.
23    Q.   -- along where you live was okay?
24    A.   Right. Right.
25    Q.   Are you aware of some breaches to

Page 79

1  the Industrial Canal levee and floodwall, though?
2     A.   Was I -- no.
3     Q.   You don't know of any breaches along
4  the Industrial Canal?
5     A.   Uh-uh. Uh-uh. No.
6     Q.   Had you heard about any overtopping
7  of water along the Industrial Canal?
8     A.   No.
9     Q.   So, as far as you've heard or as far
10 as you're aware, there was no water coming into
11 the Lower Ninth Ward from the Industrial Canal.
12 It was all coming from St. Bernard Parish.
13 That's your understanding?
14    A.   Yes.
15    Q.   Okay. Was there anything else that
16 caused damage to your house besides the flooding,
17 the water? I guess we talked earlier about
18 some -- some wind damage to your chimney and to
19 the fence, right?
20    A.   Yes.
21    Q.   Was there any other type of wind
22 damage?
23    A.   No. No. None whatsoever. No.
24    Q.   Do you know how much rain you got in
25 that area during the hurricane?

Page 80

1     A.   Uh-uh.
2     Q.   You didn't have any fire or problem
3  like that at your house, did you?
4     A.   No.
5     Q.   Do you know how much damage to your
6  house may have been caused by Hurricane Rita as
7  opposed to Hurricane Katrina?
8     A.   The home was messed up before Rita
9  came in. Katrina was the one who did the damage
10 to my home.
11    Q.   How do you know which damage was
12 from Katrina versus which damage was from
13 Hurricane Rita?
14    A.   Because the damage was did before
15 Rita came along. I think Rita was two weeks
16 after Katrina. The Ninth Ward was flooded.
17 Everything was destroyed with Katrina. When Rita
18 came along, you know, it probably made it a
19 little bit worse, but it was Katrina, the first
20 one, who came through and destroyed my home.
21    Q.   Okay. I think I understand what you
22 mean by that. Hurricane Katrina did a lot of
23 damage. Hurricane Rita may have made it worse --
24    A.   Yeah.
25    Q.   -- but you don't really know the

Page 81

1  exact amount; is that right?
2     A.   Yeah. Right.
3     Q.   When you came back, was there any
4  sign of looting or vandalism to your home?
5     A.   No.
6     Q.   Let's talk a little bit about your
7  neighborhood. I know that we talked about the
8  house that was right next door to you, the, I
9  guess, 1016 and 18 house.
10    A.   Uh-huh.
11    Q.   You said that house had a lot more
12 roof damage than yours. Was that right? Am I
13 remembering correctly?
14    A.   That house was destroyed by water,
15 also. The roof was a little bit bad on that home
16 before Katrina. But that house was destroyed,
17 just like my house, from Katrina.
18    Q.   Right. Got lots of water.
19    A.   Yes.
20    Q.   I thought you said earlier that that
21 house got more roof damage than your house got.
22 Is that correct?
23    A.   I can't remember saying it had wind
24 damage. Can you go back over that and remind me?
25    Q.   It could have been my mistake. I

b203d5cf-cf83-4456-a851-043c004e06cb

Page 82

1  didn't want to repeat too much stuff that you
2  already talked about, but I can go through it
3  again.
4      A.   Okay.
5      Q.   The house right next door to
6  yours -- let me check the address -- 1016 and
7  18 --
8      A.   Uh-huh.
9      Q.   I was under the impression that in
10 addition to the flooding, it had heavy wind
11 damage.  Is that correct?
12     A.   No.  That house was -- that house
13 was pretty good till the water hit it.  The house
14 was good till the water hit that house, that
15 home.
16     Q.   So, it did not have wind damage --
17 I'm sorry.  Let me say that again.
18          That house did not have heavy wind
19 damage, as far as you know?
20     A.   Uh-uh.
21     Q.   Or do you remember?
22     A.   No.  It didn't have that, no.
23     Q.   Do you know, is there a pump station
24 in your neighborhood that pumps the water out
25 when it rains?

Page 83

1      A.   In my neighborhood?
2      Q.   Uh-huh.  I know some neighborhoods
3  have pump stations.
4      A.   I don't know.  It might have one,
5  but I don't think it's close to the homes.  It's
6  a good little distance from that home.
7      Q.   You know that New Orleans -- a lot
8  of New Orleans is below sea level, right?
9      A.   Yes.
10     Q.   And that you have an elaborate
11 hurricane protection system all around the city
12 with lots of different, you know, levees and
13 floodwalls that were built over years and years,
14 correct?
15     MR. LANDRY:
16          I'll object to the form of
17     that.  Go ahead.
18 EXAMINATION BY MS. PAYNE:
19     Q.   Is that your understanding?
20     A.   Wait.  Repeat.
21     Q.   Is it your understanding that there
22 is an elaborate hurricane protection system, with
23 lots of different levees and floodwalls around
24 your area that was built over a course of years?
25     MR. LANDRY:

Page 84

1          Same objection.
2          Go ahead and answer the
3      question.
4      A.   Yes.
5  EXAMINATION BY MS. PAYNE:
6      Q.   And is it your understanding that
7  during Hurricane Katrina, there was various --
8  there were various breaches or overtopping of the
9  levees in different places?
10     A.   Yes.
11     Q.   All around the whole system, right?
12     A.   Yes.
13     Q.   But not all of those sources of
14 water from everywhere probably made it to your
15 house?
16     A.   No.
17     Q.   Mrs. Coats, I'm handing you a
18 document that's been marked Coats Exhibit Number
19 4.
20          (Whereupon, Coats Exhibit
21     Number 4 was marked for
22     identification.)
23     MS. PAYNE:
24          I have extras, Counsel.
25 EXAMINATION BY MS. PAYNE:

Page 85

1      Q.   This is just a Google aerial shot
2  of, you know, way up in the air from where your
3  house is of the whole area taken after -- after
4  Hurricane Katrina.  The water's down.  I guess
5  it's from so high up, it's hard to see there, but
6  see the little yellow thumbtack pointing to the
7  area?
8      A.   Uh-huh.  Yes.
9      Q.   Does that look about right for where
10 your house is located in this area?
11     A.   Yes.
12     Q.   And I'm handing you another Google
13 aerial shot.  This time, it's a little bit closer
14 in.  It's marked Coats Exhibit Number 5.
15          (Whereupon, Coats Exhibit
16     Number 5 was marked for
17     identification.)
18 EXAMINATION BY MS. PAYNE:
19     Q.   You see there with the box there in
20 the 1020 Charbonnet Street address, the little
21 square?
22     A.   Uh-huh.
23     Q.   That's the approximate area.  Can
24 you tell which of those houses on the photo
25 shot -- which of those is yours?

b203d5cf-cf83-4456-a851-043c004e06cb

1    A.   Can I tell which one is mines?
2    Q.   Yeah.  Can you tell by looking at it
3  which of those houses is yours?
4    A.   No.
5    Q.   Is it -- are you pretty close to the
6  middle of the block?  Do you need a pair --
7    A.   Yeah.
8    Q.   -- of glasses?
9    A.   I'm going to see did I bring them.
10   Q.   You're like me.  I have separate
11 reading glasses from my regular glasses.  I
12 usually switch them out.  I forgot to bring them
13 this trip.
14   A.   I didn't bring mines either.  I left
15 them home.  I didn't think I was going to have
16 to -- my house is on here?
17   Q.   It's supposed to be.  Are you near
18 the middle of the block?
19   A.   Yes.  Can I get to the window?
20   Q.   A little more light maybe.
21   A.   Is that the one with the blue top on
22 it or -- I really can't.
23   Q.   Okay.  Yeah.  If you can't see then,
24 that's -- we can just move on.
25   A.   Okay.  You can close it because I

1  really can't see.
2    Q.   The thing I was going to really get
3  at here with this picture is, you know, it's
4  taken after Hurricane Katrina, and you can see
5  all of the -- some of the houses with the blue
6  roofs, but yours didn't -- yours never had a blue
7  roof on it, did it?
8    A.   No.
9    Q.   You didn't have a blue tarp, because
10 you didn't have that serious of wind damage; is
11 that right?
12   A.   Right.
13   Q.   You had to have fairly serious wind
14 damage to get a -- at what point did somebody
15 actually get a blue tarp, do you know?
16   A.   When their roof was destroyed.  When
17 their roof was bad, bad, bad.
18   Q.   So, yours wasn't bad enough for a
19 blue tarp?
20   A.   No.  No.  I didn't have to have one.
21   Q.   Okay.  It didn't look like even on
22 your street there were any houses with a blue
23 tarp; is that right?
24   A.   Right.
25   Q.   But then a couple blocks over may

1  have been a lot of blue tarps?
2    A.   Right.
3    Q.   So, it just kind of varied depending
4  on, you know, probably where you were and the
5  condition of the roof on whether you needed a
6  blue tarp or not; is that your understanding?
7    A.   Yeah.  My roof was fine.  My roof
8  was okay.
9    Q.   Yours was fine?
10   A.   Yeah.
11   Q.   Okay.  In your general neighborhood,
12 do you have an idea of about what percentage of
13 people had to have those blue tarps on their
14 roofs?
15   A.   Not very many, because -- no.  I can
16 remember, they didn't have very many homes with
17 blue roofs --
18   Q.   Just some --
19   A.   -- in my neighborhood.  Just some of
20 them.  Not all.  Not plenty, plenty people had
21 that many blue roofs.
22   Q.   Are you saying it was kind of
23 dependent on the neighborhood?
24   A.   Yeah, I guess so, because they
25 didn't have that many with blue roofs on.

1    Q.   Okay.  You just remember some, but
2  not --
3    A.   Not a whole lot of houses.
4    Q.   Not a whole lot.  Okay.  All right.
5       Okay.  Getting back to your house
6  specifically and the damage to your house, I
7  understand you purchased the house in May of
8  1994; is that right?
9    A.   Yes.
10   Q.   And was the purchase price $16,000?
11   A.   Yes.
12   Q.   How did you decide to purchase that
13 particular property?
14   A.   Because I was living in the home at
15 the time when it went up for sale, so, I just
16 purchased the home.
17   Q.   Oh, were you a renter beforehand?
18   A.   Uh-huh.
19   Q.   Oh.  When did you start renting that
20 particular house?
21   A.   Maybe about -- before that, it was
22 about -- like, about seven, eight years before
23 that.
24   Q.   Okay.  So, you actually moved into
25 the house then sometime in the late 1980s?

23  (Pages 86 to 89)

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 90

1    A.   Yes.
2    Q.   And then in 1994, you had the
3  opportunity to purchase it, so, you did?
4    A.   Yes.
5    Q.   When you purchased the house, do you
6  recall having an appraisal done of its value?
7    A.   No.  My insurance company did, but I
8  didn't have appraisal to come out.
9    Q.   The insurance company appraised it?
10   A.   Yes.
11   Q.   Do you know what amount they
12  appraised it to worth?
13   A.   During that time?
14   Q.   Uh-huh.
15   A.   I think they appraised it to be,
16  like, about 70 -- 70,000.
17   Q.   Seventy thousand?
18   A.   Yes, during that time.
19   Q.   And how did you get to purchase it
20  for 16,000?
21   A.   Well, it's -- it was just -- it was
22  just was a lucky thing.  They just put it up for
23  sale for 16,000 because the lady was moving away
24  and she hurried up and put it for sale for 16,000
25  and we bought it.

Page 91

1    Q.   So, it was actually worth 70,000 --
2  7-0, 70, or 17?
3    MR. LANDRY:
4         Object to form.
5    MS. PAYNE:
6         I'm not sure.  I may not
7    have heard the right amount the
8    first time.
9    A.   It was worth pretty good, but she
10  just wanted $70,000 because she was having a
11  problem with -- she said God was going to destroy
12  the world and that's all she wanted for it, and
13  that's what we gave her.
14  EXAMINATION BY MS. PAYNE:
15   Q.   God was going to destroy the world?
16   A.   Yes.
17   Q.   What did she mean by that?
18   A.   She say the world was coming to a
19  end.  That's all we know.  That sounds strange,
20  but that's what happened.
21   Q.   Okay.  Just for the record, so the
22  record is clear, and this is partly my hard of
23  hearing.  I apologize.  The appraisal was 70,000,
24  seven-zero?
25   A.   No.  The people who came out and

Page 92

1  appraised my home was the insurance company when
2  I put the insurance on it.  So, that's what they
3  say the house was worth.
4    Q.   But they said the house was worth
5  seventy, seven-zero?
6    A.   Seventy thousand.
7    Q.   Okay.
8    A.   But the lady sold the house for
9  16,000.  Now, why, we don't know.
10   Q.   Okay.  But you were required to
11  maintain fire and flood insurance as a condition
12  of your mortgage?
13   A.   Yes.  Yes.
14   Q.   And how much did you insure the
15  property for?
16   A.   For the fire insurance, I put
17  $80,000 -- up to 80.
18   Q.   And what about flood insurance, do
19  you remember?
20   A.   I had -- I think I put on there
21  150,000.
22   Q.   How did you decide on the 150,000
23  amount?
24   A.   When they was going around selling
25  insurance, that's all I could get on it right

Page 93

1  then and there.
2    Q.   Is your name on the title of the
3  house?
4    A.   Yes.
5    Q.   Is anyone else's name on the title?
6    A.   My deceased husband.
7    Q.   When you were a tenant, before you
8  actually purchased the house, did you just live
9  on one side, on 1020?
10   A.   Yes.
11   Q.   Did anyone else live on the other
12  side?
13   A.   No.
14   Q.   Did you make any substantial
15  improvements to the house from the time that you
16  purchased it until Katrina?
17   A.   Yes.  Yes.
18   Q.   What all did you do?
19   A.   I wanted to renovate it.  I wanted
20  to renovate the inside.  So, I did.  I wanted my
21  living room to be large.  I made a big living
22  room, a 12-by-24.  I made a big kitchen, a
23  12-by-24.  I did work in the bathrooms.  I did
24  work in the bedrooms.  I did work on the outside.
25   Q.   Sounds like you made a lot of

24  (Pages 90 to 93)

(504) 525-1753   HUFFMAN & ROBINSON, INC.   (800) 749-1753
ONE SHELL SQUARE, #250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 94

1 improvements.
2    A.   Yes.
3    Q.   Did you have a new roof put on at
4 some point?
5    A.   Yes.
6    Q.   What year was that?
7    A.   That was about -- I'd say about
8 seven or eight years before Katrina.
9    Q.   So, probably in late '90s?
10   A.   Uh-huh.
11   Q.   What caused you to replace the roof
12 in the late 1990s?
13   A.   Well, the roof had been on there so
14 long and they had a hailstorm, and the roof that
15 I had on there, they said that it was required
16 that we couldn't have those roofs anymore.  So, I
17 just went on and put a new roof on.  They had a
18 hailstorm and they had slate, and the hailstorm
19 broke some of those slates on it, and they said
20 it wasn't required for those kind of roofs.  So,
21 I put a new roof on my home.
22   Q.   Did insurance help pay for that?
23   A.   Yes.
24   Q.   Did it pay for all of the new roof?
25   A.   Uh-huh.

Page 95

1    Q.   What do you think the fair market
2 value of your house was before Hurricane Katrina?
3    MR. LANDRY:
4       Object to form.
5       You can answer.  I'm just
6    recording an objection for the --
7    A.   Well, I had -- I had put money into
8 that home.  I'd say about a hundred and something
9 thousand, I'd say, it was worth.
10 EXAMINATION BY MS. PAYNE:
11   Q.   How much over 100,000?
12   A.   About -- I'd say it was worth about
13 100,000.
14   Q.   About 100,000?
15   A.   (Nods head affirmatively.)
16   Q.   Did you actually have the home
17 appraised?
18   A.   No.
19   Q.   Did you know about other homes in
20 your neighborhood selling for certain prices
21 about that time?
22   A.   Uh-huh.
23   Q.   About how much were those homes
24 tending to go for?
25   A.   Okay.  One lady had bought hers for

Page 96

1 75,000, one had bought one for 80-something
2 thousand, and my girlfriend just had purchased
3 one, she say, for 120,000.
4    Q.   So, yours was somewhere in the kind
5 of middle?
6    A.   Right, because I did a whole lot of
7 renovation to that home.
8    Q.   Before Hurricane Katrina, did you
9 have any preexisting, unrepaired damage that you
10 had been meaning to take care of?
11   A.   Not anything major, but I wanted to
12 take care of some different things, yes.
13   Q.   What kinds of things did you want to
14 take care of?
15   A.   Like, remodeling the other bathrooms
16 and putting a ceramic tile in my bath and the
17 kitchen.
18   Q.   Do you know what year the house was
19 built?
20   A.   No.
21   Q.   I understand it was probably the
22 early 1900s.  Does that sound about right, or do
23 you know?
24   A.   No, I don't know when it was really
25 built.

Page 97

1    Q.   How much was your house elevated?
2    A.   It's up on four cinder blocks.
3    Q.   Do you know about how many feet that
4 is?
5    A.   I'd say about three feets.
6    Q.   About three feet up?
7    A.   Uh-huh.  Up.
8    Q.   Is that pretty standard for your
9 neighborhood --
10   A.   Yes.
11   Q.   -- or do the houses vary some?
12   A.   Pretty much all the houses up on
13 blocks like that.
14   Q.   Are there any of the houses in your
15 neighborhood that are built on slabs?
16   A.   No.
17   Q.   Slab foundation?
18   A.   No.
19   Q.   Do you have any idea what your
20 property is currently worth today?
21   A.   Since Katrina?
22   Q.   Yes.
23   A.   I don't know what they go for now.
24 No.  I really don't know.
25   Q.   Have you had any type of appraisal

25  (Pages 94 to 97)

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139
b203d5cf-cf83-4456-a851-043c004e06cb

Page 98

1  since Hurricane Katrina?
2      A.  No.
3      Q.  Have you heard about any of the
4  damaged homes in your area being sold and what
5  they have been sold for?
6      A.  Thirty to $40,000.
7      Q.  Because the land's worth something,
8  right?
9      A.  Oh, yeah.
10     Q.  So, you're not sure exactly the
11 amount, but it's going to be a little bit less
12 than 100 based on, you know, what the current --
13     A.  Because the houses is gutted out
14 now.  You not going to get the whole value, what
15 you put into it, because they gutted right now.
16 So, I can't say what they would really cost --
17 how much you could sell them for now.  I really
18 don't know.
19     Q.  I will go through a few pictures
20 with you.  I guess these were taken during those
21 home inspections in mid-June.
22     A.  Okay.
23     Q.  These first two I'm putting
24 together, marking it Coats Exhibit Number 6, the
25 Bates numbers, just for the record, are

Page 99

1  WGI-CC-000018 and WGI-CC-000035.  Are these both
2  pictures of your house on Charbonnet Street?
3          (Whereupon, Coats Exhibit
4          Number 6 was marked for
5          identification.)
6      A.  Yes.
7  EXAMINATION BY MS. PAYNE:
8      Q.  Okay. One's taken, you know, kind
9  of from a distance at one angle and the other one
10 is more up close.  Okay.
11         And then I'll show you a couple
12 more. I'm handing you what's been marked Coats
13 Exhibit Number 7.  Can you reach that?
14         (Whereupon, Coats Exhibit
15         Number 7 was marked for
16         identification.)
17 EXAMINATION BY MS. PAYNE:
18     Q.  Just for the record, this is marked
19 with a Document Number WGI-CC-000037 and
20 WGI-CC-000038.  Now, these are pictures taken of
21 the inside of the house.
22     A.  Yes.
23     Q.  And is the first page, 37, is that
24 the side where you were living originally?  Is
25 that right?

Page 100

1      A.  Yes.
2      Q.  Okay.  And is the other side the
3  part where your daughter was living and that you
4  were slowly repairing?
5      A.  Renovating.
6      Q.  I mean renovating.
7      A.  Yes.  It was all -- it was finished.
8  Yes.
9      Q.  Do you need to take a break?  Are
10 you okay?
11     A.  I'm all right.
12     Q.  Do you have plans to finish
13 repairing the house?
14     A.  Yes.
15     Q.  What do you have planned to -- I
16 mean, is there a schedule that you hope to move
17 back into it?
18     A.  Uh-huh.
19     Q.  When do you hope to be able to move
20 back into it?
21     A.  When I can get a contractor or
22 something, go ahead and see what they can do for
23 me.
24     Q.  I'm handing you what's been marked
25 as Coats Exhibit Number 8.

Page 101

1          (Whereupon, Coats Exhibit
2          Number 8 was marked for
3          identification.)
4      A.  Okay.
5  EXAMINATION BY MS. PAYNE:
6      Q.  Is this just a picture of the back
7  of your house?
8      A.  Yes.
9      Q.  And is this the structure there in
10 the very back, is that something that you added
11 on?
12     A.  Yes.
13     Q.  Did you add that on after you moved
14 into the house?
15     A.  Yes.
16     Q.  What year did you add that on, do
17 you remember?
18     A.  About -- about four years, five
19 years ago.
20     Q.  And is that just another bedroom?
21     A.  Yes.
22     Q.  Do you see the house sort of in the
23 background there?
24     A.  Yes.
25     Q.  And that's your neighbor's house,

26 (Pages 98 to 101)

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139
b203d5cf-cf83-4456-a851-043c004e06cb

Page 102

1    the 1016-18?
2        A.   Yes.
3        Q.   Is that stuff hanging off the
4    roof -- that wasn't a blue tarp, was it?  Do you
5    know?
6        A.   Yes.
7        Q.   That was a blue tarp?
8        A.   Yes.
9        Q.   Do you know what happened to it?
10       A.   I guess by wearing and tear, it
11   was -- came off or something.  I don't really
12   know.  Must have came off by wearing and tearing,
13   you know, by wind and rain.
14       Q.   But you're not familiar with exactly
15   how much wind damage that house got.  Is that --
16       A.   No.
17       Q.   Okay.  So, have you paid anyone to
18   do any work on your house besides the people who
19   gutted it out?
20       A.   No.
21       Q.   That's the only thing you've had
22   done so far?
23       A.   That's all.
24       Q.   Have you gotten estimates from
25   anyone else on other work?

Page 103

1        A.   Yes.
2        Q.   What kind of estimates have you
3    received so far?
4        A.   Well, two or three contractors told
5    me it would take, like, about 125,000, 130,000 to
6    put that house back together.
7        Q.   That sounds expensive.
8        A.   Uh-huh.
9        Q.   It sounds like more than what it was
10   worth before Hurricane Katrina happened.
11       A.   Sound like more than it was worth?
12       Q.   Right.  Didn't you tell me that you
13   thought it was worth about $100,000 before
14   Hurricane Katrina?
15       A.   Yes, before.
16       Q.   So, it would cost more than that,
17   you think, to repair it?
18       A.   Right.  Yes.
19       Q.   Once you put 125 to $130,000 into
20   it, into repairing the house, do you have an idea
21   of how much it would be worth at that time?
22       MR. LANDRY:
23          Object to form.
24          Go ahead.
25       A.   What, after I put the money into the

Page 104

1    home?
2    EXAMINATION BY MS. PAYNE:
3        Q.   Yes, to repair it.
4        A.   How much it would be worth then?
5        Q.   Uh-huh.
6        A.   I really don't know.  I don't know.
7        Q.   Did you have any termite damage to
8    the house that they discovered when they gutted
9    it?
10       A.   When they gutted it?
11       Q.   Yes.
12       A.   I think they had a few, right over
13   the door by the kitchen.
14       Q.   Some termite damage?
15       A.   Yes, a little bit.  Not much.
16       Q.   Did you ever have any of your soil
17   tested to find out if there was any type of soil
18   contamination at your house?
19       A.   No.
20       Q.   But do you have any reason to
21   suspect that there would be any soil
22   contamination at your house?
23       A.   No.
24       Q.   Did the contractors that you got the
25   estimate from about how much it would cost to

Page 105

1    repair the house, did they give you an estimate
2    on how long it would take to get that done?
3        A.   Maybe -- they say about maybe a
4    year -- maybe six months to close to eight months
5    to repair that house.
6        Q.   Do you have your house under a
7    termite contract?
8        A.   Yes.
9        Q.   Who's that with?
10       A.   I had it done that time -- I had it
11   with -- what the name of that company?  What the
12   name of that company?  The name of -- I can't
13   think about it right now, but I did -- I do have
14   it.  I do have it.  I had it.
15       Q.   How long have you had it under a
16   termite --
17       A.   Since I moved in that house.  The
18   owners had it and I just picked it up from there.
19       Q.   So, just so I have the numbers
20   straight, you said earlier that you thought the
21   fair market value of your house before Hurricane
22   Katrina was somewhere around $100,000.
23       A.   Yes.
24       Q.   And that after Hurricane Katrina, it
25   would still have been worth something, but you're

27  (Pages 102 to 105)

Page 106

1  not sure what the exact amount was.
2      A.  Right.
3      Q.  But other houses in the neighborhood
4  may have been selling for around 30 or $40,000.
5      A.  Now, that's me saying that.  I don't
6  really know.  I really don't know.
7      Q.  Don't know for sure?
8      A.  No.
9      Q.  And that an estimate that you've
10 been given for how much it would cost to repair
11 your house is 125 to $130,000?
12     A.  Yes.
13     Q.  So, what amount of money in the
14 lawsuit are you actually seeking for your house?
15 Are you seeking the total amount it would take to
16 repair it, or the value of the house before
17 Katrina?  What -- how much money are you seeking
18 for your house?
19     MR. LANDRY:
20         Object to form.
21     A.  I really don't know right now.  I
22 can't say now.  What I'm -- what I'm -- what I
23 want now?
24 EXAMINATION BY MS. PAYNE:
25     Q.  Yeah.  How much money would you like

Page 107

1  to get out of this lawsuit for your house?
2      A.  I would like to put it back --
3      MR. LANDRY:
4          Same objection.
5          Go ahead.
6      A.  Maybe just for the house, not for
7  my --
8  EXAMINATION BY MS. PAYNE:
9      Q.  Just talking about the house right
10 now, not the possessions or anything like that.
11 Just the house.
12     A.  To put it back together -- I'd say
13 about three something.  Three.  Three.  Three.
14 Because I would like to rebuild it.
15     Q.  Wait.  Three hundred thousand?
16     A.  Maybe two.  I'd say 200,000.
17     Q.  Okay.  I thought you just told me
18 that it only was going to cost 125 to $130,000.
19     A.  That's to put it together, that's
20 throwing it together, like the man say.  It's
21 not -- it's going to cost more than that to put
22 that house together back the way it really needs,
23 because what they would like to do, put
24 hurricane -- what they call it -- two-by-fours,
25 the ones like that, and they would like to do

Page 108

1  different things, but I really don't have the
2  money to do that house really the way it would be
3  wanted -- back the way they want to put it back
4  together.  That's the cheap way, they say, to put
5  my house back together.
6      Q.  Okay.  But just to be clear, your
7  house wasn't worth that much before Hurricane
8  Katrina, right?
9      MR. LANDRY:
10         Object to form.
11     A.  I think it was.  I really do,
12 because I had put money into that house.
13 EXAMINATION BY MS. PAYNE:
14     Q.  So, are you changing your testimony
15 from earlier about how much you thought the house
16 was probably worth?
17     A.  Yes, because I put a whole lot of
18 money into that house before Hurricane Katrina,
19 and everything was very expensive during that
20 time.
21     Q.  About how much money do you think
22 you've put into the house after you bought it
23 until Hurricane Katrina?
24     A.  I know I had put, like, about
25 $20,000 into that house because I wanted

Page 109

1  different things did to that house, and I had put
2  pretty good money into that house.
3      Q.  About $20,000, you think, you put
4  into the house?
5      A.  Yes.  Yes.
6      Q.  And how much do you think you could
7  have sold the house for prior to Hurricane
8  Katrina?
9      A.  I never thought about it, how much I
10 could sell it for, because I didn't want to sell
11 my home.  I always wanted to keep my home.
12     Q.  Do you think you might have been
13 able to get $200,000 for that house?
14     MR. LANDRY:
15         Object to form.
16     A.  Yeah, with the renovation work I was
17 doing to it, yes.
18 EXAMINATION BY MS. PAYNE:
19     Q.  The work that you had already
20 performed on it?
21     A.  Yes, I think I could have put --
22 could have got that.  When I finished doing it,
23 yes, I would have got that much for it, because I
24 was putting quality work into that home.
25     Q.  Sorry to keep going back over some

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

1  of the same things. You know, the defendants in
2  the lawsuit need to get an idea of, you know, how
3  much damages people in the lawsuit are claiming.
4  So, I'm just trying to get a number. So -- one
5  quick break.
6      THE VIDEOGRAPHER:
7          Off the record?
8      MS. PAYNE:
9          One quick break off the
10  record.
11      THE VIDEOGRAPHER:
12          We're off the record. It's
13  11:34.
14      (Whereupon, a discussion was
15  held off the record.)
16      THE VIDEOGRAPHER:
17          Returning to the record.
18  It's 11:35.
19  EXAMINATION BY MS. PAYNE:
20      Q.   Okay. Like I was saying before we
21  took that quick break, just I'm representing the
22  defendants that you've sued in the lawsuit and,
23  you know, they just need to know, you know, how
24  much your losses are and what you're claiming.
25  So, that's why I'm asking you all these

1  questions. I'm not trying to trick you.
2      A.   Let me say it like this here. I
3  don't know, because I don't know what Katrina
4  prices out there going for now. I don't know
5  how much it would take to put my home back
6  together now, but I do know the money I put out
7  before, what it would cost to put that house,
8  that's -- some of the contractors said this, some
9  of the contractors said it would take a little
10  bit more. Some of them said it would take 20 to
11  30,000. Some might say 140,000 because the --
12  out here, selling and buying now is real, real
13  high. So, no, I can't answer that.
14      Q.   Okay. And I know it's kind of
15  difficult because I'm asking you for estimates,
16  and a lot of these, you don't know for sure.
17      A.   Right, I don't know, because
18  everything is so high now. Before Katrina, I was
19  putting out money and everything was very
20  expensive. So, now, it's even higher since
21  Katrina. So, I -- I don't work at Home Depot or
22  Lowe's to tell you the prices. Okay? I can't do
23  that.
24      Q.   Okay. I think we can --
25      A.   And the contractor say that would be

1  a cheap price to put my house back together. I
2  don't want a cheap price.
3      Q.   Okay.
4      A.   I want to put my house back together
5  like I did before Katrina. Okay?
6      Q.   That makes sense. Let's just back
7  up a little bit and just walk through it with
8  what we do know for sure and then we can kind of
9  go from there.
10      A.   Okay.
11      Q.   Bought the house in 1994 for $16,000
12  at a bargain, right?
13      A.   Yes, but I put more money out on
14  that house since then. I put very -- a great
15  deal of money out on that home.
16      MR. LANDRY:
17          Just go ahead and answer the
18  question directly, but let's just
19  do this one more time, okay,
20  because it really is getting asked
21  and answered over and over and
22  over again. If you think the
23  answers are inconsistent, that can
24  come out later on as well, but I
25  don't think we have to stay here

1  long enough to get them all lined
2  up.
3          Now, just answer a question
4  as it's presented to you.
5      THE WITNESS:
6          Okay.
7      MR. LANDRY:
8          Okay. Thank you.
9  EXAMINATION BY MS. PAYNE:
10      Q.   So, after you bought the house in
11  1994, you put about $20,000 into the house, you
12  think, on the upgrading it?
13      A.   You know what, I shouldn't answer
14  that, because it was a little bit more than that.
15  Because I was putting various -- I was putting my
16  house back together. I wanted my house to be
17  much more than what I bought it for.
18      Q.   How much money do you estimate that
19  you spent between 1994, when you bought the
20  house, and Hurricane Katrina?
21      A.   Okay. I really can't say because
22  that was all the different years and I was buying
23  stuff, buying stuff all along, putting into the
24  home.
25      Q.   What kinds of things did you do to

b203d5cf-cf83-4456-a851-043c004e06cb

Page 114

1  improve the house between 1994 --
2      A.   Okay. Like, I wanted my bathroom to
3  be the modern tubs with the -- you heard about
4  the tiger feets, I wanted all that. I bought all
5  that to put in my home. I was buying very, very
6  expensive things to put in my home.
7      Q.   And where did you get the money to
8  make these improvements to your home?
9      A.   Well, I had got -- my husband passed
10 away. I got money from that. I had got money
11 from saving money to put money into my home. And
12 another thing, when I get my check once a month,
13 I would take so much and put out on the side for
14 my home.
15     Q.   Which check are you referring to
16 that you get once a month?
17     A.   My husband's, from the VA pension
18 check.
19     Q.   How much was the VA pension check?
20     A.   Do I have to answer that?
21     MR. LANDRY:
22         Well, let me object to the
23     form of the question, but this is
24     part of what's continuing to be
25     argued about now. So, I think the

Page 115

1      judge's ruling is almost anything
2      is allowed. So, reserving every
3      objection under the sun, you -- I
4      think the court wants you to
5      answer that question.
6      THE WITNESS:
7          Okay.
8      A.   Six hundred dollars a month.
9  EXAMINATION BY MS. PAYNE:
10     Q.   I'm sorry. All I'm really trying to
11 do is get an estimate of how much you think that
12 you -- you know, money that you put into the
13 house before Hurricane Katrina, and I'm trying to
14 figure out the best way to go about it, and, you
15 know, maybe going through every improvement that
16 you made is going to take a long time. Maybe I
17 don't want to do that. I -- but, I guess, that's
18 what we need to do.
19         So, can you tell me what the next
20 improvement is that you made to the house?
21     A.   Before Katrina?
22     Q.   Before Katrina, besides the work
23 that you just described on your bathroom.
24     A.   I put on a new deck to the front --
25 the porch.

Page 116

1      Q.   A new porch to the front. Do you
2  remember how much that cost?
3      A.   With the -- with everything -- the
4  worker to do it -- I'd say was about six or
5  $7,000. I couldn't do it myself. I had to pay
6  someone to come out and do it.
7      Q.   And just backing up for a second to
8  the work you had done on the bathrooms, how much
9  did that cost?
10     A.   Each bathroom cost me about $3,000
11 to do.
12     Q.   And how many bathrooms were there?
13     A.   Two.
14     Q.   So, about $6,000 for that?
15     A.   Yes.
16     Q.   What was the next work that you had
17 done on the house?
18     A.   I built a room onto the home. I put
19 in new cabinets.
20     Q.   Were those new cabinets in the
21 kitchen?
22     A.   Yes.
23     Q.   When did you build the new room on
24 in the back?
25     A.   Five years before Katrina, I think

Page 117

1  it was.
2      Q.   About 2000?
3      A.   Yeah, I think so. Around that time.
4      Q.   And how much did that cost?
5      A.   Oh, that cost about, I'd say, with
6  labor and everything, that must have cost me
7  about eight something.
8      Q.   About $8,000?
9      A.   Yeah, with the men. Yes.
10     Q.   And then the new cabinets in the
11 kitchen, how much did that cost?
12     A.   I got those from Singer. That cost
13 me for the cabinets and everything. That was
14 about, I'd say, 10,000 for everything in the
15 kitchen and different things.
16     Q.   Any other improvements that you made
17 to the house?
18     A.   I put hardwood floors in my home.
19     Q.   Hardwood floors?
20     A.   Yes.
21     Q.   Were those throughout the entire
22 house?
23     A.   The kitchen and bathroom was ceramic
24 tiles.
25     Q.   So, kitchen and bath had ceramic

30 (Pages 114 to 117)

Page 118

1  tiles?
2      A.  Yes.  I had French doors all the way
3  through my home.
4      Q.  Did you add on the French doors?
5      A.  Yes.
6      Q.  How much did it cost to do the
7  hardwood floors and the ceramic tiles?
8      A.  About -- for the living room, the
9  bedroom -- I'm not too sure, but I think it was,
10  like, about 15 for the living room, bedroom.
11  Fifteen.
12      Q.  Fifteen thousand dollars?
13      A.  Yes, for that.
14      Q.  And then how much did it cost to
15  install -- or to put in the French doors?
16      A.  For one of my French doors, I paid
17  $300 apiece -- for one -- for the double doors, I
18  had to pay double for them because I wanted them
19  side by side.  They were six hundred and
20  something dollars apiece I paid for the double
21  doors to go from the living room to the kitchen.
22  So, I had one go from the living room to the
23  kitchen, one to the dining room to the kitchen.
24      Q.  So --
25      A.  So, I must have had about -- the

Page 119

1  double ones, I had about three of those.  The
2  single ones, I had about -- one go to my bedroom
3  door, one to my -- what it was -- my other
4  bedroom doors.  I had one -- the single.
5      Q.  So, you had about three of the doors
6  that were six hundred --
7      A.  Three of the double ones.
8      Q.  -- and three of the singles, which
9  were 300?
10      A.  Yes.
11      Q.  So, about $2,700 for the French
12  doors?
13      A.  Uh-huh.
14      Q.  Any other improvements to the house?
15      A.  I put in windows.
16      Q.  Windows?
17      A.  New windows.
18      Q.  How much did it cost to put in the
19  windows?
20      A.  Well, I bought them.  They was $90
21  apiece.
22      Q.  Ninety dollars apiece.  And how many
23  windows?
24      A.  Let me see.  They have two windows
25  to the front.  One, two -- two -- one, two, thee,

Page 120

1  four, five, six, seven.  I did about seven.  I
2  had got about seven of them.
3      Q.  So, something around $700 for the
4  windows then?
5      A.  I think.
6      Q.  Anything else?
7      A.  Well, I did -- I had -- when I
8  renovated, I did my drywalls, I put new walls and
9  new insulation in the home.  I tore the walls up
10  and put more walls in there.  Now, how much all
11  that cost, I can't say right now, but I did
12  put -- in the area, what I made it bigger -- see,
13  this is 12 by 24, this one.  Used to be two
14  rooms, but I turned them into one room, and I had
15  to put insulation and drywalls out through the
16  two front rooms, and they was 12-by-24s apiece.
17      Q.  And do you have any idea how much
18  that cost?
19      A.  No, I don't remember, because I
20  had -- I had somebody come in and do this for me,
21  but I done forgot how much that was, but I did do
22  that.
23      Q.  Anything else?
24      Okay.  I'm about ready to move on to
25  a different topic, but just to go back to

Page 121

1  something that you said a moment ago, about the
2  estimates that you've gotten about repairing your
3  house.
4      A.  Uh-huh.
5      Q.  And it sounds like you've had a
6  range of estimates.  About how many people have
7  you gotten estimates from about the cost of
8  repairing your house?
9      A.  About -- I'd say about four.
10      Q.  And what was the lowest of those
11  estimates?
12      A.  Forty -- 35 to 45,000.
13      Q.  Thirty-five to 45,000?
14      A.  Uh-huh.
15      Q.  And what was the highest of those
16  estimates?
17      A.  Well, one of the contractors say it
18  would take about 170,000.  One said the way I
19  wanted the home to did, it was going to cost --
20  the way I want it to be done, it was going to
21  take about two hundred and something thousand to
22  redo the whole thing like I wanted to be done.
23      Q.  But some of the things that you
24  wanted to be done were improvements to the house
25  beyond how it was before Hurricane Katrina; am I

31  (Pages 118 to 121)

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250  CERTIFIED  COURT REPORTERS  NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 122

1  right?
2      MR. LANDRY:
3          Object to form.
4      A.   Wait a minute. Say that again.
5  Repeat.
6  EXAMINATION BY MS. PAYNE:
7      Q.   For the $200,000 estimate to the way
8  you wanted it to be done, am I correct in -- that
9  some of those things that you wanted to be done
10 were improvements to how the house was before
11 Hurricane Katrina?
12     MR. LANDRY:
13         Same objection.
14         Go ahead.
15     A.   No. I wanted to put back together
16 just -- maybe put back together like it was, but
17 that's their price that they want to charge me.
18 EXAMINATION BY MS. PAYNE:
19     Q.   Okay. So, your goal was to get it
20 just back to how it was before Hurricane Katrina?
21     A.   Like it was or even better, but,
22 like they say, it's going to cost me a whole lot
23 of money to put back into that house.
24     Q.   Okay. So, I'm about ready to move
25 on to the personal property losses that you have.

Page 123

1  Is there anything else that -- about the loss to
2  your house that you haven't already told me that
3  you need to tell me about?
4      A.   The losses to my home?
5      Q.   Uh-huh. Before we move on to
6  personal property.
7      A.   No, I don't think so.
8      Q.   Pretty much covered everything?
9      A.   Yeah.
10     Q.   Okay. So, the loss of your personal
11 property, I think you said earlier, that when you
12 evacuated, you only were able to take a few
13 changes of clothes, and everything else, you
14 lost.
15     A.   Yeah.
16     Q.   I think that we already went over
17 this, and you estimated your losses for your
18 insurance company and gave them the itemized
19 lists, right?
20     A.   Uh-huh.
21     Q.   Is there anything other than what
22 you told me earlier about the personal property
23 that we need to talk about now?
24     A.   No, I don't think so.
25     Q.   Just to -- the amount that you gave

Page 124

1  your insurance company was $56,000 for your
2  personal property?
3      A.   Uh-huh.
4      Q.   Okay. Let's talk next about your
5  personal injury, the heart disease condition that
6  was worsened and the stress.
7      A.   Okay.
8      Q.   When did you first see a doctor for
9  your heart problem after Hurricane Katrina?
10     A.   When I went to my home and saw how
11 my home was damaged.
12     Q.   About how long after that did you
13 see the doctor?
14     A.   Maybe about a week.
15     Q.   And what's the name of that doctor?
16     A.   It was Lallie Kemp, in Hammond.
17     Q.   And how do you spell that name?
18     A.   I don't really know how -- I
19 can't -- I don't know. Lallie Kemp.
20     Q.   Lallie Kemp?
21     A.   Uh-huh.
22     Q.   And, so, was that the time that you
23 started taking the extra heart pill?
24     A.   Uh-huh.
25     Q.   And you've been taking it ever

Page 125

1  since?
2      A.   Yes.
3      Q.   How often do you go back for
4  checkups?
5      A.   Every three months.
6      Q.   Have you been getting any worse over
7  time when you go back for your checkups?
8      A.   Yes, I been getting -- my heart's
9  been bothering me a little bit, pressure's been
10 bothering me.
11     Q.   Has your doctor adjusted your heart
12 medication since that initial visit after you saw
13 your house?
14     A.   Uh-huh. Yeah.
15     Q.   What kinds of things has he done
16 with your medication?
17     A.   I was on 25 milligrams; now, I'm on
18 50 milligrams for my pressure. And I'm on -- my
19 pills for my heart was 25; now they 50
20 milligrams.
21     Q.   So, your doctor increased the dosage
22 for both your heart pill and your blood pressure
23 pill?
24     A.   Yes. Yes.
25     Q.   When did he increase the dosage for

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 126

1    your heart pill?
2        A.   Maybe about a month after I went --
3    maybe about a month after I went to the home.
4    Maybe about a month after that.
5        Q.   So, the first time you saw the
6    doctor, he gave you --
7        A.   He didn't do it right after that.
8    Just when I got -- my nerves was real, real bad.
9    That's when he had to do the pressure medicine
10   and the heart medicine, because I was having
11   problems.
12       Q.   Now, but you weren't taking any
13   heart medicine before the hurricane, right?
14       A.   No. Uh-uh.
15       Q.   So, when did you start taking the
16   heart medicine after the hurricane?
17       A.   Maybe about -- I'd say about four --
18   maybe -- because I didn't go to the home for --
19   maybe about four months or five months
20   afterwards.
21       Q.   Okay. So, you saw your home?
22       A.   Yeah.
23       Q.   Then, your doctor put you on the
24   heart medication for the first time?
25       A.   Yes. Yes.

Page 127

1        Q.   And then how long after that did he
2    increase the heart medicine dosage?
3        A.   Maybe about two weeks after that.
4        Q.   And then after the dosage was
5    increased, then, your medicine stayed the same
6    since then?
7        A.   It been the same since then.
8        Q.   And then what about your blood
9    pressure medicine?
10       A.   It's the same.
11       Q.   Did he increase the dosage for your
12   blood pressure medicine at the same time as your
13   heart medicine?
14       A.   Yes.
15       Q.   And since you've had your medicine
16   increased, have you been doing okay with your --
17       A.   No.
18       Q.   What kind of problems have you been
19   having with your --
20       A.   Well, they going to put me through a
21   whole lot of tests now. I'm going through tests
22   right now.
23       Q.   Going through tests right now?
24       A.   Uh-huh.
25       Q.   What kind of tests are you going

Page 128

1    through now?
2        A.   Well, for my heart, for my pressure,
3    going back for that. I'm having problems with my
4    heart again.
5        Q.   Do you have medical insurance that
6    covers the tests?
7        A.   No.
8        Q.   Do you have to pay for those out of
9    your own pocket?
10       A.   Uh-huh. Uh-huh. I'm going to pay
11   for that.
12       Q.   Do you have records of your medical
13   expenses that you've had since Hurricane Katrina?
14       A.   No.
15       Q.   How do you pay for your doctors'
16   visits?
17       A.   Well, I been paying for it out of my
18   pocket. Haven't been extremely high, but they
19   are fixing to see -- get some kind of help or
20   something for it now.
21       Q.   You have help from --
22       A.   No, for to go see about that now.
23       Q.   Okay. So far, you haven't had any
24   type of assistance, but you are going to see if
25   you can get some?

Page 129

1        A.   Right.
2        Q.   Do you have Medicaid or Medicare
3    insurance?
4        A.   No.
5        Q.   Who is -- which doctor is actually
6    treating you?
7        A.   At Tulane.
8        Q.   At Tulane?
9        A.   Uh-huh.
10       Q.   Do you know the doctor's name?
11       A.   No, because I just got him. He
12   going to put me through a whole lot of different
13   tests. It's a new doctor. This is the first
14   time I'm going to be going to this doctor since
15   the storm.
16       Q.   Is that where you had your surgery,
17   at Tulane?
18       A.   Uh-huh.
19       Q.   Is this the same or a different
20   doctor from your surgery?
21       A.   Different.
22       Q.   Different doctor.
23       A.   Uh-huh.
24       Q.   Has anyone else paid for any of your
25   medical expenses besides you?

33  (Pages 126 to 129)

b203d5cf-cf83-4456-a851-043c004e06cb

1    A.   No.
2    Q.   Do you know the approximate amount
3  that you've spent on medical since Hurricane
4  Katrina?
5    A.   No.
6    Q.   Do you have an estimate?  I mean, is
7  it 1,000, $10,000?
8    A.   For two of my prescriptions, it cost
9  me 100 -- $125 apiece.  So, since Katrina, I been
10  buying them for four months after Katrina.  I
11  don't know.  It should be about three
12  something -- 3,000 and something for -- for the
13  medicine I been buying because I buy about five
14  or six of them each time I go.
15    Q.   So, that's a lot of money.
16    A.   How do I pay for it?
17    Q.   Yeah.
18    A.   Help from different family members.
19    Q.   So, other people are helping you pay
20  for your medications?
21    A.   Yes.
22    Q.   Who else is helping you pay for it?
23    A.   My sisters, my brothers, Nathan
24  Morgan.
25    Q.   Besides the medicine for the

1  prescriptions -- I mean, the money that you paid
2  for the prescriptions, have you paid other money
3  just for the doctors' visits and testing?
4    A.   Yes, I have, but I have a clinic
5  doctor -- plenty of them sitting there, waiting
6  till I get my business straight so I can start
7  paying them.  You know, you don't have to pay it
8  all at once.  You can pay so much, you know.
9    Q.   Okay.  So, we've talked about your
10  heart pills and your blood pressure pills.
11    A.   Uh-huh.
12    Q.   Tell me about the nerve pills.  When
13  did you start taking those?
14    A.   About four months after I went to
15  the home.
16    Q.   Okay.  And have you been taking the
17  same pills for your nerves?
18    A.   It's the same pills.
19    Q.   And has your dosage changed on
20  those?
21    A.   (Shakes head negatively.)  No.
22    Q.   How are you doing on the nerve
23  pills?  Are they helping you?
24    A.   Sometime they do.  Just long as I
25  stay away from the home, I be okay.

1    Q.   The estimate that you gave me
2  earlier for the amount of money that you're
3  spending on medicine, does that include the nerve
4  pills?
5    A.   Yes, it includes the nerve pills.
6    Q.   Okay.  Are you seeing a different
7  doctor that prescribed the nerve pills for you?
8    A.   Well, right now, I'm going to start
9  seeing a different doctor because I won't be
10  going to Lallie Kemp anymore.  I'm going to be
11  seeing a doctor at University.
12    Q.   Okay.  So, those were prescribed by
13  a doctor at Lallie Kemp, and then --
14    A.   Yeah.  Yeah.
15    Q.   Okay.  Is there -- before we move on
16  to your mental distress, is there anything else
17  for -- physically that we haven't already talked
18  about?
19    A.   No.
20    Q.   For the severe mental distress, you
21  told me earlier about how you were having
22  problems with vomiting for a while.
23    A.   Uh-huh.
24    Q.   Is there any other way the mental
25  distress manifests itself?  I mean, any other

1  symptoms, physical symptoms?
2    A.   Crying, wanted to be by myself.
3  That's about it.
4    Q.   Did you see a counselor at all for
5  your mental distress?
6    A.   (Shakes head negatively.)
7    Q.   Just got the medication?
8    A.   Uh-huh.
9    Q.   Did you lose any family members or
10  friends in Hurricane Katrina?
11    A.   No.
12    Q.   Didn't you know anyone who --
13    A.   Other people did, but I didn't.
14    Q.   Did you know anyone who was
15  seriously injured?
16    A.   No.
17    Q.   So, most of your mental distress is
18  about losing your home and all your possessions?
19    A.   Yes.  Yep.
20    Q.   But I can tell it's been really hard
21  on you.
22    A.   (Nods head affirmatively.)
23    Q.   It sounds like the mental distress
24  part of the lawsuit --
25    A.   It came from -- see, my husband and

b203d5cf-cf83-4456-a851-043c004e06cb

Page 134

1  I -- I had different things in my house from my
2  husband because me and my husband was real, real
3  close. I lost his flag, his uniform, because he
4  was in the service. It was just a whole lot of
5  different things I had in that home I can't get
6  back. I tried to look for them, but the water
7  took them away.
8      Q.  It sounds like you may have put a
9  lot more into your home and making it just like
10 you wanted than maybe a lot of people.
11     A.  My husband and I.
12     Q.  You and your husband. So, you were
13 especially attached to everything you had there.
14     A.  (Nods head affirmatively.) Yeah.
15 If I could only just get his uniform, his flag,
16 his pictures, his awards he had, my mother's
17 pictures, my father's pictures. All those people
18 is deceased. I can't get them back. So, that's
19 where the mental problem come in at. When I go
20 to the home, very hard for me. So, that's why
21 I'm staying at 56 -- 756 Louisiana Avenue. It's
22 hard for me to see that house and everything was
23 destroyed.
24     Q.  Do you still want to move back into
25 the how's vent annually, though?

Page 135

1      A.  (Nods head affirmatively.)
2      Q.  You do.
3      A.  Yeah.
4      Q.  Is there anything else about your
5  mental distress that you want to talk about right
6  now?
7      A.  No.
8      MS. PAYNE:
9          This might be a really good
10     time to take a break, have a
11     little something for lunch.
12     A.  I'm sorry. But my kids' pictures.
13 Everything is gone. It's not like -- if the
14 water just would have taken some of the things
15 and left some of the things of value to me, I
16 probably would have been all right, but it's hard
17 for me to even look at that house because it just
18 took everything from me, and that's what problem
19 I'm really having.
20 EXAMINATION BY MS. PAYNE:
21     Q.  That's very --
22     A.  It really is. I wish I could get
23 his pictures back. We loved one another, my
24 husband and I. And I can't see his picture there
25 no more. My mother and all -- I had her big

Page 136

1  pictures on the wall, my dad's picture. The
2  water took -- so, that's why I'm having a mental
3  problem. It make my stomach hurt. Maybe some
4  people say I shouldn't go back, but that was my
5  home and my husband's. We married on our knees
6  in that home, and I will never forget it. The
7  pillows that we kneeled on to get married on --
8  in. I had it, but it's gone. Please, forgive.
9  But I lost a whole lot. The house is sticks.
10 Look at it, all my babies gone. So, that's where
11 the mental problem come in at.
12     MR. LANDRY:
13         Want to take a little break,
14     Ethel?
15     THE WITNESS:
16         Yeah.
17     THE VIDEOGRAPHER:
18         Going off the record.
19     Conclusion of Tape 2. It's 12:07.
20         (Whereupon, a discussion was
21     held off the record.)
22     THE VIDEOGRAPHER:
23         Returning to the record. It
24     is 1:22. Start of Tape 3.
25 EXAMINATION BY MS. PAYNE:

Page 137

1      Q.  Welcome back from lunch.
2      A.  Thank you.
3      Q.  I have a couple of follow-up
4  questions from things that we talked about
5  earlier.
6      A.  Uh-huh.
7      Q.  Now, I understand Jimmy Coats was
8  previously married before he married you; is that
9  right?
10     A.  Uh-huh.
11     Q.  Did -- did he have any children with
12 Muriel Davis?
13     A.  Yes.
14     Q.  How many children did --
15     A.  One.
16     Q.  What's that child's name?
17     A.  Danielle.
18     Q.  And where is Danielle living now?
19     A.  Oh, I really don't know. I don't
20 know. I don't know.
21     Q.  You don't know?
22     A.  Uh-huh.
23     Q.  And then did Jimmy Coats have any
24 children with Sandra Sanders?
25     A.  Sandra?

(504)525-1753    HUFFMAN & ROBINSON, INC.    (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb

Page 138

1    Q.   Sandra Sanders?  Do I have that name
2  right?
3    A.   That's Danielle, his daughter.
4    Q.   Oh, okay.  I was under the
5  impression that Jimmy Coats was married to Sandra
6  Sanders before he got married to you.
7    A.   Yes.
8    Q.   And did he have any children with
9  Sandra?
10   A.   One daughter.  One girl.
11   Q.   And who is that?
12   A.   Danielle.
13   Q.   Oh, so, Danielle was his daughter
14  with Sandra, not Muriel?
15   A.   Wait.  Sandra, that's who he had the
16  daughter with.  I don't know a Muriel.  Muriel?
17   Q.   Muriel Davis.
18   A.   Well, what did they say the son --
19  was it a boy child or something?
20   Q.   I don't know.  That's why I was
21  asking you.
22   A.   I don't know nothing about Danielle.
23   Q.   Do you know of any other children
24  that Jimmy Coats had besides Danielle?
25   A.   No.  Just that one girl.

Page 139

1    Q.   But you didn't have any children
2  with him?
3    A.   No.
4    Q.   Okay.  Have you done anything to
5  open up a succession on your husband's property
6  to -- anything with the title of the house, going
7  to court?
8    A.   No.  My husband died.  My husband
9  made a will out.
10   Q.   Oh, he had a will?
11   A.   Uh-huh.
12   Q.   And in the will, did he leave
13  everything to you?
14   A.   Yes.
15   Q.   Did you probate the will?
16   A.   Yes.
17   Q.   Okay.  So, you said earlier that you
18  moved to the house on Charbonnet Street in the
19  late 1980s.
20   A.   Uh-huh.
21   Q.   Were you married to Jimmy Coats at
22  that time?
23   A.   No.  We stayed together about two
24  years till we married, and then we married.
25   Q.   Where did you live with him --

Page 140

1    A.   I wasn't living with him.  I was
2  living out in Metairie -- out in Kenner.
3    Q.   Okay.  So, then -- so, you got
4  married to him after you moved into the house?
5    A.   Yes.
6    Q.   Did you live with him before you
7  moved into the house together?
8    A.   No.  No.
9    Q.   Okay.  And then -- when you first
10  moved into the house before you bought it, how
11  much money did you pay in rent?
12   A.   I think it was, like, about -- maybe
13  about 90-something dollars a month.
14   Q.   Okay.  Now you lived in that
15  neighborhood for a long time.  Did you know the
16  other people who lived on your block?
17   A.   Uh-huh.  Yes.
18   Q.   Did all of your neighbors evacuate
19  for Hurricane Katrina?
20   A.   Yes.
21   Q.   Do you know where they are now?  Do
22  you keep in touch with any of them?
23   A.   Some of them still live in Texas,
24  some of them in Baton Rouge, some of them in the
25  area that I'm living in now.

Page 141

1    Q.   Has anyone moved back in to that --
2    A.   They have a few peoples -- like,
3  one, two, three, four on the block -- on the --
4  out of the whole block, four peoples.
5    Q.   And did those people have to
6  completely redo their houses?
7    A.   Yes.
8    Q.   And do you have relatives who live
9  in New Orleans?
10   A.   No.
11   Q.   I thought your daughter lived in New
12  Orleans East.
13   A.   Oh, in New Orleans East.  I'm sorry.
14  Yes.
15   Q.   Just anywhere in New Orleans, just
16  do you have --
17   A.   I have a couple family members.
18  They live, like, in Carrollton.  I have a aunt
19  live in Carrollton.
20   Q.   Carrollton.  Where is Carrollton?
21   A.   Carrollton is -- my God -- that's
22  around -- what?
23   Q.   Is it in Orleans Parish?  Is it in
24  Orleans Parish?
25   A.   It's in Orleans Parish.

36 (Pages 138 to 141)

Page 142

1    Q.   Who is it that lives in Carrollton?
2    A.   My aunt.
3    Q.   Your aunt?
4    A.   Uh-huh.
5    Q.   Did your aunt have any damage from
6  Hurricane Katrina?
7    A.   No, I don't think so.  Not much.
8  Not really.  Not much.
9    Q.   She wasn't --
10    A.   She was on rent, I think it was.
11  She was on rent.  She was renting a house.
12    Q.   Oh, okay.  And who else do you --
13  what other relatives do you have that live in the
14  city?
15    A.   A couple cousins, and that's about
16  it, but I don't even know where they live at or
17  anything like that.
18    Q.   Okay.  Do you have any friends who
19  live in St. Bernard Parish?
20    A.   No, I don't have any friends, but I
21  know a couple people was living there, and that's
22  about it.  I don't know -- I don't have any
23  friends.
24    Q.   But you said you know a couple of
25  people who live in St. Bernard?

Page 143

1    A.   Yeah, Mr. Gil -- Gilbert Andry and
2  his wife.  And that's about it.  They was living
3  there.  They not living there anymore.
4    Q.   Do you know anyone who lives in New
5  Orleans East?
6    A.   My daughter.
7    Q.   Was she living with you at the time
8  of Hurricane Katrina?
9    A.   Yes.
10    Q.   And then she moved to New Orleans
11  East later?
12    A.   Yes.  Yes.
13    Q.   Do you know anyone else who lives in
14  New Orleans East?
15    A.   No.
16    Q.   Do you know any people who had a
17  friend or a loved one who drowned as a result of
18  Hurricane Katrina?
19    A.   They had several people saying their
20  loved ones had passed, but I don't really know.
21    Q.   Do you know of anyone who actually
22  had their roof blown off during the hurricane?
23    A.   No.
24    Q.   Have you heard of that happening to
25  anybody?

Page 144

1    A.   (Shakes head negatively.)
2    Q.   Did you hear about any houses that
3  blew up after the storm because of natural gas
4  leaks?
5    A.   Did I hear about what?  Repeat that.
6    Q.   Any of the houses, did you hear on
7  the news --
8    A.   Yeah.
9    Q.   -- anything about houses blowing up
10  from natural gas leaks?
11    A.   Yes.
12    Q.   Did that happen to anybody you know?
13    A.   No.
14    Q.   Did you hear on the news about
15  criminal looting?
16    A.   Yes.
17    Q.   Did that happen to anyone you know?
18    A.   No.
19    Q.   Mrs. Coats, who do you blame for the
20  damages you're seeking in this lawsuit?
21    MR. LANDRY:
22        Object to form.
23        Go ahead.
24    A.   Who I blame?
25  EXAMINATION BY MS. PAYNE:

Page 145

1    Q.   Uh-huh.  Yes.
2    A.   I blames the Corps of Engineer.
3    Q.   Is there anyone else besides the
4  Corps of Engineers?
5    A.   No.
6    Q.   Why do you blame the Army Corps of
7  Engineers?
8    MR. LANDRY:
9        Object to form.
10        Go ahead.
11    A.   Because, from my understanding, they
12  knew that those levees was bad and they needed
13  MRGO down in St. Bernard Parish.  They knew these
14  different things.
15  EXAMINATION BY MS. PAYNE:
16    Q.   Is there any other reason why you
17  blame the Corps of Engineers for what happened to
18  you?
19    A.   No.
20    Q.   Do you blame FEMA at all for what's
21  happened to you?
22    A.   Yes.
23    Q.   Why do you blame FEMA?
24    A.   Because I think they knowed that
25  was -- what was the problem.  Just like the Corps

b203d5cf-cf83-4456-a851-043c004e06cb

Page 146

1  of Engineer, they knew what was going on, and
2  they should have taken care of that years back.
3  Q.  Have you ever heard of Washington
4  Group International?
5  A.  No.
6  Q.  That's my client in the lawsuit.
7  A.  Okay.
8  Q.  Do you have -- do you know of
9  anything that that company did wrong as far as
10  Hurricane Katrina goes?
11  A.  No.
12  Q.  Mrs. Coats, I'm handing you what's
13  been marked as Coats Exhibit Number 9.  This is
14  a -- this is a Form 95 that we were talking about
15  earlier.  I think this front page is just a cover
16  sheet, you know, from the government saying they
17  received the Form 95, but the Form 95 itself
18  actually starts on Page 2.  You want to turn to
19  Page -- actually, can we start with the very last
20  page because that's the page that has your
21  signature on that.  I wanted to talk about that
22  with you.
23        (Whereupon, Coats Exhibit
24        Number 9 was marked for
25        identification.)

Page 147

1  A.  I see.
2  EXAMINATION BY MS. PAYNE:
3  Q.  Is that your signature there at the
4  bottom?
5  A.  Yes.
6  Q.  And then you printed your name
7  below?
8  A.  Yes.
9  Q.  And this form, it's dated October
10  28th, 2005.  Do you see that at the top?
11  A.  Yes.
12  Q.  It says: To Whom It May Concern.
13  You want to take a minute to look at the -- read
14  that, best you can without your glasses.
15  A.  I can't see it without my glasses.
16  Could you read it to me, please?
17  Q.  Would it help if I read it?
18  A.  Yes.
19  Q.  "I hereby authorize my
20  attorney, Jonathan B. Andry,
21  of The Andry Law Firm, 610
22  Baronne Street, New Orleans,
23  Louisiana, 70113, to represent
24  me in my claim against the
25  United States Army Corps of

Page 148

1  Engineers and any other
2  parties regarding the damages
3  sustained by me as a result of
4  the flooding of my property
5  between August 29th, 2005 and
6  September 30, 2005.  I authorize
7  my attorney to sign all
8  necessary forms, claim notices
9  and any other documents necessary
10  to pursue the above-mentioned
11  claim."
12        Do you remember signing this form?
13  A.  Yes.
14  Q.  And this is just where you
15  authorized your attorney to --
16  A.  Yes.
17  Q.  Okay.  So, then, let's turn to the
18  form itself.  It starts on Page 2 of the exhibit.
19  I just want to kind of go through this whole
20  thing with you.  Are you with me on Page 2?
21  A.  Uh-huh.
22  Q.  Have you seen this form before?
23  A.  Yes, when I signed the paperwork, I
24  think.
25  Q.  Okay.  So, in Box 1, you see there

Page 149

1  where it says it's submitted to the United States
2  Army Corps of Engineers?
3  A.  Uh-huh.
4  Q.  And then Box 2, one over, that's
5  your name, Ethel Coats, and the current address
6  where you live now?  Are you with me, in that
7  second box on the top of the page?
8  A.  Okay.  Yeah.  I see it.  Wait.
9  Wait.
10  MR. LANDRY:
11        Right here.
12  THE WITNESS:
13        Okay.
14  A.  All right.
15  EXAMINATION BY MS. PAYNE:
16  Q.  And then I want to skip down to that
17  big Box 8.  I don't know if you can see me
18  pointing here, but it's here kind of in the
19  middle of the page.
20  A.  Uh-huh.
21  Q.  I know this is hard for me to read
22  and I have my glasses on.
23  A.  Okay.
24  Q.  So, I just wanted to get you to look
25  at this, but if it would help, I can read it out

b203d5cf-cf83-4456-a851-043c004e06cb

Page 150

1  loud.
2      A.   Okay.
3      Q.   Would you like for me to do that?
4      A.   Yes.
5      Q.   Okay.  The instructions say:
6           "Basis of claim (State in
7      detail the known facts and
8      circumstances attending the
9      damage, injury or death,
10     identifying persons and property
11     involved, the place of occurrence
12     and the cause thereof.)  (Use
13     additional pages if necessary.)"
14          And the form says, you know,
15     what's been added here:
16          "Since the Mississippi River
17     Gulf Outlet navigational/shipping
18     structure was cut into the marshes
19     of St. Bernard and Orleans
20     Parishes, the Corps of Engineers
21     has had a legal duty under
22     Louisiana law to maintain,
23     operate, design and/or construct
24     the MRGO in a manner so as to
25     prohibit the flooding of St.

Page 151

1      Bernard and Orleans Parishes.  The
2      Corps breached that duty by
3      improperly designing,
4      constructing, operating and/or
5      maintaining the MRGO which flooded
6      St. Bernard and Orleans Parishes
7      and my property."
8           Are you satisfied with that
9      statement as being your claim
10     against the government?
11     A.   Uh-huh.  Yes.
12     Q.   And then if you skip down to Box
13     Number 9, which is the very next one down,
14     "Property Damage" --
15     A.   Uh-huh.
16     Q.   -- the information inserted on the
17     form says:
18          "The damage was a complete
19     loss of structure and contents
20     located at 1020 Charbonnet Street,
21     New Orleans, Louisiana, 70117."
22     A.   Uh-huh.
23     Q.   You feel that's accurate?
24     A.   Yes.
25     Q.   What about at 1022, the part next

Page 152

1      door, did you submit a separate form for that, or
2      is that --
3      A.   All -- it's one form.
4      Q.   You just did this one form?
5      A.   One form.
6      Q.   Do you know whether Nathan Morgan
7      submitted a Form 95 of his own?
8      A.   Yes.
9      Q.   He did?
10     A.   Uh-huh.
11     Q.   Do you know any information about
12     what property he was claiming was damaged?
13     A.   His contents that he had in the
14     home.
15     Q.   Okay.  So, he submitted one for the
16     contents?
17     A.   Uh-huh.  Yes.
18     Q.   Did your daughter --
19     A.   Contents in the home.
20     Q.   Your daughter also submitted a form
21     for the contents?
22     A.   Yes.  Yes.  Yes.
23     Q.   Okay.  Now, the very next box down,
24     Box 10, it's asking for the nature and extent of
25     each injury or cause of death which forms the

Page 153

1      basis of the claim.  And what's in the box is:
2           "As a direct and proximate
3      result of the negligence of the
4      United States Army Corps of
5      Engineers, I have been injured to
6      the extent that I have experienced
7      severe emotional distress and
8      mental anguish due to the loss of
9      my property and almost all of my
10     possessions.  Ethel Coats."
11          Is that correct?
12     A.   Yes.
13     Q.   And then down a little bit further,
14     in Box 12, where it says "Amount of Claim (in
15     dollars)," you have to fill in here the amount of
16     your various claims, and under "Property Damage,"
17     you have $500,000.
18     A.   Uh-huh.
19     Q.   Can you explain to me how you
20     arrived at that amount of property damage?
21     MR. LANDRY:
22          Object to the form.
23     EXAMINATION BY MS. PAYNE:
24     Q.   I guess that would be all property?
25     A.   Yes.

39 (Pages 150 to 153)

1    Q.   You know, your real property and
2  your personal property?
3    A.   Yes.
4    Q.   Tell me what -- how you got to
5  $500,000?
6    A.   Well, I had to pay medical -- pay
7  medical, loss of the home, because it was saying
8  that they might have to just demolish the home,
9  and the contents of the home.
10   Q.   Okay. I think the medical would be
11  included under personal injury part.
12   A.   Okay.
13  MR. LANDRY:
14       Object to form.
15  EXAMINATION BY MS. PAYNE:
16   Q.   But just talking about the property
17  damage, I think you told me earlier that you had
18  given your insurance company an estimate of about
19  $56,000 for your property. And, so, is the rest
20  of that mainly damage to your house or what -- is
21  there some other property damage that you have
22  that we haven't already discussed?
23  MR. LANDRY:
24       Let me -- so that I don't
25       have to keep interrupting, let me

1       just enter an objection as to form
2       as to all the questions regarding
3       these two damage boxes. Just make
4       that continuous as long as we're
5       talking about that section. That
6       way, I won't have to continue to
7       interrupt.
8       You may answer if you
9       remember what she asked you.
10  THE WITNESS:
11       No.
12  EXAMINATION BY MS. PAYNE:
13   Q.   Here, I can repeat it. Would you
14  like for me to repeat it?
15   A.   Yes.
16   Q.   Is there -- you told me earlier that
17  the estimate that you gave for your personal
18  property damage, not counting the other people
19  living with you, but your personal property
20  damage to your insurance company was 56,000.
21   A.   Uh-huh.
22   Q.   And I know there -- you know, there
23  was the damage to your home as well, but is there
24  anything else that we haven't talked about that
25  would go into this 500,000 number for damages to

1  your property?
2    A.   That's my property -- that's for my
3  contents or the --
4    Q.   The contents or -- do you think the
5  $500,000 number is accurate for the amount of
6  property damage you've sustained?
7    A.   Yes.
8    Q.   You think the 500,000 is accurate?
9    A.   Yes. Yes. Yes.
10   Q.   But is there any other property
11  damage we haven't already talked about today?
12   A.   No, there is no other.
13   Q.   For the next box, for "Personal
14  Injury," you also have $500,000 there, is your
15  amount of claim. Can you explain how you got to
16  that number?
17   A.   Can I explain how I got to that
18  number?
19   Q.   Uh-huh. Yes.
20   A.   No, not right now, I can't. I can't
21  explain it. I have to go back over and see what
22  it cost, this cost, that cost.
23   Q.   Do you have any idea how much of
24  that 500,000 would be for, you know, medical
25  expenses and prescriptions and how much of that

1  would be for mental distress?
2    A.   How much of that would it be
3  costing?
4    Q.   That amount. Uh-huh.
5    A.   That would be about 300,000 or maybe
6  for mental, what I went through, and for my home,
7  two hundred and something -- 200,000.
8    Q.   What would the 200,000 be for?
9    A.   Be for my -- the accents and
10  different things I had in my home, different
11  things I had, my loss. That's what I think --
12  yes.
13   Q.   Okay. According to this form, the
14  total amount of your claim is $1 million. Do you
15  think that amount is accurate?
16   A.   Yes, for my loss, for everything, my
17  mental and -- my home and everything that I had.
18  Yes, I think it's worth it. Yes.
19   Q.   Okay.
20   A.   Worth it to me.
21   Q.   Did -- when you were getting your
22  Form 95 filled out and turned in, did your
23  lawyers ask you for any kind of supporting
24  documentation, such as appraisals of the
25  property? Did you have to provide them with

b203d5cf-cf83-4456-a851-043c004e06cb

Page 158

1  anything like that?
2       A.   The appraisal of the property?  I
3  think I -- yes, I did, I think.
4       Q.   You did provide them, you think --
5       A.   I'm not too sure, but I think I did.
6       Q.   Did you get any type of written
7  reports from physicians about the nature and
8  extent of your injuries?
9       A.   Not yet, no.
10      Q.   Is that your signature at the bottom
11 of the page, that page that you're currently on,
12 the bottom of that first page of the Form 95?
13      A.   Right here, you talking about?
14 MR. LANDRY:
15           Right.  She wants to know if
16      that's your signature.
17      A.   Is that my signature?
18 EXAMINATION BY MS. PAYNE:
19      Q.   It might be your lawyer's.
20      A.   Okay.  It's my lawyer's signature.
21      Q.   Okay.  We talked earlier about the
22 various claims you made for assistance, and I
23 don't want to go over all of that again.  There's
24 just one or two things I forgot to ask you
25 earlier.  Do you know who your agent is for

Page 159

1  the -- your insurance policies for homeowner's
2  and flood insurance?
3       A.   Do I know now?  Alliance Insurance
4  Agency.
5       Q.   Is there a particular person who you
6  dealt with?  Did you have an agent?
7       A.   The agency?  No, I don't know right
8  now.
9       Q.   And do you know where the office
10 that you dealt with was located?
11      A.   Metairie.  4444 York Street, in
12 Metairie.
13      Q.   Okay.  And we talked about The Road
14 Home Program earlier, and I wasn't completely
15 sure whether you -- did you actually receive your
16 money from The Road Home Program yet?
17      A.   Uh-huh.
18      Q.   And that was the $76,000 amount?
19      A.   Uh-huh.
20      Q.   They've given you your check and you
21 have that now?
22      A.   Uh-huh.  Yes.  I'm sorry.
23      Q.   Okay.  Mrs. Coats, do you understand
24 that this lawsuit is a proposed class action?
25      A.   Repeat that again.

Page 160

1       Q.   Do you understand that this lawsuit
2  is a proposed class action?
3       A.   Yes.
4       Q.   Do you know what a class action is?
5       A.   No.  Could you explain it to me?
6       Q.   It's where you have certain people
7  named plaintiffs, like, you're a named plaintiff
8  representing the rest of the class members.
9       A.   Uh-huh.
10      Q.   Does that sound familiar?
11      A.   Yes.
12      Q.   And do you understand you're a named
13 plaintiff in this -- this lawsuit?
14      A.   Yes.  Yes.
15      Q.   What's your understanding of what it
16 means to be a named plaintiff?  What are your
17 responsibilities?
18      A.   Because it's so many peoples that
19 was down and just couldn't come and it just so
20 heartbroken -- it's so many peoples that's not
21 here, you know.  Plenty are not here right now.
22      Q.   And, so, what do you see as your
23 responsibility?
24      A.   To help them.
25      Q.   And what would you do to help them?

Page 161

1       A.   Here, fighting for them.
2       Q.   Like giving this deposition?
3       A.   Yeah.  Yeah.
4       Q.   Do you know what subclass that you
5  represent, what people you represent in the
6  lawsuit?
7       A.   What people I'm representing?  My
8  neighbors and -- that's about it, my neighbors,
9  peoples in the neighborhood.
10      Q.   And how big of a neighborhood are
11 you talking about?
12      A.   The whole Lower Ninth Ward.
13      Q.   You're representing the whole Lower
14 Ninth Ward?
15      A.   That's what I'm trying, yeah.
16      Q.   Are you representing the people in
17 St. Bernard Parish?
18      A.   No.
19      Q.   Did you know any of the plaintiffs'
20 attorneys before this lawsuit?
21      A.   Did I know any of them?  No, I
22 didn't know Mr. Jon, no.  I didn't know him.  You
23 know, I know him, but I don't know him, like,
24 personal, but I know him.
25      Q.   You knew who he was?

41  (Pages 158 to 161)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 162

1    A.   Uh-huh.
2    Q.   When did you first start thinking
3  about filing a lawsuit relating to Hurricane
4  Katrina?
5    A.   Because when they start quoting
6  prices to me about my home and losses that I had
7  in my home and the mental state, that stage that
8  I was in.
9    Q.   And how did you go about finding a
10  lawyer?
11    A.   How I went about finding a lawyer?
12  To tell you the truth, I saw Mr. Jon on TV.
13    Q.   So, did you contact Mr. Andry's
14  office?
15    A.   Yes.
16    Q.   Have you met any of the other named
17  plaintiffs in the lawsuit?
18    A.   No.
19    Q.   Do you know who they are?
20    A.   No.
21    Q.   Do you know anything about the
22  damage that people suffered over in St. Bernard
23  Parish?
24    A.   Do I know?
25    Q.   Any specifics.

Page 163

1    A.   No, I don't know nothing about no
2  specifics, but I know it was destroyed like the
3  Lower Ninth Ward was.
4    Q.   Do you feel like you can represent
5  everybody in the Lower Ninth Ward as to what
6  happened to their individual houses and property?
7    MR. LANDRY:
8      Object to form.
9    A.   Yes.  Because they hurting just like
10  I am.  Yes.
11  EXAMINATION BY MS. PAYNE:
12    Q.   Do you feel like you could represent
13  everyone in St. Bernard Parish about what
14  happened to them and their damage and -- to their
15  houses and property?
16    MR. LANDRY:
17      Object to form.
18    A.   Do I think I could represent them,
19  too?  If I had to, I would -- yes, I would try to
20  do it because they lost just like the Ninth Ward.
21  We all lost.
22  EXAMINATION BY MS. PAYNE:
23    Q.   But do you think everyone's losses
24  were the same?
25    MR. LANDRY:

Page 164

1      Object to form.
2    A.   No.  No.  Everybody loss is not the
3  same.
4  EXAMINATION BY MS. PAYNE:
5    Q.   How are they different?
6    A.   How they different?
7    Q.   (Nods head affirmatively.)
8    A.   Some was on rent, some was on --
9  owning their own home, some lost family members,
10  you know, some -- I can't say was it the same.
11  It's not the same.
12    Q.   Right.  Some people may have had a
13  lot more flooding than others --
14    A.   Right.
15    Q.   -- is that right?
16    A.   Right.
17    Q.   Some people may have had really
18  serious personal injuries?
19    A.   Yes.
20    MR. LANDRY:
21      Object to form.
22    A.   Yeah.
23  EXAMINATION BY MS. PAYNE:
24    Q.   We're starting to talk over each
25  other a little bit again.  Sorry.

Page 165

1    A.   Okay.
2    Q.   I'll say that again.  Some people
3  may have had really serious injuries and some
4  didn't have any type of personal injury; is that
5  right?
6    A.   In St. Bernard Parish?
7    Q.   Uh-huh.  Yes.
8    A.   I really don't know what everybody
9  injuries are or what, I don't know, but I do know
10  they had water, just like I did.
11    Q.   But not everyone got the same amount
12  of water --
13    MR. LANDRY:
14      Object to form.
15  EXAMINATION BY MS. PAYNE:
16    Q.   -- in St. Bernard Parish and Lower
17  Ninth Ward, wouldn't you agree?
18    A.   I can't say how much water they got.
19    Q.   You just know how much --
20    A.   But I do know it was -- everybody
21  house was underwater in St. Bernard.  They
22  probably got a little bit more water than what we
23  did because they was more close to MRGO than what
24  I was.  So, I don't know.
25    Q.   Do you know the law firms that are

42  (Pages 162 to 165)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 166

1 going to represent the -- or who are asking to
2 represent the proposed class?
3     A.   Do I know what law firm going to do
4 it?  No, I really don't know.
5     Q.   Have you done anything to look into
6 the backgrounds of the lawyers who you do know
7 about?
8     A.   No.
9     Q.   Do you know whether the lawyers you
10 know about have handled other major class
11 actions?
12    A.   Yes.
13    Q.   You do know?
14    A.   I have heard of it.  I really don't
15 know about -- I heard of them.  I don't know.
16    Q.   How much time have you spent so far
17 doing work for this case?
18    A.   How much time have I spent?
19    Q.   Before today.
20    A.   Quite a little time just going over
21 different things, going to my home -- that's what
22 you mean?
23    Q.   I mean stuff for this lawsuit
24 particularly.
25    A.   Well, I don't -- I don't really have

Page 167

1 to do that.  I have my lawyers doing -- working
2 for me.  I don't have to do any of that.
3     Q.   A couple of follow-up questions.
4 Nathan Morgan, is he your boyfriend?
5     MR. LANDRY:
6         Object to form.
7     A.   He's my fiancé.
8 EXAMINATION BY MS. PAYNE:
9     Q.   He's your fiancé.  And what does he
10 do for a living?
11    A.   He's self-employed.  He cut grass
12 and he do landscape work.
13    Q.   How long has he been doing that?
14    A.   All his life.
15    MS. PAYNE:
16        I think that we're almost
17    finished.  I just want to take one
18    last break to confer.
19    MR. LANDRY:
20        Oh, sure.  Absolutely.
21    MS. PAYNE:
22        Can we go off the record for
23    a minute?
24    THE VIDEOGRAPHER:
25        Off the record.  It's 1:56.

Page 168

1         (Whereupon, a discussion was
2     held off the record.)
3     THE VIDEOGRAPHER:
4         Returning to the record.  It
5     is 2:03.
6 EXAMINATION BY MS. PAYNE:
7     Q.   I just wanted to get the chronology
8 straight of where all you were treated for your
9 heart condition.  So, before Hurricane Katrina,
10 did you have your surgery at Tulane?
11    A.   Uh-huh.
12    Q.   That's right?  And then did you ever
13 go to Charity or University Hospital before
14 Hurricane Katrina?
15    A.   Yes.
16    Q.   Which of those?
17    A.   Both of them.
18    Q.   Both of them?
19    A.   Uh-huh.
20    Q.   And then after -- is this anywhere
21 else that you went for that treatment before
22 Hurricane Katrina?
23    A.   No.
24    Q.   And then after Hurricane Katrina,
25 you went to Lallie Kemp?

Page 169

1     A.   Yes.
2     Q.   And then now you're going to
3 University and Tulane?
4     A.   I'm going to -- call that name
5 again.  What it is?
6     Q.   Lallie Kemp?
7     A.   No.  The other one.
8     Q.   Charity?
9     A.   Yes.
10    Q.   You're going to Charity?
11    A.   Yeah.
12    Q.   Are you also going to Tulane now?
13    A.   Yes.
14    Q.   Okay.  But not University now?
15    A.   No, not University.
16    Q.   Okay.  And then on your -- on your
17 various medications that you had filled, where
18 did you get those filled before Hurricane
19 Katrina?
20    A.   Walgreens around the corner in the
21 Ninth Ward, on -- right there in the Ninth Ward.
22    Q.   So, you remember what street that
23 Walgreens was on?
24    A.   Caffin Avenue.  I think it was
25 Caffin, if I'm not mistaken.  It was Caffin.

43 (Pages 166 to 169)

b203d5cf-cf83-4456-a851-043c004e06cb

Page 170

1    Q.   After Hurricane Katrina, where did
2 you get your prescriptions filled?
3    A.   Where did I get them filled at now?
4    Q.   Or where did you first get them
5 filled after Hurricane Katrina?
6    A.   Some in -- in Independence,
7 Louisiana, Hammond, and I had some that I got
8 filled right here in New Orleans.
9    Q.   Which pharmacy did you use in
10 Hammond?
11    A.   Wal-Mart.  Wal-Mart and --
12    Q.   Was this any other pharmacy in
13 Hammond that you used to get those filled?
14    A.   No.  Uh-uh.
15    Q.   And then when you came back to New
16 Orleans, where did you get the prescriptions
17 filled?
18    A.   Walgreens.
19    Q.   And which Walgreens?
20    A.   Tchoupitoulas.
21    Q.   For the work that you were doing on
22 your house before Hurricane Katrina, did you ever
23 get any building permits from the city for that
24 work?
25    A.   No.  I didn't really get any

Page 171

1 building permits.
2    Q.   I think you said, no, I didn't
3 really get any building permits?
4    A.   No.  I didn't get -- no, I didn't
5 have one.
6    Q.   And the assistance that you got from
7 FEMA, did you ever get any housing assistance
8 other than the trailer?
9    A.   I got rental assistance one time.
10 That was it.  Once.  One time.
11    Q.   How much was that?
12    A.   Fifteen.
13    Q.   Will you repeat that?
14    A.   Fifteen hundred.
15    Q.   Fifteen hundred dollars?
16    A.   Uh-huh.
17    Q.   Can you think of any other
18 assistance that you got that you haven't already
19 told me about today?
20    A.   No.  No.  I didn't get any.
21    Q.   Okay.  One last thing.  In some
22 papers that your lawyers filed, I understand in
23 the plaintiffs' motion for class certification --
24    MS. PAYNE:
25       And I can make this an

Page 172

1 exhibit if you want me to,
2 Counsel.
3    MR. LANDRY:
4       No.
5 EXAMINATION BY MS. PAYNE:
6    Q.   -- it says that you resided in one
7 half of the double, the address on Charbonnet
8 Street, you resided in one half of the double,
9 and rented the other half for $200 per month.  Is
10 that -- is that accurate or is that a mistake?
11    A.   Where did that come from?
12    Q.   Just some papers that -- it wasn't
13 anything that you filed.  It was something that
14 the lawyers filed with the court, a legal brief.
15 I just was wondering if that was accurate or not.
16    A.   No.
17    Q.   You didn't rent the other half?
18    A.   The other half -- did I rent it?
19    Q.   Yeah.  Did you rent it to someone?
20 Did they pay you rent, $200 per month?
21    A.   What I said was my daughter, she
22 would give me a helping hand, like, $200 a month,
23 but that was it.
24    Q.   Did she give you $200 every month?
25    A.   No, not every month, no.  Just

Page 173

1 something to -- you know, sometimes she would
2 help me if my light bill be kind of high or
3 something like that, you know.
4    Q.   Was there a set amount that she paid
5 you, a minimum and then sometimes paid you more,
6 or did it just depend?
7    A.   It was just -- depend on, you know,
8 how high was the light bill, the water bill or
9 something like that.
10    MS. PAYNE:
11       I don't have anything else.
12 Thank you very much, Mrs. Coats.
13 Thank you.
14    MS. BOYER:
15       Nothing.
16    MR. LANDRY:
17       Finished?
18    MS. BOYER:
19       Oh, no.  No.  I said no.
20    MS. BERTAUT:
21       Okay.  We're done.
22    MR. LANDRY:
23       Thank you.
24    THE VIDEOGRAPHER:
25       This concludes this

44  (Pages 170 to 173)

Page 174

1   deposition.  It's 2:09 p.m.
2        (Whereupon, the testimony of
3   the witness was concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 176

1        REPORTER'S CERTIFICATE
2
3
4        I, CAROL VALLETTE SLATER, Certified
5   Court Reporter, Registered Professional Reporter,
6   in and for the State of Louisiana, as the officer
7   before whom this testimony was taken, do hereby
8   certify that ETHEL COATS, after having been duly
9   sworn by me upon authority of R.S. 37:2554, did
10   testify as hereinbefore set forth in the
11   foregoing pages; that this testimony was reported
12   by me in the stenotype reporting method, was
13   prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21        CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22        REGISTERED PROFESSIONAL REPORTER
23
24
25

Page 175

1        WITNESS' CERTIFICATE
2
3
4
5        I, ETHEL COATS, read or have had the
6   foregoing testimony read to me and hereby certify
7   that it is a true and correct transcription of my
8   testimony, with the exception of any attached
9   corrections or changes.
10
11
12
13
14
15        (Witness' Signature)
16
17
18
19
20
21
22
23
24
25

(504)525-1753   HUFFMAN & ROBINSON, INC.   (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

b203d5cf-cf83-4456-a851-043c004e06cb