# App. Tab 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                      "K" (2)
PERTAINS TO:  MRGO                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,    MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

GLYNN WADE,

4719 Bundy Road, New Orleans, Louisiana 70127,

taken in the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on Tuesday, the 10th day of July, 2007,

beginning at 9:09 A.M.

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 2

1  APPEARANCES:
2
3     EXNICIOS LAW FIRM
      (BY: RICHARD M. EXNICIOS, ESQ.)
4     7916 Nelson Street
      New Orleans, Louisiana 70125
5        ATTORNEYS FOR THE PLAINTIFFS
6
      SUTTON LAW FIRM
7     (BY: CHARLES E. SUTTON, JR., ESQ.)
      Suite 105
8     2101 North Highway 190
      Covington, Louisiana 70433
9        ATTORNEYS FOR THE BOARD OF
         COMMISSIONERS FOR THE
10       ORLEANS LEVEE DISTRICT
11
      DUPLASS, ZWAIN, BOURGEOIS, MORTON,
12    PFISTER & WEINSTOCK
      (BY: NICOLE BOYER, ESQ.)
13    Suite 2900
      3838 North Causeway Boulevard
14    Metairie, Louisiana 70002
         ATTORNEYS FOR THE BOARD OF
15       COMMISSIONERS FOR THE LAKE BORGNE
         BASIN LEVEE DISTRICT
16
17    STONE PIGMAN WALTHER WITTMANN
      (BY: CARMELITE BERTAUT, ESQ.)
18    546 Carondelet Street
      New Orleans, Louisiana 70130-3588
19
         AND
20
      JONES DAY
21    (BY: WILLIAM E. MARPLE, ESQ.)
      2727 North Harwood Street
22    Dallas, Texas 75201-1515
         ATTORNEYS FOR WASHINGTON GROUP
23       INTERNATIONAL, INC.
24
25

---

Page 3

1
      APPEARANCES CONTINUED:
2
3
4     VIDEOTAPED BY:
5        Gilly Delorimier
         Depo-Vue, Inc.
6
7
8     REPORTED BY:
         ROGER D. JOHNS, RMR, CRR, RDR, CSR
9        Certified Court Reporter
         State of Louisiana
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1              S T I P U L A T I O N
2
3       It is stipulated and agreed by and between
4    counsel for the parties hereto
5    that the deposition of the aforementioned
6    witness is hereby being taken under the
7    Federal Rules of Civil Procedure, for all
8    purposes, in accordance with law;
9       That the formalities of reading and
10   signing are specifically not waived;
11      That the formalities of certification and
12   filing are specifically waived;
13      That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19              *  *  *  *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25

---

Page 5

1                    I N D E X
2
3                                      PAGE
4     Wade 1.............................. 62
      Exhibit 2........................... 66
5     Exhibit 3........................... 74
      Exhibit 4........................... 92
6     Exhibit 5.......................... 100
      Exhibit 6.......................... 101
7     Exhibit 7.......................... 103
      Exhibit 8.......................... 104
8     Exhibit 9.......................... 106
      Exhibit 10......................... 107
9     Exhibit 11......................... 109
      12................................. 110
10    13................................. 111
      14................................. 112
11    15................................. 114
      Wade 16............................ 114
12    Wade 17............................ 116
      Exhibit 18......................... 117
13    Wade 19............................ 119
      20................................. 119
14    Exhibit 21......................... 122
      Wade Exhibit 22.................... 124
15    Exhibit 23......................... 150
      Exhibit 24......................... 151
16
17
18    EXAMINATION BY MR. MARPLE:..........6
19
20
21
22
23
24
25

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 6

1        VIDEO OPERATOR:
2        This is the videotaped deposition
3    of Glynn Wade.  This deposition is
4    being held today at 855 Baronne
5    Street, New Orleans, Louisiana, on
6    July the 10th, 2007 at approximately
7    9:09 A.M.
8        Would the Court Reporter please
9    now swear in the witness.
10       GLYNN WADE,
11   4719 Bundy Road, New Orleans, Louisiana 70127,
12   after having been duly sworn by the
13   before-mentioned court reporter, did testify
14   as follows:
15   EXAMINATION BY MR. MARPLE:
16       Q.  Mrs. Wade, have you ever been
17   deposed before?  Given a deposition like this
18   before?
19       A.  No.
20       Q.  We said off the record, but I'll say
21   it on, if you need a break at any time, you
22   just let us know, we'll be happy to
23   accommodate you.  One other thing is, this
24   gentleman, the Court Reporter, is taking down
25   everything we say, questions and answers, so

---

Page 7

1    if you'll let me finish my question before you
2    start your answer, I'll try to not interrupt
3    you or start another question before you're
4    finished.  He'll have a question and answer,
5    so that the answer doesn't appear in the
6    middle of my question in the transcript.  Is
7    that okay to try to do that?
8        A.  Yes, it is.
9        Q.  I hate to ask you this, but can you
10   tell us your date of birth?
11       A.  October 19th, 1945.
12       Q.  We're about the same age.  I'm a
13   year or two behind you.  Where were you born?
14       A.  New Orleans, Louisiana.
15       Q.  What part?
16       A.  Orleans Parish.
17       Q.  And was it a particular neighborhood
18   where you grew up?
19       A.  An area in New Orleans called Zion
20   City, around North Broad Street.
21       Q.  And did you go to school in New
22   Orleans?
23       A.  Yes, sir, I did.
24       Q.  What high school did you go to?
25       A.  Walter L. Cohen Senior High School,

---

Page 8

1    C O H E N.
2        Q.  And what year did you graduate from
3    high school?
4        A.  1963.
5        Q.  Was that a public school?
6        A.  Yes, sir, it is.
7        Q.  I'm taking in those days it was
8    probably all black?
9        A.  Yes, it was.
10       Q.  And then did you go to college?
11       A.  Yes, sir, I did.
12       Q.  Where did you go?
13       A.  Dillard University.
14       Q.  And what years approximately were
15   you at Dillard?
16       A.  From 1963 to 1967.
17       Q.  And you got a degree there?
18       A.  Yes, sir, I did.
19       Q.  In what?
20       A.  Sociology.
21       Q.  And then did you have any further
22   education after college?
23       A.  Yes, sir, I did.
24       Q.  And what's that?
25       A.  I have a Master's degree in social

---

Page 9

1    work.
2        Q.  And where did you obtain that?
3        A.  Tulane University of School of
4    Social Work.
5        Q.  And approximately what year was
6    that?
7        A.  1985.
8        Q.  And as I understand it, you worked
9    as a social worker for several years?  Is that
10   correct?
11       A.  Yes, sir.
12       Q.  Have you worked at anything other
13   than in social work?
14       A.  Well, in between when I first moved
15   from Cleveland, Ohio, I worked with retarded
16   adults as an instructor they called it, but
17   really just working and teaching them a trade
18   for the Association of Retarded Citizens of
19   Greater New Orleans.
20       Q.  Now, after you graduated, did you
21   still live -- the first time from college, did
22   you still live in New Orleans then?
23       A.  No, sir.
24       Q.  Tell me where Dillard is.
25       A.  Dillard University is in New Orleans

---

                                    3 (Pages 6 to 9)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                        7/10/2007

**Page 10**

1 in the Gentilly area.
2     Q. And then after college you moved
3 away to Ohio?
4     A. Yes, sir.
5     Q. And how long did you live in Ohio?
6     A. From 1967 to 1972.
7     Q. And then you came back to New
8 Orleans in '72?
9     A. Yes, sir.
10     Q. And have you lived in New Orleans or
11 the New Orleans area since then?
12     A. Ever since then.
13     Q. Do you remember Hurricane Betsy?
14     A. Very well.
15     Q. And tell us what you remember about
16 Betsy.
17     A. Well, I remember that I was about 19
18 years old, a student at Dillard. I was living
19 with my parents and I remember that it was a
20 very bad hurricane and a lot of people lost
21 their homes and lives.
22     Q. And where were you living? What
23 area of town were you living in then?
24     A. The area called, referred to as Zion
25 City off of North Broad Street with my

**Page 11**

1 parents.
2     Q. All right. I wasn't sure if you
3 were still living there. Did your area get
4 flooded?
5     A. No, sir, it didn't.
6     Q. The Lower Ninth got hit pretty hard;
7 right?
8     A. Yes, it did.
9     Q. Did you have occasion to see the
10 aftermath of Betsy in the Ninth Ward or other
11 places?
12     A. Yes, sir, I did.
13     Q. Did you have friends or
14 acquaintances that lived in the Lower Ninth?
15     A. No, sir, I did not.
16     Q. Now, you mentioned there was a lot
17 of homes lost and lives lost. Did you know
18 people who had lost homes in Betsy?
19     A. No, I got that information from the
20 news.
21     Q. And the loss of life, that came from
22 the news as well?
23     A. Yes, sir.
24     Q. When you came back to -- Well, let
25 me back up just a second. On Betsy, do you

**Page 12**

1 have any thoughts on what went wrong or what
2 caused the flooding with regard to Betsy?
3     A. I have no idea, sir.
4     Q. Now, when you came back in '72,
5 where did you live then?
6     A. I first moved in the Lower Ninth
7 Ward with my mother and step-father, my two
8 year old baby and I. And eventually, several
9 months later, I moved in the Gentilly area
10 with my great aunt who was well up in age and
11 asked me to move in with her to assist her.
12     Q. And the home that you were living in
13 in the Lower Ninth, had it been flooded during
14 Betsy?
15     A. I'm told by my step-father, my
16 mother that remarried, that yes, that house
17 had been flooded.
18     Q. And do you know to what extent? I
19 mean, what did they tell you about how bad it
20 was or anything?
21     A. All I know is it had been flooded.
22     Q. And then after you left with your
23 great aunt, where did you live next?
24     A. Well, 13 years ago I was able to
25 move into New Orleans East. My husband and

**Page 13**

1 I.
2     Q. All right. And I may not have --
3 Well, maybe we have. But between about 1993
4 or 1994 when you moved to where you live now,
5 right?
6     A. Yes, sir.
7     Q. Have we covered the basic places you
8 have lived before that?
9     A. Yes, sir, because my aunt left me
10 that house.
11     Q. Give us the address of the house
12 where you live now.
13     A. 4719 Bundy Road.
14     Q. And --
15     A. New Orleans, Louisiana.
16     Q. When you bought that house, do you
17 know how old it was? In other words, when it
18 was built?
19     A. Not really. No.
20     Q. And what kind of condition was it in
21 when you bought it?
22     A. Excellent condition.
23     Q. And then did you do any remodeling
24 between the time you bought it and Hurricane
25 Katrina?

GLYNN WADE  (MRGO)                                      7/10/2007

---

Page 14

1     A.  Yes, I did.
2     Q.  What did you do?
3     A.  One thing, my husband and I took the
4  screened back porch and we converted it into a
5  sun room, closed sun room.  We bought all new
6  carpeting through the entire house.  We, I
7  don't know, just renovated.  We renovated it.
8     Q.  And the house needed some updating
9  over the years between '93 or --
10    A.  It was in excellent condition, but
11 when we purchased the house I am told an
12 elderly Jewish couple owned it and he was an
13 engineer; he kept it in mint condition, too. ,
14 but the walls were dull, the carpet was dull,
15 so my husband and I worked with it to up- --
16 to upgrade it to more modern.
17    Q.  And prior to Katrina had you had any
18 flooding out there even in the street or
19 anything like that?
20    A.  We would have water come to the
21 sidewalk of our home.
22    Q.  And that was during heavy rains?
23    A.  I can't remember the different
24 hurricanes, but when we had -- not hard rains,
25 but with a hurricane, like George, I can

---

Page 15

1  remember that, I think that was -- I am not
2  sure, I think it was around 2000, maybe 1999,
3  I can't remember, but the water came to the
4  sidewalk.
5     Q.  And so during the time you have
6  lived in that home prior to Katrina, you
7  didn't have water come up in the house?
8     A.  No, sir.
9     Q.  All right.  And Hurricane George,
10 did you evacuate the house in the light of
11 warnings about Hurricane George?
12    A.  To be honest, no, because my husband
13 did not want to leave the house.
14    Q.  Did you do anything like board up
15 any windows or anything like that?
16    A.  He did that.
17    Q.  And what was your experience during
18 Hurricane George in this house?  I mean, how
19 bad was it or how much wind did you get, or
20 was there any damage to the house?
21    A.  No damage whatsoever to the house.
22    Q.  Were there high winds?
23    A.  If I recall, yes, there were high
24 winds.  But may I just interject?
25    Q.  Sure.

---

Page 16

1     A.  At the time, so much was going on,
2  my step-father had cancer, flat on his back,
3  and we had to try to get him to Tulane Medical
4  Center because Morial was taking in disabled
5  patients at Tulane Hospital, and my mom had
6  cancer, both of them were in their 80s, and
7  she did not want to leave him, but he had to
8  go to the hospital by himself.  So it was so
9  much going on trying to take care of two
10 elderly step-father and mother, trying to make
11 sure we had enough food in the house, and we
12 took out my mother, that to -- the concern of
13 the hurricane was very low to me, but my
14 husband stayed up all night watching, because
15 he does not sleep during hurricanes.  But I
16 was dealing with two elderly sick, ornery
17 parents.
18    Q.  And was there any other time during
19 the time you lived there where you considered
20 evacuating or maybe did evacuate prior to
21 Katrina?
22    A.  The year before Katrina, and I
23 cannot remember the name of the hurricane, I
24 really cannot remember, but we evacuated
25 because, number one, my parents had died, my

---

Page 17

1  daughter and my grandbaby left with her
2  daddy's people, my younger neighbors were
3  leaving and told us we best get out of the
4  area, too, so we followed the young couple on
5  our left-hand side of our house, we followed
6  them to a place named Humble, Texas.
7     Q.  And when you say on the left, would
8  that be as you're standing in your front yard
9  facing Bundy, to your left or as you face the
10 house to your left?
11    A.  Well, my house (indicating), they
12 live on this side (indicating) and the older
13 couple lived on my right-hand side.
14    Q.  How long were you away for the
15 evacuation for that hurricane, which I think
16 might have been Ivan --
17    A.  I think it was.
18    Q.  How long were you over there in
19 Humble?
20    A.  About a day and a half or two days.
21    Q.  And sort of gave the "all clear",
22 you came back and -- Is that right?
23    A.  Yes, sir.
24    Q.  And had there been any damage to
25 your house?

---

JOHNS PENDLETON COURT REPORTERS                  800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE  (MRGO)                                          7/10/2007

---

**Page 18**

1    A.  None.
2    Q.  I'm sorry, were you wanting to say
3  something else?
4    A.  No, sir.
5    Q.  Now, coming up to Hurricane Katrina,
6  can you just tell us generally your experience
7  with Katrina, if you left and when you came
8  back, where you went to, that sort of thing?
9    A.  Okay.  First of all, I need to tell
10  you that I am a State worker.  I'm a State
11  social worker.  Therefore, when there's a
12  hurricane, State workers, if they are called
13  to go and work a shelter, be it any part of
14  Louisiana, have to go.  If not, we're told
15  that we won't have a job after the hurricane.
16  So on Saturday, August 27th, 2005, about 8:00
17  A.M., I was notified by the State, saying to
18  get prepared and to pack clothes for three
19  days, get my family situated, and be ready to
20  move out with them later that day.  So I
21  called my daughter immediately, she was in the
22  Reserve living in New Orleans, and I told her
23  to contact her daddy's people right away and
24  leave New Orleans.  Leave New Orleans.  She's
25  an only child, as I am.  For my husband, I

---

**Page 19**

1  tried to get him to go with my step-children,
2  who are all adults.  Well, he is 13 years
3  older than me and very ornery and hard headed,
4  too.  So, therefore, I still got food for my
5  daughter and granddaughter and left food,
6  water, and juice for my husband, and I asked
7  my younger neighbors to please look out for
8  him and talk him into leaving with them.  I
9  had to be at City Hall that day for 3:00 and I
10  -- I didn't -- I didn't pack.  I was very
11  upset that I had to leave my family to go and
12  help other families.  I had to leave mine
13  behind.  So I took my clothes and put them in
14  a garbage bag, which is not me, because I had
15  just come from Hot Springs and my husband
16  bought me a brand new set of luggage that May,
17  but I figured if I have to go, at least I can
18  do it the way I want to do it.  So I put three
19  days of clothing in a garbage bag and I got to
20  City Hall about 3:00 that evening.  My
21  colleagues asked me had I gone crazy coming
22  with a garbage bag, but I told them, "Just
23  don't say anything to me.  I have to go, I'll
24  go the way I want to go."
25         But we stayed in City Hall from

---

**Page 20**

1  3:00 that evening until about 8:00 P.M. to
2  the head nurse of the -- the health head nurse
3  drove two other public health nurses and I,
4  the social worker, to Baton Rouge.  We got
5  there I think about 11:00.  So much happened
6  that day, but it was about 11:00 that night we
7  got to LSU campus.  It was the gymnasium on
8  that campus.  I am not sure, I think it's the
9  Pete Montz, something of that nature.  I had
10  never been there before.  And when we got
11  there, they were setting up, moving the
12  bleachers and setting up, putting, not beds,
13  but cots up.  We had to sign in and all of us
14  State workers that had just come in about
15  11:00, they told us to go sit in the bleachers
16  and rest for a while, because in a couple of
17  hours it would be our turn to receive the
18  people as they come in.
19         And there were, oh, even at 11:00
20  when we walked in, people coming in.  I recall
21  some people were coming in from Chalmette,
22  Louisiana and other areas of Louisiana.  I
23  remember Chalmette, because my mother lived on
24  Delery in Ninth Ward near Chalmette.  So I
25  remember it.  Some people from New Orleans,

---

**Page 21**

1  Lower Ninth Ward.  I could not sleep because
2  it was so -- it was so much excitement and I
3  was so nervous.  I had never experienced
4  that.  But I think I sat in the bleachers with
5  my co-workers maybe three or four hours and
6  then it was our turn to get up and start
7  working the shelters.  And when I say work,
8  that means that, of course, the nurses, public
9  health nurses were triaging and I as the
10  social worker receiving the people and
11  was counseling them.  Because this apparently
12  was new to some of the people that were coming
13  in.
14         You see, I worked a -- they call
15  it a special needs shelter.  So that was
16  either disabled people, regardless of their
17  ages, or elderly people.  And that was an
18  experience for them, too, to have to leave
19  home.  And we prepared to work for three
20  days.  And it was okay going and receiving the
21  people, but I can recall about that Monday
22  more people start coming in and by that time
23  my husband had gotten lost from the neighbor,
24  but he wound up in a very nice shelter near
25  Tallulah, Louisiana and he called me and he

---

GLYNN WADE (MRGO)                                      7/10/2007

---

Page 22

1   told me, he said, "Now, we are hearing that
2   the --" That was Monday, "-- East New Orleans
3   is flooded and so be prepared, because they
4   said that a lot of the houses were under
5   water." I don't know, because I was in the
6   middle of the shelter working and we were not
7   allowed to look at TV, which was way to the
8   side for the people that came in and living in
9   the shelter were able to do, but I remember
10  some of the people that came into the shelter
11  that Saturday, they remembered where we'd say
12  we were from and they came -- I remember some
13  of them took me by the hand and they said,
14  "You're helping us and you're counseling, but
15  you have lost your home. Because if you lived
16  in East New Orleans, you have lost everything
17  you own." I didn't believe it. But I walked
18  to the TV and CNN, I think it was, was showing
19  all the time, showed the condition of New
20  Orleans all over, Lower Ninth, the East,
21  everywhere. And I still didn't believe my
22  house was damaged. Because it had never been
23  damaged before. But my husband called me and
24  he said, "Prepare, come into the real world."
25  He says, "You have lost -- we have lost

---

Page 23

1   everything we own."
2           So I can't say I accepted it, but
3   I had to make the best of working. I was
4   still on my job working and I decided to do
5   all I could to stay busy. And with me helping
6   others helped me to keep my sanity.
7           And that night, that Monday night,
8   I remember helicopters -- to this day I cannot
9   stand to hear helicopters or planes over my
10  head, because, oh, for about several days, but
11  starting that night, that Monday night,
12  helicopters were coming in bringing people
13  into the shelter. And as we accepted the
14  people, they start telling their stories to us
15  because we were counseling them. And I
16  remember many came from Chalmette, Louisiana.
17  And some of the families stated that they were
18  blessed by relatives to be able to get put on
19  the roof, some way that relatives, the men
20  relatives were able to bust holes in the roof,
21  and I remember one lady, she said her husband
22  and mother put -- brought her -- helped her to
23  get up to the roof and then helped their
24  disabled son to get up on the roof. And when
25  she tried to lean down to get her mom, she

---

Page 24

1   said the water came so fast that she couldn't
2   help her mother or her husband and she
3   actually, she stated, saw them floating around
4   the house drowned. And there were many other
5   stories that people had to tell us.
6   Meanwhile, I'm in shock about my situation,
7   but it wasn't like seeing relatives die. So I
8   was able to -- to listen, and one of the
9   things that we as social workers were able to
10  do is start getting names, phone numbers, and
11  addresses of relatives in other states,
12  because the doctors stated to us that once the
13  patients were triaged and stabilized, the ones
14  that were on the insulin or had heart
15  conditions or whatever, if we social workers
16  could contact relatives out of Louisiana and
17  talk with them and let them talk to them and
18  they would accept them on their end, then we
19  can get them ready for the helicopter and they
20  would fly the people all over the United
21  States. And that was what I was doing.
22      Q. And if I could just interrupt a
23  little bit, we can come back to this, if I
24  could pick up a little bit on when your
25  husband left, do you know what means of

---

Page 25

1   transportation he took out of New Orleans?
2       A. Yes, sir, I do.
3       Q. What was that?
4       A. He took our old green truck, pickup
5   truck.
6       Q. And he drove himself?
7       A. Yes.
8       Q. Did he have anybody else with him?
9       A. No.
10      Q. And I heard you mention I think a
11  granddaughter. Was there anybody else living
12  there in that house with you besides your
13  husband?
14      A. Just my husband and me. My daughter
15  and her daughter, who's 13, my granddaughter,
16  they had their own house.
17      Q. And you had tried to make some
18  provisions for them before you went to work on
19  that Saturday?
20      A. I did.
21      Q. Right?
22      A. I did.
23      Q. And then where did they live in
24  relationship to where you lived?
25      A. My daughter owned a home in

---

JOHNS PENDLETON COURT REPORTERS            800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

Page 26

1   Gentilly.
2       Q.  And then did they evacuate?  Do you
3   know when they evacuated?
4       A.  She finally told me she had
5   evacuated that Sunday evening with her
6   boyfriend.
7       Q.  And your husband called you, was it
8   on Monday?  Is that when you got the call from
9   him?
10      A.  It was about Monday -- If I recall,
11  it was about Monday evening, Monday night.
12      Q.  And what kind of telephone access
13  did you have and did he have?  Was it on a
14  land line or a cell phone or what?
15      A.  I had my cell phone and my husband
16  had his cell phone.  My daughter had her cell
17  phone.
18      Q.  And you were able to talk to your
19  husband on the cell phone?
20      A.  Yes, sir.
21      Q.  And then were you able to talk to
22  your daughter on her cell phone?
23      A.  Yes, sir.
24      Q.  And you obviously had electricity up
25  at LSU in Baton Rouge.

Page 27

1       A.  Yes, sir.
2       Q.  And the shelter where your husband
3   had gotten to had power, I guess, as well?
4       A.  Yes, sir.
5       Q.  And your daughter and granddaughter,
6   where did they go?
7       A.  The only place she could get
8   reservations was in San Antonio, Texas, on I
9   think it's an Air Force base.  She was still
10  in the Navy Reserve and they -- they took
11  her.
12      Q.  And then when was it that you and
13  your husband were able to get back together in
14  person?
15      A.  October 1st, 2005.
16      Q.  And where was that?
17      A.  I was still in Baton Rouge working
18  and he came down from Tallulah, Louisiana and
19  picked me up in the -- He had his truck.  He
20  took his truck.
21      Q.  And did you come back to New Orleans
22  then?
23      A.  I came back to Destrehan,
24  Louisiana.
25      Q.  And you stayed there for a few days

Page 28

1   or a while?
2       A.  Destrehan?
3       Q.  Yes.
4       A.  I stayed there for -- Well, back
5   up.  My administrator was trying to help us
6   State workers to get apartments.  Because we
7   all had lost our homes.  And I was blessed to
8   get a one room apartment -- one bedroom
9   apartment in Destrehan September of 2005 and I
10  immediately paid the rent and deposit.  So,
11  therefore, when my husband picked me up
12  October 1st, 2005 in Baton Rouge, we had our
13  apartment waiting for us.
14      Q.  And I have been to Destrehan and,
15  what, I am going to guess wrong if I try to
16  remember where it is, but it's out west on the
17  other side of the lake; right?
18      A.  Destrehan is near LaPlace.
19  Destrehan -- First Baton Rouge, Hammond,
20  LaPlace, Destrehan.
21      Q.  And you took up residence then in
22  that apartment for quite some time?
23      A.  From October 1st, 2005 to March
24  17th, 2007.
25      Q.  And when was it that you first came

Page 29

1   back to New Orleans and saw your house?
2       A.  October 1st, 2005.
3       Q.  All right.  I'm sorry, I might have
4   missed it.  You all drove all the way to New
5   Orleans?
6       A.  From Baton Rouge.
7       Q.  And --
8       A.  We went to our apartment.  My
9   husband could -- My husband had never seen
10  it.  I was the one that found it with my
11  co-workers and administrator.  So we went to
12  look at them for him to see the apartment and
13  then we had some -- a little cash money and
14  our landlord told us where we could go and get
15  a mattress and box spring, portable TV, a
16  little TV.  And we went and bought -- We got a
17  bed frame.  We set it up and before it got
18  dark October 1st, we went to look at our
19  house.
20      Q.  And what did you see when you went
21  to your house?  I mean, what condition was it
22  in?
23      A.  Well, before we went in, some of the
24  -- a lot of the bricks had been knocked off
25  the front of our house.  The picture window,

JOHNS PENDLETON COURT REPORTERS              800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                              7/10/2007

---

Page 30

1  of course, was broken into, but they had to do
2  that to -- whomever, to search for bodies. We
3  went through that window and the water had
4  receded or gone down, but we could tell before
5  we went in the house the water line of our
6  house. Now, I can't say for sure, but it
7  looked like it was about four feet of water or
8  more. So when we got inside of the house, we
9  looked around. All of the furniture was wet.
10 The floor was slippery, and slippery. I
11 don't know what that black slippery was, but
12 we had boots on and we had held each other's
13 hand, but it was slippery, black sludge. But
14 the furniture, my living room furniture was
15 turned upside down. And then the kitchen was
16 next to the living room. Our refrigerator was
17 turned upside down. It's amazing. I have
18 never seen anything like that.
19        Some of the furniture that was in
20 the master bedroom was in the kitchen. Some
21 of the kitchen stuff was in the master bedroom
22 and the other two bedrooms. But everything
23 was just turned upside down. Damp, moldy,
24 stinky. Some of the pictures on our walls
25 that were hanging a little low were ruined.

---

Page 31

1  There was nothing in the house salvageable
2  except my mother's and daddy's portrait, and I
3  -- it was full of mold and sludge and I said,
4  "Just leave it alone. Just -- I won't try to
5  take it." But my husband took them down and
6  wiped them. And that was salvageable.
7     Q. What about things on top of the
8  counters? Had it reached the kitchen
9  countertops in the house?
10    A. Yes, sir.
11    Q. Now, did you do any -- Well, just
12 tell me what you did generally after that
13 time. Did you board anything up? Did you
14 leave it alone? I mean, what did you do?
15    A. Well, that evening we left because
16 it was getting dark and there was a curfew,
17 especially in the East. So we really weren't
18 supposed to even be there, but we did October
19 1st. But a couple of days later my husband
20 came back and he boarded up the window, the
21 window of our living room, but we didn't
22 really have to worry about anything because
23 everything was ruined. So nobody could steal
24 anything because it was stinky, dirty,
25 ruined.

---

Page 32

1        And we talked to friends and
2  neighbors and they start telling us about
3  having the house gutted out and taking all of
4  the debris out of the house. So we hired some
5  people to first take the debris out of the
6  house and then we hired people to -- men to
7  gut out the entire house.
8     Q. And was that -- had you contacted
9  your insurance agents at that point or made a
10 claim for flood on your homeowner's?
11    A. Yes, sir, I did that when I was at
12 Baton Rouge.
13    Q. And you had a flood policy on the
14 house?
15    A. Yes, sir, I did.
16    Q. And had you had that the entire time
17 you lived there?
18    A. Yes, sir.
19    Q. Was that part of the requirement on
20 the mortgage, that you have flood insurance?
21    A. Yes.
22    Q. And you also then had a regular
23 homeowner's policy as well; right?
24    A. Yes, sir.
25    Q. Did you make claims under both of

---

Page 33

1  those policies?
2     A. Yes, I did.
3     Q. Were both of those with Allstate?
4     A. Yes, they were.
5     Q. Did you get -- Well, I'll just ask
6  you what the history was of -- Let's start
7  with the one on the homeowner's policy. What
8  did you claim under the homeowner's policy?
9  And did you fill out some forms to do that?
10    A. I filled out forms, but Allstate
11 stated for the homeowner's insurance that we
12 had very little wind damage and -- on our
13 roof. So, therefore, the deductible was far
14 more than what they claimed was wind damage, so we
15 paid for the roof damage ourselves.
16    Q. Did you ever -- Did you contest that
17 or go any further with Allstate?
18    A. For wind damage?
19    Q. Yes.
20    A. No, sir. It didn't make sense.
21    Q. So Allstate said there's some wind
22 damage here to the roof and shingles off and
23 tile maybe or something there?
24    A. Uh-huh (affirmatively).
25    Q. Is that right?

---

GLYNN WADE (MRGO)                                    7/10/2007

Page 34

1    A.  Uh-huh (affirmatively).  Yes, sir.
2    Q.  But it was below what the deductible
3  on the policy was; right?
4    A.  That's correct.
5    Q.  And do you remember what the
6  deductible was?
7    A.  I can't remember if it was about --
8  maybe about $200.  I am not sure, but --
9    Q.  And you had that roof repaired then
10  on your own sometime fairly soon --
11    A.  Yes, sir.
12    Q.  -- after that?  And what did it cost
13  to repair that roof?
14    A.  About $200.
15    Q.  And was that somebody you -- some
16  roof people you knew that you hired or got
17  their name somewhere and hired them to do
18  that?
19    A.  Just a roofer that had put the roof
20  on a couple of years before Katrina.  He did
21  the repairs for us.
22    Q.  All right.  And when your roof
23  needed repairing a couple of years before, was
24  that --
25    A.  No, we bought a brand new roof.

Page 35

1    Q.  You bought a new one?
2    A.  Yes.
3    Q.  Was it because the other one had
4  gotten damaged by hail or it was old, or what
5  was the reason?
6    A.  Old.
7    Q.  Was it leaking at all?
8    A.  When?  After Katrina or what?
9    Q.  No, the old roof before you had it
10  repaired or replaced a couple --
11    A.  Every now and then we would have the
12  spots, water spouts -- spots showing and we
13  would pay our neighbor, a roofer.  And finally
14  my husband and I figured at our age we may as
15  well get a brand new roof rather than nickel
16  and dime and what have you.  We got a brand
17  new roof.
18    Q.  And now the roof that's on the house
19  now, that is same roof, but it's been repaired
20  after Katrina; right?
21    A.  That's correct.
22    Q.  When you came back to that house on
23  October 1st, did you take any photographs of
24  the inside of the house or outside?
25    A.  Not that day, but shortly after that

Page 36

1  my husband took pictures of the outside.  But
2  he did not take pictures of the inside as it
3  was with the debris and the furniture.  But he
4  took pictures of the house after it was gutted
5  out.
6    Q.  And that would have just been -- you
7  could have seen the studs and everything in
8  there; right?
9    A.  Yes, you can see that.
10    Q.  But no sheetrock or ceilings?
11    A.  It had all -- it had -- had all of
12  that gutted out.
13    Q.  And was that something you did on
14  your own to have that gutted, or by that time
15  had you gotten money from the flood policy or
16  something that you used for that?
17    A.  No, sir, we hadn't gotten money from
18  the flood policy.  But we knew that -- Well,
19  we were told mold was growing in the house,
20  the houses, so we got it gutted out.  We used
21  some of our life savings.
22    Q.  And you made a claim on the flood
23  policy about the same time you made one on the
24  homeowner's policy; right?
25    A.  Yes, sir, I did.

Page 37

1    Q.  And that also was with Allstate?
2    A.  Yes, sir.
3    Q.  Were you dealing with the same
4  people or different people at Allstate?
5    A.  The same people.
6    Q.  And where were they and who were
7  they, if you know?
8    A.  Okay.  I was blessed to be able to
9  -- my co-workers brought me to Allstate in
10  Baton Rouge when I was working, but I was able
11  to also get in touch with my agent in New
12  Orleans.
13    Q.  Who was that?
14    A.  John Elliott.
15    Q.  And on the flood policy, tell us
16  what happened on that claim.
17    A.  On the flood policy, they gave us
18  what we were insured for.
19    Q.  And what was that amount?
20    A.  If I recall, it was 84,900.
21    Q.  And about when did you get that
22  check?
23    A.  About February of 2006.
24    Q.  All right.  And was that for
25  contents and house or what?  I mean --

GLYNN WADE   (MRGO)                                    7/10/2007

---

Page 38

1      A.  It was for the house.
2      Q.  And then did they pay anything on
3  the contents?
4      A.  Yes, they paid 38,000.
5      Q.  Another 38,000 for the contents?
6      A.  Uh-huh (affirmatively).
7      Q.  Do you have a file somewhere that
8  has your flood policy in it and your claim and
9  copies of these checks and so forth?
10     A.  I'm sure I have it in my red box at
11 home.
12     Q.  And would you also have in there the
13 -- well, was there correspondence with
14 Allstate on the homeowner's policy for the
15 roof damage?  Do you have anything --
16     A.  Oh, I never kept that, because after
17 we had to pay, it was no need.  And I was not
18 going to appeal it.
19     Q.  Do you have an idea of what your
20 house was worth before Katrina had you put it
21 on the market?  I mean, do you know what
22 houses around you were selling for, have an
23 idea of what your house was worth?
24     A.  The houses in my neighborhood before
25 Katrina were being sold for about $180,000.

---

Page 40

1      Q.  And who did the work?
2      A.  Well, there was a Jamaican man that
3  was working on my co-worker's house in the
4  East and we got him to do some of the work.
5  We understand he's gone back to his homeland.
6  And there was also a Caucasian man that was
7  working on the house behind our house, and my
8  husband walked over to see his work and we
9  also hired him to do some of the work.
10     Q.  And at the end of the day, just with
11 respect to the house, not the furniture or any
12 contents, how much approximately did it cost
13 to have your house redone?
14     A.  Oh, with material and labor, about a
15 hundred some thousand.
16     Q.  And do you have receipts for all of
17 that somewhere, a file on what that cost?
18     A.  I didn't keep all of the receipts,
19 but what I -- what -- and a lot -- most of our
20 money came from, as I said, the flood policy
21 and then I was holding onto some money; my
22 parents had been dead in 2001, I inherited
23 their home.  I'm an only child.  And I used my
24 inheritance money, and my husband retired from
25 his welding company, MetFab, in 1997, but up

---

Page 39

1      Q.  180?
2      A.  Yes.
3      Q.  That were comparable to yours in
4  size and everything?
5      A.  Yes, sir.
6      Q.  I take it, though, you have never
7  put your house on the market or had it
8  appraised; right?
9      A.  No, we didn't.
10     Q.  And sometime in -- Well, you had to
11 get a building permit then to redo the house;
12 right?
13     A.  Uh-huh (affirmatively).
14     Q.  Is that right?
15     A.  Yes, sir.
16     Q.  And you got that in 2007?  Am I
17 correct?
18     A.  Uh-uh (negatively).  I got it in --
19 yeah, about 200-- -- No, -- Yeah, about 2007.
20     Q.  Earlier this year?
21     A.  To be honest, it was probably about
22 somewhere in the middle of 2006.
23     Q.  And then you hired the contractors
24 yourselves to redo the house?
25     A.  Yes, sir, we did.

---

Page 41

1  until Katrina he still worked part time and he
2  had shares of 11,000 and I would not let him
3  draw the money out because I knew as long as
4  the company kept the shares we couldn't touch
5  them.  But since then, when we needed money to
6  add on to the 84,900, along with my -- my --
7  my inheritance and some little savings we were
8  able to do, we used it.
9      Q.  And do you have -- did you pay for
10 that by personal check?  I am just trying to
11 understand if you have a record somehow --
12     A.  You want to know the truth, these
13 men wanted cash money.
14     Q.  So you paid them in cash some and
15 would not -- you know what you paid, as you're
16 telling us, but you don't have a paper trail
17 on that?
18     A.  No.
19     Q.  Is that right?
20     A.  I didn't think I needed it.
21     Q.  Now, then you got mostly, or I would
22 -- You know I have been in your house,
23 Richard and I were out there with the
24 inspectors a couple of weeks ago, so I have
25 seen it.

---

JOHNS PENDLETON COURT REPORTERS            800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 42

1      A.   Uh-huh (affirmatively).
2      Q.   So it would appear to be all new
3  furniture in the house everywhere.  Is that
4  right?
5      A.   Every bit of it.
6      Q.   And all the countertops are new;
7  correct?
8      A.   Everything in the house is brand
9  new.
10     Q.   And what about the air conditioning
11 unit on the outside?  You know, what we call
12 the compressor?
13     A.   All of that is new because it -- the
14 old one was ruined.
15     Q.   What about wiring?
16     A.   We paid an electrician to do that
17 first.
18     Q.   And was it completely rewired, or
19 did you just --
20     A.   Completely rewired.
21     Q.   And --
22     A.   Plumbing, too.
23     Q.   -- had anybody come in and taken the
24 old wiring, the copper or the pipes or
25 anything out of there before they got in there

---

Page 43

1  to gut the house, or afterwards?
2      A.   No.
3      Q.   You didn't have any vandalism or
4  theft in all of this?
5      A.   We did not have anything.
6      Q.   Let me back up a little bit to when
7  you bought that house.  You bought that with
8  your husband; right?
9      A.   Sure did.  GI Bill.
10     Q.   All right.  And it's in both of your
11 names?
12     A.   Yes, sir, it is.
13     Q.   Now, did there come a time when you
14 entered into a relationship with lawyers with
15 respect to Hurricane Katrina and possible
16 damages or claims that you might have?
17     A.   I didn't meet lawyers, but on my
18 job, when we returned to New Orleans October
19 1st, or shortly after that -- we say October
20 1st was on a Saturday if I recall.  When we
21 returned to work that Monday, several of my
22 co-worker social workers start giving
23 information about lawsuits.  Wrote it down so
24 we could get -- get it correct.  One of my
25 co-workers, I will not call her name, lost her

---

Page 44

1  home, a young white girl, lady, lost her --
2  lost everything she owns.  A social worker in
3  Chalmette.  She had just bought a home about
4  two or three years before Katrina.  She lost
5  everything.  Her home and everything inside.
6  She was one that gave us the information.  And
7  there were others, co-workers who had found
8  out about the Andry Law Firm and Bruno and
9  wrote the information down for us.  And I
10 immediately called for myself and for my
11 daughter, because my daughter lost her home.
12 Her home is demolished and she is still
13 waiting for Road Home money and she's been
14 diagnosed within a year with multiple
15 sclerosis.  So she's in bad health and has
16 lost everything she owned.  So I was inquiring
17 about everything and I signed up and I signed
18 her up.
19     Q.   And what's her name?
20     A.   Shelita Michelle Breland is her
21 maiden name, Smith, and on June 8th, last
22 month, she got married to Ray, Brian Ray, so
23 she's Shelita Michelle Breland Smith Ray, R A
24 Y.
25     Q.   And what was the street address of

---

Page 45

1  her home?
2      A.   St. Anthony.
3      Q.   And I thought -- I may not have
4  remembered right --
5      A.   It's the Gentilly area.  She's near
6  also UNO.
7      Q.   And when you say she lost her house,
8  how much water or what was the damage?  Water
9  or wind, how --
10     A.   The water went to the roof.
11     Q.   Right.
12     A.   And they demolished her house.
13     Q.   She had water up in the house, I
14 take it?
15     A.   Yes.
16     Q.   Do you know approximately how high?
17     A.   Well, I didn't go in.  She couldn't
18 go in with the multiple sclerosis, but we
19 stood on the outside while her boyfriend went
20 in.  He's now her husband.  And we could see
21 the water line.  It was to the ceiling.  And
22 we didn't go in, nor did we let our
23 granddaughter go in.  But I remember the face
24 on my granddaughter when she peeped through
25 the window to see all of her trophies, a

---

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE   (MRGO)                                         7/10/2007

---

Page 46

1 straight A student, and all her trophies on
2 the floor ruined from the water.
3     Q.  And you say -- I think you might
4 have mentioned she also had roof or wind
5 damage to her house?
6     A.  Well, she had wind damage and what
7 have you, but the City found fit -- She
8 requested to have it demolished since it was
9 not repairable and, to be honest, when I went
10 October -- December of '06 to just check on
11 her house, because she had paid to get it
12 gutted, also she came down and had it gutted,
13 there was no more house.  It was just a slab.
14 So she's waiting for Road Home money to come
15 home and rebuild.
16     Q.  All right.  Now, you have a Road
17 Home -- You got Road Home money?
18     A.  Yes, sir, I did.
19     Q.  And when did you apply for that?
20     A.  I applied around -- Well, you know,
21 whenever they said to apply.  So maybe that
22 was maybe the beginning of 2006.  I can't
23 remember.
24     Q.  It was early on when the Road Home
25 Program came into effect and got rolling?

---

Page 47

1     A.  As soon as the -- it was in the news
2 and they gave the website and phone number,
3 what have you, I applied.
4     Q.  And I don't want to know anything
5 lawyers said or you said to your lawyers, but
6 were lawyers involved in that Road Home
7 application?
8     A.  No.  No, sir.  Uh-huh (negatively.)
9     Q.  And do you have a copy of that at
10 home somewhere?
11     A.  No.  Because I got my money.  And I
12 didn't see any need to keep all of that.  I
13 did get -- We did get our money on or about
14 maybe March or April of this year.
15     Q.  And how much Road Home money did you
16 get?
17     A.  22,000.
18     Q.  Now, in terms -- have you gotten any
19 other -- aside from amounts of money you may
20 have gotten initially right after Katrina,
21 have you gotten any other aid?  Like were you
22 getting rent assistance?
23     A.  No.  FEMA said I wasn't eligible.
24     Q.  You applied for rent assistance or
25 housing assistance and FEMA turned you down?

---

Page 48

1     A.  I paid -- I also applied for
2 assistance with my medication, because I'm on
3 about eight pills a day because of
4 hypertension, diabetes, high cholesterol.
5 Many other problems.  But I was denied.  FEMA
6 said that my husband and I were not eligible.
7         Red Cross, we could not get the
8 Red Cross at all on the phone.
9     Q.  And did you get food stamps?
10     A.  For about three months while we were
11 working in -- when I say "we", OPH workers, we
12 were working in Baton Rouge, some of the
13 co-workers drove us to Port Sulphur and I
14 think we got it from October, November,
15 December.  October, November, and December,
16 both of '05 if I recall.  And at that time it
17 didn't matter what your livelihood was.  The
18 fact that you were a Katrina victim.
19     Q.  And there came a time when you made
20 a claim against the Army Corps of Engineers.
21 You filled out a form?  Do you recall that?
22     A.  Yes, sir.
23     Q.  And were the lawyers involved in
24 helping you fill out that form?
25     A.  Nobody -- No attorneys.  I have done

---

Page 49

1 everything on my own.
2     Q.  And the form, we have got it, we can
3 look at it in a little bit, but parts of it
4 were printed up, printed up ahead of time and
5 had some stuff filled in on it about what
6 happened with the levees and so forth and then
7 you filled in some additional information.  Is
8 that -- Do you remember that?
9     A.  Yes.  To be honest, maybe after I
10 had applied with the lawsuit, the law firm
11 mailed that to me.
12     Q.  So you may have gotten it from the
13 law firm and then you filled out some more
14 information on it?
15     A.  Yeah.
16     Q.  All right.  What I was wondering is
17 if there were in part of the social work
18 worker network or otherwise had these forms to
19 fill out to make claims against the Army Corps
20 of Engineers.  Is that something that was part
21 of the social work network or anything?
22     A.  There's no social work network, but
23 those that got them from the firm told us
24 where to call and get one from.
25     Q.  And when you were telling us about

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

Page 50

1  some social workers you knew had already
2  learned something about potential lawsuits and
3  the Andry firm and the Bruno firm, did you
4  then tell other people about that other than
5  your daughter, about getting involved in it or
6  calling those firms?
7      A. Yes, I did. I told my neighbors
8  that were coming and looking at their homes
9  and gutting them out. Yes, I told them.
10     Q. Was there any part of the social
11 work you were doing or others were doing,
12 where you were doing social work where they
13 were handing out --
14     A. Oh, no.
15     Q. -- information or anything like
16 that?
17     A. Oh, no. That wasn't a part of the
18 social work work. We as colleagues decided
19 since we're always dedicating our life to
20 helping others, we decided to help each other
21 this time because we were all in the same
22 boat.
23     Q. And who were -- I think you
24 mentioned there might have been more than one
25 of these people that had learned about the law

Page 51

1  firms. Who were these, what were these
2  people's names?
3      A. No, I cannot give my colleagues'
4  names. Because that had -- that is something
5  private between us as friends.
6      Q. And do you know if any of them have
7  become actively involved in any of this
8  Katrina litigation of any kind, where their
9  name is, you know, on a pleading where they're
10 suing somebody?
11     A. They haven't said anything and I
12 never mentioned anything to them.
13     Q. Whereabouts did these -- Well, let's
14 identify how many of them. How many were
15 there?
16     A. How many what?
17     Q. Of these social workers that had
18 somehow learned about the Andry and Bruno law
19 firm?
20     A. About three.
21     Q. And let's just call them A, B and C
22 for right now. And give me where they lived.
23 I am not asking a street address at this
24 point, but what areas of town did they live
25 in?

Page 52

1      A. As I said, one is a white one about
2  40 years old who had just purchased a house
3  two or three years before Katrina, they lost
4  everything. She lived in Chalmette.
5      Q. And the other two?
6      A. The other one lives in Carrollton
7  area. Another one lived in Gentilly area.
8      Q. Now, did there come a time when you
9  retired as a social worker?
10     A. Sir, I am still working. I cannot
11 -- I am 6- -- I'll be 62 October 19th. I
12 can't afford to even think about retiring. We
13 have used -- We have spent all of our life
14 savings. I can't live off of fixed income
15 with what they pay social workers.
16     Q. Now, we talked about the Road Home
17 and insurance that you got. Is there any
18 other source of funds, let's say, above $2,000
19 that you've gotten?
20     A. No, sir.
21     Q. Have you told us about the major
22 sources of aid or assistance or funds that you
23 have received already?
24     A. What I got from Allstate, the flood
25 insurance, the Road Home, my husband's shares,

Page 53

1  which he earned that after --
2      Q. I was really asking you about other
3  than your own funds that you had, have you
4  told us about most of those?
5      A. We did not have any other. That's
6  why we have exhausted our own personal nest
7  egg.
8      Q. In terms of injury for which you're
9  seeking money in this lawsuit, can you tell us
10 what kinds of injury you have?
11     A. Now, when you say -- I'm sorry.
12     Q. I'll ask it a little differently.
13 Are you seeking money in the lawsuit for
14 damage to your home, to that structure?
15     A. Yes, sir.
16     Q. And are you seeking damage for the
17 contents of the home?
18     A. Yes, sir.
19     Q. And that would be furniture and
20 appliances and personal effects; correct?
21     A. Yes, sir.
22     Q. Were you able to salvage any of
23 those personal effects at all?
24     A. No, sir.
25     Q. Did your husband or you get any, or

GLYNN WADE (MRGO)                                    7/10/2007

---

**Page 54**

1   anyone else get any of them out pre-Katrina,
2   pictures or jewelry or anything?
3       A.  My husband didn't take pictures of
4   our little jewelry before pre-Katrina, but he
5   did take pictures of his rifles and -- for
6   hunting and I think his fishing equipment.  He
7   took a picture.  He put it all on a chair and
8   took pictures.
9       Q.  Did he take those, that shotgun and
10  that rifle with him?
11      A.  No, sir.
12      Q.  He left it?
13      A.  He left for three days to come back
14  home.
15      Q.  When y'all got back around October
16  1st of 2005, were the guns still there?
17      A.  Oh, yeah, they were there.  But they
18  were ruined.  They were under our bed in our
19  master bedroom, but they were rusty and
20  stinking and just ruined.
21      Q.  And he hasn't been able to salvage
22  then, I take it?
23      A.  No, sir.
24      Q.  And then we got the green pickup
25  truck.  But you had a separate vehicle?

**Page 55**

1       A.  My Dodge.  My little Dodge Car- --
2   my little van, Dodge van.
3       Q.  And you drove that out?
4       A.  No, sir.  I left that.  I left -- I
5   let my husband drive me to City Hall to join
6   my co-workers.  I was too upset to drive.  I
7   rode in the State car with my co-workers.  I
8   left my van under my carport.
9       Q.  And was it a loss?
10      A.  Yes, sir, it was.
11      Q.  Total loss?
12      A.  Total loss.
13      Q.  And what did you get from the
14  insurance company on that?
15      A.  About 2,000.
16      Q.  And what do you think -- I'm sorry?
17      A.  Which was a down payment on the
18  Nissan that I have now.
19      Q.  And were you satisfied in terms that
20  they paid you what the fair market value of
21  that was?
22      A.  Yeah, I think it was what the blue
23  book value was.
24      Q.  Were there any other vehicles that
25  you lost?

**Page 56**

1       A.  No.
2       Q.  Or a boat?
3       A.  No, sir.  We couldn't afford that.
4       Q.  Aside from the contents of the
5   house, the structure, I assume the automobile
6   you want to be reimbursed for damage to your
7   van, minivan or whatever it was?  Is that
8   right?
9       A.  Yes, sir.
10      Q.  Do you have any personal injury for
11  which you're seeking damages?
12      A.  On myself?
13      Q.  Yes.
14      A.  No, sir.
15      Q.  Now, your husband is not named in
16  the lawsuit as a Plaintiff.  You understand
17  that; right?
18      A.  Uh-huh (affirmatively).
19      Q.  Is that correct?
20      A.  I think it is.
21      Q.  All right.  So is he seeking damages
22  for himself in this lawsuit aside from the
23  structure, the structural damage to the house
24  and the contents and the things we have talked
25  about that you're seeking recovery for?  Is he

**Page 57**

1   seeking anything?
2       A.  Can I back -- go back?
3       Q.  Sure.
4       A.  When I filled out that 94, 95,
5   whatever, I made him fill out one.  He didn't
6   want to.  I wanted him to fill out one.  So I
7   think he is a part of the lawsuit.
8       Q.  And you think he filled out one
9   separately from yours?
10      A.  No, we filled it out together.  I
11  made him fill it out.
12      Q.  All right.  And -- Well, we'll just
13  look at it in a little bit.  But your
14  understanding is you included him on that Form
15  95?
16      A.  Not on mine.  Well, I had to put his
17  name down, though.  But I think I gave him one
18  to fill out putting my name on it also, if I
19  am correct.
20      Q.  All right.  Just so I understand,
21  you think he may have filled out one with your
22  help or had his name on it that had his
23  damages on it, and then there's one that has
24  yours on it?
25      A.  Yes, sir.

---

GLYNN WADE (MRGO)                                        7/10/2007

Page 58

1    Q. All right. And do you have copies
2 of those at home?
3    A. I think I have a copy of the most
4 recent one that I filled out, which was last
5 year. And it was from the Corps of Engineers
6 and what have you. I got one and I said, "I
7 already sent one, but I better fill this one
8 out, too." But I have copies of those and the
9 other ones. In the process of moving from
10 Destrehan to back home and what have you, to
11 be honest, I don't think I have the old
12 copies.
13    Q. When did they start the redo of your
14 house? I mean, when did that start and when
15 did it get finished up?
16    A. It got started around -- Let's see.
17 I got the money in about January, February of
18 2006. Around March we proceeded on getting
19 people to do our repairs. And I want to say
20 around May of 2006 my house was completed.
21    Q. And you moved back in?
22    A. No, sir. Because I had -- we had
23 signed a lease because -- a year's lease
24 because the landlord was going up 70 dollars
25 every six months, so I thought I was going to

Page 59

1 save some money and I and my husband, which he
2 says it was me, locked ourselves in for
3 another year. So we were not able to move
4 into our home in the East until March 17th of
5 2007.
6    Q. And what, did somebody else live in
7 it during that time?
8    A. No. My husband would sleep at night
9 with me in Destrehan, but on or about 4:00 in
10 the morning he would get to our home on Bundy
11 Road because he said he did not want the
12 construction workers that were working on the
13 other houses thinking no one lived in that
14 house, because he said a lot of times they
15 would steal material or vandalize, or steal
16 material off the houses or what have you, so
17 he would be there 4:00 in the morning until
18 maybe 8:00 or 9:00 at night to watch our
19 house.
20    Q. I want to go back to that flood
21 policy for just a minute. Did you get all of
22 the coverage you had? In other words, they
23 paid you the full amount for what you had it
24 insured for?
25    A. What we could afford to have it

Page 60

1 insured.
2    Q. And at the time of Katrina did you
3 still have a mortgage on that house?
4    A. Sure did.
5    Q. And what was the approximate balance
6 on the mortgage at that time?
7    A. About 48,000.
8    Q. And do you still have that same
9 mortgage?
10    A. We paid the mortgage out first. In
11 the event that we could not afford to get our
12 house repaired, we wanted to own our land.
13    Q. So you paid off the mortgage?
14    A. Yes, sir.
15    Q. And so at this point have you
16 refinanced or gotten another mortgage or
17 anything like a home equity loan or anything
18 like that?
19    A. No, sir.
20    Q. You own it lock, stock and barrel
21 now?
22    A. Yes.
23       MR. MARPLE:
24          Why don't we take just a little
25       break. We have been going quite a

Page 61

1 while.
2       MR. EXNICIOS:
3          That's fine.
4       MR. MARPLE:
5          We'll take however long you all
6 need, five, ten, fifteen minutes.
7       VIDEO OPERATOR:
8          We're going off the record now.
9 It's 10:27.
10       (Recess.)
11       VIDEO OPERATOR:
12          Now returning to the record.
13 It's 10:28. This is the start of tape
14 2.
15 EXAMINATION BY MR. MARPLE:
16    Q. You were working for the State of
17 Louisiana as a social worker before Katrina?
18    A. Yes, sir.
19    Q. And what was your job description at
20 that time?
21    A. Social worker.
22    Q. What were you doing?
23    A. Making referrals to persons that
24 walked off the street who needed resources. I
25 also worked with the nurses into -- in the

                              16 (Pages 58 to 61)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

Page 62

1  clinics.
2      Q.  And did you have a place that you
3  went to work every day?
4      A.  Yes, sir.
5      Q.  Where was that?
6      A.  Before Katrina, I was on Tulane
7  Avenue and Jeff Davis.  I should know the
8  address, but I don't.  It's Orleans Women's
9  Clinic for Family Planning, maternity.
10     Q.  And now where do you report to work?
11     A.  At 111 North Causeway at the
12 Jefferson Parish Health Unit, which is also a
13 public health clinic in Metairie, Louisiana.
14     Q.  I'm going to hand you what we have
15 marked as Wade 1, which I'll represent to you
16 is information that was provided to us by your
17 attorneys, and there's a list of names over
18 here on the left-hand side starting with
19 Kenneth Armstrong, Sr.  Do you see that?
20     A.  Yes, sir.
21     Q.  And then you're number 5 on that
22 list.  Do you know any of those other people?
23     A.  No, I don't.
24     Q.  And then it says "Current medical
25 condition", and I think you mentioned at least

Page 63

1  one or two of these, hypertension and diabetes
2  and pinched nerve.
3      A.  Yes, sir.
4      Q.  How long have you had hypertension?
5      A.  I've had hypertension since I was
6  about 40 years old.
7      Q.  And have you been under a doctor's
8  care for that?
9      A.  Yes, sir.
10     Q.  And are you taking medication for
11 it?
12     A.  I am taking three medications
13 because I had a stroke the year 2000.
14     Q.  And what medications are you
15 taking?
16     A.  Divon, D I -- D I V O N, I believe
17 it is.  I'm sorry, one is a -- a water pill,
18 chloro-something.  And the other one is
19 Norvasc, N O R, I think, V A S.
20     Q.  And those are for hypertension?
21     A.  Yes, sir.
22     Q.  And then diabetes?
23     A.  They have changed the medication.  I
24 think -- It's a Metformin or something.
25     Q.  And how long have you had or been

Page 64

1  diagnosed with having diabetes?
2      A.  Since I was about 50.
3      Q.  And that's what we would call adult
4  onset diabetes?
5      A.  Yes, sir.
6      Q.  And do you test your blood sugar
7  level?
8      A.  Every day.
9      Q.  Prick your finger?
10     A.  Yes, sir.
11     Q.  And then you are taking some
12 medication for that; right?
13     A.  For the diabetes?
14     Q.  Yes.
15     A.  I take two tablets, one in the
16 morning and one at night.
17     Q.  And --
18     A.  And then -- And then an extra little
19 pill for diabetes called G L I M P I E (sic),
20 Glimep something.  I'm taking one pill for
21 diabetes in the morning, two at night.
22     Q.  And then the other thing it says
23 here is a pinched nerve.
24     A.  I refuse medication for the pain of
25 the pinched nerve.  Because currently I'm

Page 65

1  still going to the Elmwood Fitness Center,
2  getting in the pool twice a week, 7:00 in the
3  morning, before I go to work.
4      Q.  And where is that pinched nerve;
5  what part of your neck?
6      A.  Well, no, they said -- they showed
7  me a design where it's in the back and, as a
8  result of it, I have pain radiating through my
9  legs.  That's what brought me to the doctor
10 for that.  Severe pain in my legs.
11     Q.  So it's a lower back problem that
12 causes pain to radiate in your legs?
13     A.  Yes, sir.
14     Q.  And when you say it's a pinched
15 nerve, that's what --
16     A.  Well, they say it's a pinched nerve.
17     Q.  That's what the doctors have told
18 you?
19     A.  The neurologist.
20     Q.  And did you have an MRI for that?
21     A.  Yes, sir.
22     Q.  And when did you first have that
23 problem with a pinched nerve?
24     A.  Started about a year ago.
25     Q.  And is there something that you

17 (Pages 62 to 65)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                           7/10/2007

**Page 66**

1  think or your doctors have told you caused
2  it?
3      A.  They say age.
4      Q.  You have osteo- -- well, arthritis
5  in your vertebrae?  Is that what they're
6  telling you?
7      A.  One doctor did say that.
8      Q.  Are there any other medical problems
9  that you have at this time?
10     A.  High cholesterol.
11     Q.  And are you taking anything for
12  that?
13     A.  Yes, sir.  I am taking Crestor, C R
14  E S T O R.
15     Q.  And are these -- Well, let's --
16     A.  And Plavix because of the stroke I
17  had the year 2000.  P L A V I X.
18     Q.  Do any of those medications that
19  you're taking now affect your ability to
20  testify today?
21     A.  No, sir.
22     Q.  I'll show you what we have marked as
23  Exhibit 2.  May I look at this just for one
24  moment?  Okay.
25         MR. MARPLE:

**Page 67**

1         I didn't give you my copy, did I,
2      Richard?  It's got marking on it.
3         MR. EXNICIOS:
4         This is not the same thing.  You
5      gave me a different one.  So it might
6      be yours.
7         (Whereupon a discussion was held
8      off the record.)
9  EXAMINATION BY MR. MARPLE:
10     Q.  You okay?  What I have handed you
11  that's marked as Exhibit 2 is a document that
12  relates to one of the Form 95s that you filed
13  making a claim against the Army Corps of
14  Engineers.  Is that correct?
15     A.  Yes, sir.
16     Q.  And this one is one you filled out
17  in July of 2006?
18     A.  Yes.
19     Q.  If you look on I believe it's the
20  last page of this document, do you see "To
21  whom it may concern"?
22     A.  Uh-huh (affirmatively).
23     Q.  And --
24     A.  Yes, sir.
25     Q.  And is that your signature on that

**Page 68**

1  page?
2      A.  Yes, sir, it is.
3      Q.  That's your handwriting?
4      A.  Yes, sir, it is.
5      Q.  And would that indicate to you by
6  October 28, 2005 you had signed up, so to
7  speak, with the Andry Law Firm in connection
8  with Katrina claims?
9      A.  Yes.
10     Q.  And do you know in relationship to
11  October 28, 2005 how long before that it was
12  that you signed up with them or got in contact
13  with them?
14     A.  I don't remember.
15     Q.  Sometime before it, but in that
16  general time frame?
17     A.  Yes, sir.
18     Q.  Now, if we look at the form itself,
19  which is the page called "Claim for damage or
20  injury ", do you see that?
21     A.  Yes, sir.
22     Q.  There's typing on here at the top,
23  "United States Army Corps of Engineers" and
24  your name, "Represented by Jonathan B.
25  Andry".  Do you see all of that?

**Page 69**

1      A.  Yes, I do.
2      Q.  Did you type that or did someone
3  else type that?
4      A.  Someone else typed that.
5      Q.  All right.  Do you know how this
6  form came into your possession, if it did?  In
7  other words, how you actually got ahold of
8  it?
9      A.  Well, Andry Law Firm apparently
10  mailed it to me.  I called them and asked them
11  for whatever I needed to be a part of the
12  lawsuit.
13     Q.  And at that time you wanted to be
14  part of a lawsuit against the Army Corps of
15  Engineers?
16     A.  Yes, sir.
17     Q.  And on this one, do we see Mr.
18  Wade's name appear anywhere?
19     A.  Let's see.  I don't see his name on
20  here.
21     Q.  And does your handwriting or
22  anything you may have put on here by typing or
23  otherwise on this page, is any of that your
24  handwriting or your input?  As opposed to
25  somebody else having prepared it for you?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                           7/10/2007

Page 70

1     A.  Well, what I wrote is here
2  (indicating).  I mean when I signed my name.
3     Q.  Right.  What we looked at on the
4  back, the "To whom it may concern".  But this
5  page that we're looking at that says "Claim
6  for damage, injury or death" in the upper
7  left-hand corner on that page, is there
8  anything that you think you typed in or wrote
9  on this page?
10    A.  Well, I didn't write anything in,
11 nor did I type anything in.
12    Q.  Now, the amount of the claim down
13 here says, in 12-A as you get towards the
14 bottom, "Property damage, $500,000".  Do you
15 see that?
16    A.  Yes, sir.
17    Q.  What's that consist of?
18    A.  When you say -- When you say
19 property damage?
20    Q.  Yes.  How did you arrive at the
21 $500,000?  When we talked today, we have got a
22 house that's worth $180,000 and whether or not
23 what counts in that, but it would seem to me
24 180,000 for the house would be the max.  You
25 salvaged some of it, so it would be less than

Page 71

1  that.  And then you have got the contents
2  would be the main property damage.  Right?
3     A.  Yes, sir.
4     Q.  All right.  And if you've got a
5  $180,000 house that was worth something when,
6  you know, when it was stripped down and
7  everything and you have got the contents, how
8  do you get to $500,000 in property damage?
9     A.  I am going to answer you honestly.
10 I figure if you ask for far more, I come in
11 the middle, half or less.
12    Q.  You have got less property damage.
13 You asked for more hoping that you would
14 compromise somewhere where you come out about
15 right?
16    A.  That is correct.
17    Q.  This was what some people might call
18 your opening position?
19    A.  I don't know what it's called, but I
20 know usually when you ask for one thing, you
21 get far less.
22    Q.  And so in reality the property
23 damage you have is far less than 500,000;
24 correct?
25    A.  It's less than 500,000, yes.

Page 72

1     Q.  Do you have a number that you've
2  calculated to know what your property damage
3  is for the contents of your house, the damage
4  to the structure, and your van?
5     A.  No, sir.
6     Q.  You have not calculated that?
7     A.  No, sir, I haven't.
8     Q.  Then the next slot there is 12-B,
9  says "Personal injury, $500,000".  What's that
10 consist of?  What injuries is that?
11    A.  Well, I wasn't sure about the
12 personal injury, what that -- what that
13 meant.  Because I didn't claim to be injured
14 by Katrina.  I was in Baton Rouge working.
15    Q.  And your husband wasn't injured
16 either by Hurricane Katrina, because he got
17 out ahead of time, too; right?
18    A.  That's correct.
19    Q.  The address up at the top there is
20 P. O. Box 1101, Destrehan.  Is that the P. O.
21 Box you had up there somewhere at the Post
22 Office near the apartment?
23    A.  Yes, sir.
24    Q.  And when it talks about the basis of
25 the claim there, which is near the top of the

Page 73

1  page there, number 8, do you see that?
2     A.  Yes.  What about it?
3     Q.  Is that your understanding of what
4  the basis of your claim is against the Army
5  Corps of Engineers?
6     A.  To be honest, I -- I am not sure.  I
7  left it up to Andry Law Firm to -- to indicate
8  that.
9     Q.  Do you have any understanding from
10 personal knowledge of where the water came
11 from that flooded your house?
12    A.  No, sir, I don't.
13    Q.  And have you undertaken to make any
14 investigation since Katrina to try to
15 determine where that water came from?
16    A.  No, sir.
17    Q.  Number 8 talks about, I am basically
18 -- the design and operation and construction
19 of the MRGO.  Do you see that?
20    A.  Yes, sir.
21    Q.  And what I take it from what you're
22 telling me is you're not sure about whether
23 any, or any of the details of the construction
24 of the MRGO or otherwise that might have led
25 to flooding of your house.  Right?

19 (Pages 70 to 73)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE  (MRGO)                                                7/10/2007

---

Page 74

1    A.  All I know is that my house was
2  flooded.  I am depending on the attorneys
3  that's representing us to give the facts.  I
4  have no idea about that stuff.
5    Q.  And whether it came from rainwater
6  or water that came over a levee or through a
7  levee or which levee or which body of water,
8  that's something you don't know about as you
9  sit here today?
10    A.  I don't know anything about it.
11    Q.  Let me show you what we have marked
12  as Exhibit 3.  I believe this is the one I
13  handed to Rich earlier, giving you another one
14  now.  And is that a four-page document?
15    A.  Is this exactly what you have?
16    MR. EXNICIOS:
17         Yes, ma'am.  That appears to be
18    the same one.
19  EXAMINATION BY MR. MARPLE:
20    Q.  Is Exhibit 3 a four-page document?
21    A.  Yes, sir, it is.
22    Q.  And the top two pages are a letter
23  dated January 25th, 2007 from the Army Corps
24  of Engineers to you.  Is that correct?
25    A.  Yes, sir.

---

Page 75

1    Q.  Do you remember receiving that
2  letter?
3    A.  No, I don't.
4    Q.  You think you might have gotten it
5  and you just don't remember it?
6    A.  Yes, I believe that happened.
7    Q.  All right.  It's addressed to you
8  properly and everything; right?
9    A.  Yes, sir.
10    Q.  And it's called, or the subject line
11  is an "Acknowledgment of receipt of
12  complaint".  Do you see that?
13    A.  Yes, sir.
14    Q.  Now, if we go over to the third and
15  fourth pages, and particularly the third page,
16  this is a claim for damage, injury or death.
17  That's the same or close to being the same
18  type of form as the one we just talked about,
19  which was Exhibit 2.  Right?
20    A.  Yes, sir.
21    Q.  And this one's dated January 12,
22  2007.  Correct?
23    A.  Correct.
24    Q.  If you'd look on that page where
25  it's a claim for damage, you look down at

---

Page 76

1  number 14 in the lower right-hand corner, do
2  you see it's dated there, correct?  I'll point
3  it to you.  Right there (indicating).  Do you
4  see that?
5    A.  Okay.
6    Q.  Is that your signature there to the
7  left of that in item 13-A?
8    A.  Yes, sir, it is.
9    Q.  And is the handwriting on this page
10  your handwriting or is there someone else's
11  handwriting besides yours on this one?
12    A.  It's my handwriting.
13    Q.  And this is one -- Well, I'll ask.
14  Is this one you filled out yourself or did you
15  get part of this form from somebody and add
16  the additional information that's in
17  handwriting?  Can you tell us what happened in
18  that respect?
19    A.  I can't remember where I got this
20  form.  Yes, everything that's in here, I wrote
21  it.
22    Q.  And do you have any explanation for
23  why you would have filed this second claim
24  when you had filed one approximately six
25  months earlier?

---

Page 77

1    A.  Let me make sure I understand you.
2  You're asking me why did I file this one
3  (indicating) when I had gotten this one
4  (indicating)?
5    Q.  Well, as I understand it, the one we
6  marked as Exhibit 2 was in July, 2006 and this
7  --
8    A.  Yes.
9    Q.  -- is in January of 2007.  So I am
10  really asking you if you can explain it either
11  way.  But I am asking you why would you file
12  the second one.
13    A.  Because when I got this one
14  (indicating), and if I -- it is from the --
15  the Corps -- the Corps of Engineers, when I
16  got it, I filled it out because I figured that
17  if I didn't fill it out they would say I was
18  not cooperating.  So anything I got as far as
19  a form -- Well, this is 95?  I filled it out.
20    Q.  All right.  And the first two pages
21  there, the letter from the Army Corps of
22  Engineers to you, the Department of Army, is
23  dated January 25th, 2007.  Right?
24    A.  Yes, sir.
25    Q.  And the form is dated January 12,

---

GLYNN WADE (MRGO)                                      7/10/2007

**Page 78**

1  2007. So it would appear, would it not, that
2  the January 25th letter is acknowledging this
3  claim? So it came after you filed this
4  claim. The letter from the Army Corps of
5  Engineers would have been after you filed this
6  claim. Correct?
7      A. Yes, sir.
8      Q. So you recall receiving something
9  from the Army Corps of Engineers that said you
10 need to fill out a Form 95 or something?
11     A. All I remember is getting the Form
12 95. It was from the Corps of Engineers. And
13 I remember trying to fill it out and mailing
14 it back.
15     Q. At this point you don't recall where
16 you got it, this form?
17     A. This form?
18     Q. This one that's dated --
19     A. It came in the mail I think from the
20 Corps of Engineers.
21     Q. You think the Army Corps of
22 Engineers sent you a claim form that was
23 filled out in part saying "File a claim
24 against us"?
25     A. Sir, I have no idea what was going

**Page 79**

1  on. I was just filling out forms, to be
2  honest.
3      Q. Now, if we look at Exhibit 3 there,
4  I think you told us all the things that are
5  written in hand are your handwriting.
6  Correct?
7      A. That's correct.
8      Q. All right. If we look at 8-A,
9  there's some typed information there about
10 what happened and what the basis of the claim
11 is. You see that little paragraph that's
12 typed in 8-A?
13     A. Yes, sir.
14     Q. Right? Do you know, did you type
15 that or did someone else type it?
16     A. Obviously someone else typed it.
17     Q. And at this point you don't know who
18 did that?
19     A. No, I don't.
20     Q. Now, in 9 there it says "Briefly
21 describe the property, the nature and extent
22 of damage, and the location where the property
23 may be inspected." Do you see that?
24     A. You say 9?
25     Q. It's in 9, yes.

**Page 80**

1      A. I am looking at 9, but --
2      Q. Right below it there. I think it's
3  still part where it says "Briefly describe the
4  property".
5      A. Oh.
6      Q. Do you see that?
7      A. Yes, sir.
8      Q. It says "Destruction of real and
9  personal property resulting from water damage,
10 loss of opportunity to purchase a sufficient
11 amount of flood insurance." I wonder if you
12 could explain what that means.
13     A. I don't know what that means.
14     Q. Have you lost any opportunity to
15 purchase a sufficient amount of flood
16 insurance?
17     A. No.
18     Q. You have flood insurance now on the
19 property?
20     A. Yes, sir, I do.
21     Q. And do you know how much you have
22 your property insured for under the flood
23 policy?
24     A. Yes, sir. I don't pay until
25 September, 2007. This time I am asking

**Page 81**

1  Allstate to insure me for 100,000.
2      Q. And how did you arrive at the
3  $100,000 figure for your flood insurance?
4      A. Because of the cost of material and
5  labor.
6      Q. And that's because you got flooded
7  pretty badly up to four, four and a half feet
8  and it cost you about $100,000 to redo that
9  house; right?
10     A. It was over 100,000.
11     Q. But you thought 100,000 will take
12 care of you if it happens again?
13     A. Hopefully. I can't afford more than
14 $100,000 worth of flood insurance.
15     Q. Now, the other one, the next item,
16 it says "To modify the property or to relocate
17 as a result of fraud and/or concealment by the
18 U.S. Army Corps of Engineers". Do you know
19 what that's referring to, "to modify the
20 property"?
21     A. No, sir, I don't.
22     Q. All right. And can you tell us
23 anything about what the fraud or concealment
24 by the U.S. Army Corps of Engineers was?
25     A. I have no idea.

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

Page 82

```
 1      Q.  Now, in the next item down, in 10,
 2   it's got "mental distress" with a couple of
 3   little stars there.  Do you see that?
 4      A.  Yes, sir.
 5      Q.  And that's your handwriting; right?
 6      A.  Yes, it is.
 7      Q.  And you have circled "Personal
 8   injury" and it says "Personal injury and
 9   mental distress", you have circled "mental
10   distress"?
11      A.  That's what I circled.
12      Q.  And you didn't have any personal
13   injury, but on this one you have got mental
14   distress.  Correct?
15      A.  Yes, sir.
16      Q.  And this one mentions Mr. Wade,
17   Adolph Wade, Sr.; right?
18      A.  Yes, sir.
19      Q.  That's your husband?
20      A.  Yes, it is.
21      Q.  And you.
22      A.  Yes, sir.
23      Q.  And you are mentally distressed
24   because you had about five feet of water in
25   the home and the flood water knocked the
```

Page 83

```
 1   bricks off the front of the home and the house
 2   was severely damaged and "We lost everything
 3   we owned in our home."  Right?
 4      A.  Yes, sir.
 5      Q.  Can you describe for me the mental
 6   distress that you have as a result of that?
 7      A.  Well, at the time I wrote this, I
 8   did have mental distress.  It's -- I'll have
 9   mental distress until I die as a result of the
10   trauma we experienced.  But each day gets
11   better.  But to work for years, to try to
12   accomplish material goods, try to save a
13   little money in the bank, and to lose
14   everything you own can be mentally distressful
15   as well as physical, but somehow it just kept
16   me for a long time, but I did not go to a
17   psychiatrist.  For about a year I didn't sleep
18   hardly at night except maybe one or two hours
19   thinking about all that I have lost and my
20   husband and I trying to figure out how would
21   we try to gain some of it back.  Because we
22   will never, ever get what we lost.  All of the
23   heirlooms, family heirlooms from my
24   grandparents and my parents, they're not
25   replaceable.  They're not replaceable.  What
```

Page 84

```
 1   monies we had that we had put aside to live
 2   off of for a rainy day, I don't think we'll
 3   ever get that back, to be honest.
 4      Q.  Now, the heirlooms from your
 5   grandparents, I take it that's something very
 6   personal to you; right?
 7      A.  Very personal.
 8      Q.  And the value of that is not what
 9   somebody -- to you is not what somebody might
10   have paid you for it.  It's personal and
11   individual to you.  Is that correct?
12      A.  It certainly is.
13      Q.  And to your neighbor, those
14   heirlooms might not have any value at all;
15   right?
16      A.  Probably so.
17      Q.  And vice versa.  If they had some,
18   you might empathize with them about the loss,
19   but personally that wouldn't have value to you
20   if they lost some of their heirlooms; right?
21      A.  That's right.
22      Q.  Can you tell us what those -- some
23   of those heirlooms that you lost were?
24      A.  China, our --
25      Q.  I'm sorry.  I apologize for
```

Page 85

```
 1   interrupting, but China, did you salvage any
 2   China?
 3      A.  No.
 4      Q.  Of yours or anybody's?
 5      A.  No.
 6      Q.  And is there a reason for that?  I
 7   mean, I am -- just from a lay person's
 8   standpoint, if it weren't broken, I would have
 9   thought you could have cleaned China up.
10      A.  Everything that was in -- my China
11   was in the cabinets in the kitchen at the
12   bottom.  It was all broken.  Broken.
13      Q.  Were you able to salvage even one
14   dish or saucer or cup or anything of that --
15      A.  No, sir.
16      Q.  -- China?  And I am sorry I
17   interrupted you.  What else?
18      A.  Then I had a, what you call I guess
19   a place setting with knives and forks and what
20   have you that also belonged to my mom.  Then I
21   had pots and pans that belonged to my
22   grandmother that were not salvageable.  I had
23   linen, towels, pillow cases that had been in
24   the family for years.  When I said family, my
25   grandmother when she passed away, my mother
```

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

Page 86

1  got them; and my mother passed them to me, and
2  I was to pass them to my daughter.
3  Tablecloths. Just stuff that belonged in the
4  family. May not be important to other people,
5  but very important to us. Vases that we had
6  in the living room, the family Bible that was
7  on the -- on my coffee table that had been in
8  the family for years.
9      Q. And in that respect with these
10 heirlooms, --
11     A. Pictures of the family. Pictures.
12     Q. -- what you told us about these
13 items, there's not somebody else that you know
14 that could come in and describe that to the
15 Court or anybody as to what it meant other
16 than you. Is that right?
17     A. Right.
18     Q. Now, if we look on the form here, go
19 back to that claim -- Well, we were looking on
20 the handwritten one, the one where you filled
21 it out, you see "Property damage" in number
22 12-A?
23     A. Yes, sir.
24     Q. And it says $252,501, plus it looks
25 like 50,000 in contents. Have I got that

Page 87

1  right?
2      A. Yes.
3      Q. And how did you arrive at the
4  $252,501?
5      A. Off the top of my head.
6      Q. And the 50,000 in contents, how did
7  you come up with that?
8      A. The top of my head with the cost of
9  things now.
10     Q. And that's just to replace things;
11 that 50,000 doesn't include the sentimental
12 individualized value of losing that thing that
13 caused you some mental distress. Is that
14 right?
15     A. Right.
16     Q. And then the total over there is
17 just adding those two together. Right?
18     A. Yes, sir.
19     Q. And then I apologize if I asked you
20 this before, but that is your signature at the
21 bottom?
22     A. That is my signature.
23     Q. Now, Mr. Wade, was he involved in
24 filling this one out?
25     A. No, he wasn't.

Page 88

1      Q. And did he fill one out around this
2  time of his own, in his own handwriting like
3  this one?
4      A. To be honest, I cannot remember.
5      Q. Did you discuss this with him, this
6  form?
7      A. Yes, I told him what I was putting
8  down. I showed it to him.
9      Q. And did he express any agreement or
10 disagreement with any of the --
11     A. He didn't say anything.
12     Q. And did you say, "You need to fill
13 one of these out for yourself"?
14     A. No, I didn't, because I believe in
15 October of '05 when I was filling out one, he
16 filled out his.
17     Q. And something prompted you to fill
18 out this second one because you wanted to
19 cover your bases with the Army Corps of
20 Engineers in the forms; right?
21     A. Well, I just wanted to make sure I
22 was showing that I was cooperating by filling
23 out every form I was sent.
24     Q. And is there any reason why Mr. Wade
25 wouldn't have felt the same way? Filled one

Page 89

1  out?
2      A. Well, Mr. Wade is very passive. And
3  they sent it to me. So I filled it out.
4      Q. And I just want to back up a little
5  bit. Is it possible rather than the Army
6  Corps of Engineers sending you this form that
7  you got it through some other mechanism?
8      A. No, sir. This came from the -- If I
9  recall, you know, I can't -- I can't etch it
10 in stone -- Well, I'm pretty sure this was
11 from the Army of -- Army Corps of Engineers.
12     Q. All right. When you got this form,
13 if it came from the Army Corps of Engineers or
14 wherever it came from, did you -- and I am not
15 asking what was said, but did you contact your
16 lawyers and say, "I have gotten another form
17 here"?
18     A. No. No, I didn't call them.
19     MR. EXNICIOS:
20         Can we go off the record for like
21     one minute and I think I can help
22     resolve some of this?
23     MR. MARPLE:
24         Yes.
25     VIDEO OPERATOR:

23 (Pages 86 to 89)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 90

1        We're off the record. It's
2    11:15.
3        (Recess.)
4        VIDEO OPERATOR:
5        Returning to the record. It's
6    11:16.
7    EXAMINATION BY MR. MARPLE:
8        Q.  And while we were off the record,
9    Mrs. Wade, Mr. Exnicios gave some background
10   that there was a big media blitz sometime in
11   early 2007 here in New Orleans on television
12   and otherwise about filling out forms or a
13   Form 95 if you wanted to make a claim against
14   the Army Corps of Engineers.  And does that
15   jog your memory in any way as to when or why
16   you might have filled out this second form?
17       A.  When I received this from the Corps
18   of Engineers, I filled it out because I
19   figured if they sent it to me, I should fill
20   it out.  If I ignored it, they may think I was
21   not interested in the lawsuit.
22       Q.  All right.  Is there any reason,
23   though, why the amounts and the things are
24   different on the second form, the one we have
25   marked as Exhibit 3, from Exhibit 2?  I mean,

---

Page 91

1    is there a reason you just didn't copy that
2    one or put the same information on this second
3    form?
4        A.  I don't recall where the other one
5    was in my house.  I may have lost it.
6        Q.  I have got some photos.  We'll look
7    at this.  We'll probably mark some of these,
8    but before we get too far into them I want to
9    make sure that it's your home.  They have been
10   produced to us by your attorneys and, of
11   course, I am not familiar all the way with
12   your home.  I am going to show you the set of
13   these.
14       MR. EXNICIOS:
15       I can look at hers.
16       MR. MARPLE:
17       If you don't mind looking at
18   hers.  I'm afraid --
19       MR. EXNICIOS:
20       That's fine.  Okay.  I know what
21   those are.  That's fine.
22   EXAMINATION BY MR. MARPLE:
23       Q.  And are those -- How many do we have
24   there?  Four or five?
25       A.  There are three, four, five, six.

---

Page 92

1        Q.  Are those, all of those of your
2    home?
3        A.  Yes, sir, they are.
4        Q.  Let's see these just a second.  Are
5    these photos that you believe were taken
6    immediately prior to Katrina by your husband
7    before he evacuated?
8        A.  No, that was taken about a year
9    before Katrina.
10       Q.  I am going to mark this set as
11   Exhibit 4.  All right?
12       A.  And this is just some photos.  You
13   have others.  Some parts of the house.
14       Q.  Yes.  They were taken about a year
15   --
16       A.  About a year before Katrina.
17       Q.  And what was the occasion on which
18   you took these photos?  Or someone took them?
19       A.  The reason being that our Allstate
20   Insurance agent every year reminded us to
21   update and take pictures.  And we had ignored
22   it.  And for some reason my husband decided
23   one day to take pictures and to put it in our
24   red box where we keep important documents.
25       Q.  And when that red box -- Where was

---

Page 93

1    it during Katrina?
2        A.  The top of the closet in the master
3    bedroom.
4        Q.  And so it survived more or less
5    unscathed?
6        A.  Sure did.  It was opened and I guess
7    persons who came into the home thought maybe
8    money or jewelry was in it, but it was
9    pictures of our house and burial insurance
10   policies.
11       MR. MARPLE:
12       We'll go off a second.
13       (Discussion off the record.)
14       VIDEO OPERATOR:
15       We're off the record.  It is
16   11:21.
17       (Recess.)
18       VIDEO OPERATOR:
19       Returning to the record, it's
20   11:23.
21   EXAMINATION BY MR. MARPLE:
22       Q.  All right, Mrs. Wade.  We were
23   talking about these photos and you said you'd
24   taken them for some insurance purposes and you
25   put them in the red box and then the red box,

---

24  (Pages 90 to 93)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

Page 94

1  at least these contents survived Katrina. And
2  they were taken so you'd have a record if
3  something happened that you needed to make a
4  claim on your insurance, you could show what
5  the contents of the house were. Correct?
6      A. Yes, I was advised by our agent to
7  do it.
8      Q. And so your husband took these. And
9  this is the sun room, the very first one
10 that's got the Hawaiian Punch --
11     A. Yes.
12     Q. I'm not sure what that is, trash can
13 or beach ball or something in it. What is
14 that?
15     A. This is where we would keep our soft
16 drinks and water --
17     Q. All right.
18     A. -- when we entertained.
19     Q. And that's the room that you
20 enclosed that had been a screened-in porch and
21 you enclosed it; right?
22     A. Yes, sir.
23     Q. And you didn't run air conditioning
24 vents from the ceiling and heating from the
25 rest of the house back there; you cooled it

Page 95

1  with a window air conditioner. Then if you
2  needed heat in the wintertime, you probably
3  had a little space heater back there; right?
4      A. Yes, sir.
5      Q. As a matter of fact, I think I can
6  see the space heater under that table.
7      A. That is it.
8      Q. Correct?
9      A. Yes.
10     Q. Then on the second page, photos, if
11 you look at the next page, is another shot,
12 almost like the other one that we looked at on
13 top, and then down below we've switched around
14 and looking -- Well, I am not sure which way
15 we're looking, but that's still in the sun
16 room; right?
17     A. Yes, it is.
18     Q. And then the next photo at the top
19 is one of the bedrooms? Is that the master
20 bedroom?
21     A. Yes, it is.
22     Q. And below it is -- and in that
23 master bedroom, that's carpeting and that's
24 some of the carpeting that you had put down?
25 Is that correct?

Page 96

1      A. Yes, sir, it is.
2      Q. And then the next one, tell us what
3  room that is. I am not sure where we --
4      A. That was our -- We took one of our
5  bedrooms then and made it our den. A little
6  sitting area.
7      Q. And there's an aquarium there. Is
8  that a real one with water in it?
9      A. Yes, it is.
10     Q. And there's some kind of fish in
11 there?
12     A. Yes, sir.
13     Q. And did you lose any of those fish
14 in Katrina?
15     A. Oh, yeah.
16     Q. And there's a bird in the cage? Did
17 you take the bird with you?
18     A. No, we didn't.
19     Q. And he get out or die, or do you
20 have any idea?
21     A. I don't know what happened to him.
22 I don't even remember the cage afterwards
23 because everything was such topsy-turvy.
24     Q. And then the next one is back in the
25 front entryway room, I believe. Those two

Page 97

1  pictures. Am I right?
2      A. Yes, sir.
3      Q. And there's pictures on the wall, of
4  course. And then there's carpet in that room
5  as well.
6      A. Yes, sir.
7      Q. And is that carpet you installed
8  after you bought the house?
9      A. Yes, it is.
10     Q. And those pictures up on the wall
11 there that we see in that first photo, did you
12 salvage any of those?
13     A. The ones at the very top of my
14 husband and I, one is -- you can barely see
15 it, a picture of us we took in Hawaii and two
16 other top pictures, at the top (indicating),
17 those were salvageable. But the other ones
18 and the one at the bottom of the children and
19 grandchildren, his and mine, my children -- my
20 child, my grandchild, we lost those.
21     Q. Then the next one is, looks like a
22 rifle and shotgun is me. Is that what you see
23 in that next picture at the top?
24     A. Yeah, that's some of his hunting
25 stuff.

25 (Pages 94 to 97)

GLYNN WADE (MRGO)                                          7/10/2007

---

Page 98

1   Q.  And did he hunt deer and birds?
2   A.  Yes, sir.
3   Q.  Does he still hunt?
4   A.  No.
5   Q.  Your husband doesn't hunt any more?
6   A.  Not now.
7   Q.  Does he have guns?  Did he replace
8   the guns?
9       A.  He did get one gun, but he was also
10  in a hunting club where he could go with a
11  group of men.  But we can't afford for him to
12  be in the hunting club and, secondly, he has
13  one rifle now.
14      Q.  That's going to limit him to deer
15  pretty much now, huh?
16      A.  Sir?
17      Q.  That limits his hunting to deer?
18      A.  Right.
19      Q.  Then the bathroom there, that's a
20  real --
21      A.  That's one of the bathrooms.
22      Q.  It's kind of a 1950 -- I call it a
23  1950s bathroom?
24      A.  Yeah.
25      Q.  Because it's got that ceramic gas

---

Page 99

1   heater built into the wall; right?
2       A.  Yes.
3       Q.  And those things will heat up pretty
4   good.  That's the good news; right?
5       A.  Yes.  That's one of the bathrooms.
6       Q.  And then the next one -- Actually,
7   it's two of them of the kitchen.  And are
8   those cabinets wood?
9       A.  Yes.  I am not sure, sir, but I
10  think they were wood birch.  Those were.
11      Q.  And then we continue with some more
12  throughout the house.  Well, I guess one more
13  which shows a hallway --
14      MR. EXNICIOS:
15          She doesn't have those.
16      MR. MARPLE:
17          Okay.  It doesn't matter.
18      THE WITNESS:
19          But it is the hallway.
20      MR. EXNICIOS:
21          It's those there.
22      MR. MARPLE:
23          All right.  That's all right.
24      THE WITNESS:
25          It's the hallway.

---

Page 100

1   EXAMINATION BY MR. MARPLE:
2       Q.  That's fine.  I mean, it's kind of a
3   little more of the same.  Let me show you the
4   next group.
5       MS. BERTAUT:
6           That should be 5, right?  That
7   should be 5.
8       MR. MARPLE:
9           Are we ready for 5?
10      MR. EXNICIOS:
11          Yes.  The last pictures were 4.
12      MS. BERTAUT:
13          Yes.
14  EXAMINATION BY MR. MARPLE:
15      Q.  I'll show you what we have marked as
16  Exhibit 5.  And that's the infamous green
17  pickup truck of your husband; right?
18      A.  Yes, sir, it is.
19      Q.  And he likes that truck, doesn't he?
20      A.  He loves it.
21      Q.  And I like it, too.  And then your
22  little minivan, we can see a little bit of the
23  van that you had, I believe, there.  Is that
24  right?
25      A.  Yes, sir.

---

Page 101

1       Q.  Were these photos -- And then
2   there's one of the outdoor of the house.  Were
3   these taken at the same time as these others?
4       A.  Yes, sir, they were.
5       Q.  All right.  And this is an accurate
6   representation of what your house and actually
7   the vehicles looked like pre-Katrina?  Even
8   though it was taken a little while before
9   Katrina, things hadn't changed much?  Is that
10  right?
11      A.  Nothing had changed.
12      Q.  And that same is true in Exhibit 4.
13  Nothing substantially different immediately
14  before Katrina from when those photos were
15  taken maybe a year or so before Katrina; is
16  that right?
17      A.  No, sir, nothing had changed.
18      Q.  Now, I have some after Katrina, I
19  believe, but we'll ask.  Give them to you one
20  at a time.  Let me show you what we have
21  marked as Exhibit 6.  Is that a representation
22  or, excuse me, is that a photo of the house
23  taken sometime not -- You tell me what it is.
24      A.  That's after we returned from Baton
25  Rouge.

---

26 (Pages 98 to 101)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE  (MRGO)                                          7/10/2007

Page 102

1    Q.  If it wasn't October 1st, it was
2  sometime not too long after that?
3    A.  Shortly after that.
4    Q.  In October of 2005?
5    A.  Yes, sir.
6    Q.  And by that time you got no water
7  standing on the outside of the house anywhere;
8  correct?
9    A.  No, sir.
10    Q.  And you have got brick that are off
11  the front; correct?
12    A.  Yes, sir.
13    Q.  And as you look at the house and
14  looked at it, that was the main thing you saw
15  from the outside looking at the house, was
16  that window, picture window being out and
17  those brick being off?
18    A.  Yes, sir.
19    Q.  And is that blue, I am not sure what
20  it is -- blue tarp, is that one you bought or
21  is that some FEMA blue tarp?
22    A.  I don't remember where my husband
23  got that from.  But I am willing to think that
24  it was probably FEMA giving it out.
25    Q.  And they gave out blue tarps to put

Page 103

1  kind of -- It's something that became very
2  familiar around New Orleans, blue tarps on top
3  of houses, right, over the roofs?
4    A.  Yes, sir.
5    Q.  And that was primarily for people
6  that had roofs blown off or shingles blown off
7  and they put the blue tarps over them
8  supposedly to keep them from leaking and
9  getting rain in them, right, rainwater?
10    A.  Yes.
11    Q.  You saw a lot of those around town;
12  right?
13    A.  Yes, I did.
14    Q.  And you know some people that had
15  them?
16    A.  Yes.
17    Q.  Let me show you Exhibit 7, and is
18  that another post-Katrina photo taken about
19  this same time, in October, 2005 sometime?
20    A.  Yes, it is.
21    Q.  And in that if you just look, you're
22  not seeing any damage anywhere, are you?
23    A.  Well, I could -- I can see the
24  damage from where my bricks are missing near
25  my door, my front door.

Page 104

1    Q.  As we look around in the back,
2  that's of the sun room.  Is that correct?
3    A.  Yes, it is.
4    Q.  And from just visual observation,
5  you don't see any damage, right?  Other than
6  what you told us about where the brick are
7  off.
8    A.  Well, you can't see it, but there
9  was -- not on the outside, but on the inside.
10    Q.  Right.  I'm just talking about the
11  inside.  And then if we look at that photo at
12  the bottom of that one you're looking at,
13  which we have marked as Exhibit 7, you see a
14  few little -- you see some shingles, right,
15  almost above the door there that are a
16  different color?  Were those some of the ones
17  that were damaged that you had to have
18  replaced?
19    A.  I don't know.  I don't know.  My
20  husband took care of all of that.
21    Q.  Let me show you what we have marked
22  as Exhibit 8.  And this is after you had at
23  least begun to gut the house; right?
24    A.  Yes.
25    Q.  So how long after Katrina were these

Page 105

1  taken?  It would have been in this March or
2  early March, 2006 range?  Or actually maybe
3  before that?
4    A.  No.  No, this was along about --
5  Now, I'm not sure.  So much happened.  But I
6  would almost think that it was around December
7  of '05.
8    Q.  So by December '05 you had the
9  drywall, or sheetrock as some people call it,
10  stripped out of there; right?
11    A.  Yes, sir.
12    Q.  And this ceiling that we're looking
13  at, is that a new ceiling or is that the one
14  that had been in there?  You look at that
15  recessed light.
16    A.  That's the one that had been in
17  there.  But it doesn't really show.  They had
18  some mold on the ceiling, too.
19    Q.  And what I am getting at, I can't
20  tell if these ceiling fans are the new ones or
21  not.  Can you tell?
22    A.  Those are old, but we had to take
23  all of that down and rip out the ceiling.
24  They had mold inside of the ceiling.
25    Q.  So you think what we're seeing

GLYNN WADE (MRGO)                                    7/10/2007

Page 106

1  there, at least on the ceiling, those fans and
2  everything came out?
3      A.  When we had to rip the ceilings,
4  yes, all of that had to come out.
5      Q.  All right.  Now we get to a little
6  happier story, I hope.
7      MR. EXNICIOS:
8      9.
9  EXAMINATION BY MR. MARPLE:
10     Q.  I show you what we have marked as
11  Exhibit 9.  That's what your house looks like
12  today; right?
13     A.  Thank God, yes, sir.
14     Q.  And that was taken about when?
15     A.  About two weeks ago.
16     Q.  Recently this year, and you have got
17  the plants in the yard that are all -- have
18  the stuff around them, things around them
19  looking nice and the birdbath and all of that;
20  right?
21     A.  Yes, sir.
22     Q.  Were those plants and flowers in the
23  front, did you put those in or did you hire
24  somebody to put those in?
25     A.  We couldn't afford to hire anybody

Page 107

1  to put them.  Mr. Wade put it in.  We can't
2  afford a gardener.
3      Q.  And what about the brick that's now
4  been replaced on the front?  Was that a
5  contractor who did that --
6      A.  One of --
7      Q.  -- in front of your house?
8      A.  One of the contractors that worked
9  on our house, yes, he rebricked it, yes.
10     Q.  When you pull up to the house now,
11  just looking at it visual, does it look pretty
12  to you with all of that out front?
13     A.  To me it does.
14     Q.  It does to me, too.
15         Let's look at what we have marked
16  as Exhibit 10.  And that's what your kitchen
17  looks like today looking into the front room.
18  Am I right?
19     A.  Yes, it does.
20     Q.  And all of those cabinets are new;
21  correct?
22     A.  Brand new.
23     Q.  And the appliances are all brand
24  new; right?
25     A.  Everything in the kitchen, and

Page 108

1  you're looking also into my dining room,
2  everything is brand new.
3      Q.  The countertops, the microwave, the
4  hood, the double refrigerator, the light
5  fixtures, the fan, all brand new?
6      A.  Yes, sir, because if you recall the
7  pictures you had showed me previously,
8  everything was gutted out.  So we had to get
9  brand new everything.
10     Q.  And these are nice appliances, nice
11  looking; right?
12     A.  Well, I got what I could afford.
13     Q.  And everything works really nicely,
14  the appliances?  You haven't had any problem
15  with them yet, have you?
16     A.  No.
17     Q.  And the floor, the tiling there, is
18  that new or is that the older tile?
19     A.  That's the old tile.
20     Q.  So you salvaged the floor?
21     A.  We salvaged what we could, yes.
22     Q.  At least in this room.  And those
23  doors we see which are those six-panel doors,
24  those are new, too; right?
25     A.  Now, --

Page 109

1      Q.  See this one door that's opening
2  there down towards the --
3      MR. EXNICIOS:
4      (Indicating).
5  EXAMINATION BY MR. MARPLE:
6      Q.  -- dining room?
7      A.  Oh, no.
8      Q.  Those are brand new, right?
9      A.  Yes.
10     Q.  All the hardware on the doors are
11  new?
12     A.  Everything is brand new.
13     Q.  Right.  And all the furniture, you
14  may have mentioned this, but all of the dining
15  room furniture that we can see, and even what
16  we can see of the kitchen table, that's all
17  brand new?
18     A.  Everything we had in the house
19  before Katrina we lost.  We had to buy brand
20  new everything.
21     Q.  And then Exhibit 11 is another view
22  from the kitchen into the dining room.
23  Correct?
24     A.  Yes, sir.
25     Q.  And I am going to ask you, somebody

28 (Pages 106 to 109)

GLYNN WADE (MRGO)                                    7/10/2007

---

**Page 110**

1  did a really nice job of painting that house,
2  the walls and the colors and the baseboards
3  and everything. Right? Who did that?
4      A. The men, the contractor from
5  Jamaica.
6      Q. And he's good, because you look up
7  there along your ceiling line, he got those
8  lines perfect, didn't he?
9      A. He and his workers. But I selected
10 the colors.
11     Q. Well, and it's a little different --
12 different color scheme than what you had
13 before; right?
14     A. Yes, sir.
15     Q. Brighter, I'd call it more modern.
16 Would you agree with me on that? Hip?
17     A. Beginning of newness, happiness,
18 life.
19     Q. And it is newness and happiness and
20 life when you look at it even in the photo or
21 in real life; right?
22     A. I think it is.
23     Q. And then the next one we marked as
24 12 is -- You're going to have to tell me which
25 room this is. I am not positive if this is

---

**Page 111**

1  the front room or another room. Is that the
2  dining room, the same room we have -- Yes.
3      A. The dining room.
4      Q. Is that the room you walk into when
5  you walk in the front door? I can't
6  remember.
7      A. No, sir. This is -- This is down
8  the closed-in sun porch.
9      Q. Oh, this is the -- what was started
10 out as a screened-in porch that you closed in
11 and now it looks like this?
12     A. Yes, sir.
13     Q. All right. You have to admit it got
14 spruced up pretty darn good in this redo;
15 right?
16     A. Well, I think it came out pretty
17 decent.
18     Q. And that's new flooring then I bet
19 in there, isn't it?
20     A. Yes, sir, it is.
21     Q. And I am not sure that this is --
22     MS. BERTAUT:
23          13.
24 EXAMINATION BY MR. MARPLE:
25     Q. It looks so pretty I don't want to

---

**Page 112**

1  put a sticker on it almost. I don't know if
2  that -- Is that the same bathroom we looked at
3  in an earlier photo, or not?
4      A. Yes, it is.
5      Q. And so what about -- Is the floor
6  new there?
7      A. No, it's the same floor before
8  Katrina.
9      Q. But everything else is new; right?
10     A. Yes, sir.
11     Q. And the one we're looking at, the
12 bathroom, that's the same bathroom now updated
13 is Exhibit 13; correct?
14     A. Yes, sir.
15     Q. And the next one I believe -- Well,
16 you're going to have to tell me. Is that the
17 master bedroom?
18     A. Yes, it is.
19     Q. And that's the same room that we
20 looked at earlier, now that it's updated,
21 because we had one of the master bedroom.
22 Right?
23     A. That's correct.
24     Q. And 14's a redo of the bed, all of
25 the furniture, the ceiling fan, every -- the

---

**Page 113**

1  curtains, everything in there is new except
2  the floor; right?
3      A. No, I had carpet before in the
4  master bedroom. This time I have tile.
5      Q. And the tile is new then?
6      A. Yes, sir, it is. I told you, I used
7  -- we used our life savings to redo our
8  home.
9      Q. Let me show you -- I am not going to
10 mark it right away, but is that the house
11 that's immediately to your left if you stand
12 in your yard looking at the street? It is,
13 isn't it? Because we can see that white vinyl
14 fence that's next to your house.
15     A. Let's see. From where I am sitting,
16 yeah, it would be to the left.
17     Q. If you walked out your front door
18 and just stood facing Bundy --
19     A. It would be to the left.
20     Q. And that's -- is that where one of
21 the neighbors lived, I believe you described
22 them as the younger couple?
23     A. Yes, it is.
24     Q. And they're back in their house;
25 right?

---

29 (Pages 110 to 113)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                      7/10/2007

Page 114

1      A.  Yes, sir, they are.
2      Q.  Did they get theirs redone before or
3   after yours?
4      A.  We were doing it around the same
5   time.
6      Q.  All right.  And do you know if
7   that's a new roof on their house or that's the
8   pre-Katrina roof?  Do you know?
9      A.  It's the pre-Katrina roof, because
10  we both used the same roofers and we got roofs
11  on or about the same time by the -- our
12  neighbor who is a roofer.
13     Q.  And am I to understand that this is
14  the neighbor that did your roof that lives
15  there?
16     A.  No, sir.  Uh-uh (negatively).
17     Q.  Okay.  And did they have any damage,
18  do you know, that they had to have repaired
19  post-Katrina to the roof?
20     A.  I don't know.  I was in Destrehan.
21     Q.  I am just going to mark that
22  neighbor's house as 15.
23         And then I am going to show you
24  what we marked as Wade 16.  That's the next
25  neighbor down from where we're looking.  Is

Page 115

1   that right?  The gray house in Exhibit 16?  Or
2   white house?
3      A.  Yes.
4      Q.  And do you know those people?
5      A.  I don't know them personally, but
6   they were my neighbors, but they haven't moved
7   back in their home yet because of damage.
8      Q.  Right.  And I can't tell if that
9   truck is in their driveway or the house next
10  to them, but it looks like -- that big red
11  truck and that little red car.  Do you know?
12     A.  That's in the younger couple's
13  driveway.
14     Q.  Which would be the next drive down?
15     A.  Next to my house.  Left.  But the
16  white house is next to them.
17     Q.  Right.
18     A.  But the people have not moved back
19  in yet because I think they are waiting for
20  the Road Home money.  Their house has been
21  gutted.  All of us had, every one of us had,
22  in the neighborhood had to get our homes
23  gutted out because of the water damage.
24     Q.  All right.  And then the next house
25  down has got I'll call it a pinkish roof.  You

Page 116

1   see that one.  Do you know those people?
2      A.  I don't know them personally.
3      Q.  Let me show you what we have marked
4   as Wade 17.  And we're just moving down the
5   street to the left if you walked outside your
6   door and stood facing the street.  Right?
7   We're still moving the same direction down the
8   street.  Is that right?
9      A.  That's correct.
10     Q.  Do you see the house then that's got
11  what would appear to be roof damage on it, the
12  next house down the street?  Do you know those
13  people?
14     A.  I don't know them.  But I know they
15  live down -- they lived down the street from
16  me.  My husband and me.  I am not sure if they
17  have -- I don't think they have returned
18  either.
19     Q.  All right.  And does that look -- I
20  mean, can you see the roof damage on that
21  house?
22     A.  Yes, sir, I can.
23     Q.  And then if you look on down the
24  street, we see it looks like there's one or
25  two FEMA trailers down there; right?

Page 117

1      A.  Yes, sir.
2      Q.  Do you know any of those people down
3   there that have those FEMA trailers?
4      A.  No, I don't.  Sir, in our
5   neighborhood, we speak.  The men congregate
6   together and con-- -- you know, help each
7   other.  Those that are not able to cut grass,
8   the other ones would assist them to keep all
9   the lawns nice and neat so our subdivision
10  would be very clean and neat looking.  But the
11  women wave, speak, "Hello, neighbor."  The
12  majority of the men, the older men are
13  retired, but us wives are still working.  So
14  we wave, say hello, and we really don't visit
15  or know each other personally.  But we do
16  speak and say, "Hello, neighbor."  I don't
17  know these people.
18     Q.  And if we look at Exhibit 18, that's
19  another view of that same house that appears
20  to have the roof damage.  Right?
21     A.  Yes, sir.  But may I just say this,
22  too?
23     Q.  Sure.
24     A.  The houses -- The roofs that were
25  damaged bad, Mr. Allen did not do their roof

GLYNN WADE (MRGO)                                      7/10/2007

---

Page 118

1    -- roofs. These are old. It's my roof, my
2    younger neighbors' roof, we all got ours, and
3    some of the people across the street, a few of
4    them that could afford to, because when one
5    started doing something with the home, those
6    that could afford to would do something, too.
7    So when Wade and I decided to get our brand
8    new roof, then our young couple neighbors
9    decided to get a brand new roof and a few
10   across the street, husband and wife that was
11   school teachers, and I think maybe the couple
12   that was both postmen, both are -- both work
13   for the Post Office got new roofs. But the
14   rest of the people, they didn't get new roofs
15   before Katrina and I would imagine they
16   couldn't afford to because their houses are
17   still vacant now. They are waiting for Road
18   Home money to even try to do something to
19   their homes.
20       Q. If you're going to live out on Bundy
21   Road, you have to keep up with the Wades;
22   right?
23       A. Not really, no. The Wades don't
24   have anything either.
25       Q. Let me show you another photo. This

---

Page 119

1    is yet a different house I believe in 18. You
2    tell me. It may be across the street or back
3    the other way from you. Are you able to
4    tell? I can give you a little help here by
5    putting it in perspective. If we see this
6    house and then there are some others. I am
7    trying to see if you can tell me where that
8    one is in relation to your house, if you
9    know.
10       A. I don't know, but I think it's on
11   the same side that my house --
12       Q. Going the other way, right?
13       A. I believe so, yes.
14       Q. And that house that we're looking at
15   in Wade 19, and I am going to mark it --
16       MS. BERTAUT:
17           20.
18       MR. EXNICIOS:
19           This is your first one? Yes,
20       this is the first one.
21   EXAMINATION BY MR. MARPLE:
22       Q. In Wade 19 and 20, and in particular
23   we see where it's the focus in Wade 19, it's
24   nearby your house; right?
25       A. Yes, sir.

---

Page 120

1        Q. And that one's got --
2        A. It's heading towards Chef Highway, I
3    believe.
4        Q. And it's got more roof damage than
5    either of the other ones we looked at, but
6    it's kind of the same type of roof where they
7    didn't get it replaced probably before Katrina
8    would be your view of that; right?
9        A. I think so.
10       Q. And those people don't appear to be
11   back in there either, do they?
12       A. As I said, from talking with my
13   husband and the men in the neighborhood, many
14   of the neighbors are waiting for the Road Home
15   money.
16       Q. Were you among the first to get the
17   Road Home money you think in your
18   neighborhood?
19       A. I don't know. I do know the younger
20   couple and I got our money about the same
21   time. But my husband, in talking with me,
22   said that a lot of the men in the neighborhood
23   are saying they're waiting for the Road Home
24   money.
25       Q. And then they're going to redo and

---

Page 121

1    move back in, most of them? That neighborhood
2    is coming back when people get the money to
3    redo; right?
4        A. They plan to.
5        Q. Unlike some other neighborhoods,
6    wherever they might be in Lower Ninth or
7    Chalmette or some place, where they're not
8    coming back, at least very quickly like your
9    neighborhood. Your neighborhood is vibrant.
10   There are people there doing stuff and wanting
11   to do stuff; right?
12       A. Well, it's mostly people in their
13   60s and 50s and 40s that are still working and
14   trying to salvage their homes.
15       Q. I don't know if you'll be able to
16   help or determine anything in here, but this
17   is a Google photo that's taken after Katrina
18   and after the water is down and it's got your
19   house identified there. The way I --
20       A. Take my glasses off. These are
21   brand new glasses.
22       Q. Mine, too. I bought some new ones
23   just to come over here so I could see.
24       A. Which one is my home?
25       Q. If you look in the middle here, it's

---

31 (Pages 118 to 121)

GLYNN WADE (MRGO)                                          7/10/2007

**Page 122**

1  got a little square. Do you see that?
2      A.  Yes, sir.
3      Q.  And I don't know if you can look at
4  the median there, or not the median, the
5  neutral ground and then the cut-through on the
6  neutral ground, whether you can place your
7  house there on Bundy Road or not, identify
8  it.
9      A.  No, I can't. But I know it would be
10  one of them that did not have the tarp.
11      Q.  Right. It's along in there
12  somewhere in the center of this photograph
13  that we're looking at that we have marked as
14  Exhibit 21. Right?
15      A.  Yes, sir.
16      Q.  And you know that because you see
17  the neutral ground there on Bundy and where
18  the cut-through is and you know approximately
19  where you are; right?
20      A.  Yes, sir.
21      Q.  And then we see almost right there
22  in the middle of that, near where your home
23  would be, a couple of blue tarps. One on
24  Bundy and then one on the next street over
25  behind it. Do you see those? Those blue

**Page 123**

1  tarps?
2      A.  Which one?
3          MR. EXNICIOS:
4          Which one are you talking about?
5          Over here or --
6  EXAMINATION BY MR. MARPLE:
7      Q.  In the center. If you're here in
8  the middle of this photograph, your house, and
9  you say you're not a blue tarp, --
10      A.  Uh-huh (affirmatively).
11      Q.  -- right?
12      A.  Uh-huh (affirmatively).
13      Q.  You didn't have a blue tarp. Is
14  that right?
15      A.  No, we didn't.
16      Q.  Then there's two blue tarps, though,
17  right near there, whether it's next door or a
18  house or two down, you see a couple of blue
19  tarps; right?
20      A.  Yes, sir.
21      Q.  And those were the FEMA tarps that
22  people put over their houses when they had
23  roof damage from the wind; right?
24      A.  Yes, sir.
25      Q.  And there's a few others that are

**Page 124**

1  across the street or a little ways away that
2  you can see in that photo, too, of some other
3  blue tarps in the general neighborhood of
4  where you are; right?
5      A.  Yes, sir.
6      Q.  Let me show you what we have marked
7  as Wade Exhibit 22. And this has got some
8  file stamps on it, "Custodian of records".
9  I'll represent to you it's a public record.
10  You can go down to the -- whichever records
11  office you go to and get these things. Just
12  so you know where they came from. And this is
13  some paperwork you signed in connection with
14  getting your Road Home money. Right?
15      A.  I guess it is.
16      Q.  I mean, you see, if you look on the
17  back pages there, that you have signed it.
18  Not the very back. I guess the second-to-last
19  page, 4 or 5. Glynn Williams LeBlanc Wade.
20  Did I get that right?
21      A.  Well, I divorced from Mr. LeBlanc,
22  but they said we had to put LeBlanc's name in
23  there because that was the only way they could
24  recognize me or pull my name up. But I am --
25  Glynn Williams is my maiden name and I am

**Page 125**

1  married to Adolph Wade and I am divorced from
2  Classy LeBlanc.
3      Q.  And is that your husband's signature
4  there, Adolph Wade?
5      A.  Yes, it is.
6      Q.  He was there somewhere and signed
7  this himself; right?
8      A.  Oh, yeah, he was there for the Road
9  Home meeting.
10      Q.  And was this one of the documents
11  that you signed -- Well, let me just ask. Do
12  you sort of have a closing like you do when
13  you have a real estate loan and you go in and
14  sign a bunch of papers and then at the end of
15  all of that they hand you the check?
16      A.  No, they didn't hand us the check.
17  But the check came shortly after.
18      Q.  But what about the other part? Do
19  you go in somewhere personally and sign all of
20  this stuff or is this done just -- you do it
21  and send this in and --
22      A.  No, we went into the office where it
23  was located; if I recall, Jefferson Parish.
24      Q.  And do you understand that what this
25  talks about is some of the restrictions on

GLYNN WADE  (MRGO)                                          7/10/2007

---

Page 126

1  selling your house and you've got to live in
2  it yourself and all of that sort of thing that
3  are the rules and regulations in order to get
4  the Road Home money?
5      A.  Yes, I do.
6      Q.  And this gets filed up in the public
7  records, so that anybody that might try to buy
8  your house or whatever would know that it's
9  subject to these Road Home restrictions?  Do
10 you have a general understanding of how that
11 works?
12     A.  Yes, sir.  But we won't be selling
13 that house.  We'll die in that house.
14     Q.  I understand.  And the agreements
15 there -- Well, did you have any lawyers
16 helping you on this deal?
17     A.  No, sir.
18     Q.  On the application for Road Home?
19     A.  No.
20     Q.  Or anything else?
21     A.  No.  No.  I filled it out myself.
22     Q.  And in the middle of the page there,
23 under "Agreements," do you see there on the
24 first page where it says that "Now, therefore,
25 and in consideration of receipt of all grant

---

Page 127

1  proceeds as compensation for damages incurred
2  by the owner due to the hurricane and in order
3  to mitigate future damage from hurricanes and
4  similar natural disasters", you make the
5  following agreements?  Do you see that?
6      A.  You on the first page?
7      Q.  Yes, right in the first page where
8  it says "Agreements".
9      A.  Oh, "Agreements".  Okay.
10     Q.  Maybe you could just read that out
11 loud, that first sentence to us.
12     A.  The one that says "Covenant not to
13 sell the property"?
14     Q.  No, the one that begins "Now
15 therefore" right under the word "Agreements".
16     A.  Help me.
17        MR. EXNICIOS:
18           Where are you trying to start?
19 EXAMINATION BY MR. MARPLE:
20     Q.  Right under the word "Agreements".
21 And it starts "Now therefore".
22     A.  "Now therefore --"
23     Q.  Right.
24     A.  " -- and in consideration of receipt
25 of all grant proceeds as compensated for

---

Page 128

1  damages incurred by the -- by the owner due to
2  the hurricane --"  That's not true,, "And in
3  order to mitigate further damage from
4  hurricanes and similar natural disasters,
5  owner hereby makes the following covenants and
6  agreements with respect to the property, which
7  covenants and agreements shall constitute
8  covenants and restrictions running with the
9  encumbered property --"
10     Q.  Yes, you can stop.  That's first
11 sentence that what I was after.  It says "Now
12 therefore and in consideration of receipt of
13 all grant proceeds," and you got the grant
14 proceeds from the Road Home Program; right?
15     A.  Yes, sir, we did.
16     Q.  "As compensation for damages
17 incurred by the owner due to the hurricane".
18 Did you understand that you were getting that
19 money as compensation for damages incurred by
20 the hurricane from the government?
21     A.  Not compensate, but to help us to
22 finish with our house or whatever other
23 expenses that was needed.
24     Q.  And that's what I--
25     A.  This Road Home money could not

---

Page 129

1  compensate for the money we have spent on
2  getting our house.
3      Q.  And it compensated for part of it;
4  right?
5      A.  For some of it.
6      Q.  Some of it.  $70,000 -- Well, you
7  tell me, what did you get from Road Home?  Was
8  it 70?  I can't remember.
9      A.  No, sir.  I said we got 22,000 from
10 Road Home.
11     Q.  22,000 from Road Home.  Do you know
12 how they figured that?
13     A.  No, sir, I have no idea.
14     Q.  Because you can get up to 150,000 is
15 your understanding; right?
16     A.  No, I didn't -- I never knew how
17 much you could get.
18     Q.  You can get a lot more on --
19     A.  Most of the people I know didn't get
20 anything.
21     Q.  And do you know why you got 22,000
22 as opposed to some other number?  Did they
23 tell you why you got the 22,000?
24     A.  No, sir.
25     Q.  And are you satisfied with that

---

33 (Pages 126 to 129)

Page 130

1  22,000? I mean, did you appeal or anything?
2      A.  No, I did not appeal because my
3  husband and I figured if they run out of money
4  we best take what they offer us. Appeal it?
5  We may never live to get it. So we took what
6  was offered.
7      Q.  I may have asked you this earlier,
8  but do you have a file that has your Road Home
9  application or any --
10     A.  No, sir, I didn't keep up with that.
11     Q.  -- correspondence?
12     A.  After we got the money I did not
13  keep that.
14     Q.  And I am just trying to understand
15  your view of the Road Home money. It was
16  partial compensation to you for your injury
17  due to the hurricane. Is that right?
18     A.  It was not partial. I would say a
19  small amount.
20     Q.  A small amount of compensation,
21  $22,000 worth of compensation?
22     A.  Yes.
23     Q.  For your injury; right?
24     A.  Yes, sir. That's correct.
25         MR. MARPLE:

Page 131

1          I need to take a little break and
2  I don't know --
3          MS. BERTAUT:
4            It's noon.
5          MR. MARPLE:
6            -- if we want to take a break.
7          MR. EXNICIOS:
8            It's noon. How much longer do
9  you have?
10         MR. MARPLE:
11           Not very much longer.
12         THE WITNESS:
13           Not very much longer?
14         MR. MARPLE:
15           Don't hold me to it, but 45
16  minutes, 30 minutes, you know, an
17  hour. I don't know, somewhere in that
18  range.
19         MR. EXNICIOS:
20           I don't think she believes you.
21         MS. BERTAUT:
22           No, I am just -- Where is this
23  going? So you don't want to break for
24  lunch? You want to take a little
25  short break?

Page 132

1          MR. MARPLE:
2            That's fine. That's where I was
3  going. We need to ask the witness.
4  Can we go off the record?
5          VIDEO OPERATOR:
6            We're off the record. It's
7  12:04.
8            (Recess.)
9          VIDEO OPERATOR:
10           Now returning to the record.
11  It's 12:18, start of tape 3.
12 EXAMINATION BY MR. MARPLE:
13     Q.  Mrs. Wade, do you have any family
14  members that had personal injuries from
15  Katrina?
16     A.  No, sir.
17     Q.  And I take it then you didn't have
18  any deaths of people in your family?
19     A.  No, sir.
20     Q.  Were there any people that you knew
21  that did die as a result of Katrina?
22     A.  None.
23     Q.  And you may have told us this, but
24  with respect to the mental distress or
25  emotional distress you have described, I think

Page 133

1  you told us you hadn't been to a psychiatrist
2  or anybody. Have you been to any kind of
3  health professional for that?
4      A.  No, sir, but this is what my job did
5  for all of us that had to work the shelters.
6  They had trainings whereas we had
7  debriefings. We had many, many trainings
8  where we were able to actually discuss the
9  experiences we had and how they traumatized
10  us. But that was as a group of State workers,
11  and it was mandatory for us who had worked the
12  shelters.
13     Q.  And did you find that helpful?
14     A.  It was extremely helpful.
15     Q.  And you can tell me if I am leaving
16  something out, but what I understood from
17  today, your big losses were the damage to your
18  house and some losses of heirlooms, but your
19  house is now put back together very nicely.
20  Right?
21     A.  My house is put back together.
22     Q.  I mean, is there anything you want
23  to do differently about what it looks like
24  than how you did it when you had it redone?
25     A.  I don't know, I probably would have

GLYNN WADE (MRGO)                                          7/10/2007

---

Page 134

1  to think about it. But --
2      Q.  You do have all of those pretty
3  colors that are varied throughout the house.
4  I couldn't count them, but there's three or
5  four, five very bright colors that you
6  described to us, but each room almost has its
7  own color scheme. Right?
8      A.  Yes, sir.
9      Q.  And those are colors that you picked
10 personally, I take it?
11     A.  Yes, sir.
12     Q.  Was Mr. Wade involved in picking the
13 colors?
14     A.  No, sir. He let me do it. He
15 selected the clock.
16     Q.  All right. You brought up the clock
17 so now there's my opening. I wanted to talk
18 about the clock. For want of a better word,
19 I'll call it a coo-coo clock, but it's
20 probably not the name of it, but I am going to
21 describe it and you correct me or fill in
22 behind me. It's got jewels around it and
23 every hour or maybe more often it plays one of
24 about six or seven different pieces of music.
25 Correct?

---

Page 135

1      A.  That's not real jewels now.
2      Q.  I assumed they weren't, but I didn't
3  want to say they were rhinestones because I
4  thought you might correct me and say they were
5  diamonds.
6      A.  No. No.
7      Q.  And it plays "Love me tender" and
8  "Imagine" by the Beatles, and I can't
9  remember all of them, but I got a couple of
10 them right; right?
11     A.  Yes, sir.
12     Q.  Well, what's the history of that
13 clock? Where did you get it?
14     A.  My husband was shopping in Sam's one
15 day and he saw it and he bought it.
16     Q.  And you can go over and push the
17 button, and I don't know if it plays all seven
18 or eight that are on there, but it'll start
19 playing them if you want?
20     A.  Right. Every hour in the day, and
21 it's $98 --
22     Q.  I beg your pardon?
23     A.  -- at Sam's. It's $98 at Sam's.
24     Q.  I know, and I might get one if I can
25 find one over at Sam's at home.

---

Page 136

1      A.  Airline. Airline Highway.
2      Q.  And that's just something he liked
3  and enjoys; right?
4      A.  Yes, sir.
5      Q.  And it's a conversational piece,
6  too; right?
7      A.  Yes, sir.
8      Q.  I mean, anybody that comes into that
9  front door and is in that front room the first
10 time probably is going to say something or
11 comment or look at it?
12     A.  Yes, sir.
13     Q.  And your husband will say, "Go push
14 the button"; right?
15     A.  Yes, sir.
16     Q.  Like he did to me?
17     A.  Uh-huh (affirmatively).
18     Q.  Were you paid the entire time by the
19 State during and after Katrina?
20     A.  Yes, sir.
21     Q.  I mean, did you keep your same
22 salary and everything?
23     A.  Yes, sir.
24     Q.  Did it go up?
25     A.  No, it didn't go up, but the fact

---

Page 137

1  that we were working 12 hours a day, we were
2  being paid 12 hours a day. And many days we
3  worked seven straight days without a day off.
4      Q.  Did you get paid overtime? Is that
5  what I understand?
6      A.  We got a little bit. We got a
7  little overtime.
8      Q.  Did you get comp time for the extra
9  time you worked?
10     A.  No, sir.
11     Q.  Were you -- I may have just missed
12 it. Were you compensated in some way for
13 that?
14     A.  We got overtime.
15     Q.  You don't have any complaint with
16 the State about how much you got paid for how
17 many hours you worked?
18     A.  They didn't pay us for all the hours
19 we worked, but I'm thankful to God for what I
20 did get.
21     Q.  Were either you or your husband
22 operating any kind of business, little
23 business of any kind other than your job, his
24 as a welder and yours as a social worker?
25     A.  No, my husband is a retired welder.

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                          7/10/2007

Page 138

1    He retired in 1997.
2        Q.  I thought I understood, and I may
3    have gotten this wrong, and I thought he
4    continues or continued --
5        A.  Part time.  He was working part time
6    before Katrina.  About four hours, five days a
7    week before Katrina.
8        Q.  And he's not worked as a welder
9    since then?
10       A.  No, sir.  They haven't opened the
11   shop back yet completely.
12       Q.  And tell us how old your husband is?
13       A.  He is 75 years old.
14       Q.  And he gets Social Security, I take
15   it?
16       A.  Yes, sir.
17       Q.  Does he have any other kind of
18   pension or --
19       A.  We had the shares.
20       Q.  -- military retirement?
21       A.  No, sir.  But we had the shares of
22   which, since Katrina he pulled it out to help
23   to get that house together.
24       Q.  Who do you blame for the damages
25   that you're seeking in this lawsuit?

Page 139

1        A.  I blame no one.
2        Q.  And how is that?
3        A.  How can you blame someone?
4        Q.  Because the hurricane is an act of
5    God?
6        A.  That's what I am told it is.
7        Q.  Was there any -- Were there any
8    requirements when you redid that home or as
9    part of the Road Home money or anything that
10   you raise your house up or do anything like
11   that?
12       A.  They didn't require us to do that.
13       Q.  Have you ever looked at the
14   floodplain or flood risk of your house to know
15   if it's a category 1, 2, 3, 4, something else,
16   whether it's high or low or anything like
17   that?
18       A.  I don't understand that question.
19   Rephrase that, please.
20       Q.  Sure.  It wasn't a very good
21   question.  At least for determining flood
22   insurance premiums --
23       A.  Uh-huh (affirmatively).
24       Q.  -- there's categories of risk for
25   homes.  So if you're a high risk area, you may

Page 140

1    have to pay a higher flood insurance premium.
2    Did you understand that at all?
3        A.  My insurance, my Allstate Insurance
4    person did not say that, but I know since
5    Katrina flood insurance and homeowner's
6    insurance has gone up tremendously and since I
7    had to pay so much, I just told them to, for
8    flood insurance, let me have at least $100,000
9    worth.
10       Q.  And --
11       A.  Even without that, it's gone up.
12   Homeowner's and flood insurance.
13       Q.  Is there any kind of subsidy or
14   assistance that you're getting with respect to
15   paying any flood insurance premiums or
16   homeowner's premium?
17       A.  No more than my salary and his
18   retirement.
19       Q.  Have you talked about or thought
20   about the risk or likelihood of your house
21   flooding again?
22       A.  Yes, sir.
23       Q.  And what are your thoughts on
24   whether -- on how likely that is?
25       A.  I know it's a very high chance that

Page 141

1    it can happen.  It can happen this year.
2    Because they preparing us State workers now,
3    training us so that if and when it happens and
4    we have to evacuate, we go back to shelters
5    again to work.
6        Q.  And the State's trying to prepare
7    better than they did the first time around, or
8    at least during Katrina so that they will be
9    better prepared the next time; right?
10       A.  Well, prepare State workers to be
11   more -- to know more about how to service
12   people in the shelters.
13       Q.  And even though you know that that
14   risk of flooding again is there, you have
15   nevertheless chosen to redo that house and
16   still live in the same house that flooded
17   during Katrina; right?
18       A.  Sir, we can't afford to move.
19       Q.  Do you not want to live where you're
20   living?
21       A.  I want to live where I am living.
22       Q.  I mean, is there some other area or
23   house that you have identified that you'd
24   rather be living in right now than the one
25   you're living in?

GLYNN WADE (MRGO)                                           7/10/2007

---

Page 142

1     A.  I haven't even looked because I know
2  I cannot afford another house.
3     Q.  I may have asked you this. I
4  apologize if I repeat it.  Did you ever have
5  problems with the pumps not pumping the water
6  out other than Katrina in your neighborhood?
7     A.  No, sir.  Never.
8     Q.  You heard about that around town
9  sometimes that it rained too much or the pumps
10 didn't work, the water would build up in the
11 streets and flood?
12    A.  We never had that in our
13 neighborhood.
14    Q.  Do you have any photos or videos or
15 anything that were taken during Katrina?
16    A.  No, sir.
17    Q.  Or any photos of any of the breaches
18 of levees around the New Orleans area?
19    A.  No, sir.
20    Q.  Did you have any of the soil tested
21 in your yard or otherwise to know if you got
22 any kind of contamination there?
23    A.  No, sir.
24    Q.  Do you have any suspicion that any
25 of your soil is contaminated with anything?

---

Page 143

1     A.  I have never -- I have no idea.
2     Q.  Nobody has suggested to you that it
3  is, I take it, then?  Is that right?
4     A.  No, sir.
5     Q.  You have told us about things that
6  you're seeking money for in this lawsuit
7  today.  We have talked about that quite a
8  bit.  I wondered, is there anything else that
9  we haven't talked about, something that you
10 feel like you should be compensated for in
11 this lawsuit for some injury or damage that
12 you have that we haven't already talked about?
13    A.  No injury.  No injury.  But I would
14 like to be able to get some more -- some of
15 the things that I had in the past that I don't
16 think I would ever be able to afford again.
17 And one thing is like my husband loved his
18 rifles and his fishing equipment.  One thing I
19 owned with pride from working so many years
20 was a full length mink coat.  I will never be
21 able to afford that any more or get another
22 one.
23    Q.  You lost your mink coat in that
24 flood?
25    A.  Yes, sir, I did.  Besides a lot of

---

Page 144

1  beautiful gowns I bought throughout the years,
2  because we go to a lot of carnival balls.
3  Beautiful cocktail dresses and what have you.
4  But this was accumulated through years.  And
5  of which I took good care of my clothes.
6     Q.  In connection with the Allstate
7  payment on your flood policy, do you know if
8  you signed any papers where it says you are
9  assigning any right you had to sue somebody to
10 them, subrogation papers?  Do you know if you
11 did that or not?
12    A.  I don't think so.
13    Q.  Do you remember that coming up at
14 all in any discussions --
15    A.  No, sir.
16    Q.  -- where they subrogated, meaning
17 since they paid you for some damage, they want
18 to be able to turn around and sue the
19 Defendants in this lawsuit or somebody else
20 that they think might be responsible?
21    A.  I know nothing about that.
22    Q.  Now, you understand that you have
23 been designated in the lawsuit as a named
24 representative or class representative of
25 other members of a class of people.  Do you

---

Page 145

1  have any understanding of what that entails or
2  if that's the case?
3     A.  Well, I have been told that I was.
4     Q.  Do you have any understanding of
5  what your duties are, what all that entails?
6     A.  Well, to my knowledge, I am to share
7  my experiences with Katrina.
8     Q.  Do you know who it is or what the
9  definition is of the people, other people that
10 you're representing in this lawsuit?
11    A.  I think it's persons in the
12 community that suffered the same damages that
13 I have, and my husband.
14    Q.  Do you know what geographical area
15 it encompasses?
16    A.  No.  I think it's New Orleans East.
17    Q.  Do you have any understanding of any
18 costs that you might be responsible for to
19 pay, notice to class members or if you lose
20 the case that there might be costs assessed
21 against you, costs of the lawsuit which might
22 include the cost of depositions and
23 transcripts and some other things?
24    A.  No, but I know I can't afford it.
25 So they could charge me, but I don't have the

---

                                    37 (Pages 142 to 145)

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 146

1   money to give it to them.
2       Q.  Has any money been advanced to you
3   by the lawyers in this lawsuit for any reason?
4       A.  No, sir, not at all.
5       Q.  Did you know any of the lawyers in
6   the lawsuit, the lawyers that are representing
7   you, before you talked to the social workers
8   and called up the Andry firm?
9       A.  I never had heard of Andry or Bruno
10  and Bruno until Katrina.
11      Q.  Let me show you -- I am not going to
12  mark this by number, but I want to show you a
13  Complaint that has your name on it.  You see
14  your name up there at the top?
15      A.  Uh-huh (affirmatively).
16      Q.  And you need to answer out loud.
17      A.  Yes.
18      Q.  Thank you.
19      A.  Yes, sir.
20      Q.  Yes.  Thank you.  And do you know
21  the other two people, Dianne Lindsey and
22  Ronnie Lindsey?
23      A.  No, I don't know them, but where are
24  their names?
25      Q.  Up in the caption of the lawsuit up

Page 147

1   there at the top.
2       A.  Oh.  No, never heard of them.
3       Q.  Look at the very last page of this,
4   32.  And it's signed or it's got the name of
5   Frank Elliot.  Correct?
6       A.  Yes, sir.
7       Q.  And now, that's somebody different
8   than Mr. Bruno or Mr. Andry and I am just
9   wondering, without telling me anything that
10  was said by anybody, how you came into contact
11  or how Mr. Elliot came to represent you.
12      A.  I have no idea.
13      Q.  Around this time, this is dated
14  March 13th, 2007, you see that --
15      A.  Yes, sir.
16      Q.  -- when it was filed?  Were you in
17  consultation with lawyers about filing a
18  lawsuit?
19      A.  I knew when I filled out the Form 95
20  or whatever that lawyers would represent me,
21  but as far as counseling with any of them, I
22  have not.
23      Q.  And I am just trying to understand,
24  here's your name and these -- the two
25  Lindseys, which I think you told me you don't

Page 148

1   know them.  Is that right?
2       A.  That is correct.
3       Q.  And then there's lots of pages of
4   allegations and things, you know, said about
5   who did what in here.  And I am just wondering
6   if you have any knowledge or memory of seeing
7   this or contributing anything to this
8   document.
9       A.  No, sir, but I would assume that
10  since I was -- I am a part of the class
11  lawsuit or what have you, then the attorneys
12  that represented would do this, take care of
13  this for me, because I know nothing about the
14  law.
15      Q.  And this particular document, as I
16  understand it, you don't believe you have seen
17  before?  Is that right?
18      A.  To my knowledge I have never seen
19  it.
20      Q.  And the $350 fee that somebody's got
21  checked there on the front, do you see that on
22  the front page down there at the bottom?
23      A.  Yes, sir.
24      Q.  You didn't pay that; right?
25      A.  No, I haven't.

Page 149

1       Q.  Just backing up to Mr. Elliot, tell
2   me, how do you know him again?  I mean, what's
3   your relationship with Mr. Elliot?
4       A.  Mr. N. Frank Elliot?
5       Q.  Right.
6       A.  Never heard of him or seen him in my
7   life.  But I would assume he's an attorney or
8   somebody representing the lawsuit.
9       Q.  And you haven't been up to Lake
10  Charles to meet with him; right?
11      A.  No, sir.
12      Q.  And as far as you know he hadn't
13  come down to New Orleans to meet with you;
14  right?
15      A.  No.
16      Q.  And you haven't emailed anybody
17  named "felliot" at whatever that is on the
18  last page on the email; right?
19      A.  No, sir.
20      Q.  Did you have --
21      A.  Did --
22      Q.  Yes, I'll take that back actually.
23  Let's just make sure --
24      A.  It's with the items?
25      Q.  Let's be safe.  I'll just put a

---

38  (Pages 146 to 149)

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                          7/10/2007

Page 150

1  sticker on it.
2      MR. EXNICIOS:
3      23, I believe.
4  EXAMINATION BY MR. MARPLE:
5      Q.  And the document we have just been
6  talking about has been marked as Deposition
7  Exhibit 23.  Right?
8      A.  Yes, sir.
9      Q.  And it's got a name on it there sort
10 of in the middle of the page that says "New
11 Orleans East Class Action Complaint for
12 Damages"; right?
13     A.  Yes, sir.
14     Q.  And your name's up there among some
15 others that are named individually on behalf
16 of all other similarly situated.  Right?
17     A.  Yes.
18     Q.  With respect to requests for
19 production of documents, that sort of thing,
20 have you received or have any input into
21 answering questions, interrogatories or
22 producing documents other than the
23 photographs?
24     A.  I talked with Gwen who works for
25 Andry Law Firm and I gave her the best from --

Page 151

1  from my memory information.
2      Q.  And that was things you said as
3  opposed to documents; right?
4      A.  Yes.
5      Q.  You said to her.
6      A.  Yes.  I may have had a copy of the
7  -- the -- a copy of the flood insurance check
8  that I gave her.  But all other was from
9  memory.  To my knowledge.
10     Q.  Let me show you what we have marked
11 as Exhibit 24.  And let me make sure I've got
12 everything there.  This is all one document.
13 Actually, there's two staples there.  And
14 Exhibit 24 is a document called "Notice to
15 videotape deposition"; right?
16     A.  Yes, sir, that's what it says.
17     Q.  And it talks about the deposition of
18 you today at the offices of Bruno and Bruno on
19 Tuesday, July 10, at 9:00, which we
20 are at Bruno and Bruno and you're being
21 deposed and we started at 9:00; right?
22     A.  9:00, a little after 9:00.
23     Q.  What I was wondering is have you
24 seen this document before?
25     A.  I don't recall ever seeing it.

Page 152

1      Q.  In terms of learning about your
2  deposition, I don't want to know who you
3  talked to or what was said, but somebody in
4  one of the law offices communicated with you
5  and told you your dep was supposed to be
6  today, right?
7      A.  Yes, sir.
8      Q.  And you had a meeting a week or two
9  ago in one of the lawyers' offices to talk a
10 little bit about what was going to happen;
11 right?
12     A.  That's correct.
13     Q.  And that's how you knew when to show
14 up here today at the time you did?
15     A.  Yes, sir.
16     Q.  If you look at the second part of
17 that document called Exhibit A, you see that,
18 and it's got a long list of documents, but
19 have you looked at, seen that document before
20 where somebody was asking you this long, 23
21 items of documents to see if you had any of
22 those to produce?
23     A.  I believe that was given to me, a
24 thick thing and fill out what I could fill
25 out, what have you, maybe about a month or six

Page 153

1  weeks ago.
2      Q.  And let's look at some of these.  Do
3  you have any more of these Standard Form 95s,
4  the ones we looked at?  We had two of them on
5  two different dates.  Do you have any more
6  than those, other than the two we talked
7  about?  Like one for Mr. Wade?
8      A.  I know my husband filled out one,
9  but I don't remember bringing it to work to
10 make a copy.  The one that I do have, it has
11 nothing to do with him and I think I brought
12 it to work and made a copy of it before I sent
13 it, and I think that's the one that the Corps
14 of Engineers sent me, most recent one.
15     Q.  That's the one -- We have already
16 talked about that one.
17     A.  Right.
18     Q.  And all documents that refer or
19 relate to insurance claims, number 3 there,
20 you have some of those documents perhaps in
21 the red box or red file; right?
22     A.  Right.  Right.
23     Q.  And you haven't produced those to
24 your lawyers or to us yet; right?
25     A.  No.

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

1    Q.  Go over on the next page.  Number
2  15.  All logs or diaries or other writings.
3  Did you keep any diary or log throughout
4  Katrina as to what was going on or your
5  impressions or anything like that?
6    A.  No, sir.
7    Q.  So I take it you wouldn't have logs,
8  journals or diaries or anything like that --
9    A.  No, sir.
10   Q.  -- that sets forth anything about
11 what was going on during Katrina while it was
12 happening?
13   A.  No.
14   Q.  Now, medical records, you'd have
15 some of those; correct?  You have got medical
16 records for some of your medical conditions,
17 the prescriptions and at least bills from your
18 doctors and whatnot?  Or no?
19   A.  No, because, number one, I am a
20 State employee that pays for the Humana
21 program.  So when I go to my doctor, all I
22 have to do is pay either a $15 or $25
23 co-payment and Ochsner keep the record, but I
24 didn't have -- it wouldn't have anything to do
25 with Katrina.

1    Q.  That's because none of your physical
2  or medical ailments are -- none of those --
3  you're not attributing any of those to
4  Katrina?
5    A.  No, I never did, because they
6  didn't.
7    Q.  And with respect to mental distress
8  or emotional distress, you don't have any
9  medical records related to that because you
10 didn't see a health care provider or
11 psychiatrist other than the social work
12 training you had; right?
13   A.  That's correct.
14   Q.  And I think I asked you this, but
15 you never leased that house on Bundy; you
16 never leased it to anybody, did you?
17   A.  No, sir.
18   Q.  And the only other place that you
19 leased or rented was the apartment up in
20 Destrehan?
21   A.  That's the only one.
22   Q.  Have you ever been a party to a
23 lawsuit other than this one?  You know, where
24 you sued somebody or they sued you?
25   A.  No.  Well, --

1    Q.  Divorce.  I understand that.
2    A.  Divorce and also when my father, not
3  my step-father that died along around the same
4  time of my mother six years ago, but my
5  daughter is 37 and she was about eight.  When
6  my dad died, he left his body and fender shop
7  to my daughter and me.  She was about eight.
8  And someone in the neighborhood claimed that
9  they fell on the property and injured
10 themselves, and I had to hire an attorney to
11 assist me with that because they were trying
12 to sue me.  I would have had to sell my
13 business that my daddy left me, the auto body
14 and fender shop.
15   Q.  One of those slip and lawyer -- slip
16 and fall lawyers got ahold of that claim and
17 sued you?  Is that what it was?
18   A.  No, I didn't say that.  Someone in
19 the --
20   Q.  I was just kidding.
21   A.  Someone in the neighborhood claimed
22 --
23   Q.  Yes, I understand that.
24   A.  -- that they fell one Sunday on my
25 property.

1    Q.  And did that result in a lawsuit
2  where they actually filed something that had,
3  you know, whatever their name was?
4    A.  Well, I'm told -- the attorney said
5  it was a lawsuit, and it cost me quite a bit
6  of money to pay that attorney to prove that
7  the man did not fall on my property.  He fell
8  on the corner, drunk.
9    Q.  And did you have to go to trial and
10 testify in front of a Judge or give a
11 deposition like this or anything?
12   A.  No, I didn't have to do that.  The
13 attorney took care of everything.
14   Q.  All right.  And --
15   A.  And he also got something from the
16 hospital, Charity Hospital where the man went
17 when he got injured or what have you and his
18 statement of what happened.  The attorney took
19 care of everything for me.
20   Q.  And then I think you answered this,
21 but let's just be sure.  Other than like a
22 divorce proceeding or something like that,
23 have you ever sued anybody?
24   A.  No, sir.
25     MR. MARPLE:

3d9b11b1-2cc6-4b32-950e-2d827a0e273e

GLYNN WADE (MRGO)                                      7/10/2007

Page 158

```
1        All right.  I believe that's all
2   the questions I have.
3        MR. SUTTON:
4        I don't have any questions.
5        MS. BOYER:
6        I don't have any.
7        MR. MARPLE:
8        I believe we're finished.
9        VIDEO OPERATOR:
10        This concludes the deposition.
11   The time is 12:49.
12        *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 160

```
1
2
3               REPORTER'S CERTIFICATE
4
5        I, ROGER D. JOHNS, RMR, RDR, CRR,
6   Certified Court Reporter, do hereby certify
7   that the above-named witness, after having
8   been first duly sworn by me to testify to the
9   truth, did testify as hereinabove set forth;
10   that the testimony was reported by me in
11   shorthand and transcribed under my personal
12   direction and supervision, and is a true and
13   correct transcript, to the best of my ability
14   and understanding; that I am not of counsel,
15   not related to counsel or the parties hereto,
16   and not in any way interested in the outcome
17   of this matter.
18
19
20
21               ROGER D. JOHNS
22          CERTIFIED COURT REPORTER
23            STATE OF LOUISIANA
24
25
```

Page 159

```
1
2        WITNESS'S CERTIFICATE
3
4        I, GLYNN WADE, read or have had the
5   preceding testimony read to me, and hereby
6   certify that it is a true and correct
7   transcription of my testimony, with the
8   exception of any attached corrections or
9   changes.
10
11
12        _____
          (Witness' Signature)
13   _____
     DATE SIGNED
14
15   DEPONENT PLEASE INITIAL ONE:
16
     _____ Read with no corrections
17
18   _____ Read and correction sheet attached
19
20
     DATE TAKEN:  July 10, 2007
21
22
23
24
25
```

3d9b11b1-2cc6-4b32-950e-2d827a0e273e