# App. Tab 8

HENRY DAVIS                                      7/11/2007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION

                                 NO. 05-4182
                                 "K" (2)
PERTAINS TO:  MRGO                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,       MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

HENRY EARL DAVIS,

7650 Morel Street, New Orleans, Louisiana

70128, taken in the offices of Bruno & Bruno,

855 Baronne Street, New Orleans, Louisiana

70113, on Wednesday, the 11th day of July,

2007, beginning at 10:34 A.M.

JOHNS, PENDLETON & ASSOCIATES          800 562-1285

Page 2

1  APPEARANCES:
2
3     EXNICIOS LAW FIRM
         (BY:  RICHARD M. EXNICIOS, ESQ.)
4      7916 Nelson Street
       New Orleans, Louisiana  70125
5         ATTORNEYS FOR THE PLAINTIFFS
6
       DUPLASS, ZWAIN, BOURGEOIS, MORTON,
7      PFISTER & WEINSTOCK
         (BY:  NICOLE BOYER, ESQ.)
8      Suite 2900
       3838 North Causeway Boulevard
9      Metairie, Louisiana  70002
          ATTORNEYS FOR THE BOARD OF
10         COMMISSIONERS FOR THE LAKE BORGNE
           BASIN LEVEE DISTRICT
11
12    STONE PIGMAN WALTHER WITTMANN
         (BY:  CARMELITE BERTAUT, ESQ.)
13     546 Carondelet Street
       New Orleans, Louisiana  70130-3588
14
              AND
15
       JONES DAY
16        (BY:  JEROME R. DOAK, ESQ.
               AND
17        JULIA CRONIN, ESQ.)
       2727 North Harwood Street
18     Dallas, Texas  75201-1515
          ATTORNEYS FOR WASHINGTON GROUP
19         INTERNATIONAL, INC.
20
21
22
23
24
25

Page 3

1
       APPEARANCES CONTINUED:
2
3
4     VIDEOTAPED BY:
5        Gilly Delorimier
         Depo-Vue, Inc.
6
7
8     REPORTED BY:
         ROGER D. JOHNS, RMR, CRR, RDR, CSR
9      Certified Court Reporter
       State of Louisiana
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         S T I P U L A T I O N
2
3        It is stipulated and agreed by and between
4   counsel for the parties hereto
5   that the deposition of the aforementioned
6   witness is hereby being taken under the
7   Federal Rules of Civil Procedure, for all
8   purposes, in accordance with law;
9        That the formalities of reading and
10  signing are specifically not waived;
11       That the formalities of certification and
12  filing are specifically waived;
13       That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18
19              * * * *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22  Reporter for the State of Louisiana,
23  officiated in administering the oath to the
24  witness.
25

Page 5

1              I N D E X
2
3                              PAGE
4   Davis Exhibit 1............................ 49
5   Davis Exhibit Number 2.................... 50
6   Davis Exhibits 3, 4, and 5................ 58
7   Exhibit 3................................. 58
8   Exhibit 4................................. 59
9   Exhibit 5................................. 59
10  Exhibit 6................................. 79
11  Davis Exhibit 7........................... 80
12  Davis Exhibit 8........................... 82
13  Davis Exhibit 9........................... 116
14
15
16
17
18
19
20
21
22
23
24
25

HENRY DAVIS                                                    7/11/2007

Page 6

1    VIDEO OPERATOR:
2        This is the videotaped deposition
3    of Henry Davis. This deposition is
4    being held today at 855 Baronne Street
5    in New Orleans, Louisiana, on July the
6    11th, 2007 at approximately 10:34.
7        Would the Court Reporter please
8    now swear in the witness.
9            HENRY EARL DAVIS,
10   7650 Morel Street, New Orleans, Louisiana
11   70128, after having been duly sworn by the
12   before-mentioned court reporter, did testify
13   as follows:
14   EXAMINATION BY MR. DOAK:
15       Q. Mr. Davis, my name is Jerry Doak. I
16   represent defendant Washington Group in this
17   litigation. I'll be taking your deposition
18   today.
19       A. Okay.
20       Q. How are you?
21       A. I'm fine.
22       Q. Let's begin with have you been
23   deposed before, been in a deposition?
24       A. Yes.
25       Q. And what was that occasion and

Page 7

1    when?
2        A. I've had several. I used to be a
3    streetcar operator.
4        Q. Yes.
5        A. And whenever you have an accident,
6    you eventually have got to do a deposition.
7        Q. Yes.
8        A. So I don't really remember the
9    dates. It's been a few years ago.
10       Q. Okay. There were several of those
11   occasions, though, where you gave a deposition
12   --
13       A. Yes.
14       Q. -- in that capacity?
15       A. Yes.
16       Q. More than five or less than five?
17       A. More than five what?
18       Q. Depositions.
19       A. I don't really remember exactly how
20   many. It could have been more, it could have
21   been a little bit less.
22       Q. Okay. Other than those depositions
23   connected with your job as a streetcar
24   operator, have you ever given a deposition for
25   a different kind of case?

Page 8

1        A. No. No.
2        Q. Okay. Well, you know pretty much
3    the routine of this, but I'll just reinforce a
4    couple of points. When I ask a question,
5    please let me finish so that the Court
6    Reporter can keep up with us. We can't talk
7    over each other.
8        A. Okay.
9        Q. And I will try to do the same for
10   you. Also, if you don't understand my
11   question at any time, just let me know and I
12   will try to rephrase it so that you do
13   understand.
14       A. Okay.
15       Q. And finally, if you need a break,
16   use the restroom or just ready for a break,
17   let me know and we'll take a break at your
18   convenience.
19       A. Okay.
20       Q. What have you done to prepare for
21   this deposition?
22       A. Went and explained to me what a
23   deposition is all about. That's about it.
24       Q. You met with your attorney?
25       A. Yes.

Page 9

1        Q. Okay. And have you ever met with
2    anyone other than your attorneys to prepare
3    for this deposition?
4        A. No more than the ones I told you
5    about earlier. The ones job-related. That's
6    it.
7        Q. Okay. And have you reviewed any
8    documents or other materials to prepare for
9    this deposition?
10       A. No, none whatsoever.
11       Q. Other than the lawsuits that you
12   referred to before about accidents that you
13   may have been around as a train operator, have
14   you ever been involved in any other lawsuits?
15       A. Yeah, I have been involved in
16   lawsuits. Nothing to this magnitude I don't
17   believe.
18       Q. Right. Would you tell us about
19   those other lawsuits that you have been
20   involved in?
21       A. Once I was driving a friend's car
22   and somebody opened their door into traffic.
23       Q. Yes.
24       A. And I got in a lawsuit with that.
25       Q. Okay. And were you a witness or

3 (Pages 6 to 9)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                         7/11/2007

Page 10

1   were you one of the parties in that lawsuit?
2       A.  I was one of the parties.  I was
3   driving his car.
4       Q.  All right.  And what was the result
5   of the lawsuit?
6       A.  That was years ago.  I don't really
7   remember what came out.  All I know is the
8   other guy was at fault.
9       Q.  Okay.  Tell me about the next
10  lawsuit that you have been involved in that
11  you can recall.
12      A.  I think I was in one where somebody
13  had stole somebody's car and ran into the back
14  of me at Chef and Downman.  All I did then was
15  just to get my car fixed, --
16      Q.  All right.
17      A.  -- you know.
18      Q.  Can you remember any other lawsuits
19  you have been involved in?
20      A.  Not right offhand, no.
21      Q.  Other than those two lawsuits and
22  the lawsuits that you were involved in because
23  of your job as a train operator, have you ever
24  been a witness in any other context?
25      A.  No.

Page 11

1       Q.  Have you ever been in a proposed
2   class action?
3       A.  No.
4       Q.  Have you ever been sued yourself?
5       A.  No.
6       Q.  In the materials I have reviewed, I
7   believe that you were in bankruptcy from 1992
8   to 1995?
9       A.  Yes, sir.  Is that Chapter 11?
10      Q.  I'm not sure.
11      A.  That's what it was.
12      Q.  Do you recall any other times you
13  have declared bankruptcy?
14      A.  No, that's the only time.
15      Q.  And --
16      A.  Now wait.  I got a question,
17  though.  Chapter 11 is when you pay the whole
18  bill yourself and bankruptcy is when you don't
19  pay it; right?
20      Q.  I think they're both bankruptcy
21  proceedings.
22      A.  Okay.
23      Q.  Is there a different kind of
24  bankruptcy that you think you might have been
25  involved in besides the one from 199- --

Page 12

1       A.  No, that's the only one.
2       Q.  Okay.  Have you ever been involved
3   in any kind of criminal proceeding?
4       A.  No.
5       Q.  For the record, please, if you'd
6   state your date of birth.
7       A.  11/6/52.
8       Q.  All right.  And where were you born?
9       A.  Prentiss, Mississippi.
10      Q.  And when did you first come to New
11  Orleans?
12      A.  I came here to live in 1971.
13      Q.  And have you lived here continuously
14  since 1971?
15      A.  Up until the storm.
16      Q.  I'm sorry?
17      A.  Up until the storm and I had to
18  leave then.
19      Q.  All right.  We'll get to that in a
20  minute.  You are currently married to Yolonda
21  Ransom Davis?
22      A.  Yes.
23      Q.  And when did you marry her?
24      A.  That was February 28th -- I don't
25  remember the exact date.

Page 13

1       Q.  Do you remember the year?
2       A.  That's the part I don't remember.  I
3   remember the date, but not the year.
4       Q.  Give me an approximation.  Was it a
5   couple of years ago, five years ago, ten years
6   ago?
7       A.  Maybe -- Maybe -- Maybe sixteen
8   years ago, something like that.
9       Q.  All right.  Have you ever been
10  married except --
11      A.  Yes.
12      Q.  And tell me about the other
13  marriages, when they were.
14      A.  I was married to Loretta Blunt
15  Davis.  I got married in 1971.  We separated
16  in '75.  And then we got a divorce in probably
17  '89 or something like that.
18      Q.  All right.
19      A.  I'm just guessing at that date, too.
20      Q.  Was this Loretta Davis related to
21  Yolonda Davis?
22      A.  No.
23      Q.  Okay.  And have you been married to
24  anyone else?
25      A.  No.

4 (Pages 10 to 13)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                        7/11/2007

---

**Page 14**

1    Q.   And how many children do you have?
2    A.   I got two biological kids.
3    Q.   And their names are?
4    A.   Latonia and Keoka.
5    Q.   Can you spell the second name,
6    please?
7    A.   K E O K A.  She's the oldest.  I
8    just said them in reverse order.
9    Q.   And how old is she?
10   A.   29.
11   Q.   And Latonia is how old?
12   A.   Latonia is eighteen.
13   Q.   And you said those are your two
14   biological children.
15   A.   Right.  And I also raised up Simeon
16   Ransom Kelly and Kedrick Ranelle Bias.
17   Kedrick Bias, B I A S.
18   Q.   How old are they?
19   A.   Kedrick is 32 and Simeon is -- She
20   was born in '81, so, 2001 is 20 years.  26,
21   Simeon is.
22   Q.   Were any of these children living
23   with you immediately before Hurricane
24   Katrina?
25   A.   Latonia was.

---

**Page 15**

1    Q.   And is she still living with you?
2    A.   No, she just recently moved to Baton
3    Rouge.
4    Q.   And approximately when was that?
5    How recent?
6    A.   Three weeks ago.
7    Q.   And do you have any other people who
8    are currently dependent on you?
9    A.   No.
10   Q.   And what is your current address?
11   Is that 7650 Morel Street?
12   A.   Yes, it is.
13   Q.   And how long have you been at that
14   address?
15   A.   Since December the 15th, 1986.
16   Q.   And what is your educational
17   background?
18   A.   I graduated from high school.
19   Q.   Any other specialized training?
20   A.   No more than training for my job at
21   RTA.
22   Q.   And tell me about your job at RTA.
23   I understand that you're retired, but I don't
24   know anything else.
25   A.   Well, I started there as a streetcar

---

**Page 16**

1    driver.  I ended up as an instructor, training
2    people to drive buses and streetcars.
3    Q.   And when did you begin as a
4    streetcar driver for RTA?
5    A.   January the 17th, 1977.
6    Q.   And when did you retire?
7    A.   August 1st, last year.
8    Q.   2006?
9    A.   Yes.
10   Q.   Do you receive retirement benefits
11   from them?
12   A.   Yes.
13   Q.   And do you have any other employment
14   now in your retirement years?
15   A.   No.
16   Q.   You're fully retired since August of
17   last year?
18   A.   Yes.
19   Q.   Tell me about your experience with
20   past hurricanes, not Hurricane Katrina, but
21   past hurricanes at your house on Morel
22   Street.
23   A.   When -- Now when I know one is
24   coming, I leave town.  My wife was in Betsy as
25   a kid and she is terrified of storms.  So if

---

**Page 17**

1    there's a chance we get it, I'm out of here.
2    Q.   In the prior hurricanes, though, was
3    there damage to your house in any of them?
4    A.   One a few years back.  I don't
5    remember the name of it.  We had a little wind
6    damage.
7    Q.   Okay.
8    A.   And that's about it.
9    Q.   Approximately what was the dollar
10   value of that wind damage?
11   A.   I think about $6,000 or something
12   like that.
13   Q.   All right.
14   A.   Had a roof and my shed and stuff
15   like that messed up.  That's about it.
16   Q.   Blown off and covered by your
17   homeowner's insurance?
18   A.   Yes.  Yes.
19   Q.   You used that money to fix the
20   house?
21   A.   That's correct.
22   Q.   On any of the other past hurricanes,
23   was your house ever damaged?
24   A.   No.  We'd leave and be back in two
25   days.

---

JOHNS, PENDLETON & ASSOCIATES                        800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                      7/11/2007

---

Page 18

1    Q.  Did you ever have water standing in
2  the street as a result of those other --
3    A.  Never.
4    Q.  Water standing in your yard?
5    A.  Never.
6    Q.  So before Hurricane Katrina you
7  believe that your neighborhood was pretty well
8  located and situated as far as risk for
9  hurricane damage?
10    A.  As far as drainage and stuff, yes, I
11  do.  I believe it was.
12    Q.  The hurricane that you had the wind
13  damage in, would that have been Hurricane Ivan
14  in 2004?  Or Hurricane Georges in 1998?
15    A.  Could have been George, I think.
16  I'm not sure which one it was.
17    Q.  Okay.  In the 20 years that you've
18  lived at this house on Morel, other than
19  Hurricane Katrina, you just had this one
20  incident, don't remember which hurricane it
21  was, and the damage there was limited to wind
22  damage, approximately $6,000 that you were
23  paid by your homeowner's insurance?  Is that
24  correct?
25    A.  That's correct.

---

Page 19

1    Q.  All right.  And would you describe
2  the location of your house just for the record
3  geographically?  You're pretty near the Lake
4  Pontchartrain, aren't you?
5    A.  Yes.  I'm pretty near -- You know
6  where Jazzland is?
7    Q.  I'm from out of town, but I have
8  looked at a map so I know where you are on the
9  map.
10    A.  Okay.  Well, I'll describe it if
11  you're not from here.  Because all I can do is
12  tell you places that's around it.
13    Q.  Sure.  Go ahead.
14    A.  Okay.  Jazzland on one side, Haynes
15  and Morrison intersect.  Haynes -- I'm on
16  Morel between Morrison and, what's that
17  street, Curran.  Morrison and Curran.
18    Q.  To the north of your house up at
19  Lake Pontchartrain there is a levee wall up
20  there, isn't there?
21    A.  Yes, there is.
22    Q.  Approximately how far is that?
23    A.  From my house?  On Haynes, maybe
24  about half a mile.
25    Q.  Half a mile?  We're going to spend

---

Page 20

1  the rest of the day going through details, --
2    A.  We are?  Well, we better take breaks
3  and put money in that parking meter.
4    Q.  Let us know when you need a break.
5    A.  Okay.
6    Q.  But just give me a brief overview so
7  that I have a little bit of an idea about
8  where were you before; during, I understand
9  you evacuated, after, but could you just give
10  me a brief description so I kind of have an
11  understanding of what we're going to be
12  talking about for the rest of the day.
13    A.  Okay.  The Saturday before the storm
14  I left going to Mississippi.  That Monday, I
15  am looking at television and I see water all
16  over Jazzland so I know I am real close to
17  Jazzland.  At that point I know I am probably
18  under water, too.  Now, I wasn't sure, but
19  then when I tried to come back, I couldn't get
20  in, so then I was sure.
21    Q.  When did you try to come back?
22    A.  I tried to come back I think that
23  Friday after that Monday.
24    Q.  And Monday was the Hurricane
25  Katrina?

---

Page 21

1    A.  No, Monday was the day of the -- I
2  think Katrina was Sunday.  I think.  Was it?
3  I think.
4    Q.  I am not sure now.  Whichever day it
5  was, Friday of that week --
6    A.  Yeah, whatever day --
7    Q.  -- was when you tried to come back?
8    A.  After the storm on Friday I tried to
9  come back.
10    Q.  All right.  And you say at that time
11  you were blocked by the police, you couldn't
12  get in?
13    A.  Yeah, I couldn't get in.
14    Q.  All right.  So you went back to
15  Mississippi?
16    A.  I went back to Mississippi.
17    Q.  And when was the second time that
18  you returned to New Orleans?
19    A.  It was a couple of months later.
20  Because after that I went to Baton Rouge.  My
21  job called me to go to Baton Rouge to work.
22  And I got off there and I don't know if there
23  was -- it was still kind of blocked off, but
24  nobody was there so I just came and looked.
25  Man, looked like a bomb had hit the place.  I

---

                                6  (Pages 18 to 21)

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                                      7/11/2007

Page 22

1  didn't think I'd be able to get back.
2      Q.  Tell me a little bit more
3  specifically about how your house on Morel
4  looked.
5      A.  All the furniture was in the same
6  spot.  It just had mold coming up the wall.
7  The floors and stuff was still wet --
8      Q.  Yes.
9      A.  -- from the carpet.  A smell out of
10 this world.  It just was horrible looking.
11     Q.  But no standing water?
12     A.  No, the water had gone down, but I
13 still had it in the rugs and stuff on the
14 floor.
15     Q.  Sure.  It was still wet there?
16     A.  Uh-huh (affirmatively).
17     Q.  All right.
18     A.  And the closets, I don't know, it
19 was black stuff all over the place
20 everywhere.
21     Q.  This is a one story house?
22     A.  Okay.
23     Q.  Was there any damage to your roof?
24     A.  Some wind damage, yeah.  I had --
25 Well, where my daughter's room is, there's

Page 23

1  some kind of vent pipe that comes out.  The
2  top, it had a plastic boot thing over it.
3  That had split, water poured in; all the
4  ceiling and everything fell down.
5      Q.  Okay.
6      A.  So that room was messed up the
7  worst, my daughter's room.
8      Q.  Did any other ceilings fall in?
9      A.  No.  That's the only ceiling.
10     Q.  No other roof damage you recall?
11     A.  Well, they had -- yeah, I had
12 shingles blown off all around, but I was able
13 to get it patched back up.
14     Q.  And all of this was about two months
15 later, so you're thinking October or so?
16     A.  Somewhere in that neighborhood,
17 yeah.
18     Q.  Maybe November?
19     A.  Could be.
20     Q.  When did you actually come back to
21 New Orleans to begin repairing the house or
22 occupying it?
23     A.  After they let everybody back in, I
24 had somebody come and gut the house, take all
25 the furniture out.  I don't remember the exact

Page 24

1  date for that.  They treated the stuff for
2  mold and all of that.  And it was in July of
3  '06 that I started putting it back together.
4  The last two weeks of July I think it was.
5      Q.  And when were you able to move back
6  into the house?
7      A.  I think it was in December.
8      Q.  Okay.  As I said, we're going to
9  come back and talk about all of that.  I just
10 wanted to get a little bit of a preview.
11         Do you know what a Form 95 is?
12     A.  No.
13     Q.  You signed a written authorization
14 to allow your attorney to file a form with --
15     A.  Okay.
16     Q.  -- the government to make your claim
17 against the Corps of Engineers.
18     A.  Okay.
19     Q.  And that was -- the government's got
20 a number for everything, and that piece of
21 paper is called a Form 95.
22     A.  Okay.
23     Q.  You know that your attorney filed
24 that Form 95 on your behalf?
25     A.  Yes.

Page 25

1      Q.  And have you seen a copy of that?
2      A.  Yes.
3      Q.  All right.  I want to begin by
4  understanding the injuries that you're
5  claiming in this lawsuit.  I have had produced
6  by your attorneys, of course, that Form 95 and
7  it has three types of injuries, damages that I
8  understand.  The first is your house being
9  severely damaged, and that's one type.  I
10 understand that.  Second was your personal
11 possessions; lawyers call it personal
12 property.
13     A.  Uh-huh (affirmatively).
14     Q.  Your furniture and clothes and car
15 and boat, all of that stuff other than your
16 house and land.
17     A.  Okay.
18     Q.  So that's the second kind of damage
19 you're seeking in the lawsuit.
20     A.  Okay.
21     Q.  And third was severe mental
22 distress.  Do I understand that those are the
23 only three types of damages, types of relief
24 you're seeking in this lawsuit?
25     A.  Yes.

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

## Page 26

1    Q.  Is that correct?
2    A.  That's correct.
3    Q.  Not seeking any other relief,
4  damages or injuries in this lawsuit?
5    A.  No.
6    Q.  And again, I am going to come back
7  and talk about the circumstances of each of
8  those types of damages in detail in a minute,
9  but I would like to go through those three
10  types just to make sure I understand the
11  particular damage first.
12    A.  Okay.
13    Q.  Beginning with your house -- And
14  again, this is the house at 7650 Morel that
15  was damaged in the storm; right?
16    A.  Yeah.  Yes.
17    Q.  The house you lived at for 20 years?
18    A.  Yes.
19    Q.  Would you give me a kind of before
20  and after description of the house?  One
21  bedroom -- I mean one level house, you said?
22    A.  Yes.
23    Q.  I have seen a picture of brick
24  walls.
25    A.  Uh-huh (affirmatively).

## Page 27

1    Q.  About how many square feet?
2    A.  That, I don't really remember
3  exactly, --
4    Q.  Okay.
5    A.  -- the square footage.  It's got
6  three bedrooms, a living room, kitchen, and
7  two baths.
8    Q.  All right.
9    A.  It was in really great shape before
10  the storm because I had did some work to it.
11    Q.  Yes.
12    A.  And it was, to me, it was just in
13  great shape.  It's back in that order now, but
14  in the time in between, I didn't think I'd
15  ever be able to get back in there when I first
16  saw it.
17    Q.  Do you have any pictures of the
18  house before and after?
19    A.  No, I had some of the storm, but I
20  think I gave them to Road Home.  I don't know
21  what I did with them after that or something.
22  I don't know if I got them back or not.
23    Q.  So you think you might have given
24  that with your application for the Road Home
25  Program?

## Page 28

1    A.  Right.  Not -- Not Road Home.  The
2  other one.
3    Q.  The Form 95 that we talked about?
4    A.  No.
5    Q.  Your insurance?
6    A.  No.
7    Q.  We'll talk about those --
8    A.  Yeah, I'll think about what it is in
9  a minute.
10    Q.  We'll talk about those in a while
11  and maybe it'll come back then.  So that was
12  the damage to your home that you considered to
13  be pretty major damage.
14    A.  Right.
15    Q.  Okay.  Let's move to your second
16  kind of injury for your personal property.  Of
17  all of the possessions that you had in the
18  home, were all of them destroyed, some of them
19  destroyed?  Tell me about how much damage you
20  suffered there.
21    A.  Once I came in and saw it, I hired
22  somebody else just to -- It looked like it was
23  damaged to me.  Everything, you know, like it
24  was.
25    Q.  Were all of your clothes damaged?

## Page 29

1    A.  Oh, yeah.  They had mold all over,
2  up the wall and -- I don't think you could do
3  anything with that.
4    Q.  All right.  And your furniture?
5    A.  Yeah.  Everything that was on the
6  floor got wet.
7    Q.  So it had soaked up the water and
8  had mold on it?
9    A.  Uh-huh (affirmatively).
10    Q.  All right.  What about --
11    A.  The computer and stuff that -- one
12  part sits right on the floor, so I know that
13  was gone.  The same thing with the surround
14  sound to the TV, it sits on the floor.  A part
15  of it.  So I didn't check the part that was
16  up, but just the whole thing.
17    Q.  Did you submit an insurance claim on
18  any of these items?
19    A.  Yes.
20    Q.  Was it your homeowner's insurance or
21  flood insurance or both?
22    A.  Flood.  Homeowner's didn't pay a
23  dime.
24    Q.  All right.  Did you prepare as part
25  of that insurance claim a list of these items

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                7/11/2007

---

Page 30

1   of your personal property?
2       A.  Yes.
3       Q.  Okay.  We're going to talk about
4   that in some detail in a while.
5           Were there some items of your
6   personal possessions, though, that were
7   saved?  Maybe jewelry that your wife had or
8   maybe you had silverware, something of
9   particular value that would have been --
10      A.  No more --
11      Q.  -- up on a shelf and not been
12  damaged?
13      A.  No more than the stuff we left
14  with.  We left with a couple of watches and
15  some rings.  But the other stuff, once I got
16  back, I just told them, you know, -- Somebody
17  else went in before me.  So if anything was
18  salvageable, I didn't know anything about it.
19  I hired somebody to clean the house up.
20      Q.  Well, when you came back and you
21  looked at the house and you saw the mold
22  damage and the floors still wet and --
23      A.  Dark in that house.  No power.  We
24  looking with a flashlight.
25      Q.  At that point, though, before you

---

Page 31

1   hired someone to just take everything to the
2   outside, did you make the judgment that
3   everything inside had been ruined or not?
4       A.  It looked ruined to me.
5       Q.  Okay.  So, I mean, you didn't just
6   look around for five minutes and then say, "I
7   don't know if it's there or not, just take --
8   you know, just give it all away"?  You thought
9   it was ruined?
10      A.  I came in, they had a horrible
11  smell.
12      Q.  Yes.
13      A.  Carpet was squishing all over the
14  place.
15      Q.  Yes.
16      A.  No lights.  I am looking with a
17  flashlight.  I don't know how well I could be
18  in there a long period of time.  I looked to
19  the best of my ability, I get the heck out of
20  there.  I didn't see anything in that house
21  that I still wanted.
22      Q.  How long do you imagine you were in
23  the house doing that inspection?
24      A.  Maybe 20 minutes.
25      Q.  All right.  And at that time you

---

Page 32

1   left that address and just turned it over to
2   someone else?
3       A.  Right.
4       Q.  And --
5       A.  My daughter was still living here.
6   What I did is I gave her a key, I told her I'm
7   going to have somebody come out there to do
8   it, just come out and open the door when they
9   come in, which she came out and opened the
10  door and let them in.
11      Q.  Okay.  And who was that person that
12  you hired to do that?
13      A.  His name was Kedrick something.  I
14  saw a sign that he do that and I just hired
15  him.  Kedrick.  I don't know what his last
16  name was.  His name, his first name was
17  Kedrick, I know that.
18      Q.  Okay.  We're going to come back and
19  talk more about the detail and everything.
20  But that gives me an idea about the inside.
21          What about your property outside?
22  You have two automobiles, I believe, a --
23      A.  Yes.
24      Q.  A Tahoe and a Ford truck?
25      A.  That's what I have now.

---

Page 33

1       Q.  Okay.
2       A.  Before I got the Tahoe I had the
3   Ford truck and a -- and a -- what was that.  A
4   '97 Lumina.
5       Q.  All right.
6       A.  But when we left, we left the Lumina
7   there.
8       Q.  All right.
9       A.  It got totaled.  But they only gave
10  me I think $2,000 for it.  I thought that was
11  a rip-off.  It was in great shape.
12      Q.  I'll come back to the details of
13  that claim in a little while.  But you had
14  this car that had been left, and it was
15  totaled?
16      A.  Right.
17      Q.  And you resolved that by insurance
18  later?
19      A.  Right.
20      Q.  All right.  What about your -- Do
21  you have a boat trailer, or boat, or both?
22      A.  Both.
23      Q.  All right.  Were they left there
24  during Hurricane Katrina?
25      A.  Yes.

---

9 (Pages 30 to 33)

576dd205-a98e-429e-ae40-13d8f1ea7bee

Page 34

1      Q.   And what was their state when you
2   returned to your house?
3      A.   The boat was in good shape because
4   my neighbor across the street didn't leave.
5   He came over and put the plug in the boat.  So
6   the boat kind of floated and damaged the patio
7   poles and stuff just moving back and forth on
8   the trailer.
9      Q.   Okay.  Can you think of any other
10  high dollar items of personal property?
11     A.   That was lost.  My shed.  My shed
12  looked like a bomb hit it.  And homeowner's
13  was supposed to pay for that.  They didn't.  I
14  had the fence just destroyed all the way
15  around.  Homeowner's didn't pay nothing for
16  that either.  The roof damage, homeowner's
17  didn't pay a dime.  So all of that stuff I had
18  to fix myself out of my own pocket.
19     Q.   Let's go back and talk about those.
20  Tell me about your shed.  Where was it?
21     A.   It was in the same location as the
22  new shed I got now.  It just was --
23     Q.   Is this in the backyard?
24     A.   In the backyard, yes.
25     Q.   All right.  And how large was it?

Page 35

1      A.   This one is an 18 by 12.  That one
2   might have been 14 by 12.
3      Q.   Now, was this a structure you had
4   built or is it one of those metal sheds that
5   you buy at Sears or some place and kind of
6   construct it?
7      A.   No, it was a -- it was a built
8   shed.  Tin.  It was built out of tin.  I had a
9   guy come build it in the backyard.
10     Q.   All right.  What year was it built?
11     A.   That must have been built in about
12  '95 maybe.
13     Q.   And what kind of condition was it in
14  before Hurricane Katrina?
15     A.   It was in good shape before the
16  storm.
17     Q.   Okay.  And when you came a couple of
18  months after Hurricane Katrina, what condition
19  was it in?
20     A.   There was really nothing left but
21  the floor structure.  I don't know where all
22  the tin around it was -- it must have just
23  blew away.  I don't know what happened to it.
24  Had a little bit of it in the yard, but some
25  of it was gone.

Page 36

1      Q.   Had it been hit by other debris in
2   the storm?  Why would it be gone?
3      A.   Maybe the wind blew it away.  I
4   don't know.  I don't know what happened to it.
5      Q.   Okay.
6      A.   I know it wasn't there.  But with
7   the fence missing, too, it could have been
8   anywhere.  I don't know.  The grass was high
9   all over the place.
10     Q.   Tell me about the fence.  The fence
11  around the yard.
12     A.   It was all gone.  It was just --
13  poles bent.
14     Q.   Chain link fence?
15     A.   It was a wooden fence.
16     Q.   A wooden fence?
17     A.   Uh-huh (affirmatively).
18     Q.   How high?
19     A.   Six foot.
20     Q.   How constructed?
21     A.   It was metal poles and two by fours
22  going across.  All of that was wiped out.
23     Q.   And what do you think on that?  It
24  had to be wind?
25     A.   That's what I say.  Homeowner's said

Page 37

1   it wasn't.
2      Q.   But you said it was?
3      A.   Yeah, I said it was.
4      Q.   And your roof you said was --
5      A.   Shingles missing.
6      Q.   Tell me about the roof.  You said
7   there were some missing shingles before.
8      A.   Yes.
9      Q.   And you said that the seal around
10  the pipe --
11     A.   Pipe.
12     Q.   -- that came down to your daughter's
13  bedroom --
14     A.   It was all split.
15     Q.   Split?
16     A.   And water came in through that I'm
17  sure.
18     Q.   Okay.  Were there any other items?
19  I mean, I am going the call those two, the
20  shingles missing and the pipe that came down.
21  Was there any other damage to your roof?
22     A.   No, I got some gutters that leaked
23  that I don't think was leaking before.  I
24  can't figure out what could have caused it.
25  Maybe wind.  I don't know.

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 38

1    Q.  Okay.  Anything else that comes to
2  mind just talking about the particular
3  injuries to the house or your personal
4  possessions that we haven't covered
5  generally?
6    A.  That's about it.  I don't know.
7    Q.  Let's talk about the third type of
8  injury that you're alleging, your severe
9  mental distress.  Tell me a little bit about
10 that.
11   A.  Tell you a little bit about me first
12 and then I'll get to that.
13   Q.  All right.
14   A.  I've been taking care of me since I
15 was 18 years old.  I never thought that I
16 would be homeless also.  When I came back that
17 Monday, I realized I was really homeless.  I
18 ended up staying with some people that didn't
19 want me there at their house.  And that's
20 really stressful when somebody wants you out
21 of their house and you can't find anywhere to
22 go.  That's super stressful.  I endured that
23 part for about a month and a half before I
24 could find anything, and I found a dump.  I
25 hurried up and moved into a dump.  When you

Page 39

1  walk on the floor, it felt like you were going
2  to fall through, and I am in an upstairs
3  apartment.  That was the best I could find at
4  that time.  So that's what I mean by that.
5    Q.  Okay.  Let's start with the living
6  with people.  This is when you first evacuated
7  New Orleans --
8    A.  No.
9    Q.  -- and went to Mississippi?
10   A.  No.  When I left Mississippi and
11 came to Baton Rouge due to my job, I was
12 living with my wife's cousin --
13   Q.  Yes.
14   A.  -- who already had seven or eight
15 other people living in his house, and it's a
16 small house.  It was horrible, man.
17   Q.  So this was when you first went to
18 Baton Rouge?
19   A.  When I went to Baton Rouge.
20   Q.  And that was about one and a half
21 months?
22   A.  Before I could find an apartment.
23   Q.  Okay.  And at that time it was your
24 wife and your daughter, youngest daughter
25 living with you still?

Page 40

1    A.  Yeah.
2    Q.  All right.
3    A.  Well, what happened, that's -- my
4  youngest daughter stayed in Mississippi when I
5  left, because I thought I was only going to be
6  gone three or four days.  They had something
7  starting up in Baton Rouge for three or four
8  days, and that's what I told the gals, I was
9  going to be there for three or four days.  But
10 after I got to Baton Rouge, they wanted to
11 start up the whole nine yards and I really
12 didn't have anywhere to go, but I needed my
13 job so I had to do what I had to do.
14   Q.  So you had to stay with your wife's
15 cousin, and that was not a happy month and a
16 half?
17   A.  No.  No.
18   Q.  Okay.  And as a result of that month
19 and a half experience you suffered mental
20 distress?
21   A.  Man, just being homeless is enough
22 to do that.  But being with somebody else who
23 don't want you there, that was hard for me.
24   Q.  Now, the second part that you
25 identified was that you finally found a place

Page 41

1  that you could move your family, --
2    A.  Right.
3    Q.  -- but it was a dump?
4    A.  That was a dump.
5    Q.  Tell me about that.  That's still in
6  Baton Rouge?
7    A.  It's still in Baton Rouge.
8    Q.  Okay.
9    A.  At the front door, it felt like the
10 floor was loose.  When you step, it feel like
11 you about to go through.  The rooms was real,
12 real tiny.  You didn't have enough room really
13 to move around.  And the floors was all uneven
14 all over the place.  I think the rent was 400
15 a month or something like that.  But it just
16 wasn't a very nice place to be in.
17   Q.  So this was a small apartment that
18 was just a dump?
19   A.  Yes, it just was a dump.
20   Q.  How long did you live in this dump?
21   A.  About two months.  And then FEMA
22 gave me a trailer.  It was another little
23 hardship, but I made the best of that.
24   Q.  Okay.  So the FEMA trailer was
25 somewhat of a hardship, but nothing compared

JOHNS, PENDLETON & ASSOCIATES                   800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 42

1   to living with the relatives for a month and a
2   half?
3       A.  And the dump.  It was better than
4   that.
5       Q.  And the dump.  Okay.
6       A.  It just was real tiny.  It was
7   small.
8       Q.  Okay.  Was there any other aspect of
9   your mental distress between those three
10  items, living with your relatives, the dump,
11  and the FEMA trailer?
12      A.  That's about it.
13      Q.  Okay.  And how long were you in the
14  FEMA trailer?
15      A.  I don't know exactly what month I
16  went into it.
17      Q.  Was that still in Baton Rouge?
18      A.  It was still in Baton Rouge.
19      Q.  Okay.
20      A.  It was still in Baton Rouge until
21  they got me a trailer here in New Orleans.
22  Well, I waited until I retired to come to the
23  one here in New Orleans to start to work on my
24  house.  I just didn't work here in New Orleans
25  about maybe four -- four months.  I came in

Page 43

1   August.  September, October, November.  About
2   three months.  Because I moved in by
3   December.
4       Q.  Okay.  Any other aspects to your
5   mental distress that you haven't told me
6   about?
7       A.  Not that I could think of right now.
8       Q.  Okay.  Again, preview question, but
9   I want to get a list of the places that you
10  made claims for assistance.  I believe that
11  you mentioned that you had home insurance.
12  Did you make a claim against the home
13  insurance?
14      A.  Uh-huh (affirmatively).  What they
15  did is when I was in Baton Rouge, they gave me
16  $1,500.  Like a living expense.  I thought it
17  was.
18      Q.  Yes.
19      A.  In the end, they told me that they
20  gave me the $1,500 and that was an
21  overpayment.  That's the worst thing I ever
22  heard of, you know.
23      Q.  Okay.  We're going to go through
24  this again.  But the flood insurance, though,
25  you did receive?

Page 44

1       A.  Yes.
2       Q.  And how much of a policy for flood
3   insurance did you have?
4       A.  They gave -- I don't -- I think they
5   gave me --
6       Q.  Do you know what your policy limit
7   was?
8       A.  I don't -- I don't remember right
9   now.
10      Q.  You know what I mean, the maximum
11  amount?
12      A.  I know.  I think I got pretty much
13  the maximum amount, though.
14      Q.  Okay.
15      A.  I think I did.
16      Q.  And what about was that
17  approximately?
18      A.  Well, they gave me my -- they paid
19  me for my contents and they gave me -- I think
20  they gave me 33,000 for the contents, I
21  think.
22      Q.  Okay.  And what did they pay you for
23  the house?
24      A.  I don't -- I don't know the exact
25  figure.

Page 45

1       Q.  Okay.  And I know that you reached
2   an agreement with the Road Home Program.
3       A.  Yes.
4       Q.  And how much did they pay you?
5       A.  They gave me 52,000.
6       Q.  Okay.  And were there any other
7   Federal, state, local, charities, anything,
8   any other programs that gave you --
9       A.  FEMA gave me 2,000 and then they
10  gave me -- I don't know if it was $2,200 or
11  $2,400.  I don't remember the other one.
12  Somewhere in that field.
13      Q.  Okay.
14      A.  And LRA.  That's -- That's -- I got
15  a loan from them on my house.
16      Q.  What's the name again?
17      A.  Ain't that -- I think it's LRA.
18      Q.  LRE?
19      A.  LRA.
20      Q.  A?  And what was the loan amount?
21      A.  $10,000.
22      Q.  And that was for any purpose or to
23  use --
24      A.  For repairing stuff around -- You
25  know, I told you the homeowner's didn't give

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 46

1   me anything. I had to get my shed and stuff
2   put back. So I used the money for that.
3       Q.  Okay. I'm about to move on to
4   another area, but before I do, I want to
5   confirm that we have talked about all of your
6   injuries and damages and things. I just want
7   to make sure that you're not seeking any other
8   relief. You know, I have to get an exhaustive
9   list of everything you're claiming in the
10  lawsuit, all of which we're going to go
11  through again, but we're going to talk about
12  losing your house, number 1; number 2, losing
13  your personal possessions; and number 3, the
14  mental distress that you suffered as a result
15  of Hurricane Katrina. Are you seeking any
16  other relief in this lawsuit other than for
17  those three categories?
18      A.  No.
19      Q.  Okay. And I also want to confirm
20  with your Counsel.
21      MR. DOAK:
22          As we did in the prior
23      deposition, as you know, when the
24      deponent was noticed, attached to the
25      depo notice was Exhibit A with a list

Page 47

1   of document requests, and Defendants
2   agreed you didn't need to move for a
3   protective order on that. You
4   informed us that you were making the
5   same objections which are the current
6   subject of discovery motions that are
7   pending. But just to confirm with
8   you, based upon that agreement and
9   your current position, you're not
10  producing any documents in response to
11  that Exhibit A today, are you?
12      MR. EXNICIOS:
13          No, no documents are being
14      produced today. Some documents were
15      produced previously and then the rest
16      of it is all part of that argument I
17      think taking place on the 17th.
18      MR. DOAK:
19          Okay.
20  EXAMINATION BY MR. DOAK:
21      Q.  Mr. Davis, on June 12th the
22  Plaintiff attorneys gave the Defendants some
23  responses to a written set of discovery that
24  we do in lawsuits. Does that ring any bells
25  with you?

Page 48

1       A.  Not really.
2       Q.  There was -- I don't know that it
3   should.
4       A.  Okay.
5       Q.  I am just asking.
6       A.  Right.
7       Q.  There are three names. There was a
8   set of what lawyers call requests for
9   admissions; there was a set of
10  interrogatories; and a set of document
11  requests, all pertaining to class
12  certification issues. Do you remember seeing
13  or being asked anything about those discovery
14  requests?
15      A.  Not on the date you said, I don't
16  think.
17      Q.  Well, do you remember being involved
18  in those discovery requests on any other
19  date? It would have been in the last couple
20  of months.
21      A.  I would have to see what you're
22  talking about.
23      Q.  That's what I am getting ready to do
24  next.
25      A.  I don't know if I can answer.

Page 49

1       Q.  Mr. Davis, I'm handing to you what's
2   been marked as Davis Exhibit 1. I ask that
3   you examine that. I'll tell you that those
4   are the Plaintiff's responses to the
5   Defendants' class certification discovery
6   requests.
7       A.  I think I seen this one before.
8   Yeah. I think I seen this one.
9       Q.  Did you see that after the answers
10  were prepared?
11      A.  No. Is this the stuff that was sent
12  to me?
13      MR. EXNICIOS:
14          You can't ask me, unfortunately.
15      THE WITNESS:
16          I'm not sure. Looks familiar,
17      but I am not sure.
18  EXAMINATION BY MR. DOAK:
19      Q.  You think it may look familiar?
20      A.  Yeah.
21      Q.  Do you think that you participated
22  in giving the answers, or was it sent to you
23  after it was already done just to keep you
24  abreast of what was going on in the lawsuit?
25      A.  I don't think it was already done.

13 (Pages 46 to 49)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                          7/11/2007

Page 50

1  I don't think it was.  No.  I don't think it
2  was already done.  I think they sent me
3  something.
4      Q.  Let me hand you another document
5  that's been marked as Davis Exhibit Number 2.
6  And I will tell you that is the set of
7  Plaintiff's responses to the common liability
8  issues in the case.  I'd ask you the same
9  thing, to examine that document a little bit
10 so that we could discuss whether or not you
11 participated in its preparation.
12     A.  I think when I got this, it wasn't
13 answered and I didn't understand a lot of the
14 questions.  I did talk with somebody else on
15 this.
16     Q.  Okay.
17     A.  You know.  I didn't understand.  I
18 don't want to sign up on something I don't
19 understand.
20     Q.  I understand.
21     A.  So that's what may have happened
22 with this, --
23     Q.  Okay.
24     A.  -- you know.
25     Q.  But you think that you did talk to

Page 51

1  one of your attorneys?
2      A.  Yeah.
3      Q.  I am not asking anything about what
4  you talked about, but you think that you may
5  have talked to one of your attorneys about
6  these discovery requests?
7      A.  I think this is what led me to the
8  three things you asked me about at first,
9  other than a whole bunch of other stuff that I
10 saw.
11     Q.  Okay.
12     A.  I think this is what I was looking
13 at.
14     Q.  Okay.  Do you recall when that
15 meeting was?
16     A.  No.
17     Q.  Was it recent, a few weeks ago?  You
18 were talking about being prepared for this
19 deposition?
20     A.  No, I was talking with somebody on
21 the phone about this, I think.
22     Q.  Okay.
23     A.  But I don't know when it was.
24     Q.  Okay.
25     A.  I think whenever it was, it was

Page 52

1  shortly after I got it.  I got it like on a
2  Friday and it may have been that Monday or
3  something else I talked to somebody else on
4  it.  Because I didn't understand it.  I didn't
5  want to say a whole bunch of stuff that don't
6  pertain to me.
7      Q.  Okay.  Let me ask you a few
8  questions about some documents.  You indicated
9  that you have submitted claim forms at least
10 to the Road Home Program?  Is that correct?
11     A.  That's correct.
12     Q.  And did you keep a copy of that
13 application form?
14     A.  I may have.  I don't know.  I'm not
15 sure.
16     Q.  And you also indicated that you made
17 an insurance claim, both against your
18 homeowner's policy and your flood insurance
19 policy; correct?
20     A.  Correct.
21     Q.  Did you keep a copy of your
22 insurance claim form?
23     A.  Probably so at home.
24     Q.  And did you keep a copy of your
25 flood insurance claim form?

Page 53

1      A.  Yes, I'm sure.
2      Q.  Did you prepare any kind of notes,
3  eyewitness account, either at the time you
4  evacuated your house or on the trips when you
5  were coming back to your house on Morel about
6  your experiences?
7      A.  No.
8      Q.  Do you have any documents or notes
9  that refer to the damages to your house on
10 Morel?  Did you keep any paperwork?
11     A.  I may have.  I'm not sure.
12     Q.  You had to pay somebody to do the
13 work; right?
14     A.  Yes.
15     Q.  And who were the companies that did
16 the work?
17     A.  What, the gutting out work?  The
18 work that I was just speaking of?
19     Q.  Yes.
20     A.  Just the gutting out or the coming
21 back up?
22     Q.  Both.
23     A.  I got some paperwork on the coming
24 back up.  I used a guy, it was a contractor I
25 used, a Hispanic guy named Jose.  I got some

                                    14  (Pages 50 to 53)

JOHNS, PENDLETON & ASSOCIATES              800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 54

1  paperwork on that.
2      Q.  And do you have any paperwork about
3  your personal possessions that were lost?  You
4  said you thought you might have prepared a
5  list to one of the insurance companies in the
6  claim.
7      A.  I sent that to the insurance
8  company.  I don't know if I got it still.  I
9  may have.  I'm not sure.
10     Q.  Have you looked for it?
11     A.  No.
12     Q.  Okay.  Do you have any photographs,
13 videotapes, DVDs that refer to any of your
14 property damage?
15     A.  I had photos and I think I left them
16 at the place I told you where I got the
17 $10,000 out of.  It's not the Road Home.  It's
18 something else.  Some kind of loan.
19     Q.  But you would have something at home
20 that would probably refresh your memory
21 there?
22     A.  Maybe not.  I may have left it with
23 -- The pictures?  I might not have gotten the
24 pictures back.  Because they had to reclassify
25 me or something when I went to the City.  I

Page 55

1  had to go to City Hall and bring the pictures.
2      Q.  Yes.
3      A.  So I don't know if they still have
4  them.
5      Q.  Okay.  But what were you doing at
6  City Hall that you left the pictures with
7  somebody?  I am trying to find --
8      A.  To get -- To get certified to get a
9  permit to -- to come back up with my house.
10     Q.  A building permit?
11     A.  Yeah.
12     Q.  Okay.  And so --
13     A.  So I had to take pictures to them in
14 order to get started on the house.
15     Q.  Okay.
16     A.  And I think they kept them.
17     Q.  Did you make a copy of those
18 pictures for your lawyers?
19     A.  No.
20     Q.  Okay.
21     A.  I don't think I had a lawyer at that
22 time.
23     Q.  The various documents that we have
24 just talked about that you think you might
25 have at home, --

Page 56

1      A.  Uh-huh (affirmatively).
2      Q.  -- have you ever been asked
3  questions about those documents by your
4  attorneys?
5      A.  I was asked that about the pictures
6  and I can't find them.
7      Q.  Okay.  But what about the other
8  documents, the claim forms for the insurance
9  or the Road Home, all --
10     A.  No.
11     Q.  -- the other things we went through?
12     A.  No.
13     Q.  No, they did not ask you questions
14 --
15     A.  No.
16     Q.  -- for those documents?
17     A.  No.
18     Q.  Okay.  Now, Mr. Davis, I would like
19 to go back and talk about your three
20 categories of injuries in a little bit more
21 detail and talk about the real circumstances
22 and the details of each.  I like to give you a
23 road map.  I'm not trying to trick you.
24     A.  I thought that's what we just did.
25     Q.  No, I wanted to understand what your

Page 57

1  injuries were.  I want to talk now a little
2  bit more about what are the circumstances and
3  what you know about how those injuries
4  occurred, beginning with your house on Morel
5  being damaged.  What do you know about how
6  that damage occurred?  You weren't present.
7  You have already told me that.
8      A.  No, not -- I already told you what I
9  thought happened, you know, in that.  You
10 know, like the part on the roof, I believe
11 that water came in through there.  Now, --
12     Q.  Right.
13     A.  -- that's all I know about that.
14     Q.  Right.  No, I -- What you said on
15 the roof I understand.
16     A.  Okay.
17     Q.  What about the water that came into
18 your neighborhood; do you have any idea where
19 that water came from?
20     A.  No.  I believe it was the MRGO,
21 though.
22     Q.  Okay.
23     A.  That's where I believe it come from,
24 but I didn't see where it came from.
25     Q.  I didn't know if you know, were

JOHNS, PENDLETON & ASSOCIATES                  800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                              7/11/2007

---

Page 58

1  there any levees nearby that had overtopping
2  or breaches near your house?
3      A.  None near my house overtopped.  All
4  -- All of them are still the same, intact.
5      Q.  Okay.  We have talked about wind and
6  rain already.
7      A.  Uh-huh (affirmatively).  Okay.
8      Q.  When you came back, any sign of
9  looting or vandalism to your house?
10     A.  No.  I came back, all the furniture,
11  everything was in the same spot where it was
12  when I left it, but it just was wet, most of
13  it.
14     Q.  Okay.
15     A.  You could see where it had been
16  wet.  And mud on the floor where water came
17  in.
18     Q.  Right.  Mr. Davis, I am going to
19  hand you what's been marked Davis Exhibits 3,
20  4, and 5.  They are photographs, two per
21  page.  I just want you briefly to identify
22  it.  I guess the first page of pictures,
23  Exhibit 3, are two pictures of the outside of
24  your house?  Is that correct?
25     A.  That's correct.

---

Page 59

1      Q.  And this is a more recent photo
2  showing how it appears today now that you have
3  repaired the house?
4      A.  Uh-huh (affirmatively).
5      Q.  And the second picture would be
6  Exhibit 4, and it's two more photographs of
7  the front of your house --
8      A.  Uh-huh (affirmatively).
9      Q.  -- and your garage area?
10     A.  That's correct.
11     Q.  And the next exhibit, Exhibit 5,
12  shows your kitchen on the bottom and the --
13     A.  Kitchen on the top.
14     Q.  I'm sorry, on the top.  And on the
15  bottom, the air conditioner compressor on the
16  side of your house.
17     A.  That's correct.
18     Q.  And that's the air conditioner
19  compressor that you had before the storm;
20  right?
21     A.  That's correct.
22     Q.  And yet --
23     A.  Just recently had it changed,
24  though.
25     Q.  You did?  But this one --

---

Page 60

1      A.  Was there when they came out.
2      Q.  I'm sorry?
3      A.  That's the one that was there when
4  they came out, when they came out to take the
5  picture.
6      Q.  I'm sorry, I am not understanding.
7      A.  That's the one that was there when
8  they came to take the picture a few weeks
9  after the storm.
10     Q.  But it was working at the time,
11  wasn't it?
12     A.  It was working.
13     Q.  So it wasn't damaged too badly by
14  the storm, because it was working at the time
15  nearly two years after Katrina?
16     A.  Yeah.
17     Q.  Yes, you agree with my question?
18     A.  It was working.
19     Q.  Okay.  Now, from that it would
20  appear that there must not have been too much
21  standing water on that side of your house?
22     A.  Well, if you look at this picture
23  now, this air conditioner here is elevated as
24  opposed to a lot of them that's not.
25     Q.  You're right.  It's elevated.

---

Page 61

1      A.  Uh-huh (affirmatively).  So I don't
2  know how high the water would have to get to
3  move in.  But air conditioning on the side of
4  the house, rain goes through them all the
5  time, so you can't say it wasn't much standing
6  water.  Due to that running, you can't say
7  it.  I couldn't.  You might would, but I
8  wouldn't.
9      Q.  I understand that the elevation of
10  your house is maybe six to eight inches higher
11  than other houses on your street anyway.  Did
12  you know that?
13     A.  No, I didn't know that.
14     Q.  And you're pointing out in this
15  picture, Exhibit 5, that your air conditioning
16  compressor is sitting on a cement platform.
17     A.  Uh-huh (affirmatively).
18     Q.  And that serves to raise it up a
19  little bit.
20     A.  (Witness nods head affirmatively.)
21     Q.  And certainly there is room for a
22  few inches of water to be standing there
23  perhaps without damaging the air conditioner
24  compressor.  And I think that's what you're
25  saying.  Correct?

---

16 (Pages 58 to 61)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                          7/11/2007

Page 62

1    A.  That's what I am saying.
2       MR. EXNICIOS:
3         He's already answered, but I
4    object to the form.  Your summary, I
5    lost your summary in there.
6  EXAMINATION BY MR. DOAK:
7    Q.  When your house was repaired, tell
8  me about how much they had to gut the
9  insides.  Did they take down the drywall?
10   A.  They took out four feet of drywall
11 in all of the rooms except my daughter's
12 room.  In my daughter's room I told you it
13 came in through the roof, so the whole thing
14 had to be gutted and replaced.
15   Q.  So that was much more severe damage?
16   A.  Right.
17   Q.  Obviously you had the roof collapse
18 and you also had water coming from above that
19 the other areas of the house didn't have that
20 problem.
21   A.  That's correct.
22   Q.  They had water from below, but not
23 on top.
24   A.  That's correct.
25   Q.  Okay.  And you have already conceded

Page 63

1  that that was the water that was coming down
2  this pipe, however that pipe was damaged up on
3  the top of your house?
4    A.  That's correct.
5    Q.  For the rest of your house, though,
6  you're saying that the sheet walls in all of
7  the various rooms, they just cut out, they cut
8  it out at four feet, replaced that, and still
9  used the existing two by four studs and redid
10 the house with that repair?
11   A.  Correct.
12   Q.  Okay.  And have you ever heard
13 anybody say that you probably only had a few
14 inches of water standing in your house?
15      MR. EXNICIOS:
16        Objection to the form.
17 EXAMINATION BY MR. DOAK:
18   Q.  Have you ever heard people say that
19 you had standing water in your house that was
20 not more than six inches?
21   A.  I ain't heard nobody say that.  I
22 heard my neighbor across the street say -- You
23 know, he was here.
24   Q.  Yes.
25   A.  He said he had about three feet of

Page 64

1  water in his house.
2    Q.  All right.
3    A.  I don't know how much I had in my
4  house really.
5    Q.  Okay.  Tell me about your other
6  neighbors.  What else happened in your -- to
7  your neighbors according to either your
8  observation when you came back and looked --
9    A.  Well, this particular neighbor had
10 to change everything, because I think they
11 tried to get up in their attic and they ended
12 up falling through and all of that kind of
13 stuff.  So then they ended up on the roof for
14 four days.
15   Q.  Oh, my.  So they made the mistake of
16 not evacuating.
17   A.  And I called them to get out of
18 there and they just didn't do it.
19   Q.  And what did he report about the
20 water in your neighborhood?
21   A.  He said that the storm had passed,
22 he was taking the boards down off of his
23 windows, and he heard the water rushing around
24 the corner, with ice chests and buckets
25 banging into stuff and he couldn't figure out

Page 65

1  where the water was coming from.  And in a few
2  minutes it was up on his truck and he ran and
3  he -- somebody else had left some kids with
4  him, and he pulls the thing down for the attic
5  and run up in the attic and those kids was
6  moving around and falling through the
7  sheetrock, and they had to go back outside,
8  get on a ladder, and go on the roof.  That's
9  what he said.
10   Q.  And they were stranded for four days
11 before they were rescued?
12   A.  Four days.  Helicopters flying right
13 by them, wouldn't stop.
14   Q.  I was told that when the inspectors
15 were out, they had observed a lot of roof
16 damage, wind and rain roof damage in your
17 neighborhood.
18   A.  Uh-huh (affirmatively).
19   Q.  Do you agree with that?
20   A.  Yes.
21   Q.  Do you know from your neighbors that
22 many of them submitted insurance claims
23 because they had damage not due to the
24 flooding of water, but due to wind and rain?
25   A.  Uh-huh (affirmatively).

17 (Pages 62 to 65)

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                        7/11/2007

Page 66

1       MR. EXNICIOS:
2           Objection to the form.
3           Go ahead.
4    EXAMINATION BY MR. DOAK:
5       Q.  Your --
6       A.  I know that they made claims like
7    that.
8       Q.  And that they were paid for them?
9       A.  I don't know how much they was paid,
10   but I know they made claims.  But the one
11   neighbor that I am talking about, I know that
12   he made a claim.
13      Q.  Okay.  You were looking at your
14   watch, sir.  Do you want to go put some coins
15   in the meter?
16      A.  I figure I got a few more minutes
17   before I have to.
18      MR. EXNICIOS:
19          We'll pay -- I'll pay your
20      ticket.  Don't worry about it.  Jon
21      will pay your ticket.
22   EXAMINATION BY MR. DOAK:
23      Q.  Do you know the interior local levee
24   by name in your area?  Do you know what that
25   refers to?

Page 67

1       A.  No, I don't know the name of it.
2       Q.  Okay.  Do you know, is there a pump
3    station in your neighborhood?
4       A.  It's further down Haynes.  It's
5    maybe about two miles from where I'm at.
6       Q.  Okay.  Do you know anything that was
7    said about whether that pump station had
8    problems during Hurricane Katrina?
9       A.  Not that I know of.
10      Q.  Meaning that you haven't heard
11   anything one way or another, or that you have
12   heard and that it did not have a problem?
13      A.  I hadn't heard anything one way or
14   another.
15      Q.  Okay.
16      A.  That's always a good sign to me.  If
17   I don't hear nothing, didn't nothing happen,
18   it was working.
19      Q.  Because you weren't there, you don't
20   know how fast the water was moving?
21      A.  I wasn't there, but my neighbor said
22   it was fast.
23      Q.  Right.  Was this one neighbor across
24   the street who was in the attic, was he the
25   only neighbor that you knew who stayed, or

Page 68

1    were there others who where there during
2    Hurricane Katrina?
3       A.  There were others around the corner
4    that I know of --
5       Q.  Okay.
6       A.  -- that stayed, too.  And I don't
7    know what happened with them.
8       Q.  What's the name of the neighbor
9    across the street?
10      A.  Albert Dase.
11      Q.  Spell his last name, please?
12      A.  D A S E.
13      Q.  Going back to the specific repairs
14   on your house, I know that we were just
15   beginning to get into this before, but what
16   was the name of the person who took all the
17   stuff out when you first gave the order to do
18   that?
19      A.  His name was Kedrick.  I don't
20   remember what his last name was.  It was a one
21   day job, you know.
22      Q.  Would you have any documentation
23   that might identify him?  Did you write him a
24   check or pay him by cash?
25      A.  I may have written him a check.  I

Page 69

1    may have written him a check.  I don't know.
2    And I could have paid him by cash because it
3    wasn't that much.  I think he charged me
4    $1,500 to take all of that stuff out.  And
5    that was all of the appliances and everything.
6       Q.  Right.
7       A.  Took everything out and gutted the
8    -- gutted the house out.  And took out
9    sheetrock, too.  So I thought that was a good
10   price.  I jumped on it right away.
11      Q.  So he had to kind of cut that stuff
12   out, right?  Take it out to the curb?  Is that
13   right?
14      A.  That's right.
15      Q.  And did he take it away as well?
16      A.  No.  All he did was just set it out
17   to the curb and FEMA picked all of that stuff
18   up.
19      Q.  Okay.  I just kind of want to go
20   through the steps of you rebuilding your house
21   and find out what they were, who the
22   contractor was, what documents you have, kind
23   of how much it cost, is where I am going with
24   this.
25      A.  Uh-huh (affirmatively).

                                         18  (Pages 66 to 69)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                          7/11/2007

Page 70

1    Q.  So that was step one, to get the
2  old, ruined stuff out of the house.
3    A.  Uh-huh (affirmatively).
4    Q.  What was step two?
5    A.  Step two, I had Jose -- I don't even
6  know -- Jose something.  I got -- I probably
7  have something on him, his last name, when I
8  get home.  I had him to come back.  I gave him
9  different jobs.  I wanted to see what type
10 work he was doing --
11   Q.  Yes.
12   A.  -- before I give him everything.
13   Q.  Sure.
14   A.  So I gave him the drywall first.
15 And then I gave him the molding.  And then I
16 saw he was doing pretty good.  You know, I
17 just gave him different jobs to do until I was
18 back complete.  Inside.
19   Q.  So if step one was taking all of the
20 ruined stuff out, step two --
21   A.  Was drywall.
22   Q.  -- was beginning to replace the
23 drywall?
24   A.  Uh-huh (affirmatively).
25   Q.  Replace molding where you needed to

Page 71

1  replace it?
2    A.  Uh-huh (affirmatively).
3    Q.  Do all of that kind of --
4    A.  Do flooring.  He did some ceramic
5  tiles for me, too.
6    Q.  Yes.
7    A.  I wasn't going back with carpet
8  because carpet I believe is what held the mold
9  in place.
10   Q.  Yes.
11   A.  Places where I had ceramic tile
12 before, I didn't have as much mold in there as
13 I did where I had carpet.  So I figured if
14 this ever happened again, I have less damage.
15 So I went ceramic as opposed to carpet.
16   Q.  Right.  Did all of the cabinets that
17 sit on the floor --
18   A.  Gone.
19   Q.  -- in the kitchen have to be
20 replaced?
21   A.  Yes.
22   Q.  And your bathrooms as well?
23   A.  Yes.
24   Q.  How about the doors around the
25 house?

Page 72

1    A.  All of them.  Every door in the --
2  interior door had to be redone.
3    Q.  Okay.  How about the wood framing
4  around doors?
5    A.  All that had to be done.
6    Q.  Okay.  And all of this, is it fair
7  to say this is all step two in the process?
8    A.  Yeah, you could say.
9    Q.  Redoing all of that kind of thing?
10   A.  Yeah, all of the interior,
11 everything in the interior had to be redone.
12   Q.  Okay.
13   A.  Even the upper cabinets that didn't
14 get wet, it's no way you can match them, so
15 you got to replace all of that.
16   Q.  Okay.  And what comes after that?
17 then was it ready to be painted, or did they
18 then bring in the new cabinets and
19 refrigerator and that stuff?
20   A.  Well, they installed the cabinets.
21 They did the painting, too.  They did the
22 drywall.  They did the -- Once you put the
23 sheetrock up, you got to put some kind of
24 texture on it.  They did that part.  Then they
25 did the painting.  Then they did the floors

Page 73

1  and the molding.
2    Q.  This is still the same guy that you
3  liked?
4    A.  The same guy.  The same guy.  I
5  hired the same guy.
6    Q.  Okay.  Now, were you probably paying
7  him by check by this time?
8    A.  Yes.
9    Q.  Okay.
10   A.  I was paying him by check.
11   Q.  And do you have invoices for his
12 work?  He'd write you invoices every week or
13 every -- from time to time to say what --
14   A.  Yeah.
15   Q.  -- he had done?
16   A.  Yes, I think I still got them.
17   Q.  And kind of -- I mean, you need that
18 for your insurance claims and all of that, I
19 assume?
20   A.  I had sent all of that to them so I
21 don't really need it now, but I may still have
22 some of it.  But I had to send it off to them
23 to make sure they cut the check so I could pay
24 him.  A lot of times I paid him out of my
25 pocket and I sent it in and deposit the check

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 74

1  and replace the money.
2      Q.  Okay.  So he's done kind of all of
3  the carpentry, drywall, moldings, wood frames,
4  doors, new cabinets.  Then you had new
5  appliances brought in.
6      A.  Yeah.  Right.
7      Q.  Okay.  What else is being done to
8  the house?
9      A.  That's about it.  I --
10     Q.  Was it about done by then?
11     A.  Pretty much.
12     Q.  All of your brick on the outside was
13  still okay?
14     A.  Yeah.  My brick was all right.
15     Q.  And you had to I guess have a little
16  roof work to fix the shingles that were popped
17  loose?
18     A.  Right.  I had to do that.  I had a
19  guy named Mike, was a little roofing thing
20  done.  It's hard to get other people to do any
21  patch work, you know.  So I got this guy to
22  just patch up.
23     Q.  Those guys were real busy at that
24  time, weren't they?
25     A.  They wasn't doing no patch work.  It

Page 75

1  was real hard to find somebody to do that.
2  But this guy said he would do it.  He got up
3  there, did a pretty good, reasonable price.
4      Q.  And also fixed the drain pipe?
5      A.  Right.  Right.  He fixed that, too.
6      Q.  Okay.  And what was the name of his
7  company?
8      A.  He got -- He got up there hisself
9  and did that.  His name was Mike.
10     Q.  Do you think you got a bill from
11  him, an invoice telling you what he did?
12     A.  No.  I paid Mike cash.  You couldn't
13  -- You couldn't get a regular company to fool
14  with no patches.  They was doing whole roofs
15  and that's it.  They had plenty of them to
16  do.  But I had to get this done now.  So I had
17  to get who I can.
18     Q.  Right.  And then you also had to --
19  you said you had somebody rebuild your shed?
20     A.  I went to Crowley, Louisiana; you
21  know those things they use as a carport --
22     Q.  Yes.
23     A.  -- on a lot of houses?  Well, I
24  bought one of those, enclosed with a roll-up
25  door, and I had -- I stopped at Home Depot and

Page 76

1  got a few guys to make the flooring for it.
2  Made the flooring, they came and put it on top
3  of the flooring.  It came out nice.
4      Q.  Okay.  Do you have any invoices and
5  paperwork for that?
6      A.  Yes.  I got the part for the shed
7  itself, but not for the flooring.
8      Q.  Do you have an estimate for what was
9  the total cost of repairing your house?
10     A.  No.
11     Q.  I mean the house part.  We're not to
12  the personal property yet.
13     A.  I would have to look at the
14  paperwork.  Now, I had so much done in
15  different steps, I really don't know until I
16  look at it all together.
17     Q.  So you don't know?
18     A.  No, not right off.
19     Q.  What do you think the value of your
20  house was the day before Hurricane Katrina?
21     A.  Probably about 110.
22     Q.  And what is that based upon?
23     A.  The fact that I hadn't been long
24  refinancing.
25     Q.  As part of that refinancing did you

Page 77

1  have appraisers come out and appraise the
2  house?
3      A.  They sent somebody out and appraised
4  it.
5      Q.  Right.  And I think your last
6  refinancing was in 2003?  Is that correct?
7  Maybe one in 2000 and another one in 2003?
8      A.  I think it was in 2003, yeah.
9      Q.  Would that have been the last
10  official appraiser who came to your house?
11     A.  Yes.
12     Q.  And you think he appraised the house
13  and lot for 110,000?
14     A.  I think so.
15     Q.  Okay.
16         VIDEO OPERATOR:
17         Excuse me, Counsel.  Go off the
18     record to change tapes?
19         MR. DOAK:
20         Yes, that's a good time to take a
21     break.
22         VIDEO OPERATOR:
23         Now off the record.  That's the
24     conclusion of tape 1.  It's 11:52.
25         (Recess.)

20  (Pages 74 to 77)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                              7/11/2007

Page 78

1         VIDEO OPERATOR:
2            Returning to the record, it's
3    12:05.  This is the start of tape 2.
4    EXAMINATION BY MR. DOAK:
5       Q.  What else can you tell me about
6    other houses in your immediate neighborhood in
7    terms of the different types --
8       A.  A lot of damage, severe roof damage
9    that you could see when you drive by.  Just
10   about everybody's fence was gone like mine.
11   One of my neighbor's shed, they ended up two
12   houses over in their yard.  He had one of
13   those little metal sheds, though.  And that
14   blew two -- two houses down.
15      Q.  You had a lot of the blue roofs in
16   your neighborhood, didn't you?
17      A.  I had a lot of just shingles gone.
18   I don't think they even got the blue roof up
19   there.  They just -- You can still see it.
20      Q.  But don't you recall that a lot of
21   your neighbors had roof damage?  I thought
22   that's what you just said.
23      A.  Some in my area.  But not on my
24   street.  On my street we didn't have no blue
25   roofs.  Just had missing shingles.  Didn't

Page 79

1    nobody put a blue roof up.
2       Q.  Mr. Davis, I am going to pass to you
3    Exhibit 6, which is a totally unremarkable
4    Google aerial shot of your house --
5       A.  Oh, yeah.
6       Q.  -- from high altitude.
7         MR. EXNICIOS:
8            Is the yellow mark where his
9         house is supposed to be?
10        MR. DOAK:
11           Yes.
12        THE WITNESS:
13           Okay.
14   EXAMINATION BY MR. DOAK:
15      Q.  I mean, you can see the lake shore
16   and everything.  Doesn't that look right to
17   you, approximately?
18      A.  Approximately.
19      Q.  Okay.  I am really just showing you
20   that to kind of --
21      A.  But the only thing on this, this
22   picture looks like I'm right up against the
23   lake.  I'm not that close to it.  See that
24   here?  If this is the lake, looks like I'm
25   right up against it.

Page 80

1         MR. EXNICIOS:
2            I think that yellow mark is like
3         a little push pin thing.  So I think
4         the arrow is supposed to be here.
5         THE WITNESS:
6            Oh, I can find it.  Okay.
7         MR. EXNICIOS:
8            I think we have other ones that
9         are better.
10        THE WITNESS:
11           Okay.  I thought it was the
12        yellow mark itself.
13   EXAMINATION BY MR. DOAK:
14      Q.  I am handing to you what's been
15   marked as Davis Exhibit 7, is where I was
16   really going.  Can you locate your house on
17   that photograph, please?
18      A.  Uh-uh (negatively).  Which street is
19   supposed to be mine?  This one or this one
20   (indicating)?
21      Q.  I thought that where this white "L"
22   is, that you are in this vicinity.  I wasn't
23   sure which one.  But I thought that you would
24   be able to recognize from that shot.
25      A.  This could be it, yeah.  I think

Page 81

1    that patio cover there.  That white "L",
2    that's what that is.  This is it right here.
3       Q.  You think that's you with that white
4    "L"?
5       A.  Uh-huh (affirmatively).  See this
6    patio cover here?  It goes around the back
7    like this.  That could be it right there.
8    This looks like a double driveway, too.  This
9    is it.
10      Q.  Why don't we have you take a pen --
11   I know it may not write on there very well,
12   but do your best just to draw a box around
13   your house.
14      A.  (Writing).
15        MR. EXNICIOS:
16           That didn't show up at all.
17        Actually, hers would work better.  Try
18        it again.  Make it better.
19        THE WITNESS:
20           If I do, it'll get on somebody
21        else's house.
22        MR. EXNICIOS:
23           As long as yours is in the
24        middle.
25   EXAMINATION BY MR. DOAK:

JOHNS, PENDLETON & ASSOCIATES                800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

Page 82

1    Q. I realize this is a slick photocopy
2  paper to show the picture better.
3        MR. EXNICIOS:
4          That works.
5  EXAMINATION BY MR. DOAK:
6    Q. It's kind of hard to write on.
7    A. Give her her pen back. Here you go.
8    Q. Thank you.
9    A. I do believe that's it.
10   Q. I'm going to hand you, Mr. Davis,
11  what's been marked as Davis Exhibit 8. I am
12  really just walking you through these so you
13  can identify your house comfortably and then
14  show you a little larger view of your
15  neighborhood.
16   A. Uh-huh (affirmatively). That's it
17  right here (indicating). Draw around that
18  one, too?
19   Q. No, I think we can identify it from
20  the other ones. And you're right, that on
21  your side of the street in your block there
22  are not a lot of other blue roofs, but in your
23  general area there are quite a few houses that
24  that photograph shows as having the blue
25  roof.

Page 83

1    A. Uh-huh (affirmatively).
2    Q. Is that correct?
3    A. That's correct.
4    Q. And again, you know I am from out of
5  town, I have heard a little bit that these
6  blue roofs were some FEMA thing? Do you know
7  about that?
8    A. Right. That's what it's supposed to
9  be.
10   Q. And I'll tell you my understanding.
11  You can agree with it or you probably know
12  more than I do, but apparently if you had roof
13  damage, presumably wind, rain or debris, and
14  you could call FEMA, they would come out and
15  inspect it and, if you met some standard in
16  their mind, they had this blue roof thing that
17  they could put over to protect your house?
18   A. Uh-huh (affirmatively).
19   Q. Is that kind of what was going on?
20   A. Kind of what was going on.
21       MR. EXNICIOS:
22         I'll object to the form, but I
23       understand the spirit of the question.
24  EXAMINATION BY MR. DOAK:
25   Q. I'm sorry, your answer was?

Page 84

1    A. I think that's kind of what was
2  going on.
3    Q. So you agree with these aerial
4  photographs that in your neighborhood, there
5  was a lot of -- there were a lot of houses
6  that had this blue tarp roof on them?
7        MR. EXNICIOS:
8          I'm going to just object to the
9        form of the question again. I mean,
10       you can count the number of roofs --
11       MR. DOAK:
12         Okay.
13       MR. EXNICIOS:
14         -- and how many of them have
15       blue tarps versus those that don't.
16       THE WITNESS:
17         Yeah. Like on my street, I'm
18       concerned about the street that I turn
19       on more.
20  EXAMINATION BY MR. DOAK:
21   Q. Sure.
22   A. I really don't know too much about
23  these streets. All the other ones in those
24  areas. And then if I am riding down the
25  street, I still wouldn't be able to see that

Page 85

1  blue roof a lot.
2    Q. I know.
3    A. So I wouldn't know how many exactly
4  they had there.
5    Q. You were very fair with me earlier
6  this morning. You told me that there were a
7  lot of your neighbors that you knew had roof
8  problems --
9    A. Right.
10   Q. -- and made insurance claims. This
11  is merely --
12   A. I know they made claims, but I
13  didn't know they had roof -- blue roofs.
14   Q. This is merely supporting what you
15  already told me.
16   A. Okay. Had little patches of blue
17  roofs here.
18   Q. Do you know about any -- Have you
19  heard of houses that blew up after the storm
20  because of natural gas leaks?
21   A. Didn't happen in my area. Ours is
22  totally electric.
23   Q. Okay. That was my question.
24   A. Yeah.
25   Q. Was there any criminal activity,

HENRY DAVIS                                                    7/11/2007

Page 86

1   looting in your area?
2       A.   There was a lot of looting in my
3   area, but not at my house.
4       Q.   Right.
5       A.   The guy that stayed there could hear
6   a lot of looting going on.  He could see
7   people pushing stuff in little plastic pools
8   and all kind of ice chests and stuff that
9   float.  They were just taking stuff at will.
10  Saw a lot of people got back and they think
11  that -- they thought it was the people that
12  was checking for -- if they had bodies left in
13  the house, they kick the door in.  That wasn't
14  true in all cases.  Because my door, they
15  didn't enter my house at all before, because I
16  had bars on it.  And I had to open the bars
17  when I came back to go in.
18      Q.   Would you agree with me that the
19  level of flooding was markedly different in
20  different portions of East New Orleans
21  depending upon where you lived?
22      A.   Yes.
23      Q.   There were some areas where it was
24  completely to the top of the first floor,
25  however many feet that is; correct?

Page 87

1       A.   Correct.
2       Q.   And there were some areas that were
3   maybe three feet of standing water.  You said
4   your neighbor thought he had three feet of
5   standing water --
6       A.   Uh-huh (affirmatively).
7       Q.   -- in his living room.  Is that
8   correct?
9       A.   That's correct.
10      Q.   And I was looking around to see if I
11  could find it.  I don't know if you read that
12  article, but it was by the writer in the local
13  newspaper with a woman who came back and
14  thought a miracle had happened because she had
15  no water whatsoever at her house and she was
16  in East New Orleans.
17      A.   She must have been right on Haynes.
18      MR. EXNICIOS:
19      Objection to form.  I mean,
20      there's no question there.
21      MR. DOAK:
22      I am asking him if he happened to
23      hear of that article.
24  EXAMINATION BY MR. DOAK:
25      Q.   Which I'll find in a minute and I

Page 88

1   will give you the address and see if you know
2   where it is.
3       A.   Probably a preacher's house.  I
4   heard of a preacher's house that that happened
5   to.
6       Q.   When you purchased your house in
7   1986, what was the purchase price?
8       A.   68-5.
9       Q.   And when you purchased it in 1986
10  did you have an appraisal done as part of the
11  financing then?
12      A.   The house was brand new.
13      Q.   Okay.
14      A.   I'm the only one that ever lived in
15  that house, man.
16      Q.   But they still send out an appraiser
17  to make sure it's worth the money.
18      A.   They had it appraised, but I didn't
19  have to do it.
20      Q.   Yes.
21      A.   I think the -- whoever we financed
22  it through had somebody to appraise it.  I
23  think that's what happened.  I'm not really
24  sure.
25      Q.   And the purpose of that is to ensure

Page 89

1   that a professional appraiser makes a specific
2   value determination of how much that house is
3   worth; correct?
4       MR. EXNICIOS:
5           Objection to form.
6       THE WITNESS:
7           Oh, I don't know why they do it.
8       I think that's why.
9   EXAMINATION BY MR. DOAK:
10      Q.   You think that's why?
11      A.   (Witness nods head affirmatively.)
12      Q.   You're nodding your head "yes".
13      A.   I think -- Yes, I know why they do
14  it, but I think they do it so they won't lose
15  money, I guess.
16      Q.   Right.  Are your name and your
17  wife's name on the title of this house?
18      A.   In the beginning it was just me.
19  Years later I added her to it.
20      Q.   Okay.  And that's still true today?
21      A.   Yes.
22      Q.   And I know that it has been a
23  difficult process, but now that the home is
24  restored, it's very nice, isn't it?
25      A.   Yes.

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                                    7/11/2007

Page 90

1    Q.  Indeed, it's probably a little nicer
2  than it was before just because it's brand
3  new?
4    A.  Yeah, it's brand new again.
5    Q.  Again.  Is there anything else that
6  you want to tell me that you think is
7  important about the circumstances resulting in
8  the damage to your house?  We're going to move
9  on to your personal property in a minute.  I
10  am just trying to think if I have left
11  anything out or is there something important
12  that you have been thinking of that I haven't
13  asked?
14    A.  Well, with the house sitting like
15  that for so many days under water, I was told
16  that there's some kind of cables that run
17  through and they got little spots where they
18  patched it up, I got to get all of that
19  cleaned up and get it done.  I don't know how
20  much that's going to cost.  But it should be
21  done I was told.
22    Q.  Okay.
23    A.  And I can see the rust from where
24  it's coming from, you know, out of the
25  cement.  So I know it needs to be done.

Page 91

1    Q.  All right.
2    A.  I don't have a clue how much that
3  costs.  That's the only thing that bothers me
4  now.
5    Q.  Anything else that you are thinking
6  about with respect to the damage to your
7  house?
8    A.  That's about it.
9    Q.  Okay.  Let's turn to the
10  circumstances surrounding your loss of
11  personal property.  Again, we'll exclude your
12  car and boat, the outside stuff, for a
13  moment.
14    A.  Uh-huh (affirmatively).
15    Q.  But you basically said that except
16  for the few things you took with you when you
17  evacuated, everything inside the house was
18  a total loss?
19    A.  Yeah.
20    Q.  And I keep hearing you refer a lot
21  to mold --
22    A.  Right.
23    Q.  -- was a big problem in your house?
24    A.  Yeah.
25    Q.  I hadn't thought of it before, but

Page 92

1  just visualizing what you were saying as you
2  were speaking this morning, I guess whenever
3  you have water, there's going to be a wicking
4  effect where it's going to drag the moisture
5  up curtains, sofas, even wood?
6    A.  Clothing in the closet.  You can
7  have a baby's dress here and a trenchcoat down
8  here.  If they next to each other, that baby
9  dress is going to get messed up.
10    Q.  Because it wicked the water all the
11  way up the trenchcoat.
12    A.  (Witness nods head affirmatively.)
13    Q.  And I hadn't thought of that
14  before.
15    A.  That's what happened.
16    Q.  But after hearing you speak so
17  vividly, lots of mold all the way through --
18    A.  And all the TV commercials and stuff
19  that they was talking about, you know, you
20  can't -- I was sitting listening to on
21  television, the news, about going in those
22  molded houses, you shouldn't be in them long,
23  you should have some kind of mask and all of
24  that stuff.  So I really didn't want to be in
25  there long.

Page 93

1    Q.  Okay.
2    A.  Didn't want more health problems due
3  to this later on.
4        Wait a minute.  I might -- my mic
5  might be turned the wrong way.
6        VIDEO OPERATOR:
7        You're okay.
8        THE WITNESS:
9        I thought he couldn't hear me.
10        MR. EXNICIOS:
11        If he can't hear you, he'll tell
12  you.
13        THE WITNESS:
14        Okay.
15  EXAMINATION BY MR. DOAK:
16    Q.  I think I asked you before and you
17  said that you did not have an estimated value
18  for the loss of all of your personal
19  possessions.
20    A.  I think I've answered that as they
21  gave me the max on -- on -- What they call
22  that?  What's the name for that?  What they
23  call your personal stuff when they --
24    Q.  Personal property?
25    A.  Yeah, it might -- it might be that.

HENRY DAVIS                                                7/11/2007

Page 94

1    I thought it was something else. I think. I
2    don't remember the name that they called it,
3    but I think I got the max for that. Talking
4    about the insurance for my clothes and stuff.
5    I think they paid me the max, the insurance.
6    I think it was 33,000. Well, that includes
7    your furniture and stuff, too, I think.
8        Q.  And that was your flood insurance
9    policy?
10       A.  Yes.
11       Q.  Do you think that that was enough to
12   pay for all of your personal property
13   possessions?
14       A.  It was the most I could get. I
15   guess. It had to do.
16       Q.  What about your car that you lost?
17   You had a claim for that on your automobile
18   policy?
19       A.  Yes. And I had an insurance that
20   says, I don't remember how it's worded, but
21   they don't have to pay you blue book value.
22   Now, I didn't know if it was anything like
23   that until then. It must have been a real
24   small print. I never saw that nowhere.
25   Anyway, they only paid me $2,000 and I think

Page 95

1    the book value of it was 48 or something like
2    that, blue book value was 48 and they only
3    paid 2,000, and I felt like that was wrong,
4    and I couldn't do nothing about it.
5        Q.  And who was your homeowner's policy
6    with? Powell, was that the name?
7        A.  I think it was GIA or something like
8    that. That's when we went to Baton Rouge, we
9    went to GIA.
10       Q.  GIA?
11       A.  Uh-huh (affirmatively).
12       Q.  And you made a claim against GIA?
13   Do you know what that stands for?
14       A.  Can I call my wife and ask her?
15       MR. EXNICIOS:
16           No.
17   EXAMINATION BY MR. DOAK:
18       Q.  Sure.
19       A.  She probably know what it is.
20       MR. DOAK:
21           We'll go off the record for just
22   a minute. Take a short break.
23       THE WITNESS:
24           Okay.
25       VIDEO OPERATOR:

Page 96

1            We're going off the record. It's
2    now 12:25.
3        (Recess.)
4        VIDEO OPERATOR:
5            Returning to the record. It's
6    12:30.
7    EXAMINATION BY MR. DOAK:
8        Q.  Okay. So let me ask you again, Mr.
9    Davis. What do you think the name of your
10   homeowner's insurance company was at the time
11   of the storm?
12       A.  It was -- I forgot.
13       Q.  Louisiana Citizens?
14       A.  Louisiana Citizen and Fidelity.
15       Q.  And Fidelity for your flood policy?
16       A.  Fidelity.
17       Q.  And you said this morning that you
18   submitted a claim on your homeowner's policy
19   to Louisiana Citizens?
20       A.  Yes.
21       Q.  But --
22       A.  They didn't -- They didn't give me a
23   dime.
24       Q.  Not any?
25       A.  No. They said that the $1,500 they

Page 97

1    gave me in the beginning was -- I was overpaid
2    with that.
3        Q.  Even though you had this roof damage
4    and the water --
5        A.  Even though the shingles was gone,
6    the fence was gone, and the thing on the roof
7    still had the hole in it.
8        Q.  The shed?
9        A.  The shed was gone, just wiped out.
10   The split in the roof where the water came in
11   was still there when they took the pictures,
12   and they didn't pay a dime. What happened is
13   they sent somebody out three times. Each time
14   -- They fired the first guy, he wasn't there
15   no more; then the second guy came out and said
16   I was supposed to get X amount of dollars.
17   His services were no longer needed either, so
18   I don't know what they were doing, you know.
19       Q.  Sounds like you need a lawyer.
20       A.  I got one now.
21       Q.  Okay. And your flood policy with
22   Fidelity, --
23       A.  Right.
24       Q.  -- you --
25       A.  They -- They paid what they were

                                25  (Pages 94 to 97)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS

7/11/2007

Page 98

1   supposed to pay. They did.
2       Q.   But that was $33,000?
3       A.   That was just for my personal stuff.
4       Q.   Personal possessions.
5       A.   Right.
6       Q.   And how much did they pay for your
7   house?
8       A.   I don't -- I should have asked
9   that. I wish you would have thought. I don't
10  remember.
11      Q.   Did you receive paperwork when they
12  sent a check and stuff?
13      A.   Yeah. Yeah. I think I got all of
14  that. I am not sure.
15      Q.   Where do you buy the Louisiana
16  Citizen insurance? Do you know the broker
17  that you go through? The agent?
18      A.   I don't really know. All I know is
19  we had to go to GIA to pick up the check, and
20  I don't know if it's somebody out of there
21  that writes the policy or what.
22      Q.   Right. The same question for
23  Fidelity. Do you know where they are or who
24  you had dealings with?
25      A.   No. I don't remember.

Page 99

1       Q.   But you did at one time receive
2   letters from them --
3       A.   Sure.
4       Q.   -- explaining they were going to pay
5   this or not pay that?
6       A.   Right. Right.
7       Q.   Going back to your valuations, you
8   said that you didn't feel like you could put a
9   dollar number on your house without going back
10  and adding up all of your bills that you paid
11  out.
12      A.   Right.
13      Q.   Looking at your checkbook and the
14  records.
15      A.   Right.
16      Q.   Since the house wasn't completely
17  destroyed, you had the brick and everything --
18      A.   Uh-huh (affirmatively).
19      Q.   -- and you said that the last
20  appraisal was 110,000, --
21      A.   Uh-huh (affirmatively).
22      Q.   -- I would assume that your property
23  damage loss for the house only would probably
24  be less than $110,000?
25      A.   Yes.

Page 100

1       Q.   Okay. But you don't -- A fair
2   answer, you would have to look at your records
3   to find out?
4       A.   I have to look.
5       Q.   And then for your personal
6   possessions on the inside, you thought that
7   the $33,000 probably was a fair price for the
8   value of all of that?
9       A.   Well, that's all I had it insured
10  for. I had it insured for that amount of
11  money and they paid that amount of money and
12  so --
13      Q.   Do you think you have any loss
14  there, though, for those personal
15  possessions? Maybe a little bit?
16      A.   A little bit maybe.
17      Q.   5,000?
18      A.   Somewhere in that neighborhood.
19      Q.   Okay. And the car?
20      A.   Yeah, I think I only got half of
21  what I think it was worth.
22      Q.   And you thought the whole thing was
23  worth 4,800?
24      A.   Right.
25      Q.   Okay.

Page 101

1       A.   That's what the blue book value of
2   it was.
3       Q.   I'm with you. Anything else in your
4   -- any other numbers for your personal
5   property?
6       A.   I think that the amount of stuff
7   that I lost that was in my shed was -- I had
8   some expensive tools that was left. With no
9   fence around and your shed wide open, you
10  know, stuff just leave. So I had a lot of
11  good stuff just leave.
12      Q.   Some of those looters?
13      A.   Yeah. I don't know if it -- it
14  could have been the water taking some of it.
15  But some of those tools were too heavy for the
16  water to move.
17      Q.   Right.
18      A.   And I was told that one of my
19  neighbors seen one of the roofers using my
20  wheelbarrow. Ain't no telling what all he had
21  in the wheelbarrow when he left the yard. So
22  I lost some stuff that way that I didn't get
23  compensated for.
24      Q.   "That way" being theft?
25      A.   Yeah.

26 (Pages 98 to 101)

HENRY DAVIS                                                    7/11/2007

Page 102

1    Q.  Yes. I think that about does it for
2  personal property and real property. Let's
3  turn to your last category of injury, the
4  severe mental distress, and I don't know that
5  there's a lot more to do there. You told me
6  about three pieces of that. Living with your
7  relatives, living in the dump, living in the
8  FEMA trailer. We don't need to cover that
9  again. But that was the basis for your
10  personal injury?
11    A.  Yes.
12    Q.  Was there anything else?
13    A.  That's about it. Well, they kind of
14  -- in that FEMA trailer, if you don't want to
15  go to the store every week, you need somewhere
16  to store your stuff. Like they had a little
17  small refrigerator freezer. So if you bought
18  stuff this week, it was gone before next
19  week. So you got to go back to the store. I
20  don't like doing that. Normally when I am at
21  home I make -- I go grocery shopping maybe
22  once a month because I got a freezer I can get
23  what I want, stack it all up, and then I ain't
24  got to go next week.
25    Q.  Okay.

Page 103

1    A.  Stuff like that, I didn't -- I
2  didn't like.
3    Q.  Did you ever go see a medical
4  professional about this mental distress?
5    A.  No.
6    Q.  A nurse, a psychiatrist, a counselor
7  of any kind?
8    A.  No. Well, growing up, you get a
9  little used to being stressed out. I was.
10  But I had nothing to compare this to. This
11  was above and beyond anything I ever had to
12  deal with. You know, I dealt with it. I
13  think it was harder on my wife than me. She
14  really had problems with it. But then if I
15  don't be the stronger one, she can't make it.
16  So I got to be strong even if I don't think I
17  can make it.
18    Q.  So you didn't think that a medical
19  professional would be able to help you
20  with this particular problem?
21    A.  No, because the problem would still
22  be there. After I left his office, I still
23  have the same problem so I didn't see where it
24  made sense to spend money for somebody to tell
25  me I got a problem. I know I got a problem.

Page 104

1    Q.  Your problem was you had poor living
2  conditions and the shrink wasn't going to help
3  you with the --
4    A.  Not at all.
5    Q.  Make the trailer any bigger?
6    A.  Not at all.
7    Q.  Make the relatives' apartment any
8  bigger?
9    A.  None of that would have helped.
10    Q.  Okay. I take it you did not take
11  any medications for --
12    A.  No.
13    Q.  -- your stress?
14    A.  No.
15    Q.  No beer?
16    A.  Every now and then.
17    Q.  Okay. Let's see.
18    A.  Kind of come from a -- I had a
19  praying grandmother. Said when all else is
20  down, just pray. It'll get better.
21    Q.  Good advice. Any other details you
22  want to add to describe the losses that you
23  are seeking to get relief for in this
24  lawsuit? We have talked about your house
25  damage, we have talked about the personal

Page 105

1  property, we have talked about the various
2  bases for your emotional distress.
3    A.  I don't know if any of y'all was
4  dislocated or anything, but during the time
5  right after that storm, even in Mississippi
6  where I was, they didn't have any power and it
7  was extremely hot. Man, it was -- felt like
8  130 degrees everywhere. It just -- it was
9  unbearable. Day and night, you know. That's
10  just suffering to me. Unnecessary suffering.
11  I couldn't do anything about it. I just had
12  to deal with it.
13    Q.  All right.
14    A.  And that went on for days. The
15  people that I was living with managed to get a
16  generator enough to run some fans, but not --
17  not AC. Still was hot. Just was miserable.
18    Q.  Who do you blame for the damages
19  that you're seeking in this lawsuit?
20    A.  Well, I hear if we wouldn't have had
21  -- we survived the storm itself and I hear we
22  wouldn't have had any water if it wasn't for
23  the overtopping of the levees and the MRGO and
24  stuff. So whoever was responsible for that is
25  responsible for what happened to me.

27 (Pages 102 to 105)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

---

Page 106

1    Q.  Do you think some of it was an act
2  of God, that nobody could have prevented part
3  of the damage, it was just a terrible
4  hurricane?
5    A.  With a hurricane --
6      MR. EXNICIOS:
7        Objection to form.
8      THE WITNESS:
9        The hurricane didn't do it.  The
10       hurricane -- I don't think the
11       hurricane did it.  I think it was a
12       man part.  I think we survived the
13       hurricane.  In fact, the water came
14       the day after when it was calm.  The
15       water came.  So we survived the
16       hurricane.
17  EXAMINATION BY MR. DOAK:
18    Q.  Okay.  Well, tell me about the water
19  came when it was calm.
20    A.  Sunny, no rain, no nothing.  Here
21  come water.
22    Q.  What day was that?
23    A.  Monday.
24    Q.  Were you here on Monday?
25    A.  No.  But my neighbor was.  He's the

---

Page 107

1  only one I know of that saw what happened.  He
2  said -- I told you earlier he saw the water.
3  When he was taking them boards off his window,
4  meaning the hurricane was over, everything was
5  calm again, now here come the water.
6    Q.  So maybe the water in your
7  neighborhood didn't get there on the first day
8  at the same time as it was in other parts of
9  the city.
10    A.  What time --
11      MR. EXNICIOS:
12        Objection to form.
13      THE WITNESS:
14        What time was the water at the
15        other parts of the city?
16  EXAMINATION BY MR. DOAK:
17    Q.  Well, I don't know.  But the time
18  you're referring to, are you sure it was
19  Monday?  That's what your neighbor said?
20    A.  Well, I know it was after the
21  storm.  What day was the storm?  I know it was
22  the day after the storm.
23    Q.  The day after the storm.
24    A.  Yeah.  What day was the storm?
25    Q.  And did I ask you before what his

---

Page 108

1  name is?  I think I did.
2    A.  I think I told you.
3    Q.  Okay.  Well, I have forgotten, but
4  he hasn't.
5    A.  Okay.
6    Q.  Going back to the question about who
7  you think is responsible here, and you gave an
8  answer I understood about overtopping of the
9  levees and things, that would include the
10  Corps of Engineers?
11    A.  If they was --
12    Q.  I'm sorry?
13    A.  If they in charge of that part, I
14  guess.  So I don't know.
15    Q.  Okay.  The people who designed how
16  high the levees would be?
17    A.  Whoever is at fault is at fault.  I
18  don't know who they are.
19    Q.  Okay.  How about FEMA?  Does FEMA
20  have some of the fault for that?  Do you know?
21    A.  They have anything to do with the
22  levees?
23    Q.  I am just asking you what --
24    A.  I don't know.
25    Q.  You don't know?

---

Page 109

1    A.  No.
2    Q.  You're just saying whoever had to do
3  with the levee system?  Is that right?
4    A.  If they have -- When that water came
5  through, wherever it came from, whoever is in
6  charge of that, that's who's at fault to mine
7  -- to the best of my knowledge.
8    Q.  Okay.  Here is The Times Picayune
9  article that I had mentioned earlier.  Do you
10  perchance know a Dolores Schafer?
11    A.  No.
12    Q.  Do you know where the 8000 block of
13  Lafourche Street would be, L A F O U R C H E?
14    A.  No.
15    Q.  It's in East New Orleans somewhere.
16    A.  Might be in Michoud.  Might be.  I'm
17  not sure.
18    Q.  That's okay.
19    A.  Spell it again.
20    Q.  L A F O U R C H E.
21    A.  I know that's in Michoud.  And it
22  had to be -- If they didn't get any water,
23  that must be right on Chef.  Must be right on
24  that corner.
25    Q.  And tell me about that part of

---

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

1  town.
2      A.  Chef Menteur Highway is a little bit
3  higher than the rest of the streets out in
4  that area.  So if you're right on the corner,
5  all the water is going to pass you down here
6  and come back.
7      Q.  I see.  Yes, that's the title.  It
8  says "Katrina left many in Eastern New Orleans
9  unscathed."
10     A.  A lot of people that live right near
11 Chef or right on the corner of Haynes didn't
12 -- didn't get much water.
13     Q.  Okay.
14     A.  Because those are the high areas.
15     Q.  Okay.
16     A.  So if -- You know, water is not
17 going to be on this end of this hat
18 (indicating).  It will be back here
19 (indicating).  That's just how it is.
20     Q.  And New Orleans East, it's a large
21 area.  Do you have any idea how wide that is?
22     A.  All of that's Ninth Ward.  And the
23 Ninth Ward is the biggest ward in the city.
24 So it's huge.
25     Q.  Do you have relatives that live in

1  the city?
2      A.  Yes.
3      Q.  Where do they live?
4      A.  My sister-in-law live on Lemans.
5  They got about seven feet of water in their
6  house.
7      Q.  What parish?
8      A.  That's in Orleans.  That's in
9  Orleans Parish.
10     Q.  Okay.
11     A.  It's in Eastern New Orleans.
12     Q.  Okay.
13     A.  So, you know, certain areas got way
14 more water than others.
15     Q.  So they got a lot more water than
16 you got at your house?
17     A.  That's correct.
18     Q.  And that's your sister?
19     A.  My sister-in-law.
20     Q.  Sister-in-law?
21     A.  My wife's sister.  Yes.
22     Q.  And what was the particular area
23 again, the name of it?
24     A.  It's Eastern New Orleans.  All of
25 that East.  I'm in East New Orleans, she's in

1  East New Orleans.  It's just that in her area
2  she got more water than us.
3      Q.  How many miles is she from you?
4      A.  Maybe two or three miles at the
5  most.  She's back near Crowder.  And I am past
6  Bullard.
7      Q.  Okay.  And what happened on your
8  street is completely different from what
9  happened on her street.
10     A.  That's correct.
11     Q.  Who else do you have as a relative
12 in New Orleans?
13     A.  I got a sister that live across the
14 river.  And they didn't get no water on that
15 side.
16     Q.  Across the Mississippi River?
17     A.  Across the Mississippi River.
18     Q.  Which parish?
19     A.  Now, I don't know.  I just know
20 about the vicinity it's in.  I don't know what
21 parish it is.
22     Q.  Okay.  What other relatives do you
23 have in town?
24     A.  That's all I have in town now.
25     Q.  How about friends that you have and

1  that you have talked to, or your children's
2  friends?  I am just wondering.  Tell me about
3  different people who you know and what their
4  experience was in Hurricane Katrina.
5      A.  I talked to one guy whose sister
6  lived -- No, whose cousin lived upstairs; him
7  and his sister went to their house and the
8  water got all the way upstairs on the top step
9  and they realized they had something
10 downstairs and they come and swam under water,
11 get it, and come back up.  And that was real
12 deep.  Like ten feet or more maybe.
13     Q.  Okay.
14     A.  You know.  You hear so many
15 different stories.
16     Q.  Do you know any people who had a
17 friend or loved one who died as a result of
18 the storm, who drowned?
19     A.  Some of my co-workers.  I know of
20 one that died as a result of the storm.  Him,
21 his wife, and I think his son drowned in their
22 house.
23     Q.  Where did they live?
24     A.  Somewhere in the East.  I don't know
25 exactly where at.  But somewhere in the East

Page 114

1  they drowned in the house.
2      Q.  East, you mean East New Orleans?
3      A.  Somewhere in East New Orleans, yeah.
4      Q.  Okay.
5      A.  I didn't know where he lived at.
6      Q.  So they actually lost their life?
7      A.  Right.  Well, if you pay attention
8  on those houses where they got it got it --
9  those numbers on there --
10     Q.  Yes.
11     A.  -- and you see a zero in most of
12 them, if you see where that zero is, if it's a
13 1 or a 2, that was either one or two people that
14 died in that house.
15     Q.  Do you know any people who were
16 lucky like this lady that I gave you the
17 address of on Lafourche Street?
18     A.  I know of one other guy who actually
19 evacuated his house and stayed gone all that
20 time and when he came back, there was nothing
21 done.  Nothing wrong with it.
22         The church that I go to, none of
23 the carpet got wet in it.  And it's only three
24 blocks from my house.  That's -- That's just
25 how it is.  This guy that I was telling you

Page 115

1  about is a preacher.  So nothing happened to
2  my church or his house.  I don't know how.
3  Act of God.
4      Q.  Was this just God protecting the
5  church, or is it on a little bit of a hill?
6      A.  That church is not on a hill.  I
7  don't understand it.  The roof is all messed
8  up, but nothing is in the church.
9      Q.  The water just ran a different way?
10     A.  We still got the same carpet in the
11 church.  I don't understand it.
12     Q.  I am from Kansas.  You know that
13 tornado they had?
14     A.  Yeah.
15     Q.  The same thing happened there.  We
16 have a little second house there in a little
17 town, this is just a couple of hours over, you
18 know, that it looked like a nuclear bomb had
19 gone off and the Methodist church standing
20 there open for business.
21     A.  Yeah.
22     Q.  Very strange.
23     A.  I don't understand it.  The guy stay
24 right across the street from the church didn't
25 get no damage.  Both of them on the corner.

Page 116

1  But everything else going down the street got
2  messed up.
3      Q.  The price of houses next to churches
4  is going to go up after this.
5      A.  The fact -- The fact I try to be
6  there every Sunday.
7      Q.  Good place to be in a storm?
8      A.  Yeah.
9          MR. EXNICIOS:
10             Stay next to a preacher.
11 EXAMINATION BY MR. DOAK:
12     Q.  Any other stories about people you
13 worked with, friends, relatives, different
14 experiences around town?
15     A.  Most of them was just like me,
16 homeless.  Most of them.  Just one day you
17 don't have no home to go home to.
18     Q.  Let's talk about the Form 95 that
19 your attorney filed with the government.  And
20 that was Jonathan Andry.  Mr. Davis, I hand
21 you what's been marked as Davis Exhibit 9.
22 That's the Form 95 that your attorney
23 submitted to the government along with a cover
24 letter from the government back to you.  Do
25 you recognize this document?

Page 117

1      A.  Yeah, this was -- Yeah.  It was in
2  that stack.
3      Q.  If you would turn to the second
4  page, that's where the Form 95 itself begins.
5  The upper right corner, you see a box number 2
6  with your name, "Henry Davis", on it?
7      A.  Uh-huh (affirmatively).  Yeah, this
8  is when I was living in Baton Rouge in the
9  trailer.  4910 Hollier Road, Baton Rouge,
10 Louisiana.
11     Q.  Down here on the lower right of the
12 exhibit is a date of claim for May 23, 2006.
13     A.  Uh-huh (affirmatively).
14     Q.  Do you see that?
15     A.  Yeah.
16     Q.  Did you see this claim form before
17 it was filed or after it was filed?
18     A.  After it was filed.
19     Q.  After it was filed.  And if you'll
20 look on the back page of this exhibit, there
21 is a document "To whom it may concern"
22 authorizing your attorney, Jonathan Andry, to
23 submit this form to the government for you.
24     A.  Uh-huh (affirmatively).
25     Q.  Is that your signature?

**Page 118**

1    A.  Yes, it is.
2    Q.  Okay.  So you authorized Mr. Andry
3 to prepare and submit this form, which he did
4 on May 23 of 2006?
5    A.  That's correct.
6    Q.  And when did you first see the
7 document?  Did he send you a copy of it?
8    A.  He sent me a whole stack of stuff to
9 look through and sign.
10    Q.  What else was in the stack?
11    MR. EXNICIOS:
12       Objection, calls for client
13    privilege.
14    MR. DOAK:
15       Could we explore a little bit
16    about, without getting into the
17    substance of the documents, just kind
18    of the category?
19 EXAMINATION BY MR. DOAK:
20    Q.  I don't want to ask questions that
21 get into the attorney-client privilege between
22 the substance of you talking to your attorney
23 or the substance of him talking to you.
24 Okay?
25    MR. EXNICIOS:

**Page 119**

1       Yes.
2 EXAMINATION BY MR. DOAK:
3    Q.  If he sent you a fishing schedule,
4 of course, that's different.  That isn't
5 attorney-client privilege.  I am just kind of
6 wondering, can you talk in real general terms
7 about what else was in this stack?
8    A.  A lot of stuff was in there that I
9 didn't understand what it was and I didn't --
10 you know, the meaning of the stuff.  So when I
11 called back, I wanted them to explain to me
12 before I sign off on something.  I don't want
13 to be signing off on something and I don't
14 really know what it is.
15    Q.  Right.
16    A.  So I just called and asked, and a
17 lot of stuff we just went through, you know,
18 like that.
19    Q.  Right.
20    A.  So I don't really remember all of
21 those.
22    Q.  Okay.  But you remember that this
23 Form 95 was in that pile?
24    A.  Oh, yeah.  Because I see my
25 signature on it, I know it was in the pile.

**Page 120**

1    Q.  Your signature isn't on this,
2 though.
3    A.  Well, wait a minute.  Wait a
4 minute.  Look at that one.  Well, I was
5 thinking it was the same thing as this.
6    Q.  Your authorization, the last page,
7 apparently you did on January 3 of 2006.  That
8 was just you giving your attorney authority --
9    A.  Okay.
10    Q.  -- to act on your behalf.  This
11 document wasn't until five months later, in
12 May, when he actually submitted the form.
13    A.  Yeah.
14    Q.  So those were probably done at two
15 different times, don't you think?
16    A.  Probably so.
17    Q.  Okay.  Let's stay on this page of
18 the Form 95.
19    A.  That's the one I am on now.
20    Q.  Talk about it for a few minutes.
21    A.  Okay.
22    Q.  In the box that's marked number 8,
23 "Basis of claim," --
24    A.  Uh-huh (affirmatively).
25    Q.  -- would you please read that to

**Page 121**

1 yourself?  "Since the Mississippi River" --
2 There are just a few sentences there.  Let me
3 give you a moment to read that.
4    A.  Yeah, I remember reading this
5 before.
6    Q.  Okay.  Are you satisfied with that
7 statement as being the basis of your claim to
8 the government?
9    A.  Yeah.
10    Q.  Okay.  And down in box 9, dealing
11 with property damage, the second box down has
12 a sentence "The damage was a complete loss of
13 the structure and contents located at 7650
14 Morel Street"?
15    A.  Which one, 9?
16    MR. EXNICIOS:
17       The second half.
18    THE WITNESS:
19       The second half right down here
20    (indicating).  Okay.
21 EXAMINATION BY MR. DOAK:
22    Q.  That statement is accurate, isn't
23 it?
24    A.  This part, "Complete loss of
25 structure", what does that mean now?  The

HENRY DAVIS                                                        7/11/2007

Page 122

1    bricks and everything else?
2        Q.  A fair point.  You didn't -- "It was
3    a significant loss of your house" might have
4    been a little bit more accurate?
5        A.  Yeah.
6        Q.  The next box, number 10, is for any
7    personal injury or wrongful death, and this is
8    where your attorney identifies that you
9    experienced severe emotional distress.  And
10   you and I have talked about that today.
11   Correct?
12       A.  Correct.
13       Q.  Down in number 12, however, it asks
14   for the amount of the claim.  In number 12-A
15   it lists property damage, and that's both your
16   house property and your personal possession
17   property.  Now, he put in $500,000.  That's
18   not correct, is it?  You didn't have $500,000
19   of property damage from what you told me
20   today.
21       A.  No.  No.
22       Q.  You had something less than $110,000
23   worth of real property damage for your house.
24   Correct?
25       A.  Uh-huh (affirmatively).

Page 123

1        Q.  And your personal possessions would
2    have been 33,000 plus the 5,000 extra you
3    thought?
4        A.  Well, that's because -- I said that
5    because that's all the insurance I had.  If I
6    had $2 million worth of insurance I'd be
7    wanting 2 million.  But I only had 33.  That's
8    what I said.
9        Q.  Yes.  What do you think the dollar
10   value, the fair market value was of all of
11   your personal possessions?  Not with regard to
12   what the insurance paid.  If you had to sell
13   them, what do you think the fair market value
14   of all of those things, your household
15   possessions, the car that you lost for $4,800,
16   what do you think the total of that would be?
17   $50,000?
18       A.  Yes, somewhere in that
19   neighborhood.  Close to it if it wasn't.
20       Q.  Around $50,000?
21       A.  Around 50,000.
22       Q.  So the total amount of your property
23   damage would be approximately 100,000, plus
24   50, 150,000?
25       MR. EXNICIOS:

Page 124

1        Objection to form.
2    EXAMINATION BY MR. DOAK:
3        Q.  Is that correct?
4        A.  No, it would be 160 if the house
5    valued at 110.
6        Q.  Okay.  That's fine.  So item 12-A,
7    it would have been more accurate to say
8    approximately 160,000?
9        A.  I guess so.
10       Q.  Correct?
11       A.  Yes.
12       Q.  I am just trying to find out.
13       A.  Okay.
14       Q.  You know, I have got lots of
15   Defendants and we're trying to figure out how
16   much we're being sued for.
17       A.  Okay.
18       Q.  And I need to understand.
19           Now, the next box is number 12-B,
20   "personal injury", and that refers up here,
21   we just talked about it, to the severe
22   emotional distress.
23       A.  Yeah, I wouldn't know how to put a
24   price tag on that.  Would you?
25       Q.  Well, as a person I agree with you.

Page 125

1    It's awfully hard to value --
2        A.  It's very hard, man.
3        Q.  -- some things, and mental distress
4    is one of those.  But, of course, in a court
5    of law about the only thing they can do is
6    award money.  Sometimes we -- it is like how
7    much is a life worth?  Hard to make that
8    decision.  But in lawsuits, as I think you
9    know, sometimes we have to do that even though
10   it's difficult.
11       A.  Seem like --
12       Q.  I am just asking you as you sit here
13   today and based upon your testimony with me
14   and the different parts of your mental
15   distress claim, what would you tell a jury you
16   believe is fair amount of money to compensate
17   you for that emotional distress?
18       A.  I really wouldn't know how to put a
19   price tag on that.  The reason being, I wasn't
20   the only one that was homeless.  My wife and
21   my daughter was the same way.  They looked to
22   me to make it right.  "Whatever it is, Dad,
23   fix it."  I couldn't fix that.  So I don't
24   know how to put a price tag on that.  I really
25   don't.

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                   7/11/2007

Page 126

1    Q.  Okay.  Down in this box that I am
2  pointing to, it says "Signature of claimant".
3    A.  Which box?
4    MR. EXNICIOS:
5      Down here (indicating).
6    THE WITNESS:
7      Okay.
8  EXAMINATION BY MR. DOAK:
9    Q.  That's not your signature, is it?
10    A.  No.
11    Q.  Presumably that's Mr. Andry's
12  signature.
13    A.  I don't know.
14    Q.  But whoever it is, my question is,
15  it's not your signature; correct?
16    A.  No.
17    Q.  Your signature looks like this last
18  page?
19    A.  The last page, yeah.  That's my
20  signature on the last page.
21    Q.  Okay.  New subject matter, although
22  I think we're pretty well through it.  This is
23  about all of the claims that you have filed
24  for other assistance.  And we have talked
25  about the claim that you made to your

Page 127

1  homeowner's insurance and they didn't give you
2  anything except the $1,500 advance.
3    A.  That's it.
4    Q.  And we'll have to find out where the
5  documents of that are, although you said you
6  might have a copy of some paperwork at home.
7    A.  Right.
8    Q.  And the flood insurance we have
9  talked about, and you said they paid $33,000,
10  which I guess was your policy limit for flood
11  insurance.
12    A.  That -- That was -- No, that was for
13  my personal.
14    Q.  I'm sorry, for your personal
15  property.
16    A.  Right.
17    Q.  And then some other unknown amount
18  for the house.
19    A.  Right.
20    Q.  And again, you have paperwork you
21  think --
22    A.  Yeah.  I probably have that at home.
23    Q.  -- that relates to that.  And an
24  automobile policy that related to the car, but
25  they only gave you 2,000 and you think it

Page 128

1  should have been 4,800.
2    A.  It should have been.  I -- I thought
3  the least thing they would pay was the blue
4  book value, and they weaseled out of that.
5    Q.  Did you ever make any claims with
6  respect to that Murphy Oil leak?  You're not
7  in that area, are you?
8    A.  I don't think I am, no.  I don't
9  think I am.
10    Q.  Other than the Road Home, did you
11  make any other claims to any Federal
12  government program?
13    A.  FEMA.  I told you about FEMA.
14    Q.  FEMA.  I'm sorry.
15    A.  And I told you about -- I don't know
16  what the name of it.
17    Q.  LRA, I think?
18    A.  Yeah, something about -- I think
19  that's the name, LRA.
20    Q.  Okay.  Other than them and --
21    A.  That's it.
22    Q.  -- the Road Home, --
23    A.  That's it.
24    Q.  -- no other Federal program?
25    A.  No.

Page 129

1    Q.  No other State program?
2    A.  (Witness shakes head negatively.)
3    Q.  How about a charity, Red Cross, any
4  charitable or church organization?
5    A.  Yeah, Red Cross, I think there was
6  $500 or something.
7    Q.  Okay.  Let's talk about the Road
8  Home Program for a moment.  What do you
9  remember about the application process for
10  that?
11    A.  You had to go to a building right
12  off Poydras Street upstairs.  They fill you in
13  on, you know, what the Road Home Program does
14  and all of that.  And then they -- they set
15  you up some kind of date that you go to
16  closing.  And they give you an amount that you
17  supposed to get when you go to closing.  But
18  when I went to closing, I didn't get the
19  amount that they told me I was going to get.
20  But I ain't leaving a dime on the table, I'm
21  taking what you put up or not, and I just
22  appeal the rest.  That's all.
23    Q.  Okay.  But somewhere in there, that
24  process, there was an application form that
25  you and your wife had to complete?

                          33  (Pages 126 to 129)

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                          7/11/2007

Page 130

1    A.  Yeah.
2    Q.  And you turned that in?  That was --
3    A.  I think we did that the first time.
4  We had the form, we filled it out and sent in
5  it, and then we had to go meet with them.
6    Q.  They call you in and kind of review
7  the details?
8    A.  Right.  Right.
9    Q.  Okay.  And you don't recall whether
10  you kept a copy of that form or not?  You
11  haven't looked for that yet?
12    A.  No.  I didn't know I was going to
13  need all of that.
14        I got one little question,
15  though.  How does Road Home, what does it have
16  to do with this?  That's just -- You know,
17  just out of curiosity, what does Road Home
18  have to do with MRGO?
19    Q.  It has to do with being a statement
20  that you have made about your losses in
21  Hurricane Katrina.
22    A.  Okay.
23    Q.  You understand that in this lawsuit
24  you are called a named Plaintiff, meaning it's
25  a proposed class action and, if certified, you

Page 131

1  would be the class representative?
2    A.  I understand.
3    Q.  Those are kind of lawyer words.
4    A.  Okay.
5    Q.  What's your understanding, if any,
6  of what it means to be a named Plaintiff, to
7  be a class representative?
8    A.  To me it means that, in my
9  neighborhood, the area where I live, everyone,
10  every one of those people in that neighborhood
11  can't be there and they just want somebody
12  familiar with the neighborhood to represent
13  all of us, and I expect they want me to do
14  that.
15    Q.  What neighborhood are you referring
16  to?
17    A.  I am referring to the Little Woods
18  area, my area right there.
19    Q.  Little Woods is the name of your
20  subdivision?
21    A.  Yes.
22    Q.  How big is that?  A half mile by a
23  half mile?  A mile by a mile?
24    A.  Maybe a half mile by a half mile.
25    Q.  Okay.  And you feel that you could

Page 132

1  represent everybody in that neighborhood for
2  their damage?
3    A.  I don't really know what everybody's
4  damage is, but at the same token, I know what
5  mine was and I know what everybody immediately
6  around me is.  So I'll just use that as a
7  table of working with everybody.
8    Q.  But you understand that some people
9  in your very immediate area may have had
10  significant roof damage and others did not.
11  Right?
12    A.  Yeah.  I understand that.
13    Q.  And you understand that some people
14  in your area may have had a lot of things
15  stolen by looting and other people maybe had
16  nothing stolen?
17    A.  That's correct.
18    Q.  And you understand that some people
19  may have had a tree fall over on their house
20  and others did not?
21    A.  It's possible.
22    Q.  Lots of crazy things happen in a
23  hurricane.
24    A.  That's why I don't understand why
25  they just have one person represent everybody,

Page 133

1  because nobody, no one person can do it
2  exactly what happened to everybody out there.
3  It's no way.
4    Q.  Right.  Explain that for me, what
5  you mean.
6    A.  I mean, just like you asked me the
7  question about a tree falling on a house.
8    Q.  Right.
9    A.  How would I know a tree fell on
10  somebody's house three blocks over?  How would
11  I know?
12    Q.  Right.
13    A.  So how would I evaluate his property
14  as opposed to mine?  I thought maybe I would
15  just give you what happened to mine and y'all
16  figure out what happened with everybody else.
17    Q.  Right.  You don't know how to do
18  that.  All you can do is be fair about your
19  property.
20    A.  That's all I'm going to do.  I ain't
21  going to lie about nothing.  I can tell you
22  what happened at my house.  I can't tell you
23  what happened three blocks over.
24    Q.  Right.  Leave alone three miles
25  over.

JOHNS, PENDLETON & ASSOCIATES                    800 562-1285

576dd205-a98e-429e-ae40-13d8f1ea7bee

HENRY DAVIS                                                    7/11/2007

Page 134

1     A.  There you go.
2     Q.  Did you know any of the Plaintiffs'
3  attorneys before this lawsuit?
4     A.  No.
5     Q.  When did you first get the idea that
6  maybe you would want to participate in a
7  lawsuit as a result of Hurricane Katrina?
8     A.  When I found out that most of the
9  people in my area was saying it was from MRGO,
10  I wanted to know who was representing that.
11  And I found out from somebody that it was
12  these people.  So that's why I sent it in that
13  way.  I didn't know of anybody else that was
14  representing people for a class action suit.
15     Q.  So that's what gave you an idea, and
16  then what was it that took you to -- what
17  lawyer did you go to see?
18     A.  I don't know.  My wife got the
19  form.  I don't know where she got it from.
20  But we sat down, we filled it out, and we sent
21  it in and then we ended up with this group.  I
22  don't know if anybody else is doing this
23  lawsuit other than them.  I don't know.
24     Q.  Tell me what you know about this
25  form that your wife got.  Something that she

Page 135

1  saw some place?
2     A.  Yeah.  It was a class action suit
3  against MRGO, because the word was that's
4  where the water came from.
5     Q.  Okay.
6     A.  So I didn't know who was responsible
7  for where it came from, but I know it happened
8  after the storm.  And whoever it was, I think
9  they should have to pay.
10     Q.  And then you sent in that form?
11     A.  That's correct.
12     Q.  And then somebody gave you a call?
13     A.  Right.
14     MR. DOAK:
15        If we could take another short
16  break, I'll consult with my
17  colleagues.
18     VIDEO OPERATOR:
19        We're off the record.  It is
20  1:15.
21     (Recess.)
22     (End of deposition.)
23        *   *   *
24
25

Page 136

1
2              WITNESS'S CERTIFICATE
3
4        I, HENRY EARL DAVIS, read or have
5  had the preceding testimony read to me, and
6  hereby certify that it is a true and correct
7  transcription of my testimony, with the
8  exception of any attached corrections or
9  changes.
10
11
             _____
12             (Witness' Signature)
13
    _____
    DATE SIGNED
14
15  DEPONENT PLEASE INITIAL ONE:
16
    _____  Read with no corrections
17
18  _____  Read and correction sheet attached
19
20
    DATE TAKEN:  July 11, 2007
21
22
23
24
25

Page 137

1
2
3
4        REPORTER'S CERTIFICATE
5
6        I, ROGER D. JOHNS, RMR, RDR, CRR,
7  Certified Court Reporter, do hereby certify
8  that the above-named witness, after having
9  been first duly sworn by me to testify to the
10  truth, did testify as hereinabove set forth;
11  that the testimony was reported by me in
12  shorthand and transcribed under my personal
13  direction and supervision, and is a true and
14  correct transcript, to the best of my ability
15  and understanding; that I am not of counsel,
16  not related to counsel or the parties hereto,
17  and not in any way interested in the outcome
18  of this matter.
19
20
21
22          ROGER D. JOHNS
23      CERTIFIED COURT REPORTER
24        STATE OF LOUISIANA
25

576dd205-a98e-429e-ae40-13d8f1ea7bee