# App. Tab 11

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL        CIVIL ACTION
BREACHES CONSOLIDATED
LITIGATION                     NO. 05-4182 "K" (2)

                              JUDGE DUVAL

PERTAINS TO:  LEVEE
                              MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289


                    VOLUME I



        Deposition of PROFESSOR JOHANNES
VRIJLING, 2600 GA Delft, Stevinweg 1, 2628 CN
Delft, The Netherlands, taken in the offices
of Bruno & Bruno, 855 Baronne St., Sixth
Floor, New Orleans, Louisiana on Thursday,
the 16th day of August, 2007 at 9:14 a.m.

1913ee08-505d-4f07-bb77-e401739b2e91

## Page 2

APPEARANCES:

BRUNO & BRUNO
(By: Joseph M. Bruno, Esquire)
855 Baronne St.
New Orleans, Louisiana 70113
(504) 525-1335
    Attorneys for Plaintiffs

LAMBERT & NELSON
(By: Hugh P. Lambert, Esquire)
701 Magazine St.
New Orleans, Louisiana 70130
(504) 581-1750
    Attorneys for Plaintiffs

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR
(By: Matthew D. Schultz, Esquire)
316 S. Baylen St.
Suite 600
Pensacola, Florida 32502
(850) 435-7140
    Attorneys for Plaintiffs

McCRANIE, SISTRUNK, ANZELMO, HARDY,
MAXWELL & McDANIEL
(By: Thomas P. Anzelmo, Esquire)
3445 N. Causeway Blvd., Suite 800
Metairie, Louisiana 70002
(504) 831-0946
    Attorneys for Defendant,
    Orleans Levee District

## Page 3

APPEARANCES (continued):

SUTTON LAW FIRM, LLC
(By: Charles E. Sutton, Jr., Esquire)
2101 N. Hwy. 190
Suite 105
Covington, Louisiana 70433
(985) 249-5991
    Attorneys for Defendant,
    Orleans Levee District

LABORDE & NEUNER
(By: Ben L. Mayeaux, Esquire)
(By: Gregory A. Koury, Esquire)
(By: Laura Rougeau, Esquire)
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, Louisiana 70503
(337) 237-7000
    Attorneys for Defendant,
    Orleans Levee District

DUPLASS, ZWAIN, BOURGEOIS, MORTON,
PFISTER & WEINSTOCK
(By: Gary M. Zwain, Esquire)
(By: Joseph E. Bearden, III, Esquire)
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
    Attorneys for Defendant,
    Board of Commissioners for the
    East Jefferson Levee District
    and Lake Borgne Levee District

## Page 4

APPEARANCES (continued):

CHRISTOVICH & KEARNEY
(By: Charles M. Lanier, Jr., Esquire)
(By: Adrejia L. Boutte, Esquire)
Pan American Life Center
601 Poydras St.
New Orleans, Louisiana 70130-6078
(504) 593-4272
    Attorneys for Defendant,
    Sewerage and Water Board of New
    Orleans

BURGLASS & TANKERSLEY, L.L.C.
(By: Kea Sherman, Esquire)
5213 Airline Drive
Metairie, Louisiana 70001
(504) 836-2220
    Attorneys for Defendant,
    Parish of Jefferson

JONES DAY
(By: Jerome R. Doak, Esquire)
(By: Amy Payne, Esquire)
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
    Attorneys for Washington Group
    International, Inc.

## Page 5

APPEARANCES (continued):

MONTGOMERY BARNETT
(By: Kenneth J. Gelpi, Jr., Esquire)
2300 Energy Centre
1100 Poydras St.
New Orleans, Louisiana 70163-3200
(504) 585-7693
    Attorneys for Limitation Dredgers

PRESENT THROUGH INTERNET I-DEP:

    Candace Cain, Esquire
    Dennis Reich, Esquire
    William E. Marple, Esquire
    Kirk N. Aurandt, Esquire
    Drew Ranier, Esquire
    Traci Colquette, Esquire

ALSO PRESENT:

    Gilley DeLorimier, CLVS
    Depo-Vue, Inc.
    (504) 828-8856

Page 6

```
 1
 2   APPEARANCES (continued):
 3
 4
 5
     ALSO PRESENT:
 6
 7     Paul Kuhlmeier
 8
       Chad Morris
 9
10
11
12
     REPORTED BY:
13
       MARGARET MCKENZIE, CCR, RPR, CMR, CRR
14     Certified Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1      S T I P U L A T I O N
 2      It is stipulated and agreed by and
 3   between counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   is hereby being taken under the Federal Rules
 6   of Civil Procedure, for all purposes, in
 7   accordance with law;
 8      That the formalities of reading and
 9   signing are specifically not waived;
10   That the formalities of sealing,
11   certification and filing are specifically
12   waived;
13      That all objections, save those as to
14   the form of the question and the
15   responsiveness of the answer, are hereby
16   reserved until such time as this deposition,
17   or any part thereof, may be used or sought to
18   be used in evidence.
19
20          *  *  *  *  *
21
22      MARGARET MCKENZIE, Certified Court
23   Reporter, in and for the Parish of Orleans,
24   State of Louisiana, officiated in
25   administering the oath to the witness.
```

Page 7

```
 1           I N D E X
 2
 3
 4   EXAMINATION BY:
 5
 6   MR. MAYEAUX...........................11
 7
 8   MR. LAMBERT..........................154
 9
10   EXHIBITS:
11
12   Exhibit 1..............................20
13   Exhibit 2..............................22
14   Exhibit 3..............................25
15   Exhibit 4..............................25
16   Exhibit 5..............................25
17   Exhibit 6..............................29
18   Exhibit 7..............................29
19   Exhibit 8..............................29
20   Exhibit 9..............................30
21   Exhibit 10.............................30
22   Exhibit 11.............................31
23   Exhibit 12.............................32
24   Exhibit 13.............................57
25   Exhibit 14............................145
```

Page 9

```
 1   VIDEOGRAPHER:
 2   This is the videotape deposition of
 3   Johannes Vrijling.  This deposition
 4   is being held today at 855 Baronne
 5   Street in New Orleans, Louisiana on
 6   August 16, 2007.  The time is 9:14
 7   A.M.
 8   Would the court reporter, please,
 9   now swear in the witness.
10      PROFESSOR JOHANNES K. VRIJLING,
11   Postbus 5048, 2600 GA Delft,
12   Stevinweg 1, 2628 CN Delft, after
13   having been first duly sworn by the
14   above-mentioned court reporter, did
15   testify as follows:
16   MR. BRUNO:
17   Joseph Bruno for the plaintiffs.
18   MR. LAMBERT:
19   Hugh Lambert also for the
20   plaintiffs.
21   MR. SCHULTZ:
22   Matt Schultz from the Levin
23   Papantonio firm for the plaintiffs.
24   MR. BRUNO:
25   I hope you all will indulge me, as
```

1913ee08-505d-4f07-bb77-e401739b2e91

Page 10

```
 1    you all know, I have to leave for a
 2    minute and Hugh Lambert will be
 3    taking the first chair.
 4    MR. MAYEAUX:
 5    Good.
 6    MR. BEARDEN:
 7    Joseph Bearden, East Jefferson
 8    Levee District, Lake Borgne Levee
 9    District.
10    MR. SUTTON:
11    Charles Sutton for Orleans Levee
12    District.
13    MR. ANZELMO:
14    Tommy Anzelmo, Orleans Levee
15    District.
16    MR. LANIER:
17    Charlie Lanier for the Sewerage &
18    Water Board of New Orleans.
19    MR. PAYNE:
20    Amy Payne, Washington Group
21    International.
22    MR. DOAK:
23    Jerry Doak, Washington Group.
24    MR. ZWAIN:
25    Gary Zwain for East Jefferson Levee
```

Page 11

```
 1    District.
 2    MR. KOURY:
 3    Greg Koury, Orleans Levee District.
 4    MR. MAYEAUX:
 5    Ben Mayeaux and Laura Rougeau,
 6    Orleans Levee District.
 7    MS. SHERMAN:
 8    Kea Sherman, Jefferson Parish.
 9    MR. GELPI:
10    Kenneth Gelpi on behalf of the
11    Dredgers.
12    MR. SCHULTZ:
13    We need to note Mr. Kuhlmeier's
14    present as well.
15    MR. MAYEAUX:
16    Paul Kuhlmeier is an expert
17    retained by certain defendants in
18    the levee litigation.
19    EXAMINATION BY MR. MAYEAUX:
20    Q.  Dr. Vrijling -- is that pronounced
21    correctly?
22    A.  "Vrijling." Many people say
23    "Vrijling" in foreign countries, so whatever
24    you prefer.
25    Q.  So feel free to correct me. Please
```

Page 12

```
 1    give us, sir, your name and business address.
 2    A.  My name is Johannes Kornelis
 3    Vrijling. And I'm from the Delft University
 4    of Technology, which is located at Stevinweg
 5    1 in Delft in the Netherlands.
 6    Q.  In the Netherlands?
 7    A.  Yeah.
 8    Q.  You have the right under United
 9    States federal procedure to review your
10    deposition and make appropriate corrections
11    and revisions.
12        MR. LAMBERT:
13        He will read and sign.
14        MR. MAYEAUX:
15        Thank you.
16    EXAMINATION BY MR. MAYEAUX:
17    Q.  Have you given a deposition before?
18    A.  No.
19    Q.  Have you ever --
20        MR. LAMBERT:
21        Let me stop you just for one
22        second, if you don't mind.
23        MR. MAYEAUX:
24        Sure.
25        MR. LAMBERT:
```

Page 13

```
 1        You just nodded your head, and
 2        that's great, but you need to make
 3        a verbal noise as well because the
 4        court reporter needs to make an
 5        accurate record.  And so when you
 6        do respond, do it verbally as well
 7        as by nodding.  Okay?
 8        THE WITNESS:
 9        Okay. I will.
10        MR. MAYEAUX:
11        Thank you, counsel.
12    EXAMINATION BY MR. MAYEAUX:
13    Q.  My job is to ask questions that
14    make sense. Sometimes I do not do my job.
15    If you have any question or there is any
16    issue about understanding my question, will
17    you stop me and ask me to rephrase or explain
18    what I'm asking?
19    A.  Yes. I will do.
20    Q.  Thank you.  The goal here is so
21    that we are communicating accurately.
22    A.  Thank you.
23    Q.  Good.
24    A.  Okay.
25    Q.  Do you have difficulty
```

PROF. JOHANNES VRIJLING VOL I (LEVEE)                              8/16/2007

Page 14

1  understanding me?
2     A.  No.
3     Q.  Is this your first encounter with
4  the litigation process?
5     A.  With the American litigation
6  process.  I have some experience in the Dutch
7  arbitrage process.
8     Q.  Okay.  And what experience have you
9  had?
10    A.  I'm an arbiter in the Dutch
11 construction industry.
12    Q.  Arbiter?
13    A.  Arbiter.
14    Q.  Construction disputes?
15    A.  Yeah, construction disputes.
16    Q.  Do you have any legal training?
17    A.  No.
18    Q.  How did you come to be an arbiter
19 for construction disputes?
20    A.  In the Netherlands the dispute
21 board is organized in such a way that our
22 legal people are people from contractors,
23 people from the engineering and people from
24 architects, and I'm a representative from the
25 engineering profession.

Page 15

1     Q.  Okay.  Have you had an opportunity
2  to testify in any court or before an
3  arbitration panel?
4     A.  No.
5     Q.  Did you speak with any eyewitnesses
6  to Hurricane Katrina or the conditions of the
7  city following Hurricane Katrina in
8  connection with your work on this case?
9        MR. LAMBERT:
10       Objection.  Go ahead and answer.
11       THE WITNESS:
12       I met some people because we
13       visited New Orleans after the
14       disaster, so I don't remember
15       exactly, but Ivan Van Heerden I met
16       once and Dennis Woltering, the TV
17       man, who visited also the
18       Netherlands.  And we guided him
19       around in Holland to show him the
20       dikes and so on.  So they
21       acquainted me with the situation
22       here and I've seen it afterwards,
23       so it was around the time of
24       Carnival New Orleans in 2006.
25 EXAMINATION BY MR. MAYEAUX:

Page 16

1     Q.  The first name you mentioned was
2  Ivor Van Heerden?
3     A.  Yes.
4     Q.  And the second name you mentioned
5  was Dennis --
6     A.  Woltering.
7     Q.  Can you spell that for me at least?
8     A.  W-O-L-T-E-R-I-N-G.  Woltering.
9     Q.  My question asked whether you had
10 met with any eyewitnesses to Hurricane
11 Katrina in the aftermath, compound, so I will
12 try to parse that out.  Was it your
13 appreciation that Mr. Van Heerden was present
14 in New Orleans in August 29, 30, 31 of 2005?
15    A.  I don't know where he was exactly
16 at that moment.
17    Q.  Okay.  What about Mr. Woltering?
18    A.  He told that he lived through the
19 hurricane in his house, but he did not get
20 flooded at all.
21    Q.  And what does Mr. Woltering do?
22    A.  He is an anchorman.  We had an
23 impression that he was rather famous here,
24 but no one seems to know him here, but if you
25 type it in on Google you have him at once.

Page 17

1     Q.  For the television station?
2     A.  Yes.  For the local TV station
3  here.
4     Q.  Did you speak with any other
5  witnesses who advised you that they had
6  stayed in New Orleans during Hurricane
7  Katrina?
8     A.  Not specifically.
9     Q.  Okay.
10    A.  Of course, walking around the Ninth
11 Ward you meet people, you greet them, they
12 say something to you, but not in the sense of
13 real exchange of facts.
14    Q.  As a preface to this next question,
15 Mr. Kok authored and signed the report, the
16 August 2007 report that we will be discussing
17 in some detail today.
18    A.  Yes.
19    Q.  As I appreciate it, you are
20 standing in his stead with respect to that
21 report?
22    A.  Yes.  And I'm his boss, let's say,
23 his co-worker of mine at the university.
24    Q.  When I ask questions about what you
25 relied on or what the Delft team relied on, I

                              5 (Pages 14 to 17)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                              8/16/2007

Page 18

1  intend that that question relate to the
2  information and conclusions in the report,
3  although you didn't read it. Do you
4  understand? Excuse me. I mean you didn't
5  write it.
6     A.  Write it, yes. Yeah, yeah, yeah.
7     Q.  So if I say, if I ask did you rely
8  upon certain information or certain data,
9  would you agree that that would be a question
10 applicable to the Delft team that prepared
11 the report?
12    A.  Yes.
13    MR. LAMBERT:
14    Excuse me. Objection.
15    Go ahead and answer.
16    THE WITNESS:
17    Yes. I think I was supervising the
18    Delft team, so I'm behind the
19    report.
20    MR. MAYEAUX:
21    Are you finished?
22    MR. LAMBERT:
23    Yeah.
24    MR. MAYEAUX:
25    Okay.

Page 19

1  EXAMINATION BY MR. MAYEAUX:
2     Q.  Did you, the Delft team, rely upon
3  any information from Mr. Woltering in
4  reaching the conclusions in the August 2007
5  report?
6     A.  I don't understand.
7     MR. LAMBERT:
8     Woltering?
9     MR. MAYEAUX:
10    Woltering.
11    THE WITNESS:
12    Woltering. I thought you were --
13    oh, no, we didn't speak to Mr.
14    Woltering.
15 EXAMINATION BY MR. MAYEAUX:
16    Q.  In connection with the preparation
17 of the report?
18    A.  This report.
19    Q.  Thank you. There are a number of
20 eyewitness accounts identified in the report.
21 Did your team, the Delft team, interview any
22 of those eyewitnesses?
23    A.  No. We just relied on the reports
24 that were prepared by IPET, by Van Heerden,
25 the American Society of Civil Engineers and

Page 20

1  so on.
2     Q.  I'm marking as Exhibit 1 two
3  Notices of Deposition. They are, I believe,
4  identical, except one is issued in the levee
5  case and one is issued in the caption issued
6  in the MRGO case. Mr. Vrijling, I'm handing
7  you Exhibit 1 and refer you to Exhibit A
8  attached to the Notice of Video Deposition.
9  Have you seen that document before?
10    A.  This one (indicating).
11    Q.  Yes, sir.
12    MR. LAMBERT:
13    Do you have a copy, counsel?
14    MR. MAYEAUX:
15    That's the only one I have. There
16    is another copy attached.
17    THE WITNESS:
18    I don't know.
19 EXAMINATION BY MR. MAYEAUX:
20    Q.  Okay. You don't recall seeing that
21 before?
22    A.  No. Should I have seen it before?
23    Q.  Did you bring any materials with
24 you today to produce to us?
25    A.  No. We only provided the report

Page 21

1  (indicating).
2     Q.  Okay.
3     A.  No extra things. And, of course,
4  the reports that were already published
5  (indicating).
6     Q.  All right. Attached to the July
7  2007 report at page 52 is a list of
8  references.
9     A.  Yeah.
10    Q.  Items 1, 2 and 3 refer to versions
11 of the IPET report, correct?
12    A.  Yeah.
13    Q.  Item 4 refers to the Team Louisiana
14 report in which Van Heerden participated,
15 correct?
16    A.  Yeah.
17    Q.  Item 5 is a reference to what is
18 known as the ILIT report, yes?
19    A.  Yes, it is.
20    Q.  Number 6 is a reference to the
21 Ministry of Public Works and Water
22 Management, Flood Risk Simulation by Delft.
23    A.  Yeah, by the Ministry of Public
24 Works.
25    Q.  I'm showing you what I'm marking as

6 (Pages 18 to 21)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 22

1   Exhibit 2 is a report provided to us
2   captioned: "Flood Risks and Safety in the
3   Netherlands, Floris Study, Full Report." Mr.
4   Vrijling, is that the document referenced at
5   item 6 in the July 2007 report that you have
6   issued?
7       A.  I think so.
8       Q.  Thank you.  What information from
9   the Floris study, which we've marked as
10  Exhibit 2, is utilized in the July 2007
11  report relative to the events in New Orleans?
12      A.  Now, this shows the principle how
13  we go about assessing flood risk in the
14  Netherlands, and the same approach, the same
15  ideas we applied to your Louisiana case.  So
16  in that sense it gives background information
17  about how we proceed and how we use it.
18      Q.  Does the Floris study -- is the
19  Floris study an example of a similar
20  evaluation as the Delft team conducted in New
21  Orleans that was conducted in the
22  Netherlands?
23          MR. LAMBERT:
24          Objection.
25          Go ahead and answer.

Page 23

1           THE WITNESS:
2           Yes.  This goes a step further,
3           because this not only looks to the
4           water levels at the end of the
5           storm search, but it also
6           calculates the numbers of
7           casualties and the damage and it
8           looks a little bit deeper into the
9           causes, whether it was piping or
10          overtopping.  So it --
11          MR. LAMBERT:
12          When you say it?
13          THE WITNESS:
14          This report (indicating).
15          MR. LAMBERT:
16          The Floris report.
17          MR. MAYEAUX:
18          Exhibit 2, Floris report.
19  EXAMINATION BY MR. MAYEAUX:
20      Q.  So a difference in the Floris
21  report and the study done by your team in New
22  Orleans is that the Floris report was done in
23  more detail?
24      A.  Yeah.
25          MR. LAMBERT:

Page 24

1           Objection.
2           THE WITNESS:
3           Yeah.
4   EXAMINATION BY MR. MAYEAUX:
5       Q.  Another difference is that the
6   Floris report made damage evaluations?
7       A.  Yes.
8           MR. LAMBERT:
9           Again an objection.
10          MR. MAYEAUX:
11          Sir?
12          MR. LAMBERT:
13          Another difference, you suggested
14          that the detail was not the damages
15          and that's not necessarily the
16          correct, so I'm just objecting.
17          MR. MAYEAUX:
18          Would you read back my question and
19          the answer, please.
20          MR. LAMBERT:
21          In other words, the detail could be
22          the damages, which --
23          THE WITNESS:
24          Exactly.  So it's not really the
25          detail.

Page 25

1           MR. LAMBERT:
2           Exactly.
3   EXAMINATION BY MR. MAYEAUX:
4       Q.  The next item on page 52 of the
5   July 2007 Delft report, number 7, is Delft
6   Hydraulics 2005 User Manual.
7       A.  Yeah.
8       Q.  I'm showing you a document provided
9   to us by levee plaintiff counsel titled:
10  "Tutorial Hydrodynamics in Sewers" that I've
11  marked as Exhibit 3.
12      A.  Uh-huh.
13      Q.  I'm also showing you a document
14  captioned: "Tutorial Hydrodynamics Flooding"
15  that I've marked as Exhibit 4.
16      A.  Yes.
17      Q.  Mr. Vrijling, are those the user
18  manuals referenced in item 7 on page 52 for
19  the report references?
20      A.  Yes, they are.
21      Q.  Thank you.  Do those manuals
22  instruct a person with access to the Delft
23  model in physically how to operate the model?
24      A.  In principle they do.
25      Q.  I'm marking as Number 5 a document

7 (Pages 22 to 25)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                              8/16/2007

Page 26

1  captioned: "Research on the Relationships
2  Between Flood Characteristics and
3  Fatalities," Final Report made 2007.
4      A.  Yes.
5      Q.  Mr. Vrijling, is that the thesis
6  report by Mr. Maaskant?
7      A.  Yes, that's right.
8      Q.  Identified as item 8 on page 52 on
9  the references in your report?
10     A.  Yes.  That's correct.
11     Q.  What information from Exhibit 5,
12  the research on the relationships between
13  flood characteristics and fatalities, was
14  utilized in the July 2007 report that has
15  been submitted to us?
16     A.  I don't think it was directly
17  utilized, but Mr. Maaskant did a similar
18  project in trying to hind-cast the flooding
19  of New Orleans in order to get a better
20  estimation of the fatalities.
21     Q.  And the project which Mr. Maaskant
22  conducted is reported in Exhibit 5?
23     A.  Yes.  Yes.  It's his thesis, his
24  master's thesis.
25     Q.  Item number 9 on page 52 is the

Page 27

1  American Society of Civil Engineers report,
2  correct?
3      A.  Yeah.
4      Q.  Please look on Exhibit 1, item 1,
5  which requests production of any and all
6  materials considered or relied upon by the
7  deponent in connection with this litigation.
8      MR. LAMBERT:
9          I'm going to interpose an
10         objection.  Are you finished with
11         the question?
12     MR. MAYEAUX:
13         Sure.
14     MR. LAMBERT:
15         Just interpose an objection to that
16         because, of course, it's so broad.
17         It is hard to get a handle on it.
18     MR. MAYEAUX:
19         Great.
20  EXAMINATION BY MR. MAYEAUX:
21     Q.  Other than the references on page
22  52 of your report that we just discussed --
23     A.  Yeah.
24     Q.  -- were there other materials
25  considered or relied upon by the Delft team

Page 28

1  in preparing the July 2007 report?
2      MR. LAMBERT:
3          Objection.  Same reason.
4      THE WITNESS:
5          Yes.  This is a very wide question.
6  EXAMINATION BY MR. MAYEAUX:
7      Q.  Sure.
8      A.  Because we relied on all our
9  knowledge of physics, civil engineering and
10  so on, so only the specific information
11  pertaining to the New Orleans case is listed
12  here in the references.  It is all regarding
13  New Orleans.
14     Q.  Do any other materials that the
15  team relied upon not listed in the references
16  on page 52 of the July 2007 report come to
17  mind?
18     A.  Yes, because we used survey data
19  from Mr. Chad Morris and we used LIDAR data
20  from the same source.  We got some rainfall
21  data from a guy which is just explicitly
22  mentioned in the text.  And maybe more, but
23  it's mentioned every time when we have a
24  source, it's mentioned in the text.
25     Q.  All sources --

Page 29

1      A.  Yes.  It's not referenced here, but
2  it's mentioned if someone told us or gave us
3  data.
4      Q.  Thank you.  I'm showing you what
5  I've marked as Exhibit 6, which is captioned
6  breach ID, with, sill elevation, and x-y
7  axis, and carries a Bates number of
8  MORR-1-REL.  Could you identify that document
9  for us.
10     A.  Yeah.  I think these are
11  measurements of the breaches that were
12  provided to us by I think Mr. Chad Morris.
13     Q.  Okay.  I'm showing you a document
14  I've marked as Number 7 with appears to be a
15  Bates number MORR-3-REL Breaches.  Could you
16  identify that, Exhibit 7 (indicating).
17     A.  I presume it will be input for the
18  Delft, but I'm not sure.
19     Q.  Okay.  I'm showing you a document
20  that was provided to us with Bates number
21  MORR-3-REL that I've marked as Exhibit 8.
22  Could you identify that, Dr. Vrijling.  Mr.
23  Vrijling.  Excuse me.
24     A.  Yeah.  This is an e-mail
25  communication regarding these data between

Page 30

1   Mr. Morris, who provided us with the data,
2   and Mr. Kok, my co-worker who guided the
3   team.
4      Q.  Thank you.
5      A.  Indicating the measurements of the
6   breaches.
7      Q.  I've marked as Exhibit 9 a
8   document, four-page document, marked it
9   appears to be a Bates number as MORR-8-REL
10  levee footprint.  Would you identify this for
11  us, Mr. Vrijling.
12     A.  I think this is one part of the
13  elevation data from Mr. Morris to us.
14     Q.  What part is not there?
15     A.  I wouldn't know.
16     Q.  Does that appear to be a complete
17  report with respect to elevation data from
18  Mr. Morris?
19     A.  It doesn't seem to me, but --
20     Q.  I'm marking as Exhibit 10 two pages
21  captioned Katrina surge hydrographs.  Could
22  you identify those graphs for us?
23     A.  These are input data.  We used
24  water levels on the outside boundaries of our
25  calculation model.  So it gives water levels

Page 31

1   as a function of time at certain points that
2   are mentioned here.
3      Q.  Okay.  And this information was
4   provided to you from Mr. Kemp?
5      A.  Yes.
6      Q.  Did Mr. Kemp provide the surge data
7   in --
8      A.  Yeah.
9      Q.  -- that graphical format only?
10     A.  No.  He also gave a file with
11  numbers.
12     Q.  I will mark as Exhibit 11 an
13  eight-page document captioned VRIJ-6-REL
14  Katrina Kemp Hydro.  Mr. Vrijling, is that
15  the source data for the surge hydrographs
16  that --
17     A.  Yeah.
18     Q.  -- were provided to you by Mr.
19  Kemp?
20     A.  Yeah.
21     Q.  May I see number 11, please.
22        MR. LAMBERT:
23        Can I interpose something?
24        MR. MAYEAUX:
25        Yes.

Page 32

1         MR. LAMBERT:
2         I know this is your first time
3         giving a deposition, and we didn't
4         give you the normal preliminaries,
5         I didn't realize it was your first
6         time, but the questions that are
7         being asked, you need to wait until
8         he is all the way finished before
9         you answer so the record is clear.
10        Okay?  And you're doing fine
11        verbally and that will make the
12        record clearer so we don't have
13        partial answers.  Okay?
14        MR. MAYEAUX:
15        Thank you, counsel.
16  EXAMINATION BY MR. MAYEAUX:
17     Q.  Mr. Vrijling, I'm showing you
18  another document consisting of eight pages.
19  This one captioned VRIJ-7-REL Hurricane Five
20  I've marked as Exhibit 12.  Are these
21  additional surge -- is this additional surge
22  data provided to the Delft team by Mr. Kemp?
23        MR. LAMBERT:
24        This is 12 and 13?  Just 12.
25        MR. MAYEAUX:

Page 33

1         12.
2         THE WITNESS:
3         I think so.  It is nearly the same
4         as far as I can see.
5   EXAMINATION BY MR. MAYEAUX:
6      Q.  Okay.
7      A.  I don't know which, if there are a
8   little refinements, but this is the type of
9   information we got that was depicted in the
10  graph.
11     Q.  Thank you.  You mentioned data
12  regarding the rainfall that occurred during
13  Hurricane Katrina.
14     A.  Yeah.
15     Q.  What data was provided to the Delft
16  team with respect to the rainfall which
17  occurred during the hurricane?
18     A.  It is figure 2.4 on page 8.
19     Q.  Thank you.
20     A.  It is mentioned in words on page 5.
21     Q.  In what form did the data regarding
22  the rainfall come to the Delft team?
23     A.  In numerical form.  This plot
24  (indicating).
25     Q.  Did the Delft team receive any data

PROF. JOHANNES VRIJLING VOL I (LEVEE)                                    8/16/2007

Page 34

1  regarding the rainfall other than the graph
2  identified at figure 2.4 on page 8 of the
3  report?
4       A.  Yes.  Also rainfall data in the
5  reports that were less detailed measured.
6       Q.  The surge data, the water surge
7  data that we discussed, was presented both
8  graphically and numerical.  Yes?
9       A.  Yeah, yeah, yeah.
10      Q.  Was the rainfall data that the
11 Delft team relied upon provided to the team
12 both graphically and numerically?
13      A.  I think it was certainly have been
14 provided numerically --
15      Q.  Okay.
16      A.  -- but maybe also graphically.
17      Q.  Do you know whether the numerical
18 data has been produced in connection with
19 your deposition?
20      A.  I don't think so.  If you don't
21 have it.  I'm not aware.
22      Q.  Does your team have that data
23 available for production?
24      A.  Yeah, yeah, yeah.  We can make a
25 print of the numbers if you would like.

Page 35

1       Q.  Great.  Thank you.  And how many
2  occasions have you traveled to New Orleans in
3  connection with your work with this project?
4       A.  With this project?
5       Q.  Yes, sir.
6       A.  With this project is the first
7  time.
8       Q.  Did you travel to New Orleans in
9  connection with your review of Mr. Maaskant's
10 thesis?
11      A.  No.
12      Q.  How many times have you traveled to
13 New Orleans following Hurricane Katrina in
14 August of 2005?
15      A.  This is the second time.
16      Q.  On the first occasion -- when was
17 the first occasion?
18      A.  It was around Mardi Gras time in
19 2006.
20      Q.  Did you perform any work in
21 connection with this case during your Mardi
22 Gras visit in 2006?
23      A.  Yeah.  Yeah.  We visited the
24 breaches all along and the damaged area, all
25 the breaches that are mentioned along London

Page 36

1  Avenue, along the 17th Street Canal and all
2  the damage.  It's the first time that I saw
3  breached levees.  In Holland we were talking
4  about it, what would happen if, but I've
5  never seen it myself, so this was the first
6  chance for me to see by my own eyes what all
7  my professors have told me would be a
8  terrible disaster if the dikes breached.  And
9  it was true.
10      Q.  How long did your inspection --
11      A.  One week.
12      Q.  -- last?
13      A.  One week.
14      Q.  One week.  Who accompanied you?
15      A.  A few students.  Wim Kanning and
16 Bas Jonkman.  I think it is not of any value
17 for you.
18          MR. LAMBERT:
19          No.  You can tell him.
20          THE WITNESS:
21          Wim Kanning and Bas Jonkman.
22 EXAMINATION BY MR. MAYEAUX:
23      Q.  Who are they, colleagues?
24      A.  Yes.  College students.  As soon as
25 they finish their master's they are students,

Page 37

1  then they are colleagues.
2       Q.  Were any measurements taken during
3  your inspections of the breaches?
4       A.  Not really.  Only photos.
5       Q.  Photographs.  Did the Delft team
6  rely upon the photographs in order to reach
7  the findings and conclusions set forth in the
8  July 2007 report?
9       A.  No, not directly, other than that
10 we have seen it a few times and that you know
11 what where is and what the size and the type
12 of the breaches and so on.  We relied only on
13 the factual data that was by Mr. Morris, so
14 we knew what to ask.
15      Q.  Were -- are those photographs still
16 in your possession?
17      A.  Yeah.
18      Q.  Were any attorneys involved in your
19 inspections of the breaches during Mardi Gras
20 '06?
21          MR. LAMBERT:
22          Objection.
23          Go ahead and answer.
24          THE WITNESS:
25          No.  No attorneys were involved.

10  (Pages 34 to 37)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                                    8/16/2007

Page 38

1       We were just with a group of Dutch
2   scientists or engineers.
3   EXAMINATION BY MR. MAYEAUX:
4       Q.  Had -- did Mr. Kok participate?
5       A.  No.  He was earlier.  The
6   students -- it was an earlier trip and then
7   Mr. Kok participated.
8       Q.  Is it accurate to say that the
9   Delft team did not rely upon your personal
10  observations and photographs which were made
11  and taken during Mardi Gras '06?
12      A.  Yes.  That's correct.  Other than a
13  little inference, but not direct, direct
14  basis for this calculations.
15      Q.  Have you provided a curriculum
16  vitae to --
17      A.  Yes.
18      Q.  -- the levee plaintiffs' counsel?
19      A.  Yeah.  It should be in your
20  possession, I presume.
21          MR. LAMBERT:
22      You don't have his CV?
23          MR. MAYEAUX:
24      No, sir.  Do you all have an extra
25      copy for our review?

Page 39

1           MR. SCHULTZ:
2       I thought I got it to you
3       yesterday.
4           MR. MAYEAUX:
5       Thank you.
6           MR. SCHULTZ:
7       Actually, it is time for me to take
8       a break.  I will go downstairs and
9       bring it up before I leave.
10          MR. MAYEAUX:
11      Thank you, counsel.
12          MR. LAMBERT:
13      He's getting one.
14          THE WITNESS:
15      Okay.
16  EXAMINATION BY MR. MAYEAUX:
17      Q.  Mr. Vrijling, what is your
18  educational background?
19      A.  I'm a civil engineer by education
20  and later on economist, master's in both
21  subjects.
22      Q.  Both civil engineering and
23  economics?
24      A.  Yeah.
25      Q.  A master's?

Page 40

1       A.  Yeah.
2       Q.  From where?
3       A.  Master in Civil Engineering is from
4   Delft and Economics is from Rotterdam.
5   Erasmus University.
6       Q.  Are doctorate degrees available in
7   civil engineering -- is a doctorate degree
8   available in civil engineering?
9       A.  Yes.
10      Q.  Have you pursued your doctorate in
11  civil engineering?
12      A.  No.  No.
13      Q.  Is a doctorate degree available in
14  economics?
15      A.  Yes.
16      Q.  Have you pursued a doctorate in
17  economics?
18      A.  No.  No.
19      Q.  Upon which, if not both, fields of
20  expertise do you draw for the conclusions and
21  opinions offered in the July 2007 report?
22      A.  Mainly civil engineering.  There's
23  not much economics involved.
24      Q.  I did not see a reference to
25  economics in the July 2007 report.

Page 41

1       A.  No.
2       Q.  Is that because there is none?
3       A.  That's true.
4       Q.  The field of expertise and
5   experience that you will draw on for today
6   and in connection with the July 2007 report
7   is in civil engineering?
8       A.  Civil engineering, especially
9   hydraulic engineering.
10      Q.  Great.  What specialized training
11  did you have, if any, in hydraulic
12  engineering?
13      A.  I'm a professor in hydraulic
14  engineering.  So you need no training, I
15  believe.  And I'm also a risk analysis it is
16  commonly called, but we call it probabilistic
17  design.
18      Q.  Please?
19      A.  Probabilistic design, which means
20  shortly explain the use of risk analysis in
21  order to design better structures.
22      Q.  Are you familiar with the legal
23  pleadings that have been filed in this case,
24  particularly the Master Complaints?
25      A.  No.  I know that there is legal

1    wrangling, but I don't know any detail of it.
2       Q.  Do you know how the attorneys have
3    suggested that the areas impacted by flooding
4    should be divided?
5       A.  I do not understand what you mean.
6    I hear your question, but I --
7       Q.  Okay.  Do you know whether
8    complaints, the lawsuits, filed in this case
9    set forth geographical boundaries for the,
10   for the suits?
11      A.  No, not really.  We just took the
12   bowls, let's say, we call them polders, which
13   are the subject of the flooding.  So it was
14   Metro, East and the St. Bernard Parish.  So
15   that's our entities which are from a
16   hydraulic point of view, our entities.  Maybe
17   it is also a legal entity, I don't know, but
18   we looked at it from a hydraulic engineering
19   point of view, and it is quite logical to
20   take these three main bowls because they were
21   flooded.  You could take more bowls, but they
22   were flooded.
23      Q.  Thank you.  I take it that the
24   Delft team played no role in drawing up the
25   legal pleadings in this case, is that

1    accurate?
2       A.  Yeah.  I'm not aware of any.
3       Q.  Is it Mathijs Kok?
4       A.  Yeah, Mathijs.  It is the bible,
5    the biblical disciple.
6       Q.  Did Mr. Kok play the lead role in
7    the drafting --
8       A.  Yes.
9       Q.  -- of the July 2007 report?
10      A.  Mr. Kok guided the effort, the
11   young students, and he had the lead in
12   drafting and writing the report.
13      Q.  Did you draft any parts of the
14   report?
15      A.  No.  I reviewed it.
16      Q.  Did you generate any work product
17   in connection with your review of the report?
18      A.  No, not in detail.  Only the
19   overview.  Now, as an experienced civil
20   engineer, you have some idea what the outcome
21   should be in advance, and if it's there, then
22   it's okay; if it's not there, it's not okay.
23   So in this sense, I looked at it with the
24   eyes of an experienced engineer, but I did
25   not interfere because everything seemed

1    correct.
2       Q.  Did you prepare a written critique
3    of the July 2007 report?
4       A.  No.
5       Q.  Did you verbally critique the
6    report with the team members?
7       A.  But it is not a critique.  I said
8    it is a very nice and clear report.  So
9    mathematically speaking it is critique,
10   but --
11      Q.  You are in agreement with the
12   conclusions and opinions set forth in the
13   July 2007 report?
14      A.  Yes.
15      Q.  All right.  You adopt and stand by
16   those conclusions and opinions as your own?
17      A.  Yes, I do.
18      Q.  Have you reached any conclusions or
19   opinions in connection with your work in this
20   case that are not set forth in the July 2007
21   report?
22      A.  Yeah, but that's more from a simple
23   point of view.  If you look to the entire
24   problem, a lot of calculations are made to
25   find out what's the main cause, why you

1    should look with experience, and it is very
2    much clear that it is mainly the breaches and
3    not the rain.  So in this sense it confirmed
4    my point of view.
5       Q.  Is the point you just made set
6    forth in the July 2007 report?
7       A.  Yes.  Yes.
8       Q.  Okay.  Are you prepared to offer
9    any opinions or conclusions beyond what are
10   included in the July 2007 report?
11      A.  If you ask me and it seems
12   reasonable to me, then I can do it, but in
13   such an open question I wouldn't know.
14      Q.  Okay.  Have you been asked by
15   counsel for the levee plaintiffs to conduct
16   any additional work?
17      A.  No.
18      Q.  Have you been asked by counsel for
19   the levee plaintiffs to prepare any
20   additional reports?
21      A.  No.  The only thing which was
22   discussed that you might need more input
23   data, input files and so on.  So we said we
24   are ready to provide you with that, so that
25   would be extra work which we promised to do.

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                          8/16/2007

Page 46

1    Q.  You are prepared, if any is
2    identified, to produce materials that the
3    team relied upon in preparing the July 2007
4    report?
5    A.  Yes, indeed.
6    Q.  But you have not been asked to
7    generate any additional materials or new
8    reports?
9    A.  No.
10   Q.  Correct?
11   A.  Yeah.
12   Q.  Thank you.  Who assisted in
13   preparing the July 2007 report?
14   A.  You want to have the names?
15   Q.  Yes, sir, please.
16   A.  Yes, sir.  That's Mr. Kok.  Mr.
17   Marinus Aalberts and Bob Maaskant.  And then
18   there was an initial guy, Mr. de Wit.  So
19   they formed the team and they had some
20   discussions with me and also with a colleague
21   of mine, Professor Stelling.
22   Q.  Spell his name, please.
23   A.  S-T-E-L-L-I-N-G.  Stelling.
24   Q.  Did Professor Stelling participate
25   in the drafting or review of the July 2007

Page 47

1    report?
2    A.  No.  He was an advisor on the
3    intricacies on the Delft 1-2D package.  He is
4    originally from Delft Hydraulics and he is
5    one of the coders of the program.
6    Q.  One of the coauthors?
7    A.  Yeah, coding, writers, originators
8    of this program.  Continuously working on
9    improvements of this program.
10   Q.  Professor Stelling provided
11   technical assistance in the modeling program?
12   A.  Yeah.  Yeah.
13   Q.  Is that accurate?
14   A.  Yeah.
15   Q.  What is Mr. Kok's, what are Mr.
16   Kok's qualifications?
17   A.  He is a mathematician with, I
18   think, nearly 20 years experience in
19   hydraulic engineering and optimization in the
20   field of hydraulic engineering, safety policy
21   questions.
22   Q.  Can you describe the role Mr. Kok
23   played in the review of materials in
24   preparation of the July 2007 report?
25   A.  Yeah.  He was the project manager.

Page 48

1    Q.  M. Aalberts?
2    A.  Marinus Aalberts.  Yeah.
3    Q.  Is that Mister or Miss?
4    A.  Mister.
5    Q.  Mister.  What are Mr. Aalberts'
6    qualifications?
7    A.  He's a Bachelor of Science in Civil
8    Engineering.  At this moment he's working on
9    his master's thesis.
10   Q.  What role did Mr. Aalberts play in
11   connection with the preparation of this
12   report?
13   A.  He was running the model, Bob
14   Maaskant, he and Mr. de Wit were running the
15   model, preparing the input and checking it
16   was all okay and making runs, providing nice
17   plots and so on.
18   Q.  Mr. Maaskant, what are his
19   qualifications?
20   A.  He is a Master of Civil
21   Engineering.  He just passed his Master's
22   thesis.
23   Q.  And his participation in the
24   drafting of this report was the same as Mr.
25   Aalberts'?

Page 49

1    A.  Yes.
2    Q.  To run the model?
3    A.  Yes.
4    Q.  And the same with Mr. de Wit?
5    A.  Mr. de Wit the same, but he is a
6    few years older, so he had a little more
7    experience.
8    Q.  And Mr. De Wit's qualifications
9    are?
10   A.  Also civil engineer.
11   Q.  The Delft 1D2D model requires that
12   inputs be loaded into the model?
13   A.  Yes.
14   Q.  Generally what inputs are required?
15   A.  You need a model of the terrain
16   elevations and you need data about water
17   levels at the outside and then you need to
18   specify, in this case, how the sewers are
19   operating, in this case the operation is
20   breaching, but the intent of the package is,
21   of course, to have sewers and pumping
22   stations.  So everything you can model with
23   this package to study flows in such city
24   areas for rain, for sewage, for rivers, you
25   name it, this was applied for this special

PROF. JOHANNES VRIJLING VOL I (LEVEE)                                    8/16/2007

Page 50

1  case. Then modeling of the breaches requires
2  some extra effort because which you have to
3  specify the development in time.
4      Q. Did the Delft team independently
5  develop any of the input data that you just
6  described?
7      A. To make it very clear, because it's
8  a complicated question, what we did was we
9  looked into the available data, when and how
10 wide the breaches were, and then especially
11 on the point of time of the opening, runs
12 were made and then the flow of the water
13 inside the bowl was compared with testimonies
14 of eyewitnesses. And then the thing was
15 tuned to get it right.
16     Q. Okay.
17     A. So there is some discussion about
18 when exactly the breach was and how wide it
19 was at some moment. So then you, we tuned
20 the breach in order to be as near as possible
21 to the eyewitness accounts so that we thought
22 we had the best repeat in the model of the
23 real flood.
24     Q. Thank you. Did the Delft team
25 independently confirm the topographical

Page 51

1  elevations?
2      A. No. We just accepted them as being
3  true.
4      Q. Relied upon the information
5  provided to you by Mr. Morris?
6      A. Yes.
7      Q. Is the same true of the water
8  level?
9      A. Yes.
10     Q. Surge hydrographs?
11     A. Yes. Provided by Mr. Kemp and we
12 didn't check.
13     Q. You accepted as accurate that data?
14     A. Yeah. Yeah.
15     Q. How was the water depth calculated?
16     A. In the general it was also provided
17 by Mr. Morris. I don't know. We got GIS
18 files to model it all.
19     Q. Okay. And the Delft team accepted
20 that data as accurate?
21     A. Yes.
22     Q. The same would be true of the
23 pumping station data?
24     A. Yes. Certainly.
25     Q. The rainfall information?

Page 52

1      A. Yeah.
2      Q. Was the Delft team provided any
3  data specific to the named plaintiffs in the
4  lawsuit?
5      A. I'm not aware. I don't know the
6  names of the plaintiffs, so if it would be,
7  no.
8      Q. You have no information regarding
9  the addresses of the named plaintiffs?
10     A. I only know Mr. Bruno.
11     Q. Ah. Do you have any information
12 regarding the addresses of Mr. Bruno's
13 clients who are identified in the lawsuit?
14     A. No.
15     Q. All right. So you would not know
16 their lot elevations, their finished floor
17 elevations for their homes?
18     A. No, no, no. No.
19     Q. Have you reviewed any deposition
20 testimony from Mr. Bruno's clients?
21     A. I don't know. I've seen, as an
22 example, one deposition of the Water Board
23 about the pumping stations, if they worked,
24 the principle of the pumping station of the
25 Levee Board, just to have some idea what's

Page 53

1  happening to me.
2      Q. Is that the only deposition
3  transcript that you or the Delft team, to
4  your knowledge, has reviewed?
5      A. Yes. And no other.
6      Q. When did you review the Sewerage
7  and Water Board transcript?
8      A. I think last Sunday.
9      Q. Did you note that the information
10 in the Sewerage and Water Board deposition
11 conflicted in some respects to assumptions
12 made by the Delft team in the July 2007
13 report?
14     A. I did not compare it in detail, but
15 the idea was generally the same, that many of
16 the stations failed and that only a few were
17 actively working.
18     Q. Okay. You have made no adjustments
19 to the model due to your review of the
20 Sewerage and Water Board report?
21     A. Now, some list was provided to us
22 of which pumping stations were working at
23 which time.
24     Q. Okay.
25     A. I think it is mentioned somewhere

14  (Pages 50 to 53)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 54

1  in the report who gave us the report, so
2  there was --
3      Q.  Page 10?
4      A.  Maybe.  I don't know where it is
5  exactly mentioned, but somewhere.  Oh, yeah,
6  yeah.  I saw it in this table.
7      Q.  The table referenced as 3.2 on page
8  10 of your report is the list to which you
9  were referring?
10     A.  Yes.
11     Q.  Have you made any adjustments to
12 the model due to your review of the Sewerage
13 and Water Board deposition that occurred last
14 Sunday?
15     A.  No.  No.
16     Q.  On how many occasions has the Delft
17 1D2D model been used to attempt to depict a
18 flooding event?
19     A.  Hundreds of times because we use it
20 also to study the flooding of our Dutch
21 polders, but these are hypothetical events,
22 so we used it here to have some comparison
23 with the real events.  And in many other
24 cases, as I said, in engineering design this
25 package is used for design rivers, designing

Page 55

1  flow systems, irrigation systems, Venice
2  storm surge barrier.  Any big river project
3  in Bangladesh many, many times.
4      Q.  With respect to flooding events,
5  the model has been used in attempts to
6  predict what flooding might occur should
7  there be a breach or overtopping of a levee
8  or dike in the Netherlands?
9      A.  Yes.  Yeah.
10     Q.  Has the model ever been used to
11 attempt to recreate a flood event after there
12 had been a levee breach or overtopping before
13 this occasion?
14     A.  I -- I don't think so.
15     Q.  What did the Delft team attempt to
16 portray in its model?
17     A.  In this report?
18     Q.  Yes, sir.
19     A.  We attempted to show what the
20 relative influences of rain, overtopping and
21 breaches in a most simple explanation.
22     Q.  That would be the relative
23 influences to flooding?
24     A.  Yeah.  To flooding, to the water
25 level.

Page 56

1      Q.  The water level which you just
2  referred, would that be maximum flood depth?
3      A.  Yeah.  The development, but
4  especially the maximum flood depth at the end
5  of the disaster.
6          MR. MAYEAUX:
7          This may be a good time, counsel,
8          if you are ready to take a couple
9          of minutes.
10         MR. LAMBERT:
11         It's up to you.
12         VIDEOGRAPHER:
13         Off the record.  It's 10:24.
14         (RECESS TAKEN)
15         VIDEOGRAPHER:
16         Returning to the record.  It is
17         10:41.
18         MR. LAMBERT:
19         Before we get started, I just
20         wanted to note for the record that
21         this deposition is being taken
22         obviously pursuant to federal rules
23         and that we're reserving objections
24         except as to the form of the
25         question until the testimony is

Page 57

1  used.
2          MR. MAYEAUX:
3          Yes, as set forth in Case
4          Management Order No. 4 and
5          subsequent orders of the court
6          issued in this case.  We agree.
7  EXAMINATION BY MR. MAYEAUX:
8      Q.  Mr. Vrijling, I'm showing you
9  Exhibit No. 13 which has been provided to us
10 this morning.  Is that an accurate and
11 current copy of your Curriculum Vitae?
12     A.  Yes, it is.
13     Q.  Thank you.  I'm showing for your
14 reference a letter hand delivered today from
15 Robert Warren to myself copied Jerry Doak
16 with an attached CV that you're welcome to
17 look at.  Can you tell us what data is
18 contained on that disk?
19     A.  This disk contains the input data
20 for the Sobek model, and especially the
21 geometrical data because the data of the
22 development of the breaches is more inside
23 model.  So this could provide you very
24 quickly with -- this morning I called Holland
25 to send the files.

JOHNS PENDLETON COURT REPORTERS                    800  562-1285

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 58

1    Q.  Thank you very much.
2    A.  Regarding some question here
3  (indicating).
4    Q.  Yes.  Thank you very much.
5    A.  And if you need more, then we can
6  provide you with more, but --
7    Q.  Dr. Kolmar (phonetically spelled)
8  may tell us what more we may need?
9    A.  Yeah.
10   Q.  Thank you.  At page 1 of the report
11  under Section 1.1 the focus and the goal of
12  this exercise was to determine the relative
13  contributions of the flooding sources for
14  selected sites.
15   A.  Yes.
16   Q.  And the relative contribution of
17  the flooding sources would be to the maximum
18  flood level as calculated at the selected
19  site?
20   A.  Yes.
21   Q.  The report does not attempt to
22  correlate flood level -- excuse me.  Strike
23  that.  The report does not attempt to
24  correlate flood sources with flood damage,
25  does it?

Page 59

1       MR. LAMBERT:
2       Objection.
3       THE WITNESS:
4       It correlates -- we did not study
5       damage.  We studied flood levels,
6       so this last step we did not make.
7       And for every source we gave a
8       graph how high, what the level
9       would have come if only this source
10      or only these two sources or all
11      sources would have been available
12      or were working.
13  EXAMINATION BY MR. MAYEAUX:
14   Q.  Thank you.
15   A.  It is not only a point, it is a
16  graph in time.
17   Q.  What assumptions were made, if any,
18  with respect to the time the areas under
19  study were impacted by hurricane force winds?
20   A.  We didn't study the hurricane force
21  winds.  We only studied the flood levels.
22  And in this sense the major contributions are
23  from the breaches, so the moments at which
24  people report that the dikes, the levees have
25  broken, are important and the time sequence

Page 60

1  of the rainfall is important, but far less
2  important.
3    Q.  Whether buildings or structures had
4  been damaged by wind before the floodwaters
5  arrived is something that your team did not
6  consider?
7    A.  No.
8    Q.  Correct?
9    A.  Yeah.  That is correct.
10   Q.  On page i there's a statement that
11  output qualities are dependent upon input
12  parameters and the accuracy of the base grid,
13  yes?
14   A.  Yeah.
15   Q.  What output is referenced in that
16  statement?
17   A.  Yeah.  I think theoretically all
18  output, but my opinion, as I did in this
19  case, the resolution of the calculation is
20  far more than was needed for this subject.
21   Q.  Would you turn to page -- I'm
22  sorry.  Were you finished with your response,
23  Mr. Vrijling?
24   A.  Yeah.  Yeah.
25   Q.  Would you turn to page 19, please.

Page 61

1    A.  19.
2    Q.  On page 19 is figure 3.6.
3    A.  Uh-huh.
4    Q.  Is this a graphical depiction of
5  the various floodwater contributions to the
6  maximum flood level at location 1?
7    A.  Yes, it is.
8    Q.  Is this the output referred to in
9  this statement on page i, that output quality
10  is dependent upon the input parameters?
11   A.  Yeah, in some sense.  Yeah.
12   Q.  Okay.
13   A.  So especially the time, of course.
14  If you wouldn't know the time of the breach,
15  then the entire figures shifts.
16   Q.  What input parameters are you
17  referring to in this statement?
18   A.  Most of all, as I said, the moment
19  of the breach, the size of the breach.  And
20  then there was a particular problem, let's
21  say, in the 17th Street Canal, because if we
22  made the run there without any adaptations,
23  the polder flooded far more quickly than
24  eyewitness explained in the report.  So then
25  it was construed that there might have been

16  (Pages 58 to 61)

1  resistance in the 17th Street Canal, which
2  appeared to be so because there are
3  photographs of debris hanging in front of the
4  Hammond bridge and the inflow was reduced in
5  the 17th Street Canal in order to get a
6  better depiction of the flood inside the
7  bowl. So there you see that there's a, some
8  judgment coming into the input data to get
9  everything right.
10     Q. A subjective consideration of some
11 of the input data is necessary to calibrate
12 the model?
13     A. Yeah. And if you look as an
14 engineer to all the things that are
15 mentioned, so the debris at the bridge and
16 the size of the breach and the velocity of
17 the flooding of the polder, that you have a
18 logical way of combining all the facts as
19 good as possible and that gives you the idea
20 that you have the best hind-cast of what has
21 happened.
22     Q. One example of a subjective
23 evaluation for input data would be, as you
24 just described, the degree of blockage to the
25 17th Street Canal at its confluence with Lake

1  Pontchartrain?
2     A. Yes.
3     Q. The team made various estimates of
4  that degree of blockage in calibrating the
5  model such that the model comported with
6  available objective data?
7     A. Yeah. Eyewitness reports inside
8  the bowls.
9     Q. Okay.
10     A. So if you call it objective, then
11 yes.
12     Q. High water marks, for instance,
13 were considered?
14     A. Yeah, yeah, yeah.
15     Q. Other input parameters would
16 include rainfall?
17     A. Yeah. Rainfall.
18     Q. Distribution of rainfall?
19     A. Yeah.
20     Q. Operation of pumps?
21     A. Yeah.
22     Q. Sewers, drains?
23     A. Yeah. Sewers were not included
24 because we deemed that the sewerage system
25 was of lesser importance and the rain and its

1  total was of lesser importance. We did a
2  rough calculation of the rainfall, so not all
3  sewerage system was modeled in that model.
4     Q. Okay. The base grid referenced on
5  page i with respect to the output quality.
6     A. Uh-huh.
7     Q. Is the base grid the 50 meter
8  block?
9     A. Yeah. Yes, it's the 50 meter grid.
10     Q. So each grid square is 50 by 50
11 meters square?
12     A. Yes.
13     Q. On page 1, your report suggests
14 that three sources of floodwater causes are
15 considered: Breaches, overtopping and
16 rainfall. Is that accurate?
17     A. Yeah, that's accurate. In the text
18 somewhere also seepage is discussed as being
19 non-important.
20     Q. For purposes of your report and
21 model, what is a breach?
22     A. A breach is when the levee stops
23 starting to function as it was designed, so
24 that it gets a hole and has a top level which
25 is reduced with respect to the design ideas.

1     Q. Okay. Would -- are there also
2  floodwall breaches?
3     A. Yes. 17th Street Canal was a
4  floodwall breach.
5     Q. Okay.
6     A. And the London Avenue was a
7  floodwall breach.
8     Q. What is -- how is overtopping
9  defined and used for your model and report?
10     A. Overtopping is defined of the
11 geometry of the levee is still intact, but
12 that the water flows over it (indicating).
13     Q. What is scouring?
14     A. Scour is that you have very fast
15 flow of water and it takes soil material with
16 it and then a hole is growing. So the
17 scouring is also the process that breaches
18 the levee in the end.
19     Q. Scouring can result after a flood
20 control structure is overtopped?
21     A. Yes.
22     Q. And scouring can increase the size
23 of a flood control structure breach?
24     A. Yes. Very quickly. And also there
25 are instances where you have a connection

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 66

1   between an embankment and soil and the
2   concrete structure and you get a
3   concentration of water flow around the
4   concrete structure and mostly the soil is not
5   able to withstand it and you have a hole, not
6   in the structure, but just beside it.
7   Various examples of this failure in New
8   Orleans.
9       Q.  In the report there are various
10  water source locations identified either as a
11  breach or an overtopping.
12      A.  Yes.
13      Q.  If an overtopping results in
14  scouring, is that location characterized as a
15  breach or an overtopping?
16      A.  No.  It's only characterized as a
17  breach if the crest level is going down.
18      Q.  Which occurs with scouring,
19  correct?
20      A.  Yeah, yeah, but the scouring of an
21  embankment starts at the back slope and you
22  get a hole, so sometimes it survived with
23  only holes at the back side and sometimes it
24  goes on and the whole levee is eaten away, as
25  we have seen along the MRGO.  A few

Page 67

1   kilometers just vanished.
2       Q.  In a situation where the levee
3   structure remained intact until the water
4   surge was higher than the levee structure
5   such that overtopping occurred, if scouring
6   then followed, do you characterize that event
7   as an overtopping or a breach?
8       MR. LAMBERT:
9       Objection.
10      THE WITNESS:
11      If the crest level stays intact,
12      then we characterize it as
13      overtopping. Only if the crest
14      level goes down, then it's a
15      breach.
16  EXAMINATION BY MR. MAYEAUX:
17      Q.  Thank you.  The report attempts to
18  address, again on page 1, the main causes of
19  the flooding.
20      A.  Uh-huh.
21      Q.  Does that suggest that there are
22  other causes of the flooding not considered
23  in the model and report?
24      A.  In theory, yes, because seepage and
25  water coming from the subsoil contributes,

Page 68

1   too, but that is neglected and is negligible
2   also, practically speaking.
3       Q.  Your conclusion is that any water
4   source not considered in this report would be
5   negligible?
6       A.  Yes.
7       Q.  What, to you, on a percentage
8   scale, would be the upper limit of negligible
9   contribution?
10      MR. LAMBERT:
11      In this instance?  In this --
12      MR. MAYEAUX:
13      As referenced in the report --
14      MR. LAMBERT:
15      In this hurricane?
16      MR. MAYEAUX:
17      -- that the main causes of flooding
18      were considered on page 1,
19      subsection 1.2 2.
20      MR. LAMBERT:
21      Objection.
22      THE WITNESS:
23      My quick answer would be if it was
24      less water than a foot in the bowl.
25  EXAMINATION BY MR. MAYEAUX:

Page 69

1       Q.  Okay.  If a site that you
2   considered in the report has a floodwater
3   source of less than one foot at that site,
4   you would consider that source negligible?
5       A.  Yeah, in the context of this
6   disaster.
7       Q.  Water level is defined in your
8   report at page 3 as water height above or
9   below NAVD88, yes?
10      A.  Yes.
11      Q.  What is NAVD88?
12      A.  I think that's the reference level
13  in America. We have such a level in Holland
14  which is NAP New Amsterdam level.  I assume
15  this is the sort of American reference datum.
16      Q.  And the reference datum is to what,
17  mean sea level?
18      A.  I'm not aware exactly, but mostly
19  it is about mean sea level.
20      Q.  For the purposes of the Delft
21  team's report, did you intend that water
22  height above NAVD88 be expressed as a height
23  above mean sea level?
24      A.  I was strictly speaking about
25  reference datum, but the practice might be

18  (Pages 66 to 69)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 70

1    approximately above mean sea level --
2       Q.  Okay.
3       A.  -- but it's quite common in
4    engineering to give levels to some reference
5    datum, chart datum.  So commonly on charts
6    and technical drawings such an indication of
7    the level is given.
8       Q.  Okay.  When -- turn to page 19,
9    please, again of the report.  In figure 3.6
10   captioned "water level location 1," there is
11   a point zero -- on the left vertical axis
12   there is a reference to 0.0.
13      A.  Yeah.
14      Q.  And there also is on the left
15   vertical axis a reference to minus 7.  What
16   is the minus 7, what does that mean as far as
17   an elevation is concerned?
18      A.  That means you are 7 feet below
19   NAVD88.
20      Q.  Below NAVD88?
21      A.  Yeah.
22      Q.  Whatever NAVD88 --
23      A.  Yeah.
24      Q.  The minus 7 shown on this graph is
25   7 feet below that?

Page 71

1       A.  Yeah.
2       Q.  Do you know what NAVD88 is?
3       A.  I gave an explanation a little bit
4    earlier --
5       Q.  Okay.
6       A.  -- but I'm not --
7       Q.  For purposes of our discussion
8    today, would you be comfortable referring to
9    the NAVD88 data point as mean sea level?
10      A.  In principle, yes.
11      Q.  Okay.  Using that agreement, the
12   minus 7 on figure 3.6 would be 7 feet below
13   sea level?
14      A.  Yes.
15      Q.  Thank you.  What did the Delft team
16   use to determine ground level elevation?
17      A.  The data provided to us by Mr.
18   Morris.
19      Q.  Was that LIDAR data?
20      A.  I think so, yes.
21      Q.  Was LIDAR data also used to
22   determine water depth?
23      A.  No.  Only indirectly because you
24   feed the bottom profile in the computer,
25   that's based on the survey data, and then you

Page 72

1    calculate the water depth.
2       Q.  Okay.  Is there an accepted error
3    factor to LIDAR data?
4       A.  Yes.
5       Q.  What would that be?
6       A.  There is some discussion also in
7    the IPET report, but I think the error in the
8    LIDAR data is less than all the speculation
9    about time and flows and this.  It would be a
10   minor concern.
11      Q.  Would you agree that LIDAR
12   elevation data has an error factor of plus or
13   minus in excess of one foot?
14      A.  I would think it was less, but --
15      Q.  Okay.  That's beyond your field of
16   expertise?
17      A.  Yes.
18      Q.  The model is capable of considering
19   and analyzing sewers, drains and pumping
20   stations?
21      A.  It is.
22      Q.  Sewers and drains were not
23   considered in the model referenced in the
24   July 2007 report, correct?
25      A.  No.  They were out -- calculated by

Page 73

1    hand, the effect of the pumping stations.
2       Q.  Okay.  Two pumping stations were
3    considered?
4       A.  In the Metro bowl.
5       Q.  And those were Stations 19 and
6    I-10?
7       A.  Yeah.
8       Q.  The pumping station inputs were
9    used, were assessed using a spreadsheet
10   model?
11      A.  Yeah.
12      Q.  That's different from the
13   Sobek-1D2D?
14      A.  Yes.
15      Q.  Was the spreadsheet model
16   integrated with the Sobek-1D2D model?
17      A.  No.  It was outside.
18      Q.  Okay.  Have you produced the
19   spreadsheet model for our review?
20      A.  I don't know, but it is very
21   simple.
22      Q.  Is the spreadsheet model available
23   to you?
24      A.  Yes.  Yeah, we can ask it or you
25   can ask it.

1     Q.  Thank you.  How was the spreadsheet
2  model for the pumping stations reported in
3  the July 2007 Delft report?
4     A.  It just is collecting the rainwater
5  and pumps as long as it is raining.  It is on
6  the bottom of page 18.
7     Q.  Yes.  On page 19 again, figure 3.6
8  showing water level location 1, is the effect
9  of the operation of Pumping Station 19 and
10  Pumping Station I-10 illustrated in figure
11  3.6?
12     A.  Yes, it is.
13     Q.  Okay.  And how, if that data was
14  not integrated into the Sobek model, how was
15  it illustrated in the figure?
16     A.  This figure is based on a data file
17  containing Sobek output for the major causes.
18     Q.  Yes.
19     A.  And then the output from the
20  spreadsheet for the smaller, the rainfall
21  cause.
22     Q.  So the pump data spreadsheet model
23  was manually --
24     A.  Yes.
25     Q.  -- added to figure 3.6 and the

1  other figures showing contributions by
2  location?
3     A.  Yes.  Not strictly manual, but we
4  agree on the meaning.
5     Q.  We're communicating?
6     A.  Yeah.
7     Q.  Thank you.  Is the Sobek-1D2D
8  capable of considering and analyzing without
9  having to resort to a spreadsheet model
10  pumping station data?
11     A.  Yes.  It could contain the entire
12  sewerage system and all the pumps and so ever
13  and so on, but regarding the minor
14  contribution of the system, we choose not to
15  invest so much time in modeling the entire
16  sewerage system.  That was one reason.  And
17  the second reason was that you, as in the
18  case of such a storm surge, you are never
19  sure if it is really functioning.  It could
20  be filled with debris, whatever.  So you make
21  a very intricate model and you don't know if
22  you really improve on the model due to this
23  debris and accidents and settlements, you
24  know, on what is happening.  So that was our
25  reasoning not to take the effort to include

1  it in the Sobek model.
2     Q.  By considering the impact of the
3  operation of the two pumping stations that
4  were analyzed, is it your position that the
5  model output is more accurate?
6     A.  Yeah.  It's more accurate because
7  they have some effect as is shown in this
8  figure, 3.6.  You see the blue line is going
9  down, so first the water level is increasing
10  while the pumps are operating.  Then the
11  rainfall stops and then it goes down.
12     Q.  If you were provided accurate data
13  about the time of operation and the pump
14  capacities for the pumping stations that you
15  have not yet considered, would that data make
16  the model more accurate?
17     A.  But we considered all the data
18  available for the pumping stations.
19     Q.  I understand.  So if you were
20  subsequently provided accurate data regarding
21  the operation and capacities of the other
22  pump stations, if that data were provided to
23  you and utilized, would it make the model
24  more accurate?
25     MR. LAMBERT:

1     Objection.
2     Go ahead and answer it.
3     THE WITNESS:
4     Yeah.  If I understand your
5     question correctly, you are going
6     to the hypothetical situation that
7     all the pumping stations would have
8     worked during the storm.  And if we
9     could then include these pumping
10     stations into the model.
11  EXAMINATION BY MR. MAYEAUX:
12     Q.  Sure.
13     A.  So that answer is yes.
14     Q.  Okay.
15     A.  And then the second part of the
16  question is would it help very much.  So then
17  you give me the theoretical point that it
18  makes the model more accurate, but it doesn't
19  help you much against the flooding.  So you
20  would have said it was, how many, 8 feet and
21  then it is 7 and a half feet.
22     Q.  Okay.
23     A.  Big deal, because all the pumps
24  were working.  So that's our opinion on the
25  contribution of the pumps if they had been

Page 78

1    working all the time.  It's only a foot.
2        Q.  It would be a negligible impact as
3    we discussed earlier --
4        A.  Yes.
5        Q.  -- in your opinion?
6        A.  Exactly.
7        Q.  Relevant, but negligible?
8        A.  Yeah.  And that's, of course, in
9    the context of a disaster.  If it would be a
10   normal rainfall during a sunny day, then
11   nobody accepts that there is half a foot of
12   water in the street, so then it's
13   unacceptable, but if you have a hurricane
14   threat, then nobody cares too much about a
15   foot.
16       Q.  If the data concerning the
17   operation of the other pumping stations were
18   utilized, the model would show more
19   variability by location as to floodwater
20   source, would it not?
21           MR. LAMBERT:
22           Objection.  Objection.
23           THE WITNESS:
24           I don't think so.  I think the
25   quickness by which the water

Page 79

1        adjusts itself in the entire bowl
2        far exceeds the contribution of the
3        different pumping stations.  That
4        would be my guess.
5    EXAMINATION BY MR. MAYEAUX:
6        Q.  You have not considered the
7    operation of Pumping Station 6 in connection
8    with this model, have you not?
9        A.  No.
10       Q.  There are eight sites or
11   locations --
12       A.  Uh-huh.
13       Q.  -- modeled for the Metro New
14   Orleans polder, ten for St. Bernard and five
15   for New Orleans East?
16       A.  Yes.
17       Q.  What are those sites?  Are those
18   grid squares?
19       A.  Yes, they are grid squares where
20   you get output from the model.
21       Q.  So, for instance, site one is a 50
22   by 50 meter grid square?
23       A.  Yeah.  Or it might be the
24   connection, the corner between four grid
25   squares.

Page 80

1        Q.  Okay.  How were those sites
2    selected?
3        A.  I think they were selected in
4    discussion with Mr. Bruno.  He had the
5    specific interest and we adjusted on the deep
6    points and the shallow points.  We expect
7    differences to be seen.
8        Q.  Okay.  The sites modeled by the
9    Delft team you understand were selected by
10   counsel?
11       A.  Yes, and in agreement with us,
12   because every shift bowel has a point and the
13   Gentilly ridge has a point.
14       Q.  I did not see an address or an x-y
15   coordinate or any other descriptive that
16   would allow us to determine where those sites
17   are.  Can you help with that?
18       A.  Yes.  The first help is figure 3.5.
19       Q.  Right.
20       A.  And if you want to have more
21   detailed information, we can provide you with
22   it, yes.
23       Q.  Do you have x-y coordinates for the
24   sites that were modeled?
25       A.  Not with me, but they are known.

Page 81

1        Q.  You can provide those to us?
2        A.  Yes.
3        Q.  Thank you.  The ground elevation
4    for each site is depicted in the figures --
5        A.  Yes.
6        Q.  -- as the lowest point on the
7    vertical axis?
8        A.  Yes.
9        Q.  So would it be accurate for figure
10   3.6 water level location 1 to estimate that
11   ground level elevation at this point is just
12   a little lower than 7 feet below sea level?
13       A.  Yes.
14       Q.  Is the entire grid square at
15   location 1 in the model estimated to be a
16   little lower than 7 feet below sea level?
17       A.  Yes.
18       Q.  The water depth figures as shown in
19   the model would also correspond to the 50 by
20   50 meter square?
21       A.  Yes.
22       Q.  You would agree that there may be
23   elevation differences at any 50 by 50 --
24   within any 50 by 50 meter grid square
25   selected in --

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 82

1    A.  Yes.  These are modeling errors.
2    Q.  Sure.  Is the ground level
3  elevation for the 50 by 50 meter square
4  intended to be a depiction of an average for
5  that square?
6    A.  Yes.
7    Q.  The ground level elevation in that
8  50 by 50 meter square would not show finished
9  floor elevations for any buildings or
10  structures in that grid?
11    A.  No.
12    Q.  Is there any reason a more
13  sensitive grid size was not used?
14    A.  Practical reasons:  Computer time,
15  availability of data, and you need also more
16  GIS data.
17    Q.  You would have no criticism in
18  using a 5 meter grid square, would you?
19    A.  No.  It would be better, but it's
20  not necessary.
21    Q.  It would be better because it would
22  be more sensitive?
23    MR. LAMBERT:
24    Objection.
25    THE WITNESS:

Page 83

1    Yeah, more accurate, but there's
2    not much need to know it so
3    accurate, I think, in 5 by 5 meter
4    grids.
5  EXAMINATION BY MR. MAYEAUX:
6    Q.  For the --
7    A.  For the purpose of this study.
8    Q.  For the goals your team was
9  attempting to reach in this report, a 50
10  meter grid square was adequate?
11    A.  Yeah, too fine maybe.
12    Q.  To arrive at more sensitive
13  results, a 5 meter grid square could be used?
14    MR. LAMBERT:
15    Objection.  Vague.  Sensitive.
16    MR. MAYEAUX:
17    Sure.
18  EXAMINATION BY MR. MAYEAUX:
19    Q.  Do you understand my question?
20    A.  It could be used, but it doesn't
21  improve the results, as I said already to
22  you.  So you introduce an accuracy that is
23  only in your own mind, but not the reality.
24    Q.  For instance, if there was a 2-foot
25  elevation, ground level elevation, difference

Page 84

1  within a 50 meter grid square, the entire 50
2  meter grid square would be averaged?
3    A.  Yeah.
4    Q.  If there were 5 meter grid squares
5  used for that same area, the actual ground
6  elevation would more closely depict reality,
7  would it not?
8    MR. LAMBERT:
9    Objection.
10    THE WITNESS:
11    Yes, it would, but it wouldn't have
12    any effect on the water flows is
13    still to be seen.
14  EXAMINATION BY MR. MAYEAUX:
15    Q.  The model results are available for
16  all sites?  See page 2.
17    A.  I don't know what you mean for all
18  sites, but --
19    Q.  That's what I was fixing to ask
20  you.
21    A.  -- you could get this graph for
22  every grid point of 50 by 50.
23    Q.  Please look at the sentence below
24  the indentation on page 2.  It suggests model
25  results are available for all sites.

Page 85

1    A.  Yes, yes.  As I explained, for
2  every 50 by 50 meter grid, if you would wish
3  to have a nice birthday present we could
4  provide you with any grid.
5    Q.  No, sir.  Thank you.  If we were to
6  give you an address within New Orleans, could
7  you identify or could you or your assistants
8  identify which grid that address conforms to?
9    A.  If you would give us coordinates we
10  could help you.  If you give an address, I
11  wouldn't know.
12    Q.  Okay.  So it would be possible
13  given any, given an x-y coordinate for you to
14  model --
15    A.  To produce such graphs.
16    Q.  -- a 50 by 50 meter valuation for
17  any address in New Orleans?
18    A.  If you provide us an x-y coordinate
19  and you would like to have such a graph as
20  depicted in 3.6 --
21    Q.  Yes.
22    A.  -- we could provide you with one.
23    Q.  If we gave you multiple
24  addresses --
25    MR. LAMBERT:

22  (Pages 82 to 85)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 86

1    Counsel, just so the record is
2    clear, obviously you can take an
3    address, you can go there with a
4    GPS and get an x-y coordinate, so
5    if you could just use x-y
6    coordinates we wouldn't have to go
7    through this address thing every
8    time.
9    EXAMINATION BY MR. MAYEAUX:
10    Q.  Thank you.  If you were given
11    multiple x-y coordinates, would you then have
12    to run the model for each coordinate?
13    A.  No.  All the data are available in
14    the output files, except for the little
15    spreadsheet calculation for the rainfall
16    minus the pumping station.  That would have
17    to be added.
18    Q.  Okay.  The figure 3.6 on page 19 is
19    an output for a single x-y coordinate,
20    correct?
21    A.  Yes.
22    Q.  The figure 3.7 on page 20 is an
23    output for a different x-y coordinate,
24    correct?
25    A.  Uh-huh.  Yes.

Page 87

1    Q.  So these figures were -- and it
2    goes on for all of the different points that
3    you modeled?
4    A.  Yes.
5    Q.  In order to provide a graph as
6    shown on figure 3.6 for any additional x-y
7    coordinate that is given to you, what would
8    you have to do?
9    A.  Look into the files of the existing
10    output to get, let's say, the black, the red
11    and the green curve and then we have to add
12    the blue one by the Excel model.
13    Q.  And you would perform that process
14    for each additional x-y coordinate provided
15    to you?
16    A.  Yes.
17    Q.  On page 9, figure 3.1 for your
18    reference, on a macro scale the New Orleans
19    Metro is evaluated by the Delft team as a
20    single basin, correct?
21    A.  Yes.
22    Q.  In your comment and note to figure
23    3.1, you, the report suggests that the New
24    Orleans Metro basin actually consists of a
25    number of smaller basins or polders, correct?

Page 88

1    A.  Yes.
2    Q.  How many did the Delft team
3    identify for the New Orleans Metro basin?
4    How many polders or sub-basins?
5    A.  They are not really identified.  I
6    think they just flow from the model.  So one
7    important inference is this Gentilly ridge
8    which separates the polders, the deep
9    polders, which bordered the lake and the rest
10    of the city.  And then between the canals you
11    have sort of separation.  So it would be,
12    very quickly, one, two, three, four, five,
13    maybe -- yeah.
14    Q.  And there may be others?
15    A.  Yeah, there might be others, but
16    all this incorporated in the plan of the
17    soil, the elevation data which were fed into
18    the model.  And we make -- that's typical
19    Dutch.  We make a difference between the bowl
20    and these things by accident because the
21    Gentilly ridge is not maintained by any water
22    board.  It is there.  The railroad is not
23    meant to be a levee and it is not maintained
24    as such.  So maybe it works, maybe it
25    doesn't.

Page 89

1    Q.  The topographical data which was
2    input into the model defines by its nature
3    the existence and number of sub-basins?
4    A.  Yes.
5    Q.  And, of course -- not
6    identification -- strike that.  Inclusion of
7    the impact of the existence of sub-basins is
8    critical in the accurate functioning of the
9    Sobek model?
10    MR. LAMBERT:
11    Objection.
12    THE WITNESS:
13    Yes.  And it's also very important
14    because it could wreak havoc.  If
15    you have a small bowl which fills
16    very quickly, then all the people
17    in that bowl will drown because
18    they have no time to escape.  And
19    later on it flows on, so it has
20    also certain danger aspects.  If
21    there were small deep bowls by
22    nature, it's a dangerous aspect.
23    EXAMINATION BY MR. MAYEAUX:
24    Q.  Thank you.  Page 26, figure 4.1,
25    the New Orleans East polder similarly

23  (Pages 86 to 89)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                                    8/16/2007

Page 90

1   consists of a number of sub-basins, correct?
2       A.  Yes.
3       Q.  You have not endeavored to count
4   name and number of those basins, have you?
5       A.  Not really.
6       Q.  Okay.  Page 37, figure 5.1.  St.
7   Bernard sub-polder.  St. Bernard polder.
8   Excuse me.  Again, the topography of that
9   area shows the existence of some sub-basins,
10  does it not?
11      A.  Yes, but here is maybe a special
12  mention of this Arpent levee, which there is
13  a special double levee, the MRGO levee and
14  then the second one behind the marsh.
15      Q.  And the Arpent levee, you are
16  referring to the 40 Arpent levee?
17      A.  Yes.
18      Q.  Yes.  Thank you.  The model does
19  not consider overtopping by wave action?
20      A.  No.
21      Q.  Is that because you consider
22  overtopping by wave action in connection with
23  this model to be negligible as a floodwater
24  source?
25      A.  Yeah, more or less.  And it was

Page 91

1   included in a rather specific way.  So if we
2   knew that the wave overtopping was important,
3   and it looked how the levee was reduced in
4   crest level due to erosion.  And then as soon
5   as wave overtopping started, then in some
6   linear way the height of the levee was
7   reduced over time to model the erosion effect
8   of the wave overtopping.  So not so much the
9   water input as the erosion.  And then at some
10  moment the levee crest comes below the storm
11  surge level and then it starts to overtop and
12  flow into the bowl.
13      Q.  As a floodwater source --
14      A.  Yeah.
15      Q.  -- wave action was not considered?
16      A.  No.
17      Q.  Correct?
18      A.  Yeah.
19      Q.  Have you personally reviewed the
20  ASCE, American Society of Civil Engineers,
21  report that is referenced as a reference to
22  the Delft model?
23      A.  Yeah.  I have read it.
24      Q.  Did you note that in the Inner
25  Harbor Navigational Canal wave action in

Page 92

1   excess of four feet had been observed?
2       A.  Yes.  There is usually overtopping
3   there and damage to the inner slope.
4       Q.  Wave action in excess of 4 feet
5   would have had a negligible contribution to
6   the flooding in New Orleans in your view?
7       A.  Yeah, compared with what happened
8   on the other sides.
9       Q.  Is the Sobek-1D2D model capable of
10  analyzing the impact of wave action on flood
11  depth?
12      A.  No, because it doesn't contain wind
13  waves.
14      Q.  In contrast, the model is capable
15  of considering and analyzing sewers, ditches
16  and small waterways, correct?
17      A.  Yes.
18      Q.  But you did not attempt to input
19  the effect of sewers, ditches and small
20  waterways for the July 2007 report, correct?
21          MR. LAMBERT:
22          Objection.
23          THE WITNESS:
24          No.
25  EXAMINATION BY MR. MAYEAUX:

Page 93

1       Q.  Didn't use it?
2       A.  No.
3          MR. LAMBERT:
4          Objection.
5   EXAMINATION BY MR. MAYEAUX:
6       Q.  That's because you considered the
7   impact from those structures to be
8   negligible?
9       A.  Yeah, in principle, yes.  And it's
10  a lot of effort to include everything, so
11  apart from what was in the terrain model, we
12  did not look specifically into if there are
13  ditches --
14      Q.  If the effect of sewers, ditches
15  and small waterways had been considered,
16  would the model output be, in your view, more
17  accurate?
18          MR. LAMBERT:
19          Objection.
20          THE WITNESS:
21          No.  I don't think so.
22  EXAMINATION BY MR. MAYEAUX:
23      Q.  Why not?
24      A.  Because, as I said earlier, you're
25  operating in a fog of uncertainty, a fog of

24 (Pages 90 to 93)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                              8/16/2007

Page 94

1  war they say, but it is not a war, and you
2  can try to model everything in 5 by 5 meter
3  grids and especially all the parts, but it
4  doesn't give a better picture overall. So
5  strictly speaking, mathematically speaking it
6  could be more accurate, but there are so many
7  other things you don't know that it doesn't
8  help you really.
9      Q.  Are you suggesting that there are
10  so many variables and assumptions that in an
11  attempt as was made to hind-cast various
12  floodwater source contributions that the
13  model is simply too coarse for the
14  contributions from sewers, drains and ditches
15  to be of any assistance in reaching an
16  accurate result?
17      MR. LAMBERT:
18      Objection.
19      THE WITNESS:
20      No, not the model is too coarse,
21      but given the things that you know
22      about what happened in those days,
23      there's some limit on the level of
24      detail that you can reach.  And in
25      this case, there are so many things

Page 95

1      that are not clear, including some
2      things that might be very clear,
3      the exact location of sewers will
4      be hidden in the end result and all
5      the other uncertainties.  So it has
6      not much influence.
7  EXAMINATION BY MR. MAYEAUX:
8      Q.  Do you contend -- strike that.
9  Would you agree that there is some degree of
10  error in the team's modeling results?
11      A.  Yeah, of course.
12      Q.  Have you endeavored to quantify the
13  degree of error that may exist for any of the
14  locations that you modeled?
15      A.  Not explicitly I think.  I don't
16  think they have done it explicitly, but it
17  would very quickly be half a foot, plus or
18  minus, in the water level.
19      Q.  In the water level?
20      A.  Yeah.
21      Q.  What about in source contribution
22  percentage, would you agree that there is
23  some degree of error?
24      A.  Yeah, of course, but --
25      Q.  Have you attempted to quantify in

Page 96

1      an --
2      A.  Not --
3      Q.  -- inches or feet fashion the
4  degree of error associated with your source
5  contribution calculations?
6      A.  No, not explicitly, but we are
7  confident that what we have done is a true
8  picture of what has happened and what
9  contribution is of the various sources.  So
10  we do not think that any inaccuracy, which is
11  always there, is undermining the conclusions.
12      Q.  Depending upon what input
13  assumptions are used, reasonable engineers
14  could find some variability in the
15  comparative contributions of the flood
16  sources at any given site?
17      A.  Yes.
18      Q.  Agreed?
19      MR. LAMBERT:
20      Excuse me.  Excuse me.  Are you
21      including time in here?
22      MR. MAYEAUX:
23      I thought we've been talking about
24      maximum flood level.  That's what's
25      modeled in your --

Page 97

1      THE WITNESS:
2      We have the flood path.  So the
3      level is more reliable than the
4      path, but --
5  EXAMINATION BY MR. MAYEAUX:
6      Q.  Level more reliable than path?
7      A.  Yeah.
8      Q.  Maximum flood level?
9      A.  Yes, because the time of the breach
10  and the observations, there are some
11  differences in the various sources.  So
12  that's still unreliable, but the final level
13  and the contributions in the end are quite
14  certain.
15      Q.  Good.  Is there a question?
16      (REQUESTED PORTION READ BY REPORTER)
17  EXAMINATION BY MR. MAYEAUX:
18      Q.  Thank you.  The inclusion of the
19  effect of sewers, ditches and small waterways
20  in the model would make, would add to the
21  complexity of the model, would it not?
22      A.  Yes.
23      Q.  And would add to the variability of
24  the model output, would it not?
25      A.  I'm not certain.  It would add, I

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                                    8/16/2007

Page 98

1   think, to the quickness of flooding.  For
2   instance, if you would have a Metro line,
3   Metro or subway, and that Metro would be a
4   conduit for the floodwaters going from one
5   bowl to the other, that might have a
6   difference, but then it's quicker from one
7   side to the other than you would expect only
8   on the ground level elevations, but in this
9   one there are smaller things.  That would be
10  my suggestion.
11       Q.  Quicker from one side to the other,
12  does that mean that waters from a given
13  breach or overtopping would have traveled
14  across the polder faster than your model has
15  calculated?
16       A.  Yes.  For instance, if there would
17  have been a Metro line from Lake
18  Pontchartrain bowls under the Gentilly ridge
19  to the city, then it would have been very
20  quickly in the center of the city.
21       Q.  Which would then increase the
22  relative impact from that source to the
23  locations within the city?
24       MR. LAMBERT:
25       Objection.

Page 99

1        THE WITNESS:
2        I don't think so because the rain
3        is still locally, would be called
4        locally, and I think the
5        floodwaters would pass through this
6        Metro line.  So in the end, you
7        know, in the end the bowl is
8        entirely filled.
9   EXAMINATION BY MR. MAYEAUX:
10       Q.  To answer that question --
11       A.  Equal to the sea level.  So in the
12  end it's no difference I'm afraid.
13       Q.  Okay.
14       A.  In the final levels.
15       Q.  Are you able to -- strike that.
16  The model does not consider buildings or
17  other structures?
18       A.  No.  Other than in the general
19  value of the roughness.
20       Q.  All right.  Is the model capable of
21  considering the presence and effect of
22  buildings and other structures on, in
23  reaching its output?
24       A.  No, because we have 50 by 50 meter
25  grids, so it is insufficiently refined.

Page 100

1        Q.  What roughness coefficient did your
2   team use?
3        A.  We had a value of 2 that was also
4   communicated in some e-mail.
5        Q.  Cole --
6        A.  White and Colebrook.
7        Q.  White and Colebrook, value of 2?
8        A.  Yes.
9        Q.  Was that roughness coefficient
10  utilized uniformly for all three bowls?
11       A.  Yes.
12       Q.  Is the model capable of utilizing
13  different roughness coefficients within a
14  polder?
15       A.  Yes.  I think every 50 by 50 meter
16  element could have a different roughness if
17  you wanted.
18       Q.  If each grid square were assigned a
19  roughness coefficient depending upon its
20  characteristics, the model would be more
21  complex?
22       A.  Yeah.
23       Q.  The output would show more
24  variation?
25       A.  Yeah.  Again, it's the same route

Page 101

1   as we discussed already, it would show more
2   variation in how quickly it distributes, but
3   the final result in the depth of flooding
4   will not differ.
5        Q.  The final conclusions about the
6   sources contributing to that flooding depth
7   could very well differ?
8        MR. LAMBERT:
9        Objection.
10       THE WITNESS:
11       No.  No.  It would be the same.
12  EXAMINATION BY MR. MAYEAUX:
13       Q.  The model does not take into
14  consideration the direct impact of wind?
15       A.  No.
16       Q.  What impact of wind is relevant to
17  a hydrological model?
18       A.  It might have influence if you have
19  a water bowl and you have wind passing over
20  it and the bowl will be pushed up
21  (indicating) against --
22       Q.  The fetch?
23       A.  -- the fetch.  Exactly.  Just as
24  the Lake Pontchartrain was pushed up against
25  the levee on the south shore.  Such a case --

26 (Pages 98 to 101)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                          8/16/2007

Page 102

1  such a question you have also inside the
2  bowls, but that was neglected.
3    Q.  It was not considered in your
4  modeling effort for this report?
5    A.  Yes.  It was not considered.
6    Q.  Your model is capable of analyzing
7  the effect of wind fetch in reaching its
8  output, is it not?
9    A.  Yes.  It can be done.
10   Q.  Is the same true of underseepage,
11  you did not consider it, but the model is
12  capable of evaluating its impact?
13   A.  Yes.  You could introduce more
14  sources which give seepage, rise to seepage
15  water in the model.
16   Q.  Is backflow from pumps considered
17  in your model?
18   A.  No.
19   Q.  Is your model capable of evaluating
20  and analyzing the effect of backflow from
21  pumps in reaching its output?
22   A.  Yeah, I think so.  I think it could
23  even be done automatically if you didn't know
24  the specifications of the pump.  And as soon
25  as the water level is higher than some level,

Page 103

1  that it starts flowing back (indicating).
2    Q.  You received data from Mr. Kemp?
3    A.  Uh-huh.
4    Q.  Mr. Morris?
5    A.  Uh-huh.
6    Q.  And Ivor Van Heerden?
7    A.  Yes.
8    Q.  Are there any other sources of
9  input data used for the --
10   A.  I don't think so.
11   Q.  -- for the analysis of your report?
12   A.  I don't think so.
13      MR. LAMBERT:
14      Off the record.
15      VIDEOGRAPHER:
16      Off the record.
17      (OFF THE RECORD)
18      (LUNCH RECESS)
19      VIDEOGRAPHER:
20      We are now returning to the record.
21      It is 1:11.
22      MR. LAMBERT:
23      The last thing we were doing is
24      fetch.
25  EXAMINATION BY MR. MAYEAUX:

Page 104

1    Q.  Fetch.  Yes.  The surge hydrographs
2  were provided to you by Mr. Kemp?
3    A.  Yes.
4    Q.  And accepted by your team as
5  accurate and utilized in the model.
6    A.  Uh-huh.
7    Q.  Assume for me that for the IHNC
8  west surge hydrograph, which is location D, I
9  think, in your report, assume for me, please,
10  that that surge hydrograph by Mr. Kemp
11  underestimates the actual surge elevation at
12  that location.
13      MR. LAMBERT:
14      Objection.  Go ahead and answer.
15  EXAMINATION BY MR. MAYEAUX:
16   Q.  Okay?
17   A.  Yeah.
18   Q.  Using that assumption, that the
19  surge elevation is greater than what was
20  provided to you by Mr. Kemp --
21      MR. LAMBERT:
22      At location?  At location?
23      MR. MAYEAUX:
24      D.
25      MR. LAMBERT:

Page 105

1      Thank you.
2  EXAMINATION BY MR. MAYEAUX:
3    Q.  What impact, if any, would that
4  have on the results shown in your model?
5      MR. LAMBERT:
6      Do you have an amount?
7      MR. MAYEAUX:
8      No.
9      MR. LAMBERT:
10      Objection.
11  EXAMINATION BY MR. MAYEAUX:
12   Q.  Can you answer the question as
13  posed?
14   A.  Yeah.  Then more water would flood
15  in from that side and the relative
16  contribution of the flood or the breaches
17  overtopping from that side would be larger.
18      (OFF THE RECORD)
19  EXAMINATION BY MR. MAYEAUX:
20   Q.  Different scenario.  Assume that
21  the breach, a breach dimension is understated
22  in your model.  Would then the impact of
23  floodwaters from that breach be understated
24  in the model output?
25      MR. LAMBERT:

27 (Pages 102 to 105)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 106

1    Objection. Do you have an amount?
2    We're talking about like a gallon
3    or --
4    MR. MAYEAUX:
5    No. General proposition.
6    THE WITNESS:
7    So you're saying if the breach was
8    bigger?
9  EXAMINATION BY MR. MAYEAUX:
10   Q. No. Yes. If the breach were
11 bigger than you have modeled --
12   A. Yeah, then --
13   Q. -- in reality --
14   A. Then the flooding will be quicker,
15 but not more, because the end result is
16 decided by the outside water level, so the
17 first case you said we had a higher water
18 level at the outside. Then there will be
19 more contribution from the flood and also
20 more damage, but if the hole is bigger, then
21 it will flood in quicker, but not necessarily
22 higher.
23   Q. Is that, is the difference between
24 those two scenarios the velocity factor and
25 the timing factor that you referenced

Page 107

1  earlier?
2    MR. LAMBERT:
3    Objection.
4    THE WITNESS:
5    Yeah, but in a quite different
6    context.
7  EXAMINATION BY MR. MAYEAUX:
8    Q. Okay.
9    A. So we had the discussion about the
10 sewerage and Metro system and if you increase
11 the water level, then it is also flowing much
12 faster, but it also gets higher. And in the
13 case of the Metro and the ditches, it flows
14 faster because it would not be higher.
15   Q. But would not be higher?
16   A. No. In the end.
17   Q. Okay. Does the Sobek model take
18 into account the evolution over time of a
19 breach?
20   A. It's put as an input into the
21 model, so the breach is not developing
22 physical principles. You put in the
23 development over time as a function of time
24 as an input.
25   Q. And that development over time is

Page 108

1  calculated how?
2    A. I explained already this morning
3  that we assumed from the observation how
4  quickly it developed, and we did a
5  calculation about velocity with which the
6  floodwater spreads into the neighborhood, and
7  then we compare that with eyewitness
8  accounts. And if it's too quick, we use the
9  breach or splay a little bit until it fits
10 together.
11   Q. The relevant dimensions for a
12 breach would include width?
13   A. Yeah.
14   Q. Sill elevation?
15   A. (Witness nods head.)
16   Q. And slope?
17   A. Slope not -- the most important are
18 the width and the sill elevation. The width
19 is the amount of water and the sill elevation
20 flow velocity.
21   Q. In your model and the output
22 results from your model, is the timing that a
23 breach commenced critical to determining the
24 effect of waters from that breach on the
25 flood levels at the locations you analyzed?

Page 109

1    A. I explained this morning also
2  already that it's from inference on the
3  velocity how quickly the water reached
4  certain places if it changed the velocity of
5  the breach, but not on the final levels in
6  the bowl and also not on the contribution of
7  the various sources.
8    Q. Look, please, at figure 2.2, page
9  6. I'm sorry. Figure 2.4, page 8.
10   A. Yeah.
11   Q. I apologize. Does this graph
12 depict rainfall distribution over 24-hour
13 period for the three polders your team
14 analyzed?
15   A. Yes. That's what we put in because
16 it's based on the radar data from Mr. Lee
17 Branscome, so it's a measurement regarding
18 the rainfall.
19   Q. Did -- have you calculated total
20 24-hour rainfall for each of the three
21 polders?
22   A. I did it myself roughly. So if you
23 look roughly, it's about 10, 12 inches
24 roughly. That's also what was mentioned in
25 other reports, yes.

28 (Pages 106 to 109)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 110

1    Q.  Okay.
2    A.  12 to 14 inches rainfall.
3    Q.  Okay.  For rainfall Orleans Metro,
4  your model calculates 12 to 14 inches of
5  rainfall uniformly within the New Orleans
6  Metro polder?
7    A.  Yeah.
8    Q.  You would acknowledge that uniform
9  rainfall across that polder does not comport
10 with reality.
11    A.  It's a model.
12    Q.  Yes, sir.  Have you -- did you see
13 in the American Society of Civil Engineers
14 report that the rainfall experienced by New
15 Orleans during Hurricane Katrina was a
16 100-year rainfall event for 24-hour rainfall
17 volume?
18    A.  Yes.  I have the page here.
19    Q.  Great.
20    A.  Because I was interested to show
21 you also that it talks about the storm, it
22 addresses the waves, the water levels, and
23 only in the last sentence a little bit about
24 the rain.  So apparently these guys also
25 thought that rain was not too important.

Page 111

1    Q.  Thank you.
2    A.  Indeed they mention that it is 13.6
3  inches in total in this storm and that
4  100-year rainfall was 12.58.
5    Q.  Do you know what the engineering
6  design criteria is for the New Orleans pump
7  and drainage system?
8    A.  I don't know, but maybe something
9  in the 100 years.
10    Q.  Excuse me?
11    A.  I don't know, but maybe something
12 in the 100 years because if all had worked,
13 then they could have pumped it away.
14    Q.  It is your understanding that New
15 Orleans drainage and pumping system is
16 designed to handle a 100-year rainfall event?
17    A.  Yes, approximately, I think --
18    Q.  Okay.
19    A.  -- but I don't know, but that was
20 my estimation from it.
21    Q.  Does the Sobek model have the
22 capacity to account for differing rain
23 distributions within a polder?
24    A.  I don't think so because we had the
25 rainfall also in an outside model, in the

Page 112

1  Excel where we assumed that it was evenly
2  distributed.  And I don't think that Sobek,
3  maybe some different version, but it could
4  handle rainfall for every 50 square meters.
5  I don't think so --
6    Q.  Okay.
7    A.  -- but, anyhow, we didn't do it.
8    Q.  Because rainfall was assumed to be
9  uniform --
10    A.  Yes.
11    Q.  -- for purposes of modeling?
12    A.  Yes.
13    Q.  Would you agree that at some
14 locations the relative contribution of
15 rainfall would be understated and that other
16 locations your model would calculate the
17 relative contribution as an overstatement?
18    A.  It might be possible, but it's a
19 long period, so you have ten, 12-hour
20 periods, so that would also even out.
21    Q.  Have you seen reports of localized
22 rainfall in excess of 18 inches for a 24-hour
23 period?
24    A.  No.
25    Q.  Have you seen reports of localized

Page 113

1  rainfall in excess of 22 inches for a 24-hour
2  period during --
3    A.  Regarding New Orleans?
4    Q.  -- within New Orleans during
5  Hurricane Katrina on September 29, 2005?
6    A.  No.
7    Q.  Look, please, at page 10, table
8  3.1.
9        MR. LAMBERT:
10       What page?
11       MR. MAYEAUX:
12       Page 10, table 3.1.
13 EXAMINATION BY MR. MAYEAUX:
14    Q.  Under item 1, 17th Street, the time
15 breach development has two numbers, a 6:00
16 to 7:00.  I take it that's A.M., correct?
17    A.  That is?
18    Q.  6:00 to 7:00 A.M.?
19    A.  Yeah, yeah, yeah.
20    Q.  And then the second number is
21 described as major breach at 9:00 A.M.  Yes?
22    A.  Yes, that's true.
23    Q.  Did the model consider that the
24 floodwaters from the breach of the 17th
25 Street Canal commenced at 6:00 A.M. or 9:00

29 (Pages 110 to 113)

1913ee08-505d-4f07-bb77-e401739b2e91

Page 114

1  A.M. or some other time?
2     A.  No.  This was what I explained
3  already this morning, going to and back from
4  the results of the calculation and the
5  remodeling of the inflow under the Hammond
6  bridge and the size of this breach.  When we
7  first input the large breach we got far too
8  much inflow, so then it was reduced, but by
9  reducing the water level due to the debris at
10  the Hammond bridge.  And this breach was
11  growing starting at 7:00 and then growing
12  linearly, and then in the last five minutes
13  on the big bend, we assumed that it was five
14  minutes before 9:00, then it runs across to
15  the final size.  And that gave the best
16  modeling of the eyewitness accounts of the
17  people inside the bowl.  So then we had to,
18  let's say, suppress the amount and suppress
19  the moment in time to represent the
20  eyewitness accounts in the bowl.
21     Q.  Okay.
22     A.  But this is all available for your
23  study, if you want.
24     Q.  The calculations?
25     A.  Yeah, and how the growth of the

Page 115

1  hole was put into the model.
2     Q.  That is -- that is part of the
3  reliance data that your team reviewed and
4  relied upon in preparing the report?
5     A.  No.  We -- it was our own best
6  estimation.
7     Q.  Your work product?
8     A.  Yeah.
9     Q.  Your team's work product?
10     A.  Yes.
11     Q.  Which is translated into
12  conclusions in this report?
13     A.  Yeah.  Yeah.  So from the effects
14  of 6:00 and 7:00 and 9:00 and the story of
15  the major breach, we defined the graph which
16  gave the best results in relation to the
17  observations of eyewitnesses in the polder.
18     Q.  The variables for this particular
19  breach that I think I've understood, the
20  variables are the blockage at the confluence
21  with Lake Pontchartrain.
22     A.  Yes.
23     Q.  The timing of the minor breach.
24  Yes?
25     A.  Yes.

Page 116

1     Q.  The timing of the major breach.
2     A.  Yes.
3     Q.  The speed of the development of the
4  breach from commencement to its final size.
5     A.  Yes.
6     Q.  The elevation of the water within
7  the 17th Street Canal.
8     A.  Yeah.
9     Q.  I'm sure I've missed variables that
10  go into this calculation.  What have I
11  missed?
12     A.  No.  I don't think you're -- I
13  think your team is complete.
14     Q.  Is it fair to say that using
15  eyewitness testimony and descriptions that
16  had been reported by other researchers, you
17  were attempting to reach a result for the
18  17th Street Canal breach by manipulating the
19  five variables we just discussed?
20        MR. LAMBERT:
21        Objection.
22        THE WITNESS:
23        Yeah, but manipulating is a word
24        that has a certain intention behind
25        it.

Page 117

1  EXAMINATION BY MR. MAYEAUX:
2     Q.  I'm sorry.  Calibrating.
3     A.  Calibrating, yes.
4     Q.  Would you be more comfortable with
5  calibrating?
6     A.  Yes.
7        MR. LAMBERT:
8        Same objection.
9        THE WITNESS:
10        We had a time axis, and we had an
11        axis how large the breach was from
12        zero to the end, and then we fixed
13        the growth paths of the breach in
14        such a way that all data fitted
15        together, but make no mistake, it
16        reduced the inflow.  So if you
17        don't mess around and you just put
18        in the hole from moment 6, then you
19        have a lot more inflow.
20  EXAMINATION BY MR. MAYEAUX:
21     Q.  I didn't say mess around.
22     A.  No.  My --
23     Q.  That there is art and subjective
24  decision making that your team undertook in
25  order to make this model calibrate to your

1913ee08-505d-4f07-bb77-e401739b2e91

Page 118

1  satisfaction?
2      MR. LAMBERT:
3      Objection.
4      THE WITNESS:
5      Yes.
6  EXAMINATION BY MR. MAYEAUX:
7      Q.  Thank you.
8      A.  That was our expertise in our
9  opinion.
10     Q.  Fair description of what your team
11 did?
12     MR. LAMBERT:
13     Objection.
14     THE WITNESS:
15     Yes.
16 EXAMINATION BY MR. MAYEAUX:
17     Q.  You agree?
18     A.  Yes.
19     MR. LAMBERT:
20     Objection.
21 EXAMINATION BY MR. MAYEAUX:
22     Q.  I have a couple of very specific
23 questions.  The time breach development is
24 set forth in table 3.1.  Time breach ended is
25 not set forth or have I missed it?  Time

Page 119

1  breach ended, is there a time the breach
2  ended, water stopped coming through the
3  breach?  Do you have that time?
4      A.  That's the result of the
5  calculation.  So the breach grows to a
6  certain maximum size, which is given, and
7  then as soon as the water becomes even, then
8  it stops flowing.  Is that what you mean?
9      Q.  I'm not sure.  The railroad breach
10 at number 5, 37-foot breach, sill elevation
11 is at plus 5, correct?
12     A.  Uh-huh.
13     Q.  Would you look at your surge
14 hydrograph for location D --
15     A.  Uh-huh.
16     Q.  -- and estimate for us when the
17 surge level at that location dropped below
18 plus 5?
19     A.  That would be at approximately,
20 right here (indicating), it's 21 hours.
21     Q.  Okay.  Is that when waters stopped
22 entering the city through the railroad breach
23 identified as number 5 on table 3.1?
24     A.  I think so.
25     Q.  Okay.

Page 120

1      A.  But it's a bit more complicated,
2  because if the water level inside was already
3  higher and the outside water is falling, then
4  it starts flowing out.  So still it might be
5  flowing, but out, but it's certainly not
6  flowing in anymore.
7      Q.  Entering the city is why that --
8      A.  Yeah.
9      Q.  How is that accounted for in the
10 model?
11     A.  That's the model itself.
12     Q.  That is the model?
13     A.  Which equates water levels.  And
14 then it flows to either side or to the other
15 side depending on the water levels on both
16 sides of the breach (indicating).  So that's
17 -- so that's the essence of the model.
18     Q.  All right.  Some of the, not some,
19 time breach development are all given as
20 ranges.  How can we tell what time you
21 modeled as the breach commencement time?
22     A.  Generally speaking, the first time
23 is the commencement and the end is the end.
24 And then in between there is a function
25 assumed.

Page 121

1      Q.  I'm sorry, Dr. Vrijling.  Look at
2  17th Street Canal.
3      A.  Yeah.
4      Q.  Time breach development.  Did the
5  breach begin at 6:00 A.M. and end at 7:00
6  A.M.?  No, that's not what you've told us?
7      A.  No, no, no.  Mathematically
8  speaking, because it is zero from 6:00 to
9  7:00, and then at 7:00 it is starting to grow
10 in this case, but I think in the other cases
11 it starts at 7:00, but if you really want to
12 know it precisely, we can provide you with
13 the numbers.
14     Q.  And in what format are those
15 numbers?
16     A.  Input for the Sobek model.
17     Q.  Yes.
18     A.  So these could be given as
19 functions.
20     Q.  And that's data you can provide to
21 us?
22     A.  Yes.
23     Q.  But have not yet done so?
24     A.  No, not in this report.
25     Q.  Okay.  The London Avenue Canal had

1913ee08-505d-4f07-bb77-e401739b2e91

Page 122

1 two breaches variously referred to, depending
2 on who's reporting, as the north and south
3 breach or the east and west breach. Is the
4 north-west breach -- is the north breach the
5 same as the west breach?
6     A. Yeah, I think so, because, yeah, it
7 is north -- running northwest, so
8 north-south, the canal, so west breach is
9 the higher-up one.
10     Q. Okay.
11     A. And the --
12     Q. Your report at page 10, table 3.1,
13 identifies the London west breach and the
14 London east breach.
15     A. Uh-huh.
16     Q. Is the London west breach the
17 northernmost breach on the London Avenue
18 Canal?
19     A. Yeah. You can also see that in
20 figure 3.1. So I was guessing, but it's
21 depicted here.
22     Q. Yes, sir. Thank you. What sill
23 elevation did your team model with respect to
24 the London west or north breach?
25     A. Minus 3 and a half feet it mentions

Page 123

1 in the table.
2     Q. I'm showing you Exhibit 6 that
3 we've already described and would ask that
4 you tell me which breach ID number
5 corresponds to the London west breach. If it
6 would be helpful, Mr. Vrijling, I'm going to
7 show you figure 4.1 of Mr. Morris' report and
8 ask if that helps you coordinate the breach
9 number (indicating) to his source data.
10     A. I'm not sure. It would be this
11 one. 400. Yeah, yeah. Apparently it is 2
12 according to the numbers. The numbers are
13 the same.
14     Q. Okay.
15     A. 400 minus 3 and a half. Yeah.
16     Q. On Exhibit 6, breach ID number 2
17 corresponds with the London west canal breach
18 identified on table 3.1 of your report?
19     A. I think so.
20     Q. Yes. And the sill elevation for
21 that location you modeled at minus 3.5?
22     A. Yeah.
23     Q. And the width of that breach as
24 modeled by your team is what?
25     A. Four hundred foot.

Page 124

1     Q. Four hundred?
2     A. Four hundred feet.
3     Q. Let me show you, Mr. Vrijling,
4 Exhibit 8 (indicating), which is an e-mail
5 from Mr. Morris dated June 28, 2007.
6     A. Uh-huh.
7     Q. Do you see what the estimate for
8 the sill elevation is for --
9     A. Minus 3.
10     Q. -- for the London west?
11     A. Minus 3.
12     Q. Minus 3. Did Mr. Morris provide
13 any explanation for why he had changed his
14 sill elevation estimate for the London west
15 breach?
16     A. I'm not aware of this.
17     Q. Was the London west breach modeled
18 at a sill elevation of minus 3 or minus 3.5?
19     A. In my opinion, minus 3.5 as is
20 mentioned here.
21     Q. Assume for me that Mr. Morris'
22 correspondence to you of June 28, 2007
23 regarding the London west sill elevation is
24 accurate and that the sill elevation your
25 team modeled is inaccurate. What impact

Page 125

1 would accurately considering the sill
2 elevation for the London Avenue west have on
3 your model results?
4     MR. LAMBERT:
5     Objection.
6     THE WITNESS:
7     Slightly less inflow.
8 EXAMINATION BY MR. MAYEAUX:
9     Q. Slightly less inflow from --
10     A. Yes. You have to imagine the total
11 water depth is important (indicating). So we
12 go from minus 3 and a half to plus 7, let's
13 say. So -- not from minus 3 and a half, but
14 from minus 3 to 7. So not 10 and a half, but
15 10. The higher the water depth, the more
16 inflow you have.
17     Q. So assuming again the accuracy of
18 the sill depth in Exhibit 8, Mr. Morris'
19 subsequent information, your model to some
20 extent overstates the volume of floodwaters
21 from the London Avenue west canal?
22     A. Yeah. A few percent, I think.
23     Q. Look at No. 4, please, London east.
24 Using the -- yes, sir. On Exhibit 6 Mr.
25 Morris reports the sill elevation for the

PROF. JOHANNES VRIJLING VOL I (LEVEE)                          8/16/2007

Page 126

1  London east breach, does he not?
2      A.  Yes.  It would be zero, I think.
3  231 is the width and zero is mentioned as the
4  elevation.
5      Q.  Okay.  On Exhibit 8 does Mr. Morris
6  report a different sill elevation for the
7  London breach?
8      A.  It changed to minus 20.
9      Q.  Does Mr. Morris indicate where that
10  data came from?
11      A.  It says these elevations were
12  provided by -- it says Ivor, I presume it is
13  Ivor Van Heerden, based on his work in the
14  field.
15      Q.  Okay.  Where is that data?  Where
16  is that work?
17      A.  I cannot -- I cannot give you an
18  answer.  The only thing I can say that this
19  is the real heavy scour breach.  This is the
20  real danger one.  So from my own judgment, I
21  would doubt if it was a level of zero.
22      Q.  Oh.
23      A.  Because this is where all the sand,
24  the entire neighborhood was covered with
25  sand, a thick layer of sand inside.  So if

Page 127

1  you're telling me it was zero in the end, I
2  wouldn't believe you, but --
3      Q.  Mr. Vrijling, I'm not telling you
4  anything.
5      A.  No, but I'm giving you my opinion.
6      Q.  Have you seen in any of the
7  studies, any reports, any eyewitness account,
8  any data that confirms that the London east
9  breach sill elevation was at 20 feet below
10  sea level?
11      A.  No.
12      Q.  The only information you have
13  regarding the sill level for the London
14  Avenue east breach is this e-mail from Mr.
15  Morris?
16      A.  Yeah.  That's true for myself.  I
17  don't know if it is true for Mr. Kok, but for
18  me it is true.
19      Q.  Looking at the sill levels for the
20  other canal breaches, do you believe, using
21  your experience and training and education in
22  the field, that the London east canal sill
23  was at minus 20?
24      A.  I explained already to you that
25  that's not unlikely.  I can very well -- I've

Page 128

1  been there, so I know there was a lot of
2  sediment all around the place.
3      Q.  Are you using your personal
4  observations during Mardi Gras of '06 as a
5  confirmation of Mr. Morris' information that
6  the sill level at the London east breach was
7  20 feet below sea level?
8          MR. LAMBERT:
9          Objection.
10          THE WITNESS:
11          That's stated too strong.
12  EXAMINATION BY MR. MAYEAUX:
13      Q.  Okay.
14      A.  But then I looked in this table and
15  I did not hesitate at the minus 20 because of
16  the story I told you.  So I looked to these
17  numbers to see if I could believe it, and I
18  could.  And the reasoning behind this minus
19  20 was as I explained to you.
20      Q.  It did not strike you as being
21  unlikely?
22      A.  No, no, no.  No.  No.  If you have
23  such huge flows and sandy bottoms, then any
24  scour, nearly any scour hole is possible,
25  even minus 20 meters might be.

Page 129

1      Q.  We had discussed earlier the
2  variables you considered in calibrating I
3  think is the term we finally agreed on --
4      A.  Yes.
5      Q.  -- in calibrating the flow rates at
6  the 17th Street Canal breach.  This -- for
7  the London east breach the 20-foot, minus 20
8  sill level would be one of the variables you
9  considered in calibrating the flow rates from
10  that breach?
11      A.  Yes, but I'm not aware that they
12  had typical problems as we mentioned on the
13  other breach in calibrating.  They did not
14  report to me that there were major problems
15  in getting it right.  It was especially this
16  17th Street breach.
17      Q.  Okay.  All of the sill levels and
18  breach or overtopping widths are footnoted
19  with the exception of the Orleans Canal,
20  which is identified as number 2 on table 3.1.
21  Can you tell us where that data was, where it
22  was derived?
23      A.  I don't remember.
24      Q.  Okay.
25      A.  I don't remember.

33  (Pages 126 to 129)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                          8/16/2007

Page 130

1    Q.  Okay.  If requested, you could --
2    A.  Yeah.
3    Q.  -- research and determine the
4  source data for those figures?
5    A.  Yeah.  Yeah.  It could be an
6  accident because it's nearly all is based on
7  one, on Mr. Morris' data.  So my opinion, my
8  idea would be that it's omitted the one, but
9  we could check it.  No, no.  Now I see.  It
10  is just the elevation of the -- this is the
11  special case.  At the end of the, where the
12  floodwall is missing, so it's just the
13  elevation of the levee here (indicating)
14  because here you have the pumping station and
15  the floodwalls are running, but they are not
16  ending as it should be, in our opinion, in
17  the pumping station.  So there is just the
18  level of the, the crest level of the levee,
19  but that still doesn't mention the source.
20    Q.  Well, we know that Mr. Morris
21  provided levee crest LIDAR data.
22    A.  Yeah.
23    Q.  The width of, it is not a breach --
24    A.  No, it is not a breach.
25    Q.  The width -- these widths come from

Page 131

1  somewhere.  Do you know from whence they
2  come?
3    A.  No.
4    Q.  Okay.  Please turn to page 16.
5  Figure 3.4 is a comparison of hydrographs
6  for, one, the London east breach and then,
7  two, the IHNC west breach.  Am I interpreting
8  that correctly?
9    A.  Uh-huh.
10    Q.  The hydrograph in red with, what
11  are those Xs, Xs on it, is the hydrograph
12  your team modeled?
13    A.  Yeah.  Yes.
14    Q.  Or am I backwards, or is that
15  IPET's hydrograph?
16    A.  What is your question?
17    MR. LAMBERT:
18      Which chart are you looking at?
19  EXAMINATION BY MR. MAYEAUX:
20    Q.  Which -- chart, figure 3.4.
21    A.  With the crosses?
22    Q.  With the red -- are the crosses
23  your work or IPET's work?
24    A.  IPET's work.  And ours is the line,
25  the drawn line.

Page 132

1    Q.  What is -- why are IPET's and
2  Delft's hydrographs in this instance
3  different?
4    A.  I have no explanation what the
5  difference is in foot.
6    MR. LAMBERT:
7      For a period of time.
8    THE WITNESS:
9      Yeah.
10  EXAMINATION BY MR. MAYEAUX:
11    Q.  And in a foot or more you have
12  considered as not negligible?
13    MR. LAMBERT:
14      Objection.  When you say foot or
15      more, it's for a period of time.
16      Virtually the same.
17    THE WITNESS:
18      But the end is the same.  The
19      development is the same, the end is
20      the same, and in between there is
21      some movement of the water
22      apparently in the bowl, which is
23      accounted for in the model and
24      which is not observed by IPET.
25  EXAMINATION BY MR. MAYEAUX:

Page 133

1    Q.  And my question is can you explain
2  the difference?
3    A.  Not today.
4    Q.  Turn, please, to page 19.  Figure
5  3.6 is flood graph, is that an appropriate --
6  how do you want to call this figure?  What do
7  you want to call this?
8    A.  It's a hydrograph.
9    Q.  A hydrograph?
10    A.  Yeah.
11    Q.  Figure 3.6 is a hydrograph which
12  shows maximum flood level and other
13  information for location 1 in the New Orleans
14  Metro bowl that your team modeled, correct?
15    A.  Yes.
16    Q.  I'm going to ask that you help us
17  interpret this.
18    A.  Uh-huh.
19    Q.  Ground level elevation I think
20  we've already discussed is a little bit more
21  than minus 7 feet below sea level, correct?
22    A.  Yes.  Yes.
23    Q.  The maximum flooding you calculated
24  at location 1 occurred at around 3 and a half
25  feet, above mean sea level?

34  (Pages 130 to 133)

1913ee08-505d-4f07-bb77-e401739b2e91

Page 134

```
 1    A.  Yes.
 2    Q.  So do you interpret this as there
 3  being around 10 feet of floodwater depth at
 4  location 1?
 5    A.  Yes.
 6    Q.  All right.  Using maximum flood
 7  level, maximum water depth, what contribution
 8  did rainfall have to that flood level?
 9    A.  Roughly reasoning the same 1 foot.
10    Q.  Okay.
11    A.  If you look into the graph at
12  maximum --
13    MR. LAMBERT:
14        At what time?  Objection.  At what
15    time?
16    MR. MAYEAUX:
17        At maximum flood level.
18    THE WITNESS:
19        Yeah.
20  EXAMINATION BY MR. MAYEAUX:
21    Q.  Until otherwise noted, my questions
22  will be at maximum flood level, whatever time
23  that was.  Okay?
24    A.  Yes.
25    MR. LAMBERT:
```

Page 135

```
 1        Well --
 2  EXAMINATION BY MR. MAYEAUX:
 3    Q.  At maximum flood level the
 4  contribution from overtopping was what?
 5    A.  Half a foot.
 6    Q.  Overtopping.  Is that overtopping
 7  from the Orleans Canal?
 8    A.  Yeah.
 9    Q.  Is it overtopping from the IHNC?
10    A.  Yeah.  Yeah.
11    Q.  Okay.  At maximum flood level the
12  contribution from the 17th Street Canal
13  breach was how many feet?
14    A.  I think between -- is it 8 feet?
15  Because -- between the red line and the black
16  line, that's the contribution of 17th Street
17  Canal.
18    Q.  Have you modeled the contribution,
19  if any, from the London Avenue east breach at
20  location 1?
21    A.  Yeah.  It should be in there
22  because this is only omitting the 17th Street
23  Canal, the red line (indicating).
24    Q.  Where would that be shown on figure
25  3.6, the contribution from the London Avenue
```

Page 136

```
 1  east breach?  I'm telling you I don't think
 2  it was done, but I'm probably wrong, so --
 3    A.  But the contribution from London
 4  Avenue is this (indicating).  So in the end,
 5  so it's far away from the 1.  We are looking
 6  now at 1, aren't we?  Yeah, at 1.  And it
 7  takes some time for this breach before it
 8  reaches there.  So that's what you see.  It
 9  takes, if the 17th Street Canal is closed,
10  then it takes quite some time before the
11  water is all around.
12    Q.  Are you saying, Mr. Vrijling, that
13  the contribution from the 17th Street, excuse
14  me, are you saying that the contributions
15  from the London Avenue Canal breaches are
16  shown on the right vertical as the difference
17  between the black and red graphic?
18    A.  Yeah.  In the end.  So, you know,
19  it's a bucket and if --
20    Q.  I understand.
21    A.  -- you do one hole in it, it will
22  fill to the outside water level.  If you do a
23  hole in the other side, in the end it will
24  fill the outside water level.  And if you do
25  two holes, the same.  Only one hole, it goes
```

Page 137

```
 1  slower than with two holes.  It's the
 2  quickest on the side where the hole is.  So
 3  that's what this graph shows.
 4    Q.  Okay.  Look, please, at water level
 5  location 3, figure 3.8.  Help me at least
 6  interpret.  At maximum water level -- it's on
 7  page 21.  I'm sorry.
 8    A.  Uh-huh.
 9    Q.  At maximum water level, and there
10  at this location appears to be approximately
11  11 feet of floodwater, right?
12    A.  Uh-huh.
13    Q.  At maximum water level the
14  contribution from the 17th Street Canal at
15  location 3 is roughly a foot, am I
16  interpreting that correctly?
17    A.  Yeah, in some -- in the
18  intermediate moment.
19    Q.  Maximum water level?
20    A.  Yeah.
21    Q.  At maximum water level the
22  contribution from overtopping is roughly 7
23  feet?
24    A.  No.  Only one-third of a foot.
25  This is overtopping (indicating).  So first
```

Page 138

1   we have to the blue line, it is only rain.
2      Q.   And that's about what, about a foot
3   and a half?
4      A.   Yeah.
5      Q.   Okay.
6      A.   And then we get, if you add
7   overtopping, it is a little bit more.
8      Q.   Okay.
9      A.   And then if you add the breach, any
10  breach, it's up to two and a half foot.  And
11  then it doesn't depend too much --
12     Q.   Are you saying -- I'm sorry.  Did
13  you finish your answer?
14     A.   Then apparently it doesn't make too
15  much difference what breach it is.
16     Q.   Well, are you saying that the
17  difference between the green graph, which is
18  overtopping, and the red graph, which is
19  specifically the 17th Street Canal, those
20  waters, those floodwaters sources were other
21  breaches?
22        MR. LAMBERT:
23        Objection.
24        THE WITNESS:
25        I don't understand.

Page 139

1         MR. LAMBERT:
2         I don't either.
3         THE WITNESS:
4         First step is only rain.
5   EXAMINATION BY MR. MAYEAUX:
6      Q.   Okay.
7      A.   Then we add overtopping, which is
8   another -- so one and a half foot or one foot
9   of rain.
10     Q.   Yes.
11     A.   A little bit of overtopping.
12     Q.   Yes.
13     A.   And then if you have breaches, you
14  get one, two, three, four, five, six, seven
15  feet extra.
16     Q.   Right.  My question is have you
17  distinguished between the breaches -- the
18  17th Street Canal has a specific graph line.
19        MR. LAMBERT:
20        We're talking at location 3?
21        MR. MAYEAUX:
22        At location 3 on figure 3.8.
23  EXAMINATION BY MR. MAYEAUX:
24     Q.   The 17th Street Canal has the
25  specific graph line, that's the red graph

Page 140

1   line, correct?
2      A.   Yeah.  Yeah.
3      Q.   There is no specific graph line for
4   London east.  There is no specific graph line
5   for London west.
6      A.   No.
7      Q.   Okay.  And how much at maximum
8   water depth at location 3, how much of that
9   water does your model attribute to the 17th
10  Street Canal breach?  Earlier I think we'd
11  agreed it was approximately a foot.
12     A.   Yeah.  So if you now look to this
13  graph, not at maximum flood level, there is
14  apparently not much different, but a little
15  bit later the flood level of both breaches is
16  roughly a foot more.  So with London Avenue
17  closed at, I cannot read, thirty-one eight at
18  zero, it is 2 feet.  A little bit less than 2
19  feet (indicating).  And if you open the 17th
20  Street, it becomes nearly 3 (indicating).
21     Q.   Okay.
22     A.   But here you see independent which
23  hole it is, in the end you have the same
24  water level.
25     Q.   I understand.  Make sure we're

Page 141

1   clear.  At maximum floodwater depth at
2   location 3 --
3      A.   Uh-huh.
4      Q.   -- the contribution your model
5   attributes to the 17th Street Canal breach is
6   about a foot?
7      A.   Yeah.
8      Q.   The contribution your model
9   contributes to overtopping is something less
10  than a foot?
11     A.   Yeah.
12     Q.   The contribution your model
13  attributes to rainfall is a little more than
14  a foot?
15     A.   More than a foot, yeah.
16     Q.   The remainder of the floodwaters at
17  location 3 at maximum flood level came from
18  other breaches?  Yes?
19        MR. LAMBERT:
20        Objection.
21        THE WITNESS:
22        Yeah, I think so.
23  EXAMINATION BY MR. MAYEAUX:
24     Q.   Okay.
25     A.   But -- if you want -- I don't know

36  (Pages 138 to 141)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 142

1  if you need an explanation because in this
2  graph you see it is flooding from 17th Street
3  and flooding from London Avenue, and both are
4  independently filling and then they meet each
5  other. If you close one, then it fills from
6  one side. And if you close the other, it
7  fills from the other side. So the end is the
8  same, only the sequence is different.
9      Q. Right. And who may have to pay for
10 it in this litigation may be different as
11 well.
12     A. Yeah.
13     Q. Okay.
14     A. Okay.
15     Q. That's why I'm asking these
16 questions. Please go to page 22, water level
17 location 4. And I promise we're not going to
18 do all of these.
19     A. Okay.
20     Q. It is figure 3.9.
21     A. Yeah.
22     Q. The ground elevation is
23 approximately minus 4. The maximum
24 floodwater elevation is approximately plus 2.
25     A. Uh-huh.

Page 143

1      Q. So we have total floodwaters here
2  of about 6 feet.
3      A. Uh-huh.
4      Q. Please go through and assign at
5  maximum water level depth how many feet or
6  inches go to each of the sources you modeled.
7      A. So rainfall only would be expected
8  to be a little bit more than 2 feet, but due
9  to the action of the pumps it is a little bit
10 less than a foot less, so it's 1 and a half
11 foot let's say. Then the overtopping adds a
12 little bit more than 2 foot to it. And then
13 you have the breaches, which is difficult to
14 discern, but the 17th Street Canal with and
15 without 17th Street is approximately the
16 same.
17     Q. Right.
18     A. Right.
19     Q. Very, very little impact from
20 17th --
21     A. Yeah.
22        MR. LAMBERT:
23        Objection.
24 EXAMINATION BY MR. MAYEAUX:
25     Q. Look, please, at page 25.

Page 144

1      A. Yeah. And 4 is just outside the
2  London breach, so in front of the shower
3  there. The shower in the background.
4      Q. Look, please, at page 25 for water
5  level location 8.
6      A. Yeah.
7      Q. Ground elevation is 3 feet. Flood
8  level max is what, about 6 inches?
9      A. Uh-huh.
10     Q. Is all of that in your model, all
11 of that 6 inches, due to the 17th Street
12 Canal floodwaters, is that how you interpret
13 this?
14     A. Yeah. If you -- yeah. This graph
15 says so.
16     Q. Of course, 6 inches is within the
17 error range of the model, is it not?
18     A. Yeah.
19     Q. And 6 inches is also less than a
20 foot, and a foot you consider as negligible?
21     A. Yeah, but in reality it overflowed
22 the ridge.
23     Q. I understand.
24     A. Okay. So it's not the case that
25 it's a mistake and it did not go over the

Page 145

1  ridge.
2      Q. At maximum water level, maximum
3  floodwater level, for each of the eight
4  locations modeled in the New Orleans Metro
5  polder, the relative contributions from the
6  different floodwater sources your team
7  considered vary, do they not?
8      A. Depending on where you are.
9      Q. Yes. Which is entirely expected
10 from you as a hydrologist and engineer,
11 correct?
12     A. Yeah.
13        MR. MAYEAUX:
14        Can we take five minutes, please?
15        MR. LAMBERT:
16        Sure.
17        VIDEOGRAPHER:
18        Off the record. It is 2:11.
19        (RECESS TAKEN)
20        VIDEOGRAPHER:
21        Returning to the record. It is
22        2:20.
23 EXAMINATION BY MR. MAYEAUX:
24     Q. Mr. Vrijling, I've marked as
25 Exhibit 14 a copy of the July 2007 Delft

37 (Pages 142 to 145)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                          8/16/2007

Page 146

1   report and simply ask that you confirm that
2   that is the report your team authored and
3   prepared in connection with this lawsuit.
4       A.  That's the same report we used a
5   few moments ago.
6       Q.  I sure hope so.  I think it is.
7       A.  Then it is.
8       Q.  Why did the team select the
9   White-Colebrook friction value of 2?
10      A.  There is some reasoning given about
11  the friction of open fields and of city
12  environments and then there is a choice made
13  of two that seems to be reasonable, but here
14  we need more cities to flood to get the
15  better accurate calibration.  Maybe the
16  hurricane --
17      Q.  The primary impact that the
18  friction coefficient has on the model is
19  surface water velocity?
20      A.  Yeah.  The velocity with which the
21  water spreads through the area.
22      Q.  Had a higher friction coefficient
23  been selected, then water, surface water
24  velocities would generally be calculated at a
25  lower rate?

Page 147

1       A.  Yes.  That's correct.
2       Q.  Does the model use a steady or
3   unsteady state flow data?
4       A.  Unsteady.
5       Q.  Did you model interbasin drainage
6   connections?
7       A.  I don't know what you mean by that.
8   I saw this in the e-mail, too, but I don't
9   know.  We did not model, as far as I
10  understand, we did not model connections
11  between Metro bowl and St. Bernard Parish.
12  These were separate bowls.
13      Q.  Did you model --
14      A.  Inside the Metro bowl and the
15  Metairie ridge and left and right from London
16  Avenue, they are connected by -- as given by
17  the terrain.
18      Q.  You modeled topographical
19  connections between sub-basins, but did not
20  model --
21      A.  Within the bowls.
22      Q.  -- within the polder, but did not
23  model, for instance, sewerage or storm
24  drainage line --
25      A.  No.

Page 148

1       Q.  -- connections between the
2   sub-basins, correct?
3       A.  Yeah.
4       Q.  The geometry data flow data, plan
5   data is on the disk that we received today,
6   is that your understanding?
7       A.  Yeah.  Yeah.
8       Q.  Flow data would include discharge
9   rate calculations?
10      A.  On the disk --
11      Q.  Yes, sir.
12      A.  -- is the only input.  We did not
13  provide you with all output files.
14      Q.  Okay.
15      A.  This is just the input, which was
16  requested.
17      Q.  If output files were requested,
18  they can be retrieved?
19      A.  Yes.
20      Q.  During the process of calibration
21  of the model, for instance, as we discussed
22  with respect to the breach at the 17th Street
23  Canal, are the runs of the model conducted as
24  part of that calibration process saved?
25      A.  I don't know.  They won't have been

Page 149

1   thrown away intentionally.
2       Q.  Okay.
3       A.  Only for practical purposes.  It
4   might be that they are still there, but I --
5   I don't know.
6       Q.  As I appreciate it, there were
7   several runs, at least in connection with the
8   17th Street Canal, in order to get the model
9   to calibrate to your satisfaction?
10      A.  Yes.  And we know which steps we
11  took.  If we saved all the results, I don't
12  know.
13      Q.  If those results still exist, will
14  you retain them?
15      A.  Yeah, yeah.  We can send --
16      Q.  The Sobek-1D2D incorporates a
17  hydrologic model within the hydraulic model,
18  does it not?
19      A.  It depends what you understand,
20  because I think it doesn't comprise rainfall
21  in the way we used it, but because we call in
22  Holland hydrologically if there is rainfall a
23  runoff, which we didn't use, so there may be
24  a version which is also capable of
25  hydrological operations, but I don't think it

38  (Pages 146 to 149)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 150

1   is this specific version.
2       Q.   Did you have to run -- was your
3   team required to run two versions of the
4   model in order to reach the conclusions and
5   opinions as set forth in your report?
6       A.   No.  No, because we excluded the
7   rainfall, and we did that on the separate
8   spreadsheet as we explained already.
9       Q.   Are you aware of any critical
10  comparison of the Sobek model with the RAS
11  model?
12      A.   No.
13      Q.   Do you know if the Sobek model has
14  been used in the United States?
15      A.   I don't know, but I suspect that it
16  has been used because Delft Technologies is
17  quite active worldwide, so certainly there
18  will be some party here in the States who
19  uses it, but --
20      Q.   Mr. Maaskant --
21      A.   Maaskant.
22      Q.   -- used the model in connection
23  with his thesis, did he not?
24      A.   Yeah.
25      Q.   But other than that occasion, you

Page 151

1   are at least are unaware of the model ever
2   being used in the United States?
3       A.   Separately from New Orleans,
4   because --
5       Q.   Yes, sir?
6       A.   -- because Delft Hydaulics did many
7   studies about the flooding of New Orleans
8   because we are so much interested about
9   consequences of dike breaches.  So many times
10  New Orleans breaches have been simulated and
11  hind-casted.  So in that sense it is used in
12  Holland widely for this case.
13      Q.   Have you met Paul Kemp?
14      A.   No.
15      Q.   Have you met Chad Morris?
16      A.   Yes.  He's sitting there
17  (indicating).
18      Q.   Do you have any knowledge about Mr.
19  Kemp's qualifications?
20      A.   Not in detail.
21      Q.   Other than what was set forth in
22  his report?
23      A.   No.
24      Q.   Do you have any knowledge about Mr.
25  Morris' qualifications other than what was

Page 152

1   set forth in his report?
2       A.   No.
3       Q.   Where is Mr. Kok?
4       A.   He's in the Netherlands having
5   holiday.
6       Q.   You are Mr. Kok's supervisor?
7       A.   Yes.
8       Q.   Who is your supervisor?
9       A.   The dean of our faculty and then
10  our rector.  And then we have board, the
11  governing board of the university.
12      Q.   How are you personally being
13  compensated for the work and effort you have
14  made in connection with this project?
15      A.   From this report I don't get
16  compensation.  From this effort I get paid as
17  university professor into the university
18  account.  So personally I don't have any
19  benefit being here, apart from the gumbo.
20      Q.   Nobody has even taken you to
21  supper?
22      A.   Yeah.  That's what I said.  Gumbo.
23          MR. LAMBERT:
24          Gumbo.
25  EXAMINATION BY MR. MAYEAUX:

Page 153

1       Q.   The university is being paid, you
2   presume, for your time?
3       A.   Not presume.  I hope so.  We have
4   an agreement that we would do this
5   deposition --
6       Q.   Yes.
7       A.   -- for some fee.
8       Q.   Do you know what the fee is for
9   your deposition time?
10      A.   Yeah.  Roughly.
11      Q.   Would you share that with us,
12  please?
13      A.   Yeah?  I believe $20,000 for all
14  the days.
15          MR. LAMBERT:
16          I don't know.
17          THE WITNESS:
18          I don't know exactly.
19  EXAMINATION BY MR. MAYEAUX:
20      Q.   Do you know what the team's fee was
21  for preparation of the report?
22      A.   Yeah.  Roughly.  Roughly $80,000.
23          MR. MAYEAUX:
24          Mr. Vrijling, thank you very much.
25          Some of the other attorneys will

39 (Pages 150 to 153)

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 154

1    have some questions for you. I
2    really appreciate your time and
3    patience. Thank you.
4        THE WITNESS:
5        Okay. Thank you for your kind
6        questioning. Thank you very much.
7        MR. LAMBERT:
8        Anybody else have a question today?
9        I have a couple questions.
10   EXAMINATION BY MR. LAMBERT:
11       Q. Let me start off with where we just
12   ended. The amount of money that was paid to
13   you or to your university, did that include
14   the runs that were made on the computers and
15   so on?
16       A. Yeah.
17       Q. Okay. And is it fair to say that
18   those computers and the people that run them
19   are a fairly expensive proposition?
20       A. People are the most expensive.
21       Q. I understand. Does the university
22   get paid for the use of its computer modeling
23   in other scenarios, for example, in design
24   work and so on?
25       A. Yeah. If we do work for third

Page 155

1    parties, then we get paid. Then we have a
2    normal rate of fees which we ask.
3        Q. And is that what's going on here in
4    terms of the university receiving fees for
5    its services?
6        A. Yes, certainly.
7        Q. Okay. Now, let me ask you to look
8    at page 9 of your report. And it looks at
9    the Orleans Metro bowl. Is it fair to say
10   that the Intracoastal Waterway was a
11   contributor of floodwaters to the Metro zone
12   through the breaches identified along the
13   east side of that Metro bowl?
14       A. Yes.
15       MR. MAYEAUX:
16       Object to the form. Leading.
17       THE WITNESS:
18       Certainly.
19   EXAMINATION BY MR. LAMBERT:
20       Q. All right. And if you could
21   identify the waters -- I'm sorry. If you
22   could identify, just for the record, relative
23   to figure 3.1 the description, just the
24   description, of the breaches that fed the
25   Metro bowl from the Industrial Canal.

Page 156

1        A. Yes. The breaches 5, 6, 7 you
2    mean?
3        Q. Uh-huh. And that was, if you
4    would, please, 5, 6 and 7 from the chart 3.1
5    would be which openings?
6        A. The same in table 3.1 with the same
7    numbers.
8        Q. Okay. And what are those
9    identified as? Railroad --
10       A. Exactly. 5 is the railroad, yeah.
11   And then west IHNC west wall, west floodwall
12   and the west levee.
13       Q. Okay.
14       A. And then we have 8, which is the
15   overtopping from the canal.
16       Q. But the 5, 6 and 7 are actual
17   breaches?
18       A. Yeah.
19       Q. Okay. Now, let me ask you to look
20   at, as an example, figure 3.6. Page 19 of
21   your report. You were asked questions
22   relative to the maximum depth. Do you
23   remember those questions?
24       A. Yes.
25       Q. Okay. First of all, could you tell

Page 157

1    me, compared to the maximum depth of
2    floodwaters -- well, let's just identify,
3    what was the maximum depth above ground level
4    of floodwaters at location 1 approximately?
5        A. It was from minus 7 to plus 3 and a
6    half, so 10 and a half feet.
7        Q. And of that 10 and a half feet of
8    water at maximum flood level, how much of
9    that water came from rain?
10       MR. MAYEAUX:
11       Objection. Asked and answered.
12       THE WITNESS:
13       One foot.
14   EXAMINATION BY MR. LAMBERT:
15       Q. And how much --
16       A. With the pumps working, and one and
17   a half foot if you include overtopping and
18   failure of the pumps.
19       Q. Okay. And how much water came from
20   breaches?
21       MR. MAYEAUX:
22       Same objection.
23   EXAMINATION BY MR. LAMBERT:
24       Q. At the same time.
25       A. One, two, three, four, five, six,

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 158

1  seven, eight foot.
2      Q.  Eight foot.  If there had been no
3  breaches and only overtopping and rain, what
4  would the depth of water have been at
5  location 1?
6      A.  In the end, minus 6 foot, so
7  approximately 2 feet of water.
8      Q.  Okay.  And in the end, how much
9  water was there with the breaches instead of
10 two feet?
11     A.  One, two, three, four, five, six,
12 seven, eight, nine, nearly ten, nine and a
13 half.
14     Q.  Let's look at location 3.  What was
15 the maximum -- let me just stop for a second
16 and back up.  The maximum water depth
17 occurred between the hours of 00, which would
18 have been midnight, and on the, on the 29th
19 and 00, which is midnight, on the 30th,
20 correct?
21     A.  Maximum flood level?
22     Q.  Maybe a little bit later.
23     A.  Yeah.  I would estimate that the
24 maximum in total or you mean --
25     Q.  Yeah.  Total.

Page 159

1      A.  It would be at 6:00 in the morning
2  on the 30th, I think.
3      Q.  Okay.  So the water, the breaches
4  began at what time?
5          MR. MAYEAUX:
6          Objection.  Vague.
7  EXAMINATION BY MR. LAMBERT:
8      Q.  Approximately.
9          MR. MAYEAUX:
10         Objection.  Vague.
11         THE WITNESS:
12         I think the developments, according
13         to the graph, starts, the breaches
14         are earlier, but the real
15         development of water level is only
16         at 10:00, 11:00.  And the graph
17         comes up.
18 EXAMINATION BY MR. LAMBERT:
19     Q.  On the 29th?
20     A.  Yeah.
21     Q.  Okay.  And then a day later --
22     A.  Uh-huh.
23     Q.  -- without breaches, what would the
24 level of the water have been with rain and
25 overtopping?

Page 160

1      A.  It would be minus 5 foot.  And then
2  the bowl, it would be 2 and a half feet of
3  water.
4      Q.  Okay.  Now, with the breaches how
5  deep was it a day later?
6      A.  It was 10, 10 and a half.  Yeah.
7      Q.  Now, with the pumps running and
8  overtopping, no breaches, what would the
9  level have been of the water at noon on the
10 31st, which is the second day at location 3?
11     A.  With overtopping and the pumps
12 running?
13     Q.  Uh-huh.
14     A.  I think a half a foot or minus 7.
15 So a half a foot or a foot.
16     Q.  Okay.  Now, let's look at -- you
17 were asked some questions with regard to
18 figure 3.4.
19         MR. MAYEAUX:
20         Page?
21         MR. LAMBERT:
22         Page 16.
23         MR. MAYEAUX:
24         Thank you.
25 EXAMINATION BY MR. LAMBERT:

Page 161

1      Q.  Now, the difference between your
2  modeling and the modeling of IPET I think is
3  what you were asked about, is that correct?
4      A.  Uh-huh.  Yeah.
5      Q.  Is it fair to say that the
6  difference between the modeling done by Delft
7  and the projections, if you would, of IPET
8  have only to do with the time that it took
9  for the floodwaters to inundate the location?
10         MR. MAYEAUX:
11         Objection.  Leading.
12 EXAMINATION BY MR. LAMBERT:
13     Q.  Orleans Metro bowl.
14         MR. MAYEAUX:
15         I'm sorry.  Objection.  Leading.
16         THE WITNESS:
17         I don't know what's exactly the
18         basis of the IPET, but if I look to
19         it it might have been some
20         oscillation in the basin during
21         filling where it went up and evened
22         out (indicating).
23 EXAMINATION BY MR. LAMBERT:
24     Q.  Okay.
25     A.  And apparently the model predicts

41 (Pages 158 to 161)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 162

1    that.  A sort of sine swing, high, low and
2    then up again to nearly the same level.  And
3    IPET neglects the intermediate lower period
4    (indicating).
5        Q.  All right.  Let's put it this way.
6    Insofar as the maximum depth of the water at
7    whatever point this is or whatever depiction
8    this is in figure 3.4, isn't it fair to say
9    that the Delft model and the IPET model are
10   basically the same within less than a foot?
11       A.  I think so.  The order of error is
12   certainly a half a foot or foot, so --
13       Q.  And ultimately isn't it fair to say
14   that after a day of oscillation or filling or
15   however you want to put it, that basically
16   all of those models by the 30th at 6:00 in
17   the morning show the depth of water in the
18   New Orleans Metro bowl basically the same?
19       A.  Yeah.
20       MR. MAYEAUX:
21       Objection.  Leading.
22       THE WITNESS:
23       That's true.
24   EXAMINATION BY MR. LAMBERT:
25       Q.  Now, insofar as the sources of

Page 163

1    floodwaters are concerned, is it fair to say
2    that if the Orleans or London breaches had
3    not occurred, just the 17th Street breach
4    occurred, that ultimately the flood depth
5    would be the same?
6        MR. MAYEAUX:
7        Objection.  Leading.
8        THE WITNESS:
9        Yes.  I'm afraid that's true.  It
10       would have taken some longer time,
11       but in the end it will be the same.
12   EXAMINATION BY MR. LAMBERT:
13       Q.  All right.
14       A.  You don't know, but it could have
15   scoured more because the flow velocity is
16   higher for a longer time in the breach time.
17       Q.  So, in other words, a hole in the
18   17th Street Canal or the breach might have
19   been bigger, deeper sill, wider, whatever,
20   because the flow through there would have
21   been in a longer period of time?
22       MR. MAYEAUX:
23       Objection.
24       THE WITNESS:
25       Longer and stronger.

Page 164

1    EXAMINATION BY MR. LAMBERT:
2        Q.  But ultimately the depth would be
3    the same?
4        A.  The same.
5        Q.  Now, you mentioned that there was
6    interest on the part of Delft to study these
7    failures, breaches in levees I think,
8    because, you said, before New Orleans you
9    hadn't seen any, is that fair?
10       A.  That's true.
11       Q.  I take it then that the levee
12   system that's in place in I hear Holland, I
13   hear different versions of the explanation,
14   hasn't breached to this degree, is that fair?
15       MR. MAYEAUX:
16       Objection.  Beyond scope of report.
17       THE WITNESS:
18       I don't understand your question.
19   EXAMINATION BY MR. LAMBERT:
20       Q.  You haven't seen a breach like the
21   breach here?
22       A.  Myself?
23       Q.  Yes, yourself.
24       A.  No.  From history, when I was three
25   years old we had a big disaster back in '53,

Page 165

1    but I never saw it aside from pictures.
2        MR. MAYEAUX:
3        Same objection.
4    EXAMINATION BY MR. LAMBERT:
5        Q.  The system that's in place now has
6    not breached like this?
7        MR. MAYEAUX:
8        Same objection.
9        THE WITNESS:
10       In Holland.
11   EXAMINATION BY MR. LAMBERT:
12       Q.  In Holland?
13       A.  No.
14       MR. MAYEAUX:
15       Counsel, may I make that
16       continuing?
17       MR. LAMBERT:
18       Sure.
19   EXAMINATION BY MR. LAMBERT:
20       Q.  Now, from what I see of all of
21   these graphic depictions, location 1,
22   location 2, location 3, location 4 and so on,
23   it looks like if there were rain, with or
24   without pumps, and overtopping, that the
25   flooding at these various locations would

42  (Pages 162 to 165)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                    8/16/2007

Page 166

1  have been significantly limited. Is that
2  fair?
3      A.  Yes.  That's our opinion, that it
4  would have been a foot, maybe two feet, but
5  not much more apart from single deeper
6  locations where the water collects, but that
7  was our impression.
8      Q.  All right.  So it's the breaches
9  that caused the problem, is that fair?
10     A.  Yeah.  In our opinion there is no
11 way that the pumps would have been ever able
12 to pump out the amounts of water that
13 ingressed through the breaches.  This is an
14 order of magnitude different.
15     Q.  Basically what happens when the
16 breaches occur is the protected area inside
17 of the system is in communication with the
18 sea level around it?
19     A.  With the sea level, yeah.
20         MR. MAYEAUX:
21         Objection.  Leading.
22 EXAMINATION BY MR. LAMBERT:
23     Q.  It looks like from your report --
24 what did you -- Exhibit 14?
25         MR. MAYEAUX:

Page 167

1      Yes, sir.
2  EXAMINATION BY MR. LAMBERT:
3      Q.  The rainwater with or without
4  pumping would not have caused significant
5  flooding over a foot or two?
6          MR. MAYEAUX:
7          Object.
8  EXAMINATION BY MR. LAMBERT:
9      Q.  Is that fair?
10     A.  No.
11     Q.  Is that correct?
12     A.  Yeah, that's correct.  If the pumps
13 all had worked, my impression is there would
14 have been no flooding.
15     Q.  You were asked a series of
16 questions about whether or not the grids
17 could have been smaller, 5 meters instead of
18 50 meters, and would that have given your
19 modeling more accuracy I think was the
20 suggestion.  Do you believe that this model
21 is accurate done with a 50 meter grids?
22     A.  Yes.  My opinion is it is
23 sufficiently accurate.  So it is earlier too
24 accurate, let's say, compared to other
25 unknowns than, that it is insufficiently

Page 168

1  accurate.
2      Q.  Is it fair to say that smaller
3  grids would have been overkill?
4      A.  That would be --
5      Q.  More expensive?
6      A.  -- spending money without any use.
7      Q.  Okay.  And is it fair to say that
8  the inclusion of all little drain pipes,
9  whether they work or not, and so on would
10 have likewise, considering the breach
11 circumstance, that that would have been more
12 overkill?
13         MR. MAYEAUX:
14         I object to the form.
15         THE WITNESS:
16         What you discussed a few moments
17         ago, that the main contribution is
18         from the water flood through the
19         breaches, that the detailed
20         modeling of the sewerage system is
21         not of much value.
22         MR. LAMBERT:
23         That's all I have.  Thank you.
24         Any other questions?
25         MR. MAYEAUX:

Page 169

1          No, sir.  Thank you very much.
2          VIDEOGRAPHER:
3          Off the record.  2:52.
4
5
6
7
8          (Whereupon, the deposition was
9  concluded at 2:52 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43  (Pages 166 to 169)

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL I (LEVEE)                              8/16/2007

Page 170

1        WITNESS CERTIFICATE
2
3
4       I, PROFESSOR JOHANNES VRIJLING, do
5   hereby certify that the foregoing testimony
6   was given by me, and that the transcription
7   of said testimony, with corrections and/or
8   changes, if any, is true and correct as given
9   by me on the aforementioned date.
10
11
12
    DATE SIGNED       WITNESS' SIGNATURE
13
14
15
16       Signed with corrections as noted.
17
         Signed with no corrections noted.
18
19
20  DATE TAKEN: August 16, 2007
21
22
23
24
25

Page 171

1        REPORTER'S CERTIFICATE
2
3       I, MARGARET MCKENZIE, Certified Court
4   Reporter, do hereby certify that the
5   above-named witness, after having been first
6   duly sworn by me to testify to the truth, did
7   testify as hereinabove set forth;
8       That the testimony was reported by me
9   in shorthand and transcribed under my
10  personal direction and supervision, and is a
11  true and correct transcript, to the best of
12  my ability and understanding;
13      That I am not of counsel, not related
14  to counsel or the parties hereto, and not in
15  any way interested in the outcome of this
16  matter.
17
18
        MARGARET MCKENZIE, CCR, RPR, RMR, CRR
19  CERTIFIED COURT REPORTER
20
21
22
23
24
25

1913ee08-505d-4f07-bb77-e401739b2e91

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL        CIVIL ACTION
BREACHES CONSOLIDATED
LITIGATION                    NO. 05-4182 "K" (2)

                            JUDGE DUVAL

PERTAINS TO:  LEVEE

                            MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289


                VOLUME II
              IN RE:  MRGO


     Deposition of PROFESSOR JOHANNES
VRIJLING, 2600 GA Delft, Stevinweg 1, 2628 CN
Delft, The Netherlands, taken in the offices
of Bruno & Bruno, 855 Baronne St., Sixth
Floor, New Orleans, Louisiana on Friday, the
17th day of August, 2007 at 9:14 a.m.

## Page 2

APPEARANCES:

BRUNO & BRUNO
(By: Joseph M. Bruno, Esquire)
855 Baronne St.
New Orleans, Louisiana 70113
(504) 525-1335
    Attorneys for Plaintiffs

LAMBERT & NELSON
(By: Hugh P. Lambert, Esquire)
701 Magazine St.
New Orleans, Louisiana 70130
(504) 581-1750
    Attorneys for Plaintiffs

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR
(By: Matthew D. Schultz, Esquire)
316 S. Baylen St.
Suite 600
Pensacola, Florida 32502
(850) 435-7140
    Attorneys for Plaintiffs

BECNEL LAW FIRM, LLC
(By: Daniel E. Becnel, Jr., Esquire)
106 W. Seventh St.
P.O. Drawer H
Reserve, Louisiana 70084
(985) 536-1186
    Attorneys for Plaintiffs

## Page 3

APPEARANCES (continued):

McCRANIE, SISTRUNK, ANZELMO, HARDY,
MAXWELL & McDANIEL
(By: Thomas P. Anzelmo, Esquire)
3445 N. Causeway Blvd., Suite 800
Metairie, Louisiana 70002
(504) 831-0946
    Attorneys for Defendant,
    Orleans Levee District

SUTTON LAW FIRM, LLC
(By: Charles E. Sutton, Jr., Esquire)
2101 N. Hwy. 190
Suite 105
Covington, Louisiana 70433
(985) 249-5991
    Attorneys for Defendant,
    Orleans Levee District

LABORDE & NEUNER
(By: Ben L. Mayeaux, Esquire)
(By: Gregory A. Koury, Esquire)
(By: Laura Rougeau, Esquire)
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, Louisiana 70503
(337) 237-7000
    Attorneys for Defendant,
    Orleans Levee District

## Page 4

APPEARANCES (continued):

DUPLASS, ZWAIN, BOURGEOIS, MORTON,
PFISTER & WEINSTOCK
(By: Gary M. Zwain, Esquire)
(By: Joseph E. Bearden, III, Esquire)
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
    Attorneys for Defendant,
    Board of Commissioners for the
    East Jefferson Levee District
    and Lake Borgne Levee District

BURGLASS & TANKERSLEY, L.L.C.
(By: Kea Sherman, Esquire)
5213 Airline Drive
Metairie, Louisiana 70001
(504) 836-2220
    Attorneys for Defendant,
    Parish of Jefferson

JONES DAY
(By: Jerome R. Doak, Esquire)
(By: Amy Payne, Esquire)
(By: Erin Farris, Esquire)
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
    Attorneys for Washington Group
    International, Inc.

## Page 5

APPEARANCES (continued):

MONTGOMERY BARNETT
(By: Kenneth J. Gelpi, Jr., Esquire)
2300 Energy Centre
1100 Poydras St.
New Orleans, Louisiana 70163-3200
(504) 585-7693
    Attorneys for Limitation Dredgers

PRESENT THROUGH INTERNET I-DEP:

William E. Marple, Esquire
Margaret I. Lyle, Esquire
Kirk Aurandt, Esquire
Michele Gries, Esquire
Drew Ranier, Esquire

ALSO PRESENT:

Gilley DeLorimier, CLVS
Depo-Vue, Inc.
(504) 828-8856

PROF. JOHANNES VRIJLING VOL II (MRGO)                        8/17/2007

Page 6

1
2
APPEARANCES (continued):
3
4
5
6  ALSO PRESENT:
7
8
     Paul Kuhlmeier
9
10
     Robert A. Dalrymple
11
12
13
14
15
16  REPORTED BY:
17     MARGARET MCKENZIE, CCR, RPR, CMR, CRR
        Certified Court Reporter
18
19
20
21
22
23
24
25

Page 8

1        S T I P U L A T I O N
2        It is stipulated and agreed by and
3   between counsel for the parties hereto that
4   the deposition of the aforementioned witness
5   is hereby being taken under the Federal Rules
6   of Civil Procedure, for all purposes, in
7   accordance with law;
8        That the formalities of reading and
9   signing are specifically not waived;
10  That the formalities of sealing,
11  certification and filing are specifically
12  waived;
13       That all objections, save those as to
14  the form of the question and the
15  responsiveness of the answer, are hereby
16  reserved until such time as this deposition,
17  or any part thereof, may be used or sought to
18  be used in evidence.
19
20        *  *  *  *  *
21
22       MARGARET MCKENZIE, Certified Court
23  Reporter, in and for the Parish of Orleans,
24  State of Louisiana, officiated in
25  administering the oath to the witness.

Page 7

1            I N D E X
2
3
4  EXAMINATION BY:
5
6  MR. DOAK...........................9
7
8  MR. MAYEAUX.......................167
9
10 MR. LAMBERT.......................180
11
12
13 EXHIBITS:
14
15 Exhibit 15........................37
16
17
18 Exhibit 16........................52
19
20
21 Exhibit 17........................64
22
23
24
25

Page 9

1        VIDEOGRAPHER:
2        We are returning to the record.
3        This is Volume II of Johannes
4   Vrijling, Re: MRGO Group.  Please
5   proceed, sir.
6        MR. DOAK:
7        You will remind the witness he is
8        still under oath.
9        COURT REPORTER:
10       Do you understand you are still
11       under oath?
12       THE WITNESS:
13       Yes, I do.  I know.  It's clear to
14       me.
15  EXAMINATION BY MR. DOAK:
16       Q.  Professor Vrijling, my name again
17  is Jerry Doak.  We met the past two days.  I
18  represent Washington Group.  Today, however,
19  I'll be asking questions on behalf of the
20  MRGO litigation group.  Those are just labels
21  that the court established, but I want to
22  make sure that you understand that the levee
23  group is the Metro area to the west of the
24  Industrial Canal.  Do you understand?
25       A.  Yeah, yeah.

1    Q.  And the MRGO group is New Orleans
2  East and St. Bernard and the Lower Ninth, do
3  you understand that?
4    A.  Yes.  Now.  I understand it now.
5    Q.  If you -- the same instructions as
6  yesterday basically.  If you don't understand
7  a question at any time, just let me know and
8  I'll try to restate it for you.  We'll take
9  breaks at your convenience any time.  I will
10  try not to repeat matters from yesterday.  I
11  think I took good notes.  There were a few
12  occasions though, but I had trouble hearing,
13  so if you try to keep your voice up today I'm
14  sure I'll be able to hear you, but as you get
15  down the table I did have a little difficulty
16  yesterday and it makes it easier for the
17  court reporter and everyone.
18      Much like yesterday, when we're
19  talking about general matters not tied to
20  geography, my questions will really relate to
21  the methodology as a whole.  I think you
22  understood that yesterday.  Anything that you
23  said about the methodology in general is
24  applicable on both sides of the Industrial
25  Canal, is that correct?

1    A.  Yes.  That's correct.  Yeah.
2    Q.  Okay.  And the same will be true
3  today in my questions.
4    A.  Yes.
5    Q.  Assume that, unless I tell you that
6  we're focused on a particular geographical
7  location.  Okay?
8    A.  Yes.  So I can say there is no
9  different approach to any of the bowls --
10    Q.  Right.
11    A.  -- because we were not aware that
12  there were different cases.
13    Q.  And whenever I refer to the model,
14  I'll be referring to the model that was the
15  product and the basis for Mr. Kok's July 30,
16  2007 expert report.
17    A.  Yeah.  Okay.
18    Q.  I'd like on begin by --
19      MR. LAMBERT:
20        Jerry, we're going to reserve
21        objections except as to the form?
22      MR. DOAK:
23        That's fine.
24  EXAMINATION BY MR. DOAK:
25    Q.  Begin by reviewing your role in the

1  report.  There were a few matters from
2  yesterday that I wasn't sure of.  Can you
3  tell us, when did you first get involved in
4  this lawsuit?
5      MR. LAMBERT:
6        I'm just going to -- just
7        objection.  I don't know where
8        this -- is that the question?
9      MR. DOAK:
10        Yes.
11      MR. LAMBERT:
12        When did you first get involved?
13        All that preliminary stuff is not
14        part of the question, correct?
15  EXAMINATION BY MR. DOAK:
16    Q.  Correct.  I'm asking when did you
17  first get involved in the project of this
18  lawsuit.
19    A.  I don't remember exactly.  I think
20  it went like this, but I'm not for sure.
21  Ivor Van Heerden contacted us if we would be
22  able to help him with some calculations, and
23  there were various reactions.  And Mr. Kok
24  actively took up the contacts with Van
25  Heerden and there was some discussion, as we

1  repeated yesterday, due to our anguish for
2  American lawyers, contact with any lawyer
3  here, so that the first idea was that it
4  should go via LSU, just businesslike, so
5  nothing to do with the contents of the
6  analysis, but then finally we decided to
7  enter as the team Delft to accept the offer
8  or the thing from Bruno, Mr. Bruno's office.
9    Q.  Would this be in late 2005?
10    A.  No, no, no.  It is all in this
11  year.
12    Q.  All 2007?
13    A.  I did not know Mr. Bruno until I
14  met him in Amsterdam.  Yeah.
15    Q.  Okay.  And in these discussions you
16  said we.  I thought that originally Mr. Kok
17  was being retained to be the expert and that
18  your role was only going to be as an
19  independent reviewer of his final report.
20    A.  Yeah.  He is one of my subordinates
21  as far as you can say it in this way in the
22  university world.
23    Q.  Okay.  Tell me about that.
24    A.  He is a co-worker, assistant
25  professor at TUDelft, so in this sense I am

PROF. JOHANNES VRIJLING VOL II (MRGO)                                    8/17/2007

Page 14

1  supervising his work.
2      Q.  Okay.
3      A.  In this sense he wrote a report.
4      Q.  Yes.
5      A.  And I read it and consented that I
6  thought it was a good report.
7      Q.  But originally was his report
8  and you were going to be the independent
9  reviewer?
10     A.  Yeah, yeah, yeah, yeah.
11     Q.  But you're telling me now that even
12 in these initial discussions with Mr. Van
13 Heerden and others, you and Mr. Kok were both
14 involved in those discussions?
15     A.  He was mostly involved.  I was just
16 taking the decisions if we should take the
17 responsibility to enter into the contract
18 with an American lawyer.
19     Q.  Right.  I understand.  What is your
20 understanding of what you or Mr. Kok were
21 asked to do in this project?
22     A.  Our understanding was to hind-cast
23 the flood in the three bowls on the basis of
24 material given to us by Mr. Bruno and all the
25 names that has been mentioned and then to

Page 15

1  show how the time sequence of the water would
2  develop in these bowls.  And then later on we
3  did some, we were asked to do some
4  sensitivity studies in the sense that if you
5  close that gap what would be the influence,
6  if there would be no breaches what would be
7  the influences.  So just to get some idea
8  about subsequent influences of each of the
9  causes as far as the demonstration.
10     Q.  And all of those discussions, at
11 least in you all's mind from the Netherlands,
12 were going to be using the Sobek software
13 model?
14     A.  Yeah.  Yes.  The model that is in
15 our possession and is most fit for this type
16 of problems.
17     Q.  Okay.  So you thought that you were
18 being asked to do something that was
19 consistent with the purpose and use of the
20 Sobek model?
21     A.  Yes.  And secondly, that it was a
22 value-free scientific exercise.  So as soon
23 as we would have the idea that we were forced
24 into one or another direction due to
25 intentions of the lawyers, then we would have

Page 16

1  put on the brakes.
2      Q.  Tell me some more about your
3  relationship with Professor Kok.  How long
4  have you been a professor at the university?
5      A.  Oh, since '89.
6      Q.  All right.
7      A.  Yeah.  First as part-time professor
8  and then full-time.
9      Q.  And what is your position now?
10     A.  Professor of Hydraulic Engineering,
11 Probabilistic Design.
12     Q.  So you are a full professor?
13     A.  Yes, I'm a full professor.
14     Q.  And Professor Kok is an assistant
15 professor?
16     A.  Yes.  And part-time.  He is one day
17 a week in our service and four days a week he
18 is employed with his own consulting firm.
19     Q.  What does he do in his consulting
20 business?
21     A.  The same type of advice.
22     Q.  Using the Sobek model?
23     A.  Using the Sobek model.  He's a
24 mathematician, as I told you yesterday, or
25 your colleague yesterday.

Page 17

1      Q.  Yes.
2      A.  And his original specializations
3  is on decision theory, but he has a lot of
4  experience in applying decision theory in
5  these fields.  So after many years he is very
6  knowledgeable in the entire field of
7  hydraulic engineering, but mostly on the
8  fluid mechanics and the mathematical side,
9  not so much on the structural side.
10     Q.  What do you mean by decision
11 theory?
12     A.  That goes about the decision, for
13 instance, how high should the levee in New
14 Orleans be.  The higher we build it, the
15 smaller the risk of flooding, but the higher
16 the investment.  So there is some optimum
17 value and that should in our Dutch eyes be
18 the way to go.  So this type of mathematics.
19     Q.  And this is consistent with the
20 purpose of the Sobek model to plan?
21     A.  That has nothing -- Sobek method
22 has not much to do.  Just the fluid
23 mechanics.  That would be a basic calculation
24 about how high water levels would be given
25 certain hurricane paths.

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

ee44edda-a960-429d-9380-2859dd8626d3

Page 18

1    Q.  And then what does Professor Kok do
2  differently though that you're calling
3  decision theory, looking at the results ---
4    A.  Yeah.  If he applies decision
5  theory, then we have to know more, not only
6  the flood levels, but also the investment in
7  the better I-wall and better T-walls and the
8  value of the investment inside the city to
9  judge the risks.  And that would be some
10  optimization.
11    Q.  Did you undertake any of that kind
12  of analysis of cost efficacy in this project?
13    A.  Not in this project.  We did for
14  our own research in some exercises, we did
15  that in this direction.
16    Q.  When did you do that?
17    A.  Post Katrina.
18    Q.  Have you discussed that research
19  with your lawyers, plaintiffs' counsel?
20    A.  No, I don't think so.
21    Q.  Okay.  How is that research, is it
22  written, is there a report?
23    A.  Not -- I don't think so.  I don't
24  think so.  There is only one report which is,
25  part of the report that is Dutch offer to the

Page 19

1  Corps of Engineers, the Dutch solution, how
2  the Dutch would look to Katrina.  It is an
3  engineering effort from Delft Hydraulics, the
4  makers of this program, to the Corps of
5  Engineers.  Mr. Kok also played a part
6  together with Mr. Jonkman, whose name was
7  also mentioned yesterday.
8    MR. LAMBERT:
9    Mr. Jonkman?
10    THE WITNESS:
11    Bus Jonkman.  He was one of the
12    guys who visited with me the
13    disaster area.
14  EXAMINATION BY MR. DOAK:
15    Q.  In your original role as an
16  independent reviewer of Professor Kok's
17  report, what did you understand that role as
18  independent reviewer to be?
19    A.  To look if it was clearly reported,
20  to look if it was, let's say, true, that we
21  gave a picture of what was expected of the
22  flooding.  And, as we discussed yesterday, if
23  there would be any obvious errors in the
24  inputs.  So we discussed yesterday the depth
25  of one of these holes.  There was some

Page 20

1  discussion that if the sill would be at zero
2  level minus 20, then if it would have been
3  zero I would have said, oh, this is strange,
4  but minus 20, so in this sense I studied the
5  report and I thought it was clear.
6    Q.  Have you performed the role of
7  being an independent reviewer on other
8  projects?
9    A.  Yeah, on many projects.
10    Q.  Give me some examples.  Many
11  projects doing what?
12    A.  I've been involved in many design
13  projects in the Netherlands, so I've been
14  involved in the design of the storm surge
15  barrier Easternscheldt where I was
16  responsible for the research and detailed
17  calculations.  I helped a Dutch consultant
18  with design of breakwaters in India on both
19  sides of the coast.  I have been involved in
20  the design of the Jamuna Bridge, which is a
21  bridge over the biggest river in Bangladesh
22  cutting in two halves, so we were a bit
23  nervous if the bridge survives the latest
24  flood.  We'll see.  The Dome --
25    Q.  I was wondering --

Page 21

1    MR. LAMBERT:
2    Let him finish.
3    THE WITNESS:
4    The Dome Island, when there was a
5    previous oil -- recent exploratory
6    things to look into the Beaufort
7    Sea.  So I was involved in some
8    activities.
9  EXAMINATION BY MR. DOAK:
10    Q.  What I was wondering is what
11  standards, if any, are applicable to an
12  independent reviewer or is that just a
13  professional judgment of yours?
14    A.  It's just professional judgment,
15  yeah.
16    Q.  That list of projects that you
17  talked about, you were working as an engineer
18  on those in the design process or
19  calculating, correct?
20    A.  Yes.
21    Q.  You were not independently
22  reviewing those projects?
23    A.  No, in that sense not, no.
24    Q.  Okay.  In this project, tell me
25  what you did when you were acting in your

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                        8/17/2007

Page 22

1   role as an independent reviewer. You said
2   yesterday you read the report.
3       A.  Yes.  They made calculations. So I
4   reviewed the calculations one time in
5   between. And then Mr. Bruno visited us in
6   Holland and we gave a presentation, so that's
7   also for me an opportunity to listen to the
8   guys, how they reason, what they have done,
9   and they showed all the graphs that are in
10  here. And then later when the report was
11  finished, they mailed it to me and I read it
12  and I said, yeah, I think it is very clear,
13  concise, short report.
14      Q.  How long did it take you to read
15  the report and come to your judgment that it
16  seemed to be basically correct, I guess?
17      A.  So the last time, I think, four
18  hours, a half a day I read it and studied it.
19      Q.  All right. And you said yesterday
20  that after you had read it and studied it you
21  did not prepare any written --
22      A.  No.
23      Q.  -- summary?
24      A.  No.
25      Q.  But that you did sit down with the

Page 23

1   team and give them your verbal comments?
2       A.  Yeah.
3       Q.  And approximately how much time did
4   you spend doing that, sitting down --
5       A.  Not much because I thought it was a
6   very clear report.
7       Q.  Okay. To what extent did you
8   review the report prepared by Mr. Kemp in
9   this case regarding his input data?
10      A.  We accepted the results of Mr. Kemp
11  and they seemed not unlikely, so they are in
12  line with all the previous reports that we
13  have seen about what the levels and storm
14  surge levels and so on.
15      Q.  Did you ever actually review his
16  report?
17      A.  No.
18      Q.  Had you met Mr. Kemp prior to this
19  exercise?
20      A.  No.
21      Q.  Had you ever heard of him before
22  this exercise?
23      A.  No.
24      Q.  The report says that he is an
25  oceanographer and an expert in surge, is that

Page 24

1   your understanding?
2       A.  Yeah.
3       Q.  How is it that you came to, you or
4   the team, came to identify Mr. Kemp as the
5   person you would go to for the source of data
6   that he provided?
7       A.  I think he was mentioned to us by
8   Mr. Bruno and by Ivor Van Heerden.
9       Q.  I'm sorry. Mr. Bruno and who?
10      A.  Mr. Van Heerden. Professor Van
11  Heerden.
12      Q.  Okay. You said you met Mr. Van
13  Heerden on that earlier trip to New Orleans.
14      A.  Yeah.
15      Q.  Had you dealt with Mr. Van Heerden
16  before?
17      A.  Yeah. He visited the Netherlands
18  in the aftermath of Katrina to view our dike
19  system and our storm surge barriers and so
20  on. So I guided him and Mr. Woltering around
21  the Netherlands, but I did not meet Mr. Van
22  Heerden in the context of this report.
23      Q.  But other than Mr. Van Heerden's
24  recommendation, you didn't have any
25  independent basis for assessing Mr. Kemp's

Page 25

1   qualifications?
2          MR. LAMBERT:
3          Objection.
4          THE WITNESS:
5          No. By rumor, because my
6          impression is that he is working
7          with Mr. Westerink, who is an
8          expert on this type of modeling,
9          too, but I don't know Mr.
10         Westerink, but he has a good name
11         with a colleague professor of mine,
12         Mr. Stelling. So he would have
13         certainly pulled the alarm if there
14         was anything wrong.
15  EXAMINATION BY MR. DOAK:
16      Q.  Okay. In your role as the
17  independent reviewer, did you actually review
18  the report by Mr. Morris of his data?
19      A.  No. No.
20      Q.  Had you worked with Mr. Morris
21  before this project?
22      A.  No.
23      Q.  Had you ever heard of Mr. Morris
24  before this project?
25      A.  No.

                                    7 (Pages 22 to 25)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                          8/17/2007

Page 26

1    Q.  Did anyone recommend Mr. Morris to
2  you?
3    A.  Yeah.  The group working on it
4  here.
5    Q.  What group is that?
6    A.  The -- Mr. Bruno, Van Heerden.
7    Q.  Mr. Bruno and Mr. Van Heerden?
8    A.  Yeah.
9    Q.  Anyone else?
10   A.  I don't think so.
11   Q.  How about Dr. Branscome, the
12  gentleman who submitted the weather data?
13   A.  The same story.
14   Q.  So for all three individuals who
15  provided the input data, Mr. Kemp, Mr.
16  Morris, Dr. Branscome, you relied upon
17  recommendations that came to you from either
18  plaintiff counsel or Mr. Van Heerden?
19       MR. LAMBERT:
20       Objection.
21       THE WITNESS:
22       That's true, with one proviso, that
23       we look to the numbers to judge
24       them to be in the right direction
25       because there are many reports

Page 27

1       about water levels and scour holes
2       and so on.  So we have a fair
3       picture of what was about the size
4       and the measure of the holes and
5       water levels and so on.  This
6       didn't differ.
7  EXAMINATION BY MR. DOAK:
8    Q.  But that comment is based upon a
9  general understanding of those things --
10       MR. LAMBERT:
11       Objection.
12  EXAMINATION BY MR. DOAK:
13   Q.  -- I think?
14   A.  Yeah.
15   Q.  Because yesterday you said that
16  neither you nor the team actually went in and
17  independently checked each of the items of
18  information submitted to you, is that
19  correct?
20   A.  That's correct, but we have all the
21  reports of ASCE and the ILIT report.
22   Q.  And that's what I'm saying --
23       MR. LAMBERT:
24       Don't cut him off, counsel, please.
25       Let him finish.  He's telling you

Page 28

1       there were a bunch of reports that
2       were all consistent with the
3       information he was getting from
4       these people that you are
5       criticizing right now, so let him
6       finish.
7       THE WITNESS:
8       So that's the way we go about
9       looking in all the reports.  And as
10       soon as it would have been
11       differences, and certainly if there
12       would have been a pattern which
13       would have influenced the answers,
14       then we would have been very much
15       warned, of course.
16  EXAMINATION BY MR. DOAK:
17   Q.  Other than members of the team in
18  the Netherlands and plaintiffs' counsel and
19  Mr. Van Heerden and the three men who
20  provided the input data, have you had any
21  other interactions with people with respect
22  to preparing this report or your
23  consideration of the report as an independent
24  reviewer?
25   A.  No.

Page 29

1       MR. LAMBERT:
2       Objection.  Objection.
3       THE WITNESS:
4       No.  We only mentioned Professor
5       Stelling yesterday.  He had a
6       backseat role --
7  EXAMINATION BY MR. DOAK:
8    Q.  Yes.
9    A.  -- in judging the applicability of
10  the model itself.
11       MR. LAMBERT:
12       Did you include the other reports
13       that he's mentioned as far as
14       information material?  Did you -- I
15       missed that.
16       MR. DOAK:
17       I just meant to ask with respect to
18       were there any other people, not
19       documents.
20       MR. LAMBERT:
21       People.  All right.
22       MR. DOAK:
23       Yes.
24  EXAMINATION BY MR. DOAK:
25   Q.  And yesterday you said that you had

8  (Pages 26 to 29)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 30

1   been to New Orleans one time before this
2   trip, but after Hurricane Katrina in early
3   2006, is that correct?
4      A.  Yeah.
5      Q.  Had you ever been to New Orleans
6   before that trip?
7      A.  Yes.  Two or three times for
8   conferences.  So I knew the region a little
9   bit, but I was not exactly aware of where the
10  deepest parts were.
11     Q.  In any of those prior trips had you
12  ever gone out into the field and looked at
13  any components of the hurricane protection
14  system?
15     A.  Not really in such a way.  I looked
16  at the hurricane protection, but not in a
17  systematic way.
18     Q.  On the trip you made to New Orleans
19  in early 2006, I know you identified some of
20  the canals that you visited yesterday that
21  were on the west side of the Industrial
22  Canal.  I need a verbal answer.  Is that
23  correct?
24     A.  Yeah, yeah, yeah.  Indeed.  Yes.
25  That's correct.

Page 31

1      Q.  On that trip did you have an
2   occasion to visit New Orleans East?
3      A.  Yes.  We also visited New Orleans
4   East.
5      Q.  And whereabouts did you go in New
6   Orleans East?
7      A.  The railroad area, the famous
8   crossing.  The airport, the Lakeview Airport.
9   And we visited the dikes, which were
10  overtopped, and the bridge where the famous
11  photograph is made that you have very severe
12  overtopping.  We visited because that's for
13  us also of much interest.
14     Q.  All right.
15     A.  And, of course, we visited the
16  Ninth Ward.
17     Q.  Yes.
18     A.  And St. Bernard Parish.  And we
19  went by car all over the dike along the MRGO
20  to see holes and the breaches and the near
21  complete destruction of this outlet slew.
22     Q.  All right.  Of course, what you
23  observed on that trip came after Hurricane
24  Katrina, is that correct?
25     A.  That's correct.

Page 32

1      Q.  As I understand what you said
2   yesterday, you've adopted all of the opinions
3   that were first reached by Professor Kok and
4   his team?
5      A.  Yeah, yeah.  We are now back in
6   this time again?
7      Q.  Yes, sir.
8      A.  Yeah, yeah, yeah.
9      Q.  When your role changed from being
10  an independent reviewer to being the
11  testifying expert, did you have to do
12  anything additional in order to conclude that
13  you could adopt the opinions set forth in the
14  Kok report or did you feel that you had
15  already done enough?
16         MR. LAMBERT:
17         Objection.
18         Go ahead and answer.
19         THE WITNESS:
20         No.  I had -- I could support the
21         opinion, but the guys who made the
22         calculations introduced me into
23         details.  I had a few questions,
24         how did you get, where it came
25         from, so these type of questions,

Page 33

1      and we made a few hand calculations
2      and we extract to see if I could
3      believe it.  And we discussed the
4      obstruction near the Hammond Bridge
5      and how they came to that result
6      because that was a part of the
7      discussion and engineering
8      judgment.  So in this sense we went
9      through the reports and they
10     pointed out which pump stations had
11     been working and which were not.
12     You have a difference if you have a
13     map which ones they are.
14  EXAMINATION BY MR. DOAK:
15     Q.  All right.
16     A.  So we went to the report in an
17  afternoon and Mr. Kok was not present, only
18  the two young engineers.
19     Q.  All right.  Other than that
20  afternoon meeting with the two younger
21  engineers, was there anything else that you
22  needed to do to investigate the opinions of
23  the Kok report before adopting them
24  yourselves?
25     A.  No, I don't think so.  I read it

9  (Pages 30 to 33)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 34

1  once again on the plane to prepare.
2     Q.  Yesterday you were asked if you
3  reached any new or different opinions.  And,
4  as I recall it, you said that the only thing
5  that was different for you was that you
6  believed that it was primarily the breaches,
7  not the rain, that was the major cause of
8  flooding in Greater New Orleans.
9        MR. LAMBERT:
10        Objection.  That's a compound
11        question and it assumes it's a new
12        opinion, which is not at all what I
13        understood.  The question is
14        objectionable because it's
15        compound.
16      THE WITNESS:
17        So to repeat, we had never thought
18        in advance, never thought of the
19        idea that the rain might really be
20        the cause of the flood.  So that
21        was our opinion.  And in the sense
22        that if all pumping stations had
23        been working it might have been
24        possible to prevent the flooding by
25        the rain and, secondly, if you have

Page 35

1        overtopping that's already severe
2        you have a slight chance, but as
3        soon as the breach happens, in our
4        opinion it is impossible to pump
5        this out.
6  EXAMINATION BY MR. DOAK:
7     Q.  Right.
8     A.  Now, this was my previous opinion
9  and that was proved by the report.
10    Q.  I just wanted to clarify though
11 that that opinion is focused on the major
12 cause of flooding in the Greater New Orleans
13 area.
14    A.  It's based on the amount of rain as
15 we explained yesterday.  There has been 12 to
16 14 inches of rain in total, so if there was
17 no pumping, then you would have one foot of
18 water in the bowl if it was a flat bottom.
19 If it's sloping, then it might be two, three
20 feet in the deeper parts.
21    Q.  Let me ask it a different way.
22 You're not suggesting that wind and rain
23 could not have caused substantial damage --
24    A.  No.
25    Q.  -- to particular properties in the

Page 36

1  New Orleans area, are you?
2     A.  No, certainly not, because that's a
3  different type of damage.
4     Q.  That's what I was trying to
5  clarify.
6     A.  Yeah.
7     Q.  Your comment about rain was focused
8  on the whole area and this depth of water
9  that you said was one of the primary
10 objectives.
11    A.  Yes.  We studied flooding and not
12 the damage due to flooding or rain or wind.
13    Q.  That's something wholly different?
14    A.  Yes.
15    Q.  And not within your purview of this
16 report?
17    A.  No.  We studied it in different
18 reports.  For instance, the Maaskant report,
19 we studied how many fatalities there were,
20 but that was for Dutch purposes.
21    Q.  Yes.  What was your role, if any,
22 in preparing the supplemental report dated
23 August 3, 2007?
24    A.  The first or supplementary report?
25    Q.  I don't know if you've seen it.

Page 37

1  I'm going to come back to it, so I'm not
2  going to mark it, but have you seen a
3  document like that (indicating)?
4     A.  No, I don't think so.  I've seen
5  many of these pictures.
6        MR. LAMBERT:
7        Let him take a look at it.
8        MR. DOAK:
9        Let me go ahead and have it marked.
10       We'll come back for it.
11       MR. LAMBERT:
12       15?
13       COURT REPORTER:
14       Yes.
15       MR. MAYEAUX:
16       Counsel, do you intend to mark that
17       report as an exhibit?
18       MR. DOAK:
19       Yes.
20       (EXHIBIT MARKED)
21 EXAMINATION BY MR. DOAK:
22    Q.  Professor, I hand you what has been
23 marked Vrijling 15 and ask that you examine
24 that document.
25       MR. MAYEAUX:

10  (Pages 34 to 37)

ee44edda-a960-429d-9380-2859dd8626d3

Page 38

```
 1     We have no objection to that report
 2     being referenced and attached as an
 3     exhibit.  However, the Orleans
 4     Levee District reserves all of its
 5     objections regarding the timing of
 6     the report and its inclusion with
 7     respect to class certification
 8     here.
 9     MR. DOAK:
10     I think that I can --
11     MR. LAMBERT:
12     Who prepared this report?
13     THE WITNESS:
14     Kok, apparently.
15     MR. DOAK:
16     To the extent there is any
17     ambiguity in that, I will second
18     what Mr. Mayeaux said and am
19     confident that I can speak for
20     every defendant in the case that we
21     are not waiving anything --
22     THE WITNESS:
23     Is this in the context of this, so
24     it will certainly be his report
25     because we are very much interested
```

Page 39

```
 1     in Holland in these damages
 2     between, damage estimations between
 3     our models that we have in Holland
 4     and what's occurring here because
 5     you seldom have an opportunity to
 6     calibrate these type of damage
 7     models.  But I don't -- is this in
 8     this preparation?
 9     EXAMINATION BY MR. DOAK:
10     Q.  Let me ask the questions and we
11     will get there.  Have you seen this document
12     before I handed it to you today?
13     A.  No. No.
14     Q.  Okay.  I will take it back for now.
15     We will talk about it perhaps later.  I just
16     wanted to see if you had seen it.
17     Yesterday you were shown a Notice of
18     Deposition for this deposition by Mr.
19     Mayeaux.  You remember that?
20     A.  Yeah, yeah, yeah.  I had never seen
21     that before, the legalese note.
22     Q.  Yes.  I just wanted to confirm for
23     the MRGO group that I'm representing you
24     that you haven't brought any documents with
25     you today in response to those document
```

Page 40

```
 1     requests, have you?
 2     A.  No.  I've only, in response to
 3     questions of yesterday I provided some
 4     coordinates for the points, but that's the
 5     only additional material that will be brought
 6     in or is brought in.
 7     MR. SCHULTZ:
 8     Will be, apparently.
 9     EXAMINATION BY MR. DOAK:
10     Q.  Given your role in working with the
11     team, were you in a position to know all of
12     the documents and potential evidence that was
13     submitted to the team for consideration in
14     their work or were you not that close?
15     A.  To our team?
16     Q.  Yes, sir.
17     A.  I knew in broad view what materials
18     they got, but not in detail, so I knew that
19     they got from Chad Morris these data, that
20     they got from Mr. Kemp, so that I knew, but I
21     didn't see it myself.
22     Q.  All right.  So if I ask you to
23     identify every document that was submitted to
24     the team for consideration, you wouldn't be
25     able to tell me that complete list?
```

Page 41

```
 1     A.  No. No. No.
 2     Q.  I want to go back to your
 3     experience at the university.  I think you
 4     said that you'd been a professor there since
 5     1989 approximately?
 6     A.  Yeah.  Yeah.
 7     Q.  And when did you get your Master's
 8     degree?
 9     A.  In '74.
10     Q.  And what did you do in that
11     intervening 15-year period?
12     A.  Between -- so first I was employed
13     by a contracting company in the Netherlands.
14     And then I worked in Saudi Arabia on the Al
15     Jubail port project.  Then I was seconded by
16     the contractor to the storm surge project in
17     the Easternscheldt.  And there I have been
18     working for ten years from '76 to '86 going
19     through the ranks from junior design engineer
20     to responsible for difficult calculations and
21     scale model tests and these type of
22     calculations.  So I was research coordinator
23     of that project.
24     Q.  Very active practicing civil
25     engineer for that 15-year period?
```

PROF. JOHANNES VRIJLING VOL II (MRGO)                                          8/17/2007

Page 42

1     A.  Yeah.  And then after that I was --
2  so after a few years I was changed jobs from
3  the contractor to Rijkswaterstaat, our Corps
4  of Engineers, let's say.  And then I worked
5  for some years until -- from '86 when the
6  barrier was finished to '89 or '99 in the
7  construction division of Rijkswaterstaat.
8  And then I changed over to the university.
9  And the projects we referred to, it was quite
10  common for Rijkswaterstaat employees to be
11  seconded to not foreign, but to Dutch
12  engineering firms.
13     Q.  Yes.
14     A.  So then you went for half a year or
15  three months with Haskoning or Arcadis to
16  India or Bangladesh to help.
17     Q.  One of the terms that you used was
18  that you were a professor in hydraulic
19  engineering.  Would you explain that in
20  laymen's language.
21     A.  The obvious aim of humans is to
22  influence nature and to make areas that are
23  not really habitable for humans, more and
24  better habitable as you try in New Orleans,
25  and many times they are successful and some

Page 43

1  they are not, and it is the work of civil
2  engineers to do it, in general, making roads
3  and hydraulic engineers especially when there
4  is water involved in that regards.
5  Protection against flood as regards shipping
6  facilities.  It regards bridges.  It regards
7  river training, all these kind of endeavors
8  that --
9     Q.  All right.
10     A.  -- mankind undertakes.
11     Q.  And you also used the term being a
12  professor in probabilistic design.  Would you
13  explain a little bit what you mean by that
14  term.
15     A.  Yeah.  So there's a branch of
16  mathematic systems engineering that looks
17  into the risk of engineering systems, but
18  that's a bit passive, so we changed it in
19  such a sense that we use risk analysis to
20  improve on these systems.  So you have a
21  preliminary design, then you make a risk
22  analysis and you think these are the weak
23  spots.  Then we improve it and we do it
24  again.  That's a relatively new development
25  which was initiated by me and by a colleague

Page 44

1  of mine, Professor Vrouwenvelder
2  (indicating).
3     Q.  As you are saying that, you are
4  motioning with your hand to almost make a
5  circle.
6     A.  A cycle, yes.
7     Q.  Of a design process, as I
8  understand it.
9     A.  Exactly.
10     Q.  And part of that design process,
11  I'm asking, is to use this kind of model and
12  projection and learn from it, is that
13  correct?
14     A.  That's correct.  Because all
15  decisions in life are influenced by
16  uncertainty, mostly we do it with our belly,
17  but this type of probabilistic engineering
18  tries to model the uncertainties and to take
19  them into account in a mathematically correct
20  way.
21     Q.  Where is the intersect with that
22  and computer modeling?
23     A.  Yes.  It's a different branch of
24  computer models, so we call this type of
25  modeling (indicating) deterministic modeling.

Page 45

1     Q.  I'm sorry?
2     A.  We call this type of modeling
3  deterministic modeling.  So you put in the
4  water flow and it is certain what the output
5  will be.  But there are also types of
6  programs, and the most common name is Monte
7  Carlo analysis, where you feed in not one
8  input, but many, with a certain probability
9  distribution and also the answer is
10  characterized by a probability distribution.
11  So then you make not one calculation of the
12  flow, but ten thousand.
13     Q.  When did all of this computer
14  modeling in general begin in engineering?
15     A.  I can tell you because we started
16  with the ideas in this Easternscheldt period
17  in '76 and then it was very difficult to do
18  it because computers were not yet available.
19  So with the growth of the computers and the
20  PCs and so on, we were able to do better and
21  better calculations.  So it's a growth which
22  goes parallel with the development of the PC,
23  I think.  Very early on I had an Apple
24  computer to do these types of calculations.
25     Q.  I know you indicated yesterday that

12 (Pages 42 to 45)

PROF. JOHANNES VRIJLING VOL II (MRGO)                              8/17/2007

Page 46

1  you had used this Sobek software before. For
2  how many years have you been using it?
3      A.  I have not been using it myself,
4  but in the projects that we were involved it
5  has always been used. For instance, it
6  played an important role in, let's say, the
7  grandfather of Sobek, not this one, but it
8  played an important role in the closure of
9  the Easternscheldt in predicting what the
10  flow would be after the barrier had been
11  installed, but also during construction it
12  was for us a very important task to provide
13  the contractor with accurate flow predictions
14  he had to do his activities in the, in the
15  tidal, in the mouth of the tidal estuary. So
16  we had to provide him with weather reports of
17  what occurred. It was all based on this type
18  of modeling (indicating).
19      MR. LAMBERT:
20      That was during the construction?
21      THE WITNESS:
22      During the construction period,
23      yeah. So in the design period as
24      well as in the construction period.
25  EXAMINATION BY MR. DOAK:

Page 47

1      Q.  When was this Sobek software
2  developed?
3      A.  It has grown over a period of time.
4  It's already quite old, but it's renewed all
5  the time.
6      Q.  Yes. About when did it start?
7      A.  Yeah. About '70, '75, I think, the
8  first numerical 1D models and it has grown.
9  This 1D2D is a recent development five years
10  ago when there was interest in the flooding
11  of polders where you had ditches, because
12  originally the engineers were only interested
13  in flows through the rivers and through the
14  ditch, but only with these flooding problems
15  they got interested in when it came out of
16  the ditch over the field. So that was a
17  special of the 1D2D development, which is the
18  basis of this model.
19      Q.  I was a little confused in there is
20  apparently some interaction between the Sobek
21  software and the Delft University 1 or 2D.
22      A.  Not some. Many of the -- so it's
23  officially owned by Delft Hydraulics, but
24  many of the new additions are first tried out
25  by or developed by Professor Stelling or by

Page 48

1  other professors and then implemented, tried
2  out by students, and then finally they get in
3  the commercial version.
4      Q.  But it's okay if I refer to it as
5  the Sobek software as including all of that?
6      A.  Yeah, yeah, because this is the
7  Delft Hydraulics version, not a research
8  version. It's the --
9      Q.  Okay. And the report of Professor
10  Kok indicates that the Sobek software's
11  purpose is to generate flood simulation. Do
12  you agree with that?
13      A.  Yeah. Yeah.
14      Q.  And you said yesterday that it had
15  been used hundreds of times to study Dutch
16  systems?
17      A.  Yes.
18      Q.  Can you give me some examples of
19  those prior uses that you're familiar with?
20      A.  Yeah. Especially in this field we
21  are calculating the failure probabilities of
22  our polders, which is done in the Floris
23  study, which was presented yesterday, very
24  thick report. And in that report it also
25  tried to estimate damage and so on. Yeah. I

Page 49

1  think here, for the damage functions --
2      MR. LAMBERT:
3      Exhibit 2 is it? Look at the front
4      of it, please.
5      THE WITNESS:
6      I cannot read. It is an American
7      2.
8      MR. LAMBERT:
9      It's a 2.
10      THE WITNESS:
11      And so for these purposes, all
12      these diagrams are flooded with the
13      same program to estimate water
14      depths.
15  EXAMINATION BY MR. DOAK:
16      Q.  But what exactly does it do, it
17  predicts the flow of water?
18      A.  Yeah. It predicts the flow of
19  water. And the specialty, as I tried to
20  explain a few moments earlier, that normally
21  we only modeled the ditches and the rivers so
22  the water courses, but in this flooding type
23  of problem you want to know how quickly it
24  passes over the grass fields beside the flow.
25  And that's a special addition to this model.

13 (Pages 46 to 49)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 50

1    Q.  And when you say that's the special
2  addition of this model, do you mean of the
3  latest model of Sobek software or the special
4  thing about the project model --
5    A.  The Sobek and then model 1D2D.
6  Delft -- the Delft 1D2D model (indicating).
7    Q.  Okay.  Has the Sobek software ever
8  been used on American sites?
9    A.  Yeah.  We discussed that yesterday
10  also.  I'm not aware personally, but knowing
11  Delft Hydraulics, I'm convinced that there
12  have been projects which it is used.  And it
13  has been used in our hands and in Delft
14  Hydraulics' hands to rehind-cast this flood
15  in New Orleans.
16    Q.  May I see Exhibits 2 and 3 -- 3 and
17  4 from yesterday, please.  I understand the
18  documents that have previously been marked as
19  Exhibits 3 and 4.  I wondered if you are
20  aware of any other documents that describe
21  the purpose of the Sobek software.
22    A.  I think there will be more than
23  that.
24    Q.  That there would be more than this?
25    A.  Yes.  Yeah, yeah.  I even said

Page 51

1  jokingly, if you don't believe it you can buy
2  the model.  It is available.
3        MR. MAYEAUX:
4        How much?
5        THE WITNESS:
6        So there are packages and
7        information, leaflets and many
8        things.
9  EXAMINATION BY MR. DOAK:
10    Q.  Would those documents likely
11  explain the intended uses and purposes of the
12  software?
13    A.  Yeah, yeah.  Certainly.  And there
14  are various packages, so it ranges from not
15  Sobek, but Waqua, which is really 2 or 3D, to
16  the simple Sobek 1D, which is only the river
17  and ditches, let's say.
18    Q.  Has the Sobek software ever
19  established a margin of error?
20    A.  The model has -- in any normal
21  case, let's say, normal project, the model is
22  calibrated.  So you have past observations
23  and you try if you can rehind-cast them.  So
24  in that sense, for every project it is
25  calibrated and more in general there is a lot

Page 52

1  of project experience, so for many projects
2  this procedure has been applied.  And the
3  matter as such is nothing special.  As we
4  discussed yesterday, there are also Danish
5  packages that do the same, Mike 11 and Mike
6  22.
7        MR. DOAK:
8        Mark that next in order.
9        (EXHIBIT MARKED)
10  EXAMINATION BY MR. DOAK:
11    Q.  Mr. Vrijling, I hand you what has
12  been marked as Deposition Exhibit 16 and ask
13  that you examine that document.
14    A.  Uh-huh.
15    Q.  Do you recognize this as one of
16  the --
17    A.  The leaflets which I had mentioned.
18    Q.  Which was produced to defendants?
19    A.  Yeah, yeah, yeah.  This is what I
20  intended with the leaflets.
21    Q.  Yes.  According to the first
22  paragraph on the first page, it says that the
23  program is typically used to simulate the
24  progression of floodwaters and the depth of
25  flooding in the area.  Would you agree with

Page 53

1  that description of the purpose of this
2  model?
3    A.  Yes, yes, yes.  That's the same as
4  I explained.
5    Q.  And I assume that this defined
6  purpose is the reason you told us yesterday
7  that of all of the objectives of this model,
8  the most important was to reach this final
9  depth of water?
10    A.  Yeah.
11    Q.  Correct?
12    A.  Yeah, yeah.
13    Q.  Because that is the defined purpose
14  of the software in the first place --
15    A.  Yeah.
16    Q.  -- as opposed to other things it
17  might do, correct?
18    A.  Yes.  That's correct.
19    Q.  And in the second paragraph there's
20  a list of bullets, but if you would look at
21  the third paragraph, it says that it enables
22  users to make reliable predictions, correct?
23    A.  (Witness nods head.)
24        MR. LAMBERT:
25        Where are you reading from?

14  (Pages 50 to 53)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 54

1       THE WITNESS:
2       Here (indicating).
3       MR. LAMBERT:
4       Oh, I see.  Okay.
5       THE WITNESS:
6       The fourth.
7   EXAMINATION BY MR. DOAK:
8       Q.  I'm sorry.  You were nodding your
9   head.  I need to have a verbal answer in that
10  third paragraph --
11      A.  Yeah.  In the third paragraph it
12  says you can make a reliable prediction of a
13  flood in a shallow area or polder area.
14      Q.  And these predictions are
15  future-looking predictions, right?
16      A.  Yes.  So it's --
17      Q.  And in the list of illustrative
18  uses that are on this front page, disaster
19  management, evacuation planning, you see that
20  language?
21      A.  Yes.
22      Q.  It doesn't say anything about using
23  this for litigation purposes, does it?
24      A.  No.  No.
25      Q.  And it doesn't say anything about

Page 55

1   recreating a past hurricane event, does it?
2       A.  No, but you're now going into a --
3   because you can already attack, if you want,
4   that it can be predicting flooding events
5   because I think this is the first flooding
6   event of New Orleans where we have the
7   possibility of really testing it, but --
8       Q.  Well, but your model did not
9   purport to be an analysis to predict some
10  future hurricane event, did it?
11      A.  No, not hurricane.  It predicts the
12  flow of water if you have a shallow area and
13  you let it flow in in the shallow area a lot
14  of water, how it will progress in the shallow
15  area.  If this water is caused by a hurricane
16  or a Dutch storm or by a breach of the river
17  levee is not important.
18      Q.  My point though is for this
19  litigation purpose you used the model to
20  attempt to simulate, reduplicate a past
21  historical event?
22      A.  Yes.
23      Q.  And that's different from trying to
24  predict a future event?
25      A.  Yeah, not really.  Physically so in

Page 56

1   the sense of your words it is different, but
2   in the meaning of the physics it's the same
3   because --
4       Q.  But in predicting a future event
5   don't you have a tighter control over the
6   variables?
7       A.  Not really.  If I try to predict a
8   future flooding of the Netherlands, which has
9   not happened for 50 years, then I have no
10  control whatsoever because I have to guess a
11  breach, I have to guess circumstances.  If I
12  hind-cast a disaster that has happened, then
13  I know how high the water level was and I
14  know how wide the breach was and I know if it
15  was storming or not.
16      Q.  Okay.
17      A.  So in this sense is a hind-cast is
18  more reliable than the prediction, but
19  physically it's now the same because you put
20  in input parameters and you get a result.
21  And with a hind-cast you know what the inputs
22  have been because they are measured.  And in
23  a prediction you even don't know the inputs.
24  You have to get them from thin air.
25      Q.  The title of this page says:

Page 57

1   "Sobek Rural Overland Flow Module."  Are
2   there different modules of the Sobek
3   software?
4       A.  Yes.  I tried to explain to you
5   that there is a whole range, from 1D
6   software, if you look only to river flow, up
7   to 3D software if you want to have a real
8   mixing and problem with in the sea where also
9   the depth is of importance to mix chemicals
10  or hot water.
11      Q.  What I'm trying to find out is how
12  many different models, modules of this
13  software are there to your knowledge?
14      A.  I didn't know.  At least three or
15  four.
16      Q.  All right.  But for this project
17  you used this module, is that correct?
18      A.  Yeah.
19      Q.  And why did you choose to use the
20  module for rural areas?
21      A.  Yeah, because it says rural, but it
22  is meant for, as pictured above, so land and
23  house and so on.  Not really a city
24  environment, but, as we discussed yesterday,
25  we model a pack of houses only by roughness,

15  (Pages 54 to 57)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 58

1  not by individual houses. So in that
2  sense --
3      Q. I think I just heard you say so it
4  is not really intended for city purposes?
5      MR. LAMBERT:
6      Objection.
7      THE WITNESS:
8      If you have a really tight block
9      city, then the only way to model
10     that city in Sobek is to create
11     roughness. It's not that the
12     individual houses are modeled. If
13     you would like to do that, then you
14     have to make a far more 3D type --
15 EXAMINATION BY MR. DOAK:
16     Q. Well, I'm not sure I understand
17 that you are answering what I'm trying to
18 ask. Maybe I'm not asking the question well.
19 (Whereupon Daniel E. Becnel, Jr., Esquire
20 entered the room.)
21     MR. LAMBERT:
22     Objection.
23 EXAMINATION BY MR. DOAK:
24     Q. I assume from the title that the
25 people who wrote the title thought there was

Page 59

1  some significance to this being a rural
2  module. Does that make sense to you?
3      A. Yeah, yeah, yeah, but then the
4  definition, what is rural, it comes into
5  play.
6      Q. Okay.
7      A. And we in the Netherlands, we
8  understand under rural such type of landscape
9  (indicating). So that means housing and a
10 park and some gardens and a meadow and so on.
11     Q. You were pointing to the picture on
12 the first page of Exhibit 16?
13     A. Yes. Yes.
14     Q. Is that correct?
15     A. Yes, that's correct.
16     Q. Okay.
17     A. If you think that rural is only
18 meadows and some trees, that's not correct.
19     Q. And do you consider the Greater New
20 Orleans area to be rural?
21     A. Yeah. In this sense it's rural.
22 Yeah. It is low housing, gardens, trees.
23     Q. Do you know if there are different
24 modules by Sobek that would be more suited
25 for cities?

Page 60

1      A. No. There are none.
2      Q. I believe that you acknowledged
3  yesterday that, to your knowledge, the Sobek
4  software has never been used for litigation
5  purposes, is that correct?
6      A. I'm not aware of it.
7      Q. I would like to go back and
8  understand some more about the projects where
9  you have previously been involved in this
10 Sobek software was used. How did the size of
11 those projects compare to the size of the
12 analysis you've done for this litigation in
13 trying to simulate Hurricane Katrina?
14     MR. LAMBERT:
15     Objection.
16     THE WITNESS:
17     And you mean geometrical size
18     (indicating)?
19 EXAMINATION BY MR. DOAK:
20     Q. In part.
21     MR. LAMBERT:
22     Objection. You see, that's the
23     problem I'm having. It is kind of
24     vague. What do you mean by size?
25     MR. DOAK:

Page 61

1      I'll be glad to spell it out.
2  EXAMINATION BY MR. DOAK:
3      Q. I would like to try to compare the
4  complexity and magnitude of the situations
5  that you previously have applied the Sobek
6  model to.
7      A. Yeah.
8      Q. And compare or contrast that with
9  the project that you have done for this
10 expert report.
11     A. I --
12     MR. LAMBERT:
13     Excuse me. Objection. Is that a
14     question?
15     MR. DOAK:
16     Yes.
17     MR. LAMBERT:
18     Objection.
19     THE WITNESS:
20     I can only tell you the
21     Easternscheldt is the size of
22     approximately 25 kilometers by 10
23     (indicating), and Jamuna River is,
24     I think, 15 kilometers wide. The
25     part we modeled was a few hundred

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 62

1    kilometers.  The flooding areas in
2    Holland we studied are roughly --
3    because each polder in the
4    Netherlands is approximately 50 by
5    50 kilometers roughly.  And we have
6    used it in a project in Husum,
7    which was a closure project, which
8    was, I think, 10 by 10 kilometers
9    area, which was a marshy and bottom
10   shoals.
11   EXAMINATION BY MR. DOAK:
12     Q.  All of those --
13     A.  Yeah.  All of these --
14     Q.  All of those go to geographic size?
15     A.  Yeah.  Yeah.
16     Q.  And I'm wondering about the
17   complexity in the sense of being able to
18   input data that's quality data, how you would
19   compare your prior uses and overall
20   complexity to the job you did here.
21       MR. LAMBERT:
22         So the record is clear, counsel,
23       could we get a kilometer by
24       kilometer comparison.  In other
25       words, what is this project, for

Page 63

1    example, the polders in New
2    Orleans, kilometer-wise, what by
3    what?
4    THE WITNESS:
5    To my opinion, the entire New
6    Orleans area is equal to our
7    Province Utrecht.  So the size of a
8    bowl in New Orleans is a little bit
9    smaller, but not much than our big
10   polders, the entities that we are
11   protecting or seeing as one polder.
12   EXAMINATION BY MR. DOAK:
13     Q.  Okay.
14     A.  So they are similar in size.
15     Q.  Okay.
16     A.  And then to your question, you
17   know, it may sound strange, but this was in
18   this sense less complicated.  Much has been
19   measured here.  So in many of these projects
20   out in the sea and in the rivers, then you
21   have very scarce measurements and they are
22   not done by reliable Americans, but by Indian
23   people.  So there is a lot of doubt in these
24   projects if you have actually good data.  So
25   then even more, which you might not suspect,

Page 64

1    but even more you have this cycle of do I
2    believe what I get out of it or has someone
3    made a mistake in providing me with data.
4      Q.  Yes.
5      A.  So in this sense this was not so
6    complex.
7      Q.  We'll get to the details of
8    breaches later, but do you recall
9    approximately how many breaches you all took
10   into account in preparing this model?
11     A.  Here?
12     Q.  Yes.
13     A.  I think 25 or something in total.
14   We can count them.  They are all in the
15   tables (indicating).  Roughly 8 per bowl.
16       MR. DOAK:
17         Did we mark yesterday the report of
18       Mr. Morris?
19       MS. PAYNE:
20         No.
21       MR. DOAK:
22         Let me, please, have this marked as
23       Vrijling Exhibit No. 17.
24       (EXHIBIT MARKED)
25   EXAMINATION BY MR. DOAK:

Page 65

1      Q.  Mr. Vrijling, I'm going to hand you
2    the report by Mr. Morris dated July 30, 2007,
3    which has been marked as Vrijling Exhibit 17,
4    and I ask that you examine figure 4-1 in that
5    document (indicating).  It had been my
6    understanding, which I wanted to confirm or
7    correct with you, that this top figure 4-1
8    was showing upwards of 200 different breach
9    sites around the overall area.
10     A.  Yeah, yeah.  If you count these
11   all --
12     Q.  I don't want to fight about
13   numbers, so I'm trying to find a way that we
14   can reconcile this that you're comfortable
15   with.  I guess this would suggest that if you
16   want to take breaches at a small enough
17   location there may be as many as 200 plus, is
18   that correct?
19     A.  Yes.  It could well be, yeah.
20     Q.  But that there is a much smaller
21   number that you consider to be the
22   significant breach sites --
23     A.  Yeah.
24       MR. LAMBERT:
25         I have to make an objection.  You

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 66

1    have a whole bunch of numbers along
2    the --
3    MR. DOAK:
4    Just state your objection, counsel.
5    MR. LAMBERT:
6    Well, my objection is that you're
7    trying to characterize by using the
8    word significant --
9    MR. DOAK:
10   I'm asking a question that the
11   witness can answer and he can say
12   no.
13   MR. LAMBERT:
14   And I'm objecting to it because
15   you're characterizing a number of,
16   a numbering system of breaches
17   along a long leeve where apparently
18   somebody has measured or counted
19   numerous ones versus breach sites,
20   which are fewer in number.
21   MR. DOAK:
22   Are you done?
23   MR. LAMBERT:
24   Maybe.  For now.
25   MR. DOAK:

Page 67

1    Okay.
2    THE WITNESS:
3    Yeah, because these numbers, we
4    don't know what they mean, so you
5    say they are breaches, but --
6    EXAMINATION BY MR. DOAK:
7    Q.  No, sir.  I was asking you.  This
8    was submitted by your --
9    A.  Okay.
10   Q.  -- by Mr. Morris who submitted data
11   for the model.  So this is not my data.
12   A.  No.  You are saying these are
13   breaches.
14   Q.  Well, I was asking you.  Do you
15   know what information was submitted on breach
16   data by Mr. Morris?
17   A.  I had to estimate the number of
18   breaches.  And I said it was approximately 25
19   or something like that order.
20   Q.  Okay.
21   A.  And then you produced this and you
22   said, well, there are much more (indicating),
23   at least that was the impression, but I don't
24   know if these intend to be breaches all,
25   because many are overtopping scour holes,

Page 68

1    which did not lead to real breaches, here in
2    the south part.  In the north part there was
3    one big breach, in my understanding, but here
4    also are many numbers, so I don't know
5    exactly what's the definition of these --
6    Q.  On the top figure 4-1 --
7    A.  Uh-huh.
8    Q.  -- the legend here (indicating)
9    says breach locations, is that correct?
10   A.  Yes.
11   Q.  And surrounding that there are a
12   series of numbers all throughout the New
13   Orleans area, is that correct?
14   A.  Yes.  That's correct.
15   Q.  And this was the report prepared by
16   your sub-expert, Mr. Morris, correct?
17   A.  Uh-huh.
18   Q.  And Mr. Morris was the one you
19   relied upon to submit breach data that you
20   input into the model, is that correct?
21   A.  That's correct.
22   Q.  And do you have an understanding of
23   what these numbers up to 226 mean or not?
24   A.  I don't know this in detail, but if
25   you look to the next page, Exhibit 4-2, then

Page 69

1    it is in my opinion are not really breaches
2    yet, but breaches in development where you
3    have the scour type.  So if he counts them as
4    breaches, then the definition of breach is a
5    little bit different because we call it only
6    breach if the sill level is far below the
7    water level and you have real inflow of
8    water, not these small damages to the inner
9    slope.
10   Q.  How many breaches do you recall in
11   number were used as input data into your
12   software model?
13   A.  They are exactly given in the
14   tables with the specification of width and
15   depth.
16   Q.  It would be the sum of those?
17   A.  Yeah.
18   Q.  Approximately 25 you thought?
19   A.  Yeah.
20   Q.  If, however, this chart 4-1 does
21   include very minor breaches or overtoppings
22   up to 226, then someone had to make a choice
23   on which breach sites were large enough to be
24   input into the data, correct?
25   A.  Yes.

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 70

1    Q.  And some very significant number of
2  sites were selected not to be included in the
3  input data?
4    A.  Yeah.
5    Q.  Okay.  And that's the kind of thing
6  that happens in modeling, correct?
7    A.  Yeah.
8    Q.  You have to do it.
9    A.  Yeah, yeah, yeah.
10    Q.  Okay.  What I was trying to compare
11  this to in my earlier question was whether
12  the total magnitude of what you were
13  analyzing in the New Orleans situation with
14  all of the hydrographs and all of the breach
15  sites and all of the sizes of breach and all
16  of the data combined with the geographical
17  miles was comparable in complexity to the
18  prior uses you have made of the Sobek model.
19    MR. LAMBERT:
20    Objection.
21    Go ahead and answer.
22    THE WITNESS:
23    I think so.
24  EXAMINATION BY MR. DOAK:
25    Q.  So this wasn't anything new in the

Page 71

1  use of the model?
2    A.  No.
3    Q.  Okay.  In the prior occasions where
4  you've been on a project making use of the
5  Sobek model, what was the general purpose of
6  the modeling?
7    A.  Mostly it was about river
8  engineering and the closure of tidal
9  estuaries, so the major attention went to the
10  flow in the channel and if you narrow the
11  channel what will happen to the flow and to
12  the water levels and so on.  And only in the
13  project we described in the Floris type of
14  analysis we were using it in the purpose as
15  it's used here.
16    Q.  As I understand it though, this is
17  in connection with the design function much
18  like your teaching expertise, you are about
19  to design something and want to use a model
20  to make predictions that might help improve
21  your design?
22    A.  Yes.
23    MR. LAMBERT:
24    Objection.
25    THE WITNESS:

Page 72

1    Yes.
2  EXAMINATION BY MR. DOAK:
3    Q.  And is that the typical use that
4  you have made of the Sobek model on the
5  projects you've used it before?
6    A.  Yeah, but I've explained earlier
7  already that if you use it for design, then
8  you start with replaying old situations, old
9  floods, old river floods, to see if the model
10  can replay history.  And then you start to
11  play the future.  In this case, in fact,
12  only do the first part, replaying history, to
13  see if you can understand and explain what
14  happened and why and where.  And if you are
15  confident that it fits, then you know at once
16  in all points of the polder, as we have
17  shown, you know the water levels which were
18  previously only known there where
19  eyewitnesses have been standing or waiting or
20  filming.  So then, by using few points from
21  eyewitnesses, you can spread the information
22  over the whole area.
23    Q.  Are you familiar with computer
24  modeling in other areas than simulating
25  floods?

Page 73

1    A.  Yes.
2    Q.  Is there any common methodology
3  that's kind of systemic to all modeling?
4    A.  Yeah.  The architecture of the
5  software and the computer language, which is
6  mostly FORTRAN, PC today.
7    Q.  How does the Sobek software model
8  compare to the models that are used to
9  forecast weather?  Is there a similarity of
10  methodology there?
11    MR. LAMBERT:
12    Objection.
13    Go ahead and answer.
14    THE WITNESS:
15    I don't know.  I think forecast
16    modeling is more complex, but I'm
17    not an expert in this because it
18    involves heat exchange, too, and
19    air is compressible and water is
20    not, so it is considerably more
21    difficult.
22  EXAMINATION BY MR. DOAK:
23    Q.  Same answer for models that
24  forecast hurricanes?
25    A.  Yeah.  The air movement.

19 (Pages 70 to 73)

ee44edda-a960-429d-9380-2859dd8626d3

1    Q.  I don't know what words you would
2  use to describe it.  I understand software to
3  have field layouts that can be populated with
4  data.
5        MR. LAMBERT:
6        Objection.
7        THE WITNESS:
8        Input.
9  EXAMINATION BY MR. DOAK:
10    Q.  Input?
11    A.  Yeah.
12    Q.  And yesterday you told us about a
13  few specific types of data that the Sobek
14  model was preprogrammed to be prepared to
15  accept such input, is that correct?
16    A.  Yeah.
17    Q.  Are you aware of any document that
18  lists what those subject areas are for the
19  Sobek program?
20    A.  Yes.  In principle, those tutorials
21  that you have two examples of, they give the
22  possibilities how to play with the program.
23    Q.  Yesterday we went through a number
24  of areas that you said that the model could
25  accept the data, but you all decided not to

1  input such data.  Do you remember that?
2        MR. LAMBERT:
3        Objection.
4        THE WITNESS:
5        Not exactly.  Which we didn't
6        accept, but we discussed the --
7  EXAMINATION BY MR. DOAK:
8    Q.  Yes.
9    A.  -- various possibilities of input.
10    Q.  Yes.  Are you able off the top of
11  your head to identify for me every place the
12  Sobek model is prepared to accept a
13  particular kind of data that was not added in
14  this case?
15        MR. LAMBERT:
16        Objection.
17        THE WITNESS:
18        I do not understand your question.
19  EXAMINATION BY MR. DOAK:
20    Q.  I have it coming up later, and I'll
21  ask you a different time with a reference to
22  yesterday.  Did you ever seek to validate the
23  predictions made in this model on the New
24  Orleans flooding?
25    A.  By cutting the dikes again when the

1  next hurricane comes.  That's the problem.
2  With these floods, you can never validate
3  them because then you have to repeat the
4  flood or -- this is exactly the nasty thing
5  why we are so glad that New Orleans flooded
6  and not the Netherlands.
7    Q.  Well, you said yesterday that you
8  accepted a list of illustrative points in
9  each of the main geographical areas that
10  are --
11    A.  Yeah.
12    Q.  -- that are identified in the
13  report, is that correct?
14    A.  Yeah.  That's correct.  We --
15    Q.  And you could have added to that
16  list of illustrative points specific
17  addresses, such as the named plaintiffs, and
18  then gone out in the field and investigated
19  what happened at a particular house --
20    A.  Yeah.
21    Q.  -- and sought to compare that
22  forensic inspection to the prediction in your
23  model.  You did not do that, did you?
24    A.  No.  We had only the eyewitness
25  reports that were available that we used for

1  calibration.
2    Q.  But in science you will agree with
3  me that it's very important to validate
4  things with empirical evidence --
5    A.  Yes.  That's what I tried to say.
6  Then you need to flood --
7    Q.  Professor, you've got to let me
8  finish the question.  If we were just talking
9  it would be fine, but with the court reporter
10  you have to let me finish the question or
11  she'll get lost.
12        MR. LAMBERT:
13        I have an objection to the question
14        also, that you didn't finish.  I
15        made it already.
16  EXAMINATION BY MR. DOAK:
17    Q.  Is part of the reason that you did
18  not seek to test the model's prediction
19  against particular houses and properties is
20  that's simply going beyond the intended
21  purpose of this model?
22        MR. LAMBERT:
23        Objection.  Objection.  Counsel,
24        you're good, but you really are
25        pushing the envelope here.  You

PROF. JOHANNES VRIJLING VOL II (MRGO)                                    8/17/2007

Page 78

1    don't have an eyewitness set up at
2    a particular class representative's
3    address so you verify where you
4    have the eyewitness.  You don't --
5    you can't pick a particular
6    address --
7    MR. DOAK:
8        Counsel, I think you are making a
9        coaching objection --
10   MR. LAMBERT:
11       No, I'm not.
12   MR. DOAK:
13       -- and I will ask for you just to
14       state your objection and not
15       comment on the subject area in
16       front of the witness.
17   MR. LAMBERT:
18       I'm trying not to have such a
19       long-winded waste of time in terms
20       of your attack, which is, I mean,
21       you also equate scientific analysis
22       with a specific plaintiff's
23       address.  And this is just silly.
24       I mean, it takes a lot of time.
25   MR. DOAK:

Page 79

1    Then let the witness tell me it's
2    silly.
3    MR. LAMBERT:
4        I'm telling you it is silly and I'm
5        objecting.
6    MR. DOAK:
7        Then state your objections without
8        making the comments.
9    MR. LAMBERT:
10       That's what I was trying to do, but
11       I thought you invited my objection
12       comments.
13   EXAMINATION BY MR. DOAK:
14   Q.  In view of that, I think I need to
15   go back and confirm my understanding.  I
16   thought that you had just agreed with me that
17   science does try to validate things based
18   upon empirical evidence.
19   A.  Yes.
20   Q.  That's not Jerry Doak making up
21   that theory, is it?
22   A.  No.
23   Q.  That's a well-accepted principle we
24   all learned early in science class.
25   A.  Yes.

Page 80

1    Q.  And I assume you would agree with
2    me that there are a number of ways individual
3    houses in the New Orleans area might have
4    evidence from which an investigator or an
5    eyewitness may be able to make very specific
6    statements about what happened to that
7    particular property.  Would you agree with
8    that?
9    A.  Yeah, but the problem is that you
10   need an observation of water level and a
11   certain time.  So in this case the evidence
12   of a house is insufficient because all the
13   phases of flooding have passed the house and
14   the house cannot tell at what moment how
15   high.  Only eyewitnesses can do that or these
16   types of clocks, battery clocks, that have
17   stopped by the water level.  Then you also
18   have some idea at what time, what level was
19   reached.  So we used these data, we tried to
20   use all the eyewitnesses and some clock data.
21   So that's what we tried to use.
22   Q.  What I'm aiming at though is that
23   you are focused on what is the final depth of
24   the water, correct, primarily?
25   A.  For the final result of the

Page 81

1    calculation.
2    Q.  Yes.
3    A.  But --
4    Q.  Because that's what the model is
5    intended to do?
6    A.  Yeah, but it also gives you the
7    progression, how the flood progresses through
8    the polders.  And in the calibrations we try
9    to get this as accurate as possible in
10   relation to eyewitness observations.
11   Q.  Yes.  What if a tree fell over on
12   the house before the water got there, would
13   your model know about that?
14   A.  No, but it wouldn't be of much
15   interest for the water.
16   Q.  It's not of much interest because
17   that's what the model isn't intended to do,
18   correct?
19   A.  No, and it doesn't have too much
20   influence either.
21   Q.  Okay.
22   A.  Unless it would be an entire wood.
23   Q.  Okay.  What about if somebody had
24   inspected a house and said that they could
25   determine that the flooding height was three

21  (Pages 78 to 81)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 82

1  feet high and it was a professional who did
2  that, would you credit that information from
3  water?
4      A.  It would be an eyewitness report, I
5  think.
6      Q.  Yes.  And if you had that on a
7  particular house that your chart predicted
8  should have been 12 feet high of water, that
9  would be of concern to you, wouldn't it?
10     A.  Yeah.  It would.
11     Q.  Or it may be simple variation
12  within a grid or other things?
13         MR. LAMBERT:
14         Objection.
15         THE WITNESS:
16         That's a bit too strong for
17         variation, I'm afraid, from 3 foot
18         to 10 foot, an unlikely variation,
19         because it would be an unknown
20         steepness of the water.
21         MR. DOAK:
22         We'll come back to that.  I'm told
23         we have to take a break because
24         they can change the videotape.
25         VIDEOGRAPHER:

Page 83

1          Off the record.  It is 10:40.
2          (RECESS TAKEN)
3          VIDEOGRAPHER:
4          Returning to the record.  It is
5          11:06.
6  EXAMINATION BY MR. DOAK:
7      Q.  Professor, next I'd like to turn to
8  the limits of modeling just in a general way.
9  Would you agree that real world events tend
10  to have hundreds of complex interacting
11  factors?
12     A.  Yes.
13     Q.  And that makes it very difficult to
14  get all of that information correctly into a
15  computer to replicate it?
16     A.  Yes.  And the first step is we
17  limit the real world to one aspect, in this
18  case, the flow of water, and we don't look
19  into psychological, economical, whatever
20  aspects.  So that's the first big
21  schematicization.
22     Q.  Yes.
23     A.  And then we have to do even more.
24     Q.  In your preface of the report, and
25  I know y'all went through this yesterday,

Page 84

1  making the obviously correct statement that
2  output quality is completely dependent on
3  input and accuracy of the base grid.
4      A.  Yes.
5      Q.  I think we discussed that
6  yesterday.
7      A.  Yes.
8      Q.  Isn't it also important -- it's not
9  only the accuracy of the data, but the
10  completeness of the data?
11     A.  No.  I think the beautiful thing of
12  using such a model is that you can with
13  relative incomplete data set, you can find
14  points that you would like to know by using
15  these equations of physics.  This is exactly
16  what we are doing.  We have a very scarce
17  data set, and from that we predict how the
18  flow was going, and these few points we have
19  from eyewitnesses we can check if it's right.
20  And then, although we have only a few points,
21  if we get it right, then we have many points.
22     Q.  But if that always worked, why
23  wouldn't you be able to run reliability
24  studies on programs and methodologies and
25  come up with a margin of error rate?

Page 85

1          MR. LAMBERT:
2          Objection.
3          THE WITNESS:
4          I didn't say we couldn't come up
5          with a margin of error.  We can
6          come up with a general margin of
7          error of Sobek or models in general
8          because it is not really -- you
9          don't need one case.  That's even
10         better to have various cases
11         between European river and American
12         river and a Russian river, and then
13         these together tell you how
14         reliable Sobek is, but in this case
15         the reliability of Sobek is not an
16         issue because generally the
17         reliability of the input is far
18         more difficult, and also in this
19         case, of course, because you don't
20         know exactly how high the water
21         levels were and how big the
22         breaches.  And it is all
23         observations afterwards.
24  EXAMINATION BY MR. DOAK:
25     Q.  And that does make for difficulty?

22  (Pages  82 to 85)

PROF. JOHANNES VRIJLING VOL II (MRGO)                          8/17/2007

Page 86

1   A.  That makes it limited accuracy.
2   Q.  And in this model you did make
3 assumptions, which are reflected in the
4 report, correct?
5   A.  Yeah.
6   Q.  And making assumptions carries with
7 it the potential for error?
8   A.  Yes.
9   Q.  And you always have some relevant
10 factors where you just don't have data on
11 those relative factors.  And you allude to
12 that a few times in the report.
13      MR. LAMBERT:
14      Objection.
15      THE WITNESS:
16      Yeah, but in this case I think we
17      have quite some confidence in the
18      prediction of the model.  We have
19      no reason to doubt it apart from,
20      let's say, a foot or a half a foot
21      in the water levels.
22 EXAMINATION BY MR. DOAK:
23   Q.  Okay.  We'll talk about that.
24   A.  If you talk about time, it is a
25 little more difficult, as we discussed

Page 87

1 yesterday.
2   Q.  Yes.
3   A.  But we are not lacking confidence
4 in the model results.
5   Q.  Does it affect the accuracy of the
6 prediction in a flood simulation model when
7 you increase the number of data sets that are
8 being fed to it?
9      MR. LAMBERT:
10      Objection.
11      THE WITNESS:
12      I do not understand your question.
13 EXAMINATION BY MR. DOAK:
14   Q.  For example, here we have a very
15 large size area.  We have changing
16 topography.  We have issues of friction.  We
17 have issues of drains and sewerage and
18 highways, streams, ditches, whether they are
19 built structures or not, wind, rain,
20 overtopping, breaches, canals that come down
21 into some part of the city, two lakes on the
22 side, surge effect.  As you take account of
23 those kind of factors, isn't there a
24 correlation between the more of those factors
25 that bear upon a flooding event, the more

Page 88

1 difficult it will be to model it on a
2 computer?
3      MR. LAMBERT:
4      Objection.
5      THE WITNESS:
6      Not really, depending on what you
7      want to know, because in this case
8      it's in the end fairly simple, full
9      is full.  How many houses and
10      highways there are, it fills it
11      up.  So the only question is it
12      could be a little bit faster or a
13      little bit slower because it is
14      hitting houses or more houses.  And
15      if there is a ditch, it goes a
16      little bit quicker through the
17      ditch.  If there is a ditch which
18      you had modeled --
19 EXAMINATION BY MR. DOAK:
20   Q.  And again --
21      MR. LAMBERT:
22      Let him finish.
23      THE WITNESS:
24      In the end it doesn't have much
25      difference.

Page 89

1 EXAMINATION BY MR. DOAK:
2   Q.  And again when you say not much
3 difference, that's because you are focusing
4 on the importance of the final high water
5 depth?
6   A.  Yeah.  The entire process of
7 flooding where finally the question is is it
8 really 10 feet or is it only two feet.
9   Q.  But you are not as focused on
10 incremental changes or property damage that
11 can occur at a particular house or location?
12      MR. LAMBERT:
13      Objection.
14      THE WITNESS:
15      No, because we, we look to the
16      pattern in time as a way of
17      checking if the model is correct,
18      but I think nobody in the world
19      knows if the damage in the house is
20      growing quicker if the flood is
21      quicker or slower or lower when the
22      flood is slower.  All of these
23      damage models is really unknown,
24      but we didn't touch that, so that's
25      without area of this project, the

PROF. JOHANNES VRIJLING VOL II (MRGO)                           8/17/2007

Page 90

1    damage. It's only the flood
2    prediction. And they are quite
3    reliable.
4  EXAMINATION BY MR. DOAK:
5    Q.  Let's talk again briefly about what
6  you say this model purports to do. Yesterday
7  you read the statement in the preface about
8  determining the contributions of various
9  water inputs that combined led to the
10 flooding of the three polders in Greater New
11 Orleans, correct?
12   A.  Yes.
13   Q.  And you agreed with that, but said
14 but especially to get the maximum flood depth
15 at the end.
16   A.  Yeah.
17   Q.  And that specific statement of
18 yours is buttressed by the two-page exhibit I
19 showed you earlier about the purposes of the
20 Sobek model, correct?
21   A.  Yeah.
22   Q.  You are not suggesting, are you,
23 that this model can directly predict property
24 damage of an individual house or building?
25   A.  No.  We never said that.

Page 91

1    Q.  Okay.
2    A.  And you need additional models
3  which were not in play here.  We weren't
4  asked to do that.
5    Q.  Okay.  I want to talk about the
6  bowl idea also.  You used that phrase.
7    A.  Uh-huh.
8    Q.  Would you agree that the Greater
9  New Orleans area is reasonably flat --
10   A.  Uh-huh.
11   Q.  -- correct?
12   A.  Yeah, yeah, compared with
13 mountainous countries it is.
14   Q.  It may be beneath sea level, and it
15 is, correct?
16   A.  Yeah, it is.
17   Q.  And there are minor variations, is
18 it two feet below or ten feet below, but
19 relative to the land mass of over 50 square
20 miles, those are very minor depressions,
21 aren't they?
22   A.  If I put you in one such minor
23 depression you will drown.
24   Q.  Absolutely.
25   A.  So what's minor, yeah, but compared

Page 92

1  to the Alps it is minor, compared to your
2  length it is major.
3    Q.  What I'm trying to explore is --
4    MR. LAMBERT:
5    I should have objected because it
6    is vague.  Major, minor.
7  EXAMINATION BY MR. DOAK:
8    Q.  What I'm trying to explore is the
9  validity of using the term bowl.
10   MR. LAMBERT:
11   Anyway, object.
12   THE WITNESS:
13   But there are also several types of
14   bowls, you know.  I was already
15   expecting this.  You have bowls
16   which are like this (indicating).
17   You have bowls like this with
18   various forms (indicating).
19 EXAMINATION BY MR. DOAK:
20   Q.  But it is really very central to
21 what you do, you are talking about water
22 getting into the polder, right?
23   A.  Yeah, yeah.
24   MR. LAMBERT:
25   Excuse me, counsel.  Objection.

Page 93

1    He's been using the term polder.
2    You've been using the term bowl.
3    Now you want to complain about the
4    term bowl.
5    MR. DOAK:
6    Yesterday he used the term bowl and
7    I want to follow up on that.
8    MR. LAMBERT:
9    Bowl, polder.  Can we just use the
10   term polder from now on and we can
11   skip this whole line of BS?
12   MR. DOAK:
13   I will -- counsel, we're going to
14   have a problem if you keep making
15   talking objections.
16   MR. LAMBERT:
17   Okay.  My objection is that your
18   term was bowl. He's been saying
19   polder.
20   MR. DOAK:
21   Whose term was bowl?
22   MR. LAMBERT:
23   You used the term bowl today.  He's
24   been using polder.  Now you want to
25   complain about bowl, but that's

                              24  (Pages 90 to 93)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 94

1    okay. Let me stop. I want to get
2    along with you.
3    MR. DOAK:
4    Good.
5    MR. LAMBERT:
6    I'll be quiet. Objection. That's
7    it.
8    EXAMINATION BY MR. DOAK:
9    Q. What I'm trying to establish is
10   that the New Orleans area is very flat.
11   MR. LAMBERT:
12   Objection.
13   THE WITNESS:
14   Subject to the remarks I made.
15   EXAMINATION BY MR. DOAK:
16   Q. Yes. On a relative scale.
17   A. Not relative to your length it is
18   not flat, but relative to the Alps it is
19   flat.
20   Q. Do you know how long New Orleans
21   East is approximately?
22   A. I don't know. 20 kilometers. I
23   don't know exactly.
24   Q. And what would the maximum
25   elevation change be in that distance?

Page 95

1    A. Two, three meters. Maybe there is
2    a hill somewhere, five.
3    Q. So if you were to make a diagram of
4    that to scale, would an ordinary person look
5    at that and say that is virtually flat?
6    MR. LAMBERT:
7    Objection.
8    THE WITNESS:
9    You are touching on a very
10   interesting area because that's why
11   in civil engineering you take these
12   bowls with exaggerated scales in
13   the vertical sense and reduce
14   scales horizontally because,
15   otherwise, you don't see anything.
16   If you make a crossing over the
17   Mississippi River, you won't
18   discover the Mississippi River
19   unless you enlarge it. So that is
20   true, that these are very shallow
21   slopes and very limited depths,
22   geometrically speaking.
23   EXAMINATION BY MR. DOAK:
24   Q. That's my simple point. And that
25   shape doesn't resemble a cereal bowl?

Page 96

1    MR. LAMBERT:
2    Objection.
3    EXAMINATION BY MR. DOAK:
4    Q. To scale.
5    A. Yeah. Depending on the
6    relativeness, because here we're talking
7    about people that are drowning or not and
8    three or six feet is sufficient.
9    Q. But here we're not talking about
10   people that are drowning in your model, are
11   we?
12   MR. LAMBERT:
13   Objection.
14   THE WITNESS:
15   Yeah. We didn't look into damage,
16   but finally that's, of course, the
17   idea. We wouldn't be here if there
18   was no damage and if people had not
19   drowned. And this whole issue
20   would not be on the table issue.
21   EXAMINATION BY MR. DOAK:
22   Q. Turn to page 4 of the report. And
23   let's review the -- I'll hand you -- you have
24   your own copy?
25   A. Yeah, yeah.

Page 97

1    MR. LAMBERT:
2    Where are you going, Jerry? I'm
3    sorry. I missed it.
4    MR. DOAK:
5    Page 4 of the report.
6    THE WITNESS:
7    Our report.
8    MR. LAMBERT:
9    Okay.
10   MR. DOAK:
11   I should have said page 5.
12   EXAMINATION BY MR. DOAK:
13   Q. I want to go through the input data
14   again. I know we did some of this yesterday.
15   MR. LAMBERT:
16   That was going to be my next
17   objection. We went through that.
18   MR. DOAK:
19   I'm not going to ask the same
20   questions.
21   MR. LAMBERT:
22   Okay. I'll hold you to that.
23   EXAMINATION BY MR. DOAK:
24   Q. The first item of information
25   listed at the top of page 5 is Digital

25 (Pages 94 to 97)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 98

1  Elevation Model.  Would you explain what that
2  is and how LIDAR data is taken?
3       MR. LAMBERT:
4       Objection.  Is this -- never mind.
5       THE WITNESS:
6       It is not my field of expertise, so
7       I know they measure laser pulses
8       and then by computer application
9       they can produce a list, as you
10      have seen, of all the terrain
11      elevations relative to this NAVD88,
12      which we also discussed yesterday.
13      And then you get a file with a lot
14      of numbers giving the terrain
15      elevation.
16  EXAMINATION BY MR. DOAK:
17      Q.  What does this first line mean when
18  it says available for whole area with 15-foot
19  resolution?
20      A.  I think that's squares of 15 foot
21  they have, at corners they have numbers, the
22  elevation numbers.
23      Q.  And for the next clause, the same
24  thing, that the resolution of the elevation
25  data around the levee crest is within one

Page 99

1  foot?
2      A.  Yes.
3      Q.  Do you know what the margin of
4  error is for LIDAR data?
5      A.  Yeah.  Now I know because I heard
6  it.  Yesterday I estimated a half a foot to a
7  foot and yesterday I got confirmation that it
8  is true.
9      Q.  And is that the most accurate of
10  data available today?
11      A.  I don't think the most accurate.
12  If you go surveying directly with people it
13  is more accurate.
14      Q.  But not on an aggregate level?
15      A.  No.  No.
16      Q.  Are you aware of any other
17  limitations of this elevation data?
18      A.  No.
19      Q.  This is the elevation of just the
20  ground though, right?
21      A.  Yeah.
22      Q.  It does not measure the offset of a
23  house above ground (indicating)?
24      A.  No.  Maybe by accident, but that's
25  not the intention.

Page 100

1      Q.  By no, you mean my statement was
2  correct, that it does not measure the offset
3  distance?
4      A.  No, no.
5      Q.  On the next item, the surge
6  hydrographs, were these taken from IPET or
7  someplace else?
8       MR. LAMBERT:
9       Excuse me, counsel.  These
10      questions were gone through
11      yesterday.  And he answered the
12      questions yesterday, so we're not
13      going to do it again.
14      MR. DOAK:
15      I don't recall that question from
16      yesterday.
17      MR. LAMBERT:
18      I do.
19      MR. ZWAIN:
20      I don't.
21      MR. LAMBERT:
22      Okay.  That's two against one.  Go
23      ahead and answer it.
24      THE WITNESS:
25      I think we got them from IPET, but

Page 101

1      they were provided --
2      MR. LAMBERT:
3      By Kemp.
4      THE WITNESS:
5      By Kemp, yeah.  That was the
6      source.
7  EXAMINATION BY MR. DOAK:
8      Q.  Why are there only ten locations
9  for them?  Were more locations available, do
10  you know?
11      A.  I think these ten were available.
12  It is enough.
13      Q.  Does that mean you don't know
14  whether or not more hydrograph locations were
15  available?
16      A.  I think they are the result from
17  calculations, so you can have as many as you
18  want, but the question is at which points do
19  you need them.  And these are sufficient for
20  our model.
21      Q.  Do you know whether or not
22  additional hydrographs were available for
23  different locations than those identified on
24  figure 2.1?
25      A.  I don't know, but I presume that if

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 102

1  there are any numerical simulations, then
2  there will be more available.
3      Q.  So there may be additional data
4  that was not input into the model, is that
5  correct?
6      A.  Yeah, but you need as much input as
7  you need, and that's sufficient.
8      Q.  Do you know the number of square
9  miles in these three areas, the Greater New
10 Orleans area, New Orleans East and St.
11 Bernard, do you know what the aggregate
12 square miles are?
13     MR. BRUNO:
14         Wait, Jerry.  That's one thing
15     we're not going to do.  You are
16     going to talk about New Orleans
17     East.  Yesterday was your
18     opportunity to talk about the
19     center bowl.  And I will call the
20     magistrate in the next second and a
21     half if you'd like to to resolve
22     that because we spoke to the
23     magistrate and he gave us specific
24     instruction on this point.
25     MR. DOAK:

Page 103

1          Okay.
2      MR. BRUNO:
3          You insisted on two depositions.
4          You are getting two depositions.
5          Today you are going to talk about
6          New Orleans East.
7      MR. DOAK:
8          Okay.
9      MR. BRUNO:
10         So if you want me to call him, I
11         will.
12     MR. DOAK:
13         I'm agreeing to restrict my
14         questions to New Orleans East and
15         St. Bernard Parish.
16     MR. BRUNO:
17         Thank you.
18 EXAMINATION BY MR. DOAK:
19     Q.  Let me also ask, before we go
20 there, can you tell me, some of these
21 locations, I'm not sure where they're going.
22 I'm assuming D and E are clearly labeled for
23 the IHNC.  And I understand those two.  They
24 are listed on the next page (indicating).
25     A.  Oh, yeah.

Page 104

1      Q.  D and E.
2      A.  Yeah, uh-huh.  So those go with St.
3  Bernard and Lower Ninth.
4      Q.  What about location G on Paris
5  Road, do you know, is this north of the
6  Intracoastal Waterway or is it south?  I
7  can't tell from where the dot is.
8      A.  G is outside water level, so it
9  will be in the water.
10     Q.  That's in the Intracoastal
11 Waterway?
12     A.  Yes.  These are data of the outside
13 water levels.  That's relative to our bowls.
14     Q.  And H and I are the same way, those
15 are the water levels in the MRGO?
16     A.  They are all outside water
17 conditions, water level conditions.  So
18 boundary conditions to the model of flooding
19 the bowls or the polders.
20     Q.  Are you aware of any limitations on
21 the accuracy of these ten hydrographs that
22 were provided?
23     A.  They are hind-cast, so the same
24 remarks go for these as we made already for
25 our own model predictions.  So they were also

Page 105

1  hind-cast of this phenomenon.  Somewhere they
2  will be checked against various measurements
3  and they will have taken an effort to make it
4  most accurate as possible.  And in other
5  areas it is prediction.
6      Q.  Let me make sure I understand it.
7  By hind-cast do you mean that these
8  hydrographs were themselves a product of a
9  model?
10     A.  Yeah.
11     Q.  So this input was not hard
12 empirical data input, but, instead, data
13 derived from a model output, is that correct?
14     A.  Yes.
15     Q.  And that's what you were
16 acknowledging when I asked the question about
17 what limitations might these hydrographs
18 have, is that right?
19     A.  Yeah.
20     Q.  The next item on page 5 is the
21 breach locations and sizes.  I can read the
22 words GIS, Geographical Information System,
23 but what does that mean, GIS data?
24     A.  It is a database where you have
25 data related to the map.  So a normal

27  (Pages 102 to 105)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                     8/17/2007

Page 106

1  telephone book gives you the data related to
2  the alphabetical order of the names, GIS
3  gives you the data related to the map. And
4  then you can say, well, how is it there, and
5  then they put up the value of the houses
6  there or whatever. It is given or stored in
7  the database. In this case it's the terrain
8  level.
9     Q. But it's the -- I'm confused when
10 you say terrain level. I thought that this
11 was breach location.
12    A. Yeah, yeah, yeah, but on the map.
13 The breach -- you said what is the GIS.
14    Q. Yes.
15    A. So I said that's the database where
16 the entrance is the map.
17    Q. Okay.
18    A. So if I put my finger on the map I
19 have a location (indicating). And then the
20 database says it is a terrain level or a
21 breach depth of so much. So that's the
22 principle of the GIS.
23    Q. As I understand it, these breach
24 sites were determined from aerial
25 photography?

Page 107

1     A. Yeah, and the LIDAR.
2     Q. Can you explain how that data is
3  actually obtained?
4     A. Yeah. They fly over it with a
5  special plane and then they measure it.
6  Sometimes there is a tree or a house in front
7  and then they have to approach it from the
8  other side once again to get a complete
9  picture. So that would be the reason of this
10 list of zeros that was produced by your
11 colleague yesterday.
12    Q. Okay.
13    A. Empty area. And they have to fly
14 it again and get the measurements.
15    Q. Did your team receive any of the
16 aerial photography that was the basis of that
17 input or did you --
18    A. No. We only received the Excel
19 files or what you name it which were shown
20 yesterday.
21    Q. Okay. Do you know when that aerial
22 photography was taken?
23    A. No.
24    Q. Isn't that important?
25    A. Yeah, yeah, yeah, but we have to

Page 108

1  rely on the expertise of Mr. Morris who knows
2  to what use we will put the data. And I'm
3  certain he will not provide us with data
4  before Katrina, but only after Katrina with
5  the correct measurements.
6     Q. Well, let me hand you again Mr.
7  Morris' report marked as deposition Exhibit
8  17, figure 4.1. That is the map where he
9  appears to depict the breach locations, is
10 that correct?
11    A. The --
12    Q. The legend at the bottom right says
13 breach --
14    A. Yeah. We are going to repeat this
15 question now? Because I said I don't know if
16 each was a breach.
17    Q. No. That's not going to be my
18 question, sir.
19    A. So there are lines.
20    Q. My question was this is the map in
21 his report where he is talking about breach
22 locations was my question.
23    A. Okay. Yeah.
24    Q. But you see on the left-hand side
25 this refers to satellite imagery of October

Page 109

1  10, 2005.
2     A. Uh-huh.
3     Q. Do you know if satellite imagery
4  from October 2005 was what he used for the
5  LIDAR measurements of the breach locations?
6     A. I don't know. My impression was
7  that he had not only satellite data, so this
8  is a picture of an overview, so this is
9  certainly based on satellite data, but actual
10 measurements of the breaches and so on is
11 based on LIDAR, which is a different
12 technique as far as I'm informed.
13    Q. LIDAR is always done by plane?
14    A. I think so.
15    Q. Okay.
16    MR. BRUNO:
17    Why did you ask that question? You
18    knew that. Trickster.
19    MR. DOAK:
20    I don't know. That's why I'm
21    asking the questions. That's why
22    I'm asking questions.
23    MR. BRUNO:
24    No, you're trying to trick him,
25    but, of course, he's too smart.

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                          8/17/2007

Page 110

1      (OFF THE RECORD)
2    EXAMINATION BY MR. DOAK:
3      Q.  Do you understand that there are --
4    let me strike that and start over.  Are there
5    any limitations of this breach location data
6    that you are aware of?
7      A.  The accuracy, it will be plus or
8    minus half a foot or whatever, but the
9    location -- there is also double information,
10   triple information, because people have seen
11   it themselves.  It has been measured by Mr.
12   Van Heerden, how deep it was and how wide,
13   and then we have these data.  And as soon as
14   there are major differences everybody starts
15   crying, of course.
16     Q.  For -- I mean, I assume they get
17   the location right.
18     A.  Uh-huh.
19     Q.  That's one thing that this does,
20   right, where it is?
21     A.  Yes.  Even a lawyer could.
22     Q.  I have to go one thing at a time.
23   And the second thing is to measure the width
24   of the breach on top, correct (indicating)?
25     A.  Yeah.

Page 111

1      Q.  And when they take that measurement
2    of the breach on top, they're taking that
3    measurement after the storm is over, whatever
4    the date is the storm is over, right?
5      A.  Yes.
6      Q.  Has it been your experience that
7    breaches frequently happen in a progressive
8    cycle?  A breach doesn't have to just fall
9    over at one time, it can happen
10   progressively?
11       MR. BRUNO:
12         You don't mean cycle.  You mean
13       over time.
14   EXAMINATION BY MR. DOAK:
15     Q.  Over time.
16     A.  I don't know what you are aiming
17   at, but it will progress during the storm,
18   when the water is flowing in with great
19   velocity.
20     Q.  Right.
21     A.  Afterwards when everything has come
22   to rest, then it won't grow anymore.
23     Q.  Right.  That's exactly where I'm
24   headed.  When it first breaches, the breach
25   width on top might be 10 meters.  And as

Page 112

1    hurricane water goes crashing through that,
2    that might grow to 20 meters.
3      A.  Yep.
4      Q.  And then to 40 meters, correct?
5      A.  Yes.
6      Q.  But all of the breach size data
7    that you input is taken from photographs that
8    came after Hurricane Katrina?
9      A.  Yes, but we explained yesterday how
10   we did that.  That we have a sort of
11   hypothesized starting size of the breach and
12   we know the final end and then we model the
13   behavior in between, first simply linearly.
14   And if that gave a too-quick progress of the
15   water into the bowl, then we start to change
16   the function of the growth a bit.
17     Q.  Is there any more scientific
18   validity though to that modeling other than
19   taking a starting point and --
20     A.  You could do a study -- there are
21   models available at our university which
22   would show you how the breach grows, so the
23   interaction between the water flow and the
24   deposition of the settlement, but, of course,
25   this is hypothetical because there are sheet

Page 113

1    piling, there are rock, there are people,
2    there are houses.  They didn't know the soil
3    composition apparently, at least the
4    foundation engineers didn't know.
5        MR. BRUNO:
6          The Americans, what do you expect.
7    EXAMINATION BY MR. DOAK:
8      Q.  My point is LIDAR you can't see
9    under the water, right?
10     A.  No.  They filled that in.  You have
11   the measure of the breach, and then with
12   different methods, maybe different LIDAR, I
13   don't know, they filled in the water.
14     Q.  The model filled that in?
15     A.  No.  No.  The measurements.  We got
16   data from Mr. Morris and he showed me one
17   thing which gave on the water zero and then
18   he filled that in with other measurements.
19     Q.  How did he fill in that bottom part
20   of the geom --
21     A.  I don't know.
22     Q.  Is that called breach geometry, is
23   that the word you use for that?
24     A.  Yeah, yeah, yeah.  That would be a
25   nice expression.

29  (Pages 110 to 113)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                          8/17/2007

Page 114

1    Q.  How would you have been the
2  independent reviewer on this if you didn't
3  have any sense of how he was investigating
4  and predicting the breached geometry?
5    A.  We discussed this yesterday, too.
6  I said if you have a bit of experience in
7  breaching, then you have some idea what a
8  reasonable size of the breach is.  And there
9  was a discussion yesterday about if it would
10  be at level zero or at level minus 20.  And
11  then I said if Mr. Kok had put zero in the
12  report I would have said, ah, how do you know
13  this for certain, but now when it is minus 20
14  I believe it.  So this sense of expertise
15  helps you, but, of course, it is, I mean, it
16  is plus or minus a foot the depths of the
17  breach.
18    Q.  Believe me, I'm not challenging
19  your expertise for a moment.  I'm simply
20  saying --
21      MR. BRUNO:
22      He says that now.
23  EXAMINATION BY MR. DOAK:
24    Q.  -- the judgment is made within kind
25  of what you think are expected --

Page 115

1    A.  Yes.
2    Q.  -- expected parameters?
3    A.  Yeah.
4    Q.  And as long as it doesn't go
5  outside of that, your judgment doesn't send
6  off a warning flag?
7    A.  Yes.  Exactly.
8    Q.  Going back to the measurement of
9  this breach ge --
10      MR. BRUNO:
11      Geometry.
12      THE WITNESS:
13      Geometry.
14  EXAMINATION BY MR. DOAK:
15    Q.  -- breach geometry, and how it can
16  be a progressively growing breach, that first
17  happens when the water goes crashing through
18  the breach, right?
19    A.  Yes.
20    Q.  And you know that in the Lower
21  Ninth, that some point in time the water in
22  the Lower Ninth got higher than the floodwall
23  and now the water started going east to west
24  instead of coming west to east, it's going
25  the opposite direction?

Page 116

1    A.  Yes.
2      MR. BRUNO:
3      You mean it was higher than the
4      water in the canal, not higher than
5      the floodwall?
6  EXAMINATION BY MR. DOAK:
7    Q.  Higher than the water in the canal?
8    A.  Yeah.  Yeah.
9    Q.  In any event, now the water is
10  going in the opposite direction, west?
11    A.  Yeah.
12    Q.  And that surge of water through the
13  breach site could enlarge the breach
14  geometry, couldn't it?
15    A.  It could.
16    Q.  And for some of the breach sites,
17  those, the size of that breach hole might
18  have also been enlarged by Hurricane Rita,
19  depending on when someone took measurements?
20    A.  Yeah.  It might have been possible,
21  but also there are many other places the
22  dikes have been cut on purpose to let the
23  floodwater flow out.  So the velocity will be
24  less in the aftermath because there were more
25  holes punched in the dikes.  So in principle

Page 117

1  you are correct, and especially it would have
2  been correct because in Holland we have the
3  flood, the tide goes on and off, so we have a
4  3-meter difference between the high and the
5  low water, and then it starts scouring all
6  the days behind.  Here you have relative
7  minor astronomical tides, so that process is
8  limited here.
9    Q.  The next subject I want to talk
10  about is the breach timelines.  And I think
11  you all were very fair in the report
12  identifying where there were conflicts in the
13  evidence at times.  When you have that
14  situation of multiple reports and conflicting
15  evidence, ultimately the modeler just has to
16  use his best judgment and choose one over
17  another in order to input it?
18    A.  Yes.
19    Q.  And that's your professional
20  judgment?
21    A.  Yes.  Exactly.
22    Q.  And in this case I guess that
23  professional judgment was made by the
24  gentleman who submitted the data to you?
25    A.  No, because yesterday I explained

30  (Pages 114 to 117)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 118

1  to your colleague how we fiddled around, how
2  we calibrated flow, which is not your area,
3  but in central Metro area with the 17th
4  Street Canal. So we combined all the data,
5  then we tried, where we didn't know exactly
6  to change a little bit to fit the other ones.
7      Q. On page 27 you'll see figure 4.1.
8      A. Yeah, table. Yeah.
9      Q. And item numbers 1, I'm sorry, item
10 numbers 2, 3 and 4 have in the last column
11 under time breach a time, but they don't have
12 a footnote indicating where that data came
13 from. Do you know where that data came from?
14     A. No, I don't know. I think it's
15 just because at the airport it is just
16 overtopping and so on, so I think we decided
17 by just the water levels, but the time is
18 especially difficult if you have like 17th
19 Street Canal, a bursting wall, so then the
20 storm level doesn't give you any indication,
21 at least with this quality of structure, so
22 then you are in doubt about the time. But if
23 it's a wall that is overtopping and still
24 standing there, as it was near the airport,
25 then it is just the moment at which the

Page 119

1  hydrograph says overtopping starts. I think
2  that's the reason why there is no number in
3  the last, no superscript.
4      Q. Okay. Turn to 38, please, page 38.
5  The first two lines, the IHNC north and south
6  breach lists the source as being Team
7  Louisiana, but the breach times for items 3,
8  4 and 5 are to the IPET report, is that
9  correct?
10     A. Yes.
11     Q. So in this instance someone looked
12 at these investigative reports and chose, and
13 in that person's mind the Team Louisiana time
14 breach was the best data for breaches number
15 1 and 2, but that for breaches 3, 4 and 5 the
16 IPET had the better time estimate. Am I
17 understanding that correctly?
18     A. I don't -- if it is so specific. I
19 think they just found it there. And if it
20 was not conflicting in IPET, then I think
21 they will have named the first source or --
22     Q. Well, I think that you all
23 indicated in your report that there was
24 conflicting evidence with respect to the
25 breaches on the Industrial Canal at the

Page 120

1  bottom paragraph of 38, but that you --
2      A. Oh, yeah.
3      Q. -- the person that prepared the
4  input chose one number over another.
5      A. Yeah.
6      Q. And this is an example of, and I
7  think we talked about it before, there are
8  times that modelers have two different pieces
9  of empirical evidence and they have to
10 choose -- if they are in conflict you have to
11 choose one and disregard the other.
12     A. Yeah. You are right. Yeah.
13     Q. We'll skip that for right now.
14 Sorry. I have too many documents in front of
15 me and I'm getting some of them mixed up.
16     A. The American legal system.
17     MR. BRUNO:
18     Wait. I'll take issue on that one.
19 EXAMINATION BY MR. DOAK:
20     Q. Okay. The next item on page 4 or 5
21 of input is the rainfall data.
22     A. Uh-huh.
23     Q. But there were only six locations
24 reflected on page 6, figure 2.2.
25     A. Uh-huh. Yes.

Page 121

1      Q. And I know we talked about these
2  yesterday, but I don't know that we talked
3  about the size of these six locations.
4  Ignoring subdivision 1 for today, but looking
5  at subdivisions 2, 3, 4, 5 and 6, some of
6  these are pretty large locations to some
7  talking about rainfall, correct?
8      A. Yep. We discussed that yesterday.
9      Q. Was there not better data
10 available?
11     A. We discussed that also yesterday
12 because our professional opinion is that
13 rainfall is not the real threat for this type
14 of disaster. It may be a threat for a local
15 community or a local car parked in a
16 not-so-wise surrounding, but here the breach
17 of the dikes is paramount. So going into too
18 much detail about rainfall and about the flow
19 of the rain through the streets is a waste of
20 money in our opinion. So that's why we did
21 it simple.
22     Q. That's all I wanted to confirm,
23 that you made that choice because you were
24 interested in looking at the flow of the
25 water and the ultimate final depth of the

31 (Pages 118 to 121)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                          8/17/2007

Page 122

1    water primarily?
2        A.  Yeah.
3        Q.  And, therefore -- well, strike
4    that.  And because of that focus, you don't
5    care about wind or rain that may cause very
6    substantial property damage at a particular
7    building?
8            MR. BRUNO:
9            Objection.  First of all -- no.
10           Objection.  Wind is not in the
11           case.  It is not in the case.  He's
12           not modeling wind.  So I'm going to
13           ask you to rephrase the question.
14           And secondly, he didn't say that
15           about the rain.  Go ahead.
16           THE WITNESS:
17           I have to answer now or --
18           MR. BRUNO:
19           I'm asking him to rephrase because
20           wind is not in the case and, if
21           not, break it down into two
22           separate questions, one for wind
23           and one for rain so the record is
24           clear.
25       EXAMINATION BY MR. DOAK:

Page 123

1        Q.  I think that you just testified
2    that you would not argue that rain could have
3    caused substantial damage to particular
4    houses at particular locations, is that
5    correct?
6        A.  Yeah.  That's correct.
7        Q.  Let's go to the next item of
8    information that was listed on 5, the
9    eyewitness reports.  Were you ever informed
10   that a witness with the Sewerage and Water
11   Board had given deposition testimony about a
12   sighting of the breach and timing of one of
13   the breaches on the Industrial Canal?
14       A.  No.  I've seen only one deposition.
15   It was from the chief attendant of the Water
16   Board about the functioning of the pumping
17   stations.
18           MR. BRUNO:
19           That's the same one he's referring
20           to.
21           THE WITNESS:
22           Oh.  I didn't see that he mentioned
23           the time of the breaches.
24       EXAMINATION BY MR. DOAK:
25       Q.  If you had an official with the

Page 124

1    Sewerage and Water Board who observed
2    specific phenomena on the Industrial Canal
3    that went to the timing of the breach, would
4    that be important to you in your model?
5        A.  Yeah.  It would be important to me.
6    And then we have the judgment if it's
7    important for the phenomena we are studying
8    there, and then it might become important for
9    the model, but he has dissenting opinion
10   about the flooding moments.
11       Q.  Right.  And you admit in the report
12   at page 28 that in chaos situations these
13   eyewitness accounts are always a problem in
14   this situation?
15       A.  Yes.
16       Q.  And you acknowledge that?
17       A.  Yeah.
18       Q.  In your data for overtopping, as I
19   understand it, the model is not relying upon
20   actual overtopping data, it is relying on a
21   model prediction that is using the
22   hydrographs and the height of the floodwalls
23   and, based upon that input, the model then is
24   telling you where the overtopping occurred,
25   is that correct?  Am I understanding that

Page 125

1    right?
2        A.  No.  I think the -- I don't know if
3    we speak about the same problem, but wave
4    overtopping is not included in the model, no.
5        Q.  Right.
6        A.  So that's omitted.
7        Q.  Yes.
8        A.  But wave overtopping scours the
9    dike away or the -- if it -- so then we
10   started at the moment that wave overtopping
11   occurred, we started gradually to reduce the
12   crest level of the dike from zero point to
13   the point as given by Mr. Morris in the end.
14   So -- and then at some moment overtopping by
15   fixed water starts.  That is filling the
16   bowl, but the wave overtopping was not
17   included because the waves are not in this
18   Sobek model.
19       Q.  And I understood that, but in
20   projecting water coming over a levee, such as
21   the 40 Arpent --
22       A.  Which is a wall.
23       Q.  A wall.
24       A.  Yeah, yeah.
25       Q.  It was my understanding that that

32  (Pages 122 to 125)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 126

1  data was not taken from photographs or some
2  source like that, but rather was a projection
3  of the model looking at the hydrographs and
4  the known height of the wall, so you were
5  able to forecast where the overtopping would
6  occur?
7     A.  Yes.  So that would be an accurate
8  calculation within this model.
9     Q.  Yes.
10    A.  Because the area, the marshy area
11 is filled over the MRGO dike, and then the
12 level of flooding is compared with the level
13 of the Arpent levee.  And if it's above,
14 there is a nice form line that calculates how
15 much water, how quickly it flows over this
16 level (indicating).
17    Q.  I'm just trying to understand what
18 information is purports to be actual recorded
19 information from an aerial photograph versus
20 information that has been projected by the
21 model.
22    A.  Okay.
23    Q.  What do you consider the
24 limitations of this data to be, the
25 overtopping projections?

Page 127

1     A.  When what -- can you repeat
2  clearly, repeat the question?
3     Q.  With respect to this information in
4  the model about when and where overtopping
5  occurred, do you think that information has
6  any limitations in its accuracy or
7  completeness?
8     A.  I don't think so, no.
9     Q.  I'm just asking you for your
10 professional judgment.  I can't tell by
11 looking at it.
12    A.  No.  I see no reason why it --
13    MR. BRUNO:
14    Jerry, this just came in
15    (indicating).  It is in Dutch, so I
16    don't know what it is.
17    THE WITNESS:
18    That's for me.  It has nothing to
19    do with this case.
20    MR. BRUNO:
21    Never mind.  You never know.
22    THE WITNESS:
23    We are Homeland Security in
24    Holland, so we wanted to mimic the
25    Americans (indicating).

Page 128

1     MR. BRUNO:
2     Do a better job, why don't you.
3  EXAMINATION BY MR. DOAK:
4     Q.  On the pump station operation, I
5  know about the two that y'all discussed
6  yesterday in the Orleans Metro bowl, but why
7  wasn't there any pump station data for New
8  Orleans East or St. Bernard?
9     A.  I don't know.  I presume that no
10 pumps have worked there.
11    Q.  Do you know?
12    A.  No, I don't know, but because they
13 were not included.
14    Q.  On page 4, at the very bottom of
15 page 4 in the last sentence, you say:  "We
16 know that there are uncertainties in the
17 data."  What are the uncertainties that you
18 are referring to there?
19    A.  But now you're going back to the
20 main line of the report?  How do you -- how
21 should I interpret that question, because
22 this regards the entire model setup and
23 everything we discussed this morning.
24    Q.  Yes.  Well, it may, but --
25    A.  We're now looking to the St.

Page 129

1  Bernard and the Arpent levee and so on?  Just
2  for my understanding, are we now discussing
3  the data limitations in regard to Arpent or
4  in general (indicating)?
5     Q.  As I understand the beginning of
6  section 2.2, which is labeled Data, which I
7  assume referred to data that was input into
8  the model across the board --
9     A.  Yes, right.
10    Q.  And it begins with all input data.
11    A.  Yeah.
12    Q.  And lists a number of things.  And
13 that paragraph concludes with a sentence,
14 where the author of this report properly
15 trying to fairly disclose the fact that there
16 are uncertainties in the data.
17    A.  Yes.
18    Q.  And I'm asking you what
19 uncertainties in the data was that referring
20 to.  It says there are uncertainties, but I
21 don't know what they are.
22    A.  Yeah, but we discussed already --
23    Q.  All of the things that --
24    A.  Yeah, yeah.  The levels and the
25 hydrographs and the actual measurements of

33 (Pages 126 to 129)

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

Page 130

1 the breaches, the moments at which
2 observations were taken by eyewitnesses. All
3 these things.
4     Q. Okay. And you just said we
5 discussed a lot of them. My only question is
6 have we discussed all of them yesterday and
7 today?
8     A. I think so. Within our human
9 possibilities.
10    Q. Of course.
11    A. Yeah.
12    Q. But as you sit here right now, you
13 don't recall any other uncertainties in the
14 data that we have not already discussed?
15    A. No, no. That's why I was confused.
16    Q. Was there any additional input data
17 beyond this that is listed in the report, any
18 other data input that wasn't reflected in the
19 report?
20    A. I can -- I can say yes because we
21 input gravity in it and I didn't tell you, so
22 there are many inputs which are common to
23 engineering models. The specific weight of
24 water was put in it --
25    Q. Okay.

Page 131

1     A. -- it was salt water.
2     MR. BRUNO:
3         We are on the earth, the spin of
4         the moon.
5     THE WITNESS:
6         So there are many data that input
7         that are not specifically
8         mentioned. I don't know what you
9         are aiming at.
10 EXAMINATION BY MR. DOAK:
11    Q. And I thank you for your candor and
12 acknowledging those kinds of things. Is
13 there a more substantive kind of variable
14 input?
15    A. No.
16    Q. Okay.
17    A. Not in my opinion.
18    Q. Tell me, Professor, what additional
19 input data do you wish you would have had? I
20 can't refer you, but somewhere in your
21 testimony yesterday and a couple of times in
22 the report you talk about -- well, one time
23 yesterday you said so much data is simply
24 missing, which would be expected in a chaotic
25 event of a storm like Hurricane Katrina. I

Page 132

1 just, with the benefit of completing this
2 project, wanted to ask what additional input
3 data would you have liked to have had, but
4 you simply couldn't get your hands on?
5     A. You might have liked real accurate
6 observation of the real water level during
7 the hurricane. Then if the instruments were
8 destroyed, which was never done, but if there
9 would have been measurements, really
10 measurements inside the bowl, at what time
11 and at what level it would have also been
12 perfect, but --
13    Q. So to have real hydrograph data
14 rather than hydrographs that were the output
15 of another model?
16    A. Yes.
17    Q. Okay. And you think that would
18 have been an important improvement?
19    A. No, I don't think -- I think these
20 models are generally quite accurate, at least
21 for these bowls.
22    Q. Are there any other items of input
23 data that come to your mind that you would
24 have liked to have had but did not have
25 available to you?

Page 133

1     A. No, not really.
2     Q. Yesterday you were talking about a
3 blockage in the 17th Street Canal. I'm not
4 going back to that, but you said in all of
5 this inputting of data you have to use some
6 subjective judgments and professional
7 judgments. Is that also true with respect to
8 the data and analysis that you did for the
9 east side of the Industrial Canal?
10    A. No. That was most the case in this
11 17th Street Canal breach.
12    Q. You didn't have an occasion in New
13 Orleans East or St. Bernard to --
14    A. No. Where we had trouble fitting
15 the things together.
16    Q. Okay.
17    MR. DOAK:
18        It is probably a good place to
19        stop.
20    MR. BRUNO:
21        It is all right by me.
22    VIDEOGRAPHER:
23        We're now off the record. It is
24        12:07.
25    (LUNCH RECESS)

34  (Pages 130 to 133)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 134

1       VIDEOGRAPHER:
2       Returning to the record.  It is
3       1:38.
4   EXAMINATION BY MR. DOAK:
5       Q.  Turning to a new area, the
6   assumptions on page 4 of the input data.
7   We'll go through a lot of these quickly, I
8   hope.  We discussed yesterday overtopping by
9   waves not included in input data, correct?
10      A.  Yeah.
11      Q.  But I think that you acknowledged
12  that -- strike that.  The reason you said you
13  didn't include it was because you did not
14  believe it was important to the overall
15  flooding, which I understand.
16      A.  Yes.
17      Q.  But overtopping by waves could be
18  very important to causing property damage at
19  a street across, at a house immediately
20  across the street from that location?
21      A.  Yeah.
22      Q.  And you confirmed that there was a
23  lot of peak activity up by Lake Pontchartrain
24  on, by the airport.
25      MR. LAMBERT:

Page 135

1       Objection.
2       THE WITNESS:
3       Yeah, but I think also still water
4       overtopping because there were huge
5       scour holes behind the walls in
6       that area.  So I don't think it is
7       only wave overtopping there.
8   EXAMINATION BY MR. DOAK:
9       Q.  No, but that there was significant
10  waves reported in that area?
11      A.  Yeah, yeah, yeah.
12      MR. LAMBERT:
13      Well, objection.  But there were
14      significant -- is that a question?
15      MR. DOAK:
16      Yes.  There was an inflection of a
17      question mark at the end of it that
18      he understood and answered.
19      MR. LAMBERT:
20      I objected.
21  EXAMINATION BY MR. DOAK:
22      Q.  The second assumption --
23      MR. LAMBERT:
24      We went through these yesterday,
25      counsel.

Page 136

1       MR. DOAK:
2       I know.
3       MR. LAMBERT:
4       Then let's not do it again.
5       MR. DOAK:
6       Well, I need to go through things
7       we didn't cover yesterday.
8       MR. LAMBERT:
9       We covered these.  We went through
10      the overtopping, the sewer --
11      MR. DOAK:
12      I'm going to go over each one of
13      them briefly.
14      MR. LAMBERT:
15      Then I'm going to object.
16  EXAMINATION BY MR. DOAK:
17      Q.  Okays.  The sewers, ditches and
18  small waterways, would you explain how it is
19  that those three things can serve as a flood
20  highway.  I think that terminology was used
21  yesterday, and I think I understand it, but I
22  would like to have your explanation on the
23  record.
24      MR. LAMBERT:
25      Objection.  Asked and answered.

Page 137

1       THE WITNESS:
2       So sewers and ditches are pathways
3       for floodwater.  We discussed
4       yesterday that they do not
5       influence the better as such in
6       total, but it could advance a
7       little bit more quickly if you
8       included sewers and waterways.
9   EXAMINATION BY MR. DOAK:
10      Q.  And from a damage point of view,
11  that's the problem, that they channel and
12  centralize water and move it more rapidly?
13      MR. LAMBERT:
14      Objection.
15      THE WITNESS:
16      If you're -- that might be better,
17      that's on a more detailed level
18      than we modeled it.
19  EXAMINATION BY MR. DOAK:
20      Q.  Yes.
21      A.  So if you want to know loads on
22  buildings and so on, then it might be a
23  difference, but I think there is no theory
24  available for you to calculate if --
25      MR. LAMBERT:

35  (Pages 134 to 137)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 138

1    Objection.
2  EXAMINATION BY MR. DOAK:
3    Q.  I'll tell you my script for this
4  section.  I'm just going to go through and
5  confirm that while you didn't think these
6  were important with respect to the big
7  picture, simply that they could be important
8  with respect to specific locations.
9    MR. LAMBERT:
10   Objection.
11   THE WITNESS:
12   Yeah, but your questions also
13   implied a more detailed model,
14   which will in the end be impossible
15   to solve.  So we could want to know
16   all this, and then you can say you,
17   well, you could have done it so
18   much better, but this is not true
19   because the models will fail you.
20   There is no theory for you to help
21   you if you would know all these
22   details.
23 EXAMINATION BY MR. DOAK:
24   Q.  Actually, it was not my intention
25 to imply that.

Page 139

1    A.  Okay.
2    Q.  Buildings and other structures, I
3  would like for you to just briefly describe
4  that phenomenon again.  I'm not sure that we
5  really got that on the record and I would
6  like for you to describe why buildings and
7  structures can be important in the flow of
8  water.
9    MR. LAMBERT:
10   Objection.
11   THE WITNESS:
12   So buildings stand in the way of
13   the floodwaters, as trees do, as
14   shrubs do, but in this model you
15   can only change the roughness of
16   the bottom.  So we accounted for
17   these obstructions in a general way
18   by evenly applying the same
19   roughness everywhere, which is two.
20 EXAMINATION BY MR. DOAK:
21   Q.  The coarseness single factor that
22 we discussed yesterday?
23   A.  Yes.  Exactly.
24   Q.  Okay.  Again, my question though is
25 not withstanding your position on why you

Page 140

1  didn't think it was important to include
2  buildings and other structures for your
3  purposes, you would agree that that phenomena
4  could be important to the cause of property
5  damage at a specific location?
6    A.  Yes.  If a building was unlucky to
7  stand just in front of a street which was
8  spouting water.
9    Q.  Yes.
10   A.  Then that would be a bad luck
11 question.
12   Q.  Similarly, for the next assumption,
13 not making a distinction between house blocks
14 and streets --
15   A.  Yeah.
16   Q.  -- your opinion was not important
17 to the macro picture, but could be important
18 to the micro picture?
19   A.  Micro picture, exactly.
20   Q.  Okay.  Is the same true for the
21 direct impact of wind, not important to the
22 macro objective of your model, but might be
23 important with respect to damage at a
24 particular location?
25   A.  Yeah.  Certainly true, but

Page 141

1  that's -- yeah -- a difficult subject.
2    Q.  What's your experience in -- I just
3  don't know, but take the 40 Arpent, I guess,
4  as MRGO water is coming across those
5  marshlands or whatever and comes up to those
6  floodwalls, would a wind current at the back
7  of that have an effect in overtopping?
8    A.  Yes.
9    MR. LAMBERT:
10   Objection.
11   THE WITNESS:
12   You get wind setup in this marshy
13   area and it might easily be more
14   serious than we anticipated in our
15   model.
16 EXAMINATION BY MR. DOAK:
17   Q.  Back this morning when we were
18 talking about the Sobek software, I told you
19 I'd come back.  I had asked the question
20 about were there, I called it a field layout,
21 but was there a particular place in the
22 program set aside for loading a particular
23 type of data.  And in your testimony you gave
24 three examples, the sewers, ditches and small
25 waterways.  You said the program had a place

                              36  (Pages 138 to 141)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 142

1  for that data, correct?
2      A.  Yes.
3      Q.  But you all didn't input it?
4      A.  No.
5      Q.  The second place was the wind, but
6  you didn't input it, correct?
7      A.  Yes.
8      Q.  And third, the backflow from the
9  pumps?
10     A.  Yeah.
11     Q.  Besides those three examples that I
12 remember from yesterday, does that bring to
13 your mind any other factors that the Sobek
14 model has a field for to be populated if you
15 have the data?
16     A.  I don't think so.
17     Q.  Okay.  Next I'd like to talk about
18 the completeness of the report.  I think I
19 heard you say something yesterday to the
20 effect that you thought the report was
21 complete and nothing further was going to be
22 done.
23     A.  Yeah.
24     Q.  But I want --
25     A.  Yes.

Page 143

1      Q.  Because you realized there are a
2  couple of places in the report where it
3  suggests that there might be further
4  refinements.  And I don't need to go through
5  those.
6      A.  Uh-huh.
7      Q.  I just don't want to be surprised.
8  Are you telling me that this expert report is
9  done?
10     A.  Yes, I think so.
11     Q.  Okay.
12     A.  Apart from further questions or --
13 because many details were asked, could you
14 provide us with the water level in that area,
15 could you -- and this type of questions.  So
16 that's not rerunning the model, but giving
17 more detailed output.
18     Q.  Well, that may be -- then you're
19 talking about another expert report.
20     MR. LAMBERT:
21        Excuse me.  Objection.
22     MR. DOAK:
23        I guess the lawyers can fight about
24        that.
25     MR. LAMBERT:

Page 144

1        Right.  Right.
2  EXAMINATION BY MR. DOAK:
3      Q.  You don't currently have any
4  intention of providing any further report?
5      A.  No, but I offered if you wanted to
6  know at a certain spot --
7      Q.  Yes.  Right.
8      A.  -- the data, then we could provide
9  you with it from the input -- from the output
10 files as they are stored.
11     Q.  Let's talk quickly about things
12 that --
13        (OFF THE RECORD)
14 EXAMINATION BY MR. DOAK:
15     Q.  I have a list of things that I
16 think you're going to agree with --
17     A.  Yeah.
18     Q.  -- but are things that the model
19 doesn't do.  For example, yesterday you
20 agreed that the model doesn't differentiate
21 elevation within the 50 meter by 50 meter
22 grid.
23     A.  Yeah.
24     Q.  And I think you have already
25 acknowledged today that the model doesn't

Page 145

1  take into account how a particular house or
2  building sits on elevation (indicating).
3        MR. LAMBERT:
4           Objection.  Wait one second.
5           You're going to force me to
6           instruct the witness not to answer
7           if you keep that up.  This is the
8           third time you've asked him that
9           question today, you, not in the
10          past, but you yourself have asked
11          that question three times.  So this
12          is it.  There's not going to be
13          anymore of that.
14       MR. DOAK:
15          I won't ask that question again.
16       MR. LAMBERT:
17          Good.  Then maybe he doesn't even
18          have to answer it so we can get
19          some teeth in this outfit.
20          Don't answer it.
21    EXAMINATION BY MR. DOAK:
22       Q.  The next thing I think you'll agree
23    with is that the model doesn't identify what
24    damage occurred to any particular piece of
25    property.

37 (Pages 142 to 145)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

ee44edda-a960-429d-9380-2859dd8626d3

Page 146

```
1    MR. LAMBERT:
2    Objection. Now that one has been
3    asked and answered a number of
4    times. You know he's told you that
5    that wasn't what this --
6    MR. DOAK:
7    Counsel, I could be done with this
8    list of about four more items in
9    the next five minutes.
10   MR. LAMBERT:
11   I know, but you can keep doing that
12   all afternoon.
13   MR. DOAK:
14   You want to instruct him, then go
15   ahead and instruct him, but I would
16   urge you not to because this is not
17   a privileged matter. I'm going to
18   be done early today.
19   MR. LAMBERT:
20   Okay. That's a promise?
21   MR. DOAK:
22   That's a promise.
23   MR. LAMBERT:
24   There you go.
25   (OFF THE RECORD)
```

Page 147

```
1    MR. LAMBERT:
2    But really, please, don't do this.
3    You don't have to. You can dig
4    through the dirtg. She's smart.
5    She can find all of these things
6    for you wherever they are. You
7    don't even have to look.
8    MR. BECNEL:
9    If you are from Oklahoma, you've
10   got good talent.
11   MR. DOAK:
12   We're going to go flying through
13   this in less than five minutes.
14   MR. LAMBERT:
15   Okay. All right.
16   EXAMINATION BY MR. DOAK:
17   Q. Just to repeat the question that I
18   just said a minute ago so it will sound
19   familiar, you admit that the model does not
20   identify what damage occurred to a particular
21   house or building?
22   MR. LAMBERT:
23   Objection.
24   THE WITNESS:
25   It is not included in the study, so
```

Page 148

```
1    it's asking for something that we
2    didn't study.
3    EXAMINATION BY MR. DOAK:
4    Q. Fine. And you acknowledge that the
5    model doesn't identify where the water caused
6    injuries to any particular people?
7    MR. LAMBERT:
8    Objection.
9    THE WITNESS:
10   It is not in the model, so it's not
11   of any --
12   EXAMINATION BY MR. DOAK:
13   Q. Okay. And you agree that the model
14   does not address the cause of any levee
15   breach or overtopping failure?
16   A. No. It's not -- it's input.
17   MR. DOAK:
18   We're done with that series,
19   counsel.
20   MR. LAMBERT:
21   Good. Thank you.
22   EXAMINATION BY MR. DOAK:
23   Q. Let's discuss the model's ability
24   to identify the source or sources of water
25   reaching specific locations. Are there some
```

Page 149

```
1    locations in the area of the MRGO group, by
2    which I mean New Orleans East, Lower Nine and
3    St. Bernard, are there some locations in that
4    group that you believe the model can
5    accurately predict all of the sources of
6    water reaching a particular location?
7    A. I cannot fully understand the
8    question, because it is filling with water
9    and you cannot follow each particle of water
10   how it exactly behaves, but in a macro
11   picture you can see it easiest in the Ninth
12   Ward. And you see that the Ninth Ward is
13   flooded first from the north and secondly
14   from the south. And then if the water -- so
15   as long as the water didn't meet, it's clear
16   from which side what water come, but as soon
17   as it meets, then --
18   Q. This is not a trick question.
19   A. Okay.
20   Q. I will tell you what I think the
21   answer --
22   MR. SCHULTZ:
23   He's giving you the answer.
24   MR. LAMBERT:
25   Wait. Please let him finish.
```

38  (Pages 146 to 149)

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 150

1      THE WITNESS:
2      So then, from that moment on you
3      are not (indicating), which water
4      from what side, so then that's an
5      engineering assumption then, if you
6      would.  It is not discussing that,
7      but you --
8      MR. LAMBERT:
9      Jerry --
10  EXAMINATION BY MR. DOAK:
11    Q.  So I assume that you agree that
12  there are some locations in the MRGO area
13  where the model could predict which sources
14  of water reached it, some but not all?
15    A.  Yeah, in some instances it is very
16  clear from what side the water came and which
17  is causing the damage.  And in other cases
18  you could do, which we did in the central
19  mostly, if you close one hole, if it would
20  have reached the other side.  And in many
21  times this is the case.  So if one hole
22  didn't occur, if the Arpent levee would be
23  high enough, then I am still certain that the
24  entire area up to Chalmette would have been
25  flooded.

Page 151

1    Q.  Uh-huh.
2    A.  So that calculation we didn't make,
3  but it could have been made.
4    Q.  The converse of the last question I
5  asked would be that there are other areas,
6  locations within the MRGO area where you
7  would not be able to predict with your model
8  each of the sources whose water reached it?
9      MR. LAMBERT:
10      Objection.
11      THE WITNESS:
12      Yeah.  As I explained, where after
13      that water front have met, it will
14      be difficult to attribute which was
15      damaged by what side (indicating),
16      but the other solution would be if
17      you close one hole, then you can
18      see that in most cases everything
19      will be flooded by one, by that
20      single hole that is open.
21  EXAMINATION BY MR. DOAK:
22    Q.  Does your model purport to be able
23  to distinguish which area in the Lower Nine
24  was affected by the north breach as opposed
25  to the south breach of the Industrial Canal?

Page 152

1      MR. LAMBERT:
2      Objection.
3      THE WITNESS:
4      Yeah.  I think the graphs show
5      clearly.  I don't know exactly
6      where the Lower Ninth Ward ends,
7      but you see in my opinion it is
8      here (indicating).  So --
9  EXAMINATION BY MR. DOAK:
10    Q.  Yes.
11    A.  So the Lower Ninth Ward is mostly
12  hit by the, this breach.
13    Q.  The reason I ask, Professor, on
14  page 26, you see how tight the breach points
15  labeled number 1 and 4 are.
16    A.  Uh-huh.
17    Q.  Page 26.
18    A.  Yeah.
19    Q.  So they are pretty close together
20  there.
21    A.  Yeah.
22    Q.  And if you turn back to your --
23  when you turn back to some of the later
24  charts it simply refers to the Industrial
25  Canal breaches without differentiating

Page 153

1  between that site number 1 and 4.
2    A.  Oh, yeah.
3    Q.  So I don't know whether you believe
4  that in that area of the Lower Nine the model
5  is able to differentiate between --
6    A.  We are making a mistake, I think,
7  because --
8    Q.  Page 46, location 1.
9    A.  You are discussing this picture?
10  This is not Lower Ninth Ward (indicating).
11    Q.  I'm looking at the wrong page.
12  Sorry.
13    A.  So page 37 is the Lower Ninth Ward.
14  Yeah.  Yeah.  1 and 2.  Yeah.  Now your
15  question was?
16    Q.  On page 46 showing the water levels
17  at location number 1, you see that the solid
18  purple line is no breaches at IHNC.
19    A.  Uh-huh.
20    Q.  And that chart combined with this
21  series of projections on page 40 in
22  particular certainly (indicating) predict
23  water coming into the Lower Ninth area, but I
24  don't know if you are saying that the model
25  differentiates whether this water is coming

39 (Pages 150 to 153)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 154

1   from breach site number 1 or breach site
2   number 2, the north and the south on the
3   Industrial Canal, or if they're so close you
4   can't differentiate. I just don't know
5   what --
6       A. You could do such the same if you
7   wanted to know, such the same calculation,
8   closing one and closing the other and see
9   what the effect is. And in this case I would
10  think that the biggest one, because one is
11  much bigger than the other, the one is 800
12  feet, 2, and the other is only 200 feet, that
13  the bigger one will have most effect.
14      Q. Okay.
15      A. And then the picture shows again
16  that whatever you close, you still have the
17  bowl full of water (indicating).
18      Q. What, if anything -- strike that.
19  Are you familiar with the phrase the chute
20  effect of MRGO?
21      A. No.
22          MR. LAMBERT:
23          How about funnel?
24          THE WITNESS:
25          Funnel?

Page 155

1   EXAMINATION BY MR. DOAK:
2       Q. Funnel effect?
3       A. Funnel effect. Yeah.
4           MR. LAMBERT:
5           There we go.
6   EXAMINATION BY MR. DOAK:
7       Q. You are familiar with that?
8       A. I know the term. I know the term.
9       (OFF THE RECORD)
10  EXAMINATION BY MR. DOAK:
11      Q. Does your model predict anything
12  about the impact of that funnel effect of the
13  MRGO and, if so, how?
14      A. We don't predict it, but we -- if
15  the data from outside water levels contained
16  the funnel effect, then it's included in our
17  boundary conditions (indicating). So the
18  funnel effect is something, what plays with
19  the water movement through the MRGO, through
20  the Intracoastal Waterway and how it enters
21  into the narrower part, so that is part of
22  the calculations that were given us by Mr.
23  Kemp.
24      Q. Those are going to be in the
25  hydrographs for this location --

Page 156

1       A. Yeah.
2       Q. -- coming in on the Intracoastal
3   Waterway?
4       A. Yes. They are in or hidden or not
5   available. I don't know exactly.
6       Q. Do you know if your input data
7   included information on the water elevation
8   in the Industrial Canal to the south of
9   breach point number 2, which breach point is
10  identified on page 37?
11      A. You're asking this because if you
12  look to figure 2.1, and there is an overview,
13  and it shows a white dot E just in front of
14  the lock. So I think we include a hydrograph
15  at the end of the canal. Is that what you
16  asked?
17      Q. Yes.
18          MR. DOAK:
19          What are we going to do about these
20          backup materials? We didn't, you
21          know, get all of them here. Will
22          these backup materials on the
23          hydrographs be available in advance
24          of the deposition of Mr. Kemp and
25          Morris for next week so we can look

Page 157

1   at them?
2           MR. SCHULTZ:
3           Which ones do you have specifically
4           in mind, Jerry?
5           MR. DOAK:
6           My particular question is to get
7           the data submitted from the
8           hydrograph at location E in figure
9           2.1, but that's simply --
10          MR. SCHULTZ:
11          What page?
12          MR. DOAK:
13          I'm sorry. Page 5. But that's
14          simply the question I have in mind
15          right now. I guess we can talk
16          about it later when the deposition
17          is done, but --
18          MR. LAMBERT:
19          I don't think it should matter with
20          regard to his testimony.
21          MR. DOAK:
22          That's what I'm saying, that
23          obviously we are going to finish
24          this today --
25          MR. SCHULTZ:

                                40  (Pages 154 to 157)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285
ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 158

1     And it has been made an issue in
2     ya'll's brief for extension, so we
3     will be talking about it one way or
4     the other and, of course, we will
5     endeavor to get you everything you
6     ought to have.
7  EXAMINATION BY MR. DOAK:
8     Q.  Just make sure -- there is not any
9  chance that you would remember that kind of
10 input data from one hydrograph, would you?
11    A.  No.  Given a table of 200 points
12 every half an hour water level is a lot.
13    Q.  I credit you with being a very
14 intelligent man, Professor.  I just wanted to
15 make sure.  Still focused on the St. Bernard
16 area.  As I understand it, I'm going to be
17 referring to the 40 Arpent Canal, you're not
18 listing that as separate breach sites, but
19 rather just this very, very long floodwall
20 that was overtopped as the MRGO water came
21 across the marshlands moving to the
22 southwest, is that correct?
23    A.  You said Arpent canal?  You said --
24 but you mean Arpent wall?
25    Q.  Yes.  I misspoke.

Page 159

1     A.  Yes.
2     Q.  Floodwall.
3     A.  My first idea was, oh, I didn't
4  know there was a canal.  No, sir.  As far as
5  we know, the wall kept standing and it was
6  overtopped, so, as we explained this morning,
7  then it's just a structure (indicating).  And
8  as soon as the water level in the model
9  exceeds the structure, then it starts flowing
10 over.
11    Q.  Does that -- and I understand that
12 concept, but does that necessarily mean that
13 the water flow volume, velocity is going to
14 be uniform across that very long stretch or
15 not?
16    A.  That depends on the model because
17 it's an angle, so you have at first the
18 horizontal water level and then it starts
19 flowing over, then the water has to flow to
20 the wall (indicating).  And that might give
21 on our 50 by 50 grid, that might, the
22 roughness, that might influence the pattern a
23 little bit, but, roughly speaking, it will be
24 horizontal at a certain level.
25    Q.  Is there --

Page 160

1     A.  More or less a foot or whatever
2  above the crest of the wall.
3     Q.  There wouldn't then be anything
4  about the character of the marshlands, I
5  don't know, the depth of the water out there
6  or anything that might affect that force of
7  it coming over the 40 Arpent?
8     A.  Not really.
9     Q.  Okay.  I want to make sure I'm not
10 missing something.
11       MR. LAMBERT:
12       I don't know how you could.  You've
13       been over it three times.
14       MR. DOAK:
15       I'm a slow learner.
16       MR. LAMBERT:
17       I'm just joking with you.
18 EXAMINATION BY MR. DOAK:
19    Q.  If you would turn back, please, to
20 the New Orleans East beginning at page 26.
21    A.  Uh-huh.
22    Q.  And page 33 where your illustrative
23 locations are set out, and I would like to
24 focus on location number 1.  I will represent
25 to you that on page 33 the residence of named

Page 161

1  plaintiff Hank Davis would be a very short
2  distance south of that number 1.
3     A.  Uh-huh.  And they never saw water
4  or what?
5     Q.  Now, if you look at page 33, which
6  shows the maximum flood depths by a color
7  code --
8     A.  Um --
9     Q.  Page 31.
10    A.  Thirty-one.  Yeah.
11    Q.  You'll see that area I just
12 identified, it's a dark blue there.
13    A.  Yeah.  Yeah (indicating).
14    Q.  And I guess the other example would
15 be the water chart for location 1 at page 34.
16    A.  Uh-huh.
17    Q.  Am I reading the water level chart
18 at page 34 correctly to say that the model is
19 predicting approximately 13 feet at this
20 location?
21    A.  Yeah.
22    Q.  See, this is one of the cases where
23 I was wondering how you reconciled this with
24 the rest of the discovery record in this
25 case.  The named plaintiff testifies he had a

41  (Pages 158 to 161)

ee44edda-a960-429d-9380-2859dd8626d3

Page 162

1  little water, and I'm not going to say, I can
2  read you a transcript that would suggest one
3  foot, I can show you a transcript that would
4  suggest three feet.
5      MR. LAMBERT:
6      Well, it's right there in that
7      area.
8      MR. DOAK:
9      I'm sorry?
10     MR. LAMBERT:
11     It's -- never mind.  I'm sorry.
12     Excuse me.
13  EXAMINATION BY MR. DOAK:
14     Q.  But where this -- and I know he is
15  not at location number 1, but I don't see any
16  difference on the color blue chart between
17  where location 1 is and where this is.
18     A.  Yeah.
19     Q.  If you would be concerned with that
20  or is that just --
21     A.  Yes, if it's true.  I was joking,
22  if he saw no water.  That would be of
23  concern, of course.
24     Q.  I can also represent to you that a
25  forensic investigator went to his house and

Page 163

1  found a waterline in the house inside the
2  plenum or something that he finds significant
3  that was 12 inches.
4      A.  Yeah, okay, but we need to know
5  according to NAVD88, so now you're referring
6  to levels of the house, but I don't know how
7  high the house was.
8      Q.  Well --
9      A.  But if it is true that we predict
10  13 feet and it was only three, then
11  there's --
12     Q.  That would be a big discrepancy to
13  you?
14     A.  Yeah, yeah, yeah.  Certainly.
15     Q.  Let's turn back to page 51, the
16  section on Conclusions.  The first expressed
17  conclusion I see is in the second paragraph,
18  the sentence, the second sentence, it is
19  concluded that the contribution of these
20  sources depend on the location.  And that's
21  confirmed by all your various charts showing
22  that different amounts of floodwater ended up
23  at different locations around the MRGO area,
24  correct?
25     A.  Yeah.  Correct.  With the side

Page 164

1  remark that if you have one hole, then you
2  have a good chance that still everything is
3  flooded.
4      Q.  Uh-huh.  The next sentence is
5  worded slightly differently, that it can be
6  concluded that rainfall and overtopping
7  contributed heavily.  Was that language
8  intended to be equivocable by saying it can
9  be concluded or is that also a conclusion?
10     A.  No.  That's a conclusion for St.
11  Bernard and Orleans Metro the rainfall is
12  relatively small, but the East the inference
13  is more.
14     Q.  Yes.  Professor Vrijling, I showed
15  this to you before, but I'm going to hand you
16  again what's been marked as Exhibit 15 and
17  ask you to just briefly look at that
18  (indicating).  You see Professor Kok's name
19  is on the first page?
20     A.  Uh-huh.  Uh-huh.
21     Q.  But you have not seen this document
22  before?
23     A.  No.
24     Q.  Okay.  So as we sit here today,
25  this document does not reflect any opinion

Page 165

1  held by you?
2      A.  No.
3      Q.  You haven't read it?  I'm not
4  asking you to read it.
5      A.  No, I have not read it, but, as I
6  have explained, I'm familiar with these type
7  of things because I know that the various
8  contexts that we try to refine our damage
9  models by using the Katrina data as well in
10  the field of fatalities, as in the economic
11  damage.
12     Q.  Okay.  That's all.
13     A.  Okay (indicating), but that was not
14  part of this study.
15     Q.  Do you by any chance know Professor
16  Giegengack at the University of Pennsylvania,
17  a geologist?
18     A.  No.
19     Q.  We briefly bumped into this before
20  that, what's your level of familiarity with
21  New Orleans and you said that you had some
22  knowledge of it.
23     A.  (Witness nods head.)
24     Q.  Would you elaborate on that a
25  little bit more.  Did you know something

PROF. JOHANNES VRIJLING VOL II (MRGO)                                    8/17/2007

Page 166

1 about the design and construction of the
2 hurricane protection system here?
3     A.  No, not before the Katrina
4 disaster.  Just general knowledge as any
5 tourist, but not in depth.
6     Q.  Yes.  Did you know about the debate
7 surrounding the loss of the wetlands and the
8 detrimental effect of that on hurricanes?
9     A.  Not really.
10    Q.  Okay.  Did you know about the MRGO
11 channel and this so-called --
12    A.  No, that I certainly didn't know.
13    Q.  Were you familiar with the role of
14 the political process in America in the
15 development, design and construction of the
16 hurricane protection system?
17        MR. LAMBERT:
18        Objection.
19        THE WITNESS:
20        That's a very generally-phrased
21        question, so I'm aware of the
22        political process in relation to
23        protection of public property and
24        so on, but not specifically any
25        discussion surrounding New Orleans.

Page 167

1    EXAMINATION BY MR. DOAK:
2     Q.  And did you have any specific
3 knowledge of the approximately 100-year
4 history of the canals and levee system built
5 around the New Orleans area?
6        MR. LAMBERT:
7        Objection.
8        THE WITNESS:
9        In general, I knew that it was a
10       very old town, the French Quarter,
11       and so, witness of that, but not in
12       detail.
13    MR. DOAK:
14    Okay.  If we could have a short
15    brief break.
16    MR. LAMBERT:
17    Sure.
18    VIDEOGRAPHER:
19    We're off the record.  It is 2:18.
20    (RECESS TAKEN)
21    VIDEOGRAPHER:
22    Back on the record.  It's 2:26.
23    MR. MAYEAUX:
24    Thank you.
25 EXAMINATION BY MR. MAYEAUX:

Page 168

1     Q.  Professor Vrijling, Ben Mayeaux
2 again.  I reintroduce myself.  I have a few
3 questions for you.  The models are run over
4 time.  What is the time frequency, every 30
5 minutes, every hour, every 5 minutes?  How
6 often?
7     A.  I don't know exactly, but I think
8 five or ten minutes time stamps.
9     Q.  Have you provided to us the model
10 run or information from which we can make
11 that determination?
12    A.  I don't think so that we have given
13 yet.
14    Q.  Is that something you can provide
15 for us?
16    A.  Yeah, we can provide.
17    Q.  Breach --
18    A.  But it's a common time stamp, so
19 any model expert like the professor knew
20 would know it would such a stamp because the
21 model itself more or less chooses and warns
22 if it's incorrect.
23    Q.  Is this a function -- this is a
24 function of the model itself?
25    A.  Yeah.  Not the model.  And also

Page 169

1 what you put it through.  If you want very
2 quick changes, then you need smaller time
3 stamps, if you have very small depth and all
4 kind of things, the inference is the maximum
5 time stamp.
6     Q.  Breach hydrograph and flow rates,
7 through the breaches as they develop, is
8 information that is estimated and then
9 entered into the model?
10    A.  (Witness shakes head.)
11    Q.  No?
12    A.  No.  The size of the breach is
13 estimated and put in the model as a function
14 of time.
15    Q.  Great.
16    A.  And then the amount of water that
17 flows through the breach is calculated.
18    Q.  Is calculated by the model itself?
19    A.  Yes.
20    Q.  Yesterday a disk of data was
21 provided to us.  Will we find in that data
22 the through-breach flow rates over the top?
23    A.  No. No.
24    Q.  Okay.
25    A.  It's only the layout of the bottom.

43  (Pages 166 to 169)

ee44edda-a960-429d-9380-2859dd8626d3

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 170

1    Q.  All right.  Where do you have the
2  through-breach hydroflow rates?
3    A.  They are inside the output files of
4  the model.
5    Q.  And have those been produced?
6    A.  No.
7    Q.  Can they be produced?
8    A.  Yes.
9    Q.  Thank you.  Please turn to page 35
10 of the July 2007 report.  Do the two figures
11 on page 35, figures 4.7 and 4.8, depict --
12 I'm sorry.
13   A.  Yeah, yeah, yeah.  I have them
14 here.
15   Q.  I'll wait until you get them here.
16   MR. LAMBERT:
17     Wait.  I want to get the rest of
18     the question, too.
19   MR. MAYEAUX:
20     I'm waiting for the professor to
21     get to the page.
22   THE WITNESS:
23     I have the page, but I'm looking
24     for the map, which points are --
25     yeah.

Page 171

1  EXAMINATION BY MR. MAYEAUX:
2    Q.  Okay.  Let me try my question.  The
3  two figures on page 35, I think it's 4.7 and
4  4.8, depict what the model has calculated as
5  the contributions of various sources to the
6  flooding at those two locations, locations 2
7  and 3, correct?
8    A.  Yes.
9    Q.  And we can find plotted where
10 locations 2 and 3 are in the New Orleans East
11 polder by looking at your map on page 33.
12   A.  Yeah.
13   Q.  Please, for figure 4.7 on page 35,
14 tell us what the total maximum floodwater
15 level was as calculated --
16   A.  Approximately five and a half foot
17 above our reference datum.
18   Q.  Okay.  Is estimated ground level at
19 minus 7?
20   A.  Yes, according to this graph it is.
21   Q.  All right.  And would estimated
22 maximum flood level be five foot plus?
23   A.  Yeah, yeah.
24   Q.  So actual total floodwaters at this
25 location would be approximately 12 feet?

Page 172

1    A.  Twelve feet, yes.
2    Q.  Yes.  Of the 12 feet, how many feet
3  was attributed by the model to each of the
4  flood sources considered?
5    A.  Yes.  So it is one foot to the
6  rain, if there were no pumping.
7    Q.  Okay.
8    A.  Then one, two, three, four, five,
9  nearly six feet to overtopping.
10   Q.  Yes, sir.
11   A.  Then we get a little bit more for
12 no breaches.  And then finally four feet for
13 due to the all causes together.
14   Q.  Okay.  Would you please share with
15 us the various contributions for the total
16 flooding at location 3 as shown on figure
17 4.8.
18   A.  Yes.  So due to overtopping would
19 have caused nearly 7 foot already.  And then
20 one foot extra to no breaches and then 4 more
21 in total, but be careful.  If there were only
22 breaches, then it would also be high.  It's
23 not to understand that if the others were not
24 there, then this black line would run there
25 (indicating).

Page 173

1    Q.  I understand.
2    A.  Okay.
3    Q.  As we discussed yesterday, if we
4  were to assume some breaches had not
5  occurred, then floodwaters from other
6  breaches may have impacted a given location
7  anyway?
8    A.  Yeah.  Exactly.
9    Q.  But you modeled -- your attempt was
10 to model for accuracy --
11   A.  Yeah.
12   Q.  -- and to actually show the impact
13 of each breach --
14   A.  Yeah.
15   Q.  -- or overtopping that you modeled?
16   A.  Yes.
17   MR. LAMBERT:
18     Objection.
19   THE WITNESS:
20     And especially the big discussion
21     if rain were a major factor or not.
22 EXAMINATION BY MR. MAYEAUX:
23   Q.  Yes, sir.  Please turn to page 46
24 of your report.  I will ask you a few
25 questions about some of the locations modeled

44  (Pages 170 to 173)

Page 174

1  there. Let's -- take a look at water level
2  at location 1, which is figure 5.6 on page
3  46.
4      A.  Yes.
5      Q.  And that location is shown
6  graphically in the St. Bernard polder on the
7  map on page 44, correct?
8      A.  Yeah. Yes.
9      Q.  Would you, please, at the maximum
10  flood level for the water level at location 1
11  in the St. Bernard polder first tell us what
12  the flood level -- flooding aboveground level
13  was.
14      A.  Eleven feet above -- aboveground
15  level?
16      Q.  Aboveground level.
17      A.  Fifteen feet.
18      Q.  Of the 15 feet, would you explain
19  to us how much your model attributes to each
20  potential flood source?
21      A.  So first no or half a foot to rain
22  depending on the activity of the pumps. Then
23  we have, let's say, two feet due to
24  overtopping. And then here we have such a
25  question if there were no breaches, the

Page 175

1  Harbor Navigation Channel the maximum would
2  have occurred later, so at this moment it
3  contributes one, two, three, four, five, six,
4  seven, eight, nine, ten -- ten feet and then
5  two more to the maximum.
6      Q.  Yes, sir.
7      A.  Do you understand (indicating)?
8      Q.  I'm following.
9      A.  But if you wait for a few moments,
10  then the other hole would have filled the
11  bowl, not up to the maximum foot less, but --
12      Q.  Okay. So no breaches IHNC, the
13  impact is the solid gray line, correct?
14      A.  Yeah.
15      Q.  And that impact added how many feet
16  at maximum water level?
17      A.  We said ten? One, two, three,
18  four, five, six, seven, eight, nine, ten.
19  Yeah.
20      Q.  And the MRGO breach your model
21  shows added how many feet to the flooding at
22  maximum water depth?
23      A.  Yeah. Then two extra at this
24  moment.
25      Q.  All right. Thank you. Please

Page 176

1  let's look at 49, page 49, the water level at
2  location 7, St. Bernard polder, which is
3  figure 5.12.
4      A.  Yeah.
5      Q.  What is the maximum -- what was the
6  flood level aboveground at location 7 for the
7  St. Bernard polder?
8      A.  More than 14 feet. Fourteen, 15
9  feet.
10      Q.  Of the 14 feet at, of the 14 feet
11  maximum flood level, how many feet was
12  contributed by rainfall according to your
13  model prediction?
14      A.  Yeah. A half to one feet,
15  depending on the action of the pumps. It is
16  very small.
17      Q.  How much by MRGO breaches, how many
18  feet by MRGO breaches?
19      A.  Then you see that it's filled
20  anyhow here (indicating).
21      Q.  Okay.
22      A.  So with or without the -- the
23  graphs are on top of each other.
24      Q.  At maximum flood level, which
25  occurred at approximately 9:00 A.M. on the

Page 177

1  29th of August?
2      A.  Yeah.
3      Q.  Your model shows no contribution
4  from the MRGO breaches at that time, is that
5  correct?
6      A.  I don't know -- because if there
7  were no breaches in MRGO we would have the
8  dotted line, wouldn't we? No breaches MRGO,
9  so we would have this (indicating) --
10      Q.  Right.
11      A.  -- at 7. Now, the breaches in MRGO
12  were much higher, so this extra -- so there's
13  little difference in 7 between only MRGO or
14  MRGO plus Inner Harbor Navigation Channel --
15  there is quite some difference if there would
16  be no breaches in MRGO because then,
17  according to this graph, the waterline would
18  be limited to four feet.
19      Q.  And the flooding would have
20  occurred later?
21      A.  Yeah.
22      Q.  From that source?
23      A.  Yeah, but that's -- because then we
24  are so late, maybe the storm is over.
25      Q.  So at maximum flood level, which

ee44edda-a960-429d-9380-2859dd8626d3

Page 178

1    occurred approximately 9:00 A.M. on September
2    29, your model depicts here less than one
3    foot is contributed by water.
4       A.  Rain.  Rainwater.
5       Q.  Rainwater.
6       A.  Yeah.
7       Q.  Thank you.  And the remainder of
8    the floodwaters at that location at that time
9    were from which source?  Page 44.
10         MR. LAMBERT:
11         Source, you mean point of entry?
12      MR. MAYEAUX:
13         Or sources, points of entry.
14         Either.
15      MR. LAMBERT:
16         Okay.
17      THE WITNESS:
18         So at that moment the main
19         contribution came from the north,
20         from the Inner Harbor Navigation
21         Channel.
22   EXAMINATION BY MR. MAYEAUX:
23      Q.  Which is depicted with the solid
24   gray line?
25      A.  Yeah.

Page 179

1       Q.  Yes.  Okay.  Thank you.
2       MR. LAMBERT:
3          Okay.  Your 15 minutes are just
4          about up.  Actually, they are twice
5          as much as up.  Are you done?
6       MR. MAYEAUX:
7          I think so.
8    EXAMINATION BY MR. MAYEAUX:
9       Q.  I think I'm waiting -- have you
10   completed your answer to the pending
11   question?
12      A.  Didn't we make a mistake?  Because
13   I'm still looking at this fixed gray line.
14   It says there's no breaches in the Inner
15   Harbor Navigation Channel.  So that means it
16   is the MRGO contribution in 7.
17      Q.  At location 7 at peak water level.
18      A.  Yeah.  Yeah.  And you see that the
19   complete gray line is no breaches Inner
20   Harbor Navigation Channel.  So that means
21   that everything is coming off of the Arpent
22   levee from the MRGO.  So that's the biggest
23   contribution.
24      Q.  So I said it backwards.  Had there
25   been on August 29 at 9:00 A.M. peak water

Page 180

1    level, now we interpret the model as showing
2    approximately one foot of the floodwaters
3    attributable to rainfall.
4       A.  Yes.
5       Q.  And the remainder of the
6    floodwaters at that time attributable to MRGO
7    breaches.
8       A.  Yes.  Yes.
9       Q.  Thank you.
10      A.  Yes.  Yes.
11         MR. LAMBERT:
12         That was your one question.  Thank
13         you.  Are you done?
14      MR. MAYEAUX:
15         Yes, we are.
16      MR. LAMBERT:
17         Good.
18   EXAMINATION BY MR. LAMBERT:
19      Q.  Just a couple of really quick
20   questions.  First of all, from where we are
21   right now, if it hadn't rained, which is
22   totally hypothetical, but if there was no
23   contribution from rain and if there was no
24   contribution from overtopping, what would the
25   depth be of water at 9:00 in the morning?

Page 181

1       A.  Approximately the same because the
2    major contribution comes already from the
3    breaches.  And if the other sources wouldn't
4    have filled it up a little bit, then
5    everything would have come from the breaches.
6       Q.  Now, if there hadn't been any
7    contribution from rain hypothetically, and if
8    there hadn't been any overtopping
9    hypothetically, would the water depth with
10   the breaches along the MRGO have ultimately
11   reached the same depth that it reached?
12      A.  I think so.
13      Q.  Okay.
14      A.  Yeah.
15      Q.  So from the a timing standpoint, it
16   just happens that the rain was adding some
17   water early on, but even if it hadn't rained
18   and even if there had been no contribution
19   from overtopping, if you got breaches along
20   the MRGO you end up with the same depth of
21   water anyway?
22      A.  I'm afraid you're right.
23      Q.  Yeah.  And the same thing goes for
24   all three bowls --
25      MR. MAYEAUX:

PROF. JOHANNES VRIJLING VOL II (MRGO)                    8/17/2007

Page 182

1      Object to the form.
2    EXAMINATION BY MR. LAMBERT:
3      Q.  Correct?
4      A.  Yes.
5      MR. LAMBERT:
6      Okay.  No further questions.
7      MR. MAYEAUX:
8      Mr. Vrijling.  It has been a
9      pleasure.
10     THE WITNESS:
11     Thank you very much.
12     VIDEOGRAPHER:
13     The end of this deposition.  It is
14     2:45.
15
16
17     (Whereupon, the deposition was
18   concluded at 2:45 p.m.)
19
20
21
22
23
24
25

Page 184

1            REPORTER'S CERTIFICATE
2
3        I, MARGARET MCKENZIE, Certified Court
4    Reporter, do hereby certify that the
5    above-named witness, after having been first
6    duly sworn by me to testify to the truth, did
7    testify as hereinabove set forth;
8        That the testimony was reported by me
9    in shorthand and transcribed under my
10   personal direction and supervision, and is a
11   true and correct transcript, to the best of
12   my ability and understanding;
13       That I am not of counsel, not related
14   to counsel or the parties hereto, and not in
15   any way interested in the outcome of this
16   matter.
17
18
         MARGARET MCKENZIE, CCR, RPR, RMR, CRR
19       CERTIFIED COURT REPORTER
20
21
22
23
24
25

Page 183

1          WITNESS CERTIFICATE
2
3
4      I, PROFESSOR JOHANNES VRIJLING, do
5    hereby certify that the foregoing testimony
6    was given by me, and that the transcription
7    of said testimony, with corrections and/or
8    changes, if any, is true and correct as given
9    by me on the aforementioned date.
10
11
12
   DATE SIGNED       WITNESS' SIGNATURE
13
14
15
16     Signed with corrections as noted.
17
      Signed with no corrections noted.
18
19
20   DATE TAKEN: August 17, 2007
21
22
23
24
25

JOHNS PENDLETON COURT REPORTERS              800 562-1285

ee44edda-a960-429d-9380-2859dd8626d3