# App. Tab 14

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES          CIVIL ACTION

CONSOLIDATED LITIGATION                NO. 05-4182 K2

                                       JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO             MAG. WILKINSON


(V O L U M E   I)


        Deposition of JOHN A. KILPATRICK,

PH.D., MRICS, given in both the levees and MRGO

cases, at the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on August 13th, 2007.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 22

1  Parish left over from Murphy as part of our
2  data gathering process there, and that's in the
3  box.
4      Q.  What about Orleans?
5      A.  Don't know if there is anything for
6  Orleans or not.  There may be, but I'm not
7  sure.
8      Q.  Do you have anything for Orleans?
9      A.  If I do, it's in Iron Mountain.
10     Q.  All right.  With respect to Request
11 Number 5, any and all materials in the
12 deponent 's possession or control regarding the
13 class representatives' properties, including
14 but not limited to any and all data, documents
15 and/or photographs pertaining to tax
16 assessments, market value at any point in time,
17 condition, transactions, occupancy,
18 depreciation and/or repairs, what if anything
19 do you have responsive to that request?
20     A.  Anything that was in our possession in
21 our office would be in the box or in the Murphy
22 Oil files which, as I said, will be delivered
23 to you as quickly as I can.
24     Q.  Okay.  So what's in the box and what's
25 not?

Page 23

1      A.  Well, in the box is basically
2  electronic stuff that was on file in our
3  office.  In Iron Mountain would be paper stuff
4  that wasn't in possession in our office.
5      Q.  All right.  So am I understanding you
6  correctly to say that if by some coincidence
7  the materials that you gathered from Murphy Oil
8  pertain to some of the class representatives in
9  this case then you have information responsive
10 regarding class representatives, if it doesn't
11 then you don't?
12     A.  That's a good way of phrasing it, yes,
13 counselor.
14     Q.  You have no specific subfiles that you
15 went to or groupings of documents that pertain
16 to each -- or to any individual designated
17 class representative in either of the levee
18 lawsuit or the MRGO lawsuit?
19     A.  No.
20     Q.  You have none of their tax
21 assessments, you have no photographs, you have
22 no -- nothing that depicts the condition or
23 configuration of their properties?
24     A.  No, not at this juncture.  I'm sure
25 when we go forward with respect to data

Page 24

1  gathering, we'll get all of that in a timely
2  fashion, but not at this point.
3      Q.  Request Number 6 regards any and all
4  photographs in the deponent 's possession
5  regarding the Greater New Orleans areas,
6  including both Orleans and St. Bernard
7  parishes.  Do you have that?
8      A.  I asked my staff to make sure that any
9  photograph we had of the area was included on
10 the CD.  If we have other photographs which are
11 included in Iron Mountain, we'll deliver that
12 in a timely fashion.
13     Q.  All right.  And what member of your
14 staff did you direct that request to?
15     A.  Well, I asked our director of
16 administration Ms. McSherry to take that role
17 on herself.  Her -- my assistant Ms. Rix was
18 helping her with that.  We had two or three
19 other junior staff who aided them.  So I guess
20 there were probably five or six people total
21 who were at one time or another working on this
22 project on Friday.
23     Q.  All right.  And have you received a
24 report this morning as to what the status of
25 their progress is at this point?

Page 25

1      A.  No.  You know, it's 6:30 in the
2  morning -- it's 7:30 in the morning over there.
3  They're still getting their first Starbucks.
4      Q.  Do you know if they worked on it over
5  the weekend?
6      A.  No, I'm pretty sure they didn't.
7      Q.  So they worked on it Friday,
8  basically.
9      A.  That's correct.
10     Q.  Request Number 7 regards any and all
11 reports that the deponent has ever presented
12 concerning properties in the Greater New
13 Orleans area including both Orleans and
14 St. Bernard Parishes.
15     A.  Well, the only report that I've
16 presented would have been my affidavit in
17 support or class certification in Murphy Oil,
18 and that's included in the box.
19     Q.  Have you done any property appraisals
20 in the Greater New Orleans area?
21     A.  No.
22     Q.  Ever?
23     A.  No, not -- I mean, narrowly defining
24 Greater New Orleans, no.  In other parts of
25 Louisiana, sure.  But not here in New Orleans,

7 (Pages 22 to 25)

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 26

1   no.
2       Q.  How do you define Greater New Orleans?
3       A.  Those parishes which surround New
4   Orleans and touch Orleans Parish.  You know,
5   St. Bernard, Jefferson, Plaquemines -- I can't
6   remember all of them offhand.
7       Q.  All right.  Item Number 8 calls for
8   production of the most recent six reports that
9   the deponent has prepared regarding evaluation
10  of real estate involved in class action
11  litigation.  Did you produce those?
12      A.  No.
13      Q.  Why not?
14      A.  Time.  Simply ran out of time.  We'll
15  produce those when I get back to the office.
16      Q.  All right.  To the best of your
17  knowledge, what do you believe those reports
18  would include?  What cases?
19      A.  Well, you'll have two different
20  things.  First, if they've been class action
21  cases, it would have been some affidavit and/or
22  testimony in support of class certification.
23      Q.  Right.  And I'm asking you to the best
24  of your ability can you identify those cases
25  that you believe would fall within the six most

Page 27

1   recent class action reports you've written?
2       A.  Okay.  Well, um -- trying to look back
3   on it, and again, I'm going off of memory here,
4   we have the Murphy Oil case, which class was
5   certified.  We have, um -- a case versus Dupont
6   in, um -- near Baton Rouge, Myrtle Grove area
7   down near the town of Plaquemine.  I can't
8   remember if that's been certified or not.  But
9   that's pending.  We have --
10      MR. BECNEL:
11          That's called the Myrtle Grove
12      case.
13      THE WITNESS:
14          Yeah.
15      A.  We have a case in Lake Charles,
16  Louisiana, which was certified a couple of
17  years ago.  And I think that settled.  I never
18  testified in the merits phase.
19  EXAMINATION BY MR. ZWAIN:
20      Q.  Was that the Guillory case?
21      A.  Guillory v. Union Pacific, yes.
22          We have a class action in Kansas,
23  which is the BP Amoco.  We have a class action
24  in Michigan, Henry v. Dow which is in Saginaw,
25  Michigan.

Page 28

1           I'm thinking.  It's been a while.
2   I'll have to go back and look.  I can remember
3   those offhand.
4       Q.  Okay.  Who retained you -- what law
5   firm retained you in the Myrtle Grove case?
6       A.  Um -- Law Office of Patrick Pendley.
7   P-E-N-D-L-E-Y.
8       Q.  What about the Lake Charles Guillory
9   case?
10      A.  That would have been Lundy & Davis.
11  L-U-N-D-Y and Davis.
12      Q.  Have you done any work -- well, I take
13  it some of lawyers in this room retained you in
14  the Murphy Oil case.
15      A.  Yes.
16      Q.  Other than the Murphy Oil case, have
17  you done any work for any of the lawyers in
18  this room before?
19      A.  Not that I can recall.
20      Q.  Have you done any work for any of the
21  lawyers on the plaintiffs' side of these cases
22  before, other than Murphy Oil?
23      A.  Not that I can recall.
24      MR. BECNEL:
25          Counsel, he hasn't done any work

Page 29

1           for us in the Coffeeville, Kansas oil
2       tank that just floated.  We retained
3       him, but the work hasn't begun yet.
4       It only happened a few weeks ago.
5       MR. ZWAIN:
6           Thank you.
7   EXAMINATION BY MR. ZWAIN:
8       Q.  Request Number 9 asks for production
9   of any and all models that the deponent has
10  prepared to capture the stigma effect of any
11  real estate.
12      A.  Well, as you may or may not be aware,
13  our firm and I personally, as well as other
14  members of our firm, have written and published
15  extensively on that.  To the extent it's been
16  included in some of the other material, we've
17  delivered it here.  We've also included a lot
18  of stigma models which are not in the form of
19  peer review published material in reports that
20  we've prepared in various matters both
21  litigation and non litigation.  We do a lot of
22  stuff other than litigation that involves
23  stigma.
24          That having been said, we feel that
25  our published work has captured the essence of

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 30

1  our views on stigma, and I believe that a
2  cross-section of that has been delivered here.
3  But as part of our further responsiveness in
4  this case, we'll try to wipe the plate clean
5  with respect to anything that's been published
6  by our firm. It's a fairly large volume of
7  material, and we'll have that delivered with
8  respect to -- or along with the other material.
9      Q.  Well, when you say that you're going
10 to produced published material, does that
11 include models or reports that you've written
12 regarding the stigma effect in litigation?
13     A.  Well, we don't separate stigma in
14 litigation versus non litigation. I mean, we
15 have written, published, lectured, extensively
16 on stigma in academic and practitioner
17 materials, in non litigation consulting cases,
18 um -- Brownfield Redevelopment, for example.
19 We have opined with respect to stigma in a
20 variety of circumstances.
21     As I was perhaps not clear in my
22 previous answer, we believe that our views on
23 stigma are well captured in the published
24 material, both things published in the peer
25 reviewed academic literature as well as things

Page 31

1  published in the more practitioner literature.
2  And we'll certainly endeavor to make sure all
3  of those stigma models are included in the
4  material that we deliver to you later on.
5      Q.  Are there stigma models that you have
6  written that have not been published?
7      A.  I'll have to go back and look. I
8  certainly can't recall one, but it's worth
9  taking a look at.
10     Q.  Are there stigma models that you've
11 written that have been written for purposes of
12 litigation?
13     A.  I don't think anything we've done has
14 been done for the purpose of litigation.
15     Q.  Have there been stigma models that
16 you've written that have been used in
17 litigation?
18     A.  Well, yes. Now that's true.
19     Q.  And not published elsewhere.
20     A.  I can't recall if there is anything
21 that's been used in litigation that hasn't been
22 published elsewhere. I will say this: We do,
23 I think, a very robust job of ensuring that any
24 stigma model proffered by us in a litigation
25 matter is exceptionally well supported in the

Page 32

1  literature. In other words, we don't pave any
2  new ground in a litigation report, we basically
3  make sure that we're simply applying models
4  which have already been peer reviewed. Now,
5  many if not most of those come from authorship
6  of members of my firm. There may be stigma
7  models which we have applied in litigation
8  which come from the pen of people who are not
9  employed by me. I'm willing to leave that door
10 open. So we'll take a look at all of that and
11 make sure that a representative cross-section
12 of stigma models which have been published
13 somewhere are included in what we deliver you,
14 to the extent they haven't already been
15 delivered to you by what we've sent at this
16 point.
17     Q.  Well, how many models do you think you
18 have written, whether published or not? You or
19 your firm.?
20     MR. MEUNIER:
21        To capture the stigma effect?
22     MR. ZWAIN:
23        Yes, sir.
24     A.  Over a dozen.
25 EXAMINATION BY MR. ZWAIN:

Page 33

1      Q.  Well, what's the burden in producing
2  all of them for us?
3      A.  No burden at all. I will be glad to.
4      Q.  All right. Request Number 10 calls
5  for production of any and all documents
6  pertaining to the model that the deponent
7  proposes that the Court adopt in the instant
8  litigation.
9      A.  Well, I think I was fully responsive
10 to that in the CD that was sent following my
11 affidavit, with the exception of the Bruce and
12 Sundell article, which I mentioned had to be
13 faxed the next day.
14     Q.  Are you proposing a specific model for
15 the Court to adopt in this litigation?
16     A.  Yes.
17     Q.  What model is that?
18     A.  Well, mass appraisal in general. I'm
19 not suggesting any particular hedonic formula.
20 That will have to be empirically determined as
21 part of the what you attorneys might call the
22 merits phase of this. But with respect to
23 certification of class, it's clear and indeed I
24 think overwhelmingly compelling that some sort
25 of large scale mass appraisal model is not only

JOHN KILPATRICK (LEVEE VOL I)                        8/13/2007

Page 34

1   recommended but imperative in order to
2   intellectually get one's arms around the
3   magnitude of this -- of these cases.
4        Q.   So if I'm understanding you correctly,
5   you think that a mass appraisal model can be
6   constructed for purposes of this case, but you
7   haven't gone about to do it yet.  Is that
8   right?
9        A.   I'm not sure if I heard every word of
10  that question.  Did you say I think a mass
11  appraisal model?  Was that --
12       MR. ZWAIN:
13            Could you read the question back.
14       (Whereupon the previous question was
15  read back.)
16       A.   Yeah.  I have a little trouble with
17  that word think.  You know, if I take one of
18  these coffee cups here and hold it out over the
19  floor and let go of it, the certainty with
20  which I know that it's going to fall to the
21  floor transcends the word think.  So I don't
22  have an opinion that that coffee cup is going
23  to fall out of my hand and hit the floor, I
24  have a high degree of certainty that unless a
25  small animal runs along and catches it before

Page 35

1   it touches the floor it's going to hit the
2   floor.
3            Now, I have a certainty that some kind
4   of mass appraisal model is the only way you're
5   going to get at the truth here.  That's not
6   something I think, it's not an opinion I hold,
7   that's just, to be frank, a reality that I've
8   attempted to summarize as best I could in my
9   affidavit.
10       Q.   Well, regardless of what you think or
11  of what you're certain about, you have not gone
12  about the business of constructing such a model
13  for purposes of this case and recommending it
14  to the court.
15       A.   No, we haven't constructed a specific
16  empirical model, but I think the generalities
17  of a mass appraisal model are well described in
18  the affidavit that I've put forth.
19       Q.   So the affidavit you've written for
20  the purposes of those cases is the only
21  document that you are producing in response to
22  the request for documents pertaining to the
23  model that you propose to recommend to the
24  Court for adoption in this particular
25  litigation, is that right?

Page 36

1        MR. MEUNIER:
2            Did you say his affidavit?
3        MR. ZWAIN:
4            Yes.
5        MR. MEUNIER:
6            Didn't he just talk about the CD
7   of reliance material?  I think that
8   was his earlier answer.
9        A.   Well, I think I have already testified
10  that I sent, with the exception of the Bruce
11  and Sundell article, a CD which contained a
12  host of material which more fully flesh out and
13  support the use of a mass appraisal model.
14  EXAMINATION BY MR. ZWAIN:
15       Q.   All right.  So your affidavit and that
16  reliance material that your affidavit relies
17  upon are the only documents that you have
18  responsive to Item No. 10, correct?
19       A.   Well, I understand we may have put two
20  definitions on the word only.  I don't want to
21  minimize what I've done by saying that's the
22  only thing I've done.  I think captured in that
23  is a pretty good course on how you do these
24  sorts of things.
25       Q.   What other documents, if any, do you

Page 37

1   have that are responsive to Number 10?
2        A.   Well, nothing else is needed.
3        Q.   Do you have any other documents that
4   are responsive to Number 10, yes or no?
5        A.   No.
6        Q.   Thank you.
7            Request Number 11 calls for production
8   of any and all documents relating to instances
9   in which the deponent's model or models have
10  been accepted by the Court -- by any Court.
11  I'm sorry.
12            Do you have such documents?
13       A.   Not yet.
14       Q.   All right.  When do you expect to get
15  them?
16       A.   When I deliver more material to you.
17  Probably in a week or two.
18       Q.   All right.  And what's the material
19  that you're going to deliver responsive to
20  Number 11 going to include?
21       A.   Well, it will certainly include copies
22  of all of the affidavits and citations where
23  the Court has accepted a mass appraisal model
24  as being useful.  In my material which I've
25  sent you to date, including in there is a list

10  (Pages 34 to 37)

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

---

Page 110

1  for the Journal of Real Estate Literature, I
2  specifically directed my attention to, um --
3  two items, which are the third and second from
4  the bottom in the list, in the bibliography on
5  Page 227 of that. The Brookings Institute,
6  "New Orleans After the Storm, Lessons from the
7  Past, Plan for the Future," published October,
8  2005, and the Urban Land Institute, "New
9  Orleans, Louisiana, A Strategy for Rebuilding,"
10  Washington, D.C., 2005. So I took another
11  glance at those two articles just to refresh my
12  memory on some of the supportive material that
13  Professor Dermisi and I have put into this
14  article.
15      I read the National Geographic
16  article, the current article about New Orleans,
17  which I've included a copy of that National
18  Geographic issue in the box which I brought
19  with me here today.
20      Um -- that's about it.
21  Q.  All right. You said you read your
22  affidavit, notice of deposition, the article
23  that you attached to your affidavit, the
24  National Geographic article, and you said
25  something else about documents supportive of

---

Page 111

1  this deposition. So I'm not sure what you
2  meant.
3  A.  Sure, I asked my staff to, um --
4  devote whatever people we had available to
5  be -- to, um -- print out as much as we could
6  to be responsive to Appendix A to your notice.
7  And I also reviewed two articles which appear
8  on Page 227 of the Kilpatrick Dermisi article,
9  and those were the Brookings Institute article
10  and the Urban Land Institute publication. I
11  reviewed those and put them in a box, and then
12  reviewed the National Geographic article and
13  put it in the box.
14  Q.  Since your report was prepared, you
15  have not felt the need to change it or alter
16  your opinions and conclusions stated in this
17  report?
18  A.  No.
19  Q.  Have you ever had an occasion to read
20  either the Complaint and Amended Complaint
21  filed in the levee case and the complaint filed
22  in the MRGO case?
23  A.  Yeah. I think I did. They don't
24  stand out in my mind. I was focusing my
25  attention more on real estate issues and not so

---

Page 112

1  much on legal issues.
2  Q.  Okay. So you may have read it, you
3  may not, you just don't remember?
4  A.  That's correct.
5  Q.  All right. Have you ever read any of
6  the depositions of any of the plaintiffs that
7  we've taken in these cases?
8  A.  No.
9  Q.  Have you read any summaries of those
10  depositions?
11  A.  No. I obviously will want to read
12  those when we get to the actual empirical
13  portion of this case. But at present, that
14  wasn't part of formulation of my opinion.
15  Q.  Have you met any of the class
16  representatives in this case?
17  A.  Know, I may have. I don't know.
18  Q.  Do you remember speaking to any of
19  them?
20  A.  No. I mean, I've met lots and lots of
21  people here, so I don't know if any of them
22  happen to be included in the class reps. I
23  don't want to be disinclusive of that, but I
24  haven't purposefully met with anyone in my role
25  as an expert in the case and their role as a

---

Page 113

1  class rep in the case.
2  Q.  Have you reviewed any of the
3  plaintiffs' written discovery responses in this
4  case?
5  A.  No. But again, I certainly will when
6  we get to the appropriate part of the analysis.
7  Q.  Have you reviewed the Motion for Class
8  Certification in the levee case?
9  A.  I think so. I don't recall if I have
10  or haven't.
11  Q.  Have you reviewed the Amended Motion
12  for Class Certification in the levee case?
13  A.  Again, I can't recall if I have or
14  haven't.
15  Q.  Have you reviewed the Motion for Class
16  Certificate in the MRGO case?
17  A.  Again, I can't recall.
18  Q.  Have you reviewed the Amended Motion
19  of Class Certification in the MRGO case?
20  A.  No.
21  Q.  And have you looked at any photographs
22  or diagrams or any other descriptions or
23  depictions of any of the class representatives'
24  properties in these cases?
25  A.  Not specific the formulating my

---

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                8/13/2007

Page 114

1   opinion here today.  I mean, I've looked at at
2   least one map, one modeling map.  Of course,
3   I've looked at hundreds of maps of the area and
4   I can't tell you how many flood maps.
5       Q.  I'm interested to know if you've
6   looked at any properties owned by the class
7   plaintiffs.  Class representatives.
8       A.  Right.  And with respect specific to
9   this case, no.  Specific to my preparation thus
10  far in this case, I have not yet.
11      Q.  Okay.  Have you sent anyone down from
12  Greenfield to look at any of the class
13  representatives' properties in these cases?
14      A.  Not yet.  But I have every intention
15  of doing that at the appropriate time.
16      Q.  Have you looked at any assessor data
17  with respect to any of the class
18  representatives' property in these cases?
19      A.  No, not yet.
20      Q.  Have you looked at any bank appraisal
21  for mortgages with respect to any of the class
22  representatives' properties in these cases?
23      A.  No, not yet.
24      Q.  All of these things you intend to do
25  at some point in the future?

Page 115

1       A.  Um -- yes, as we move forward in the,
2   um -- the empirical analysis phase, all of this
3   will be considered in its appropriate light as
4   we gather data and formulate the quantitative
5   component of the model and put that in place.
6       Q.  Are you charging by the hour in this
7   case?
8       A.  Yes.
9       Q.  What is your hourly rate?
10      A.  Currently, six hundred.
11      Q.  How many others at Greenfield are
12  engaged in this particular project?  And when I
13  say this particular project, I'm talking about
14  the MRGO and the levee case.
15      A.  Um -- until Thursday afternoon, none.
16  As of Thursday afternoon, about five.
17      Q.  And the sort of people who are engaged
18  in this case at Greenfield are the people that
19  you talked about who are trying to respond to
20  the request for documents we made in Exhibit A?
21      A.  That's correct.
22      Q.  And so how do you charge their time,
23  if at all?
24      A.  By the hour.
25      Q.  At what rate?

Page 116

1       A.  It ranges from fifty to a hundred
2   dollars an hour.
3       Q.  Were you the sole crafter of this
4   report, this Exhibit 3?
5       A.  Yes.
6       Q.  No one helped you?
7       A.  I believe Dr. Kummerow, Max Kummerow,
8   read through it for me, and I probably had
9   Ms. McSherry read through it for typos and
10  those sorts of things.
11      Dr. Kummerow is one of our analysts at
12  Greenfield, a former professor, and he has
13  written extensively.  In fact, I've cited him
14  in a couple of places here.  So, um -- I asked
15  him to read these things before I send them
16  out.
17      Q.  Besides traveling here and preparing
18  or your deposition and preparing and drafting
19  your affidavit, have you done any other work in
20  this case?
21      A.  Not that I can recall.
22      Q.  About how long did it take you to
23  draft your affidavit?
24      A.  Um -- you know, I'll have to go back
25  and look at the billing records.  It was -- it

Page 117

1   wasn't a trivial amount of time, but it didn't
2   take a month.  So obviously somewhere between
3   an hour and a month.  Now that sounds stupid,
4   but frankly, as I sit here today I can't tell
5   you whether that took me ten hours or twenty
6   hours or twenty-five hours.  I don't know.
7       Q.  Would it be somewhere in that range?
8       A.  Yeah.  That sounds about right.
9       Q.  All right.  Is your compensation for
10  your hourly rate, I guess for the time spent
11  drafting the report, the same as your rate for
12  traveling to and testifying in this deposition?
13      A.  Right.
14      Q.  Is your rate any different for
15  testifying at a certification hearing or in a
16  trial?
17      A.  No.  Not yet.  If the room gets any
18  hotter, I'm going to raise it, though.
19      (Off the record.)
20  EXAMINATION BY MR. ZWAIN:
21      Q.  All right.  So can you tell me when
22  you were first contacted about this case, being
23  MRGO and levee?
24      A.  You know, first contacted about it, I
25  don't know.  It may have been a while ago.

30  (Pages 114 to 117)

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 122

1  that, yes.
2    Q.  All right.  Does this affidavit
3  contain all of the opinions and conclusions
4  which factual observations that you have made
5  with respect to this case?
6      MR. MEUNIER:
7        Relative to class certification.
8      MR. ZWAIN:
9        Yes.
10   A.  Relevant to class certification, yes.
11 EXAMINATION BY MR. ZWAIN:
12   Q.  Now, tell me, besides writing this
13 report, which took you between ten and
14 twenty-five hours, and discussing your
15 retention with Mr. Becnel -- I assume it was
16 Mr. Becnel who sent you the retention letter.
17 Is that right?
18   A.  I believe so.
19   Q.  -- what else, if anything, have you
20 done in connection with this case?
21   A.  Well, we've had conversations on the
22 phone with the attorneys, we've talked about
23 issues like, you know, who the class reps were,
24 you know, things like commonality and
25 representation and those sorts of things.  I've

Page 123

1  talked in general about, um -- the common
2  factors issues, about modeling and how we would
3  adapt and adopt the models drawn and use them
4  in our valuation empirics, just pretty general
5  conversations about how the case would
6  progress.
7    Q.  Well, have you had any conversations
8  regarding this case with any people other than
9  the attorneys who represent the plaintiffs?
10   A.  My staff and my wife.
11   Q.  Anyone else?
12   A.  I can't think of any, no.
13   Q.  Have you had any conversations
14 regarding this case or these cases with any of
15 the plaintiffs' experts or consultants?
16   A.  No.
17   Q.  Have you reviewed any of the other
18 expert reports tendered on behalf of the
19 plaintiffs in these cases?
20   A.  No.
21   Q.  Estimate for me the amount of time
22 that you have spent in conversation with the
23 lawyers who represent the plaintiffs in these
24 cases, for purposes of discussing these cases.
25   A.  A couple of hours.

Page 124

1    Q.  Have you generated any work product
2  other than your affidavit, for purposes of
3  these cases?
4    A.  No.
5    Q.  What documents, if any, have the
6  plaintiffs' attorneys provided you in this
7  case?
8    A.  I'd have to go back and look.  You
9  know, obviously the things we've talked about
10 earlier today.  I think they've sent us some of
11 the filings in the case, um -- but not much.
12   Q.  Okay.  By some of the filings in the
13 case, you mean the complaints?
14   A.  I think they've sent a copy of the
15 complaint.
16   Q.  You don't recall whether you've looked
17 at those are not?
18   A.  I can't recall as I sit here today.
19   Q.  What other documents might they have
20 sent you?
21   A.  Not much.
22   Q.  Anything else besides the complaint?
23   A.  Not much I can think of.  I mean,
24 honestly, as I sit here today, it's not -- you
25 know, and don't take this the wrong way, but

Page 125

1  I'm not hung up on the legal side of this, I'm
2  hung up on the evaluation side of it.  And so
3  we had conversations on the phone about what
4  this case was all about, and, um -- I came to
5  an understanding in oral conversations with the
6  client about what it was that this case hinged
7  on, and my affidavit is, um -- is based on and
8  relies on those oral conversations with the
9  clients.
10   Q.  Those oral conversations with the
11 client, by client you mean the plaintiffs'
12 attorneys?
13   A.  That's correct.
14   Q.  Do you intend to write any other
15 reports or affidavits prior to class
16 certification hearings that were scheduled in
17 this case to begin in November?
18   A.  Um -- I haven't been asked to, um --
19 and I'm not sure what will come out of
20 conversations that I have with the clients.
21 But as I sit here today, I haven't made any
22 plans in that regard.
23     MR. BECNEL:
24        Counsel, to put you on notice,
25        that after our experts are deposed and

32  (Pages 122 to 125)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 142

1   is to gain a familiarity with -- that we needed
2   to gather prior to making the decision to open
3   an office, but part of it also is just general
4   purpose information.
5           I was writing an article for the
6   Journal of Real Estate Literature, of course
7   that's attached here. I wanted to get general
8   impressions about the marketplace as part of
9   the research I was doing for that article. So
10  it's all, um -- basically research on my
11  nickel, not on my client 's, to get better
12  familiar with how the market dynamics were
13  working pre and post-Katrina.
14      Q.  So as a result of your extensive
15  examinations do you feel that you have a
16  fairly -- or do you feel you have an adequate
17  understanding of the New Orleans market that
18  would allow you to advocate your opinions at
19  the class certificate hearing scheduled in
20  November?
21      A.  Yes.
22      Q.  You don't have to do any more
23  extensive examination for purposes of that
24  hearing?
25      A.  I'm not going to suggest that I won't,

---

Page 143

1   but --
2           MR. MEUNIER:
3               Again, subject to my earlier
4           objection reservation that counsel
5           developing legal strategy may invite
6           him to do more. But subject to that
7           qualification he can answer for
8           himself.
9       A.  I'm not going to suggest that I won't,
10  but I don't at this juncture have to.
11  EXAMINATION BY MR. ZWAIN:
12      Q.  How many neighborhoods are there in
13  the class as defined in the levee case?
14      A.  I don't know.
15      Q.  How many markets?
16      A.  Well, the word market has a bit of a,
17  um -- lay connotation to it. As a --
18      Q.  Well, you used the term New Orleans
19  market at Paragraph 4 of your affidavit. What
20  did you mean by that?
21      A.  I'm thinking of New Orleans broadly as
22  being a real estate market. Admittedly, a
23  person who might buy a house in one
24  neighborhood might not be a potential buyer of
25  a house in another neighborhood, but broadly

---

Page 144

1   defined New Orleans can certainly be considered
2   one comprehensive market.
3       Q.  How many neighborhoods are there in
4   the class defined by the levee complaint?
5       A.  At this point, I don't know. That's
6   something that we would certainly empirically
7   determine when we begin doing our quantitative
8   what you guys might call merits analysis.
9       Q.  What is the topography of any of those
10  neighborhoods?
11      A.  Well, without a map in front of me,
12  I'm going to make a general characterization.
13  Compared to other parts of the country, one
14  might consider most of New Orleans to be flat.
15  But in fact there's a rolling topography such
16  that, for example, in Lakeview you might have a
17  change in elevation of as much as ten or twelve
18  feet in a span of just a short distance. So
19  compared to, say, my own home neighborhood of
20  the Cascade Mountains, it's pretty flat.
21  Compared to a wheat field in Iowa -- or a corn
22  field in Iowa, it's fairly rolling in some
23  places.
24      Q.  Have you familiarized yourself yet
25  with the mix of residential uses or commercial

---

Page 145

1   uses, or governmental uses, industrial uses
2   that affect any particular area or neighborhood
3   within the class defined by the levee
4   complaint?
5       A.  Not specifically to the various
6   neighborhoods within the class definition.
7   Clearly, that's the sort of work that we would
8   do at the empirical investigation phase of our
9   analysis.
10      Q.  Would your answer to my question be
11  the same if I were to pose it with reference to
12  the MRGO complaint?
13      A.  That's correct.
14      Q.  What is your understanding of how the
15  class is defined, or the proposed class is
16  defined by the levee complaint?
17      A.  Broadly speaking, it's defined by a
18  series of subclasses that have to do with,
19  um -- areas that flooded from, um -- either
20  water from the MRGO canal or water from the
21  Lake Pontchartrain. In general, it's made up
22  of subclasses defined by the topography of
23  areas east and west of the canal.
24      Q.  What's the difference in topography of
25  areas east and west of the canal?

---

JOHNS PENDLETON COURT REPORTERS                 800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 146

1    A.  Well, at this point I can't comment on
2    that, but we will certainly.
3        Q.  You don't know?
4        A.  That's correct.
5        Q.  What's the difference in topography
6    between any of the subclasses identified in the
7    levee complaint?
8        A.  That's part of what we're going to
9    examine in our empiric investigation.
10       Q.  Don't know that?
11       A.  Don't know.
12       Q.  You say in the third sentence of
13   Paragraph 4 that since the Murphy Oil spill
14   matter concluded, quote, we have continued to
15   gather data about the New Orleans market, and I
16   continue to conduct personal inspections of
17   neighborhoods affected by the flooding.
18       Did I read that correctly?
19       A.  Yes.
20       Q.  What data have you gathered?
21       A.  I think that sentence probably ought
22   to focus on the personal inspections and less
23   on the data.  We've actually not gathered an
24   extensive amount of data.  There is in the file
25   box, for example, a, um -- copy of the National

Page 147

1    Geographic which has a great article about New
2    Orleans in the current edition.
3        Q.  Do you regard that as data?
4        A.  Yes.  We've got material from the
5    Urban Land Institute, we've got data from the
6    Brookings Institute, we've got data from the
7    Whitehouse post-Katrina study, we've got a
8    great deal of data that I and, um -- Professor
9    Dermisi gathered for the article that just came
10   out in the Journal of Real Estate Literature.
11   So all of that is what I'm referring to when I
12   talk about data.
13       Q.  Regarding the Urban Land Institute,
14   you cite something from them in your article.
15   If you could turn to Page 225 of that article,
16   which is attached to your report, I want to ask
17   you something about that.
18       A.  I'm at 225, yes.
19       Q.  Look at Footnote 8.
20       A.  Yes.
21       Q.  It says, under -- you see where it
22   says Zone A?
23       A.  Yes.
24       Q.  And then if you look at the second
25   sentence, it reads:  It is anticipated that

Page 148

1    block-by-block and even parcel-by-parcel
2    analysis will be required, and great care must
3    be taken to get the residents to determine
4    appropriate patterns of reinvestment.  In many
5    cases, partial and even block reconfigurations
6    may be needed.
7        What does that sentence mean to you?
8        A.  Well, first, there is nothing in that
9    sentence that's inconsistent with a mass
10   appraisal model I want to stress that.
11       Q.  I just asked what it meant to you.
12       A.  I understand, and I'm trying to tell
13   you, counsel.
14       Q.  Okay.
15       A.  Um -- number two, the -- ULI 's
16   analysis does not preclude the notion of
17   gathering consistent data throughout the
18   market, but it does recognize the fact that the
19   data within whatever database is put together
20   is going to have to have a certain level of
21   specificity.
22       Q.  I just asked what the sentence meant
23   to you.
24       A.  I understand.  Counselor, I'm trying
25   to answer that.

Page 149

1        Q.  Okay.  Go ahead.
2        A.  Thank you.  That sentence then means,
3    to me, that in the conduct of a mass appraisal
4    model our databases will include information
5    specific to individual parcels and properties.
6    So within the context of the work I do, and
7    within the context of my reading of the ULI 's
8    recommendations, I find great support for
9    creation of a large scale, comprehensive
10   database such as we would propose to do in this
11   case.
12       Q.  So you agree with the sentence I just
13   read?
14       A.  Every bit of it, yes.
15       Q.  You said that the use of the term
16   market was a layman 's term.  What did you mean
17   by that?
18       A.  Well, I want to make sure that I'm not
19   imbuing any economic meaning, or shall I say
20   meaning within the jargon of economics, to the
21   word market.  I'm tending to use the word
22   market in a broader context.  Market does have
23   some meanings within the field of economics
24   which are somewhat different from the way most
25   people take it.  When I'm using the word market

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 150

1  in here, I'm referring as one might generally
2  refer to New Orleans as one big market.
3      Q.  But it's not, is it?
4      A.  Um -- in some contentions, it is.  So
5  I don't know that I would agree with what you
6  just said.
7      Q.  In what context is it not?
8      A.  Well, if someone says, you know, I
9  just got a job teaching at Tulane, I need to go
10 buy a house in New Orleans, so as they begin
11 thinking about moving here, they initially, and
12 correctly, think of New Orleans as one big
13 market made up of varying neighborhoods.
14     Q.  What's the definition that you would
15 use as a professional appraiser or refinance
16 expert, of neighborhood?
17     A.  Well, a neighborhood, within a market,
18 has certain, um -- cohesive factors, which mean
19 that one house in that neighborhood has very
20 much the same valuation components, in a
21 hedonic sense, as any other house in that
22 neighborhood.
23     Q.  All right.  I take it there are
24 multiple neighborhoods within the City of New
25 Orleans and within the Parish of St. Bernard.

Page 151

1      A.  That's correct.
2      Q.  How many neighborhoods are there
3  within the City of New Orleans?
4      A.  As I sit here today, I'm not prepared
5  to answer that question.  That's something that
6  we would empirically determine as part of our
7  investigation.
8      Q.  How are any of those neighborhoods
9  distinguished from one another?
10     A.  Well, it's an empirical
11 distinguishing, that is to say, um -- one would
12 not from a real estate valuation perspective
13 distinguish one neighborhood from another
14 neighborhood until one had examined the pricing
15 in these neighborhoods and --
16     Q.  And you have not done that?
17     A.  Not yet.
18     Q.  So you don't have any idea as we sit
19 here today how many neighborhoods you might
20 ultimately determine there to be in the New
21 Orleans market.
22     A.  Well, that's a little pejorative,
23 counselor.  I mean, I know that we're talking
24 about a finite and measurable number of
25 neighborhoods.  I recognize that we're not

Page 152

1  talking about thousands of neighborhoods.  We
2  may not even be talking about hundreds of
3  neighborhoods.  But certainly within the New
4  Orleans market and within the affected area
5  we're talking about more than a few.  So it's
6  not as if I have no idea, it's that it's a
7  matter that we would empirically investigate.
8      Q.  What is your idea?
9      A.  That we have more than a few but
10 probably less than a hundred.
11     Q.  Can you estimate for me, or what's
12 your appreciation of the number of
13 neighborhoods that exist in Subclass 1 of the
14 levee complaint?
15     A.  I don't have that information yet.
16     Q.  Subclass 2?
17     A.  Same answer.
18     Q.  Subclass 3?
19     A.  Same answer.
20     Q.  Subclass 4.
21     A.  Same answer.
22     Q.  Subclass 5?
23     A.  Same answer.
24     Q.  Subclass 1 of the MRGO complaint.
25     A.  Same answer.

Page 153

1      Q.  Subclass 2?
2      A.  Same answer.
3      Q.  Subclass 3?
4      A.  Same answer.
5      Q.  Subclass 4?
6      A.  Same answer.
7      Q.  You say in the sentence I've just
8  quoted from that you continue to conduct
9  personal inspections of neighborhoods affected
10 by the flooding.
11         Did I read that correctly?
12     A.  Yes.
13     Q.  What neighborhoods have you inspected
14 personally?
15     A.  Well, for example, Wednesday we'll go
16 back over the Lakeview neighborhood --
17 singular.  I suspect we will also traverse some
18 other neighborhoods.  My wife and I have talked
19 about going up in some other parts of town.
20     Q.  Okay.  But that's what you're going to
21 do, right?
22     A.  Right.
23     Q.  What have you done?
24     A.  Now since then, I was, um -- well,
25 again, Lakeview, we've gone all along the

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 162

1 that they're not inconsistent with one another.
2 They --
3    Q.  I'm sorry.
4    A.  The lines may not match up perfectly,
5 but --
6    Q.  I'm sorry.  Go ahead.
7    A.  -- but my understanding of the extent
8 of the flooding and my extent of the modeling
9 work, particularly having conversed with the
10 attorneys about this, is sufficient for me to
11 believe that the modeling work will be
12 congruent with the opinions I've expressed in
13 my report.
14    Q.  Have you seen the modeler's report?
15    A.  No.
16    Q.  What have the attorneys told you about
17 what the model will show?
18    A.  They have just -- they have given me a
19 broad stroke understanding of where the water
20 came from and what the underlying concepts of
21 these subclasses are.
22    Q.  Where did the water --
23    MR. MEUNIER:
24       I don't want you to share any
25    underlying concepts you shared with

Page 163

1    counsel.
2    MR. ZWAIN:
3       I don't want underlying concepts
4    either, but I want facts.
5    MR. MEUNIER:
6       I just want to make sure we don't
7    step into privileged discussions.
8    MR. ZWAIN:
9       I don't know what underlying
10    concept is, I just want facts.
11 EXAMINATION BY MR. ZWAIN:
12    Q.  Where did the water come from?
13    A.  Let's talk about MRGO first.  Well,
14 first things first.  This is not a
15 representation of what the clients have told
16 me, but a representation of my own, um --
17 understanding of the flooding, which predates
18 my in engagement in this case.
19    Q.  When you say clients, you're talking
20 about the lawyers who hired you?
21    A.  That's correct.  Whenever I use the
22 word client I'm always referring to the
23 attorneys who engaged me.
24    Q.  Regardless of what source is, what's
25 your understanding -- let's talk about MRGO

Page 164

1 first -- of where the water came from?
2    A.  That the water came up the MRGO canal
3 following Hurricane Katrina.
4    Q.  Where was there a breach or
5 overtopping of water relative to Subclass 1?
6    A.  I don't know.
7    Q.  What about relative to Subclass 2?
8    A.  I don't know.
9    Q.  How many breaches or overtoppings were
10 there on the MRGO?
11    A.  Offhand, I don't know.
12    Q.  How many breaches -- is MRGO the only
13 source of water for the MRGO class?
14    A.  I'm sure I've read that, and not from,
15 um -- work I've done with the attorneys, but
16 just general information that I've read, but as
17 I sit here today I can't recall that.
18    Q.  Okay.  What is the source of water for
19 the levee case?
20    A.  And again, this is my own personal,
21 um -- data gathering prior to my engagement in
22 the case and not representative of any
23 information that's been provided to me by my
24 clients, but my understanding is it came from
25 Lake Pontchartrain.

Page 165

1    Q.  Okay.  How did it get into the levee
2 case class area?
3    A.  Oh, a series of floodings and
4 breaches.
5    Q.  How did the floodings and breaches
6 occur?
7    A.  Again, I've read that, but as I sit
8 here today, it's not germane to what I've
9 written and as a result I don't have it fresh
10 in my mind.
11    Q.  Where did the water come from
12 regarding Subclass 1 in the levee case?
13    A.  Again, I don't know.
14    Q.  Subclass 2?
15    A.  As I sit here today, I don't know.
16    Q.  Subclass 3?
17    A.  Same answer.
18    Q.  4?
19    A.  Same answer.
20    Q.  5?
21    A.  Same answer.
22    Q.  How, if at all, do the neighborhoods
23 in New Orleans correlate with the subclass
24 boundaries as defined by the plaintiffs?
25    A.  That's a matter I'll have to

42 (Pages 162 to 165)

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 170

1  a statistically valid, extraordinarily
2  efficient and rigorously peer reviewed
3  methodology in which one can accomplish this
4  thing without spending millions of dollars in
5  unneeded costs and years of time. So if you
6  want to know all of the damage to properties in
7  a particular subclass, if you want to know all
8  of the damage to properties in a particular
9  neighborhood which were flooded as opposed to
10 the properties in that neighborhood that
11 weren't flooded, if you want to know Sam and
12 Susan Jones' house and how much it was damaged
13 by the flood, we'll be able to pull that out of
14 the database. In fact, using a valid, sortable
15 database, I can give you a total of how many --
16 how much dollar damage was done to all the
17 houses with fireplaces. I can give you a
18 damage figure for all the houses that are one
19 story as opposed to all of the houses that are
20 two story. So that using this kind of model
21 that I'm proposing here provides a set of
22 exceptionally powerful tools not only for the
23 plaintiff attorneys but as well as for the
24 defense attorneys and certainly provides a
25 level of efficiency for the Court that just

Page 171

1  doesn't -- isn't available any other way.
2      Q. You say that the amount of damages,
3  the amount of damage can be determined on a
4  subclass-by-subclass basis expressed as a
5  percentage of loss of pre-Katrina property
6  value. Right?
7      A. Correct.
8      Q. Am I understanding that correctly to
9  mean that you will be in a position to
10 calculate each individual 's percentage of loss
11 on a subclass-by-subclass basis?
12     A. Or on a type of property by type of
13 property basis, or on -- if you want to know
14 the percentage loss for John and Susan Jones'
15 house, we can do it that way, too.
16     Q. Okay. Also, if I'm understanding you
17 correctly, what you will not be able to
18 determine, and what you're expressing no
19 opinions about, is the amount of damage
20 expressed in the necessary repair costs in
21 order to repair damage caused by flooding.
22     A. At this juncture, um -- it's not my
23 anticipation to do that. At this juncture, my
24 anticipation is to develop a comprehensive loss
25 in value model, that is to say, what is the

Page 172

1  diminution in value which would encompass both
2  the anticipated repair costs as well as any
3  stigma damage which might be associated with
4  other economic losses in the marketplace. So,
5  as is well captured in the literature,
6  immediately after Katrina a loss in market
7  value of an individual property, or a whole
8  collection of properties, would be the sum of
9  that anticipated repair cost plus the stigma
10 damages dealt to the property.
11     Q. Well, are you going to be able to
12 delineate what repair costs might be
13 attributable to wind and rain as opposed to
14 flood?
15     A. Well, with can certainly delineate
16 what loss in value might be attributable to
17 flood as opposed to other factors. And indeed,
18 we have got some very powerful tools, such as
19 survey research, which have proven to be
20 consistently useful and acceptable not only for
21 determining the total amount of market value
22 lost to a given property but also to be able to
23 delineate, on a statistically valid and
24 reliable basis, how much loss is attributable
25 to one component as opposed to how much loss is

Page 173

1  attributable to another component. That's
2      In the Murphy Oil case, that's
3  precisely what we were in the process of doing
4  when the case finally settled.
5      Q. Are you going to be able to attribute
6  or allocate value lost to a particular source
7  of damage, in other words, waters coming from a
8  particular place as opposed to another place?
9      A. I'm not sure I understand that
10 question.
11     Q. Are you going to be able to attribute,
12 on any particular property, that amount of
13 damage attributable to water coming from the
14 17th Street Canal as opposed to the London
15 Avenue Canal, for instance?
16     A. Oh, I see. Well, that's an intriguing
17 research question. As I sit here today, it
18 seems like something that would certainly be
19 doable. We've been thinking about flooding in
20 the aggregate, that is to say if you have a
21 particular house and it's been flood damaged,
22 what's it's loss in market value. But if the
23 modelers tell us that there is an apportionment
24 issue, that this damage ought to be apportioned
25 between 60 percent that water and 40 percent

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 174

1  this other water, then that becomes almost a
2  trivially simple exercise. And if in fact the
3  modelers can draw a geographic model over water
4  and express that through GIS shape files or
5  other statistical, um -- expressions or other
6  mathematical expressions, it becomes almost
7  trivially simple to incorporate that into our
8  valuation model.
9      Q.  And what if they can't?
10     A.  In other words, what if it's unknown
11  as to how much water on Sam and Susan Jones'
12  house came from this source as opposed to this
13  other source?
14     Q.  What if the plaintiffs' modelers can't
15  make an attribution with respect to how much
16  damage was allocated -- allocable from one
17  source of water as opposed to another source of
18  water?
19     A.  Well, then in my somewhat lay opinion,
20  that becomes a matter for the Courts to decide.
21  We, as valuation experts, can certainly tell
22  the Court what the aggregate amount of
23  diminution of value to Sam and Susan Jones'
24  house is and then leave it up to the Court to
25  decide how much of that damage to allocate to

Page 175

1  one defendant as opposed to how much to
2  allocate to another defendant. My lay
3  understanding is the Courts do that all the
4  time.
5      Q.  Okay. Who are the defendants or
6  potential parties at fault with respect to the
7  17th Street Canal?
8      A.  Oh. I don't know.
9      Q.  London Avenue Canal?
10     A.  You know, I haven't got myself, um --
11  bogged down in that, because who might be at
12  fault here is not part of -- you know, my job
13  is not to lay fault on people, my job is just
14  to measure.
15     Q.  Industrial Canal?
16     A.  I don't know.
17     Q.  Do you have an understanding as to
18  where the water from any of the canals went?
19     A.  You know, I think I read that, but I
20  can't recall offhand. And when say read it,
21  not in the material provided to me by my
22  clients, but in general reading and studying
23  I've done about New Orleans.
24     Q.  Does your model deal with, or does
25  your -- model. Does your projected model deal

Page 176

1  with business interruption loss?
2      A.  Well, we haven't gotten to the
3  specifics of that yet.
4      Q.  Does your business model deal with
5  anything other than diminished real estate
6  values?
7      A.  We haven't gotten specific to that
8  yet. We certainly can. I mean, that's
9  something that's, um -- easily modelable and
10  doable.
11     Q.  Well, but you were asked -- I think we
12  just discussed a moment ago that you were asked
13  to determine from a real estate analysis and
14  appraisal perspective whether this case can
15  best be analyzed by a class action. Right?
16     A.  Right.
17     Q.  That's what you're doing in this case,
18  right?
19     A.  Right.
20     Q.  You're not undertaking to do anything
21  else, so far as we know, correct?
22     A.  Correct.
23     Q.  Turning to Paragraph 7, the fourth
24  subparagraph, can plaintiffs be found who are
25  representative of the class and adequately

Page 177

1  represented so as to protect the interests of
2  the class? Do you see that?
3      A.  I do.
4      Q.  Have you made any determinations as to
5  whether or not the proposed class
6  representatives are representative of the class
7  and adequately represent the class?
8      A.  I haven't made any determination.
9  I've had conversations with the clients about
10  this issue from an appraisal perspective and
11  how, um -- in our work in cases like this it's
12  often useful for us as appraisers to have class
13  representatives who are within the -- any
14  statistical sample we take. But, um -- other
15  than that, I haven't made any particular
16  empirical determination.
17     Q.  Do you know whether these class
18  representatives are within any statistical
19  sample that you might take?
20     A.  I haven't made that determination.
21  That's something that we will make a
22  determination of when we get to the empirics
23  component of this.
24     Q.  So you won't have that determination
25  made by November.

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 178

1    A.  I didn't say that.
2    Q.  Well, I'm asking you.
3    A.  We may be asked to do that, but we
4  haven't done it yet.
5    Q.  So in answer to my question are
6  these -- do you think these class
7  representatives adequately represent and
8  protect the interests of the class, your answer
9  is you don't know?
10   A.  I haven't made any sort of empirical
11 determination about it.  I know that sounds
12 like a fancy way of saying I don't know, but
13 it's a little different.
14   Q.  That's what it sounds like.
15   A.  It's a little bit different.
16   MR. BECNEL:
17       Counsel, remember, you're not
18   entitled to merits discovery right
19   now.  This is certification only.
20   MR. ZWAIN:
21       That's why I'm asking about the
22   class representatives.
23   MR. BECNEL:
24       No.  Merits.  Three fourths of
25   what you've been asking for the last

Page 179

1     hour is merits.
2  EXAMINATION BY MR. ZWAIN:
3    Q.  Do you know whether all of the
4  properties located within any class boundary --
5  subclass boundary flooded?
6    A.  Perhaps I didn't understand that
7  question.  Could you repeat it, please?
8    Q.  Do you know whether all of the
9  properties located in each subclass boundary,
10 either from MRGO or levee, flooded?
11   A.  Not yet.  That's something I'll
12 empirically determine as part of the merits
13 investigation.
14   Q.  Do you know the percentages of those
15 houses or those properties that flooded as
16 opposed to those that did not?
17   A.  Again, that's something that I'll
18 determine as part of the merits investigation.
19   Q.  Do you know the percentage of
20 properties that flooded due to rainwater as
21 opposed to those that flooded due to canal
22 breaches?
23   A.  Same answer.
24   Q.  Do you know the percentage of those
25 that flooded due to rainwater or canal breaches

Page 180

1  or overtopping?
2    A.  Same story.  Same answer.
3    Q.  To the extent that there are
4  properties within any class boundaries that did
5  not flood, would you expect those properties'
6  values to be diminished or increased?
7    A.  That would be a matter for empirical
8  investigation.
9    Q.  You don't know.
10   A.  Well, I'm going to stick with that
11 would be a matter for our empirical
12 investigation.
13   Q.  That investigation won't take place
14 until after the class certification hearing is
15 complete?
16   A.  Properly so, that's correct.
17   Q.  The model that you propose to suggest
18 to the Court as a basis in part to support
19 class certification, what will your valuation
20 date be?
21   A.  Well, there are two answers to that
22 question.  From a practical matter, we're going
23 to have a conversation with our clients to make
24 that determination.  Um -- my recommendation,
25 however, will be that the unimpaired values of

Page 181

1  properties be valued immediately before
2  Katrina, and the impaired values of the
3  properties will be effective immediately after
4  Katrina.  But there are occasions when the
5  Courts have asked us to use other dates more
6  arbitrarily set.
7    Q.  So for pre-Katrina values, you're
8  going to use values effective August 28th 2005?
9    A.  I believe that's the date, yes.
10   Q.  For post-Katrina value, you're going
11 to use values August 30th, 2005?
12   A.  Right.  Assuming the, um -- our
13 clients and the Court, um -- concur with that
14 recommendation.
15   Q.  And why are you going to select as the
16 valuation date for a post-Katrina value
17 August 30th, 2005?
18   A.  Well, you want to pick a date
19 immediately after Katrina.
20   Q.  Why?
21   A.  In other words -- well, if you have an
22 event which occurred, and we want to, um --
23 pick up an impact of that event, it's a little
24 bit, um -- silly, in fact -- I mean, we could
25 pick any arbitrary date and say what's the

JOHN KILPATRICK (LEVEE VOL I)                                8/13/2007

Page 194

1  floor, those sorts of things. That's what
2  carries you up to about ninety thousand on the
3  rehab.
4      Q.  Was the purchase of this property
5  financed by Gulf Coast Bank?
6      A.  Yes.
7      Q.  Was there an appraisal done in
8  connection with that purchase?
9      A.  Yes.
10     Q.  Who did the appraisal?
11     A.  I can't remember.
12     Q.  But it was an individual appraisal?
13     A.  Yes.
14     Q.  Do you know whether all the damage to
15 your townhouse was flood damage or was there
16 some wind and rain damage?
17     A.  Um -- there was a minimal amount of
18 wind damage. Um -- we went ahead and had the
19 place rerofed anyway, even though it -- the
20 house was about fifteen years old. The roof
21 was about fifteen years old, and so I went
22 ahead and had it reroofed. It was the first
23 thing I did after I bought it, at a cost of I
24 think $2,300. So I don't know how much of that
25 was wind damage and how much of it was just old

Page 195

1  age of the roof, but I went ahead and had that
2  done anyway.
3      Q.  Was there ever a blue roof on the
4  roof?
5      A.  There wasn't when I bought it.
6      Q.  Okay. Do you know the names of the
7  people you purchased from?
8      A.  Yes. As I testified this morning, it
9  was Mr. and Mrs. Lester Sack. S-A-C-K.
10     Q.  And where is Mr. Sack today?
11     A.  He lives in the warehouse district
12 here in New Orleans.
13     Q.  Did he buy a new condominium after he
14 sold his townhouse?
15     A.  I don't know what his living
16 arrangements are now other than he lives in the
17 warehouse district.
18     Q.  You made mention previously to cost
19 savings that you felt would result from use of
20 mass appraisal techniques as opposed to
21 individual appraisals and the time that might
22 be saved by doing mass appraisal as opposed to
23 individual appraisals.
24         Did I understand you correctly about
25 that?

Page 196

1      A.  Yes.
2      Q.  If you were retained to do a mass
3  appraisal, damage model report, whatever you
4  call it, what do you think it would cost in
5  terms of fees and expenses?
6      A.  Well, I don't have a good estimate of
7  that. These kinds of cases range anywhere from
8  a hundred thousand to a million dollars in
9  terms of the appraisal expense. A lot of that
10 depends on, um -- a number of factors that I
11 haven't ascertained at this point. We have
12 done cases like this for in the range of a
13 hundred thousand.
14     Q.  Well, the largest case I think you've
15 had in terms of numbers of properties was that
16 case up in West Virginia. Is that right?
17     A.  That's correct.
18     Q.  How much did that cost?
19     A.  I don't know. I would estimate that
20 our budget to date is somewhere north of a half
21 a million.
22     Q.  In the West Virginia case.
23     A.  That's correct.
24     Q.  You would expect that preparation of a
25 damage report and model would be greater in

Page 197

1  this case than it would be in that case?
2      A.  I have no estimate of that one way or
3  the other. The -- you know, what I do know is
4  that any way you stack it up, it's going to be
5  at least an order of magnitude cheaper than
6  doing individual appraisals on these
7  properties.
8      Q.  Well, what's the cost of doing
9  individual appraisals on the property?
10     A.  Well, let's do the math. We've got a
11 hundred and fifty thousand houses, let's say,
12 at three hundred bucks a throw, just for the
13 appraisers. That assumes we can hire enough
14 appraisers. That's forty-five million dollars.
15 Now, if you're going to run this project,
16 you're going to have a supervisory process to
17 sort of aggregate and supervise all these
18 people. It's going to take you another, oh,
19 less say at least another 25 to 50 percent of
20 that, so let's just say that the cost alone is
21 somewhere in the sixty million range.
22     Q.  Uh-huh.
23     A.  I'm probably being conservative. I
24 don't know if you can do these properties for
25 three hundred bucks a throw, but if you can

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 198

1  that's the number.  Now, let's start talking
2  about time.  A hundred and fifty thousand
3  properties, let's say an appraiser can do --
4  and this is going to be tough, but let's say he
5  could do five a week.  Okay?  Now I'm going to
6  try to do the math in my head.  That's thirty
7  thousand man weeks, or -- and I mean people
8  weeks, because we have female appraisers, as
9  well.  Excuse me.  Thirty thousand person
10  weeks, fifty work weeks in a year, assuming we
11  give them a little bit of a vacation, is six
12  hundred person years.  If we hire, let's say,
13  every appraiser in the state of Louisiana, we
14  could probably do the job in two to three
15  years.  However, mortgage lending, eminent
16  domain and taxation in the state would freeze
17  for a period of two to three years as we sucked
18  up every available appraiser in the state.
19       So in terms of an expense, it's
20  horrendous.  In terms of an organizational
21  undertaking, yes, I would like to have the job.
22  And in terms of the disruption to the appraisal
23  community in the state of Louisiana, it's
24  utterly unprecedented.
25    Q.  You seem readily able to run a quick

Page 199

1  calculation as to how much it would take to do
2  individual approvals.  I'm just curious as to
3  why that same calculation can't be done to run
4  a mass appraisal, something you're so
5  intimately familiar with.
6    A.  Well, I said that it was going to cost
7  somewhere between a hundred thousand and a
8  million.  Given -- given the various, um --
9  components of a mass appraisal model, there are
10  a number of different ways we could stack it
11  up, and until we get into the empirics of it,
12  um --
13    Q.  You just don't know.
14    A.  I just don't know.  But it is pretty
15  obvious that it's at least an order and a half
16  of magnitude cheaper than trying to do it by an
17  individual appraisal process.
18    Q.  What does an order and a half
19  magnitude cheaper mean?
20    A.  It's got more than a zero difference
21  in the price.  I mean, we go from a million at
22  the upper end of my scale to sixty million
23  doing it the other way.
24    Q.  In paragraph 11, you talk about
25  numerosity.  And again, you mention in the

Page 200

1  first sentence, our own research into the
2  post-Katrina market in New Orleans.
3       What research into the post-Katrina
4  market in New Orleans have you done?
5    A.  Well, all of that, um -- research that
6  I detailed with respect to the five or ten
7  trips that I've made to, um -- New Orleans
8  since the end of Murphy Oil, not to mention all
9  the research that we did with respect to Murphy
10  Oil.
11    Q.  Well, I think you were talking before
12  about extensive investigation which you
13  mentioned in -- or extensive examinations which
14  you wrote about in Paragraph 4, and now in
15  Paragraph 11 we're talking about your own
16  research.  So is there a distinction between
17  the two?
18    A.  Not really.
19    Q.  Okay.  You say that your own research
20  demonstrates that tens of thousands of
21  individual properties have been similarly
22  affected by the flooding.  What does similarly
23  affected mean?
24    A.  Well, they've been flooded.  I mean --
25    Q.  By what?

Page 201

1    A.  Excuse me -- by water.
2    Q.  Coming from where?
3    A.  From various sources.
4    Q.  You say in Paragraph 17, in the second
5  sentence, that real estate markets are
6  segmented, of course, by property types and by
7  neighborhoods, and properties are heterogeneous
8  in many of their characteristics.
9       Have you made any attempts to segment
10  the real estate markets in the levee case or
11  the MRGO case?
12    A.  No.  And here we're using markets
13  somewhat more analogously to neighborhoods.  I
14  don't want to get away from the notion that New
15  Orleans is one big market and that within that
16  big market you have multiple neighborhoods.  So
17  I don't want anything I've said there to be
18  construed otherwise.  Certainly, as I testified
19  earlier, a rigorous investigation into this
20  would be part of the empirical analysis.
21    Q.  You say in the first sentence of
22  Paragraph 17, an additional common factor in
23  this case would be the local market and in
24  particular a degree of stigma in market
25  perceptions of the affected properties.

Page 206

1    A.  Well, New Orleans gets hit by storms
2  on occasion.
3    Q.  When was the last one?
4    A.  Offhand, I can't tell you.
5    Q.  Okay.  How many in the 20th century?
6    A.  Oh, I can't tell you that offhand.
7    Q.  How often has New Orleans flooded?
8    A.  That I can't tell you either.
9    Q.  What areas of town have flooded prior
10  to Katrina?
11    A.  Well, that's part of what I need to
12  study with respect to the, um -- empirical
13  component of this case.  But our focus of study
14  is going to be specific to the Katrina
15  flooding.  And in fact, it's going to be
16  empirically determinable just how much
17  diminution in value has occurred with respect
18  to Katrina as opposed to all of that flooding
19  that may have happened in the past and the
20  discounted notion of normal flooding occurring
21  in the future.
22    Q.  What's normal flooding?
23    A.  Well, you have anticipatable events.
24  I just mentioned the earthquake study out of
25  California.  Markets are pretty good at

Page 207

1  anticipating the fact that they're going to
2  have some problems.  New Orleans has,
3  throughout its history, had storms that have
4  come through, and so property values here
5  discounted normal events.  Katrina and the
6  follow-up flooding is not a normal event and
7  not discounted in real estate prices;
8  therefore, our study will be able to isolate
9  specifically what impact this Katrina-related
10  flooding has had on property values as opposed
11  to any of the other flooding that's happened in
12  the past several centuries.
13    Q.  You say in Paragraph 20, in your last
14  sentence, these effects can also be measured by
15  the same methods in areas not affected by
16  flooding and, thus, unaffected areas can be
17  used as controls for model testing.
18        What do you mean by that?
19    A.  Well, if we want to test a hedonic
20  model -- and all real estate appraisals,
21  whether you're talking about individual
22  appraisals or mass appraisals, are, at the end
23  of the day, some form of hedonic model.  If you
24  want to test that hedonic model, you can take a
25  control areas that's unaffected by the flooding

Page 208

1  and apply that hedonic model to it and get an
2  output which let's you fine tune the model.
3  The term of art in real estate appraisal is
4  called calibrating the model.  That language is
5  contained in the Uniform Standards of
6  Professional Appraisal Practice Standards Rule
7  6.  So we can use a control area to calibrate
8  whatever model is utilized empirically here.
9    Q.  Well, what control area or control --
10  what area would you want to use as your control
11  for model testing for, let's say, Subclass 1 in
12  the levee case?
13    A.  Well, we haven't determined that.
14  That's part of the empirical investigation to
15  go in and make a determination as to which
16  control areas.  And I would almost certainly
17  say plural areas would provide us with a good
18  model testings or model calibration areas for
19  the various neighborhoods in these subclasses.
20    Q.  You haven't even started to think
21  about that?
22    A.  Yeah, I've started thinking about it.
23    Q.  Well, have you identified any
24  potential areas of interest?
25    A.  No.  Not yet.  When we get to the

Page 209

1  empirics, that's something that we'll want to
2  do some testing.  But those will be empirically
3  determined class areas.  We won't try to ex
4  ante make a determination, we'll want to do
5  some appropriate empirics and make sure that
6  we've, um -- developed an appropriate set of
7  control areas.
8    Q.  So I guess would I be correct in
9  assuming that you haven't considered any areas
10  for model testing with respect to any of the
11  subclasses in either the levee case or the MRGO
12  case?
13    A.  Well, we haven't begun the empirics to
14  determine those.  That doesn't mean we haven't
15  started considering.
16    Q.  Well, what areas have you considered?
17    A.  Well, we would consider any area that
18  hasn't flooded.  we consider any area --
19    Q.  Give me an example.
20    A.  Well, we might even go to the other
21  side of the lake --
22    Q.  Where?
23    A.  -- and work over there.  I mean, I've
24  thought about going out to Metairie.  I've
25  thought about, um -- going, um -- further out.

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

---

**Page 210**

1  But we've just thought about these areas that
2  we're going to want to empirically test. And
3  unquestionably that's an appropriate and
4  important part of the empirical testing, but I
5  think we would be getting the cart way before
6  the horse if we try to arbitrarily establish or
7  even begin to identify some potential control
8  areas today without doing the appropriate level
9  of testing.
10    Q.  But what would you be testing for?
11    A.  Well, we would be testing in a
12  pre-Katrina control area for pricing models
13  that resemble what we would have seen prior to
14  Hurricane Katrina.
15    Q.  Seen where?
16    A.  In the affected area versus the
17  unaffected area.
18    Q.  The affected area being entire
19  Subclass 1, for instance, in the levee case?
20    A.  Well, neighborhoods within Subclass 1.
21    Q.  And you don't know how many
22  neighborhoods there are.
23    A.  Well, I think we determined earlier
24  today that that's an empirical determination.
25    Q.  So you'd have to get a test group for

---

**Page 211**

1  each and every neighborhood identified in each
2  and every subclass in the levee case and in the
3  MRGO case?
4    A.  Well, I'm certain that within our
5  empirical investigation we will delineate, A,
6  neighborhoods, B, neighborhood characteristics,
7  and C, pricing factors within those
8  neighborhoods affected by those neighborhood
9  characteristics.
10    Q.  Well, let me just -- let's say there's
11  a hundred neighborhoods in Subclasses 1 through
12  5 in New Orleans.  Does that mean you'd have to
13  get a hundred different control groups to
14  correspond with each of those neighborhoods?
15    A.  No.
16    Q.  What does it mean?
17    A.  It means that to the extent those
18  hundred neighborhoods have differences, we will
19  went to identify a sufficient number of control
20  areas in order to be able to accommodate those
21  hundred neighborhoods.  Now you might have a
22  hundred neighborhoods but a lot of them are
23  alike.  You might have twenty kinds of
24  neighborhood characteristics, that is to say
25  twenty sets of characteristics which define a

---

**Page 212**

1  neighborhood.  So in fact, many neighborhoods
2  might be alike, they just are different
3  neighborhoods.  And so with that, we might at
4  most need twenty control areas.  Although
5  oftentimes we find that even though two
6  neighborhoods have different pricing
7  characteristics we can capture those in one
8  control area.  So, in fact, the number of
9  control areas might be much smaller than the
10  number of neighborhoods.  You'll never need --
11  or I don't want to say never, but you hardly
12  ever need a number of control areas greater
13  than the number of neighborhoods.  But all in
14  all --
15    Q.  You might need as many control groups
16  as there are neighborhoods, and you might need
17  less, but you're still going to need multiple
18  control groups.
19    A.  Well, sure, but it's an empirically
20  manageable task.  In other words, within the
21  context of a statistically robust pricing
22  model, it's a pretty easy thing to manage.
23  It's certainly a heck of a lot easier to manage
24  this than it would be to manage a hundred and
25  fifty thousand individual appraisals.

---

**Page 213**

1    By the way, each of those hundred and
2  fifty thousand individual appraisals would have
3  to draw data from an unaffected area, and so
4  would have to go find identically the same
5  number of control areas that we'll have to find
6  in this mass appraisal model.  So I want to
7  make sure I'm making clear that the use of
8  control areas is not something that's
9  necessitated only by the model we're talking
10  about.  Even if we were to do the hundred and
11  fifty thousand individual appraisals at a cost
12  of sixty million dollars that your line of
13  questioning suggests, we would still need to go
14  find control areas from which to draw
15  comparable data.
16    Q.  What control area did the appraiser
17  who appraised your townhouse use?
18    A.  I think he used unflooded houses, or
19  excuse me, post-repair or unflooded houses in
20  the Lakeview neighborhood.
21    Q.  Was he right to do that?
22    A.  I'm not going to suggest he was wrong.
23  I mean, he managed to do an appraisal which
24  satisfied the bank and the bank reviewers.
25    Q.  Did it satisfy you?

---

54 (Pages 210 to 213)

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 226

1    A.  Well, contingent valuation is just one
2  of a whole host of survey research tools and
3  techniques.  It's a fairly large bag full of
4  tools.  Which one we pull out and use is
5  something that we'll develop when we develop
6  the scope of work of the merits phase.
7    Q.  All right.  So are you or are you not
8  going to recommend the use of contingent
9  valuation on either the MRGO model you want to
10 build or the levee model you want to build?
11   A.  Well, counselor, I may not have been
12 clear about that.
13   Q.  And it may be me.  I'm just dense.
14   A.  No, that's okay.  Let me try to be
15 clearer.
16       Every appraiser, even in an
17 individual, single property appraisal, uses
18 some kind of survey research.  When the
19 appraiser appraised the townhouse that I
20 bought, he used some kind of survey research in
21 order to ascertain what comparable data was
22 selling for and what market participants were
23 viewing in the marketplace.  So every time
24 every appraiser does every appraisal, there is
25 a little bit of survey work into it.  There are

Page 227

1  several different what I'll call systematic and
2  statistically valid methods which come into
3  play when we're looking at a large number of
4  properties; in other words, when we've got a
5  scope of work sufficient to be able to gather a
6  lot of data, we can start utilizing some
7  methodology that has some statistical validity
8  to it.  Contingent valuation is one of those
9  which, as I say, is highly regarded outside of
10 the appraisal profession by people who value
11 real estate.  It's also regarded within the
12 appraisal profession by quite a few appraisers,
13 although there are some appraisers who don't
14 like it.  They tend to be atheists on that
15 subject.
16       There's also conjoint analysis.
17 There's perceived diminution.  These three
18 together are some of the statistically valid
19 survey research techniques.  I think certainly
20 in a case here where you had a market that just
21 froze after the flooding and properties didn't
22 transact, and the market is still in what we
23 might gently call disarray, a statistically
24 valid survey research technique like this would
25 be extraordinarily valuable.  That doesn't mean

Page 228

1  we can't do it without it, that just means it's
2  a tool that we would want to bring into play
3  and would highly recommend that.
4        And so whether we use conjoint or
5  perceived diminution or contingent valuation or
6  something else will be a matter that we'll
7  decide when we put together the scope of work
8  of our merits phase.
9    Q.  Did you use any of those survey
10 research approach titles or terminologies in
11 your report?
12   A.  No.
13   Q.  Why not?
14   A.  Well, whether you choose to use those
15 or some other tools and techniques, the kernel
16 of this problem is explaining to the Court
17 whether a large, statistically valid and
18 reliable appraisal model is preferred over a
19 set of individual happenstance appraisals done
20 by four or five hundred individual appraisers
21 over a period of three years at a cost of tens
22 of millions of dollars.  The individual
23 methodologies from which the appraiser might
24 choose to employ for the mass appraisal model
25 are irrespective of the superiority of the mass

Page 229

1  appraisal model.
2        In other words, um -- it's like
3  getting sick and deciding whether to go to the
4  doctor or not go to the doctor.  If you're sick
5  and you're sick enough that, you know, you're
6  in decline, you need to go to the physician and
7  get yourself taken care of.  I mean, that's the
8  superior course of action.  You know, trying to
9  treat yourself with some aspirin and chicken
10 soup is probably not going to solve your
11 problem.  So that's what we've got here.  You
12 know, we've got a big problem, it needs to be
13 solved in a statistically valid, efficient way.
14 We don't know exactly what diagnosis the
15 physician is going to give us, and we don't
16 know exactly what treatment the physician might
17 apply, but we know that going to the physician
18 is a much, much superior course of action to
19 just staying home and getting worse and worse.
20 Those are our choices here.
21   Q.  So you may or may not use some form of
22 survey research in connection with constructing
23 your model either in the MRGO case or the levee
24 case, you haven't made that determination yet.
25   A.  Well, we're almost certainly going to

58 (Pages 226 to 229)

dffb28e8-c1d7-4049-9fbd-3ab4463f0c85

Page 273

1  up transaction prices, pricing differentials
2  that are going to include both the anticipated
3  cost of repair plus the stigma. And so I'm
4  not -- we're not going to go in and try to
5  impute stigma, we are instead going to be able
6  to go and to a certain extent directly measure
7  stigma by the diminution in property prices
8  which will help us formulate an opinion of the
9  diminution in market value.
10  Q. Um -- so you plan to look at actual
11  post-Katrina sales of property in New Orleans
12  and in St. Bernard and in the class areas to
13  determine diminished value, if any, is that
14  correct?
15  A. Well, that would be my recommendation
16  to the clients. Now, as of this juncture,
17  um -- I have recommendations rather than plans.
18  But we would certainly recommend that a
19  starting point for our analysis is going to be
20  a widespread, um -- examination of the property
21  pricing phenomenon immediately after Katrina
22  and, in fact, all the way to today.
23  Q. You told us yesterday you were going
24  to do it -- your recommendation was to do it
25  immediately post-Katrina. Now you're saying

Page 274

1  you're going to look at it all the way up until
2  whenever you get your report done; is that
3  right?
4  A. No, that's not what I said.
5  MR. MEUNIER:
6  Objection to the form.
7  A. Our proposed valuation date would be
8  immediately after Katrina. Um -- we can, of
9  course, oblige whatever arbitrary date might be
10  established by the Court. But nonetheless, in
11  order to formulate an opinion of value
12  immediately after Katrina, we would be remiss
13  in not capturing any data which might be
14  available to us during the period from Katrina
15  right up until the day we, um -- put wet ink on
16  a paper.
17  Q. And let's take your hypothetical
18  hundred thousand dollar piece of property that
19  includes a structure, a home, and the real
20  property pre-Katrina. You've used that
21  example, I believe, here before. Right? And
22  let's say today, and this is a property touched
23  by water in some way, it's worth a hundred and
24  fifty thousand dollars.
25  Does it have a diminished value?

Page 275

1  A. Well, let me give if an actual
2  example. I mean, that's a hypothetical, but I
3  think reality is probably more explanatory than
4  hypothetical. Yesterday we talked about a
5  townhouse that I bought in order to create an
6  office here in, um -- New Orleans. In the
7  small, um -- enclave of townhouses where I
8  bought this, pre-Katrina these townhouses had
9  been selling in the high three hundred, low
10  four hundred range. So let's take the middle
11  of that and go four hundred. The particular
12  townhouse that I acquired had damage to the
13  first floor as a result of flooding, no damage
14  to the second, and de minimis damage to the
15  roof. I was able to acquire that townhouse,
16  um -- roughly, almost two years after Katrina,
17  at a price of about a hundred and fifty
18  thousand dollars. I'm not sure of the exact
19  number.
20  If prices in New Orleans had been
21  going up at pre-Katrina rates, and I'm just
22  going to pick an almost arbitrary percentage of
23  5 percent a year, it may have been a little
24  less than that, it may have been a lil little
25  more, but let's say that, that four hundred

Page 276

1  thousand dollar townhouse should have been
2  worth about four hundred and forty, four
3  hundred and fifty thousand dollars. So I
4  picked it up for a hundred and fifty thousand
5  dollars, or a diminution in value of roughly
6  two-thirds of its otherwise unimpaired value.
7  Now, that diminution in value was a sum of the
8  anticipated repair cost, which as I testified
9  yesterday would be somewhere between sixty and
10  ninety thousand dollars, and the stigma damage,
11  that is to say the loss in value from it being
12  in a neighborhood which was subjected to the
13  flooding that is at the heart of this case. So
14  there, we've got one example of absolute actual
15  diminution in value of a property in the flood
16  area that withstood about an 8-foot floodwater
17  into the ground floor, um -- and is repairable
18  and has a, um -- an anticipated repair cost.
19  Um -- that's the sort of market data that we
20  want to gather on a class-wide basis and
21  present to the Court as a part of our opinion.
22  Q. So am I to understand you are not
23  going to recommended that there be a contingent
24  value survey done to determine stigma or
25  diminished value in these two cases?

1  because of people's personal circumstance.
2  Fortunately enough, we have a very simple and
3  easy to apply mechanism, which is a diminution
4  in market value, that captures both of those,
5  the anticipated cost of repair plus the
6  additional stigma over and above that.
7      Q.  And just so I understand, you won't be
8  looking at any individual plaintiff's actual
9  receipts or what they actually spent to restore
10  the property to get where you were just talking
11  about, is that correct?
12      MR. BECNEL:
13          Objection, repetitious.  It was
14          covered yesterday.
15      A.  As our core, um -- measurement, we
16  will be looking at the market pricing
17  phenomenon.  In the same way that we will look
18  at some sort of survey research, some sort of
19  formalized, such as conjoint measurement, it's
20  highly likely that we will survey some market
21  participants, some random sample of those, to,
22  um -- get an understanding of, um -- of their
23  own specific, um -- experiences in order to
24  flesh out and explain to the Court why market
25  value is a valid measure of the diminution in

1  value.  So, um -- in answer to your question,
2  we will look at some situations, we will survey
3  some people to get their, um -- actual
4  experiences, but that won't be the core
5  valuation model that we will use.
6  EXAMINATION BY MR. MARPLE:
7      Q.  If we go back to Mr. Mundy and
8  McLean 's article, which is 8, on 294, one of
9  the criticisms he notes in his little bold
10  subheading there is Funny Money.  You see that?
11      A.  Yes.
12      Q.  And as I understand what he's talking
13  about is -- well, maybe you can tell me what
14  he's talking about here.
15          What's this criticism all about with
16  funny money?
17      A.  Well, again, um -- he's doing, um --
18  two things here.  Number one, he's describing a
19  hypothetical situation and, of course, as I
20  have already testified, that hypothetical
21  situation bearings no, um -- has no bearing on,
22  um -- this flooding case because we're going to
23  be dealing with realities.  Number 2, Dr. Mundy
24  and Mr. McLean are offering up an example of a
25  factor which appraisers need to control for.

1  And, um -- these -- and all of these factors
2  have now been taken into account in other,
3  um -- supportive material subsequent to this
4  1998 article which helps appraisers explain or
5  understand, um -- how to do, um -- these kinds
6  of surveys.
7      MR. BECNEL:
8          Counsel, if you're going to keep
9      using exhibits, I think the rule is
10      that you're supposed to provide us a
11      copy of them.
12      MR. MARPLE:
13          We've got you one.
14      MR. BECNEL:
15          Well, then let's have them.  I
16  haven't gotten one.
17      MR. MARPLE:
18          You haven't asked for one.
19      MR. BECNEL:
20          No, no, but that's the rule.
21  It's not the rule for me to have to --
22      MR. MARPLE:
23          You've got it.
24      MR. MEUNIER:
25          Can I have a copy of the Mundy

1  article?
2      MR. BECNEL:
3          I want every one of them.  I want
4  the newspaper, I want the National
5  Geographic, I want every one of them.
6      MR. MARPLE:
7          Sorry, I don't have one of the
8  National Geographic.
9      MR. BECNEL:
10          Then you better get it or
11  withdraw it.
12      MR. MEUNIER:
13          Whatever new exhibits you're
14  bringing in today we'd like.  As you
15  hand the witness one, why don't you
16  hand us one.
17      MR. MARPLE:
18          Sure.  Are y'all satisfied on
19  that?  I gave you one.
20      MR. MEUNIER:
21          One will do for our side.  One
22  total.
23  EXAMINATION BY MR. MARPLE:
24      Q.  You recognize what we've marked as
25  Exhibit 9, correct?

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 317

1    There's a copyright on this, and
2    unless you have a waiver of the
3    copyright or you have purchased the
4    copyright, that's improper and it's
5    subject to the copyright infringement.
6    So I'm just pointing it out to you
7    before you do it.
8    MR. MARPLE:
9        Counsel, I don't want to debate
10   fair use with you.
11   MR. BECNEL:
12       Okay.  That's fine.  Long as you
13   know you're violating the law.
14   MR. MEUNIER:
15       If the question is whether this
16   is the article he had previously cited
17   in --
18   MR. MARPLE:
19       His testimony immediately before
20   the break.
21   MR. MEUNIER:
22       That's right.  Before the break.
23   A.  It appears to be that.
24   EXAMINATION BY MR. MARPLE:
25   Q.  Now, I think you told us that you

Page 318

1    could do a sampling or survey of repair cost as
2    part of what you might do in this case.  Is
3    that right?
4    A.  I think I said that I would propose
5    doing that as a supplement to explain the
6    validity of market value observations.
7    Q.  And have you put together any protocol
8    to do that in this case?
9    A.  No.  But I could assure you whatever
10   protocols we put together will follow proper
11   form and substance, um -- as is expressed in
12   best practices in the appraisal profession.
13   Q.  Now, as part of any model that you've
14   done to establish diminished value, have you
15   done such a such a survey of repair costs?
16   A.  Yes.
17   Q.  And in which case?
18   A.  Oh, I can't recall.  Um -- I, um -- I
19   mean I know I've done one, but it's been a long
20   time since we've done that sort of thing.
21   Um -- I'd have to go back and reflect on that.
22   Q.  Approximately how long ago was it?
23   A.  It's quite a few years ago.  I did a
24   good bit of work on what are called
25   construction defects.  I'm a what's called a

Page 319

1    professional member of the International Code
2    Council, which is the group that writes the
3    building codes here in the United States.  And,
4    um -- I have, as a result of that, written some
5    articles about, um -- the valuation implication
6    of various kinds of construction defects.  As a
7    part of the research for those articles, as
8    well as a few cases that I testified on, um --
9    I did some surveys of construction costs, and
10   of course I've kept abreast of construction
11   costs, um -- as a result of my work as an
12   appraiser.  Um -- and as a result of my work
13   with the International Code Council.  So
14   exactly when those were, four, five, six years
15   ago are probably the most recent that I've done
16   something like that.
17   Q.  And have you done modeling work in
18   connection with a class action to sample or
19   survey or evaluate repair costs?
20   A.  Um -- we did a study, um -- a very
21   informal survey, the sort of informal survey
22   that appraisers do all the time, in St. Croix,
23   Virgin Islands about these kinds of issues,
24   um -- and appended that to our property value
25   report.  I think I testified about that

Page 320

1    yesterday.
2    Q.  And just let me ask you, was that one
3    of the reports you said you could find and
4    would produce to us sometime here in the near
5    future?
6    A.  If we submitted an affidavit about
7    class certification in that case, then that is
8    one, yes.
9    Q.  And would it have these appended to
10   it, what you just mentioned?
11   A.  Well, the damage report in that case
12   would.  Now, my understanding from yesterday
13   was that what I'll be asked to submit is any
14   affidavit that we have, um -- submitted in
15   support of class certification.  What I'm
16   hearing you say now is something different,
17   which is the actual merits report, which is
18   different from what I thought I understood that
19   I was agreeing to yesterday.
20   Q.  And how long ago did you do that, what
21   you're now referring to as the damage report or
22   merit report in the Virgin Islands case?
23   A.  It's been a couple of years.  I want
24   to say more than two years ago.
25   Q.  You do have it, correct?

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 341

1  house a couple of months ago at a two-thirds
2  discount from the approximate otherwise
3  unimpaired value. So I think mere restoration
4  of services has not totally alleviated the
5  potential for stigma damages. Nonetheless, our
6  model will pick that up.
7      Q. Have you conducted an individual
8  appraisal of residential property in the last
9  four years using a Fannie Mae Form 1004?
10     A. Yeah.
11     Q. And when did you do that?
12     A. I can't remember. I know I've done
13 quite a few in the last four years. I just
14 can't remember exactly when or where. I would
15 guess it been a couple of dozen.
16     Q. And were those for lenders?
17     A. Um -- I doubt it very strongly. Um --
18 I would say these were probably either for
19 investment or litigation purposes.
20     Q. Let me show you what we've marked as
21 Kilpatrick Deposition Exhibit 12. Do you
22 recognize that as a Fannie Mae Form 1004?
23     (Kilpatrick Exhibit 12 was marked for
24 identification and is attached hereto.)
25     A. I do. I have the software in my

Page 342

1  office to print these out. It's like a canned
2  software package, and there are different
3  providers who, um -- have a contract with
4  Fannie Mae and Freddie Mac to be able to print
5  this form out. We use a firm called "a la
6  mode" software in our office, and I can get a
7  key and fill in all these blanks and do it
8  right from my laptop in my office.
9      Q. And so am I to understand you can, if
10 you want to, you, meaning Mr. Kilpatrick, can
11 fill out a lot of the information that is asked
12 for, or for which there are blanks to fill in,
13 from your desk?
14     A. Well, um -- after appropriate field
15 research, you can. I mean, um -- the starting
16 point for filling this form out is to go out in
17 the field and do field research. On an
18 individual property-by-property basis, it
19 eventually gets pretty expensive if we're going
20 to do a whole bunch of them. That's why this
21 is an appropriate form to use if you just want
22 to appraise one house. But if you want to
23 appraise a hundred and fifty thousand houses,
24 or even a hundred or a couple of hundred or a
25 thousand, a mass appraisal model consistent

Page 343

1  with Appraisal Standards Rule 6 is the accepted
2  and appropriate method for doing that.
3      Q. The Universal Residential Appraisal
4  Report, Fannie Mae Form 1004, is the maybe even
5  required but certainly the accepted individual
6  appraisal report form that's used by most
7  lenders when they're doing individual
8  appraisals of residential property, correct?
9      A. On an individual basis. But including
10 the addendum, this report here is fifteen pages
11 long. No, if I was going to produce this
12 fifteen-page report on a hundred and fifty
13 thousand properties, that would be a document
14 two million two hundred and fifty thousand
15 pages long. It would certainly be much more
16 efficient for the Court if I were to do this in
17 a computerized database and a simple mass
18 appraisal report summarizing all of that rather
19 than burdening the Court with reading two
20 million two hundred and fifty thousand pages of
21 individual appraisal reports.
22     Q. With respect to any work you're doing,
23 I take it you're not going to do any modeling
24 or anything for any health problems that any of
25 the class members or putative class members may

Page 344

1  have, right?
2      A. No, that's not my field.
3      Q. And that would include you're not
4  going to do any modeling or work on mental
5  distress or emotional distress that any class
6  member may have. Is that right?
7      A. No.
8          MR. MEUNIER:
9              Counsel, just for the record, you
10         meant to associate with the appraisal
11         report those two attachments, the
12         frequently asked questions and the --
13         MR. MARPLE:
14             Oh, sure.
15 EXAMINATION BY MR. MARPLE:
16     Q. You understand, and I think you may
17 have referenced, Mr. Kilpatrick, that there's
18 some explanatory materials attached to that
19 that came from the Fannie Mae website. Is that
20 right?
21     A. That's correct. What's missing from
22 here are, um -- forms for photographs of the
23 property, sketches of the property. If in fact
24 this was required by a lender, I wouldn't send
25 the lender these frequently asked questions,

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 345

1  but I would send the lender various addenda and
2  appendices which would include the text of,
3  um -- any, um -- limiting conditions or
4  assumptions or hypothetical conditions, plus
5  photographs and maps of the property itself as
6  well as the comparables.  So when I said that
7  this document would go up to about fifteen
8  pages, that's the typical length of a Fannie
9  Mae or Freddie Mac Uniform Residential
10 Appraisal Report submitted, um -- for, um --
11 Fannie Mae underwriting.
12    Q.   And you told us you've done several of
13 these in the last four years, and I apologize
14 if you already answered, but were they done in
15 connection with litigation reports?
16    A.   Probably.  They may have also been
17 done for investment purposes.  Or I think in
18 one case we had a, um -- we do a fair amount of
19 investment consultation, things like that.  And
20 I think we were aiding a, um -- an estate in,
21 um -- disposing of a single-family residence
22 that had a value in the eight to ten million
23 dollar range.  So we started out by doing an
24 appraisal, and I think we used a URAR form for
25 that, and then we followed up with a

Page 346

1  consultation project on the estate disposition.
2  In short, we do those for a lot of things.  I
3  cannot recall a circumstances in which we did
4  one for financing purposes.
5     Q.   You're familiar with the Appraisal of
6  Real Estate 12th Edition, correct?
7     A.   Yes.
8     Q.   And you cite it in your report as
9  being an authoritative and reliable source on
10 the appraisal of real estate, correct?
11    A.   I mean, to the extent -- to the
12 extent -- it is what it is.  I mean, it's,
13 um -- it's exceptionally valuable and used as a
14 textbook for appraisal courses.  But let's
15 don't lose site of the fact that it is what it
16 is.
17    Q.   Can I have a copy of your report?  I
18 think it might be Exhibit 4.
19    A.   Which report?
20    Q.   Deposition Exhibit 3 or 4.
21    A.   There we go.  Here's Deposition
22 Exhibit 3.
23    Q.   In your report, you say that the
24 Appraisal of Real Estate 12th -- and that's the
25 back I have here, right?

Page 347

1     A.   Yes.
2     Q.   -- is universally regarded as the
3  leading authoritative guide on the subject in
4  the world today.
5        Meaning the appraisal of real estate,
6  right?
7     A.   Yes.
8     Q.   Have you done work to determine the
9  number of housing units in New Orleans East, or
10 the New Orleans East subclass of MRGO?
11    A.   No, not yet.
12    Q.   Or in St. Bernard Parish?
13    A.   No, not yet.  Well, let my take that
14 back.  We did some studies about St. Bernard
15 Parish with respect to the Murphy Oil case.  I
16 don't have that number memorized, but as I
17 recall yesterday I cited a database of
18 twenty-eight thousand plus properties which we
19 had gathered in St. Bernard Parish.  So I think
20 that is indicative of the research we've done
21 thus far in St. Bernard Parish.
22    Q.   And do you know if that's the totality
23 of the properties, or is that something less
24 than the whole, the twenty-eight thousand?
25    A.   As I sit here today, I can't tell you.

Page 348

1     Q.   And did that include businesses?
2     A.   Again, I can't tell you.
3     Q.   And I assume then you don't know if it
4  included professional offices, retail stores,
5  shopping centers, or any other aspect or type
6  of property.  Right?
7     A.   Well, we do know from our studies in
8  St. Bernard Parish that there are some
9  properties that have mixed uses.  In other
10 words, you might have somebody who owns a home
11 and runs a chiropractor 's office in the ground
12 floor, or has a, um -- automobile repair shop
13 in the backyard.  These are not uncommon mixed
14 uses in some lightly zoned residential
15 neighborhoods.
16    Q.   And with respect to those people who
17 may be a chiropractor or a car repair guy that
18 may have claims for damages from lost business,
19 are you going to model that and opine to the
20 Court as to what those damages are for business
21 losses?
22    A.   We have not been asked to do --
23       MR. MEUNIER:
24          Objection, just on the basis that
25          it's repetitive and was already asked

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 349

1   and answered yesterday.
2       A.  Our report is going to be focused on
3   market value of real estate.  And by the way,
4   when I say market value, I want to be sure to
5   note that there are varying definitions of
6   value, and I think I have already cited here
7   today that one commonly defined standard of
8   value is called market value.  It's promulgated
9   by federal lending organizations, and in fact
10  the text of that is contained in this Fannie
11  Mae report which is Exhibit 12.  State of
12  Louisiana promulgates two other, um --
13  definitions of fair market value, one
14  statutorily and one administratively.  We'll
15  include all of these definitions in our report
16  and, um -- reconcile them for purposes of
17  establishing a basis of value.
18      Q.  And so have you done that yet,
19  reconciled those definitions?
20      A.  I have done them in other cases here
21  in Louisiana.  Um -- I recently wrote, in a
22  particular case, in a different piece of
23  property, in a different part of Louisiana,
24  that -- I reconciled the language of those
25  three and showed, um -- how they were, um --

Page 350

1   for purposes of that analysis, consistent with
2   one another.
3       Q.  And what is your definition of market
4   value once you've done all that?
5       A.  Well, we don't attempt to formulate an
6   ad hoc opinion of market value or an ad hoc
7   definition, we simply cite all of them and
8   discuss the differences among them, and, um --
9   for purposes of their relevance with respect to
10  the analysis we're doing.
11      Q.  Well, I understand, but at the end of
12  the day in this case, in the merits end of it
13  as you call it, when you actually get a damage
14  report, are you going to have to have -- at
15  that point will have defined market value?
16      A.  I will have defined our basis for
17  value.  And it may very well be -- include the,
18  um -- market value definition proffered by
19  federal organizations for federal lending, but
20  it also -- we will provide and cite the
21  statutorily provided definitions of value here
22  in the state of Louisiana.  We don't want to
23  leave anything out.
24      Q.  And so you may get different numbers
25  depending on the definition you use.

Page 351

1       A.  No, I don't think so.  In the case --
2   other case that I just wrote a report on, which
3   has not been submitted anywhere yet, it's still
4   in process, so to speak, um -- we found that
5   for purposes of our analysis there was no,
6   um -- difference.  Now, um -- the definition of
7   value, that is to say establishing the basis
8   for value, in the, um -- appraisal analysis, is
9   part of what's called the scope of work
10  decision which is done right up front in what
11  you attorneys would call the merits analysis.
12  When we get to the actual, um -- boots on the
13  ground portion of this case, one of the very
14  first things we will do is reconcile those
15  definitions, and they will provide guidance for
16  gathering data.  As a result of that, we won't
17  come up with different values based on
18  different definitions of value, we will
19  reconcile all of that prior to the data
20  gathering portion of our analysis.
21      Q.  And if I understood you correctly,
22  you've done that in this other case in
23  Louisiana, and so do you contemplate that you
24  could come up with a different definition in
25  this case?

Page 352

1       A.  I don't contemplate that.  I suspect
2   as we sit here today that, um -- the same
3   finding that I had in that other case, which is
4   that the other definitions, plural, of value
5   established by law and regulation in the state
6   of Louisiana will be internally consistent with
7   the language of the definition of market value
8   used in federal lending.  But, hey, you just
9   pointed out the Appraisal of Real Estate 12th
10  Edition, and if you turn to Page 24, you'll
11  find an essay -- I think it's Page 24 -- you'll
12  find an essay which, um -- outlines I believe
13  it's 15 definitions of value which can be used
14  by appraisers in different circumstances.  And
15  in fact they go on to provide language in,
16  um -- in that discussion to show that various
17  definitions of value are applicable in various
18  circumstances.
19      So we're not wedded to anything in
20  particular, but as good appraisers we will
21  determine the standard of value right up front,
22  we will provide that, we will provide a
23  citation to it, and we'll explain what that
24  means in the context of the analysis we're
25  doing.

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 357

1  done any studies of the knowledge of flood risk
2  by the public in New Orleans East or St.
3  Bernard or the Lower 9th Ward prior to Katrina?
4      A.  Um -- well, the focus groups helped us
5  with that.  In fact, that was part of the
6  questioning in the focus groups, was to elicit
7  from people their anticipation of flood risks
8  as buyers in this market, or for that matter
9  buyers in other hurricane or flood prone
10  communities such as Wilmington, Corpus Christi
11  and St. Charles, Missouri.  We chose those
12  communities for focus groups specifically
13  because people who have bought homes in those
14  communities are aware of the risks -- and I'll
15  call them the normal and anticipated risks, of,
16  um -- of flooding and/or hurricanes.
17      Q.  All right.  And those focus groups
18  were done after Katrina, right?
19      A.  That's correct.
20      Q.  And did those focus groups which we
21  have here ask questions or determine any
22  knowledge of risk by anybody of these
23  participants of flood risk prior to Katrina?
24      A.  That's exactly what we were asking.
25      Q.  All right.  And then did you ask them,

Page 358

1  okay, now what do you know about it now?
2      A.  Yes.
3      Q.  Is any work you're doing going to
4  include renters?
5      A.  To the extent that rental values
6  impact the market value of homes, we're
7  certainly going to survey rental rates before
8  and after Katrina.  And that may include an
9  actual survey of renters, but it will certainly
10  include a survey of landlords, property
11  managers, brokers, and other market
12  participants to inquire about rental rates
13  before Katrina and rental rates after Katrina.
14      Q.  As it would affect value of the homes,
15  correct?
16      A.  Correct.
17      Q.  Not as determining a percentage or any
18  amount of damage that a renter gets.
19      A.  That's correct.
20      Q.  Okay.  And would a renter have the
21  same amount of intangible stigma, injury, or
22  whatever that is, as a homeowner?
23      A.  Renters are going to have a couple of
24  different layers of damage, but that's not part
25  of this case.  That's not part of what we're

Page 359

1  measuring.  Our focus is on market value of
2  homes themselves.  And so, um -- the varying
3  stigma levels suffered by renters is outside
4  the scope of what I've contemplated or what I'm
5  opining to here.
6      Q.  And are you proposing that there is a
7  model for which you can construct the damage to
8  rental property, property that is owned for
9  rental purposes, whether it be a home or a
10  duplex or an apartment complex?
11      A.  If it's, um -- a residence which is a
12  part of this, um -- study, um -- and it has the
13  potential to be rented and rental rates in that
14  neighborhood can be ascertained, then certainly
15  for the sake of completeness we'll include that
16  as part of our analysis.
17      Q.  And what about an apartment complex,
18  let's say a 100-unit apartment complex, are you
19  going to opine on the diminished value or
20  perhaps increased value of an apartment
21  complex?
22      A.  Well, I haven't, um -- determined yet
23  from my clients whether non residential
24  property is going to be part of the case, but
25  certainly if non residential property, that

Page 360

1  is -- and when I say non residential property,
2  I include apartment complexes because it's
3  income producing, exclusively income producing.
4  So if you have apartments, office buildings,
5  shopping centers, industrial property, vacant
6  land, um -- whatever, even public buildings
7  within a flooded area, all of that is easily
8  ascertainable because all of those have pre and
9  post-Katrina determinable market values.  And
10  so we could, in the same kind of model, model
11  pre and post-Katrina market values of every
12  square inch of the flooded area irrespective of
13  its pre or post-Katrina use.
14          And by the way, that will also take
15  into account properties which have a change in
16  use pre and post-Katrina.
17      Q.  And you could do a refinery?
18      A.  Well, I could, sure.
19      Q.  I mean, is that within the scope of
20  this, the Murphy Oil Refinery; are you going to
21  come up with a diminished value for Murphy Oil
22  Refinery?
23      A.  I have not yet asked whether the
24  actual Murphy Oil Refinery is included in the
25  property list to be appraised.  If it is, we'll

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 369

1   measure of central tendency.
2          Now, indeed counselor, if in fact the
3   truth is that $100,000 houses pre-Katrina are
4   selling for $200,000 today, then your clients
5   win. And this is the only way to get at the
6   truth of that.
7       Q. Or if we had actual sales data and
8   showed that we can get at it that way, too.
9       A. Well, that's exactly what I propose to
10  do, counselor. And in fact, whichever side is
11  right in this case, whether the plaintiffs are
12  right or the defense is right, all I'm
13  proposing to do is to follow the tried and true
14  methodology on a large scale, statistically
15  valid basis to get at the truth. And so the
16  only thing I'm proposing to do here is study
17  the actual data in the marketplace on a
18  statistically valid and reliable basis in order
19  to get at the truth. And if the truth falls
20  down on the plaintiffs' side, so be it. If the
21  truth falls down on the defense side, so be it.
22  But any objection to the analysis I'm proposing
23  is an objection to a statistically valid method
24  of getting at the truth.
25      Q. Is the market now in equilibrium?

Page 370

1       A. Don't know. But that's something that
2   can only be tested in a large scale,
3   statistically valid analytical process.
4       Q. And it could be or could not be,
5   correct?
6       A. Well, it could or could not be, but,
7   you know, if I was going to try to perform an
8   individual appraisal, the likes of which you
9   were suggesting with the Fannie Mae form a
10  minute ago, then I'd still have to do a large
11  scale test of this market in order to determine
12  whether sales in the marketplace were
13  equilibrium sales or not. So in fact even if I
14  wanted to use this one Fannie Mae appraisal
15  form which is Exhibit 12 in order to perform a
16  single appraisal in that marketplace, for it to
17  be in any way, shape or form valid I'd have to
18  start out with some sort of large scale test in
19  order to determine if the comps in the
20  neighborhood were indeed valid comps.
21      Q. All right. Market data of actual
22  sales is going to be one of the primary forms
23  of data or sources of data post-Katrina that
24  you're going to use, right?
25      A. Both pre and post-Katrina. But yes,

Page 371

1   that's correct.
2       Q. All right. But then in addition,
3   you've mentioned different kinds of surveys for
4   different issues to screen for or to provide
5   information to you, right?
6       A. Consistent with best practices in the
7   appraisal profession, we, um -- would
8   recommended to our clients that we can use
9   survey research in order to help explain the
10  phenomenon that we're observing in the
11  marketplace.
12      Q. And have you developed any protocol or
13  budget that -- for how many of these surveys
14  that you would conduct?
15      A. No. We haven't developed that yet,
16  but certainly as part of the scope of work
17  process in the merits phase we will develop
18  those protocols.
19      Q. There are sales of residential
20  properties that have taken place in New
21  Orleans, quite a few, now, in 2007 and
22  particularly second half of 2006, correct?
23      A. Yes. I think we have already
24  discussed the fact that I bought one of them.
25      Q. Yeah. And typically each of those

Page 372

1   residences, if they were sold to -- from one
2   private owner to the other, would have had --
3   the lender would have done an appraisal,
4   something similar to the Form 1004 we have
5   talked about earlier, right?
6       A. Um -- one would think so. I have not
7   examined all those transactions, but if in fact
8   the property has been financed with a federally
9   regulated mortgage, then that would be the
10  protocol.
11      Q. Let me ask you if you're familiar with
12  a book called A Guide to Appraisal Valuation
13  Modeling published by the Appraisal Institute.
14      A. The name sounds familiar. Who's the
15  author of it?
16      Q. The authors are Mark L. Linne and
17  Stephen Cane and George Dell.
18      A. Yes, I'm familiar with it. I reviewed
19  it.
20      Q. You did?
21      A. Yes. I was the reviewer on that book.
22      Q. Is this the one, or one of the ones
23  you told us you did review earlier?
24      A. It is.
25      Q. All right.

JOHN A. KILPATRICK (VOL II)                        8/14/2007

Page 377

1  ones.  We can come back to that, and maybe
2  we'll stop and do that, but I'm letting you
3  know where I was going with this.
4         The location.
5     A.  It may be.
6     Q.  The neighborhood name.
7     A.  It may be.
8     Q.  Real estate taxes.
9     A.  They may be.
10    Q.  Whether it's owned in fee simple or
11  some other ownership.
12    A.  Um -- that probably would be.
13    Q.  The asking price.
14    A.  Probably not.
15    Q.  Conditions in the contract for sale.
16    A.  Probably not.
17    Q.  For instance, subject to below market
18  financing.
19    A.  No.  In fact, that's a condition of
20  sale which appraisers are supposed to adjust
21  away in determining value.
22    Q.  Would that be a factor that a buyer or
23  seller might consider in an individual
24  transaction?
25    A.  Yeah.

Page 378

1     Q.  Financing?  Chinese financing,
2  whatever you want to call it.
3     A.  Well --
4     Q.  Maybe that wasn't a good question.
5     A.  Well, without respect to any
6  particular type of financing, the, um -- the
7  nature of the financing, pro or con, may
8  influence the price pro or con.  It doesn't
9  influence the underlying value.  So in an
10  individual appraisal, the appraiser has to take
11  that into account in determining value.  In a
12  mass appraisal, the appraiser has to take it
13  into account but usually does so by making some
14  examination of whether or not those factors on
15  a mass appraisal basis are normally
16  distributed, that is to say you've got as many
17  plus signs as you have minus signs.  If in fact
18  it's determined that the factors are not
19  normally distributed, then you have to make
20  some accounting for that.
21         Um -- so, um -- it's something you
22  consider in the valuation process for sure, but
23  it doesn't -- the availability of exceptional
24  financing, good or bad, does not, per se,
25  influence value, unless that's a long-term

Page 379

1  systematic reality.
2     Q.  Does the perceived or actual growth
3  potential of a neighborhood affect market
4  value?
5     A.  Generally, yes.
6     Q.  It could be rapid, stable or slow.
7     A.  Could be.
8     Q.  Or something else.
9     A.  Or something else.
10    Q.  And whether property values are
11  increasing, stable or declining is a factor in
12  determining market value, right?
13    A.  Could be.
14    Q.  Zoning?
15    A.  Could be.
16    Q.  I mean, you mentioned earlier it could
17  be mixed use zoning which would allow
18  residences and some sort of businesses being
19  run out of homes, or other uses mixed in with
20  residential?
21    A.  Could be.
22    Q.  And not always, but more often than
23  not mixed use would have an adverse effect on
24  residential property value, right?
25    A.  Not necessarily.  That's -- I see

Page 380

1  increasing trends toward higher value property
2  in mixed use neighborhoods.
3     Q.  And do you know how many mixed use
4  neighborhoods there are in St. Bernard Parish?
5     A.  No, but that's something that we'll
6  investigate in the empirical, that is to say
7  the merits phase of our analysis.  Naturally,
8  it would -- it's included in the model that we
9  plan to develop, we just haven't done that yet.
10    Q.  And same would be true, then, I take
11  it, in New Orleans East or the Lower 9th Ward?
12    A.  Of course, that's something we
13  recommended to our clients that we incorporate
14  as part of our analytical process.
15    Q.  And the neighborhoods that have mixed
16  use may well have a different end result in
17  diminished value, if that's the result, than
18  one next door that's not mixed use, right?
19    A.  We identified yesterday -- I had
20  discussed under oath that we would do a, um --
21  an analysis on a neighborhood-by-neighborhood
22  basis.  That's part of the model that I'm
23  proposing to the Court here.
24    Q.  Now, there is also grandfathered uses
25  in individual properties, right?

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 433

1     A.  Well, again, I think I testified
2  already that I have not done a, um -- thorough
3  investigation of that.  I only know what I read
4  about in the newspaper.  And I recognize the
5  fact that adjudicating Road Home from an
6  appraisal perspective turned out to be
7  horrendously expensive and probably could have
8  been done considerably cheaper if they had
9  opted to use a mass appraisal model.
10     Q.  And you don't know whether the Road
11  Home program considered using the mass
12  appraisal approach and decided against it or
13  what their reasons were for doing it the way
14  that they're doing it, right?
15     A.  Well, you know, I don't want to blow
16  my own horn here, but I think we testified
17  yesterday that my firm is one of the few in the
18  country that's really set up to do one of these
19  in this kind of circumstance, and I know they
20  didn't call me.
21     Q.  Are you familiar with Morris Knutsen?
22     A.  Name's familiar, but I don't know how
23  I know that name.
24     Q.  Or Washington Group International?  Do
25  you know what their role would be, if any, in

Page 434

1  this litigation?
2     A.  No.
3     Q.  You haven't done any work for them, I
4  take it.
5     A.  No.
6     Q.  To the extent that some sort of
7  diminished value of cultural heritage or
8  anything like that is involved in this case,
9  you're not the person that's going to opine on
10  what those factors are or what goes into that,
11  you would only quantify something somebody else
12  did?
13     A.  Well, the quantification is manifested
14  in market values.  The decline in cultural
15  heritage, public services, loss of schools,
16  churches, utilities, services, all those kind
17  of things, are things which contribute to the
18  diminution in market value.  So indeed it gets
19  the cart before the horse to try to talk about
20  cultural services and then use that to opine
21  with respect to property value diminution.  We
22  will observe property value diminution but then
23  use those kind of factors to explain the things
24  that we're seeing.
25     Q.  And I think you've testified there

Page 435

1  could be a lot of different factors that would
2  go into that diminished value.
3     A.  And by isolating the time period
4  immediately surrounding the flood, we'll be
5  able to control for changes in those another
6  factors exogenous to the problem.
7     Q.  And you haven't developed a protocol
8  for how you would allocate these various
9  factors, whether it's loss of cultural heritage
10  or fear -- perceived fear of future flooding,
11  or anything like that, to determine how you
12  would allocate within whatever the diminished
13  value, if any, is, is that right?
14     A.  At the present, we haven't, although
15  it doesn't seem to be a terribly complicated
16  problem.  Certainly this is one of the benefits
17  of using survey research, it becomes almost
18  trivially simple to, in a statistically valid
19  and comprehensive manner, determine from among
20  various reasons how much one would allocate to
21  A versus B versus C.
22       (Brief recess.)
23  EXAMINATION BY MR. MARPLE:
24     Q.  Mr. Kilpatrick, have you ever seen
25  what we've marked as Exhibit 17 before?

Page 436

1       (Kilpatrick Exhibit 17 was marked for
2  identification and is attached hereto.)
3     A.  Yeah.  I did.
4  EXAMINATION BY MR. MARPLE:
5     Q.  And Mr. Wilson, here, the author, has
6  criticisms of mass appraisal method, right?
7     A.  That's correct.
8       MR. BECNEL:
9          Counsel, once again this is a
10  copyrighted document.
11       MR. MARPLE:
12          Will you advise him as to fair
13  use?
14       MR. BECNEL:
15          I don't think you can do that.
16       MR. MARPLE:
17          You know, he produced a bunch of
18  this stuff.
19       MR. BECNEL:
20          Yeah, but he isn't a lawyer.
21       MR. MARPLE:
22          Oh, it a different rule for
23  lawyers?
24       MR. BECNEL:
25          Yeah.

46 (Pages 433 to 436)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

Page 453

1    Q.  Let me show you what we have marked as
2  Exhibit 19.
3       Have you seen that article?
4       (Kilpatrick Exhibit 19 was marked for
5  identification and is attached hereto.)
6    A.  Um -- I don't think so.
7  EXAMINATION BY MR. MARPLE:
8    Q.  All right.  And so you, um -- one of
9  the things that's being reported here is that a
10 person came back to their home after Katrina
11 and it was unscathed.  And I'm asking if that
12 rings a bell or you know, have read that
13 newspaper account before.
14   A.  I don't recall reading that in the
15 newspaper.
16   Q.  All right.  And you've certainly, I
17 take it, if you've looked through that, don't
18 have any reason to dispute what's being
19 reported there factually.  Right?
20   A.  No.
21   Q.  I show you what we've marked as
22 Exhibit 20.
23       Have you seen that article before?
24       (Kilpatrick Exhibit 20 was marked for
25 identification and is attached hereto.)

Page 454

1    A.  No.
2  EXAMINATION BY MR. MARPLE:
3    Q.  And let me ask you something.  You've
4  produced an article to us out of the
5  Times-Picayune in the box or in your reliance
6  material, I think it was in the box.  Do you
7  remember that?
8       MR. BECNEL:
9          No.
10   A.  I may have, yes.  I can't recall.
11      MR. BECNEL:
12         I think it was USA Today.
13      MR. MARPLE:
14         You may be right.
15 EXAMINATION BY MR. MARPLE:
16   Q.  It was a newspaper article that talked
17 about the New Orleans real estate market, and
18 it was about June or July 27th, but within the
19 last month or two, right?
20   A.  May very well have, yes.
21   Q.  All right.  And have you undertaken to
22 do a newspaper search in the Times-Picayune or
23 USA Today to determine what's being said,
24 publicly, about the recovery of the real estate
25 market or the state of the real estate market

Page 455

1  in New Orleans?
2    A.  No.  We will, of course, when we get
3  to the merits portion of our analysis.
4  Naturally, that would be consistent with the
5  model we're proposing to use in here to provide
6  explanatory information for the empirical
7  observations that we'll measure in the
8  marketplace.
9       MR. BECNEL:
10         Counsel, let me enter an
11      objection.  I think Mr. Wade Ragas has
12      stated in the article that the repairs
13      plunged by 42 percent -- or the prices
14      plunged by 42 percent.  And he's an
15      expert for one of the defendants in
16      here.  After having talked to some of
17      the plaintiffs in here, I think he's
18      conflicted out.  But I'm quite
19      concerned about that.
20 EXAMINATION BY MR. MARPLE:
21   Q.  By the way, you cited Mr. Ragas'
22 article, one of his articles, it's the one
23 about the St. Bernard Parish --
24      MR. BECNEL:
25         14 years ago.

Page 456

1  EXAMINATION BY MR. MARPLE:
2    Q.  -- done back in 1991 or whatever it
3  was, right?
4    A.  Yes.
5    Q.  I believe that's all I have.
6  EXAMINATION BY MR. ZWAIN:
7    Q.  Okay.  Dr. Kilpatrick, I'm going to
8  try not to repeat what we have already done.
9  If I do, it's an oversight so I apologize I in
10 advance.
11      MR. BECNEL:
12         We'll stop you.
13      MR. ZWAIN:
14         Thank you.
15 EXAMINATION BY MR. ZWAIN:
16   Q.  Have you been told that class
17 certification will not be sought to prove what
18 damages floodwaters caused to a particular home
19 or property?
20   A.  Um -- I haven't had those
21 conversations with my clients.
22   Q.  All right.  If that were true, what I
23 just said, how would it impact, if at all, your
24 understanding of what your role in this case is
25 about?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 457

1    A.  Well, I'm not sure I understand that
2  question, then.
3    Q.  Okay.  Do you have an understanding
4  that the model you are to recommend or advocate
5  for use by the Court is to include an appraisal
6  of individual pieces of real estate owned by
7  individual class members?
8    A.  Well, I understand that, um -- but
9  there's a little bit of a subtle nuance here.
10  I'm not recommending a model to the Court, per
11  se, I'm trying to explain to the court what the
12  appropriate model is.
13    Q.  I understand.
14    A.  It may seem like a subtle difference
15  to you, it's a real difference to me, but that
16  model will of course include an appraisal
17  opinion of value on each and every residence in
18  the affected area -- each and every property in
19  the affected area.  I think we're sticking to
20  residences here, so we'll -- I'll limit that
21  answer to residences.
22    MR. MEUNIER:
23        Perhaps just to clarify, real
24    property diminution, as an element of
25    recovery, is the subject of the Rule

Page 458

1    23 certification request by the
2    plaintiffs.  So I don't want your
3    question to be misunderstood by the
4    witness.
5  EXAMINATION BY MR. ZWAIN:
6    Q.  Well, if I'm understanding what your
7  basic bottom line opinion is going to reflect,
8  and I'm looking at, if you have your report in
9  front of you, Exhibit 3, Paragraph 6, last
10  sentence, I believe that the amount of the
11  damage can be determined on a
12  subclass-by-subclass basis expressed as a
13  percentage loss of pre-Katrina property value.
14    Did I read that correctly?
15    A.  You did.
16    Q.  So if I understand what you're going
17  to do is you are going to seek to appraise each
18  individual class member 's property value loss
19  comparing the post-Katrina value to the
20  pre-Katrina value and state a percentage of
21  what that loss is.
22    A.  Well, it will come out as a dollar
23  figure and as a percentage.  And so I might
24  have Sam and Susan Jones' house at a particular
25  address and I might -- this model, the mass

Page 459

1  appraisal model, which has proven so useful in
2  so many other situations, would determine and
3  allow me the opine that Mr. and Mrs. Jones'
4  house would have been worth a hundred thousand
5  dollars before Katrina, that it's been
6  diminished in value 50 percent, and so
7  immediately after Katrina it has a diminished
8  value of fifty thousand dollars.
9    Q.  Okay.  And that percentage or that
10  dollar figure that will you state for the Jones
11  residence will contain within it the amount of
12  diminution attributable to stigma?  True?
13    A.  As one of its components, yes.
14    Q.  And the amount of diminution
15  attributable to necessary repair costs?
16    A.  Um -- as one of the components, yes.
17    Q.  And the amount of diminution
18  attributable to economic or social disruption.
19    A.  Well, that's part and parcel of
20  stigma.  In other words, the social disruption
21  stigmatizes homes within affected neighborhoods
22  because it diminishes services, culture, the
23  neighborhood, all of those external assets
24  which make up the value of homes.
25    Q.  Okay.  So when you use economic or

Page 460

1  social disruption in your report, that's
2  synonymous with stigma.
3    A.  It's part of stigma.  It's not
4  synonymous with stigma but it's contributory to
5  stigma.
6    Q.  All right.
7    A.  And by the way, I want to be very
8  clear.  We're not going to go exogenously
9  measure stigma and then imply it in the model.
10  The model itself will measure diminution in
11  value, part of which is anticipated repair cost
12  and part of which is the other diminution in
13  value which we're labeling stigma.  Stigma is
14  just a label that we put on that diminution in
15  value which is over and above the anticipated
16  repair cost.
17    Q.  Just so I'm clear, what components
18  comprise stigma in your mind?
19    A.  Well, I don't want to try to offer an
20  all inclusive list here.
21    Q.  Do the best you can.
22    A.  I would suggest to you that
23  stigma will include but certain not be limited
24  to, um -- risk of a recurrence of, um -- the,
25  um -- post-Katrina flood, it will include a

Page 461

1  loss of community services such as schools and
2  shopping and other kinds of services, it will
3  capture all of those changes in the value of
4  the neighborhood, um -- from pre Katrina to
5  post-Katrina which have been stimulated by the
6  flood, and it will include any other factors
7  which have influenced the values of these
8  properties as a result of the flooding.
9      Q.  All right.  So those components
10  comprise stigma.  And we've talked about repair
11  costs or anticipated repairs cost as making up
12  the percentage figure which will represent
13  diminution of value of a particular class
14  members 's home.
15      Is that all that goes into that
16  percentage?
17      A.  Well, no, I don't want to make that an
18  all-inclusive list.
19      Q.  Then --
20      A.  That's just what hits me on the top of
21  my head right now.
22      Q.  Well, I'm trying to be as
23  all-inclusive as we can possible be right now
24  because I want to come to an understanding as
25  to what that percentage means.

Page 462

1      A.  Well, counsel, I've been focused very
2  narrowly on defining the model for the Court,
3  which is of course that it's a pre-Katrina
4  value model versus post-Katrina value model.
5  And I've attempted to explain to you that
6  within that model there's going to be
7  anticipated costs of repair of these
8  properties, plus an additional component, an
9  additional diminution in value which we're
10  labeling stigma.  Now, the question you're
11  positing to me is what things make up, why --
12  other than repair costs, why else would
13  properties be diminished in value?  Um -- which
14  is a matter for great study.  And indeed, as
15  part of the, um -- merits phase of this, that's
16  arts of what we're going to study.  Now, we
17  just spent a lot of time today talking about
18  contingent valuation.  One of the reasons I'm
19  going to survey people is to ask them the
20  question, why is this true, why is this
21  diminution in value occurring; in other words,
22  what is it that's causing these properties to
23  be diminished in value?  In short, counselor,
24  as I sit here today I can think of some
25  reasons, but I really want to ask the good

Page 463

1  people of New Orleans what those reasons are.
2  And that will be part of the merits phase of my
3  investigation.
4      Q.  So as we sit here today, other than
5  those categories that might comprise stigma
6  that you specifically mentioned, you cannot
7  give us or don't feel comfortable giving us at
8  this time an estimate of the number of
9  variables or varieties of influences that might
10  make up stigma damage.
11      A.  Well, just to the contrary,
12  counselor -- and first, it's not that I don't
13  feel comfortable about something.  As you'd
14  probably guess, I'm pretty comfortable
15  answering as many questions as I can as long as
16  they don't run into that gray area of ethical
17  problems.  The issue, however, is that in our
18  empirical investigation of the whys and
19  wherefores of the New Orleans market, we want
20  to let the market speak for itself.  And in
21  fact, part of our merits investigation will be
22  an exploration of why those things are true.
23  So I'm not going to try and presuppose any
24  motivations on the part of market participants
25  here in New Orleans.  Indeed, I think that a

Page 464

1  rigorous analysis of this case would require
2  that we go out and let the citizens of New
3  Orleans and prospective buyers in New Orleans
4  tell us what those reasons are.  And what's
5  what I'm going to investigate.  I'm not going o
6  put a cap on the number of reasons, I'm not
7  going to put a cap on what those reasons are,
8  and I'm not going to try to suggest any reasons
9  ex ante to this study.
10      Q.  Now, despite the likelihood -- and we
11  used the Smith property as our mythical -- the
12  Smith property as our example.  The likelihood
13  that Mr. and Mrs. Smith 's repair invoices,
14  estimates, what they paid for repair costs,
15  will not be reviewed by you or your team,
16  you're going to make an assessment as to what
17  their anticipated repair costs are anyway, is
18  that right?
19      A.  No, we're going to make an appraisal
20  of what their diminution in market value is.
21  And appraisal principles would tell us that
22  people won't pay more for a house than is
23  dictated by its anticipated cost of repair and
24  its stigma and these other factors --
25      Q.  Okay.  I guess what I'm trying to find

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 465

1  out --
2      A.  -- so it's almost a tautology.
3      Q.  What I'm trying to find out is, how
4  are you going to figure out anticipated cost of
5  repair if you're not going to do an inspection
6  or appraisal or an assessment of a particular
7  home 's repair needs?  That's what I'm trying
8  to find out.
9      A.  Well, our focus is on diminution in
10  property value, however, if indeed we want
11  to -- we are asked to parse, for each one of
12  these properties, the difference between
13  anticipated repair costs and anticipated
14  stigma, we could certainly do some sampling and
15  develop a statistical model of that.  That's
16  not what I'm proposing to do here, but it would
17  certainly be trivially easy to accomplish.
18      Q.  Well, then, I'm confused, because I
19  thought you said a minute ago that your
20  percentage, um -- is going to have two
21  components, the stigma component and the
22  anticipated repair cost component.
23      Did I miss something in the
24  translation there?
25      A.  No.  You didn't miss a bit.  It's

Page 466

1  going to have both, but the raw model, the
2  appraisal won't parse between the two.
3      Q.  Explain.
4      A.  Well, um -- let me give an example of
5  somebody who overeats and drinks beer too much
6  and as a result becomes overweight.  Um -- we
7  know he's overweight, and we can measure
8  precisely how overweight he is, but we can't
9  know how much over that overweight came from
10  eating too much, and we don't know how much of
11  that overweight came from drinking too much
12  beer.  But we know it came from the two of
13  them.
14      The precise answer here is that if we
15  measure the diminution of value of each of
16  these properties, we can tell you that
17  it's the sum of their repair costs plus their,
18  um -- stigma.  Now, precisely how much of it is
19  repair costs and how much of it is stigma is
20  not a dividing line that we are proposing to
21  cut, um --
22      Q.  I see.  Okay.  Okay.  So let's take
23  Mr. and Mrs. Smith 's home.  And let's lay over
24  that not only the anticipated repair cost and
25  the stigma damage, but let's talk about the

Page 467

1  possibility that Mr. and Mrs. Smith's home --
2  some of that damage is attributable to wind and
3  rain, some of it is attributable to water that
4  comes from overtops rather than breached
5  levees, and some of it is attributable to
6  looting or loss of electrical power or a
7  variety of other things.
8      How is your model going to account for
9  these things that, for instance, are not within
10  the control or not the legal fault of the East
11  Jefferson Levee District who is the client I
12  happen to represent in one of these cases?
13      A.  Well, I understand.  And --
14      MR. MEUNIER:
15          I want to make an objection.
16      This is repetitive.  We covered it
17      yesterday.  And to some extent the
18      answer calls for a legal analysis. .
19          Subject to those objections,
20      Mr. Kilpatrick, you can answer.
21      A.  And you know, I offered up an example
22  of the townhouse that I'm, um -- in the process
23  of converting into an office, which in the
24  greater scheme of things required a new roof
25  it had some holes in the roof and needed to be

Page 468

1  patched, and I wrote a check with, for me, is a
2  relatively trivial amount of twenty-three
3  hundred dollars and had a brand new roof put
4  on.  In the greater scheme of things, that cost
5  was, um -- I don't want to suggest that
6  twenty-three hundred dollars is
7  inconsequential, but it was certainly minor
8  compared to the roughly two hundred and
9  sixty-seven thousand dollar diminution in value
10  two hundred and fifty thousand dollar
11  diminution in value of the property as a whole.
12  The roof repair cost was roughly 1 percent of
13  the whole diminution in value.  Now, that's
14  just one anecdotal example.
15      But as a real estate appraiser, I know
16  that the measure of economic damages is a
17  diminution in value of the property.  And if
18  you have two houses side by side and have the
19  same diminution in value but one property
20  owner, let's say he's a real estate appraiser
21  from Seattle who has a little extra money and
22  doesn't feel like wielding a hammer -- and
23  certainly it's not economically advisable for
24  me to wield a hammer -- then that property
25  owner is just going to write a check to

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 469

1  contractors, and it may take him ninety or a
2  hundred thousand dollars get his house cleaned
3  up. On the other hand, you got a property
4  owner next door who has identically the same
5  sort of townhouse, identically the same sort of
6  damage, but he's retired and has a little time
7  on his hands, and money is a little tighter for
8  him so he's going to do his own hammer and
9  nails, and lay his own tile and carpet and put
10  in his own appliances. He manages to do
11  identically the same repairs for thirty or
12  forty thousand dollars. Now, counselor, if I
13  go out to measure repair costs as a standard of
14  damage, the appraiser who bought the townhouse
15  from Seattle is going to get a hundred thousand
16  dollars, and the poor retired guy who was tight
17  on a nickel is only going to get thirty or
18  forty thousand dollars. The true measure of
19  damage to both of these people is the
20  diminution in value of their property. And how
21  they choose to use that money, whether one of
22  them wants to pay a contractor or the other one
23  wants to earn some sweat equity, is up to the
24  two of them.
25      Q.  So you're going to state a figure as

Page 470

1  far as anticipated repair costs that is
2  essentially an average of the amount that each
3  home sustained.
4      A.  No. We're not going to --
5      MR. MEUNIER:
6          Objection to form. That's not
7      his testimony at all.
8      A.  I'm not going to do anything like
9  that.
10  EXAMINATION BY MR. ZWAIN:
11      Q.  What are you going to do?
12      A.  Well, we're going to measure
13  diminution in value of each and every property
14  in the marketplace using a mass appraisal
15  model.
16      Q.  And how are you going to account for
17  the specific repair costs in each individual
18  home?
19      MR. MEUNIER:
20          Objection, asked and answered.
21  EXAMINATION BY MR. ZWAIN:
22      Q.  That's what I'm trying to figure out.
23      A.  Don't need to do that.
24      MR. MEUNIER:
25          Asked and answered multiple

Page 471

1  times.
2          Go ahead.
3      A.  Don't need to do that.
4  EXAMINATION BY MR. ZWAIN:
5      Q.  Why not?
6      A.  Because the diminution in value is
7  going to include that as well as any stigma
8  loss.
9      Q.  How?
10      A.  Because it does. It's a tautology in
11  the real estate appraisal model.
12      Q.  Explain it to me.
13      A.  And it's a very simple formula,
14  counsel. Diminution in value of the property
15  equals the anticipated repair cost plus the
16  stigma damage, period.
17      Q.  And how do you plug into that equation
18  anticipated repair cost?
19      A.  You don't. You just -- you measure
20  the diminution in value and know that it
21  includes the anticipated repair cost plus
22  stigma. You don't break it out between the
23  two.
24      Q.  Okay. But if someone is paid the
25  amount that you estimate in terms of diminution

Page 472

1  of value, that amount should be sufficient to
2  repay -- or pay that person's repair costs to
3  repair his or her home?
4      A.  Anticipated repair costs plus their
5  loss of value attributable to stigma, that's
6  correct.
7      Q.  Okay. Now, do you have any
8  familiarity with any individual neighborhood to
9  determine how similar or dissimilar neighboring
10  homes may be in terms of their construction,
11  their elevations, how many stories they have
12  and so on?
13      A.  Well, I'm more familiar with some
14  neighborhoods like Lakeview than I am with
15  other neighborhoods. Um -- of course we did an
16  intensive study in the St. Bernard Parish area.
17  That having been said, um -- even if I did not
18  have that sort of familiarity, even if this was
19  my very first trip to New Orleans today, I'd
20  still be proposing identically the same model,
21  and I would be telling you that those
22  neighborhood characteristics would be developed
23  as part of the merits phase of our analysis.
24      Q.  How long does stigma take to go away?
25      A.  That's a matter for some debate. In

55  (Pages 469 to 472)

JOHN A. KILPATRICK (VOL II)                                8/14/2007

Page 485

1  door to it or within a block of it suffers very
2  little to no flooding?
3     A.  Well, your earlier question was
4  contiguous.  So now you're talking about a
5  block away.  You may very well have that sort
6  of differential a block away.  That's possible.
7  Contiguous I'd find a little bit unlikely.
8  Nonetheless, the model -- any appraisal model,
9  whether we do a mass appraisal or individual
10 appraisals, we're going to take that into
11 account.
12    Q.  How are you going to take it into
13 account?
14    A.  Well, we're going to let the data
15 speak for itself.  It's a diminution in value
16 case.  So we'll value the two houses -- the
17 only difference here is whether we value them
18 all at the same time or we hire every appraiser
19 in the region and spend three years trying to
20 appraise them one at a time and generate two
21 million pages worth of paper.  I mean, we're
22 going to take this into account in either
23 model.
24    Q.  Just tell me how the model takes in
25 into account.  That's all I want to know.

Page 486

1     A.  Well, we're going to measure market
2  values.  We'll have a market value before and
3  the market value after, and the data will speak
4  for itself.  But in the merits phase, either in
5  the two million page model or maybe the hundred
6  page model, we're going to go out and measure
7  the differential market values between the
8  house that was severely flooded versus the
9  house in your first question that's next door
10 that only had two inches of flooding.  We'll
11 have to measure that.  The data will speak for
12 itself and the model will take that into
13 account.
14    Q.  How is the model going to do that?
15 Walk me through it.
16    A.  Well, at this juncture we know what
17 the model is going to look like.  We're going
18 to have to go gather the data to see what
19 market value data in these markets tell us
20 about the value of one house versus the value
21 of another house.  In other words, you're
22 asking me to tell you just what, for example,
23 the sales adjustment grid on a house I haven't
24 appraised yet is going to look like.  I don't
25 know what the adjustments are going to be.  I

Page 487

1  don't know what the exact factors are going to
2  be.  I'm not sure exactly how much stigma this
3  house might be because it sits up on a hill in
4  a neighborhood that was otherwise flooded,
5  versus a house that sits down in a gully in a
6  neighborhood that was otherwise above water --
7  or above the water level.  So indeed, this is
8  something we're going to empirically
9  investigate in the merits phase.  It doesn't
10 have anything to do with which model we choose.
11    Q.  You haven't seen houses in
12 neighborhoods in New Orleans where on one lot
13 the house sits on a slab virtually flush with
14 the ground, and right next door to it is a
15 house raised three or four feet off the ground?
16 You've not seen that?
17    A.  As I sit here thinking about it, sure
18 we've seen that.  And counselor, we're going to
19 appraise that.  It's going to be included in
20 the appraisal.  And exactly what appraisal
21 adjustments we're going to use, as I sit here
22 today, not only would I not know but no
23 appraiser would know that.  We're going to have
24 to go out and investigate in the field the
25 market values and report that to you in an

Page 488

1  appraisal report.  But at this juncture, I
2  haven't done the merits investigation yet.  At
3  this juncture, what I'm testifying to is that
4  these factors, whatever they tend to be, will
5  be more easily ascertainable, more efficiently
6  measured, and more statistically validly
7  reportable in a mass appraisal model than they
8  would be in a grossly inefficient individual
9  house appraisal.  But we're going to measure
10 identically the same thing.  We just haven't
11 measured it yet.
12    Q.  Well, I'd still like you to tell me
13 how you're going to measure for that.  And if
14 you can't tell me, I guess you should tell me
15 you can't tell me.
16    A.  Well, I can tell you, but not today.
17    Q.  When?
18    A.  Well, once we have done our merits
19 investigation.
20    Q.  How long is that going to take?
21    A.  Well, a whole lot less time than it
22 would take if we were trying to do one
23 appraisal at a time.
24    Q.  But I didn't ask you that.
25       How long is it going to take?

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 489

1    A.  Well, after the certification of this
2 case, and once we have begun our merits
3 investigation, um -- certainly a matter of
4 months.  Not a matter of three years or more
5 the way individual appraisals would take.  But
6 it certainly will take a matter of months.
7    Q.  How many months?
8    A.  I can't tell you at this juncture.
9 More than three, probably less than twelve.
10    Q.  Okay.  How many people are you going
11 to have working on it?
12    A.  I haven't tasked that out yet, because
13 working with my client, in a manner properly
14 prescribed by appraisal standards, we will
15 develop a scope of work that's sufficient for
16 the intended use of this appraisal in this
17 case.
18    Q.  How many people with your background
19 will be asked to work on it with you?
20    A.  Well, we have got, oh, I guess about
21 eight people with Ph.D.'s on our payroll either
22 under contract or as full-time employees.  I
23 suspect, as I sit here today, um -- we may have
24 as many as four people with Ph.D.s working on
25 the project.

Page 490

1    Q.  And what are their hourly rates?
2    A.  They vary from three hundred and fifty
3 dollars -- excuse me, I think I've got one at
4 two seventy-five, up to my own six hundred.
5    Q.  All right.  And for purposes of
6 preparing this model, will you be working on
7 anything else during the time it takes to
8 prepare this model?
9    A.  Yes.  You talking about me personally
10 or my firm?
11    Q.  Both.
12    A.  Well, the firm, as I indicated
13 yesterday under questioning, has at any point
14 in time thirty to fifty projects going on.
15    Q.  Right.  You told us you're very busy.
16 So I'm just wondering how much time you have to
17 devote to this project?
18    A.  Well, I will certainly personally
19 devote a substantial amount of time.
20    Q.  How much time?
21    A.  I at this juncture can't tell you, but
22 I think it's fair to say more than, um -- 10
23 percent of my time.  But certainly less than
24 100 percent of my time.
25    Q.  What about your colleges?

Page 491

1    A.  I may very well task a couple of the
2 Ph.D.s to work on it a quarter to half time,
3 and more than likely several master degreed
4 people to work on it, probably one of them
5 full-time.
6    Q.  How many master's degreed people?
7    A.  On my payroll?
8    Q.  How many will you assign to this
9 matter?
10    A.  I haven't decided that yet.
11    Q.  Approximately?
12    A.  Well, in total, um -- including
13 contract employees, it wouldn't surprise me if
14 we have four or five people.  Now, they won't
15 all work full time.  We would probably have one
16 Master degreed person or Ph.D.'d person, I
17 hadn't figured that out yet, working as a
18 project coordinator full time on the project
19 for the duration of the project.  Then we
20 would --
21    Q.  At what hourly rate?
22    A.  They vary anywhere from a hundred to a
23 hundred and seventy-five an hour.
24    Q.  Okay.  Will any other types of people
25 be working on this project besides Greenfield

Page 492

1 people?
2    A.  Well, we have other research analysts,
3 many of whom have bachelor's degrees.  In fact,
4 I think nearly all of them have bachelor's
5 degrees.
6    Q.  And how many of them will be working
7 on this project?
8    A.  Probably one or two full-time, and
9 then we'll put some part-time people on it from
10 time to time as we need them.
11    Q.  And at what rates?
12    A.  They vary in hourly rate from fifty to
13 a hundred dollars an hour.
14    Q.  And will they be working full time on
15 this project or part-time?
16    A.  Probably one or two people working
17 full time and we'll put other people on the
18 project on an as-needed basis.
19    Q.  Anybody else?
20    A.  Um --
21    Q.  At Greenfield.
22    A.  At Greenfield?  Um -- to the extent we
23 need to hire temporary people, and they may
24 usually be billed out at rates of fifty or
25 sixty bucks an hour.  Particularly when we

60  (Pages 489 to 492)

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 493

1  start doing -- if we do any survey research,
2  um -- we may need to hire some, um -- contract
3  people, and usually, like I say, we bill them
4  out fifty or sixty dollars an hour.
5      Q.  Will you contract out any of that
6  work?  Any of work associated with building the
7  model?
8      A.  Well, in the past, we have used, um --
9  contracted people.  We use a company called
10 Northwest Research in the focus group issues
11 in, um -- Murphy Oil.  I can't remember exactly
12 what we paid them, but it was on an order of
13 sixty thousand dollars, something like that.
14     Q.  Okay.  And that was to do how many
15 interviews?
16     A.  That was to do series of eight focus
17 groups in four cities over a period of several
18 weeks.
19     Q.  Do you expect the number of focus
20 groups in these two cases will be more than
21 that?
22     A.  I don't know if we're going to do
23 focus groups or not.
24     Q.  But if you did?
25     A.  If we did, I don't know.  Quite

Page 494

1  frankly, the focus groups were contributory to
2  an anticipated contingent valuation survey, but
3  as I say, I hadn't made up my mind if we're
4  going to do contingent valuation or something
5  else.
6      Q.  Okay, now would you have to acquire
7  any new software or hardware in order to build
8  this model?
9      A.  Well, we're always acquiring new
10 hardware and software.  I don't know that we
11 would have to acquire any new hardware or
12 software in order to build this model, per se,
13 but that doesn't mean that we might not.  We're
14 always buying new stuff.
15     Q.  To what extent does hedonic modeling
16 require there to be a market in equilibrium?
17     A.  It, um -- anticipates a market in
18 equilibrium.
19     Q.  Would you say that the New Orleans
20 market was in equilibrium on the day after
21 Katrina passed?
22     A.  Um -- no.  And I think I testified
23 yesterday I didn't believe it was.
24     Q.  You're not even sure it is today.
25     A.  Not sure, but that's certainly

Page 495

1  something we're going to test.  We do believe
2  that the market was in equilibrium prior to
3  Katrina, and so we're able to come up with a
4  hedonic model at least of the unimpaired
5  values.  And we will measure the valuation
6  model after Katrina by examining prices in the
7  market and seeing what we've got here.  We
8  haven't -- in other words, we haven't
9  investigated the equilibrium circumstance
10 post-Katrina yet, but that's certainly going to
11 be something that we're going to investigate as
12 part of our merits phase.
13     Q.  From an appraisal standpoint, the term
14 market equilibrium has a specific meaning?
15     A.  Um -- you know, appraisers hardly ever
16 use that phrase.  It has more of a meaning in
17 economics, and I can't exactly cite you the
18 textbook definition of it offhand.
19     Q.  Give me your understanding as to what
20 its definition is.
21     A.  Oh, markets which are clearing at
22 values above reservation prices.
23     Q.  Markets that are clearing at prices
24 that are above reservation prices?
25     A.  Yes.

Page 496

1      Q.  What does that mean?
2      A.  Well, markets that are clearing means
3  that sellers have a reasonable anticipation of
4  finding buyers.  And reservation prices are
5  prices above which properties have to transact
6  or sellers are obligated to hold them off the
7  market because they can't deliver clear title.
8      Q.  Okay.  So in layman's terms, it means
9  an environment where there are willing buyers
10 and willing sellers and no artificial
11 impediments to their getting together and doing
12 deals.
13     A.  Right.  The reservation prices is
14 something of an artificial impediment because
15 there's a price below which the market can't
16 clear.  So if the supply and demand curves --
17 and I'm using a very simplistic Econ 101 type
18 analogy -- if the supply and demand curves have
19 shifted such that the market clearing price is
20 below the reservation price, then the market
21 can't clear because the transaction can't
22 occur, so the market is at disequilibrium.
23     Q.  To what extent would a market reaching
24 equilibrium tell you that whatever stigma that
25 might have been previously associated with that

37e1fdda-6ee6-45f3-b5e7-ec48c590d114

JOHN A. KILPATRICK (VOL II)                    8/14/2007

Page 501

1  pursue this case. In fact, this
2  week --
3  MR. ZWAIN:
4      I hear you, Danny. I hear you.
5  MR. BECNEL:
6      -- I will file -- for the record,
7  I will file seventy thousand lawsuits
8  this week or next week. And I'm
9  putting your clients on notice for
10 policy limits now.
11 MR. ZWAIN:
12     I'm a levee district. I --
13 MR. BECNEL:
14     I know where you are. Whatever
15 policies there are. Whatever policies
16 you are, I'm putting you on notice for
17 policy limits. Failing that, take
18 your chances.
19 MR. ZWAIN:
20     Okay. Well, don't be surprised
21 if I didn't write you back.
22 MR. BECNEL:
23     Well, that's why I got it on the
24 record for you.
25 THE WITNESS:

Page 502

1      And counselor, may I amend what
2  my earlier testimony of $60 million
3  was predicated on the notion of a
4  hundred and fifty thousand properties.
5  If we have three hundred thousand
6  properties, the math would suggest
7  that we're talking about over a
8  hundred million dollars in appraisal
9  costs and over four and a half million
10 pages of appraisal reports to deliver
11 to the Judge.
12 EXAMINATION BY MR. ZWAIN:
13 Q. Okay. How are you going to test the
14 accuracy of your model?
15 A. Sampling.
16 Q. Describe it.
17 A. We'll go out and sample actual prices.
18 In fact, if we indeed determine that the market
19 is at equilibrium, then the testing will be a
20 tautology. But in fact we can pretest the
21 model by going into unaffected areas, and that
22 is the say control areas. And indeed the model
23 itself will use pre-Katrina prices in the
24 affected areas of the control area, so we'll
25 have almost a perfect test case for this ahead

Page 503

1  of time.
2  Q. So you're just going to take a
3  sampling of actual real estate transactions in
4  various areas of town and compare those samples
5  to your data as a whole?
6  A. That's right. Counselor, this is a
7  textbook case of how to use this kind of
8  situation. I could not have dreamed up a
9  better circumstance for using a large scale
10 hedonic mass appraisal model. There's utterly
11 no other way I'd consider doing this. And
12 frankly, when it's all over with I'm going to
13 write I book about it.
14 Q. Me, too.
15 MR. ZWAIN:
16     All right. I'm done. Thank you
17 very much.
18 MR. BECNEL:
19     That's it? Thank you.
20
21
22
23
24
25

Page 504

1      WITNESS' CERTIFICATE
2
3      I, JOHN A. KILPATRICK, Ph.D., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____
11 DATE SIGNED        JOHN A. KILPATRICK, Ph.D.
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN: August 14th, 2007

37e1fdda-6ee6-45f3-b5e7-ec48c590d114