# App. Tab 20

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NO. 05-4182<br>"K" (2) |
| PERTAINS TO: MRGO | JUDGE DUVAL |
| FILED IN: 05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324, 05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152, 06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066, 06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159, 06-5161, 06-5162, 06-5260, 06-5771, 06-5786, 06-5937, 07-0206, 07-0621, 07-1073, 07-1271, 07-1285 | MAG. WILKINSON |

Videotaped Deposition of

KERRY DEAN VANDELL,

2658 Victoria Drive, Laguna Beach, California 92651, taken in the offices of Stone, Pigman, Walther, Wittmann, 546 Carondelet Street, New Orleans, Louisiana 70130, on Monday, the 17th day of September, 2007.

Page 194

1  that testified that for some reason the
2  preacher's home and the church seemed to be
3  untouched, and maybe some others nearby,
4  whatever, for whatever reason. And I believe
5  he looked rather truthful. I think he was
6  probably telling us the truth. For whatever
7  reason, these properties seemed to escape some
8  of the serious -- the damage. I don't
9  remember, I believe Mr. Davis may have
10 experienced about one or two feet worth of
11 water in his residence, although it is
12 repaired now, I understand. But I think the
13 point of that is that there's -- there was
14 differential, even in a nearby neighborhood,
15 there were very differential effects of the
16 flooding. And he was simply providing an
17 eyewitness account to that.
18     Q. All right. Well, maybe I
19 misunderstood. You were not citing the
20 presence of a church in a residential
21 neighborhood as a problem for an AVM or
22 hedonic pricing approach because of the
23 heterogeneity of the neighborhood; you were
24 citing it to show that floods can affect
25 different structures in different ways?

Page 195

1     A. In different ways, that's correct.
2     Q. So a flood can affect a house
3  differently than it can affect a church?
4     A. Right.
5     Q. And that's because a church is built
6  different than the house and higher up or
7  whatever?
8     A. Possibly could. I mean, I could
9  draw you a little diagram showing this whole
10 scenario, that depending upon the circumstance
11 of the unit -- First, I want to point out,
12 it's a little hard to be discussing commercial
13 property here. Mr. Kilpatrick really didn't
14 deal with commercial property at all. All of
15 his discussion was based upon residential,
16 even though commercial property certainly is
17 included as part of the proposed class. But
18 that does add to the diversity. You have
19 differential construction styles, foundational
20 effects. You could just think of a
21 neighborhood with a retail tatoo parlor on the
22 corner, a two or three story multi-family
23 property next to it with a garage underneath,
24 a home next door that may be on a raised site
25 or on piers and had a roof leak, and another

Page 196

1  one next to that that was on a slab, but it
2  was in good condition, and you can see how
3  these different effects of the flood -- the
4  storm event, that, again, with the wind, the
5  rain coming in, the drainage from the rain
6  that happened before the floods occurred, the
7  overtopping of the canals, and then finally
8  the breaching of the canals could have a very
9  much different effect on each one of those
10 properties even though they're immediately on
11 the same block. And that diversity is really
12 quite high in New Orleans in general, which is
13 known to have a diverse stock of housing and
14 commercial property, in part because of its
15 age, but in part just because of its history
16 that makes that situation even more true.
17     Q. Are you telling us that it's
18 impossible to identify flood damage in an area
19 where the water rose to the same level, a
20 residential area, because of the possibility
21 of non-flood damage occurring? Or because the
22 same flood level will affect different houses
23 differently?
24     A. The first has to do with because of
25 the different possibility of other non-flood

Page 197

1  events occurring and the sequence at which
2  they occur and the degree to which they
3  occurred. With respect to the flood, one can
4  say, well, it all rises in the same amount and
5  the same way. Different properties are built
6  differently. And very clearly, I mean,
7  depending on the nature of the -- If we're
8  talking ultimately about damage here. Even at
9  the same flood level for different types of
10 materials and other such things, it would be a
11 very much different -- different cost.
12 However, it was clear that for certain types
13 of properties, those that were on raised
14 sites, those that had piers or -- especially
15 those that were up on, you know, concrete
16 piers and allowed the water to go through and
17 under would sustain much less damage than
18 those down on a slab at -- at grade level.
19 And so -- And that varied substantially across
20 the neighborhoods.
21     Q. You attached the pictures of the
22 skating rink in another class rep area?
23     A. Right.
24     Q. And what's the relevance of that?
25     A. I think what that was intended to

### Page 206

there tend to be, say, more expensive or less expensive homes or homes of a certain characteristic that for one reason or another would tend to dominate, hence, bias that estimate of what the sales price would be during that period of time. But what you're doing there in that analysis is you're making use of a reference. The means that have been proposed to correct this situation is to make use of the estimate of sales homes to impute characteristics. There's something called an inverse mills ratio. There are other statistical techniques that can be applied that tell you how far off you are from what is the traditional set of characteristics of the property, and then allow you statistically to create a biased -- an unbiased result from that. So you're still working off of actual transactions in that case.

In the case of contingent valuation, you're dealing -- it's completely devoid of any actual transactions having been experienced within the marketplace. And, as a result, many of the contingent valuation estimates that have been made have tended to

### Page 207

be -- have tended to come in quite, quite high. And, in fact, in those cases where there have been opportunities to actually go back and say, let's look at what contingent valuations suggested would be paid for this or what sort of diminution in value would result from this versus what actually occurred, they found significant divergence in those results. And that's why I am critical. Because to me, the ultimate test associated with the technique should be the validity of that in terms of testing against what actually occurred. And I don't think it's met the market test in most of the circumstances I have seen it applied.

Q. So you would deny that both the conjoint analysis and the contingent valuation technique or method, you would deny that these are methods which a significant amount of economists view as acceptable and useful for measuring non-market value? You would deny --

A. I would deny that they do? I think there are significant numbers that have significant problems with them as providing adequate empirical estimates for cases such as

### Page 208

damage estimates and other such purposes.

I do believe conjoint analysis, as I indicated, is used primarily for marketing purposes. It's trying, for example, if you want to develop a golf ball or a widget that has certain things you can trade off in terms of quality and type of production, that you can use information from the market to try to get some idea as to what is considered most important by people. Sometimes this is done in a real estate market with rental properties. Apartment owners try to decide what amenities they want to include based upon the survey information they can get. On those purposes, for those purposes, it may be an entirely acceptable way of approaching this in terms of looking at trade-offs. But in terms of actually pricing things for damage purposes, I think it oftentimes falls quite short.

Q. Well, have you seen it used for that purpose, though?
A. For what?
Q. For the purpose of pricing things.
A. Yes. Not -- I'm not sure what

### Page 209

you're asking. For the purpose of trade-offs in amenities like for apartment properties?
Q. Right. Right.
A. I have a colleague, Ron Wick, MPF Research in Dallas, that they undertake these sorts of surveys on a regular basis to help developers identify what -- But for those purposes, I don't have much of a problem with it. I do have a problem, and that -- that says nothing about the proposed use of the techniques here, which we haven't gotten into and you haven't asked me about, as to their relevance and how they can be applied in these particular circumstances.

I found actually Dr. Kilpatrick's discussion of this to be quite ambiguous, to say the least, as to how they would be applied. And once I tried to dig into the insides as to exactly how they would be applied, I come to a conclusion that the techniques are not really applicable in this case. That they can't -- they can't provide what he is required to provide if you really are intent on trying to get an estimate of breach of duty damages.

Page 222

1  flooded due to levee failure.
2     A.  Right.
3     Q.  And according to the footnote that
4  continues on page 28, 15 months later there
5  was some kind of substantial recovery.
6     A.  Right.
7     Q.  You're not suggesting, of course, in
8  this case that the flooding which occurred
9  here could be compared to what happened in
10 California in 1988?
11    A.  Well, certainly not the breadth of
12 its effect. I don't know about the
13 intensity. I just don't know anything about
14 that.
15    Q.  We're now 24 months after the
16 event. Do you believe that the stigma effect
17 has been diminished over time?
18    A.  I think there are -- I haven't
19 really studied that. I do believe there have
20 been announcements certainly made of intent to
21 -- to improve the hurricane protection system
22 here. Others would have to answer to the
23 extent to which those are believable or which
24 there's progress being made. It's not for me
25 to decide that. So, I mean, the point being

Page 223

1  is it really depends upon the circumstances
2  that I couldn't judge.
3     Q.  Right. You haven't been following
4  the -- taking the pulse of the local populace
5  in reaction to press coverage about the Corps
6  of Engineers and the problems associated with
7  what happened, have you?
8     A.  Well, I have certainly followed the
9  press as anyone -- as anyone has in terms of
10 what's been going on. I do get a sense that
11 the market -- and there are certain areas of
12 the market from what I have been able to see
13 that are coming back, and we saw certain
14 neighborhoods that very clearly, and they were
15 as impacted early on in terms of their general
16 location as other neighborhoods nearby, and
17 they're at a much greater stage of
18 redevelopment. I also see some evidence of
19 gradual increases in the number of
20 transactions, which, by the way, is reverse of
21 what's going on in the country as a whole.
22 So, you know, I would say there is some
23 evidence of recovery going on here.
24    Q.  Is there evidence of stigma?
25    A.  I think that would be for the

Page 224

1  analysts to have to look at and to decompose.
2  I couldn't just answer that question here on
3  the fly.
4     Q.  So you see evidence of recovery, but
5  you're not willing to acknowledge continuing
6  stigma from the flood?
7     A.  If we're narrowly defining "stigma"
8  as a reputational effect, I -- I just have to
9  say I don't know. I haven't studied that.
10    Q.  Is an oil spill an event which could
11 result in stigma?
12    A.  I think that to the extent that
13 there was a perception, an increased
14 perception that it could happen again, it
15 could result in stigma. To the extent that it
16 was seen as a one-time event, it's unlikely to
17 occur again, I think that would go away.
18    Q.  Is the failure of a levee that
19 results in the flooding of an entire community
20 the kind of thing that can result in stigma?
21    A.  I think it depends upon expectations
22 as to whether the situation can be remediated
23 to an adequate degree.
24    Q.  So for someone living adjacent to
25 the failed area of the Industrial Canal where

Page 225

1  flooding occurred in this case, you don't
2  believe any stigma could be associated with
3  the property at that location?
4     A.  I think it depends upon
5  circumstances. If you -- Again, if you were
6  in the Netherlands and they were repairing as
7  they have done with their flood control
8  system, that level, I would have no problem at
9  all living immediately adjacent to that.
10    Q.  How about here?
11    A.  I don't know the circumstances with
12 respect to the Army Corps' announcement and
13 other activity that's been undertaken.
14    Q.  At page 18, paragraph 39, you
15 discuss the omitted variable bias as a problem
16 with hedonic modeling; correct?
17    A.  Yes. It's on 39, paragraph 39?
18    Q.  Page 18, paragraph 39.
19    A.  Right.
20    Q.  You suggest Dr. Kilpatrick would
21 have to collect and measure all relevant
22 property value characteristics; correct?
23    A.  That's correct.
24    Q.  Dr. Vandell, don't published papers,
25 including that by Rosen in 1974, generally

Page 226

1  support hedonic models as the best available
2  method to estimate price effects of property
3  characteristics?
4      A.  I -- I actually think -- I mean,
5  Rosen's was a seminal piece that first
6  developed the hedonic approach, but it's not
7  -- it's certainly not the last word in
8  research that's been done on hedonics.  There
9  have been many papers subsequent to that that
10 have demonstrated traditional hedonic approach
11 to be inferior in a variety of ways.  And let
12 me say specifically if you're talking about in
13 comparison to traditional what we call grid
14 adjustment approaches or sales comparison
15 approaches to valuation, there have been
16 several papers that have demonstrated that
17 under a variety of conditions hedonic
18 approaches are inferior to the grid adjustment
19 method.
20     Q.  Isn't it true that not all
21 characteristics of interest must be measured,
22 but only a sufficient number measured to
23 explain the variation in price or value?
24     A.  That depends on the circumstances
25 that you are applying the model to.  I guess

Page 227

1  if you were attempting to get at the unbiased
2  estimates of coefficient values, that is, the
3  price effects, you -- you need to have all of
4  the variables in there to try to make -- to
5  make sure that you don't have omitted variable
6  bias in your coefficient estimates.
7      Q.  You don't deny, do you, that
8  heterogeneity property characteristics is
9  something that can be addressed in hedonic
10 price models by using a geographically
11 weighted regression scheme?
12     A.  By "geographically weighted", a
13 weightedly squares approach doesn't
14 necessarily handle all of that.  Because it
15 assumes this geography is still at the
16 neighborhood level typically.  And it assumes
17 all the properties within that area have
18 similar sets of characteristics.  And, in
19 fact, if you're looking at a place such as the
20 Lower Ninth Ward in which your variation of
21 properties exists from property to property
22 and varies all over the place, it can't deal
23 properly with that.
24     Q.  Now, the real estate appraisal
25 profession is based on valuating unsold homes

Page 228

1  by inferring information from transactions
2  involving other homes; correct?
3      A.  The real estate profession is --
4      Q.  Real estate appraisal profession.
5      A.  Is -- Is based -- They make use of
6  sold homes as evidence, that's correct.
7      Q.  And they valuate unsold homes by
8  inferring information from sales
9  transactions.
10     A.  That's -- That's correct.  Right.
11 This is what I call revealed preference, okay,
12 in the marketplace.
13     Q.  Now, at pages 20 and 21, paragraph
14 43, you acknowledge that the
15 government-sponsored mortgage enterprises,
16 Freddie Mac and Fannie Mae, both use AVMs in
17 the mortgage evaluation process.  Correct?
18     A.  That's correct.
19     Q.  And it's true, isn't it, that AVMs
20 are playing an increasing role in the mortgage
21 lending industry?
22     A.  Actually, I am not sure that I would
23 necessarily agree with that.  I mean, they
24 exist at a certain level, but Freddie and
25 Fannie in particular have been burned by

Page 229

1  relying upon AVMs, especially for higher
2  loan-to-value ratio loans, so they ceased to
3  rely upon those at that level any more.  So,
4  you know, even though there is use of that,
5  they're cost effective, again they're used in
6  the same way as AVMs applied in assessment
7  reviews.  They're more or less a first cut.
8  And if there are any issues, Fannie and
9  Freddie can require an appraisal, in fact,
10 they say explicitly there's nothing to
11 substitute for an appraiser's judgment in
12 their literature.  Or they also can shift the
13 risk, and to the extent that they allow this
14 -- this sort of underwriting technique to
15 substitute for traditional appraisals, if they
16 start to experience higher than normal
17 defaults from those sorts of loans that have
18 been applied, they have the ability to go back
19 to the seller of the loan and get their money
20 back.  So they're shoving off risk.  They're
21 recognizing the fact that they need to in some
22 way mitigate the risk associated with going
23 with these AVM systems.
24     Q.  Is it necessary that an AVM system
25 replace the judgment of a skilled appraiser,