UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | * | CIVIL ACTION NO. 05-4182 |
| CONSOLIDATED LITIGATION | * | |
| | * | SECTION "K" |
| | * | |
| PERTAINS TO: | * | MAGISTRATE (2) |
| NO.   07-3500 | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| | * | |
| * * * * * * * * * * * * * * * * | | |

PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO MOTION TO DISMISS
OR, ALTERNATIVELY, TO STAY
BY WASHINGTON GROUP INTERNATIONAL, INC.

**MAY IT PLEASE THE COURT:**

"Just who does Washington Group International[1] think it is?"

On June 25, 2007, Civil Action No. 07-3500 was instituted against the United States of America, and others, for the primary purpose of presenting to a Court of competent jurisdiction a new litigation brought by plaintiffs who had presented administrative claims to the United States more than six (6) months previously, and without any subsequent action of any type on the claims by the United States or its agency, the U.S. Army Corps of Engineers.  One of the "other" defendants was WGI. For the two to three months or so prior to instituting Civil Action No. 07-3500, counsel for the parties had been meeting intermittently for the purpose of evaluating the claims

---

[1] Washington Group International, Inc. will be referred to herein as "WGI".

-1-

against WGI, and "plowing through" some 40 boxes of documents which had recently been produced by WGI and its counsel, addressing the work which was done by WGI for the Corps of Engineers in the "East Bank Industrial Area", i.e., on the batture area between the Florida Avenue and Claiborne Avenue bridges, between 1998 and July 2005, only one month prior to Hurricane KATRINA.

To the knowledge of undersigned counsel, nothing contained in the U.S. Constitution, the Louisiana Constitution of 1974, the United States Code Annotated, the Federal Rules of Civil Procedure, or in any Order of any Jurist on the Bench of the United States District Court for the Eastern District of Louisiana precluded counsel for plaintiffs from filing that particular Civil Action No. 07-3500, or naming any of the parties he named as parties defendant on behalf of his clients.

WGI has reacted with a motion to dismiss and, alternatively, to stay plaintiffs' claims against it, essentially saying that other actions were filed first by seemingly competent counsel, and that Civil Action No. 07-3500 should therefore be dismissed or at least stayed. Plaintiffs' response to WGI's motion is that plaintiffs' substantive claims should be transferred and consolidated into already existing cases, if any there be, with plaintiffs' substantive claims against WGI allowed to "tag along" with respect to any duplicative allegations. With respect to non-duplicative substantive allegations, plaintiffs in Civil Action No. 07-3500 do not intend to take, and will resist, a "back of the bus" position. Undersigned counsel for plaintiffs in Civil Action No. 07-3500 concedes that WGI should not be required to "re-litigate" matters which have already competently addressed by the Plaintiffs' Liaison Committee, such as class certification, and that it was not his intention to unnecessarily "duplicate" litigation.

Notwithstanding the factual and legal "complexity" of this litigation, many of the lawyers and litigants in "Victims of KATRINA" litigation view this as a "single issue" case: Does the United States of America enjoy immunity or not? If the answer to that question is in the negative, then the plaintiffs in Civil Action No. 07-3500 will be perfectly content to collect their damages from the Federal Government, and to voluntarily dismiss their claims against ALL remaining defendants, including WGI, with prejudice, upon satisfaction of any final judgment or exchange of settlement funds. However, if the answer to that question is in the affirmative, then all other defendants, including particularly WGI, have a "BIG" problem, not only with plaintiffs in Civil Action No 07-3500, but with other plaintiffs as well.

In the meantime, plaintiffs respectfully submit that This Honorable Court has no discretion but assist undersigned counsel in protecting plaintiffs' legal rights against all potentially liable parties.

What plaintiffs claim WGI did or failed to do, and at whose orders, which caused plaintiffs' damages, play very prominently in addressing the question of whether the United States of America may enjoy immunity or not. Plaintiffs in Civil Action No. 07-3500 have alleged the following with specific reference to the United States of America and to WGI:

### VI.

The above-described suffering was caused and/or occasioned by the following:

    a)    The defective design, construction, and maintenance (including, without limitation, dredging) of the Industrial Canal, the Mississippi River Gulf Outlet (MRGO), and the Gulf Intracoastal Waterway (GICW) by the United States of America. Plaintiffs aver that the Industrial Canal, MRGO, and GICW were and are

    designed, constructed, and maintained as navigable waterways, not as flood control projects, and Plaintiffs' allegations arise from the design, construction, and maintenance of navigable waterways, not from any flood control project.  Plaintiffs further aver that the Army Corps of Engineers violated federal law in the investigation, planning, and construction of the MRGO, including the River and Harbor Act of 1945 and the Fish and Wildlife Coordination Act of 1946, as well as the Army Corps of Engineers' own internal engineering policies and rules.  Plaintiffs further aver that the unlawful and otherwise negligent actions of the United States were not decisions of public policy, but instead failed to comport with appropriate standards of care as to engineering and other non-public-policy elements.

b)   The failure to properly inspect, operate, and maintain the Industrial Canal and the MRGO by the Board of Commissioners of the Orleans Levee District.

c)   The failure to properly inspect, operate, and maintain the Industrial Canal by the Board of Commissioners of the Port of New Orleans.

* * *

g)   Negligently performed work in and near the Industrial Canal by Washington Group International, Inc. (WGI).  Plaintiffs aver that such work included, without limitation, removal of underwater and below-ground objects (including, without limitation, structures, obstructions, facilities, slabs, barges, and pilings).  Plaintiffs further aver that such work was negligently implemented in that (1) WGI used techniques (including, without limitation, vibratory extraction) that, as WGI knew or should have known, unnecessarily caused damage to the Industrial Canal and its structures;  (2) WGI failed to follow proper procedures and to comply with appropriate standards and regulations in performing its work;  and (3) WGI failed to call the damage that its work had caused to the attention of appropriate authorities.  Plaintiffs further aver that these negligent acts and omissions were neither required nor authorized by WGI's contract with the Army Corps of Engineers.  Plaintiffs further allege that WGI's negligence resulted in underseepage-induced erosion and other damage to the Industrial Canal's levee and/or wall, ultimately causing and/or contributing to its catastrophic failure.

VII.

In addition, plaintiffs aver the following additional fault (including statutory fault) and neglect by the U.S. Army Corps of Engineers and Washington Group International, Inc.:

1. The U.S. Army Corps of Engineers' use of an illegal, and artificially low, vertical elevation datum in building the retaining walls on the East side of the Industrial Canal, with the result being that Hurricane KATRINA's predicted storm surge caused significant "overtopping" for a period of several hours more than would have occurred had the proper datum been utilized during the design and construction phases, and had the works taken into account subsidence, which is a well-known phenomenon all over the world, particularly in South Louisiana. These facts, coupled with earthen levees which were not "armored" on the land-side, contributed to catastrophic soils failures within both breach areas.

2. A very extensive amount of excavation work had been conducted on the "batture", between the Industrial Canal and the levees and retaining walls adjacent to the areas of both breaches between 1998 and July 2005, only one month prior to Hurricane KATRINA. The area was and is known as the "East Bank Industrial Area". The batture land was excavated by Washington Group International, Inc. under a contract with the U.S. Army Corps of Engineers, which had acquired the land for the new navigation lock which had been authorized by Congress for the area, and for a bypass channel while the new lock is being constructed. The work done by Washington Group International, Inc. included removing construction materials, such as concrete slabs, obstructions, such as sunken barges, wharf materials, bulkheads and bank stabilizing pilings, abandoned rail cars, drums containing pollutants and wastes, and underground tanks, as well as environmental remediation and removal of contaminated soil from the entire area in preparation for the dredging which must be performed in connection with constructing the new navigation lock and bypass channel.

3. There was no managerial oversight within the lock preparation project, either by the U.S. Army Corps of Engineers or by Washington Group International, Inc. concerning how work on the project might impact the pre-existing levees and retaining walls.

Since the soil conditions on the East side of the Industrial Canal between the Florida Avenue and Claiborne Avenue bridges are no different from the soil conditions elsewhere along the Industrial Canal, plaintiffs herein aver that it is

more than a coincidence that the only two breaches on the East side of the Industrial Canal occurred in the East Bank Industrial Area, namely, in the area adjacent to where Washington Group International, Inc. had completed its extensive excavation work for the Corps of Engineers only one month prior to Hurricane KATRINA.

Since making the above and foregoing allegations, counsel for plaintiffs in Civil Action No. 07-3500 also filed a "Certificate of Impossibility" on July 25, 2007 (Record Document No. 6684), in which it was averred as follows:

> The claims asserted by Plaintiffs in this litigation and in Civil Action No. 07-3500 are already a matter of public record and will not be repeated here. To summarize, however, the claims implicating the United States of America include the following:
>
> 1. The COE's use of an illegal, and artificially low, vertical elevation datum during construction of the retaining walls along this particular stretch of the canal.
>
> 2. The failure of the COE to take subsidence into account.
>
> 3. Erecting retaining walls which were not armored on the land side.
>
> 4. Numbers 1 and 2, supra, resulting in water from the canal overtopping the retaining walls during KATRINA, and for a longer period of time than if they had been built higher.
>
> 5. All of which permitted erosion of the soil on the opposite or landward side of the retaining walls, destabilizing the walls and the soils in which they were imbedded, which were not as robust or stable as the soils should have been, since COE regulations provide that levees be built "outwards" for every foot built "upwards", i.e., the survey term "rise-to-run".
>
> The overtopping described, supra, was attributable, in part, to the fact that the U.S. Army Corps of Engineers did not open the lock where the Industrial Canal meets the Mississippi River prior to or during KATRINA, therefore allowing the water level in the canal to rise significantly above where it would have been had the lock been opened.    Plaintiffs also will not repeat their allegations of fault against Washington Group International, Inc. in Civil Action No. 07-3500, except to emphasize that the extensive excavation work performed by WGI and the Corps of Engineers in the batture area between the canal and the retaining walls over the course of several years prior to KATRINA occurred

directly adjacent to the two breaches described, <u>supra</u>.  Refer to the attached aerial photographs, marked as Exhibits Nos. 2 and 3, respectively, which show as follows:

> Exhibit No. 2:  Large sink hole directly opposite the northernmost breach; and
>
> Exhibit No. 3 – Large sink hole directly opposite the northernmost part of the southernmost breach.  See bottom photograph discreetly marked as Exhibit No. 3.

Plaintiffs aver that the sink holes are more than a mere coincidence and are directly attributable to the work performed negligently by WGI for the COE.  Plaintiffs also aver that the sink holes which are clearly visible in Exhibit Nos. 2 and 3 indicate evidence of "mechanisms of seepage and subsurface erosion", engineering concepts which were recently addressed by Professor Robert G. Bea in Record Document No. 6674 in Civil Action No. 05-4182 as follows:

>> Most egregious were oversimplified assumptions and analyses concerning mechanisms of seepage and subsurface erosion.  Such mechanisms have been well known for decades.  Seepage beneath levees is discussed in depth in the USACE Engineer Manual EM 1110-2-1913, *Design and Construction of Levees*, Chapter 5 "Seepage Control."  This chapter begins as follows:  *"Without control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself.  Under seepage problems are most acute where a pervious substratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of a levee."*  <u>Inappropriate evaluation and analyses of the hydraulic and strength – deformation characteristics of the highly pervious organic marsh (swamp) layers underlying most of the greater New Orleans area has been a historic and pervasive `blind spot'.  Forensic engineering investigations subsequent to hurricane Katrina clearly have identified its potential effects</u> at the SSC breach, the London Canal breaches, many of the important breaches along the Mississippi River Gulf Outlet protective structures, and <u>at the two breaches at the Lower 9th Ward.</u>  (emphasis supplied).  Record Document No. 6674 in Civil Action No. 05-4182, Bea Declaration, pp. 37-38.

Although Plaintiffs also aver that negligence *per se,* and a presumption of fault, is applicable to the liability of all parties which had actual or constructive care, custody and control of the Ingram Barge ING-4727, because the barge

moorings were supposed to hold the barge during the storm, and not break, the evidence in this case will demonstrate that the moorings broke, at least in part, due to the water level and currents in the canal.  Additionally, if one or more of the breaches occurred prior to the barge moorings breaking, then those breaches probably contributed to the barge being sucked away from shore, straining its moorings.

While the "first-filed" rule may be applicable, maybe not, undersigned counsel for plaintiffs in Civil Action No. 07-3500 has found himself at odds with Members of the Plaintiffs' Liaison Committee on a variety of subjects since the inception of this litigation, the most recent "disagreement" involving the obvious conflict of interests between certain Members of the Plaintiffs' Liaison Committee (and Sub-Committees), whose names appeared on pleadings filed as counsel of record for the State of Louisiana on August 29, 2007,[2] and with Members of "the Class", with respect to "Levee" and other cases.  At this juncture, it is not at all clear how that obvious, and irreconcilable, conflict of interests is going to play out.  For no reason other than that one, namely a conflict of interests between Plaintiffs' Committee Members and Members of the Class, plaintiffs' counsel in Civil Action No. 07-3500 respectfully submits that his clients' substantive claims against ALL parties he has sued in that civil action, and particularly those against WGI, should remain viable, and that he should not be required to place his destiny, or his clients' destiny, in the hands of the people with whom his clients are in a conflict of interests position.

    Respectfully submitted,

    **LAW OFFICES OF**
    **ASHTON R. O'DWYER, JR.**

    **By:   S/Ashton R. O'Dwyer, Jr.**
         **Ashton R. O'Dwyer, Jr.**

---

[2] Two such matters are Civil Action Nos. 07-5023 and 07-5040.

-9-

                                                  **Bar No. 10166**
                                                  **821 Baronne Street**
                                                  **New Orleans, LA 70113**
                                                  **Tel. 504-679-6166**
                                                  **Fax. 504-581-4336**

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon all counsel of record via Electronic filing, this 23rd day of October 2007.

                                                  S/Ashton R. O'Dwyer, Jr.