**EXHIBIT A**

**THE BARGE CASE IN BRIEF**

A.      FACTS

The Plaintiffs (including Claimants-in-Limitation) are - according to year 2000 United States Census data - about 90, 000 persons who sustained property losses and other damages in Katrina. The Defendants (including Petitioners-in-Limitation) are Ingram Barge Company, Lafarge North America, Unique Towing, Joseph C. Domino Towing, Zito Towing and Zito Fleeting. Ingram Barge is a closely held private corporation based in Nashville, TN.  They are insured, and are one of the nation's largest carriers, with a fleet of over 3000 barges.  Lafarge,  an international conglomerate is also insured.  Unique is the insured owner of the M/V REGINA H, and Domino, also insured, is Unique's agent and broker.  The REGINA H is "chartered-in"  to Domino.   Zito Towing and Fleeting are also insured, and are Ingram's towing and fleeting agents.  Unique, Domino and Zito are local companies.

Ingram and Lafarge North America were parties to a Transportation Agreement whereby Ingram transported Lafarge's cargo from its plant in Joppa, IL to the Lower Mississippi for distribution.  On August 25, 2005, Ingram Barge ING 4727 was delivered by Zito to the Lafarge France Road distribution facility on the IHNC, along with ING 4525, both carrying loads of oilfield grade cement.  The barges had been diverted a few days earlier from Westlake, near Lake Charles, in light of a cement shortage that had already cost Lafarge around $170,000.00 in contractual demurrage vis-a-vis its oilfield customers.

On August 26, 2005, numerous weather advisories demonstrated Katrina's increasing westerly path, placing New Orleans in the crosshairs.  Governor Blanco declared a state of

emergency that afternoon. Ingram Barge had no written hurricane plan, held several telephone hurricane meetings, but made a conscious decision not to take any action with respect to their barges located at third-party facilities. They did not communicate with Lafarge, and took no action to ensure that the barge was moved from the IHNC or moored properly. Meanwhile, Lafarge continued to conduct business as usual, and unloaded 4727 during the night until it was emptied around 8:00 or 9:00 a.m. on Saturday, August 27, 2005. Around that time, Ingram area maintenance manager, Stanley Cook, a retired Coast Guard officer, arrived at the Lafarge facility, purportedly for the sole purpose of ensuring that the barge's fiberglass cargo hold covers were tied down. He walked on the barges, but supposedly paid no attention to their mooring status. Ingram states that it adheres to a policy whereby it does not concern itself with hurricane preparation of its barges located at its customers' facilities.

    At around the same time, according to Lafarge supervisor, Ed Busch, Mr. Busch called Zito to inform them that the barge was empty, and therefore ready for pickup. Zito is Ingram's agent for transport and release of its barges pursuant to longstanding practice and a written Service Agreement. Ingram had given Lafarge blanket instruction not to call Ingram, but to call Zito for pickup of Ingram's barges. Zito never arrived. Mr. Busch stated that he left a voicemail message using his Nextel phone. Zito claims that Mr. Busch never called. The truth has not been determined. About an hour later, Zito sent an email stating that it was closing its operations shortly thereafter in light of the impending storm, but records show that Zito did not cease operations. It is possible that Lafarge did not receive the email when it was sent, as the facility was cut-off from virtually all communication due to an ongoing construction project there. Zito testified in the limitation action trial that they could have fleeted ING 4727.

    At this time, around 10:00 on Saturday, ING 4727 was empty, and was moored directly to

the dock, using one-part lines, with the loaded ING 4525 moored to, abreast and outboard of 4727, using three one-part lines. Mr. Busch then called Domino Towing, sole broker and agent for Unique Towing, instructing that they "top-around" this two barge tier. Topping around is an evolution whereby the two barges would remain moored to one-another, but the entire tier rotated 180 degrees resulting in the full 4525 moored to the dock, and the empty 4727 moored to 4525. After placing this call, the Lafarge facility was abandoned around noon. Lafarge and Ingram never communicated about mooring, berthing, moving, fleeting, ballasting or otherwise preparing or safguarding Ingram's barges for the storm.

     At about 2:45 p.m. Saturday, August 27, 2005, Unique vessel REGINA H arrived and found the Lafarge facility abandoned. They performed the top-around, but found the moorings between 4525 and the dock to be inadequate. They doubled-up the lines to the dock and added an additional piece of line found lying around at Lafarge. They could not find any more line at Lafarge. They did not address the rigging between the barges. The end result was the empty 4727 outboard, entirely exposed to the canal, with a freeboard height approximately eight feet, well above the loaded 4525 which was the only object 4727 was moored to. REGINA H crewman Eric Thigpen testified that a loaded barge should never be moored to an empty as the height differential is problematic. 4727 was moored to 4525 with only with three one-part polypropylene lines, which is wholly inadequate, contrary to law, Coast Guard guidelines, and applicable maritime standards of care. Domino and Unique's acts and omissions were also contrary to the Domino Towing Policy Manual, which governs safe harbor in a hurricane, instructs communication to Domino of conditions such as those found at Lafarge, and instructs the addition of extra rigging for hurricanes, among other procedures not followed. Instead, Domino-Unique left 4727 in the IHNC (not safe harbor according to the Domino Manual), did not add extra rigging (due to Domino policy not to unless requested or

purchased), and communicated with nobody concerning the mooring arrangement, despite clear knowledge of its inadequacy.

During the storm, ING 4727 broke from its moorings. At around 3:30 - 3:45 a.m., Sewerage and Water Board Lower Ninth Ward pumping station operator, Bill Villavasso, eyewitnessed the barge crash into the IHNC flood wall and cause it to breach, its prow protruding slightly through the area that would come to be known as the north breach, just south of the Florida Avenue Bridge. The barge did not pass through the breach, but unleashed a violent tidal wave of floodwater. At around 4:30 - 5:30 a.m., eyewitness, Terry Adams, at the northern stretch of Jourdan Avenue, saw the barge cause what would become known as the south breach. This time, it crashed through, landing on Arthur Murph's house in the southerly area of Jourdan Avenue. Mr. Murph was home, heard the barge scraping along the intact floodwall nearer to N. Claiborne Avenue, and soon witnessed these events for himself. Another tidal wave followed, lifting houses from their foundations, floating them along the street, and smashing them into bits. This water traveled east as far as Paris Road, south near the Mississippi River, and along a northern boundary defined by the Public Belt railway south of the wetlands barrier between the Lower Nine and GIWW. These areas flooded from the IHNC long before the MRGO failed or overtopped.

**B.    LAW, REGULATIONS, AND MARITIME STANDARDS**

Put as succinctly as possible, the Code of Federal Regulations, United States Coast Guard Sector New Orleans Hurricane Plan, Coast Pilot 5, American Waterways Operators, and the Greater New Orleans Barge Fleeting Association establish law and maritime standards of care whereby barge owners, barge masters and crew, persons in custody of barges, and waterfront facilities have certain duties to safeguard barges in the face of a hurricane. These include, without limitation, cessation of cargo activities, cabling barges to shore, not mooring them abreast, using at least two-part line,

communication between the parties and Port Commander concerning anchorage or berthing of barges, not mooring an empty to a full in light of mooring difficulties inherent in that configuration, accounting for wind and storm surge, moving it from the IHNC, etc.  In Phase I of the limitation action trial, Judge Berrigan found that petitioners in limitation, Ingram, Domino and Unique, were putatively negligent, and their vessels putatively unseaworthy, in the following respects **(05-4419, excerpts from Record Doc. 702):**

> More specifically, Ingram has not shown by a preponderance of the evidence that it lacked privity or knowledge: (1) that the ING4727 was delivered to LNA as Hurricane Katrina was approaching; (2) of the USCG and statutory regulations and recommendations for hurricane preparedness and that it did not discharge its alleged duties thereunder; (3) that it did not move the ING4727 out of harm's way; (4) that it did not have a written hurricane plan; (5) of the ING4727's alleged unseaworthiness in failing to have adequate mooring lines; or, (6) that Cook allegedly did not make a reasonably inquiry into the ING4727's safety.[7]  The evidence and testimony presented at

> Unique and Domino have not shown by a preponderance of the evidence that they lacked privity or knowledge: (1) that the M/V REGINA H's was unseaworthy because the crew was ill prepared and the vessel lacked the requisite mooring lines; (2) that the M/V REGINA H's crew did not report emergencies to Domino as was allegedly required; and, (3) that the M/V REGINA H's crew was not in compliance with Domino's policies and procedure's manual.

Lafarge's negligence is premised on the same laws, regulations, and standards, equally applicable to Lafarge in its capacity as a dockside facility, and as joint custodian of the barge, which obligations Lafarge also failed to uphold in any respect. The barge-related allegations are more fully expressed in the complaints (original and supplemental) in *Mumford, Boutte*, *Benoit,* and *Lagarde*, as well as undersigned counsel's (Group A, in 05-4419) Phase I and II Pretrial Order submissions and Trial Memoranda in the limitation action. Undersigned counsel respectfully suggest that the nuances of which the Court spoke during the telephone conference, such as expert opinion, and more detailed facts, are contained in that record, and will enable the Court to clearly appreciate the impropriety and error of any decisions appending the BARGE case to MRGO or *Robinson* for scheduling, class certification, consolidation, or any other purpose.

It is also important to appreciate the effect of *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979), *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113 (5th Cir. 1995), *en banc*, and jurisprudence consistent therewith, whereunder the law of joint and several liability governs admiralty cases such as the BARGE plaintiffs', which, in practical terms, means that if any maritime defendant was a substantial cause (no matter how slight in percentage) of the damages, that defendant is liable for the entire measure of damages. See also *The Matter of the Complaint of City of New York*, 03-CV-6049 (S.D.N.Y. 2/26/07).