## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
## NEW ORLEANS DIVISION

In Re:  KATRINA CANAL BREACHES   *       CIVIL ACTION NO. 05-4182
        CONSOLIDATED LITIGATION   *

                                                *     SECTION "K"

                                                *

PERTAINS TO:                                *     MAGISTRATE (2)
NO.    07-5023                       *
          07-5040                       *     JUDGE DUVAL

                                                  *     MAGISTRATE WILKINSON

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF MANUAL ATTACHMENT

Exhibit No. 1, <u>Cooper v. Department of Public Works</u>, 870 So.2d 315, (La. App. 3d Cir. 2004).

Respectfully submitted,
**LAW OFFICES OF**
**ASHTON R. O'DWYER, JR.**

By:   **S/Ashton R. O'Dwyer, Jr.**
        **Ashton R. O'Dwyer, Jr.**
        **Bar No. 10166**
        **821 Baronne Street**
        **New Orleans, LA 70113**
        **Tel. 504-679-6166**
        **Fax. 504-581-4336**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record via Electronic filing, this 1st day of November 2007.

                S/Ashton R. O'Dwyer, Jr.

## Louisiana Case Law

COOPER v. LA D.O.P.W., 03-1074 (La.App. 3 Cir. 3/3/04); 870 So.2d 315

TRAVIS COOPER, ET AL. v. LOUISIANA DEPARTMENT OF PUBLIC WORKS.

No. 03-1074.

Court of Appeal of Louisiana, Third Circuit.

March 3, 2004.

Rehearing Denied May 5, 2004.

APPEAL FROM THE SEVENTH JUDICIAL DISTRICT COURT PARISH OF
CATAHOULA, NUMBER 18,754 "A", HONORABLE KATHY A. JOHNSON,
DISTRICT JUDGE.
**West Page 316**

[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN
OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 317**

[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN
OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 318**

[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN
OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 319**

V. RUSSELL PURVIS, JR., Smith, Taliaferro, Purvis & Boothe,
Counsel for Plaintiffs/Appellees: Travis Cooper, et al.

JULIE MOBLEY LAFARGUE, Abrams & Lafargue, Counsel for
Defendant/Appellant: State of Louisiana, Department of
Transportation and Development (formerly Louisiana Department of
Public Works).

Court composed of BILLIE COLOMBARO WOODARD, ELIZABETH A.
PICKETT, and ARTHUR J. PLANCHARD,**[fn*]** Judges.

[fn*] Judge Arthur J. Planchard, Retired, participated in this
decision by appointment of the Louisiana Supreme Court as Judge
*Pro Tempore.*

**Page 1**

WOODARD, Judge.

The State of Louisiana, through the Department of
Transportation and Development (DOTD), formerly the Louisiana
Department of Public Works, asserts that the trial court should
have denied the Plaintiffs' motion for partial summary judgment
because the Plaintiffs do not have a right of action against it
for the permanent flooding of portions of their lands which the
construction of a series of locks and dams, along the Ouachita

and Black Rivers, caused. We affirm the trial court's grant of a
partial summary judgment to Plaintiffs.

* * * * *

    In 1960, the United States Congress enacted the River and
Harbor Act, which authorized the construction of the Jonesville
Lock and Dam and the Columbia Lock and Dam. The purpose of this
construction project was to promote navigation on the Ouachita
and Black Rivers by creating a navigational channel at least nine
(9) feet deep and one hundred (100) feet wide at all points along
these rivers.

    On January 15, 1962, the State of Louisiana, through the
DOTD, executed an "Act of Assurances" in conjunction with this
construction project, in which it gave assurances to the
United States that it would:
**West Page 320**

> A. Furnish free of cost to the United States all
> lands, easements, and right of way[s], including
> flowage rights in overflow areas, and suitable
> spoil-disposal areas necessary for construction
> of the project and for its subsequent
> maintenance, when and as required; [and]
>
> . . . .
>
> C. Hold and save the United States free from
> damages due to construction and maintenance of
> the project.

    In 1972, the United States Corps of Engineers (Corps)
completed construction. When the subject locks and dams became
operational, a pool formed in the Ouachita River, commonly
referred to as the Jonesville Pool, that extended approximately
107 miles upstream to the Columbia Lock and Dam. Since its
creation, the Corps has maintained the Jonesville Pool at a
minimum elevation of thirty-four (34) feet above mean sea level.
Previously, the water level was a minimum elevation of twenty-one
**Page 2**
and a half (21.5) feet above mean sea level. Rawson Creek flows
into the Jonesville Pool. Gastis Creek and Dry Lake are
tributaries of Rawson Creek.

    On March 28, 1972 and at all times since this date, when
the Jonesville Pool's water level rose to an elevation of
thirty-four (34) feet, the water level of Rawson Creek, Gastis
Creek, Dry Lake, and all the tributaries of the Ouachita and
Black Rivers rose to a minimum elevation of thirty-four (34) feet
above mean sea level.

    On June 14, 1994, nineteen individuals, each of whom owns
property along Rawson Creek, Gastis Creek, Dry Lake, Hooter
Creek, Big Creek, or Oil Well Creek, filed suit against the DOTD,
seeking damages for the permanent flooding of portions of their
lands which the construction of these locks and dams along the
Black and Ouachita Rivers caused.

    Based on their assumption that the Plaintiffs' lands were

within the federal navigational servitude granted to the federal government by the commerce clause of the United States Constitution, the DOTD never attempted to acquire this property before it became inundated. It, also, never offered to pay any compensation of any type to Plaintiffs as consideration for the taking or damaging of their lands.

In their petition, the Plaintiffs requested that the trial court grant them the following relief: (1) a declaration that these constructions interfere with their servitude of drainage; (2) an injunction, directing the DOTD to remove or make modifications to these constructions that obstruct natural drainage to permit the natural flow of surface waters from their estates; (3) compensation for the unlawful taking of their lands by means other than expropriation proceedings and for the resulting damage to these lands; and (4) alternatively, if it is determined that they are not entitled to removal or modification of this obstruction, they are due compensation for the loss of their servitude of drainage. They further contend that this continuous inundation of their lands is a continuing tort, entitling them to compensation from the time that these lands initially became inundated in 1972.

On December 15, 1998, Plaintiffs filed an "Amending and Supplemental Petition," converting their action to a class action. By stipulation of the parties, the issues of liability and quantum were bifurcated.

On December 19, 2001, the class, which Plaintiffs represent, moved for a partial summary judgment, seeking a judgment on liability. They alleged that the DOTD's liability for their property loss arose out of its agreement to acquire all lands,
**Page 3**
servitudes, and right of ways "necessary for construction of the project and for its
**West Page 321**
subsequent maintenance, when and as
required."

On December 12, 2002, the trial court rendered judgment, granting the Plaintiffs a partial summary judgment on liability. Specifically, it found that the DOTD had become the insurer of the United States under the "Act of Assurances" executed to facilitate this construction project and, as such, according to the provisions of the Louisiana Direct Action Statute,**[fn1]** the DOTD is liable for the damage to Plaintiffs' lands.

The DOTD appeals, complaining that the trial court erred: (1) when it held that the Plaintiffs' claims had not prescribed; (2) in ruling that it interfered with the Plaintiffs' servitudes of drainage and that such interference constitutes a continuous tort that prevents the prescription of Plaintiffs' claims; (3) in finding that it failed to meet its burden of proving the limits of the federal navigational servitude; (4) in holding that the "Act of Assurances" gives Plaintiffs a right of action against it; and (5) in finding that the DOTD previously stipulated to liability for similar claims and for concluding that these alleged stipulations are binding in this litigation and, in the alternative, in not finding that an issue of material fact exists

regarding these stipulations.

* * * * *

## STANDARD OF REVIEW

We review summary judgments *de novo*.**[fn2]** Thus, we ask the same questions the trial court previously asked in determining whether summary judgment is appropriate.**[fn3]** This inquiry seeks to determine whether any genuine issues of material fact exist and whether the movant is entitled to judgment as a matter of law.**[fn4]** Once the movant has made a *prima facie* showing that suggests we should grant the motion for summary judgment, the burden of production shifts to the nonmoving party to

**Page 4**

present evidence,
demonstrating the existence of issues of material fact which preclude the granting of a summary judgment.**[fn5]**

## PRESCRIPTION

The Plaintiffs brought this action against the DOTD to recover damages and injunctive relief for the permanent flooding of portions of their lands which the impingement of their servitude of drainage caused. However, the DOTD asserts that their claims have prescribed.

Louisiana Civil Code Article **667** provides, in part:

Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

**West Page 322**

"An action for damages for a violation of [La.Civ. Code art.] 667 is most closely associated with an action for damages based on [La.Civ. Code art.] 2315 *et seq.*"**[fn6]** As such, a violation of Article 667 constitutes fault within the meaning of Article 2315.**[fn7]** Accordingly, our supreme court in *Dean v. Hercules***[fn8]** held that any interference with a servitude is a violation of Article 667 which gives rise to a delictual action that prescribes in one year.**[fn9]**

Louisiana Civil Code Article **3493** provides:

**Page 5**

When damage is caused to immovable property, the one year prescription commences to run from the

day the owner of the immovable acquired, or
should have acquired, knowledge of the damage.

In the instant case, the parties have stipulated that the
Plaintiffs were aware of the inundation of their lands since
1972. Therefore, *normally*, their delictual action against the
DOTD would have prescribed one year later.

*Continuing Tort Theory*

Nonetheless, the Plaintiffs assert that their compensation
claims have not prescribed under the continuing tort theory since
the cause of their injuries is continuous and leads to successive
damages; thus, prescription will not begin to run until the
wrongful conduct (the inundation of their lands) ceases. The DOTD
retorts that these injuries were not of a continuous nature
because the tortious conduct ceased in 1972 when the Corps
completed construction.

To apply the continuing tort theory, the operating cause of
the injury must be a continuous one that results in continuous
damages.**[fn10]** Frank L. Maraist and Thomas C. Galligan, Jr.,
in their treatise on Louisiana tort law, clarified this
requirement:

> Ordinarily, the tortfeasor's act that causes
> damage is short-lived though the damage it causes
> may continue. In some cases, multiple, distinct
> acts by the tortfeasor cause separate and
> distinct damages; in those cases, each act gives
> rise to a separate tort, and prescription begins
> to accrue on each tort when the damage is
> sustained or at some later date, if the
> "discovery doctrine" applies. However, if both
> the tortious conduct and the damages continue,
> the tort may be deemed a "continuing" one and
> prescription may not begin to run until the
> wrongful conduct ceases.**[fn11]**

Therefore, if the operating cause of injury is tortious and
continually gives rise to successive damages, prescription begins
to run from the cessation of the particular
**Page 6**
wrongful conduct causing the damage.**[fn12]** "A continuing tort
is occasioned by unlawful acts, not the continuation of the ill
effects of an original, wrongful act."**[fn13]**

In this matter, because each instance of damage (each
interference with
**West Page 323**
the servitudes of drainage) constitutes a tort
under Article 667 and given Plaintiffs' belief that, both, the
damage and interference are continuous, Plaintiffs assert that
each of these torts qualifies as a continuing tort. We agree.

In *Crump v. Sabine River Authority*,**[fn14]** the supreme
court had to determine whether the application of the continuing
tort theory was appropriate. The plaintiff, Sarah Crump, objected
to the digging of a canal that caused a diversion of the flow of
water away from an oxbow, which, in turn, cut off her access to

the Toledo Bend Lake from her property. She asserted that the
defendant's contacts with her after this diversion of water took
place and its repeated representations that it would resolve the
water flow problem, as well as its unsuccessful attempts to do
so, constituted continuous tortious conduct. The *Crump* court,
however, concluded that it could not apply the continuing tort
theory to the facts of that case because the complained of
actions by the defendant were simply the continued ill effects
that arose from a single tortious act, the digging of the canal.
It further reasoned that:

> [T]he defendant's duty to remove the canal would
> stem from its obligation under La.Civ. Code
> article **2315** to repair the damage caused by its
> tortious conduct. However, the breach of the duty
> to right a wrong and make the plaintiff whole
> simply cannot be a continuing wrong which
> suspends the running of prescription, as that is
> the purpose of any lawsuit and the obligation of
> every tortfeasor.

Unlike *Crump*, in the instant case, the continuous action
that the Plaintiffs' complain of is the tortious conduct — the
constant interference with their servitudes of drainage, causing
the permanent flooding of their lands. Actually, this case is
more analogous to *Estate of Patout v. City of New
Iberia***[fn15]** and other cases, in which the
Page 7
courts held that
debris and other objects placed on another's property constituted
a
continuing trespass (or a continuing tort) and, accordingly,
prescription did not run until the trespass was abated.**[fn16]**

Likewise, prescription will not run in this case until the
flooding of Plaintiffs' lands is abated. Therefore, we find,
through application of the continuing tort theory, that
prescription has not, yet, begun to run on their claims for
compensation.

*Louisiana Revised Statutes* **13:5111**

The DOTD argues that the one year prescriptive period for
delictual actions is not applicable under these circumstances.
Instead, it suggests that the three year prescriptive period for
takings, which is apparently unaffected by the continuing tort
theory, governs the Plaintiffs' claims. Specifically, it contends
that the taking of property, by flooding or otherwise without
proper exercise of eminent domain, is not a tort; rather, it is
an appropriation by a governmental entity, subject to the
three-year prescriptive period found in La.R.S. **13:5111**, which
provides, in part:

> Actions for *compensation for property taken by
> the state, a parish, municipality, or other
> political subdivision or any one of their
> respective agencies* shall
> West Page 324
> *prescribe three years
> from the date of such taking.*

(Emphasis added.)

The court cannot supply the objection of prescription; a party must plead it.**[fn17]** The party pleading prescription has the burden of proving that the claim had prescribed.**[fn18]** We must strictly construe prescriptive statutes against prescription and in favor of the obligation that a party seeks to have extinguished.**[fn19]** Therefore, when
**Page 8**
there are two possible constructions, we should adopt the construction that favors maintaining, as opposed to barring, an action.**[fn20]**

A strict reading of La.R.S. **13:5111** leaves one no choice but to conclude that the three-year prescriptive period should only apply when it is "the state, a parish, municipality, or other political subdivision or any one of their respective agencies" taking the property. Even if we had any doubt whether this language encompassed takings by the United States, we could not alter our conclusion, given the mandate that we strictly construe ambiguous prescription statutes against prescription and in favor of the obligation sought to be extinguished.**[fn21]**

In a very similar case, an aggrieved landowner requested our supreme court to hold the City of Bogalusa, instead of the United States, as the appropriating authority responsible for the damage to her property.**[fn22]** The City of Bogalusa asked the United States to construct a navigable channel 50 to 100 feet wide and 6 to 9 feet deep in the Pearl River from the Rigolets to Bogalusa. The United States agreed to construct the proposed improvement to Pearl River with these stipulations:

    (a) That local interests shall furnish, free of cost to the United States, the land required for the dams, locks, canal and appurtenances and all flowage and dumpage easements needed for initial construction and subsequent maintenance of the improvement and shall assume full responsibility for all property damage incident to construction and maintenance of the canal.

    (b) That local interests shall give assurances satisfactory to the Secretary of War that they will provide, free of cost to the United States, the ferries and bridges required for land traffic across the lateral and terminal canals, and construct a terminal canal from Pearl River to and including a terminal basin at Bogalusa with suitable terminal facilities open to all on equal terms.**[fn23]**

In this resolution, the City of Bogalusa also guaranteed that it would "hold and save harmless the United States of America, and its agents, from all claims for damages
**Page 9**
that may or
might result from the construction and maintenance of the improvement aforesaid."**[fn24]**

The landowner based her right to sue the city on this resolution, contending that the city assumed full responsibility for all the damages to her property incidental to

**West Page 325**

the construction of the canal. However, the supreme court found that she had no right of action against the city because the United States was the appropriating authority. It reasoned:

> [T]he documents annexed to her petition and which necessarily control the allegations therein contained, show that the United States government was acting under its own constitutional rights in the exercise of the power belonging exclusively to it in improving a navigable river and that the dredging of the canal was incidental thereto.
>
> If plaintiff has suffered damage, then the active and only agency causing the damage is the United States government. The work is solely under the direction and control of the United States government and title to the lands to be acquired, whether by purchase or condemnation, shall vest in the United States. The cost of the construction of the canal, locks, and dams is being paid by the United States. The supervision, operation, and maintenance of the finished project vests solely in the United States. The City of Bogalusa stands only in the position of being willing to pay whatever expenses or assessment the United States might incur in connection with the acquisition of the necessary right of way and such property damage as the owner might recover against the United States.**[fn25]**

For the same reasons, La.R.S. **13:5111** is inapplicable to the facts of this case since the United States' appropriation of Plaintiffs' lands, rather than the State's appropriation, led to the filing of this class action. Therefore, we disagree with the DOTD's assertion that the three-year prescriptive period for takings bars these claims.

We realize that this finding directly contradicts this court's holding in *Hawthorne v. Louisiana Department of Public Works*.**[fn26]** Nonetheless, strict application of La.R.S. **13:5111**, together with the supreme court's reasoning in

**Page 10**

*Cooper v. City of Bogalusa,***[fn27]** compels this result. Thus, given our belief that La.R.S. **13:5111** is inapplicable to the facts of this case, the general one-year prescriptive period for delictual actions governs Plaintiffs' claims for reimbursement.

*Claims for Injunctive Relief*

The Plaintiffs allege, and the DOTD concedes, that the Corps' construction of locks and dams along the Black and

Ouachita Rivers obstructed the natural drainage of water from Plaintiffs' lands.

Louisiana Civil Code Article **655** acknowledges that "an estate situated below owes a natural servitude of drainage to an estate situated above and, thus, is bound to receive the surface waters that flow naturally from that estate.**[fn28]** Comment (a) to Article 655 provides: "This provision reproduces the substance of the first paragraph of Article **660** of the Louisiana Civil Code of 1870. *It does not change the law.* Louisiana jurisprudence interpreting Article 660 continues to be relevant." (Emphasis added.) Our legislature repealed Article 660 in 1977, which specifically referred to the situation before us: "The proprietor below is not at liberty to raise any *dam*, or to make any other work, to prevent this running of the water." (Emphasis added.)
**West Page 326**

Thus, the law prohibits the *owner* of the servient estate from doing anything to prevent the natural flow of surface water from the dominant estate.**[fn29]** When the *owner* of the servient estate does something to prevent the flow of water, the remedy is a mandatory injunction, ordering the owner of the servient estate to remove any obstacles to natural drainage.**[fn30]** "*The prescription of nonuse does not run against natural servitudes*."**[fn31]** (Emphasis added.) Therefore, Plaintiffs' claims for injunctive relief to enforce their natural servitudes of drainage did not prescribe.**[fn32]**
**Page 11**

Even though their claims for injunctive relief cannot prescribe, the DOTD contends that the trial court can order, only, the *owner* of the servient estate to remove obstacles to natural drainage. Thus, the DOTD maintains that trial court cannot order it to modify or remove the locks and dams that obstruct the Plaintiffs' servitude of drainage because the United States owns these structures. Essentially, the DOTD is alleging that the Plaintiffs' have no right of action against it.

**NO RIGHT OF ACTION**

The DOTD believes the trial court committed reversible error when it found that the "Act of Assurances" gave Plaintiffs a right of action against it since the uncontested facts clearly show that the United States owns, constructed, financed, and continues to manage the subject locks and dams that caused the inundation of their lands. On the other hand, the Plaintiffs argue that since the State agreed to use its inherent power of eminent domain to save the United States harmless against all claims arising out of the construction, maintenance, and operation of these locks and dams, the DOTD agreed to accept responsibility for their claims; thus, Plaintiffs can look to the DOTD for just and adequate compensation.

According to the "Act of Assurances," through the Rivers and Harbors Act, the United States agreed to build these locks and dams to promote navigation on the Ouachita and Black Rivers. As a condition to this agreement, Congress mandated that, first, the State must agree to furnish all lands, servitudes, and

right-of-ways incident to the construction, maintenance, and operation of the project, and, second, _it must indemnify and hold the United States harmless against all claims_ that might result from the construction of the channel.

The record clearly shows that the United States was acting under its own constitutional rights in the exercise of its power, which belongs exclusively to it, to improve navigable rivers.**[fn33]** Consequently, the only entity that caused the flooding of Plaintiffs' lands is the United States. The project was solely under the direction and control of the United States and title to the lands acquired, whether by purchase or condemnation, vested in the United States. It, also, paid all construction costs of the canal, locks, and dams. Moreover, the supervision, operation, and maintenance of the
**Page 12**
finished project
are and have always been the sole responsibility of the United States. The DOTD is, merely, bound to pay any claims for damages, expenses, and assessments that the United States may have incurred involving the
**West Page 327**
acquisition of property and servitudes
that were necessary for the project.

As such, the United States (the _owner of the servient estate_ through which water runs) is bound to receive the natural drainage of surface waters that flow from the Plaintiffs' properties (the dominant estate).**[fn34]** The United States may make use of the water while it runs over its estate, but it "cannot stop it or give it another direction and is bound to return it to its ordinary channel where it leaves [the] estate."**[fn35]** Thus, the United States (as _owner of the servient estate_) cannot make the Plaintiffs' servitude more burdensome by obstructing the natural flow of water and, thus, it may be enjoined from doing so.**[fn36]**

However, since the United States is the operator and title owner of these locks and dams and given that it owns the land on which these constructions stand, we cannot enjoin the DOTD when it never had legal authority over these constructions and when it never owned the servient estate.**[fn37]** Under these circumstances, the United States is the only party we could enjoin, but it is not a party to this suit. Therefore, we must deny the Plaintiffs' request for injunctive relief, ordering the DOTD to remove these locks and dams that obstruct their servitude of drainage.

Nevertheless, even though the United States is primarily responsible for the inundation of Plaintiffs' lands, the DOTD is liable for any of the Plaintiffs' claims for reimbursement since it promised to hold and save the United States harmless for any loss or damages ensuing from the construction and maintenance of this project.
**Page 13**

_Direct Action Statute_

The trial court agreed with the Plaintiffs' assertion that the "Act of Assurances" and hold harmless agreement, in essence,

constituted an insurance contract and that, under this act of
insurance, the Plaintiffs have a right of action against the
DOTD, as the "responsible state agency" and insurer under the
act. Its reasoning is based on language in the Direct Action
Statute,**[fn38]** which gives third parties to an insurance
contract a direct right of action against a tortfeasor's
liability insurance carrier.

Under this statute, an injured third party's right of
action against the liability insurer vests at the time of
injury.**[fn39]** Therefore, Plaintiffs urge that their right of
action would have vested in 1972 when the Corps completed
construction of the project.

In 1972, the Direct Action Statute, which is a part of the
Insurance Code, provided, in part:

> *The injured person or his or her survivors or
> heirs hereinabove referred to, at their option,
> shall have a right of direct action against the
> insurer within the terms and limits of the
> policy*; and such action may be brought against
> the insurer alone, or against both the insured
> and insurer jointly and *in solido,*

**West Page 328**
> in the
> parish in which the accident or injury occurred
> or in the parish in which an action could be
> brought against either the insured or the insurer
> under the general rules of venue prescribed by
> Art. 42, Code of Civil Procedure.

(Emphasis added.) In its written reasons for judgment, the trial
court specifically addressed the Plaintiffs' contention that the
"Act of Assurances" is an insurance policy which the Direct
Action Statute governed:

> The "Act of Assurance[s]" executed by the State
> in favor of the United States is a simple two
> page document and under its provisions the State
> assures all damages for the construction and
> maintenance of the locks and dams constructed.
> The word indemnity is not used in the document.
> It is, however, unclear whether the contract is
> one of insurance or indemnity. The agreement
> merely provides [that the State will]: "Hold and
> save the United States free from damages due to
> construction and maintenance of the project."
> Blacks Law Dictionary defines "insurance" as:

**Page 14**

> A contract whereby, for a stipulated
> consideration, one party undertakes to compensate
> the other for loss on a specified subject by
> specified perils. *The party agreeing to make the
> compensation is usually called the "insurer" or
> "underwriter,"* the other, the "insured" or
> "assured;" the agreed consideration, the
> "premium;" the written contract, a "policy;" the
> events insured against, "risks" or "perils;" and

the subject, right, or interest to be protected,
the "insurable interest."

Under this definition the "Act of Assurance[s]"
executed by the State would constitute insurance,
and as such fall under the Direct Action Statute.

(Emphasis added.)

In support of its conclusion that the DOTD became the
liability insurer of the United States under the "Act of
Assurances," the trial court quoted *Quinlan v. Liberty Bank &
Trust Company*:

Unless the parties to the insurance contract have
agreed unambiguously that the contract shall be
an indemnity contract only, it would be
inequitable to deny an innocent tort victim the
right to bring a direct action against the
insurer, even if he has sustained only loss or
damage to an incorporeal.**[fn40]**

Without any such unambiguous declaration in the "Act of
Assurances," expressly stating that it is an indemnity contract,
the trial court reasoned that the DOTD is obligated to act as the
United States' liability insurer.

In 1972, the definitions section of the Insurance Code,
La.R.S. **22:5** contained the following applicable provisions:

In this Code, unless the context otherwise
requires, the following definitions shall be
applicable:

(1) "Insurance" is a contract whereby one
undertakes to indemnify another or pay a
specified amount upon determinable contingencies.

**Page 15**

(2) *"Insurer" includes every person engaged in
the business of making contracts of insurance*,
other than a fraternal benefit society. A
reciprocal, an inter-insurance exchange, or a
Lloyds organization is an "insurer."

. . . .

(6) "Person" means any individual, company,
insurer, association, organization, reciprocal or
inter-insurance exchange,
**West Page 329**
partnership, business,
trust, or corporation.

(Emphasis added.) Clearly, the state and its respective agencies
were not designated as insurers under La.R.S. **22:5**(2).**[fn41]**
Therefore, the trial court improperly deemed the DOTD as an
insurer of the United States and, as such, the application of the
Direct Action Statute to this matter is not feasible.

Given the inapplicability of the Direct Action Statute, we must determine if an alternate theory would allow the Plaintiffs to bring this action directly against the DOTD. Louisiana Code of Civil Procedure Article **862** mandates that "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings* and the latter contain no prayer for general and equitable relief." (Emphasis added.) Because Louisiana is a fact pleading state, a plaintiff must state the facts of their claim, but they do not have to set forth every possible theory of recovery.**[fn42]**

*Indemnification Agreement v. Suretyship*

The *Cooper* court,**[fn43]** when faced with a very similar predicament, held that the plaintiff property owner did not have a right to bring a direct action against the City of Bogalusa, the local indemnifying authority, for the damages to her property that resulted from a navigation project solely under the United States' control.
Page 16
Specifically, it held that the city's assurance to hold the United States harmless was in the nature of an indemnification agreement rather than one of suretyship.

Louisiana Civil Code Article **3035** defines suretyship as follows:

Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so.

A surety is liable to the creditor for the full performance of the obligation of the principal obligor, without benefit of division or discussion, even in the absence of an express agreement of solidarity.**[fn44]** A promise of suretyship need not contain technical formalities, but it must contain a clear expression of a party's intent to be bound as a surety.**[fn45]**

The plaintiff in *Cooper* believed the resolutions, to which the City of Bogalusa had agreed, established for it a suretyship obligation.**[fn46]** Accordingly, she alleged that the city was acting as a surety for the United States and, as such, the city was solidarily liable for the damage to her property which the United States' construction of a navigable channel in the Pearl River caused.**[fn47]** Our supreme court, however, found that these resolutions were, merely, evidence of an indemnification agreement between the city and the United States.**[fn48]** Therefore, it held that the plaintiff did not have a direct right of action against the city because its agreement to reimburse the United States for the damages it incurred due to the maintenance and construction
West Page 330
of the channel
did not make the City of Bogalusa a solidary obligor.**[fn49]**

Considering that the resolutions in *Cooper* are almost identical in substance to the "Act of Assurances" at issue in

this matter, we conclude that the DOTD merely agreed
**Page 17**
to indemnify
the United States in the "Act of Assurances" and, thus, never
agreed to act as its surety.**[fn50]**

*Third Party Beneficiaries*

Notwithstanding, this indemnification agreement between the
United States and the DOTD created a *stipulation pour autrui* in
favor of the Plaintiffs who are third party beneficiaries to the
"Act of Assurances."**[fn51]**

A stipulation made in favor of a third party beneficiary (a
*stipulation pour autrui*) gives a third party the right to
demand performance from the promisor.**[fn52]** Our courts have
consistently recognized the beneficiary's right to demand
performance from the promisor, *directly*.**[fn53]**

Our law favors stipulations made in favor of third
persons.**[fn54]** The supreme court in *Andrepont v. Acadia
Drilling Company* enumerated factors for us to consider when
deciding whether a contract provides a benefit for a third
person:

>(1) The existence of a legal relationship between
>the promisee and the third person involving an
>obligation owed by the promisee to the
>beneficiary which performance of the promise will
>discharge;

>(2) the existence of a factual relationship
>between the promisee and the third person, where
>(a) there is a possibility of future liability
>either personal or real on the part of the
>promisee to the beneficiary against which
>performance of the promisee [sic] will protect
>the former; (b) securing an advantage for the
>third person may beneficially affect the promisee
>in a material way; (c) there are ties of kinship
>or other circumstances indicating that a benefit
>by way of gratuity was intended.**[fn55]**

**Page 18**

When we apply these factors to the facts of this case, the
legal relationship between the promisee (United States) and the
third persons (Plaintiffs) involves an obligation (to reimburse
the Plaintiffs for the permanent flooding of their land caused by
the construction and maintenance of the locks and dams along the
Ouachita and Black Rivers) owed by the promisee (United States)
to the beneficiaries (Plaintiffs)
which performance of the promise (to "[f]urnish free of cost to
the United States all lands, easements, and right of way[s],
including flowage rights in overflow areas, and suitable
spoil-disposal areas necessary for construction of the project
and for its subsequent maintenance, when and as required" and to
"[h]old and save the United States free from damages due to
construction and maintenance of the project") by the promisor
(DOTD) would discharge.**[fn56]**

In other words, the obligation that the United States
imposed as a condition of the "Act of Assurances" and undertaken
**West Page 331**
by the DOTD (to provide the United States with all lands and
servitudes necessary for the construction and maintenance of the
locks and dams along the Ouachita and Black Rivers) constitutes a
*stipulation pour autrui* in favor of the Plaintiffs.**[fn57]**
The inference is clear that the United States knew before it
constructed these locks and dams that it needed to acquire
multiple pieces of property and servitudes to carry out this
massive construction project. As such, it was interested in
having the DOTD undertake its obligation to compensate the
Plaintiffs if construction resulted in the taking of their lands
because, otherwise, the United States would be responsible for
paying their claims for reimbursement.

In addition, the relationship between the United States and
the Plaintiffs was sufficient to support the inference that there
was a possibility that the United States could be liable to the
Plaintiffs sometime in the future, but performance of the DOTD's
promise would protect the United States. This possibility of
future liability (for the damaging or taking of land caused by
the construction of these locks and dams) stems from the very
obligation that the United States wanted discharged. Therefore,
this case fits squarely within the guidelines our supreme court
set for determining when claimants should receive third-party
beneficiary status.
**Page 19**

The fact that the parties did not specifically name the
Plaintiffs in the "Act of Assurances" as third party
beneficiaries is of no consequence because our jurisprudence
recognizes that parties to a contract may make a *stipulation
pour autrui*
in favor of undetermined persons.**[fn58]** Moreover, the law
does not require express acceptance or consent by third party
beneficiaries, nor does it require a particular form of
acceptance or consent.**[fn59]** Comment (b) to La.Civ. Code
art. **1978** states that "the beneficiary's intention to accept the
benefit may be made known in any manner, even implied." Thus, by
simply filing suit, the Plaintiffs made known their intention to
accept the benefit.**[fn60]**

Consequently, we find that the Plaintiffs have a right to
proceed directly against the DOTD for the damages arising out of
the breach of its promise to the United States to provide it,
free of claims, with all lands and servitudes necessary for the
construction and maintenance of the locks and dams along the
Ouachita and Black Rivers.

*Recovery in Tort*

Under some circumstances, a third party beneficiary can
look beyond this contract theory for recovery.**[fn61]** Thus,
when a party's damage arises from the breach of a contractual
relationship, he or she may have a remedy both in contract and in
tort.**[fn62]** Therefore, the same acts or omissions may
constitute a breach of both a general

**Page 20**
duty owed to all persons
(*ex delicto*) and a breach of a special obligation the obligor
contractually assumed
**West Page 332**
(*ex contractu*).**[fn63]** Thomas C.
Galligan, Jr. acknowledged:

> One readily sees the relationship between tort
> recovery in such cases and third party
> beneficiary recovery in contract cases or
> obligations. However, as we have seen, the third
> party beneficiary theory may not be
> the only available means of recovery; tort causes
> of action may be available as well.**[fn64]**

Louisiana Civil Code Article **2315** provides, in part: "Every
act whatever of man that causes damage to another obliges him by
whose fault it happened to repair it." In other words, every
action, even if lawful, must be conducted with due regard for the
rights of others.**[fn65]** A party is at fault when they breach
a duty owed to another under the particular facts and
circumstances of a given case.**[fn66]** Fault encompasses the
exercise of contractual rights in a manner that causes
unreasonable property damage.**[fn67]** As such, the assumption
of a contractual duty may create a corollary or incidental tort
duty in favor of third persons.**[fn68]** Professor Glenn G.
Morris explains further:

> A tort duty is a duty that society imposes on a
> person, without his consent, in order to protect
> other persons from harm to certain legally
> protected interests. If a person causes damage by
> breaching a tort duty owed to the plaintiff,
> then, absent immunity, he is personally liable to
> the plaintiff for those damages. The fact that he
> may have agreed — in a contract or otherwise — to
> commit the tort on behalf of someone else (or,
> more realistically, to have agreed to engage in
> the conduct giving rise to the risk of injury
> against which the duty involved is designed to
> protect) is a matter that is irrelevant to his
> own liability. While the person for whom he was
> acting may also be held liable under

**Page 21**
> appropriate
> circumstances — if, for example, he had the
> requisite control and economic relationship — the
> fact that someone else may be held . . . liable
> for the tort does not eliminate the liability of
> the tortfeasor himself. . . .

> . . . .

> It is important to understand, however, that even
> though the duty involved would be factually
> related to the contract, it would be legally
> distinct from and independent of that contract.
> Indeed, it really would not matter whether the

situation was created by a contract that was
enforceable as such — as a legal contract — or
whether by some other form
of consensual undertaking. . . . Thus, if the
contract happened to be unenforceable . . . the
tort duty would arise nevertheless. That would be
so because the source of the duty involved would
not be the contract itself, but rather society's
interests in protecting its members against
uncompensated . . . injury.**[fn69]**

**West Page 333**

Considering the foregoing, we hold that the DOTD's
obligation to reimburse Plaintiffs arises each time the
United States' interferes with their natural servitudes of drainage.
Since each instance of damage (each interference with Plaintiffs'
servitudes of drainage) constitutes a new tort under Article 667
and given that, both, the damage and interference are continuous,
each of these torts qualifies as a continuing tort. Therefore,
the Plaintiffs can proceed directly against the DOTD for its
failure to reimburse them for the permanent flooding of their
lands which the continuous interference with their servitudes of
drain has caused. This direct action by the Plaintiffs, the
parties who suffered the ultimate loss, "against the party
ultimately responsible for it avoids the multiplicity and
circuitry of action otherwise necessary to achieve the payment of
the loss to [those] who suffered it by the one who caused
it."**[fn70]** In other words, permitting this direct action
against the DOTD, under these limited circumstances, promotes
judicial economy by not requiring the Plaintiffs to, first, file
an action against the Federal Government, which would, in turn,
be filed against the DOTD.

**Page 22**

### FEDERAL NAVIGATIONAL SERVITUDE

The DOTD maintains that all of the Plaintiffs' inundated
lands fall within and are subject to the federal navigational
servitude. If this superior navigational servitude extends to
these inundated lands, neither the United States nor the DOTD can
be held liable for any damage this construction project, designed
to promote navigation on Black and Ouachita Rivers, caused.

The federal navigational servitude arises by virtue of the
Commerce Clause in navigable waters, but it does not extend to
all navigable waters.**[fn71]** This servitude
recognizes the public's interest in using waterways as continuous
highways for the purpose of navigation.**[fn72]** However, this
interest is not absolute and the imposition of this servitude is
not automatic.**[fn73]**

The only evidence the DOTD presented at trial to support
its contention that the Plaintiffs' lands were subject to the
federal navigational servitude was the self-serving testimony of
Merlin A. Pistorious, an engineer for the DOTD. According to Mr.
Pistorious, the Corps did not instruct the DOTD to purchase any
property or servitudes in the area of the Jonesville Pool because
it assumed that this property was subject to the federal
navigational servitude. Specifically, he stated:

A. The Corps of Engineers provided us with
drawings and maps indicating to us where these
right-of-ways would have to be acquired. In the
Jonesville Pool, we were not required or given
any drawings showing that we had to acquire
easements or right-of-ways for flowage.

Q. And why not?

A. Because of the raising of the pool. Well, the
explanation that I was given — and I came onto
this project in 1972 — and *bear in mind the
Jonesville Lock and Dam had already been
constructed when I came into this area*, but in
conversations with Corps of Engineers'
right-of-way and real estate employees and with
superiors within my department, I was informed
that the Corps had

**West Page 334**

always maintained that we
would not require flowage easements . . . in the
Jonesville Pool *because all of the lands that*

**Page 23**

*would be inundated by the permanent pool fell
within the navigation servitude . . .* and
therefore did not require the taking of any new
rights.

(Emphasis added.)

The DOTD believes Mr. Pistorious' unrefuted testimony is
enough to defeat the Plaintiffs' motion for summary judgment.
However, the burden of proving navigability rests upon the party
asserting it.**[fn74]** Therefore, considering the fact that the
permanently flooded portions of Plaintiffs' lands were along
Rawson Creek, Gastis
Creek, Dry Lake, Hooter Creek, Big Creek, and Oil Well Creek and
the absence of evidence regarding their navigability, we must
consider these waterways to be non-navigable for the purposes of
the present case.**[fn75]**

In *Goose Creek Hunting Club, Inc. v.
United States*,**[fn76]** the court explained further:

[I]f . . . an improvement on a navigable stream
raises the water level in the stream and thereby
damages privately owned property situated within
the bed of the stream, the Government is not
liable for the ensuing damages. This is because
privately owned property situated within the bed
of a navigable stream is always subject to the
Government's dominant servitude in the interest
of navigation.

. . . .

On the other hand, *the navigational servitude of
the Government does not extend beyond the beds
of navigable streams*; and if an action taken by
the Government to improve the navigability of a

*navigable stream raises the water level in the*
*stream and thereby causes it to overflow or*
*otherwise damage property situated outside the*
*bed of such stream, the Government is liable*
*for the ensuing damages.*

(Emphasis added.)

Accordingly, even if the DOTD's assertion that the Black
and Ouachita Rivers are navigable streams, subject to the federal
navigational servitude, is correct, the
**Page 24**
Plaintiffs' inundated
lands are not subject to this servitude because their lands are
situated beyond the beds of those rivers.**[fn77]** As such, the
DOTD's contention that Mr. Pistorious' testimony proves the
Plaintiffs' inundated lands were subject to the federal
navigational servitude is without merit.

**PRIOR STIPULATIONS TO LIABILITY**

The DOTD asserts that the trial court erroneously concluded
that it previously stipulated to liability for similar claims in
prior proceedings. The DOTD, also, believes the trial court
improperly held that those stipulations were binding in this
litigation.

We will not address this assignment of error because these
alleged stipulations were not a factor that affected our findings
in any way.

Accordingly, we must conclude that the DOTD is liable for
the permanent flooding of Plaintiffs' lands which the
United States' construction of locks and dams along the Black and
Ouachita Rivers caused. We, also, find that the Plaintiffs had
the right to bring this action directly against the DOTD to
recover damages for
**West Page 335**
the United States' appropriation of their
lands. Although, given that the DOTD is not the owner of the
servient estate, we cannot grant the Plaintiffs' request for
injunctive relief.

**CONCLUSION**

We affirm the trial court's judgment, granting the
Plaintiffs a partial summary judgment on liability. Further, we
conclude that they have a direct right of action against the DOTD
to recover damages for the inundation of their lands, but we deny
their request for injunctive relief. We assess all costs of this
appeal to the DOTD.

**AFFIRMED.**

[fn1] La.R.S. **22:655**.


[fn2] *Magnon v. Collins*, 98-2822 (La. 7/7/99), **739 So.2d 191**.

[fn3] *Thompson v. McKnight*, 01-190 (La.App. 3 Cir. 6/6/01), **787 So.2d 620**, *writ denied*, 01-2882 (La. 1/25/02), **807 So.2d 249**.

[fn4] La. Code Civ.P. art. **966**(B).

[fn5] *Hayes v. Autin*, 96-287 (La.App. 3 Cir. 12/26/96), **685 So.2d 691**, *writ denied*, 97-281 (La. 3/14/97), **690 So.2d 41**.

[fn6] *Dean v. Hercules, Inc.*, **328 So.2d 69**, **72** (La. 1976).

[fn7] *Id.*

[fn8] *Id.*

[fn9] La.Civ. Code. art. 3492.

[fn10] *Crump v. Sabine River Auth.*, 98-2326 (La. 6/29/99), **737 So.2d 720**; *Bustamento v. Tucker*, **607 So.2d 532** (La. 1992); *S. Cent. Bell Tel. Co. v. Texaco, Inc.*, **418 So.2d 531** (La. 1982).

[fn11] FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 10-4(e) (2001) (citations omitted).

[fn12] *S. Cent. Bell Tel. Co.*, **418 So.2d 531**; *Crump*, **737 So.2d 720**.

[fn13] *Crump*, **737 So.2d at 728**.

[fn14] *Id.*

[fn15] 97-1097 (La.App. 3 Cir. 3/6/98), **708 So.2d 526**, *writ granted*, 98-961 (La. 7/2/98), **721 So.2d 897**, *affirmed by*, 98-961 (La. 7/7/99), **738 So.2d 544**.

[fn16] *See Dore v. Jefferson Guar. Bank*, **543 So.2d 560** (La.App. 4 Cir. 1989). *See also Terral v. Poole*, **484 So.2d 227** (La.App. 3 Cir. 1986).

[fn17] La. Code Civ.P. art. **927**; La.Civ. Code art. **3452**.

[fn18] *Pearson v. Hartford Accident & Indem. Co.*, **281 So.2d 724** (La. 1973).

[fn19] *See Unlimited Horizons, LLC v. Parish of E. Baton Rouge,*
99-889 (La.App. 1 Cir. 5/12/00), **761 So.2d 753**.

[fn20] *See Id.*

[fn21] *See State ex rel. Guste v. Simoni, Heck & Assoc.,*
**331 So.2d 478** (La. 1976).

[fn22] *Cooper v. City of Bogalusa,* **198 So. 510** (La. 1940).

[fn23] *Id.* at 511.

[fn24] *Id.*

[fn25] *Id.* at 512.

[fn26] **540 So.2d 1261** (La.App. 3 Cir.), *writ denied,*
**544 So.2d 406** (La. 1989).

[fn27] **198 So. 510**.

[fn28] La.Civ. Code art. **655**.

[fn29] La.Civ. Code art. **656**.

[fn30] *Gaharan v. State of La., through the DOTD,* **579 So.2d 420**
(La. 1991).

[fn31] La.Civ. Code art. **758**.

[fn32] *Gaharan,* **579 So.2d 420**.

[fn33] *See Cooper,* **198 So. 510**.

[fn34] La.Civ. Code art. **655**; La.Civ. Code art. **658**.

[fn35] La.Civ. Code art. **658**.

[fn36] *Gravity Drainage Dist. v. Vallee,* **512 So.2d 473** (La.App.
3 Cir.), *writ denied,* **513 So.2d 820** (La. 1987); La.Civ. Code
art. **655**; La.Civ. Code art. **656**.

[fn37] *See Carbo v. City of Slidell*, 01-170 (La.App. 1 Cir. 1/8/03), **844 So.2d 1**, *writ denied*, 03-392 (La. 4/25/03), **842 So.2d 400**; *See also Robertson v. Lebermuth*, 61 So. 388 (La. 1913).

[fn38] La.R.S. **22:655**.

[fn39] *King v. King*, **217 So.2d 395** (La. 1968).

[fn40] **575 So.2d 336** (La. 1990).

[fn41] *Nelson v. Cont'l Cas. Co.*, **412 So.2d 701** (La.App. 2 Cir.), *writ denied*, **413 So.2d 507** (La. 1982).

[fn42] *State ex rel. Ieyoub v. Racetrac Petroleum, Inc.*, 01-458 (La.App. 3 Cir. 6/20/01), **790 So.2d 673**.

[fn43] **198 So. 510**.

[fn44] La.Civ. Code art. **3045**.

[fn45] *Ball Mktg. Enter. v. Rainbow Tomato Co.*, **340 So.2d 700** (La.App. 3 Cir. 1976).

[fn46] *Cooper*, **198 So. 510**.

[fn47] *Id.*

[fn48] *Id.*

[fn49] *Id.*

[fn50] *See Id.*

[fn51] *See* La.Civ. Code art. **1978**.

[fn52] La.Civ. Code art. **1981**.

[fn53] Comment to La.Civ. Code art. **1981**.

[fn54] *Andrepont v. Acadia Drilling Co.*, **231 So.2d 347** (La.

1969).

[fn55] *Id.* at 351 (citing Smith, *Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui*, 11 TUL.L.REV. 18, 58 (1936)).

[fn56] *See Id.*

[fn57] *Id.*

[fn58] *Id.; Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp.*, 01-345 (La.App. 3 Cir. 6/20/01), **790 So.2d 93**, *writ denied*, 01-2115 (La. 7/26/01), **794 So.2d 834**, *writ denied*, 01-2303 (La. 8/10/01), **794 So.2d 836**; *Dartez v. Dixon*, **502 So.2d 1063** (La. 1987).

[fn59] *Hazelwood Farm, Inc.*, **790 So.2d 93**; *Andrepont*, **231 So.2d 347**.

[fn60] *See* Comment (b) to La.Civ. Code art. **1978**. *See also* Andrepont, **231 So.2d 347**.

[fn61] *Barrie v. V.P. Exterminators*, **625 So.2d 1007** (La. 1993).

[fn62] *Corbello v. Iowa Prod.*, 02-826 (La. 2/25/03), **850 So.2d 686**; *Fed. Ins. Co. v. Ins. Co. of N. Am., et al.*, **263 So.2d 871** (La. 1972).

[fn63] *Fed. Ins. Co.*, **263 So.2d 871**; *Davis v. LeBlanc*, **149 So.2d 252** (La.App. 3 Cir. 1963); *United Gas Pipe Line Co. v. Cargill, Inc.*, **612 So.2d 783** (La.App. 1 Cir. 1992).

[fn64] Thomas C. Galligan Jr., *Contortions Along the Boundary Between Contracts and Torts*, 69 Tul. L. Rev. 457, 525 (1994).

[fn65] *Broussard v. Northcott Exploration Co.*, **481 So.2d 125** (La. 1986).

[fn66] *Id.*

[fn67] *Id.*

[fn68] *Smith v. State*, **620 So.2d 1172** (La.App. 1 Cir. 1992). *See Barrie*, **625 So.2d 1007**. *See also Broussard*,

**481 So.2d 125**.

[fn69] Glenn G. Morris, *Developments in the Law: Business Associations*, 50 LA.L.REV. 211, 220-21 & 224 (1989) (citations omitted).

[fn70] *State ex rel. Guste*, **331 So.2d at 484**.

[fn71] *Dardar v. Lafourche Realty Co., Inc.*, **985 F.2d 824** (5th Cir. La. 1993).

[fn72] *Id.*

[fn73] *Dardar v. Lafourche Realty Co.*, **55 F.3d 1082** (5th Cir. La. 1995).

[fn74] *Goose Creek Hunting Club, Inc. v. United States*, **518 F.2d 579**, 207 Ct. Cl. 323, U.S. Ct. Cl. (1975).

[fn75] *See Id.*

[fn76] *Id.* at 330-31.

[fn77] *See Id.*

Copyright © 2007 Loislaw.com, Inc. All Rights Reserved