**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE KATRINA CANAL BREACHES                              CIVIL ACTION
CONSOLIDATED LITIGATION
                                                                            NO. 05-4182

PERTAINS TO:  LEVEE/MRGO                              SECTION "K"(2)
*Daubert* Hearings:    **Kilpatrick (Doc. 7992)**
                               **Truax (Doc. 8116)**

<u>**ORDER AND REASONS**</u>

Before the Court are "Defendants' Motion to Exclude the Report and Testimony of

Plaintiffs' Putative Expert John A. Kilpatrick" (Doc. 7992), "Sewerage and Water Board of New

Orleans' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A.

Kilpatrick" (Doc. 8167) and "Plaintiffs' Motion in Limine to Exclude the Class Certification-

Related Testimony of Michael W. Truax." (Doc. 8116).  These motions came for hearing on

October 17, 2007 where the live testimony of  of Kerry Dean Vandell ("Vandell"), James

Richardson ("Richardson")  and Michael Truax ("Truax") was adduced.  In essence, both

defendants and plaintiffs have sought to strike their respective opponents' experts concerning

damages for class certification purposes.  The Court has reviewed the pleadings, memoranda, the

deposition testimony of Dr. John A. Kilpatrick ("Kilpatrick"), the exhibits and the relevant law.

Based upon all of this evidence, the Court finds that both motions will be denied with a certain

caveat with respect to Mr. Truax's opinion  for the reasons that follow.  The Court will begin

with the defendants' motions to exclude Dr. Kilpatrick.

I.      **Kilpatrick**

**A.      Background –Are Damages an Issue which Predominates for Purposes of
        Class Certification?**

Plaintiffs are seeking class certification pursuant to Fed. R. Civ. 23 for two classes and

seven sub-classes of plaintiffs who suffered damages as a result of the inundation of Greater

New Orleans as a result of Katrina and the levee breaches.  The Levee Class encompasses all of

Orleans Parish north of the Mississippi River and west of the Industrial Canal as well as parts of

Jefferson Parish on its east bank.   It is comprised of five sub-classes that correspond to the

topography of the class geography, topography being a major factor in determining the source of

water and that water's ultimate location. (Doc. 9772, Memorandum in Support of Plaintiffs'

Motion for Class Cert. Ex. A, Area & Sub-Class maps).  The MRGO class encompasses the

portion of Orleans Parish east of the Industrial Canal, all of St. Bernard Parish and all of New

Orleans East.  It is comprised of two subclasses: the Lower Ninth Ward & St. Bernard Sub-Class

and the New Orleans East Sub-Class.

Plaintiffs seek classification under Rule 23(a) and Rule 23(b)(3) as a common-question

class action.  Thus, the appropriate rules provide:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or
> be sued as representative parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the class, and (4) the representative
> parties will fairly and adequately protect the interests of the class.

> **(b) Class Actions Maintainable.** An action may be maintained as a class action
> if the prerequisites of subdivision (a) are satisfied, and in addition:

> . . .

> > **(3)** the court finds that the questions of law or fact common to the
> > members of the class predominate over any questions affecting only individual
> > members, and that a class action is superior to other available methods for the fair

and efficient adjudication of the controversy. The matters pertinent to the findings
include: (A) the interest of members of the class in individually controlling the
prosecution or defense of separate actions; (B) the extent and nature of any
litigation concerning the controversy already commenced by or against members
of the class; (C) the desirability or undesirability of concentrating the litigation of
the claims in the particular forum; (D) the difficulties likely to be encountered in
the management of a class action.

Fed. R. Civ. P 23.

While plaintiffs provide a list of nine "common legal and factual issues" for both classes[1],

the focus of these *Daubert* motions concern the proof each side seeks to adduce with respect to

the ninth issue–whether class-wide damages were suffered.  Plaintiffs contend that this issue is

particularly suited for class certification purposes because using a mass appraisal model, there

are questions of fact with respect to damages that are common to the members of the class and

---

[1]The list is as follows:

1.   What legal duties did each Defendant owe to all class member?

2.   What causes of action might class members bring(or, mor pointedly, might they all bring the causes of action stated in the governing complaints)?

3.   What immunities, if any, does each Defendant enjoy as a matter of law, and based upon what universal set of facts?

4.   What historical facts (from past acts to legislative mandates and the like) are material to the case?

5.   Whose acts and omissions proximately caused the failures of the floodwalls of the 17th Street Canal, London Avenue Canal, the IHNC (wet and east) , and along the MRGO?

6.   How might fault be allocated among the defendants based upon the ultimate fact determinations concerning their conduct?  What legal principles are implicated, such as solidary obligations, master and servant, shared immunity, etc.?

7.   Where and at what times did water begin to enter the relevant class areas?  How may sources contributed within a give area? in short, where did the water com from; where did ti go; how did it get where it went; how deep was it once there; and when?

8.   How might the answer to the above questions have differed had Defendants acted differently?

9.   What class-wide damages were suffered?

(Doc. 9772, Memorandum in Support of Motions for Class Certification at 11).

that predominate over any questions affecting  only individual members.  Thus, plaintiffs

maintain that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy.

Plaintiffs opine:

Even certain damages–specifically, diminution of real property values–are
suited for class treatment.  The Class Representatives propose using the well-
established mass appraisal methodology for valuing class members' real property
damages. They plan to call Dr. John Kilpatrick to render expert testimony on the
application of the mass appraisal valuation method in this case.  Dr. Kilpatrick's
testimony will clearly establish that the question of damaged property values can
best be analyzed on a class-wide basis using mass appraisal methodology, as
recently was done by Dr. Kilpatrick himself in the *Murphy Oil*  case.  Mass
appraisal offers efficiencies that far outweigh, and thus are superior to, the chaos
of individualized damage computations.
The mass appraisal valuation methodology measures property damages by
coupling objective factors with common facts. The result is a practical,
economical approach to addressing property damage claims that arise from a
single event and on an unprecedented level.  Real property losses must be
computed in this action or in the thousands of alternate actions that failure to
certify would engender.

(Doc. 9772, Memorandum in Support of at 16) ("Memo in Support").

Plaintiffs also contend  that Judge Fallon acknowledged in *Turner v. Murphy Oil USA*,

2006 WL 91364 (E.D.La. Jan. 12, 2006), the availability of objective criteria–public records–and

the scientific validity of Dr. Kilpatrick's mass appraisal methodology, including its acceptance in

the community of his peers as a recognized standard under Rule 6 of the Uniform Standards of

Professional Appraisal Practice ("USPAP")[2] in  *Id.* at 5.  Plaintiffs opine that consideration of

damages on an aggregate scale permits a proper reliance on objective criteria together with the

---

[2]USPAP are the governing rules of real estate appraisal in Louisiana. *Turner v. Murphy Oil USA*, 2006 WL
91364, at *5 (E.D.La. Jan. 12, 2006); *Vela v. Plaquemine Parish Gov't.*, 729 So.2d 178 (La. App. 4th Cir. 1999)
(recognizing reasonableness of utilizing mass appraisal methodology in a class action hurricane levee protection
appropriation suit).

importation of common facts.  This method is used by tax assessors and insurance companies for

valuation of property.  Furthermore, the cost of individual assessments could cost over

$15,000,000.00.

**B.      Defendants' Motion to Exclude the Report and Testimony of Plaintiffs'
         Putative Expert John A. Kilpatrick–Applicable Standard and Alleged
         Deficiencies**

Defendants seek to exclude Kilpatrick's report based on their contention that this Court is

required to employ a full-blown *Daubert*[3] gate-keeping function at the class certification stage of

these proceedings.  Defendants maintain that where expert testimony is offered to support a

motion for class certification, the Fifth Circuit Court of Appeals instructs that a court should

consider the "admissibility of the testimony of an expert proffered to establish one of the Rule 23

elements in the context of a motion to strike *prior* to considering class certification. "  *Unger v.

Amedisys, Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005) (emphasis added); *Bell v. Ascendant

Solutions, Inc.*, 2004 WL 1490009 at * 4 (N.D. Tex. July 1, 2004).  They contend that Judge

Fallon's decision in the *Murphy Oil* litigation using a "*Daubert-lite*" standard is incorrect,

particularly in light of the Second Circuit's decision in *In re Initial Public Offering Securities

Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*") where that court clarified its decision in *In

re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d  Cir. 1999).

Rather, defendants contend that  Fed. R. Evid. 702  provides  the proper method of

evaluating Kilpatrick's testimony at this point, regardless of the stage of litigation. As applied to

Kilpatrick's testimony, they contend that *ipse dixit* nature of his report does not satisfy the

---

[3]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

5

intellectual rigor required by Rule 702.   Defendants argue that Kilpatrick's opinion does not provide a model or methodology.  They contend that  Kilpatrick's promise to develop a model which calculates actual or stigma-based diminution in property value is not enough.  Kilpatrick's failure to explain how this model will work, lack of detail about the model and the failure to identify or analyze any piece of data makes it inadmissible.  Defendants further opine that under Rule 702, a trial court cannot simply take the expert's word as the basis for reliability because the reliability prong would be subsumed by the qualification prong of the expert's test.  Thus, they seek its exclusion for failing to "articulate the methodology he intends to apply and disclose the facts and data required by the Federal Rules."

Furthermore, defendants maintain that Kilpatrick has not studied any data as of this date, and  Kilpatrick's ruminations are not the product of reliable principles and methods,  and,  as such, his report fails Rule 702(2).  Because the model has not been created, it cannot be tested nor is subject to peer review.  They also argue that while he references  automated valuation, hedonic and regression models–all of which have at least some academic acceptance–Kilpatrick has not provided any detail as to how he will use them and thus, he again is disqualified under Rule 702.  Defendants further rely on the fact that the Road Home Program and the insurance companies have abandoned mass valuation techniques in dealing with the Katrina losses.  In addition, the defendants claim that Kilpatrick's survey techniques such as "contingent valuation" are inherently flawed and produce unreliable results.

Defendants argue that Kilpatrick to date has only provided his real estate appraisal qualifications, a general description of a "mass appraisal methodologies" and identified "common factors" purporting to favor a mass appraisal methodology in this case.  They contend

6

that Kilpatrick has unreasonably asserted that a model he will create will measure the actual effects of flooding–without differentiating among the many and disparate causes of those effects–and the prospective effects of an intangible stigma arising from the possibility of future flooding.

While Kilpatrick maintains that his description of a mass appraisal model should be sufficient to demonstrate *his ability* to analyze property values on a class-wide, this *Daubert* challenge arises from the fact that he has not provided any details about how he will create (or apply) a model that will (1) purportedly control a multitude of property characteristics; (2) address divergent impacts of Katrina [defendants maintaining it was not a singular occurrence, but a confluence of events] and (3) ultimately deliver figures relating to the alleged diminution of real property values. Thus, the defendants argue that the complexities of this case are too varied to be reduced to a model. Since the model still has not been produced, the defendants move the Court to strike Kilpatrick from testifying as an expert witness.

### C.    Plaintiffs' Response

Plaintiffs argue that there are two methods for assessing or quantifying flood damage–individual appraisals conducted on a property-by-property basis–or mass appraisal which is Kilpatrick's approach. Plaintiffs maintain that there being well over 100,000 properties which allegedly sustained flood damage demonstrates that the mass appraisal method is the preferable approach. This approach was used in *Murphy Oil*, *supra*. Another example is *Cook v. Rockwell Int'l Corp.*, 2006 WL 3533049 (D.Colo 2006) where a plaintiff class sought damages

7

from the operators of a nuclear weapons plant near Denver, Col. based on plutonium

contamination.

    In essence, plaintiffs maintain that the issue at hand is expert witness admissibility for a

class certification proceeding, and not trial on the merits.  As such, they rely on  Judge Fallon's

reasoning wherein he stated:

>    a district court may not weigh conflicting expert evidence or engage in a
>    statistical dueling of experts.  The question for the district court at the class
>    certification stage is whether the plaintiffs' expert evidence is sufficient to
>    demonstrate common questions of fact warranting certification of the proposed
>    class, not whether the evidence will ultimately be persuasive.

*Turner v. Murphy Oil USA, Inc.* , 2006 WL 91364 (E.D.La. Jan. 12, 2006) at *3 citing  *In re Visa*

*Check/Master Money Antitrust Litigation,* 280 F.3d 124, 135 (2nd Cir. 2001), the case that the

Second Circuit's decision in  *In re IPO Litigation* called into question.  Plaintiffs argue that

defendants are incorrect in that the Fifth Circuit has **not** directly addressed whether a *Daubert*

analysis should or should not be conducted by the district court in the context of class

certification.  Plaintiffs note that in *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307(5th Cir. 2005)

(quoting *Unger*) the Fifth Circuit simply affirmed the district court's denial of class certification

finding that it had acted properly in "applying 'rigorous, though preliminary, standards of proof'"

to the class certification question.  *Id*. at  313.

    Plaintiffs' also take issue with defendants' characterization of *In re IPO*.  They maintain

that it did not address what *Daubert*  standard, if any, applies in the class certification context.

In fact, they maintain that neither Rule 702 nor *Daubert* is even discussed in the opinion.  The

major thrust of the opinion in the context of *Murphy Oil*, which was decided prior to *In re IPO*

was that the circuit court disavowed the suggestion in *Visa Check* that an expert's testimony may

8

establish a component of a Rule 23 requirement simply by being not "fatally flawed."  Thus,

plaintiffs maintain that Judge Fallon's decision took the correct approach in allowing Kilpatrick

to testify.

Plaintiffs maintain that Dr. Kilpatrick has described the mass appraisal method and

techniques and has referred to the type of data that he intends to gather for model input.  To rebut

defendant's contentions, plaintiffs argue:

1) He has presented the data he already possesses regarding St. Bernard which is the biggest sub-class in MRGO by virtue of the *Murphy* litigation which contains precise property and housing data.  (Doc. 7992-6, Deposition of Kilpatrick at 16) ( "Dep. of Kilpatrick").

2) He will have constructed a larger database to include all properties in the classes' area, enabling discernment of property damages on a sub-class (or even neighborhood) basis and by specific type of home (Dep. of Kilpatrick at 170).

3. He will have analyzed all post-Katrina transactional sales data for the class area (Dep. of Kilpatrick at 366-67).

4. His affidavit report declares that he has done "extensive examination" of the New Orleans market.  (Doc. 7992-5 Exhibit 2, Affidavit of Kilpatrick at ¶4) ("Aff. of Kilpatrick").  (Also see an article he co-authored on the flood effects of Katrina on the real estate market on New Orleans which is attached to that affidavit.)

5. He identified the type of mass appraisal mode or Automated Valuation Model (AVM); he possess a number "stigma models" from the past and that he does not "create such models purely for litigation."  The statistical model he intends to use has been peer reviewed (Dep. of Kilpatrick, at 29 & 32).

6. He proposes a mass appraisal "loss in value model."  (Dep. of Kilpatrick at 33, 171-72).  It will focus on (a) loss attributable to the post-Katrina flood, (b) the amount of such loss being determined on a location basis and (c) expressed as a percentage diminution of pre-Katrina property value (Dep. of Kilpatrick at 160 & 172).  The model's reference point will be value just prior to Katrina and value diminishment of the same immediately following Katrina.

7. This model will reveal two things:
  a) Pre-Katrina values "sortable" in different characteristics–by house type, etc.

      b)     Impaired values after Katrina due to flooding (Dep. of Kilpatrick at  231-33).  This will capture both repair costs and stigma as merged components of damage.  (Dep. of Kilpatrick at 238-39)

8.      "Common factors" which will be addressed as variable in the mass appraisal model include:
     a.     flood
     b.     stigma of risk perception
     c.     economic impact of flood in real estate market
     d.     post-Katrina higher insurance premium
(Aff. of Kilpatrick at  ¶9).

9.      Authority for mass appraisal/AVM exists both in industry standards and in published and peer-reviewed literature.  (Aff. of Kilpatrick at ¶¶25, 33-48).

10.    The mass appraisal model can provide a large, statistically valid and reliable model at 5 to 10 percent of the cost in a year to two less years of time.

11.    The model will be "hedonic"  meaning–one designed to determine the value diminution impact of a negative externality.   These values would then be tested by referring to a control area unaffected by the flooding which serves to calibrate the model as specified by USPAP. (Dep. of Kilpatrick at  207-209).

12.    "The purpose of the hedonic model is to isolate the post-Katrina flood experience in the class area as a stigma, or negative externality." (Dep. of Kilpatrick at 474-75).  Stigma, by definition is recognized in the real estate industry as a common factor affecting the market value of properties; and it has been documented as such in peer-reviewed literature. (Aff. of Kilpatrick at ¶17).

Kilpatrick says that his model will also rely upon survey research to investigate the impact of the flood as well as the effect of the promised repair of flood control structures.  This would be done in a statistically valid manner so that each factor could be isolated.

**D.**    **Analysis**

    **1. Legal Standard**

Based on the foregoing, the initial issue before the Court is where an expert seeks to testify at a class certification hearing, whether he or she must meet the standard of a full *Daubert* challenge–that is one  equal to a Daubert challenge brought on at the time of hearing on the merits.  In espousing this standard as being mandated by the Fifth Circuit, defendants rely primarily on *Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005) and *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005).  In addition, as noted, they contend that Judge Fallon's acceptance of Dr. Kilpatrick as an expert in the *Murphy Oil*  matter is undercut and incorrect in light of  *In re IOP*, 471 F.3d 24 (2d Cir. 2006).   A close review of these cases belies this assertion.

Rule 702 was enacted in response to the United States Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and *Kuhmo Tire v. Carmichael*, 526 U.S. 137 (199), which held that before an expert is allowed to testify, the trial court must assess the reliability of the methodology of the proposed expert and the relevance of the testimony to the facts at issue.  *Legier & Materne v. Great Plains Software, Inc.*, 2005 WL 2037346 at *1 (E.D. La.  August 3, 2005).   Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.   As this Court has stated before:

> Under *Daubert,* the proponent of the evidence must first prove that the offered testimony is based on sufficient facts or data. *See* Fed.R.Evid. 702. Next, the party must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.... The expert's assurances

that he has utilized generally accepted scientific methodology is insufficient."
*Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc).
The proponent of the evidence must prove the testimony's reliability by a
preponderance of the evidence. *Id.*

> In *Daubert,* the Supreme Court identified a non-exclusive list of factors
for a district court to consider in determining reliability: (1) whether the theory
has been tested; (2) whether the theory has been subject to peer review and
publication; (3) the known or potential rate of error; and (4) the general
acceptance of the methodology in the scientific community. *Daubert,* 509 U.S. at
593-95. A district court must focus on methodology, not conclusions. In *Kumho
Tire v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the
Court cautioned that the district court must ensure "that an expert, whether basing
testimony upon professional studies or personal experiences, employs in the
courtroom the same level of intellectual rigor that characterizes the practice of an
expert in the relevant field." *Kumho Tires,* 526 U.S. at 152. After the proponent of
the expert testimony has carried her burden of showing reliability, the party must
also prove the expert opinions' relevance. That is, that the experts' opinions have
"a valid ... connection to the pertinent inquiry." *Daubert,* 509 U.S. at 592.

*Legier,* at 1.

As to the applicability of *Daubert* in the context of a class certification hearing, the Fifth

Circuit has addressed this issue in its appellate opinion *Bell v. Ascendant Solutions, Inc.*, 422

F.3d 307 (5th Cir. 2005).  In *Bell*, purchasers of common stock of Ascendant Solutions brought

five securities fraud class action complaints that were consolidated into an amended class action

complaint alleging that Ascendant  made false and misleading statements in connection with its

initial public offering in violation of federal securities laws.  Plaintiffs sought class certification

pursuant to Fed. R. Civ. P. 23(b)(3) of a class consisting of all persons (except defendants and

certain related persons and interests) who purchased Ascendant common stock on the open

market between the date of the IPO and the day Ascendant announced its troubles,  and who

were damaged by defendants' allegedly false and misleading statements in violation of sections

10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. *Bell*, 422 F.3d at 309.

Ascendant opposed certification and submitted an expert report demonstrating that Ascendant's common stock did not trade in an efficient market.  As such, the "putative class could not invoke the fraud-on-the-market theory recognized in *Basic  Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L.Ed.2d 194 (1988), and obtain the benefit of its class-wide presumption of reliance, leaving plaintiffs' fraud claims dependent on proving individual reliance and thus unsuited for aggregation."  *Id.*  at 310.  In response plaintiffs offered their own expert who included an event study that allegedly proved that Ascendant common stock did, in fact, trade in an efficient market.  The district court, however, excluded the expert report.   In doing so, the district court stated:

> Initially, Plaintiffs argue that any consideration of the admissibility of Professor Pettit's testimony is premature, since class certification is not the appropriate stage to indulge in a "battle of the experts." While Plaintiffs are correct that the class certification stage is not the time to conduct an inquiry into the merits of the case, the Court must still determine whether Plaintiffs have met their burden of proving market efficiency-so as to satisfy the Rule 23 requirement of predominance-when considering class certification. *See Lehocky v. Tidel Technologies, Inc.,* 220 F.R.D. 491, 507-08 (S.D.Tex. 2004) (examining Professor Pettit's analysis of market efficiency at class certification stage); *Krogman v. Sterritt,* 202 F.R.D. 467, 477 n .14 (N.D.Tex. 2001) (weighing conflicting expert testimony concerning market efficiency in order to conclude that plaintiff was not entitled to presumption of reliance for class certification purposes). Although many courts, such as the *Lehocky* court, weigh the admissibility of expert testimony in the context of a motion for class certification rather than a *Daubert*-style motion to strike, the Fifth Circuit has made clear that:
>
> > A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.

*Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). In many cases, it makes sense to consider the admissibility of the testimony of an expert proffered to establish one of the rule 23 elements in the context of a motion to strike prior to considering class certification. *See McNamara v. Bre-XMinerals Ltd.,* No. 5:97-CV-159, 2002 WL 32076175, at *4 (E.D.Tex. Sept. 30, 2002) (considering defendants' rule 702 motion to strike expert's testimony of market efficiency prior to subsequent class certification analysis). In order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable. Accordingly, a *Daubert*-type review is not premature.

*Bell v. Ascendant Solutions, Inc.,* 2004 WL 1490009, *2 (N.D.Tex. July 1, 2004).

Defendants sought to exclude plaintiffs' expert's testimony concerning the efficiency of the market for Ascendant stock based on their contention that his analysis of stock price movement in response to company specific new was severely flawed.  In the context of this type of litigation, the use of cause-and-effect relationships between unexpected corporate events or financial releases and immediate responses in stock price are used; however, the district court basically found the expert's use of "information days" and "absolute value" made his report "unreliable" if not in essence "rigged" to obtain the results needed.  *Id.* at 3-4.  The court noted that many of the dates chosen "appeared to  be consciously chosen in order artificially to support his hypothesis of efficiency." *Id.*  Furthermore, many of the choices of dates did not meet generally-accepted finance methodology used to establish efficiency.  He also employed "absolute value" to determine market price reaction to company news, "a technique never previously used to test for market efficiency and disavowed by the author of an article presented by plaintiffs of support its use."  *Id.* at 4.  Thus, the court found "the techniques supporting the expert's finding of market efficiency have not been tested, have not been subject to peer review and publication, and do not enjoy general acceptance within a relevant scientific community."

*Id.* The court then found that without proof of efficiency being established as a prerequisite for the use of "fraud on the market" theory of reliance, the Court denied the certification motion.

Plaintiffs in *Bell* appealed contending that they were required only to plead market efficiency at the class certification stage and that the district court had erred by requiring a threshold showing, improperly deciding an issue going to the merits. The Fifth Circuit rejected this contention noting that since its decision in *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) where it found that a fraud class action cannot be certified when individual reliance is an issue, it has made clear that a district court "may certainly look past the pleadings to determine whether the requirements of rule 23 have been met." *Bell*, 422 F.3d at 312 n. 7. Thus, the court noted that in the context of a reliance issue, it espoused the "rigorous, though preliminary, application of standards of proof to the market efficiency determination." This holding was in line with the court's previous decision in *Unger v. Amedisys Inc.*, 410 F.3d 316 (5th Cir. 2005).

In *Unger*, the Fifth Circuit, again in the context of a securities fraud and a "fraud on the market" theory, stated unequivocally that "[w]hen a court considers class certification based on the fraud on the market theory, it must engage in a thorough analysis, weigh the relevant factors, require both parties to justify their allegations and base its ruling on admissible evidence." Unquestionably, then, these cases stand for the proposition, that a court in approaching class certification must be certain that the methods underlying the proof of any requirement for class certification are reliable.

With respect to *In re IPO*, the Second Circuit addressed the issue of the proper standard to use at the class certification stage and characterized the issues presented there as follows:

This appeal primarily concerns the issue, surprisingly unsettled in this Circuit, as to what standards govern a district judge in adjudicating a motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. Comprehended within this broad issue are subsidiary issues such as[1] whether a definitive ruling must be made that each Rule 23 requirement has been met or whether only some showing of a requirement suffices, [2] whether all of the evidence at the class certification stage is to be assessed or whether a class plaintiff's evidence, if not fatally flawed, suffices, and [3] whether the standards for determination of a Rule 23 requirement are lessened when a Rule 23 requirement overlaps with an aspect of the merits of the proposed class action. Finally, the appeal presents  the question whether granting a motion for class certification in the pending litigation exceeded the District Court's discretion.

*In re IPO*, 471 F.3d at 26-27. (emphasis added).   In resolving these issues the Second Circuit reviewed in great detail Supreme Court precedent concerning the proper standard of examination for a Rule 23 certification and the genesis of the *In re Visa/MasterMoney* standard (methodology that is not "fatally flawed" is sufficient to meet Rule 23 requirements).  In essence, the Second Circuit found that its use of this standard was misguided and that it was incorrect to apply the "no merits inquiry" language found in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140 (1974) to prohibit a court from a full examination of the class certification requirements when they overlap with merits.  *In re IPO,* 471 F.3d at 33.  Thus, in *In re IPO*, the court sought to clarify its approach to class certification and held the following:

In light of the foregoing discussion, we reach the following conclusions: (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) **a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to**

**determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.**

In drawing these conclusions, we add three observations. First, our conclusions necessarily preclude the use of a "some showing" standard, and to whatever extent *Caridad* might have implied such a standard for a Rule 23 requirement, that implication is disavowed. **Second, we also disavow the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed. A district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit. Finally, we decline to follow the dictum in *Heerwagen* suggesting that a district judge may not weigh conflicting evidence and determine the existence of a Rule 23 requirement just because that requirement is identical to an issue on the merits.**

*In re IPO*, 471 F.3D at 41-42 (emphasis added).

Thus, it is clear that while some of the language that is cited by Judge Fallon in the *Murphy Oil* opinion, in particular the statement that a court "'cannot 'engage in a statistical dueling of experts'" *Murphy Oil*, 2006 WL 91364 at *4,** might be called into question, in reality, *In re IPO* adopts the same standard of examination as mandated by the Fifth Circuit but underscores that a court should not make a final determination of the merits at the certification stage.  Instead,  a court should exercise its discretion to insure that class certification does not become a pretext for a partial trial of the merits.  Thus, the Second Circuit reiterated that  a vigorous examination of the factors is required and noted that it was joining the ranks of the other circuit courts including the Fifth Circuit in enunciating such a requirement.  *In re IPO*, 471 F.3d at 38-39.

However, nothing in this language stands squarely for the proposition that a full *Daubert* review is mandated by *In re IPO*.  This position is supported by *Hnot v. Willis Group Holdings, Ltd.*, 241 F.R.D. 204 (S.D. N.Y. March 8,  2007) ("*Hnot II*").  In this case, a district court was

asked to reconsider its having granted plaintiffs' motion for class certification in light of *In re IPO*.   That court characterized *In re IPO* stating,  "Thus, the holdings of *In re IPO* are both significant and narrow–a district judge must consider all of the relevant evidence in determining whether Rule 23 has been satisfied, but a district judge may not go beyond the boundaries of Rule 23 when making such a determination."  *Id.* at 209.   That district court noted as well:

> Contrary to defendants' assertions, *In re IPO* does not stand for the proposition that the Court should, or is even authorized to, determine which of the parties' expert reports is more persuasive. **Defendants ignore the fact that *In re IPO* specifically rejected this interpretation of Rule 23. Instead, *In re IPO* reiterated that "experts' disagreement *on the merits*-whether a discriminatory impact [can] be shown-[is] *not a valid basis* for denying class certification." *In re IPO*, 471 F.3d at 35 (emphasis supplied), citing *Krueger*, 163 F.R.D. at 440.** Thus, the Court may only examine the expert reports as far as they bear on the Rule 23 determination.

*Id.*  at 210 (emphasis added).

Subsequently, another Southern District of New York court took up the issue of class action certification standards in *Velvez v. Novartis Pharmaceuticals Corp.,* 244 F.R.D. 243 (S.D.N.Y.  2007).  That court cited *In re IPO* noting its clarification of the standards for the adjudication of motions for class certification:

> [A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; [and] such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met. [*In re IPO*] at 41.

*Id.* at 256.   The court continued:

> *In re IPO* makes clear that courts may resolve contested factual issues where necessary to decide on class certification, and when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue.  *See In re IPO*, 471 F.3d at 42 (denying class certification as to the issue of reliance because the

presumption on which plaintiffs' theory depended was inapplicable).  However "[c]ommonality requires that plaintiffs present common *questions* of fact or law; plaintiffs' ultimate success at trial on the merits requires an *answer* to that question, specifically that defendants actually did discriminate against plaintiffs." *Hnot II,* 241 F.R.D. at 211 (emphasis in original).  "For the Court to decide which expert report was more persuasive would be to decide whether the class was actually discriminated against by defendants.  This the Court was not required to do, either before or after, *In re IPO."   Hnot II*, 241 F.R.D. at 211.

*Velvez*, 244 F.R.D. at 257.

In light of the foregoing, the Court finds that its Rule 702 review of the expert report of Dr. Kilpatrick will be vigorous but limited to the opinion's reliability and relevance to the requirements of class certification under Rule 23. That inquiry will be focused on whether there are questions of fact with respect to damages that are common to the members of the class and that predominate over any questions affecting only individual members or not.   A full *Daubert* examination will not be taken at this stage,  and a determination at this time whether Kilpatrick's opinion will be accepted at the time of trial on the issues will not be made.   The purpose of this examination is:

> [to] ensure that [these expert opinions] contain no flaws that would render [either] inadmissible as a matter of law:  the methodology must show some hallmarks of reliability whether through peer review or use of generally-accepted standards or methods; the expert must be qualified; and the opinion must have probative value for the issues of class certification.

*Murphy Oil*, 2006 WL 91364 at *4 *citing In re Polypopylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 26 (N.D.Ga. 1997).   Obviously, the foregoing legal analysis and standard are equally applicable to the Truax opinion and shall be the basis for the Court's decision in that regard.

Clearly, comprehensive expert reports as will be required on the merits are not feasible at the Rule 23 stage.  If the class is certified a detailed report will be necessary and required at the trial on the merits.  The court's inquiry here is to determine if the expert testimony has sufficient

19

reliability to be presented at the class certification hearing.  Is the approach used by the experts sufficiently trustworthy to assist the Court in determining the requirements of commonality with respect to damages?  In essence, the Court must determine if the expert's testimony **may** reliably establish that a class action should or not be certified.

### 2.      Application to Dr. Kilpatrick

The Court finds that Dr. Kilpatrick's report is acceptable for purposes of class certification.  To begin, his credentials are substantial.   Dr. Kilpatrick holds a Ph.D degree in Real Estate Finance and is a state-certified (general) real estate appraiser in Louisiana and many other states.  He is president of Greenfield Advisors, formerly Mundy Associates, LLC, a real estate appraisal and consulting firm headquartered in Seattle, Washington.  This firm has specialized in the valuation of contaminated sites.  He has authored or acted as editor of fours books on real estate.  He is the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research" a peer-reviewed article written at the invitation of the *Journal of Real Estate Literature* (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in new Orleans following the 2005 hurricane.  The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas.  He has also made extensive examination of the New Orleans market.  (Affidavit of Kilpatrick, ¶¶ 1-4).  He has never been rejected as an expert of mass appraisals.  (Dep. of Kilpatrick at 38).

Furthermore, the Court is satisfied that the methodology is reliable.   Clearly, mass appraisal is an accepted methodology.  As previously noted, it is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and has been accepted in this district in another case arising out of Hurricane Katrina where damages were to be assessed concerning oil damage that occurred simultaneously with flooding in *Turner v. Murphy Oil US*, 2006 WL 91364 (E.D.La. Jan. 12, 2006). Indeed, a large swath of those seeking damages in the MRGO Class Action would involve the same properties as in the *Murphy Oil* case.  This approach is used in appraiser's offices all over the country to determine value. (Dep. of Kilpatrick at 248);  *see also Berne Corp. v. Government of Virgin Islands*, 262 F. Supp. 2d 540 (V.I. 2003).

In essence the defense argues that Kilpatrick's mass appraisal is unreliable when there are multiple factors for the cause of damages and heterogeneity of the neighborhoods.  Because of the differences in property values from block to block, house to house, as well as the differences in the type of structures block to block, house to house, the defense maintains that the mass appraisal construct would not provide reliable information and thus should be stricken at this time.  However, the Court was not persuaded by his testimony.  Kilpatrick maintains that these factors can be calibrated in a model that he will construct once he obtains all of the data involved.  While the defense argues that Kilpatrick is asking the Court to "trust him" when he has no specific modeling data, it must be kept in mind that the court has not certified this class at this time and will listen carefully at the hearing.   As noted above, at this stage, the Court must be satisfied that the methodology is reliable to demonstrate that commonality is present with respect to damages.  Mass appraisal  is used throughout the country and used in hundreds of

communities which must involve heterogeneity by each tax assessor.  While it may or may not

be as precise as appraisal,  it uses a consistent methodology.

As stated in *Statistical Evidence of Real Estate Valuation: Establishing Value without*

*Appraisers*, 21 S.Ill.U.L.J. 113 (Fall 1996):

> From the references cited herein, it is plain that the hedonic methodology qualifies under the majority of the court's suggested factors.  As demonstrated, hedonic[4] pricing has often has often been tested and subjected to extensive peer review in the field of financial economics.  Spatial models have received equal acceptance in economic geography.  Error rates are not only discernible in statistical studies, the errors (in the form of observed variances from estimated values) are actually  one of the principal objects of study.  Thus, at least the first part of the *Daubert* test can be met, leaving only the question of relevance to a particular set of facts.

*Id.* at 146-47.

Defendants argued to the Court that this report is a pig in a poke; however, the Court has

not bought the pig yet.  It will listen to the expert testimony at the time of the class certification

hearing to determine whether the Rule 23 factors are present.  While Kilpatrick has not yet

reached the empirical investigation stage, certainly, his report demonstrates that the mass

appraisal technique is accepted and can demonstrate commonality for purposes of computation

of damages.

The Court must reiterate that it is accepting this expert for purposes of demonstrating

Rule 23 criteria; when and if this matter goes to trial on the merits, the report which by then

should encompass all the empirical data necessary to create a model to demonstrate damages

must be present.  Kilpatrick avers that his model can:

---

[4]The term "hedonic" is used to describe events in a model–such as flooding–which would be factored into a mass appraisal to demonstrate the economic effect thereof to the value of the property.

> delineate what loss in value might be attributable to flood as opposed to other
> factors.  And indeed, we have got some very powerful tools, such as survey
> research, which have proven to be consistently useful and acceptable not only for
> determining the total amount of market value lost to a given property but also to
> be able to delineate, on a statistically valid and reliable basis, how much loss is
> attributable to another component.

(Dep. of Kilpatrick at 172).  Indeed, he maintains that his model will be able to separate out the

valuation component of one damage versus another, such as wind versus rain.  (Dep. of

Kilpatrick at 232).  Kilpatrick opined that on a property by-property basis, within the confines of

a statistically valid database, the model will demonstrate what a property was worth before the

storm and immediately after the storm.  This model will differentiate by variables–the number of

bathrooms  or the number of floors, for example–as well as by exigencies of fate, like wind

damage.   (Dep. at 232-233).[5]

In addition, clearly, in order for individual appraisals of all of the affected properties to

occur, hundreds of individual appraiser would be employed.  By definition, the subjective

differences of each of reports  would result in some inherent inconsistencies.  Additionally, the

time to accomplish this task would be greater, as well as the cost would be exponentially more.

Accordingly,

**IT IS ORDERED** that "Defendants' Motion to Exclude the Report and Testimony of

Plaintiffs' Putative Expert John A. Kilpatrick" (Doc. 7992) and "Sewerage and Water Board of

New Orleans' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A.

Kilpatrick" (Doc. 8167) are **DENIED**.

---

[5]This report will not include information for rental property or for loss of profits for businesses.

II.     **Plaintiffs' Motion in Limine to Exclude the Class Certification-Related Testimony of Michael W. Truax." (Doc. 8116)**

Plaintiffs have moved the Court to strike the proposed testimony of Mr. Michael Truax primarily on the basis that he  has neither ever performed a mass appraisal nor is he sufficiently familiar with the factors necessary to construct a mass appraisal and/or hedonic model.

In the executive summary of his consulting report, he gave the following four items as the scope of his assignment and the following summary of his conclusions.

**Scope of the Assignment:**

I.   Appropriate analysis methodology and relevant property issues/ factors to be considered to provide accurate/reliable value and damage estimates for proposed class properties.

II.  Efficacy and reliability of mass appraisal techniques for use in determining value and damage estimates for proposed class properties.

III. Reliability of local tax assessment data and values for use in determining value and damage estimates for proposed class properties.

IV.  Adequacy of inadequacy of properties of the named plaintiffs as proposed class representative.

**Summary of Conclusions:**

I.   Individual/detailed property analysis and evaluation are necessary to produce accurate/credible value and damage estimates for properties in the proposed class.

II.  The use of mass appraisal techniques to assess value and damage estimates for properties in the proposed class will not produce accurate/credible results.

III. Local tax assessment data and values cannot reliably be utilized to project value and damage estimates for properties in the proposed class.

IV.  The properties of named plaintiffs are not broadly representative of those in the proposed class.

Expert/Consulting Report of Michael W. Truax (Exh. 1 at hearing).

Clearly, Mr. Truax is an extremely well-qualified appraiser and is extremely knowledgeable in the realm of the Greater New Orleans real estate market.  Plaintiffs' primary focus is his lack of knowledge of mass appraisal techniques.  Mr. Truax has opined, *inter alia,*

24

that the efficacy of mass appraisal techniques for properties in the proposed class will not produce accurate and/or credible results.  The primary basis for this opinion is his experience in comparing his individual appraisals to mass appraisals performed by the Jefferson Parish and/or Orleans Parish tax assessors.  Mr. Truax acknowledged that he did not know specifically what model was being used by the various assessors, but he acknowledged that they were "rudimentary".

Although Mr. Truax has not had the benefit (nor has the Court) of seeing a full report by Dr. Kilpatrick and what statistical variables and modeling techniques he will utilize, Mr. Truax would still not be in a position to give expert testimony on the reliability or the validity of the Kilpatrick model.  Therefore, the Court is reluctant to allow Mr. Truax to opine on the reliability of mass appraisal techniques where his only basis for the opinion is the comparison of his appraisals to the local tax assessors' appraisal when it is unclear how analogous or lacking in sophistication these models are to those of  Dr. Kilpatrick's.

Therefore, the Court will allow Mr. Truax to testify as to his Conclusion I, III and IV as set forth above as they relate to the issue of commonality and typicality with respect to Rule 23; he is well-qualified to so opine.  The defense has other experts that will testify as to the inappropriate use of mass appraisal techniques in the Greater New Orleans area.  These experts may of course rely on the information and opinions contained in Mr. Truax's report in Sections I, III and IV.  Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion in Limine to Exclude the Class Certification-Related Testimony of Michael W. Truax is **GRANTED** with respect to Conclusion II and **DENIED** with respect to Conclusions I, III, and IV.

New Orleans, Louisiana, this __1st__ day of November, 2007.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

26