## DECLARATION OF JESSE L. ARNOLD, P.E.

I, Jesse L. Arnold, P.E., declare under penalty of perjury as follows:

1. This Declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States* in connection with the Flood Control Act ("FCA") immunity issues. As detailed below, this Declaration constitutes my FCA expert report concerning the composition of materials, design, and construction of the man-made features bordering the southwest bank of the Mississippi River-Gulf Outlet (MR-GO).   I reserve the right to revise and supplement this Declaration in light of the fact that the United States Army Corps of Engineers (USACE) has not completed production of documents, has not yet furnished Plaintiffs' counsel with usable electronic copies of numerous documents selected for production, and I have not had the opportunity to review or assess these documents.  If called to testify, I could and would testify competently to the following:

## I.    QUALIFICATIONS

Education

BSCE, Louisiana State University, 1971

MSCE, Louisiana State University, 1978 (Geotechnical Engineering major)

Registration

Professional Engineer, No. 17147, Louisiana, Civil and Environmental disciplines



Experience

2. I have practiced as a Geotechnical Engineer in Louisiana, since 1973. This practice involves geotechnical investigations, laboratory testing, engineering analyses, reporting and consultation, and construction (both foundation and earthwork) consultation for industrial, commercial, and residential clients. My practice is primarily in southern Louisiana, an area characterized by weak and compressible soils. In this environment, my expertise is applied to the design and construction of structures that support large and heavy objects such as embankments, tanks, and industrial structures.   A true and correct copy of my *curriculum vitae* is attached hereto.

3. The geotechnical tasks for these projects were focused on stability and settlement analyses. Several significant projects of this type were undertaken in the vicinity of New Orleans:

- Planning of one new landfill to be located on soft, peat laden soils in New Orleans East;

- Planning of a large landfill expansion in the vicinity of Waggaman;

- Planning and loading of several large oil storage tanks at an industrial site near Chalmette;

- Design and construction of a temporary flood protection embankment for the Lower 9th Ward floodwall repair.

2

The soils at these locations are comparable to those at the MR-GO locale.

## II.   INTRODUCTION

4.   The Greater New Orleans "flood protection system" is a massive and complex civil works project spanning years of development and engaging the effort of countless workers. Today, the function of this system is intuitively divided into three tasks:

> (a) control of floodwaters from the Mississippi River;
>
> (b) control of floodwaters resulting from near passes of hurricanes; and
>
> (c) control of rain water accumulations within the levee encircled portions of the city.

5.   These tasks are accomplished by a system of levees, ditches, earthen embankments, and large pumping stations that have evolved as the city has grown. In the early history of New Orleans, development of these system components was not coordinated. Thus, portions of the city continued to suffer the miseries of flooding.

6.   In more recent times, the task of constructing flood control components has been assigned to the USACE. This is the case in Orleans and St. Bernard Parishes.  As an organization, the USACE has developed and applied means and methods focused on the flood control effort in New Orleans and elsewhere in the

3

nation. One noteworthy example of their capability is the performance of the levee system within the Mississippi River basin.

7. Nevertheless, in the course of Hurricanes Katrina and Rita passing, catastrophic failures throughout the alleged Greater New Orleans "flood protection system" occurred, resulting in the tragic loss of life and massive destruction. Public discourse, both written and conversational, has focused on the question, why? This report offers my opinion with regard to the major contribution of one critical component of the supposed system—the putative hurricane flood protection features along the southwest bank of Reach 2 of the MR-GO. Specifically, it is my opinion that by the time of Hurricane Katrina, the USACE had not completed constructing a hurricane flood protection "levee" along Reach 2 of the MR-GO as that concept is generally understood by engineers and as specified in relevant USACE manuals and guidelines. What was in place by late August 2005 was nothing more than an earthen embankment that was not a "levee" because, among other things, it offered no meaningful hurricane surge protection to the human population in the vicinity. The remainder of this report summarizes the basis for my opinion.

## III. BACKGROUND

8. The MR-GO was constructed between 1958 and 1968 for service of commerce by shipping. In brief, this tidewater navigational channel was dredged

4

into alluvial deposits on an alignment from the Gulf Intracoastal Waterway (GIWW) near the Paris Road Bridge into Breton Sound southeast of New Orleans through miles of marshlands. Spoil from the dredge was placed in a containment area along the southwest bank of the MR-GO. The containment area was approximately 4000 feet wide. When the MR-GO was constructed, there were no levees built to protect the neighboring populations and property from flooding.

9.      Near the end of this construction, in 1965, Hurricane Betsy passed over Greater New Orleans, causing extensive damage and flooding and death. Shortly thereafter, Congress authorized the USACE to undertake improvements to the Greater New Orleans "flood protection system." A portion of this authorization contemplated the construction of a new levee built atop the spoil bank alongside Reach 2 of the MR-GO.

## IV.   PROJECT PLANNING

10.     Two USACE manuals provide insight regarding this aspect of project planning. One is the *Coastal Engineering Manual*, EM 1110-2-1100 (referenced hereafter as *CEM*). Although this manual is a recent publication, dated July 31, 2003, the concepts presented are recognized to have evolved from an earlier USACE manual, *The Shore Protection Manual*. The second USACE manual is *Design and Construction of Levees*, EM 1110-2-1912, dated April 30, 2000 (referenced hereafter as *DCL*). As with the *CEM*, the *DCL* is also recognized to

**5**

have evolved from earlier versions of the same name. A 1978 edition in my
possession has practically the same table of contents and much of the text is
adapted to form the 2000 edition. Given the long history of USACE involvement
in levee design and construction, it is reasonable to presume that the fundamental
concepts embodied in the current manuals were recognized at the time of
construction along the MR-GO.

11.     The *CEM* directly addresses the selection and design of coastal flood
protection components such as levees (called "dikes" in the *CEM).* The *DCL*
presents design and construction considerations for levees with an apparent
emphasis on river environments. In addition, since Defendants have failed to
provide usable copies of documents provided to Plaintiffs for inspection only, I
have not been able to determine whether the USACE primarily relied on the *CEM*
or the *DCL* in designing or constructing the alleged levee along Reach 2 of the
MR-GO.  I therefore reserve the right to supplement this report when such
materials are made available to Plaintiffs.  In any event, the two manuals serve as a
thorough checklist for levee design and construction.

## V.     GEOTECHNICAL INFORMATION

12.     The initial task of the USACE in the original construction of the MR-
GO was to conduct an investigation of the soils along the prospective channel

**6**

alignment. This information would also be relevant to the later planning of the any
alleged flood protection levees alongside the channel.

13.     Geotechnical conditions along the MR-GO alignment are described in
a USACE report, *Geological Investigation of the Mississippi River-Gulf Outlet
Channel*, Miscellaneous Paper No. 3-259, February 1958. Principal contributors to
the report are Messrs. W.J. Turnbull (General Supervision), C.R. Kolb, and J.R.
Van Lopik. A true and correct copy of this report is attached hereto as Exhibit B.

14.     A copy of Plate 4 on page 22 of this Declaration provides a convenient
means to grasp the character of the soils. This drawing is a section showing the soil
strata encountered by the investigation. The segment of interest to this report
begins at the left hand end of the profile and extends to about the 13 mile distance.
Two principal strata are shown: the Pleistocene and overlying alluvial deposits (not
named on the section). The latter is divided into the following components: marsh,
interdistributary, intradelta, prodelta, and nearshore gulf. These components are
distinguished in terms of the depositional environment. From a geotechnical
perspective, the alluvial stratum is characterized by weak and compressible soils,
particularly the prodelta, interdistributary, and marsh materials. Included in this
fine-grained matrix are beds of sand and shells attributable to former beaches and
sea floor sediments. The Pleistocene stratum is an older geologic unit that is

7

typically stronger and less compressible than the alluvial deposits. The USACE borings confirmed this generalization.

15. A portion of the profile described above was dredged to form the MR-GO channel. The depth of dredging was planned to an elevation -36 in the area of the alleged hurricane flood protection levee. By reference to the profile, it is seen that the dredging spoil was wholly derived from the alluvial deposits. The stronger Pleistocene materials were not penetrated. The following paragraphs expand the characterization of these particular soils since they were later used to form what the Defendants claim to be the MR-GO hurricane flood protection levee. In addition, my opinions regarding the suitability of these materials for use in the disputed levee are presented. After that, my opinions on the effects of manipulation of the materials in course of constructing the supposed levee, whether intentional or natural, are explained.

16. The soil materials described in the USACE report, as they were *in-situ*, were not suitable for use to form a hurricane flood protection levee. As noted above, the soils are very wet and weak, are bedded with sand and shell strata, and contain large deposits of highly organic material. In this wet condition, the materials would be impractical to shape into an embankment, since the equipment needed to shape the material would become continually stuck, buried, and mired.

17. Particular note is made of the stratum of highly organic material near the surface, identified as "marsh." These materials retain moisture, are subject to compression under load, and are spongy under construction loads. These materials could also be prone to erosion.

18. In addition to the difficulties attributable to the *in-situ* material is the effect of dredging. Historical photographs available from local library archives indicate that the channel was dredged with a cutter head. This equipment discharges the dredged material as slurry possibly with chunks of cohesive material intact. In effect the material dredged during construction of the MR-GO would have been placed in the spoil bank at higher moisture content than *in-situ*. More importantly, suspension in slurry can result in segregation of materials, *e.g.* sands and silts could be separated from clay clods. This segregation could result in inclusions that are susceptible to seepage and erosion.

19. It appears that the dredge spoil was simply discharged into a dike enclosed area and left to the effects of weathering for several years prior to initiation of the putative levee construction. Accordingly, the spoil would have retained a high moisture content and would have segregated texturally (*i.e* shells, sand, silt, clay, and organic components were distinguishable as layers and masses). In order to use these materials for construction of a hurricane flood

9

protection levee, much planning and extensive earthwork activities beyond that used for river levees would be expected.

20. In sum, the USACE undertook to construct a hurricane flood protection using unusually poor quality materials. In order to meet the criteria described in subsequent paragraphs, they would be required to implement an equally rigorous plan of earthwork. The utter devastation of large segments of the claimed MR-GO levee suggests that such a plan was not accomplished. As it appears, the USACE did not use materials that were acceptable under generally accepted practice nor the USACE's own manuals.

21. For example, the USACE's design report, *Lake Borgne - Mississippi River Gulf Outlet Shoreline Protection (PO-32), St. Bernard Parish, Louisiana*, December 2004 at pp. 18, 32 recognized and acknowledged that the MR-GO site is composed "entirely of marsh deposits" consisting of "highly organic clay, silty clays and peat with high water contents," which resulted in "poor soil conditions in the area." Yet, these were the very materials that the USACE's own levee manual warned against using when constructing levees designed to protect human populations. *DCL* at p. 4-2(a) (stating that "almost any type of soil is suitable for construction *except very wet, fine-grained soils or highly organic soils*.") (emphasis added).

22. Here, it is undisputed that the Army Corps used uncompacted, hydraulic

fill to design and construct the alleged MR-GO Reach 2 levees. The *DCL*,

however, warns explicitly about the characteristics and use of hydraulic fill to

construct levees:

> Hydraulic fill consists mostly of pervious sands. . . [and] would
> be very pervious and have a low density. . . and would be
> susceptible to soil liquefaction. Hydraulic fill would also quickly
> erode upon overtopping or where an impervious covering was
> penetrated. For these reasons, hydraulic fill may be used for
> stability berms, pit fills and seepage berms but *shall not normally
> be used in constructing levee embankments*.

*DCL* at p. 6-3 (b) (emphasis added).

23. Additionally, the *DCL* warned that hydraulic fill should only be utilized

in the levee construction in a "temporary emergency" and that those levees should

"protect[] agricultural areas whose failure *would not endanger human life*. . . ."

*DCL* at p. 6-3(b) and Table 7-1 (III) (emphasis added).

24. The *DCL* also details certain consequences for a list of levee

construction deficiencies. *See DCL* at Table 7-2. My analysis of the UCACE's

design and construction of the purported Reach 2 "levees" revealed that each of

these deficiencies actually existed in the putative Reach 2 levee, and the

anticipated consequences occurred during and after Hurricane Katrina.

**11**

**Table 7-2**
**Embankment Construction Deficiencies**

| Deficiency | Possible Consequences |
| --- | --- |
| Organic material not stripped from foundation | Differential settlements; shear failure; internal erosion caused by through seepage |
| Highly organic or excessively wet or dry fill | Excessive settlements; inadequate strength |
| Placement of pervious layers extending completely through the embankment | Allows unimpeded through seepage which may lead to internal erosion and failure |
| Inadequate compaction of embankment (lifts too thick, haphazard coverage by compacting equipment, etc.) | Excessive settlements; inadequate strength; through seepage |
| Inadequate compaction of backfill around structures in embankment | Excessive settlements; inadequate strength; provides seepage path between structure and material which may lead to internal erosion and failure by piping |

*DCL* at Table 7-2.

25.  This Table, along with the other deficiencies detailed herein, represent the USACE's failure to design and construct a hurricane flood protection levee that met its own criteria.  Accordingly, the earthen berm along the southern bank of the MR-GO could not have been a hurricane flood protection levee.  Moreover, the USACE did not adequately address, repair, or remediate any of these well-documented failures and deficiencies in the Reach 2 "levees" during the 40-year interval between the 1965 Congressional authorization of the Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan and Hurricane Katrina in August, 2005.

26.   Other soil investigations have been done by the USACE in the vicinity of the MR-GO spoil bank since the 1958 report. However, these sources of geotechnical information are only indicated on drawings and some are available only as poor quality copies, unfit for reference herein. As noted, I reserve the right

12

to supplement this Declaration since these materials are most likely in the possession of the USACE, and it has not provided this information to Plaintiffs' counsel in a usable format.

## VI.   LEVEE DESIGN CRITERIA

27.   When knowledgeable engineers use the term "levee" in the context of a flood protection structure, a "levee" is a planned structure having certain characteristics that serve to achieve the intended protective function of the levee. In this case, the intended function of any Reach 2 MR-GO "levee" is to prevent storm surge from flooding the communities that are supposed to be protected by the "levee."   Obviously, the supposedly-protected communities are rendered more vulnerable to flooding if the USACE makes a decision not to build a genuine levee because it makes a choice to omit several characteristics of a hurricane flood protection levee designed or constructed according to generally accepted engineering principles or in compliance with the USACE's own standards for such "levee" construction.   In this context, the absence of a critical characteristic for a structure to be considered a "levee" renders the structure unable to provide flood protection.   It is as if there was no "levee" at all.

28.   By analogy, a burglar alarm system is not a burglar alarm system if the installer does not install the detectors or provide power to the system. Instead, it is at best a work in progress.   And it does not become a burglar alarm system

**13**

merely because the installer says it is one or makes a notation on a construction plan that a burglar alarm system has been installed.

29.     Similarly, merely because the USACE claims that it intended to build "levees" along Reach 2 of the MR-GO, or that it began the process, or that it has indicated the presence of "levee" on its maps or other drawings, this does not transform miles of unarmored earthen embankments composed of sandy, uncompacted, and highly erodeable soils and hydraulic fill with widely varying crest elevations into "levees."

30.     Design criteria serve the purpose of selecting those characteristics that make any system functional, including flood protection levees.  The presence or absence of certain characteristics determines the nature and functionality of the structure that has been built.  Reference to the *CEM* and *DCL* suggests that the following characteristics had to be addressed if the man-made features along Reach 2 of the MR-GO were to function as genuine "levees" affording meaningful flood protection: settlement, stability, seepage, erosion, overtopping, and wave action.

The following paragraphs discuss each of these characteristics in turn.

**Settlement**

31.     I noted earlier that the deposits along the MR-GO alignment at the time of its original construction, as well as those to be used for the proposed "levees" after 1965, are compressible. This means that the soils will deform under

14

the load of the levee. This response of the soil to load is time-dependent and variable in amount at different locations. In other words, settlement begins at the placement of load (the levee) and continues to increase as time passes. Since this response differs according to properties of the soil, certain segments of the levee will experience more settlement than others at a given time. Thus, the crest grade of the levee, originally built to one elevation, will over time display an uneven grade.

32.    If the levee was originally built to the planned grade, any settlement later would represent that the planned grade was not attained. This is a real concern since the grade chosen is based on the height of storm surge and wave action expected at the site. Thus, the height of the grade at the crest is the maximum level of hurricane surge protection.  (Note that the height of storm surge and wave action is estimated by other members of a project design and construction team practiced in coastal engineering. The findings of their work are used in coordination with the geotechnical engineer designing the levee.)

33.    Thus, a part of the design work is to prepare estimates of settlement that could occur at points along the levee and at times in the course of levee service. The range of settlements indicated by this work is used to select higher crest grades for the construction effort to compensate for the inevitable settlement to come. Thus, the levee is over-built in anticipation of settlement.

34.   Scientific papers and portions of the USACE Design Memoranda for the MR-GO and the Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan ("LPVHPP") suggest that estimates of settlement were made for certain levee segments.  It is likely that additional calculations were made for other segments and that a comprehensive memorandum addressing this aspect of the design was prepared for the project as a whole. (Again, I reserve the right to supplement this report since the relevant materials are most likely in the possession of the USACE, and it has not provided Plaintiffs' counsel with promised documentation in a usable format.)  What is evident from the documents available, however, is that over the years after 1965, the USACE undertook multiple design and construction efforts to raise crest grade on those levee segments to correct the effects of settlement.  (Team Louisiana, *The Failure of the New Orleans Levee System During Hurricane Katrina*, Report to the Louisiana Department of Transporation and Development (2007)("Team Louisiana Report") at page 270). Thus, at the time of Hurricane Katrina, the construction of the structure by the USACE remained an uncompleted work in progress but it was not a levee offering flood control protection. (Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* (2006) ("ILIT Report") at  Sections 10.5.7,  10.5.8, and 10.5.9, first paragraph in each section, pages 10-18 to 10-20) .

**16**

35.    It is likely that any survey of the levee crest prior to Hurricane Katrina will show that large segments of the levee were not at the planned grade. (This conclusion is supported by the analyses prepared by other Plaintiffs' experts, including Chad Morris.) If so, this departure from plan increases the exposure of the community to flooding.  Since these records have not yet been provided by the USACE, I reserve the right to supplement this Declaration.

**Stability**

36.    Because the alluvial deposits were also known to be weak (i.e. having low shear strength), analyses of levee stability are an appropriate part of the design effort.  Stability analyses investigate the prospect of weak soils yielding rapidly and significantly under the imposed levee and storm loads. If the analysis indicates the possibility of instability, then the analysis is used to revise the proposed levee section (and possibly the construction sequence) to mitigate this problem.

37.    Portions of the MR-GO and LVPHPP Design Memoranda contain working copies of such analyses for certain levee segments. The working copies suggest that issues of stability were addressed  at least for these particular levee segments. Other investigators (Team Louisiana and ILIT) do not report stability to be a problem contributory to the failures of the earthen embankments along Reach 2 of the MR-GO.  Even so, as with the settlement analysis, stability analyses for other levee segments and a comprehensive memorandum are not presently

**17**

available to me, and this Declaration will be accordingly supplemented when they are received from the USACE.

### Seepage

38.    Seepage analysis deals with the movement of water through the levee and the underlying soils. If uncontrolled, seepage through or below the levee can cause rapid and catastrophic destruction of the levee. Since this levee is expected to be serving as a barrier to storm surge, the possibility of seepage is real and pronounced. Although this consideration is relevant, the scope of any seepage investigations by the USACE have not been released to Plaintiffs' counsel, and this Declaration will be updated to comment to these materials when received.

### Erosion

39.    Any levee is continually subject to degradation due to passing weather, particularly erosion by rainfall run-off. For gently sloped embankments in Louisiana, the most common measure employed to control erosion is grass cover. Since records related to the erosion control measures taken with respect to the MR-GO or the LVPHPP have not been provided by the USACE, this Declaration will be revised to add remarks concerning these measures when provided by the Defendants.

40.    It should be noted, however, that in his Plaintiffs' expert report, Dr. Bob Bea notes that there was substantial erosion of the earthen embankments and that large stretches of these man-made features along Reach 2 of the MR-GO were not protected by grass cover.  By contrast, Dr. Bea notes that there was grass cover on some of the man-made features along Reach 1 of the MR-GO that did not experience heavy erosion or wash outs during and after Hurricane Katrina.

**Overtopping**

41.    Regardless of the care exercised in estimating the height of storm surge, there remains the prospect of a storm that exceeds the design value. In that case, the levee is subject to overtopping.  For the MR-GO "levee" along Reach 2, this problem is worsened by the settlement phenomenon discussed above because settlement results in lower crest elevation, thereby increasing the possibility of overtopping.

42.    In addition, the observation by ILIT team members that vast segments of the Reach 2 embankments are made of sand, silt, and shells (ILIT Report, page 6-3 and 10-18 to 10-20) presented the serious threat of catastrophic degradation as the overtopping water flows across the embankments.  For structures constructed of materials readily subject to erosion, the *CEM* (VI-2-2 Paragraph a.) recognizes the need to use slope armoring.  This design criterion is reflected in comments by ILIT (ILIT Report pages 10-20 and 10-21, references to surface slope protection).

Since these embankments were also below grade, it is inferred that subsequent construction to attain design grade could have included slope protection features. For whatever reason, however, at the time of Hurricane Katrina, there was no armoring along most, if not all, of Reach 2 of the MR-GO. This is another indication that the MR-GO "levee" was incomplete—at best an earthen embankment—but not fully developed as a "levee" affording hurricane flood protection to people and property in the vicinity.

### Wave Action

43.    Wave action is to be expected as the storm surge rises onto the levee slope. The danger posed by this occurrence is recognized in *CEM* (page VI-2-7) and by ILIT (Figure 10.5, page 10-40). This degrading effect is best countered by providing slope protection features such as the bank armoring discussed above. Hence, the conclusions drawn with regard to overtopping also apply here, namely, that at the time of Hurricane Katrina, the man-made features along Reach 2 of the MR-GO were merely earthen embankments but nowhere completed "levees" offering any realistic storm surge protection to adjoining communities.

## VII.  CONCLUSIONS

44.    The foregoing discussion of levee design criteria and their application to Reach 2 of the MR-GO man-made features leads to one conclusion: construction of  genuine "levees" had not been, and was far from, completed by the USACE by

late August 2005. Instead, the construction was, and still remains, a work in progress. The work in-place at the time of Hurricane Katrina's passing was essentially an earthen embankment lacking two features required to meet the characteristics of a flood protection "levee" contemplated by the criteria listed in USACE manuals. One item was additional earthen fill to attain the planned grades. The other was armoring to resist erosive forces due to overtopping and wave action. Without these items, the embankment along Reach 2 of the MR-GO was not a "levee" designed to protect the communities of Chalmette and the Lower Ninth Ward.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 17th day of September, 2007 in Baton Rouge, Louisiana.

Jesse L. Arnold, P.E.

21



## INFORMATION CONSIDERED

*Coastal Engineering Manual*, EM 1110-2-1100 (referenced hereafter as *CEM*), July 31, 2003

*Design and Construction of Levees*, EM 1110-2-1912, April 30, 2000

*Geological Investigation of the Mississippi River-Gulf Outlet Channel*, Miscellaneous Paper No. 3-259, February 1958.

USACE, *Lake Borgne - Mississippi River Gulf Outlet Shoreline Protection (PO-32)*, *St. Bernard Parish, Louisiana*, December 2004

USACE Design Memoranda for the MR-GO and the *Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan* (herein abbreviated as "LPVHPP")

Team Louisiana, *The Failure of the New Orleans Levee System During Hurricane Katrina*, Report to the Louisiana Department of Transporation and Development (2007)

Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29,* 2005 (2006)