## DECLARATION OF ARTHUR R. THEIS

I, Arthur R. Theis, declare under penalty of perjury as follows:

1. This declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States* in connection with the Flood Control Act ("FCA") immunity issues. As detailed below, my Declaration constitutes my FCA expert report concerning the composition of the material, design, and construction of the man-made features bordering the southwest bank of the Mississippi River-Gulf Oulet (MR-GO). I reserve the right to revise and supplement this Declaration in light of the fact that the United States Army Corps of Engineers ("USACE") has not completed production of documents, has not furnished Plaintiffs' counsel with usable electronic copies of numerous documents selected for production, and I have not had the opportunity to evaluate these documents. If called to testify, I could and would testify competently to the following:

### I. EDUCATION AND BACKGROUND

2. I have attached as Exhibit A my resume.

(a)  My engineering education began at Louisiana Tech University, Ruston, Louisiana where I graduated in June, 1953 with a B.S. in civil engineering. Upon graduation, I became a registered professional engineer in Louisiana which at that time included land surveying. I immediately was employed as a professional

1



engineer with the Louisiana Department of Public Works ("Public Works"), a state agency responsible for water resources programs. Public Works provided engineering support for most of the Levee Boards in Louisiana with the general exception of the Orleans Levee District. Public Works also provided engineering support to other state agencies upon request. I was employed by Public Works for 34 years, rising to the level of Chief Engineer until my retirement in 1986. My work experience included extensive involvement with the design, construction, and operation of flood control works, waterways, drainage structure, and pumping stations in Louisiana.

(b) I am knowledgeable about various aspects of the causes and devastating effects of the flooding during and after Hurricane Katrina. I was asked to serve as a member of Team Louisiana with regard to the forensic analysis of the levee failures in the New Orleans Hurricane Protection System.

3. Public Works, as a general rule, provides the engineering support to various levee districts, including the Lake Borgne Basin Levee District. Public Works, however, generally did not provide engineering support to the Port of New Orleans, commonly referred to as the "Dock Board."

4. The Public Works staff consisted primarily of civil engineers, land surveyors, and engineering technicians with normal office staff support, including

2

secretaries, draftsmen, surveyors, chainmen, etc. This gave Public Works the capability to survey lands, layout projects, provide project inspection, and administer contracts. This activity did not include federal projects.

5. Public Works also acted as a federal program coordinator for numerous USACE authorized projects, acting in coordination with the project sponsor (local interests) in Louisiana. In many cases, Public Works provided engineering review and comments for the federal project design memorandums, plans and specifications, and construction.

## II.   MISSISSIPPI RIVER-GULF OUTLET CONSTRUCTION

6. In the case of the Mississippi River-Gulf Outlet ("MR_GO"), the primary sponsor was the Dock Board which was the prime mover in establishing the project through the USACE with Congressional approval and funding. The USACE, of course, performed all engineering and contract management.

7. With respect to the construction of the MR-GO, I, as a member of the New Orleans Public Works office, visited the MR-GO construction site during the period from 1958 through 1963. This was the period during which the channel was dredged, constructed, and completed, permitting seagoing ships to enter the Port of New Orleans directly from the Gulf of Mexico.

8. The construction of the MR-GO navigational waterway did not include any levee construction. The waterway construction also did not include any bank protection works (such as armoring) to provide bankline stability and prevent erosion that subsequently substantially widened the canal to as much as 2000 feet or more. This bank erosion, primarily from ship generated wakes, also resulted in a substantial loss of wetlands adjacent to the canal. A dike was also constructed in Breton Sound to reduce channel siltation and alleviate the required maintenance dredging to maintain the channel depth.

9. I also observed the construction of a spoil area along what became the southern bank of Reach 2 of the MR-GO. This area was a depository for the spoil dredged from the path of the Reaches 1 and 2 of the MR-GO during its construction and during maintenance cycles. The MR-GO required periodic dredging to remove silt deposited at the bottom of the channel, If this silt was left unremoved, it would reduce the canal's depth.

10. It is my opinion that the construction of bank stabilization works would have prevented or reduced erosion, which would of course reduce wetland loss and greatly reduce maintenance dredging. Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil

4

disposal area. This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate.

## III. CONSTRUCTION AND COMPOSITION OF ALLEGED MR-GO LEVEES

11.     The enactment of The Flood Control Act of 1965 was a direct result of Hurricane Betsy in 1965 which catastrophically flooded the same area of St. Bernard Parish and portions of New Orleans Parish – primarily below or east of the IHNC – that catastrophically flooded during and after Hurricane Katrina.

12.     The Flood Control Act of 1965 required the construction of a "new levee" along the south bank of Reach 2 of the MR-GO as part of Lake Pontchartrain and Vicinity Hurricane Flood Protection Plan ("LPVHPP"). It is my understanding that the USACE, New Orleans District, decided to use spoil from the MR-GO dredging operations to construct this "levee" instead of importing more substantial soils. Reach 2 of this "levee" was supposed to tie into the Inner Harbor Navigation Canal ("IHNC") east bank levee system in New Orleans and, through the subsequent Chalmette extension, provide an extension to the return levee along the route of the existing (Verret to Caernarron) back levee to the Mississippi River main line levee at Poydras roughly at the line between the Parishes of St. Bernard and Plaquemines.

13.     The major portion of this MR-GO "levee" was supposed to provide protection for the developed portion of St. Bernard Parish and the aforementioned portion of Orleans Parish. The existing back levee system in St. Bernard and Orleans Parishes was supposed to become a secondary levee utilized primarily as a tide water control system for the developed areas currently under pumped drainage.

14..    The vast majority of the material to be used in this Reach 2 "levee" construction was from the spoil disposal area where the initial affluent discharges into the 3800 ft wide spoil disposal area parallel and adjacent to the MR-GO. Observations during construction (and confirmed by extensive soil borings) indicate that practically all of the dredged material was sand with prodigious amounts of shell and some silts and clays.

15.     The MR-GO dredging operation was a cutterhead hydraulic dredge that breaks up the material and, through pumping as an effluent, disposes of the material in a diked retainage area. This process essentially separates the material, and the heavier sand and shell settles out immediately at the discharge point. The clays and silts, on the other hand, remain in suspension and are dispersed over the large 3800 ft. wide disposal area.

16. The decision to construct a "levee" along Reach 2 of the MRGO from the existing available materials was based on the USACE's normal flood control levee construction methods employed on the inland waterways. This system heavily uses adjacent borrow to build levees. *Using conventional land based equipment and not a cutterhead hydraulic dredge,* the USACE had proceeded to construct these inland levees on an embankment of the spoil material which was primarily sand and shell, but very little less erodeable silt and clay.

17. The dredging operation along the MR-GO, however, used a cutterhead hydraulic dredge that breaks up the material and through pumping as an effluent disposes of the material in a diked retainage area. This means that the entire embankment was essentially pure sand with some shell dispersed in it. The USACE had enough experience and available expertise to know that an embankment from sand only *without surface protection would not be sufficient to withstand ocean generated waves and tidal surges resulting from hurricanes.* The plans did not include toe or slope protection and therefore would not withstand the onslaught of severe wave action associated with a storm such as a hurricane with high winds. Therefore, in my opinion, the structure built by the USACE could not have been and was not a hurricane flood protection "levee" for a populated urban area. In reality, this man-made feature was an earthen embankment composed of uncompacted hydraulic fill (mostly sand and shell) that is notoriously susceptible

7

to water erosion and affords no protection against storm surge. Therefore, it is hardly surprising that vast stretches of the Reach 2 earthen embankments washed away and breached during and after Hurricane Katrina. This is what you would expect from unprotected embankments of the type of material dredged from the channel.

18..    In addition to the use of soil materials unsuitable for "levee" construction, the USACE knew that it would require a number of "lifts" to elevate such a hurricane flood protection levee to the required and designed grade. The base on which the levees was constructed, however, was unconsolidated marsh land with some 80 feet plus being of recent geological deposit. This means that inevitable short term and long term subsidence would require the levee to be topped out every few years and that a stable embankment –requiring years to develop – was a prerequisite for a sufficiently sound hurricane flood protection "levee". Based on my observations of the USACE construction over the years, and my review of relevant data, reports and other materials, the USACE did not "top out" the so-called levee every few years, nor did it stabilize the MR-GO embankment. There is no record that the USACE imported select material from off-site borrow or installed a hard structure such as T-walls or other equally secure sea walls except at outlet structures such as Bayou Bienvenue and Bayou Dupre. Thus, the embankments that the USACE constructed after 1965 never reached a

constant, stabilized height that would have afforded a reasonable measure of protection from the 17.5 feet of surge that hit Reach 2 during and after Hurricane Katrina. The short reaches of sheet pile walls in the dope of the levee in reality was a "for show" enhancement that had no real structural value.

19.     In regards to the referenced subsidence and consolidation, the USACE has a great deal of geotechnical information developed over long periods of time in the construction of the Atchafalaya Basin levees. Their records show that extensive use of inclinometers installed in these levees yielded valuable information on levee subsidence. For instance, I remember discussions with the head of the New Orleans District Chief of Soils and Foundation Branch in the 1960s who showed me records indicating that they were experiencing horizontal displacement of at minus (-) 80 msl, which of course is deep and well below the levee base. With this experience and knowledge of coastal engineering, the USACE had to have known what was designed and constructed along the MR-GO was not a hurricane flood protection "levee". It is standard or common practice to use subsidence photos in the construction of back levees and levees constructed in marsh lands. These photos consist of 4 x 4 platforms placed in the embankment and subsequently covered with embankment material. A riser pipe is installed on the platform in order to continually monitor the settlement.

20. There are other indications that the USACE was not building a "levee" offering any realistic safeguard against hurricane-induced storm surge. In addition to not providing "levee"-like foundation conditions, the lack of slope protection -- both front and back -- indicates a lack of regard for known hazardous meteorological conditions that could be expected to occur in that coastal area that has a long record of severe storms. The lack of any sort of armoring or grass cover on either slope of the earthen embankments along Reach 2 appears to be in disregard to the Congressional directive in the Flood Control Act of 1965 to provide protection for the most severe event likely to occur in this area.

21. The only conclusion one can draw from this information is that the USACE did not apply the knowledge readily available to the New Orleans District to provide the hurricane flood protection system mandated by Congress.

22. Having participated in the Team Louisiana Report in regards to the forensic analysis of the levee failures in the New Orleans Hurricane Protection System, I have had the opportunity to participate in the inspection and analysis of the various systems or features that included levees and floodwalls. Accordingly, I concur with Dr. Robert Bea's statement that "there are ample signs of rejection of technology and signs that indicate lethal arrogance." Professor Bea's comments are included in the Team Louisiana Report as Appendix 6.

10

23.     It is apparent from the three reports -- Team Louisiana, ILIT and IPET -- that the USACE, New Orleans District, did not apply due diligence and reasonable engineering knowledge to planning, designing and constructing the New Orleans Hurricane Protection System. Instead of constructing a hurricane protection "levee" along the MR-GO as authorized by Congress, the USACE elected to design and erect something else. That something else can variously be described as earthen embankments, but in no technical or functional sense can it be considered a "levee" affording realistic hurricane storm flooding protection to the people and property of nearby Orleans and St. Bernard Parishes. The USACE constructed embankment along the sought bank of the MR-GO was not a completed levee system to project design and grade. The very unstable foundation for this proposed levee resulted in below grade crown elevations being attained on a sustained basis. While this also resulted in substantially reduced protection, it should not have prevented the Corps for a continued construction process to provide additional "lifts" not only to reach project grade by to provide some overbuild to offset anticipated subsidence. The continued lack of embankment protection was a serious defect.

## IV.    CHALMETTE BACK LEVEES

24.     St. Bernard Parish is downstream of New Orleans on the Mississippi River and also east of New Orleans. While the parish has a very small amount of

relatively high alluvial land on the river, it has very large coastal wetlands fronting on the Gulf of Mexico. Subsidence has taken its toll on the lands above MSL which has been substantially reduced from the amount that existed in the early 1800s. At that time, a substantial area existed, and it was commonly referred to as the Chalmette Ridge. This ridge was of course part of the famous 1812 encounter between the British and General Andrew Jackson. This same ridge would become the principal inhabited area of St. Bernard through the 1800s and 1900s. As the overall land area was being protected from Mississippi River floods, it was at the same time suffering from area and local subsidence and exposure to the Gulf of Mexico

25. With the advent of tidal encroachment on the developed lands, the locals began to build small tidal control embankments and establish the Chalmette Back Levee District with local support. This gave way to creation of the Lake Borgne Basin Levee District that took over operation of all levees in the Parish and the outfall drainage stations in the 1950s.

26. In the 1950s and 1960s, my employer, the Louisiana Department of Public Works, provided engineering assistance to initiate a more pronounced tidal water control levee system with pumping stations capacity to provide drainage to the area between the Back Levees and the Mississippi River levees. Since the land

generally slopes away from the river, the Back Levee pumping plants provided a reasonable collection point.

27. The levees were constructed from adjacent protected side borrow which also served as the drainage conveyance to the pumping plant that then discharged into the unprotected wetlands. These levees were built with draglines using large buckets to place the borrowed material. This excavation method produced a reasonably cohesive embankment that was allowed to dry to the extent that bulldozers could compact and dress the embankment into a stable levee. In addition, the slopes were fertilized, seeded and sodded to form a section that generally prevented rain wash erosion and erosion from tidal wave action.

28. The 40 Arpent Canal Levee, while being overtopped in both Hurricanes Betsy and Katrina, survived largely intact because of the well constructed and grass sodded embankment and the limited protection afforded by the forested wetlands in a sizeable area seaward of the developed area.

29. This impressive performance during two hurricanes stands in stark contrast to the method used to construct the earthen structure along Reach 2 of the MR-GO. As noted earlier, this man-made feature was created with largely uncompacted hydraulic fill and lacked any surface protection from the eroding effects of storm surge and wave action.

13

30. In conclusion, it is my opinion that the earthen structures along Reach 2 of the MR-GO was not a hurricane flood protection "levee" system either by design, construction, or functionality. At most, they were earthen embankments affording no hurricane flood protection because (among other reasons) of the poor, highly erodeable soil composition, lack of compaction, construction on unstable, subsiding material, uneven heights of the elevation crests, and lack of any front or back slope protection.

I declare under penalty of perjury under the laws of the State of Louisiana that the foregoing is true and correct and that this Declaration is executed this 17th day of September, 2007 in Baton Rouge, Louisiana.

*Arthur R. Theis*

Arthur R. Theis

14