UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES  *   Civil Action No. 05-4182
                                *   Consolidated Litigation
_____ *
                                *   Section "K"
PERTAINS TO:                    *
RECORD DOCUMENTS 8224 and 8428  *   New Orleans, Louisiana
                                *   October 31, 2007
* * * * * * * * * * * * * * * * *


HEARING
BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiffs:                 Ashton R. O'Dwyer, Jr., Attorney
                                  at Law
                                By:  ASHTON R. O'DWYER, JR., ESQ.
                                821 Baronne Street
                                New Orleans, Louisiana 70113


For Plaintiffs' Liaison         Bruno & Bruno
Committee:                      By:  JOSEPH M. BRUNO, ESQ.
                                By:  LEWIS SCOTT JOANEN, ESQ.
                                855 Baronne Street
                                New Orleans, Louisiana 70113


For Plaintiffs' Liaison         Law Office of Brian A. Gilbert
For the Barge Group:            By:  BRIAN A. GILBERT, ESQ.
                                821 Baronne Street
                                New Orleans, Louisiana 70113


For Defendant Washington        Stone, Pigman, Walther, Wittmann
Group International, Inc.:       By:  WILLIAM D. TREEBY, ESQ.
                                By:  HEATHER SHAURI LONIAN, ESQ.
                                546 Carondelet Street
                                New Orleans, Louisiana 70130-3588

**APPEARANCES CONT'D.**

| | |
|---|---|
| For Defendant Board of<br>Commissioners for the<br>Orleans Levee District: | McCranie, Sistrunk, Anzelmo,<br>   Hardy, Maxwell & McDaniel<br>By:  MARK E. HANNA, ESQ.<br>3445 N. Causeway Blvd., Suite 800<br>Metairie, Louisiana 70002 |
| | Laborde & Neuner<br>By:  BEN L. MAYEAUX, ESQ.<br>One Petroleum Center<br>Post Office Drawer 52828<br>1001 W. Pinhook Road, Suite 200<br>Lafayette, Louisiana 70505 |
| For Defendant<br>East Jefferson Levee<br>District: | Duplass Zwain Bourgeois Morton<br>   Pfister & Weinstock<br>By:  GARY M. ZWAIN, ESQ.<br>29th Floor, Three Lakeway Center<br>3838 North Causeway Boulevard<br>Metairie, Louisiana 70002 |
| For Cross Claimant<br>Lafarge North America, Inc. | Sutterfield & Webb, LLC<br>By:  DANIEL A. WEBB, ESQ.<br>650 Poydras Street, Suite 2715<br>New Orleans, Louisiana 70130 |
| Court Audio Operator: | Cindy Usner |
| Transcriptionist: | Dorothy Bourgeois<br>c/o U.S. District Court<br>500 Poydras Street, Room C151<br>New Orleans, Louisiana 70130<br>(504) 589-7721 |

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

```
                          I N D E X


EXHIBITS:                                       Marked    Received

O'Dwyer 1    B. Bea E-Mail 7/2/07                 24        37


O'Dwyer 2
A thru F     Emails 6/26/07 through 7/10/07       30        37

O'Dwyer 3    Unspecified                          33        37
```

4

```
 1                    P R O C E E D I N G S

 2               (Wednesday, October 31, 2007)

 3                 (Call to Order of the Court)

 4          THE CLERK:  This is Civil Action 05-4182, Section K.

 5   This pertains to the Barge, Parfait family in Civil Action

 6   07-3500.

 7          MR. TREEBY:  If Your Honor please, William Treeby for

 8   Washington Group International in 07-3500.

 9          MR. O'DWYER:  Ashton O'Dwyer for Plaintiffs,

10   Your Honor, in the same civil action.

11          THE COURT:  Thank you, sir.

12          MR. TREEBY:  Your Honor, I'm here on a Motion to

13   Dismiss and/or Stay the Parfait case.

14          THE COURT:  Yes.  Did you also have an opportunity to

15   read, although it's not set for today to my knowledge,

16   Mr. O'Dwyer's Motion to Sever?

17          MR. TREEBY:  I did.  I wasn't going to -- I'm

18   prepared to address it if Your Honor wants that addressed.  I

19   don't think it needs to be addressed to deal with this motion,

20   but I do understand the relevance of that issue.

21          THE COURT:  I'd like to know your thinking on it.

22          MR. TREEBY:  I can start there, if that's what

23   Your Honor --

24          THE COURT:  Yeah, I guess just as an overview and,

25   you know, the Court is -- look, it's my task to try to organize
```

1  this thing in as orderly and cohesive a fashion as possible and

2  that's what I'm going to try to do.  So, I'm listening to

3  everybody to try to come up with a solution.  I think one of

4  the problems is that concerns me is that ultimately, assuming

5  we get through the motion gamut or gauntlet I should say, the

6  motion gauntlet, is one of the issues I'm going to have to

7  decide in the Barge case is the culpability, and I have to

8  decide the Government's liability, a jury can be advisory, but

9  I have to decide that, the liability of the Government vis-à-

10  vis what happened at the Industrial Canal in reference to MRGO.

11  In other words, the theory of the MRGO complaints, the bulk of

12  them, is that regardless of any flood control project this

13  would have occurred anyhow because of the mal-design of the

14  MRGO, and this would have overwhelmed the systems, and it was

15  negligence extrinsic from the flood control projects and these

16  people would have flooded regardless because of the

17  inappropriate design of the MRGO.  That's the theory.

18          So, it seems in Barge especially with the third party

19  complaint and the Parfait complaint I'm going to have to some

20  how quantify the -- it seems to me, and I'm willing to be

21  enlightened on this, it seems I'm going to have to make a

22  finding reference to Government at one time or another.

23  Certainly, I'm going to have to do that as well in the Robinson

24  matter, so they conflate in that regard.  I understand how

25  they're separate, they conflate.  And one of the things that's

1    overriding my concern is how do I avoid -- unless I put them

2    all together, frankly, that is unless I just everything on the

3    same track and let the hide go with the hair.  That is

4    something that has crossed my mind.

5            So, I have not decided on any of this.  I'm willing

6    to listen to all of you, because we have to do it intelligently

7    and I'm not quite sure right now what is the most intelligent

8    way to do it.

9            With that I'll hear your motion and anything else you

10   want to say.

11           MR. TREEBY:  Your Honor, and I'll begin it that way.

12   I'm a little handicapped today, I apologize to the Court; so I

13   can't write.  So, this is going to be a little bit different

14   than I normally present things.

15           I think Mr. O'Dwyer despite the fact that his Parfait

16   complaint was untimely in that I believe it was clearly an

17   amendment for which he did not seek leave, it belonged in the

18   Master Complaint category.  I think in fact he originally had

19   it right in that how can you split your cause of action?  How

20   can you say -- this Motion to Sever makes no sense to me,

21   because how in the world can you say that, well, the barge --

22   set it up this way:  You have the case.  It's set one week

23   apart, one Monday and the next Monday.  One Monday he stands up

24   for the same Plaintiffs and says, "The barge did it.  The barge

25   did it.  The barge did it" and tries to put down anything about

1    anybody else doing it.  And the next week he stands up and

2    says, "No, it wasn't the barge, it was the poor design, it was

3    the undermining of the levee, it was all this."  You can't --

4    that doesn't make any sense.

5         Now, we approached the problem when we originally --

6    before this Motion to Sever, we approached the problem from the

7    viewpoint of Washington Group which is this matter is -- the

8    same class that he alleges, putative class, is subsumed within

9    the MRGO subclass of St. Bernard and the Lower Ninth Ward.  So,

10   that makes it in my mind clearly fall under the rubric that has

11   been well developed in this circuit.  Judge Feldman did it in a

12   case, Cambridge I believe is the name of it, and also the Cadle

13   case that came out of Texas, the Fifth Circuit addressed it

14   clearly.

15        I've done a lot of work over the years in collateral

16   estoppel and res judicata.  And so it's kind of confusing

17   because this is -- and I found this quote that we didn't cite

18   in our brief that I think addresses it in the Cadle case which

19   says, "The first to file rule by contrast to collateral

20   estoppel is essentially a forward looking doctrine.  Courts use

21   this rule to maximize judicial economy and minimize

22   embarrassing inconsistencies by prophylactically refusing to

23   hear a case raising issues that might substantially duplicate

24   those raised by a case pending in another court," or in the

25   same court, because other cases apply the same rule when it's

1   in the same court.

2          So, that was the way we sought to address it here,

3   but I understand that the Court's concern.  That wasn't in my

4   argument today, but as I expressed on the telephone the other

5   day in our conference, it seems to me these cases -- any case

6   that is going to deal with the allocation of fault among and

7   between the various alleged tortfeasors who broke the law

8   between the Florida Avenue Bridge and the North Claiborne

9   Avenue Bridge ought to be in the same case.  The same finder of

10  fact ought to do it at the same time.

11         Now, I think what happened here was that it came up

12  in the context of a limitations action and that caused some of

13  the misgivings.  And I have gone back --

14         THE COURT:  I think that's true.

15         MR. TREEBY:  -- and read the Phase 1 order by

16  Judge Berrigan and the Phase 2 order for the trial that I guess

17  is supposed to take place later in November, but neither of

18  those two phases frankly gets to this issue that would be -- in

19  which a fact finder would need to determine and allocate fault.

20  And, frankly, judicial economy and avoiding inconsistencies of

21  result it seems to me cry out in this case that those two cases

22  be conflated when it comes to that task of a finder of fact, be

23  it judge or jury or in the same trial both, deciding how to

24  allocate the fault.

25         THE COURT:  Well, I'm also thinking, you know, this

1   is -- I'm ruminating here, not pontificating.  I'm thinking on

2   the Barge class certification -- we have a Barge track and a

3   MRGO track and maybe it doesn't make a lot of sense for them to

4   be separate even from the class certification standpoint.

5           MR. TREEBY:  All the same issues apply to both.

6   Frankly, when I first saw CMO Number 5 and tried to read

7   through it and understand what was going on I frankly thought

8   that what the Court had in mind was being informed -- giving

9   the -- you know, giving some due process to the people who were

10  in CMO Number 5 in terms of class cert by not forcing them into

11  the November 5th deadline --

12          THE COURT:  Yes.

13          MR. TREEBY:  -- but at the same time I had no -- I

14  was persuaded to be unpersuaded that whatever result obtained

15  from a November 5th trial, however long it took on class cert,

16  it wouldn't be any different when it came to the trial next

17  year as was indicated in CMO Number 5, it couldn't.  I don't

18  see how it could be.  It's the same people, same damages, same

19  water.  The only question is what caused the water to get into

20  their house?

21          THE COURT:  Right.

22          MR. TREEBY:  Who was negligent in causing the water

23  to get into their house?  And as to the comparative fault

24  aspect, the allocation of fault, as I believe there's a brief

25  that was filed Monday -- I don't know if Your Honor had a

1    chance to read it, I've skimmed through it --

2              THE COURT:  Yes.

3              MR. TREEBY:  -- by Lafarge --

4              THE COURT:  I did.

5              MR. TREEBY:  -- I found myself -- even though what

6    he's saying it all ought to be tried in the Barge case.  But he

7    was saying clearly what I'm saying; it's got to all be tried at

8    one time.  He wants the right to point the finger at the U.S.

9    and whoever else.  He hasn't named us, I'm thankful for that; I

10   don't think he should have.  But whoever was at fault is going

11   -- in a hearing under Louisiana law or Admiralty law the

12   allocation of fault is going to be decided and it ought not be

13   decided in a way that would potentially cause embarrassing

14   inconsistencies.  And that's what could easily happen if it's

15   not done.

16           You know, I'm used to trying cases against the empty

17   chair.  You know, some people like it, some people don't.

18   That's what would happen in a MRGO trial, frankly, even if the

19   Barge wasn't -- even if the Barge Defendants weren't there

20   somebody would be pointing at an empty chair and say that's

21   Lafarge Barge, that's Zito Towing, that's whoever -- that's

22   Ingram; they were at fault.  They didn't have enough mooring

23   cables.  They didn't do this, they didn't do that and that

24   caused the barge -- and we have two witnesses now I understand

25   who say that's what broke the floodwall.  I don't know if

1  they're right or wrong, you know.  But you'd better believe if

2  I'm representing my client I'm going to be pointing at them as

3  I should, and I'm going to be bringing out any evidence that

4  could, if I'm ever in a liability trial, which we hope we're

5  not, but if we ever are there we're going to be pointing at

6  anybody who's potentially responsible.

7          THE COURT:  Including the Government, I would assume.

8          MR. TREEBY:  Absolutely, absolutely.  So --

9          THE COURT:  It's your suggestion -- first, I know

10  you're arguing that it's an amendment and should be dismissed,

11  and I understand that.

12          MR. TREEBY:  And second, under the first to file rule

13  you can dismiss or stay it.

14          THE COURT:  Right.  And secondly, from a court

15  management standpoint does it make sense, because I don't want

16  to find -- we -- you know -- the Government liability I've got

17  -- and I'm going to have Robinson before this case goes to

18  trial.  In other words I will have -- of course it will be

19  absent any so far as I know, who knows -- but assuming that the

20  Government 702C immunity doesn't prevail, it might; so there

21  may be no Robinson if I find in favor of the Government on 702C

22  immunity.  If I don't at least in part, in whole or in part,

23  then there'll be a trial where I will assess the Government's

24  liability in reference to MRGO in a certain context.  And that

25  trial is going to be set before the Barge trial.

1          But then we have the class action MRGO, assuming

2     that's certified.  It's a little more complicated.  But under

3     any event I'm going to have to make -- and then there's a jury

4     in the Lafarge thing.  But I'm going to have to make a

5     determination as to what the Government's responsibility is

6     vis-à-vis the MRGO case in Robinson and MRGO in the class

7     action and in the Barge case in the third party complaint and

8     insofar as Mr. O'Dwyer has brought the Government in, in

9     Parfait.  So, those have to be in my mind -- going to go to the

10    Court of Appeal, which certainly they will, at least somewhat

11    uniform and somewhat cohesive.

12          MR. TREEBY:  And I'm not an expert on the Robinson

13    case; however, --

14          THE COURT:  The Robinson case has six plaintiffs and

15    one defendant --

16          MR. TREEBY:  I understand that much --

17          THE COURT:  -- namely the U.S.

18          MR. TREEBY:  -- but what I don't understand is my

19    appreciation of the pleadings, and I've read them, is the

20    allegation has to do not with breaking the floodwall --

21          THE COURT:  Exactly correct.

22          MR. TREEBY:  -- it has to do with overtopping and

23    breaking through the MRGO spoil banks levees, whatever you want

24    to call them --

25          THE COURT:  The basic theory is notwithstanding the

1  fact that there were flood control projects, they may have been

2  fine, the flooding would have occurred anyway.

3       MR. TREEBY:  So, I don't know how the Robinson

4  plaintiffs avoid the -- I don't know what happens with the

5  United States being able to say -- they can't point to the

6  floodwall and say it's floodwall that broke.  That's an

7  interesting dilemma, but --

8       THE COURT:  It is.

9       MR. TREEBY:  -- it's not my dilemma.

10       THE COURT:  Right, right.  Your dilemma really gets

11  more -- when we look at Parfait, MRGO class action, and Barge.

12       MR. TREEBY:  Right.  And it seems to me the class

13  action determinations for the class actions between the so-

14  called Barge category of cases and the MRGO category of cases

15  is an identical class cert fight, --

16       THE COURT:  That does seem logical.

17       MR. TREEBY:  -- it's an identical liability fight and

18  a causation fight, and it's going to all be tried -- it can all

19  be tried twice or it can all be tried once.  The problem with

20  trying it twice both those things is, I don't think Your Honor

21  will come to inconsistent conclusions on the class cert, with

22  all due respect, but it could come -- with finders of fact it

23  could produce some bizarre results if the liability phase was

24  not tried together.

25       THE COURT:  I understand and you make a good

1   argument.

2          MR. TREEBY:  I mean that's really all I have to say.

3   I think Mr. O'Dwyer, you know, in his memo simply says, "Well,

4   I don't know whether the first to file rule applies or not."

5   Well, I think it does apply; I'll just say that.  I think it's

6   clear.  I think that he doesn't cite one case in opposition to

7   it applying.

8          On the amendment I have no doubt that was an improper

9   amendment and he had amended to add us in long ago in 12.  We

10  fought it, opposed it, and it was granted.  The amendment was

11  granted.  He added us into his class action that was in MRGO.

12  It was consolidated into the Master Complaint.  He makes

13  virtually the same allegations on behalf of the same class,

14  different -- perhaps to some extent different class reps,

15  although some of them are even in common between the one that

16  got bound into the Master Complaint and the one he now files.

17  That's just an improper amendment.  And the Court has the power

18  and the discretion to do or not do, to dismiss it on that

19  grounds.  It also has the power to dismiss or stay on the first

20  to file grounds and we think it should do either and we would

21  not -- you know, I think it makes -- it's not my primarily my

22  laboring oar, but we think it makes sense that any liability or

23  class cert trials between the classes alleged in the Barge

24  category of cases and the classes alleged in the MRGO as it

25  applies to the subclass that involves the Lower Ninth and

1   St. Bernard belong together.

2           THE COURT:  Thank you, sir.

3           MR. HANNA:  Very briefly, Your Honor, Mark Hanna on

4   behalf of the Orleans Levee District.

5           We filed a Motion to Adopt Washington Group's Motion

6   to Dismiss --

7           THE COURT:  Right.

8           MR. HANNA:  -- or Alternative Motion to Stay.  I join

9   in Mr. Treeby's comments not only insofar as this particular

10  motion, but in response to the Court's questions on the

11  proprietary of joining MRGO and the Barge cases together and I

12  agree wholeheartedly with what Mr. Treeby had to say in that

13  regard.

14          THE COURT:  Thank you, sir.

15          MR. GILBERT:  Your Honor, Brian Gilbert.  I'm a

16  Plaintiff's Liaison for the Barge Group.  I just want to

17  respond to a few of Mr. Treeby's allegations.

18          I want to make note of the fact that from my

19  perspective as moving party in the Barge Group of cases I'm not

20  concerned with allocation of fault with other actors.  Maritime

21  law under the Edmonds case, under Coats v Penrod Drilling, all

22  the cases that follow this, such that any fault on the part of

23  the maritime actor is purely joint and several.  Any fault, any

24  substantial fault no matter how small the percentage obligates

25  the maritime defendant to pay the whole of the damages.  The

1    law explicitly states, the jurisprudence explicitly states that

2    concurrent fault does not inure to the benefit of the maritime

3    defendant.

4           THE COURT:  So, are you telling me that in your

5    client against Lafarge and --

6           MR. GILBERT:  Ingram and so forth.

7           THE COURT:  -- that allocation of costs are not a

8    problem, but you do have the Parfait case sitting out there

9    with Barge and you do have a third party complaint.

10          MR. GILBERT:  The Parfait case, Your Honor, obviously

11   I stand behind the motions that we filed last week to sever the

12   like from the unlike and put MRGO together and keep the Barge

13   cases together.

14          THE COURT:  Well, what about the third party

15   complaint?  That seems to be a rub.

16          MR. GILBERT:  The third party complaint is a claim

17   for contribution and indemnity.  It does not need to be

18   appended to the Barge case itself.  It can stand on its own.  A

19   claim for contribution and indemnity can give rise to a cause

20   of action.  It can be consolidated into the MRGO action.  I

21   know Lafarge would not like it this way because it might cause

22   them some delay.  If they're held liable to the Barge

23   plaintiffs it might cause them some delay in being able to

24   recapture what they have to pay.

25          THE COURT:  But isn't Lafarge going to contend it's

1    not their fault at all, that it was the Government's fault?

2            MR. GILBERT:  They are.  That's going to be the basis

3    of their --

4            THE COURT:  So, aren't I inextricably going to have

5    to in your case assess the Government's fault?

6            MR. GILBERT:  Well, whether you're going to have to,

7    I don't know.  I don't think that I even belong here to be

8    honest with you, Your Honor.

9            THE COURT:  I know, but you see that's a fait

10   accompli, sir.  So, here you are and you're not --

11           MR. GILBERT:  Here I am.

12           THE COURT:  -- and you're not going to be going

13   anywhere.

14           MR. GILBERT:  Nonetheless, here I am.

15           There will have to be a determination of whether

16   there was any fault on the part of the Government, but it does

17   not need to be appended to what is going on in MRGO.  Our case

18   is clearly so simple, so straightforward based on completely

19   different law, based on different theories as to the causes of

20   the flooding.  We laid it out in the opposition to the Motion

21   to Modify CMO Number 4.

22           THE COURT:  Okay.

23           MR. GILBERT:  But I just wanted to address those

24   things, Your Honor.

25           THE COURT:  How are you prejudiced if your trial --

1         Your trial is set for 2009 now, is that correct?

2         MR. GILBERT:  That's correct.

3         THE COURT:  -- if that trial date would be basically

4  the same date it just is tried in connection with whatever is

5  left of MRGO, Parfait, or whatever?

6         MR. GILBERT:  Well, in the ways that -- I noted the

7  potential for great jury confusion in a situation such as that.

8  They're going to be hearing evidence that we would not be --

9  that they would not be considering concerning the MRGO, which

10  covers a much greater expanse than our proposed class area.

11         THE COURT:  You don't think they're going to be

12  hearing evidence on the defense about the MRGO, that is

13  Lafarge?

14         MR. GILBERT:  New Orleans East, I don't think so.

15  We're not even -- we're not looking to certify such an area.

16  We're much smaller.  We go from -- we're hoping to go from --

17         THE COURT:  The MRGO allegedly, according to some,

18  also flooded the area where you say was flooded, the barge

19  caused the flooding.

20         MR. GILBERT:  Allegedly.

21         THE COURT:  I understand.

22         MR. GILBERT:  And also, Your Honor, we're not seeking

23  the same damages as the MRGO case.  There are a lot of

24  differences and they're all expressed in writing in the

25  opposition that I made.

```
 1            THE COURT:  I am --

 2            MR. GILBERT:  I just wanted to note these things for

 3   the Court because they came up today and I didn't expect them

 4   to.  But I would also add that to the extent that Parfait makes

 5   Barge allegations, that WGI doesn't have any ground to

 6   complain.  They don't affect WGI.  And I would simply ask that

 7   whatever the Court does that the Court preserves the Barge

 8   claims.

 9            THE COURT:  All right, thank you, sir.

10            MR. GILBERT:  Thank you, Judge.

11            THE COURT:  Mr. O'Dwyer.  You know, when I read your

12   Certificate of Impossibility, I kind of thought you were right,

13   but maybe you can explain to me where we are now.

14            MR. O'DWYER:  Your Honor, I have made a presentation

15   for you this morning, but I want to get a couple of things out

16   of the way first.  I don't get the opportunity to address you

17   very often, so I'm going to take advantage of this opportunity.

18            Part of the reason that I'm here today I thought was

19   to argue in opposition to any notion that Washington Group

20   International should be dismissed from this litigation on the

21   papers, Rule 12(b)(1), Rule 12(b)(3).  I didn't get that

22   opportunity when the case was argued on June the 23rd.  And

23   what brought all of this to a boil with the filing of Civil

24   Action Number 07-3500 was a great deal of attention that was

25   paid to Washington Group International after the 40-some boxes
```

1  of documents which were cherry picked by WGI and their Counsel

2  to give us, and meeting and talking and asking questions, all

3  of this occurred between say January and the filing of the

4  Master Complaint in March, March the 15th of 2007.

5          The Master Complaint in my judgment didn't address

6  things that I thought needed to be addressed.  And I spoke with

7  Mr. Bruno on a number of occasions and with Scott Joanen, who

8  is in the courtroom today, he's Mr. Bruno's colleague.  Scott,

9  perhaps more than any other lawyer in the case with the

10  possible exception of Mr. Treeby, knows what is in those 40-

11  some odd boxes of documents and what ain't.

12          Now, I'm just laying this out as a predicate for you.

13  I do want the opportunity address why I believe WGI should not

14  be dismissed on the papers.

15          THE COURT:  That's under submission to me already and

16  has been argued and briefed --

17          MR. O'DWYER:  Well, I'm going to explain to you --

18          THE COURT:  -- under Rule 12.

19          MR. O'DWYER:  -- why my interests were not

20  represented in connection with that, Your Honor.

21          THE COURT:  Let me say this, I have done a vast

22  amount of research on that and that ruling is coming up.  The

23  issue there is a Rule 12 motion; that is not what we're arguing

24  here today.  So, let's not -- you know, we've got a lot of

25  things -- we've got a lot of motions out there.  Let's kind of

 1    stick to what's today.

 2               MR. O'DWYER:  Yes, sir.

 3               THE COURT:  The Rule 12 motion has been filed,

 4    argued, submitted, and brief.  It now has to be decided.

 5               MR. O'DWYER:  I'm just letting you know that

 6    something is coming, Your Honor.

 7               THE COURT:  Something is always coming in this case,

 8    so that is not an epiphany.  Go ahead.

 9               MR. O'DWYER:  The issue has been raised about whether

10    or not Barge can be separated from MRGO and the Industrial

11    Canal, okay.

12               THE COURT:  This is true.

13               MR. O'DWYER:  The very simply answer to that question

14    is a maritime case called Edmonds v Transatlantique.  If a

15    maritime defendant is found to be one percent at fault --

16               THE COURT:  The Court's aware of that.

17               MR. O'DWYER:  -- 100 percent of the judgment is

18    recoverable from that party.  The plain, simple, honest answer

19    to why should Barge be separate is because it represents easy

20    money to our clients under the rule of Edmonds v

21    Transatlantique.  Why should we be required to go along with

22    MRGO and my MRGO case is different from the Robinson case.  My

23    MRGO case is different from what I perceived to have been

24    pleaded by the Plaintiffs' Liaison Committee in the Master MRGO

25    complaint.

1        The next issue I wanted to bring up as a preliminary,

2   here I am in front of Your Honor once again being accused of

3   impropriety which I deny.  Case 07-3500 was a timely filed

4   action which was calculated to respond to the dismissal of my

5   innocent clients' claims against the almighty Federal

6   Government because I didn't exhaust administrative remedies.

7   I've already laid the predicate for what work Mr. Bruno,

8   Mr. Joanen, and I were doing with the experts going through

9   these 40-some boxes of documents and fleshing out precisely

10  what Washington Group International did wrong that we didn't

11  know before we got these 40-some odd boxes.

12        Mr. Treeby raises a first to file rule.  No, I didn't

13  rebut it because I talked with other Counsel in the case and

14  they said they'd read and the cases and they said, "We think

15  Mr. Treeby's right on that.  He cited the proper holdings of

16  the cases."  I respectfully disagree and I refer Your Honor to

17  Civil Action Number 06-4389 which was filed in August of 2006,

18  some nine months before the Master MRGO complaint was ever

19  filed in which I named Washington Group International, Inc. as

20  a party defendant.  I go back and read that complaint.  That

21  complaint is just left out there as a dangling participle.

22        I'm not a member of the Plaintiffs' Liaison

23  Committee.  Nobody asked my views about Washington Group

24  International before the Master MRGO complaint was filed.  I

25  did what I had to do because I had to file a new suit against

1    the Government to comply with the provisions of the Federal

2    Tort Claims Act, which I deny is applicable, but which I assume

3    argumentatively that I had to comply with and I added my

4    allegations against Washington Group and others in that

5    pleading.  I respectfully submit that that is not improper and

6    I did nothing even bordering on impropriety.

7              My case, 06-4389, was the first filed.  Look at

8    07-3500 as an appendage to that case after the review of the

9    40-some boxes of documents.

10             With leave of Court, Your Honor, I would like to move

11   into the substantive part of my presentation, having gotten the

12   preliminaries out of the way, unless you have questions for

13   me --

14             THE COURT:  No, sir.

15             MR. O'DWYER:  -- on what I just said.

16             THE COURT:  I understand right now on the motion that

17   you think Barge can be tried because of the Edmonds case

18   separately from your -- now what about your Parfait which makes

19   joint allegations, that is against the Government and the

20   Barge, now what do you intend to do with your Parfait case?

21             MR. O'DWYER:  Your Honor, I stand by the pleadings to

22   which I affixed my signature last week.  And the context in

23   which all of that came about, I wasn't privy to Your Honor's

24   thinking about all of this that I heard you state this morning.

25   All I had to go on was the order that I replied to with a

1   Certificate of Impossibility some months ago.  Mr. Gilbert and

2   Mr. Wiedemann, under whose roof I am now living Mr. Wiedemann

3   kindly agreed to shelter the homeless, put this issue to me

4   last week and I signed the document.  I'm not backing off that.

5   I believe that the Barge case presents our clients with an

6   opportunity for quick, easy money because of the one percent

7   rule and please bear that in mind.

8        Judge, the first thing I wanted to do this morning

9   was offer, introduce, and file into evidence an exhibit which

10  I've marked for identification as O'Dwyer Number 1.  It is an

11  e-mail to me of July 2nd, 2007.  This gives you the context of

12  when all of this stuff was going on, from Bob Bea.  "Hi Ashton.

13  I will need your number or you can call me at my home office

14  when workable for you," and he gives me the number.

15       MR. TREEBY:  I'm going to make one objection.  I

16  think this is going to come up again.  Your Honor can do what

17  it will with it.  This is hearsay, inadmissible.  He sent me

18  these things yesterday.  I ignored them because they had

19  nothing to do with this hearing in my view, and I think he's

20  trying to go into what Your Honor has said, and I agree, has

21  been submitted, which is the Rule 12(b)(1) motion that we made.

22  I'll make that objection once I --

23       THE COURT:  What is before the Court today is your

24  motion -- one, I'm interested in any discussion, anything

25  anybody has to say about how the most intelligent way for the

1    Court to handle the various allegations and the potential

2    finding of fault of the Government, or allocation of fault of

3    the Government in any of these cases and how the most efficient

4    way to try them is.

5           Two, we have a motion filed by the Washington Group

6    to stay and/or dismiss the Parfait case.  That's what's before

7    the Court today.

8           MR. O'DWYER:  All right, Your Honor, and this

9    addresses the Motion to Dismiss the Parfait case.

10          THE COURT:  All right, sir.

11          Now, insofar as evidence, since this is -- I'm

12   assuming these are attachments to your pleadings.  Right now

13   I'm not going to apply the Rules of Evidence.  I'm just going

14   to regard this as argument.  Go ahead.

15          MR. TREEBY:  If Your Honor please, I think that's

16   correct.  It wasn't attached, however, to any filing.

17          THE COURT:  Oh, it was not?

18          MR. TREEBY:  No.

19          MR. O'DWYER:  It was not.  It was sent to Mr. Treeby

20   yesterday.  Quote -- this is him to me, Bob Bea to Ashton

21   O'Dwyer, "Based on the information and photographs I have been

22   able to assemble, WGI definitely had a role in both Breaches at

23   the lower Ninth Ward," --

24          THE COURT:  Okay, what does this have to do with a

25   Motion to Stay or Dismiss?  It seems to be based on the fact

1   that, one, your pleading was, they allege, an inappropriate

2   amendment; two, the first to file.  So you've addressed the

3   first to file, I think.  So, what does this have to do with

4   their saying they're being unduly burdened by the Parfait case

5   and they want me to stay it dismiss it?

6            MR. O'DWYER:  It goes --

7            THE COURT:  Not on the merits.  Let's assume it's a

8   fantastic case.

9            MR. O'DWYER:  It goes to the Motion to Dismiss

10  allegations that I have made in 07-3500 which are different

11  from the allegations made in the Master MRGO complaint.

12           THE COURT:  Well, this e-mail has nothing to do with

13  that in the pleadings, it does not.  But what has to do with it

14  are the complaints and the allegations therein, not the e-mail.

15           MR. O'DWYER:  Just a moment, Your Honor; I'm losing

16  my place.  I do have copies of both complaints to offer,

17  introduce, and file into evidence.

18           THE COURT:  I have those.

19           MR. O'DWYER:  You have those?

20           THE COURT:  I have those and I have compared them.

21           MR. O'DWYER:  All right.  Let me address then why I

22  maintain Ashton O'Dwyer's two cases, 07-3500 and 06-4389 are

23  unique --

24           THE COURT:  Okay, you can do that.

25           MR. O'DWYER:  -- and why I maintain that my client's

1    interests are not being adequately represented by other

2    Counsel.

3              THE COURT:  All right, sir.

4              MR. O'DWYER:  Your Honor, there is a storm brewing in

5    this case.  I am not sure whether Your Honor is aware of this,

6    but I have publicly called for the resignation of two members

7    of the Plaintiffs' Liaison Committee.  It may be that other

8    members of the Committee including Subcommittee members are

9    also tainted.  There is an obvious and irreconcilable conflict

10   of interest between "The Class," or "The Classes" not yet

11   certified and the State of Louisiana and its agencies.  Two

12   members of the Plaintiffs' Liaison Committee on August 29, 2007

13   filed pleadings in this Court in Civil Action Number 07-5023

14   and 07-5040 on behalf of the State of Louisiana claiming

15   $200 billion on behalf of the State in direct property damage

16   caused as a result of the same transactions or occurrences for

17   which I have asserted claims against the State and its agencies

18   in the Victims of the Katrina litigation.

19             I charge the Plaintiffs' Liaison Committee and more

20   particularly these two members for whose resignations I have

21   called for as being adverse to my clients' interests as a

22   result of conflicts of interest.

23             I also bring the Court's attention the possibility --

24             THE COURT:  Now, has a motion been filed for the

25   Court to -- the Court ultimately makes those determinations

1   unless there's a consensus among the persons involved, has a

2   motion been filed with the Court to in essence rescind their

3   appointments?

4           MR. O'DWYER:  You know that no motion has been filed,

5   Your Honor.

6           THE COURT:  No, I don't know that.  You think I know

7   about all -- how do you know what I -- I don't know about all

8   the 9,000 pleadings filed in this suit.  I don't know; I'm

9   asking you directly.  Have you filed a motion?

10          MR. O'DWYER:  I have not filed a motion, Your Honor.

11          THE COURT:  All right.  So, you know, the only way I

12  do things is if you file a motion.  So, this bloviation until

13  you file something with this Court.  So what?  I don't care

14  about whatever the internal disagreements are.  I care about

15  what's filed in this Court backed up with law in a brief.  And

16  I don't know all the motions.  I wish I did.  I was I were that

17  omniscient.  This would all be a lot easier for me, but I'm

18  not.  So, don't presume to know what I know or don't know, sir.

19  I certainly don't presume to know what you know or don't know.

20          So, the bottom line is what does this have to do with

21  the price of beans if there's nothing before this Court?  If

22  you want something before the Court file it, set it for

23  hearing.

24          MR. O'DWYER:  I respectfully submit that this is not

25  bloviation.

1          THE COURT:  Well, what does it have to do with the

2    motion that they're arguing about, about whether we should stay

3    or dismiss Parfait?

4          MR. O'DWYER:  It is a response to a Motion to Dismiss

5    my clients' claims against WGI upon the grounds that other

6    pleadings filed by other lawyers have taken care of my client's

7    interests.  I maintain they have not, because these lawyers are

8    in conflict with my clients' interests.

9          THE COURT:  So you say that the pleadings that are

10   filed -- I don't know about the lawyers, but the pleadings that

11   are filed do not represent your interest.  I'm not sure about

12   the lawyers, but the pleadings you're saying that are presently

13   filed do not represent the Parfait client interest, the

14   pleadings that are filed in the MRGO class action.

15         MR. O'DWYER:  Your Honor, there are different types

16   of conflicts of interests.  We can look at the words in a

17   complaint.  We can look at who filed the complaint.  I am

18   saying that the people who filed the complaint, the MRGO Master

19   Complaint, are in conflict with my clients' interests.

20         THE COURT:  Well, that's something that needs to be

21   directed to the Court.

22         MR. O'DWYER:  And my clients' interests are,

23   therefore, not protected by reliance solely on pleadings filed

24   by those people.

25         THE COURT:  All right.

1          MR. O'DWYER:  Now, Your Honor, Mr. Bruno is here

2    today.  He has been anointed as Plaintiffs' Liaison Counsel by

3    Your Honor.

4          THE COURT:  Does the word "anointed" have any

5    pejorative you think or do you just use that in your usual

6    colorful infusive rhetoric?  Do you have some shall we say

7    insidious -- you think there's some insidious motive there?

8    You know, words mean something, Mr. O'Dwyer.  You're quite a

9    wordsmith.  Tell me what do you mean "anointed"?  I though it

10   was appointed.  So, what did you intend to use?

11         You know, you want to be persuasive, don't you?

12   There may be a reason why you're not listened to sometimes,

13   sir.

14         MR. O'DWYER:  I'll concede the point.

15         THE COURT:  I'd maybe suggest you engage in a little

16   introspection.  I wouldn't hurt you.  We all should.  So should

17   the Court I might say.

18         MR. O'DWYER:  I'll concede the point.  Mr. Bruno has

19   been appointed by Your Honor as Plaintiffs' Liaison Counsel.

20         THE COURT:  Thank you.

21         MR. O'DWYER:  I have --

22         THE COURT:  If I could anoint, believe me I wouldn't

23   be sitting here.  Go ahead.

24         MR. O'DWYER:  I have marked for identification as

25   O'Dwyer Exhibit Number 2 A through F --

1          THE COURT:  Don't forget, oral argument is a

2     privilege, Mr. O'Dwyer, it's not a right.  At least just keep

3     it in mind --

4          MR. O'DWYER:  A series of e-mails between June 28th

5     and July the 10th seeking certain documents from Plaintiffs'

6     Liaison Counsel that had been identified to me by Mr. Joanen as

7     bearing directly upon the legal liability of Washington Group

8     International to my clients.  I'm not going to read each of the

9     e-mails to you, but I still don't have the documents.  And

10    there are six of them all sent on different dates and the last

11    one says, to Mr. Bruno and Mr. Joanen, "Joe and Scott, WADDUA

12    have to do file a Motion to Compel against the Plaintiffs'

13    Liaison Counsel to provide access to documents any litigant

14    already has a right to?"  I still don't have the documents.

15         I'll tell you what they are reportedly, because I

16    haven't seen them.  I was informed that there are at least two,

17    maybe more documents that indicate that pre-Katrina Washington

18    Group International had information to the effect that the

19    sheet pile on the east side of the Industrial Canal between the

20    Florida Avenue and Claiborne Avenue bridges had been driven to

21    a depth of 25 feet.

22         When I heard that my immediate reaction was, well,

23    did they verify that information?  What did they do in order to

24    determine whether or not that was in fact a fact before they

25    started digging their holes in the 32-acre batture area?

1   That's the reason these documents were important to me,

2   Your Honor.  I still don't have them.  This is just one example

3   of my efforts to gain access to information which was denied to

4   me.

5           THE COURT:  Well, what is your understanding as to

6   why Washington Group from a legal standpoint wants to stay or

7   dismiss your suit?  One, they said it's an improper amendment.

8   Two, they've alleged first to file.

9           MR. O'DWYER:  It's a hybrid motion.  It has --

10  Washington Group's motion is not the type of motion that is

11  addressed by the Federal Rules of Civil Procedure.  Nothing

12  precluded my right to file Civil Action Number 06-4389 or

13  07-3500 when I did.  And they, like other people in this

14  litigation, would just like me out of the way.

15          Now, I'll address for you allegations that I have

16  made against them that I don't believe that anybody has made.

17  Your Honor, the contract at issue here is an integrated

18  engineering -- I'm sorry -- the contract at issue here is a

19  design build contract.  In the construction parlance design

20  build means the Corps of Engineers hires the private contractor

21  to do the design and engineering work that the Corps would

22  ordinarily do and then submit to a contractor in the form of

23  specification --

24          THE COURT:  That has been argued by your --

25          MR. O'DWYER:  It has been argued.

1          THE COURT:  Yes.

2          MR. O'DWYER:  Okay.  I maintain that a multinational

3   corporation like Washington Group International has an

4   independent obligation to its principal and to their parties,

5   not only under maritime law, but under state law to make an

6   informed reasonable determination of whether or not the work

7   that it has been asked to do potentially causes harm to third

8   parties through damage to property.  I don't see that anywhere

9   in the Master MRGO complaint, Your Honor.

10          I've also alleged that because they designed the

11   project and because the 40 boxes of documents are devoid of any

12   piece of paper, or word, or anything that Washington Group and

13   the Corps failed to investigate through engineering analysis

14   how the holes that they dug in the 32-acre batture area might

15   impact the existing retaining walls.  Did they know that the

16   sheets were only 25 feet deep?  I have documents in front of me

17   today from Page 6-15 of the Independent Levee Investigation

18   Team Report, which I also gave Mr. Treeby yesterday that says

19   the sheets there were between a depth of 18 and 23 feet.  They

20   didn't even make it to 25 feet.

21          Another little known fact, in 1997 the Lock Project,

22   which had originally been slated for a depth of 22 feet, was

23   modified and enlarged so that the lock to be constructed was to

24   be 36 feet in depth.  It was going to be a lock for deep draft

25   vessels.  This is Exhibit Number 3, Your Honor.  And I

34

1    respectfully submit that this is directly relevant to the depth

2    of the holes that Washington Group drew its own specs for --

3         THE COURT:  Is your point that you placed this in

4    your pleadings which are separate, and distinct, and unique

5    from the --

6         MR. O'DWYER:  Yes.

7         THE COURT:  All right.

8         MR. O'DWYER:  I've also made an allegation that the

9    general maritime law applies and this is in the Fifth Circuit

10   right now in two separate cases that have not been argued much

11   less ruled on.  But what we're dealing with here and they like

12   to say, "Oh, we gave them 40 boxes of documents," they only

13   gave us boxes of documents pertaining to the Bolland and Saucer

14   Marine sites.  This entire project was a waterways management

15   project.  It involved the modification of an existing navigable

16   waterway system.  And I respectfully submit that maritime law

17   applies to all of this an I've included in my allegations a

18   claim about negligent design, construction, operation,

19   inspection, and maintenance of an entire navigable waterway

20   system including this particular reach on the east side of the

21   Industrial Canal.

22        Your Honor, my colleagues are telling me to cut it

23   off.  I think I've made a sufficient record that I wanted to

24   make today.  I just want to bring one more thing to your

25   attention.

1          THE COURT:  While you're sitting there, is there a

2    motion -- did you notice your Motion to Sever for hearing?  I

3    read the motion, but I don't know if it's noticed a hearing or

4    not.

5          MR. GILBERT:  Your Honor, Brian Gilbert, Barge

6    Plaintiff Liaison.

7          It was done ex parte because basically it retained a

8    recitation of the Court's earlier order.

9          THE COURT:  Okay.  There may be some opposition to it

10   however.

11         MR. GILBERT:  I thought the --

12         THE COURT:  I would guess.

13         MR. GILBERT:  I thought the Court's will would trump

14   that being that it's --

15         THE COURT:  The Court's will will ultimately trump

16   it, but I usually let somebody weight in on it.

17         MR. GILBERT:  Your Honor, would you have me re-file

18   it?

19         THE COURT:  Maybe we can work that out today where

20   you won't have to re-file it.

21         MR. GILBERT:  Okay.

22         THE CLERK:  I'll notice it for hearing.

23         MR. GILBERT:  Thank you.

24         MR. O'DWYER:  Your Honor, I didn't make copies of

25   this one for Mr. Treeby.  It's one of his client's documents

1    entitled "Recap Work Plan Amendment, Bank Material Remediation,

2    Inner Harbor Navigation Canal, Eastbank Industrial Area,

3    New Orleans, Louisiana," prepared for the Army Corps of

4    Engineers by Washington Group International dated June 2002.

5    On Page 2 of their own document they stated as follows:  "In

6    the work plan that was proposed to remediate all unacceptable

7    contamination by excavation and disposal at a permitted

8    landfill.  However, there are problems associated with that

9    excavation of the bank material, two in particular."  I'm going

10   to skip the first one.  "The second is the variety of fill,

11   construction materials, and debris that compose the bank make

12   it extremely difficult to excavate without compromising the

13   integrity of the entire bank and allowing water incursion."

14           In my Certificate of Impossibility to which I have

15   quoted Dr. Bea's affidavit which is a part of the record,

16   under-seepage and penetration of the piping and under-seepage

17   were big problems at this location that he directly associates

18   of the failure of the retaining wall.  I don't know who's right

19   and who's wrong at this point.  Maybe the barge did do it.  But

20   I've got to protect my clients' interests until the fact finder

21   determines --

22           THE COURT:  I understand that.

23           MR. O'DWYER:  All right.

24           The last point and I'll sit down, Your Honor.  You've

25   seen the term "vibrating" --

1          THE COURT:  Yes, I have.

2          MR. O'DWYER:  -- in the papers including the Master

3     Complaint.

4          THE COURT:  Yes.

5          MR. O'DWYER:  Well, I took a look at Eason's last

6     night and I respectfully submit that the type of work that

7     Washington Group was doing on the 32-acre batture area was in

8     the nature of ultra-hazardous activity akin to pile driving.

9     Would there be any doubt in Your Honor's mind that if a pile

10    driver had been on the batture area and that the retaining wall

11    gave way because of cracks that you would be letting them out

12    on the papers?

13         I'll submit it, Your Honor.

14         THE COURT:  Thank you.

15         MR. O'DWYER:  I offer, introduce, and file the

16    exhibits that I have made --

17         THE COURT:  All right, let them be filed.

18         MR. O'DWYER:  -- in evidence.

19         THE COURT:  Let them be filed and made part of the

20    record.

21         MR. TREEBY:  Your Honor, please, do you want me to

22    respond to Mr. O'Dwyer's few remarks that I want to respond to

23    or do you want to hear from others on the motion first?

24         THE COURT:  I'll let you go last, Mr. Treeby.

25         MR. TREEBY:  Okay.

1          THE COURT:  You get the last word.

2          MR. BRUNO:  Judge, thank you again for this

3    challenge.  Joseph Bruno.

4          First for the record if I may, my firm identified

5    Washington Group as a potential defendant in this case.  My

6    firm identified the theories and causes of action against the

7    Washington Group.  My firm along with the assistance of other

8    Counsel opposed the motion filed by Washington Group and we did

9    the best that we could.  For the record, all motions that are

10   filed in this case are served on every Plaintiff Counsel and

11   every Defense Counsel in the case.  Despite the fact that

12   Your Honor has appointed Liaison Counsel and Sub-Liaison

13   Counsel, no one -- no Plaintiff lawyer in this case is

14   prohibited from filing any memoranda in support or an

15   opposition to any motion that's filed.  There's nothing in

16   Your Honor's orders that prohibits any party from coming to a

17   hearing and expressing themselves in opposition to or in favor

18   of a motion.

19         I'm sorry that Mr. O'Dwyer feels that I didn't serve

20   his interest well.  I've tried my best and I hope I serve this

21   Court and the parties whom I represent.

22         Mr. O'Dwyer does make an interesting point though and

23   it's frankly the point that I want to -- you know, I'm here to

24   address, because I see my role as assisting other parties in

25   organizing this case in a way that is most efficient for this

1    Court, that avoids duplication of effort, and gives everybody

2    an opportunity to be heard.  Mr. O'Dwyer makes the point that

3    he hasn't been heard.  Well, in my role I'm sitting here as

4    liaison and I am aware of the fact that there are all these

5    various class actions pending in this Court.  And so I thought

6    I would recap with you just a little bit.

7           This map (indicating) identifies every break in the

8    entire system, in the hurricane protection system for the

9    Greater New Orleans area.  What's at issue before this Court

10   today regards the Lower Ninth Ward, and Your Honor will know

11   that the breaks in particular which all these parties have

12   brought to this Court and asked you to consider are Breaks 2A

13   and 2B and that, Your Honor, is referred to as "Reach 2" of the

14   MRGO.

15          THE COURT:  Right.

16          MR. BRUNO:  The allegation there is that the

17   construction of the MRGO was such that it caused increased

18   surge, differential wave action which destroyed those levees

19   and flooded the Lower Ninth and the St. Bernard area, and it's

20   the whole Coast Guard Cutter crashing into the levee argument;

21   you've heard that before.  But all I want to do is identify

22   what's at issue.

23          The other areas at issue are 6A and B.  Six A and B

24   are the breaks at the Lower Nine, what we call the North and

25   the South Breach.  So, that's all that's at issue.  There are

1   really -- 2A and B are really one breach if you look at it.

2   Six A and B are two breaches of the Lower Nine.

3            Now, what I'm about to show you is not intended to be

4   evidence.  This is just to give you some sense of where we all

5   are.  We've all spent a lot of money on this business and we

6   have generally the results of the Dutch modeling.

7            Is it on your screen, Judge?

8            THE COURT:  I can see it.

9            MR. BRUNO:  If you can see it, I'll just play it --

10           THE COURT:  I can see it.

11           MR. BRUNO:  -- because I don't want to hold you up.

12           Anyway, this is just very quickly note -- this is the

13  result of the Dutch expert's models and what I want you to

14  observe is that 2A and B compare to and contrast the Lower

15  Nine.  The Lower Nine is off to the left.  Now, you see how

16  it's coming over there; you see how it's breaching?  And what

17  you see is the waters come together right about at Paris Road,

18  okay.

19           Now, so here we are, Judge, back to our St. Bernard

20  and Lower Nine area.  In fact, what we now see is that that

21  area needs to be divided into two sections, one Zone A and one

22  -- I'm sorry, 7A and 7B and that's the result of all this

23  effort and all this time that we've spent with the experts and

24  so forth and so on.  And there is a difference of opinion I

25  must say in deference to Mr. Gilbert as to when the water broke

1   through, but in terms of where the water went, everybody is

2   pretty much in agreement.

3          Now, I'm saying all this to you just to give you some

4   general background because the Zone A, the 7A -- 7A, okay -- as

5   Liaison I have to come before you and say that there are at

6   least three different sub-umbrellas which seek to address

7   issues in that 7A zone.  You have the MRGO group who has filed

8   a lawsuit against the Government and against the Washington

9   Group, all right, and they allege they caused that break of the

10  6A and B, that breach on the east side.  Then you've got the

11  Barge group who seeks to represent that same group of people

12  alleging the barge broke that 6B, not 6A but 6B --

13          MR. GILBERT:  Both.

14          MR. BRUNO:  Oh both?  I'm sorry, Brian.

15          He's alleging the barge knocked them both out.

16          THE COURT:  Right.

17          MR. BRUNO:  And then we have the dredgers who are

18  alleging that the dredging caused increases in surge and that

19  also caused high water --

20          THE COURT:  True.

21          MR. BRUNO:  -- and caused -- and here's the key,

22  Judge, and this is the point.  I'm not here advocating them; I

23  feel like I need to be here just to sort of see where we are.

24  Each of these subgroups have filed purported class actions.

25  And here's the rub, the rub is that each of these three lawyers

```
 1    if you will seek to represent the same plaintiff, because

 2    there's no difference between the plaintiffs in each of these

 3    three groups and therein lies the rub I mean intellectually for

 4    me.

 5            Now, Robinson of course is different and the reason

 6    why it's different is because that's a Plaintiff Mr. Robinson.

 7    Mr. Robinson has made an informed decision to sue Party A and

 8    not Party B, C, D, and F.  That's his prerogative.  But when

 9    you appoint me as a liaison and I have the responsibility of

10    handling a class action, my responsibilities grossly change.  I

11    don't have the luxury of picking and choosing.  I think I have

12    to invite everybody to the table.  And on that point let me say

13    that when I drafted and the folks that you appointed drafted

14    the Master Supplemental Amending Complaint, the State of

15    Louisiana was not a defendant.

16            THE COURT:  Or a plaintiff.

17            MR. BRUNO:  Or a plaintiff.  So, again, we did our

18    best and didn't bring a claim against the State because they

19    weren't there.  There was no pending claim against the barge,

20    and so we didn't make allegation against the barge.  And at

21    that time you'll remember the dredging case had been dismissed.

22            THE COURT:  Yes.

23            MR. BRUNO:  So, again, I can't let it be said that we

24    failed.  We're trying --

25            THE COURT:  Still is as far as I know.
```

 1          MR. BRUNO:  We're doing our best to include.  But the

 2    point is here's where we are today.  Where we are today is that

 3    in fact like it or not we have these three competing groups

 4    seeking to represent the same class of people.  If you certify

 5    one, necessarily there will have to be an opt out of everybody

 6    else.  It's going to be -- it's difficult.  I don't know that I

 7    can wrap my arms around it.

 8          We have as well some very intriguing legal issues

 9    which relate to immunity which relate to the power of this

10    Court to certify any class in view of the administrative

11    requirements, all of which can be resolved in due course.  We

12    also have for guidance the Castano case which for me introduced

13    the notion of the immature tort and the idea that there perhaps

14    needs to be some development of some issues before in a case

15    like that you get the certification.

16          So, Judge, I just wanted to come here and say to you

17    that, you know -- and by the way, with regard to Zone 7B let me

18    just finish the thought.  Seven B is really the case against

19    the MRGO as it relates to the Reach 2 only and I think that

20    would really regard only the Barge and the MRGO folks in that

21    section.  If the Court believes that this line that I've drawn,

22    arbitrary by me but if you adopt it, makes a nice demarcation

23    between these issues so that you've got the 7B stuff -- and I

24    think Brian would agree that there's no claim by the Barge

25    folks that the folks in that zone are affected by the barge.

1   And I make no claim --

2          MR. GILBERT:  That's correct.  We're roughly to Paris

3   Road.

4          MR. BRUNO:  And I make no claim that any of the folks

5   in 7B were affected by --

6          I'm being generous today.

7          MR. TREEBY:  That's news to me.

8          MR. BRUNO:  No it's not news to you.

9          MR. O'DWYER:  I don't join in that stipulation.

10         MR. BRUNO:  And in fairness to Mr. O'Dwyer, he may

11  have a different view.  But there will be a time -- I only make

12  that -- I only say that to make the point that there will be an

13  opportunity for anybody who has that view to get up and express

14  it.  So, I think in response to your initial question, "What do

15  I do about all this," I think the first thing that needs to be

16  done is to make the parties sit down and recognize that you

17  know there are -- there's crossover.  Whether we like it or

18  not, there is crossover on these issues.

19         THE COURT:  Unquestionable there is.

20         MR. BRUNO:  I think that it is absolutely impractical

21  to try class actions serially when you're asked to determine

22  the cause of the breach, of the same breach over and over and

23  over again.  I don't see how that could possibly be done.

24         I have lots of ideas.  I don't know that this is the

25  time or place to share them with you.

1        THE COURT:  Well, I tell you what, I'm certainly

2   interested in ideas, because this is -- from the Court's

3   perspective each of us has a perspective.  My perspective is

4   what is the most, if there is and there's bound to be, an

5   optimum way --

6        MR. BRUNO:  Sure.

7        THE COURT:  -- to handle this from the administration

8   of justice standpoint where I'm at least moderately fair to all

9   the parties, but at the same time fair to the system and don't

10  get us bogged down in some quagmire from which we will never

11  get out of by the time your Plaintiffs, you know, their

12  grandchildren are going to be the Plaintiffs.

13       MR. BRUNO:  Right.  Well, Judge, and that's --

14       THE COURT:  We have to make some decisions.

15       MR. BRUNO:  -- and that's exactly right and that's,

16  you know, why I say I do honor this challenge because that's

17  what it is.  And I do -- I mean I really enjoy Ashton's input

18  because it gives me a different perspective.  It doesn't mean I

19  have to adopt it.  I mean we have a difference of opinion for

20  example about whether a particular piece of evidence exonerates

21  a defendant or inculpates that defendant.  We have a difference

22  of opinion.  But he has the right to come forward and share

23  that view with me.

24       Having said that, Judge, to me what makes sense is to

25  find a way to do something that nobody could be offended, and

1    that would be --

2            THE COURT:  I don't know if that exists, but go

3    ahead.

4            MR. BRUNO:  Well, that's true.  How about this,

5    nobody's rights, nobody's rights are in any way taken away.

6            What I'm thinking of and again I go back to Castano

7    because I think it does give us some guidance.  You've got

8    Robinson coming up which is a good thing because it's going to

9    address a whole host of immunity issues which we have to deal

10   with them, like it or not.

11           THE COURT:  No question.

12           MR. BRUNO:  My simply view there is if I've got to go

13   to the Fifth Circuit, I want a fully developed record.  I've

14   said that before and that's all I want.  Whatever happens up

15   there happens, but I don't want to be faulted for not having

16   done my job.  So, that's that.

17           Now, I think with regard to Zone 7A I think what

18   would be a good idea would be to pick a particular plaintiff,

19   or perhaps two, or perhaps three, I mean we could pick three

20   Barge and three non-Barge.  I don't care, just put them in a

21   room and try the cause of the Lower Nine breaches.  And make

22   certain -- it would be my job to make certain that I've

23   gathered together everybody who's got an allegation and they

24   can put up their own plaintiffs so that there would be no

25   conflict.  In other words if Lawyer A wants to make this

1    assertion and he differs from Lawyer B, then Lawyer A makes

2    that assertion for his three, Lawyer B makes whatever assertion

3    he wants for his clients, Lawyer C makes whatever assertion for

4    his, just like a red light crash where you have a passenger and

5    a driver in the case.  I mean there are conflicts that nobody

6    can avoid, but the Court still has to resolve who had the red

7    light, the passenger's fault --

8            THE COURT:  Now, there may be a jury on part of it

9    and the Court as reference the Government.

10           MR. BRUNO:  Absolutely there will be and you'll hear

11   Mr. Treeby shout about impossible to get a jury, and they'll be

12   others who will disagree --

13           THE COURT:  Right.

14           MR. BRUNO:  -- but let's get that out of the way

15   sooner rather than later.

16           So, you know those are my thoughts --

17           THE COURT:  The best way to present something to me

18   is if the Plaintiffs can get together.  Of course if the

19   Plaintiffs and the Defendants can get together that would be

20   fantastic, but that may be impossible.  I think the Court is

21   ultimately going to have to decide this is the way I'm going to

22   handle this monster and this is the way it is, like it or not.

23   But I want input before I make that decision.  I'm trying not

24   to be precipitous.  So, the more you can agree, the less

25   arbitrary the Court will be.  It's as simple as that.

 1   Otherwise, I'm just going to do it.

 2          MR. BRUNO:  Judge, and I will share with you, of

 3   course.  Before I decided to take the podium today I did meet

 4   with Brian and I met with Larry Wiedemann and they have a

 5   difference of opinion.  They strongly disagree with everything

 6   I've said and I'm sure Brian will say that, but I'm here to

 7   simply -- you know, I think my role is different.  I hope I'm

 8   not appearing as an advocate.  I'm simply outlining to you what

 9   I know about the facts of this case and I will say unabashedly,

10   I don't know anybody --

11          THE COURT:  We've got conflicting classes --

12          MR. BRUNO:  -- anybody who knows --

13          THE COURT:  Unquestionably we have conflicting

14   classes.

15          MR. BRUNO:  And I don't know that anybody --

16          THE COURT:  Unquestionably that we have some

17   causation issues in my mind despite the one percent at least in

18   my mind right now crossed the spectrum.  So, I'm concerned

19   about those and nobody has intellectually explained to me how

20   they don't.  So, it concerns me.  I'm not going to have a

21   series of trials -- I'm just telling you right now, unless you

22   can come together with a trial plan, I will not have a series

23   of trials that deal with some of the same coterminous issues.

24          MR. BRUNO:  Sure.

25          THE COURT:  It won't happen.

1          MR. BRUNO:  Well, I just want you to know --

2          THE COURT:  It won't happen in this litigation.

3          MR. BRUNO:  -- I have broached the subject with

4    Mr. Aldock -- I haven't talked to -- I've talked to everybody

5    and I don't know that they're --

6          THE COURT:  You understand what's going to happen is

7    ultimately the Court -- just understand, the Court is going to

8    render, it's going to modify its case management order and is

9    going to render one that's going to be pretty much it and

10   that's going to be it.  So, I'm going to hear from all of you

11   before I do so, but I'm at that point now.  I'm seeing a little

12   more clearly the conundrum and trying to sort it out and then

13   ultimately make a decision.

14         MR. BRUNO:  Well, I don't want you to consider this

15   as either the Bruno proposal, or the MRGO proposal --

16         THE COURT:  I'm not considering any proposal.

17         MR. BRUNO:  -- but I would like this, I would suggest

18   since this is all -- you know, we finally have a forum where

19   this can be aired that Your Honor order --

20         THE COURT:  My agenda is the only one that really is

21   going to be what is the most economically judicious way to do

22   this, not a strategic help to any Plaintiff or Defendant.

23         MR. BRUNO:  And that's why I'm going to ask

24   Your Honor to order first that the Plaintiffs get together and

25   to the extend that they can either (a) put something together

1    that's joint, or at least identify everybody's issues, and then

2    subsequent to that to order me or perhaps others to make a

3    presentation of what that is to the Defendants to either see if

4    I can get some agreement, or at least to identify where there

5    are disagreements, and then present this to Your Honor for some

6    determination.

7            THE COURT:  I've got plenty to do in the meantime.

8    I've got lots of substantive decisions to make on motions.  We

9    have a plethora of motions and I intend to start -- I've read

10   them all and we've got -- actually formulated preliminary

11   decisions on some, but we need to start getting those out.

12   I've got Robinson to try eventually.  There's a lot for us to

13   do.  But eventually these things have to come to trial, either

14   get certified or not certified and to come to trial.

15           MR. BRUNO:  That's all I -- Judge, if you have no

16   questions, I'll stand down.

17           THE COURT:  No.

18           MR. WEBB:  Judge, Dan Webb, one of the insurers for

19   Lafarge.  I was not planning on taking the podium until I got

20   accused of being easy and fast money.

21           As Mr. Bruno stated, this is 7A.  Seven A is going to

22   be a lot smaller by the time we get finished with it.  It's not

23   going to be as big as it is right now.  So, it's going to be a

24   much smaller group.

25           There's already been testimony by one witness that he

1   was on top of his house and his neighborhood was flooded, so he

2   was on his roof when this happened, when he claims he saw the

3   barge.  Now, whether he saw the barge will be a horse of a

4   different color, but he was already flooded out by MRGO water

5   before anything ever happened with the barge.  And Mr. Gilbert

6   was at that deposition.

7            MR. GILBERT:  And that wasn't his testimony.

8            MR. WEBB:  That was his testimony, Mr. Gilbert.

9            THE COURT:  All right, we don't have time for that.

10           MR. WEBB:  Your Honor, we also -- I'm shocked that

11   they say easy money, because have IPET, ILIT, and Team

12   Louisiana that say nothing about the barge other than it didn't

13   do it.  So, I don't know where they're coming from.

14           But the other thing is they talked about joint and

15   several of one percent.  This is not a joint and several case.

16   To have joint and several you have to have concurrent

17   negligence.  There was no concurrent negligence in this case.

18   Temporally it was all different.

19           As far as the third party claims being able to stand

20   on their own, they can't.  We have to try this case where the

21   Court can somehow figure out the allocation among all the doers

22   of the dirty deeds including Washington Group and anybody else

23   and make that decision.  And Mr. Bruno may be right in

24   separating these out one by one, because the damages for these

25   individual Plaintiffs are so different and the causes are so

1   different we may never get this thing done in a big group.   And

2   that's all I have to say.

3             THE COURT:   Thank you.

4             MR. GILBERT:   Your Honor, I would just speak to an

5   issue that I think is becoming apparent to the Court which

6   again was briefed in my opposition.   The alignments, interests,

7   and the objectives in this case are such that the MRGO

8   Plaintiffs are more aligned with the Barge Defendants than they

9   are with the Barge Plaintiffs given then competing theories of

10  what caused the flooding.   This prejudices the Plaintiffs when

11  we are appended to the MRGO action.

12            THE COURT:   So we might have one big, long trial

13  where all of you participate, that's what that's looking like

14  to me.   I'm just letting you know that right now.

15            MR. GILBERT:   Thank you, Judge.

16            MR. TREEBY:   Your Honor, please, I'm going to try to

17  get back to my motion --

18            THE COURT:   I feel sorry for the jury, but go ahead.

19            MR. TREEBY:   I'm going to be very quick --

20            THE COURT:   All right.

21            MR. TREEBY:   -- but I'm going to try to get back to

22  my motion.   Not to deal with allegations here, I don't like to

23  but I will.   The notion that Washington Group cherry picked

24  documents to give them in the 40 boxes is just simply untrue.

25  As Mr. Joanen and Mr. Bruno know, we had an understanding.

1   We'll give you whatever you want, tell us.  If you want every

2   worksite, it will be a lot more documents.  And they said, no,

3   we agree that for now we would produce documents that related

4   to Saucer Marine and Bolland Marine, because they were directly

5   in front of the breaches, and so they weren't cherry picked.

6   The documents are all available.  I have no idea who got -- you

7   know who was able to really get them.

8           I'm glad Your Honor said that you've read the two

9   complaints.  I don't think that the allegations against

10  Washington Group are any different in Mr. O'Dwyer's first --

11  the wording is slightly different, but there's no different

12  theories expressed.  This is noticed pleading and you have to

13  give enough facts, which we argued in our 12(b)(1) motion to --

14  in some instances you have to give enough facts to support your

15  claims and I think a comparison the Parfait complaint and the

16  MRGO Master Complaint don't reveal any real differences.  And

17  we did a comparison of those in our memorandum.  I haven't

18  heard any real comparison done other than that one and we think

19  it's an accurate comparison in our Memorandum in Support of the

20  Motion.

21          The certificate -- I come back to this and I want to

22  address the Court's concerns.  If Mr. Bruno is -- if they will

23  -- frankly, I do think and I'm sure I'll hear howls over here

24  but I get the last word so I'm going to say this, I think they

25  understand now this can't really be a class.  And if he wants

1   to try individual cases as bellwethers or whatever, if we or

2   anybody else is left standing when the motions are decided, I

3   think it's a very good idea to start trying some of them and

4   things will sort themselves out.  But to do that before a class

5   cert is decided with class cert still looming, I think that

6   would be improper and would hope the Court would not do that.

7           Mr. O'Dwyer mentioned his pleading 06-4389 in some

8   kind of an argument.  I didn't fully understand the argument,

9   but it's incorporated in the Master Complaint.  It was one of

10  those incorporated in the Master Complaint.  But before he

11  filed that one Mr. Bruno correctly as he said, he was the first

12  to make the allegations against Washington Group and that also

13  got consolidated in the Master Complaint.  So, the first to

14  file rule certainly applies.

15          I'm going to resist trying to reargue my --

16          THE COURT:  The Rule 12?  Thank you.

17          MR. TREEBY:  -- Motion to Dismiss.

18          THE COURT:  I appreciate that.

19          MR. TREEBY:  I'm stifling myself, Your Honor.

20          THE COURT:  We've had a lot of argument and a lot of

21  papers and I've given it lots of consideration.

22          MR. TREEBY:  Thank you, Your Honor.

23          THE COURT:  All right, thank you.

24          We are adjourned for the day.

25          MR. GILBERT:  Thank you, Judge.

1          THE COURT:  And I'll take these under advisement.  I

2     really would like, you know, if we get some kind of reasonable

3     -- even to find where we differ and where we don't as to a

4     giant trial plan --

5          MR. BRUNO:  You'd help me if you ordered it.  I mean

6     I've already tried, Judge, and that's why --

7          THE COURT:  All right, because it's to everybody's

8     interest because you kind of -- I hope everybody gets the drift

9     of where I'm going.

10          MR. BRUNO:  Yes, sir, we do.

11          THE COURT:  And it's going to be Federal Court, it

12     won't be a state court trial.  Keep that in mind.  I'm going to

13     put time limits on all of them and segment it.  So, keep it in

14     mind, keep in mind where you are.

15                         *    *    *    *    *

16                         (Hearing Concluded)

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

/S/Dorothy M. Bourgeois                  11/9/07
 DOROTHY M. BOURGEOIS                  DATE