**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES * | CIVIL ACTION NO. 05-4182 |
| CONSOLIDATED LITIGATION * | |
| * | SECTION "K" |
| * | |
| PERTAINS TO: * | MAGISTRATE (2) |
| NO.   06-4389 * | |
|         07-3500 * | |
| * | JUDGE DUVAL |
| * | |
| * | MAGISTRATE WILKINSON |
| * | |
| * * * * * * * * * * * * * * * * * * | |

**CERTAIN PLAINTIFFS' SECOND SUPPLEMENTAL
MEMORANDUM IN OPPOSITION TO
MOTION(S) TO DISMISS FILED BY
WASHINGTON GROUP INTERNATIONAL, INC.
(RECORD DOCUMENT NOS. 4140 AND 8224)**

**MAY IT PLEASE THE COURT:**

On Friday, November 9, 2007, defendant Washington Group International, Inc. ("WGI") filed a supplemental memorandum in support of WGI's motion(s) to dismiss, opposing Plaintiffs' Motion for Leave to File a Supplemental Memorandum in Opposition to WGI's Motion(s) to Dismiss. Although WGI failed to obtain leave of Court, if the Court ultimately considers WGI's supplemental memorandum, then plaintiffs seek leave of Court to rebut WGI's latest arguments as follows:

**PLAINTIFFS' COUNSEL DOES NOT
APOLOGIZE FOR THE AD HOMINEM
<u>ATTACK ON WGI'S COUNSEL</u>**

Coincidentally, early today, November 13, 2007, undersigned counsel for plaintiffs and local counsel for WGI, Mr. Treeby, exchanged E-mails concerning documents which WGI had previously provided Plaintiffs' Liaison Counsel in this case, which undersigned counsel had not seen.  Among the several hundred, if not thousands, of documents provided by WGI today was a document entitled:  "Statement of Work" in connection with the contract entered into by the U.S. Army Corps of Engineers, Tulsa, Oklahoma District on the one hand, and by WGI's predecessor, Morrison Knudsen Corporation, on the other hand.  The Court may have heard that contract (or series of contracts, by amendment) referred to as "Contract No. DACA 56-94 D-2001", or as "MK Task Order No. 26".  In paragraph 3 of the "Statement of Work" document, which is dated June 1, 1998, the following appears:

> 3.  <u>Project Requirements</u>
>
> <u>The Contractor shall furnish all engineering services</u>, material, supplies, labor, as required, in connection with the technical review of site documents, attendance at site meetings and travel necessary for the period of approximately 21 June 1999 through 30 Sep 1999, associated with the demolition and remediation of the east bank of the Inner Harbor Navigation Canal (IHNC).  <u>In addition to reviewing the site documents the Contractor shall prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to [be] filled by</u> sampling or <u>other investigations</u>.  (insert and emphasis supplied).

The above and foregoing quotation is entirely clear and self-explanatory, and is easily contrasted with the following statements made on the record by counsel for WGI in Open Court at oral argument on June 13, 2007:

BY MS. McELVOY:

". . . that they were not asked to perform engineering services". The fact that they were not asked to perform engineering services makes these allegations about regulations and standards and procedures even more curious, because its not clear if Washington Group was not performing engineering services, what code of conduct would govern its performance of the contract. And we certainly had no clue based on this allegation."

The Court can decide whether Ms. McElvoy's misrepresentation about her client "not [being] asked to perform engineering services" was simply negligent, grossly negligent, or intentional. The fact of the matter is, contrary to Ms. McElvoy's assertion and representation to the Court, her client's predecessor, Morrison Knudsen Corporation, was specifically tasked with providing engineering services, as well as with making recommendations to its client, the Corps of Engineers, which included "any data gaps that may need to [be] filled by . . . other investigations." Why then, in the 40 or so boxes of documents produced by WGI in this litigation to date, is there no engineering analysis reflecting how the work which WGI would perform in the East Bank Industrial Area might affect the pre-existing levees and floodwalls? Wasn't that something that a competent, multi-national engineering and construction firm should have provided the Corps of Engineers as a "recommendation" to fill a "data gap"? If it wasn't, then plaintiffs respectfully submit that it should have been, which is why Your Honor should not dismiss plaintiffs' claims against WGI on the papers.

Plaintiffs respectfully submit that, on their pleadings as written, they have sufficiently stated a cause of action for independent negligence[1] against WGI, who had a duty to third parties, such as plaintiffs, to exercise ordinary care and to refrain from creating hazardous conditions in the fulfillment of contractual obligations, whether WGI

---

[1] Contrary to the assertion by counsel for WGI, the so-called "government contractor defense" is not before the Court.

-3-

framed the plans and specs themselves (and plaintiffs say they did) or whether WGI was handed them by someone else.  Eason's, Louisiana Personal Injury Law, 2004 Edition, page 257 and authorities cited therein.

Plaintiffs' well-pleaded claims of independent negligence against WGI should not be dismissed on the papers.

## LEARNED EXPERTS BELIEVE WGI WAS INDEPENDENTLY NEGLIGENT

Appended to this memorandum as Exhibit No. 1 (A through D) are a series of four (4) aerial photographs of the North breach area in the East Bank Industrial Area, upon which one of plaintiffs' experts, Chad Morris, has superimposed buildings, which WGI demolished, and excavations and other "activity" conducted by WGI in this very area prior to Hurricane KATRINA.  Plaintiffs respectfully submit that the graphic pictures are worth "a thousand words", and are completely self-explanatory.  The Court cannot help but observe, in Exhibit No. 1-C, taken on April 15, 2005, prior to Hurricane KATRINA, and in Exhibit No. 1-D, taken on September 2, 2005, only three (3) days after Hurricane KATRINA, the huge "hole" which WGI had dug directly in front of the North breach area prior to the storm, but failed to backfill, and which the storm simply "enlarged".

Attached to plaintiffs' Certificate of Impossibility of Compliance (Record Document No. 711) as an Exhibit was a photograph of the large "sink hole" in front of the North breach.  However, at the time the Certificate of Impossibility of Compliance and Exhibits were filed, plaintiffs were totally unaware that the very same "sink hole" had actually been dug by WGI not long before Hurricane KATRINA, but not backfilled. Plaintiffs respectfully submit that this new "revelation" is truly "earth-shattering" (no pun

intended), and demonstrates why dismissal of plaintiffs' claims against WGI "on the papers" at this time would not be logical, given the ultra-hazardous nature of WGI's work and plaintiffs' invocation of the Doctrine of R*es Ipsa Loquitur*.

Also appended to this memorandum as Exhibit No. 2 is a 42-page supplement to the original Declaration Under Penalty of Perjury by Professor Robert Bea, another of plaintiffs' experts, which Professor Bea has labeled "Appendix C". (See Record Document Nos. 6674, 6803 and 6804, with attachments). Exhibit No. 2 is a virtual treasure trove [2] of information detrimental to WGI, and amply documents WGI's "independent" negligence.

Although Professor Bea's "Appendix C", Exhibit No. 2, contains a narrative summary of the history of the site and why WGI was retained by the Corps of Engineers to remediate the site, specific references by Professor Bea on how WGI's work adversely effected the pre-existing levees and retaining walls are enumerated as follows:

> The available information indicates a high degree of correlation of the site clearing work for the USACE Lock Expansion Project at the East Bank Industrial Area (EBIA) sites and the two breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable sub-soils (marsh layers) would have facilitated the under seepage discussed in this Appendix. In addition, removal of the soils on the canal side of the floodwall would have reduced the lateral stability of the flood protection structure. Page C.1.

\* \* \*

---

[2] According to Professor Bea, the document, Exhibit No. 2 was executed and sent to the Plaintiffs' Liaison Committee on September 27, 2007, and was thereafter filed with the Court. As of the submission of this Second Supplemental Memorandum, undersigned counsel for plaintiffs has been unable to verify whether the document has, indeed, already been submitted to the Court, but counsel is himself submitting it, now, and apologizes for any unnecessary "duplication".

Figure C.9 is an aerial photograph of both the North and South breach sites taken on September 6, 2005. The Court will note the lock expansion site clearing "holes" left immediately outside the flood walls at both locations. Page C.11.

\* \* \*

Identified in Figure C.13 and Figure C.14 (taken while water is flowing into the Lower 9th Ward) are "holes" located immediately outside (IHNC side) the flood wall. This feature can be seen more clearly in Figure C.15. This feature is in the immediate vicinity of one of the underground excavations reported by WGI in the EBIA lock expansion site clearing report (WGI 2005). Page 15.

\* \* \*

The large excavation "hole" [in front of the South breach] on the former EBIA site immediately outside the breach and adjacent to the former alignment of the flood wall is indicated on Figure 16. This feature is in the immediate vicinity of one of the underground excavations reported by WGI in the EBIA lock expansion site clearing report (WGI 2005). Page 17. [insert added].

\* \* \*

A similar but earlier photograph is shown in Figure C.17. This photograph was taken during the water outflow the afternoon of 29 August 2005. The deep "holes" immediately outside the floodwall alignment at the north and south ends of the South Breach are indicated on the photograph. The aerial photograph taken about the same time shown in Figure C.18 shows the excavation holes at the north and south ends of the South Breach. Page 18.

\* \* \*

There is a well-established history of under seepage problems along this and nearby levee frontages (ILIT 2006, Team Louisiana 2007). Page 22.

\* \* \*

Results from the USACE IPET and ILIT soil borings and in situ tests performed in this area indicate the presence of "marsh" layers to a depth of -20+feet (NAVD88). During the ILIT sampling program, very high conductivity through the marsh layers was observed during drilling through these layers at each of the sites in this area (Figure C.25). As the

hole was drilled at one location, the drilling fluids quickly communicated through the marsh lawyers to the nearby adjacent holes which had been previously drilled. Examination of the samples indicated distinctive preferential layering of the organic material indicating much higher horizontal water conductivity compared with the vertical water conductivity. Page 26.

\* \* \*

Currently, the author is performing analyses to determine the effects of these holes [dug by WGI] on the performance of the levee – floodwall – sheetpile system. Page 28. [insert added].

\* \* \*

Even though a range of permeabilities and soil shear strengths were studied, they do not explain the occurrence of failure at this site [the North breach area] as early as between 5:00 a.m. and 6:00 a.m. The conclusions drawn from the analyses were that under seepage and piping exacerbated by uplist or "blowout" at the inboard toe of the levee was the principal cause of this failure. It is postulated that the substantially shortened seepage paths caused by the water filled gap and the unfilled excavations left immediately outside the floodwall and sheetpiling will show that "blowout" conditions could have existed as early as 5:00 a.m. and 6:00 a.m., thus explaining the water observed coming from the breach area. Page 31. [insert added].

\* \* \*

Both sets of these analyses have not addressed the potential effects of the "holes" that existed on the IHNC side of the flood wall. As noted earlier, I am performing analyses to determine the effects of these excavations. The analyses will include a broad range of parameters to assist in development of additional insights into the reasons for the premature failure at the North Breach. Page 32.

\* \* \*

As for the North Breach [pertaining to the South breach], these analyses do not include the effects of the navigation channel lock expansion site clearing unfilled excavations left immediately outside two locations along this stretch of the floodwall and sheetpiling. These effects will be addressed by future analyses. Page 32. [insert added].

\* \* \*

At the same time, the current (Seed et al 2007) transient flow analyses show that the rising storm surge in the IHNC was effectively transmitted to the inboard side levee toe area. Based on the analyses summarized here, by about 8:00 a.m., approximately 75% TO 90% of the steady state flow surge-induced pore pressures reached the foundation soils beneath the inboard toe of the levee. It is important to note that these flow analyses did not include the dramatically shortened flow paths caused by the gaps formed behind the floodwall nor the site clearing unfilled excavation holes. Abundant evidence of flood side cracking and sinkhole formation on the protected side was found in the surviving I-wall segment between the north and south breaches. These under seepage effects would have had extremely important effects on the soil strengths and resistance to lateral and vertical forces. Page 37.

* * *

Most egregious were oversimplified assumptions and analyses performed by the USACE IPET concerning mechanisms of seepage and hydraulic uplift effects. Such mechanisms have been well known for decades. Seepage beneath levees is discussed in depth in the USACE Engineer Manual EM 1110-2-1913, *Design and Construction of Levees,* Chapter 5 "Seepage Control." This chapter begins as follows: *"Without control, under seepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself. Under seepage problems are most acute where a pervious substratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of a levee."* Inappropriate evaluation and analyses of the hydraulic and strength – deformation characteristics of the highly pervious organic marsh (swamp) layers underlying most of the great New Orleans area has been a historic and pervasive "blind spot". Forensic engineering investigations subsequent to hurricane Katrina clearly have identified its potential effects at the 17th Street Canal breach, the London Canal breaches, many of the important breaches along the MR-GO protective structures, and at the two breaches at the Lower 9th Ward. Page 41.

* * *

There is substantial evidence to indicate that the USACE lock expansion EBIA site clearing and underground storage tank removal operations played important roles in initiation of the North Breach and South Breach. The information reviewed by the author provided by the USACE and Washington Group International has been limited. Time has not permitted review of the large number of documents provided by USACE and Washington Group International.

-8-

> The information that is available clearly indicates a high degree of correlation with the site remediation work conducted by WGI in behalf of the USACE at the EBIA sites and the breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable subsoils (marsh layers) would have facilitated the under seepage discussed earlier in this Appendix. In addition, removal of the soils on the canal side of the floodwall would have reduced the lateral stability of the flood protection structure. Page 42.

Plaintiffs respectfully submit that in the face of such unrefuted (to date) documentation, the Court should not "pull the plug" on plaintiffs' claims against WGI. Alternatively, plaintiffs aver that they should be granted leave to amend their allegations, in order to specifically include the "new" information recently furnished by the experts Chad Morris and Professor Bea.

## WGI HAS IMPROVIDENTLY STYLED WHAT IS REALLY A RULE 56 MOTION AS A RULE 12 MOTION

Let's "call a spade a spade": WGI and its counsel want their Rule 56 motion for summary judgment decided as a Rule 12 motion to dismiss on the papers, because counsel and their client know the "parade of horribles" that discovery will reveal about the multiple problems encountered by WGI, and the effect of WGI's work, in the East Bank Industrial Area.

Additionally, WGI and their counsel want the Court to treat their Rule 56 motion as a Rule 12 motion, so they can continue to argue to the Court that plaintiffs' pleadings are insufficient as a matter of law, and to continue to attempt to preclude opposing counsel from referencing exhibits, such as experts Chad Morris' graphic "evolution" of

the North breach, and Professor Bea's "Appendix C", arguing that "It is inappropriate to attach exhibits in opposition to a Rule 12 motion".

However, it is respectfully submitted by plaintiffs that counsel for WGI know that is not the law, and that the Court may consider exhibits outside of the pleadings, so long as WGI and its counsel are given adequate notice and the opportunity to rebut.

The legal authorities surrounding Rule 12 motions to dismiss for failure to state a claim upon which relief can be granted can be found in Federal Procedure, Lawyers Edition (1984) Sections 62:464, et seq., 62:471, et seq., and 62:618, et seq., and authorities cited therein. The axioms which may be postulated from a review of those authorities are the following:

1. Generally, a Rule 12 motion is used to test the sufficiency of the Complaint;

2. The applicable standard is stated in Rule 8(a), which requires that a pleading setting forth a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief";

3. Rule 12 motions are looked on with disfavor by the Courts and are granted sparingly and with care, with the main reason for this disfavor being the basic precept that the primary objective of the law is to obtain a determination on the merits of a claim, and that, accordingly, the law generally requires that a case should be tried on the proofs rather than on the pleadings;

4. As a general rule, the Court may only consider the pleading which is attacked by a Rule 12 motion in determining its sufficiency.

However, if the Court looks at matters outside the record which are presented to it, and not excluded, and if the Court considers those matters, then the Rule 12 motion to dismiss is converted, by the express terms of Rule 12(b), into a Motion for Summary Judgment, after notice and reasonable opportunity to present material pertinent to a Rule 56 motion;

5. The clear wording of the last sentence of Rule 12(b) provides that if, on a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56", after notice, and reasonable opportunity to present material pertinent to a Rule 56 motion;

6. The conversion of a Rule 12 Motion to Dismiss to a Rule 56 Motion for Summary Judgment is triggered when matters outside the pleading under attack are presented to and not excluded by the Court;

7. Rule 12(b) allows the Court the option, in its discretion, of disregarding or excluding extra-record matters, and treating the motion as a Rule 12(b)(6) Motion to Dismiss; and

8. When a plaintiff submits extraneous matter, such as an affidavit, which discloses that a triable issue of fact is present in the case, it

is reversible error for the Court to exclude such matter and to dismiss the Complaint under Rule 12(b)(6).

Plaintiffs urge the Court not to dismiss their claims against WGI on the papers, and to allow plaintiffs' case against WGI to go forward for a determination on the merits, and more particularly on the "proofs", by the finder of fact, a jury. Plaintiffs also urge the Court to consider Mr. Morris' and Professor Bea's expert presentations, with adequate notice to WGI and the opportunity to rebut, if WGI and its counsel dare to do so.

### NO CORPS OF ENGINEERS PERMIT OR OTHER FORM OF PERMIT, OR EVEN A "LETTER OF NO OBJECTION", HAS BEEN PRODUCED BY WGI, AND FOR THIS REASON ALONE WGI'S MOTION(S) TO DISMISS SHOULD BE DENIED.

It is no secret that the Inner Harbor Navigation Canal Lock Expansion Project was something "desired" by the Local Sponsor, The Board of Commissioners for the Port of New Orleans, which the Court knows is an agency and instrumentality of the State of Louisiana. Although no permit documents have been produced by WGI, plaintiffs aver, upon information and belief, that at the very least a "Letter of No Objection" from the Louisiana Department of Transportation and Development to the Levee District having jurisdiction of the levees and retaining walls on the East side of the Industrial Canal would have had to be issued to the "permittee", probably in connection with the issuance of a Corps of Engineers permit for the work pursuant to the provisions of The Rivers and Harbors Act. "Typical" language in a "Letter of No Objection" from the Louisiana Department of Transportation and Development are the following conditions:

> The proposed work must not restrict the Levee District's maintenance operations, or any potential flood fight activities at the levee, nor shall it obstruct or impede drainage, or create areas of standing water on the levee batture. The applicant must employ and maintain at the project site suitable erosion protection measures to the satisfaction of the

> Levee Board. The applicant or owner must immediately notify the Levee Board of any seepage or sand boils that occurred during high water conditions.

If we could all see the permit(s) in question, or even a "Letter of No Objection" from the Louisiana Department of Transportation and Development, then we would all know whether the above-quoted "boiler-plate" language was made applicable to WGI, which would be particularly relevant to WGI's liability to plaintiffs, since the Independent Levee Investigation Team has previously specifically referred to a "long history of under-seepage at this location".

## CONCLUSION

Undersigned counsel for plaintiffs was not present for, but has read the transcript of, oral argument on WGI's Motion to Dismiss on June 13, 2007. Although no one can read Your Honor's mind, certain statements on the record at that hearing have caused plaintiffs and undersigned counsel great consternation. Plaintiffs respectfully request the Court to consider, not only the well-pleaded facts of plaintiffs' Complaint(s), but also the FACTS recently developed by some of plaintiffs' experts, before deciding motions to dismiss plaintiffs' claims against WGI. After the Court does so, plaintiffs respectfully submit that WGI's motion(s) to dismiss should be denied.

>Respectfully submitted,
>
>**LAW OFFICES OF**
>**ASHTON R. O'DWYER, JR.**
>
>**By:   S/Ashton R. O'Dwyer, Jr.**
>**Ashton R. O'Dwyer, Jr.**
>**Bar No. 10166**
>**821 Baronne Street**
>**New Orleans, LA 70113**
>**Tel. 504-679-6166**
>**Fax. 504-581-4336**

-14-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record via Electronic filing, this 13th day of November 2007.

                                                S/Ashton R. O'Dwyer, Jr.